## EXHIBIT I.A.250.b

PRINCIPAL TERMS OF NEW GRS ACTIVE PENSION PLAN

## NEW GRS ACTIVE PENSION PLAN -- MATERIAL TERMS

1.      Benefit Formula:  FAC (average base compensation over last 10 consecutive years of employment) x Years of Service  x 1.5%.  If an employee had leave of not less than 2 months without pay under the Family and Medical Leave Act in the last 2 years of employment, such employee's FAC will be determined using the highest 10 consecutive years of base compensation over the last 12 consecutive years of employment.  Average base compensation means no overtime, no unused sick leave, no longevity or any other form of bonus.

2.      Actual time for accrual is actual time served.  For vesting and eligibility, 1,000 hours for a year of service.

3.      Normal Retirement Age – age 62 with a transition period for active employees as of June 30, 2014 as follows:

| Age as of July 1, 2014 | Normal Retirement Age |
|---|---|
| 61 years | 60 years |
| 60 years | 60 years |
| 59 years | 60.3 years |
| 58 years | 60.6 years |
| 57 years | 60.9 years |
| 56 years | 61.0 years |
| 55 years | 61.3 years |
| 54 years | 61.6 years |
| 53 years | 61.9 years |
| 52 years | 62 years |

4.      10 Years of Service for vesting.

5.      Early retirement  -- Eligible at 55 & 30 years of service, with true actuarial reduction.  No pension payments allowed below age 55; terminated employees must wait until 62.

6.      Deferred Vested  -- 10 Years payable at  62.

7.      Disability  -- to be provided by commercial insurance until normal retirement age.  In applying the formula for an age 62 pension, a disabled employee will be credited with service for the period of long-term disability leave.

8.      Annuity Savings Fund - voluntary Annuity Savings Fund contributions equal to 3%, 5% or 7% of after-tax pay.  Interest will be credited at the actual net investment rate of return for GRS, but will in no event be lower than 0% or higher than 5.25%.  No in-service withdrawals permitted.

9.      Investment Return/Discount Rate – 6.75%

10.    COLA  - Variable COLA benefit payable after the hybrid plan has been in effect for 4 full plan years, provided that the funding level is above 100%.  A simple 2% COLA on hybrid benefit.  Retirees become eligible for a COLA only for plan years after the retiree reaches age 62 and has been retired for a minimum of 12 months.

11.    Contributions -  Employer contribution of 5% of the base compensation of eligible employees.  A portion of such contribution is used to fund  normal cost and a portion  is credited to a rate stabilization fund.  Employees contribute 4% of base compensation toward normal cost.

12.    If the funding level is below 100% (based on 3 year look back of smoothed returns),  the plan's risk-shifting levers listed below will be applied in the listed order, until the actuary can state that by virtue of the use of levers, and a 6.75% discount rate and return assumption, the funding level is projected to be 100% on a market value basis within the next 5 years.

    (a)    No COLAs will be paid;
    (b)    Amounts credited to the rate stabilization fund will be used to fund accrued benefits; and
    (c)    Employee contributions to the hybrid will increase by 1% to 5% of base compensation for up to a 5 year period.

If the funding level is below 80%  (without taking into account the use of rate stabilization funds and the 1% increase in employee contributions):

    (d)    The steps taken in (a), (b) and (c) above will be continued;
    (e)    The most recently awarded COLA is rescinded (i.e., Members' future benefit payments will be not include that COLA);
    (f)    Employee contributions to the hybrid will increase to 6% of base compensation for up to a 5 year period;
    (g)    The  second most recently awarded COLA is rescinded; and
    (h)    The benefit accrual rate is decreased from 1.5% to 1% for up to 5 years.

**EXHIBIT I.A.254.a**

FORM OF NEW PFRS ACTIVE PENSION PLAN

# COMBINED PLAN
# FOR THE
# POLICE AND FIRE
# RETIREMENT SYSTEM OF
# THE CITY OF DETROIT, MICHIGAN

**Amendment and Restatement Effective July 1, 2014**

# TABLE OF CONTENTS

**Page**

COMPONENT I ......................................................................................................... 1

ARTICLE 1.      GENERAL PROVISIONS .................................................................. 1

     Sec 1.1.      Police and Fire Retirement System Established; Adoption of 2014 Plan Document........................................................................... 1

     Sec 1.2.      Retirement System Intended to be Tax-Qualified; Governmental Plan ...................................................................................... 1

     Sec 1.3.      Compliance With Plan of Adjustment ...................................... 1

     Sec 1.4.      Board of Trustees ..................................................................... 2

     Sec 1.5.      Board of Trustees – Membership; Appointment ...................... 2

     Sec 1.6.      Board of Trustees; Scheduling of Elections for Active and Retiree Trustees ...................................................................... 3

     Sec 1.7.      Procedures for election of Retiree Trustees ............................. 3

     Sec 1.8.      Board of Trustees; Oath; Term; Vacancies............................... 4

     Sec 1.9.      Board of Trustees; Officers and Employees ............................ 4

     Sec 1.10.      Board of Trustees; Meetings; Rules of Procedure; Votes; Quorum .......... 4

     Sec 1.11.      Board of Trustees; Compensation; Expenses ........................... 5

     Sec 1.12.      Rules for Administration of Funds ........................................... 5

     Sec 1.13.      Board of Trustees; Certain Data to be Kept.............................. 5

     Sec 1.14.      Board of Trustees; Annual Audit Report................................... 5

     Sec 1.15.      Board of Trustees; Legal Advisors ........................................... 5

     Sec 1.16.      Board of Trustees; Medical Director ........................................ 6

     Sec 1.17.      Designation of Actuary; Authority to Engage Additional Actuaries......... 6

     Sec 1.18.      Board of Trustees; Adoption of Mortality and Other Tables of Experience and Rates of Interest; Limitations on Payments by the Retirement System ....................................................... 6

     Sec 1.19.      Board of Trustees; Annual Actuarial Valuation of Assets and Liabilities ...................................................................... 7

     Sec 1.20.      Board of Trustees; Powers and Duties; Fiduciary Status; Fiduciary Duties ...................................................................... 7

     Sec 1.21.      Investment Committee; Establishment; Purpose; Fiduciary Status; Fiduciary Duties............................................................ 7

     Sec 1.22.      Investment Committee; Membership; Appointment ................. 8

Sec 1.23. Investment Committee; Term; Resignation and Removal; Vacancies ................................................................ 9

Sec 1.24. Investment Committee; Operation; Meetings; Quorum; Voting ............ 10

Sec 1.25. Investment Committee; Compensation; Expenses; Employment of Advisors ............................................................. 12

Sec 1.26. Investment Committee; Special Reporting Obligation ........................... 12

ARTICLE 2. DEFINITIONS ............................................................... 14

Sec 2.1. Definitions ................................................................ 14

ARTICLE 3. MEMBERSHIP ................................................................ 22

Sec 3.1. Eligible Employees ........................................................ 22

Sec 3.2. Cessation of Membership; Re-Employment ................................... 22

Sec 3.3. Report From City .......................................................... 23

ARTICLE 4. SERVICE CREDIT ............................................................. 24

Sec 4.1. Credited Service ........................................................... 24

Sec 4.2. Vesting Service ............................................................ 24

Sec 4.3. Service Credit; Military Service ............................................ 24

Sec 4.4. Service Credit; Qualified Military Service .................................. 25

ARTICLE 5. ELIGIBILITY FOR RETIREMENT ................................................ 26

Sec 5.1. Eligibility for Unreduced Normal Retirement Benefit ........................ 26

Sec 5.2. Eligibility for Deferred Vested Retirement Benefit .......................... 26

Sec 5.3. Eligibility for Disability Retirement Benefit – Duty Disability .............. 26

Sec 5.4. Eligibility for Disability Retirement Benefit – Non-Duty Disability ...... 28

Sec 5.5. Disability Retirees; Reexamination ........................................ 28

Sec 5.6. Disability Benefits; Procedures for Determination of Disability ............. 29

Sec 5.7. Return of Accumulated Mandatory Contributions to Non-Vested Member ............................................................... 31

Sec 5.8. Benefits Offset by Compensation Benefits; Subrogation ........................ 31

ARTICLE 6. RETIREMENT ALLOWANCE; VARIABLE PENSION IMPROVEMENT FACTOR (ESCALATOR) ............................................. 33

Sec 6.1. Retirement Allowance .......................................................... 33

Sec 6.2. Variable Pension Improvement Factor (Escalator) ................................ 33

# TABLE OF CONTENTS
(continued)

Page

ARTICLE 7.      DEATH BENEFITS .................................................................. 34

Sec 7.1.      Accidental Death Benefit; Performance of Duty ....................................... 34

Sec 7.2.      Non-Duty Death Benefits ........................................................................ 35

Sec 7.3.      Refund of Accumulated Mandatory Contributions Upon Death of Member ............ 35

ARTICLE 8.      FORMS OF PAYMENT.................................................................. 36

Sec 8.1.      Retirement Allowance Options.................................................................. 36

Sec 8.2.      Disposition of Surplus Benefits upon Death of Retiree and Beneficiary ............ 37

ARTICLE 9.      FUNDING AND RESERVES .......................................................... 38

Sec 9.1.      Funding Objective of the Retirement System........................................... 38

Sec 9.2.      Funds.................................................................................................... 38

Sec 9.3.      Method of Financing Retirement System Benefits.................................... 39

Sec 9.4.      Member Contributions Picked-Up........................................................... 40

Sec 9.5.      Fiscal Responsibility: Benefit Reductions and Increased Funding Obligations ...... 40

ARTICLE 10.      VOLUNTARY EMPLOYEE CONTRIBUTIONS .......................... 42

Sec 10.1.      Voluntary Employee Contributions; Amount; Vesting ........................... 42

Sec 10.2.      Changing an Election to Contribute......................................................... 42

Sec 10.3.      Individual Member Accounting; Crediting of Earnings ......................... 42

Sec 10.4.      Distribution of Accumulated Voluntary Employee Contributions .......... 42

ARTICLE 11.      LOAN PROGRAM FOR VOLUNTARY EMPLOYEE CONTRIBUTIONS .................................................................. 44

Sec 11.1.      The Loan Program ................................................................................. 44

Sec 11.2.      Eligibility for Loan ................................................................................ 44

Sec 11.3.      Amount of Loan..................................................................................... 44

Sec 11.4.      Terms and Conditions ........................................................................... 44

Sec 11.5.      Loan Balance ........................................................................................ 45

Sec 11.6.      Default................................................................................................... 45

Sec 11.7.      Distribution ........................................................................................... 46

ARTICLE 12.      DEFERRED RETIREMENT OPTION PLAN ("DROP") PROGRAM....... 47

# TABLE OF CONTENTS
### (continued)

**Page**

Sec 12.1. General Provisions ........................................................................... 47

Sec 12.2. Conversion to Retirement Allowance .............................................. 47

Sec 12.3. Investment of DROP Assets ............................................................ 47

Sec 12.4. Distribution of Amounts Credited to DROP Account ...................... 48

Sec 12.5. Death of Member While Participating in the DROP Program ............... 48

Sec 12.6. Disability of Member While Participating in the DROP Program ......... 48

Sec 12.7. Cost Neutrality ................................................................................ 49

ARTICLE 13. LIMITATION ON BENEFITS AND CONTRIBUTIONS ......................... 50

Sec 13.1. Compliance With Code Section 415(b) And Regulations ...................... 50

Sec 13.2. Compliance with Code Section 415(c) and Regulations ....................... 53

ARTICLE 14. RETIREMENT SYSTEM ADMINISTRATION ......................................... 54

Sec 14.1. Board of Trustees as Retirement System Administrator ......................... 54

Sec 14.2. Powers and Duties of Board ............................................................ 54

Sec 14.3. Executive Director; Employees ........................................................ 56

Sec 14.4. Discretionary Authority .................................................................. 56

Sec 14.5. Administrator's Decision Binding ................................................... 57

ARTICLE 15. MANAGEMENT OF FUNDS ................................................................. 58

Sec 15.1. Board as Trustee of Retirement System Assets ................................. 58

Sec 15.2. Maintenance of Segregated Funds ................................................... 58

Sec 15.3. Custodian of Funds .......................................................................... 58

Sec 15.4. Exclusive Purpose ........................................................................... 58

Sec 15.5. Prohibited Conduct ......................................................................... 58

ARTICLE 16. INVESTMENT OF RETIREMENT SYSTEM ASSETS ........................... 60

Sec 16.1. Investment Powers of the Board and the Investment Committee ........... 60

Sec 16.2. Investment Management .................................................................. 61

Sec 16.3. Best Practices ................................................................................... 62

Sec 16.4. Chief Investment Officer ................................................................ 62

Sec 16.5. Investment Consultants ................................................................... 63

Sec 16.6. Consistency With Plan of Adjustment ............................................. 64

ARTICLE 17. RETIREE MEDICAL ACCOUNT ........................................................... 65

# TABLE OF CONTENTS
### (continued)

**Page**

| | | |
|---|---|---|
| Sec 17.1. | Establishment of Account | 65 |
| Sec 17.2. | Effective Date | 65 |
| Sec 17.3. | Funding of Benefits | 65 |
| Sec 17.4. | Limitation on Contributions | 65 |
| Sec 17.5. | Impossibility of Diversion | 65 |
| Sec 17.6. | Administration | 66 |
| Sec 17.7. | Right to Amend or Terminate Medical Plans | 66 |
| Sec 17.8. | Reversion | 66 |
| Sec 17.9. | Limitation of Rights | 66 |
| ARTICLE 18. | MISCELLANEOUS | 67 |
| Sec 18.1. | Nonduplication of Benefits | 67 |
| Sec 18.2. | Assignments Prohibited | 67 |
| Sec 18.3. | Protection Against Fraud | 67 |
| Sec 18.4. | Conviction of Felony; Forfeiture of Rights | 67 |
| Sec 18.5. | Amendment; Termination; Exclusive Benefit | 67 |
| Sec 18.6. | Forfeitures Not to Increase Benefits | 68 |
| Sec 18.7. | Required Distributions - Compliance with Code Section 401(a)(9) and Regulations | 68 |
| Sec 18.8. | Direct Rollovers | 68 |
| Sec 18.9. | Construction | 70 |
| Sec 18.10. | Severability | 70 |

# COMPONENT I

# ARTICLE 1.  GENERAL PROVISIONS

## Sec 1.1.  Police and Fire Retirement System Established; Adoption of 2014 Plan Document

Effective July 1, 1941, a Pension System for Policemen and Firemen of the City of Detroit was established for the purpose of providing retirement allowances and death benefits for Policemen and Firemen and their beneficiaries by amendment to the Charter of the City of Detroit.  That Pension System was amended on numerous occasions after July 1, 1941, including an amendment renaming the Retirement System as the "Police and Fire Retirement System of the City of Detroit." The provisions of the Police and Fire Retirement System of the City of Detroit, as in effect July 1, 2014, are set forth in this Plan Document (including Appendix A attached hereto).  Component I of the Plan Document applies to benefits accrued by Members on and after July 1, 2014 and to operation of the Police and Fire Retirement System of the City of Detroit on and after July 1, 2014.  Component II of the Plan Document generally applies to benefits accrued by Members prior to July 1, 2014.  Except as specifically provided in Component II, benefits provided under Component II of the Plan Document are frozen effective June 30, 2014.

Pursuant to Section 47-1-2 of the Detroit City Code, this Combined Plan Document shall replace the provisions of the Police and Fire Retirement System of the City of Detroit as set forth in the City of Detroit Charter, the Detroit City Code and any conflicting provisions in any collective bargaining agreements, rulings or opinions covering Members (including, without limitation, City Employment Terms).  All resolutions and policies of the Board previously enacted which are inconsistent with the provisions of this Plan Document are also hereby repealed to the extent of such inconsistency.

## Sec 1.2.  Retirement System Intended to be Tax-Qualified; Governmental Plan

The Retirement System is a governmental plan under Section 414(d) of the Internal Revenue Code which is intended to be a qualified plan and trust pursuant to applicable provisions of the Internal Revenue Code.  The Board shall construe and administer the provisions of the Retirement System in a manner that gives effect to the tax-qualified status of the Retirement System.

## Sec 1.3.  Compliance With Plan of Adjustment

The Retirement System is intended to comply with all relevant provisions (including Exhibits) of the Plan for the Adjustment of Debts of the City of Detroit, as approved by the United States Bankruptcy Court in *In re City of Detroit, Michigan, Case No. 13-53846* ("Plan of Adjustment").  Component I and Component II of the Combined Plan shall be interpreted and construed by the City, the Board of Trustees and the Retirement System to give full effect to the Plan of Adjustment.  To the extent that a conflict arises between the Combined Plan Document and the Plan of Adjustment, the City, the Board of Trustees, the Investment Committee and the Retirement System are directed to interpret any inconsistency or ambiguity to give full effect to the Plan of Adjustment.

## Sec 1.4.  Board of Trustees

Effective July 1, 1941, a Board of Trustees of the Police and Fire Retirement System of the City of Detroit was created. The Board is vested with responsibility for the general administration, management and operation of the Police and Fire Retirement System of the City of Detroit and with the trust and investment powers conferred in this Combined Plan Document.

## Sec 1.5.  Board of Trustees – Membership; Appointment

The Board of Trustees of the Police and Fire Retirement System of the City of Detroit shall consist of seventeen Trustees, as follows:

(1)     The Mayor, *ex-officio*, or the Mayor's designee;

(2)     The President of City Council or a member thereof elected by the City Council, *ex-officio*;

(3)     The City Treasurer or Deputy City Treasurer, *ex-officio*;

(4)     The City Finance Director, or a designated representative, *ex-officio*;

(5)     The City Budget Director, or a designated representative, *ex-officio*;

(6)     The Corporation Counsel of the City, or a designated representative, *ex-officio*;

(7)     Three Fire Members of the Retirement System to be elected by the Fire Members under such rules and regulations as may be established by the Board of Fire Commissioners to govern such elections, as follows:

    (a)     Two to be elected by and from Members holding the rank of lieutenant (or its equivalent) and lower ranks; and

    (b)     One to be elected by and from Members holding ranks above the rank of lieutenant (or its equivalent);

(8)     Three Police Members of the Retirement System to be elected by the Police Members under the rules and regulations as may be established by the Commissioner of Police to govern such elections, as follows:

    (a)     Two to be elected by and from Members holding the rank of lieutenant (or its equivalent) and lower ranks; and

    (b)     One to be elected by and from Members holding a rank above lieutenant (or its equivalent); and

(9)     One individual who neither is a Member of the Retirement System nor an employee of the City in any capacity to be selected by the Board;

(10) Two Retirees receiving benefits under the Retirement System, one of whom shall be elected by Retired Police Members and one of whom will be elected by Retired Fire Members pursuant to Sections 1.6 and 1.7 below;

(11) One Trustee appointed by the Mayor upon election of a Retiree Police Trustee; and

(12) One Trustee appointed by the Mayor upon election of a Retiree Fire Trustee.

### Sec 1.6. Board of Trustees; Scheduling of Elections for Active and Retiree Trustees

(1) Annual elections for active Police Officers and Fire Fighters shall be held in the Police and Fire Departments during the month of May to elect a trustee to fill the vacancy created by the expiration of a term.

(2) Elections to fill vacancies created by the expiration of a term for a Retiree Trustee shall be held every three years during the month of May.

(3) A special election for Retiree Trustees shall be held as soon as practicable after the Plan of Adjustment is confirmed. Unless a Retiree Trustee elected by reason of this special election resigns or is removed from the position of Trustee in accordance with the terms of the Combined Plan Document, a Retiree elected to the office of Trustee in the special election shall be eligible to serve a full term of three (3) years from the date of the special election, plus such period of time until the last day of June that follows the third anniversary of the special election, at which time an election for Retiree Trustees shall be held in accordance with Section 1.7.

### Sec 1.7. Procedures for election of Retiree Trustees

The procedures for the election of the Retiree Trustees shall be as follows:

(1) *Notice*. Notice of a primary election shall be sent to each Retiree by United States Mail.

(2) *Notice of Candidacy*. A proposed candidate shall submit a notarized letter to the executive director notifying the Retirement System of his or her candidacy.

(3) *Ballot*. Each candidate whose name appears on the ballot at any election held for the office of Retiree Trustee shall be identified by the title of the position the Retiree held at the time of retirement and by the word "incumbent" if the candidate is a current trustee seeking re-election. No ballot shall contain any organizational or political designation or mark. Rotation and arrangement of names on the ballot shall be in accordance with the rules and regulations of the Board.

(4) *Voting*. Procedures regarding mailing of ballots, poll lists, custody of ballots, marking of ballots, return of ballots, handling of return envelopes received, and sealed ballot boxes shall be the same as those adopted and followed by the Board in the immediately preceding election of an active employee Trustee.

(5)     *Procedures*.  Procedures regarding the selection and certification of successful candidates for nomination, the selection of Trustees from nominees, tie votes, and the destruction of ballots shall be the same as those adopted and followed by the Board in the immediately preceding election of an active employee Trustee.

(6)     *Board Rules*.  Any matters relative to the election of the Retiree member of the Board not covered by this Section 1.7 shall be handled in accordance with such rules and regulations as the Board may adopt and Michigan law.

## Sec 1.8.     Board of Trustees; Oath; Term; Vacancies

Within ten days after appointment or election, each Trustee shall take an oath of office to be administered by the City Clerk.

The term of office for each elected Trustee under Sections 1.5(7), (8) and (10) shall be three years.  The term of office for the Trustee who is selected by the Board under Section 1.5(9) shall be two years.  The term of office for the Trustees appointed by the Mayor under Sections 1.5(11) and (12) shall be three years.  Except as provided in Section 1.6(3), elected Trustees holding office on June 30, 2014 shall serve the remainder of their terms.

If a Trustee resigns or is removed by the other Trustees for cause, or if an elected or appointed Trustee fails to attend three consecutive scheduled Board meetings without being excused for cause by the Trustees attending such meetings, the Trustee shall be considered to have resigned from the Board.  If a vacancy occurs in the office of Trustee from any cause other than expiration of a term, the vacancy for the unexpired term shall be filled within sixty days of the date of said vacancy in the same manner as the office was previously filled.  No vacancy shall result by reason of a change in the rank or grade of a Trustee during the term of office.

## Sec 1.9.     Board of Trustees; Officers and Employees

The Board of Trustees shall elect from its membership a chairman and a vice chairman. The executive director of the Retirement System or his or her representative shall serve as secretary of the Board of Trustees.  The Board may employ such special actuarial, medical and other employees as shall be required, subject to the powers and authority reserved to the Investment Committee and subject to the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.*

## Sec 1.10.   Board of Trustees; Meetings; Rules of Procedure; Votes; Quorum

(1)     The Board shall hold regular meetings, at least one in each month, and shall designate the time and place thereof in advance.  The Board shall adopt its own rules of procedure, including provisions for special meetings and notice thereof, and shall keep a record of proceedings.  All meetings of the Board shall be public and are subject to the *Michigan Open Meetings Act, MCL 15.261 et seq.*  All Board meetings shall be held within the City of Detroit.

(2)     Each Trustee shall be entitled to one vote on each question before the Board.  A majority vote of the Trustees present shall be necessary for a decision by the Trustees at any meeting of the Board.

(3)     Eight members of the Board, four of whom must be elected members, shall constitute a quorum.

### Sec 1.11.   Board of Trustees; Compensation; Expenses

All members of the Board of Trustees shall serve without additional compensation from the City or the Retirement System; however Retiree Trustees shall receive a hourly stipend from the Retirement System equal to the lowest rate of pay received by an active employee Trustee for attending Board meetings, educational time and travel out of the City on official business of the Retirement System.  All Trustees shall be reimbursed from the Expense Fund for all actual, reasonable and necessary expenses incurred in the performance of their duties as Trustees.

### Sec 1.12.   Rules for Administration of Funds.

Subject to the limitations contained in this Combined Plan document, the Board of Trustees shall, from time to time, establish rules and regulations for the administration of the funds created by this Combined Plan document and for the transaction of its business.

### Sec 1.13.   Board of Trustees; Certain Data to be Kept

The Board of Trustees shall keep, or cause to be kept, in convenient form, such data as shall be necessary for the actuarial valuation of the various funds of the Retirement System and for checking and compiling the experience of the Retirement System.  The ordinary actuarial, accounting and clerical services for the operation of the Retirement System shall be performed by the employees of the Retirement System.

### Sec 1.14.   Board of Trustees; Annual Audit Report

The Board shall render a report to the Mayor, the City Council and the Investment Committee on or before the fifteenth day of January, showing the fiscal transactions of the Retirement System for the year ending on the preceding thirtieth day of June, the amounts of accumulated cash and securities in the various funds of the System, and the last balance sheet showing the financial condition of the Retirement System by means of an actuarial valuation of the assets and liabilities of the Retirement System.

### Sec 1.15.   Board of Trustees; Legal Advisors

(1)     The Board shall appoint legal advisors (including a general counsel) who shall be directly responsible to and shall hold office at the pleasure of the Board of Trustees.  Any legal advisor to the Board of Trustees shall be an attorney licensed to practice law in the State of Michigan and shall be experienced in matters relating to pension systems.  The qualifications of legal counsel shall be approved by the Board of Trustees.

(2)     Legal advisors to the Board of Trustees shall have such duties relative to pension matters as shall be assigned by the Board of Trustees.

(3)     Costs and expenses relative to the position of legal advisors to the Board shall be payable out of the assets of the Retirement System, subject to the provisions of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.*

### Sec 1.16.   Board of Trustees; Medical Director

(1)     The Board shall appoint a Medical Director who is directly responsible to and shall hold office at the pleasure of the Board. The Medical Director shall be a physician who has not at any time been regularly or permanently employed by any department, board, or commission of the City, county, or state, has not held an elective, appointive, or salaried office in any city, county, or state government at any time, and is not eligible to participate in a retirement system maintained by the City. However, service as an intern in any city, county, or state hospital or sanitarium and service in any state military body shall not disqualify a physician for appointment as Medical Director.

(2)     The Medical Director shall arrange for and pass upon all medical examinations required under the provisions of the Combined Plan, and shall report in writing to the Board of Trustees his or her conclusions and recommendations on medical matters referred to it.

### Sec 1.17.   Designation of Actuary; Authority to Engage Additional Actuaries

The Retirement System actuary as of July 1, 2014 shall continue to serve as such until resignation or removal by the Board.  In the event the Board desires to retain a new actuary, the Board and the Investment Committee shall collectively participate in the evaluation and selection of a qualified actuary.  The Retirement System actuary shall be responsible for assisting the Board and the Investment Committee in performing its actuarial duties and shall comply with all requests for information or modeling requested by the Investment Committee, and shall attend meetings of the Board and Investment Committee as requested, so as to allow the Investment Committee to perform satisfactorily the rights and duties set forth in the Combined Plan, the governance terms attached to the that certain Agreement by and between the Michigan Settlement Administration Authority, the Retirement System, the General Retirement system for the City of Detroit, Michigan ("GRS"), and the City (the "State Contribution Agreement") as Exhibit B (the "Governance Term Sheet"), and the Plan of Adjustment.  Furthermore, the Board shall not act on any recommendation made by the Retirement System's actuary based on any calculation, assumption or assessment rejected by the Investment Committee.

Nothing herein shall be interpreted as limiting the Investment Committee's authority to engage an actuarial consulting firm other than the Retirement System's actuary to perform actuarial services deemed necessary to fulfill its fiduciary and other duties to the Retirement System as set forth in the Governance Term Sheet and the Plan of Adjustment.

### Sec 1.18.   Board of Trustees; Adoption of Mortality and Other Tables of Experience and Rates of Interest; Limitations on Payments by the Retirement System

(1)     Subject to Section 15.1, the Board shall adopt such mortality and other tables of experience, and a rate or rates of interest, as shall be necessary for the operation of the System on an actuarial basis, provided, that the authority granted by this Section shall not permit or be used to provide for an interest rate which would violate the prohibitions of Subsection (2) or (3) of this Section.

(2)     The Retirement System and the Trustees charged with management of the System shall not make any payment to active or retired Members other than payments that are required by the governing documents of the Retirement System. This prohibition applies to all payments that are not authorized by this Combined Plan, whether such payments are those commonly referred to as a "thirteenth check" or by any other name.

(3)     Anything in this Combined Plan Document or any other document to the contrary notwithstanding, the annual actuarial interest rate assumption for the period commencing July 1, 2014 and ending June 30, 2023 shall be six and three-quarters percent (6.75%).

## Sec 1.19.  Board of Trustees; Annual Actuarial Valuation of Assets and Liabilities

Subject to Section 15.1, each year, on the basis of such mortality and other tables of experience, and such rate or rates of regular interest as the Board shall adopt pursuant to Section 1.18, the Board shall cause to be made an actuarial valuation of the assets and liabilities of the Retirement System.

## Sec 1.20.  Board of Trustees; Powers and Duties; Fiduciary Status; Fiduciary Duties

The Board of Trustees shall have such powers and duties as are necessary for the proper administration of the Retirement System and the custody and investment of Retirement System assets, other than those powers and duties reserved to the Investment Committee. To the extent the Board exercises discretion with respect to investment of Retirement System assets, the Board shall be an investment fiduciary as defined in the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq*., and a Board member shall discharge his or her duties with respect to the Retirement System in compliance with the provisions of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq*. A member of the Board of Trustees shall discharge his or her duties with the care, skill and caution under the circumstances then prevailing that a prudent person, acting in a like capacity and familiar with such matters, would use in the conduct of an activity of like character and purpose. Board members shall comply with all Board governance policies and procedures, including the Ethics and Code of Conduct Policies, unless such compliance would violate the member's fiduciary duties or conflicts with the provisions set forth in this Combined Plan Document.

## Sec 1.21.  Investment Committee; Establishment; Purpose; Fiduciary Status; Fiduciary Duties

As of the effective date the Plan of Adjustment, but subject to consummation of the State Contribution Agreement, an Investment Committee is hereby created for the purpose of making recommendations to, and approving certain actions by, the Board of Trustees and/or making determinations and taking action under and with respect to certain investment management matters relating to the Retirement System. The creation and operation of the Investment

13-53846-swr   Doc 8045-2   Filed 10/22/14   Entered 10/22/14 05:47:43   Page 462 of
13-53846-swr   Doc 4635-1   Filed 10/22/14   Entered 10/22/14 05:47:43   Page 462 of
409
429

Committee is controlled by the Governance Term Sheet. The Investment Committee shall remain in effect for a period of not less than twenty years following the date of confirmation of the Plan of Adjustment. The Investment Committee shall be an investment fiduciary as defined in the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq*. and shall have all powers granted fiduciaries under the first sentence of *MCL 38.1133(5) and (6)*. The Investment Committee shall serve in a fiduciary capacity with respect to the investment management of Retirement System assets, determination of the investment return assumptions, and Board compliance with provisions of the governing documents of the Retirement System. An Investment Committee member shall discharge his or her duties with respect to the Retirement System in compliance with the provisions of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.* An Investment Committee member shall discharge his or her duties with the care, skill and caution under the circumstances then prevailing that a prudent person, acting in a like capacity and familiar with such matters, would use in the conduct of an activity of like character and purpose. Investment Committee members shall comply with all Board governance policies and procedures, including the Ethics and Code of Conduct Policies, unless such compliance would violate the member's fiduciary duties or conflict with the provisions set forth in the Governance Term Sheet.

## Sec 1.22.  Investment Committee; Membership; Appointment

The Investment Committee shall consist of nine (9) members, determined as follows:

(1)     Five independent members, at least two of whom must be residents of the State of Michigan, and none of whom may be a party in interest with respect to the Retirement System, as defined in as defined in Section 38.1132d(4) of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq*. Each independent Investment Committee member shall have expert knowledge or extensive experience with respect to either (a) economics, finance, or institutional investments, or (b) administration of public or private retirement plans, executive management, benefits administration or actuarial science. At least one of the independent Investment Committee members shall satisfy the requirements of (a) above and at least one of the independent Investment Committee members shall satisfy the requirements of (b) above. The initial independent Investment Committee members shall be selected by mutual agreement of the appropriate representatives of the State of Michigan, the City and the Board, in consultation with the Foundation for Detroit's Future (the "Foundation"), and shall be named in the Plan of Adjustment. If one or more of the five initial independent Investment Committee members are not selected by mutual agreement prior to confirmation of the Plan of Adjustment, then the United States Bankruptcy Court, Eastern District of Michigan shall designate such number of independent Investment Committee members as necessary to bring the number of independent Investment Committee members to five (5);

(2)     Two Retirees who shall be appointed by the Board consisting of one elected retired Police Member and one elected retired Fire Member who are serving on the Board and who are receiving benefit payments under the Retirement System;  and

(3)     Two Employee members who shall be appointed by the Board consisting of one Fire Department Employee and one Police Department Employee who are active members of the Board.


**Sec 1.23.   Investment Committee; Term; Resignation and Removal; Vacancies**

The term of office for the independent members of the Investment Committee shall be six years; provided, however, that the initial term for the independent Investment Committee members shall be determined as follows:

| Independent Member | Term of Office |
| :---: | :---: |
| (1) | 2 years |
| (2) | 3 years |
| (3) | 4 years |
| (4) | 5 years |
| (5) | 6 years |

The term of office for a Retiree or Employee Investment Committee member shall be the number of years remaining on such individual's term of office as a member of the Board of Trustees.  Each Investment Committee member shall serve until his or her successor is appointed at the expiration of his or her term of office, or until his or her death, incapacity, resignation or removal, if earlier.  Notwithstanding any provision of this Combined Plan document, an initial independent Investment Committee member shall not be prohibited from becoming a successor independent Investment Committee member after expiration of his or her initial term.

An Investment Committee member may resign at any time by giving ninety days' prior written notice to the Investment Committee, the City and the Board, which notice or time period may be waived by the Investment Committee.  An Investment Committee member may be removed from office by majority vote of the remaining Investment Committee members for any of the following reasons: (a) the member is legally incapacitated from executing his or her duties as a member of the Investment Committee and neglects to perform those duties; (b) the member has committed a material breach of the provisions of the Retirement System or the policies or procedures of the Retirement System and the removal of the member is in the interests of the Retirement System or its Members and Beneficiaries; (c) the member is convicted of a violation of law and the removal is accomplished by a vote of the members of the Investment Committee in accordance with the voting procedure set forth in Section 1.24; or (d) if the member holds a license to practice and such license is revoked for misconduct by any State or federal government.  A member who fails to attend four (4) consecutive scheduled meetings of the Investment Committee shall be deemed to have resigned, unless in each case his or her absence is excused for cause by the remaining members attending such meetings.  In the event of any removal or resignation, the Investment Committee shall by resolution declare the office of the member vacated as of the date such resolution is adopted.

Any vacancy occurring on the Investment Committee shall be filled within sixty (60) days following the date of the vacancy for the unexpired portion of the term, in the same manner in which the office was previously filled.

Successor independent Investment Committee members shall be recommended by a majority of the remaining independent Investment Committee members and shall be confirmed by the Board and the Treasurer of the State of Michigan ("Treasurer"), in consultation with the Foundation, in accordance with such rules and regulations as may be adopted by the Investment Committee (provided that such rules are not inconsistent with the Governance Term Sheet or the Plan of Adjustment). In the event the Board and the Treasurer cannot agree on a successor independent Investment Committee member within thirty (30) days of the receipt of the recommendation of the Investment Committee, the remaining independent Investment Committee members shall appoint the successor independent Investment Committee member.

In the event the United States Bankruptcy Court, Eastern District of Michigan appoints one or more of the initial independent Investment Committee members, a successor to any such independent Investment Committee member shall be appointed in the same manner as provided in the preceding paragraph following three (3) weeks' notice to the Board of the individuals appointed, in accordance with such rules and regulations as may be adopted by the Investment Committee (provided that such rules are not inconsistent with either the Governance Term Sheet or the Plan of Adjustment).

Successor Investment Committee members shall have the powers and duties conferred on Investment Committee members herein.

**Sec 1.24.  Investment Committee; Operation; Meetings; Quorum; Voting**

The Investment Committee members shall select from among the independent members a chair and a vice chair. The Investment Committee members shall select from among themselves a secretary. The Investment Committee shall hold regular meetings, not less frequently than once every other month, and shall hold special meetings as necessary. The Investment Committee shall designate the time and place thereof in advance. The secretary or his or her designee shall be responsible for providing meeting notices to the other Investment Committee members. The Investment Committee shall adopt its own rules of procedure and shall keep a record of proceedings. Notice and conduct of all Investment Committee meetings, both regular and special, shall be subject to the *Michigan Open Meetings Act, MCL 15.261 et seq.* All Investment Committee meetings shall be held within the City of Detroit.

Five Investment Committee members shall constitute a quorum at any meeting, as long as at least three of the independent Investment Committee members are in attendance. Each independent Investment Committee member shall be entitled to one vote on each question before the Investment Committee. Each Retiree and Employee member shall be entitled to one-half vote on each question before the Investment Committee. Except as otherwise provided in the Governance Term Sheet, at least four concurring votes shall be necessary for a decision by the Investment Committee and each Investment Committee member shall be entitled to one vote on each question before the Investment Committee.

An Investment Committee member may have his or her voting privileges temporarily suspended by a 70% or higher vote of the other members if the member is indicted or sued by a state or federal government for an alleged violation of the law that relates to his or her service on the Investment Committee, or for other alleged financial crimes, including fraud.

## Sec 1.25.   Investment Committee; Compensation; Expenses; Employment of Advisors

Investment Committee members shall not receive any compensation from the Retirement System for their services; Investment Committee members shall, however, be reimbursed for the reasonable, actual and necessary expenses incurred in the performance of their duties.   All reasonable and proper expenses related to the administration of the Investment Committee, including but not limited to the purchase of insurance, shall be payable out of the assets of the Retirement System.   The Investment Committee may retain actuarial, legal counsel, audit or other professional or support personnel to provide advice to the Investment Committee as it deems reasonably necessary to perform its functions, and such parties or persons may be reasonably compensated from the assets of the Retirement System.   Such engagements shall not be subject to approval of the Board.

## Sec 1.26.   Investment Committee; Special Reporting Obligation

(1)     Beginning in calendar year 2015, pursuant to Section 6 of the State Contribution Agreement, the Investment Committee shall provide compliance reports to the Treasurer on a semi-annual basis and at such other times as the Treasurer reasonably may request (each, a "Compliance Report") that certifies that the Investment Committee is not aware of any defaults under the State Contribution Agreement, or, if the Investment Committee is aware of a default under the State Contribution Agreement, specifically identifying the facts of such default.

(2)     In the event the Retirement System receives a written notice from the Treasurer declaring and specifically identifying the facts of an alleged default under the State Contribution Agreement ("Default Notice"), and such default is cured as provided in the State Contribution Agreement, the Investment Committee must provide to the Treasurer a written certification that (i) the default has been cured, and (ii) no material damages have been caused by the default that have not otherwise been remedied (the "Cure Certification").

(3)     Beginning in calendar year 2015, the Investment Committee shall provide to the City not later than December 31 of each year evidence reasonably necessary to show that the internal controls governing the investment of Retirement System assets are in compliance with the applicable provisions of the Plan of Adjustment.

(4)     Beginning in calendar year 2015 and for each calendar year thereafter, as of a date which is not later than December 31 of each such calendar year the Investment Committee shall provide to the Foundation the following information:

(a)     a copy of the audited annual financial statement and the corresponding management letter for the Retirement System for the Fiscal Year ending June 30 of such calendar year, containing a non-qualified opinion of an independent external auditor to the Retirement System;

(b)     a certification from the Chair of the Investment Committee on behalf of the Investment Committee ("Pension Certificate") in a form reasonably acceptable to

the Foundation that, as of the date of the annual report ("Annual Report") required to be provided by the City to the Foundation:

(i)      the City is current in its obligation to contribute to Component II of the Combined Plan determined in accordance with the Plan of Adjustment;

(ii)      the Investment Committee has been operated in accordance with the terms set forth in this Component I of the Combined Plan document; and

(iii)      the City continues to maintain the pension governance terms reflected in this Component I of the Combined Plan as of the effective date of the Plan of Adjustment, without modification or amendment during the twenty (20) year period following the effective date of the Plan of Adjustment, except as required to comply with applicable federal law, including without limitation to maintain the tax qualified status of the Retirement System under the Internal Revenue Code, or to comply with the Plan of Adjustment;

(c)      a copy of (i) the Compliance Report covering the calendar year for which the Annual Report is made; (ii) any additional Compliance Reports provided during the calendar year for which the Annual Report is made as requested by the Treasurer; (iii) either the certificate of compliance or the Default Notice, within the meaning of Section 6 of the State Contribution Agreement, as applicable, that was provided to the Investment Committee by the Treasurer; and (iv) in the event that the Treasurer issued a Default Notice, the Cure Certification, within the meaning of Section 6 of the State Contribution Agreement, provided by the Investment Committee. Notwithstanding anything in this paragraph (c) to the contrary, if the parties to the State Contribution Agreement agree to revise the requirements of Section 6 of the State Contribution Agreement or the information required in the Compliance Report, in order to meet the obligations of this paragraph (c), the Investment Committee shall be required only to provide documentation to the Foundation that meets such revised requirements; and

(d)      any additional information that may be reasonably requested by the Foundation from time to time.

(e)      Beginning in calendar year 2016, before May 15th of each calendar year, the Investment Committee shall provide to the Chief Financial Officer of the City confirmation that, as of the date of the City's report to the Foundation, there has been no impairment or modification of the information contained in the most recent Pension Certificate since the date of such Pension Certificate.

# ARTICLE 2.  DEFINITIONS

## Sec 2.1.    Definitions

Unless a different definition is contained within this Combined Plan Document, or a different meaning is plainly required by context, for purposes of this Combined Plan Document the following words and phrases have the meanings respectively ascribed to them by this section:

(1)     *Accumulated Mandatory Employee Contributions* means the sum of all amounts deducted from the Compensation of a Member and credited to the Accumulated Mandatory Employee Contribution Fund for periods on and after July 1, 2014.

(2)     *Accumulated Voluntary Employee Contributions* means the total balance in a Member's individual account under Component I of the Retirement System.

(3)     *Actuarial Equivalent or Actuarially Equivalent* means a Retirement Allowance or benefit amount having the same Actuarial Equivalent Value as another applicable benefit.  The rates of interest adopted by the Board from time to time shall not violate the terms of the Plan of Adjustment.

(4)     *Actuarial Equivalent Value* means the value of an applicable Retirement Allowance or benefit amount, where values are calculated under generally accepted actuarial methods and using the applicable tables, interest rates and other factors established by the Board upon recommendation of the Investment Committee.

(5)     *Administrative Rules and Regulations* means rules and regulations promulgated by the Board of Trustees for the administration of the Retirement System and for the transaction of its business.

(6)     *Age, Attainment of* means the age an individual reaches on the day of his or her birthday.

(7)     *Average Final Compensation* means the average Compensation received by a Member during the five consecutive years of Credited Service which immediately precede the date of the Member's last termination of City employment as an employee of the Police Department or the Fire Department.  If a Member has less than five years of Credited Service, the Average Final Compensation shall be the average of the annual Compensation received by the Member during the Member's total years of Credited Service.

(8)     *Beneficiary* means any person or persons (designated by a Member pursuant to procedures established by the Board) who are entitled to receive a Retirement Allowance or Pension payable from funds of the Retirement System due to the participation of a Member.

(9)     *Board of Trustees or Board or Retirement Board* means the Board of Trustees of the Police and Fire Retirement System of the City of Detroit.

(10)    *City* means the City of Detroit, Michigan, a municipal corporation.

(11)   *City Council or Council* means the legislative body of the City.

(12)   *Combined Plan* means the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan, effective July 1, 2014, and as amended thereafter.

(13)   *Compensation* means a Member's base salary or wages actually paid to the Member for personal services rendered to the Employer, excluding bonuses, overtime pay, payment of unused accrued sick leave, longevity pay, payment for unused accrued vacation, the cost or value of fringe benefits provided to the Member, termination or severance pay, reimbursement of expenses, or other extra payment of any kind. Compensation will include any amount which is contributed by the City to a plan or program pursuant to a salary reduction agreement and which is not includable in the income of the Member under Sections 125, 402(e)(3), 402(h) or 403(b) of the Internal Revenue Code or which is contributed by the City on behalf of a Member as provided in Section 9.3(3) and 9.5 pursuant to a qualified "pick-up program".

For periods of time prior to July 1, 2014, the City shall provide to the Retirement System actual base salary or wages paid to Members using the best and most reliable sources of information available to the City. In the event the City is unable to provide actual base wages to the Retirement System, the City shall make reasonable estimates of each Member's base salary or wages for purposes of determining a Member's Compensation for periods prior to July 1, 2014.

Notwithstanding the foregoing, for purposes of determining a Member's Voluntary Employee Contributions, Compensation shall mean the gross salary or wages paid to the Member for personal services rendered to the City.

The annual Compensation of each Member taken into account for the purposes of determining all benefits provided under the Retirement System for any determination period shall not exceed the limitation set forth in Code Section 401(a)(17) ($260,000 for the Plan Year commencing July 1, 2014). Such limitation shall be adjusted for the cost-of-living in accordance with Section 401(a)(17)(B) of the Internal Revenue Code. The cost-of-living adjustment in effect for a calendar year applies to any determination period beginning in such calendar year. If Compensation for any prior determination period is taken into account in determining a Member's benefits for the current determination period, the Compensation for such prior determination period is subject to the applicable annual compensation limit in effect for that determination period. If a determination period consists of fewer than 12 months, the annual compensation limit is an amount equal to the otherwise applicable annual compensation limit multiplied by a fraction, the numerator of which is the number of months in the short determination period, and the denominator of which is 12.

(14)   *Component I* means the portion of the Retirement System described in this Combined Plan and which consists of:

(a)   the 2014 Defined Benefit Plan, which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code; and

(b)      the 2014 Defined Contribution Plan which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code.

(15)   *Component II* means the portion of the Retirement System described in this Combined Plan and which consists of:

(a)      the Defined Benefit Plan, which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code; and

(b)      the Defined Contribution Plan, which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code.

(16)   *Credited Service* means service credited to a Member to the extent provided in Article 4 of Component I of this Combined Plan Document.

(17)   *Disability or Disabled*: see Total Disability or Totally Disabled.

(18)   *DFFA* means the Detroit Fire Fighters Association.

(19)   *DPCOA* means the Detroit Police Command Officers Association.

(20)   *DPLSA* means the Detroit Police Lieutenants and Sergeants Association.

(21)   *DPOA* means the Detroit Police Officers Association.

(22)   *DROP Account* means the account established by the Board for a Member who is eligible for and who elects to participate in the DROP Program.

(23)   *DROP Program* means a program established for eligible Members pursuant to Article 12.

(24)   *Employee* means an employee of the City's Police Department who has taken an oath of office or a Fire Fighter providing services to the City, but does not include:

(a)      individuals whose City services are compensated on a contractual or fee basis;

(b)      any person during any period when such person is classified by the City as a non-common-law employee or an independent contractor for federal income tax and withholding purposes whose compensation for services is reported on a form other than Form W-2 or any successor form for reporting wages paid to and taxes withheld from employees, even if a court or administrative agency determines that such person is a common-law employee of the City;

(c)      the Medical Director of the Retirement System.

If a person described in (b) above is reclassified by the City as a common-law employee of the City and otherwise meets the definition of an Employee, the person will be eligible to participate in the Retirement System prospectively as of the actual date of such

reclassification only (and only to the extent such individual otherwise qualifies as an Employee).

(25) *Employer* means the City.

(26) *Final Compensation* means the annual compensation of a Member at the time of his or her termination of employment.

(27) *Fire Fighter* means the rank in the Fire Department currently or formerly classified by the civil service commission as Fire Fighter.

(28) *Fire Member* means an employee of the Fire Department of the City of Detroit who is a participant in the Retirement System.

(29) *Fiscal Year* means the twelve month period commencing each July 1 and ending on the following June 30.

(30) *Hour of Service* means (i) each hour for which a Member is paid or entitled to payment by the City for the performance of duties, and (ii) each hour for which a Member is directly paid or entitled to payment by the City for reasons other than the performance of duties (such as vacation, holiday, illness or approved leave of absence).

(31) *Internal Revenue Code or Code* means the United States Internal Revenue Code of 1986, as amended.

(32) *Investment Committee* means the committee established pursuant to Section 1.22 which shall have the powers and duties described herein.

(33) *Mandatory Employee Contributions* mean the contributions made by a Member to the Retirement System pursuant to Section 9.3(3).

(34) *Medical Beneficiary* means a Member who has retired from employment with the Employers and the spouses and dependents of such Member who are receiving post-retirement benefits in accordance with the terms of a retiree medical plan sponsored or maintained by an Employer.

(35) *Medical Benefits* mean the provision of payments for certain sickness, accident, hospitalization and medical benefits within the meaning of Treasury Regulation section 1.401-14(a), including dental, vision and mental health benefits, as designated by the City.

(36) *Medical Benefits Account* means the bookkeeping account established under Section 17.1 to provide for the payment of Medical Benefits on behalf of Medical Beneficiaries.

(37) *Medical Director* means the physician appointed by the Board pursuant to Section 1.16.

(38) *Member* means any Police Member or Fire Member who has not retired or died.

(39) *Normal Retirement Age* means for any Member Age fifty with twenty-five years of Credited Service, with the following transition period regarding payment of Component I benefits only:

| Fiscal Year | Age and Service |
|---|---|
| 2015 | Age 43 and 20 years |
| 2016 | Age 43 and 20 years |
| 2017 | Age 44 and 21 years |
| 2018 | Age 45 and 22 years |
| 2019 | Age 46 and 23 years |
| 2020 | Age 47 and 24 years |
| 2021 and thereafter | Age 50 and 25 years |

Pursuant to Code Section 411(e), as in effect in 1974, a Member shall be 100% vested in his accrued benefit under the Retirement System upon Attainment of Normal Retirement Age while in Service.

(40) *Notice to Members, Beneficiaries, and Retirees* means a mailing using First Class United States Mail to the Members, Beneficiaries, and Retirees at their last known addresses.

(41) *Patrolman* means the rank in the Police Department currently or formerly known as patrolman.

(42) *Pension Reserve* means the present value of all payments to be made on account of any Retirement Allowance. Such Pension Reserve shall be computed upon the basis of such mortality and other tables of experience, and interest, as provided herein until June 30, 2023 and, thereafter, as shall be adopted by the Board upon the recommendation of the Investment Committee.

(43) *Plan Actuary or Actuary* means the enrolled actuary or actuarial firm appointed as provided in Section 1.17 to serve as technical advisor to the Investment Committee and the Board on matters regarding the funding and operation of the Retirement System and to perform such other duties as the Investment Committee or the Board may direct.

(44) *Plan Document or Combined Plan Document* means this instrument, effective as of July 1, 2014, with all amendments hereafter adopted.

(45) *Plan of Adjustment* means the Plan for the Adjustment of Debts of the City of Detroit, which has been approved by the United States Bankruptcy Court in *In re City of Detroit, Michigan,* Case No. 13-53846.

(46) *Plan Year* means the twelve month period commencing on July 1 and ending on June 30.

(47) *Police and Fire Retirement System of the City of Detroit or Retirement System* means the Police and Fire Retirement System of the City of Detroit created and, prior to July 1, 2014, memorialized in Title IX, Chapter VI, of the 1918 Detroit City Charter, as amended, continued in effect through the 1974, 1997 and 2012 Detroit City Charters, Article 47 of the Detroit City Code, Article 54 of the Detroit City Code of 1964, and

collective bargaining agreements and, on and after July 1, 2014, pursuant to Section 47-1-2 of the Detroit City Code, memorialized in this Combined Plan Document, as amended from time to time.

The Retirement System consists of:

(a)      The 2014 Defined Benefit Plan, which is described in Component I hereof;

(b)      the Defined Contribution Plan, consisting of the Voluntary Employee Contribution Account, which are described in Component I hereof;

(c)      the Frozen Defined Benefit Plan, which is described in Component II hereof; and

(d)      the Frozen Defined Contribution Plan, which is described in Component II hereof.

References to the words Retirement System in Component I of the Plan Document shall mean the provisions of the Defined Benefit Plan and Defined Contribution Plan described in Component I, unless a different meaning is plainly required by context.

(48)    *Police Member* means a Police Officer who has taken the oath of office as prescribed in the Detroit City Charter, excluding patrolmen of other City departments, privately employed patrolmen and special patrolmen, who is a participant in the Retirement System.

(49)    *Police Officer* means the rank in the Police Department currently or formerly known as Police Officer.

(50)    *Prior Service* means the service credit awarded to a Member before July 1, 2014 under the terms of the Retirement System as in effect on June 30, 2014, as certified by the Board of Trustees.

(51)    *Retiree* means a former Member who is receiving a Retirement Allowance from the Retirement System.

(52)    *Retirement* means a Member's withdrawal from the employ of the City with a Retirement Allowance paid by the Retirement System.

(53)    *Retirement Allowance* means an annual amount payable in monthly installments by the Retirement System, whether payable for a temporary period or throughout the future life of a Retiree or Beneficiary.

(54)    *Service* means personal services rendered to the City by an employee of the Police Department or Fire Department, provided such person is compensated by the City for such personal services.

(55)    *Spouse* means the person to whom a Member is legally married under applicable law at the time a determination is made.

(56) *Straight Life Retirement Allowance* means payment of a Member's Retirement Allowance over the Member's lifetime.

(57) *Total Disability or Totally Disabled* means:

(a) during the first twenty-four (24) months that a Member receives benefits from the Retirement System due to injury, illness or disease, that the Member is unable to perform, for wage or profit, the material and substantial duties of the Member's occupation; and

(b) during all subsequent months that a Member receives benefits from the Retirement System due to illness, injury or disease, that the Member is unable to perform, for wage or profit, the material and substantial duties of any occupation for which the Member is suited, based on education, training and experience.

(58) *Vesting Service* means service credited to a Member to the extent provided in Section 4 of Component I of this Combined Plan Document.

(59) *Voluntary Employee Contributions* mean the after-tax contributions made by an eligible Member to the Retirement System pursuant to Section 10.1.

(60) *Voluntary Employee Contributions Account* means the account established pursuant to Section 10.3 for an eligible Member who elects to make Voluntary Employee Contributions.

The following terms shall have the meanings given to them in the Sections of this Combined Plan Document set forth opposite such term:

| | |
|---|---|
| Accumulated Mandatory Employee Contribution Fund | Section 9.2(1) |
| Accumulated Voluntary Employee Contribution Fund | Section 9.2(2) |
| Annual Addition | Section 13.2(2) |
| Annual Report | Section 1.26(4)(b) |
| Authority | Section 1.26(1) |
| compensation | Section 13.1(12) |
| Compliance Report | Section 1.26(1) |
| Cure Certification | Section 1.26(2) |
| current active | Section 9.3(3) |
| Default Notice | Section 1.26(2) |
| Deferred Retirement Option Plan Fund | Section 9.2(3) |
| Deferred Retirement Option Plan Program (DROP) | Section 12.1 |
| Differential Wage Payment | Section 4.4 |
| Direct rollover | Section 18.8(1)(b) |
| Distributee | Section 18.8(1)(c) |
| Dollar Limit | Section 13.1(3)(b) |
| DRRB | Section 5.6 |
| Eligible retirement plan | Section 18.8(1)(d) |
| Eligible rollover distribution | Section 18.8(1)(e) |
| Expense Fund | Section 9.2(7) |

| | |
|---|---|
| Foundation | Section 1.22 |
| funding level | Section 9.5(3) |
| Governance Term Sheet | Section 1.17 |
| Income Fund | Section 9.2(8) |
| ING | Section 12.3(1) |
| investment management decision or investment management matter | Section 16.2 |
| limitation year | Section 13.1(2) |
| Medical Benefits Account Fund | Section 9.2(4) |
| Medical Plans | Section 17.1 |
| new employee | Section 9.3(3) |
| Option "A". Joint and Seventy-Five Percent Survivor Allowance | Section 8.1(1)(c) |
| Option "B". Joint and Twenty-Five Percent Survivor Allowance | Section 8.1(1)(e) |
| Option One. Cash Refund Annuity | Section 8.1(1)(a) |
| Option Three. Joint and Fifty Percent Survivor Allowance | Section 8.1(1)(d) |
| Option Two. Joint and One Hundred Percent Survivor Allowance | Section 8.1(1)(b) |
| Pension Accumulation Fund | Section 9.2(5) |
| Pension Certificate | Section 1.26(4)(b) |
| Pension Improvement Factor (Escalator) | Section 6.2 |
| Plan of Adjustment | Section 1.3 |
| Police and Fire Retirement System of the City of Detroit | Section 1.1 |
| Pop-up Form | Section 8.1(2)(b) |
| Rate Stabilization Fund | Section 9.2(6) |
| Standard Form | Section 8.1(2)(a) |
| State Contribution Agreement | Section 1.17 |
| Straight Life Retirement Allowance | Section 8.1(1) |
| Treasurer | Section 1.23 |

# ARTICLE 3.  MEMBERSHIP

## Sec 3.1.    Eligible Employees

(1)    Except as provided in Section 3.2, the membership of the Retirement System shall consist of all persons who are employed with the Police and Fire Departments of the City and who are employed as Police Officers or Fire Fighters according to the rules and regulations of the respective Departments.  An eligible Employee's membership in the Retirement System shall be automatic; no eligible Employee shall have the option to elect to become a Member of the Retirement System.

(2)    Any appointive official of the Police Department or Fire Department appointed from the membership thereof shall be permitted to remain a Member, paying contributions and entitled to benefits as though he had remained in the rank, grade or position held at the date of his appointment.

(3)    Any Police Officer or Fire Fighter who, prior to being confirmed, shall be killed or Totally Disabled as the result of the performance of active duty, shall be deemed to have been a Member as of his or her date of death.

(4)    Any Member who shall be transferred to a civilian position in his Department shall continue as a Member, subject to all the obligations of a Member.

## Sec 3.2.    Cessation of Membership; Re-Employment

(1)    If a Member dies, or is separated from service with the City by resignation, dismissal, retirement or disability, he shall cease to be a Member.  A Member who elects to participate in the DROP Program under Component I, Component II or both shall be considered to have separated from service with the City by reason of retirement and shall neither accrue a benefit under the Retirement System nor be required to make Mandatory Employee Contributions to the Retirement System pursuant to Section 9.3(3) or 9.5 or permitted to make Voluntary Employee Contributions pursuant to Section 10.1.

(2)    If a Member ceases to be a Member under paragraph (1) other than by reason of participation in the DROP Program and later becomes a Police Officer or Fire Fighter other than in the position of Police Assistant, he shall again become a Member, subject to the obligations of a Member.

(3)    If a Member ceases to be a Member under paragraph (1) and later becomes employed as a Police Assistant, such Member shall not become a Member upon reemployment.  If such Member was receiving a Retirement Allowance from the Retirement System prior to his or her date of rehire, such Retirement Allowance shall not be suspended during the period of the Member's reemployment as a Police Assistant.

(4)    Retirement benefits for a Retiree who returns to active full time employment other than as a Police Assistant shall be subject to the following:

(a)      A Retiree who returns to work will have his Retirement Allowance suspended upon re-employment. The variable Pension Improvement Factor (Escalator) shall not be added to the amount of the original Retirement Allowance during the Retiree's re-employment period.

(b)      A Retiree who returns to work will be entitled to receive a second Retirement Allowance in accordance with the provisions of the Retirement System in effect during his re-employment period.

(c)      A Retiree's Average Final Compensation and Credited Service for purposes of determining the Retiree's second Retirement Allowance will be based upon the Compensation and Credited Service earned by the Retiree after he returns to work.

(d)      An individual who retires for a second time will not be allowed to change the payment option selected by the Member with respect to the original Retirement Allowance. However, the individual may select a separate payment option with respect to his second Retirement Allowance.

## Sec 3.3.    Report From City

It shall be the duty of the City to submit to the Board of Trustees a statement showing the name, title, compensation, duties, date of birth, date of hire, and length of service of each Member, and such other information as the Board of Trustees may require or reasonably request for proper administration of the Retirement System.

# ARTICLE 4.  SERVICE CREDIT

## Sec 4.1.    Credited Service

(1)    The Board shall keep an accurate record of each Member's accumulated Service credit from the date of commencement of employment with the City to the date of termination of employment with the City.

(2)    A Member shall be credited with one month of Credited Service for each calendar month during which he performs one hundred forty (140) or more Hours of Service for the City as a Police Officer or Fire Fighter beginning on the later of (i) July 1, 2014 or (ii) his date of hire with the City as a Police Officer or Fire Fighter and ending on the date his employment with the City as a Police Officer or Fire Fighter is terminated.  Service shall be credited in years and twelfths ($1/12^{th}$) of a year.  Not more than one-twelfth ($1/12^{th}$) of a year of Credited Service shall be credited to a Member on account of all Service rendered to the City in a calendar month.  Not more than one year of Credited Service shall be credited to a Member on account of all Service rendered to the City in any period of 12 consecutive months.

(3)    Not more than one month of Credited Service shall be granted for any period of more than one month during which the Member is absent without pay; notwithstanding the foregoing, any Member who shall  be suspended from duty and subsequently reinstated to duty without further disciplinary action shall receive credit for the time of such period of suspension.

(4)    Solely for purposes of determining eligibility for a retirement benefit under Sections 5.1 and 5.4, a Member shall be credited with the sum of his Prior Service as determined by the Board and his Credited Service on and after July 1, 2014 determined under Section 4.1(2).  The period of time during which a Member is on layoff from the service of the City shall be included in the Member's Credited Service solely for the purposes of determining whether the Member has attained his Normal Retirement Age for purposes of Section 5.1.

## Sec 4.2.    Vesting Service

(1)    A Member shall be credited with a year of Vesting Service for each Plan Year commencing on or after July 1, 2014 during which the Member performs 1,000 or more Hours of Service for the City.

(2)    A Member's total Vesting Service shall be the sum of his Prior Service and his Service determined under Section 4.2(1).

## Sec 4.3.    Service Credit; Military Service

A Member who enters the military service of the United States while employed with the City shall have the period of such military service credited as City Service in the same manner as if the Member had served the City without interruption, provided that (1) the Member's entry into such military service and re-employment thereafter shall be in accordance with applicable

laws, ordinances, and regulations of the State of Michigan and the City, (2) he or she is re-employed by the City upon completion of such military service, and (3) the Member contributes to the Retirement System the Mandatory Employee Contributions that would have been made by the Member but for the Member's military service. The Member shall be permitted to make such contributions in accordance with Code Section 414(u) and regulations thereunder. During the period of military service and until return to City employment, the Member's Mandatory Employee Contributions to the Retirement System shall be suspended.

## Sec 4.4.    Service Credit; Qualified Military Service

Notwithstanding any provision of this Combined Plan Document to the contrary, contributions, benefits, and service credit with respect to qualified military service under Component I, shall be provided in accordance with Code Section 414(u). Notwithstanding anything to the contrary herein, if a Member dies while performing qualified military service (as defined in Code Section 414(u)), to the extent required by Code Section 401(a)(37), the survivors of the Member are entitled to any additional benefits (if any, and other than benefit accruals relating to the period of qualified military service) provided under the Retirement System as if the Member had resumed and then terminated employment on account of death.

Notwithstanding anything to the contrary herein, if the City decides to provide Differential Wage Payments to individuals who are performing service in the uniformed services (as defined in Chapter 43 of Title 238, United States Code) while on active duty for a period of more than thirty days, such Differential Wage Payment will be treated as compensation under the Code Section 415(c)(3) limits, but not for purposes of benefit accruals under the Retirement System. For these purposes the term "Differential Wage Payment" means a payment defined in Code Section 3401(h)(2) that is made by the City to an individual who is performing service in the uniformed services while on active duty for a period of more than thirty days.

# ARTICLE 5.  ELIGIBILITY FOR RETIREMENT

### Sec 5.1.    Eligibility for Unreduced Normal Retirement Benefit

Any Member who attains his Normal Retirement Age while employed by the City may retire upon written application filed with the Board setting forth the date on which the Member desires to be retired.  The date of retirement shall be effective as of the first day following the later of (i) the Member's last day on the City payroll, or (ii) the date the Member executes and files an application for retirement, notwithstanding that the Member may have separated from Service during the notification period.  Such a Member shall be entitled to receive an unreduced Retirement Allowance calculated as provided in Section 6.1 and payable in a form of payment selected by the Member pursuant to Section 8.1.

### Sec 5.2.    Eligibility for Deferred Vested Retirement Benefit

Any Member who terminates employment with the City prior to satisfying the requirements for receipt of a retirement benefit under Section 5.1 and who is credited with ten (10) or more years of Vesting Service upon his or her termination of employment (regardless of Age) shall be entitled to receive an unreduced Retirement Allowance commencing at any time following his Attainment of Age sixty-two.  At a Member's election, the Member may begin receiving a Retirement Allowance following his Attainment of Age fifty-five, actuarially reduced for early commencement, in lieu of an unreduced Retirement Allowance beginning at age sixty-two.  Deferred vested retirement benefits shall be payable in accordance with a form of payment selected by the Member pursuant to Section 8.1.

### Sec 5.3.    Eligibility for Disability Retirement Benefit – Duty Disability

(1)    If, prior to attainment of his Normal Retirement Date, a Member shall become Totally Disabled for duty by reason of injury, illness or disease resulting from performance of duty and if, pursuant to Section 5.6, the Board shall find such injury, illness or disease to have resulted from the performance of duty, on written application to the Board by or on behalf of such Member or by the head of his Department such Member shall be retired; notwithstanding that during such period of notification he or she may have separated from service and provided further that the Medical Director, after examination of such Member shall certify to the Board the Member's Total Disability.  A Member who retires as a result of duty disability shall receive for a period of twenty-four months the sum of:

    (a)    a basic benefit equal to fifty percent (50%) of his Final Compensation at the time his duty disability retirement begins, and

    (b)    a supplemental benefit equal to sixteen and two-thirds percent (16-2/3%) of his Final Compensation at the time his duty disability retirement begins.

Subject to Section 9.5, on the first day of each Plan Year, a Member's duty disability benefit will be increased as provided in Section 6.2.

(2)    After a Member receives benefits hereunder for a period of twenty-four months, the Board will determine whether the Member is disabled from any occupation.  If the

Member is disabled from any occupation, the Member shall continue to receive the benefit provided in paragraphs (1)(a) and (1)(b) until such time as the Member would have attained twenty-five years of Credited Service had he continued in active Service with the City. At that time, the Member shall continue to receive the benefit described in paragraph 1(a) above; however, benefits described in paragraph (1)(b) above will cease. If the Member is not disabled from any occupation, he shall continue to receive the benefit described in paragraph (1)(a) above; benefits described in paragraph 1(b) will cease.

(3)     In the event a Member receiving duty disability benefits has attained twenty-five years of Credited Service, duty disability benefits shall continue to be paid to the Member until the earlier of (i) the Member's Attainment of Age sixty-five, or (ii) the date the Member ceases to be Totally Disabled as determined by the Board. Upon termination of disability or Attainment of Age sixty-five, a Member with twenty-five years of Credited Service shall be eligible to receive a Retirement Allowance as provided in Section 6.1. The amount of such Retirement Allowance shall be equal to the amount which would have been payable to the Member if the Member's conversion from duty disability retirement to a Retirement Allowance had occurred on the date the Member attained twenty-five years of Credited Service.

(4)     If a Member on duty disability retirement returns to active Service with the City and shall re-qualify for duty disability retirement for the same or related reasons within twenty-four months of his return to active Service, then the disability shall be deemed a continuation of the prior Total Disability and the period of the Member's active Service following the return to work will not qualify the Member to be entitled to a new initial determination of disability for purposes of determining the benefit payable to the Member. Instead, such Member will return to duty disability retirement benefits based on the number of months of disability with which the Member was credited at the time of his return to active Service, as if there had not been a break in his period of duty disability retirement.

(5)     During the period a Member is eligible to receive duty disability benefits under this Section 5.3, the Member shall continue to be credited with Credited Service until the Member accrues twenty-five years of Credited Service, at which time accrual of Credited Service shall cease.

(6)     In the event that a recipient of a duty disability retirement benefit receives earned income from gainful employment during a calendar year, the amount of the Member's disability benefit payable during the next subsequent Plan Year will be adjusted so it does not exceed the difference between (i) the Member's base salary at the date of duty disability, increased by the variable Pension Improvement Factor (Escalator) (if any) applicable to such benefit pursuant to Section 6.2 multiplied by the number of full Plan Years from the date of the Member's duty disability to the year in which the earnings offset is applied, and (ii) the amount of the Member's remuneration from gainful employment during the prior calendar year. The amount of income received by a Member shall be determined by the Board based upon information received from the Member or based upon information secured from other reliable sources. Furnishing such information to the Board at such

times as the Board shall require shall be a condition for the Member's continued eligibility for duty disability benefits.

## Sec 5.4.  Eligibility for Disability Retirement Benefit – Non-Duty Disability

(1)  Upon the application of a Member or the Member's Department head, a Member who becomes totally and permanently disabled prior to his or her Normal Retirement Date in the employ of the City not resulting from the performance of duty shall be retired by the Board; provided that the Medical Director shall certify to the Board after a medical examination, that such Member is mentally or physically totally and permanently disabled for the further performance of duty to the City.  Such a Member shall receive the following applicable benefits:

   (a)  If such Member has less than five years of Credited Service at the time of his disability retirement, his Accumulated Mandatory Employee Contributions standing to his credit in the Accumulated Mandatory Employee Contributions Fund shall be returned to him, or at his option he shall receive a cash refund annuity which shall be the actuarial equivalent of his Accumulated Mandatory Employee Contributions.

   (b)  If such Member has five or more years of Credited Service at the time of his disability retirement, he shall receive a disability Retirement Allowance computed in accordance with the provisions of Section 6.1 payable in any of the optional forms provided in Section 8.1 hereof.  His annual Straight Life Retirement Allowance shall not be less than twenty per cent (20%) of his Average Final Compensation.

(2)  If a Member receiving non-duty disability retirement benefits is or becomes engaged in a gainful occupation, business, or employment paying more than the difference between the disabled Member's Retirement Allowance and Average Final Compensation, the Member's Retirement Allowance shall be reduced by the amount of such difference.  If the amount of the Retiree's earnings changes, the Retirement Allowance may be adjusted accordingly.  The amount of income received by a Member shall be determined by the Board based upon information received from the Member or based upon information secured from other reliable sources.  Furnishing such information to the Board at such times as the Board shall require shall be a condition for the Member's continued eligibility for non-duty disability benefits.

## Sec 5.5.  Disability Retirees; Reexamination

(1)  At least once each year during each year following the retirement of a Member under Section 5.3 or Section 5.4, the Board shall require that such disability Retiree who has not attained his Normal Retirement Age undergo a medical examination, to be made by, or under the direction of the Medical Director; provided, however, that medical examinations shall not be required if the Medical Director determines that the Retiree's condition is permanent and there is no need for further reexamination.  Retirees shall be reimbursed for reasonable costs actually incurred by the Retirees in connection with such

examinations.  Should any such Retiree who has not attained Normal Retirement Age fail to submit to a required medical examination, the Retiree's Retirement Allowance may be suspended by the Board until the examination is completed.  Should such failure continue for one year, all of the disability Retiree's rights in and to the duty or non-duty disability Retirement Allowance may be revoked by the Board.  If upon such examination of a Retiree, the examiner reports that the Retiree is no longer Totally Disabled, and such report is concurred in by the Board, the Retiree shall be restored to active service with the City and the Retirement Allowance paid pursuant to Section 5.3 or Section 5.4 shall be suspended until the Retiree terminates active Service with the City.

(2)     A disabled Retiree who has been, or shall be, reinstated to active Service in the employ of the City shall again become a Member.  All Credited Service at the time of the disability retirement shall be restored to the Member.

**Sec 5.6.     Disability Benefits; Procedures for Determination of Disability**

(1)     The Board shall establish procedures for determining whether a Member is Totally Disabled.  Such procedures shall be consistent with any collective bargaining agreements between the City and the unions covering Police Employees and Fire Employees.

(2)     If a Member is determined to be Totally Disabled under Section 5.3(1) or 5.4(1), the Board or its designee will examine the pension file, including the submissions of the Member and the Police or Fire Department, to determine if there is any dispute as to whether the disability "resulted from the performance of duty" within the meaning of the Combined Plan.  If it is undisputed that the disability did result from the performance of duty, the Board will grant duty disability retirement benefits.  If it is undisputed that the disability did not result from the performance of duty, the Board will grant non-duty disability retirement benefits, provided the Member meets the other conditions of eligibility.  If the performance of duty issue is in dispute, the Board will refer the matter to arbitration by a member of the Disability Retirement Review Board ("DRRB"). The decision of the DRRB member as to whether the disability resulted from the performance of duty shall be final and binding upon the Member, the Department and the Board. The DRRB shall consist of three qualified arbitrators who will be individually assigned in rotating order to decide the matters referred to arbitration by the Board.  The three members of the DRRB shall be disinterested persons qualified as labor arbitrators and shall be selected in accordance with agreements between the City and the unions representing Members.  The procedure for the termination of DRRB members and the selection of new DRRB members also shall be carried out in accordance with the agreements between the City and the unions representing Members.

(3)     The hearing before a member of the DRRB will be conducted in accordance with the following procedures:

(a)     The Member and the City will have the right to appear in person or otherwise may be represented by counsel if they wish and will be afforded an equal opportunity to present evidence relevant to the issues;

(b)     A court reporter will be present and make a stenographic record of the proceedings;

(c)     The hearing will be closed to the public, except that the Member may select one person to be with him or her in the hearing room; provided, however, that person may not testify;

(d)     The witnesses will be sequestered;

(e)     The witnesses will be sworn by the court reporter and testify under oath;

(f)     The Member may not be called by the City as an adverse witness;

(g)     The DRRB member will apply the rules of evidence and follow the procedures which are customarily applied and followed in labor arbitration cases;

(h)     If the Member wishes to have an employee of the City released from duty to appear as a witness on his or her behalf, the Member may so inform the Board in writing which, in turn, will submit a written request to the appropriate Department executive for the release of the employee for the purpose of so testifying;

(i)     The DRRB member will afford the parties an opportunity for the presentation of oral argument and/or the submission of briefs;

(j)     The DRRB member will issue a written decision containing credibility resolutions as necessary, findings of fact and conclusions with respect to all relevant issues in dispute;

(k)     The authority of the DRRB member is limited to deciding whether or not the Member's disability "resulted from the performance of duty" within the meaning of the Combined Plan. The DRRB member shall have no authority to add to, subtract from, modify or disregard the terms of the Combined Plan: and

(l)     The costs associated with the hearing, including the arbitrator's fees and expenses and the court reporter's fees and expenses, will be paid by the Retirement System.

(4)     If a disability Retiree is determined by the Board to no longer be Totally Disabled, he or she may appeal that determination within seven (7) days thereof by filing a written request with the Board for a re-examination. The Board shall promptly arrange for such re-examination. The Member's disability benefits will be continued pending that final and binding medical finding, and if the finding is that the Member is no longer Totally Disabled, his or her disability benefits will be further continued while the Police or Fire Department conducts such examinations and/or investigations as necessary to determine whether the Member is qualified for reappointment to active duty. In the event that the examinations and/or investigations conducted by the Police Department result in a determination that a Member represented by DPLSA is not qualified, for medical reasons, for reappointment to active duty, disability benefits will be continued.

(5)    The Board shall not act upon or grant the application filed by a Member who, although he or she is not capable of performing the full duties of a Police Employee or Fire Employee, has not suffered any diminishment of his or her base wages or benefits because he or she is either:

    (a)    regularly assigned to a position, the full duties of which he or she is capable of performing; or

    (b)    assigned to a restricted duty position, unless the Member's Department advises that it intends to seek a disability retirement for the Member in the foreseeable future.

(6)    The provisions in paragraph (5) above are not intended to and will not:

    (a)    affect the right of a Member to seek a disability retirement when no restricted duty position is available; or

    (b)    restrict in any way the existing authority of the Chief of Police or the Fire Commissioner to seek a duty or non-duty disability retirement for a Member for that Member at that time to request a duty or non-duty disability retirement.

### Sec 5.7.    Return of Accumulated Mandatory Contributions to Non-Vested Member

If a Member ceases employment with the City before becoming eligible for a Retirement Allowance under Section 5.1 or 5.2 or a disability Retirement Allowance pursuant to Section 5.3 or 5.4, the Member may elect to receive distribution of the Accumulated Mandatory Employee Contributions made to the Retirement System by such Member. If a Member elects to receive his Accumulated Mandatory Employee Contributions, such amounts shall be paid to the Member in a lump sum payment or in equal monthly installments for a period not to exceed three years, according to such rules and regulations as the Board may adopt from time to time.

### Sec 5.8.    Benefits Offset by Compensation Benefits; Subrogation

(1)    Any amounts which may be paid or payable to a Member, Retiree, or Beneficiary on account of disability or death under the provisions of any Workers' Compensation, pension, or similar law, except federal Social Security old-age and survivors' and disability insurance benefits, shall be an offset against any amounts payable from funds of the Retirement System (Component I and Component II combined) on account of the same disability or death. If the present value of the benefits payable under said Workers' Compensation, pension, or similar law, is less than the Pension Reserve for the Retirement Allowance payable by the Retirement System (under both Component I and Component II), the present value of the said Workers' Compensation, pension, or similar legal benefit shall be deducted from the amounts payable by the Retirement System (under both Component I and Component II), and such amounts as may be provided by the Retirement System, so reduced, shall be payable as provided in this Combined Plan Document.

(2) In the event a person becomes entitled to a pension payable by the Retirement System because of an accident or injury caused by the act of a third party, the Retirement System shall be subrogated to the rights of said person against such third party to the extent of the benefit which the Retirement System pays or becomes liable to pay.

## ARTICLE 6.  RETIREMENT ALLOWANCE; VARIABLE PENSION IMPROVEMENT FACTOR (ESCALATOR)

### Sec 6.1.    Retirement Allowance

The Retirement Allowance payable to a Member commencing at the later of his Normal Retirement Age or his actual retirement from employment with the City in the form of a Straight Life Retirement Allowance shall be equal to two percent (2%) of the Member's Average Final Compensation multiplied by the Member's years (computed to the nearest one-twelfth (1/12th) year) of Credited Service earned after June 30, 2014.

### Sec 6.2.    Variable Pension Improvement Factor (Escalator)

Except as provided in Section 9.5, beginning July 1, 2015 and effective the first day of each Plan Year thereafter, the Board may determine that the annual Retirement Allowance of a Member shall be increased by a factor of one percent (1.0%), computed each year on the basis of the amount of the original Retirement Allowance received at the time of Retirement ("Pension Improvement Factor (Escalator)"); provided, that the recipient of said Retirement Allowance shall have been receiving a Retirement Allowance for a period of not less than twelve months prior to the first day of such Plan Year.  The Pension Improvement Factor (Escalator) shall be compounded.

# ARTICLE 7.  DEATH BENEFITS

## Sec 7.1.    Accidental Death Benefit; Performance of Duty

(1)    If a Member is killed in the performance of duty in the service of the City, or dies as the result of illness contracted or injuries received while in the performance of duty in the service of the City, and such death, illness, or injury resulting in death, is found by the Board to have resulted from the actual performance of duty in the service of the City, the following benefits shall be paid:

(a)    the Accumulated Mandatory Employee Contributions standing to his or her credit in the Accumulated Mandatory Employee Contributions Fund at the time of his or her death shall be paid to such person or persons as the Member shall have nominated by written designation duly executed and filed with the Board.  If no such designated person survives the Member, the said Accumulated Mandatory Employee Contributions shall be paid to the Member's legal representative, subject to paragraph (e) of this Section 7.1(1).

(b)    the surviving spouse shall receive a pension of five-elevenths of the Member's Final Compensation payable for the spouse's lifetime.  If the Member's child or children under age eighteen years also survive the deceased Member, each such child shall receive a pension of one-tenth of such Final Compensation; provided, that if there are more than two such surviving children under age eighteen years, each such child's pension shall be an equal share of seven thirty-thirds of such Final Compensation.  Upon the death, marriage, adoption, or Attainment of Age eighteen years of any such child, his or her pension shall terminate and there shall be a redistribution of the benefit by the Board to the deceased Member's remaining eligible children, if any; provided, that in no case shall any such child's pension exceed one-tenth of the Member's Final Compensation.  In no case shall the total of the benefits provided for in this paragraph (b), payable on account of the death of a Member exceed two-thirds of the Member's Final Compensation.

(c)    if no surviving spouse survives the deceased Member or if the Member's surviving spouse dies before his youngest unmarried surviving child attains Age eighteen years, his unmarried child or children under Age eighteen years shall each receive a pension of one-fourth of the Member's Final Compensation; provided that if there are more than two such surviving children under age eighteen years, each such child's pension shall be an equal share of one-half of such Final Compensation.  Upon the death, marriage, adoption, or Attainment of Age eighteen years of any such child, his or her pension shall terminate and there shall be a redistribution by the Board to the deceased Member's remaining eligible children, if any; provided, that in no case shall any such child's pension exceed one-fourth of the Member's Final Compensation.

(d)    if the Member has no surviving spouse or surviving children under Age eighteen years and if the Member leaves surviving either a father or mother or both, whom the Board shall find to be actually dependent upon such Member for financial

support, such dependent father and mother shall each receive a pension of one-sixth of the Member's Final Compensation.

(e)     If a Member dies intestate, without having designated a person or persons, as provided in paragraph (a) of this Section 7.1(1), and without heirs, the amount of his Accumulated Mandatory Employee Contributions in the Accumulated Mandatory Employee Contribution Fund, not to exceed a reasonable sum, to be determined by the Board, shall be used to pay his burial expenses, provided the Member leaves no other estate sufficient for such purpose.  Any balance credited to such Member in the Accumulated Mandatory Employee Contribution Fund, and not used for burial expenses shall remain a part of the funds of the Retirement System and shall be transferred to the Pension Accumulation Fund.

## Sec 7.2.    Non-Duty Death Benefits

The surviving spouse of any Member who dies while in the employ of the City (other than in the performance of duty) after the date such Member has earned ten or more years of Credited Service, shall receive a Retirement Allowance computed in the same manner in all respects as if said Member had (i) retired effective on the day preceding the Member's death, notwithstanding that the Member had not attained Normal Retirement Age, (ii) elected a Joint and One Hundred Percent Survivor Allowance as described in Section 8.1, and (iii) nominated the surviving spouse as Beneficiary.

## Sec 7.3.    Refund of Accumulated Mandatory Contributions Upon Death of Member

If a Member who is not covered by Section 7.1 dies while employed by the City or following termination of employment but prior to commencement of a Retirement Allowance, the Member's Accumulated Mandatory Employee Contributions to the Retirement System at the time of death shall be paid to the Beneficiary nominated in a written designation duly executed by the Member and filed with the Board.  In the event there is no such designated Beneficiary surviving, the Member's Accumulated Mandatory Employee Contributions shall be paid to the Member's estate.  If a Member  who dies without a legal will has not nominated a Beneficiary, the Member's Accumulated Mandatory Employee Contributions at the time of death may be used to pay burial expenses if the Member leaves no other estate sufficient for such purpose. Such expenses shall not exceed a reasonable amount as determined by the Board.

# ARTICLE 8.  FORMS OF PAYMENT

## Sec 8.1.    Retirement Allowance Options

(1)     Until the date the first Retirement Allowance payment check is issued, any Member may elect to receive a Straight Life Retirement Allowance payable throughout life, or the Member may elect to receive the Actuarial Equivalent of the Straight Life Retirement Allowance computed as of the effective date of retirement, in a reduced Retirement Allowance payable throughout life, and nominate a Beneficiary, in accordance with the options set forth below:

    (a)     *Option One.  Cash Refund Annuity*.  A Retiree will receive a reduced Retirement Allowance for as long as he or she lives, provided that if the Retiree dies before payment of the Accumulated Mandatory Employee Contributions made to the Retirement System on and after July 1, 2014 has been received in an aggregate amount equal to, but not exceeding the Retiree's Accumulated Mandatory Employee Contributions at the time of retirement, the difference between said Accumulated Mandatory Employee Contributions and the aggregate amount of annuity payments already received, shall be paid in a single lump sum to a Beneficiary nominated by written designation duly executed by the Member and filed with the Board.  If there are no such designated Beneficiaries surviving said Retiree, any such difference shall be paid to the Retiree's estate.

    (b)     *Option Two.   Joint and One Hundred Percent Survivor Allowance*.  Upon the death of a Retiree  who elected a Joint and One Hundred Percent Survivor Allowance, one hundred percent of the Member's reduced Retirement Allowance shall be paid to and continued throughout the life of the Beneficiary nominated by written designation duly executed and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

    (c)     *Option "A".   Joint and Seventy-Five Percent Survivor Allowance*.  Upon the death of a Retiree who elected a Joint and Seventy-Five Percent Survivor Allowance, seventy-five percent of the Member's reduced Retirement Allowance shall be continued throughout the life of and paid to the Beneficiary nominated by written designation duly executed by the Member and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

    (d)     *Option Three.  Joint and Fifty Percent Survivor Allowance*.  Upon the death of a Retiree who elected a Joint and Fifty Percent Survivor Allowance, fifty percent of the Member's reduced Retirement Allowance shall be continued throughout the life of and paid to the Beneficiary nominated by written designation duly executed by the Member and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

    (e)     *Option "B".  Joint and Twenty-Five Percent Survivor Allowance*.  Upon the death of a Retiree who elected a Joint and Twenty-Five Percent Survivor Allowance, twenty-five percent of the Member's reduced Retirement Allowance shall be

continued throughout the life of and paid to the Beneficiary nominated by written designation duly executed by the Member and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

(2)     *Joint and Survivor Optional Forms of Payment*.  The Joint and Survivor Optional Forms of Payment provided under the Retirement System shall be made available in either the standard form or the pop-up form, as follows:

(a)     *Standard Form*.  Under the Standard Form, the reduced Retirement Allowance shall be paid throughout the lifetime of the Retiree.

(b)     *Pop-up Form*.  Under the Pop-up Form, the reduced Retirement Allowance shall be paid throughout the lifetime of the Retiree and the designated Beneficiary.  In the event of the death of the designated Beneficiary during the lifetime of the Retiree, the amount of the Retirement Allowance payable to the Retiree shall be changed to the amount that would have been payable had the Retiree elected the Straight Life Retirement Allowance Form of Payment.

## Sec 8.2.    Disposition of Surplus Benefits upon Death of Retiree and Beneficiary

If under a Joint and One Hundred Percent Survivor allowance, a Joint and Seventy-Five Percent Survivor allowance, a Joint and Fifty Percent Survivor allowance or a Joint and Twenty-Five Percent Survivor allowance as provided for under Section 8.1, both a Retiree and Beneficiary die before they have received in Retirement Allowance payments an aggregate amount equal to the Retiree's Accumulated Mandatory Employee Contributions (and if the Retiree makes an election pursuant to Section 10.4(2), his Accumulated Voluntary Employee Contributions) at the time of retirement, the difference between the said Accumulated Mandatory Employee Contributions (and Accumulated Voluntary Employee Contributions, if applicable) and the aggregate amount of Retirement Allowances paid to the Retiree and Beneficiary, shall be paid in a single lump sum to such person or persons nominated by written designation of the Retiree duly executed and filed with the Board.  If there is no such person or persons surviving the Retiree and the Beneficiary, any such difference shall be paid to the estate of the Retiree or the Beneficiary, whichever is the last to die.

# ARTICLE 9.  FUNDING AND RESERVES

## Sec 9.1.     Funding Objective of the Retirement System

The funding objective of Component I of the Retirement System is to establish and receive City and Member contributions during each Plan Year that are sufficient to fully cover the actuarial cost of benefits anticipated to be paid on account of Credited Service rendered by Members during the Plan Year (the normal cost requirements of the Retirement System), and to amortize the unfunded actuarial costs of benefits likely to be paid on account of Credited Service rendered on or after July 1, 2014 and before the first day of the Plan Year (the unfunded actuarial accrued liability of the Retirement System).

## Sec 9.2.     Funds

Component I of the Retirement System shall consist of the Accumulated Mandatory Employee Contribution Fund, the Accumulated Voluntary Contribution Fund, the Deferred Retirement Option Program Fund (if applicable), the Medical Benefits Account Fund, the Pension Accumulation Fund, the Rate Stabilization Fund, the Expense Fund and the Income Fund, as follows:

(1)     The Accumulated Mandatory Employee Contribution Fund shall be the Fund in which shall be accumulated the contributions of Members to provide their Retirement Allowances.  Upon the retirement, termination, disability or death of a Member with a Retirement Allowance, the Member's Accumulated Mandatory Employee Contributions shall be deemed to be part of the Pension Reserve which shall be used to pay the Member's or Beneficiary's Retirement Allowance.

(2)     The Accumulated Voluntary Employee Contribution Fund shall be the Fund in which shall be accumulated the voluntary after-tax contributions of Members, together with earnings thereon.

(3)     The Deferred Retirement Option Plan Fund shall be the fund in which shall be accumulated the amounts credited to the DROP Accounts of Members who have elected to participate in the DROP Program pursuant to Article 12, together with earnings thereon, provided that the DROP Accounts are held and invested within the Retirement System.

(4)     The Medical Benefits Account Fund shall be the fund in which shall be accumulated the amounts contributed to the Retirement System for the purposes of paying Medical Benefits.

(5)     The Pension Accumulation Fund shall be the fund in which shall be accumulated reserves for the Retirement Allowances and other benefits payable from that portion of the City's annual contribution that is not credited to the Rate Stabilization Fund and amounts transferred to Component I as provided in Section G-2(f) of Component II and from which shall be paid Retirement Allowances and other benefits on account of Members.

(6)     The Rate Stabilization Fund shall be the Fund to which shall be credited City contributions in excess of the amount of the City's contribution which is credited to the Pension Accumulation Fund and amounts transferred to Component I as provided in Section G-2(f) of Component II.

(7)     The Expense Fund shall be the fund to which shall be credited any money provided by the City, if any, to pay the administrative expenses of the Retirement System, and from which shall be paid certain expenses incurred in connection with the administration and operation of the Retirement System.

(8)     The Income Fund shall be the Fund to which shall be credited all interest, dividends, and other income derived from the investments of the assets of Component I of the Retirement System, all gifts and bequests received by Component I of the Retirement System, and all other moneys credited to Component I of the Retirement System, the disposition of which is not specifically provided for in this Article 9.  There shall be paid or transferred from the Income Fund, all amounts required to credit earnings and losses to the various Funds of the Retirement System in accordance with the provisions of Component I of this Combined Plan Document.  Amounts credited to the Income Fund in excess of amounts needed to credit earnings and losses of the Retirement System as provided in this Component I for any Plan Year shall be transferred to the Pension Accumulation Fund and used to pay Retirement Allowances and other benefits on account of Members.

**Sec 9.3.     Method of Financing Retirement System Benefits**

(1)     The pension liabilities for Members under this Component I shall be determined by the Plan's Actuary using the entry-age normal cost method of actuarial valuation.

(2)     The City's annual contribution to finance the prospective pension liabilities during the nine Plan Year period commencing July 1, 2014 and ending June 30, 2023 shall be (a) eleven and two-tenths percent (11.2%) of the base Compensation of active employees who are members of the DFFA (for pay periods ending on or before the effective date of the 2014-2019 collective bargaining agreement between the City and DFFA) and members of DPOA (for pay periods ending on or before October 3, 2014) and (b) twelve and one-quarter percent (12.25%) of the base Compensation of active employees who are members of the DPCOA, the DPLSA, the DPOA (for pay periods beginning on or after October 3, 2014) and the DFFA (for pay periods beginning on or after the effective date of the 2014-2019 collective bargaining agreement between the City and DFFA).  A portion of the City's annual contribution for each Plan Year shall be credited to the Rate Stabilization Fund.  The remainder of the City's annual contribution shall be allocated to the Pension Accumulation Fund.

(3)     Except as provided in Section 9.5, for each Plan Year, a Member who was an active employee as of June 30, 2014 ("current active") shall contribute to the Retirement System an amount equal to six percent (6%) of his or her base Compensation for such Plan Year and a Member who is hired or rehired by the City on or after July 1, 2014 ("new employee") shall contribute to the Retirement System an amount equal to eight percent

(8%) of his or her base Compensation for such Plan Year. A Member's Mandatory Employee Contributions for the Plan Year beginning July 1, 2014 and ending June 30, 2015 shall commence as of the Member's first payroll date occurring in August 2014. The officer or officers responsible for processing the payroll shall cause a Member's Mandatory Employee Contributions to be deducted from the Member's Compensation on each and every payroll, for each and every payroll period, from the later of (i) the Member's first payroll date occurring in August 2014 and (ii) the Member's date of hire, to the date he ceases to be a Member. The contribution shall be deducted from the Members' Compensation, notwithstanding that the minimum compensation provided by law for any Member shall be reduced thereby. Payment of compensation, less said Mandatory Employee Contributions, shall be a complete discharge of all claims and demands whatsoever for the services rendered by the said Member during the period covered by such payment. Member Mandatory Employee Contributions will be used for the purpose of funding the normal cost of the Retirement System.

## Sec 9.4.    Member Contributions Picked-Up

(1)    The City shall pick up Member Mandatory Employee Contributions required pursuant to Sections 9.3(3) and 9.5 in accordance with Code Section 414(h).

(2)    The picked-up contributions, although designated as employee contributions shall be treated as City contributions for the purpose of determining a Member's tax treatment under the Internal Revenue Code. The City shall pay the contributions picked-up on behalf of a Member from the same source of funds that are used for paying compensation to the Member.

(3)    The City shall pick up Member Mandatory Employee Contributions by a reduction in the Member's cash salary or an offset against a future salary increase, or both. The City shall designate the Mandatory Employee Contributions that are picked-up and paid to the Retirement System as employer contributions and not as employee contributions. No Member who participates in the Retirement System shall have the option of choosing to receive the contributed amounts directly instead of having those amounts paid by the City to the Retirement System.

## Sec 9.5.    Fiscal Responsibility: Benefit Reductions and Increased Funding Obligations

(1)    To safeguard the long-term actuarial and financial integrity of the Retirement System, in the event the funding level of Component I of the Retirement System projected over a five year period falls below ninety percent (90%), the Trustee may not award the variable Pension Improvement Factor (Escalator) described in Section 6.2 to any individual beginning with the Plan Year following the Plan Year in which such determination is made and continuing until the funding level is restored to not less than ninety percent (90%).

(2)    In the event the funding level of the Retirement System projected over a five year period falls below ninety percent (90%), the following remedial action shall be required in the order set forth below, beginning with the Plan Year following the Plan Year in which

such determination is made and continuing until the funding level is projected to be one hundred percent (100%) on a market value basis within the next five years:

(a)     the remedial action required in Section 9.5(1) shall be implemented or continued;

(b)     all amounts credited to the Rate Stabilization Fund shall be transferred to the Pension Accumulation Fund for the purposes of funding benefits payable under the Retirement System;

(c)     Mandatory Employee Contributions for active and new employees shall be increased by one percent (1%) for up to the next following five Plan Years;

(d)     Mandatory Employee Contributions for active and new employees shall be increased by an additional one percent (1%) per year;

(e)     Mandatory Employee Contributions for active and new employees shall be increased by an additional one percent (1%) per year;

(f)     the Retirement Allowance payable to a Retiree shall not include the variable Pension Improvement Factor (Escalator) that was most recently paid to the Retiree on the date the funding level is projected to fall below ninety percent (90%);

(g)     the Retirement Allowance payable to a Retiree shall not include the variable Pension Improvement Factor (Escalator) that was most recently added to the Member's Retirement Allowance for the Plan Year preceding the Plan Year referenced in paragraph (f) above;

(h)     Mandatory Employee Contributions for active and new employees shall be increased by an additional one percent (1%) per year; and

(i)     contributions made to the Retirement System by the City shall be increased, consistent with applicable actuarial principles and the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.*

(3)     For purposes of this Section 9.5, the "funding level" shall mean the ratio of the market value of the assets of Component I of the Retirement System to the actuarial accrued liability of Component I of the Retirement System. The actuarial accrued liability shall be calculated by the Plan's Actuary utilizing an interest rate assumption of six and three-quarters percent (6.75%) and other reasonable assumptions as directed by the Board upon the recommendation of the Investment Committee. The market value of assets shall be determined on the basis of a three-year look back period of smoothed investment returns.

## ARTICLE 10. VOLUNTARY EMPLOYEE CONTRIBUTIONS

### Sec 10.1.   Voluntary Employee Contributions; Amount; Vesting

Subject to procedures established by the Board, a Member who is covered by a collective bargaining agreement with the City that permits the Member to make Voluntary Employee Contributions to Component I of the Retirement System may elect to reduce his Compensation for any Plan Year by a whole percentage not less than one percent (1%) nor more than ten percent (10%) and have such amount contributed by the City to a Voluntary Employee Contribution Account maintained on his behalf under Component I of the Retirement System.  A Member represented by the DPOA may elect to reduce the amount paid to him or her by the City for accumulated sick leave in excess of 400 hours by a whole percentage not less than one percent (1%) nor more than one hundred percent (100%) of such amount and have such amount contributed by the City to a Voluntary Employee Contribution Account maintained on his behalf under Component I of the Retirement System.  Voluntary Employee Contributions shall be made to the Retirement System on an after-tax basis.  Amounts credited to a Member's Voluntary Employee Contribution Account shall be one hundred percent (100%) vested at all times.

### Sec 10.2.   Changing an Election to Contribute

A Member may change or revoke an election to make Voluntary Employee Contributions to the Retirement System pursuant to this Article 10 in such manner and with such advance notice as the City shall determine.  Notwithstanding the foregoing, a Member shall be permitted to change such election not less frequently than annually.

### Sec 10.3.   Individual Member Accounting; Crediting of Earnings

The Board shall maintain a Voluntary Employee Contribution Account on behalf of each Member who elects to make Voluntary Employee Contributions to the Retirement System.  Each Plan Year, a Member's Voluntary Employee Contribution Account shall be credited with earnings at a rate equal to the actual net investment rate of return on the assets of the Retirement System for the second Fiscal Year immediately preceding the Fiscal Year in which the earnings are credited; in no event, however, shall the earnings rate credited to a Member's Voluntary Employee Contribution Account for any Plan Year be less than zero percent (0%) nor greater than five and one-quarter percent (5.25%).

### Sec 10.4.   Distribution of Accumulated Voluntary Employee Contributions

(1)     If a Member ceases employment with the City other than by reason of death, the Member may elect to receive distribution of the Accumulated Voluntary Employee Contributions made to the Retirement System by such Member.  If a Member elects to receive his Accumulated Voluntary Employee Contributions, such amounts shall be paid to the Member in a lump sum payment or in equal monthly installments for a period not to exceed three years, according to such rules and regulations as the Board may adopt from time to time.

(2)     In lieu of receiving distribution of his Accumulated Voluntary Employee Contributions as provided in Section 10.4(1), a Member may elect to have the Actuarial Equivalent

Value of his Accumulated Voluntary Employee Contributions added to his Retirement Allowance and paid in the form of an annuity described in Section 8.1.

(3)    If a Member dies while employed by the City or following termination of employment but prior to receiving distribution of the Member's Accumulated Voluntary Employee Contributions, the amounts credited to the Member's Voluntary Employee Contribution Account at the time of death shall be paid to the Beneficiary nominated in a written designation duly executed by the Member and filed with the Board. In the event there is no such designated Beneficiary surviving, the Member's Accumulated Voluntary Employee Contributions shall be paid to the Member's estate. If a Member who dies without a legal will has not nominated a Beneficiary, the Member's Accumulated Voluntary Employee Contributions at the time of death may be used to pay burial expenses if the Member leaves no other estate sufficient for such purpose. Such expenses shall not exceed a reasonable amount as determined by the Board.

# ARTICLE 11.  LOAN PROGRAM FOR VOLUNTARY EMPLOYEE CONTRIBUTIONS

## Sec 11.1.  The Loan Program

A loan program shall be available to Members who have amounts credited to a Voluntary Employee Contributions Account.  The Board is authorized to adopt rules and regulations, from time to time, to govern the administration and the operation of the loan program.  Copies of the rules shall be made available to eligible Members in the offices of the Retirement System.  Any loans granted or renewed under the Retirement System shall be made and administered pursuant to and in compliance with Section 72(p) of the Internal Revenue Code and regulations thereunder.

## Sec 11.2.  Eligibility for Loan

Subject to the rules and procedures established by the Board, loans may be made to eligible Members from such Member's Voluntary Employee Contribution Account.  An eligible Member is any Member who has participated in the Retirement System for twelve (12) months or more.  Former Members, spouses and Beneficiaries are not eligible to receive any loans from the Retirement System.  No Member shall have more than two (2) outstanding loans from the Retirement System (Component I and/or Component II) at any time.  A Member who has previously defaulted on a loan under either Component I or Component II of the Combined Plan shall not be eligible for a loan from the Retirement System.

## Sec 11.3.  Amount of Loan

An eligible Member who has satisfied applicable rules and procedures established by the Board may borrow from his Voluntary Employee Contribution Account an amount, which does not exceed the lesser of (i) fifty percent (50%) of the Member's Voluntary Employee Contribution Account balance, and (ii) Fifteen Thousand Dollars ($15,000.00), in each case reduced by the excess, if any, of: (1) the Member's highest outstanding loan balance under the Retirement System (both Component I and Component II) during the one (1) year period ending on the day before the date on which the loan is made, or (2) the outstanding loan balance under the Retirement System (both Component I and Component II) on the date on which the loan is made, whichever is less.  The minimum loan amount shall be One Thousand Dollars ($1,000.00).

## Sec 11.4.  Terms and Conditions

In addition to such rules and procedures that are established by the Board, all loans shall comply with the following terms and conditions:

(a)     Each loan application shall be made in writing.

(b)     All loans shall be memorialized by a collateral promissory note for the amount of the loan, including interest, payable to the order of the Retirement System and properly executed by the Member.

(c)     Each loan shall be repaid by substantially equal payroll deductions over a period not to exceed five (5) years, or, where the loan is for the purpose of buying a

principal residence, a period not to exceed fifteen (15) years. In no case shall the amount of the payroll deduction be less than Twenty Dollars ($20.00) for any two-week pay period. A Member receiving a loan will be required to authorize payroll deductions from his compensation in an amount sufficient to repay the loan over its term.

(d) An amount equal to the principal amount of the loan to a Member (but not more than one half of the Member's vested interest in the Defined Contribution Plans of the Retirement System) will be designated as collateral for guaranteeing the loan.

(e) Each loan shall bear interest at a rate determined by the Board. The Board shall not discriminate among Members in its determination of interest rates on loans. However, loans initiated at different times may bear different interest rates, where, in the opinion of the Board, the difference in rates is supported by a change in market interest rates or a change in the Retirement System's current assumed rate of return. The loan interest rate shall bear a reasonable relationship to market rates for secured loans of a similar duration and shall bear a reasonable relationship to the costs to the Retirement System of administering the loan. The loan interest rate shall be calculated in a manner that will not negatively affect either the City's costs with respect to the Retirement System or the investment return allocated to Members.

(f) Loan repayments shall be suspended during a period of military service, as permitted by Section 414(u)(4) of the Internal Revenue Code. A Member who has an outstanding loan balance from the Retirement System who is absent from employment with the City, and who has satisfied the requirements of Section 414(u) of the Internal Revenue Code shall not be required to make loan repayments to the Retirement System during said periods of absence.

## Sec 11.5. Loan Balance

A Member's outstanding loan balance shall be considered a directed investment by the Member and interest payments shall be credited to the Member's Voluntary Employee Contribution Account (provided that the interest credited to the Member's Voluntary Employee Contribution Account shall be reduced appropriately to cover the administrative costs of the loan program and avoid negatively affecting the City's costs or the Retirement System's investment returns), and shall not be part of the Retirement System's net investment income or part of the Member's Voluntary Employee Contribution Account balance for the purpose of allocation of net investment income under the Retirement System.

## Sec 11.6. Default

In the event a Member defaults on a loan before the loan is repaid in full, the unpaid balance thereof will become due and payable and, to the extent that the outstanding amount is not repaid by the end of the calendar quarter which follows the calendar quarter in which the last payment was received, such amount shall be deemed to have been distributed to the Member for tax purposes, consistent with Section 72(p) of the Internal Revenue Code.

**Sec 11.7.  Distribution**

No distribution shall be made to a Member, former Member, spouse or Beneficiary from the Retirement System until all outstanding loan balances and applicable accrued interest have been repaid or offset against amounts distributable to the Member from the Retirement System.

# ARTICLE 12.  DEFERRED RETIREMENT OPTION PLAN ("DROP") PROGRAM

## Sec 12.1.  General Provisions

The following provisions are hereby established as the Deferred Retirement Option Plan ("DROP") Program under Component I, which shall be available to Members who are covered by collective bargaining agreements with the City that permit such Members to participate in the DROP program and those non-union executives of the Police Department and the Fire Department.

(1)     In lieu of terminating employment and accepting a Retirement Allowance under the Component I, any Member of the Retirement System who is eligible for the DROP program and who is eligible to immediately retire and receive an unreduced Retirement Allowance under Section 5.1 may elect to participate in the DROP program and defer the receipt of his or her Retirement Allowance in accordance with the provisions of this Article 12.  Any such election shall be irrevocable.

(2)     A Member shall be entitled to participate in the DROP program under Component I for a maximum of five years.  At the end of such five year period of participation in the DROP program, the Member shall be retired from employment.

## Sec 12.2.  Conversion to Retirement Allowance

Upon the effective date of a Member's participation in the DROP program, the Member shall cease to accrue a Retirement Allowance pursuant to Section 6.1 and shall elect a form of payment for his Retirement Allowance pursuant to Section 8.1.  Seventy-five percent (75%) of the monthly Retirement Allowance (including applicable variable Pension Improvement Factor (Escalator) increases) that would have been payable, had the Member elected to terminate employment with the City on the effective date of his or her DROP election and receive an immediate Retirement Allowance, shall be paid into a DROP Account established on behalf of the Member under the Retirement System or in an entity selected by the Board.

## Sec 12.3.  Investment of DROP Assets

(1)     ING was previously selected by the Board as the DROP administration and investment entity for Members who elect to participate in the DROP program.  ING shall continue to be the DROP administration and investment entity, unless and until such time as the Board terminates the agreement with ING as provided in paragraph (4) or determines that it is administratively feasible for the DROP program to be administered and invested under the Retirement System.

(2)     As soon as possible after July 1, 2014, the Board shall determine whether it is administratively feasible for the DROP program to be administered and the assets in DROP accounts invested under the Retirement System.  If the Board determines that it is feasible to administer the DROP program under the Retirement System, the Board shall promptly take appropriate steps to implement such decision.

(3)     If amounts credited to a DROP Account are invested under the Retirement System, such amounts shall be comingled with the assets of the Retirement System for investment purposes and shall be invested by the Trustees.  A Member's DROP Account shall be credited with annual earnings at a rate equal to seventy-five percent (75%) of the actual net earnings rate of the assets of the Retirement System; however, in no event shall the earnings rate applied to a Member's DROP Account for any Plan Year be less than zero percent (0%) nor greater than seven and three-quarters percent (7.75%).

(4)     The Board of Trustees entered into an administrative services agreement with ING.  Such agreement shall remain in effect until such time as it is terminated by the Board as provided therein.

(5)     The Board of Trustees may replace ING with a trust type vehicle or the Board may determine that amounts subject to a DROP election will be invested with Retirement System assets as provided above.

(6)     Any fees associated with the maintenance of DROP Accounts outside of the Retirement System shall be paid by the Members by means of deduction from their DROP Accounts.

## Sec 12.4.   Distribution of Amounts Credited to DROP Account

A Member shall not receive a distribution of amounts credited to his DROP Account prior to his termination of employment with the City.  Upon termination of employment, a Member who is a participant in the DROP program shall receive, at his or her option either a lump sum payment from the DROP Account equal to the amount then credited to the DROP Account or an annuity based upon the amount credited to his DROP Account.  In addition, one hundred percent (100%) of the Member's monthly Retirement Allowance that otherwise would have been paid upon the Member's retirement had he or she not elected to participate in the DROP program (together with any applicable variable Pension Improvement Factor (Escalator) increases) shall commence to the Member in accordance with the form of payment selected by the Member at the commencement of his or her participation in the DROP program.  Termination of employment includes termination of any kind, such as resignation, retirement, discharge or disability.

## Sec 12.5.   Death of Member While Participating in the DROP Program

If a Member dies while participating in the DROP program, a lump sum payment equal to the Member's DROP Account balance shall be paid to the Beneficiary named by the Member, or if no Beneficiary has been designated, to the Member's estate.  In addition, one hundred percent (100%) of the Member's Retirement Allowance (together with any applicable variable Pension Improvement Factor (Escalator) increases) that would have been paid to the Member but for the Member's decision to participate in the DROP program will be restored.  Survivor benefits, if any, shall be paid in accordance with the payment option elected by the deceased Member at the time the Member elected to participate in the DROP program.

## Sec 12.6.   Disability of Member While Participating in the DROP Program

If a Member becomes Totally Disabled while participating in the DROP program and while still an Employee and his employment with the City is terminated because he is Totally Disabled, such Member (a) shall be immediately retired and one hundred percent (100%) of the Retirement Allowance) that would have been paid to the Member but for the Member's decision to participate in the DROP program (together with any applicable variable Pension Improvement Factor (Escalator) increases) will commence in accordance with the payment option selected by the Member at the commencement of the Member's participation in the DROP program as provided in Section 12.1(2), and (b) shall be entitled to receive payment of the funds in his DROP Account (in the form of a lump sum or other form of payment described in Section 8.1). Such Member shall not be entitled to disability retirement benefits under Section 5.3 or Section 5.4 hereof.

## Sec 12.7.  Cost Neutrality

(1)     The DROP program shall be effective only for as long as it is cost-neutral to the City, provided however, that the DROP program shall continue during the pendency of proceedings, described in paragraph (2) below, designed to restore the Retirement System to cost neutrality.

(2)     If the City contends that the DROP program is not cost-neutral, including, but not limited to, making the City's annual contribution to the Retirement System higher than it would be if the DROP program was not in effect, the Board and the City, along with the Plan Actuary as well as an actuary appointed by the City (who will be an associate or a fellow of the Society of Actuaries and a member of the American Academy of Actuaries) shall meet and confer in good faith regarding the cost.  If the Board and the City are unable to reach an agreement as to cost, the matter shall be submitted to a third, independent, actuary, chosen or agreed upon by the Plan Actuary and the City's actuary.  This actuary, when rendering a decision, will be limited to ordering implementation of changes necessary to make the DROP program cost-neutral.  Upon the implementation of changes necessary to make the DROP program cost-neutral, Members shall have thirty days to elect to either (a) retire from active employment with the City or (b) withdraw from the DROP program and resume active participation in Component I of the Retirement System.  The Board shall notify DROP participants of these changes prior to implementation.  Those DROP participants resuming participation in Component I of the Retirement System shall not accumulate Credited Service for any time that they were participating in the DROP program (under either Component I or Component II).  Those not making either election shall remain participants in the DROP program.

(3)     In the event the DROP program cannot be changed to restore cost neutrality, it shall be discontinued and Members participating in the DROP program at that time shall have the option to either (i) retire or (ii) continue active employment with the City and resume active participation in Component I of the Retirement System.  DROP participants resuming participation in Component I of the Retirement System shall not accumulate Credited Service for the time during which such DROP participants participated in the DROP program (under Component I or Component II).

# ARTICLE 13. LIMITATION ON BENEFITS AND CONTRIBUTIONS

## Sec 13.1.  Compliance With Code Section 415(b) And Regulations

(1)     Notwithstanding any other provision of this Combined Plan Document, the defined benefit component of the Retirement System shall be administered in compliance with the provisions of Code Section 415(b) and regulations thereunder that are applicable to governmental plans.

(2)     The maximum annual benefit accrued by a Member during a "limitation year" (which shall be the Plan Year) and the maximum annual benefit payable under the Retirement System to a Member at any time within a Plan Year, when expressed as an annual benefit in the form of a straight life annuity (with no ancillary benefits), shall be equal to $160,000 (as such amount is adjusted pursuant to Code Section 415(d) for such Plan Year).

(3)     Notwithstanding the foregoing:

(a)     if the benefit under the Retirement System is payable in any form other than a straight life annuity, the determination as to whether the limitation described in Section 13.1(2) has been satisfied shall be made, in   accordance with the regulations prescribed by the Secretary of the Treasury, by adjusting such benefit to the Actuarially Equivalent straight life annuity beginning at the same time, in accordance with Section 13.1(9) or (10);

(b)     if the benefit under the Retirement System commences before Age sixty-two, the determination of whether the limitation set forth in Section 13.1(2) (the "Dollar Limit") has been satisfied shall be made, in accordance with regulations prescribed by the Secretary of the Treasury, by reducing the Dollar Limit so that the Dollar Limit (as so reduced) is equal to an annual benefit payable in the form of a straight life annuity, commencing when such benefit under the Retirement System commences, which is Actuarially Equivalent to a benefit in the amount of the Dollar Limit commencing at Age sixty-two (adjusted for participation of fewer than 10 years, if applicable); provided, however, if the Retirement System has an immediately commencing straight life annuity commencing both at Age sixty-two and the age of benefit commencement, then the Dollar Limit (as so reduced) shall equal the lesser of (i) the amount determined under this Section 13.1(3)(b) without regard to this proviso, or (ii) the Dollar Limit multiplied by a fraction the numerator of which is the annual amount of the immediately commencing straight life annuity under the Retirement System and the denominator of which is the annual amount of the straight life annuity under the Retirement System,  commencing at Age sixty-two; and

(c)     if the benefit under the Retirement System commences after Age sixty-five, the determination of whether the Dollar Limit has been satisfied shall be made, in accordance with regulations prescribed by the Secretary of the Treasury, by increasing the Dollar Limit so that the Dollar Limit (as so increased) is equal to an

annual benefit payable in the form of a straight life annuity, commencing when the benefit under the Retirement System commences, which is Actuarially Equivalent to a benefit in the amount of the Dollar Limit commencing at Age sixty-five; provided, however, if the Retirement System has an immediately commencing straight life annuity commencing both at Age sixty-five and the Age of benefit commencement, the Dollar Limit (as so increased) shall equal the lesser of (i) the amount determined under this Section 13.1(3)(c) without regard to this proviso, or (ii) the Dollar Limit multiplied by a fraction the numerator of which is the annual amount of the immediately commencing straight life annuity under the Retirement System and the denominator of which is the annual amount of the immediately commencing straight life annuity under the Retirement System, commencing at Age sixty-five.

(4)   The adjustments in Sections 13.1(3)(b) shall not apply to a Member with at least 15 years of Credited Service as a Police Member or a Fire Member within the meaning of Code Section 415(b)(2)(H). In addition, the adjustments in Sections 13.1(3)(b) and 13.1(6) shall not apply to benefits payable on account of the disability or the death of a Member.

(5)   Notwithstanding the foregoing provisions of this Section 13.1, except as provided in Section 13.1(6), the maximum annual benefit specified in Section 13.1(2) above shall not apply to a particular Retirement System benefit if (a) the annual amount of such Retirement System benefit, together with the aggregate annual amount of any other pensions payable with respect to such Member under all other defined benefit plans maintained by the City, does not exceed $10,000 for the Plan Year or any prior Plan Year, and (b) the Member was not at any time a participant in a Defined Contribution Plan maintained by the City.

(6)   In the case of a Member who has less than ten years of participation in the Retirement System, the limitation set forth in Section 13.1(2) shall be such limitation (without regard to this Section 13.1(6)), multiplied by a fraction, the numerator of which is the number of years of participation in the Retirement System (or parts thereof) credited to the Member and the denominator of which is ten. In the case of a Member who has less than ten years of Vesting Service, the limitations set forth in Paragraph (b) of Section 13.1(2) and in Section 13.1(5) shall be such limitations (determined without regard to this Section 13.1(6)) multiplied by a fraction, the numerator of which is the number of years of Vesting Service, or parts thereof, credited to the Member and the denominator of which is ten. The adjustment in this Section 13.1(6) shall not apply to benefits paid on account of the disability or death of a Member.

(7)   Notwithstanding anything in this Section 13.1 to the contrary, if the annual benefit of a Member who has terminated employment with the City is limited pursuant to the limitations set forth in Section 13.1(2), such annual benefit shall be increased in accordance with the cost-of-living adjustments of Code Section 415(d).

(8)   For purposes of determining actuarial equivalence under Paragraph (b) or (c) of Section 13.1(3), the interest rate assumption shall be five percent (5%) and the mortality table used shall be the applicable mortality table specified by the Board.

(9)     The Actuarially Equivalent straight life annuity for purposes of adjusting any benefit payable in a form to which Code Section 417(e)(3) does not apply, as required by Paragraph (a) of Section 13.1(3), is equal to the greater of (a) the annual amount of the straight life annuity payable under the Retirement System commencing at the same annuity starting date as the form of benefit payable to the Member, or (b) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same actuarial present value as the form of benefit payable to the Member, computed using the interest rate and mortality assumptions set forth in Section 13.1(8).

(10)    The Actuarially Equivalent straight life annuity for purposes of adjusting any benefit payable in a form to which Code Section 417(e)(3) applies, as required by Paragraph (a) of Section 13.1(3), is equal to the greatest of (a) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same Actuarial Equivalent present value as the form of benefit payable to the Member, (b) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same actuarial present value as the form of benefit payable to the Member, computed using a five and one-half percent (5.5%) interest rate assumption and the applicable mortality table specified by the Board, or (c) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same actuarial present value as the form of benefit payable to the Member, computed using the applicable interest rate and the applicable mortality table, both as specified by the Board, divided by 1.05.

(11)    For purposes of applying the limitations set forth in this Section 13.1, all qualified defined benefit plans (whether or not terminated) ever maintained by the City shall be treated as one defined benefit plan.

(12)    For purposes of this Section 13.1, the term "compensation" shall include those items of remuneration specified in Treasury Regulation § 1.415(c)-2(b) and shall exclude those items of remuneration specified in Treasury Regulation § 1.415(c)-2(c), taking into account the timing rules specified in Treasury Regulation § 1.415(c)-2(e), but shall not include any amount in excess of the limitation under Code Section 401(a)(17) in effect for the year.  The term "compensation" as defined in the preceding sentence shall include any payments made to a Member by the later of (a) two and one-half months after the date of the Member's severance from employment with the City or (b) the end of the limitation year that includes the date of the Member's severance from employment with the City, provided that, absent a severance from employment, such payments would have been paid to the Member while the Member continued in employment with the City and are regular compensation for services performed during the Member's regular working hours, compensation for services outside the Member's regular working hours (such as overtime or shift differential pay), commissions, bonuses or other similar compensation.

(13)    This Section 13.1 shall be administered in conformity with the regulations issued by the Secretary of the Treasury interpreting Code Section 415 including, but not limited to those interpreting Section 415(b)(2)(H), and any regulation providing for the "grandfathering" of any benefit accrued prior to the effective date of such regulations or statutory provision.

**Sec 13.2.  Compliance with Code Section 415(c) and Regulations**

(1)     The "Annual Addition" with respect to a Member for a limitation year shall in no event exceed the lesser of:

    (a)     $40,000 (adjusted as provided in Code Section 415(d)); or

    (b)     One hundred percent (100%) of the Member's compensation, as defined in Code Section 415(c)(3) and regulations issued thereunder, for the limitation year.

(2)     The Annual Addition with respect to a Member for a limitation year means the sum of his Voluntary Employee Contributions made to the Retirement System, and the employer contributions, employee contributions and forfeitures allocated to his accounts under any other qualified Defined Contribution Plan (whether or not terminated) maintained by the City, and the amounts described in Code Sections 415(l)(2) and 419A(d)(2) allocated to his account.

(3)     In the event the Annual Addition to the Retirement System on behalf of a Member would otherwise exceed the amount that may be applied for his benefit under the limitation contained in this Section 13.2, the limitation shall be satisfied by reducing the Member's Voluntary Employee Contributions to the extent necessary and distributing such amounts to the Member.

## ARTICLE 14. RETIREMENT SYSTEM ADMINISTRATION

### Sec 14.1.   Board of Trustees as Retirement System Administrator

(1)     The Retirement Board shall have the power and authority to manage and administer the Retirement System in accordance with the provisions of this Combined Plan Document.

(2)     The Retirement Board shall provide procedures for the processing and review of benefit claims, corrections of errors, and similar matters, as further described in Section 14.2.

(3)     The Retirement Board and the Retirement System shall not make any payment to active or retired Members or Beneficiaries other than payments that are required by the Retirement System as established by this Combined Plan Document. This prohibition applies to all payments that are not authorized by this Combined Plan Document, whether such payments are those commonly referred to as a "thirteenth check" or payments by any other name.

### Sec 14.2.   Powers and Duties of Board

(1)     The Board shall have the following powers and duties:

(a)     exclusive authority regarding the administration, management and operation of the Retirement System, including, but not limited to, the right to contract for office space, computer hardware and software, and human resource services (any or all of which may be obtained from the City), and to make rules and regulations with respect to the operation of the Retirement System not inconsistent with the terms of the Combined Plan Document and applicable law, and to amend or rescind such rules and regulations;

(b)     to determine questions of law or fact that may arise as to the rights of any person claiming rights under the Retirement System;

(c)     to determine the contributions to the Retirement System required of the City and Members pursuant to the documents governing operation of the Retirement System, including the Plan of Adjustment;

(d)     to construe and interpret the provisions of the Retirement System and to reconcile any inconsistencies;

(e)     to perform ministerial functions, whether or not expressly authorized, which the Board may deem necessary or desirable in carrying out its duties under the Retirement System;

(f)     except to the extent authority is vested in the Investment Committee, authority to employ, contract and pay for professional services including, but not limited to, actuarial, investment, legal, accounting, medical, and any other services that the Board considers necessary for the proper operation of the Retirement System;

(g)     except to the extent authority or responsibility is vested in the Investment Committee, to arrange for annual audits of the records and accounts of the Retirement System by a certified public accountant or by a firm of certified public accountants pursuant to generally accepted auditing standards;

(h)     to prepare an annual report for the Retirement System for each Fiscal Year in compliance with generally accepted accounting principles.  The report shall contain information regarding the financial, actuarial, and other activities of the Retirement System during the Fiscal Year.  The Board shall furnish a copy of the annual report to the Mayor and finance director of the City, to the chair of the City Council and the Investment Committee.  The report shall also contain a review of the latest actuarial valuation of the Retirement System;

(i)     to maintain or cause to be maintained such separate funds and accounts as are required to be maintained under the provisions of Components I and II of the Combined Plan Document and such additional accounts as the Board deems necessary or expedient for the proper administration of the Retirement System and the administration and investment of the assets of the Retirement System.  The Board shall maintain suitable records, data and information in connection with the performance of its functions, including, but not limited to, accurate and detailed accounts of all investments, receipts, disbursements, and other actions, including the proportionate interest therein and contributions of each Member who has made contributions to the Retirement System;

(j)     to correct any error in the records of the Retirement System that results in overpayment or underpayment of contributions to the Retirement System by the City or a Member, or overpayment or underpayment of benefits to a Member, former Member, or Beneficiary by the Retirement System.  In the event of overpayment to a Member, former Member or Beneficiary, the Board may, as far as practicable, adjust future payments to such individual in such a manner that the Actuarial Equivalent of the benefit to which such individual was entitled shall be paid;

(k)     to the extent permissible under Michigan law (and consistent with the Retirement System's favorable tax qualified status under Code Section 401(a)), purchase one or more insurance policies to indemnify any person and such person's heirs and legal representatives who is made a party to (or threatened to be made a party to) any action, suit or proceeding whether brought by or in the right of the Board, the Investment Committee or the Retirement System or otherwise, by reason of the fact that such person is or was a Board member, Investment Committee member, director, officer, employee or agent of the Board (or an advisory body or committee of the Board) or the Retirement System.  The insurance policies purchased by the Board shall not indemnify any person who is judicially determined to have incurred liability due to fraud, gross negligence or malfeasance in the performance of his duties; and

(l)    except to the extent authority or responsibility is vested in the Investment Committee, to perform any other function that is required for the proper administration of the Retirement System.

## Sec 14.3.  Executive Director; Employees

The Board shall employ on behalf of the Retirement System an executive director and any other employees for which the Board establishes positions.  The executive director shall do all of the following:

(a)    manage and administer the Retirement System under the supervision and direction of the Board;

(b)    annually prepare and submit to the Board for review, amendment, and adoption an itemized budget projecting the amount required to pay the Retirement System's expenses for the following Fiscal Year; and

(c)    perform such other duties as the Board shall delegate to the executive director.

The executive director, unless such power is retained by the Board, shall determine the compensation of all employees of the Retirement System (except the executive director, whose compensation shall be determined by the Board and the chief investment officer, whose compensation shall be determined by the Investment Committee) and such compensation shall be payable from the Retirement System.  Any person employed by the Retirement System may but need not be an employee of the City.

## Sec 14.4.  Discretionary Authority

The Board shall have sole and absolute discretion to:

(a)    interpret the provisions of the Retirement System;

(b)    make factual findings with respect to any and all issues arising under the Retirement System;

(c)    determine the rights and status of Members, Retirees, Beneficiaries and other persons under the Retirement System;

(d)    decide benefit claims and disputes arising under the Retirement System pursuant to such procedures as the Board shall adopt; and

(e)    make determinations and findings (including factual findings) with respect to the benefits payable hereunder and the persons entitled thereto as may be required for the purposes of the Retirement System.

## Sec 14.5.   Administrator's Decision Binding

The Board's decision on any matter arising in connection with administration and interpretation of the Retirement System shall be final and binding on Members, Retirees and Beneficiaries.

# ARTICLE 15. MANAGEMENT OF FUNDS

## Sec 15.1.  Board as Trustee of Retirement System Assets

The Board of Trustees shall be the trustee of the funds held under the Retirement System, shall receive and accept all sums of money and other property paid or transferred to it by or at the direction of the City, and subject to the terms of Article 16, shall have the power to hold, invest, reinvest, manage, administer and distribute such money and other property subject to all terms, conditions, limitations, and restrictions imposed on the investment of assets of public employee retirement systems or plans by *Act No. 314* of the *Public Acts of 1965, being sections 38.1132 et seq. of the Michigan Compiled Laws*, as amended.

## Sec 15.2.  Maintenance of Segregated Funds

The Board of Trustees shall maintain separate funds as required for the proper administration of the Retirement System and shall not commingle the assets held under the Retirement System for the purpose of funding benefits accrued by Members prior to July 1, 2014, together with earnings and losses on such assets (or replacement assets), as more fully described in Component II of this Combined Plan document, with the assets of the Retirement System held for the purpose of paying benefits accrued by Members on and after July 1, 2014 as described in this Component I of the Combined Plan document.  Notwithstanding the foregoing, the assets held under Components I and II of this Combined Plan document may be commingled for investment purposes and transferred as provided in Section G-2(f) of Component II.

## Sec 15.3.  Custodian of Funds

The Board of Trustees shall appoint or employ custodians of the assets of the Retirement System.  The custodians shall perform all duties necessary and incidental to the custodial responsibility and shall make disbursements as authorized by the Board.

## Sec 15.4.  Exclusive Purpose

All money and other assets of the Retirement System shall be held by the Trustees and invested for the sole purpose of paying benefits to Members and Beneficiaries and shall be used for no other purpose.  In exercising its discretionary authority with respect to the management of the money and other assets of the Retirement System, the Trustees shall exercise the care, skill, prudence and diligence under the circumstances then prevailing, that a person acting in a like capacity and familiar with such matters, would use in the conduct of an enterprise of like character with like aims.

## Sec 15.5.  Prohibited Conduct

Members of the Board and employees of the Retirement System are prohibited from:

(1)    Having any beneficial interest, direct or indirect, in any investment of the Retirement System;

(2)     Being an obligor or providing surety for any money loaned to or borrowed from the Retirement System;

(3)     Except as provided in Article 11, borrowing any money or other assets of the Retirement System; and

(4)     Receiving any pay or other compensation from any person, other than compensation paid by the Retirement System, with respect to investments of the Retirement System.

# ARTICLE 16.  INVESTMENT OF RETIREMENT SYSTEM ASSETS

## Sec 16.1.   Investment Powers of the Board and the Investment Committee

Subject to the requirements set forth in this Article 16, the Board shall have the power and authority to manage, control, invest and reinvest money and other assets of the Retirement System subject to all terms, conditions, limitations, and restrictions imposed on the investment of assets of public employee retirement systems or plans by *Act No. 314* of the *Public Acts of 1965, being sections 38.1132 et seq. of the Michigan Compiled Laws*, as amended.  Notwithstanding anything in this Combined Plan Document to the contrary, for the twenty year period following the effective date of the Plan of Adjustment, the Investment Committee shall make recommendations to the Board with respect to investment management matters as provided in this Article 16.

All investment management decisions made by the Board, as more fully described in Section 16.2, shall require a recommendation by an affirmative vote of the Investment Committee as provided in this Combined Plan Document.  The Board shall take no action with respect to any matter for which the Investment Committee has responsibility and authority, including the investment management matters described in Section 16.2, unless and until such action has been approved by affirmative vote of the Investment Committee.  All actions and recommendations of the Investment Committee shall be forwarded to the Board for consideration and are subject to Board approval.  If (a) the Board fails to approve or disapprove an investment management decision that has been recommended by an affirmative vote of the Investment Committee, and such failure continues for forty-five days after the date that the recommendation was made to the Board, or (b) the Board disapproves an investment management decision within such forty-five day period but fails to provide to the Investment Committee within such forty-five day period a detailed written response outlining the reasons for such disapproval, then the Investment Committee and the chief investment officer are authorized to implement the decision.

If the Board disapproves an investment management decision within such forty-five day period and provides to the Investment Committee within such forty-five day period a detailed written response outlining the reasons for such disapproval, then the Investment Committee shall have forty-five days after the receipt of the Board response to either (a) withdraw the recommended investment management decision, or (b) request, in writing, a conference with the Board to be held within ten days, but not less than five business days, of the request by the Investment Committee to discuss the disapproval by the Board described in the written response. Any such conference shall be conducted with at least three independent Investment Committee members present in person or by phone.  Within ten days of the commencement of the conference or twenty days following the Investment Committee's request for a conference if no conference is held, the Investment Committee shall either withdraw the recommended investment management decision or provide the Board with a written explanation of the Investment Committee's decision to proceed with the recommended investment management decision.  After delivery of such written explanation by the Investment Committee, the Investment Committee and the chief investment officer are authorized to implement the decision. Any action taken by the Board or the Investment Committee in violation of the terms of this Article 16 shall constitute an *ultra vires* act and the Investment Committee or the Board is

granted the express right to seek to preliminarily enjoin such action without the need to show irreparable harm.

## Sec 16.2.  Investment Management

(1)     For purposes of this Combined Plan, "investment management decisions" and "investment management matters" shall include:

      (a)     development of an investment policy statement with sound and consistent investment goals, objectives, and performance measurement standards which are consistent with the needs of the Retirement System;

      (b)     within 120 days after the effective date of the Plan of Adjustment, placement of all of the assets of the Retirement System not already under qualified management with qualified investment managers selected by the Investment Committee;

      (c)     evaluation, retention, termination and selection of qualified managers to invest and manage the Retirement System's assets;

      (d)     review and affirmation or rejection of the correctness of any and all calculations, actuarial assumptions and/or assessments used by the Actuary including, but not limited to (i) those underlying the restoration of pension benefits, funding levels and amortization thereof, all in accordance with the pension restoration program attached to the Plan of Adjustment (as more fully described in Article K of Component II of this Combined Plan Document), (ii) those underlying the determination of annual funding levels and amortization thereof, and (iii) on or after Fiscal Year 2024, the recommended annual contributions to the Retirement System in accordance with applicable law;

      (e)     in accordance with approved actuarial work as provided in paragraph (d) above and based on the annual actuarial valuation reports and any other projections or reports as applicable from the Actuary or other professional advisors, the determination of the extent of restoration of pension benefits, including but not limited to the payment of lost COLA payments, all in conformance with the pension restoration program attached to the Plan of Adjustment;

      (f)     communication of the Retirement System's investment goals, objectives, and standards to the investment managers, including any material changes that may subsequently occur;

      (g)     determination and approval of the Retirement System's investment and asset allocation guidelines, taking into account the appropriate liquidity needs of the Retirement System;

      (h)     the taking of corrective action deemed prudent and appropriate when an investment manager fails to perform as expected;

(i)     interpretation of Retirement System governing documents, existing law, the Plan of Adjustment or other financial determination that could affect funding or benefit levels;

(j)     review and approval, prior to final issuance, of the annual audit and all financial reports prepared on behalf of the Retirement System and meet and confer with the Auditor or other professional advisors as necessary prior to approval of the annual audit or other financial reports;

(k)     determination of the funding status of the Retirement System and any remedial action to be taken pursuant to Section 9.5; and

(l)     causing an asset/liability valuation study to be performed for the Retirement System every three years or, more often, as requested by the Investment Committee or the Board.

All actions of the Investment Committee shall comply with the provisions of pertinent federal, state, and local laws and regulations, specifically *Public Act 314* and *Plan Investment Guidelines*.

### Sec 16.3.   Best Practices

Prior to adopting investment guidelines and asset allocation policies, selecting investment managers or adopting investment return assumptions, the Investment Committee shall have an understanding of and shall give appropriate consideration to the following:

(a)     the fiduciary best practices and institutional standards for the investment of public employee retirement system plan assets;

(b)     the objective to obtain investment returns above the established actuarial investment return assumption to support the restoration of benefits under the pension restoration program described in the Plan of Adjustment and Component II of this Combined Plan Document, to the extent that it is prudent and consistent with the overall funding, liquidity needs and actuarial assumptions governing the Retirement System; and

(c)     the liquidity needs of the Retirement System.

### Sec 16.4.   Chief Investment Officer

The Investment Committee shall have the exclusive power to select, retain and terminate the services of a chief investment officer for the Retirement System.  The Investment Committee shall determine any and all compensation and other terms of employment of any chief investment officer hired by it.   The chief investment officer shall report directly to the Investment Committee and the Executive Director of the Board.   The chief investment officer shall be responsible for assisting the Investment Committee and the Board with respect to oversight of the Retirement System's investment portfolio.   The chief investment officer shall

provide such periodic reports relating to the Retirement System's assets to the Investment Committee and the Board as it or they shall request.

## Sec 16.5.  Investment Consultants

The Board and/or Investment Committee may retain the services of one or more investment consultants who shall be responsible for assisting the Investment Committee and the Board with oversight of the Retirement System's investment portfolio.  Any such investment consultant shall be a registered advisor with the United States Securities and Exchange Commission and shall be a nationally recognized institutional investment consultant with expertise in the investment of public pension plan assets.  Any such investment consultant shall acknowledge in writing its role as investment fiduciary with respect to the Retirement System as defined in the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq*.  The Board or the Investment Committee, as appropriate, shall determine the compensation and other terms of employment of any investment consultant hired by it.  The duties of an investment consultant may include, but shall not be limited to:

(a)     providing an asset/liability valuation study for the Retirement System;

(b)     reviewing the Retirement System's asset allocation based on current market assumptions;

(c)     identifying and recommending to the Investment Committee and the Board appropriate investment strategies based on the financial condition of the Retirement System;

(d)     implementing the approved investment strategies, such as recommending to the Investment Committee, for Board approval, an asset allocation strategy, building an investment structure for the Retirement System, and identifying qualified investment managers (through an organized search process) to execute and implement investment strategies;

(e)     monitoring and evaluating the ongoing progress of the investment managers toward stated investment goals and objectives;

(f)     recommending to the Investment Committee and the Board any necessary corrective actions, including adjustments to the investment structure or investment management organizations in the event of a deviation from expectations;

(g)     communicating the investment policies of the Retirement System to the investment managers;

(h)     reviewing the investment policies with the appropriate employees of the Retirement System;

(i)     aiding the Investment Committee in providing recommendations on issues relating to rebalancing and cash flow management, securities lending, transition management, cash equalization and other investment related topics;

13-53846-swr   Doc 8045-2   Filed 10/22/14   Entered 10/22/14 15:47:43   Page 74 of
429
13-53846-swr   Doc 4605-1   Filed 10/22/14   Entered 10/22/14 15:46:43   Page 510 of

(j)       attending Investment Committee and Board meetings in person, or telephonically, as needed or as requested;

(k)      meeting with the Investment Committee to provide detailed quarterly performance reports and executive summaries of performance;

(l)       meeting with the Investment Committee and the Board to review capital markets and inform the Board and Retirement System employees on the current investment environment; and

(m)     meeting with the Investment Committee and the Board to provide recommendations on asset allocation, investment structure, and manager selections.

## Sec 16.6.  Consistency With Plan of Adjustment

Nothing herein shall be interpreted as permitting the Investment Committee or the Board to alter or depart from the requirements set forth in the Plan of Adjustment.

# ARTICLE 17.  RETIREE MEDICAL ACCOUNT

## Sec 17.1.  Establishment of Account

A Medical Benefits Account shall be established and maintained under the Retirement System out of which the Board of Trustees shall pay the cost, which would otherwise be borne by the City, for certain medical and related benefits provided under the plans or programs maintained by the City to provide Medical Benefits (the "Medical Plans") for the benefit of the Medical Beneficiaries.  The provisions of this Article 17 are intended to comply with Section 401(h) of the Code and shall be construed to comply therewith.

## Sec 17.2.  Effective Date

Medical Benefits shall be paid from the Medical Benefits Account beginning October __, 2014 or such other date recommended by an enrolled actuary (within the meaning of Section 7701(a)(35) of the Code) and approved by the Board and Investment Committee.

## Sec 17.3.  Funding of Benefits

Subject to the right reserved to the City to amend or terminate the provision of Medical Benefits under its general power to amend the Combined Plan document under Section 18.5, the City expects and intends to make actuarially determined contributions under the Retirement System from time to time to fund the Medical Benefits Account.  The assets of the Medical Benefits Account may be invested together with the other assets of the Retirement System, in which case earnings of the Retirement System shall be allocated to the Medical Benefits Account on a reasonable basis or such assets may be invested separately.  In any event, no part of the Retirement System, other than the assets of the Medical Benefits Account, shall be available to pay for any part of the cost of Medical Benefits.

The amount determined by the City to be contributed for any Plan Year pursuant to the paragraph above shall be reasonable and ascertainable and shall not exceed the total cost for such Plan Year of providing Medical Benefits to the Medical Beneficiaries, determined in accordance with generally accepted actuarial methods and assumptions that are reasonable in view of the provisions and coverage of the medical and other welfare plans providing such benefits, the funding medium and any other applicable considerations.  At the time the City makes a contribution to the Trustee, the City shall designate the portion thereof that is allocable to the Medical Benefits Account.

## Sec 17.4.  Limitation on Contributions

At all times the aggregate of the contributions made by the City to provide Medical Benefits shall not exceed twenty-five percent (25%) of the sum of the aggregate contributions made by the City to the Plan under Sections 9.3 and 9.5, other than the contributions to fund past service credits, plus the aggregate contributions to the Medical Benefits Account.  In the event that a contribution under Section 17.3 shall exceed the amount described in the preceding sentence, such contribution shall be reduced by the excess amount.

## Sec 17.5.  Impossibility of Diversion

13-53846-swr   Doc 8045-2   Filed 10/22/14   Entered 10/22/14 15:47:43   Page 52 of
13-53846-swr   Doc 4045-2   Filed 10/26/14   Entered 10/26/14 15:46:49   Page 76 of
409

In no event, prior to the satisfaction of all liabilities to provide Medical Benefits shall the Medical Benefits Account be used for, or diverted to, any purpose other than the payment of such benefits and any necessary or appropriate expenses of administration associated therewith. Any amounts credited to the Medical Benefits Account following the satisfaction of all such liabilities shall be returned to the City.

### Sec 17.6.    Administration

The Medical Plans shall continue to be administered, and claims processed, under their respective terms.  Notwithstanding, the interpretation and administration of the terms of this Article 17 shall be pursuant to the provisions of the Combined Plan document.

### Sec 17.7.    Right to Amend or Terminate Medical Plans

The City expressly reserves the exclusive right, retroactively to the extent permitted by law, to amend, modify, change, terminate or revoke any medical or other welfare plan or policy maintained by the City that provides medical or other welfare benefits, including but not limited to Medical Benefits, and to require Members, former Members, their eligible spouses and dependents to pay all or any portion of the cost of such medical benefits.

### Sec 17.8.    Reversion

At any time prior to the satisfaction of all liabilities under the Retirement System to provide Medical Benefits, no part of the Medical Benefits Account may be used for any purpose other than providing Medical Benefits, and any necessary or appropriate expenses attributable to the administration of the Medical Benefits Account.  If any residual assets remain in the Medical Benefits Account after the satisfaction of all obligations of the City to provide Medical Benefits to the Medical Beneficiaries, such assets shall be returned to the City.  In the event a Medical Beneficiary's interest in the Medical Benefits Account is forfeited prior to the termination of the Retirement System, an amount equal to such forfeiture shall be applied as soon as possible to reduce the City's contributions.

### Sec 17.9.    Limitation of Rights

A Medical Beneficiary shall have no right, title or claim in any specific asset of the Medical Benefits Account, but shall have the right only to the Medical Benefits provided from time to time under the Medical Benefits Account.

# ARTICLE 18.  MISCELLANEOUS

## Sec 18.1.  Nonduplication of Benefits

If any Member is a participant in another defined benefit pension plan, retirement system or annuity plan sponsored by the City (including Component II of this Retirement System) and the Member is or becomes entitled to accrue pension benefits under such plan or retirement system (including Component II of this Retirement System) with respect to any period of service for which he is entitled to accrue a benefit under Component I of this Retirement System, such Member shall not be eligible to accrue or receive payment of a benefit under Component I with respect to such period of service.

## Sec 18.2.  Assignments Prohibited

The right of a person to a pension, annuity, the return of Accumulated Voluntary Employee Contributions and/or the return of Accumulated Mandatory Employee Contributions, the Retirement Allowance itself, to any optional form of benefit, to any other right accrued or accruing to any person under the provisions of this Retirement System, and the monies in the various funds of the Retirement System shall not be assignable and shall not be subject to execution, garnishment, attachment, the operation of bankruptcy or insolvency law, or any other process of law whatsoever, except as specifically provided in this Combined Plan Document or by an eligible domestic relations order of a lawful court.

## Sec 18.3.  Protection Against Fraud

A person who, with intent to deceive, makes any statements or reports required under this Retirement System that are untrue, or who falsifies or permits to be falsified any record or records of this Retirement System, or who otherwise violates, with intent to deceive, any terms or provisions of the Retirement System, shall be subject to prosecution under applicable law.

## Sec 18.4.  Conviction of Felony; Forfeiture of Rights

If a Member or Beneficiary shall be convicted by a court of competent jurisdiction of a felony or high misdemeanor involving moral turpitude committed during active Service, the Board shall have the power to order the forfeiture of all rights of the Member or Beneficiary to benefits hereunder, except the return of the Member's Accumulated Mandatory Employee Contributions and Accumulated Voluntary Employee Contributions.

## Sec 18.5.  Amendment; Termination; Exclusive Benefit

The City reserves the right to amend the Combined Plan document created hereunder at any time; such amendments may include termination of the Retirement System; provided, however, that following the effective date of the Plan of Adjustment, no amendment other than amendments permitted under the terms of the Plan of Adjustment (including amendments contemplated in Section K-4(5) of Component II) may be made to the terms, conditions and rules of operation of the Combined Plan or any successors plan or trust that govern the calculation of pension benefits, nor may any amendment or termination deprive any Member, former Member or Beneficiary of any then vested benefit under the Retirement System, except as provided in the

Plan of Adjustment.  Notwithstanding the foregoing, the City and the Board have the authority to amend the Combined Plan document as necessary to retain the tax qualified status of the Retirement System under the Internal Revenue Code.  The City shall make no amendment or amendments to the Retirement System which causes any part of the assets of the Retirement System to be used for, or diverted to, any purpose other than the exclusive benefit of Members, former Members or their Beneficiaries; provided, that the City may make any amendment necessary, with or without retroactive effect, to comply with applicable federal law.  Any amendment of the Retirement System by the City must be approved by the Council or a person standing in the stead of the Council.

Upon termination of the Retirement System or upon complete discontinuance of contributions to the Retirement System, the rights of all Members to benefits accrued to the date of such termination or discontinuance, to the extent then funded, shall be nonforfeitable.

### Sec 18.6.   Forfeitures Not to Increase Benefits

Any forfeitures arising under the Retirement System due to a Member's termination of employment or death, or for any other reason, shall be used to pay expenses of the Retirement System and shall not be applied to increase the benefits any Member would otherwise receive under the Retirement System at any time prior to termination of the Retirement System.

### Sec 18.7.   Required Distributions - Compliance with Code Section 401(a)(9) and Regulations

The Retirement System will apply the minimum distribution requirements of Code Section 401(a)(9) in accordance with the final regulations issued thereunder, notwithstanding any provision in the Combined Plan document to the contrary.  Pursuant to Code Section 401(a)(9)(A)(ii), a Member's interest must begin to be distributed by the later of (i) the April 1 of the calendar year following the calendar year that he attains the Age of seventy and one-half (70-1/2), or (ii) April 1 of the calendar year following the year in which he retires.  Distributions will be made in accordance with Regulations Sections 1.401(a)(9)-2 through 1.401(a)(9)-9.  The provisions of this Section 18.7 and the regulations cited herein and incorporated by reference override any inconsistent plan distribution options.

### Sec 18.8.   Direct Rollovers

(1)     For purposes of compliance with Code Section 401(a)(31), a distributee may elect, at the time and in the manner prescribed by the Board, to have any portion of an eligible rollover distribution paid directly to an eligible retirement plan specified by the distributee in a direct rollover.

      (a)     For purposes of this Section 18.8, the following terms shall have the following meanings:

      (b)     *"Direct rollover"* means a payment by the Retirement System to an eligible retirement plan specified by a distributee.

(c)    *"Distributee"* means a Member or former Member. It also includes the Member's or former Member's surviving spouse, a spouse or former spouse who is the alternate payee under an eligible domestic relations order, or a nonspouse beneficiary who is a designated beneficiary as defined by Code Section 401(a)(9)(E). However, a nonspouse beneficiary may only make a direct rollover to an individual retirement account or individual retirement annuity established for the purpose of receiving the distribution, and the account or annuity will be treated as an "inherited" individual retirement account or annuity.

(d)    *"Eligible retirement plan"* means any of the following that accepts a distributee's eligible rollover distribution:

    (i)    a qualified trust described in Code Section 401(a);

    (ii)    an annuity plan described in Code Section 403(a);

    (iii)    an annuity contract described in Code Section 403(b);

    (iv)    an individual retirement account described in Code Section 408(a);

    (v)    an individual retirement annuity described in Code Section 408(b);

    (vi)    a Roth IRA described in Code Section 408A; or

    (vii)    a plan eligible under Code Section 457(b) that is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or a political subdivision of a state that agrees to separately account for amounts transferred into that plan from the Retirement System.

(e)    *"Eligible rollover distribution"* means any distribution of all or any portion of the balance to the credit of a distributee under the Retirement System, except that an eligible rollover distribution does not include: any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or the life expectancy) of the distributee or the joint lives (or joint life expectancies) of the distributee and the distributee's designated beneficiary, or for a specified period of ten years or more; any distribution to the extent such distribution is required under Code Section 401(a)(9); the portion of any distribution that is not includible in gross income; and any other distribution which the Internal Revenue Service does not consider eligible for rollover treatment, such as any distribution that is reasonably expected to total less than $200 during the year. Notwithstanding the foregoing, a portion of a distribution will not fail to be an "eligible rollover distribution" merely because the portion consists of after-tax contributions that are not includible in Member's gross income upon distribution from the Retirement System. However, such portion may be transferred only (i) to an individual retirement account or annuity described in Code Section 408(a) or (b) or to a qualified defined contribution plan described in Code Section 401(a) that agrees to separately account for amounts so transferred (and earnings thereon), including separately accounting for the portion

of the distribution that is includible in gross income and the portion of the distribution that is not so includible; (ii) to a qualified defined benefit plan described in Code Section 401(a) or to an annuity contract described in Code Section 403(b) that agrees to separately account for amounts so transferred (and earnings thereon), including separately accounting for the portion of the distribution that is includible in gross income and the portion of the distribution that is not so includible; or (iii) to a Roth IRA described in Code Section 408A.

## Sec 18.9. Construction

Words in the singular should be read and construed as though used in the plural, and words in the plural should be read and construed as though used in the singular, where appropriate. The words "hereof", "herein", and "hereunder" and other similar compounds of the word "here", shall mean and refer to Component I of this Combined Plan document and not to any particular provision or section thereof. The table of contents, article and section headings are included for convenience of reference, and are not intended to add to, or subtract from, the terms of the Combined Plan document or the Retirement System created hereunder.

## Sec 18.10. Severability

If any section or part of a section of this Combined Plan document or provision relating to the Retirement System is for any reason held to be invalid or unconstitutional, such holding shall not be construed as affecting the validity of the remaining sections of the Combined Plan document or Retirement System or of the Combined Plan document or Retirement System in its entirety.

## EXHIBIT I.A.254.b

PRINCIPAL TERMS OF NEW PFRS ACTIVE PENSION PLAN

13-53846-swr   Doc 8045-2   Filed 10/22/14   Entered 10/22/14 15:47:43   Page 82 of
429
13-53846-tjt   Doc 8045-2   Filed 10/22/14   Entered 10/22/14 05:46:29   Page 82 of
429

## NEW PFRS ACTIVE PENSION PLAN -- MATERIAL TERMS

1.  Benefit Formula for all employees is Final Average Compensation (average base compensation over last 5 consecutive years of employment) x Years of Service earned after June 30, 2014  x 2.0%.  Average base compensation means no overtime, no unused sick leave, no longevity or any other form of bonus – just employee's base salary.

2.  Actual time for benefit accrual is actual time served.  For vesting service, 1,000 hours in a 12 month period to earn a year of service.

3.  Normal Retirement Age for all employees is age 50 with 25 years of service, with the following 7 year transition period:

    | Fiscal Year | Age and Service |
    | --- | --- |
    | 2015 | Age 43 and 20 years |
    | 2016 | Age 43 and 20 years |
    | 2017 | Age 44 and 21 years |
    | 2018 | Age 45 and 22 years |
    | 2019 | Age 46 and 23 years |
    | 2020 | Age 47 and 24 years |
    | 2021 and thereafter | Age 50 and 25 years |

4.  10 Years of Service for vesting.

5.  Deferred vested  pension -- 10 years of service and age 55 for reduced benefit; 10 years of service and age 62 for unreduced benefit.

6.  Duty Disability  - consistent with current PFRS

7.  Non-Duty Disability – consistent with current PFRS

8.  Non-Duty Death Benefit for Surviving Spouse – consistent with current PFRS

9.  Duty Death Benefit for Surviving Spouse – consistent with current PFRS

10.  COLA: 1% compounded, variable

11.  DROP Accounts will be available for existing and future accrued benefits for employees who are eligible to retire under concurrent eligibility requirements.  No more than 5 years of DROP participation (both for Old PFRS and New PFRS) for employees not already in DROP.  DROP accounts will be managed by the PFRS instead of ING, if administratively and legally feasible.  If managed by PFRS, interest will be credited to DROP accounts at a rate equal to 75% of the actual net investment return of PFRS, but in no event lower than 0% or higher than 7.75%.

12. Annuity Savings Fund – employees may make voluntary Annuity Savings Fund contributions up to 10% of total after-tax pay. Interest will be credited at the actual net investment rate of return for PFRS, but will in no event be lower than 0% or higher than 5.25%. No in-service withdrawals permitted. An employee represented by the Detroit Police Officers Association may elect to contribute up to 100% of the amount paid to him or her by the City for accumulated sick leave in excess of 400 hours.

13. Investment Return/Discount rate – 6.75%

14. City Contributions

   a. Detroit Fire Fighters Association Employees
      i. 11.2% of the base compensation of eligible employees for payroll periods beginning prior to the effective date of the collective bargaining agreement and 12.25% of the base compensation of eligible employees for payroll periods beginning after the effective date of the collective bargaining agreement. A portion of such contribution will be credited to a rate stabilization fund.

   b. Detroit Police Command Officers Association Employees
      i. 12.25% of the base compensation of eligible employees. A portion of such contribution will be credited to a rate stabilization fund.

   c. Detroit Police Officers Association Employees
      i. 11.2% of the base compensation of eligible employees for payroll periods beginning prior to the effective date of the collective bargaining agreement and 12.25% of the base compensation of eligible employees for payroll periods beginning after the effective date of the collective bargaining agreement. A portion of such contribution will be credited to a rate stabilization fund.

   d. Detroit Police Lieutenants and Sergeants Association Employees
      i. 12.25% of the base compensation of eligible employees. A portion of such contribution  will be credited to a rate stabilization fund.

15. Employee Contributions – Employees hired before July 1, 2014 (current actives) will contribute 6% of base compensation (pre-risk shifting); employees hired on or after July 1, 2014 (new employees) will contribute 8% of base compensation (pre-risk shifting). Maximum employee contributions of 10% (current actives) and 12% (new employees).

16. Risk Shifting:

   a. If the funding level is less than 90% (using the fair market value of assets), COLAs will be eliminated (to the extent applicable).

-2-
13-53846-swr   Doc 8045-2   Filed 10/22/14   Entered 10/22/14 15:47:43   Page 84 of
13-53846-swr   Doc 8045-2   Filed 10/22/14   Entered 10/22/14 15:47:43   Page 84 of
429

b. If the funding level is 90% or lower (using the fair market value of assets and a 3-year look back period), the following corrective actions will be taken in the order listed below, until the actuary can state that by virtue of the use of corrective action, and a 6.75% discount rate and return assumption, the funding level is projected to be 100% on a market value basis within the next 5 years:

    i. eliminate COLAs (if applicable);
    ii. use amounts credited to the rate stabilization fund to fund accrued benefits;
    iii. increase employee contributions by 1% per year (6% to 7% for current actives and 8% to 9% for new employees) for up to 5 years;
    iv. increase employee contributions (active and new employees) by an additional 1% per year;
    v. increase employee contributions (active and new employees) by an additional 1% per year;
    vi. implement a 1 year COLA fallback;
    vii. implement a second 1 year COLA fallback;
    viii. increase employee contributions by an additional 1% per year; and
    ix. increase City contributions consistent with applicable actuarial principles and PERSIA.

# EXHIBIT I.A.280

PRIOR GRS PENSION PLAN

# COMBINED PLAN
# FOR THE
# GENERAL RETIREMENT SYSTEM
# OF THE
# CITY OF DETROIT, MICHIGAN

**Amendment and Restatement Effective July 1, 2014**

# TABLE OF CONTENTS

**Page**

COMPONENT II ...................................................................................................... 1

ARTICLE A.   COMMON PROVISIONS OF THE GENERAL RETIREMENT
SYSTEM ............................................................................................ 2

    Sec. A-1.    Common Provisions ...................................................... 2

ARTICLE B.   FREEZE OF GENERAL RETIREMENT SYSTEM AS OF JUNE 30,
2014 ..................................................................................................... 4

    Sec. B-1.    Freeze of Eligibility and Benefits Under General Retirement
System ........................................................................... 4

ARTICLE C.   DEFINITIONS ..................................................................................... 6

    Sec. C-1.    Definitions .................................................................... 6

ARTICLE D.   SERVICE CREDIT .............................................................................. 11

    Sec. D-1.    Service Credit .............................................................. 11

    Sec. D-2.    Service Credit; Former Employees of the Founder's Society—
Detroit Institute of Arts .............................................. 11

    Sec. D-3.    Service Credit; Transfer to Other Governmental Service ....... 11

    Sec. D-4.    Service Credit; Military Service .................................. 11

    Sec. D-5.    Service Credit; Qualified Military Service (Pre-Employment
Service) ........................................................................ 11

ARTICLE E.   DEFINED BENEFIT/DEFINED CONTRIBUTION (ANNUITY) PLAN
OF THE GENERAL RETIREMENT SYSTEM ............................... 13

    Sec. E-1.    Membership ................................................................. 13

    Sec. E-2.    Cessation of Membership; Re-Employment by the Employer ............... 13

    Sec. E-3.    Service Retirement ...................................................... 16

    Sec. E-4.    Service Retirement Allowance .................................. 19

    Sec. E-5.    Disability Retirement .................................................. 20

    Sec. E-6.    Accidental Death Benefit; Performance of Duty .................. 23

    Sec. E-7.    Accumulated Contributions; Return of 1973 Defined Contribution
Plan Amount ............................................................... 24

    Sec. E-8.    Retirement Allowance Options .................................. 25

    Sec. E-9.    Benefits for Surviving Spouses; Generally ............... 27

    Sec. E-10.    Benefits for Surviving Spouses; Disability Retirees .............. 27

    Sec. E-11.    Disposition of Surplus Benefits upon Death of Retiree and
Beneficiary ................................................................. 28

# TABLE OF CONTENTS
## (continued)

Page

Sec. E-12. Pensions Offset by Compensation Benefits; Subrogation ...................... 28

Sec. E-13. Disability Retirees; Reexamination; Authority of the Board.................. 28

Sec. E-14. Transfer of Department or Department Functions; Generally................ 29

Sec. E-15. Pension Improvement Factor (Escalator)................................... 30

Sec. E-16. Adoption of Rates of Interest; Limitations on Payments By Retirement System; Transfer of Investment Returns in Excess of Crediting Rate ...................................................................... 31

Sec. E-17. Funds................................................................... 32

Sec. E-18. Method of Financing...................................................... 32

Sec. E-19. Determination of City's Annual Contribution ........................... 35

ARTICLE F. PARTICIPANT LOAN PROGRAM........................................... 36

Sec. F-1. Established ............................................................. 36

Sec. F-2. The Loan Program ....................................................... 36

Sec. F-3. Eligibility ............................................................. 36

Sec. F-4. Amount of Loan.......................................................... 37

Sec. F-5. Terms and Conditions ................................................... 37

Sec. F-6. Renewal of Loan ........................................................ 38

Sec. F-7. Loan Balance ........................................................... 38

Sec. F-8. Distributions........................................................... 38

Sec. F-9. Annual Report .......................................................... 38

ARTICLE G. SPECIAL PLAN OF ADJUSTMENT PROVISIONS ...................... 39

Sec. G-1. Benefit Changes Implemented Pursuant to the Terms of the Plan Of Adjustment................................................................ 39

Sec. G-2. Annuity Savings Fund Recoupment ....................................... 40

Sec. G-3. Income Stabilization Benefits ........................................... 43

Sec. G-4. Restoration of Pension Benefits.......................................... 46

ARTICLE H. MISCELLANEOUS PROVISIONS OF THE GENERAL RETIREMENT SYSTEM........................................................................ 56

Sec. H-1. Enforcement; Civil Action .............................................. 56

Sec. H-2. Limitation of Other Statutes............................................. 56

# COMPONENT II

# ARTICLE A.  COMMON PROVISIONS OF THE GENERAL RETIREMENT SYSTEM

## Sec. A-1.  Common Provisions

Certain provisions of the Combined Plan for the General Retirement System of the City of Detroit, Michigan described below are common to both Component I and this Component II as in effect July 1, 2014.  Those provisions are set forth in the following Sections of Component I:

(a)     Article I (General Provisions);

(b)     Article II (Definitions):

Actuarial Equivalent or Actuarially Equivalent

Actuarially Equivalent Value

Administrative Rules and Regulations

Age; Attainment of

Board of Trustees or Board or Retirement Board

City

City Council or Council

Combined Plan

Component I

Component II

Employer

Fiscal Year

General Retirement System or Retirement System

Internal Revenue Code or Code

Investment Committee

Member

Notice to Members, Beneficiaries and Retirees;

Plan Actuary or Actuary;

Plan Document or Combined Plan Document;

Plan of Adjustment;

Plan Year;

Spouse; and

Straight Life Retirement Allowance;

(c)     Article 12 (Limitation on Benefits and Contributions);

(d)     Article 13 (Retirement System Administration);

(e)     Article 14 (Management of Funds);

(f)     Article 15 (Investment of Retirement System Assets); and

(g)     Article 17 (Miscellaneous).

## ARTICLE B.  FREEZE OF GENERAL RETIREMENT SYSTEM AS OF JUNE 30, 2014

### Sec. B-1.  Freeze of Eligibility and Benefits Under General Retirement System

Notwithstanding anything in Articles I, II, III, or IV of Chapter 47 of the 1984 Detroit City Code or this Combined Plan for the General Retirement System of the City of Detroit, Michigan to the contrary, effective as of June 30, 2014 (the "Freeze Date"):

(a)     No new employee hired by an Employer on or after July 1, 2014 shall become a Member who is eligible to accrue a benefit under the terms of the General Retirement System in effect as of the Freeze Date;

(b)     No employee who is rehired by an Employer on or after July 1, 2014 shall become a Member who is eligible to accrue either a benefit or service credit for any purpose under the terms of the General Retirement System in effect as of the Freeze Date; provided, however, that a Member who is entitled to a Frozen Accrued Benefit as defined in subsection (c) of this Section B-1 and who is rehired by an Employer on or after July 1, 2014 but prior to the date the Member incurs a six-year break in service shall be eligible to accrue service credit following rehire solely for the purpose of determining the Member's vesting in and eligibility for payment of his Frozen Accrued Benefit;

(c)     Benefit accruals for Members with respect to service rendered prior to July 1, 2014 will be frozen based on a Member's years of service, Average Final Compensation, and the pension multiplier formulae in effect as of such Freeze Date under the terms of the General Retirement System ("Frozen Accrued Benefit");

(d)     Except as otherwise provided in subsection (e) of this Section B-1, compensation of a Member shall be frozen effective as of the Freeze Date for purposes of determining the Member's Frozen Accrued Benefit.  No compensation of any type earned by a Member after the Freeze Date shall be taken into consideration for purposes of determining the Member's Frozen Accrued Benefit under the General Retirement System;

(e)     Any Member who, as of June 30, 2014, would have been eligible to elect to use a portion of his unused accrued sick leave to increase his Average Final Compensation ("Sick Leave Rollover") if the Member had been eligible to retire and had elected to retire as of June 30, 2014, shall have a one-time election ("Special Election") to add the value of twenty-five percent (25%) of the Member's unused sick leave accrued for purposes of the Sick Leave Rollover in accordance with the terms of the applicable collective bargaining agreement, City Employment Terms or Detroit Code of Ordinance to the earnings used in computing Average Final Compensation for purposes of determining the Member's Frozen Accrued Benefit; provided, however, that at least twenty-five percent (25%) of the Member's sick leave accrued for purposes of the Sick Leave Rollover in accordance with the terms of the applicable collective bargaining agreement, City Employment Terms or Detroit Code of Ordinance remains in the Member's sick leave bank at the time the completed Special Election form is received by the Retirement System and, provided further that the completed Special Election form is received by the Retirement System no later than August 22, 2014 or, if later, the date set forth in a collective bargaining

agreement between the City and a union whose members are eligible to make a Special Election. A Member's Special Election shall be made in the manner set forth by the Board of Trustees and the Retirement System. A Member may revoke a Special Election, as long as such revocation occurs on or before the latest date upon which such Member is permitted to make a Special Election. Notwithstanding anything in this subsection (e) to the contrary, a Member's Special Election will be void and the determination of the Member's Average Final Compensation for purposes of calculating the Member's Frozen Accrued Benefit will not take into account any of the Member's unused sick leave, if (i) the electing Member would not have been eligible to receive an immediate service retirement if he retired as of June 30, 2014, and (ii) the electing Member's employment with an Employer is terminated before the electing Member becomes eligible for an immediate service retirement under the Retirement System;

(f)     Service earned after the Freeze Date shall be credited to a Member solely for purposes of determining the Member's vesting in and eligibility for payment of his or her Frozen Accrued Benefit. Service credit for all Members for benefit accrual purposes under the terms of the General Retirement System in effect as of the Freeze Date shall be frozen effective as of the Freeze Date and no Member shall earn service credit with respect to benefits payable under the terms of the General Retirement System in effect as of the Freeze Date (except for vesting and benefit payment eligibility purposes) after the Freeze Date; and

(g)     No Member shall make contributions to the Annuity Savings Fund under the General Retirement System in effect as of June 30, 2014 with respect to wages earned on or after the earliest date following June 30, 2014 that the City's payroll department can implement the freeze. All after tax contributions made on or after the date referenced in the preceding sentence shall be made to and in accordance with the terms of Component I of the Combined Plan.

The foregoing terms shall be referred to as the "Freeze" of the provisions of the General Retirement System as in effect on the Freeze Date and the provisions of Articles I, II, III, or IV of Chapter 47 of the 1984 Detroit City Code and this Component II of the Combined Plan shall be interpreted and construed by the Board of Trustees and the Retirement System to give full effect to the Freeze. To the extent that a conflict arises between this Section B-1, the provisions in Chapter 47, or any collective bargaining agreement or other document governing the terms of employment of any employee, the Board of Trustees and the Retirement System are directed to interpret any inconsistency or ambiguity to give full effect to the Freeze.

# ARTICLE C.  DEFINITIONS

## Sec. C-1.  Definitions

Unless a different meaning is plainly required by context, for purposes of this Component II the following words and phrases have the meanings respectively ascribed to them by this Section C-1:

(1)     *Accrued Service* means a Member's credited service for employment rendered before July 1, 2014.

(2)     *Accumulated Contributions* means the sum of all amounts deducted from the compensation of a Member and credited to the Member's individual account in the Annuity Savings Fund, together with regular interest thereon.

(3)     *Annuity* means the portion of the retirement allowance which is paid for by a Member's accumulated contributions.

(4)     *Annuity Reserve* means the present value of all payments to be made on account of any annuity or benefit in lieu of any annuity.  Such annuity reserve shall be computed upon the basis of such mortality tables and regular interest as shall be adopted by the Board.

(5)     *Average Final Compensation* means:

  a.     On or before June 30, 1992.  For those Members who retired or separated from active service with vested pension rights on or before June 30, 1992, the highest average compensation received by a Member during any period of five consecutive years of credited service selected by the Member from the ten years of credited service which immediately preceded the date of the Member's last termination of City employment. If a Member has less than five years of credited service, the Average Final Compensation shall be the average of the annual compensation received during the Member's total years of credited service.

  b.     On or after July 1, 1992 but before July 1, 1998.  For those Members who retired or separated from active service with vested pension rights on or after July 1, 1992 but before July 1, 1998, the highest average compensation received by a Member during any period of four consecutive years of credited service during the ten years of credited service which immediately preceded the date of the Member's last termination of City employment.  If a Member has less than four years of credited service, the Average Final Compensation shall be the average of the annual compensation received during the Member's total years of credited service.

  c.     On or after July 1, 1998.  For those Members who retire or separate from active service with vested pension rights on or after July 1, 1998, the

highest average compensation received by a Member during any period of three consecutive years of credited service during ten years of credited service which immediately precede the date of the Member's last termination of City employment. If a Member has less than three years of credited service, the Average Final Compensation shall be the average of the annual compensation received during the Member's total years of credited service.

    d.    Sick Leave Election. For those nonunion Members with a regular or early service retirement who retire on or after July 1, 1999, in computing the highest average compensation received by a Member, the Member shall have the option of adding the value of twenty-five percent (25%) of the Member's unused accrued sick leave at the time of retirement to the earnings used in computing the Average Final Compensation. Bargaining unit members who retire on or after July 1, 1999 and prior to July 1, 2014 shall have the Unused Sick Leave On Retirement benefit provided for in the applicable bargaining agreement. For any Member choosing to exercise this option, the lump sum payment the Member will receive will be the remaining value of the unused accrued sick leave bank as provided in the bargaining agreement.

(6)    *Beneficiary* means any person or persons (designated by a Member pursuant to procedures established by the Board) who are entitled to receive a retirement allowance or pension payable from funds of the General Retirement System due to the participation of a Member.

(7)    *Compensation* means:

    a.    On or before June 30, 1992. For those Members retired or separated from active service with vested pension rights, on or before June 30, 1992, all remuneration, excluding longevity payments, paid to a Member because of personal services rendered by the Member to the Employer. Compensation in excess of the limitations set forth in Section 401(a)(17) of the Internal Revenue Code shall be disregarded.

    b.    On or after July 1, 1992. For those Members who retire on or after July 1, 1992, all remuneration, including longevity payments, paid to a Member because of personal services rendered by the Member to the Employer. Compensation in excess of the limitations set forth in Section 401(a)(17) of the Internal Revenue Code shall be disregarded.

(8)    *Conversion* means that date on which a Member's benefits change from disability retirement benefits to normal retirement benefits.

(9)    *Credited Service* means membership service credited to a Member to the extent provided in this Component II.

(10)   *Final Compensation* means a Member's annual rate of compensation at the time employment with all Employers is last terminated.

(11)   *Pension* means, for purposes of this Component II, the portion of a retirement allowance which is paid for by appropriations made by the Employers into the appropriate funds.

(12)   *Pension Reserve* means the present value of all payments to be made on account of any pension, or benefit in lieu of any pension. Such pension reserve shall be computed upon the basis of such mortality and other tables of experience, and regular interest, as shall be adopted by the Board.

(13)   *Regular Interest* means such rate or rates per annum, compounded annually, as the Board of Trustees shall determine in accordance with the limitations contained in Section E-16 of this Component II.

(14)   *Retiree* means a former Member who is receiving a retirement allowance from Component II of the Retirement System.

(15)   *Retirement* means a Member's withdrawal from the employ of the Employers with a retirement allowance or pension paid by Component II of the Retirement System.

(16)   *Retirement Allowance* means the sum of the annuity and the pension.

(17)   *Service* means personal services rendered to the Employer by a person as an employee of the Employer, provided such person is compensated by the Employer for such personal services.

(18)   *Service credit for purposes of the 1973 Defined Benefit/Defined Contribution (Annuity) Plan* means that, in accordance with such rules and regulations as the Board shall adopt, each Member shall be credited with service as follows: (1) One month of service credit is earned when the Member is paid for eighty hours of work during the month; (2) A full year of credit is earned for nine months of credit in any calendar year, except the Member's last year of work, which service credit shall be determined as of the Member's last day on the Employer's payroll. Less than nine months of service rendered in a calendar year shall neither be credited as a full year of service, nor shall more than one year of service be credited to any Member for service rendered in any one calendar year. Service credit is used to determine eligibility for service retirement, vesting, non-duty disability and survivor benefits. Service credit is also earned by a Member while retired on a duty disability or while receiving Workers' Compensation benefits.

The following terms shall have the meanings given to them in the Sections of this Component II set forth opposite such term:

| | |
|---|---|
| 2023 UAAL Amortization | Section G-4(3)a |
| Accrued Liability Fund | Section E-18(d) |

| | |
|---|---|
| Actual Return | Section G-2(5) |
| Adjusted Accrued Benefit | Section G-1(1)a |
| Adjusted Deferred Accrued Benefit | Section G-1(1)b |
| Annuity Reserve Fund | Section E-18(b) |
| Annuity Savings Fund Excess Amount | Section G-2(1) |
| Annuity Savings Fund of the 1973 Defined Contribution Plan | Section E-18(a) |
| ASF | Section G-2 |
| ASF account | Section G-2(1) |
| ASF Recalculation Period | Section G-2 |
| ASF Excess Return | Section E-16(c) |
| ASF Recoupment | Section G-1(1)(c) |
| Cash Option Cap | Section G-2(4) |
| Cash Repayment Option | Section G-2(4) |
| Certificate of Default | Section G-3(7) |
| COLA | Section G-4 |
| Determination Date | Section E-18 |
| Eligible Pensioner | Section G-3(5) |
| Estimated Adjusted Annual Household Income | Section G-3(3)b |
| Excess Assets | Section G-3(7) |
| Expense Fund | Section E-18(f) |
| Extra Contribution Account | Section G-4(3)b |
| Federal Poverty Level | Section G-3(6) |
| Final Payment Notice | Section G-2(4) |
| Freeze | Section B-1 |
| Freeze Date | Section B-1 |
| Frozen Accrued Benefit | Section B-1(c) |
| Funded Level | Section G-4(2) |
| Funding Conditions | Section G-1(1)a |
| Funding Proceeds | Section E-18(d) |
| Funding Target | Sections G-4(2)a, G-4(3)a, G-4(4)a |
| Governor | Section G-4(5) |
| IME | Section E-5(a) |
| Income Fund | Section E-18(g) |
| Income Stabilization Benefit | Section G-3(2) |
| Income Stabilization Benefit Plus | Section G-3(3) |
| Income Stabilization Fund | Section G-3(4) |
| Monthly Annuity Savings Fund Excess Amount | Section G-2(2) |
| Option "A". Joint and Seventy-Five Percent Survivor Allowance | Section E-8(a) |
| Option "B". Joint and Twenty-Five Percent Survivor Allowance | Section E-8(a) |
| Option One.  Cash Refund Annuity | Section E-8(a) |
| Option Three. Joint and Fifty Percent Survivor Allowance | Section E-8(a) |
| Option Two. Joint and One Hundred Percent Survivor | |

Allowance                                      Section E-8(a)
Participant Loan Program                        Section F-1
Pension Accumulation Fund                        Section E-18(c)
Pension Funding Transaction                      Section E-18(d)
Pension Improvement Factor (Escalator)           Sections E-15, G-1(2)
Pension Reserve Fund                             Section E-18(e)
Pension Restoration Agreement                    Section G-4
Permanent Restoration Target                     Section G-4(2)g, G-4(3)a,
                                                 G-4(4)a
Pop-up Form                                      Section E-8(b)(2)
Restoration Reserve Account                      Section G-4(2)a
Restoration Reserve Suspension Trigger           Sections G-4(2)g, G-4(3)a,
                                                 G-4(4)a
Restoration Target                               Sections G-4(2)a, G-4(3)a,
                                                 G-4(4)a
Sick Leave Rollover                              Section B-1(e)
Special Election                                 Section B-1(e)
Standard Form                                    Section E-8(b)(1)
Straight Life Retirement Allowance               Section E-8(a)
Transition Cost                                  Section E-16(c)
UAAL                                             Sections E-18(d), G-4
Waterfall Classes                                Section G-4(1)

# ARTICLE D.  SERVICE CREDIT

## Sec. D-1.  Service Credit

The Board shall keep an accurate record of each employee's accumulated service credit from the date of commencement of employment with the Employers.

## Sec. D-2.  Service Credit; Former Employees of the Founder's Society—Detroit Institute of Arts

Pursuant to Section 6-519 of the 1974 Detroit City Charter, and for the sole purpose of computing service credit to determine eligibility for a retirement allowance from the General Retirement System, a person who was inducted into the classified service of the City during the calendar year 1984 as a result of the transfer of certain functions at the Detroit Institute of Arts from The Founder's Society/Detroit Institute of Arts to the City, shall be credited with service credit equivalent to continuous time worked as a full time employee of the Founder's Society/Detroit Institute of Arts retroactive to January 1, 1984.  Such Founder's Society/Detroit Institute of Arts service credit shall have no effect upon the amount of retirement benefits paid by the General Retirement System.  Such Founder's Society/Detroit Institute of Arts service credit shall be added to the service credit earned as a City employee only for purposes of meeting service credit eligibility requirements under the General Retirement System.  The Board of Trustees of the General Retirement System shall make all determinations of crediting of such Founder's Society/Detroit Institute of Arts service credit in accordance with the provisions of this Component II of the Combined Plan.

## Sec. D-3.  Service Credit; Transfer to Other Governmental Service

A Member transferred from the City payroll by his or her department head to the payroll of any City, county, state, or federal government to serve the interests of the City during peace time shall continue to be a Member of the Retirement System for purposes of service credit in accordance with the ordinance or resolution passed to implement such transfer.

## Sec. D-4.  Service Credit; Military Service

An Employee of the Employer who enters the military service of the United States while so employed shall have such service credited as City service for purposes of this Component II in the same manner as if the employee had served the employer without interruption, provided that (1) the employee's entry into such service and re-employment thereafter shall be in accordance with applicable laws, ordinances, and regulations of the State of Michigan and the City, and (2) he or she is re-employed by the Employer upon completion of such service.  During the period of service and until return to City employment, his or her contributions to the fund shall be suspended and the fund balance shall be accumulated at regular interest.

## Sec. D-5.  Service Credit; Qualified Military Service (Pre-Employment Service)

(a)     Notwithstanding any provision of this Component II to the contrary, contributions, benefits, and service credit with respect to qualified military service, shall be provided in accordance with Section 414(u) of the Internal Revenue Code.  Up to three years of pre-

employment service credit may be purchased prior to June 30, 2014 for the following periods: service for a period of not less than ninety days between (1) the date of declaration of war by Congress and the recognized date of cessation of military hostilities; (2) the onset of World War II on December 8, 1941 to its conclusion on July 1, 1946; (3) the onset of the Korean Conflict on June 27, 1950 to its conclusion on December 31, 1953; (4) the onset of the Vietnam Conflict on February 28, 1961 to its conclusion on May 7, 1975, or (5) beginning on the date of the recognition of an emergency condition by the issuance of a presidential proclamation or a presidential executive order, during which emergency condition the Member received the Armed Forces Expeditionary or other Campaign Service Medal authorized by the Federal Government for the Expedition or Campaign.

(b)    This time may be applied toward a Member's credited service and may be used in meeting the minimum time needed for an automatic Option Two or automatic Option Three pension.

(c)    This time shall not apply toward meeting the minimum service and age requirements for vesting, for a non-duty disability pension, or for a service pension.

## ARTICLE E.  DEFINED BENEFIT/DEFINED CONTRIBUTION (ANNUITY) PLAN OF THE GENERAL RETIREMENT SYSTEM

### Sec. E-1.  Membership

The membership of the General Retirement System 1973 Defined Benefit/Defined Contribution (Annuity) Plan – Component II of the Combined Plan - shall consist of all persons who are full time employees of the Employer except:

(a)     persons who are members of the Police and Fire Retirement System of the City of Detroit, Michigan, established under Title IX, Chapter VII of the 1918 Detroit City Charter and continued in the 1974, 1997 and 2012 Detroit City Charters and as continued in the form of the Combined Plan for the Police and Fire Retirement System for the City of Detroit, Michigan, effective July 1, 2014 and as thereafter amended;

(b)     persons who are hired or rehired by an Employer on or after July 1, 2014; and

(c)     Any person who is a member of any other public employee pension or retirement plan adopted by the State of Michigan, other than the Michigan National Guard, or by any other political subdivision of the State of Michigan.

Special Service employees who worked more than fourteen hundred forty (1440) hours per Fiscal Year ending on or before June 30, 2014 will be eligible to participate in Component II of the Retirement System.

### Sec. E-2.  Cessation of Membership; Re-Employment by the Employer

(a)     Any Member who retires under Section E-3(a), (b), or (c), or dies, shall have a non-forfeitable right to a benefit.

(b)     With respect to persons not on the active payroll prior to October 1, 2005, the following provisions of this subsection shall apply:

(1)     Except as otherwise provided for in this Component II, if any non-vested Member leaves City employment for any reason other than retirement or death, such person shall thereupon cease to be a Member and his or her credited service at that time shall be forfeited.  In the event of re-employment by the City prior to July 1, 2014, such person shall again become a Member of the Retirement System and shall accrue benefits pursuant to Component II of the Combined Plan.  In the event of reemployment by the employer on or after July 1, 2014, such person shall again become a Member of the Retirement System and shall accrue benefits pursuant to Component I of the Combined Plan.  If re-employment occurs prior to July 1, 2014 and within a period of six (6) years from and after the date City employment last terminated, credited service last forfeited shall be restored to the employee's credit for purposes of accruing a benefit after re-employment.

(2)     With respect to persons on the active payroll on or after October 1, 2005, re-employment prior to July 1, 2014 shall restore any previously forfeited service credit notwithstanding the time of re-employment.

(c)     Vested former employees rehired prior to receiving pension benefits and prior to July 1, 2014.

(1)     Former employees who are vested but have not yet begun to receive pension benefits who are rehired prior to July 1, 2014 and prior to being separated for six (6) years shall have their pensions calculated in accordance with the rules in effect at the earlier of (i) the time of their last termination of active service or retirement and (ii) June 30, 2014.

(2)     Former employees who are vested but have not begun to receive pension benefits and are rehired after July 1, 1992 but prior to July 1, 2014 and after being separated for more than six (6) years who accumulate enough service credit to be eligible for a second pension shall be entitled to two (2) separate and distinct pensions, each to be calculated in accordance with the rules in effect at the earlier of (i) the time of each separation from service and (ii) June 30, 2014.

(3)     An employee who becomes eligible to collect his or her previously vested pension while still working, shall not be eligible to receive his or her vested pension but will be entitled to have the pension improvement factor earned through June 30, 2014 added to the vested amount of the original pension for payment when the employee eventually retires.  The basic pension amount of twelve dollars ($12.00) per year for up to ten (10) years will only be included on the employee's original pension.

(d)     Vested former employees rehired prior to receiving pension benefits and on or after July 1, 2014.

(1)     Former employees who are vested but have not yet begun to receive pension benefits who are rehired prior to being separated for six (6) years and on or after July 1, 2014 shall have their Component II pension calculated in accordance with the rules in effect on June 30, 2014 and their Component I pension calculated in accordance with the rules in effect at the time of their last termination of active service or retirement.

(2)     Former employees who are vested but have not begun to receive pension benefits and are rehired after July 1, 2014 after being separated for more than six (6) years who accumulate enough service credit to be eligible for a Component I pension shall be entitled to two (2) separate and distinct pensions under Component I and Component II, each to be calculated in accordance with the rules in effect at the time of each separation from service.

(3)     An employee who becomes eligible to collect his or her previously vested pension while still working, shall not be eligible to receive his or her vested pension but will be entitled to have the pension improvement factor added to the vested

amount of the original pension for payment when the employee eventually retires. The basic pension amount of twelve dollars ($12.00) per year for up to ten (10) years will only be included on the employee's original pension.

(e)    Retirement benefits for retirees who return to active full time employment prior to July 1, 2014.

(1)    Retirees who return to work will have their pension benefit amount suspended upon re-employment. However, retirees who have not withdrawn the amounts credited to their defined contribution account shall be entitled to continue to receive the monthly annuity from the 1973 Defined Contribution Plan. The pension improvement factor shall continue to be added to the vested amount of the original pension but shall not be paid on the defined benefit amount until the employee again separates from service.

(2)    Retirees who return to work prior to July 1, 2014 will be entitled to receive a second pension benefit in accordance with the rules in effect at the earlier of (1) their final separation, or (ii) June 30, 2014, with respect to service credit earned after the retiree returns to active employment. Previous service credit will be used to determine the retirement factors that will be credited to service time earned after return to active employment and used to calculate the new pension amount.

(3)    Average Final Compensation will be based upon the amounts earned after the retiree returns to work through the earlier of (1) their final separation and (ii) June 30, 2014.

(4)    Employees who retire under this Section E-2(e) for a second time will not be allowed to change the original option selection with respect to the original pension benefit. However, employees may make a separate option selection on their second pension benefit amount.

(5)    The basic pension amount of twelve dollars ($12.00) per year for up to ten (10) years will be included only on the employee's original pension.

(6)    The coordination of benefits (equated Social Security) option will not be available on a second pension amount.

(7)    If a retiree who returns to work and dies while working, had an accumulated combined total service time of at least twenty years, the employee's Spouse will be eligible for automatic Option Two benefits, notwithstanding the option form of retirement originally elected.

(8)    If a retiree who returns to work and dies while working had an accumulated combined total service time of at least fifteen years but less than twenty years, the employee's Spouse will be eligible for automatic Option Three benefits, notwithstanding the option form of retirement originally elected.

13-53846-swr  Doc 8045-1  Filed 10/22/14  Entered 10/22/14 05:47:23  Page 104 of
13-53846-tjt  Doc 8045-1  Filed 10/22/14  Entered 10/22/14 05:48:23  Page 104 of
429

(9)     If the employee returns to work and dies prior to accumulating a combined total of fifteen years of service credit, the original pension and benefit option chosen shall resume unless the employee had chosen the Straight Life Option which would result in no survivor pension benefits.

(10)    The Board of Trustees will determine all entitlements for re-employed individuals on a case by case basis consistent with this section and will resolve all issues based upon special circumstances or unique situations.

## Sec. E-3. Service Retirement

(a)     *Retirement after thirty years of service.*  Any Member hired prior to January 1, 1996 who has accumulated at least thirty or more years of credited service regardless of age, or, for any Member who was hired on or after January 1, 1996 and who has accumulated at least thirty or more years of credited service and has attained age fifty-five, may retire upon written application filed with the Board setting forth the date on which the Member desires to be retired.  The date of retirement shall be effective on the first day following the Member's last day on City payroll.  Upon retirement, the Member shall receive a retirement allowance as provided in Section E-4 of this Component II of the Combined Plan.

(b)     *Retirement after twenty-five years of service.*  Any Employee who is covered by the provisions of this Component II and who is a member of the International Union of Operating Engineers IUOE Local 324 (Principal Clerks), the International Brotherhood of Teamsters Teamster Local 214, the Police Officers Association of Michigan, or the Emergency Medical Service Officers Association, who on July 1, 1995, or later has twenty-five (25) or more years of credited service may retire upon his or her written application filed with the Board of Trustees setting forth the date on which the Member desires to be retired.  The date of retirement shall be effective on the first day following the Member's last day on City payroll.  Upon retirement the Member shall receive a Retirement Allowance as provided in Section E-4 of this Component II of the Combined Plan.

(c)     *Retirement at age sixty-five with eight years of service; at age sixty with ten years of service.*

(1)     Sixty-five and eight.  Any Member who has attained sixty-five years of age and has at least eight years of credited service may retire upon written application filed with the Board setting forth an anticipated retirement date.

(2)     Sixty and ten.  Any Member who has attained sixty years of age and has at least ten years of credited service may retire upon written application filed with the Board setting forth an anticipated retirement date.

The date of retirement shall be effective on the first day following the Member's last day on City payroll.  Upon retirement, the former Member shall receive the retirement allowance provided for in Section E-4 of this Component II of the Combined Plan.

(d)  *Conversion of Duty-Disability benefit to Retirement Allowance.*

(1)  Retirees who are members of the Emergency Medical Service Officers Association or the Police Officers Association of Michigan and who began receiving a Duty Disability Pension after July 1, 1995 may choose to convert to a service retirement at the time they would have had twenty-five (25) years of service with the City.

(e)  *Retirement after twenty-five years of service without attaining age sixty years; reduced pension.*

(1)  Early retirement.  Any Member of the Retirement System who is on the payroll on or after July 1, 1992, and who has twenty-five years of credited service and has not attained sixty years of age, shall have the option of early retirement by accepting an actuarially reduced retirement allowance as determined by the Board after consultation with the Plan Actuary, notwithstanding the age of the Member who elects early retirement; provided however that any Member hired by an Employer on or after January 1, 1996 must have twenty-five years of credited service and have attained age fifty-five to have such early retirement option.  Said election shall be made within ninety days of separation from City service. Actuarial tables provided by the Plan Actuary shall always provide this actuarially reduced retirement allowance at no cost to the employee.

Notwithstanding the foregoing, any Member hired by an Employer on or after January 1, 1996 who has twenty-five years of credited service and has attained age fifty-five shall have the option of early retirement by accepting

(2)  Fringe benefits.  Employees utilizing the early retirement provision in Section E-3(e)(1) will not be entitled to the fringe benefits, if any, accruing to employees who qualify for a normal service retirement until such time as they would have qualified for a normal service retirement under Section E-3(a) or (b) of this Component II of the Combined Plan.

(f)  *Vested retirement allowance; age forty and eight years of service; ten years of service regardless of age.*

(1)  Eligibility.

a.  Any Member hired before July 1, 1980 who has reached forty years of age and has acquired eight or more years of credited service shall be eligible to receive benefits provided by Section E-3(f)(2) of this Component II of the Combined Plan.

b.  Any Member hired on or after July 1, 1980 who has acquired ten years of credited service shall be eligible to receive the benefits provided by Section E-3(f)(2) of this Component II of the Combined Plan, regardless of age.

    c.        Any non-union Member hired on or after July 1, 1980 but before March 31, 1992 who has acquired ten years of credited service regardless of age or has reached age forty with eight or more years of credited service, whichever is earlier, shall be eligible to receive benefits provided by Section E-3(f)(2) of this Component II of the Combined Plan.

(2)    *Benefits*.

    a.        Any Member described in Section E-3(f)(1) of this Component II who left City employment on or before June 30, 1992 but prior to the date the Member would have first become eligible to retire as provided in Section E-3(a), (b) or (c) of this Component II of the Combined Plan, for any reason except discharge for reasons covered by the State Forfeiture Law, retirement or death, shall be entitled to a retirement allowance based upon one point five percent (1.5%) of Average Final Compensation for the first ten years of service and one point six three percent (1.63%) for service in excess of ten years.  There shall be no change to the base pension upon which future increases are based.

    b.        Any Member described in Section E-3(f)(1) of this Component II of the Combined Plan who leaves City employment on or after July 1, 1992, but prior to the date the Member would have first become eligible to retire as provided in Section E-3(a), (b) or (c) of this Component II of the Combined Plan, for any reason except discharge for reasons covered by the State Forfeiture Law, retirement or death, shall be entitled to a retirement allowance computed according to Section E-4 of this Component II of the Combined Plan.

(3)    *Commencement of retirement allowance*.  The retirement allowance shall begin on the first day of the calendar month following the month in which a retirement application is filed with the Board, on or after that date on which the Member would have been eligible to retire with an unreduced service retirement under Section E-3(a) or (b) of this Component II of the Combined Plan, had City employment continued or on the date when age sixty is reached, whichever is earlier.  Unless otherwise provided in this Article, no service credit shall be earned for the period of absence from City employment and such person's beneficiary shall not be entitled to any other benefit afforded in this Article except those benefits afforded either in Section E-3 or in Section E-4 of this Component II of the Combined Plan notwithstanding termination of membership.

(4)    *Withdrawal of accumulated contributions*.  Upon separation from City employment, Members who qualify for benefits pursuant to Section E-3(f)(1) of this Component II of the Combined Plan  may withdraw their 1973 Defined Contribution Plan accumulated contributions and all other funds standing to their credit in the Annuity Savings Fund at that time without affecting their benefits under Section E-3(f)(2) or E-4 of this Component II of the Combined Plan.

In the event that any law, State or Federal, is passed during the term of the collective bargaining agreement or City Employment Terms agreement which permits Employees to vest their pension prior to meeting the vesting requirements set forth in this Component II, any Employee who vests his or her pension in such a manner shall not be eligible for any pension benefits until his or her sixty-second (62nd) birthday. This provision will not affect the current practice governing disabled Employees.

### Sec. E-4. Service Retirement Allowance

Upon retirement, a Member who meets the qualifications set forth in section E-3(a), (b) or (c) of this Component II of the Combined Plan, shall receive a Straight Life Retirement Allowance, and shall have the right to elect to receive in lieu of the Straight Life Retirement Allowance, a reduced retirement allowance under an option provided for in E-8 of this Component II of the Combined Plan.

The Straight Life Retirement Allowance shall consist of:

(a)  An Annuity which shall be the actuarial equivalent of the Member's accumulated contributions in the 1973 Defined Contribution Annuity Savings Fund at the time of retirement; and

(b)  A Basic Pension of twelve dollars ($12.00) per annum multiplied by the number of years, and fractions of years of credited service, not to exceed ten (10) years; and

(c)  A Membership Service Pension.

(1)  For Members who retire on or before June 30, 1992, a membership service pension of one point five percent (1.5%) of Average Final Compensation for the first ten (10) years of service and one point six three percent (1.63%) for service in excess of ten (10) years.

(2)  For Members who retire on or after July 1, 1992 but prior to July 1, 1998, a membership service pension of one point five percent (1.5%) of Average Final Compensation for each year of service for the first ten (10) years, plus one point seven percent (1.7%) of Average Final Compensation for each year of service in excess of ten (10) years up to twenty (20) years of service, plus one point nine percent (1.9%) of Average Final Compensation for each year of service in excess of twenty years. In no event shall benefits paid by the Retirement System exceed ninety percent (90%) of Average Final Compensation.

(3)  For Members who retire on or after July 1, 1998, a membership service pension for service rendered prior to July 1, 2012 of one point six percent (1.6%) of Average Final Compensation for each year of service for the first ten (10) years, plus one point eight percent (1.8%) of Average Final Compensation for each year of service in excess of ten (10) years, up to twenty (20) years of service, plus two percent (2%) of Average Final Compensation for each year of service in excess of twenty (20) years up to twenty-five (25) years, plus two point two percent (2.2%) of Average Final Compensation for each year of service in excess of twenty-five

(25) years; plus, for service rendered after July 1 2012 and prior to July 1, 2014, one and one-half percent (1.5%) of Average Final Compensation for each year of service; plus twelve dollars ($12) for each year of City service not to exceed one hundred twenty dollars ($120). Notwithstanding the foregoing, for members of the Michigan Council 25 of the American Federation of State, County and Municipal Employees, AFL-CIO Local 2920 and the Detroit Senior Water Systems Chemists Association bargaining units, the effective date of the one and one-half percent multiplier was April 1, 2013 for all years of service rendered after that date. In no case shall benefits paid by the Retirement System exceed ninety percent (90%) of Average Final Compensation.

(d)     With respect to regular service retirees under Section E-3(a) and (b) of this Component II of the Combined Plan only and excluding persons who receive vested benefits under Section E-3(c) and (d) of this Component II of the Combined Plan, in no case shall the total of the annual Straight Life Pension be less than three hundred sixty dollars ($360.00) times each of the first ten (10) years of service at retirement, plus one hundred twenty dollars ($120.00) for each year of service in excess of ten (10) years. Effective July 1, 2007, each year of service in excess of ten (10) years earned prior to July 1, 2014 shall be calculated using two hundred twenty-five dollars ($225.00).

(e)     The recalculation of the pension benefit shall include previous pension improvement factors but shall not include special increases granted by prior separate ordinances.

(f)     If a retiree dies before receipt of Straight Life Retirement allowance payments in an aggregate amount equal to, but not exceeding, the retiree's accumulated contributions in the Annuity Savings Fund at the time of retirement, the difference between these accumulated contributions and the aggregate amount of Straight Life Retirement allowance payments received, shall be paid to such person or persons nominated by written designation duly executed by the retiree and filed with the Board. If there is no such designated person or persons surviving the retiree, such difference shall be paid to his or her estate. In no case shall any benefits be paid under this section because of the death of a retiree if the retiree had elected any of the Options provided for in Section E-8 of this Component II of the Combined Plan.

## Sec. E-5. Disability Retirement

(a)     *Duty Disability; Eligibility.*  Upon the application of a Member or the Member's department head, a Member who becomes totally and permanently incapacitated for duty in the employ of the Employer shall be retired by the Board; provided, such incapacity is found by the Board to be the natural and proximate result of the actual performance of duty, without willful negligence on the part of the Member; provided further, that any employee who is seeking a duty disability retirement, shall have an examination conducted by an independent medical examiner ("IME"). If the IME concludes that the employee's physical or medical condition does not relate to his/her employment with the City, the employee shall not be eligible for the duty disability retirement.

(b)     *Duty disability; Benefits.*  Upon retirement for disability as provided in Section E-5(a) of this Component II of the Combined Plan, a retiree shall receive the following benefits:

(1)     Any Member who is eligible for a Service Retirement under Section E-3(a) or (b) of this Component II of the Combined Plan shall receive a Service Retirement Allowance as provided in Section E-4 of this Component II of the Combined Plan and shall have the right to elect an option provided for in Section E-8 of this Component II of the Combined Plan.

(2)     Any Member prior to eligibility for a Service Retirement under Section E-3(a) or (b) of this Component II of the Combined Plan shall receive a Disability Retirement Allowance to begin as of the date of disability.  In no case shall the Disability Retirement Allowance be retroactive to more than six months before the date the application for Disability Retirement is filed with the Board, or prior to the date the Member's name last appeared on a City payroll with pay, whichever is later.  The Disability Retirement Allowance shall continue until the Member reaches eligibility for Service Retirement or recovers prior to that event.  Upon reaching eligibility for Service Retirement, he or she shall receive a pension as provided in Sections E-4(b)-(e) of this Component II of the Combined Plan, together with an annuity which shall be the equivalent of the annuity which would have been received had contributions to the Annuity Savings Fund continued.  Said contributions are to be based on the final compensation at the date of duty disability and the annuity percentage in effect for the employee on the July first prior to the effective date on which the employee is added to the disability retirement payroll, provided said July first is at least six months prior to the effective date that the employee is added to the regular retirement payroll.  In computing the pension, membership service credit shall be given for the period a Duty Disability Retirement Allowance is received.  The Disability Retirement Allowance shall consist of:

(i)     Cash Refund Annuity which shall be the actuarial equivalent of the Member's accumulated contributions in the Annuity Savings Fund at the time of retirement.  If a retiree dies before receipt of annuity payments in an aggregate amount equal to, but not exceeding, the retiree's accumulated contributions, the difference between the accumulated contributions and the aggregate amount of annuity payments received shall be paid in a single lump sum to such person or persons nominated by written designation duly executed and filed with the Board.  If there is no such designated person surviving the retiree, such difference shall be paid to the retiree's estate.

(ii)    In addition to the Annuity, a Disability Pension of sixty-six and two-thirds percent (66-2/3%) of the Member's Average Final Compensation at the time of duty disability, subject to the provisions of Sections E-12 and E-13 of this Component II of the Combined Plan.  This Disability Pension shall in no event exceed fifty-seven hundred dollars ($5,700.00) per annum.

(iii) For Members who retired on disability on or after January 1, 1999 or on or after July 1, 2012 for members of the Emergency Medical Service Officers Association and Police Officers Association of Michigan bargaining units, in addition to the Annuity, a Disability Pension of sixty-six and two-thirds percent (66-2/3%) of the Member's average compensation at the time of duty disability, subject to the provisions of Sections E-12 and E-13 of this Component II of the Combined Plan. This Disability Pension shall in no event exceed nine thousand dollars ($9,000.00) per annum.

(c) *Non-Duty Disability; Eligibility.* Upon the application of a Member or the Member's department head, a Member who has at least ten years of credited service who becomes totally and permanently incapacitated for duty as a result of causes which do not occur in the actual performance of duty to the employer, may be retired by the Board if the IME certifies to the Board after examination that such Member is mentally or physically totally incapacitated for the further performance of duty, that such incapacity is likely to be permanent, and that such Member should be retired.

(d) *Non-Duty Disability; Benefits.* Upon retirement for non-duty disability as provided in Section E-5(c) of this Component II of the Combined Plan, a Member shall receive the following benefits:

(1) After attaining sixty years of age, a Member shall receive a Service Retirement Allowance as provided in Section E-4 of this Component II of the Combined Plan and shall have the right to elect an Option as provided in Section E-8 of this Component II.

(2) Prior to age sixty, a Member shall receive benefits as provided in Section E-5(d)(2)(i)-(iv) of this Component II of the Combined Plan:

i. A Cash Refund Annuity which shall be the actuarial equivalent of the Member's accumulated contributions in the Annuity Savings Fund at the time of retirement. In the event a retiree dies before the total of the Cash Refund Annuity payments received equals or exceeds the amount of his or her accumulated contributions at the time of retirement, the remainder shall be paid in a single lump sum to such person or persons nominated by written designation duly executed by the Member and filed with the Board. If there is no such designated person or persons surviving, any such remainder shall be paid to the retiree's estate.

ii. In addition to the Annuity, a Disability Pension which shall be based on the Service Retirement factors in effect on the effective date of disability. The service retirement factors shall be multiplied by the Average Final Annual Compensation multiplied by the number of years and fractions of years of service credited to the retiree. In addition, a basic pension of twelve dollars ($12.00) per annum for a maximum of ten years of credited service shall be added for a total not to exceed one hundred twenty dollars ($120.00) and adjustments thereto, as calculated pursuant to applicable

provisions of this Component II of the Combined Plan. Said Disability Pension shall begin as of the date of the disability. However, in no case shall the Disability Pension begin more than six months before the date the application for disability retirement was filed with the Board, or prior to the date his or her name last appeared on a City payroll with pay, whichever is later. Payment of the Disability Pension shall continue to age sixty. Said Disability Pension shall not exceed thirty-nine hundred dollars ($3,900.00) per annum, and shall be subject to the provisions of Sections E-12 and E-13 of this Component II of the Combined Plan.

iii.    A Member who retired on disability on or after January 1, 1999 shall receive a Disability Pension as provided for in Section E-5(d)(2)(ii) of this Component II of the Combined Plan. Said Disability Pension shall not exceed six thousand dollars ($6,000.00) per annum, and shall be subject to the provisions of Sections E-12 and E-13 of this Component II of the Combined Plan.

iv.    Effective July 1, 1967, notwithstanding the limitations contained in Section E-5(d)(2)(ii) of this Component II of the Combined Plan, disability retirees under Section E-5(c) of this Component II of the Combined Plan, who retired (1) prior to August 13, 1953, shall receive a supplementary Disability Pension of forty dollars ($40.00) per month; or (2) after August 13, 1956 and prior to July 1, 1966, shall receive a supplementary Disability Pension of twenty dollars ($20.00) per month.

v.    Upon Attaining Age Sixty, the retiree shall receive a Pension computed according to the provisions of Section E-4(b)-(e) of this Component II of the Combined Plan; provided, that no service credit shall be given for the time a Disability Pension provided for in Section E-5(d)(2)(ii) of this Component II of the Combined Plan was received. Upon attaining age sixty, the retiree shall have the right to make an election under Section E-8 of this Component II of the Combined Plan.

**Sec. E-6. Accidental Death Benefit; Performance of Duty**

If a Member is killed in the performance of duty in the service of the employer, or dies as the result of illness contracted or injuries received while in the performance of duty in the service of the employer, and such death, illness, or injuries resulting in death, is found by the Board to have resulted from the actual performance of duty in the service of the employer, the following benefits shall be paid, subject to Section E-12 of this Component II of the Combined Plan:

(a)    *Annuity Savings Fund.* Accumulated savings in the Member's Annuity Savings Fund at the time of death shall be paid in a single lump sum to such person or persons as the Member nominated in a writing duly executed and filed with the Board. In the event there is no designated person or persons surviving the Member, the accumulated contributions shall be paid to the Member's estate.

(b)     *A Pension* of one-third of the final compensation of said Member shall be paid to the surviving Spouse to continue until remarriage.  If an unmarried child, or children under age eighteen also survive the deceased Member, each surviving child shall receive a pension of one-fourth of said final compensation, to be divided equally.  Upon any such child's adoption, marriage, attainment of age eighteen, or death, whichever occurs first, such child's pension shall terminate and there shall be a redistribution by the Board to the surviving eligible children under age eighteen.  In no event shall any child receive a pension of more than one-fourth of said final compensation.

(c)     *No Surviving Spouse; Children*.  If there is no surviving Spouse, or if such surviving Spouse dies or remarries before the youngest surviving child of a deceased Member shall have attained the age of eighteen, any unmarried child or children under age eighteen, if any, shall receive a Pension equal to one-fourth of the deceased Member's final compensation; provided, that if there are more than two such surviving children, each shall receive a pension of an equal share of one-half of said final compensation.  Upon any such child's adoption, marriage, attainment of age eighteen, or death, whichever occurs first, the child's Pension shall terminate and there shall be a redistribution by the Board to the surviving eligible children under age eighteen.  In no case shall any such child's Pension be more than one-fourth of the deceased Member's final compensation.

(d)     *Annual Limit*.  The total amount payable under Section E-6(b) and (c) of this Component II of the Combined Plan on account of the death of a Member, shall not exceed nine thousand dollars ($9,000.00) per annum.

(e)     *Dependent Father and/or Mother*.  If the deceased Member has no surviving Spouse or children eligible for a Pension under this section, a Pension equal to one-sixth of the deceased Member's final compensation shall be paid to the Member's surviving dependent father and/or mother; provided that in no case shall either parent's Pension exceed fifty dollars ($50.00) per month.  Payment to a dependent parent or parents shall be contingent upon a finding by the Board of Trustees after investigation that such parent or parents were actually dependent upon said deceased Member through a lack of earning power resulting from physical or mental disability.

(f)     *Section E-12 of Component II of the Combined Plan Applicable*.  The benefits provided in Section E-6 of this Component II shall be subject to Section E-12 of this Component II.

**Sec. E-7.  Accumulated Contributions; Return of 1973 Defined Contribution Plan Amount**

(a)     *Cessation of Employment*.

        (1)     If a Member ceases to be an employee of the employer before becoming eligible for a Pension paid out of City contributions to the Retirement System, such Member shall be paid all or part of the Member's Annuity Savings Fund, being the 1973 Defined Contribution Plan amount, as the Member shall demand by written application filed with the Board.

(2)     Except as otherwise provided in this Article, upon the death of a Member, the Member's Annuity Savings Fund shall be paid to such person or persons nominated in a written designation duly executed by the Member and filed with the Board.  In the event there is no such designated person or persons surviving, the Member's said accumulated contributions shall be paid to the Member's estate.

(3)     If a Member who dies without a legal will is not survived by a Spouse and has not nominated a beneficiary as provided in Section E-7(a)(2) of this Component II, the Member's accumulated Annuity Savings Fund contributions at the time of death may be used to pay burial expenses, if the Member leaves no other estate sufficient for such purpose.  Such expenses shall not exceed a reasonable amount as determined by the Board.

(4)     Accumulated contributions to be returned as provided in this section may be paid in equal monthly installments for a period not to exceed three years, according to such rules and regulations as the Board may adopt from time to time.  After a Member ceases to be a Member, any balance in the Annuity Savings Fund which is unclaimed by the said Member or the Member's heirs, shall remain a part of the funds of the Retirement System and shall be transferred to the Pension Accumulation Fund.

(b)     *One-Time Withdrawal; Twenty-Five Years*.  Prior to the receipt of the first retirement benefit check, an employee with twenty-five or more years of service shall be allowed to withdraw either a partial or full amount of his or her accumulated contributions, one time only.

(c)     *One-Time Withdrawal; Duty and Non-Duty Disability Retirees*.  Duty and non-duty disability retirees shall be allowed to withdraw either a partial or full amount of their accumulated contributions, one time only.

(d)     *One-Time Withdrawal*.  Withdrawal by a Member under either (b) or (c) of this Section E-7 constitutes the one time withdrawal allowed.

## Sec. E-8.  Retirement Allowance Options

(a)     *Election by Member*.  Until the earlier of the first time a retirement allowance payment check is cashed, or six months after the first payment check is issued, but not thereafter, any Member may elect to receive a Straight Life Retirement Allowance payable throughout life, or the Member may elect to receive the actuarial equivalent of the Straight Life Retirement Allowance computed as of the effective date of retirement, in a reduced retirement allowance payable throughout life, with the exception that there will be no reduction in the benefits received pursuant to Section E-4(e) of this Component II of the Combined Plan, and nominate a beneficiary to receive benefits following the Member's death, in accordance with the options set forth below:

*Option One.  Cash Refund Annuity*.  If a retiree who elected a Cash Refund Annuity dies before payment of the annuity portion of the reduced retirement allowance has been

received in an aggregate amount equal to, but not exceeding the retiree's accumulated contributions in the Annuity Savings Fund at the time of retirement, the difference between said accumulated contributions and the aggregate amount of annuity payments already received, shall be paid in a single lump sum to such person or person nominated by written designation duly executed by the Member and filed with the Board. If no such designated person or persons survive the retiree, any such difference shall be paid to the retiree's estate.

*Option Two. Joint and One Hundred Percent Survivor Allowance*. Upon the death of a retiree who elected a Joint and One Hundred Percent Survivor Allowance, one hundred percent of the reduced retirement allowance shall be paid to and continued throughout the life of the person nominated by written designation duly executed and filed with the Board prior to the date the first payment of the retirement allowance becomes due.

*Option "A". Joint and Seventy-Five Percent Survivor Allowance*. Upon the death of a retiree who elected a Joint and Seventy-Five Percent Survivor Allowance, seventy-five percent of the reduced retirement allowance shall be continued throughout the life of and paid to the person nominated by written designation duly executed by the Member and filed with the Board prior to the date the first payment of the retirement allowance becomes due.

*Option Three. Joint and Fifty Percent Survivor Allowance*. Upon the death of a retiree who elected a Joint and Fifty Percent Survivor Allowance, fifty percent of the reduced retirement allowance shall be continued throughout the life of and paid to the person nominated by written designation duly executed by the Member and filed with the Board prior to the date the first payment of the retirement allowance becomes due.

*Option "B". Joint and Twenty-Five Percent Survivor Allowance*. Upon the death of a retiree who elected a Joint and Twenty-Five Percent Survivor Allowance, twenty-five percent of the reduced retirement allowance shall be paid throughout the life of the person nominated by written designation duly executed and filed with the Board prior to the date the first payment of the retirement allowance becomes due.

(b)  *Joint and Survivor Optional Forms of Payment*. The Joint and Survivor Optional Forms of Payment provided under Section E-8(a) of this Component II of the Combined Plan shall be made available in either the standard form or the pop-up form, as follows:

   (1)  *Standard Form*. Under the Standard Form, the reduced retirement allowance shall be paid throughout the lifetime of the retiree.

   (2)  *Pop-up Form*. Under the Pop-up Form, the reduced allowance shall be paid throughout the lifetime of the retiree and the designated beneficiary. In the event of the death of the designated beneficiary during the lifetime of the retiree, the amount of the allowance shall be changed to the amount that would have been payable had the retiree elected the Straight Life Retirement Allowance form of payment.

(c) *Coordination of Benefits.* According to such rules and regulations as the Board shall adopt, until the first payment of a retirement allowance becomes due, but not thereafter, a Member under age sixty-five may elect to have the Member's Straight Life Retirement Allowance provided for in Section E-4 of this Component II of the Combined Plan equated on an actuarial equivalent basis to provide an increased retirement allowance payable to age sixty-two or age sixty-five, and to provide a decreased retirement allowance thereafter. The increased retirement allowance payable to such age shall approximate the total of the decreased retirement allowance payable thereafter and the estimated social security benefit. If a Member elects to receive increased and then decreased retirement allowance payments provided for in this paragraph, he or she may also elect to have such payments reduced by electing one of the optional forms of payment provided for in paragraph (a) of this section. This coordination of benefits option shall not create any additional actuarial costs.

## Sec. E-9. Benefits for Surviving Spouses; Generally

(a) The surviving Spouse of any Member who dies while in the employ of the City or in the employ of a second governmental unit as provided in Section E-14 of this Component II after the date such Member either (1) has earned twenty years of credited service regardless of age, or (2) has earned eight years of credited service and has attained age sixty-five, or (3) has earned ten or more years of credited service and has attained age sixty, shall receive a retirement allowance. The Spouse's retirement allowance shall be computed according to Section E-4 of this Component II of the Combined Plan in the same manner in all respects as if the said Member had retired effective the day preceding the Member's death, notwithstanding that the Member had not attained age sixty, elected a Joint and One Hundred Percent Survivor Allowance as provided for in Section E-8 of this Component II, and nominated the surviving Spouse as beneficiary. No payments shall be made under this Section E-9 on account of the death of a Member if any benefits are paid under Section E-6 of this Component II. If an Employee dies with twenty (20) years of service and without a surviving Spouse, dependent children shall be paid a total of nine thousand dollars ($9,000.00) per year which shall be divided equally among all eligible dependent children until the youngest child reaches age nineteen, or for life, if a child is permanently physically or mentally impaired and such impairment occurred prior to the child's attainment of age nineteen. There shall be no retirement escalator for this payment.

(b) In addition to in-service death benefits which existed prior to July 1, 1998 for Members with twenty or more years of service, if a Member dies on or after July 1, 1998 or such later date as provided in a collective bargaining agreement, after having attained fifteen or more but less than twenty years of creditable service at any age below sixty, the surviving Spouse will be paid a Fifty Percent Joint and Survivor benefit. If there is no eligible surviving Spouse, dependent children shall be paid a total of six thousand dollars ($6,000.00) which shall be divided equally among all eligible dependent children until the youngest child reaches age nineteen, or for life if a child is permanently physically or mentally impaired.

## Sec. E-10. Benefits for Surviving Spouses; Disability Retirees

The surviving Spouse of a disability retiree who retired under the provisions of Section E-5 of this Component II of the Combined Plan and who died before the age of sixty shall receive a retirement allowance computed in the same manner as if the disability retiree had been a Member who became eligible for death benefits under Section E-9 of Component II of the Combined Plan, provided the disability retiree had earned fifteen or more years of credited service. In the case of a non-duty disability retiree, credited service shall be determined on the effective date of the non-duty disability retirement. In the case of a duty disability retiree, credited service shall be determined on the date of death of the disability retiree assuming City employment had continued until the date of death.

## Sec. E-11. Disposition of Surplus Benefits upon Death of Retiree and Beneficiary

If under a Joint and One Hundred Percent Survivor allowance, a Joint and Seventy-Five Percent Survivor allowance, a Joint and Fifty Percent Survivor allowance, or a Joint Twenty-Five Percent Survivor allowance as provided for under Section E-8 of this Component II of the Combined Plan, both a retiree and beneficiary die before they have received in retirement allowance payments, an aggregate amount equal to the retiree's accumulated contributions in the Annuity Savings Fund at the time of retirement, less withdrawals, the difference between the said accumulated contributions and the said aggregate amount of retirement allowances paid the retiree and beneficiary, shall be paid in a single lump sum to such person or persons nominated by written designation of the retiree duly executed and filed with the Board. If there are no person or persons surviving retiree and beneficiary, any such difference shall be paid to the retiree's estate.

## Sec. E-12. Pensions Offset by Compensation Benefits; Subrogation

(a)     <u>Generally</u>. Any amounts which may be paid or payable to a Member, retiree, or to the dependents of a Member or retiree on account of any disability or death under the provisions of any Workers' Compensation, pension, or similar law, except federal Social Security old-age and survivors' and disability insurance benefits, shall be offset against any pensions payable from funds of the Retirement System on account of the same disability or death. If the present value of the benefits payable under said Workers' Compensation, pension, or similar law, is less than the Pension Reserve for said pension payable by the Retirement System, the present value of the said Workers' Compensation, pension, or similar legal benefit shall be deducted from the Pension Reserve, and such pensions as may be provided by the Pension Reserve so reduced shall be payable as provided in this Article E.

(b)     <u>The City's right of subrogation</u>. In the event a person becomes entitled to a pension payable by the Retirement System because of an accident or injury caused by the act of a third party, the City shall be subrogated to the rights of said person against such third party to the extent of the benefit which the City or the Retirement System pays or becomes liable to pay.

## Sec. E-13. Disability Retirees; Reexamination; Authority of the Board

(a) *Medical examination*.  At least once each year during the first five years following the retirement of a Member with a Disability Retirement Allowance or Disability Pension, and at least once in every three year period thereafter, the Board may, and upon the retiree's application shall, require that any disability retiree who has not attained age sixty undergo a medical examination, to be made by, or under the direction of, the Medical Director.  Should any such disability retiree who has not attained age sixty refuse to submit to at least one such medical examination in any such period, the retiree's retirement allowance or pension may be discontinued by the Board until withdrawal of such refusal.  Should such refusal continue for one year, all of the disability retiree's rights in and to the Pension portion of the Retirement Allowance may be revoked by the Board.  If upon such examination of a disability retiree, the Medical Director reports that the retiree is physically able and capable of resuming employment, and such report is concurred in by the Board, the retiree shall be restored to active service with the City and the Disability Retirement Allowance shall terminate.

(b) *Other employment*.  If such disability retiree is or becomes engaged in a gainful occupation, business, or employment paying more than the difference between the retiree's Disability Retirement Allowance and final compensation, the Pension portion of the Disability Retirement Allowance shall be reduced by the amount of such difference. If the amount of the earnings changes, the Pension may be adjusted accordingly.

(c) *Reinstatement to active service*.  A disability retiree who has been, or shall be, reinstated to active service in the employ of the City as provided in this Section, shall again become a Member of the Retirement System.  All credited service at the time of the retirement shall be restored to full force and effect and a duty disability retiree shall be given membership service credit for the period said retiree was out of service due to such duty disability.

## Sec. E-14.  Transfer of Department or Department Functions; Generally

In the event a function or functions of a City Department or the Department itself is transferred to the federal or state government, or to a political subdivision of the State of Michigan (second governmental unit), a Member of the Retirement System whose employment is transferred from the City to the second governmental unit shall be entitled to a retirement allowance payable by the Retirement System subject to the following conditions:

(a) *Employment within sixty days of transfer*.  The employee enters the employment of the second governmental unit within sixty days from and after the effective date of the transfer of the function or functions of a City Department or the Department itself to the second governmental unit.

(b) *Credited service combined; ten year minimum*.  The employee's credited service as a Member of the Retirement System plus any credited service acquired in the employ of the second governmental unit totals at least ten years.

(c) *Retirement; second governmental unit*.  If the employee retires from employment with the second governmental unit on account of age and service, the employee's Retirement

13-53846-swr  Doc 8045-1  Filed 10/20/14  Entered 10/20/14 05:47:23  Page 118 of
13-53846-tjt  Doc 8405-2  Filed 11/20/14  Entered 11/20/14 05:48:23  Page 562 of
629
409

Allowance shall be computed in accordance with Section E-3(b) or Section E-4 of this Component II of the Combined Plan, whichever is applicable. If the employee retires from employment in the second governmental unit because of total and permanent disability arising from non-service connected causes, the Retirement Allowance shall be computed in accordance with Section E-5(d) of this Component II of the Combined Plan. In computing the Retirement Allowance, the basic pension shall not exceed twelve dollars ($12.00) per year for a maximum of ten years for a total amount to not exceed one hundred twenty dollars ($120.00), and the membership service pension shall be based only upon City-credited service existing at the time of transfer. In determining the Average Final Compensation defined in Section C-1 of this Component II of the Combined Plan, the compensation received as an employee of the second governmental unit shall be regarded as compensation paid by the City. If the employee leaves the employ of the second governmental unit with a deferred retirement allowance, no City retirement allowance shall be paid unless the employee has met the requirements of Section E-3(d)(1) of this Component II of the Combined Plan. Notwithstanding the foregoing, effective as of the Freeze Date, for purposes of calculating a Retirement Allowance for a Member whose employment was transferred prior to July 1, 2014 from the City to a second governmental unit, Average Final Compensation for the transferred Member shall be compensation received by such transferred Member prior to July 1, 2014 as an employee of the second governmental unit.

(d)     *Allowance starting date*. The retirement allowance shall begin upon retirement from the employment of the second governmental unit, but in no event prior to the date the employee would have become eligible for retirement had the employee continued in City employment. If retirement is because of total and permanent disability arising from non-service-connected causes, the retirement allowance shall begin upon the approval of retirement by the Board.

## Sec. E-15. Pension Improvement Factor (Escalator)

(a)     *Increase of pension*. On or after July 1, 1992 and prior to the effective date of the Plan of Adjustment, effective as of the first day of July of each year, the pension portion of any Retirement Allowance or Duty Death Benefit which is paid or payable under this Article shall be increased by a factor of two and one quarter percent (2.25%), computed on the basis of the amount of the original pension received at the time of retirement, including, if applicable, any supplemental pensions provided under this Article; provided, that the recipient of said pension shall have been on the retirement rolls at least one year prior to said July first date. If the recipient has been on the retirement payroll less than one year prior to said July first date, the amount of the increase shall be prorated accordingly.

(b)     *Payment*. Except as provided in paragraph (c) below, the pension improvement factor of two and one quarter percent (2.25%) provided for in Section E-15(a) of this Component II, shall be payable notwithstanding any Retirement Allowance or pension amount limitation provisions in this Article to the contrary.

(c)     After the effective date of the City Employment Terms between the City of Detroit and Police Officers Association of Michigan presented to the union on July 18, 2012,

13-53846-tjr Doc 8045-1 Filed 10/22/14 Entered 10/22/14 05:47:23 Page 563 of
13-53846-swr Doc 8045-1 Filed 10/22/14 Entered 10/22/14 05:48:23 Page 563 of
409

employees represented by the union will no longer receive the two and one-quarter percent (2.25%) per annum escalation.

(d)     Effective April 1, 2013, the post-retirement escalator factor for all service after that date shall be eliminated for any employee who is a member of the American Federation of State, County and Municipal Employees, AFL-CIO Local 2920.

## Sec. E-16.  Adoption of Rates of Interest; Limitations on Payments By Retirement System; Transfer of Investment Returns in Excess of Crediting Rate

(a)     The Retirement System and the Board of Trustees shall not make any payment to active or retired Members other than payments that are required by the Retirement System as established by this Combined Plan to govern the Retirement System or the Plan of Adjustment.  This prohibition applies to all payments that are not authorized by this Combined Plan, whether such payments are those commonly referred to as a "thirteenth check" or by any other name.

(b)     The Retirement System and the Board of Trustees shall not provide any savings plan, annuity plan, or other Member investment or savings vehicle that provides an annual return to investing Members which in any year is greater than the actual investment return net of expenses of the Retirement System's invested reserves for the year in which the return is earned and accrued, provided that such return shall neither be greater than the assumed annual return as expressed in the Retirement System's valuation for that year nor less than zero.  This prohibition shall apply to all annual returns credited to accounts of investing Members in the Annuity Savings Fund of the 1973 Defined Contribution Plan from the effective date of Ordinance 37-11 to June 30, 2013.  Notwithstanding anything in this Section E-16 to the contrary, effective for Plan Years beginning on and after July 1, 2013, the annual rate of return credited to a Member's account in the Annuity Savings Fund of the 1973 Defined Contribution Plan shall be no less than zero and no greater than the lesser of (i) 5.25% or (ii) the actual investment return net of expenses of the Retirement System's invested reserves for the second Plan Year immediately preceding the Plan Year in which the annual return is credited.

(c)     In any Plan Year during the period beginning on or after July 1, 2014 and ending June 30, 2023 in which the annual rate of return credited to the accounts of Members investing in the Annuity Savings Fund as provided in paragraph (b) is less than the actual rate of return net of expenses of the Retirement System's invested assets for the second Plan Year immediately preceding the Plan Year in which the annual rate of return is credited ("ASF Return Excess"), an amount equal to the value of the ASF Return Excess shall be transferred to the Pension Accumulation Fund maintained under Component I of the Combined Plan and shall be used to fund the Transition Cost relating to Component I. The Transition Cost is a measure of the liability that Component I of the Retirement System has at its inception; due to the fact that at its inception, Members in Component I of the Retirement System receive vesting and eligibility credit under Component I for service that was earned prior to July 1, 2014 and is otherwise credited to Members under Component II of the Retirement System, as such Transition Cost is calculated by the Plan Actuary.  In the event there is an ASF Return Excess for a Plan Year following the Plan

Year in which such transfers have fully funded the Transition Costs relating to Component I, fifty percent (50%) of such ASF Return Excess shall be transferred to the Pension Accumulation Fund maintained under Component II and the remaining fifty percent (50%) of such ASF Return Excess shall be transferred to Component I and credited to the Rate Stabilization Fund maintained under Component I. "Transition Cost" shall be determined by the Plan Actuary.

## Sec. E-17. Funds

The 1973 Defined Benefit/Defined Contribution (Annuity) Plan shall consist of the Annuity Savings Fund, the Annuity Reserve Fund, the Pension Accumulation Fund, the Pension Reserve Fund, and the Income Fund.

## Sec. E-18. Method of Financing

(a)     *Annuity Savings Fund of the 1973 Defined Contribution Plan*.

(1)     The Annuity Savings Fund of the 1973 Defined Contribution Plan shall be the fund in which shall be accumulated at regular interest, in accordance with the limitations that are contained in Section E-16 of this Component II of the Combined Plan, the contributions of Members made prior to the first payroll date occurring in August 2014 to provide their annuities. At the election of the Member, the amount of the basic contribution of a Member to the Retirement System prior to the first payroll date occurring in August 2014 were zero percent (0%), three percent (3%), five percent (5%), or seven percent (7%) of annual compensation. If a Member elected three percent (3%), his or her contribution shall be that amount which is subject to taxation under the provisions of the *Federal Insurance Contribution Act, 26 USC 3101 et seq. (Act)*, plus five percent (5%) of the portion of annual compensation, if any, which exceeds the amount subject to taxation under that *Act*.

(2)     The contribution rate elected by the Member under Section E-18(a)(1) of this Component II of the Combined Plan were deducted from the Member's compensation notwithstanding that the minimum compensation provided by law for any Member were reduced thereby. Payment of compensation, less said deductions, constituted a complete discharge of all claims and demands whatsoever for the services rendered by the said Member during the period covered by such payment, except as to benefits provided under this Article E.

(3)     Upon retirement of a Member with a Retirement Allowance, the Member's accumulated contributions shall be transferred from the Annuity Savings Fund to the Annuity Reserve Fund, refunded to the Member, or a combination thereof.

(b)     *Annuity Reserve Fund*. The Annuity Reserve Fund shall be the fund, from which all annuities and benefits in lieu of annuities payable as provided in this Article E, shall be paid. If a disability retiree is reinstated to active City service, the retiree's Annuity Reserve at that time shall be transferred from the Annuity Reserve Fund to the Annuity Savings Fund and credited to his or her individual account therein.

(c)   *Pension Accumulation Fund.* The Pension Accumulation Fund shall be the fund in which shall be accumulated reserves for the pensions and other benefits payable from the contributions made by the City, including various departments thereof, the Detroit Public Library, and certain third parties pursuant to the Plan of Adjustment and from which shall be paid pensions and other benefits on account of Members with prior service credit, and transfers as provided in this Section E-18. Contributions to the Pension Accumulation Fund from the effective date of the Plan of Adjustment through Fiscal Year 2023, shall be made only in the amounts and from the sources identified in the Plan of Adjustment.

For Fiscal Years beginning after June 30, 2023, contributions to fund pension benefits (adjusted as provided in the Plan of Adjustment) shall be made as follows:

(1)   Certain amounts shall be contributed by certain third parties as provided in the Plan of Adjustment.

(2)   The City's annual contribution shall be calculated by the Actuary as provided in Section E-19.

(3)   Upon the retirement of a Member without prior service credit, or upon a Member's death in the performance of duty, the Pension Reserve Fund for the pension or pensions to be paid on the Member's account shall be transferred from the Pension Accumulation Fund to the Pension Reserve Fund.

(4)   Upon the basis of such mortality and other tables of experience and interest as the Board shall adopt from time to time consistent with Section 1.16(d) of Component I, the Actuary shall compute annually the pension reserve liabilities for pension benefits being paid to retirees and beneficiaries.

(5)   On an annual basis, the Board shall ascertain and report to the Mayor and the Council the amount of City contributions due to the Retirement System. The Council shall appropriate and the City shall pay such contributions during the appropriate Fiscal Year. When paid, such contributions shall be credited to the Pension Accumulation Fund.

(6)   If the amount appropriated by the City and paid to the Retirement System for any Fiscal Year is insufficient to make the transfers and pay the pensions, as adjusted in the Plan of Adjustment, from the Pension Accumulation Fund as provided in this Section E-18, the amount of such insufficiency shall be provided by the appropriating authorities of the City.

(d)   *Accrued Liability Fund.* Pursuant to *Ordinance No. 5-05*, which authorized the creation of the Detroit General Retirement Service Corporation, the City previously entered into a transaction (the "Pension Funding Transaction") to obtain funds as an alternative to those available through the traditional funding mechanism described above in Subsection (c). The proceeds generated by the Pension Funding Transaction (or any Additional Pension Funding Transactions, as described below) that were deposited into the System are termed the "Funding Proceeds." The Funding Proceeds were deposited into a new fund in the System to be called the Accrued Liability Fund. The purpose of the Funding

13-53846-tjt   Doc 8045-1   Filed 10/20/14   Entered 10/20/14 05:47:23   Page 122 of
429
13-53846-swr   Doc 8045-3   Filed 10/22/14   Entered 10/22/14 05:48:23   Page 566 of
809

Proceeds was to fund all or part of the heretofore unfunded actuarial accrued liability ("UAAL") of the Retirement System, as determined as of a date certain, that is, the "Determination Date," pursuant to the Retirement System's actuarial valuation as of that date. The Funding Proceeds are assets of the Retirement System and will be applied, together with all other assets of the Retirement System, to fund the Retirement System's obligation to pay pension benefits, as adjusted in the Plan of Adjustment.

This Accrued Liability Fund shall contain only the Funding Proceeds of this Pension Funding Transaction, and any earnings thereon. Prior to Fiscal Year 2013, funds were transferred each Fiscal Year (or monthly portion thereof) from the Accrued Liability Fund to the Pension Accumulation Fund as provided in *Chapter 47 of the 1984 Detroit City Code* and *Ordinance No. 5-05*.

As soon as practicable following the effective date of the Plan of Adjustment, any amounts remaining credited to the Accrued Liability Fund shall be transferred to the Pension Accumulation Fund and the Accrued Liability Fund shall cease to exist.

(e)     *Pension Reserve Fund*. The Pension Reserve Fund shall be the fund from which pensions shall be paid to retirees and beneficiaries. Should a disability retiree be reinstated to active service, the retiree's Pension Reserve at that time, shall be transferred from the Pension Reserve Fund to the Pension Accumulation Fund.

(f)     *Expense Fund*. The Expense Fund shall be the fund to which shall be credited all money provided by the City to pay the administrative expenses of the Retirement System, and from which shall be paid all the expenses necessary in connection with the administration and operation of the Retirement System.

(g)     *Income Fund*. The Income Fund shall be the Fund to which shall be credited all interest, dividends, and other income derived from the investments of the Retirement System (other than those derived from the investments credited to any Accrued Liability Fund), all gifts and bequests received by the Retirement System, and all other moneys the disposition of which is not specifically provided for in this Article E. There shall be paid or transferred from the Income Fund, all amounts required to credit regular interest to the various Funds of the Retirement System, except for the Accrued Liability Fund which is to be credited with interest, dividends and other earnings pursuant to Section E-18(d)(2) of this Component II of the Combined Plan in accordance with the limitations that are contained in Section E-18 of this Component II of the Combined Plan.

(h)     *Maintenance of Reserves*.

(1)     The maintenance of proper reserves in the various Funds of the Retirement System except the Expense Fund are hereby made obligations of the Pension Accumulation Fund.

(2)     City contributions to the Retirement System to the extent necessary to provide pensions on account of Members who are employees of a revenue-supported division of the City shall be made from the revenues of the said division. Any City contribution to the Retirement System from any Fund by law with a certain

and definite purpose shall, at the direction of the Finance Director, be accounted for separately.

### Sec. E-19. Determination of City's Annual Contribution

(a)    For the period ending June 30, 2023, the City shall make only those contributions to the Retirement System as are set forth in the Plan of Adjustment.

(b)    For Fiscal Years beginning on and after July 1, 2023, the annuity and pension reserve liabilities for Members, retirees, and beneficiaries, shall be actuarially evaluated as set forth in this Article for each division as is accounted for separately pursuant to Section E-18(h)(2) of this Component II of the Combined Plan.

   (1)    *Pension Liabilities*.

      a.    The pension liabilities for Members shall be determined by the Actuary using reasonable and appropriate actuarial assumptions approved by the Board and the Investment Committee.

      b.    The City's annual contribution to finance any unfunded accrued pension liabilities, expressed as a percentage of active employees' compensation, shall be determined by amortizing such unfunded accrued pension liabilities as a level percentage of such compensation over a period or periods of future years as established by the Board and approved by the Investment Committee.

   (2)    *Pension Accumulation Fund*.    Based upon the provisions of this Article E including any amendments, the Board shall compute the City's annual contributions to the Retirement System, expressed as a percentage of active Member compensation each Fiscal Year, using actuarial valuation data as of the June thirtieth date which date is a year and a day before the first day of such Fiscal Year.  The Board shall report to the Mayor and Council the contribution percentages so computed.  Such contribution percentages shall be used in determining the contribution dollars to be appropriated by Council and paid to the Retirement System.  Such contribution dollars shall be determined by multiplying the applicable contribution percentage for such Fiscal Year by the Member compensation paid for such Fiscal Year.  Such contribution dollars for each Fiscal Year shall be paid to the Retirement System in such Fiscal Year in a manner to be agreed upon from time to time by the Board and the City, provided, for any Fiscal Year for which an agreement has not been reached before the first day of such Fiscal Year, such contribution dollars shall be paid in equal monthly installments at the end of each calendar month in such Fiscal Year.

# ARTICLE F.  PARTICIPANT LOAN PROGRAM

## Sec. F-1.  Established.

Any loans granted or renewed shall be made pursuant to a Participant Loan Program which shall conform with the requirements of Section 72(p) of the Internal Revenue Code.  Such loan program shall be established in writing by the Board of Trustees, and must include, but need not be limited to the following:

(1)  The identity of the administrator of the Participant Loan Program;

(2)  A procedure to apply for loans, the amount of loan that will be approved or denied, and limitations, if any, on the types and amount of loans offered;

(3)  The procedures under the program for determining a reasonable rate of interest; and

(4)  The events constituting default and the steps that will be taken to preserve plan assets.

## Sec. F-2.  The Loan Program.

(1)  This Loan Program shall be contained in a separate written document copies of which shall be made available in the offices of the Retirement System for prospective participants in the Loan Program.  The Board of Trustees is authorized to adopt rules and regulations, from time to time, to govern the administration and the operation of this program.  Copies of the rules shall also be made available to prospective Members in the offices of the Retirement System; and

(2)  All collective bargaining agreements which accept the terms of this section are specifically agreeing to be subject to the Board's authority to modify or amend the Participant Loan Program from time to time, including during the effective terms of the applicable labor agreement and no such modification or amendment shall be deemed a violation of said labor agreement and no grievance or other form of action shall be effective to overturn or alter the Board's decision.

## Sec. F-3.  Eligibility.

Subject to rules and procedures established by the Board, loans will initially be made only to non-union Members of the Retirement System.  Union employees will be eligible when their respective bargaining unit has accepted the Loan Program.  Former Members, spouses of Members, and beneficiaries are not eligible to receive any loans from the Retirement System.  Subject to rules and procedures established by the Board, a Member who has been in the Combined Plan for twelve (12) months or more is eligible to apply for a loan under this Component II.  No Member shall have more than two outstanding loans from the Retirement System (Component I and/or Component II) at any time.  A Member who has previously defaulted on a loan (under either Component I or Component II) shall not be eligible for a loan from the Retirement System.

## Sec. F-4.  Amount of Loan.

A Member who has satisfied applicable rules and procedures may borrow from his or her account an amount, which does not exceed fifty percent (50%) of the Member's vested accumulated balance, or ten thousand dollars ($10,000.00) reduced by the excess, if any, of: 1) the highest outstanding balance of loans from the Retirement System (both Component I and Component II) during the one (1) year period ending on the day before the date on which the loan is made, or 2) the outstanding balance of loans from the Retirement System (both Component I and Component II) on the date on which the loan is made, whichever is less.  The minimum loan amount shall be one thousand dollars ($1,000.00).

## Sec. F-5.  Terms and Conditions.

In addition to such rules and procedures that are established by the Board, all loans shall comply with the following terms and conditions:

(1)  Loan applications shall be in writing;

(2)  Loans shall be repaid by equal payroll deductions over a period not to exceed five (5) years, or, where the loan is for the purpose of buying a principal residence, a period not to exceed fifteen (15) years.  In no case shall the amount of the payroll deduction be less than twenty dollars ($20.00) for any two-week period;

(3)  Each loan shall be made against the assignment of the Member's entire right, title, and interest in and to the Retirement System, supported by the Member's collateral promissory note for the amount of the loan, including interest payable to the order of the Board of Trustees;

(4)  Each loan shall bear interest at a rate determined by the Board.  The Board shall not discriminate among Members in its determination of interest rates on loans.  Loans initiated at different times may bear different interest rates, where, in the opinion of the Board, the difference in rates is supported by a change in market interest rates or a change in the Retirement System's current assumed rate of return.  The loan interest rate shall bear a reasonable relationship to market rates for secured loans of a similar duration and shall bear a reasonable relationship to the costs to the Retirement System of administering the Combined Plan.  The loan interest rate shall be calculated in a manner that will not negatively affect the Employers' costs with respect to the Retirement System or the investment return allocated to Members;

(5)  Loan repayments shall be suspended under this plan as permitted by Section 414(u)(4) of the Internal Revenue Code.  A participant who has an outstanding loan balance from the plan who is absent from employment with the employer, and who has satisfied the requirements of Section 414(u) of the Internal Revenue Code shall not be required to make loan repayments to the Retirement System during said periods of absence.

**Sec. F-6.  Renewal of Loan.**

Any loans granted or renewed shall be made pursuant to the Participant Loan Program and Section 72(p) of the Internal Revenue Code and the regulations thereunder.

**Sec. F-7.  Loan Balance.**

A Member's outstanding loan balance shall be considered a directed investment by the Member and interest payments shall be credited to the Member's account balance, and shall not be part of net investment income or part of the Member's account balance for the purpose of allocation of net investment income under the Retirement System.

**Sec. F-8.  Distributions.**

No distributions shall be made to a Member, former Member, or beneficiary until all loan balances drawn on the applicable vested accumulated balance and applicable accrued interest have been liquidated.

**Sec. F-9.  Annual Report.**

The Retirement System shall include, in its annual report to all Members, an accounting of the Loan Program established by this Article F, which contains the number and amount of loans made under this Component II, the costs of administering the Loan Program under Component II, the amount of payments made including interest received by Component II of the Retirement System, the amount of loans outstanding, including any defaults or delinquencies, and an evaluation as to whether the interest charged in that Fiscal Year covered the costs of administering the Loan Program maintained under this Component II.

# ARTICLE G.  SPECIAL PLAN OF ADJUSTMENT PROVISIONS

## Sec. G-1.  Benefit Changes Implemented Pursuant to the Terms of the Plan Of Adjustment

Notwithstanding anything in Articles A, C, D or E of Component II to the contrary, as of the effective date of the Plan of Adjustment and during the period that ends no earlier than June 30, 2023, the following provisions to comply with the terms of the Plan of Adjustment shall be implemented:

(1)      *Reduction in monthly pension payments.*

        a.      For a retiree or a surviving beneficiary who is receiving a monthly pension benefit as of the effective date of the Plan of Adjustment, as soon as practicable following such effective date such retiree's or surviving beneficiary's monthly pension benefit will be reduced to an amount that is equal to 95.5% of the monthly pension benefit being paid to such retiree or surviving beneficiary as of the date immediately preceding the effective date of the Plan of Adjustment ("Adjusted Accrued Benefit"); provided, however, that the Board and the Investment Committee shall determine on the effective date of the Plan of Adjustment and not less frequently than annually thereafter that the "Funding Conditions" as defined herein have been satisfied, and in the event that such Funding Conditions have not been satisfied then such retiree's or surviving beneficiary's Adjusted Accrued Benefit will be reduced in proportion to the funding which is not received by the Retirement System but not below an amount that is equal to 73% of the monthly pension benefit being paid to such retiree or surviving beneficiary as of the date immediately preceding the effective date of the Plan of Adjustment.

        b.      The Frozen Accrued Benefit that will be paid as a monthly Retirement Allowance upon the retirement or death of an active employee Member or a vested former employee Member on or after the Effective Date, will be reduced to an amount that is equal to 95.5% of the monthly pension benefit that would otherwise have been paid to the active employee or vested former employee under the terms of this Component II of the Combined Plan without taking into account this Section G-1 ("Adjusted Deferred Accrued Benefit"); provided, however, that the Board and the Investment Committee shall determine on an annual basis that the "Funding Conditions" as defined herein have been satisfied, and in the event such Funding Conditions have not been satisfied then such active employee Member's or vested former employee Member's Adjusted Accrued Benefit will be reduced in proportion to the funding which is not received by the Retirement System but not below an amount that is equal to 73% of the monthly pension benefit that would otherwise have been paid to the active employee or vested former employee under the terms of this Component II of the Combined Plan without taking into account this Section G-1.

c.    *Cap on Benefit Reductions for Certain Retirees*.  With respect to any retiree or surviving beneficiary receiving monthly pension benefits from the Retirement System as of June 30, 2014, such retiree's or surviving beneficiary's Adjusted Accrued Benefit, as further reduced to take into account any ASF Recoupment under Section G-2, shall not be less than 80% of the monthly pension benefit being paid to such retiree or surviving beneficiary as of the date immediately preceding the Effective Date.

For purposes of this Sec. G-1, the term "Funding Conditions" shall mean that (i) Class 10 and Class 11 voted in favor of the Plan of Adjustment in accordance with the procedures for such vote under the Plan of Adjustment, (ii) the Plan of Adjustment is confirmed by the U.S. Bankruptcy Court, and (iii) the funds that are pledged to be contributed to the Retirement System pursuant to the terms of the State Contribution Agreement and the DIA Settlement Documents have been received.

(2)    *Elimination of Pension Improvement Factor*.  For all pension benefits payable after the Effective Date, the Pension Improvement Factor (Escalator) that will be applied to the monthly Adjusted Accrued Benefit or Adjusted Deferred Accrued Benefit of a Member, retiree, surviving beneficiary or vested former employee will be equal to 0%.

(3)    *Recoupment of Excess Returns on Annuity Savings Fund Account*.  The terms of Section G-2 Annuity Savings Fund Recoupment shall apply to the Annuity Savings Fund account of Members, retirees and vested former employees as provided in Section G-2.

(4)    *Future Disability Pensions Eliminated*.   The Duty Disability Retirement Allowance and Non-Duty Disability Retirement Allowance are eliminated with respect to Members who become disabled on or after July 1, 2014.

(5)    *Effect of Payment Default*.  In the event that all or a portion of the funds pledged to be contributed to the Retirement System pursuant to the terms of the DIA Settlement Agreement are not received by the Retirement System, the Board shall automatically reduce the monthly pension benefits payable to Members, retirees, surviving beneficiaries, and former employees to the extent of such default.

## Sec. G-2.  Annuity Savings Fund Recoupment

Notwithstanding anything in Articles A, B, C, D or E to the contrary, upon the effective date of the Plan of Adjustment, Members, retirees or vested former employees who were identified by the City as a Class 11 Holder under the Plan of Adjustment and who participated in the Annuity Savings Fund ("ASF") at any time during the period that began on July 1, 2003 and ended on June 30, 2013 ("ASF Recalculation Period") are subject to the following provisions:

(1)    *Recoupment from Members, retirees and vested former employees who maintain an Annuity Savings Fund account ("ASF account") as of the Effective Date*.  For each Member, retiree or vested former employee who maintains an ASF account

in the Retirement System as of the effective date of the Plan of Adjustment, such individual's ASF account balance will be reduced by such individual's Annuity Savings Fund Excess Amount, as determined by the City in accordance with this Section G-2 (1).

    a.        For a Member, retiree or former vested employee who did not receive any distribution or loan from such individual's ASF account during the ASF Recalculation Period, the Annuity Savings Fund Excess Amount means the difference between the value of such individual's ASF account as recalculated using the Actual Return (as defined in paragraph (3) below) and the actual value of such individual's ASF account as of June 30, 2013; provided, however, that an individual's Annuity Savings Fund Excess Amount shall not exceed 20% of the highest value of such individual's ASF account balance (including any unpaid loan balance relating to the ASF account) during the ASF Recalculation Period.

    b.        For a Member, retiree or vested former employee who during the ASF Recalculation Period has received a distribution (other than a total distribution) or loan from the ASF, the Annuity Savings Fund Excess Amount means the difference between (i) the sum of (A) the value of such individual's ASF account as of June 30, 2013 and (B) all distributions (including any unpaid loans) received by such individual from his or her ASF account during the ASF Recalculation Period, and (ii) the value of such individual's ASF account as of June 30, 2013 as recalculated using the Actual Return; provided, however, that an individual's Annuity Savings Fund Excess Amount shall not exceed 20% of the highest value of such individual's ASF account balance (including any unpaid loans made to the individual) during the ASF Recalculation Period.

(2)    *Recoupment from Members, retirees and former employees who previously took total Annuity Savings Fund account distributions.*  Except as provided in paragraph (4) below, for each Member, retiree or vested former employee who has received a total distribution of the individual's ASF account during the ASF Recalculation Period, the individual's monthly pension benefit (and the survivor monthly pension benefit payable to the Member's survivor, if any) will be reduced by the individual's "Monthly Annuity Savings Fund Excess Amount" as determined by the City in accordance with this Section G-2(2).

A Monthly Annuity Savings Fund Excess Amount means the difference between (i) the value of the ASF account of a Member, retiree or vested former employee as of the date of distribution to such individual from the ASF, provided such date falls within the ASF Recalculation Period, and (ii) the value of the individual's ASF account as of such date, as recalculated using the Actual Return; provided, however, such difference shall not exceed 20% of the highest value of such individual's ASF account balance (including any unpaid loan balance) during the ASF Recalculation Period; provided, further, such amount will be converted into

13-53846-swr Doc 8045-1 Filed 10/20/14 Entered 10/20/14 05:47:23 Page 170 of
13-53846-tjt Doc 8045-1 Filed 10/22/14 Entered 10/22/14 05:48:23 Page 130 of
429

a monthly annuity amount based on the individual's life expectancy, gender and, if the Member has not already retired, the expected date of retirement.

(3) *Recoupment from Members, retirees and former employees who received partial Annuity Savings Fund account distributions.* A Member, retiree or vested former employee who previously received a distribution of a portion but not the entirety of the Member's Annuity Savings Account shall be subject to paragraph (1) to the extent of any funds then credited to the Member's Annuity Savings Fund account and shall be subject to paragraph (2) to the extent of any Excess Amount that cannot be recovered pursuant to paragraph (1).

(4) *Cash repayment option.* Notwithstanding paragraphs (2) and (3) above and subject to the Cash Option Cap described below, a Member, retiree, employee or former employee whose monthly pension benefit will be reduced pursuant to paragraph (2) or (3) may elect to make a single lump sum cash payment to the Retirement System of the Annuity Savings Fund Excess Amount by cashier's check or wire transfer ("Cash Repayment Option"). Each individual eligible for the Cash Repayment Option shall be provided by first-class U.S. mail an election notice and an election form no later than seven days following the Effective Date. The individual shall have thirty-five days from the date on which the election form is mailed to return the election form as directed on the form. An election of the Cash Repayment Option shall be effective only if it is received by the deadline set forth on the election form.

No later than fourteen days following the election deadline, the Board shall notify each individual who timely elects the Cash Repayment Option of the amount to be repaid to the Retirement System ("Final Payment Notice"). Such amount must be paid to the Retirement System on or before the later of (i) ninety days after the Effective Date, or (ii) fifty days following the date on which the Final Payment Notice is mailed to the individual.

If payment is not timely received, the monthly pension benefit of an individual who elects the Cash Repayment Option shall be reduced as provided in paragraph (2) or (3).

The Cash Repayment Option shall be limited to an aggregate amount of $30 million (the "Cash Option Cap"). In the event the Retirement System receives timely and properly completed election forms representing an aggregate recovery amount in excess of the Cash Option Cap, then each individual who made a timely election of the Cash Repayment Option shall be permitted to repay an amount equal to his pro rata share of the Cash Option Cap. Any Annuity Savings Fund Excess Amount that is not repaid under the Cash Repayment Option shall be repaid as provided in paragraph (2) or (3).

(5) *Definition of Actual Return.* "Actual Return" means the actual net return percentage on the Retirement System's invested assets for each Fiscal Year

during the ASF Recalculation Period; provided, however, that for any such Fiscal Year the net return shall not be greater than 7.9% nor less than 0%.

(6) *Limitation on recoupment.* Notwithstanding anything in this Section G-2 to the contrary:

a. a Member's ASF account value after recoupment of the Member's Annuity Savings Fund Excess Amount will never be less than the contributions made to the ASF by such Member and will reflect all interest credited by the Board to the Member's ASF account for the Fiscal Years ending prior to July 1, 2002; and

b. in no event shall the amount recovered from a Member described in Section G-2(2) (or G-2(3), with respect to amounts that may not be recovered pursuant to Section G-2(1)) exceed the Member's Annuity Savings Fund Excess Amount plus interest on such amount at a rate of 6.75%. Upon the Member's repayment of such amount in full, the Member's monthly pension benefit in effect immediately prior to adjustment as provided in Section G-2(2) (adjustment as provided in Section G-1), increased as provided in Section G-4, if applicable, shall be fully restored.

(7) *Cap on benefit reductions for certain retirees.* With respect to any retiree or surviving beneficiary receiving monthly pension benefits from the Retirement System as of June 30, 2014, the Adjusted Accrued Benefit of such retiree or surviving beneficiary, as further reduced to take into account any ASF Recoupment under Section G-2, shall not be less than 80% of the monthly pension benefit being paid to such retiree or surviving beneficiary as of the date immediately preceding the Effective Date.

Annuity Savings Fund Excess Amounts of Members described in paragraphs (1) and (3) shall be transferred from the Annuity Savings Fund to the Pension Accumulation Fund and shall be used to pay pensions and other benefits to Members as provided in Component II of the Combined Plan.

## Sec. G-3. Income Stabilization Benefits

(1) The provisions of this Section G-3 shall become effective only if each of the Conditions Precedent (as that term is defined in the State Contribution Agreement) have been met to the satisfaction of the Authority and the Treasurer, unless any one or more of such conditions are waived in a writing executed by the Authority and the Treasurer.

(2) Beginning not later than 120 days after the Effective Date, Component II of the Combined Plan shall pay, in accordance with this Section G-3, an annual supplemental pension income stabilization benefit ("Income Stabilization Benefit") to each Eligible Pensioner (as defined in Section G-3(5)) equal to the lesser of either (i) the amount needed to restore an Eligible Pensioner's reduced

annual pension benefit to 100% of the amount of the annual pension benefit that the Eligible Pensioner received from the Retirement System in 2013; or (ii) the amount needed to bring the total annual 2013 household income of the Eligible Pensioner up to 130% of the Federal Poverty Level for 2013. The Income Stabilization Benefit as determined under this Section G-3(2) will not increase after the date on which the Income Stabilization Benefit is determined. The Income Stabilization Benefit payable to an Eligible Pensioner will terminate immediately at such time as the Eligible Pensioner ceases to qualify as an Eligible Pensioner.

(3)     To the extent an Eligible Pensioner's Estimated Adjusted Annual Household Income (as defined in this Section G-3) in any calendar year after the first year that the Eligible Pensioner receives a benefit under this Section G-3 is less than 105% of the Federal Poverty Level in that year, the Eligible Pensioner will receive an additional "Income Stabilization Benefit Plus" benefit commencing as of the next following July 1.

   a.     The Income Stabilization Benefit Plus benefit for a calendar year will be equal to the lesser of either (i) the amount needed to restore 100% of the Eligible Pensioner's pension benefit, as increased by any Pension Improvement Factor (Escalator), under Component II of the Combined Plan; or (ii) the amount needed to bring the Eligible Pensioner's Estimated Adjusted Annual Household Income in that calendar year up to 105% of the Federal Poverty Level in that year.

   b.     An Eligible Pensioner's "Estimated Adjusted Annual Household Income" for any year will be the sum of (i) the Eligible Pensioner's 2013 total household income (per his or her (or in the case of a minor child, his or her legal guardian's) 2013 income tax return or equivalent documentation), less the pension benefit paid to the Eligible Pensioner from the Retirement System in 2013, as adjusted for inflation or Social Security COLA increases; (ii) the Adjusted Accrued Benefit that is payable to the Eligible Pensioner for that year as determined under Section G-1, (iii) any pension restoration payment to the Eligible Pensioner as determined under Section G-4; and (iv) the Eligible Pensioner's Income Stabilization Benefit.

(4)     A separate recordkeeping fund called the "Income Stabilization Fund" shall be established by the Board for the sole purpose of paying the Income Stabilization Benefits and Income Stabilization Benefits Plus to Eligible Pensioners. Any funds received by the Retirement System that is designated by the City as UTGO Bond Tax Proceeds or a contribution to the Income Stabilization Fund shall be credited by the Board to the Income Stabilization Fund. The assets credited to the Income Stabilization Fund will be invested on a commingled basis with assets of the Retirement System and will be credited with a pro-rata portion of the earnings and losses of the Retirement System. Amounts credited to the Income Stabilization Fund may not be used for any purpose other than the payment of

Income Stabilization Benefits and Income Stabilization Benefit Plus benefits to Eligible Pensioners, except as expressly provided in Section G-3 (7).

(5) For purposes of this Section G-3, an "Eligible Pensioner" is a retiree or surviving spouse who is at least 60 years of age or a minor child receiving survivor benefits, each as of the effective date of the Plan of Adjustment, whose benefit will be reduced as provided in Section G-1, and who is eligible to receive Income Stabilization Benefits because (i) such individual is receiving monthly pension benefits from the Retirement System as of the effective date of the Plan of Adjustment, and (ii) such individual has a total annual household income equal to or less than 140% of the federal poverty level in 2013 (per his or her (or in the case of a minor child, his or her legal guardian's) 2013 income tax return or equivalent documentation).

   a. An eligible individual must apply for an Income Stabilization Benefit in accordance with procedures established by the Authority and provide such substantiation of the individual's aggregate annual household income as is required by the State in its sole discretion.

   b. The initial determination of Eligible Pensioners, and amount of the Income Stabilization Benefit payable to each Eligible Pensioner shall be made by the State in its sole discretion. The State shall transmit the list of Eligible Pensioners to the Investment Committee and the Board. The Board, with the assistance of the Investment Committee, shall be responsible for administering the Income Stabilization Fund and annually certifying to the State Treasurer that it has administered the requirements for eligibility and payment of benefits with respect to Eligible Pensioners in accordance with the terms of the State Contribution Agreement.

   c. After the initial determination of Eligible Pensioners is made, no new individuals will be eligible to receive an Income Stabilization Benefit or an Income Stabilization Benefits Plus benefit at any time in the future.

   d. An Eligible Pensioner will cease to be an Eligible Pensioner as of the earlier of (i) the Eligible Pensioner's death, or (ii) with respect to any minor child receiving survivor benefits, the date the minor child reaches the age of 18 years.

(6) For purposes of this Section G-3, the "Federal Poverty Level" means the poverty guidelines published each year in the Federal Register by the United States Department of Health and Human Resources.

(7) In the event that in 2022 (provided that the State has not issued a Certificate of Default (as defined in the State Contribution Agreement) with respect to the Retirement System at any time prior to 2022), it is the opinion of at least 75% of the independent members of the Investment Committee that the assets of the Income Stabilization Fund exceed the Income Stabilization Benefits and Income

Stabilization Benefits Plus benefits anticipated to be made to Eligible Pensioners by the Retirement System in the future ("Excess Assets"), the Investment Committee may, in its sole discretion, recommend to the Board that all or a portion of the Excess Assets, in an amount not to exceed $35 million, be used to fund the Adjusted Accrued Benefits or Adjusted Deferred Accrued Benefits, as applicable, payable by the Retirement System. The Investment Committee shall have the right to engage professional advisers to assist in making this determination and such expenses shall be paid by the Retirement System.

(8)     In the event that any funds remain in the Income Stabilization Fund on the date upon which there are no Eligible Pensioners under the Retirement System, such funds shall be used to fund the Adjusted Accrued Benefits or Adjusted Deferred Accrued Benefits, as applicable, payable by the Retirement System.

## Sec. G-4. Restoration of Pension Benefits

The following rules shall govern how accrued pensions, including Pension Improvement Factor ("COLA") benefits, that are reduced as part of the Plan of Adjustment, shall be restored during the thirty year period following the confirmation order issued by the Bankruptcy court in *In Re. City of Detroit, Michigan*, Case No. 13-53846. The pension restoration process shall be supervised, and restoration decisions undertaken by the Investment Committee and in accordance with the pension governance provisions set forth in the State Contribution Agreement and exhibits thereto. The pension restoration program shall be deemed a part of this Component II, but in the event of any conflict between the language set forth herein and the pension restoration agreement attached to and made a part of the Plan of Adjustment ("Pension Restoration Agreement"), the terms of the Pension Restoration Agreement will govern.

(1)     *Waterfall Classes.*

There will be three Waterfall Classes:

a.     Waterfall Class 1 – Retirees, in retirement benefit pay status as of June 30, 2014, and their surviving spouses and beneficiaries.

b.     Waterfall Class 2 – Retirees, who entered into retirement benefit pay status after June 30, 2014, and their surviving spouses and beneficiaries, and who are in pay status as of the end of the Fiscal Year prior to the year in which the restoration decision is made.

c.     Waterfall Class 3 – All other Members who as of June 30, 2014 are not in retirement benefit pay status.

(2)     *Restoration of Benefits Through June 30, 2023.*

a.     Each year in conjunction with the annual actuarial valuation report, the Plan Actuary will project the funded ratio of the Retirement System as of 2023 based upon the market value of plan assets relative to the actuarial

accrued liabilities (the "Funded Level"). This projection will be further based upon a 6.75% assumed rate of investment return which is net of expenses (investment and administrative), future Employer contributions as set forth in the Plan of Adjustment (subject to the conditions in the Plan of Adjustment) and such other actuarial assumptions as utilized by the Plan Actuary. For purposes of restoration of benefits through June 30, 2023, the Funding Target will be a 70% funded ratio, the Restoration Target will be a 75% funded ratio, and the Restoration Reserve Suspension Trigger will be a 71% funded ratio, all projected to June 30, 2023. For purposes of calculating the funded ratio, the assets in the Restoration Reserve Account will be excluded. Each year, if the Actuary projects that the projected Funded Level as of June 30, 2023 (excluding Restoration Reserve Account assets to avoid double counting) exceeds the Restoration Target (i.e., exceeds 75%), a credit of assets for bookkeeping purposes will be made into a new notional "Restoration Reserve Account". The notional credit will be in an amount equal to the excess of assets above the amount projected to be needed to satisfy the Restoration Target. Once the Restoration Reserve Account is established, each year thereafter, Restoration Reserve Account assets will be credited with interest in an amount equal to the net return on Retirement System investments, but capped at the actuarially assumed rate of investment return (i.e., 6.75% for the period through June 30, 2023). In the event of net losses, the credited asset value of the Restoration Reserve Account will be diminished to reflect such losses and any required transfer to the Pension Reserve Fund.

b.      To the extent that the City's (including DWSD or a successor authority) actual contributions in any of the Fiscal Years 2015 through 2023 are less than the contributions provided for in the Plan of Adjustment, such difference and any investment earnings thereon shall be notionally allocated to the Pension Reserve Fund.

c.      Actual restoration payments and credits will work as follows: each year in conjunction with preparation of the annual actuarial valuation report and following establishment of the Restoration Reserve Account, the Plan Actuary will determine whether there are sufficient funds in such account to restore a portion of the 4.5% across the board pension cuts in one or more minimum incremental amounts equal to ½% of the monthly benefit for each member of Waterfall Class 1 (i.e. reducing the initial across the board cut to 4.0%). This restoration only occurs if the funding level in the Restoration Reserve Account can fund 100% of each incremental increase over the remaining actuarially projected lives of the eligible recipients in Waterfall Class 1. If the Restoration Reserve Account satisfies the required funding level, then in the next Fiscal Year, actual restoration payments will be made to Waterfall Class 1 members in amounts equal to the benefit associated with each increment that have been fully funded in the Restoration Reserve Account. Once Waterfall Class 1 has sufficient

assets in the Restoration Reserve Account to fully fund and restore the 4.5% cut in their monthly benefits, and to the extent that additional assets in the Restoration Reserve Account remain and will fully fund at least ½% of the monthly benefit for each member of Waterfall Class 2 over their remaining actuarially projected lives, then Waterfall Class 2 members will receive pension restoration in minimum ½% benefit increments until an amount equal to the 4.5% cuts in their monthly benefits has been fully funded. At that juncture, and to the extent that additional assets in the Restoration Reserve Account remain and will fund at least a minimum ½% of the monthly benefit of each member in Waterfall Class 3 over their remaining actuarially projected lives, then each such member of Waterfall Class 3 shall receive a credit granting them a right upon retirement to receive pension restoration equal to the benefit increments that are fully funded. Restoration payments will be calculated and paid on a prospective basis only.

d.    After the full 4.5% across the board pension cuts are restored for all three Waterfall Classes, and to the extent there are additional assets in the Restoration Reserve Account to fully fund COLA benefits over the actuarially-projected lives of the eligible recipient Waterfall Class, such assets will be used to fully fund and restore a portion of the COLA values that were eliminated as part of the Plan of Adjustment. COLA will be restored in minimum 10% COLA value increments up to 50% of the future COLA values for each member of Waterfall Class 1 (i.e., a 50% future COLA value will constitute a 1.25% simple COLA), then up to 50% of the future COLA values for each member of Waterfall Class 2, and then up to 50% of the future COLA values for each member of Waterfall Class 3 until all members of the three Waterfall Classes have had 50% of the value of their COLAs fully funded and restored. After 50% of the future values of COLA have been fully funded and restored, and to the extent there are additional assets in the Restoration Reserve Account for each of the three Waterfall Classes, then a second 50% COLA restoration will be made, first to members of Waterfall Class 1, then Waterfall Class 2, and then Waterfall Class 3. Classes will be restored in minimum 10% COLA value increments. Restoration payments will be calculated and paid on a prospective basis only.

e.    If the amounts in the Restoration Reserve Account are sufficient to fully-fund the 4.5% across the board pension cuts for all three Waterfall Classes and 100% COLA restoration for all three Waterfall Classes, then any additional assets in the Restoration Reserve Account shall be used to increase the frozen accrued benefits of active and other Members whose Annuity Savings Fund accounts were diminished as part of the Annuity Savings Fund Recoupment (described in Section G-2), such that they receive treatment equal to the 20%/20% ceiling applied to retirees in pay status under the Plan of Adjustment. If after such pension restoration there are additional assets in the Restoration Reserve Account to fully

fund benefit increments over their remaining actuarially projected lives, Waterfall Class 1 members will receive pension restoration in ½% benefit increments of the reductions to their monthly pension due to Annuity Savings Fund Recoupment, and once such pension benefits are restored, Waterfall Class 2 members will receive pension restoration in ½% benefit increments in connection with the reductions to their monthly pensions due to Annuity Savings Fund Recoupment.  Restoration payments will be calculated and paid on a prospective basis only

f.     Once restoration payments to applicable retirees and restoration credits to active employees begin, as long as the Restoration Reserve Account continues to have assets sufficient to fund 100% of an incremental pension restoration amount for such Waterfall Class members for their actuarially projected lives, such restoration payments and credits will continue; provided, however, that in the event the Restoration Reserve Account, after having sufficient assets to fund 100% of two or more increments (over their actuarially projected lives), falls below 100% for the second or greater increment, the annual amounts to pay such second or other additional increment can continue until the Restoration Reserve Account lacks any assets to fund it.  For example, assume a ½% increment in Waterfall Class 1 requires $10 million in assets to be fully funded for the Waterfall Class members' actuarially projected lives, and that based on Fiscal Year 2018 results the Restoration Reserve Account has assets of $22 million so as to fund two increments of restoration in Fiscal Year 2019, (i.e., a 1% pension increase).  Assume further that in the following Fiscal Year the Restoration Reserve Account drops in value to $17 million; in such event two increments could still be paid, and the second increment of ½% would cease being paid only if the value of assets in the Restoration Reserve Account dropped to or below $10 million (in the event they dropped below $10 million, the first increment also would cease being paid).  For purposes of restoration reduction, restoration increments will be taken away in reverse order in which they were granted (i.e. last in, first out).

g.     In the event the Funded Level (not including the assets in the Restoration Reserve Account) falls below 71% (hereinafter, "Restoration Reserve Suspension Trigger"), then, until such time as the projected Funded Level in 2023 is 71% or above, further interest credits to the notional Restoration Reserve Account will cease notwithstanding the actual net investment returns for the Retirement System for the Fiscal Year in question. Furthermore, if the Funded Level projected to 2023 falls below the Funding Target (i.e., 70%) then restoration payments and credits in the following year will be modified in the following manner: (1) funds previously credited  to the Restoration Reserve Account will be notionally transferred and credited to the Pension  Reserve Account in sufficient amounts to restore the projected Funded Level in 2023 to 70%; (2) following such transfer, the remaining assets in the Restoration Reserve

13-53846-swr  Doc 8045-1   Filed 10/22/14   Entered 10/22/14 05:47:23   Page 582 of
409
13-53846-tjt  Doc 8045-1   Filed 10/22/14   Entered 10/22/14 05:48:23   Page 132 of

Account shall be applied to make restoration payments in accordance with and pursuant to the same mechanism described in paragraph f.

h.      Following receipt of the actuarial reports for 2019, and in the event that the projected Funded Level as of 2023 is less than 71%, the Plan Actuary shall revisit the restoration calculations that it made during each of the prior four (4) years.  It shall recalculate each such prior year's Funded Level  projection, this time by assuming the lesser of (i) $4.5 million in annual administrative expenses until 2023, or (ii) an amount of annual administrative expenses until 2023 equal to the average annual normal course administrative expenses in the prior four (4) years applicable to Component II, in addition to a net 6.75% annual investment return.  If such retrospective recalculation indicates that fewer amounts would have transferred to the Restoration Reserve Account than actually were transferred during such look back period, then the Restoration Reserve Account shall be debited by the lesser of (i) this difference (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period) or (ii) the dollars that were actually paid out in restoration payments during such look-back period (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period); or (iii) the amount required to increase the projected 2023 Funded Level to 71%.

(3)     *Restoration of Benefits from July 1, 2023 to June 30, 2033.*

a.      During this period, the Funding Target, the Restoration Target, the Permanent Restoration Targets and the Restoration Reserve Suspension Trigger shall be as set forth below:

| 2023 Funded Level | 2033 Funding Target/Restoration Target |
|---|---|
| 75% | 75%/78% |
| 74% | 74%/77% |
| 73% | 73%/76% |
| 72% | 72%/75% |
| 71% | 71%/74% |
| 70% | 70%/73% |
| 69% or lower | the % = to 2023 Funded Level %/73% |

2033 Permanent Restoration Target
75%, or if greater, 1% more  than 2033 Restoration Target

2033 Restoration Reserve Suspension Trigger
1%  more than the projected Funding Target for all time periods

The same rules for variable restoration payments and credits that applied during the period ending June 30, 2023 shall apply during the period ending June 30, 2033 (including ceasing interest credits in the event of a Restoration Reserve Suspension Trigger,  and making Restoration Reserve Account asset transfers to the Pension Reserve Fund in the event the 2033 Funded Level falls below the 2033 Funding Target), except as follows.

For purposes of determining whether the 2033 Restoration Target has been satisfied, the Plan Actuary shall project investment returns through June 30, 2033 at the then current investment return assumption which is assumed to be net of expenses (administrative and investment) and the applicable actuarial assumptions as utilized in the annual actuarial valuation. Further, the Plan Actuary shall assume, merely for purposes of determining whether the Restoration Target is satisfied, that the annual City contribution amount shall be the annual amount necessary to fund the Retirement System based upon an amortization of the actual 2023 UAAL at market value over 30 years (hereinafter, the "2023 UAAL Amortization") and in such manner that the resulting annual contribution stream would achieve the Funding Target set forth above as of 2033. (Such projected, hypothetical contributions shall be for purposes only of making restoration determinations, and shall not necessarily be the actual contributions made or required to be made by the City or recommended during such period; all of which shall be determined independent of the restoration calculation process.). For purposes of calculating the funded ratio, the assets in the Restoration Reserve Account will be excluded.

b.     To the extent that the City's actual contributions to the Retirement System in any of the Fiscal Years 2024 (the year ending June 30, 2024) through 2033 are greater than the projected annual contribution under the 2023 UAAL Amortization, such amounts, and any investment earnings thereon, shall be notionally credited to a new bookkeeping account in the Retirement System called the Extra Contribution Account. In determining pension restoration during the period from Fiscal Year 2024 through 2033, none of the amounts in the Extra Contribution Account shall be considered for purposes of determining the projected funded level for the Restoration Target or Permanent Restoration Targets. To the extent that the City's (including for this purpose DWSD or a successor authority) actual contributions in any of the Fiscal Years 2024 through 2033 are less than the projected annual contribution under the 2023 UAAL Amortization, such difference and any investment earnings thereon shall be notionally allocated to the Pension Reserve Fund.

c.     Each year, in addition to the credit of assets that exceed the amount necessary to satisfy the Restoration Target, existing Restoration Account assets will be credited with interest equal to the net return on Retirement System investments, but capped at the then investment return assumption. In the event of net losses, the credited asset value of the Restoration Reserve Account will be diminished to reflect such losses.

d.     In connection with preparation of the actuarial report for Fiscal Year 2028, the Plan Actuary will determine whether the Retirement System has satisfied the applicable Permanent Restoration Target, which shall be 75%. Transfers from the Restoration Reserve Account for credit to the Pension Reserve Fund may be made in such amounts as are necessary to

satisfy the Permanent Restoration Target.  If following such transfers the Funded Level as of June 30, 2028 has satisfied  the Permanent Restoration Target (75%), then the amounts in the Restoration Reserve Account, if any (which will necessarily represent excess not necessary to satisfy the Permanent Restoration Target), and which fully fund one or more increments of restoration payments for one or more Waterfall Classes over such Waterfall Class members' actuarially projected lives, shall be transferred from the Restoration Reserve Account and credited to the Pension Reserve Account and the applicable incremental payments shall be permanently restored for the applicable Waterfall Class and shall no longer be variable from year to year.  Variable restoration payments will continue to be paid or credited during the period from July 1, 2028 through June 30, 2033 based on the applicable Restoration Target set forth in paragraph a and otherwise in accordance with this Section G-4, notwithstanding whether the Restoration Target during this period is less than the Permanent Restoration Target as of June 30, 2028 of 75%.

e.  In connection with preparation of the annual actuarial valuation report for Fiscal Year 2033, the Plan Actuary will determine whether the Retirement System has satisfied the Permanent Restoration Target for 2033, as set forth in paragraph a.  Transfers from the Restoration Reserve Account for credit to the Pension Reserve Account may be made in such amounts as are necessary to satisfy the Permanent Restoration Target.  If following such transfers the Funded Level as of June 30, 2033 has satisfied the applicable Permanent Restoration Target, then the amounts in the Restoration Reserve Account if any (which will necessarily represent excess not necessary to satisfy the Permanent Restoration Target), and which fully fund one or more increments of restoration payments for one or more Waterfall Classes over such Waterfall Class members' actuarially projected lives, shall be transferred from the Restoration Reserve Account and credited to the Pension  Reserve Account and the applicable incremental payments shall be permanently restored for the applicable Waterfall Class and shall no longer be variable from year to year.

f.  Following receipt of the actuarial reports for 2028, and in the event that the projected Funded Level of the Retirement System as of 2033 is less than 71%, the Plan Actuary shall revisit the restoration calculations that it made during each of the prior four (4) years.  It shall recalculate each such prior year's Funded Level  projection, this time by assuming the lesser of (i) $4.5 million in annual administrative expenses until 2033, or (ii) an amount of annual normal course administrative expenses until 2033 equal to the average annual administrative expenses in the prior four (4) years applicable to Component II, in addition to a net 6.75% annual investment return.  If such retrospective recalculation indicates that fewer amounts would have transferred to the Restoration Reserve Account than actually were transferred during such look back period, then the Restoration Reserve Account shall be debited by the lesser of (i) this difference (plus

interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period) or (ii) the dollars that were actually paid out in restoration payments during such look-back period (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period); or (iii) the amount required to increase the projected 2033 Funded Level to 71%.

(4)  *Restoration of Benefits from July 1, 2033 to June 30, 2043.*

a.  During this period, the Funding Target, the Restoration Target , the Permanent Restoration Target and the Restoration Reserve Suspension Trigger shall be as set forth below:

| 2023 Funded Level | 2043 Funding Target/Restoration Target |
|---|---|
| 75% | 75%/78% |
| 74% | 74%/77% |
| 73% | 73%/76% |
| 72% | 72%/75% |
| 71% | 71%/74% |
| 70% | 70%/73% |
| 69% or lower | the % = to 2023 Funded Level %/73% |

2043 Permanent Restoration Target
75% ,or if greater, 1% more  than 2043 Restoration Target

2043 Restoration Reserve Suspension Trigger
1%  more than the projected Funding Target for all time periods

The same rules for restoration that applied during the period ending June 30, 2033 shall otherwise apply (including ceasing interest credits in the event of a Restoration Reserve Suspension Trigger, and making Restoration Account asset transfers to the Pension Reserve Fund in the event the 2043 Funded Level falls below the 2043 Funding Target). For example, for purposes of determining whether the 2043 Restoration Target has been satisfied, the Plan Actuary shall project annual contributions using the same 2023 UAAL Amortization. For purposes of calculating the funded ratio, the assets in the Restoration Reserve Account will be excluded, and no Extra Contribution Account assets shall be included for purposes of determining  whether the Funded Level meets the Restoration Target or Permanent Restoration Target, including any additions to such account after 2033.

b.  In connection with preparation of the annual actuarial valuation report for Fiscal Year 2043, the Plan Actuary will determine whether the Retirement System has satisfied the applicable Permanent Restoration Target, as set forth in paragraph a.  Transfers from the Restoration Reserve Account for credit to the Pension Reserve Account may be made in such amounts as are necessary to satisfy the Permanent Restoration Target.  If following such transfers the Funded Level as of June 30, 2043 is equal to or greater than the applicable Permanent Restoration Target, then the amounts in the

Restoration Reserve Account if any (which will necessarily represent excess not necessary to satisfy the Permanent Restoration Target), shall be transferred from the Restoration Reserve Account and credited to the Pension Reserve Account and the applicable payments for the applicable Waterfall Class shall be permanently restored and shall no longer be variable.

(5)     *Modification of the Pension Restoration Program.*

If any time after July 1, 2026, the Investment Committee (by vote of 5 of its 7 members), or the Board of Trustees (by a greater than 66% vote) determines that a change in relevant circumstances has occurred, or there was a mutual mistake of fact in developing the Pension Restoration Agreement, such that the continued operation of the Pension Restoration Agreement without amendment will: (a) materially harm the long-term economic interests of the City, or Retirement System; (b) materially impair the City's ability to fully fund over a reasonable period the then existing frozen benefit liabilities; or (c) materially hinder the restoration program, if as of that juncture (and for purposes of applying this subsection 5) annual funding levels (excluding the Extra Contribution Account) had materially exceeded the applicable Restoration Targets for a substantial period yet without any material actual restoration of benefits as contemplated herein having been made, the Investment Committee or the Board, as the case may be, shall provide written notice to the other entity of such a determination and of the need to amend the Pension Restoration Agreement and this Section G-4 (it being understood that the post-Chapter 9, 40-year amortization period (to 2053) to fully fund the Retirement System's frozen liabilities is, unless the relevant facts demonstrate otherwise, presumptively reasonable). The Investment Committee and the Board shall then meet to negotiate amendments to the Pension Restoration Agreement that address the identified risk of harm or impairment, but which also considers the Pension Restoration Agreement's objective of providing pension restoration. Such negotiations shall take into account reasonable actions the City has pursued or could pursue to mitigate such harm or impairment. Any such amendments shall require the approval of a majority vote of the combined members of the Investment Committee and Board (persons who sit on both the Board and Investment Committee shall have one vote). Such parties shall consult with the Mayor, City Council and the Governor of the State of Michigan ("Governor") in connection with such negotiation.

If the Board, acting through a majority, and the Investment Committee, acting through a majority, cannot agree to such amendments with the 90-day period following the provision of such notice by the determining party, then the Board and Investment Committee shall proceed to mediation upon demand from either the Board or the Investment Committee. In this regard, within 30-days following expiration of the 90-day period the Board and the Investment Committee shall each select a mediator from the list of approved mediators for the United States District Court for the Eastern District of Michigan. The two selected mediators shall appoint a third neutral mediator from the approved list. Each party shall

furnish a written statement to the mediators within 30 days of selection of the neutral mediator. Representatives of the Mayor and the Governor shall be consulted in connection with such mediations. If following a 90-day mediation period following submission of the written statements the matter is not settled, then either the Investment Committee or the Board can file an action in the United Stated District Court for the Eastern District of Michigan asking it to declare, inter alia, whether or in what manner to amend the Pension Restoration Agreement and this Section G-4.

## ARTICLE H.  MISCELLANEOUS PROVISIONS OF THE GENERAL RETIREMENT SYSTEM

**Sec. H-1.  Enforcement; Civil Action.**

A civil action for relief against any act or practice which violates the state law, the 1997 Detroit City Charter, 1984 Detroit City Code or the terms of this Plan, may be brought by:

(1)　A Plan participant who is or may become eligible to receive benefit;

(2)　A beneficiary who is or may become eligible to receive a benefit;

(3)　A Plan fiduciary, including a Trustee;

(4)　The Finance Director, on behalf of the City as Plan sponsor.

**Sec. H-2.  Limitation of Other Statutes.**

No other provision of law, charter, or ordinance, which provides pensions or retirement benefits wholly or partly at the City expense, exclusive of federal Social Security old-age and survivors' insurance benefits for City employees, their surviving spouses and other dependents, shall apply to Members, retirees or beneficiaries of the Retirement System, their surviving spouses or other dependents.

**EXHIBIT I.A.281**

PRIOR PFRS PENSION PLAN

13-53846-tjt Doc 8045-1 Filed 10/20/14 Entered 10/20/14 05:47:23 Page 146 of
429
13-53846-swr Doc 8045-1 Filed 10/20/14 Entered 10/20/14 05:48:23 Page 590 of
809

# COMBINED PLAN
# FOR THE
# POLICE AND FIRE
# RETIREMENT SYSTEM OF
# THE CITY OF DETROIT, MICHIGAN

## Amendment and Restatement Effective July 1, 2014

13-53846-tjt Doc 8045-1 Filed 10/22/14 Entered 10/22/14 05:47:23 Page 147 of
429
13-53846-swr Doc 8405-21 Filed 10/20/14 Entered 10/20/14 05:48:23 Page 591 of
809

# TABLE OF CONTENTS

COMPONENT II ........................................................................................................... 1

ARTICLE A.    COMMON PROVISIONS OF THE POLICE AND FIRE
RETIREMENT SYSTEM ............................................................... 2

    Sec. A-1.    Common Provisions.................................................................. 2

ARTICLE B.    FREEZE OF POLICE AND FIRE RETIREMENT SYSTEM AS OF
JUNE 30, 2014.............................................................................. 4

    Sec. B-1.    Freeze of Police and Fire Retirement System as of June 30, 2014........... 4

ARTICLE C.    DEFINITIONS................................................................................ 6

    Sec. C-1.    Definitions............................................................................... 6

ARTICLE D.    MEMBERSHIP ............................................................................. 13

    Sec. D-1.    Generally................................................................................ 13

    Sec. D-2.    Membership election option prior to July 1, 2014.................... 14

    Sec. D-3.    Cessation of membership ........................................................ 15

ARTICLE E.    SERVICE CREDITABLE................................................................ 16

    Sec. E-1.    Members to file statement of service, etc ................................ 16

    Sec. E-2.    Credit for service.................................................................... 16

    Sec. E-3.    Employees in military service commencing prior to July 1, 2014 ......... 16

    Sec. E-4.    Verification of service claimed................................................ 19

    Sec. E-5.    Prior Service certificates ......................................................... 19

    Sec. E-6.    Creditable service at retirement .............................................. 19

ARTICLE F.    BENEFITS PROVIDED TO MEMBERS.................................... 20

    Sec. F-1.    Petition for retirement, mandatory age ................................... 20

    Sec. F-2.    Old Plan/New Plan.................................................................. 22

    Sec. F-3.    Pension Multiplier................................................................... 23

    Sec. F-4.    Disposition of surplus benefits upon death of retired member ............... 24

    Sec. F-5.    Retirement allowance for certain persons leaving City employment
after eight years service (40 & 8)............................................. 24

    Sec. F-6.    Reduced Early Pension Benefits (40 & 8 Vesting Retirees)................... 25

    Sec. F-7.    Duty disability........................................................................ 26

    Sec. F-8.    Duty disability benefits; members in service on or after July 1,
1941 but prior to January 1, 1969 ........................................... 26

# TABLE OF CONTENTS
## (continued)

Sec. F-9. Duty disability benefits; members beginning service on or after January 1, 1969 and becoming disabled prior to the dates set forth in Section F-10 ................................................................ 28

Sec. F-10. Duty Disability benefits; DFFA, DPOA and DPLSA members beginning service on or after January 1, 1969 and becoming disabled on or after the dates set forth below ........................................... 29

Sec. F-11. Non-duty disability ................................................................. 31

Sec. F-12. Disability retirement procedures ............................................. 32

Sec. F-13. Generally ................................................................................ 34

Sec. F-14. Increase of Benefits; Pension Improvement Factor (Escalator) ............. 35

Sec. F-15. Payment ................................................................................. 36

Sec. F-16. Generally ................................................................................ 36

Sec. F-17. Payment of Accumulated Contributions ................................... 38

Sec. F-18. Allowances to surviving spouses ............................................. 38

Sec. F-19. Payment of benefits ................................................................ 40

Sec. F-20. Payment of benefits ................................................................ 40

Sec. F-21. Deferred vested benefits ......................................................... 40

Sec. F-22. Forfeiture of rights ................................................................. 41

Sec. F-23. Generally ................................................................................ 41

Sec. F-24. Disposition of surplus benefits upon death of Member and Beneficiary ..................................................... 43

Sec. F-25. Generally ................................................................................ 43

Sec. F-26. Generally ................................................................................ 43

Sec. F-27. Authority of Board ................................................................. 44

Sec. F-28. Member With Twenty or Twenty-Five Years of Service ............ 45

Sec. F-29. Disabled Member ................................................................... 45

Sec. F-30. Optional Annuity Withdrawal ................................................. 45

ARTICLE G. METHOD OF FINANCING ..................................................... 48

Sec. G-1. General ................................................................................... 48

Sec. G-2. Annuity Savings Fund ............................................................ 48

Sec. G-3. Annuity Reserve Fund ............................................................ 49

Sec. G-4. Alternative Financing Method ................................................. 49

# TABLE OF CONTENTS
## (continued)

**Page**

Sec. G-5. Contributions to and payments from Pension Accumulation Fund ......... 50

Sec. G-6. Retiree payments from Pension Reserve Fund; reinstatement of disability retirees to active service ............................................................ 51

Sec. G-7. Expense Fund ............................................................................................... 51

Sec. G-8. Appropriations prior to July 1, 2014 ....................................................... 51

Sec. G-9. Maintenance of reserves ........................................................................... 51

Sec. G-10. Survivors Benefit Fund .............................................................................. 51

Sec. G-11. Computation of Annuity and Pension Reserve liabilities for Members, Retirees and Beneficiaries ...................................................... 53

Sec. G-12. Determination of City's annual contribution — Disability Pension liabilities ...................................................................................................... 56

Sec. G-13. Determination of City's annual contribution — Death Pension liabilities ...................................................................................................... 56

Sec. G-14. Determination of City's annual contribution — Actuarial evaluation of annuity and Pension Reserve liabilities ............................ 57

Sec. G-15. Determination of City's annual contribution — Service Pension liabilities for Fiscal Years commencing prior to July 1, 2014 ................ 57

Sec. G-16. Board of trustees to compute City's annual contribution ....................... 57

Sec. G-17. Refunds for certain Members ................................................................... 58

Sec. G-18. Employer Contribution ............................................................................. 58

ARTICLE H. MISCELLANEOUS ................................................................................. 59

Sec. H-1. Recall of Retirees during emergencies .................................................... 59

ARTICLE I. DEFERRED RETIREMENT OPTION PLAN ........................................... 60

Sec. I-1. General provisions ................................................................................... 60

Sec. I-2. Conversion to Retirement Allowance ...................................................... 60

Sec. I-3. Investment of DROP assets ...................................................................... 60

Sec. I-4. Distribution of amounts credited to DROP Account .............................. 61

Sec. I-5. Death of Member while participating in the DROP program ................. 61

Sec. I-6. Disability of Member While Participating in the DROP Program .......... 62

Sec. I-7. Cost Neutrality ......................................................................................... 62

ARTICLE J. PARTICIPANT ANNUITY SAVINGS FUND LOAN PROGRAM ........... 64

Sec. J-1. Participant Annuity Savings Fund Loan Program ................................. 64

-iii-

# TABLE OF CONTENTS
(continued)

ARTICLE K. SPECIAL PLAN OF ADJUSTMENT PROVISIONS ................................. 67

    Sec. K-1. Benefit Changes implemented in accordance with the terms of the Plan Of Adjustment ...................................................................... 67

    Sec. K-2. Income Stabilization Benefits .............................................. 67

    Sec. K-3. Restoration of Pension Benefits ........................................... 70

APPENDIX A ........................................................................................ 79

ARTICLE IX, SECTION 24 OF STATE OF MICHIGAN CONSTITUTION ......................... 79

CITY OF DETROIT CHARTER ......................................................................... 80

DETROIT CITY CODE ................................................................................... 81

# COMPONENT II

# ARTICLE A.  COMMON PROVISIONS OF THE POLICE AND FIRE RETIREMENT SYSTEM

**Sec. A-1.**     **Common Provisions**

Certain provisions of the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan described below are common to both Component I and this Component II as in effect July 1, 2014.  Those provisions are set forth in the following Sections of Component I:

(a)     Article I (General Provisions);

(b)     Article II (Definitions):

Actuarial Equivalent or Actuarially Equivalent

Actuarially Equivalent Value

Administrative Board of Trustees

Administrative Rules and Regulations

Age; Attainment of

Board of Trustees or Board or Retirement Board

City

City Council or Council

Combined Plan

Component I

Component II

DFFA

DPLSA

DPCOA

DPOA

Detroit Police and Fire Retirement System or Retirement System

Fiscal Year

Internal Revenue Code or Code

Investment Committee

Medical Director

Notice to Members, Beneficiaries and Retirees;

Plan Actuary or Actuary;

Plan Document or Combined Plan Document;

Plan of Adjustment;

Plan Year;

Spouse;

Straight Life Retirement Allowance; and

Total Disability or Totally Disabled;

(c)     Article 13 (Limitation on Benefits and Contributions);

(d)     Article 14 (Retirement System Administration);

(e)     Article 15 (Management of Funds);

(f)     Article 16 (Investment of Retirement System Assets); and

(g)     Article 18 (Miscellaneous).

13-53846-tjt   Doc 8045-1    Filed 10/20/14    Entered 10/20/14 05:47:23    Page 154 of
429
13-53846-swr   Doc 8045-1    Filed 10/20/14    Entered 10/20/14 05:46:23    Page 598 of
809

## ARTICLE B.  FREEZE OF POLICE AND FIRE RETIREMENT SYSTEM
## AS OF JUNE 30, 2014

**Sec. B-1.**       **Freeze of Police and Fire Retirement System as of June 30, 2014.**

Notwithstanding anything in Chapter 47 of the 1984 Detroit City Code, or in Chapter 54, Article II of the 1964 Detroit City Code, or any ordinances, resolutions, or orders, or parts thereof, whether codified or not codified, or any collective bargaining agreement or other documents governing terms of employment to the contrary, effective as of June 30, 2014 (the "Freeze Date"):

(a)        No new employee hired by the City on or after July 1, 2014 shall become a Member who is eligible to accrue a benefit under the terms of the Police and Fire Retirement System in effect as of the Freeze Date;

(b)        No employee who is rehired by the City on or after July 1, 2014 and who received a distribution of his accumulated employee contributions prior to July 1, 2014, shall become a Member who is eligible to accrue a benefit under the terms of the Police and Fire Retirement System in effect as of the Freeze Date; provided, however, that if a Member who is entitled to a Frozen Accrued Benefit as defined in subsection (d) of this Section B-1 and who is rehired by the City on or after July 1, 2014 repays to the Police and Fire Retirement System in accordance with a payment schedule approved by the Board of Trustees the amount of accumulated employee contributions that he withdrew, then such Member shall be eligible to accrue service credit under this Component II following rehire solely for the purpose of determining the Member's eligibility for payment of his Frozen Accrued Benefit;

(c)        No Member shall make contributions to the Annuity Savings Fund under the Police and Fire Retirement System in effect as of June 30, 2014 with respect to payroll dates occurring on or after August 1, 2014 and all Member contributions made with respect to payroll dates occurring on or after August 1, 2014 shall be made to and in accordance with the terms of Component I of the Combined Plan;

(d)        Benefit accruals for Members with respect to service rendered prior to July 1, 2014 will be frozen based on a Member's years of service and Average Final Compensation and the pension multiplier formulae as of such Freeze Date ("Frozen Accrued Benefit");

(e)        Except as otherwise provided in this Section B-1, compensation of a Member shall be frozen effective as of the Freeze Date for purposes of determining the Member's Frozen Accrued Benefit.  No compensation of any type earned by a Member after the Freeze Date shall be taken into consideration for purposes of determining the Member's Frozen Accrued Benefit under the Police and Fire Retirement System;

(f)        Any Member who, as of June 30, 2014, would have been eligible to elect to use a portion of the unused accrued sick leave that he could have received in cash upon retirement ("Cashable Sick Leave") to increase his Average Final Compensation if the Member had been eligible to retire and had elected to retire as of June 30, 2014,

13-53846-tjt  Doc 8045-1  Filed 10/20/14  Entered 10/20/14 05:47:23  Page 155 of
13-53846-swr  Doc 8045-1  Filed 10/20/14  Entered 10/20/14 05:48:23  Page 555 of
409

shall have a one-time election to have the value of twenty-five percent (25%) of the Member's Cashable Sick Leave as of June 30, 2014 included in the computation of the Member's Average Final Compensation for purposes of determining the Member's Frozen Accrued Benefit ("Sick Leave Election"); provided, however, that the amount of the member's Cashable Sick Leave at the time the completed election form is received by the Retirement System is at least equal to the value of twenty-five percent (25%) of the Member's Cashable Sick Leave as of June 30, 2014 and, provided further that the completed election form is received by the Retirement System no later than the dates established by the City. A Member's Sick Leave Election shall be made in the manner set forth by the Board of Trustees and the Police and Fire Retirement System. Notwithstanding anything in this subsection (f) to the contrary, a Member's Sick Leave Election will be void and the determination of the Member's Average Final Compensation for purposes of calculating the Member's Frozen Accrued Benefit will not take into account any of the Member's Cashable Sick Leave, if (i) the electing Member would not have been eligible to receive an immediate service retirement benefit if he retired as of June 30, 2014, and (ii) the electing Member's employment with the City is terminated before the electing Member becomes eligible for an immediate service retirement benefit under the Police and Fire Retirement System;

(g)     Service earned after the Freeze Date shall be credited to a Member under this Component II solely for purposes of determining a Member's vesting in and eligibility for payment of his or her Frozen Accrued Benefit and to a rehired Member solely for purposes of determining the Member's eligibility for payment of his or her Frozen Accrued Benefit. Service credit for all Members for benefit accrual purposes under the terms of the Police and Fire Retirement System in effect as of the Freeze Date shall be frozen effective as of the Freeze Date and no Member shall earn service credit with respect to benefits payable under the terms of the Police and Fire Retirement System in effect as of the Freeze Date (except for vesting and benefit payment eligibility purposes) after the Freeze Date; and

(h)     The Deferred Retirement Option Plan ("DROP") shall remain in effect for all Members who have either enrolled in or elected to participate in the DROP as of June 30, 2014. Members also may elect to participate in the DROP after June 30, 2014 with respect to their Frozen Accrued Benefits; however, participation in DROP with respect to such Frozen Accrued Benefits shall be limited to five years.

The foregoing terms of Section B-1 shall be referred to as the "Freeze" of the provisions of the Police and Fire Retirement System as in effect on the Freeze Date and the provisions of Component II of the Police and Fire Retirement System shall be interpreted and construed by the Board of Trustees and the Police and Fire Retirement System to give full effect to the Freeze. To the extent that a conflict arises between this Section B-1 and the provisions of Chapter 54 of the 1964 Detroit City Code, or any Charter, ordinances, resolutions, or orders, or parts thereof, whether codified or not codified, or any collective bargaining agreement or other document governing terms of employment of an employee, the Board of Trustees and the Police and Fire Retirement System are directed to interpret any inconsistency or ambiguity to give full effect to the Freeze.

# ARTICLE C.  DEFINITIONS

Sec. C-1.        **Definitions.**

Unless a different meaning is plainly required by context, for purposes of this Component II the following words and phrases have the meanings respectively ascribed to them by this Section C-1:

(1)     *Accrued Service* shall mean a Member's credited service for employment rendered before the date of an actuarial valuation of the Retirement System and before July 1, 2014.

(2)     *Accumulated Contributions* shall mean the sum of all amounts deducted from the compensation of a Member and credited to his individual account in the Annuity Savings Fund, together with Regular Interest, as provided in this Component II of the Combined Plan.

(3)     *Annuity* shall mean payments derived from the Accumulated Contributions of a Member.

(4)     *Annuity Reserve* shall mean the present value of all payments to be made on account of any Annuity, or benefits in lieu of any Annuity, computed on the basis of such mortality tables and Regular Interest as shall be adopted by the Board of Trustees.

(5)     *Average Final Compensation* shall mean:

   a.     With respect to an "Old Plan Member" (an employee described in Section F-2(a)) the current maximum salary for the rank(s), grade(s) or position(s) held by the Member over the sixty (60) months immediately preceding the earlier of:  (i) the date his employment with the City last terminated and (ii) June 30, 2014.  The salary shall be obtained from the official compensation schedule for the Fiscal Year of the earlier of the dates described in (i) or (ii) and an average shall be determined.  A Member who retires on or after July 1, 2000 (for DPCOA and DFFA members) or July 1, 1998 (for all other Members) shall have the Member's most recent full longevity payment included in his Average Final Compensation.

   b.     With respect to a "New Plan Member" (an employee described in Section F-2(b)) the current maximum salary for the rank(s), grade(s) or position(s) held by the Member over the sixty (60) months immediately preceding the earlier of:  (i) the date his employment with the City last terminated and (ii) June 30, 2014.  The salary shall be obtained from the official compensation schedule for the Fiscal Year of the earlier of the dates described in (i) or (ii) and an average shall be determined.  If more than one (1) rank, grade or position has been held over the sixty (60) month period, a weighted average is determined based on time spent in each rank, grade or position during this sixty (60) month period.

(i)     A Member who retires on or after July 1, 2000 (for DPCOA and fire equivalents) or July 1, 1998 (for all other Members) shall have the Member's most recent full longevity payment included in his Average Final Compensation.

(ii)    Effective July 1, 2000, Average Final Compensation shall be calculated for members of the DPCOA, Executive members and their fire equivalents by using the current maximum salary for the rank(s), grade(s) or position(s) held by the Member over the thirty-six (36) months immediately preceding the earlier of:  (i) the date his employment with the City last terminated and (ii) June 30, 2014.

c.      With respect to reduced duty disability retirements occurring on or after July 1, 1992, notwithstanding the provisions of Article F, Part B, Section F-8, for those Members who receive benefits under Article F, Part B, Section F-9(a), the Average Final Compensation used in the computation of the reduced duty disability allowance shall mean the maximum salary at the date of conversion to reduced duty disability retirement for the rank(s), grade(s), or positions(s) which were held by the Member over the sixty (60) months prior to his or her duty disability retirement.

d.      Subject to Section B-1(f), for purposes of computing the Average Final Compensation received by a Member who retires on or after July 1, 2008 and prior to July 1, 2014, the Member shall have the option of adding the value of the three year average of twenty-five percent (25%) of the Member's unused accrued sick leave at the time of retirement to the earnings used in computing the Average Final Compensation.

e.      The Average Final Compensation for "Old Plan" and "New Plan" Members represented by DFFA retiring on or after July 1, 1992 or on or after July 1, 2000 for Members represented by DPOA is calculated pursuant to paragraph (b) above.  The salary is obtained from the Official Compensation Schedule for the Fiscal Year prior to the Member's elective date of retirement and an average shall be determined.

f.      Effective July 1, 2000, for Members represented by DFFA with a parity relationship with the DPCOA Inspector, Average Final Compensation shall be calculated pursuant to paragraph (b)(ii) above.  The salary is obtained from the Official Compensation Schedule for the Fiscal Year prior to the Member's elective date of retirement and an average shall be determined.

g.      For Members represented by DFFA who have a parity relationship with the DPLSA and the DPCOA Inspector, who retire on or after July 1, 1998 and for those having a parity relationship with the DPOA who retire on or after July 1, 2000 and prior to July 1, 2014, the amount of the Member's

most recent full longevity payment shall be included in the definition of Average Final Compensation.

h.      Subject to Section B-1(f), all Members represented by DFFA who retire on or after July 1, 2008 and prior to July 1, 2014, may choose to receive the 3-year average of twenty-five percent (25%) of the unused accrued sick leave bank and have that sum included in the average compensation used to compute the Members' service Pension of their Retirement Allowance.

i.      Subject to Section B-1(f), non-union uniformed Police and Fire executives represented by DPCOA who retire on or after January 15, 2010 and prior to July 1, 2014 may choose to receive the 3-year average of twenty-five percent (25%) of the unused accrued sick leave bank, and have that sum included in the Average Final Compensation used to compute the Member's service Pension of their Retirement Allowance.

j.      Subject to Section B-1(f), a Member represented by DPLSA who retires on or after July 1, 2008 and prior to July 1, 2014 may choose to receive the 3-year average of twenty-five percent (25%) of eighty-five percent (85%) of his or her unused accrued sick leave bank, and have that sum included in the Average Final Compensation used to compute the Member's service Pension of their Retirement Allowance.

(6)     *Beneficiary* shall mean any person or persons (designated by a Member pursuant to procedures established by the Board) who are in receipt of a Retirement Allowance or Pension payable from funds of the Retirement System due to the participation of a Member.

(7)     *Decrement Probabilities* shall mean the probabilities of a Member's withdrawal from City employment, death while in the employ of the City, retirement from City employment with a Pension payable from funds of the Retirement System, and death after retirement.

(8)     *Final Compensation* shall mean the annual rate of earnable compensation of a Member at the earlier of (i) the time of termination of employment or (ii) June 30, 2014. Effective July 1, 1992 and prior to July 1, 2014, compensation shall also include the value of the percentage reduction in compensation for non-union employees, pursuant to ordinance, resolution or executive order. In cases of any doubt regarding these values, the decisions of the Board of Trustees shall be controlling to implement the intention that no non-union employee will suffer a diminution of Pension benefits computation due to reduction in compensation because of fiscal emergency and that Pension benefits with respect to Fiscal Years beginning July 1, 1992 and ending June 30, 2014 should always be computed as if no reduction in compensation occurred due to ordinance, resolution or executive order or directive.

(9)     *Fire Employees* (formerly referred to as "Firemen") shall mean all employees of the Fire Department who have taken the oath of office as prescribed in Section 12 of Chapter XXI of Title IV of the 1918 Detroit City Charter employed therein prior to November 10, 1937, and who shall be in the employ of the Fire Department of the City of Detroit prior to the effective date of this amendment and restatement and, where the context requires, all persons who shall take the said oath of office and become members of the Fire Department thereafter.

(10)    *Fire Fighter* shall mean the rank in the Fire Department currently or previously classified by the civil service commission as Fire Fighter.

(11)    *Member* shall mean any member of the Retirement System who has not retired.

(12)    *Membership Service* shall mean the total service rendered as a Police Employee or Fire Employee prior to July 1, 2014.

(13)    *New Plan* shall mean the plan originally created by Title IX, Chapter VII, Article IV, Section 1(D) of the 1918 City of Detroit Charter as amended through June 30, 1974 and continued in effect through June 30, 2014 by Article 11, Section 102 of the City of Detroit Charter.

(14)    *Old Plan* shall mean the plan originally created by Title IX, Chapter VII, Article IV, Section 1(A) and (B) of the 1918 City of Detroit Charter as amended through June 30, 1974 and continued in effect through June 30, 2014 by Article 11, Section 102 of the City of Detroit Charter.

(15)    *Patrolman* shall mean the rank in the Police Department currently or previously known as patrolman.

(16)    *Pension* shall mean the portion of a Retirement Allowance which is paid for by appropriations made by the City.

(17)    *Pension Reserve* shall mean the present value of all payments to be made on account of any Pension, or benefit in lieu of any Pension, computed upon the basis of such mortality tables and Regular Interest as shall be adopted by the Board of Trustees.

(18)    *Police Employees* (formerly referred to as "Policemen") shall mean all employees of the Police Department who have taken the oath of office as prescribed in Section 12 of Chapter XXI of Title IV of the 1918 Detroit City Charter, and who shall be in the employ of the Police Department of the City of Detroit prior to the effective date of this amendment and restatement and, where the context requires, all persons who shall take the said oath of office and become members of the Police Department thereafter.

(19)    *Prior Service* shall mean service in the military rendered prior to July 1, 2014 as provided in Section E-3.

(20) *Regular Interest* shall mean, for a period of five years from the effective date of the Retirement System interest at four per centum per annum, compounded annually. For the subsequent five year period, and each five year period beginning thereafter but prior to July 1, 2013, Regular Interest shall be such rate of interest as the Board of Trustees, in its discretion, may determine and adopt. For Fiscal Years beginning on and after July 1, 2013:

    a. the annual rate of return for purposes of determining the Regular Interest to be credited to a Member's account in the Annuity Savings Fund shall not be less than zero and shall not be greater than the lesser of (i) 5.25% or (ii) the actual investment return net of expenses of the Retirement System's invested reserves for the second Fiscal Year immediately preceding the Fiscal Year in which the Regular Interest is credited; and

    b. the rate(s) of Regular Interest adopted by the Board from time to time as necessary for the operation of the Retirement System on an actuarial basis shall not violate the Plan of Adjustment.

(21) *Retiree* shall mean any Member who has retired with a Pension payable from funds of the Retirement System.

(22) *Retirement* shall mean for any Member that such Member has retired, with a Pension payable from the funds of the Retirement System.

(23) *Retirement Allowance* shall mean the sum of the Annuity and the Pension.

(24) *Retirement System or System* shall mean the Police and Fire Retirement System of the City of Detroit created and established by Title IX, Chapter VII of the 1918 Charter of the City as amended through June 30, 1974 and continued in effect by the provisions of the July 1, 1974 City Charter, and as set forth in the Combined Plan effective as of July 1, 2014 and this amendment and restatement of the Combined Plan.

(25) *Salary Factors* shall mean the ratio between a Member's rate of compensation as of the date of an actuarial valuation of the Retirement System and his rate of compensation as of the earlier of (i) the date of his Retirement and (ii) June 30, 2014.

(26) *Service* shall mean service with the City as a Police Employee or Fire Employee.

The following terms shall have the meanings given to them in the Sections of this Combined Plan Document set forth opposite such term:

Accrued Liability Fund      Section G-4(a)
additional years      Section F-9(a)(3)
Adjusted Pension Benefit      Section K-1(1)
Annuity Reserve Fund      Section G-3
Annuity Savings Fund      Section G-2(a)

ASF Excess Return                                   Section G-2(f)
Authority                                           Section K-2(1)
Cashable Sick Leave                                 Section B-1(f)
COLA                                                Section K-3
Deferred Retirement Option Plan (DROP)              Section B-1(h), Article I
Determination Date                                  Section G-4(a)
Disability Retirement Review Board                  Section F-12(b)
Eligible Pensioner                                  Section K-2(5)
Estimated Adjusted Annual Household Income          Section K-2(3)b
Expense Fund                                        Section G-7
Federal Poverty Level                               Section K-2(6)
Freeze                                              Section B-1
Freeze Date                                         Section B-1
Frozen Accrued Benefit                              Section B-1(d)
Funding Conditions                                  Section K-1(1)
Funding Proceeds                                    Section G-4(a)
Funding Target                                      Section K-3(2)(a)
GRS                                                 Section K-2(1)
Income Stabilization Benefit                        Section K-2(2)
Income Stabilization Benefit Plus                   Section K-2(3)
Income Stabilization Fund                           Section K-2(4)
New Plan Member                                     Section F-2(b)
Old Plan Member                                     Section F-2(a)
Optional Forms                                      Section F-23
Option 1. Cash Refund Annuity                       Section F-23(a)(1)
Option 2. Joint and Last Survivorship Retirement    Section F-23(a)(2)
Allowance
Option 3. Joint and Seventy-Five Percent Survivor   Section F-23(a)(3)
Allowance
Option 3(A). Modified Joint and Last Survivorship   Section F-23(a)(4)
Allowance
Option 3(B). Joint and Twenty-Five Percent Survivor Section F-23(a)(5)
Allowance
Participant Loan Program                            Section J-1
Pension Accumulation Fund                           Section G-5
Pension Funding Transaction                         Section G-4(a)
Pension Improvement Factor (Escalator)             Section F-14
Pension Reserve Fund                                Section G-6
Pop-up Form                                         Section F-23(b)(ii)
Sick Leave Election                                 Section B-1(f)
Standard Form                                       Section F-23(b)(i)
State Treasurer                                     Section K-2(1)
Straight Life Retirement Allowance                  Section F-23
Survivors Benefit Fund                              Section G-10
Transition Cost                                     Section G-2(f)
UAAL                                                Section G-4(a)

# ARTICLE D.  MEMBERSHIP

**Sec. D-1.**     **Generally.**

Subject to Section B-1, the membership of Component II of the Retirement System shall consist of the following:

(a)  All Police Employees and Fire Employees who were in Service on or after July 1, 1941, but prior to January 1, 1969; provided, however, that any Police Employee or Fire Employee who, on or before July 1, 1941, shall have been in the employ of the Police or Fire Department for a period of twenty years, or who shall have a total of twenty years of creditable Service, shall be excluded from the provisions hereof and shall retain for himself or herself, his or her wife, children, dependent mother and dependent sister all rights and privileges provided by Chapters XV and XXI of title IV of the 1918 Detroit City Charter, unless any such Police Employee or Fire Employee, on or before June 1, 1941, shall file with the City Controller his or her written election to become a Member of the Retirement System, in which event he or she shall be a Member; such excluded Police Employee not electing to become a Member, from and after July 1, 1941, while he or she remains an active member of the Police Department, shall pay five per cent of each salary payment into the fund for retired Police Employees, and any such excluded Fire Employee not electing to become a Member, from and after July 1, 1941, while he or she remains an active member of the Fire Department, shall pay five per cent of each salary payment into the Fire Department Pension and Retirement Fund, and such salary contributions shall hereafter be used toward the payments of Retirement Allowances provided for under Chapter XV, Section 14, subsections (1), (2), and (3) thereof.  On retirement, the contributions of such excluded members shall cease.

(b)  All persons who became Police Employees or Fire Employees on or after July 1, 1941, but prior to January 1, 1969, and who are confirmed as Police Employees or Fire Employees according to the rules and regulations of the respective Departments shall thereupon become Members of the Retirement System, subject, however, to the following provisions:

(i)  Any person who shall become a Police Employee or Fire Employee at an attained age of thirty-one years or more may become a Member of the Retirement System only by vote of the Board of Trustees who shall fix the rate of contribution of such Member on a basis recommended by the Actuary for the attained age of such Member.

(ii)  Any appointive official of the Police Department or Fire Department appointed from the membership thereof shall be permitted to remain a Member of the Retirement System, paying contributions and entitled to benefits as though he had remained in the rank, grade or position held at the date of his appointment.

     (iii)     Any Police Employee or Fire Employee who, prior to being confirmed, shall be killed or Totally Disabled as the result of the performance of active duty, shall be deemed to have been a Member of the Retirement System.

(c)     Any Member as defined in paragraph (a) or (b) of this Section D-1 who shall be transferred to a civilian position in his Department shall continue as a Member, subject to all the obligations of a Member.

(d)     All persons who became Police Employees or Fire Employees on or after January 1, 1969 and prior to July 1, 2014 and who are not individuals re-employed with the Police and Fire Departments on or after January 1, 1969 and prior to July 1, 2014, and who are confirmed as Police Employees or Fire Employees according to the rules and regulations of the respective Departments shall thereupon become Members of the Retirement System subject, however, to the following provisions:

     (i)     Any person who shall become a Police Employee or Fire Employee at an attained age of thirty-one years or more may become a Member of the Retirement System only by vote of the Board of Trustees who shall fix the rate of contribution of such Member on a basis recommended by the actuary for the attained Age of such Member.

     (ii)     Any appointive official of the Police Department or Fire Department appointed from the membership thereof shall be permitted to remain a Member of the Retirement System, paying contributions and entitled to benefits as though he had remained in the rank, grade or position held at the date of his appointment.

     (iii)     Any Police Employee or Fire Employee who, prior to being confirmed, shall be killed or Totally Disabled as the result of the performance of active duty, shall be deemed to have been a Member of the Retirement System.

     (iv)     Any Member as defined in Section D-1(a), (b), or (c) who was separated from Service by resignation or dismissal or discharge who subsequently again becomes a Member shall be considered a Member for all purposes under this Component II under Section D-1(a), (b), or (c) and shall not be considered a Member under Section D-1(d).

     (v)     Any Member as defined in Section D-1(d) who shall be transferred to a civilian position in his Department shall continue as a Member, subject to all the obligations of a Member.

## Sec. D-2.     Membership election option prior to July 1, 2014.

Any person who is a Member as defined in Section D-1(a), (b), or (c) who was in active service on January 1, 1969, shall have had the option to elect to become a Member of the Retirement System as defined in Section D-1(d) by filing his written election with the Board of Trustees on or before January 31, 1969, or any Retiree who retired on or before December 31, 1968, under the provisions of Article F, Part B, Section F-8, who returns to active service prior to July 1, 2014 shall have the option to elect to become a Member of this Retirement System as

defined in Section D-1(d), by filing his written election with the Board of Trustees on or before the earlier of (i) thirty days after his return to active service and (ii) June 30, 2014. The election shall be effective on the date that it is filed with the Board of Trustees.

### Sec. D-3.  Cessation of membership.

(a) Should a Member die or become a Retiree or be separated from service by resignation, dismissal, or disability, he shall thereupon cease to be a Member.

(b) Any person who became a Member under Section D-1(a), (b), or (c) and ceases to be a Member, as provided in Section D-3(a), and who becomes a Police Employee or Fire Employee prior to July 1, 2014, shall again become a Member of Component II of the Retirement System, under section D-1(a), (b), or (c) subject to the provisions of Article G, Section G-2(d).

(c) Any person who became a Member under Section D-1(d) and ceases to be a Member, as provided in Section D-3(a), and who becomes a Police Employee or Fire Employee prior to July 1, 2014, shall again become a Member of Component II of the Retirement System under Section D-1(d), subject to the provisions of Article G, Section G-2(d).

(d) Any Member of the Retirement System from the Fire Department who retires as a Member of the Retirement System and who is rehired prior to July 1, 2014 as a civilian Member of the Fire Department may elect on or before June 30, 2014 to again become a Member of Component II of the Retirement System.

## ARTICLE E.  SERVICE CREDITABLE.

### Sec. E-1.    Members to file statement of service, etc.

Under such rules and regulations as the Board of Trustees shall adopt, each Police Employee and Fire Employee who shall become a Member prior to July 1, 2014 shall file a detailed statement of all prior service rendered by him as an employee of the Police Department or Fire Department, for which he claims credit, and of such other facts as the Board of Trustees may require, for the proper operation of the Retirement System.

### Sec. E-2.    Credit for service.

The Board of Trustees shall fix and determine by appropriate rules and regulations how much service in any year is equivalent to a year of service, but in no case shall less than six months' service constitute one year, nor shall more than one year of service be creditable for all service in one calendar year.  The Board of Trustees shall not allow credit as service for any period of more than one month during which the Member was or shall be absent without pay provided that if a Member shall be transferred from his Department payroll to the payroll of any city, county or state government or the federal government, by his Department head, during peace times, then such Member shall continue to be a Member of the System and shall he required to make regular contributions into the Annuity Savings Fund; and provided further, that if a Member, so transferred, shall fail to make such contributions for three consecutive months, he shall cease to be a Member of the System four months (of 31 days each) after the due date of his first defaulted Annuity contribution; and provided further, that any Member who was or shall be suspended from duty and subsequently reinstated to duty without further disciplinary action, shall receive total credit for the time of such period or periods of suspension.

### Sec. E-3.    Employees in military service commencing prior to July 1, 2014.

(a)     If a Member of the Retirement System was or shall be drafted, or enlisted or shall enlist into military, naval, marine, or other service of the United States government during time of war, or if a Member shall be drafted into such service during time of peace, and prior to the earlier of (i) ninety days from the date of his separation from such government service or from the date peace was or shall be established by treaty, whichever date was or shall be earlier, and (ii) June 30, 2014 resumed or shall resume employment as a Police Employee or Fire Employee, then such government service rendered prior to July 1, 2014 shall be credited to him as a Member of the Retirement System.    During the period of such government service of a Member, his contributions to the Annuity Savings Fund shall be suspended and the balance in the Annuity Savings Fund, standing to his credit as of the last payroll date preceding his leave of absence from the service of his Department shall be accumulated at Regular Interest.  Prior to July 1, 2014, even though the applicant may have been unable to satisfy all the foregoing requirements, the Board of Trustees had the power to grant the privileges provided for by this section in exceptional or extraordinary cases.

(b)     A Member on the City payroll on or after January 1, 1979 and prior to July 1, 2014 who, prior to employment in the City service, was called to or entered or is called to

13-53846-tjt   Doc 8405-1   Filed 10/20/14   Entered 10/20/14 05:47:23   Page 167 of
409
13-53846-swr   Doc 8053-1   Filed 10/22/14   Entered 10/22/14 05:46:43   Page 161 of
400

or enters any full time military service of the United States during time of war, period of compulsory military service, or period of unusual emergency as defined in this ordinance, shall have the required period of active duty credited him as Membership Service, subject to the following conditions and limitations:

(1)     The Member files a written election with the Board of Trustees, before the earlier of (i) 180 days following the effective date of this provision or 180 days from the date of his first employment in the City service, whichever is most recent, and (ii) June 30, 2014, to claim military service credit under the provisions of this section.  A Member who is included in a collective bargaining unit shall file a written election to claim military service credit with the Board of Trustees within 180 days following the date of a negotiated approval and acceptance of this section by his duly authorized bargaining agent as transmitted to the Board of Trustees by the Labor Relations Director or, in the case of Members hired subsequent to the transmittal of approval and acceptance by his duly authorized bargaining agent, within 180 days from the date of his first employment in the City service; provided that any such election is required to be filed prior to July 1, 2014.

(2)     The Member furnishes the Board of Trustees such information as the Board of Trustees determines necessary to verify the amount of military service claimed.

(3)     The Member pays to the Pension Accumulation Fund of the Retirement System an amount of five (5) percent of the Member's annual rate of compensation at the time of payment multiplied by the years or parts of years of military service claimed.

(4)     The required payment shall be made under one of the following options:

    a.     Payment in full within 30 days of the election to claim military service.

    b.     Payment in equal bi-weekly installments by payroll deduction over a 36 month period starting 30 days following the election to claim military service.  Interest shall accrue during the period of installment payments at the compound rate of 5 percent per annum.  Payments must be completed prior to application for retirement.

    c.     If a Member has sufficient funds in the principal portion of his Annuity, he may authorize the Board to transfer such funds to the Pension Accumulation Fund to meet the required payment.

(5)     In the event a Member, who has filed the required election of this benefit, and who would be eligible for a Pension in all respects except for paying the full amount, dies prior to completion of the payment required in paragraph (4) preceding, the person otherwise entitled to a Retirement Allowance may pay the full amount due within 30 days of the Member's death to become eligible for an additional Pension credit under this section.

(6)     Military service credited under the provisions of Section 54-30-3(c) of the 1964 Detroit City Code shall not be claimed or credited under the provisions of this section.

(7)     Military service which is or will be the basis of service credit under any other public employee retirement program shall not be claimed or credited under the provisions of this section.

(8)     In no case shall more than 3 years of pre-employment military service be credited a Member on account of military service.  For the purpose of this limitation, military service credited pursuant to Section 54-30-3(a) of the 1964 Detroit City Code shall be combined with military service created pursuant to this section.

(9)     The required payments made to the Pension Accumulation Fund for military service credit pursuant to this section shall, upon application by the Member or his estate, be returned without interest to any Member who dies or leaves City employment prior to being eligible for a Pension.

(10)    Only honorable military service during the following periods shall be covered by this Section E-3(b):

        World War II — December 8, 1941 to July 1, 1946.

        Korean Conflict — June 27, 1950 to December 31, 1953.

        Vietnam Conflict — August 5, 1964 to May 7, 1975.

(11)    The military service credit pursuant to this section shall not apply toward meeting the minimum service and age requirements for vesting, for a non-duty disability Pension or for a service Pension.  Such service credit may be used in meeting the minimum time needed for an automatic Option Two Pension in case of death of a Member.

(12)    In no case shall benefits be based on the military service credit provided by this section unless the Member shall have been credited a minimum of eight years of service credit not including military service credit.

(13)    Special service, contractual, part time, seasonal and summer camp employees are not eligible for the military service credit.

(14)    In cases of doubt, the Board of Trustees will determine whether a Member is entitled to the benefits of this section consistent with the requirements and limitations herein.

(15)    Any member of DFFA, DPCOA or DPLSA who performed military service prior to employment by the City and membership in the Retirement System

may, prior to July 1 2014, claim service credit as a Member of the Retirement System for time spent in the military service.

(16) Effective December 15, 2008, any member of DFFA, DPCOA or DPLSA who has performed any honorable military service may, prior to July 1, 2014, claim up to thirty-six (36) months service in the Pension time for time spent in the military.  However, the Member will be required to purchase this military service credit as provided above.

(17) Effective March 8, 2007, all DPOA bargaining unit members who have served in the military may, prior to July 1, 2014, purchase a maximum of three (3) years Pension time.

## Sec. E-4.    Verification of service claimed.

Subject to the above restrictions and to such other rules and regulations as the Board of Trustees may adopt, the Board of Trustees shall verify, as soon as practicable after the filing of such statements of service, the service therein claimed.

## Sec. E-5.    Prior Service certificates.

Upon verification of the statements of service, the Board of Trustees shall issue Prior Service certificates, certifying to each Member the length of Prior Service rendered, with which he is credited.  A Prior Service certificate shall be final and conclusive for retirement purposes as to such service; provided, however, that within one year from the date of issuance or modification of such certificate the Board of Trustees on its own motion or on the request of a Member may modify or correct the Prior Service certificate.

## Sec. E-6.    Creditable service at retirement.

Creditable service at retirement, on which the Retirement Allowance of a Member shall consist of the Membership Service rendered by him prior to July 1, 2014 and, if he has a Prior Service certificate in full force and effect as of July 1, 2014, the amount of service certified thereon.

# ARTICLE F.  BENEFITS PROVIDED TO MEMBERS

## Part A - Service Retirement Allowance

### Sec. F-1.        Petition for retirement, mandatory age.

(a)        Any Member as defined in Article D, Section D-1 (a), (b), or (c) in service may file with the Board of Trustees his written application for retirement setting forth the date not less than fifteen days nor more than ninety days subsequent to the filing thereof, on which he or she desires to be retired; and provided the Board of Trustees shall determine that the Member, at the date so specified for his retirement will have a total of twenty-five years or more of creditable service he shall on the date specified be retired, notwithstanding that during such period of notification he may have separated from service.

Provided, further, that in the case of any Fire Fighter as defined in Article D, section D-1 (a), (b) or (c) having served twenty-five years or more of creditable service, upon recommendation of the Board of Fire Commissioners, the Fire Fighter shall be retired forthwith, by the Board of Trustees.

(b)        Any Members as defined in Article D, Section D-1 (d) in service may file with the Board of Trustees his written application for retirement setting forth the date not less than fifteen days nor more than ninety days subsequent to the filing thereof, on which he or she desires to be retired; and provided the Board of Trustees shall determine that the Member, at the date so specified for his retirement, will have a total of twenty-five years (effective as of March 8, 2007, twenty years for members of DPOA and their fire equivalents) or more of creditable service and has attained Age fifty-five, he shall on the date specified be retired, notwithstanding that during such period of notification he may have separated from service.

Provided, further, that, effective July 1, 1983 for members of DPOA and fire equivalents and June 30, 1986 for DPLSA and fire equivalents and new Members, a Member described in Article D, Section D-1(d) shall be eligible to retire upon attainment of twenty-five years (effective as of March 8, 2007, twenty years for members of DPOA and their fire equivalents) or more of creditable service, regardless of Age.  Effective July 1, 1998 (June 30, 2001 for DPOA members and their fire equivalents), the time a Member is on layoff from service of the City shall be included in actual service rendered to the City for purposes of determining whether a Member has twenty-five years or twenty years of creditable service.  The Pension benefit to which such Member is entitled shall be based only on his actual years of creditable service.  Effective July 1, 1989, the minimum Age requirement for deferred Pensions payable for post 1969 Members represented by DPOA and hired before June 30, 1985 shall be eliminated.

Notwithstanding the foregoing provisions, effective October 15, 2014, a DPLSA member shall be eligible to terminate employment with the City and commence

receipt of a Retirement Allowance (or make a DROP election as provided in Article I) under this Component II provided the Member satisfies the following requirements:

| Fiscal Year | Age and Service |
|---|---|
| 2015 | Age 45 and 24 years |
| 2016 | Age 46 and 23 years |
| 2017 | Age 47 and 23 years |
| 2018 | Age 48 and 22 years |
| 2019 | Age 49 and 23 years |
| 2020 and thereafter | 25 years of service |

(c)     Effective June 30, 2001, any Member represented by DPOA and fire equivalents who has been laid off shall be eligible to retire at what would have been the Member's 25th anniversary. To determine eligibility for retirement, the Member's actual service time and time on lay off shall be combined. To calculate the Member's Retirement Allowance for members of DFFA, however, only actual service time shall be used. For DFFA members having a parity relationship with the DPLSA and the DPCOA Inspector, only lay off time which occurred between July 1, 1973 and July 1, 1998 will be credited. Effective in accordance with the specific date and terms of the DPLSA award in Act 312 No. D98 F-0944, Members represented by DPCOA shall have the right to retire on their 25th anniversary date, notwithstanding any service time they may have lost due to any layoffs, as provided in such award.

(d)     Any Member represented by DPOA who was hired on or after July 1, 1985 and who leaves City employment after being vested shall not be eligible for Pension benefits until said individual reaches his or her sixty-second birthday.

(e)     Any Member of the Retirement System as defined in Article D, Section D-1(a), (b), (c), and (d) who shall reach the Age of sixty years shall be retired forthwith, or on the first day of the calendar month next succeeding that in which the Member shall have reached Age sixty. On the written request of the Member and of the Commissioner of Police or the Board of Fire Commissioners, as the case may be, the Board of Trustees may continue such Member in active service for a period of two years beyond his sixtieth birthday, and on the expiration of such period, on like request, may continue such Member for a further period of two years.

(f)     Any Member of the Retirement System who satisfies the requirements for a Pension as defined in Article F, Section F-5 shall be eligible upon ninety days notice to make an irrevocable election to receive an immediate Retirement Allowance, actuarially reduced for early commencement, in lieu of a deferred Retirement Allowance.

(g)     Any Member of the Retirement System who was in the service of the City on or after July 1, 1941 but prior to January 1, 1969 and who was still an active Member on July 1, 1983 for DPLSA and fire equivalents and July 1, 1986 for DPOA members and fire equivalents shall have the option of retiring under the Old Plan or the New Plan.

(h)     Pursuant to IRC 411(e), as in effect in 1974, an employee shall be 100 percent vested in his or her Retirement System accrued benefit upon attaining normal retirement hereunder while in service.

## Sec. F-2.     Old Plan/New Plan

Effective July 1, 1986, Members of the Retirement System as defined under the terms of the Retirement System in effect on July 1, 1977, who were in service on or after July 1, 1941 but prior to January 1, 1969, and are active Members on July 1, 1986 shall have the option of retiring under the Old Plan or the New Plan.

(a)     *Amount of allowance – Old Plan Members*.  Upon his or her retirement from service, a Member as defined in Article D, Section D-1(a), (b), or (c) ("Old Plan Member") shall receive a straight life Retirement Allowance which shall consist of the benefits provided in paragraphs (1) and (2) below; and he or she shall have the right to elect an option provided for in Part H of this Article F:

(1)     An Annuity which shall be the Actuarial Equivalent of the Member's Accumulated Contributions standing to his or her credit in the Annuity Savings Fund at the time of his or her retirement; and

(2)     A Pension which, when added to the Member's Annuity, will provide a straight life Retirement Allowance equal to two percent (2.0%) of his or her Average Final Compensation, multiplied by the number of years, and fraction of a year, of his or her creditable service, not to exceed twenty-five years; provided, that the Retirement Allowance of a Police Employee shall in no case exceed fifteen twenty-seconds of the maximum earnable compensation of a Patrolman and the Retirement Allowance of a Fire Fighter shall not exceed fifteen twenty-seconds of the maximum earnable compensation of a Fire Fighter (and if either or both of the said ranks shall be hereafter abolished, the equivalent thereof).  The foregoing Pension limitation shall not apply to any Police Employee or Fire Employee who on July 1, 1941, shall be entitled to a certificate for twenty years or more of prior service and who remains under the provisions of Chapter XV or Chapter XXI of Title IV of the 1918 Detroit City Charter.

(b)     *Amount of allowance – New Plan Members*.  Upon his retirement from service, a Member as defined in Article D, Section D-1(d) ("New Plan Member") shall receive a straight life Retirement Allowance which shall consist of the benefits provided in paragraphs (1) and (2) below; and he shall have the right to elect an option provided for in Part H of this Article F:

(1)     An Annuity which shall be the Actuarial Equivalent of the Member's Accumulated Contributions standing to his or her credit in the Annuity Savings Fund at the time of his retirement; and

(2)     A Pension which, when added to his or her Annuity, will provide a straight life Retirement Allowance equal to:

a. two and one-half percent (2.5%) of the Member's Average Final Compensation multiplied by the number of years and fraction of a year of his or her creditable service, for the first twenty-five (25) years of such service; and

b. two and one-tenths percent (2.1%) of the Member's Average Final Compensation multiplied by the number of years and fraction of a year of his or her creditable service in excess of twenty-five (25) years, subject to a maximum of thirty-five (35) years.

### Sec. F-3.    Pension Multiplier

(a)    Notwithstanding Section F-2(a)(2) and F-2(b)(2), effective July 1, 1992 each Member who retires on or after that date shall be entitled to a Pension which, when added to the Annuity, will provide a straight life Retirement Allowance equal to 2.1% of his or her Average Final Compensation, multiplied by the number of years and fraction of a year, of his or her creditable service, not to exceed thirty-five (35) years of service for New Plan Members and twenty-five (25) years of service for Old Plan Members.

(b)    Effective July 1, 1997 or for DPCOA members the effective date of the CET-DPCOA, each Member who retires shall be entitled to a Pension which when added to the Annuity will provide a straight life Retirement Allowance equal to 2.5% (or 2.1% for DPCOA members) of his or her Average Final Compensation multiplied by the number of years and fraction of year of his or her creditable service for the first twenty-five (25) years or, in the case of a DPCOA member of his or her creditable service earned or accrued on or after the effective date of the CET-DPCOA.  For Members represented by DFFA, DPCOA and DPLSA, the multiplier shall be 2.1% for each year of service over twenty-five (25) years.  Maximum years of service for Pension credit shall be thirty-five (35) years for New Plan Members and twenty-five (25) years for Old Plan Members.

(c)    Effective September 1, 2011, each Member represented by DPOA who retires shall only be entitled to a Pension which, when added to the Annuity, will provide a straight life Retirement Allowance equal to 2.1% of his or her Average Final Compensation multiplied by the number of years and fraction of a year of his or her creditable service earned or accrued on or after September 1, 2011.  Hence, for the first twenty-five (25) years of service accrued on or after September 1, 2011, the multiplier shall no longer be 2.5%; rather, 2.1%.  Maximum years of service for Pension credit shall be thirty-five (35) years for New Plan Members and twenty-five (25) years for Old Plan Members.  Service credit accrued prior to September 1, 2011 will be unaffected by this Section F-3(c).

(d)    Each DPLSA member who retires shall only be entitled to a Pension which, when added to the Annuity, will provide a straight life Retirement Allowance equal to 2.1% of his or her Average Final Compensation multiplied by the number of years and fraction of a year of his or her creditable service earned or accrued following the date of the Act 312 Award in D09 G-0786.  Hence, for the first twenty-five (25) years of

service accrued after the date of the Act 312 Award, the multiplier shall no longer be 2.5% as stated in paragraph (b) above. Maximum years of service for Pension credit shall be thirty-five (35) years for New Plan Members and twenty-five (25) years for Old Plan Members.

**Sec. F-4.    Disposition of surplus benefits upon death of retired member.**

In the event a retired Member dies before he or she has received in straight life Retirement Allowance payments an aggregate amount equal to his or her Accumulated Contributions standing to his or her credit in the Annuity Savings Fund at the time of his or her retirement, the difference between his or her said Accumulated Contributions and the said aggregate amount of straight life Retirement Allowance payments received by him or her shall be paid to such person or persons as he or she shall have nominated by written designation duly executed and filed with the Board of Trustees. If there is no such designated person or persons surviving the said deceased Retiree such difference, if any, shall be paid to his or her legal representative. No benefits shall be paid under this Section F-4 on account of the death of such a retired Member if he or she had elected Option 1, 2, 3, 3A or 3B provided for in Part H of this Article F.

**Sec. F-5.    Retirement allowance for certain persons leaving City employment after eight years service (40 & 8).**

(a)    Should any DPLSA member or any fire equivalent who (1) has attained age forty years of Age, and (2) has acquired eight or more years of credited service, or any Member who terminates employment with the City on or after August 29, 2003 with ten or more years of credited service leave the employ of the Police Department or Fire Department prior to the date he or she would have first become eligible to retire as provided in this Part A, for any reason except his or her retirement or death, he or she shall be entitled to a Retirement Allowance computed according to Section F-2 (a) or (b) of this Article F, whichever is applicable, as said Section was in force as of the earlier of (i) the date his or her employment with the City last terminated or (ii) June 30, 2014; provided, that he or she does not withdraw his or her Accumulated Contributions from the Annuity Savings Fund. The Member's Retirement Allowance shall begin the first day of the calendar month next following the month in which his or her application for same is filed with the Board of Trustees, on or after the date he or she would have been eligible to retire had he or she continued in City employment. Notwithstanding the foregoing, prior to March 3, 2008 the Retirement Allowance of a DPOA member or a fire equivalent hired on or after July 1, 1985 shall not begin prior to the date on which the Member reaches his or her sixty-second birthday. Unless otherwise provided in this Component II, such person shall not receive service credit for the period of his or her absence from the City Police Department and/or Fire Department employ, nor shall his or her Beneficiary be entitled to any other benefit afforded in this Component II, except the benefits provided in Part A, Section F-2(a) or (b) or Part F of this Article F, whichever is applicable, subject to the above provisions, notwithstanding, his or her membership has terminated.

(b)     Effective August 28, 2003, for DPOA members and fire equivalents who terminate employment after ten (10) years of service shall be vested and shall have all options afforded to 40 & 8 Retirees.

**Sec. F-6.     Reduced Early Pension Benefits (40 & 8 Vesting Retirees)**

(a)     Members who terminate employment and who are eligible for a Pension pursuant to Article F, Part A, Section F-5 of Component II (40 & 8) shall have the option of receiving an immediate, but reduced early Pension benefit in lieu of a deferred Pension.

(b)     This reduced early Pension benefit shall not result in an increase in employer contribution rates; therefore, the value of the Reduced Early Pension Benefit shall be the Actuarial Equivalent of the 40 & 8 Pension.

(c)     For employees represented by DFFA in ranks or classifications with a parity relationship to employees represented by the DPLSA and employees in higher ranks or classifications, upon termination, a vested employee must within 90 calendar days make an irrevocable election as to whether or not to take this option.

(d)     Individuals represented by DFFA, DPOA or DPLSA, who terminated employment prior to July 1, 1986, are not eligible for this option.

(e)     An employee who receives a lump sum payment for accumulated time upon termination is not allowed to have that time count towards his retirement service.

(f)     Since Members (other than DPOA and fire equivalents) are eligible to begin collecting their vested Pension as soon as they would have been eligible to retire had they continued their City employment, minimum retirement age (i.e., Age 55) shall not be a factor in computing the actuarially reduced Pension benefit.

(g)     All DFFA members, except those members in ranks or classifications with a parity relationship to employees represented by the DPOA, electing to receive the reduced early Pension benefits shall receive upon separation full pay for fifty percent (50%) of the unused sick bank amounts. This provision shall have no effect on a Member electing to receive the deferred 40 & 8 vested Pension who shall continue to be reimbursed for unused sick time in accordance with an applicable collective bargaining agreement.

(h)     Effective August 28, 2003, DPOA members and fire equivalents who terminate employment after ten (10) years of service shall be vested and shall have all options afforded to 40 & 8 retirees.

## Part B — Total Disability Pension and Retirement Allowances

**Sec. F-7.** **Duty disability.**

If a Member shall become Totally Disabled for duty by reason of injury, illness or disease resulting from performance of duty and if the Board of Trustees shall find such injury, illness or disease to have resulted from the performance of duty, on written application to the Board of Trustees by or on behalf of such Member or by the head of his Department such Member shall be retired; notwithstanding that during such period of notification he or she may have separated from service; provided, the Medical Director, after examination of such Member shall certify to the Board of Trustees his or her Total Disability. If said Member was separated from service after filing of the written application, and he or she had attained twenty-five years or more of service prior to the date of separation, the Board of Trustees, shall retire said Member, under this Part B.

**Sec. F-8.** **Duty disability benefits; members in service on or after July 1, 1941 but prior to January 1, 1969.**

(a)     A Member, as defined under Article D, Section D-1(a), (b), or (c), shall receive the following benefits:

(1)     Each such Member shall receive a disability Pension of fifty percent (50%), or such other higher percentage that is in effect and applies to such Member, of the Member's Average Final Compensation at the time of disability retirement. On the date that a Member, who retired under Section F-7 and who receives benefits under this Section F-8, would have accrued twenty-five years of creditable service had the Member continued in active service, or on the date that the Member reaches age sixty, whichever comes first, the Member shall be eligible for optional benefits as provided Part H of this Article F.

(2)     In addition to the disability Pension provided for in Section F-8(a)(1), any Member who receives a disability Pension pursuant to Section F-8(a)(1) and has not accrued a total of twenty-five (25) years of creditable service as of the date of the Member's disability retirement shall receive a supplemental disability payment in the amount of sixteen and two-thirds percent (16-2/3%) of the Member's Average Final Compensation at the earlier of (i) the time of disability retirement or (ii) June 30, 2014. This supplemental payment shall terminate upon the expiration of the period when a Member who retired under Section F-7 of this Part B and who receives benefits under Section F-8(a)(1) would have accrued twenty-five years of creditable service had the Member continued in active service, or on the date that the Member reaches Age sixty, whichever comes first.

Effective July 1, 1992 for DPLSA members, the Average Final Compensation used in this computation shall mean the current maximum salary for the rank(s), grade(s) or position(s) which would have been held by the Member over the sixty months prior to the earlier of (i) the date of retirement (reduced disability/service retirement when the Member would have attained a total of twenty-five years of

credited service) had he or she continued working in that classification which he or she held at the time of his or her disability or (ii) June 30, 2014. For Members who begin receiving such benefits on or after July 1, 1998 and before July 1, 2014, the amount of the Member's most recent full longevity payment shall be included in the definition of Average Final Compensation.

Effective July 1, 1992 for DFFA and DPOA members, the Average Final Compensation used in this computation shall be the highest average annual compensation that would have been received by such a Member had he or she continued working in the classification he or she held at the time of his or her disability, during any period of five consecutive years, selected by the Member, contained within the last ten years immediately preceding the earlier of (i) expiration of the period when the Member would have attained a total twenty-five years of creditable service and (ii) June 30, 2014.

Effective July 1, 2000, the Average Final Compensation used in this computation shall mean the current maximum salary, including the annual longevity payment provided above, for the rank(s), grade(s) or position(s) which would have been held by the Member over the thirty-six (36) months prior to the earlier of (i) retirement or (ii) June 30, 2014.

(3) In the case of a Member retired under Section F-8 who receives benefits under F-8(a)(1) and F-8(a)(2), the Accumulated Contributions standing to the Member's credit at the date of retirement shall continue to be held in the Annuity Savings Fund and Regular Interest shall be credited thereto. If such Member dies before the date upon which the Member would have achieved a total of twenty-five years of creditable service had the Member continued in active service and before such Member reaches Age sixty, the balance of the member's Annuity Savings Account including interest thereon shall be paid as provided in Part D and Part E of this Article F.

(b) This Section shall be applicable to those Members receiving benefits on the date of adoption of this Section who are not covered by the arbitration decision regarding the DPOA which became effective July 1, 1995, or the arbitration decision regarding the DPLSA which became effective June 30, 1998.

(c) This Section does not rescind any substantive rights of disability retirees from the Retirement System who retired prior to the July 1, 1995 arbitration award, or the substantive rights of disability retirees from the DPLSA who retired prior to the June 30, 1998 arbitration award.

(d) This Section does not amend any computations used to determine disability benefits payable under this Section F-8, or result in an increase or decrease in such disability benefits.

**Sec. F-9.** **Duty disability benefits; members beginning service on or after January 1, 1969 and becoming disabled prior to the dates set forth in Section F-10.**

(a)     A Member, as defined under Article D, Section D-1(d), who retired under Section F-7, shall receive the following benefits:

(1)     Each such Member shall receive a disability Pension of fifty percent (50%), or such other higher percentage that is in effect and applies to such Member, of the Member's Average Final Compensation at the earlier of (i) the time of disability retirement or (ii) June 30, 2014. On the date that a Member who retired under Section F-7 of this Part B and who receives benefits under this Section would have accrued twenty-five years of creditable service had the Member continued in active service, or on the date that the Member reaches Age sixty, whichever comes first, the Member shall be eligible for optional benefits as provided Part H of this Article F.

(2)     In addition to the disability Pension provided for in Section F-8(a)(1) of this Part B, any Member who receives a disability Pension pursuant to Section F-8(a)(1) of this Part B and who has not accrued a total of twenty-five years or more of creditable service as of the date of the Member's disability retirement shall receive a supplemental disability payment in the amount of sixteen and two-thirds percent (16-2/3%) of the Member's Average Final Compensation at the earlier of (i) the time of the Member's disability retirement and (ii) June 30, 2014. This supplemental payment shall terminate when a Member who retires under Section F-7 and who receives benefits under Section F-8(a)(1) would have accrued twenty-five years of creditable service had he or she continued in active service or on the date that the Member reaches Age sixty, whichever comes first.

(3)     In addition to the disability Pension provided for in Section F-8, any Member who receives a disability Pension pursuant to Section F-8(a)(1) and who has accrued more than twenty-five years ("additional years") of creditable service as of the earlier of (i) the date of the Member's disability retirement and (ii) June 30, 2014 shall receive another supplemental disability payment equal to two percent (2%), or such other higher percentage that is in effect and applies to such Member, of the Member's Average Final Compensation as of the earlier of such dates, multiplied by the number of additional years of creditable service the Member has accrued; provided, however, that such supplemental disability payment shall not exceed twenty percent (20%), or such other higher percentage that is in effect and applies to such Member, of the Member's Average Final Compensation.

(4)     In the case of a Member who retires under Section F-7 and who receives benefits described under Section F-8(a)(1) through (3), the Accumulated Contributions standing to the Member's credit at the date of disability retirement shall continue to be held in a separate fund in the Annuity Savings Fund and Regular Interest shall be credited thereto. If such Member dies prior

to the time when the Member would have achieved a total of twenty-five years of creditable service had the Member continued in active service and before such Member reaches Age sixty, the amount of the Member's Accumulated Contributions so set aside and interest thereon shall be paid as provided in Part D and Part E of this Article. F

(5)     The amendment of Section F-8(a)(1) shall not result in an increase or decrease in the amount of disability benefits payable to Members.

(b)     This Section shall be applicable to those Members receiving benefits on the effective date of this Section F who are not covered by the arbitration decision regarding the DPOA which became effective July 1, 1995, or the arbitration decision regarding the DPLSA which became effective June 30, 1998.  This Section does not rescind any substantive rights of disability retirees from the Retirement System who retired prior to the July 1, 1995 arbitration award, or the substantive rights of disability retirees from DPLSA who retired prior to the June 30, 1998 arbitration award.

(c)     This Section does not amend any computations used to determine benefits under Section F-8 of this Part, or result in an increase or decrease in such benefits.

### Sec. F-10.     Duty Disability benefits; DFFA, DPOA and DPLSA members beginning service on or after January 1, 1969 and becoming disabled on or after the dates set forth below.

(a)     This Section F-10 shall be applicable to:

(1)     DFFA employees who file applications for disability retirement on or after July 1, 1995 and who have a parity relationship with the DPOA and on or after June 30, 1998, for DFFA employees with a parity relationship with the DPLSA and the DPCOA Inspector;

(2)     all DPLSA employees who file applications for disability retirement on or after June 30, 1998; and

(3)     all DPOA members who file applications for disability retirement on or after July 1, 1995.

(b)     A Member who retires as a result of duty disability shall receive for a period of twenty-four months the sum of:

(i)     a basic benefit equal to 50% of the Member's Final Compensation at the earlier of (i) the time his or her duty disability retirement begins or (ii) June 30, 2014; and

(ii)    a supplemental benefit equal to 16-2/3% of the Member's Final Compensation at the earlier of (i) the time his or her duty disability retirement begins or (ii) June 30, 2014.

On July 1st of each year, the benefits determined under paragraphs (i) and (ii) above then payable will each be increased by adding to said amounts the product of the initial amount of said benefit which was computed at the time the duty disability retirement began and the applicable Pension Improvement Factor (Escalator).

(c)     After a Member receives benefits hereunder for a period of twenty-four months, the Board will determine whether the Member is disabled from any occupation. If the Member is disabled from any occupation, the Member shall continue to receive the benefit provided in paragraphs (b)(i) and (b)(ii) until such time as the Member would have attained twenty-five years of creditable service had he continued in active Service with the City. At that time, the Member shall continue to receive the benefit described in paragraph (b)(i) above; however, benefits described in paragraph (b)(ii) above will cease. If the Member is not disabled from any occupation, he shall continue to receive the benefit described in paragraph (b)(i) above; benefits described in paragraph (b)(ii) will cease.

(d)     Duty disability retirement benefits shall continue to be paid to a Member on duty disability retirement after the Member has attained twenty-five years of creditable service, to the earlier of (i) the Member's attainment of Age sixty-five, or (ii) termination of disability as determined by the Board. Upon termination of disability or attainment of Age sixty-five, a Member with twenty-five years of creditable service shall be eligible to receive a service retirement benefit. The amount of such service retirement benefit shall be the same amount which would have been payable if the conversion from duty disability retirement to service retirement had occurred at the date of attaining twenty-five years of creditable service. In the event that the examinations and/or investigations conducted by the Police Department result in a determination that a DPOA Member is not qualified for reappointment as a Police Employee, for medical reasons, disability benefits will be continued.

(e)     If a Member on duty disability retirement returns to active service and within a twenty-four month period re-qualifies for duty disability retirement for the same or related reasons he or she had been retired, then the disability shall be deemed a continuation of the prior disabling condition and the period of the return to work will not have caused the Member to be entitled to a new initial determination of benefit amounts as set forth in paragraph (b) above. Instead, such Member will return to retirement at the point he or she had reached in sub-paragraphs (b), (c) or (d) above as if there had not been a break in his or her period of placement on duty disability retirement.

(f)     Disability retirement benefits shall continue to be considered benefits provided by the City pursuant to the 1918 Detroit City Charter, as amended, which are paid instead of and not in addition to any benefits under the State Workers' Disability Compensation Act.

(g)     Survivor benefit coverage applicable to active Members shall be continued during the period a Member is eligible for a duty disability benefit. Upon conversion to a service retirement benefit as provided in paragraph (d), automatic survivor benefit

coverage shall terminate.  At that time, the Member shall have the right to elect an optional form of payment in the same manner as if he or she had retired from active membership on the conversion date.

(h)     Pension Credit While on Duty Disability Status

   (1)     While eligible to receive duty disability benefits, Pension service credit shall continue to accrue, but not beyond June 30, 2014.

   (2)     The accrual of Pension service credit will cease on the earlier of (i) the date the Member has twenty-five years of creditable service, or (ii) June 30, 2014.

(i)     Earnings Offset

   (1)     In the event that a recipient of a duty disability retirement benefit receives earned income from gainful employment during a calendar year, the amount of the Member's disability benefit payable during the next subsequent Fiscal Year will be adjusted so it does not exceed the difference between (i) the Member's base salary at the date of disability, increased by 2.25% times the number of full years from the date of disability to the year in which the earnings offset is applied, and (ii) the amount of remuneration from gainful employment during the prior calendar year.

   (2)     The earnings test shall be based on information the Board may periodically require from a duty disability benefit recipient or has secured from other reliable sources.  Furnishing such information shall be a condition for a Member's continued eligibility for a duty disability benefit.

(j)     The withdrawal provision of the Retirement System will continue to apply to Members on duty disability.  If a duty disability recipient elects annuity withdrawal after attaining twenty-five years of creditable service, the applicable benefit reduction will offset the duty disability benefit until the conversion date, after which it will offset the converted service retirement benefit.

**Sec. F-11.     Non-duty disability.**

(a)     On written application to the Board by or on behalf of a Member or by the head of his Department, a Member, who becomes Totally Disabled for duty by reason of injury, illness or disease not resulting from the performance of duty as determined by the Board of Trustees, shall be retired by the Board of Trustees.  If said Member was separated from service after the filing of the written application and had attained twenty-five years or more of creditable service prior to the date of separation, the Board shall retire said Member, under this Part B.

(b)     A Member retired under paragraph (a) above shall receive the following applicable benefits:

(1)    If such Member has less than five years of creditable service at the time of his or her disability retirement, his or her Accumulated Contributions standing to his or her credit in the Annuity Savings Fund shall be returned to the Member, or at his or her option, he or she shall receive a cash refund annuity which shall be the Actuarial Equivalent of his or her Accumulated Contributions.

(2)    If such Member has five or more years of creditable service at the time of his or her disability retirement, he or she shall receive a disability Retirement Allowance computed in accordance with the provisions of this Article F, Part A, Section F-2(a) or (b), whichever is applicable, and he or she shall have the right to elect an Option provided for in Part H of this Article F.   The Member's Straight Life Retirement Allowance shall not be less than twenty per cent of his or her Average Final Compensation.   Such Retirement Allowance shall be subject to Parts I and K of this Article F.

(3)    If a Member receiving non-duty disability benefits has any Accumulated Contributions standing to his or her credit in the Annuity Savings Fund when the Member would have attained twenty-five years (effective as of March 8, 2007, twenty years for DPOA members and fire equivalents) of creditable service, such Member may withdraw the balance of such contributions at that time.

## Sec. F-12.    Disability retirement procedures.

(a)    The Board shall establish procedures for determining whether a Member is disabled. Such procedures shall be consistent with any collective bargaining agreements between the City and the unions covering Police Employees and Fire Employees.

(b)    If a Member is determined to be disabled, the Board or its designee will examine the pension file, including the submissions of the Member and the Police or Fire Department, to determine if there is any dispute as to whether the disability "resulted from the performance of duty" within the meaning of the Combined Plan.   If it is undisputed that the disability did result from the performance of duty, the Board will grant duty disability retirement benefits.   If it is undisputed that the disability did not result from the performance of duty, the Board will grant non-duty disability retirement benefits, provided the Member meets the other conditions of eligibility.   If the performance of duty issue is in dispute, the Board will refer the matter to arbitration by a member of the Disability Retirement Review Board ("DRRB"). The decision of the DRRB member as to whether the disability resulted from the performance of duty shall be final and binding upon the Member, the Department and the Board. The DRRB shall consist of three qualified arbitrators who will be individually assigned in rotating order to decide the matters referred to arbitration by the Board.   The three members of the DRRB shall be disinterested persons qualified as labor arbitrators and shall be selected in accordance with agreements between the City and the unions representing Members.   The procedure for the termination of DRRB members and the selection of new DRRB members also shall be carried out in

accordance with the agreements between the City and the unions representing Members.

(c)    The hearing before a member of the DRRB will be conducted in accordance with the following procedures:

    (1)    The Member and the City will have the right to appear in person or otherwise may be represented by counsel if they wish and will be afforded an equal opportunity to present evidence relevant to the issues;

    (2)    A court reporter will be present and make a stenographic record of the proceedings;

    (3)    The hearing will be closed to the public, except that the Member may select one person to be with him or her in the hearing room; provided, however, that person may not testify;

    (4)    The witnesses will be sequestered;

    (5)    The witnesses will be sworn by the court reporter and testify under oath;

    (6)    The Member may not be called by the City as an adverse witness;

    (7)    The DRRB member will apply the rules of evidence and follow the procedures which are customarily applied and followed in labor arbitration cases;

    (8)    If the Member wishes to have an employee of the City released from duty to appear as a witness on his or her behalf, the Member may so inform the Board in writing which, in turn, will submit a written request to the appropriate Department for the release of the employee for the purpose of so testifying;

    (9)    The DRRB member will afford the parties an opportunity for the presentation of oral argument and/or the submission of briefs;

    (10)    The DRRB member will issue a written decision containing credibility resolutions as necessary, findings of fact and conclusions with respect to all relevant issues in dispute;

    (11)    The authority of the DRRB member is limited to deciding whether or not the Member's disability "resulted from the performance of duty" within the meaning of the Combined Plan. The DRRB member shall have no authority to add to, subtract from, modify or disregard the terms of the Combined Plan; and

    (12)    The costs associated with the hearing, including the arbitrator's fees and expenses and the court reporter's fees and expenses, will be paid by the Retirement System.

(d)     If a disability retiree is determined by the Board or its delegate to no longer be disabled, he or she may appeal that determination within seven (7) days thereof by filing a written request with the Board for a re-examination. The Board or its delegate shall promptly arrange for such re-examination. The Member's disability benefits will be continued pending that final and binding medical finding, and if the finding is that the Member is no longer disabled, his or her disability benefits will be further continued while the Police or Fire Department conducts such examinations and/or investigations as necessary to determine whether the Member is qualified for reappointment to active duty. In the event that the examinations and/or investigations conducted by the Police Department result in a determination that a Member represented by DPLSA is not qualified, for medical reasons, for reappointment to active duty, disability benefits will be continued.

(e)     The Board of Trustees shall not act upon or grant the application filed by a Police Employee or Fire Employee who, although he or she is not capable of performing the full duties of a Police Employee or Fire Employee, has not suffered any diminishment of his or her base wages or benefits because he or she is either:

(1)     regularly assigned to a position, the full duties of which he or she is capable of performing; or

(2)     assigned to a restricted duty position, unless the Police Department or Fire Department advises that it intends to seek a disability retirement for the Police Employee or Fire Employee in the foreseeable future.

(f)     The provisions in paragraph (e) above are not intended to and will not:

(1)     affect the right of a Member to seek a disability retirement when no restricted duty position is available; or

(2)     restrict in any way the existing authority of the Chief of Police or the Fire Commissioners to seek a duty or non-duty disability retirement for a Member or for that Member at that time to request a duty or non-duty disability retirement.

(g)     DPCOA and DPLSA members who are retired on disability Pensions pursuant to this Part B shall be entitled to lump sum payments of all accumulated time from the date that the Board of Trustees determines that they are entitled to such a Pension. These members shall not be required to utilize such time delaying their retirement dates.

## Part C — Escalation and Change in Compensation, Rank

### Sec. F-13.     Generally.

Subject to the Plan of Adjustment, if hereafter the rate of compensation of the rank, grade or position on which the service Retirement Allowance, disability Pension or disability Retirement Allowance of a Member who was hired prior to July 1, 1969 or is a Beneficiary of such a Member as defined in Article D, Section D-1(a), (b), or (c) is based shall be changed, his

or her service Retirement Allowance, disability Pension, or disability Retirement Allowance shall be changed proportionately, and if such rank, grade, or position shall have been abolished, his or her service Retirement Allowance, disability Pension, or disability Retirement Allowance shall be changed in proportion to the change made in the compensation of the existing rank, grade, or position most nearly approximating the rank, grade, or position so abolished.

### Sec. F-14. Increase of Benefits; Pension Improvement Factor (Escalator).

On and after July 1, 1969, and the first of July of each year thereafter until July 1, 1992, the Pension portion of any Retirement Allowance or death benefit of a Member or Beneficiary of a Member as defined in Article D, Section D-1(d), which is paid or payable under this Component II shall be increased at the rate of two per cent (2.0%) per annum computed on the basis of the amount of the Pension received at the time of retirement.

On or after July 1, 1992 and the first of July each year thereafter until July 1, 2014, the Pension portion of any Retirement Allowance or death benefit of a Member or Beneficiary of a Member as defined in Article D, Section D-1(d), (including those Members who opt to retire under the New Plan provisions) shall be increased at the rate of two and twenty-five one-hundredths per cent (2.25%) per annum computed on the basis of the amount of the Pension received at the time of retirement.

Effective for Members who retire on or after July 1, 1997 (July 1, 1998 for DPCOA members, DPLSA members and DFFA members with a parity relationship with DPCOA and July 1, 2001 for DPOA members and their fire equivalents), the Pension Improvement Factor (Escalator) described in this Section shall be re-computed each Fiscal Year ending before July 1, 2014 on the basis of the amount of Pension received in the previous Fiscal Year (i.e., the 2.25% per annum escalation amount shall be compounded).

Pension benefits for DPCOA members under Component II based on service rendered after November 30, 2012 shall not be subject to any escalation amounts.

The Pension portion of any Retirement Allowance or death benefit of a Member, or Beneficiary of a Member as defined in Article D, Section D-1(d) of the Combined Plan provisions, and Article 51.G. of the DPLSA collective bargaining agreement or Article 3.K. of the DPOA collective bargaining agreement (to include those Members who opt out to retire under the New Plan provisions) earned after April 1, 2011 (for DPLSA members) or September 1, 2011 (for DPOA members), shall not be increased whatsoever, per annum or otherwise. The Pension portion of any Retirement Allowance or death benefit of a Member, or Beneficiary of a Member as defined herein, accrued prior to April 1, 2011 (for DPLSA members) or September 1, 2011 (for DPOA members), shall still be increased as provided herein. Hence, Pension benefits earned based on service rendered after April 1, 2011 (for DPLSA members) or September 1, 2011 (for DPOA members) will no longer receive the 2.25% per annum escalation amount. The 2.25% per annum escalation amount shall continue to apply to Pension benefits earned based on service rendered before April 1, 2011 (for DPLSA members) or September 1, 2011 (for DPOA members).

### Sec. F-15.    Payment.

Except as provided in the Plan of Adjustment, the escalation factor contained in Section F-14 above shall be payable to the Member or Beneficiary of a Member as defined in Article D, Section D-1(d), notwithstanding any Retirement Allowance or Pension amount limitation provisions in this Component II to the contrary.

## Part D — Death Benefits.

### Sec. F-16.    Generally.

If a Member, or a Retiree who was a Member, is killed in the performance of his or her duty or dies as the result of illness contracted or injuries received while in the performance of his or her duty and such death, illness or injuries resulting in death, is found by the Board of Trustees to have resulted from the performance of his or her duty, the following applicable benefits shall be paid, subject to Part I, Section F-25, of this Article F.

(a)    The Accumulated Contributions standing to his or her credit in the Annuity Savings Fund at the time of his or her death shall be paid to such person or persons as he or she shall have nominated by written designation duly executed and filed with the Board of Trustees. If there is no such designated person surviving, his or her said Accumulated Contributions shall be paid to his or her legal representative, subject to paragraph (e) of this Section F-16.

(b)    A Member's surviving spouse shall receive a Pension of five-elevenths of the maximum earnable compensation for the rank of Patrolman or Fire Fighter as the case may be determined as of the earlier of (i) the date of death or (ii) June 30, 2014. If his or her child or children under Age eighteen years also survive the deceased Member each such child shall receive a Pension of one-tenth of such maximum earnable compensation as of the earlier of (i) the date of death or (ii) June 30, 2014; provided, that if there are more than two such surviving children under Age eighteen years, each such child's Pension shall be an equal share of seven thirty-thirds of such maximum earnable compensation. Upon the death, marriage, adoption, or Attainment of Age eighteen years of any such child his or her Pension shall terminate and there shall be a redistribution by the Board of Trustees to the deceased Member's remaining eligible children, if any; provided, that in no case shall any such child's Pension exceed one-tenth of such maximum earnable compensation. In no case shall the total of the Pensions, provided for in this paragraph (b), payable on account of the death of a Member exceed two-thirds of the maximum earnable compensation for the rank of Patrolman or Fire Fighter, as the case may be, determined as of the earlier of (i) the date of the Member's death or (ii) June 30, 2014.

Effective July 1, 1986, widows of Police Department or Fire Department employees who have been receiving a flat monthly benefit of $300.00 should receive an increase of $500.00 per month thereby making the flat monthly benefit $800.00.

(c)    If no spouse survives the deceased Member or if his or her surviving spouse dies or remarries before his or her youngest unmarried surviving child attains Age eighteen

13-53846-tjt   Doc 8045-1    Filed 10/20/14   Entered 10/20/14 05:47:23   Page 187 of
409
13-53846-swr   Doc 8045-1    Filed 10/20/14   Entered 10/20/14 05:48:43   Page 531 of
409

years, his or her unmarried child or children under age eighteen years shall each receive a Pension of one-fourth of the maximum earnable compensation for the rank of Police Employee or Fire Employee, as the case may be as of the earlier of (i) the date of the Member's death or (ii) June 30, 2014; provided that if there are more than two such surviving children under Age eighteen years, each such child's Pension shall be an equal share of one-half of such maximum earnable compensation. Upon the death, marriage, adoption, or Attainment of Age eighteen years of any such child his or her Pension shall terminate and there shall be a redistribution by the Board of Trustees to the deceased Member's remaining eligible children, if any; provided, that in no case shall any such child's Pension exceed one-fourth of the maximum earnable compensation for the rank of Patrolman or Fire Fighter, as the case may be determined as of the earlier of (i) the date of the Member's death, or (ii) June 30, 2014.

(d)    If there is no surviving spouse and if there are no children under Age eighteen years surviving such deceased Member and if he or she leaves surviving either a father or mother or both, whom the Board of Trustees shall find to be actually dependent upon such Member for financial support, such dependent father and mother shall each receive a Pension of one-sixth of the maximum earnable compensation for the rank of Patrolman or Fire Fighter, as the case may be determined as of the earlier of (i) the date of the Member's death, or (ii) June 30, 2014.

(e)    If a Member dies intestate, without having designated a person or persons, as provided in sub-section (a) of this section, and without heirs, the amount of his or her Accumulated Contributions in the Annuity Savings Fund, not to exceed a reasonable sum, to be determined by the Board of Trustees, shall be used to pay his or her burial expenses, provided he or she leave no other estate sufficient for such purpose; any balance credited to such Member in the Annuity Savings Fund, and not used for burial expenses shall remain a part of the funds of the Retirement System and shall be credited to the Pension Accumulation Fund.

(f)    If the maximum earnable compensation for the rank of Patrolman or Fire Fighter, as the case may be, is subsequently changed, the Pensions provided in this Section F-16 for beneficiaries of Members as defined in Article D, Section D-1(a), (b), or (c) shall be proportionately changed; provided, however, that no increases shall be made after June 30, 2014.

(g)    The maximum earnable compensation for the rank of Patrolman or Fire Fighter, as the case may be, to be used in computing the Pensions provided in this Section for beneficiaries of Members as defined in Article D, Section D-1(d) shall be the maximum earnable compensation of the rank of Patrolman or Fire Fighter as established by the City's budget for the Fiscal Year in which occurs the earlier of (i) the date of the Member's death, or (ii) June 30, 2014.

## Part E — Nonduty Death.

### Sec. F-17.        Payment of Accumulated Contributions.

If a Member, or a Member who retires after June 30, 1965, under Part B, Section F-7 of this Article F, dies and no Pension or Pensions become payable under this Component II on account of his or her death, the Accumulated Contributions standing to his or her credit in the Annuity Savings Fund at the time of death shall be paid to such person or persons as he or she shall have nominated by written designation duly executed and filed with the Board of Trustees. If there is no such designated person or persons surviving the said Member, his or her said Accumulated Contributions shall be paid to his or her legal representative. If such Member dies intestate, without having designated a person as above provided, and without heirs, his or her said Accumulated Contributions not to exceed a reasonable sum to be determined by the Board of Trustees, shall be used to pay his or her burial expenses, provided he or she leaves no other estate sufficient for such purpose; and any balance credited to such Member in the Annuity Savings Fund not so used for burial expenses shall be transferred to the Survivors Benefit Fund.

### Sec. F-18.        Allowances to surviving spouses.

Upon the death of a Member, or a Member who retires after June 30, 1965, under Part B, Section F-7 of this Article F, and such death is found by the Board of Trustees not to have resulted from the performance of his or her duty, the applicable Retirement Allowances provided in paragraphs (a), (b), (c) and (d) of Section F-1 shall be paid from the Survivors Benefit Fund, to the extent of available funding, and shall be subject to paragraphs (e), (f) and (g) of Section F-1.

(a)        His or her surviving spouse shall receive a Retirement Allowance computed in the same manner in all respects as if the said Member had (1) regularly retired on the earlier of (i) the day preceding the date of his or her death, or (ii) June 30, 2014, notwithstanding that he or she might not have acquired twenty-five years of creditable service, in the case of a Member as defined in Article D, Section D-1(a), (b), or (c), or notwithstanding that he or she might not have acquired twenty-five years of service or more and had not attained age fifty-five, in the case of a Member as defined in Article D, Section D-1(d); (2) elected Option 2 provided for in Part H of this Article F; and (3) nominated his or her surviving spouse as joint Beneficiary; provided, that in no case shall the Retirement Allowance payable to such joint Beneficiary be less than twenty per cent of said Member's Average Final Compensation as of the earlier of (i) the Member's date of death, and (ii) June 30, 2014. If a Member who had less than twenty-five years of creditable service dies prior to July 1, 2001, the Retirement Allowance payable to the surviving spouse shall be terminated in the event the surviving spouse remarries.

(b)        His or her unmarried child or children under Age eighteen years shall each receive a Retirement Allowance of one-seventh of the annual maximum earnable compensation of the rank of a Patrolman or a Fire Fighter, as the case may be determined as of the earlier of (i) the Member's date of death, and (ii) June 30, 2014; provided, that if there are more than two such children, each child shall receive a Retirement

Allowance of an equal share of two-sevenths of said annual maximum earnable compensation. Upon any such child's adoption, marriage, death or Attainment of Age eighteen years, whichever occurs first, his or her Retirement Allowance shall terminate, and there shall be a redistribution by the Board of Trustees to the deceased Member's remaining eligible children under Age eighteen years; provided, that in no case shall the Retirement Allowance payable to any such child exceed one-seventh of the said annual maximum earnable compensation.

(c)     If, at the time of the said Member's death, there shall be neither a surviving spouse nor children eligible for a Retirement Allowance provided for in this Section F-18, each of his or her parents shall receive a Retirement Allowance of one-seventh of the annual maximum earnable compensation of a Patrolman, or a Fire Fighter, as the case may be determined as of the earlier of (i) the Member's date of death, and (ii) June 30, 2014; provided, that the Board of Trustees finds that such parent was dependent upon the said Member for at least fifty per cent of his or her financial support. Upon the remarriage of any such parent, his or her Retirement Allowance shall thereupon terminate.

(d)     In the event all the Retirement Allowances, provided for in this Section F-18, payable on account of the death of a Member, terminate before there has been paid an aggregate amount equal to the said Member's Accumulated Contributions standing to his or her credit in the Annuity Savings Fund at the time of death, the difference between his or her said Accumulated Contributions and the said aggregate amount of Retirement Allowances shall be paid to such persons as the said Member shall have nominated by written designation duly executed and filed with the Board of Trustees. If there are no such designated person or persons surviving the said Member such difference, if any, shall be paid to his or her legal representative.

(e)     In no case shall any Retirement Allowance be paid under this Section F-18 on account of the death of a Member if any benefits are paid under Part D of this Article F on account of his or her death. The Retirement Allowance provided for in this Section F-18 shall be subject to Part I of this Article F.

(f)     All benefits provided in this Part E for Beneficiaries of Members as defined in Article D, Section D-1(a), (b), or (c) shall be based on the maximum earnable compensation of the rank of Patrolman or Fire Fighter, as the case may be determined as of the earlier of (i) the Member's date of death, or (ii) June 30, 2014. If a Member died before July 1, 2014 and the compensation of such rank shall be changed prior to July 1, 2014, the benefits provided shall be changed proportionately. All benefits provided in this Part E for Beneficiaries of Members as defined in Article D, Section D-1(d) shall be based on the maximum earnable compensation of the rank of Patrolman or Fire Fighter as established in the City's budget for the year of the earlier of (i) the Member's death or (ii) June 30, 2014.

(g)     In the event a Member has withdrawn his or her Accumulated Contributions from the Annuity Savings Fund and has not returned in full all amounts due the fund by him or her, the survivors benefits provided in paragraphs (a), (b), (c) and (d) of this Section

shall be reduced to the proportion that the Member's Accumulated Contributions standing to his or her credit in the Annuity Savings Fund, at the time of his or her death bears to the amount his Accumulated Contributions would have been had he or she not made a withdrawal from the Annuity Savings Fund.

## Part F — Termination of Membership Otherwise than by Retirement, Death or Becoming a Beneficiary.

**Sec. F-19.     Payment of benefits.**

If the membership of a Member as defined in Article D, Section D-1(a), (b), or (c) shall terminate for any reason other than retirement, his or her becoming a Beneficiary, or death, the Member shall be paid the Accumulated Contributions standing to the credit of his or her individual account in the Annuity Savings Fund, such payment to be made within ninety days after such termination of membership; provided, however, that if a Member eligible for retirement shall resign or be dismissed from service, the Board of Trustees, on the written petition of such Member filed within one year from his or her separation from service and prior to the withdrawal of his or her Accumulated Contributions in the Annuity Savings Fund, shall grant such Member service retirement benefits computed in accordance with Article F, Part A, Section F-2(a), subject to the provisions of Part G of this Article F.

**Sec. F-20.     Payment of benefits.**

If the membership of a Member as defined in Article D, Section D-1(d) shall terminate for any reason other than retirement, his or her becoming a Beneficiary or death, he or she shall be paid the Accumulated Contributions standing to the credit of his or her individual account in the Annuity Savings Fund, such payment to be made within ninety days after such termination of membership; provided, however, that if a Member having twenty-five or more years of service and having attained age fifty-five shall resign or be dismissed from service, the Board of Trustees, on the written petition of such Member filed within one year from his or her separation from service and prior to the withdrawal of his Accumulated Contributions in the Annuity Savings Fund, shall grant such Member service retirement benefits computed in accordance with Article F, Part A, Section F-2(b), subject to the provisions of Part G of this Article F.

**Sec. F-21.     Deferred vested benefits.**

A Member (i) whose employment is terminated before August 28, 2003 and who is credited with eight or more years of creditable service and has attained Age forty, or (ii) whose employment is terminated after August 27, 2008 and who is credited with ten or more years of creditable service, but in each case less than twenty-five years (effective as of March 8, 2007, twenty years for DPOA members and fire equivalents) of creditable service shall be eligible to receive a full Retirement Allowance under Component II beginning on the date upon which the Member would have been eligible to commence a full Retirement Allowance had he or she continued in the service of the City until such date. Alternatively, such Member may elect to receive an actuarially reduced early Retirement Allowance at any time following his or her termination of employment with the City.

## Part G — Conviction of Felony.

**Sec. F-22.  Forfeiture of rights.**

If a Member or retiree as defined in Article D, Section D-1(a), (b), (c) or (d) shall be convicted of by a court of competent jurisdiction or enters a nolo contendere plea accepted by a court for a felony against the City arising out of his or her service as an employee of the City and while a Member of the Retirement System, the court may order the forfeiture of all or a portion of the rights of the Member to benefits hereunder, except the return of his or her Accumulated Contributions, as provided in the *Public Employee Retirement Benefits Forfeiture Act, MCL 38.2701, et. seq.* In such case, the Retirement System shall pay to an individual, if any, who would otherwise be a Beneficiary of the Member or retiree whose retirement benefit is being forfeited under this Section F-22 an Actuarially Equivalent monthly retirement allowance at the Age that the Member or Retiree would have become eligible for unreduced retirement benefits under the Retirement System.

## Part H — Option Elections.

**Sec. F-23.  Generally.**

(a)  Prior to the first payment of any Retirement Allowance normally due, except a disability Pension payable under Part B, Sections F-8 and F-11 of this article, a Member may elect to receive his or her Retirement Allowance as a Straight Life Retirement Allowance payable throughout the Member's life; or the Member may elect to receive the Actuarial Equivalent, as of the date of the Member's retirement, of his or her Straight Life Retirement Allowance in a reduced Retirement Allowance payable throughout the Member's life and nominate a joint Beneficiary, in accordance with the provisions of Options 1, 2, 3, 3(A) or 3(B) as follows:

(1)  OPTION 1. *Cash Refund Annuity.* Under Option 1, a Member will receive a reduced Retirement Allowance. If a Member who selected Option 1 dies before full payment of the Annuity has been received, the person or persons nominated by that Member's written designation duly executed by the Member and filed with the Board of Trustees shall receive in a single payment the difference between the present value of the Member's Annuity on the date the Member retired, minus the amount of Annuity payments already paid to the Member. If there is no such designated person(s) surviving the retired deceased Member, such difference, if any, shall be paid to the Member's legal representative.

(2)  OPTION 2. *Joint and Last Survivorship Retirement Allowance.* Under Option 2, upon a Member's death, payment of a reduced Retirement Allowance shall be continued through the life of and paid the person having an insurable interest in the Member's life and nominated by written designation duly executed by the Member and filed with the Board of Trustees prior to the first payment of the Member's Retirement Allowance is due.

(3)  OPTION 3. *Joint and Seventy-Five Percent Survivor Allowance.* Under Option 3, upon a Member's death, payment of seventy-five percent (75%) of

the Member's reduced Retirement Allowance shall be continued throughout the life of and paid to the person having an insurable interest in the Member's life and nominated by that Member's written designation duly executed by the Member and filed with the Board of Trustees prior to the date the first payment of the Retirement Allowance is due.

(4)      OPTION 3(A). *Modified Joint and Last Survivorship Allowance*. Under Option 3(A), upon a Member's death, payment of one-half (50%) of the Member's reduced Retirement Allowance shall be continued throughout the life of and paid to the person having an insurable interest in the Member's life and nominated by that Member's written designation duly executed by the Member and filed with the Board of Trustees prior to the date the first payment of the Retirement Allowance is due.

(5)      OPTION 3(B). *Joint and Twenty-Five Percent Survivor Allowance*. Under Option 3(B), upon a Member's death, payment of twenty-five percent (25%) of the Member's reduced Retirement Allowance shall be continued throughout the life of and paid to the person having an insurable interest in the Member's life and nominated by that Member's written designation duly executed by the Member and filed with the Board of Trustees prior to the date the first payment of the Retirement Allowance is due.

(b)      The Joint and Survivor Optional Forms of Payment provided under Options 2, 3, 3(A) and 3(B) shall be made available in either the standard form or the pop-up form, as follows:

(i)      *Standard Form*. Under the Standard Form, the reduced Retirement Allowance shall be paid throughout the lifetime of the Retiree.

(ii)      *Pop-up Form*. Under the Pop-up Form, the reduced allowance shall be paid throughout the lifetime of the Retiree and the designated Beneficiary. In the event of the death of the designated Beneficiary during the lifetime of the Retiree, the amount of the allowance shall be changed to the amount that would have been payable had the Retiree elected the Straight Life Form of Payment. The actuarial cost of the change in benefit shall be borne by the Member who seeks change in his or her election.

In addition, a Member may elect to have all or part of his Accumulated Contributions paid to the Member in a single sum or used to purchase an annuity contract from an insurance company of his or her choice in which case, any annuity payments attributable to such amount under the Retirement System shall not be payable from the Annuity Reserve fund but shall be the responsibility of the insurance company. A Member's Retirement Allowance shall be reduced by the actuarial equivalent of the amount so paid or used.

(c)      This Section does not rescind any substantive rights of disability retirees from the Retirement System who retired prior to the arbitration decision regarding DPOA

members that became effective on July 1, 1995, or the arbitration decision regarding DPLSA members that became effective on June 30, 1998.

(d)    This Section does not amend any computations used to determine benefits under Part B, Sections F-8 and F-11 of this Component II, or result in an increase or decrease in such benefits.

(e)    Retirees of the Retirement System shall be entitled to change their Pension option from either Option 2, Option 3, Option 3(A) or Option 3(B) to a Straight Life Retirement Allowance after they have commenced collection of the Pension if the Member's Beneficiary predeceases the Member. The actuarial cost of the change in benefit shall be borne by the Member who seeks change in his option election. The pop-up option shall be based upon the investment return assumption as recommended by the Plan Actuary and adopted by the Board of Trustees.

### Sec. F-24.    Disposition of surplus benefits upon death of Member and Beneficiary.

In the event a Member elected Option 2, 3, 3(A) or 3(B) provided for in Section F-23 of this Part H and both the Member and his or her designated joint Beneficiary die before there has been paid in Retirement Allowances an aggregate amount equal to his or her Accumulated Contributions standing to his or her credit in the Annuity Savings Fund at the time of his or her retirement, the difference between his or her said Accumulated Contributions and the said aggregate amount of Retirement Allowances paid shall be paid to the said retired Member's legal representative.

## Part I — Pension Offset by Compensation Benefits.

### Sec. F-25.    Generally.

Any amounts which may be paid under the provisions of any workmen's compensation, or pension, or similar law to a Member, or to the dependents of a Member on account of any disability or death, shall be offset against and payable out of funds provided by the City under the provisions of the Retirement System on account of the same disability or death. In case the present value of the total commuted benefits under said workmen's compensation, pension, or similar law, is less than the Pension Reserve or benefits otherwise payable from the funds provided by the City under this Retirement System, then the present value of the commuted payments shall be deducted from the Pension Reserve, and such benefits as may be provided by the Pension Reserve, so reduced, shall be payable under the provisions of the Retirement System.

## Part J — Monthly Payments.

### Sec. F-26.    Generally.

Unless otherwise herein provided, all benefits payable under this Retirement System shall be paid in equal monthly installments.

## Part K — Re-Examination of Beneficiaries.

### Sec. F-27.    Authority of Board.

(a)    Once each year during the retirement of a Member on a disability Pension or a disability Retirement Allowance and at least once in every three year period thereafter the Board of Trustees shall require any disability retiree, if he or she would not then be eligible for a service Retirement Allowance had he or she remained in active service, to undergo a medical examination at a place to be fixed by the Board of Trustees.  If the retiree shall be required to travel more than twenty miles to reach such place, the Board of Trustees shall pay his or her reasonable traveling expenses.  Should such disability retiree refuse to submit to such examination, his or her disability Pension or disability Retirement Allowance may be discontinued until he or she shall submit to such examination and should such refusal continue for one year, all of the Member's rights in and to a Pension may be revoked by the Board of Trustees.  If, on medical examination of a Beneficiary, the Board of Trustees determines that the retiree is physically able and capable of resuming active duty, he or she shall be restored to such duty and his or her other disability Pension or disability Retirement Allowance shall cease.  Such Member so restored to active duty shall be returned to duty in a rank or grade equivalent to or higher than the rank or grade in which he or she was serving at the time of his or her last retirement and his or her compensation shall be that provided for the rank or grade in which he or she is restored to service.  It shall be the duty of the Commissioner of Police or the Board of Fire Commissioners to restore such Member to duty forthwith.

(b)    If the Board of Trustees determines that a disabled Old Plan Member is engaged in a gainful occupation, paying more than the difference between his or her Final Compensation as of the earlier of (i) the date of disability or (ii) June 30, 2014 and his or her disability Pension, or disability Retirement Allowance, the amount of his or her Pension shall be reduced to an amount, which together with the amount earned by the Member, shall equal the amount of such Final Compensation.  If the Board of Trustees determines that a disabled New Plan Member is engaged in a gainful occupation, paying more than the difference between his or her base salary at the earlier of (i) the time of disability or (ii) June 30, 2014, increased by two and twenty-five one hundredths percent (2.25%) for each full year from the date of disability and his or her disability Pension, or disability Retirement Allowance, the amount of his or her Pension shall be reduced to an amount, which together with the amount earned by him or her, shall equal the amount of such final compensation.  Should his or her earnings be later changed, the amount of his or her Pension may be further modified in like manner.

(c)    A disability retiree who shall be reinstated to active service prior to July 1, 2014 as provided in this Section, shall from the date of such restoration again become a Member of the Retirement System, and he or she shall contribute to the Retirement System thereafter in the same manner and at the same rate as he or she paid prior to his or her disability retirement.  A disability retiree who shall be reinstated to active service after June 30, 2014, shall from the date of such restoration become an active

Member of the Retirement System and shall accrue future benefits pursuant to Component I.  He or she shall contribute to the Retirement System at the rate required of active Members pursuant to Component I.  Any Prior Service and Membership Service on the basis of which his or her service was computed at the time of his or her disability retirement shall be restored to full force and effect, and he or she shall be given service credit under Component I or Component II, as applicable, for the period of time he or she was in retirement due to such disability, except in the case of nonservice connected disability.

## Part L — Withdrawal of Accumulated Contributions

### Sec. F-28.    Member With Twenty or Twenty-Five Years of Service.

Effective July 1, 1982, a Member with twenty-five years or more of creditable service (effective as of March 8, 2007, twenty years for DPOA members and fire equivalents) shall be allowed to withdraw either a portion or the full amount of his or her Accumulated Contributions, one time only, whether or not the Member retires.  A Member shall make such election prior to the receipt of his or her first retirement benefit check.

### Sec. F-29.    Disabled Member

A Member who is receiving disability benefits (duty or non-duty) from the Retirement System and who has twenty-five years (effective as of March 8, 2007, twenty years for DPOA members and fire equivalents) or more of creditable service shall have the right to withdraw the full amount of his or her Accumulated Contributions.  If such Member withdraws his or her Accumulated Contributions, his or her retirement benefit shall be actuarially reduced to reflect such withdrawal.

### Sec. F-30.    Optional Annuity Withdrawal

(a)    A Member shall have the right to elect to receive on the effective date of his or her service retirement a partial or total refund of his or her Accumulated Contributions.  If a Member makes such an election, an Annuity payable under any Retirement Allowance or reduced Retirement Allowance shall be reduced proportionally.  If the total Accumulated Contributions are withdrawn, no Annuity shall be payable.

The limitation of fifteen twenty-seconds of the maximum earnable compensation of a Police Employee and Fire Employee continues in effect.  For purposes of determining the fifteen twenty-seconds limitation, a computation based on the Annuity which is an Actuarial Equivalent of the Accumulated Contributions standing to a Member's credit in the Annuity Savings Fund prior to any partial or total refund will be used.

On or after July 1, 1974, Members or former Members who are entitled to begin to receive the 40 & 8 benefit provided under Section F-6 will be entitled to the annuity refund withdrawal option.

On or after July 1, 1974, non-duty disability retirees represented by DFFA, DPCOA and DPLSA who retired pursuant to Article D, Section D-1(a), (b) or (c) prior to

having twenty-five years of service credit, shall be entitled to the annuity refund withdrawal option on the date he or she would have had twenty-five years of service credit had he or she continued as an active employee. Said option shall only apply to the balance of Accumulated Contributions, if any, remaining to such retiree's credit in accordance with the existing annuity refund provisions.

Survivor benefit beneficiaries as defined in Title IX, Chapter VII, Article VI, Part E, Section 2, parts (a), (b) and (c) of the 1918 City Charter in effect as of June 30, 1974, and continued in effect by Section 11-102 of the City Charter shall be entitled to the annuity withdrawal refund option subject to the same rules that would have been applicable to the deceased Member or Members had he or she not died. Said option shall only apply to the balance of Accumulated Contributions, if any, remaining to the applicable former Member's credit.

In any case of doubt, the Board of Trustees shall decide whether a Member or Beneficiary is entitled to an annuity refund withdrawal option.

(b)     A Member shall have the right on or after the effective date of his becoming eligible for a full service Retirement Allowance (Members who have either twenty or twenty-five years of creditable service depending upon the applicable bargaining unit) to elect to receive a partial or total refund of his or her Accumulated Contributions to the Annuity Savings Fund. If a Member makes such an election, an Annuity payable under any Retirement Allowance or reduced Retirement Allowance shall be reduced proportionally. If the total Accumulated Contributions are withdrawn, no Annuity shall be payable.

If a Member makes such an election, the Retirement Allowance shall be reduced to reflect the value of the Annuity withdrawn. The amount of the Annuity at the time of such election shall be the amount used at the time of retirement for purposes of computing the Retirement Allowance.

All members (except DPOA members retiring prior to July 1, 1982) who complete their required years of service, shall have the right to withdraw all or part of their Accumulated Contributions whether they choose to retire or not.

Effective July 21, 2000 for DFFA members having a parity relationship with the DPOA and for the DPCOA Inspector, and effective July 1, 2003 for DPLSA members, and effective July 21, 2000 for DPOA members, a Member who has elected to retire and elected to withdraw his or her Annuity for the purposes of calculating his or her Retirement Allowance (thereby lowering the Retirement Allowance), may nevertheless choose to leave the Annuity in the Retirement System collecting regular annuity interest with the option of a one-time withdrawal of the Annuity funds at a later date.

For a DPCOA, DPLSA or DFFA member or an employee with a parity relationship with the DPLSA and for the DPCOA Inspector who retires on or after July 1, 1990, and who has made or makes an election to receive a total or partial refund of his or

13-53846-swr  Doc 8045-1   Filed 10/22/14   Entered 10/22/14 05:47:43   Page 197 of
429
13-53846-tjt  Doc 8405-21   Filed 11/20/14   Entered 11/20/14 05:46:23   Page 541 of
609

her accumulated contribution to the Annuity Savings Fund, there shall be no reduction of Retirement Allowances due to the portion of withdrawal representing interest credits. For members of DFFA and DPLSA, this Subsection shall be controlled by the requirements of the Act 312 arbitration award issued June 25, 1990 (MERC Case No. B89 C-0622, page numbers 22 and 23).

Effective January 15, 2010 for members of DPCOA and fire equivalents, or December 15, 2008 for DPLSA and fire equivalents, or March 8, 2007 for DPOA members and fire equivalents, a Member who retires and elects to leave a balance in the Annuity Savings Fund shall have the option of receiving a quarterly payment of interest earnings only or to take periodic withdrawals of principal, in addition to a one time complete withdrawal. Members of DPCOA and DPLSA and their fire equivalents must make their elections a minimum of thirty days before the beginning of a quarter; quarter defined as beginning March 1, June 1, September 1, and December 1.

An employee represented by DFFA, DPCOA or DPLSA who is entitled to a Retirement Allowance under Article F, Part A, Section F-5 of the Retirement System and who leaves the employ of the Police or Fire Department of the City on or after July 1, 1982 shall have the right to elect to receive on the effective date of termination a partial or total refund of his Accumulated Contributions. The Pension portion of his Retirement Allowance shall be computed as if the Member had not withdrawn his or her Accumulated Contributions from the Annuity Savings Fund until the date he or she was eligible to retire had he or she continued in City employment.

(c)     Effective in accordance with the specific date and terms of the DPOA award in Act 312 No. D98 E-0840 (Chairman Donald F. Sugerman, dated July 21, 2000), a DPOA member shall have the right to leave his or her withdrawn Annuity in the Pension system and accumulating interest, as provided therein.

13-53846-swr  Doc 8045-1  Filed 10/22/14  Entered 10/22/14 05:47:23  Page 198 of
429
13-53846-tjt  Doc 8045-1  Filed 10/22/14  Entered 10/22/14 05:46:29  Page 542 of
829

## ARTICLE G.  METHOD OF FINANCING.

### Sec. G-1.  General.

The funds of the Retirement System shall be the Annuity Savings Fund, Annuity Reserve Fund, Pension Accumulation Fund, Pension Reserve Fund, Expense Fund and the Survivors Benefit Fund.

### Sec. G-2.  Annuity Savings Fund.

(a)  The Annuity Savings Fund shall be the fund in which shall be accumulated at Regular Interest, the contributions deducted from the compensation of Members to provide for their Annuities.  Subject to Section B-1(c), the contributions of a Member as defined in Article D, Section D-1(a), (b) or (c) shall be five percent of a Member's compensation until the Member has acquired twenty-five years of creditable service. Subject to Section B-1(c), the contribution of a Member as defined in Article D, Section D-1(d) shall be five percent of his or her compensation until he or she has acquired at least twenty-five years of creditable service (effective as of March 8, 2007, twenty years for DPOA members and fire equivalents) and attained age fifty-five.  No Member shall have the option of choosing to receive the compensation required to be contributed hereunder directly instead of having such amounts paid by the City to the Annuity Savings Fund.

(b)  The City shall cause the contributions provided for in paragraph (a) above to be deducted from the compensation of each Member on each and every payroll, for each and every payroll period, from the date of his or her entrance in the System to the earlier of (i) the date he or she ceases to be a Member or (ii) the last payroll date occurring in July 2014.

(c)  The deductions provided for herein shall be made notwithstanding that the minimum compensation provided by law for any Member shall be reduced thereby.  Every Member shall be deemed to consent and agree to the deductions made and provided for herein, and payment of his or her salary or compensation, less said deduction, shall be a full and complete discharge and acquittance of all claims and demands whatsoever for the services rendered by such person during the period covered by such payments, except as to the benefits provided under this Retirement System.  The amounts to be deducted shall be deducted by the City Treasurer and when deducted shall be paid into the Annuity Savings Fund and shall be credited to the individual account of the Member from whose compensation said deduction was made.

(d)  If, under the provisions of this Component II, any person shall withdraw or be paid any part or all of his Accumulated Contributions and shall thereafter again become a Member on or before June 30, 2014, he or she shall, in addition to the contributions provided for in paragraph (a) above, redeposit in the Annuity Savings Fund, by an increased rate of contribution to be determined by the Board of Trustees, or by a single payment, such amount that his or her Accumulated Contributions at the date of

13-53846-swr   Doc 8045-1    Filed 10/22/14    Entered 10/22/14 05:47:23    Page 199 of
429
13-53846-tjt   Doc 8405-21    Filed 11/20/14    Entered 11/20/14 05:48:23    Page 643 of
709

his or her eligibility for retirement will be the same amount it would have been had no withdrawal or payment been made therefrom.

(e)     Except as is otherwise provided in this Component II, upon the death or retirement of a Member, his or her Accumulated Contributions shall be transferred from the Annuity Savings Fund to the Annuity Reserve Fund.

(f)     In any Plan Year during the period beginning on or after July 1, 2014 and ending June 30, 2023 in which the annual rate of return credited to the accounts of Members investing in the Annuity Savings Fund as provided in paragraph (a) is less than the actual rate of return net of expenses of the Retirement System's invested assets for the second Plan Year immediately preceding the Plan Year in which the annual rate of return is credited ("ASF Return Excess"), an amount equal to the value of the ASF Return Excess shall be transferred to the Pension Accumulation Fund maintained under Component I of the Combined Plan and shall be used to fund the Transition Cost relating to Component I  The Transition Cost is a measure of the liability that Component I of the Retirement System has at its inception; due to the fact that at its inception, Members in Component I of the Retirement System receive vesting and eligibility credit under Component I for service that was earned prior to July 1, 2014 and is otherwise credited to Members under Component II of the Retirement System, as such Transition Cost is calculated by the Plan Actuary.  In the event there is an ASF Return Excess for a Plan Year following the Plan Year in which such transfers have fully funded the Transition Costs relating to Component I, fifty percent (50%) of such ASF Return Excess shall be transferred to the Pension Accumulation Fund maintained under Component II and the remaining fifty percent (50%) of such ASF Return Excess shall be transferred to Component I and credited to the Rate Stabilization Fund maintained under Component I.  "Transition Cost" shall be determined by the Plan Actuary.

## Sec. G-3.     Annuity Reserve Fund.

The Annuity Reserve Fund shall be the fund from which shall be paid all Annuities payable as provided in this Component II, except Annuities which are payable from the Survivors Benefit Fund.  Should a disability retiree be restored to active service, his or her Annuity Reserve at the time shall be transferred from the Annuity Reserve Fund to the Annuity Savings Fund and credited to his or her individual account therein.

## Sec. G-4.     Alternative Financing Method.

Except as provided regarding the Survivors Benefit Fund, the Pension Accumulation Fund shall be the fund in which shall be accumulated reserves for the Pensions and other benefits payable from contributions made by the City, and from which transfers shall be made as provided in this section.

(a)     *Accrued Liability Fund*. Pursuant to *Ordinance No. 05-05*, which authorized the creation of the Detroit Police and Fire Retirement System Service Corporation, the City entered into a transaction ("the Pension Funding Transaction") to obtain funds as

an alternative to those available through the traditional funding mechanism described in Section G-5. The proceeds generated by the Pension Funding Transaction (or any Additional Pension Funding Transaction, as described below) that were deposited into the Retirement System will be termed the "Funding Proceeds." The Funding Proceeds were deposited into a new Fund in the Retirement System called the Accrued Liability Fund. The purpose of the Funding Proceeds is to fund all or part of the heretofore unfunded accrued liabilities ("UAAL") of the Retirement System. The Funding Proceeds are the assets of the Retirement System and will be applied, together with all other assets of the Retirement System, to fund the Retirement System's obligation to pay accrued benefits, as adjusted in the Plan of Adjustment.

This Accrued Liability Fund shall contain only the Funding Proceeds of the Pension Funding Transaction, and any earnings thereon. Prior to Fiscal Year 2013, funds were transferred each Fiscal Year (or monthly portion thereof) from the Accrued Liability Fund to the Pension Accumulation Fund as provided in the documents governing the Retirement System, including *Ordinance No. 5-05*.

(b)　　As soon as practicable following the effective date of the Plan of Adjustment, any amounts remaining credited to the Accrued Liability Fund shall be transferred to the Pension Accumulation Fund and the Accrued Liability Fund shall cease to exist.

## Sec. G-5.　　Contributions to and payments from Pension Accumulation Fund.

Contributions to and payments from the Pension Accumulation Fund shall be made as follows:

(a)　　For Fiscal Years commencing prior to July 1, 2014, upon the basis of such assumptions as to future financial experiences as the Board of Trustees shall from time to time adopt, the Actuary annually computed the City's contribution, expressed as a percent of active Member contributions, to provide the Pension Reserves covering the Pensions or other City-financed benefits to which Members might be entitled or which might be payable at the time of their discontinuances of City employment; provided, such contribution percents shall not be less than amounts which, expressed as percents of active Member compensation will remain level from generation to generation of Detroit citizens.　Upon the retirement or death of a Member, the Pension Reserve for any benefits payable on his or her behalf shall be transferred from the Pension Accumulation Fund to the Pension Reserve Fund, to the extent of there being assets in the Pension Accumulation Fund.

(b)　　For Fiscal Years commencing prior to July 1, 2014, the Board of Trustees annually ascertained and reported to the Mayor and the Council the amount of contributions due the Retirement System by the City, and the Council may have appropriated and the City may have paid such contributions to the Retirement System during the ensuing Fiscal Year.　When paid, such contributions were credited to the Pension Accumulation Fund.

(c)     For Fiscal Years commencing after June 30, 2014, he City shall make contributions to the Pension Accumulation Fund only as provided in the Plan of Adjustment.

### Sec. G-6.     Retiree payments from Pension Reserve Fund; reinstatement of disability retirees to active service.

Except as to the Survivor's Benefit Fund, the Pension Reserve Fund shall be the fund from which shall be paid Pensions on account of Members.  Should a disability retiree be reinstated to active service, the Member's Pension Reserve, at that time, shall be transferred from the Pension Reserve Fund to the Pension Accumulation Fund.

### Sec. G-7.     Expense Fund.

The Expense Fund shall be the fund to which shall be credited all money provided by the City, if any, to pay the administration expenses of Component II, and from which shall be paid all the expenses necessary in connection with the administration and operation of Component II.

### Sec. G-8.     Appropriations prior to July 1, 2014.

(a)     The Board of Trustees shall certify the amount of the appropriation necessary to pay to the various funds of Component II of the Retirement System the amounts payable by the City as enumerated in this Component II, according to legal budget procedure.

(b)     To cover the requirements of Component II prior to July 1, 2014, such amounts as shall have been necessary to cover the needs of Component II prior to July 1, 2014 shall be paid into the Pension Accumulation Fund and the Expense Fund by special appropriations or transfers to the Retirement System; provided, however that no transfers can be made from the Accrued Liability Fund other than the annual transfer of the scheduled amortizing amount, or transfers under special circumstances pursuant to Section G-4 (as in effect prior to July 1, 2014).

### Sec. G-9.     Maintenance of reserves.

The maintenance of the Annuity Reserves in the Annuity Reserve Fund and the Pension Reserves in the Pension Reserve Fund are hereby made obligations of the Pension Accumulation Fund. All income, interest, and dividends derived from deposits and investments authorized by this Component II, which are not required for the allowance of interest to the funds of the Retirement System as provided herein, shall be credited to the Pension Accumulation Fund. Prior to July 1, 2014, the moneys credited to the Accrued Liability Fund were credited to the Pension Accumulation Fund only to the extent authorized pursuant to the terms of the Retirement System as in effect prior to July 1, 2014.  Any contributions by the City to the System from any fund impressed by law with a certain and definite purpose shall be accounted for separately.

### Sec. G-10.     Survivors Benefit Fund.

(a)     The Survivors Benefit Fund shall be the fund in which shall be accumulated, at Regular Interest, the reserves for survivors benefits provided for in Article F, Part E, Section F-18, hereof, and from which such benefits shall be paid, but only to the

extent sufficient assets are credited to the fund at the time a claim for benefits is made. In the event there are insufficient assets credited to the Survivor's Benefit Fund to pay the benefits provided under this Section G-10, such benefits thereafter shall be payable from the Pension Reserve Fund.

(b)     After June 30, 1965 and prior to July 1, 1986, each Member shall contribute to the Survivors Benefit Fund one per cent of his or her compensation paid by the City until he or she has acquired twenty-five years of creditable service. The City shall cause the said contributions to be deducted from the Member's compensation, on each and every payroll, for each and every payroll period so long as he or she remains a Member and has not acquired twenty-five years of creditable service. Each and every Member shall be deemed to consent and agree to the said deductions. Said contributions, when deducted, shall be credited to the Survivors Benefit Fund and shall in no case become a part of the said Member's Accumulated Contributions, nor be subject to refund.

(c)     Each Member who retires after June 30, 1965, under Part B, Section F-7 of Article F shall, prior to July 1, 1986, contribute to the Survivors Benefit Fund one per cent of his or her final compensation as defined until he or she would have had a total of twenty-five years of creditable service had he or she continued in active service. The Retirement System shall cause the said contribution to be deducted from the Pension of each such retired Member on each and every retirement roll, for each and every retirement roll period, so long as he or she is receiving a Pension under Part B, Section F-8(a) of Article F. Each and every such retired Member who is receiving a Pension under Part B, Section F-8(a) of Article F shall be deemed to consent and agree to said deductions. Said contributions, when deducted, shall be credited to the Survivors Benefit Fund and shall in no case become a part of said Member's Accumulated Contributions, nor be subject to refund.

(d)     Effective July 1, 1986, the contributions, required by Article G, Section G-10(b) and G-10(c), to the Survivors Benefit Fund were eliminated for union members. For Fiscal Years ending prior to July 1, 2014, the City shall make the contributions necessary to maintain the benefit level by contributing that amount necessary to replace the contributions of members of DFFA and DPOA to the Survivor's Benefit Fund.

(e)     For Fiscal Years ending prior to July 1, 2014, upon the basis of such mortality and other tables of experience, and Regular Interest, as the Board of Trustees shall from time to time adopt, the Actuary shall annually compute the liabilities for benefits being paid from the Survivors Benefit Fund. The Board of Trustees shall report to the Mayor and the Council the amount of contributions to be made by the City to the Survivors Benefit Fund, and the Council shall appropriate and the City shall pay such amount to the Retirement System during the ensuing Fiscal Year. When paid, such appropriations shall be credited to the Survivors Benefit Fund. For Fiscal Years commencing prior to July 1, 2014, if the balance in the fund is not sufficient to fully cover the liabilities so computed, the City shall appropriate and pay, in the ensuing Fiscal Year, the amount of such insufficiency. For Fiscal Years commencing on and

after July 1, 2014, the City shall not make any contributions to the Survivor's Benefit Fund.

(f)    Upon the death of a Member, on whose account survivors benefits become payable as provided in Article F, Part B, Section F-8, hereof, his or her Accumulated Contributions standing to his or her credit in the Annuity Savings Fund at the time of his or her death shall be transferred from the Annuity Savings Fund to, and shall become a part of, the Survivors Benefit Fund, notwithstanding any provisions in this Component II to the contrary.

### Sec. G-11.    Computation of Annuity and Pension Reserve liabilities for Members, Retirees and Beneficiaries.

In computing the Annuity and Pension Reserve liabilities for Members, retirees and beneficiaries, the Board of Trustees shall cause the following annual Decrement Probabilities, Salary Factors and interest assumption to be used.

(a)    The annual Decrement Probabilities and Salary Factors to be used in evaluating the Annuity and Pension liabilities for Members shall be as shown in Tables 1 and 2 hereinafter set forth.

(b)    The total of active Member annual compensation shall be assumed to increase three percent per annum, compounded annually.

(c)    The mortality assumption for retirees and beneficiaries shall be the mortality rates contained in the 1971 group annuity male mortality table, without setback for men and set back five years for women.

(d)    The investment return assumption shall be five percent per annum, compounded annually, for Fiscal Years commencing prior to July 1, 2014.

(e)    For Fiscal Years commencing on or after July 1, 2014, the Annuity and Pension Reserve liabilities shall be calculated in a manner which is consistent with the Plan of Adjustment.

**TABLE 1.**

**City of Detroit Policemen and Firemen
Retirement System
Active Member Annual**

**Probabilities
and Salary Factors**

| Age | Withdrawal from Service | Death in Service | Salary Factors |
|---|---|---|---|
| 18 | .04120 | .00098 | .10561 |
| 19 | .04090 | .04099 | .11327 |
| 20 | .04030 | .00100 | .12126 |
| 21 | .04000 | .00101 | .12988 |
| 22 | .03960 | .00102 | .13913 |
| 23 | .03910 | .00103 | .14913 |
| 24 | .03890 | .00104 | .15971 |
| 25 | .03840 | .00105 | .17068 |
| 26 | .03800 | .00107 | .18204 |
| 27 | .03700 | .00108 | .19347 |
| 28 | .03600 | .00111 | .20527 |
| 29 | .03480 | .00113 | .21712 |
| 30 | .03340 | .00117 | .22916 |
| 31 | .03200 | .00121 | .24124 |
| 32 | .03000 | .00126 | .25321 |
| 33 | .02730 | .00133 | .26522 |
| 34 | .02370 | .00143 | .27753 |
| 35 | .01990 | .00154 | .29015 |
| 36 | .01500 | .00168 | .30306 |
| 37 | .01160 | .00184 | .31637 |
| 38 | .00850 | .00204 | .32995 |
| 39 | .00600 | .00227 | .34405 |
| 40 | .00390 | .00252 | .35851 |
| 41 | .00210 | .00281 | .37333 |
| 42 | .00090 | .00313 | .38861 |
| 43 | .00000 | .00348 | .40435 |
| 44 | .00000 | .00387 | .42051 |
| 45 | .00000 | .00429 | .43709 |
| 46 | .00000 | .00475 | .45395 |
| 47 | .00000 | .00526 | .47144 |
| 48 | .00000 | .00582 | .48929 |
| 49 | .00000 | .00643 | .50750 |
| 50 | .00000 | .00710 | .52639 |
| 51 | .00000 | .00783 | .54560 |
| 52 | .00000 | .00864 | .56535 |

| Age | Withdrawal from Service | Death in Service | Salary Factors |
|-----|------------------------|------------------|----------------|
| 53 | .00000 | .00953 | .58548 |
| 54 | .00000 | .01051 | .60612 |
| 55 | .00000 | .01157 | .62711 |
| 56 | .00000 | .01270 | .64867 |
| 57 | .00000 | .01392 | .67066 |
| 58 | .00000 | .01520 | .69319 |
| 59 | .00000 | .01656 | .71610 |
| 60 | .00000 | .01802 | .73939 |
| 61 | .00000 | .01959 | .76316 |
| 62 | .00000 | .02133 | .78747 |
| 63 | .00000 | .02322 | .81211 |
| 64 | .00000 | .02526 | .83715 |
| 65 | .00000 | .02750 | .86258 |
| 66 | .00000 | .03000 | .88848 |
| 67 | .00000 | .03277 | .91514 |
| 68 | .00000 | .03584 | .94264 |
| 69 | .00000 | .03919 | .97094 |
| 70 | .00000 | .04278 | 1.00000 |

**TABLE 2.**

**City of Detroit Policemen and Firemen
Retirement System
Annual Probabilities of Age and Service
Retirement Applicable to Members
Who Are Eligible to Retire**

| Age | Probabilities of Retirement |
|---|---|
| 45 | 25% |
| 46 | 25 |
| 47 | 25 |
| 48 | 25 |
| 49 | 25 |
| 50 | 25 |
| 51 | 25 |
| 52 | 25 |
| 53 | 25 |
| 54 | 20 |
| 55 | 20 |
| 56 | 15 |
| 57 | 10 |
| 58 | 15 |
| 59 | 30 |
| 60 | 100 |

**Sec. G-12.      Determination of City's annual contribution — Disability Pension liabilities.**

For Fiscal Years commencing prior to July 1, 2014, the City's annual contribution, expressed as a percent of active Member compensation, to finance disability Pensions shall be determined by dividing the average of the Pension Reserve liabilities for disability retirements incurred, during the three Fiscal Years ending with the date of the valuation by one percent of the active Members' annual compensation used in the valuation.

**Sec. G-13.      Determination of City's annual contribution — Death Pension liabilities.**

For Fiscal Years commencing prior to July 1, 2014, the City's annual contribution, expressed as a percent of active Member compensations, to finance death-in-service Pensions shall be determined by dividing the average of the Pension reserve liabilities for death-in-service claims incurred during the three Fiscal Years ending with the date of the valuation by one percent of the active Member's annual compensations used in the valuation.

**Sec. G-14.    Determination of City's annual contribution — Actuarial evaluation of annuity and Pension Reserve liabilities.**

The Annuity and Pension Reserve liabilities for Members, retirees and beneficiaries shall be actuarially evaluated as set forth in this Article G and the Plan of Adjustment.

**Sec. G-15.    Determination of City's annual contribution — Service Pension liabilities for Fiscal Years commencing prior to July 1, 2014.**

(a)    The service Pension liabilities for Members shall be determined using the entry age-normal cost method of actuarial valuation.

(b)    The City's annual contribution, expressed as a percent of active Member compensations, to finance the prospective service Pension liabilities shall be determined by dividing the total of the individual annual normal costs of the active Members by one percent (1%) of the active Members' annual compensation used in the valuation.

(c)    The City's annual contribution, expressed as a percent of active Member compensation, to finance any unfunded Accrued Service Pension liabilities, including instances in which assets exceed liabilities, shall be determined by dividing such unfunded Accrued Service Pension liabilities by one percent (1%) of the present value of future compensation payable during a period of future years.  Such period of future years shall be thirty years for the actuarial valuation as of June 30, 1974, decreasing one (1) year at each subsequent June 30th until a twenty year period is reached, which twenty year period shall be used in each subsequent actuarial valuation until June 30th, 2004 when the period shall again be thirty years.

**Sec. G-16.    Board of trustees to compute City's annual contribution.**

Based upon the provisions of this Article, including any amendments, the Board of Trustees shall compute the City's annual contributions for Fiscal Years commencing prior to July 1, 2014, expressed as a percent of active Member compensation, to the Retirement System for the Fiscal Year beginning July 1, 1975, using actuarial valuation data as of June 30, 1974, and for each subsequent Fiscal Year prior to July 1, 2014 using actuarial valuation data as of the June 30th date which date is a year and a day before the first day of such Fiscal Year.  The Board shall report to the Mayor and to the City Council the contribution percents so computed, and such contribution percents shall be used in determining the contribution dollars to be appropriated by the City Council and paid to the Retirement System.  For each Fiscal Year beginning July 1, 1975 and each Fiscal Year thereafter and prior to July 1, 2014, such contribution dollars shall be determined by multiplying the applicable contribution percent for such Fiscal Year by the Member compensation paid for such Fiscal Year; provided that for the one Fiscal Year beginning July 1, 1975 and ending June 30, 1976, such Member compensation so used shall not exceed 106.09 percent of the active Members' annual compensation used in the actuarial valuation determining such contribution percent.

### Sec. G-17.  Refunds for certain Members.

Effective July 1, 1974, a Member who holds the rank of police inspector and above and who is not covered by a collective bargaining agreement shall, notwithstanding any other provisions of Component II to the contrary, have the right to elect to receive on the effective date of his or her service retirement a partial or total refund of his or her Accumulated Contributions. Effective as of March 8, 2007, a DPOA and fire equivalent retiree who elects not to withdraw his or her Accumulated Contributions as of the effective date of his or her service retirement shall have the option of receiving a quarterly payment of interest credited to his or her Accumulated Contributions or to receive periodic withdrawals of the contributions such Retiree made to Component II of the Retirement System.  If a Member makes such an election, an Annuity payable under any Retirement Allowance or reduced Retirement Allowance shall be reduced proportionately.  If the total Accumulated Contributions are withdrawn no Annuity shall be payable with respect to such withdrawn amounts.

### Sec. G-18.  Employer Contribution

Effective January 1, 1987 for members of DFFA and DPLSA or upon issuance of the 1986-89 Act 312 Award for members of DPOA, the employee contributions to the Annuity Fund, although designated as employee contributions, shall be paid by the City in lieu of contributions by the Employee.  The Employee shall not have the option of choosing to receive the contributed amount directly instead of having them paid by the City to the Annuity Fund. There shall be no additional contribution expense to the City, and the amounts so contributed by the City on behalf of the Employee shall be treated, for tax purposes, as employer contributions and thus shall not be taxable to the Employee until these amounts are distributed or made available to the Employee.

This provision shall not affect the amount or benefit level of the Retirement Allowance, or the City's obligation with respect thereto.

# ARTICLE H.  MISCELLANEOUS.

**Sec. H-1.**        **Recall of Retirees during emergencies.**

During an emergency declared by the Commissioner of Police or the Board of Fire Commissioners, the Commissioner or the Board of Fire Commissioners, as the case may be, shall have power, with the consent of a Retiree, to recall to active duty a Retiree for such period of service as the commissioner or the Board of Fire Commissioners shall deem advisable; provided, however, that the foregoing power shall not apply in the case of a Retiree who has reached the age of sixty-four years, and provided further, that any Retiree so recalled may, at any time, separate from active duty on his or her own application or by order of the Commissioner or the Board of Fire Commissioners.  A Retiree so recalled shall serve in the rank at which he or she retired, or a higher rank, and shall receive the pay of such rank without deduction.  On subsequent separation from active duty, such Retiree shall resume the Retiree status held by him prior to such recall.

## ARTICLE I.  DEFERRED RETIREMENT OPTION PLAN.

**Sec. I-1.        General provisions.**

For periods on and after July 1, 2014, the Deferred Retirement Option Plan ("DROP") Program under Component II shall be available to Members who are covered by collective bargaining agreements with the City that permit such Members to participate in the DROP program and non-union executives of the Police Department and the Fire Department.

(a)        In lieu of terminating employment and accepting a Retirement Allowance under the Component II, any Member of the Retirement System who is eligible for the DROP program and who is eligible to immediately receive a twenty-five year (or twenty year) Retirement Allowance may elect to participate in the DROP program and defer the receipt of his or her Retirement Allowance in accordance with the provisions of this Article I.  Any such election shall be irrevocable.

(b)        Participation in the DROP program for Members for who elected to participate in the DROP program prior to July 1, 2014 shall be limited to ten years.  Participation for Members who elect to participate in DROP program after June 30, 2014 shall be limited to five years.  At the end of such five (or ten) year period of participation in the DROP program, the Member shall be retired from employment.

**Sec. I-2.        Conversion to Retirement Allowance**

Upon the effective date of a Member's participation in the DROP program, the Member shall cease to accrue a Retirement Allowance under Component I and shall elect a form of payment for his Retirement Allowance pursuant to Part H of Article F.  Seventy-five percent (75%) of the monthly Retirement Allowance (including applicable variable Pension Improvement Factor (Escalator) increases) that would have been payable, had the Member elected to terminate employment with the City on the effective date of his or her DROP election and receive an immediate Retirement Allowance, shall be paid into a DROP Account established on behalf of the Member under the Retirement System or in an entity selected by the Board.

**Sec. I-3.        Investment of DROP assets**

(a)        ING was previously selected by the Board as the DROP administration and investment entity for Members who elect to participate in the DROP program.  ING shall continue to be the DROP administration and investment entity, unless and until such time as the Board terminates the agreement with ING as provided in paragraph (d) or determines that it is administratively feasible for the DROP program to be administered and invested under the Retirement System.

(b)        As soon as possible after July 1, 2014, the Board shall determine whether it is administratively feasible for the DROP program to be administered and the assets in DROP accounts to be invested under the Retirement System. If the Board determines that it is feasible to administer the DROP program under the Retirement System, the Board shall promptly take appropriate steps to implement such decision.

(c) If amounts credited to DROP accounts are invested under the Retirement System, such amounts shall be comingled with the assets of the Retirement System for investment purposes and shall be invested by the Trustees. A Member's DROP account shall be credited with annual earnings at a rate equal to seventy-five percent (75%) of the actual net earnings rate of the assets of the Retirement System; however, in no event shall the earnings rate applied to a Member's DROP account for any Plan Year be less than zero percent (0%) nor greater than seven and three-quarters percent (7.75%).

(d) The Board of Trustees entered into an administrative services agreement with ING. Such agreement shall remain in effect until such time as it is terminated by the Board as provided therein.

(e) The Board of Trustees may replace ING with a trust type vehicle or the Board may determine that amounts subject to a DROP election will be invested with Retirement System assets as provided above.

(f) Any fees associated with the maintenance of DROP Accounts outside of the Retirement System shall be paid by the Members by means of deduction from their DROP Accounts.

## Sec. I-4.    Distribution of amounts credited to DROP Account

A Member shall not receive a distribution of amounts credited to his DROP Account prior to his termination of employment with the City. Upon termination of employment, a Member who is a participant in the DROP program shall receive, at his or her option either a lump sum payment from the DROP Account equal to the amount then credited to the DROP Account or an annuity based upon the amount credited to his DROP Account. In addition, one hundred percent (100%) of the Member's monthly Retirement Allowance that otherwise would have been paid upon the Member's retirement had he or she not elected to participate in the DROP program (together with any applicable variable Pension Improvement Factor (Escalator) increases) shall commence to the Member in accordance with the form of payment selected by the Member at the commencement of his or her participation in the DROP program. Termination of employment includes termination of any kind, such as resignation, retirement, discharge or disability.

## Sec. I-5.    Death of Member while participating in the DROP program

If a Member dies while participating in the DROP program, a lump sum payment equal to the Member's DROP Account balance shall be paid to the Beneficiary named by the Member, or if no Beneficiary has been designated, to the Member's estate; provided, notwithstanding anything to the contrary herein, the Member's adjusted DROP Account balance under Component II upon the Member's death while participating in the DROP program shall not be less than total system DROP payments into his or her account (not including earnings and losses). In addition, one hundred percent (100%) of the Member's Retirement Allowance (together with any applicable variable Pension Improvement Factor (Escalator) increases) that would have been paid to the Member but for the Member's decision to participate in the DROP

program will be restored. Survivor benefits, if any, shall be paid in accordance with the payment option elected by the deceased Member at the time the Member elected to participate in the DROP program.

## Sec. I-6.     Disability of Member While Participating in the DROP Program

If a Member becomes Totally Disabled while participating in the DROP program and while still an Employee and his employment with the City is terminated because he is Totally Disabled, such Member (a) shall be immediately retired and one hundred percent (100%) of the Retirement Allowance) that would have been paid to the Member but for the Member's decision to participate in the DROP program (together with any applicable variable Pension Improvement Factor (Escalator) increases) will commence in accordance with the payment option selected by the Member at the commencement of the Member's participation in the DROP program as provided in Section I-2, and (b) shall be entitled to receive payment of the funds in his DROP Account (in the form of a lump sum or other form of payment described in Part H of Article F). Such Member shall not be entitled to disability retirement benefits under Article F hereof.

## Sec. I-7.     Cost Neutrality

(a)     The DROP program shall be effective only for as long as it is cost-neutral to the City, provided however, that the DROP program shall continue during the pendency of proceedings, described in paragraph (2) below, designed to restore the Retirement System to cost neutrality.

(b)     If the City contends that the DROP program is not cost-neutral, including, but not limited to, making the City's annual contribution to the Retirement System higher than it would be if the DROP program was not in effect, the Board and the City, along with the Plan Actuary as well as an actuary appointed by the City (who will be an associate or a fellow of the Society of Actuaries and a member of the American Academy of Actuaries) shall meet and confer in good faith regarding the cost. If the Board and the City are unable to reach an agreement as to cost, the matter shall be submitted to a third, independent, actuary, chosen or agreed upon by the Plan Actuary and the City's actuary. This actuary, when rendering a decision, will be limited to ordering implementation of changes necessary to make the DROP program cost-neutral. Upon the implementation of changes necessary to make the DROP program cost-neutral, Members shall have thirty days to elect to either (a) retire from active employment with the City or (b) withdraw from the DROP program and resume active participation in Component I of the Retirement System. The Board shall notify DROP participants of these changes prior to implementation. Those DROP participants resuming participation in Component I of the Retirement System shall not accumulate Credited Service for any time that they were participating in the DROP program (under either Component I or Component II). Those not making either election shall remain participants in the DROP program.

(c)     In the event the DROP program cannot be changed to restore cost neutrality, it shall be discontinued and Members participating in the DROP program at that time shall have the option to either (i) retire or (ii) continue active employment with the City

and resume active participation in Component I of the Retirement System. DROP participants resuming participation in Component I of the Retirement System shall not accumulate Credited Service for the time during which such DROP participants participated in the DROP program (under Component I or Component II).

# ARTICLE J.  PARTICIPANT ANNUITY SAVINGS FUND LOAN PROGRAM

## Sec. J-1.  Participant Annuity Savings Fund Loan Program

A Participant Annuity Savings Fund Loan Program (Participant Loan Program) will be established and available to bargaining unit Members.  Its terms will be as follows:

(a)  Any loans granted or renewed shall conform to the requirements of Section 72(p) of the Internal Revenue Code.  Such loan program shall be established in writing by the Board of Trustees in conformity with the terms of the Combined Plan document and applicable collective bargaining agreements, and must include, but need not be limited to the following:

   (1)  The identity of the administrator of the Participant Loan Program;

   (2)  A procedure to apply for loans, the amount of loan that will be approved or denied, and limitations, if any, on the types and amount of loans offered;

   (3)  The procedure under the program for determining a reasonable rate of interest;

   (4)  The events constituting default and the steps that will be taken to preserve plan assets.

(b)  The Participant Loan Program shall be contained in a separate written document copies of which shall be made available in the offices of the Retirement System for Members.  The Board of Trustees is authorized to adopt rules and regulations, from time to time, to govern the administration and the operation of this program.  Copies of the rules shall also be made available to prospective participating Members of the Retirement System in the offices of the Retirement System.

(c)  Subject to the rules and procedures established by the Board, loans may be made to Members from such Member's contributions to the Annuity Savings Fund.  Former Members, spouses of Members, and Beneficiaries are not eligible to receive any loans from the Retirement System.  Subject to rules and procedures established by the Board, a Member who has been in the Retirement System for twelve (12) months or more is eligible to apply for a loan.  No Member shall have more than two (2) outstanding loans from the Retirement System (Component I and/or Component II) at any time.  A Member who has previously defaulted on a loan under either Component I or Component II of the Combined Plan shall not be eligible for a loan from the Retirement System.

(d)  A Member who has satisfied applicable rules and procedures may borrow from his or her Annuity Savings Fund account an amount, which does not exceed fifty percent (50%) of the Member's vested accumulated balance, up to fifteen thousand dollars ($15,000.00) reduced by the excess, if any, of: (1) the highest outstanding balance of loans from the Retirement System during the one (1) year period ending on the day before the date on which the loan is made (under both Component I and Component II), or (2) the outstanding balance of loans from the Retirement System on the date on

which the loan is made (under both Component I and Component II), whichever is less. The minimum loan amount shall be one thousand dollars ($1,000.00).

(e)  In addition to such rules and procedures that are established by the Board, all loans shall comply with the following terms and conditions:

(1)  Loan applications shall be in writing.

(2)  All loans shall be memorialized by a promissory note made to the Retirement System and properly executed by the Member.

(3)  Loan shall be repaid by equal payroll deductions over a period not to exceed five (5) years, or, where the loan is for the purpose of buying a principal residence, a period not to exceed fifteen (15) years. In no case shall the amount of the payroll deduction be less than twenty dollars ($20.00) for any two-week period.

(4)  Each loan granted under Component II shall be made against the assignment of the Member's entire right, title, and interest in and to the Annuity Savings Fund supported by the Member's collateral promissory note for the amount of the loan, including interest payable to the order of the Board of Trustees.

(5)  Each loan shall bear interest at a rate determined by the Board. The Board shall not discriminate among Members in its determination of interest rates on loans. Loans initiated at different times may bear different interest rates, where, in the opinion of the Board, the difference in rates is supported by a change in market interest rates or a change in the Retirement System's current assumed rate of return. The loan interest rate shall bear a reasonable relationship to market rates for secured loans of a similar duration and shall bear a reasonable relationship to the costs to the Retirement System of administering the Retirement System. The loan interest rate shall be calculated in a manner that will not negatively affect the City's costs relating to the Retirement System or the return to Members.

(6)  Loan repayments shall be suspended under this Retirement System as permitted by Section 414(u)(4) of the Internal Revenue Code. A Member who has an outstanding loan balance from the Retirement System who is absent from employment with the City, and who has satisfied the requirements of Section 414(u) of the Internal Revenue Code shall not be required to make loan repayments to the Retirement System during said periods of absence.

(f)  Any loans granted or renewed shall be made and administered pursuant to the participant loan program and Section 72(p) of the Internal Revenue Code and the regulations thereunder.

(g)  A Member's outstanding loan balance shall be considered a directed investment by the Member and interest payments shall be credited to the Member's account balance (provided that the interest credited shall be reduced appropriately to cover the

administrative cost of the loan program and avoid negatively affecting the City's costs or the Retirement System's investment returns), and shall not be part of net investment income or part of the Member's account balance for the purpose of allocation of net investment income under Article G.

(h)   No distributions shall be made to a Member, former Member, or Beneficiary until all loan balances drawn on the applicable vested accumulated balance and applicable accrued interest have been repaid or offset against the distributable Annuity Savings Fund account balance.

(i)   The Retirement System shall include, in its annual report to all Members, an accounting of the loan program established by this section, which contains the number and amount of loans made, the costs of administering the program, the amount of payments made including interest received by the Retirement System, the amount of loans outstanding, including any defaults or delinquencies, and an evaluation as to whether the interest charged in the Fiscal Year covered the costs of administering the program.

13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 05:47:23   Page 217 of
13-53846-tjt   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 05:48:29   Page 661 of
429
809

# ARTICLE K.  SPECIAL PLAN OF ADJUSTMENT PROVISIONS

**Sec. K-1.**     **Benefit Changes implemented in accordance with the terms of the Plan Of Adjustment**

Notwithstanding anything in Articles A, C, D or E to the contrary, as of the effective date of the Plan of Adjustment and during the period that ends no earlier than June 30, 2023, the following changes in benefits provided under Component II of the Combined Plan shall be implemented:

(1)     <u>Elimination or Reduction in Pension Improvement Factor (Escalator)</u>.  With respect to all Pension benefits payable on or after the effective date of the Plan of Adjustment, the Pension Improvement Factor (Escalator) that will be applied to the monthly Pension benefit of a Member, Retiree, surviving Beneficiary or vested former employee will be equal to 1.0125%; provided, however, that the Board and the Investment Committee shall determine on the effective date of the Plan of Adjustment and not less frequently than annually thereafter that the "Funding Conditions" as defined herein have been satisfied, and in the event that such Funding Conditions have not been satisfied then the Pension Improvement Factor (Escalator) that will be applied to the monthly Pension benefit of a Member, Retiree, surviving Beneficiary or vested former employee will be reduced in proportion to the funding which is not received by the Retirement System ("Adjusted Pension Benefit").

For purposes of this Section K-1, the term "Funding Conditions" shall mean that (i) Class 10 and Class 11 voted in favor of the Plan of Adjustment in accordance with the procedures for such vote under the Plan of Adjustment, (ii) the Plan of Adjustment is confirmed by the U.S. Bankruptcy Court, and (iii) the funds that are pledged to be contributed to the Retirement System pursuant to the terms of the State Contribution Agreement and the DIA Settlement Documents have been received.

(2)     <u>Effect of Payment Default</u>.  In the event that all or a portion of the funds pledged to be contributed to the Retirement System pursuant to the terms of the DIA Settlement Agreement are not received by the Retirement System, the Board shall proportionately reduce the Pension Improvement Factor (Escalator) to be applied to the monthly Pension benefit of any retirees, surviving beneficiaries, employees and former employees to the extent of such default.

**Sec. K-2.**     **Income Stabilization Benefits**

(1)     The provisions of this Section K-2 shall become effective only if each of the Conditions Precedent (as that term is defined in the State Contribution Agreement) have been met to the satisfaction of the Authority and the Treasurer, unless any one or more of such conditions are waived in writing executed by the Authority and the Treasurer.

(2) Beginning not later than 120 days after the Effective Date, Component II of the Combined Plan shall pay, in accordance with this Section K-2, an annual supplemental pension income stabilization benefit ("Income Stabilization Benefit") to each Eligible Pensioner (as defined in Section G-3(5)) equal to the lesser of either (i) the amount needed to restore an Eligible Pensioner's reduced annual pension benefit to 100% of the amount of the annual pension benefit that the Eligible Pensioner received from the Retirement System in 2013; or (ii) the amount needed to bring the total annual 2013 household income of the Eligible Pensioner up to 130% of the Federal Poverty Level for 2013. The Income Stabilization Benefit as determined under this Section K-2(2) will not increase after the date on which the Income Stabilization Benefit is determined. The Income Stabilization Benefit payable to an Eligible Pensioner will terminate immediately at such time as the Eligible Pensioner ceases to qualify as an Eligible Pensioner.

(3) To the extent an Eligible Pensioner's Estimated Adjusted Annual Household Income (as defined in this Section K-2) in any calendar year after the first year that the Eligible Pensioner receives a benefit under this Section K-2 is less than 105% of the Federal Poverty Level in that year, the Eligible Pensioner will receive an additional "Income Stabilization Benefit Plus" benefit commencing as of the next following July 1.

    a.    The Income Stabilization Benefit Plus benefit for a calendar year will be equal to the lesser of either (i) the amount needed to restore 100% of the Eligible Pensioner's Pension benefit, as increased by any Pension Improvement Factor (Escalator), under Component II of the Combined Plan; or (ii) the amount needed to bring the Eligible Pensioner's Estimated Adjusted Annual Household Income in that calendar year up to 105% of the Federal Poverty Level in that year.

    b.    An Eligible Pensioner's "Estimated Adjusted Annual Household Income" for any year will be the sum of (i) the Eligible Pensioner's 2013 total household income (per his or her (or in the case of a minor child, his or her legal guardian's) 2013 income tax return or equivalent documentation), less the Pension benefit paid to the Eligible Pensioner by the Retirement System in 2013, as adjusted for inflation or Social Security COLA increases; (ii) the Adjusted Pension Benefit that is payable to the Eligible Pensioner for that year as determined under Section K-1, (iii) any pension restoration payment to the Eligible Pensioner as determined under Section K-3; and (iv) the Eligible Pensioner's Income Stabilization Benefit.

(4) A separate recordkeeping fund called the "Income Stabilization Fund" shall be established by the Board for the sole purpose of paying the Income Stabilization Benefits and Income Stabilization Benefits Plus to Eligible Pensioners. Any funds received by the Retirement System that is designated by the City as UTGO Bond Tax Proceeds or a contribution to the Income Stabilization Fund shall be

credited by the Board to the Income Stabilization Fund. The assets credited to the Income Stabilization Fund will be invested on a commingled basis with assets of the Retirement System and will be credited with a pro-rata portion of the earnings and losses of the Retirement System. Amounts credited to the Income Stabilization Fund may not be used for any purpose other than the payment of Income Stabilization Benefits and Income Stabilization Benefit Plus benefits to Eligible Pensioners, except as expressly provided in Section K-2(6).

(5)     For purposes of this Section K-2, an "Eligible Pensioner" is a retiree or surviving spouse who is at least 60 years of age or a minor child receiving survivor benefits, each as of the effective date of the Plan of Adjustment, whose benefit will be reduced as provided in Section K-1, and who is eligible to receive Income Stabilization Benefits because (i) such individual is receiving monthly pension benefits from the Retirement System as of the effective date of the Plan of Adjustment, and (ii) such individual has a total annual household income equal to or less than 140% of the federal poverty level in 2013 (per his or her (or in the case of a minor child, his or her legal guardian's) 2013 income tax return or equivalent documentation).

a.      An eligible individual must apply for an Income Stabilization Benefit in accordance with procedures established by the Authority and provide such substantiation of the individual's aggregate annual household income as is required by the State in its sole discretion.

b.      The initial determination of Eligible Pensioners, and amount of the Income Stabilization Benefit payable to each Eligible Pensioner shall be made by the State in its sole discretion. The State shall transmit the list of Eligible Pensioners to the Investment Committee and the Board. The Board, with the assistance of the Investment Committee shall be responsible for administering the Income Stabilization Fund and annually certifying to the State Treasurer that it has administered the requirements for eligibility and payment of benefits with respect to Eligible Pensioners in accordance with the terms of the State Contribution Agreement.

c.      After the initial determination of Eligible Pensioners is made, no new individuals will be eligible to receive an Income Stabilization Benefit or an Income Stabilization Benefits Plus benefit at any time in the future.

d.      An Eligible Pensioner will cease to be an Eligible Pensioner as of the earlier of (i) the Eligible Pensioner's death or (ii) with respect to any minor child receiving survivor benefits, the date the minor child reaches the age of 18 years.

(6)     For purposes of this Section K-2, the "Federal Poverty Level" means the poverty guidelines published each year in the Federal Register by the United States Department of Health and Human Resources.

(7)     In the event that, in 2022 (provided that the State has not issued a Certificate of Default (as defined in the State Contribution Agreement) with respect to the Retirement System at any time prior to 2022), it is the opinion of at least 75% of the independent members of the Investment Committee that the assets of the Income Stabilization Fund exceed the Income Stabilization Benefits and Income Stabilization Benefits Plus benefits anticipated to be made to Eligible Pensioners by the Retirement System in the future ("Excess Assets"), the Investment Committee may, in its sole discretion, recommend to the Board that all or a portion of the Excess Assets, in an amount not to exceed $35 million, be used to fund the Adjusted Benefits payable by the Retirement System. The Investment Committee shall have the right to engage professional advisers to assist in making this determination and such expenses shall be paid by the Retirement System.

(8)     In the event that any funds remain in the Income Stabilization Fund on the date upon which there are no Eligible Pensioners under the Retirement System, such funds shall be used to fund the Adjusted Benefits payable by the Retirement System.

## Sec. K-3.  Restoration of Pension Benefits

The following rules shall govern how Pension Improvement Factor (Escalator) ("COLA") benefits, that are reduced as part of the Plan of Adjustment, shall be restored during the thirty year period following the confirmation order issued by the Bankruptcy court in *In Re City of Detroit, Michigan,* Case No. 13-53846. The pension restoration process shall be supervised, and restoration decisions undertaken by the Investment Committee and in accordance with the pension governance provisions set forth in the State Contribution Agreement and exhibits thereto. The pension restoration program shall be deemed a part of this Component II, but in the event of any conflict between the language set forth herein and the pension restoration agreement attached to and made a part of the Plan of Adjustment ("Pension Restoration Agreement"), the terms of the Pension Restoration Agreement will govern.

(1)     *Waterfall Classes.*

There will be three Waterfall Classes:

a.      Waterfall Class 1 – Retirees, in retirement benefit pay status as of June 30, 2014, and their surviving spouses and Beneficiaries.

b.      Waterfall Class 2 – Retirees, who entered into retirement benefit pay status after June 30, 2014, and their surviving spouses and Beneficiaries, and who are in pay status as of the end of the Fiscal Year prior to the year in which the restoration decision is made.

c.      Waterfall Class 3 – All retirees, surviving spouses, and beneficiaries in pay status and all other Members who as of June 30, 2014 are not in retirement benefit pay status.

(2)     *Restoration of Benefits Through June 30, 2023.*

a.      Each year in conjunction with the annual actuarial valuation report, the Plan Actuary will project the funded ratio of the Retirement System as of 2023 based upon the market value of plan assets relative to the actuarial accrued liabilities (the "Funded Level"). This projection will be further based upon a 6.75% assumed rate of investment return which is net of expenses (administrative and investment), future employer contributions as set forth in the Plan of Adjustment (subject to conditions in the Plan of Adjustment), and such other actuarial assumptions as utilized by the Plan Actuary. For purposes of restoration of benefits through June 30, 2023, the Funding Target will be a 75% funded ratio, and the Restoration Target will be a 78% funded ratio, both projected to June 30, 2023. For purposes of calculating the funded ratio, the assets in the Restoration Reserve Account will be excluded. Each year, if the Plan Actuary projects that the Funded Level as of 2023 (excluding Restoration Reserve Account assets to avoid double counting) exceeds the Restoration Target (i.e., exceeds 78%), a credit of assets for bookkeeping purposes will be made into a new notional Restoration Reserve Account. The notional credit will be an amount equal to the excess of assets above the amount projected to be needed to satisfy the Restoration Target. Once the Restoration Reserve Account is established, each year thereafter, Restoration Account assets will be credited with interest in an amount equal to the net return on Retirement System investments but capped at the actuarially assumed rate of investment return (i.e., 6.75% for the period through June 30, 2023). In the event of net losses, the credited asset value of the Restoration Reserve Account will be diminished to reflect such losses and any required transfer to the PFRS Pension Reserve Fund as provided herein.

b.      Actual restoration payments and restoration credits will work as follows: each year, in conjunction with the preparation of the annual actuarial valuation report and following establishment of the Restoration Reserve Account, the Plan Actuary will determine whether there are sufficient funds in such account to restore COLA benefits in a minimum incremental amount of 10% or more. For example: if a retiree's then current COLA benefit is a 1.0% annual compounded COLA, the minimum incremental restoration would increase the COLA benefit to 1.225%. COLA restoration only will occur if the funding level in the Restoration Reserve Account can fund 100% of the COLA increase over the actuarially-projected lives of the eligible recipient Waterfall Class. If the Plan Actuary certifies that the Restoration Reserve Account as of the end of the prior Fiscal Year satisfies the required funding level for one or more increments of restoration, then in the next immediate Fiscal Year actual COLA restoration payments will be made to PFRS Waterfall Class 1 members in such increments until an amount sufficient to fund 66% of the value of their future COLA payments (e.g., a 1.5% compound COLA, or as otherwise applicable) has been funded. At that juncture, and to the

extent that additional assets in the Restoration Reserve Account would fully fund COLA restoration in at least one minimum 10% increment (i.e., amounts equal to 10% of the value of future COLA payments), Waterfall Class 2 members will receive COLA restoration, until an amount sufficient to fund 66% of the value of their future COLA payments has been funded. At that juncture, and to the extent that additional assets in the Restoration Reserve Account would fully fund COLA restoration in at least one minimum 10% increment (i.e., amounts equal to 10% of the value of future COLA payments), Waterfall Class 3 members will receive COLA restoration on a pro-rata basis. For Waterfall Class 3 members who are in pay status at that time of restoration, they will receive COLA payments; for active employees at the time of restoration, they will receive credits granting them a right upon retirement to receive COLA restoration equal to the 10% increments that are fully funded to Waterfall Class 3 members. For example: assume there are sufficient assets credited to the Restoration Reserve Account as of the end of a Fiscal Year to fully fund 66% of the value of the COLA for all Waterfall Class 1 and Class 2 members for their actuarially projected lives. To the extent additional assets remain in the Restoration Reserve Account to fully fund at least a 10% COLA increment for Waterfall Class 3 members for their actuarially projected lives, then (i) all retirees would receive a restoration payment of 76% of the value of their COLAs (their having already received by virtue of their membership in Waterfall Classes 1 and 2 an increase to 66% of the value of their COLAs) and also a 10% COLA increment would be credited to eligible active employees which would be included in their benefit payments upon retirement (thus causing their COLAs to increase in value from 45% to 55%). Restoration amounts actually paid from the Restoration Reserve Account will be debited from such account. Restoration payments will be calculated and paid on a prospective basis only.

c.      Once restoration payments and credits begin, as long as the Restoration Reserve Account continues to have assets to fund 100% of an incremental COLA restoration amount for such Waterfall Class for their actuarially projected lives, the restoration payments and credits will continue; provided, however, that in the event the Restoration Reserve Account, after having sufficient assets to fund 100% of two or more increments, falls below 100% for the second or greater increment, the annual amounts to pay such second or greater increment can continue until the Restoration Reserve Account lacks any assets to fund such additional increment. For example, assume a 10% increment in Waterfall Class 1 requires $10 million in assets to be fully funded for the Waterfall Class members' actuarially projected lives, and that based on Fiscal Year 2018 results the Restoration Reserve Account has assets of $22 million so as to fund two increments of restoration in Fiscal Year 2019. Assume further that in the following year the Restoration Reserve Account drops in value to $17 million; in such event two increments could still be paid, and the second

increment would cease being paid only if the value of assets in the Restoration Reserve Account dropped to or below $10 million (in the event they dropped below $10 million, the first increment also would cease being paid). For purposes of restoration reduction, restoration increments will be taken away in reverse order in which they were granted (i.e. last in, first out).

d. If the Funded Level (excluding Restoration Reserve Assets) projected to 2023 falls below 76% (hereinafter, "Restoration Reserve Suspension Trigger"), then, until such time as the projected Funded Level in 2023 is 76% or above, further interest credits to the notional Restoration Reserve Account will cease notwithstanding the actual net Retirement System investment returns for the Fiscal Year in question. Furthermore, if the Funded Level projected to 2023 falls below the Funding Target (i.e., 75%) then restoration payments to retirees and credits to active employees in the following year will be modified in the following manner: (1) funds previously credited to the Restoration Reserve Account will be notionally transferred and credited to the Pension Reserve Fund in sufficient amounts to restore the projected Funded Level in 2023 to 75%; (2) following such transfer, the remaining assets in the Restoration Reserve Account shall be applied to make restoration payments in accordance with and pursuant to the same mechanism described in paragraph c.

e. In connection with preparation of the actuarial report for Fiscal Year 2023, the Plan Actuary will determine whether the Retirement System has satisfied the Permanent Restoration Target, which shall be 78%. Transfers from the Restoration Reserve Account for credit to the Pension Reserve Fund may be made in such amounts as are necessary to satisfy the Permanent Restoration Target. If following such transfers, the Funded Level as of June 30, 2023 has satisfied the Permanent Restoration Target (i.e., 78%), then the residual amounts, if any, in the Restoration Reserve Account (which will necessarily represent excess not necessary to satisfy the Permanent Restoration Target), and which fully fund one or more increments of COLA restoration payments for one or more Waterfall Classes for their actuarially projected lives, shall be transferred from the Restoration Reserve Account and credited to the Pension Reserve Fund and the applicable incremental COLA payments shall be permanently restored for the applicable Waterfall Class and shall no longer be variable from year to year.

f. Following receipt of the actuarial reports for 2019, and in the event that the projected Funded Level of the Retirement System as of 2023 is less than 76%, the Plan Actuary shall revisit the restoration calculations that it made during each of the prior four (4) years. It shall recalculate each such prior year's Funded Level projection, this time by assuming the lesser of (i) $4.5 million in annual administrative expenses until 2023, or (ii) an amount of annual administrative expenses until 2023 equal to the average

annual normal course administrative expenses in the prior four (4) years applicable to Component II, in addition to a net 6.75% annual investment return. If such retrospective recalculation indicates that fewer amounts would have transferred to the Restoration Reserve Account than actually were transferred during such look back period, then the Restoration Reserve Account shall be debited by the lesser of (i) this difference (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period or (ii) the dollars that were actually paid out in restoration payments during such look-back period (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period); or (iii) the amount required to increase the projected 2023 Funded Level to 76%.

(3)     *Restoration of Benefits from July 1, 2023 to June 30, 2033*.

a.     If and to the extent that all COLA payments have not been restored as of June 30, 2023 pursuant to Section (2)(e), then during this period and for purposes of variable restoration, the Funding Target, the Restoration Target, the Permanent Restoration Target and the Restoration Reserve Suspension Trigger shall be as set forth below, all projected as of June 30, 2033:

| 2023 Funded Level | 2033 Funding Target/Restoration Target |
|---|---|
| 78% | 81%/84% |
| 77% | 80%/83% |
| 76% | 79%/82% |
| 75% | 78%/81% |
| 74% or lower | 3% >than 2023 Funded Level %/81% |

2033 Permanent Restoration Target - Same as 2033 Restoration Target

2033 Restoration Reserve Suspension Trigger – 1% higher than the projected Funding Target for all time periods

b.     The same rules for restoration payments that applied during the period ending June 30, 2023 shall apply (including ceasing interest credits in the event of a Restoration Reserve Suspension Trigger, and making Restoration Account asset transfers to the Pension Reserve Fund in the event the 2033 Funded Level falls below the 2033 Funding Target), except as follows. For purposes of determining whether the 2033 Restoration Target has been satisfied, the Plan Actuary shall project investment returns through June 30, 2033 using the then current investment return assumption which is assumed to be net of expenses (administrative and investment), and the then applicable actuarial assumptions as utilized in the annual actuarial valuation. Further, the Plan Actuary shall assume, merely for purposes of determining whether the Restoration Target is satisfied, that

13-53846-swr  Doc 8045-1   Filed 10/20/14   Entered 10/20/14 05:47:23   Page 225 of
429
13-53846-tjt  Doc 8045-1   Filed 10/20/14   Entered 10/20/14 05:48:23   Page 669 of
809

the annual City contribution amount shall be the annual amount necessary to fund the Retirement System based upon an amortization of the actual 2023 UAAL (using the market value of assets) over 30 years (hereinafter, the "2023 UAAL Amortization") and in such manner that the resulting annual contributions would achieve the applicable Funding Target (pursuant to paragraph b) as of 2033. Such projected, hypothetical contributions shall be for purposes only of making restoration determinations, and shall not necessarily be the actual contributions made or required to be made by the City or recommended during such period; all of which shall be determined independent of the restoration calculation process. For purposes of calculating the funded ratio, the assets in the Restoration Reserve account will be excluded.

c.     To the extent that the City's actual contributions to the Retirement System in any of the Fiscal Years 2024 (i.e., the year ending June 20, 2024) through 2033 are greater than the projected annual contribution under the 2023 UAAL Amortization, such amounts, and any investment earnings thereon, shall be notionally credited to a new bookkeeping account in the Retirement System called the Extra Contribution Account. In determining pension restoration during the period from Fiscal Year 2024 through 2033, none of the amounts in the Extra Contribution Account shall be considered for purposes of determining the projected Funded Level for purposes of determining whether the Retirement System has attained the Restoration Target or the Permanent Restoration Target. To the extent that the City's actual contributions in any of the Fiscal Years 2024 through 2033 are less than the City's projected annual contribution under the 2023 UAAL Amortization, such difference and any investment earnings thereon shall be notionally allocated to the Pension Reserve Fund.

d.     Each year, in addition to the notional credit of amounts that exceed the amount necessary to satisfy the Restoration Target, existing notional Restoration Account assets will be credited with interest equal to the net return on Retirement System investments; however, such interest shall not exceed the then investment return assumption. In the event of net losses on the Retirement System's investments, the notional assets credited to the Restoration Reserve Account will be reduced to reflect such losses.

e.     In connection with preparation of the actuarial report for Fiscal Year 2033, the Plan Actuary will determine whether the Retirement System has satisfied the applicable Permanent Restoration Target (i.e., the 2033 Restoration Target). Transfers from the Restoration Reserve Account for credit to the Pension Reserve Fund may be made in such amounts as are necessary to satisfy the Permanent Restoration Target. If following such transfers the funding level as of June 30, 2033 has satisfied the applicable Permanent Restoration Target, then the residual amounts in the Restoration Reserve Account, if any (which will necessarily represent excess not necessary to satisfy the Permanent Restoration Target), and

which fully fund one or more increments of COLA restoration payments for one or more Waterfall Classes, shall be transferred from the Restoration Reserve Account and credited to the Pension Reserve Fund and the applicable incremental COLA payments shall be permanently restored for the applicable Waterfall Class and shall no longer be variable from year to year.

f. Following receipt of the actuarial report for 2028, and in the event that the projected Funded Level as of 2033 is less than 79%, the Plan Actuary shall revisit the restoration calculations that it made during each of the prior four (4) years. It shall recalculate each such prior year's Funded Level projection, this time by assuming the lesser of (i) $4.5 million in annual administrative expenses until 2033, or (ii) an amount of annual administrative expenses until 2033 equal to the average annual normal course administrative expenses in the prior four (4) years applicable to Component II, in addition to a net 6.75% annual investment return. If such retrospective recalculation indicates that fewer amounts would have transferred to the Restoration Reserve Account than actually were transferred during such look back period, then the Restoration Reserve Account shall be debited by the lesser of (i) this difference (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the applicable look-back period) or (ii) the dollars that were actually paid out in restoration payments during such look-back period (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the applicable look-back period); or (iii) the amount required to increase the projected 2033 Funded Level to 79%.

(4) *Restoration of Benefits from July 1, 2033 to June 30, 2043*.

a. If and to the extent that all COLA payments have not been restored pursuant to Section (3)(f) as of June 30, 2033, then during the period ending June 30, 2043 and for purposes of variable restoration, the Funding Target, the Restoration Target, the Permanent Restoration Target and the Restoration Reserve Suspension Trigger shall be as set forth below, all projected as of June 30, 2043.

| 2023 Funded Level | 2043 Funding Target/Restoration Target |
|---|---|
| 78% | 84%/87% |
| 77% | 83%/86% |
| 76% | 82%/85% |
| 75% | 81%/84% |
| 74% or lower | 3% > than 2023 Funded Level %/84% |

2043 Permanent Restoration Target - Same as 2043 Restoration Target

b.   The same rules for restoration that applied during the period ending June 30, 2033 shall otherwise apply (including ceasing interest credits in the event of a Restoration Reserve Suspension Trigger, and the making of notional asset transfers from the Restoration Reserve Account to the Pension Reserve Fund in the event the 2043 Funded Level falls below the 2043 Funding Target) and shall be rolled forward.  For example,  for purposes of determining whether the 2043 Restoration Target has been satisfied, the Plan Actuary shall project annual contributions using the same 2023 UAAL Amortization.  For purposes of calculating the funded ratio, the assets in the Restoration Reserve account will be excluded, and no Extra Contribution Account assets shall be included for purposes of determining whether the Funded Level meets the Restoration Target or Permanent Restoration Target, including any additions to such account after 2033.

c.   In connection with preparation of the annual actuarial valuation report for Fiscal Year 2043, the Plan Actuary will determine whether the Retirement System has satisfied the applicable Permanent Restoration Target, as set forth in paragraph a above.  Transfers from the Restoration Reserve Account for credit to the Pension Reserve Fund may be made in such amounts as are necessary to satisfy the Permanent Restoration Target.  If following such transfers the Funded Level as of June 30, 2043 is equal to or greater than the applicable Permanent Restoration Target, then the residual amounts in the Restoration Reserve Account, if any  (which will necessarily represent excess not necessary to satisfy the Permanent Restoration Target), shall be transferred from the Restoration Reserve Account and credited to the Pension Reserve Fund and the applicable incremental COLA payments shall be permanently restored for the applicable Waterfall Class and shall no longer be variable from year to year.

(5)   *Modification of the Pension Restoration Program.*

If at any time after July 1, 2026, the Investment Committee by vote of five of its seven Members, or the Board of Trustees by a greater than 66% vote, determines that a change in relevant circumstances has occurred, or there was a mutual mistake of fact in developing the Pension Restoration Agreement attached to and made a part of the Plan of Adjustment, such that the continued operation of the Pension Restoration Agreement and this Section K-3 without amendment will: (a) materially harm the long-term economic interests of the City or Retirement System; (b) materially impair the City's ability to fully fund over a reasonable period the then existing frozen benefit liabilities; or (c) materially hinder the Restoration Program, if as of that juncture (and for purposes of applying this subsection K-3(5)(a)) annual funding levels (excluding the Extra Contribution Account) had materially exceeded the applicable Restoration Targets for a substantial period yet

13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 05:47:23   Page 672 of
13-53846-swr   Doc 8045-1   Filed 10/20/14   Entered 10/20/14 05:48:23   Page 672 of
409

without any material actual restoration of benefits as contemplated herein having been made, the Investment Committee or the Board, as the case may be, shall provide written notice to the other entity of such a determination and of the need to amend the Pension Restoration Agreement and this Section K-3 (it being understood that the post-Chapter 9, 40-year amortization period (to 2053) to fully fund frozen liabilities is, unless the relevant facts demonstrate otherwise, presumptively reasonable). The Investment Committee and the Board shall then meet to negotiate amendments to the Pension Restoration Agreement that address the identified risk of harm or impairment, but which also considers the Agreement's objective of providing pension restoration. Such negotiations shall take into account reasonable actions the City has pursued or could pursue to mitigate such harm or impairment. Any such amendments shall require the approval of a majority vote of the combined members of the Investment Committee and Board (persons who sit on both the Board and Investment Committee shall have one vote). Such parties shall consult with the Mayor, City Council and the Governor in connection with such negotiation.

If the Board, acting through a majority, and the Investment Committee, acting through a majority, cannot agree to such amendments with the 90-day period following the provision of such notice by the determining party, then the Board and Investment Committee shall proceed to mediation upon demand from either the Board or the Investment Committee. In this regard, within 30-days following expiration of the 90-day period the Board and the Investment Committee shall each select a mediator from the list of approved mediators for the United States District Court for the Eastern District of Michigan. The two selected mediators shall appoint a third neutral mediator from the approved list. Each party shall furnish a written statement to the mediators within 30 days of selection of the neutral mediator. Representatives of the Mayor and the Governor shall be consulted in connection with such mediations. If following a 90-day mediation period following submission of the written statements the matter is not settled, then either the Investment Committee or the Board can file an action in the United Stated District Court for the Eastern District of Michigan asking it to declare, *inter alia*, whether or in what manner to amend the Pension Restoration Agreement and this Section K-3.

# APPENDIX A

The following provisions shall also have general applicability to the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan:

## MCLS Const. Art. IX, § 24 (2003)

### § 24.   Public pension plans and retirement systems, obligation.

Sec. 24.  The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby.

Financial benefits arising on account of service rendered in each Fiscal Year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities.

**Relevant Provisions of**
**January 1, 2012**
**City of Detroit Charter**

## ARTICLE 11.
## RETIREMENT PLANS

**Sec. 11-101. City's Duties**.

1.     The City shall provide, by ordinance, for the establishment and maintenance of retirement plan coverage for city employees.

2.     Financial benefits arising on account of service rendered in each Fiscal Year shall be funded during that year and that funding shall not be used for financing unfunded accrued liabilities.

3.     The accrued financial benefits of active and retired city employees, being contractual obligations of the city, shall in no event be diminished or impaired.

**Sec. 11-102. Continuation of Existing Plans**.

The retirement plans of the city existing when this Charter takes effect, including the existing governing bodies for administering those plans, the benefit schedules for those plans and the terms for accruing rights to and receiving benefits under those plans shall, in all respects, continue in existence exactly as before unless changed by this Charter or an ordinance adopted in accordance with this article.

13-53846-tjt  Doc 8045-1   Filed 10/20/14   Entered 10/20/14 05:46:23   Page 675 of
13-53846-swr   Doc 8045-1   Filed 10/20/14   Entered 10/20/14 05:47:23   Page 231 of
809
429

## Sec. 47-1-2. Detroit Police and Fire Retirement System.

Notwithstanding any collective bargaining agreement or other documents governing terms of employment to the contrary, effective as of July 1, 2014, the Detroit Police and Fire Retirement System shall hereinafter be memorialized in a separate written document entitled "Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan," which shall comprise the exclusive terms of the Detroit Police and Fire Retirement System and be kept in the Office of the City Clerk for the City of Detroit.

## Collective Bargaining Agreements.

Except to the extent otherwise provided in the Plan of Adjustment, under Michigan Law if there is any conflict between the Retirement System provisions and collective bargaining agreement provisions, the terms of the collective bargaining agreement control.

(a)     The Board of Trustees shall administer the Retirement System consistent with the pension provisions of the 2014-2019 collective bargaining agreement between the City of Detroit and the Detroit Police Officers Association with respect to police officers covered by said collective bargaining agreement.

(b)     The Board of Trustees shall administer the Retirement System consistent with the pension provisions of the 2014-2019 collective bargaining agreement between the City of Detroit and the Detroit Police Lieutenants and Sergeants Association.

(c)     The Board of Trustees shall administer the Retirement System consistent with the pension provisions of the 2014-2019 collective bargaining agreement between the City of Detroit and the Detroit Police Command Officers Association.

(d)     The Board of Trustees shall administer the Retirement System consistent with the pension provisions of the 2014-2019 collective bargaining agreement between the City of Detroit and the Detroit Fire Fighters Association.

**EXHIBIT I.A.292**

RESTORATION TRUST AGREEMENT

# CITY OF DETROIT PENSION RESTORATION TRUST

THIS TRUST AGREEMENT, entered into effective _____, 2014, by and among, the City of Detroit ("Detroit" or the "City") acting by and through **[Kevyn Orr acting as the appointed Emergency Manager pursuant to PA 436, M.C.L. §141.1541 et seq./Mayor Michael E. Duggan]** and each member of the Board of Trustees named herein.

## WITNESSETH:

WHEREAS, Detroit filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code on July 18, 2013 in the United States Bankruptcy Court for the United States Bankruptcy Court Eastern District of Michigan, Case No. 13-53846 (the "Court");

WHEREAS, pursuant to the Plan for the Adjustment of Debts of the City of Detroit (as confirmed by the Court, the "Plan of Adjustment"), the City agreed to establish a trust upon the Effective Date of the Plan of Adjustment (i) to hold the DWSD CVR (as defined in the Plan of Adjustment) and enforce rights related to its terms, and to consult with the trustees and investment committee of the Police and Fire Retirement System for the City of Detroit ("PFRS") and the General Retirement System for the City of Detroit ("GRS"), respectively in connection with General Restoration and Special Restoration relating to the DWSD CVR, each as defined below;

WHEREAS, Detroit hereby establishes this City of Detroit Pension Restoration Trust (the "Trust");

WHEREAS, the Board of Trustees shall be responsible for maintaining and administering this Trust and managing the property held by this Trust;

WHEREAS, the members of the Board of Trustees are willing to exercise the authority and rights of consultation granted to it herein with regard to the Trust; and

NOW THEREFORE, in consideration of the premises and the covenants contained herein, Detroit and the members of the Board of Trustees agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    Board of Trustees or Board. The Board of Trustees is the body described in Article VII to which Detroit has delegated responsibility for: (i) maintaining and administering this Trust and managing the property held by this Trust; and (ii) exercising the duties and responsibilities of the Board of Trustees set forth in this Trust Agreement. The Board of Trustees shall be constituted in accordance with Article VII and shall have the duties and authorities described in Article V.

Section 1.2    Code. Means the Internal Revenue Code of 1986, as amended, and any successor statute thereto.

CLI-2245193v3

13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 05:47:43   Page 235 of 429
13-53846-tjt   Doc 8405-1   Filed 10/22/14   Entered 10/22/14 05:48:23   Page 675 of 409

Section 1.3     Beneficiaries.  Means the beneficiaries of this Trust, which beneficiaries shall be the GRS, the PFRS and the participants in GRS and PFRS entitled to the benefits of the Restoration Plan.

Section 1.4     DWSD CVR.  Has the meaning given to that term in the Plan of Adjustment.

Section 1.5     General Restoration.  Means the potential restoration or replacement of benefit reductions imposed by the Plan of Adjustment pursuant to the terms of the Restoration Plan.

Section 1.6     GRS.  Means the General Retirement System for the City of Detroit.

Section 1.7     Holder of Pension Claims.  Has the meaning given to that term in the Plan of Adjustment.

Section 1.8     Plan of Adjustment.  Means the Plan for the Adjustment of Debts of the City of Detroit, as confirmed by order of the Court dated [---], a copy of which is attached hereto as Exhibit A.

Section 1.9     PFRS.  Means the Police and Fire Retirement System for the City of Detroit.

Section 1.10    Qualifying DWSD Transaction.  Has the meaning given to that term in the Plan of Adjustment.

Section 1.11    Restoration Plan.  Means the general rules governing pension benefit restoration to the PFRS and the GRS as set forth in Exhibit II.B.3.q.ii.C and Exhibit II.B.3.r.ii.C of the Plan of Adjustment.  A copy of the Restoration Plan is attached hereto as Exhibit B.

Section 1.12    Retiree Committee.  Has the meaning given to that term in the Plan of Adjustment.

Section 1.13    Special Restoration.  Means the potential restoration or replacement of benefit reductions imposed by the Plan of Adjustment in connection with a Qualifying DWSD Transaction, as described in Section IV.F of the Plan of Adjustment.

Section 1.14    Trust Agreement.  This agreement as it may be amended hereafter from time to time by the parties hereto.

Section 1.15    Trust or Trust Fund.  The City of Detroit Pension Restoration Trust established by this Trust Agreement, comprising all property or interests in property held by, or under the custody and control of, the Board from time to time under this Trust Agreement.

## ARTICLE II
## ESTABLISHMENT OF TRUST

Section 2.1    Purpose.  The Trust is established to receive and hold the DWSD CVR and enforce rights related to its terms, and to consult with the trustees and investment committee of the PFRS and the GRS, respectively in connection with General Restoration and Special Restoration relating to the DWSD CVR.

Section 2.2    Receipt of Funds.  The Board shall accept all sums of money and other property contributed to the Trust by Detroit pursuant to Article III.  The Board shall hold, manage and administer the Trust Fund without distinction between principal and income.

Section 2.3    Inurement and Reversion Prohibited.  At no time shall any part of the principal or income of the Trust Fund be used for, or diverted to, any purpose other than distributing proceeds from the DWSD CVR in the manner described by Section IV.F of the Plan of Adjustment.  Nothing in this Trust Agreement shall be construed in such a way as to prohibit the Board from using the assets of the Trust Fund to pay reasonable fees and other expenses and obligations incurred in maintaining and administering the Trust or to maintain a reserve of funds needed to pay reasonable fees and expenses expected to be incurred in the future.

Section 2.4    No Residual Interest.  Detroit shall not have any legal or equitable interest in the assets of the Trust Fund at any time, including following the termination of the Trust.

## ARTICLE III
## CONTRIBUTIONS TO THE TRUST FUND

Section 3.1    Detroit Contributions.  The Board will accept the City's contribution of the DWSD CVR to the Trust Fund pursuant to the Plan of Adjustment.  Apart from the contribution of the DWSD CVR (and any amounts payable to the Trust Fund pursuant to the terms of the DWSD CVR), Detroit shall have no further obligation to contribute to the Trust.

## ARTICLE IV
## PAYMENTS FROM THE TRUST FUND

Section 4.1    Payments from the Trust Fund.

(a)    Subject to paragraph (b) below, the Board shall within a reasonable time after receiving proceeds from the DWSD CVR distribute such proceeds (less the amount retained by the Trust Fund in the sole discretion of the Board to pay reasonable fees and expenses previously incurred or expected to be incurred to maintain and administer the Trust) directly to the GRS and PFRS in the manner described in Section IV.F of the Plan of Adjustment.

(b)    The Board may retain or withhold all or any part of any payment as the Board in the exercise of its reasonable discretion may deem proper, to protect the Board and the Trust against any liability or claim on account of any income or other tax whatsoever; and with all or any part of any such payment so retained or withheld, may discharge any such liability.  Any part of any such payment so retained or withheld by the Board that may be determined by

the Board to be in excess of any such liability will upon such determination by the Board be paid to the GRS and PFRS in the manner described in Section IV.F of the Plan of Adjustment.

Section 4.2     Excessive Payments.  If the payment of any distributions under the Trust is determined to have been excessive or improper, and the recipient thereof fails to make repayment to the Board or Board's agent of such excessive or improper payment upon the Board's request, the Board shall deduct the amount of such excessive or improper payment from any other benefits thereafter payable to such person.  Until repaid to the Board or Board's agent, the amount of said excessive or improper payment shall not be included in the Trust Fund.

## ARTICLE V
## BOARD POWERS AND DUTIES

Section 5.1     Powers of the Board Generally.  The Board has whatever lawful powers are required to discharge its obligations and to accomplish any of the purposes of this Trust Agreement, including (but not limited to) the powers specified in the following Sections of this Article, and the powers and authority granted to the Board under other provisions of this Trust Agreement.  The enumeration of any power herein shall not be by way of limitation, but shall be cumulative and construed as full and complete power in favor of the Board.

Section 5.2     Powers Exercisable by the Board.  The Board is authorized and empowered to exercise the following powers at its discretion in satisfaction of the duties imposed on it under this Trust Agreement:

(a)     To place securities orders, settle securities trades, hold securities in custody, deposit securities with custodians or securities clearing corporations or depositories or similar organizations, and other related activities as shall be necessary and appropriate in performing its duties under this Trust Agreement.  Trades and related activities conducted through a broker shall be subject to reasonable fees and commissions established by the broker, which may be paid from the Trust Fund or netted from the proceeds of trades.

(b)     To make, execute, acknowledge and deliver any and all documents of transfer and conveyance and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted.

(c)     To cause any investment in the Trust Fund to be registered in, or transferred into, the name of any institutional custodian appointed by the Board, or the name of its nominee or nominees, or to retain such investments unregistered in a form permitting transfer by delivery, but the books and records of the Board shall at all times show that all such investments are part of the Trust Fund, and the Board shall be fully responsible for any misappropriation in respect of any investment held by its nominee or held in unregistered form; and shall cause the indicia of ownership to be maintained within the jurisdiction of the district courts of the United States;

(d)     To receive, hold, invest and reinvest Trust Fund assets and income under provisions of law from time to time existing and in accordance with Article V;

(e)     To exercise or abstain from exercising any option, privilege or right attaching to any Trust Fund assets;

(f)     To make payments from the Trust Fund in accordance with Article IV and for the payment of expenses as provided in Section 5.5;

(g)     To employ suitable agents and depositaries (domestic or foreign), public accountants, brokers, custodians, ancillary trustees, appraisers, legal counsel and other expert advisors as shall be necessary and appropriate, and to pay their reasonable expenses and compensation;

(h)     To pay any income or other tax or estimated tax, charge or assessment attributable to any property or benefit out of such property or benefit in its sole discretion, or any tax on income of the Trust, if any, out of the Trust Fund;

(i)     To file all reports and returns that are required to be made with respect to the Trust:

(j)     To vote, in person or by general or limited proxy, at any election of any corporation in which the Trust Fund is invested, and similarly to exercise, personally or by a general or limited power of attorney, any right appurtenant to any investment held in the Trust Fund; and

(k)     To accept, compromise or otherwise settle any obligations or liability due to or from the Trust as the Board hereunder, including any claim that may be asserted for taxes, assessments or penalties under present or future laws, or to enforce or contest the same by appropriate legal proceedings.

Notwithstanding the foregoing, the Board shall not (i) assign, transfer, convey or sell its interest in the DWSD CVR except for an assignment due to the appointment of successors to members of the Board in accordance with Section 7.2; and (ii) invest any assets in real estate or real estate securities

Section 5.3     <u>Title to Trust Fund</u>.  All rights, title and interest in and to the Trust Fund shall at all times be vested exclusively in the Board.

Section 5.4     <u>General Duties and Obligations of Board</u>.

(a)     In accordance with Article II but subject to Section 4.1, the Board shall hold all property received by it and any income and gains thereupon.  In accordance with this Article, the Board shall manage, invest and reinvest the Trust Fund, shall collect the income therefrom, and shall make payments or disbursements in accordance with Section 4.1.

(b)     The Board shall confer with the trustees and investment committee of the GRS and PFRS, respectively, with respect to the Special Restoration and General Restoration; provided, however, that the Board shall not have any right to initiate any enforcement

13-53846-swr   Doc 8045-1   Filed 10/20/14   Entered 10/20/14 05:47:43   Page 233 of
429
13-53846-tjt   Doc 8405-21   Filed 11/20/14   Entered 11/20/14 05:48:29   Page 683 of
809

proceedings against the trustees or investment committee of either GRS or PFRS with respect to Special Restoration or General Restoration.

        (c)    The Board shall discharge its duties in the interests of the Beneficiaries and for the exclusive purpose of making distributions to the GRS and PFRS as provided in Section 4.1 and defraying reasonable expenses of administering the Trust and shall act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in like capacity and familiar with such matters would use in conduct of an enterprise of like character and with like aims.

Section 5.5    <u>Payment of Expenses</u>.  The Board shall apply the assets of the Trust Fund to pay all reasonable costs, charges, and expenses (including, but not limited to, all brokerage fees and transfer tax expenses and other expenses incurred in connection with the sale or purchase of investments, all real and personal property taxes, income taxes and other taxes of any kind at any time levied or assessed under any present or future law upon, or with respect to, the Trust Fund or any property included in the Trust Fund and all legal, actuarial, accounting and financial advisory expenses) reasonably incurred by the Board in connection with maintaining and administering the Trust, including attendance at meetings related thereto.  The expenses of the Board shall constitute a lien on the Trust Fund.

Section 5.6    <u>No Board Compensation</u>.  Except as provided in Section 5.5, the members of the Board shall serve without compensation.

## ARTICLE VI
## BOARD ACCOUNTS

Section 6.1    <u>Records</u>.  The Board shall maintain accurate and detailed records and accounts of all investments, receipts, disbursements, and other transactions with respect to the Trust, and all accounts, books and records relating thereto shall be open at all reasonable times to inspection and audit by interested persons at the principal office of the Trust.

Section 6.2    <u>Annual Audit</u>.  The Trust Fund shall be audited annually by an independent firm of certified public accountants, and a statement of the results of such audit shall be provided to the Board and also made available for inspection by interested persons at the principal office of the Trust.

Section 6.3    <u>No Interest by Beneficiaries</u>.  In no event shall any Beneficiary have any interest in any specific asset of the Trust Fund.  At no time shall any account or separate fund be considered a savings account or investment or asset of any particular Beneficiary, or class of Beneficiaries, and no Beneficiary shall have any right to any particular asset which the Board may have allocated to any account or separate fund for accounting purposes.

Section 6.4    <u>Accounting Year, Cash Basis</u>.  The accounting year of the Trust shall be the calendar year.  All accounts of the Board shall be kept on a cash basis.

## ARTICLE VII
## COMPOSITION OF AND PROCEDURES FOR THE BOARD OF TRUSTEES

Section 7.1    Number and Appointment of Members.  The Board of Trustees shall consist of five (5) voting members.  The Retiree Committee has selected the following initial members of the Board of Trustees:[_____, _____, _____, _____, and _____.]

By execution of this Trust Agreement each Board member hereby acknowledges his or her appointment and acceptance of the duties and responsibilities set forth in this Trust Agreement.

Section 7.2    Term of Office.  Each member of the Board shall serve a period of four years until the termination of the Trust, or if earlier, until his or her death, incapacity to serve hereunder, or resignation.  In the event of a vacancy, the replacement Board member shall be appointed pursuant to procedures established by the Board.

Section 7.3    Resignation.  A Board member may resign, and shall be fully discharged from further duty or responsibility under this Trust Agreement to the extent permitted by law, by giving at least ninety (90) days' advance written notice to the remaining Board Members stating a date when such resignation shall take effect, which notice or time period may be waived by the Board.

Section 7.4    Operation of the Board; Quorum.  The Board shall select from among its members a chair and a vice chair.  The Board shall hold regular meetings, and shall designate the time and place thereof in advance.  The Board shall adopt its own rules of procedure and shall keep a record of proceedings.  Each Board Member shall be entitled to one vote on each question before the Board.  Three (3) members shall constitute a quorum at any meeting.  A majority vote of the members present at a meeting of the Board at which a quorum exists shall be necessary for a decision by the Board.

Section 7.5    Reliance on Written Instruments.  Each member of the Board shall be fully protected in acting upon any instrument, certificate or paper believed by him or her to be genuine and to be signed or presented by a duly authorized person or persons, and shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing, but may accept the same as conclusive evidence of the truth and accuracy of the statements therein contained.

Section 7.6    No Individual Liability on Contracts.  The members of the Board shall not be liable personally for any debts, obligations, or undertakings contracted by them, or for the breach of any contracts.  Such claims and obligations shall be paid out of the Trust; provided, however, that the Board shall not be exempt from personal liability for willful misconduct, intentional wrongdoing, breach of applicable fiduciary duty, negligence or fraud, and the Trust shall not indemnify the Board for such liabilities, or to the extent that application of this sentence would violate any law.

Section 7.7   City Not Liable for Conduct of Board.  The Board is not, in its capacity as the Board of Trustees, an officer, agent, employee, or representative of Detroit.  In its capacity as the Board of Trustees, the Board is a principal acting independently of the City, which shall not be liable for any act, omission, contract, obligation, or undertaking of the Trust, the Board or its officers, agents, or representatives.

Section 7.8   Liability Insurance.  The Board may obtain and keep current a policy or policies of insurance, insuring the members of the Board from and against any and all liabilities, costs and expenses incurred by such persons as a result of any act, or omission to act, in connection with the performance of their duties, responsibilities and obligations under this Trust Agreement or the Plan.  To the extent permitted by applicable law, the premiums on such policies may be paid from the Trust Fund.

Section 7.9   Reimbursement for Defense of Claims.  To the extent permitted by applicable law and not otherwise covered by liability insurance purchased by the Trust (without regard to any non-recourse rider purchased by the insured), the Board, employees of the Board and persons acting on the Board's behalf pursuant to an express written delegation (each separately, the "Indemnified Party") shall be reimbursed by the Trust Fund for reasonable expenses, including without limitation attorneys fees, incurred in defense of any claim that seeks a recovery of any loss to the Plan or Trust Fund or for any damages suffered by any party to, or beneficiary of this Trust Agreement (a) for which the Indemnified Party is adjudged not liable, or (b) which is dismissed or compromised in a final settlement, where the Board or, where required by applicable law, an independent fiduciary determines that the settling Indemnified Party was not primarily responsible (in such cases, all or only a portion of the settling Indemnified Party's reasonable expenses may be reimbursed, as directed by the Board or an independent fiduciary), provided that, the Board shall have the right to approve of the retention of any counsel whose fees would be reimbursed by the Trust Fund, but such approval shall not be withheld unreasonably.

## ARTICLE VIII
## AMENDMENT, TERMINATION AND MERGER

Section 8.1   Duration of the Trust.  Unless terminated earlier pursuant to Section 8.3, this Trust Agreement shall terminate automatically on the earlier of:  (a) the eighth anniversary of the Effective Date of the Plan of Adjustment if the City and the Board shall have agreed in writing that no Qualifying DWSD Transaction has occurred; or (b) the later of (i) written notice from GRS and PFRS of the death of the last individual who was a participant in such pension plans on the Effective Date of the Plan of Adjustment or (ii) the 90th anniversary of the effective date of this Trust Agreement.

Section 8.2   Amendment.  The Trust Agreement may be amended at any time in writing by the Board or by Court order upon proper motion by the Board or the City, provided, however, that no amendment may impose a contribution obligation on the City beyond that specified in Section 3.1.  No amendment to the Trust Agreement shall modify the responsibilities of the Board hereunder unless the Board has first consented to such amendment.

Section 8.3    Termination.

(a)    Notwithstanding Section 8.1, the Trust and this Trust Agreement may be terminated at any time in writing by the Board with a copy of such written instrument to be provided to the City, or by Court order upon proper motion.  Upon termination of this Trust Agreement, the assets of the Trust Fund, if any, shall be paid out at the direction of the Board to the GRS and PFRS as provided in Section IV.F of the Plan of Adjustment.  Neither Detroit nor the Board shall have any beneficial interest in the Trust Fund.  If the Trust Fund has assets at the time of its termination, it shall remain in existence only until all such assets have been distributed.

(b)    Upon termination of the Trust pursuant to Section 8.1 or 8.3, the Board shall continue to have all of the powers provided in this Trust Agreement as are necessary or desirable for the orderly liquidation and distribution of the Trust Fund in accordance with the provisions hereof.

# ARTICLE IX
# MISCELLANEOUS

Section 9.1    Rights in Trust Fund.  No Beneficiary or other person shall have any right, title or interest in the Trust Fund or any legal or equitable right against the Board, the Board, or Detroit, except as may be otherwise expressly provided in this Trust Agreement.

Section 9.2    Non-Alienation.  Except to the extent required by applicable law, the rights or interest of any Beneficiary to any future distributions under the provisions of the GRS or PFRS shall not be subject to attachment or garnishment or other legal process by any creditor of any such Beneficiary, nor shall any such Beneficiary have any right to alienate, anticipate, commute, pledge, encumber or assign any of the benefits or payments which he may expect to receive, contingent or otherwise, under GRS or PFRS.

Section 9.3    Controlling Laws.  The Trust shall be construed and the terms hereof applied according to the laws of the state of Michigan to the extent not superseded by federal law.

Section 9.4    Counterparts.  This Trust Agreement may be executed in any number of counterparts, each of which shall be considered as an original.

Section 9.5    Headings.  The headings and subheadings of this Trust Agreement are for convenience of reference only and shall have no substantive effect on the provisions of this Trust Agreement.

Section 9.6    Notices.  All notices, requests, demands and other communications under this Trust Agreement shall be in writing and shall be deemed to have been duly given (a) on the date of receipt if served personally or by confirmed facsimile or other similar confirmed electronic communication; (b) on the first business day after sending if sent for guaranteed next day delivery by Federal Express or other next-day courier service; or (c) on the fourth business

13-53846-tjw   Doc 8045-1   Filed 10/20/14   Entered 10/20/14 05:47:23   Page 243 of
429
13-53846-swr   Doc 8045-1   Filed 10/20/14   Entered 10/20/14 05:46:23   Page 667 of
409

day after mailing if mailed to the party or parties to whom notice is to be given by registered or certified mail, return receipt requested, postage prepaid, and properly addressed as follows:

<u>If to the City:</u>

**[insert name and address]**

<u>If to the Board:</u>

**[insert name and address]**

82645430\V-2                                                    10

CLI-2245193v3

13-53846-tjt   Doc 8405-21   Filed 11/20/14   Entered 11/20/14 15:47:43   Page 244 of
429

13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 05:48:23   Page 685 of
809

IN WITNESS WHEREOF, and as evidence of the establishment of the Trust created hereunder, the parties hereto have caused this instrument to be executed as of the date above first written.

**CITY OF DETROIT**

By: _____

Print Name: _____

Title: _____

Date: _____


**MEMBERS OF THE BOARD OF TRUSTEES**

By: _____

Print Name: _____

     Acknowledged by me on the _____ day of _____ ,

     Signature _____

     Printed name _____

     Notary public, State of Michigan, County of

     My commission expires _____


By: _____

Print Name: _____

     Acknowledged by me on the _____ day of _____ ,

     Signature _____

     Printed name _____

     Notary public, State of Michigan, County of

     My commission expires _____


By: _____

Print Name: _____

     Acknowledged by me on the _____ day of _____ ,

     Signature _____

     Printed name _____

     Notary public, State of Michigan, County of

     My commission expires _____

By: _____
Print Name: _____

     Acknowledged by me on the     day of _____,
     Signature _____
     Printed name _____

     Notary public, State of Michigan, County of
     My commission expires _____


By: _____
Print Name: _____

     Acknowledged by me on the     day of _____,
     Signature _____
     Printed name _____

     Notary public, State of Michigan, County of
     My commission expires _____

82645430\V-2

12

CLI-2245193v3

**EXHIBIT A**

**PLAN OF ADJUSTMENT**

**EXHIBIT B**

**RESTORATION PLAN**

**EXHIBIT C**

**CONFIRMATION ORDER**

13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 05:48:29   Page 693 of
809

# EXHIBIT I.A.298

RETIREE HEALTH CARE SETTLEMENT AGREEMENT

13-53846-tjt   Doc 8045-21   Filed 10/22/14   Entered 10/22/14 15:47:43   Page 250 of
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 05:48:23   Page 694 of
429
809

<h1 style="text-align:center">SETTLEMENT AGREEMENT</h1>

Plaintiffs, the Official Committee of Retirees of the City of Detroit, Michigan (the "<u>Committee</u>"), Detroit Retired City Employees Association, Retired Detroit Police and Fire Fighters Association, and AFSCME Sub-Chapter 98, City of Detroit Retirees (collectively with the Committee, the "<u>Plaintiffs</u>") and Defendants, the City of Detroit, Michigan (the "<u>City</u>") and Kevyn Orr, individually and in his official capacity as Emergency Manager of the City of Detroit, Michigan (collectively with the City, the "<u>Defendants</u>"), hereby enter into this Settlement Agreement as of the 14th day of February, 2014 (the "Agreement"), which contains the following terms:

<h2 style="text-align:center">I.  GENERAL PROVISIONS</h2>

**1.** **<u>Agreement Modifies March 1, 2014 Plan</u>**.  The City agrees to make the changes listed in Part II herein to the City of Detroit Retiree Health Care Plan for the period March 1, 2014 through December 31, 2014.  The changes enumerated in Part II are modifications to the City of Detroit Retiree Health Care Plan described in the 2014 Health Care Plan Options Booklet ("<u>Booklet</u>") distributed approximately January 2, 2014.  These modifications are premised on the terms summarized in the Booklet going into effect on March 1, 2014, subject only to the modifications set forth in this Agreement, which resolves the Plaintiffs' claims in Adversary Proceeding No. 14-04015 (the "<u>Adversary Proceeding</u>").

**2.** **<u>Modifications Will Not Decrease Benefits Offered in March 1, 2014 Plan</u>**.  None of the modifications in Part II reduces or eliminates any of the benefits in the City of Detroit Retiree Health Care Plan for the period March 1, 2014 through December 31, 2014 as described in the Booklet, except as specified in Part II(4)(a) and (b) below.

**3.** **<u>Effective Date of Plan Modifications</u>**.  The modifications listed in Part II of this Agreement shall be effective with the beginning of the plan on March 1, 2014 unless otherwise noted in the Agreement.

**4.** **<u>Aggregate Caps</u>**.  Unless specifically noted below, there is no cap on the amount that the City will spend to fulfill the modifications listed in Part II.  For the two modifications listed in Part II(3)(a)/(b) and (d)/(e) that expressly include capped funds of $2,500,000 and $3,000,000, respectively, the City shall aggregate those caps to a total of $5,500,000 such that if one capped fund is exhausted the City must draw from the other capped fund to the extent that the other capped fund has not been exhausted.

**5.** **<u>Conditions on Agreement</u>**.  This Agreement, and the additional benefits set forth herein, are conditioned upon the City receiving debtor in possession financing that can be used for quality of life purposes on or before May 1, 2014 (the "DIP").  In the event the DIP is not in effect on or before May 1, 2014 and the City is unable to otherwise perform under this

Agreement, this Agreement shall be null and void and the parties shall be returned to their respective positions.

## II. MODIFICATIONS TO THE CITY'S RETIREE HEALTH CARE PLAN FOR THE PERIOD MARCH 1, 2014 THROUGH DECEMBER 31, 2014

**1.** **Modification of Dental and Vision Coverage**.

**(a)** **Dental Coverage**. The City will make available an additional dental benefits option in addition to the dental benefits coverage option described in the Booklet. The additional option will be offered by Golden Dental Inc. ("Golden"). The premium charged for this group coverage option will be no greater than $23.73 per month for single coverage, $38.83 per month for two-person coverage, and $57.17 per month for family coverage, and the benefits will be as described in Exhibit 1 hereto; provided, however, that the amount charged to the retiree shall be increased to include an additional administrative charge, which administrative charge shall not exceed 20% of the applicable premium. The enrolling retiree will be fully responsible to pay the premium associated with this dental option, including the additional administrative charge, and the City shall allow the retirees to utilize the pension reduction feature for payment of the monthly premium. The City will use Reasonable Efforts to have such coverage effective June 1, 2014, including taking Reasonable Efforts to notify retirees by mail of this option as soon as practicable, and taking Reasonable Efforts to minimize the administrative charge. Reasonable Efforts, as used in this Agreement, requires the City to use good faith and reasonable diligence in light of its capabilities.

**(b)** **Vision Coverage**. The City will make available an additional vision benefits option in addition to the vision benefits coverage option described in the Booklet. The additional option will be offered by Heritage Vision Plans, Inc. ("Heritage"). The premium for this group coverage option will be no greater than $6.95 per month for single coverage and $13.75 per month for 2 or more person coverage; provided, however, that the amount charged to the retiree shall be increased to include an additional administrative charge, which administrative charge shall not exceed 20% of the applicable premium. The option shall be a national network vision option similar to the option that the City provides to active employees. The enrolling retiree will be fully responsible to pay the premium associated with this vision option, including the additional administrative charge, and the City shall allow the retirees to utilize the pension reduction feature for payment of the monthly premium. The City will use Reasonable Efforts to have such coverage effective June 1, 2014, including taking Reasonable Efforts to notify retirees by mail of this option as soon as practicable, and taking Reasonable Efforts to minimize the administrative charge.

**2.** **Modifications for Retirees Eligible for Medicare**.

**(a)** **Extension of Enrollment Deadline to Opt Out of Medicare Advantage Plan Coverage**. For retirees of the City who are enrolled in Medicare and receive

coverage under a City-sponsored Medicare Advantage Plan through February 28, 2014, the date to opt out of such coverage was extended to February 7, 2014. Such retirees may opt out by hand delivery (no later than close of business February 7) or first-class mail delivery (post-marked on or before February 7) of the designated opt out form to the City Benefits Administration Office at Suite 1026, 2 Woodward Avenue, Detroit MI 48226. Retirees were permitted to request the designated opt out form by calling the City's Benefit Administration Customer Service Line or contacting the City Benefits Administration Office at the address above. The City will use Reasonable Efforts to process any such opt outs for which it receives timely notice in a manner so as to eliminate such Medicare Advantage Plan coverage effective March 1, 2014. To the extent the City is not able to process the timely sent opt out notices in a manner so as to eliminate such coverage effective March 1, 2014, such coverage shall be eliminated effective April 1, 2014. Retirees who did not opt out by February 7, 2014 will be enrolled in a City-sponsored Medicare Advantage Plan as described in the Booklet.

(b) **HRA Contribution for Medicare-Eligible Retirees Who Opt Out**. For each Medicare-eligible retiree who opted out of coverage under the City-sponsored Medicare Advantage Plans on or prior to February 7, 2014, the City shall automatically enroll such retiree in a City-sponsored Health Reimbursement Arrangement ("HRA"). The HRA shall be administered by Flex Plan, Inc. The City will provide each electing enrollee with a vested $115 monthly contribution credit to his or her HRA during the remainder of 2014, which will carry forward until used by the retiree or otherwise forfeited under terms to be negotiated by the parties hereto. The City will make all Reasonable Efforts to implement the HRA credits effective May 1, 2014, retroactive to March 1, 2014. The initial monthly credit for May 2014 shall be in an amount equal to the total of $115 multiplied by the number of months starting March 2014 for which the enrolled retiree did not have Medicare Advantage Plan coverage (e.g., if John Smith had City-sponsored Medicare Advantage Plan coverage until February 28, 2014, the initial monthly credit for May 2014 will be $345, covering March, April, and May; thereafter, the payments shall be $115 per month for each month in 2014).

(c) **Medicare Advantage Plan Catastrophic Drug Expenses**. Each of the Medicare Advantage Plans sponsored by the City for the period March 1, 2014 through December 31, 2014 include Medicare Part D prescription drug coverage, under which, once the $4,550 out-of-pocket threshold is met, the participant's cost sharing obligation is limited to the greater of 5% of the cost of the prescription, or $2.55 per prescription for generic and preferred multi-source drugs or $6.35 per prescription for all other prescription drugs; provided, that the participant's cost sharing obligation shall never be greater than the cost sharing that applied prior to the participant meeting such threshold. For each participant who meets the $4,550 out-of-pocket threshold while enrolled in one of the City's Medicare Advantage Plans during the period March 1, 2014 through December 31, 2014, the City will reimburse the amount of this cost sharing obligation to the related

ATI-2594662v5                            -3-

13-53846-tjr   Doc 8045-1   Filed 10/20/14   Entered 10/20/14 05:47:23   Page 253 of
13-53846-swr   Doc 8045-1   Filed 10/20/14   Entered 10/20/14 05:48:29   Page 657 of
429

retiree.  For the avoidance of doubt, participant means both retiree and any retiree's spouse who is covered by the City's Medicare Advantage Plans.

**3.**     **Modifications for Retirees Not Eligible for Medicare**.

**(a)**     **Additional Stipend to Retirees With $75,000 or Lower Household Income Who Acquire  Health Care Coverage  on an Exchange**.  The City will provide non-duty disabled retirees who are not eligible for Medicare a $125 stipend that they may use to purchase health care coverage.  The City will increase this stipend by $50 for any non-Medicare eligible retiree who either (i) was enrolled in the City's retiree health program on December 31, 2013 or (ii) transitioned from active City benefits to retiree City benefits on or after November 1, 2013; but only to the extent such retiree described in (i) or (ii) above meets the following requirements:

i)      Not eligible for Medicare or Medicaid;

ii)     Not eligible for a benefit under Part II(4);

iii)    Not a duty-disabled retiree (duty-disabled retirees are eligible for higher stipends as provided for in the Booklet);

iv)     Under 65 years old (non-Medicare eligible retirees age 65 and older may receive an increased stipend under Part II(3)(c) below);

v)      Household income is $75,000 or less, as demonstrated by satisfaction of the process set forth in Part II(3)(b);

vi)     Does not acquire a City-offered group health plan as set forth in Part II(3)(f); and

vii)    Purchases or is covered by a health insurance policy acquired through a health insurance exchange ("Exchange") established pursuant to the Patient Protection and Affordable Care Act.

**(b)**     **Process to Obtain Additional $50 Monthly Stipend.**

i)      The City will retain Aon Hewitt to administer the eligibility process for the additional $50 monthly stipend set forth above in Part II(3)(a). Retirees will be given a 30-day notice period, to expire no later than April 30, 2014, during which they shall provide to Aon Hewitt the following:

(1)     Submission of having purchased an insurance policy through an Exchange that covers such retiree.  Such submission shall include information necessary to validate the retiree's eligibility, including the name of the insurer, monthly premium amount, and the amount of federal

subsidy, if any, that the retiree is to receive in connection with such Exchange-acquired coverage; and

(2) If the proof of Exchange-acquired coverage shows that the retiree's premium does not also include a federal subsidy amount, such retiree shall also submit a copy of his or her most recently filed federal income tax return with proof of filing, but in no event a return prior to the 2011 tax year. If such federal income tax return shows household income in excess of $75,000 and the retiree believes that household income in 2013 was below $75,000, the retiree shall also submit – along with a copy of the most recently filed federal income tax return – proof sufficient for Aon Hewitt to conclude that his or her household income in 2013 was less than $75,000.

ii) Aon Hewitt shall submit to the City its list of retirees eligible for the additional $50 monthly stipend and the monthly stipends shall be paid to the approved eligible retirees beginning in the month of June 2014 or as soon thereafter as administratively practical, with payments retroactive to March 1, 2014. For example, if the first payment is made in June 2014, it will be in the amount of $200 for the months of March, April, May, and June; thereafter, the payments shall be $50 per month for each succeeding month in 2014. The list provided by Aon Hewitt shall be final and no changes shall be made to such list for the remainder of 2014.

*The City shall cap the amount that it pays for this additional $50 stipend during the period from March through December 2014 at $3,000,000.* In the event that there are more retirees meeting the requirements in Part II(3)(a) and (b) (*i.e.*, retirees listed on the final list) than can be paid in full for $3,000,000, each retiree will have his or her stipend amount reduced pro rata, unless there are additional funds that can be used as detailed in Part I(4).

(c) **Additional Payment to Non-Medicare Eligible Retirees Age 65 and Older**. The City will increase the stipend that it gives non-Medicare eligible retirees who are 65-years-old and older to $300/month. For such purposes, a non-Medicare eligible retiree is any retiree age 65 or older who is not – directly or through his or her spouse – eligible to automatically enroll in and obtain premium-free coverage under Part A of Medicare as evidenced by a denial letter from the Centers for Medicare and Medicaid Services ("CMS"). Retirees who have previously submitted such a letter to the City will not be required to resubmit it. Non-Medicare eligible retirees who are duty-disabled will not be eligible for this increase because their stipend is already $300 or more. The City will coordinate with Blue Cross Blue Shield of Michigan to determine the number of non-Medicare eligible retirees who are eligible for this $300 stipend. The increased stipend will apply for each month from March 2014 through December 2014. The City will make all Reasonable Efforts to implement the $300 increased

ATI-2594662v5                                   -5-

13-53846-tjt   Doc 8045-1   Filed 10/20/14   Entered 10/20/14 05:47:43   Page 255 of
13-53846-swr   Doc 8045-1   Filed 10/20/14   Entered 10/20/14 05:48:29   Page 655 of
409

monthly stipend beginning April 1, 2014, with payment of the increased amount over the stipend otherwise paid for prior months being retroactive to March 1, 2014; thereafter, the stipend shall be $300 per month for each succeeding month in 2014. Such eligible retirees will not receive any other stipend amounts from the City that are described in the Booklet or this Agreement.

**(d)** **$125 Monthly Stipend For City Retirees' Spouses Who are Under Age 65, With $75,000 or Lower Household Income, and Are Enrolled in Health Care Coverage on an Exchange**. The City will provide a $125 stipend to certain married retirees whose spouses either (i) were enrolled in the City's retiree health program on December 31, 2013 or (ii) transitioned from active City benefits to retiree City benefits on or after November 1, 2013; but only to the extent such spouse described in (i) or (ii) above meets the following requirements:

i)   Not eligible to enroll in one of the City's Medicare Advantage Plans;

ii)  Not eligible for Medicaid;

iii) Not eligible for a benefit under Part II(4);

iv)  Under 65 years old;

v)   Household income is $75,000 or less, as demonstrated by satisfaction of the process set forth in Part II(3)(e);

vi)  Does not acquire a City-offered group health plan as set forth in Part II(3)(f); and

vii) Purchases or is covered by a health insurance policy acquired through an Exchange.

**(e)** **Process to Obtain $125 Monthly Spouse Stipend.**

i)   The City will retain Aon Hewitt to administer the eligibility process for the $125 monthly spouse stipend. Retirees will be given a 30-day notice period, to expire no later than April 30, 2014, during which they shall provide to Aon Hewitt the following proof:

   (1)  Submission of proof that their spouse is covered under an insurance policy purchased through an Exchange, including information necessary to validate the retirees' eligibility, including the name of the insurer, monthly premium amount, and the amount of federal subsidy, if any, that the spouse is to receive in connection with such Exchange-acquired coverage; and

   (2)  If the proof of Exchange-acquired coverage shows that the spouse's premium does not also include a federal subsidy

amount, such retiree shall also submit a copy of his or her most recently filed federal income tax return with proof of filing, but in no event a return prior to the 2011 tax year. If such federal income tax return shows household income in excess of $75,000 and the retiree believes that household income in 2013 was below $75,000, the retiree shall also submit – along with a copy of the most recently filed federal income tax return – proof sufficient for Aon Hewitt to conclude that his or her household income in 2013 was less than $75,000.

ii) Aon Hewitt shall submit to the City its list of retirees who are eligible for this $125 monthly stipend and the monthly stipends shall be paid to the approved married retirees beginning in the month of June 2014 or as soon thereafter as administratively practical, with payments retroactive to March 1, 2014. For example, if the first payment is made in June 2014, it will be in the amount of $500 for the months of March, April, May, and June; thereafter, the payments shall be $125 per month for each succeeding month in 2014. The list provided by Aon Hewitt shall be final and no changes shall be made to such list for the remainder of 2014, except as follows:

(1) if an eligible retiree ceases to be married (whether by death or divorce), the retiree's spouse will cease to be eligible for this stipend and the retiree shall be removed from the list effective as of the month immediately following such event; and

(2) if a retiree's spouse transitions from active City benefits to retiree City benefits during 2014 and meets the eligibility provisions described in Part II(3)(d) and is approved as eligible pursuant to the process described in Part II(3)(e), the related retiree shall be added to the list effective as of the month in which the transition to retiree City benefits occurs, provided there is sufficient availability under the Aggregate Caps as described below.

*The City will cap the amount that it pays for spousal stipends at $2,500,000.* In the event that there are more retirees initially satisfying the requirements in Part II(3)(e) (*i.e.*, retirees listed on the first list submitted by Aon Hewitt to the City) than can be paid in full for $2,500,000, each such retiree will have his or her stipend amount reduced pro rata, provided that if there are additional funds that can be used as detailed in Part I(4), each such retiree will only have his or her stipend amount reduced pro rata to the extent the aggregate amount is not sufficient to satisfy the full amount of such stipends. Retirees who become eligible for this spousal stipend during the year, as described above, shall only be eligible for a stipend to the extent there is sufficient availability under the

13-53846-swr   Doc 8045-1   Filed 10/20/14   Entered 10/20/14 05:47:23   Page 251 of
409
13-53846-tjt   Doc 8405-1   Filed 11/20/14   Entered 11/20/14 05:46:29   Page 751 of
809

Aggregate Caps detailed in Part I(4). The addition or removal of retirees from the list shall not impact the amount of the stipend being paid to other eligible retirees.

**(f)** **City Group Plan**. In 2014, the City agrees to contract with Blue Cross Blue Shield of Michigan to offer a fully-insured group health plan option to retirees who are not eligible for Medicare. Such plan option shall be reasonably equivalent to the coverage offered by the City to active employees in 2014. The enrolling retiree will be fully responsible to pay the monthly premium associated with this option. The premium cost to retirees of such policy will include the cost to the City of enrollment and administration related to this policy option, so that the City will not incur any additional expense in offering this policy. The parties will use Reasonable Efforts to have such coverage effective May 1, 2014. The City shall provide a monthly stipend of $100 to each retiree who enrolls in the City group plan, beginning with the May 1, 2014 payment. No other stipend amounts from the City that are described in the Booklet or this Agreement shall be available to retirees enrolling in this group option, unless either (i) the retiree is duty-disabled, in which case, he or she will instead receive the stipend available to duty-disabled retirees described in the Booklet, or (ii) the retiree is eligible for the stipend described in Part II(3)I, in which case, he or she will instead receive such stipend.

**4.** **Modifications for Retirees Below the Federal Poverty Level**.

**(a)** **Coverage for Michigan Resident Retirees Eligible For Medicaid Coverage On or After April 1, 2014**. The parties recognize that CMS has approved the State of Michigan's request to operate the "Healthy Michigan" program for adults who will become eligible for Medicaid under Section 1902(a)(10)(A)(i)(VIII) of the Social Security Act, and that on April 1, 2014 Michigan will provide Medicaid coverage to all adults residing in the State with income up to and including 133% of the Federal Poverty Level. "Federal Poverty Level" means the applicable poverty guideline based on state of residence and household size issued annually by the U.S. Department of Health and Human Services. For those retirees who are eligible for Medicaid under the scheduled April 1, 2014 expansion, the City will facilitate their transition in the following manner: Within 10 days of the effective date of this Agreement, the City shall contact by letter those non-Medicare eligible retirees, who, according to the Retirement Systems' records, reside in Michigan and whose annual pension income is in an amount less than 100% of the Federal Poverty Level. Such retirees will be given a 30 day opportunity to submit to Aon Hewitt proof that their income falls below the Federal Poverty Level. Upon receipt by Aon Hewitt of a list of such retirees falling below the Federal Poverty Level, the City shall provide payment to such retirees of the amount equal to the value of the federal subsidy for the month of March that they would have received in connection with the second lowest cost Exchange-purchased silver plan, had such retiree, and to the extent the retiree is married, such retiree's spouse, been eligible for such subsidy for the month of March 2014 for such plan based on a determination of household income at 100% of the Federal Poverty Level. A similar payment will be made by the City in

ATI-2594662v5                          -8-

13-53846-swr   Doc 8405-1   Filed 10/20/14   Entered 10/20/14 05:47:43   Page 252 of
13-53846-tjt   Doc 8485-21   Filed 11/20/14   Entered 11/20/14 15:48:28   Page 752 of
409

connection with insurance coverage for April 2014 if such retiree and spouse are not covered by Medicaid. To the extent that the Medicaid expansion rules in Michigan have not provided such retirees the opportunity to migrate into the Michigan Medicaid program by May 1, 2014, the City shall cease its continued payment but the parties agree to negotiate in good faith an additional reasonable accommodation to such retirees that balances the City's and such retirees' interests. *Retirees eligible for payments under this subsection are not eligible for any other payment offered by the City as set forth in the Booklet or as set forth in this Agreement.*

**(b)** **Coverage for Non-Medicare Eligible Retirees in States that Have Not Expanded Medicaid**. The City recognizes that not all States have chosen to expand Medicaid coverage in accordance with Title II of the Patient Protection and Affordable Care Act, and certain non-Medicare eligible retirees residing outside the State of Michigan whose incomes fall below 133% of the Federal Poverty Level will not be eligible for Medicaid coverage. Accordingly, in connection with such retirees, the City will pay a monthly amount equal to the lesser of: (1) the second lowest cost monthly premium for a silver plan for such retiree and spouse purchased through an Exchange in their place of residence; or (2) the ratable monthly amount necessary to increase the retiree's annual household income to 100% of the Federal Poverty Level. Within 10 days of the effective date of this Agreement, the City shall contact by letter those retirees, who, according to the Retirement Systems' records, reside in states that do not provide Medicaid coverage to adults up to the Federal Poverty Level, and whose annual pension income is in an amount less than 100% of the Federal Poverty Level. Such retirees will be given a 30 day opportunity to submit to Aon Hewitt proof that their income falls below the Federal Poverty Level. The City shall commence such payments as soon as reasonably practicable after receiving a list of such retirees from Aon Hewitt. *Retirees eligible for payments under this subsection are not eligible for any other payment offered by the City as set forth in the Booklet or as set forth in this Agreement.*

## III. RELEASES, FUTURE LEGAL PROCEEDINGS, AND MISCELLANEOUS

**1.** **Future Claims in City Plan Confirmation Proceedings**. This Agreement is entered into without prejudice to any party to this litigation with respect to any issue involving the rights, claims, obligations, and payments of health care and other post-employment benefits ("OPEB"); provided that the City will not seek to recover directly from the retirees any postpetition OPEB payments made to or on behalf of retirees. Each party expressly reserves its rights on OPEB issues in connection with negotiations of a plan of adjustment, and the Plaintiffs are free to pursue, and the City to oppose, their position that the postpetition OPEB payments the City made to or on behalf of retirees were a business necessity.

**2.** **Release**. Following the execution of this Agreement, the Plaintiffs will promptly dismiss the lawsuit – which solely addresses 2014 retiree health care benefits – with prejudice; provided, however, that any party to the lawsuit may bring an action in the Bankruptcy Court to enforce the terms of this Agreement resolving the lawsuit (an "Enforcement Action") and if the

conditions contained in the last sentence of Part I(5) occur, then Plaintiffs are free to reinstate the Adversary Proceeding. Solely for purposes of an Enforcement Action, the City consents, pursuant to 11 U.S.C. § 904, to the Bankruptcy Court's hearing and deciding such Enforcement Action.

3. **Counterparts.** This Agreement may be signed in counterparts, and each counterpart shall be treated as an original.

4. **Good Faith.** As evidenced by the undersigned acknowledgment of Judge Wiley Daniel, Mediator, this Agreement was negotiated and entered into by all parties in good faith.

5. **Plan of Adjustment.** The terms of this Agreement, including Part III(4), shall be incorporated into any plan of adjustment filed by the City and confirmed by the Bankruptcy Court in 2014 in this bankruptcy case.

Agreed,

_____
Evan Miller, attorney for Defendants

_____
Sam J. Alberts, attorney for the Committee

_____
Brian O'Keefe, attorney for Detroit Retired City Employees Association and Retiree Police and Fire Fighters Association

_____
Richard Mack, attorney for AFSCME Sub-Chapter 98, City of Detroit Retirees

Acknowledged:

_____
Judge Wiley Daniel, Mediator

conditions contained in the last sentence of Part I(5) occur, then Plaintiffs are free to reinstate the Adversary Proceeding. Solely for purposes of an Enforcement Action, the City consents, pursuant to 11 U.S.C. § 904, to the Bankruptcy Court's hearing and deciding such Enforcement Action.

3.    **Counterparts.** This Agreement may be signed in counterparts, and each counterpart shall be treated as an original.

4.    **Good Faith.** As evidenced by the undersigned acknowledgment of Judge Wiley Daniel, Mediator, this Agreement was negotiated and entered into by all parties in good faith.

5.    **Plan of Adjustment.** The terms of this Agreement, including Part III(4), shall be incorporated into any plan of adjustment filed by the City and confirmed by the Bankruptcy Court in 2014 in this bankruptcy case.

Agreed,

_____
Evan Miller, attorney for Defendants

_____
Sam J. Alberts, attorney for the Committee

_____
Brian O'Keefe, attorney for Detroit Retired City Employees Association and Retiree Police and Fire Fighters Association

_____
Richard Mack, attorney for AFSCME Sub-Chapter 98, City of Detroit Retirees

Acknowledged:

_____
Judge Wiley Daniel, Mediator

ATI-2594662v5

-10-

conditions contained in the last sentence of Part I(5) occur, then Plaintiffs are free to reinstate the Adversary Proceeding. Solely for purposes of an Enforcement Action, the City consents, pursuant to 11 U.S.C. § 904, to the Bankruptcy Court's hearing and deciding such Enforcement Action.

     **3.**    <u>**Counterparts.**</u> This Agreement may be signed in counterparts, and each counterpart shall be treated as an original.

     **4.**    <u>**Good Faith.**</u> As evidenced by the undersigned acknowledgment of Judge Wiley Daniel, Mediator, this Agreement was negotiated and entered into by all parties in good faith.

     **5.**    <u>**Plan of Adjustment.**</u> The terms of this Agreement, including Part III(4), shall be incorporated into any plan of adjustment filed by the City and confirmed by the Bankruptcy Court in 2014 in this bankruptcy case.

Agreed,

_____

Evan Miller, attorney for Defendants

_____

Sam J. Alberts, attorney for the Committee

_____

Brian O'Keefe, attorney for Detroit Retired City Employees Association and Retiree Police and Fire Fighters Association

_____

Richard Mack, attorney for AFSCME Sub-Chapter 98, City of Detroit Retirees

Acknowledged:

_____

Judge Wiley Daniel, Mediator

conditions contained in the last sentence of Part I(5) occur, then Plaintiffs are free to reinstate the Adversary Proceeding. Solely for purposes of an Enforcement Action, the City consents, pursuant to 11 U.S.C. § 904, to the Bankruptcy Court's hearing and deciding such Enforcement Action.

      **3.**   **Counterparts.** This Agreement may be signed in counterparts, and each counterpart shall be treated as an original.

      **4.**   **Good Faith.** As evidenced by the undersigned acknowledgment of Judge Wiley Daniel, Mediator, this Agreement was negotiated and entered into by all parties in good faith.

      **5.**   **Plan of Adjustment.** The terms of this Agreement, including Part III(4), shall be incorporated into any plan of adjustment filed by the City and confirmed by the Bankruptcy Court in 2014 in this bankruptcy case.

Agreed,

_____
Evan Miller, attorney for Defendants

_____
Sam J. Alberts, attorney for the Committee

_____
Brian O'Keefe, attorney for Detroit Retired City Employees Association and Retiree Police and Fire Fighters Association

_____
Richard Mack, attorney for AFSCME Sub-Chapter 98, City of Detroit Retirees

Acknowledged:

_____
Judge Wiley Daniel, Mediator

conditions contained in the last sentence of Part I(5) occur, then Plaintiffs are free to reinstate the Adversary Proceeding. Solely for purposes of an Enforcement Action, the City consents, pursuant to 11 U.S.C. § 904, to the Bankruptcy Court's hearing and deciding such Enforcement Action.

3.  **Counterparts.** This Agreement may be signed in counterparts, and each counterpart shall be treated as an original.

4.  **Good Faith.** As evidenced by the undersigned acknowledgment of Judge Wiley Daniel, Mediator, this Agreement was negotiated and entered into by all parties in good faith.

5.  **Plan of Adjustment.** The terms of this Agreement, including Part III(4), shall be incorporated into any plan of adjustment filed by the City and confirmed by the Bankruptcy Court in 2014 in this bankruptcy case.

Agreed,

_____
Evan Miller, attorney for Defendants


_____
Sam J. Alberts, attorney for the Committee


_____
Brian O'Keefe, attorney for Detroit Retired City Employees Association and Retiree Police and Fire Fighters Association


_____
Richard Mack, attorney for AFSCME Sub-Chapter 98, City of Detroit Retirees


Acknowledged:

_____
Judge Wiley Daniel, Mediator

# EXHIBIT 1

(See next page)

13-53846-swr   Doc 8405-21   Filed 11/20/14   Entered 11/20/14 05:48:23   Page 705 of
809



January 2014

# Certificate of Coverage
# City of Detroit Retirees

## CLASS I
**Diagnostic and Preventive:**

Exams, X-Rays, Prophylaxis, Fluoride -up to age 19 **100%**

## CLASS II
**Restorative:**

Fillings, Root Canals, Routine Extractions **100%**

## CLASS III
**Prosthetics:**

Crowns, Bridges, Partials, Dentures, Space Maintainers **80%**

## CLASS IV
**Specialty Care:**
Periodontics
Endodontics
Oral Surgery **70%**

## ORTHODONTICS (Interceptive excluded)
Lifetime Benefit Maximum: Dependents up to age 19 **$3,000**
Lifetime Benefit Maximum: Subscriber and Spouse **$3,000**

**Out-Of-Area Emergency Coverage $100 reimbursement**

**Annual Maximum:**        $1,600.00
**Annual Renewal:**        **07/01**
**Membership Card Reads:**  Detroit Retirees

| Rate Type | Current Rates |
|---|---|
| Single Person | $23.73 |
| Family of two | $38.83 |
| Family | $57.17 |

**EXHIBIT I.A.305**

SCHEDULE OF SECURED GO BOND DOCUMENTS

13-53846-tjt   Doc 8405-21   Filed 10/20/14   Entered 10/20/14 05:47:43   Page 267 of
429
13-53846-swr   Doc 8045-1   Filed 10/20/14   Entered 10/20/14 05:48:23   Page 71 of
809

## SCHEDULE OF SECURED GO BOND DOCUMENTS

| Secured GO Bond Documents | Series of Secured GO Bonds | Balance as of Petition Date |
|---|---|---|
| Resolution of the City Council adopted February 23, 2010<br><br>Finance Director's Order dated March 11, 2010<br><br>Master Debt Retirement Trust Indenture dated as of March 1, 2010, as supplemented and amended (the "Master Indenture"), between the City of Detroit and U.S. Bank National Association, as trustee | Distributable State Aid General Obligation Limited Tax Bonds, Series 2010 | $252,475,366 |
| Resolution of the City Council adopted July 20, 2010<br><br>Finance Director's Order dated December 9, 2010<br><br>Master Indenture | Distributable State Aid Second Lien Bonds (Unlimited Tax General Obligation), Series 2010(A) (Taxable-Recovery Zone Economic Development Bonds – Direct Payment) | $101,707,848 |
| Resolution of the City Council adopted March 27, 2012<br><br>Finance Director's Order dated March 28, 2012 (Series 2012(A2) and Series 2012(B2))<br><br>Finance Director's Order dated July 3, 2012 (Series 2012 (A2) and Series 2012(B2))<br><br>Finance Director's Order dated August 16, 2012 (Series 2012(A2-B), Series 2012 (A2) and Series 2012(B2))<br><br>Master Indenture | Self Insurance Distributable State Aid Third Lien Bonds (Limited Tax General Obligation), Series 2012(A2) | $39,254,171 |
| Resolution of the City adopted March 27, 2012<br><br>Finance Director's Order dated August 16, 2012 (Series 2012(A2-B), Series 2012 (A2) and Series 2012(B2))<br><br>Master Indenture | Self Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(A2-B) | $31,037,724 |

| Secured GO Bond Documents | Series of Secured GO Bonds | Balance as of Petition Date |
|---|---|---|
| Resolution of the City Council adopted March 27, 2012<br><br>Finance Director's Order dated March 28, 2012 (Series 2012(B))<br><br>Finance Director's Order dated July 3, 2012 (Series 2012(B))<br><br>Finance Director's Order dated August 16, 2012 (Series 2012(B))<br><br>Master Indenture | General Obligation Distributable State Aid Third Lien Capital Improvement Refunding Bonds (Limited Tax General Obligation), Series 2012(B) | $6,469,135 |
| Resolution of the City Council adopted March 27, 2012<br><br>Finance Director's Order dated March 28, 2012 (Series 2012(A2) and Series 2012(B2))<br><br>Finance Director's Order dated July 3, 2012 (Series 2012 (A2) and Series 2012(B2))<br><br>Finance Director's Order dated August 16, 2012 (Series 2012(A2-B), Series 2012 (A2) and Series 2012(B2))<br><br>Master Indenture | Self Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(B2) | $54,055,927 |

-2-

**EXHIBIT I.A.332**

STATE CONTRIBUTION AGREEMENT

## CONTRIBUTION AGREEMENT

This Contribution Agreement ("Agreement"), dated as of _____, 2014, is made by and among the Michigan Settlement Administration Authority, a Michigan body public corporate (the "Authority"), the General Retirement System of the City of Detroit, the Police and Fire Retirement System of the City of Detroit and the City of Detroit (the "City").

## RECITALS

A.     The City filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code on July 18, 2013 (the "Chapter 9 Case") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Court").

B.     During the course of the Chapter 9 Case, the City has asserted that the City's Police and Fire Retirement System (the "PFRS" or a "System") and the General Retirement System (the "GRS" or a "System" and collectively with the PFRS, the "Systems") are underfunded.

C.     During the course of the Chapter 9 Case, there have been suggestions that the State of Michigan (the "State") may be obligated to pay all or a portion of the underfunding of pension benefits payable to retirees, a suggestion the State vigorously disputes.

D.     As part of the mediation process in the Chapter 9 Case, the mediators asked the State and other parties to assist in reducing the amount of underfunding in the PFRS and GRS pension funds by providing settlement funds for the benefit of pensioners that would not be otherwise available.

E.     As part of its determination that the City was eligible to file the Chapter 9 Case, the Court determined that pension obligations of the City can be impaired or diminished in the Chapter 9 Case and are not protected from such impairment or diminution by the State Constitution.

F.     In support of confirmation of the City's Fourth Amended Plan of Adjustment dated May 5, 2014 (as may be further amended from time to time, the "Plan"), the State has agreed, subject to satisfaction of the terms and conditions set forth herein and in the Plan, to make a contribution to the GRS and PFRS in return for releases from, among others, the GRS and PFRS as set forth in the Support and Release Agreement entered into by the State and each of the Systems in connection with this matter.

G.     On June 20, 2014, the Authority was established as the disbursement agent for the State with respect to the State Contribution (as defined below).

H.     Capitalized terms used in this Agreement but not defined have the same meanings as set forth in the Plan.

1

NOW THEREFORE, THE PARTIES HERETO AGREE AS FOLLOWS:

1.      State Contribution.   On the later of (a) the date on which the Conditions Precedent have been satisfied, and (b) 60 days after the Effective Date of the Plan, the Authority shall disburse $98,800,000 to GRS and $96,000,000 to PFRS (collectively, the "State Contribution") for the purpose of increasing the assets of the PFRS and GRS.  The total aggregate State Contribution is equal to the net present value of $350,000,000 payable over 20 years determined using a discount rate of 6.75%, which results in a total contribution by the State of $194,800,000.  The State Contribution shall only be used to fund payments to holders of GRS Pension Claims and PFRS Pension Claims, each as defined in the Plan.

2.      Governance Requirements of the GRS and PFRS.  At all times during the 20 year period following the disbursement of the State Contribution to the GRS and PFRS, the GRS and PFRS each must establish an investment committee (the "Investment Committee") for the purpose of making recommendations to, and approving certain actions by, the respective System's board of trustees and/or making determinations and taking action under and with respect to Investment Management, as set forth in the terms and conditions enumerated on **Exhibit A** and **Exhibit B**, respectively, each attached to and incorporated by reference into this Agreement.  Further, the Emergency Manager for the City and any subsequently appointed emergency manager for the City, appointed under PA 436 or under any successor or replacement statutes to PA 436, shall not seek to exercise any powers granted under section 12(1)(m) of PA 436 (or equivalent provision under any successor or replacement statute) against the Board of GRS or the Board of PFRS until the earlier of (a) one year following entry of an order confirming the Plan, and (b) December 31, 2015.

3.      Income Stabilization Funds and Income Stabilization Payments.  The City, GRS and PFRS shall establish an income stabilization program and amend the governing documents for GRS and the governing documents for PFRS to include the following:

      a.      A supplemental pension income stabilization payment (the "Income Stabilization Payments") payable on an annual basis beginning not later than 120 days after the Effective Date, to each Eligible Pensioner equal to the lesser of (a) the amount needed to restore the Eligible Pensioner's reduced pension benefit to the amount of the pension benefit that the Eligible Pensioner received from GRS or PFRS in 2013, or (b) the amount needed to bring the total annual household income of the Eligible Pensioner up to 130% of the Federal Poverty Level in 2013.

      b.      In addition, to the extent an Eligible Pension's Estimated Adjusted Annual Household Income in any calendar year is less than 105% of the Federal Poverty Level in that year, the Eligible Pensioner will receive an additional benefit ("Income Stabilization Benefit Plus"). The Income Stabilization Benefit Plus shall be equal to the lesser of either (a) 100% restoration of pension benefits, including escalators and cost of living adjustments; or (b) the amount needed to bring the Eligible Pensioner's Estimated Adjusted Annual Household Income in that calendar year up to 105% of the Federal Poverty Level in that year.

2

c.  An Eligible Pensioner's "Estimated Adjusted Annual Household Income" shall be calculated as follows: (i) the annual pension benefit amount paid in 2013 shall be subtracted from the Eligible Pensioner's 2013 total household income (per their (or in the case of minor children, their legal guardian's) 2013 income tax returns or equivalent documentation) as adjusted for inflation or Social Security COLA increases to create a base additional income amount, plus (ii) the following three items as applicable, (x) the reduced pension benefit that GRS will pay the Eligible Pensioner for that year, (y) any GRS pension restoration due to an improved GRS funding level, and (z) the Eligible Pensioner's Income Stabilization Benefit. Notwithstanding the foregoing, Income Stabilization Payments, including the Income Stabilization Benefit Plus, under both GRS and PFRS shall not exceed $20 million in aggregate.

d.  A separate recordkeeping sub-account called the "Income Stabilization Fund" will be set up under each of GRS and PFRS for the sole purpose of paying the Income Stabilization Payments to Eligible Pensioners. The assets credited to the sub-accounts will be invested on a commingled basis with the applicable System's assets and will be credited with a pro-rata portion of the System's earnings and losses.

e.  Amounts credited to the Income Stabilization Fund, including the Assigned UTGO Bond Tax Proceeds, may not be used for any purpose other than the payment of Income Stabilization Payments to Eligible Pensioners, except as expressly provided in subparagraph (f) below.

f.  In 2022, provided that the State has not issued a certificate of default with respect to a System at any time prior to 2022, the Investment Committee for that System shall conduct a valuation to determine the Income Stabilization Payments anticipated to be made from the System in the future, in order for the System to fulfill the obligation to make Income Stabilization Payments (the "Estimated Future Liability"). In the event that 75% of the independent members of the Investment Committee determine that the GRS or PFRS Income Stabilization Fund is credited with assets in excess of its Estimated Future Liability (the "Excess Assets"), the Investment Committee may, in its sole discretion, recommend to the Board of Trustees that the Excess Assets, but not more than $35 million, be used to fund each System's payment of Adjusted Pension Amounts. The Investment Committee shall have the right to engage professionals to assist in this task as necessary, and such expenses shall be paid by the Systems. If any funds remain in the GRS or PFRS Income Stabilization Fund on the date upon which no Eligible Pensioners under their respective System are living, the remainder of each System's Income Stabilization Fund shall be used to fund each System's payment of Adjusted Pension Amounts.

3

g.  "Eligible Pensioners" are those retirees or surviving spouses who are at least 60 years of age or those minor children receiving survivor benefits from GRS or PFRS, each as of the Effective Date, whose pension benefit from GRS or PFRS will be reduced by the confirmed Plan, and who have a total household income equal to or less than 140% of the Federal Poverty Line in 2013 (per their (or in the case of minor children, their legal guardian's) 2013 income tax returns or equivalent documentation). No new persons will be eligible to receive an Income Stabilization Payment at any time in the future, and any minor child receiving survivor benefits shall cease to be an Eligible Pensioner after he or she turns 18 years of age.

h.  The initial determination of Eligible Pensioners, and the amounts of Income Stabilization Payments payable to Eligible Pensioners shall be made by the State in its sole discretion.  The State shall transmit the list of Eligible Pensioners to the Investment Committee and the Board of Trustees of GRS and PFRS, as applicable. The Board of Trustees, with the assistance of the Investment Committee of GRS and PFRS, shall be responsible for properly administering the respective Income Stabilization Fund and annually certifying to the Treasurer that it has properly administered the requirements for eligibility and payment of benefits with respect to Eligible Pensioners.

4.  Conditions Precedent.  The Authority's obligations under this Agreement are not effective or enforceable until each of the following conditions (the "Conditions Precedent") have been met to the satisfaction of the Authority and the Treasurer, unless any one or more of such conditions are waived in a writing executed by the Authority and the Treasurer:

a.  The Authority receives the State Contribution from the State.

b.  An endorsement of the Plan by the Official Retiree Committee which will include a letter from the Official Retiree Committee as part of the Plan solicitation package recommending to Classes 10 and 11 a vote in favor of the Plan, or equivalent assurances from member organizations representing a majority of retirees in the respective classes.

c.  Cessation of all litigation, including the cessation of funding of any litigation initiated by any other party, as it relates to the City (a) challenging PA 436 or any actions taken pursuant to PA 436, including but not limited to, a dismissal with prejudice of the cases set forth on **Exhibit D**, or (b) seeking to enforce Article IX, Section 24 of the Michigan Constitution; provided, however, (i) until the State Contribution is received by the Systems, the Systems agree to stay any pending litigation described in this subparagraph, and (ii) that as a condition precedent to the GRS and the PFRS dismissing any pending litigation described in this subparagraph that they are prosecuting, the GRS and the PFRS have the right to receive written confirmation from the Authority

4

that the Authority is prepared and authorized to disburse the State Contribution in accordance with this Agreement and the Plan, subject only to the dismissal by the GRS and PFRS of any pending litigation described in this subparagraph that they are prosecuting.

d.    Active support of the Plan by, a release of and covenant not to sue the State from, and an agreement not to support in any way (including funding) the litigation described in subparagraph 4(c) by the parties listed on **Exhibit C**, or equivalent assurance of litigation finality (which, as to the Systems, shall be deemed satisfied by the execution of the Support and Release Agreement to be entered into by the State and each of the Systems in connection with this matter).

e.    Classes 10 and 11 accept the Plan.

f.    By December 31, 2014, the Court enters a final, non-appealable order confirming the Plan that includes, at a minimum, the following:

    i.    A release of the State and State Related Entities by each holder of a Pension Claim of all Liabilities arising from or related to the City, the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution that such party has, had or may have against the State and any State Related Entities.

    ii.    A requirement that the governing documents of GRS and the governing documents of PFRS be amended to include:

        a)    the governance terms and conditions set forth in Paragraph 2, Exhibit A and Exhibit B of this Agreement; and

        b)    the Income Stabilization Payments and Income Stabilization Fund described in Paragraph 3 of this Agreement.

    iii.    Approval of, and authority for the City to enter into, the UTGO Settlement.

    iv.    A requirement that the City irrevocably assigns the right to receive not less than an aggregate amount of $20,000,000 of the payments on the Reinstated Stub UTGO Bonds to the Income Stabilization Funds of the GRS and PFRS. Such payments will be made to the Income Stabilization Funds in the form of annual installment payments over a 14 year period, pursuant to a payment schedule approved by the State.

5

       v.        Approval of, and authority for the City to enter into, the DIA Settlement.

       vi.      Agreement to and compliance with MCL 141.1561 and cooperation with the transition advisory board appointed pursuant to MCL 141.1563, or compliance with any new legislation that is enacted regarding post-bankruptcy governance.

g.      Evidence satisfactory to the State of an irrevocable commitment by:

       i.        The Foundations to fund $366,000,000 (or the net present value thereof) as part of the DIA Settlement; and

       ii.      The DIA Corp. to fund $100,000,000 (or the net present value thereof) as part of the DIA Settlement.

h.      The Plan Effective Date occurs on or before April 1, 2015.

5.      <u>Non-occurrence of Conditions Precedent</u>.    If the Conditions Precedent are not met to the satisfaction of the Authority and the Treasurer on or before April 1, 2015, upon written request of the Treasurer, the Authority shall remit the State Contribution to the Department and shall have no further obligations under this Agreement.

6.      <u>Default by GRS and PFRS; Cure Period; Remedies</u>.

a.      A System will be in default if the System has not materially complied with any of the terms and conditions set forth in (i) the Plan, (ii) the Governing Documents, or (iii) this Agreement, including, but not limited to, failing to make the required Income Stabilization Payments or using funds in the Income Stabilization Fund for unauthorized purposes. For the purposes of this Agreement, "<u>Governing Documents</u>" shall mean, (x) for the GRS, the Combined Plan for the General Retirement System of the City of Detroit, Michigan, and (y) for the PFRS, the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan. Notwithstanding subparagraph 'e' below, there shall not be an event of default for purposes of this paragraph 6 unless and until the Treasurer delivers to the alleged defaulting System a written notice declaring and specifically identifying the facts of an alleged default (the "<u>Default Notice</u>"). Nothing herein shall prohibit the subject System from contesting the alleged default; provided, however, until the contest over the alleged default is resolved, the subject System may not include its State Contribution, as adjusted for earnings and losses, for purposes of determining whether benefits reduced by the Plan may be restored.

b.      In the event of a default by a System, the System shall have 100 days after receiving the Default Notice in accordance with subparagraph 'a' above (the "<u>Cure Period</u>") to cure such default by remedying the damages sustained as a result of the default, as well as making any delinquent

6

Income Stabilization Payments, and restoring any funds improperly removed from any other fund maintained by the System, including the Income Stabilization Fund, as applicable. Prior to the expiration of the Cure Period, at least six of the seven total aggregate votes of the Investment Committee for the defaulting System must certify to the Treasurer that (i) the default has been cured, and (ii) that no material damages have been caused by the default that have not otherwise been remedied (the "Cure Certification"). During the Cure Period, the defaulting System may not include its State Contribution, as adjusted for earnings and losses, for purposes of determining whether benefits reduced by the Plan may be restored.

c.      If the Investment Committee for the defaulting System provides the Cure Certification to the Treasurer in accordance with subparagraph 'b' above, then the default will be deemed cured and the defaulting System may once again include its State Contribution, as adjusted for earnings and losses, for purposes of determining whether benefits reduced by the Plan may be restored.

d.      If the Investment Committee for the defaulting System fails to provide the Cure Certification to the Treasurer in accordance with subparagraph 'b' above, then no portion of the total State Contribution to the defaulting system, as adjusted for earnings and losses, may be taken into consideration by the System during the remainder of the 20 year period following the date of such default for purposes of determining whether benefits reduced by the Plan may be restored. Notwithstanding the foregoing, if at any time during or after the Cure Period the Investment Committee certifies by a simple majority vote, that (i) the default has been cured; and (ii) that no material damages have been caused by the default that have not otherwise been remedied, then the Treasurer may consent to the defaulting System once again including its State Contribution, as adjusted for earnings and losses, for purposes of determining whether benefits reduced by the Plan may be restored, which consent shall not be unreasonably withheld.

e.      Each Investment Committee shall provide compliance reports to the Treasurer on a semi-annual basis and at such other times as the Treasurer reasonably may request (each, a "Compliance Report") that certifies that the Investment Committee is not aware of any defaults, or, if the Investment Committee is aware of a default, specifically identifying the facts of such default. After review of a Compliance Report, the Treasurer shall provide to the System either a certificate of compliance or a Default Notice.

f.      Notwithstanding the foregoing, in the event of a default, the Treasurer and the Authority shall have the right to pursue all available legal and

7

equitable remedies against the Board of Trustees for the defaulting System, the Investment Committee, or any other person.

7.   Execution in Counterparts.   This Agreement may be executed in counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.

8.   Governing Law/Jurisdiction.   This Agreement shall be construed in accordance with the laws of the State of Michigan, without reference to its conflict of law provisions, and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws.   The Bankruptcy Court of the Eastern District of Michigan shall have exclusive jurisdiction over any action or proceeding solely with respect to this Agreement, and each party, to the extent permitted by law, agrees to submit to such jurisdiction and to waive any defense based on venue or jurisdiction of such court.

9.   Amendment.   This Agreement may be amended, modified, superseded or canceled, and any of the terms, covenants, representations, warranties or conditions hereof may be waived only by an instrument in writing signed by each of the Parties.

10.   Limitation of Liability.   The obligation to make the State Contribution is not a general obligation or indebtedness of the State or the Authority and is subject to satisfaction of the conditions described herein.   Furthermore, neither the State nor the Authority has any liability or obligation arising from or related to the contributions and funding of the Income Stabilization Fund of each System.   Notwithstanding anything contained herein to the contrary, no State Related Entity or board member of the Authority shall have any liability for the representations, warranties, covenants, agreements or other obligations of the State or the Authority hereunder or in any of the certificates, notices or agreements delivered pursuant hereto.

11.   Severability.   If any one or more of the covenants, agreements or provisions of this Agreement shall be determined by a court of competent jurisdiction to be invalid, the invalidity of any such covenants, agreements and provisions shall in no way affect the validity or effectiveness of the remainder of this Agreement, and it shall continue in force to the fullest extent permitted by law.

12.   Headings.   Any headings preceding the text of the several articles and sections hereof, and any table of contents or marginal notes appended to copies hereof, shall be solely for convenience or reference and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect.

[Remainder of Page Intentionally Left Blank – Signatures on Following Page]

**MICHIGAN SETTLEMENT ADMINISTRATION AUTHORITY**


By: _____
Title: Authorized Officer


**GENERAL RETIREMENT SYSTEM OF THE CITY OF DETROIT**


By: _____
Title: Authorized Officer


By: _____
Title: Authorized Officer


**POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT**


By: _____
Title: Authorized Officer


By: _____
Title: Authorized Officer


**CITY OF DETROIT**

By: _____
Title: Emergency Manager

9

**EXHIBIT A – GRS Governance Terms**

*In re City of Detroit, Michigan*

# INVESTMENT COMMITTEE GOVERNANCE
## FOR GENERAL RETIREMENT SYSTEM

| | |
|---|---|
| PREAMBLE | This document was prepared to set forth the pension governance requirements under the State Contribution Agreement (as that term is defined in the City's Fourth Amended Plan for the Adjustment of Debts of the City of Detroit, as amended from time to time) applicable to the General Retirement System of the City of Detroit (GRS). |
| SCOPE OF SETTLEMENT | The GRS is currently administered by a ten (10) member Board of Trustees (the "Board") that is vested with the fiduciary authority for the general administration, management and operation of the Retirement System. The Board currently makes all administrative, actuarial and investment related decisions for the GRS. Upon the Effective Date under the POA, but subject to consummation of the State Contribution Agreement, there shall be established, by appropriate action and amendments to governing documents, an Investment Committee ("IC") at GRS which shall be vested with the authority and responsibilities as outlined herein for a period of twenty (20) years after the Effective Date of the POA. All administrative, managerial, and operational matters not addressed in this Term Sheet shall continue to be addressed by the Board in the ordinary course of its affairs. |
| INVESTMENT COMMITTEE | The IC shall consist of seven (7) voting members consisting of:<br>  i. Five (5) Independent Members;<br>  ii. One (1) Employee Member; and<br>  iii. One (1) Retiree Member.<br>Collectively, or individually, "Members" or "Member."<br><br>At least two (2) of the five (5) Independent Members of the committee shall be residents of the State of Michigan. None of the Independent Members shall be a party in interest as defined by MCL 38.1132d (4) to the City or the GRS.<br><br>Each Independent Member of the IC shall have expert knowledge or extensive experience with respect to either: (a) economics, finance, or institutional investments; or (b) administration of public or private retirement plans, executive management, benefits administration or actuarial science. At least one (1) of the IC Independent Members shall satisfy the requirements of (a) above and at least one (1) of the IC Independent Members shall satisfy the requirements of (b) above.<br><br>The five (5) initial IC Independent Members shall be selected by mutual agreement of the appropriate representatives of the State, the City and the Board, in consultation with the Foundation for Detroit's |

Future. The initial Independent Members and their terms of office will be as follows: Ken Whipple (2 years), David Sowerby (3 years), Robert Rietz (4 years), Doris Ewing (5 years) and Kerrie VandenBosch (6 years). Successor Independent Members shall be recommended by a majority of the remaining Independent Members and confirmed by the Board and the State Treasurer in consultation with the Foundation for Detroit's Future, in accordance with such rules and regulations as may be adopted by the IC, provided such rules and regulations are not inconsistent with the POA and this agreement. In the event the Board and the State Treasurer cannot agree on the successor Independent Member within thirty (30) days of the receipt of the recommendation of the IC, the remaining Independent Members of the IC shall appoint the successor Independent Member.

If no mutual agreement is reached as to the selection of one or more of the initial IC Independent Members by the time of confirmation of the City's Plan of Adjustment, then the Bankruptcy Court shall select the Independent Members necessary to fill the five (5) initial IC Independent Member positions for which no agreement has been reached.

In the event the Bankruptcy Court selects the initial Independent Members as described immediately above, successor Independent Members shall be appointed in the same manner as the Independent Member being replaced, as described immediately above, after three (3) weeks' notice to the Board of the individuals chosen, in accordance with such rules and regulations as may be adopted by the IC, provided such rules and regulations are not inconsistent with the POA and this agreement.

The Employee Member shall be an employee-elected Member from the Board appointed by the Board. The initial Employee Member will be June Nickleberry.

The Retiree Member shall be a retiree-elected Member from the Board appointed by the Board. The initial Retiree Member will be Thomas Sheehan.

The terms of office of the initial IC Independent Members shall be staggered at the time of appointment so that Independent Members shall have varying initial terms of office, with one each having a 2, 3, 4, 5 and 6 year term. Each initial Independent Member shall serve until the expiration of his/her initial term. After the initial term of office, the term of office of the IC Independent Members shall be six years. Each successor Independent Member shall be selected in accordance with the provisions above and shall serve until his or her death, incapacity, resignation or removal in accordance with the paragraph below. Upon expiration of his or her term of office, an Independent Member shall continue to serve until his or her successor is appointed. Nothing herein shall bar an initial Independent Member from becoming a successor Independent Member after his/her initial

2

term.

The terms of office of the Employee Members and Retiree Members of the IC shall conform to their respective terms of office on the Board.

A Member may be removed by the remaining Members for any of the following reasons: (a) the Member is legally incapacitated from executing his or her duties as a Member of the IC and neglects to perform those duties, (b) the Member has committed a material breach of GRS provisions, policies or procedures and the removal of the Member is in the interests of the system or its participants or its participants' beneficiaries, (c) the Member is convicted of a violation of law and the removal shall be accomplished by a vote of the IC in accordance with the voting procedures in this agreement, (d) if the Member holds a license to practice and such license is revoked for misconduct by any State or federal government, or (e) if an IC Member shall fail to attend scheduled meetings of the IC for four (4) consecutive meetings, unless in each case excused for cause by the remaining Members attending such meetings, the Member shall be considered to have resigned from the IC, and the IC shall, by resolution, declare the office of the Member vacated as of the date of adoption of such resolution. In addition, a Member of the IC may have voting privileges temporarily suspended by a 70% or higher vote of the other members if the Member is indicted or sued by a State or federal government for an alleged violation of the law that relates to his or her service on the IC, or for other alleged financial crimes, including fraud. Any vacancy occurring in the office of Member shall be filled within sixty (60) days following the date of the vacancy, for the unexpired portion of the term, in the same manner in which the office was previously filled.

All members of the IC shall be reimbursed for the reasonable, actual and necessary expenses incurred in the performance of their duties. All reasonable and proper expenses related to the administration of the IC, including but not limited to the purchase of insurance, shall be payable out of the assets of the GRS. The IC may retain actuarial, legal counsel, audit or other professional or support personnel to provide advice to the IC as it deems reasonably necessary to perform its functions and such parties or persons may be reasonably compensated from the assets of the Plan; such engagements shall not be subject to the approval of the Board.

The IC shall be an investment fiduciary to the GRS. An IC Member or other fiduciary under the GRS shall discharge his or her duties with respect to the GRS in compliance with the provisions of Public Act 314 of 1965, as amended. An IC Member shall discharge his or her duties with the care, skill, and caution under the circumstances then prevailing which a prudent person, acting in a like capacity and familiar with those matters, would use in the conduct of an activity of like character and purpose. Members of the IC shall comply with all Board governance policies and procedures, including the Ethics and

| | |
|---|---|
| | Code of Conduct Policies, unless such compliance violates the Member's fiduciary duties or conflicts with the terms and conditions of this agreement. |
| IC MEETINGS | The IC shall meet at least once every other month. The Members shall determine the time for the regular meetings of the IC and the place or places where such meetings shall be held. The Secretary or his or her designee shall be responsible for giving notice of the time and place of such meetings to the other Members.<br><br>Notice and conduct of all meetings of the IC, both regular and special, shall be held within the City of Detroit and in accordance with applicable law including the Michigan Open Meetings Act (MCL §15.261 et seq.).<br><br>The IC shall adopt its own rules of procedure and shall keep a record of its proceedings. Five (5) Members shall constitute a quorum at any meeting of the IC, so long as at least three (3) Independent Members are present. Each Member shall be entitled to one vote on each question before the IC and at least four (4) concurring votes shall be necessary for a decision of the committee except as otherwise provided in this Term Sheet. |
| INVESTMENT COMMITTEE - RESPONSIBILITY | The IC shall serve in a fiduciary capacity with respect to the Investment Management of all GRS Plan Assets, determination of the investment return assumption, and Board compliance with benefit plan provisions, as set forth more fully below. The IC shall have all the powers as a fiduciary under the first sentence of MCL §38.1133(5) and (6).<br><br>All Investment Management decisions approved by the Board shall require a recommendation by an affirmative vote of the IC, in accordance with the provisions of this agreement. All actions and recommendations of the IC shall be forwarded to the Board for consideration and are subject to Board approval. The Board shall take no action with respect to any matter for which the IC has responsibility and authority, including the Investment Management matters described in the next paragraph, unless and until such action has been approved by affirmative vote of the IC. If (a) the Board fails to approve or disapprove an Investment Management decision that has been recommended by an affirmative vote of the IC, and such failure continues for 45 days after the date that the recommendation was made to the Board, or (b) the Board disapproves an Investment Management decision within such 45-day period but fails to provide to the IC within such 45-day period a detailed written response outlining the reasons for such disapproval, then the IC and the Chief Investment Officer are authorized to implement the decision. If the Board disapproves an Investment Management decision within such 45-day period and provides to the IC within such 45-day period a detailed written |

4

13-53846-tjt  Doc 8045-1   Filed 10/20/14   Entered 10/20/14 05:47:23   Page 234 of
13-53846-swr  Doc 8045-1   Filed 10/20/14   Entered 10/20/14 05:48:23   Page 735 of
409
429

response outlining the reasons for such disapproval, then the IC shall have 45 days after the receipt of the Board response to either (a) withdraw the recommended Investment Management decision, or (b) request, in writing, a conference with the Board to be held within ten (10) days, but not less than five (5) business days, of such request by the IC, unless a later date is agreed to in writing by the Board and the IC, to discuss the disapproval by the Board described in the written response. Any such conference shall be conducted with at least three (3) Independent Members present in person or by phone. Within ten (10) days of the commencement of the conference, or twenty (20) days following the IC's request for a conference if no conference is held, the IC shall either withdraw the recommended Investment Management decision or provide the Board a written explanation of the IC's decision to proceed with the recommended Investment Management decision. After delivery of such written explanation by the IC, the IC and the Chief Investment Officer are authorized to implement the decision. Any action taken by the Board or the IC in violation of the terms of this agreement shall constitute an ultra vires act and the IC or the Board, whichever is applicable, is granted the express right to seek to preliminarily enjoin such violation of the breaching party without the need to show irreparable harm.

"Investment Management" with respect to plan assets shall mean:

1. Developing an Investment Policy Statement with sound and consistent investment goals, objectives and performance measurement standards which are consistent with the needs of the Plan.

2. Within 120 days after the Effective Date of the POA, all of the plan assets not already under qualified management, if any, must be managed by qualified managers selected by the IC.

3. Evaluating, retaining, terminating, and selecting qualified managers to invest and manage the plan assets.

4. Reviewing and affirming or rejecting the correctness of any and all calculations, actuarial assumptions and/or assessments used by the Plan Actuary including, but not limited to, (i) those underlying the restoration of pension benefits, funding levels and amortization thereof, all in accordance with the Pension Restoration Program attached to the City's Plan of Adjustment, (ii) those underlying the determination of annual funding levels and amortization thereof, and (iii) on or after fiscal year 2024 the recommended annual contributions to GRS in accordance with applicable law.

5. In accordance with approved actuarial work as provided in the immediate preceding paragraph and based on the annual actuarial valuation reports and

5

any other projections or reports as applicable from the Plan Actuary or other professional advisors, the determination of the extent of restoration of pension benefits, including but not limited to the payment of a portion of the 4.5% reduction in base monthly pension amounts and the payment of lost COLA payments, all in conformance to the Pension Restoration Program between the City and the Board attached to the Plan of Adjustment.

6. Communicating the investment goals, objectives, and standards to the investment managers; including any material changes that may subsequently occur.

7. Determining and approving the Plan's investment and asset allocation guidelines, taking into account the appropriate liquidity needs of the Plan.

8. Any interpretation of Plan documents, existing law, the POA or other financial determination that could affect funding or benefit levels.

9. Taking whatever corrective action is deemed prudent and appropriate when an investment manager fails to perform as expected.

10. Complying with the provisions of pertinent federal, state, and local laws and regulations, specifically Public Act 314 and Plan Investment Guidelines.

11. Reviewing and approving, prior to final issuance, the annual audit and all financial reports prepared on behalf of the GRS and meet and confer with the Plan's outside auditor or other professional advisors as necessary prior to approving the annual audit or other financial reports.

12. Causing an asset/liability valuation study to be performed for GRS every three (3) years, or as requested by the IC or Board.

The IC shall give appropriate consideration to and have an understanding of the following prior to the adoption of the investment guidelines and asset allocation policies, the selection of manager(s), and/or the adoption of investment return assumptions:

1. The fiduciary best practices and institutional standards for the investment of public employee retirement system plan assets.

2. The objective to obtain investment returns above the established actuarial investment return assumption to support the restoration of benefits under the Pension Restoration Program, to the extent that is prudent and consistent with the overall funding, liquidity needs and actuarial

6

13-53846-tjt  Doc 8045-1   Filed 10/20/14   Entered 10/20/14 05:47:23   Page 236 of
13-53846-swr  Doc 4805-1   Filed 10/20/14   Entered 10/20/14 05:48:23   Page 236 of
409

| | |
|---|---|
| | assumptions governing the Plan.<br>3. The liquidity needs of the GRS Plan. |
| CHIEF INVESTMENT OFFICER (CIO) | The IC shall evaluate and select the CIO, set and approve any and all compensation for, and terms of employment of, the CIO. With respect to plan assets, the CIO shall report directly to the IC and the Executive Director of the Board. The CIO shall be responsible for assisting the IC and the Board in overseeing the GRS's investment portfolio.<br><br>The initial CIO is Ryan Bigelow [subject to State due diligence.] |
| PLAN ACTUARY | The current Plan Actuary is Gabriel Roeder Smith & Company. In the event the Board desires to retain a new actuary, the Board and IC shall collectively participate in the evaluation and selection of a qualified Plan Actuary. The Plan Actuary shall be responsible for assisting the Board and IC in performing its actuarial duties and shall comply with all requests for information or modeling requested by the IC, and shall attend meetings of the IC as requested, so as to allow the IC to perform satisfactorily the rights and duties set forth herein. Furthermore, the Board shall not act on any recommendation made by the Plan Actuary based on any calculation, assumption or assessment rejected by the IC.<br><br>Nothing herein shall be interpreted as limiting the IC's authority to engage an actuarial consulting firm other than the Plan Actuary to perform actuarial services deemed necessary to fulfill its fiduciary duties to the GRS and other duties to GRS as set forth herein. |
| CONSISTENCY WITH PLAN OF ADJUSTMENT | Nothing herein shall be interpreted as permitting the IC or the Board to alter or depart from the requirements set forth in the confirmed Plan of Adjustment. |

DETROIT 56620-1 1315511v11

7

**EXHIBIT B – PFRS Governance Terms**

*In re City of Detroit, Michigan*

## INVESTMENT COMMITTEE GOVERNANCE
## FOR POLICE AND FIRE RETIREMENT SYSTEM

| | |
|---|---|
| PREAMBLE | This document was prepared to set forth the pension governance requirements under the State Contribution Agreement (as that term is defined in the City's Fourth Amended Plan for the Adjustment of Debts of the City of Detroit, as amended from time to time) applicable to the Police and Fire Retirement System of the City of Detroit (PFRS). |
| SCOPE OF SETTLEMENT | The PFRS is currently administered by a seventeen (17) member Board of Trustees (the "Board") that is vested with the fiduciary authority for the general administration, management and operation of the Retirement System.  The Board currently makes all administrative, actuarial and investment related decisions for the PFRS.  Upon the Effective Date under the POA, but subject to consummation of the State Contribution Agreement, there shall be established, by appropriate action and amendments to governing documents, an Investment Committee ("IC") at PFRS which shall be vested with the authority and responsibilities as outlined herein for a period of twenty (20) years after the Effective Date of the POA.  All administrative, managerial, and operational matters not addressed in this Term Sheet shall continue to be addressed by the Board in the ordinary course of its affairs. |
| INVESTMENT COMMITTEE | The IC shall consist of nine (9) voting members consisting of:<br>  i. Five (5) Independent Members;<br>  ii. Two (2) Employee Members; and<br>  iii. Two (2) Retiree Members.<br>Collectively, or individually, "Members" or "Member."<br><br>At least two (2) of the five (5) Independent Members of the committee shall be residents of the State of Michigan.  None of the Independent Members shall be a party in interest as defined by MCL 38.1132d (4) to the City or the PFRS.<br><br>Each Independent Member of the IC shall have expert knowledge or extensive experience with respect to either:  (a)economics, finance, or institutional investments; or (b) administration of public or private retirement plans, executive management, benefits administration or actuarial science.  At least one (1) of the IC Independent Members shall satisfy the requirements of (a) above and at least one (1) of the IC Independent Members shall satisfy the requirements of (b) above.<br><br>The five (5) initial IC Independent Members shall be selected by mutual agreement of the appropriate representatives of the State, the |

1

City and the Board, in consultation with the Foundation for Detroit's Future. The initial Independent Members and their terms of office will be as follows: Rebecca Sorenson (2 years), Joseph Bogdahn (3 years), Robert C. Smith (4 years), McCullough Williams III (5 years) and Woodrow S. Tyler (6 years). Successor Independent Members shall be recommended by a majority of the remaining Independent Members and confirmed by the Board and the State Treasurer in consultation with the Foundation for Detroit's Future, in accordance with such rules and regulations as may be adopted by the IC, provided such rules and regulations are not inconsistent with the POA and this agreement. In the event the Board and the State Treasurer cannot agree on the successor Independent Member within thirty (30) days of the receipt of the recommendation of the IC, the remaining Independent Members of the IC shall appoint the successor Independent Member.

If no mutual agreement is reached as to the selection of one or more of the initial IC Independent Members by the time of confirmation of the City's Plan of Adjustment, then the Bankruptcy Court shall select the Independent Members necessary to fill the five (5) initial IC Independent Member positions for which no agreement has been reached.

In the event the Bankruptcy Court selects the initial Independent Members as described immediately above, successor Independent Members shall be appointed in the same manner as the Independent Member being replaced, as described immediately above, after three (3) weeks' notice to the Board of the individuals chosen, in accordance with such rules and regulations as may be adopted by the IC, provided such rules and regulations are not inconsistent with the POA and this agreement.

The Employee Members shall consist of one active police member and one active fire member from the Board, appointed by the Board. The initial Employee Members will be Mark Diaz and Sean Neary.

The Retiree Members shall consist of one retiree-elected police member and one retiree-elected fire member from the Board, each receiving a pension from PFRS and appointed by the Board. The initial elected Retiree Members will be Michael Simon and Louis Sinagra.

Each of the four (4) uniformed Members shall have one-half (1/2) vote.

The terms of office of the initial IC Independent Members shall be staggered at the time of appointment so that Independent Members shall have varying initial terms of office, with one each having a 2, 3, 4, 5 and 6 year term. Each initial Independent Member shall serve until the expiration of his/her initial term. After the initial term of office, the term of office of the IC Independent Members shall be six years. Each successor Independent Member shall be selected in

2

accordance with the provisions above and shall serve until his or her death, incapacity, resignation or removal in accordance with the paragraph below. Upon expiration of his or her term of office, an Independent Member shall continue to serve until his or her successor is appointed. Nothing herein shall bar an initial Independent Member from becoming a successor Independent Member after his/her initial term.

The terms of office of the Employee Members and Retiree Members of the IC shall conform to their respective terms of office on the Board.

A Member may be removed by the remaining Members for any of the following reasons: (a) the Member is legally incapacitated from executing his or her duties as a Member of the IC and neglects to perform those duties, (b) the Member has committed a material breach of PFRS provisions, policies or procedures and the removal of the Member is in the interests of the system or its participants or its participants' beneficiaries, (c) the Member is convicted of a violation of law and the removal shall be accomplished by a vote of the IC in accordance with the voting procedures in this agreement, (d) if the Member holds a license to practice and such license is revoked for misconduct by any State or federal government, or (e) if an IC Member shall fail to attend scheduled meetings of the IC for four (4) consecutive meetings, unless in each case excused for cause by the remaining Members attending such meetings, the Member shall be considered to have resigned from the IC, and the IC shall, by resolution, declare the office of the Member vacated as of the date of adoption of such resolution. In addition, a Member of the IC may have voting privileges temporarily suspended by a 70% or higher vote of the other members if the Member is indicted or sued by a State or federal government for an alleged violation of the law that relates to his or her service on the IC, or for other alleged financial crimes, including fraud. Any vacancy occurring in the office of Member shall be filled within sixty (60) days following the date of the vacancy, for the unexpired portion of the term, in the same manner in which the office was previously filled.

All members of the IC shall be reimbursed for the reasonable, actual and necessary expenses incurred in the performance of their duties. All reasonable and proper expenses related to the administration of the IC, including but not limited to the purchase of insurance, shall be payable out of the assets of the PFRS. The IC may retain actuarial, legal counsel, audit or other professional or support personnel to provide advice to the IC as it deems reasonably necessary to perform its functions and such parties or persons may be reasonably compensated from the assets of the Plan; such engagements shall not be subject to the approval of the Board.

The IC shall be an investment fiduciary to the PFRS. An IC Member or other fiduciary under the PFRS shall discharge his or her duties with respect to the PFRS in compliance with the provisions of Public Act

3

| | |
|---|---|
| | 314 of 1965, as amended. An IC Member shall discharge his or her duties with the care, skill, and caution under the circumstances then prevailing which a prudent person, acting in a like capacity and familiar with those matters, would use in the conduct of an activity of like character and purpose. Members of the IC shall comply with all Board governance policies and procedures, including the Ethics and Code of Conduct Policies, unless such compliance violates the Member's fiduciary duties or conflicts with the terms and conditions of this agreement. |
| IC MEETINGS | The IC shall meet at least once every other month. The Members shall determine the time for the regular meetings of the IC and the place or places where such meetings shall be held. The Secretary or his or her designee shall be responsible for giving notice of the time and place of such meetings to the other Members.<br><br>Notice and conduct of all meetings of the IC, both regular and special, shall be held within the City of Detroit and in accordance with applicable law including the Michigan Open Meetings Act (MCL §15.261 et seq.).<br><br>The IC shall adopt its own rules of procedure and shall keep a record of its proceedings. Five (5) Members shall constitute a quorum at any meeting of the IC, so long as at least three (3) Independent Members are present. Each Member shall be entitled to one vote on each question before the IC and at least four (4) concurring votes shall be necessary for a decision of the committee, except as otherwise provided in this Term Sheet. |
| INVESTMENT COMMITTEE - RESPONSIBILITY | The IC shall serve in a fiduciary capacity with respect to the Investment Management of all PFRS Plan Assets, determination of the investment return assumption, and Board compliance with benefit plan provisions, as set forth more fully below. The IC shall have all the powers as a fiduciary under the first sentence of MCL §38.1133(5) and (6).<br><br>All Investment Management decisions approved by the Board shall require a recommendation by an affirmative vote of the IC, in accordance with the provisions of this agreement. All actions and recommendations of the IC shall be forwarded to the Board for consideration and are subject to Board approval. The Board shall take no action with respect to any matter for which the IC has responsibility and authority, including the Investment Management matters described in the next paragraph, unless and until such action has been approved by affirmative vote of the IC. If (a) the Board fails to approve or disapprove an Investment Management decision that has been recommended by an affirmative vote of the IC, and such failure continues for 45 days after the date that the recommendation was made to the Board, or (b) the Board disapproves an Investment Management decision within such 45-day period but fails to provide to the IC within |

4

such 45-day period a detailed written response outlining the reasons for such disapproval, then the IC and the Chief Investment Officer are authorized to implement the decision. If the Board disapproves an Investment Management decision within such 45-day period and provides to the IC within such 45-day period a detailed written response outlining the reasons for such disapproval, then the IC shall have 45 days after the receipt of the Board response to either (a) withdraw the recommended Investment Management decision, or (b) request, in writing, a conference with the Board to be held within ten (10) days, but not less than five (5) business days, of such request by the IC, unless a later date is agreed to in writing by the Board and the IC, to discuss the disapproval by the Board described in the written response. Any such conference shall be conducted with at least three (3) Independent Members present in person or by phone. Within ten (10) days of the commencement of the conference, or twenty (20) days following the IC's request for a conference if no conference is held, the IC shall either withdraw the recommended Investment Management decision or provide the Board a written explanation of the IC's decision to proceed with the recommended Investment Management decision. After delivery of such written explanation by the IC, the IC and the Chief Investment Officer are authorized to implement the decision. Any action taken by the Board or the IC in violation of the terms of this agreement shall constitute an ultra vires act and the IC or the Board is granted the express right to seek to preliminarily enjoin such action without the need to show irreparable harm.

"Investment Management" with respect to plan assets shall mean:

1. Developing an Investment Policy Statement with sound and consistent investment goals, objectives and performance measurement standards which are consistent with the needs of the Plan.
2. Within 120 days after the Effective Date of the POA, all of the plan assets not already under qualified management, if any, must be managed by qualified managers selected by the IC.
3. Evaluating, retaining, terminating and selecting qualified managers to invest and manage the plan assets.
4. Reviewing and affirming or rejecting the correctness of any and all calculations, actuarial assumptions and/or assessments used by the Plan Actuary including, but not limited to, (i) those underlying the restoration of pension benefits, funding levels and amortization thereof, all in accordance with the Pension Restoration Program attached to the City's Plan of Adjustment, (ii) those underlying the determination of annual funding levels and amortization thereof, and (iii) on or after fiscal year 2024, the recommended annual contributions to PFRS in accordance with applicable law.

5

5. In accordance with approved actuarial work as provided in the immediate preceding paragraph and based on the annual actuarial valuation reports and any other projections or reports as applicable from the Plan Actuary or other professional advisors, the determination of the extent of restoration of pension benefits, including but not limited to the payment of lost COLA payments, all in conformance to the Pension Restoration Program between the City and the Board attached to the Plan of Adjustment.

6. Communicating the investment goals, objectives, and standards to the investment managers; including any material changes that may subsequently occur.

7. Determining and approving the Plan's investment and asset allocation guidelines, taking into account the appropriate liquidity needs of the Plan.

8. Any interpretation of Plan documents, existing law, the POA or other financial determination that could affect funding or benefit levels.

9. Taking whatever corrective action is deemed prudent and appropriate when an investment manager fails to perform as expected.

10. Complying with the provisions of pertinent federal, state, and local laws and regulations, specifically Public Act 314 and Plan Investment Guidelines.

11. Reviewing and approving, prior to final issuance, the annual audit and all financial reports prepared on behalf of the PFRS and meet and confer with the Plan's outside auditor or other professional advisors as necessary prior to approving the annual audit or other financial reports.

12. Causing an asset/liability valuation study to be performed for PFRS every three (3) years, or as requested by the IC or Board.

The IC shall give appropriate consideration to and have an understanding of the following prior to the adoption of the investment guidelines and asset allocation policies, the selection of manager(s), and/or the adoption of investment return assumptions:

1. The fiduciary best practices and institutional standards for the investment of public employee retirement system plan assets.

2. The objective to obtain investment returns above the established actuarial investment return assumption to support the restoration of benefits under the Pension Restoration Program, to the

6

| | |
|---|---|
| | extent that is prudent and consistent with the overall funding, liquidity needs and actuarial assumptions governing the Plan.<br>3. The liquidity needs of the PFRS Plan. |
| CHIEF INVESTMENT OFFICER (CIO) | The IC shall evaluate and select the CIO, set and approve any and all compensation for, and terms of employment of, the CIO. With respect to plan assets, the CIO shall report directly to the IC and the Executive Director of the Board. The CIO shall be responsible for assisting the IC and the Board in overseeing the PFRS's investment portfolio.<br><br>The initial CIO is Ryan Bigelow [subject to State due diligence.] |
| PLAN ACTUARY | The current Plan Actuary is Gabriel Roeder Smith & Company. In the event the Board desires to retain a new actuary, the Board and IC shall collectively participate in the evaluation and selection of a qualified Plan Actuary. The Plan Actuary shall be responsible for assisting the Board and IC in performing its actuarial duties and shall comply with all requests for information or modeling requested by the IC, and shall attend meetings of the IC as requested, so as to allow the IC to perform satisfactorily the rights and duties set forth herein. Furthermore, the Board shall not act on any recommendation made by the Plan Actuary based on any calculation, assumption or assessment rejected by the IC.<br><br>Nothing herein shall be interpreted as limiting the IC's authority to engage an actuarial consulting firm other than the Plan Actuary to perform actuarial services deemed necessary to fulfill its fiduciary duties to the PFRS and other duties to PFRS as set forth herein. |
| CONSISTENCY WITH PLAN OF ADJUSTMENT | Nothing herein shall be interpreted as permitting the IC or the Board to alter or depart from the requirements set forth in the confirmed Plan of Adjustment. |

DETROIT 56620-1 1315534v8

7

## EXHIBIT C

1. General Retirement System

2. Police and Fire Retirement System

3. AFSCME

4. UAW

5. Detroit Police Officers Association

6. Detroit Police Command Officers Association

7. Detroit Police Lieutenants and Sergeants Association

8. Detroit Fire Fighters Association

9. Retired Detroit Police and Fire Fighters Association

10. Retired Detroit Police Members Association

11. Detroit Retired City Employees Association

12. Official Retirees Committee

13. City of Detroit

# EXHIBIT D

Cases to be dismissed:

1. GRS et al. v. Emergency Manager of Detroit (Ingham County Circuit Court)
2. Webster et al. v. State of Michigan, Governor, and State Treasurer (Ingham County Circuit Court)
3. Detroit Library Commission v. Governor, State Treasurer, and Detroit Public Schools Emergency Manager (Ingham County)
4. Flowers et al. v. Governor, State Treasurer, and State of Michigan (Ingham County Circuit Court)
5. DPOA v. City of Detroit (Michigan Court of Appeals)

The settling parties will not attempt to amend to include the City of Detroit or its Emergency Manager as a defendant, or collaterally or retroactively attack the Detroit bankruptcy or actions of Detroit or its EM, or otherwise participate, support, fund or appeal in the following cases:

1. Phillips et al v. Governor and State Treasurer (E.D. Mich.)
2. Michigan AFSCME Council 25 v. Governor, State Treasurer, et al. (E.D. Mich.)
3. NAACP v. Governor, State Treasurer, and Secretary of State (E.D. Mich.)
4. Robert Davis/Citizens United Against Corrupt Government v. Governor, State of Michigan, Dept. of Treasury, Dept. of State Police, et al. (Ingham County Circuit Court)
5. Robert Davis/Citizens United Against Corrupt Government v. Michigan Department of Treasury and Carla Robert (Wayne County Circuit Court)
6. Robert Davis v. Local Emergency Financial Assistance Loan Board (Ingham Court)
7. Robert Davis v. Weatherspoon, Governor, Attorney General, and State Treasurer (E.D. Mich.)
8. Allen Park Retirees v. EM Parker, City of Allen Park (Wayne Circuit)
9. Allen Park Retirees v. State (Court of Claims)
10. Deborah Moore-El v. Snyder (E.D. Mich.)
11. Faith, et al. v. Snyder (E.D. Mich.)
12. Sarella Johnson, et al. v. Snyder (E.D. Mich.)
13. United Retired Government Employees (URGE) et al. v. Governor, et al. (E.D. Mich.)

DETROIT 56620-1 1314985v13

**EXHIBIT I.A.340**

FORM OF SYNCORA DEVELOPMENT AGREEMENT

13-53846-tjt   Doc 8405-21   Filed 10/20/14   Entered 10/20/14 15:47:43   Page 293 of
439
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 05:46:29   Page 742 of
809

<u>**DEVELOPMENT AGREEMENT**</u>

**OPTION TO PURCHASE AND DEVELOP LAND**

**BY AND BETWEEN**

**CITY OF DETROIT**

**AND**

**PIKE POINTE HOLDINGS, LLC**

     **THIS AGREEMENT** (referred to herein as the "<u>Agreement</u>") is entered into as of the _____ day of September, 2014 (the "<u>Effective Date</u>"), by and between the City of Detroit, a Michigan public body corporate (the "<u>City</u>"), acting through its Planning & Development Department ("<u>PDD</u>"), whose address is 2300 Cadillac Tower, Detroit, Michigan 48226, and Pike Pointe Holdings, LLC, a Delaware limited liability company ("<u>Developer</u>"), whose address is [ _____ ]. The City and Developer are sometimes referred to in this Agreement as a "Party" and, collectively, as the "Parties."

**Recitals:**

    A.    In consideration of the Parties' various contractual arrangements entered into contemporaneously herewith, including without limitation, extension of the lease of the Windsor Tunnel between the City and affiliates of Developer, and the mutual desire of the Parties to promote economic growth in the City (the "<u>Arrangement</u>"), the City has agreed to grant an option to Developer to acquire various parcels of land located in the City of Detroit as described in the attached **Exhibit A** (each a "<u>Property</u>" and, collectively, the "<u>Properties</u>"). Unless otherwise set forth herein, references in this Agreement to a Property shall apply only to the applicable Property and not the other Properties.

1

B.    If Developer exercises its option with respect to one or more of parcels of the Property as set forth herein, Developer shall develop such Property in accordance with the terms and provisions of this Agreement.

Accordingly, the Parties agree as follows:

## Section 1.    TERMS OF OPTION

(A)    <u>Grant of Option</u>. The City hereby grants to Developer an option (the "<u>Option</u>") to, from time to time, acquire any or all of the Properties from the City upon the terms and conditions set forth in this Agreement.  The Option shall be effective for five (5) years from the Effective Date, except with respect to that certain Property located at 2200 Franklin for which the Option shall be effective for seven (7) years from the Effective Date (the "<u>Option Period</u>"). The Parties agree and acknowledge that the sole and exclusive consideration for the Option and any subsequent acquisition of any Property hereunder is deemed to be the Arrangement, the sufficiency of which is hereby acknowledged.  The City shall cause to be recorded and maintained of record against the Properties in the appropriate land records for the duration of the Option Period the memorandum of option attached hereto as **Exhibit B**. Notwithstanding the foregoing, the Option Period may be extended for a period not to exceed two (2) years upon written consent of the City, which consent shall not be unreasonably withheld, conditioned or delayed (the "<u>Option Extension</u>").   For purposes of the Option Extension, it shall be unreasonable for the City to withhold consent thereto to the extent that, (i) on the date of Developer's request therefor, development in the immediate vicinity of the Property has materially decreased or the general economic condition of the City or geographic region in which the Property is located has deteriorated, in either instance from and after the Effective Date to such a level that it would not be economically feasible for the Developer to pursue development of the Property and/or (ii) the Option Extension is reasonable given the complexity of the development contemplated by the Developer.  Any dispute between the Parties with regard to a request for Option Extension which cannot be resolved by the Parties within sixty (60) days following the Developer's request therefor shall be brought in the Bankruptcy Court for so long as it has jurisdiction, and thereafter in the United States District Court for the Eastern District of Michigan; provided, that if the United States District Court for the Eastern District of Michigan does not have jurisdiction, then such legal action, suit or proceeding shall be brought in such other court of competent jurisdiction located in Wayne County, Michigan; provided, further, by execution and delivery of this Agreement, each of the Parties irrevocably accepts and submits to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding and specifically consents to the jurisdiction and authority of the Bankruptcy Court to hear and determine all such actions, suits, and proceedings under 28 U.S.C. §157(b) or (c), whichever applies.

(B)    Diligence Notice.  If the Developer desires (in its sole discretion) to undertake Due Diligence Activities (as hereinafter defined) with respect to one or more of the Properties, the Developer shall, from time to time, give prior written notice of its intent thereof to the City not less than sixty (60) days prior to the expiration of the Option Period (each, a "Diligence Notice").  The Developer shall be entitled to deliver any number of Diligence Notices with respect to the various Properties during the Option Period; provided, however, that any such Diligence Notice shall indicate reference to the Property the Developer intends to subject to the Due Diligence Activities hereunder.

(C)    Condition of Property.

(1)    Due Diligence Activities. Subject to the requirements of Section 2 below, upon delivery of the Diligence Notice to the City with respect to any Property, Developer shall have a period commencing on the date of the Diligence Notice and continuing through and including the date that is sixty (60) days prior to the expiration of the Option Period (the "Due Diligence Period") to conduct its due diligence activities on any Property that is the subject of a Diligence Notice.   For purposes of this Agreement, "Due Diligence Activities" include but are not limited to the following:

(a)    such physical inspections, surveys, soil borings and bearing tests, possible relocation of utilities, and such environmental due diligence on or for the Property as Developer deems appropriate, all of which shall be completed at Developer's expense;

(b)    investigations, environmental site assessments, including Phase I and Phase II site assessments, sampling and testing of soil, groundwater, surface water, soil vapors, indoor air, and building materials (such as Asbestos and lead-based paint), and/or a Baseline Environmental Assessment, ("BEA"), as defined in Part 201 of the Natural Resources and Environmental Protection Act ("NREPA"), being MCL 324.20101 *et seq*., and such other investigations and assessments as Developer may deem needed in its sole discretion to determine the condition of the Property and the Property's compliance with Environmental Law and any other federal, state and local laws, rules, regulations and orders relating in any way to protection of human health, the environment and natural resources, all of which shall be completed at Developer's expense; and

(c)    a review of the title evidence, survey, entitlements, and payment of taxes and assessments, all of which shall be completed at Developer's expense.

(d)    a review of financing sources related to Developer's proposed development and use of the Property, or any other matter that in Developer's sole discretion is relevant to Developer's acquisition of the Property.

(e)    a review of all City Information and all publicly-available information with respect to the Property.

(f)    a review of available public and private utilities and public accesses necessary for the proposed development of the Property.

3

(f)     application and procurement of any zoning, site plan, elevation, special land use, environmental, conditional use or other municipal approvals or permits, or variances therefrom, required or appropriate for the proposed development of the Property.  The City hereby authorizes the Developer to submit and apply for all such approvals, permits, and variances upon the commencement of the Due Diligence Period.

(2)     City Information.  The City shall use reasonable efforts to make available to Developer all information in the City's (or the City's agencies' or departments') possession or control related to the applicable Property within thirty (30) days following delivery to the City of a Diligence Notice for the applicable Property, including but not limited to existing leases, licenses, permits, approvals, contracts, warranties, title searches and policies, surveys, appraisals, environmental audits, Phase I environmental site assessments, Phase II reports or other testing or sampling data, asbestos surveys, reports, specifications, from the Planning, Building, Assessing, Environmental Affairs and Fire Departments, notices of violations of applicable laws, regulations and ordinances or other documents in the City's possession or control related to the applicable Property (collectively, the "City Information").  The City shall cooperate with the Developer and use reasonable efforts to facilitate the Developer's Due Diligence Activities, all at no material incremental cost to the City, including providing information, coordinating with tenants or other third party users of the Property as applicable, and executing such documentation as may be reasonable and necessary for Developer's access to the site and completion of the Due Diligence Activities including the preparation of a BEA.

(3)     Insurance.  Prior to entering onto any Property for any Due Diligence Activities, Developer or its contractors shall maintain the insurance coverage and comply with the insurance requirements specified in the City's Right-of-Entry, a form of which is attached as **Exhibit C** (the "Right-of-Entry").

(4)     Indemnity.  Developer shall defend, indemnify and hold harmless the City from and against any loss, liability, cost or expense incurred by the City to the extent resulting from Developer's (including its duly authorized employees, agents, engineers or other representatives) negligence or willful acts occurring in connection with the Due Diligence Activities; provided, however, that (i) in the event Developer provides an Objection Notice or otherwise elects not to proceed to Closing, the Developer shall in no circumstance have any obligation or liability with respect to any conditions pre-existing at the Property including without limitation any environmental condition, soil or groundwater contamination or other environmental conditions that may discovered in the course of the Developer's Due Diligence Activities and thereafter disclosed to the City as required hereunder, except to the extent such conditions are materially exacerbated due to the negligence or willful acts of Developer or any of its duly authorized employees, agents, engineers or other representatives, and (ii) the Developer shall not be responsible for any loss, liability, cost, or expense resulting from the discovery of any adverse information or condition regarding the applicable Property or from the City's (or the City's agencies' or departments') negligence or misconduct.

(5)     Results of Due Diligence Activities.  If Developer concludes, in Developer's sole discretion, that a particular Property is satisfactory, then Developer shall so

CHI-1941899v10

notify the City in writing on or before the last day of the Due Diligence Period, by sending an "Election Notice," and the parties shall proceed to closing the applicable Property subject to other terms and conditions of this Agreement. If Developer concludes, in Developer's sole discretion, that, for any reason or for no reason, a particular Property is not satisfactory, then Developer shall so notify the City in writing on or before the last day of the Due Diligence Period, by sending a "Rejection Notice," and the parties shall not proceed to Closing with respect to the applicable Property at such time. In the event the Developer issues a Rejection Notice with respect to any Property, Developer may not later elect to re-commence Due Diligence Activities with respect to the same Property and the Option granted hereunder with respect to such Property will be thereafter deemed released and of no further force or effect. If Developer concludes, in Developer's sole discretion, as a result of the Due Diligence Activities that the condition of the Property is not satisfactory but Developer wants the City to cure such unsatisfactory conditions, then Developer shall notify the City in writing on or before the last day of the Due Diligence Period, by sending an "Objection Notice" setting forth with reasonable specificity the particular condition of the applicable Property which is unacceptable to Developer (each such condition referred to as a "Defect"). The City shall have the right, but not the obligation, within sixty (60) days of the Objection Notice (the "City Cure Period"), to cure such Defects; provided, however, that the City shall be required to cure any liens or encumbrances (collectively, a "Mandatory Cure") (x) in favor of the City or any agency or department of the City or (y) result from a violation of Section 5(G) of this Agreement. If the City is unable or unwilling to cause any or all of the Defects (other than Mandatory Cures which the City shall be obligated to cure) during such City Cure Period, Developer shall have the right to either (i) elect not to exercise the Option with respect to the applicable Property by sending written notice to City of such election within two (2) days after the expiration of the City Cure Period, in which event the Developer may later elect to commence Due Diligence Activities with respect to the same Property by delivery of a Diligence Notice pursuant to the terms of Section 1(B) above; or (ii) waive its objection to such Defects and accept the Property subject to those Defects (Developer being deemed to have elected this option (ii) if it fails to make the election in the preceding option (i)). If Developer fails to provide an Election Notice or an Objection Notice within the Due Diligence Period, then Developer shall be deemed to have delivered a Rejection Notice with respect to the applicable Property. Notwithstanding any provision herein to the contrary, the City agrees to (1) cooperate with the Developer in clearing title to the Property to the extent that the title related Defects described in the Objection Notice are within the reasonable control of the City to address or eliminate and (2) cure all Mandatory Cure Defects. In the event that the expiration of the City Cure Period for a particular Property occurs (or would occur) after the expiration of the Option Period, the Option Period shall be extended for such Property until the date that is fifteen (15) days after the expiration of the applicable City Cure Period.

(6)     As Is Condition of Property; City Cooperation. From time to time with respect to each Property, subject to the earliest to occur of (i) delivery by Developer of an Election Notice, (ii) written notice to Developer that the City has cured all Defects set forth in an Objection Notice provided prior to the expiration of the City Cured Period, or (iii) waiver by Developer of any Defects, each pursuant to Section 1(C)(5) above, closing of the transactions contemplated hereby with respect to a particular Property (each, a "Closing") shall be on an "as-is, where-is" basis and the Developer shall take the applicable Property as it finds it at Closing

5

other than a matter resulting from a violation of the covenant set forth in Section 5(G) of this Agreement. The City makes no implied or express representations or warranties of any kind as to its condition, including its environmental condition and any other condition that may adversely affect the development, or its fitness for absolutely any purpose whatsoever. By proceeding to Closing after completion of its Due Diligence Activities, Developer will acknowledge that it is satisfied with the condition of the applicable Property, except as otherwise provided in this Agreement. By accepting title to the applicable Property at Closing, Developer shall be deemed to have waived any right to object to the status of title or to the condition of the applicable Property, regardless of the result of any Due Diligence Activities, and shall be deemed to have declared its full satisfaction with the status of title to and condition of the applicable Property, except as otherwise provided in this Agreement.

(7)     <u>Release of City from Liability</u>. Upon Closing on any particular Property, Developer shall release the City and its officials, employees, and agents (but not any third party) from any and all claims or causes of action the Developer may have against the City for any liability, injury or loss as a result of any physical defects in or physical conditions of the applicable Property, including but not limited to any surface, subsurface, latent or patent conditions whether naturally occurring or by action of any party, including but not limited to environmental condition, other than a matter resulting from a violation of the City's covenant set forth in Section 5(G)(ii) of this Agreement.

(8) <u>Security of Properties</u>. In the event that a Property is vacant or otherwise not being utilized by the City, without imposing any liability or obligation with respect thereto, commencing on the commencement of Due Diligence Activities with respect to such Property, Developer shall have the right, but not the obligation, it is sole and absolute discretion, at Developer's cost and expense, to undertake any actions it deems reasonably necessary to secure the Property and prevent damage or unauthorized access to the applicable Property, including, without limitation, installing and maintaining fencing and/or signage on the applicable Property. As a condition to Developer exercising its right hereunder to secure any Property, the Developer must first obtain a general liability policy of insurance in connection with such activities in form and amount reasonably satisfactory to the City, with the City named as an additional insured thereto. In addition, Developer shall not be deemed to be in control of or operating the applicable Property as a result of Developer's undertaking of any security measures with respect to this section. Notwithstanding the foregoing, in exercising its right to secure the Property provided for herein, Developer shall not be deemed to have warranted to the City the effectiveness of the security measures so implemented.

(D)     <u>Manner of Conveyance</u>. At the Closing, the applicable Property shall be conveyed to Developer (or its designee) by one or more quit claim deeds substantially in the form of the deed set forth in **Exhibit D** (the "<u>Deeds</u>") using legal descriptions approved by Developer and the City.

(E)     <u>Brokerage and Finder's Fees and Commission</u>. Developer will defend and indemnify the City and hold it harmless with respect to any commissions, fees, judgments, or expenses of any nature and kind that the City or Developer may become liable to pay by reason of any claims by or on behalf of brokers, finders or agents claiming by, through or under Developer incident to this Agreement and the transaction contemplated hereby or any litigation

6

or similar proceeding arising therefrom unless the City has a written agreement with a broker, finder or agent providing for such payment in which case the City shall be responsible for such broker, finder or agents' commissions, fees, judgments or expenses. To the maximum extent permitted by applicable law, the City will defend and indemnify the Developer and hold it harmless with respect to any commissions, fees, judgments, or expenses of any nature and kind that the City or Developer may become liable to pay by reason of any claims by or on behalf of brokers, finders or agents claiming by, through or under the City incident to this Agreement and the transaction contemplated hereby or any litigation or similar proceeding arising therefrom unless the Developer has a written agreement with a broker, finder or agent providing for such payment in which case the Developer shall be responsible for such broker, finder or agents' commissions, fees, judgments or expenses.

(F)     Taxes And Assessments.

(1)     Property on Tax Rolls at Closing. All taxes and assessments which (i) have become a lien upon the Property or part thereof prior to the date of Closing, and (ii) have been discovered and specifically identified by Developer prior to the applicable Closing, shall be paid by the City and shall be a Mandatory Cure; provided, however, that all current property taxes shall be prorated and adjusted to the date of Closing on a due date basis. From and after each Closing, Developer shall be solely responsible for all taxes, liens, and assessments that become due and payable for the period after the applicable Closing against the applicable Property it acquires hereunder or any part thereof, whenever assessed, levied, or due, and shall have no claim against the City on account thereof.

(2) Approval of Requests for Economic Incentives/Entitlements and Land Use Approvals.

(i)     The City agrees to consider any requests by Developer or its designee for any development or economic inducements (including tax abatements, tax credits, tax increment financing, grants, loans, cost reimbursements and like development incentives) for which any of the Properties are eligible, whether or not such requests are made as part of Developer's Due Diligence Activities or thereafter. The City also agrees to cooperate with and support Developer or its designee in any request to procure such development or economic inducements from other governmental authorities (whether or not related to or controlled by City).

(ii)     The City agrees to consider requests or applications by Developer or its designee for approvals relating to zoning, site plans, special use permits, uses, variances or other municipal approvals that are necessary or appropriate to develop the Properties, provided that if the requests pertain to any of the Properties other than 1300 Beaubien, such requests are for uses that are consistent with the SD4 zoning classification as of the Effective Date or otherwise are consistent with residential, parking, retail or commercial uses permitted within the SD4 zoning classification as currently in effect or other uses suitable for the location.

(iii)     The following shall apply to any consideration or cooperation by the City with respect to any formal requests made by Developer or its designee to the City, described in subsections (i) or (ii) of this Section: (a) the City agrees to process such requests pursuant

7

to its ordinary processes for the applicable requests, (b) the City shall not unreasonably withhold, condition or delay approvals of the applicable requests, and shall not unreasonably impede or interfere with development activities consistent with this Agreement, (c) the City shall not discriminate against Developer or its designee in the consideration or approval of such requests on account of the Arrangement, the events leading up to the Arrangement or this Agreement, and (d) the City shall use reasonable efforts to facilitate such requests, taking into consideration other similar requests for approvals or inducements, as applicable, of third parties granted by the City for similarly situated developments and uses as those contemplated by Developer for the Property; provided, however, the City shall process such requests pursuant to all then applicable rules, regulations, statutes and similar requirements.

(G) <u>Inability to Convey</u>. Subject to the Developer's rights under Section 6(D) below, if, for any reason, the City is unable to convey title to a particular Property to the Developer upon exercise of the Option and Developer's election to proceed to Closing with respect to the applicable Property pursuant to the terms of this Agreement, which shall include (i) if the City (or an agency or department of the City) does not own title to such Property, (ii) there is a Defect that is not cured or removed as of the Closing and such Defect materially hinders Developer's ability to develop the applicable Property in an economically viable manner, (iii) there are any uncured Mandatory Cure items, or (iv) if Developer determines that the scope or expense of any environmental remediation necessary to develop the applicable Property would make the development thereof, as contemplated by the Developer, economically unfeasible, the Developer and the City shall mutually agree upon alternate consideration commensurate to the undeveloped, fair-market value of the applicable Property (the "<u>Alternate Consideration</u>"); provided, however, that such value shall assume that any applicable Defects have been removed; provided, further, that, with respect to the applicable Property, the reasonable, actual and out-of-pocket acquisition and development costs incurred by Developer or its designee after the Effective Date and prior to the date upon which Developer or its designee obtains actual knowledge of the existence of the particular Defect or condition of such Property giving rise to Alternate Consideration, including, without limitation, costs associated with Due Diligence Activities, remediation activities, and architect, engineering, and design activities, shall be included in the amount of Alternate Consideration to the extent Alternate Consideration is required pursuant to Section 1(G)(i) or 1(G)(iii) above.

To the extent the Parties do not agree on the Alternate Consideration within sixty (60) days of establishing that Alternative Consideration is required, then, within thirty (30) days thereafter, the Developer and the City shall deliver to each other Developer's or City's, as the case may be, determination of the Alternate Consideration (which shall be in the form of an alternate parcel of real property or cash payment amount). Within ten (10) days after each Party delivers to the other party such Party's determination of the Alternate Consideration, the Developer and the City shall each appoint one disinterested appraiser having the qualifications set forth herein. Each such appraiser must be a Member of the Appraisal Institute (MAI) and have at least ten (10) years of experience appraising commercial or industrial property in the Detroit metropolitan area as a MAI appraiser. If either the Developer or the City fails to appoint an appraiser within such ten (10) day period, the appraiser appointed by the Developer or the City, as the case may be, shall appoint an appraiser having the qualifications set forth herein. As promptly as possible, but in no event later than thirty (30) days after the appointment of both

8

appraisers, the appraisers shall notify the Developer and the City in writing of their determination of which of the Developer's or the City's determination more closely approximates Alternate Consideration (all as valued as of the determination date). The Alternate Consideration so selected by the two appraisers will constitute the Alternate Consideration for purposes of this section, and will be binding upon the Developer and the City. If the two appraisers are unable to agree as to the Alternate Consideration, then the two appraisers shall promptly agree upon and appoint a third appraiser having the qualifications set forth herein. The third appraiser shall, within thirty (30) days of appointment, determine which of the two determinations of the Developer or the City more closely approximates Alternate Consideration, and shall notify the Developer and the City thereof. The Alternate Consideration selected by the third appraiser will constitute the Alternate Consideration for purposes of this section, and will be binding upon the Developer and the City. To the extent the Alternate Consideration selected by the appraisers hereunder is real property, (i) such real property shall be reasonably acceptable to Developer, and (ii) the City may elect in its sole discretion to satisfy such Alternate Consideration in the form of a cash payment to the Developer in an amount equal to the appraisers' determination of the cash value of the Alternate Consideration selected. To the extent the Alternate Consideration to be given to the Developer hereunder is real property, the City shall be deemed to be have granted Developer an option with respect to such Alternative Consideration property pursuant to the same terms as this Agreement; provided, however, that the time periods with respect to such option, including without limitation, the Option Period, shall commence upon the date that such new option with respect to the Alternative Consideration is granted to Developer and not as of the Effective Date.

(H)     Use of the Properties During the Due Diligence Period.  Commencing on the commencement of the Due Diligence Period, Developer shall have the right (but not the obligation), in its sole discretion, to elect to utilize all or a portion of the Properties identified on Schedule 1(H) prior to acquiring title of the Use Property for the operations of a surface lot parking facility and ancillary uses (collectively, the "Parking Use") by providing thirty (30) days' prior written notice thereof to City (a "Use Notice").  The Use Notice shall identify the Properties that will be used by Developer for the Parking Use (collectively, the "Use Property"). Developer's right to utilize the Use Property for the Parking Use shall commence as a license from the City upon the expiration of thirty (30) days following the delivery of the Use Notice to the City.  Developer shall have the right to enter into an agreement with a third party to operate the Parking Use on the Use Property.  Developer shall pay all costs associated with the Parking Use of the Use Property (including all federal, state and local taxes and charges as may be applicable thereto; however, Developer shall not be responsible for ad valorem property taxes during the Use Period) and shall receive all revenue with respect thereto.  In the event that Developer delivers a Use Notice, Developer shall be required to deliver an Election Notice with respect to the Use Property; provided however, Developer shall have the right to elect at what point during the Due Diligence Period such Election Notice is given by providing written notice of such election prior to the expiration of the Due Diligence Period. The period between a Use Notice and Closing shall be referred to herein as the "Use Period."  If Developer fails to deliver such election prior to the expiration of the Due Diligence Period, Developer shall be deemed to have delivered an Election Notice with respect to the Use Property on the last day of the Due Diligence Period.  Developer shall maintain such commercially reasonable insurance as is customary for operations similar to the Parking Use on the Use Property and shall defend,

9

indemnify and hold harmless the City from and against any loss, liability, cost or expense incurred by the City to the extent resulting from the Parking Use; provided, however, that the Developer shall not be responsible for any loss, liability, cost, or expense resulting from the City's (or of the City's agencies' or departments') negligence or misconduct.  Developer shall at all times keep the Use Property clean and free of debris and shall not permit any area of the Use Property to be littered with refuse during the Use Period.  The City disclaims all representations and warranties as to the condition of the Use Property, including, but not limited to, any implied or express warranty of fitness of the Use Property for the Parking Use.  Developer covenants and agrees that it shall not use the Use Property during the Use Period in any manner which violates the laws of the United States of America, the laws of the State of Michigan or any ordinances or other regulations of any governing municipality or other political subdivision.  Developer's use of the Use Property and any activities or actions of Developer or its designee in connection therewith shall not be deemed a violation of the City's covenants under Section 5(G) below.

**Section 2.  ENVIRONMENTAL MATTERS**

    (A)   <u>Definitions</u>.  The following words and expressions shall, wherever they appear in this document, be construed as follows:

        (1)    "Asbestos" shall have the meanings provided under the Environmental Laws and shall include, but not be limited to, asbestos fibers and friable asbestos as such terms are defined under the Environmental Laws.

        (2)    "Environmental Claims" shall mean all claims, demands, suits, proceedings, actions, whether pending or threatened, contingent or non-contingent, known or unknown, including but not limited to investigations and notices by any governmental authority, brought under common law and/or under any of the Environmental Laws which can or do relate to the Property.

        (3)    "Environmental Laws" shall mean all applicable federal, state, and local laws, rules, regulations, orders, judicial determinations and decisions or determinations by any judicial, legislative or executive body of any governmental or quasi-governmental entity, whether in the past, present or future, with respect to:

            (i)    the installation, existence, or removal of, or exposure to, Asbestos on the Property;

            (ii)    the existence on, or discharge from, or removal from the Property of Hazardous Materials; and

            (iii)    the effects on the environment of the Property or any activity conducted now, previously or hereafter conducted on the Property.

Environmental Laws shall include, but are not limited to, the following: (i) the Michigan Natural Resources and Environmental Protection Act, 1994 Public Act 451, as amended ("<u>NREPA</u>"); the Comprehensive Environmental Response,

CHI-1941899v10

13-53846-tjt  13-53846-swr  Doc 8405-1  Doc 8045-1  Filed 10/20/14  Filed 11/20/14  Entered 10/20/14 05:47:43  Entered 11/20/14 05:46:23  Page 792 of  Page 302 of  809  429

Compensation, and Liability Act, 42 USC Sections 9601, et seq. ("CERCLA"); the Superfund Amendments and Reauthorization Act, Public Law 99-499, 100 Stat. 1613; the Resource Conservation and Recovery Act, 42 USC Sections 6901, et seq.; the National Environmental Policy Act, 42 USC Section 4321; the Toxic Substances Control Act, 15 USC Section 2601; the Hazardous Materials Transportation Act, 49 USC Section 1801; the Clean Air Act, 42 USC Sections 7401, et seq.; and the regulations promulgated in connection therewith; (ii) Environmental Protection Agency regulations pertaining to Asbestos (including 40 CFR Part 61, Subpart M); Occupational Safety and Health Administration Regulations pertaining to Asbestos (including CFR Sections 1901.1001 and 1926.58) as each may now or hereafter be amended; and (iii) any Michigan state and local laws and regulations pertaining to any Hazardous Materials.

(4)     "Hazardous Materials" shall mean any of the following as defined by the Environmental Laws:   Asbestos; hazardous wastes; solid wastes; toxic or hazardous substances, wastes or contaminants (including but not limited to polychlorinated biphenyls (PCBs), paint containing lead and urea formaldehyde foam insulation), and sewage.

(B)     The City and Developer acknowledge and agree that some of the parcels to be transferred may be "facilities" pursuant to Part 201 of NREPA, whether or not as yet discovered to be such, and that given the number of parcels being transferred, the 100-year period over which the parcels were developed, numerous changes in uses, and the City's lack of knowledge about the condition or history of most of the parcels, it may not be practicable or possible to identify all pre-existing contamination or conditions on the parcels which may strictly violate Environmental Laws.  Further, the City and Developer acknowledge that although the Developer can give its general undertaking to comply with Environmental Laws with regard to its conduct of future activities on the parcels, at the time of Closing, neither City nor Developer will be able to estimate exactly what such compliance may involve with regard to existing contamination and other existing conditions on the parcels that may violate Environmental Laws.  The City acknowledges that the Developer may conduct a BEA and CERCLA "All Appropriate Inquiry" assessment activities respecting the Property, the results of which assessments may be reported to federal and state authorities at such time as Developer issues an Election Notice to proceed to Closing with respect to such Property, in order to seek the associated protections from liability with respect to pre-existing environmental conditions at the Property ("Liability Protection"), or such earlier date as required pursuant to Environmental Laws or in order to preserve Liability Protection.

(C)  The City shall authorize the Developer, through a fully executed Right-of-Entry (in the form attached), to enter upon the applicable Property during the Due Diligence Period to, subject to the conditions set forth herein, undertake environmental remediation activities approved by the City hereunder, and make soil boring and bearing tests, undertake such surveying and environmental due diligence activities as Developer deems appropriate, including without limitation sampling and testing of soil, soil vapor, surface water, groundwater, indoor air, and the installation of groundwater wells, provided such do not materially and permanently interfere with demolition or site improvement activities of the City or the rightful use of the

11

CHI-1941899v10
13-53846-tjt   Doc 8405-21   Filed 10/20/14   Entered 10/20/14 05:47:23   Page 309 of
13-53846-swr   Doc 8045-1   Filed 10/20/14   Entered 10/20/14 05:48:23   Page 703 of
429

Property by a tenant in possession or other third party, if any. All such testing and remediation shall be done at Developer's expense. Developer shall at all times during the Due Diligence Period comply with the terms and provisions of the Right-of-Entry, and Developer's right to enter upon the applicable Property is subject to execution of such Right-of-Entry. To the extent any provision of such Right-of-Entry conflicts with the terms set forth herein, the terms of this Agreement shall govern. Developer shall upon request submit to the City a copy of each final survey or environmental testing report generated as a result of such activities. Developer shall give prior written notice to the City to inspect, investigate and/or remediate the condition of the Property during the Due Diligence Period, including any investigation of the environmental condition (each such notice referred to herein as an "Investigation Notice"). To the extent the Investigation Notice includes a request to perform any environmental remediation activities upon the applicable Property, prior to undertaking such remediation, the Developer shall submit to the City in writing (i) the scope of remediation activities contemplated by the Developer, (ii) evidence of commercially reasonable insurance appropriate for the scope of remediation contemplated by the Developer, and (iii) evidence that the Developer has the financial resources to complete the scope of remediation contemplated, each of which shall be subject to the prior written approval of the City, which approval shall not be unreasonably withheld, conditioned or delayed. Upon written request of Developer, the City shall provide an electronic mail address for delivery of any Investigation Notice; provided, Developer shall mail a copy of any Investigation Notice sent via electronic mail to the City pursuant to the provisions of Section 4 below. Developer shall use all commercially reasonable efforts to minimize damage to the Property in connection with such entry and shall restore the Property to substantially the condition existing prior to such entry, provided that the City acknowledges that soil borings and groundwater well sampling may be conducted, and it may not be practicable to fully restore the Property to the exact same condition. Developer shall indemnify, defend and hold the City harmless from and against any and all loss, cost, liability and expense, including reasonable attorney fees and litigation costs, suffered or incurred by the City as a result of the Developer's (including any of its duly authorized employees, agents, engineers or other representatives) negligent acts or omissions or willful misconduct occurring in connection with the activities conducted in accordance with the Right-of-Entry; provided however that (A) in the event Developer provides an Objection Notice or otherwise elects not to proceed to Closing, the Developer shall in no circumstance have any indemnity obligation or other liability with respect to any environmental conditions pre-existing at the Property including without limitation any soil or groundwater contamination or other environmental conditions that may discovered in the course of the Developer's Due Diligence Activities and thereafter disclosed to the City as required hereunder, except to the extent such environmental conditions are materially exacerbated due to the negligence or willful misconduct of Developer or any of its duly authorized employees, agents, engineers or other representatives, and (B) in no event shall Developer have any indemnity obligation or other liability with respect to any loss, cost, liability or expense incurred by the City as the result of the gross negligence or willful misconduct of the City or its agents.

(D)     In the event Developer elects to proceed to take title to any Property, upon the Closing, Developer takes such Property as it finds it, "AS IS", and the City makes no express or implied representations or warranties as to its fitness for absolutely any purpose whatsoever, including but not limited to any warranty that the Property is fit for the Developer's purpose or

regarding the presence or absence of Hazardous Materials at, on, in, under, about, or from the Property and compliance with the Property with Environmental Laws. Developer acknowledges that neither the City nor any agent or employee of the City has made any representation, warranty or agreement, either express or implied, and Developer has not relied on any representation, warranty or agreement of any kind made by the City or any agent or employee of the City, concerning (a) the physical or environmental condition of the Property, or (b) the presence or absence of any condition, substance or material, including but not limited to any waste material, equipment or device at, on, in, under, about, or from the Property. Developer agrees that the disclosures of the City concerning the Property and its condition are intended to satisfy any duties the City may have under the law, including but not limited to the statutes, Environmental Laws, and common law. Developer shall rely solely on its own due diligence with respect to such inquiries, investigations and assessments. By executing this Agreement, Developer acknowledges that it is satisfied with the condition of the Property, subject only to its Due Diligence Activities, including but not limited to inspection of the Property, review of title, and the results of the tests, investigations and surveys permitted under this Agreement. If, prior to Closing, Developer fails to undertake such investigations and/or obtain such test results and surveys, or fails to object to the condition of the Property based on the results of its Due Diligence Activities, and Developer thereafter elects to proceed to Closing, Developer shall thereupon be deemed to have waived any right to object to the condition of the Property and shall be deemed to have declared its full satisfaction therewith.

(E)     Upon Closing on any particular Property, subject to the City's covenant set forth in Section 5(G)(ii) below, Developer, for itself and its successors and assigns, expressly waives and releases all Environmental Claims (whether for personal injury, property damage or otherwise) that Developer may have against the City and its officials, employees and agents in connection with or related to such Property or any aspect thereof except for Environmental Claims arising out of actions by the City of its employees or agents that caused the release or threatened release of hazardous substances on the parcels being transferred. Upon Closing on any particular Property, Developer releases and discharges the City from all Environmental Claims that Developer may have against the City in connection with or arising out of the present condition of the Property.

(F)     Intentionally omitted.

(G)     Subject to the City's covenant set forth in Section 5(G)(ii) below, after the Closing with respect to a Property, the City shall have no obligation or liability to Developer whatsoever to undertake any cleanup or other remedial action that may be required in connection with the Property under any Environmental Law, or to comply with any other federal, state or local requirement to attend to the physical condition of the Property.

(H)     At its sole cost and expense, with respect to an applicable Property for the period commencing on the applicable Closing and ending on the applicable Commencement of Construction, Developer shall: (a) comply with all Environmental Laws; (b) pay when due the cost of Developer's compliance with the Environmental Laws resulting directly or indirectly out of environmental conditions caused or permitted by Developer during its period of ownership, use, possession or development of the Property; and (c) keep the Property free of any lien

13

imposed pursuant to the Environmental Laws resulting out of Developer's ownership, use, possession, or development of the Property.

(I)     During the earliest of the date that Developer (a) receives title to the Property, (b) receives possession of the Property or (c) performs any removal or remedial activities on the Property, Developer shall comply with all Environmental Laws and will undertake to complete any further investigation and remediation of the environmental conditions, if any, necessary to permit the intended use of the Property in accordance with the Environmental Laws.  As between the City and Developer but not as to third parties, Developer assumes the risk of liability for any and all Hazardous Materials, whether known or unknown, which may have been or may be present in, at, on, under about or from the Property except for hazardous materials released by the City or its agents, employees, or contractors.

(J)     Notwithstanding anything to the contrary which may be contained in this Agreement, Developer represents and warrants and covenants to the City for the period after Developer's commencement of ownership, use, possession or development of the Property and terminating upon the Commencement of Construction at an applicable Property, as follows:

(i)     Developer shall not directly or indirectly use or allow the use of the Property for the purpose of storing any Hazardous Materials Developer brings into the Property, nor shall Developer directly or indirectly use the Property in a manner which will cause or increase the likelihood of causing the release of such Hazardous Materials onto or from the Property, other than those Hazardous Materials which are necessary and commercially reasonable for the conduct of Developer's development activities or the business operated on the Property and which Hazardous Materials shall be, handled and disposed of in compliance with all Environmental Laws and industry standards and in a commercially reasonable manner.

(ii)     Developer shall promptly notify the City of any claims or litigation against the Developer by any person (including any governmental authority), concerning the presence or possible presence of Hazardous Materials contamination at the Property or concerning any violation or alleged violation of the Environmental Laws by the Developer respecting the Property, and shall furnish the City with a copy of any such communication received by Developer.

(iii)     Developer shall notify the City promptly and in reasonable detail in the event that Developer becomes aware of or suspects the presence of Hazardous Materials contamination or a violation of the Environmental Laws at the Property.

(iv)     If Developer's operations at the Property violate the Environmental Laws so as to subject Developer or the City to a formal notice of violation by a governmental agency alleging a violation of the Environmental Laws, Developer shall promptly investigate the underlying circumstances and notify the City within fourteen (14) days of the results of its investigation. If Developer determines that an ongoing violation by Developer is occurring or did occur,  Developer shall, to

14

the extent required by Environmental Laws, cease or cause a cessation of or take other actions to address those aspects of the use or operations causing the violation and shall remedy and cure in compliance with the Environmental Laws any conditions arising therefrom to the extent required by Environmental Laws at its own cost and expense. If Developer disputes that its activities are violating Environmental Laws, it shall expeditiously appeal and prosecute an appeal of the notice of violation or take other commercially reasonable actions to dispute such notice.

**Section 3.      CLOSING**

(A)      <u>Time and Place of Closing</u>. The closing with respect to a particular Property shall take place at the office of the PDD, or such other location designated by the City and acceptable to Developer.  Each Closing will take place within fifteen (15) days following the earliest to occur of (i) delivery by Developer of a Election Notice with respect to a particular Property, (ii) written notice to Developer that the City has cured all Defects set forth in an Objection Notice provided prior to the expiration of the City Cured Period with respect to a particular Property, or (iii) waiver by Developer of any Defects with respect to a particular Property, each pursuant to Section 1(C)(5) above.  For the avoidance of doubt, no additional consideration shall be due from the Developer to the City at any Closing.

(B)      <u>Conditions to Closing</u>.   The City's obligation to proceed with a Closing is conditioned on the fulfillment by Developer of each of the following conditions precedent:

a.      <u>Resolution of Developer's Authority</u>. Developer shall furnish to the City a certified copy of a resolution in form and substance as set forth on **Exhibit E**, duly authorizing the execution, delivery and performance of this Agreement and all other documents and actions contemplated hereunder with respect to a particular Property.

b.      <u>Intentionally Omitted</u>.

c.      <u>Payment of Closing Costs</u>. Developer shall have tendered payment of the closing costs payable by Developer, which shall include all title charges, escrow, closing and recording fees associated with any conveyance hereunder.  For avoidance of doubt, the City shall not be responsible for any closing charges or transaction fees in connection with any Closing hereunder other than the payment of its own legal fees and expenses.

(C)      <u>Delivery of Deeds and Possession</u>. The City will deliver to Developer at each Closing the Deeds with respect to the particular Property that is subject of such Closing to and possession of the applicable Property.

(D)      <u>Recording</u>.  Provided that Developer has complied with all conditions precedent as specified herein, the Deeds with respect to a particular Property shall be delivered at the applicable Closing for prompt recordation with the Register of Deeds of Wayne County, Michigan. Developer shall pay at each Closing all costs for recording the Deeds.  Possession of the applicable Property shall be delivered to Developer at the applicable Closing.

**Section 4:      NOTICES**

A notice, demand or other communication under this Agreement by either Party to the other shall be sufficiently given if it is dispatched by certified or registered mail, postage prepaid, return receipt requested, or sent by recognized overnight delivery service, or hand delivered, with receipt obtained, and addressed as follows:

If to Developer: _____
       _____
       _____

If to the City:  Director
       Planning & Development Department
       65 Cadillac Square, Suite 2300
       Detroit, Michigan 48226

       With a copy to (which copy shall not constitute notice):

       Corporation Counsel
       City of Detroit Law Department
       2 Woodward Avenue
       Suite 500
       Detroit, MI 48226

All notices shall be deemed given on the day of mailing. Either Party to this Agreement may change its address for the receipt of notices at any time by giving notice thereof to the other as provided in this section. Any notice given by a Party hereunder must be signed by an authorized representative of such Party.

**Section 5:**  **COVENANTS**

(A)  Developer covenants for itself and its successors and assigns and every successor in interest to any Property constituting a part of the Properties, that from and after Closing on such Property, Developer and its successors and assigns shall develop such Property only to and in accordance with the uses specified in this Agreement, unless otherwise agreed in writing by the City. The uses specified in this Agreement are for development and use of such Property into parking facilities, residential housing, commercial, retail space or any other use suitable for the location, consistent with the City's urban planning policies and the City's comprehensive development plan in effect as of the date the Developer seeks zoning and land use approval for such development. Subject to force majeure delays, within fifteen (15) months following Closing (the "Commencement Deadline") on any Property, the Developer shall achieve Commencement of Construction (as defined below) with respect to such Property. Following Commencement of Construction, the Developer shall diligently prosecute such development on the Property to substantial completion (which shall mean substantial completion of such development and all material improvements related thereto, exclusive of landscaping, punch list items and any tenant work for commercial or other space for which there are no tenants or for which the work is to be done by a tenant and any onsite or offsite work that is not commercially

16

necessary for occupancy) (the date upon which such substantial completion occurs referred to herein as the "Completion Date"). Subject to force majeure delays, the Completion Date shall occur within thirty nine (39) months following Closing for the applicable Property, or such longer period of time as may be reasonably necessary for Developer or its designee to actually achieve substantial completion of the applicable development or improvements, provided Developer is diligently pursuing such completion (the "Completion Deadline"). For purposes hereof, "force majeure delays" shall mean acts of God, terrorism, flooding, strikes, lockouts or other labor trouble, materially adverse weather conditions, fire or other casualty, governmental preemption in connection with an emergency, any rule, order or regulation of any governmental authority or any department or subdivision thereof and any other cause or event beyond the reasonable control of Developer (other than failure of Developer to secure necessary land use or zoning approvals from any governmental authority), or inability to secure materials, labor or access to the Property because of any such emergency, rule, order, regulation, war, civil disturbance, terrorist act or other emergency, or inability to secure materials, labor or access to the Property because of any other cause or event beyond the reasonable control of Developer (other than shortage of funds). In the event that the Developer elects to undertake environmental remediation of the Property after the Closing, "force majeure delays" also shall include the time reasonably necessary for the proper completion of all applicable remediation activities. In the event that Developer ceases, delays, or slows its development activities for a particular Property as a result of any claim or cause of action filed, threatened or asserted by the City (or any of its agencies or departments) and, (1) a court of competent jurisdiction dismisses such action or rules in favor of Developer with respect thereto or (2) the City withdraws its claims or causes of actions, the delay associated with such reduction or cessation in the development shall be deemed a "force majeure delay." The Commencement Deadline and Completion Deadline shall be extended for a period of time equal to the number of days during which Developer is prevented from proceeding with the construction of the development at the Property by reason of force majeure, provided that (i) Developer is otherwise in material compliance with the terms and provisions of this Agreement, and (ii) Developer notifies the City of the events constituting such force majeure upon the later of (i) Closing with respect to the applicable Property and (ii) sixty (60) days after Developer has actual knowledge of their occurrence.

(B)     For purposes of this Agreement, "Commencement of Construction" on a Property shall be deemed to have occurred when the Developer shall have commenced foundation or other equivalent site preparation work on the Property, which site preparation work may include renovation or demolition of existing buildings located on the Property, as applicable.

(C)     If the development plan for a Property calls for development of improvements on the Property in two or more discrete phases, the requirements set forth in this Agreement relative to the Completion of Construction, as well as the remedies of the City applicable thereto, shall be satisfied upon Completion of Construction of the initial phase.

(D)     Developer covenants and agrees that from and after Closing it will: (i) comply with all zoning requirements, and all other applicable state and federal statutes and regulations and local laws and ordinances applicable to the ownership, use and/or occupancy of the Property; and (ii) pay and discharge when due without penalty, and in all events before penalty for nonpayment attaches thereto, all taxes, assessments and governmental charges, including but not

17

limited to real estate taxes or assessments on the Property or any part thereof, except where the same may be contested in good faith.

(E) <u>Certificate of Completion</u>. The Developer shall give the City prompt written notice of the Completion Date. The City agrees that the PDD shall inspect the Property for purposes of issuance of the Certificate of Completion promptly following the Completion Date, and shall provide Developer with notice of any deficiencies in compliance with this Agreement, and an opportunity for cure and re-inspection. If, as of the Completion Deadline, PDD determines that Developer is in compliance with all provisions and requirements of this Agreement, PDD shall issue a "<u>Certificate of Completion</u>." The Certificate of Completion shall be a conclusive acknowledgment by PDD of satisfaction by Developer of its obligations under this Agreement for the applicable Property or portion of the applicable Property addressed by the Certificate of Completion. The Certificate of Completion shall not, however, constitute evidence of compliance with or satisfaction of the requirements of any department, agency or entity with respect to any building, occupancy, or other permits, to the extent such departments are exercising their regulatory authority. The Certificate of Completion shall be in such form as can be recorded against the Property, or portion thereof, and shall release the Property, or portion thereof, from the City's rights under this Agreement. The cost of recording the Certificate of Completion shall be the responsibility of Developer.

(F) <u>Estate Conveyed</u>. Notwithstanding anything contained in this Agreement to the contrary, the estate conveyed hereby shall be deemed to be a determinable fee and only upon the Commencement of Construction on the Property will the possibility of reverter retained by the City automatically expire as to that part of the applicable Property.

(G) <u>City Covenants</u>. During the Option Period and prior to a Closing with respect each Property, the City shall (i) maintain such Property in at least the same condition and repair (except for environmental condition and repair thereof, which is addressed in sub-clause (ii) below) as of the Effective Date, (ii) not, through its own action (or the action of any agency, department, employee, agent, or contractor), alter the environmental condition of the Property, as such exists as of the Effective Date, in a material and adverse manner, (iii) not "down zone" the Property or take zoning or land use action on the Property that would materially and adversely affect Developer's ability to develop the Property for the uses otherwise permitted in this Agreement, and (iv) not execute or grant any lease, contract, agreement, lien, security interest, encumbrance, easement, or restriction with respect to such Property, or amend, modify, renew, extend or terminate any of the foregoing, without prior written consent of the Developer, which consent shall not be unreasonably withheld, conditioned or delayed.

## Section 6: REMEDIES

(A) <u>City's Remedies Prior to Conveyance</u>. Except with respect to assignment to a Permitted Entity (as defined below), in the event that, prior to the conveyance of the Property, Developer assigns this Agreement or any right therein or in a Property without the prior written approval of the City, this Agreement and any rights of Developer in this Agreement, may, at the option of the City, be terminated by the City after thirty (30) days written notice and opportunity to cure provided by the City to Developer. Notwithstanding the foregoing, the Developer's rights and obligations under this Agreement may be assigned: (i) to a wholly owned subsidiary

18

of Developer, or (ii) to a joint venture, limited liability company, partnership, limited partnership or other entity formed to develop or finance a Property or the Properties, provided that the Developer retains a direct or indirect interest in such entity (any such assignee being referred to as a "Permitted Entity"). In any case, the Developer shall provide written notice to the City of such assignment.

(B)     City's Remedies Subsequent to Conveyance.

(1)  Event of Default.  If, prior to the issuance of a Certificate of Completion on a Property, Developer breaches any covenant set forth in Sections 5(A) or (D) hereof applicable to such Property and fails to cure such breach within ninety (90) days after written demand by the City, such an event shall be deemed to constitute an **Event of Default**, provided, however, that if the nature of Developer's default is such that more than the cure period provided is reasonably required for its cure, then Developer shall not be deemed to be in default and an Event of Default shall not have occurred if Developer commences such cure within said period and thereafter diligently pursues such cure to completion within two hundred seventy (270) days of City's initial written demand hereunder.  Notwithstanding the foregoing, Developer shall have the right to dispute that an Event of Default has occurred or that an Event of Default has not been timely cured by written notice of dispute sent to the City ("Notice of Dispute"). In the event a Notice of Dispute is sent, the parties shall meet and in good faith work to resolve their differences.  In the event the City and Developer cannot resolve their differences as to whether an Event of Default has occurred or has been cured, then the City shall not record a notice of an uncured and undisputed Event of Default as described in Section 6(B)(2) below without first bringing an action in a court of competent jurisdiction for a final judicial determination that an Event of Default occurred and was uncured.  To the extent a court of competent jurisdiction deems that an Event of Default occurred prior to the Commencement of Construction and such cause of action was filed with the court of competent jurisdiction prior to the Commencement of Construction, irrespective of the date the court makes such determination, the City shall have all rights and remedies available to it hereunder as if such Event of Default was undisputed prior to the Commencement of Construction in the first instance. The City may, in its sole discretion, waive in writing any Default or Event of Default by Developer.  Notwithstanding any provision contained herein to the contrary, any lender of Developer that has a security interest in a Property, shall have an additional notice and cure right that should provide such lender with a reasonable period of time after the expiration of any cure periods available to Developer in which to cure any Event of Default prior to the City enforcing its remedies hereunder.

(2)     Right of Reverter.  It is expressly understood and agreed between the Parties hereto that until the Commencement of Construction on a particular Property, the conveyance of such Property to Developer shall be construed and interpreted as the conveyance of a fee simple determinable, and that such conveyance shall endure only so long as subsequent to the conveyance and prior to the Commencement of Construction there has been no uncured or undisputed Event of Default with respect to such Property and such Event of Default results from a failure of the Commencement of Construction to have occurred prior to the Commencement Deadline (a "Reverter Event of Default").  In the event of an uncured and undisputed Reverter Event of Default and the City's recording of a notice thereof, after a judicial determination as required by Section 6(B)(1) above and written notice from the City to Developer of the City's election to enforce the reverter set forth in this Section, title to the applicable Property (and only

19

the applicable Property) shall revest in the City, except for parcels of Property previously conveyed where Commencement of Construction has already been achieved. Upon such revesting of title, the City shall have the right to re-enter and take immediate possession of the applicable Property. Upon an uncured and undisputed Reverter Event of Default as to a Property occurring prior to the Commencement of Construction and expiration of the cure period, this Agreement and any rights of Developer arising hereunder with respect to the Property subject to the reverter, may, at the option of the City, be terminated by the City by the City providing written notice of such termination to the Developer prior to the cure of such Reverter Event of Default, and the Developer shall thereafter have no further interest in the reverted Property. In such case Developer agrees to promptly execute and deliver a quit claim deed for any such portion of reverted Property to the City. While the right of reversion as to a Property automatically terminates upon Commencement of Construction on such Property, the City agrees to provide Developer with a written acknowledgement, in recordable form, that the Commencement of Construction has occurred and the City's right of reversion has terminated as to such Property.

    (3)  <u>Intentionally Omitted</u>.

    (C)  <u>Rights and Remedies Cumulative</u>. The rights and remedies of the City, whether provided by law or by this Agreement, shall be cumulative, and the exercise by the City of any one or more remedies shall not preclude the exercise by it, at the same or different times, of any other remedy for the same default or breach or any other default or breach by the Developer. No waiver made by either Party shall apply to obligations beyond those expressly waived in writing.

    (D)  <u>Developer's Remedies</u>. If the City breaches its obligations under this Agreement after reasonable notice and opportunity to cure, Developer shall have the right to seek injunctive relief, specific performance or other equitable remedies for the City's breach of this Agreement. In no event shall the Developer be entitled to monetary damages as a result of the City's breach of this Agreement, except to the extent such damages arise out of the City's uncured breach of the covenant set forth in Section 5(G) above.

    (E)  <u>City's Representatives Not Individually Liable</u>. No official or employee of the City shall be personally liable to Developer or any successor in interest, in the event of any default or breach by the City or for any amount which may become due to Developer or successor or on any obligations under the terms of this Agreement.

**Section 7:     PROVISIONS NOT MERGED WITH DEEDS**

No provision of this Agreement is intended to or shall be merged into the Deeds transferring title to each Property from the City to Developer or any successor in interest, and any such Deeds shall not be deemed to affect or impair the provisions and covenants of this Agreement.

**Section 8:     ENTIRE AGREEMENT; AMENDMENT**

This Agreement (including all exhibits, schedules or other attachments hereto) constitutes the complete and exclusive statement of the terms of the agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, understandings, promises, and arrangements, oral or written, between the Parties with respect to the subject matter hereof.  This Agreement may be amended or modified only by an instrument in writing signed by both of the Parties.

**Section 9:     GOVERNING LAW**

This Agreement shall be governed by and construed in accordance with the laws of the State of Michigan without regard to conflicts-of-law principles that would require the application of any other law.

**Section 10:     COUNTERPARTS**

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, but together such counterparts shall constitute one and the same instrument.

**Section 11:     <u>AUTHORITY OF CITY</u>.**

**Notwithstanding anything in this Agreement, in law or in equity, or otherwise to the contrary, this Agreement shall be of no force or effect and may not in any way be enforced against the City unless or until this Agreement and the transaction contemplated hereby have been: (i) approved in writing by the Emergency Manager for the City of Detroit, in accordance with Emergency Manager Order No. 5, (ii) either included in the Emergency Manager's financial and operating plan or approved in writing by the Governor of the State of Michigan or his or her designee, in accordance with Section 12(1)(k) of Public Act 436 of 2012; and (iii) either included in the Emergency Manager's financial and operating plan or approved in writing by the State Treasurer, in accordance with Section 15(1) of Public Act 436 of 2012.**

**Section 12:  CITY AGENCIES AND DEPARTMENTS**.  Whenever this Agreement requires an action or creates an obligation on behalf of the City, the City shall also be required, as applicable, to cause all of its agencies and departments to undertake such obligations.

(signatures on following pages)

21

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

WITNESSES:                              DEVELOPER

                                        PIKE    POINTE    HOLDINGS,    LLC,    a
                                        Delaware limited liability company


_____        By: _____
Print: _____        Print: _____
                                        Its: _____



STATE OF MICHIGAN        )
                         ) ss.
COUNTY OF WAYNE          )

The foregoing instrument was acknowledged before me on September __, 2014 by _____ the _____ of Pike Pointe Holdings, LLC, a Delaware limited liability company, on behalf of said company.


                                        _____

                                        Notary Public, Wayne County, Michigan
                                        Acting in Wayne County, Michigan
                                        My commission expires:


[*signatures continue on following page*]

22

CHI-1941899v10
13-53846-tjt   Doc 8045-1   Filed 10/20/14   Entered 10/20/14 05:47:23   Page 320 of
13-53846-swr   Doc 8405-2   Filed 11/20/14   Entered 11/20/14 05:48:28   Page 764 of
409

WITNESSES:        CITY OF DETROIT,
               a Michigan public body corporate


_____ By:_____
Print:_____ Print: _____
               Its: _____


STATE OF MICHIGAN   )
          ) ss.
COUNTY OF WAYNE   )

   The foregoing instrument was acknowledged before me on September ___ 20__ by _____, the _____ of the City of Detroit, a Michigan public body corporate, on behalf of the City.


           _____

           Notary Public, Wayne County, Michigan
           Acting in Wayne County, Michigan
           My commission expires:

---

Pursuant to § 18-5-12 of the Detroit City Code, I hereby certify that proper and fair consideration has been received by the City pursuant to this contract.

   Finance Director

Approved by the City Law Department pursuant to Sec. 7.5-206 of the Charter of the City of Detroit.

   Corporation Counsel

City Council Approval Date:

---

**Drafted by and when recorded return to:**

Bruce N. Goldman
Senior Assistant Corporation Counsel
City of Detroit Law Department
2 Woodward Avenue, Suite 500
Detroit, Michigan 48226

# EXHIBIT A

## LEGAL DESCRIPTION

1. The contiguous parcels of (2.701 acres):

       1303 E Atwater  .908

       1365 E Atwater  .220

       1364 Franklin  .337

       1310 Franklin  .145

       1399 E Atwater  .287

       1325 E Atwater .707

       1370 Gloin St .097

2. The contiguous parcels of (3.545):

       2200 Franklin (3.545)

3. The contiguous parcels of (2.108 acres) :

       2290 E Jefferson (1.199)

       [2310 E Jefferson (.730)] **SUBJECT TO CITY APPROVAL**

       301 Chene  (.179)

4. 1300 Beaubein (Former Police HQ)

5. Parcel(s) mutually agreeable to the Parties which parcels shall:

       a. have reasonably equivalent value to the aggregate value of 2263 E Atwater (2.812 acres) and 281 Chene St (.430 acres);

       b. be consistent with the Developer's development scheme; and

       c. be identified within forty-eight (48) hours following the September 15, 2014 bankruptcy court hearing related to the Arrangement.

[legal descriptions of the above parcels to be attached based on mutual agreement by the parties hereto following the Effective Date]

**EXHIBIT B**

**MEMORANDUM OF OPTION**

[the form of which shall be mutually agreed upon by the parties hereto promptly following the
Effective Date hereof]

2

CHI-1941899v10

13-53846-tjt   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 03:48:23   Page 767 of
809
13-53846-swr   Doc 8405-2   Filed 11/20/14   Entered 11/20/14 15:47:43   Page 323 of
429

**EXHIBIT C**

**RIGHT OF ENTRY**

[the form of which shall be mutually agreed upon by the parties hereto promptly following the Effective Date hereof]

**EXHIBIT D**

**QUIT CLAIM DEED**

The City of Detroit, a Michigan public body corporate whose address is 2 Woodward Avenue, Detroit, MI 48226 ("Grantor"), quit claims to _____, a Michigan _____ ("Grantee"), whose address is _____, the premises located in the City of Detroit, Wayne County, Michigan, described as:

A/K/A _____ Ward: _____ Item(s):

(the "Property"), for the sum of _____ ($_____), subject to and reserving to the City of Detroit its rights under public easements and rights of way, easements of record, applicable zoning ordinances, development plans pursuant to Act 344 of 1945 as amended (if any), and restrictions of record.

This Deed is given subject to the terms, covenants and conditions of a Development Agreement - Option to Purchase and Develop Land dated _____, 20___ entered into by the parties hereto and which is incorporated herein by reference and a memorandum of which was recorded on _____, 20___ in the Office of the Register of Deeds for the County of Wayne in Liber _____ on Pages _____ through _____ inclusive, none of the terms, covenants and conditions of which shall be deemed merged in this Deed. The covenants therein recited to be covenants running with the land are hereby declared to be covenants running with the land enforceable by the City as therein set forth until issuance of a Certificate of Completion.

The Grantor grants to the Grantee the right to make all divisions under Section 108 of the land division act, Act No. 288 of the Public Acts of 1967, as amended. This property may be located within the vicinity of farmland or a farm operation. Generally accepted agricultural and management practices which may generate noise, dust, odors, and other associated conditions may be used and are protected by the Michigan right to farm act.

This deed is dated as of _____.

CITY OF DETROIT,
a Michigan public body corporate

By: _____

Print: _____

Its: _____

*[acknowledgement on following page]*

CHI-1941899v10

13-53846-tjt   Doc 8045-1   Filed 10/20/14   Entered 10/20/14 05:47:23   Page 325 of 429
13-53846-swr   Doc 8045-1   Filed 10/20/14   Entered 10/20/14 05:48:23   Page 765 of 809

STATE OF MICHIGAN　　)
　　　　　　　　　　　　) ss.
COUNTY OF WAYNE　　)

　　　　The foregoing instrument was acknowledged before me on _____
20__, by _____, the _____ of
the City of Detroit, a Michigan public body corporate, on behalf of the City.

　　　　　　　　　　　　　　　　　_____

　　　　　　　　　　　　　　　　　Print: _____
　　　　　　　　　　　　　　　　　Notary Public, Wayne County, Michigan
　　　　　　　　　　　　　　　　　Acting in Wayne County, Michigan
　　　　　　　　　　　　　　　　　My commission expires:

---

Pursuant to § 18-5-12 of the Detroit City Code, I hereby certify that proper and fair consideration has been received by the City pursuant to this contract.

　　　　　Finance Director

Approved by the City Council on.

JCC pp _____ or Detroit Legal News,

_____, on file in my office.

Approved by the City Law Department pursuant to Sec. 7.5-206 of the Charter of the City of Detroit.

　　　　　Corporation Counsel

Approved by Mayor on

　　　　　City Clerk

---

**This Instrument Drafted by:**

Bruce N. Goldman
Senior Assistant Corporation Counsel
City of Detroit Law Department
2 Woodward Avenue, Suite 500
Detroit, MI 48226

**When recorded, return to:**

Grantee

Exempt from transfer taxes pursuant to MCL § 207.505(h)(i) and MCL § 207.526(h)(i).

2

# EXHIBIT E

## CERTIFICATE OF AUTHORITY FOR LIMITED LIABILITY COMPANY

I, _____, Manager of
_____, a _____ limited liability company (the "Company")

DO HEREBY CERTIFY that the following is a true and correct excerpt from *[check appropriate box]*

☐ the minutes of a meeting of the Members of the Company duly called and held on

☐ a consent in lieu of a meeting, with signed consents received from all of the [Members] of the Company on

and that the same is now in full force and effect:

"RESOLVED, that any [Manager of the Company], is hereby authorized to execute and deliver, in the name and on behalf of the Company, any agreement or other instrument or document in connection with any matter or transaction with the City of Detroit that shall have been duly approved; the execution and delivery of any agreement, document, or other instrument by any of such [Managers] to be conclusive evidence of such approval."

I FURTHER CERTIFY that the following persons are [Managers]:

I FURTHER CERTIFY that any of the aforementioned managers of the Company are authorized to execute or guarantee and commit the Company to the conditions, obligations, stipulations and undertakings contained in the attached Agreement, and that all necessary approvals have been obtained in relationship thereto.

IN WITNESS WHEREOF, I have set my hand this _____ day of _____, 20\_\_.

_____
Print: _____
Its: Manager

*Schedule 1(H)*

1365 E Atwater St, 48207

1325 E Atwater St, 48207

1399 E Atwater, 48207

1370 Gloin St, 48207

1310 Franklin St, 48207

1364 Franklin St, 48207

**EXHIBIT I.A.344**

FORM OF SYNCORA SETTLEMENT DOCUMENTS

# SETTLEMENT AGREEMENT

This SETTLEMENT AGREEMENT (this "Agreement") is entered into as of September __, 2014, among the City of Detroit, Michigan (the "City"), Syncora Guarantee, Inc. and Syncora Capital Assurance Inc. (collectively, "Syncora"). The City and Syncora are referred to herein each individually as a "Party" and collectively as the "Parties".

WHEREAS, the Detroit General Retirement System Service Corporation, a Michigan nonprofit corporation ("DGRS"), and the Detroit Police and Fire Retirement System Service Corporation, a Michigan nonprofit corporation ("PFRS" and, together with DGRS, each a "Service Corporation" and collectively the "Service Corporations") created each of (i) the Detroit Retirement Systems Funding Trust 2005 (the "2005 Pension Funding Trust") pursuant to the Trust Agreement, dated June 2, 2005, among the Service Corporations and U.S. Bank National Association as trustee and (ii) the Detroit Retirement Systems Funding Trust 2006 (the "2006 Pension Funding Trust") pursuant to the Trust Agreement, dated June 12, 2006, among the Service Corporations and U.S. Bank National Association as trustee;

WHEREAS, the 2005 Pension Funding Trust issued certain Taxable Certificates of Participation Series 2005 (the "2005 Pension Funding Securities") and the 2006 Pension Funding Trust issued certain Taxable Certificates of Participation Series 2006 (the "2006 Pension Funding Securities" and collectively with the 2005 Pension Funding Securities, the "Certificates of Participation");

WHEREAS, the Service Corporations are parties to swap transactions under certain ISDA Master Agreements referred to as the COP Swap Agreements;

WHEREAS, the City issued $44,020,000 in General Obligation Bonds (Unlimited Tax), Series 2003-A;

WHEREAS, Syncora has issued insurance policies in respect of certain of the Certificates of Participation;

WHEREAS, Syncora has issued insurance policies in respect of certain of the Swap Agreements;

WHEREAS, Syncora has issued insurance policies in respect of certain of the General Obligation Bonds (Unlimited Tax), Series 2003-A;

WHEREAS, Syncora beneficially owns or insures Certificates of Participation in the amounts set forth herein;

WHEREAS, the Parties and their representatives have engaged in good faith, arm's length settlement discussions regarding a consensual resolution of their disputes under or in respect of the Certificates of Participation and the COP Swap Agreements;

1

**NOW, THEREFORE**, in consideration of the foregoing and the promises, mutual covenants, and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

**Section 1          Definitions and Interpretations.**

**1.1     Plan Definitions.**  Capitalized terms used herein, but not otherwise defined, shall have the meaning ascribed to such terms in the POA.

**1.2     Additional Definitions.**  The following terms have the respective meanings set forth below for all purposes of this Agreement.

"<u>Class 9</u>" means that class of claims associated with COPs as set forth in the Sixth Amended POA.

"<u>POA</u>" means that certain Plan for the Adjustment of Debts of the City of Detroit, as amended in accordance herewith.

"<u>Sixth Amended POA</u>" shall mean that certain Sixth Amended Plan for the Adjustment of Debts of the City of Detroit, as filed with the Bankruptcy Court.

**1.3     Other Definitional and Interpretive Provisions.**  The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  References to Sections and Schedules are to Sections and Schedules of this Agreement unless otherwise specified.  Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular.  Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import.  References to any statute shall be deemed to refer to such statute as amended from time to time and to any rules or regulations promulgated thereunder.  References from or through any date mean, unless otherwise specified, from and including or through and including, respectively.  References to "law", "laws" or to a particular statute or law shall be deemed also to include any and all applicable law.

**Section 2          Plan.**

**2.1     Proofs of Claim.**  The Parties agree Section 2, Section 4 and Section 5 hereof fully resolve, address, satisfy and discharge Proofs of Claim # 1352 and 1354; <u>provided that,</u> except as expressly provided to the contrary herein, this Agreement shall have no effect regarding any UTGO Claims asserted in such Proofs of Claim or otherwise held or insured by Syncora, and any such UTGO Claims shall receive the treatment provided for all UTGO Claims by the POA and the UTGO Settlement Agreement.  The City shall not file or otherwise assert any objection to such Proofs of Claim.

**2.2     Voting.**  All votes cast by Syncora to accept or reject the Sixth Amended POA shall be deemed to have been cast as accepting the POA.

2

13-53846-tjt   Doc 8405-1   Filed 10/20/14   Entered 10/20/14 05:47:23   Page 331 of
13-53846-swr   Doc 8045-1   Filed 10/20/14   Entered 10/20/14 05:48:23   Page 375 of
409

**2.3    Approval.**    The City shall (i) use its best efforts to seek approval of this Agreement in connection with confirmation of the POA, and (ii) seek a Confirmation Order, which Confirmation Order shall be in form and substance reasonably acceptable to Syncora (solely with respect to any terms thereof that affect the rights of Syncora or any Related Entity with respect to Syncora), that approves (A) this Agreement and all transactions contemplated hereby, (B) the Development Agreement and all transactions contemplated thereby, and (C) the assumption of the Tunnel Lease, as amended pursuant to the First Amendment to Lease dated as of ___, 2014 between the City of Detroit and the Detroit Windsor Tunnel LLC.

**2.4    Plan Support.**

(a)    Syncora shall (i) use commercially reasonable efforts to support the City's efforts to seek approval of this Agreement in connection with confirmation of the proposed POA, (ii) support confirmation of the POA, and (iii) not object to confirmation of the POA and withdraw all objections, oppositions and reservations of rights to confirmation of the POA (collectively, the "Syncora Plan Objections"), including those objections filed with the Bankruptcy Court at ECF #'s 4679, 5706, 6009, 6651, 7041, 7150 and its participation in 7103 (A) without prejudice (and subject to Syncora's retaining the right to assert such objections in the event this Agreement is terminated) as soon as reasonably practicable after execution of this Agreement and (B) with prejudice as soon as reasonably practicable after Bankruptcy Court approval of this Agreement and confirmation of the POA.

(b)    Without limiting the foregoing, Syncora shall withdraw all objections to the UTGO Settlement Agreement (including those contained in Syncora's objections to the Plan) (i) without prejudice (and subject to Syncora's retaining the right to assert such objections in the event this Agreement is terminated) as soon as reasonably practicable after execution of this Agreement and (ii) with prejudice as soon as reasonably practicable after Bankruptcy Court approval of this Agreement and confirmation of the POA. The City shall not alter or amend the treatment provided to holders of Allowed Class 8 Claims in the Plan.

(c)    Without limiting the foregoing, Syncora shall not object to inclusion of the COP Swap Counterparties in the definition of "Exculpated Parties" under the POA.

**2.5    Plan Amendment.**    The City shall not, without Syncora's prior written consent, amend the POA in a manner that (a) would have a materially adverse effect on Class 9 or (b) adversely affect Syncora.

**Section 3          Global Resolution; Litigation Support; Etc.**

**3.1    Global Resolution.**    The Parties agree that this Agreement shall constitute a global resolution of all matters among the Parties as and to the extent set forth herein, and all litigation (including appeals) outstanding between the City and Syncora arising out of or related to the City's Chapter 9 Case shall be dismissed as and to the extent set forth herein.

**3.2    Withdrawal of Syncora Plan Objections.**    Syncora shall withdraw the Syncora Plan Objections as set forth in Section 2.4 hereof.

3

**3.3    Stay and Withdrawal or Dismissal of Appeals.**    As soon as reasonably practicable after execution of this Agreement, Syncora and the City shall file joint motions with the applicable courts requesting stays of those certain appeals styled: 2:14-cv-10501-BAF-PJK (PLA appeal); 2:14-cv-11995-BAF-PJK (PPF appeal); 2:14-cv-12062-BAF-PJK (COP Swap Settlement appeal); 2:13-cv-14305-BAF-PJK (property of the debtor appeal); and 2:14-cv-13044-BAF-PJK (Mediation Order Appeal) (collectively, the "<u>Syncora Appeals</u>").  As soon as reasonably practicable after Bankruptcy Court approval of this Agreement and the occurrence of the Effective Date with respect to the POA, Syncora will voluntarily dismiss with prejudice the Syncora Appeals.

**3.4    Litigation Support.**    Syncora shall provide such reasonable, active support as may be reasonably requested by the City, the Litigation Trust or any successor plaintiffs in the COP Litigation.

**3.5    Retention of Counsel.**    Syncora shall continue to retain Kirkland & Ellis LLP in connection with satisfying the support obligations set forth in Sections 2.4(a) and 3.2 hereof.

**Section 4        Class 9 Treatment.**

**4.1    Amendment to Sixth Amended POA.**    The City shall amend the Sixth Amended POA as set forth on Schedule 1.

**Section 5        Swap Related Claims; Etc.**

**5.1    Swap Related Claims.**    On the Effective Date or as soon thereafter as practical, the City shall pay the sum of $5 million in full satisfaction of all of Claims filed or asserted against the City by Syncora relating to the COP Swap Agreements and any agreements related thereto, including the COP Swap Insurance Policies and the COP Swap Collateral Agreement.

**Section 6        Representations and Warranties.**

**6.1    Representations and Warranties of the City.**    The City represents to Syncora that:

(a)    It is a municipal corporation of the State of Michigan.

(b)    It has the power to execute and deliver this Agreement and to perform its obligations hereunder and it has taken all necessary action to authorize such execution, delivery and performance.

(c)    Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets.

(d)    Other than (i) approvals by the City Council, the Emergency Loan Board, the State Treasurer, the execution of the  Emergency Manager Order, and the approvals required by Section 19 of Act 436, and (ii) the approval of the Bankruptcy Court, all governmental and Emergency Manager consents and approvals that are required to have been obtained by it as of

4

13-53846-tjt  Doc 8405-1   Filed 10/20/14   Entered 10/20/14 05:47:23   Page 333 of
13-53846-swr  Doc 8045-1   Filed 10/20/14   Entered 10/20/14 05:46:23   Page 333 of
429

the date of execution of this Agreement with respect to the execution, delivery and performance of this Agreement have been obtained and are in full force and effect and all conditions of any such consents and approvals have been complied with.

**6.2** **Representations and Warranties of Syncora.** Syncora represents to the City that:

(a)     It is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and in good standing.

(b)     It has the power to execute this Agreement, to deliver this Agreement and to perform its obligations under this Agreement and it has taken all necessary action to authorize such execution, delivery and performance.

(c)     Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets.

(d)     All governmental consents that are required to have been obtained by it with respect to this Agreement have been obtained and are in full force and effect and all conditions of any such consents have been complied with.

(e)     Syncora owns or insures COPs in the principal amount of $299,155,000.00; Syncora paid insured principal claims in an amount not less than $52,750,000.00; and, as of the Petition Date, Syncora paid insured interest claims in an amount not less than $1,649,692.00.

(f)     The *Stipulation by and Between the City of Detroit, Michigan and the COPs Creditors Regarding Certain Facts and the Admission of Certain Exhibits for the Confirmation Trial* remains in effect.

**Section 7**     **No Admission.**

This Agreement is a proposed settlement of claims and disputes among the Parties and is the product of good faith, arm's length negotiations among the Parties hereto. If this Agreement is terminated, this Agreement will not be an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating hereto will not be admissible into evidence in any proceeding. However, this Agreement will be admissible into evidence in any proceeding to obtain court approval of this Agreement or to enforce or interpret the terms of this Agreement, and, subject to any otherwise applicable rules in the Federal Rules of Evidence (other than Federal Rule of Evidence 408), this Agreement may be admitted into evidence in any proceeding arising as a result of or in connection with a Party's breach of this Agreement or in which breach of this Agreement is alleged as a relevant fact. The admissibility of all negotiations related to this Agreement shall be governed by the *Mediation Order* [Docket No. 322] entered by the Bankruptcy Court, as the same has been amended and supplemented. Notwithstanding the foregoing, nothing herein shall limit the scope or effect of the Mediation Order.

**Section 8**     **Termination.**

Any Party may terminate this Agreement upon one Business Day's prior written notice to the other Party if:   (a) the Bankruptcy Court denies approval of this Agreement or the transactions contemplated hereby, the Development Agreement or the transactions contemplated thereby, or the assumption of the Tunnel Lease, as amended pursuant to the First Amendment to Lease dated as of ___, 2014 between the City of Detroit and the Detroit Windsor Tunnel LLC, or confirmation of the POA; (b) if the Confirmation Order is not in form and substance reasonably acceptable to Syncora (solely with respect to any terms thereof that affect the rights of Syncora or any Related Entity with respect to Syncora) or is vacated or reversed on appeal or, after entry, is modified without the terminating Party's consent, in any matter considered by the terminating Party to be adverse to the terminating Party; or (c) the other Party is in material breach of any provision of this Agreement, and such breach is continuing and has not been cured within 5 Business Days.

In the event that this Agreement is terminated as set forth herein, then neither this Agreement, nor any document filed with the Bankruptcy Court with respect to the approval of this Agreement, will have any res judicata or collateral estoppel effect or be of any force or effect, and each of the Parties' respective interests, rights, remedies and defenses will be restored without prejudice as if this Agreement had never been executed and the Parties will be automatically relieved of any further obligations under this Agreement.  For the avoidance of doubt, in the event this Agreement is terminated, Syncora shall retain the right to make any arguments, objections, or other assertions (other than res judicata or collateral estoppel as set forth in the preceding sentence), pursue any litigation, appeals, or other disputes related to confirmation of the POA (or any other plan) or any other matter otherwise resolved by this Agreement.

**Section 9**     **Miscellaneous.**

**9.1     Execution of this Agreement**.  This Agreement may be executed and delivered (by facsimile, PDF, or otherwise) in any number of counterparts, each of which, when executed and delivered, will be deemed an original, and all of which together will constitute the same agreement.  Each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

**9.2     Binding Obligation; Successors and Assigns**.  This Agreement is a legally valid and binding obligation of the Parties, enforceable in accordance with its terms, and will inure to the benefit of the Parties and their respective successors, assigns and transferees.   This Agreement grants no rights to any third party.

**9.3     Complete Agreement; Interpretation**.  This Agreement and the POA constitute the complete agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto.  This Agreement is the product of negotiation by and among the Parties.  Any Party enforcing or interpreting this Agreement will interpret it in a neutral manner.  There will be no presumption concerning whether to interpret this Agreement for or against any Party by reason of that Party

6

having drafted this Agreement, or any portion thereof, or caused it or any portion thereof to be drafted.

**9.4** **Costs**. Each Party will bear its own costs and expenses (including legal and other professional fees and expenses) incurred in connection with all matters set forth herein, including in connection with Sections 2 and 3 of this Agreement. Syncora agrees to pay any Allowed Claim for COP Agent Fees held by the COP Agent in accordance with and as set forth in the POA.

**9.5** **Amendment, Modification and Waiver**. This Agreement may be modified, altered, amended, or supplemented only by an agreement in writing signed by each Party. No waiver of any provision of this Agreement will be effective unless made in a writing signed by the Party making the waiver, nor will the waiver be extend to any other right, claim or remedy.

**9.6** **Notices**. All notices and other communications required under this Agreement will be given in writing and delivered, if sent by telecopy, electronic mail, courier, or by registered or certified mail (return receipt requested) to the following addresses and telecopier numbers (or at such other addresses or telecopier numbers as will be specified by like notice):

> If to the City:
>
> City of Detroit, Michigan
> 1200 Coleman A. Young Municipal Center
> 2 Woodward Avenue
> Detroit, Michigan 48226
> Attention: CFO
>
> with copies (which shall not constitute notice) to:
>
> City of Detroit Law Department
> First National Building, Suite 1650
> 660 Woodward Avenue
> Detroit, Michigan 48226
> Attention: Corporation Counsel
>
> and
>
> Jones Day
> 222 East 41st Street
> New York, NY 10017-6702
> Attn: Corinne Ball (cball@JonesDay.com)
>
> If to Syncora:
>
> Syncora Guarantee, Inc.
> Syncora Capital Assurance Inc.
> Attn: Claude LeBlanc
> 135 West 50th Street, 20th Floor

New York, NY 10020
claude.leblanc@scafg.com

with copies (which shall not constitute notice) to:

Kirkland & Ellis LLP
Attn: Ryan B. Bennett
300 N. LaSalle
Chicago, IL 60654
rbennett@kirkland.com

Any notice given by delivery, mail, or courier will be effective when received.  Any notice given by telecopier will be effective upon oral or machine confirmation of transmission.  Any notice given by electronic mail will be effective upon oral or machine confirmation of receipt.

      **9.7**    **Headings**.  The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

      **9.8**    **Governing Law and Jurisdiction**.  THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF MICHIGAN, WITHOUT REGARD TO ANY PRINCIPLES OF CONFLICTS OF LAW THEREOF THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANOTHER JURISDICTION.  By its execution and delivery of this Agreement, each of the Parties hereby irrevocably and unconditionally agrees that any dispute with respect to this Agreement will be resolved by the Bankruptcy Court to the extent that the Bankruptcy Court then has jurisdiction and power to enforce the terms of this Agreement.  Each of the Parties irrevocably consents to service of process by mail at the addresses listed for such Party in Section 9.6 hereof.  Each of the Parties agrees that its submission to jurisdiction and consent to service of process by mail is made for the sole and express benefit of each of the other Parties to this Agreement.

      **9.9**    **Waiver of Jury Trial**.  TO THE EXTENT PERMITTED BY LAW, THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT.

[Signature Pages Follow]

8

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.


THE CITY OF DETROIT


By:_____
     Name:
     Title:

13-53846-tjt   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 05:47:43   Page 332 of
409
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 05:46:29   Page 782 of
809

SYNCORA GUARANTEE, INC.

By:_____
    Name:
    Title:

SYNCORA CAPITAL ASSURANCE INC.

By: _____
    Name:
    Title:

TUNNEL LEASE AMENDMENT

# FIRST AMENDMENT TO LEASE

THIS FIRST AMENDMENT TO LEASE (this "**Amendment**") is made and entered into as of the ___ day of _____, 2014 (the "**Date Hereof**"), by and between the City of Detroit, a Michigan municipal corporation (the "**City**"), and Detroit Windsor Tunnel LLC, a Michigan limited liability company ("**Tenant**").

## R E C I T A L S

A.      The City, as landlord, and Tenant, as successor-in-interest to Detroit & Canada Tunnel Corporation ("**DCTC**"), as tenant, are parties to the Tube Lease, dated March 20, 1978 (the "**Tube Lease**"), whereby the City leases to Tenant the portion of the Detroit Windsor Tunnel (the entire such tunnel, the "**Tunnel**") located in Detroit, which portion is more particularly defined in the Tube Lease and referenced herein as the "**Tube**."

B.      The City, as landlord, as successor-in-interest to Ford Motor Properties, Inc. as sublandlord, and Tenant, as tenant, as successor-in-interest to DCTC as subtenant, are parties to the Sublease, dated March 20, 1978 (the "**Plaza Lease**"; together with the Tube Lease, the "**Lease**"), whereby the City leases to Tenant certain property defined in the Plaza Lease as the "New Tunnel Plaza" (such premises, the "**Plaza Premises**"; together with the Tube, the "**Property**").

C.      The term of the Lease (the "**Term**") expires on November 3, 2020, and the period commencing on the Effective Date through and including November 3, 2020 shall be referenced herein as the "**Existing Remainder Term**".

D.      The City desires to enter into a long-term agreement regarding the operation of the Property to assure that (i) the Tunnel will continue to provide to residents of Detroit and to other Tunnel passengers a safe and efficient route between Detroit and Windsor; (ii) the Property will be maintained and enhanced; and (iii), to promote such goals, there is transparency to the City regarding the operation of the Property.

E.      In furtherance of the goals of the City, the Tenant desires to enter into a long-term agreement with the City regarding the leasing and operation of the Property.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      <u>Capitalized Terms; Effective Date</u>.  Any capitalized term used herein and not otherwise defined shall have the meaning ascribed to such term in the Plaza Lease.  "**Effective Date**" means the first day of the month next succeeding the month in which occurs the Date Hereof.

2.      <u>Extension of Term</u>.  The term of the Tube Lease is extended for the period beginning November 4, 2020 and ending on December 31, 2040 (such period, the "**Extension Term**"), upon all the terms and conditions as contained in the Tube Lease and applicable during the Third Renewal Option (as defined in the Plaza Lease), except as amended hereby.  The term

of the Plaza Lease is extended for the Extension Term, upon all the terms and conditions as contained in the Plaza Lease and applicable during the Third Renewal Option (as defined in the Plaza Lease), except as amended hereby.

    3.    <u>Existing Term CapEx Credit; CapEx Schedule</u>.

    (a)    For any Capital Expenditures (as defined below) paid by Tenant during the Existing Remainder Term (the "**Existing Remainder Term Capital Expenditures**"), Tenant shall receive a credit equal to the amount of such Existing Remainder Term Capital Expenditures (a "**CapEx Credit**") against the aggregate rentals payable by Tenant pursuant to Article IV of the Plaza Lease (such amounts, the "**Rent**") during the Existing Remainder Term; *provided, however*, that the aggregate CapEx Credit to which Tenant is entitled pursuant to this Paragraph 3 shall not exceed the aggregate Rent payable by Tenant during the Existing Remainder Term. Tenant shall not claim a CapEx Credit for any Capital Expenditures paid in advance of the performance of the related work, other than for progress payments customary in the industry (or payments required due to emergency) without the City's prior written approval, which shall not be unreasonably withheld, delayed or conditioned. Subject to Paragraph 5, Tenant may not take a CapEx Credit during the Extension Term for an Existing Remainder Term Capital Expenditure.

    (b)    "**Capital Expenditures**" means (i) capital expenditures, as determined by generally accepted accounting principles consistently applied in the United States ("**GAAP**"), paid for work to or at the Plaza Premises and (ii) (x) while the Existing JOA (as defined herein) or any successor agreement between Tenant (or its affiliate) and the City of Windsor (or its instrumentality) (any such agreement, a "**D/W Agreement**") is in effect, 50% of the total capital expenditures, determined in accordance with GAAP, paid by Tenant (or its affiliate) and the City of Windsor (or its instrumentality) pursuant to a D/W Agreement for work to or at all or any portion of the underground tube of the Tunnel (i.e., the tube from and including the Detroit portal to and including the Windsor portal; such tube, the "**Underground Portion**"); provided, however, that Capital Expenditures made to the Underground Portion while a D/W Agreement is in effect shall be made such that the Detroit side of the Underground Portion is in a condition commensurate with the condition of the Windsor side of the Underground Portion; or (y) if no D/W Agreement is in effect, 100% of the capital expenditures, determined in accordance with GAAP, paid by Tenant for work to or at all or any portion for the Tube.

    (c)    Within ninety (90) days after the Effective Date, Tenant shall provide the City a detailed plan and schedule for the capital improvements planned to be made to the Tunnel during the year in which the Effective Date occurs and the approximately five (5) years following the Effective Date. On or before each January 31st during the Term, Tenant shall deliver to the City an annual update of such plan together with a plan for the succeeding five (5) years.

4.  Extension Term CapEx Credit.

(a)    For any Capital Expenditures paid by Tenant during the Extension Term (the "**Extension Term Capital Expenditures**"), Tenant shall receive a CapEx Credit against the Rent payable by Tenant during the Extension Term equal to the amount of such Extension Term Capital Expenditures; *provided, however*, the aggregate CapEx Credit to which Tenant is entitled during the Extension Term pursuant to this Paragraph 4 shall not exceed $8,000,000; and *provided, further,* that the annual CapEx Credit claimed by Tenant under this Paragraph 4 in any given calendar year of the Extension Term shall not exceed 75% of the Rent payable for such calendar year (but such annual limitation shall not in any way reduce the aggregate CapEx Credit to which Tenant is entitled under this Paragraph 4). If the Lease (as amended from time to time) terminates prior to December 31, 2040, other than due to a default by Tenant, then the City shall pay to Tenant, on thirty (30) days' written notice from Tenant, the amount of CapEx Credits that have accrued to Tenant but have not been applied against the Rent.

(b)    No more than sixty (60) days prior to November 4, 2020, Tenant shall provide the City a high-level, strategic plan for the capital improvements that may be made to the Tunnel during the Extension Term to the extent such plan is known or is customary in the tunnel operations field.

5.  CapEx Credit Documentation.

(a)    Tenant may offset the amount of any accrued but uncredited CapEx Credits against any monthly payments of Rent, subject to the limitations in Paragraphs 3 and 4. On or prior to the date of claiming any CapEx Credit (i.e., on or before the date of payment of any monthly installment of Rent, or if none is payable, on or before the date such monthly installment of Rent would otherwise have been payable) or requesting payment pursuant to the last sentence of Paragraph 4(a), Tenant shall submit to the City a notice setting forth the amount of the claimed CapEx Credit, together with reasonably detailed written documentation of the Capital Expenditures (and the work associated therewith) for which Tenant is entitled to a CapEx Credit (such notice, a "**CapEx Notice**"). Within five (5) days after receipt of any CapEx Notice, the City shall have the right to ask for reasonable additional information to verify such Capital Expenditures were paid and to determine the nature of work associated with such Capital Expenditure. If the City in good faith believes that a CapEx Credit was claimed for an expenditure that does not fall within the definition of "Capital Expenditure," as such term is defined in Paragraph 3(b) above, then the City shall give Tenant notice thereof (a "**Dispute Notice**") within fifteen (15) days after receipt of the applicable CapEx Notice, and the date on which Rent is due shall be extended by fifteen (15) days. If the City timely delivers a Dispute Notice, Tenant shall receive the portion of the CapEx Credit that is undisputed, if any, and shall pay the amount of disputed Rent, subject to the provisions of Article XVIII(2) of the Plaza Lease regarding disputed payments.

(b)     Notwithstanding anything to the contrary in the Lease, as amended hereby, if the City timely provides a Dispute Notice in connection with a CapEx Credit claimed for Existing Remainder Term Capital Expenditures, and if and to the extent such dispute is resolved in Tenant's favor, then the City shall promptly pay an amount equal to the formerly disputed CapEx Credit to Tenant, or at Tenant's option, Tenant may credit such formerly disputed CapEx Credit against the Rent next coming due; provided, however, if (i) the aggregate accrued but unapplied CapEx Credit to which Tenant is entitled under Paragraph 3, plus the formerly disputed CapEx Credit, exceed the aggregate Rent payable during the portion of the Existing Remainder Term commencing at the time the dispute is resolved; or (ii) at the time the dispute is resolved, the Existing Remainder Term has ended; then in addition to, and without in any way reducing, the CapEx Credits to which Tenant is entitled under Paragraph 4, Tenant may take such formerly disputed CapEx Credit as a credit against the Rents payable during the Extension Term. Notwithstanding the foregoing, in no event shall Tenant be entitled to aggregate CapEx Credits for the Existing Remainder Term Capital Expenditures in excess of the aggregate Rent payable during the Existing Remainder Term.

(c)     Notwithstanding anything to the contrary in the Lease, as amended hereby, if the City timely delivers a Dispute Notice in connection with a CapEx Credit claimed for Extension Term Capital Expenditures, and if and to the extent such dispute is resolved in Tenant's favor, then the City shall promptly pay an amount equal to the formerly disputed CapEx Credit to Tenant, or at Tenant's option, Tenant may credit such formerly disputed CapEx Credit against the Rent next coming due (in addition to, and not in limitation of, any CapEx Credit due under Paragraph 4). Notwithstanding the foregoing, in no event shall Tenant be entitled to aggregate CapEx Credits for Extension Term Capital Expenditures in excess of $8,000,000.

(d)     The provisions of this Paragraph 5 shall survive the expiration or sooner termination of the Lease, as amended hereby.

6.     Repair and Maintenance Standards.  Notwithstanding anything to the contrary in the Lease, but subject to the casualty and condemnation provisions therein, Tenant shall maintain the Property in a good and safe condition and repair, in compliance with all applicable laws, and in accordance with the following sections of the Existing JOA (as defined below): Sections 8.1(d), (e) and (f), and the first grammatical paragraph of Section 8.1; Sections 8.3(a), (b) and (c); Section 8.4; Section 8.6;  Section 9; Exhibit 8.1 and Sections 1, 2 and the first paragraph of Section 3 of Exhibit  9.1, provided that the second sentence of that first paragraph of Section 3 of Exhibit 9.1 shall be replaced with "The program shall include regular and customary cleaning and grounds maintenance."    In the event that the Existing JOA is terminated or amended, these standards shall continue to apply (to the extent applicable).

7.     Reporting.  In addition to its reporting obligations under the Lease, but subject to Paragraph 10 hereof, Tenant shall deliver, at its sole cost and expense, the following reports and information to the City:

(a)     Within one hundred eighty (180) days following the end of each calendar year ending during the term of the Lease: (i) a copy of the audited balance sheets of Tenant at the end of each such calendar year and the related audited statements of income, calculation of annual rental, changes in equity and cash flows for such year, including, in each case, the notes thereto, together with the report thereon of the independent certified public accountants of Tenant, in each case in a manner and containing information consistent with Tenant's current practices and certified by Tenant's chief financial officer that such financial statements fairly present the financial condition and the results of operations, changes in equity and cash flows of Tenant as at the respective dates of and for the periods referred to in such financial statements, all in accordance with generally accepted accounting principles in the United States consistently applied; (ii) a report, in a format reasonably acceptable to the City, certified by the Tenant's chief financial officer, providing reasonably detailed information regarding any work associated with Capital Expenditures undertaken by the Tenant with respect to the Property, including such information as may be reasonably requested by the City, which shall include the type of work associated with such Capital Expenditures, the expected cost therefor, the expected completion date, the contractor engaged to perform such work associated with such Capital Expenditures, and any expected disruption of traffic in the Property as a result of the work associated with such Capital Expenditures; and (iii) a report, in a format reasonably acceptable to the City, detailing the amount of traffic through the Property on a weekly, monthly and quarterly basis, the make-up of that traffic and the Tenant's projections for the traffic in the upcoming calendar year and the Tenant's basis therefor;

(b)     Within thirty (30) days after the end of each six-month period, commencing with the six-month period ending June 30, 2015, a report, in a format reasonably acceptable to the City, detailing all material incidents that occurred in the Tunnel, including, but not limited to, vehicular accidents and hazardous material releases, but in each case only if such incidents materially impeded the normal operations of the Tunnel;

(c)     promptly after the occurrence thereof, an email report on any incident occurring in the Tunnel and causing material damage to property or injury to persons, if such incident results in the closure of any portion of the Tunnel for at least an hour;

(d)     within thirty (30) days after receipt by Tenant, a copy of (i) the engineering reports required by Sections 8.7 and 8.8 of the Joint Operating Agreement by and among the Corporation of the City of Windsor, the Windsor Tunnel Commission and Tenant (as successor-in-interest to DCTC and The Detroit and Windsor Subway Company, Ltd.) dated November 1, 1997 (the "**Existing JOA**"); or (ii) if the Existing JOA is amended or modified to change the requirements for those reports, (x) every year, an engineering report based on visual inspection of the Tunnel made by an independent, licensed engineer reasonably acceptable to Tenant and (y) every five (5) years a comprehensive engineering report on the Tunnel prepared by an independent, licensed engineer reasonably acceptable to

CHI-1941736v5
5
13-53846-tjt   Doc 8405-21   Filed 10/20/14   Entered 10/20/14 05:47:23   Page 346 of 429
13-53846-swr   Doc 8053-1   Filed 10/20/14   Entered 10/20/14 05:48:23   Page 346 of 429

the City, which report shall include, but not be limited to, an analysis of the structural integrity of the Tunnel, a description of the current state of the Tunnel, including its fixtures and mechanical systems, recommended capital expenditures for the Tunnel and such other information as the City may reasonably request; and

(e)     Within thirty (30) days after such request, any information regarding the Property reasonably requested by the City, provided that such information is in the possession or control of Tenant.

8.     <u>Right to Inspect</u>.  The City shall have the right, upon at least three (3) business days' written notice to Tenant, at reasonable times, provided that such inspection does not unreasonably interfere with the normal operation of the Property (and as to any portion of the Property subleased as of the date hereof or subsequently subleased to a governmental authority, does not violate the applicable sublease) and at the City's sole cost and expense, to have the Property inspected by an engineer, who is (i) either employed directly by the City or with whom the City has contracted; and (ii) licensed and has at least ten (10) years' experience in engineering matters related to construction, maintenance and repair of infrastructure projects or tunnels.  Inspections made pursuant to this Paragraph 8 may only be performed once in each calendar year, except such limitation shall not apply when Tenant is in default of its obligations under Paragraph 6 of this Amendment or any other of its obligations regarding the repair, maintenance and operation of the Tunnel.  Tenant shall make the Property and a senior officer who is responsible for maintenance and/or operations of the Property reasonably available to such engineer for the purposes of such inspection and shall provide such engineer any documentation in Tenant's possession or control, reasonably requested by such engineer, subject to Paragraph 10.  Without limiting any provision hereof, any such engineering inspections conducted by or on behalf of the City shall be performed in accordance with all applicable laws and with all reasonable operating rules and regulations applicable to the Property.   The City shall cause any individual or firm performing an inspection pursuant to this Paragraph 8 to be bound by the confidentiality obligations of the City pursuant to the provisions of Paragraph 10 hereof.

9.     <u>Calculation of Net Operating Income</u>.  For the avoidance of doubt, in calculating "net operating income" as defined in Section IV(2)(b) of the Plaza Lease, Tenant shall not include any expenses that are not attributable to the operation, maintenance and repair of the Property or to Tenant's obligations under the Lease; and, to the extent Tenant or Tenant's affiliates incur costs that are only partially attributable to the Property, Tenant shall not include as an expense for Section IV(2)(b) of the Plaza Lease the portion of those costs that are not attributable to the Property.  Allocations will be prepared consistent with GAAP and the specific methodology and allocation shall be reflected and set forth in the companies' audited financial statements.

10.     <u>Confidentiality</u>.

(a)     Notwithstanding anything to the contrary in the Lease, no information or document provided by Tenant to the City pursuant to or in connection with the Lease, as amended hereby, shall be subject to any confidentiality restrictions, and the City may publicly disclose such information or disclose such information to

third parties as it deems appropriate in its sole discretion; *provided, however*, that Tenant shall have no obligation to deliver to the City (and Tenant may redact from information it delivers to the City) any Confidential Information (as defined below); and *provided, further*, that if Tenant delivers to the City any Confidential Information (and labels it as such), then the City shall not disclose such information to third parties (other than to its professional advisors, employees, third-party report providers, affiliates, officers, members, underwriters, agents, consultants, lenders, investors and legal counsel and as to those, only on a need-to-know basis, as reasonably determined by the City, provided such parties are bound by the confidentiality obligations of the City set forth in this Paragraph 10).

(b)     "**Confidential Information**" means information that (i) relates to maintaining national security and/or to maintaining security at the Tunnel; (ii) is required to be kept confidential by applicable law, regulation or order; or (iii) is a trade secret or is other information that is proprietary to Tenant (including, without limitation, information regarding Tenant's proprietary toll and revenue collecting and accounting system and Tenant's mobile app for express payments, and other technical and business information relating to Tenant's proprietary ideas, patentable ideas, copyrights, and other proprietary systems and software).

(c)     If Tenant chooses to withhold Confidential Information from the City, Tenant shall promptly provide written notice that it has done so.  The City, through its authorized representative, shall have the right, upon reasonable advance written notice to Tenant, to inspect any Confidential Information, which shall not be redacted, at the offices of Tenant within the City to verify during customary business hours that such information is Confidential Information and to review such Confidential Information, provided that the City may not make a copy of such Confidential Information.

(d)     Notwithstanding anything to the contrary in Lease (as amended hereby), in an effort to ensure that the City, Tenant and the City of Windsor can effectively and efficiently operate the Tunnel in an integrated and seamless manner, the City shall have the right to share with Windsor all information regarding the Tunnel it receives, and Tenant shall cause it and its affiliates to not restrict the City of Windsor, or its affiliates, from providing the City any information related to the Tunnel.

(e)     Nothing contained in this Lease (as amended hereby) shall be construed to limit or reduce the rights and powers of the State of Michigan or the United States of America.

11.     <u>Ineligible Parties</u>.  It shall be a default under the Lease, as amended hereby, if any Ineligible Party (as defined below) shall be involved in the operation, financing, construction or management of the Property or the improvements thereon, or if such Ineligible Party has a direct or indirect beneficial interest in Tenant.  "**Ineligible Party**" means any individual or entity,  or any entity controlled by, controlling or under common control with any individual or entity, maintaining a controlling interest in any crossing of the border between the State of Michigan

and Canada, such as any tunnel, bridge or other similar infrastructure; *provided, however* that the term "Ineligible Party" shall not include Pike Pointe Holdings, LLC; any entity controlled, controlling or under common control with Pike Pointe Holdings LLC; or Windsor.

12.     <u>Operation of an Integrated Tunnel</u>.  The parties acknowledge that it is in their respective and joint interests to cause the entire Tunnel to be operated in a harmonious and integrated manner.  The City understands that to effect such operation, Tenant intends to negotiate a new or amended operating agreement with the City of Windsor (or an agency or instrumentality thereof), and that Tenant will negotiate such agreement in good faith (but that Tenant shall have no obligation to enter into such an agreement).  The City also understands that achieving such purpose may require amendments to the Lease  (as amended hereby) and agrees to be reasonable, and to act in good faith, in discussing and considering any such amendments.  For avoidance of doubt, (i) Tenant will not have any obligation to enter into any such amendment that would (x) adversely affect (other than in a de minimis manner) its rights under the Lease, as amended hereby, (y) increase (other than in a de minimis manner) its obligations under the Lease, as amended from time to time or (z) decrease (other than in a de minimis manner) the City's obligations under the Lease, as amended from time to time; and (ii) the City will not have any obligation to enter into any such amendment that would (x) adversely affect (other than in a de minimis manner) its rights under the Lease, as amended hereby, (y) increase (other than in a de minimis manner) its obligations under the Lease, as amended from time to time or (z) decrease (other than in a de minimis manner) Tenant's obligations under the Lease, as amended from time to time.

13.     <u>Notices</u>.   Article XVIII(3) of the Plaza Lease and Article XV(3) of the Tube Lease are each amended and restated as follows:

3. All notices and other communications authorized or required hereunder, to be given to the City or the Tenant, shall be in writing and shall be given by hand delivery or by nationally recognized overnight courier to the following addresses:

If to the City, to

**The City of Detroit**
Office of the Mayor
Coleman A. Young Municipal Center
2 Woodward Avenue, Suite 1126
Detroit, MI 48226
Attn: Mayor

with a copy to (which will not constitute notice):

**The City of Detroit**
Law Department
Coleman A. Young Municipal Center
2 Woodward Avenue, 5th Floor
Detroit, MI 48226
Attention: Corporation Counsel

If to Tenant, to

> Detroit Windsor Tunnel LLC
> 100 East Jefferson Avenue
> Detroit, MI 48226
> Attn:  Neal Belitsky

with a copy to

> Dykema Law Firm
> 400 Renaissance Center
> Detroit, MI 48243
> Sherrie L Farrell, Esq.

Notices shall be effective if given by a party's attorneys.  Any party may change its address for notices by a notice given in accordance with this section.  Notices shall be deemed given and received on the date received, as evidenced by receipt.

14.     Counterparts.  This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

15.     Conflict.  In the event the terms of the Lease conflict with the terms of this Amendment, the terms of this Amendment shall control and govern in all instances.

16.     Full Force and Effect. The Lease, as modified hereby, remains in full force and effect.

17.     Severability.  If any provision of this Amendment or the application thereof to any person or circumstances shall, to any extent, be declared invalid, illegal or unenforceable by a court of competence jurisdiction, all other provisions and applications hereof shall remain in full force and effect.

18.     Inter-Governmental Authority.  Expressly subject and subordinate to the terms of the Lease (as amended hereby and as amended from time to time), the City may enter into an agreement with Windsor to establish an intergovernmental authority concerning the Tunnel.  For avoidance of doubt, no such agreement shall adversely affect (other than in a de minimis manner) Tenant's rights nor increase (other than in a de minimis manner) its obligations under the Lease, as amended from time to time.

19.     Memorandum of Lease. This Amendment shall not be recorded; *provided, however,* that upon the request of either party, the other party shall join in the execution of a memorandum or short form of the Lease, as amended hereby, which shall describe the parties, the Demised Premises, the term of the Lease, and special provisions and shall incorporate the Lease, as amended hereby, only by reference.

*[**Signature page follows**]*

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first above written.

**CITY:**

CITY OF DETROIT

By: _____

    Name:

    Title:


**TENANT:**

DETROIT WINDSOR TUNNEL LLC

By: _____

    Name:

    Title:

# OPTION AGREEMENT

# OPTION AGREEMENT

THIS OPTION AGREEMENT (this "**Agreement**") is made and entered into as of the ___ day of _____, 2014, by and between Pike Pointe Holdings, LLC ("**Pike Pointe**") and the City of Detroit, a Michigan municipal corporation (the "**City**").

## R E C I T A L S

A.    The City owns that certain parking garage, commonly known as the Grand Circus Parking Garage, located at 1600-01 Woodward Avenue, Detroit, Michigan, as more particularly described in Exhibit 1 (the "**Circus Garage**").

B.    The Detroit Building Authority (the "**DBA**") had previously owned the Circus Garage and had leased it to the City pursuant to the Contract of Lease No. 2 by and between the City and the DBA, dated October 1985, (as amended, the "**DBA Lease**").

C.    The DBA Lease has previously terminated pursuant to its terms, and pursuant to the terms of the DBA Lease, title to the property leased thereunder, including the Circus Garage, reverted back to the City.

D.    Syncora Capital Assurance Inc. and Syncora Guarantee Inc. (collectively, "**Syncora**") own the entire beneficial interest in Pike Pointe.

E.    Syncora, through one or more of its affiliates, including Pike Pointe, owns and operates certain public infrastructure projects.

F.    In connection with the continued improvement of the City, the City desires to grant an option to Pike Pointe with respect to the possibility of negotiating and entering into a mutually agreeable concession agreement for the operation and maintenance of the Circus Garage pursuant to the terms of this Agreement, and Pike Pointe desires to accept such option.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Option.  Pike Pointe shall have the option, in its sole discretion, to enter into a concession for the Circus Garage (the "**Option**") on the terms set forth herein.  In order to exercise the Option, Pike Pointe must deliver written notice to the City notifying the City that Pike Pointe has exercised the Option (the "**Exercise Notice**"), which Exercise Notice must be delivered within one (1) year from the effective date of the Seventh Amended Plan for the Adjustment of Debts of the City of Detroit, as it may be further amended and as modified (the "**Plan of Adjustment**").  After delivery of the Exercise Notice, the City and Pike Pointe shall promptly and in good faith, negotiate a concession agreement in accordance with the terms set forth in Exhibit 2; provided, however, that neither party shall be obligated to execute a concession agreement.  If, within ninety (90) days following the delivery of the Exercise Notice, an agreement has not been reached between the City and Pike Pointe regarding the Circus Garage, either party may, by delivery of notice to the other party, terminate this Option, and thereafter Pike Pointe shall have no right with respect to the Circus Garage.

CHI-1941902v4

1

13-53846-swr   Doc 8045-1   Filed 10/20/14   Entered 10/20/14 05:47:43   Page 354 of
13-53846-swr   Doc 8045-1   Filed 10/20/14   Entered 10/20/14 05:48:23   Page 354 of
429

2.  <u>Failure to Exercise</u>.  If Pike Pointe fails to send the Exercise Notice within one (1) year after the effective date of the Plan of Adjustment, Pike Pointe will be deemed to have not exercised the Option and will have no further right to do so nor shall it have any interest in the Circus Garage.  At such time, this Agreement and the Option will have no further force or effect.

3.  <u>Anti-Assignment</u>.  Pike Pointe may not assign to any third party (other than a wholly owned subsidiary or other affiliate of Syncora in which Syncora is the direct or indirect beneficial owner (a "**Pike Pointe Affiliate**"), any interest in this Agreement or the Option without the City's prior written consent, which consent may be withheld in the City's sole discretion.  Any attempted assignment without the City's consent shall be void ab initio and of no force and effect, and such purported transferee shall have no right to exercise the Option nor shall it have any interest in the Circus Garage.  Notwithstanding anything to the contrary in this Agreement, Pike Pointe shall have no right to exercise the Option if, at the time of such exercise and the execution of the Concession Agreement, Syncora is not a direct or indirect beneficial owner of Pike Pointe.

4.  <u>Title to Circus Garage</u>.  The City shall cause the DBA to execute such documentation as is necessary to confirm the transfer of ownership of the Circus Garage to the City promptly after execution of this Agreement.  The City shall retain title to the Circus Garage during such time as Pike Pointe has the right to exercise the Option and shall maintain the Circus Garage in at least the same condition and repair as of the date hereof.

5.  <u>Development Agreements</u>.  Pike Pointe hereby acknowledges that the City has entered into certain development agreements with third party developers, which agreements contemplate that those developers will have the right to use parking spots within the Circus Garage at fair market rates (as determined by Pike Pointe from time to time and consistent with the rates provided to other patrons of the Circus Garage), and Pike Pointe agrees that it shall execute leases, licenses or other usage agreements with such developers on those terms.  The City will provide the material terms and conditions of those development agreements with respect to developers' use of Circus Garage as soon as is reasonably practicable following execution of this Agreement.

6.  <u>Due Diligence Activities</u>.

(a)  Prior to delivery of the Exercise Notice, Pike Pointe shall have a period commencing on the date hereof and continuing through and including the date of the delivery of the Exercise Notice or the expiration or termination of this Option, whichever is sooner, (the "<u>Due Diligence Period</u>") to conduct its due diligence activities on the Circus Garage, which shall not unreasonably interfere with the use and operation of the Circus Garage.  For purposes of this Agreement, "<u>Due Diligence Activities</u>" include but are not limited to the following:

(A)  such physical inspections, soil borings and bearing tests, surveys, and possible relocation of utilities on or for the Circus Garage as Pike Pointe deems appropriate, all of which shall be completed at Pike Pointe's expense;

(B)     investigations, environmental site assessments, including Phase I and Phase II site assessments, sampling and testing of soil, groundwater, surface water, soil vapors, indoor air, and building materials (such as Asbestos and lead-based paint), and/or a Baseline Environmental Assessment, ("**BEA**"), as defined in Part 201 of the Natural Resources and Environmental Protection Act ("**NREPA**"), being MCL 324.20101 et seq., and such other investigations and assessments as Pike Pointe may deem needed in its sole discretion to determine the condition of the Circus Garage and the Circus Garage's compliance with applicable law, all of which shall be completed at Pike Pointe's expense; and

(C)     a review of the title evidence, survey, entitlements, and payment of taxes and assessments, all of which shall be completed at Pike Pointe's expense;

(D)     a review of financing sources related to Pike Pointe's proposed use of the Circus Garage, or any other matter that in Pike Pointe's sole discretion is relevant to Pike Pointe's use of the Circus Garage;

(E)     a review of all City Information and all publicly-available information with respect to the Circus Garage;

(F)     a review of available public and private utilities and public accesses necessary for the proposed use of the Circus Garage; and

(G)     application and procurement of any zoning, site plan, elevation, special land use, environmental, conditional use or other municipal approvals or permits, or variances therefrom, required or appropriate for the proposed use of the Circus Garage.  The City hereby authorizes Pike Pointe to submit and apply for all such approvals, permits, and variances upon the commencement of the Due Diligence Period.

(b)     <u>Restoration of City Property</u>.  Promptly following completion of a Due Diligence Activity, Pike Pointe shall restore the Circus Garage and all property therein to the state in which it existed prior to the commencement of the Due Diligence Activity.

(c)     <u>City Information</u>.  The City shall use reasonable efforts to make available to Pike Pointe all information in the City's (or the City's agencies' or departments') possession or control related to the Circus Garage within thirty (30) days following the effective date of the Plan of Adjustment, including but not limited to existing leases, licenses, permits, approvals, contracts, warranties, title searches and policies, surveys, appraisals, environmental audits, Phase I environmental site assessments, Phase II reports or other testing or sampling data, asbestos surveys, reports, specifications, from the Planning, Building, Assessing, Environmental

Affairs and Fire Departments, notices of violations of applicable laws, regulations and ordinances or other documents in the City's possession or control related to the Circus Garage, to the extent the City is not required by law or applicable agreement to keep such information confidential (collectively, the "**City Information**").  The City shall cooperate with Pike Pointe and use reasonable efforts to facilitate Pike Pointe's Due Diligence Activities, all at no material incremental cost to the City, including providing information, coordinating with third party users of the Circus Garage as applicable, and executing such documentation as may be reasonable and necessary for Pike Pointe's access to the site and  completion of the Due Diligence Activities including the preparation of a BEA.

(d)     <u>Insurance</u>.  Prior to entering onto the Circus Garage for any Due Diligence Activities, Pike Pointe or its contractors shall enter into a right-of-entry agreement regarding the entry into the Circus Garage to be reasonably agreed to by the City and Pike Pointe.

(e)     <u>Indemnity</u>.  Pike Pointe shall defend, indemnify and hold harmless the City from and against any loss, liability, cost or expense incurred by the City to the extent resulting from Pike Pointe's (including its duly authorized employees, agents, engineers or other representatives) negligence or willful acts occurring in connection with the Due Diligence Activities; provided, however, that Pike Pointe shall in no circumstance have any obligation or liability with respect to any conditions pre-existing at the Circus Garage including without limitation any environmental condition, soil or groundwater contamination or other environmental conditions that may be discovered in the course of the Pike Pointe's Due Diligence Activities and thereafter disclosed to the City, except to the extent such conditions are materially exacerbated due to the negligence or willful acts of Pike Pointe or any of its duly authorized employees, agents, engineers or other representatives, and (ii) Pike Pointe shall not be responsible for any loss, liability, cost, or expense resulting from the discovery of any adverse information or condition regarding the Circus Garage or from the City's (or the City's agencies' or departments') negligence or misconduct.

7.     <u>Notices</u>.   All notices, demands and other communications given or delivered under this Agreement shall be given in writing to the address indicated below (or such other address as the recipient specifies in writing) and will be deemed to have been given when delivered personally, three (3) business days after mailed by certified or registered mail, return receipt requested and postage prepaid, or when delivery is guaranteed if sent via a nationally recognized overnight carrier, or when receipt is confirmed if sent via facsimile or other electronic transmission to the recipient with telephonic confirmation by the sending party.

**[The City of Detroit**
Office of the Mayor
Coleman A. Young Municipal Center
2 Woodward Avenue, Suite 1126
Detroit, Michigan 48226

Facsimile: (313)224-4128
Attention: Mayor ]


with a copy to (which will not constitute notice):

The City of Detroit
Law Department
Coleman A. Young Municipal Center
2 Woodward Avenue, 5th Floor
Detroit, Michigan 48226
Telephone: (313)224-1352
Facsimile: (313)224-5505
Attention: Corporation Counsel


with a copy to (which will not constitute notice):

The City of Detroit
Municipal Parking Department
1600 W. Lafayette
Detroit, Michigan 48216
Telephone: (313)221-2500
Facsimile: (313)221-2501
Attention: Director of Municipal Parking

**[Pike Pointe]**

_____
_____
_____
_____


8.     <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

9.     <u>Time of Essence</u>.  Time is of the essence of this Agreement.

10.     <u>Severability</u>.  If any provision of this Agreement or the application thereof to any person or circumstances shall, to any extent, be declared invalid, illegal or unenforceable by a court of competence jurisdiction, all other provisions and applications hereof shall remain in full force and effect.

11.     <u>Merger of Prior Agreements</u>.  This Agreement supersedes all prior agreements and understandings between the parties hereto relating to the subject matter hereof.

12.     <u>Governing Law; Venue</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Michigan.  By its execution and delivery of this

CHI-1941902v4
5
13-53846-swr  Doc 8405-1  Filed 11/20/14  Entered 11/20/14 05:47:43  Page 352 of 429
13-53846-swr  Doc 8045-1  Filed 10/20/14  Entered 10/20/14 05:48:23  Page 358 of 409

Agreement, each of the City and Pike Pointe irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement, or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding shall be brought in the Bankruptcy Court for so long as it has jurisdiction, and thereafter in the United States District Court for the Eastern District of Michigan; provided that if the United States District Court for the Eastern District of Michigan does not have jurisdiction, then such legal action, suit or proceeding shall be brought in such other court of competent jurisdiction located in Wayne County, Michigan. By execution and delivery of this Agreement, each of the City and Pike Pointe irrevocably accepts and submits to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding and specifically consents to the jurisdiction and authority of the Bankruptcy Court to hear and determine all such actions, suits, and proceedings under 28 U.S.C. §157(b) or (c), whichever applies.

13. _Amendments_. Except as otherwise provided herein, this Agreement may be amended or modified by, and only by, a written instrument executed by the parties hereto.

14. _Captions_. The captions used in this Agreement are for convenience of reference only and do not constitute a part of this Agreement and will not be deemed to limit, characterize or in any way affect any provision of this Agreement, and all provisions of this Agreement will be enforced and construed as if no caption had been used in this Agreement.

15. _Successors and Assigns_. This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their permitted respective successors, heirs, administrators and assigns.

16. _No Strict Construction_. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent. In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties, and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

[*Signature page follows*]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**CITY:**

CITY OF DETROIT

_____

By:
Its:


**TENANT:**

[PIKE POINTE]

_____

By_____
Its _____

CHI-1941902v4

13-53846-tjt  Doc 8405-21  Filed 11/20/14  Entered 11/20/14 05:47:43  Page 360 of 429
13-53846-swr  Doc 8045-1  Filed 10/22/14  Entered 10/22/14 05:48:29  Page 304 of 309

# EXHIBIT 1

## DESCRIPTION OF GRAND CIRCUS PARKING GARAGE

Grand Circus is a three level underground parking structure, situated below the two parcels described below.  Grand Circus includes all ramps, walkways, stairwells and other ingress and egress points to the parking structure existing as of the date hereof.

**Parcel 02001886: 1883 Woodward Ave**
Legal Description: W WOODWARD ALL THAT PT OF GOVERNOR AND JUDGES PLAN BOUNDED BY WOODWARD AVE, E ADAMS ST & PARK AVE A K A WLY PT OF GRAND CIRCUS PARK2/--- 357 IRREG
**Parcel 01004139: 1600 Woodward Ave**
Legal Description: E WOODWARD ALL THAT PT OF GOVERNOR & JUDGES PLAN BOUNDED BY WOODWARD AVE, E ADAMS AND WITHERELL STS A K A ELY PT OF GRAND CIRCUS PARK1/--- 357 IRREG

## EXHIBIT 2

## CONCESSION AGREEMENT TERMS

- 30 year term, structured as a concession agreement
- Pike Pointe (or a Pike Pointe Affiliate) is obligated to operate and maintain the Circus Garage during the term at its sole cost and expense and has the right to collect all parking revenue derived from the Circus Garage
- Pike Pointe (or a Pike Pointe Affiliate) shall be responsible, at its sole cost and expense, for all necessary capital expenditures to the Circus Garage, including, without limitation, $13.5 million in capital expenditures during the first 5 years of the term.
- Rent to the City will be calculated as 25% of Free Cash Flow. Free Cash Flow is defined as revenue collected from the Circus garage minus operating expenses minus capital expenditures, which shall not include the $13.5 million in initial capital expenditures made by Pike Pointe.
- No Rent shall be due to the City until Pike Pointe has received a return of 140% on its initial capital expenditures of $13.5 million.
- Pike Pointe (or a Pike Pointe Affiliate) will enter into market-rate long term leases, licenses or usage agreements with the developers of properties adjacent to the Circus Garage pursuant to existing development agreements between the City and such developers.

# EXHIBIT I.A.354

SCHEDULE OF UNLIMITED TAX GENERAL OBLIGATION BOND DOCUMENTS
& RELATED UNLIMITED TAX GENERAL OBLIGATION BONDS

## SCHEDULE OF UNLIMITED TAX GENERAL OBLIGATION BOND
## DOCUMENTS & RELATED UNLIMITED TAX GENERAL OBLIGATION BONDS

| Unlimited Tax General Obligation Bond Documents | Series of Unlimited Tax General Obligation Bonds | Balance as of Petition Date |
|---|---|---|
| Resolution of the City Council adopted March 3, 1999<br><br>Finance Director's Order dated April 1, 1999 | Series 1999-A | $18,747,364 |
| Amended and Restated Resolution of the City Council adopted April 6, 2001 and Supplement No. 1 to Amended and Restated Resolution, adopted June 13, 2001 (collectively, "2001 UTGO Resolution")<br><br>Finance Director's Order dated August 1, 2001 ("2001 UTGO Sale Order") | Series 2001-A(1) | $78,787,556 |
| 2001 UTGO Resolution<br><br>2001 UTGO Sale Order | Series 2001-B | $4,063,616 |
| Resolution of the City Council adopted July 24, 2002<br><br>Finance Director's Order dated August 2, 2002 | Series 2002 | $6,745,767 |
| Resolution of the City Council adopted September 19, 2003<br><br>Finance Director's Order dated October 9, 2003 | Series 2003-A | $34,908,150 |
| Bond Authorizing Resolution adopted June 14, 2004 ("2004 UTGO Resolution")<br><br>Finance Director's Order dated August 27, 2004 ("2004 UTGO Sale Order") | Series 2004-A(1) | $39,872,258 |
| 2004 UTGO Resolution<br><br>2004 UTGO Sale Order | Series 2004-B(1) | $38,206,678 |
| 2004 UTGO Resolution<br><br>2004 UTGO Sale Order | Series 2004-B(2) | $736,241 |
| Resolution of the City Council adopted July 6, 2005 ("2005 UTGO Resolution")<br><br>Finance Director's Order dated December 5, 2005 ("2005 UTGO Sale Order") | Series 2005-B | $45,452,501 |
| 2005 UTGO Resolution<br><br>2005 UTGO Sale Order | Series 2005-C | $18,671,105 |

| Unlimited Tax General Obligation Bond Documents | Series of Unlimited Tax General Obligation Bonds | Balance as of Petition Date |
|---|---|---|
| Resolution of the City Council adopted November 17, 2006 ("2008 UTGO Resolution")<br><br>Finance Director's Order dated May 30, 2008 ("2008 UTGO Sale Order") | Series 2008-A | $59,487,564 |
| 2008 UTGO Resolution<br><br>2008 UTGO Sale Order | Series 2008-B(1) | $28,982,532 |

## EXHIBIT I.A.360

FORM OF UTGO SETTLEMENT AGREEMENT

13-53846-swr   Doc 8045-2   Filed 10/26/14   Entered 10/26/14 05:47:49   Page 366 of
429
13-53846-swr   Doc 8045-2   Filed 10/26/14   Entered 10/26/14 05:47:49   Page 1 of 06

# SETTLEMENT AGREEMENT

This Settlement Agreement ("**Agreement**") is entered into as of July 18, 2014, among the City of Detroit (the "**City**"), Ambac Assurance Corporation ("**Ambac**"), Assured Guaranty Municipal Corp. and Assured Guaranty Corp. (together, "**Assured**"), and National Public Finance Guarantee Corporation ("**NPFG**"). In this Agreement, each of the City, Ambac, Assured, and NPFG is referred to individually as a "**Party**"; Ambac, Assured, and NPFG (including their successors and assigns) are referred to collectively as the "**Bond Insurers**"; and the City and the Bond Insurers are referred to collectively as the "**Parties**."

## RECITALS

**WHEREAS**, as of the close of Fiscal Year 2013 (*i.e.*, June 30, 2013), the City had $369.115 million in outstanding principal amount of unlimited tax general obligations bonds, excluding the 2010 Series A Bonds hereinafter mentioned (the "**Prior UTGO Bonds**");

**WHEREAS,** more than 90% of the Prior UTGO Bonds are insured by one of the three Bond Insurers under financial guaranty insurance policies (the "**Bond Insurance Policies**") that were issued contemporaneously with the respective Prior UTGO Bonds;

**WHEREAS**, the Governor of the State of Michigan determined on March 1, 2013 that a financial emergency existed in the City, and the Emergency Manager (together with any successors, the "**Emergency Manager**") was appointed for the City on March 14, 2013;

**WHEREAS**, on July 18, 2013 (the "**Petition Date**"), the City filed a voluntary petition for relief under chapter 9 of title 11 of the United States Code (the "**Bankruptcy Code**"), thereby commencing Bankruptcy Case No. 13-53846 (the "**Bankruptcy Case**") before the United States Bankruptcy Court for the Eastern District of Michigan (the "**Bankruptcy Court**");

**WHEREAS**, as of the Petition Date, the balance due on the Prior UTGO Bonds, including prepetition interest accrued as of that date, was $374,686,297;

**WHEREAS,** on October 1, 2013, the City defaulted on its obligation to make interest payments on the Prior UTGO Bonds in the amount of $9,372,276 and the Bond Insurers paid claims and were subrogated to the rights of the owners for such payments, and the insurance documents contemplate the assignment of the Prior UTGO Bonds to the Bond Insurers upon payment of a claim;

**WHEREAS**, on April 1, 2014, the City defaulted on its obligations on the Prior UTGO Bonds to pay interest in the amount of $9,372,276 and to pay principal in the amount of $38,205,000, and the Bond Insurers paid claims and were subrogated to the

rights of the owners for such payments, and the insurance documents contemplate the assignment of the Prior UTGO Bonds to the Bond Insurers upon payment of a claim;

**WHEREAS**, on November 8, 2013, Assured and NPFG filed an adversary proceeding against the City seeking declaratory relief with regard to their rights in respect of the Prior UTGO Bonds pending before the Bankruptcy Court (Adv. Proc. No 13-05309) (the "**Assured/NPFG Action**"), and Ambac filed an adversary proceeding against the City seeking declaratory relief with regard to its rights in respect of, *inter alia*, the Prior UTGO Bonds pending before the Bankruptcy Court (Adv. Proc. No 13-05310) (the "**Ambac Action**");

**WHEREAS**, on or about February 21, 2014, each of the Bond Insurers filed proofs of claim in the Bankruptcy Case (the "**UTGO Claims**") asserting claims against the City for the full amount of principal and interest due under the documents pursuant to which the Prior UTGO Bonds were issued (including post-petition interest), amounts due the Bond Insurers for payments pursuant to the Bond Insurance Policies, and contractual reimbursements due for charges, fees, costs, losses, liabilities and expenses incurred by the Bond Insurers in connection with the Bond Insurance Policies; and

**WHEREAS**, the Parties have engaged in good faith and arms' length negotiations regarding a consensual resolution of their disputes under or in respect of the Prior UTGO Bonds, the Assured/NPFG Action, the Ambac Action, and the UTGO Claims;

**NOW, THEREFORE**, in consideration of the foregoing and the promises, mutual covenants, and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1.    <u>Recitals</u>.  The recitals set forth above are incorporated by reference and are explicitly made a part of this Agreement.

Section 1.2.    <u>Definitions</u>.  In addition to the capitalized terms defined in the preamble and recitals, the following definitions shall apply to and constitute part of this Agreement and all schedules, exhibits and annexes hereto:

"**Act 436**" shall mean the Local Financial Stability and Choice Act of the State, Act 436 of 2012, Public Acts of Michigan, 2012.

"**Additional Bonds**" shall mean any unlimited tax general obligation bonds issued on a parity with the Prior UTGO Bonds, the UTGO Bonds and the 2010 Series A Bonds as to the Aggregate UTGO Tax Levy.

"**Additional DSA Debt**" has the meaning ascribed to it in Section 2.6(a).

"**Agreement to Deposit State Aid**" shall mean the agreement, dated as of the date of the issuance of the MFA Bonds, among the City, the State Treasurer and U.S. Bank National Association, as Master Trustee, providing for the deposit of Distributable State Aid payments by the State Treasurer directly into the funds and accounts held by the Master Trustee pursuant to the Master Indenture for purposes of retiring the Municipal Obligation for so long as the Municipal Obligation remains outstanding.

"**Aggregate UTGO Tax Levy**" shall mean all proceeds of the ad valorem tax millage levies, including delinquent millage payments received from Wayne County or otherwise, on account of unlimited tax general obligation bonds of the City, including the Prior UTGO Bonds (or after the Effective Date, the UTGO Bonds), the 2010 Series A Bonds and any Additional Bonds hereafter issued by the City.

"**Allowed Claim**" has the meaning ascribed to it in the Plan.

"**Ambac Action**" has the meaning ascribed to it in the recitals hereof.

"**Approval Motion**" shall mean a motion filed by the City with the Bankruptcy Court in accordance with Section 2.8(c), seeking entry of the Approval Order pursuant to Federal Rule of Bankruptcy Procedure 9019, which motion shall be in form and substance reasonably satisfactory to the Parties.

"**Approval Order**" shall mean an order of the Bankruptcy Court (other than the Plan Confirmation Order) approving the compromise and settlement set forth in this Agreement authorizing and directing the consummation of the transactions contemplated herein, which order shall be in a form and substance reasonably satisfactory to the Parties.

"**Assigned UTGO Bond Tax Proceeds**" has the meaning ascribed to it in Section 2.1(b)(i).

"**Assured/NPFG Action**" has the meaning ascribed to it in the recitals hereof.

"**Bankruptcy Case**" has the meaning ascribed to it in the recitals hereof.

"**Bankruptcy Code**" has the meaning ascribed to it in the recitals hereof.

"**Bankruptcy Court**" has the meaning ascribed to it in the recitals hereof.

"**Bond Insurance Policies**" has the meaning ascribed to it in the recitals hereof.

"**Bond Insurer Claims**" has the meaning ascribed to it in Section 2.1.

"**Bond Insurer Exculpated Parties**" means the Bond Insurers solely in their capacity as insurers of the Prior UTGO Bonds, and their respective parents, affiliates, shareholders, directors, officers, managers, employees, agents, attorneys, advisors, accountants, restructuring consultants, financial advisors and investment bankers, solely in their capacity as such.

"**Claim**" shall mean a "claim" as defined in Section 101(5) of the Bankruptcy Code.

"**Class**" means each class of Claims established under the Plan.

"**Debt Millage Escrow Agreement**" shall mean an escrow agreement substantially in the form of Exhibit A hereto between the City and U.S. Bank National Association as escrow trustee providing, among other things, for the deposit and distribution of the Aggregate UTGO Tax Levy collected by the City, to be executed and delivered on the date of this Agreement.

"**Debt Millage Escrow Trustee**" has the meaning ascribed to it in Section 2.4(a).

"**Distributable State Aid**" shall mean the shared revenue payments that the City is entitled to receive from the State under the Michigan Constitution and the provisions of the Glenn Steil State Revenue Sharing Act, Act 140, Public Acts of Michigan, 1971, as amended ("**Act 140**") in each City fiscal year ending June 30.

"**DSA Deposit**" has the meaning ascribed to it in Section 2.5(c).

"**DSA Deposit Date**" has the meaning ascribed to it in Section 2.5(c).

"**Deposit Date Balance Requirement(s)**" has the meaning ascribed to it in Section 2.5(c).

"**Deposit Date Balance Requirement for the Municipal Obligation**" has the meaning ascribed to it in Section 2.5(e).

"**DSA Escrow Funds**" has the meaning ascribed to it in Section 2.5(b).

"**DTC System**" shall mean the system maintained by the Depository Trust Company used for trading municipal securities.

"**Effective Date**" shall mean the effective date of any Plan.

"**Emergency Manager**" has the meaning ascribed to it in the recitals hereof.

"**Emergency Manager Order**" shall mean an order of the Emergency Manager in substantially the form attached hereto as Exhibit B.

"**Event of Default**" has the meaning ascribed to it in Section 4.1.

"**Existing DSA Debt**" has the meaning ascribed to it in Section 2.6(a).

"**Final Order**" shall mean an order or judgment including any associated findings of fact and conclusions of law of the Bankruptcy Court or other court of competent jurisdiction with respect to the applicable subject matter which has not been reversed, stayed, modified or amended and as to which (a) any right to appeal or seek certiorari, review, reargument, stay or rehearing has expired and no appeal or petition for certiorari, review, reargument, stay or rehearing is pending, or (b) an appeal has been taken or petition for certiorari, review, reargument, stay or rehearing has been filed and (i) such appeal or petition for certiorari, review, reargument, stay or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which certiorari, review, reargument, stay or rehearing was sought or (ii) the time to appeal further or seek certiorari, review, reargument, stay or rehearing has expired and no such further appeal or petition for certiorari, review, reargument, stay or rehearing is pending; provided, however, that the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Federal Rule of Bankruptcy Procedure 9024 may be filed relating to such order shall not cause such order to not be a Final Order.

"**Financial Terms**" has the meaning ascribed to it in Section 2.2.

"**Hard Pay Instruments**" has the meaning ascribed to it in Section 2.11(a)(i).

"**Holders Restructured UTGO Bonds**" has the meaning ascribed to it in Section 2.1(a).

"**Holder**" shall mean the holder of a Claim under or evidenced by the Prior UTGO Bonds.

"**Impaired Financial Creditors**" has the meaning ascribed to it in Section 2.11(a).

"**Insurer Owned Restructured UTGO Bonds**" has the meaning ascribed to it in Section 2.1(a).

"**Master Indenture**" shall mean the Master Debt Retirement Trust Indenture dated as of March 1, 2010 by and between the City and U.S. Bank National Association, Detroit, Michigan, as Master Trustee, as supplemented by the First Supplemental Debt Retirement Trust Indenture dated as of March 1, 2010, by the Second Supplemental Debt Retirement Trust Indenture dated as of December 1, 2010, the Third Supplemental Debt Retirement Trust Indenture dated as of March 1, 2012, the Fourth Supplemental Debt Retirement Trust Indenture dated as of August 1, 2012 and by the Fifth Supplemental Debt Retirement Trust Indenture to be dated as of the first day of the

month of the issuance of the MFA Bonds, by and between the City and the Master Trustee.

"**Master Trustee**" shall mean U.S. Bank National Association, Detroit, Michigan, as trustee under the Master Indenture or any successor trustee appointed pursuant to the terms of the Master Indenture.

"**MFA Bonds**" has the meaning ascribed to it in Section 2.2.

"**Municipal Obligation**" has the meaning ascribed to it in Section 2.2.

"**Plan**" shall mean the chapter 9 plan of adjustment filed by the City and incorporating the terms and conditions set forth in this Agreement, in substantially the form of the draft thereof dated May 5, 2014, as such plan may be amended, modified or supplemented from time to time, which plan, as it relates to this Settlement Agreement, shall be in form and substance reasonably satisfactory to the Bond Insurers.

"**Plan Confirmation Order**" shall mean findings of fact and an order of the Bankruptcy Court confirming the Plan and meeting the requirements of Section 2.9 of this Agreement.

"**Plan Documents**" shall mean the Plan, the Plan Confirmation Order and any Plan related documents effectuating this Agreement.

"**Plan Instruments**" shall have the meaning ascribed to it in Section 2.11(a)(ii).

"**Prior UTGO Bonds**" has the meaning ascribed to it in the recitals hereof.

"**Pro Rata**" shall mean the proportion that a claim of one Holder of Restructured UTGO Bonds bears to the aggregate of all claims of all of the Holders of Restructured UTGO Bonds.

"**Restructured UTGO Bonds**" has the meaning ascribed to it in Section 2.1.

"**Series 2014 DSA Escrow Fund**" has the meaning ascribed to it in Section 2.5(d).

"**Settlement Escrow Agreement**" has the meaning ascribed to it in Section 2.8.

"**Settlement-Related Documents**" shall mean this Agreement, the Plan Documents, the Approval Order (if applicable), the Debt Millage Escrow Agreement, the Settlement Escrow Agreement, the Restructured UTGO Bonds, the Stub UTGO Bonds, the Municipal Obligation, the MFA Bonds and all documents related to the MFA Bonds

(other than a Bond Insurer's insurance policies related to the MFA Bonds, Restructured UTGO Bonds and the Stub UTGO Bonds), each of which shall be in form and substance reasonably satisfactory to the Parties (and, in the case of the Plan Documents, solely as they relate to this Agreement).

"**Shared Credit Rating Act**" shall mean the Shared Credit Rating Act, Act No. 227 of the Public Acts of 1985 of the State, as from time to time amended.

"**Soft Pay Instruments**" has the meaning ascribed to it in Section 2.11(a)(ii).

"**State**" shall mean the State of Michigan.

"**State Treasurer**" shall mean the State Treasurer of the State.

"**Stub UTGO Bonds**" has the meaning ascribed to it in Section 2.1(b).

"**Stub UTGO Challenge**" has the meaning ascribed to it in Section 6.3(b).

"**Syncora**" shall mean Syncora Capital Assurance Inc. and Syncora Guarantee Inc. as insurer of the Series 2003(A) Unlimited Tax General Obligation Bonds.

"**2010 Senior Bonds**" has the meaning ascribed to it in Section 2.3(d)(i).

"**2010 Series A Bonds**" shall mean the City's $100,000,000 Distributable State Aid Second Lien Bonds (Unlimited Tax General Obligation), Series 2010 (A) (Taxable Recovery Zone Economic Development Bonds-Direct Payment).

"**Third Lien Bonds**" has the meaning ascribed to it in Section 2.3(d)(iii).

"**Top-Off Payments**" has the meaning ascribed to it in Section 2.11(b).

"**Trigger Event**" has the meaning ascribed to it in Section 2.11(b).

"**Trigger Payments**" has the meaning ascribed to it in Section 2.11(b).

"**UTGO Bond Tax Levy**" shall mean that portion of the Aggregate UTGO Tax Levy in the amount that was allocable to the Prior UTGO Bonds.

"**UTGO Bonds**" shall mean the Municipal Obligation and the Stub UTGO Bonds.

"**UTGO Claims**" has the meaning ascribed to it in the recitals hereof.

"**UTGO Litigation**" has the meaning ascribed to it in Section 2.13.

Section 1.3.    Interpretation.  The Parties have participated jointly in the negotiation and drafting of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties hereto and no presumption or burden of proof will arise favoring or disfavoring any Party hereto because of the authorship of any provision of this Agreement.

Section 1.4.    General Rules of Construction.  For all purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires

(a)    Defined terms in the singular shall include the plural as well as the singular, and vice versa.

(b)    All accounting terms not otherwise defined herein shall have the meanings assigned to them, and all computations herein provided for shall be made, in accordance with generally accepted accounting principles.  All references herein to "generally accepted accounting principles" refer to such principles as they exist at the date of application there.

(c)    All references in this instrument to designated "Articles", "Sections" and other subdivisions are to the designated Articles, Sections and subdivisions of this instrument as originally executed.

(d)    The terms "herein", "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision.

(e)    All references in this instrument to a separate instrument are to such separate instrument as the same may be amended or supplemented from time to time pursuant to the applicable provisions thereof.

(f)    The term "person" shall include any individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization and any government or agency or political subdivision thereof.

## ARTICLE II
## SETTLEMENT TERMS

Section 2.1.    Claim Treatment.  The City hereby agrees that the total Allowed Claim relating to the Prior UTGO Bonds will be $388,000,000, allocated as follows:

(a)    $287,560,790 of the Prior UTGO Bonds which mature on or after April 1, 2015 will be restructured and allocated (i) among the Holders of the Prior UTGO Bonds which mature on or after April 1, 2015 on a Pro Rata basis, as set forth on

Schedule 1a annexed hereto (the "**Holders Restructured UTGO Bonds**") and (ii) the Bond Insurers and Syncora, as set forth on Schedule 1b (the "**Insurer Owned Restructured UTGO Bonds**" and, together with the Holders Restructured UTGO Bonds, the "**Restructured UTGO Bonds**"), and the Restructured UTGO Bonds will be restructured by delivery of the Municipal Obligation to the MFA and the delivery by the MFA of the MFA Bonds as described in Section 2.2 below, which, as restructured through the MFA, will be a full faith and credit general obligation payable from all legally available resources and secured, to the extent permitted by law, including Section 12(1)(x) of Act 436, by a lien upon the UTGO Bond Tax Levy, and payable and further secured by a lien on Distributable State Aid as provided in Section 2.3(a)(iii); and

(b)     The remainder of the Prior UTGO Bonds (the "**Stub UTGO Bonds**") which mature on or after April 1, 2015, in the principal amount of $43,349,210, will be reinstated and remain outstanding, and will be payable from the UTGO Bond Tax Levy, subject to the following terms and conditions:

(i)     The Holders' rights to the proceeds of the UTGO Bond Tax Levy in an amount equal to the principal and interest payable on the Stub UTGO Bonds (but subject to the prior rights of the holders of the Municipal Obligation) will be assigned under and pursuant to the Plan (without any consent or action on the part of, or additional consideration payable to, the Bond Insurers or the Holders) to a designee or designees of the City (the "**Assigned UTGO Bond Tax Proceeds**"), and such proceeds will not be paid to the paying agent for the UTGO Bonds.

(ii)     The obligations of the Bond Insurers to the Holders of the Prior UTGO Bonds that are not Holders Restructured UTGO Bonds under the existing applicable Bond Insurance Policies shall be unchanged.

(c)     The Bond Insurers shall be granted Allowed Claims for all amounts actually paid by the Bond Insurers to Holders of the Prior UTGO Bonds together with any policy advances made from and after the Effective Date by the Bond Insurers in respect of the Stub UTGO Bonds pursuant to this Agreement up to an aggregate amount of $100.5 million (the "**Bond Insurer Claims**"), which Allowed Claims shall receive distributions only when and if the Most Favored Nations clause set forth in Section 2.11 becomes operative and only pursuant to the terms of such Most Favored Nations clause.

Section 2.2.     Restructuring of Restructured UTGO Bonds by Delivery of Municipal Obligation to MFA and Delivery of MFA Bonds.

(a)     On or before the Effective Date (i), the Restructured UTGO Bonds will be restructured as follows:  By execution of the Emergency Manager Order the City will authorize the issuance and delivery of a local government municipal obligation (the "**Municipal Obligation**") to the Michigan Finance Authority ("**MFA**"), in accordance with applicable law, (ii) the City will request the MFA to issue its Local Government Loan Program Revenue Bonds, Series 2014 (City of Detroit Unlimited Tax General Obligation Restructured Local Project Bonds) (the "**MFA Bonds**"), and (iii) the

MFA Bonds shall be distributed Pro Rata to the Holders of the Holders Restructured UTGO Bonds as set forth on Schedule 1a annexed hereto and among the Bond Insurers and Syncora as set forth on Schedule 1b annexed hereto. The Municipal Obligation and the MFA Bonds will have the same principal amount (rounded down for each denomination to the nearest whole dollar), interest rate, payment dates, amortization schedule, prepayment terms (including first call date) and other financial terms (other than the pledge of Distributable State Aid and the priority of payment from the UTGO Bond Tax Levy relative to the Stub UTGO Bonds) as the Restructured UTGO Bonds (the "**Financial Terms**"). The MFA Bonds will be limited obligations of the MFA, payable from and secured by (i) payments made by the City on the Municipal Obligation and all right, title and interest in and to the Municipal Obligation, which shall include, to the extent permitted by applicable law, including without limitation Section 12(1)(x) of Act 436, a lien on the portion of the UTGO Bond Tax Levy allocable to the Municipal Obligation, pledged by the City to secure the Municipal Obligation as required by Section 2.3(a), and (ii) a lien, made a statutory lien as provided by the Shared Credit Rating Act, on moneys in the funds and accounts established for the MFA Bonds under the authorizing resolution for such bonds, including payments pledged by the City and received and held by the MFA or its trustee for the MFA Bonds, which include, without limitation, all payments of (x) the proceeds of the UTGO Bond Tax Levy and (y) Distributable State Aid deposited as described in Sections 2.4 and 2.5.

(b)     All documents relating to the Municipal Obligation and the MFA Bonds will be in form and substance reasonably satisfactory to the Bond Insurers. Such documentation will include that the Master Indenture will not be amended in any manner which adversely affects the MFA Bonds or the rights of the Bond Insurers. Each Bond Insurer will insure the Series of MFA Bonds relating to the Holders Restructured UTGO Bonds originally insured by such Bond Insurer set forth on Schedule 1a attached hereto by either (i) issuing a new bond insurance policy (and to the extent applicable canceling the existing policy), (ii) endorsing its existing Bond Insurance Policy or (iii) amending its existing Bond Insurance Policy.

(c)     Each of the MFA Bonds will be freely transferable through the DTC System under a unique CUSIP identification number that is separate and distinct from the CUSIP identification number for the Stub UTGO Bonds or, if the DTC System is discontinued with respect to the MFA Bonds, in such other manner as is permitted in accordance with their terms.

(d)     The paying agent for the Prior UTGO Bonds shall issue new certificates representing the Stub UTGO Bonds to the Holders in principal amounts representing the balance of each Holder's Prior UTGO Bonds not restructured through the delivery of the MFA Bonds.

Section 2.3.     The Municipal Obligation and Distributable State Aid. The City agrees, with the cooperation of the MFA, to restructure the Restructured UTGO Bonds as the Municipal Obligation as of the Effective Date. The City covenants and agrees that:

(a)     The Municipal Obligation:

(i)     will be approved pursuant to the Emergency Manager Order and in accordance with all applicable laws;

(ii)     will be payable from the unlimited tax full faith, credit and resources of the City and the UTGO Bond Tax Levy and secured, to the extent permitted by law, including without limitation Section 12(1)(x) of Act 436, by a lien granted by the City on the UTGO Bond Tax Levy pursuant to the Emergency Manager Order, the grant of which will be confirmed by the Bankruptcy Court in the Plan Confirmation Order (or, if applicable, the Approval Order);

(iii)     also will be secured by and payable from a portion of the City's Distributable State Aid, subject to a statutory lien and trust as provided in section 15(2) of the Shared Credit Rating Act;

(iv)     will have the same rights (other than priority) in and to the Distributable State Aid, and have the same protections (including, without limitation, a statutory lien to the same extent the 2010 Series A Bonds are secured by a statutory lien), as the 2010 Series A Bonds, except that the City's Deposit Date Balance Requirement (as defined in Section 2.5) with respect to the Municipal Obligation shall be as described in paragraph 2.5(e) below;

(v)     will have the identical Financial Terms as the Restructured UTGO Bonds; and

(vi)     will be pledged by the MFA to the bond trustee for the holders of the MFA Bonds pursuant to a resolution of the MFA authorizing the issuance of the MFA Bonds.

(b)     The UTGO Bond Tax Levy shall be escrowed and used to pay the Municipal Obligation prior to the use of Distributable State Aid in the same manner as provided for the 2010 Series A Bonds, as described herein.

(c)     Distributable State Aid will be pledged by the City and secured by a lien under the Master Indenture to be used for the purpose of paying principal of and interest on the Municipal Obligation and any additional bonds or other future obligations issued by the City and secured by Distributable State Aid.

(d)     The lien on Distributable State Aid for the Municipal Obligation will be a fourth priority lien, subordinate, as of the MFA Bonds issuance date, only to the following:

(i)     the first priority lien on Distributable State Aid for the City's $249,790,000 Distributable State Aid General Obligation Limited Tax Bonds, Series 2010 (the "**2010 Senior Bonds**");

(ii)     the second priority lien on Distributable State Aid for the City's 2010 Series A Bonds, which lien in favor of the 2010 Series A Bonds is subordinate to the lien in favor of the 2010 Senior Bonds; and

(iii)     the third priority lien on Distributable State Aid for the City's third-lien limited tax general obligations bonds (the "**Third Lien Bonds**") securing the MFA's $129,520,000 Local Government Loan Program Revenue Bonds, Series 2012C (City of Detroit Limited Tax General Obligation Local Project Bonds Third Lien), which lien in favor of the Third Lien Bonds is subordinate to the lien in favor of the 2010 Series A Bonds.

(e)     The Emergency Manager shall issue the Emergency Manager Order in substantially the form attached hereto as Exhibit B.

Section 2.4.     Escrow and Application of Aggregate UTGO Tax Levy.

(a)     The City agrees that, pursuant to documentation in form and substance satisfactory to the Parties, proceeds of the Aggregate UTGO Tax Levy collected by the City will be segregated and transmitted no less often than as provided in the schedule of Statutory Tax Collection Distribution Dates published by the Bureau of Local Government Services of the Michigan Department of Treasury, and in any event, no less often than (x) bi-monthly during the period beginning each July 1 and ending the following March 31, and (y) monthly during the period beginning April 1 and ending the following June 30 of each year, to U.S. Bank National Association as escrow trustee (the "**Debt Millage Escrow Trustee**"), to be held and distributed pursuant to the terms and conditions of the Debt Millage Escrow Agreement. The Debt Millage Escrow Trustee shall be required to allocate the revenue pro rata, as required by the Debt Millage Escrow Agreement, among the outstanding UTGO Bonds, the 2010 Series A Bonds, and any Additional Bonds.

(b)     Proceeds of the Aggregate UTGO Tax Levy allocated to the UTGO Bonds will be transferred promptly by the Debt Millage Escrow Trustee (i) first, for deposit to the Tax Levy Account held by the Master Trustee for the Municipal Obligation in an amount sufficient, together with funds already on deposit therein to pay debt service due on the Municipal Obligation on or before the April 1 following such deposit, together with any past due debt service on the Municipal Obligation, and (ii) second, to the assignee of the rights to payment from the Assigned UTGO Bond Tax Levy of amounts payable on the Stub UTGO Bonds on or before the April 1 following such deposit, an amount equal to the scheduled debt service on the Stub UTGO Bonds. Proceeds of the Aggregate UTGO Bond Tax Levy transferred to the Master Trustee for the purpose of paying debt service on the Municipal Obligation will be held in trust under applicable State law.

(c)     Neither the Holders of the MFA Bonds nor the Bond Insurers will seek payment from the proceeds of the UTGO Bond Tax Levy in excess of the amounts necessary to pay the Municipal Obligation scheduled annual debt service

plus any amount necessary to pay past due Municipal Obligation debt service plus any amounts required by Section 2.14(b).

Section 2.5.     Distributable State Aid and Flow of Funds.

(a)     Pursuant to the Agreement to Deposit Distributable State Aid, the State Treasurer has agreed to deliver 100% of the Distributable State Aid due the City to the Master Trustee for deposit under the Master Indenture for as long as the Municipal Obligation is outstanding.  Payments by the State Treasurer of Distributable State Aid will be deposited directly into the funds and accounts held by the Master Trustee in accordance with and as provided by the Agreement to Deposit Distributable State Aid and  the Master Indenture.  Distributable State Aid payments made to the Master Trustee for the purpose of paying debt service on the Municipal Obligation will be held in trust and subject to a statutory lien under applicable State law.

(b)     The Master Trustee will be required to deposit all of the City's Distributable State Aid in the Debt Retirement Fund established under the Master Indenture and allocate and set aside Distributable State Aid into the various Distributable Aid Escrow Funds as provided in the Master Indenture, including, without limitation, the Series 2014 DSA Escrow Fund defined in Section 2.5(d) below (the "**DSA Escrow Funds**") created pursuant to one or more supplemental indentures to the Master Indenture for the purpose of accumulating Distributable State Aid in amounts required by such supplemental indentures to be deposited in the DSA Escrow Funds by the dates specified in such supplemental indentures to pay debt service on the bonds and obligations of the City secured by a pledge of Distributable State Aid.

(c)     On each date that the State Treasurer deposits a payment of the City's Distributable State Aid (each a "**DSA Deposit**") with the Master Trustee (each a "**DSA Deposit Date**"), the Master Trustee shall set-aside such amounts as shall be sufficient to fund the minimum balances required to be on deposit in each DSA Escrow Fund to pay the then current annual principal and interest requirements on the related obligation as provided in the Master Indenture (each, a "**Deposit Date Balance Requirement**" and collectively the "**Deposit Date Balance Requirements**").  Any amounts remaining in the Debt Retirement Fund after the setting aside of the amounts necessary to satisfy the Deposit Date Balance Requirements of all DSA Escrow Funds, shall be released to the City for deposit to the General Fund of the City.

(d)     On or before the Effective Date, the City pursuant to a supplemental indenture to the Master Indenture shall establish with the Master Trustee a Series 2014 DSA Escrow Fund (the "**Series 2014 DSA Escrow Fund**") for the purpose of accumulating Distributable State Aid in sufficient amounts to pay debt service on the Municipal Obligation.  Moneys on deposit in the Series 2014 DSA Escrow Fund shall be held and withdrawn by the Master Trustee solely for the purpose of paying to the bond trustee for the holders of the MFA Bonds (as assignee of the MFA) the principal of and interest on the Municipal Obligation when due and payable, which payments will be used to make corresponding payments of principal and interest on the MFA Bonds.  Within the

Series 2014 DSA Escrow Fund there shall be created three separate and segregated sub-accounts designated the "Distributable Aid Account," the "Tax Levy Account," and the "General Account." Proceeds of the Aggregate UTGO Tax Levy allocated to the Municipal Obligation and transferred to the Master Trustee by the Escrow Agent pursuant to Section 2.4(b)(i) shall be deposited to the Tax Levy Account and used as described in subsection (f) below. That portion of Distributable State Aid necessary to pay the principal of and interest on the Municipal Obligation when due, shall be set aside and maintained in the Distributable Aid Account and used as described in subsection (e) below. All other moneys deposited to the Series 2014 DSA Escrow Fund from time to time by the City shall be set aside and maintained in the General Account and used as described in subsection (f) below.

(e)     To the extent the Master Trustee does not have on deposit in the Tax Levy Account the required portions of principal and interest due on the next October 1 or April 1 on the first day of each month set forth below (the "**Deposit Date Balance Requirement for the Municipal Obligation**"), the Master Indenture will provide for the deposit of all, or such lesser amount as is necessary to correct the deficiency in the Deposit Date Balance Requirement for the Municipal Obligation, of that month's distribution of Distributable State Aid into the Distributable State Aid Account of the Series 2014 DSA Escrow Fund (after all deposits to DSA Escrow Funds established to pay debt service on obligations of the City having priority over the Municipal Obligation) . The Deposit Date Balance Requirement for the Municipal Obligation will be as follows:

DEPOSIT DATE BALANCE REQUIREMENT

| MONTH OF DSA PAYMENT | PORTION OF NEXT MUNICIPAL OBLIGATION INTEREST PAYMENT | PORTION OF NEXT MUNICIPAL OBLIGATION PRINCIPAL PAYMENT |
|---|---|---|
| November | 1/3 | 4/6 |
| January | 2/3 | 5/6 |
| March | 100% | 100% |
| September | 100% | 3/6 |

(f)     Amounts on deposit in the Series 2014 DSA Escrow Fund shall be withdrawn from the DSA Escrow Fund for the purpose of paying debt service on the Municipal Obligation when due to the bond trustee for the holders of the MFA Bonds (as assignee of the MFA), which payments will be used to make corresponding payments of principal and interest on the MFA Bonds. Amounts shall be debited first from the Tax Levy Account in an amount necessary to pay the principal of and interest on the

13-53846-tjt   Doc 8045-22   Filed 10/29/14   Entered 10/29/14 05:47:43   Page 380 of 16
429

Municipal Obligation on the corresponding payment date, and thereafter, if the amount on deposit in the Tax Levy Account is not sufficient to make the payments required, the amount necessary to satisfy the deficiency shall be debited, first, from the Distributable Aid Account, and second, from the General Account.

Section 2.6. Additional Indebtedness. From and after the date of this Agreement and, pursuant to documentation in form and substance satisfactory to the Parties, until the MFA Bonds have been paid in full:

(a)  the City shall not incur, or permit to be outstanding, debt secured by a lien on the Distributable State Aid that is senior to the lien securing the Municipal Obligation, other than debt secured by a lien on the Distributable State Aid on the date of this Agreement ("**Existing DSA Debt**") and additional debt ("**Additional DSA Debt**") secured on a second or third lien level so that the aggregate principal amount of (x) Existing DSA Debt (as of the effective date of this Agreement – i.e., $479,310,000) plus (y) the Additional DSA Debt thereafter issued will not exceed $560,000,000, provided that, with respect to any Additional Debt the existing financial covenants in the Master Indenture restricting the issuance of additional bonds under the Master Indenture are satisfied.

(b)  Notwithstanding clause (a), the City may issue first, second or third lien refunding bonds secured pursuant to the Master Indenture so long as any such refunding issuance results in debt service savings by the City in each year that such refunding bonds will be outstanding (based upon the amortization schedule in effect prior to the time of such refunding) or, if the last maturity of the MFA Bonds is prior to final maturity of the refunding bonds then to be issued, then in each year during which the MFA Bonds are outstanding.

(c)  The City shall not incur debt secured by a lien on the Distributable State Aid that is pari passu with the lien securing the Municipal Obligation.

(d)  The City may incur debt secured by a lien on the Distributable State Aid that is junior and subordinate to the lien securing the Municipal Obligation.

Section 2.7. Levy and Collection of the Ad Valorem Debt Millage.

The Settlement-Related Documents will provide that:

(a)  The City shall impose in each year a separate debt millage levy reasonably projected to be in an amount necessary to pay the debt service coming due on all unlimited tax general obligation bonds (including both the Municipal Obligation and the Stub UTGO Bonds) before the next annual tax levy, including any past due amounts, plus any amounts necessary to reimburse the City for other City funds used to pay prior debt service, less any millage proceeds or other funds already on deposit with the Debt Millage Escrow Trustee which are available to pay the debt service next

coming due. The City shall comply with applicable law in levying and collecting ad valorem millage levied to pay all unlimited tax general obligation bonds.

(b) The City shall certify annually not later than June 30 in each year that it has imposed the debt millage levy as required by and in accordance with Section 2.7(a). Such annual certification shall be in the form attached hereto as Exhibit C and shall be promptly provided to the Bond Insurers.

(c) The City shall furnish to the Bond Insurers promptly upon request such information reasonably requested by the Bond Insurers to confirm the imposition of the debt millage levy and to monitor collections. The Bond Insurers shall have the right to discuss such information with the City, and the City will use reasonable efforts to explain the collection process to the Bond Insurers, including the allocation methods used for partial property tax payments.

Section 2.8.   Plan Effectiveness and Escrowing of Payments.

(a) If the Effective Date of the Plan does not occur on or prior to September 30, 2014 for any reason other than proximately by reason of the actions or positions taken by any of the executing Bond Insurers, or their failure to support the Plan as provided in Section 3.1 below, solely in their capacity as the insurers of the Prior UTGO Bonds and not in any other capacity (including, for the avoidance of doubt in their capacity as insurers of any other obligations of the City), the City will pay into an escrow to be established with the current paying agent for the Prior UTGO Bonds the pro rata portion of the October 2014 scheduled interest debt service payment and any pro rata payments of principal and interest due thereafter, which would otherwise be paid on the Restructured UTGO Bonds, as if the transaction contemplated by this Agreement (other than the MFA Bond issuance) had closed. Specifically, and for clarification of the City's obligation under this paragraph, the City will pay into escrow the pro rata portion of scheduled debt service payments on the $287.56 million of Restructured UTGO Bonds due after September 30, 2014 through the Effective Date of the Plan, on the same terms and schedule as set forth in the current documents governing the Prior UTGO Bonds, which, subject to Section 2.8(b) below, such escrowed funds shall be released to the Bond Insurers on the Effective Date of the Plan. Such escrow shall be pursuant to the Settlement Escrow Agreement ("**Settlement Escrow Agreement**") in the form of Exhibit D attached hereto, which will be executed and delivered on the date of the execution and delivery of this Agreement.

(b) If the Plan is not effective by March 31, 2015, and the Bankruptcy Court has issued an Approval Order (that is not stayed pending appeal) approving the settlement embodied in this Agreement, then on [March 31, 2015] the monies in such escrow will be released to the Bond Insurers, and the City will make all subsequent debt service payments, including the payment due on April 1, 2015, directly to the paying agent for the Prior UTGO Bonds as if the Restructured UTGO Bonds transaction (other than the MFA Bond issuance) had closed. If an Approval Order is entered but is subject to a stay pending appeal, the City shall continue to pay into escrow

the scheduled debt service on the Prior UTGO Bonds for so long as such stay remains in effect, and shall release all monies in the escrow accounts as soon as such order is no longer subject to stay.

(c)     If the Plan is not effective by September 30, 2014, then within fifteen (15) days of a request by the Bond Insurers, the City shall file an Approval Motion pursuant to Bankruptcy Rule 9019 with the Bankruptcy Court. The City and the Bond Insurers may mutually make an Approval Motion pursuant to Bankruptcy Rule 9019 at any time upon mutual agreement of the City and the Bond Insurers.

Section 2.9.     Confirmation Order and Findings. The Plan Confirmation Order shall include provisions substantially in the form of Exhibit E. Any material modification to such provisions shall be reasonably satisfactory to the Parties.

Section 2.10.     Conditions to Plan Effectiveness. The Plan shall provide that the effectiveness of the Plan is subject to the following conditions:

(a)     The Michigan Finance Authority board shall have approved the issuance of the MFA Bonds and such bonds shall have been issued; and

(b)     The City shall have obtained all governmental and Emergency Manager consents and approvals required to carry out the terms of this Agreement.

Section 2.11.     Most Favored Nation. In recognition of the unique features of the UTGO Bonds and in consideration of the settlement, the City agrees that the Bond Insurers will benefit from a "most favored nation" provision consisting of the two fundamental protections below and that such provision will be described in the Plan. Further, the City agrees that, if a class of Impaired Financial Creditors receives treatment other than the current treatment in the *Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (May 5, 2014)* [Docket No. 4392], such class' treatment in the Plan will include the existence of this "most favored nation" provision.

(a)     Recovery Percentage Projected as of Confirmation Date. Under no circumstances shall the terms of the Plan permit either of the Limited Tax General Obligation Claims or the COP Claims (each as defined in the Plan and collectively, the "**Impaired Financial Creditors**") to recover more on a percentage basis than the UTGO Claims as projected at Plan confirmation. In determining whether a Class of Impaired Financial Creditors will recover more on a percentage basis than the UTGO Claims as projected at Plan confirmation, the recovery percentage for each of the Impaired Financial Creditors' Claims will be the sum of:

(i)     the percentage that any cash payments and the principal amount of any "hard pay" instrument, combination of instruments or any other evidences of indebtedness or payment obligations of any kind (collectively, the "**Hard Pay Instruments**") provided to such Impaired Financial Creditor Class under the Plan is

of the aggregate amount of all the Allowed Claims in such Impaired Financial Creditor Class; and

(ii)     the percentage that the reasonably anticipated recovery (as reasonably determined by the City as of Plan confirmation and as disclosed to creditors subject to the Bond Insurers' right to contest such determination as part of the confirmation hearing) on account of any "soft pay", contingent, or similar type of instrument, combination of instruments or any other evidences of indebtedness, contracts or settlements creating payment obligations of any kind including, without limitation, payment obligations relating to a sale, lease, privatization, public private partnership or similar arrangement or the value of any assets projected to be distributed or promised revenue streams or recoveries of any kind (collectively, the "**Soft Pay Instruments**" and together with the Hard Pay Instruments, the "**Plan Instruments**") provided to such Impaired Financial Creditor Class under the Plan is of the aggregate amount of all the Allowed Claims in such Impaired Financial Creditor Class.

(b)     Actual Recovery Percentage Post-Confirmation.  In the event the actual recovery percentage of any Impaired Financial Creditor Class on the aggregate Plan Instruments provided to such Impaired Financial Creditor's Class would result in such Class receiving 69.5% or more of the aggregate amount of all the Allowed Claims in any such Class (the "**Trigger Event**"), then payments that contribute to the Impaired Financial Creditor Class receiving a recovery over 69.5% (the "**Trigger Payments**") shall be made under such Plan Instruments to the Bond Insurers ("**Top-Off Payments**") on account of the Bond Insurer Claims in amounts equal to the following:

(i)     the amount of the Trigger Payment, multiplied by

(ii)     the quotient of

(A)     $100.5 million, divided by

(B)     the sum of (x) 30.5% of the aggregate amount of all the Allowed Claims in the particular Impaired Financial Creditor Class, and (y) $100.5 million.

For purposes of this sub-section, all actual recoveries for Impaired Financial Creditor Classes shall be determined by discounting the payments using a 5% discount rate back to the date of Plan confirmation.  Amounts payable to the Bond Insurers pursuant to the provisions of this Section 2.11 will be allocated to the Bond Insurers as set forth on Schedule 2 attached hereto.

(c)     Reporting.  The City shall deliver to the Bond Insurers:

(i)     promptly after the first payment is made thereunder, a written notice of any payment under any Soft Pay Plan Instrument benefiting any Impaired Financial Creditor Class, including the amount and date of such payment;

(ii)     on each January 15 of every year beginning in the year after the first payment is made on any Soft Pay Plan Instrument benefiting any Impaired Financial Creditor Class and until the maturity date of the Soft Pay Instrument, a written report calculating the aggregate recovery percentage of each Impaired Financial Creditor Class;

(iii)     after any Impaired Financial Creditor Class achieves a recovery percentage on the aggregate amount of all the Allowed Claims in such class equal to or greater than 60%, on each January 15 and July 15, a written report calculating the aggregate recovery percentage of each Impaired Financial Creditor Class;

(iv)     after a Trigger Event occurs, a written report on each date that a payment is made under any Plan Instruments held by or benefiting an Impaired Financial Creditor Class that explains the calculation for the Trigger Payment and the Top-Off Payment and demonstrates compliance with the terms of this Agreement; and

(v)     written notice in the event any Impaired Financial Creditor challenges or disagrees in any manner with the determination of any payments related to a Trigger Payment.

The City official executing any written notice or written report described above will respond within a reasonable time to written inquiries from any Bond Insurer regarding such notice or report.  In the event any Bond Insurer or Insurers make a written request to meet with such City official, such City Official will meet within a reasonable time period with such Bond Insurer or Insurers to answer their reasonable questions regarding any such notice or report.

(d)     Dispute Resolution.  In the event any of the Bond Insurers provides a written notice to the City articulating disagreement with the City's determination of whether a Trigger Event has occurred or with the amount of shared payments after a Trigger Event pursuant to subsection 2.11(c)(iv), the City will notify all Bond Insurers and meet with the Bond Insurers within 15 business days of such written notice.  At the meeting the Parties will attempt in good faith to resolve the differences.  If the Parties are unable to reach a resolution of the differences the Bond Insurers will have the right to bring an enforcement action in the Bankruptcy Court.

Section 2.12.  Legal Opinions.

Bond counsel will provide at closing customary legal opinions relating to the validity, priority and enforceability of any MFA transaction in form and substance reasonably satisfactory to the Bond Insurers; such opinions to include standard bankruptcy opinion exceptions. Bond counsel will also provide a customary opinion in form and substance reasonably satisfactory to the Bond Insurers,  on the exemption of interest from Federal and State taxation of the MFA Bonds and the Municipal Obligation.

No opinion will be provided with respect to any aspect of any lien on the UTGO Bond Tax Levy.

Section 2.13. <u>Stay of Litigation, Proofs of Claim</u>.

(a)     The Assured/NPFG Action and Ambac Action (the "**UTGO Litigation**") as it relates to the Prior UTGO Bonds shall be stayed pending the issuance of an Approval Order or Plan Confirmation Order and the occurrence of the Effective Date, whereupon the Parties shall ask the Bankruptcy Court to dismiss the UTGO Litigation without prejudice until the Approval Order or the Plan Confirmation Order, as applicable, is a Final Order, when such dismissal shall be deemed to be with prejudice.

(b)     As soon as practicable subsequent to the execution and delivery of this Agreement by each of the Parties, but in no event later than five (5) business days subsequent thereto, the Parties shall take any and all action as is appropriate to (i) stay the UTGO Litigation as provided in subsection (a) above, (ii) maintain the status quo of the Parties in the UTGO Litigation as of the execution of this Agreement, and (iii) ensure that no action (including separate litigation and any objection to proofs of claim filed by the Bond Insurers relating to the Prior UTGO Bonds) is undertaken or commenced inconsistent with seeking a stay of and maintaining the status quo of the UTGO Litigation; <u>provided</u>, <u>however</u>, that any such stay shall terminate on the first (1st) business day following termination of this Agreement.

(c)     In the event (i) an Approval Motion is made by the City and denied by the Bankruptcy Court, (ii) an Approval Order is issued but is not consistent with this Agreement in any material respect or is overturned on appeal, (iii) a Plan consistent with this Agreement in all material respects is not confirmed by the Bankruptcy Court other than changes regarding payments relating to the Stub UTGO Bonds, or (iv) a Plan Confirmation Order is entered by the Bankruptcy Court but is not consistent in all material respects with this Agreement, or is overturned on appeal, then any Party (including one or more of the Bond Insurers as to such Bond Insurer or Bond Insurers) may resume the UTGO Litigation and terminate this Agreement as to such Party by written notice to the Parties.

(d)     The Bond Insurers agree that all proofs of claims filed by any of them with respect to Prior UTGO Bonds shall be deemed resolved and fully satisfied by approval of this Agreement in the Plan Confirmation Order, which is a Final Order or an Approval Order, which is a Final Order, as applicable.

Section 2.14. <u>Additional Covenants</u>

(a)     <u>City Will Not Contest</u>. The City shall not contest the validity or enforceability of any of the liens or interests granted under this Agreement or any of the obligations of the City set forth in this Agreement.

(b)     Paying Agent, Master Trustee and Escrow Agent Fees.
The City shall pay the reasonable and customary fees and expenses (including reasonable attorneys' fees) of (i) the paying agent with respect to the Prior UTGO Bonds (including the paying agent relating to the Prior UTGO Bonds that are not Holders Restructured UTGO Bonds) and (ii) of the paying agent, the Master Trustee, the Debt Millage Escrow Trustee and the escrow agent identified in the Settlement Escrow Agreement in respect of all transactions contemplated by this Agreement.

(c)     Further Action. To the extent that the City has not taken all necessary action to authorize the execution, delivery and performance of this Agreement, it will do so.


# ARTICLE III
# PLAN OF ADJUSTMENT AND PLAN SUPPORT

Section 3.1.    Plan Support Commitment. From and after the date hereof, and so long as the City has complied, and is complying, with its covenants and obligations under this Agreement, the Bond Insurers will each support the treatment of the Prior UTGO Bonds in the Plan by, at a hearing or in a court filing, expressing such support solely as insurers of the Prior UTGO Bonds and, if each Bond Insurer has established its right to vote, will each vote Prior UTGO Bonds and reimbursement claims in support of such Plan treatment. The Plan shall provide that such treatment, consistent with this Agreement, is the treatment for all holders of the Prior UTGO Bonds. For the absence of doubt, nothing contained in this Agreement shall require any Bond Insurer to support or vote for the treatment of any class of claims under the Plan other than the UTGO Bonds.

Section 3.2.    Solicitation Required in Connection with Plan. Notwithstanding anything contained in this Article III or elsewhere in this Agreement to the contrary, this Agreement is not, and shall not be deemed to be, a solicitation of acceptances of the Plan. The City and the Bond Insurers acknowledge and agree that the acceptance of the Plan will not be solicited until the Bankruptcy Court has approved the Disclosure Statement and related ballots, and such Disclosure Statement and ballots have been transmitted to parties entitled to receive same.

Section 3.3.    Plan Document Provisions. All Plan Documents, as they relate to the settlement embodied in this Agreement must (i) be in form and substance reasonably satisfactory to the Bond Insurers and to the City and be consistent with this Agreement, (ii) provide that the Plan treatment for Prior UTGO Bonds is part of a settlement of the pending UTGO Litigation.

## ARTICLE IV
## DEFAULTS AND REMEDIES

Section 4.1.   Events of Default.  The breach by any Party of any material agreement or covenant set forth in this Agreement or the Settlement Escrow Agreement will be an event of default ("**Event of Default**") under this Agreement.

Section 4.2.   Remedies.  The Parties acknowledge and agree that a breach of the provisions of this Agreement by any Party would cause irreparable damage to the other Parties and that such other Parties would not have an adequate remedy at law for such damage.  Therefore, the obligations of the Parties set forth in this Agreement and the Settlement Escrow Agreement shall be enforceable by an order compelling specific performance issued by the Bankruptcy Court, and appropriate injunctive relief may be applied for and granted in connection therewith.  Upon an Event of Default by the City, any Bond Insurer will have the right to compel immediate payment of amounts held under the Settlement Escrow Agreement by order of the Bankruptcy Court.  Such remedies shall be cumulative and not exclusive and shall be in addition to any other remedies that the Parties may have under this Agreement, the Settlement Escrow Agreement or otherwise. Any Bond Insurer may exercise its rights hereunder on its own. Consistent with Section 904 of the Bankruptcy Code, the City hereby consents to the Bankruptcy Court enforcing the terms of this Agreement and the Settlement Escrow Agreement.

Section 4.3.   Termination.

(a)    This Agreement may be terminated by the mutual agreement of all of the Bond Insurers upon an Event of Default caused by the City.  This Agreement may be terminated by less than all of the Bond Insurers as to such Bond Insurer or Bond Insurers upon an Event of Default caused by the City  if (i) an action or proceeding seeking to enforce the material agreement or covenant purported to be breached is brought by one or more Bond Insurers before the Bankruptcy Court, (ii) the Bankruptcy Court, after notice and a hearing, finds that an Event of Default caused by the City has occurred and (iii) either (A) the Bankruptcy Court declines to issue an order compelling specific performance by the City of the applicable agreement or covenant purported to be breached or (B) the Bankruptcy Court issues such an order compelling specific performance but the City fails to comply with the order.

(b)    This Agreement may be terminated by the City if any of the Bond Insurers fails to (i) support the Plan with respect to Class 8 – UTGO Claims or (ii) if it has the right to vote its Class 8 Claims as determined by the voting procedures process approved by the Bankruptcy Court in an order entered on March 11, 2014 (Docket No. 2984) (as such order may have been amended from time to time), vote its Class 8 Claims to accept the Plan.  This Agreement may be terminated by the City upon an Event of Default caused by the Bond Insurers, or any of them, if (i) an action or proceeding seeking to enforce the material agreement or covenant purported to be breached is brought by the City before the Bankruptcy Court, (ii) the Bankruptcy Court finds, after

notice and a hearing, that an Event of Default caused by the applicable Bond Insurer has occurred and (iii) either (A) the Bankruptcy Court declines to issue an order compelling specific performance by the applicable Bond Insurer of the applicable agreement or covenant purported to be breached or (B) the Bankruptcy Court issues such an order compelling specific performance but the applicable Bond Insurer fails to comply with the order.

(c)     Upon any such termination, any Party (including one or more of the Bonds Insurers as to such Bond Insurer or Bond Insurers) may resume the UTGO Litigation unless it has been previously dismissed with prejudice or has been previously deemed dismissed with prejudice.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

Section 5.1.     <u>Representations and Warranties of the City</u>.  The City represents and warrants to the Bond Insurers that:

(a)     It is a municipal corporation of the State of Michigan.

(b)     It has the power to execute and deliver this Agreement and to perform its obligations hereunder and it has taken or will take all necessary action to authorize such execution, delivery and performance.

(c)     Such execution, delivery and performance do not violate or conflict with any law applicable to it, any order or judgment of any court or other agency of government applicable to it, or any material agreements specifically applicable to it or any of its assets.

(d)     Other than (i) approvals by the MFA, the State Treasurer, the execution of the Emergency Manager Order, and the approvals required by Section 19 of Act 436 to be obtained prior to delivery of the Municipal Obligation, all of which the City reasonably expects to be obtained prior to the Effective Date, and (ii) the approval of the Bankruptcy Court, all governmental and Emergency Manager consents and approvals that are required to have been obtained by it as of the date of execution of this Agreement with respect to the execution, delivery and performance of this Agreement have been obtained and are in full force and effect and all conditions of any such consents and approvals have been complied with.

Section 5.2.     <u>Representations and Warranties of the Bond Insurers</u>.  Each of the Bond Insurers represents to the City that:

(a)     It is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation.

(b)    It has the power to execute and deliver this Agreement and to perform its obligations under this Agreement and it has taken all necessary corporate action to authorize such execution, delivery and performance.

(c)    Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it, or any agreements specifically applicable to it or any of its assets.

(d)    All corporate or governmental consents and approvals that are required to have been obtained by it with respect to this Agreement have been obtained and are in full force and effect and all conditions of any such consents and approvals have been complied with.

(e)    Each of the respective Bond Insurers had and has standing to bring and resolve the UTGO Litigation related to the Prior UTGO Bonds that it insures (Assured and NPFG represent that each had and has standing to bring and resolve the Assured/NPFG Action, and Ambac represents that it had and has standing to bring and resolve the Ambac Action).

Section 5.3.    Mutual Representations and Warranties.  Unless otherwise noted, each Party makes the following representations, warranties and covenants (on a several basis, with respect to such Party only) to each of the other Parties:

(a)    Each person signing this Agreement warrants that he or she is legally competent and authorized to execute this Agreement on behalf of the Party whose name is subscripted at or above such person's signature.

(b)    The Parties have not made any statement or representation to each other regarding any facts relied upon by them in entering into this Agreement, and each of them specifically does not rely upon any statement, representation or promise of the other Parties hereto or any other person in entering into this Agreement, except as expressly stated herein or in the exhibits hereto.  Each party has relied upon its own investigation and analysis of the facts and not on any statement or representation made by any other party in choosing to enter into this Agreement and the transactions contemplated herein.

(c)    The Parties and their respective attorneys have made such investigation of the facts pertaining to this Agreement and all of the matters pertaining thereto as they deem necessary.

## ARTICLE VI
## EXCULPATION

Section 6.1.    Exculpation.  The Plan will include the Bond Insurer Exculpated Parties as exculpated parties for acts and omissions (other than those

constituting gross negligence or willful misconduct) in connection with (i) the Plan as it relates to this Agreement and (ii) this Agreement.

Section 6.2. <u>Releases</u>. Upon the dismissal with prejudice or deemed dismissal with prejudice of the applicable UTGO Litigation, the Parties to the applicable UTGO Litigation shall be deemed to have released each other, and the Parties' officials, officers, directors, employees and representatives, of and from any and all claims and causes of action related to the applicable UTGO Litigation and the Prior UTGO Bonds.

Section 6.3. <u>Defense Against Challenges</u>. (a) Subject to the terms of Section 6.3(b) below, if, after the issuance of the Plan Confirmation Order or the Approval Order, the validity or enforceability of any term or provision of this Agreement or the Settlement-Related Documents (as they relate to the settlement set forth in this Agreement) is challenged in any action, suit or proceeding, each of the named Parties in such action, suit or proceeding shall assume its own defense of such action, suit or proceeding.

(b) If, after the issuance of the Plan Confirmation Order or the Approval Order, an action, suit or proceeding is brought, an issue in which is the validity or enforceability of the Stub UTGO Bonds, including, without limitation, a challenge to the Assigned UTGO Bond Tax Proceeds (a "**Stub UTGO Challenge**"), the City shall assume the defense of such issue in any such action, suit or proceeding. If any of the Bond Insurers are named as a party in a Stub UTGO Challenge, the City will appoint counsel to the named Bond Insurers, which may or may not be counsel to the City. In all events, such counsel must be reasonably acceptable to the named Bond Insurers, and the City will pay the reasonable costs of such counsel.

## ARTICLE VII
## DISMISSAL OF CASE AND TERMINATION

Section 7.1. <u>Effect of Dismissal of the Bankruptcy Case</u>. In the event the Bankruptcy Case is dismissed, any Party may at any time within 60 days after such dismissal immediately terminate this Agreement by written notice to the other Parties.

Section 7.2. <u>Effect of Termination</u>. In the event of the termination of this Agreement by any Party pursuant to any provisions of this Agreement, this Agreement shall become null and void and be deemed of no force and effect, with no liability on the part of any Party hereto (or of any of its elected or appointed officials, directors, officers, employees, consultants, contractors, agents, legal and financial advisors or other representatives) arising from such termination, and no Party shall have any obligations to any other Party arising out of this Agreement. Upon termination, neither this Agreement nor any terms or provisions set forth herein shall be admissible in any dispute, litigation, proceeding or controversy among the Parties and nothing contained herein shall constitute or be deemed to be an admission by any Party as to any matter, it being understood that the statements and resolutions reached herein were as a result of negotiations and compromises of the respective positions of the Parties. If this

Agreement is terminated, then no Party hereto may (i) use this Agreement, any of its terms or any discussions or negotiations conducted in respect of this Agreement, or any part of the foregoing, in the UTGO Litigation; (ii) seek discovery with respect to any of the matters described in subsection (i) in the UTGO Litigation; or (iii) seek to admit any of the matters described in subsection (i) into evidence in the UTGO Litigation.

## ARTICLE VIII
## MISCELLANEOUS

Section 8.1.    <u>Amendments</u>.  This Agreement may not be modified, amended or supplemented except by a written agreement executed by each Party to be affected by such modification, amendment or supplement.

Section 8.2.    <u>No Admission of Liability</u>.

(a)    The execution of this Agreement is not intended to be, nor shall it be construed as, an admission or evidence in any pending or subsequent suit, action, proceeding or dispute of any liability, wrongdoing, or obligation whatsoever (including as to the merits of any claim or defense) by any Party to any other Party or any other person with respect to any of the matters addressed in this Agreement.

(b)    None of this Agreement (including, without limitation, the recitals and exhibits hereto), the settlement or any act performed or document executed pursuant to or in furtherance of this Agreement or the settlement:  (i) is or may be deemed to be or may be used as an admission or evidence of the validity of any claim or of any wrongdoing or liability of any Party; or (ii) is or may be deemed to be or may be used as an admission or evidence of any liability, fault or omission of any Party in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal. None of this Agreement, the settlement, or any act performed or document executed pursuant to or in furtherance of this Agreement or the settlement shall be admissible in any proceeding for any purposes, except to enforce the terms of the Agreement, and except that any Party may file this Agreement in any action for any purpose, including, but not limited to, in order to support a defense or counterclaim based on the principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense of counterclaim.

Section 8.3.    <u>Good Faith Negotiations</u>.  The Parties recognize and acknowledge that each of the Parties hereto is represented by counsel, and such Party received independent legal advice with respect to the advisability of entering into this Agreement.  Each of the Parties acknowledges that the negotiations leading up to this Agreement were conducted regularly and at arm's length; this Agreement is made and executed by and of each Party's own free will; that each knows all of the relevant facts and his or its rights in connection therewith, and that he or it has not been improperly influenced or induced to make this settlement as a result of any act or action on the part of any party or employee, agent, attorney or representative of any party to this

Agreement. The Parties further acknowledge that they entered into this Agreement because of their desire to avoid the further expense and inconvenience of litigation and other disputes, and to compromise permanently and settle the claims between the Parties settled by the execution of this Agreement.

Section 8.4. <u>Rights and Remedies</u>. Nothing in this Agreement is intended to augment or impair any rights, remedies and interests, including without limitation, liens, of any of the Parties hereto other than with respect to the Prior UTGO Bonds.

Section 8.5. <u>Third Party Beneficiaries</u>. Nothing in this Agreement, express or implied, is intended or shall be construed to confer upon, or to give to, any Person other than the Parties hereto and their respective successors and assigns, any right, remedy or claim under or by reason of this Agreement or any covenant, condition or stipulation thereof; and the covenants, stipulations and agreements contained in this Agreement are and shall be for the sole and exclusive benefit of the Parties hereto and their respective successors and assigns.

Section 8.6. <u>Governing Law; Retention of Jurisdiction; Service of Process</u>. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Michigan, without giving effect to any principles of conflicts of law and applicable federal law. By its execution and delivery of this Agreement, each of the Parties hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding between any or all of the foregoing with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought in the Bankruptcy Court for that purpose only, and, by execution and delivery of this Agreement, each hereby irrevocably accepts and submits itself to the jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding. In the event any such action, suit or proceeding is commenced, the Parties hereby agree and consent that service of process may be made, and personal jurisdiction over any Party hereto in any such action, suit or proceeding may be obtained, by service of a copy of the summons, complaint and other pleadings required to commence such action, suit or proceeding upon the Party at the address of such Party set forth in Section 8.11 hereof, unless another address has been designated by such Party in a notice given to the other Parties in accordance with Section 8.11 hereof. The City agrees that the Bankruptcy Court will have exclusive post-confirmation authority and power to enforce this Agreement and all Settlement-Related Documents and to hear and adjudicate any challenge, action, suit or proceeding brought by any third party challenging the validity or enforceability of any provision of this Agreement, until all UTGO Bonds have been paid in full and all Plan Instruments are no longer outstanding. Pursuant to Section 904 of the Bankruptcy Code, the City hereby consents to the Bankruptcy Court enforcing the terms of this Agreement and the Settlement Escrow Agreement.

Section 8.7. <u>Headings</u>. The headings of the Articles and Sections of this Agreement are inserted for convenience only and are not part of this Agreement and do

not in any way limit or modify the terms or provisions of this Agreement and shall not affect the interpretation hereof.

Section 8.8. Binding Agreement Successors and Assigns; Joint and Several Obligations. This Agreement shall be binding upon the execution and delivery of this Agreement by the Parties listed on the signature pages hereto. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, administrators, constituents and representatives. The agreements, representations, covenants and obligations of the Parties under this Agreement are several only and not joint in any respect and none shall be responsible for the performance or breach of this Agreement by another.

Section 8.9. Entire Agreement. This Agreement shall constitute the full and entire agreement among the Parties with regard to the subject hereof, and supersedes all prior negotiations, representations, promises or warranties (oral or otherwise) made by any Party with respect to the subject matter hereof. No Party has entered into this Agreement in reliance on any other Party's prior representation, promise or warranty (oral or otherwise) except for those that may be expressly set forth in this Agreement.

Section 8.10. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original copy of this Agreement and all of which, when taken together, shall constitute one and the same Agreement. Copies of executed counterparts transmitted by telecopy or other electronic transmission service shall be considered original executed counterparts, provided receipt of copies of such counterparts is confirmed.

Section 8.11. Notices. All demands, notices, requests, consents, and other communications hereunder shall be in writing and shall be deemed to have been duly given (a), when personally delivered by courier service or messenger, (b) upon actual receipt (as established by confirmation of receipt or otherwise) during normal business hours, otherwise on the first business day thereafter if transmitted electronically (by e-mail transmission), by facsimile or telecopier, with confirmation of receipt, or (c) three (3) Business Days after being duly deposited in the mail, by certified or registered mail, postage prepaid-return receipt requested, to the following addresses, or such other addresses as may be furnished hereafter by notice in writing, to the following Parties:

If to the City, to:

Chief Financial Officer
City of Detroit
1126 Coleman A. Young Municipal Center
Two Woodward Avenue
Detroit MI 48226
Phone: (313) 224-3382
Fax: (313) 224-2827

with a copy given in like manner to:

> Corporation Counsel
> City of Detroit Law Department
> Coleman A. Young Municipal Center
> 2 Woodward Avenue
> Detroit MI 48226
> Phone: (313) 237-3018
> Fax: (313) 224-5505
>
> Miller, Canfield, Paddock and Stone, PLC
> 150 West Jefferson, Suite 2500
> Detroit, MI 48226
> Attention: Jonathan Green
> Email: green@millercanfield.com
> Attention: Amanda Van Dusen
> Email: vandusen@millercanfield.com

If to the Bond Insurers, to:

> Ambac Assurance Corporation
> One State Street Plaza
> New York, New York 10004
> Attention: Surveillance Department and General Counsel's Office
> Fax: (212) 208-3384

with a copy given in like manner to:

> Arent Fox LLP
> 1675 Broadway
> New York, New York 10019
> Attention: David L. Dubrow, Esq.
> Telecopy: (212) 484-3990
> Email: david.dubrow@arentfox.com

> Assured Guaranty Municipal Corp and Assured Guaranty Corp.
> 31 West 52nd Street
> New York, NY 10019
> Attention: Kevin J. Lyons
> Email: klyons@assuredguaranty.com
> Attention: Terence Workman
> Email: tworkman@assuredguaranty.com

with a copy given in like manner to:

Chadbourne & Parke LLP
30 Rockefeller Plaza
New York, NY 10112
Attention: Lawrence A. Larose
Fax: (212) 541-5369
Email: llarose@chadbourne.com
Attention: Samuel S. Kohn
Fax: (212) 541-5369
Email: skohn@chadbourne.com

National Public Finance Guarantee Corporation
113 King Street
Armonk, NY 10504
Attention: Kenneth Epstein and William J. Rizzo
Telecopy: (914) 765-3259
Email: kenneth.epstein@optinuityar.com
Email: bill.rizzo@nationalpfg.com

with a copy given in like manner to:

Sidley Austin LLP
555 West 5th Street
40th Floor
Los Angeles, CA 90013
Attention: Jeffrey E. Bjork
Telecopy: (213) 896-6600
Email: jbjork@sidley.com

Sidley Austin LLP
555 California Street
Suite 2000
San Francisco, CA 94104
Attention: Eric D. Tashman
Telecopy: (415) 772-7400
Email: etashman@sidley.com

Section 8.12. <u>Further Assurances</u>. Each of the Parties hereto agrees to execute and deliver, or to cause to be executed and delivered, all such instruments, and to take all such action as the other Parties may reasonably request in order to effectuate the intent and purposes of, and to carry out the terms of, this Agreement.

Section 8.13. <u>Non-Severability of Agreement</u>. This Agreement is to be construed as a whole, and all provisions of it are to be read and construed together. Notwithstanding anything in this Agreement, the Approval Order (if applicable) or the Plan Confirmation Order to the contrary, and in light of the integrated nature of the settlements and compromises embodied in this Agreement, in the event that (i) a court of

competent jurisdiction enters a Final Order ruling that any of the transactions contemplated in this Agreement are void, invalid, illegal or unenforceable in any material respect, (ii) any of the transactions contemplated by this Agreement are reversed, vacated, overturned, voided or unwound in any material respect, or (iii) the Approval Order or Plan Confirmation Order as it relates to the transactions contemplated in this Agreement is reversed, vacated, overturned or amended in any material respect, then in each case, the entirety of this Agreement (other than this Section 8.13) shall be void ab initio and of no force and effect and, during any subsequent proceeding, the Parties shall not assert claim preclusion, issue preclusion, estoppel or any similar defense in respect of rights and claims of the Parties that were the subject of this Agreement prior to this Agreement being of no force or effect.

(Signature page follows)

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date set forth above.

THE CITY OF DETROIT, as Debtor

By: _____
    Name:
    Title:

AMBAC ASSURANCE CORPORATION

By: _____
    Name:
    Title:

ASSURED GUARANTY CORP.

By: _____
    Name:
    Title:

ASSURED GUARANTY MUNICIPAL CORP.

By: _____
    Name:
    Title:

NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION

By: _____
    Name:
    Title:

**Schedule 1**

**(Pro Rata Allowed Claims for Restructured UTGO Bonds and Stub UTGO Bonds)**

S-1

## Schedule 1a - Holders Restructured UTGO Bonds

| Series | Outstanding UTGO Bond Principal | Restructured % | Holders Restructured UTGO Bond Principal |
|---|---|---|---|
| UTGO1999A (Assured) | $15,765,000 | 84.50% | $13,321,425 |
| UTGO2001A1 (National) | 74,800,000 | 84.50% | 63,206,000 |
| UTGO2001B (National) | - | - | - |
| UTGO2002 (National) | 6,645,000 | 84.50% | 5,615,025 |
| UTGO2003A (Syncora) | 31,675,000 | 84.50% | 26,765,375 |
| UTGO2004A1 (Ambac) | 39,270,000 | 84.50% | 33,183,150 |
| UTGO2004B1 (Ambac) | 29,365,000 | 84.50% | 24,813,425 |
| UTGO2004B2 (Ambac) | 575,000 | 84.50% | 485,875 |
| UTGO2005B (Assured) | 42,615,000 | 84.50% | 36,009,675 |
| UTGO2005C (Assured) | 15,525,000 | 84.50% | 13,118,625 |
| UTGO2008A (Assured) | 55,895,000 | 84.50% | 47,231,275 |
| UTGO2008B1 (Assured) | 18,780,000 | 84.50% | 15,869,100 |
| Total | $330,910,000 | | $279,618,950 |

**Schedule 1b - Insurer Owned Restructured UTGO Bonds**

| Series | UTGO Bond Principal | Restructured % | Ambac | Assured | National | Syncora | Total |
|--------|--------------------:|---------------:|------:|--------:|---------:|--------:|------:|
| | | | **Insurer Owned Restructured UTGO Bond Principal** | | | | |
| UTGO1999A (Assured) | $15,765,000 | 2.4% | - | 378,360 | - | - | $378,360 |
| UTGO2001A1 (National) | 74,800,000 | 2.4% | 249,977 | 1,545,223 | - | - | 1,795,200 |
| UTGO2001B (National) | - | 2.4% | - | - | - | - | - |
| UTGO2002 (National) | 6,645,000 | 2.4% | 22,207 | 137,273 | - | - | 159,480 |
| UTGO2003A (Syncora) | 31,675,000 | 2.4% | 99,245 | 613,476 | - | 47,479 | 760,200 |
| UTGO2004A1 (Ambac) | 39,270,000 | 2.4% | 942,480 | - | - | - | 942,480 |
| UTGO2004B1 (Ambac) | 29,365,000 | 2.4% | 704,760 | - | - | - | 704,760 |
| UTGO2004B2 (Ambac) | 575,000 | 2.4% | 13,800 | - | - | - | 13,800 |
| UTGO2005B (Assured) | 42,615,000 | 2.4% | - | 1,022,760 | - | - | 1,022,760 |
| UTGO2005C (Assured) | 15,525,000 | 2.4% | - | 372,600 | - | - | 372,600 |
| UTGO2008A (Assured) | 55,895,000 | 2.4% | - | 1,341,480 | - | - | 1,341,480 |
| UTGO2008B1 (Assured) | 18,780,000 | 2.4% | - | 450,720 | - | - | 450,720 |
| Total | $330,910,000 | | $2,032,469 | $5,861,892 | $ - | $47,479 | $7,941,840 |

**Schedule 2**

**(Pro Rata Payments to Bond Insurers)**

**Schedule 2 - Allocation of Amount Payable to Bond Insurers**

| Insurer | Pro Rata Share |
|---------|----------------|
| Ambac | 23.209% |
| Assured | 50.400% |
| National | 26.391% |
| Total | 100.000% |

**Exhibit A**

**FORM OF DEBT MILLAGE ESCROW AGREEMENT**

# DEBT MILLAGE DEPOSIT ESCROW AGREEMENT
# CITY OF DETROIT, COUNTY OF WAYNE
# STATE OF MICHIGAN

THIS ESCROW AGREEMENT (the "Agreement") dated as of the ___ day of _____, 2014, made by and between the City of Detroit, County of Wayne, State of Michigan (the "City") and U. S. Bank National Association, Detroit, Michigan (the "Escrow Trustee").

## WITNESSETH:

WHEREAS, on March 1, 2013, the Governor (the "Governor") of the State of Michigan (the "State") determined that a financial emergency existed within the City pursuant to the Local Government Fiscal Responsibility Act, Act 72, Public Acts of Michigan, 1990, as amended ("Act 72"); and

WHEREAS, on March 14, 2013, the Governor confirmed that a financial emergency existed within the City and, pursuant to Act 72, assigned to the Local Emergency Financial Assistance Loan Board established pursuant to the Emergency Municipal Loan Act, Act 243 Public Acts of Michigan, 1980, as amended (the "Board") the responsibility for managing the financial emergency; and

WHEREAS, on March 14, 2013, pursuant to Act 72, the Board appointed Kevyn D. Orr as Emergency Financial Manager for the City; and

WHEREAS, by operation of law the financial emergency continues to exist within the City pursuant to the Local Financial Stability and Choice Act, Act 436, Public Acts of Michigan, 2012 ("Act 436") and the Emergency Financial Manager continues in the capacity of the Emergency Manager for the City (the "Emergency Manager"); and

WHEREAS, on July 18, 2013 (the "Petition Date"), in accordance with Act 436 and the approval of the Governor, the Emergency Manager filed on behalf of the City a petition for relief pursuant to Chapter 9 of title 11 of the United States Code, 11 U.S.C. Sections 101-1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"); and

WHEREAS, as of the close of Fiscal Year 2013 (*i.e.*, June 30, 2013), the City had $369.115 million in outstanding principal amount of unlimited tax general obligation bonds, excluding the 2010A UTGO Bonds hereinafter mentioned (the "Prior UTGO Bonds"); and

WHEREAS the City has previously issued and delivered its Distributable State Aid Second Lien Bonds (Unlimited Tax General Obligation) Series 2010A (Taxable Recovery Zone Economic Development Bonds Direct Payment) (the "2010A UTGO Bonds") which, together

with the Prior UTGO Bonds, are outstanding in the amounts, bear interest at the rates, are payable on such dates and have the redemption provisions shown on Exhibit A hereto; and

WHEREAS, more than 90% of the Prior UTGO Bonds are insured by either Ambac Assurance Corporation, Assured Guaranty Municipal Corp. or National Public Finance Guarantee Corporation (each a "Bond Insurer" and collectively, the "Bond Insurers"), as shown on Exhibit A; and

WHEREAS, the City and the Bond Insurers have entered into a settlement agreement entered into as of July ___, 2014 (the "UTGO Settlement Agreement"); and

WHEREAS, the City intends to restructure $287,560,790 of the Prior UTGO Bonds which mature on or after April 1, 2015 (the "Restructured UTGO Bonds") as described below; and

WHEREAS, on _____, 2014, pursuant to Section 12(1) and Section 19(1) of Act 436, the Emergency Manager filed with the City Council of the City (the "City Council") his Order No. ___ Approval of _____ (Order No. ___"), in part, to accomplish the restructuring of the Restructured UTGO Bonds as the Distributable State Aid Fourth Lien Restructured Bonds (Unlimited Tax General Obligation), Series 2014 (the "Bonds" or the "Municipal Obligation") in the amounts shown on Exhibit B attached hereto; and

WHEREAS, on _____, 2014, in accordance with Section 19(1) of Act 436, the City Council adopted a resolution entitled ["Resolution of the City Council of the City of Detroit, County of Wayne, State of Michigan Approving the Emergency Manager of the City of Detroit Order No. ___ Approval of UTGO _____"] (the "Council Resolution") under which the City Council approved the issuance and delivery of the Municipal Obligation to the Michigan Finance Authority ("MFA"); and

WHEREAS, the Restructured UTGO Bonds will be restructured as described in Section 2.2 of the UTGO Settlement Agreement: and

WHEREAS, on _____, 2014, the Bankruptcy Court issued an order approving the UTGO Settlement Agreement (the "Confirmation Order"); and

WHEREAS, the portion of the Prior UTGO Bonds not restructured through the issuance of the Municipal Obligation, which mature on or after April 1, 2015, in the principal amount of $43,410,000 (the "Stub UTGO Bonds" and together with the 2010A UTGO Bonds, the Municipal Obligation and any Additional Bonds (defined below), the "UTGO Bonds") will be reinstated and shall remain Outstanding in the amounts and will remain payable as shown on Exhibit C hereto and as provided in Order No. _____; and

WHEREAS, pursuant to the Prior UTGO Bonds and the 2010A UTGO Bonds and Order No. ___ and Section 4a of Act 279, the City has pledged, and to the extent permitted by applicable law, including without limitation Section 12(1)(x) of Act 436, in Order No. __, has created a lien upon the Debt Millage Revenues (as hereinafter defined) to pay the debt service on the UTGO Bonds; and

2

WHEREAS, pursuant to Section 4a of Act 279, and Section 701 of the Revised Municipal Finance Act, Act No. 34, Public Acts of Michigan, 2001, as amended, Order No. ___ provides for the deposit of the Debt Millage Revenues into a separate escrow account to be used for the sole purpose of paying principal of and interest on the UTGO Bonds and the administrative costs related to the deposit and escrow of Debt Millage Revenues; and

WHEREAS, in order to effectuate the pledge of the Debt Millage Revenues in favor of the owners of the UTGO Bonds, it is necessary for the City to provide for the deposit with the Escrow Trustee of the proceeds of 100% of its debt millage levy to satisfy the Debt Service Requirements to be held by the Escrow Trustee in trust, to further secure payment of the debt service on the UTGO Bonds;

NOW, THEREFORE, in consideration of the mutual undertakings, provisions and agreements herein contained, the sufficiency of which are hereby acknowledged, that in order to provide for the payment of the UTGO Bonds, for the benefit of the owners thereof and the Bond Insurers, and to secure the performance and observance of the conditions and covenants herein set forth and for other valuable consideration, the receipt of which is hereby acknowledged, the City covenants and agrees with the Escrow Trustee for the benefit of the respective owners from time to time of the UTGO Bonds and the Bond Insurers as follows:

## ARTICLE I
## DEFINITIONS

Section 101.    Definitions.  In addition to the terms defined in the preambles to this Escrow Agreement , the following terms shall have, unless the context otherwise requires, the meanings herein specified:

"Act 279" means Act No. 279, Public Acts of Michigan, 1909, as amended.

"Additional Bonds" means any series of unlimited tax general obligation bonds issued by the City on a parity as to Debt Millage Revenue levies with the 2010A UTGO Bonds, the Municipal Obligation and the Stub UTGO Bonds.

"Business Day" means a day which is not (i) a Saturday, Sunday or legal holiday on which banks located in either the State of Michigan or the state or states in which the principal corporate trust office of the Escrow Trustee, is located are authorized or required by law to be closed, or (ii) a day on which the New York Stock Exchange is closed.

"Debt Millage Deposit" or "Debt Millage Deposits" means whenever used herein singularly, each payment of Debt Millage Revenues, and collectively all payments of Debt Millage Revenues by the City to the Escrow Trustee for deposit in the UTGO Debt Millage Fund in accordance with Section 204 hereof.

"Debt Millage Revenues" means the proceeds of the debt millage levies, including interest subsidy payments received by the City in respect of the 2010A UTGO Bonds, delinquent millage payments received from Wayne County, Michigan or otherwise, pledged to and on

3

account of unlimited tax general obligation bonds of the City for the payment of debt service on the Prior UTGO Bonds, or after the Effective Date of the UTGO Bonds, and the 2010A UTGO Bonds and any Additional Bonds.

"Debt Retirement Schedule" means the table attached as Exhibit D hereto, showing the dates Debt Service Requirements are due and payable on each series of the UTGO Bonds.

"Debt Service Requirement" means an amount equal to the principal of and/or interest due on any series of UTGO Bonds (including the Stub UTGO Bonds) semi-annually on each payment date as set forth in Exhibit D.

"Effective Date" mean the effective date of the City's chapter 9 plan of adjustment.

"Escrow Trustee" means initially, U.S. Bank National Association, Detroit, Michigan, or any successor in trust or assignees, as Escrow Trustee hereunder.

"Event of Default" means the breach by the City of any material agreement or covenant set forth in the UTGO Settlement Agreement or this Agreement, written notice of which has been provided by a Bond Insurer to the City and the Escrow Trustee.

"Fiscal Year" means the City's fiscal year, commencing July 1 and ending June 30.

"General Retirement System" means the General Retirement System of the City of Detroit, _____ Fund.

"Income Stabilization Funds" means the Police & Fire Retirement System of the City of Detroit, Income Stabilization Fund, and the General Retirement System of the City of Detroit, Income Stabilization Fund.

"Master Trustee" means U. S. Bank National Association, Detroit, Michigan, as trustee under the Master Debt Retirement Trust Indenture dated as of March 1, 2010, as supplemented, between the City and the Master Trustee.

"Outstanding" when used with respect to the UTGO Bonds, means, as of the date of determination, the UTGO Bonds theretofore authenticated and delivered pursuant to the resolution, indenture and/or order for that series, except:

(a) UTGO Bonds theretofore canceled by the trustee or paying agent for such UTGO Bonds or delivered to such trustee or paying agent for cancellation;

(b) UTGO Bonds for whose payment money in the necessary amount, without the need for reinvestment thereof, has been theretofore deposited with the trustee or paying agent for such UTGO Bonds in trust for the registered owners of such UTGO Bonds;

(c) UTGO Bonds delivered to the trustee or paying agent for such UTGO Bonds for cancellation in connection with (i) the exchange of such UTGO

4

Bonds for other bonds or (ii) the transfer of the registration of such UTGO Bonds;

(d)     UTGO Bonds alleged to have been destroyed, lost or stolen which have been paid or replaced pursuant to the resolution, indenture or order for that series or otherwise pursuant to law; and

(e)     UTGO Bonds deemed paid as provided in the resolution, indenture or order for that series.

"Permitted Investments" means those investments specified in Article III of this Escrow Agreement.

"Plan Assignees" means the Income Stabilization Funds and the General Retirement System.

"Set Aside Ledger" means the table attached as Exhibit D hereto, showing the allocation of each Debt Millage Deposit to the UTGO Debt Millage Fund in such fractional amounts determined in accordance with Section 204(a) herein.

"Stub UTGO Bonds Paying Agent" means U. S. Bank National Association, Detroit, Michigan.

"UTGO Debt Millage Fund" means the City of Detroit UTGO Debt Millage Fund created and described in Section 201 of this Agreement.

## ARTICLE II
## ESTABLISHMENT OF FUNDS AND ACCOUNTS

Section 201.    Establishment of UTGO Debt Millage Fund.  There is hereby created and established with the Escrow Trustee, pursuant to Order No. ___ and this Escrow Agreement, a single and common trust fund designated the "UTGO Debt Millage Fund."

Section 202.    Establishment of Accounts and Subaccounts.  (a) There are hereby created within the UTGO Debt Millage Fund three (3) separate and segregated accounts, designated as follows:

1.     "2010A UTGO Bonds Debt Millage Account" ("2010A UTGO Account").  The Escrow Trustee shall deposit Debt Millage Revenues allocable to the Debt Service Requirements on the 2010A UTGO Bonds, as set forth on Exhibit D, in the 2010A UTGO Account.

2.     "2014 UTGO Bonds Debt Millage Account" ("2014 UTGO Bonds Account").  The Escrow Trustee shall deposit Debt Millage Revenues allocable to the Debt Service Requirements on the Municipal Obligation and the Stub UTGO Bonds, as set forth on Exhibit D, in the 2014 UTGO Bonds Account.

5

3. "Additional Bonds Debt Millage Account" ("Additional Bonds Account"). The Escrow Trustee shall deposit Debt Millage Revenues allocable to the Debt Service Requirements (to be reflected in a supplement to Exhibit D) on any series of Additional Bonds in a subaccount established for such series in the Additional Bonds Account pursuant to a supplement to this Agreement.

(b)     There are hereby created within the 2014 UTGO Bonds Account two separate and segregated subaccounts, designated as follows:

1.     The 2014 UTGO Municipal Obligation Subaccount ("2014 Municipal Obligation Subaccount").

2.     The Stub UTGO Bonds Subaccount ("Stub UTGO Bonds Subaccount").

The Escrow Trustee shall allocate and deposit Debt Millage Revenues deposited in the 2014 UTGO Bonds Account among the 2014 Municipal Obligation Subaccount and the Stub UTGO Bonds Subaccount as provided in Section 204(a).

Section 203.     Deposits to the UTGO Debt Millage Fund. Commencing on the Effective Date, and thereafter in accordance with the distribution schedule published by the Michigan Department of Treasury, and in any event, no less often than (x) bi-monthly during the period beginning each July 1 and ending the following March 31, and (y) monthly during the period beginning April 1 and ending the following June 30 of each year, the City shall remit the Debt Millage Revenues to the Escrow Trustee for deposit in the UTGO Debt Millage Fund.  In the Order, the City has covenanted that it shall cause to be deposited with the Escrow Trustee, in accordance with the terms of this Escrow Agreement, 100% of the Debt Millage Revenues received by the City for as long as the Municipal Obligation and the Stub UTGO Bonds remain outstanding.  The Escrow Trustee shall deposit any Debt Millage Revenues received by it from the City into the UTGO Debt Millage Fund and allocate such deposits in accordance with the provisions of Section 204 below.

Section 204.     Allocation and Deposit.  (a) Each Fiscal Year, commencing with the Effective Date and for as long as any UTGO Bonds remain outstanding, within one (1) Business Day of receipt by the Escrow Trustee of each Debt Millage Deposit, the Escrow Trustee shall set aside in the UTGO Debt Millage Fund each Debt Millage Deposit received, and make transfers from the UTGO Debt Millage Fund, as follows:

1.     FIRST, a percentage of each Debt Millage Deposit received shall be allocated and set aside in each of the 2010A UTGO Account, the 2014 UTGO Bonds Account and any Additional Bonds Account that corresponds to the percentage that the Debt Service Requirement payable on the related series of UTGO Bonds as shown on Exhibit D bears to the Debt Service Requirement payable (or past due) on all UTGO Bonds on or before May 1 of each Fiscal Year until the sum of the aggregate Debt Millage Deposits (when taken together with any investment earnings on deposit) equals the Debt Service Requirement on all UTGO Bonds for such Fiscal Year.  Once the Debt Service Requirement has been satisfied for all UTGO Bonds for payments due on or before May 1 of each Fiscal Year, any excess shall be allocated to the same accounts in

6

proportion to the Debt Service Requirements payable on such UTGO Bonds in the next Fiscal Year.

2.    SECOND, the Escrow Trustee shall allocate deposits made to the 2014 UTGO Bonds Account (i) first to the 2014 Municipal Obligation Subaccount until the Debt Service Requirement payable (or past due) on the Municipal Obligation as shown on Exhibit D on or before April 1 of the then current Fiscal Year has been satisfied and (ii) second, to the Stub UTGO Bonds Subaccount until the Debt Service Requirement payable (or past due) on the Stub UTGO Bonds on or before April 1 of the then current Fiscal Year has been satisfied. Once the Debt Service Requirement for all Prior UTGO Bonds has been satisfied for the then current Fiscal Year, any excess shall be allocated first to the 2014 Municipal Obligation Subaccount for application to the next Fiscal Year's Debt Service Requirements for the Municipal Obligation and then to the next Fiscal Year's Debt Service Requirements for the Stub UTGO Bonds.

3.    THIRD, within three Business Days after a deposit is made to any account or subaccount in the UTGO Debt Millage Fund the Escrow Trustee shall transfer the funds in such account or subaccount as follows:

(a) Funds on deposit in the 2010A UTGO Debt Millage Account shall be transferred to the Master Trustee for application to Debt Service Requirements for the 2010A UTGO Bonds.

(b) Funds on deposit in the 2014 Municipal Obligation Subaccount shall be transferred to the Master Trustee for deposit in the Series 2014 Tax Levy Account for application to Debt Service Requirements for the Municipal Obligation.

(c) Funds on deposit in the Stub UTGO Bonds Subaccount shall be transferred to the Plan Assignees pursuant to the direction and in the amounts shown on Exhibit F. In the event insufficient funds are on deposit in the Stub UTGO Bonds Subaccount on the date set for any transfer, the Escrow Trustee shall allocate and transfer the funds then on deposit in the Stub UTGO Bonds Subaccount to the Plan Assignees pro rata, in proportion to the amount due to each Plan Assignee on such date.

(d) Funds on deposit in the Additional Bonds Account shall be transferred to the paying agent or trustee for the related series of Additional Bonds.

(b)    The Escrow Trustee shall keep and maintain a ledger on its books and records showing each Debt Millage Deposit into the Debt Millage Fund of the UTGO Debt Millage Fund, all transfers of funds from one account to another or from the UTGO Debt Millage Fund to the Master Trustee or the Income Stabilization Funds or the paying agent or trustee for any Additional Bonds, which ledger shall be substantially in the form attached hereto as Exhibit D-2 (the "Set Aside Ledger"). Not later than one (1) Business Days after the receipt of each Debt Millage Deposit, the Escrow Trustee shall promptly confirm electronically or in writing to the

7

City the receipt of each Debt Millage Deposit and provide with such notice a copy of the Set Aside Ledger which shall include the deposit entries for the then most recent Debt Millage Deposit, all prior deposits for the Fiscal Year and entries for any inter-fund transfers during the Fiscal Year. While any of the Municipal Obligation or the Stub UTGO Bonds remains Outstanding, upon request of the Bond Insurers, the Escrow Trustee shall furnish a copy of the Set Aside Ledger to the Bond Insurers.

(c) Upon receipt of the Set Aside Ledger from the Escrow Trustee, the Finance Director of the City shall allocate on the books and records of the City a fractional amount of each Debt Millage Deposit shown in the Set Aside Ledger equal to the percentage of each Debt Millage Deposit that corresponds to the Debt Service Requirement by the City for the payment of that portion of debt service due on the UTGO Bonds in accordance with the ratios of the Debt Service Requirements for each series of UTGO Bonds to the total Debt Service Requirement for all UTGO Bonds set forth in Exhibit D hereto.

## ARTICLE III
## INVESTMENT OF FUNDS

Section 301. <u>Permitted Investments</u>. All money held by the Escrow Trustee pursuant to this Agreement shall be invested by the Escrow Trustee, without the need for further direction by the City, in accordance with written instructions from the City in mutual funds registered under the investment company act of 1940, title I of chapter 686, 54 Stat. 789, 15 USC 80a-1 to 80a-3 and 80a-4 to 80a-64, that have been rated at the time of purchase within the highest classification established by not less than two standard rating services and so long as the portfolio of such mutual funds is limited to bonds, and other obligations on which the full and timely payment of principal and interest is unconditionally guaranteed by the full faith and credit of the United States. In the absence of written direction delivered to the Escrow Trustee by the City, the Escrow Trustee shall hold funds uninvested. The Escrow Trustee shall be entitled to rely on any written direction from the City as to the suitability and legality of the directed investment.

## ARTICLE IV
## THE ESCROW TRUSTEE

Section 401. <u>Powers and Duties of Escrow Trustee</u>. (a) The Escrow Trustee may execute any of the trusts or powers hereof and perform any of its duties by or through attorneys, agents, receivers or employees, and shall be entitled to act upon the opinion or advice of its counsel concerning all matters hereof, and may in all cases be reimbursed hereunder for reasonable compensation paid to all such attorneys, agents, receivers and employees as may reasonably be employed in connection with the trust hereof. The Escrow Trustee may act upon an opinion of counsel and shall not be responsible for any loss or damage resulting from any action or nonaction by it taken or omitted to be taken in good faith in reliance upon such opinion of counsel.

(b) The Escrow Trustee shall not be responsible for any recital herein, or for the validity of the execution by the City of this Escrow Agreement, or of any supplements thereto or

8

instruments of further assurance, or for the validity or sufficiency of, or filing of documents related to the security for the UTGO Bonds intended to be secured hereby.

(c)     The Escrow Trustee shall not be responsible or liable for any loss suffered in connection with any investment of funds made by it in accordance with this Escrow Agreement .

(d)     The Escrow Trustee shall be protected in acting upon any notice, request, consent, certificate, order, affidavit, letter, telegram or other paper or document reasonably believed by it to be genuine and correct and to have been signed or sent by the proper person or persons.

(e)     As to the existence or non-existence of any fact or as to the sufficiency or validity of any instrument, paper or proceeding, the Escrow Trustee shall be entitled to rely upon a certificate believed in good faith to be genuine and correct, signed on behalf of the City by an authorized officer of the City as sufficient evidence of the facts therein contained. The Escrow Trustee may also accept a similar certificate to the effect that any particular dealing, transaction or action is necessary or expedient, but may at its discretion secure such further evidence deemed necessary or advisable, but shall in no case be bound to secure the same.

(f)     The permissive right of the Escrow Trustee to do things enumerated in this Escrow Agreement, as amended, shall not be construed as a duty and the Escrow Trustee shall not be answerable for other than its gross negligence or willful misconduct.  The immunities and exceptions from liability of the Escrow Trustee shall extend to its officers, directors, employees and agents.

(g)     The Escrow Trustee shall not be required to give any bond or surety in respect to the execution of its rights and obligations hereunder.

(h)     All moneys received by the Escrow Trustee shall, until used or applied or invested as herein provided, be held in trust in the manner and for the purpose for which they were received, but need not be segregated from other funds except to the extent required by this Escrow Agreement, as amended, or by law.  The Escrow Trustee shall not be under any liability for interest on any moneys received hereunder except such as may be agreed upon.

(i)     The Escrow Trustee shall not be under any obligation to initiate any suit or to take any remedial proceeding under this Escrow Agreement or to take any steps in the execution of the trusts created by this Escrow Agreement or in the enforcement of any rights and powers under this Escrow Agreement until it has been indemnified to its satisfaction against any and all fees, costs and expenses and other reasonable disbursements and against all liability.

(j)     The Escrow Trustee shall have no responsibility or liability with respect to any information, statement or recital in any official statement, offering memorandum or other disclosure material prepared or distributed with respect to the issuance of the UTGO Bonds, except for liability for its own gross negligence or willful misconduct.

(k)     The Escrow Trustee may become the holder of any of the UTGO Bonds with the same rights it would have if it were not Escrow Trustee, and, to the extent permitted by law, may act as depositary for and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, any committee formed to protect the rights of holders, whether or

9

not such committee shall represent the holders of a majority in principal amount of any of the UTGO Bonds of such series then outstanding.

(l)     The Escrow Trustee shall not be liable for any error of judgment made in good faith by any of its officers, employees, agents or representatives, unless it shall be proved that the Escrow Trustee was negligent in ascertaining the pertinent facts.

(m)     The Escrow Trustee has no obligation or liability to the holders for the payment of interest on, principal of or redemption premium, if any, with respect to the UTGO Bonds from its own funds; but rather the Escrow Trustee's obligations shall be limited to the performance of its duties hereunder.

(n)     Whether or not therein expressly so provided, every provision of this Agreement or related documents, relating to the conduct or affecting the liability of or affording protection to the Escrow Trustee shall be subject to the provisions of this Article.

Section 402.     Fees and Expenses of Escrow Trustee.  (a) The Escrow Trustee shall be entitled to reasonable fees for services rendered under this Escrow Agreement, as amended, and shall be reimbursed for all expenses reasonably incurred in connection with such services.  Such fees and expenses shall be payable by the City and shall be determined in accordance with the Fee Schedule attached as Exhibit E of this Agreement or as otherwise may be agreed to by the City and the Escrow Trustee.

(b)     The City shall be liable for all fees, expenses, charges, losses, costs, liabilities and damages incurred by the Escrow Trustee pursuant to this Agreement except for those which are adjudicated to have resulted from the gross negligence or willful misconduct of the Escrow Trustee, and shall pay such amounts to or at the direction of the Escrow Trustee.

Section 403.     Resignation; Appointment of Successor Escrow Trustee; Successor Escrow Trustee Upon Merger, Consolidation or Sale.  (a)  The Escrow Trustee and any successor Escrow Trustee may resign only upon giving 60 days' prior written notice to the City and, while any of the Municipal Obligation or the Stub UTGO Bonds remains Outstanding, the Bond Insurers.  Such resignation shall take effect only upon the appointment of a successor Escrow Trustee as described in Section 403(b) below and the acceptance of such appointment by the successor Escrow Trustee.  Upon appointment of a successor Escrow Trustee, the resigning Escrow Trustee shall, after payment of its fees, costs and expenses, assign all of its right, title and interest in the Debt Millage Revenues, and transfer and assign its right, title and interest in the Escrow Agreement to the successor Escrow Trustee.  The successor Escrow Trustee shall meet the requirements of Section 403(b) below and shall accept in writing its duties and responsibilities hereunder and file such acceptance with the City.

(b)     In case the Escrow Trustee shall give notice of resignation or be removed, or be dissolved, or shall be in the course of dissolution or liquidation, or otherwise become incapable of acting hereunder, or in case it shall be taken under the control of any public office or offices, or of a receiver appointed by a court, a successor may with the prior written consent of the City (so long as no Event of Default shall have occurred and be continuing under this Escrow Agreement ) and, while any of the Municipal Obligation or the Stub UTGO Bonds remains

10

Outstanding, the Bond Insurers, be appointed by the owners of a majority in aggregate principal amount of UTGO Bonds then Outstanding, by an instrument or concurrent instruments in writing signed by such owners, or by their duly authorized attorneys in fact, a copy of which shall be delivered personally or sent by first class mail, postage prepaid, to the City, the retiring Escrow Trustee, and the successor Escrow Trustee, which, while any of the Municipal Obligation or the Stub UTGO Bonds remains Outstanding must be acceptable to the Bond Insurers insuring such Outstanding Bonds. In the absence of an appointment by the bondholders, the City may appoint a successor Escrow Trustee, by an instrument in writing signed by an authorized officer of the City, a copy of which shall be delivered personally or sent by first class mail, postage prepaid, to the retiring Escrow Trustee and the successor Escrow Trustee. If the owners of the UTGO Bonds and the City fail to so appoint a successor Escrow Trustee, hereunder within thirty (30) days after the Escrow Trustee has given notice of its resignation, has been removed, has been dissolved, has otherwise become incapable of acting hereunder or has been taken under control by a public officer or receiver, the Escrow Trustee shall have the right to petition a court of competent jurisdiction to appoint a successor hereunder. Every such Escrow Trustee appointed pursuant to the provisions of this Section 403(b) (i) shall at all times be a bank having trust powers or a trust company, (ii) shall at all times be organized and doing business under the laws of the United States of America or of any state, (iii) shall have, or be wholly owned by an entity having, a combined capital and surplus of at least $75,000,000, (iv) shall be authorized under such laws to exercise corporate trust powers, and (v) shall be subject to supervision or examination by federal or state authority.

(c)      Any corporation or association into which the Escrow Trustee may be merged or converted or with or into which it may be consolidated, or to which it may sell or transfer its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any merger, conversion, sale, consolidation or transfer to which it is a party, provided such company shall be eligible under Section 403(b) hereof, shall be and become successor Escrow Trustee hereunder and shall be vested with all the trusts, powers, rights, obligations, duties, remedies, immunities and privileges hereunder as was its predecessor, without the execution or filing of any instrument or any further act on the part of any of the parties hereto.

Section 404.   Removal of Escrow Trustee. The Escrow Trustee may be removed at any time by an instrument or concurrent instruments in writing delivered to the Escrow Trustee and signed by the City; provided that if an Event of Default has occurred and is continuing hereunder, then, while any of the Municipal Obligation or the Stub UTGO Bonds remains Outstanding, the Escrow Trustee may not be removed without the consent of the holders of a majority in aggregate principal amount of the UTGO Bonds then Outstanding and the Bond Insurers. No removal of the Escrow Trustee and no appointment of a successor Escrow Trustee shall become effective until the successor Escrow Trustee has accepted its appointment in the manner provided in Section 403 hereof. Upon such removal and the payment of its fees, costs and expenses, the Escrow Trustee shall assign to the successor Escrow Trustee all of its right, title and interest in the Trust Estate in the same manner as provided in Section 403 hereof.

# ARTICLE V
## ADDITIONAL BONDS

Section 501.  Issuance of Additional Bonds.  The City reserves the right to issue unlimited tax full faith and credit bonds payable  on a parity basis with the pledge of the City's unlimited tax full faith and credit as security for the UTGO Bonds.  While any of the Municipal Obligation or the Stub UTGO Bonds remains Outstanding, the debt millage levy with respect to any such parity bonds shall be subject to the terms of this Agreement.

Section 502.  Notices Regarding Additional Bonds.  The City hereby covenants to provide notice to the Escrow Trustee and, while any of the Municipal Obligation or the Stub UTGO Bonds remains Outstanding, the Bond Insurers, of the issuance of each series of Additional Bonds.  The City may enter into additional agreements or supplements hereto with the Escrow Trustee to provide for the remittance of Debt Millage Revenues to the Escrow Trustee to be held and transferred for the payment of principal of and interest on any Additional Bonds pursuant to this Agreement.

Section 503.  Defeasance or Redemption.  The City hereby covenants to provide notice to the Escrow Trustee of the defeasance or redemption of all or any portion of the UTGO Bonds. In the event that the City issues Additional Bonds as described in Section 501 hereof, the City hereby covenants to provide notice to the Escrow Trustee of the defeasance or redemption of all or any portion of the Additional Bonds.

# ARTICLE VI
## AMENDMENTS

Section 601.  Modifications and Amendments Not Requiring Consent.  Any provision of this Agreement may be amended at any time by the parties hereto, and while any of the Municipal Obligation or the Stub UTGO Bonds remains Outstanding, with the prior written consent of the Bond Insurers, for any one or more of the following purposes:

(a)     To cure any ambiguity or formal defect or omission in this Agreement.

(b)     To grant to or confer upon the Escrow Trustee any additional rights, remedies, powers, authority or security that may lawfully be granted to or conferred upon the Escrow Trustee.

(c)     To accomplish, implement or give effect to any other action which is authorized or required by this Agreement.

(d)     To comply with the requirements of the Internal Revenue Code of 1986, as amended, applicable to the UTGO Bonds or any Additional Bonds.

(e)     To appoint separate or successor trustees.

(f)     To provide for the deposit of Debt Millage Revenues with respect to any Additional Bonds.

12

(g)     To make any other change which, in the judgment of the Escrow Trustee, is not to the material prejudice of holders of the UTGO Bonds, upon the opinion of bond counsel or other professionals.

(h)     To create obligation specific Escrow Funds and sub-accounts in accordance with Article II herein for further securing and establishing deposit and set-aside requirements of all UTGO Bonds issued by the City.

Within thirty (30) days after the execution of any amendment pursuant to this Section 601, the Escrow Trustee shall cause notice thereof to be mailed, postage prepaid to the Master Trustee, the Stub UTGO Paying Agent and the trustee or paying agent for any Additional Bonds at their addresses shown in Section 701. The notice shall briefly set forth the nature of the supplement and shall state that copies thereof are on file at the corporate trust office of the Escrow Trustee for inspection by all such holders. Any such supplement so executed shall be valid and binding notwithstanding any failure of the Escrow Trustee to mail the notice herein required and notwithstanding any objections which may be received pursuant to any mailed notice.

Upon the execution of any Amendment pursuant to the provisions of this Section, this Agreement shall be deemed to be modified and amended in accordance therewith and the respective rights, duties and obligations under this Agreement of the City, the Escrow Trustee, the Bond Insurers, and all registered holders of the UTGO Bonds shall thereafter be determined, exercised and enforced hereunder, subject in all respects to such modifications and amendments.

## ARTICLE VII
## MISCELLANEOUS

Section 701. Notices. Except as other provided, all notices, certificates, requests, complaints, demands or other communications under this Agreement shall be deemed sufficiently given when sent by first class mail or overnight mail postage prepaid, addressed as follows:

If to the City, to:              City of Detroit
                                 Coleman A. Young Municipal Center
                                 2 Woodward Avenue, Suite 1126
                                 Detroit MI 48226
                                 Attention: Chief Financial Officer

If to the Escrow Trustee, the Master Trustee or the Stub UTGO Bonds Paying Agent, to:
                                 U.S. Bank National Association
                                 535 Griswold, Suite 550
                                 Detroit, Michigan 48226
                                 Attention: Corporate Trust Services

13

If to the Bond Insurers, to:      Ambac Assurance Corporation
One State Street Plaza
New York, New York 10004
Attention: Surveillance Department and
General Counsel's Office


Assured Guaranty Municipal Corp and
Assured Guaranty Corp.
31 West 52nd Street
New York, NY 10019
Attention: Kevin J. Lyons
Attention: Terence Workman

National Public Finance Guarantee
Corporation
113 King Street
Armonk, NY 10504
Attention: Kenneth Epstein and William J.
Rizzo

The City, the Escrow Trustee or the Bond Insurers may, by giving notice hereunder, in writing, designate any further or different addresses to which subsequent notices, certificates, requests, complaints, demands or other communications hereunder shall be sent.

Section 702. <u>Termination</u>. This Agreement shall terminate following delivery of written direction from the City to the Escrow Trustee to so terminate, together with written notice: (1) that all of the Municipal Obligation and the Stub UTGO Bonds have been paid in full at maturity or defeased (and for each series of UTGO Bonds that have been or are to be defeased prior to termination, such notice shall include written certification by an independent verification agent for the City that sufficient cash or obligations necessary to defease such UTGO Bonds in accordance with the applicable defeasance requirements are on deposit with the Master Trustee, in the case of the Municipal Obligation, and the Income Stabilization Funds, in the case of the Stub UTGO Bonds to be defeased, as of the date of the City's notice), and (2) that all fees owed to the Escrow Trustee have been paid in full. Upon termination of this Agreement, any money remaining on deposit in the funds and accounts created and established hereunder shall be paid to the City.

Section 703. <u>Severability</u>. If any one or more sections, clauses or provisions of this Escrow Agreement shall be determined by a court of competent jurisdiction to be invalid or ineffective for any reason, such determination shall in no way affect the validity and effectiveness of the remaining sections, clauses and provisions of the Agreement.

Section 704. <u>Headings</u>. Any headings shall be solely for convenience of reference and shall not constitute a part of the Agreement, nor shall they affect its meaning, construction or effect.

14

Section 705. <u>Escrow Agreement Executed in Counterparts</u>. This Escrow Agreement may be executed simultaneously in several counterparts, each of which shall be deemed an original, and such counterparts together shall and will constitute one and the same instrument.

Section 706. <u>Parties Interested Herein</u>. Nothing in this Escrow Agreement expressed or implied is intended or shall be construed to confer upon, or to give to, any person or entity, other than the Escrow Trustee, the City, the Bond Insurers and the registered owners of the UTGO Bonds, any right, remedy or claim under or by reason of this Escrow Agreement or any covenant, condition or stipulation hereof, and all covenants, stipulations, promises and agreements in this Agreement on behalf of the City shall be for the sole and exclusive benefit of the Escrow Trustee, the City, the Bond Insurers and the registered owners of the UTGO Bonds.

IN WITNESS WHEREOF, this Escrow Agreement has been signed on behalf of the City by its Emergency Manager and U.S. Bank National Association to evidence the acceptance of the trust, has caused this Escrow Agreement to be executed in its behalf by its authorized officer, all as of the date first above written.

CITY OF DETROIT

By _____
      Kevyn D. Orr
      Its:  Emergency Manager

U.S. BANK NATIONAL ASSOCIATION,
as Escrow Trustee

By _____

    Its: _____

16

**EXHIBIT A**
**DEBT RETIREMENT SCHEDULES**
**(BY SERIES)**

| CUSIP | Maturity Date | Rate | Principal | Insurer | Interest 10/1/14 | 4/1/15 | 10/1/15 | 4/1/16 | 10/1/16 | 4/1/17 | 10/1/17 | 4/1/18 | 10/1/18 | 4/1/19 | 10/1/19 | 4/1/20 | 10/1/20 | 4/1/21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **UTGO 1999-A** | | | | | | | | | | | | | | | | | | |
| ...M3 | 4/1/15 | 5.250% | $2,850,000.00 | Assured | $74,812.50 | $74,812.50 | | | | | | | | | | | | |
| ...N1 | 4/1/16 | 5.000% | $2,995,000.00 | Assured | $74,875.00 | $74,875.00 | $74,875.00 | $74,875.00 | | | | | | | | | | |
| ...P6 | 4/1/17 | 5.000% | $3,145,000.00 | Assured | $78,625.00 | $78,625.00 | $78,625.00 | $78,625.00 | $78,625.00 | $78,625.00 | | | | | | | | |
| ...Q4 | 4/1/18 | 5.000% | $3,305,000.00 | Assured | $82,625.00 | $82,625.00 | $82,625.00 | $82,625.00 | $82,625.00 | $82,625.00 | $82,625.00 | $82,625.00 | | | | | | |
| ...R2 | 4/1/19 | 5.000% | $3,470,000.00 | Assured | $86,750.00 | $86,750.00 | $86,750.00 | $86,750.00 | $86,750.00 | $86,750.00 | $86,750.00 | $86,750.00 | $86,750.00 | $86,750.00 | | | | |
| | | | **$15,765,000.00** | | $397,687.50 | $397,687.50 | $322,875.00 | $322,875.00 | $248,000.00 | $248,000.00 | $169,375.00 | $169,375.00 | $86,750.00 | $86,750.00 | | | | |
| **UTGO 2000-A(I)** | | | | | | | | | | | | | | | | | | |
| ...VG3 | 4/1/15 | 5.375% | $5,840,000.00 | NPFG | $159,637.50 | $159,637.50 | | | | | | | | | | | | |
| ...VH1 | 4/1/16 | 5.375% | $6,260,000.00 | NPFG | $168,237.50 | $168,237.50 | $168,237.50 | $168,237.50 | | | | | | | | | | |
| ...VJ7 | 4/1/17 | 5.375% | $6,600,000.00 | NPFG | $177,375.00 | $177,375.00 | $177,375.00 | $177,375.00 | $177,375.00 | $177,375.00 | | | | | | | | |
| ...VK4 | 4/1/18 | 5.375% | $6,600,000.00 | NPFG | $176,750.00 | $176,750.00 | $176,750.00 | $176,750.00 | $376,750.00 | $376,250.00 | $376,250.00 | $376,250.00 | | | | | | |
| ...VM9 | 4/1/19 | 5.375% | $14,000,000.00 | NPFG | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | | | | |
| ...VN7 | 4/1/20 | 5.000% | $14,000,000.00 | NPFG | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | |
| ...VP2 | 4/1/21 | 5.000% | $14,000,000.00 | NPFG | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 |
| ...VQ0 | 4/1/21 | 5.000% | $14,030,000.00 | NPFG | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | | | | | | | | | $350,000.00 | $350,000.00 |
| | | | **$19,880,000.00** | | $1,531,500.00 | $1,531,500.00 | $1,371,862.50 | $1,371,862.50 | $1,603,625.00 | $1,603,625.00 | $1,426,250.00 | $1,426,250.00 | $1,050,000.00 | $1,050,000.00 | $700,000.00 | $700,000.00 | $350,000.00 | $350,000.00 |
| **UTGO 2002** | | | | | | | | | | | | | | | | | | |
| ...VW8 | 4/1/21 | 5.125% | $3,240,000.00 | NPFG | $83,025.00 | $83,025.00 | $83,025.00 | $83,025.00 | $83,025.00 | $83,025.00 | $83,025.00 | $83,025.00 | $83,025.00 | $83,025.00 | $83,025.00 | $83,025.00 | $83,025.00 | $83,025.00 |
| ...WX6 | 4/1/21 | 5.125% | $3,405,000.00 | NPFG | $87,253.13 | $87,253.13 | $87,253.13 | $87,253.13 | $87,253.13 | $87,253.13 | $87,253.13 | $87,253.13 | $87,253.13 | $87,253.13 | $87,253.13 | $87,253.13 | $87,253.13 | $87,253.13 |
| | | | **$6,645,000.00** | | $170,278.13 | $170,278.13 | $170,278.13 | $170,278.13 | $170,278.13 | $170,278.13 | $170,278.13 | $170,278.13 | $170,278.13 | $170,278.13 | $170,278.13 | $170,278.13 | $170,278.13 | $170,278.13 |
| **UTGO 2003-A** | | | | | | | | | | | | | | | | | | |
| ...XV0 | 4/1/15 | 4.000% | $300,000.00 | Syncora | $6,000.00 | $6,000.00 | | | | | | | | | | | | |
| ...XW8 | 4/1/16 | 5.250% | $2,550,000.00 | Syncora | $66,937.50 | $66,937.50 | $66,937.50 | $66,937.50 | | | | | | | | | | |
| ...XX6 | 4/1/17 | 5.250% | $2,995,000.00 | Syncora | $78,618.75 | $78,618.75 | $78,618.75 | $78,618.75 | $78,618.75 | $78,618.75 | | | | | | | | |
| ...XY4 | 4/1/18 | 5.500% | $3,150,000.00 | Syncora | $87,018.75 | $87,018.75 | $85,687.50 | $85,687.50 | $85,687.50 | $87,018.75 | $87,018.75 | $87,018.75 | | | | | | |
| ...XZ1 | 4/1/19 | 5.500% | $3,490,000.00 | Syncora | $91,612.50 | $91,612.50 | $91,612.50 | $91,612.50 | $91,612.50 | $91,612.50 | $91,612.50 | $91,612.50 | $91,612.50 | $11,250.00 | $11,250.00 | | | |
| ...YA5 | 4/1/20 | 5.250% | $3,175,000.00 | Syncora | $11,250.00 | $11,250.00 | $11,250.00 | $11,250.00 | $11,250.00 | $11,250.00 | $11,250.00 | $11,250.00 | $11,250.00 | $11,250.00 | $11,250.00 | $11,250.00 | | |
| ...YX7 | 4/1/21 | 5.250% | $3,360,000.00 | Syncora | $83,343.75 | $83,343.75 | $83,343.75 | $83,343.75 | $83,343.75 | $83,343.75 | $83,343.75 | $83,343.75 | $83,343.75 | $83,343.75 | $83,343.75 | $83,343.75 | $83,343.75 | $83,343.75 |
| ...XX1 | 4/1/21 | 5.250% | $3,175,000.00 | Syncora | $101,325.00 | $101,325.00 | $101,325.00 | $101,325.00 | $101,325.00 | $101,325.00 | $101,325.00 | $101,325.00 | $101,325.00 | $101,325.00 | $101,325.00 | $101,325.00 | $101,325.00 | $101,325.00 |
| ...XY1 | 4/1/21 | 4.625% | $1,565,000.00 | Syncora | $11,562.50 | $11,562.50 | $11,562.50 | $11,562.50 | $11,562.50 | $11,562.50 | $11,562.50 | $11,562.50 | $11,562.50 | $11,562.50 | $11,562.50 | $11,562.50 | $11,562.50 | $11,562.50 |
| ...XZ8 | 4/1/22 | 5.250% | $1,500,000.00 | Syncora | $93,581.25 | $93,581.25 | $93,581.25 | $93,581.25 | $93,581.25 | $93,581.25 | $93,581.25 | $93,581.25 | $93,581.25 | $93,581.25 | $93,581.25 | $93,581.25 | $93,581.25 | $93,581.25 |
| ...ZA0 | 4/1/23 | 5.250% | $2,275,000.00 | Syncora | $34,687.50 | $34,687.50 | $34,687.50 | $34,687.50 | $34,687.50 | $34,687.50 | $34,687.50 | $34,687.50 | $34,687.50 | $34,687.50 | $34,687.50 | $34,687.50 | $34,687.50 | $34,687.50 |
| | | | **$31,675,000.00** | | $72,843.75 | $72,843.75 | $72,843.75 | $72,843.75 | $72,843.75 | $72,843.75 | $72,843.75 | $72,843.75 | $72,843.75 | $72,843.75 | $72,843.75 | $72,843.75 | $72,843.75 | $72,843.75 |
| | | | | | $821,468.75 | $821,468.75 | $745,531.25 | $745,531.25 | $669,912.50 | $669,912.50 | $557,225.00 | $557,225.00 | $500,206.25 | $468,593.75 | $468,593.75 | $468,593.75 | $310,000.00 | $310,000.00 |
| **UTGO 2004-A(I)** | | | | | | | | | | | | | | | | | | |
| ...W25 | 4/1/15 | 5.250% | $4,500,000.00 | Ambac | $118,125.00 | $118,125.00 | $118,125.00 | $118,125.00 | $118,125.00 | $118,125.00 | $118,125.00 | $118,125.00 | $118,125.00 | $118,125.00 | | | | |
| ...W26 | 4/1/16 | 4.250% | $185,000.00 | Ambac | $3,931.25 | $3,931.25 | $3,931.25 | $3,931.25 | $3,931.25 | $3,931.25 | $3,931.25 | $3,931.25 | $3,931.25 | $3,931.25 | $3,931.25 | | | |
| ...W27 | 4/1/17 | 5.250% | $6,085,000.00 | Ambac | $159,731.25 | $159,731.25 | $159,731.25 | $159,731.25 | $159,731.25 | $159,731.25 | $159,731.25 | $159,731.25 | $159,731.25 | $159,731.25 | $159,731.25 | | | $165,000.00 |
| ...X50 | 4/1/18 | 5.250% | $6,600,000.00 | Ambac | $165,000.00 | $165,000.00 | $165,000.00 | $165,000.00 | $165,000.00 | $165,000.00 | $165,000.00 | $165,000.00 | $165,000.00 | $165,000.00 | $165,000.00 | $165,000.00 | $165,000.00 | $165,000.00 |
| ...X27 | 4/1/19 | 5.000% | $6,000,000.00 | Ambac | $181,912.50 | $181,912.50 | $181,912.50 | $181,912.50 | $181,912.50 | $181,912.50 | $181,912.50 | $181,912.50 | $181,912.50 | $181,912.50 | $181,912.50 | $181,912.50 | $181,912.50 | $181,912.50 |
| ...X57 | 4/1/20 | 4.500% | $375,000.00 | Ambac | $8,437.50 | $8,437.50 | $8,437.50 | $8,437.50 | $8,437.50 | $8,437.50 | $8,437.50 | $8,437.50 | $8,437.50 | $8,437.50 | $8,437.50 | $8,437.50 | $8,437.50 | $8,437.50 |
| ...X35 | 4/1/21 | 5.250% | $6,020,000.00 | Ambac | $181,650.00 | $181,650.00 | $181,650.00 | $181,650.00 | $181,650.00 | $181,650.00 | $181,650.00 | $181,650.00 | $181,650.00 | $181,650.00 | $181,650.00 | $181,650.00 | $181,650.00 | $181,650.00 |
| ...X23 | 4/1/23 | 5.250% | $6,020,000.00 | Ambac | $18,055.00 | $18,055.00 | $18,055.00 | $18,055.00 | $18,055.00 | $18,055.00 | $18,055.00 | $18,055.00 | $18,055.00 | $18,055.00 | $18,055.00 | $18,055.00 | $18,055.00 | $18,055.00 |
| ...X41 | 4/1/24 | 5.250% | $6,850,000.00 | Ambac | $180,862.50 | $180,862.50 | $180,862.50 | $180,862.50 | $180,862.50 | $180,862.50 | $180,862.50 | $180,862.50 | $180,862.50 | $180,862.50 | $180,862.50 | $180,862.50 | $180,862.50 | $180,862.50 |
| | | | **$39,270,000.00** | | $1,017,705.00 | $1,017,705.00 | $1,017,705.00 | $1,017,705.00 | $1,017,705.00 | $1,017,705.00 | $1,017,705.00 | $1,017,705.00 | $1,017,705.00 | $1,017,705.00 | $899,580.00 | $899,580.00 | $735,107.50 | $735,107.50 |

* = Mandatory Redemption

| CUSIP | Maturity Date | Rate | Principal | Insurer | Interest | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 10/1/14 | 4/1/15 | 10/1/15 | 4/1/16 | 10/1/16 | 4/1/17 | 10/1/17 | 4/1/18 | 10/1/18 | 4/1/19 | 10/1/19 | 4/1/20 | 10/1/20 | 4/1/21 |
| **UTGO2004-B(1)** | | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 5.000% | $8,675,000.00 | Ambac | $216,875.00 | $216,875.00 | $239,500.00 | $239,500.00 | | | | | | | | | | |
| | 4/1/16 | 5.250% | $9,105,000.00 | Ambac | $239,006.25 | $239,006.25 | $60,425.00 | $60,425.00 | $6,100.00 | $6,100.00 | | | | | | | | |
| | 4/1/17 | 4.000% | $205,000.00 | Ambac | $6,100.00 | $6,100.00 | $243,600.00 | $243,600.00 | $243,600.00 | $243,600.00 | | | | | | | | |
| | 4/1/17 | 5.250% | $9,290,000.00 | Ambac | $243,600.00 | $243,600.00 | $52,500.00 | $52,500.00 | $52,500.00 | $52,500.00 | $52,500.00 | $52,500.00 | | | | | | |
| | 4/1/18 | 5.250% | $2,080,000.00 | Ambac | $52,500.00 | $52,500.00 | | | | | | | | | | | | |
| | | | **$29,365,000.00** | | $758,081.25 | $738,081.25 | $541,206.25 | $541,206.25 | $302,200.00 | $302,200.00 | $52,500.00 | $52,500.00 | | | | | | |
| **UTGO2004-B(2)** | | | | | | | | | | | | | | | | | | | |
| | 4/1/X | 5.240% | $575,000.00 | Ambac | $15,065.00 | $15,065.00 | $11,034.00 | $11,034.00 | $6,681.00 | $6,681.00 | $2,327.00 | $2,327.00 | | | | | | |
| | | | **$575,000.00** | | | | | | | | | | | | | | | |
| **UTGO2005-B** | | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 5.000% | $2,280,000.00 | Assured | $57,250.00 | $57,250.00 | | | | | | | | | | | | |
| | 4/1/16 | 5.000% | $2,425,000.00 | Assured | $60,125.00 | $60,125.00 | $60,125.00 | $60,125.00 | $54,180.00 | $54,180.00 | | | | | | | | |
| | 4/1/17 | 4.300% | $2,535,000.00 | Assured | $54,180.00 | $54,180.00 | $54,180.00 | $54,180.00 | $54,180.00 | $54,180.00 | | | | | | | | |
| | 4/1/17 | 5.000% | $130,000.00 | Assured | $65,875.00 | $65,875.00 | $65,875.00 | $65,875.00 | $65,875.00 | $65,875.00 | $65,875.00 | $60,125.00 | $60,125.00 | | | | | |
| | 4/1/G95 | 5.000% | $2,765,000.00 | Assured | $69,125.00 | $69,125.00 | $69,125.00 | $69,125.00 | $69,125.00 | $69,125.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | | | |
| | 4/1/G58 | 5.000% | $5,000,000.00 | Assured | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | |
| | 4/1/G60 | 5.000% | $5,000,000.00 | Assured | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 |
| | 4/1/21 | 5.000% | $5,000,000.00 | Assured | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 |
| | 4/1/G62 | 5.000% | $5,000,000.00 | Assured | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 |
| | 4/1/25 | 5.000% | $5,000,000.00 | Assured | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 |
| | | | **$42,615,000.00** | | $1,056,555.00 | $1,056,555.00 | $999,305.00 | $999,305.00 | $930,180.00 | $930,180.00 | $885,000.00 | $885,000.00 | $870,125.00 | $870,125.00 | $750,000.00 | $750,000.00 | $625,000.00 |
| **UTGO2005-C** | | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 5.000% | $2,300,000.00 | Assured | $57,625.00 | $57,625.00 | | | | | | | | | | | | |
| | 4/1/16 | 5.000% | $2,425,000.00 | Assured | $60,625.00 | $60,625.00 | $60,625.00 | $60,625.00 | $54,717.50 | $54,717.50 | | | | | | | | |
| | 4/1/17 | 5.000% | $2,545,000.00 | Assured | $54,717.50 | $54,717.50 | $54,717.50 | $54,717.50 | $54,717.50 | $54,717.50 | $65,750.00 | $65,750.00 | | | | | |
| | 4/1/18 | 5.000% | $2,630,000.00 | Assured | $65,750.00 | $65,750.00 | $65,750.00 | $65,750.00 | $65,750.00 | $65,750.00 | $71,793.75 | $71,793.75 | $71,793.75 | $71,793.75 | | | |
| | 4/1/19 | 5.000% | $2,730,000.00 | Assured | $71,793.75 | $71,793.75 | $71,793.75 | $71,793.75 | $71,793.75 | $71,793.75 | $75,731.25 | $75,731.25 | $75,731.25 | $75,731.25 | $75,731.25 | $75,731.25 | $75,731.25 |
| | 4/1/20 | 5.250% | $2,885,000.00 | Assured | $75,731.25 | $75,731.25 | $75,731.25 | $75,731.25 | $75,731.25 | $75,731.25 | $213,275.00 | $213,275.00 | $147,525.00 | $147,525.00 | | | |
| | | | **$15,525,000.00** | | $386,242.50 | $386,242.50 | $328,657.50 | $328,657.50 | $207,992.50 | $207,992.50 | $213,275.00 | $213,275.00 | $147,525.00 | $147,525.00 | $75,731.25 | $75,731.25 | |
| **UTGO2008-A** | | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 5.000% | $2,875,000.00 | Assured | $71,875.00 | $71,875.00 | $75,375.00 | $75,375.00 | | | | | | | | | | |
| | 4/1/16 | 5.000% | $3,015,000.00 | Assured | $75,375.00 | $75,375.00 | $75,375.00 | $75,375.00 | $79,250.00 | $79,250.00 | | | | | | | | |
| | 4/1/17 | 5.000% | $3,170,000.00 | Assured | $79,250.00 | $79,250.00 | $79,250.00 | $79,250.00 | $79,250.00 | $79,250.00 | $66,500.00 | $66,500.00 | | | | | |
| | 4/1/18 | 4.000% | $3,325,000.00 | Assured | $66,500.00 | $66,500.00 | $66,500.00 | $66,500.00 | $66,500.00 | $66,500.00 | $86,500.00 | $86,500.00 | $86,500.00 | $86,500.00 | | | |
| | 4/1/19 | 5.000% | $3,460,000.00 | Assured | $86,500.00 | $86,500.00 | $86,500.00 | $86,500.00 | $86,500.00 | $86,500.00 | $90,750.00 | $90,750.00 | $90,750.00 | $90,750.00 | $90,750.00 | $90,750.00 | $90,750.00 |
| | 4/1/20 | 5.000% | $3,630,000.00 | Assured | $90,750.00 | $90,750.00 | $90,750.00 | $90,750.00 | $90,750.00 | $90,750.00 | $95,375.00 | $95,375.00 | $95,375.00 | $95,375.00 | $95,375.00 | $95,375.00 | $95,375.00 |
| | 4/1/21 | 5.000% | $3,815,000.00 | Assured | $95,375.00 | $95,375.00 | $95,375.00 | $95,375.00 | $95,375.00 | $95,375.00 | $100,125.00 | $100,125.00 | $100,125.00 | $100,125.00 | $100,125.00 | $100,125.00 | $100,125.00 |
| | 4/1/25 | 5.000% | $4,005,000.00 | Assured | $100,125.00 | $100,125.00 | $100,125.00 | $100,125.00 | $100,125.00 | $100,125.00 | $215,500.00 | $215,500.00 | $215,500.00 | $215,500.00 | $215,500.00 | $215,500.00 | $215,500.00 |
| | 4/1/24 | 5.000% | $8,620,000.00 | Assured | $215,500.00 | $215,500.00 | $215,500.00 | $215,500.00 | $215,500.00 | $215,500.00 | $495,500.00 | $495,500.00 | $495,500.00 | $495,500.00 | $495,500.00 | $495,500.00 | $495,500.00 |
| | 4/1/25 | 5.000% | $19,980,000.00 | Assured * | $499,500.00 | $499,500.00 | $495,500.00 | $495,500.00 | $495,500.00 | $495,500.00 | $1,154,250.00 | $1,154,250.00 | $1,087,750.00 | $1,087,750.00 | $1,001,250.00 | $1,001,250.00 | $990,500.00 |
| | | | **$55,895,000.00** | | $1,380,750.00 | $1,380,750.00 | $1,308,875.00 | $1,308,875.00 | $1,233,500.00 | $1,233,500.00 | $1,154,250.00 | $1,154,250.00 | $1,087,750.00 | $1,087,750.00 | $1,001,250.00 | $1,001,250.00 | $990,500.00 |
| **UTGO2008-B(1)** | | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 5.000% | $1,270,000.00 | Ambac | $199,250.00 | $199,250.00 | | | | | | | | | | | | |
| | 4/1/16 | 5.000% | $3,440,000.00 | Ambac | $86,000.00 | $86,000.00 | $86,000.00 | $86,000.00 | $86,000.00 | $86,000.00 | | | | | | | | |
| | 4/1/17 | 5.000% | $3,580,000.00 | Ambac | $89,500.00 | $89,500.00 | $89,500.00 | $89,500.00 | $89,500.00 | $89,500.00 | $84,750.00 | $84,750.00 | | | | | |
| | 4/1/18 | 5.000% | $3,290,000.00 | Ambac | $94,750.00 | $94,750.00 | $94,750.00 | $94,750.00 | $94,750.00 | $94,750.00 | $84,750.00 | $84,750.00 | | | | | |
| | | | **$18,780,000.00** | | $469,500.00 | $469,500.00 | $270,250.00 | $270,250.00 | $184,250.00 | $184,250.00 | $84,750.00 | $84,750.00 | | | | | |
| **UTGO2010-A** | | | | | | | | | | | | | | | | | | | |
| | 11/1/14 | 5.12% | $1,885,000.00 | Ambac | $48,343.93 | | | | | | | | | | | | | |
| | 11/1/15 | 5.42% | $1,995,000.00 | Ambac | $53,882.83 | $53,882.83 | $53,882.83 | $53,882.83 | $54,065.68 | $54,065.68 | $70,074.40 | $70,074.40 | | | | | |
| | 11/1/16 | 6.087% | $2,105,000.00 | Ambac | $64,065.68 | $64,065.68 | $64,065.68 | $64,065.68 | $54,065.68 | $54,065.68 | $70,074.40 | $70,074.40 | | | | | |
| | 11/1/17 | 6.337% | $3,240,000.00 | Ambac | $70,074.40 | $70,074.40 | $70,074.40 | $70,074.40 | $70,074.40 | $70,074.40 | $499,566.00 | $499,566.00 | $499,566.00 | $499,566.00 | $499,566.00 | $499,566.00 | $499,566.00 |
| | 11/1/22 | 7.148% | $13,000,000.00 | Ambac * | $499,566.00 | $499,566.00 | $499,566.00 | $499,566.00 | $499,566.00 | $499,566.00 | $3,250,997.83 | $3,250,997.83 | $3,259,097.83 | $3,259,097.83 | $3,330,944.20 | $3,330,944.20 | $3,221,570.10 |
| | 11/1/35 | 8.369% | $77,885,000.00 | Ambac * | $3,259,097.83 | $3,259,097.83 | $3,259,097.83 | $3,259,097.83 | $3,259,097.83 | $3,259,097.83 | $3,670,643.83 | $3,670,643.83 | $3,672,347.53 | $3,672,347.53 | $3,580,042.03 | $3,580,042.03 | $3,480,462.93 |
| | | | **$100,000,000.00** | | $3,995,927.75 | $3,947,586.73 | $3,947,586.73 | $3,947,586.73 | $3,093,703.90 | $3,093,703.90 | $3,670,643.83 | $3,670,643.83 | $3,672,347.53 | $3,672,347.53 | $3,580,042.03 | $3,580,042.03 | $3,480,462.93 |
| | | | **$439,500,000.00** | | $12,400,760.68 | $12,352,419.65 | $11,438,096.15 | $11,384,213.53 | $10,537,023.03 | $10,472,962.35 | $9,602,473.35 | $9,531,498.95 | $6,638,603.20 | $6,638,603.20 | $7,555,475.15 | $6,686,737.65 | $6,386,363.55 |

Subject to Mandatory Redemption

429

# UTGO Bond Series Debt Retirement Schedules

| Maturity Date | Rate | Principal | Insurer | 10/1/21 | 4/1/22 | 10/1/22 | 4/1/23 | 10/1/23 | 4/1/24 | 10/1/24 |
|---|---|---|---|---|---|---|---|---|---|---|
| **UTGO 2004-A** | | | | | | | | | | |
| 4/1/15 | 5.250% | $2,850,000.00 | Assured | - | - | - | - | - | - | - |
| 4/1/15 | 5.000% | $2,995,000.00 | Assured | - | - | - | - | - | - | - |
| 4/1/16 | 5.000% | $3,145,000.00 | Assured | - | - | - | - | - | - | - |
| 4/1/18 | 5.000% | $3,305,000.00 | Assured | - | - | - | - | - | - | - |
| 4/1/19 | 5.000% | $3,470,000.00 | Assured | - | - | - | - | - | - | - |
| | | **$15,765,000.00** | | - | - | - | - | - | - | - |
| **UTGO 2004-A(II)** | | | | | | | | | | |
| 4/1/15 | 5.375% | $5,940,000.00 | NPFG | - | - | - | - | - | - | - |
| 4/1/16 | 5.375% | $6,260,000.00 | NPFG | - | - | - | - | - | - | - |
| 4/1/17 | 5.375% | $6,600,000.00 | NPFG | - | - | - | - | - | - | - |
| 4/1/18 | 5.375% | $14,100,000.00 | NPFG | - | - | - | - | - | - | - |
| 4/1/19 | 5.000% | $14,000,000.00 | NPFG | - | - | - | - | - | - | - |
| 4/1/20 | 5.000% | $14,000,000.00 | NPFG | - | - | - | - | - | - | - |
| 4/1/21 | 5.000% | $14,000,000.00 | NPFG | - | - | - | - | - | - | - |
| | | **$74,900,000.00** | | - | - | - | - | - | - | - |
| **UTGO 2002** | | | | | | | | | | |
| 4/1/21 | 5.125% | $5,240,000.00 | NPFG | $87,253.13 | $87,253.13 | - | - | - | - | - |
| 4/1/22 | 5.125% | $3,405,000.00 | NPFG | | | | | | | |
| | | **$6,645,000.00** | | $87,253.13 | $87,253.13 | - | - | - | - | - |
| **UTGO 2005-A** | | | | | | | | | | |
| 4/1/20 | 4.000% | $500,000.00 | Syncora | | | | | | | |
| 4/1/15 | 5.250% | $2,550,000.00 | Syncora | | | | | | | |
| 4/1/16 | 5.250% | $2,995,000.00 | Syncora | | | | | | | |
| 4/1/17 | 5.250% | $3,150,000.00 | Syncora | | | | | | | |
| 4/1/18 | 5.250% | $3,315,000.00 | Syncora | | | | | | | |
| 4/1/19 | 5.250% | $3,490,000.00 | Syncora | | | | | | | |
| 4/1/20 | 4.500% | $300,000.00 | Syncora | | | | | | | |
| 4/1/20 | 5.250% | $3,175,000.00 | Syncora | | | | | | | |
| 4/1/21 | 5.250% | $3,860,000.00 | Syncora | $11,562.50 | $11,562.50 | | | | | |
| 4/1/22 | 4.625% | $500,000.00 | Syncora | $93,581.25 | $93,581.25 | | | | | |
| 4/1/22 | 5.250% | $3,565,000.00 | Syncora | $34,687.50 | $34,687.50 | $34,687.50 | | | | |
| 4/1/23 | 4.625% | $1,500,000.00 | Syncora | $72,843.75 | $72,843.75 | $72,843.75 | $34,687.50 | | | |
| 4/1/23 | 5.250% | $2,775,000.00 | Syncora | | | | $72,843.75 | | | |
| | | **$31,675,000.00** | | $232,675.00 | $232,675.00 | $107,531.25 | $107,531.25 | - | - | - |
| **UTGO 2004-A(II)** | | | | | | | | | | |
| 4/1/19 | 5.250% | $4,500,000.00 | Ambac | | | | | | | |
| 4/1/20 | 4.250% | $185,000.00 | Ambac | | | | | | | |
| 4/1/20 | 5.250% | $6,085,000.00 | Ambac | | | | | | | |
| 4/1/21 | 5.000% | $6,600,000.00 | Ambac | $181,912.50 | $181,912.50 | | | | | |
| 4/1/22 | 5.000% | $6,930,000.00 | Ambac | $8,437.50 | $8,437.50 | $8,437.50 | $8,437.50 | | | |
| 4/1/22 | 4.500% | $375,000.00 | Ambac | $181,650.00 | $181,650.00 | $181,650.00 | $181,650.00 | | | |
| 4/1/23 | 5.250% | $6,920,000.00 | Ambac | $18,055.00 | $18,055.00 | $18,055.00 | $18,055.00 | $18,055.00 | $18,055.00 | |
| 4/1/24 | 4.600% | $785,000.00 | Ambac | $180,862.50 | $180,862.50 | $180,862.50 | $180,862.50 | $180,862.50 | $180,862.50 | |
| 4/1/24 | 5.250% | $6,890,000.00 | Ambac | | | | | | | |
| | | **$39,270,000.00** | | $570,917.50 | $570,917.50 | $389,005.00 | $389,005.00 | $198,917.50 | $198,917.50 | - |

*"+" = Subject to Mandatory Redemption*

| Maturity Date | Rate | Principal | Issuer | Interest | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 10/1/21 | 4/1/22 | 10/1/22 | 4/1/23 | 10/1/23 | 4/1/24 | 10/1/24 | 4/1/25 | 10/1/25 | 4/1/26 | 10/1/26 | 4/1/27 | 10/1/27 | 4/1/28 |
| **UTGO2004-B(1)** | | | | | | | | | | | | | | | | | |
| 4/1/16 | 5.000% | $6,675,000.00 | Ambac | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4/1/17 | 5.250% | $9,105,000.00 | Ambac | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4/1/17 | 4.000% | $305,000.00 | Ambac | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4/1/17 | 5.250% | $9,200,000.00 | Ambac | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4/1/18 | 5.250% | $2,000,000.00 | Ambac | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4/1/18 | 5.750% | $2,000,000.00 | Ambac | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | | $29,365,000.00 | | | | | | | | | | | | | | | |
| **UTGO2005-B(2)** | | | | | | | | | | | | | | | | | |
| 4/1/19 | 5.240% | $575,000.00 | Ambac | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **UTGO2005-B** | | | | | | | | | | | | | | | | | |
| 4/1/15 | 5.000% | $2,290,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4/1/16 | 5.000% | $2,405,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4/1/17 | 4.300% | $2,520,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4/1/18 | 5.000% | $2,655,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4/1/19 | 5.000% | $2,765,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4/1/20 | 5.000% | $5,300,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4/1/21 | 5.000% | $5,000,000.00 | Assured | - | $175,000.00 | $125,000.00 | - | - | - | - | - | - | - | - | - | - | - |
| 4/1/22 | 5.000% | $5,000,000.00 | Assured | $175,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | - | - | - | - | - | - | - | - | - | - |
| 4/1/23 | 5.000% | $5,000,000.00 | Assured | $175,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | - | - | - | - | - | - | - | - |
| 4/1/24 | 5.000% | $5,000,000.00 | Assured | $175,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $175,000.00 | $175,000.00 | - | - | - | - | - | - |
| 4/1/25 | 5.000% | $5,000,000.00 | Assured | $125,000.00 | | | | | | | $125,000.00 | $125,000.00 | - | - | - | - | - |
| | | $42,695,000.00 | | $500,000.00 | $500,000.00 | $375,000.00 | $375,000.00 | $250,000.00 | $250,000.00 | $175,000.00 | $125,000.00 | | | | | | |
| **UTGO2005-C** | | | | | | | | | | | | | | | | | |
| 4/1/15 | 5.000% | $2,305,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4/1/16 | 5.000% | $2,475,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4/1/17 | 4.300% | $2,545,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4/1/18 | 5.000% | $2,630,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4/1/19 | 5.250% | $3,125,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4/1/20 | 5.750% | $2,855,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | | $15,525,000.00 | | | | | | | | | | | | | | | |
| **UTGO2006-A** | | | | | | | | | | | | | | | | | |
| 4/1/16 | 5.000% | $2,875,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4/1/17 | 5.000% | $3,035,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4/1/18 | 5.000% | $3,170,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4/1/19 | 4.000% | $3,125,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4/1/20 | 5.000% | $3,440,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4/1/21 | 5.000% | $3,630,000.00 | Assured | - | $100,125.00 | $215,500.00 | - | - | - | - | - | - | - | - | - | - | - |
| 4/1/22 | 5.000% | $3,815,000.00 | Assured | $100,125.00 | $215,500.00 | $215,500.00 | $215,500.00 | - | - | - | - | - | - | - | - | - | - |
| 4/1/23 | 5.000% | $4,095,000.00 | Assured | $215,500.00 | $215,500.00 | $215,500.00 | $215,500.00 | $110,375.00 | $110,375.00 | - | - | - | - | - | - | - | - |
| 4/1/24 | 5.000% | $8,620,000.00 | Assured | $215,500.00 | $215,500.00 | $215,500.00 | $215,500.00 | $110,375.00 | $110,375.00 | $495,500.00 | $495,500.00 | - | - | - | - | - | - |
| 4/1/25 | 5.000% | $19,780,000.00 | Assured | $811,125.00 | $811,125.00 | $715,000.00 | $715,000.00 | $609,875.00 | $609,875.00 | $495,500.00 | $495,500.00 | $385,625.00 | $385,625.00 | $261,875.00 | $261,875.00 | $134,125.00 | $134,125.00 |
| | | $35,875,000.00 | | $811,125.00 | $811,125.00 | $715,000.00 | $715,000.00 | $609,875.00 | $609,875.00 | $495,500.00 | $495,500.00 | $385,625.00 | $385,625.00 | $261,875.00 | $261,875.00 | $134,125.00 | $134,125.00 |
| **UTGO2006-B(1)** | | | | | | | | | | | | | | | | | |
| 4/1/15 | 5.000% | $7,970,000.00 | Ambac | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4/1/16 | 5.000% | $5,440,000.00 | Ambac | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4/1/17 | 5.000% | $5,580,000.00 | Ambac | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4/1/18 | 5.000% | $3,790,000.00 | Ambac | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | | $18,780,000.00 | | | | | | | | | | | | | | | |
| **UTGO2006-A** | | | | | | | | | | | | | | | | | |
| 11/1/14 | 5.129% | $1,885,000.00 | Ambac | $221,570.10 | $114,828.30 | $114,828.30 | - | - | - | - | - | - | - | - | - | - | - |
| 11/1/15 | 5.429% | $1,985,000.00 | Ambac | $3,249,097.85 | $3,259,097.85 | $3,259,097.85 | $3,259,097.85 | $3,259,097.85 | $3,259,097.85 | $2,557,195.38 | $2,557,195.38 | $2,786,458.55 | $2,786,458.55 | $2,600,666.75 | $2,600,666.75 | $2,398,764.63 | $2,398,764.63 |
| 11/1/16 | 6.087% | $2,105,000.00 | Ambac | $3,480,667.95 | $3,373,926.13 | $3,373,926.13 | $3,373,926.13 | $3,259,097.85 | $3,259,097.85 | $3,114,523.35 | $3,114,523.35 | $2,957,195.38 | $2,957,195.38 | $2,786,458.55 | $2,786,458.55 | $2,600,666.75 | $2,600,666.75 |
| 11/1/17 | 6.137% | $2,240,000.00 | Ambac | | | | | | | | | | | | | | |
| 11/1/22 | 7.148% | $13,300,000.00 | Ambac | | | | | | | | | | | | | | |
| 11/1/16 | 8.369% | $77,385,000.00 | Ambac | $3,480,667.95 | $5,559,896.75 | $4,960,662.38 | $4,415,434.08 | $4,317,890.33 | $4,773,315.85 | $3,739,923.35 | $3,381,895.38 | $3,343,020.38 | $3,343,083.55 | $3,048,333.55 | $2,862,541.75 | $2,734,791.75 | $2,532,889.63 |
| | | $100,900,000.00 | | | | | | | | | | | | | | | |

* Subject to Mandatory Redemption

### UTGO 2003-A

| Maturity Date | Rate | Principal | Insurer | Interest (10/1/28 – 10/1/35) | Total Interest | Total Principal & Interest |
|---|---|---|---|---|---|---|
| 4/1/15 | 5.250% | $2,850,000.00 | Assured | — | $149,625.00 | $2,999,625.00 |
| 4/1/16 | 5.000% | $2,995,000.00 | Assured | — | $299,500.00 | $3,294,500.00 |
| 4/1/17 | 5.000% | $3,145,000.00 | Assured | — | $411,750.00 | $3,644,750.00 |
| 4/1/18 | 5.000% | $3,505,000.00 | Assured | — | $641,000.00 | $3,766,000.00 |
| 4/1/19 | 5.000% | $3,470,000.00 | Assured | — | $867,500.00 | $5,317,520.00 |
| | | $15,365,000.00 | | | $2,449,375.00 | $18,214,375.00 |

### UTGO 2003-A[1]

| Maturity Date | Rate | Principal | Insurer | Interest | Total Interest | Total Principal & Interest |
|---|---|---|---|---|---|---|
| 4/1/15 | 5.375% | $3,940,000.00 | NPFG | — | $310,275.00 | $6,259,275.00 |
| 4/1/16 | 5.375% | $6,360,000.00 | NPFG | — | $672,950.00 | $6,372,950.00 |
| 4/1/17 | 5.375% | $6,600,000.00 | NPFG | — | $1,064,250.00 | $7,644,250.00 |
| 4/1/18 | 5.375% | $14,000,000.00 | NPFG | — | $3,010,000.00 | $17,010,000.00 |
| 4/1/19 | 5.000% | $14,000,000.00 | NPFG | — | $3,500,000.00 | $17,500,000.00 |
| 4/1/20 | 5.000% | $14,000,000.00 | NPFG | — | $4,200,000.00 | $18,200,000.00 |
| 4/1/21 | 5.000% | $14,000,000.00 | NPFG | — | $4,900,000.00 | $18,900,000.00 |
| | | $74,400,000.00 | | | $17,666,475.00 | $92,466,475.00 |

### UTGO 2002

| Maturity Date | Rate | Principal | Insurer | Interest | Total Interest | Total Principal & Interest |
|---|---|---|---|---|---|---|
| 4/1/21 | 5.125% | $3,240,000.00 | NPFG | — | $1,162,350.00 | $4,402,350.00 |
| 4/1/22 | 5.125% | $3,405,000.00 | NPFG | — | $1,396,950.00 | $4,801,950.00 |
| | | $6,645,000.00 | | | $2,558,600.00 | $9,203,600.00 |

### UTGO 2003-A

| Maturity Date | Rate | Principal | Insurer | Interest | Total Interest | Total Principal & Interest |
|---|---|---|---|---|---|---|
| 4/1/15 | 4.000% | $700,000.00 | Syncora | — | $12,000.00 | $712,000.00 |
| 4/1/15 | 4.000% | $2,530,000.00 | Syncora | — | $153,875.00 | $2,683,875.00 |
| 4/1/16 | 5.250% | $2,995,000.00 | Syncora | — | $314,475.00 | $3,309,475.00 |
| 4/1/17 | 5.250% | $3,150,000.00 | Syncora | — | $496,125.00 | $3,646,125.00 |
| 4/1/18 | 5.250% | $3,315,000.00 | Syncora | — | $696,150.00 | $4,011,150.00 |
| 4/1/19 | 5.250% | $3,490,000.00 | Syncora | — | $916,125.00 | $4,406,125.00 |
| 4/1/20 | 4.500% | $500,000.00 | Syncora | — | $135,000.00 | $635,000.00 |
| 4/1/20 | 5.250% | $3,175,000.00 | Syncora | — | $1,000,125.00 | $4,175,125.00 |
| 4/1/21 | 5.250% | $3,360,000.00 | Syncora | — | $1,418,550.00 | $5,278,550.00 |
| 4/1/22 | 4.625% | $500,000.00 | Syncora | — | $185,000.00 | $685,000.00 |
| 4/1/22 | 5.250% | $3,565,000.00 | Syncora | — | $1,497,300.00 | $5,062,300.00 |
| 4/1/23 | 4.625% | $1,550,000.00 | Syncora | — | $624,375.00 | $2,174,375.00 |
| 4/1/23 | 5.250% | $2,775,000.00 | Syncora | — | $1,311,187.50 | $4,086,187.50 |
| | | $33,675,000.00 | | | $8,740,287.50 | $40,415,287.50 |

### UTGO 2004-A[I]

| Maturity Date | Rate | Principal | Insurer | Interest | Total Interest | Total Principal & Interest |
|---|---|---|---|---|---|---|
| 4/1/19 | 5.250% | $4,500,000.00 | Ambac | — | $1,181,250.00 | $5,681,250.00 |
| 4/1/20 | 4.250% | $185,000.00 | Ambac | — | $27,375.00 | $212,375.00 |
| 4/1/20 | 5.250% | $6,085,000.00 | Ambac | — | $1,916,275.00 | $8,001,275.00 |
| 4/1/21 | 5.000% | $6,600,000.00 | Ambac | — | $2,310,000.00 | $8,910,000.00 |
| 4/1/22 | 5.500% | $8,430,000.00 | Ambac | — | $416,600.00 | $8,846,600.00 |
| 4/1/22 | 5.250% | $375,000.00 | Ambac | — | $352,875.00 | $727,875.00 |
| 4/1/23 | 4.500% | $6,930,000.00 | Ambac | — | $3,259,700.00 | $10,189,700.00 |
| 4/1/23 | 5.250% | $795,000.00 | Ambac | — | $351,000.00 | $1,146,000.00 |
| 4/1/24 | 4.600% | $185,000.00 | Ambac | — | — | — |
| 4/1/24 | 5.250% | $980,000.00 | Ambac | — | $3,617,250.00 | $53,037,250.00 |
| | | $39,270,000.00 | | | $18,767,250.00 | $53,037,250.00 |

*= Subject to Mandatory Redemption

|  |  |  |  | Interest | | | | | | | | | | | | | | | | Total Interest | Total Principal & Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Maturity Date | Rate | Principal | Insurer | 10/1/28 | 4/1/29 | 10/1/29 | 4/1/30 | 10/1/30 | 4/1/31 | 10/1/31 | 4/1/32 | 10/1/32 | 4/1/33 | 10/1/33 | 4/1/34 | 10/1/34 | 4/1/35 | 10/1/35 |  |  |
| **UTGO04-B(1)** | | | | | | | | | | | | | | | | | | | | |
| 4/1/15 | 5.000% | $8,675,000.00 | Ambac | | | | | | | | | | | | | | | | $433,750.00 | $9,108,750.00 |
| 4/1/16 | 5.250% | $10,105,000.00 | Ambac | | | | | | | | | | | | | | | | $956,025.00 | $11,061,025.00 |
| 4/1/17 | 4.000% | $335,000.00 | Ambac | | | | | | | | | | | | | | | | $36,600.00 | $341,600.00 |
| 4/1/17 | 5.250% | $9,280,000.00 | Ambac | | | | | | | | | | | | | | | | $1,461,600.00 | $10,741,600.00 |
| 4/1/18 | 5.250% | $1,170,000.00 | Ambac | | | | | | | | | | | | | | | | $420,000.00 | $2,420,000.00 |
| | | **$29,565,000.00** | | | | | | | | | | | | | | | | | **$4,307,975.00** | **$33,672,975.00** |
| **UTGO04-B(2)** | | | | | | | | | | | | | | | | | | | | |
| 251X1 | 4/1/19 | 5.240% | $575,000.00 | Ambac | | | | | | | | | | | | | | | $69,954.00 | $644,954.00 |
| **UTGO05-B** | | | | | | | | | | | | | | | | | | | | |
| 4/1/15 | 5.000% | $2,250,000.00 | Assured | | | | | | | | | | | | | | | | $114,500.00 | $2,464,500.00 |
| 4/1/16 | 5.000% | $2,405,000.00 | Assured | | | | | | | | | | | | | | | | $340,500.00 | $2,645,500.00 |
| 4/1/16 | 5.000% | $2,530,000.00 | Assured | | | | | | | | | | | | | | | | $325,080.00 | $2,845,080.00 |
| 4/1/17 | 4.300% | $2,635,000.00 | Assured | | | | | | | | | | | | | | | | $527,000.00 | $3,162,000.00 |
| 4/1/17 | 5.250% | $2,265,000.00 | Assured | | | | | | | | | | | | | | | | $69,250.00 | $69,250.00 |
| 4/1/19 | 5.000% | $2,765,000.00 | Assured | | | | | | | | | | | | | | | | $1,500,000.00 | $6,500,000.00 |
| 4/1/21 | 5.000% | $5,000,000.00 | Assured | | | | | | | | | | | | | | | | $1,750,000.00 | $6,750,000.00 |
| 4/1/22 | 5.000% | $5,000,000.00 | Assured | | | | | | | | | | | | | | | | $300,000.00 | $5,300,000.00 |
| 4/1/23 | 5.000% | $5,000,000.00 | Assured | | | | | | | | | | | | | | | | $2,250,000.00 | $7,250,000.00 |
| 4/1/24 | 5.000% | $5,000,000.00 | Assured | | | | | | | | | | | | | | | | $2,500,000.00 | $7,500,000.00 |
| 4/1/25 | 5.000% | $5,000,000.00 | Assured | | | | | | | | | | | | | | | | $2,750,000.00 | $7,750,000.00 |
| | | **$42,415,000.00** | | | | | | | | | | | | | | | | | **$14,848,330.00** | **$57,263,330.00** |
| **UTGO05-C** | | | | | | | | | | | | | | | | | | | | |
| 4/1/15 | 5.000% | $2,305,000.00 | Assured | | | | | | | | | | | | | | | | $115,250.00 | $2,420,250.00 |
| 4/1/16 | 5.000% | $2,425,000.00 | Assured | | | | | | | | | | | | | | | | $242,500.00 | $2,667,500.00 |
| 4/1/17 | 5.000% | $2,545,000.00 | Assured | | | | | | | | | | | | | | | | $328,305.00 | $2,873,305.00 |
| 4/1/17 | 4.300% | $2,630,000.00 | Assured | | | | | | | | | | | | | | | | $526,000.00 | $3,156,000.00 |
| 4/1/18 | 5.000% | $3,125,000.00 | Assured | | | | | | | | | | | | | | | | $717,937.50 | $3,842,937.50 |
| 4/1/20 | 5.250% | $2,885,000.00 | Assured | | | | | | | | | | | | | | | | $808,770.00 | $3,379,770.00 |
| | | **$15,525,000.00** | | | | | | | | | | | | | | | | | **$2,838,767.50** | **$18,363,767.50** |
| **UTGO08-A** | | | | | | | | | | | | | | | | | | | | |
| 4/1/15 | 5.000% | $2,875,000.00 | Assured | | | | | | | | | | | | | | | | $143,750.00 | $3,018,750.00 |
| 4/1/16 | 5.000% | $3,015,000.00 | Assured | | | | | | | | | | | | | | | | $301,500.00 | $3,316,500.00 |
| 4/1/16 | 5.000% | $3,170,000.00 | Assured | | | | | | | | | | | | | | | | $475,500.00 | $3,645,500.00 |
| 4/1/17 | 5.000% | $3,325,000.00 | Assured | | | | | | | | | | | | | | | | $532,000.00 | $3,857,000.00 |
| 4/1/18 | 5.000% | $3,325,000.00 | Assured | | | | | | | | | | | | | | | | $865,000.00 | $4,325,000.00 |
| 4/1/19 | 5.000% | $3,460,000.00 | Assured | | | | | | | | | | | | | | | | $1,089,000.00 | $4,719,000.00 |
| 4/1/20 | 5.000% | $3,630,000.00 | Assured | | | | | | | | | | | | | | | | $1,135,250.00 | $5,130,250.00 |
| 4/1/21 | 5.000% | $3,851,000.00 | Assured | | | | | | | | | | | | | | | | $1,602,000.00 | $5,607,000.00 |
| 4/1/22 | 5.000% | $4,095,000.00 | Assured | | | | | | | | | | | | | | | | $4,095,750.00 | $12,795,750.00 |
| 4/1/28 | 5.000% | $8,620,000.00 | Assured | | | | | | | | | | | | | | | | $12,548,750.00 | $23,528,750.00 |
| 4/1/63 | 5.000% | $19,780,000.00 | Assured | | | | | | | | | | | | | | | | $2,710,000.00 | $78,887,000.00 |
| | | **$55,895,000.00** | | | | | | | | | | | | | | | | | **$22,992,000.00** | **$78,887,000.00** |
| **UTGO08-B(1)** | | | | | | | | | | | | | | | | | | | | |
| 4/1/15 | 5.000% | $7,670,000.00 | Ambac | | | | | | | | | | | | | | | | $398,500.00 | $8,368,500.00 |
| 4/1/16 | 5.000% | $3,140,000.00 | Ambac | | | | | | | | | | | | | | | | $344,000.00 | $3,784,000.00 |
| 4/1/17 | 5.000% | $3,580,000.00 | Ambac | | | | | | | | | | | | | | | | $337,000.00 | $4,317,000.00 |
| 4/1/18 | 5.000% | $3,790,000.00 | Ambac | | | | | | | | | | | | | | | | $758,000.00 | $4,548,000.00 |
| | | **$18,780,000.00** | | | | | | | | | | | | | | | | | **$2,037,500.00** | **$20,817,500.00** |
| **UTGO09-A** | | | | | 11/1/28 | 5/1/29 | 11/1/29 | 5/1/30 | 11/1/30 | 5/1/31 | 11/1/31 | 5/1/32 | 11/1/32 | 5/1/33 | 11/1/33 | 5/1/34 | 11/1/34 | 5/1/35 | 11/1/35 | | |
| 11/1/14 | 5.125% | $1,885,000.00 | Ambac | | | | | | | | | | | | | | | | $48,340.63 | $1,933,340.63 |
| 11/1/15 | 5.425% | $1,585,000.00 | Ambac | | | | | | | | | | | | | | | | $161,648.48 | $2,746,648.48 |
| 11/1/16 | 6.087% | $2,105,000.00 | Ambac | | | | | | | | | | | | | | | | $370,128.78 | $2,475,328.78 |
| 11/1/17 | 6.337% | $2,240,000.00 | Ambac | | | | | | | | | | | | | | | | $496,820.80 | $2,736,820.80 |
| 11/1/23 | 7.188% | $13,930,000.00 | Ambac | | | | | | | | | | | | | | | | $6,637,758.60 | $20,567,758.60 |
| 11/1/34 | 8.369% | $77,285,000.00 | Ambac | $2,398,764.63 | $2,398,764.63 | $2,179,078.38 | $2,179,078.38 | $1,940,352.65 | $1,940,352.65 | $1,680,794.43 | $1,680,794.43 | $1,399,250.68 | $1,399,250.68 | $1,091,317.60 | $1,091,317.60 | $757,603.73 | $757,603.73 | $394,598.35 | $116,357,184.65 | $185,667,287.58 |
| | | **$100,090,000.00** | | $2,398,764.63 | $2,398,764.63 | $2,179,078.38 | $2,179,078.38 | $1,940,352.65 | $1,940,352.65 | $1,680,794.43 | $1,680,794.43 | $1,399,250.68 | $1,399,250.68 | $1,091,317.60 | $1,091,317.60 | $757,603.73 | $757,603.73 | $394,598.35 | **$116,357,184.65** | **$216,447,184.65** |
| **Total** | | **$436,930,000.00** | | | | | | | | | | | | | | | | | **$209,265,073.65** | **$646,071,073.65** |

* = Subject to Mandatory Redemption

# UTGO Series - Prior Bonds

Bond Series Subject to Mandatory Redemption

## Issuance: 2004-B(2)

CUSIP 25903VZX1

| Date | Issuer | Fiscal Year | Mandatory Redemption Amounts | Outstanding | Rate | Interest |
|---|---|---|---|---|---|---|
| 10/1/14 | Ambac | | - | $575,000.00 | 5.240% | $15,065.00 |
| 4/1/15 | Ambac | 6/30/15 | - | $420,000.00 | 5.240% | $15,065.00 |
| 10/1/15 | Ambac | | $155,000.00 | $420,000.00 | 5.240% | $11,004.00 |
| 4/1/16 | Ambac | 6/30/16 | - | $420,000.00 | 5.240% | $11,004.00 |
| 10/1/16 | Ambac | | $165,000.00 | $255,000.00 | 5.240% | $6,681.00 |
| 4/1/17 | Ambac | 6/30/17 | - | $255,000.00 | 5.240% | $6,681.00 |
| 10/1/17 | Ambac | | $85,000.00 | $85,000.00 | 5.240% | $2,227.00 |
| 4/1/18 | Ambac | 6/30/18 | - | $85,000.00 | 5.240% | $2,227.00 |
| 4/1/18 | Ambac | | $85,000.00 | - | | |
| **Total** | | | **$575,000.00** | | | **$69,954.00** |

## Issuance: 2008-A

CUSIP 25903NS5

| Date | Issuer | Fiscal Year | Mandatory Redemption Amounts | Outstanding | Rate | Interest |
|---|---|---|---|---|---|---|
| 10/1/14 | Assured | | - | $8,620,000.00 | 5.000% | $215,500.00 |
| 4/1/15 | Assured | 6/30/15 | - | $8,620,000.00 | 5.000% | $215,500.00 |
| 10/1/15 | Assured | | - | $8,620,000.00 | 5.000% | $215,500.00 |
| 4/1/16 | Assured | 6/30/16 | - | $8,620,000.00 | 5.000% | $215,500.00 |
| 10/1/16 | Assured | | - | $8,620,000.00 | 5.000% | $215,500.00 |
| 4/1/17 | Assured | 6/30/17 | - | $8,620,000.00 | 5.000% | $215,500.00 |
| 10/1/17 | Assured | | - | $8,620,000.00 | 5.000% | $215,500.00 |
| 4/1/18 | Assured | 6/30/18 | - | $8,620,000.00 | 5.000% | $215,500.00 |
| 10/1/18 | Assured | | - | $8,620,000.00 | 5.000% | $215,500.00 |
| 4/1/19 | Assured | 6/30/19 | - | $8,620,000.00 | 5.000% | $215,500.00 |
| 10/1/19 | Assured | | - | $8,620,000.00 | 5.000% | $215,500.00 |
| 4/1/20 | Assured | 6/30/20 | - | $8,620,000.00 | 5.000% | $215,500.00 |
| 10/1/20 | Assured | | - | $8,620,000.00 | 5.000% | $215,500.00 |
| 4/1/21 | Assured | 6/30/21 | - | $8,620,000.00 | 5.000% | $215,500.00 |
| 10/1/21 | Assured | | - | $8,620,000.00 | 5.000% | $215,500.00 |
| 4/1/22 | Assured | 6/30/22 | - | $8,620,000.00 | 5.000% | $215,500.00 |
| 10/1/2022 | Assured | | $4,205,000.00 | $8,620,000.00 | 5.000% | $215,500.00 |
| 4/1/2023 | Assured | 6/30/23 | - | $4,415,000.00 | 5.000% | $110,375.00 |
| 10/1/2023 | Assured | | $4,415,000.00 | $4,415,000.00 | 5.000% | $110,375.00 |
| 4/1/2024 | Assured | 6/30/24 | - | - | 5.000% | |
| **Total** | | | **$8,620,000.00** | | | **$4,059,750.00** |

## Issuance: 2008-A

CUSIP 25903N63

| Date | Issuer | Fiscal Year | Mandatory Redemption Amounts | Outstanding | Rate | Interest |
|---|---|---|---|---|---|---|
| 10/1/14 | Assured | | - | $19,980,000.00 | 5.000% | $499,500.00 |
| 4/1/15 | Assured | 6/30/15 | - | $19,980,000.00 | 5.000% | $499,500.00 |
| 10/1/15 | Assured | | - | $19,980,000.00 | 5.000% | $499,500.00 |
| 4/1/16 | Assured | 6/30/16 | - | $19,980,000.00 | 5.000% | $499,500.00 |
| 10/1/16 | Assured | | - | $19,980,000.00 | 5.000% | $499,500.00 |
| 4/1/17 | Assured | 6/30/17 | - | $19,980,000.00 | 5.000% | $499,500.00 |
| 10/1/17 | Assured | | - | $19,980,000.00 | 5.000% | $499,500.00 |
| 4/1/18 | Assured | 6/30/18 | - | $19,980,000.00 | 5.000% | $499,500.00 |
| 10/1/18 | Assured | | - | $19,980,000.00 | 5.000% | $499,500.00 |
| 4/1/19 | Assured | 6/30/19 | - | $19,980,000.00 | 5.000% | $499,500.00 |
| 10/1/19 | Assured | | - | $19,980,000.00 | 5.000% | $499,500.00 |
| 4/1/20 | Assured | 6/30/20 | - | $19,980,000.00 | 5.000% | $499,500.00 |
| 10/1/20 | Assured | | - | $19,980,000.00 | 5.000% | $499,500.00 |
| 4/1/21 | Assured | 6/30/21 | - | $19,980,000.00 | 5.000% | $499,500.00 |
| 10/1/21 | Assured | | - | $19,980,000.00 | 5.000% | $499,500.00 |
| 4/1/22 | Assured | 6/30/22 | - | $19,980,000.00 | 5.000% | $499,500.00 |
| 10/1/2022 | Assured | | - | $19,980,000.00 | 5.000% | $499,500.00 |
| 4/1/2023 | Assured | 6/30/23 | - | $19,980,000.00 | 5.000% | $499,500.00 |
| 10/1/2023 | Assured | | - | $19,980,000.00 | 5.000% | $499,500.00 |
| 4/1/2024 | Assured | 6/30/24 | - | $19,980,000.00 | 5.000% | $499,500.00 |
| 10/1/2024 | Assured | | $4,635,000.00 | $19,980,000.00 | 5.000% | $499,500.00 |
| 4/1/2025 | Assured | 6/30/25 | - | $15,345,000.00 | 5.000% | $383,625.00 |
| 10/1/2025 | Assured | | $4,870,000.00 | $15,345,000.00 | 5.000% | $383,625.00 |
| 4/1/2026 | Assured | 6/30/26 | - | $10,475,000.00 | 5.000% | $261,875.00 |
| 10/1/2026 | Assured | | $5,110,000.00 | $10,475,000.00 | 5.000% | $261,875.00 |
| 4/1/2027 | Assured | 6/30/27 | - | $5,365,000.00 | 5.000% | $134,125.00 |
| 10/1/2027 | Assured | | $5,365,000.00 | $5,365,000.00 | 5.000% | $134,125.00 |
| 4/1/2028 | Assured | 6/30/28 | | | | |
| **Total** | | | **$19,980,000.00** | | | **$12,548,250.00** |

# UTGO Series – 2010A

## Bond Series Subject to Mandatory Redemption

### Issuance: 2010-A

CUSIP 59447PD84

| Date | Issuer | Fiscal Year | Mandatory Redemption Amounts | Outstanding | Rate | Interest |
|---|---|---|---|---|---|---|
| 11/1/14 | Ambac | | | $13,900,000.00 | 7.188% | $499,566.00 |
| 5/1/15 | Ambac | 6/30/15 | | $13,900,000.00 | 7.188% | $499,566.00 |
| 11/1/15 | Ambac | | | $13,900,000.00 | 7.188% | $499,566.00 |
| 5/1/16 | Ambac | 6/30/16 | | $13,900,000.00 | 7.188% | $499,566.00 |
| 11/1/16 | Ambac | | | $13,900,000.00 | 7.188% | $499,566.00 |
| 5/1/17 | Ambac | 6/30/17 | | $13,900,000.00 | 7.188% | $499,566.00 |
| 11/1/17 | Ambac | | | $13,900,000.00 | 7.188% | $499,566.00 |
| 5/1/18 | Ambac | 6/30/18 | | $13,900,000.00 | 7.188% | $499,566.00 |
| 11/1/18 | Ambac | | | $13,900,000.00 | 7.188% | $499,566.00 |
| 5/1/19 | Ambac | 6/30/19 | $2,395,000.00 | $11,505,000.00 | 7.188% | $413,489.70 |
| 11/1/19 | Ambac | | | $11,505,000.00 | 7.188% | $413,489.70 |
| 5/1/20 | Ambac | 6/30/20 | $2,575,000.00 | $8,930,000.00 | 7.188% | $320,944.20 |
| 11/1/20 | Ambac | | | $8,930,000.00 | 7.188% | $320,944.20 |
| 5/1/21 | Ambac | 6/30/21 | $2,765,000.00 | $6,165,000.00 | 7.188% | $221,570.10 |
| 11/1/21 | Ambac | | | $6,165,000.00 | 7.188% | $221,570.10 |
| 5/1/22 | Ambac | 6/30/22 | $2,970,000.00 | $3,195,000.00 | 7.188% | $114,828.30 |
| 11/1/22 | Ambac | 6/30/23 | $3,195,000.00 | $3,195,000.00 | 7.188% | $114,828.30 |
| | | | **$13,900,000.00** | | | **$6,637,758.60** |

### Issuance: 2010-A

CUSIP 59447PD16

| Date | Insurer | Fiscal Year | Mandatory Redemption Amounts | Outstanding | Rate | Interest |
|---|---|---|---|---|---|---|
| 11/1/14 | Ambac | | | $77,885,000.00 | 8.369% | $3,259,097.83 |
| 5/1/15 | Ambac | 6/30/15 | | $77,885,000.00 | 8.369% | $3,259,097.83 |
| 11/1/15 | Ambac | | | $77,885,000.00 | 8.369% | $3,259,097.83 |
| 5/1/16 | Ambac | 6/30/16 | | $77,885,000.00 | 8.369% | $3,259,097.83 |
| 11/1/16 | Ambac | | | $77,885,000.00 | 8.369% | $3,259,097.83 |
| 5/1/17 | Ambac | 6/30/17 | | $77,885,000.00 | 8.369% | $3,259,097.83 |
| 11/1/17 | Ambac | | | $77,885,000.00 | 8.369% | $3,259,097.83 |
| 5/1/18 | Ambac | 6/30/18 | | $77,885,000.00 | 8.369% | $3,259,097.83 |
| 11/1/18 | Ambac | | | $77,885,000.00 | 8.369% | $3,259,097.83 |
| 5/1/19 | Ambac | 6/30/19 | | $77,885,000.00 | 8.369% | $3,259,097.83 |
| 11/1/19 | Ambac | | | $77,885,000.00 | 8.369% | $3,259,097.83 |
| 5/1/20 | Ambac | 6/30/20 | | $77,885,000.00 | 8.369% | $3,259,097.83 |
| 11/1/20 | Ambac | | | $77,885,000.00 | 8.369% | $3,259,097.83 |
| 5/1/21 | Ambac | 6/30/21 | | $77,885,000.00 | 8.369% | $3,259,097.83 |
| 11/1/21 | Ambac | | | $77,885,000.00 | 8.369% | $3,259,097.83 |
| 5/1/22 | Ambac | 6/30/22 | | $77,885,000.00 | 8.369% | $3,259,097.83 |
| 11/1/22 | Ambac | | | $77,885,000.00 | 8.369% | $3,259,097.83 |
| 5/1/23 | Ambac | 6/30/23 | | $77,885,000.00 | 8.369% | $3,259,097.83 |
| 11/1/23 | Ambac | | | $77,885,000.00 | 8.369% | $3,259,097.83 |
| 5/1/24 | Ambac | 6/30/24 | $3,455,000.00 | $74,430,000.00 | 8.369% | $3,114,523.35 |
| 11/1/24 | Ambac | | | $74,430,000.00 | 8.369% | $3,114,523.35 |
| 5/1/25 | Ambac | 6/30/25 | $3,755,000.00 | $70,675,000.00 | 8.369% | $2,957,395.38 |
| 11/1/25 | Ambac | | | $70,675,000.00 | 8.369% | $2,957,395.38 |
| 5/1/26 | Ambac | 6/30/26 | $4,085,000.00 | $66,590,000.00 | 8.369% | $2,786,458.55 |
| 11/1/26 | Ambac | | | $66,590,000.00 | 8.369% | $2,786,458.55 |
| 5/1/27 | Ambac | 6/30/27 | $4,440,000.00 | $62,150,000.00 | 8.369% | $2,600,666.75 |
| 11/1/27 | Ambac | | | $62,150,000.00 | 8.369% | $2,600,666.75 |
| 5/1/28 | Ambac | 6/30/28 | $4,825,000.00 | $57,325,000.00 | 8.369% | $2,398,764.63 |
| 11/1/28 | Ambac | | | $57,325,000.00 | 8.369% | $2,398,764.63 |
| 5/1/29 | Ambac | 6/30/29 | $5,250,000.00 | $52,075,000.00 | 8.369% | $2,179,078.38 |
| 11/1/29 | Ambac | | | $52,075,000.00 | 8.369% | $2,179,078.38 |
| 5/1/30 | Ambac | 6/30/30 | $5,705,000.00 | $46,370,000.00 | 8.369% | $1,940,352.65 |
| 11/1/30 | Ambac | | | $46,370,000.00 | 8.369% | $1,940,352.65 |
| 5/1/31 | Ambac | 6/30/31 | $6,205,000.00 | $40,165,000.00 | 8.369% | $1,680,704.43 |
| 11/1/31 | Ambac | | | $40,165,000.00 | 8.369% | $1,680,704.43 |
| 5/1/32 | Ambac | 6/30/32 | $6,750,000.00 | $33,415,000.00 | 8.369% | $1,398,250.68 |
| 11/1/32 | Ambac | | | $33,415,000.00 | 8.369% | $1,398,250.68 |
| 5/1/33 | Ambac | 6/30/33 | $7,335,000.00 | $26,080,000.00 | 8.369% | $1,091,317.60 |
| 11/1/33 | Ambac | | | $26,080,000.00 | 8.369% | $1,091,317.60 |
| 5/1/34 | Ambac | 6/30/34 | $7,975,000.00 | $18,105,000.00 | 8.369% | $757,603.73 |
| 11/1/34 | Ambac | | | $18,105,000.00 | 8.369% | $757,603.73 |
| 5/1/35 | Ambac | 6/30/35 | $8,675,000.00 | $9,430,000.00 | 8.369% | $394,598.35 |
| 11/1/35 | Ambac | 6/30/36 | $9,430,000.00 | $9,430,000.00 | 8.369% | $394,598.35 |
| Total | | | **$77,885,000.00** | | | **$108,522,287.58** |

Page 8 of 8