# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| In re<br><br>CITY OF DETROIT, MICHIGAN<br><br>Debtor. | Chapter 9<br><br>Case No.: 13-53846<br><br>Hon.  Steven W. Rhodes |

## CITY OF DETROIT'S CONSOLIDATED OBJECTION TO APPELLANTS' MOTIONS FOR STAY PENDING APPEAL

The City of Detroit (the "City") hereby objects to the *Motion for Limited Stay Pending Appeal* (Dkt. No. 8341) (the "Ochadleus Stay Motion"),[1] *John P. Quinn's Motion for Partial Stay Pending Appeal* (Dkt. No. 8413) (the "Quinn Stay Motion"),[2] and the *Motion To Stay and Memorandum of Law on the Confirmation*

---

[1] The City notes that several of the Ochadleus Appellants also have leadership positions in the Retired Detroit Police Members Association (the "RDPMA").  As the Court is aware, the RDPMA challenged the City's eligibility to be a chapter 9 debtor and raised related state issues as part of that challenge. The RDPMA appealed this Court's order finding the City was eligible to be a chapter 9 debtor.  As part of its settlement of its objections to confirmation of the Plan, and in exchange for the consideration granted by the City in the Plan, the RDPMA is obligated to withdraw its appeal of the Eligibility Order and any related litigation against the State of Michigan related to, among other things, the issues of pension reductions, PA 436, and this chapter 9 case.  By appealing the Confirmation Order on what appear to be pension-reduction-related grounds, the RDPMA officers who are appellants appear to be breaching their obligations under the Plan settlement and their release agreement with the State.

[2] The City's responses to the Quinn Stay Motion apply equally to all of the motions that have joined it. For example, Dennis Taubitz and Irma Industrious filed a *Joint Motion to Join Joh[n] P. Quinn's Motion for Partial Stay Pending Appeal* (Dkt. No. 8429).  Similar motions were filed by William Davis (Dkt. No.

*of the Plan and Opinion of Magistrate Judge Steven W Rhodes* (Dkt. No. 8426)

(the "Williams Stay Motion"), filed by Carl Williams, Hassan Aleem, and

Dorothea Haris (the "Williams Appellants"). By these motions, the Ochadleus

Appellants, John P. Quinn, and the Williams Appellants (collectively, the

"Appellants") seek a stay pending appeal of the *Order Confirming Eighth*

*Amended Plan for the Adjustment of Debts of the City of Detroit* (Dkt. No. 8272)

(the "Confirmation Order").

## PRELIMINARY STATEMENT

1.      After 18 months of hard-fought negotiations and following decades of

decline in the City's health, the City and the vast majority of its creditors have

---

(continued…)

8432), H. Jean Powell (Dkt. No. 8434), Belinda Florence-Meyers (Dkt. No. 8435), Cecily McClellan (Dkt. No. 8436), Paulette Brown (Dkt. No. 8438), Yvonne Williams Jones (Dkt. No. 8439), Lula Millender (Dkt. No. 8440), Mary Diane Bukowski (Dkt. No. 8441), Marlisa Meah (Dkt. No. 8442), Sheila Thompkins (Dkt. No. 8443), Vera C. Magee (Dkt. No. 8444), Mark L. Smith (Dkt. No. 8445), Vickie L. Shackelford (Dkt. No. 8446), Stephen Michael Paraski (Dkt. No. 8448), Walter Gary Knall (Dkt. No. 8449), David D. Espie (Dkt. No. 8450), George Cannon (Dkt. No. 8451), Amru Meah (Dkt. No. 8452), Wanda Jan Hill (Dkt. No. 8453), and Benyne Goldston (Dkt. No. 8454). Many of these movants who have joined the Quinn Stay Motion—all but Mr. Taubitz and Ms. Industrious—have not filed notices of appeal, precluding them from seeking a stay pending appeal. Additionally, Gregory M. Penney filed a motion joining the Quinn Stay Motion (Dkt. No. 8464) that is untimely because it was filed on November 25, 2014. Cornell Squires also filed a stay motion (Dkt. No. 8483) that is untimely because it was filed on November 26, 2014, and is in any event meritless because it does not make any argument on any of the stay factors.

2

finally agreed to a complex, carefully interwoven Plan of Adjustment to reduce the City's debts and restore basic City services to the 700,000 residents of Detroit, which this Court has now confirmed. At the heart of the confirmed Plan is a comprehensive settlement involving, among other things, a reduction in the City's pension obligations, which was supported by the overwhelming majority of the City's retirees. Appellants are a small group of holdouts who seek to stay the Confirmation Order to prevent any reductions to their pensions. Their request for a stay should be denied.

2.      Granting a stay would pose a grave threat to the entire Plan, imperil the City's chance for recovery, and delay the restoration of basic services that the City's residents desperately need. Further delay would also jeopardize millions of dollars in outside funding needed to soften the blow to retiree health and pension benefits, and put at risk the carefully constructed settlement to preserve the cultural treasure of the Detroit Institute of Arts ("DIA"). Similarly, staying the Annuity Savings Fund ("ASF") Recoupment, which provides almost $200 million in liquidity to the General Retirement Systems ("GRS"), would cause the settlements underlying the Plan to collapse, throwing the City back into economic chaos with no clear path forward. In that case, the City would be forced to return to the drawing board to formulate a new plan to reduce its debts, which would ultimately require significantly *higher* pension cuts than those currently contemplated. That

outcome would severely harm the City, its residents, and all of its creditors, including Appellants themselves.

