UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,          .          Docket No. 13-53846
        MICHIGAN,                 .
                                  .          Detroit, Michigan
                                  .          November 24, 2014
                       Debtor.    .          10:00 a.m.
. . . . . . . . . . . . . . . . .

HEARING RE. (#8286) ORDER SETTING HEARING, STATUS
CONFERENCE RE. PLAN, IMPLEMENTATION, (#7581) MOTION
TO FILE A LATE CLAIM
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:        Jones Day
                       By:  HEATHER LENNOX
                       222 East 41st Street
                       New York, NY  10017
                       (212) 326-3837

                       Jones Day
                       By:  JEFFREY ELLMAN
                       1420 Peachtree Street, N.E., Suite 800
                       Atlanta, GA  39309
                       (404) 581-8309

For the State of       Dickinson Wright
Michigan:              By:  STEVEN HOWELL
                       500 Woodward Avenue, Suite 4000
                       Detroit, MI  48226-3245
                       (313) 223-3033

For the Detroit        Clark Hill, PLC
Retirement             By:  ROBERT D. GORDON
Systems:               151 South Old Woodward Avenue, Suite 200
                       Birmingham, MI  48009
                       (248) 988-5882

                       Clark Hill
                       By:  RONALD A. KING
                       212 East Grand River Ave.
                       Lansing, MI  48906
                       (517) 318-3015

APPEARANCES (continued):

```
                        Arnold and Porter, LLP
                        By:  LISA FENNING
                        77 South Figueroa Street
                        Los Angeles, CA  90017
                        (213) 243-4019

For Greenhill &         Steinberg, Shapiro & Clark
Co.:                    By:  MARK SHAPIRO
                        25925 Telegraph Road, Suite 203
                        Southfield, MI  48033
                        (248) 352-4700

For Thomasena           THOMASENA BARGE
Barge:                  In pro per


Court Recorder:         Letrice Calloway
                        United States Bankruptcy Court
                        211 West Fort Street
                        21st Floor
                        Detroit, MI  48226-3211
                        (313) 234-0068

Transcribed By:         Lois Garrett
                        1290 West Barnes Road
                        Leslie, MI  49251
                        (517) 676-5092
```

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1       THE CLERK:  All rise.  Court is in session.  Please

2   may be seated.  Case Number 13-53846, City of Detroit,

3   Michigan.

4       THE COURT:  Good morning.  I thought we would do our

5   status conference first and then our motion regarding the

6   late claim and then the hearing regarding PFRS and GRS.

7       MS. LENNOX:  Thank you, your Honor.  For the record,

8   Heather Lennox of Jones Day on behalf of the city.  Your

9   Honor, I do have an updated checklist if your Honor would

10  like to review, if I may approach?  Your Honor, what I handed

11  up was the same form of checklist that we used last week, and

12  you will see that a lot more of the boxes are now shaded in

13  this pinkish color showing that they're completed.  With

14  respect to all of the approvals that we need for the plan, we

15  have all approvals other than the state approvals needed for

16  the FGIC and Syncora development agreements, and we expect

17  those this week.  There was a title issue with JLA, which we

18  expect to be resolved this week.

19      The documents -- I'm going to put the debt documents

20  to one side.  The other documents, your Honor, are generally

21  executed and ready to go.  I think the VEBA agreements are

22  out for signature, but the other documents we have a lot of

23  signatures back, and we're holding them in escrow.

24      As to the financing documents, the exit facility

25  documents and the B note documents are in pretty good shape

1  and are almost complete.  The C note documents -- the last

2  document that we have to really get in order is the parking

3  agreement document where the revenues come in through the

4  bank, and we're working that out with Syncora and the bank.

5  We expect that should be done this week.

6      With respect to the reinstated UTGO documents, we

7  are now working through some issues that were raised in the

8  last couple of days both by U.S. Bank as the trustee and a

9  couple of the insurers.  There were a lot of discussions over

10  the weekend.  Again, I'm hoping that these get resolved this

11  week.

12      Also, as I reported last week, the debt disclosure

13  documents that accompany the actual debt documents -- there

14  have to be disclosure documents that are posted so that

15  people who want to trade these can trade them -- those are

16  almost complete.  What they are really missing is the

17  inclusion of the city's new budget.  We are currently

18  expecting that that budget process will be done during the

19  first week of December, and we intend to close as soon as

20  possible thereafter.

21      I also think Mr. Howell had some items that he

22  wanted to report to your Honor unless the Court has any

23  questions of me.

24      THE COURT:  Stand by one second, please.

25      MS. LENNOX:  Um-hmm.

1    THE COURT:  When do you expect the plan to be

2    effective?

3    MS. LENNOX:  Again, we are expecting -- we have been

4    told that the budget should be completed no later than the

5    end of the first week of December.  Obviously we are

6    encouraging people to make that mid-week rather than the end

7    of the week, so we would expect to close -- we have to do

8    pre-closings for each of the debt documents because the

9    documents are voluminous, so we would expect to start the

10   pre-closings and the closings immediately that Monday the

11   following week, so we would expect the effective date to

12   occur either early to mid second week of December, between

13   the 8th and the 10th.

14   THE COURT:  One more moment, please.  All right.

15   Mr. Howell.

16   MR. HOWELL:  Good morning, your Honor.  Steven G.

17   Howell, Dickinson Wright, special assistant attorney general

18   appearing on behalf of the State of Michigan.  Your Honor, I

19   just want to bring you up to date on several things that are

20   going on with the state and the various entities that have

21   been created.  First thing I want to touch on is the -- where

22   did it go -- the income stabilization program.  There have

23   been extensive discussions, and the application is in the

24   mail -- will be in the mail or is in the mail with the

25   December 1 pension check for eligibility and qualification

1   for the income stabilization program.  The application is one

2   page long, and if the pensioners have filed Michigan taxes in

3   2013, there is only one -- literally only one box they have

4   to check plus provide a name, signature, and some basic

5   identification information.  The pensioners will have until

6   December 31 to have it postmarked, e-mailed, or faxed back to

7   the Treasury Department, and they're in support of sort of

8   the spirit of what's been happening with this case.  There

9   have been many parties that have offered to help, and the

10  Accounting Aid Society and the Michigan Association of CPAs

11  have teamed up to offer an instructional video, hotline, and

12  walk-in or appointments for those who need assistance filling

13  this out.  The volunteers will be staffing this operation

14  during most business hours in December.

15          In another volunteer offer by a gentleman by the

16  name of Lukasz Paszek, who has helped the state from time to

17  time, he has -- is building and will be presenting to the

18  pension systems an Excel tool that will automatically

19  calculate the income stabilization benefits for those who

20  qualify and to provide it to the Retirement Systems free of

21  charge.  The state will also arrange for this volunteer to

22  come into the Retirement Systems and walk them through how to

23  use it in the future years.  The state has committed to turn

24  around the full list of those who have applied and qualified

25  to the Retirement Systems by January 30th, 2015, and this

1   allows the Retirement Systems the time to implement the cuts

2   and income stabilization so that both are reflected in the

3   March 1 check.  That's the goal that we have.  This timeline

4   meets the requirements in the state contribution agreement.

