**THE BANKRUPTCY COURT HAS NOT APPROVED THE PROPOSED DISCLOSURE STATEMENT TO ACCOMPANY THIS PLAN. THE DISTRIBUTION OF THIS PLAN AND THE DISCLOSURE STATEMENT IS NOT INTENDED TO BE, AND SHOULD NOT BE CONSTRUED AS, A SOLICITATION OF VOTES ON THIS PLAN. THE CITY OF DETROIT, MICHIGAN RESERVES THE RIGHT TO MODIFY, AMEND, SUPPLEMENT, RESTATE OR WITHDRAW THIS PLAN, THE DISCLOSURE STATEMENT AND ALL ANCILLARY DOCUMENTS AT ANY TIME.**

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

```
------------------------------------------------------------ x
                                                             :
In re                                                        :        Chapter 9
                                                             :
CITY OF DETROIT, MICHIGAN,                                   :        Case No. 13-53846
                                                             :
              Debtor.                                        :        Hon. Steven W. Rhodes
                                                             :
                                                             :
------------------------------------------------------------ x
```

## PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT
### (February 21, 2014)

DAVID G. HEIMAN
HEATHER LENNOX
THOMAS A. WILSON
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

BRUCE BENNETT
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 489-3939
Facsimile: (213) 243-2539
bbennett@jonesday.com

JONATHAN S. GREEN
STEPHEN S. LAPLANTE
MILLER, CANFIELD,
   PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE DEBTOR

1353846140221000000000003

# TABLE OF CONTENTS

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME .................. 1

    A.      Defined Terms. ........................................................................................................ 1

    B.      Rules of Interpretation and Computation of Time. ................................................ 21

          1.      Rules of Interpretation. .............................................................................. 21

          2.      Computation of Time. ................................................................................ 21

ARTICLE II CLASSIFICATION OF CLAIMS; CRAMDOWN; EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........................................................................................................ 21

    A.      Unclassified Claims. .............................................................................................. 21

          1.      Payment of Administrative Claims. ........................................................... 21

          2.      Bar Dates for Administrative Claims. ........................................................ 22

    B.      Classified Claims. ................................................................................................. 22

          1.      Designation of Classes. .............................................................................. 22

          2.      Subordination; Reservation of Rights to Reclassify Claims. ...................... 23

          3.      Treatment of Claims. ................................................................................. 24

    C.      Confirmation Without Acceptance by All Impaired Classes .................................. 34

    D.      Treatment of Executory Contracts and Unexpired Leases ..................................... 34

          1.      Assumption. ............................................................................................... 34

          2.      Assumption of Ancillary Agreements. ....................................................... 34

          3.      Approval of Assumptions and Assignments. .............................................. 34

          4.      Payments Related to the Assumption of Executory Contracts and Unexpired Leases .......................................................................................... 35

          5.      Contracts and Leases Entered Into After the Petition Date. ......................... 35

          6.      Rejection of Executory Contracts and Unexpired Leases. ........................... 35

          7.      Rejection Damages Bar Date. .................................................................... 35

          8.      Preexisting Obligations to the City Under Rejected Executory Contracts and Unexpired Leases. .................................................................................... 36

          9.      Insurance Policies. ..................................................................................... 36

ARTICLE III CONFIRMATION OF THE PLAN ................................................................................ 36

    A.      Conditions Precedent to the Effective Date. .......................................................... 36

    B.      Waiver of Conditions to the Effective Date. .......................................................... 37

    C.      Effect of Nonoccurrence of Conditions to the Effective Date. ............................... 37

    D.      Effect of Confirmation of the Plan. ....................................................................... 37

          1.      Dissolution of Official Committees. ........................................................... 37

           2.      Preservation of Rights of Action by the City. ............................................ 37

           3.      Comprehensive Settlement of Claims and Controversies. ........................... 38

           4.      Discharge of Claims. .................................................................................. 38

| | 5. | Injunction. | 38 |
| | 6. | Exculpation. | 39 |
| | 7. | Releases | 39 |
| E. | | Effectiveness of the Plan. | 40 |
| F. | | Binding Effect of Plan | 40 |
| ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN | | | 40 |
| A. | | Alternatives Related to the DWSD. | 40 |
| | 1. | DWSD Remains a Department of the City. | 40 |
| | 2. | Potential DWSD Transaction. | 40 |
| B. | | The New Securities. | 41 |
| C. | | The Plan COP Settlement. | 41 |
| D. | | The Plan GRS Settlement. | 41 |
| E. | | The Plan PFRS Settlement. | 41 |
| F. | | The DIA Settlement. | 41 |
| | 1. | Funding Contributions. | 42 |
| | 2. | Transfer of DIA Assets. | 42 |
| | 3. | Conditions to the Foundations' Participation. | 42 |
| G. | | Issuance of the New Securities. | 42 |
| H. | | Cancellation of Existing Bonds and Bond Documents. | 42 |
| I. | | Release of Liens. | 43 |
| J. | | Professional Fee Reserve | 43 |
| K. | | Assumption Of Indemnification Obligations. | 43 |
| L. | | Incorporation of Retiree Health Care Settlement Agreement. | 43 |
| M. | | Exit Facility. | 43 |
| ARTICLE V PROVISIONS REGARDING DISTRIBUTIONS UNDER THE PLAN | | | 44 |
| A. | | Appointment of Disbursing Agent. | 44 |
| B. | | Distributions on Account of Allowed Claims. | 44 |
| C. | | Certain Claims to Be Expunged. | 44 |
| D. | | Record Date for Distributions; Exception for Bond Claims. | 44 |
| E. | | Means of Cash Payments. | 44 |
| F. | | Selection of Distribution Dates for Allowed Claims | 45 |
| G. | | Limitations on Amounts to Be Distributed to Holders of Allowed Claims Otherwise Insured. | 45 |
| H. | | City's Rights of Setoff Preserved. | 45 |
| I. | | Delivery of Distributions and Undeliverable or Unclaimed Distributions. | 45 |
| | 1. | Delivery of Distributions Generally. | 45 |
| | 2. | Delivery of Distributions on Account of Bond Claims. | 45 |

|   |   | 3. | De Minimis Distributions / No Fractional New Securities. | 46 |
|   |   | 4. | Undeliverable or Unclaimed Distributions. | 46 |
|   |   | 5. | Time Bar to Cash Payment Rights. | 46 |
|   | J. | Other Provisions Applicable to Distributions in All Classes | | 46 |
|   |   | 1. | No Postpetition Interest. | 46 |
|   |   | 2. | Compliance with Tax Requirements. | 46 |
|   |   | 3. | Allocation of Distributions. | 47 |
|   |   | 4. | Surrender of Instruments. | 47 |

ARTICLE VI PROCEDURES FOR RESOLVING DISPUTED CLAIMS ......................... 47

|   | A. | Treatment of Disputed Claims. | | 47 |
|   |   | 1. | General. | 47 |
|   |   | 2. | ADR Procedures. | 48 |
|   |   | 3. | Tort Claims. | 48 |
|   | B. | Disputed Claims Reserve. | | 48 |
|   | C. | Objections to Claims. | | 49 |
|   |   | 1. | Authority to Prosecute, Settle and Compromise. | 49 |
|   |   | 2. | Application of Bankruptcy Rules. | 49 |
|   |   | 3. | Expungement or Adjustment of Claims Without Objection. | 49 |
|   |   | 4. | Extension of Claims Objection Bar Date. | 49 |
|   |   | 5. | Authority to Amend List of Creditors. | 49 |

ARTICLE VII RETENTION OF JURISDICTION ................................................... 49

ARTICLE VIII MISCELLANEOUS PROVISIONS ................................................ 51

|   | A. | Modification of the Plan. | 51 |
|   | B. | Revocation of the Plan. | 51 |
|   | C. | Disclosure of Amounts to Be Paid for Chapter 9 Case Services. | 51 |
|   | D. | Severability of Plan Provisions. | 51 |
|   | E. | Effectuating Documents and Transactions. | 51 |
|   | F. | Successors and Assigns. | 52 |
|   | G. | Plan Controls. | 52 |
|   | H. | Notice of the Effective Date. | 52 |
|   | I. | Governing Law. | 52 |
|   | J. | Request for Waiver of Automatic Stay of Confirmation Order. | 52 |
|   | K. | Term of Existing Injunctions and Stays. | 52 |
|   | L. | Service of Documents | 52 |
|   |   | 1. | The City | 53 |
|   |   | 2. | The Retiree Committee | 53 |

# TABLE OF EXHIBITS

| Exhibit I.A.50 | Schedule of COP Swap Agreements |
|---|---|
| Exhibit I.A.62 | Form of Detroit VEBA Trust Agreement |
| Exhibit I.A.64 | Schedule of DIA Assets |
| Exhibit I.A.71 | Form of DIA Settlement Documents |
| Exhibit I.A.88 | Schedule of DWSD Class A Sewer Documents & Related DWSD Class A Sewer Bonds |
| Exhibit I.A.91 | Schedule of DWSD Class A Water Documents & Related DWSD Class A Water Bonds |
| Exhibit I.A.94 | Schedule of DWSD Class B Sewer Documents & Related DWSD Class B Sewer Bonds |
| Exhibit I.A.97 | Schedule of DWSD Class B Water Documents & Related DWSD Class B Water Bonds |
| Exhibit I.A.102 | Schedule of DWSD Revolving Sewer Bond Documents & Related DWSD Revolving Sewer Bonds |
| Exhibit I.A.105 | Schedule of DWSD Revolving Water Bond Documents & Related DWSD Revolving Water Bonds |
| Exhibit I.A.119 | Principal Terms of Exit Facility |
| Exhibit I.A.140 | Material Terms Related to GRS Hybrid Pension Formula |
| Exhibit I.A.146 | Schedule of HUD Installment Note Documents & Related HUD Installment Notes |
| Exhibit I.A.150 | Interest Rate Reset Chart |
| Exhibit I.A.154 | Schedule of Limited Tax General Obligation Bond Documents & Related Limited Tax General Obligation Bonds |
| Exhibit I.A.160 | Principal Terms of New B Notes |
| Exhibit I.A.161 | Form of New B Notes Documents |
| Exhibit I.A.162 | New B Notes Valuation |
| Exhibit I.A.163 | Principal Terms of New C Notes |
| Exhibit I.A.164 | Form of New C Notes Documents |
| Exhibit I.A.165 | Form of New DWSD Bond Documents |
| Exhibit I.A.166 | Principal Terms of New DWSD Bonds |
| Exhibit I.A.167 | Form of New DWSD Revolving Bond Documents |

| | |
|---|---|
| Exhibit I.A.168 | Principal Terms of New DWSD Revolving Bonds |
| Exhibit I.A.169 | Form of New Existing Rate DWSD Bond Documents |
| Exhibit I.A.170 | Principal Terms of New Existing Rate DWSD Bonds |
| Exhibit I.A.171 | Form of New Existing Rate GLWA Bond Documents |
| Exhibit I.A.172 | Principal Terms of New Existing Rate GLWA Bonds |
| Exhibit I.A.173 | Form of New GLWA Bond Documents |
| Exhibit I.A.174 | Principal Terms of New GLWA Bonds |
| Exhibit I.A.175 | Form of New GLWA Revolving Bond Documents |
| Exhibit I.A.176 | Principal Terms of New GLWA Revolving Bonds |
| Exhibit I.A.182.a | Principal Terms of OPEB Claims Note |
| Exhibit I.A.182.b | Form of OPEB Claims Note |
| Exhibit I.A.195 | Material Terms Related to PFRS Hybrid Pension Formula |
| Exhibit I.A.201 | Form of Plan COP Settlement Documents |
| Exhibit I.A.203 | Form of Plan GRS Settlement Documents |
| Exhibit I.A.205 | Form of Plan PFRS Settlement Documents |
| Exhibit I.A.206 | Principal Terms of Plan UTGO Notes |
| Exhibit I.A.207 | Form of Plan UTGO Note |
| Exhibit I.A.220 | Principal Terms of Retiree Health Care Settlement Agreement |
| Exhibit I.A.225 | Schedule of Secured GO Bond Documents |
| Exhibit I.A.258 | Schedule of Unlimited Tax General Obligation Bond Documents & Related Unlimited Tax General Obligation Bonds |
| Exhibit II.B.3.t.i | Schedule of Reductions to Allowed PFRS Claims and Related Allowed OPEB Claims |
| Exhibit II.B.3.t.ii.A | Schedule of Payments and Sources of Payments for Modified PFRS Pension Benefits |
| Exhibit II.B.3.u.i | Schedule of Reductions to Allowed GRS Claims and Related Allowed OPEB Claims |
| Exhibit II.B.3.u.ii.A | Schedule of Payments and Sources of Payments for Modified GRS Pension Benefits |
| Exhibit II.B.3.u.ii.D | Reduction Formula for Participants in Annuity Savings Fund Accounts |
| Exhibit II.D.5 | Schedule of Postpetition Collective Bargaining Agreements |
| Exhibit II.D.6 | Executory Contracts and Unexpired Leases to Be Rejected |

Exhibit III.D.2          Retained Causes of Action

**INTRODUCTION**

The City of Detroit proposes the following plan for the adjustment of its debts pursuant to and in accordance with chapter 9 of the Bankruptcy Code.

A discussion of the City's organizational structure, operations, capital structure and events leading to the commencement of the City's Chapter 9 Case, as well as a summary and description of the Plan and certain related matters, is included in the Disclosure Statement. Other agreements and documents, which have been or will be Filed with the Bankruptcy Court, are referenced in the Plan or the Disclosure Statement and are available for review.

The City encourages all of its creditors to read the Plan, the Disclosure Statement and the other material that has been approved for use in soliciting votes on the Plan before casting a vote to accept or reject the Plan and before choosing among available treatment options.

**ARTICLE I**
**DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME**

A. **Defined Terms.**

Capitalized terms used in the Plan have the meanings set forth in this Section I.A. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

1. "2005 COPs" means, collectively, the Detroit Retirement Systems Funding Trust 2005 Certificates of Participation Series 2005-A, issued by the Detroit Retirement Systems Funding Trust 2005 pursuant to the 2005 COPs Agreement, in an initial principal amount of $640 million, bearing interest at 4.0% to 4.948%.

2. "2005 COPs Agreement" means that certain Trust Agreement by and between the COP Service Corporations and U.S. Bank National Association, as trustee, dated June 2, 2005, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary instruments and agreements related thereto.

3. "2006 COPs" means, collectively, the (a) Detroit Retirement Systems Funding Trust 2006 Certificates of Participation Series 2006-A, issued by the Detroit Retirement Systems Funding Trust 2006 pursuant to the 2006 COPs Agreement, in an initial principal amount of $148.5 million, bearing interest at 5.989%; and (b) Detroit Retirement Systems Funding Trust 2006 Certificates of Participation Series 2006-B, issued by the Detroit Retirement Systems Funding Trust 2006 pursuant to the 2006 COPs Agreement, in an initial principal amount of $800 million, bearing interest at a floating rate.

4. "2006 COPs Agreement" means that certain Trust Agreement by and between the COP Service Corporations and U.S. Bank National Association, as trustee, dated June 12, 2006, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary instruments and agreements related thereto.

5. "36th District Court" means the district court for the thirty-sixth judicial district of the State.

6. "Active Employee" means an active employee of the City on and after the Confirmation Date.

7. "Adjusted Pension Amount" means the GRS Adjusted Pension Amount and/or the PFRS Adjusted Pension Amount, as applicable.

8. "Administrative Claim" means a Claim against the City arising on or after the Petition Date and prior to the Effective Date for a cost or expense of administration related to the Chapter 9 Case that is entitled to priority or superpriority under sections 364(c)(1), 503(b) or 507(b)(2) of the Bankruptcy Code; provided that any

-1-

13-53846-tjt Doc 2708 Filed 02/15/14 Entered 02/15/14 14:57:55 Page 8 of 120
13-53846-swr Doc 2708 Filed 02/15/14 Entered 02/15/14 14:57:25 Page 8 of 120

claim for professional fees or any other costs or expenses incurred by the Creditors' Committee shall not be considered an Administrative Claim.

9.     "ADR Injunction" means the injunction set forth at Section I.B of the ADR Procedures.

10.     "ADR Procedures" means the alternative dispute resolution procedures approved by the ADR Procedures Order, as such procedures may be modified by further order of the Bankruptcy Court.

11.     "ADR Procedures Order" means the Order, Pursuant to Sections 105 and 502 of the Bankruptcy Code, Approving Alternative Dispute Resolution Procedures to Promote the Liquidation of Certain Prepetition Claims (Docket No. 2302), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on December 24, 2013, as it may be subsequently amended, supplemented or otherwise modified.

12.     "Affiliate" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

13.     "Allowed Claim(s)" means: (a) a Claim, proof of which has been timely Filed by the applicable Bar Date (or for which Claim under express terms of the Plan, the Bankruptcy Code or a Final Order of the Bankruptcy Court, a proof of Claim is not required to be Filed); (b) a Claim (i) that is listed in the List of Creditors, (ii) that is not identified on the List of Creditors as contingent, unliquidated or disputed and (iii) for which no proof of Claim has been timely Filed; (c) a Claim allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; (d) a Claim designated as allowed in a stipulation or agreement between the City and the Holder of the Claim that is Filed; or (e) a Claim designated as allowed in a pleading entitled "Designation of Allowed Claims" (or a similar title of the same import) that is Filed; *provided*, that with respect to any Claim described in clauses (a) or (b) above, such Claim shall be considered allowed only if and to the extent that (x) no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or (y) if an objection is so interposed, the Claim shall have been allowed by a Final Order. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed to be an Allowed Claim unless and until such Entity pays in full the amount that it owes the City.  "Allow" and "Allowing" shall have correlative meanings.

14.     "Annuity Savings Fund Account" means that sub-account and pension benefit arrangement that that is part of the GRS and operated by the trustees of the GRS.

15.     "Ballot" means the ballot upon which a Holder of an Impaired Claim entitled to vote shall cast its vote to accept or reject the Plan and make certain elections provided for in the Plan.

16.     "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as now in effect or hereafter amended.

17.     "Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Michigan having jurisdiction over the Chapter 9 Case, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to § 151 of title 28 of the United States Code, the District Court.

18.     "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the general, local and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended, as applicable to the Chapter 9 Case.

19.     "Bar Date" means the applicable bar date by which a proof of Claim must be or must have been Filed, as established by a Final Order of the Bankruptcy Court, including a Bar Date Order and the Confirmation Order.

20.     "Bar Date Order" means any order of the Bankruptcy Court establishing Bar Dates for Filing proofs of Claim in the Chapter 9 Case, including the Order, Pursuant to Sections 105, 501 and 503 of the Bankruptcy Code and Bankruptcy Rules 2002 and 3003(c), Establishing Bar Dates for Filing Proofs of Claim and

Approving Form and Manner of Notice Thereof (Docket No. 1782), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on November 21, 2013, as it may be amended, supplemented or otherwise modified.

21.     "Bond Agent" means a trustee, paying agent or similar Entity, as applicable, under the Bond Documents.

22.     "Bond Claims" means, collectively, the DWSD Class A Sewer Claims, the DWSD Class A Water Claims, the DWSD Class B Sewer Claims, the DWSD Class B Water Claims, the DWSD Revolving Bond Claims, the General Obligation Bond Claims, the HUD Installment Note Claims, the Parking Bond Claims and the Secured GO Bond Claims.

23.     "Bond Documents" means, collectively, the DWSD Class A Sewer Documents, the DWSD Class A Water Documents, the DWSD Class B Sewer Documents, the DWSD Class B Water Documents, the DWSD Revolving Bond Documents, the General Obligation Bond Documents, the HUD Installment Note Documents, the Parking Bond Documents and the Secured GO Bond Documents.

24.     "Bond(s)" means, individually or collectively, the DWSD Class A Sewer Bonds, the DWSD Class A Water Bonds, the DWSD Class B Sewer Bonds, the DWSD Class B Water Bonds, the DWSD Revolving Sewer Bonds, the DWSD Revolving Water Bonds, the General Obligation Bonds, the HUD Installment Notes, the Parking Bonds and/or the Secured GO Bonds.

25.     "Bondholder" means any beneficial or record holder of a Bond.

26.     "Bond Insurance Policies" means those policies and/or other instruments insuring certain Bonds and obligations related thereto.

27.     "Bond Insurer" means any party, other than the City, that has issued a Bond Insurance Policy.

28.     "Business Day" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

29.     "Cash" means legal tender of the United States of America and equivalents thereof.

30.     "Causes of Action" means, without limitation, any and all actions, causes of action, controversies, liabilities, obligations, rights, suits, damages, judgments, claims and demands whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Effective Date, including without limitation (a) claims and causes of action under sections 502(d), 510, 544, 545, 547, 548, 549(a), 549(c), 549(d), 550, 551 and 553 of the Bankruptcy Code and (b) any other avoidance or similar claims or actions under the Bankruptcy Code or under similar or related state or federal statutes or common law, and, in the case of each Cause of Action, the proceeds thereof, whether received by judgment, settlement or otherwise.

31.     "CFSEM Supporting Organization" means the Foundation for Detroit's Future, a supporting organization of, and an Entity legally separate from, the Community Foundation for Southeast Michigan.

32.     "Chapter 9 Case" means the bankruptcy case commenced by the City under chapter 9 of the Bankruptcy Code, captioned as *In re City of Detroit, Michigan*, Case No. 13-53846 (Bankr. E.D. Mich.), and currently pending before the Bankruptcy Court.

33.     "City" means the City of Detroit, Michigan.

34.     "City Council" means the duly-elected City Council of the City.

35.     "Claim" means a claim, as defined in section 101(5) of the Bankruptcy Code, against the City.

36.     "Claims and Balloting Agent" means Kurtzman Carson Consultants, LLC, in its capacity as Bankruptcy Court-appointed claims and balloting agent for the Chapter 9 Case.

37.     "Claims Objection Bar Date" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) one year after the Effective Date, subject to extension by an order of the Bankruptcy Court, (b) 90 days after the Filing of a proof of Claim for such Claim and (c) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court.

38.     "Claims Register" means the official register of Claims maintained by the Claims and Balloting Agent.

39.     "Class" means a class of Claims, as described in Section II.B.

40.     "Confirmation" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 9 Case.

41.     "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket in the Chapter 9 Case, within the meaning of Bankruptcy Rules 5003 and 9021.

42.     "Confirmation Hearing" means the hearing held by the Bankruptcy Court on Confirmation of the Plan, as such hearing may be continued.

43.     "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 943 of the Bankruptcy Code, as it may be subsequently amended, supplemented or otherwise modified.

44.     "Convenience Claim" means a Claim that would otherwise be an Other Unsecured Claim that is (a) an Allowed Claim in an amount less than or equal to $25,000.00; or (b) in an amount that has been reduced to $25,000.00 pursuant to an election made by the Holder of such Claim; *provided* that, where any portion(s) of a single Claim has been transferred, (y) the amount of all such portions will be aggregated to determine whether a Claim qualifies as a Convenience Claim and for purposes of the Convenience Claim election and (z) unless all transferees make the Convenience Claim election on the applicable Ballots, the Convenience Claim election will not be recognized for such Claim.

45.     "COPs" means, collectively, the 2005 COPs and the 2006 COPs.

46.     "COP Claim" means a Claim under or evidenced by the COP Service Contracts.

47.     "COP Litigation" means the adversary proceeding captioned as *City of Detroit, Michigan v. Detroit General Retirement System Service Corporation, Detroit Police and Fire Retirement System Service Corporation, Detroit Retirement Systems Funding Trust 2005 and Detroit Retirement Systems Funding Trust 2006*, Case No. 14-04112 (Bankr. E.D. Mich.), filed in the Chapter 9 Case on January 31, 2014.

48.     "COP Service Contracts" means, collectively, the (a) the GRS Service Contract 2005, dated May 25, 2005, by and between the City and the Detroit General Retirement System Service Corporation; (b) the PFRS Service Contract 2005, dated May 25, 2005, by and between the City and the Detroit Police and Fire Retirement System Service Corporation; (c) the GRS Service Contract 2006, dated June 7, 2006, by and between the City and the Detroit General Retirement System Service Corporation; and (d) the PFRS Service Contract 2006, dated June 7, 2006, by and between the City and the Detroit Police and Fire Retirement System Service Corporation, as each of the foregoing may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary instruments and agreements related thereto.

49.     "COP Service Corporations" means, collectively, the Detroit General Retirement System Service Corporation and the Detroit Police and Fire Retirement System Service Corporation.

50. "COP Swap Agreements" means the 1992 ISDA Master Agreements (Local Currency Single Jurisdiction) between the COP Service Corporations and the COP Swap Counterparties, as set forth on Exhibit I.A.50, together with all ancillary instruments and agreements related thereto, as the same may have been subsequently amended, restated, supplemented or otherwise modified.

51. "COP Swap Claim" means a Claim arising under the COP Swap Documents.

52. "COP Swap Collateral Agreement" means the Collateral Agreement among the City, the Service Corporations, the COP Swap Collateral Agreement Custodian and the COP Swap Counterparties, together with all ancillary instruments and agreements related thereto.

53. "COP Swap Counterparties" means UBS AG or Merrill Lynch Capital Services, Inc., as successor to SBS Financial Products Company LLC under the COP Swap Documents.

54. "COP Swap Documents" means the COP Swap Agreements and the COP Swap Collateral Agreement.

55. "Counties" means, collectively, Macomb County, Oakland County and Wayne County.

56. "Creditor Representative" means (a) if all Retiree Classes accept the plan, the Retiree Committee, (b) if any Retiree Class rejects the Plan and Class 7 accepts the Plan, a person or committee of persons appointed by the five largest beneficial holders of Class 7 Claims other than the LTGO Insurer and (c) if any Retiree Class rejects the plan and Class 7 rejects the plan, a person or committee of persons appointed by the Emergency Manager.

57. "Creditors' Committee" means the statutory official committee of unsecured creditors first appointed by the United States Trustee in the Chapter 9 Case on December 23, 2013 (Docket No. 2290), as such committee may be reconstituted.

58. "Cure Amount Claim" means a Claim based upon the City's defaults under an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the City under section 365 of the Bankruptcy Code to the extent such Claim is required to be cured by section 365 of the Bankruptcy Code.

59. "Current Accrued Annual Pension" means, with respect to any Holder of a Pension Claim, the amount of annual pension benefits that the applicable Retirement System (a) is obligated to pay to such Holder as of June 30, 2014 to the extent such Holder is retired and receiving, or terminated from City employment and eligible to receive, a monthly pension as of such date or (b) would pay such Holder were such Holder to terminate active employment with the City on June 30, 2014 and defer his or her vested pension, in either case as reflected on the books and records of the applicable Retirement System as of such date, but in no case shall such Current Accrued Annual Pension include a right to supplemental pension benefits to be paid after July 1, 2014 in respect of cost of living allowances.

60. "Detroit VEBA" means a voluntary employees' beneficiary association established in accordance with section 501(c)(9) of the Internal Revenue Code of 1986 and regulations thereunder that provides life, sickness, accident or other similar benefits to Detroit VEBA Beneficiaries, certain of their dependents and future retirees of the City.

61. "Detroit VEBA Beneficiary" means a Holder of an OPEB Claim.

62. "Detroit VEBA Trust Agreement" means the definitive documentation to be executed in connection with the formation of the Detroit VEBA, in substantially the form attached hereto as Exhibit I.A.62.

63. "DIA" means The Detroit Institute of Arts, a museum and cultural facility located at 5200 Woodward Avenue, Detroit, Michigan 48202.

64.     "DIA Assets" means the assets identified on Exhibit I.A.64, to the extent that the City holds title to any such assets as of the Effective Date.

65.     "DIA Corp." means The Detroit Institute of Arts, a Michigan non-profit corporation.

66.     "DIA Funding Parties" means the Foundations and DIA Corp.

67.     "DIA Proceeds" means, collectively, the irrevocable funding commitments described in Section IV.F.1.

68.     "DIA Proceeds Default Amount" means a reduction in the Adjusted Pension Amount of a Holder of a Pension Claim (or a surviving spouse thereof) by virtue of a DIA Proceeds Payment Default, as determined by the trustees of GRS or PFRS, or any successor plan or trust thereto, in an amount commensurate with the amounts scheduled to be paid to the City in accordance with the DIA Settlement but not received.

69.     "DIA Proceeds Payment Default" means a default which has not been cured during any applicable grace period, as determined by the trustees of the GRS or the PFRS, or of any successor plan or trust thereto, by one or more DIA Funding Parties respecting material amounts scheduled to be paid to the City in accordance with the DIA Settlement, and which the City is required to pay over to the GRS or the PFRS in accordance with the terms and conditions of the Plan.

70.     "DIA Settlement" means the comprehensive settlement regarding the DIA Assets, as described at Section IV.F and as definitively set forth in the DIA Settlement Documents.

71.     "DIA Settlement Documents" means the definitive documentation to be executed in connection with the DIA Settlement, in substantially the form attached hereto as Exhibit I.A.71.

72.     "Disbursing Agent" means the disbursing agent(s) appointed pursuant to Section V.A.

73.     "Disclosure Statement" means the disclosure statement (including all exhibits and schedules thereto or referenced therein) that relates to the Plan and has been prepared and distributed by the City and approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, as the same may be amended, supplemented or otherwise modified.

74.     "Disclosure Statement Order" means the [_____] (Docket No. [___]), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on [_____], 2014, approving the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, as it may have been subsequently amended, supplemented or otherwise modified.

75.     "Disputed Claim" means any Claim that is not Allowed.

76.     "Disputed COP Claims Reserve" means the reserve for Disputed COP Claims established pursuant to Section II.B.3.s.iii.B.1.

77.     "Distribution" means any initial or subsequent payment or transfer made on account of an Allowed Claim under or in connection with the Plan.

78.     "Distribution Date" means any date on which a Distribution is made.

79.     "Distribution Record Date" means 5:00 p.m., Eastern Time, on the Confirmation Date.

80.     "District Court" means the United States District Court for the Eastern District of Michigan.

81. "Document Website" means the internet site address http://www.kccllc.net/Detroit, at which the Plan, the Disclosure Statement and all Filed Exhibits to the Plan shall be available to any party in interest and the public, free of charge.

82. "Downtown Development Authority Claims" means Claims in respect of the Downtown Development Authority Loans.

83. "Downtown Development Authority Loans" means loans made pursuant to that certain Loan Agreement, dated August 26, 1991, by and between the City and the City of Detroit Downtown Development Authority, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary instruments and agreements related thereto.

84. "DWSD" means the Detroit Water and Sewerage Department, which is a department of the City.

85. "DWSD Bonds" means, collectively, the DWSD Class A Sewer Bonds, the DWSD Class B Sewer Bonds, the DWSD Class A Water Bonds and the DWSD Class B Water Bonds.

86. "DWSD Class A Sewer Bonds" means the secured notes issued pursuant to the DWSD Class A Sewer Documents, as set forth on Exhibit I.A.88.

87. "DWSD Class A Sewer Claims" means any Claim against the City arising under or evidenced by the DWSD Class A Sewer Documents, including a Claim for principal and interest on the DWSD Class A Sewer Bonds.

88. "DWSD Class A Sewer Documents" means the ordinances passed, resolutions adopted, orders issued and/or indentures executed with respect to the DWSD Class A Sewer Bonds, as set forth on Exhibit I.A.88, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary instruments and agreements related thereto.

89. "DWSD Class A Water Bonds" means the secured notes issued pursuant to the DWSD Class A Water Documents, as set forth on Exhibit I.A.91.

90. "DWSD Class A Water Claims" means any Claim against the City arising under or evidenced by the DWSD Class A Water Documents, including a Claim for principal and interest on the DWSD Class A Water Bonds.

91. "DWSD Class A Water Documents" means the ordinances passed, resolutions adopted, orders issued and/or indentures executed with respect to the DWSD Class A Water Bonds, as set forth on Exhibit I.A.91, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary instruments and agreements related thereto.

92. "DWSD Class B Sewer Bonds" means the secured notes issued pursuant to the DWSD Class B Sewer Documents, as set forth on Exhibit I.A.94.

93. "DWSD Class B Sewer Claims" means any Claim against the City arising under or evidenced by the DWSD Class B Sewer Documents, including a Claim for principal and interest on the DWSD Class B Sewer Bonds.

94. "DWSD Class B Sewer Documents" means the ordinances passed, resolutions adopted, orders issued and/or indentures executed with respect to the DWSD Class B Sewer Bonds, as set forth on Exhibit I.A.94, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary instruments and agreements related thereto.

95. "DWSD Class B Water Bonds" means the secured notes issued pursuant to the DWSD Class B Water Documents, as set forth on Exhibit I.A.97.

96. "DWSD Class B Water Claims" means any Claim against the City arising under or evidenced by the DWSD Class B Water Documents, including a Claim for principal and interest on the DWSD Class B Water Bonds.

97. "DWSD Class B Water Documents" means the ordinances passed, resolutions adopted, orders and reports issued and/or indentures executed with respect to the DWSD Class B Water Bonds, as set forth on Exhibit I.A.97, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary instruments and agreements related thereto.

98. "DWSD Revolving Bond Claims" means, collectively, the DWSD Revolving Sewer Bond Claims and the DWSD Revolving Water Bond Claims.

99. "DWSD Revolving Bond Documents" means, collectively, the DWSD Revolving Sewer Bond Documents and the DWSD Revolving Water Bond Documents.

100. "DWSD Revolving Bonds" means, collectively, the DWSD Revolving Sewer Bonds and the DWSD Revolving Water Bonds.

101. "DWSD Revolving Sewer Bond Claims" means any Claim against the City arising under or evidenced by the DWSD Revolving Sewer Bond Documents, including a Claim for principal and interest on the DWSD Revolving Sewer Bonds.

102. "DWSD Revolving Sewer Bond Documents" means the ordinances passed, resolutions adopted and/or indentures or agreements executed with respect to the DWSD Revolving Sewer Bonds, as set forth on Exhibit I.A.102, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary instruments and agreements related thereto.

103. "DWSD Revolving Sewer Bonds" means the secured notes issued pursuant to the DWSD Revolving Sewer Bond Documents, as set forth on Exhibit I.A.102.

104. "DWSD Revolving Water Bond Claims" means any Claim against the City arising under or evidenced by the DWSD Revolving Water Bond Documents, including a Claim for principal and interest on the DWSD Revolving Water Bonds.

105. "DWSD Revolving Water Bond Documents" means the ordinances passed, resolutions adopted and/or indentures or agreements executed with respect to the DWSD Revolving Water Bonds, as set forth on Exhibit I.A.105, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary instruments and agreements related thereto.

106. "DWSD Revolving Water Bonds" means the secured notes issued pursuant to the DWSD Revolving Water Bond Documents, as set forth on Exhibit I.A.105.

107. "DWSD Series" means an individual issue of DWSD Bonds or DWSD Revolving Bonds having the same lien priority, issue date and series designation.

108. "DWSD Transaction" means the potential formation (including the transfer of certain assets owned by the DWSD) and operation of the GLWA, as described in Section IV.A.2.

109. "Effective Date" means the Business Day, as determined by the City, on which each applicable condition contained in Section III.A has been satisfied or waived.

110. "Electing GRS Holder" means any Holder of a GRS Pension Claim who elects to participate in the Plan GRS Settlement on a timely-returned Ballot accepting the Plan.

111.     "Electing PFRS Holder" means any Holder of a PFRS Pension Claim who elects to participate in the Plan PFRS Settlement on a timely-returned Ballot accepting the Plan.

112.     "Emergency Manager" means Kevyn D. Orr, in his capacity as emergency manager for the City serving in accordance with PA 436 or any successor emergency manager.

113.     "Employee Health and Life Insurance Benefit Plan" means the Employee Health and Life Insurance Benefit Plan, a welfare benefit plan sponsored and administered by the City, which provides hospitalization, dental care, vision care and life insurance to (a) all officers and employees of the City who were employed on the day preceding the effective date of the benefit plan, and who continued in the employ of the City on and after the Effective Date and (b) substantially all retired officers and employees of the City.

114.     "Employees Death Benefit Board of Trustees" means the governing board of the City of Detroit Employee Benefit Plan, which operates and administers the Employee Death Benefit Plan for retired officers and employees of the City.

115.     "Employees Death Benefit Plan" means the City of Detroit Employee Death Benefit Plan, a pre-funded defined benefit plan and trust administered by the Employee Death Benefit Board of Trustees that provides supplemental death benefits to retired officers and employees of the City.

116.     "Entity" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

117.     "Executory Contract" means a contract to which the City is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code.

118.     "Exhibits" means, collectively, the documents listed on the "Table of Exhibits" included herein, which documents will be Filed no later than five days before the Confirmation Hearing, to the extent not Filed earlier; *provided*, *however*, that (a) Exhibits I.A.140, I.A.162, I.A.195, I.A.206, II.B.3.t.i, II.B.3.u.i, II.B.3.u.ii.D and II.D.6 will be Filed no later than five Business Days prior to the Voting Deadline; and (b) Exhibits I.A.64, I.A.71, I.A.119, I.A.203 and I.A.205 will be Filed only if the transactions related to and/or underlying such Exhibits are to be consummated by the City.  All Exhibits will be made available on the Document Website once they are Filed. The City reserves the right, in accordance with the terms hereof, to modify, amend, supplement, restate or withdraw any of the Exhibits after they are Filed and shall promptly make such changes available on the Document Website.

