# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

-------------------------------------------------------

In re

CITY OF DETROIT, MICHIGAN,

                  Debtor.

Chapter 9

Case No. 13-53846

Hon. Steven W. Rhodes

-------------------------------------------------------

## OBJECTIONS OF CREDITORS DEBORAH RYAN, WALTER SWIFT, CRISTOBAL MENDOZA  AND ANNICA CUPPETELLI, INTERESTED PARTIES, TO AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT

NOW COME DEBORAH  RYAN, WALTER SWIFT, CRISTOBAL

MENDOZA  and ANNICA CUPPETELLI, interested parties and object to the

"*Amended Plan for the Adjustment of Debts of the City of Detroit (March 31,*

*2014).*" [**Dkt .#3380**]  In support of those objections, the aforementioned interested

parties state the following:

1.  All four petitioners are persons whose lives have been profoundly and

adversely affected by the unconstitutional acts of the City of Detroit (hereafter,

"Debtor") and its officials; all four, as well, have brought actions in the United States District Court for the Eastern District of Michigan, to wit:

   a. *Deborah Ryan v. City of Detroit, et al.,* **Civ. Action No. 11-cv-10900**;

   b. *Walter Swift v. City of Detroit, et al.,* **Civ.Action No. 10-cv-12911**;

   c. *Mendoza and Cupetelli v. City of Detroit, et al.,* **Civ. Action No. 11-cv-10899**.

**[Exhibits 2, 3 and 4; underlying Complaints filed in the Eastern District of Michigan]**

2.  All of the aforementioned Complaints were filed pursuant to the Civil Rights Act of 1871, 42 U.S.C. §§ 1983, 1985, and 28 U.S.C. §1343.  These cases all share certain characteristics, to wit:

   a. ***Deborah Ryan* (C.A. # 11-cv-10900):**  As this Court is aware, Petitioner Ryan asserts that the Debtor City of Detroit and its officials (individual Defendants Kozloff and Blackmon) affirmatively acted to substantially increase the risk to her daughter, Patricia Williams, an outstanding Detroit police officer, thereby resulting in Patricia Williams' vicious and violent murder. These actions violated constitutional rights secured by the Due Process clauses of the Fifth and Fourteenth Amendments of the United States Constitution **[See Dkt. #819, Paragraphs 4-5]**;

   b. ***Walter Swift* (C.A. #10-cv-12911):**  In this case, Walter Swift was wrongfully convicted in 1982 for the crime of rape he did not commit, resulting in 26 cruel years in prison. His claims against the City of Detroit and its officials (Paavola-Nobliski and Lewandowski) thus arise from the unconstitutional wrongful conviction, malicious prosecution and hiding of evidence that convincingly points to innocence, all of which violated his Due Process rights as referenced above, as well as violations of the Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution **[See Dkt. #2140-1, Paragraph 2]**; and

c. ***Mendoza & Cuppetelli*** **(C.A. #11-cv-10899):** Professor Mendoza's (a Wayne State Art Professor) and Ms. Cuppetelli's (an artist), case involves claims against the City of Detroit and its officials (Carson, Petty and Glover) for the unconstitutional use of excessive force and subsequent malicious prosecution, triggered by Professor Mendoza taking photographs of a movie set on a public street; and therefore, these claims implicate the First, Fourth and Fourteenth Amendments of the United States Constitution.

3. On July 18, 2013, the Debtor filed for an adjudication of bankruptcy, pursuant to Chapter 9 of the Bankruptcy Code [**Dkt. #1**].

4. On July 25, 2013, this Court entered both automatic and extended Stays of Proceedings [**Dkt. #s 166 and 167**]. These Stays had the effect of stopping all proceedings in the aforementioned cases including, but not limited to, discovery in all forms, motions for summary judgment, motions for sanctions and for other relief, and any kind of serious discussions of settlement or alternative dispute resolution.

5. On September 11, 2013, Petitioner Ryan filed a Motion for Relief from Stays [**Dkt. #819**] on several bases, including the assertion that this Court's Automatic Stay [**Dkt. #167**], as well as its Extended Stay [**Dkt. #166**], as applied to causes of action arising under 42 U.S.C. §1983 for violations of her, as well as other claimants', constitutional rights, are in violation of the Fourteenth Amendment to the United States Constitution insofar as they infringe upon and diminish rights secured by the Fourteenth Amendment; and, in addition, that the

Stays also violate principles of judicial economy.  **[Dkt. #819-4, pp. 14-22 of 23]**

6.  Since the filing of the *Ryan Motion,* this Court has issued an *Order Resolving the Motion for Relief from the Stay* brought by Petitioner Ryan but explicitly denying her complete relief from the effects of the bankruptcy filing herein, to wit:

> "5.    (T)he Chapter 9 Stay shall otherwise remain in full force and effect with respect to the Lawsuit. Absent further order of the Court, the Plaintiff shall not be permitted to collect on or to seek any proceeding supplementary to judgment from the City or the Member Defendants on any Final Judgment entered in the Lawsuit."

**[Dkt. #2584, ¶5, p.4]**

7.  Further, there has been no relief at all from the Stays imposed by this Court for the three additional Petitioners identified in these Objections; and, all four Petitioners remain burdened with the effects and impairments of this Chapter 9 Bankruptcy filing and its anticipated future implications. Therefore all four Petitioners anticipate that the respective violations of their constitutional rights, as protected by the Fourteenth Amendment to the United States Constitution and effectuated by 42 U.S.C. §1983, will never be fully vindicated.

8.  On March 31, 2014, the Debtor city of Detroit filed with this Court its Amended Plan of adjustment, including Paragraph 191, which provides as follows:

> "191.  Other Unsecured Claim" means any Claim that is not an Administrative Claim, a Convenience Claim, a COP Claim, a Downtown Development Authority Claim, a General Obligation Bond Claim, a GRS Pension Claim, an OPEB Claim, a PFRS Pension Claim, a Secured Claim or

a Subordinated Claim. *For the avoidance of doubt, Section 1983 Claims are included within the definition of Other Unsecured Claim.*"

**[Dkt. #3380, Paragraph 191] (Emphasis added.)**

9.   These Petitioners, and others who claim egregious violations of their precious Constitutional rights, now stand before this Court presenting mere "unsecured claims."

10.   The Amended Plan would therefore contravene the very purpose and intent of the Fourteenth Amendment and of Congress, as elaborated by the Supreme Court, in enacting and enforcing § 1983, to provide a full and complete judicial/legal remedy for the violation of one's rights under the Constitution. Accord *Felder v. Casey*, 487 U.S. 131, 148 (1988) (recognizing that civil rights actions "belong in court") (quoting *Burnett v. Grattan*, 468 U.S. 42, 50 (1984)); *Mitchum v. Foster*, *supra,* at 242-43 (noting that the enforcement of federal rights is of the highest priority).

11. Thus, the *Amended Plan of Adjustment* **[Dkt. #3380]** clearly and coldly contemplates the diminishment of the Constitutional rights of those whose rights have been violated by the City of Detroit and its officials, in the following ways:

    a.   Section 1983 plaintiffs will receive only a fraction of those sums to which they are entitled by the United States Constitution, including but not limited to the Fourteenth Amendment;

b. They will be deprived of a meaningful trial by jury[1] which would otherwise entitle them to the full compensation determined by any such jury, all in violation of rights secured by the United States Constitution of the United States, including but not limited to the Seventh Amendment;

c. These Petitioners will also be deprived of their right to recover attorney fees and of the accompanying right to act as private attorney generals to enforce the United States Constitution (*See, e.g., Blanchard v. Bergeron*, 489 U.S. 87, 95 (1989))

d. Similarly, everyone else for whom Section 1983 is expressly intended to protect from and ensure the vindication of Constitutional violations, will be deprived that protection by the diminishment, indeed evisceration, of the Bill of Rights by the Debtor's *Amended Plan of Adjustment*;

e. Finally, these Petitioners have already been denied the full and complete ability to engage in discovery and motion litigation in order to enforce their Section 1983 claims; now the Debtor proposes, in its *Amended Plain,* to dilute, diminish their rights and further weaken any ability to fully enforce their Constitutional rights or to be fully compensated for the violations thereof.

12. Thus the *Amended Plan*, **[Dkt. #3380],** specifically Paragraph 191 thereof, limits and constrains Petitioners herein from the full vindication of the egregious violations of their rights under the United States Constitution and, more importantly, in obtaining full and complete relief for those violations, including not only compensation for their damages but also their right to recover attorney fees

---

[1] Although this Court has temporarily lifted the stay as to Petitioner Ryan to allow her a jury trial, **[Dkt. #2584],** as noted above she still has no right under the terms of this Court's Order to "…collect on or to seek any proceeding supplementary to judgment from the City." **[Dkt. #2584, ¶5, p.4]**

and punitive damages.

13.  The limitations and constraints imposed by the City of Detroit's Amended Plan are unconstitutional to the extent that they undermine, diminish and weaken the Constitutional rights of Petitioners, as well as many other parties who have claims arising from the violation of their Constitutional rights pending against the City and/or officials of the City.

14.  As if to reinforce and underscore the injustice of the consequences of this Amended Plan, the debtor never once even mentions the United States Constitution, the Civil Rights Act of 1871 or even the terms "civil rights" or "Constitutional rights" anywhere in the 235 pages of its *Amended Plan*. **[Dkt. #3380]**  Rather, the *Amended Plan* merely refers to "Section 1983" cases, without so much as a statutory citation, thereby clearly demonstrating its contempt for those rights so desperately at stake herein.

15.  Notably, in the *Order* that provided Petitioner Ryan with partial relief from the Stay, **[Dkt. #2584],**  this Court did not and has not yet addressed or adjudicated Ryan's  Constitutional challenge (nor those of the other Petitioners) to the effects of the Debtor City of Detroit's filing pursuant to Chapter 9 of the Bankruptcy Code. This Court has not yet, in any form, addressed these important and portentous issues. These concerns are now particularly pressing, in light of the Debtor's *Amended Plan of Adjustment*, and Paragraph 191 therein, and the

Debtor's demonstrated contempt for these concerns.

**WHEREFORE,** for the reasons stated above and in the attached *Brief in Support*, **[Exhibit # 1, attached hereto]**, the Petitioners request that this Court provide the following relief:

A. Determine that the *Amended Plan* **[Dkt .# 3380]** is in violation of the Fourteenth Amendment of the United States Constitution as it applies to Petitioners herein and may apply to all persons asserting claims against the Debtor pursuant to 42 U.S.C. §1983 and the United States Constitution;

B. Issue an Order that rejects the *Amended Plan* **[Dkt. # 3380]** and denies the relief sought therein as it applies to Petitioners herein and all persons asserting claims against the Debtor pursuant to 42 U.S.C. §1983 and the United States Constitution;

C. Require the Debtor to set forth a revised Amended Plan that exempts claims brought under 42 U.S.C. §§1983, 1988 from any resolution short of full and complete compensation, including their damages, attorney fees and punitive damages, where appropriate.

Respectfully submitted,

**GOODMAN & HURWITZ, P.C.**

By: */s/William H. Goodman*
William H. Goodman  P14173
Julie H. Hurwitz P34720
1394 E. Jefferson Ave.
Detroit, MI 48207
313-567-6170
bgoodman@goodmanhurwitz.com
*Attorneys for Deborah  Ryan, Walter Swift,*
*Cristobal Mendoza  and Annica Cuppetelli*

Dated: April 14, 2014

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

-------------------------------------------------------

In re                                                    Chapter 9

CITY OF DETROIT, MICHIGAN,                                Case No. 13-53846

                Debtor.                        Hon. Steven W. Rhodes

-------------------------------------------------------

<u>**INDEX OF EXHIBITS**</u>
**TO:**
**OBJECTIONS OF CREDITORS DEBORAH RYAN, WALTER SWIFT,**
**CRISTOBAL MENDOZA AND ANNICA CUPPETELLI, INTERESTED**
**PARTIES, TO AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF**
**THE CITY OF DETROIT**


1.    Brief in Support of Objections of Creditors Deborah Ryan, Walter Swift,
      Cristobal Mendoza  and Annica Cuppetelli, Interested Parties, to Amended
      Plan For The Adjustment Of Debts Of The City Of Detroit;

2.    Amended Complaint & Jury Demand, Swift v. City of Detroit, et al., 9/5/12;

3.    Amended Complaint & Jury Demand, Ryan vs. City of Detroit, et al., 5/20/11;
      and

4.    Amended Complaint & Jury Demand, Mendoza, et al. vs. City of Detroit, et
      al., 9/24/13.

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

--------------------------------------------------------

| | |
|---|---|
| In re | Chapter 9 |
| CITY OF DETROIT, MICHIGAN, | Case No. 13-53846 |
| Debtor. | Hon. Steven W. Rhodes |

-----------------------------------------------------

## BRIEF IN SUPPORT OF OBJECTIONS OF PETITIONERS DEBORAH RYAN, WALTER SWIFT, CRISTOBAL MENDOZA AND ANNICA CUPPETELLI, INTERESTED PARTIES, TO THE AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT

## TABLE OF CONTENTS

INDEX OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ................................................................................................1

STATEMENT OF FACTS ...................................................................................3

ARGUMENT ........................................................................................................4

Petitioners Object to the Amended Plan in that it Violates their Constitutional Rights, as Secured by the First, Fourth, Fifth, Sixth, Seventh and Fourteenth Amendments to the United States Constitution ........................................................4

CONCLUSION ....................................................................................................8

i

# INDEX OF AUTHORITIES

## *Cases*

*Burnett v. Grattan*, 468 U.S. 42 (1984) ..................................................................6, 7

*Felder v. Casey*, 487 U.S. 131 (1988) .................................................................6, 7

*Fox v. Vice*, 131 S.Ct. 2205 (2011).........................................................................5

*Hensley v. Eckerhart*, 461 U.S. 424 (1983) ..............................................................5

*Jaco v. Bloechle*, 739 F.2d 239 (6th Cir. 1984) ........................................................4

*King v. Conde*, 121 F.R.D. 180 (1988) .....................................................................5

*McDonald v. West Branch*, 466 U.S. 284 (1984) ......................................................7

*Mitchum v. Foster*, 407 U.S. 225 (1972) .............................................................2, 6

*Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496 (1981)...................................5

*V.W. ex rel. Barber v. City of Vallejo*, No. 12-1629, 2013 WL 3992403
   (E.D. Cal. Aug. 2, 2013) ...................................................................................7, 8


## *Statutes & Constitutions*

28 U.S.C. § 1343 .....................................................................................................6

42 U.S.C. §1983.................................................................................................*passim*

Ku Klux Klan Act of 1871, Ch 22, § 1, 17 Stat. 13 (1871) .....................................1, 4

U.S. const. amend. XIV, § 5 ..............................................................................*passim*

# INTRODUCTION

The rights afforded to persons under the United States Constitution are sacrosanct, as has been codified by our Congress when it first enacted Section 1 of the Ku Klux Klan Act of 1871, pursuant to Section 5 of the Fourteenth Amendment in order to ensure the enforceability of the rights created under that amendment. When Congress adopted the Fourteenth Amendment to the United States Constitution in 1868, it made sure that the promise of that blood soaked Civil War Amendment—freedom from violations of due process and equal protection by public officials—would be fulfilled by appropriate legislation. Section 1 of the Klu Klux Klan Act of 1871 is thus specifically entitled, "An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for other purposes," 17 Stat. 13 (1871).

As early as 1874, Congress enacted a proleptical version of the Civil Rights Act, 42 U.S.C. §1983. The United States Supreme Court has broadly described the primary purpose of § 1983 as follows:

> As a result of the new structure of law that emerged in the post-Civil War era—and especially of the Fourteenth Amendment, which was its centerpiece—the role of the Federal Government as the guarantor of basic federal rights against state power was clearly established. Section 1983 opened the federal courts to private citizens, offering a uniquely federal remedy against incursions under the claimed authority of state law upon rights secured by the Constitution and laws of the Nation . . . .
>
> The very purpose of section 1983 was to interpose the federal

1

courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law . . . .

*Mitchum v. Foster*, 407 U.S. 225, 238-39, 242 (1972).

Thus, for almost one hundred fifty years, the ability of our citizens to enforce their rights under the U.S. Constitution in a United States District Court has been a bulwark of the democratic principles that inspire the world. Weakening, diluting or eliminating those rights should not be undertaken lightly.

The facts of the underlying cases at issue in this Objection, arise from injustice and egregious constitutional violations, as follows:

1. *Ryan:* the tragic and needless death of a young police officer in the prime of her life;

2. *Swift:* the wrongful 26 year incarceration of a young man about to start a family who was convicted of a crime he did not commit, all as the result of documentable police misconduct; and,

3. *Mendoza-Cuppetelli:* the false arrest and beating by a Detroit police officer of a Wayne State University Professor of Art and a local Detroit artist for taking photographs on a public downtown Detroit street.

The *Amended Plan of Adjustment* presented by Debtor City of Detroit herein **[Dkt. #3380]** attempts to severely diminish and tolerate the violation of rights

2

secured by the very heart of the U.S. Constitution, the First, Fourth, Fifth, Sixth Seventh and Fourteenth Amendments.

## STATEMENT OF FACTS

For each Petitioner, the underlying facts and claims are set forth in detail as follows, and incorporated herein:

a. ***Deborah Ryan* (C.A. # 11-cv-10900):**  Debtor City of Detroit and its officials (individual Defendants Kozloff and Blackmon) affirmatively acted to substantially increase the risk to her daughter, Patricia Williams, an outstanding Detroit police officer, thereby resulting in Patricia Williams' vicious and violent murder. These actions violated constitutional rights secured by the Due Process clauses of the Fifth and Fourteenth Amendments of the United States Constitution [***See*** **Dkt #819, Paragraphs 4-5; *Brief in Support* thereof, Dkt #819-4, Exhibit 3, Statement of Facts] [Also see, attached hereto, Exh. 2, Plaintiff's First Amended Complaint];**

b. ***Walter Swift* (C.A. #10-cv-12911):**  Walter Swift was wrongfully convicted in 1982 for the crime of rape he did not commit, resulting in 26 cruel years in prison. His claims against the City of Detroit and its officials (Paavola-Nobliski and Lewandowski) thus arise from the unconstitutional wrongful conviction, malicious prosecution and hiding of evidence that convincingly points to innocence, all of which violated his Due Process rights as referenced above, as well as violations of the Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution [***See*** **Dkt #2140-1, Paragraph 2], [Also see, attached hereto, Exh. 3, Plaintiff's First Amended Complaint];** and

c. ***Mendoza & Cuppetelli* (C.A. #11-cv-10899):** Professor Mendoza's (a Wayne State Art Professor) and Ms. Cuppetelli's (an artist), case involves claims against the City of Detroit and its officials (Carson, Petty and Glover) for the unconstitutional use of excessive force and subsequent malicious prosecution, triggered by Professor Mendoza taking  photographs of a movie set on a public street; and therefore,

3

these claims implicate the First, Fourth and Fourteenth Amendments of the United States Constitution. **[***See*** Exh. 4, attached hereto, Plaintiffs' First Amended Complaint]** [1]

Procedurally, the status of the *Ryan* matter is well known to this Court. **[See *Order* of this Court, Dkt. #2584]**. As to the other three Petitioners, their cases against the City of Detroit and its officials remain stayed, pursuant to this Court's *Orders* of *Automatic* and *Extended Stays*. **[Dkts. #167 and 166, respectively]**

## ARGUMENT

### Petitioners Object to the Amended Plan in that it Violates their Constitutional Rights, as Secured by the First, Fourth, Fifth, Sixth, Seventh and Fourteenth Amendments to the United States Constitution

Section 1983 of Title 42, the Civil Rights Act of 1871, (42 U.S.C. §1983) was enacted under the enforcement power given to Congress by Section 5 of the Fourteenth Amendment and provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State . . . subjects, or causes to be subjected thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. Congress enacted § 1983 with the "goal of compensating the injured" and "preventing official illegality." *Jaco v. Bloechle*, 739 F.2d 239, 244

---

[1] While defendants other than the City of Detroit and its officials have been identified in the attached "First Amended Complaint," the actions against non-Detroit Defendants have been settled and dismissed, leaving only the actions against the Debtor and its officials remaining.

(6th Cir. 1984). In doing so, it clearly established the Federal Government as the guarantor of "the basic federal rights of individuals against incursions by state power." *Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 503 (1981).

The Debtor's Proposed *Amended Plan*, if approved, will have the following dire implications for all those constitutionally and statutorily entitled to fully vindicate the violations of their Constitutional rights, among others:

- Diminish the ability of victims of constitutional violations to fully prove these violations through thorough discovery, much of which has already been precluded due to the Stays entered by this Court, thus allowing the Debtor to, in the words of judge Weinstein, "frustrate the important federal interests in broad discovery and truth-seeking and the interest in vindicating important federal substantive policy such as that embodied in section 1983" *King v. Conde*, 121 F.R.D. 180 at 187 (1988);

- Diminish the ability of the Petitioners to vindicate the violations of the Constitution by substantially reducing the full and complete recovery to which they are Constitutionally entitled;

- Diminish the ability of the Petitioners to vindicate the Constitution by eliminating their ability to attorney fees and punitive damages, to which they are Constitutionally entitled;

- Eliminate, reduce and/or diminish the ability of persons whose Constitutional rights have been violated to serve as 'private attorneys general' and thereby serve to prevent future Constitutional violations. *Fox v. Vice*, 131 S.Ct. 2205 (2011)[2]

---

[2] "The purpose of <u>§ 1988</u> is to ensure 'effective access to the judicial process' for persons with civil rights grievances." *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983)

The *Amended Plan* would therefore contravene the very purpose and intent of the Fourteenth Amendment and of Congress, as elaborated by the United States Supreme Court, in enacting and enforcing §1983, to provide a full and complete judicial remedy for the violation of one's rights under the Constitution. Accord *Felder v. Casey*, 487 U.S. 131, 148 (1988) (recognizing that civil rights actions "belong in court") (quoting *Burnett v. Grattan*, 468 U.S. 42, 50 (1984)); *Mitchum v. Foster*, *supra,* at 242-43 (noting that the enforcement of federal rights is of the highest priority).

Specifically, the *Amended Plan*, if adopted, would violate Petitioners' rights to due process of law (*Swift* and *Ryan*), to a fair trial (*Swift*), to free speech (in the case of *Mendoza* and *Cuppetelli*), to be free from unreasonable seizures (*Swift, Mendoza* and *Cuppetelli* ), and to a meaningful and enforceable jury trial in a civil case (all four). They would therefore no longer have any recourse to effectively vindicate the deprivation of their Constitutional rights through 42 U.S.C. § 1983.

Petitioners' rights to vindicate the violation of their Constitutional rights include the right to have a jury trial in federal court. See 28 U.S.C. § 1343(3) ("district courts shall have original jurisdiction of any civil action . . . [t]o redress the deprivation under color of any State law . . . of any right, privilege or immunity secured by the Constitution of the United States . . . .").

