UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:                                                    Chapter 9

City of Detroit, Michigan,                                No. 13-53846

                    Debtor.                               Hon. Steven W. Rhodes

_____/

## SUPPLEMENTAL STATEMENT OF THE DETROIT POLICE OFFICERS ASSOCIATION INCLUDING COLLECTIVE BARGAINING AGREEMENT LANGUAGE IN SUPPORT OF DISCHARGE OF <u>INDIRECT EMPLOYEE INDEMNIFICATION CLAIMS</u>

The Detroit Police Officers Association (the "DPOA"), through its counsel Erman, Teicher, Zucker & Freedman, P.C. files this Supplemental Statement Including Collective Bargaining Agreement Language in Support of Discharge of Indirect Employee Indemnification Claims (the "Supplemental Statement"):

1.      At the confirmation hearing held on October 27, 2014, this Court raised questions about the City's request to discharge the Indirect Employee Indemnification Claims specifically related to whether the City's obligation to indemnify was discretionary.  As set forth herein, that obligation, upon a final determination that it exists, is mandatory.

2.     The DPOA, through counsel, attempted to address the Court's question at the time of the hearing but did not have at hand the precise language that controlled the answer. The DPOA files this Supplemental Statement including the language of the DPOA's state approved collective bargaining agreement with the City (the "DPOA CBA").

3.     Attached as Exhibit A is a copy of the DPOA CBA.[1]  Pursuant to the terms of the DPOA CBA, Exhibit A, Section 27, p. 44, the City is obliged to provide a defense and to indemnify DPOA members under certain specified circumstances.  Specifically:

"The City *will* provide legal counsel and pay any costs and judgments that arise out of lawsuits filed against Employees alleging any act committed while said Employee was in the good faith performance of his duties. A contrary determination by the City is not final and binding as provided by the Municipal Code of the City of Detroit but is subject to review by an arbitration panel under the grievance arbitration provisions of this Agreement. Pending a final determination of whether or not the Employee is entitled to defense and

---

[1] At the October 27, 2014 hearing, counsel for the City indicated that it intended to seek approval of the state approved collective bargaining agreements (the "CBAs") it had reached with its various unions, including the DPOA and other public safety unions.  Because the CBAs have not yet been filed by the City, a copy of the referenced DPOA CBA is being submitted as an exhibit to this Supplemental Statement.

indemnification by the City, the City shall promptly undertake such defense on behalf of such Employee.

This provision shall otherwise be in accordance with Section 13-11-3 of the Municipal Code of the City of Detroit."

DPOA CBA, Exhibit A, Section 27, p. 44 (emphasis added).

4.     Section 13-11-1 of the City's Municipal Code provides as follows:

"For the purpose of this article, the following definitions shall apply: *Employees* shall include, in addition to appointees as defined in the Charter, and all employees on the city payroll, including all physicians and dentists employed on a salaried or contractual basis by the department of health, retired employees or appointive officers, and all physicians and dentists whether volunteers, staff, intern, resident or special duty, whether or not on city payrolls, assigned to patient care duties in Detroit General Hospital, whose credentials have been approved by the director of hospitals.

*Official duties* shall mean acts done pursuant to authority conferred by law or within the scope of employment or in relation to matters committed by law to the officer or employee's control or supervision or committed to the department or office under whose authority the officer or employee is acting, whether or not there is negligence in the doing of such acts. Where there is willful misconduct or lack of good faith in the doing of any such acts, the same shall not constitute the performance of the official duties of any appointive officer or employee of the city within the operation or effect of this article."

See City of Detroit Municipal Code 1964, § 16-13-1; Ord. No. 516-H, § 1, 9-29-82.

5.     Although Section 13-11-2 of the City's Municipal code provides that:

[a]t the discretion of and only upon approval by the city council, the city may pay, on behalf of any city officer or employee, all or part of any sum which such officer or employee might become legally obligated to pay as damages because of:(1) Bodily injury, sickness or disease, including death, at any time resulting therefrom, sustained by any person; or (2) Injury to or destruction of property, including the loss of use thereof; or (3) Illegal confinement, detention or other alleged injury

3

caused by or arising out of the performance in good faith of the official duties of any such officer or employee . . . ,"

this provision of the Municipal Code is subject to the employee's rights under the DPOA CBA.

6.     The City's Eight Amended Plan for the Adjustment of Debts of the City of Detroit (October 22, 2014) (the "Plan") proposes to discharge claims against DPOA and other public safety union members for which they are entitled to indemnification from the City as Indirect Employee Indemnification Claims. See Docket No. 8046, pp. 25, 28-29, 57. Before any Indirect Employee Indemnification Claim can be discharged, there must be a final determination of the employee's right to indemnification. The DPOA has supported and continues to support that request. See Pre-Trial Brief of the DPOA [Docket No. 7202]. The City will continue to have an obligation to provide any affected employee with a defense, pending a final determination of the City's indemnification obligation. The City's inclusion of the discharge of the Indirect Employee Indemnification Claims in the Plan distinguishes this case from *V.W. ex rel Barber v. City of Vallejo*, 2013 WL 3992403 (E.D. Cal. Aug. 2, 2013).

7.     If this Court does not grant the City's request to discharge the Indirect Employee Indemnification Claims, the DPOA CBA, consistent with past City practice and prior collective bargaining agreements, obliges the City to indemnify

any DPOA member who successfully asserts a right to indemnification in the ordinary course. Failure to discharge the Indirect Employee Indemnification Claims would, as the City's counsel noted at the hearing, create a preferred class of creditors for claims that ultimately look to the City for recovery. It would also, given the City's cash strapped status and the mandatory nature of the City's obligation, create a potentially perverse incentive for the City to seek to avoid its indemnification obligations to individual police officers.

## RELIEF REQUESTED

WHEREFORE, the Detroit Police Officers Association respectfully requests that this Court confirm the City's Plan and, in doing so, consider this Supplemental Statement and find that the Indirect Employee Indemnification Claims are discharged.

Respectfully submitted,
ERMAN, TEICHER, ZUCKER & FREEDMAN, P.C.

By:   /s/ Barbara A. Patek
     Earle I. Erman  (P24296)
     Craig E. Zucker  (P39907)
     Barbara A. Patek (P34666)
     Counsel for the Detroit Police Officers Association
     400 Galleria Officentre, Suite 444
     Southfield, MI  48034
     Telephone: (248) 827-4100
     Facsimile:  (248) 827-4106
     E-mail:  bpatek@ermanteicher.com

DATED:   November 6, 2014
F:\CHAP 9\DETROIT\Plan of Adjustment\Supplemental Statement Including CBA Language In Support of Discharge of Indirect Employee Indemnification Claims.docx

5

13-53846-tjt  Doc 8720  Filed 12/15/14  Entered 12/15/14 15:07:10  Page 5 of 5
13-53846-swr  Doc 8191  Filed 11/06/14  Entered 11/06/14 15:07:10  Page 5 of 5

# EXHIBIT A

# Part 1

# MASTER AGREEMENT

**BETWEEN THE**

# CITY OF DETROIT

**AND THE**

## DETROIT POLICE
## OFFICERS ASSOCIATION

# 2014 - 2019

CHI-1939680v4

# LAW ENFORCEMENT-CODE OF ETHICS

As a law enforcement officer, my fundamental duty is to serve mankind; to safeguard lives and property; to protect the innocent against deception; the weak against oppression or intimidation; and the peaceful against violence or disorder; and to respect the constitutional rights of all persons to liberty, equality and justice.

I will keep my private life unsullied as an example to all; maintain courageous calm in the face of danger, scorn or ridicule; develop self-restraint; and be constantly mindful of the welfare of others. Honest in thought and deed in both my personal and official life, I will be exemplary in obeying the laws of the land and the regulations of my department. Whatever I see or hear of a confidential nature or that is confided to me in my official capacity will be kept ever secret unless revelation is necessary in the performance of my duty.

I will never act officiously or permit personal feelings, prejudices, animosities, or friendships to influence my decisions. With no compromise for crime and with relentless prosecution of criminals, I will enforce the law courteously and appropriately without fear or favor, malice or ill will, never employing unnecessary force or violence, and never accepting gratuities.

I recognize the badge of my office as a symbol of public faith, and I accept it as public trust to be held so long as I am true to the ethics of police service. I will constantly strive to achieve these objectives and ideals, dedicating myself before God to my chosen profession -- LAW ENFORCEMENT.

The Law Enforcement Officers Code of Ethics, by agreement of the parties, is not a provision or article of this contract, but rather is included herein to remind all who read this document of the dedication, sacrifice, courage, valor, judgment, wisdom, responsibility, accountability, loyalty and professionalism which is displayed by the membership of the Detroit Police Officers Association while serving the citizens of the City of Detroit.

CHI-1939680v4

# AGREEMENT

This Agreement is entered into between the City of Detroit, a Michigan Municipal Corporation (hereinafter referred to as the "City," the "Department," or the "Employer"), and the Detroit Police Officers Association, an organization existing under the laws of the State of Michigan (hereinafter referred to as the "Union" or the "Association").

# PURPOSE AND INTENT

The general purpose of this Agreement is to set forth terms and conditions of employment and to promote orderly and peaceful labor relations for the mutual interest of the City of Detroit in its capacity as an Employer, the Employees, the Union and the people of the City of Detroit.

The parties recognize that the interest of the community and the job security of the Employees depend upon the Employer's success in establishing proper services to the community.

To these ends, the Employer and the Union encourage to the fullest degree friendly and cooperative relations between the respective representatives at all levels and among all employees.

# 1. DEFINITIONS

A.   "Association" or "Union" means Detroit Police Officers Association, Inc.

B.   "Employee" means any person who is a Police Officer below the rank of Detective employed by the Detroit Police Department.

C.   "Department" means the Detroit Police Department.

D.   "Employer" means the Detroit Police Department or the City of Detroit.

E.   "Commanding Officer" means the officer officially designated by the Detroit Police Department as the commander of a given entity.

F.   "Reviewing Officer" means the superior officer in charge of the next higher command or level above the commanding officer of the employee originating the grievance.

G.   "Labor Relations" means Labor Relations of the Detroit Police Department.

H.   "Grievance" means the claimed unjust treatment, violation, misinterpretation, or inequitable application of any of the provisions of this Agreement or rules, regulations, and procedures covering working conditions applicable to the employees of the Department.

I.   "Association Officer" means any one of the four elected officers of the Association -- President, Vice-President, Secretary-Treasurer and Sergeant-at-Arms.

J.      "Steward" means the agent of the Association at the lowest departmental unit, that is, the representative at the precinct, or entity, or other similar level.

K.      "Alternate Steward" means the agent of the Association who shall function in the absence of the steward.

L.      "Chief Steward" means the representative of the Association at the precinct level other than Association officer.

M.      "Alternate Chief Steward" means the agent of the Association who shall function in the absence of the Chief Steward.

N.      "Executive Board" means the nine (9) elected members of the Board of Directors of the Association and the four (4) elected officers of the Association, as defined in the Association's by-laws.

O.      "Board of Directors" means all of the stewards and the Executive Board.

P.      "Grievance Committee" means a committee of not more than three (3) members designated by the Union to review, screen and adjust grievances presented by employees.

Q.      "Shall" and "will" as used in this contract have the same meaning; they are used to express what is mandatory or obligatory.

R.      Pronouns of masculine and feminine gender include each other.

# 2. RECOGNITION OF UNION

Pursuant to and in accordance with all applicable provisions of Act 336 of the Public Acts of 1947, as amended, the Employer hereby recognizes the Union as the exclusive representative for the purpose of collective bargaining in respect to rates of pay, wages, hours of employment, and other terms and conditions of employment for all Police Assistants and Police Officers of the Detroit Police Department, below the rank of Detective, for the term of this Agreement.

# 3. UNION SECURITY

A.      Employees are free to join or not to join the Union.

B.      Employees who are not members of the Union and who desire membership in the Union shall confirm their desire to join for the duration of this Agreement by initiating their Union application form and dues deduction authorization forms within forty-five (45) calendar days after the effective date of this Agreement.

C.      Any person who is employed with the City prior to the effective date of this Agreement and is covered by this Agreement who is not a member of the Union and who does not make application for membership within forty-five (45) calendar days after the effective date of this Agreement shall, as a condition of employment, pay to the Union each month a service charge as a contribution toward the administration of this Agreement in an amount equal to the regular Union membership dues. Employees who fail to comply

with this requirement shall be discharged by the Employer within thirty (30) calendar days after receipt of written notice to the Employer from the Union, unless the City is otherwise notified by the Union in writing within said thirty (30) calendar days.

D.  Any person who becomes an employee of the City after this Agreement is in effect and is covered by this Agreement who is not a member of the Union and who does not make application for membership within ninety (90) calendar days from the date of employment shall, as a condition of employment pay to the Union each month a service charge as a contribution toward the administration of this Agreement in an amount equal to the regular monthly Union membership dues. Employees who fail to comply with this requirement shall be discharged by the Employer within thirty (30) calendar days after receipt of written notice to the Employer from the Union, unless the City is otherwise notified by the Union in writing within said thirty (30) calendar days.

E.  All deductions under this Article shall be subject to revocation by the employee who executed such assignments, upon giving written notice within thirty (30) calendar days immediately prior to the expiration date of this Agreement, to assignees and the Finance Director. The Finance Director and the City Treasurer shall thereafter cease withholding any money whatever under such assignments.

F.  The Union shall have no rights or interest whatsoever in any money authorized withheld until such money is actually paid over to it; however, the City shall promptly remit said monies received to the Union. The City or any of its officers and employees shall not be liable for any reasonable delay in carrying out such deductions, and upon forwarding check in payment of such deductions by mail to the Union's last known address, the City and its officers and employees shall be released from all liability to the employee and the Union under such assignments (Section 13-4-4 of the Municipal Code of the City of Detroit).

G.  If any provision of this Article is invalid under Federal Law, or the laws of the State of Michigan, said provision shall be modified to comply with the requirements of Federal or State Law or shall be re-negotiated for the purpose of adequate replacement.

H.  <u>Dues Deduction.</u>

The Employer agrees to deduct from the wages of bargaining unit employees, all Union membership dues, initiation fees and assessments uniformly required, if any, as provided in a written authorization in accordance with the standard form used by the Employer provided that the said form shall be executed by the employee. The written authorization for Union dues deduction or service fee deductions shall remain in full force and effect during the period of this Agreement and may only be revoked within the thirty (30) calendar day period immediately prior to the expiration of this contract. The revocation notice must be given to both the Employer and the Union.

Dues and initiation fees will be authorized, levied and certified in accordance with the constitution and by-laws of the Union. Each bargaining unit employee and the Union hereby authorize the City to rely upon and to honor certifications by the Secretary-Treasurer of the Union regarding the amounts to be deducted and the legality of the adopting action specifying such amounts of the Union dues and initiation fees.

I.   Service Fee Deduction.

The Employer agrees to deduct from the wages of any bargaining unit employee who is not a member of the Union all Union service fees as provided in a written authorization in accordance with the standard form used by the Employer provided that the said form shall be executed by the employee. The written authorization for service fee deduction shall remain in full force and effect during the period of this contract and may only be revoked on written notice within the thirty (30) calendars day period immediately prior to the expiration of this contract. The revocation notice must be given both to the Employer and to the Union.

J.   The Employer agrees to deduct from the wages of bargaining unit Employees a political contribution deduction as provided for in a written authorization in accordance with the standard form used by the Employer, provided that the form shall be executed by the Employee. The amount to be deducted shall be a set amount which shall be deducted on a bi-weekly basis. The Secretary-Treasurer of the Union shall notify the City, in writing, of the amount to be deducted. This deduction may be revoked by the Employee at any time by giving written notice to both the Finance Department and to the Union.

K.   The Association shall refund to Employees, dues and service fees erroneously deducted by the City and paid to the Association. The City may offset any amount erroneously or improperly deducted and paid to the Association from any subsequent remittance to the Association.

L.   The Union agrees that in the event of litigation against the City, its agents, or Employees arising out of this provision it will co-defend and indemnify and hold harmless the City, its agents, or Employees from any monetary award arising out of such litigation.

# 4. BASIS OF REPRESENTATION

A.   In each representative Precinct (See Schedule A) Employees shall be represented by one (1) steward for each shift, who shall be a regularly scheduled bargaining unit employee working in that Precinct and on that shift. One (1) alternate may be selected in each Precinct for each shift to serve in the absence of the steward. The member selected shall, for the purpose of title only, be considered a steward and not an alternate steward.

B.   The representative units and number of representatives allocated to each entity are listed in Schedule A attached to this Agreement. If any existing precinct, or entity is eliminated or any new precinct, or entity is created, or if the number of bargaining unit personnel of any existing entity is increased or decreased substantially, the parties to this Agreement shall re-negotiate the number of representatives allocated to such entity on a basis consistent with the principle of proportional representation.

C.   Stewards shall be allowed to communicate official Union business to members prior to on-duty roll call or following off-duty roll call.

D.   Only one (1) chief steward and one (1) steward from each shift shall enjoy top seniority insofar as remaining with their precinct, section, unit, district or platoon during their term

of office, and they shall not be transferred out of their Precinct, Section, Unit, District or Platoon, except for justifiable cause, reduction in force, or in connection with civilianization and/or use of Police Assistants in accordance with the terms of this Agreement. This provision will apply when reductions in force occur except when a Section, Unit, or Platoon is discontinued or otherwise inactivated or consolidated.

E.  Those nine (9) stewards who are members of the Executive Board of the Union shall be allowed a minimum of one (1) working day a month without loss of pay or benefits to attend Executive Board meetings.

F.  Only one (1) steward from each representative Precinct, Section, or Unit shall be excused from work without loss of pay or benefits to attend the monthly Board of Directors meetings when such meetings coincide with their normal working hours.

G.  The President, Vice President, Secretary-Treasurer and Sergeant-at-Arms shall be allowed to conduct Union business on a full-time basis without loss of pay or benefits. When reductions in force occur, the above titled officers will have top seniority under Article 10.

H.  The Union officers upon leaving their positions shall have the right to return to their previous assignment.

I.  Union officers shall be permitted to discuss Union business with members during their duty hours, provided such discussions shall not interfere with the performance of the member's duties. Such discussions shall not interfere with the normal operations of the precinct, or entity involved.

J.  In the event of a full mobilization of the Department's resources, now known as a M02 complete, the Union officers shall contact the office of the Chief of Police and shall remain available during the period of the mobilization for the purpose of establishing a Department/Union liaison to deal with any labor relations problem which may arise.

K.  The Union President, or in his/her absence, the next Union officer in line, shall be given written notice, in advance, of anticipated major changes in working conditions.

L.  A copy of each special order, general order, notation, personnel order, training bulletin and materials that are distributed to the general membership shall be sent promptly to the Union President through the Department mails.

M.  A copy of photographs of all Department functions shall be available to the Union upon request on each specific occasion.

N.  Within thirty (30) days after the effective date of this Agreement, the Union President shall provide the Chief of Police written confirmation of the names of all stewards, chief stewards, the nine (9) stewards who are members of the Executive Board, Union officers, designated representatives, and Grievance Committee members who will function in an official capacity for the Union. As changes occur, the President shall notify the Chief of Police, in writing, within a reasonable time.

O.   The Association may establish a three-member Grievance Committee for the purpose of working under the authority of the Union President in processing grievances. Grievance Committee members shall receive two (2) working days off per week in order to investigate and process grievances. Grievance Committee members may also attend those meetings and hearings as set forth in the grievance and arbitration articles of this contract and any other meetings or hearings with officials of the City with the permission of the Labor Relations Section. Such permission shall not be unreasonably denied.

P.   The stewards and chief stewards may, during their working hours without loss of time, pay or benefits, investigate and present grievances to the Employer, after having obtained release from work from their supervisors. Such release shall be within a reasonable time. Such privilege shall not interfere with vital police service. The stewards and chief stewards shall not be released for simultaneous investigation of grievances, unless mutually agreed between the Chief Steward and the Desk Supervisor.

Q.   Special Conferences on important matters may be requested by either party and will be arranged between the Union President or his/her designated representative and either the Board of Police Commissioners or their designated representative, or the Chief of Police or his/her designated representative. When the Union elects to have a special conference with the Board of Police Commissioners, the Union shall submit a copy of the request to the Chief of Police.

Arrangements for such special conferences shall be made five (5) calendar days in advance whenever possible and an agenda of matters to be taken up at the meeting shall be presented in writing at the time the conference is requested. Matters taken up in special conferences shall be confined to those included on the agenda.

## 5. UNION RESPONSIBILITIES

A.   Recognizing the crucial role of law enforcement in the preservation of the public health, safety and welfare of a free society, the Union agrees that it will take all reasonable steps to cause the Employees covered by this Agreement, individually and collectively, to perform all police duties, rendering loyal and efficient service to the very best of their abilities.

B.   The Union, therefore, agrees that there shall be no interruption of these services for any cause whatsoever by the Employees it represents; nor shall there by any concerted failure by them to report for duty; nor shall they absent themselves from their work or abstain, in whole or in part, from the full, faithful and proper performance of all the duties of their employment.

C.   The Union further agrees that it shall not encourage any strikes, sit-downs, stay-ins, slow-downs, stoppages of work, malingering or any acts that interfere in any manner or to any degree with the continuity of police services.

# 6. MANAGEMENT RIGHTS AND RESPONSIBILITIES

A.   Both the Department and the Association acknowledge their shared responsibility for the enforcement of the laws and ordinances of the City of Detroit and the State of Michigan as well as for assuring the safety and property of the citizens of the City of Detroit, and agree to work together cooperatively to maintain the highest standards of professionalism and integrity in the service of the City and its citizens.  The Union recognizes the prerogatives of the Department to operate and manage its affairs in all respects in accordance with its responsibilities and powers of authority and the terms and provisions of this Agreement. Except as specifically limited by the provisions of this Agreement or applicable law, the Department will have the discretion and authority:

1.   to hire, direct, classify, assign, reassign, promote, demote, evaluate, transfer, layoff, and/or recall Employees, including the assignment or reassignment of Employees;

2.   to determine the size of its workforce, including the number of Employees, the number of job classifications, departments, and shifts of work whether increased or decreased;

3.   to develop, establish, or modify job descriptions and job postings for positions in the Department;

4.   to determine policies affecting the selection, evaluation and training of Employees;

5.   to establish and modify hours of work, including the beginning and ending time for shifts of work, whether increased or decreased, and the establishment of the hours of the shifts, whether increased or decreased;

6.   to determine the content and nature of the work to be performed, and the competencies and qualifications needed to perform the work;

7.   to determine the organizational structure of the Department, including the planning, direction, control, increase, decrease, or discontinuance of operations or services, and the organization of the same;

8.   to determine the location and types of facilities, including the establishment of new units, precincts, departments, divisions, or subdivisions thereof and the right to transfer Employees and equipment between and among the Department's various facilities;

9.   to establish, regulate, determine, revise, or modify at any time the policies, practices, protocols, processes, techniques, methods, means and procedures used in the Department, including, but not limited to machinery, materials, methods, facilities, tools, and equipment;

10.  to transfer, relocate, merge, consolidate or close its facilities and operations, in whole or in part, and to separate its Employees in connection with said

transferring, relocation, merger, consolidation or closing after discussing the effects of such decision with the Association to the extent required by law;

11. to create and maintain special units and to select Employees to work within such special units provided that the Department will provide reasonable notice to the Association;

12. to establish and enforce policies pertaining to drug testing and substance abuse;

13. to assign an Employee to work in a restricted capacity for good cause;

14. to enforce state and local licensing, certifications, and other requirements;

15. to subcontract or civilianize any job or job function, subject to the limits set forth in Article 39.H of this Agreement; and

16. with respect to any other matter related to the enforcement of the laws of the City of Detroit or the State of Michigan and the protection of its citizens and their property.

