UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---------------------------------------------------------x
                                                         :
In re                                                    :   Chapter 9
                                                         :
CITY OF DETROIT, MICHIGAN,                               :   Case No. 13-53846
                                                         :
         Debtor.                                         :   Hon. _____
                                                         :
                                                         :
---------------------------------------------------------x

# DECLARATION OF CHARLES M. MOORE IN SUPPORT OF CITY OF DETROIT, MICHIGAN'S STATEMENT OF QUALIFICATIONS PURSUANT TO SECTION 109(c) OF THE BANKRUPTCY CODE

I, Charles M. Moore, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

***1.*** I am a Senior Managing Director at Conway MacKenzie, Inc. ("Conway"), which currently serves as operational restructuring advisor to the City of Detroit ("Detroit" or the "City"), the debtor in the above-captioned chapter 9 case.

***2.*** Contemporaneously with the filing of its petition and this Declaration, the City has filed its: (a) Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (the "Statement of Qualifications"), certifying that the City satisfies each of the criteria set forth in section 109(c) of title 11 of the United States Code (the "Bankruptcy Code") for determining its

eligibility to be a debtor under chapter 9 of the Bankruptcy Code; and

(b) Memorandum of Law in Support of Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (the "Memorandum of Law"). This Declaration is made in support of the Statement of Qualifications and the Memorandum of Law.

*3.* Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge, my review of relevant documents and/or my opinion based upon my experience and knowledge of the City's operations and financial conditions. If called to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, review of documents and/or opinion.

### Education and Experience

*4.* I have a Bachelor of Arts and a Master of Business Administration, both from Michigan State University. Before joining Conway in 2001, I was the Chief Financial Officer of a privately owned automotive supplier. Prior to that, I was a Manager in the middle market consulting practice of what was then known as Deloitte & Touche. I have approximately 19 years of extensive experience dealing with both financial and operational aspects of corporate revitalization.

5. At Conway, I provide crisis management and turnaround consulting services to under-performing entities in a variety of industries, including governmental, financial services, technology, gaming and hospitality, automotive, manufacturing, distribution, consumer products, construction and real estate. Working for debtor, creditor and customer constituents, I have negotiated and executed debt restructuring and reorganization transactions both in and out of court. I also have extensive experience with defined benefit pension plans and other post-retirement employee benefits.

6. I am a Certified Turnaround Professional, a Certified Public Accountant, Certified in Financial Forensics, and a member of the Turnaround Management Association, American Bankruptcy Institute, American Institute of Certified Public Accountants and Michigan Association of Certified Public Accountants. I am also a past President and a former member of the Board of Directors for the Detroit Chapter of the Turnaround Management Association. Recently, I was appointed to serve on the Legislative Commission on Government Efficiency, a nine-person task force charged with identifying ways to improve the State of Michigan's operations.

## The City's Pension Liabilities

7. The City engaged Conway in January 2013 to assist the City with its ongoing restructuring initiatives. I have been actively involved in Conway's work for the City since that time.

8. Over a period of 5 months, my colleagues at Conway and I conducted an extensive and detailed department-by-department review of the City's operations, infrastructure and needed investments. This work, completed in consultation with the Emergency Manager and the City's other advisors, resulted in a detailed plan for operational restructuring initiatives and investments. I also have spent a significant amount of time analyzing the City's pension liabilities in order to: (a) understand the nature and scope of the City's obligations under its defined benefit pension plans; (b) identify factors impacting the funded status of the defined benefit pension plans; (c) evaluate future potential contribution requirements by the City to the defined benefit pension plans; and (d) analyze the City's options for modifications thereto.

*The City's Unfunded Pension Liabilities are Understated*

9. It is my understanding that as of the end of fiscal year 2012 (*i.e.*, June 30, 2012), the City's two retirement systems — the General Retirement System (the "GRS") and the Police and Fire Retirement System (the "PFRS", and, together with the GRS, the "Systems") — together had over 20,000 retirees

-4-

13-53846-tjt    Doc 8733-5    Filed 12/15/14    Entered 12/15/14 18:46:09    Page 4 of 13
13-53846    Doc 133    Filed 07/18/13    Entered 07/18/13 21:53:26    Page 4 of 13

receiving benefits under the applicable Systems' defined benefit plans. In addition, I understand that more than 2,400 former employees were entitled to but were not yet receiving benefits, and more than 9,700 active employees were members of the Systems with an expectation of receiving benefits when they retire.

*10.* Using the valuation assumptions and methods currently employed by the Systems and their outside actuary, as of June 30, 2011 (the most recent actuarial valuation available), the GRS had reported Unfunded Actuarial Accrued Liabilities ("UAAL") of approximately $639.9 million. (UAAL measures the difference between the present value of a pension fund's accrued liabilities and the actuarial value of the pension fund's assets.) A draft of the GRS actuarial valuation report as of June 30, 2012, indicates that its UAAL has grown to approximately $829.8 million. As of June 30, 2012 (the most recent actuarial valuation available), the PFRS actuarial valuation reported UAAL of approximately $147.2 million. Therefore, based on current actuarial assumptions and methods employed by the Systems' actuary, the estimated UAAL as of the end of fiscal year 2012 for both Systems combined is approximately $977.0 million.

