# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

------------------------------------------------------x
                                            :
In re                                       :          Chapter 9
                                            :
CITY OF DETROIT, MICHIGAN,                   :          Case No. 13-53846
                                            :
                           Debtor.          :          Hon. _____
                                            :
                                            :
------------------------------------------------------x

# MEMORANDUM IN SUPPORT OF STATEMENT
## OF QUALIFICATIONS PURSUANT TO
## <u>SECTION 109(c) OF THE BANKRUPTCY CODE</u>

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................1

II. DISCUSSION ...........................................................................6

    A. The City of Detroit is a Municipality ...............................8

    B. The City of Detroit is Specifically Authorized to be a Debtor ...........9

    C. The City of Detroit is Insolvent .......................................12

        1. Insolvency Standard ................................................12

        2. The City Satisfies the First Test for Municipal Insolvency Because the City is Not Paying Its Bona Fide Debts as They Become Due ...................................13

        3. The City Satisfies the Second Test for Municipal Insolvency Because the City is Unable to Pay Its Debts as They Become Due .............................14

            a. Test for Cash Insolvency is Prospective ......................14

            b. The Test for Cash Insolvency is Informed by "Budget Insolvency" and "Service Delivery Insolvency" .................................................16

            c. A Municipality Need Not Pursue All Possible Means of Generating and Conserving Cash Prior to Seeking Chapter 9 Relief ..........................17

            d. The City Has Experienced and, Absent Restructuring, Will Continue to Experience Negative Cash Flows and an Eroding Cash Position for Years ...................................19

            e. The City is "Budget Insolvent" ....................................22

            f. The City is "Service Delivery Insolvent" .....................23

            g. The City is "Cash Insolvent" ........................................26

            h. The City is Unable to Render Itself Solvent .................27

                (i) Revenue Cannot Be Meaningfully Increased ...........................................28

                (ii) Expenditures Have Already Been Slashed and Cannot be Further Decreased at This Time ...........................................33

    D.      The City of Detroit Desires to Effect a Plan to Adjust Its Debts.......35

    E.      Negotiations with All of the City's
           Creditors are Impracticable, But the City
           Nevertheless Has Made Good Faith Efforts to
           Engage Its Creditor Constituencies Where Possible..........................39

         1.     The City Has Satisfied the Requirements of
              Section 109(c)(5)(C) of the Bankruptcy Code Because
              Negotiations with Creditors are Impracticable........................40

         2.     The City Has Satisfied the Requirements of
              Section 109(c)(5)(B) of the Bankruptcy Code Because
              It Has Negotiated in Good Faith With Certain of Its
              Creditors Unsuccessfully.........................................................53

III.   CONCLUSION.............................................................................................62

## EXHIBITS

Exhibit A:   Complaints filed in (a) Flowers v. Snyder, No. 13-729-CZ
               (Ingham Cnty. Circuit Court), dated July 3, 2013, (b) Webster
               v. Snyder, No. 13 734 CZ (Ingham Cnty. Circuit Court), dated
               July 3, 2013 and (c) General Retirement System of the City of
               Detroit v. Orr, No. 13-768-CZ (Ingham Cnty. Circuit Court),
               dated July 17, 2013

# TABLE OF AUTHORITIES

## CASES

*Amos v. PPG Indus., Inc.*,
  699 F.3d 448 (6th Cir. 2012) ..............................................................50

*Cleveland Elec. Illuminating Co. v. Util. Workers Union, Local 270*,
  440 F.3d 809 (6th Cir. 2006) ........................................................ 49-50

*Flowers v. Snyder*,
  No. 13-729-CZ (Ingham Cnty. Cir. Ct. 2013) ...................................48

*General Retirement System of the City of Detroit v. Orr*,
  No. 13-768-CZ (Ingham Cnty. Circuit Court)...................................48

*Hamilton Creek Metro. Dist. v. Bondholders Colo. Bondshares
  (In re Hamilton Creek Metro. Dist.)*,
  143 F.3d 1381 (10th Cir. 1998) ........................................................15

*In re Addison Cmty. Hosp. Auth.*,
  175 B.R. 646 (Bankr. E.D. Mich. 1994) .............................................7

*In re Barnwell Cnty. Hosp.*,
  471 B.R. 849 (Bankr. D.S.C. 2012)....................................................7

*In re City of Bridgeport*,
  129 B.R. 332 (Bankr. D. Conn. 1991) ......................................... 14-16

*In re City of Stockton, Cal.*,
  No. 12-32118-C-9, 2013 WL 2629129
  (Bankr. E.D. Cal. June 12, 2013)................... 8, 12, 14-18, 38, 43, 45

*In re City of Wellston*,
  42 B.R. 282 (Bankr. E.D. Mo. 1984)...................................................7

*In re Cnty. of Orange*,
  183 B.R. 594 (Bankr. C.D. Cal. 1995) ...............................7, 36, 41, 45

*In re McCurtain Mun. Auth.*,
  No. 07–80363, 2007 WL 4287604
  (Bankr. E.D. Okla. Dec. 4, 2007) ........................................18, 29, 54

-iii-

13-53846  Doc 8734-1  Filed 12/15/14  Entered 12/15/14 12:56:51  Page 4 of 106
13-53846  Doc 8734-1  Filed 07/18/15  Entered 07/18/15 12:56:51  Page 4 of 106

*In re New York City Off-Track Betting Corp.*,
   427 B.R. 256 (Bankr. S.D.N.Y. 2010)......................11, 13, 30, 35-36, 41-43, 60

*In re Pierce Cnty. Hous. Auth.*,
   414 B.R. 702 (Bankr. W.D. Wash. 2009)....................................7, 16, 36, 42, 45

*In re Pleasant View Util. Dist. of Cheatham Cnty., Tenn.*,
   24 B.R. 632 (Bankr. M.D. Tenn. 1982).........................................18, 36, 43, 54

*In re Sullivan Cnty. Reg'l Refuse Disposal Dist.*,
   165 B.R. 60 (Bankr. D.N.H. 1994).....................................................................15

*In re Valley Health Sys.*,
   383 B.R. 156 (Bankr. C.D. Cal. 2008) ....................................................7, 43, 45

*In re Vills. at Castle Rock Metro. Dist. No. 4*,
   145 B.R. 76 (Bankr. D. Colo. 1990)......................................................18, 45, 54

*Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo
   (In re City of Vallejo)*,
   408 B.R. 280 (B.A.P. 9th Cir. 2009) ..................... 8, 18-19, 35-36, 38, 42-43, 60

*United Steelworkers of Am. v. Cooper Tire & Rubber Co.*,
   474 F.3d 271 (6th Cir. 2007) ...............................................................................50

*Webster v. Snyder*,
   No. 13-734-CZ (Ingham Cnty. Cir. Ct. 2013) ....................................................48

FEDERAL STATUTES

11 U.S.C. § 101(32) .................................................................................................12

11 U.S.C. § 101(40) ...................................................................................................8

11 U.S.C. § 109(c) ............................................................................................*passim*

STATE STATUTES

Initiated Law 1 of 1996 - MCL § 432.212................................................................29

Public Act 100 of 1990 - MCL § 141.1152(1) ........................................................29

Public Act 279 of 1909 - MCL § 117.3 ...................................................................29

Public Act 279 of 1909 - MCL § 117.5 ......................................................................29

Public Act 394 of 2012 - MCL § 141.503(2) ...........................................................29

Public Act 436 of 2012 - MCL § 141.1542(e)............................................................1

Public Act 436 of 2012 - MCL § 141.1549(6)(c) ...................................................53

Public Act 436 of 2012 - MCL § 141.1558. ..................................................... 9-10

Public Act 436 of 2012 - MCL § 141.1571 .................................................................1

OTHER AUTHORITIES

2 COLLIER ON BANKRUPTCY ¶ 109.04[3][d] ...........................................................35

6 COLLIER ON BANKRUPTCY ¶ 900.02[2][c][ii] ......................................................14

6 COLLIER ON BANKRUPTCY ¶ 900.02[2][e][iii] .....................................................42

H.R. Rep. No. 94–686 (1975) ...................................................................... 7, 41-42

H.R. Rep. No. 100–1011 (1988) ..............................................................................19

S. Rep. No. 94–458 (1975) ........................................................................................7

For the following reasons, the City of Detroit, Michigan (the "City" or "Detroit") is eligible for relief under section 109(c) of title 11 of the United States Code (the "Bankruptcy Code").

## I.    INTRODUCTION

On March 1, 2013, based on the conclusions of a State-appointed "financial review team" charged with reviewing the City's financial condition, the Governor of the State of Michigan (the "Governor") determined that a "local government financial emergency" existed within the City of Detroit.  By the end of the month, this determination had resulted in the extraordinary decision to appoint Kevyn D. Orr (the "Emergency Manager") as the emergency financial manager for the City under State law.[1]

---

[1]    Kevyn Orr serves as the Emergency Manager in accordance with Public Act 436 of 2012 of the State of Michigan, also known as the Local Financial Stability and Choice Act, Michigan Compiled Laws ("MCL") §§ 141.1541-141.1575  ("PA 436").  Mr. Orr was appointed to the position of "emergency financial manager" for the City by the Local Emergency Financial Assistance Loan Board (the "LEFALB") created under the Emergency Municipal Loan Act, MCL §§ 141.931-141.942, on March 15, 2013, pursuant to Public Act 72 of 1990 of the State of Michigan, also known as the Local Government Fiscal Responsibility Act, MCL §§ 141.1201-141.1291 ("PA 72").  Mr. Orr formally took office as the emergency financial manager for the City under PA 72 on March 25, 2013.  On March 28, 2013, the effective date of PA 436, PA 72 was repealed, and Mr. Orr became the Emergency Manager of the City pursuant to sections 2(e) and 31 of PA 436 (MCL §§ 141.1542(e) and 141.1571).

The financial emergency prompting the State's action is extreme – perhaps more extreme than anyone could have imagined – and has been a long time in coming.  The appointment of the Emergency Manager addresses a crisis that has existed but has not been adequately addressed for years.  The City has endured plummeting population, employment and revenues, decaying infrastructure, deteriorating services and fiscal mismanagement.  Crime is rampant, the City is infested with urban blight and it cannot provide residents with even the most basic municipal services in a timely or effective manner.  With streetlights failing throughout the City, Detroit is literally struggling to keep the lights on.  As discussed in greater detail below, the City consistently runs nine-figure operating budget deficits and, after addressing years of liquidity crises through the issuance of debt, the deferral of payments, draconian cuts to operating expenditures and other cash conservation measures, faces the exhaustion of its available cash by the end of this calendar year.

The City's enormous debts and other legacy liabilities present a substantial barrier to addressing these problems.  The City owes various constituencies more than *$18 billion*:  approximately (a) $5.85 billion in special revenue obligations; (b) $6.4 billion in other post-employment benefit, or "OPEB," liabilities; (c) $3.5 billion in underfunded pension liabilities based on current actuarial estimates; (d) $1.13 billion in secured and unsecured general obligation ("GO")

liabilities; (e) $1.43 billion in liabilities under pension-related certificates of participation ("COPs"); (f) $296.5 million in swap liabilities related to the COPs; and (g) $300 million in other liabilities. Debt service on the obligations other than those secured by special revenues consumed a staggering 42.5% of the City's revenues in the 2013 fiscal year. That percentage is projected to increase to almost 65% of revenues by 2017.

On May 12, 2013, the Emergency Manager issued a report on the status of the City that found, among other things, that the City was "clearly insolvent on a cash flow basis." The City had positive cash flows of $31.5 million (excluding the impact of borrowings) as of the end of its most recent fiscal year (i.e., as of June 30, 2013), but only as a result of, among other things, the deferral of nearly $108 million in pension contributions and the City's recent decision not to make nearly $40 million in scheduled debt payments. Absent these and other measures, the City would have exhausted its available cash prior to June 30, 2013.

The City's marginal cash flows are only expected to deteriorate going forward. Absent restructuring, the City is projecting (i) cash flows of negative $198.5 million in the current 2014 fiscal year and (ii) negative net cash positions (after required property tax distributions) of $11.6 million as early as December 2013 and $143.3 million as of the end of the current 2014 fiscal year.

Both before and after the appointment of the Emergency Manager, the City had been in discussions with representatives of virtually all of its creditors[2] in an effort to address the City's financial condition and resolve its growing liquidity crisis without recourse to the protections and powers of chapter 9 of the Bankruptcy Code.  Despite these good faith efforts, however, these discussions did not result in any substantial indication that the City could negotiate debt reductions with its creditors without the aid of chapter 9 proceedings.  To be sure, such negotiations may have been impracticable as a threshold matter in light of the fragmented, de-centralized and far-flung nature of the City's creditor constituency.  But the City attempted dialogue in any event.  As described in greater detail below, at a two-hour meeting held on June 14, 2013, the City presented approximately 150 invited representatives of the City's creditors with a comprehensive proposal for the restructuring of the City's operations, finances and capital structure, as well as proposed recoveries for each creditor group.  In the weeks between that presentation and the commencement of this chapter 9 case, the City participated in numerous individual meetings with as many of its creditors (and their advisors) as were interested in doing so, including representatives of the City's unions, retirees,

---

[2]     As set forth below, the City's efforts to negotiate with its creditor constituencies has been complicated by, among other things, the lack of any representative agent or committee to serve as an authorized negotiator with the ability to bind the City's nearly 20,000 retirees.

-4-

13-53846-swr Doc 1873-4 Filed 07/18/13 Entered 07/18/13 12:08:51 Page 10 of 106

pension systems, holders of general obligation debt and insurers of the City's debt. The City responded to all requests for additional information and to all questions it received in these negotiations. Although these creditor meetings generally were constructive and conducted in good faith, the process did not produce sufficient consensual savings from the City's major creditor constituencies to ameliorate its cash crisis or leave the City in a position to successfully restructure its finances.

On July 16, 2013, the Emergency Manager recommended to the Governor that no reasonable alternative existed to rectifying the financial emergency facing the City other than petitioning for relief under chapter 9. On July 18, 2013, the State of Michigan, through the Governor and in accordance with State law, specifically authorized the commencement of this case.

With the authorization of the State, and the desire to effect an adjustment of its debts, the City filed a petition for chapter 9 relief on the date hereof. In connection with the petition, the City also filed a statement of qualifications that certifies that the City has met each of the eligibility requirements contained in section 109(c) of the Bankruptcy Code (the "Statement of Qualifications"). In support of the petition and the Statement of Qualifications, the City respectfully

-5-

13-53846-tjt   Doc 1873-1   Filed 07/18/13   Entered 07/18/13 22:42:08   Page 10 of
13-53846-tjt   Doc 4734   Filed 05/12/15   Entered 05/12/15 14:18:56   Page 11 of
106

submits this Memorandum further demonstrating that it is eligible for the relief

requested.[3]

## II.    DISCUSSION

To be eligible for relief under chapter 9, an entity must satisfy five statutory

criteria.  Specifically, the entity must demonstrate that it:

> (1) is a municipality;
>
> (2) is specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter;
>
> (3) is insolvent;
>
> (4) desires to effect a plan to adjust such debts; and
>
> (5) (A) has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter; (B) has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter; (C) is unable

---

[3]    Contemporaneously with the filing of this Memorandum, the City has filed the (a) Declaration of Kevyn D. Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (the "Orr Declaration"); (b) Declaration of Gaurav Malhotra in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (the "Malhotra Declaration"); and (c) Declaration of Charles M. Moore in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (the "Moore Declaration").

-6-

13-53846-tjt   Doc 1873-1   Filed 07/18/13   Entered 07/18/13 12:08:56   Page 12 of
106
13-53846-tjt   Doc 1873   Filed 07/18/13   Entered 07/18/13 12:42:18   Page 18 of 106

to negotiate with creditors because such negotiation is impracticable; or (D) reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title.

11 U.S.C. § 109(c)(1) – (5).

Because the fundamental purposes of chapter 9 are to provide a municipal debtor with a breathing spell from debt collection efforts and time to establish a repayment plan with creditors (see In re Addison Cmty. Hosp. Auth., 175 B.R. 646, 649-50 (Bankr. E.D. Mich. 1994)), the eligibility requirements of section 109(c) are construed broadly to provide municipalities with ready access to such relief.  In re Valley Health Sys., 383 B.R. 156, 163 (Bankr. C.D. Cal. 2008) ("Section 109(c)'s eligibility requirements are to be construed broadly to provide access to relief in furtherance of the [Bankruptcy] Code's underlying policies." (internal quotations and citation omitted)); see also In re Barnwell Cnty. Hosp., 471 B.R. 849, 859 (Bankr. D.S.C. 2012) (same; quoting Valley Health); In re Pierce Cnty. Hous. Auth., 414 B.R. 702, 710 (Bankr. W.D. Wash. 2009) (same); In re Cnty. of Orange, 183 B.R. 594, 601 (Bankr. C.D. Cal. 1995) ("Certainly, the term 'municipality' should not be narrowly construed."); In re City of Wellston, 42 B.R. 282, 284 (Bankr. E.D. Mo. 1984) (describing the eligibility requirements as "minimal"; determining that entity was eligible for chapter 9 relief based solely on statement of qualifications and limited testimony in support); accord H.R. Rep. No. 94-686, at 19-20 (1975), reprinted in 1978 U.S.C.C.A.N. 539, 557 (expanding

"the applicability of Chapter IX as much as possible."); S. Rep. No. 94-458, at 13 (1975) ("The provisions of [chapter 9] should provide ready access to the bankruptcy courts.").

The burden of proving an entity's satisfaction of the section 109(c) eligibility criteria by a preponderance of the evidence is on the petitioner.  E.g., In re City of Stockton, Cal., No. 12-32118-C-9, 2013 WL 2629129, at *19 (Bankr. E.D. Cal. June 12, 2013) ("[I]t is straightforward that the § 109(c) eligibility elements are matters as to which the City has the affirmative burden to establish in all respects by preponderance of evidence…."); Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo (In re City of Vallejo), 408 B.R. 280, 289 (B.A.P. 9th Cir. 2009) (expressly rejecting objector's argument for the application of a "more rigorous clear and convincing burden of proof…").  As set forth below, the City easily satisfies each of the five criteria for eligibility set forth at section 109(c) of the Bankruptcy Code.