3. With the City's historic bankruptcy finally nearing the finish line, Appellants have failed to demonstrate that they are entitled to the extraordinary remedy of a stay pending appeal. *First*, the Ochadleus Appellants have failed to make any merits argument or even identify any specific issue on which they seek to appeal, leaving the City and the Court unable to assess their likelihood of success on the merits. The Williams Appellants make a vague and conclusory allegation that the Plan is based on "fraud," but they fail to make any showing that they are likely to succeed on appeal. Mr. Quinn, for his part, identifies the issues he plans to appeal but offers no new argument or case law in support of reversal. *Second*, Appellants have made no showing of irreparable harm but have merely speculated that their claims may become equitably moot in the absence of a stay. Mr. Quinn argues that his potential monetary damages are "irreparable," but claims for money damages are generally not irreparable, and insofar as he relies on equitable mootness his argument is unavailing. *Third*, Appellants have overlooked the far greater harms a stay would impose on the City, its residents, and its creditors. And *fourth*, they have disregarded the public interest, which overwhelmingly favors denial of a stay.

4.     In addition, Appellants have failed entirely to address the need for a supersedeas bond to secure the City against the enormous losses it could suffer as the result of a stay for the sake of an appeal that, by the Ochadleus Appellants' own concession, has no more than a one-in-four chance of succeeding.  As shown below, were the Court to issue a stay despite the severe harms it could impose on the City, the Court should at a minimum condition any stay on the posting of a substantial bond.

## **ARGUMENT**

5.     To determine whether to grant a stay pending appeal, a court must consider four factors:

> (1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay.

*Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991).  *See also In re Holstine*, 458 B.R. 392, 394 (E.D. Mich. 2011); *In re ASC Inc.*, 386 B.R. 187, 198 (E.D. Mich. 2008); *In re Dow Corning Corp.*, 255 B.R. 445, 542 (E.D. Mich. 2000).

6.     These factors represent "interrelated considerations that must be balanced together."  *Griepentrog*, 945 F.2d at 153.  Thus, the court must ultimately "consider how the factors should be balanced in light of the overall circumstances

of the case." *In re Grand Traverse Dev. Co.*, 151 B.R. 792, 796 (W.D. Mich. 1993). In all events, "[t]he party requesting a stay bears the burden of showing that the circumstances justify an exercise of [the court's] discretion." *Nken v. Holder*, 556 U.S. 418, 433-34 (2009). *See also In re W.R. Grace*, 475 B.R. 34, 206 (D. Del. 2012) ("[T]he moving party bears the burden of showing that the circumstances justify the imposition of a stay."); *In re Adelphia Commc'ns Corp.*, 333 B.R. 649, 659 (S.D.N.Y. 2005) ("A party seeking a stay pending appeal carries a heavy burden."); *Thomas M. Cooley Law Sch. v. American Bar Ass'n*, 2005 BL 82490, at *2 (W.D. Mich. July 11, 2005) (denying the motion for stay pending appeal because the movant "has failed to carry its burden").

## A. Appellants Cannot Meet Any of the Four Stay Factors.

### 1. Appellants Fail To Demonstrate that They Are Likely To Succeed on the Merits.

7.     In seeking a stay, Appellants must establish "a strong or substantial likelihood or probability of success on the merits" of their appeal. *In re ASC*, 386 B.R. at 198. Because a motion for a stay pending appeal is made after the bankruptcy court "has considered fully the merits of the underlying action and issued judgment, . . . a movant seeking a stay pending review on the merits of a [bankruptcy] court's judgment will have greater difficulty in demonstrating a likelihood of success on the merits." *Griepentrog*, 945 F.2d at 153. "In essence, a party seeking a stay must ordinarily demonstrate . . . that there is a likelihood of

reversal." *Id.  See also Grand Traverse*, 151 B.R. at 796 ("A motion to stay a court's order pending appeal places on the movant a *higher burden . . .* than does a motion for a preliminary injunction because the appellant must establish the likelihood that it will win reversal on its appeal." (emphasis added)).[3]

8.    Although the Sixth Circuit has applied a sliding scale where "the probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiffs will suffer absent the stay," the movant must "always . . . demonstrate more than the mere 'possibility' of success on the merits." *Griepentrog*, 945 F.2d at 153.  At the very minimum, the movant must show "serious questions going to the merits." *Id.* (citations omitted).  But this lowered threshold for likelihood of success applies only where the movant has *also* "demonstrate[d] irreparable harm that decidedly outweighs any potential harm to the defendant if a stay is granted." *Id.* at 153-54.

9.    Finally, where the movant "fails to explain the basis for its apparent argument that the Bankruptcy Court incorrectly resolved" particular issues, it has, as a matter of law, "fail[ed] to show a likelihood of success of reversal on the

---

[3] For this reason, the Williams Appellants' reliance on the underlying purpose of a preliminary injunction, *see* Williams Stay Motion at 4, is misplaced. Because the City won the trial on the merits, there is no reason to maintain the pre-trial status quo.

merits of [those] issue[s] on appeal." *In re Akron Thermal, LP*, 414 B.R. 193, 205 (N.D. Ohio 2009).

## The Ochadleus Appellants

10.     The Ochadleus Appellants have failed to demonstrate a likelihood of success on the merits for three reasons. *First*, under the Sixth Circuit's "sliding scale" analysis, the lowered threshold for likelihood of success on the merits does not apply because, as explained *infra* at ¶¶ 18-32, the Ochadleus Appellants have not "demonstrate[d] irreparable harm that decidedly outweighs any potential harm to the defendant if a stay is granted." *Griepentrog*, 945 F.2d at 153-54.