5   That is the income stabilization issue.

6         On the Financial Review Commission, that commission

7   is not effective yet until the effective date, but there have

8   been two meetings that have occurred already, and I don't

9   know if the Court -- I'm sure the Court is aware of the

10  appointees, and those have been publicized, so those two

11  meetings have been held.  A third is scheduled for December

12  5th, and there's been some orientation and some other

13  activities going on to get that group ready so that when the

14  time comes they're up and running.

15        The third point I just wanted to cover is the

16  Michigan Settlement Administration Authority, which is the

17  entity responsible for approving the disbursement of the

18  state contribution.  There have been two meetings held so

19  far, and there are three conditions that are outstanding.

20  One is the effective date.  The second is there are cases

21  identified in the state contribution agreement for them for

22  which dismissal orders will need to be entered.  We have

23  worked with all the various parties to the support and

24  release agreements.  We have a stipulation.  We're going to

25  be holding at Dickinson Wright stipulations and orders to be

1  presented as soon as the plan goes effective.

2  The last one is the final nonappealable confirmation

3  order requirement, and the Michigan Settlement Administration

4  Authority last week agreed to waive that condition, which is

5  required by December 31, so with that we are teed up so that

6  when these two things happen, the 60-day clock starts to run,

7  but the money will be then transferred to the pension

8  systems, so those are the things I wanted to cover, your

9  Honor.  Thank you for the opportunity to do so.

10  THE COURT:  And thank you, sir.  Ms. Lennox, may I

11  have your attention again, please?

12  MS. LENNOX:  Yes, sir.

13  THE COURT:  I think it's probably valuable to

14  reconvene or at least schedule another one of these status

15  conferences regarding the effectiveness of the plan.  I would

16  propose that we do that on either December 8th or December

17  15th.  I will tell you that it is my intent to schedule a

18  status conference regarding the processing of the fee issue

19  for December 15th.

20  MS. LENNOX:  Okay.

21  THE COURT:  So if you want to report to the Court

22  and to the public on the effective date on the 8th, I'm

23  available and willing to do that, or if we want to do it at

24  the same time as this fee thing on the 15th, that's fine with

25  me also, and, of course, if, in the meantime, you have filed

1    your paper that the plan is effective, then we don't need to

2    have a status conference on it.

3            MS. LENNOX:  Right; right.  I would suggest, your

4    Honor, that we try to do -- you know, consolidate travel

5    schedules and do it on the 15th.

6            THE COURT:  Okay.

7            MS. LENNOX:  We're certainly willing to do it

8    earlier if your Honor prefers.

9            THE COURT:  No.  The 15th is fine, and we'll figure

10   out a time and a courtroom for that --

11           MS. LENNOX:  Thank you, your Honor.

12           THE COURT:  -- and do a notice of hearing.

13           MS. LENNOX:  Okay.

14           THE COURT:  I am interested, although it's not

15   technically on the agenda today, regarding -- for an update

16   regarding the estimates of claims in Class 14 that we had

17   talked about earlier.

18           MS. LENNOX:  Yes.  I think Mr. Ellman will be able

19   to address that, your Honor.

20           MR. ELLMAN:  Good morning, your Honor.  Jeffrey

21   Ellman on behalf of the city from Jones Day.  Your Honor, we

22   are making progress on that front.  I think the biggest issue

23   right now is, as your Honor may recall, there are a number of

24   litigation claims in this case that have gone through an ADR

25   process in a few cases or a settlement process in a number of

1  cases or litigation in other courts, not this court.  Those

2  matters have been handled by the city law department, and so

3  we're really just trying now to consolidate, you know, the

4  database effectively they've been keeping with what the

5  claims agent has been keeping so we can make sure we have all

6  the information in one place, and I would guess we should be

7  able to determine an estimate for claims in the coming couple

8  of weeks.  I don't see it as a big impediment to getting

9  distributions out, you know.  Our bigger challenge may be

10  just some of the large claims that we're going to have to

11  reserve for at the outset, which is the nature of having the

12  claims process where it is, but --

13          THE COURT:  Okay.

14          MR. ELLMAN:  -- that's where we are, your Honor.

15          THE COURT:  All right.  Well, let me ask you for a

16  further update at that hearing on December 15th.

17          MR. ELLMAN:  We will do that.  Thank you.

18          THE COURT:  Is there anything else that anyone would

19  like to bring up in the context of a just generalized status

20  conference?

21          MR. KING:  Good morning, your Honor.  Ron King,

22  Clark Hill, on behalf of the Retirement Systems.  Just a

23  little update on Mr. Howell's discussion.  The General

24  Retirement System actually is planning to do a couple of town

25  hall meetings in the second week of December, and I think our

1  big challenge right now in the income stabilization program

2  is maximizing participation.

3          THE COURT:  Right.

4          MR. KING:  So we're trying -- we're working very

5  closely with the state and with the city folks in trying to

6  get this implemented.  Otherwise we are, in fact, on target

7  to implement that program, the ASF recoupment, and the

8  initial benefit cuts as of March 1.  That's the plan.

9          THE COURT:  Thank you, sir.  All right.  Let's turn

10  our attention to this motion to file a late claim filed by

11  Creditor Thomasena Barge.

12          MS. BARGE:  Good morning, your Honor, and thank you

13  for hearing -- including me in this hearing.

14          THE COURT:  Could you pull that microphone down and

15  talk right into it for me?

16          MS. BARGE:  Yes.

17          THE COURT:  And what is your name, please?

18          MS. BARGE:  Thomasena Barge, your Honor.

19          THE COURT:  Go ahead.

20          MS. BARGE:  Yes.  I'm a former City of Detroit

21  employee.  I left the city in May of 1988.  I was 45 years

22  old at the time.  Little did I know that I was eligible for

23  anything until just about a year ago, and I had a lump sum

24  coming from 2002 when I turned 60 years old.  I did receive a

25  lump sum payment the end of February, which was for March

1    1st.  I didn't realize I was a creditor until I received a

2    ballot to vote, and the creditor amount said $18,823, which

3    made me a creditor.  My only concern, your Honor, is that out

4    of my lump sum payment that I had coming that any monies that

5    was taken from me that shouldn't have been taken is restored.

6    I had no voice, and that's why I'm here.  And I'd leave it up

7    to you to examine my exhibits and make a decision, and I

8    thank you.

9         THE COURT:  Okay.

10        MR. ELLMAN:  Jeffrey Ellman again, your Honor, on

11   behalf of the city.  We didn't oppose the motion that was

12   filed.  We did file a statement with the court, I think, on

13   Friday.  Ms. Barge does have a pension claim in this case.

14   She does not have to have a proof of claim to have a claim,

15   so the filing of a claim at this point would be unnecessary.

16   We've been trying without a great deal of success to reach

17   Ms. Barge, so I think maybe the best thing we could do at

18   this point is make sure we have a good contact number for her

19   and make sure we can try to walk through what it is that she

20   is going to be entitled to.  She might benefit from --

21   potentially from some of the information about income

22   stabilization.