119.     "Exit Facility" means a credit facility that will be entered into by the City, the Exit Facility Agent and the other financial institutions party thereto on the Effective Date on substantially the terms set forth on Exhibit I.A.119.

120.     "Exit Facility Agent" means the agent under the Exit Facility.

121.     "Face Amount" means (a) if a proof of Claim has been Filed by the applicable Bar Date:  (i) if only a liquidated amount is provided on the proof of Claim, the full stated amount claimed by the Holder in such proof of Claim, and (ii) if a portion of the Claim is stated as unliquidated, the liquidated amount claimed by the Holder in such proof of Claim; or (b) if a proof of Claim has not been Filed, the liquidated, undisputed, non-contingent amount, if any, set forth for a Claim in the List of Creditors.

122.     "Fee Examiner" means Robert M. Fishman, in his capacity as the fee examiner appointed pursuant to the Fee Examiner Order.

123.     "Fee Examiner Order" means the Order Appointing Fee Examiner (Docket No. 383), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on August 19, 2013, as it may have been amended, supplemented or otherwise modified.

124.     "Fee Examiner Parties" means, collectively, (a) the Fee Examiner and (b) any counsel or other professional advising the Fee Examiner whose fees and expenses are subject to the Fee Review Order.

125.     "Fee Review Order" means the Fee Review Order (Docket No. 810), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on September 11, 2013, as it may have been amended, supplemented or otherwise modified.

126.     "Fee Review Professionals" means, collectively, (a) those professionals retained by the City and the Retiree Committee to render services in connection with the Chapter 9 Case who seek payment of compensation and reimbursement of expenses from the City for postpetition services pursuant to and in accordance with the Fee Review Order and (b) the Fee Examiner Parties.  For the avoidance of doubt, any professionals retained by the Creditors' Committee or any other official committee appointed in the Chapter 9 Case other than the Retiree Committee are not Fee Review Professionals.

127.     "Fee Review Professional Fees" means the fees and expenses of the Fee Review Professionals incurred during the period beginning on the Petition Date and ending on the Effective Date.

128.     "File," "Filed," or "Filing" means file, filed or filing with the Bankruptcy Court or the Claims and Balloting Agent, as applicable, in the Chapter 9 Case.

129.     "Final Order" means an order or judgment of the Bankruptcy Court, or any other court of competent jurisdiction, as entered on the docket in the Chapter 9 Case or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move, under Bankruptcy Rule 9023 and/or Rule 59 of the Federal Rules of Civil Procedure, for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied or resulted in no modification of such order; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed shall not prevent such order from being a Final Order.

130.     "Fiscal Year" means a fiscal year for the City, commencing on July 1 of a year and ending on June 30 of the following year.  A Fiscal Year is identified by the calendar year in which the Fiscal Year ends, such that, for example, the 2015 Fiscal Year is the Fiscal Year commencing on July 1, 2014, and ending on June 30, 2015.

131.     "Foundation" means any Entity, other than DIA Corp., that is a contributing party to the DIA Settlement.

132.     "General Fund" means the primary governmental fund and the chief operating fund of the City, which fund accounts for several of the City's primary services, including police, fire, public works, community and youth services.

133.     "General Obligation Bond Claims" means, collectively, the Limited Tax General Obligation Bond Claims and the Unlimited Tax General Obligation Bond Claims.

134.     "General Obligation Bond Documents" means, collectively, the Limited Tax General Obligation Bond Documents and the Unlimited Tax General Obligation Bond Documents.

135.     "General Obligation Bonds" means, collectively, the Limited Tax General Obligation Bonds and the Unlimited Tax General Obligation Bonds.

136.     "GLWA" means the Great Lakes Water and Sewer Authority, to be formed pursuant to a DWSD Transaction to conduct the operations currently conducted by the DWSD as described in Section IV.A.2.

137.     "GRS" means the General Retirement System for the City of Detroit.

138.    "GRS Adjusted Pension Amount" means, with respect to a Holder of a GRS Pension Claim, the Current Accrued Annual Pension payable to such Holder as adjusted in accordance with the following formula: (a) for such a Holder who is either retired and receiving a monthly pension or a surviving beneficiary, a 34% reduction in the monthly pension amount; and (b) for such a Holder who is an Active Employee, a 34% reduction in the monthly pension amount; provided that, with respect to Holders who are Active Employees, in the event the unfunded liabilities of the GRS for the plan year ending June 30, 2014 are greater than the unfunded liabilities of the GRS as of June 30, 2013, the reduction in the monthly pension amount shall be increased to the extent necessary to ensure that there is no change in the amount of the underfunding between Fiscal Years 2013 and 2014.

139.    "GRS Claim" means, with respect to any Holder of a GRS Pension Claim, (a) such GRS Pension Claim and (b) any OPEB Claim held by such Holder.

140.    "GRS Hybrid Pension Formula" means an accrual rate for active employee participants in the GRS for benefits earned for service on or after July 1, 2014 that equals the product of (a) 1.5% multiplied by (b) such employee's average base compensation over an employee's final 10 years of service, multiplied by (c) such employee's years of service after July 1, 2014. For purposes of this definition, base compensation will exclude overtime, longevity or other bonuses, and unused sick leave, and the GRS Hybrid Pension Formula will be part of a hybrid program that will contain rules to shift funding risk to participants in the event of underfunding of hybrid pensions, and mandate minimum retirement ages for unreduced pensions and other material terms as set forth in Exhibit I.A.140.

141.    "GRS Pension Claim" means any Claim (other than an OPEB Claim), whether asserted by current or former employees of the City, their heirs or beneficiaries or by the GRS or any trustee thereof or any other Entity acting on the GRS's behalf, against the City or any fund managed by the City (including, but not limited to, the General Fund, the water fund, the sewage disposal fund, the Detroit General Retirement System Service Corporation fund or the pension funds) based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law for (a) any pension, disability or other post-retirement payment or distribution to be made by the GRS in respect of the employment of current or former employees or (b) the payment by the GRS to persons who at any time participated in, were beneficiaries of or accrued post-retirement pension or financial benefits under the GRS.

142.    "GRS Restoration Payment" means an addition to the pension benefits that comprise the GRS Adjusted Pension Amount during the period ending June 30, 2023. A GRS Restoration Payment may be made and approved only by the trustees of the GRS, or of any successor trust or pension plan, and only in the event that the funding level of the GRS for Fiscal Year 2023 is projected to exceed 80%, based on the then-market value of assets projected forward at an assumed 6.25% investment return rate. For purposes of calculating a GRS Restoration Payment, market value of assets shall not include any City contributions other than those listed on Exhibit II.B.3.u.ii.A. A GRS Restoration Payment may be made in amounts, and only to the extent, that the projected funding level of the GRS for Fiscal Year 2023 as an immediate consequence of such GRS Restoration Payment is not less than 80%.

143.    "GRS Settlement Benefit Amount" means, with respect to any Electing GRS Holder, an amount equal to such Holder's Pro Rata share (calculated by reference to the GRS Pension Claims held by Electing GRS Holders) of such percentage of the State GRS Consideration as is equal to the ratio of Electing GRS Holders to all Holders of GRS Pension Claims, which GRS Settlement Benefit Amount is estimated to equal 8.0% of such Electing GRS Holder's Current Accrued Annual Pension.

144.    "Holder" means an Entity holding a Claim.

145.    "HUD Installment Note Claims" means any Claim against the City arising under or evidenced by the HUD Installment Note Documents, including a Claim for principal and interest on the HUD Installment Notes.

146.    "HUD Installment Note Documents" means the promissory notes executed with respect to the HUD Installment Notes, as set forth on Exhibit I.A.146, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary instruments and agreements related thereto.

147.    "HUD Installment Notes" means, collectively, the secured notes issued under the HUD Installment Note Documents, as set forth on Exhibit I.A.146.

148.    "Impaired" means, with respect to a Class or a Claim, that such Class or Claim is impaired within the meaning of section 1124 of the Bankruptcy Code.

149.    "Indirect 36th District Court Claim" means any claim arising in connection with a Cause of Action against the 36th District Court, solely to the extent that (a) the 36th District Court is entitled to receive funding from the City to satisfy any such claim and (b) any Claim for such funding by the 36th District Court is resolved pursuant to the Plan and the treatment accorded to any Allowed Other Unsecured Claims held by the 36th District Court pursuant to Section II.B.3.w.

150.    "Interest Rate Reset Chart" means a chart identifying interest rates for the New DWSD Bonds, the New DWSD Revolving Bonds, the New GLWA Bonds and the New GLWA Revolving Bonds, attached as Exhibit I.A.150.

151.    "Liabilities" means any and all claims, obligations, suits, judgments, damages, demands, debts, rights, derivative claims, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, arising in law, equity or otherwise, that are based in whole or in part on any act, event, injury, omission, transaction, agreement, employment, exposure or other occurrence taking place on or prior to the Effective Date.

152.    "Lien" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

153.    "Limited Tax General Obligation Bond Claims" means any Claim against the City arising under or evidenced by the Limited Tax General Obligation Bond Documents, including a Claim for principal and interest on the Limited Tax General Obligation Bonds.

154.    "Limited Tax General Obligation Bond Documents" means the resolutions adopted and orders issued with respect to the Limited Tax General Obligation Bonds, as set forth on Exhibit I.A.154, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary instruments and agreements related thereto.

155.    "Limited Tax General Obligation Bonds" means, collectively, the unsecured notes issued under the Limited Tax General Obligation Bond Documents, as set forth on Exhibit I.A.154.

156.    "List of Creditors" means the Second Amended List of Creditors and Claims, Pursuant to Sections 924 and 925 of the Bankruptcy Code (together with the summaries and schedules attached thereto), attached as Exhibit A to the Notice of Filing of Second Amended List of Creditors and Claims, Pursuant to Sections 924 and 925 of the Bankruptcy Code (Docket No. 1059), Filed by the City on September 30, 2013, as such list, summaries and/or schedules may be amended, restated, supplemented or otherwise modified.

157.    "LTGO Insurer" means Ambac Assurance Corp., solely in its capacity as insurer of the City's obligations with respect to the Limited Tax General Obligation Bonds.

158.    "Macomb County" means the County of Macomb, Michigan.

159.    "Mayor" means the duly-elected mayor of the City.

160.    "New B Notes" means the unsecured notes to be issued by the City pursuant to the New B Notes Documents, substantially on the terms set forth on Exhibit I.A.160.

161.    "New B Notes Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued and/or indentures to be executed with respect to the New B Notes, in substantially the form attached hereto as Exhibit I.A.161.

162.     "New B Notes Valuation" means the valuations of each of the New B Notes, as set forth on Exhibit I.A.162.

163.     "New C Notes" means the unsecured notes to be issued by the City pursuant to the New C Notes Documents, substantially on the terms set forth on Exhibit I.A.163.

164.     "New C Notes Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued and/or indentures to be executed with respect to the New C Notes, in substantially the form attached hereto as Exhibit I.A.164.

165.     "New DWSD Bond Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued and/or indentures to be executed with respect to the New DWSD Bonds if a DWSD Transaction is not consummated, in substantially the form attached hereto as Exhibit I.A.165.

166.     "New DWSD Bonds" means the secured notes to be issued by the City pursuant to the New DWSD Bond Documents if a DWSD Transaction is not consummated, substantially on the terms set forth on Exhibit I.A.166.

167.     "New DWSD Revolving Bond Documents" means the ordinances to be passed, resolutions to be adopted and/or indentures or agreements to be executed with respect to the New DWSD Revolving Bonds if a DWSD Transaction is not consummated, in substantially the form attached hereto as Exhibit I.A.167.

168.     "New DWSD Revolving Bonds" means the secured notes to be issued by the City pursuant to the New DWSD Revolving Bond Documents if a DWSD Transaction is not consummated, on substantially on the terms set forth on Exhibit I.A.168.

169.     "New Existing Rate DWSD Bond Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued and/or indentures to be executed to be executed with respect to the New Existing Rate DWSD Bonds if a DWSD Transaction is not consummated, in substantially the form attached hereto as Exhibit I.A.169.

170.     "New Existing Rate DWSD Bonds" means the secured notes to be issued by the City pursuant to the New Existing Rate DWSD Bond Documents if a DWSD Transaction is not consummated, substantially on the terms set forth on Exhibit I.A.170.

171.     "New Existing Rate GLWA Bond Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued and/or indentures to be executed with respect to the New Existing Rate GLWA Bonds if a DWSD Transaction is consummated, in substantially the form attached hereto as Exhibit I.A.171.

172.     "New Existing Rate GLWA Bonds" means the secured notes to be issued by the GLWA pursuant to the New Existing Rate GLWA Bond Documents if a DWSD Transaction is consummated, substantially on the terms set forth on Exhibit I.A.172.

173.     "New GLWA Bond Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued and/or indentures to be executed with respect to the New GLWA Bonds if a DWSD Transaction is consummated, in substantially the form attached hereto as Exhibit I.A.173.

174.     "New GLWA Bonds" means the secured notes to be issued by the GLWA pursuant to the New GLWA Bond Documents if a DWSD Transaction is consummated, substantially on the terms set forth on Exhibit I.A.174.

175.     "New GLWA Revolving Bond Documents" means the ordinances to be passed, resolutions to be adopted and/or indentures or agreements to be executed with respect to the New GLWA Revolving Bonds if a DWSD Transaction is consummated, in substantially the form attached hereto as Exhibit I.A.175.

176.     "New GLWA Revolving Bonds" means the secured notes to be issued by the GLWA pursuant to the New GLWA Revolving Bond Documents if a DWSD Transaction is consummated, on substantially on the terms set forth on Exhibit I.A.176.

177.     "New Securities" means, collectively, the New DWSD Bonds, the New DWSD Revolving Bonds, the New Existing Rate DWSD Bonds, the New Existing Rate GLWA Bonds, the New GLWA Bonds, the New GLWA Revolving Bonds, the New B Notes, the New C Notes, the OPEB Claims Note and the Plan UTGO Notes.

178.     "Oakland County" means the County of Oakland, Michigan.

179.     "Official Committees" means the Creditors' Committee and the Retiree Committee.

180.     "OPEB Benefits" means, collectively, post-retirement health, life and death benefits provided to retired employees of the City and their dependents (including surviving spouses) pursuant to the Employee Health and Life Insurance Benefit Plan and the Employee Supplemental Death Benefit Plan, including the members of the certified class in the action captioned *Weiler et. al. v. City of Detroit*, Case No. 06-619737-CK (Wayne County Circuit Court), pursuant to the "Consent Judgment and Order of Dismissal" entered in that action on August 26, 2009.

181.     "OPEB Claim" means any Claim against the City for OPEB Benefits.

182.     "OPEB Claims Note" means the unsecured note to be issued by the City to the Detroit VEBA, substantially on the terms set forth on Exhibit I.A.182.a and substantially in the form set forth on Exhibit I.A.182.b.

183.     "Other Secured Claim" means a Secured Claim, other than a COP Swap Claim, a DWSD Class A Sewer Claim, a DWSD Class A Water Claim, a DWSD Class B Sewer Claim, a DWSD Class B Water Claim, a DWSD Revolving Bond Claim, a HUD Installment Note Claim, a Parking Bond Claim or a Secured GO Bond Claim.

184.     "Other Unsecured Claim" means any Claim that is not an Administrative Claim, a Convenience Claim, a COP Claim, a Downtown Development Authority Claim, a General Obligation Bond Claim, a GRS Pension Claim, an OPEB Claim, a PFRS Pension Claim, a Secured Claim or a Subordinated Claim.  For the avoidance of doubt, Section 1983 Claims are included within the definition of Other Unsecured Claim.

185.     "PA 436" means Public Act 436 of 2012 of the State, also known as the Local Financial Stability and Choice Act, Michigan Compiled Laws §§ 141.1541-141.1575.

186.     "Parking Bond Documents" means the resolutions adopted, ordinances passed and orders issued with respect to the Parking Bonds, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary instruments and agreements related thereto.

187.     "Parking Bonds" means the secured $9,300,000 Outstanding Principal Amount City of Detroit Building Authority Revenue Bonds (Parking and Arena System), Series 1998A, issued pursuant to the Parking Bond Documents.

188.     "Parking Bonds Claim" means any Claim against the City arising under or evidenced by the Parking Bond Documents, including a Claim for principal and interest on the Parking Bonds.

189.     "Patient Protection and Affordable Care Act" means Public Law 111-148, 111th Congress, 42 U.S.C. §§ 18001, *et seq.*

190.     "Pension Claim" means a GRS Pension Claim or a PFRS Pension Claim.

191.     "Petition Date" means July 18, 2013.

192.     "PFRS" means the Police and Fire Retirement System for the City of Detroit.

193.     "PFRS Adjusted Pension Amount" means, with respect to a Holder of a PFRS Pension Claim, the Current Accrued Annual Pension payable to such Holder as adjusted in accordance with the following formula: (a) for such a Holder who is either retired and receiving a monthly pension or a surviving beneficiary, a 10% reduction in the monthly pension amount; and (b) for such a Holder who is an Active Employee, elimination of the deferred retirement option plan feature of PFRS and a 10% reduction in the monthly pension amount; provided that, with respect to Holders that are Active Employees, in the event the unfunded liabilities of the PFRS for the plan year ending June 30, 2014 are greater than the unfunded liabilities of the PFRS as of June 30, 2013, the reduction in the monthly pension amount shall be increased to the extent necessary to ensure that there is no change in the amount of the underfunding between plan years ending 2013 and 2014.

194.     "PFRS Claim" means, with respect to any Holder of a PFRS Pension Claim, (a) such PFRS Pension Claim and (b) any OPEB Claim held by such Holder.

195.     "PFRS Hybrid Pension Formula" means an accrual rate for active employee participants in the PFRS for benefits earned on or after July 1, 2014 that equals the product of (a) 2.0% multiplied by (b) an employee's average base compensation over the employee's final 10 years of service, multiplied by (c) such employee's years of service after July 1, 2014.  For purposes of this definition, base compensation will mean the actual employee's base compensation and will exclude overtime, longevity or other bonuses, and unused sick leave, and the PFRS Hybrid Pension Formula will be part of a hybrid program that will contain rules to shift funding risk to participants in the event of underfunding of hybrid pensions, and mandate minimum retirement ages for unreduced pensions and other material terms as set forth on Exhibit I.A.195.

196.     "PFRS Pension Claim" means any Claims (other than an OPEB Claim), whether asserted by current or former employees of the City, their heirs or beneficiaries or by the PFRS or any trustee thereof or any other Entity acting on the PFRS's behalf, against the City or any fund managed by the City (including, but not limited to, the General Fund, the Police and Fire Retirement System Service Corporation fund or the pension funds) based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law for (a) any pension, disability, or other post-retirement payment or distribution to be made by the PFRS in respect of the employment of such current or former employees or (b) the payment by the PFRS to persons who at any time participated in, were beneficiaries of or accrued post-retirement pension or financial benefits under the PFRS.

197.     "PFRS Restoration Payment" means an addition to the pension benefits that comprise the PFRS Adjusted Pension Amount during the period ending June 30, 2023.  A PFRS Restoration Payment may be made and approved only by the trustees of the PFRS, or of any successor trust or pension plan, and only in the event that the funding level of the PFRS for Fiscal Year 2023 is projected to exceed 80%, based on the then-market value of assets projected forward at an assumed 6.50% investment return rate.  For purposes of calculating a PFRS Restoration Payment, market value of assets shall not include any City contributions other than those listed on Exhibit II.B.3.t.ii.A.  A PFRS Restoration Payment may be made in amounts, and only to the extent, that the projected funding level of the PFRS for Fiscal Year 2023 as an immediate consequence of such PFRS Restoration Payment is not less than 80%.

198.     "PFRS Settlement Benefit Amount" means, with respect to any Electing PFRS Holder, an amount equal to such Holder's Pro Rata share (calculated by reference to the PFRS Pension Claims held by Electing PFRS Holders) of such percentage of the State PFRS Consideration as is equal to the ratio of Electing PFRS Holders to all Holders of PFRS Pension Claims, which PFRS Settlement Benefit Amount is estimated to equal 4.0% of such Electing PFRS Holder's Current Accrued Annual Pension.

199.     "Plan" means this plan of adjustment and all Exhibits attached hereto or referenced herein, as the same may be amended, restated, supplemented or otherwise modified.

200.     "Plan COP Settlement" means the comprehensive settlement regarding COP Claims on terms and conditions described in Section II.B.3.s.iii.A and definitively set forth in the Plan COP Settlement Documents.

201.     "Plan COP Settlement Documents" means the definitive documentation to be executed in connection with the Plan COP Settlement, in substantially the form attached hereto as Exhibit I.A.201.

202.     "Plan GRS Settlement" means the comprehensive settlement regarding GRS Pension Claims on terms and conditions described in Section II.B.3.u.ii.I and definitively set forth in the Plan GRS Settlement Documents.

203.     "Plan GRS Settlement Documents" means the definitive documentation to be executed in connection with the Plan GRS Settlement, in substantially the form attached hereto as Exhibit I.A.203.

204.     "Plan PFRS Settlement" means the comprehensive settlement regarding PFRS Pension Claims on terms and conditions described in Section II.B.3.t.ii.G and definitively set forth in the Plan PFRS Settlement Documents.

205.     "Plan PFRS Settlement Documents" means the definitive documentation to be executed in connection with the Plan PFRS Settlement, in substantially the form attached hereto as Exhibit I.A.205.

206.     "Plan UTGO Notes" means the notes to be issued by the City pursuant to the Plan UTGO Notes Documents, substantially on the terms set forth on Exhibit I.A.206.

207.     "Plan UTGO Notes Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued and/or indentures to be executed with respect to the Plan UTGO Notes, in substantially the form attached hereto as Exhibit I.A.207.

208.     "Postpetition Financing Agreement" means any financing agreement (a) entered into by the City and the Postpetition Lenders after the Petition Date but prior to the Effective Date and (b) approved by the Bankruptcy Court.

209.     "Postpetition Financing Order" means an order entered by the Bankruptcy Court on the docket of the Chapter 9 Case approving the Postpetition Financing Agreement.

210.     "Postpetition Lender Claims" means any Claim against the City under or evidenced by (a) the Postpetition Financing Agreement and (b) the Postpetition Financing Order.

211.     "Postpetition Lenders" means those entities identified as lenders in the Postpetition Financing Agreement and their respective permitted successors and assigns (solely in their capacity as lenders under the Postpetition Financing Agreement.

212.     "Pro Rata" means, when used with reference to a distribution of property to Holders of Allowed Claims in a particular Class or other specified group of Claims, proportionately so that with respect to a particular Allowed Claim in such Class or in such group, the ratio of (a)(i) the amount of property to be distributed on account of such Claim to (ii) the amount of such Claim, is the same as the ratio of (b)(i) the amount of property to be distributed on account of all Allowed Claims in such Class or group of Claims to (ii) the amount of all Allowed Claims in such Class or group of Claims. Until all Disputed Claims in a Class or other specified group of Claims are resolved, Disputed Claims shall be treated as Allowed Claims in their Face Amount for purposes of calculating a Pro Rata distribution of property to holders of Allowed Claims in such Class or group of Claims.

213.     "Professional Fee Reserve" means the reserve for Fee Review Professional Fees established pursuant to Section IV.J.

214.     "Reinstated" means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the Holder or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) the cure of any such default other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) the reinstatement of the

maturity of such Claim as such maturity existed before such default; (iii) compensation of the Holder of such Claim for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim arises from any failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensation of the Holder of such Claim for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the Holder. "Reinstate" and "Reinstatement" shall have correlative meanings.

215. "Related Entity" means, with respect to any Entity, such Entity's Affiliates, predecessors, successors and assigns (whether by operation of law or otherwise), and with respect to any of the foregoing their respective present and former Affiliates and each of their respective current and former officials, officers, directors, employees, managers, attorneys, advisors and professionals, each acting in such capacity, and any Entity claiming by or through any of them (including their respective officials, officers, directors, employees, managers, advisors and professionals).

216. "Released Parties" means, collectively and individually, the State and the State Related Entities.

217. "Retiree Classes" means Classes 10 and 11, as set forth in Section II.B.

218. "Retiree Committee" means the official committee of retired employees first appointed by the United States Trustee in the Chapter 9 Case on August 22, 2013 (Docket No. 566), as such committee may be reconstituted.

219. "Retiree Health Care Litigation" means the adversary proceeding captioned as *Official Committee of Retirees of the City of Detroit, Michigan, et al. v. City of Detroit, Michigan, et al.*, Case No. 14-04015 (Bankr. E.D. Mich.), filed in the Chapter 9 Case on January 9, 2014.

220. "Retiree Health Care Settlement Agreement" means the Settlement Agreement, effective February 14, 2014, between the parties to the Retiree Health Care Litigation pursuant to which such parties agreed to certain modifications to changes to retiree health care proposed by the City, the principal terms of which agreement are set forth at Exhibit I.A.220.

221. "Retirement Systems" means, collectively, the GRS and the PFRS.

222. "Section 1983 Claim" means any Claim against the City, its employees or both arising under 42 U.S.C. § 1983 that has not been settled, compromised or otherwise resolved and with respect to which Claim a lawsuit was pending before the District Court on or prior to the Petition Date.

223. "Secured Claim" means a Claim that is secured by a Lien on property in which the City has an interest or that is subject to valid setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the City's interest in such property or to the extent of the amount subject to valid setoff, as applicable, as determined pursuant to section 506 of the Bankruptcy Code.

224. "Secured GO Bond Claims" means, collectively, the Secured GO Series 2010 Claims, the Secured GO Series 2010(A) Claims, the Secured GO Series 2012(A)(2) Claims, the Secured GO Series 2012(A2-B) Claims, the Secured GO Series 2012(B) Claims and the Secured GO Series 2012(B2) Claims.

225. "Secured GO Bond Documents" means, collectively, the Secured GO Series 2010 Bond Documents, the Secured GO Series 2010(A) Bond Documents, the Secured GO Series 2012(A)(2) Bond Documents, the Secured GO Series 2012(A2-B) Bond Documents, the Secured GO Series 2012(B) Bond Documents and the Secured GO Series 2012(B2) Bond Documents.

226. "Secured GO Bonds" means, collectively, the Secured GO Series 2010 Bonds, the Secured GO Series 2010(A) Bonds, the Secured GO Series 2012(A)(2) Bonds, the Secured GO Series 2012(A2-B) Bonds, the Secured GO Series 2012(B) Bonds and the Secured GO Series 2012(B2) Bonds.

227. "Secured GO Series 2010 Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2010 Bonds, as set forth on Exhibit I.A.225, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary instruments and agreements related thereto.

228. "Secured GO Series 2010 Bonds" means the secured $249,790,000 Distributable State Aid General Obligation (Limited Tax) Bonds, Series 2010, issued pursuant to the Secured GO Series 2010 Bond Documents.

229. "Secured GO Series 2010 Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2010 Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010 Bonds.

230. "Secured GO Series 2010(A) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2010(A) Bonds, as set forth on Exhibit I.A.225, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary instruments and agreements related thereto.

231. "Secured GO Series 2010(A) Bonds" means the secured $100,000,000 Distributable State Aid Second Lien Bonds (Unlimited Tax General Obligation), Series 2010(A) (Taxable-Recovery Zone Economic Development Bonds – Direct Payment), issued pursuant to the Secured GO Series 2010(A) Bond Documents.

232. "Secured GO Series 2010(A) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2010(A) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010(A) Bonds.

233. "Secured GO Series 2012(A)(2) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(A)(2) Bonds, as set forth on Exhibit I.A.225, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary instruments and agreements related thereto.

234. "Secured GO Series 2012(A)(2) Bonds" means the secured $38,865,000 Outstanding Principal Amount Self-Insurance Distributable State Aid Third Lien Bonds (Limited Tax General Obligation), Series 2012(A)(2), issued pursuant to the Secured GO Series 2012(A)(2) Bond Documents.

235. "Secured GO Series 2012(A)(2) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(A)(2) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010(A)(2) Bonds.

236. "Secured GO Series 2012(A2-B) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(A2-B) Bonds, as set forth on Exhibit I.A.225, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary instruments and agreements related thereto.

237. "Secured GO Series 2012(A2-B) Bonds" means the secured $53,520,000 Self-Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(A2-B), issued pursuant to the Secured GO Series 2012(A2-B) Bond Documents.

238. "Secured GO Series 2012(A2-B) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(A2-B) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(A2-B) Bonds.

239. "Secured GO Series 2012(B) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(B) Bonds, as set forth on Exhibit I.A.225, as the

same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary instruments and agreements related thereto.

240. "Secured GO Series 2012(B) Bonds" means the $6,405,000 General Obligation Distributable State Aid Third Lien Capital Improvement Refunding Bonds (Limited Tax General Obligation), Series 2012(B), issued pursuant to the Secured GO Series 2012(B) Bond Documents.

241. "Secured GO Series 2012(B) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(B) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(B) Bonds.

242. "Secured GO Series 2012(B2) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(B2) Bonds, as set forth on Exhibit I.A.225, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary instruments and agreements related thereto.

243. "Secured GO Series 2012(B2) Bonds" means the $30,730,000 Self-Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(B2), issued pursuant to the Secured GO Series 2012(B2) Bond Documents.

244. "Secured GO Series 2012(B2) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(B2) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(B2) Bonds.

245. "Settling COP Claimant" means a beneficial holder of a COP Claim that elects to participate in the Plan COP Settlement as to some or all COP Claims held by or assigned to it and its Affiliates by so indicating on a timely-returned Ballot.

246. "State" means the state of Michigan.

247. "State GRS Consideration" means an amount up to $175,000,000.00 to be deposited by the State into the GRS in accordance with the Plan GRS Settlement and Section II.B.3.u.ii.I; provided that the amount of the State GRS Consideration shall be reduced by certain amounts attributable to the payment of pension benefits owing to Holders of GRS Pension Claims with household income less than a threshold amount (a) tied to a percentage of federal poverty levels and (b) to be determined pursuant to further discussions between the City and the State.

248. "State PFRS Consideration" means an amount up to $175,000,000.00 to be deposited by the State into the PFRS in accordance with the Plan PFRS Settlement and Section II.B.3.t.ii.G; provided that the amount of the State PFRS Consideration shall be reduced by certain amounts attributable to the payment of pension benefits owing to Holders of PFRS Pension Claims with household income less than a threshold amount (a) tied to a percentage of federal poverty levels and (b) to be determined pursuant to further discussions between the City and the State.

249. "State Related Entities" means, collectively: (a) all officers, legislators, judges and justices of the State; (b) the Governor of the State; (c) the Treasurer of the State; (d) all members of the Local Emergency Financial Assistance Loan Board created under the Emergency Municipal Loan Act, Michigan Compiled Laws §§ 141.931-141.942; (e) each of the State's agencies and departments; and (f) the Related Entities of each of the foregoing.

250. "Stay Extension Order" means the Order Pursuant to Section 105(a) of the Bankruptcy Code Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non-Officer Employees and (C) Agents and Representatives of the Debtor (Docket No. 166), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on July 25, 2013, as it may be amended, supplemented or otherwise modified.

251.     "Subordinated Claim" means a Claim of the kind described in sections 726(a)(3) or 726(a)(4) of the Bankruptcy Code and/or Claims subordinated under sections 510(b) or 510(c) of the Bankruptcy Code.

252.     "Tax" means:  (a) any net income, alternative or add-on minimum, gross income, gross receipts, gross margins, sales, use, stamp, real estate transfer, mortgage recording, ad valorem, value added, transfer, franchise, profits, license, property, payroll, employment, unemployment, occupation, disability, excise, severance, withholding, environmental or other tax, assessment or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any federal, state, local or foreign taxing authority; or (b) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a transferee or successor or a party to any agreement or arrangement whereby liability for payment of any such amounts is determined by reference to the liability of any other Entity.

253.     "Tort Claim" means any Claim that has not been settled, compromised or otherwise resolved that arises out of allegations of personal injury or wrongful death claims and is not a Section 1983 Claim.

254.     "Unexpired Lease" means a lease to which the City is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code.

255.     "Unimpaired" means, with respect to a Class or a Claim, that such Class or Claim is not Impaired.

256.     "United States Trustee" means the Office of the United States Trustee for the Eastern District of Michigan.

257.     "Unlimited Tax General Obligation Bond Claims" means any Claim against the City arising under or evidenced by the Unlimited Tax General Obligation Bond Documents, including a Claim for principal and interest on the Unlimited Tax General Obligation Bonds.

258.     "Unlimited Tax General Obligation Bond Documents" means the resolutions passed and orders issued with respect to the Unlimited Tax General Obligation Bonds, as set forth on Exhibit I.A.258, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all instruments and agreements related thereto.

259.     "Unlimited Tax General Obligation Bonds" means, collectively, the notes issued under the Unlimited Tax General Obligation Bond Documents, as set forth on Exhibit I.A.258.

260.     "Unsecured Claim" means a Claim that is not a Secured Claim or an Administrative Claim.

261.     "Unsecured Pro Rata Share" means, when used with reference to a Distribution of New B Notes to Holders of Allowed Claims within Classes 7, 9, 12 and 13 entitled to receive a distribution of New B Notes, the proportion that an Allowed Claim bears to the sum of all Allowed Claims and Disputed Claims within such Classes. Until all Disputed Claims in a Class are resolved, Disputed Claims shall be treated as Allowed Claims in their Face Amount for purposes of calculating the Unsecured Pro Rata Share of property to be distributed to Holders of Allowed Claims in such Class, unless otherwise ordered by the Bankruptcy Court.

262.     "Voting Deadline" means the deadline fixed by the Bankruptcy Court in the Disclosure Statement Order for submitting Ballots to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code.

263.     "Voting Record Date" means the record date fixed by the Bankruptcy Court in the Disclosure Statement Order establishing the Holders of Claims entitled to vote to accept or reject the Plan.

264.     "Wayne County" means the Charter County of Wayne, Michigan.

**B.** **Rules of Interpretation and Computation of Time.**

    **1.** **Rules of Interpretation.**

        For purposes of the Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter gender; (b) unless otherwise provided in the Plan, any reference in the Plan to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference herein to an existing document or Exhibit Filed or to be Filed shall mean such document or Exhibit, as it may have been or may be amended, restated, supplemented or otherwise modified pursuant to the Plan, the Confirmation Order or otherwise; (d) any reference to an Entity as a Holder of a Claim includes that Entity's successors, assigns and Affiliates; (e) all references to Sections or Exhibits are references to Sections and Exhibits of or to the Plan; (f) the words "herein," "hereunder," "hereof" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (h) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; and (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the extent not inconsistent with any other provision of this Section.

    **2.** **Computation of Time.**

        In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**ARTICLE II**
**CLASSIFICATION OF CLAIMS; CRAMDOWN;**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

        Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims are classified under the Plan for all purposes, including voting, Confirmation and Distribution. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, as described in Section II.A, have not been classified and thus are excluded from the Classes described in Section II.B.1. A Claim shall be deemed classified in a particular Class only to the extent that the Claim qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim qualifies within the description of such other Class. Notwithstanding the foregoing, in no event shall any Holder of an Allowed Claim be entitled to receive payments or Distributions under the Plan that, in the aggregate, exceed the Allowed amount of such Holder's Claim.

**A.** **Unclassified Claims.**

    **1.** **Payment of Administrative Claims.**

        **a.** **Administrative Claims in General.**

        Except as specified in this Section II.A.1, and subject to the bar date provisions herein, unless otherwise agreed by the Holder of an Administrative Claim and the City, or ordered by the Bankruptcy Court, each Holder of an Allowed Administrative Claim will receive, in full satisfaction of such Allowed Administrative Claim, Cash in an amount equal to such Allowed Administrative Claim either: (1) on the Effective Date or as soon as reasonably practicable thereafter; or (2) if the Administrative Claim is not Allowed as of the Effective Date, 30 days after the date on which such Administrative Claim becomes an Allowed Claim. No Claim of any official or unofficial creditors' committee (other than the Retiree Committee) or any member thereof for professionals' fees or other costs and expenses incurred by such creditors' committee or by a member of such creditors' committee shall constitute an Allowed Administrative Claim.

-21-

b. **Claims Under the Postpetition Financing Agreement.**

Unless otherwise agreed by the Postpetition Lenders pursuant to the Postpetition Financing Agreement, on or before the Effective Date, Postpetition Lender Claims that are Allowed Administrative Claims will be paid in Cash equal to the amount of those Allowed Administrative Claims.