Debtor's *Amended Plan* will deprive Petitioners of their opportunity to have

their Constitutional violations decided by a jury *and* to be fully compensated therefore.[3] In this regard the *Amended Plan* flouts the teaching of *Burnett v. Gratton, supra*, that the "dominant characteristic" of a civil rights case is that "they belong in court." *Id* at 50. See also *McDonald v. West Branch*, 466 U.S. 284, 290 (1984). Similarly, it mocks the spirit of *Felder v. Casey*, *supra*, 148, that the actions of this Debtor (and this Court, as proposed by this Debtor) may not "adulterate or dilute" the Constitutional rights that the Civil Rights Act seeks to vindicate.

The potential tension between the Fourteenth Amendment, as vindicated through 42 U.S.C. § 1983 and Chapter 9 is well described in a recent opinion from the Eastern District of California, *V.W. ex rel. Barber v. City of Vallejo*, No. 12-1629, 2013 WL 3992403 (E.D. Cal. Aug. 2, 2013). In *Vallejo*, the court notes as follows:

> [A]larming as it is, as the bankruptcy statute appears to be written, a municipality may erase its own liability to persons whom it and its officers have willfully and maliciously deprived of their civil rights—and even their lives—by filing for bankruptcy. This extraordinary result would appear to exalt the bankruptcy laws over the civil rights laws (even though the civil rights laws, like the bankruptcy laws, are anchored in the constitution).

*Id.* at 4. In *Vallejo*, however neither party actually raised this issue. Indeed the

---

[3] Although this Court has temporarily lifted the stay as to Petitioner Ryan to allow her a jury trial, **[Dkt #2584]**, as noted above she still has no right under the terms of this Court's Order to "…collect on or to seek any proceeding supplementary to judgment from the City." **[Dkt #2584, ¶5, p.4]**

Plaintiff conceded the jurisdiction of the Bankruptcy Court to discharge her claims.

Therefore the court did not decide the merits of this issue. Nonetheless, the *Vallejo*

court went out of its way to identify and flag how Chapter 9, if improperly applied,

may well unconstitutionally interfere with rights secured by 42 U.S.C. § 1983 and

the Fourteenth Amendment. If permitted to stand, Paragraph 191 of the Debtor's

Proposed *Amended Plan of Adjustment* would result in just that.

## CONCLUSION

It is clear that the intent and purpose of Paragraph 191of the *Amended Plan*

**[Dkt. #3380]**, by specifically stating, "For the avoidance of doubt, Section 1983

Claims are included within the definition of Other Unsecured Claims," i**s** to lump

together all common law, state law, and Constitutional claims made against the

City of Detroit and its officials – regardless of their bases or their statutory and

Constitutional origins. To do this is to ignore, indeed to violate, the Fourteenth

Amendment of the United States Constitution and must be rejected.

**WHEREFORE,** the Petitioners herein request that this Court provide the

following relief:

    A. Determine that the *Amended Plan* **[Dkt # 3380]** is in violation of the Fourteenth Amendment of the United States Constitution as it applies to Petitioners herein and may apply to all persons asserting claims against the Debtor pursuant to 42 U.S.C. §1983 and the United States Constitution;

    B. Issue an Order that rejects the *Amended Plan* **[Dkt # 3380]** and denies the relief sought therein as it applies to Petitioners herein and all persons

asserting claims against the Debtor pursuant to 42 U.S.C. §1983 and the United States Constitution;

C. Require the Debtor to set forth a revised Amended Plan that exempts claims brought under 42 U.S.C. §§1983, 1988 from any resolution short of full and complete compensation, including their damages, attorney fees and punitive damages, where appropriate.

Respectfully submitted,

**GOODMAN & HURWITZ, P.C.**

By: */s/William H. Goodman*
William H. Goodman   P14173
Julie H. Hurwitz P34720
1394 E. Jefferson Ave.
Detroit, MI 48207
313-567-6170
bgoodman@goodmanhurwitz.com
*Attorneys for Deborah  Ryan, Walter Swift,*
*Cristobal Mendoza  and Annica Cuppetelli*

Dated:  April 15, 2014

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

DEBORAH RYAN, on behalf of herself
individually and as Personal Representative of
the Estate of Patricia "Katie" Williams,

                     Plaintiff,

vs.

CITY OF DETROIT, acting through its agency
the Detroit Police Department, Detroit Police
Sergeant BARBARA KOZLOFF, in her
individual capacity, Detroit Police Inspector
(formerly Lieutenant) DWANE BLACKMON,
in his individual capacity; CANTON TOWNSHIP,
Canton Police Lieutenant MARK SCHULTZ,
in his individual capacity; Canton Police Officer
ADAM FALK, in his individual capacity,

                Defendants.

Case No. 11-10900
Honorable Mark A. Goldsmith
Magistrate Judge Michael J. Hluchaniuk

_____/

William H. Goodman (P14173)
Julie H. Hurwitz (P34720)
Kathryn Bruner James (P71374)
Goodman & Hurwitz, P.C.
1394 E. Jefferson Ave.
Detroit, MI 48207
(313) 567-6170/Fax: (313) 567-4827
bgoodman@goodmanhurwitz.com
jhurwitz@goodmanhurwitz.com
kjames@goodmanhurwitz.com
*Attorneys for Plaintiff*

Kathleen J. Kalahar (P60301)
Goodman Kalahar
1394 E Jefferson Ave
Detroit, MI 48207
(313) 567-6165/Fax: (313) 567-4827
kkalahar@goodmankalahar.com
*Co-Counsel for Plaintiff*

Michael M. Muller (P38070)
Lee'Ah D.B. Giaquinto (P60168)
City of Detroit Law Dept.
660 Woodward Ave., Suite 1800
Detroit, MI 48226
(313) 237-3062/Fax: (313) 224-5505
MullM@detroitmi.gov
Basel@detroitmi.gov
*Attorneys for Defendants City of Detroit, Kozloff and
Blackmon*

_____/

## FIRST AMENDED COMPLAINT AND JURY DEMAND

1

NOW COMES Plaintiff, DEBORAH RYAN, on behalf of herself individually and as Personal Representative of the Estate of Patricia Williams, deceased, by and through her attorneys, GOODMAN & HURWITZ, P.C., and GOODMAN KALAHAR, P.C., and for her Complaint against the above-named Defendants, states as follows:

## PRELIMINARY STATEMENT

1.      This tragic case arises from the needless death of a dedicated, young and beautiful Detroit police officer and mother, Patricia Catherine Williams (hereafter "Katie Williams"), who lost her life at the hands of her estranged and mentally unbalanced husband (Edward G. Williams, II (hereafter "Ed Williams"), who was also a Detroit police officer and who took his own life at the same time. Their employer, the CITY OF DETROIT, and the individually named City of Detroit Defendants, KOZLOFF and BLACKMON, as well as CANTON TOWNSHIP and the individually named Canton Township Defendants, SCHULTZ and FALK, knowingly and consciously chose to shield the husband officer from suspension, investigation and potential criminal prosecution at the expense of protecting the wife from clear and obvious risk and danger.

2.      This action is based on the highly foreseeable risk of serious danger posed by a person suffering from severe emotional problems, who had recently abused his wife and who possesses one or more firearms. That person's status as a police officer should not be used, but in this case was used, to diminish the calculation of the danger created by the toxic interaction of mental illness, domestic abuse and firearms.

3.       This action is also based on the customs, practices and policies of deliberate failure of the Defendant CITY OF DETROIT, acting through its Police Department, to address the severe psychological pathology of some of its officers, due to the mere fact, standing alone,

2

that they are police officers. Therefore its failure and refusal to help those officers, their families and others around them, has gravely increased, enhanced, contributed to, exacerbated and aggravated the death and serious injury to the families, colleagues and friends of seriously disturbed Detroit police officers.

4.    This action is based, as well on the proactive and affirmative acts of the Detroit Defendants, despite the Detroit Police Department's refusal to recognize and address the severe emotional and psychological diseases, pathologies and problems of its officers, when these Defendants acted in such a way as to create – that is, to knowingly increase, exacerbate, aggravate and enhance – the danger posed by one such police officer, such that it became substantially likely that harm would result.

5.    This action is, as well, based on the customs, practices and policies of the Defendant CITY OF DETROIT and the actions of Defendants KOZLOFF and BLACKMON, whereby troubled Detroit police officers who clearly evidence involvement in abusive, criminal, threatening, dangerous and suspicious acts are treated differently and preferentially over persons who are not police officers. This differential and preferential treatment is without any rational or reasonable basis.

6.    Similarly, this action is based on the customs, practices and policies of the Defendant CANTON TOWNSHIP and the actions of Defendants  SCHULTZ and FALK, whereby troubled police officers, who clearly evidence involvement in abusive, criminal, threatening, dangerous and suspicious acts, are treated differently and preferentially over persons who are not police officers. This differential and preferential treatment is without any rational or reasonable basis.

7.    Therefore, Plaintiff DEBORAH RYAN seeks relief on behalf of herself and as

Personal Representative of the Estate of her deceased daughter Katie Williams, for the Defendants' violation, at all times under color of state law, of their rights, privileges and immunities secured by the Civil Rights Act of 1871, 42 U.S.C. §1983, the Fifth and Fourteenth Amendments to the United States Constitution, and the Constitution and laws of the State of Michigan, including but not limited to the Michigan Wrongful Death Act, MCL 600.2922.

8.      On or about the days leading up to and on or about September 20 through 22, 2009, Defendants engaged in conduct that violated the rights of Plaintiff's decedent and of Plaintiff, as secured by the Due Process and Equal Protection clauses of the Fifth and Fourteenth Amendment to the United States Constitution.

9.      At all times herein, Plaintiff was the mother of Katie Williams, now deceased, whose death on September 22, 2009 was the result of the wrongful and unconstitutional actions of the Defendants, in particular Detroit Police Inspector DWANE BLACKMION, and Detroit Police Sergeant BARBARA KOZLOFF, acting in their individual capacities and undertaken pursuant to the policies, customs and practices of the Defendant herein, CITY OF DETROIT which policies, customs and practices were a driving force in the death of Katie Williams.

10.     At all times herein, Plaintiff was the mother of Katie Williams, now deceased, whose death on September 22, 2009 was the result of the wrongful and unconstitutional actions of the Defendants, in particular Canton Police Lieutenant MARK SCHULTZ and Canton Police Officer ADAM FALK, acting in their individual capacities and undertaken pursuant to the policies, customs and practices of the Defendant herein, CANTON TOWNSHIP,  which policies, customs and practices were a driving force in the death of Katie Williams.

11.     Plaintiff seeks compensatory and punitive damages, declaratory relief, an award of attorney's fees and costs, and such other and further relief as the Court deems proper.

4

### JURISDICTION

12.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343 (3) and (4), as this action seeks redress for the violation of Plaintiff's constitutional and civil rights. Plaintiff's claim for declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure. Plaintiff further invokes this Court's supplemental jurisdiction, pursuant to 28 U.S.C. §1367(a), over any and all state constitutional and state law claims that are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

### VENUE

13.     Venue is proper in the United States District Court for the Eastern District of Michigan, pursuant to 28 U.S.C. § 1391 (b)(2), in that this is the judicial district in which the events giving rise to the claim occurred.

### JURY DEMAND

14.     Plaintiff demands a trial by jury in this action on each and every one of her claims.

### PARTIES

15.     Plaintiff DEBORAH RYAN (hereafter "RYAN") was the mother of Plaintiff's decedent Katie Williams, and is the Personal Representative of her Estate. As such, she is the proper party to bring this action for and on behalf of the benefit of the Estate. She is a resident of the City of Canton, Wayne County, Michigan, as was her daughter, Katie Williams.

16.     Defendant CITY OF DETROIT (hereafter "DETROIT") is a municipal corporation, so authorized by the laws of the State of Michigan, that operates the Detroit Police Department (hereafter "DPD"), as a part of its responsibilities and services. At all times relevant

5

herein, this Defendant acted under color of regulation, usage, custom and law and pursuant to its policies and practices, as did all the individual Defendants herein BARBARA KOZLOFF AND DWANE BLACKMON.

17.     Defendant Sergeant BARBARA KOZLOFF (hereafter "KOZLOFF") is, and at all times herein was, a police homicide Sergeant in the DPD of Defendant DETROIT, acting under color of regulation, usage, custom and law, acting within the scope of her authority and employment as a police homicide supervisor and pursuant to the policies and practices of Defendant DETROIT, through its agency and unit, the DPD.

18.     Defendant Inspector DWANE BLACKMON (hereafter "BLACKMON") is, and at all times herein was, the Commanding Officer of DPD Homicide. In September of 2009, he was a Lieutenant. At all times herein, he was acting under color of regulation, usage, custom and law, acting within the scope of his authority and employment as a police homicide supervisor and pursuant to the policies and practices of Defendant DETROIT, through its agency and department, the DPD.

19.     Defendant CANTON TOWNSHIP  (hereafter "CANTON") is a municipal corporation, so authorized by the laws of the State of Michigan that operates the Canton Police Department (hereafter "CPD"), as a part of its responsibilities and services. At all times relevant herein, this Defendant acted under color of regulation, usage, custom and law and pursuant to its policies and practices, as did all the individual Defendants herein MARK SCHULTZ and ADAM FALK.

20.     Defendant Lt. MARK SCHULTZ (hereafter "SCHULTZ") is, and at all times herein was, a lieutenant in the CPD of Defendant CANTON, acting under color of regulation, usage, custom and law, acting within the scope of her authority and employment as a police

supervisor and pursuant to the policies and practices of Defendant CANTON, through its agency and department, the CPD.

21.    Defendant Officer ADAM FALK (hereafter "FALK") is, and at all times herein was, a police officer in the CPD of Defendant CANTON, acting under color of regulation, usage, custom and law, acting within the scope of her authority and employment as a police homicide supervisor and pursuant to the policies and practices of Defendant CANTON, through its agency and department, the CPD.

## STATEMENT OF FACTS

*22.*    At all times herein ED WILLIAMS was a DPD police officer, assigned to the Homicide unit, where he had been assigned for at least 10 years. He had been a Detroit police officer for approximately 15 years.

23.    At all times herein, KATIE WILLIAMS was a Detroit police officer and had been so for approximately 14 years. In September 2009, she was just returning to active duty after being on light duty for 2 years due to a work related back injury.

24.    Prior to and including September 22, 2009, Plaintiff's Decedent, Katie Williams bad been married to Edward Ed Williams, both Detroit police officers. They lived together at 3543 Wall St., Canton, Michigan with Katie Williams' son, Kevin Swope Jr., who was eleven years old at the time of her death.

25.    Prior to September 19, 2009, Ed and Katie Williams had been experiencing serious marital problems, largely as a result of Ed Williams' infidelity, to such an extent that they had agreed to divorce and each sought lawyers to pursue that divorce.

26.    At all times relevant hereto, including between September 19 and September 22, 2009, Defendants were on notice of the Williams' marital conflicts.

27.     Late in the evening of September 19, 2009, Ed Williams assaulted and battered Katie Williams in their marital home, causing her to be physically and visibly injured.

28.     As a result of that assault, in the early morning hours of September 20, 2009, Katie Williams went to Defendant CANTON's police headquarters to advise the Canton Department of Public Safety that she had been assaulted and to request a police escort to get safely back into her house so she could retrieve some personal items and then leave the house. There, she was interviewed by Defendant FALK.

29.     At the time and date of her appearance at the CPD on September 20, 2009, Katie Williams was accompanied by Clifford Lee, also a DPD officer whom she had been seeing. Mr. Lee told Defendant FALK that Katie was concerned that, in the long term, Ed Williams would "do something to her," and that he had threatened her in the past.

30.     At this time Katie Williams advised Defendant FALK that her husband was a Detroit police officer and that she was also a Detroit police officer. FALK asked her if she wanted to make a report against her husband. FALK further stated that, because of Katie Williams' visible signs of violent assault and her oral statement, there was sufficient to authorize him, FALK, to initiate a criminal investigation, regardless of whether she filed a written report of the incident.

31.     She declined to file a written report because she feared that he would lose his job and, also, that if she officially reported her husband, as a Detroit police officer, she would face retaliation from both Ed Williams and from fellow police officers, due to an unspoken but iron clad code, custom and policy of silence within DPD that demanded that police officers never report the misconduct of fellow officers.

8

32.     Although at that time (between 12:15 and 12:45 a.m.), Katie Williams did not report either her name or her husband's name to Defendant FALK or to the Canton police headquarters, by 9:19 a.m. that same morning, this information had been reported to CPD by Clifford Lee, who identified the location (3543 Wall St., Canton, Michigan) of the assailant, Ed Williams, and the victim, Katie Williams.

33.     On September 20, 2009, due to at least two calls for help, the Canton Police performed a SWAT team operation at the Williams' Wall Street home and, thereafter, Defendants CANTON and SCHULTZ were aware of the following documented facts, which were subsequently reported to Defendants DETROIT, KOZLOFF and BLACKMON, prior to the morning of September 22, 2009:

a.  On the night of September 19, 2009, Ed Williams had criminally assaulted Katie Williams. Her injuries from this assault were witnessed and recorded by CPD  and were reported by Clifford Lee to the Canton PD as a criminal assault and battery;

b.  On the morning of September 20, 2009, Katie Williams, accompanied by her mother, Plaintiff DEBORAH RYAN, went to the Wall St. address to retrieve of Katie Williams' personal belongings, not expecting Ed Williams to be there. Ed Williams had deliberately concealed his presence in the house by parking his car some distance from the house and garage and having a friend drop him of at the Wall Street house.

c.  While inside the house, DEBORAH RYAN reported that Ed Williams was holding an un-holstered handgun while intoxicated in violation of criminal

9

statutory law, "possession of a firearm while intoxicated," MCLA section

750.237.

d.   When the Canton police officers arrived at the Wall Street location, the found

that Ed Williams had fled but that he had left a note in the house that they

determined was a suicide note. It stated:

> "I Edward G. Williams II of sound mind (a
> little pissed off though), hereby leave all
> worldly possessions to my mother, Wanda
> Williams. This is to include all life insurance
> policies and bank accounts.
>            /s/
> 9-20-09       6:15 AM"

e.   Katie Williams was with another man, Clifford Lee (also a Detroit police

officer), and that the relationship appeared to be that of "boyfriend/girlfriend."

Further, Defendant SCHULTZ, who communicated this information to

Defendant SCHULTZ also communicated to Defendant DETROIT that, if Ed

Williams learned that Katie was seeing another man, it was likely that the

situation would become dangerous;

f.   Based on these circumstances, Defendants SCHULTZ and CANTON issued a

statewide "notice of suspicious behavior" by Ed Williams, pursuant to the

Law Enforcement Information Network (hereafter "LEIN"), advising that Ed

Williams was missing and endangered and that he was dangerous, as

evidenced by the following narrative in the LEIN alert:

> "DPD officer, intox, no known veh reg, after
> domestic situation left a suicide note poss left
> home with handgun, if any contact use caution and
> call Canton PD."

10

34.     As a result of these incidents and occurrences, Defendants would have initiated a criminal investigation of Ed Williams, had they not known that he was a sworn and licensed police officer. However, thereafter, on the same day, SCHULTZ and CANTON did verbally advise Defendants DETROIT, BLACMON and KOZLOFF, through Sgt. Martel, as to all the information set forth in Paragraphs 25 - 33, above.

35.     During the course of the day of September 20, 2009, the following interactions between personnel of Defendant CITY and Defendant CANTON occurred:

    a.  Sgt. Martel of the DPD agreed with Defendant SCHULTZ that the note prepared by Ed Williams at approximately 6:15 a.m. on September 20, 2009 was a suicide note ("exactly"), and Martel so indicated to Defendants KOZLOFF and BLACKMON;

    b.  Martel also agreed with SCHULTZ that it would be very dangerous if Ed Williams already was aware or was to become aware of the involvement of Katie Williams and Clifford Lee", and so indicated to Defendants KOZLOFF and BLACKMON;

    c.  Martel agreed that, based on the aforementioned information, there was a palpable, serious and realistic danger that the situation could get "really out of control," unless such a dire consequence was proactively prevented by the DPD, and so indicated to Defendants KOZLOFF and BLACKMON;

    d.  Martel advised SCHULTZ that, pursuant to orders from his "chain of command," all materials were to go directly to the Internal Affairs unit of the DPD, which would "handle this whole thing" – i.e. that Ed Williams'

11

colleagues and friends in Homicide, including Defendants BLACKMON and KOZLOFF, were to be definitively and "completely out of it."

e.  Martel further insistently advised Defendants SCHULTZ and CANTON that *no* materials were to be sent to DPD Homicide, but rather to DPD Internal Affairs; and he gave SCHULTZ and CANTON the telephone number of DPD Internal Affairs, to which CANTON was, upon request from the DPD, to 'fax' all the written reports concerning the actions of Ed Williams on September 19-20, 2009. He further assured Defendants SCHULTZ and CANTON that the DPD, through its Internal Affairs investigators, would take responsibility for preventing Ed Williams from seriously injuring anyone ("Hopefully, we can get this thing before it gets really out of control").

f.  SCHULTZ advised Martel that there would be no criminal investigation of Ed Williams by the Defendant CANTON.

g.  Defendants SCHULTZ and CANTON advised Defendants DETROIT, KOZLOFF and BLACKMON, as well as Sgt. Martel and Ed Williams that, pursuant to the LEIN alert, they would "kick (Ed Williams) into a psychiatric unit" unless he saw someone in the DPD who would advise CANTON and SCHULTZ that he, Williams, was OK.

36.  Based on this representation, as set forth in Paragraph 35(f) above, from SCHULTZ to both Martel and Ed Williams, and despite the mandated procedure that DPD Homicide was to be "completely out of it" and that DPD Internal Affairs would take over, Ed Williams contacted Defendant KOZLOFF, a Homicide supervisor acting at the direction and under the supervision of Defendant BLACKMON. Ed Williams' purpose in contacting

12

KOZLOFF, as completely understood by both BLACKMON and KOZLOFF, was so that she

would advise SCHULTZ and CANTON as to whether or not they should "kick (Ed Williams)

into a psychiatric unit

37.     It was also the purpose of BLACKMON and KOZLOFF that KOZLOFF was to

advise SCHULTZ and CANTON that they should remove Ed Williams from the LEIN so that

CANTON and its officers would  not "kick (Ed Williams) into a psychiatric unit."