B. The Department has the right to schedule overtime work as required in a manner most advantageous to the Department and consistent with requirements of municipal employment and the public safety and consistent with the provisions of this Agreement.

C. It is understood by the parties that every incidental duty connected with operations enumerated in job descriptions is not always specifically described.

D. The Department reserves the right to discipline and discharge for just cause and to establish reasonable work rules and rules of conduct. The Department reserves the right to lay off Employees for lack of work or funds or for the occurrence of conditions beyond the control of the Department or when such continuation of work would be wasteful and unproductive.

E. The City of Detroit is obligated, legally and morally, to provide equality of opportunity, consideration and treatment of all members of the Department and to establish policies and regulations that will insure such equality of opportunity, consideration and treatment of all members employed by the Department in all phases of the employment process, without regard to race, color, creed, national origin, citizenship status, religion, age, political orientation, sex, sexual orientation, genetic information, arrest record, height, weight, familial status, marital status, or disability, in accordance with applicable State and Federal laws. To this end, basic rights and equities of members are established through the City Charter, Executive Orders of the Mayor, Ordinances and Resolutions of the City Council and the rules of the Department.

F. The Department shall notify in advance, in writing, the Association President, or in his absence the next officer in line, when it anticipates exercising its right to make changes in working conditions. Conferences to discuss said anticipated changes shall be conducted at the request of either party. Such conferences shall not be construed as "formal" negotiations. Provided however, in no event shall the City make decisions which alter

CHI-1939680v4                                           8

the relationship between the parties in regard to wages, hours, and the terms and conditions of employment as set forth in this Agreement. Any changes in that area require renegotiations of the contract.

G.    No Department official or agent of the City shall:

    1.    Interfere with, restrain, or coerce Employees in the exercise of their right to join or refrain from joining a labor organization, except where permitted *by law* to avoid a conflict of interest; or

    2.    Initiate, create, dominate, contribute to or interfere with the formation, administration, internal affairs, elections, meetings, dues policies or officers, of the Association; or

    3.    Discriminate in regard to employment or conditions of employment in order to encourage or discourage membership in a labor organization; or

    4.    Discriminate against an Employee because he has given testimony or taken part in any grievance procedures or other hearings, negotiations, or conferences as a part of the labor organization recognized under the terms of this Agreement; or

    5.    Refuse to meet, negotiate, or confer on proper matters with representatives of the Association as set forth in this Agreement.

H.    It is agreed that the City retains and reserves all rights, powers and authorities given to it under any national, state or local law unless otherwise negotiated in this Agreement.

I.    The Union pledges full support for continuity of employment during normal or emergency working conditions.

J.    The Department shall comply with applicable laws pertaining to labor and employment matters.

# 7. GRIEVANCE PROCEDURE

A.    Every Employee of the Department shall have the right to present grievances in accordance with the procedure provided herein. The Association will hand deliver grievances directly to a Captain or Commander. The written grievance will set forth the nature of the grievance, the date of the matter complained of, the name(s) of the employee or employees involved, and the provisions of this Agreement, if any, that the grievant claims have been violated. Receipt of the grievance will be acknowledged by signature of the Captain or Commander who receives the grievance. Any grievance not filed within fourteen (14) calendar days of the occurrence of the alleged violation or within fourteen (14) calendar days of an Employee or the Association becoming aware of an alleged violation will be considered untimely and will not be processed.

B.    The informal resolution of differences or grievances is urged and encouraged to be resolved at the lowest possible level of supervision.

C. Immediate supervisors, commanding officers and reviewing officers shall consider promptly all grievances presented to them and, within the scope of their authority, take such timely action as is required.

D. Grievances shall be processed according to the following procedure

**STEP 1 - Written – Sergeant, Lieutenant, or Captain:**

The sergeant, lieutenant, or captain will provide a written answer to the steward within seven (7) calendar days after receipt. Acceptance or rejection of the answer will be written on the grievance form by the steward.

**STEP 2 - Appeal to Commanding Officer of the Precinct or Division:**

If the grievance is not satisfactorily adjusted at Step 1 or acted upon by the sergeant, lieutenant, or captain within seven (7) calendar days, it may be appealed by the chief steward to the Commanding Officer of the precinct or division within three (3) calendar days. The Commanding Officer will discuss the grievance with the steward, chief steward, or both, and the aggrieved Employee(s) and render a written answer within seven (7) calendar days of his/her receipt of the grievance.

**STEP 3 - Appeal to the Chief of Police:**

If the grievance is not satisfactorily settled or adjusted in Step 2, it will be referred to the President of the Association or his designated representative, who may appeal it to the Chief of Police within fifteen (15) calendar days. A meeting to discuss the grievance will be held between the President or his designee, or both, and members of the grievance committee, and the Chief of Police or his designee within ten (10) calendar days after receipt of the grievance by the Chief of Police. A written decision will be rendered by the Chief, or his designated representative, within ten (10) calendar days of the meeting. By mutual agreement, the parties may extend the timeline in order to enable the Chief of Police to participate directly.

**Medical Grievance Procedure:**

The Labor Relations Division will provide notice to the President of the Association and the Employee's Commander of all grievances involving medical issues

E. Notwithstanding any other provisions herein, individual Employees may present their own grievances to the Department and have them adjusted without the intervention of the steward or Union officers; provided, however, that the Department has given the steward or Union officers notice and an opportunity to be present at such adjustment. In no event shall any such adjustment be contrary to or inconsistent with the terms of any agreement between the Department and the Union.

F. Grievances not appealed in writing to the next step within the time limits set forth above will be considered settled on the basis of the last decision, provided that any grievance not responded to by the Department within the time limits set forth above will be

information to the Union in accordance with applicable law. The Department and the Association may mutually agree to establish further guidelines regarding the processing of medical grievances.

B. There shall be no appeal from the decision of an arbitrator if made in accordance with his or her jurisdiction and authority under this Agreement. It shall be final and binding on the Association, on all bargaining unit members, and on the Department. The Association will actively discourage attempts by any bargaining unit Employee to appeal a decision of the arbitrator to any Court or labor board, and will not aid or abet in any such attempt.

C. In the event a case is appealed to the arbitrator and he/she finds that the arbitrator has no power or authority to rule on such case, the matter shall be referred back to the parties without decision or recommendation on the merits of the case.

D. The decision of an arbitrator in any case shall not require a retroactive wage adjustment in any other case. Either party may, prior to the submission of a dispute to arbitration, state, and the opposite party is bound to agree, that the award not be binding precedent in analogous situations pending at that time.

E. The arbitrator shall limit his/her decision strictly to the interpretation, application or enforcement of the specific articles and sections of this Agreement, and he/she shall be without power or authority to make any decisions:

1. Contrary to, or inconsistent with or modifying or varying in any way, the terms of this Agreement or of applicable laws covering the terms of this Agreement.

2. Involving the exercise of discretion by the City under the provisions of this Agreement, its Charter or applicable laws, so long as the exercise of this discretion does not conflict with this Agreement.

3. Limiting or interfering in any way with the powers, duties or responsibilities of the City under its Charter or applicable laws covering the terms of this Agreement.

4. Contrary to, inconsistent with, changing, altering, limiting or modifying any practice, policy, rules or regulations presently or in the future established by the City so long as such practice, policy, rules or regulations do not conflict with this Agreement.

5. Implying any restriction or condition binding upon the City from this Agreement, it being understood that, except as such restrictions or conditions upon the City are specifically set forth herein, or are fairly inferable from the express language of any article and section hereof, the matter in question falls within the City's management rights under Article 6.

6. Concerning the establishment of wage scales, rates on new or changed jobs, or change in any wage rate.

7.    Providing agreement for the parties in those cases where, by their contract, they may have agreed that further negotiations should occur to cover the matters in dispute.

8.    Granting any right or relief for any alleged grievance occurring at any time other than the contract period in which such right originated.

# 9. DISCIPLINE

A.    The Department reserves the right to discipline, discharge, or demote Employees for just cause.

B.    Investigation/Discipline.

1.    Investigations regarding any potential or alleged misconduct, actions, or omissions that may result in discipline will be completed as expeditiously as practicable. If the Department determines that disciplinary action is warranted, such discipline will be issued as soon as practicable after the completion of the investigation. The Department shall provide written notice of the disciplinary action ("Notice of Discipline") to the Employee, with a copy to the Association, stating the Employee's violation, the date, time, and location of the violation, a concise statement setting forth the relevant facts, and the disciplinary penalty. Except as set forth in Sections F, H, and I below, no discipline will be implemented or incorporated into an Employee's file until the completion of the applicable procedures set forth below.

2.    In all cases when a supervisor has reason to believe that an Employee has committed acts warranting discipline and contemplates issuance of disciplinary action, the supervisor shall inform the Employee and allow the Employee the opportunity to have union representation to the extent required by applicable law. Exceptions to this procedure would be in situations where the Employee is absent without leave and is not reasonably reachable.

C.    Chief's Hearing. Except as set forth in Section H, within two (2) days of the receipt of a disciplinary action, an Employee may appeal the discipline to a Chief's Hearing (which will be presided over by the Chief or his/her designee). The Chief's Hearing is a non-adversarial proceeding, which must be held within seven (7) days of the date the discipline was issued. An Employee will have the right to review the investigation and charges against him, and make a statement of explanation. The Chief or his/her designee presiding over the Chief's Hearing will have the authority to rescind the discipline, affirm the discipline, or lower the level of discipline, but may not increase the disciplinary penalty from what was stated in the Notice of Discipline. An Employee, with approval of the Association, may elect to appeal any decision from a Chief's Hearing to expedited arbitration when a suspension of more than three (3) days has been rendered. Subject only to the Chief's discretion, any written reprimand or disciplinary suspension of three (3) days or less will be considered final and binding with no right of appeal.

D.  Voluntary Mediation. The parties may mutually agree to submit a dispute to mediation under terms agreeable to the parties.

E.  Expedited Arbitration. To the extent that a dispute regarding a suspension of more than three (3) days or the discharge of an Employee cannot be resolved through the Chief's Hearing or mediation (if applicable), an Employee, with the approval of the Association, will have the right to appeal the disciplinary action to expedited arbitration. The disciplinary action must be appealed to arbitration by providing written notice to the Department within seven (7) days of the date of the decision resulting from the Chief's Hearing. Any information requests shall accompany the request to arbitrate. The Department will provide responsive information to the extent required by applicable law, and within thirty (30) days of receipt of the Association's requests. The arbitration hearing must be held within sixty (60) days of the date the appeal was filed by the Employee, so long as an arbitrator on the panel has availability within a sixty (60) day period.

    1.  Both the Employee and the Department will have the right to be represented by counsel, to introduce evidence, and to present and cross-examine witnesses.

    2.  The arbitrator will issue his or her Award in writing within five (5) days of the hearing. An explanatory opinion shall follow as soon as practicable.

    3.  The costs of the arbitration will be shared equally by the parties.

    4.  The parties may request in writing of each other cooperation to have available at the arbitration proceedings any witnesses requested by the other party.

    5.  The decision of the arbitrator will be final and binding on the Employee and the Department subject to the Chief's Authority as set forth in Section G.

    6.  Arbitration cases under this Article will be heard by an arbitrator on the panel detailed in Article 8. Such arbitrators will hear cases on a chronological rotation subject to arbitrator availability. To the extent no arbitrator on the panel is available to hear the case within sixty (60) days, the arbitrator with the next available date to hear the case will be selected. Where an Employee is suspended without pay, the arbitration shall be scheduled with the next available arbitrator without regard to the sixty (60) day time period.

F.  Discharge Cases. Where a decision is made to discharge an Employee, that Employee will be suspended without pay pending the outcome of the disciplinary process set forth in this Article.

G.  Chief's Authority. The Chief of Police, at his or her sole discretion, may rescind or mitigate any disciplinary action at any step of the disciplinary process including, but not limited to, after the conclusion of an arbitration. However, the Chief of Police shall have no authority to increase any disciplinary action after the conclusion of an arbitration.

H.  Written Reprimand. All written reprimands will be issued and implemented as soon as practicable following an investigation. Written reprimands will remain in employees'

files for a period of time not to exceed two (2) years from the date of issuance of the reprimand.

I.    Informal Counseling. The Department may conduct informal counseling sessions concerning minor misconducts, actions, or omissions. Such counseling sessions will not be considered disciplinary action, but the substance of the counseling session may be reduced to writing and added to an Employee's file for up to one (1) year.

J.    Department Right to Immediately Suspend Employee. The Department shall have the right to immediately suspend an Employee with pay in order to preserve order within the Department and/or in those cases where an Employee is the subject of a criminal investigation. Moreover, the Department shall have the right to suspend an Employee without pay in accordance with the terms of the Detroit Police Department Manual. However, the Department must follow the procedures set forth in this Article before any discipline relating to the conduct underlying such suspension is incorporated into an Employee's file.

## 10. SENIORITY

A.    Seniority Defined. Seniority is defined as the length of continuous service with the Police Department of the City of Detroit as a police officer. Seniority is not the same as "service time" as that term may be used in connection with the various economic benefit provisions.

B.    Continuous Service. Continuous service shall mean employment by the City of Detroit without interruption or breaks. The following shall not be considered breaks in service.

    1.    Service in the Armed Forces of the United States up to five (5) years, or longer if such service is exempt under applicable law.

    2.    Absence from work due to injuries compensated for under the Workers' Compensation Act of the State of Michigan.

    3.    Lay off as a result of a reduction in force for a period not exceeding two (2) years.

    4.    Other approved leaves of absence for a period not exceeding one (1) year.

C.    Personal Leave. Employees may be granted a personal leave by the City for up to one (1) year. Seniority accrued prior to the leave will be retained but Employees will not accumulate additional seniority for the period of the leave, except that this provision shall not apply to leaves related to the military.

D.    Forfeiture. An Employee shall forfeit seniority rights for the following reasons:

    1.    Resignation.

    2.    Retirement.

    3.    Discharge.

4. If an Employee fails to report to work for five (5) consecutive days without providing proper notice to the Employee, unless the Employee, in the judgment of the Department, is completely incapacitated through no fault of his/her own or subject to some other emergency situation that, through no fault of his/her own, makes him/her unable to report said absence and is able to supply sufficient proof thereof.

5. If an Employee fails to report within five (5) days after leave of absence, vacation, or suspension or, if the Employee receives notice from the Department by certified letter that his/her leave of absence has been terminated, within five (5) days after receipt of such certified letter.

6. Failure of a laid-off Employee to notify the Department of his/her intent to return to work within seven (7) days after notice has been sent by the Department to the laid-off Employee at his/her last address on the Department's records at time of layoff.

7. Absence from work for any reason (including lay-off) in excess of two (2) years, except as set forth in Section B.1 of this Article.

E. Probationary Employees.

1. The probationary period for new Employees shall be eighteen (18) months from the date of hire, or twelve (12) months from the date of graduation from the Detroit Metropolitan Police Academy, whichever is earlier. New Employees shall acquire seniority twelve (12) months after their date of hire. Once a member has completed the Detroit Metropolitan Police Academy and has been assigned a command, the Department shall continue the existing practice of utilizing the appointment date of a probationary employee with regard to: leave days, furloughs, holidays, prescheduled overtime, involuntary transfers and in other circumstances where the appointment date has been used.

F. Transfers.

1. Transfers between precincts and entities will be made using a Department transfer list maintained by the Personnel Unit. Such list will be created from transfer requests submitted by Employees on form DPD #402. Separate lists should be maintained for each rank.

   a. Transfer requests shall be valid for a period until October 1st each year. Continuation requests may be submitted on or after August 15th.

   b. Whenever openings occur in precincts or entities, the Employee to be transferred will be selected from the transfer list based upon knowledge, training, experience, performance evaluation ratings, certifications, ability, skills, disciplinary history, attendance, safety record, efficiency, and seniority. When all other qualifications are equal, the senior qualified Employee who submitted a transfer request will be selected.

c.   Employees submitting transfer requests will not be unreasonably denied placement on the transfer list. To deny an Employee's request, the Department must verify with factual information that the Employee is not qualified for the requested transfer. Such decisions may be appealed utilizing the grievance and arbitration procedures set forth in this Agreement.

d.   With the exception of releasing information pertaining to a current criminal investigation, an Employee who is denied placement on the transfer list will be advised in writing of the reasons for such denial upon request.

e.   The Employee will be notified of the result of his request for transfer within thirty (30) days of the submission of the form DPD #402.

f.   Voluntary transfers to vacant positions will be awarded based on merit. The Department will consider knowledge, training, experience, performance evaluation ratings, certifications, ability, skills, disciplinary history, attendance, safety record, efficiency, and seniority. If all other qualifications are equal, the senior qualified Employee will be selected.

2.   Should the need arise for a temporary assignment from one precinct patrol location to another, the temporary assignment may not exceed one hundred and twenty five (125) working days. At the expiration of this period, the Employee will be immediately returned to his former position. In no event shall the Department utilize temporary assignments to circumvent the transfer provisions of this Section or as a form of discipline. The parties further stipulate that the Department's authority to make temporary assignments under this Section must be exercised reasonably.

3.   Notwithstanding the foregoing, the Chief of Police has the right to permanently transfer an Employee from one precinct patrol location to another based upon good cause shown upon review of the entire case.

4.   Once placed on a DPD #350, the Commanding Officer of the transfer requested entity may, upon request, have the Employee removed from the transfer list to that entity.

5.   Blue Slip Units. Notwithstanding any provisions in this Agreement that could be construed to the contrary, the Chief of Police may make transfers involving Blue Slip units at his or her sole discretion. The Department shall provide the Association with a list of current Blue Slip units as of the effective date of this Agreement. From time to time, the Chief of Police may designate other units as Blue Slip Units, provided that a precinct patrol unit may not be designated as a Blue Slip Unit. The Chief of Police, or his or her designee, will meet and confer with the Association before designating a unit as a Blue Slip Unit.

G.  Assignments.

1.  A request for assignments within a precinct, or entity once an Employee is assigned there, can be made by submitting DPD Form #31 (referred to as a Blue Slip) to the Commanding Officer. The request shall be valid for a period until October 1st each year. An Employee may have only one (1) assignment request on file at any time; the most recent request will replace the earlier requests. Whenever openings occur within precincts or entities, the Department will consider knowledge, training, experience, performance evaluation ratings, certifications, ability, skills, disciplinary history, attendance, safety record, efficiency, and seniority. If all other qualifications are equal, the senior qualified Employee will be selected.

    In order to determine when such receipt occurred, a copy of the job assignment request, dated and signed by the supervisor who received the request and the time he/she received it, shall be provided to the member.

2.  Moreover, notwithstanding any provisions in this Agreement that could be construed to the contrary, the Chief of Police may exclude assignments from the above procedure and make assignments involving Blue Slip units at his or her sole discretion.

H.  General Seniority Provision.

An up-to-date seniority list showing the names, length of service dates, and Departmental assignments shall be furnished to the Union every six (6) months. A copy of the list shall be maintained in all precincts for inspection by members.

I.  Lay-off and Recall.

1.  When there is an impending reduction in force within the bargaining unit, the City shall inform and consult with the Association as soon as practicable.

2.  In the event of a reduction in force in the Police Department, it shall be made among Employees by seniority.

    a.  The Employees with the least amount of service shall be the first laid off and last to be recalled.

    b.  A demotion to the next lower rank shall be required before a layoff, provided the Employee had prior time in the classification to which demoted.

    c.  Any officer demoted due to a reduction in force shall be promoted back in the reverse order of demotion without any competitive re-examination for the classification from which he was demoted.

3.  Any grievance submitted concerning a layoff will be submitted at the third step of the grievance procedure and the parties expressly agree that they will expedite the final resolution thereof.

J.  Reinstatement and Reappointment.

1.  Reinstatement.  A former member may, upon written request, be considered for reinstatement into the rank of police officer.  Such request may be honored, at the discretion of the Chief of Police, provided that it is made prior to the expiration of two (2) years from the date of separation from service; the member was in good standing at the time of the separation; and the former member is still physically qualified.  Persons so requesting shall submit a written request in letter form to the Chief of Police, who shall direct the Recruiting Section to conduct an investigation of the former member's activities during the period of absence to determine the applicant's qualifications to return to duty.  The investigation report from the Recruiting Section shall be forwarded to the Chief of Police for appropriate action prior to reinstatement.  Such investigation shall be conducted regardless of the reason for the separation.  Persons so reinstated will lose all longevity pay time.  Seniority for time absent from the job will be lost; however, unused accrued sick time will be returned to the member's sick bank.  At the discretion of the Chief of Police, a member who has been reinstated may be required to attend a complete recruit training program or portion thereof, at the Detroit Metropolitan Academy.

2.  Reappointment.  A former member who has been separated from the Department for a period of two (2) years or more may apply for reappointment to the rank of police officer.  Reappointment is a re-hire procedure, and a former member applying for reappointment will be placed on an eligibility list, provided that the former member meets all requirements for appointment to the Department under current recruit hiring practices.  Persons reapplying to the Department and approved for reappointment by the Recruiting Section must have final approval by the Chief of Police.  Should the person be re-appointed, all longevity pay time will be lost, plus all previously unused sick time.  All previous seniority will be lost until a one (1) year probationary period is completed, at which time an adjusted seniority date will be furnished, excluding the time the member was absent from the job, strictly for Department purposes.

3.  Salary Status.  The salary of reinstated or re-appointed members will be reduced by one (1) step for each full year of absence.  Any officer above the rank of police officer who resigns and is subsequently reinstated or re-appointed is precluded from returning to the member's former rank.  Should an officer of the rank of sergeant or above resign and then be reinstated or re-appointed, and at a future date be promoted, the time in rank previous to the resignation shall not be counted as seniority within the rank.

4.  Military Service.  The foregoing limitations other than physical qualifications shall not be applicable to those members who return from active military service and are entitled to re-employment under Federal law.  Such written request must

be made within ninety (90) days after the expiration of government service. However, to facilitate prompt processing of the reinstatement application, persons are encouraged to request reinstatement prior to separation from military service.