*11.* The combined reported UAAL for the Systems, however, is premised upon a host of valuation assumptions and methods that, in the City's view, serve to substantially understate the Systems' unfunded liabilities. For example, current actuarial valuations project annual net rates of return on

-5-

13-53846-tjt Doc 8733-5 Filed 12/15/14 Entered 12/15/14 18:46:09 Page 5 of 13
13-53846 Doc 133-5 Filed 07/18/13 Entered 07/18/13 21:53:26 Page 5 of 13

investments (GRS — 7.9%; PFRS — 8.0%) that are unrealistically high based on the demographics of the Systems and the targeted investment mix for System assets. Using more realistic assumed annual rates of return of 7.0%, or even 7.25%, increases the UAAL, and the resulting City contributions required to maintain adequate funding levels to pay benefits. In the June 30, 2012 actuarial valuation report for the PFRS, its own actuary recommended that PFRS "[r]educe the investment return assumption as the asset allocation is changed to meet changing cash-flow needs." In its draft actuarial valuation report for the GRS as of June 30, 2012, the GRS actuary indicates that it will undertake an experience study for GRS following the June 30, 2012 valuation and that it expects "(*at a minimum*) to recommend consideration of changes to the . . . [a]ssumed rate of investment return…" (Emphasis added.)

      *12.* The Systems also mask their actual funding shortfall by "smoothing" asset gains and losses over a seven-year period. "Smoothing" means that gains and losses in excess of the assumed net rates of return (8.0% for PFRS and 7.9% for GRS) are recognized over a period of seven years, provided that the difference between the actuarial value of assets and the market value of assets stays within a "corridor" set by the Systems. As of June 30, 2012, the actuarial value of assets was higher than the actual market value of assets as of that date for the PFRS and the GRS by approximately $701 million and $648 million, respectively.

-6-

13-53846-tjt Doc 8733-5 Filed 12/15/14 Entered 12/15/14 18:46:09 Page 6 of 13
13-53846 Doc 133-5 Filed 07/18/13 Entered 07/18/13 21:53:26 Page 6 of 13

Using actual market values of assets as of June 30, 2012 would reduce the funded status of the PFRS from approximately 96% to approximately 78% and the GRS from approximately 77% to approximately 59%. In its draft actuarial report for GRS for the period ending June 30, 2012, the GRS actuary recognized the problem, and stated that it "expect[s] ... to recommend consideration of changes to the ... [l]ength of the asset smoothing period and/or the amount of the corridor."

*Estimated Underfunding Using More Realistic Assumptions & Methods*

13. As part of its restructuring process, the City has sought to ascertain an accurate picture of the funded position of the Systems, and to accurately measure the amount of the contributions that the City would have to make to each of the Systems going forward. As discussed above, the current assumptions and methods used by the Systems serve to, in the City's view, substantially understate the Systems' unfunded liabilities. Using what the City believes are more realistic assumptions, Milliman, Inc. ("Milliman"), which provides actuarial services to the City, has estimated that the combined underfunding for the GRS and PFRS as of June 30, 2013 is approximately $3.5 billion.

14. To arrive at the City's estimated underfunding of approximately $3.5 billion, Milliman used a 7.0% net assumed rate of return for both Systems, rather than the 7.9% and 8.0% assumptions used by GRS and PFRS, respectively.

In addition, Milliman used the estimated market value of assets as of June 30, 2013 rather than the actuarial value of assets. All other assumptions used in the actuarial valuations by the Systems' actuary remained the same.

### *GRS' Amortization Method Is Unreasonable*

15. The PFRS and the GRS, respectively, use 29-year and 30-year amortization periods for funding the UAAL. The GRS amortization method is "open," meaning that the amortization period is applied anew each year to the full amount of unfunded liability. That is akin to annually refinancing a 30-year mortgage, which means that the underfunding in the GRS never gets reduced by City contributions — it simply gets pushed forward with the hope that it will eventually be reduced by exceptional returns or other favorable experience. Use of a 30-year open amortization period is one of the factors used by the actuary in its recommendation to the GRS of the City's annual contributions. By employing GRS' open, 30-year amortization methodology, its actuary's annual recommended contributions to amortize GRS' UAAL do not even cover the amount of interest accruing on the UAAL. This causes the UAAL to grow rapidly (due to compounding), and essentially "kicks the can" of responsible pension funding "down the road." Although many governmental plans use long amortization periods to fund liabilities — in part to justify lower current contributions to their pension systems — use of a 30-year amortization period on an open-ended basis

simply defers indefinitely the cost to the City of the Systems' liabilities. This is especially problematic in mature pension funds like GRS and PFRS, in which the number of retirees receiving monthly pension payments far outnumber the active employees, many of whom will not begin to draw a pension for years. Such pension funds have significant annual pension payment obligations, reducing assets and increasing future UAAL. Indeed, the outside actuary for GRS estimated based on its actuarial valuation as of June 30, 2011, that during the ten-year period from July 1, 2011 through June 30, 2021, GRS would pay out roughly $3 billion in pensions. In its draft report, the GRS actuary reported that, as of June 30, 2012, the market value of the GRS assets was approximately $2.159 billion.