A.    The City of Detroit is a Municipality

The City is a municipality.  The term "municipality" means a "political subdivision or public agency or instrumentality of a State."  11 U.S.C. § 101(40).  The City is a Michigan municipal corporation located in Wayne County.  The City is a home rule city organized under Public Act 279 of 1909 of the State of Michigan (as amended), also known as the Home Rule City Act,

MCL §§ 117.1-117.38. The City has comprehensive home rule power under the State Constitution of 1963 (the "Constitution"), the Home Rule City Act and the 2012 Charter of the City of Detroit (the "Charter"), subject to the limitations on the exercise of that power contained in the Constitution, the Charter or applicable Michigan statute. Accordingly, (1) the City is a "political subdivision" of the State of Michigan and, thus, a "municipality" within the meaning of section 101(40) of the Bankruptcy Code, and (2) the eligibility requirement of section 109(c)(1) of the Bankruptcy Code is satisfied.

      B.      <u>The City of Detroit is Specifically Authorized to be a Debtor</u>

Because (1) Michigan law empowers the Governor to authorize the City to be a debtor under chapter 9 of the Bankruptcy Code and (2) the Governor has authorized the City to commence this chapter 9 case in accordance with applicable Michigan law, the eligibility requirement of section 109(c)(2) of the Bankruptcy Code is satisfied.

PA 436 provides that "[i]f, in the judgment of the emergency manager, no reasonable alternative to rectifying the financial emergency of the local government which is in receivership exists, then the emergency manager may recommend to the governor and the state treasurer that the local government be authorized to proceed under chapter 9." MCL § 141.1558(1). The emergency manager's recommendation to the Governor and the Treasurer of the State of

Michigan (the "<u>Treasurer</u>") must include at least one of three statutorily-identified bases for the recommendation, including "[a] determination by the emergency manager that no feasible financial plan can be adopted that can satisfactorily rectify the financial emergency of the local government in a timely manner." MCL § 141.1558(2)(a).  If the governor approves the recommendation, "the governor shall inform the state treasurer and the emergency manager in writing of the decision…."  MCL § 141.1558(1).

PA 436 further provides that, "[u]pon receipt of the written approval [of the Governor], the emergency manager is authorized to proceed under chapter 9."  <u>Id.</u> It continues:  "This section empowers the local government for which an emergency manager has been appointed to become a debtor under title 11 of the United States Code, 11 USC 101 to 1532, as required by section 109 of title 11 of the United States Code, 11 USC 109, and empowers the emergency manager to act exclusively on the local government's behalf in any such case under chapter 9."  <u>Id.</u>

On July 16, 2013, the Emergency Manager provided the Governor and Treasurer with his written recommendation that the City be authorized to file for chapter 9 relief.  <u>See</u> Orr Declaration, at Exhibit J (copy of Emergency Manager's written recommendation).  The recommendation was based on, among other things, the Emergency Manager's (1) determination that the City cannot adopt a feasible financial plan that can satisfactorily rectify its financial emergency in a

timely manner and (2) judgment that no reasonable alternative to chapter 9 would allow the Emergency Manager to rectify the City's financial emergency in a timely manner. Thereafter, on July 18**,** 2013, the Governor approved in writing the Emergency Manager's recommendation to commence this chapter 9 case. See id., at Exhibit K (copy of Governor's written approval of Emergency Manager's recommendation). Finally, on July 18, 2013, consistent with the Governor's written approval, the Emergency Manager issued a written order directing the City to commence this chapter 9 case. See id., at Exhibit L (copy of Emergency Manager's order directing commencement); In re New York City Off-Track Betting Corp., 427 B.R. 256, 267 (Bankr. S.D.N.Y. 2010) (finding that the eligibility requirement of section 109(c)(2) of the Bankruptcy Code is satisfied by "explicit authorization" that is "written, exact, plain, and direct with well-defined limits so that nothing is left to inference or implication.") (quotation omitted).

Accordingly, under applicable State law and pursuant to the specific approval of the Governor in accordance with MCL § 141.1558(1), (1) the City has been specifically authorized to be a debtor under chapter 9 of the Bankruptcy Code (in both "its capacity as a municipality" and "by name") and (2) the eligibility requirement of section 109(c)(2) of the Bankruptcy Code is satisfied.

C.     The City of Detroit is Insolvent

1.     *Insolvency Standard*

Section 109(c)(3) of the Bankruptcy Code provides that only an "insolvent" municipality is eligible to be a debtor under chapter 9 of the Bankruptcy Code. 11 U.S.C. § 109(c)(3).  Section 101(32)(C) of the Bankruptcy Code provides that "with reference to a municipality," "insolvent" means a "financial condition such that the municipality is – (i) generally not paying its debts as they come due unless such debts are the subject of a bona fide dispute; or (ii) unable to pay its debts as they become due." 11 U.S.C. § 101(32)(C)(i), (ii).  Accordingly, the Bankruptcy Code sets forth a discrete definition of municipal insolvency that differs from the familiar "balance sheet insolvency" test applicable in chapter 7 and 11 cases.[4] "The theme underlying the two alternative definitions of municipal insolvency in § 101(32)(C) is that a municipality must be in bona fide financial distress that is not likely to be resolved without use of the federal exclusive bankruptcy power to impair contracts.  The insolvency must be real and not transitory." Stockton, 2013 WL 2629129, at *12.  As demonstrated below, the City is insolvent under either of the alternative tests for municipal insolvency.

---

[4]     Compare 11 U.S.C. § 101(32)(C) (cited above) with 11 U.S.C. § 101(32)(A) (defining "insolvent" for non-partnership, non-municipal entities as "financial condition such that the sum of such entity's debts is greater than all of such entity's property at a fair valuation…").

2.    *The City Satisfies the First Test for*
      *Municipal Insolvency Because The City is Not*
      *Paying Its Bona Fide Debts as They Become Due*

The City is insolvent within the meaning of section 101(32)(C)(i) of the

Bankruptcy Code because it is "generally not paying its debts as they become due."

The City's cash crisis has become particularly acute in the weeks preceding the

commencement of this chapter 9 case and, in response, the City has been forced to

suspend payments on unsecured debt.  Specifically, to conserve its dwindling cash,

on June 14, 2013, the City (a) did not make a $39.7 million payment due and

owing to certain service corporations established in connection with the issuance of

the COPs and (b) publicly declared a moratorium on principal and interest

payments related to unsecured debt going forward.  See Orr Declaration, at ¶ 54,

n.152.  Apart from these recent events, the City has deferred and not paid required

pension contributions and other payments (including approximately $37 million in

pension contributions for fiscal year 2012 and an estimated $71 million in such

contributions for fiscal year 2013).  See id. at ¶ 12; New York City Off-Track

Betting Corp., 427 B.R. at 272 (finding deferral of current payments evidence of

debtor's insolvency).

Because the City has not been, and currently is not, paying bona fide

obligations as they have come due, (a) the City is "insolvent" within the meaning

-13-
13-53846-tjt  Doc 1873-4  Filed 07/18/13  Entered 07/18/13 22:08:56  Page 19 of
13-53846-tjt  Doc 1873  Filed 07/18/13  Entered 07/18/13 12:18:51  Page 19 of 106
106

of section 101(32)(C)(i) of the Bankruptcy Code, and (b) the eligibility

requirement of section 109(c)(3) of the Bankruptcy Code is satisfied.

3.    *The City Satisfies the Second Test for Municipal Insolvency Because The City is Unable to Pay Its Debts as They Become Due*

Even if the City's non-payment of existing debts did not render it "insolvent"

for the purposes of section 109(c)(3) of the Bankruptcy Code (which it does),[5] the

City would still satisfy that section's requirement because the City is "unable to pay

its debts as they become due" within the meaning of section 101(32)(C)(ii) of the

Bankruptcy Code.  Courts have referred to a municipality's inability to pay as "cash

insolvency" (e.g., Stockton, 2013 WL 2629129, at *13) and the test for municipal

insolvency set forth at section 101(32)(C)(ii) of the Bankruptcy Code as the

"cash-flow test" (e.g., In re City of Bridgeport, 129 B.R. 332, 337 (Bankr. D.

Conn. 1991)).

a.    <u>Test for Cash Insolvency is Prospective</u>

Importantly, section 101(32)(C)(ii) of the Bankruptcy Code does <u>not</u> require

a municipality to wait until it completely exhausts all available cash before it is

---

[5]    Indeed, proof of actual non-payment of debt has itself been characterized as proof of a municipality's inability to pay. See 6 COLLIER ON BANKRUPTCY ¶ 900.02[2][c][ii] (Alan S. Resnick and Henry J. Sommer eds., 16th ed. rev.) ("In most circumstances, proof of nonpayment may amount to proof of inability, for municipalities, invested as they are with the public trust, will generally cease paying only in circumstances in which they are unable to pay or if the debts are in bona fide dispute.").

deemed to be "cash insolvent" and, thus, eligible to seek chapter 9 relief.

See, e.g., Bridgeport, 129 B.R. at 339 ("[A] city should not have to wait until it runs out of money in order to qualify for bankruptcy protection.").  Rather, courts have recognized that the "cash-flow test" looks forward, gauging the City's prospective ability to pay its debts over the near future rather than on the petition date.

> The language "unable to pay as they become due" in the municipal insolvency definition implicates the notions of time and projections about the future.  Statutory construction rules likewise point to a temporal aspect as the § 101(32)(C)(ii) phrase "as they become due" must mean something different than its § 101(32)(C)(i) partner "generally not paying its debts."  The consequence of the § 101(32)(C)(ii) temporal definition of insolvency is that a municipality need not be actually out of cash before it is cash insolvent.

Stockton, 2013 WL 2629129, at *12; see also Hamilton Creek Metro. Dist. v. Bondholders Colo. Bondshares (In re Hamilton Creek Metro. Dist.), 143 F.3d 1381, 1384 (10th Cir. 1998) ("While the test under § 101(32)(C)(i) looks to current, general non-payment, the test under 101(32)(C)(ii) is an equitable, prospective test looking to future inability to pay.") (quoting In re Sullivan Cnty. Reg'l Refuse Disposal Dist., 165 B.R. 60, 80 (Bankr. D.N.H. 1994)); Bridgeport, 129 B.R. at 336-37 (finding that section 101(32)(C)(ii) of the Bankruptcy Code "requires a prospective analysis," that interpretations to the contrary would render

-15-

13-53846-tjt  Doc 1873  Filed 07/18/13  Entered 07/18/13 18:56:51  Page 21 of 106
13-53846-swr  Doc 4873-1  Filed 12/15/14  Entered 12/15/14 18:08:51  Page 21 of 106

subsection (C)(ii) nothing more than a subsection of (C)(i) (and thus surplusage) and that a "prospective analysis also comports with the purpose of chapter 9").

Although courts have not settled on how far into the future such a prospective analysis should reach, it is clear that a projected exhaustion of cash within the municipality's current or succeeding fiscal year will serve to demonstrate cash insolvency.  E.g., Stockton, 2013 WL 2629129, at *13 ("[W]hen a municipality lacks the funds to pay its contractual obligations within the current or the next succeeding fiscal year, it is unable to pay its debts as they become due within the meaning of § 101(32)(C)(ii)."); Pierce Cnty. Hous. Auth., 414 B.R. at 711 (finding that the debtor had demonstrated its cash insolvency when, among other things, the debtor's financial expert "properly evaluated the current fiscal year and the next fiscal year"); Bridgeport, 129 B.R. at 338 ("[T]o be found insolvent a city must prove that it will be unable to pay its debts as they become due in its current fiscal year or, based on an adopted budget, in its next fiscal year.").

> b.      The Test for Cash Insolvency is Informed by
> "Budget Insolvency" and "Service Delivery Insolvency"

The Stockton court determined that "[t]hree types of insolvency inform the § 109(c)(3) analysis:  cash insolvency; budget insolvency; and service delivery insolvency."  Stockton, 2013 WL 2629129, at *12.  An inquiry into "service delivery insolvency" focuses on a municipality's ability to provide basic municipal services – especially those required to maintain public safety – to its residents.  Id.

at *14 (identifying spiking crime rates as a "paradigm example of service delivery insolvency" demonstrating that the debtor's cash insolvency was not a technical or "chimer[ical]" default). "Budget insolvency" analyzes a municipality's ability to draft a balanced budget and generate sufficient revenue to cover expenses in the absence of restructuring initiatives. Id. (determining that the debtor was "budget insolvent" where steady-state projections demonstrated budget imbalances that would persist for decades).

The concepts of "budget insolvency" and "service delivery insolvency" are intended to inform a court's determination of cash insolvency by demonstrating the deep-seated and intractable nature of a municipality's financial crisis; i.e., that the cash insolvency is "real and not transitory." See id. at *13 ("While cash insolvency – the opposite of paying debts as they become due – is the controlling chapter 9 criterion under § 101(32)(C), longer-term budget imbalances (budget insolvency) and the degree of inability to fund essential government services (service delivery insolvency) also inform the trier of fact's assessment of the relative degree and likely duration of cash insolvency.").

     c.     A Municipality Need Not Pursue All Possible Means of
                Generating and Conserving Cash Prior to Seeking Chapter 9 Relief

A municipality is not required to defy fiscal prudence and exhaust all possible opportunities for revenue generation (e.g., tax increases; asset sales) prior to seeking relief under chapter 9 for fear of being unable to satisfy the insolvency

requirement of section 109(c)(3) of the Bankruptcy Code.  A municipality can be

cash insolvent without having tapped every available resource, especially where

short term and short-sighted revenue generation ultimately would exacerbate the

municipality's financial crisis.  E.g., Stockton, 2013 WL 2629129, at *14 (rejecting

objectors' arguments that the debtor was ineligible for relief for failure to have

sought tax increases prior to filing where raising taxes was subject to numerous

practical and legal obstacles and may not have produced the desired revenue in any

event); Vallejo, 408 B.R. at 293 (affirming bankruptcy court's rejection of unions'

argument that debtor was solvent because it could "pillage[] all of its component

agency funds … to subsidize its General Fund;" affirming bankruptcy court's

finding of insolvency where raiding Vallejo's other funds to satisfy short term cash

needs "would leave Vallejo more debilitated tomorrow than it is today"); In re

McCurtain Mun. Auth., No. 07–80363, 2007 WL 4287604, at *4 (Bankr. E.D.

Okla. Dec. 4, 2007) (finding that the failure to impose assessments is not a factor

in a determination of the debtor's solvency); In re Vills. at Castle Rock Metro. Dist.

No. 4, 145 B.R. 76, 84 (Bankr. D. Colo. 1990) (noting that creditor's argument that

taxes could theoretically be raised would not render the municipality solvent and

would result in a "death spiral"); In re Pleasant View Util. Dist. of Cheatham Cnty.,

Tenn., 24 B.R. 632, 639 (Bankr. M.D. Tenn. 1982) ("[T]he mere contingency that

the District could improve its financial situation by increasing its rates does not

alter the fact that at the present time the District cannot meet its debts as they mature.").

Similarly, a municipality need not adopt every possible cost-cutting measure to conserve cash as a prerequisite to demonstrating cash insolvency under section 101(32)(C)(ii) of the Bankruptcy Code. Certainly, spending cuts that impair the basic functioning of a municipality and jeopardize the health and safety of its residents are not required for purposes of chapter 9 eligibility. See Vallejo, 408 B.R. at 294 (City was insolvent where further funding reductions would threaten its ability to provide for the basic health and safety of its citizens); see also H.R. Rep. No. 100-1011, at 2 (1988), reprinted in 1988 U.S.C.C.A.N. 4115, 4116 (stating that chapter 9 is intended to enable a financially distressed city to "continue to provide its residents with essential services such as police protection, fire protection, sewage and garbage removal, and schools ...").

     d.     The City Has Experienced and,
                Absent Restructuring, Will Continue to Experience
                Negative Cash Flows and an Eroding Cash Position for Years

The City has experienced negative cash flows for years. Orr Declaration, at ¶ 11. As a recent past example, excluding the impact of proceeds from short term borrowings, the City had negative cash flows of $115.5 million in fiscal year 2012. Id.; Malhotra Declaration at ¶ 20. In March 2012, the City was forced to borrow $80 million on a short term, secured basis (of which the City spent

-19-
13-53846-tjt   Doc 1873-1   Filed 07/18/13   Entered 07/18/13 12:08:51   Page 25 of
13-53846-swr   Doc 1873   Filed 07/18/13   Entered 07/18/13 11:18:56   Page 25 of 106
106

$50 million in fiscal year 2012).  Orr Declaration, at ¶ 11.  Absent this borrowing

and other significant cash conservation measures (<u>e.g.</u>, payment deferrals), the City

would have run out of cash prior to the end of its 2012 fiscal year (<u>i.e.</u>, prior to

June 30, 2012). <u>Id.</u>

For years, the City's cash shortfalls have been addressed through the

issuance of short term and long term debt.  The City issued $75 million in debt in

fiscal year 2008, $250 million in long-term fiscal stabilization bonds in fiscal year

2010 and $129.5 million in debt in August 2012 (collectively, the "<u>Recent Debt</u>

<u>Issuances</u>").  Orr Declaration, at ¶ 50.  More recently, the City's cash shortfalls

have been addressed with deferrals of payments on current obligations, wage cuts,

employee furloughs/layoffs, cash pooling, borrowings from other City funds and

other working capital generating tactics.  Orr Declaration, at ¶ 51.  The City

experienced positive cash flows of $31.5 million (excluding the impact of

borrowings) as of June 30, 2013, but only as a result of, among other cash

conservation measures:  (1) deferring approximately $108 million of current and

prior year pension contributions (including approximately $37 million in pension

contributions for fiscal year 2012 and an estimated $71 million in such

contributions for fiscal year 2013); (2) drawing $10 million of the escrowed

proceeds of the $129.5 million Recent Debt Issuance; and (3) the City's decision

not to make the scheduled $39.7 million payments due to certain service

corporations in connection with the COPs.  Id. at ¶ 56; Malhotra Declaration,

at ¶ 20.  Absent these measures (as well as borrowings from other City funds,

deferrals of amounts owed to other City funds and other cash management

measures), the City would have exhausted its available cash prior to the end of the

2013 fiscal year on June 30, 2013.  Orr Declaration, at ¶ 11.