11.     *Second*, even if the lowered threshold for likelihood of success did apply, the Ochadleus Appellants would still fall far short. Although they broadly identify the issue on which they seek to appeal (pension cuts, *see* Ochadleus Stay Motion at 10), they offer *no* argument for why those cuts should be overturned. They have thus failed to show any "serious question going to the merits." *Griepentrog*, 945 F.2d at 153. Because they identify no merits question at all, the City and the Court are left to guess at what they would argue on appeal. Under *In re Akron Thermal*, 414 B.R. at 205, the Ochadleus Appellants have failed to carry their burden as a matter of law.

12.     *Third*, read most favorably, the Ochadleus Appellants seek to argue on appeal that the reduction of their pensions under the Plan violates the Pensions

Clause of the Michigan Constitution, art. IX, § 24. But as this Court has already explained, *In re City of Detroit*, 504 B.R. 97, 149-54 (Bankr. E.D. Mich. 2013), that argument is entirely meritless: The Pensions Clause simply confers the same protection as the Contracts Clause by providing that public pensions are "contractual obligations" that may not be diminished or impaired "[]by" the State or its political subdivisions. *Id.* And as the Supreme Court held in *United States v. Bekins*, 304 U.S. 27, 54 (1938), that protection does not pose any obstacle to the authorization and maintenance of a municipal bankruptcy case, where contractual obligations may be impaired by order of a federal bankruptcy court, pursuant to the federal bankruptcy power, which trumps any contrary state-law protections. *See In re City of Stockton*, 478 B.R. 8, 15-16 (Bankr. E.D. Cal. 2012).

### John P. Quinn

13. Similarly, Mr. Quinn has failed to demonstrate a likelihood of success on the merits. As an initial matter, he argues that the Plan violates § 1123(a)(4) of the Bankruptcy Code by providing for ASF Recoupment that supposedly treats claims within the same class differently without the claimants' consent. *See* Quinn Stay Motion at 3-4. That is incorrect. In fact, ASF Recoupment does not affect the way *claims* are treated, but is instead a mechanism for recovering funds that were distributed to certain *claimants*, all of whom have claims in Class 11. This distinction is crucial because § 1123(a)(4) is concerned with the equal treatment of

9

claims, not with the treatment of claimants. *See In re UNR Indus., Inc.*, 143 B.R. 506, 523 (Bankr. N.D. Ill. 1992) (noting that the debtor had confused "equal treatment of *claims* with the equal treatment of *claimants*"), *rev'd on other grounds sub nom. UNR-Rohn Inc. v. Bloomington Factory Workers (In re UNR Indus., Inc.*, 173 B.R. 149 (N.D. Ill. 1994); 7 Collier on Bankruptcy ¶ 1123.01[4][b] (16th ed. rev. 2014) (explaining that section 1123(a)(4)'s requirement that the plan provide the "same treatment for each claim . . . of a particular class" does not apply "to the plan's overall treatment of the creditors holding such claims"). Because ASF Recoupment applies only to claimants, and not to the treatment of their claims, it cannot violate § 1123(a)(4).

14. Put simply, ASF Recoupment is not a component of the treatment of GRS Pension Claims in Class 11. Rather, as the Court found in the Confirmation Order, "ASF Recoupment is a settlement mechanism designed to (a) implement a critical component of the City's comprehensive settlement of pension-related issues and (b) enable the trustees of the GRS . . . to recover a portion of excess interest allocated to members' Annuity Savings Fund accounts from the GRS's traditional defined benefit pension plan." Confirmation Order at pp. 8-9. As such, "ASF Recoupment may be deemed ([a]) separate and distinct from the calculation of recoveries provided to holders of GRS Pension Claims and, thus, ([b]) disregarded for purposes of determining whether the Plan complies with section

1123(a)(4) of the Bankruptcy Code." *Id.* at p. 9. Mr. Quinn's assertion that the Plan violates § 1123(a)(4) as a result of ASF Recoupment is meritless because it relies on the faulty assumption that ASF Recoupment treats some claims in Class 11 differently than other claims in Class 11. To the contrary, ASF Recoupment applies only to claimants, and not to the treatment of their claims. Thus, the Plan does not violate § 1123(a)(4) with respect to Class 11.

15. Mr. Quinn also argues that the Plan violates section 941 of the Bankruptcy Code because it impermissibly impairs third-party rights by reducing pension obligations that belong not to the City but to the GRS. *See* Quinn Stay Motion, at 4-5. Because the City is the sole sponsor of the GRS pension plan, it is not clear to the City which "obligations" GRS may have that the Plan may impair. As Mr. Quinn fails to set forth any detailed argument on this point, he fails to establish any likelihood of success as a matter of law.

16. In previous filings, Mr. Quinn has confused the City's annual obligation to fully fund accrued pension benefits and any amount of underfunding with the mechanical distribution of pension benefits by the GRS.[4] This argument obscures the fact that the ultimate liability for pension obligations lies with the City. As the City explained in its briefing prior to confirmation, it is the sole

---

[4] *See* John P. Quinn's Objections to Fourth Amended Plan of Adjustment (Docket No. 5723), at 9-16.

sponsor of both GRS and the Police and Fire Retirement Systems ("PFRS"), which are the conduits by which the City funds its pension obligations.[5]  As such, there can be no dispute that the City is liable to GRS and PFRS participants on account of their pension claims, and participants have no benefit claims against the Retirement Systems.  *See In re City of Detroit,* 504 B.R. 97, 154 (Bankr. E.D. Mich. 2013) (holding that pension claims are subject to impairment in the City's chapter 9 case).  Accordingly, the Plan's impairment of Pension Claims does not constitute the improper impairment of claims against third parties, and Mr. Quinn has failed to establish any likelihood of success on this issue.