23        THE COURT:  Right.

24        MR. ELLMAN:  We've been trying to provide that

25   information to her.  I was able to speak with her briefly

1    before the hearing.  We didn't finish our conversation, but

2    she did indicate that she had not -- you know, there's some

3    issue with her phone.  There's some better number we probably

4    could get to reach her.  That would be helpful to both of us,

5    I think, but I don't think there's an issue for the Court

6    personally to address.  I think really this is an issue of

7    information for Ms. Barge that we'd be happy to try to

8    provide to her.

9                THE COURT:  All right.  Thank you.  Ms. Barge, may I

10   have your attention again, please?  I'm going to ask you to

11   spend a little time either on the phone or in person with Mr.

12   Ellman here, and he can explain to you what your rights and

13   obligations are under the plan.  And then what I'm going to

14   do is reschedule this hearing for December 15th, so if you're

15   not satisfied with the information you have or if you're

16   still concerned about it, we can have a further conversation

17   about it then.  Is that okay with you?

18               MS. BARGE:  I appreciate it so much, your Honor.

19               THE COURT:  Well, you're welcome.

20               MS. BARGE:  Thank you.

21               THE COURT:  All right.  All right.  So we'll adjourn

22   this matter until December 15th, and we'll let everyone know

23   what time that will be and what courtroom.  Okay.  So let's

24   turn our attention then to the GRS-PFRS issue.

25               MR. GORDON:  Good morning, your Honor.  Good

1   morning, your Honor.  Robert Gordon of Clark Hill on behalf

2   of the Retirement Systems.

3           THE COURT:  I will tell you that I did read your --

4   I guess it was a corrected exhibit that was filed just a bit

5   ago this morning.

6           MR. GORDON:  Yes, your Honor.  Okay.

7           THE COURT:  I did read that.

8           MR. GORDON:  Okay.  Great.  And we apologize.  We

9   wanted to submit a signed copy on Friday, and we --

10          THE COURT:  It's okay.

11          MR. GORDON:  -- couldn't get there.  Your Honor,

12  pursuant to the Court's order and invitation on November

13  13th, we did file a brief in support of our limited objection

14  to the confirmation order addressing these issues regarding

15  whether the fees -- professional fees incurred by

16  professionals for the Retirement Systems should be subject to

17  review under Section 943(b)(3) of the Bankruptcy Code.  In

18  short, your Honor, we identify what I would submit are a

19  number of different bases, all of which we would submit are

20  compelling reasons why there simply isn't jurisdiction to

21  review our fees.  First of all, we submit that under Section

22  943(b)(3) itself, the Court has jurisdiction to review fees

23  that the city would be paying as an administrative expense

24  and that would be due and payable on the effective date under

25  943(b)(5) as well as fees incident to transactions necessary

1   to effectuate the plan.  Our fees are not identified in the

2   plan as administrative expenses, and they are not being paid

3   incident to any transactions to effectuate the plan.  The

4   plan will go effective, as Ms. Lennox just indicated,

5   sometime between December 8th and December 10th without any

6   payment of the Retirement Systems' professional fees

7   whatsoever.  The fees are also not reviewable by operation

8   merely of the pension settlement under the plan either.  The

9   city -- in its negotiations with us, the city created a model

10  for -- which included projections of all sorts of things out

11  to 2023 and beyond in order to -- and ultimately what we --

12  the settlement that was negotiated between the Retirement

13  Systems and the city and others envisioned that based upon

14  those -- the model that the city was relying upon in its

15  projections that as of July 1, 2023, based upon modifications

16  to the benefits that would be paid and amounts of money that

17  the city was willing to contribute based upon its cash flows

18  and its needs, that the Retirement Systems would be at a

19  funding level of 70 percent for the General Retirement System

20  and 75 percent for the Police and Fire Retirement System.

21  Those projections included assumptions on a macro level, if

22  you will, regarding administrative expenses but also

23  actuarial experience, including mortality rates and things of

24  that nature.  There was never any -- and the plan clearly

25  says and the settlement clearly says that if the funding

1   level in 2023 is below what is projected that the city is on

2   the hook, is responsible for picking up that underfunding,

3   period. And the reason why the city is -- why it's provided

4   that way is in our negotiations the city obviously got

5   comfortable with its projections if they were reasonable and

6   reasonably conservative that they would likely be at 70

7   percent and 75 percent, respectively, funding levels as of

8   July 1, 2023. There is no mechanism in the settlement for

9   the city to then review any particular administrative

10  expenses that it had projected in its model with the

11  Retirement Systems, including the professional fees. There's

12  no mechanism in there, so the attempt now to ingraft a

13  mechanism is contrary to the settlement itself, your Honor.

14          Now, the city, through the mayor's office, filed

15  papers on Friday in which they argued that the language of

16  943(b)(3) permits the Court to basically look at fees being

17  paid by any party, but it cites no authority for that

18  proposition whatsoever, and we have cited ample authority in

19  which courts have viewed the scope of 943(b)(3) to be limited

20  to looking at administrative expenses that the city is going

21  to pay as well as fees incident to transactions to effectuate

22  the plan. We also cited the legislative history that

23  contradicts strongly the city's position in that regard.

24          The city also, through its other counsel, filed

25  papers on Friday evening as well in which they suggest that

1    professional fees are, indeed, being paid by the city in

2    terms of contributions during the next nine years, and that

3    is simply false, your Honor.  There is no indication in the

4    plan that the city is paying any line item administrative

5    expenses during the next nine years.  As I just indicated,

6    the city has certain projections of administrative expenses

7    and other items, including, again, actuarial experience and

8    so forth, that help underpin the ultimate settlement here,

9    but the amount of dollars that are actually coming to the

10   Retirement Systems, and particularly the GRS, from the city

11   because the city is not making any contributions to the

12   police and fire during these nine years are lump sums.  They

13   are not allocated to any particular item.  They are amounts

14   coming to the Systems to help fund the Systems so that the

15   Systems will presumably be at the projected funding levels in

16   2023, period.  There is no line item allocation whatsoever.

17        The reasoning of the city that the expenses being

18   paid for professional fees ought to be subject to review by

19   this Court would lead to the conclusion that this Court ought

20   to review all third-party contracts of the Retirement Systems

21   between now and July 1 of 2023 because any of those could, in

22   theory, affect the funding levels of the Retirement Systems.

23   We would submit that that concept is absurd, and it

24   highlights the flaw in the reasoning, and it's antithetical

25   to the Retirement Systems' independence under state law, but

1    it is also, we would submit, estopped.  As we pointed out in

2    our papers, the city entered into a stipulation with Bank of

3    New York Mellon in which Bank of New York -- it was

4    stipulated that Bank of New York Mellon's rights under its

5    third-party contracts with the Retirement Systems would not

6    be affected in any way by the plan.  Bank of New York Mellon

7    was concerned because it has a custodial bank relationship

8    with the Retirement Systems that is completely separate and

9    independent from the city.  The city is not a signatory to

10   that agreement whatsoever.  Bank of New York Mellon wanted to

11   know and have the comfort that the city and its plan was not

12   going to affect any of its rights -- the bank's rights

13   against the Retirement Systems under those contracts.  We

14   would submit that the contracts of the professionals with the

15   Retirement Systems are no different.  The city does not have

16   any rights under those contracts whatsoever, and that has

17   been also borne out by the declaration that we have filed

18   on -- the declaration of Cynthia Thomas.