2. **Bar Dates for Administrative Claims.**

a. **General Bar Date Provisions**

Except as otherwise provided in Section II.A.2.b or in a Bar Date Order or other order of the Bankruptcy Court, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the City pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than 30 days after the Effective Date. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date will be forever barred from asserting such Administrative Claims against the City or its property, and such Administrative Claims will be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the City and the requesting party by the later of (i) 150 days after the Effective Date, (ii) 60 days after the Filing of the applicable request for payment of Administrative Claims or (iii) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Administrative Claims.

b. **Claims Under the Postpetition Financing Agreement.**

Holders of Administrative Claims that are Postpetition Lender Claims will not be required to File or serve any request for payment or application for allowance of such Claims. Such Administrative Claims will be satisfied pursuant to Section II.A.1.b.

c. **No Modification of Bar Date Order.**

The Plan does not modify any Bar Date Order already in place, including Bar Dates for Claims entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

**B.** **Classified Claims.**

1. **Designation of Classes.**

The following table designates the Classes and specifies whether such Classes are Impaired or Unimpaired by the Plan.

| CLASS | NAME | IMPAIRMENT |
|---|---|---|
| *Secured Claims* | | |
| 1A | All Classes of DWSD Class A Water Claims (One Class for each DWSD Series of DWSD Class A Water Bonds, as set forth on Exhibit I.A.91) | Impaired/Voting |
| 1B | All Classes of DWSD Class B Water Claims (One Class for each DWSD Series of DWSD Class B Water Bonds, as set forth on Exhibit I.A.97) | Impaired/Voting |
| 1C | All Classes of DWSD Class A Sewer Claims (One Class for each DWSD Series of DWSD Class A Sewer Bonds, as set forth on Exhibit I.A.88) | Impaired/Voting |

| CLASS | NAME | IMPAIRMENT |
|---|---|---|
| 1D | All Classes of DWSD Class B Sewer Claims<br>(One Class for each DWSD Series of DWSD Class B Sewer Bonds,<br>as set forth on Exhibit I.A.94) | Impaired/Voting |
| 1E | All Classes of DWSD Revolving Sewer Bond Claims<br>(One Class for each DWSD Series of DWSD Revolving Sewer Bonds,<br>as set forth on Exhibit I.A.102) | Impaired/Voting |
| 1F | All Classes of DWSD Revolving Water Bond Claims<br>(One Class for each DWSD Series of DWSD Revolving Water Bonds,<br>as set forth on Exhibit I.A.105) | Impaired/Voting |
| 2A | Secured GO Series 2010 Claims | Unimpaired/Nonvoting |
| 2B | Secured GO Series 2010(A) Claims | Unimpaired/Nonvoting |
| 2C | Secured GO Series 2012(A)(2) Claims | Unimpaired/Nonvoting |
| 2D | Secured GO Series 2012(A2-B) Claims | Unimpaired/Nonvoting |
| 2E | Secured GO Series 2012(B) Claims | Unimpaired/Nonvoting |
| 2F | Secured GO Series 2012(B2) Claims | Unimpaired/Nonvoting |
| 3 | Other Secured Claims | Unimpaired/Nonvoting |
| 4 | HUD Installment Notes Claims | Unimpaired/Nonvoting |
| 5 | COP Swap Claims | To be determined |
| 6 | Parking Bond Claims | Unimpaired/Nonvoting |
| *Unsecured Claims* | | |
| 7 | Limited Tax General Obligation Bond Claims | Impaired/Voting |
| 8 | Unlimited Tax General Obligation Bond Claims | Impaired/Voting |
| 9 | COP Claims | Impaired/Voting |
| 10 | PFRS Claims | Impaired/Voting |
| 11 | GRS Claims | Impaired/Voting |
| 12 | Downtown Development Authority Claims | Impaired/Voting |
| 13 | Other Unsecured Claims | Impaired/Voting |
| 14 | Convenience Claims | Impaired/Voting |
| 15 | Subordinated Claims | Impaired/Nonvoting |

2.    **Subordination; Reservation of Rights to Reclassify Claims.**

The allowance, classification and treatment of Allowed Claims and the respective Distributions and treatments specified in the Plan take into account the relative priority and rights of the Claims in each Class and all contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the City reserves the right to re-classify any Disputed Claim in accordance with any applicable contractual, legal or equitable subordination.

3. **Treatment of Claims.**

    a. **Class 1A – DWSD Class A Water Claims.**

        i. **Classification and Allowance.**

DWSD Class A Water Claims relating to each DWSD Series of DWSD Class A Water Bonds shall be separately classified, as reflected on Exhibit I.A.91, with each Class receiving the treatment set forth below. On the Effective Date, the DWSD Class A Water Claims shall be deemed Allowed in the amounts set forth on Exhibit I.A.91.

        ii. **Treatment.**

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed DWSD Class A Water Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as reasonably practicable after the Effective Date:

        A. **Treatment if DWSD Transaction Consummated.**

If a DWSD Transaction is consummated on the Effective Date, at the option of the City, either (1) New GLWA Bonds having a principal amount equal to the principal amount of the DWSD Class A Water Bonds held by such Holder; or (2) Cash in the full amount of such Allowed DWSD Class A Water Claim. Each Holder of an Allowed DWSD Class A Water Claim in a Class of DWSD Class A Water Claims that accepts the Plan may elect to receive New Existing Rate GLWA Bonds having a principal amount equal to the principal amount of the DWSD Class A Water Bonds held by such Holder in lieu of New GLWA Bonds.

        B. **Treatment If DWSD Transaction Not Consummated.**

If a DWSD Transaction is not consummated on the Effective Date, New DWSD Bonds having a principal amount equal to the principal amount of the DWSD Class A Water Bonds held by such Holder; provided, that, in lieu of the foregoing treatment, the City alternatively may elect to Reinstate any DWSD Series of DWSD Class A Water Bonds by filing a notice of such Reinstatement prior to the commencement of the Confirmation Hearing. Each Holder of an Allowed DWSD Class A Water Claim in a Class of DWSD Class A Water Claims that accepts the Plan may elect to receive New Existing Rate DWSD Bonds having a principal amount equal to the principal amount of the DWSD Class A Water Bonds held by such Holder in lieu of New DWSD Bonds.

    b. **Class 1B – DWSD Class B Water Claims.**

        i. **Classification and Allowance.**

DWSD Class B Water Claims relating to each DWSD Series of DWSD Class B Water Bonds shall be separately classified, as reflected on Exhibit I.A.97, with each Class receiving the treatment set forth below. On the Effective Date, the DWSD Class B Water Claims shall be deemed Allowed in the amounts set forth on Exhibit I.A.97.

        ii. **Treatment.**

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed DWSD Class B Water Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as reasonably practicable after the Effective Date:

        A. **Treatment if DWSD Transaction Consummated.**

If a DWSD Transaction is consummated on the Effective Date, at the option of the City, either (1) New GLWA Bonds having a principal amount equal to the principal amount of the DWSD Class B Water Bonds

held by such Holder; or (2) Cash in the full amount of such Allowed DWSD Class B Water Claim. Each Holder of an Allowed DWSD Class B Water Claim in a Class of DWSD Class B Water Claims that accepts the Plan may elect to receive New Existing Rate GLWA Bonds having a principal amount equal to the principal amount of the DWSD Class B Water Bonds held by such Holder in lieu of New GLWA Bonds.

### B. Treatment If DWSD Transaction Not Consummated.

If a DWSD Transaction is not consummated on the Effective Date, New DWSD Bonds having a principal amount equal to the principal amount of the DWSD Class B Water Bonds held by such Holder; provided, that, in lieu of the foregoing treatment, the City alternatively may elect to Reinstate any DWSD Series of DWSD Class B Water Bonds by filing a notice of such Reinstatement prior to the commencement of the Confirmation Hearing. Each Holder of an Allowed DWSD Class B Water Claim in a Class of DWSD Class B Water Claims that accepts the Plan may elect to receive New Existing Rate DWSD Bonds having a principal amount equal to the principal amount of the DWSD Class B Water Bonds held by such Holder in lieu of New DWSD Bonds

### c. Class 1C – DWSD Class A Sewer Claims.

#### i. Classification and Allowance.

DWSD Class A Sewer Claims relating to each DWSD Series of DWSD Class A Sewer Bonds shall be separately classified, as reflected on Exhibit I.A.88, with each Class receiving the treatment set forth below. On the Effective Date, the DWSD Class A Sewer Claims shall be deemed Allowed in the amounts set forth on Exhibit I.A.88.

#### ii. Treatment.

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed DWSD Class A Sewer Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as reasonably practicable after the Effective Date:

### A. Treatment if DWSD Transaction Consummated.

If a DWSD Transaction is consummated on the Effective Date, at the option of the City, either (1) New GLWA Bonds having a principal amount equal to the principal amount of the DWSD Class A Sewer Bonds held by such Holder; or (2) Cash in the full amount of such Allowed DWSD Class A Sewer Claim. Each Holder of an Allowed DWSD Class A Sewer Claim in a Class of DWSD Class A Sewer Claims that accepts the Plan may elect to receive New Existing Rate GLWA Bonds having a principal amount equal to the principal amount of the DWSD Class A Sewer Bonds held by such Holder in lieu of New GLWA Bonds.

### B. Treatment If DWSD Transaction Not Consummated.

If a DWSD Transaction is not consummated on the Effective Date, New DWSD Bonds having a principal amount equal to the principal amount of the DWSD Class A Sewer Bonds held by such Holder; provided, that, in lieu of the foregoing treatment, the City alternatively may elect to Reinstate any DWSD Series of DWSD Class A Sewer Bonds by filing a notice of such Reinstatement prior to the commencement of the Confirmation Hearing. Each Holder of an Allowed DWSD Class A Sewer Claim in a Class of DWSD Class A Sewer Claims that accepts the Plan may elect to receive New Existing Rate DWSD Bonds having a principal amount equal to the principal amount of the DWSD Class A Sewer Bonds held by such Holder in lieu of New DWSD Bonds.

### d. Class 1D – DWSD Class B Sewer Claims.

#### i. Classification and Allowance.

DWSD Class B Sewer Claims relating to each DWSD Series of DWSD Class B Sewer Bonds shall be separately classified, as reflected on Exhibit I.A.94, with each Class receiving the treatment set forth below.

On the Effective Date, the DWSD Class B Sewer Claims shall be deemed Allowed in the amounts set forth on Exhibit I.A.94.

### ii. Treatment.

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed DWSD Class B Sewer Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as reasonably practicable after the Effective Date:

#### A. Treatment if DWSD Transaction Consummated.

If a DWSD Transaction is consummated on the Effective Date, at the option of the City, either (1) New GLWA Bonds having a principal amount equal to the principal amount of the DWSD Class B Sewer Bonds held by such Holder; or (2) Cash in the full amount of such Allowed DWSD Class B Sewer Claim. Each Holder of an Allowed DWSD Class B Sewer Claim in a Class of DWSD Class B Sewer Claims that accepts the Plan may elect to receive New Existing Rate GLWA Bonds having a principal amount equal to the principal amount of the DWSD Class B Sewer Bonds held by such Holder in lieu of New GLWA Bonds.

#### B. Treatment If DWSD Transaction Not Consummated.

If a DWSD Transaction is not consummated on the Effective Date, New DWSD Bonds having a principal amount equal to the principal amount of the DWSD Class B Sewer Bonds held by such Holder; provided, that, in lieu of the foregoing treatment, the City alternatively may elect to Reinstate any DWSD Series of DWSD Class B Sewer Bonds by filing a notice of such Reinstatement prior to the commencement of the Confirmation Hearing. Each Holder of an Allowed DWSD Class B Sewer Claim in a Class of DWSD Class B Sewer Claims that accepts the Plan may elect to receive New Existing Rate DWSD Bonds having a principal amount equal to the principal amount of the DWSD Class B Sewer Bonds held by such Holder in lieu of New DWSD Bonds.

### e. Class 1E – DWSD Revolving Sewer Bond Claims

#### i. Classification and Allowance.

DWSD Revolving Sewer Bond Claims relating to each DWSD Series of DWSD Revolving Sewer Bonds shall be separately classified, as reflected on Exhibit I.A.102, with each Class receiving the treatment set forth below. On the Effective Date, the DWSD Revolving Sewer Bond Claims shall be deemed Allowed in the aggregate amounts set forth on Exhibit I.A.102.

#### ii. Treatment.

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed DWSD Revolving Sewer Bond Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as reasonably practicable after the Effective Date: (A) if a DWSD Transaction is consummated on the Effective Date, New GLWA Revolving Bonds having a principal amount equal to the principal amount of the DWSD Revolving Sewer Bonds held by such Holder; or (B) if a DWSD Transaction is not consummated on the Effective Date, New DWSD Revolving Bonds having a principal amount equal to the principal amount of the DWSD Revolving Sewer Bonds held by such Holder.

### f. Class 1F – DWSD Revolving Water Bond Claims

#### i. Classification and Allowance.

DWSD Revolving Water Bond Claims relating to each DWSD Series of DWSD Revolving Water Bonds shall be separately classified, as reflected on Exhibit I.A.105, with each Class receiving the treatment set forth below. On the Effective Date, the DWSD Revolving Water Bond Claims shall be deemed Allowed in the amounts set forth on Exhibit I.A.105.

ii. **Treatment.**

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed DWSD Revolving Water Bond Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as reasonably practicable after the Effective Date: (A) if a DWSD Transaction is consummated on the Effective Date, New GLWA Revolving Bonds having a principal amount equal to the principal amount of the DWSD Revolving Water Bonds held by such Holder; or (B) if a DWSD Transaction is not consummated on the Effective Date, New DWSD Revolving Bonds having a principal amount equal to the principal amount of the DWSD Revolving Water Bonds held by such Holder.

g. **Class 2A – Secured GO Series 2010 Claims.**

On the Effective Date, (i) the Secured GO Series 2010 Claims shall be deemed Allowed in the aggregate amount of $252,475,366.00 and (ii) each Holder of an Allowed Secured GO Series 2010 Claim shall have its Allowed Secured GO Series 2010 Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

h. **Class 2B – Secured GO Series 2010(A) Claims.**

On the Effective Date, (i) the Secured GO Series 2010(A) Claims shall be deemed Allowed in the aggregate amount of $101,707,848.00 and (ii) each Holder of an Allowed Secured GO Series 2010(A) Claim shall have its Allowed Secured GO Series 2010(A) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

i. **Class 2C – Secured GO Series 2012(A)(2) Claims.**

On the Effective Date, (i) the Secured GO Series 2012(A)(2) Claims shall be deemed Allowed in the aggregate amount of $39,254,171 and (ii) each Holder of an Allowed Secured GO Series 2012(A)(2) Claim shall have its Allowed Secured GO Series 2012(A)(2) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

j. **Class 2D – Secured GO Series 2012(A2-B) Claims.**

On the Effective Date, (i) the Secured GO Series 2012(A2-B) Claims shall be deemed Allowed in the aggregate amount of $54,055,927 and (ii) each Holder of an Allowed Secured GO Series 2012(A2-B) Claim shall have its Allowed Secured GO Series 2012(A2-B) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

k. **Class 2E - Secured GO Series 2012(B) Claims.**

On the Effective Date, (i) the Secured GO Series 2012(B) Claims shall be deemed Allowed in the aggregate amount of $6,469,135 and (ii) each Holder of an Allowed Secured GO Series 2012(B) Claim shall have its Allowed Secured GO Series 2012(B) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

l. **Class 2F – Secured GO Series 2012(B2) Claims.**

On the Effective Date, (i) the Secured GO Series 2012(B2) Claims shall be deemed Allowed in the aggregate amount of $31,037,724 and (ii) each Holder of an Allowed Secured GO Series 2012(B2) Claim shall have its Allowed Secured GO Series 2012(B2) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

m.   **Class 3 – Other Secured Claims.**

On the Effective Date, each Holder of an Allowed Other Secured Claim shall have its Allowed Other Secured Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

n.   **Class 4 – HUD Installment Note Claims.**

On the Effective Date, (i) the HUD Installment Note Claims shall be deemed Allowed in the aggregate amount of $90,075,002.00 and (ii) each Holder of a HUD Installment Note Claim shall have its Allowed HUD Installment Note Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

o.   **Class 5 – COP Swap Claims.**

The Allowance of, and treatment to be accorded to, COP Swap Claims is the subject of continuing discussions between the City and the COP Swap Counterparties, is yet to be determined and will be supplied shortly.

p.   **Class 6 – Parking Bond Claims.**

On the Effective Date, (i) the Parking Bond Claims shall be deemed Allowed in the amount of $8,099,287.00 and (ii) each Holder of an Allowed Parking Bond Claim shall have its Allowed Parking Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

q.   **Class 7 – Limited Tax General Obligation Bond Claims.**

   i.   **Allowance.**

On the Effective Date, the Limited Tax General Obligation Bond Claims shall be deemed Allowed in the amount of $163,543,187.86.

   ii.   **Treatment.**

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Limited Tax General Obligation Bond Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, Unsecured Pro Rata Shares of (A) New B Notes and (B) New C Notes.

r.   **Class 8 – Unlimited Tax General Obligation Bond Claims.**

   i.   **Allowance.**

On the Effective Date, the Unlimited Tax General Obligation Bond Claims shall be deemed Allowed in the amount of $374,661,332.97.

   ii.   **Treatment.**

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Unlimited Tax General Obligation Bond Claim, in full satisfaction of such Allowed Claim, shall receive its Pro Rata share of Plan UTGO Notes on or as soon as reasonably practicable after the Effective Date. The maturity(ies) of the Plan UTGO Notes shall be no longer than the existing maturity(ies) of each series of Unlimited Tax General Obligation Bonds receiving Plan UTGO Notes. The Plan UTGO Notes shall contain such other terms as will result in each Holder of an Allowed Unlimited Tax General Obligation Bond Claim receiving a payment stream the present value of which is equal to approximately 20% of such Holder's Allowed Unlimited Tax General Obligation Bond Claim as of the Effective Date.

### s. Class 9 – COP Claims.

#### i. Disputed.

The COP Claims are Disputed Claims and are not Allowed by the Plan, and the City reserves all rights to (A) object to, avoid or subordinate such Claims on any and all available grounds, including through the assertion of any and all grounds asserted in the COP Litigation, and (B) assign the right to object to, avoid or subordinate such Claims or the City's rights in the COP Litigation to the Creditor Representative.

#### ii. Assignment.

Solely for purposes of facilitating Distributions under this Plan and for no other purpose, on and as of the Effective Date, those portions of COP Claims that relate to, and are measured by, the payment schedule under the COPs shall be deemed assigned to the beneficial holders of the COPs on a Pro Rata basis, with each beneficial holder deemed to receive such portions of COP Claims in an amount equal to the proportion that the unpaid principal amount of such holder's COPs bears to the aggregate unpaid principal amount of all COPs. Each beneficial holder of COPs may elect to participate in the Plan COP Settlement in respect of some or all of those portions of COP Claims that would be deemed assigned to it and its Affiliates in the event that the Effective Date occurs.

#### iii. Treatment.

##### A. Plan COP Settlement Option.

Each beneficial holder of COPs may settle issues relating to allowance of the COP Claims that are deemed assigned to it and become a Settling COP Claimant as to some or all COPs held by it and its Affiliates by electing to participate in the Plan COP Settlement on a timely-returned Ballot accepting the Plan. Each Settling COP Claimant shall have its COP Claims deemed to be Allowed Claims in an amount equal to 40% of the aggregate unpaid principal amount of COPs held by such Settling COP Claimant and shall receive, on or as soon as reasonably practicable after the Effective Date, Unsecured Pro Rata Shares of (A) New B Notes and (B) New C Notes.

##### B. Non-Settling Holders.

Each beneficial holder of COPs shall receive the following treatment on account of its COP Claims unless such holder agrees to a different treatment of such Claims:

###### 1. Disputed COP Claims Reserve.

On the Effective Date, the City shall establish the Disputed COP Claims Reserve. The Disputed COP Claims Reserve shall contain no less than (a) Unsecured Pro Rata Shares of New B Notes and New C Notes, in each case calculated as if such Disputed COP Claims were Allowed in an amount equal to the aggregate unpaid principal amount as of the Petition Date for the COPs not subject to the Plan COP Settlement; and (b) any distributions made on account of New B Notes and New C Notes held in the Disputed COP Claims Reserve.

###### 2. Distributions From The Disputed COP Claims Reserve.

If and to the extent that Disputed COP Claims become Allowed Claims, the Holders of such Allowed Claims shall be sent a Distribution from the Disputed COP Claims Reserve of no less than (A) the portions of New B Notes and New C Notes held in the Disputed COP Claims Reserve initially allocated to the Disputed COP Claims that became Allowed Claims; and (B) any distributions received by the Disputed COP Claims Reserve on account of such portions of New B Notes and New C Notes. Upon the entry of an order by the trial court having jurisdiction over the objections to the Disputed COP Claims resolving all objections to the Disputed COP Claims and after all Distributions on account of Allowed COP Claims have been made or provided for, 70% of any New B Notes, New C Notes and distributions thereon remaining in the Disputed COP Claims Reserve shall be

distributed to holders of Claims entitled to receive New B Notes and New C Notes under the Plan, each of which shall receive their Unsecured Pro Rata Share of such property. The remaining 30% of any New B Notes, New C Notes and distributions thereon shall be cancelled (with respect to the New B Notes and New C Notes) or revert to the City and be transferred to the General Fund (with respect to the distributions on such portion of New B Notes and New C Notes).

### t. Class 10 – PFRS Claims.

#### i. Allowance.

The PFRS Claims shall be allowed in an aggregate amount equal to the sum of approximately $3,281,800,000. All OPEB Claims included in such PFRS Claims shall be allowed as general Unsecured Claims in an aggregate amount equal to approximately $1,693,800,000; provided that the aggregate amounts of the Allowed OPEB Claims and, correspondingly, the Allowed PFRS Claims described in this Section II.B.3.t.i shall be reduced to reflect mitigation of damages resulting from the projected value of, as applicable, (A) federal governmental subsidies toward the payment of health benefit premiums provided under the Patient Protection and Affordable Care Act or (B) federal governmental health care plans, as set forth on Exhibit II.B.3.t.i.

#### ii. Treatment.

##### A. Contributions to PFRS.

During the Fiscal Years from the Effective Date through the Fiscal Year ending June 30, 2023, annual contributions shall be made to the PFRS only in the amounts identified on Exhibit II.B.3.t.ii.A. The exclusive source for such contributions shall be DIA Proceeds equal to $175,000,000. After June 30, 2023, the City will contribute sufficient funds required to pay each Holder of a PFRS Pension Claim his or her PFRS Adjusted Pension Amount in accordance with and as modified by the terms and conditions contained in the Plan and the Plan PFRS Settlement.

##### B. Investment Return Assumption.

During the period that ends on June 30, 2023, the trustees of the PFRS, or the trustees of any successor trust or pension plan, shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the PFRS that shall not be higher than 6.50%.

##### C. Modification of Benefits for PFRS Participants.

During the period that ends no earlier than June 30, 2023, the pension benefits payable to each Holder of a PFRS Pension Claim shall be equal to the PFRS Adjusted Pension Amount for such Holder, provided that such PFRS Adjusted Pension Amount shall be (1) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (2) increased by (a) the Plan PFRS Settlement (as set forth in Section II.B.3.t.ii.G) and (b) any PFRS Restoration Payment.

##### D. Accrual of Future Benefits.

Each Holder of a PFRS Pension Claim who is an Active Employee shall receive, in addition to his or her PFRS Adjusted Pension Amount, as may be modified herein, such additional pension benefit for service on or after July 1, 2014 consistent with the terms and conditions of the PFRS Hybrid Pension Formula.

##### E. Governance.

The composition of the board of trustees of the PFRS and the manner in which it is operated and administered shall be consistent with such governance provisions as are (1) required by the DIA Settlement Documents and the Plan PFRS Settlement and (2) acceptable to the State and the DIA Funding Parties.

### F. No Changes in Terms for Ten Years.

The Confirmation Order shall include an injunction against the subsequent amendment of the terms and conditions, and rules of operation, of the PFRS, or any successor plan or trust, that governs the calculation of pension benefits (including the PFRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, the PFRS Restoration Payment and the PFRS Hybrid Pension Formula and terms of the hybrid arrangement) or against any action that governs the selection of the investment return assumption described in Section II.B.3.t.ii.B, the contribution to the PFRS or the calculation or amount of PFRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.

### G. Plan PFRS Settlement.

If Classes 10 and 11 accept the Plan, Holders of PFRS Pension Claims who accept the Plan will have the option to enter into a settlement with the City and the State by electing to participate in the Plan PFRS Settlement on a timely-returned Ballot accepting the Plan. The Plan PFRS Settlement shall include the following principal terms: (1) the State will deposit the State PFRS Consideration into the PFRS in equal annual installments over a period of 20 years, (2) each Electing PFRS Holder shall be entitled to the PFRS Settlement Benefit Amount in addition to such Holder's PFRS Adjusted Pension Amount and (3) each Electing PFRS Holder will release the City and its Related Entities and the State and the State Related Entities from all PFRS Pension Claims, as more particularly described in the Plan PFRS Settlement Documents.

### H. Establishment of Detroit VEBA.

On or as soon as practicable following the Effective Date, the City will establish the Detroit VEBA to provide health care, life and other legally authorized welfare benefits to Detroit VEBA Beneficiaries and certain of their dependents and future City retirees. The Detroit VEBA will be governed by a board of trustees that will be responsible for, among other things, management of property held by the Detroit VEBA, administration of the Detroit VEBA and determination of the level and distribution of benefits to Detroit VEBA Beneficiaries. The Detroit VEBA Trust Agreement and related plan documentation will be substantially in the form set forth on Exhibit I.A.62, which shall, among other things, identify the members of the Detroit VEBA's initial board of trustees. Promptly after the Detroit VEBA is established, the City shall (1) distribute the OPEB Claims Note to the Detroit VEBA and (2) direct the trustees of the Employee Death Benefit Plan to terminate that plan and transfer all assets (net of expenses of termination) to the Detroit VEBA. The City shall have no responsibility following the Effective Date to provide life insurance or death benefits to retirees. Holders of PFRS Claims that also hold OPEB Claims shall be Detroit VEBA Beneficiaries.

### u. Class 11 – GRS Claims.

#### i. Allowance.

The GRS Claims shall be allowed in an aggregate amount equal to the sum of approximately $3,790,100,000. All OPEB Claims included in such GRS Claims shall be allowed as general Unsecured Claims in an aggregate amount equal to approximately $1,491,100,00; provided that the aggregate amounts of the Allowed OPEB Claims and, correspondingly, the Allowed GRS Claims described in this Section II.B.3.u.i shall be reduced to reflect mitigation of damages resulting from the projected value of, as applicable, (A) federal governmental subsidies toward the payment of health benefit premiums provided under the Patient Protection and Affordable Care Act or (B) federal governmental health care plans, as set forth on Exhibit II.B.3.u.i.

### ii. Treatment.

#### A. Contributions to GRS.

During the Fiscal Years from the Effective Date through the Fiscal Year ending June 30, 2023, annual contributions shall be made to the GRS only in the amounts identified on Exhibit II.B.3.u.ii.A. The exclusive sources for such contributions shall be pension-related payments received by the City from the DWSD equal to approximately $675,000,000, and proceeds received from the DIA Funding Parties in the amount of approximately $50,000,000. After June 30, 2023, (1) approximately $195,000,000 of proceeds contributed by the DIA Funding Parties in connection with the DIA Settlement shall be contributed to the GRS and (2) the City will contribute such additional funds as are necessary to pay each Holder of a GRS Pension Claim his or her GRS Adjusted Pension Amount in accordance with and as modified by the terms and conditions contained in the Plan and the Plan GRS Settlement.

#### B. Investment Return Assumption

During the period that ends on June 30, 2023, the board of trustees of the GRS, or the trustees of any successor trust or pension plan, shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the GRS that shall not be higher than 6.25%.

#### C. Modification of Benefits for GRS Participants.

During the period that ends no earlier than June 30, 2023, the pension benefits payable to each Holder of a GRS Pension Claim shall be equal to the GRS Adjusted Pension Amount for such Holder, provided that such GRS Adjusted Pension Amount shall be (1) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (2) increased by (a) the Plan GRS Settlement (as set forth in Section II.B.3.u.ii.I) and (b) any GRS Restoration Payment.

#### D. Annuity Savings Fund Restitution.

Excess allocations to Annuity Savings Fund Accounts during the period beginning January 1, 1999 and ending December 31, 2012 may be applied to reduce (1) Annuity Savings Fund Accounts of Active Employees who participate in the GRS and (2) the Current Accrued Annual Pension of former participants in the Annuity Savings Fund Account now receiving monthly pensions, in accordance with the formulae set forth on Exhibit II.B.3.u.ii.D. In the event of any such reduction, a Holder's GRS Adjusted Pension Amount shall be increased to take into account such Annuity Savings Fund Account restitution reduction.

#### E. Accrual of Future Benefits.

Each Holder of a GRS Pension Claim who is an Active Employee shall receive, in addition to his or her GRS Adjusted Pension Amount, as may be modified herein, such additional pension benefit for service on or after July 1, 2014 consistent with the terms and conditions of the GRS Hybrid Pension Formula.

#### F. Governance.

The composition of the board of trustees of the GRS and the manner in which it is operated and administered shall be consistent with such governance provisions as are (1) required by the DIA Settlement Documents and the Plan GRS Settlement and (2) acceptable to the State and the DIA Funding Parties.

#### G. Potential Transfer of DWSD-Related Pension Liabilities.

If the City consummates a DWSD Transaction on or prior to the Effective Date, the GLWA will assume the pension liability associated with DWSD employees and retirees as accrued through the closing date of the DWSD Transaction. A pro rata share of the existing GRS assets and liabilities will be transferred to a successor

pension fund managed by the GLWA. The successor pension plan will be closed to new GLWA employees and benefit levels frozen.

### H. No Changes in Terms for Ten Years.

The Confirmation Order shall include an injunction against the subsequent amendment of the terms and conditions, and rules of operation, of the GRS, or any successor plan or trust, that govern the calculation of pension benefits (including the GRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, GRS Restoration Payment and the GRS Hybrid Pension Formula and terms of the hybrid arrangement) or against any action that governs the selection of the investment return assumption described in Section II.B.3.u.ii.B, the contribution to the GRS, or the calculation or amount of GRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.

### I. Plan GRS Settlement

If Classes 10 and 11 accept the Plan, Holders of GRS Pension Claims who accept the Plan will have the option to enter into a settlement with the City and the State by electing to participate in the Plan GRS Settlement on a timely-returned Ballot accepting the Plan. The Plan GRS Settlement shall include the following principal terms: (1) the State will deposit the State GRS Consideration into the GRS in equal annual installments over a period of 20 years, (2) each Electing GRS Holder shall be entitled to the GRS Settlement Benefit Amount in addition to such Holder's GRS Adjusted Pension Amount and (3) each Electing GRS Holder will release the City and its Related Entities and the State and the State Related Entities from all GRS Pension Claims, as more particularly described in the Plan GRS Settlement Documents.

### J. GRS Claim Holders with OPEB Claims.

Holders of GRS Claims that also hold OPEB Claims shall be Detroit VEBA Beneficiaries of the Detroit VEBA.

### v. Class 12 – Downtown Development Authority Claims.

#### i. Allowance.

On the Effective Date, the Downtown Development Authority Claims shall be deemed Allowed in the amount of $33,600,000.

#### ii. Treatment.

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Downtown Development Authority Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, Unsecured Pro Rata Shares of (A) New B Notes and (B) New C Notes.

### w. Class 13 – Other Unsecured Claims.

#### i. Treatment.

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Other Unsecured Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, Unsecured Pro Rata Shares of (A) New B Notes and (B) New C Notes.

x.      **Class 14 – Convenience Claims.**

i.      **Treatment.**

Each Holder of an Allowed Convenience Claim, in full satisfaction of such Allowed Claim, shall receive Cash equal to the amount of 25% of such Allowed Claim (as reduced, if applicable, pursuant to an election by such Holder in accordance with Section I.A.44) on or as soon as reasonably practicable after the Effective Date, unless such Holder agrees to a different treatment of such Claim.

y.      **Class 15 – Subordinated Claims.**

i.      **Treatment.**

On the Effective Date, all Subordinated Claims shall be disallowed, extinguished and discharged without Distribution under the Plan, and Holders of Subordinated Claims shall not receive or retain any property on account of such Claims.  Pursuant to section 1126(g) of the Bankruptcy Code, Class 15 is deemed to have rejected the Plan and Holders of Subordinated Claims are not entitled to cast a Ballot in respect of such Claims.

## C.      Confirmation Without Acceptance by All Impaired Classes

The City requests Confirmation under section 1129(b) of the Bankruptcy Code in the event that any impaired Class does not accept or is deemed not to accept the Plan pursuant to section 1126 of the Bankruptcy Code.  The Plan shall constitute a motion for such relief.

## D.      Treatment of Executory Contracts and Unexpired Leases

### 1.      Assumption.

Except as otherwise provided in the Plan, in any contract, instrument, release or other agreement or document entered into in connection with the Plan or in a Final Order of the Bankruptcy Court, or as requested in any motion Filed on or prior to the Effective Date, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the City will be deemed to assume all Executory Contracts and Unexpired Leases to which it is a party.

### 2.      Assumption of Ancillary Agreements.

Each Executory Contract and Unexpired Lease assumed pursuant to Section II.D.1 will include any modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such Executory Contract or Unexpired Lease, unless any such modification, amendment, supplement, restatement or other agreement is rejected pursuant to Section II.D.6 or designated for rejection in accordance with Section II.D.3.

### 3.      Approval of Assumptions and Assignments.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumption of Executory Contracts or Unexpired Leases pursuant to Section II.D.1 (and any related assignment) as of the Effective Date, except for Executory Contracts or Unexpired Leases that (a) have been rejected pursuant to a Final Order of the Bankruptcy Court, (b) are subject to a pending motion for reconsideration or appeal of an order authorizing the rejection of such Executory Contract or Unexpired Lease, (c) are subject to a motion to reject such Executory Contract or Unexpired Lease Filed on or prior to the Effective Date, (d) are rejected pursuant to Section II.D.6 or (e) are designated for rejection in accordance with the last sentence of this paragraph.  An order of the Bankruptcy Court (which may be the Confirmation Order) entered on or prior to the Confirmation Date will specify the procedures for providing notice to each party whose Executory Contract or Unexpired Lease is being assumed pursuant to the Plan of:  (a) the Executory Contract or Unexpired Lease being assumed; (b) the Cure Amount Claim, if any, that the City believes it would be obligated to pay in connection with such assumption; (c) any assignment of an Executory Contract or Unexpired Lease; and (d) the procedures for such party to object to

the assumption of the applicable Executory Contract or Unexpired Lease, the amount of the proposed Cure Amount Claim or any assignment of an Executory Contract or Unexpired Lease. If an objection to a proposed assumption, assumption and assignment or Cure Amount Claim is not resolved in favor of the City, the applicable Executory Contract or Unexpired Lease may be designated by the City for rejection, which shall be deemed effective as of the Effective Date.

### 4. Payments Related to the Assumption of Executory Contracts and Unexpired Leases

To the extent that such Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract or Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the City: (a) by payment of the Cure Amount Claim in Cash on the Effective Date or (b) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease. If there is a dispute regarding: (a) the amount of any Cure Amount Claim, (b) the ability of the City or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to the assumption of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code will be made within 30 days following the entry of a Final Order resolving the dispute and approving the assumption.

### 5. Contracts and Leases Entered Into After the Petition Date

Contracts, leases and other agreements entered into after the Petition Date by the City, including (a) any Executory Contracts or Unexpired Leases assumed by the City and (b) the collective bargaining agreements identified on Exhibit II.D.5, will be performed by the City in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts or Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

### 6. Rejection of Executory Contracts and Unexpired Leases.

On the Effective Date, each Executory Contract and Unexpired Lease that is listed on Exhibit II.D.6 shall be deemed rejected pursuant to section 365 of the Bankruptcy Code. The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the later of: (a) the Effective Date or (b) the resolution of any objection to the proposed rejection of an Executory Contract or Unexpired Lease. Each contract or lease listed on Exhibit II.D.6 shall be rejected only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease. The City reserves its right, at any time on or prior to the Effective Date, to amend Exhibit II.D.6 to delete any Executory Contract or Unexpired Lease therefrom, thus providing for its assumption pursuant to Section II.D.1 or add any Executory Contract or Unexpired Lease thereto, thus providing for its rejection pursuant to this Section II.D.6. The City will provide notice of any amendments to Exhibit II.D.6 to the parties to the Executory Contracts or Unexpired Leases affected thereby and to the parties on the then-applicable service list in the Chapter 9 Case. Listing a contract or lease on Exhibit II.D.6 shall not constitute an admission by the City that such contract or lease is an Executory Contract or Unexpired Lease or that the City has any liability thereunder. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan shall be treated as Class 13 Claims (Other Unsecured Claims), subject to the provisions of section 502 of the Bankruptcy Code.

### 7. Rejection Damages Bar Date.

Except as otherwise provided in a Final Order of the Bankruptcy Court approving the rejection of an Executory Contract or Unexpired Lease, Claims arising out of the rejection of an Executory Contract or Unexpired Lease must be Filed with the Bankruptcy Court and served upon counsel to the City on or before the later of: (a) 30 days after the Effective Date or (b) 30 days after such Executory Contract or Unexpired Lease is rejected pursuant to a Final Order or designated for rejection in accordance with Section II.D.3. Any Claims not Filed within such applicable time periods will be forever barred from receiving a Distribution from, and shall not be enforceable against, the City.