38.     The interview between KOZLOFF (at all times herein acting in concert and under

the supervision of  Defendant BLACKMON, her supervisor) and Ed Williams was:

   a.  Very superficial and brief, lasting, at most, 10 minutes;

   b.  Unprofessional, inappropriate and likely to lead to incorrect and dangerous

       decisions based on poor judgment, in that:

           i.   KOZLOFF, acting in concert with BLACKMON, determined that it
                was of no significance, and therefore required no action by
                KOZLOFF, BLACKMON or any member of the Detroit Police
                Department, that: Ed Williams had inflicted domestic violence on his
                wife, Katie Williams; that Ed Williams had earlier that day written a
                suicide note; and that Ed Williams had lied to KOZLOFF during the
                interview between them.

          ii.   Although KOZLOFF made a determination as to Ed Williams mental
                status and stability, she  was not trained to assess a police officer's
                mental fitness for duty and thus incapable of determining whether "all
                is well" with Ed Williams, from a mental health, counseling,
                psychiatric, risk assessment or personal perspective;

         iii.   Although she was Ed Williams' supervisor, KOZLOFF was incapable
                of objectivity and independent judgment in making serious decisions
                as to whether Ed Williams should be taken off active duty, be arrested,
                have his firearms confiscated or be seen immediately by a psychiatric
                professional, due to her personal relationship with him as a friend and
                colleague;

          iv.   KOZLOFF, as a member of the homicide division, was supposed to
                have stayed "completely out of it," and should have turned Ed
                Williams over to DPD Internal Affairs;

13

     v.  Despite the fact that it was obvious that there was probable cause to believe Ed Williams had recently violated criminal laws of the State of Michigan and that he was very psychologically disturbed and, indeed suicidal, KOZLOFF deliberately refused to arrest him, remove him from duty, require him to turn in his weapons and order him to be examined by a psychologist or psychiatrist;

     vi.  KOZLOFF falsely asserted that she had been told by SCHULTZ that there was no probable cause to have arrested Ed Williams when, in fact, SCHULTZ never said nor believed any such thing;

     vii.  KOZLOFF and BLACKMON both refused to reach out to and communicate with Katie Williams so as to better assess the situation between Ed and Katie Williams and to assess Ed Williams' mental stability; and

     viii.  KOZLOFF and BLACKMON falsely advised Ed Williams that if he needed help he could call the Personal Affairs section of the DPD.

39.    Defendants KOZLOFF and BLACKMON falsely asserted that that the Canton Police Department had represented that there was no probable cause to arrest Ed William. However had the Defendants SCHULTZ, FALK and CANTON initiated a criminal investigation regarding Ed Williams on September 20, 2009, Defendants KOZLOFF and BLACKMON would have had no choice but to take his guns, remove him from duty, force him to consult a psychiatric professional and arrest him.

40.    Based upon the aforementioned woefully inadequate and incompetent interview, Defendants BLACKMON and KOZLOFF deliberately and affirmatively took action which increased a foreseeable and highly dangerous risk of harm to Plaintiff's decedent by communicating to Defendants SCHULTZ and CANTON that "all is well" with Ed Williams, and as follows:

     a.  That he was both fit for duty and perfectly able and to safely have and use firearms;

14

    b.   That he did not require psychological treatment or care before being allowed to possess and use firearms;

    c.   That the note he had written was not a suicide note, i.e. KOZLOFF, at all times acting in concert with Defendant BLACKMON, falsely represented to Defendants SCHULTZ and CANTON, that it was not a suicide note and that it did not give rise to any possible inference of improper or violent behavior on the part of Ed Williams; and

    d.   That he was not suicidal, notwithstanding the fact that KOZLOFF had no reasonable basis upon which to make such a judgment.

    e.   KOZLOFF, at all times acting in concert with Defendant BLACKMON and speaking on behalf of the DPD, advised that the DPD would "really appreciate it" if the Canton PD would cancel the LEIN alert.

41.    As a result of this improper and inappropriate proactive and affirmative series of actions by KOZLOFF acting in concert with BLACKMON, the LEIN alert was cancelled and CANTON took no further interest in the matter by way of investigation or other law enforcement action until more than 36 hours later when Ed and Katie Williams were both already dead—Katie having been murdered by Ed and Ed then having then committed suicide.

42.    At all times herein, KOZLOFF, BLACKMON and DETROIT acted deliberately to affirmatively intervene in the Ed Williams case with Defendant SCHULTZ and CANTON to terminate CANTON's investigation and law enforcement actions despite knowledge that supervisors had taken all DPD Homicide officers and supervisors, including KOZLOFF, off the case and that she was not authorized to intervene.

43.     At all times herein, all Defendants herein deliberately refused and failed to address the known serious threat of harm that Ed Williams posed to his wife and others, including himself, during the time period between September 19 and 22, as evidenced by their knowledge of his suicidal and violent conduct and the fact that there was probable cause to believe that he had was guilty of at least two dangerous criminal acts.

44.     In refusing and failing to adequately respond to the threat posed by Ed Williams, as evidenced by his psychological problems and criminal and violent actions, Defendants BLACKMON, KOZLOFF and DETROIT treated him differently and preferentially than they would have, had he not been a police officer, acting in a threatening and dangerous manner toward a wife, family member or himself. Defendants' intent and purpose to respond to allegations of police officer Ed Williams' criminal and dangerous behavior more preferentially than to non-police officer domestic abusers is evidenced by the following, among others:

a.   Defendants' active intervention with another law enforcement agency in favor of Ed Williams, which they would not have done for a perpetrator of domestic violence inflicted by someone other than a Detroit police officer;

b.   The refusal of the Defendants to objectively, neutrally and fairly investigate the situation and conflict between Ed and Katie Williams, which they would not have done for a perpetrator of domestic violence inflicted by someone other than  a Detroit police officer;

c.   Defendants' refusal to communicate with, talk to or interview the domestic abuse victim, Katie Williams, notwithstanding their policy that required them to do so, had the victim been the spouse of anyone other than a police officer;

16

d.  The refusal of the Defendants to arrest or detain Ed Williams, despite clear evidence that established probable cause that he had violated the law and despite clear policy that required the Defendants to arrest anyone whom they had probable cause to believe had committed any crime, including a misdemeanor, that involved domestic violence, which policy was waived and/or disregarded when the perpetrator was a police officer, such as, in particular, Ed Williams. Defendants would not have waived this policy had Ed Williams been anyone other than a Detroit police officer;

e.  Defendants' active assertion to Defendants SCHULTZ and CANTON that Ed Williams was mentally stable, competent and reliably able to possess firearms, which they would not  have done for a perpetrator of domestic violence inflicted by someone other than a Detroit police officer;

f.  Interviewing Ed Williams in a superficial and non-probing way that resulted in their acceptance, without question, of his representations, statements and assertions, which they would not have done for a perpetrator of domestic violence inflicted by someone other than a Detroit police officer; and

g.  Making a medical and psychological diagnosis regarding Ed Williams' mental health without the benefit of professional training, advice, consultation or participation, which they would not have done for a perpetrator of domestic violence inflicted by someone other than a Detroit police officer.

45.   In refusing and failing to adequately respond to the threat posed by Ed Williams as evidenced by his psychological problems and criminal and violent actions, Defendants SCHULTZ, FALK and CANTON treated him differently and preferentially than they would

17

have, had he not been a police officer, acting in a threatening and dangerous manner toward a wife, family member or himself. Defendants' intent and purpose to respond to allegations of police officer Ed Williams' criminal and dangerous behavior more preferentially than to non-police officer domestic abusers is evidenced by the following, among others:

   a. The refusal of the Defendants to objectively, neutrally and fairly evaluate the following circumstances, which, had Ed Williams not been a police officer, would most certainly have resulted in the immediate initiation of a criminal investigation by these Defendants:

   i. That Katie Williams appeared at the Canton Police Department in the very early hours of September 20, 2009 reporting that she was assaulted by her husband;

   ii. That she had an evident mark on her face as the result of the apparent assault;

   iii. That several hours later, these Defendants received two 911 calls that reported that Ed Williams was in the family house, in the presence of his estranged wife and mother-in-law while intoxicated and having pulled his firearm;

   iv. That when the Canton officers, including Defendant SCHULTZ, responded, Ed Williams fled the scene so that he could avoid being interrogated; and

   v. That, as evidence of his potentially violent intent, after he fled, he left behind a clear message of suicide and anger.

   b. The refusal of these Defendants to arrest or detain Ed Williams, despite clear evidence that established probable cause that he had violated the law and despite their clear policy that required the Defendants to arrest anyone whom they had probable cause to believe had committed a crime, including a misdemeanor, that involved domestic violence, which policy was shelved, waived and/or disregarded because the perpetrator was a police officer, in

particular Ed Williams, which they would not have done for a perpetrator of domestic violence inflicted by someone other than a police officer.

46.     As such, all Defendants treated Ed Williams more preferentially and favorably than they would have had the perpetrator been a person other than a police officer.

47.     Further, all Defendants treated Ed Williams' victim, Katie Williams, differently, more adversely and more injuriously than they would have treated those potential victims of someone who was not a police officer.

48.     Defendants' purposely intended to respond to allegations of police officer Ed Williams' criminal and dangerous behavior, *vis-à-vis* his victim Katie Williams, more adversely and injuriously to Katie Williams than to victims of non-police officer domestic abuse. Further they purposely intended to respond to these allegations more favorably and preferentially to Ed Williams than they would have had he not been a police officer.

49.     The objective impact and effect of those actions was adverse to Katie Williams and favorable and preferential to Ed Williams.

50.     The aforementioned objective impact and effect, as well as Defendants' purpose and intent, is evidenced, in part, by those incidents and circumstances set forth above.

51.     At no time was there any reasonable and/or rational basis for the differential treatment set forth and summarized above.

52.     The actions of the Defendants KOZLOFF and BLACKMON were as a result of the customs, policies and practices of Defendants DETROIT, including but not limited to the following:

        a.   Failure to train, supervise and discipline its officers and supervisors to respond to situations of both real and potential domestic violence by DPD officers as

vigorously, firmly, aggressively and promptly as they respond to such situations where the domestic violence suspect is not a police officer;

b.  Routinely accept and condone DPD supervisors' and officers' regular practice and custom of responding to complaints, accusations and/or charges of domestic violence or other wrongdoing against other police officers with favoritism, cronyism and/or partiality, rather than with professionalism, objectivity and responsibility;

c.  Failure to train, supervise and discipline DPD supervisors so that they will recognize and appropriately refer officers whom they supervise and who exhibit serious psychological problems to Internal Affairs for psychological evaluation and counseling and require it when appropriate;

d.  Failure to train, supervise and discipline DPD supervisors so that they will recognize that a police officer with serious psychological poses a serious threat to the general public, his/her colleagues and especially his/her spouse, neighbors, family members and self;

e.  Failure to promulgate or implement, through training, supervision and discipline, guidelines, policy, practices, customs or investigative techniques that required Detroit police officers, investigating claims of domestic violence or abuse by Detroit police officers, to interview, inquire of or ask the officer's domestic violence victim/spouse for her information regarding the events in question.

f.  Despite being on notice that there was an epidemic of suicidal pathology amongst DPD officers at the time of these incidents, these Defendants

20

routinely ignored their obligation to have in place a mandatory requirement of psychological evaluation and counseling of officers who exhibit any signs of such problems and the immediate confiscation of their firearms, pending the completion of psychiatric examination and treatment;

g. Routine failure to have clear mandatory guidelines, mechanisms, protocols, resources or procedures to be used by DPD officers and supervisors when they are put on notice of a police officer who poses a serious threat to the general public, his/her colleagues and especially his/her spouse, neighbors, family members, and self;

h. Failure to have clear mandatory guidelines, mechanisms, protocols, resources and procedures to be used by DPD officers and supervisors when they are put on notice of a police officer who exhibit serious psychological symptoms;

i. Failure to promulgate or implement, through training, supervision and discipline, any policies or proper procedure that instructed or guided supervisors who reasonably believed that that subordinates may be under non-duty-related stress that may be deemed to effect their duties and/or require hospitalization;

j. Failure to promulgate or implement, through training, supervision and discipline, any policies or proper procedure whatsoever, regarding members who are experiencing psychological difficulties; and

k. Tolerance, ratification and authorization of an unspoken code and policy of silence within the Detroit Police Department that demanded that police

21

officers not report misconduct, criminal activity, or potential mental illness by other fellow officers.

53.   The actions of the Defendants CANTON, SCHULTZ and FALK were as a result of the customs, policies and practices of Defendants CANOTN herein, including but not limited to the following:

a.   Failure to train, supervise and discipline its officers and supervisors to respond to situations of both real and potential domestic violence by police officers as vigorously, firmly, aggressively and promptly as they respond to such situations where the domestic violence suspect is not a police officer;

b.   Routinely accept and condone CANTON supervisors' and officers' regular practice and custom of responding to complaints, accusations and/or charges of domestic violence or other wrongdoing against other police officers with favoritism, cronyism and/or partiality, rather than with professionalism, objectivity and responsibility;

54.   The aforementioned customs, policies and practices were likely to result in the violations of rights of others secured under the Fifth and Fourteenth Amendments to the United States Constitution, including Plaintiff and Plaintiff's decedent Katie Williams.

55.   The aforementioned customs, policies and practices were a driving force and proximate cause of in the actions of the Defendants that resulted in the violations of the rights of others, in particular the Plaintiff and Plaintiff's decedent herein, Katie Williams, to both due process and equal protection of the law, as secured under the Fifth and Fourteenth Amendments to the United States Constitution.

56.     As a result of the actions of the Defendant DETROIT's and CANTON's aforementioned customs, policies and practices, on September 22, 2009, Ed Williams tragically shot and killed Katie Williams and then shot and killed himself.

## CLAIMS

### COUNT I - FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – DENIAL OF DUE PROCESS
### BY DEFENDANTS DETROIT, KOZLOFF AND BLACKMON
### (STATE CREATED DANGER)

57.     Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 56 as if fully set forth herein.

58.     In their actions, set forth above, the Defendants DETROIT, KOZLOFF and BLACKMON violated the Plaintiff's decedent's clearly established and fundamental right under the substantive due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution, i.e. decedent's rights to personal security, bodily integrity and life. These violations are and were all of such magnitude of liberty deprivation that these abuses that Defendants have inflicted upon Plaintiff's decedent stripped from her the very essence of her personhood.

59.     Defendants' violations of the aforementioned clearly established rights, were characterized by the following:

      a.   They caused harm that was foreseeable and direct;

      b.   They acted with a degree of culpability that shocks the conscience;

      c.   They affirmatively undertook actions that increased the risk of serious injury and/or death and therefore were a cause of the death of Plaintiff's decedent, Katie Williams, notwithstanding that a relationship existed between these

23

Defendants and Katie Williams such that she was a foreseeable victim of these Defendants' acts;

d.  Katie Williams was a member of a discrete class of persons subjected to the harm caused by the Defendant's actions, rather than a member of the public in general; and

e.  Defendants, in particular KOZLOFF and BLACKMON, used their authority so as to act affirmatively and proactively and to thereby create a grave danger to Katie Williams and/or to render her more vulnerable to danger than had these Defendants not acted at all.

60.     As a direct and proximate result of the actions and conduct of the Defendants DETROIT, KOZLOFF and BLACKMON, Plaintiff herein suffered the following injuries and damages:

a.  As to the estate of Patricia ("Katie") Williams:

i.  Physical injury as a result of being shot with a handgun, resulting in death;

ii.  Conscious physical and emotional pain, suffering, anguish, distress and fear; and

iii.  Loss of earning capacity.

b.  As to the survivors, under the Michigan Wrongful Death Act, MCL 600.2922, *et seq.:*

i.  Loss of love;

ii.  Emotional distress and anguish;

iii.  Loss of society and companionship;

iv.  Loss of services;

v.  Loss of emotional support; and

24

      vi.  Loss of past and future economic support.

**COUNT II - SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983– DENIAL OF EQUAL PROTECTION**
**BY ALL DEFENDANTS**

61.    Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 60 as if fully set forth herein.

62.    At all times herein all the Defendants herein violated Plaintiff's decedent's rights to the equal protection of the law as secured by the Fourteenth Amendment to the United States Constitution, in that she was a victim of domestic violence, inflicted by a Detroit Police Officer, as distinguished from being a victim of domestic violence inflicted by a person other than a police officer, as set forth above.

63.    Defendants encountered, responded to and treated Plaintiff's decedent differently, adversely and more injuriously due to her status as a victim of domestic violence inflicted by a Detroit Police Officer than they would have encountered, responded to and treated her, had she been a victim of domestic violence, inflicted by a person other than a police officer

64.    These Defendants had no rational or reasonable basis for treating Plaintiff's decedent differently by virtue of the fact that her assailant or potential assailant was a police officer, than the victims of assailants or potential assailants who are not police officers.

65.    As a direct and proximate result of the acts and conduct of the Defendants, Plaintiff herein suffered the following injuries and damages:

      a.  As to the estate of Patricia ("Katie") Williams:

          i.  Physical injury as a result of being shot with a handgun, resulting in death;

25

      ii.  Conscious physical and emotional pain, suffering, anguish, distress and fear; and

     iii.  Loss of earning capacity.

b.  As to the survivors, under the Michigan Wrongful Death Act, MCL 600.2922, *et seq.*:

      i.  Loss of love;

     ii.  Emotional distress and anguish;

    iii.  Loss of society and companionship;

    iv.  Loss of services;

     v.  Loss of emotional support; and

    vi.  Loss of past and future economic support.

### COUNT III - THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – *MONELL* CLAIM
### DEFENDANT CITY OF DETROIT

66.    Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 65, as if fully set forth herein.

67.    At all times herein the Defendant DETROIT had established, promulgated, implemented and maintained customs, policies and/or practices, as set forth above.

68.    Defendant DETROIT was on actual notice that each of the aforementioned policies set forth above, were highly likely and probable to proximately cause violations of the Constitutional rights of members of the public, including Plaintiff's decedent, Katie Williams.

69.    As a direct and proximate result of the acts and conduct of the Defendants, Plaintiff herein suffered the following injuries and damages:

a.  As to the estate of Patricia ("Katie") Williams:

    i.   Physical injury as a result of being shot with a handgun, resulting in death;

    ii.   Conscious physical and emotional pain, suffering, anguish, distress and fear; and

    iii.   Loss of earning capacity.

b.  As to the survivors, under the Michigan Wrongful Death Act, MCL 600.2922,

*et seq.*:

    i.   Loss of love;

    ii.   Emotional distress and anguish;

    iii.   Loss of society and companionship;

    iv.   Loss of services;

    v.   Loss of emotional support; and

    vi.   Loss of past and future economic support.

### COUNT IV – FOURTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – *MONELL* CLAIM
### DEFENDANT CITY OF CANTON

70.    Plaintiff incorporates by reference the allegations set forth in Paragraphs 1through 69, as if fully set forth herein.

71.    At all times herein the Defendant CANTON had established, promulgated, implemented and maintained customs, policies and/or practices, as set forth in Paragraph 48 above.

72.    Defendant CANTON was on actual notice that each of the aforementioned policies set forth above, were highly likely and probable to proximately cause violations of the Constitutional rights of members of the public, including Plaintiff's decedent, Katie Williams.

27

73.     As a direct and proximate result of the acts and conduct of the Defendants,

Plaintiff herein suffered the following injuries and damages:

    a.   As to the estate of Patricia ("Katie") Williams:

        i.   Physical injury as a result of being shot with a handgun, resulting in death;

        ii.   Conscious physical and emotional pain, suffering, anguish, distress and fear; and

        iii.   Loss of earning capacity.

    b.   As to the survivors, under the Michigan Wrongful Death Act, MCL 600.2922,

        *et seq.*:

        i.   Loss of love;

        ii.   Emotional distress and anguish;

        iii.   Loss of society and companionship;

        iv.   Loss of services;

        v.   Loss of emotional support; and

        vi.   Loss of past and future economic support.

### COUNT V – FIFTH CLAIM FOR RELIEF
### STATE LAW – GROSS NEGLIGENCE
### DEFENDANTS KOZLOFF and BLACKMON

74.     Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through

73, as if fully set forth herein.

75.     At all times herein, Defendants KOZLOFF and BLACKMON acted in a manner

so reckless, as set forth above in Paragraphs 20 – 39 herein above, as to demonstrate substantial

lack of concern as to whether injury or death would occur and, as such, are not protected by

governmental immunity pursuant to MCLA 691.1407.

28

76.     As a direct and proximate result of the acts and conduct of Defendants, Plaintiff

herein suffered the following injuries and damages:

    a.  As to the estate of Patricia ("Katie") Williams:

        i.   Physical injury as a result of being shot with a handgun, resulting in death;

        ii.  Conscious physical and emotional pain, suffering, anguish, distress and fear; and

        iii. Loss of earning capacity.

    b.  As to the survivors, under the Michigan Wrongful Death Act, MCL 600.2922,

      *et seq.*:

        i.   Loss of love;

        ii.  Emotional distress and anguish;

        iii. Loss of society and companionship;

        iv.  Loss of services;

        v.   Loss of emotional support; and

        vi.  Loss of past and future economic support.

**COUNT VI - SIXTH CLAIM FOR RELIEF**
**WRONGFUL DEATH**

77.     Plaintiff incorporates by reference the allegations set forth in Paragraphs 1through

76 as if fully set forth herein.

78.     This action is brought pursuant to the Michigan Wrongful Death Act, MCL

600.2922, *et seq.* and damages are sought on behalf of the Estate of Patricia ("Katie") Williams

and on behalf of those family members who enjoyed a close personal relationship with her and

who, due to her death, have been deprived of his love, society, companionship and affection, in particular her son, mother and siblings, to wit:

    a.  Loss of love;

    b.  Emotional distress and anguish;

    c.  Loss of society and companionship;

    d.  Loss of services;

    e.  Loss of emotional support; and

    f.  Loss of past and future economic support.

### RELIEF REQUESTED

WHEREFORE, Plaintiff demands the following relief, jointly and severally, against all Defendants for the violation of her rights as set forth herein, First through Fifth Claims for Relief:

    a.  A declaration that Defendants violated the federal and state law rights of Plaintiff;

    b.  Whatever amount the jury may determine for compensatory damages for physical, emotional, and economic injuries suffered by Plaintiff's decedent – past, present and future – by reason of Defendants' unlawful, unconstitutional and unjustified conduct, in an amount that is fair, just and reasonable and in conformity with the evidence at trial;

    c.  Whatever amount the jury may determine for compensatory damages for the loss of consortium, emotional suffering, loss of society and companionship

and loss of services suffered by Plaintiff's decedent's heirs, under the

Michigan Wrongful Death Act, MCL §600.2922, *et seq*;

d.   Punitive and exemplary damages against the individual Defendants to the

extent allowable by law;

e.   Attorneys fees, as allowed, pursuant to 42 U.S.C. §1988 and MCL 37.1606;

f.   The costs, interest and disbursements of this action; and

g.   Such other and further legal and/or equitable relief as appears just and proper.


Respectfully submitted,


GOODMAN & HURWITZ, P.C.

*By:  w/William H. Goodman*
William H. Goodman (P14173)
1394 E. Jefferson Ave.
Detroit, MI 48207
(313) 567-6170/Fax: (313) 567-4827
bgoodman@goodmanhurwitz.com
*Attorneys for Plaintiffs*
-and-

GOODMAN KALAHAR
By:  Kathleen J. Kalahar (P60301)
1394 E Jefferson Ave
Detroit, MI  48207
(313) 567-6165/Fax: (313) 567-4827
kkalahar@goodmankalahar.com
*Co-Counsel for Plaintiffs*

Dated:  September 5, 2012

31

## DEMAND FOR JURY TRIAL

NOWCOMES Plaintiff, DEBORAH RYAN as Personal Representative of the Estate of

Patricia "Katie" Williams, deceased, by and through her attorneys, GOODMAN & HURWITZ,

P.C., and GOODMAN KALAHAR, P.C., and hereby demands a trial by jury on all issues of this

cause.

Respectfully submitted,

GOODMAN & HURWITZ, P.C.