## 11. GENERAL CONDITIONS

A.   The Department will furnish for the use of the Union, space for a bulletin board at each of its precincts or entities where Union members are assigned. Bulletin boards shall be used only for the following notices:

1.   Recreational and social affairs of the Union

2.   Union meetings

3.   Union elections

4.   Information of happenings of other departments or unions

5.   Reports of the Union

Notices and announcements shall not contain anything of a political nature except notices with respect to internal elections. Notices and announcements shall not contain anything of a libelous nature.

B.   An Employee shall not use his privately owned vehicle for any police purpose.

C.   Employees are urged to keep their commanding officers informed of where they can be reached whenever they are out of town off duty for periods of forty-eight (48) hours or less. For absences of longer periods, Employees must so inform their commanding officers.

D.   Safety glasses and ear protectors shall be provided at all police firing ranges.

E.   Lockers of individual officers shall not be opened for inspection except with permission of and in the presence of the officer or his designated representative or steward.

F.   No member shall be prohibited from engaging in any political activity, either partisan or non-partisan, except while working.

G.   Compensatory Time Banks. Compensatory time shall be separated into two (2) categories which shall be reported on the Employee's bi-weekly paycheck statement. The first category shall reflect compensatory time accumulated prior to April 15, 1986 and shall reflect excused time as described in Article 31 (Excused Time). The second category shall include compensatory time earned on or after April 15, 1986, which shall be subject to the provisions of the Fair Labor Standards Act (F.L.S.A.). Compensatory time in the second category shall be limited to a total of four hundred eighty (480) hours or whatever limitation may hereafter be imposed by law. Compensatory time used shall first be charged to the pre-April 15, 1986 bank and thereafter charged to the post-April 15, 1986 bank. Immediately prior to an Employee's promotion to a position outside the

DPOA bargaining unit, the Department shall have the option to pay out the Employee's accumulated compensatory time based upon the Employee's then-current rate of pay or as otherwise provided by law.

H.    Work Period. The work period for purposes of computing overtime is twenty-eight (28) consecutive days and includes eight (8) leave days.

## 12. FUNERAL LEAVE

A.    If a death occurs among members of the Employee's immediate family, such Employee will be granted three (3) days funeral leave, not to be deducted from his sick bank, provided that such leave may be extended to five (5) days within the discretion of the Commanding Officer based on individual circumstances.

B.    If a death occurs among the relatives of the Employee, such Employee will be granted one (1) day funeral leave not to be deducted from his sick bank.

C.    The immediate family is defined as wife, husband, son, daughter, brother, sister, father, mother, stepmother, stepfather or other members of the household.

D.    A relative is defined as a grandson, granddaughter, grandmother, grandfather, great grandchild, great grandparent, brother-in-law, sister-in-law, uncle, aunt, mother-in-law or father-in-law.

## 13. OFF-DUTY COURT APPEARANCES

A.    A minimum of three (3) hours credit at time and one-half shall be credited for each off-duty court appearance, except as specified herein. When an officer who is on-duty is directed to appear in court and that court appearance extends beyond his normal off-duty time it shall be recorded as overtime and not as off-duty court time. Off-duty court appearances for a period of less than forty-five (45) minutes which abut a pre-scheduled shift may be treated as either overtime or court time at the option of the Department. Employee's regularly scheduled working hours shall not be changed to circumvent this provision for payment for off-duty court appearances.

B.    Should a police officer attend court while being carried sick on Platoon Two, the following provisions shall apply:

If the actual amount of time spent in court is less than three (3) hours, the member shall be credited with three (3) hours worked at straight time. For the remaining portion of the member's shift, a deduction shall be made from the member's sick time.

If the court appearance is for three (3) hours or more, the member shall be carried working for the actual amount of time spent in court. For the remaining portion of the member's shift, a deduction shall be made from the member's sick time. If the court appearance extends beyond the end of Platoon Two, the member shall be compensated at the rate of time and one-half for the actual amount of time spent in court beyond the end of the shift.

Members who are carried disabled are already paid for their time off and therefore shall be carried on Platoon Two and will not receive compensation of any type for their appearance in court. If the court appearance extends beyond the end of Platoon Two, the member shall be compensated at the rate of time and one-half for the actual amount of time spent in court beyond the end of the shift.

C.  Department members scheduled to work Platoon One or Platoon Three who are carried sick shall be compensated for off-duty court appearances pursuant to contractual guidelines when they appear in court on Platoon Two.

D.  For all off-duty court time earned, on each court appearance notice turned in, the first forty (40) hours of straight time earned as off-duty court time (60 hours at time and one-half) shall be compensatory time. Thereafter, members shall be given the option of being paid in cash or being credited with compensatory time. Furthermore, such off-duty court time shall be paid in cash rather than granting compensatory time when necessary to comply with F.L.S.A. requirements.

E.  Normally, Employees shall not be required to attend court on their leave days or during their furlough period. In the event that court attendance may be required while he is on leave or furlough, an Employee may be carried on-duty or off-duty, at his option, while on Platoon Two.

F.  Employees not assigned or working downtown shall be reimbursed for their parking fees if the following procedure is followed. When the police lot is filled, the Employee shall show the lot attendant his Court Appearance slip and receive a Parking Fee Reimbursement Authorization form. The Employee shall be reimbursed monthly by the Accounting Office via Department mail.

G.  A member who is required to appear in court on a holiday will receive credit either for an off-duty court appearance at the three (3) hour minimum or holiday premium pay (1.5 x) for the actual time spent on the court appearance, whichever is greater.

H.  Any time that compensation is due under the Fair Labor Standards Act, it shall be paid the next pay period following performance of the work.

# 14. OVERTIME

Pursuant to its management rights under Article 6, the City has the right to schedule overtime work and to require Employees to work mandatory overtime.

A.  Prior to any fiscal year all members will be required to sign a list indicating their preference to be paid in cash or compensatory time for overtime worked. Once a member elects or does not elect to take time instead of cash payment, he/she is restricted to that choice for the entire fiscal year. All overtime will be credited at the rate of time and one-half. For the first seventy-five (75) hours of overtime work in a fiscal year, for which there is one hundred twelve and one-half (112½) hours of credit, the Employee shall have an option of receiving compensatory time instead of payment in cash. All overtime beyond the first one hundred twelve and one-half (112½) converted time hours must be

paid in cash. However, in any fiscal year, not more than one hundred twelve and one-half (112½) converted time hours may be earned as compensatory time as a result of overtime worked. Furthermore, such overtime shall be paid in cash rather than granting compensatory time when necessary to comply with F.L.S.A. requirements.

B.     Overtime shall be calculated on the following basis:

    1.     An Employee shall be entitled to an Overtime Premium for all compensable hours of work in excess of eighty (80) hours in a single two (2) week pay period. For purposes of computing overtime, meal periods will not be deemed to be compensable or counted as time worked for the purposes of computing overtime unless the member is denied such period by competent authority. The tour of duty shall include time spent at the normal line-up or roll-call. For purposes of applying these overtime rules, normal line-up or roll-call shall be deemed to consist of fifteen (15) minutes at the beginning of a day's assignment and fifteen (15) minutes at the end of the assignment.

    2.     An Employee shall be entitled to an Overtime Premium for all compensable hours of work on a leave day, as defined in this Article.

    3.     When an emergency makes it necessary for a member to work all or part of a furlough or leave day excluding court appearances, such time shall be considered as overtime. Any furlough or leave days for which overtime credit are given shall be canceled.

    4.     In no case shall overtime or other premium compensation be pyramided, duplicated, compounded or paid twice for the same hours of work.

C.     Unless additional compensation is required by the FLSA or some other wage and hour law, the Overtime Premium will be computed by dividing the Employee's annual salary by 2080 and multiplying that quotient by 1.5. In those cases where an Employee works overtime and is entitled to receive a shift premium, the shift premium rate of pay for overtime hours worked will be determined by multiplying the rate of the applicable shift premium by 1.5

D.     To the extent any subsequent CBA between the parties provides for longevity payments, the parties may consider incorporating the language in the Article 14, Section C of the 2009-2012 collective bargaining agreement as a potential guideline for calculating overtime in such subsequent agreement.

E.     <u>Prescheduled Overtime.</u>

    1.     If the Department has been notified of a personnel shortage with two (2) or more hours notice before the work schedule is to start, then filling of the vacancy should first be attempted by shifting personnel from one assignment to another. All Employees within the collective bargaining unit can be considered for this purpose.

2.   If it is not possible to meet service needs by such shifting, then overtime work will be required but the same must be offered in the following order:

a.   First, by seniority order amongst Employees of the rank of the vacancy, in the unit of the vacancy, and on the shift of the vacancy. Such is to be done by telephone canvassing of the Employees in said category who are not working on that day.

(1)   In the event that such an Employee not working is contacted and agrees to work the overtime, said Employee is to be informed that he MUST appear for duty no later than the regularly scheduled start of the shift (15 minute roll call period is optional depending on circumstances and the Employee's wishes); furthermore, if his services will be needed for less than a full eight (8) hours (as in cases when he may be needed only until the power shift supervisors report for duty), then he shall be notified of same.

(2)   In the event the Employee contacted does not arrive at the time agreed to, an on-duty supervisor selected by seniority rotation may work overtime. If the Employee not working (the one who was called at home) arrives later, the Employee working overtime is not to be replaced by the other Employee. The other Employee will not work.

b.   If phone contacts do not produce an Employee willing to work, then the work can be assigned to an Employee selected in inverse seniority order off of a precinct-wide seniority list. Also, depending upon needs, the overtime in such cases may be ended prior to the end of the shift with the vacancy (see paragraph 2 above).

F.   <u>Overtime Rotation List</u>. The following guidelines will be adhered to with respect to accounting for overtime that is worked: There shall be a seniority roster for each rank on each shift, and the roster shall be kept up-to-date.

1.   Employees who elect to accept the offered overtime do not fall within the Department payroll category "Recall Compensation" and the contractual provisions concerning such are not applicable. Also, no minimum amount of overtime is to be guaranteed beyond that agreed to on the telephone.

2.   Employees who refuse the overtime or who cannot report for duty by the start of the shift will lose their turn on the overtime rotation list and will not again be offered overtime until their name is again reached in seniority order.

3.   Employees who cannot be contacted by telephone (one attempt) shall be listed as "unable to contact" (UTC) and shall retain their rotation position.

4.   Limited duty personnel will not normally be offered overtime, however, such an Employee shall not lose his position on the overtime roster. The Department may

offer overtime to an Employee, who can fill the position needed, even if he is on limited duty.

5. Employees on furlough will be eligible for overtime opportunities on a voluntary basis. The fact that they are on furlough shall be entered on the overtime roster.

6. Employees being carried sick or disabled on the preceding day need not be contacted, unless such Employee has notified his work location that he is ready for duty and will report for his next scheduled tour of duty. Sick or Disabled will be entered on the overtime roster.

7. The Association steward and the shift lieutenant will verify the overtime roster after each selection.

## 15. LEAVES OF ABSENCE

A. General Leaves of Absence.

A leave of absence without pay may be granted to Employees with at least three (3) years of continuous service with the City as a police officer for a period not to exceed one (1) year. The Employee shall submit the request for the leave of absence, in writing, to the Chief of Police through channels. The request shall include the reason(s) for the leave and the length of time requested. All recipients of educational leaves must present continuing proof of enrollment for the specified period of absence. The Union shall be notified when a leave of absence of thirty (30) days or more has been granted.

B. Medical Leaves of Absence.

1. To be eligible for a medical leave of absence, an Employee must have a minimum of one (1) year of continuous service with the City as a police officer from the date of appointment to the effective date of the leave of absence. No Employee shall be required to exhaust banked sick time or other accrued benefits as a condition of taking a medical leave of absence.

2. A medical leave of absence without pay shall be granted to an Employee who is suffering from a non-service connected sickness or disability for which the Employee's physician prescribes extended treatment or rest.

3. A written request for a medical leave of absence shall be submitted to the Chief of Police. The request shall contain the diagnosis, treatment prescribed, and length of absence required. It must be accompanied by a signed endorsement from a physician describing a complete medical diagnosis.

4. In no case may a medical leave of absence extend beyond six (6) months except with the permission of the Chief of Police. Before an Employee on medical leave is returned to duty, a physician designated by the Department shall make a written recommendation to the Chief of Police. Employees desiring rehire after the leave of absence has expired shall apply for reappointment under the prevailing Department policies.

C.  Maternity Leaves of Absence.

1.  To be eligible for a maternity leave of absence, an Employee must have a minimum of one (1) year of continuous service with the City as a police officer from the date of appointment to the effective date of the leave of absence. No Employee shall be required to exhaust banked sick time or other accrued benefits as a condition of taking a maternity leave of absence.

2.  Maternity leave without pay shall commence when it is deemed by competent medical authority that an Employee is no longer able to perform all the duties involved in taking proper police action; when an Employee thinks she can no longer safely work; or when her medical condition or any other valid reason leads the Department to believe a mandatory leave of absence is necessary.

3.  Upon confirmation of pregnancy, the commanding officer of the Employee's entity must be notified without unnecessary delay. The Employee shall furnish to her commanding officer and a physician designated by the Department written medical evidence from her doctor verifying her condition, stating an expected delivery date, and evaluating her physical ability to perform regular police duties.

    Prior to commencement of the leave, the Employee shall prepare an Inter-Office memorandum, DPD Form #568, addressed to the Chief of Police requesting a leave of absence for maternity reasons. This memorandum shall be prepared in quadruplicate and shall state the request for leave with date of commencement and the expected date of return to duty. It shall be presented to the Employee's commanding officer along with the appropriate medical letter from her doctor.

4.  Within sixty (60) days after delivery, an Employee shall report to a physician designated by the Department for a determination of her ability to return to full duty. At this time the Employee shall present a medical letter from her doctor indicating the appropriate date of her return to work. Notwithstanding the above, in no case may an Employee's maternity leave of absence extend six (6) months beyond the date of delivery except with permission of the Chief of Police. Before an Employee on maternity leave is returned to duty a physician designated by the Department shall make a written recommendation to the Chief of Police. Employees desiring rehire after the leave of absence has expired shall apply for reappointment under the prevailing Department policies.

D.  Mandatory Leave of Absence.

The Omnibus Consolidated Appropriations Act of 1997 amended the federal gun control act to make it unlawful for any person (including a law enforcement officer) to ship, transport, possess or receive firearms or ammunition, if convicted of a crime of domestic violence.

1.  A misdemeanor crime of domestic violence is defined as an offense that:

    a.  is a misdemeanor under federal or state law; and

b.  has, as an element, the use or attempted use of physical force or the threatened use of a deadly weapon, committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting or has cohabited with the victim as a spouse, parent or guardian, or by a person similarly situated to a spouse, parent or guardian of the victim.

2.  Any member convicted of a misdemeanor crime of domestic violence will be carried working in an administrative restricted duty capacity at any work location as determined by management for nine (9) months from the date of conviction in order to permit the member to have the conviction reversed, pardoned, set aside or expunged, or if the disqualification is removed because of a change in legislation or the act is invalidated.

3.  If the conviction has not been removed after nine (9) months, the member will be placed on a three (3) month unpaid leave of absence.

4.  At the end of the three (3) month leave of absence, unless the conviction is removed, the member's employment shall be terminated. The member may reapply for employment provided that the conviction is subsequently removed and he meets all other criteria for employment, including requirements of the Michigan Commission on Law Enforcement Standards (M.C.O.L.E.S.).

E.  Termination of Leaves of Absence.

At least thirty (30) days prior to the expiration date of a leave of absence the Employee shall submit to the Chief of Police written notice of intent to return to duty. For failure to submit the above notice or failure to report at the expiration of the leave, the Employee will be considered to be absent without leave.

F.  Conduct on Leave.

Employees on leaves of absence shall maintain the same standards of conduct that are required of sworn police officers. Acts of misconduct of a serious or grave nature that are committed by an Employee while on a leave of absence may subject the Employee to disciplinary action in accordance with this Agreement up to and including discharge from the Department.

# 16. EMPLOYEES' RIGHT - INVESTIGATIVE PROCEDURES

Each Employee shall be guaranteed the following rights but this section shall not be construed as a section of limitation:

A.  Any Employee who is accused of violating any criminal law, City, State or Federal shall be entitled to his or her full rights under the State and Federal Constitutions without being disciplined for exercising such rights.

B.  After an Employee is ordered to make any written statement in response to any alleged misconduct or possible misconduct on his part, he shall have at least forty-eight (48)

hours from the time of the order in which to comply. The parties may extend this period by mutual agreement. If any Employee is ordered to make an oral statement, he shall comply subject to the receipt of Miranda or Garrity warnings or both and shall be given a reasonable time to act in accordance with such rights.

C.     An Association officer, counsel or both shall have the right to be present at all disciplinary hearings at the request of the Employee and shall further have the right to be present during all administrative and investigatory proceedings when the investigated officer must be present.

D.     Throughout all disciplinary hearings, each Employee shall be presumed innocent.

E.     No Employee shall be disciplined, discriminated against, or transferred because he exercises any of his constitutional rights before any grand jury, investigative body, court or law enforcement agency - Federal, State and Local as well as any investigative committee of any legislative body - Federal, State and Local.

F.     If any disciplinary procedures within the Department are changed during the term of this Agreement in such a way as to render any of the provisions of this section inapplicable or as to require additional provisions in this section or as to require modifications to this section, the subject matter and provisions of this section will be subject to renegotiation between the City and the Association.

G.     No Employee shall be prohibited from engaging in political activity, either partisan or non-partisan, except when actually on duty, or while in uniform or while acting in official capacity as a police officer.

H.     An Employee who is indicted or charged with a felony, a crime of moral turpitude, or a misdemeanor with a potential jail sentence may be placed on unpaid administrative leave without pay but with medical benefits pending the outcome of the criminal proceeding. At the conclusion of the criminal proceeding, if the Department chooses not to pursue disciplinary action, the Employee will be reinstated. If the Department pursues disciplinary action for a matter arising out of the same set of facts and circumstances as those surrounding the criminal proceedings, the Employee will be subject to the discipline process pursuant to the terms and time frames set forth in Article 9.

An Employee indicted or charged with a crime less than a felony, a crime of moral turpitude, or a misdemeanor with a potential jail sentence may be assigned to administrative duties consistent with the needs of the Department or suspended with pay pending resolution of the criminal proceedings.

I.     In the event that an Employee is exonerated from criminal charges and subsequently ordered to be reinstated by an arbitrator, that Employee's back pay award will be determined by the arbitrator based on the facts of the case subject to the limitations of Section L. In no case will an Employee who admits to a felony, a crime of moral turpitude, or a misdemeanor with a potential jail sentence or accepts a plea arrangement be entitled to any back pay upon reinstatement.

J.   Whenever a member is being questioned or interviewed by his/her Commanding Officer and/or the Department or by any of its units or bureaus, for any reason which could lead to criminal actions or charges, such questioning or interview shall be conducted under the following conditions:

1.   The investigative interview shall be conducted at a reasonable hour, preferably at a time when the member is on duty, unless the seriousness of the questioning is of such a degree that an immediate investigative interview is required.

2.   No investigative interview shall begin until the member has been notified that he/she has a right to have counsel or an officer of the Association present.

3.   An Employee will be given forty-eight (48) hours written notice prior to an investigative interview in a non-criminal investigation, except in cases of emergency. In non-criminal investigations, the Employee shall be supplied with a copy of any complaints that have been filed against him/her and all relevant information at the time he/she is ordered to appear at the investigative interview.

   In those instances where a command level investigation of an informal citizen's complaint, as opposed to those on DPD 512, progresses to the point where a written statement is ordered, the officer will be provided with an inter-office memorandum stating the complaint made against him, the identity of the person who filed the complaint, and the specific questions that the investigating supervisor wants answered. This shall include investigations delegated to the command to handle from other departmental agencies, such as the Internal Controls Bureau.

4.   Employees required to be interviewed by the Professional Standard Bureau will be given forty-eight (48) hours written notice prior to the investigative interview. Provided, however, that the obligation to give forty-eight (48) hours written notice shall not apply: (1) to individuals who have been arrested; (2) to individuals who are questioned under Miranda; and (3) where the seriousness of the investigation is of such degree that an immediate interview is required.

5.   No investigative interview shall begin until the Employee has been notified that he/she has a right to have legal counsel and a representative of the Union present, except that an officer who is called before the Internal Affairs Section who at the time he/she is notified to appear is advised in writing that the purpose of the questioning is not to charge him/her with any criminal conduct or to discipline him/her and that he/she is only being called as a witness, shall not be entitled to the presence of a Union representative during the investigative interview. In investigations in which the suspect officers are unknown, the Department may require the Union representative to be a Union officer.

6.   The Employee being questioned shall be informed prior to such investigative interview of the name of all persons present during the investigative interview. If any of the interviewers are sworn police officers, at least one shall be present during the investigative interview who is of a rank higher than that of the officer being interviewed.

7. The attorney representing the officer shall be allowed to ask questions at the time of the investigative interview.

8. Neither the home address nor the photograph of any member suspected of any wrongdoing shall be given to the press or the news media without the written consent of the member.

9. If a record is made at the time of the investigative interview and improper conduct is alleged, the Employee shall be entitled to a copy of the tape or the transcript, if a transcript is made, for the cost of duplication. If a transcript is made at the Union's request the Union will pay for the cost of the transcript.

K. The complete investigative interview of the member, including a notation of all recess periods, shall be recorded and there shall be no unrecorded questions or statements. At the request of the member, a copy of the investigative interview shall be furnished to him.

L. If an Employee's disciplinary penalty is simply modified or lessened to the extent that he/she has a claim for partial back wages during a period of suspension as the result of the modification or the lessening of the penalty, claims for back wages will be limited to the amount of wages that the Employee otherwise would have earned less any compensation for personal services he may have received from any source during the period in question but excluding previously Department authorized income earned outside his regularly scheduled work period.

M. The Investigative staff of the Board of Police Commissioners will have the right to question and interview Employees and such right will in no way abridge or change the rights of Employees under this Agreement or under any Local, State, or Federal law or the Constitution of the United States, or State of Michigan.

In no event will any recommendations or actions resulting from such investigative interview or questioning lead to any discipline outside or inconsistent with any discipline procedures or discipline matters maintained in this Agreement or as may be established and maintained by the Department in accordance with this Agreement.

Further, no Employee, after he/she has been once disciplined by the Department, will be re-disciplined, for any reason whatever for any matters arising out of the same set of facts and circumstances surrounding the first disciplinary action.

N. An Employee will be notified in writing of the results of any departmental investigation of him/her within sixty (60) days after the investigation is completed. If the Employee is charged either criminally or departmentally, that will be the notification.