*16.* In addition to determining the System's underfunding based on more realistic actuarial methods and assumptions, the City also asked Milliman to determine the City's future contribution obligations using more reasonable amortization periods. Milliman estimated future contributions using shorter, closed amortizations periods — 15 years for the PFRS (to account for the fact that the PFRS is already closed to new hires) and 18 years for the GRS. The 18 year amortization period for GRS was selected to provide for annual contributions toward the UAAL in an amount at least equal to the interest generated on the UAAL, thus preventing the UAAL from growing due to the amortization methodology.

17. By any measure, the Systems will require significant future contributions that the City cannot possibly afford. Even applying the current assumptions and methods used by the Systems — not the more realistic assumptions and methods that the City believes should be applied to determine and pay down the underfunding — the Systems' actuary projected, based on the June 30, 2011 valuations, that annual contributions to the GRS over the ten year period through fiscal year 2023 would need to be approximately $1.15 billion, and that for the PFRS, contributions would need to be approximately $796 million. Even with these levels of contributions and using existing actuarial assumptions and methods, the Systems' actuary projects funded levels for the GRS and the PFRS would decline by the end of fiscal year 2023 to 57% and 85%, respectively.

*Past Practices and Deferrals of Current Contributions*

18. Miscellaneous past practices by the Systems' trustees and City officials — particularly as it relates to the GRS — have contributed to the Systems' significant underfunding. The most egregious example, upon information and belief, relates to GRS. Under the terms of the GRS plan, active City employees may elect to invest three, five or seven percent of their paychecks into an "annuity savings plan" (*i.e.*, a separate defined contribution arrangement) that earns interest based on a rate of return established at the discretion of the GRS board of trustees. These employee contributions are aggregated and invested with the other assets of

the GRS on a commingled basis. But in many years, the GRS trustees chose to credit these annuity savings plan employee accounts with rates of return that were far greater than the actual GRS rate of return earned on the investments. This abuse of discretion was most egregious in 2009, when the GRS lost 24.1% of the value of its assets, but the trustees appear to have credited annuity savings plan accounts with an investment return of 7.5%. And they did so by taking GRS assets attributable to City contributions to fund defined benefit pensions, and reallocating those assets to the annuity savings plan, thus effectively robbing GRS of precious funds necessary to support the traditional pensions the City had promised. Hundreds of millions of dollars of plan assets intended to support the City's traditional defined benefit pension arrangements were converted by GRS trustees to provide a windfall to the annuity savings accounts of active employees outside of the defined benefit pension plan.

*19.* This transfer of assets that were intended to support pensions was not limited to practices involving annuity savings plan accounts of active employees. In certain years in which the respective System's actual investment return exceeded the assumed rate of return, the trustees — and it appears this includes both GRS and, albeit more rarely, the PFRS trustees — paid out a portion of the excess to already retired pensioners. Dubbed the "13th check" program — because the additional pension check would be in excess of the 12 monthly pension

checks the retiree normally received in that year — these payments were in excess of the pensioner's earned pension and deprived the Systems of assets that would be needed to support liabilities, especially since it is inevitable that in certain years the Systems' investment returns would fall short of their assumed rates of return.

    *20.* Deferrals of current contributions and funding credits granted by the Systems also have contributed to the Systems' underfunding. The City has deferred payment of its year-end contributions to PFRS and GRS (and finances such deferrals at a rate of 8.0% for PFRS and 7.9% for GRS). According to City records, as of June 30, 2012, the City owed the PFRS its full contribution for fiscal year 2012 in the amount of approximately $50 million. As of June 30, 2013, the City had deferred approximately $108 million in pension contributions owing both to the GRS and PFRS for fiscal years 2012 and 2013. Contributions made in the form of notes nevertheless have been treated for actuarial purposes as made to the System during the applicable financial year. Further, I understand that the City was granted a "funding credit" by the PFRS trustees for contributions to PFRS in the amount of $25 million, for each of the fiscal years from 2008 to 2010, resulting in the City actually making lower contributions in those fiscal years.

I, the undersigned, declare under penalty of perjury that the foregoing is true and correct.

Executed on July 18, 2013    By: /s/ Charles M. Moore
　　　　　　　　　　　　　　　　Charles M. Moore
　　　　　　　　　　　　　　　　Senior Managing Director
　　　　　　　　　　　　　　　　Conway MacKenzie, Inc.