     The City's cash flows, as marginal as they are, will only deteriorate in the

current and subsequent fiscal years.  Absent restructuring, the City projects a cash

flow deficit of $198.5 million in the current 2014 fiscal year and an additional

deficit of $260.4 million in fiscal year 2015.  Orr Declaration, at ¶ 57; Malhotra

Declaration, at ¶ 21.  These projections show the City in a net cash position (after

required property tax distributions) of *negative* $11.6 million as early as

December 2013 – i.e., the City's net cash position will turn negative during the

current calendar year and well before the conclusion of the current fiscal year.  Orr

Declaration, at ¶ 57; Malhotra Declaration, at ¶ 22.  In the absence of restructuring,

the City's net negative cash position (after required property tax distributions) will

continue its downward spiral, reaching negative $143.3 million as of the end of the

current 2014 fiscal year and negative $404.5 million as of the end of fiscal year

2015.  Orr Declaration, at ¶ 57; Malhotra Declaration, at ¶ 22.

     As shocking as these numbers are, they are probably *understated*.  Including

the City's accumulated payment deferrals in the foregoing totals would result in a

-21-

13-53846-tjt   Doc 1873-1   Filed 07/18/13   Entered 07/18/13 12:08:56   Page 27 of 106
13-53846-swr   Doc 1873   Filed 07/18/13   Entered 07/18/13 14:18:51   Page 27 of 106

net negative cash position of $300.6 million as of the end of fiscal year 2014 and $568.7 million as of the end of fiscal year 2015. Malhotra Declaration, at ¶ 22.

e.    The City is "Budget Insolvent"

The City has run substantial deficits (excluding financing proceeds) for the last six fiscal years of approximately $128 million (2008), $124 million (2009), $72 million (2010), $57 million (2011), $122 million (2012) and $47 million (2013). Orr Declaration, at ¶ 50. *Including* the effect of the Recent Debt Issuances, the City's accumulated general fund deficit stood at approximately $327 million as of the end of fiscal year 2012 and $237 million as of the end of fiscal year 2013. Id.; Malhotra Declaration, at ¶ 23. *Excluding* the effect of the Recent Debt Issuances (which, as an accounting matter, reduce the amount of the accumulated deficit by an amount equal to the funds borrowed), the City's accumulated general fund deficit (a) has grown continuously over an extended period and (b) would have been approximately $700 million as of the end of the 2013 fiscal year. Orr Declaration, at ¶ 50; Malhotra Declaration, at ¶ 23. At the City's current run rate, its accumulated deficit could grow to approximately $1.3 billion by fiscal year 2017. Orr Declaration, at ¶ 50; Malhotra Declaration, at ¶ 23.

f.    The City is "Service Delivery Insolvent"

As set forth in detail in the Orr Declaration, the City is unable to fund the necessary costs of providing its residents with basic municipal services, and is accordingly "service delivery insolvent."  Decades of economic headwinds and mismanagement have prevented the City from making investments critical to the health and safety of its residents.  Orr Declaration, at ¶ 31.  Moreover, drastic cost-cutting actions taken over the years have gutted City departments, including departments providing core services (e.g., police; fire; emergency medical services ("EMS"); public lighting; transportation; parks and recreation).  Id.

The City's crime statistics bring the depths of its service delivery insolvency into stark relief.  During calendar year 2011, approximately 136,000 crimes were reported in the City, a shocking number of which (15,245) were violent crimes.  Id. at ¶ 32.  *In 2012, the City's violent crime rate was five times the national average and the highest of any city with a population in excess of 200,000.*  Id.  The City's case clearance rates for violent crimes and all crimes (18.6% and 8.7%, respectively) are substantially below that of comparable municipalities nationally and surrounding local municipalities,[6] and the response times of the Detroit Police Department are far in excess of comparable and surrounding cities.[7]  Id.

---

[6]    Clearance rates in 2011 for comparable municipalities include Pittsburgh (50.4% clearance rate for violent crimes and a 34.0% rate for all crimes),

-23-

Emblematic of the City's pervasive inability to deliver basic services is the fact that the City is literally struggling to keep the lights on. As of April 2013, approximately 40% of the City's street lights were not working, due to both burned-out bulbs and the obsolescence of the distribution-only electrical grid maintained by the City's Public Lighting Department. Id. at ¶ 33. Compounding this problem is the fact that many of the street lights that *are* working do not meet residents' actual needs, instead serving under-populated sections of the City's historical footprint. Id.

Perhaps most fundamental to Detroit's decline – and presently an insurmountable obstacle to reversal of the City's service delivery insolvency – is its extensive urban blight. Long-term population decline and declining property values have left the City littered with abandoned, forfeited or foreclosed land and

---

(continued…)

Milwaukee (37.1% clearance rate for violent crimes and a 23.3% rate for all crimes) and St. Louis (47.6% clearance rate for violent crimes and a 23.5% rate for all crimes). Clearance rates in 2011 for surrounding municipalities include Southfield (39.2% clearance rate for violent crimes and a 18.8% rate for all crimes), Livonia (41.1% clearance rate for violent crimes and a 28.6% rate for all crimes) and Dearborn (49.9% clearance rate for violent crimes and a 33.8% rate for all crimes). Orr Declaration, Exhibit A at 10-11.

[7] Detroit's average response time in 2013 for top priority crimes was approximately 58 minutes. The national average response time is approximately 11 minutes. Police response times for Livonia and Dearborn are approximately 24 minutes and nine minutes respectively. Orr Declaration, Exhibit A at 13.

structures. Id. at ¶ 34.  There are more than 140,000 blighted properties strewn throughout the City:  (1) approximately 78,000 abandoned and blighted structures — nearly half of which are considered dangerous — and (2) approximately 66,000 blighted and vacant parcels of real property (which parcels are not free of debris). Id. at ¶ 35.  Due to foreclosures, fires and the expensive, time-consuming and highly-regulated process of removing blighted structures, these numbers are only increasing.  Id.  The average cost to the City of demolishing a blighted residential structure is approximately $8,500; i.e., the cost to the City of materially addressing its urban blight could easily exceed half a billion dollars.  Id. at ¶ 36.  In the absence of a restructuring, the City simply is unable to make this necessary investment.

Widespread blight not only impedes the City's efforts to remedy its core municipal services, it exacerbates the problem because City resources are diverted to blighted areas.  Blighted structures are a breeding ground for crime, straining the resources of the Detroit Police Department.  Id. at ¶¶ 34-35.  Further, approximately 60% of the 11,000 to 12,000 fires that the City has experienced each year for the past decade occur in blighted and unoccupied buildings, forcing the Detroit Fire Department to expend a disproportionate and arguably unnecessary amount of time and resources fighting fires in vacant structures.  Id. at ¶ 35.

Any of the foregoing public safety crises are more than sufficient to demonstrate the City's service delivery insolvency. Yet further and equally intractable problems plague the City. The infrastructure and equipment for the City's police, fire and EMS departments are aged, inadequately maintained and lack modern information technology, and the City recently has been reduced to accepting charitable donations to inspect its ground and truck ladders and to upgrade its police and EMS vehicle fleets (donations which do not begin to resolve the issues plaguing the City's vehicle fleet). <u>Id.</u> at ¶¶ 37-39. Exacerbating many of Detroit's problems, nearly all of the City's departments are saddled with obsolete and non-integrated information technology ("<u>IT</u>") infrastructure and software. These IT deficiencies lead directly to massive inefficiencies and costs, and significantly hinder the City's efforts to reform its service delivery. <u>Id.</u> at ¶¶ 41-44.

The City is plainly "service delivery insolvent."

g.    <u>The City is "Cash Insolvent"</u>

The foregoing conclusively demonstrates that the City is "unable to pay its debts as they become due" within the meaning of section 101(32)(C)(ii) of the Bankruptcy Code. The City has presented evidence that, absent restructuring, it will (a) be in a net negative cash position by the end of the current calendar year and (b) have net negative cash positions as of the end of its current and subsequent fiscal years well into the hundreds of millions of dollars. The City has further

presented evidence that its substantial long-term budget imbalances (past, present and future) and its inability to fund essential government services (particularly with respect to public health and safety) demonstrate that its cash insolvency is both acute and entrenched.  Thus, the City (i) is "cash insolvent" and (ii) satisfies the eligibility requirement of section 109(c)(3) of the Bankruptcy Code.

      h.    <u>The City is Unable to Render Itself Solvent</u>

In the years leading up to the commencement of this case, the City – and, importantly, its residents, businesses and employees – have made significant sacrifices to avoid the commencement of this chapter 9 proceeding.  The City's residents and businesses currently bear the heaviest tax burden in the State of Michigan.  The City has slashed expenditures across the board and, in the process, undermined its ability to provide public services and preserve public safety and imposed substantial burdens upon its employees.  The City estimates that these measures have allowed it to realize more than $200 million in annual savings.  <u>Id.</u> at ¶ 58.  The City also entered into a consent agreement with the State of Michigan to address its financial stress, resulting in the creation of a "Financial Advisory Board" to oversee the City's operations and implement reforms.  <u>Id.</u> at ¶ 64.

Unfortunately these measures have fallen far short of curing the City's insolvency.  To the contrary, they have served as life support, allowing the City to continue to operate at a sub-optimal level while postponing a comprehensive

restructuring of its financial affairs. But the City is now in a state of insolvency that cannot be remedied outside of a chapter 9 case. Its cash is essentially exhausted. It cannot further raise taxes. It cannot further slash expenditures without further endangering public health and safety. It cannot impose further cuts upon employees that have already accepted deep reductions in compensation and benefits and that have opportunities to work elsewhere. And even if it made sense to do so, it cannot borrow additional monies to pay maturing claims or fund deficits because its access to public debt markets is severely limited. The City had only one option left – a comprehensive financial restructuring implemented in a chapter 9 case.

<ul>
<li>(i)      Revenue Cannot Be Meaningfully Increased</li>
</ul>

<u>The City Cannot Raise Taxes</u>. The *per capita* tax burden on Detroit residents is the highest in Michigan. <u>Id.</u> at ¶ 29. This tax burden is borne by a population that can least afford it given the level of *per capita* income in Detroit.[8] <u>Id.</u> The City's income tax rates – 2.4% for residents, 1.2% for non residents and 2.0% for businesses (which rate was doubled in January 2012) – are the highest in Michigan. <u>Id.</u> Detroiters pay the highest total property tax rates of residents of

---

[8]     The most recent census data demonstrates that Detroiters' *per capita* income is $15,261 per year. *Per capita* annual income for residents of Dearborn, Michigan, Livonia, Michigan and Southfield, Michigan are $22,816, $31,959 and $29,228, respectively. Orr Declaration, at Exhibit A, p. 5.

Michigan cities with a population over 50,000 (inclusive of property taxes paid to overlapping jurisdictions, such as the State and Wayne County). Id. Even if the City's residents and businesses could bear further tax increases (which is doubtful), such increases could well stall the economic growth that is a prerequisite for a return to financial stability. Cf. McCurtain Mun. Auth., 2007 WL 4287604, at *4 (finding the municipality acted in good faith in failing to raise assessments where the rates were significantly higher than surrounding areas and the residents consisted primarily of low-income citizens).

Moreover, even if the City were able to add revenue through increased taxation, it currently is legally prohibited from doing so. The City is currently levying all taxes at the statutory maximums. Michigan Public Act 394 of 2012 fixed the City's maximum income tax rates at their current levels. MCL § 141.503(2). State law limits municipalities' property tax rates to 20 mills, and a constitutionally required "Headlee rollback" further limits that rate to 19.952 mills (which is the rate charged by the City). MCL §§ 117.3, 117.5; Orr Declaration, at ¶ 30. The City's utility users' tax (the only such tax is the State) and casino wagering tax are fixed at their current 5% and 10.9% levels, respectively, by the State statutes authorizing these Detroit specific taxes. MCL §§ 141.1152(1); 432.212(4),(6), (7). Accordingly, even if it were advisable

to do so (which it almost certainly is not), the City is legally incapable of raising revenue through additional taxation.

Asset Sales Will Not Meaningfully Reverse the City's Fortunes.

The Emergency Manager currently is evaluating the City's various assets to determine the most advantageous course of action to preserve or maximize the value of such assets for the City's long term benefit. Orr Declaration, at ¶ 83, n.53. The City is not obliged to sell assets – even non-essential assets – prior to the commencement of a chapter 9 case for the purpose of temporarily staving off impending and inevitable cash insolvency. See, e.g., New York City Off-Track Betting Corp., 427 B.R. at 282 ("Even assuming [the debtor] could have theoretically done more to avoid bankruptcy, courts do not require chapter 9 debtors to exhaust every possible option before filing for chapter 9 protection."). This proposition is especially salient in the present circumstances, where different constituencies have expressed competing views with respect to the City's ability to realize value from particular assets (e.g., the City-owned art collection exhibited and/or stored at the Detroit Institute of Arts (the "DIA")).[9]

---

[9]     For example, with respect to the City-owned assets located at the DIA, the Attorney General for the State of Michigan and the non-profit entity that has contracted with the City to operate the DIA have issued opinions that such assets are held in a public trust for the benefit of the City's residents, while certain of the City's creditor constituencies have expressed contrary views,

Ultimately, the City must retain assets (including cultural significant assets) to effect a sustainable and successful restructuring. No decisions have been made regarding any particular asset, however, and the Emergency Manager will continue to evaluate his options with respect to the disposition of assets to fund a plan of adjustment. Orr Declaration, at ¶ 83, n.53.[10] Moreover, the resolution of any disputes regarding any particular City asset is unlikely to be achieved in the near term, with the consequence that the City's impending cash crisis will not be solved by the realization of value from such assets.

In any event, the City does not believe that asset sales will be sufficient to ameliorate the City's insolvency. The near-term sale or monetization of the City's various assets (even if such sale or monetization were possible) would not be sufficient to (A) fully resolve its approximately $18 billion debt burden or

_____

(continued…)

taking the position that all non-essential City assets should be made available for their recoveries.

[10] Notably, as set forth in the "City of Detroit: Proposal for Creditors," dated June 14, 2013 (the "June 14 Creditor Proposal," attached to the Orr Declaration as Exhibit A), whatever decisions the City ultimately reaches with respect to potential asset sales, the City has proposed that its unsecured creditors will share in the value of certain of such sales. As set forth at pages 106 to 108 of the June 14 Creditor Proposal, the City has proposed to (a) provide holders of unsecured claims with a *pro rata* distribution of $2 billion in limited recourse participation notes and (b) apply 75% of the cash proceeds of certain asset sales to the reduction of the principal amount of such notes.

13-53846-tjt   Doc 1873-4   Filed 07/18/13   Entered 07/18/13 12:08:56   Page 37 of
106

(B) reverse its prospective budget insolvency without significantly impairing the City's long term growth prospects and, thus, the City's chances for a sustainable restructuring.

The City's Access to Credit Markets is Limited.  The City's ability to defer maturing obligations and payments becoming due by accessing the credit markets to fund deficits has been hampered by its plummeting credit ratings.  Id. at ¶ 53. No major U.S. city has a lower credit rating than Detroit.  Id.  As of June 17, 2013, S&P and Moody's had lowered Detroit's credit ratings to CC and Caa3, respectively.  See Press Release, Standard & Poor's, "Detroit GO Debt Rating Lowered to 'CC' from 'CCC-' on Announced Cessation of Debt Service Payments" (June 14, 2013); Press Release, Moody's, "Rating Action:  Moody's Downgrades Detroit's GOULT Rating to Caa3" (June 17, 2013).  All of these ratings are below investment grade.  Moreover, even assuming that the City could access the credit markets to temporarily defer maturing obligations and payments (which is a questionable assumption; recent debt issuances have been made possible only through State assistance), the City would only be piling further – and likely expensive and secured – debt onto an already unsustainable capital structure, thereby diminishing recoveries for stakeholders that are already facing significant losses.

-32-

13-53846-swr  Doc 1873-4  Filed 07/18/13  Entered 07/18/13 12:08:51  Page 38 of 106
13-53846-swr  Doc 1473  Filed 07/18/13  Entered 07/18/13 21:42:08  Page 39 of 106

(ii)     Expenditures Have Already Been
         Slashed and Cannot be Further Decreased at This Time

The City's liquidity crisis and cash insolvency cannot be solved through further cost-cutting without imposing unacceptable risks to public health and safety. As set forth in the Orr Declaration, the City has aggressively reduced operating expenditures in the years leading up to the Petition Date (from $1.1 billion in fiscal year 2008 to $692 million in fiscal year 2013). The City has slashed its employee headcount from more than 12,000 to less than 10,000 in just the last two years. Orr Declaration, at ¶ 65. It has imposed significant reductions on the wages and benefits earned by its remaining employees through, among other things, the imposition of the "City Employment Terms." Id. at ¶ 66. It has consistently deferred critical expenditures on maintenance and capital improvements necessary to preserve and protect the safety of its residents. Id. at ¶ 72.

The consequences of the City's drastic cost-cutting efforts have been predictable: (A) substantially diminished levels of core services to Detroiters, including with respect to public safety, transportation and recreation (id. at ¶ 31); (B) aging fleets of vehicles and equipment and lack of investment in infrastructure (such as roads, bridges, parks, the lighting grid and streetlights) (id. at ¶¶ 38-39); (C) obsolescence in information technology across nearly all City departments (id. at ¶ 41-44); and (D) highly manual processes and inefficiencies in every day functions within City government (id.). These consequences severely frustrate the

City's ability to (A) provide core municipal services to its citizens and (B) implement a restructuring that promotes the long-term health and revitalization of the City.  Further reductions in operating expenditures would not revive the City,[11] they would only feed the crisis afflicting it.

In fact, further reductions in operating expenditures do *nothing* to address the crushing burden of the City's debt service, pension and retiree benefit obligations, which obligations are consuming ever greater portions of the City's revenues over time.  Debt service for the City's general fund – including payments related to limited and unlimited tax GO debt, obligations related to the City's pension-related certificates of participation, pension contributions and the cost of other retiree benefits – was $461.6 million for fiscal year 2012, and $477.3 million in fiscal year 2013.  Malhotra Declaration, at ¶ 25. *These legacy liabilities threaten to consume ever-increasing portions of the City's revenues absent restructuring, from 42.5% in fiscal year 2013 to 64.6% in just four more years.*  Id. It quickly becomes apparent that further reductions to the City's operating expenditures would do little more than increase the risk to Detroiters' health, safety and quality of life, while providing marginal benefits (at best) to its financial position.  The City is not required to implement such essentially cosmetic (but

---

[11]    This is particularly so given the decrepitude of the City's information technology that requires manual processes.

potentially harmful) reductions in the likely vain hope of temporarily forestalling insolvency.  See, e.g., Vallejo, 408 B.R. at 294 (affirming bankruptcy court's finding of insolvency where (a) the debtor (i) had already slashed its discretionary budget, (ii) reduced employee headcount, (iii) cut funding for recreational activities such as municipal parks and (iv) operated a vehicle fleet the majority of which was near or past its expected life and (b) "further funding reductions would threaten Vallejo's ability to provide for the basic health and safety of its citizens").