---

[5] *See* Consolidated Response to Certain *Pro Se* Objections to Confirmation of the Sixth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 7303), at 58-60; Consolidated (A) Pretrial Brief in Support of Confirmation of Sixth Amended Plan for the Adjustment of Debts of the City of Detroit and (B) Response to (I) Certain Objections Filed by Individual Bondholders and Individual Retirees and (II) Supplemental Objections (Docket No. 7143), at 118-19.

## The Williams Appellants

17.    The Williams Appellants make a vague and conclusory allegation of "fraud," *see* Williams Stay Motion at 3, but they fail to make any argument to substantiate this claim.  Accordingly, they fall well short of demonstrating any likelihood of success on appeal.

### 2.    Appellants Fail To Demonstrate That They Will Be Irreparably Harmed Absent a Stay.

18.    Next, Appellants must demonstrate that they would suffer some irreparable harm absent a stay.  *See Griepentrog*, 945 F.2d at 154.  To evaluate this factor, courts generally consider "(1) the substantiality of the injury alleged; (2) the likelihood of its occurrence; and (3) the adequacy of the proof provided."  *Id.*[6]

## The Ochadleus Appellants

19.    Here, the Ochadleus Appellants' sole argument concerning irreparable harm is that, in the absence of a stay, their appeal may become statutorily or equitably moot.  *See* Ochadleus Stay Motion at 10.  Most courts to consider this issue, however, have held that "the fact that an appeal may become moot if a stay is not granted does not, in itself, demonstrate or establish irreparable harm."  *In re Akron Thermal*, 414 B.R. at 208 (quoting the bankruptcy court's order with

---

[6] The Williams Appellants fail to allege irreparable harm.

approval).[7]  Indeed, to hold otherwise would mean that practically every appeal of

a confirmation order would warrant a stay, and that decidedly is not the case.  *See*

*In re W.R. Grace*, 475 B.R. at 207.

20.    Even the few courts that have acknowledged that mootness could

potentially amount to an irreparable injury have held that the irreparable-injury

requirement is satisfied only "where the denial of a stay pending appeal risks

mooting *any* appeal of *significant* claims of error."  *In re Adelphia Commc'ns*

*Corp.*, 361 B.R. 337, 347-48 (S.D.N.Y. 2007).   Thus, the concern about mootness

and the possible loss of appellate rights "is inextricably related to the appellants'

---

[7] *See also, e.g.*, *Republic of the Philippines v. Westinghouse Electric Corp.*,
949 F.2d 653, 658 (3d Cir. 1991) (The possibility of mootness "alone does not
justify pretermitting an examination of the nature of the irreparable injury alleged
and the particular harm that will befall the appellant should the stay not be
granted."); *BDC Capital,Inc. v. Thoburn*, 508 B.R. 633, 640 (E.D. Va. 2014)
("[T]he fact that an appeal may become moot without a stay does not alone
constitute irreparable harm."); *In re W.R. Grace*, 475 B.R. at 206 ("[T]he risk of
equitable mootness by itself is insufficient to demonstrate irreparable injury for
purposes of a stay."); *In re F.G. Metals, Inc.*, 390 B.R. 467, 477-78 (Bankr. M.D.
Fla. 2008) (noting that a majority of cases have held that the risk of mootness alone
does not constitute irreparable harm and holding that the movant failed to satisfy
the irreparable injury requirement because it "ha[d] not asserted any basis other
than mootness for claiming that it will be irreparably injured if the stay is not
granted"); *In re Irwin*, 338 B.R. 839, 853 (E.D. Cal. 2006) ("It is well settled that
an appeal being rendered moot does not itself constitute irreparable harm."
(citations omitted)); *In re Fullmer*, 323 B.R. 287, 304 (Bankr. D. Nev. 2005)
("[G]iven this court's view that irreparable injury cannot be shown solely from the
possibility that an appeal may be moot, [the party seeking a stay] has thus not
established that denial of a stay will cause him irreparable injury.").

likelihood of success on the merits." *In re BGI, Inc.*, 504 B.R. 754, 763 (S.D.N.Y.

2014).[8]

21.    Because the Ochadleus Appellants have failed to develop any

argument for their vague pension-related challenge to the Confirmation Order and

have accordingly failed to demonstrate a likelihood of success on the merits, the

possible mootness of their appeal cannot constitute irreparable injury under any

view.[9]

---

[8] *See also CWCapital Asset Mgmt., LLC v. Burcam Capital II, LLC*, 2013 BL 174761, at *8 (E.D.N.C. June 28, 2013) (finding that the loss of appellate rights constituted irreparable harm where "the appellate issue in the case involve[d] a significant legal question"); *In re Doctors Hosp. of Hyde Park, Inc.*, 376 B.R. 242, 249 (Bankr. N.D. Ill. 2007) (noting that the minority view applies "only if the appellant can show a substantial appellate issue and likelihood of success" and holding that, because the movant failed to make these showings, "possible mootness alone [was] not enough to establish irreparable injury").

[9] It is also worth noting that, at the same time Appellants advance this equitable mootness theory, they significantly undermine it by stating that they "believe[] that equitable mootness would be inapplicable here" and that "some relief may be possible notwithstanding the Confirmation Order." Stay Motion at 10. Contrary to these insinuations, equitable mootness applies in chapter 9 cases. *See Lionel v. City of Vallejo (In re City of Vallejo)*, 551 Fed. Appx. 339 (9th Cir. 2013); *Alexander v. Barnwell Cnty. Hosp.*, 498 B.R. 550 (D.S.C. 2013). Recent authority to the contrary—namely *Bennett v. Jefferson County*, 2:14-CV-0213, 2014 BL 272387 (N.D. Ala. Sept. 30, 2014)—ignores the similarities between a substantially consummated chapter 9 plan and a substantially consummated chapter 11 plan, as well as the public's interest in the speedy and certain resolution of chapter 9 litigation. Moreover, the *Jefferson County* court's primary concern—that ratepayers in general might have their state constitutional rights violated without any chance for appellate review, *see id.* at *20-*23—is not present here.