19          So, your Honor, a position has been taken by the

20   city that third-party contracts of the Retirement Systems are

21   not subject to the purview of the city, and the Court has

22   entered that -- so ordered that stipulation, so we would

23   submit that estoppel, constitutive estoppel and judicial

24   estoppel, would prevent taking a position contrary to that,

25   and the position that's being submitted to the Court today by

1    the city is directly contrary and inconsistent with the

2    stipulation that was entered into previously with Bank of New

3    York Mellon.

4         Your Honor, the Retirement Systems -- and this is

5    also borne out by the declaration.  We're prepared to put

6    testimony on today about that, if necessary.  The Retirement

7    Systems have taken all appropriate measures already as

8    fiduciaries of the Systems with respect to the professional

9    fees that they have incurred in this bankruptcy case.  They

10   actively negotiated with each of the professionals as they

11   entered into engagement contracts with each of those

12   professionals.  All of the bills submitted by those

13   professionals have been reviewed by independent counsel.

14   Recommendations were made to the boards.  The boards reviewed

15   the fees and the recommendations and determined to approve

16   them.

17        THE COURT:  Who was that?

18        MR. GORDON:  The independent counsel for the police

19   and fire Retirement System was Robert Klausner, an attorney

20   from Florida who has done work for the Systems previously.

21   And for the General Retirement System, the bills were

22   reviewed by Mr. Van Overbeke as general counsel for the

23   General Retirement System.  He didn't -- I don't know -- I'm

24   speaking specifically about the bills of other than himself

25   were reviewed by him in an independent capacity.

1       Your Honor, I just would indicate that while we
2   think that the legal arguments we've put before the Court
3   would obviate the need for an evidentiary hearing, based upon
4   our understanding that this could be an evidentiary hearing
5   today, I just wanted to indicate to the Court that we do have
6   Mr. Brad Robins from Greenhill here in the room from New York
7   as well as Ms. Cynthia Thomas, the executive director of the
8   Retirement Systems, pursuant to her declaration that was
9   filed, and we certainly would also reserve the right to
10  provide a rebuttal witness as well.  If the Court has any
11  questions --
12       THE COURT:  Well, here's the fundamental question
13  that I need you to address.  In my oral opinion, I came to
14  the conclusion that the Court's obligation to review fees for
15  reasonableness under Section 943(b)(3) is connected directly
16  to the Court's obligation to determine that the plan is fair
17  and equitable to all of the creditors in the case, and this
18  is what the Supreme Court held in the Asbury Park case that I
19  cited, so --
20       MR. GORDON:  You mean the Avon Park case?
21       THE COURT:  Avon Park.
22       MR. GORDON:  Yes.
23       THE COURT:  Yes.  Thank you.
24       MR. GORDON:  Um-hmm.
25       THE COURT:  So the question is how can I hold out to

1  all of the creditors in this case that this plan is fair and

2  reasonable -- fair and equitable without reviewing the fees

3  of the pension system?  And just by way of example, and not

4  to suggest the reality of this hypothetical, strictly a

5  hypothetical, suppose there was yet another professional

6  because I don't want to name anyone here who had a success

7  fee of -- I don't know -- pick a number -- $10 million, $20

8  million -- okay -- that the pension plans were obligated to

9  pay when the plan becomes effective.  If that were the

10  case -- and, again, not to say it is -- as far as I know,

11  there is no such phantom professional out there -- but if it

12  were, how could I hold that the plan is fair and equitable to

13  all of the creditors in the case?  And if the answer to that

14  is I couldn't, then why aren't all the fees subject to

15  review?

16          MR. GORDON:  First of all, to make sure the record

17  is clear, there are no such fee structures in this case.  I

18  would submit --

19          THE COURT:  Well, there is one.

20          MR. GORDON:  There is a -- there is a transaction

21  fee that is going to be due to Greenhill, but it's not on

22  that order of magnitude whatsoever.

23          THE COURT:  Well, some might consider $3 million a

24  lot of money.  Is it three or three and a half?

25          MR. GORDON:  3.55, to be exact.

1    THE COURT:  But the amount of money isn't the issue

2  for this question.

3    MR. GORDON:  A couple of things.  One -- and, again,

4  I don't know that you're referring to it for any particular

5  purpose here, but the Avon case I would submit is not apples

6  to oranges -- or apples to apples here.  You know, that case

7  involved very specific facts in which a fiscal agent for the

8  city stood to benefit in various economic ways from various

9  transactions under the plan, and none of those disclosed, and

10  the Court, I think, found there was a lack of good faith.

11  There was a failure to meet the standards under whatever the

12  precursor to 1125 was.  There was a whole disclosure problem

13  there that we don't have here because there is no economic

14  interest in transactions for which the city is going to be

15  paying at this point.  I would hearken back to what I just

16  said, which is the fees of the Retirement Systems are

17  administrative expenses of the Retirement Systems.  They are

18  a nondebtor third party.  And those fees and those

19  administrative expenses have already been baked into the

20  settlement with the city in this case.  I mean they've

21  reviewed everything and determined what they believe the

22  underfunding level will be in 2023, and I would submit that,

23  your Honor, you've already approved that settlement as being

24  part of feasibility and part of being fair and equitable

25  under Rule 9019 and under 943(b)(7).  It's already been

1    approved.

2              THE COURT:  All right.  Thank you.

3              MR. GORDON:  Thank you, your Honor.

4              MR. SHAPIRO:  Good morning, your Honor.  Mark

5    Shapiro appearing on behalf of Greenhill & Company, LLC, the

6    financial advisors to the Police and Fire and General

7    Retirement Systems.

8              THE COURT:  Speak right into the mike for me.

9              MR. SHAPIRO:  Oh, sorry.  Your Honor, I'd actually

10   like to start by answering the question that your Honor just

11   posed to Mr. Gordon and at least my answer to it, and I

12   think, as I understood that question, it was how can the

13   Court determine that the plan is fair and equitable to

14   creditors unless it reviews all of the fees of the

15   professionals that were involved in the case.

16             THE COURT:  Well, no, not all of the fees of the

17   professionals involved in the case.  That would be a

18   monumental undertaking, which I agree with Mr. Gordon Section

19   943(b)(3) doesn't require.  All of the fees for which the

20   city is ultimately responsible is the question.

21             MR. SHAPIRO:  Well, in my mind, the answer to that

22   question is that because unless those fees can impact on

23   feasibility of the plan, the issue simply isn't relevant to

24   the proceedings, and I think that the point that I'll make --

25             THE COURT:  Well, but how do I know that unless I

1  review them?

2      MR. SHAPIRO:  Well, I think it's because of the

3  circumstances of the plan, not only the position that Mr.