8. **Preexisting Obligations to the City Under Rejected Executory Contracts and Unexpired Leases.**

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the City under such contract or lease. Notwithstanding any applicable non-bankruptcy law to the contrary, the City expressly reserves and does not waive any right to receive, or any continuing obligation of a non-City party to provide, warranties, indemnifications or continued maintenance obligations on goods previously purchased, or services previously received, by the City from non-City parties to rejected Executory Contracts or Unexpired Leases, and any such rights shall remain vested in the City as of the Effective Date.

9. **Insurance Policies.**

From and after the Effective Date, each of the City's insurance policies (other than welfare benefits insurance policies) in existence as of or prior to the Effective Date shall be reinstated and continue in full force and effect in accordance with its terms and, to the extent applicable, shall be deemed assumed by the City pursuant to section 365 of the Bankruptcy Code and Section II.D.1. Nothing contained herein shall constitute or be deemed a waiver of any Causes of Action that the City may hold against any Entity, including any insurer under any of the City's insurance policies.

## ARTICLE III
## CONFIRMATION OF THE PLAN

A. **Conditions Precedent to the Effective Date.**

The Effective Date will not occur, and the Plan will not be consummated, unless and until the City has determined that all of following conditions have been satisfied or waived in accordance with Section III.B:

1. The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the City.

2. The Bankruptcy Court shall have entered an order (which may be included in the Confirmation Order) approving and authorizing the City to take all actions necessary or appropriate to implement the Plan, including the transactions contemplated by the Plan and the implementation and consummation of the contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan.

3. The Confirmation Order shall not be stayed in any respect.

4. All actions and all contracts, instruments, releases and other agreements or documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable, in form and substance satisfactory to the City.

5. All authorizations, consents and regulatory approvals, if any, required in connection with the consummation of the Plan have been obtained and not revoked.

6. The Plan and all Exhibits shall have been Filed and shall not have been materially amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with Section VIII.A.

7. If Classes 10 and 11 accept the Plan, all conditions to the effectiveness of (a) the Plan PFRS Settlement set forth in the Plan PFRS Settlement Documents and (b) the Plan GRS Settlement set forth in the Plan GRS Settlement Documents have been satisfied.

8. Sufficient value shall have been realized from the DIA Assets (through the DIA Settlement or otherwise) to fund contributions to the PFRS as set forth on Exhibit II.B.3.t.ii.A.

9.      The Effective Date shall occur within 180 days of the entry of the Confirmation Order, unless such deadline is extended by the Bankruptcy Court.

**B.      Waiver of Conditions to the Effective Date.**

The conditions to the Effective Date set forth in Section III.A may be waived in whole or part at any time by the City in its sole and absolute discretion.

**C.      Effect of Nonoccurrence of Conditions to the Effective Date.**

If each of the conditions to the Effective Date is not satisfied, or duly waived in accordance with Section III.B, then upon motion by the City made before the time that each of such conditions has been satisfied and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order will be vacated by the Bankruptcy Court; provided, however, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is satisfied before the Bankruptcy Court enters an order granting such motion.  If the Confirmation Order is vacated pursuant to this Section III.C:  (1) the Plan will be null and void in all respects, including with respect to (a) the discharge of Claims pursuant to section 944(b) of the Bankruptcy Code, (b) the assumptions, assignments or rejections of Executory Contracts and Unexpired Leases pursuant to Section II.D and (c) the releases described in Section III.D.7; and (2) nothing contained in the Plan, nor any action taken or not taken by the City with respect to the Plan, the Disclosure Statement or the Confirmation Order, will be or will be deemed to be (a) a waiver or release of any Claims by or against the City, (b) an admission of any sort by the City or any other party in interest or (c) prejudicial in any manner the rights of the City or any other party in interest.

**D.      Effect of Confirmation of the Plan.**

**1.      Dissolution of Official Committees.**

Following the Effective Date, all Official Committees, to the extent not previously dissolved or disbanded, will dissolve and disband, and the members of the Official Committees and their respective professionals will cease to have any role arising from or related to the Chapter 9 Case, provided, however, that, if and only if the Retiree Committee is the Creditor Representative under the Plan, the Retiree Committee shall continue to exist solely for the purposes of objecting to or otherwise asserting the City's or its creditors' rights with respect to Disputed COP Claims pursuant to Section II.B.s.i.  If the Retiree Committee is the Creditor Representative, it shall be disbanded upon the final resolution of all Disputed COP Claims or pursuant to an order of the Bankruptcy Court, which order may be sought by the City for good cause shown.  All fees and expenses of the Creditor Representative shall be subject to the approval of the City.  All disputes relating to the approval of fees and expenses shall be determined by the Bankruptcy Court.  No party to any such dispute shall have any right to appeal an order of the Bankruptcy Court resolving any such dispute.

**2.      Preservation of Rights of Action by the City.**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code, the City will retain and may enforce any claims, demands, rights, defenses and Causes of Action that it may hold against any Entity, to the extent not expressly released under the Plan or pursuant to any Final Order of the Bankruptcy Court.  A nonexclusive schedule of currently pending actions and claims brought by the City is attached as Exhibit III.D.2.  The City's inclusion or failure to include any right of action or claim on Exhibit III.D.2 shall not be deemed an admission, denial or waiver of any claims, demands, rights or Causes of Action that the City may hold against any Entity, and all Entities are hereby notified that the City intends to preserve all such claims, demands, rights or Causes of Action.

3. **Comprehensive Settlement of Claims and Controversies.**

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all claims or controversies relating to the rights that a holder of a Claim may have with respect to any Allowed Claim or any Distribution to be made pursuant to the Plan on account of any Allowed Claim. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements are (a) in the best interests of the City, its property and Claim Holders and (b) fair, equitable and reasonable.

4. **Discharge of Claims.**

a. **Complete Satisfaction, Discharge and Release.**

Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims arising on or before the Effective Date, including any interest accrued on Claims from and after the Petition Date. Except as provided in the Plan or in the Confirmation Order, Confirmation will, as of the Effective Date, discharge the City from all Claims or other debts that arose on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (iii) the Holder of a Claim based on such debt has accepted the Plan.

b. **Discharge.**

In accordance with Section III.D.4.a, except as expressly provided otherwise in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination, as of the Effective Date, of a discharge of all Claims and other debts and Liabilities against the City, pursuant to sections 524(a)(1), 524(a)(2) and 944(b) of the Bankruptcy Code, and such discharge will void any judgment obtained against the City at any time, to the extent that such judgment relates to a discharged Claim; underlined provided that such discharge will not apply to (i) Claims specifically exempted from discharge under the Plan; and (ii) Claims held by an Entity that, before the Confirmation Date, had neither notice nor actual knowledge of the Chapter 9 Case.

5. **Injunction.**

**On the Effective Date, except as otherwise provided herein or in the Confirmation Order,**

a. **all Entities that have been, are or may be holders of Claims against the City or Indirect 36th District Court Claims, along with their Related Entities, shall be permanently enjoined from taking any of the following actions against or affecting the City or its property, DIA Corp. or its property, the DIA Assets, the Foundations or their respective property, if a DWSD Transaction is consummated on or prior to the Effective Date, the GLWA and its property and the Related Entities of each of the foregoing, with respect to such claims (other than actions brought to enforce any rights or obligations under the Plan and appeals, if any, from the Confirmation Order):**

1. **commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against or affecting the City or its property (including (A) all suits, actions and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice and (B) Indirect 36th District Court Claims);**

2. **enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order against the City or its property;**

3. creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the City or its property;

4. asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the City or its property;

5. proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan or the settlements set forth herein to the extent such settlements have been approved by the Bankruptcy Court in connection with Confirmation of the Plan; and

6. taking any actions to interfere with the implementation or consummation of the Plan.

b. All Entities that have held, currently hold or may hold any Liabilities released or exculpated pursuant to the Plan will be permanently enjoined from taking any of the following actions against any Released Party or its property on account of such released Liabilities: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien; (iv) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due a Released Party; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

6. **Exculpation.**

From and after the Effective Date, to the fullest extent permitted under applicable law, neither the City, its Related Entities (including the members of the City Council, the Mayor and the Emergency Manager), to the extent a claim arises from actions taken by such Related Entity in its capacity as a Related Entity of the City, nor the Released Parties shall have or incur any liability to any person or Entity for any act or omission in connection with, relating to or arising out of the City's restructuring efforts and the Chapter 9 Case, including the formulation, preparation, negotiation, dissemination, consummation, implementation, confirmation or approval (as applicable) of the Plan, the property to be distributed under the Plan, the Exhibits, the Disclosure Statement, any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan or the management or operation of the City (except for any liability that results from willful misconduct or gross negligence as determined by a Final Order or from any act or omission occurring before the Petition Date). The City, its Related Entities (with respect to actions taken by such Related Entities in their capacities as Related Entities of the City) and the Released Parties shall be entitled to rely upon the advice of counsel and financial advisors with respect to their duties and responsibilities under, or in connection with, the Chapter 9 Case, the administration thereof and the Plan.

7. **Releases**

Without limiting any other applicable provisions of, or releases contained in, the Plan or any contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, as of the Effective Date, in consideration for the obligations of the City under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, (a) each holder of a Claim that votes in favor of the Plan, to the fullest extent permissible under law, will be deemed to forever release, waive and discharge all Liabilities in any way relating to the City, the Chapter 9 Case, the Plan, the Exhibits or the Disclosure Statement that such entity has, had or may have against any Released Party (which release will be in addition to the discharge of Claims provided herein and under the Confirmation Order and the Bankruptcy Code) and (b) if the Plan PFRS Settlement and the Plan GRS Settlement are consummated, the City will be deemed to forever release, waive and discharge all Liabilities in any way related to the Pension Claims that the City has, had or may have against any Released Party.

## E.      Effectiveness of the Plan.

The Plan shall become effective on the Effective Date.  Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

## F.      Binding Effect of Plan.

Pursuant to section 944(a) of the Bankruptcy Code, on and after the Effective Date, the provisions of the Plan shall bind all Holders of Claims, and their respective successors and assigns, whether or not the Claim of any such Holder is Impaired under the Plan and whether or not such Holder has accepted the Plan.  The releases and settlements effected under the Plan will be operative, and subject to enforcement by the Bankruptcy Court, from and after the Effective Date, including pursuant to the injunctive provisions of the Plan.  Once approved, the compromises and settlements embodied in the Plan, along with the treatment of any associated Allowed Claims, shall not be subject to any collateral attack or other challenge by any Entity in any court or other forum.  As such, any Entity that opposes the terms of any compromise and settlement set forth in the Plan must (1) challenge such compromise and settlement prior to Confirmation of the Plan and (2) demonstrate appropriate standing to object and that the subject compromise and settlement does not meet the standards governing bankruptcy settlements under Bankruptcy Rule 9019 and other applicable law.

## ARTICLE IV
## MEANS FOR IMPLEMENTATION OF THE PLAN

## A.      Alternatives Related to the DWSD.

### 1.      DWSD Remains a Department of the City.

#### a.      Rates and Revenues.

The DWSD will maintain Fiscal Year 2015 rate setting protocols for a minimum of five years, subject to certain changes necessary to stabilize water and sewer revenues.  Immediately following the Effective Date, the City will begin planning a rate stability program for City residents. Such program may provide for affordability of retail rates to be taken into account in the development of wholesale rates across the system.

#### b.      DWSD CBAs.

Collective bargaining agreements with respect to current DWSD employees that are in effect as of the Effective Date will be assumed by the City.

#### c.      The New DWSD Bonds, New Existing Rate DWSD Bonds and New DWSD Revolving Bonds.

If a DWSD Transaction is not consummated, the DWSD shall, as necessary:  (1) execute the New DWSD Bond Documents, issue the New DWSD Bonds, in one or more series, substantially on the terms set forth on Exhibit I.A.166, and distribute the New DWSD Bonds as set forth in the Plan; (2) execute the New Existing Rate DWSD Bond Documents, issue the New Existing Rate DWSD Bonds, in one or more series, substantially on the terms set forth on Exhibit I.A.170, and distribute the New Existing Rate DWSD Bonds as set forth in the Plan; and (3) execute the New DWSD Revolving Bond Documents, issue the New DWSD Revolving Bonds, in one or more series, substantially on the terms set forth on Exhibit I.A.168, and distribute the New DWSD Revolving Bonds as set forth in the Plan.

### 2.      Potential DWSD Transaction.

The City may enter into a DWSD Transaction that will include the formation of the GLWA to conduct the operations currently conducted by the DWSD.  The City will only enter into a DWSD Transaction if

such transaction enables the City to make larger, more rapid or more certain distributions to at least some of its creditors as compared to the Distributions specified in Section II.B.

      **a.**      **The New GLWA Bonds, New Existing Rate GLWA Bonds and New GLWA Revolving Bonds.**

If the City enters into a DWSD Transaction, the GLWA shall, as necessary: (a) execute the New GLWA Bond Documents, issue the New GLWA Bonds, in one or more series, substantially on the terms set forth on Exhibit I.A.174 and distribute the New GLWA Bonds as set forth in the Plan; (b) execute the New Existing Rate GLWA Bond Documents, issue the New Existing Rate GLWA Bonds, in one or more series, substantially on the terms set forth on Exhibit I.A.172, and distribute the New Existing Rate GLWA Bonds as set forth in the Plan; and (c) execute the New GLWA Revolving Bond Documents, issue the New GLWA Revolving Bonds, in one or more series, substantially on the terms set forth on Exhibit I.A.176, and distribute the New GLWA Revolving Bonds as set forth in the Plan.

**B.**      **The New Securities.**

On the Effective Date, the City shall (1) execute the New B Notes Documents, issue the New B Notes, substantially on the terms set forth on Exhibit I.A.160, and distribute the New B Notes as set forth in the Plan; (2) execute the New C Notes Documents, issue the New C Notes, substantially on the terms set forth on Exhibit I.A.163, and distribute the New C Notes as set forth in the Plan; (3) execute and issue the OPEB Claims Note, substantially on the terms set forth on Exhibit I.A.182.a, and distribute the OPEB Claims Note as set forth in the Plan; and (4) execute the Plan UTGO Notes Documents, issue the Plan UTGO Notes, substantially on the terms set forth on Exhibit I.A.206, and distribute the Plan UTGO Notes as set forth in the Plan.

**C.**      **The Plan COP Settlement.**

The City shall consummate the Plan COP Settlement on the Effective Date, substantially on the terms set forth on Exhibit I.A.201. Settling COP Claimants shall receive the treatment described in Section II.B.3.s.iii.A.

**D.**      **The Plan GRS Settlement.**

The City shall consummate the Plan GRS Settlement on the Effective Date, substantially on the terms set forth on Exhibit I.A.203. Electing GRS Holders shall receive the treatment described in Section II.B.3.u.ii.I.

**E.**      **The Plan PFRS Settlement.**

The City shall consummate the Plan PFRS Settlement on the Effective Date, substantially on the terms set forth on Exhibit I.A.205. Electing PFRS Holders shall receive the treatment described in Section II.B.3.t.ii.G.

**F.**      **The DIA Settlement.**

On the Effective Date, the City and the DIA Funding Parties will enter into the DIA Settlement, pursuant to which (1) the DIA Funding Parties have committed to assist in the funding of the City's restructured legacy pension obligations and (2) the City has agreed to enter into certain transactions that will cause the DIA Assets to remain in the City in perpetuity and to otherwise make the DIA Assets available for the benefit of the residents of the City and the Counties and the citizens of the State. The definitive documentation governing the DIA Settlement is attached hereto at Exhibit I.A.71 and provides generally for, and entirely qualifies, the following:

1.     **Funding Contributions.**

The DIA Settlement will be funded as follows:  (a) an irrevocable commitment of at least
$365 million by the Foundations; and (b) in addition to its continuing commitments outside of the DIA Settlement,
an irrevocable commitment from DIA Corp. to raise at least $100 million from its donors.  The foregoing
commitments shall be funded over the course of the 20-year period immediately following the Effective Date
(subject to the annual confirmation of the City's continuing compliance with the terms of the DIA Settlement).
Amounts committed by the Foundations will be paid to the CFSEM Supporting Organization, which will (a) transfer
such amounts for the purpose of funding the Retirement Systems upon the City's satisfaction of certain conditions
and (b) not be subject to claims of creditors of the Community Foundation for Southeast Michigan.

2.     **Transfer of DIA Assets.**

On the Effective Date, the City shall irrevocably transfer the DIA Assets to DIA Corp., as trustee,
to be held in perpetual charitable trust, and within the City limits, for the primary benefit of the residents of the City
and the Counties and the citizens of the State.

3.     **Conditions to the Foundations' Participation.**

The Foundations' participation in the DIA Settlement is conditioned upon, among other things, the
following:  (i) the irrevocable commitment from the DIA Corp. described in Section IV.F.1; (ii) the acceptance of
the Plan by Classes 10 and 11; (iii) the irrevocable transfer by the City of the DIA Assets described in
Section IV.F.2; (iv) the existence of appropriate governance and oversight structures at DIA Corp. that include
representation of the City, the DIA Funding Parties and other stakeholders; (v) the earmarking of all funds provided
by the DIA Funding Parties towards the recoveries upon Pension Claims under the Plan for Holders of Claims in
Classes 10 and 11; (vi) the existence of appropriate prospective governance and financial oversight mechanisms for
the Retirement Systems; (vii) the affirmation by County authorities of certain existing funding obligations with
respect to DIA Corp.; (viii) the approval of the DIA Settlement by the Attorney General for the State; (ix) the
agreement of the State to provide the State GRS Consideration and the State PFRS Consideration in an aggregate
amount up to $350 million; (x) the occurrence of the Confirmation Date no later than December 31, 2014; and
(xi) the City's agreement to indemnify and hold harmless the Foundations and the CFSEM Supporting Organization
pursuant to, and in accordance with, the terms of the DIA Settlement Documents.

G.     **Issuance of the New Securities.**

The City shall issue the New Securities on the Effective Date or a subsequent Distribution Date, as
applicable.  To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable
non-bankruptcy law, the issuance of New Securities will be exempt from registration under the Securities Act
of 1933, as amended, and all rules and regulations promulgated thereunder and any other applicable non-bankruptcy
law or regulation.

H.     **Cancellation of Existing Bonds and Bond Documents.**

Except (a) as provided in any contract, instrument or other agreement or document entered into or
delivered in connection with the Plan, (b) for purposes of evidencing a right to Distribution under the Plan or (c) as
specifically provided otherwise in the Plan, on the Effective Date, the Bonds and the Bond Documents will be
deemed automatically cancelled, terminated and of no further force or effect against the City without any further act
or action under any applicable agreement, law, regulation, order or rule and the obligations of the parties, as
applicable, under the Bonds and the Bond Documents shall be discharged; provided, however, that the Bond
Documents shall continue in effect solely (i) to allow the Disbursing Agent to make any Distributions as set forth in
the Plan and to perform such other necessary administrative or other functions with respect thereto, (ii) for any
trustee, agent or similar entity under the Bond Documents to have the benefit of all the rights and protections and
other provisions of the Bond Documents and all other related agreements with respect to priority in payment and
lien rights with respect to any Distribution and (iii) as may be necessary to preserve any claim by a Bondholder
and/or Bond Agent under a Bond Insurance Policy or against any Bond Insurer.  Nothing in the Plan is intended to

impair, modify, affect or otherwise alter the rights of Bondholders and/or Bond Agents with respect to claims under applicable Bond Insurance Policies and/or against the Bond Insurers.

## I.      Release of Liens.

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date, all Liens against the City's property will be deemed fully released and discharged, and all of the right, title and interest of any holder of such Liens, including any rights to any collateral thereunder, will revert to the City.  As of the Effective Date, (1) the holders of such Liens will be authorized and directed to release any collateral or other property of the City (including any cash collateral) held by such Holder and to take such actions as may be requested by the City to evidence the release of such Lien, including the execution, delivery, filing or recording of such releases as may be requested by the City, and (2) the City shall be authorized to execute and file on behalf of creditors Form UCC-3 Termination Statements or such other forms as may be necessary or appropriate to implement the provisions of this Section.

## J.      Professional Fee Reserve

On the Effective Date, the City shall establish and fund the Professional Fee Reserve.  The Professional Fee Reserve shall be funded in an amount sufficient to pay the Fee Review Professional Fees that remain unpaid as of the Effective Date.  The funds held in the Professional Fee Reserve may not be used for any purpose other than the payment of Fee Review Professional Fees until any and all disputes regarding the Fee Review Professional Fees, including any disputes arising under the Fee Review Order, have been fully and finally resolved pursuant to a Final Order or a stipulation between the disputing parties.  Any amounts remaining in the Professional Fee Reserve after final resolution of all such disputes and the payment of all Fee Review Professional Fees determined to be reasonable in accordance with the Fee Review Order shall be released to the General Fund.

## K.      Assumption Of Indemnification Obligations.

Notwithstanding anything otherwise to the contrary in the Plan, nothing in the Plan shall discharge or impair the obligations of the City as provided in the City Charter of the City or other organizational documents, resolutions, employment contracts, applicable law or other applicable agreements as of the Petition Date to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of officers and employees of the City (including without limitation the members of the City Council, the Mayor and the Emergency Manager) and their Related Entities, in each case to the extent such Entities were acting in such capacity, against any claims or causes of action whether direct or derivative, liquidated or unliquidated, foreseen or unforeseen, asserted or unasserted.

## L.      Incorporation of Retiree Health Care Settlement Agreement.

The terms of the Retiree Health Care Settlement Agreement resolving the Retiree Health Care Litigation, as set forth on Exhibit I.A.220, are incorporated herein by reference and shall be binding upon the parties thereto.

## M.      Exit Facility.

On the Effective Date, the City shall enter into the Exit Facility, as well as any ancillary notes, documents or agreements in connection therewith, including, without limitation, any documents required in connection with the creation or perfection of the liens securing the Exit Facility.

## ARTICLE V
## PROVISIONS REGARDING DISTRIBUTIONS UNDER THE PLAN

**A.      Appointment of Disbursing Agent.**

The City may act as Disbursing Agent or may employ or contract with other Entities to act as the Disbursing Agent or to assist in or make the Distributions required by the Plan.  Any Disbursing Agent appointed by the City will serve without bond.  Other than as specifically set forth in the Plan, the Disbursing Agent shall make all Distributions required to be made under the Plan.

**B.      Distributions on Account of Allowed Claims.**

Except as otherwise provided in the Plan, on the Effective Date or as soon as practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive from the Disbursing Agent the Distributions that the Plan provides for Allowed Claims in the applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Section VI.B.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the Distributions provided for in the Plan, regardless of whether such Distributions are delivered on or at any time after the Effective Date.  Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Distribution in excess of the Allowed amount of such Claim.

**C.      Certain Claims to Be Expunged.**

Any Claim that has been or is hereafter listed in the List of Creditors as contingent, unliquidated or disputed, and for which no proof of Claim is or has been timely Filed, is not considered to be an Allowed Claim and shall be expunged without further action by the City and without further notice to any party or any action, approval or order of the Bankruptcy Court.

**D.      Record Date for Distributions; Exception for Bond Claims.**

With the exception of Bond Claims, neither the City nor any Disbursing Agent will have any obligation to recognize the transfer of, or the sale of any participation in, any Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute only to those Holders of Allowed Claims (including Holders of Claims that become Allowed after the Distribution Record Date) that are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date.  With the exception of the Bond Claims, the City and any Disbursing Agent shall instead be entitled to recognize and deal for all purposes under the Plan with only those record Holders stated on the official Claims Register as of the close of business on the Distribution Record Date.  Unless otherwise set forth in the Confirmation Order, the City shall not establish a record date for Distributions to Holders of Bond Claims.

**E.      Means of Cash Payments.**

Except as otherwise specified herein, all Cash payments made pursuant to the Plan shall be in U.S. currency and made by check drawn on a domestic bank selected by the Disbursing Agent or, at the option of the Disbursing Agent, by wire transfer, electronic funds transfer or ACH from a domestic bank selected by the Disbursing Agent; provided, however, that Cash payments to foreign Holders of Allowed Claims may be made, at the option of the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

F. **Selection of Distribution Dates for Allowed Claims.**

Except where the Plan requires the making of a Distribution on account of a particular Allowed Claim within a particular time, the Disbursing Agent shall have the authority to select Distribution Dates that, in the judgment of the Disbursing Agent, provide Holders of Allowed Claims with payments as quickly as reasonably practicable while limiting the costs incurred in the distribution process. Upon the selection of a Distribution Date by the Disbursing Agent, the Disbursing Agent shall File a notice of such Distribution Date that provides information regarding the Distribution to be made.

G. **Limitations on Amounts to Be Distributed to Holders of Allowed Claims Otherwise Insured.**

No Distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the City's insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy; provided that, if the City believes a Holder of an Allowed Claim has recourse to an insurance policy and intends to direct the Disbursing Agent to withhold a Distribution pursuant to this Section V.G, the City shall provide written notice to such Holder regarding what the City believes to be the nature and scope of applicable insurance coverage. To the extent that one or more of the City's insurance carriers agrees to satisfy a Claim in full, then immediately upon such agreement such Claim may be expunged without a Claims objection having to be Filed and without any further notice or any action, order or approval of the Bankruptcy Court. Nothing in the Plan, including this Section V.G, shall constitute a waiver of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities that any Entity may hold against any other Entity other than the City, including the City's insurance carriers. For the avoidance of doubt, this Section shall not apply to Bond Insurance Policies.

H. **City's Rights of Setoff Preserved.**

Notwithstanding anything to the contrary in the Plan, pursuant to section 553 of the Bankruptcy Code or otherwise applicable non-bankruptcy law, the City may set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Allowed Claim the claims, rights and Causes of Action of any nature that the City may assert against the Holder of such Claim; provided, however, that neither the failure to effect a setoff nor the allowance of any Claim pursuant to the terms of the Plan shall constitute a waiver or release by the City of any claims, rights and Causes of Action that the City may assert against such Holder, all of which are expressly preserved.

I. **Delivery of Distributions and Undeliverable or Unclaimed Distributions.**

1. **Delivery of Distributions Generally.**

Except as set forth in Section V.I.2, Distributions to Holders of Allowed Claims shall be made at the addresses set forth in the City's records unless such addresses are superseded by proofs of Claim or transfers of Claim Filed pursuant to Bankruptcy Rule 3001.

2. **Delivery of Distributions on Account of Bond Claims.**

Distributions on account of the Bond Claims shall (a) be made by the Disbursing Agent to the Bond Agent under the applicable Bond Documents for the benefit of Holders of Bond Claims and (b) be deemed completed when made by the Disbursing Agent to the Bond Agent as if such Distributions were made directly to the Holders of such Claims. The applicable Bond Agent, in turn, shall make such distributions to the applicable Holders pursuant to the terms and conditions of the applicable Bond Documents and subject to the respective rights, claims and interests, if any, that the Bond Agent may have under the applicable Bond Documents or otherwise to the recovery and/or reimbursement of their fees, costs and expenses (including the fees, costs and expenses of counsel and financial advisors) from any distribution hereunder, whether such rights, claims or interests are in the nature of a charging lien or otherwise. The Bond Agent shall not be required to give any bond, surety or other security for the performance of its duties with respect to such Distributions.

### 3. De Minimis Distributions / No Fractional New Securities.

No distribution shall be made by the Disbursing Agent on account of an Allowed Claim if the amount to be distributed to the specific Holder of an Allowed Claim on the applicable Distribution Date has an economic value of less than $25.00. No fractional New Securities shall be distributed. Where a fractional portion of a New Security otherwise would be called for under the Plan, the actual issuance shall reflect a rounding down to the nearest whole New Security.

### 4. Undeliverable or Unclaimed Distributions.

In the event that any Distribution to any Holder is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such Distribution shall be made to such Holder without interest.

Any Holder of an Allowed Claim that does not claim an undeliverable or unclaimed Distribution within six months after the Effective Date shall be deemed to have forfeited its claim to such Distribution and shall be forever barred and enjoined from asserting any such claim against the City or its property. In such cases, any Cash held by the City on account of such undeliverable or unclaimed Distributions shall become the property of the City free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary. Any New Securities held for distribution on account of such Claims shall be canceled and of no further force or effect. Nothing contained in the Plan shall require any Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

### 5. Time Bar to Cash Payment Rights.

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof. Requests for reissuance of any check shall be made to the Disbursing Agent by the Holder of the Allowed Claim to whom such check originally was issued within 180 days after the date of the original check issuance. After such date, the Claim of any Holder to the amount represented by such voided check shall be released and forever barred from assertion against the City and its property.

## J. Other Provisions Applicable to Distributions in All Classes

### 1. No Postpetition Interest.

Except as otherwise specifically provided for in the Plan, or required by applicable bankruptcy law, the City shall have no obligation to pay interest on an Allowed Claim accrued after the Petition Date and no Holder of a Claim shall be entitled to be paid interest accruing on or after the Petition Date on any Claim without regard to whether such amount has accrued for federal income tax purposes. Any such interest that has been accrued and has not been paid by the City shall be cancelled as of the Effective Date for federal income tax purposes.

### 2. Compliance with Tax Requirements.

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the City and any Disbursing Agent shall comply with all Tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions under the Plan shall be subject to such withholding and reporting requirements. All such amounts withheld and paid to the appropriate governmental unit shall be treated as if made directly to the Holder of an Allowed Claim. The City and the Disbursing Agent shall be authorized to take any actions that they determine, in their reasonable discretion, to be necessary or appropriate to comply with such withholding and reporting requirements, including withholding Distributions pending receipt of information necessary to facilitate such Distributions, or establishing any other mechanisms they believe are reasonable and appropriate.

Notwithstanding any other provision of the Plan, each Entity receiving or deemed to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any

Tax imposed on such Entity on account of such Distribution, including income, withholding and other Tax obligations. The City has the right, but not the obligation, to refuse, or to direct a Disbursing Agent to refuse, to make a Distribution until a Holder of an Allowed Claim has made arrangements satisfactory to the City and any Disbursing Agent for payment of any such Tax obligations. The City may require, as a condition to making a Distribution, that the Holder of an Allowed Claim provide the City or any Disbursing Agent with a completed Form W-8, W-9 and/or other Tax information, certifications and supporting documentation, as applicable.

If the City makes such a request and the Holder of an Allowed Claim fails to comply before the date that is 180 days after the initial request is made, the amount of such Distribution shall irrevocably revert to the City and any Claim in respect of such Distribution shall be released and forever barred from assertion against the City and its property.

### 3. Allocation of Distributions.

All Distributions to Holders of Allowed Claims that have components of principal and interest shall be deemed to apply first to the principal amount of such Claim until such principal amount is paid in full, and then the remaining portion of such Distributions, if any, shall be deemed to apply to any applicable accrued interest included in such Claim to the extent interest is payable under the Plan.

### 4. Surrender of Instruments.

As a condition to participation under this Plan, the Holder of a note, debenture or other evidence of indebtedness of the City that desires to receive the property to be distributed on account of an Allowed Claim based on such note, debenture or other evidence of indebtedness shall surrender such note, debenture or other evidence of indebtedness to the City or its designee (unless such Holder's Claim will not be Impaired by the Plan, in which case such surrender shall not be required), and shall execute and deliver such other documents as are necessary to effectuate the Plan; provided, however, that, if a claimant is a Holder of a note, debenture or other evidence of indebtedness for which no physical certificate was issued to the Holder but which instead is held in book-entry form pursuant to a global security held by the Depository Trust Company or other securities depository or custodian thereof, the City or the applicable Bond Agent for such note, debenture or other evidence of indebtedness may waive the requirement of surrender. In the City's sole discretion, if no surrender of a note, debenture or other evidence of indebtedness occurs and the Holder of Claim does not provide an affidavit and indemnification agreement, in form and substance reasonably satisfactory to the City, that such note, debenture or other evidence of indebtedness was lost, then no distribution may be made to such Holder in respect of the Claim based on such note, debenture or other evidence of indebtedness. For the avoidance of doubt, no Bond, note, debenture or other evidence of indebtedness of the City shall be surrendered or deemed surrendered hereby to the extent necessary to make and/or preserve a claim under any Bond Insurance Policy or against any Bond Insurer.

### ARTICLE VI
### PROCEDURES FOR RESOLVING DISPUTED CLAIMS

## A. Treatment of Disputed Claims.

### 1. General.

No Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order (including the Confirmation Order) allowing such Claim. Notwithstanding any other provision of the Plan, no payments or Distributions shall be made on account of a Disputed Claim until such Claim becomes an Allowed Claim. Without limiting the foregoing in any way, no partial payments and no partial Distributions will be made with respect to a disputed, contingent or unliquidated Claim, or with respect to any Claim for which a proof of Claim has been Filed but not Allowed, until the resolution of such disputes or estimation or liquidation of such Claim by settlement or by Final Order.

2. **ADR Procedures.**

At the City's option, any Disputed Claim designated or eligible to be designated for resolution through the ADR Procedures may be submitted to the ADR Procedures in accordance with the terms thereof and the ADR Procedures Order. For the avoidance of doubt, the designation of a Disputed Claim for resolution through the ADR Procedures, either prior to or after the Effective Date, will not modify, and will not be deemed to have modified, the terms of the ADR Injunction imposed pursuant to the ADR Procedures Order. Disputed Claims not resolved through the ADR Procedures will be resolved pursuant to the Plan.

3. **Tort Claims.**

At the City's option, any unliquidated Tort Claim (as to which a proof of Claim was timely Filed in the Chapter 9 Case) not resolved through the ADR Procedures or pursuant to a Final Order of the Bankruptcy Court will be determined and liquidated in the administrative or judicial tribunal(s) in which it is pending on the Effective Date (subject to the City's right to seek removal or transfer of venue) or, if no action was pending on the Effective Date, in an administrative or judicial tribunal of appropriate jurisdiction selected by the City that (a) has personal jurisdiction over the parties, (b) has subject matter jurisdiction over the Tort Claim and (c) is a proper venue. The City may exercise the above option by service upon the holder of the applicable Tort Claim of a notice informing such holder that the City has exercised such option (which notice shall be deemed to satisfy the notice requirements of Section I.B of the ADR Procedures). Upon the City's service of such notice, the automatic stay imposed pursuant to sections 362 and 922 of the Bankruptcy Code (along with any extension of such stay pursuant to the terms of the Stay Extension Order) or, after the Effective Date, the injunction set forth at Section III.D.5, will be deemed modified, without the necessity for further Bankruptcy Court approval or any further action by the City, solely to the extent necessary to allow the parties to determine or liquidate the Tort Claim in the applicable administrative or judicial tribunal(s); provided that nothing contained in this Section will modify, or will be deemed to have modified, the terms of the Stay Extension Order with respect to any Tort Claim prior to the City having served notice of its intent to determine and liquidate such Tort Claim pursuant to this Section. If the City does not serve such a notice upon a holder of a Tort Claim by the Claims Objection Bar Date, such holder may file a motion with the Bankruptcy Court seeking relief from the discharge injunction imposed pursuant to Section III.D.5 in order to liquidate and determine its Claim.

Any Tort Claim determined and liquidated pursuant to a judgment obtained in accordance with this Section VI.A.3 and applicable non-bankruptcy law that is no longer appealable or subject to review will be deemed an Allowed Claim, provided that only the amount of such Allowed Tort Claim that is not satisfied from proceeds of insurance payable to the holder of such Allowed Tort Claim will be treated as an Allowed Claim for the purposes of distributions under the Plan. Distributions on account of any such Allowed Tort Claim shall be made in accordance with the Plan. Nothing contained in this Section will constitute or be deemed a waiver of any claim, right or Cause of Action that the City may have against any Entity in connection with or arising out of any Tort Claim, including any rights under section 157(b)(5) of title 28 of the United States Code. All claims, demands, rights, defenses and Causes of Action that the City may have against any Entity in connection with or arising out of any Tort Claim are expressly retained and preserved.

B. **Disputed Claims Reserve.**

On and after the Effective Date, until such time as all Disputed Claims have been compromised and settled or determined by Final Order and before making any Distributions, consistent with and subject to section 1123(a)(4) of the Bankruptcy Code, the City shall establish and maintain a reserve of property equal to the Distributions to which Holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims in the Face Amount of such Disputed Claims or such lesser amount as required by an order of the Bankruptcy Court. On the first Distribution Date that is at least 30 days (or such fewer days as may be agreed to by the City in its sole discretion) after the date on which a Disputed Claim becomes an Allowed Claim, the Disbursing Agent shall remit to the Holder of such Allowed Claim any Distributions such Holder would have been entitled to under the Plan on account of such Allowed Claim had such Claim been Allowed as of the Effective Date. If a Disputed Claim is disallowed by Final Order, the property reserved on account shall become available for Distribution to the Holders of Allowed Claims within the Class(es) entitled to receive such property. Each Holder of

a Disputed Claim that ultimately becomes an Allowed Claim will have recourse only to the assets held in the disputed claims reserve and not to any other assets held by the City, its property or any property previously distributed on account of any Allowed Claim. Notwithstanding the foregoing, the disputed claim reserve established pursuant to this Section shall not include any reserve of property on account of Disputed COP Claims, which shall receive the treatment set forth in Section II.B.3.s.iii.