*By: w/William H. Goodman*_____
William H. Goodman (P14173)
1394 E. Jefferson Ave.
Detroit, MI 48207
(313) 567-6170/Fax: (313) 567-4827
bgoodman@goodmanhurwitz.com
*Attorneys for Plaintiffs*

-and-

GOODMAN KALAHAR
By: Kathleen J. Kalahar (P60301)
1394 E Jefferson Ave
Detroit, MI 48207
(313) 567-6165/Fax: (313) 567-4827
kkalahar@goodmankalahar.com
*Co-Counsel for Plaintiffs*

Dated: September 5, 2012

CERTIFICATE OF SERVICE

I hereby certify that on September 5, 2012, I electronically filed the foregoing pleading with the Clerk of the Court using the ECF system, which will send notification of such filing to all attorneys of record thus far.

*By: w/William H. Goodman*_____
William H. Goodman (P14173)
*Attorneys for Plaintiffs*

32

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

WALTER SWIFT,

     Plaintiff,

vs.

CITY OF DETROIT, a municipal corporation,
COUNTY OF WAYNE, a municipal corporation,
DETROIT POLICE SERGEANT ELIZABETH
LEWANDOWSKI, former DETROIT POLICE
OFFICER JANICE PAAVOLA/NOBLISKI, DETROIT
POLICE OFFICER RONALD BADACZEWSKI, JOHN
DOE 1-3, current and/or former DETROIT POLICE
OFFICERS and RICHARD ROE 4 - 6, current and/or
former DETROIT POLICE SUPERVISORS, all acting in
their individual capacities,

     Defendants.

**FIRST AMENDED
COMPLAINT AND
DEMAND FOR JURY
TRIAL**

Case No.: 10-cv-12911
Honorable: Bernard A.
Friedman

_____/

| | |
|---|---|
| William H. Goodman (P14173) | Barry C. Scheck (NY ID No. 1634765) |
| Julie H. Hurwitz (P34720) | Deborah L. Cornwall (NY ID No. 3924651) |
| Kathryn Bruner James (71374) | Emma Freudenberger (NY ID No. 4624045) |
| *Attorneys for Plaintiff* | *Attorneys for Plaintiff* |
| GOODMAN AND HURWITZ, P.C. | NEUFELD SCHECK & BRUSTIN, LLP |
| 1394 E. Jefferson Ave. | 99 Hudson Street, 8th Floor |
| Detroit, MI 48207 | New York, NY 10013 |
| (313) 567-6170 | (212) 965-9081 |

_____/

1

## COMPLAINT AND DEMAND FOR JURY TRIAL

NOW COMES Plaintiff WALTER SWIFT, by and through his attorneys and for his Complaint and Jury Demand, does hereby allege as follows:

## PRELIMINARY STATEMENT

1. This is a civil rights action in which Plaintiff WALTER SWIFT, seeks relief for extraordinary and ongoing injuries stemming from Defendants' violation, under color of state law, of his rights, privileges and immunities secured by the Civil Rights Act of 1871, 42 U.S.C. § 1983, the Fourth, Fifth and Fourteenth Amendments to the United States Constitution, and the Constitution and laws of the State of Michigan.

2. Mr. SWIFT was arrested on September 16, 1982, and wrongfully convicted on November 10, 1982, for the home invasion rape and armed robbery of a pregnant Indian Village woman in the presence of her infant son.  Mr. SWIFT spent nearly twenty-six years in prison before evidence of gross misconduct surrounding the process through which he was arrested and convicted surfaced, causing a Wayne County Judge to vacate Mr. SWIFT's conviction.

3. The deceit, concealment, dishonesty and other wrongful acts of the police officer defendants herein caused the victim to falsely and arbitrarily identify Mr. SWIFT and prevented the prosecution and the defense from learning that the "identification"— which was substantially the only evidence linking Mr. SWIFT to the crime—was both the product of undue suggestion and otherwise unreliable.

4. The arresting officers and supervisors were not alone in causing Mr. SWIFT's wrongful conviction.  A police laboratory analyst deliberately and knowingly withheld an

2

exculpatory amended laboratory report from the prosecution and the defense that he

knew or should have known could have provided significant exculpatory evidence.

That report demonstrates that the results of ABO blood typing performed on stains from

a bed sheet and from the robe worn by the victim during one of the rapes were not

inconclusive, as suggested by the original, un-amended laboratory report produced to

the prosecution and the defense, but instead excluded Mr. SWIFT.

5. Lead investigator and supervisor Sergeant LEWANDOWSI further knew about the

exculpatory amended lab report, and deliberately or knowingly withheld it from the

prosecution and defense, despite the fact that she knew or should have known that it

exculpated Mr. SWIFT.

6. Individual Detroit Police defendants SERGEANT ELIZABETH LEWANDOWSKI,

OFFICER JANICE PAAVOLA/NOBLISKI, OFFICER Ronald BADACZEWSKI,

Defendants DOE 1 – 3 and Defendants ROE 4 – 6, acting individually, as well as

jointly and severally, did cause WALTER SWIFT to be subjected to a violation of his

constitutional rights under the Fourth and Fourteenth Amendments, amounting to an

unlawful seizure of his person, by way of false imprisonment, withholding of

exculpatory evidence, and malicious prosecution, all of which resulted in his incredibly

unjust arrest, trial, conviction and imprisonment for twenty-six years for a crime which

Defendants knew or had actual notice that he did not commit.

7. The conduct of these Detroit Police Department officers was made possible by

Defendant CITY OF DETROIT'S ("the City") policy, custom and practice of failing to

properly train and supervise police officers in their investigations, including in

conducting and documenting identification procedures, avoiding manipulating and shaping the recollections of witnesses, preparing investigative reports, and disclosing exculpatory evidence.  Had Detroit Police Department officers been properly trained and supervised, an innocent man would not have spent nearly 26 years of his life in prison.

8.  The City was deliberately indifferent to the known and obvious consequences of its policies and customs regarding criminal investigations, which was that innocent men and women would be illegally and unjustly convicted by unduly suggestive and arbitrarily conducted identification procedures.

9.  The unconstitutional conduct responsible for Mr. SWIFT's injuries was not limited to actions by the City and its police and laboratory personnel.  Defendant COUNTY OF WAYNE ("the COUNTY") also caused Mr. Swift's conviction.

10.  During and prior to the early 1980s the COUNTY, acting through its official policymakers, maintained an official policy and custom of failing to adequately fund its woefully inadequate system of indigent representation in serious felony cases.  The COUNTY  knew of this policy and custom, and implemented it with deliberate indifference to its known and obvious consequences: that the court-appointed defense bar assigned to represent indigent defendants in serious felony cases would lack the resources to mount serious defenses, specifically the funds to hire investigators to find, interview and prepare witnesses and/or experts to explain forensic evidence, and as a result, innocent citizens would be illegally and wrongfully convicted of crimes they did not commit.

4

11.  Moreover, the illegal and unconstitutional conduct committed by Defendants LEWANDOWSKI, PAAVOLA/NOBLISKI, and BADECZEWSKI, as well as John DOE Officers and Richard ROE supervisors and defendants CITY OF DETROIT and COUNTY OF WAYNE, not only sent an innocent man to prison for nearly twenty-six years; it also allowed the real rapist to remain at large and free to commit more heinous crimes.

12.  On May 21, 2008, Plaintiff WALTER SWIFT was finally exonerated and released from prison after serving almost twenty-six years behind bars as an innocent man, during which time he suffered incalculable harm.

13.  Through this action, Walter SWIFT seeks compensatory and punitive damages, declaratory relief, an award of reasonable attorneys' fees and costs, and such other and further relief as the Court deems proper.

14.  Beyond compensating Mr. SWIFT for the nearly twenty-six years that he spent in prison and his ongoing extreme suffering, all directly attributable to the Defendants' respective conduct–all committed pursuant to the customs policies and practices of the Defendants CITY OF DETROIT and COUNTY OF WAYNE–this action seeks to remedy the unlawful CITY OF DETROIT and WAYNE COUNTY policies, practices, and customs of failing to adequately train and supervise its officers, and failing to adequately fund its grossly inadequate system of indigent representation, respectively, which led Defendants to violate Mr. SWIFT's constitutional rights as guaranteed by the Fourth, Fifth and Fourteenth Amendments of the United States Constitution, and the laws of the State of Michigan.

## JURISDICTION

15.   Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343(3) and (4), as

this action seeks redress for the violation of plaintiff's federal constitutional and civil

rights.

16.   Plaintiff's claims for declaratory relief are authorized by 28 U.S.C. §§ 2201 and 2202

and Rule 57 of the Federal Rules of Civil Procedure.

17.   Plaintiff further invokes this Court's supplemental jurisdiction, pursuant to 28 U.S.C.

§1367(a), over any and all state constitutional and state law claims that are so related to

the claims within the original jurisdiction of this Court that they form part of the same

case or controversy.

## VENUE

18.   Venue is proper in the United States District Court for the Eastern District of Michigan,

pursuant to 28 U.S.C. § 1391(b)(2), in that this is the judicial district in which the

events giving rise to the claim occurred.

## JURY DEMAND

19.   Plaintiff demands a trial by jury in this action on each and every one of his claims.

## PARTIES

20.   Plaintiff WALTER SWIFT is a citizen of the United States, and was at all times

relevant herein a resident of the County of Wayne, State of Michigan.

21.   Defendant CITY OF DETROIT ("CITY") is a municipal corporation, authorized under

and created by the laws of the State of Michigan. It is, and has been at all times relevant

hereto, authorized by law to maintain and operate a Police Department.  By and through

its agents, including but not limited to the Chief of Police, its supervisors, operating

officers, Boards, Commissions and Committees and its final policymakers, Defendant

CITY, at all times relevant hereto, established, promulgated and implemented the

policies, written and unwritten, of the Detroit Police Department ("DPD"), with regard

to hiring, training, supervision and discipline of the employees of said department, as

well as the investigative practices and procedures of its Sex Crimes Unit and the

officers who worked within that Unit.

22.   Defendant COUNTY OF WAYNE ("COUNTY") is a municipal corporation,

authorized under and created by the laws of the State of Michigan. Through its agents,

supervisors, operating officers, Boards and Committees and final policymakers,

Defendant COUNTY establishes, promulgates and implements the policies regarding

the assignment and compensation of defense counsel to indigent defendants in criminal

cases.

23.   Defendant Sergeant ELIZABETH LEWANDOWSKI was at all times relevant herein a

police officer acting within the scope of her authority and under color of law as a

supervisor in the Sex Crimes Unit of the Detroit Police Department, a supervisor of

Defendant Officer JANICE PAAVOLA/NOBLISKI and the DOE Defendants, and was

the Officer In Charge of the investigation and subsequent arrest, prosecution and

conviction of Plaintiff WALTER SWIFT.

24.   Defendant JANICE PAAVOLA/NOBLISKI, (formerly JANICE PAAVOLA,

hereinafter referred to as PAAVOLA/NOBLISKI), was at all times relevant herein a

police officer acting within the scope of her authority and under color of law as an officer within the Sex Crimes Unit of the Detroit Police Department, the original Officer In Charge of the investigation resulting in the arrest and subsequent prosecution of Plaintiff WALTER SWIFT, and testified at his criminal trial in that capacity.

25.   Defendant Ronald BADACZEWSI was at all times relevant herein a police officer acting within the scope of his authority and under color of law as an officer within the Serology and Trace Evidence Unit of the Detroit Police Department Crime Lab, who tested evidence from the crime scene for the presence of blood, seminal fluid, and testified at Plaintiff's criminal trial in that capacity.

26.   Defendants DOE 1-3 were at all times relevant herein Detroit Police officers acting within the scope of their authority and under color of law, and were directly involved in the conduct which resulted in the deprivation of Plaintiff's constitutional rights.

27.   At all times relevant herein, the individual Defendants violated clearly established rights guaranteed by the Fourth, Fifth and Fourteenth Amendments of the United States Constitution, rights of which a reasonable police officer and/or public official under these circumstances would have known, and of which in this case defendants were on actual notice.

## STATEMENT OF FACTS

28.   Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 27 as if fully set forth herein.

29.   In the late morning hours of September 2, 1982, S.F.S.[1], a pregnant 35-year-old white

---

[1] To protect the victim's privacy she is referred to herein by her initials "S.F.S.".

8

woman, was the victim of a vicious home-invasion rape.

30.    S.F.S. was playing with her eight-month-old son on the floor of an upstairs bedroom when she was grabbed from behind by an unknown black male and dragged into the bedroom she shared with her husband, at which time her assailant raped her on her bed.

31.     After the first rape, the rapist allowed her to put on her robe and then led her downstairs where he again raped her on a rug on the floor.

32.    The rapist then told her to close her eyes and left the premises.

## FABRICATED AND UNDULY SUGGESTIVE "IDENTIFICATION" AND FAILURE TO DISCLOSE
## PRIOR SEVEN PHOTO SELECTIONS

33.    The victim S.F.S. immediately described the rapist to investigating police officers simply as a black male of dark complexion, 15 to 18 years of age, with an unusual hairstyle: "very small braids," and "poofs of hair."  She affirmatively described him as not having any facial hair.

34.    By contrast, at that time, WALTER SWIFT was 21 years old, with a mature moustache, long sideburns, and shortly cropped hair.

35.    On September 10, 1982, eight days after the rape, the victim S.F.S. was contacted by Defendant PAAVOLA/NOBLISKI and asked to come to the Detroit Police Headquarters to look at photographs.

36.    At that time, the victim S.F.S. was shown hundreds of photographs, arranged in order of race, size and age.

9

37. Prior to ever seeing a photograph of Plaintiff WALTER SWIFT, the victim S.F.S.
    selected seven (7) different photographs of seven (7) different men, indicating that each
    had  features similar to her assailant, such as eyes, hair, or expression.

38. After the victim S.F.S. selected the photograph of the seventh man whom she said
    resembled, or had a feature similar to, her assailant, Defendant
    PAAVOLA/NOBLISKI, for reasons that were unclear even to her and remain so,
    arbitrarily decided that the next person the victim selected as having features similar to
    the perpetrator would be arrested and brought in for an in-person line-up identification.

39. This arbitrary, reckless and clearly dangerous decision was without probable cause,
    thus constituting deliberate indifference to the obvious likelihood that simply placing
    the next person the victim selected in this way in a line-up would lead to a
    misidentification.

40. The eighth photograph the victim pointed to was that of the plaintiff WALTER SWIFT.
    S.F.S. did not positively identify Mr. SWIFT as the perpetrator, but as with the previous
    seven photographs, said only that he had features "similar" to the perpetrator: in Mr.
    SWIFT's case, his eyes.

41. S.F.S. did not put any extra emphasis on WALTER SWIFT'S photograph as compared
    to the pictures of the seven (7) men she had previously said resembled her rapist.

42. The arbitrary, reckless and dangerous decision to bring the eighth individual selected in
    for a line-up was conscience-shocking, deliberately indifferent, and without probable
    cause or any reasonable basis, because:

a.  Defendant PAAVOLA/NOBLISKI knew that it was improper to place somebody in a line-up on the sole basis of having one similar facial feature to the perpetrator;

b.  Defendant PAAVOLA/NOBLISKI knew that it was improper to place Mr. SWIFT in a line-up when the victim said nothing new about his photograph that she had not said about seven other men; and

c.  Defendant PAAVOLA/NOBLISKI knew that conducting a line-up after a weak photo selection would create the obvious risk of a misidentification.

43.  Defendant PAAVOLA/NOBLISKI knew that Plaintiff WALTER SWIFT was not the perpetrator of this crime, given the following facts (*see* **Paavola/Nobliski Affidavit, attached hereto as Exhibit A**):

a.  The victim's original description of her assailant was vastly dissimilar to Plaintiff SWIFT's photograph, and therefore someone other than Plaintiff;

b.  The victim selected seven (7) other African-American men's photographs immediately prior to selecting WALTER SWIFT's photograph, saying that their photographs also contained solitary features that were purportedly similar to those of her rapist, thereby rendering her selection of the Plaintiff meaningless; and

c.  The victim at the time of her photographic selection of the Plaintiff, never positively identified WALTER SWIFT as the perpetrator of her rapes, but rather, merely stated that his eyes, as depicted in the photograph, were similar to the rapist's eyes.

11

44. Defendant PAAVOLA/NOBLISKI nevertheless arranged to have the victim view a live line-up that included only Plaintiff WALTER SWIFT from amongst the eight (8) total men whose photographs she had pointed to as the possible rapist.

45. Also, at some point prior to the line-up, Defendant PAAVOLA/NOBLISKI explicitly disclosed to the victim that SWIFT would be among the supposedly "anonymous" persons who would constitute the line-up.

46. The pre-identification disclosure to the victim that Plaintiff WALTER SWIFT would be in the lineup, along with several other pre-identification actions taken by Defendants PAAVOLA/NOBLISKI, LEWANDOWSKI and others, all pursuant to Defendant CITY's customs, policies and practices, created an obviously and unduly suggestive bias in the victim S.F.S., virtually ensuring that she would misidentify Mr. SWIFT.

47. Furthermore, the line-up Defendant PAAVOLA/NOBLISKI arranged was unduly suggestive on account of the fact that Plaintiff Walter SWIFT was one of only five individuals in the line-up, and was the only one in the line-up whose photograph S.F.S. had selected.

48. Defendant PAAVOLA/NOBLISKI's unduly suggestive conduct irreparably tainted the victim's ability to remember what her actual rapist looked like and instead redirected her attention toward Mr. SWIFT.

49. A reasonable police officer in Defendants PAAVOLA/NOBLISKI's and LEWANDOWSKI's shoes would have known that such suggestive conduct was unlawful and violated the Plaintiff's clearly established constitutional rights under the

12

Fifth, Sixth and Fourteenth Amendments, especially given the totality of the circumstances.

50. Predictably, the victim selected Mr. SWIFT at the line-up, albeit ambiguously. She stated only that she "believed" that he was her assailant, and therefore did not make a positive identification.

51. Despite the victim's statement, Defendant PAAVOLA/NOBLISKI was so skeptical of the identification that she told Plaintiff he was free to leave the police headquarters, and arranged for him to submit to a polygraph examination, scheduling it for the following week, after she, PAAVOLA/NOBLISKI, returned from her vacation.

52. The fact that Defendant PAAVOLA/NOBLISKI had scheduled a polygraph should have indicated to Defendant LEWANDOWSKI pursuant to the generally accepted police practice of making an arrest after a reliable identification that the identification was not, in fact, reliable.

53. However, two days after the line-up, while Defendant PAAVOLA/NOBLISKI was still on vacation, Defendant LEWANDOWSKI arbitrarily removed Defendant PAAVOLA/NOBLISKI from the case and took over responsibility for the alleged "investigation."

54. While Defendant PAAVOLA/NOBLISKI was still on vacation, Defendant LEWANDOWSKI cancelled the polygraph test that Defendant PAAVOLA/NOBLISKI had scheduled for Mr. SWIFT, obtained a warrant, and on September 16, 1982, had WALTER SWIFT arrested and charged with rape.

13

55. Plaintiff WALTER SWIFT was detained without bail following his arraignment on September 17, 1982 and through his trial.

56. September 16, 1982, was WALTER SWIFT's last day of freedom until May 21, 2008, nearly twenty-six years after he was first arrested.

57. When Defendant PAAVOLA/NOBLISKI returned from vacation, she was advised by Defendant LEWANDOWSKI that she had been removed from the case.

58. This was the only time Defendant PAAVOLA/NOBLISKI had ever been removed from a case in thirteen years working for the Detroit Police Department Sex Crimes Unit.

59. When Defendant PAAVOLA/NOBLISKI explained why she was not convinced that Mr. SWIFT was the perpetrator, Defendant LEWANDOWSKI stated that although Plaintiff SWIFT may not have done this crime, she was sure that he had committed some other crime before that he had gotten away with.

60. Defendant LEWANDOWSKI knew that Mr. SWIFT was placed in a line-up improperly on the basis of an unreliable photo selection, and knew that the victim had not made a positive identification at the line-up.

61. Defendant LEWANDOWSKI also knew or was on actual notice that the improper line-up, where the victim had been told that Walter Swift–whose photo was the 8th and last photo she had selected–would be appearing, was in and of itself unduly suggestive.

14

62. Defendant LEWANDOWSKI therefore knew that there was not even arguably sufficient credible evidence to establish probable cause for Plaintiff's arrest, nor to charge him with this horrendous crime.

63. Neither Defendants PAAVOLA/NOBLISKI nor LEWANDOWSKI ever disclosed to either the prosecutor's office or defense counsel that the victim had selected photographs of *seven* (7) other men before selecting Mr. SWIFT out of the lineup as the man who "may have" raped her.

64. In both written and oral pretrial reports to the prosecutor, Defendants PAAVOLA/NOBLISKI and LEWANDOWSKI misrepresented the circumstances of the victim's unreliable identification.

65. The prosecution thus relied on the victim's supposed "identification" of Mr. SWIFT as the primary evidence against him, erroneously arguing to the jury that he was the *only* man she identified, to wit:

> "She doesn't look at one or two or three or four or five pictures, she looks at over five hundred pictures... According to Officer Paavola [NOBLISKI]. And she goes through all those pictures and finally does not even finish the second stack but somewhere in the second stack of photos she sees the picture of WALTER SWIFT and indicates that is the individual. At that point Officer Paavola [NOBLISKI] takes the picture and arranges a show-up."

**(Excerpt of Peoples' Summation, attached as Exhibit B.)**

66. Neither Defendants PAAVOLA/NOBLISKI, nor LEWANDOWSKI ever corrected this critically important misrepresentation of the facts.

67. Indeed, and upon information and belief consistent with her pretrial communications with the prosecutor, Defendant PAAVOLA/NOBLISKI testified at Mr. SWIFT's

15

criminal trial that the victim had selected Mr. SWIFT's photograph from more than 500 photographs shown to her, without ever disclosing that the victim had also, at the same sitting, selected photographs of seven other men who, like Mr. SWIFT, allegedly had "similar features" to the man who had raped her.

68. Aside from the victim's "identification," the prosecution relied on the testimony of Sheila Romano, a friend of the victim's who lived a few blocks away, that on the day of the attack she heard a noise at her back door and saw a black male crouched down jiggling the doorknob. Three weeks after catching a glimpse of this man behind her home, and after the victim had "identified" Walter SWIFT, leading to his arrest, Romano picked Plaintiff WALTER SWIFT out of a lineup, and later identified him in court. Romano also testified, however, that she did not observe Plaintiff's moustache or long sideburns on the man she saw.

69. The prosecution also relied on testimony by DPD crime lab technician Officer Ronald BADACZEWSKI that preliminary tests conducted on stains found on the victim's robe and bed sheet were positive for both blood and seminal fluid, which the prosecution argued was evidence that was likely left by Walter SWIFT during the rapes.

70. None of the Defendants herein, nor any of Defendant CITY's other agents, ever disclosed to any of the Plaintiff's criminal defense attorneys, to the Wayne County Prosecutor, or to any of the assistant prosecuting attorneys who worked on this case, that the victim had selected *seven (7)* other photographs as resembling her rapist/assailant *before* she selected a photograph of Plaintiff WALTER SWIFT.