## 17. PERFORMANCE EVALUATION RATINGS

A. Rating Periods.

Performance evaluation ratings will be completed twice a year for all members. The rating periods shall be from May 1st through October 31st and November 1st through April 30th.

The May through October ratings shall be completed during the month of November and forwarded by December 10th, to be reviewed per the distribution outline. Final distributions will be completed by December 20th.

The November through April ratings shall be completed during the month of May and forwarded by June 10th, to be reviewed per the distribution outline. Final distributions will be completed by June 20th.

B.    Each Employee shall be rated by his or her immediate supervisor.

C.    Upon completion of the rating, each member will be personally informed of his respective evaluations by the immediate supervisor who prepared the evaluation.

D.    Any member who wishes to appeal his performance evaluation must make a written request to the Chief of Police or his/her designee within thirty (30) days of receiving his copy of the evaluation and must identify each aspect of the evaluation he is appealing and cite a brief basis for appealing that rating.

## 18. LEAVE DAYS AND JOB ASSIGNMENTS

A.    A prescheduled temporary absence from duty of twenty-four (24) hours duration shall be defined as a leave day unless otherwise designated (e.g., sick leave, funeral leave, compensatory time, etc.) by the Department. Leave days granted to Employees who work Monday through Friday shall be Saturdays and Sundays. An Employee working an eight hour shift schedule shall be entitled to eight (8) leave days in each twenty-eight (28) day work period.

B.    The present practice of Employees submitting leave day requests shall continue. Upon submitting the request the Employee shall circle the days he wishes to be granted under the conditions of this Article.

      1.    Employees shall be granted a minimum of four (4) circled days for each twenty-eight (28) day work period; provided, that an Employee may select five (5) circled days in four (4) work periods per fiscal year which shall be designated by the Union and promulgated by special order.

      2.    Further, in the event that more leave day requests are submitted than the allowable percentage to be off on any given day or days, then the most senior Employees shall be granted their requests. When leave day requests are less than the allowable percentage to be off, then all such requests for that day or days shall be granted.

C.    Under normal conditions, job assignments and leave days shall be posted seven (7) days prior to the end of the current work period. After having been posted, leave days shall be changed only by mutual consent of the officer and the Department, except when leave days are canceled because of an emergency.

D.    After leave days are posted, Employees may mutually agree, with prior written approval of their supervisor, to exchange leave days.

# 19. UNIFORMS

A.  Initial Uniform Allowance. At time of hire, Employees shall receive an initial uniform allowance of eight hundred and fifty dollars ($850) or, in the alternative, the Department may institute a uniform voucher system and issue Employees uniform vouchers in lieu of a cash payment. In the event that the Department changes its specifications regarding uniforms and/or equipment, Employees shall receive an initial uniform allowance as provided above. The initial uniform allowance that Employees receive in the event of a change in Department specifications shall be provided in lieu of the annual uniform allowance as set forth in Section B. In no event shall any Employee receive both an initial uniform allowance and an annual uniform allowance in the same year.

B.  Annual Uniform Allowance. The Department will no longer issue replacement uniforms and accessories. Except as provided in Section A, members will instead receive a uniform allowance of eight hundred and fifty dollars ($850) annually for the procurement and maintenance of all of the member's required uniforms and accessories. Alternatively, the Department may institute a uniform voucher system and issue Employees uniform vouchers in lieu of cash payments. The member shall be responsible for procuring uniforms and equipment according to Department specifications. This allowance shall not include maintenance and procurement of bulletproof vests or other specialty equipment, which the Department shall continue to procure and issue directly to members.

C.  Annual Cleaning Allowance. Employees shall receive an annual uniform cleaning allowance of two hundred and fifty dollars ($250) per year payable the first payroll period each fiscal year. Alternatively, the Department may institute a uniform cleaning voucher system and issue Employees uniform cleaning vouchers in lieu of cash payments.

D.  The annual uniform allowance shall be payable on July 1st to Employees who were hired on or before April 1st of that year. Employees who were hired after April 1st of that year, will not receive an annual uniform allowance until the subsequent July 1st.

E.  For purposes of calculating eligibility for payment of these allowances, all members shall receive payment of these allowances with the following exceptions:

    1.  A member shall be considered off the payroll and ineligible for this allowance if he/she has retired, resigned or has been discharged with an effective date before July 1st of the fiscal year payment is to be made.

    2.  Members discharged and suspended without pay who have a pending appeal of the discharge shall not receive payment of the uniform cleaning allowance unless and until the discharge is overturned at an appellate level at which time they shall be made whole.

    3.  Members on extended AWOL or ANP status on July 1st of the fiscal year payment is to be made will not receive the uniform cleaning allowance unless

they return to active regular duty during the fiscal year at which time they will receive full payment.

4. Members on an unpaid leave of absence on July 1st of the fiscal year will not be entitled to payment for the uniform cleaning allowance until the next fiscal year.

# 20. HOSPITALIZATION, MEDICAL, DENTAL AND OPTICAL CARE

A. During the term of this Agreement, Employees will be eligible to participate in the group medical, prescription drug, dental, and vision plans ("Medical Plans") offered by the City. Unless the parties mutually agree otherwise, the City's 2014 medical plan designs ("Medical Plan Designs") will remain in place during the term of this Agreement. For purposes of this Section, the term Medical Plan Design will collectively refer to deductibles, co-payments, covered services, networks, and third party administrators or insurers.

1. Notwithstanding this section A, the City will promptly analyze providing ScriptGuideRx, Inc. as a pharmacy benefits manager ("PBM") for the self-insured PPO option provided to police and firefighter active employees who enroll for health insurance. The City agrees to include ScriptGuide as a PBM for its self-insured option for active police and firefighter enrollees if (i) the City concludes - in its sole discretion - that ScriptGuide can be provided on a cost neutral or lower cost basis for the City during its first contract year of use and the Contract term, and (ii) following an analysis by the City respecting ScriptGuide's applicable managed formulary, generic utilization, network and co-payment structure, and sharing of that analysis and discussion with the Unions, the Unions approve the City's use of ScriptGuide as the PBM for its self-insured option for active police and firefighter enrollees, even if the co-pay structure for generic, brand or specialty prescription drugs necessary for cost neutrality requires higher active employee co-pays for certain forms of prescription drugs. The City shall determine whether ScriptGuide will be cost neutral or lower prescription drug costs based on the cost for the entire active population.

B. Employees will be required to make monthly contributions for their benefits based upon the plan and coverage tier selected by the Employee. Monthly contributions will be deducted from Employee payroll disbursements on a pre-tax basis (if authorized by the employee), in accordance with applicable law.

1. For calendar year 2014, Employees' monthly contributions under the City's Medical Plans will remain at the levels in place as of the effective date of this Agreement.

2. For subsequent calendar years during the term of this Agreement, Employees' monthly contributions under the City's Medical Plans will be adjusted annually to the level necessary to maintain an 80/20 proportional share of the cost of the medical coverage, subject to the terms and conditions and limitations set forth in this Article. Under this cost sharing arrangement, the City will pay eighty percent

(80%) of the costs of each coverage tier in the City's Medical Plans, and Employees participating in each coverage tier will pay twenty percent (20%) of the costs for such coverage tier. Premiums will be calculated as follows:

a.   For the Health Alliance Plan ("HAP") health maintenance organization ("HMO") plan, a participating Employee will pay 20% of the premium charged by HAP for his/her coverage tier. Such premiums will be established by HAP, subject to confirmation by an independent enrolled actuary retained by the City ("Enrolled Actuary").

b.   For the Blue Cross/Blue Shield ("BCBS") preferred provider organization ("PPO") plan, monthly contributions will be set such that Employees in each coverage tier collectively pay twenty (20%) of the costs for that coverage tier. Such monthly contributions will be calculated by the Enrolled Actuary. Monthly contributions will be calculated in accordance with generally accepted actuarial principles, and will take into account claims experience from the prior fiscal year, inflation, actual and anticipated administrative costs, actual and anticipated fees and surcharges (including those associated with compliance with the Patient Protection and Affordable Care Act ("ACA")), and any other relevant costs or factors as determined by the Enrolled Actuary.

C.   **C.O.P.S. Health Trust**: For calendar year 2015 and for subsequent calendar years during the term of this Agreement, Employees may elect to participate in medical benefit plans offered by C.O.P.S. Health Trust ("COPS Trust") in lieu of the City's Medical Plans subject to the following conditions:

1.   An Employee who participates in COPS Trust may not concurrently participate in any City Medical Plan.

2.   For each Employee who elects to be covered by COPS Trust, the City will make a monthly contribution to COPS Trust that is equal to the lesser of (a) the City's *pro rata* contribution under the HAP Plan in the corresponding coverage tier (*e.g.* single, two person, family) or (b) the City's *pro rata* contribution under the BCBS Plan for the corresponding coverage tier. Under no circumstances will the City's monthly contribution to COPS Trust exceed the City's monthly contribution for coverage under the lowest cost City plan for the applicable coverage tier.

3.   The City will have no obligations in connection with COPS Trust other than to make the payments described in this Section C. Specifically, the City will not have any administrative involvement whatsoever in connection with employee participation in COPS Trust, and any employee participating in COPS Trust will be responsible for paying any additional monthly premium payments beyond the City's monthly contribution pursuant to Section C.2 of this Article directly to COPS Trust. Under no circumstances will the City be deemed to be an

administrator or fiduciary with respect to any medical plans provided by COPS Trust.

4. The Union agrees to indemnify the City, and hold the City harmless, against any and all claims asserted by employees or third parties against the City or any of its elected or appointed officials, employees, agents, attorneys, or consultants that are in any way related to or connected with employee participation in COPS Trust, any medical plans offered by COPS Trust, including but not limited to any claims for benefits provided to, or denied, City employees by COPS Trust, as well as any and all claims that are in any way related to any acts or omissions by COPS Trust, or its officers, directors, trustees, employees, or agents.

D. <u>VSP</u>: For calendar year 2015 and for subsequent calendar years during the term of this Agreement, Employees may elect to participate in vision benefit plans offered by VSP in lieu of the City's vision plan subject to the following conditions:

1. An Employee who participates in VSP may not concurrently participate in any City vision plan.

2. For each Employee who elects to be covered by VSP, the City will make a monthly contribution to VSP that is equal to the the City's *pro rata* contribution under the Heritage vision plan in the corresponding coverage tier (*e.g.* single, two person, family). Under no circumstances will the City's monthly contribution to VSP exceed the City's monthly contribution for coverage under the lowest cost City plan for the applicable coverage tier.

3. The City will have no obligations in connection with VSP other than to make the payments described in this Section C. Specifically, the City will not have any administrative involvement whatsoever in connection with employee participation in VSP, and any employee participating in VSP will be responsible for paying any additional monthly premium payments beyond the City's monthly contribution pursuant to Section C.2 of this Article directly to VSP. Under no circumstances will the City be deemed to be an administrator or fiduciary with respect to any medical plans provided by VSP.

4. The Union agrees to indemnify the City, and hold the City harmless, against any and all claims asserted by employees or third parties against the City or any of its elected or appointed officials, employees, agents, attorneys, or consultants that are in any way related to or connected with employee participation in VSP, any vision plans offered by VSP, including but not limited to any claims for benefits provided to, or denied, City employees by VSP, as well as any and all claims that are in any way related to any acts or omissions by VSP, or its officers, directors, trustees, employees, or agents

E. Except as provided in this Article, the extent of coverage under the City's Medical Plans will be governed by the terms and conditions set forth in the applicable Medical Plans offered by the City during the term of this Agreement. Plan documents may be modified or amended by the City from time to time in accordance with the terms of the applicable plan documents, provided that such amendments do not violate the terms of this Article.

Any questions or disputes concerning any City Medical Plans will be resolved in accordance with the terms and conditions set forth in the applicable insurance policies or plan documents and will not be subject to the Grievance & Arbitration Procedures set forth in Articles 7 and 8 of this Agreement.

F.   The failure of any insurance carrier(s), PBM, or plan administrator(s) to provide any benefit for which it has contracted or is obligated will not result in any liability to the City, nor will such failure be considered a breach by the City of any obligation undertaken under this or any other Agreement. However, nothing in this Agreement will be construed to relieve any insurance carrier(s) or plan administrator(s) from any liability it may have to bargaining unit Employees or beneficiaries of bargaining unit Employees.

G.   Except as set forth in this Article, during the term of this Agreement, the City Medical Plans will provide benefits with an actuarial value as determined by the Enrolled Actuary that are at the "Gold" level (i.e., approximate actuarial value of 80%), as defined by the ACA. In the event that the actuarial value of a City Medical Plan's benefits falls below the "Gold" level as determined by the Enrolled Actuary during the term of the Agreement, the City will meet and confer with the Union to discuss potential modifications to the Medical Plan during the subsequent plan year to raise the actuarial value of the benefits to the "Gold" level.

H.   Notwithstanding any provision in this Article that could be construed to the contrary, this Article will not be construed to require the City to fall out of compliance with the requirements Public Act 152 of 2011 ("PA 152"). MCL § 15.561 et. seq. The City's Enrolled Actuary will be responsible for periodically monitoring compliance with the requirements of PA 152. In any event where the Enrolled Actuary determines that the City is reasonably likely to fall out of compliance with PA 152, the City will meet and confer with the Union for a period not longer than thirty (30) days in order to discuss potential modifications to the terms of the Medical Plans or to the allocation of premium payments by the City and the Employees. To the extent the City and the Union are unable to reach an agreement within thirty (30) days, the City may make any necessary modifications to ensure compliance with PA 152.

I.   Surviving Spouses/Dependents. Current and future spouses and dependents of bargaining unit employees who are killed in the line of duty will be eligible to continue to participate in the City's Hospitalization, Medical Insurance, Optical and Dental care plans on the same terms and conditions as active bargaining unit members.

J.   Retiree Medical Benefits.

1.   Retiree Medical Subsidy. The City will contribute the following amounts towards the cost of retiree health benefits for Eligible Retirees (the "Retiree Medical Subsidy"):

a.   On or before January 31, 2015 (and each subsequent January 31 during the term of this Agreement), the City will contribute a total sum of one million dollars and no cents ($1,000,000.00) to the Public Safety Retiree 401(h) Account to fund retiree medical benefits for City of Detroit employees (and Eligible Retirees) in

the bargaining units represented by the Detroit Fire Fighters Association (DFFA), the Detroit Police Command Officers Association (DPCOA), the Detroit Police Lieutenants and Sergeants Association (DPLSA) and the Detroit Police Officers Association (DPOA) (collectively, the "Public Safety Unions"). The amount contributed on behalf of each bargaining unit will be determined by: (a) dividing the total DPOA bargaining unit headcount as of July 1, 2014, by (b) the total active employee headcount in the four Public Safety Unions as of July 1, 2014, and then (c) multiplying the quotient by $1,000,000.00 (DPOA headcount ÷ total Public Safety Union headcount) × $1,000,000.00).

b.      Any foundation money available to fund medical benefits for Public Safety Union retirees shall also be contributed to the Public Safety Retiree 401(h) Account.

c.      Other than the Retiree Medical Subsidy, the City shall not be required to pay any additional amounts including, but not limited to start-up costs, for the Public Safety Retiree 401(h) Account, or to pay any other sums (including but not limited to administration expenses) , in connection with retiree health coverage for Eligible Retirees during the term of the Agreement.

2.    Public Safety Retiree 401(h) Account.  The Retiree Medical Subsidy will be contributed to a separate account within the City of Detroit Police and Fire Retirement System (the "Public Safety Retiree 401(h) Account") established under Section 401(h) of the Internal Revenue Code of 1986, as amended.    The PFRS shall create sub-accounts within the Public Safety Retiree 401(h) Account for each Public Safety Union for whose active members amounts are contributed, and separately account for the contributions and earnings and losses thereon, for each such union's members.

a.      To the extent that the Public Safety Retiree 401(h) Account is not in effect as of January 1, 2015, the Retiree Medical Subsidy will be contributed into a separate account and transferred to the Public Safety Retiree 401(h) Account as soon as practicable.

b.      The City shall establish and administer a health reimbursement arrangement ("HRA") for each Eligible Retiree upon such Eligible Retiree's retirement from the City.  Effective January 2015 and through December 2017, the Public Safety Retiree 401(h) Account shall transfer to each retired Eligible Retiree's HRA the amount of $____ per month, no later than the 15th day of such month. Each Eligible Retiree for whom an HRA is established may obtain reimbursement for all qualified medical expenses under the Internal Revenue Code up to the amounts in such person's HRA account.  Unused amounts in the HRA account shall be carried

over from year to year. To the extent that the HRA accounts – in order to shield any investment earnings thereon – need to be maintained within a VEBA trust, the City shall create such trust and appoint a bank to serve as trustee. No later than September 15, 2017, a health care actuary retained by the City shall project whether the anticipated sums in the sub-account of the Public Safety Retiree 401(h) Account for DPOA Eligible Retirees will be sufficient to continue to provide a $___ per month HRA for the calendar year 2018. If the City actuary concludes that such sums will not be able to continue to provide a $___ per month HRA contribution, it shall – no later than September 15, 2017 -- determine the appropriate monthly amount of the HRA contribution for 2018, and that sum shall be the monthly HRA amount for 2018. No later than November 15, 2018 the City shall advise DPOA of any projected surplus in the DPOA sub-account of the Public Safety Retiree 401(h) Account as of December 31, 2018, net of expenses. No later than December 15, 2018, the DPOA shall advise the City whether it wants such surplus to remain in the DPOA such-account of the Public Safety Retiree 401(h) Account or have the residual amount transferred to the existing HRAs as of December 31, 2018.

3. <u>Eligibility.</u> Employees who retire on or before to December 31, 2014 shall participate in the OPEB settlement available to existing retirees in accordance with the Plan of Adjustment in <u>In re City of Detroit</u>, Case No. 13-53846. Employees who retire and receive pension benefits from the PFRS on or after January 1, 2015 ("<u>Eligible Retirees</u>") shall be eligible for retiree health care benefits from the Public Safety Retiree 401(h) Account.

## 21. FURLOUGH SELECTION AND CANCELLATION

A. The annual furlough shall be divided into two (2) seasons, Summer and Winter. Each furlough season shall consist of thirteen (13) furlough periods, corresponding with the bi-weekly payroll periods. Each furlough period shall contain ten (10) consecutive days, which shall also include the standard number of leave days and up to three (3) Bonus Vacation Days granted in connection with the furlough.

An Employee drawing the first furlough in any given work period may attach five (5) leave days and up to three (3) Bonus Vacation Days at the end of the furlough (F) days. An Employee drawing the second furlough in any given work period shall have the following options concerning the five (5) attached leave days and up to three (3) Bonus Vacation Days with the furlough:

**Option 1:** Attach one (1) leave day at the beginning of the furlough period with the remaining four (4) leave days attached at the end of the furlough period. Should one (1) or more Holiday(s) fall within the furlough period, then those days replaced by the Holiday(s) may be attached at the beginning or the end of the furlough period. When

Bonus Vacations Days are attached, they may be placed at the beginning and/or the end of the furlough period.

**Option 2:** Attach five (5) leave days and up to three (3) Bonus Vacation Days at the end of the furlough period.

This does not change the requirement that eight (8) leave days must be used in each twenty-eight (28) day work period. Leave days will not be carried forward into another work period.

B.  The choice of furloughs shall be by seniority on a shift basis, consistent with the efficient operation of the precincts, and entity. In a given precinct, or entity, normally not more than ten percent (10%) of the total number of police officers shall be absent on furlough at the same time, unless the Department determines that the operational needs of the Department require otherwise. Employees assigned to special or desired jobs on Platoon Two shall draw furlough assignments among themselves and the overall ten percent (10%) limitation shall apply. Certain Employees of the Traffic Safety Section, whose duty assignments must be coordinated with the school year, may be furloughed to the greatest extent possible during the prolonged school holidays occurring during Christmas, Easter and summer vacations and between semesters and the overall ten percent (10%) limitation set forth above shall not apply. Where there is a fraction of a percentage over the ten percent (10%), an additional furlough period shall be allowed unless such fractional allowance is specifically vetoed by the Chief in writing and posted prior to the furlough draw.

C.  In the absence of an Employee, the officer in charge or another Employee designated as a representative of the absent Employee shall select the furlough period for him/her in accordance with his/her choice by seniority.

D.  Employees shall make their furlough selection in accordance with the established schedule of furlough periods.

Drawing for Summer furlough will be conducted on February 15th. Drawing for winter furlough will be conducted on August 15th.

If the scheduled drawing date falls on a Saturday, the draw will be held on the preceding Friday. If the date falls on a Sunday, the draw will be held on the following Monday.

E.  Leave days when added to a furlough shall not be canceled unless the accompanying furlough is canceled.

F.  If an Employee is sick or disabled immediately prior to his vacation, and the Employee provides medical proof of such illness or disability, the vacation shall be rescheduled to a date that is mutually acceptable to the Employee and his commanding officer.

G.  Members may elect to sell up to one (1) week of furlough time (five (5) consecutive days) per furlough period. An election to sell furlough time shall be at the time of the furlough draw. Payment shall be made within thirty (30) days after the furlough draw.

H.  Members shall have the option of selling or banking one additional week of furlough time annually. Payment for the second week shall be at the officer's current rate of pay. Payments pursuant to this Article shall not be included in average final compensation for purposes of determining pensions. Such an option shall be given, in writing, by the member at the time of furlough selection. Failure to exercise the option, in writing, at the time of furlough selection shall be a full and complete waiver of the option for that furlough period.

## 22. STEP INCREMENTS

Step increments shall be applied on the first day of the pay period in which the anniversary step date of an Employee falls.

All Employees shall receive annual step increments which shall be equal to one-fifth (1/5) of the difference between the maximum and minimum rate for Police Officer, not to exceed the maximum rate in the range, pursuant to the attached Official Compensation Schedule.

## 23. EMERGENCY/EXCUSED LEAVE DAYS

Emergency or excused days shall be granted to a member for an absence justified by urgent reasons such as attendance to demanding personal business and other pressing matters which cannot be covered by other banked time. Permission to use emergency days must be granted in advance from the member's commanding officer or the officer in charge of his/her entity. Supervisory personnel may make reasonable inquiries in order to verify that the request is legitimate but shall maintain the confidentiality of any personal information. Not more than five (5) emergency or excused days may be granted in any one fiscal year under any circumstances. All emergency or excused days will be deducted from the member's accumulated sick bank, and will consequently affect the accumulation of bonus vacation days.

Any member under the restrictions of the attendance control program (DPD 350) shall not be allowed to have emergency or excused days deducted from his sick banks and will be carried Absent No Pay.

## 24. DEPARTMENT FILES

A.  All personnel records which include home addresses, phone numbers and pictures of members shall be kept confidential and never released to any person other than officials of the Department or upon the written authorization of the member involved.

B.  A member shall have the right to inspect his official personnel record wherever kept, twice a year or more often for good cause shown.