> D.     The City of Detroit Desires to Effect a Plan to Adjust Its Debts

Section 109(c)(4) of the Bankruptcy Code requires that an entity demonstrate that it "desires to effect a plan to adjust [its] debts."  11 U.S.C. § 109(c)(4).  Courts have consistently noted that "no bright-line test for determining whether a debtor desires to effect a plan" exists because of the "highly subjective nature of the inquiry."  New York City Off-Track Betting Corp., 427 B.R. at 272 (quoting City of Vallejo, 408 B.R. at 295).  A putative debtor need only show that the "purpose of the filing of the chapter 9 petition [is] not simply … to buy time or evade creditors."  Vallejo, 408 B.R. at 295 (quoting 2 COLLIER ON BANKRUPTCY ¶ 109.04[3][d] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev.)); New York Off-Track Betting Corp., 427 B.R. at 272 (same).

A municipality may meet the subjective eligibility requirement of section 109(c)(4) of the Bankruptcy Code by attempting to resolve claims,

submitting a draft plan or producing other direct or circumstantial evidence customarily submitted to show intent. See Vallejo, 408 B.R. at 294-95; see also New York City Off-Track Betting Corp., 427 B.R. at 272 (municipality satisfied section 109(c)(4) requirement where its statement of qualifications provided it "desires to effect a plan to adjust its debts" and it was drafting and negotiating a plan of adjustment); Pierce Cnty. Hous. Auth., 414 B.R. at 710 (debtor satisfied section 109(c)(4) of the Bankruptcy Code where it had stated its intention to effect, and had begun negotiating and drafting, a plan of adjustment); Cnty. of Orange, 183 B.R. at 607 (finding that debtor's proposal of a global settlement to its creditors months after the commencement of its chapter 9 case evidenced a desire to effect a plan of adjustment); Pleasant View Util., 24 B.R. at 639 ("Nor can there be any doubt that the debtor desires to effect a plan to adjust its debts since the debtor has already submitted such a plan for the court's approval.").

Here, the City's desire to effect a plan of adjustment is manifest in its efforts to restructure its debts prior to its commencement of this chapter 9 proceeding, efforts that culminated in the Emergency Manager's presentation of the June 14 Creditor Proposal (attached to the Orr Declaration as Exhibit A) and subsequent negotiations related thereto. On June 14, 2013 – less than three months after the Emergency Manager took office – the Emergency Manager and his advisors met

with approximately 150 representatives of all of the City's various creditor groups (the "June 14 Meeting") to present them with (1) comprehensive information regarding the state of the City's finances and operations and (2) the June 14 Creditor Proposal (i.e., a comprehensive proposal to provide needed investment in the City and restructure the City's obligations). See generally June 14 Creditor Proposal; Orr Declaration, at ¶¶ 80-84. In addition to describing the economic circumstances that resulted in Detroit's current predicament, the 128-page June 14 Creditor Proposal describes a thorough overhaul and restructuring of the City's operations, finances and, importantly, existing capital structure. Orr Declaration, at ¶ 83. The June 14 Creditor Proposal identified each of the City's current categories of debt, and proposed adjustments and recoveries to each creditor group holding such debt consistent with their non-bankruptcy rights against the City. Id., Exhibit A at 101-109.

The June 14 Meeting lasted approximately two hours, and the Emergency Manager and his advisors answered all questions posed by attendees. Id. at ¶ 81. At the conclusion of the June 14 Meeting, the Emergency Manager indicated that he would welcome modifications and alternative ideas consistent with the City's (1) urgent need for reinvestment to improve essential City services and (2) current and projected cash flows. Id. As described in much greater detail in Section II.E.2 below, the Emergency Manager and his advisors have devoted significant time and

-37-

13-53846-swr  Doc 1873-4  Filed 07/18/13  Entered 07/18/13 12:08:56  Page 48 of
13-53846-tjt  Doc 1873-4  Filed 07/18/13  Entered 07/18/13 12:08:56  Page 43 of
106

resources during the period between the June 14 Meeting and the Petition Date to engaging the City's various stakeholder constituencies with respect to the adjustment of their respective debts consistent with the June 14 Creditor Proposal.

Moreover, where a city would be left in worse financial condition as a result of the decision not to attempt to adjust its debts through the chapter 9 process, courts have found that to be persuasive evidence of the municipality's honest desire to effect such an adjustment of debt. See Stockton, 2013 WL 2629129, at *16 (finding that the debtor had "little choice but to effect a plan" to adjust its debts where a dismissal of the proceeding would have left the debtor in worse financial condition than existed in chapter 9). Here, the City similarly has no choice but to effect a plan of adjustment where a return to the status quo leaves the City gasping for cash by the end of the calendar year and unable to provide Detroiters with basic services. See Section II.E.3 above; Orr Declaration, at ¶¶ 7, 12.

Finally, the City's submission of its Statement of Qualifications also reflects the City's desire to adjust its debts. See Vallejo, 408 B.R. at 295 (finding that the debtor's submission of a statement of qualifications that was certified under oath by the Vallejo city manager was evidence supporting the subjective inquiry into the debtor's desire to effect a plan of adjustment).

Accordingly, (1) the City honestly desires to effect a plan of adjustment within this chapter 9 case, (2) the City has not commenced this proceeding "simply

… to buy time or evade creditors" and (3) the City satisfies the eligibility requirement set forth at section 109(c)(4) of the Bankruptcy Code.

E.    Negotiations with All of the City's Creditors are Impracticable, But the City Nevertheless Has Made Good Faith Efforts to Engage Its Creditor Constituencies Where Possible.

Section 109(c)(5) of the Bankruptcy Code requires a municipality to either (1) have negotiated with its creditors unsuccessfully prior to seeking relief, (2) demonstrate that such negotiation was impracticable or (3) meet certain other statutory criteria. *See* 11 U.S.C. § 109(c)(5). Specifically, a municipal debtor may satisfy the disjunctive test set forth at section 109(c)(5) of the Bankruptcy Code by demonstrating that it:

(A) has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

(B) has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

(C) is unable to negotiate with creditors because such negotiation is impracticable; or

(D) reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title.

11 U.S.C. § 109(c)(5). The City has satisfied the requirements of both

sections 109(c)(5)(B) and 109(c)(5)(C) of the Bankruptcy Code.[12] As a threshold

matter, the City was unable to negotiate effectively with each class of creditors

because such comprehensive negotiations were impracticable (thus satisfying

section 109(c)(5)(C) of the Bankruptcy Code). Despite the ultimate

impracticability of such negotiations, the City nevertheless attempted, where

possible, to negotiate with its various creditor constituencies in good faith, but has

not been able to obtain the agreement of creditors holding a majority in amount of

each class the City intends to impair under a plan of adjustment (thus satisfying

section 109(c)(5)(B) of the Bankruptcy Code).

1. *The City Has Satisfied the Requirements of Section 109(c)(5)(C) of the Bankruptcy Code Because Negotiations with Creditors are Impracticable*

The City submits that (a) it has satisfied the eligibility requirement of

section 109(c)(5)(C) of the Bankruptcy Code because it is impracticable for the

City to negotiate with each of its creditors under the circumstances and (b) this

---

[12] The City concedes that it has not satisfied the test for chapter 9 eligibility set forth at section 109(c)(5)(A) of the Bankruptcy Code as it has not received the agreement of creditors holding a majority in amount of claims in each class it intends to impair. The City continues to evaluate whether any creditor was attempting to obtain a transfer avoidable under section 547 of the Bankruptcy Code as of the petition date, and reserves its rights to argue that such an attempt (if any) establishes independent grounds for eligibility under section 109(c)(5)(D) of the Bankruptcy Code.

"impracticability" requirement was added to the Bankruptcy Code to address precisely the situation presented here – i.e., the chapter 9 petition of a major U.S. city such as Detroit.

Congress passed the 1976 amendments to chapter 9 of the Bankruptcy Code in the shadow of the financial crises afflicting New York City and other large American cities. H.R. Rep. 94-686, at 4 (1975), reprinted in 1978 U.S.C.C.A.N. 539, 541-42 (the "1975 House Report"). The 1975 House Report explained that the prior municipal bankruptcy law was unworkable for all but the smallest entities and that a workable reorganization procedure for the country's larger cities was vital. Id. Among other changes, the 1976 amendments added a provision that a municipality could seek chapter 9 relief when negotiation with creditors was "impracticable." This provision was inserted to address the difficult problems created by the insolvency of major municipalities, which had numerous known and unknown creditors. See New York City Off-Track Betting Corp., 427 B.R. at 276 ("Congress added this mechanism to satisfy section 109's negotiation requirement in response to possible large municipality bankruptcy cases that could involve vast numbers of creditors."); Cnty. of Orange, 183 B.R. at 607 n.3 ("Section 109(c)(5)(C) was necessary because it was otherwise impossible for a large municipality, such as New York, to identify all creditors, form the proper committees, and obtain the necessary consent in a short period of time."); see also

6 COLLIER ON BANKRUPTCY ¶ 900.02[2][e][iii] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev.) ("This alternative was inserted in the 1976 Act as a means of dealing with the difficult problems created by major municipalities, such as New York City, whose bonds are exceedingly numerous and are frequently in bearer form." ); 1975 House Report, at 4 (1975) (explaining modifications to chapter 9 were designed to allow a municipality of any size to obtain such relief and noting practical limitations on a city's ability to negotiate with unknown bondholders).

In light of this history, courts hold that the "impracticability" requirement is "broad" and can be established in a variety of ways.  Vallejo, 408 B.R. at 298 (describing impracticability's definition as "broad," providing examples, and noting that such examples are not exclusive); New York City Off-Track Betting Corp., 427 B.R. at 277 ("Courts have looked to the plain meaning of the words of section 109(c)(5)(C) to avoid a crabbed interpretation of the statute."). "[I]mpracticability of negotiations is a fact-sensitive inquiry that 'depends upon the circumstances of the case.'"  Id. (quoting Vallejo, 408 B.R. at 298); see also Pierce Cnty., 414 B.R. at 713 (same).

The sheer number of creditors of a municipality, for example, can alone make negotiations impracticable.  See Vallejo, 408 B.R. at 298 ("Petitioners may demonstrate impracticability by the sheer number of their creditors ….") (citing

<u>Valley Health</u>, 383 B.R. at 163).  The inability of a municipal debtor to negotiate with a natural representative of a numerous and far-flung creditor class (with the power to bind such class) also has been found to satisfy the "impracticability" requirement.  <u>See</u>, <u>e.g.</u>, <u>Stockton</u>, 2013 WL 2629129, at *18 (finding that it was "impracticable to negotiate with 2,400 retirees for whom there is no natural representative capable of bargaining on their behalf.  A retiree committee to speak on behalf of the retirees can be appointed by the United States trustee, but only after entry of the order for relief.").

The refusal of creditor constituencies to engage a municipality in good faith negotiations over the adjustment of debts may also render such negotiations impracticable.  <u>See</u>, <u>e.g.</u>, <u>Stockton</u>, 2013 WL 2629129, at *18 (finding that negotiations were impracticable where objecting creditors refused to engage the debtor prepetition; "[I]t is impracticable to negotiate with a stone wall."); <u>cf.</u> <u>Pleasant View Util. Dist.</u>, 24 B.R. at 639 (finding that negotiations were impracticable where creditor that had rejected every proposal made by the debtor threatened the debtor with litigation prior to the petition date).

"Negotiations may also be impracticable when a municipality must act to preserve its assets and a delay in filing to negotiate with creditors risks a significant loss of those assets." <u>Valley Health</u>, 383 B.R. at 163; <u>see</u> <u>also</u> <u>Vallejo</u>, 408 B.R. at 298 ("Petitioners may also show impracticability by their need to act

quickly to protect the public from harm."); New York City Off-Track Betting Corp., 427 B.R. at 277 ("Courts also frequently find that negotiations are impracticable where pausing to negotiate before filing for chapter 9 protection would put the debtor's assets at risk.").

Further, negotiations are impracticable if there are legal or other restrictions that limit a debtor's ability to make concessions necessary for its effective reorganization. See id. ("mandatory statutory distributions currently prevent the issuance of municipal bonds necessary to pay the past debts and recapitalize the company … Thus, without a statutory change, NYC OTB cannot present a plan of reorganization to its creditors and negotiations are not feasible.").

Here, the City has indebtedness estimated to exceed $18 billion, with an incalculable number of bondholders and other creditors, most of which at present are unknown or not yet identified. Orr Declaration, at ¶ 105. The creditor list filed by the City pursuant to section 924 of the Bankruptcy Code and Rule 1007 of the Federal Rules of Bankruptcy Procedure contemporaneously with this Memorandum identifies well over 100,000 discrete creditors. The City has over 60 series of bonds, including sewage disposal system revenue bonds, water supply system bonds, secured GO bonds and unsecured GO bonds. In addition, the City has numerous other notes, loans, revolving loans, pension obligation certificates, hedges and other forms of indebtedness or other obligations that are held by

multiple holders.  The City also has (a) approximately 20,000 retirees (which do not appear to be represented by an agent or committee that is authorized to negotiate revisions to retiree benefits on behalf of a material number of retirees) and (b) potential involuntary creditors that are unknown or as of yet unidentified.

While, as described below, the City has in good faith undertaken to conduct negotiations with as many of its creditors as possible, the numerosity of the City's creditors has made negotiations with the entire creditor body impractical.  Courts have found negotiations impractical with significantly smaller creditor constituencies and less complex capital structures.  See, e.g., Stockton, 2013 WL 2629129, at *18 (finding that negotiations with 2,400 retirees was impracticable); Valley Health, 383 B.R. at 165 (negotiations impractical where City sent notice of commencement of case to 2,775 creditors and other parties in interest); Pierce Cnty. Hous. Auth., 414 B.R. at 714 (negotiations were impractical where mailing matrix included over 7,000 creditors); Cnty. of Orange, 183 B.R. at 607 (finding that "[s]ection 109(c)(5)(C) is directly applicable here where the [debtor] has over 200 participants and hundreds of accounts with many complex accountings); Vills. at Castle Rock, 145 B.R. at 76 ("It certainly was impracticable for District 4 to have included several hundred Series D bondholders in these conceptual discussions.").

Here, a consensual resolution with the City's vast and fragmented creditor constituency simply is not realistic. With respect to the City's bond debt, certain of the City's bond issuances permit a majority of holders to agree to certain amendments to the terms of such bonds. Orr Declaration, at ¶ 107. However, in many, if not all, cases, an extension of the maturity date of the indebtedness or an agreement to reduce its principal amount requires the consent of *all* bondholders. Id. Given the widespread distribution of the City's bonds, it is impracticable for the City to secure such consents.[13]

Moreover, the City is generally unable to negotiate with bargaining representatives with the authority to bind the City's bondholders. Either (a) U.S. Bank acts solely as a paying agent (and not as a trustee) with respect to a given series of bonds (e.g., the City's Series 1999-A unlimited tax bonds and Series 2003-A unlimited tax bonds); (b) the debt is uninsured, such that no insurer of the City's bond debt (any such insurer, a "Bond Insurer") has the right to control an out-of-court restructuring of the debt (e.g., the City's Series 2008A-(1) and 2008-A(2) limited tax bonds); or (c) the debt is insured but the Bond Insurer has no

---

[13]     See Amended and Restated Bond Ordinance No. 01-05, § 22(B)(1) (water system bonds); Amended and Restated Bond Ordinance No. 18-01, § 22(B)(1) (sewage disposal system bonds); see also Resolutions authorizing the City's limited tax and unlimited tax general obligation bonds (providing that the City may only amend the resolutions without the consent of any bondholders in certain specified limited circumstances which would not materially affect the security for the bonds).

control rights (provided that the Bond Insurer has not made a payment under its respective policy) (e.g., Series 1999-A unlimited tax bonds and Series 2003-A unlimited tax bonds).  Orr Declaration, at ¶ 107.  In addition, to date, no bondholder group holding even a majority of the debt outstanding under any of the City's 60 series of debt has organized so that the City could negotiate with them. Negotiations regarding the out-of-court restructuring of the City's bonds are, thus, impracticable.

Moreover, public statements made – and litigation filed – by certain members of the City's creditor constituencies in the wake of the June 14 Creditor Proposal demonstrate that the City's efforts to negotiate a consensual adjustment of its debts are infeasible.  For example, on July 3, 2013, multiple lawsuits were filed by City employees (both active and retired) against the Governor and Treasurer of the State of Michigan seeking, among other things, (1) a declaratory judgment that PA 436 violated the Constitution of the State of Michigan to the extent that it purported to authorize chapter 9 proceedings in which vested pension benefits might be compromised and (2) an injunction preventing the defendants from authorizing any chapter 9 proceeding for the City within which vested pension benefits might be adjusted.  On July 17, 2013, the Pension Systems (as such term is defined below) commenced a similar lawsuit against the Governor and the Emergency Manager seeking declaratory judgments that PA 436 (1) does not

authorize the defendants to take any action that may result in the compromise of the City's pension obligations and (2) when read in conjunction with the Michigan Constitution, requires the defendants to refrain from attempting to compromise pension obligations within a chapter 9 proceeding (or, alternatively, that PA 436 violates the Michigan Constitution). <u>See</u> Complaints filed in (1) <u>Flowers v. Snyder</u>, No. 13-729-CZ (Ingham Cnty. Cir. Ct.); (2) <u>Webster v. Snyder</u>, No. 13-734-CZ (Ingham Cnty. Cir. Ct.) and (3) <u>General Retirement System of the City of Detroit v. Orr</u>, No. 13-768-CZ (Ingham Cnty. Circuit Court), collectively attached hereto as <u>Exhibit A</u>.

Further, on July 8, 2013, a Bond Insurer serving as surety for approximately $170 million of the City's limited and unlimited tax general obligation debt issued a public statement declaring that the June 14 Creditor Proposal was "harmful to Detroit and the interests of the taxpayers in Michigan" and "necessarily imperiled" the City's access to cost-effective financing. <u>See</u> Orr Declaration, Exhibit I (Press Release, Ambac Financial Group, dated July 8, 2013). These lawsuits and statements suggest that the City's proposals with respect to the restructuring of its obligations have been declared dead on arrival with significant sections of its creditor constituency. It is worth noting that none of the lawsuits or statements contain any suggestion of how the City might successfully restructure its financial

affairs. Each just asserts that the plaintiff or speaker should not contribute in any meaningful way to any restructuring.

Further, the negotiation of changes to pension and retiree benefits with the City's retiree constituency is impracticable outside of chapter 9, where (a) the approximately 20,000 retirees entitled to receive retiree benefits from the City cannot be bound by out-of-court negotiations between the City and the 47 discrete union bargaining units that formerly represented these retirees and might represent them for these purposes with the retirees' consent and (b) in any event, the majority of those units have expressly refused to represent such retirees. Id. at ¶ 106.