22.     Lastly, the few courts to consider equitable mootness in their irreparable harm determinations weigh that harm against the harms a stay would impose on other parties. *See, e.g.*, *In re GM Corp.*, 409 B.R. 24, 30 (Bankr. S.D.N.Y. 2009) (even assuming that "the threat of equitable mootness is enough to satisfy the requirement of showing *some* irreparable injury," it would still need to be "weighed against different kinds of irreparable injury that others would suffer"); *In re Cujas*, 376 B.R. 480, 487 (Bankr. E.D. Pa. 2007) (adopting the minority position but "hasten[ing] to add . . . that the existence of such harm is no guarantee that an appellant is entitled to a stay pending appeal" because that harm must "be balanced against the potential harm other parties may suffer"). Here, as explained *infra* at ¶¶ 24-32, the harm that a stay would inflict on the City, its residents, and its creditors far outweighs the potential harm to Appellants if a stay is not granted. Indeed, because a stay would threaten to unravel the City's carefully negotiated Plan, including the provision of Outside Funding to minimize reductions to the City's pension obligations, there is a strong likelihood that granting a stay would actually *harm* Appellants in the long run instead of protecting them. That is likely why the vast majority of retirees have supported the Plan instead of seeking to derail it.

23.     Mr. Quinn argues that he will be irreparably harmed absent a stay because, "even if the district court holds that the Plan should not have been confirmed . . . , the money that will by then have been withheld from my pension will never be paid to me." Quinn Stay Motion at 5. Ordinarily, however, monetary harms standing alone are not irreparable by their very nature. *See Basicomputer Corp. v. Scott*, 973 F.2d 507 (6th Cir. 1992) (holding that a movant's "harm is not irreparable if it is fully compensable by money damages"); *In re Plastech Engineered Prods., Inc.*, 382 B.R. 90, 115 (Bankr. E.D. Mich. 2008) (holding that, when "damages are compensable by money," they "do not . . . constitute irreparable injury"). To the extent Mr. Quinn alleges that his monetary harms will be irreparable due to the risk of his appeal becoming equitably moot, the City has already addressed that argument above.

**3.      Appellants Fail To Show the Absence of Harm to the City, Other Creditors, and Other Stakeholders.**

24.     Appellants must next show that the issuance of a stay would not cause substantial harm to others. *See Griepentrog*, 945 F.2d at 153; *In re ASC*, 386 B.R. at 198. On this count, the Ochadleus Appellants offer nothing more than the conclusory—and undeniably false—assertion that "the Debtor[] will suffer no

harm." Ochadleus Stay Motion at 11.[10]  Mr. Quinn's assessment is largely the

same.  *See* Quinn Stay Motion at 6 (noting that the costs stemming from the

payment of his individual pension "will have no impact on the City during the

foreseeable duration of a stay pending appeal").[11]  If the Plan does not become

effective by December 31, 2014, essential funding contributions will not occur,

and the Plan will be doomed, leaving the City, its residents, employees, and

retirees in limbo at best.

25.    As the Court is aware, the Plan reduces the City's estimated $18

billion debt burden by approximately $7 billion.  Equally important, the Plan

provides for the reinvestment of approximately $1.7 billion over 10 years in

initiatives (the "Reinvestment Initiatives") designed to restore adequate levels of

municipal services and improve the everyday lives of Detroit residents.  The

Reinvestment Initiatives will allow the City to achieve approximately $483 million

in additional revenue and $358 million is cost savings during the ten years

following the Effective Date, resulting in a net reinvestment in the City of

approximately $877 million.  *See* Confirmation Order at ¶ H.16.  The

---

[10] The Williams Appellants similarly ignore the harms to the City and its
residents.  *See* Williams Stay Motion at 4 ("Respondent will not be irreparabl[y]
harmed by a stay pending appeal.").

[11] Of course, Mr. Quinn ignores the reality that staying the provisions he
targets would affect the City's payments to every similarly situated pensioner, not
just him.

Reinvestment Initiatives have already begun and more are expected to be implemented right after the Effective Date. All are dependent on the Plan becoming effective and the exit financing being implemented.

26. As part of the DIA Settlement component of the "Grand Bargain," a cornerstone upon which the Plan rests, certain philanthropic foundations (the "Foundations") and DIA Corp. have agreed to contribute approximately $466 million to reduce the Retirement Systems' current levels of underfunding over the next 20 years (with the Foundations contributing $366 million and DIA Corp. contributing $100 million). Along with the DIA Settlement, the State of Michigan has agreed to contribute $350 million over a 20-year period (a net present value of $194.8 million) to reduce the Retirement Systems' current levels of underfunding (the "State Contribution Agreement"). The combined contributions' value of $816 million to be received pursuant to the DIA Settlement and the State Contribution Agreement constitute the "Outside Funding." The recoveries upon all Allowed Claims under the Plan depend upon timely receipt of the Outside Funding.

27. Significantly, the receipt of the Outside Funding is conditioned upon, among other things, the Plan's Effective Date occurring no later than December 31, 2014. *See* Exhibit I.A.127 to the City's Plan, § II.a.2. Specifically, the separate agreements between each of the Foundations and the CFSEM Supporting Organization are conditioned upon the Plan becoming effective by December 31,

2014. Should that condition fail, (1) these agreements would be canceled automatically and the Foundation funds would not be received, and (2) the State Contribution Agreement could not be consummated because it is conditioned upon the Foundations' funding obligations (excluding the Special Foundation Funders) becoming irrevocable. *See* Plan at § IV.D.3; Exhibit I.A.332 to the City's Plan, at 4(g).