4  Gordon took with regard to the fact that there's already been

5  a settlement and determination that incorporated those

6  issues, but a couple of other points that I wanted to make to

7  the Court that --

8      THE COURT:  Go ahead.

9      MR. SHAPIRO:  -- were slightly different.  Your

10  Honor, this is the first matter that I've had an opportunity

11  to argue before this Court in this case, so I want to

12  apologize up front for any misunderstanding or lack of

13  understanding that I have about the issues before the Court

14  today.  I will tell the Court that I listened to the audio

15  transcript recording of the hearing on November 11th, which

16  is when the issue was apparently first addressed, and I've

17  reviewed all of the pleadings that were filed in connection

18  with this matter.  I'll also note to the Court again that I'm

19  not -- I'm going to try very hard not to cover any of the

20  issues that Mr. Gordon covered for purposes of brevity, but

21  there were a couple of issues that I think have particular

22  pertinence to my client that I did want to address, and I'll

23  try and be brief with that.

24      Your Honor, it's the position of Greenhill that

25  Section 943(b) does not apply to the fees to be paid by the

1    Retirement Systems to its professionals, including Greenhill,

2    for the following reasons.  First of all, I think it's

3    noteworthy that Section 943(b)(3) appears in connection with

4    the requirements of confirmation, not as an independent

5    mechanism for fee review.  This becomes even more clear when

6    you consider the legislative history and the addition of the

7    language, quote, "paid by any person," which did not appear

8    in this statute until amendments to the statute in 1976.  In

9    that regard, reading the words, quote, "any person," in

10   Section 943(b)(3) to include fees paid by the Retirement

11   Systems is inconsistent with the legislative intent of the

12   statute.  The statute was amended in 1976 from the words,

13   quote, "payments by the debtor," end quote, to, quote,

14   "payments by the debtor or by any person," end quote.  As

15   noted by Mr. Gordon, contrary to the reading suggested by the

16   city and the mayor in their filing with the Court, the House

17   report on the change expressly states, quote, "The inclusion

18   of the phrase 'by any person' is intended solely to prevent

19   the petitioner from circumventing the requirement of this

20   paragraph by making payments indirectly through some third

21   person for the benefit of the petitioner.  It is not intended

22   that the court examine all payments made to all attorneys and

23   agents that are in any way connected with the case."  That

24   might take far too much time for the expeditious --

25            THE COURT:  I just said that.

1    MR. SHAPIRO:  I'm sorry.

2    THE COURT:  I just said that.

3    MR. SHAPIRO:  Understood.  And I was going to make

4    the point that particularly after having listened to the

5    November 10 transcript, it seems that that's an even greater

6    issue given the issues that were discussed with the fee

7    examiner and the timeliness of that review process.

8         The words, quote, "in the case" or "incident to the

9    plan" as appear in the statute is a clear indication that

10   there must be a direct connection or nexus between the fees

11   and confirmation of the plan, in effect, that the fees must

12   be a direct payment --

13   THE COURT:  Well, why don't we have that here with

14   your client?

15   MR. SHAPIRO:  Because there is no direct payment or

16   reimbursement that's being made to my client.

17   THE COURT:  Well, but the work was done in

18   connection with the plan.

19   MR. SHAPIRO:  Well, it clearly was, but, again, your

20   Honor, I think that the -- both the legislative history and

21   the case law on this indicates that this must be a direct

22   obligation of the debtor, that being the crucial distinction,

23   or at very least that there has to be some causation or nexus

24   in between those fees and the feasibility of the plan, and

25   that's what we've submitted to be saying here.

1          THE COURT:  Right.  That's what I need you to

2    address.

3          MR. SHAPIRO:  Your Honor, the payment of the fees

4    owed to the professionals incurred -- or employed by the

5    Police and Fire and General Retirement Systems does not fall

6    into either category for a number of reasons, either that

7    they are a current issue or that they would be a potential

8    future issue.  First, again, the fees are not a direct

9    obligation of the debtor nor a payment by a third party of

10   the debtor's obligations.  The city's obligation to the

11   pension funds is for underfunded liability, as indicated by

12   Mr. Gordon.  While the fees of the professional funds may be

13   a line item calculation in the annual audits of the pension

14   funds, as pointed out in the debtor's brief, the calculation

15   of underfunded liability is a complex actuarial calculation

16   which considers a multitude of facts, administrative expenses

17   of the pensions being only one of those many issues.  In

18   reality, the only potential impact of the fees incurred by

19   the pension funds would be if the funds became underfunded as

20   a direct result of the -- or consequence of the fees thereby

21   creating liability for the debtor that rendered the plan not

22   feasible.  This cannot be possible for at least a couple of

23   reasons.  First of all, all current fees owed by the

24   Retirement Systems to the professionals have been paid by the

25   funds during the course of the case.  As noted by the Court

1  at the November 10th hearing, the city has made no

2  contributions to the pension fund since before or at very

3  least since the filing date.  Additionally, whether the

4  police and fire and/or general retirement funds are under or

5  overfunded at the present time cannot affect confirmation or

6  feasibility because the pensions and the city have reached an

7  agreement with regard to the city's obligations, and that

8  agreement has been incorporated into the plan which has

9  been -- confirmation of which has been approved.

10  Furthermore, under the terms of the plan --

11          THE COURT:  Let me ask you to pause there.  Why

12  isn't it the case that every dollar that the pension plans

13  pay today for professional fees is one more dollar that the

14  city will have to pay in ten years or whenever back to the

15  pension plans?

16          MR. SHAPIRO:  Because it's so completely speculative

17  that it's impossible to make that connection between the two.

18          THE COURT:  What is speculative about it?  It seems

19  relatively certain to me.

20          MR. SHAPIRO:  Because, first of all -- and that was

21  my next point -- that we're not talking about any change in

22  the liability levels of the city for at least nine years from

23  now.  The obligations of the city are fixed until July of

24  2023, so whatever the issues that exist with regard to the

25  professional fees at this point does not change in any way,

1   shape, or form the city's obligations for the next nine
2   years.  At the end of that nine-year period, then it becomes
3   solely dependent upon whether or not the pension funds are
4   underfunded, in which case the city could have additional
5   liabilities, or that they're overfunded, in which case the
6   city, as I understand it, is entitled to the benefit of that
7   overfunding.

8           THE COURT:  Um-hmm.

9           MR. SHAPIRO:  Additionally and to go one step
10  further, even if there is underfunding at that point, not --
11  and, again, you would have to draw the causal connection to
12  the professional fees being the cause of that underfunding,
13  but even if there is any underfunding at that point, the City
14  has the ability to amortize that additional obligation
15  over -- I believe it's a 30-year period.

16          THE COURT:  But it's still the city's obligation.

17          MR. SHAPIRO:  It's still the city's obligation, but,
18  again, drawing that causal --

19          THE COURT:  The major contingency will be whether in
20  ten years or nine the plans are overfunded or underfunded,
21  and by that, of course, we mean the targets --

22          MR. SHAPIRO:  Correct.

23          THE COURT:  -- the 70 and the 75 percent.

24          MR. SHAPIRO:  Correct.  And the problem is trying to
25  draw the causal connection to that over or underfunding and

1  the professional fees is difficult, if not impossible.  In

2  point of fact, I'm told that the most likely cause of

3  underfunding at that point or any difference in the

4  projections would be the stock market fluctuations, not

5  because of professional fees or any other administrative

6  expenses incurred by the funds.