## C.     Objections to Claims.

### 1.     Authority to Prosecute, Settle and Compromise.

The City's rights to object to, oppose and defend against all Claims on any basis are fully preserved. Except as otherwise provided in Section II.B.3.s.i with respect to Disputed COP Claims, as of the Effective Date, only the City shall have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims, including pursuant to the ADR Procedures or any similar procedures approved by the Bankruptcy Court. Any objections to Claims shall be Filed no later than the Claims Objection Bar Date. On and after the Effective Date, the City may settle or compromise any Disputed Claim or any objection or controversy relating to any Claim without any further notice or any action, order or approval of the Bankruptcy Court.

### 2.     Application of Bankruptcy Rules.

To facilitate the efficient resolution of Disputed Claims, the City shall be permitted to File omnibus objections to claims notwithstanding Bankruptcy Rule 3007(c).

### 3.     Expungement or Adjustment of Claims Without Objection.

Any Claim that has been paid, satisfied or superseded shall be expunged from the Claims Register by the Claims and Balloting Agent at the request of the City, and any Claim that has been amended by the Holder of such Claim shall be adjusted on the Claims Register by the Claims and Balloting Agent at the request of the City, without the Filing of an objection and without any further notice or any action, order or approval of the Bankruptcy Court.

### 4.     Extension of Claims Objection Bar Date.

Upon motion to the Bankruptcy Court, the City may request, and the Bankruptcy Court may grant, an extension to the Claims Objection Bar Date generally or with respect to specific Claims. Any extension granted by the Bankruptcy Court shall not be considered to be a modification to the Plan under section 1127 of the Bankruptcy Code.

### 5.     Authority to Amend List of Creditors.

The City will have the authority to amend the List of Creditors with respect to any Claim and to make Distributions based on such amended List of Creditors without approval of the Bankruptcy Court. If any such amendment to the List of Creditors reduces the amount of a Claim or changes the nature or priority of a Claim, the City will provide the Holder of such Claim with notice of such amendment and such Holder will have 20 days to File an objection to such amendment with the Bankruptcy Court. If no such objection is Filed, the Disbursing Agent may proceed with Distributions based on such amended List of Creditors without approval of the Bankruptcy Court.

## ARTICLE VII
## RETENTION OF JURISDICTION

Pursuant to sections 105(c), 945 and 1142(b) of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 9 Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

A.      Allow, disallow, estimate, determine, liquidate, reduce, classify, re-classify, estimate or establish the priority or secured or unsecured status of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the amount, allowance, priority or classification of Claims;

B.      Enforce the term (maturity) of the collective bargaining agreements identified on Exhibit II.D.5 of the Plan, notwithstanding any state law to the contrary;

C.      Resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including claims for payment of any cure amount;

D.      Ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

E.      Adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving the City that may be pending on the Effective Date or brought thereafter;

F.      Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

G.      Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents;

H.      Approve any modification of the Plan or approve any modification of the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any order, the Plan, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, or enter any order in aid of confirmation pursuant to sections 945 and 1142(b) of the Bankruptcy Code, in such manner as may be necessary or appropriate to consummate the Plan;

I.      Issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

J.      Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or Distributions pursuant to the Plan are enjoined or stayed;

K.      Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

L.      Enforce or clarify any orders previously entered by the Bankruptcy Court in the Chapter 9 Case;

M.      Enter a final decree closing the Chapter 9 Case pursuant to section 945(b) of the Bankruptcy Code; and

N.      Hear any other matter over which the Bankruptcy Court has jurisdiction under the provisions of the Bankruptcy Code and the Bankruptcy Rules subject to any limits on the Bankruptcy Court's jurisdiction and powers under sections 903 and 904 of the Bankruptcy Code.

# ARTICLE VIII
# MISCELLANEOUS PROVISIONS

## A.      Modification of the Plan.

Subject to section 942 and 1127(d) of the Bankruptcy Code, the City may alter, amend or modify the Plan or the Exhibits at any time prior to or after the Confirmation Date but prior to the substantial consummation of the Plan.  A Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as altered, amended or modified so long as the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

## B.      Revocation of the Plan.

The City reserves the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the City revokes or withdraws the Plan, or if the Confirmation Date does not occur, then the Plan shall be null and void in all respects, and nothing contained in the Plan, nor any action taken or not taken by the City with respect to the Plan, the Disclosure Statement or the Confirmation Order, shall be or shall be deemed to be:  (1) a waiver or release of any claims by or against the City; (2) an admission of any sort by the City or any other party in interest, or (3) prejudicial in any manner to the rights of the City or any other party in interest.

## C.      Disclosure of Amounts to Be Paid for Chapter 9 Case Services.

No later than five days before the Confirmation Hearing, (1) the City shall File a statement of all amounts to be paid by it for services or expenses in the Chapter 9 Case or incident to the Plan; and (2) as applicable, all other persons shall File statements of all amounts to be paid by them for services or expenses in the Chapter 9 Case or incident to the Plan.  Pursuant to section 943(b)(3) of the Bankruptcy Code, the Bankruptcy Court must approve such amounts as reasonable as a condition to Confirmation.

## D.      Severability of Plan Provisions.

If any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, in each case at the election of and with the consent of the City, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the City's consent; and (3) non-severable and mutually dependent.

## E.      Effectuating Documents and Transactions.

The City is authorized to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and any notes or securities issued pursuant to the Plan.  All such actions shall be deemed to have occurred and shall be in effect pursuant to applicable non-bankruptcy law and the Bankruptcy Code, without any requirement of further action by the City Council, the Emergency Manager, the Mayor or any employees or officers of the City.  On the Effective Date, the appropriate employees and officers of the City are authorized and directed to execute and deliver the agreements, documents and instruments contemplated by the Plan, and to take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan, in the name and on behalf of the City.

## F. Successors and Assigns.

Except as expressly provided otherwise in the Plan, the rights, benefits and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, representative, beneficiary or guardian, if any, of each Entity.

## G. Plan Controls.

In the event and to the extent that any provision of the Plan is inconsistent with the provisions of the Disclosure Statement, the provisions of the Plan shall control and take precedence.

## H. Notice of the Effective Date.

On or before ten Business Days after occurrence of the Effective Date, the City shall mail or cause to be mailed to all Holders of Claims a notice that informs such Holders of (1) entry of the Confirmation Order; (2) the occurrence of the Effective Date; (3) the assumption and rejection of Executory Contracts and Unexpired Leases pursuant to the Plan, as well as the deadline for the filing of Claims arising from such rejection; (4) the deadline for the filing of Administrative Claims; and (5) such other matters as the City deems to be appropriate.

## I. Governing Law.

Unless (1) a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or (2) otherwise specifically stated herein or in any contract, articles or certificates of incorporation, bylaws, codes of regulation, ordinance, similar constituent documents, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the laws of the State of Michigan, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction and implementation of the Plan and any contract, articles or certificates of incorporation, bylaws, codes of regulation, similar constituent documents, instrument, release or other agreement or document entered into or delivered in connection with the Plan.

## J. Request for Waiver of Automatic Stay of Confirmation Order.

The Plan shall serve as a motion seeking a waiver of the automatic stay of the Confirmation Order imposed by Bankruptcy Rule 3020(e). Any objection to this request for waiver shall be Filed and served on the parties listed in Section VIII.L on or before the Voting Deadline.

## K. Term of Existing Injunctions and Stays.

All injunctions or stays provided for in the Chapter 9 Case under sections 105, 362 or 922 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

## L. Service of Documents

Any pleading, notice or other document required by the Plan or the Confirmation Order to be served on or delivered to (1) the City and (2) the Retiree Committee must be sent by overnight delivery service, facsimile transmission, courier service or messenger to:

1.      **The City**

David G. Heiman, Esq.
Heather Lennox, Esq.
Thomas A. Wilson, Esq.
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212

Bruce Bennett, Esq.
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 243 2382
Facsimile: (213) 243 2539

Jonathan S. Green, Esq.
Stephen S. LaPlante, Esq.
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500

(Counsel to the City)

2.      **The Retiree Committee**

Claude Montgomery, Esq.
Carole Neville, Esq.
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 768-6700
Facsimile: (212) 768-6800

Matthew E. Wilkins, Esq.
Paula A. Hall, Esq.
BROOKS WILKINS SHARKEY & TURCO PLLC
401 South Old Woodward, Suite 400
Birmingham, Michigan 48009
Telephone: (248) 971-1711
Facsimile: (248) 971-1801

(Counsel to the Retiree Committee)

Dated:  February 21, 2014

Respectfully submitted,

The City of Detroit, Michigan

By:     /s/  Kevyn D. Orr
Name:   Kevyn D. Orr
Title:     Emergency Manager for the City of Detroit, Michigan

COUNSEL:


  /s/ David G. Heiman
David G. Heiman
Heather Lennox
Thomas A. Wilson
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Bruce Bennett
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243 2382
Facsimile:  (213) 243 2539

Jonathan S. Green
Stephen S. LaPlante
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500

ATTORNEYS FOR THE DEBTOR

**EXHIBIT I.A.50**

SCHEDULE OF COP SWAP AGREEMENTS

## SCHEDULE OF COP SWAP AGREEMENTS

| COP Swap Agreements |
|---|
| ISDA Master Agreement (including the Schedule thereto) dated as of May 25, 2005, between Detroit Police and Fire Retirement System Service Corporation ("DPFRS Service Corporation") and Merrill Lynch Capital Services, Inc. (as successor to SBS Financial Products Company LLC) ("Merrill Lynch") and the Confirmation thereunder dated June 7, 2006 (bearing Reference No. SBSFPC-0010) (as amended, modified or supplemented). |
| ISDA Master Agreement (including the Schedule thereto) dated as of May 25, 2005 between DFPRS Service Corporation and Merrill Lynch and the Confirmation thereunder dated June 7, 2006 (bearing Reference No. SBSFPC-0011) (as amended, modified or supplemented). |
| ISDA Master Agreement (including the Schedule thereto) dated as of May 25, 2005 between Detroit General Retirement System Service Corporation ("DGRS Service Corporation") and Merrill Lynch and the Confirmation thereunder dated June 7, 2006 (bearing Reference No. SBSFPC-0009) (as amended, modified or supplemented). |
| ISDA Master Agreement (including the Schedule thereto) dated as of June 7, 2006 between DGRS Service Corporation and Merrill Lynch and the Confirmation thereunder dated June 7, 2006 (bearing Reference No. SBSFPC-0012) (as amended, modified or supplemented). |
| ISDA Master Agreement between DGRS Service Corporation and UBS AG, dated as of June 7, 2006, including the Schedule and Credit Support Annex thereto and the Confirmations thereunder, dated June 7, 2006, bearing UBS AG Reference No. 37380291 (as amended, modified or supplemented). |
| ISDA Master Agreement between DFPRS Service Corporation and UBS AG, dated as of May 25, 2005, including the Schedule and Credit Support Annex thereto and the Confirmations thereunder, dated June 7, 2006, bearing UBS AG Reference No. 37380351 (as amended, modified or supplemented). |
| ISDA Master Agreement between DFPRS Service Corporation and UBS AG, dated as of May 25, 2005, including the Schedule and Credit Support Annex thereto and the Confirmations thereunder, dated June 7, 2006, bearing UBS Reference No. 37380313 (as amended, modified or supplemented). |
| ISDA Master Agreement between DGRS Service Corporation and UBS AG, dated as of May 25, 2005, including the Schedule and Credit Support Annex thereto and the Confirmations thereunder, dated June 7, 2006, bearing UBS Reference No. 37380341 (as amended, modified or supplemented). |

**EXHIBIT I.A.88**

SCHEDULE OF DWSD CLASS A SEWER DOCUMENTS & RELATED DWSD CLASS A SEWER BONDS

## SCHEDULE OF (I) DWSD CLASS A SEWER DOCUMENTS, (II) RELATED DWSD CLASS A SEWER BONDS, (III) CLASSES OF DWSD CLASS A SEWER CLAIMS AND (IV) ALLOWED AMOUNTS OF DWSD CLASS A SEWER CLAIMS

| DWSD Class A Sewer Documents | DWSD Series of DWSD Class A Sewer Bonds | Class | Allowed Amount of DWSD Class A Sewer Claims in Class |
|---|---|---|---|
| Ordinance No. 18-01 adopted October 18, 2001 ("Sewage Bond Ordinance")[1]  Trust Indenture dated as of June 1, 2012 among the City of Detroit, Detroit Water and Sewage Department and U.S. Bank National Association, as trustee ("Sewage Indenture")  Bond Authorizing Resolution adopted on August 1, 2001 and Amendment dated October 10, 2001  Composite Sale Order of the Finance Director of the City of Detroit dated August 1, 2001 | Series 2001-D | Class 1C-1 | $21,316,121.00 |
| Sewage Bond Ordinance  Sewage Indenture  Bond Authorizing Resolution of the City Council adopted May 7, 2003  Composite Sale Order of the Finance Director of the City of Detroit dated May 14, 2003 | Series 2003-A | Class 1C-2[2] | $129,239,097.00 |
| Sewage Bond Ordinance  Sewage Indenture  Resolution of the City Council adopted February 15, 2006  Sale Order of Finance Director of the City of Detroit dated November 29, 2006 | Series 2006-D | Class 1C-3 | $288,885,311.00 |

---

[1] Ordinance No. 18-01 amended and restated Ordinance No. 27-86 adopted on December 9, 1986, as amended.

[2] Bonds within Series 2003-A that are callable under the terms specified under the related sewer bond documents are DWSD Class A Sewer Bonds. All other bonds within Series 2003-A are DWSD Class B Sewer Bonds.

**EXHIBIT I.A.91**

SCHEDULE OF DWSD CLASS A WATER DOCUMENTS & RELATED DWSD CLASS A WATER BONDS

**SCHEDULE OF (I) DWSD CLASS A WATER DOCUMENTS, (II) RELATED
DWSD CLASS A WATER BONDS, (III) CLASSES OF DWSD CLASS A WATER CLAIMS
AND (IV) ALLOWED AMOUNTS OF DWSD CLASS A WATER CLAIMS**

| DWSD Class A Water Documents | DWSD Series of DWSD Class A Water Bonds | Class | Allowed Amount of DWSD Class A Water Claims in Class |
|---|---|---|---|
| Ordinance No. 01-05 adopted January 26, 2005 ("Water Bond Ordinance")[1]<br><br>Trust Indenture dated as of February 1, 2013 among the City of Detroit, Detroit Water and Sewerage Department and U.S. Bank National Association, as trustee ("Water Indenture")<br><br>Bond Authorizing Resolution of the City Council adopted January 31, 2001 and a Resolution Amending the Bond Authorizing Resolution, adopted April 25, 2001<br><br>Sale Order of Finance Director of the City of Detroit dated May 17, 2001 | Series 2001-A | Class 1A-1 | $73,961,840.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>Bond Authorizing Resolution of the City Council adopted Nov. 27, 2002 ("2003 Water Resolution")<br><br>Sale Order of the Finance Director of the City of Detroit dated January 24, 2003 and Supplement to Sale Order of the Finance Director – 2003 Bonds, dated February 6, 2003 (collectively, "2003 Sale Order") | Series 2003-A | Class 1A-2 | $179,200,784.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>2003 Water Resolution<br><br>2003 Sale Order | Series 2003-B | Class 1A-3 | $41,867,273.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>2003 Water Resolution<br><br>2003 Sale Order | Series 2003-C | Class 1A-4 | $27,717,476.00 |

---

[1]  Ordinance No. 0-05 amends and restates Ordinance No. 30-02 adopted November 27, 2002, which amended and restated Ordinance No. 06-01 adopted October 18, 2001, which amended and restated Ordinance No. 32-85, as amended.

**EXHIBIT I.A.94**

SCHEDULE OF DWSD CLASS B SEWER DOCUMENTS & RELATED DWSD CLASS B SEWER BONDS

**SCHEDULE OF (I) DWSD CLASS B SEWER DOCUMENTS, (II) RELATED
DWSD CLASS B SEWER BONDS, (III) CLASSES OF DWSD CLASS B SEWER CLAIMS
AND (IV) ALLOWED AMOUNTS OF DWSD CLASS B SEWER CLAIMS**

| DWSD Class B Sewer Documents | DWSD Series of DWSD Class B Sewer Bonds | Class | Allowed Amount of DWSD Class B Sewer Claims in Class |
|---|---|---|---|
| Ordinance No. 18-01 adopted October 18, 2001 ("<u>Sewage Bond Ordinance</u>")[1]<br><br>Trust Indenture dated as of June 1, 2012 among the City of Detroit, Detroit Water and Sewage Department and U.S. Bank National Association, as trustee ("<u>Sewage Indenture</u>")<br><br>Resolution of the City Council adopted May 6, 1998 ("<u>1998 Bond Resolution</u>")<br><br>Sale Order of the Finance Director of the City of Detroit dated December 9, 1998 ("<u>1998 Sale Order</u>") | Series 1998-A | Class 1D-1 | $62,764,670.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>1998 Bond Resolution<br><br>1998 Sale Order | Series 1998-B | Class 1D-2 | $62,318,566.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Resolution adopted on November 24, 1999<br><br>Sale Order of the Finance Director of the City of Detroit dated December 10, 1999 | Series 1999-A | Class 1D-3 | $55,576,628.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted on August 1, 2001 and Amendment dated October 10, 2001 (collectively, "<u>2001 Bond Resolution</u>")<br><br>Composite Sale Order of the Finance Director of the City of Detroit dated August 1, 2001 ("<u>2001 Sale Order</u>") | Series 2001-B | Class 1D-4 | $110,833,190.00 |

---

[1]     Ordinance No. 18-01 amended and restated Ordinance No. 27-86 adopted on December 9, 1986, as amended.

| | | | |
|---|---|---|---|
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2001 Bond Resolution<br><br>2001 Sale Order | Series 2001-C(1) | Class 1D-5 | $152,859,785.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2001 Bond Resolution<br><br>2001 Sale Order and Amendment No. 1 to Sale Order of the Finance Director (2001(C-2) and (E)) dated April 23, 2008 ("2001 Sale Order Amendment") and Supplement to Prior Sale Orders (2001(C-2), 2001(E) and 2006(A)) dated May 1, 2008 ("2001/2006 Supplement to Sale Orders") | Series 2001-C(2) | Class 1D-6 | $121,649,072.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2001 Bond Resolution<br><br>2001 Sale Order, 2001 Sale Order Amendment and 2001/2006 Supplement to Sale Orders | Series 2001-E | Class 1D-7 | $136,514,621.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution of the City Council adopted May 7, 2003 ("2003 Bond Resolution")<br><br>Composite Sale Order of the Finance Director of the City of Detroit dated May 14, 2003 | Series 2003-A | Class 1D-8[2] | $55,533,349.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2003 Bond Resolution<br><br>Composite Sale Order of the Finance Director of the City of Detroit dated May 22, 2003 | Series 2003-B | Class 1D-9 | $150,523,973.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution of the City Council adopted May 7, 2003<br><br>Composite Sale Order of the Finance Director dated January 9, 2004 | Series 2004-A | Class 1D-10 | $60,942,805.00 |

---

[2] Bonds within Series 2003-A that are callable under the terms specified under the related sewer bond documents are DWSD Class A Sewer Bonds. All other bonds within Series 2003-A are DWSD Class B Sewer Bonds.

| | | | |
|---|---|---|---|
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Resolution of the City Council authorizing sale of the 2005 adopted November 17, 2004 ("2005 Bond Resolution")<br><br>Sale Order of the Finance Director of the City of Detroit, Series 2005-A, dated March 9, 2005 | Series 2005-A | Class 1D-11 | $238,425,912.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2005 Bond Resolution<br><br>Sale Order of the Finance Director of the City of Detroit, Series 2005-B, dated March 9, 2005 | Series 2005-B | Class 1D-12 | $37,286,604.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2005 Bond Resolution<br><br>Sale Order of the Finance Director of the City of Detroit, Series 2005-C, dated March 9, 2005 | Series 2005-C | Class 1D-13 | $49,695,460.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Resolution of the City Council adopted February 15, 2006 ("2006 Bond Resolution")<br><br>Sale Order of Finance Director of the City of Detroit, Series 2006(A), dated August 4, 2006, Amendment No. 1 to Sale Order dated April 23, 2008 and 2001/2006 Supplement to Sale Orders | Series 2006-A | Class 1D-14 | $123,971,760.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2006 Bond Resolution<br><br>Sale Order of Finance Director of the City of Detroit, Series 2006(B), dated July 27, 2006 | Series 2006-B | Class 1D-15 | $243,795,428.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2006 Bond Resolution<br><br>Sale Order of Finance Director of the City of Detroit, Series 2006(C), dated August 4, 2006 | Series 2006-C | Class 1D-16 | $26,622,841.00 |

| | | | |
|---|---|---|---|
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Resolution of the City Council adopted July 19, 2011<br><br>Sale Order of the Finance Director of the City of Detroit dated June 20, 2012 | Series 2012-A | Class 1D-17 | $661,353,260.00 |

**EXHIBIT I.A.97**

SCHEDULE OF DWSD CLASS B WATER DOCUMENTS & RELATED DWSD CLASS B WATER BONDS

**SCHEDULE OF (I) DWSD CLASS B WATER DOCUMENTS, (II) RELATED
DWSD CLASS B WATER BONDS, (III) CLASSES OF DWSD CLASS B WATER CLAIMS
AND (IV) ALLOWED AMOUNTS OF DWSD CLASS B WATER CLAIMS**

| DWSD Class B Water Documents | DWSD Series of DWSD Class B Water Bonds | Class | Allowed Amount of DWSD Class B Water Claims in Class |
|---|---|---|---|
| Ordinance No. 01-05 adopted January 26, 2005 ("Water Bond Ordinance")[1] <br><br> Trust Indenture dated as of February 1, 2013 among the City of Detroit, Detroit Water and Sewerage Department and U.S. Bank National Association, as trustee ("Water Indenture") <br><br> Bond Resolution adopted on October 14, 1993 <br><br> Resolution adopted October 22, 1993 <br><br> Final Report of the Finance Director delivered to City Council December 22, 1993 | Series 1993 | Class 1B-1 | $24,799,852.00 |
| Water Bond Ordinance <br><br> Water Indenture <br><br> Bond Resolution adopted July 9, 1997 <br><br> Sale Order of the Finance Director of the City of Detroit dated August 6, 1997 | Series 1997-A | Class 1B-2 | $13,470,658.00 |
| Water Bond Ordinance <br><br> Water Indenture <br><br> Resolution of the City Council adopted April 25, 2001 <br><br> Sale Order of the Finance Director of the City of Detroit dated May 31, 2001 and Supplement to Prior Sale Orders of Finance Director dated May 6, 2008 | Series 2001-C | Class 1B-3 | $188,732,240.00 |
| Water Bond Ordinance <br><br> Water Indenture <br><br> Bond Authorizing Resolution of the City Council adopted November 27, 2002 <br><br> Sale Order of Finance Director of the City of Detroit dated February 5, 2003 | Series 2003-D | Class 1B-4 | $140,911,713.00 |

---

[1]     Ordinance No. 0-05 amends and restates Ordinance No. 30-02 adopted November 27, 2002, which amended and restated Ordinance No. 06-01 adopted October 18, 2001, which amended and restated Ordinance No. 32-85, as amended.

| | | | |
|---|---|---|---|
| Water Bond Ordinance<br><br>Water Indenture<br><br>Bond Authorizing Resolution of the City Council adopted January 21, 2004 ("2004 Bond Resolution")<br><br>Sale Order of Finance Director of the City of Detroit dated May 12, 2004 ("2004 Sale Order") | Series 2004-A | Class 1B-5 | $68,762,674.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>2004 Bond Resolution<br><br>2004 Sale Order | Series 2004-B | Class 1B-6 | $114,975,691.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>Amended and Restated Resolution of the City Council adopted January 26, 2005 ("2005-A/C Bond Resolution")<br><br>Sale Order of Finance Director of the City of Detroit dated March 3, 2005 (Series 2005-A) | Series 2005-A | Class 1B-7 | $88,581,161.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>Amended and Restated Resolution of the City Council dated March 22, 2005 (Series 2005-B)<br><br>Sale Order of Finance Director of the City of Detroit dated March 22, 2005 (Series 2005-B), Amendment No. 1 to Sale Order of the Finance Director dated April 23, 2008 and Supplement to Prior Sale Orders of Finance Director dated May 6, 2008 | Series 2005-B | Class 1B-8 | $187,792,939.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>2005-A/C Bond Resolution<br><br>Sale Order of Finance Director of the City of Detroit dated March 3, 2005 (Series 2005-C) | Series 2005-C | Class 1B-9 | $109,459,313.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>Resolution of the City Council adopted November 18, 2005 ("2006 Bond Resolution")<br><br>Sale Order of Finance Director of the City of Detroit dated July 19, 2006 (Series 2006-A) | Series 2006-A | Class 1B-10 | $260,775,875.00 |

| | | | |
|---|---|---|---|
| Water Bond Ordinance<br><br>Water Indenture<br><br>2006 Bond Resolution<br><br>Sale Order of Finance Director of the City of Detroit dated August 15, 2006 (Series 2006-B) | Series 2006-B | Class 1B-11 | $120,067,563.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>2006 Bond Resolution<br><br>Sale Order of Finance Director of the City of Detroit dated July 19, 2006 (Series 2006-C) | Series 2006-C | Class 1B-12 | $217,184,085.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>2006 Bond Resolution<br><br>Sale Order of Finance Director of the City of Detroit dated July 19, 2006 (Series 2006-D | Series 2006-D | Class 1B-13 | $142,532,444.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>Resolution of the City Council adopted April 5, 2011 ("2011 Bond Resolution")<br><br>Sale Order of the Finance Director dated as of December 15, 2011 ("2011 Sale Order") | Series 2011-A | Class 1B-14 | $371,720,309.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>2011 Bond Resolution<br><br>2011 Sale Order | Series 2011-B | Class 1B-15 | $15,509,284.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>2011 Bond Resolution<br><br>2011 Sale Order | Series 2011-C | Class 1B-16 | $102,908,415.00 |

**EXHIBIT I.A.102**

SCHEDULE OF DWSD REVOLVING SEWER BONDS
DOCUMENTS & RELATED DWSD REVOLVING SEWER BONDS

**SCHEDULE OF (I) DWSD REVOLVING SEWER BOND DOCUMENTS, (II) RELATED DWSD REVOLVING SEWER BONDS, (III) CLASSES OF DWSD REVOLVING SEWER BOND CLAIMS AND (IV) ALLOWED AMOUNTS OF DWSD REVOLVING SEWER BOND CLAIMS**

| DWSD Revolving Sewer Bond Documents | Series of DWSD Revolving Sewer Bonds | Class | Allowed Amount of DWSD Revolving Sewer Bond Claims in Class |
|---|---|---|---|
| Ordinance No. 18-01 adopted October 18, 2001 ("Sewage Bond Ordinance")[1] <br><br> Trust Indenture dated as of June 1, 2012 among the City of Detroit ("City"), Detroit Water and Sewage Department and U.S. Bank National Association, as trustee ("Sewage Indenture") <br><br> Bond Authorizing Resolution adopted September 9, 1992 <br><br> Supplemental Agreement dated September 24, 1992, among City, Michigan Bond Authority ("Authority") and the State of Michigan acting through the Department of Natural Resources | Series 1992-B-SRF | Class 1E-1 | $115,679.00 |
| Sewage Bond Ordinance <br><br> Sewage Indenture <br><br> Bond Authorizing Resolution adopted September 30, 1993 <br><br> Supplemental Agreement regarding $6,603,996 Sewage Disposal System Revenue Bond Series 1993-B -SRF, among the City, Authority and DEQ | Series 1993-B-SRF | Class 1E-2 | $779,574.00 |
| Sewage Bond Ordinance <br><br> Sewage Indenture <br><br> Bond Authorizing Resolution adopted July 30, 1997 <br><br> Supplemental Agreement dated September 30, 1997, among City, the Authority and the State of Michigan acting through the Department of Environmental Quality ("DEQ") | Series 1997-B-SRF | Class 1E-3 | $1,882,416.00 |

---

[1]     Ordinance No. 18-01 amended and restated Ordinance No. 27-86 adopted on December 9, 1986, as amended.

| | | | |
|---|---|---|---|
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted May 12, 1999<br><br>Supplemental Agreement regarding $21,475,000 City Sewage Disposal System Revenue Bond, Series 1999-SRF1, dated June 24, 1999, among City, Authority and DEQ | Series 1999-SRF-1 | Class 1E-4 | $8,814,549.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted August 4, 1999 ("1999 SRF Resolution")<br><br>Supplemental Agreement regarding $46,000,000 SRF-2, $31,030,000 SRF-3, $40,655,000 SRF-4 dated September 30, 1999 ("1999 SRF Supplemental Agreement"), among City, Authority and DEQ | Series 1999-SRF-2 | Class 1E-5 | $26,050,770.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>1999 SRF Resolution<br><br>1999 SRF Supplemental Agreement | Series 1999-SRF-3 | Class 1E-6 | $14,400,455.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>1999 SRF Resolution<br><br>1999 SRF Supplemental Agreement | Series 1999-SRF-4 | Class 1E-7 | $18,863,135.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted February 9, 2000<br><br>Supplemental Agreement regarding Sewage Disposal System Revenue Bond (SRF Junior Lien), Series 2000-SRF1, dated March 30, 2000, among City, Authority and DEQ | Series 2000-SRF-1 | Class 1E-8 | $22,109,906.00 |

| | | | |
|---|---|---|---|
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted July 19, 2000<br><br>Supplemental Agreement regarding Sewage Disposal System Revenue Bond (SRF Junior Lien) Series 2000-SRF2 dated September 28, 2000, among City, Authority and DEQ | Series 2000-SRF-2 | Class 1E-9 | $36,317,016.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted March 7, 2001<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System Revenue Bonds (SRF Junior Lien), Series 2001-SRF-1, dated June 28, 2001 among City, Authority and DEQ | Series 2001-SRF-1 | Class 1E-10 | $54,544,430.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted November 21, 2001<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2001-SRF2, dated December 20, 2001 among City, Authority and DEQ | Series 2001-SRF-2 | Class 1E-11 | $39,720,877.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted June 5, 2002<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2002-SRF1, dated June 27, 2002 among City, Authority and DEQ | Series 2002-SRF-1 | Class 1E-12 | $10,738,639.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted June 5, 2002<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2002-SRF2, dated June 27, 2002 among City, Authority and DEQ | Series 2002-SRF-2 | Class 1E-13 | $871,753.00 |

| | | | |
|---|---|---|---|
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted November 13, 2002<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2002-SRF3, dated December 19, 2002 among City, Authority and DEQ | Series 2002-SRF-3 | Class 1E-14 | $19,331,028.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted May 14, 2003<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2003-SRF1, dated June 26, 2003 among City, Authority and DEQ | Series 2003-SRF-1 | Class 1E-15 | $34,467,406.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted July 9, 2003<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2003-SRF2, dated September 25, 2003 among City, Authority and DEQ | Series 2003-SRF-2 | Class 1E-16 | $16,511,283.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted April 21, 2004 ("2004 SRF Resolution")<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2004-SRF1, dated June 24, 2004 among City, Authority and DEQ | Series 2004-SRF-1 | Class 1E-17 | $1,901,851.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2004 SRF Resolution<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2004-SRF2, dated June 24, 2004 among City, Authority and DEQ | Series 2004-SRF-2 | Class 1E-18 | $11,963,005.00 |

| | | | |
|---|---|---|---|
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2004 SRF Resolution<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2004-SRF3, dated June 24, 2004 among City, Authority and DEQ | Series 2004-SRF-3 | Class 1E-19 | $8,284,197.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted May 16, 2007<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2007-SRF1, dated September 20, 2007 among City, Authority and DEQ | Series 2007-SRF-1 | Class 1E-20 | $140,784,514.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted November 5, 2008<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2009-SRF1, dated April 17, 2009 among City, Authority and DEQ | Series 2009-SRF-1 | Class 1E-21 | $9,878,643.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted September 29, 2009<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2010-SRF1, dated January 22, 2010 among City, Authority and DEQ | Series 2010-SRF-1 | Class 1E-22 | $3,383,696.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted December 13, 2011<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2012-SRF1, dated August 30, 2012 among City, Authority and DEQ | Series 2012-SRF | Class 1E-23 | $4,332,541.00 |

**EXHIBIT I.A.105**

SCHEDULE OF DWSD REVOLVING WATER BOND
DOCUMENTS & RELATED DWSD REVOLVING WATER BONDS

**SCHEDULE OF (I) DWSD REVOLVING WATER BOND DOCUMENTS, (II) RELATED DWSD REVOLVING WATER BONDS, (III) CLASSES OF DWSD REVOLVING WATER BOND CLAIMS AND (IV) ALLOWED AMOUNTS OF DWSD REVOLVING WATER BOND CLAIMS**

| DWSD Revolving Water Bond Documents | Series of DWSD Revolving Water Bonds | Class | Allowed Amount of DWSD Revolving Water Bond Claims in Class |
|---|---|---|---|
| Ordinance No. 01-05 adopted January 26, 2005 ("Water Bond Ordinance")[1]<br><br>Trust Indenture dated as of February 1, 2013 among the City of Detroit ("City"), Detroit Water and Sewerage Department and U.S. Bank National Association, as trustee ("Water Indenture")<br><br>Bond Authorizing Resolution adopted April 29, 2005 ("2005 SRF Resolution")<br><br>Supplemental Agreement dated as of September 22, 2005 among City, Michigan Municipal Bond Authority ("Authority") and Michigan Department of Environmental Quality ("DEQ") | Series 2005-SRF-1 | Class 1F-1 | $10,022,619.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>2005 SRF Resolution<br><br>Supplemental Agreement regarding the Water Supply System SRF Junior Lien Revenue Bond, Series 2005-SRF2, dated September 22, 2005 among City, Authority and DEQ | Series 2005-SRF-2 | Class 1F-2 | $6,280,869.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>Bond Authorizing Resolution adopted February 15, 2006<br><br>Supplemental Agreement regarding the Water Supply System SRF Junior Lien Revenue Bond, Series 2006-SRF1, dated September 21, 2006 among City, Authority and DEQ | Series 2006-SRF-1 | Class 1F-3 | $3,739,227.00 |

---

[1]  Ordinance No. 0-05 amends and restates Ordinance No. 30-02 adopted November 27, 2002, which amended and restated Ordinance No. 06-01 adopted October 18, 2001, which amended and restated Ordinance No. 32-85, as amended.

| | | | |
|---|---|---|---|
| Water Bond Ordinance<br><br>Water Indenture<br><br>Bond Authorizing Resolution and Bond Ordinance, adopted July 15, 2008<br><br>Supplemental Agreement regarding Water Supply System SRF Junior Lien Revenue Bonds, Series 2008-SRF1, dated September 29, 2008 among City, Authority and DEQ | Series 2008-SRF-1 | Class 1F-4 | $1,547,272.00 |

**EXHIBIT I.A.146**

SCHEDULE OF HUD INSTALLMENT NOTE
DOCUMENTS & RELATED HUD INSTALLMENT NOTES

## SCHEDULE OF HUD INSTALLMENT NOTE
## DOCUMENTS & RELATED HUD INSTALLMENT NOTES

| HUD Installment Note Documents | HUD Installment Notes | Balance as of Petition Date |
|---|---|---|
| City Note No. B-94-MC-26-0006-A | Garfield Project Note | $764,442 |
| City Note No. B-94-MC-26-0006-D | Stuberstone Project Note | $122,346 |
| City Note No. B-97-MC-26-0006 | Ferry Street Project Note | $1,928,285 |
| City Note No. B-98-MC-26-0006-A | New Amsterdam Project Note | $8,345,728 |
| City Note No. B-98-MC-26-0006-B | Vernor Lawndale Project Note | $1,844,974 |
| City Note No. B-02-MC-26-0006 | Mexicantown Welcome Center Project Note | $3,689,487 |
| City Note No. B-03-MC-26-0006 | Garfield II Note 1 | $6,570,458 |
| City Note No. B-03-MC-26-0006 | Garfield II Note 2 | $2,111,028 |
| City Note No. B-03-MC-26-0006 | Garfield II Note 3 | $6,717,760 |
| City Note No. B-03-MC-26-0006 | Garfield II Note 4 | $1,602,954 |
| City Note No. B-05-MC-26-0006 | Woodward Garden Project 1 Note | $7,202,570 |
| City Note No. B-05-MC-26-0006 | Woodward Garden Project 2 Note | $6,315,019 |
| City Note No. B-05-MC-26-0006 | Woodward Garden Project 3 Note | $5,770,733 |
| City Note No. B-05-MC-26-0006-A | Book Cadillac Project Note | $7,486,218 |
| City Note No. B-05-MC-26-0006-A | Book Cadillac Project Note II | $10,938,812 |
| City Note No. B-05-MC-26-0006-B | Fort Shelby Project Note | $18,664,190 |