16

71. Indeed, the prosecutor was led to believe that Mr. SWIFT was the only person identified out of hundreds of photographs, and that the victim subsequently identified Mr. SWIFT again at a properly conducted line-up.

72. The prosecutor thus used the victim's identification of Mr. SWIFT as the centerpiece of the prosecution.  Had Defendants disclosed the truth to him, the prosecutor would have been constitutionally, legally, ethically and professionally obligated to advise plaintiff WALTER SWIFT's attorneys (trial and appellate) of this critical and exculpatory evidence.  Indeed, if Defendants PAAVOLA/NOBLISKI or LEWANDOWSKI had disclosed the truth about the suggestive and unreliable circumstances of the victim's identification, the prosecution would have been duty-bound to abandon the entire prosecution against WALTER SWIFT.

## FAILURE TO DISCLOSE EXCULPATORY AMENDED LABORATORY REPORT

73. On September 23, 1982, the prosecution provided Plaintiff's criminal defense counsel with one Laboratory Analysis Report, dated September 22, 1982.

74. The September 22, 1982 report documented the results of serological testing performed on stains from the victim's robe and bed sheet, as well as testing performed on samples of Plaintiff's saliva and blood. (*See* **Original Lytle Report, Attached as Exhibit C**).

75. That first lab report showed the presence of seminal fluid in the samples collected from the robe and the bed sheet, but indicated that no blood group substances were found in either stain.

17

76. Because no blood group substances were detected, the lab report was silent as to the blood type of the rapist.

77. In addition to testing stains on the robe and the bed sheet, the laboratory performed tests on saliva and blood samples from Plaintiff WALTER SWIFT, which showed that he was a "secretor"—someone whose blood group substances are present in (and therefore discernable from) their other bodily fluids, like semen, saliva, sweat and vaginal fluids—and that he was blood type O Rh+.

78. Based on the information contained in the original September 22, 1982 report, an expert would have been able to discern two possible explanations of the evidence, either:

   a. The victim was a "non-secretor" whose vaginal fluid was "masking" or obscuring the blood group substances present in the rapist's seminal fluid; or

   b. The rapist, unlike Walter SWIFT, was a non-secretor.

79. No samples of blood or saliva from the victim, S.F.S., had been tested at the time the original report was prepared, and it was therefore not known whether she was a secretor or a non-secretor. As such, the original September 22, 1982 laboratory report neither inculpated nor exculpated WALTER SWIFT. It simply did not exclude him as the source of the seminal fluid.

80. On October 14, 1982, Defendant LEWANDOWSKI accompanied S.F.S.to the Serology Unit of the Detroit Police Crime Laboratory for the purpose of collecting samples of her saliva and blood.

81.   A Detroit Police Department laboratory serologist, Paula Lytle, subsequently prepared an amended laboratory report that included the results of the October 14, 1982 testing of the victim's saliva and blood.   (*See* **Amended Lytle Report, Attached as Exhibit D).**

82.   Testing on those samples showed that the victim was a "secretor," eliminating the possibility that her vaginal fluid simply "masked" the blood group substances present in the rapist's seminal fluid.  (*See* **9/12/03 Letter from Paula Lytle to Niamh Murray, Attached as Exhibit E).**

83.   Because the victim was a secretor, her vaginal fluids could not have masked blood group substances present in the rapist's seminal fluid without the detection of any blood group substances from *her* secretions.  *See id.*

84.   The fact that no blood group substances were detected at all therefore confirmed that the rapist was in fact a "non-secretor."  *See id.*

85.   Based on the results of the subsequent testing on the blood and saliva samples from the victim, on October 14, 1982, and the fact that Mr. SWIFT was a "secretor," an expert would have been able to essentially *exclude* Mr. SWIFT as the rapist.  *See id.*

86.   In 1982, the police had a clearly established constitutional duty to disclose any and all evidence favorable to the defense.  At this time, Detroit Police Department practice was to turn over all pretrial discovery to the defense directly.

87.   However, neither the fact of the October 14, 1982 testing of the victim's saliva, nor the critically exculpatory amended laboratory report were ever disclosed to any of the

19

Plaintiff's criminal defense attorneys, to the Wayne County Prosecutor or to any of the

assistant prosecuting attorneys who worked on the criminal case against Mr. SWIFT.

88.   Paula Lytle was never called to testify at the criminal trial.

89.   At trial, Defendant Ronald BADACZEWSKI testified that sperm was found on

samples from both the robe and the bed sheet, but that he had no personal knowledge

of the results of further serological testing conducted on that evidence because he had

not performed the testing himself.

90.   Defendant BADACZEWSKI so testified despite the fact that he had in his possession

the complete DPD laboratory file and therefore was on actual notice of the existence

of Lytle's amended, exculpatory laboratory report which included the October testing

results.

91.   Lytle's amended lab report was never even known to exist by anyone outside the

Detroit Police Department until twenty-one years later, when it was uncovered as part

of the post-conviction investigation that ultimately led to Plaintiff's exoneration and

release.

92.   Had this exculpatory evidence been disclosed, it would have shown that Plaintiff

WALTER SWIFT was not a viable suspect in the crime.

93.   Because Defendant LEWANDOWSKI personally escorted the victim, S.F.S., to the

DPD laboratory on October 14, 1982, Defendant LEWANDOWSKI knew that

samples of S.F.S.'s blood and saliva were taken.  These samples were taken by Paula

Lytle in Defendant LEWANDOWSKI's presence.  Defendant LEWANDOWSKI was

therefore in contact with Paula Lytle knew testing on the victim's blood and saliva

20

samples was being conducted, and would have received an oral report of the results from Lytle, as well as the amended laboratory report.

94.   As a consequence of Defendant LEWANDOWSKI escorting S.F.S. to the DPD laboratory, Defendant LEWANDOWSKI also had an opportunity to reinforce the victim's misidentification of Mr. SWIFT.

95.   Plaintiff WALTER SWIFT was unlawfully held in custody even after Defendant LEWANDOWSKI became aware that the serological testing on the samples retrieved from the scene of the rape excluded him as the source of the seminal fluid on the robe and the bed sheet.

96.   Mr. SWIFT was illegally held in pretrial custody from his arrest on September 16, 1982, through his conviction on November 10, 1982, and illegally imprisoned thereafter for twenty-five years, six months and twelve days, until May 21, 2008, when he was finally exonerated, his conviction was vacated, and he was released from prison.

97.   The individual Defendants' acts and omissions described above were intentional, wanton, willful and/or malicious, and were performed in violation of and with deliberate indifference to, and/or in reckless disregard for Plaintiff WALTER SWIFT's clearly established rights, as secured by the Fourth and Fourteenth Amendments to the United States Constitution.

98.   At all times herein, Defendants LEWANDOWSKI, PAAVOLA/NOBLISKI, BADACZEWSKI and DOE 1-3 were acting under color of law, within the scope of their authority as law enforcement officers and pursuant to the customs, policies and

practices of Defendant CITY OF DETROIT.

99.    At all times herein Defendants DOE 1 -3 acted deliberately, knowingly, and directly in

concert with Defendants LEWANDOWSKI and PAAVOLA/NOBLISKI and aided

and abetted said Defendants LEWANDOWSKI and PAAVOLA/NOBLISKI in those

acts undertaken by them and complained of herein, all pursuant to the customs,

policies and practices of Defendant CITY OF DETROIT.

### THE CITY'S CUSTOM, PATTERN AND PRACTICE OF FAILING TO ADEQUATELY TRAIN, SUPERVISE AND DISCIPLINE DPD OFFICERS IN CONNECTION WITH FELONY INVESTIGATIONS

100.    It was the custom and policy of the Defendant CITY, by and through its final

policymakers, to authorize, ratify, condone, tolerate and approve illegal and

unconstitutional actions by Detroit Police Department officers, supervisors and

investigators.

101.    Those illegal and unconstitutional actions and practices included but were not limited to:

a.    Conducting inadequate investigations into serious crimes by making arbitrary arrests

in order to close cases quickly and affirmatively choosing not to develop or pursue

actual leads and evidence;

b.    Using unreliable, discredited and improper identification techniques like five-person

lineups;

c.    Engaging in unduly suggestive behavior and improperly documenting line-ups; and

d.    Ignoring their constitutional duty to disclose exculpatory evidence to prosecutors and

defense counsel, including the concealment of improper suggestion on the part of

officers conducting line-ups.

22

102.   Defendant CITY, by and through its final policymakers, further maintained a custom and policy of failing to adequately train, supervise, and/or discipline officers concerning proper and constitutionally adequate investigatory techniques, evidence collection and evidence disclosure.

103.   Through this custom and policy of failing to adequately train, supervise or discipline its officers, Defendant CITY abdicated its duty to ensure that officers would:

   a.   Conduct constitutionally adequate investigations;

   b.   Never fabricate inculpatory evidence;

   c.   Obtain probable cause to ensure that suspects would not be falsely arrested and maliciously prosecuted;

   d.   Disclose to prosecutors and defense counsel material information favorable to criminal defendants such as Mr. SWIFT;

   e.   Follow the duties imposed by *Brady v. Maryland* and its progeny; and

   f.   Refrain from administering arbitrary and unduly suggestive identification proceedings.

104.   Defendant CITY, by and through its final policymakers, had actual notice of the DPD's failures to train, supervise and/or discipline its employees.  It failed to train and supervise them despite the obvious need, and although the CITY knew that it was foreseeable that their police officers would predictably confront these situations, and that as a result of the failure to train, supervise and/or discipline, constitutional violations would result.

23

105. Because of these unconstitutional customs and policies maintained by Defendant CITY OF DETROIT, individuals such as Plaintiff Walter SWIFT were wrongfully arrested, convicted and imprisoned in violation of their constitutional rights.

## WAYNE COUNTY'S FAILURE TO ADEQUATELY FUND OR COMPENSATE ASSIGNED CRIMINAL DEFENSE COUNSEL IN CAPITAL CASE

106. In 1982 in the CITY OF DETROIT, "capital," or "serious felony," cases[2] were heard in Detroit Recorder's Court, which is now a part of the Wayne County Circuit Court.

107. By statute, the defendant WAYNE COUNTY was responsible for setting a budget for funding to indigent defenders and paying "reasonable compensation for services performed" in all felony and misdemeanor cases in the City of Detroit.  *See* MCL 775.16 (1980).

108.  Defendant COUNTY, by and through its final policymakers, the County Board of Commissioners, maintained a custom or practice of providing grossly inadequate funding to indigent defenders, such that criminal defense attorneys were unable to hire or consult with experts in even the most serious felony claims carrying penalties of up to life in prison.

109. In 1982, at the time of Plaintiff WALTER SWIFT's trial, pursuant to the customs, policies and practices of Defendant COUNTY OF WAYNE, compensation rates for cases during trial were set at the same rate that had been in place since 1967, with no uniform standards or eligibility criteria for attorneys appointed to represent indigent criminal defendants.

---

[2] In the State of Michigan, due to the abolition of the death penalty, all criminal felony cases in which the accused could be sentenced to life in prison are referred to as "capital cases."

110. Defense attorneys in serious felony cases were paid $125 for the full preparation and investigation before a criminal trial—including all costs and all jail visits to the client—regardless of how much or how little time the attorney actually spent investigating and preparing the case.

111. Compensation for trial attorneys in serious felony cases was $150 for each day of trial, a rate that had not been changed since 1967 and was far lower than the market rates for experienced criminal defense attorneys in the Detroit area in 1982.

112. Assigned counsel were paid an additional $50 for attending the sentencing hearing in the event of a conviction.

113. Although the trial judges of the Recorder's Court, City of Detroit, approved a Revised Fee Schedule in April 1979 that would have, upon information and belief, tripled fees paid to attorneys assigned to represent indigent individuals accused of crimes in the Recorder's Court, the Wayne County Board of Auditors refused to budget for that schedule. (*See* June 1, 1983 Letter from Ted Mrozowski to Richard D. Dunn, Attached as Exhibit F.)

114. At his arraignment, Plaintiff WALTER SWIFT was assigned Mr. Lawrence Greene as his court-appointed attorney.

115. Pursuant to the policies, customs and practices of Defendant COUNTY, Mr. Greene was provided a flat fee of $125 for investigating and prepping this very serious felony case in which Mr. SWIFT was facing up to life in prison.

116. As of 1982, the compensation scheme for attorneys appointed to represent indigent criminal defendants in WAYNE COUNTY was widely known, including to the County's

25

final policymakers, to be severely inadequate, resulting in widespread ineffective representation by overburdened attorneys.

117. For example, in 1981 several bar associations, including the Detroit Bar Association and the Recorder's Court Bar Association, filed an Application in the Supreme Court of Michigan for a Writ of Superintending Control arguing that the schedule of compensation for lawyers appointed to represent indigent defendants accused of crimes in the Wayne County Circuit Court and the Recorder's Court for the City of Detroit conflicted with the principles underlying the Constitutionally guaranteed right to counsel. Recognizing that the judiciary had approved an increased fee schedule, the Court dismissed the lawsuit without prejudice provided that the new fee schedule was put into effect. Upon information and belief, despite the Court's order, the County subsequently refused to pay any vouchers submitted for services in felony cases, rendering moot the judicial approval of the fee increase.

118. Because of the Defendant COUNTY'S policies of grossly inadequate compensation rates, Mr. Greene could not afford to and therefore did not hire or request funds to consult with a single expert in the areas of forensic serology about the original laboratory report of the serological testing and analysis performed on the biological evidence from the crime scene in this case. In order to do so, he would have had to pay an expert out of the $150 he received to compensate him for his time investigating and prepping the case, or apply to the court for extra funding, which he knew, based on the County's custom and practice of inadequately funding indigent defenders, was futile.

26

119.    An expert in forensic serology would have explained to Mr. Greene, based on the results
        reported in the original laboratory report, that if the victim S.F.S. was a secretor, Mr.
        SWIFT would have been ruled out as the perpetrator.

120.    Had he had such knowledge, Mr. Greene could have called Paula Lytle to testify and
        would have generated evidence to support the defense that testing by the Detroit Police
        Department on biological evidence from the crime scene definitively eliminated the
        plaintiff, WALTER SWIFT, as a suspect.

121.    Without the funding to consult with an expert in forensic serology, Mr. Greene was not
        able to present this critically exculpatory evidence to the jury, especially since he, like
        most public defenders, did not possess an adequate understanding of forensic serology on
        his own to probe beyond the results reported in the original laboratory report in order to
        adequately cross-examine Defendant BADECZEWSKI regarding the import of the
        forensic evidence.  (*See* Exhibit E).

122.    Because Mr. Greene did not possess a sufficient understanding of forensic serology on his
        own, and because he did not have adequate funds to consult with an expert, he was not
        aware of the potentially exculpatory nature of the results reported on the original
        laboratory report, and did not insist that Lytle be called as a witness.  Indeed, he *stipulated*
        to the admission of her report without conducting any cross examination whatsoever; he
        *waived* her appearance as a witness altogether.

123.    Ms. Lytle's testimony would have been exculpatory in that it would definitively have
        excluded Mr. Swift as a possible source of the semen or other fluids deposited by the real
        rapist, which were collected by Defendant BADECZEWSKI and analyzed by Lytle.

27

124.  Had there been sufficient funding to adequately prepare MR. SWIFT's defense, including the hiring of a serological expert, Mr. Greene would have known that the results reported on the original laboratory report were potentially exculpatory, he would have asked Defendant BADACZEWSKI whether the victim's secretor status had been determined; would have talked to Paula Lytle; and would have known that the victim was a secretor and that Lytle's take on the evidence was that because the victim was a secretor, Mr. SWIFT was excluded as the rapist.

125.  Defendant COUNTY, by and through its final policymakers, had actual notice of its persistently inadequate funding of representation in serious felony cases, yet, nonetheless continued to provide inadequate funding despite an obvious need for the provision of adequate funds for defense attorneys to, at a minimum, consult with experts.

126.  For example, on May 6, 1982, the Combined Executive Committee of both the Recorder's Court and the Third Judicial Circuit Court adopted a resolution—which Executive Chief Judge Richard Dunn sent to the Chairman of the Wayne County Board of Auditors on May 12, 1982—that "the present inadequate attorneys fee schedule jeopardizes the rights of accused persons to have legal counsel of average competence.  In recognition of existing fiscal conditions, this Committee is willing to wait a month for the Wayne County Board of Auditors to complete this study, but we are not prepared to accept inaction for a longer period of time."  (*See* May 12, 1982 Letter from Richard D. Dunn to Ted Mrozowski, Attached as Exhibit G.)  On June 1, 1982, the Wayne County Board of Auditors informed the judiciary that "In view of the current fiscal condition of the

28

County and the need for reductions and cutbacks, the Board of Auditors feels that it would be extremely inappropriate to increase the fees at this time." (*See* Exhibit F.)

127. Defendant COUNTY's policy of inadequately funding indigent defenders in serious felony cases so that defense attorneys would predictably confront situations in which exculpatory forensic results would not be presented at trial because defense attorneys would be unable to pay experts who could explain the science to enable cross-examination of police laboratory analysts at trial, was objectively unreasonable and highly likely to result in constitutional violations.

128. Mr. Greene further did not have sufficient funds to and therefore did not consult with any other experts, including but not limited to experts in the areas of eyewitness identification or crime scene investigation.

129. Defendant COUNTY's custom and policy, maintained by and through its final policymakers, of persistently inadequately funding its indigent defenders in serious felony cases deprived Mr. SWIFT of constitutionally adequate representation.

130. As a direct and foreseeable result of these lapses, WALTER SWIFT was convicted of a crime he did not commit, and lost 26 years of his life to Michigan prisons.

## **DAMAGES**

131. As a direct and proximate result of the acts and conduct of the Defendants in the initiation and institution of the aforementioned baseless and malicious prosecution, resulting in his unjust conviction and imprisonment, Plaintiff WALTER SWIFT has suffered severe damages, many of which effects continue to plague Mr. SWIFT to this day and will plague him for the rest of his life, including but not limited to:

29

a.  Deprivation of liberty for over 26 years;

b.  Personal and physical injuries;

c.  Pain and suffering;

d.  Severe mental anguish;

e.  Emotional distress;

f.  Extreme fear;

g.  Economic damages including loss of income;

h.  Infliction of physical illness and injury resulting from his confinement;

i.  Inadequate medical care; humiliation, indignities, and embarrassment;

j.  Degradation;

k.  Permanent loss of natural psychological development, including the onset of traumatic mental illness; and

l.  Restrictions on all forms of personal freedom and physical liberty including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

m.  Damage to his relationship with his daughter -- his only child -- who was two years old when Plaintiff went to prison, and twenty-seven years old when he was released.

n.  Damage to his relationship with his family, including but not limited to his parents -- who passed away while Plaintiff was in prison and never saw their son exonerated -- and his many siblings.

## CLAIMS

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983: 4TH, AND 14TH AMENDMENTS
### FALSE ARREST/FALSE IMPRISONMENT AND MALICIOUS PROSECUTION

132. Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 131, as if fully set forth herein.

133. By their conduct, as described herein, Defendants are liable to Plaintiff WALTER SWIFT under 42 U.S.C. § 1983, for the violation, under color of law, of his constitutional rights to be free from unreasonable searches and seizures of his person, in particular false imprisonment and malicious prosecution, under the Fourth and Fourteenth Amendments to the United States Constitution; and his constitutional right to be free from any deprivation of liberty without due process of law under the Fifth and Fourteenth Amendments to the United States Constitution.

134. At no time relevant herein, especially with the combined knowledge of the circumstances surrounding the victim's unreliable selection of Mr. SWIFT'S photo and the results of the serological testing conducted by the Detroit Police Department Crime Lab, did Defendants LEWANDOWSKI and PAAVOLA/NOBLISKI have reasonable grounds to believe that Plaintiff WALTER SWIFT had committed this crime, based on all the facts known to them at the time and what a reasonable police officer would have believed under the same circumstances.

135. For example, Defendant LEWANDOWSKI, an experienced police Sergeant, knew that the victim had not positively identified Mr. SWIFT either by photograph or in the lineup, and knew that Defendant PAAVOLA/NOBLISKI, the Officer-In-Charge who

31

13-52846.wit Doc 8798-2 Filed 12/15/14 Entered 12/15/14 15:20:37 Page 33 of 57
135
13-53846-swr Doc 4098-2 Filed 04/15/14 Entered 04/15/14 17:26:31 Page 33 of

conducted the identification proceedings believed that the identifications were unreliable and knew that the case had not been adequately investigated.  No reasonable police officer would have believed an unreliable identification generated under the circumstances presented here would provide probable cause to arrest.

136.  By her own admission, as reported by Defendant PAAVOLA/NOBLISKI, Defendant LEWANDOWSKI did not believe Mr. SWIFT had committed this crime, but proceeded with his arrest because she "was sure that he did some crime before and had gotten away with it."  (*See* **Exhibit A).**

137.  Nevertheless, LEWANDOWSKI had PAAVOLA/NOBLISKI taken off the case and ordered Mr. SWIFT's arrest.  No reasonable police officer would have believed it lawful to arrest a suspect for a crime knowing he was innocent, based on the suspicion that he had probably committed some other crime in the past and evaded punishment.

138.  Defendant PAAVOLA/NOBLISKI took no action to intervene and stop Mr. SWIFT's arrest beyond informing her direct supervisor, Defendant LEWANDOWSKI, about the flaws in the identification procedures and the deficient investigation.  Defendant NOBLISKI never took steps to report the improper identification procedures up the chain of command or to the prosecutors, despite knowing that Defendant LEWANDOWKI was going to continue with Mr. SWIFT's unconstitutional arrest, although she clearly could have and should have done so despite having been taken off the case.

139.  Under Michigan law, the statute of limitations for false arrest was equitably tolled through and until May 21, 2008, at which time Plaintiff SWIFT was exonerated and

32

his conviction was vacated.

140.   At all times herein Defendants LEWANDOWSKI, PAAVOLA/NOBLISKI,

BADACZEWSKI, DOES and ROES, did knowingly cause the State to initiate or

continue a criminal prosecution against the Plaintiff, WALTER SWIFT.

141.   As to that criminal prosecution:

a.   The prosecution was initiated or continued by Defendants LEWANDOWSKI and

PAAVOLA/NOBLISKI, acting without probable cause.

b.   There was not even arguably probable cause to initiate or continue said criminal

prosecution in light of the following facts, of which Defendants

LEWANDOWSKI and PAAVOLA/NOBLISKI were aware:

i.   The victim, S.F.S., selected multiple photographs of other men with a

facial feature resembling that of the perpetrator, before she selected Mr.