C.  Inspection shall be during regular business hours of the respective repository and be conducted under supervision of the Department. Said member shall have the right to make duplicate copies for his own use at his own expense. No records, reports, investigations, evaluations or similar data belonging in the Personnel File or Medical File shall be hidden from a member's inspection.

D.    A member shall have the right to include in his personnel record and in any other file kept by the Department, a written refutation of any material he considers to be detrimental and to request its removal.

E.    Members may inspect their personnel file upon retirement and nothing shall be inserted in such files after the date of retirement.

F.    The Department need not comply with the above provisions for inspection in those areas where there is a current investigation of the officer. The officer must be told, however, that he is being investigated and appraised of the subject matter of the investigation.

G.    The language in this Article shall not be construed in a manner that would violate applicable law.

# 25.  POLICE RESERVES

In continuing its policy on police reserves, the City will in no event use police reserves to perform the essential core duties of bargaining unit members or to circumvent the holiday overtime and/or any other provisions of this Agreement. Should a dispute over the deployment of reserves arise, the burden of proceeding and the burden of proof in any grievance/arbitration matter shall be on the Employer to establish by probative, objective evidence, that its use of reserves did not circumvent any provision of the collective bargaining agreement, and, but for the deployment of reserves, bargaining unit members would not have been used to participate in the particular event, duty, function, activity, etc.

Subject to the Department's management rights under Article 6, reserves cannot be assigned to ride with Employees unless the Employee consents and reserves shall not ride with Employees assigned to one person cars.

# 26.  POLICE ASSISTANTS

A.    Notwithstanding any other provision of this Agreement, the Department, at its discretion, may utilize Police Assistants to perform the functions listed in Section D.

B.    In filling Police Assistant positions, the Department shall give first preference to individuals with prior experience as Police Officers with the Detroit Police Department. However, the Department shall have no obligation to hire any individual who had a significant disciplinary record with the Department or any person who has been previously dismissed from a Police Assistant position, and if the Department cannot reasonably or timely fill all Police Assistant positions with persons who have prior Detroit Police Department experience, it may utilize individuals who had previous experience as police officers with other police departments in the State of Michigan.

C.    The Department shall require that all Police Assistants, as a requirement for employment, either currently are, or will become within ninety (90) days, Michigan Commission on Law Enforcement Standards (M.C.O.L.E.S.) certified.

D.    The functions that may be performed by Police Assistants should be limited to the following:

Court Officer
Crime Analysis
Crime Scene Services
Disciplinary Administration
Fire Arms Inventory
Fiscal Operations
Forfeiture
Labor Relations
Liquor License
Media Relations
Police Law
Police Medical
Police Personnel
Prisoner Transport/Processing
Property Control
Records Management
Recruiting
Resource & Facilities Management
Secondary Employment
Technology Bureau
Traffic
Training

E.    Police Assistants will be part of the DPOA bargaining unit. Notwithstanding any other provision in this Agreement, Police Assistants will work on a part-time basis and shall serve at the discretion of the Chief. Accordingly, Police Assistants shall not have access to the grievance procedure (Article 7), arbitration procedure (Article 8), or disciplinary procedure (Article 9). Police Assistants shall be paid $21 per hour except that Police Assistants shall be eligible for wage increases in 2016, 2017, and 2018 as set forth in Article 40. Police Assistants will be eligible for uniform allowances in accordance with Article 19 of this Agreement.

F.    Except as set forth in Section E and as required by law, Police Assistants are expressly excluded from participating in, or benefiting from, the following provisions of this Agreement: Grievance Procedure (Article 7), Arbitration (Article 8), Discipline (Article 9), Seniority (Article 10), Funeral Leave (Article 12), Off-Duty Court Appearances (Article 13), Hospitalization, Medical, Dental and Optical Care (Article 20) (unless required to provide such benefits under applicable law), Furlough (Article 21), Step Increments (Article 22), Emergency/Excused Leave Days (Article 23), Shift Differential (Article 28), Holidays (Article 29), Floating Holidays (Article 30), Excused Time (Article 31), Pension (Article 32), Recall Pay (Article 33), Sick Leave (Article 34), Bonus Vacation Days (Article 36), Jury Duty (Article 37), Death Benefits and Life Insurance (Article 38), Service Weapons (Article 39.C), Lump Sum for Banked Time (Article 39.F). Furthermore, while Police Assistants formerly employed by the Department will

not lose any previously accrued pension benefits, Police Assistants will not be eligible to earn or accrue additional pension benefits.

G.     The Department's use of Police Assistants shall not result in a reduction in force (lay off) among other bargaining unit Employees, nor shall the Department utilize Police Assistants while any Employees are on lay off. Employees performing functions assigned to Police Assistants shall be reassigned to other duties in accordance with the terms of this Agreement, provided that an Employee reassigned under the terms of this Section shall have the first right of return to his or her former position if, within two years, the Department elects to again utilize a Police Officer to perform the functions of the Employee's former position.

H.     This Article shall not impact or diminish the Department's rights under any other provision of this Agreement, including but not limited to Article 25 (Police Reserves) and Article 39.H (Miscellaneous – Civilianization).

I.      The DPOA acknowledges that, as an express quid pro quo for the receipt of an 8% wage increase instead of a 5% wage increase for Police Officers effective the first pay period following ratification of this Agreement that it has agreed to (a) the City's use of Police Assistants in accordance with the terms and conditions set forth in this Article, (b) reduction in the number of holidays (Article 29) and the institution of floating holidays (Article 30), (c) elimination of accumulation of seniority sick bank time and creation of the City's right to pay out annually accumulated sick time in excess of 400 hours at 85% (Article 34), (d) elimination of 2% lump sum payment effective January 1, 2015 and 1% lump sum payment effective July 1, 2015, and (e) creation of City right to pay out accumulated compensatory time upon promotion out of the DPOA bargaining unit (Article 11). The DPOA further agrees to waive all rights to seek modifications to the terms and conditions for Police Assistants set forth in this Article to the maximum extent allowable under applicable law.

## 27. LEGAL REPRESENTATION AND INDEMNIFICATION

The City will provide legal counsel and pay any costs and judgments that arise out of lawsuits filed against Employees alleging any act committed while said Employee was in the good faith performance of his duties. A contrary determination by the City is not final and binding as provided by the Municipal Code of the City of Detroit but is subject to review by an arbitration panel under the grievance arbitration provisions of this Agreement. Pending a final determination of whether or not the Employee is entitled to defense and indemnification by the City, the City shall promptly undertake such defense on behalf of such Employee.

This provision shall otherwise be in accordance with Section 13-11-3 of the Municipal Code of the City of Detroit.

## 28. SHIFT DIFFERENTIAL

Shift premium shall be paid to all members whose regular tour of duty begins within the hours prescribed as follows, and in the amounts as set forth herein; if the tour of duty begins between 11:00 A.M. and 6:59 P.M., the rate of shift premium pay is fifty-five cents ($.55) per hour. If the

tour of duty begins between 7:00 P.M. and 3:59 A.M., the rate of shift premium is sixty cents ($.60) per hour.

The shift premium is paid to a member in addition to his basic rate of pay, for the regular tour of duty starting within the hours designated above and any overtime hours worked in conjunction with an afternoon or midnight shift.

## 29. HOLIDAYS

A.   Schedule of Holidays.

Each Employee shall be entitled to the following holidays in accordance with this schedule.

| | |
|---|---|
| New Years Day | January 1 |
| Thanksgiving Day | Fourth Thursday in November |
| Christmas Day | December 25th |

B.   Day of Celebration.

1.   The paid holiday, for all Employees of the Department, will be the actual holiday date. Should the holiday fall on a weekend, the paid holiday will still be the actual holiday date.

2.   All entities normally closed on weekends will close on Friday if the holiday falls on Saturday or they will close on Monday if the holiday falls on Sunday. The Friday or Monday will be the leave day.

3.   Should the holiday fall on Sunday and the Monday leave day begins the next twenty-eight (28) day work cycle, the leave day will be the Friday prior to the holiday or a day mutually agreed upon between the employee and the Department. Should that Friday already be used in conjunction with Article 31 (Excused Time), then the leave day will be Thursday or a day mutually agreed upon.

4.   Leave days shall not be scheduled on any designated holiday.

C.   Holiday Compensation.

1.   Holiday Premium. Employees who are required to work on a holiday shall receive one and one half time (1.5x) premium pay in addition to the regular day's pay.

2.   Hours and Shifts. Any Employee who works a shift during which four (4) or more regularly assigned hours, excluding overtime, extend into a paid holiday, shall be entitled to holiday pay for the entire duration of the shift; provided however, that the application of this rule shall not entitle any Employee to more than one shift of holiday pay for all regular hours worked on a single holiday.

D.   Rotation of Work Opportunity.  The scheduling of Employees to work on holidays shall be on a seniority rotation basis with separate rotating rosters for each precinct platoon, as specifically outlined in sub-section E. 5. and for each non-precinct entity in accordance with past practice.

E.   Preparation and Maintenance of Holiday Rosters.

1.   Posting Holiday Details.  Holiday detail sheets will be posted on bulletin boards in each precinct, or entity.

Under normal conditions, holiday assignments for Employees shall be posted seven (7) days prior to the holiday.  In instances where two (2) holidays fall within a fourteen (14) day period, assignments for the second holiday will be posted a minimum of two (2) days in advance of that holiday.  Should a position become available after the holiday detail sheet is posted and the Department decides to fill that position, supervisors will ask the next eligible Employee(s) if that Employee desires to work the holiday.  Those Employees who decline under this circumstance shall not be considered a refusal, and shall be entered on the roster as "Holiday-Late Posting" (HLP).

If the holiday detail sheet is posted prior to the required contractual posting time, management maintains the right to make any change.  If the change in the holiday detail is made, management shall notify any Employee affected by such change as soon as possible, as well as the local Union representative.  The corrected holiday detail sheet must be re-posted within the minimal contractual posting time limitation.

Once the holiday detail sheet is posted, within the minimum contractual posting time, it may be changed only to correct an error or to fill a vacancy, and after notice to a local Union representative.  Supervisors shall notify any Employee affected by such change as soon as possible.

Holiday detail sheets are posted in order to give all parties advance notice of assignments and to permit the Union steward or the Employee to bring any mistakes to the attention of his or her immediate supervisor in a timely manner.  An Employee shall notify his or her immediate supervisor of an error on the holiday detail sheet immediately upon discovery, so that it may be corrected forthwith.  If an Employee who knows or reasonably should have known of an error fails to provide such notice of the error to his or her immediate supervisor, the error is not grievable.

2.   Removal and Addition of Names.  Throughout the year, Employee names will be removed and added to various holiday rosters due to transfers, shift changes, recalls from lay-off, new hire, etc.  Employees shall be added to a roster according to their respective seniority date.  An Employee being added to a roster with a common seniority date of an Employee already on the roster shall be placed on the roster immediately below the Employees already on the roster with the same seniority date.

If the holiday detail sheet has already been posted, in accordance with the contractual time limits for posting, these Employees shall be placed on the roster for the next holiday and not considered for the holiday already posted, unless new vacancies arise prior to the holiday.

3.  Holiday Rotation.  Holiday rotation shall continue in accordance with the following rules:

    a.  The holiday rotation roster shall have continual rotation and will not start anew each July lst.

    b.  The following steps shall be utilized for preparing a holiday roster.

        i.  A supervisor preparing the holiday roster shall list all members, in descending seniority order, who will be considered to work that respective holiday. The removal and addition of names to the holiday roster shall conform with the preceding contractual holiday requirements. A member's holiday status for the previous holiday shall be taken into consideration regardless of where he worked or what roster he was on.

        ii.  Once this step is completed, the supervisor shall begin by first selecting, in descending seniority order, the members who were carried with a "Special Red Designation" (i.e., Holiday-Furlough, Holiday-Sick, Holiday-Jury Duty, Holiday-Suspended, Holiday-Limited Duty, Holiday-Late Posting, Holiday-Disabled, Holiday-Absent with Leave, Holiday-Funeral Leave) during the previous holiday. When selecting members who were carried with a Special Red Designation, the supervisor shall begin at the starting point of the previous holiday and continue through the entire holiday roster once before ending at the current holiday's starting point.

        iii.  Once the members with Special Red Designations have been selected, members with a red "Holiday" designation shall be chosen, in descending seniority order, beginning at the starting point of the current holiday and shall continue through the entire holiday roster, returning to the current holiday's starting point.

        iv.  Once all members with red designations are selected for work opportunities, the continual rotation shall continue from where it left off the previous holiday (the current "starting point"), selecting in descending seniority order members with black "holiday worked", "holiday refused" or no previous status, until sufficient personnel are obtained.

        v.  A new cut off point will then be marked immediately following the last member selected for a holiday worked opportunity.

# EXHIBIT A

# Part 2

c.   Members eligible to work are to be selected to work scheduled hours which correspond to the roster from which they are selected.

d.   Employees who have flexible starting times (such as Cruiser crews, 30 Series, Morality crews, etc.) shall have their normal starting times designated at the beginning of the twenty-eight (28) day work cycle in which the holiday(s) fall. This designation is to be used for holiday rosters only and shall not impede management from changing their working hours.

4.   Precinct Rosters. All precinct personnel shall be included on one of the following rosters with the exception as noted in E.4.e. below:

a.   **Platoon One.** All employees who start work between 12:00 a.m. and 3:59 a.m.

b.   **Platoon Two.** All employees who start work between 4:00 a.m. and 10:59 a.m. (including staff personnel).

c.   **Platoon Three.** All employees who start work between 11:00 a.m. and 4:00 p.m.

d.   **Platoon Four.** All employees who start work between 4:01 p.m. and 11:59 p.m.

e.   The exception to the above is personnel assigned to Special Operations (formerly Special Events Section) of the First Precinct. Only First Precinct Special Operations shall maintain their own rosters.

     NOTE: These start times shall not include roll call time, nor desk personnel who start earlier than normal hours.

5.   Entries on Roster. Entries on the holiday roster shall be made in the following manner:

a.   Worked -W- (Black) - indicates an employee worked the holiday.

b.   Holiday Refused -HR- (Black) - indicates an employee was given the opportunity to work, but refused.

c.   Holiday -H- (Red) - indicates an employee was not up to work the holiday and was on holiday.

d.   Holiday Furlough -HF- (Red) - indicates an employee was eligible to work the holiday but declined the holiday due to being on furlough. The furlough period for this designation shall consist of the ten (10) furlough days as well as the customary number of leave days and up to three (3) Bonus Vacation Days attached to the furlough period.

e. Holiday Sick -HS- (Red) - indicates an employee was eligible to work the holiday, but was unable to do so because of being sick.

f. Holiday Disabled -HD- (Red) - indicates an employee was eligible to work the holiday, but was unable to do so because of being disabled.

g. Holiday Jury Duty -HJD- (Red) - indicates an employee was eligible to work the holiday, but was unable to do so because of jury duty.

h. Holiday Limited Duty -HLD- (Red) - indicates an employee was eligible to work the holiday, but was not allowed to do so due to the fact that there was no job openings available for an employee on limited duty status.

i. Holiday Late Posting -HLP- (Red) - indicates an employee was not eligible to work the holiday when the holiday roster was posted but after the posting was asked due to a position becoming available and declined.

j. Holiday Suspended - HX - (Red) - indicates an employee was eligible to work the holiday but was suspended on the holiday and had disciplinary proceedings still pending or an employee who was serving a suspension of more than thirty (30) days as a result of completed disciplinary action (after all appeals have been exhausted).

An officer serving a suspension of thirty (30) days or less as a result of completed disciplinary action (after all appeals have been exhausted) shall be allowed to work a holiday if eligible.

k. Holiday Absent with Leave - HAWL - (Red) - indicates an employee was eligible to work the holiday but was on an authorized absence with leave.

l. Holiday Funeral Leave - HFL - (Red) - indicates an employee was eligible to work but was on funeral leave.

6. Insufficient Personnel. In the event that insufficient Employees volunteer to work the holiday, reverse seniority shall prevail and Employees shall be ordered to work.

Exceptions to this draft shall be as follows:

Employees on furlough (inclusive of the customary number of attached leave days) shall be bypassed in a draft situation.

F. Special Rules Affecting Rotation.

1. Sick or Disabled Absences. Employees who are scheduled to work a holiday, but are unable to do so due to being sick or disabled, shall be carried "Holiday Sick" (HS) or "Holiday Disabled" (HD).

2.    Employees on Furlough. For purposes of this Article, a furlough period includes the customary five (5) attached leave and up to three (3) attached Bonus Vacation Days. The furlough includes the holiday even if it should fall on the first day of the regularly scheduled furlough.

Employees scheduled for a furlough period that would include a holiday shall not be charged with a furlough day for the holiday.

Employees on furlough when a holiday occurs shall be offered an opportunity to work the holiday if their names are reached on the roster. If the Employee accepts the opportunity, the entry made on the holiday roster shall be the same as if the holiday had been worked while not on furlough. In order to assure that the holiday scheduling of such Employees can be properly managed, prior to starting their furlough or prior to the minimum posting date, whichever is earlier, the employees must inform their immediate supervisor in writing whether or not they desire to work the holiday.

The supervisor shall take into account the Employee's choice when making up the holiday detail sheet. Furloughed Employees who have expressed a desire to work shall be responsible for ascertaining from the Precinct Desk Supervisor or the supervisor in charge, whether or not they are scheduled to work the holiday. Furloughed Employees who have expressed the desire to work and who successfully receive a holiday assignment are subject to all the employment and payroll rules of other non-furloughed Employees also scheduled to work and should they fail to report to their assignment, the fact that they are on furlough will not be an acceptable excuse.

Employees on furlough when a holiday occurs, and who decline their opportunity to work, shall not be considered as having refused holiday work and shall be entered on the roster as "Holiday Furlough" (HF).

Employees on furlough when a holiday occurs and who did not have an opportunity to work because their names were not reached on the roster, shall be entered on the roster as "Holiday" (H).

3.    Employees on Limited Duty. Employees on limited duty status are fully entitled to participate in the normal continuous rotation of holiday work opportunities. However, their opportunity to receive an assignment is restricted to those assignments which can be performed by the Employee on limited duty. Limited duty positions shall not be created by bumping regular assigned Employees from their respective regular job assignments.

4.    Employees Temporarily Assigned-Out to Other Commands. Employees assigned-out to other commands shall remain on the holiday roster of their parent command and are fully entitled to work a holiday assignment at that command when their name is reached with the following exceptions:

a.    **Belle Isle Summer Detail (Harbormaster Section).** Employees assigned to this detail shall be removed from their parent command's holiday roster

and placed on the appropriate roster maintained at the Harbormaster Section.

b. **Auto Theft.** Employees assigned into this entity, on limited duty status (usually long term limited duty employees), shall be removed from their parent command's holiday roster and placed on the appropriate holiday roster maintained at the Auto Theft.

c. **Telephone Crime Reporting Section.** Employees assigned into this section (usually long term limited duty employees), shall only be allowed to work at TCRS if they are eligible to work on their parent command's roster. If no work is available at this section, the employee retains the right to work at his parent command if a position is available.

d. **Field Duty Officer - Driver.** The Field Duty Officer may select a driver of his choice for a holiday regardless of whether or not the employee is eligible to work the holiday on the parent command's roster.

e. **Identification Section.** Employees assigned into this section (usually long term limited duty employees), shall only be allowed to work at the Identification Section if they are eligible to work on their parent command's roster. If no work is available at this section, the employee retains the right to work at his/her parent command if a position is available.

f. **224-DOPE.** Employees assigned into this section (usually long term limited duty employees) shall only be allowed to work at 224-DOPE if they are eligible to work on their parent command's roster. If no work is available at this section, the employee retains the right to work at his parent command if a position is available.

g. **Records and Statistics Section.** Employees assigned into this section (usually long term limited duty employees), shall only be allowed to work at this section if they are eligible to work on their parent command's roster. If no work is available at this section, the employee retains the right to work at his parent command if a position is available.

G. <u>Job Assignment</u>. Employees working a holiday shall normally work their regular assignments. In the event that the Employee's regular assignment is not scheduled to be worked on the holiday, those Employees shall be assigned to other vacant detail sheet assignments from within their respective roster. Job bumping shall not be allowed among those Employees eligible to work the holiday.

## 30. FLOATING HOLIDAYS

Each employee shall be entitled to four (4) floating holidays. Each floating holiday shall be a day off work at the regular straight time rate of pay. An officer may request to take his floating holidays by submitting a request in writing to his commanding officer. An officer may request

to take his floating holidays in any sequence, provided, however, that a floating holiday may not be attached to a furlough. This request will be reviewed for the availability of personnel by his commanding officer. In all cases, preference shall be given for Employee requests for use of floating holidays over requests for bonus vacation days (Article 36) or excused time (Article 31). Seniority will be a prime consideration when several officers request to use a floating holiday on the same day.

This article does not affect or limit the right of the Department to determine the number of employees assigned to work. Consequently, there will be no increase in the total number of employees who are absent and the effect of granting an employee's request could be that the seniority leave day request of another employee (even if more senior) will be denied.

Floating holidays must be used in the fiscal year that they are earned and shall not be carried over to a subsequent fiscal year. The Department shall ensure that floating holidays are expended proportionately throughout the year and are not carried until the last months of the fiscal year; therefore, on April 1st, the commanding officer shall assign any unselected floating holidays at his or her discretion.

## 31. EXCUSED TIME

Employees shall be granted eight (8) hours of "Excused Time" on Good Friday or the last eight (8) hours on the last scheduled day prior to Good Friday, eight (8) hours of "excused time" on Easter or the last eight (8) hours on the last scheduled day prior to Easter, and eight (8) hours of "Excused Time" on the last scheduled paid day before Christmas Day and before New Year's Day and Martin Luther King's Birthday provided they are on the payroll through the holiday in question. Employees required to work any portion of the "Excused Time" on these days will receive equal time off for hours worked or straight time cash at the option of the Chief of Police. No holiday premium will be paid for work on these days.

## 32. PENSION PROVISIONS/PLAN OF ADJUSTMENT

During the term of this Agreement Employees will be entitled to retirement benefits in accordance with the terms of the Memorandum of Understanding Regarding the Police and Fire Retirement System of the City of Detroit, Michigan. The terms of the Memorandum of Understanding may be modified to conform with any plan of adjustment approved by the United States Bankruptcy Court.

## 33. RECALL PAY

Employees are entitled to recall pay at time and one-half (1½ ) rate if recalled to duty after reporting off duty and before their next tour of duty. A minimum of two (2) hours will be granted to a recalled member. Travel time, not to exceed one-half (½) hour each way shall be granted for travel to and from the duty station when the total time worked exceeds one (1) hour.

The recall rate shall not be paid when a member works continuously beyond his normal tour without first being relieved. The recall rate shall terminate as of the time that his next regular tour was scheduled to begin and he will not receive any travel time back to his residence.