Under prevailing Sixth Circuit law, a union does not automatically have either standing or authorization to represent retired former employees in disputes concerning those retirees' benefits. Only where a union and the retirees' former employer bargain for retirees' benefits and include such benefits in their collective bargaining agreement does a union have such standing. See, e.g., Cleveland Elec. Illuminating Co. v. Util. Workers Union, Local 270, 440 F.3d 809, 814-18 (6th Cir. 2006) (affirming holding that "union has standing to represent the retirees in any dispute concerning those benefits" bargained for and included in any contract between union and the employer).

Even if a union *does* have standing to represent retirees, however, it may not do so "in litigation that could bind them" unless the union first obtains the retirees'

consent.  See, e.g., Amos v. PPG Indus., Inc., 699 F.3d 448, 450-53

(6th Cir. 2012) (reversing holding that retirees were bound by an adverse federal

court decision against their former unions where prior action was not "brought by

the unions 'in a representative capacity' on behalf of the plaintiff retirees" since

unions never "obtain[ed] the assent of the retirees"), cert. denied, 133 S. Ct. 2008

(2013); see also United Steelworkers of Am. v. Cooper Tire & Rubber Co.,

474 F.3d 271, 273-83 (6th Cir. 2007) (affirming holding compelling arbitration of

side agreement between union and employer that limited contributions to retiree

medical benefits, while vacating order certifying a class of retirees and survivors,

where union had standing to represent retirees regarding bargained-for benefits in

side agreement, but unions were required to obtain authorization from retirees for

class membership so that retirees would not "be bound by an unfavorable

arbitration decision to which they never consented"); see also Cleveland Elec.

Illuminating Co., 440 F.3d at 817-18 (requiring that union "obtain the consent of

the retirees before taking the grievance to arbitration" to ensure that union is

"authorized to act on the retirees' behalf").

        The City has been unsuccessful in its good faith attempts to identify a

bargaining representative with the authority to bind the City's retirees.  A total of

approximately 47 distinct bargaining units (collectively, the "Bargaining Units") of

28 unions (collectively, the "Unions") represent employees and/or retirees of the

City.  Orr Declaration, at ¶ 106; n.161.  At least four retiree associations (collectively, the "Associations") also provide voluntary membership to retirees of the City's Unions.  Id. at n.160.  Prior to the commencement of this case, the City sent letters to each of the Unions to determine whether they are willing to represent their respective retirees in connection with the City's restructuring.  As of the date hereof, eight Unions (comprising ten Bargaining Units) offered to represent their retirees in restructuring discussions.  Thirteen Unions (comprising 28 Bargaining Units) have expressly indicated that they are unwilling to represent their retirees.  Another seven Unions (comprising nine Bargaining Units) have neither explicitly agreed nor refused to represent their retirees.  The City also sent letters to each of the Associations to determine whether they are willing to represent Union retirees in connection with the City's restructuring.  Two Associations – the Detroit Retired City Employees Association and the Retired Detroit Police and Fire Fighters Association – offered to represent retirees in these discussions, while two other Associations have expressly indicated that they will not represent retirees.  Id. at n.161.  Despite the City's efforts to organize the retirees prior to this chapter 9 case, most retirees remain unrepresented in negotiations.  Id. at ¶ 106.  Accordingly, negotiations with the City's retiree constituency – which can assert approximately $6.4 billion in unfunded actuarially accrued retiree healthcare benefits and additional amounts related to underfunded pension liability – have

-51-

13-53846doit  Doc 1873-4  Filed 07/18/13  Entered 07/18/13 12:08:56  Page 57 of
13-53846  Doc 1873-4  Filed 07/18/13  Entered 07/18/13 12:08:56  Page 57 of
106

proven impracticable despite the City's best efforts. Only in chapter 9 could a committee be formed to represent and bind all retirees.

Further delay of the commencement of this chapter 9 case to allow for extended creditor negotiations was also impracticable where (a) the City has simply run out of time and cash and (b) the time frame within which the Emergency Manager may effect a restructuring of the City's debts may be limited.

As set forth in Sections I and II.E.3 above and in the Orr and Malhotra Declarations, the City is in a state of financial emergency. As of the date of the filing, the City's cash position is precarious, with approximately $71.3 million in cash on hand before required property tax distributions and $36.0 million net of such distributions. Malhotra Declaration, at ¶ 21. The City is projected to be in a net negative cash position by the end of the current calendar year. Id. at ¶ 22. The City has been able to achieve these slim cash margins only through the non-payment or deferral of tens of millions in current obligations. Without such actions, the City would already be out of cash *entirely*. Orr Declaration, at ¶ 11. The public health and safety of the City's residents currently are in jeopardy, and are further jeopardized every day that necessary restructuring and reinvestment is delayed. The City must preserve its ability to continue providing its residents uninterrupted services. It can no longer delay the measures necessary to secure that ability, including the commencement of this chapter 9 proceeding, for the sake

of additional negotiations with creditors — or to locate and negotiate with unknown or unidentified creditors.

Further, the tenure of the Emergency Manager – and the attendant opportunity to improve public safety and implement a sustainable restructuring of the City – may be limited. Pursuant to section 9(6)(c) of PA 436 (MCL § 141.1549(6)(c)), after at least 18 months of service, the Emergency Manager may be removed from his position by a two-thirds vote of the City Council approved by the Mayor. Accordingly, the City could not delay its entry into chapter 9 (and, for the same reasons, does not intend to tarry in chapter 9) without jeopardizing its best opportunity to effect a plan of adjustment and restructure its debts.

Accordingly, for all of the foregoing reasons, it is impracticable for the City to continue negotiations with its creditors in light of its current circumstances and the City thus satisfies the eligibility requirement of section 109(c)(5)(C) of the Bankruptcy Code.

2. *The City Has Satisfied the Requirements of Section 109(c)(5)(B) of the Bankruptcy Code Because It Has Negotiated in Good Faith With Its Certain of Its Creditors Unsuccessfully*

The City has satisfied the eligibility requirement of section 109(c)(5)(B) of the Bankruptcy Code because, despite the impracticability of reaching agreements with tens of thousands of unorganized retirees and bondholders, it has still negotiated in good faith with those of its creditors who are organized (even if they

-53-
13-53846-tjt   Doc 1873-1   Filed 07/18/13   Entered 07/18/13 22:18:56   Page 59 of
106
13-53846-swr   Doc 873   Filed 07/18/13   Entered 07/18/13 12:42:08   Page 59 of

could not officially bind certain other groups). Nevertheless, the City has not obtained the agreement of creditors holding at least a majority in amount of the claims of each class that the City has to impair under a plan of adjustment.

A municipality need not negotiate with *every* creditor within a given class; negotiations with large or prominent blocs of creditors will suffice to render a city eligible for chapter 9 relief. See, e.g., Vills. at Castle Rock, 145 B.R. at 84-85 (municipality satisfied requirement of negotiating with creditors by consulting with large institutional bondholders, even though all series of bonds were not invited to participate in negotiations); Pleasant View Util. Dist., 24 B.R. at 639 (municipality satisfied requirement through unsuccessful negotiations with large bondholders); see also McCurtain Mun. Auth., 2007 WL 4287604, at *4 (municipality satisfied requirement by making offers of settlement to creditor). Indeed, as set forth in the preceding section, negotiating with every one of the City's creditors is clearly impracticable, and likely impossible.

Prior to the commencement of this chapter 9 proceeding, the City engaged in extensive good faith negotiations with various of its creditor constituencies. As set forth in Section II.D above and in ¶¶ 80-83 of the Orr Declaration, the City convened the June 14 Meeting – attended by approximately 150 representatives of the City's bondholders, Bond Insurers, unions, pensioners and others (i.e., representatives of the various classes of creditors to be impaired under the

City's eventual plan of adjustment) – for the purpose of engaging its creditors with respect to a consensual restructuring of the City's various classes of debt within the framework of the June 14 Creditor Proposal. At the June 14 Meeting, the Emergency Manager openly invited the City's creditors to contact the City and its advisors to begin negotiations. Orr Declaration, at ¶¶ 81, 85.

The Emergency Manager's invitation was accepted by many of the City's creditor constituencies, and he and his advisors have filled the time between the June 14 Meeting and the Petition Date with negotiations with various stakeholder constituencies regarding the adjustment of their respective debts. Id. at ¶ 85. For example:

- On June 20, 2013, at the request of National Public Finance Guarantee Corporation ("NPFGC"), a Bond Insurer, the City's restructuring counsel and investment banker met with NPFGC's advisors to discuss the June 14 Creditor Proposal and NPFGC's comments thereto. Id. at n.158.

- On June 20, 2013, the City's advisors met in Detroit with representatives of all of the City's unions and four retiree associations (the "June 20 Union/Retiree Meeting") to (a) present its union and retiree constituencies with an in-depth look at the City's analysis of its retiree health and pension obligations and (b) suggest proposals for the modification thereof that the City could fund within its means going forward. Id. at ¶ 91. The June 20 Union/Retiree Meeting consisted of two discrete sessions: a morning session (for non-uniformed employees and retirees) and an afternoon session (for uniformed employees and retirees), which were attended by approximately 100 and 35 union and retiree representatives, respectively. Id. Representatives and advisors of the City's two pension systems – the General Retirement System ("GRS") and the Police and Fire Retirement System (the "PFRS" and, together with the GRS, the "Pension Systems") – also attended both meetings. Id. At both the start and conclusion of each session, the City's advisors

stressed that the City welcomed the unions' and retirees' views regarding how best to implement the dramatic, but necessary, modifications to compensation and benefits required by the City. Id. at ¶ 93. On June 27, 2013, the City's advisors contacted all union representatives that had attended any prior presentations by, or meetings with, the City and/or its advisors to invite additional requests for information and diligence from such parties. Id. at ¶ 94.

- On June 25, 2013, the City's advisors and the Emergency Manager's Senior Advisor held a meeting in New York (the "June 25 Bond/Pension Meeting") that was attended by approximately 70 representatives and advisors for (a) all six of the City's Bond Insurers, (b) the GRS and the PFRS and (c) U.S. Bank, N.A. ("U.S. Bank"), as the trustee or paying agent on all of the City's bond issuances. Id. at ¶ 97. During the five-hour June 25 Bond/Pension Meeting, the City's advisors discussed: (a) the 10-year financial projections and cash flows presented in the June 14 Creditor Proposal (together with the assumptions and detail underlying those projections and cash flows); (b) the City's contemplated reinvestment initiatives and related costs; and (c) the retiree benefit and pension information and proposals that had been presented at the June 20 Union/Retiree Meeting. Id.

- Also on June 25, 2013, the City's advisors held an additional meeting with U.S. Bank and its advisors to discuss (a) the City's intentions with respect to the Detroit Water and Sewer Department (and the special revenue bond debt related thereto), (b) the City's proposed treatment of its general obligation debt and the COPs and (c) various other issues raised by U.S. Bank. Id. at ¶ 98.

- Following the June 25 Bond/Pension Meeting, the City's advisors held separate follow-up meetings with each Bond Insurer that requested such a meeting. Id. at ¶¶ 99-100. On June 26, 2013, the City team met with business people, lawyers and financial advisors from NPFGC in a two-hour meeting and Ambac Assurance Corporation ("Ambac") in a 90-minute meeting. Id. at ¶ 99. Financial Guaranty Insurance Corporation ("FGIC") originally had requested a meeting to be held on June 26, 2013, but subsequently cancelled. Id. On June 27, 2013, the City team met with business people, lawyers and financial advisors from Syncora Guarantee Inc. ("Syncora") in a 90-minute meeting and Assured Guaranty Municipal Corporation ("Assured Guaranty") in a 90-minute

meeting.  Id.  At these various meetings with the Bond Insurers, the City's advisors discussed many aspects of the June 14 Creditor Proposal, including but not limited to (a) the treatment of general obligation debt, (b) legal issues related to the City's interest rate swap contracts, (c) the City's contemplated restructuring and reinvestment initiatives, (d) urban blight and (e) potential asset dispositions.  Id. at ¶ 100.  The City team answered all questions posed by the Bond Insurers.  Id.  The City team invited counterproposals or alternative views on the June 14 Creditor Proposal that were consistent with the City's current and projected financial condition.  Id.

- Both prior to and following the June 14 Meeting, the City engaged in several meetings with its significant interest rate swap counterparties (the "Swap Counterparties") and exchanged concrete proposals for the adjustment of its swap-related obligations.  Id. at ¶¶ 86-89.  In March 2012, the City suffered ratings downgrades with respect to its unlimited tax general obligation debt, which gave rise to the risk that the Swap Counterparties could terminate the swap transactions, seek a termination payment from the City and direct U.S. Bank, as custodian, to seize certain wagering tax revenues previously pledged by the City.  Id. at ¶ 86.  As reported in its annual report for fiscal year 2012, the City commenced negotiating with the Swap Counterparties to come up with an acceptable course of action due to the credit rating downgrade.  Id. at ¶ 86; 2012 CAFR, at 15.  These negotiations with the Swap Counterparties (and other related parties) continued during the course of 2013 and intensified in the weeks preceding the commencement of this proceeding.  Orr Declaration at ¶ 87.  The negotiations included (a) several in-person and telephonic meetings among the City, Swap Counterparties and their respective advisors; (b) the exchange of various economic offers between the parties; and (c) the generation of numerous draft agreements memorializing such offers.  Id.  Despite the significant time and effort devoted to reaching a resolution that would permit the City access to the wagering tax revenues, following the assertion of alleged rights by Syncora, the City's access to funds was blocked.  Id. at ¶ 88.  Accordingly, the City acted to protect its interests and preserve its access to its wagering tax revenues – a critical funding source for the City – and commenced litigation in the Circuit Court for Wayne County, Michigan to seek (a) the release of revenues held by U.S. Bank as custodian and (b) the recovery of damages suffered by the City due to Syncora's interference with its banking relationships.  Id.  On

-57-

13-53846jt  Doc 1873-1  Filed 07/18/13  Entered 07/18/13 12:18:56  Page 63 of
106
13-53846  Doc 1873  Filed 07/18/13  Entered 07/18/13 12:08:51  Page 63 of 106

July 5, 2013, the City obtained a temporary restraining order against Syncora and U.S. Bank, thus temporarily preserving its access to wagering tax revenues. Id. Following those activities, the City was able to make timely payment on its swap obligations, triggering the release of wagering tax revenues to the City. Id. at ¶ 89. Concurrently, the City was able to restart negotiations with the Swap Counterparties. Negotiations culminated in the Forbearance and Optional Termination Agreement, dated as of July 15, 2013, by and among the City, the Swap Counterparties and certain related service corporations, which agreement compromises issues regarding the validity and enforceability of certain pledge and lockbox arrangements with respect to the wagering tax revenues. Id.

- On July 9-10, 2013, the City and its advisors held follow-up diligence sessions in Detroit with representatives and/or advisors of NPFGC, Ambac, FGIC, Assured Guaranty, Syncora and the GRS and PFRS. Id. at ¶ 101. At these sessions, the City generally addressed its baseline 10-year business plan and its proposed restructuring and reinvestment initiatives. Id. Key discussion points included: (a) the City's revenue forecasts (and the assumptions and detail underlying the same), (b) alternatives with respect to taxation and increasing the City's attractiveness to investment, (c) the restructuring of, and reinvestment in, key City departments, the cost of such reinvestment and the assumptions and detail underlying the City's proposal, (d) the City's proposal for addressing its urban blight, (e) the structure of the limited recourse participation notes proposed to be provided to unsecured creditors by the City, (f) the City's knowledge of the State's position with respect to the City's restructuring and (g) logistical matters (e.g., timing; access to information). Id. The City answered all questions posed by the attendees and invited requests for further diligence and analyses. Id.

- On July 10, 2013, the City and certain of its advisors held separate meetings with (a) representatives and advisors of the GRS, as well as representatives and counsel for certain non-uniformed unions and retiree associations, and (b) representatives and advisors of the PFRS, as well as representatives and counsel for certain uniformed unions and retiree associations. Id. at ¶ 95. Each meeting lasted approximately two hours. Id. The purposes of each meeting were to (a) provide additional information on the City's pension restructuring proposal and (b) discuss a process for reaching a consensual agreement on (i) pension underfunding

issues and (ii) the treatment of any related claims. Id. At each meeting, the parties generally discussed (a) the actuarial assumptions underlying the Systems' claims related to underfunding (and that will be used for funding purposes going forward); (b) the City's prospective ability to make contributions to the Systems; and (c) adjustments to pension benefit design necessary to reduce liabilities, and consequent underfunding, to a level that will allow the City to fund the Systems going forward. Id.

- On July 11, 2013, the City and its advisors held separate follow-up meetings with representatives and advisors for (a) select non-uniform unions and retiree associations and the GRS and (b) certain uniformed unions and retiree associations and the PFRS to discuss retiree health issues. Id. at ¶ 96. At each of these meetings, the City's advisors reviewed the proposals for the modification of retiree health benefits that previously had been presented and discussed at the prior meetings on June 20, 2013. Id. Further information describing, among other things, the premium costs of proposed replacement health insurance (which costs would be an obligation of the City) and key benefit plan design terms was distributed to all attendees. Id. The meeting with uniformed unions and PFRS personnel involved an extensive (and relatively heated) question and answer session, which session primarily addressed retiree concerns over (a) the lack of replacement coverage in the City's proposal for retirees under the age of 55 and (b) the vesting of certain pensions in the event the PFRS were frozen. Id.

- On July 12, 2013, the City's advisors met with advisors to the Pension Systems to discuss (a) the Proposed DWSD Transaction (and, particularly, the amount of any recurring payment that would be received by the City in connection therewith) and (b) the implications of such transaction for the Pension Systems. Id. at ¶ 102.

- On July 17, 2013, the City and its advisors held separate meetings with representatives and advisors for NPFGC and Assured Guaranty to discuss (a) the Proposed DWSD Transaction (and, particularly, the amount of any recurring payment that would be received by the City in connection therewith), (b) the City's proposed restructuring of the special revenue debt related to the DWSD (as set forth at pages 101-102 of the June 14 Creditor Proposal) and (c) the insurers' response to the foregoing. Each meeting lasted approximately two hours. Id. at ¶ 103.