28.     The non-consummation of the Foundation/CFSEM Supporting Organization agreements and the State Contribution Agreement would doom the Plan, as the occurrence of the Effective Date is expressly conditioned upon the execution and effectuation of all agreements necessary to implement the Plan's terms and provisions. *See id.* at § III.A.6; *see also id.* at § III.A.12 (requiring, as a condition to the Effective Date, that "all conditions to the effectiveness of the State Contribution Agreement and the DIA Settlement Documents have been satisfied").

29.     If the Plan were to fail, the following are some of the harms that would ensue: (1) the City would lose the benefits of *all* of the hard-fought settlements incorporated in the Plan, including the mutually-beneficial development partnerships between the City and (a) FGIC (an insurer of more than $1 billion of the City's debt) and (b) Syncora (an active litigant in the City's Chapter 9 Case that holds or insures more than $350 million of debt); (2) either (a) the City's bankruptcy case would be dismissed, and, because the City would lack

sufficient revenues to continue paying its creditors, those creditors would seek to vindicate their claims under state law, which would lead to the issuance of myriad judgment levies that would quickly deplete the City's limited resources, or (b) all of the money and time the City invested over the past 16 months would be wasted, as the City would be back to square one in the bankruptcy and would need a new emergency manager to conduct another round of negotiations with all of the creditors, this time without the benefit of the Outside Funding; and (3) in either event, the City's recent momentum would be lost and, once again, it would struggle to attract and retain residents, businesses, and investment.

30. "The purpose of the Plan is to adjust the City's debts to enable the City to reverse its decades-long financial decline, eliminate its service delivery insolvency, restore adequate municipal services to its residents and meet its future financial obligations, consistent with the overarching remedial purpose of chapter 9 and the objectives and purposes of the Bankruptcy Code." Confirmation Order at ¶ H.16. Accomplishing these goals under the Plan is urgent because, as this Court found, "a large number of Detroit residents are suffering hardship due to the City's service delivery insolvency. This condition is inhumane and intolerable, and can only be successfully addressed if the Plan is confirmed." *Id.* at ¶ H.29. In light of these purposes and conditions, the Court must also consider the harm a stay would impose on Detroit's residents. *See In re Grand Traverse*, 151 B.R. at 800

(discussing the short- and long-term impacts that a deterioration in maintenance and service would have on the well-being of those who did business with the Debtor and on the broader community that benefitted from the Debtor's operations).

31.     Some aspects of the Plan and the Reinvestment Initiatives have already begun to be implemented, and any disruption or further delay in the implementation process would prolong the City's service-delivery insolvency and the hardship to Detroit residents due to the City's current inability to provide basic services.  Moreover, unless the Reinvestment Initiatives continue to be implemented, the City will remain unable "to reverse the exodus of residents and businesses from the City that has depleted the City's tax base, reduced land values and led to widespread abandonment and blight." *Id.* at ¶ N.9.

32.     Finally, while the Ochadleus Stay Motion purports to call for a "Limited Stay," it is unclear how the Ochadleus Appellants intend for the stay to be limited.  Perhaps they, like Mr. Quinn, seek to stay only those provisions relating to pension reductions.  *See* Quinn Stay Motion at 1-2.  But such a piecemeal approach is impossible because the City cannot make good on its other commitments under the Plan if it continues to make pension payments in full.  For one thing, the savings that will result from reduced pension contributions are necessary to fund the Plan's restructuring and reinvestment initiatives.  In addition,

projections for the economic feasibility of the Plan assume that the Outside Funding will be deposited as and when required by the Plan and begin earning interest, which means that any delay would hinder the City's ability to meet its projections.

### 4. Denial of the Motion for Stay Pending Appeal Is Strongly in the Public Interest.

33.     Finally, the movant must demonstrate some "public interest in granting the stay." *Griepentrog*, 945 F.2d at 153 (citation omitted).  In other words, Appellants must show that "the public interest would be harmed by failing to grant a stay pending appeal," *In re Target Graphics, Inc.*, 372 B.R. 866, 876 (E.D. Tenn. 2007), or, at the least, that "[t]he public interest will not be harmed if the stay is granted," *In re Grand Traverse*, 151 B.R. at 796 (citation omitted).

34.     In general, there is a strong public interest in "the finality of confirmed plans in bankruptcy and the orderly administration of bankruptcy cases."  *In re HNRC Dissolution Co.*, 371 B.R. 210, 237 (E.D. Ky. 2007).  *See also In re W.R. Grace*, 475 B.R. at 208 ("In the bankruptcy context, there is a general public policy weighing in favor of affording finality to bankruptcy judgments."); *In re Metiom, Inc.*, 318 B.R. 263, 272 (S.D.N.Y. 2004) (recognizing the "public interest in the expeditious administration of bankruptcy cases").