7       THE COURT:  Well, but it's not a question of

8  causation.  If the plans are underfunded by -- I don't

9  know -- we'll just pick a number -- $10 million -- okay --

10  if, in the meantime, the city has paid $3 million to your

11  client, they will be that $3 million plus what they could

12  have earned on it more underfunded than they would have been

13  if they hadn't paid that amount; isn't that true?

14       MR. SHAPIRO:  That's true, but the underlying

15  speculation is --

16       THE COURT:  But isn't that end of the -- isn't that

17  the end of the discussion?

18       MR. SHAPIRO:  Respectfully, I don't believe that

19  that is, your Honor, because, again, I think it has to come

20  back to what's the possibility or likelihood that there will

21  be any liability that makes the plan not feasible, and there

22  have been all sorts of representations during the

23  confirmation process that this plan is feasible based upon

24  negotiations and agreements that were reached prior to

25  confirmation.

1    THE COURT:  Well, but <u>Avon Park</u> doesn't link the

2  Court's obligation to review fees to feasibility.  It reviews

3  it to fair and equitable.

4    MR. SHAPIRO:  But the difference here is that

5  943(b)(3) appears in connection with the requirements for

6  confirmation, so it has to relate back to an issue of whether

7  or not this plan is feasible.

8    THE COURT:  Well, but that doesn't address the

9  Supreme Court's linking it to fair and equitable.  It may be

10  linked a whole lot of things, but the Supreme Court says this

11  obligation arises because of this fair and equitable

12  requirement.  And the fact that it's feasible doesn't mean

13  it's not fair and equitable --

14    MR. SHAPIRO:  Understood.

15    THE COURT:  -- or doesn't mean that it is fair and

16  equitable.

17    MR. SHAPIRO:  Understood.

18    THE COURT:  Let me repeat that.  Just because it's

19  feasible doesn't mean that it's automatically fair and

20  equitable.

21    MR. SHAPIRO:  I understood what you meant.

22    THE COURT:  Good.  At least one of us did.

23    MR. SHAPIRO:  But, your Honor, the problem is,

24  again, there is an underlying premise that went into the

25  confirmation of this plan, and that was that all of the

1    negotiations and agreements up to that point were acceptable

2    to all the parties.  And I would equate that --

3         THE COURT:  But let's pause there.  Let's pause

4    there even.  Doesn't the Court have an independent obligation

5    to review fair and equitable even if there are no objections

6    on that ground?

7         MR. SHAPIRO:  I would agree with that, but it would

8    be my position that that was already done in confirming the

9    plan, if not directly indirectly, based upon the

10   representations made to the Court.

11        THE COURT:  Oh, no.  I specifically withheld the

12   issue of the reasonableness of fees --

13        MR. SHAPIRO:  I understand, but --

14        THE COURT:  -- to get the case going because

15   otherwise we were going to be here for a period of time

16   trying to work out fees and holding up everyone's

17   distributions, et cetera.

18        MR. SHAPIRO:  I understand that, but it's my

19   position that inherent in the representations made to this

20   Court by all of the parties that led to confirmation there

21   was an understanding and a submission to this Court that all

22   of those issues were --

23        THE COURT:  And my question back to you is even

24   assuming that's true, as the Court, I'm not bound by that.  I

25   still have an independent obligation to determine all of the

1  elements of confirmation; right?

2      MR. SHAPIRO:  I understand that, and that's where I

3  think that our opinions differ is that I don't see this as an

4  issue as to confirmation.  It simply was not -- now I'm

5  jumbling my words.  Your Honor, this simply is not an issue

6  that's necessary to be considered for confirmation because it

7  essentially is an agreement between nondebtor parties as to

8  the amounts that would be paid, and I think it also, to a

9  certain extent, impacts on --

10      THE COURT:  I was a little puzzled by what I thought

11  I saw was your withdrawal of your concurrence in the pension

12  plan's papers.  What did you intend by that?

13      MR. SHAPIRO:  There was an original filing that

14  linked to the wrong concurrence.  It was actually a prior

15  concurrence, so the --

16      THE COURT:  All right.

17      MR. SHAPIRO:  -- correct concurrence was filed, and

18  the original one was withdrawn, nothing more substantive than

19  that.  Your Honor, the other issue that I wanted to deal with

20  is really because of what we believe is an application of

21  943(b)(3) to the obligations -- to obligations that the

22  debtor has no liability for subjecting the professional fees

23  of the Retirement Systems to review creates what I see as a

24  real dilemma, which is essentially that this Court is

25  affecting the contractual obligations of nondebtor parties.

1   In all candor, I don't pretend to know what the

2   jurisdictional issues are with regard to that, but I do think

3   that it bears consideration, particularly when you consider

4   the point that I made at the beginning of the argument that

5   the Code section we're discussing is a requirement for

6   confirmation, not an independent mechanism under the Code for

7   fee review.

8           Finally, and without it sounding terribly petty, I

9   want to emphasize the difficulty of subjecting the

10  professional fees of the Retirement Systems to court review

11  when those professionals were not made aware of this review

12  until after confirmation of the plan and negotiated their

13  engagements without consideration being given to the prospect

14  of court review of those engagements. My client, Greenhill &

15  Company, particularly, was engaged on a flat monthly fee

16  arrangement and not required to maintain or submit time

17  records. Asking them to try and document or quantify their

18  time now would be potentially impossible and at a minimum

19  very, very expensive. And had it been known from the start,

20  I'm told that the terms of the engagement, which were reduced

21  substantially from the original proposal, probably would have

22  been different because they would have had to --

23          THE COURT: Well, but I think the truth here is that

24  most, if not all, of the professionals who are in the

25  943(b)(3) net entered into their agreements with the city

1   lacking that same understanding.  I sprung the fee examiner

2   process on people here with -- well after they were retained

3   in the case.

4           MR. SHAPIRO:  Well, understood, and I guess the only

5   issue or distinction I would make then is that they've had

6   more of an opportunity to --

7           THE COURT:  That's true.

8           MR. SHAPIRO:  -- deal with that.

9           THE COURT:  Clearly.  That was at the beginning of

10  the case or near the beginning of the case, and we're not

11  there anymore obviously.

12          MR. SHAPIRO:  So in conclusion, your Honor, I'm

13  sorry for taking up the Court's time, and, again, I apologize

14  for any lack of understanding.

15          THE COURT:  Don't apologize.  No apologies needed.

16          MR. SHAPIRO:  But it's the position of my client

17  that Section 943(b)(3) to the professional fees of the Police

18  and Fire and General Retirement Systems seems to have no

19  application from both a substantive as well as a temporal

20  standpoint because the payment of the fees are so far removed

21  from any current or future impact on the feasibility of the

22  plan so, your Honor, from our perspective, we believe that we

23  should not be part of that process and should be allowed to

24  proceed in the manner that we have been.

25          THE COURT:  Thank you, sir.

1    MR. GORDON: Your Honor, I don't know if -- I just
2  want to make sure that the Court was aware that Ms. Fenning
3  is also -- Lisa Fenning is on -- I understand telephonically
4  for Arnold & Porter, who also co-signed to our objection.  I
5  didn't know if she had any comments she wanted to respond.