**EXHIBIT I.A.150**

INTEREST RATE RESET CHART

| Series Name | CUSIP | Lien | Insurer | Maturity | Amount | Coupon | Call Date | Indicative Interest Rates | | | Rate Reset Analysis (Push Market Rates on 6/30/2014) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Sr. Curve | 2nd Curve | Indicative CUSIP Reset Rate | Coupon less Sr. Curve | Coupon less 2nd Curve |
| **Sewer Bonds** | | | | | | | | | | | | |
| Sewer1998A | 251237S87 | Senior | MBIA | 7/1/2014 | 3,110,000 | 5.500% | N/A | N/A | | | N/A | |
| Sewer1998A | 251237S95 | Senior | MBIA | 7/1/2015 | 3,225,000 | 5.500% | N/A | 0.68% | | | 4.82% | |
| Sewer1998A | 251237T29 | Senior | MBIA | 7/1/2016 | 3,540,000 | 5.500% | N/A | 0.85% | | | 4.65% | |
| Sewer1998A | 251237T37 | Senior | MBIA | 7/1/2017 | 3,660,000 | 5.500% | N/A | 1.14% | | | 4.36% | |
| Sewer1998A | 251237T45 | Senior | MBIA | 7/1/2018 | 3,885,000 | 5.250% | 7/1/2017 | 1.50% | | | 3.75% | |
| Sewer1998A | 251237T52 | Senior | MBIA | 7/1/2019 | 4,095,000 | 5.250% | 7/1/2017 | 1.89% | | | 3.36% | |
| Sewer1998A | 251237T60 | Senior | MBIA | 7/1/2020 | 7,415,000 | 5.250% | 7/1/2017 | 2.27% | | | 2.98% | |
| Sewer1998A | 251237T78 | Senior | MBIA | 7/1/2021 | 7,745,000 | 5.250% | 7/1/2017 | 2.65% | | | 2.60% | |
| Sewer1998A | 251237S87 | Senior | MBIA | 7/1/2022 | 12,585,000 | 5.250% | 7/1/2017 | 3.00% | | | 2.25% | |
| Sewer1998A | 251237T94 | Senior | MBIA | 7/1/2023 | 13,350,000 | 5.250% | 7/1/2017 | 3.34% | | | 1.91% | |
| | | | | | | | | | | | | |
| Sewer1998B | 251237U92 | Senior | MBIA | 7/1/2014 | 3,125,000 | 5.500% | N/A | N/A | | | N/A | |
| Sewer1998B | 251237V26 | Senior | MBIA | 7/1/2015 | 3,240,000 | 5.500% | N/A | 0.68% | | | 4.82% | |
| Sewer1998B | 251237V34 | Senior | MBIA | 7/1/2016 | 3,455,000 | 5.500% | N/A | 0.85% | | | 4.65% | |
| Sewer1998B | 251237V42 | Senior | MBIA | 7/1/2017 | 3,575,000 | 5.500% | N/A | 1.14% | | | 4.36% | |
| Sewer1998B | 251237V59 | Senior | MBIA | 7/1/2018 | 3,895,000 | 5.250% | 7/1/2017 | 1.50% | | | 3.75% | |
| Sewer1998B | 251237V67 | Senior | MBIA | 7/1/2019 | 4,015,000 | 5.250% | 7/1/2017 | 1.89% | | | 3.36% | |
| Sewer1998B | 251237V75 | Senior | MBIA | 7/1/2020 | 7,330,000 | 5.250% | 7/1/2017 | 2.27% | | | 2.98% | |
| Sewer1998B | 251237V83 | Senior | MBIA | 7/1/2021 | 7,665,000 | 5.250% | 7/1/2017 | 2.65% | | | 2.60% | |
| Sewer1998B | 251237V91 | Senior | MBIA | 7/1/2022 | 12,600,000 | 5.250% | 7/1/2017 | 3.00% | | | 2.25% | |
| Sewer1998B | 251237W25 | Senior | MBIA | 7/1/2023 | 13,265,000 | 5.250% | 7/1/2017 | 3.34% | | | 1.91% | |
| | | | | | | | | | | | | |
| Sewer2001C1 (Ins) | 251237G3 | Senior | Assured Guaranty | 7/1/2014 | 575,000 | 5.250% | N/A | N/A | | | N/A | |
| Sewer2001C1 (Ins) | 251237H11 | Senior | Assured Guaranty | 7/1/2015 | 600,000 | 5.250% | N/A | 0.68% | | | 4.57% | |
| Sewer2001C1 (Ins) | 251237J7 | Senior | Assured Guaranty | 7/1/2016 | 625,000 | 5.250% | N/A | 0.85% | | | 4.40% | |
| Sewer2001C1 (Ins) | 251237K64 | Senior | Assured Guaranty | 7/1/2017 | 655,000 | 5.250% | N/A | 1.14% | | | 4.11% | |
| Sewer2001C1 (Ins) | 251237L2 | Senior | Assured Guaranty | 7/1/2018 | 690,000 | 5.250% | N/A | 1.50% | | | 3.75% | |
| Sewer2001C1 (Ins) | 251237M0 | Senior | Assured Guaranty | 7/1/2019 | 720,000 | 5.250% | N/A | 1.89% | | | 3.36% | |
| Sewer2001C1 (Ins) | | Senior | Assured Guaranty | 7/1/2024 | 10,100,000 | 7.000% | 7/1/2019 | 3.62% | | | 3.38% | |
| Sewer2001C1 (Ins) | | Senior | Assured Guaranty | 7/1/2025 | 27,325,000 | 7.000% | 7/1/2019 | 3.83% | | | 3.17% | |
| Sewer2001C1 (Ins) | | Senior | Assured Guaranty | 7/1/2026 | 35,705,000 | 7.000% | 7/1/2019 | 4.05% | | | 2.96% | |
| Sewer2001C1 (Ins) | 251237P3 | Senior | Assured Guaranty | 7/1/2027 | 37,380,000 | 7.000% | 7/1/2019 | 4.21% | | 4.01% | 2.79% | |
| | | | | | | | | | | | | |
| Sewer2001C1 (Unins) | | Senior | N/A | 7/1/2020 | 755,000 | 6.500% | 7/1/2019 | 2.27% | | | 4.23% | |
| Sewer2001C1 (Unins) | | Senior | N/A | 7/1/2021 | 790,000 | 6.500% | 7/1/2019 | 2.65% | | | 3.85% | |
| Sewer2001C1 (Unins) | | Senior | N/A | 7/1/2022 | 10,225,000 | 6.500% | 7/1/2019 | 3.00% | | | 3.50% | |
| Sewer2001C1 (Unins) | | Senior | N/A | 7/1/2023 | 10,150,000 | 6.500% | 7/1/2019 | 3.34% | | | 3.16% | |
| Sewer2001C1 (Unins) | 251237N8 | Senior | N/A | 7/1/2024 | 16,080,000 | 6.500% | 7/1/2019 | 3.62% | | 3.33% | 2.88% | |
| | | | | | | | | | | | | |
| Sewer2001C2 | 2512374G5 | Senior | FGIC / BHAC | 7/1/2014 | 310,000 | 4.000% | N/A | N/A | | | N/A | |
| Sewer2001C2 | 2512374H13 | Senior | FGIC / BHAC | 7/1/2015 | 325,000 | 4.000% | N/A | 0.68% | | | 3.32% | |
| Sewer2001C2 | 2512374J9 | Senior | FGIC / BHAC | 7/1/2016 | 345,000 | 4.000% | N/A | 0.85% | | | 3.15% | |
| Sewer2001C2 | 2512374K6 | Senior | FGIC / BHAC | 7/1/2017 | 365,000 | 4.000% | N/A | 1.14% | | | 2.86% | |
| Sewer2001C2 | 2512374L4 | Senior | FGIC / BHAC | 7/1/2018 | 380,000 | 4.000% | N/A | 1.50% | | | 2.50% | |
| Sewer2001C2 | 2512374M2 | Senior | FGIC / BHAC | 7/1/2019 | 400,000 | 4.000% | 7/1/2018 | 1.89% | | | 2.11% | |
| Sewer2001C2 | | Senior | FGIC / BHAC | 7/1/2020 | 420,000 | 4.500% | 7/1/2018 | 2.27% | | | 2.23% | |
| Sewer2001C2 | | Senior | FGIC / BHAC | 7/1/2021 | 440,000 | 4.500% | 7/1/2018 | 2.65% | | | 1.85% | |
| Sewer2001C2 | | Senior | FGIC / BHAC | 7/1/2022 | 470,000 | 4.500% | 7/1/2018 | 3.00% | | | 1.50% | |
| Sewer2001C2 | | Senior | FGIC / BHAC | 7/1/2023 | 495,000 | 4.500% | 7/1/2018 | 3.34% | | | 1.16% | |
| Sewer2001C2 | | Senior | FGIC / BHAC | 7/1/2024 | 520,000 | 4.500% | 7/1/2018 | 3.62% | | | 0.88% | |
| Sewer2001C2 | | Senior | FGIC / BHAC | 7/1/2025 | 550,000 | 4.500% | 7/1/2018 | 3.83% | | | 0.67% | |
| Sewer2001C2 | | Senior | FGIC / BHAC | 7/1/2026 | 580,000 | 4.500% | 7/1/2018 | 4.05% | | | 0.46% | |
| Sewer2001C2 | 2512374N0 | Senior | FGIC / BHAC | 7/1/2027 | 615,000 | 4.500% | 7/1/2018 | 4.21% | | 3.45% | 0.29% | |
| Sewer2001C2 | 2512374P5 | Senior | FGIC / BHAC | 7/1/2028 | 55,840,000 | 5.250% | 7/1/2018 | 4.37% | | | 0.88% | |
| Sewer2001C2 | 2512374Q3 | Senior | FGIC / BHAC | 7/1/2029 | 59,300,000 | 5.250% | 7/1/2018 | 4.50% | | | 0.75% | |
| | | | | | | | | | | | | |
| Sewer2003A (Call) | 251237K77 | Senior | Assured Guaranty | 7/1/2014 | 3,225,000 | 5.000% | 6/30/2014 | N/A | | | N/A | |
| Sewer2003A (Call) | 251237YM9 | Senior | Assured Guaranty | 7/1/2015 | 275,000 | 3.650% | 6/30/2014 | 0.68% | | | 2.97% | |
| Sewer2003A (Call) | 251237K85 | Senior | Assured Guaranty | 7/1/2015 | 3,325,000 | 5.000% | 6/30/2014 | 0.68% | | | 4.32% | |
| Sewer2003A (Call) | 251237YQ0 | Senior | Assured Guaranty | 7/1/2016 | 190,000 | 3.700% | 6/30/2014 | 0.85% | | | 2.85% | |
| Sewer2003A (Call) | 251237Q89 | Senior | Assured Guaranty | 7/1/2016 | 10,000 | 5.000% | 6/30/2014 | 0.85% | | | 4.15% | |
| Sewer2003A (Call) | 251237YT4 | Senior | Assured Guaranty | 7/1/2017 | 250,000 | 3.800% | 6/30/2014 | 1.14% | | | 2.66% | |
| Sewer2003A (Call) | 251237Q97 | Senior | Assured Guaranty | 7/1/2017 | 3,200,000 | 5.000% | 6/30/2014 | 1.14% | | | 3.86% | |
| Sewer2003A (Call) | 251237YW7 | Senior | Assured Guaranty | 7/1/2018 | 535,000 | 4.000% | 6/30/2014 | 1.50% | | | 2.50% | |
| Sewer2003A (Call) | 251237R21 | Senior | Assured Guaranty | 7/1/2018 | 180,000 | 5.000% | 6/30/2014 | 1.50% | | | 3.50% | |
| Sewer2003A (Call) | 251237YZ0 | Senior | Assured Guaranty | 7/1/2019 | 300,000 | 4.000% | 6/30/2014 | 1.89% | | | 2.11% | |
| Sewer2003A (Call) | 251237ZB2 | Senior | Assured Guaranty | 7/1/2020 | 50,000 | 4.000% | 6/30/2014 | 2.27% | | | 1.73% | |
| Sewer2003A (Call) | 251237ZD8 | Senior | Assured Guaranty | 7/1/2021 | 4,795,000 | 5.000% | 6/30/2014 | 2.65% | | | 2.35% | |
| Sewer2003A (Call) | 251237ZE6 | Senior | Assured Guaranty | 7/1/2022 | 25,000 | 4.250% | 6/30/2014 | 3.00% | | | 1.25% | |
| Sewer2003A (Call) | 251237ZF3 | Senior | Assured Guaranty | 7/1/2022 | 5,440,000 | 5.000% | 6/30/2014 | 3.00% | | | 2.00% | |
| Sewer2003A (Call) | 251237ZG1 | Senior | Assured Guaranty | 7/1/2023 | 1,000,000 | 4.300% | 6/30/2014 | 3.34% | | | 0.96% | |
| Sewer2003A (Call) | 251237ZH9 | Senior | Assured Guaranty | 7/1/2023 | 7,935,000 | 5.000% | 6/30/2014 | 3.34% | | | 1.66% | |
| Sewer2003A (Call) | 251237ZJ5 | Senior | Assured Guaranty | 7/1/2024 | 18,215,000 | 5.000% | 6/30/2014 | 3.62% | | | 1.38% | |
| Sewer2003A (Call) | 251237Y72 | Senior | Assured Guaranty | 7/1/2025 | 13,210,000 | 5.000% | 6/30/2014 | 3.83% | | | 1.17% | |
| Sewer2003A (Call) | 251237Y80 | Senior | Assured Guaranty | 7/1/2026 | 9,005,000 | 5.000% | 6/30/2014 | 4.05% | | | 0.96% | |
| Sewer2003A (Call) | | Senior | Assured Guaranty | 7/1/2027 | 9,520,000 | 5.000% | 6/30/2014 | 4.21% | | | 0.79% | |
| Sewer2003A (Call) | 251237Y98 | Senior | Assured Guaranty | 7/1/2028 | 9,965,000 | 5.000% | 6/30/2014 | 4.37% | | 4.29% | 0.63% | |
| Sewer2003A (Call) | | Senior | Assured Guaranty | 7/1/2029 | 10,540,000 | 5.000% | 6/30/2014 | 4.50% | | | 0.50% | |
| Sewer2003A (Call) | | Senior | Assured Guaranty | 7/1/2030 | 11,055,000 | 5.000% | 6/30/2014 | 4.61% | | | 0.39% | |
| Sewer2003A (Call) | | Senior | Assured Guaranty | 7/1/2031 | 11,270,000 | 5.000% | 6/30/2014 | 4.71% | | | 0.29% | |
| Sewer2003A (Call) | 251237Z22 | Senior | Assured Guaranty | 7/1/2032 | 5,425,000 | 5.000% | 6/30/2014 | 4.79% | | 4.63% | 0.21% | |
| | | | | | | | | | | | | |
| Sewer2003A (Not Call) | 251237YK3 | Senior | Assured Guaranty | 7/1/2014 | 3,815,000 | 3.500% | N/A | N/A | | | N/A | |
| Sewer2003A (Not Call) | 251237YN7 | Senior | Assured Guaranty | 7/1/2015 | 11,880,000 | 3.500% | N/A | 0.68% | | | 4.82% | |
| Sewer2003A (Not Call) | 251237YR8 | Senior | Assured Guaranty | 7/1/2016 | 12,535,000 | 5.500% | N/A | 0.85% | | | 4.65% | |
| Sewer2003A (Not Call) | 251237YU1 | Senior | Assured Guaranty | 7/1/2017 | 13,215,000 | 5.500% | N/A | 1.14% | | | 4.36% | |
| Sewer2003A (Not Call) | 251237YX5 | Senior | Assured Guaranty | 7/1/2018 | 13,950,000 | 5.000% | N/A | 1.50% | | | 4.00% | |

| Series Name | CUSIP | Lien | Insurer | Maturity | Amount | Coupon | Call Date | Indicative Interest Rates | | | Rate Reset Analysis (Push Market Rates on 6/30/2014) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Sr. Curve | 2nd Curve | Indicative CUSIP Reset Rate | Coupon less Sr. Curve | Coupon less 2nd Curve |
| Sewer2003B | | Senior | Assured Guaranty | 7/1/2032 | 24,500,000 | 7.500% | 7/1/2019 | 4.79% | | | 2.71% | |
| Sewer2003B | 2512376Q1 | Senior | Assured Guaranty | 7/1/2033 | 125,500,000 | 7.500% | 7/1/2019 | 4.86% | | 4.85% | 2.64% | |
| Sewer2004A | 251237B69 | Senior | Assured Guaranty | 7/1/2018 | 7,310,000 | 5.000% | N/A | N/A | | | N/A | |
| Sewer2004A | 251237B77 | Senior | Assured Guaranty | 7/1/2019 | 14,830,000 | 5.250% | N/A | 1.89% | | | 3.36% | |
| Sewer2004A | 251237B85 | Senior | Assured Guaranty | 7/1/2020 | 15,605,000 | 5.250% | N/A | 2.27% | | | 2.98% | |
| Sewer2004A | 251237B93 | Senior | Assured Guaranty | 7/1/2021 | 5,525,000 | 5.250% | N/A | 2.65% | | | 2.60% | |
| Sewer2004A | 251237C27 | Senior | Assured Guaranty | 7/1/2022 | 5,545,000 | 5.250% | N/A | 3.00% | | | 2.25% | |
| Sewer2004A | 251237C35 | Senior | Assured Guaranty | 7/1/2023 | 5,835,000 | 5.250% | N/A | 3.34% | | | 1.91% | |
| Sewer2004A | 251237C43 | Senior | Assured Guaranty | 7/1/2024 | 6,145,000 | 5.250% | N/A | 3.62% | | | 1.63% | |
| Sewer2006C | 251237P31 | Senior | FGIC | 7/1/2016 | 8,495,000 | 5.250% | N/A | 0.85% | | | 4.40% | |
| Sewer2006C | 251237P49 | Senior | FGIC | 7/1/2017 | 8,915,000 | 5.000% | 7/1/2016 | 1.14% | | | 3.86% | |
| Sewer2006C | 251237P56 | Senior | FGIC | 7/1/2018 | 9,150,000 | 5.000% | 7/1/2016 | 1.50% | | | 3.50% | |
| Sewer2012A (Ins) | 251250AC0 | Senior | Assured Guaranty | 7/1/2017 | 8,880,000 | 5.000% | N/A | 0.85% | | | 4.15% | |
| Sewer2012A (Ins) | 251250AE6 | Senior | Assured Guaranty | 7/1/2018 | 9,750,000 | 5.000% | N/A | 1.50% | | | 3.50% | |
| Sewer2012A (Ins) | | Senior | Assured Guaranty | 7/1/2037 | 15,830,000 | 5.000% | 7/1/2022 | 5.10% | | | -0.10% | |
| Sewer2012A (Ins) | | Senior | Assured Guaranty | 7/1/2038 | 16,650,000 | 5.000% | 7/1/2022 | 5.15% | | | -0.15% | |
| Sewer2012A (Ins) | 251250AS5 | Senior | Assured Guaranty | 7/1/2039 | 17,520,000 | 5.000% | 7/1/2022 | 5.21% | | 5.15% | -0.21% | |
| Sewer2012A (Unins - 22 Call) | 251250AA4 | Senior | N/A | 7/1/2014 | 5,820,000 | 5.000% | N/A | N/A | | | N/A | |
| Sewer2012A (Unins - 22 Call) | 251250AB2 | Senior | N/A | 7/1/2015 | 6,005,000 | 5.000% | N/A | 0.68% | | | 4.32% | |
| Sewer2012A (Unins - 22 Call) | 251250AD8 | Senior | N/A | 7/1/2017 | 6,430,000 | 5.000% | N/A | 1.14% | | | 3.86% | |
| Sewer2012A (Unins - 22 Call) | 251250AF3 | Senior | N/A | 7/1/2019 | 19,930,000 | 5.000% | N/A | 1.89% | | | 3.11% | |
| Sewer2012A (Unins - 22 Call) | 251250AG1 | Senior | N/A | 7/1/2020 | 13,925,000 | 5.000% | N/A | 2.27% | | | 2.73% | |
| Sewer2012A (Unins - 22 Call) | 251250AH9 | Senior | N/A | 7/1/2021 | 9,845,000 | 5.000% | N/A | 2.65% | | | 2.35% | |
| Sewer2012A (Unins - 22 Call) | 251250AJ5 | Senior | N/A | 7/1/2022 | 14,860,000 | 5.000% | N/A | 3.00% | | | 2.00% | |
| Sewer2012A (Unins - 22 Call) | 251250AK2 | Senior | N/A | 7/1/2023 | 22,275,000 | 5.000% | 7/1/2022 | 3.34% | | | 1.66% | |
| Sewer2012A (Unins - 22 Call) | 251250AN6 | Senior | N/A | 7/1/2026 | 13,170,000 | 5.250% | 7/1/2022 | 4.05% | | | 1.21% | |
| Sewer2012A (Unins - 22 Call) | 251250AP1 | Senior | N/A | 7/1/2027 | 9,800,000 | 5.250% | 7/1/2022 | 4.21% | | | 1.04% | |
| Sewer2012A (Unins - 22 Call) | | Senior | N/A | 7/1/2028 | 11,010,000 | 5.000% | 7/1/2022 | 4.37% | | | 0.63% | |
| Sewer2012A (Unins - 22 Call) | | Senior | N/A | 7/1/2029 | 2,780,000 | 5.000% | 7/1/2022 | 4.50% | | | 0.50% | |
| Sewer2012A (Unins - 22 Call) | | Senior | N/A | 7/1/2030 | 11,710,000 | 5.000% | 7/1/2022 | 4.61% | | | 0.39% | |
| Sewer2012A (Unins - 22 Call) | | Senior | N/A | 7/1/2031 | 25,225,000 | 5.000% | 7/1/2022 | 4.71% | | | 0.29% | |
| Sewer2012A (Unins - 22 Call) | 251250AQ9 | Senior | N/A | 7/1/2032 | 69,540,000 | 5.000% | 7/1/2022 | 4.79% | | 4.71% | 0.21% | |
| Sewer2012A (Unins - 22 Call) | | Senior | N/A | 7/1/2034 | 1,470,000 | 5.250% | 7/1/2022 | 4.92% | | | 0.33% | |
| Sewer2012A (Unins - 22 Call) | | Senior | N/A | 7/1/2035 | 1,440,000 | 5.250% | 7/1/2022 | 4.98% | | | 0.27% | |
| Sewer2012A (Unins - 22 Call) | | Senior | N/A | 7/1/2036 | 1,400,000 | 5.250% | 7/1/2022 | 5.04% | | | 0.21% | |
| Sewer2012A (Unins - 22 Call) | | Senior | N/A | 7/1/2037 | 91,340,000 | 5.250% | 7/1/2022 | 5.10% | | | 0.15% | |
| Sewer2012A (Unins - 22 Call) | | Senior | N/A | 7/1/2038 | 96,105,000 | 5.250% | 7/1/2022 | 5.15% | | | 0.10% | |
| Sewer2012A (Unins - 22 Call) | 251250AR7 | Senior | N/A | 7/1/2039 | 101,110,000 | 5.250% | 7/1/2022 | 5.21% | | 5.15% | 0.04% | |
| Sewer2012A (Unins - 17 Call) | 251250AL0 | Senior | N/A | 7/1/2024 | 23,630,000 | 5.000% | 7/1/2017 | 3.62% | | | 1.38% | |
| Sewer2012A (Unins - 17 Call) | 251250AM8 | Senior | N/A | 7/1/2025 | 32,240,000 | 5.000% | 7/1/2017 | 3.83% | | | 1.17% | |
| Sewer2001B | | Second | FGIC / BHAC | 7/1/2023 | 2,825,000 | 5.500% | N/A | | 3.66% | | | 1.84% |
| Sewer2001B | | Second | FGIC / BHAC | 7/1/2024 | 15,835,000 | 5.500% | N/A | | 3.95% | | | 1.55% |
| Sewer2001B | | Second | FGIC / BHAC | 7/1/2025 | 16,635,000 | 5.500% | N/A | | 4.17% | | | 1.33% |
| Sewer2001B | | Second | FGIC / BHAC | 7/1/2026 | 17,480,000 | 5.500% | N/A | | 4.39% | | | 1.11% |
| Sewer2001B | | Second | FGIC / BHAC | 7/1/2027 | 18,345,000 | 5.500% | N/A | | 4.56% | | | 0.94% |
| Sewer2001B | | Second | FGIC / BHAC | 7/1/2028 | 19,260,000 | 5.500% | N/A | | 4.73% | | | 0.77% |
| Sewer2001B | 251237WV1 | Second | FGIC / BHAC | 7/1/2029 | 20,170,000 | 5.500% | N/A | | 4.87% | 4.45% | | 0.63% |
| Sewer2001E | | Second | FGIC | 7/1/2024 | 1,750,000 | 5.750% | 7/1/2018 | | 3.95% | | | 1.80% |
| Sewer2001E | | Second | FGIC | 7/1/2025 | 1,870,000 | 5.750% | 7/1/2018 | | 4.17% | | | 1.58% |
| Sewer2001E | | Second | FGIC | 7/1/2026 | 1,885,000 | 5.750% | 7/1/2018 | | 4.39% | | | 1.36% |
| Sewer2001E | | Second | FGIC | 7/1/2027 | 1,890,000 | 5.750% | 7/1/2018 | | 4.56% | | | 1.19% |
| Sewer2001E | | Second | FGIC | 7/1/2028 | 1,160,000 | 5.750% | 7/1/2018 | | 4.73% | | | 1.02% |
| Sewer2001E | | Second | FGIC | 7/1/2029 | 1,100,000 | 5.750% | 7/1/2018 | | 4.87% | | | 0.88% |
| Sewer2001E | | Second | FGIC | 7/1/2030 | 62,305,000 | 5.750% | 7/1/2018 | | 4.99% | | | 0.76% |
| Sewer2001E | 2512374R1 | Second | FGIC | 7/1/2031 | 64,190,000 | 5.750% | 7/1/2018 | | 5.10% | 5.00% | | 0.65% |
| Sewer2005A | 251237E41 | Second | MBIA | 7/1/2014 | 625,000 | 3.600% | N/A | | N/A | | | N/A |
| Sewer2005A | 251237E58 | Second | MBIA | 7/1/2015 | 490,000 | 3.700% | N/A | | 0.93% | | | 2.77% |
| Sewer2005A | 251237E66 | Second | MBIA | 7/1/2016 | 510,000 | 3.750% | 7/1/2015 | | 1.11% | | | 2.64% |
| Sewer2005A | 251237E74 | Second | MBIA | 7/1/2017 | 545,000 | 4.000% | 7/1/2015 | | 1.41% | | | 2.59% |
| Sewer2005A | 251237E82 | Second | MBIA | 7/1/2018 | 555,000 | 4.000% | 7/1/2015 | | 1.78% | | | 2.22% |
| Sewer2005A | 251237E90 | Second | MBIA | 7/1/2019 | 830,000 | 4.000% | 7/1/2015 | | 2.17% | | | 1.83% |
| Sewer2005A | 251237F24 | Second | MBIA | 7/1/2020 | 860,000 | 4.000% | 7/1/2015 | | 2.56% | | | 1.44% |
| Sewer2005A | 251237F32 | Second | MBIA | 7/1/2021 | 905,000 | 4.100% | 7/1/2015 | | 2.96% | | | 1.14% |
| Sewer2005A | 251237F40 | Second | MBIA | 7/1/2022 | 925,000 | 4.125% | 7/1/2015 | | 3.31% | | | 0.82% |
| Sewer2005A | 251237F57 | Second | MBIA | 7/1/2023 | 970,000 | 4.250% | 7/1/2015 | | 3.66% | | | 0.59% |
| Sewer2005A | 251237F65 | Second | MBIA | 7/1/2024 | 490,000 | 4.250% | 7/1/2015 | | 3.95% | | | 0.30% |
| Sewer2005A | | Second | MBIA | 7/1/2026 | 4,475,000 | 5.000% | 7/1/2015 | | 4.39% | | | 0.61% |
| Sewer2005A | | Second | MBIA | 7/1/2027 | 7,290,000 | 5.000% | 7/1/2015 | | 4.56% | | | 0.44% |
| Sewer2005A | 251237Z55 | Second | MBIA | 7/1/2028 | 7,650,000 | 5.000% | 7/1/2015 | | 4.73% | 4.59% | | 0.27% |
| Sewer2005A | 251237Z63 | Second | MBIA | 7/1/2033 | 24,820,000 | 5.000% | 7/1/2015 | | 5.27% | | | -0.27% |
| Sewer2005A | | Second | MBIA | 7/1/2034 | 67,705,000 | 5.000% | 7/1/2015 | | 5.34% | | | -0.34% |
| Sewer2005A | | Second | MBIA | 7/1/2034 | 23,000,000 | 4.500% | 7/1/2015 | | 5.34% | | | -0.84% |
| Sewer2005A | 251237F99 | Second | MBIA | 7/1/2035 | 71,240,000 | 5.000% | 7/1/2015 | | 5.40% | 5.37% | | -0.40% |

| Series Name | CUSIP | Lien | Insurer | Maturity | Amount | Coupon | Call Date | Indicative Interest Rates | | Rate Reset Analysis (Push Market Rates on 6/30/2014) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Sr. Curve | 2nd Curve | Indicative CUSIP Reset Rate | Coupon less Sr. Curve | Coupon less 2nd Curve |
| Sewer2005A | 251237G23 | Second | MBIA | 7/1/2035 | 24,000,000 | 4.500% | 7/1/2015 | | 5.40% | 5.37% | | -0.90% |
| Sewer2005B | 251237G64 | Second | MBIA | 7/1/2014 | 7,775,000 | 5.000% | N/A | | N/A | | | N/A |
| Sewer2005B | 251237G72 | Second | MBIA | 7/1/2015 | 8,010,000 | 5.000% | N/A | | 0.93% | | | 4.07% |
| Sewer2005B | 251237G80 | Second | MBIA | 7/1/2021 | 10,420,000 | 5.500% | N/A | | 2.96% | | | 2.54% |
| Sewer2005B | 251237G98 | Second | MBIA | 7/1/2022 | 10,990,000 | 5.500% | N/A | | 3.31% | | | 2.19% |
| Sewer2005C | 251237J20 | Second | MBIA | 7/1/2014 | 4,140,000 | 5.000% | N/A | | N/A | | | N/A |
| Sewer2005C | 251237J38 | Second | MBIA | 7/1/2015 | 4,345,000 | 5.000% | N/A | | 0.93% | | | 4.07% |
| Sewer2005C | 251237J46 | Second | MBIA | 7/1/2016 | 4,570,000 | 5.000% | 7/1/2015 | | 1.11% | | | 3.89% |
| Sewer2005C | 251237J53 | Second | MBIA | 7/1/2017 | 4,795,000 | 5.000% | 7/1/2015 | | 1.41% | | | 3.59% |
| Sewer2005C | 251237J61 | Second | MBIA | 7/1/2018 | 5,030,000 | 5.000% | 7/1/2015 | | 1.78% | | | 3.22% |
| Sewer2005C | 251237J79 | Second | MBIA | 7/1/2019 | 5,280,000 | 5.000% | 7/1/2015 | | 2.17% | | | 2.83% |
| Sewer2005C | 251237J87 | Second | MBIA | 7/1/2020 | 7,355,000 | 5.000% | 7/1/2015 | | 2.56% | | | 2.44% |
| Sewer2005C | 251237J95 | Second | MBIA | 7/1/2021 | 7,720,000 | 5.000% | 7/1/2015 | | 2.96% | | | 2.04% |
| Sewer2005C | 251237K28 | Second | MBIA | 7/1/2025 | 6,345,000 | 5.000% | 7/1/2015 | | 4.17% | | | 0.83% |
| Sewer2006A | | Second | FGIC / BHAC | 7/1/2034 | 7,525,000 | 5.500% | 7/1/2018 | | 5.34% | | | 0.16% |
| Sewer2006A | | Second | FGIC / BHAC | 7/1/2035 | 7,880,000 | 5.500% | 7/1/2018 | | 5.40% | | | 0.10% |
| Sewer2006A | 251237Z4 | Second | FGIC / BHAC | 7/1/2036 | 108,250,000 | 5.500% | 7/1/2018 | | 5.47% | 5.46% | | 0.03% |
| Sewer2006B | 251237M83 | Second | FGIC | 7/1/2014 | 1,835,000 | 5.000% | N/A | | N/A | | | N/A |
| Sewer2006B | 251237M91 | Second | FGIC | 7/1/2015 | 1,825,000 | 5.000% | N/A | | 0.93% | | | 4.07% |
| Sewer2006B | 251237N25 | Second | FGIC | 7/1/2016 | 1,430,000 | 5.000% | N/A | | 1.11% | | | 3.89% |
| Sewer2006B | 251237N33 | Second | FGIC | 7/1/2017 | 1,505,000 | 5.000% | 7/1/2016 | | 1.41% | | | 3.59% |
| Sewer2006B | 251237N41 | Second | FGIC | 7/1/2018 | 1,590,000 | 5.000% | 7/1/2016 | | 1.78% | | | 3.22% |
| Sewer2006B | | Second | FGIC | 7/1/2019 | 1,660,000 | 4.500% | 7/1/2016 | | 2.17% | | | 2.33% |
| Sewer2006B | | Second | FGIC | 7/1/2020 | 1,690,000 | 4.500% | 7/1/2016 | | 2.56% | | | 1.94% |
| Sewer2006B | | Second | FGIC | 7/1/2021 | 2,240,000 | 4.500% | 7/1/2016 | | 2.96% | | | 1.54% |
| Sewer2006B | 251237N58 | Second | FGIC | 7/1/2022 | 1,925,000 | 4.500% | 7/1/2016 | | 3.31% | 2.78% | | 1.19% |
| Sewer2006B | | Second | FGIC | 7/1/2023 | 1,585,000 | 4.500% | 7/1/2016 | | 3.66% | | | 0.59% |
| Sewer2006B | | Second | FGIC | 7/1/2024 | 2,115,000 | 4.250% | 7/1/2016 | | 3.95% | | | 0.30% |
| Sewer2006B | 251237N66 | Second | FGIC | 7/1/2025 | 2,840,000 | 4.250% | 7/1/2016 | | 4.17% | 3.97% | | 0.08% |
| Sewer2006B | | Second | FGIC | 7/1/2026 | 1,840,000 | 5.000% | 7/1/2016 | | 4.39% | | | 0.61% |
| Sewer2006B | | Second | FGIC | 7/1/2027 | 2,425,000 | 5.000% | 7/1/2016 | | 4.56% | | | 0.44% |
| Sewer2006B | | Second | FGIC | 7/1/2028 | 2,550,000 | 5.000% | 7/1/2016 | | 4.73% | | | 0.27% |
| Sewer2006B | | Second | FGIC | 7/1/2029 | 2,675,000 | 5.000% | 7/1/2016 | | 4.87% | | | 0.13% |
| Sewer2006B | | Second | FGIC | 7/1/2030 | 2,810,000 | 5.000% | 7/1/2016 | | 4.99% | | | 0.01% |
| Sewer2006B | | Second | FGIC | 7/1/2031 | 3,835,000 | 5.000% | 7/1/2016 | | 5.10% | | | -0.10% |
| Sewer2006B | | Second | FGIC | 7/1/2032 | 4,035,000 | 5.000% | 7/1/2016 | | 5.18% | | | -0.18% |
| Sewer2006B | 251237N74 | Second | FGIC | 7/1/2033 | 4,230,000 | 5.000% | 7/1/2016 | | 5.27% | 4.96% | | -0.27% |
| Sewer2006B | | Second | FGIC | 7/1/2034 | 22,460,000 | 5.000% | 7/1/2016 | | 5.34% | | | -0.34% |
| Sewer2006B | 251237N82 | Second | FGIC | 7/1/2034 | 40,000,000 | 4.625% | 7/1/2016 | | 5.34% | 5.34% | | -0.71% |
| Sewer2006B | | Second | FGIC | 7/1/2035 | 65,435,000 | 5.000% | 7/1/2016 | | 5.40% | | | -0.40% |
| Sewer2006B | 251237N90 | Second | FGIC | 7/1/2036 | 68,705,000 | 5.000% | 7/1/2016 | | 5.47% | 5.44% | | -0.47% |
| **Sewer Capital Appreciation and Variable Bonds** | | | | | | | | | | | | |
| Sewer1999A[1] | 251237VM2 | Senior | FGIC | 7/1/2014 | 8,395,000 | N/A | N/A | | N/A | | | N/A |
| Sewer1999A[1] | 251237VN0 | Senior | FGIC | 7/1/2015 | 8,228,111 | 6.039% | N/A | | 0.68% | | | 5.36% |
| Sewer1999A[1] | 251237VP5 | Senior | FGIC | 7/1/2016 | 8,174,016 | 6.090% | N/A | | 0.85% | | | 5.24% |
| Sewer1999A[1] | 251237VQ3 | Senior | FGIC | 7/1/2017 | 7,597,422 | 6.142% | N/A | | 1.14% | | | 5.00% |
| Sewer1999A[1] | 251237VR1 | Senior | FGIC | 7/1/2018 | 7,155,785 | 6.193% | 7/1/2017 | | 1.50% | | | 4.69% |
| Sewer1999A[1] | 251237VS9 | Senior | FGIC | 7/1/2019 | 6,762,707 | 6.245% | 7/1/2017 | | 1.89% | | | 4.36% |
| Sewer1999A[1] | 251237VT7 | Senior | FGIC | 7/1/2020 | 6,048,715 | 6.286% | 7/1/2017 | | 2.27% | | | 4.02% |
| Sewer1999A[1] | 251237VU4 | Senior | FGIC | 7/1/2021 | 6,628,298 | 6.307% | 7/1/2017 | | 2.65% | | | 3.65% |
| Sewer2006D[2] | | Senior | Assured Guaranty | 7/1/2026 | 36,570,000 | Variable | 6/30/2014 | | 4.05% | | | N/A |
| Sewer2006D[2] | | Senior | Assured Guaranty | 7/1/2027 | 42,480,000 | Variable | 6/30/2014 | | 4.21% | | | N/A |
| Sewer2006D[2] | | Senior | Assured Guaranty | 7/1/2028 | 28,795,000 | Variable | 6/30/2014 | | 4.37% | | | N/A |
| Sewer2006D[2] | | Senior | Assured Guaranty | 7/1/2029 | 38,225,000 | Variable | 6/30/2014 | | 4.50% | | | N/A |
| Sewer2006D[2] | | Senior | Assured Guaranty | 7/1/2030 | 60,880,000 | Variable | 6/30/2014 | | 4.61% | | | N/A |
| Sewer2006D[2] | | Senior | Assured Guaranty | 7/1/2031 | 61,645,000 | Variable | 6/30/2014 | | 4.71% | | | N/A |
| Sewer2006D[2] | 251237W66 | Senior | Assured Guaranty | 7/1/2032 | 20,185,000 | Variable | 6/30/2014 | | 4.79% | 4.47% | | N/A |
| Sewer2001D[3] | 251237WY5 | Second | MBIA | 7/1/2032 | 21,315,000 | Variable | 6/30/2014 | | 5.18% | | | N/A |