SWIFT's photo on the same grounds, and there was therefore no basis for

putting Mr. SWIFT in a line-up;

ii.   The line-up was unduly suggestive in that the victim was told ahead of

time that WALTER SWIFT would be in the line-up;

iii.   The victim's purported "identification" of Mr. SWIFT at the line-up was

in fact tentative and did not constitute a positive identification at all;

iv.   By the time officers requested  a warrant from the Wayne County

Prosecutors Office to arrest plaintiff WALTER SWIFT, both Defendant

LEWANDOWSI and Defendant PAAVOLA/NOBLISKI had admitted

that they did not believe that Mr. Swift committed the rapes of S.F.S.; and,

33

    v.   The results of the serological testing conducted on biological evidence from the crime scene excluded Mr. Swift as the rapist.

   c.   The prosecution was the result of malice on the part of the aforementioned Defendants as evidenced by the fact that that while Defendant LEWANDOWSKI'S statement that she did not believe WALTER SWIFT had raped or assaulted S.F.S., but she was sure he had done something wrong before and therefore deserved to be prosecuted for the S.F.S. rapes.

   d.   After twenty-six years, on May 21, 2008, the prosecution ended in the Plaintiff's favor, when he was exonerated and all charges ultimately dismissed on a joint motion filed by Plaintiff and the Wayne County Prosecutor for relief from the original judgment of guilt entered in the aforementioned criminal case in 1982;

142.   At all times herein, each of the aforementioned defendants violated the Plaintiff's clearly established right to be free from arrest and prosecution without probable cause.

143.   As a direct and proximate result of the acts and conduct of the Defendants in the initiation and institution of the aforementioned baseless and malicious prosecution, resulting in his unjust conviction and imprisonment, Plaintiff WALTER SWIFT has suffered severe damages, many of which effects continue to plague Mr. SWIFT to this day and will plague him for the rest of his life, including but not limited to:

   a.   Deprivation of liberty for over 26 years;

   b.   Personal and physical injuries;

   c.   Pain and suffering;

   d.   Severe mental anguish;

34

e.  Emotional distress;

f.  Extreme fear;

g.  Economic damages including loss of income;

h.  Infliction of physical illness and injury resulting from his confinement;

i.  Inadequate medical care; humiliation, indignities, and embarrassment;

j.  Degradation;

k.  Permanent loss of natural psychological development, including the onset of traumatic mental illness; and

l.  Restrictions on all forms of personal freedom and physical liberty  including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

m.  Damage to his relationship with his daughter—his only child—who was two years old when Plaintiff went to prison, and twenty-seven years old when he was released.

n.  Damage to his relationship with his family, including but not limited to his parents—who passed away while Plaintiff was in prison and never saw their son exonerated—and his many siblings.

## SECOND CLAIM FOR RELIEF
## 42 U.S.C. § 1983: 5TH, AND 14TH AMENDMENTS
## DENIAL OF DUE PROCESS: FABRICATION OF INCULPATORY EVIDENCE;
## UNDULY SUGGESTIVE IDENTIFICATION PROCEDURES;
## FAILURE TO DISCLOSE EXCULPATORY AND IMPEACHMENT EVIDENCE

35

144. Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 143, as if fully set forth herein.

145. Defendant police officers and investigators, including Defendants LEWANDOWSKI, PAAVOLA/NOBLISKI, and DOES 1-3 knowingly and deliberately fabricated evidence that was used to arrest, indict, prosecute and convict Mr. SWIFT for the rapes of S.F.S. Specifically, Defendants PAAVOLA/NOBLISKI, LEWANDOWSKI and DOES 1-3 recklessly and arbitrarily included Mr. SWIFT in an impermissible, five-person live line-up despite knowing there was no reasonable basis to do so, and knowingly and intentionally or recklessly disclosed to S.F.S. that Mr. SWIFT was going to be among the supposedly "anonymous" persons in the line-up, thereby creating an obviously and unduly suggestive bias and virtually ensuring that she would misidentify Mr. SWIFT. Defendants took this action with reckless disregard for the known and obvious likelihood that placing Mr. SWIFT in a line-up would lead to a misidentification. Defendants then falsely reported in written reports and statements to the prosecution before the grand jury, pretrial hearings and trial that S.F.S. had affirmatively identified Mr. SWIFT at both a properly administered photo showing and a properly administered line-up.

146. Defendants fabricated S.F.S.'s purported identification of Mr. SWIFT despite knowing that:

   a. it was improper to place somebody in a line-up on the sole basis of having one similar facial feature to the perpetrator;

   b. it was improper to place Mr. SWIFT in a line-up when the victim said nothing new about his photograph that she had not said about seven other men;

36

    c.   conducting a line-up after a weak photo selection would create the obvious risk of a misidentification;

    d.   it was improper to inform the victim that Mr. SWIFT would be among the men in the line-up;

    e.   a five-person line-up was in and of itself unduly suggestive; and,

    f.   the victim's "identification" was in fact tentative.

147.   Any reasonable officer in 1982 would have known—and these defendants did know—that such arbitrary, reckless, and conscious-shocking conduct was unlawful and violated the Plaintiff's clearly established constitutional rights under the Fifth, Sixth and Fourteenth Amendments, especially given the totality of the circumstances.  No reasonable officer would have believed this conduct was lawful.

148.   Defendants' fabrications directly and proximately caused Mr. Swift's unfair trial, wrongful conviction, and deprivation of liberty without due process of law during his imprisonment, as well as all the ongoing injuries and damages set forth above.

149.   Furthermore, the photo showing and live line-up described in paragraphs 37 through 67 above was so unnecessarily suggestive and conducive to irreparable mistaken identification as to violate Mr. SWIFT's due process right to be free of unduly suggestive identification procedures under the 5th and 14th amendments to the United States Constitution.  Defendants PAAVOLA/NOBLISKI and LEWANDOWSKI nevertheless administered the identification procedures in the unconstitutional manner set forth above and falsely reported in written reports and reports to the prosecution prior to the pretrial hearings and trial that S.F.S. had affirmatively identified Mr. SWIFT at both a properly administered photo showing and a properly administered

line-up.Any reasonable officer in 1982 would have known—and these defendants did know—that such arbitrary, reckless, and conscious-shocking conduct was unlawful and violated the Plaintiff's clearly established constitutional rights under the Fifth, Sixth and Fourteenth Amendments, especially given the totality of the circumstances. No reasonable officer would have believed this conduct was lawful.

150. The unduly suggestive identification procedures described above directly and proximately caused Mr. Swift's unfair trial, wrongful conviction, and deprivation of liberty without due process of law during his imprisonment, as well as all the ongoing injuries and damages set forth above.

151. Defendant police officers and investigators, including Defendants LEWANDOWSKI, PAAVOLA/NOBLISKI, BADACZEWSKI, and DOES 1-3 knowingly and deliberately failed to document and disclose to either the prosecutors or to defense counsel material exculpatory and impeachment information, as required by the Fifth and Fourteenth Amendments to the Constitution of the United States, to wit:

   a. That the victim, S.F.S., selected photographs of seven other men with a facial feature resembling that of the perpetrator before she selected Plaintiff's photo on the same grounds, and there was therefore no basis for putting Plaintiff in a line-up;

   b. That the line-up, in which the victim later picked out Plaintiff WALTER SWIFT, was unfair—indeed tainted—in multiple ways including because Defendant PAAVOLA/NOBLISKI informed the victim that of the eight photographs she had selected as resembling her rapist/assailant, *only one of them*, Plaintiff WALTER

38

SWIFT, the last and eighth person selected by the witness, would be standing in the line-up;

c.   That the identification of Plaintiff WALTER SWIFT at the lineup by the victim was unsure and therefore not a positive identification;

152.   Defendant LEWANDOWSKI, after she removed Defendant PAAVOLA/NOBLISKI from the case and admitted that Mr. SWIFT "may not have done the crime," further knowingly and deliberately failed to document and disclose to either the prosecutor or defense counsel that the DPD Crime Lab Report had been amended to include the results of blood typing on blood and saliva samples from the victim, which confirmed that the rapist was a "non-secretor," and could not have been Plaintiff WALTER SWIFT, a "secretor."  (*See* **Exhibit D; Exhibit E).**

153.   Defendant BADACZEWSKI further knowingly and deliberately failed to document and disclose to either the prosecutor or defense counsel that the DPD Crime Lab Report had been amended to include the results of blood typing on blood and saliva samples from the victim, which confirmed that the rapist was a "non-secretor," and could not have been Plaintiff WALTER SWIFT, a "secretor."

154.   Had the aforementioned evidence been disclosed to the criminal defense, there is a reasonable probability that the result of the criminal proceeding against Plaintiff WALTER SWIFT would have been different, including but not limited to the probability that the prosecutor's office itself would have dropped or dismissed the baseless criminal charges against him.

155.   By failing to disclose the exculpatory facts about the line-up, the results of testing on the victim's blood and saliva samples, and the existence of the exculpatory amended laboratory report, Defendants violated the due process clause of the Fourteenth Amendment, as interpreted by *Brady v. Maryland*, 373 U.S. 83 (1963), and its clearly established pre-1982 progeny, which imposed an explicit duty on these Defendants to disclose all material exculpatory and impeachment evidence to both the prosecutors and the criminal defense counsel.

156.   Defendants' intentional, malicious, bad-faith, and/or reckless failure to disclose this material exculpatory information to both the prosecutors and defense counsel deprived Mr. SWIFT of significant exculpatory and impeachment material that would have rendered any identification of the Plaintiff, WALTER SWIFT, meaningless and non-incriminatory.

157.   As a direct and proximate result of the acts and conduct of the Defendants in the initiation and institution of the aforementioned baseless and malicious prosecution, resulting in his unjust conviction and imprisonment, Plaintiff WALTER SWIFT has suffered severe damages, many of which effects continue to plague Mr. SWIFT to this day and will plague him for the rest of his life, including but not limited to:

   a.   Deprivation of liberty for over 26 years;

   b.   Personal and physical injuries;

   c.   Pain and suffering;

   d.   Severe mental anguish;

   e.   Emotional distress;

f.   Extreme fear;

g.   Economic damages including loss of income;

h.   Infliction of physical illness and injury resulting from his confinement;

i.   Inadequate medical care; humiliation, indignities, and embarrassment;

j.   Degradation;

k.   Permanent loss of natural psychological development, including the onset of

traumatic mental illness; and

l.   Restrictions on all forms of personal freedom and physical liberty  including but

not limited to diet, sleep, personal contact, educational opportunity, vocational

opportunity, athletic opportunity, personal fulfillment, sexual activity, family

relations, reading, television, movies, travel, enjoyment, and expression.

m.  Damage to his relationship with his daughter–his only child–who was two years

old when Plaintiff went to prison, and twenty-seven years old when he was

released.

n.   Damage to his relationship with his family, including but not limited to his

parents–who passed away while Plaintiff was in prison and never saw their son

exonerated–and his many siblings.

### THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – *MONELL* CLAIM
### DEFENDANT CITY OF DETROIT

158.  Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 157,

as if fully set forth herein.

41

159.  At all times herein the CITY, by and through its final policymakers, established, promulgated, implemented and maintained DPD customs, policies and/or practices of authorizing, ratifying, condoning, tolerating and approving illegal and unconstitutional actions by Detroit Police Department officers, supervisors and investigators.  Those illegal and unconstitutional actions included conducting inadequate investigations into serious crimes by making arbitrary arrests in order to close cases quickly and affirmatively choosing not to develop or pursue actual leads and evidence.  They also included the practices of using unreliable, discredited and improper identification techniques like five-person lineups; engaging in unduly suggestive behavior and improperly documenting line-ups; concealing or mis-reporting the results of serological testing when those results tended to undermine the prosecution's theory in criminal cases; and ignoring the constitutional duty to disclose exculpatory evidence to prosecutors and defense counsel, including by concealing improper suggestion on the part of officers conducting line-ups.

160.  Defendant CITY, by and through its final policymakers, maintained a custom and policy of inadequately training, supervising, and/or disciplining officers concerning all of the practices identified in paragraph 153.

161.  Defendant CITY, by and through its final policymakers, had actual or constructive notice of inadequate training and supervision in the areas identified in paragraph 153. Defendant CITY maintained those inadequate practices despite an obvious need for training and supervision in those areas, and despite the foreseeable risk that police would predictably confront these situations and, without adequate training and supervision, constitutional violations would result.

162.  Defendant CITY was therefore deliberately indifferent to the known and obvious risk that its policies, customs, and practices of inadequate training and supervision would lead to constitutional violations of the type suffered by plaintiff Walter SWIFT.

163.  Because of these unconstitutional customs and policies maintained by the CITY of Detroit, individuals such as Walter SWIFT were wrongfully arrested and convicted in violation of their constitutional rights.

164.  Each of the aforementioned policies was instrumental and a driving force in the violations of rights sustained by WALTER SWIFT, as set forth herein.

165.  As a direct and proximate result of the acts and conduct of the Defendants in the initiation and institution of the aforementioned baseless and malicious prosecution, resulting in his unjust conviction and imprisonment, Plaintiff WALTER SWIFT has suffered severe damages, many of which effects continue to plague Mr. SWIFT to this day and will plague him for the rest of his life, including but not limited to:

   a.  Deprivation of liberty for over 26 years;

   b.  Personal and physical injuries;

   c.  Pain and suffering;

   d.  Severe mental anguish;

   e.  Emotional distress;

   f.  Extreme fear;

   g.  Economic damages including loss of income;

   h.  Infliction of physical illness and injury resulting from his confinement;

   i.  Inadequate medical care; humiliation, indignities, and embarrassment;

43

j.  Degradation;

k.  Permanent loss of natural psychological development, including the onset of traumatic mental illness; and

l.  Restrictions on all forms of personal freedom and physical liberty including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

m.  Damage to his relationship with his daughter–his only child–who was two years old when Plaintiff went to prison, and twenty-seven years old when he was released.

n.  Damage to his relationship with his family, including but not limited to his parents–who passed away while Plaintiff was in prison and never saw their son exonerated–and his many siblings.

### FOURTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – *MONELL* CLAIM
### DEFENDANT COUNTY OF WAYNE

166.  Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 165, as if fully set forth herein.

167.  At all times herein, Defendant COUNTY, by and through its final policymakers, maintained a custom or practice of providing grossly inadequately funding to its system of indigent representation, insofar as criminal defense attorneys such as Lawrence Greene who represented Plaintiff Walter SWIFT at trial, did not have the

44

funds to hire or consult with experts in even the most serious felony claims carrying penalties of up to life in prison.

168. Prior to and at all times herein, Defendant COUNTY, by and through its final policymakers, had actual or constructive notice of such failure to adequately fund its system of indigent representation for serious felony cases despite an obvious need for the provision of adequate funds for defense attorneys to consult with experts. Defendant COUNTY further knew it was foreseeable that defense attorneys would predictably confront situations in which the results of forensic testing could exculpate a defendant but the attorney would be unable to pay an expert who could explain the proper questions to ask at trial. Defendant COUNTY further knew that as a result of the failure to provide adequate funding for this purpose, constitutional violations would result.

169. Defendant COUNTY's custom and policy, maintained by and through its final policymakers, of failing to adequately fund its system of indigent representation in serious felony cases deprived Mr. SWIFT of constitutionally adequate representation.

170. As a direct and proximate result of the acts and conduct of the Defendants in the initiation and institution of the aforementioned baseless and malicious prosecution, resulting in his unjust conviction and imprisonment, Plaintiff WALTER SWIFT has suffered severe damages, many of which effects continue to plague Mr. SWIFT to this day and will plague him for the rest of his life, including but not limited to:

   a. Deprivation of liberty for over 26 years;

   b. Personal and physical injuries;

45

    c.  Pain and suffering;

    d.  Severe mental anguish;

    e.  Emotional distress;

    f.  Extreme fear;

    g.  Economic damages including loss of income;

    h.  Infliction of physical illness and injury resulting from his confinement;

    i.  Inadequate medical care; humiliation, indignities, and embarrassment;

    j.  Degradation;

    k.  Permanent loss of natural psychological development, including the onset of traumatic mental illness; and

    l.  Restrictions on all forms of personal freedom and physical liberty  including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

    m. Damage to his relationship with his daughter–his only child–who was two years old when Plaintiff went to prison, and twenty-seven years old when he was released.

    n.  Damage to his relationship with his family, including but not limited to his parents–who passed away while Plaintiff was in prison and never saw their son exonerated–and his many siblings.

### FIFTH CLAIM FOR RELIEF
### FALSE IMPRISONMENT – STATE LAW

171.  Plaintiff incorporates paragraphs 1 through 170, as more fully stated above.

46

172. That this court has jurisdiction over the allegations contained in this count under the equitable doctrine of pendent and supplemental jurisdiction, as the state tort claims alleged in this count arise from the same facts and circumstances underpinning Plaintiff's federal cause of action.

173. Defendants LEWANDOWSKI'S and PAAVOLA/NOBLISKI'S actions arresting Plaintiff without probable cause and causing him to be held against his will constituted false imprisonment, as there was no lawful basis for such action.

174. That this false imprisonment was malicious, willful, wanton, and demonstrated a reckless disregard for Plaintiff's rights.

175. As a direct and proximate result of the acts and conduct of the Defendants LEWANDOWSKI and PAAVOLA/NOBLISKI in the imprisonment of Plaintiff without probable cause, Plaintiff WALTER SWIFT has suffered serious damages, including but not limited to:

  a. Deprivation of liberty;

  b. Personal and physical injuries;

  c. Psychological and emotional anguish, distress, pain and suffering;

  d. Fear;

  e. Economic damages including loss of income;

  f. Degradation; and,

  g. Restrictions of personal and physical freedom.

### SIXTH CLAIM FOR RELIEF
### MALICIOUS PROSECUTION – STATE LAW

176. Plaintiff incorporates paragraphs 1 through 175, as more fully stated above.

47

177.  That this court has jurisdiction over the allegations contained in this count under the equitable doctrine of pendent and supplemental jurisdiction, as the state tort claims alleged in this count arise from the same facts and circumstances underpinning Plaintiff's federal cause of action.

178.  That the Defendants, LEWANDOWSKI, PAAVOLA/NOBLISKI and BADECZEWSKI did cause and further the issuance and maintenance of criminal charges against Plaintiff without probable cause, charging him with the offenses of Breaking and Entering with Intent to Commit Criminal Sexual Conduct, contrary to MCL 750.110, two counts of First Degree Criminal Sexual Conduct, contrary to MCL 750.520b and Robbery, contrary to MCL750.530.

179.  That the above charges were resolved in Plaintiff's favor in the Wayne County Circuit Court on Tuesday May 21, 2008, when the Wayne County Circuit Court dismissed all charges and discharged Plaintiff from all charges and custody.

180.  The above-mentioned prosecution was instituted by the Defendant Officers maliciously, in bad faith, and without probable cause.

181.  As a direct and proximate result of the acts and conduct of the Defendants in the initiation and institution of the aforementioned baseless and malicious prosecution, resulting in his unjust conviction and imprisonment, Plaintiff WALTER SWIFT has suffered severe damages, many of which effects continue to plague Mr. SWIFT to this day and will plague him for the rest of his life, including but not limited to:

   a.  Deprivation of liberty for over 26 years;

   b.  Personal and physical injuries;

48

c.  Pain and suffering;

d.  Severe mental anguish;

e.  Emotional distress;

f.  Extreme fear;

g.  Economic damages including loss of income;

h.  Infliction of physical illness and injury resulting from his confinement;

i.  Inadequate medical care; humiliation, indignities, and embarrassment;

j.  Degradation;

k.  Permanent loss of natural psychological development, including the onset of traumatic mental illness; and

l.  Restrictions on all forms of personal freedom and physical liberty including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

### SEVENTH CLAIM FOR RELIEF
### GROSS NEGLIGENCE – STATE LAW

182.  Plaintiff incorporates paragraphs 1 through 181, as more fully stated above.

183.  That the Defendants, LEWANDOWSKI, PAAVOLA/NOBLISKI  and BADECZEWSKI  in falsely arresting, falsely imprisoning and maliciously prosecuting Plaintiff did act in a manner that was grossly negligent in the following ways:

a.  These defendants knew that their actions, including failure to disclose, and indeed affirmatively concealing, information that clearly constituted exculpatory

49

evidence;

b. Despite this knowledge, these Defendants deliberately persisted in their failure to disclose and in concealing the exculpatory information and evidence;

c. These Defendants well knew that their failure to disclose, and in fact concealing, the exculpatory evidence would harm the Plaintiff, in the ways set forth above;

d. Notwithstanding the knowledge that their actions, as set forth above, would seriously harm the Plaintiff, these Defendants failed to take any action to prevent that harm;

e. There was no reasonable law enforcement purpose served by the actions of the Defendants in failing to disclose, and in fact concealing the aforementioned exculpatory evidence;

f. Indeed, revealing and disclosing such evidence would have, in no way, weakened or undermined any reasonable or legitimated law enforcement purpose.

184. Furthermore, Defendants LEWANDOWSKI and PAAVOLA/NOBLISKI improperly suggested to witnesses that they identify the alleged rapist as Plaintiff WALTER SWIFT, notwithstanding their knowledge that the Plaintiff was not the rapist and that such improper and false suggestions would lead to serious harm and injury to the Plaintiff.  These improper and false suggestions were undertaken despite the fact that there was no reasonable or legitimate law enforcement purpose served by these improper and false suggestions and actions.

185. As a direct and proximate result of these grossly negligent acts and conduct of the Defendants, Plaintiff WALTER SWIFT has suffered severe damages, many of which

effects continue to plague Mr. SWIFT to this day and will plague him for the rest of his life, including but not limited to:

a. Deprivation of liberty for over 26 years;

b. Personal and physical injuries;

c. Pain and suffering;

d. Severe mental anguish;

e. Emotional distress;

f. Extreme fear;

g. Economic damages including loss of income;

h. Infliction of physical illness and injury resulting from his confinement;

i. Inadequate medical care; humiliation, indignities, and embarrassment;

j. Degradation;

k. Permanent loss of natural psychological development, including the onset of traumatic mental illness; and

l. Restrictions on all forms of personal freedom and physical liberty including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

## EIGHTH CLAIM FOR RELIEF
## INTENTIONAL INFLICTION OF EMOTIONAL HARM – STATE LAW

186. Plaintiff incorporates paragraphs 1 through 185, as more fully stated above.

187. The Defendants, LEWANDOWSKI, PAAVOLA/NOBLISKI and BADECZEWSKI

in actions that failed to disclose exculpatory evidence, deliberately concealed

exculpatory evidence and falsely suggested the identity of the Plaintiff as the rapist

herein, when Defendants knew that not to be the case, were intentional and directed at

the Plaintiff, in the following particular respects, among others:

   a. They were designed to result in the arrest, prosecution, conviction and long term

   imprisonment of Plaintiff, despite the fact that these Defendants knew that the

   Plaintiff was not guilty of the alleged rape;

   b. The actions of the Defendants were so reckless as to deliberately inflict emotional

   damage on the Plaintiff;

   c. The actions of the individual Defendants were in avoidance of the Governmental

   Immunity Act, MCLA §691.1406, et seq.