Recall pay shall not be granted when:

A.    A mobilization has been ordered;

B.    Leave, furlough, bonus vacation days or compensatory time days have been canceled;

C.    A member has been directed to appear in court;

D.    A member is given notice of a change in shift starting time prior to his going off duty.

# 34. SICK LEAVE

A.    <u>Sick Banks</u>.

    1.    Current sick bank is designated as that sick time accumulated at the rate of one (1) day for every calendar month in which a member has been credited for not less than eighteen (18) paid time days, excluding overtime.

    2.    Current sick time bank shall accumulate without limitation, provided that, for Employees who on July 1st of any year have accumulated more than 400 hours of sick time (including both unused current sick time and unused seniority sick bank time), the Department at its discretion may pay out all or any portion of the Employees' accumulated sick time in excess of 400 hours. Such payments shall be in accordance with the following terms:

        a.    The Department will announce whether it has elected to pay out sick time under the terms of this Agreement up to one year in advance. For example, as soon as practicable after the effective date of this Agreement, the Department will announce whether it will elect to pay out sick time accrued as of July 1, 2015. As soon as practical after July 1, 2015, the Department will announce wither it will elect to pay out sick time accrued as of July 1, 2016, and so on.

        b.    At the time it makes such announcements, the Department will also announce the amount of sick time that it may buy out.

        c.    Any payments under this Section shall be made at 85% of the Employee's base rate of pay during the previous fiscal year. If the Department elects to make a payment under this provision, the payment shall be made on the first pay date after December 1, or earlier if agreed upon by both parties. For example, any payment made based upon sick time accrued as of July 1, 2015 shall be made on the first pay date after December 1, 2015, unless otherwise mutually agreed. Notwithstanding any other provision of this Agreement, an Employee may elect to have a payment made pursuant to this Section contributed into the Employee's Annuity Savings Account in lieu of a cash payment.

    3.    Employees shall no longer accumulate additional seniority sick bank time.

B.   Sick Time Credit. The term "sick time" shall be defined as absence due to illness or injury of the member, to exposure to a contagious disease and to the attendance upon immediate members of the family of the member of the Department living within his household, including husband, wife, children, father, mother, sister, brother and relatives living in the same household regardless of degree of relationship. The granting of sick time for attendance upon these relatives is not limited to any given number of days per fiscal year; however, no more than three (3) days will be granted in one instance.

This sick time is granted to permit the member to make arrangements for care of the ill person so that he may return to duty. When it comes to the attention of the Department that a member is abusing sick leave, the Chief of Police may cause an investigation to be initiated. Such investigation may result in disciplinary action, consistent with this Agreement.

C.   Deductions from the Sick Bank. Sick banks, both current and seniority, are designed to provide for non-duty connected illness or disability. No deduction from either current or the seniority sick banks shall be made for any sick time resulting from a service-connected illness or disability which is certified by a physician designated by the Department.

Sick time shall be charged first to the current sick bank and secondly, to the seniority sick bank, in periods of not less than half-days.

When a member starts his shift but is unable to finish the shift because of sickness, sick time will be deducted in the following manner. If less than four (4) hours has been worked, the Employee will be charged half a sick day and credited with half a work day. If four (4) or more hours have been worked from the beginning of the shift, the Employee will be credited with a full work day.

During a period of illness, only that time which would be actual working time will be deducted from the sick bank. Illness or injury during furlough time may be changed to sick time in lieu of the member's furlough, provided such illness or injury during the furlough shall be reported forthwith to the member's commanding officer and to a physician designated by the Department. Such illness or injury will be verified by the physician designated by the Department. The unused portion of the member's furlough will be rescheduled and used immediately following recovery from the illness or injury which made the change necessary.

D.   Reporting Illness or Disability. When any member becomes sick, the officer in charge must be notified without delay and informed where the member is confined. If a member is hospitalized, the officer in charge shall be notified and will cause a physician designated by the Department to be notified, during the next regular office hours, of the nature of the illness and the hospital to which the member was admitted. Members unable to report for duty because of sickness shall have their duty station notified not less than one (1) hour before roll call daily, in order to remain in a sick status. An Employee calling in sick in accordance with this provision will not be allowed to work until his next scheduled tour of duty. Under normal circumstances, a physician designated by the Department will not make visits to an individual member's home. When attending a sick

officer, a physician designated by the Department shall issue him a notice stating the nature of the illness and whether or not the officer shall remain off duty. The notice must be turned in to the commanding officer when the member returns to duty.

Employees on extended sick leave (more than three (3) work days) are required to keep their commands informed of their incapacity and expected date of return. In this instance, the Employee shall not be required to call in daily as specified above. Employees on sick leave of thirty (30) days or more may be ordered to obtain verification by a physician designated by the Department.

E.     Limited Duty. Officers placed on limited duty by a physician designated by the Department shall report immediately with their limited duty authorization slip to an appropriate command designated by the Chief of Police. Said command will determine an appropriate limited duty assignment and notify the member's commanding officer. Limited duty assignments are made by the Chief of Police under the authority granted by Article VII, Chapter VIII, Section VI, paragraph (4) of the City Charter and are subject to the limitations thereof.

An officer on limited duty normally shall not wear a uniform except under emergency conditions when ordered by his commanding officer. In such cases, however, the officer shall not leave the building or travel to and from work in uniform.

The number, location, and duration of restricted duty assignments, as well as whether a restricted duty assignment vacancy exists, shall be within the discretion of the Department.

The Department may give preference for restricted duty assignments to those Employees whose injury or illness is determined to have occurred in the line of duty over Employees whose injury or illness is determined to have occurred not in the line of duty. When the Department determines that the number of restricted duty Employees exceeds the available number of restricted duty assignments, in accordance with the limitations enumerated below, Employees having or seeking a restricted duty position for a non-duty related medical condition may be required to utilize sick time benefits. An Employee who is required to utilize sick time benefits by operation of this paragraph but who has no accumulated sick time will be allowed to use other accumulated time to cover the absence.

When an Employee having a non-duty related injury or illness is displaced from a restricted duty position, or when no restricted duty position is currently available, the Employee shall be placed on a waiting list for assignment to an available restricted duty position. Placement on this waiting list shall be by departmental seniority and placement in restricted duty positions shall be made in seniority order provided the Employee is able to perform the duties of the particular restricted duty position.

Notwithstanding the provisions of this Article, Employees on restricted duty for a non-duty related injury or illness and who are able to perform the duties of their regularly assigned job shall not be subject to being displaced by either an employee having a duty-related injury or illness or by a more senior employee having a non-duty related injury or illness.

The Department shall maintain a continuous listing of those Employees who are restricted duty which shall indicate their duty assignment, seniority date, whether the status is for a duty or non-duty related reason, and other relevant data the parties may from time to time agree upon. The Department shall provide the Association with a copy of the list on any day that a change has been made.

Nothing in this Article shall affect the right of the Department under the Charter of the City of Detroit to refer Employees for duty or non-duty disability pensions.

F.    <u>Determination of Sick or Disability Status</u>. It is the responsibility of a physician designated by the Department to determine whether the illness or injury of a member is duty incurred. When a member sustains an original injury in the performance of duty during his regular duty hours, and is unable to complete his tour of duty, he shall be carried disabled. At all other times, he shall be carried sick until a final determination is made by a physician designated by the Department. Under no circumstances shall the status of a member being carried sick or disabled be changed in the time book or other Department records without the written authorization of a physician designated by the Department. A physician designated by the Department shall authorize such change by preparing an inter-office memorandum. Employees are automatically assigned to Platoon Two while disabled.

G.    <u>Report for Duty When Ordered</u>. Any member reported fit for duty by a physician designated by the Department who does not report at the roll call indicated by the physician shall be considered absent without leave.

H.    <u>Return to Duty</u>. To assure proper health safeguards for Department personnel, members who are ordered off duty by a physician designated by the Department due to illness or injury, whether service connected or not, shall not be returned to active or limited duty assignments without being certified for such assignment by a physician designated by the Department.

I.    <u>Illness or Injury Services</u>. In non and/or post emergency cases, police personnel who have incurred a service connected illness or injury must obtain approval from a physician designated by the Department before securing any type of medical attention or treatment for the illness or injury, including x-rays and dental care. The Department will not be liable for costs so incurred unless prior approval is obtained.

Officers who are duty disabled or on limited duty shall report for physical examinations when directed by a physician designated by the Department. Furthermore as a condition for continuing disabled or limited duty status and the benefits thereof, the officers must submit to all reasonable examinations ordered by the Department. Failure to do so will lead to immediate termination of such status and benefits.

J.    <u>Depletion of Sick Banks</u>. If a member is unable to perform police duties when all his sick banks are exhausted, he shall be dropped from the payroll unless he is eligible for non-duty connected retirement benefits. A member exhausting his sick banks who has completed five (5) or more years of service and who is otherwise eligible for non-duty connected disability retirement, may be retired at his own request or at the request of the Chief of Police subject to the approval of the Retirement Board.

A member may apply for reinstatement within two (2) years of being removed from the payroll if he recovers sufficiently from his illness or injury to return to duty. He/She may be reinstated in the same status as when he/she left upon proper certification by a physician designated by the Department and appointment by the Chief of Police.

K.   Retirement and Death Sick Leave Payment. Immediately preceding the effective day of a member's retirement, exclusive of duty and non-duty disability retirement, or at the time of a member's death, he or his estate shall be entitled to pay for his unused accumulated sick banks as follows:

An Employee shall receive full pay for eighty-five percent (85%) of the unused accumulated sick bank amounts.

If a member is granted a duty or non-duty disability retirement, he shall be entitled to a reimbursement of unused sick time according to the preceding formula, upon attaining his normal full duty retirement date and petitioning the Chief of Police for such reimbursement.

## 35. REGULARITY IN THE USE OF SICK LEAVE BENEFITS

A.   General. The Detroit Police Department is responsible for providing efficient law enforcement services. Maximum attendance is required from all members if this responsibility is to be fulfilled.

It is, therefore, necessary to identify and correct members who have developed a pattern of regularity in the use of their sick leave benefits. Therefore, all commanding officers are to review the records of their members quarterly: each January 10th, April 10th, July 10th and October 10th.

B.   Counseling Regarding Regularity in the Use of Sick Leave Benefits. Upon review and approval of the commanding officer, a ranking member shall counsel subordinates whose records show such an indication. The counseling session shall include a discussion of the pattern observed to date, and the member's reason for absences. Where appropriate, the supervisor shall explore positive future courses of available action with the member in an effort to assist the member in adopting corrective measures. At the end of the counseling session, the supervisor shall prepare a detailed report of the meeting and attach the report to the member's Detroit Police Department Attendance Card, D.P.D. 350-C. A copy of this report shall be provided to the member. Note, however, that said counseling does not constitute disciplinary action and as such may not be noted in the administrative counseling register. Further, said detailed report shall be removed from D. P. D. 350-C at the end of six months providing no further corrective action has been necessary since the initial counseling session with the member.

C.   Continued Pattern of Regularity in the Use of Sick Leave Benefits. If counseling does not produce improved attendance, and the supervisor, after meeting with the member, determines that no satisfactory reason exists which would justify said continued regularity in sick leave usage, upon review and approval of the commanding officer, the supervisor shall personally serve the member with a Notice of Regularity in the Use of

Sick Leave Benefits, D.P.D. 350, and forward the necessary copies as outlined on the form. The supervisor shall inform the member of the requirement to obtain documentation of the illness or of the illness of a family member which necessitates the member's absence from work. This documentation shall consist of a statement from a physician concerning the illness for each sick day taken during the next three month period. This requirement must be strictly adhered to during said period of time, except where the commanding officer is convinced that a reasonable basis exists for not requiring a physician's note in conjunction with a particular absence. The member will also be advised that said physician's documentation shall be submitted on D.P.D. 350-A, or an equally detailed doctor's note, and shall be presented to the member's section commanding officer within three days after returning to duty. This documentation is subject to the review of the department physician. Commanding officers shall ensure that the copy of D.P.D. 350-A which is submitted by the member is forwarded to the Medical forthwith for retention.

A member who has been served with a Notice of Regularity in the Use of Sick Leave Benefits, D.P.D. 350, and is being carried sick due to personal illness or injury or for attendance upon a sick family member, must secure permission from the officer in charge of the member's entity or, if the entity is closed, from the officer in charge of the precinct in which the member resides before the member may leave the member's place of confinement. This restriction does not apply on leave days or non-duty hours.

"Improved attendance" as used herein shall mean that the member has consistently and reliably demonstrated the capacity to provide proper and sustained attendance within the meaning of this article. For purposes of interpreting the preceding sentence, the word "sustained" shall be construed to mean an improvement which demonstrates that the abuse has been eliminated.

The supervisor shall further advise the member that failure to satisfactorily comply with the regulation will result in the designation of each working day taken as "Sick" to "Absent No Pay." The supervisor shall also advise the member that unless attendance improves, additional disciplinary action may be imposed.

D.   Improved Attendance. A member placed on a D.P.D. 350 will have his attendance reviewed on a quarterly basis and will be removed from the restrictions of that provision upon a showing of improved attendance within the meaning of the above definition.

E.   Extended Medical Treatment. Members who document that their illness requires treatment on a regular basis may submit D.P.D. 350-A for that ailment on a semi-annual basis. The physician designated by the department, however, may want further verification concerning said ailment, and accordingly the member may be required to see the physician.

F.   Failure to Present Documentation by a Physician. If failure to comply with the regulation set forth on D.P.D. 350 occurs, the section commanding officer shall personally serve the member with a Notice of Failure to Present Documentation by a Physician, D.P.D. 350-B, and shall forward the necessary copies as outlined on the form. A designation of "Absent No Pay" will be entered in timekeeping records.

G.   Appeals. Any member may file a grievance regarding the imposition of a Notice of Regularity in the Use of Sick Leave Benefits, D.P.D. 350. If the grievance is granted, the arbitrator shall be empowered to provide an appropriate remedy, including reimbursement of expenses for medical visits ordered by the Department.

# 36. BONUS VACATION DAYS

Bonus vacation days are granted for unused current sick time. Officers who have accumulated a minimum of thirty-five (35) sick days including both current and seniority days and have a minimum of six (6) years of service on July 1st of each year will be credited with one-half (1/2) of the unused current sick time from the previous fiscal year up to six (6) days. An officer may request to take his bonus vacation days in any sequence (except when attached to a furlough as stated below) by submitting a request in writing to his commanding officer. This request will be reviewed for the availability of personnel by his commanding officer. Seniority will be a prime consideration when several officers request the same period of time off.

An officer shall be allowed to use up to three (3) bonus vacation days in conjunction with a furlough. The request to utilize bonus vacation days in this manner must be included in the leave day request. Bonus vacation days, when connected to a furlough, shall not be canceled unless the accompanying furlough is canceled. This article does not affect or limit the right of the Department to determine the number of employees assigned to work. Consequently, there will be no increase in the total number of employees who are absent and the effect of granting an employee's request could be that the seniority leave day request of another employee (even if more senior) will be denied.

The Department must insure that bonus vacation days are expended proportionately throughout the year and are not carried until the last months of the fiscal year; therefore, on April 1st, the commanding officer shall assign the remaining bonus vacation days at his discretion. Any request to utilize unused bonus vacation days in conjunction with a furlough scheduled during the months of April, May or June must be submitted to the commanding officer by April 1st or those bonus vacation days will be assigned.

Bonus vacation time shall be deducted from the member's bonus vacation bank before compensatory time shall be taken.

# 37. JURY DUTY

A.   All Employees who serve on jury duty on regularly scheduled work days exclusive of leave days, furlough days and holidays will be paid the difference between their pay for jury duty and their regular straight time pay for all days they are required to serve on jury duty.

B.   In the event that an Employee reports for jury duty but does not actually serve on jury, he will be paid the difference between the jury pay received and his regular day's pay and be excused for the day.

C.   In order to receive payment for jury duty supplementation, an Employee must have been regularly scheduled to work on a non-overtime basis, must give reasonably prompt prior

notice to his supervisor that he has been summoned for jury duty, and must furnish satisfactory evidence that he reported for or performed jury duty on the days for which he claims such payment, provided that the commanding officer shall have discretion in seeking to have the Employee excused when his services are essential.

D.   Employees shall have the option when called to jury duty to use vacation, bonus vacation or compensatory time for such service. In that event, the Employee will not be required to turn in his jury pay. However, the Employee must notify the Department of his desire to exercise this option prior to the first date of jury service.

If the date for jury duty falls upon a day when the Employee is scheduled to work other than Platoon 2, the Department, upon request of the Employee, will rearrange the Employee's working schedule so that he will be carried working Platoon 2 on that date(s). If the date for jury duty falls upon a holiday an Employee is scheduled to work, the Employee shall be allowed to attend jury duty without loss of the Employee's holiday work opportunity.

E.   For payroll purposes, jury duty shall be considered as time worked.

F.   An Employee on jury duty will be continued on the payroll and be paid at his straight time hourly rate of his normally scheduled hours of work. Upon return from jury duty, the Employee shall present evidence of the amount received from such jury duty and return that amount to the City, less any mileage allowance paid for the jury service.

If an Employee fails to turn in his jury duty payment, the City will hold subsequent payments due to the Employee until the City is reimbursed for all time lost due to the alleged jury duty service.

G.   Where Employees once impaneled are excused for days or parts of days, reimbursement shall be made only for time served. Employees should otherwise be expected to report for work.

## 38. DEATH BENEFITS AND LIFE INSURANCE

A.   <u>Death Benefits</u>. Section 13-8-8 of the Municipal Code of the City of Detroit currently provides a death benefit of ten thousand dollars ($10,000).

  1.   Membership shall be mandatory for regular Employees.

  2.   Contribution

  By the City - $13.30 per year per Employee.

  By the Employee - $.20 per week or $10.40 per year.

B.   Payment for employees killed or permanently disabled in line of duty:

  1.   A lump sum duty death benefit of ten thousand dollars ($10,000) shall be paid to the beneficiaries or estate of Employees who are killed or who die as a result of

injuries sustained in the actual performance of their duties in accordance with the City Council resolution of August 23, 1977, p. 1683, March 26, 1974, p. 627, and March 2, 1954, p. 509.

2. A lump sum payment of ten thousand dollars ($10,000) shall be made to any Employee who is totally and permanently disabled from illness or injury arising solely out of the actual performance of his duties. "Totally and permanently disabled" shall be defined exclusively as follows:

   a. Total and permanent loss of sight of both eyes.

   b. Loss of both legs or both feet at/or above the ankle.

   c. Loss of both arms or both hands at/or above the wrist.

   d. Loss of any two of the members of facilities enumerated in a., b., c.

   e. Permanent and complete paralysis of both legs or both arms or one leg and one arm.

   f. Incurable insanity or imbecility. Claims for this payment shall be made in accordance with the City Council resolution of March 26, 1974, p. 627.

3. Employees who receive a permanent disability under this Article shall be ineligible for the $10,000 Duty Death Benefit described in Section B.1. above. Denial of the $10,000 Duty Death Benefit may be appealed directly to arbitration in accordance with Article 8 (Arbitration) of this Agreement.

C. **Group Life Insurance:**

A group life insurance program for the Employee and his family is available for all members of the Employees Benefit Plan on an optional basis, under the provisions of the City Code, Chapter 13, Article 9.

1. Membership

   Optional for members of the Employees Benefit Plan.

2. Contributions

   The City shall pay one hundred percent (100%) of the premium for insurance up to and including thirty-five thousand dollars ($35,000) for each member plus five thousand dollars ($5,000) for each dependent.

   Additional life insurance may be purchased through this plan at the Employee's expense.

   Employees and their dependents who are on a duty disability retirement shall be covered by this program.

# 39. MISCELLANEOUS

A. <u>Relation to Regulations, etc</u>. This Agreement shall supersede any rules, regulations, ordinances or resolutions inconsistent herewith.

B. <u>Savings Clause</u>. If any article or section of this Agreement or any supplement thereto should be held invalid by operation of law or by any tribunal of competent jurisdiction, or if compliance with or enforcement of any article or section should be restrained by such tribunal, the remainder of this Agreement and supplements shall not be affected thereby, and the parties shall enter into immediate collective bargaining negotiations for the purpose of arriving at a mutually satisfactory replacement for such article or section.

C. <u>Service Weapon</u>. All Employees shall be provided at no charge with their department-issued service weapon upon full service retirement. An Employee will have no more than thirty (30) days after separation to make such request to the Chief of Police. The Department may refuse to give Employees their weapon for good cause shown. Good cause will be established where an Employee has pending criminal charges or has been convicted of a crime, is subject to departmental investigations, or psychological restrictions. Employees who are involuntarily discharged will not receive a service weapon.

D. <u>Longevity Pay</u>. There will be no longevity payments during the term of this Agreement.

E. <u>Direct Deposit</u>. Members of the bargaining unit may participate in the direct deposit programs offered by the City.

F. <u>Lump Sum for Banked Time</u>. Whenever an Employee leaves employment with the Department, such Employee will be paid for all banked time, other than sick time, at the prevailing rate of pay in effect at the time of separation. This includes, but is not limited to separation with a deferred vested pension or under a disability. DROP plan participants will only receive payout for banked time when they permanently retire, not when they enter the DROP plan. Payments will be paid within ninety (90) days if the amount is less than ten thousand dollars ($10,000), and if in excess of ten thousand dollars ($10,000), the amount will be made in semi-annual installments over a three (3) year period with the installments due on February 1 and August 1 with no interest due.

G. <u>Correction of Overpayments and Underpayments</u>. Where by payroll error an Employee is underpaid or overpaid, the City is expressly authorized to correct the underpayment or overpayment by payroll adjustment. The City shall notify an Employee in writing fourteen (14) calendar days prior to making any payroll recovery. Each deduction by the City shall be substantiated in the records of the City and shall be identified as to the individual Employee.

H. <u>Civilianization</u>. Positions within the Department that do not require Michigan Commission on Law Enforcement Standards (M.C.O.L.E.S.) certification are subject to civilianization at any time. Any reductions in force (lay-offs) resulting from civilianization will comply with Article 10.I. (Seniority – Lay-off and Recall).

I.   Ammunition. All members shall be provided with limited penetration, full expansion rounds to be carried on or off duty. Members shall also be allowed to purchase (at their own expense) and carry other Department approved limited penetration, full expansion rounds.

J.   Canine. With respect to any assignment made to Canine (K-9), the City may, at its discretion, direct the member on said assignment to return all departmental dogs under the age of five (5) and all departmental equipment to the department at such time as that member is no longer assigned to Canine.