Accordingly, the City has negotiated, or sought negotiations, with representatives of the various classes of creditors that it will seek to impair under a plan of adjustment with respect to the treatment to be accorded such creditors' claims in connection with the City's restructuring (as set forth in the June 14 Creditor Proposal). See, e.g., New York City Off-Track Betting Corp., 427 B.R. at 274-75 (finding that debtor had satisfied section 109(c)(5)(B) of the Bankruptcy Code where it had "engaged in negotiations with creditors regarding the possible terms of a reorganization plan prior to filing"; stating that "talks need not involve a formal plan to satisfy section 109(c)(5)(B)'s negotiation requirement."); Vallejo, 408 B.R. at 297 (noting that section 109(c)(5)(B) of the Bankruptcy Code is satisfied where the debtor conducts "negotiations with creditors revolving around a proposed plan, at least in concept…. [that] designates classes of creditors and their treatment…."). Although the City believes that these sessions were constructive, significant data was conveyed to the creditor groups and the sessions were conducted in good faith, the feedback received from creditors has led the City to determine that a comprehensive agreement with its stakeholders allowing for an out-of-court restructuring of the City's debt is unlikely in the near term.[14] Orr

---

[14] The City's various discussions with its creditors included settlement communications. Thus, in the absence of an agreement to disclose the contents of the City's negotiations or a creditor's public disclosure of its position (e.g., Ambac's press release), the City is respecting the

-60-

13-53846-swr  Doc 1873-1  Filed 07/18/13  Entered 07/18/13 12:18:56  Page 66 of 106

Declaration, at ¶ 111. Ultimately, the City did not obtain the agreement of creditors holding at least a majority in amount of the claims of each class. Accordingly, the City has satisfied the eligibility requirement set forth at section 109(c)(5)(B) of the Bankruptcy Code.

---

(continued…)

confidentiality of those negotiations and refraining from disclosing the substance of the positions taken by its creditors.

## III.   CONCLUSION

For the foregoing reasons, the City is eligible to be a debtor under

section 109(c) of the Bankruptcy Code.

Dated: July 18, 2013                  Respectfully submitted,


  /s/  David G. Heiman
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
   STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE CITY

# EXHIBIT A

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

ROBBIE FLOWERS, MICHAEL WELLS,
JANET WHITSON, MARY WASHINGTON
and BRUCE GOLDMAN

Plaintiffs,

vs.

RICK SNYDER, as the Governor of the State
of Michigan; ANDY DILLON, as the Treasurer of
the State of Michigan; and the STATE OF MICHIGAN;

Defendants.

_____/

There is no other pending or
resolved civil action arising
out of the same transaction
or occurrence as alleged in
the complaint.

Case No. 13-729-CZ
Hon. Rosemarie E. Aquilina

William A. Wertheimer (P26275)
Attorney for plaintiffs
30515 Timberbrook Lane
Bingham Farms, MI 48025
248-644-9200
billwertheimer@gmail.com

Andrew Nickeloff (P37990)
Marshall J. Widick (P53942)
James A. Britton (P71157)
Attorneys for plaintiffs
Sachs Waldman
1000 Farmer
Detroit, MI 48226
313-496-9429
anickelhoff@sachswaldman.com
mwidick@sachswaldman.com
jabritton@sachswaldman.com

RECEIVED
JUL 08 2013
Clerk of the Court
30th Judicial Circuit

Dept of Attorney General

JUL 0 8 2013

State Operations Division
RECEIVED

## AMENDED VERIFIED COMPLAINT

Plaintiffs, by their attorneys, state:

## I. NATURE OF PLANTIFFS' CLAIMS

1.    Plaintiffs are three City of Detroit retirees currently receiving pension benefits and two City of Detroit employees with vested pension benefits whose rights are being violated in the emergency financial management proceedings that the State has implemented in response to Detroit's fiscal crisis and whose rights will be threatened with abrogation if Governor Snyder authorizes the Detroit Emergency Manager to proceed under Chapter 9 in bankruptcy.

2.    This action is brought for violations of plaintiffs' constitutional rights under Article 9, Section 24 of the Michigan Constitution which provides: "The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation whereof which shall not be diminished or impaired thereby."

3.    The *Local Financial Stability and Choice Act*, Public Act 436 of 2012, MCL 141.1541, *et seq.* (Public Act 436) permits Governor Snyder to authorize a Chapter 9 bankruptcy. MCL 141.1558. A copy of Public Act 436 is available at www.legislature.mi.gov.

4.    The Detroit Emergency Manager has, as part of his restructuring planning, publicly announced that he intends to significantly cut vested pension amounts of the city's retirees and employees in violation of Article 9, Section 24 and threatened to seek to extinguish their Article 9, Section 24 rights in bankruptcy if they fail to agree which they have not.

5.    Plaintiffs seek an order precluding Governor Snyder or the State Treasurer from authorizing Detroit's Emergency Manager to proceed under Chapter 9 of the federal Bankruptcy Code because to do so would threaten to abrogate their rights under Article 9, Section 24 of the Michigan Constitution.

## II. JURISDICTION AND VENUE

6.    This Court has jurisdiction under MCL 600.6419(4) (proceedings for declaratory or equitable relief against state) and 600.605 (original jurisdiction of circuit courts).

7.    Venue is proper in Ingham County pursuant to MCL 600.1615 (actions against

governmental units) and MCL 600.1621 (county in which a defendant conducts business).

### III. PARTIES

8.    Plaintiff Robbie Flowers resides at 6533 East Jefferson, Apt. 602T, Detroit, Michigan. She is a citizen of the State of Michigan, and an employee of the Detroit Library Commission, an enterprise agency and component unit of the City of Detroit, with a right to vested pension benefits from Detroit's General Retirement System (GRS).

9.    Plaintiff Michael Wells resides at 100 Atkinson, Detroit, Michigan. He is a citizen of the State of Michigan, and a retiree from the Detroit Library Commission receiving a pension from Detroit's GRS.

10.    Plaintiff Janet Whitson resides at 25260 East Deborah, Redford, Michigan. She is a citizen of the State of Michigan, and a retiree from the Detroit Library Commission receiving a pension from Detroit's GRS.

11.    Plaintiff Mary Washington resides at 7120 Pebble Park Drive, West Bloomfield, Michigan. She is a citizen of the State of Michigan, and a retiree from the City of Detroit receiving a pension from Detroit's GRS.

12.    Plaintiff Bruce Goldman resides at 25840 Forestview Drive, Southfield, Michigan. He is a citizen of the State of Michigan, and is an employee of the City of Detroit's Law Department with a right to vested pension benefits from Detroit's GRS.

13.    Defendant Rick Snyder is the Governor of the State of Michigan and is sued in that capacity.

14.    The Detroit Emergency Manager serves at the pleasure of the Governor. MCL 141.1549(3)(d).

15.    Defendant Andy Dillon is the Treasurer of the State of Michigan and is sued in that capacity.

16.     The Governor may delegate to the State Treasurer his duties under MCL 141.1549.

17.     The Emergency Manager submits quarterly reports to the State Treasurer. MCL 141.1549(8) and 141.1549(5).

18.     Defendant State of Michigan is the governmental entity on behalf of which the Governor and State Treasurer are acting.

## IV. IT WOULD BE UNCONSTITUTIONAL FOR THE GOVERNOR TO AUTHORIZE THE DETROIT EMERGENCY MANAGER TO PROCEED UNDER CHAPTER 9

19.     The Detroit Emergency Manager is acting pursuant to Public Act 436.

20.     Public Act 436 provides that the Governor can authorize the Emergency Manager to proceed under chapter 9 of the Federal Bankruptcy Code. MCR 141.1558.

21.     On 14 June 2013 the Detroit Emergency Manager issued an "Executive Summary" of a "Proposal for Creditors," which stated under "Claims for Unfunded Pension Liabilities": "Because the amounts realized on the underfunding claims will be substantially less than the underfunding amount, there must be **significant** cuts, in accrued, vested pension amounts for **both active and currently retired persons**." (Emphasis in original.) A copy of this document is available at www.detroitmi.gov under the "Emergency Manager" tab.

22.     The same day the Detroit Emergency Manager released this "Executive Summary" he spoke to the Detroit Free Press Editorial Board. The relevant questions and answers read as follows:

Q.     You said in this report that you don't believe there is an obligation under our state constitution to pay pensions if the city can't afford it?

A.     The reason we said it that way is to quantify the bankruptcy question. We think federal supremacy trumps state law.

Q.     Which the Ninth Circuit agrees for now.

A.     It is what it is – so we said that in a soft way of saying, "Don't make us go into bankruptcy." **If you think your state-vested pension rights, either as an employee or a retiree – that's not going to protect you. If we don't reach an agreement one way or the other, we feel fairly**

4

**confident that the state federal law, federalism, will trump state law or negotiate.** The irony of the situation is we might reach a deal with creditors quicker because employees and retirees think there is some benefit and that might force our hand. That might force a bankruptcy.

(Emphasis added.) The interview is available at www.freep.com/article/20130616OPINION.

23.    At no place in this "Executive Summary" or anyplace else has the Detroit Emergency Manager (or Defendants Snyder or Dillon) stated that he is bound by or in any way intends to recognize the applicability of Article 9, Section 24 of the Michigan Constitution.

24.    It is clear from the above recitation of facts that unless plaintiffs and other City of Detroit retirees and employees with vested pension benefits accede to the threats of the Detroit Emergency Manager he will recommend to the Governor and the State Treasurer that the City of Detroit be authorized to proceed under Chapter 9. MCL 141.1558.

25.    It is also clear from the above recitation of facts that if the Governor and/or the State Treasurer authorize a Chapter 9 filing the Detroit Emergency Manager will not uphold but rather seek to abrogate the rights of plaintiffs and others to their accrued pension benefits in violation of Article 9, Section 24 of the Michigan Constitution.

26.    If the Governor and the State Treasurer are not enjoined from authorizing a Chapter 9 filing, plaintiffs will be irreparably harmed.

27.    The harm to plaintiffs absent injunctive relief outweighs the harm an injunction would cause defendants.

28.    Plaintiffs are likely to succeed on the merits.

29.    There will be harm to the public interest if an injunction is not issued, as thousands of City of Detroit retirees and employees will be threatened with the loss of their constitutional rights to their vested pensions.

## VI. RELIEF

WHEREFORE, plaintiffs respectfully request that this Honorable Court issue:

A. an injunction precluding the Governor or the State Treasurer from authorizing the Detroit Emergency Manager to commence proceedings under Chapter 9 of the federal Bankruptcy Code;

B. appropriate declaratory relief;

C. such other relief in the form of injunctions, writs or orders, as this Court deems just and equitable; and

D. award plaintiffs their costs and expenses including, but not limited to, attorney fees incurred in pursuing this action.

Respectfully submitted,

William A. Wertheimer (P 26275)
Attorney for plaintiffs
30515 Timberbrook Lane
Bingham Farms, MI 48025
248-644-9200
billwertheimer@gmail.com

Andrew Nickeloff (P37990)
Marshall J. Widick (P53942)
James A. Britton (P71157)
Attorneys for plaintiffs
Sachs Waldman
1000 Farmer
Detroit, MI 48226
313-496-9429
anickelhoff@sachswaldman.com
mwidick@sachswaldman.com
jabritton@sachswaldman.com

Dated: 8 July 2013

# VERIFICATION

STATE OF MICHIGAN     )
                             ) ss
COUNTY OF OAKLAND    )

      William A. Wertheimer, being first duly sworn, deposes and states he is the attorney

representing plaintiffs herein; that he has read the foregoing verified complaint by him

subscribed for and on behalf of plaintiffs; that he knows the contents thereof to be true except as

to those matters stated upon information and believe, and as to those matters, he believes them to

be true, and he is authorized to sign said verified complaint on behalf of plaintiffs.

                         William A. Wertheimer

Subscribed and sworn to before me this 8th day of July 2013.

                         Karen Purslow, Notary Public
                         County of Oakland, State of Michigan
                         My Commission Expires: 4·19·2014

---

### PROOF OF SERVICE

THE UNDERSIGNED CERTIFIES THAT ON 8 JULY 2013 THE FOREGOING
INSTRUMENT WAS SERVED UPON THE FOLLOWING:

1.   Governor Rick Snyder
2.   State of Michigan (through AG)
3.   State Treasurer Andy Dillion

BY:

| | | | |
|---|---|---|---|
| ___ | U.S. MAIL | ___ | FAX |
| X | HAND DELIVERY | ___ | U.S. EXPRESS MAIL |
| ___ | UPS | ___ | OTHER: email address |

BY:
SIGNATURE: _____

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

GRACIE WEBSTER and
VERONICA THOMAS,

Plaintiffs,

vs

THE STATE OF MICHIGAN;
RICHARD SNYDER, as Governor
of the State of Michigan; and
ANDY DILLON, as Treasurer of
the State of Michigan,

Defendants.

Case No. 13-734-CZ

Hon. CLINTON CANADY III

JOHN R. CANZANO (P30417)
McKNIGHT, McCLOW, CANZANO,
SMITH & RADTKE, P.C.
Attorneys for Plaintiffs
400 Galleria Officentre, Suite 117
Southfield, MI 48034
248-354-9650
jcanzano@michworklaw.com

A civil action between these parties or
other parties arising out of the transaction
or occurrence alleged in the Complaint has
been previously filed in this Court,
where it was given docket number 13-729-CZ
and was assigned to Judge Aquilina.
The action remains pending.

**VERIFIED COMPLAINT FOR
DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

**NATURE OF ACTION**

1.     This action seeks a declaratory judgment that the "Local Financial Stability and

Choice Act," 2012 PA 436, MCL 141.1541 *et seq* ("PA 436") is unconstitutional and in violation of

Article IX Section 24 of the Michigan Constitution because PA 436 permits accrued pension benefits to be diminished or impaired by bankruptcy proceedings in direct contravention of the Constitution. This action also seeks a preliminary and/or final injunction enjoining the Governor and/or the State Treasurer from authorizing a bankruptcy proceeding permitting an unconstitutional diminishment or impairment of accrued pension benefits under PA 436.

## PARTIES, JURISDICTION AND VENUE

2.     Plaintiff Gracie Webster is a retiree from the City of Detroit. She retired in 2000 and is receiving a pension benefit under the City of Detroit's General Retirement System Pension Plan. She resides in Detroit and is a citizen of the State of Michigan.

3.     Plaintiff Veronica Thomas is an employee of the City of Detroit. She has worked for the City for 17 years. She is a participant in the City of Detroit's General Retirement System Pension Plan. Although she has not yet retired, based on her years of service Plaintiff Thomas has earned the right to an accrued vested pension benefit under the terms of the pension plan.

4.     Defendant State of Michigan is a governmental entity and sovereign state of the United States, retaining all powers reserved to it under the 10th Amendment to the United States Constitution.

5.     Defendant Richard Snyder is the Governor of the State of Michigan acting in his official capacity.

6.     Defendant Andy Dillon is Treasurer of the State of Michigan acting in his official capacity.

7.     The Governor may delegate his duties under Section 9 of PA 436, MCL 141.1549 to the State Treasurer.

8.     This court has jurisdiction under MCL 600.6419(4), which provides for the jurisdiction of circuit courts in proceedings for declaratory or equitable relief against the State, and

2

MCL 600.605, which provides original jurisdiction in the circuit courts.

9.     Venue is proper in this court under MCL 600.1621(a), because Defendants conduct
business in Ingham County.

## COUNT I:  DECLARATORY JUDGMENT

**PA 436 Is Unconstitutional Because It Permits Accrued Pension Benefits To Be
Diminished Or Impaired In Direct Violation Of Article IX, Section 24 Of The
Michigan Constitution**

10.     Article IX Section 24 of the Michigan Constitution provides in pertinent part:

> The accrued financial benefits of each pension plan and retirement
> system of the state and its political subdivisions shall be a contractual
> obligation thereof **which shall not be diminished or impaired**
> thereby.

11.     PA 436 was enacted by the Michigan Legislature on December 28, 2012 and became
effective March 28, 2013.

12.     Among the purposes of PA 436, as stated in its preamble, are to "prescribe remedial
measures to address a financial emergency within a local unit of government;" "to prescribe the
powers and duties of an emergency manager for a local unit of government;" and "to provide a
process by which a local unit of government . . . may file for bankruptcy."

13.     On March 14, 2013, Defendant Snyder appointed Kevyn Orr as Emergency Financial
Manager for the City of Detroit, pursuant to 1990 PA 72, MCL 141.1201 *et seq* ("PA 72"). PA 436
is a successor statute to, and expressly repeals, PA 72.

14.     Pursuant to Sec 9(10) of PA 436, MCL 141.1549(10), Kevyn Orr, as an emergency
financial manager appointed under former 1990 PA 72 "and serving immediately prior to the
effective date of this act, shall be considered an emergency manager under this act [PA 436] and
shall continue under this act to fulfill his or her powers and duties."

15.     Chapter 9 of the U.S. Bankruptcy Code, 11 USC §§901 *et seq*, provides a process by

3

which a municipality may file for bankruptcy and become a debtor under Chapter 9 in federal bankruptcy court.

16.    However, in order to protect state sovereignty and in recognition of federalism principles under the 10th Amendment to the U.S. Constitution, Chapter 9 of the Bankruptcy Code prohibits municipalities from filing for bankruptcy unless the municipality "is specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter." Absent such authorization, federal bankruptcy courts have no jurisdiction under Chapter 9 over a municipality as a debtor. 11 USC §109(c)(2). See *Ashton v Cameron County Water Improvement Dist No 1*, 298 US 513; 56 S Ct 892; 80 L Ed 1309 (1936); and *United States v Bekins*, 304 US 27, 58 S Ct 811; 82 L Ed 1137 (1938).

17.    Section 18 of PA 436, MCL 141.1558, specifically authorizes a local unit of government to become a debtor in a Chapter 9 bankruptcy proceeding if the emergency manager for the local government recommends to the Governor and the State Treasurer that the local government be authorized to proceed under Chapter 9, and if the Governor approves the recommendation by informing the emergency manager and State Treasurer in writing of his decision.

18.    PA 436 nowhere requires that in considering whether to approve an emergency manager's recommendation to proceed under Chapter 9, the Governor shall not approve such recommendation if accrued pension benefits may be diminished or impaired in violation of Article IX Section 24 of the Michigan Constitution.

19.    Accordingly, because PA 436 does not prohibit a municipality from proceeding under Chapter 9 of the U.S. Bankruptcy Code if accrued pension benefits may be unconstitutionally diminished or impaired , PA 436 is unconstitutional on its face in violation of Article IX Section 24 of the Michigan Constitution.

4

20.     Section 11 of PA 436, MCL 141.1551, provides that "an emergency manager shall develop and may amend a written financial operating plan for the local government [and that] [t]he financial and operating plan shall provide for . . . [t]he timely deposit of required payments to the pension fund for the local government or in which the local government participates."