35.     "The public interest requires bankruptcy courts to consider the good of the case as a whole," not individual parties' concerns.  *In re Adelphia Commc'ns*

*Corp.*, 368 B.R. 140, 284 (Bankr. S.D.N.Y. 2007). Thus, it is appropriate to consider the will of the overwhelming majority of creditors and stakeholders who voted in favor of the Plan. *See id.* ("It would be grossly unconscionable . . . to thwart the will of such an overwhelming majority to accommodate the desires of such a small minority, who are simply dissatisfied with the Settlement under the Plan."). It is also appropriate to consider whether "the incremental recoveries to" Appellants in the event of a successful appeal "would be modest," relative to "the maximization of value for all" under the Plan. *Id.*

36.     Here, it is clear that "the good of the case as a whole" requires the denial of the Stay Motions, for substantially the same reasons that this Court gave for finding that the Plan is fair and equitable, *see* Confirmation Order at H.29, and for waiving the automatic 14-day stay, Confirmation Order at ¶ BB. *First*, the overwhelming majority of interested parties voted in favor of the Plan. Indeed, those with interests identical to Appellants' supported it by a wide margin. *See* Pacque Decl. (Dkt. No. 6179) at ¶ 33 (showing that 82% of the non-uniformed retirees (by number and amount) voted for the Plan, as did 73% of the uniformed retirees (by number and amount, with rounding), and that 88% by vote and 84% by amount voted in favor of the treatment of OPEB (health benefit) claims). As the *Adelphia* court explained, the Court should not allow Appellants, who represent a tiny minority, to thwart the will of an overwhelming majority and derail the entire

Plan.  368 B.R. at 284.  *Second*, even in Appellants' unrealistic best-case scenario where the City could somehow find a way to keep paying pensions in full, Appellants' incremental recoveries would be modest, at least compared to the far greater harms that would fall upon the City's other residents and creditors as a result.  Indeed, because pensions were tied to the OPEB settlement, any increase in the City's obligation for pensions would come at the expense of recoveries under OPEB, as the $450 million in B notes to support retiree health care would either disappear or be materially reduced.  *Third*, because a stay would fatally threaten the Outside Funding, upon which the City's settlements with the retiree creditors and all other creditors, as well as the recoveries on all Allowed Claims, depends, the issuance of a stay would irreparably harm all non-moving claimants.  *Fourth*, staying the Confirmation Order would cause severe harm to the City's residents, as the City would be unable to restore adequate municipal services, its tax base would continue to deteriorate, and the current abandonment and blight problems would deepen.  *See supra* at ¶¶24-32. "[G]ranting a stay . . . at the expense of all [these] other interests—and especially without [a] bond . . . would be unconscionable."  *In re GM*, 409 B.R. at 35.  It is essential that the Court avoid *any* risk of delaying the City's restructuring and reinvestment initiatives.

37.     The public interest in a stay is diminished where, as here, "there is no substantial probability of success on the merits of the appeal."  *In re Metiom*, 318

B.R. at 272. In any event, any possible benefit of a stay is greatly outweighed by the harms described above. On balance, the public interest strongly favors denying the Stay Motions.

**B.      Even If a Stay Were Appropriate, It Could Be Granted Only with a Substantial Bond To Protect the City, Its Creditors, and Other Stakeholders.**

38.      Pursuant to Federal Rule of Bankruptcy Procedure 8005, a bankruptcy court may stay its judgment "on such terms as will protect the rights of all parties in interest," including by requiring "the filing of a bond or other appropriate security with the bankruptcy court." Fed. R. Bankr. P. 8005. There is a presumption that a supersedeas bond will be required absent exceptional circumstances. *See In re Tribune*, 477 B.R. at 478; *In re Adelphia*, 361 B.R. at 350 (same); *see also In re Grubb & Ellis Co.*, 2012 BL 73969, at 12 (Bankr. S.D.N.Y. Mar. 27, 2012) ("[I]f a party seeks a stay pending appeal, it is normally required to file a bond in a sum sufficient to protect the rights of the party who prevailed in the bankruptcy court."); *In re Ahmed*, 2010 BL 125977, at *3 (Bankr. C.D. Cal. Jan. 8, 2010) (noting that "a supersedeas bond is *usually* required to obtain a stay" (emphasis added)); *In re Gleasman*, 111 B.R. at 602 ("There is in general a strong policy against granting stays without providing some security to the adverse party.").

39.     Whether and what amount of a bond to require are matters for the court's discretion.  *See In re Innovative Commc'ns*, 390 B.R. 184, 191 (Bankr. D.V.I. 2008); *In re Gleasman*, 111 B.R. 595, 602 (Bankr. W.D. Tex. 1990) ("The form, the amount and the sufficiency of [the] security are generally matters within the discretion of . . . the bankruptcy court."); *In re Texas Equip. Co.*, 283 B.R. 222, 229 (Bankr. N.D. Tex. 2002) (bond decisions guided by "general equitable principles.").

40.     "In determining whether a bond should be ordered, the court looks to whether [it is] necessary to protect against diminution in the value of property pending appeal and to secure the prevailing party against **any loss that might be sustained** as a result of an ineffectual appeal."  *In re Tribune Co.*, 477 B.R. 465, 478 (Bankr. D. Del. 2012) (internal quotation marks and citation omitted) (emphasis added).  *See also In re Adelphia*, 361 B.R. at 250 (same).  This inquiry reflects the bond's purpose, which "is to indemnify the party who was successful in the Bankruptcy Court against loss caused by an attempt to reverse the decision upon appeal."  *In re Blixeth*, 509 B.R. at 705 (citations omitted).  *See also In re Weinhold*, 389 B.R. 783, 787 (Bankr. M.D. Fla. 2008) ("The purpose of a supersedeas bond under Rule 8005 is to protect the prevailing party against any loss that might result from a stay of the judgment or order." (citation omitted)).

41.     Supersedeas bonds are especially likely to be required in complex

cases involving large sums of money.  For example, before requiring the appellant

to post a $1.5 billion bond, the bankruptcy court in *In re Tribune* quoted with

approval the appellee's statement that a supersedeas bond is

> especially important in the context of a complicated and multi-faceted
> plan of reorganization in a large and complex [bankruptcy] case,
> where . . . the debtor's business operations, its wherewithal, and the
> anticipated distributions of billions of dollars of consideration to
> thousands of creditors, may be threatened by a stay.