6    THE COURT: Let's find out.  Ms. Fenning, are you
7  there, and would you like to be heard on this matter?

8    MS. FENNING: Please, your Honor.  I am here.  I
9  think the main issue, as I see it, is that the claim of the
10  pension systems is a pre-petition claim.  The underfunding
11  amount is a pre-petition claim, and it's not an
12  administrative claim.  The underfunding treatment under the
13  plan was the subject of, I think it's fair to say, extensive
14  mediation analysis, calculation, estimation, and that process
15  folded in assumptions about extensive and other
16  administrative issues, and all of that was bargained for in
17  the grand bargain, the mediation process, and all of it dealt
18  with the pre-petition elements entirely.  There's no
19  administrative priority claim here, and our -- the fees of
20  the Systems are very much in the nature of the fees of
21  Syncora, the fees of FGIC, the fees of any other creditor who
22  is getting a claim -- pre-petition claim paid through the
23  case where that claim has been negotiated an amount.  The
24  claim of the Systems was compromised.  The Systems are not
25  getting paid in full.  The pension claims are not getting

1  paid in full.  And the issue about how all of that folded

2  together was all in the form of an overriding treatment of

3  the claims, so in looking at whether it's the -- the overall

4  plan is fair and equitable, the issue is whether the

5  settlement of the pension claims as a part of the plan under

6  the treatment provided, voted for by the various retirees and

7  employees and other creditors, whether that overall treatment

8  of the pension claims is fair and equitable.  The fees are

9  not subject to separate review.  They are a minor component

10 of the overall issue here just as all of the other

11 administrative expenses of the Retirement Systems for the

12 next 40 years, but the key here is that this has already been

13 compromised and negotiated and imbedded in the treatment of

14 the pension plans and the projections that are the basis for

15 the plan itself.  To go back and pick out one of the

16 administrative expenses incurred by the Systems that could

17 have some impact on how many dollars it has in the bank makes

18 no more sense than looking at the salary paid to the

19 executive director, the lunch expenses for the meetings that

20 are held by the board, picking out any of the other

21 administrative expenses.  Those aren't subject to review by

22 this Court.  The fees should not be subject to review by this

23 Court because we are talking about a pre-petition claim that

24 has been compromised and negotiated and ought to be treated

25 as a package deal, which is how all the parties treated it up

1    until the 11th hour, you know, 59th minute, 59th second, and

2    that is why it passes muster under the fair and equitable

3    standard because it's the whole deal, the whole compromise of

4    the pension plans that your Honor is required to consider,

5    and the whole deal itself has -- is what was voted on.  Thank

6    you, your Honor.

7            THE COURT:  Thank you.

8            MS. LENNOX:  Your Honor, I'd like to note a couple

9    of things to start before I get into a little bit of the

10   facts and the law.  First, despite your Honor's noting this

11   twice on the record, the Retirement Systems' brief, again,

12   seeks to paint this as a city-raised issue rather than a

13   Court-raised issue.  As the Court raised it and invited

14   briefing, I think arguments such as waiver and estoppel

15   should be ignored, particularly because what we're talking

16   about here is a court review process, not a city review

17   process.  Your Honor will be the one evaluating these fees.

18   Secondly, the brief and the joinders -- the brief filed by

19   the pension systems and the joinders read as if the city or

20   the Court are seeking to disallow the professional fees in

21   their entirety, and they're very concerned that if you break

22   a contract, we're not going to get paid, and it all raises

23   the hyperbole of we won't get paid.  That is clearly not the

24   case.  Subjecting fees to a reasonableness review is a far

25   cry from seeking wholesale disallowance of them.

1          Third, the analogy that Mr. Gordon made to the

2     custodian stipulation where the city simply agreed that the

3     custodian possesses whatever rights it has in its contract

4     against the pension funds are preserved is inapt.  I would

5     like to make it clear that it doesn't seem that -- certainly

6     the city is not and I don't think this Court is trying to

7     break contracts or interfere with contracts.  The debtor's

8     professionals and the Retiree Committee professionals also

9     have contracts with the city, and they are subject to the fee

10     review process.  This is simply a Court review process, so

11     even -- again, even if one wants to make that argument, this

12     is not seeking to break the contract.  This is simply the

13     Court doing whatever review it needs to redo to -- it needs

14     to do to satisfy the standards for confirmation, so I think

15     contract breaking analogies are also inapt.

16          Fourth, it's been raised and suggested by the

17     parties here today that somehow the pension settlement had

18     everything to do when we settled these fees.  I will say that

19     these fees had nothing to do with the pension settlement.

20     The city certainly didn't even know what they were, so it

21     couldn't settle them.  The claim that was settled were the

22     claims of the pensioners.  The pensioners voted.  We

23     allocated a portion of the underfunding to them on the

24     ballot.  They were the ones.  The claims devolved to them,

25     and they voted, so the pension systems' professional fees

1   were never part of the discussion at all and we don't believe

2   were part of the settlement.

3           Now, I will be the first to admit that the issue the

4   Court raised presents a really interesting legal and factual

5   question, one that, as far as I can tell, hasn't been

6   squarely addressed in the Chapter 9 jurisprudence at all

7   because of the unique relationship between the city and its

8   pension plans, so I think when you get to that point you're

9   left to look to the words of the statute and the facts of the

10  city's relationship with its pension funds, so starting with

11  the words of the statute -- they're actually pretty simple --

12  Section 943(b)(3) provides that the Bankruptcy Court shall

13  confirm a Chapter 9 plan of adjustment if, quote, "all

14  amounts to be paid by the debtor or by any person for

15  services or expenses in the case or incident to the plan have

16  been fully disclosed and are reasonable."  That's pretty

17  straightforward.  So that's the law.  What are the facts?  As

18  I said last week, the city does not receive invoices from the

19  Retirement Systems' professionals and does not directly cut a

20  check.  That is true.  But the relationship between the city

21  and the pension funds is a lot more complicated than that.

22  Under the law, under the city's ordinances, and under the

23  plan of adjustment, this city is the sole sponsor of each

24  pension plan.  That means that the city and only the city is

25  wholly responsible for funding these plans.  Frankly, your

1  Honor, this is not unlike the city's responsibility to fund
2  the 36th District Court.
3       The assets of each of the pension plans comes from
4  two sources.  It comes from the city's contributions or it
5  comes from investment gains on those assets.  Of course, for
6  some years there are not gains.  There are losses.  The
7  Systems themselves make no -- contribute no assets.  All the
8  Systems do is manage the city's contributions.  The
9  Retirement Systems pay the professionals and other
10 administrative costs from earnings if there are any or from
11 underlying plan assets principal if there are no earnings.
12 Of course, earnings, once they're made, constitute pension
13 assets, too, and they are earnings on the city's
14 contributions because, of course, the Systems do not
15 contribute any assets.  Thus, your Honor, every payment for
16 administering the pension plans derives from the city's
17 contributions or earnings on the city's contributions.
18 Indeed, as we noted in our papers, the city's contributions
19 normally do and will continue to include amounts for costs
20 for administration of these plans, and these costs now
21 expressly include the Systems' Chapter 9-related professional
22 fees, an extra two percent for the last fiscal year for GRS
23 and a half a point for PFRS.  So at the end of the day, no
24 matter how you look at it, the city actually -- the city is
25 the one that funds these administrative costs.  It does so

1  directly when it makes contributions or it does so indirectly

2  from plan assets, its past contributions, or earnings on its

3  past contributions.  Of course, any plan assets, as your

4  Honor pointed out, or earnings that are used for

5  administrative costs are dollars not used to pay pensions, so

6  that would result in higher city contributions in the future

7  to make it up, so eventually and ultimately the city is the

8  sole bearer of these costs.