**Notes**

(1) Sewer 1999A capital appreciation bonds amount outstanding as of 7/1/2014. Effective interest rate calculated.
(2) Variable interest rate calculated as follows: 67% of Three Month LIBOR plus 0.60%.
(3) Variable interest rate calculated per Auction Rate (determined based on AA Financial Commercial Paper). Approximated to be 0.24%.

| Series Name | CUSIP | Lien | Insurer | Maturity | Amount | Coupon | Call Date | Sr. Curve | 2nd Curve | Indicative CUSIP Reset Rate | Coupon less Sr. Curve | Coupon less 2nd Curve |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Water Bonds** | | | | | | | | | | | | |
| Water1993 | | Senior | FGIC | 7/1/2014 | 11,815,000 | 6.500% | N/A | N/A | | | N/A | |
| Water1993 | 251255TP0 | Senior | FGIC | 7/1/2015 | 12,910,000 | 6.500% | N/A | 0.68% | | | 0.36% | 5.82% |
| | | | | | | | | | | | | |
| Water1997A | 2512557T6 | Senior | MBIA | 7/1/2014 | 6,520,000 | 6.500% | N/A | N/A | | | N/A | |
| Water1997A | 2512557R0 | Senior | MBIA | 7/1/2015 | 6,910,000 | 6.500% | N/A | 0.68% | | | | 5.82% |
| | | | | | | | | | | | | |
| Water2001A | | Senior | FGIC | 7/1/2029 | 25,020,000 | 5.000% | 6/30/2014 | 4.50% | | | 0.50% | |
| Water2001A | 251255A21 | Senior | FGIC | 7/1/2030 | 48,770,000 | 5.000% | 6/30/2014 | 4.61% | | 4.57% | 0.39% | |
| | | | | | | | | | | | | |
| Water2003A | 251255D77 | Senior | MBIA | 7/1/2019 | 500,000 | 4.500% | 6/30/2014 | 1.89% | | | 2.61% | |
| Water2003A | 251255D93 | Senior | MBIA | 7/1/2021 | 250,000 | 4.700% | 6/30/2014 | 2.65% | | | 2.05% | |
| Water2003A | 251255E27 | Senior | MBIA | 7/1/2022 | 3,550,000 | 4.750% | 6/30/2014 | 3.00% | | | 1.75% | |
| Water2003A | 251255F8 | Senior | MBIA | 7/1/2025 | 9,970,000 | 5.000% | 6/30/2014 | 3.83% | | | 1.17% | |
| Water2003A | 251255K20 | Senior | MBIA | 7/1/2026 | 20,955,000 | 5.000% | 6/30/2014 | 4.05% | | | 0.96% | |
| Water2003A | 251255K38 | Senior | MBIA | 7/1/2027 | 21,900,000 | 5.000% | 6/30/2014 | 4.21% | | | 0.79% | |
| Water2003A | | Senior | MBIA | 7/1/2028 | 22,985,000 | 5.000% | 6/30/2014 | 4.37% | | | 0.63% | |
| Water2003A | | Senior | MBIA | 7/1/2029 | 24,120,000 | 5.000% | 6/30/2014 | 4.50% | | | 0.50% | |
| Water2003A | | Senior | MBIA | 7/1/2030 | 2,825,000 | 5.000% | 6/30/2014 | 4.61% | | | 0.39% | |
| Water2003A | | Senior | MBIA | 7/1/2031 | 2,970,000 | 5.000% | 6/30/2014 | 4.71% | | | 0.29% | |
| Water2003A | | Senior | MBIA | 7/1/2032 | 3,115,000 | 5.000% | 6/30/2014 | 4.79% | | | 0.21% | |
| Water2003A | | Senior | MBIA | 7/1/2033 | 3,275,000 | 5.000% | 6/30/2014 | 4.86% | | | 0.14% | |
| Water2003A | 251255E68 | Senior | MBIA | 7/1/2034 | 62,370,000 | 5.000% | 6/30/2014 | 4.92% | | 4.72% | 0.08% | |
| | | | | | | | | | | | | |
| Water2003C (Fix) | 251255J22 | Senior | MBIA | 7/1/2015 | 2,120,000 | 4.250% | 6/30/2014 | 0.68% | | | 3.57% | |
| Water2003C (Fix) | 251255J30 | Senior | MBIA | 7/1/2016 | 2,620,000 | 5.250% | 6/30/2014 | 0.85% | | | 4.40% | |
| Water2003C (Fix) | 251255J48 | Senior | MBIA | 7/1/2017 | 2,655,000 | 5.250% | 6/30/2014 | 1.14% | | | 4.11% | |
| Water2003C (Fix) | 251255J55 | Senior | MBIA | 7/1/2018 | 2,930,000 | 5.250% | 6/30/2014 | 1.50% | | | 3.75% | |
| Water2003C (Fix) | 251255J63 | Senior | MBIA | 7/1/2019 | 2,790,000 | 5.250% | 6/30/2014 | 1.89% | | | 3.36% | |
| Water2003C (Fix) | 251255J71 | Senior | MBIA | 7/1/2020 | 2,965,000 | 5.250% | 6/30/2014 | 2.27% | | | 2.98% | |
| Water2003C (Fix) | 251255J89 | Senior | MBIA | 7/1/2021 | 4,580,000 | 5.000% | 6/30/2014 | 2.65% | | | 2.35% | |
| Water2003C (Fix) | 251255J97 | Senior | MBIA | 7/1/2022 | 4,665,000 | 5.000% | 6/30/2014 | 3.00% | | | 2.00% | |
| | | | | | | | | | | | | |
| Water2003D | 251255T1 | Senior | MBIA | 7/1/2014 | 325,000 | 4.000% | N/A | N/A | | | N/A | |
| Water2003D | 2512552U8 | Senior | MBIA | 7/1/2015 | 335,000 | 4.100% | N/A | 0.68% | | | 3.42% | |
| Water2003D | 2512552V6 | Senior | MBIA | 7/1/2016 | 350,000 | 4.200% | N/A | 0.85% | | | 3.35% | |
| Water2003D | 2512552W4 | Senior | MBIA | 7/1/2017 | 360,000 | 4.250% | 7/1/2016 | 1.14% | | | 3.11% | |
| Water2003D | 2512552X2 | Senior | MBIA | 7/1/2018 | 370,000 | 4.250% | 7/1/2016 | 1.50% | | | 2.75% | |
| Water2003D | | Senior | MBIA | 7/1/2019 | 385,000 | 5.000% | 7/1/2016 | 1.89% | | | 3.11% | |
| Water2003D | | Senior | MBIA | 7/1/2020 | 405,000 | 5.000% | 7/1/2016 | 2.27% | | | 2.73% | |
| Water2003D | | Senior | MBIA | 7/1/2021 | 420,000 | 5.000% | 7/1/2016 | 2.65% | | | 2.35% | |
| Water2003D | | Senior | MBIA | 7/1/2022 | 440,000 | 5.000% | 7/1/2016 | 3.00% | | | 2.00% | |
| Water2003D | | Senior | MBIA | 7/1/2023 | 455,000 | 5.000% | 7/1/2016 | 3.34% | | | 1.66% | |
| Water2003D | 2512552Y0 | Senior | MBIA | 7/1/2024 | 480,000 | 5.000% | 7/1/2016 | 3.62% | 2.84% | | 1.38% | |
| Water2003D | | Senior | MBIA | 7/1/2025 | 9,360,000 | 5.000% | 7/1/2016 | 3.83% | | | 1.17% | |
| Water2003D | | Senior | MBIA | 7/1/2026 | 9,800,000 | 5.000% | 7/1/2016 | 4.05% | | | 0.96% | |
| Water2003D | 2512552Z7 | Senior | MBIA | 7/1/2027 | 10,250,000 | 5.000% | 7/1/2016 | 4.21% | | 4.03% | 0.79% | |
| Water2003D | 2512553A1 | Senior | MBIA | 7/1/2028 | 23,920,000 | 5.000% | 7/1/2016 | 4.37% | | | 0.63% | |
| Water2003D | | Senior | MBIA | 7/1/2032 | 26,325,000 | 5.000% | 7/1/2016 | 4.79% | | | 0.21% | |
| Water2003D | 2512553B9 | Senior | MBIA | 7/1/2033 | 56,605,000 | 5.000% | 7/1/2016 | 4.86% | | 4.84% | 0.14% | |
| | | | | | | | | | | | | |
| Water2004B | 2512554A0 | Senior | MBIA | 7/1/2014 | 85,000 | 4.000% | N/A | N/A | | | N/A | |
| Water2004B | 2512554B8 | Senior | MBIA | 7/1/2015 | 90,000 | 4.000% | N/A | 0.68% | | | 3.32% | |
| Water2004B | 2512554C6 | Senior | MBIA | 7/1/2016 | 10,000,000 | 5.000% | N/A | 0.85% | | | 4.15% | |
| Water2004B | 2512554D5 | Senior | MBIA | 7/1/2016 | 3,545,000 | 4.250% | 7/1/2016 | 0.85% | | | 3.40% | |
| Water2004B | 2512554E2 | Senior | MBIA | 7/1/2017 | 13,925,000 | 5.000% | 7/1/2016 | 1.14% | | | 3.86% | |
| Water2004B | 2512554F9 | Senior | MBIA | 7/1/2017 | 350,000 | 4.250% | 7/1/2016 | 1.14% | | | 3.11% | |
| Water2004B | 2512554G7 | Senior | MBIA | 7/1/2018 | 14,940,000 | 5.000% | 7/1/2016 | 1.50% | | | 3.50% | |
| Water2004B | 2512554H5 | Senior | MBIA | 7/1/2019 | 15,810,000 | 5.000% | 7/1/2016 | 1.89% | | | 3.11% | |
| Water2004B | 2512554J1 | Senior | MBIA | 7/1/2020 | 16,665,000 | 5.000% | 7/1/2016 | 2.27% | | | 2.73% | |
| Water2004B | 2512554K8 | Senior | MBIA | 7/1/2021 | 16,085,000 | 5.000% | 7/1/2016 | 2.65% | | | 2.35% | |
| Water2004B | 2512554L6 | Senior | MBIA | 7/1/2022 | 16,935,000 | 5.000% | 7/1/2016 | 3.00% | | | 2.00% | |
| Water2004B | 2512554M4 | Senior | MBIA | 7/1/2023 | 6,280,000 | 5.000% | 7/1/2016 | 3.34% | | | 1.66% | |
| | | | | | | | | | | | | |
| Water2005A | 251255M85 | Senior | FGIC | 7/1/2014 | 50,000 | 3.750% | N/A | N/A | | | N/A | |
| Water2005A | 251255Q81 | Senior | FGIC | 7/1/2014 | 2,070,000 | 5.000% | N/A | N/A | | | N/A | |
| Water2005A | 251255M93 | Senior | FGIC | 7/1/2015 | 85,000 | 3.850% | N/A | 0.68% | | | 3.17% | |
| Water2005A | 251255Q99 | Senior | FGIC | 7/1/2015 | 2,145,000 | 5.000% | N/A | 0.68% | | | 4.32% | |
| Water2005A | 251255N27 | Senior | FGIC | 7/1/2016 | 95,000 | 3.900% | 7/1/2015 | 0.85% | | | 3.05% | |
| Water2005A | 251255R23 | Senior | FGIC | 7/1/2016 | 2,265,000 | 5.000% | 7/1/2015 | 0.85% | | | 4.15% | |
| Water2005A | 251255N35 | Senior | FGIC | 7/1/2017 | 125,000 | 4.000% | 7/1/2015 | 1.14% | | | 2.86% | |
| Water2005A | 251255R31 | Senior | FGIC | 7/1/2017 | 2,370,000 | 5.000% | 7/1/2015 | 1.14% | | | 3.86% | |
| Water2005A | 251255R43 | Senior | FGIC | 7/1/2018 | 20,000 | 4.000% | 7/1/2015 | 1.50% | | | 2.50% | |
| Water2005A | 251255R49 | Senior | FGIC | 7/1/2018 | 2,615,000 | 5.000% | 7/1/2015 | 1.50% | | | 3.50% | |
| Water2005A | 251255N50 | Senior | FGIC | 7/1/2019 | 2,790,000 | 5.000% | 7/1/2015 | 1.89% | | | 3.11% | |
| Water2005A | 251255N68 | Senior | FGIC | 7/1/2020 | 2,955,000 | 5.000% | 7/1/2015 | 2.27% | | | 2.73% | |
| Water2005A | 251255N76 | Senior | FGIC | 7/1/2021 | 3,030,000 | 5.000% | 7/1/2015 | 2.65% | | | 2.35% | |
| Water2005A | 251255N84 | Senior | FGIC | 7/1/2022 | 3,225,000 | 5.000% | 7/1/2015 | 3.00% | | | 2.00% | |
| Water2005A | 251255N92 | Senior | FGIC | 7/1/2023 | 3,430,000 | 5.000% | 7/1/2015 | 3.34% | | | 1.66% | |
| Water2005A | 251255P25 | Senior | FGIC | 7/1/2024 | 3,650,000 | 5.000% | 7/1/2015 | 3.62% | | | 1.38% | |
| Water2005A | 251255P33 | Senior | FGIC | 7/1/2025 | 3,790,000 | 5.000% | 7/1/2015 | 3.83% | | | 1.17% | |
| Water2005A | 251255P41 | Senior | FGIC | 7/1/2026 | 4,080,000 | 5.000% | 7/1/2015 | 4.05% | | | 0.96% | |
| Water2005A | 251255P58 | Senior | FGIC | 7/1/2027 | 4,290,000 | 5.000% | 7/1/2015 | 4.21% | | | 0.79% | |
| Water2005A | 251255P66 | Senior | FGIC | 7/1/2028 | 4,615,000 | 5.000% | 7/1/2015 | 4.37% | | | 0.63% | |
| Water2005A | 251255P74 | Senior | FGIC | 7/1/2029 | 4,890,000 | 4.500% | 7/1/2015 | 4.50% | | | -0.00% | |
| Water2005A | 251255P82 | Senior | FGIC | 7/1/2030 | 5,145,000 | 4.500% | 7/1/2015 | 4.61% | | | -0.11% | |
| Water2005A | 251255P90 | Senior | FGIC | 7/1/2031 | 5,415,000 | 4.500% | 7/1/2015 | 4.71% | | | -0.21% | |
| Water2005A | 251255Q24 | Senior | FGIC | 7/1/2032 | 5,715,000 | 4.500% | 7/1/2015 | 4.79% | | | -0.29% | |
| Water2005A | | Senior | FGIC | 7/1/2033 | 6,095,000 | 4.500% | 7/1/2015 | 4.86% | | | -0.36% | |

| Series Name | CUSIP | Lien | Insurer | Maturity | Amount | Coupon | Call Date | Indicative Interest Rates | | | Rate Reset Analysis (Push Market Rates on 6/30/2014) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Sr. Curve | 2nd Curve | Indicative CUSIP Reset Rate | Coupon less Sr. Curve | Coupon less 2nd Curve |
| Water2005A | | Senior | FGIC | 7/1/2034 | 6,550,000 | 4.500% | 7/1/2015 | 4.92% | | | -0.42% | |
| Water2005A | 251255Q32 | Senior | FGIC | 7/1/2035 | 6,880,000 | 4.500% | 7/1/2015 | 4.98% | | 4.92% | -0.48% | |
| | | | | | | | | | | | | |
| Water2005B | 251255T7R0 | Senior | FGIC / BHAC | 7/1/2014 | 2,125,000 | 5.000% | N/A | N/A | | | N/A | |
| Water2005B | 2512557S8 | Senior | FGIC / BHAC | 7/1/2015 | 2,225,000 | 5.000% | N/A | 0.68% | | | 3.32% | |
| Water2005B | 2512557T6 | Senior | FGIC / BHAC | 7/1/2016 | 2,305,000 | 4.000% | N/A | 0.85% | | | 3.15% | |
| Water2005B | 2512557U3 | Senior | FGIC / BHAC | 7/1/2017 | 2,385,000 | 4.000% | N/A | 1.14% | | | 2.86% | |
| Water2005B | 2512557V1 | Senior | FGIC / BHAC | 7/1/2018 | 2,465,000 | 1.500% | N/A | 1.50% | | | 4.00% | |
| Water2005B | 2512557W9 | Senior | FGIC / BHAC | 7/1/2019 | 2,575,000 | 5.500% | 7/1/2018 | 1.89% | | | 3.61% | |
| Water2005B | 2512557X7 | Senior | FGIC / BHAC | 7/1/2020 | 2,690,000 | 5.500% | 7/1/2018 | 2.27% | | | 3.23% | |
| Water2005B | 2512557Y5 | Senior | FGIC / BHAC | 7/1/2021 | 2,905,000 | 5.500% | 7/1/2018 | 2.65% | | | 2.85% | |
| Water2005B | 2512557Z2 | Senior | FGIC / BHAC | 7/1/2022 | 3,025,000 | 5.500% | 7/1/2018 | 3.00% | | | 2.50% | |
| Water2005B | 2512558A6 | Senior | FGIC / BHAC | 7/1/2023 | 3,145,000 | 5.500% | 7/1/2018 | 3.34% | | | 2.16% | |
| Water2005B | 2512558B4 | Senior | FGIC / BHAC | 7/1/2024 | 3,270,000 | 5.500% | 7/1/2018 | 3.62% | | | 1.88% | |
| Water2005B | 2512558C2 | Senior | FGIC / BHAC | 7/1/2025 | 3,490,000 | 5.500% | 7/1/2018 | 3.83% | | | 1.67% | |
| Water2005B | 2512558D0 | Senior | FGIC / BHAC | 7/1/2026 | 3,620,000 | 5.500% | 7/1/2018 | 4.05% | | | 1.46% | |
| Water2005B | 2512558E8 | Senior | FGIC / BHAC | 7/1/2027 | 3,850,000 | 5.500% | 7/1/2018 | 4.21% | | | 1.29% | |
| Water2005B | 2512558F5 | Senior | FGIC / BHAC | 7/1/2028 | 3,980,000 | 5.500% | 7/1/2018 | 4.37% | | | 1.13% | |
| Water2005B | | Senior | FGIC / BHAC | 7/1/2029 | 4,215,000 | 4.750% | 7/1/2018 | 4.50% | | | 0.25% | |
| Water2005B | | Senior | FGIC / BHAC | 7/1/2030 | 4,425,000 | 4.750% | 7/1/2018 | 4.61% | | | 0.14% | |
| Water2005B | | Senior | FGIC / BHAC | 7/1/2031 | 4,630,000 | 4.750% | 7/1/2018 | 4.71% | | | 0.04% | |
| Water2005B | | Senior | FGIC / BHAC | 7/1/2032 | 4,840,000 | 4.750% | 7/1/2018 | 4.79% | | | -0.04% | |
| Water2005B | | Senior | FGIC / BHAC | 7/1/2033 | 5,050,000 | 4.750% | 7/1/2018 | 4.86% | | | -0.11% | |
| Water2005B | 2512558G3 | Senior | FGIC / BHAC | 7/1/2034 | 5,255,000 | 4.750% | 7/1/2018 | 4.92% | | 4.74% | -0.17% | |
| Water2005B | 2512558H1 | Senior | FGIC / BHAC | 7/1/2034 | 57,365,000 | 5.500% | 7/1/2018 | 4.98% | | | 0.52% | |
| Water2005B | 2512558J7 | Senior | FGIC / BHAC | 7/1/2035 | 57,500,000 | 5.250% | 7/1/2018 | 4.98% | | | 0.27% | |
| | | | | | | | | | | | | |
| Water2005C | 251255S63 | Senior | FGIC | 7/1/2014 | 9,270,000 | 5.000% | N/A | N/A | | | N/A | |
| Water2005C | 251255S71 | Senior | FGIC | 7/1/2015 | 9,735,000 | 5.000% | N/A | 0.68% | | | 4.32% | |
| Water2005C | 251255S89 | Senior | FGIC | 7/1/2016 | 17,545,000 | 5.000% | 7/1/2015 | 0.85% | | | 4.15% | |
| Water2005C | 251255S97 | Senior | FGIC | 7/1/2017 | 18,425,000 | 5.000% | 7/1/2015 | 1.14% | | | 3.86% | |
| Water2005C | 251255T21 | Senior | FGIC | 7/1/2018 | 18,700,000 | 5.000% | 7/1/2015 | 1.50% | | | 3.50% | |
| Water2005C | 251255T39 | Senior | FGIC | 7/1/2019 | 8,245,000 | 5.000% | 7/1/2015 | 1.89% | | | 3.11% | |
| Water2005C | 251255T47 | Senior | FGIC | 7/1/2020 | 8,655,000 | 5.000% | 7/1/2015 | 2.27% | | | 2.73% | |
| Water2005C | 251255T54 | Senior | FGIC | 7/1/2021 | 9,090,000 | 5.000% | 7/1/2015 | 2.65% | | | 2.35% | |
| Water2005C | 251255T62 | Senior | FGIC | 7/1/2022 | 9,540,000 | 5.000% | 7/1/2015 | 3.00% | | | 2.00% | |
| | | | | | | | | | | | | |
| Water2006A | 251255V36 | Senior | Assured Guaranty | 7/1/2014 | 7,285,000 | 5.000% | N/A | N/A | | | N/A | |
| Water2006A | 251255V44 | Senior | Assured Guaranty | 7/1/2015 | 7,650,000 | 5.000% | N/A | 0.68% | | | 4.32% | |
| Water2006A | 251255V51 | Senior | Assured Guaranty | 7/1/2016 | 8,030,000 | 5.000% | N/A | 0.85% | | | 4.15% | |
| Water2006A | 251255V69 | Senior | Assured Guaranty | 7/1/2017 | 8,430,000 | 5.000% | 7/1/2016 | 1.14% | | | 3.86% | |
| Water2006A | 251255V77 | Senior | Assured Guaranty | 7/1/2018 | 8,835,000 | 5.000% | 7/1/2016 | 1.50% | | | 3.50% | |
| Water2006A | 251255V85 | Senior | Assured Guaranty | 7/1/2019 | 9,295,000 | 5.000% | 7/1/2016 | 1.89% | | | 3.11% | |
| Water2006A | 251255V93 | Senior | Assured Guaranty | 7/1/2020 | 9,760,000 | 5.000% | 7/1/2016 | 2.27% | | | 2.73% | |
| Water2006A | 251255W27 | Senior | Assured Guaranty | 7/1/2021 | 10,250,000 | 5.000% | 7/1/2016 | 2.65% | | | 2.35% | |
| Water2006A | 251255W35 | Senior | Assured Guaranty | 7/1/2022 | 10,760,000 | 5.000% | 7/1/2016 | 3.00% | | | 2.00% | |
| Water2006A | 251255W43 | Senior | Assured Guaranty | 7/1/2023 | 11,300,000 | 5.000% | 7/1/2016 | 3.34% | | | 1.66% | |
| Water2006A | 251255W50 | Senior | Assured Guaranty | 7/1/2024 | 11,865,000 | 5.000% | 7/1/2016 | 3.62% | | | 1.38% | |
| Water2006A | 251255W68 | Senior | Assured Guaranty | 7/1/2025 | 12,460,000 | 5.000% | 7/1/2016 | 3.83% | | | 1.17% | |
| Water2006A | 251255W76 | Senior | Assured Guaranty | 7/1/2026 | 13,080,000 | 5.000% | 7/1/2016 | 4.05% | | | 0.96% | |
| Water2006A | | Senior | Assured Guaranty | 7/1/2027 | 13,735,000 | 5.000% | 7/1/2016 | 4.21% | | | 0.79% | |
| Water2006A | | Senior | Assured Guaranty | 7/1/2028 | 14,420,000 | 5.000% | 7/1/2016 | 4.37% | | | 0.63% | |
| Water2006A | | Senior | Assured Guaranty | 7/1/2029 | 15,140,000 | 5.000% | 7/1/2016 | 4.50% | | | 0.50% | |
| Water2006A | | Senior | Assured Guaranty | 7/1/2030 | 15,900,000 | 5.000% | 7/1/2016 | 4.61% | | | 0.39% | |
| Water2006A | | Senior | Assured Guaranty | 7/1/2031 | 16,695,000 | 5.000% | 7/1/2016 | 4.71% | | | 0.29% | |
| Water2006A | | Senior | Assured Guaranty | 7/1/2032 | 17,530,000 | 5.000% | 7/1/2016 | 4.79% | | | 0.21% | |
| Water2006A | | Senior | Assured Guaranty | 7/1/2033 | 18,405,000 | 5.000% | 7/1/2016 | 4.86% | | | 0.13% | |
| Water2006A | 251255W84 | Senior | Assured Guaranty | 7/1/2034 | 19,325,000 | 5.000% | 7/1/2016 | 4.92% | | 4.65% | 0.08% | |
| | | | | | | | | | | | | |
| Water2006D | 251255Z81 | Senior | Assured Guaranty | 7/1/2015 | 15,000 | 4.000% | N/A | N/A | | | N/A | |
| Water2006D | 251255Z99 | Senior | Assured Guaranty | 7/1/2015 | 15,000 | 4.100% | N/A | 0.68% | | | 3.42% | |
| Water2006D | 2512552A2 | Senior | Assured Guaranty | 7/1/2016 | 15,000 | 4.200% | N/A | 0.85% | | | 3.35% | |
| Water2006D | 2512552B0 | Senior | Assured Guaranty | 7/1/2017 | 20,000 | 4.250% | 7/1/2016 | 1.14% | | | 3.11% | |
| Water2006D | 2512552C8 | Senior | Assured Guaranty | 7/1/2018 | 20,000 | 4.300% | 7/1/2016 | 1.50% | | | 2.80% | |
| Water2006D | 2512552D6 | Senior | Assured Guaranty | 7/1/2019 | 2,650,000 | 5.000% | 7/1/2016 | 1.89% | | | 3.11% | |
| Water2006D | 2512552E4 | Senior | Assured Guaranty | 7/1/2020 | 3,200,000 | 5.000% | 7/1/2016 | 2.27% | | | 2.73% | |
| Water2006D | | Senior | Assured Guaranty | 7/1/2021 | 5,000 | 5.000% | 7/1/2016 | 2.65% | | | 2.35% | |
| Water2006D | | Senior | Assured Guaranty | 7/1/2022 | 5,000 | 5.000% | 7/1/2016 | 3.00% | | | 2.00% | |
| Water2006D | 2512552F1 | Senior | Assured Guaranty | 7/1/2023 | 20,125,000 | 5.000% | 7/1/2016 | 3.34% | | 3.34% | 1.66% | |
| Water2006D | 2512552G9 | Senior | Assured Guaranty | 7/1/2024 | 27,425,000 | 5.000% | 7/1/2016 | 3.62% | | | 1.38% | |
| Water2006D | 2512552H7 | Senior | Assured Guaranty | 7/1/2025 | 9,955,000 | 5.000% | 7/1/2016 | 3.83% | | | 1.17% | |
| Water2006D | | Senior | Assured Guaranty | 7/1/2026 | 40,000 | 4.625% | 7/1/2016 | 4.05% | | | 0.58% | |
| Water2006D | | Senior | Assured Guaranty | 7/1/2027 | 40,000 | 4.625% | 7/1/2016 | 4.21% | | | 0.42% | |
| Water2006D | | Senior | Assured Guaranty | 7/1/2028 | 40,000 | 4.625% | 7/1/2016 | 4.37% | | | 0.25% | |
| Water2006D | | Senior | Assured Guaranty | 7/1/2029 | 45,000 | 4.625% | 7/1/2016 | 4.50% | | | 0.12% | |
| Water2006D | | Senior | Assured Guaranty | 7/1/2030 | 45,000 | 4.625% | 7/1/2016 | 4.61% | | | 0.02% | |
| Water2006D | | Senior | Assured Guaranty | 7/1/2031 | 13,615,000 | 4.625% | 7/1/2016 | 4.71% | | | -0.08% | |
| Water2006D | 2512552J3 | Senior | Assured Guaranty | 7/1/2031 | 37,535,000 | 5.000% | 7/1/2016 | 4.71% | | | 0.29% | |
| Water2006D | | Senior | Assured Guaranty | 7/1/2032 | 7,280,000 | 4.625% | 7/1/2016 | 4.79% | | 4.73% | -0.16% | |
| Water2006D | 2512552K0 | Senior | Assured Guaranty | 7/1/2032 | 20,095,000 | 5.000% | 7/1/2016 | 4.79% | | 4.75% | 0.21% | |
| | | | | | | | | | | | | |
| Water2011A | 251256BA0 | Senior | N/A | 7/1/2014 | 3,410,000 | 5.000% | N/A | N/A | | | N/A | |
| Water2011A | 251256BB8 | Senior | N/A | 7/1/2015 | 3,550,000 | 5.000% | N/A | 0.68% | | | 4.32% | |
| Water2011A | 251256BC6 | Senior | N/A | 7/1/2016 | 3,695,000 | 5.000% | N/A | 0.85% | | | 4.15% | |
| Water2011A | 251256BD4 | Senior | N/A | 7/1/2017 | 3,845,000 | 5.000% | N/A | 1.14% | | | 3.86% | |
| Water2011A | 251256BE2 | Senior | N/A | 7/1/2018 | 4,000,000 | 5.000% | N/A | 1.50% | | | 3.50% | |
| Water2011A | 251256BF9 | Senior | N/A | 7/1/2019 | 3,160,000 | 5.000% | N/A | 1.89% | | | 3.11% | |
| Water2011A | 251256BG7 | Senior | N/A | 7/1/2020 | 3,225,000 | 5.000% | N/A | 2.27% | | | 2.73% | |
| Water2011A | 251256BH5 | Senior | N/A | 7/1/2021 | 4,215,000 | 5.000% | N/A | 2.65% | | | 2.35% | |