188.  As a direct and proximate result of these grossly negligent acts and conduct of the

   Defendants, Plaintiff WALTER SWIFT has suffered severe damages, many of which

   effects continue to plague Mr. SWIFT to this day and will plague him for the rest of

   his life, including but not limited to:

   a. Deprivation of liberty for over 26 years;

   b. Personal and physical injuries;

   c. Pain and suffering;

   d. Severe mental anguish;

   e. Emotional distress;

   f. Extreme fear;

   g. Economic damages including loss of income;

52

h.   Infliction of physical illness and injury resulting from his confinement;

i.   Inadequate medical care; humiliation, indignities, and embarrassment;

j.   Degradation;

k.   Permanent loss of natural psychological development, including the onset of traumatic mental illness; and

l.   Restrictions on all forms of personal freedom and physical liberty including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

**WHEREFORE**, Plaintiff demands the following relief jointly and severally against all defendants:

(a)  A declaration that Defendants violated the federal rights of Plaintiff pursuant to 28 U.S.C. § 2201;

(b)  A declaration that Plaintiff was actually innocent of the rape for which he was convicted pursuant to 28 U.S.C. § 2201;

(c)  Compensatory damages for physical, emotional, and economic injuries suffered by plaintiff by reason of defendants' unlawful and unjustified conduct, in an amount fair, just and reasonable and in conformity with the evidence at trial;

(d)  Punitive and exemplary damages against the individual defendants to the extent allowable by law;

(e)  Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

53

(f)  The costs and disbursements of this action pursuant to 42 U.S.C. § 1920; and

(g) Such other and further relief as appears just and proper.

Respectfully submitted,

GOODMAN & HURWITZ, P.C.

s/William H. Goodman_____
William H. Goodman (P14173)
Julie H. Hurwitz (P34720)
Kathryn Bruner James (71374)
1397 Jefferson Ave,
Detroit, Michigan 48207
(313) 567-6170

-and-

NEUFELD SCHECK & BRUSTIN, LLP
Barry C. Scheck
Deborah L. Cornwall
Emma Freudenberger
99 Hudson Street, 8th Floor
New York, NY 10013
(212) 965-9081

*Attorneys for the Plaintiff*

Dated:  **May 20, 2011**

# Exhibit A

## AFFIDAVIT OF JANICE NOBLISKI

1.     I, Janice Nobliski (formerly Janice Paavola), worked as a Police Officer in the Sex Crimes Unit with the Detroit Police Department from 1971 until 1982. I was the Police Officer initially in charge of the rape case of Suzanne Sizemore that occurred on September 2, 1982 (located at 1430 Seminole, Indian Village, Detroit).

2.     A week after the attack, Suzanne Sizemore came to the Detroit Police Department where I showed her several hundred photographs that were on file to see if she could identify the man who attacked her. The photographs were arranged in order of race, size and age. As Ms. Sizemore looked through the pictures, she selected the photographs of seven different men, stating that each man had similar features, such as eyes, hair or expression, as the perpetrator. After Ms. Sizemore selected the photograph of the seventh man who she said resembled the assailant, I decided, at that point, that the next person Ms. Sizemore selected as having features similar to the perpetrator would be brought in for an in person line-up identification. The next person's photograph Ms. Sizemore selected belonged to Walter Swift. Ms. Sizemore said that Mr. Swift had similar eyes to the perpetrator. She did not say that Walter Swift was the perpetrator and did not make a positive identification. She did not put any extra emphasis on Walter Swifts' photograph in comparison to the pictures of the seven other men that she previously said resembled the assailant. Any one of the eight men that Ms. Sizemore selected as resembling the assailant could have been brought in for a line-up identification. I was confident that she would not identify Mr. Swift as the perpetrator in the line up.

3.     A few days later, I held a line-up which included Mr. Swift and four other black men. I can say with confidence that Ms. Sizemore did not make a positive identification of Mr. Swift. At that time, I had worked in the Sex Crime Unit for thirteen years and had a lot of experience in carrying out line-up identifications. Mrs. Sizemore and her husband attended the line up together. Mrs. Sizemore selected Walter Swift, who was number two in the line up, as the perpetrator, stating "I believe that it is number 2". I commented that it was not a positive identification. I was not confident with this identification and, as a result, arranged for a polygraph examination to be carried out on Mr. Swift.

4.     Because I was about to leave for vacation, I scheduled the polygraph for the following week. When I returned from vacation, I learned that the polygraph had been canceled and that instead a warrant for Mr. Swift's arrest had been obtained. I was upset that the polygraph had been canceled and that a warrant had been issued instead, so I went to my supervisor Sergeant Lewandowski to discuss the matter. I explained to her that Mrs. Sizemore had been unsure in her identification of Mr. Swift as the perpetrator and she had not positively identified him in either the photo or the in person line-up. I also explained that I felt very strongly that Mr. Swift should have been given a polygraph and that a proper and thorough investigation certainly had not been carried out. I also explained that I was not convinced that Mr. Swift was the perpetrator. Sergeant Lewandowski's response to me was that Mr. Swift may not have done this crime but

1

she was sure that he did some crime before and had gotten away with. I was very unhappy with this response, but felt as if there was nothing else I could do since I had been taken off the case. In the thirteen years I worked for Sex Crimes Unit I was never taken off a case. I was not given any explanation as to why I was taken off the Sizemore Investigation.

5.     At trial, defense counsel, Lawerence Greene's cross examination of me was very weak. Mr. Greene failed to ask me any questions about whether Mrs. Sizemore had selected other persons in the photograph identification process. As I was never asked these questions, I was unable to explain this in my testimony.

6.     When I learned that Mr. Swift was found guilty of the rape of Mrs. Sizemore, I went to visit the Honorable Leonard Townsend who was the presiding judge in this case at his court room. I explained to him that I was upset with the verdict, that I felt Mr. Swift was innocent and asked him to be lenient in the sentence. Later that same week I was informed by my supervisor that I had been transferred out of the Sex Crimes Unit and was to report to the 6th Precinct, where I was assigned to patrol duty. I was not given any valid reason for this transfer.

7.     I am providing this affidavit because I have thought about this case a lot over the years and am still upset by the way the case was handled and the result. I have always felt that in a way I played a part in sending an innocent man to prison.

_Janice Nobliski_
JANICE NOBLISKI

Sworn To Before Me
this 17th Day of September, 2003

_Jacqueline Kay Tom_
Notary Public

JACQUELINE KAY TOM
Notary Public - Nevada
CLARK COUNTY
My Appt. Exp. April 30, 2005
No. 01-68847-1

JACQUELINE KAY TOM
Notary Public - Nevada
CLARK COUNTY
My Appt. Exp. April 30, 2005
No. 01-68847-1

2

TOTAL P.03

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

CRISTOBAL MENDOZA and
ANNICA CUPPETELLI,

      Plaintiffs,

vs.

CITY OF DETROIT, a Municipal Corporation;
MARK CARSON, in his individual capacity;
SGT. CONWAY PETTY, in his individual
capacity; SGT. RODERICK GLOVER, in his
individual capacity; PARAMOUNT PICTURES;
D.W. STUDIOS PRODUCTIONS L.L.C.; NICK
DEROO; and DAVID RUMBLE, jointly and
severally,

      Defendants.

Case No.: 11-10899
Honorable Arthur J. Tarnow
Magistrate Judge Michael J. Hluchaniuk

_____/

Kathryn Bruner James (P71374)
William H. Goodman (P14173)
Julie H. Hurwitz (P34720)
Goodman & Hurwitz, P.C.
1394 E. Jefferson Ave.
Detroit, MI 48207
(313) 567-6170
(313) 567-4827 fax
mail@goodmanhurwitz.com
*Attorneys for Plaintiffs*

Dennis Burnett (P27099)
City of Detroit Law Department
660 Woodward Avenue, Suite 1650
Detroit, MI 48226
(313) 237-3013/Fax: (313) 224-5505
burnd@detroitmi.gov
*Attorneys for City of Detroit & Carson*

_____/


**PLAINTIFFS' FIRST AMENDED COMPLAINT AND JURY DEMAND**

1

## PLAINTIFFS' FIRST AMENDED COMPLAINT AND JURY DEMAND

NOW COME Plaintiffs, CRISTOBAL MENDOZA and ANNICA CUPPETELLI, and for their Complaint against Defendants state as follows:

### PRELIMINARY STATEMENT

1.      This is a civil rights action in which Plaintiffs seek relief for Defendants' violations, under color of state law, of their individual rights, privileges, and immunities secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution as enforced by the Civil Rights Act of 1871, 42 U.S.C. § 1983.

2.      At all times described herein, individual Defendants MARK CARSON, CONWAY PETTY, and RODERICK GLOVER acted under color of law and pursuant to the customs, policies, and practices of Defendant CITY OF DETROIT.

3.      At all times described herein, individual Defendants NICK DEROO and DAVID RUMBLE acted in the course and scope of their agency and/or employment relationship with Defendants PARAMOUNT PICTURES and/or D.W. STUDIOS PRODUCTIONS L.L.C. (hereafter "D.W.STUDIOS").

4.      At all times described herein, Defendants PARAMOUNT PICTURES and D.W. STUDIOS willfully participated in joint action and conspired with Defendant CITY OF DETROIT to interfere with private individuals' ability to take photos on a public street, to falsely arrest and prosecute said persons without probable cause, and to use excessive/unreasonable force against said persons, in violation of their First and Fourth Amendment rights. Thus, at all times relevant hereto, Defendants PARAMOUNT PICTURES and D.W. STUDIOS were state actors and acted under color of law.

5.      This case involves two people, the Plaintiffs herein, who, on September 25, 2010,

2

attempted to walk on the public streets of downtown Detroit and whose right to do so freely – as secured by the First, Fourth and Fourteenth Amendments of the United States Constitution – was denied, infringed, and violated by the Defendants.

6.     It further involves Plaintiffs' rights as residents of the Detroit community, and as artists, to express themselves artistically, to freely use a camera in public places for expressive purposes, and to be free from retaliation for so doing, as secured by the First, Fourth and Fourteenth Amendments of the United States Constitution.

7.     Finally, it involves the right of Plaintiffs to be free from seizure, arrest, detention, and ongoing threat of prosecution without probable cause and in an unreasonable and excessive manner, as secured by the Fourth and Fourteenth Amendments of the United States Constitution.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this matter, pursuant to 28 U.S.C. § 1331, 42 U.S.C § 1983, and the First, Fourth, and Fourteenth Amendments of the United States Constitution.

9.     The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

10.    Venue is proper in the United States District Court for the Eastern District of Michigan pursuant to 28 U.S.C. § 1391 (b)(2), in that this is the judicial district in which the events giving rise to the claim occurred.

## JURY DEMAND

11.    Plaintiffs demand a trial by jury in this action on each and every one of their claims.

## PARTIES

12.    Plaintiff CRISTOBAL MENDOZA (hereafter "MENDOZA") was at all relevant

3

times an Assistant Professor of Art and Art History at Wayne State University.  He is also an

artist and utilizes photography professionally as a part of his work as an artist and professor.  At

all relevant times herein he was a resident of the City of Detroit, County of Wayne, State of

Michigan.

13.    Plaintiff ANNICA CUPPETELLI (hereafter "CUPPETELLI") is and was, at all

relevant times, employed at an art gallery and is also an artist.  In the course of her work as an

artist, she and MENDOZA were collaborators.  At all relevant times herein, she was a resident of

the City of Detroit, County of Wayne, State of Michigan.

14.    Defendant CITY OF DETROIT (hereafter "DETROIT") is a municipal corporation,

so authorized by the laws of the State of Michigan, which operates the Detroit Police Department

(hereafter "DPD") as a part of its responsibilities and services.  At all times relevant herein, this

Defendant acted under color of regulation, usage, custom, and law and pursuant to its policies

and practices, as did the individual Defendants herein.

15.    Defendant Sergeant MARK CARSON (hereafter "CARSON") is and, at all times

herein, was a police officer in the DPD of Defendant DETROIT, acting under color of

regulation, usage, custom, and law, acting within the scope of his authority and employment.

Defendant CARSON, at the times relevant herein, also acted on behalf of, at the direction of, and

in concert with Defendants PARAMOUNT PICTURES and/or D.W. STUDIOS.

16.    Defendant SGT. CONWAY PETTY (hereafter "PETTY") is and, at all times herein,

was a supervisor in the Detroit Police Department.  He was a direct and immediate supervisor of

Defendant CARSON.  At all relevant times herein, Defendant PETTY acted under color of

regulation, usage, custom, and law, acting within the scope of his employment as a DPD

supervisor, pursuant to the policies and practices of Defendant DETROIT, through its

4

department, agency and unit, the DPD. Defendant PETTY, at the times relevant herein, also acted on behalf of, at the direction of, and in concert with Defendants PARAMOUNT PICTURES and/or D.W. STUDIOS.

17.   Defendant SGT. RODERICK GLOVER (hereafter "GLOVER") is and, at all times herein, was a supervisor in the Detroit Police Department.  He was a direct and immediate supervisor of Defendant CARSON.  At all relevant times herein, Defendant GLOVER acted under color of regulation, usage, custom, and law, and within the scope of his employment as a DPD supervisor, pursuant to the policies and practices of Defendant DETROIT, through its department, agency and unit, the DPD.

18.   Defendant PARAMOUNT PICTURES CORPORATION (hereafter "PARAMOUNT") is and, at all time herein, was a Delaware corporation with its principal place of business in Los Angeles, California; a registered office in East Lansing, Michigan; and who did business in the City of Detroit.  Defendant PARAMOUNT is and was in the business of producing motion pictures including the "Transformers 3" movie, which was filmed in part in the City of Detroit in September 2010.  At all times relevant herein, this Defendant acted under color of state law.

19.   Defendant D.W. STUDIOS PRODUCTIONS L.L.C. (hereafter "D.W. STUDIOS") is and, at all times herein, was a Delaware corporation with its principal place of business in Universal City, California; a registered office in East Lansing, Michigan; and who did business in the City of Detroit.  Defendant D.W. STUDIOS is and was in the business of providing technical support, supervision, and production of film sets, props, and/or filing for the motion-picture industry including the "Transformers 3" movie, which was filmed in part in the City of Detroit in September 2010. At all times relevant herein, this Defendant acted under color of state

5

law.

20.   Defendants NICK DEROO (hereafter "DEROO") and DAVID RUMBLE (hereafter "RUMBLE") were set-location managers for the filming of "Transformers 3" in the City of Detroit in September 2010.  Based on information and belief, Defendants DEROO and RUMBLE are residents of the State of Michigan.

### STATEMENT OF FACTS

21.   At all times herein, Defendant DETROIT, through its police department, had a custom, policy, or practice of providing private entities (including Defendants PARAMOUNT and D.W. STUDIOS) with security and law enforcement services for the benefit of the private entities.

22.   Pursuant to the above custom, policy, or practice, Defendant D.W. STUDIOS and/or Defendant PARAMOUNT contracted with Defendant DETROIT to provide police officers, including Defendant CARSON, to patrol a movie set on and/or around Griswold Street in downtown Detroit. Defendant DETROIT provided police officers on overtime; Defendant PARAMOUNT and/or Defendant D.W. STUDIOS paid Defendant DETROIT for the officers' wages.

23.   On the evening of September 24, 2010 and into the early morning hours of September 25, 2010, Plaintiffs attended an art opening in Ferndale and then a lecture at the Detroit Institute of Arts.  They then went to dinner at a restaurant in downtown Detroit, followed by another art reception. Finally, they went to a downtown club, Cafe D'Mongo's, located at 1439 Griswold Street.  They arrived there around midnight and stayed for no longer than 45 minutes.

24.   When they arrived at the club, it was evident that a movie was being filmed in the

area.  There were changes to the facades of buildings and prop vehicles located throughout the immediate vicinity.

25.    Plaintiffs parked off of Griswold and, as they entered the area of Griswold between John R Street and Grand River Avenue on foot, they observed signs posted that announced that the businesses in the area were open for business.

26.    Shortly after 1:00 a.m., the two Plaintiffs left Cafe D'Mongo together.  Plaintiff MENDOZA raised his camera to take a photograph and was yelled at by a person who appeared to be a private security guard, who told him, "No pictures!"

27.    Plaintiff MENDOZA immediately complied, but stated in protest that "this is a public street."

28.    At this time and place, after Plaintiff MENDOZA replaced his camera back into his pocket, Defendant CARSON charged forward and forcefully threw Plaintiff CUPPETELLI, who was standing next to Plaintiff MENDOZA, against a wall. She fell to the ground due to the force of CARSON's assault upon her and suffered bruises and abrasions.

29.    The aforementioned assault by Defendant CARSON on Plaintiff CUPPETELLI was without provocation, without reason, and without any reasonable purpose and, as such, was unjustifiable, unreasonable and excessive.

30.    Defendant CARSON then proceeded to strike Plaintiff MENDOZA, who fell to the ground; thereafter, Defendant CARSON continued to assault and batter him repeatedly about the head, face and body, causing abrasions, contusions, and bruises, among other injuries.

31.    Defendant CARSON then arrested both Plaintiffs for the following alleged violations:

> a.  Plaintiff MENDOZA was charged with "Disorderly Conduct;" and

b.  Plaintiff CUPPETELLI was charged with "Interfering with a City Employee."

32.    At no time was there any basis or reason for either charge. Indeed, there was absolutely no probable cause for the assault or subsequent arrest of either Plaintiff.

33.    Defendant CARSON's actions, as set forth above, were undertaken under the supervision, direction, and approval of Defendants PETTY and GLOVER, as well as agents of Defendants PARAMOUNT and/or D.W. STUDIOS.

34.    Earlier that morning, Defendants DEROO and PETTY had instructed Defendant CARSON, in his capacity as a Detroit Police Officer, to protect the alleged copyright interests of Defendants PARAMOUNT and/or D.W. STUDIOS and to prevent anyone from taking pictures of the movie set, notwithstanding the clearly established constitutional right to do so.

35.    After his arrest, because he had been obviously injured during the course of his arrest, Plaintiff MENDOZA was immediately taken to Detroit Receiving Hospital as a police prisoner, as was Plaintiff CUPPETELLI.  There, they were examined, treated, and released as patients, at which point they were forced to appear in public, e.g. in the halls of the hospital, in handcuffs and shackles, and were thus further publicly humiliated.

36.    At this time, Plaintiff MENDOZA was taken to the 6th Precinct of the DPD, where he was held in custody until the late afternoon or early evening of September 25, 2010.

37.    At the time of his release from custody in the late afternoon or early evening of September 25, 2010, Plaintiff MENDOZA was forced to pay a $50 bond and ordered to subsequently report to the 36th District Court to answer the false charge of disorderly conduct.

38.    After her arrest, Plaintiff CUPPETELLI was taken to the 12th Precinct of the DPD, where she was held for several hours more.  At this time she was publically humiliated in numerous ways, including, but not limited to, the following:

8

a. Defendant GLOVER sat alone with Plaintiff CUPPETELLI in an isolated room prior to CUPPETELLI's booking and stared at her for long periods of time, for no legitimate governmental purpose other than to harass, intimidate and humiliate her;

b. She was physically frisked in a humiliating fashion by a female DPD officer – including an attempt to frisk her underneath her bra – in front of several male DPD officers, including Defendants CARSON and GLOVER, for no legitimate governmental purpose other than to harass and humiliate her; and

c. She was forced, if she needed to urinate, to do so in a humiliating fashion in the vicinity of several male DPD officers, who could easily see her if they chose to look, for no legitimate governmental purpose other than to harass and humiliate her.

39.   All of the above detention conditions are in accord with the customs, policies, and procedures of Defendant DETROIT.

40.   Later, on the morning of September 25, 2010, Plaintiff CUPPETELLI was released from DPD custody, after being required to post a $100 bond and ordered to subsequently report to the 36th District Court to answer the false charges of interfering with a police officer.

41.   On October 4, 2010, Plaintiff MENDOZA appeared at the 36th District Court at the date and time that he was ordered to so appear, at which time he was advised of the following:

a. Defendant CARSON had filed his report with the City of Detroit Law Department, the agency responsible for prosecuting misdemeanor ordinance violations; however, the charges had not yet been processed; and

b. Plaintiff MENDOZA was required to continue checking with the court to find out whether he and Plaintiff CUPPETELLI would still be prosecuted.

42.   On October 5, 2010, Plaintiff CUPPETELLI appeared at the 36th District Court at the date and time that she was ordered to so appear, at which time she was advised of the same information described in Paragraph 41 above.

43.   After nearly a month had gone by since the initial initiation of their criminal prosecutions, and several inquiries to the 36th District Court following their appearances on October 4 and 5, respectively, without any criminal prosecution having been processed and no

record of their criminal cases in the system, Plaintiffs requested and were refunded their

respective bonds:  $100 to Plaintiff CUPPETELLI and $50 to Plaintiff MENDOZA.

44. They were further told at that time that Defendant CARSON had up to a year to

pursue the prosecution against them.

45. As of the date of filing this *First Amended Complaint*, Plaintiffs have received no

further notice from the 36th District Court regarding the charges against them that arose from

this incident.

## CLAIMS

### COUNT I:
### Fourth Amendment – Excessive Force
### [42 U.S.C. § 1983]
### (Against Defendants CARSON, PETTY, GLOVER,
### PARAMOUNT, D.W. STUDIOS, DEROO, and RUMBLE)

46. Plaintiffs incorporate Paragraphs 1-45, as if fully restated herein.

47. Defendant CARSON directly violated Plaintiffs' rights to be free from

unreasonable and excessive physical force imposed under color of law, said rights being secured

by the Fourth and Fourteenth Amendments to the United States Constitution, by throwing

Plaintiff CUPPETELLI against a wall and repeatedly striking Plaintiff MENDOZA, as described

in Paragraphs 28 – 30 above.

48. Defendant PETTY violated Plaintiffs' rights to be free from unreasonable and

excessive physical force by explicitly instructing Defendant CARSON to protect the private

copyright interests of Defendants PARAMOUNT and/or D.W. STUDIOS.  Defendant PETTY's

instruction to Defendant CARSON was the proximate cause of the violations of Plaintiffs'

constitutional rights.

49. Defendants PETTY and GLOVER violated Plaintiffs' rights to be free from

10

excessive force by their failure to supervise, train, and discipline Defendant CARSON, who had

a known history within DPD of using excessive force.  Defendants PETTY and GLOVER's

failure to supervise, train, and discipline Defendant CARSON was the proximate cause of the

violations of Plaintiffs' constitutional rights.

50.    Defendants PARAMOUNT and D.W. STUDIOS also violated Plaintiffs' rights to

be free from excessive or unreasonable force by explicitly instructing Defendants CARSON and

PETTY to protect the alleged copyright interests of Defendants PARAMOUNT and/or D.W.

STUDIOS.  This unlawful instruction would and did inevitably lead to a conflict between police

officers and members of the public, particularly Plaintiffs herein, and caused the unlawful,

unreasonable, and excessive use of force against the Plaintiffs.  Defendants PARAMOUNT and

D.W. STUDIOS' instruction to Defendants CARSON and PETTY was thus a proximate cause of

the violations of Plaintiffs' constitutional rights.

51.    Moreover, Defendants PARAMOUNT and D.W. STUDIOS willfully participated

and conspired jointly with Defendant DETROIT to violate the constitutional rights of

individuals, including Plaintiffs herein, insofar as Defendant DETROIT's police officers

enforced Defendants PARAMOUNT and/or D.W. STUDIOS' alleged private copyrights

interests.  In doing so, Defendant DETROIT improperly favored Defendants PARAMOUNT

and/or D.W. STUDIOS' private interests over the valid, legitimate, and constitutional rights of

others, in particular the Plaintiffs herein, and thereby violated the rights of others, in particular

the Plaintiffs herein.