K.   Care of Departmental Dogs. Employees will be paid at a rate of time and one-half for the actual off-duty time spent caring for Department dogs, provided such work is authorized. Employees may expend a maximum of forty (40) minutes per day caring for Department dogs; provided, however, that Employees may expend additional time per day with the prior approval of their supervisor. Employees caring for more than one Department dog shall receive an additional fifteen (15) minutes per day, per dog. The Department retains the discretion to determine whether time spent in excess of the above is necessary and whether it shall be performed while the member is on duty or off duty. Employees shall maintain a record, on a form to be established by the Department, of the time spent in the performance of these duties, and submit the form to the Administrative Sergeant on a bi-weekly basis. This time shall be reported on the bi-weekly Time and Attendance Report as kind-of-time 66.

## 40. WAGES

A.   Wages – September ___, 2014 through June 30, 2019 – Base Salary:

○   8% wage increase effective first payroll period after the ratification of this Agreement.

○   2.5% wage increase effective July 1, 2016.

○   2.5% wage increase effective July 1, 2017.

○   2.5% wage increase effective July 1, 2018.

In addition to the foregoing, DPOA members shall receive their pro rata share of the lump sum payments described in Section 5 of the July 8, 2014 Term Sheet between the DPOA and the City of Detroit. In all other respects, this wage provision supersedes any prior agreement or term sheet between the parties.

B.   Wage Scale. Employees' wages during the term of this Agreement are set forth in the attached Official Compensation Schedule.

C.   Differential. Salaries for the following classifications will be maintained at the dollar differentials indicated for the term of this Agreement.

1.   Communications Officer - Police Officer (Class Code 33-12-11)

| Start | $450 over starting salary of Police Officer |
| After one year | $450 over salary of one-year Police Officer |
| After two years | $450 over salary of two-year Police Officer |
| After three years | $450 over salary of three-year Police Officer |
| After four years | $450 over salary of four-year Police Officer |
| After five years | $450 over salary of five-year Police Officer |

2.  Band Director - Police Officer (Class Code 33-12-14)

    $821 over maximum of salary of Police Officer

3.  Assistant Supervisor of Motor Vehicles - Police Officer (Class Code 33-12-15)

    $862 over maximum salary of Police Officer

4.  Police Data Processing Programmer - Police Officer (Class Code 33-12-26)

    Minimum: $589 over maximum salary of Police Officer
    Maximum: $1,738 over maximum salary of a Police Officer

5.  Radio Maintenance Officer - Police Officer (Class Code 33-12-12)

    $862 over maximum salary of a Police Officer

6.  Radio Systems and Planning Officer - Police Officer (Class Code 33-12-13)

    $1,567 over maximum salary of a Police Officer

7.  Senior Police Data Processing Programmer - Police Officer (Class Code 33-12-36)

    Police Lieutenant salary

8.  Neighborhood Police Officer (Class Code __-__-__)

    $1,198 over maximum salary of a Police Officer

9.  Police Detective Trainee (Class Code __-__-__)

    $1,198 over maximum salary of a Police Officer

10. Police Corporal (Class Code __-__-__)

| Start | $1,198 over maximum salary of a Police Officer |
| When engaged in field training operations | $2,396 over maximum salary of a Police Officer |

# 41. PERMANENT SHIFT PROGRAM

A.   The permanent shift program shall only apply to precinct job assignments on the day, afternoon and midnight shifts that historically rotated among all three (3) shifts. In addition, the permanent shift program shall apply to the Harbormaster which for purposes of the program shall be treated as an entity distinct from the Northeastern Precinct and to the Tactical Response Unit (TRU), Canine and the Public Housing Section. All assignments shall be based on seniority provided the Employee is qualified.

B.   There shall be no periodic re-bidding procedure and vacancies will be filled, if and when the Department decides to fill them, in accordance with the following procedures:

1.   A vacancy exists when an officer performing the assignment is permanently transferred, permanently reassigned, resigns, retires, dies, is separated, or when the Department increases the number of officers on a shift.

2.   Employees having less than two (2) years of service may be assigned to shifts and assignments within the discretion of management. At the end of two (2) years of service, their positions shall be considered vacancies and shall be subject to the procedures of this Article except where an officer has obtained a permanent job reassignment through the blue slip procedure in accordance with the provisions of Subsection 4 of this Section B.

3.   Whenever the Department chooses to fill vacancies created as a result of officers completing two (2) years of service, the positions to be filled shall be posted at least ten (10) days before they are permanently filled.

4.   Employees with less than eighteen (18) months service shall not be entitled to use the blue slip procedure to bid on a permanent job assignment. Employees with at least eighteen (18) months and less than twenty-four (24) months service shall be entitled to use the blue slip procedure to bid on a permanent job assignment other than a scout car.

5.   In addition to the existing procedure for filling job assignments, Employees may also submit a blue slip indicating their preference for a shift change. In accordance with present practice, a blue slip that is accepted shall be reviewed promptly to determine if the Employee is qualified. When vacancies occur the most senior qualified Employee will have his blue slip request honored. All blue slips will expire on October 1 of each year. The blue slip procedure is for the filling of vacancies and no Employee may be bumped. The blue slip of an officer requesting a particular assignment on a shift shall be honored before the blue slip of an officer requesting the shift only.

6.   In the event of an involuntary reassignment from one shift to another, the officer having the least Department seniority shall be reassigned. This provision shall not affect the Department's right to reassign members in accordance with B.2.

7.      Employees transferring into an entity participating in the permanent shift plan, may be initially assigned to shifts and assignments within the discretion of management, provided there are no blue slips on file for the requested shift or assignment. Thereafter, except as limited by the provisions of Subsections 2 and 4 of this Section B., Employees may utilize the blue slip procedure in Article 10, Section G.1. While Employees shall be entitled to submit a blue slip for a shift or assignment they shall not be eligible to exercise seniority for shifts for a period of six (6) months or assignments for one (1) year. When Employees are involuntarily transferred to an entity participating in the permanent shift program they shall not be eligible to exercise seniority for shifts for a period of three (3) months or assignments for six (6) months.

C.      A Joint Labor Management Permanent Shift Committee, consisting of not more than five (5) representatives from the Association and five (5) representatives of the Department shall meet within five (5) working days of the request by either party. The Committee shall meet to discuss issues related to the transition from rotating to permanent shifts and to the implementation and continuation of the permanent shifts concept. The Committee will attempt to resolve any such issues without the filing of a formal grievance with due regard to the fact that in negotiating permanent shifts the parties may not have considered all of the effects of such change and that flexibility is necessary and desirable to ensure that an orderly transition from rotating shifts to permanent shifts is effectuated.

D.      The Panel shall retain jurisdiction over the permanent shift award and, upon the request of either party, for a period of one (1) year after permanent shifts are implemented, shall convene, with substitute delegates if a party so designates, to resolve any dispute concerning permanent shifts which has not been resolved by the Committee.

E.      In the case of a bona fide hardship, reviewed and approved by the Chief of Police or the appropriate Deputy Chief, management may change an Employee's shift for a period not to exceed thirty (30) days. No other Employee shall be displaced from his shift or assignment as the result of such a reassignment. The Association will be notified of any approved request. This provision shall be applicable not only to those entities participating in the permanent shift plan, but to all assignments on a Department-wide basis.

## 42. OUTSIDE EMPLOYMENT

An Employee may engage in outside business activity or outside employment provided it is not inconsistent or incompatible with or does not interfere with the proper discharge of the Employee's duties and responsibilities as a police officer.

Approval for outside business activity or outside employment must be obtained from the Chief of Police, and shall be for a period of one (1) year. The Employee may request it be renewed after one (1) year. If an Employee is on the Attendance Control Program (DPD 350), that Employee cannot be approved for outside employment, and prior approval can be revoked at the discretion of the Chief of Police.

Approval will not be granted for an outside business activity or outside employment which would involve more than thirty (30) hours per week of work, or for work in businesses that are regulated by the Detroit Police Department (e.g., bars, adult movies or adult bookstores, etc.)

Officers may not be in uniform when engaged in any outside employment. Officers may not carry or use any equipment or accessories issued by the Department when engaged in any outside business activity or outside employment in private or personal security.

Approval to engage in outside business activity or outside employment shall not be unreasonably withheld.

## 43. WORK AREAS

The City will provide and maintain safe, clean, sanitary and healthful work premises, facilities and equipment. The City shall have the responsibility and authority first to determine what constitutes safe, clean, sanitary and healthful work premises, facilities and equipment. Grievances alleging a violation, that is, whether or not the City has provided and maintained safe, clean, sanitary and healthful work premises, facilities and equipment, shall be entered at the last step of the grievance procedure and shall be subject to arbitration.

## 44. DURATION

This Agreement shall be effective and binding on the Union and the City as of October __, 2014, and shall continue in full force and effect through June 30, 2019 (the "Term"). This Agreement, including the Term, shall be incorporated into and become a part of both the plan of adjustment and order confirming the plan of adjustment, and the Agreement shall be subject to the post-confirmation ongoing jurisdiction of the Bankruptcy Court for the full Term, including without limitation, whatever jurisdiction the Bankruptcy Court's retains to enforce the Term. This Agreement, including specifically, the Term, shall be duly authorized and approved by and consented to by the Governor, the Treasurer and the Emergency Manager, with these consents reflected by duly authorized signatures.

If either party desires to modify this Agreement, it may give written notice to the other party during the month of March 2019.

In the event that the Department and the Association fail to arrive at an agreement on wages, fringe benefits, other monetary matters, and non-economic items by June 30, 2019, this Agreement will remain in effect on a day-to-day basis. Either party may terminate this Agreement by giving the other party a ten (10) day written notice on or after June 30, 2019.

IN WITNESS WHEREOF, the parties hereto have executed this

Agreement on this ____ day of October, 2014.

DETROIT POLICE OFFICERS ASSOCIATION:

Mark Diaz, President

Bernard Cybulski, Vice President

Donna Latouf, Secretary-Treasurer

Linda Broden, Sergeant at Arms

CITY OF DETROIT:

Michael E. Duggan, Mayor

James Craig, Chief of Police

[see next page]

Office of the State Treasurer, Michigan

Michael A. Hall, Labor Relations

## 44. DURATION

This Agreement shall be effective and binding on the Union and the City as of October __, 2014, and shall continue in full force and effect through June 30, 2019 (the "Term"). This Agreement, including the Term, shall be incorporated into and become a part of both the plan of adjustment and order confirming the plan of adjustment, and the Agreement shall be subject to the post-confirmation ongoing jurisdiction of the Bankruptcy Court for the full Term, including without limitation, whatever jurisdiction the Bankruptcy Court's retains to enforce the Term. This Agreement, including specifically, the Term, shall be duly authorized and approved by and consented to by the Governor, the Treasurer and the Emergency Manager, with these consents reflected by duly authorized signatures.

If either party desires to modify this Agreement, it may give written notice to the other party during the month of March 2019.

In the event that the Department and the Association fail to arrive at an agreement on wages, fringe benefits, other monetary matters, and non-economic items by June 30, 2019, this Agreement will remain in effect on a day-to-day basis. Either party may terminate this Agreement by giving the other party a ten (10) day written notice on or after June 30, 2019.

IN WITNESS WHEREOF, the parties hereto have executed this

Agreement on this __ day of October, 2014.

DETROIT POLICE OFFICERS                    CITY OF DETROIT:
ASSOCIATION:

_____                  _____
Mark Diaz, President                        Michael E. Duggan, Mayor

_____                  _____
Bernard Cybulski, Vice President            James Craig, Chief of Police

_____                  _____
Donna Latouf, Secretary-Treasurer           Office of the State Treasurer, Michigan

_____                  _____
Linda Broden, Sergeant at Arms              Michael A. Hall, Labor Relations

## 44. DURATION

This Agreement shall be effective and binding on the Union and the City as of October __, 2014, and shall continue in full force and effect through June 30, 2019 (the "Term"). This Agreement, including the Term, shall be incorporated into and become a part of both the plan of adjustment and order confirming the plan of adjustment, and the Agreement shall be subject to the post-confirmation ongoing jurisdiction of the Bankruptcy Court for the full Term, including without limitation, whatever jurisdiction the Bankruptcy Court's retains to enforce the Term. This Agreement, including specifically, the Term, shall be duly authorized and approved by and consented to by the Mayor of the City of Detroit, the Treasurer of the State of Michigan, and the Emergency Manager, with these consents reflected by duly authorized signatures.

If either party desires to modify this Agreement, it may give written notice to the other party during the month of March 2019.

In the event that the Department and the Association fail to arrive at an agreement on wages, fringe benefits, other monetary matters, and non-economic items by June 30, 2019, this Agreement will remain in effect on a day-to-day basis. Either party may terminate this Agreement by giving the other party a ten (10) day written notice on or after June 30, 2019.

IN WITNESS WHEREOF, the parties hereto have executed this

Agreement on this __ day of October, 2014.

DETROIT POLICE OFFICERS
ASSOCIATION:

CITY OF DETROIT:

_____
Mark Diaz, President

_____
Michael E. Duggan, Mayor

_____
Bernard Cybulski, Vice President

_____
James Craig, Chief of Police

_____
Donna Latouf, Secretary-Treasurer

_____
Office of the State Treasurer, Michigan

_____
Linda Broden, Sergeant at Arms

_____
Michael A. Hall, Labor Relations

_____
Kevin Orr, Emergency Manager

## SCHEDULE A

| District | Work Location & Platoon | Stewards | Alternates |
|----------|------------------------|----------|------------|
| 1 | 1st Precinct<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |
| | 3rd Precinct<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |
| | Downtown SVS / Gaming<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |
| 2 | 2nd Precinct<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |
| | 4th Precinct<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |
| 3 | 6th Precinct<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |
| | 8th Precinct<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |
| 4 | 10th Precinct<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |
| | 12th Precinct<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |

| District | Work Location & Platoon | Stewards | Alternates |
|---|---|---|---|
| 5 | 5th Precinct<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |
| | 9th Precinct<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |
| 6 | 7th Precinct<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |
| | 11th Precinct<br>Platoon 1<br>Platoon 2<br>Platoon 3<br>HMS | 3 | 3 |
| | Mound Rd. / Detention Center<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |
| 7 | Communications Ctr. / Tech Support/ Fleet<br>Communications Systems<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |
| 8 | Narcotics / Firearms Inventory | 2 | 2 |
| | Forfeiture / Auction Detail / Magnet | 1 | 1 |
| 9 | DPSH 1301 Third Floors 1-7 | 4 | 4 |
| | Police Personnel / Recruiting / IA / Medical | | |
| | Sex Crimes / Homicide | | |
| | Domestic Violence / Child Abuse | | |
| | Evidence Tech. Unit | | |

| District | Work Location & Platoon | Stewards | Alternates |
|---|---|---|---|
| 10 | Law Dept. / OCI / EPU / Disciplinary CRIB / Ident. / Records / Liquor License | 1 | 1 |
| | DMPA / Range | 1 | 1 |
| | Commercial Auto Theft | 1 | 1 |
| 11 | Canine / Support Svc. | 1 | 1 |
| | Tac Response Unit | 1 | 1 |
| | SRT / Bomb Squad | 1 | 1 |
| | Special Crimes | 1 | 1 |
| | TEU / TSU | 1 | 1 |
| | Totals | 60 | 60 |

**EXHIBIT I**
**Official Compensation Schedule**

CHI-1939680v4

# MEMORANDUM OF UNDERSTANDING
## REGARDING THE POLICE AND FIRE RETIREMENT SYSTEM
### BETWEEN
### THE CITY OF DETROIT
### AND
### THE DETROIT POLICE OFFICERS ASSOCIATION

This Memorandum of Understanding is made and entered into this 1st day of October, 2014, by and between the City of Detroit ("City") and the Detroit Police Officers Association ("DPOA" or the "Association").

WHEREAS, on July 18, 2013, the City filed for protection under Chapter 9 of the U.S. Bankruptcy Code, 11 U.S.C. §§ 101-1550; and

WHEREAS, on December 5, 2013, the U.S. Bankruptcy Court for the Eastern District of Michigan ("Bankruptcy Court") ruled that the City is eligible to be a debtor under Chapter 9 of the U.S. Bankruptcy Code; and

WHEREAS, the City's duty to bargain with the Association over changes to terms and conditions of employment has been suspended pursuant to Public Act 436, MCL § 141.1541 *et seq.*; and

WHEREAS, on August 16, 2013 the Bankruptcy Court ordered the City and the Association to participate in Court-supervised mediation regarding the terms of a successor collective bargaining agreement, including retirement benefits for current employees; and

WHEREAS, the City and the Association agree that it is in the best interests of the City and its employees for the City to provide fiscally responsible but high quality retirement benefits to its future retirees; and

WHEREAS, in connection with the mediation, the City and the Association have discussed ways to address the unfunded liabilities of the Police and Fire Retirement System ("PFRS") and to reach an agreement to provide sustainable retirement benefits to future retirees of the City; and

WHEREAS, benefit accruals under the PFRS ceased effective June 30, 2014, pursuant to Ordinance No. 12-14; and

WHEREAS, effective July 1, 2014, employees represented by certain City unions, including the DPOA, became eligible to participate in the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan (the "Combined Plan"), which consists of provisions relating to benefits accrued by members under PFRS prior to July 1, 2014 ("Old PFRS") and provisions relating to benefits accrued by members under PFRS on and after July 1, 2014 ("New PFRS"); and

1

WHEREAS, this Memorandum of Understanding supplements any collective bargaining agreements entered into between the City and the Association and/or any Act 312 Arbitration Award pertaining to the Association and the City until the expiration of this Memorandum of Understanding;

NOW, THEREFORE, it is agreed that the City and the Association have entered into this Memorandum of Understanding, and any proposals or counter-proposals made during related discussions by either the City or the Association, but not included in this Memorandum of Understanding, are hereby withdrawn. The City and the Association further agree as follows:

A.    The Police and Fire Retirement System. During the term of this Memorandum of Understanding, pension benefits for eligible employees (which, in all cases, shall exclude Police Assistants) represented by the DPOA shall be in accordance with this Memorandum of Understanding, as follows:

1.    City Contribution. The City shall contribute to New PFRS, on an annual basis, an amount equal to twelve and one-quarter percent (12.25%) of each eligible employee's base compensation. A portion of such contribution will be credited to a rate stabilization fund.

2.    Employee Contribution. Eligible employees hired by the City on or before June 30, 2014 shall make pre-tax contributions equal to six percent (6%) of their base compensation to New PFRS (pre-risk shifting). Eligible employees hired or rehired by the City on and after July 1, 2014 shall make pre-tax contributions equal to eight percent (8%) of their base compensation to New PFRS (pre-risk shifting).

3.    Plan Terms. Except as set forth herein, the following key terms relating to New PFRS shall apply to benefits accrued by eligible employees on and after July 1, 2014 and prior to January 1, 2024:

| BENEFIT FORMULA | Final Average Compensation (average base compensation over last 5 consecutive years of employment) x Years of Service earned after June 30, 2014 x 2.0%. Average base compensation does not include overtime, unused sick leave, longevity payments, or any other form of bonus or additional compensation – just the employee's base salary. |
|---|---|
| | Actual time for benefit accrual is actual time served. For vesting service, an eligible employee must work 1,000 hours in a 12-month period to accrue a year of service. |

2

| | |
|---|---|
| **NORMAL RETIREMENT AGE** | Age 50 with 25 years of service, with the following 7 year transition period:<br><br>Fiscal Year                Age and Service<br>2015                         Age 43 and 20 years<br>2016                         Age 43 and 20 years<br>2017                         Age 44 and 21 years<br>2018                         Age 45 and 22 years<br>2019                         Age 46 and 23 years<br>2020                         Age 47 and 24 years<br>2021 and thereafter      Age 50 and 25 years |
| | 10 Years of Service for vesting. |
| | Deferred vested pension -- 10 years of service and age 55. |
| | Duty Disability - consistent with Old PFRS. |
| | Non-Duty Disability – consistent with Old PFRS. |
| | Non-Duty Death Benefit for Surviving Spouse – consistent with Old PFRS. |
| | Duty Death Benefit for Surviving Spouse – consistent with Old PFRS. |
| **COLA** | 1% compounded, variable. |
| **DROP ACCOUNTS** | Available for frozen Old PFRS benefits and future accrued benefits under New PFRS for employees who are eligible to retire under concurrent eligibility requirements. No more than 5 years of DROP participation for employees not already in DROP as of June 30, 2014. DROP accounts will be managed by PFRS instead of ING, if administratively and legally feasible. If managed by PFRS, interest will be credited to DROP accounts at a rate equal to 75% of the actual net investment return of PFRS, but in no event lower than 0% or higher than 7.75%. |
| **ANNUITY SAVINGS** | Voluntary Annuity Savings Fund contributions up to 10% of after-tax pay. Interest will be credited at the actual net investment rate of return for PFRS, but will in no event be lower than 0% or higher than 5.25%. No in-service withdrawals permitted. |
| | Investment Return/Discount rate – 6.75%. |

3

| | If the funding level is less than 90% (using the fair market value of assets), COLAs will be eliminated (to the extent applicable). |
|---|---|
| **RISK SHIFTING** | If the funding level is 90% or lower (using the fair market value of assets and a 3-year look back period), the following corrective actions will be taken in the order listed below, until the PFRS actuaries can state that by virtue of the use of corrective action, and a 6.75% discount rate and return assumption, the funding level is projected to be 100% on a market value basis within the next 5 years:<br><br>1. eliminate COLAs (if applicable); use amounts credited to the rate stabilization fund to fund accrued benefits;<br>2. increase employee contributions by 1% per year (6% to 7% for current actives and 8% to 9% for new employees in year 1) for up to 5 years;<br>3. increase employee contributions (active and new employees) by an additional 1% per year;<br>4. increase employee contributions (active and new employees) by an additional 1% per year;<br>5. implement a 1 year COLA fallback;<br>6. implement a second 1 year COLA fallback;<br>7. increase employee contributions by an additional 1% per year; and<br>8. increase City contributions consistent with applicable actuarial principles and PERSIA. |

a)     In accordance with the 2014-2019 collective bargaining agreement between the City and the DPOA ("CBA"), the ten percent (10%) cap on annual contributions to the Annuity Savings Account will not apply to payments of accrued sick leave into an Annuity Savings Account made pursuant to Article 34, Section A.2.c. of the CBA.

b)     Employees in the DPOA bargaining unit will have the option to participate in a one-time irrevocable "roll-in election" with respect to calculation of their frozen accrued benefits under Old PFRS. The purpose of this roll-in election is to give each eligible employee the option to allocate a portion of his or her unused sick pay bank to the employee's Average Final Compensation, which in turn will be used to determine the employee's frozen accrued benefits under Old PFRS as of June 30, 2014. If the employee elects to roll-in a portion of his or her unused sick pay, the employee's Average Final Compensation will include the portion of the employee's sick pay bank determined as of June 30, 2014 that would have been included in the member's Average Final Compensation in accordance with the terms of Old PFRS, as though the employee had retired on June 30, 2014 with 20 years of service. In the event an employee terminates employment with the City prior to attaining 20 years of service, the employee's roll-in election will be nullified. If an employee makes a roll-in election, the employee's unused sick leave bank

4

will be reduced by the number of hours included in the employee's Average Final Compensation calculation and the employee may not use those hours for sick leave or receive the value in cash when the employee retires. The form for making a roll-in election will be available to employees on-line, and paper copies of the form will also be made available. An eligible employee wishing to roll-in a portion of his or her unused sick pay must sign the form in the presence of a witness and return the form to the PFRS office no later than October 15, 2014. The one-time roll-in election will have no impact on benefits accrued under New PFRS.

c)     For avoidance of doubt, 'eligible to retire under concurrent eligibility requirements' of the Combined Plan means that an Association member with accrued benefits under Old PFRS may retire upon attaining 20 years of service, regardless of age. This member would immediately receive a frozen pension under Old PFRS. If the member does not meet the age and years of service requirements of the New PFRS, he or she will begin receiving an additional payment (actuarially reduced to reflect early commencement) based on his or her accrued benefit under New PFRS when he or she turns 55. He or she can begin receiving an unreduced normal retirement benefit under New PFRS when he/she reaches age 62.