21.     On May 12, 2013, Emergency Manager Orr issued a financial and operating plan pursuant to Section 11 of PA 436. (Available at www.freep.com/assets/freep/pdf/C4205233512.pdf.) The plan does not schedule the "timely deposit of required payments" to the pension funds as required by Section 11 of PA 436, but instead notes that payments have been deferred to manage a liquidity crisis.

22.     On June 14, 2013, Emergency Manager Orr issued a "Proposal for Creditors" in which he presents various restructuring options. (Available at http://www.freep.com/assets/freep/pdf/C4206913614.pdf.) Nowhere in this document does Emergency Manager Orr indicate any intent to comply with Article IX Sec 24 of the Michigan Constitution. Instead, in direct contravention of the Michigan Constitution, the proposal expressly states that *there must be significant cuts in accrued, vested pension amounts for both active and currently retired persons.*"

23.     Emergency Manager Orr has publicly threatened, in a June 14 interview with the Detroit Free Press Editorial Board, that vested pension benefits will be abrogated in a Chapter 9 proceeding authorized by the Governor pursuant to PA 436, and that any state law protecting vested pension benefits is "not going to protect" retirees or employees with vested pension benefits in bankruptcy court. (See www.freep.com/article/20130616/OPINION05/306160052/kevyn-orr-detroit-emergency-manager-creditors-fiscal-crisis.)

24.     Article IX Section 24 of the Michigan Constitution is such a state law, which Emergency Manager Orr has asserted will "not . . . protect" vested pension benefits.

5

25.     Under PA 436, the only way Emergency Manager Orr could impose his desired "significant cuts in accrued, vested pension amounts for both active and currently retired persons" is through a Chapter 9 bankruptcy filing.

26.     Plaintiffs are entitled to a declaratory judgment that PA 436 is unconstitutional under Article IX Section 24 of the Michigan Constitution because PA 436 does not prohibit the Governor from authorizing a Chapter 9 bankruptcy filing which threatens to unconstitutionally diminish or impair the Plaintiffs' accrued pension benefits, and a final judgment ordering that Defendant Snyder and/or Defendant Dillon not authorize a Chapter 9 filing which threatens to diminish or impair accrued pension benefits in violation of the Michigan Constitution.

27.     This case presents an actual controversy entitling Plaintiffs to a declaratory judgment because the facts stated above indicate " an adverse interest necessitating the sharpening of the issues raised." *Lansing School Education Ass'n v Lansing Bd of Educ*, 487 Mich 349, 372 n20; 792 NW2d 686 (2010), quoting *Associated Builders and Contractors v Dep't of Consumer and Indus Servs Dir*, 472 Mich 117, 126; 693 NW2d 374 (2005). Plaintiffs are entitled to a declaratory judgment here "to obtain adjudication of rights before an actual injury occurs [and] to settle a matter before it ripens into a violation of the law . . ." *Rose v State Farm Mut Auto Ins Co*, 274 Mich App 291, 294; 732 NW2d 160 (2006).

28.     Plaintiff's need for a Declaratory Judgment is urgent.  Based on the above facts, a request by the Emergency Manager to proceed under Chapter 9 is imminent, because he has credibly threatened – indeed, has given every indication – that he intends to impair or diminish accrued pension benefits in contravention of Article IX Section 24 of the Michigan Constitution, and that Chapter 9 bankruptcy proceedings are the mechanism by which he can do so. Thus Plaintiffs' rights under the Michigan Constitution not to have their pension benefits "diminished or impaired" can

6

only be guaranteed if this Court acts *before* the Governor approves a request to proceed under Chapter 9. Moreover, Emergency Manager Orr's threats that he will unconstitutionally diminish or impair Plaintiffs' vested pension rights have themselves harmed Plaintiffs by instilling in Plaintiffs a reasonable fear that their constitutional rights will be trampled upon and, in the process, their future source of income drastically eroded.

29. Accordingly, Plaintiffs are entitled to a speedy hearing under MCR 2.605(D) on their request for declaratory relief.

## COUNT II: PRELIMINARY INJUNCTION

30. Plaintiffs incorporate by reference the allegations in paragraphs 1 through 29 above.

31. Plaintiffs will suffer irreparable harm if Defendants Snyder and Dillon are not enjoined from authorizing the Emergency Manager to proceed under Chapter 9 of the U.S. Bankruptcy Code and thereby seeking to abrogate Plaintiffs' rights under the Michigan Constitution and the source of livelihood it guarantees them in a forum which the Emergency Manager contends does not protect those rights.

32. The harm to Plaintiffs absent injunctive relief outweighs the harm to Defendants if an injunction is granted because the Governor and Treasurer will not be harmed if they are enjoined from authorizing the Emergency Manager to file under Chapter 9.

33. Plaintiffs are likely to succeed on the merits.

34. There will be harm to the public interest absent an injunction, as the accrued vested pension rights of thousands of City of Detroit retirees and employees will be threatened with abrogation in violation of the Michigan Constitution.

7

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this Honorable Court grant the following relief:

A.  A declaratory judgment that PA 436 is unconstitutional in violation of Article IX Section 24 of the Michigan Constitution.

B.  A preliminary and/or permanent injunction enjoining Defendant Snyder and Defendant Dillon from authorizing the Detroit Emergency Manager to commence proceedings under Chapter 9 of the U.S. Bankruptcy Code.

C.  An award to Plaintiffs of their costs and expenses, including attorneys' fees, incurred in this action.

Respectfully submitted,

McKNIGHT, McCLOW, CANZANO,
SMITH & RADTKE, P.C.

By: _____
John R. Canzano (P30417)
Attorneys for Plaintiffs
400 Galleria Officentre, Suite 117
Southfield, MI 48034
248-354-9650
jcanzano@michworklaw.com

Date: July 3, 2013

## VERIFICATION

STATE OF MICHIGAN      )
                       )ss
COUNTY OF OAKLAND      )

John R. Canzano, being first duly sworn, deposes and states he is the attorney representing Plaintiffs herein; that he has read the foregoing verified complaint by him subscribed for and on

8

behalf of Plaintiffs; that he knows the contents thereof to be true except as to those matters stated upon information and belief, and as to those matters, he believes them to be true, and he is authorized to sign said Verified Complaint on behalf of Plaintiffs.

John R. Canzano

Subscribed and sworn to before me this 3rd day of July 2013.

Karen Ann Purslow, Notary Public
County of Oakland, State of Michigan
My Commission Expires:   April 19, 2014

9

# STATE OF MICHIGAN
## IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

THE GENERAL RETIREMENT SYSTEM
OF THE CITY OF DETROIT, and THE
POLICE AND FIRE RETIREMENT
SYSTEM OF THE CITY OF DETROIT,

        Plaintiffs,

vs.

KEVYN D. ORR, in his official capacity as the
EMERGENCY MANAGER OF THE CITY OF
DETROIT, and RICHARD SNYDER, in his
official capacity as the GOVERNOR OF THE
STATE OF MICHIGAN,

        Defendants.

Case No. 13- 768 -CZ

Hon. CLINTON CANADY III

---

Ronald A. King (P45088)
Aaron O. Matthews (P64744)
Michael J. Pattwell (P72419)
CLARK HILL PLC
212 East Grand River Avenue
Lansing, Michigan 48906
(517) 318-3100
Attorneys for Plaintiffs

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
The following civil actions between the
above-named parties and/or other parties
arising out of the same transactions and
occurrences alleged in this Complaint have
previously been filed in this Court: (i) Case
No. 13-729-CZ assigned to Judge Aquilina;
and (ii) Case No. 13-734-CZ assigned to
Judge Canady and then reassigned to Judge
Aquilina. Those actions remain pending.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

---

## COMPLAINT FOR DECLARATORY RELIEF

Plaintiffs, the General Retirement System of the City of Detroit ("GRS"), and the Police

and Fire Retirement System of the City of Detroit ("PFRS") (together, the "Retirement Systems"

or "Plaintiffs"), through their attorneys, Clark Hill PLC, allege as follows for their Complaint for

Declaratory Relief against Defendants Kevyn D. Orr, in his official capacity as the Emergency

9192834.3 14893/144127

Manager of the City of Detroit (the "Emergency Manager"), and Richard Snyder, in his official

capacity as the Governor of the State of Michigan (the "Governor"):

## I.    INTRODUCTION

1.    The Retirement Systems bring this action on their own behalf and on behalf of the

more than 32,000 active and retired employees of the City of Detroit (the "City"), who are

participants in the Retirement Systems and whose "accrued financial benefits" the Retirement

Systems were created to protect.

2.    Under Count I, Plaintiffs request that this Court declare that:

    a)    the Local Financial Stability and Choice Act, 2012 PA 436, MCL 141.1541 *et seq.* ("PA 436") does <u>not</u> expressly grant to the *Governor* the authority to authorize the Emergency Manager to take any actions that will result in the impairment of the City of Detroit's pension debts, but rather, when read in conjunction with Article IX, section 24 and Article I, section 10 of the Michigan Constitution, requires that the *Governor* refrain from authorizing the Emergency Manager to take any action that causes the City's pension debts to be subject to impairment under Chapter 9 of the United States Bankruptcy Code, 11 USC §§ 901 *et seq.*, ("Chapter 9"); or, alternatively,

    b)    <u>if</u> PA 436 implicitly grants to the *Governor* the authority to authorize the Emergency Manager to take actions that will result in the impairment of the City of Detroit's pension debts, <u>then</u> PA 436 contravenes Article IX, section 24 and Article I, section 10 of the Michigan Constitution and is of no force or effect.

3.    Under Count II, Plaintiffs request that this Court declare that:

    a)    PA 436 does <u>not</u> expressly grant to the *Emergency Manager* the authority to take actions that will result in the impairment of the City of Detroit's pension debts, but rather, when read together with Article IX, section 24 and Article I, section 10 of the Michigan Constitution, precludes the *Emergency Manager* from taking any action that causes the City's pension debts to be subject to impairment under Chapter 9; or, alternatively,

    b)    <u>if</u> PA 436 implicitly grants to the *Emergency Manager* the authority to take actions that will result in the impairment of the City of Detroit's pension debts, <u>then</u> PA 436 contravenes Article IX, section 24 and Article I, section 10 of the Michigan Constitution and is of no force or effect.

2

4.     If, before the Court is able to grant the declaratory relief requested above, the Governor attempts to grant to the Emergency Manager an unconditional authorization to proceed under Chapter 9, Plaintiffs request that this Court immediately issue an injunction prohibiting the Emergency Manager from acting pursuant to the Governor's purported and unconstitutional Chapter 9 authorization until such time as Plaintiffs' request for declaratory relief has been fully adjudicated.

## II.     THE PARTIES

5.     Plaintiff GRS is a municipal employee retirement system and pension plan and trust created by the City's Charter to provide retirement, disability, and survivor benefits to eligible non-uniformed City employees and their beneficiaries, as authorized by the Michigan Constitution and the Home Rule City Act of 1909, MCL 117.1 *et seq*. Among many other duties, GRS has the power and obligation to ensure that the City tenders its annual contribution to GRS and to protect the "accrued financial benefits" of its participants.

6.     Plaintiff PFRS is a municipal employee retirement system and pension plan and trust created by the City's Charter to provide retirement, disability, and survivor benefits to eligible City Police and Fire Department employees and their beneficiaries, as authorized by the Michigan Constitution and the Home Rule City Act of 1909, MCL 117.1 *et seq*. Among many other duties, PFRS has the power and obligation to ensure that the City tenders its annual contribution to PFRS and to protect the "accrued financial benefits" of its participants.

7.     Defendant Kevyn D. Orr is the Emergency Manager of the City.

8.     Defendant Richard Snyder is the Governor of the State of Michigan.

## III.     JURISDICTION AND VENUE

9.     This Court possesses jurisdiction over this matter pursuant to Mich Const 1963, art VI, § 13, MCL 600.601, MCL 600.605, and MCL 600.6419(4). Furthermore, this Court has

3

jurisdiction to render the declaratory judgments requested herein pursuant to MCR 2.605 because there exists an actual controversy between the parties.

10. Venue in this circuit is proper pursuant to MCL 600.1615 and MCL 600.1621(a).

## IV. GENERAL ALLEGATIONS

**A. The Governor's Duty And Oath To Uphold The Constitution**

11. Article XI, section 1 of the Michigan Constitution requires that all officers, legislative, executive and judicial in the state of Michigan must take and subscribe to the following oath:

> I do solemnly swear (or affirm) that I will support the Constitution of the United States and the Constitution of this state, and that I will faithfully discharge the duties of the office of . . . . . . . . . according to the best of my ability. [Mich Const 1963, art XI, § 1.]

12. Similarly, Article V, section 8 of the Michigan Constitution demands that "the governor shall take care that the laws be faithfully executed." Mich Const 1963, art V, § 8.

13. And, section 64 of the Michigan Election Law ("PA 116") makes clear that "[e]very person elected to the office of governor . . . before entering upon the duties of his office, shall take and subscribe to the oath as provided in section 1 of article 11 of the state constitution and deposit same with the secretary of state." MCL 168.64.

14. On December 30, 2010, the Governor did in fact swear the following oath, which was later filed with the Michigan Secretary of State: "I do solemnly swear that I will support the Constitution of the United States and the Constitution of this State, and that I will faithfully discharge the duties of the office of Governor according to the best of my ability." This oath of office is attached as **Exhibit A**.

4

B. **The Emergency Manager's Duty And Oath To Uphold The Constitution**

15. Pursuant to section 9 of PA 436, the Emergency Manager is a public officer and servant appointed by the Governor and serves at the Governor's pleasure. MCL 141.1549.

16. Accordingly, just like the Governor, Article XI, section 1 of the Michigan Constitution requires the Emergency Manager to take and subscribe to the following oath:

> I do solemnly swear (or affirm) that I will support the Constitution of the United States and the Constitution of this state, and that I will faithfully discharge the duties of the office of . . . . . . . . . according to the best of my ability. [Mich Const 1963, art XI, § 1.]

17. Furthermore, section 1 of the Constitutional Oath of Office Act ("PA 22") requires that: "[a]ll persons now employed, or who may be employed by the state of Michigan . . . . shall, as a condition of their employment, take and subscribe to the oath or affirmation required of members of the legislature and other public officers by section 2 of article 16 of the constitution of 1908 of the state of Michigan [(*i.e.,* the predecessor of Mich Const 1963, art 11, § 1)]." MCL 15.151.

18. On March 14, 2013, the Emergency Manager did in fact swear the following oath, which was later filed with the Michigan Secretary of State: "I do solemnly swear that I will support the Constitution of the United States and the Constitution of this State, and that I will faithfully discharge the duties of the office of Emergency Financial Manager – City of Detroit according to the best of my ability." This oath of office is attached as **Exhibit B**.

C. **The Michigan Constitution Commands That Accrued Financial Benefits Of A Pension Plan May Not Be Diminished Or Impaired**

19. The first paragraph of Article IX, section 24 of the Michigan Constitution demands that "the accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby." Mich Const 1963, art IX, § 24.

5

20. This constitutional provision (adopted by the people of this State) is a solemn guarantee that -- absent a constitutional amendment duly adopted by the people of this State -- accrued pension benefits of each pension plan and retirement system of the state and its political subdivisions (including those of the City) shall not be impaired.

21. The second paragraph of Article IX, section 24 of the Michigan Constitution demands that "financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities." Mich Const 1963, art IX, § 24.

22. This constitutional provision (adopted by the people of this State) mandates that municipalities timely deposit with their respective public employee pension systems moneys sufficient to cover actuarial liabilities.

23. Article I, section 10 of the Michigan Constitution demands that "[n]o . . . law impairing the obligation of contract shall be enacted."

24. In accordance with the above-cited constitutional guarantees, section 12(1)(m)(ii) of PA 436 states that if appointed sole trustee of either of the Retirement Systems, "[t]he emergency manager shall fully comply with . . . section 24 of article IX of the state constitution of 1963." MCL 141.1552(1)(m)(ii).

25. Likewise, section 11(1)(d) of PA 436 requires that any financial and operating plan developed by the Emergency Manager shall provide for "[t]he timely deposit of required payments to the pension fund for the local government or in which the local government participates." MCL 141.1551(1)(d).

6

**D. The City Owes And Will Owe The Retirement Systems Substantial Sums For Accrued Financial Benefits The City Promised To Pay Its Employees**

26. Over the last several decades, the City and its employees have entered into collective bargaining agreements wherein the City promised to provide its employees with pension benefits and accordingly make annual pension contributions to the Retirement Systems.

27. In reliance on those contractual promises, tens of thousands of City employees served the City and, thus, pursuant to their applicable collective bargaining agreements, became entitled to receive their pensions (*i.e.*, accrued financial benefits).

28. At present, the City owes the Retirement Systems tens of millions of dollars for past annual pension contributions; the present non-payment of which is in violation of, among other laws, Article IX, section 24 of the Michigan Constitution, section 20m of the Public Employee Retirement System Investment Act, 1965 PA 314 (as amended), MCL 38.1132 *et seq.* ("PA 314"), section 11(1)(d) of PA 436, and Article 11, section 101 of the City's Charter.

29. Despite these legal requirements, the Emergency Manager has made clear through his public statements and various public reports that he has no intention of causing the City to make its past annual pension contributions to the Retirement Systems.

30. If the City further and permanently evades its obligation to make its past annual pension contributions to the Retirement Systems by way of impairment of that obligation in a Chapter 9 bankruptcy proceeding or otherwise, the accrued financial benefits of the Retirement Systems and their participants will be diminished and impaired.

31. Moving forward the City also has an obligation to pay into the Retirement Systems substantial sums for accrued financial benefits.

32. If the City further and permanently evades its obligation to make its future annual pension contributions to the Retirement Systems by way of impairment in a Chapter 9

7

bankruptcy proceeding or otherwise, the accrued financial benefits of the Retirement Systems and their participants will be diminished and impaired.

**E.  Defendants' Unlawful Plan To Impair And Diminish Plaintiffs' Accrued Financial Benefits By Way Of A Chapter 9 Bankruptcy Proceeding**

33.  On March 26, 2013, after having found that the City was in severe financial distress, the Governor (and the State Treasurer) caused Kevyn Orr to be appointed as the Emergency Manager of the City.

34.  Michigan's contract with the Emergency Manager for emergency manager services provides that "[t]he Emergency Manager's role is to remedy the financial distress of the City by requiring, within available resources, prudent fiscal management and an efficient provision of municipal services by exercising the necessary authority conferred herein to take appropriate action on behalf of the City and its residents."