477 B.R. at 480.  Similarly, before requiring a $1.3 billion bond, the *Adelphia*

court stated:

> [A] stay of a confirmation order in one of the longest-running and
> most complex bankruptcies in our history threatens grave harm to
> thousands of parties who have been waiting . . . to obtain sizeable
> distributions from a group of bankrupt estates.   After grueling
> negotiations, a plan of reorganization and a settlement of many
> ancillary disputes has been reached.  The Plan was put to the vote of
> creditors and overwhelmingly approved.   The Plan was subject to
> searching review by the Bankruptcy Court, which approved it in a
> lengthy decision.  The inability to consummate the Plan resulting from
> a stay of that order could cause the estates to incur more than a billion
> dollars in additional costs or could even cause the Plan to collapse.
> This is not a risk that should be taken lightly.

361 B.R. at 342.

42.     As these cases demonstrate, bonds are typically set "at or near the full

amount of the potential harm to the non-moving parties." *Id.* at 351.  This harm

may include "the whole amount of the judgment remaining unsatisfied, costs of the

appeal, interest, and damages for delay." *In re Texas Equip.*, 283 B.R. at 229

(internal quotation marks and citations omitted). The extent to which such a bond is difficult for a movant to post "only serves to highlight the substantial risk of dramatic injury to Debtor[] and other creditors if the Bankruptcy Court's orders were erroneously stayed." *In re DJK Residential, LLC*, 2008 BL 55478, at *6 (S.D.N.Y. Mar. 07, 2008).

43.     Given the general rule in favor of conditioning stays on sufficient bonds, the party seeking the stay "has . . . [the] burden of showing that no bond is required." *In re Weinhold*, 389 B.R. at 787. Indeed, "[b]ecause a supersedeas bond is designed to protect the appellee, the party seeking the stay without a bond has the burden of providing specific reasons why the court should depart from the standard requirement of granting a stay only after posting of supersedeas bond in the full amount of the judgment." *Id.* (quoting *de la Fuente v. DCI Telecommc'ns Inc.*, 269 F. Supp. 2d 237, 240 (S.D.N.Y. 2003)). *See also In re GM*, 409 B.R. at 30 ("[I]f the movant seeks the imposition of a stay without a bond, the applicant has the burden of demonstrating why the court should deviate from the ordinary full security requirement." (internal quotation marks and citation omitted)).

44.     Here, Appellants have entirely ignored the possibility that a bond may be required. Because they have not and cannot satisfy their burden to proffer specific reasons not to require a bond, "the Court should exercise its discretion to require a bond." *In re Weinhold*, 389 B.R. at 788. Such a ruling is especially

appropriate because the City has come forth with specific examples of harm a stay would impose—not only on the City but also on its residents and its creditors. *See id.* The exact concerns that animated the *Tribune* and *Adelphia* courts are present here—namely, (1) this large and complex bankruptcy case involved grueling negotiations and culminated in a Plan that was overwhelmingly favored, subjected to searching review, and then approved by this Court; (2) given the various interlocking settlements and agreements, many of which are expressly conditioned on the Effective Date occurring by the end of the year, a stay could cause the Plan to collapse; and (3) the Plan's demise would compromise the distributions of billions of dollars and the City's ability to provide basic services to residents.

45.    In light of these concerns and to secure the City against all losses that might be sustained as a result of an ineffectual appeal, the Court should require Appellants to post a bond sufficient to cover the full amount of debt reduction achieved by the Plan ($7 billion) and the total amount of reinvestment envisioned under the Plan ($1.7 billion), for a total amount of $8.7 billion.  Such a bond is fully within the precedents for such a large and complex bankruptcy.[12]

---

[12] *See In re GM*, 409 B.R. at 34 (stay would require bond of at least $7.4 billion); *see also, e.g.*, *In re Tribune*, 477 B.R. at 469 (conditioning stay on bond of "$1.5 billion"); *In re Innovative Commc'ns*, 390 B.R. at 191 (finding that "a bond in the amount of $700 million would be necessary"); *In re Calphine Corp.*, 2008 BL 14381, at *8 (Bankr. S.D.N.Y. Jan. 24, 2008) ($900 million); *In re Adelphia*, 361 B.R. at 369 (ordering "a bond in the amount of $1.3 billion").

46.     In the alternative, the Court should require a bond that covers the full amount of the Outside Funding ($560.8 million), the amount of exit financing ($325 million), the amount of ASF Recoupment ($190 million), and $200 million to protect the City from losses that might result from any delay in Reinvestment Initiatives implementation, for a total amount of $1.2758 billion.

Dated:      November 26, 2014             Respectfully submitted,

/s/ Heather Lennox
Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 243-2382
Facsimile: (213) 243-2539
bbennett@jonesday.com

Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
hlennox@jonesday.com

Thomas F. Cullen, Jr. (DC 224733)
Gregory M. Shumaker (DC 416537)
Geoffrey S. Stewart (DC 287979)
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap
PEPPER HAMILTON LLP
4000 Town Center
Suite 1800
Southfield, MI 48075
Telephone: (248) 359-7300
Facsimile: (248) 359-7700
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

*Counsel for the City of Detroit, Michigan*

## <u>CERTIFICATE OF SERVICE</u>

I, Heather Lennox, hereby certify that the foregoing City of Detroit's Consolidated Objection to Appellants' Motions for Stay Pending Appeal was filed and served via the Court's electronic case filing and noticing system on this 26th day of November, 2014.

/s/  Heather Lennox