9       I think the way that the Retirement Systems look at

10 the facts and the statute are too simplistic and narrow.  It

11 matters not that the city doesn't pay invoices directly.  The

12 fact of the matter is is that the city ultimately must fully

13 fund these pension plans and make up for the asset depletions

14 caused by those assets being used to pay the plan's

15 administrative costs.  So let's hearken back to Section

16 943(b)(3) and its words.  First, are these fees that the

17 debtor, the city, will pay?  That's the first part of the

18 test.  Note that the statute doesn't say pay on the effective

19 date of the plan.  It doesn't say pay in as administrative

20 expense under the plan.  It just says pay.  And I think the

21 facts that I just went through says that the answer to that

22 question is yes.

23      Secondly, the second part of that test is are these

24 fees for services or expenses in the case.  Again,

25 indisputably yes.  These are bills that the Systems incurred

1   during this Chapter 9 case, so, no, I don't think we have to
2   review bills through 2023.  What we're looking at the Court
3   doing is reviewing bills for the past 16 months.  So it's not
4   improper to have these fees subject to the Court's process
5   and the Court's review for reasonableness.  It's not an
6   interference with their contracts.  It is not a claim
7   objection.  It has nothing to do with the grand bargain.  It
8   is simply part of the Court's review process.  And I would
9   point out and remind folks that the Court did review the fees
10  of the DWSD creditors that were supposed to be paid by DWSD,
11  and the Court did that as part of its approval of the
12  settlement that was related and the tender motion and the
13  tender order, so creditor fees, even if you want to look at
14  these as creditor fees, they are not immune from the reaches
15  of Section 943(b)(3) of the Code.

16          THE COURT:  Mr. Shapiro asks an interesting
17  question, which is why wasn't this issue of reviewing pension
18  plan professional fees raised in the context of the fee
19  examiner orders or the fee review orders initially in the
20  case?

21          MS. LENNOX:  You know, your Honor, I think because
22  until your Honor raised it and people started thinking about
23  it, I think everybody took a too simplistic view of it.  And
24  also at the beginning of the case, again, people hadn't yet
25  started to dive into the interrelationships.  Remember, this

1  was very early in the case.  People had not really started to

2  dive into the interrelationships between what the city cuts a

3  check for and what the city actually funds and how it's

4  funded.  We had come later in the case to get into a little

5  bit of thorny issues with the 36th District Court on these

6  very kind of interrelationships.  We got into a little bit

7  toward the end of the case of an issue with the

8  interrelationships between how the city and the Detroit

9  Public Library interact, particularly with respect to

10 benefits.  And so at the very beginning of the case, I don't

11 think people really had focused on just because we're not

12 cutting a check, does that mean we're not really paying for

13 it, and so certainly kudos to your Honor for raising the

14 issue because it's there, but that's the answer.

15         THE COURT:  Thank you.  Anyone else wish to be heard

16 on the same side as the city here?  No?  Rebuttal.

17         MR. GORDON:  Thank you, your Honor.  I'll be brief.

18 Counsel for the city stated that the settlement only included

19 consideration of benefits being paid and a settlement of

20 those benefits and the treatment of those claims, and that's

21 just not correct.  As I already indicated, if you look, the

22 city projected administrative expenses for the next nine

23 years for the Retirement Systems in coming to a conclusion

24 about what funding was necessary and what the funding levels

25 would look like in 2023, so the city definitely did consider

1  the administrative expenses over the next nine years.

2  Whether or not they specifically looked at the professional

3  fees of the Retirement System or not I don't know, but that

4  was part of the settlement that was entered into and approved

5  by this Court, and the city was comfortable that its

6  projections, which include administrative expenses, were

7  reasonable and reasonably conservative such that the funding

8  levels in 2023 would be where they're supposed to be.  So the

9  argument being made now is really an attempt to open up the

10 settlement again and say maybe we aren't comfortable with our

11 own projections.  It's not fair.

12        THE COURT:  But let me ask this question in that

13 regard.  Was there a disclosure in that context of the

14 pension plan's professional fees in this case?

15        MR. GORDON:  I don't recall the question being

16 asked.  I don't recall how they went about --

17        THE COURT:  So the answer is no?

18        MR. GORDON:  I don't recall, your Honor.  That's all

19 I can tell you is I don't -- I personally was not --

20        THE COURT:  Okay.

21        MR. GORDON:  -- a party to any such conversation.  I

22 don't know how they --

23        THE COURT:  Okay.

24        MR. GORDON:  -- modeled their expenses.  Secondly, I

25 don't -- in all honestly, I don't understand the treatment of

1   our argument under the Bank of New York Mellon case and the

2   impairment of contracts here.  I'm hearing Ms. Lennox say

3   this is a fee review process.  It's not to impair contracts.

4   But my understanding is that what's envisioned by this

5   process would be at the end of the day, if there was some

6   determination that some amount of fees needed to be reduced,

7   that the given professional would not be able to then go into

8   state court under its contract solely with the Retirement

9   Systems and say, "I've got a contract with you.  I don't care

10  what the Court said."  There is going to be an impairment,

11  and that is a third-party injunction essentially against a

12  noncreditor of the bankruptcy case.  The professionals aren't

13  creditors of the bankruptcy case.  They are creditors of the

14  Retirement Systems, a nondebtor entity, and they are going to

15  be enjoined.  And that's why BNY Mellon got the order it got,

16  and it should apply to us as well.  The DWSD example is inapt

17  because the trustee for the water bonds is seeking

18  reimbursement of a portion of its fees as part of the

19  settlement, and, therefore, the Court has a right to review

20  those.  We aren't seeking reimbursement because there isn't

21  any right to reimbursement as that term is commonly

22  understood, so they're not comparable at all, your Honor.

23  Thank you.

24          THE COURT:  Any further rebuttal?  Mr. Shapiro.

25          MR. SHAPIRO:  Nothing, your Honor.

1    THE COURT:  Ms. Fenning, is there anything further

2  you'd like to add here?

3    MS. FENNING:  No, your Honor.

4    THE COURT:  All right.  The Court will take the

5  matter under advisement and issue an opinion.  Anything else

6  for today?

7    MS. LENNOX:  No, your Honor.

8    THE COURT:  All right.  We'll be in recess.  Thank

9  you.

10    THE CLERK:  All rise.  Court is adjourned.

11    (Proceedings concluded at 11:08 a.m.)

INDEX


<u>WITNESSES:</u>

     None

<u>EXHIBITS:</u>

     None


        I certify that the foregoing is a correct transcript
from the sound recording of the proceedings in the above-
entitled matter.


/s/ Lois Garrett                    December 1, 2014
_____         _____
Lois Garrett