| Series Name | CUSIP | Lien | Insurer | Maturity | Amount | Coupon | Call Date | Sr. Curve | 2nd Curve | Indicative CUSIP Reset Rate | Coupon less Sr. Curve | Coupon less 2nd Curve |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | |
| Water2011A | 251256BJ1 | Senior | N/A | 7/1/2022 | 4,195,000 | 5.250% | 7/1/2021 | 3.00% | | | 2.25% | |
| Water2011A | 251256BK8 | Senior | N/A | 7/1/2023 | 4,170,000 | 5.250% | 7/1/2021 | 3.34% | | | 1.91% | |
| Water2011A | 251256BL6 | Senior | N/A | 7/1/2024 | 4,140,000 | 5.250% | 7/1/2021 | 3.62% | | | 1.63% | |
| Water2011A | 251256BM4 | Senior | N/A | 7/1/2025 | 4,085,000 | 5.250% | 7/1/2021 | 3.83% | | | 1.42% | |
| Water2011A | 251256BN2 | Senior | N/A | 7/1/2026 | 4,020,000 | 5.250% | 7/1/2021 | 4.05% | | | 1.21% | |
| Water2011A | 251256BP7 | Senior | N/A | 7/1/2027 | 3,930,000 | 5.250% | 7/1/2021 | 4.21% | | | 1.04% | |
| Water2011A | | Senior | N/A | 7/1/2028 | 3,935,000 | 5.000% | 7/1/2021 | 4.37% | | | 0.63% | |
| Water2011A | | Senior | N/A | 7/1/2029 | 3,910,000 | 5.000% | 7/1/2021 | 4.50% | | | 0.50% | |
| Water2011A | | Senior | N/A | 7/1/2030 | 3,550,000 | 5.000% | 7/1/2021 | 4.61% | | | 0.39% | |
| Water2011A | 251256BQ5 | Senior | N/A | 7/1/2031 | 3,470,000 | 5.000% | 7/1/2021 | 4.71% | | 4.54% | 0.29% | |
| Water2011A | | Senior | N/A | 7/1/2032 | 3,590,000 | 5.000% | 7/1/2021 | 4.79% | | | 0.21% | |
| Water2011A | | Senior | N/A | 7/1/2033 | 3,725,000 | 5.000% | 7/1/2021 | 4.86% | | | 0.14% | |
| Water2011A | | Senior | N/A | 7/1/2034 | 3,850,000 | 5.000% | 7/1/2021 | 4.92% | | | 0.08% | |
| Water2011A | | Senior | N/A | 7/1/2035 | 3,990,000 | 5.000% | 7/1/2021 | 4.98% | | | 0.02% | |
| Water2011A | 251256BR3 | Senior | N/A | 7/1/2036 | 13,735,000 | 5.000% | 7/1/2021 | 5.04% | | 4.96% | -0.04% | |
| Water2011A | 251256BF19 | Senior | N/A | 7/1/2037 | 49,315,000 | 5.750% | 7/1/2021 | 5.10% | | | 0.65% | |
| Water2011A | | Senior | N/A | 7/1/2038 | 52,156,000 | 5.250% | 7/1/2021 | 5.15% | | | 0.10% | |
| Water2011A | | Senior | N/A | 7/1/2039 | 54,885,000 | 5.250% | 7/1/2021 | 5.21% | | | 0.04% | |
| Water2011A | | Senior | N/A | 7/1/2040 | 57,770,000 | 5.250% | 7/1/2021 | 5.22% | | | 0.03% | |
| Water2011A | 251256BS1 | Senior | N/A | 7/1/2041 | 59,495,000 | 5.250% | 7/1/2021 | 5.23% | | 5.21% | 0.02% | |
| | | | | | | | | | | | | |
| Water2011B | | Senior | N/A | 7/1/2014 | 685,000 | 3.607% | N/A | N/A | | | N/A | |
| Water2011B | | Senior | N/A | 7/1/2015 | 630,000 | 3.607% | N/A | 0.68% | | | 2.93% | |
| Water2011B | 251256AV5 | Senior | N/A | 7/1/2016 | 655,000 | 3.607% | N/A | 0.85% | | 0.50% | 2.76% | |
| Water2011B | | Senior | N/A | 7/1/2017 | 680,000 | 5.000% | N/A | 1.14% | | | 3.86% | |
| Water2011B | | Senior | N/A | 7/1/2018 | 715,000 | 5.000% | N/A | 1.50% | | | 3.50% | |
| Water2011B | | Senior | N/A | 7/1/2019 | 750,000 | 5.000% | N/A | 1.89% | | | 3.11% | |
| Water2011B | | Senior | N/A | 7/1/2020 | 790,000 | 5.000% | N/A | 2.27% | | | 2.73% | |
| Water2011B | 251256AW3 | Senior | N/A | 7/1/2021 | 825,000 | 5.000% | 7/1/2021 | 2.65% | | 1.93% | 2.35% | |
| Water2011B | | Senior | N/A | 7/1/2022 | 865,000 | 6.000% | 7/1/2021 | 3.00% | | | 3.00% | |
| Water2011B | | Senior | N/A | 7/1/2023 | 915,000 | 6.000% | 7/1/2021 | 3.34% | | | 2.66% | |
| Water2011B | | Senior | N/A | 7/1/2024 | 735,000 | 6.000% | 7/1/2021 | 3.62% | | | 2.38% | |
| Water2011B | | Senior | N/A | 7/1/2025 | 780,000 | 6.000% | 7/1/2021 | 3.83% | | | 2.17% | |
| Water2011B | | Senior | N/A | 7/1/2026 | 650,000 | 6.000% | 7/1/2021 | 4.05% | | | 1.96% | |
| Water2011B | | Senior | N/A | 7/1/2027 | 690,000 | 6.000% | 7/1/2021 | 4.21% | | | 1.79% | |
| Water2011B | | Senior | N/A | 7/1/2028 | 730,000 | 6.000% | 7/1/2021 | 4.37% | | | 1.63% | |
| Water2011B | | Senior | N/A | 7/1/2029 | 775,000 | 6.000% | 7/1/2021 | 4.50% | | | 1.50% | |
| Water2011B | | Senior | N/A | 7/1/2030 | 825,000 | 6.000% | 7/1/2021 | 4.61% | | | 1.39% | |
| Water2011B | | Senior | N/A | 7/1/2031 | 870,000 | 6.000% | 7/1/2021 | 4.71% | | | 1.29% | |
| Water2011B | | Senior | N/A | 7/1/2032 | 925,000 | 6.000% | 7/1/2021 | 4.79% | | | 1.21% | |
| Water2011B | 251256AX1 | Senior | N/A | 7/1/2033 | 980,000 | 6.000% | 7/1/2021 | 4.86% | | 4.17% | 1.14% | |
| | | | | | | | | | | | | |
| Water2011C | 251256BV4 | Senior | N/A | 7/1/2021 | 2,700,000 | 5.000% | N/A | 2.65% | | | 2.35% | |
| Water2011C | 251256BW2 | Senior | N/A | 7/1/2023 | 9,965,000 | 5.250% | 7/1/2021 | 3.34% | | | 1.91% | |
| Water2011C | 251256BX0 | Senior | N/A | 7/1/2024 | 10,490,000 | 5.250% | 7/1/2021 | 3.62% | | | 1.63% | |
| Water2011C | 251256BY8 | Senior | N/A | 7/1/2025 | 11,035,000 | 5.250% | 7/1/2021 | 3.83% | | | 1.42% | |
| Water2011C | 251256BZ5 | Senior | N/A | 7/1/2026 | 11,615,000 | 5.250% | 7/1/2021 | 4.05% | | | 1.21% | |
| Water2011C | 251256CA9 | Senior | N/A | 7/1/2027 | 5,000,000 | 5.250% | 7/1/2021 | 4.21% | | | 1.04% | |
| Water2011C | 251256CC5 | Senior | N/A | 7/1/2027 | 7,230,000 | 4.500% | 7/1/2021 | 4.21% | | | 0.29% | |
| Water2011C | | Senior | N/A | 7/1/2037 | 8,075,000 | 5.000% | 7/1/2021 | 5.10% | | | -0.10% | |
| Water2011C | | Senior | N/A | 7/1/2038 | 8,480,000 | 5.000% | 7/1/2021 | 5.15% | | | -0.15% | |
| Water2011C | | Senior | N/A | 7/1/2039 | 8,905,000 | 5.000% | 7/1/2021 | 5.21% | | | -0.21% | |
| Water2011C | | Senior | N/A | 7/1/2040 | 9,350,000 | 5.000% | 7/1/2021 | 5.22% | | | -0.22% | |
| Water2011C | 251256CB7 | Senior | N/A | 7/1/2041 | 9,820,000 | 5.000% | 7/1/2021 | 5.23% | | 5.19% | -0.23% | |
| | | | | | | | | | | | | |
| Water2001C | 2512556U4 | Second | FGIC / BHAC | 7/1/2014 | 350,000 | 3.500% | N/A | | N/A | | | N/A |
| Water2001C | 251255SV2 | Second | FGIC / BHAC | 7/1/2015 | 365,000 | 4.250% | N/A | | 0.93% | | | 3.32% |
| Water2001C | 251255SW0 | Second | FGIC / BHAC | 7/1/2016 | 380,000 | 4.250% | N/A | | 1.11% | | | 3.14% |
| Water2001C | 251255SX8 | Second | FGIC / BHAC | 7/1/2017 | 390,000 | 4.250% | N/A | | 1.41% | | | 2.84% |
| Water2001C | 251255SY6 | Second | FGIC / BHAC | 7/1/2018 | 415,000 | 4.250% | N/A | | 1.78% | | | 2.47% |
| Water2001C | 2512556Z3 | Second | FGIC / BHAC | 7/1/2019 | 12,510,000 | 5.750% | 7/1/2018 | | 2.17% | | | 3.58% |
| Water2001C | 2512557A7 | Second | FGIC / BHAC | 7/1/2020 | 13,235,000 | 5.750% | 7/1/2018 | | 2.56% | | | 3.19% |
| Water2001C | 2512557B5 | Second | FGIC / BHAC | 7/1/2021 | 14,025,000 | 5.750% | 7/1/2018 | | 2.96% | | | 2.79% |
| Water2001C | 2512557C3 | Second | FGIC / BHAC | 7/1/2022 | 14,865,000 | 5.750% | 7/1/2018 | | 3.31% | | | 2.44% |
| Water2001C | 2512557D1 | Second | FGIC / BHAC | 7/1/2023 | 15,750,000 | 5.750% | 7/1/2018 | | 3.66% | | | 2.09% |
| Water2001C | 2512557E9 | Second | FGIC / BHAC | 7/1/2024 | 16,690,000 | 5.750% | 7/1/2018 | | 3.95% | | | 1.80% |
| Water2001C | 2512557F6 | Second | FGIC / BHAC | 7/1/2025 | 17,690,000 | 5.750% | 7/1/2018 | | 4.17% | | | 1.58% |
| Water2001C | 2512557G4 | Second | FGIC / BHAC | 7/1/2026 | 18,735,000 | 5.750% | 7/1/2018 | | 4.39% | | | 1.36% |
| Water2001C | 2512557H2 | Second | FGIC / BHAC | 7/1/2027 | 19,945,000 | 5.750% | 7/1/2018 | | 4.56% | | | 1.19% |
| Water2001C | 2512557J8 | Second | FGIC / BHAC | 7/1/2028 | 4,000,000 | 5.750% | 7/1/2018 | | 4.73% | | | 1.02% |
| Water2001C | | Second | FGIC / BHAC | 7/1/2028 | 7,090,000 | 4.500% | 7/1/2018 | | 4.73% | | | -0.23% |
| Water2001C | | Second | FGIC / BHAC | 7/1/2028 | 10,115,000 | 4.750% | 7/1/2018 | | 4.73% | | | 0.02% |
| Water2001C | 2512557L3 | Second | FGIC / BHAC | 7/1/2029 | 13,000,000 | 4.500% | 7/1/2018 | | 4.87% | 4.83% | | -0.37% |
| Water2001C | 2512557K5 | Second | FGIC / BHAC | 7/1/2029 | 8,700,000 | 4.750% | 7/1/2018 | | 4.87% | 4.80% | | -0.12% |
| | | | | | | | | | | | | |
| Water2003B | 2512555H4 | Second | MBIA | 7/1/2034 | 41,770,000 | 5.000% | 6/30/2014 | | 5.34% | | | -0.34% |
| | | | | | | | | | | | | |
| Water2004A | 2512553G8 | Second | MBIA | 7/1/2014 | 4,250,000 | 5.250% | N/A | | N/A | | | N/A |
| Water2004A | 2512553H6 | Second | MBIA | 7/1/2015 | 4,475,000 | 5.250% | N/A | | 0.93% | | | 4.32% |
| Water2004A | 2512553J2 | Second | MBIA | 7/1/2016 | 4,710,000 | 5.250% | N/A | | 1.11% | | | 4.14% |
| Water2004A | 2512553K9 | Second | MBIA | 7/1/2017 | 4,955,000 | 5.250% | 7/1/2016 | | 1.41% | | | 3.84% |
| Water2004A | 2512553L7 | Second | MBIA | 7/1/2018 | 5,215,000 | 5.250% | 7/1/2016 | | 1.78% | | | 3.47% |
| Water2004A | 2512553M5 | Second | MBIA | 7/1/2019 | 5,490,000 | 5.250% | 7/1/2016 | | 2.17% | | | 3.08% |
| Water2004A | 2512553N3 | Second | MBIA | 7/1/2020 | 5,780,000 | 5.250% | 7/1/2016 | | 2.56% | | | 2.69% |
| Water2004A | 2512553P8 | Second | MBIA | 7/1/2021 | 6,085,000 | 5.250% | 7/1/2016 | | 2.96% | | | 2.29% |
| Water2004A | 2512553Q6 | Second | MBIA | 7/1/2022 | 6,400,000 | 5.250% | 7/1/2016 | | 3.31% | | | 1.94% |
| Water2004A | 2512553R4 | Second | MBIA | 7/1/2023 | 6,735,000 | 5.250% | 7/1/2016 | | 3.66% | | | 1.59% |
| Water2004A | | Second | MBIA | 7/1/2024 | 7,090,000 | 4.500% | 7/1/2016 | | 3.95% | | | 0.55% |
| Water2004A | 2512553S2 | Second | MBIA | 7/1/2025 | 7,415,000 | 4.500% | 7/1/2016 | | 4.17% | 4.06% | | 0.33% |

| Series Name | CUSIP | Lien | Insurer | Maturity | Amount | Coupon | Call Date | Indicative Interest Rates | | | Rate Reset Analysis (Push Market Rates on 6/30/2014) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Sr. Curve | 2nd Curve | Indicative CUSIP Reset Rate | Coupon less Sr. Curve | Coupon less 2nd Curve |
| Water2006B | 251256AG8 | Second | Assured Guaranty | 7/1/2014 | 100,000 | 3.900% | N/A | N/A | | | | N/A |
| Water2006B | 251256AH6 | Second | Assured Guaranty | 7/1/2015 | 100,000 | 4.000% | N/A | 0.93% | | | | 3.07% |
| Water2006B | 251256AJ2 | Second | Assured Guaranty | 7/1/2016 | 100,000 | 4.250% | N/A | 1.11% | | | | 3.14% |
| Water2006B | 251256AK9 | Second | Assured Guaranty | 7/1/2017 | 100,000 | 4.600% | N/A | 1.41% | | | | 3.19% |
| Water2006B | 251256AL7 | Second | Assured Guaranty | 7/1/2018 | 100,000 | 4.800% | N/A | 1.78% | | | | 3.02% |
| Water2006B | 251256AM5 | Second | Assured Guaranty | 7/1/2019 | 100,000 | 5.000% | N/A | 2.17% | | | | 2.83% |
| Water2006B | | Second | Assured Guaranty | 7/1/2020 | 100,000 | 5.500% | 7/1/2019 | 2.56% | | | | 2.94% |
| Water2006B | | Second | Assured Guaranty | 7/1/2021 | 100,000 | 5.500% | 7/1/2019 | 2.96% | | | | 2.54% |
| Water2006B | | Second | Assured Guaranty | 7/1/2022 | 100,000 | 5.500% | 7/1/2019 | 3.31% | | | | 2.19% |
| Water2006B | 251256AN3 | Second | Assured Guaranty | 7/1/2023 | 100,000 | 5.500% | 7/1/2019 | 3.66% | 3.12% | | | 1.84% |
| Water2006B | | Second | Assured Guaranty | 7/1/2024 | 100,000 | 6.625% | 7/1/2019 | 3.95% | | | | 2.68% |
| Water2006B | | Second | Assured Guaranty | 7/1/2025 | 100,000 | 6.625% | 7/1/2019 | 4.17% | | | | 2.46% |
| Water2006B | | Second | Assured Guaranty | 7/1/2026 | 100,000 | 6.625% | 7/1/2019 | 4.39% | | | | 2.24% |
| Water2006B | | Second | Assured Guaranty | 7/1/2027 | 100,000 | 6.625% | 7/1/2019 | 4.56% | | | | 2.06% |
| Water2006B | | Second | Assured Guaranty | 7/1/2028 | 100,000 | 6.625% | 7/1/2019 | 4.73% | | | | 1.89% |
| Water2006B | | Second | Assured Guaranty | 7/1/2029 | 100,000 | 6.625% | 7/1/2019 | 4.87% | | | | 1.75% |
| Water2006B | | Second | Assured Guaranty | 7/1/2030 | 100,000 | 6.625% | 7/1/2019 | 4.99% | | | | 1.64% |
| Water2006B | | Second | Assured Guaranty | 7/1/2031 | 100,000 | 6.625% | 7/1/2019 | 5.10% | | | | 1.53% |
| Water2006B | | Second | Assured Guaranty | 7/1/2032 | 100,000 | 6.625% | 7/1/2019 | 5.18% | | | | 1.44% |
| Water2006B | | Second | Assured Guaranty | 7/1/2033 | 100,000 | 6.625% | 7/1/2019 | 5.27% | | | | 1.36% |
| Water2006B | | Second | Assured Guaranty | 7/1/2034 | 100,000 | 6.625% | 7/1/2019 | 5.34% | | | | 1.29% |
| Water2006B | | Second | Assured Guaranty | 7/1/2035 | 100,000 | 6.625% | 7/1/2019 | 5.40% | | | | 1.22% |
| Water2006B | 251256AP8 | Second | Assured Guaranty | 7/1/2036 | 56,000,000 | 7.000% | 7/1/2019 | 5.47% | | | | 1.53% |
| Water2006B | 251256AQ6 | Second | Assured Guaranty | 7/1/2036 | 61,500,000 | 6.250% | 7/1/2019 | 5.47% | 5.46% | | | 0.78% |
| | | | | | | | | | | | | |
| Water2006C | 251255X83 | Second | Assured Guaranty | 7/1/2014 | 1,100,000 | 4.000% | N/A | N/A | | | | N/A |
| Water2006C | 251255X91 | Second | Assured Guaranty | 7/1/2015 | 3,725,000 | 5.000% | | 0.93% | | | | 4.07% |
| Water2006C | 251255Y25 | Second | Assured Guaranty | 7/1/2016 | 3,795,000 | 5.000% | | 1.11% | | | | 3.89% |
| Water2006C | 251255Y33 | Second | Assured Guaranty | 7/1/2017 | 4,010,000 | 5.000% | 7/1/2016 | 1.41% | | | | 3.59% |
| Water2006C | 251255Y41 | Second | Assured Guaranty | 7/1/2018 | 4,765,000 | 5.000% | 7/1/2016 | 1.78% | | | | 3.22% |
| Water2006C | | Second | Assured Guaranty | 7/1/2019 | 1,360,000 | 5.000% | 7/1/2016 | 2.17% | | | | 2.83% |
| Water2006C | | Second | Assured Guaranty | 7/1/2020 | 1,425,000 | 5.000% | 7/1/2016 | 2.56% | | | | 2.44% |
| Water2006C | | Second | Assured Guaranty | 7/1/2021 | 1,500,000 | 5.000% | 7/1/2016 | 2.96% | | | | 2.04% |
| Water2006C | 251255Y58 | Second | Assured Guaranty | 7/1/2022 | 1,575,000 | 5.000% | 7/1/2016 | 3.31% | 2.77% | | | 1.69% |
| Water2006C | | Second | Assured Guaranty | 7/1/2023 | 1,650,000 | 5.000% | 7/1/2016 | 3.66% | | | | 1.34% |
| Water2006C | | Second | Assured Guaranty | 7/1/2024 | 1,730,000 | 5.000% | 7/1/2016 | 3.95% | | | | 1.05% |
| Water2006C | | Second | Assured Guaranty | 7/1/2025 | 1,820,000 | 5.000% | 7/1/2016 | 4.17% | | | | 0.83% |
| Water2006C | 251255Y66 | Second | Assured Guaranty | 7/1/2026 | 9,680,000 | 5.000% | 7/1/2016 | 4.39% | 4.23% | | | 0.61% |
| Water2006C | | Second | Assured Guaranty | 7/1/2027 | 10,165,000 | 5.000% | 7/1/2016 | 4.56% | | | | 0.44% |
| Water2006C | | Second | Assured Guaranty | 7/1/2028 | 10,675,000 | 5.000% | 7/1/2016 | 4.73% | | | | 0.27% |
| Water2006C | 251255Y74 | Second | Assured Guaranty | 7/1/2029 | 11,205,000 | 5.000% | 7/1/2016 | 4.87% | 4.73% | | | 0.13% |
| Water2006C | | Second | Assured Guaranty | 7/1/2030 | 33,990,000 | 5.000% | 7/1/2016 | 4.99% | | | | 0.01% |
| Water2006C | | Second | Assured Guaranty | 7/1/2031 | 35,690,000 | 5.000% | 7/1/2016 | 5.10% | | | | -0.10% |
| Water2006C | | Second | Assured Guaranty | 7/1/2032 | 37,475,000 | 5.000% | 7/1/2016 | 5.18% | | | | -0.18% |
| Water2006C | 251255Y82 | Second | Assured Guaranty | 7/1/2033 | 39,345,000 | 5.000% | 7/1/2016 | 5.27% | 5.14% | | | -0.27% |
| **Water Variable Rate Bonds** | | | | | | | | | | | | |
| Water2003C (Var)[4] | 251255H99 | Senior | MBIA | 7/1/2014 | 2,330,000 | 2.410% | 6/30/2014 | N/A | N/A | | N/A | |

**Notes**

(4) Variable interest rate based on MUNI - CPI Rate. Estimated to be 2.41%.

**EXHIBIT I.A.154**

SCHEDULE OF LIMITED TAX GENERAL OBLIGATION BOND
DOCUMENTS & RELATED LIMITED TAX GENERAL OBLIGATION BONDS

**SCHEDULE OF LIMITED TAX GENERAL OBLIGATION BOND
DOCUMENTS & RELATED LIMITED TAX GENERAL OBLIGATION BONDS**

| Limited Tax General Obligation Bond Documents | Series of Limited Tax General Obligation Bonds | Balance as of Petition Date |
|---|---|---|
| Bond Authorizing Resolution adopted May 26, 2004<br><br>Finance Director's Order approving sale of General Obligation Self-Insurance Bonds (Limited Tax) Series 2004, dated August 27, 2004 | Self Insurance - Series 2004 | $13,186,559 |
| Bond Authorizing Resolution adopted May 6, 2005 ("2005 LTGO Resolution")<br><br>Finance Director's Order dated June 24, 2005 ("2005 Sale Order") | Series 2005-A(1) | $60,776,168 |
| 2005 LTGO Resolution<br><br>2005 Sale Order | Series 2005-A(2) | $11,080,060 |
| 2005 LTGO Resolution<br><br>2005 Sale Order | Series 2005-B | $9,003,535 |
| Resolution of the City Council adopted November 17, 2006 ("2006 LTGO Resolution")<br><br>Finance Director's Order dated May 30, 2008 ("2008 LTGO Sale Order") | Series 2008-A(1) | $43,905,085 |
| 2006 LTGO Resolution<br><br>2008 LTGO Sale Order | Series 2008-A(2) | $25,591,781 |

**EXHIBIT I.A.160**

NEW B NOTES

SUMMARY OF PRINCIPAL TERMS

**NEW B NOTES**
**SUMMARY OF PRINCIPAL TERMS**[1]

On the Effective Date, the City shall issue the New B Notes and distribute them as set forth in the Plan. The definitive documentation governing the New B Notes shall provide generally for the following terms:

| | |
|---|---|
| Obligation | The City's obligations with respect to the New B Notes shall be a general and unsecured obligation of the City. |
| Initial Principal Amount | $360.0 million. |
| Interest Rate | 5.0%, payable semi-annually in cash, except for initial PIK period described below. |
| Initial PIK Period | Interest may be paid in kind through and including the interest payment date closest to the fifth anniversary of issuance. |
| Maturity | 30 years. |
| Amortization | Amortization in 20 equal annual installments beginning on the interest payment date nearest to the 11th anniversary from issuance. |

---

[1] Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan.

**EXHIBIT I.A.166**

NEW DWSD BONDS

SUMMARY OF PRINCIPAL TERMS

# NEW DWSD BONDS
## SUMMARY OF PRINCIPAL TERMS[1]

       If a DWSD Transaction is not consummated, on the Effective Date, the City shall issue the New DWSD Bonds, in one or more series, and distribute them as set forth in the Plan.  The definitive documentation governing the New DWSD Bonds shall provide generally for the following terms:

| | |
|---|---|
| Principal | The principal shall be equal to the amount of each DWSD Series of DWSD Bonds receiving New DWSD Bonds, plus amounts necessary to pay expenses of the financing. |
| Interest Rate | The interest rate of the New DWSD Bonds shall be calculated by reference to the Interest Rate Reset Chart attached as Exhibit I.A.150 to the Plan. |
| Maturity Dates | The maturity date(s) of the New DWSD Bonds shall be the same as the existing maturity(ies) of each series of DWSD Series of DWSD Bonds receiving New DWSD Bonds. |
| Prepayment | The City may prepay or redeem all or any portion of the New DWSD Bonds at any time at its option and without penalty or premium. |
| Transfer of Assets | The City shall have the authority to permit the lease or transfer of assets currently used in DWSD's operations to one or more new authorities formed to provide water and/or sewer services provided that such transferee(s) assume the applicable portion of the then outstanding New DWSD Bonds. In the event that such DWSD assets are leased or transferred, the definition of "operations and maintenance expenses" in the documentation for the New DWSD Bonds shall be amended to (i) include the amount of any lease payment payable to the City's General Fund; and (ii) exclude such amount from the liens securing the New DWSD Bonds. |
| Other Terms | The New DWSD Bonds otherwise shall have the same terms and conditions as the applicable DWSD Series of DWSD Bonds receiving New DWSD Bonds. |

---

[1]      Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan.

**EXHIBIT I.A.168**

NEW DWSD REVOLVING BONDS

SUMMARY OF PRINCIPAL TERMS

## NEW DWSD REVOLVING BONDS
## SUMMARY OF PRINCIPAL TERMS[1]

   If a DWSD Transaction is not consummated, on the Effective Date, the City shall issue the New DWSD Revolving Bonds, in one or more series, and distribute them as set forth in the Plan.  The definitive documentation governing the New DWSD Revolving Bonds shall provide generally for the following terms:

| | |
|---|---|
| Principal | The principal of the New DWSD Revolving Bonds shall be equal to the outstanding principal on the relevant existing DWSD Revolving Bonds. |
| Interest Rate | The interest rate of the New DWSD Revolving Bonds shall be calculated by reference to the Interest Rate Reset Chart attached as Exhibit I.A.150 to the Plan. |
| Maturity Dates | The maturity date(s) of the New DWSD Revolving Bonds shall be the same as the existing maturity(ies) of each series of DWSD Series of DWSD Revolving Bonds receiving New DWSD Revolving Bonds. |
| Prepayment | The City may prepay or redeem all or any portion of the New DWSD Revolving Bonds at any time at its option and without penalty or premium. |
| Transfer of Assets | The City shall have the authority to permit the lease or transfer of assets currently used in DWSD's operations to one or more new authorities formed to provide water and/or sewer services provided that such transferee(s) assume the applicable portion of the then outstanding New DWSD Revolving Bonds.  In the event that such DWSD assets are leased or transferred, the definition of "operations and maintenance expenses" in the documentation for the New DWSD Revolving Bonds shall be amended to (i) include the amount of any lease payment payable to the City's General Fund; and (ii) exclude such amount from the liens securing the New DWSD Revolving Bonds. |

---

[1]   Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan.

**EXHIBIT I.A.170**

NEW EXISTING RATE DWSD BONDS

SUMMARY OF PRINCIPAL TERMS

# NEW EXISTING RATE DWSD BONDS
## SUMMARY OF PRINCIPAL TERMS[1]

If a DWSD Transaction is not consummated, on the Effective Date, the City shall issue the New Existing Rate DWSD Bonds, in one or more series, and distribute them as set forth in the Plan. The definitive documentation governing the New Existing Rate DWSD Bonds shall provide generally for the following terms:

| | |
|---|---|
| Principal | The principal of the New Existing Rate DWSD Bonds shall be equal to the amount of each DWSD Series of DWSD Bonds receiving New Existing Rate DWSD Bonds, plus amounts necessary to pay expenses of the financing. |
| Interest Rate | The interest rate(s) of the New Existing Rate DWSD Bonds shall be the same as existing interest rates of each series of DWSD Bonds receiving New Existing Rate DWSD Bonds. |
| Maturity Dates | The maturity date(s) of the New Existing Rate DWSD Bonds shall be the same as the existing maturity(ies) of each series of DWSD Bonds receiving New Existing Rate DWSD Bonds. |
| Prepayment | The City may prepay or redeem all or any portion of the New Existing Rate DWSD Bonds at any time at its option and without penalty or premium. |
| Transfer of Assets | The City shall have the authority to permit the lease or transfer of assets currently used in DWSD's operations to one or more new authorities formed to provide water and/or sewer services provided that such transferee(s) assume the applicable portion of the then outstanding New Existing Rate DWSD Bonds. In the event that such DWSD assets are leased or transferred, the definition of "operations and maintenance expenses" in the documentation for the New Existing Rate DWSD Bonds shall be amended to (i) include the amount of any lease payment payable to the City's General Fund; and (ii) exclude such amount from the liens securing the New Existing Rate DWSD Bonds. |
| Other Terms | The New Existing Rate DWSD Bonds otherwise shall have the same terms and conditions as the applicable DWSD Series of DWSD Bonds receiving New Existing Rate DWSD Bonds. |

---

[1]     Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan.

**EXHIBIT I.A.172**

NEW EXISTING RATE GLWA BONDS

SUMMARY OF PRINCIPAL TERMS

# NEW EXISTING RATE GLWA BONDS
## SUMMARY OF PRINCIPAL TERMS[1]

       If a DWSD Transaction is consummated, on the Effective Date, the GLWA shall issue the New Existing Rate GLWA Bonds, in one or more series, and distribute them as set forth in the Plan. The definitive documentation governing the New Existing Rate GLWA Bonds shall provide generally for the following terms:

| | |
|---|---|
| Obligations | The New Existing Rate GLWA Bonds shall be obligations of GLWA. |
| Principal | The principal shall be equal to the amount of each DWSD Series of DWSD Bonds receiving New Existing Rate GLWA Bonds, plus amounts necessary to pay expenses of the financing. |
| Interest Rate | The interest rate(s) of the New Existing Rate GLWA Bonds shall be the same as existing interest rates of each series of DWSD Bonds receiving New Existing Rate GLWA Bonds. |
| Maturity Dates | The maturity date(s) of the New Existing Rate GLWA Bonds shall be the same as the existing maturity(ies) of each series of DWSD Bonds receiving New Existing Rate GLWA Bonds. |
| Prepayment | GLWA may prepay or redeem all or any portion of the New Existing Rate GLWA Bonds at any time at its option and without penalty or premium. |
| Operation and Maintenance Expenses | The "operations and maintenance expenses" of GLWA shall (i) include the amount of any lease payment payable to the City's General Fund; and (ii) be excluded from the liens securing the New Existing Rate GLWA Bonds. |
| Other Terms | The New Existing Rate GLWA Bonds otherwise shall have the same terms and conditions as the applicable DWSD Series of DWSD Bonds receiving New Existing Rate GLWA Bonds (to the extent not otherwise negotiated). |

---

[1]     Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan.

# EXHIBIT I.A.174

NEW GLWA BONDS

SUMMARY OF PRINCIPAL TERMS

# NEW GLWA BONDS
## SUMMARY OF PRINCIPAL TERMS[1]

  If a DWSD Transaction is consummated, on the Effective Date, the GLWA shall issue the New GLWA Bonds, in one or more series, and distribute them as set forth in the Plan. The definitive documentation governing the New GLWA Bonds shall provide generally for the following terms:

| Obligations | The New GLWA Bonds shall be obligations of GLWA. |
|---|---|
| Principal | The principal shall be equal to the amount of each DWSD Series of DWSD Bonds receiving New GLWA Bonds, plus amounts necessary to pay expenses of the financing. |
| Interest Rate | The interest rate of the New GLWA Bonds shall be calculated by reference to the Interest Rate Reset Chart attached as Exhibit I.A.150 to the Plan. |
| Maturity Dates | The maturity date(s) of the New GLWA Bonds shall be the same as the existing maturity(ies) of each series of DWSD Series of DWSD Bonds receiving New GLWA Bonds. |
| Prepayment | GLWA may prepay or redeem all or any portion of the New GLWA Bonds at any time at its option and without penalty or premium. |
| Operation and Maintenance Expenses | The "operations and maintenance expenses" of GLWA shall (i) include the amount of any lease payment payable to the City's General Fund; and (ii) be excluded from the liens securing the New GLWA Bonds. |
| Other Terms | The New GLWA Bonds otherwise shall have the same terms and conditions as the applicable DWSD Series of DWSD Bonds receiving New GLWA Bonds. |

---

[1]  Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan.

**EXHIBIT I.A.176**

NEW GLWA REVOLVING BONDS

SUMMARY OF PRINCIPAL TERMS

## NEW GLWA REVOLVING BONDS
## SUMMARY OF PRINCIPAL TERMS[1]

     If a DWSD Transaction is consummated, on the Effective Date, the GLWA shall issue the New GLWA Revolving Bonds, in one or more series, and distribute them as set forth in the Plan.  The definitive documentation governing the New GLWA Revolving Bonds shall provide generally for the following terms:

| | |
|---|---|
| Obligations | The New GLWA Revolving Bonds shall be obligations of GLWA. |
| Principal | The principal of the New GLWA Revolving Bonds shall be equal to the outstanding principal on the relevant existing DWSD Revolving Bonds. |
| Interest Rate | The interest rate of the New GLWA Revolving Bonds shall be calculated by reference to the Interest Rate Reset Chart attached as Exhibit I.A.150 to the Plan. |
| Maturity Dates | The maturity date(s) of the New GLWA Revolving Bonds shall be the same as the existing maturity(ies) of each series of DWSD Series of DWSD Revolving Bonds receiving New GLWA Revolving Bonds. |
| Prepayment | The GLWA may prepay or redeem all or any portion of the New GLWA Revolving Bonds at any time at its option and without penalty or premium. |

---

[1]    Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan.

**EXHIBIT I.A.182.a**

OPEB CLAIMS NOTE

SUMMARY OF PRINCIPAL TERMS

**OPEB CLAIMS NOTE**
**SUMMARY OF PRINCIPAL TERMS[1]**

On or as soon as practicable following the Effective Date, the City shall distribute the OPEB Claims Note to the Detroit VEBA established to provide health care benefits to Detroit VEBA Beneficiaries. The definitive documentation governing the OPEB Claims Note shall provide generally for the following terms:

| | |
|---|---|
| Principal | The principal of the OPEB Claims Note shall be $526.5 million, minus the aggregate amount paid or accrued by the City for OPEB Benefits during the period beginning on the Petition Date and ending on the later of the Effective Date or the date of formation for the Detroit VEBA. |
| Interest Rate | The OPEB Claims Note shall not pay interest. |
| Maturity | 20 years. |
| Prepayment | The City may prepay all or any portion of the OPEB Claims Note at any time at its option and without penalty or premium. |
| Amortization | Payable in 10 equal annual installments, such that, as of the 10th anniversary of issuance, the principal remaining is $100 million, which remainder shall be payable in 10 equal annual installments beginning on the 11 anniversary of issuance. |

---

[1]     Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan.

**EXHIBIT I.A.225**

SCHEDULE OF SECURED GO BOND DOCUMENTS

## SCHEDULE OF SECURED GO BOND DOCUMENTS

| Secured GO Bond Documents | Series of Secured GO Bonds | Balance as of Petition Date |
|---|---|---|
| Resolution of the City Council adopted February 23, 2010<br><br>Finance Director's Order dated March 11, 2010<br><br>Master Debt Retirement Trust Indenture dated as of March 1, 2010, as supplemented and amended (the "<u>Master Indenture</u>"), between the City of Detroit and U.S. Bank National Association, as trustee | Distributable State Aid General Obligation Limited Tax Bonds, Series 2010 | $252,475,366 |
| Resolution of the City Council adopted July 20, 2010<br><br>Finance Director's Order dated December 9, 2010<br><br>Master Indenture | Distributable State Aid Second Lien Bonds (Unlimited Tax General Obligation), Series 2010(A) (Taxable-Recovery Zone Economic Development Bonds – Direct Payment) | $101,707,848 |
| Resolution of the City Council adopted March 27, 2012<br><br>Finance Director's Order dated March 28, 2012 (Series 2012(A2) and Series 2012(B2))<br><br>Finance Director's Order dated July 3, 2012 (Series 2012 (A2) and Series 2012(B2))<br><br>Finance Director's Order dated August 16, 2012 (Series 2012(A2-B), Series 2012 (A2) and Series 2012(B2))<br><br>Master Indenture | Self Insurance Distributable State Aid Third Lien Bonds (Limited Tax General Obligation), Series 2012(A2) | $39,254,171 |
| Resolution of the City adopted March 27, 2012<br><br>Finance Director's Order dated August 16, 2012 (Series 2012(A2-B), Series 2012 (A2) and Series 2012(B2))<br><br>Master Indenture | Self Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(A2-B) | $31,037,724 |

| Secured GO Bond Documents | Series of Secured GO Bonds | Balance as of Petition Date |
|---|---|---|
| Resolution of the City Council adopted March 27, 2012<br><br>Finance Director's Order dated March 28, 2012 (Series 2012(B))<br><br>Finance Director's Order dated July 3, 2012 (Series 2012(B))<br><br>Finance Director's Order dated August 16, 2012 (Series 2012(B))<br><br>Master Indenture | General Obligation Distributable State Aid Third Lien Capital Improvement Refunding Bonds (Limited Tax General Obligation), Series 2012(B) | $6,469,135 |
| Resolution of the City Council adopted March 27, 2012<br><br>Finance Director's Order dated March 28, 2012 (Series 2012(A2) and Series 2012(B2))<br><br>Finance Director's Order dated July 3, 2012 (Series 2012 (A2) and Series 2012(B2))<br><br>Finance Director's Order dated August 16, 2012 (Series 2012(A2-B), Series 2012 (A2) and Series 2012(B2))<br><br>Master Indenture | Self Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(B2) | $54,055,927 |

**EXHIBIT I.A.258**

SCHEDULE OF UNLIMITED TAX GENERAL OBLIGATION BOND
DOCUMENTS & RELATED UNLIMITED TAX GENERAL OBLIGATION BONDS

## SCHEDULE OF UNLIMITED TAX GENERAL OBLIGATION BOND
## DOCUMENTS & RELATED UNLIMITED TAX GENERAL OBLIGATION BONDS

| Unlimited Tax General Obligation Bond Documents | Series of Unlimited Tax General Obligation Bonds | Balance as of Petition Date |
|---|---|---|
| Resolution of the City Council adopted March 3, 1999 <br><br> Finance Director's Order dated April 1, 1999 | Series 1999-A | $18,747,364 |
| Amended and Restated Resolution of the City Council adopted April 6, 2001 and Supplement No. 1 to Amended and Restated Resolution, adopted June 13, 2001 (collectively, "2001 UTGO Resolution") <br><br> Finance Director's Order dated August 1, 2001 ("2001 UTGO Sale Order") | Series 2001-A(1) | $78,787,556 |
| 2001 UTGO Resolution <br><br> 2001 UTGO Sale Order | Series 2001-B | $4,063,616 |
| Resolution of the City Council adopted July 24, 2002 <br><br> Finance Director's Order dated August 2, 2002 | Series 2002 | $6,745,767 |
| Resolution of the City Council adopted September 19, 2003 <br><br> Finance Director's Order dated October 9, 2003 | Series 2003-A | $34,908,150 |
| Bond Authorizing Resolution adopted June 14, 2004 ("2004 UTGO Resolution") <br><br> Finance Director's Order dated August 27, 2004 ("2004 UTGO Sale Order") | Series 2004-A(1) | $39,872,258 |
| 2004 UTGO Resolution <br><br> 2004 UTGO Sale Order | Series 2004-B(1) | $38,206,678 |
| 2004 UTGO Resolution <br><br> 2004 UTGO Sale Order | Series 2004-B(2) | $736,241 |
| Resolution of the City Council adopted July 6, 2005 ("2005 UTGO Resolution") <br><br> Finance Director's Order dated December 5, 2005 ("2005 UTGO Sale Order") | Series 2005-B | $45,452,501 |
| 2005 UTGO Resolution <br><br> 2005 UTGO Sale Order | Series 2005-C | $18,671,105 |

| Unlimited Tax General Obligation Bond Documents | Series of Unlimited Tax General Obligation Bonds | Balance as of Petition Date |
|---|---|---|
| Resolution of the City Council adopted November 17, 2006 ("2008 UTGO Resolution")<br><br>Finance Director's Order dated May 30, 2008 ("2008 UTGO Sale Order") | Series 2008-A | $59,487,564 |
| 2008 UTGO Resolution<br><br>2008 UTGO Sale Order | Series 2008-B(1) | $28,982,532 |