52.    Defendant CARSON's actions, as described in Paragraphs 28 – 34 above, were

undertaken and committed in furtherance of the conspiracy between Defendants PARAMOUNT,

D.W. STUDIOS, and DETROIT.

11

53. In addition, as a result of their conspiracy with Defendant DETROIT, Defendants PARAMOUNT and D.W. STUDIOS acted under color of state law.

54. Defendants DEROO and RUMBLE also violated Plaintiffs' rights to be free from unreasonable and excessive physical force by instructing and/or causing Defendants CARSON and PETTY to be instructed to protect the alleged copyright interests of Defendants PARAMOUNT and/or D.W. STUDIOS. This unlawful instruction would and did inevitably lead to a conflict between police officers and members of the public, particularly Plaintiffs herein, and caused the unlawful, unreasonable, and excessive use of force. Defendants DEROO and RUMBLE's instruction to Defendants CARSON and PETTY was thus a proximate cause of the violations of Plaintiffs' constitutional rights.

55. As a direct and proximate result of Defendants' actions, Plaintiffs have suffered severe damages, including but not limited to:

    a. Seizure;

    b. Loss of liberty;

    c. Psychological harm, past and future;

    d. Degradation, humiliation, embarrassment, loss of reputation, loss of enjoyment of life, and past and future mental anguish;

    e. Pain and suffering due to physical injury; and

    f. Loss of earnings.

## COUNT II:

### Fourth Amendment – False Arrest
### [42 U.S.C. § 1983]
### (Against Defendants CARSON, PETTY, GLOVER, PARAMOUNT, D.W. STUDIOS, DEROO, and RUMBLE)

56. Plaintiffs incorporate Paragraphs 1-55 as if fully restated herein.

12

57.   Defendant CARSON directly violated Plaintiffs' rights to be free from arrest without probable cause, said rights being secured by the Fourth and Fourteenth Amendments to the United States Constitution.

58.   Defendant PETTY violated Plaintiffs' rights to be free from arrest without probable cause by explicitly instructing Defendant CARSON to protect the alleged private copyright interests of Defendants PARAMOUNT and/or D.W. STUDIOS.  Defendant PETTY's instruction to Defendant CARSON was the proximate cause of Plaintiffs' wrongful arrests and consequent violations of their constitutional rights.

59.   Defendants PETTY and GLOVER also violated Plaintiffs' rights to be free from arrest without probable cause, by their failure to supervise, train, and discipline Defendant CARSON, who had a known history within DPD of arresting individuals without probable cause.  Defendants PETTY and GLOVER's failure to supervise, train, and discipline Defendant CARSON was a proximate cause of Plaintiffs' wrongful arrests and consequent violations of their constitutional rights.

60.   Defendants PARAMOUNT and D.W. STUDIOS also violated Plaintiffs' rights to be free from arrest without probable cause by explicitly instructing and conspiring with Defendants CARSON and PETTY to protect the alleged private copyright interests of Defendants PARAMOUNT and/or D.W. STUDIOS.  Defendants PARAMOUNT and D.W. STUDIOS' instruction to Defendants CARSON and PETTY was a proximate cause of Plaintiffs' wrongful arrests and consequent violations of their constitutional rights.

61.   Moreover, Defendants PARAMOUNT and D.W. STUDIOS willfully participated and conspired jointly with Defendant DETROIT to violate Plaintiffs' constitutional rights, insofar as Defendant DETROIT's police officers enforced Defendants PARAMOUNT and/or

13

D.W. STUDIOS' copyrights.  In doing so, Defendant DETROIT favored Defendants PARAMOUNT and/or D.W. STUDIOS' private interests over the valid, legitimate, and constitutional rights of others, in particular the Plaintiffs herein, and thereby violated the rights of others, in particular the Plaintiffs herein.

62.   Defendant CARSON's actions, as described in Paragraphs 28 through 34 above, were committed in furtherance of the conspiracy between Defendants PARAMOUNT, D.W. STUDIOS, and DETROIT.

63.   By means of their conspiracy with Defendant DETROIT, Defendants PARAMOUNT and D.W. STUDIOS acted under color of state law.

64.   Defendants DEROO and RUMBLE also violated Plaintiffs' rights to be free from arrest without probable cause by instructing and/or causing Defendants CARSON and PETTY to be instructed to protect the alleged copyright interests of Defendants PARAMOUNT and/or D.W. STUDIOS.  This unlawful instruction would and did inevitably lead to a conflict between police officers and members of the public, particularly Plaintiffs herein, and caused the unlawful, unreasonable and wrongful arrests.  Defendants DEROO and RUMBLE's instruction to Defendants CARSON and PETTY was thus a proximate cause of the violations of Plaintiffs' constitutional rights.

65.   As a direct and proximate result of Defendants' arrest of Plaintiffs without probable cause, Plaintiffs have suffered damages, including but not limited to:

a.   Seizure;

b.   Loss of liberty;

c.   Psychological harm, past and future;

d.   Degradation, humiliation, embarrassment, loss of reputation, loss of enjoyment of life, and past and future mental anguish; and

14

e.  Loss of earnings.

## COUNT III:
### Fourth Amendment – Malicious Prosecution
#### [42 U.S.C. § 1983]
#### (Against Defendants CARSON, PETTY, GLOVER, PARAMOUNT, D.W. STUDIOS, DEROO, and RUMBLE)

66.   Plaintiffs incorporate Paragraphs 1-65 as if fully restated herein.

67.   Defendant CARSON directly violated Plaintiffs' rights to be free from the initiation of criminal prosecutions without probable cause, said rights being secured by the Fourth and Fourteenth Amendments to the United States Constitution.

68.   Defendant CARSON initiated the aforementioned criminal prosecutions of Plaintiffs MENDOZA and CUPPETELLI by charging Plaintiffs with misdemeanor crimes, taking them into custody, requiring Plaintiffs to pay a bond in order to secure their release from jail, filing his report with the City of Detroit Law Department, and requiring Plaintiffs' appearance in the 36th District Court on October 4, 2010 and October 5, 2010, respectively.

69.   There was no probable cause for the aforementioned initiation of criminal prosecutions against these Plaintiffs.

70.   As a consequence of the criminal prosecutions initiated by Defendant CARSON, Plaintiffs MENDOZA and CUPPETELLI have suffered a deprivation of liberty and damages from the confinement that was imposed pursuant to legal process, insofar as Plaintiffs' bond money was withheld from them for a period time, they were required to appear in court, and they face a continued threat of charges for up to a year from the date of the incident.

71.   Although Defendant CARSON initiated the aforementioned criminal prosecutions, the charges were never perfected, and as of September 25, 2011, Defendant CARSON was no longer able to pursue these charges, so that they have been resolved favorably to the Plaintiffs

herein.

72.   Defendants PETTY and GLOVER violated Plaintiffs' rights to be free from prosecution without probable cause by their failure to supervise, train, and discipline Defendant CARSON, who had a known history within DPD of initiating prosecutions against persons without probable cause.  Defendants PETTY and GLOVER's failure to supervise, train, and discipline Defendant CARSON was a proximate cause of the violations of Plaintiffs' constitutional rights.

73.   Defendants PARAMOUNT and D.W. STUDIOS also violated Plaintiffs' rights to be free from prosecution without probable cause by explicitly instructing Defendants CARSON and PETTY to protect the alleged copyright interests of Defendants PARAMOUNT and/or D.W. STUDIOS.  In doing so, Defendant DETROIT favored Defendants PARAMOUNT and/or D.W. STUDIOS' alleged private interests over the valid, legitimate, and constitutional rights of others, and thereby violated the rights of others, in particular the Plaintiffs herein.  Defendants PARAMOUNT and D.W. STUDIOS' instruction to Defendants CARSON and PETTY was a proximate cause of the violations of Plaintiffs' constitutional rights.

74.   Moreover, Defendants PARAMOUNT and D.W. STUDIOS willfully participated and conspired jointly with Defendant DETROIT to violate the constitutional rights of individuals, including Plaintiffs herein, insofar as Defendant DETROIT's police officers enforced Defendants PARAMOUNT and/or D.W. STUDIOS' copyright and/or other private interests, even where those interests were in conflict with the constitutional rights of public citizens.

75.   Defendant CARSON's actions, as described in Paragraphs 28 through 34 above, were committed in furtherance of the conspiracy between Defendants PARAMOUNT, D.W.

16

STUDIOS, and DETROIT.

76.   By means of their conspiracy with Defendant DETROIT, Defendants PARAMOUNT and D.W. STUDIOS acted under color of state law.

77.   Defendants DEROO and RUMBLE also violated Plaintiffs' rights to be free from prosecution without probable cause by instructing and/or causing Defendant CARSON and PETTY to be instructed to protect the alleged copyright interests of Defendants PARAMOUNT and/or D.W. STUDIOS.  This unlawful instruction would and did inevitably lead to a conflict between police officers and members of the public, particularly Plaintiffs herein, and caused the unlawful and unreasonable initiation of Plaintiffs' criminal prosecution without probable cause. Defendants DEROO and RUMBLE's instruction to Defendants CARSON and PETTY was thus a proximate cause of the violations of Plaintiffs' constitutional rights.

78.   As a direct and proximate result of Defendants' prosecution of Plaintiffs without probable cause, Plaintiffs have suffered damages, including but not limited to:

    a.  Seizure;

    b.  Loss of liberty;

    c.  Psychological harm, past and future;

    d.  Degradation, humiliation, embarrassment, loss of reputation, loss of enjoyment of life, and past and future mental anguish; and

    e.  Loss of earnings.


## COUNT IV:

### First Amendment
### [42 U.S.C. § 1983]
### (Against Defendants CARSON, PETTY, GLOVER, PARAMOUNT, D.W. STUDIOS, DEROO, and RUMBLE)

79.   Plaintiffs incorporate Paragraphs 1-78, as if fully restated herein verbatim.

80.     In using and attempting to use his camera on Griswold Street in downtown Detroit on September 25, 2010, Plaintiff MENDOZA, acting in collaboration with Plaintiff CUPPETELLI, engaged in expressive conduct that was also a part of the Plaintiffs' professional interests and activities and that constituted speech and conduct protected by the First Amendment and Fourteenth Amendments to the United States Consitution.

81.     Defendant CARSON directly violated Plaintiffs' rights to freedom of speech, expression, and association, said rights being secured by the First and Fourteenth Amendments to the United States Constitution, by stopping Plaintiffs from engaging in such protected activity and by arresting Plaintiffs in retaliation for Plaintiff Mendoza's protest that he had been taking a photograph on a public street and the Plaintiffs' use of photography as a constitutionally protected expressive activity.

82.     Defendant PETTY violated Plaintiffs' First Amendment rights by explicitly instructing Defendant CARSON to protect the private copyright interests of Defendants PARAMOUNT and/or D.W. STUDIOS.  Defendant PETTY's instruction to Defendant CARSON was a proximate cause of the violations of Plaintiffs' constitutional rights.

83.     Defendants PETTY and GLOVER violated Plaintiffs' First Amendment rights by their failure to supervise, train, and discipline Defendant CARSON, who had a known history within DPD of preventing and stopping individuals from engaging in protected activity and of arresting individuals in retaliation for engaging in such activity.  Defendants PETTY and GLOVER's failure to supervise, train, and discipline Defendant CARSON was a proximate cause of the violations of Plaintiffs' constitutional rights.

84.     Defendants PARAMOUNT and D.W. STUDIOS also violated Plaintiffs' First Amendment rights by explicitly instructing Defendants CARSON and PETTY to protect the

18

alleged copyright interests of Defendants PARAMOUNT and/or D.W. STUDIOS and to prevent

people from taking photos on a public street.  In doing so, Defendant DETROIT favored

Defendants PARAMOUNT and/or D.W. STUDIOS' private interests over the valid, legitimate,

and constitutional rights of others, in particular the Plaintiffs herein, and thereby violated the

rights of others, in particular the Plaintiffs herein.  Defendants PARAMOUNT and D.W.

STUDIOS' instruction to Defendants CARSON and PETTY was a proximate cause of the

violations of Plaintiffs' constitutional rights.

85.     Moreover, Defendants PARAMOUNT and D.W. STUDIOS willfully participated

and conspired jointly with Defendant DETROIT, through its supervisors and/or policymakers, to

violate the constitutional rights of individuals, including Plaintiffs herein, insofar as Defendant

DETROIT's police officers enforced Defendants PARAMOUNT and/or D.W. STUDIOS'

copyright and/or other private interests, even where those interests were in conflict with the

constitutional rights of the public.

86.     Defendant CARSON's actions, as described in Paragraphs 28 through 34 above,

were committed in furtherance of the conspiracy between Defendants PARAMOUNT, D.W.

STUDIOS, and DETROIT.

87.     By means of their conspiracy with Defendant DETROIT, Defendants

PARAMOUNT and D.W. STUDIOS acted under color of state law.

88.     Defendants DEROO and RUMBLE also violated Plaintiffs' First Amendment rights

by instructing and/or causing Defendants CARSON and PETTY to be instructed to protect the

alleged copyright interests of Defendants PARAMOUNT and/or D.W. STUDIOS.  This

unlawful instruction inevitably led to a conflict between police officers and members of the

public, particularly Plaintiffs herein, and caused the unlawful interference with Plaintiffs'

19

exercise of protected First Amendment activity. Defendants DEROO and RUMBLE's instruction to Defendants CARSON and PETTY was thus a proximate cause of the violations of Plaintiffs' constitutional rights.

89.   As a direct and proximate result of Defendants' violation of Plaintiffs' First Amendment rights, Plaintiffs have suffered severe damages, including but not limited to:

    a.   Seizure;

    b.   Loss of liberty;

    c.   Psychological harm, past and future;

    d.   Degradation, humiliation, embarrassment, loss of reputation, loss of enjoyment of life, and past and future mental anguish;

    e.   Pain and suffering due to physical injury; and

    f.   Loss of earnings.

### COUNT V:
### Fourth Amendment – Unreasonable Conditions of Seizure
### In the Alternative, Fourteenth Amendment – Substantive Due Process
### [42 U.S.C. § 1983]
### (Plaintiff CUPPETELLI only – Against Defendants GLOVER and DETROIT)

90.   Plaintiff CUPPETELLI incorporates Paragraphs 1-89 as if fully restated herein.

91.   Following Plaintiff CUPPETELLI's warrantless arrest and prior to any probable-cause hearing, CUPPETELLI's Fourth Amendment right to be free from the unreasonable conditions of a seizure was also violated in the following ways:

    a.   Defendant GLOVER sat alone with Plaintiff CUPPETELLI in an isolated room prior to CUPPETELLI's booking and stared at her for long periods of time, for no legitimate governmental purpose other than to harass and humiliate her;

    b.   She was physically frisked in a humiliating fashion by a female DPD officer – including an attempt to frisk her underneath her bra – in front of several male DPD officers, including Defendants CARSON and GLOVER, for no legitimate governmental purpose other than to harass and humiliate her; and

20

    c. She was forced, if she needed to urinate, to do so in a humiliating fashion in the vicinity of several male DPD officers, who could easily see her if they chose to look, for no legitimate governmental purpose other than to harass and humiliate her.

92.    The conduct described in Paragraph 91 above had no legitimate counter-veiling governmental interest other than to harass and humiliate Plaintiff CUPPETELLI.

93.    In the alternative, the conduct described in Paragraph 91 above violated Plaintiff CUPPETELLI's Fourteenth Amendment right to substantive due process and bodily integrity. Said conduct was so egregious and so outrageous that it shocks the contemporary conscience, and it constituted an arbitrary exercise of governmental power, unjustified by any governmental interest whatsoever.

94.    As a direct and proximate result of Defendants GLOVER and DETROIT's violations of Plaintiffs' Fourth and/or Fourteenth Amendment rights, Plaintiff CUPPETELLI has suffered injuries, including but not limited to:

    a. Psychological harm, past and future;

    b. Degradation, humiliation, embarrassment, loss of reputation, loss of enjoyment of life, and past and future mental anguish.

### COUNT VI:

### *Monell* Claim
### [42 U.S.C. § 1983]
### (Against Defendant CITY OF DETROIT)

95.    Plaintiffs incorporate Paragraphs 1-94 as if fully restated herein.

96.    At all times herein, Defendant DETROIT, through its supervisors and/or policymakers, established, promulgated, implemented, and/or maintained the following customs, policies, and/or practices:

    a. To infringe upon and punish expressive activity protected by the First

21

Amendment to the United States Constitution by condoning and/or acquiescing in the arrests and prosecutions of persons who take or attempt to take photographs in public places, such as the streets of the City of Detroit;

b.  To inadequately and/or fail to train, supervise, and/or discipline police officers and supervisors, with regard to the fact that the use of photography for expressive, artistic, and professional activities is protected by the First Amendment to the United States Constitution and therefore cannot be a basis for arrests, prosecutions, and/or the use of force;

c.  To hire and/or retain as police officers and supervisors certain persons when the aforementioned Defendant DETROIT knew, or had actual notice, that these persons employed excessive and unreasonable force;

d.  To hire and/or retain as police officers and supervisors certain persons when the aforementioned Defendant DETROIT knew, or had actual notice, that these persons undertook and engaged in arrests that lacked probable cause;

e.  To inadequately train, supervise, and/or discipline those police officers and supervisors when the aforementioned Defendant DETROIT knew, or had actual notice, that these officers and supervisors employed excessive and unreasonable force;

f.  To inadequately train, supervise, and/or discipline those police officers and supervisors when the aforementioned Defendant DETROIT knew, or had actual notice, that these officers and supervisors undertook and engaged in arrests that lacked probable cause;

g.  To inadequately train, supervise, and/or discipline police officers and supervisors with regard to the false, malicious, and improper initiation of criminal charges that lacked probable cause;

h.  To hire and/or retain as police officers and supervisors certain persons when the aforementioned Defendant DETROIT knew, or had actual notice, that these persons engaged in conduct amounting to the imposition of shocking conditions of confinement on female prisoners in their custody; and

i.  To inadequately train, supervise, and/or discipline those police officers and supervisors when the aforementioned Defendant DETROIT knew, or had actual notice, that these officers and supervisors engaged in conduct amounting to the imposition of shocking conditions of confinement on female prisoners in their custody.

97.   Each of the aforementioned customs, policies, and/or practices, i.e., the failures to

train, supervise, and/or discipline the individual Defendants and other nonparty employees, was

22

known to Defendant DETROIT as being highly likely and probable to cause violations of the constitutional rights of members of the public, in particular the Plaintiffs herein.  Each such custom, policy, and/or practice was a moving force in the violations of Plaintiffs' constitutional rights, as set forth herein.

98.   As a direct and proximate result of Defendants' customs, policies and/or practices – which were a moving force in the violations of Plaintiffs' Constitutional rights, as set forth in Counts I-V above – Plaintiffs have suffered severe damages, including but not limited to:

    a.  Seizure;

    b.  Loss of liberty;

    c.  Psychological harm, past and future;

    d.  Degradation, humiliation, embarrassment, loss of reputation, loss of enjoyment of life, and past and future mental anguish;

    e.  Pain and suffering due to physical injury; and

    f.  Loss of earnings.

## COUNT VII:
### Conspiracy in Violation of § 1983
### [42 U.S.C. § 1983]
### (Against Defendants PARAMOUNT and D.W. STUDIOS)

99.   Plaintiffs incorporate Paragraphs 1-98 as if fully restated herein.

100.  Defendants PARAMOUNT and D.W. STUDIOS willfully participated in joint action and conspired with Defendant DETROIT to violate the constitutional rights of individuals, including Plaintiffs herein, insofar as they directed Defendant DETROIT's police officers to enforce Defendants PARAMOUNT and/or D.W. STUDIOS' copyright and/or other private interests.  In doing so, these Defendants favored Defendants PARAMOUNT and/or D.W.

23

STUDIOS' private interests over the valid, legitimate, and constitutional rights of others, in particular the Plaintiffs herein, and thereby violated the rights of others, in particular the Plaintiffs herein.

101.  Defendant CARSON's actions, as described in Paragraphs 28 through 34 above, were committed in furtherance of the conspiracy between Defendants PARAMOUNT, D.W. STUDIOS, and DETROIT.

102.  By means of their conspiracy with Defendant DETROIT, Defendants PARAMOUNT and D.W. STUDIOS acted under color of state law.

103.  As a direct and proximate result of Defendants PARAMOUNT and D.W. STUDIO's conspiracy with Defendant DETROIT to violate Plaintiffs' constitutional rights, Plaintiffs have suffered severe damages, including but not limited to:

    a.  Seizure;

    b.  Loss of liberty;

    c.  Psychological harm, past and future;

    d.  Degradation, humiliation, embarrassment, loss of reputation, loss of enjoyment of life, and past and future mental anguish;

    e.  Pain and suffering due to physical injury; and

    f.  Loss of earnings.

### REQUESTED RELIEF

**WHEREFORE**, Plaintiffs demand the following relief, jointly and severally against all Defendants:

    (a)  A declaration that Defendants violated the federal constitutional rights of Plaintiffs;

    (b)  Compensatory damages for physical, emotional, psychological, and economic injuries suffered by Plaintiffs by reason of Defendants' unlawful and unjustified

conduct, in an amount that is fair, just, and reasonable and in conformity with the evidence at trial;

(c) Punitive and exemplary damages against the individual Defendants to the extent allowable by law;

(d) Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

(e) The costs and disbursements of this action pursuant to 42 U.S.C. § 1920; and

(f) Such other and further relief as appears just and proper.


Respectfully submitted,

GOODMAN & HURWITZ, P.C.

*s/Kathryn Bruner James*
Kathryn Bruner James (P71374)
William H. Goodman (P14173)
Julie H. Hurwitz (P34720)
*Attorneys for Plaintiffs*
1394 E. Jefferson Ave.
Detroit, MI 48207
(313) 567-6170
(313) 567-4827 fax
mail@goodmanhurwitz.com

Dated: September 24, 2012

25

## DEMAND FOR JURY TRIAL

Plaintiffs CRISTOBAL MENDOZA and ANNICA CUPPETELLI, by and through

undersigned counsel, hereby demand a trial by jury on all issues of this cause.

Respectfully submitted,

GOODMAN & HURWITZ, P.C.

*s/Kathryn Bruner James*
Kathryn Bruner James (P71374)
William H. Goodman (P14173)
Julie H. Hurwitz (P34720)
*Attorneys for Plaintiffs*
1394 E. Jefferson Ave.
Detroit, MI 48207
(313) 567-6170
(313) 567-4827 fax
mail@goodmanhurwitz.com

Dated: September 24, 2012

## CERTIFICATE OF SERVICE

I hereby certify that on September 24, 2012, I electronically filed the foregoing pleading with the Clerk of the Court using the ECF system, which will send notification of such filing to all attorneys of record.

Further, a copy of this pleading will be served with the Summons and Complaint on all new Defendants.

*s/Kathryn Bruner James*
Kathryn Bruner James (P71374)
*Attorneys for Plaintiffs*
kjames@goodmanhurwitz.com

26