The age 50 and 25 years of service requirements of New PFRS apply only to New PFRS and are subject to the 7 year transition period set forth above. The transition applies as set forth below:

1.     Under the transition, after July 1, 2014, an Association member who reaches 20 years of service and age 43 on or before June 30, 2015 can retire anytime after reaching 20 years of service and age 43, and he or she will immediately receive an unreduced accrued New PFRS benefit.

2.     Beginning on July 1, 2015, an Association member who reaches 20 years of service and age 43 on or before June 30, 2016 can retire anytime after reaching 20 years of service and age 43, and he or she will immediately receive an unreduced accrued New PFRS benefit.

3.     After June 30, 2020, an Association member must be at least 50 years old with 25 years of service to retire and immediately receive his or her unreduced accrued New PFRS benefit.

An Association member who does not meet these New PFRS requirements will not begin receiving his or her unreduced accrued New PFRS benefit until the Association member reaches age 62 and has been credited with 10 years of service. An Association member with 10 years of service may elect to retire at age 55 with an actuarially reduced benefit.

5

d)      Section 1.4 (Board of Trustees – Membership; Appointment) of the New PFRS and Article III, Section 2 of the Old PFRS (Membership of Board) shall not be modified during the term of the CBA.

e)      The City will remit to the New PFRS all contributions withheld from employees' pay checks.

The City shall promptly transfer these employees' contributions to the new PFRS, but in no event shall such City transfers be made later than the 15th day of the month following the month of the pay dates when the employees' contributions are withheld by the City (hereinafter "Contribution Due Date"). (By way of illustration and example only, the City must transfer to the New PFRS by no later than February 15 all of the employees' contributions withheld on the pay dates of the immediately preceding January.)

If the City does not transfer the employees' withheld contributions to the New PFRS by the Contribution Due Date, these contributions shall be deemed delinquent contributions (hereinafter "Delinquent Contributions"). The City shall be liable to the New PFRS in the amount of the Delinquent Contributions and any Lost Earnings ("Lost Earnings") on the Delinquent Contributions, which would have been earned on the employees' contributions, had the City timely made the transfer of these employees' contributions.

Notwithstanding the above, the City shall be liable for Lost Earnings in an amount not less than the applicable corporate underpayment rate(s), effective during the delinquency, established under Section 6621(a)(2) of the Internal Revenue Code.

B.      Reservation of Rights by City. This Memorandum of Understanding shall in no way be construed to interfere with, or add additional requirements with respect to, the City's rights to modify the terms of any pension plan document currently in effect, or that may be in effect during the term of this Memorandum of Understanding, including but not limited to the Combined Plan; provided, however, that the City shall not modify the terms of the applicable pension plan(s), in any manner that conflicts with those terms set forth in Section A above, unless the City is ordered to do so by the Bankruptcy Court in the plan of adjustment dated August 20, 2014 (as it may be amended, modified or supplemented, "Plan of Adjustment") in the case *In re: City of Detroit*, Case No. 13-53846 or as set forth in Section D below.

C.      Compliance with Plan of Adjustment. The terms of this Memorandum of Understanding are subject to confirmation of the Plan of Adjustment and may be modified therein to achieve confirmation of the Plan of Adjustment. Any proposed modification to the Plan of Adjustment is subject to the rights of the DPOA to object to same. During the term of this Memorandum of Understanding, the City shall not make any modifications to the terms of the Combined Plan that are contrary to the terms of the

6

automatically moved to the next step in the grievance procedure. Additionally, the time limits of the grievance procedure may be shortened or extended by mutual agreement.

G.    Grievances affecting a large number of employees or concerning a transfer between commands may be treated as policy grievances and entered at the third step of the grievance procedure by the Union. One or more members of the Grievance Committee may attend hearings on policy grievances entered at Step 3 with the permission of the Labor Relations Section. Such permission shall not be unreasonably refused.

H.    In instances wherein the subject matter of the grievance lies within the jurisdiction of specific City agencies (e.g., payroll, etc.), the grievance steps may be reduced in order to bring the grievance to the agency's immediate attention for a recommendation as to the action to be taken. Further, the Chief of Police and the President of the Association will be permitted, at their discretion, to participate at any step of the grievance procedure.

I.    <u>Binding Mediation Procedure</u>. By mutual agreement, the parties may submit certain disputes to an abbreviated binding mediation procedure in lieu of arbitration. The parties will identify at least one (1) permanent arbitrator from the permanent panel selected under Article 8 who shall schedule one (1) additional hearing date each month. Prior to each scheduled hearing date, each party may submit up to five (5) grievances and disciplinary matters for a binding recommendation by the arbitrator serving as a mediator. Each party shall provide the other party and the arbitrator with advance notice of the matters to be presented, including relevant documentation. Either party may reject a matter that is proposed to be heard. The mediation hearing shall be informal and the parties agree to be bound by the recommendation of the arbitrator serving as a mediator.

# 8. ARBITRATION

A.    Any unresolved grievance relating only to the interpretation, application or enforcement of a specific article and section of this Agreement or any Supplementary Agreement, hereto, having been processed fully through the last step of the grievance procedure, may be submitted to arbitration by the Department or the Association in strict accordance with the following:

1.    Arbitration may be initiated by written notice to the other party of an intention to arbitrate. Such written notice of intent to arbitrate must be made within ten (10) calendar days after receipt of the Step 3 answer.

2.    Selection of Arbitrator and Permanent Panel

a.    Within thirty (30) calendar days after the execution of this Agreement, the parties shall convene and select four (4) disinterested persons qualified in labor-management relations to serve as permanent arbitrators. If the parties are unable to agree upon four (4) individuals to serve as permanent arbitrators, for each unfilled position, the Director of the Michigan Employment Relations Commission (MERC) shall be requested to submit the names of five (5) disinterested persons qualified and willing to act as impartial arbitrators. From each list, the Department and Union shall each

alternately strike one name until four (4) names have been eliminated and the person whose name remains on the list shall be selected to act as one of the four (4) permanent arbitrators.

b. If at any time either party desires to terminate the service of an arbitrator, it shall give notice in writing to that effect to the other party, specifying the date of termination. The parties shall then send a joint written notice to the arbitrator of his termination. Neither party may terminate the services of an arbitrator unless he has heard at least one (1) case.

c. Once the arbitrator has received written notice that his services are terminated, he shall not hear any further cases. However, he shall render decisions on all cases that he has heard prior to receiving such notice.

d. In the event an arbitrator is terminated, a new arbitrator shall be immediately selected in accordance with the procedure described in Section 2.a.

e. The arbitrators will hear cases on a chronological rotation.

3. It will be within the authority of the arbitrator to make a decision binding upon the parties regarding the interpretation, application, or enforcement of the Agreement.

4. The arbitrator will not consider any evidence submitted by either party, which was not produced in the grievance procedure unless such evidence was not then known to the party submitting the same.

5. The costs of the arbitration will be shared equally by the parties, except that each party will make arrangements to pay its own attorneys and witnesses. In cases where the arbitrator provides that either party has filed or denied a grievance in bad faith, the arbitrator will have the discretion to assess all costs and expenses of the arbitration hearing, including reasonable attorneys' fees, against the non-prevailing party.

6. The parties may request in writing of each other co-operation to have available at the arbitration proceedings any witnesses requested by the other party.

7. If the central issue in the unresolved grievance is an Employee's medical condition, which may be the case in matters pertaining to sick leave, qualifications to perform work, requests for light duty assignments, or accommodation of disabilities, the arbitration procedure specified in this Article will not apply, and the parties will instead select a neutral physician to resolve any disputes concerning medical issues. Such a neutral physician must be licensed to practice and currently practicing medicine. The neutral physician will be jointly selected by the Department and the Association. To the extent the Department and Association cannot agree on a neutral physician, the neutral physician will be mutually selected by the Employee's treating physician and the Police Department's designated physician. Upon request, the City will provide medical

Plan of Adjustment as confirmed by the Bankruptcy Court.

D.    Compliance with Public Act 183.   Notwithstanding any provision of this Memorandum of Understanding that can be construed to the contrary, this Memorandum of Understanding will not be construed to require the City to fall out of compliance with the requirements of Public Act 183, House Bill 5568 ("PA 183"). In the event that the City determines that it has fallen out of compliance with, or is reasonably likely to fall out of compliance with PA 183, the City will provide written notice to the Association, and offer to meet and confer with the Association for a period not longer than thirty (30) days to discuss potential modifications to the terms of the Memorandum of Understanding in order to comply with the requirements of PA 183. To the extent that the City and the Association are unable to reach an agreement within thirty (30) days, the City may make any necessary modifications to ensure compliance with PA 183.

E.    Duration.   This Memorandum of Understanding will become effective upon approval by the Emergency Manager and the Treasurer of the State of Michigan and shall remain in effect until December 31, 2023. The City and the Association hereby agree to waive any and all collective bargaining rights with respect to pension benefits, including but not limited to benefits provided under, and any other issues relating to, the Combined Plan (the "Waived Issues") from the date that this Memorandum of Understanding is executed through December 31, 2023. The parties acknowledge that they are enjoined from collective bargaining regarding the Waived Issues through June 30, 2023 and further agree to waive any right to raise any of the Waived Issues in any Act 312 arbitration proceeding. The City and the Association agree that they may engage in collective bargaining regarding the Waived Issues beginning June 30, 2023, but that no modifications may be made with respect to any Waived Issue until after December 31, 2023.

F.    Grievance and Arbitration:   Any dispute pertaining to the provision of benefits pursuant to this Memorandum of Understanding shall be subject to the grievance and arbitration procedures set forth in Articles 7 and 8 of the CBA or any comparable provision set forth in a successor collective bargaining agreement entered into between the City and the DPOA. In resolving any dispute pertaining to provision of benefits pursuant to this Memorandum of Understanding, the Arbitrator shall be bound by the terms of this Memorandum of Understanding, the Combined Plan, and the Plan of Adjustment, and shall have no authority to issue any award or order that is contrary to the terms of these documents.

IN WITNESS WHEREOF, the parties hereto have affixed their signatures below:

Dated this 1st day of October 2014.

DETROIT POLICE OFFICERS ASSOCIATION:

_____
Mark Diaz, President

_____
Bernard Cybulski, Vice President

_____
Donna Latouf, Secretary-Treasurer

_____
Linda Broden, Sergeant at Arms

CITY OF DETROIT:

_____
Michael E. Duggan, Mayor

_____
Michael A. Hall, Director of Labor Relations

_____
James E. Craig, Chief of Police

[see next page]
_____
Office of the State Treasurer, Michigan

8

IN WITNESS WHEREOF, the parties hereto have affixed their signatures below:

Dated this 1st day of October 2014.

DETROIT POLICE OFFICERS
ASSOCIATION:

_____
Mark Diaz, President

_____
Bernard Cybulski, Vice President

_____
Donna Latouf, Secretary-Treasurer

_____
Linda Broden, Sergeant at Arms

CITY OF DETROIT:

_____
Michael E. Duggan, Mayor

_____
Michael A. Hall, Director of Labor Relations

_____
James E. Craig, Chief of Police

_____
Office of the State Treasurer, Michigan

8

IN WITNESS WHEREOF, the parties hereto have affixed their signatures below:

Dated this ___ day of October 2014.

DETROIT POLICE OFFICERS                    CITY OF DETROIT:
ASSOCIATION:


_____           _____
Mark Diaz, President                       Michael E. Duggan, Mayor


_____           _____
Bernard Cybulski, Vice President           Michael A. Hall, Director of Labor Relations


_____           _____
Donna Latouf, Secretary-Treasurer          James E. Craig, Chief of Police


_____           _____
Linda Broden, Sergeant at Arms             Office of the State Treasurer, Michigan

                                           _____
                                           Kevin Orr, Emergency Manager

8

# MEMORANDUM OF UNDERSTANDING
## BETWEEN
## THE CITY OF DETROIT
## AND
## DETROIT POLICE OFFICERS ASSOCIATION

The Detroit Police Officers Association ("Association") and the City of Detroit ("Detroit") discussed the application of Article 20, Section J.2 and Article 40, Section A of the 2014-2019 Collective Bargaining Agreement. In connection with those discussions, the parties have agreed to the following:

1. The 8% wage increase listed in Article 40, Section A shall become effective the second pay period following the effective date of the Collective Bargaining Agreement.

2. Each Employee who was on the City's payroll as of October 1, 2014 shall receive a one-time signing bonus equal to $620.00.

3. With respect to Article 20, Section J.2, the DPOA shall have 10 business days to identify an existing VEBA to which the City may make the contributions set forth in that provision and confirm that such VEBA is willing to accept said contributions. If the DPOA identifies such a VEBA within the applicable time frame, the parties shall meet and confer with respect to necessary changes to the Collective Bargaining Agreement. If the Association does not identify such a VEBA, the provisions of Article 20, Section J.2 shall remain unchanged.

IN WITNESS WHEREOF, the parties have affixed their signatures below:

Dated this 1st day of October, 2014.

DETROIT POLICE OFFICERS ASSOCIATION

Mark Diaz, President

Bernard Cybulski, Vice President

Donna Latouf, Secretary-Treasurer

Linda Broden, Sergeant-at-Arms

CITY OF DETROIT

Michael E. Duggan, Mayor

Michael A. Hall, Director of Labor Relations

James E. Craig, Chief of Police

[see next page]

Office of the State Treasurer, Michigan

# MEMORANDUM OF UNDERSTANDING
## BETWEEN
## THE CITY OF DETROIT
## AND
## DETROIT POLICE OFFICERS ASSOCIATION

The Detroit Police Officers Association ("Association") and the City of Detroit ("Detroit") discussed the application of Article 20, Section J.2 and Article 40, Section A of the 2014-2019 Collective Bargaining Agreement. In connection with those discussions, the parties have agreed to the following:

1. The 8% wage increase listed in Article 40, Section A shall become effective the second pay period following the effective date of the Collective Bargaining Agreement.

2. Each Employee who was on the City's payroll as of October 1, 2014 shall receive a one-time signing bonus equal to $620.00.

3. With respect to Article 20, Section J.2, the DPOA shall have 10 business days to identify an existing VEBA to which the City may make the contributions set forth in that provision and confirm that such VEBA is willing to accept said contributions. If the DPOA identifies such a VEBA within the applicable time frame, the parties shall meet and confer with respect to necessary changes to the Collective Bargaining Agreement. If the Association does not identify such a VEBA, the provisions of Article 20, Section J.2 shall remain unchanged.

IN WITNESS WHEREOF, the parties have affixed their signatures below:

Dated this 1st day of October, 2014.

DETROIT POLICE OFFICERS ASSOCIATION

CITY OF DETROIT

Mark Diaz, President

Michael E. Duggan, Mayor

Bernard Cybulski, Vice President

Michael A. Hall, Director of Labor Relations

Donna Latouf, Secretary-Treasurer

James E. Craig, Chief of Police

Linda Broden, Sergeant-at-Arms

Office of the State Treasurer, Michigan

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN**
**THE CITY OF DETROIT**
**AND**
**DETROIT POLICE OFFICERS ASSOCIATION**

The Detroit Police Officers Association ("Association") and the City of Detroit ("Detroit") discussed the application of Article 20, Section J.2 and Article 40, Section A of the 2014-2019 Collective Bargaining Agreement. In connection with those discussions, the parties have agreed to the following:

1. The 8% wage increase listed in Article 40, Section A shall become effective the second pay period following the effective date of the Collective Bargaining Agreement.

2. Each Employee who was on the City's payroll as of October 1, 2014 shall receive a one-time signing bonus equal to $620.00.

3. With respect to Article 20, Section J.2, the DPOA shall have 10 business days to identify an existing VEBA to which the City may make the contributions set forth in that provision and confirm that such VEBA is willing to accept said contributions. If the DPOA identifies such a VEBA within the applicable time frame, the parties shall meet and confer with respect to necessary changes to the Collective Bargaining Agreement. If the Association does not identify such a VEBA, the provisions of Article 20, Section J.2 shall remain unchanged.

IN WITNESS WHEREOF, the parties have affixed their signatures below:

Dated this *15th* day of October, 2014.

DETROIT POLICE OFFICERS
ASSOCIATION

CITY OF DETROIT

_____
Mark Diaz, President

_____
Michael E. Duggan, Mayor

_____
Bernard Cybulski, Vice President

_____
Michael A. Hall, Director of Labor Relations

_____
Donna Latouf, Secretary-Treasurer

_____
James E. Craig, Chief of Police

_____
Linda Broden, Sergeant-at-Arms

Office of the State Treasurer, Michigan

_____
Kevyn Orr, Emergency Manager

October 1, 2014

Mr. Mark Diaz
President
Detroit Police Officers Association
1938 Jefferson Ave.
Detroit, MI 48207

Re: Prescheduled Overtime (2014-2019 Collective Bargaining Agreement)

Dear Mr. Diaz:

During negotiations with respect to the parties' 2014-2019 collective bargaining agreement, the Detroit Police Department (the "Department") and the Detroit Police Officers Association ("DPOA") discussed the methods by which the Department may shift personnel from one assignment to another pursuant to Article 14, Section E.1. The Department shall utilize Employees in the DPOA bargaining unit and, absent exigent circumstances, shall follow the following process:

1. The Department shall first attempt to address the personnel shortage by shifting Employees within the Command.

2. To the extent the Department cannot address the personnel shortage by shifting Employees within the Command, the Department shall next attempt to shift Employees from adjacent Precincts.

3. If the Department cannot fill the vacancy by shifting personnel within the Command or by shifting Employees from an adjacent Precinct, the Department may assign DPOA Employees without restriction.

Sincerely,

James Craig
Chief of Police

Acknowledged and Agreed:

Mark Diaz
President, DPOA

October 1, 2014

Mr. Mark Diaz
President
Detroit Police Officers Association
1938 Jefferson Ave
Detroit, MI 48207

    Re:    <u>Funeral Leave (2014-2019 Collective Bargaining Agreement)</u>

Dear Mr. Diaz:

    During negotiations with respect to the parties' 2014-2019 collective bargaining agreement, the Detroit Police Department ("Department") and the Detroit Police Officers Association ("DPOA") discussed the application of Article 12 of the collective bargaining agreement. In connection with those discussions, the parties have agreed that an Employee's Legal Guardian, or an individual over whom the Employee serves as Legal Guardian, shall be treated as an immediate family member for purposes of eligibility for funeral leave. The Department may require the Employee to furnish proof of legal guardianship.

                                             Sincerely,

                                           James Craig
                                         Chief of Police

Acknowledged and Agreed:

_____
Mark Diaz
President, DPOA

October 1, 2014

Mr. Mark Diaz
President
Detroit Police Officers Association
1938 Jefferson Ave.
Detroit, MI 48207

Re: Letter of Agreement – Group Health Care

Dear Mr. Diaz:

In connection with the negotiations regarding the 2014-2019 collective bargaining agreement (the "CBA") between the City of Detroit (the "City") and the Detroit Police Officers Association (the "DPOA") (collectively, the "Parties"), the Parties discussed the administration and application of the language contained in Article 20 of the CBA pertaining to Hospitalization, Medical, Dental and Optical Care (the "Group Health Care Provisions"). In particular, the Parties discussed the interpretation and application of Group Health Care Provisions pertaining to compliance with Michigan Public Act 152, Michigan Combined Laws ("MCL"), §§ 15.561 *et seq.* ("PA 152"), in connection with the administration of the City's group health care program provided to DPOA bargaining unit employees. With respect to the interpretation and application of Article 20.H of the CBA, the Parties agree as follows:

1.      In the event that the annual "Medical Benefit Plan Costs" (as defined in MCL § 15.562(F)) exceed the maximum public employer payment set forth in MCL § 15.563 (the "Hard Cap"), the City agrees to present a resolution to the City Council requesting that, for each applicable year, the City elect to comply with the provisions of MCL § 15.564 (the "80/20 Cost Allocation"), in order to maintain the current Medical Plan Design and premium allocations set forth in Articles 20.A and 20.B of the CBA.

2.      In the event that the City Council does not approve the 80/20 Cost Allocation by majority vote in any year, the City agrees to meet and confer with the Union for a period not longer than thirty (30) days, as outlined in Article 20.H of the CBA, in order to discuss potential modifications to the terms of the Medical Plan Designs (as defined in Article 20.A of the CBA) to maintain compliance with PA 152.

3.      In the event that the Parties are unable to reach an agreement after thirty (30) days, as outlined in Article 20.H of the CBA, the City may make necessary modifications to the Medical Plan Designs to ensure compliance with PA 152 but will not modify the 80/20 monthly contribution allocation set forth in Article 20.B of the CBA without the agreement of the DPOA. However, the Parties agree that, in the event that the City is required to modify the Medical Plan Designs in order to ensure compliance with PA 152, the City shall be relieved of any obligation under Article 20.G of the CBA to provide "Gold"-level coverage.

4.      In the event that any other bargaining unit reaches a different resolution of these issues, the DPOA may elect to adopt that agreement.

Very truly yours,

Michael E. Duggan
Mayor, City of Detroit

2

3.     In the event that the Parties are unable to reach an agreement after thirty (30) days, as outlined in Article 20.H of the CBA, the City may make necessary modifications to the Medical Plan Designs to ensure compliance with PA 152 but will not modify the 80/20 monthly contribution allocation set forth in Article 20.B of the CBA without the agreement of the DPOA. However, the Parties agree that, in the event that the City is required to modify the Medical Plan Designs in order to ensure compliance with PA 152, the City shall be relieved of any obligation under Article 20.G of the CBA to provide "Gold"-level coverage.

4.     In the event that any other bargaining unit reaches a different resolution of these issues, the DPOA may elect to adopt that agreement.

Very truly yours,

Michael E. Duggan
Mayor, City of Detroit

Kevyn Orr
Emergency Manager

2