35.  The contract does not expressly authorize the Emergency Manager to take any action that would impair the accrued financial benefits of Plaintiffs.

36.  Chapter 9 sets forth the process by which a municipality may file for bankruptcy and seek to have its debts adjusted. 11 USC §§ 901 *et seq.*

37.  A limitation on this immense federal power is that a municipality may <u>only</u> become a debtor under Chapter 9 if such entity "is specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter." 11 USC §§ 109(c)(2).

38.  In Michigan, section 18 of PA 436 grants to the Governor the authority to authorize the Emergency Manager to initiate a Chapter 9 bankruptcy proceeding on behalf of the City:

8

If, in the judgment of the emergency manager, no reasonable alternative to rectifying the financial emergency of the local government which is in receivership exists, then the emergency manager may recommend to the governor and the state treasurer that the local government be authorized to proceed under chapter 9. If the governor approves of the recommendation, the governor shall inform the state treasurer and the emergency manager in writing of the decision . . .Upon receipt of the written approval, the emergency manager is authorized to proceed under chapter 9. This section empowers the local government for which an emergency manager has been appointed to become a debtor under title 11 of the United States Code, 11 USC 101 to 1532, as required by section 109 of title 11 of the United States Code, 11 USC 109, and empowers the emergency manager to act exclusively on the local government's behalf in any such case under chapter 9. [MCL 141.1558.]

39.     Along those same lines, section 26(1) of PA 436 states, *inter alia*, that "with the written approval of the governor, a local government may file a petition under Chapter 9 and exercise powers pursuant to federal bankruptcy law if the local government adopts a resolution . . . that declares a financial emergency . . . ." MCL 141.1566(1).

40.     And, section 26(2) of PA 436 goes on to state, among other things, that "[t]he governor may place contingencies on a local government in order to proceed under chapter 9" and "upon receipt of the written approval and subject to this subsection, the local government may proceed under Chapter 9 and exercise powers under federal bankruptcy law." MCL 141.1566(2).

41.     Nothing in PA 436, however, expressly authorizes the Governor or Emergency Manager to seek to have municipal pension debts or the accrued financial benefits of municipal pension plans impaired under Chapter 9.

42.     Nevertheless, since his appointment, the Emergency Manager has made public that he intends to do an end-run around Article IX, section 24 of the Michigan Constitution by asking the Governor to authorize an unconditional Chapter 9 proceeding wherein the Emergency

9

Manager will seek to have the City's pension debts and the accrued financial benefits of the Retirement Systems impaired.

43.    More specifically, the Emergency Manager has made it abundantly clear that he intends to diminish or eliminate the accrued financial benefits of the Retirement Systems and their participants by way of impairment under Chapter 9 unless such benefits are "voluntarily" diminished or impaired.

44.    For example, in the May 12, 2013 Financial Operating Plan for the City of Detroit, the Emergency Manager states that:

> [T]he City faces substantial unfunded OPEB obligations for retiree medical expenses, most recently estimated at $5.7 billion, and hundreds of millions of dollars (perhaps billions based on more recent actuarial calculations with more conservative assumptions) in pension funding requirements. Recently, tens of millions of dollars of pension funding and other payments have been deferred to manage a severe liquidity crisis at the City. Even with these deferrals, the City has operated at a significant and increasing deficit. It is expected that the City will end this fiscal year with approximately $125 million in accumulate deferred obligations and a precariously low cash position.

45.    On June 14, 2013, the Emergency Manager issued his Proposal for Creditors (the "Restructuring Proposal"). In his Restructuring Proposal, the Emergency Manager states that:

- As set forth above, preliminary analysis indicates that the underfunding in the GRS and PFRS is approximately $3.5 billion. At this level of underfunding, the City would have to contribute approximately $200 million to $350 million annually to fully fund currently accrued, vested benefits. Such contributions will not be made under the plan.

- Claims for the underfunding will be exchanged for a pro rata (relative to all unsecured claims) principal amount of new Notes.

- Because the amounts realized on the underfunding claims will be substantially less than the underfunding amount, there must be significant cuts in accrued, vested pension amounts for both active and currently retired person.

10

46.     To summarize and add clarity to the above excerpted provisions, the Emergency Manager's Restructuring Proposal takes the position that pension debts are "unsecured claims" that may be, and must be, impaired in any prospective Chapter 9 bankruptcy of the City.

47.     The Emergency Manager's Restructuring Proposal further proposes to place the City's alleged approximate $3.5 billion underfunding liability in a pool of claims comprising a total of approximately $11.5 billion in unsecured claims, and then have those claims exchanged for a *pro rata* share of an unsecured note in the face amount of $2.0 billion.

48.     As such, the Emergency Manager's Restructuring Proposal would diminish and impair the accrued pension benefits of the participants in the Retirement Systems.

49.     Notably, there has been no indication by the Emergency Manager that his Restructuring Proposal will not also serve as a template for the plan of adjustment that the Emergency Manager would propose and seek to confirm in a Chapter 9 bankruptcy proceeding. Indeed, in a June 13, 2013 interview with The Detroit Free Press, the Emergency Manager made the following statements:

> Q:     You said in this report that you don't believe there is an obligation under our state constitution to pay pensions if the city can't afford it?
>
> A:     The reason we said it that way is to quantify the bankruptcy question. We think federal supremacy trumps state law.
>
> Q:     Which the 9th Circuit agrees for now.
>
> A:     It is what it is – so we said that in a soft way of saying, "Don't make us go into bankruptcy." If you think your state-vested pension rights, either as an employee or retiree – that's not going to protect you. If we don't reach an agreement one way or the other, we feel fairly confident that the state federal law, federalism, will trump state law or negotiate. The irony of the situation is we might reach a deal with creditors quicker because employees and retirees think there is some benefit and that might force our hand. That might force a bankruptcy. [*Detroit's Emergency*

11

*Manager Talks About City's Future*, June 16, 2013 (The
Detroit Free Press), attached as **Exhibit C**.]

50.   The Governor has publically proclaimed his support for the Emergency Manager
and stated that the filing of a Chapter 9 bankruptcy remains a viable option. *What Snyder, Bing
said about Detroit emergency manager 45-day report, Detroit Free Press,* May 12, 2013,
http://www.freep.com/article/20130512/NEWS01/305120162/kevyn-orr-quotes-report-45-day-
city-financial-crisis-emergency-manager.

51.   At no time has the Governor stated that he will make any Chapter 9 authorization
"contingent" on the requirement that the City's pension debts not be impaired.

52.   Even in a recent filing in *Flowers v Snyder*, Case No. 13-729-CZ, pending before
the Ingham County Circuit Court, the Governor did not deny that he is poised to authorize the
Emergency Manager to proceed under Chapter 9 without any conditions whatsoever.

53.   The Emergency Manager and/or his spokesperson have stated on several
occasions that a decision as to whether to file a Chapter 9 bankruptcy petition would likely be
made as soon as by the end of the current week.

54.   At no time has the Emergency Manager stated that he will not seek to have the
City's pension debts impaired under Chapter 9, or even that his proposed Plan of Reorganization
will not request that the City's pension debts be impaired.

55.   Accordingly, it appears imminent that the Governor will grant to the Emergency
Manager the unconditional power to proceed under Chapter 9 and the Emergency Manager will
seek to have the City's pension debts impaired pursuant to Chapter 9 unless the Retirement
Systems and their participants accept the Emergency Manager's unilateral imposition of
significant impairments to their accrued financial benefits.

12

# COUNT I
## DECLARATORY JUDGMENT
**The Governor May Not Take Any Action Which Would Cause The City's Pension Debts
To Be Subject To Impairment In A Chapter 9 Bankruptcy**

56.     Plaintiffs incorporate paragraphs 1-55 and 81-102 of this Complaint with the same force and effect as if fully set forth herein.

57.     The Governor must uphold and abide by the Michigan Constitution and may not take any action that violates same.

58.     The Governor may not do indirectly what he is forbidden from doing directly.

59.     Article I, section 10 of the Michigan Constitution demands that "[n]o . . . law impairing the obligation of contract shall be enacted."

60.     The Retirement Systems and their participants' right to receive accrued financial benefits is contractually provided for by numerous collective bargaining agreements entered into with the City.

61.     Article IX, section 24 of the Michigan Constitution demands that "the accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby."

62.     If the Governor issues an unconditional Chapter 9 authorization to the Emergency Manager, the Emergency Manager has made clear that he will seek to have City's pension debts impaired in Chapter 9.

63.     Any such impairment of the City's pension debts in Chapter 9 will diminish and impair the accrued financial benefits of the Retirement Systems and their participants in violation of Article IX, section 24 of the Michigan Constitution.

13

64.     Any such impairment of the City's pension debts in Chapter 9 will also impair the

City's obligation under the collective bargaining agreements in violation of Article I, section 10

of the Michigan Constitution.

65.     While section 18 and 26 of PA 436 grant to the Governor the authority to

authorize the Emergency Manager to proceed under Chapter 9, nothing in PA 436 (or any

Michigan law for that matter) expressly authorizes the Governor or Emergency Manager to seek

to have the City's pension debts impaired under Chapter 9.

66.     To the contrary, section 12(1)(m)(ii) of PA 436 states that if appointed sole trustee

of the Retirement Systems "[t]he emergency manager shall fully comply with . . . section 24 of

article IX of the state constitution of 1963," MCL 141.1552(1)(m)(ii), and section 11(1)(d) of PA

436 requires that any financial and operating plan developed by the Emergency Manager shall

provide for "[t]he timely deposit of required payments to the pension fund for the local

government or in which the local government participates," MCL 141.1551(1)(d).

67.     When enacting PA 436 it must be presumed that the Legislature did not intend to

violate Article IX, section 24 or Article I, section 10 of the Michigan Constitution.

68.     PA 436 must be construed in such a way as to save it from being unconstitutional.

69.     The only way to save PA 436 from being unconstitutional is to read section 26(2)

of PA 436 as requiring that the Governor condition any Chapter 9 authorization on the

contingency that the Emergency Manager (and any designee with power to take action on behalf

of the City) not seek or accede to any impairment of the City's pension debts in such Chapter 9

bankruptcy proceeding.

70.     Similarly, the only way for the Governor to avoid violating Article IX, section 24

and Article I, section 10 of the Michigan Constitution is to condition any Chapter 9 authorization

14

on the contingency that the Emergency Manager (and any designee with power to take action on behalf of the City) not seek or accede to any impairment of the City's pension debts in such Chapter 9 bankruptcy proceeding.

71.     Section 26(2) of PA 436, itself, provides that the Governor may condition his Chapter 9 authorization on "contingencies" the Emergency Manager must follow in order to proceed under Chapter 9.

72.     As such, the Governor may authorize the Emergency Manager to proceed under Chapter 9, but only on the condition that the City's pension debts not be impaired in Chapter 9.

73.     Because the Governor has consistently proclaimed his support for the Emergency Manager who, in turn, has made clear his intention to have the City's pension debts discharged under Chapter 9, there exists a real and imminent threat that the Governor may issue to the Emergency Manager an unconditional authorization to proceed under Chapter 9.

74.     There is an actual controversy between the parties as to the constitutionality and validity of PA 436 and the ability of the Governor to issue to the Emergency Manager the unconditioned authority to proceed under Chapter 9 and seek to impair the City's pension debts.

75.     The Retirement Systems have a substantial interest in safeguarding the accrued financial benefits owed by the City; in fact, the Retirement Systems were created precisely for that purpose.

76.     The interest of the Retirement Systems, both directly and through their participants, in the accrued financial benefits owed by the City is different from the citizenry at large because the City does not owe accrued financial benefits to the citizenry at large and because the City did not enter into collective bargaining agreements with the citizenry at large.

15

77. A present adjudication of this controversy is necessary to guide the future conduct of the parties and preserve their legal rights.

78. The declaratory relief here requested will avoid a multiplicity of actions at law.

79. This Court must therefore advise the Governor of his legal obligations under Michigan law on an expedited basis and by way of a declaratory judgment.

80. If, before the Court is able to grant the declaratory relief requested above, the Governor attempts to grant to the Emergency Manager an unconditional authorization to proceed under Chapter 9, Plaintiffs request that this Court immediately issue an injunction prohibiting the Emergency Manager from acting pursuant to the Governor's purported and unconstitutional Chapter 9 authorization until such time as Plaintiffs' request for declaratory relief has been fully adjudicated.

## COUNT II
## DECLARATORY JUDGMENT
**The Emergency Manager May Not Take Any Action Which Would Cause The City's Pension Debts To Be Subject To Impairment In A Chapter 9 Bankruptcy**

81. Plaintiffs incorporate paragraphs 1-80 of this Complaint with the same force and effect as if fully set forth herein.

82. The Emergency Manager must uphold and abide by the Michigan Constitution and may not take any action that violates same.

83. The Emergency Manager may not do indirectly what he is forbidden from doing directly.

84. Article I, section 10 of the Michigan Constitution demands that "[n]o . . . law impairing the obligation of contract shall be enacted."

16

85.     The Retirement Systems and their participants' right to receive accrued financial benefits is contractually provided for by numerous collective bargaining agreements entered into with the City.

86.     Article IX, section 24 of the Michigan Constitution demands that "the accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby."

87.     If the Emergency Manager proceeds under Chapter 9 and has the City's pension debts impaired in Chapter 9, such impairment of the City's pension debts in Chapter 9 will diminish and impair the accrued financial benefits of the Retirement Systems and their participants in violation of Article IX, section 24 of the Michigan Constitution.

88.     Any such impairment of the City's pension debts in Chapter 9 will also impair the City's obligation under the collective bargaining agreements in violation of Article I, section 10 of the Michigan Constitution.

89.     While section 18 and 26 of PA 436 grant to the Governor the authority to authorize the Emergency Manager to proceed under Chapter 9, nothing in PA 436 (or any Michigan law for that matter) expressly authorizes the Emergency Manager to seek to have the City's pension debts impaired under Chapter 9.

90.     To the contrary, section 12(1)(m)(ii) of PA 436 states that if appointed sole trustee of the Retirement Systems "[t]he emergency manager shall fully comply with . . . section 24 of article IX of the state constitution of 1963," MCL 141.1552(1)(m)(ii), and section 11(1)(d) of PA 436 requires that any financial and operating plan developed by the Emergency Manager shall

17

provide for "[t]he timely deposit of required payments to the pension fund for the local government or in which the local government participates," MCL 141.1551(1)(d).

91.     When enacting PA 436 it must be presumed that the Legislature did not intend to violate Article IX, section 24 or Article I, section 10 of the Michigan Constitution.

92.     PA 436 must be construed in such a way as to save it from being unconstitutional.

93.     The only way to save PA 436 from being unconstitutional is to read section PA 436 as not authorizing an impairment of pension debts under Chapter 9 and conditioning any Chapter 9 authorization on the protection of accrued pension benefits.

94.     Similarly, the only way for the Emergency Manager (and any designee with power to take action on behalf of the City) to avoid violating Article IX, section 24 and Article I, section 10 of the Michigan Constitution is to refrain from seeking or acceding to any impairment of the City's pension debts in a Chapter 9 bankruptcy proceeding.

95.     Because the Emergency Manager has made clear his intention to have the City's pension debts impaired under Chapter 9, and because the Governor has stated that he would be willing to grant such authority to the Emergency Manager, there exists a real and imminent threat that the Emergency Manager may proceed under Chapter 9 in order to have the City's pension debts impaired.

96.     There is thus an actual controversy between the parties as to the constitutionality and validity of PA 436 and the ability of the Emergency Manager to proceed under Chapter 9 and have discharged the City's pension debts.

97.     The Retirement Systems have a substantial interest in safeguarding the accrued financial benefits owed by the City; in fact, the Retirement systems were created precisely for that purpose.

98. The interest of the Retirement Systems, both directly and through their participants, in the accrued financial benefits owed by the City is different from the citizenry at large because the City does not owe accrued financial benefits to the citizenry at large and because the City did not enter into collective bargaining agreements with the citizenry at large.

99. A present adjudication of this controversy is necessary to guide the future conduct of the parties and preserve their legal rights.

100. The declaratory relief here requested will avoid a multiplicity of actions at law.

101. This Court must therefore advise the Emergency Manager of his legal obligations under Michigan law on an expedited basis and by way of a declaratory judgment.

102. If, before the Court is able to grant the declaratory relief requested above, the Governor attempts to grant to the Emergency Manager an unconditional authorization to proceed under Chapter 9, Plaintiffs request that this Court immediately issue an injunction prohibiting the Emergency Manager from acting pursuant to the Governor's purported and unconstitutional Chapter 9 authorization until such time as Plaintiffs' request for declaratory relief has been fully adjudicated.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that, on an expedited basis, this Court issue an Order:

(a) declaring that PA 436 does not expressly grant to the Governor the authority to authorize the Emergency Manager to take actions that will result in the impairment of the City of Detroit's pension debts, but rather, when read in conjunction with Article IX, section 24 and Article I, section 10 of the Michigan Constitution, requires that the Governor refrain from authorizing the Emergency Manager to take any action that causes the City's pension debts to be subject to impairment under Chapter 9 or, alternatively, that, if PA 436 implicitly grants to the Governor the authority to authorize the Emergency Manager to take actions that impair the City of Detroit's pension debts, then PA 436 contravenes Article IX, section 24 and Article I, section 10 of the Michigan Constitution and is of no force or effect;

19

(b) declaring that PA 436 does <u>not</u> expressly grant to the Emergency Manager the authority to take actions that will result in the impairment of the City of Detroit's pension debts, but rather, when read together with Article IX, section 24 and Article I, section 10 of the Michigan Constitution, precludes the Emergency Manager from taking any action that causes the City's pension debts to be subject to impairment under Chapter 9 or, alternatively, that, <u>if</u> PA 436 implicitly grants to the Emergency Manager the authority to take actions that impair the City of Detroit's pension debts, <u>then</u> PA 436 contravenes Article IX, section 24 and Article I, section 10 of the Michigan Constitution and is of no force or effect;

(c) enjoining the Emergency Manager, if necessary, from acting pursuant to any future unconstitutional Chapter 9 authorization of the Governor; and

(d) granting to Plaintiffs any further such relief this Court deems equitable and just.


Respectfully submitted,

CLARK HILL PLC


By: _____

Ronald A. King (P45088)
Aaron O. Matthews (P64744)
Michael J. Pattwell (P72419)
212 East Grand River Avenue
Lansing, Michigan 48906
(517) 318-3100
Attorneys for Plaintiffs

Date: July 17, 2013

20