**EXHIBIT I.A.270**

PRIOR PFRS PENSION PLAN

13-53846-tjr Doc 8734-1 Filed 12/15/14 Entered 12/15/14 20:21:43 Page 1 of 455
13-53846-swr Doc 6903-1 Filed 08/20/14 Entered 08/20/14 23:27:34 Page 900 of
632

# COMBINED PLAN
# FOR THE
# POLICE AND FIRE
# RETIREMENT SYSTEM OF
# THE CITY OF DETROIT, MICHIGAN

**Effective July 1, 2014**

# COMPONENT II

**This Component II of the Combined Plan For the Police and Fire Retirement System of the City of Detroit, Michigan is intended to memorialize the documentation for the Police and Fire Retirement System of the City of Detroit as it existed on June 30, 2014.**

13-53846-tjw Doc 8304-1 Filed 12/15/14 Entered 12/15/14 09:43 Page 3 of 455
13-53846-swr Doc 6904-1 Filed 08/20/14 Entered 08/20/14 23:27:34 Page 902 of
632

COMPILATION
OF
PLAN PROVISIONS
OF THE
POLICE AND FIRE RETIREMENT SYSTEM
OF THE CITY OF DETROIT


JULY 1, 2014


Including


Article IX, Section 24
of the
1963 State of Michigan Constitution


Article 11
of the
2012 Home Rule Charter
of the
City of Detroit
effective January 1, 2012


Chapter VII of Title IX
of the
1918 City of Detroit Charter
as amended and supplemented from time to time
by amendments to the Charter, City Ordinance and by Agreement


Chapter 54, Article II
of the
1964 Detroit City Code
as amended and supplemented from time to time
by City Ordinance
which was saved from repeal by
Section 11-102 of the 1974, 1997, and 2012 Detroit City Charters
and incorporated by reference into, but not codified in,
Chapter 47 of the 1984 Detroit City Code


Collective Bargaining Agreements

# TABLE OF CONTENTS

**Page**

Article IX, Section 24 of 1963 State of Michigan Constitution ................................................... ix

Article 11 of January 1, 2012 City of Detroit Charter ................................................ x

Chapter VII of Title IX of the 1918 City of Detroit Charter, as amended and supplemented from time to time by amendments to the Charter, City Ordinance and by Agreement (Retirement System of the Policemen and Firemen Retirement System of the City of Detroit) .............................................................................................. 1

Special Provisions ................................................................................................... 2

| Sec. 1. | Freeze of Police and Fire Retirement System as of June 30, 2014 .................... 2 |
| Sec. 2. | Limitation on Interest Crediting Rate for Police and Fire Retirement System Annuity Savings Fund; Rates of Regular Interest Adopted by Board for Actuarial Purposes ............................................................. 4 |

| ARTICLE I. | Name and Date of Establishment ................................................. 5 |

| ARTICLE II. | Definitions ................................................................... 6 |

| Sec. 1. | 'System' ............................................................ 6 |
| Sec. 2. | 'Policemen' ......................................................... 6 |
| Sec. 3. | 'Firemen' ........................................................... 6 |
| Sec. 4. | 'Member' ............................................................ 6 |
| Sec. 5. | 'City' .............................................................. 6 |
| Sec. 6. | 'The Council' ....................................................... 6 |
| Sec. 7. | 'The Medical Director' .............................................. 6 |
| Sec. 8. | 'Service' ........................................................... 6 |
| Sec. 9. | 'Prior service' ..................................................... 6 |
| Sec. 10. | 'Membership service' ............................................... 7 |
| Sec. 11. | 'Beneficiary' ....................................................... 7 |
| Sec. 12. | 'Regular Interest' .................................................. 7 |
| Sec. 13. | 'Accumulated contributions' ......................................... 7 |
| Sec. 14. | 'Average Final Compensation' ....................................... 7 |
| Sec. 15. | 'Final compensation' ............................................... 9 |
| Sec. 16. | 'Annuity' .......................................................... 10 |
| Sec. 17. | 'Accrued Service' .................................................. 10 |
| Sec. 18. | 'Pension' .......................................................... 10 |
| Sec. 19. | 'Retirement allowance' ............................................. 10 |
| Sec. 20. | 'Retirement' ....................................................... 10 |
| Sec. 21. | 'Annuity reserve' .................................................. 10 |
| Sec. 22. | 'Pension Reserve' .................................................. 10 |
| Sec. 23. | 'Merit Board' ...................................................... 10 |
| Sec. 24. | 'Patrolman' ........................................................ 10 |
| Sec. 25. | 'Fire-fighter' ..................................................... 10 |
| Sec. 26. | 'Board of trustees or board' ....................................... 10 |
| Sec. 27. | 'Decrement probabilities' .......................................... 10 |

# TABLE OF CONTENTS

(continued)

Page

| | | |
|---|---|---|
| Sec. 28. | 'Salary factors' | 10 |
| **ARTICLE III.** | **Administration; Board of Trustees** | **12** |
| Sec. 1. | Board created | 12 |
| Sec. 2. | Membership of Board | 12 |
| Sec. 3. | Terms of Active Trustees, Trustee Selected by Board, Retirant Trustees, and Trustees Designated by Mayor | 15 |
| Sec. 4. | Scheduling of Elections for Active and Retirant Trustees | 15 |
| Sec. 5. | Procedures for Election of Retiree Trustees | 16 |
| Sec. 6. | Vacancies | 16 |
| Sec. 7. | Compensation | 17 |
| Sec. 8. | Oath | 17 |
| Sec. 9. | Meetings | 17 |
| Sec. 10. | Rules for administration of funds | 17 |
| Sec. 11. | Officers | 17 |
| Sec. 12. | Data for actuarial valuation of funds | 18 |
| Sec. 13. | Record of proceedings; annual report | 18 |
| Sec. 14. | Legal advisor | 18 |
| Sec. 15. | Medical Director | 18 |
| Sec. 16. | Actuary of Retirement System technical advisor to Board | 19 |
| Sec. 17. | Investigation of mortality, service and compensation experience of members | 19 |
| Sec. 18. | Regular actuarial investigations | 20 |
| Sec. 19. | Actuarial valuations of assets and liabilities | 20 |
| **ARTICLE IV.** | **Membership** | **22** |
| Sec. 1. | Generally | 22 |
| Sec. 2. | Membership election option | 24 |
| Sec. 3. | Cessation of membership | 24 |
| Sec. 4. | Report on employees | 24 |
| **ARTICLE V.** | **Service Creditable** | **26** |
| Sec. 1. | Members to file statement of service, etc | 26 |
| Sec. 2. | Credit for service | 26 |
| Sec. 3. | Employees in military service | 26 |
| Sec. 4. | Verification of service claimed | 29 |
| Sec. 5. | Prior service certificates | 30 |
| Sec. 6. | Creditable service at retirement | 30 |
| **ARTICLE VI.** | **31** | |
| Part A — | Service Retirement Allowance | **31** |
| Sec. 1. | Petition for retirement, mandatory age | 31 |
| Sec. 2. | Amount of allowance – Old Plan Members | 34 |

# TABLE OF CONTENTS

(continued)

                                                                              **Page**

Sec. 2.1.    Amount of allowance – New Plan Members ................................................. 35

Sec. 2.2.    Pension Multiplier .................................................................................... 35

Sec. 3.      Disposition of surplus benefits upon death of beneficiary ............................ 36

Sec. 4.      Retirement allowance for certain persons leaving city employment
             after eight years service ............................................................................ 37

Part B —     Total Disability Pension and Retirement Allowances ................................... 39

Sec. 1.      Duty disability .......................................................................................... 39

Sec. 2.      Duty disability benefits; members in service on or after July 1, 1941
             but prior to January 1, 1969 ...................................................................... 40

Sec. 2.1.    Duty disability benefits; members beginning service on or after January 1,
             1969 ......................................................................................................... 41

Sec. 3.      Non-duty disability .................................................................................... 50

Sec. 4.      Benefits ..................................................................................................... 50

Part C —     Application, Escalation and Change in Compensation, Rank ....................... 51

Sec. 1.      Generally ................................................................................................... 51

Sec. 2.      Increase of Benefits .................................................................................... 52

Sec. 3.      Payment ..................................................................................................... 54

Part D —     Death Benefits ........................................................................................... 54

Sec. 1.      Generally ................................................................................................... 54

Part E —     Nonduty Death ........................................................................................... 56

Sec. 1.      Payment of accumulated contributions ........................................................ 56

Sec. 2.      Allowances to widows, etc .......................................................................... 57

Part F —     Termination of Membership Otherwise than by Retirement, Death or
             Becoming a Beneficiary ............................................................................. 59

Sec. 1.      Payment of benefits .................................................................................... 59

Sec. 2.      Payment of benefits .................................................................................... 60

Sec. 3.      Deferred vested benefits ............................................................................. 60

Part G —     Conviction of Felony .................................................................................. 60

Sec. 1.      Forfeiture of rights ..................................................................................... 60

Part H —     Option Elections ......................................................................................... 60

Sec. 1.      Generally ................................................................................................... 60

Sec. 2.      Disposition of surplus benefits upon death of member and beneficiary .......... 63

Part I —     Pension Offset by Compensation Benefits .................................................... 63

Sec. 1.      Generally ................................................................................................... 63

13-53846-swr   Doc 8704-1   Filed 12/15/14   Entered 12/15/14 09:27:34   Page 7 of 455
13-53846-tjt   Doc 6904   Filed 08/20/14   Entered 08/20/14 23:27:34   Page 906 of
632

Part J —        Monthly Payments .................................................................. 63

Part K —        Re-Examination of Beneficiaries ............................................ 63

Sec. 1.         Authority of Board ................................................................63

Part L —        Medical Board of Review ....................................................... 65

Part M —        Benefit Limitations ............................................................... 65

Part N —        Withdrawal of Accumulated Contributions ................................. 65

Sec. 1.         Member With Twenty or Twenty-Five Years of Service ...............65
Sec. 2.         Disabled Member ...................................................................65

ARTICLE VII.    Method of Financing .............................................................. 69

Sec. 1.         Annuity Savings Fund.............................................................69
Sec. 2.         Annuity Reserve Fund .............................................................70
Sec. 3.         Alternative Financing Method ..................................................70
Sec. 4.         Contributions to and payments from pension accumulation fund ..................76
Sec. 5.         Retiree payments from Pension Reserve Fund; reinstatement of
                disability retirees to active service ................................................77
Sec. 6.         Expense Fund ........................................................................77
Sec. 7.         Appropriations ......................................................................77
Sec. 8.         Maintenance of reserves ..........................................................77
Sec. 9.         Survivors Benefit Fund ............................................................78
Sec. 10.        Computation of annuity and pension reserve liabilities for members,
                retirants and beneficiaries .......................................................79
Sec. 11.        Determination of city's annual contribution — Disability pension
                liabilities.............................................................................82
Sec. 12.        Determination of city's annual contribution — Death pension
                liabilities.............................................................................82
Sec. 13.        Determination of city's annual contribution — Actuarial evaluation of
                annuity and pension reserve liabilities .........................................82
Sec. 14.        Determination of city's annual contribution — Service pension
                liabilities.............................................................................82
Sec. 15.        Board of trustees to compute city's annual contribution ...................83
Sec. 16.        Repealed...............................................................................83
Sec. 17.        Refunds for certain members .....................................................83

ARTICLE VIII.   Management of Funds ............................................................. 85

Sec. 1.         Board named Trustees for various funds ......................................85
Sec. 2.         Purchase, sale, etc., of securities and investments .........................85
Sec. 3.         Annual interest ......................................................................85
Sec. 4.         Custodian of funds ..................................................................85
Sec. 5.         Available funds shall be kept upon deposit ...................................86
Sec. 6.         Prohibition against reversion of funds to the City ..........................86
Sec. 7.         Enforcement; Civil Action ........................................................86

13-53846-tjwr  Doc 8704-1  Filed 12/15/14  Entered 12/15/14 09:27:34  Page 8 of 455
13-53846-swr  Doc 6904  Filed 08/20/14  Entered 08/20/14 19:09:43  Page 8 of
632

ARTICLE IX.     Miscellaneous ................................................................. 87

    Sec. 1.     Assignments prohibited ..........................................87
    Sec. 2.     Protection against fraud ...........................................87
    Sec. 3.     Errors.......................................................................87
    Sec. 4.     Recall of beneficiaries during emergencies ................87
    Sec. 5.     Limitation of other statutes ......................................88
    Sec. 6.     Tax Qualified Plan ...................................................89
    Sec. 7.     Definition of Compensation......................................89
    Sec. 8.     Limitation of Compensation .....................................90
    Sec. 9.     Limitation of Benefits ..............................................91
    Sec. 10.    Direct Rollovers .......................................................92

ARTICLE X.      Collective Bargaining Agreements ............................... 94

ARTICLE XI.     Compliance With USERRA ......................................... 95

ARTICLE XII.    Deferred Retirement Option Plan ................................. 96

ARTICLE XIII.   Participant Annuity Savings Fund Loan Program ....................................... 101

## § 24. Public pension plans and retirement systems, obligation.

Sec. 24. The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby.

Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities.

# ARTICLE 11.
## RETIREMENT PLANS

### Sec. 11-101.  City's Duties.

1.  The city shall provide, by ordinance for the establishment and maintenance of retirement plan coverage for city employees.

2.  Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and that funding shall not be used for financing unfunded accrued liabilities.

3.  The accrued financial benefits of active and retired city employees, being contractual obligations of the city, shall in no event be diminished or impaired.

### Sec. 11-102.  Continuation of Existing Plans.

The retirement plans of the city existing when this Charter takes effect, including the existing governing bodies for administering those plans, the benefit schedules for those plans and the terms for accruing rights to and receiving benefits under those plans shall, in all respects, continue in existence exactly as before unless changed by this Charter or an ordinance adopted in accordance with this article.

### Sec. 11-103.  Principles Applicable In Administering Plans.

Not more than two (2) governing bodies for administering the city's retirement plans may be established.

1.  The board of trustees of the general retirement system shall consist of:

    A.  The mayor;

    B.  A city council member selected by that body;

    C.  The city treasurer;

    D.  Five (5) members of the retirement system, to be elected by the members of the retirement system under rules and regulations as may be adopted by the board;  except that not more than one (1) trustee shall be elected from any department;

    E.  A citizen of the city who is neither an employee of the city nor eligible to receive benefits under the retirement system, appointed by the mayor, subject to approval of the Board; and

F. One (1) retirant, receiving benefits under the retirement system and elected by retired city employees under procedures established by ordinance.

2. The board of trustees of the police and fire retirement system shall consist of:

A. The mayor or in the absence of the mayor, a designee;

B. A city council member selected by that body;

C. The city treasurer;

D. The chief of police;

E. The fire commissioner;

F. Three (3) firefighters who are members of the retirement system elected by the firefighter members under the rules and regulations as may be adopted by the board. Trustees shall be:

1. Two (2) to be elected by and from members holding the rank of lieutenant (or equivalent) and lower ranks;

2. One (1) to be elected by and from members holding a rank above lieutenant (or equivalent);

G. Three (3) police officers who are members of the retirement system elected by police officer members under the rules and regulations as may be adopted by the board. Trustees shall be:

1. Two (2) to be elected by and from members holding the rank of lieutenant (or equivalent) and lower ranks;

2. One (1) to be elected by and from members holding a rank above lieutenant (or equivalent); and

H. Two retirants, receiving benefits under the retirement system, who shall be residents of the city, one elected by retired firefighters and one elected by retired police officers under procedures established by ordinance.

Staff services required by a governing body shall be provided as determined by the finance director.

## Sec. 11-104. Information Required Before Benefit Increase.

Before final action on any proposed change in future retirement benefits is taken, the city council shall obtain a report as to the immediate and long-term costs of the change from an independent actuary of its choosing and may not take final action until at least three (3) months after the report of the actuary is made public at a meeting of the city council.

x
13-53846-swr    Doc 8300-1    Filed 12/25/14    Entered 12/25/14 13:09:44    Page 12 of
13-53846-swr    Doc 8300-1    Filed 12/25/14    Entered 12/25/14 13:27:34    Page 51 of
455
632

**Sec. 11-105.   Audits.**

The board of trustees for the city retirement plans shall contract for annual independent audits.

**CHAPTER VII OF TITLE IX**
**OF THE**
**1918 CITY OF DETROIT CHARTER**
as amended and supplemented from time to time
by amendments to the Charter, City Ordinance and by Agreement

Including

**CHAPTER 54, ARTICLE II**
**OF THE**
**1964 DETROIT CITY CODE**
as amended and supplemented from time to time
by City Ordinance
which was saved from repeal by
Section 11-102 of the 1974, 1997, and 2012 Detroit City Charters
and incorporated by reference into, but not codified in,
Chapter 47 of the 1984 Detroit City Code

**Special Provisions**

**Sec. 1.     Freeze of Police and Fire Retirement System as of June 30, 2014.**

Notwithstanding anything in Chapter 47 of the 1984 Detroit City Code, or in Chapter 54, Article II of the 1964 Detroit City Code, or any ordinances, resolutions, or orders, or parts thereof, whether codified or not codified, or any collective bargaining agreement or other documents governing terms of employment to the contrary, effective as of June 30, 2014 (the "Freeze Date") –

(a)     No new employee hired by the City on or after July 1, 2014 shall become a member who is eligible to accrue a benefit under the terms of the Police and Fire Retirement System in effect as of the Freeze Date;

(b)     No employee who is rehired by the City on or after July 1, 2014 and who received a distribution of his accumulated employee contributions prior to July 1, 2014, shall become a member who is eligible to accrue a benefit under the terms of the Police and Fire Retirement System in effect as of the Freeze Date; *provided, however,* that if a member who is entitled to a Frozen Accrued Benefit as defined in subsection (d) of this Section 54-2-15 and who is rehired by the City on or after July 1, 2014 repays to the Police and Fire Retirement System in accordance with a payment schedule approved by the Board of Trustees the amount of accumulated employee contributions that he withdrew then such member shall be eligible to accrue service credit following rehire solely for the purpose of determining the member's eligibility for payment of his Frozen Accrued Benefit;

(c)     No member shall make contributions to the Annuity Savings Fund under the Police and Fire Retirement System in effect as of June 30, 2014 with respect to wages earned on or after July 14, 2014 and all member contributions made on or after July 14, 2014 shall be made to and in accordance with the terms of the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan;

(d)     Benefit accruals for members with respect to service rendered prior to July 1, 2014 will be frozen based on a member's years of service and Average Final Compensation and the pension multiplier formulae as of such Freeze Date ("Frozen Accrued Benefit");

(e)     Except as otherwise provided in this Section 54-2-15, compensation of a member shall be frozen effective as of the Freeze Date for purposes of determining the member's Frozen Accrued Benefit.  No compensation of any type earned by a member after the Freeze Date shall be taken into consideration for purposes of determining the member's Frozen Accrued Benefit under the Police and Fire Retirement System;

(f)     Any member who, as of June 30, 2014, would have been eligible to elect to use a portion of the unused accrued sick leave that he could have received in cash upon retirement ("Cashable Sick Leave") to increase his Average Final Compensation if the member had been eligible to retire and had elected to retire as of June 30, 2014, shall have a one-time election to have the value of twenty-five percent (25%) of the member's Cashable Sick Leave as of June 30, 2014 included in the computation of the member's Average Final Compensation for purposes of determining the member's Frozen Accrued Benefit ("Sick Leave Election"); provided, however, that the amount of the member's Cashable Sick Leave at the time the completed election form is received by the Retirement System is at least equal to the value of twenty-five percent (25%) of the member's Cashable Sick Leave as of June 30, 2014 and, provided further that the completed election form is received by the Retirement System no later than August 15, 2014. A member's Sick Leave Election shall be made in the manner set forth by the Board of Trustees and the Police and Fire Retirement System. Notwithstanding anything in this subsection (f) to the contrary, a member's Sick Leave Election will be void and the determination of the member's Average Final Compensation for purposes of calculating the member's Frozen Accrued Benefit will not take into account any of the member's Cashable Sick Leave, if (i) the electing member would not have been eligible to receive an immediate service retirement benefit if he retired as of June 30, 2014, and (ii) the electing member's employment with the City is terminated before the electing member becomes eligible for an immediate service retirement benefit under the Police and Fire Retirement System;

(g)     Service earned after the Freeze Date shall be credited to a member solely for purposes of determining a member's vesting in and eligibility for payment of his or her Frozen Accrued Benefit and to a rehired member solely for purposes of determining the member's eligibility for payment of his or her Frozen Accrued Benefit. Service credit for all members for benefit accrual purposes under the terms of the Police and Fire Retirement System in effect as of the Freeze Date shall be frozen effective as of the Freeze Date and no member shall earn service credit with respect to benefits payable under the terms of the Police and Fire Retirement System in effect as of the Freeze Date (except for vesting and benefit payment eligibility purposes) after the Freeze Date; and

(h)     Effective as of July 1, 2014, the Deferred Retirement Option Plan ("DROP") shall be closed to, and no longer a distribution option with respect the Frozen Accrued Benefit of, members who are represented by the Detroit Fire Fighters Association or the Detroit Police Officers Association and who, as of June 30, 2014, have not elected to participate in the DROP. The DROP shall remain in effect for all members who either have enrolled in or elected to participate in the DROP as of June 30, 2014. Further, for members who are represented by the Detroit Police

Command Officers Association and the Detroit Police Lieutenants and Sergeants Association who elect to participate in DROP after June 30, 2014, participation in DROP with respect to their Frozen Accrued Benefit shall be limited to five years.

The foregoing terms of Section 54-2-15 shall be referred to as the "Freeze" of the provisions of the Police and Fire Retirement System as in effect on the Freeze Date and the provisions of the Police and Fire Retirement System shall be interpreted and construed by the Board of Trustees and the Police and Fire Retirement System to give full effect to the Freeze. To the extent that a conflict arises between this Section 54-2-15 and other provisions in Chapter 54 of the 1964 Detroit City Code, or any Charter, ordinances, resolutions, or orders, or parts thereof, whether codified or not codified, or any collective bargaining agreement or other document governing terms of employment of an employee, the Board of Trustees and the Police and Fire Retirement System are directed to interpret any inconsistency or ambiguity to give full effect to the Freeze.

(Ord. No. 12-14, Sec. 54-2-15.)

**Sec. 2.  Limitation on Interest Crediting Rate for Police and Fire Retirement System Annuity Savings Fund; Rates of Regular Interest Adopted by Board for Actuarial Purposes.**

Notwithstanding anything in Chapter 47 of the 1984 Detroit City Code or in Chapter 54, Article II of the 1964 Detroit City Code, or any City Charter provision, ordinances, resolutions, or orders, or parts thereof, whether codified or not codified, or any collective bargaining agreement or other documents governing terms of employment to the contrary, effective as of June 30, 2014 for plan years beginning on and after July 1, 2014;

(a)     the annual rate of return credited to a member's account in the Annuity Savings Fund of the Police and Fire Retirement System of the City of Detroit shall be no less than zero and no greater than the lesser of (i) 5.25% or (ii) the actual investment return net of expenses of the System's invested reserves for the second fiscal year immediately preceding the fiscal year in which the annual return is credited; and

(b)     the rate(s) of regular interest adopted by the Board from time to time as necessary for the operation of the system on an actuarial basis shall not violate the plan for the adjustment of debts of the City of Detroit, as confirmed by an order of the United States Bankruptcy Court for the Eastern District of Michigan in the City's chapter 9 bankruptcy case (*In re City of Detroit, Michigan*, Case No. 13-53846).

(Ord. No. 13-14, Sec. 54-2-16.)

# ARTICLE I.

## Name and Date of Establishment.

A Pension System for Policemen and Firemen of the City of Detroit Police and Fire Departments is hereby established for the purpose of providing retirement allowances, death and survivor benefits for eligible police and fire employees and their beneficiaries. The effective date of this System is July 1, 1941. Upon the effective date of this Ordinance, the former *Policemen and Firemen Retirement System* shall be called the *Police and Fire Retirement System*. (Ord. No. 04-05, Sec. 54-43-1.)

---

## By Agreement

Defined Contribution Plan for Current and New Hires – The City reserves the right to design, establish, manage, amend, and implement a Defined Contribution Plan and related duty disability retirement provisions for current employees and new hires, which may include a Defined Contribution Retirement health care plan.

The City reserves the right to modify, amend, and/or eliminate any and all aspects of its pension/retirement plan(s), unless prohibited by law.[1]

---

_____
[1]     DPCOA (§ 41.O-R.).

# ARTICLE II.

## Definitions.

The following words and phrases as used in this amendment, unless a different meaning is plainly required by the context, shall have the following meanings:

Sec. 1. "System" shall mean the Police and Fire Retirement System of the City of Detroit created and established by Title IX, Chapter VII of the 1918 charter of the city as amended through June 30, 1974 and continued in effect by the provisions of the July 1, 1974 city charter. (Ord. No. 77-H, Sec. 54-2-1.)

The system consists of a defined benefit plan (having a pension accumulation fund and pension reserve fund) and a defined contribution plan (having an annuity savings fund and annuity reserve fund) and income and expense funds applicable to each of the plans.

Sec. 2. "Policemen" shall mean all employees of the Police Department who have taken the oath of office as prescribed in Section 12 of Chapter XXI of Title IV of the 1918 Detroit City Charter, and who shall be in the employ of the Police Department of the City of Detroit on the effective date of this amendment and all persons who shall take the said oath of office and become members of the Police Force thereafter, excluding Patrolmen of either departments, privately employed patrolmen and special patrolmen.

Sec. 3. "Firemen" shall mean all employees of the Fire Department employed therein prior to November 10, 1937, and all future employees whom the Board of Trustees shall designate as Firemen; provided, however, that employees inducted subsequent to November 10, 1937, and excluded from the provisions hereof by reason of their classification as civilian employees, shall become eligible for membership in the Retirement System for employees of the City of Detroit under Title IX, Chapter VI of the 1918 Detroit City Charter, and their inclusion under such System shall not affect the rights of any other member of the Fire Department.

Sec. 4. "Member" shall mean any member of the retirement system who has not retired. (Ord. No. 77-H, Sec. 54-2-1.)

Sec. 5. "City" shall mean the City of Detroit, State of Michigan.

Sec. 6. "The Council" shall mean the City Council of the City of Detroit.

(Per July 1, 1974 Charter, "The Council" means City Council of the City of Detroit.)

Sec. 7. "The Medical Director" shall mean the physician provided for in Article III, Section 12 (a) of this amendment.

Sec. 8. "Service" shall mean service as a Policeman or Fireman.

Sec. 9. "Prior service" shall mean service as an employee of the Police Department or Fire Department prior to the effective date of this amendment.

Sec. 10. "Membership service" shall mean the total service rendered as a Policeman or Fireman after the effective date of this amendment.

Sec. 11. "Beneficiary" shall mean any person, except a retirant, who is in receipt of a retirement allowance or pension payable from funds of the system. (Ord. No. 77-H, Sec. 54-2-1.)

Sec. 12. "Regular Interest" shall mean, for a period of five years from the effective date of the system interest at four per centum per annum, compounded annually. For the subsequent five year period, and each five year period thereafter "regular interest" shall be such rate of interest as the Board of Trustees, in its discretion, may determine and adopt.

Sec. 13. "Accumulated contributions" shall mean the sum of all amounts deducted from the compensation of a member and credited to his individual account in the Annuity Savings Fund, together with regular interest, as provided in Article VII and VIII of this amendment.

Sec. 14. "Average Final Compensation" shall mean:

(a) With respect to an "old plan member" the current maximum salary for the rank(s), grade(s) or position(s) held by the member over the sixty (60) months immediately preceding the date his employment with the city last terminated. The salary shall be obtained from the official compensation schedule for the fiscal year of the member's elective date of retirement **[and an average is determined[2]]**. A member who retires on or after July 1, 1998 shall have the member's most recent full longevity payment included in his average final compensation.

(b) With respect to a "new plan member" **[retiring on or after July 1, 1992[3]]** the current maximum salary for the rank(s), grade(s) or position(s) held by the member over the sixty (60) months immediately preceding the date his employment with the City last terminated. The salary shall be obtained from the official compensation schedule for the fiscal year of the member's elective date of retirement **[and an average is determined[4]]**. If more than one (1) rank, grade or position has been held over the sixty (60) month period, a weighted average is determined based on time spent in each rank, grade or position during this sixty (60) months period. (Ord. No. 18-93, Sec. 47-12.2-14(C).) A member who retires on or after July 1, 1998 shall have the member's most recent full longevity payment included in his average final compensation. Effective July 1, 2000, the average final compensation shall be calculated for members of the DPCOA, Executive members and their fire equivalents by using the current maximum salary for the rank(s), grade(s) or position(s) held by the member over the thirty-six (36) months immediately preceding the date his employment with the City last terminated.

---

[2] DPCOA (§ 41.D.1.); DPLSA (§ 51.D.1.).

[3] DPLSA (§ 51.D.2.).

[4] DPCOA (§ 41.D.2.); DPLSA (§ 51.D.2.).

Effective July 1, 1992, with respect to reduced duty disability retirements, on or after July 1, 1992, notwithstanding the provisions of Article VI, Part B, Section 2.1, for those members who receive benefits under Article VI, Part B, Section 2.1(a), the average final compensation used in the computation of the reduced duty disability allowance shall mean the maximum salary at the date of conversion to reduced duty disability retirement for the rank(s), grade(s), or positions(s) which were held by the member over the sixty (60) months prior to his or her duty disability retirement.  (Ord. No. 18-93, Sec. 47-12.2-14(E).)

For purposes of computing the average final compensation received by a member who retires on or after July 1, 2008, the member shall have the option of adding the value of the three year average of twenty-five percent (25%) of the member's unused accrued sick leave at the time of retirement to the earnings used in computing the Average Final Compensation.

## By Agreement

### Definition of Average Final Compensation

The average final compensation for "old plan" and "new plan" members **[or for "old plan" members and for "new plan" members retiring on or after [July 1, 1992[5] or July 1, 2000[6]]** is calculated by using the current maximum salary for the rank(s), grade(s) or position(s) held by the member over the sixty (60) months just prior to the member's elective date of retirement **[plus the amount of their most recent full longevity payment.  The salary is obtained from the Official Compensation Schedule for the fiscal year prior to the member's elective date of retirement and an average is determined[7]].[8]**

## DFFA

Effective July 1, 2000, for members with a parity relationship with the DPCOA Inspector, the average final compensation shall be calculated by using the current maximum salary for the ranks(s), grade(s), or position(s) held by the member over the thirty-six (36) months just prior to the member's elective date of retirement. The salary is obtained from the Official Compensation Schedule for the fiscal year prior to the member's elective date of retirement and an average is determined.

For members having a parity relationship with the DPLSA and the DPCOA Inspector, who retire on or after July 1, 1998 and for those having  a parity relationship with the DPOA who retire on or after July 1, 2000, the amount of the member's most recent full longevity payment shall be included in the definition of average final compensation.

---

[5]    DPOA (§ 33.J.)(does not include longevity pay for these members).

[6]    DPOA (§ 33.J.)(does include longevity pay for these members).

[7]    DPOA (§ 33.J.)(The longevity pay is included only for those members retiring on or after July 1, 2000.).

[8]    DFFA (§ 22.A.14.k.); DPOA (§ 33.J.).

All members who retire on or after July 1, 2008, may choose to receive the 3-year average of twenty-five percent (25%) of the unused accrued sick leave bank and have that sum included in the average compensation used to compute the members' service pension of their retirement allowance.[9]

---

**DPCOA**

---

Retirement and Death Sick Leave Payment

(1) Effective January 15, 2010, non-union uniformed Police and Fire executives shall receive full pay for one hundred percent (100%) of the unused accumulated sick bank amounts, or

(2) choose to receive the 3-year average of twenty-five percent (25%) of the unused accrued sick leave bank as provided in (1) above, and have that sum included in the average final compensation used to compute the member's service pension of their retirement allowance. For any member choosing to exercise this option, the lump sum payment the member will receive will be the remaining value of the unused accrued sick leave bank as provided in (1) above.[10]

---

**DPLSA**

---

(1) Effective July 1, 2008, a member shall receive full pay for eighty-five percent (85%) of the unused accumulated sick bank amounts, or

(2) choose to receive the 3-year average of twenty-five percent (25%) of the unused accrued sick leave bank as provided in 1) above, and have that sum included in the average final compensation used to compute the member's service pension of their retirement allowance. For any member choosing to exercise this option, the lump sum payment the member will receive will be the remaining value of the unused accrued sick leave bank as provided in 1) above.

---

Sec. 15. "Final compensation" shall mean the annual rate of earnable compensation of a member at the time of termination of employment. Effective July 1, 1992, compensation shall also include the value of the percentage reduction in compensation for non-union employees, pursuant to ordinance, resolution or executive order. In cases of any doubt regarding these values, the decisions of the Board of Trustees of the Policemen and Firemen Retirement System of the City of Detroit shall be controlling to implement the intention that no non-union employee will suffer a diminution of pension benefits computation due to reduction in compensation because of fiscal emergency and that pension benefits with respect to fiscal years beginning July 1, 1992 and thereafter should always be computed as if no reduction in compensation occurred

---

[9]     DFFA (§ 22.A.14.k.).

[10]    312 Award # 2, Union Issue No.5-Sick Bank Payout, pg. 20 (as articulated in a memorandum from Joseph P. Martinico, Labor Relations Director to the Detroit City Council, dated March 22, 2010 titled "Re: Implementation of Wage Increases and Fringe Benefit Changes for Non-Union Uniformed Police and Fire Executives").

due to ordinance, resolution or executive order or directive.  (Ord. No. 18-93, Sec. 47-12.2-14(D).)

Sec. 16.  "Annuity"  shall mean payments derived from the accumulated contributions of a member.  (Ord. No. 77-H, Sec. 54-2-1.)

Sec. 17.  "Accrued Service"  shall mean a member's credited service for employment rendered before the date of an actuarial valuation of the retirement system.  (Ord. No. 77-H, Sec. 54-2-1.)

Sec. 18.  "Pension"  shall mean the portion of a retirement allowance which is paid for by appropriations made by the City.  (Ord. No. 77-H, Sec. 54-2-1.)

Sec. 19.  "Retirement allowance"  shall mean the sum of the annuity and the pension.

Sec. 20.  "Retirement"  shall mean for any member that such member has retired, with a pension payable from the funds of the retirement system.

Sec. 21.  "Annuity reserve"  shall mean the present value of all payments to be made on account of any annuity, or benefits in lieu of any annuity, computed on the basis of such mortality tables and regular interest as shall be adopted by the Board of Trustees.

See. 22.  "Pension Reserve"  shall mean the present value of all payments to be made on account of any pension, or benefit in lieu of any pension, computed upon the basis of such mortality tables and regular interest as shall be adopted by the Board of Trustees.

Sec. 23.  "Merit Board"  shall mean the Police Merit Board established by section 14, of Chapter XXI, of Title IV, of the 1918 Detroit City Charter, as amended.

Sec. 24.  "Patrolman"  shall mean the rank in the Police Department currently known as patrolman.  (As amended November 5, 1968.  In effect January 1, 1969.)

Sec. 25.  "Fire-fighter"  shall mean the rank in the Fire Department currently classified by the civil service commission as fire-fighter.  (As amended November 5, 1968.  In effect January 1, 1969.)

Sec. 26.  "Board of trustees" or "board"  shall mean the board of trustees of the City of Detroit police and fire retirement system.  (Ord. No. 77-H, Sec. 54-2-1.)

Sec. 27.  "Decrement probabilities"  shall mean the probabilities of a member's withdrawal from City employment, death while in the employ of the City, retirement from City employment with a pension payable from funds of the retirement system, and death after retirement.  (Ord. No. 77-H, Sec. 54-2-1.)

Sec. 28.  "Salary factors"  shall mean the ratio between a member's rate of compensation as of the date of an actuarial valuation of the retirement system and his rate of compensation as of the date of his retirement.  (Ord. No. 77-H, Sec. 54-2-1.)

Sec. 29.  "Retirant" shall mean any member who has retired with a pension payable from funds of the retirement system.  (Ord. No. 77-H, Sec. 54-2-1.)

Sec. 30.  "Old plan" shall mean the plan originally created by Title IX, Chapter VII, Article IV, Section 1(A) and (B) of the 1918 City of Detroit Charter as amended through June 30, 1974 and continued in effect by Article 11, Section 102 of the July 1, 1974 City of Detroit Charter.  (Ord. No. 18-93, Sec. 47-12.6A-2.3.)

Sec. 31.  "New plan" shall mean the plan originally created by Title IX, Chapter VII, Article IV, Section 1(D) of the 1918 City of Detroit Charter as amended through June 30, 1974 and continued in effect by Article 11, Section 102 of the July 1, 1974 City of Detroit Charter.  (Ord. No. 18-93, Sec. 47-12.6A-2.3.)

Sec. 32.  The masculine pronoun shall include the feminine pronoun.

(1918 Detroit City Charter, Title IX, Ch. VII, Art. II.)

# ARTICLE III.

## Administration; Board of Trustees.

### Sec. 1.    Board created.

There is hereby created a Board of Trustees of the System, in which is vested the general administration, management and responsibility for the proper operation of the System and for making effective the provisions of this amendment.  The Board of Trustees shall be organized immediately after five of the Trustees, provided for in this article, shall have qualified and taken the oath of office. (1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 1.)

### Sec. 2.    Membership of Board.

The Board of Trustees shall consist of seventeen (17) Trustees as follows:

(1)    The Mayor of the City or his delegate, or his or her designated representative, ex-officio;

(2)    The President of the City Council or another member of the Body elected by the City Council, ex-officio;

(3)    The City Treasurer, or Deputy City Treasurer, ex-officio;

(4)    The Finance  Director, or a designated representative, ex-officio;

(5)    The Budget Director, or a designated representative, ex-officio;

(6)    The Corporation Counsel, or a designated representative, ex-officio;

(7)    Three (3) firefighters who are members of the System to be elected by the Firemen members as follows:

    (a)    Two (2) to be elected by and from the members holding the rank of lieutenant, or its equivalent, and lower ranks; and

    (b)    One (1) to be elected by and from the members holding ranks above the rank of lieutenant, or its equivalent;

(8)    Three (3) police officers who are members of the System to be elected by the Policemen members, as follows:

    (a)    Two (2) to be elected by and from the members holding the rank of lieutenant, or its equivalent, and lower ranks; and

    (b)    One (1) to be elected by and from the members holding a rank above the rank of lieutenant, or its equivalent;

(9)    One (1) trustee who neither is a participant in the plan nor employed by the City in any capacity and is selected by the Board;

(10)    Two (2) retirees who are receiving benefits under the System, are residents of the City of Detroit, and are elected in accordance with Section 5 of this Article, as follows:

    (a)    One (1) to be elected by retiree police officers; and

    (b)    One (1) to be elected by retiree firefighters;

(11)    Upon election of a retiree police officer trustee, the Mayor shall designate one (1) non-participating trustee; and

(12)    Upon election of a retiree firefighter trustee, the Mayor shall designate one (1) non-participating trustee.

(Ord. No. 07-12, Sec. 54-2-8.1; Ord. No. 19-93, Sec. 47-9-1; Ord. No. 339-H, Sec. 54-2-9.)

---

## By Agreement

(a)    The Board of Trustees shall consist of twelve (12) trustees, as follows:

(1)    The Mayor of the City or his/her designated representative, ex-officio.

(2)    The President of the City Council, or another member thereof elected by the City Council, ex-officio.

(3)    The City Treasurer or Deputy City Treasurer, ex-officio.

(4)    The Finance Director or designated representative, ex-officio.

(5)    The Budget Director or designated representative, ex-officio.

(6)    The Corporation Counsel or designated representative, ex-officio.

(7)    Three (3) Firefighters who are members of the system to be elected by the Firefighter members under such rules and regulations as may be established by the Fire Commissioner to govern such elections.  Such trustees shall consist of:

    a.    Two (2) to be elected by and from members holding the rank of Lieutenant (or its equivalent) and lower ranks.

    b.    One (1) to be elected by and from the members holding rank above the rank of Lieutenant (or its equivalent).

(8) Three (3) Police Officers who are members of the system to be elected by the Police Officer members under such rules and regulations as may be established by the Police Chief to govern such elections. Such trustees shall consist of:

   a. Two (2) to be elected by and from the members holding the rank of Lieutenant (or its equivalent) and lower ranks.

   b. One (1) to be elected by and from the members holding ranks above the rank of Lieutenant (or its equivalent).

(b) Annual elections shall be held in the Police and Fire Departments during the month of May to elect a trustee to fill the vacancy created by the expiration of a term.

   In each such election the members entitled to vote shall be those of classes provided above, the term of whose representative is about to expire. The terms of office for all elected trustees shall be three (3) years. Elected trustees holding office on the effective date of this provision shall serve the remainder of their term.

(c) Deadlock and thirteenth trustee: **[Effective September 1, 2011,[11]**] an additional thirteenth trustee, who may not be a participant in the plan or employed by the City in any capacity, shall be selected by the Board of Trustees. Such trustee shall serve as a full member of the Board of Trustees and vote on any and all matters considered by the Board. This thirteenth member of the Board of Trustees, and successors, shall serve as a member for two (2) years from the date of selection.

(d) Equal number of participant trustees and non-participant trustees: **[Effective September 1, 2011,[12]**] under no circumstances shall the number of trustees on the Board of Trustees who are participants in the plan exceed the number of non-participant trustees named in paragraphs A.1 through A.6 herein. The Mayor of the City shall designate an additional trustee or trustees pursuant to subparagraph A.1 as necessary to maintain compliance with these provisions.[13]

---

| DPCOA |
|---|

The City reserves the right to change the composition, structure and decision making procedures of the Pension Board.[14]

---

[11] DPOA (§ 46.J.).

[12] DPOA (§ 46.K.).

[13] DFFA (§ 21.); DPCOA (§ 42.); DPLSA (§ 56.); DPOA (§ 46.).

[14] DPCOA (§ 42.E.).

**Sec. 3.** **Terms of Active Trustees, Trustee Selected by Board, Retirant Trustees, and Trustees Designated by Mayor.**

    (a)    The term of office for elected active trustees under Sections 2(7) and (8) of this Article shall be three (3) years. Elected trustees holding office on the effective date of this section shall serve the remainder of their term.

    (b)    The term of office for the trustee who is selected by the Board under Section 2(9) of this Code shall be two (2) years from the date of selection.

    (c)    Except as otherwise provided in Section 4(c), the term of office for elected retirant trustees under Section 2(10) of this Article shall be three (3) years.

    (d)    The term of office for trustees who are designated by the Mayor under Sections 2(11) and 2(12) of this Article shall be three (3) years.

    (Ord. No. 14-14, Sec. 54-2-8.2; Ord. No. 07-12, Sec. 54-2-8.2)

**Sec. 4.** **Scheduling of Elections for Active and Retirant Trustees.**

    (a)    For active police and firefighters, annual elections shall be held in the Police and Fire Departments during the month of May to elect a trustee to fill the vacancy created by the expiration of a term.

    (b)    For retirants;

        (1)    The first election to elect the two (2) retirant trustees shall be held sixty (60) days after the effective date of this section; and

        (2)    After the first election, an election shall be conducted every three (3) years during the Month of May to fill vacancies created by the expiration of a term.

    (c)    A special election for retirant trustees shall be held as soon as practicable after the plan for the adjustment of debts of the City of Detroit is confirmed by an order of the United States Bankruptcy Court for the Eastern District of Michigan in the City's chapter 9 bankruptcy case (*In re City of Detroit, Michigan*, Case No. 13-53846). Notwithstanding anything in Section 3(c) to the contrary, unless a retirant trustee elected by reason of this special election resigns or is removed from the position of trustee in accordance with the terms of the governing documents for the retirement system, a retirant elected to the office of trustee in the special election shall be eligible to serve a full term of three (3) years from the date of the special election, plus such period of time until the first month of May that follows the third anniversary of the special election, at which time an election for retirant trustees shall be held in accordance with Section 5.

    (Ord. No. 14-14, Sec. 54-2-8.3; Ord. No. 07-12, Sec. 54-2-8.3)

## Sec. 5.  Procedures for Election of Retiree Trustees.

The procedures for the election of the retiree trustees shall be as follows:

(a) *Notice*. A notice of a primary election shall be sent to each retiree of the System by Unites States mail;

(b) *Nominating petitions*. No candidate's name shall be placed on the primary election ballot, unless a nominating petition containing the signatures of at least one hundred and twenty-five (125) retirees of the System is filed with the Secretary of the Board. The form of the nominating petition, the filing of the petition, and the procedure for verification of signatures shall be in accordance with rules and regulations adopted by the Board;

(c) *Ballot*. Each candidate whose name appears on the ballot at any election held for the Office of Retiree Trustee shall be identified by the title of the position held at the time of retirement and the word "incumbent" where the candidate is a current trustee seeking re-election. No ballot shall contain any organizational or political designation or mark. Rotation and arrangement of names on the ballot shall be in accordance with the rules and regulations of the Board;

(d) *Voting*. Procedures regarding mailing of ballots, poll lists, custody of ballots, marking of ballots, return of ballots, handling of return envelopes received, and sealed ballot boxes shall be the same procedures as adopted and followed by the Board in the immediately preceding election of an active employee trustee;

(e) *Procedures*. Procedures regarding the selection and certification of successful candidates for nomination, the selection of trustees from nominees, the votes, and the destruction of ballots shall be the same procedures as adopted and followed by the Board in the immediately preceding election of an active employee trustee; and

(f) Any matters relative to election of the retiree members of the Board not covered by this section shall be according to such rules and regulations as the Board may adopt.

(Ord. No. 07-12, Sec. 54-2-8.4; Ord. 56-H, Sec. 54-3-3.1.)

## Sec. 6.  Vacancies.

If a vacancy occurs in the office of Trustee from any cause other than expiration of a term, the vacancy for the unexpired term shall be filled within sixty days of the date of said vacancy in the same manner as the office was previously filled. No vacancy shall result by reason of change in rank or grade of a Trustee during his term of office. (1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 3.)

### Sec. 7.    Compensation.

All members of the Board of Trustees shall serve without additional compensation from the City, but they shall be reimbursed from the Expense Fund for all necessary expenses incurred through service on the Board of Trustees.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 4.)

### Sec. 8.    Oath.

Each Trustee shall, within ten days after his appointment or election, take an oath of office to be administered by the City Clerk.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 5.)

### Sec. 9.    Meetings.

(a)    The Board of Trustees shall hold meetings regularly, at least one in each month, and shall designate the time and place thereof.  It shall adopt its own rules of procedure, including provisions for special meetings and notice thereof and shall keep a record of its proceedings.  All meetings of the Board of Trustees shall be public.

(b)    Each Trustee shall be entitled to one vote in the meetings of the Board of Trustees.  Five members of the Board of Trustees, three of whom must be elected members, shall constitute a quorum and a majority of concurring votes shall be necessary for a decision by the Trustees at any meeting of the Board of Trustees.

(1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 6.)

### Sec. 10.    Rules for administration of funds.

Subject to the limitations contained in this amendment, the Board of Trustees shall, from time to time, establish rules and regulations for the administration of the funds created by this amendment and for the transaction of its business.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 7.)

### Sec. 11.    Officers.

The Board of Trustees shall elect from its membership a Chairman and a Vice Chairman. The City Controller or his representative, shall be ex-officio Secretary of the Board of Trustees. The Board of Trustees may employ, and fix the compensation of such special actuarial, medical and other employees as shall be required.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 8.) (Historical Reference:  the words "and subject to the approval of the Common Council" after the word "employ" in the last sentence were deleted pursuant to Public Act 55 of 1982 effective April 6, 1982.)

### Sec. 12.   Data for actuarial valuation of funds.

The Board of Trustees shall keep, or cause to be kept, in convenient form, such data as shall be necessary for the actuarial valuation of the various funds of the System and for checking and compiling the experience of the System.  The ordinary actuarial, accounting and clerical services for the operation of the System shall be performed by the employees of the Retirement System provided for by Chapter VI of Title IX of the 1918 Detroit City Charter.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 9.)

### Sec. 13.   Record of proceedings; annual report.

The Board of Trustees shall keep a record of all its proceedings, which shall be open to public inspection.  It shall render a report to the Mayor and the City Council on or before the fifteenth day of July, showing the fiscal transactions of the System for the year ending on the preceding thirty-first day of December, the amounts of accumulated cash and securities in the various funds of the System, and the last balance sheet showing the financial condition of the System by means of an actuarial valuation of the assets and liabilities of the System.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 10.)

### Sec. 14.   Legal advisor.

    (a)    The Board of Trustees shall appoint a legal counsel who shall be directly responsible to and shall hold office at the pleasure of the Board of Trustees.  The appointment shall be made jointly with the Board of Trustees of the General City Retirement System.

    (b)    The legal counsel to the Board of Trustees shall be an attorney licensed to practice law in the State of Michigan and shall be experienced in matters relating to pension systems.  The qualifications of candidates for the position shall be examined by the Board of Trustees.

    (c)    The legal counsel to the Board of Trustees shall have such duties relative to pension matters as shall be assigned by the Board of Trustees.

    (d)    Costs and expenses relative to the position of legal counsel to the Board of Trustees shall be payable out of the earnings of the system, subject to approval of the City Council.

    (Ord. No. 65-H, Sec. 54-2-10.)

### Sec. 15.   Medical Director.

    (a)    The Board of Trustees shall appoint as Medical Director the Medical Director of the Retirement System provided for by Chapter VI of Title IX of the 1918 Detroit City Charter.

    (b)    The Medical Director shall arrange for and pass upon all medical examinations required under the provisions of this amendment; shall

investigate all essential statements and certificates by or on behalf of a member in connection with application for disability retirement and in connection with all applications for death benefits, and shall report in writing to the Board of Trustees his conclusions and recommendations on matters referred to him.

(c)      If the Board of Trustees, any member, any beneficiary or any other person claiming, benefits hereunder, shall disagree with any medical finding of the Medical Director, the Board of Trustees on its own motion may or on petition of any such member, beneficiary or person claiming benefits hereunder, shall refer the matter in dispute to a Medical Board of Review consisting of three physicians or surgeons, of whom one shall be named by the Board of Trustees, one by the affected member, beneficiary, or other person claiming benefits, and the third by the two so named. The Medical Director shall in no case be a member of the Board of Review. Such Board of Review shall be named within ten days after the filing of such petition. The Board of Review shall promptly examine the medical findings in dispute and shall within sixty days from its appointment file with the Board of Trustees a written report of its findings, which shall be final and binding as to the medical findings. The reasonable expenses of such Board of Review shall be paid from the Expense Fund.

(1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 12.)

## Sec. 16.  Actuary of Retirement System technical advisor to Board.

The actuary of the Retirement System shall be selected by the Board of Trustees and, shall be the technical advisor to the Board of Trustees on matters regarding the operation of the funds created by the provisions of this amendment and shall perform such other duties as are required in connection therewith. (1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 13.)

## Sec. 17.  Investigation of mortality, service and compensation experience of members.

Immediately after the establishment of the System, the Board of Trustees shall authorize such investigation of the mortality, service and compensation experience of the members as the actuary shall recommend and, on the basis of such investigation, the actuary shall recommend for adoption by, the Board of Trustees such tables and such rates as are required in Section 18, Paragraphs (a) and (b) of this Article. The Board of Trustees shall adopt tables and certify rates, and, as soon as practicable thereafter, the actuary shall make a valuation, based on such tables and rates, of the assets and liabilities of the various funds of the Retirement System created by this Charter amendment. (1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 14.)

Effective as of July 1, 1984, for purposes of determining a benefit which is actuarially equivalent to any other benefit, the actuarial reserve required to provide the benefit must be equal to the actuarial reserve required to provide such other benefit computed on the basis of the actuarial rates, tables and procedures outlined below:

| | |
|---|---|
| interest rate: | 6 ½% for joint and survivor benefits, and 5% for all other benefits |
| mortality table: | 1971 group annuity mortality table assuming a 90% male and 10% female mix |

No adjustment in a determination of an actuarially equivalent value or amount shall be made if such tables, rates and procedures are changed subsequent to such determination. (Historical reference: de facto operation July 1, 1984. See also: June 26, 1986 Board resolution.)

## Sec. 18.    Regular actuarial investigations.

At least once in each five year period, the Board of Trustees shall cause an actuarial investigation to be made into the mortality, service, and compensation experience of the members and beneficiaries of the Retirement System, and shall make a valuation of the assets and liabilities of the funds of the Retirement System, and on the basis of such investigation and valuation, the Board of Trustees shall:

(a)    Certify the rates of contributions payable by the members under the provisions of this Charter amendment;

(b)    Certify the rates of contribution payable by the City on account of new entrants into the retirement system at various ages;

(c)    Adopt for the Retirement System a regular rate of interest as defined in Article II, Section 12 of this Charter amendment.

(1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 15.)

## Sec. 19.    Actuarial valuations of assets and liabilities.

On the basis of such tables, adopted by the Board of Trustees under the provisions of Section 18 of this Article, the Board of Trustees shall cause to be made an actuarial valuation of the assets and liabilities of the funds of the System created by this amendment. (1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 16.)

─────────────────────────   **By Agreement**   ─────────────────────────

Within fifteen (15) days of the effective date of this CET, the Pension Board shall provide to the Mayor and City Council all pension plan documents, including but not limited to: Plan Documents, Plan Amendments, Favorable Determination Letters (Pension Only), Summary Plan Descriptions, All Summaries of Material Modifications, Model Enrollment Forms, Insurance Contracts, All Funding/Actuarial Reports, All Explanations provided to Participants/Employees such as "Benefits at a Glance" and/or other summaries. The Pension Board shall provide to the Mayor and City Council all future amendments to any such documents within five (5) days of the

amendment.[15]

---

[15] DPCOA (§ 42.E.); DPOA (as modified by 312 Award # 1, Issue # 96, pg. 59).

# ARTICLE IV.

## Membership.

### Sec. 1.    Generally.

The membership of the System shall consist of the following:

(a)    All Policemen and Firemen, as defined in sections 2 and 3 of Article II, who are in service on or after July 1, 1941, but prior to January 1, 1969; provided, however, that any Policeman or Fireman who, on or before July 1, 1941, shall have been in the employ of the Police or Fire Department for a period of twenty years, or who shall have a total of twenty years of creditable service, shall be excluded from the provisions hereof and shall retain for himself, wife, children, dependent mother and dependent sister all rights and privileges provided by Chapters XV and XXI of title IV of the 1918 Detroit City Charter, unless such Policemen or Firemen, on or before June 1, 1941, shall file with the City Controller his written election to become a member of the System, in which event he shall be a member; such excluded Policeman not electing to become members, from and after July 1, 1941, while they remain active members of the Police Department, shall pay five per cent of each salary payment into the fund for retired Policemen, and such excluded Firemen not electing to become members, from and after July 1, 1941, while they remain active members of the Fire Department, shall pay five per cent of each salary payment into the Fire Department Pension and Retirement Fund, and such salary contributions shall hereafter be used toward the payments of retirement allowances provided for under Chapter XV. section 14, subsections (1), (2), and (3) thereof.  On retirement, the contributions of such excluded members shall cease.

(b)    All persons who become Policemen or Firemen on or after July 1, 1941, but prior to January 1, 1969, and who are confirmed as Policemen or Firemen according to the rules and regulations of the respective Departments shall thereupon become members of the System; subject, however, to the following provisions:

(1)    Any person who shall become a Policeman or Fireman at an attained age of thirty-one years or more may become a member of the System only by vote of the Board of Trustees who shall fix the rate of contribution of such member on a basis recommended by the Actuary for the attained age of such member.

(2)    Any appointive official of the Police Department or Fire Department appointed from the membership thereof shall be permitted to remain a member of the System, paying contributions and entitled to

benefits as though he had remained in the rank, grade or position held at the date of his appointment.

(3)     Any Policeman or Fireman who, prior to being confirmed, shall be killed or totally incapacitated as the result of the performance of active duty, shall he deemed to have been a member of the System.

(c)     Any member as defined in paragraph (a) or (b) of this section who shall be transferred to a civilian position in his department shall continue as a member, subject to all the obligations of a member.

(d)     All persons who become Policemen or Firemen on, or after January 1, 1969, and who are not individuals re-employed with the police and fire departments on or after January 1, 1969, and who are confirmed as policemen or firemen according to the rules and regulations of the respective departments shall thereupon become members of the system subject, however, to the following provisions:

(1)     Any person who shall become a Policeman or Fireman at an attained age of thirty-one years or more may become a member of the system only by vote of the Board of Trustees who shall fix the rate of contribution of such member on a basis recommended by the actuary for the attained age of such member.

(2)     Any appointive official of the Police Department or Fire Department appointed from the membership thereof shall be permitted to remain a member of the system, paying contributions and entitled to benefits as though he had remained in the rank, grade or position held at the date of his appointment.

(3)     Any Policeman or Fireman who, prior to being confirmed, shall be killed or totally incapacitated as the result of the performance of active duty, shall be deemed to have been a member of the system.

(4)     Any member as defined in section 1 (a), (b), or (c) of this article who was separated from service by resignation or dismissal or discharge who subsequently again becomes a member shall be considered a member for all purposes under this chapter under section 1 (a), (b), or (c) of this article and shall not be considered a member under section 1 (d) of this article.

(5)     Any member as defined in section 1 (d) of this article who shall be transferred to a civilian position in his department shall continue as a member, subject to all the obligations of a member.  (As amended November 5, 1968.  In effect January 1, 1969.)

(1918 Detroit City Charter, Title IX, Ch. VII, Art. IV, § 1.)

## Sec. 2. Membership election option.

Any person who is a member as defined in section 1 (a), (b), or (c) of this article who is in active service on January 1, 1969, shall have the option to elect to become a member of the system as defined in section 1 (d) of this article by filing his written election with the board of trustees on or before January 31, 1969, or any retirant retired on or before December 31, 1968, under the provisions of article VI, part B, section 2, who later returns to active service shall have the option to elect to become a member of this system as defined in section 1 (d) of this article; by filing his written election with the board of trustees on or before thirty days after his return to active service. The election shall be effective on the date that it is filed with the Board of Trustees. (As amended November 5, 1968. In effect January 1, 1969.) (1918 Detroit City Charter, Title IX, Ch. VII, Art. IV, § 2.)

## Sec. 3. Cessation of membership.

    (a)    Should a member die or become a beneficiary or be separated from service by resignation, dismissal, or disability, he shall thereupon cease to be a member.

    (b)    Any person who became a member under section 1 (a), (b), or (c) of this article and ceases to be a member, as provided in section 3(a) of this article, and who later becomes a policeman or fireman, shall again become a member of the system, under section 1 (a), (b), or (c) of this article subject to the provisions of article VII, section 1 (d).

    (c)    Any person who became a member under section 1 (d) of this article and ceases to be a member, as provided in section 3(a) of this article, and who later becomes a policeman or fireman, shall again become a member of the system under section 1(d) of this article, subject to the provisions of article VII, section 1(d). (As amended November 5, 1968. In effect January 1, 1969.)

(1918 Detroit City Charter, Title IX, Ch. VII, Art. IV, § 3.)

---

**By Agreement**

---

Any member of the Policemen and Firemen Retirement System from the Fire Department who retires as a member of that System and who later is rehired as a civilian member of the Fire Department may elect to again become a member of the System.[16]

---

## Sec. 4. Report on employees.

It shall be the duty of the City Controller to submit to the Board of Trustees a statement showing the name, title, compensation, duties, date of birth, and length of service of each

---

[16] DFFA (§ 22.A.14.o.).

- 24 -

13-53846-swr    Doc 8300-1    Filed 02/25/14    Entered 02/25/14 13:09:42    Page 37 of
13-53846-swr    Doc 6008-1    Filed 06/30/14    Entered 06/30/14 23:27:34    Page 330 of
655
632

member, and such other information as the board of trustees may require. (As amended November 5, 1968. In effect January 1, 1969.) (1918 Detroit City Charter, Title IX, Ch. VII, Art. IV, § 4.)

# ARTICLE V.

## Service Creditable.

### Sec. 1.  Members to file statement of service, etc.

Under such rules and regulations as the Board of Trustees shall adopt, each Policeman and Fireman who shall become a member on the effective date of this amendment shall file a detailed statement of all prior service rendered by him as an employee of the Police Department or Fire Department, for which he claims credit, and of such other facts as the Board of Trustees may require, for the proper operation of the System.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. V, § 1.)

### Sec. 2.  Credit for service.

The Board of Trustees shall fix and determine by appropriate rules and regulations how much service in any year is equivalent to a year of service, but in no case shall less than six months' service constitute one year, nor shall more than one year of service be creditable for all service in one calendar year.  The Board of Trustees shall not allow credit as service for any period of more than one month during which the member was or shall be absent without pay provided that if a member shall be transferred from his Department payroll to the payroll of any City, County or State government or the Federal Government, by his Department Head, during peace times, then such member shall continue to be a member of the System and shall he required to make regular contributions into the Annuity Savings Fund; and provided further, that if a member, so transferred, shall fail to make such contributions for three consecutive months, he shall cease to be a member of the System four months (of 31 days each) after the due date of his first defaulted annuity contribution; and provided further, that any member who was or shall be suspended from duty and subsequently reinstated to duty without further disciplinary action, shall receive total credit for the time of such period or periods of suspension.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. V, § 2.)

### Sec. 3.  Employees in military service.

(a)     If a member of the System was or shall be drafted, or enlisted or shall enlist into military, naval, marine, or other service of the United States Government during time of war, or if a member shall be drafted into such service during time of peace, and within ninety days from the date of his separation from such government service or from the date peace was or shall be established by treaty, whichever date was or shall be earlier, resumed or shall resume employment as a Policeman or Fireman, then such government service shall be credited to him as a member of the System.  During the period of such government service of a member, his contributions to the Annuity Savings Fund shall be suspended and the balance in the Annuity Savings Fund, standing to his credit as of the last payroll date preceding his leave of absence from the service of his Department shall be accumulated at regular interest.  Even though the applicant may be unable to satisfy all the foregoing requirements, the

Board of Trustees shall have the power to grant the privileges provided for by this section in exceptional or extraordinary cases.

(b)     A member on the City payroll on or after January 1, 1979 who, prior to employment in the city service, was called to or entered or is called to or enters any full time military service of the United States during time of war, period of compulsory military service, or period of unusual emergency as defined in this ordinance, shall have the required period of active duty credited him as membership service, subject to the following conditions and limitations:

(1)     The member files a written election with the Board of Trustees, within 180 days following the effective date of this ordinance or 180 days from the date of his first employment in the city service, whichever is most recent, to claim military service credit under the provisions of this section.  A member who is included in a collective bargaining unit shall file a written election to claim military service credit with the Board of Trustees within 180 days following the date of a negotiated approval and acceptance of this section by his duly authorized bargaining agent as transmitted to the Board of Trustees by the Labor Relations Director or, in the case of members hired subsequent to the transmittal of approval and acceptance by his duly authorized bargaining agent, within 180 days from the date of his first employment in the city service.

(2)     The member furnishes the Board of Trustees such information as the Board of Trustees determines necessary to verify the amount of military service claimed.

(3)     The member pays to the Pension Accumulation Fund of the Retirement System an amount of five (5) percent of the member's annual rate of compensation at the time of payment multiplied by the years or parts of years of military service claimed.

(4)     The required payment shall be made under one of the following options:

a.     Payment in full within 30 days of the election to claim military service.

b.     Payment in equal bi-weekly installments by payroll deduction over a 36 month period starting 30 days following the election to claim military service.  Interest shall accrue during the period of installment payments at the compound rate of 5 percent per annum.  Payments must be completed prior to application for retirement.

c.     If a member has sufficient funds in the principal portion of his annuity, he may authorize the Pension Bureau to transfer such

funds to the Pension Accumulation Fund to meet the required payment.

(5)     In the event a member, who has filed the required election of this benefit, and who would be eligible for a pension in all respects except for paying the full amount, dies prior to completion of the payment required in Item (4) preceding, the person otherwise entitled to a retirement allowance may pay the full amount due within 30 days of the member's death to become eligible for on additional pension credit under this section.

(6)     Military service credited under the provisions of 54-30-3(c) shall not be claimed or credited under the provisions of this section.

(7)     Military service which is or will be the basis of service credit under any other public employee retirement program shall not be claimed or credited under the provisions of this section.

(8)     In no case shall more than 3 years of pre-employment military service be credited a member on account of military service.  For the purpose of this limitation, military service credited pursuant to Section 54-30-3(a) shall be combined with military service created pursuant to this section.

(9)     The required payments made to the Pension Accumulation Fund for military service credit pursuant to this section shall, upon application by the member or his estate, be returned without interest to any member who dies or leaves City employment prior to being eligible for a pension.

(10)     Only honorable military service during the following periods:

World War II — December 8, 1941 to July 1, 1946.

Korean Conflict — June 27, 1950 to December 31, 1953.

Vietnam Conflict — August 5, 1964 to May 7, 1975, are applicable to this section.

(11)     The military service credit pursuant to this section shall not apply toward meeting the minimum service and age requirements for vesting, for a non-duty disability pension or for a service pension.  Such service credit may be used in meeting the minimum time needed for an automatic Option Two Pension in case of death of a member.

(12)     In no case shall benefits be based on the military service credit provided by this section unless the member shall have been credited a minimum of eight years of service credit not including military service credit.

(13)     Special service, contractual, part time, seasonal and summer camp employees are not eligible for the military service credit.

(14)     In cases of doubt, the Board of Trustees will determine whether a member is entitled to the benefits of this section consistent with the requirements and limitations herein.

(Ord. No. 356-H, Sec. 54-30-3(b).)

**By Agreement**

## Military Service Credit

Any member of the bargaining unit who performed military service prior to employment by the City of Detroit and inclusion in the pension systems may claim service credit as a member of the retirement systems for time spent in the military service in accordance with Ordinances 356-H and 357-H of the Ordinances of the City of Detroit.

**[This provision will be retroactive to July 1, 1983.[17]]**

Effective December 15, 2008, any member who has performed any honorable military service may claim up to thirty-six (36) months service in the pension for time spent in the military. However, those provisions in Ordinance 356-H of the Ordinance of the City of Detroit that required the member to purchase this military service credit are not modified by this change.[18]

**DPOA**

Effective March 8, 2007, all bargaining unit members who have served in the military may purchase a maximum of three (3) years pension time.[19]

### Sec. 4.     Verification of service claimed.

Subject to the above restrictions and to such other rules and regulations as the Board of Trustees may adopt, the Board of Trustees shall verify, as soon as practicable after the filing of such statements of service, the service therein claimed.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. V, § 4.)

---

[17]     DPCOA (§ 40.B.); DPLSA (§ 49.B.).

[18]     DFFA (§ 22.A.14.n.); DPCOA (§ 40.); DPLSA (§ 49.).

[19]     DPOA (§ 33.T.).

## Sec. 5.    Prior service certificates.

Upon verification of the statements of service, the Board of Trustees shall issue prior service certificates, certifying to each member the length of prior service rendered, with which he is credited.  A prior service certificate shall be final and conclusive for retirement purposes as to such service; provided, however, that within one year from the date of issuance or modification of such certificate the Board of Trustees on its own motion or on the request of a member may modify or correct his prior service certificate.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. V, § 5.)

## Sec. 6.    Creditable service at retirement.

Creditable service at retirement, on which the retirement allowance of a member shall be based, shall consist of the membership service rendered by him and if he has a prior service certificate, in full force and effect, the amount of service certified thereon.  (As amended November 5, 1968.  In effect January 1, 1969.)  (1918 Detroit City Charter, Title IX, Ch. VII, Art. V, § 6.)

# ARTICLE VI.

## Part A — Service Retirement Allowance

### Sec. 1. Petition for retirement, mandatory age.

(a)     Any member as defined in article IV, section 1 (a), (b), or (c) in service may file with the Board of Trustees his written application for retirement setting forth on what date not less than fifteen days nor more than ninety days subsequent to the filing thereof, he desires to be retired; and provided the Board of Trustees shall determine that the member, at the date so specified or his retirement will have a total of twenty-five years or more of creditable service he shall on the date specified be retired, notwithstanding that during such period of notification he may have separated from service.

Provided, further, that in the case of any fireman as defined in article IV, section 1 (a), (b) or (c) having served twenty-five years or more of creditable service, upon recommendation of the Board of Fire Commissioners, the fireman shall be retired forthwith, by the Board of Trustees.

(b)     Any members as defined in article IV, section 1 (d) in service may file with the Board of Trustees his written application for retirement setting forth on what date not less than fifteen days nor more than ninety days subsequent to the filing thereof, he desires to be retired; and provided the Board of Trustees shall determine that the member, at the date so specified for his retirement, will have a total of twenty-five years (effective as of March 8, 2007, twenty years for members of DPOA and their fire equivalents) or more of creditable service and has attained age fifty-five, he shall on the date specified be retired, notwithstanding that during such period of notification he may have separated from service.

Provided, further, that, effective July 1, 1983 for DPOA and Fire equivalents and July 1, 1986 for LSA and equivalents and new members, a member described in article IV, section 1(d) shall be eligible to retire upon attainment of twenty-five years (effective as of March 8, 2007, twenty years for members of DPOA and their fire equivalents) or more of creditable service, regardless of age. Effective July 1, 1998 (June 30, 2001 for DPOA members and their fire equivalents), the time a member is on layoff from service of the City shall be included in actual service rendered to the City for purposes of determining whether a member has twenty-five years or twenty years of creditable service. The pension benefit to which such member is entitled shall be based on his actual years of creditable service.

Pursuant to IRC 411(e), as in effect in 1974, an employee shall be 100 percent vested in their System accrued benefit upon attaining normal retirement hereunder while in service.

---

**By Agreement**

---

**[Effective June 30, 1986,[20] or July 1, 1983,[21]]** the requirement that a member as defined in Article IV, Section 1(d) of the Policemen and Firemen Retirement System shall attain age 55 to be eligible for retirement shall be eliminated. **[Effective March 8, 2007,[22]]** such members will be eligible to retire after 25 **[or twenty (20)[23]]** years of service regardless of age.[24]

**[Effective June 30, 2001, any member who has been laid off shall be eligible to retire at what would have been the member's 25th anniversary. To determine eligibility for retirement, the member's actual service time and time on lay off shall be combined.[25]] [To calculate the member's retirement allowance, however, only actual service time shall be used. For members having a parity relationship with the DPLSA and the DPCOA Inspector, only lay off time which occurred between July 1, 1973 and July 1, 1998 will be credited.[26]]**

---

**DFFA**

---

**Service Retirement**

1. For employees in ranks or classifications with a parity relationship to employees represented by the Detroit Police Lieutenants and Sergeants Association and employees in higher ranks or classification, the requirement that a member as defined in Article IV, Section 1(d) of the Policemen and Firemen Retirement System shall attain age 55 to be eligible for retirement shall be eliminated. Such members will be eligible to retire after 25 years of service regardless of age.

2. For employees in ranks or classifications with a parity relationship to the employees represented by the Detroit Police Officers Association, the requirement that a member as defined in Article IV, Section 1(d) of the Policemen and Firemen Retirement System shall attain age 55 to be eligible for retirement shall be eliminated. Effective March 8, 2007, such members will be eligible to retire after twenty (20) years of service regardless of age.

---

[20]    DPLSA (§ 51.E.).

[21]    DPOA (§ 33.H.).

[22]    DPOA (§ 33.H.).

[23]    DPOA (§ 33.H.).

[24]    DPCOA (§ 41.E.); DPLSA (§ 51.E.); DPOA (§ 33.H.).

[25]    DFFA (§ 22.A.14.d.); DPOA (§ 33.H.).

[26]    DFFA (§ 22.A.14.d.).

Effective July 1, 1989, the minimum age 55 requirement for deferred pensions payable for post 1969 members hired before June 30, 1985, shall be eliminated.[27]

---

### DPCOA

Reduction in Force Time:  Effective in accordance with the specific date and terms of the Detroit Police Lieutenants and Sergeants Association (DPLSA) award in Act 312 No. D98 F-0944, the membership of this bargaining unit shall have the right to retire on their 25th Anniversary Date, notwithstanding any service time they may have lost due to any layoffs, as provided therein.[28]

---

### DPOA

Effective July 1, 1989, the minimum age 55 requirement for deferred pensions payable for post 1969 members hired before June 30, 1985 shall be eliminated.

Employees hired on or after July 1, 1985 who leave City employment after being vested shall not be eligible for pension benefits until said individual reaches his or her sixty-second birthday.[29]

---

(c)     Any member of the system as defined in article IV, section 1 (a), (b), (c), and (d) who shall reach the age of sixty years shall be retired forthwith, or on the first day of the calendar month next succeeding that in which the member shall have reached sixty.  On the written request of the member and of the Commissioner of Police or the Board of Fire Commissioners, as the case may be, the Board of Trustees may continue such member in active service for a period of two years beyond his sixtieth birthday, and on the expiration of such period, on like request, may continue such member for a further period of two years.  (As amended November 5, 1963.  In effect January 1, 1969.)

(d)     Any member of the system who satisfies the requirements for a pension as defined in article VI, section 4 shall be eligible upon ninety days notice to make an irrevocable election to receive an immediate retirement allowance, actuarially reduced for early commencement, in lieu of a deferred retirement allowance.

(e)     Any member of the retirement system who was in the service of the City on or after July 1, 1941 but prior to January 1, 1969 and who was still an active member on July 1, 1983 for LSA and equivalents and July 1, 1986

---

[27]     DFFA (§ 22.A.14.d.).

[28]     DPCOA (§ 41. F.).

[29]     DPOA (§ 33.H.).

for DPOA members and fire equivalents shall have the option of retiring under the old plan or the new plan.

(1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part A, § 1.)

---

**By Agreement**

---

### Old Plan/New Plan

Members of the Policemen and Firemen Retirement System as defined in the previous charter of the City of Detroit – Chapter VII of Title IX, Section 2 of Article II as adopted by Article 11, Section 11-102 of the present charter of the City of Detroit as previously amended to July 1, 1977, who were in the service on or after July 1, 1941 but prior to January 1, 1969, and are still active members shall have the option of retiring under any existing plan of the pension system (i.e., amendment of November 5, 1969, or previous plan) commonly known as new plan and old plan.[30]

**[This provision shall be effective July 1, 1986.[31]]**

---

### Sec. 2.        Amount of allowance – Old Plan Members.

Upon his retirement from service, a member as defined in article IV, section 1 (a), (b), or (c) ("old plan member") shall receive a straight life retirement allowance which shall consist of the benefits provided in paragraphs (a) and (b) below; and he shall have the right to elect an option provided for in part H of this article:

(a)    An annuity which shall be the actuarial equivalent of his accumulated contributions standing to his credit in the Annuity Savings Fund at the time of his retirement; and

(b)    A pension, which when added to his annuity, will provide a straight life retirement allowance equal to two percent (2.0%) of his average final compensation, multiplied by the number of years, and fraction of a year, of his creditable service, not to exceed twenty-five years; provided, that the pension of a policeman shall in no case exceed fifteen twenty-seconds of the maximum earnable compensation of a patrolman and the pension of a fireman shall not exceed fifteen twenty-seconds of the maximum earnable compensation of a fire fighter (and if either or both of the said ranks shall be hereafter abolished, the equivalent thereof).  The foregoing pension limitation shall not apply to any policeman or fireman who on July 1, 1941, shall be entitled to a certificate for twenty years or more of prior service and who remains under the provisions of chapter XV or chapter XXI of

---

[30]    DFFA (§ 22.A.14.m.); DPCOA (§ 41.H.); DPLSA (§ 51.G.); DPOA (§ 33.N.).

[31]    DPOA (§ 33.N.).

Title IV of the 1918 Detroit City Charter. (As amended September 1, 1964. In effect September 15, 1964. As amended November 5, 1968. In effect January 1, 1969.)

(1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part A, § 2.)

## Sec. 2.1.    Amount of allowance – New Plan Members.

Upon his retirement from service, a member as defined in article IV, section 1(d) ("new plan member") shall receive a straight life retirement allowance which shall consist of the benefits provided in paragraphs (a) and (b) below; and he shall have the right to elect an option provided for in part H of this article:

> (a)    An annuity which shall be the actuarial equivalent of his accumulated contributions standing to his credit in the Annuity Savings Fund at the time of his retirement; and

> (b)    A pension which when added to his annuity, will provide a straight life retirement allowance equal to:

> > (i)    two and one-half percent (2.5%) of his average final compensation multiplied by the number of years and fraction of a year of his creditable service, for the first twenty-five (25) years of such service; and

> > (ii)    two and one-tenths percent (2.1%) of his average final compensation multiplied by the number of years and fraction of a year of his creditable service in excess of twenty-five (25) years subject to a maximum of thirty-five (35) years.

## Sec. 2.2.    Pension Multiplier

Effective July 1, 1992 each member who retires on or after said date shall be entitled to a pension which, when added to the annuity, will provide a straight life retirement allowance equal to 2.1% of his/her average final compensation, multiplied by the number of years and fraction of a year, of his/her creditable service, not to exceed thirty-five (35) years service for new plan members and twenty-five (25) years service for old plan members. (Ord. No. 18-93, Sec. 47-12.6A-2.3.)

---

**By Agreement**

---

**[Effective September 1, 2012, each member who retires shall only be entitled to a pension which, when added to the annuity, will provide a straight life retirement allowance equal to 2.1% of his/her average final compensation multiplied by the number of years and fraction of a year of his/her creditable service earned or accrued on or after September 1, 2011. Hence, for the first twenty-five (25) years of service accrued on or after September 1, 2011, the multiplier shall no longer be 2.5%; rather, 2.1%.  Maximum years of service for**

**pension credit shall be thirty-five (35) years for new plan members and twenty-five (25) years for old plan members. Service credit accrued prior to September 1, 2011 will be unaffected by this modification.[32]**]

Effective July 1, 1997 **[or following the effective date of the CET-DPCOA[33]]**, each member who retires shall be entitled to a pension which when added to the annuity will provide a straight life retirement allowance equal to 2.5% **[or 2.1%[34]]** of his average final compensation multiplied by the number of years and fraction of year of his creditable service for the first twenty-five (25) years **[or of his creditable service earned or accrued on or after the effective date of the CET-DPCOA[35]].**

For years of service over twenty-five (25) years the multiplier shall be 2.1%. Maximum years of service for pension credit shall be thirty-five (35) years for new plan members and twenty-five (25) years for old plan members.[36]

**[Each member who retires shall only be entitled to a pension which, when added to the annuity, will provide a straight life retirement allowance equal to 2.1% of his her average final compensation multiplied by the number of years and fraction of a year of his/her creditable service earned or accrued following the date of the Act 312 Award in D09 G-0786. Hence, for the first twenty-five (25) years of service accrued after the date of the Act 312 Award, the multiplier shall no longer be 2.5% as stated in the paragraph above; rather, as stated in this paragraph, 2.1%. Maximum years of service for pension credit shall be thirty-five (35) years for new plan members and twenty-five (25) years for old plan members.[37]]**

---

**Sec. 3.      Disposition of surplus benefits upon death of beneficiary.**

In the event a beneficiary, who was a member, dies before he has received in straight life retirement allowance payments an aggregate amount equal to his accumulated contributions standing to his credit in the Annuity Savings Fund at the time of his retirement, the difference between his said accumulated contributions and the said aggregate amount of straight life retirement allowance payments received by him shall be paid to such person or persons as he shall have nominated by written designation duly executed and filed with the board of trustees. If there be no such designated person or persons surviving the said deceased beneficiary (who was a member) such difference, if any, shall be paid to his legal representative. No benefits shall be paid under this section on account of the death of such a beneficiary if he had elected Option

---

[32]     DPOA (§ 33.B.).

[33]     DPCOA (§ 41.L.).

[34]     DPCOA (§ 41.L.).

[35]     DPCOA (§ 41.L.).

[36]     DFFA (§ 22.A.14.j.); DPCOA (§ 41.L.); DPLSA (§ 51.K.2.).

[37]     DPLSA (§ 51.K.3.).

1, 2 or 3 provided for in part H of this article.  (As amended September 1, 1964.  In effect September 15, 1964.)  (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part A, § 3.)

## Sec. 4.    Retirement allowance for certain persons leaving city employment after eight years service.

Should any LSA member or any fire equivalent who (1) has attained age forty years of age, and (2) has acquired eight or more years of credited service, or any member who terminates employment with the City on or after August 29, 2003 with ten or more years of credited service leave the employ of the police department or fire department of the City of Detroit prior to the date he would have first become eligible to retire as provided in this part A, for any reason except his retirement or death, he shall be entitled to a retirement allowance computed according to section 2 or 2.1 of this article, whichever is applicable, as said section was in force as of the date of his employment with the city last terminated; provided, that he does not withdraw his accumulated contributions from the Annuity Savings Fund.  His retirement allowance shall begin the first day of the calendar month next following the month in which his application for same is filed with the Board of Trustees, on or after the date he would have been eligible to retire had he continued in city employment. Notwithstanding the foregoing, prior to March 3, 2008 the retirement allowance of a DPOA member or a fire equivalent hired on or after July 1, 1985 shall not begin prior to the date on which the member reaches his sixty-second birthday.  Unless otherwise provided in this chapter such person shall not receive service credit for the period of his absence from the City Police Department and/or Fire Department employ, nor shall he or his beneficiary be entitled to any other benefit afforded in this chapter except the benefits provided in part A, section 2 or 2.1 or part F of this article VI, whichever is applicable, subject to the above provisions, notwithstanding, his membership has terminated.  (As amended September 1, 1964.  In effect September 15, 1964.  As amended November 5, 1968.  In effect January 1, 1969.)  (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part A, § 4.)

## By Agreement

**Reduced Early Pension Benefits (40 & 8 Vesting Retirees)**

1. Members who terminate employment who are eligible for a pension pursuant to Article VI, Part A, Sec. 4 of the Policemen and Firemen Retirement System (40 & 8) provision shall have the option of receiving an immediate, but reduced early pension benefit in lieu of a deferred pension.

2. This reduced early pension benefit shall not result in an increase in employer contribution rates therefore, the value of the Reduced Early Pension Benefit shall be the actuarial equivalent of the 40 & 8 pension.

3. No other benefits or amounts payable pursuant to the Policemen and Firemen Retirement System including benefits available to persons who retire under Article VI, Sec. 4 shall be affected by this contractual provision.  Health insurance benefits payable under this provision will commence when the member would have been eligible to retire with a

service retirement under Article 22 B 14 (d) of the collective bargaining agreement [**or Article VI of the Pension Plan[38]**].

4. [**For employees in ranks or classifications with a parity relationship to employees represented by the Detroit Police Lieutenants and Sergeants Association and employees in higher ranks or classifications,[39]**] upon termination, an employee vesting his pension must within 90 calendar days make an irrevocable election as to whether or not to take this option.

5. [**Individuals, who terminated prior to July 1, 1986, are not eligible for this [new[40] option.[41]**]

6. An employee who receives a lump sum payment for accumulated time upon termination is not allowed to have that time count towards his retirement service.

7. Since members [**or all DFFA members, except those members in ranks or classifications with a parity relationship to employees represented by the Detroit Police Officers Association,[42]**] are eligible to begin collecting their vested pension as soon as they would have been eligible to retire had they continued their City employment, minimum retirement age (i.e. age 55) shall not be a factor in computing the actuarially reduced pension benefit.[43]

---

**DFFA**

---

All members, except those members in ranks or classifications with a parity relationship to employees represented by the Detroit Police Officers Association, electing to receive the Reduced Early Pension Benefits shall receive upon separation full pay for fifty (50) percent of the unused sick bank amounts. This provision shall have no effect on a member electing to receive the deferred 40 & 8 vested pension who shall continue to be reimbursed for unused sick time in accordance with the formula in Article 22.B.9(e).

Employees hired on or after July 1, 1985, with a parity relationship to employees represented by the DPOA, who leave City employment after being vested shall not be eligible for pension benefits until said individual reaches his or her sixty-second birthday.

---

38      DPCOA (§ 41.G.3.); DPLSA (§ 51.F.3.).

39      DFFA (§ 22.A.14.f.4.).

40      DFFA (§ 22.A.14.f.5.).

41      DFFA (§ 22.A.14.f.5.); DPLSA (§ 51.F.5.).

42      DFFA (§ 22.A.14.f.).

43      DFFA (§ 22.A.14.f.); DPCOA (§ 41.G.); DPLSA (§ 51.F.).

Effective August 28, 2003, DPOA allied members who terminate employment after ten (10) years of service shall be vested and shall have all options afforded to current 40 & 8 retirees.[44]

---

| **DPOA** |
| --- |

**Reduced Early Pension Benefits**.  Members who terminate employment who are eligible for a pension pursuant to Article VI, Part A, Section 4 of the Policemen and Firemen Retirement System (40 & 8) provision shall have the option of receiving an immediate, but reduced early pension benefit in lieu of a deferred pension.

This reduced early pension benefit shall not result in an increase in Employer contribution rates, therefore, the value of the Reduced Early Pension Benefit shall be the actuarial equivalent of the 40 & 8 pension.

Effective August 28, 2003, members who terminate employment after ten (10) years of service shall be vested and shall have all options afforded to current 40 & 8 retirees.

No other benefits or amounts payable pursuant to the Policemen and Firemen Retirement System, including benefits available to persons who retire under Article VI, Section 4, shall be affected by this contractual provision.  Health insurance benefits payable under this provision will commence when the member would have been eligible to receive a regular service retirement under Article 33.F. of the collective bargaining agreement.

This provision shall be retroactive to July 1, 1986.[45]

---

## Part B — Total Disability Pension and Retirement Allowances.

**Sec. 1.    Duty disability.**

If a member shall become totally incapacitated for duty by reason of injury, illness or disease resulting from performance of duty and if the Board of Trustees shall find such injury, illness or disease to have resulted from the performance of duty, on written application to the Board of Trustees by or on behalf of such member or by the head of his Department such member shall be retired; notwithstanding that during such period of notification he may have separated from service; provided, the Medical Director, after examination of such member shall certify to the Board of Trustees his total incapacity.  If said member was separated from service after filing of the written application, and he had attained twenty-five (25) years or more of service prior to the date of separation, the Board of Trustees, shall retire said member, under this part B.  (Ord. No. 5-00, Sec. 54-2-11; Ord. No. 4-00, Sec. 54-2-11.)

---

[44]       DFFA (§ 22.A.14.f.).

[45]       DPOA (§ 33.I.).

**Sec. 2.    Duty disability benefits; members in service on or after July 1, 1941 but prior to January 1, 1969.**

(a)    A member, as defined under Article IV, Section 1(a), (b), or (c), shall receive the following benefits:

(1)    Each such member shall receive a disability pension of fifty percent (50%), or such other higher percentage that is in effect and applies to such member, of the member's average final compensation at the time of disability retirement. On the date that a member, who retired under Section 1 of this Part and who receives benefits under this Section, would have accrued twenty-five (25) years of creditable service had the member continued in active service, or on the date that the member reaches age sixty (60), whichever comes first, the member shall be eligible for optional benefits as provided Part H of this Article.

(2)    In addition to the disability pension provided for in Section 2(a)(1), any member who receives a disability pension pursuant to Section 2(a)(1) and has not accrued a total of twenty-five (25) years of creditable service, as of the date of the member's disability retirement shall receive a supplemental disability payment in the amount of sixteen and two-thirds percent (16-2/3%) of the member's average final compensation at the time of disability retirement. This supplemental payment shall terminate upon the expiration of the period when a member who retired under Section 1 of this Part and who receives benefits under Section 2(a)(1) would have accrued twenty-five (25) years of creditable service and the member continued in active service, or on the date that the member reaches age (60), whichever comes first.

(3)    In the case of a member retired under Section 1 of this Part who receives benefits under 2(a)(1) and 2(a)(2), the accumulated contributions standing to the member's credit at the date of retirement shall continue to be held in the defined contribution plan and regular interest shall be credited thereto. If such member dies before the date upon which the member would have achieved a total of twenty-five (25) years of creditable service had the member continued in active service and before such member reaches age sixty (60), the balance of the member's defined contribution plan including interest thereon shall be paid as provided in Part D and Part E of this Article.

(b)    This Section shall be applicable to those members receiving benefits on the date of adoption of this Section who are not covered by the arbitration decision regarding the Detroit Police Officers Association which became effective July 1, 1995, or the arbitration decision regarding the Detroit Police Lieutenant's and Sergeant's Association which became effective June 30, 1998.

(c)     This Section does not rescind any substantive rights of disability retirees from the Policemen and Firemen Retirement System who retired prior to the July 1,1995 arbitration award, or the substantive rights of disability retirees from the Detroit Police Lieutenant's and Sergeant's Association who retired prior to the June 30, 1998 arbitration award.

(d)     This Section does not amend any computations used to determine disability benefits payable under this Section 2, or result in an increase or decrease in such disability benefits.

(e)     Existing 1099R reporting procedures shall continue as currently in effect. A change in said procedures shall only occur as the result of an Internal Revenue Service ruling letter in favor of such change.

(Ord. No. 05-00, Sec. 54-2-12; Ord. No. 04-00, Sec. 54-2-12.)

**Sec. 2.1.     Duty disability benefits; members beginning service on or after January 1, 1969.**

(a)     A member, as defined under Article IV, Section 1(d), who retired under Section 1 of this Part, shall receive the following benefits:

(1)     Each such member shall receive a disability pension of fifty percent (50%), or such other higher percentage that is in effect and applies to such member, of the member's average final compensation at the time of disability retirement, On the date that a member who retired under Section 1 of this Part and who receives benefits under this Section would have accrued twenty-five (25) years of creditable service had the member continued in active service, or on the date that the member reaches age sixty (60), whichever comes first, the member shall be eligible for optional benefits as provided Part H of this Article.

(2)     In addition to the disability pension provided for in Section 2.1(a)(1) of this Part, any member who receives a disability pension pursuant to Section 2.1(a)(1) of this Part and who has not accrued a total of twenty-five (25) years or more of creditable service as of the date of the member's disability retirement shall receive a supplemental disability payment in the amount of sixteen and two-thirds percent (16-2/3%) of the member's average final compensation at the time of the member's disability retirement. This supplemental payment shall terminate when a member who retires under Section 1 of this Part and who receives benefits under Section 2.1(a)(1) of this Part would have accrued twenty-five (25) years of creditable service had he or she continued in active service or on the date that the member reaches age sixty (60), whichever comes first.

---

**By Agreement**

---

**Disability Conversion**

[**Effective July 1, 1992,**[46]] add to the Policemen and Firemen Retirement System, Article VI, Part B, [Section 2.1(a)(2)] the following:

". . . with the specific exception that for those members who receive benefits under [Section 2.1(a)(1)], above, the 'average final compensation' used in this computation shall mean the current maximum salary for the rank(s), grade(s) or position(s) which would have been held by the member over the sixty (60) months prior to retirement (reduced disability/service retirement when the member would have attained a total of twenty-five (25) years of credited service) had he/she continued working in that classification which he/she held at the time of his/her disability.["[47]] For members who begin receiving such benefits on or after July 1, 1998, the amount of the member's most recent full longevity payment shall be included in the definition of average final compensation.[48]

## DFFA / DPOA

Add to the Policemen and Firemen Retirement System, Article VI, Part B, [Section 2.1(a)(2)] the following:

". . . with the specific exception that for those members who receive benefits under [Section 2.1(a)(1)], above, the 'average final compensation' used in this computation shall be the highest average annual compensation that would have been received by such a member had he/she continued working in the classification he/she held at the time of his disability, during any period of five consecutive years, selected by the member, contained within the last ten years immediately preceding the expiration of the period when the member would have attained a total twenty-five years of creditable service."[49]

## DPCOA

Effective July 1, 2000, the "average final compensation" used in this computation shall mean the current maximum salary for the rank(s), grade(s) or position(s) which would have been held by the member over the thirty-six (36) months prior to retirement, including the annual longevity payment provided above.[50]

---

(3)     In addition to the disability pension provided for in Section 2.1(a)(1) of this Part, any member who receives a disability pension pursuant to Section 2.1(a)(1) of this Part and who has accrued more than

---

[46]     DPLSA (§ 51.C.).

[47]     DPCOA (§ 41.C.); DPLSA does not have a closing quotation mark within this paragraph.

[48]     DPCOA (§41.C.); DPLSA (§ 51.C.).

[49]     DFFA (§ 22.A.14.e.); DPOA (§ 33.E.).

[50]     DPCOA (§41.C.).

twenty-five (25) years ("additional years") of creditable service as of the date of the member's disability retirement shall receive another supplemental disability payment equal to two percent (2%), or such other higher percentage that is in effect and applies to such member, of the member's average final compensation, multiplied by the number of additional years of creditable service the member has accrued; provided, however, that such supplemental disability payment shall not exceed twenty percent (20%), or such other higher percentage that is in effect and applies to such member, of the member's average final compensation.

(4)    In the case of a member who retired under Section 1 of this Part and who receives benefits described under Section 2.1(a)(1) through (3) of this Part, the accumulated contributions standing to the member's credit at the date of disability retirement shall continue to be held in a separate fund in the annuity savings fund and regular interest shall be credited thereto. If such member dies prior to the time when the member would have achieved a total of twenty-five (25) years of creditable service had the member continued in active service and before such member reaches age sixty (60), the amount of the member's accumulated contributions so set aside and interest thereon shall be paid as provided in Part D and Part E, of this Article.

(5)    The amendment of Section 2.1(a)(1) of this Part shall not result in an increase or decrease in the amount of disability benefits payable to members.

(b)    This Section shall be applicable to those members receiving benefits on the effective date of this Section who are not covered by the arbitration decision regarding the Detroit Police Officers Association which became effective July 1, 1995, or the arbitration decision regarding the Detroit Police Lieutenant's and Sergeant's Association arbitration decision which became effective June 30, 1998.

(c)    This Section does not rescind any substantive rights of disability retirees from the Policemen and Firemen Retirement System who retired prior to the July 1, 1995 arbitration award, or the substantive rights of disability retirees from the Detroit Police Lieutenant's and Sergeant's Association who retired prior to the June 30, 1998 arbitration award.

(d)    This Section does not amend any computations used to determine benefits under Section 2.1 of this Part, or result in an increase or decrease In such benefits.

(e)    Existing 1099R reporting procedures shall continue as currently in effect. A change in said procedures shall only occur as the result of an Internal Revenue Service ruling letter in favor of such change.

(Ord. No. 5-00, Sec. 54-2-13; Ord. No. 4-00; Sec. 54-2-13.)

---

**By Agreement**

---

**Duty Disability Retirement Provisions**

1. **[As applicable to all current employees who file applications for disability retirement on or after July 1, 1995,[51]] [for employees with a parity relationship with the DPOA, and on or after June 30, 1998, for employees with a parity relationship with the DPLSA and the DPCOA Inspector, and to all future employees[52]] [As applicable to all current employees who file applications for disability retirement on or after June 30, 1998, and to all future employees,[53]] [and to all future employees,[54]]** the definition of "total disability" and "total incapacity" in the Policemen and Firemen Retirement System pension plan will be changed to read as follows:

   Own Occupation: During the first 24 months of benefits, total disability exists when, due to injury, illness or disease, an employee is unable to perform, for wage or profit, the material and substantial duties of the employee's occupation.

   Any Occupation: After the first 24 months of benefits, total disability exists when, due to illness, injury or disease, an employee is unable to perform, for wage or profit, the material and substantial duties of any occupation for which the employee is suited, based on education, training and experience.

2. a. The duty disability retirement benefits payable to an eligible member shall consist of the amount derived from the sum of the applicable following factors and annual escalators in accordance with the definitions of "own occupation" and "any occupation" as set forth in paragraph 1 above.

   (1) <u>Part A.</u> A basic duty disability benefit amount which is 50% of the member's final compensation at the time his duty disability retirement began.

   (2) <u>Part B.</u> A supplemental duty disability benefit which is 16 2/3% of the member's final compensation at the time his duty disability retirement began.

   (3) **[<u>Escalators.</u> On July 1st of each year, the amounts of Parts A and B then payable will each be increased by adding to said amounts the product of 2.25% times the initial amount of said Part A and B benefit**

---

[51]    DFFA (§ 22.A.14.q.); DPOA (§ 33.Q.1.).

[52]    DFFA (§ 22.A.14.q.).

[53]    DPLSA (§ 51.N.1.).

[54]    DPOA (§ 33.Q.1.).

**which was computed at the time the duty disability retirement began.**[55]**]**

b.      For the first 24 months that a member is on duty disability retirement his benefit shall be the sum of Parts A and B plus applicable escalators.

c.      After 24 months, a member who is disabled from any occupation shall continue to receive a duty disability retirement benefit which is the sum of Parts A and B plus applicable escalators. After the expiration of the period when the member would have attained 25 years of creditable service had he/she continued in active service, payment of Part B will cease.

d.      After 24 months, a member who is not disabled from any occupation shall only receive Part A plus applicable escalators as his duty disability retirement benefit.

e.      Conversion. Duty disability retirement benefits shall continue to be paid to a member on duty disability retirement after the member has attained 25 years of credited service, to the earlier of (i) the member's attainment of age 65, or (ii) termination of disability as determined by the third party administrator (TPA). Upon termination of disability or attainment of age 65, a member with 25 years of credited service shall be eligible to receive a service retirement benefit. The amount of such service retirement benefit shall be the same amount which would have been payable if the conversion from duty disability retirement to service retirement had occurred at the date of attaining 25 years of service credit. **[In the event that the examinations and/or investigations conducted by the Police Department result in a determination that the member is not qualified for reappointment as a police officer, for medical reasons, disability benefits will be continued.**[56]**]**

f.      If a member on duty disability retirement returns to active service and within a 24 month period re-qualifies for duty disability retirement for the same or related reasons he/she had been retired, then the disability shall be deemed a continuation of the prior disabling condition and the period of the return to work will not have caused the employee to be entitled to a new initial determination of Part A and B benefit amounts as set forth in sub-paragraphs 2.a.(1) and 2.a.(2) above. Instead, such employee will return to retirement at the point he/she had reached in sub-paragraphs 2.b., 2.c. or 2.d. above as if there had not been a break in his period of placement on duty disability retirement.

g.      Non-duty disability benefits will continue to be calculated as provided by the City Charter.

---

[55]      DFFA (§ 22.A.14.q.); DPLSA (§ 51.N.2a.3.); DPOA (§ 33.Q.2.a.3.).

[56]      DPOA (§ 33.Q.2.e.).

h.   [**As in the past,**[57]] disability retirement benefits shall continue to be considered Charter benefits which are paid instead of and not in addition to any benefits under the State Workers' Disability Compensation Act.

i.   Survivor Benefits.  Survivor benefit coverage applicable to active members shall be continued during the period a member is eligible for a duty disability benefit. Upon conversion to a service retirement benefit as provided in 2.e., automatic survivor benefit coverage shall terminate.  At that time, the member shall have the right to elect an optional form of payment in the same manner as if he/she had retired from active membership on the conversion date.

3.   <u>Pension Credit While on Duty Disability Status.</u>

a.   While eligible to receive duty disability benefits, regular defined pension service credit shall continue to accrue.

b.   The accrual of regular defined benefit pension service credit will cease when the member has 25 years of credited service.

4.   Earnings Offset.

a.   In the event that a recipient of a duty disability retirement benefit receives earned income from gainful employment during a calendar year, the amount of the member's disability benefit payable during the next subsequent fiscal year will be adjusted so it does not exceed the difference between (i) the member's base salary at the date of disability, increased by 2.25% times the number of full years from the date of disability to the year in which the earnings offset is applied, and (ii) the amount of remuneration from gainful employment during the prior calendar year.

b.   The earnings test shall be based on information the TPA may periodically require from a duty disability benefit recipient or have secured from other reliable sources. Furnishing such information shall be a condition for continued eligibility for a duty disability benefit.

5.   <u>Annuity Withdrawal.</u>  The current withdrawal provision of the retirement system will continue.  If a duty disability recipient elects annuity withdrawal after attaining 25 years of credited service, the applicable benefit reduction will offset the duty disability benefit until the conversion date, after which it will offset the converted service retirement benefit.

6.   <u>The disability retirement procedure will be revised as follows:</u>

a.   [**Medical Boards of Review will no longer be used.**[58]]  The function now performed by Medical Boards of Review with respect to the determination of

---

[57]   DPOA (§ 33.Q.2.h.).

[58]   DPOA (§ 33.Q.6.a.).

whether an applicant is disabled will be performed by a qualified physician or surgeon in the appropriate specialty at Detroit Receiving Hospital or such other medical facility as may subsequently be mutually determined by the Union and the City.  If either the Union or the City desires to terminate the services of the medical facility, it shall give notice in writing to that effect to the other party, specifying the date of termination.  The parties shall then send a joint written notice to the medical facility of its termination.  Neither party may terminate the services of a medical facility unless it has heard at least one case.  Once the medical facility has received written notice that its services are terminated, it shall hear no further cases.  However, the medical facility shall render decisions on all cases where the applicant has been examined and evaluated prior to receiving such notice.  The medical facility will select the doctor who will perform the examination and evaluation.  The medical finding of this physician or surgeon as to whether the applicant in disabled shall be final and binding on all interested parties.

b.　　　If the applicant is determined to be disabled, the Board of Trustees or its designee will examine the pension file, including the submissions of the applicant and the Police or Fire Department, to determine if there is any dispute as to whether the disability "resulted from the performance of duty" within the meaning of the pension plan.　If it is undisputed that the disability did result from the performance of duty, the Board of Trustees will grant duty disability retirement benefits.  If it is undisputed that the disability did not result from the performance of duty, the Board of Trustees will grant non-duty disability retirement benefits, provided the applicant meets the other conditions of eligibility, e.g., five years of creditable service.  If the performance of duty issue is in dispute, the Board of Trustees will refer the matter to arbitration by a member of the Disability Retirement Review Board (DRRB).  The decision of the DRRB member as to whether the disability resulted from the performance of duty shall be final and binding upon all interested parties.  The DRRB shall consist of 3 qualified arbitrators who will be individually assigned in rotating order to decide the matters referred to arbitration by the Board of Trustees. **[[By March 1, 1998,[59] or within thirty (30) days after the issuance of the Act 312 Award (Case No. D92 C-554),[60]] the Union and the City shall convene and select 3 disinterested persons qualified as labor arbitrators to serve as members of the DRRB.[61]]** The procedure for the termination of umpires and the selection of new umpires **[currently in use by the Union and the Police or Fire Department[62] or found**

---

[59]　　　DPLSA (§ 51.N.6.b.).

[60]　　　DPOA (§ 33.Q.6.b.).

[61]　　　DPCOA (§ 41.N.6.b.); DPLSA (§ 51.N.6.b.).

[62]　　　DFFA (§ 22.A.14.q.6.b.)(referring to "the DFFA and the Department"); DPCOA (§ 41.N.6.b.)(referring to "the DPOA [sic] and the Department"); DPLSA (§ 51.N.)(referring to "the DPOA [sic] and the Department").

in **Article 8**[63]] shall apply to the termination and the selection of new DRRB arbitrators.

c.  The hearing before a member of the DRRB will be conducted in accordance with the following procedures:

1.  The applicant and the City will have the right to appear in person or otherwise, may be represented by counsel if they wish and will be afforded an equal opportunity to present evidence relevant to the issues;

2.  A court reporter will be present and make a stenographic record of the proceedings;

3.  The hearing will be closed to the public, except that the applicant may select one person to be with him in the hearing room; provided, however, that person may not testify;

4.  The witnesses will be sequestered;

5.  The witnesses will be sworn by the court reporter and testify under oath;

6.  The applicant may not be called by the City as an adverse witness;

7.  The DRRB member will apply the rules of evidence and follow the procedures which are customarily applied and followed in labor arbitration cases;

8.  If the applicant wishes to have an employee of the City released from duty to appear as a witness on his behalf, the applicant may so inform the Board of Trustees in writing which, in turn, will submit a written request to the appropriate Department executive for the release of the employee for the purpose of so testifying;

9.  The DRRB member will afford the parties an opportunity for the presentation of oral argument and/or the submission of briefs;

10. The DRRB member will issue a written decision containing credibility resolutions as necessary, findings of fact and conclusions with respect to all relevant issues in dispute. The decision of the DRRB member shall be final and binding on all interested parties;

11. The authority of the DRRB member is limited to deciding whether or not the applicant's disability "resulted from the performance of duty" within the meaning of the Pension Plan. The DRRB member shall have no authority to add to, subtract from, modify or disregard the terms of the Pension Plan; and

---

[63]  DPOA (§ 33.Q.6.b.).

12. The costs associated with the hearing, including the arbitrator's fees and expenses, and the court reporter's fees and expenses, shall be paid by the Board of Trustees.

d. A Third Party Administrator (TPA) mutually selected by the Union and the City shall provide all ongoing duties of administering the disability benefits after initial eligibility has been determined. These duties shall include:

1. Monthly payment of benefits;

2. The former duties of the Medical Director for conducting investigations to assure continuing eligibility for disability retirement benefits, including the annual re-examination of disability beneficiaries;

3. Conducting investigations to determine any earnings the disability beneficiary may have for offset to system benefits; and

4. The TPA shall have reasonable powers to insure compliance with re-examination and proof of earnings requirements including the withholding of monthly payments until compliance is achieved.

e. If a disability beneficiary is determined by the TPA to no longer be disabled, he/she may appeal that determination within seven (7) days thereof by filing a written request with the TPA for a re-examination by a qualified physician or surgeon at and selected by the medical facility identified in paragraph 6.a. above whose medical finding will be final and binding. The TPA shall promptly arrange for such re-examination. The applicant's disability benefits will be continued pending that final and binding medical finding, and if the finding is that the applicant is no longer disabled, his disability benefits will be further continued while the Police or Fire Department is conducting such examinations and/or investigations as necessary to determine whether the applicant is qualified for reappointment to active duty. **[In the event that the examinations and/or investigations conducted by the Police Department result in a determination that the member is not qualified, for medical reasons, for reappointment to active duty, disability benefits will be continued.[64]]**

f. In the event that the Union and the City are unable to reach agreement upon the medical facility to perform the functions described in paragraph 6.a. or the TPA to perform the functions described in paragraph 6.d. of this section, within thirty (30) days after a vacancy occurs, each shall nominate one choice as its selection and after reviewing any materials submitted and considering any arguments advanced by the parties in support of their respective nominations, a member of the DRRB

---

[64] DPLSA (§ 51.N.6.e.).

shall decide which of the two nominees shall serve as the medical facility or the TPA.[65]

7. **[The Board of Trustees shall not act upon or grant the application filed by an officer who, although he/she is not capable of performing the full duties of a police officer, has not suffered any diminishment of his/her base wages or benefits because he/she is either:**

    a.    **regularly assigned to a position, the full duties of which he/she is capable of performing; or**

    b.    **assigned to a restricted duty position, unless the Police Department advises that it intends to seek a disability retirement for the officer in the foreseeable future.**

8. **The provisions in paragraph 7 above are not intended to and will not:**

    a.    **affect the officer's right to seek a disability retirement when no restricted duty position is available; or**

    b.    **restrict in any way the existing authority of the Chief of Police to seek a duty or non-duty disability retirement for an officer or for that officer at that time to request a duty or non-duty disability retirement.[66]]**

---

## Sec. 3.　　Non-duty disability.

On written application to the Board of Trustees by or on behalf of a member or by the Head of his Department, a member, who becomes totally incapacitated for duty by reason of injury, illness or disease not resulting from the performance of duty, shall be retired by the Board of Trustees; provided, the Medical Director, after an examination of such member, shall certify to the Board of Trustees his total incapacity.  If said member was separated from service after the filing of the written application and had attained 25 years or more of service prior to the date of separation, the Board of Trustees shall retire said member, under this Part B.  (As amended November 5, 1968.  In effect January 1, 1969.)  (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part B, § 3.)

## Sec. 4.　　Benefits.

A member retired under section 3 above shall receive the following applicable benefits:

---

[65]　　DFFA (§ 22.A.14.q.); DPCOA (§ 41.N.); DPLSA (§ 51.N.); DPOA (§ 33.Q.). All references to "Police or Fire Department" mean either the Police Department or the Fire Department, whichever is applicable to the respective Union.

[66]　　DPCOA (§ 41.N.7-8.); DPLSA (§ 51.N.7-8.); DPOA (§ 33.Q.7-8.).

(a) If such member has less than five years of creditable service at the time of his retirement, his accumulated contributions standing to his credit in the Annuity Savings Fund shall be returned to him, or at his option he shall receive a cash refund annuity which shall be the actuarial equivalent of his accumulated contributions. (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part B, § 4(a).)

(b) If such member has five or more years of creditable service at the time of his retirement, he shall receive a disability retirement allowance computed in accordance with the provisions of this article, part A, section 2 or 2.1, whichever is applicable, and he shall have the right to elect an option provided for in Part H of this Article. His straight life retirement allowance shall not be less than twenty per cent of his average final compensation. Such retirement allowance shall be subject to Parts I and K of this Article. (As amended September 1, 1964. In effect September 15, 1964. As amended November 5, 1968. In effect January 1, 1969.) (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part B, § 4(b).)

(c) If a member receiving non-duty disability benefits has any accumulated contributions standing to his credit in the Annuity Savings Fund upon attainment of twenty-five years (effective as of March 8, 2007, twenty years for DPOA members and fire equivalents) of creditable service, such member may withdraw the balance of such contributions at that time.

---

**By Agreement**

---

Persons who are retired on disability pensions pursuant to Article VI, B of the Policemen and Firemen Retirement System shall be entitled to lump sum payments of all accumulated time from the date that the Board of Trustees determines that they are entitled to such a pension. Members shall not be required to utilize such time delaying their retirement date.[67]

---

### Part C — Application, Escalation and Change in Compensation, Rank

All applications for retirement shall be subject to the provisions of section 14, as amended, of Chapter XXI, Title IV of the 1918 Detroit City Charter, insofar as the same are applicable. (As amended November 5, 1968. In effect January 1, 1969.) (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part C.)

## Sec. 1.    Generally.

If hereafter the rate of compensation of the rank, grade or position on which the service retirement allowance, disability pension or disability retirement allowance of a beneficiary who was a member or is a beneficiary of member as defined in article IV, section 1 (a), (b), or (c) is

---

[67]    DPCOA (§41.J.); DPLSA (§ 51.I.).

based shall be changed, his service retirement allowance, disability pension, or disability retirement allowance shall be changed proportionately, and if such rank, grade, or position shall have been abolished, his service retirement allowance, disability pension, or disability retirement allowance shall be changed in proportion to the change made in the compensation of the existing rank, grade, or position most nearly approximating the rank, grade, or position so abolished. (As amended November 5, 1968. In effect January 1, 1969.) (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part C, § 1.)

### Sec. 2. Increase of Benefits.

The retirement allowance or death benefit of a member who was hired prior to July 1, 1969 shall be increased proportionally with the increases in the pay of active employees of the rank on which the retirement allowance was computed.

On and after July 1, 1969, and the first of July of each year thereafter until July 1, 1992, the pension portion of any retirement allowance or death benefit of a member or beneficiary of a member as defined in article IV, section 1(d), which is paid or payable under this chapter shall be increased at the rate of two per cent (2.0%) per annum computed on the basis of the amount of the pension received at the time of retirement. (As amended November 5, 1968. In effect January 1, 1969.) (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part C, § 2.)

On or after July 1, 1992 and the first of July each year thereafter, the pension portion of any retirement allowance or death benefit of a member or beneficiary of a member as defined in article IV, section 1(d), shall be increased at the rate of two and twenty-five one-hundredths per cent (2.25%) per annum computed on the basis of the amount of the pension received at the time of retirement. (Ord. No. 18-93, Sec. 47-12.6C-2.1.)

Effective for members who retire on or after July 1, 1997 (July 1, 1998 for DPOA members and their fire equivalents), the pension escalator described in this section shall be compounded annually.

---

### By Agreement

**Post Retirement Escalator**

For persons **[or members with a parity relationship with the DPLSA and the DPCOA Inspector[68]]**, retiring on or after July 1, 1998 **[or July 1, 2001[69]]**, under the new plan provisions, the 2.25% per annum escalation amount shall be re-computed each fiscal year on the basis of the amount of pension received in the previous fiscal year (i.e., the 2.25% per annum escalation amount shall be compounded).[70]



### DFFA

---

[68]    DFFA (§ 22.A.14.a.).

[69]    DPOA (§ 33.K.).

[70]    DFFA (§ 22.A.14.a.); DPLSA (§ 51.L.); DPOA (§ 33.K.). As of the effective date of the 312 Award # 1, this provision has been deleted from DPOA. 312 Award # 1, Issue # 61, pgs. 121–24.

For members with a parity relationship with the DPOA, retiring on or after July 1, 2001, under the new plan provisions, the 2.25% per annum escalation amount shall be re-computed each fiscal year on the basis of the amount of pension received in the previous year.[71]



**DPCOA**

Pension benefits based on service rendered after the effective date of this CET-DPCOA shall not be subject to any escalation amounts.[72]

**DPLSA / DPOA**

On or after July 1, 1992, and the first of July each year thereafter, the pension portion of any retirement allowance or death benefit of a member or beneficiary of a member as defined in Article VI, Section 1(d) of the plan provisions, and **[Article 51.G. of the DPLSA CBA or Article 33.K. of the CPOA CBA]** (to include those members who opt to retire under the new plan provisions) shall be increased at the rate of 2.25% per annum computed on the basis of the amount of the pension received at the time of retirement by all new plan members who are currently retired or who retire on or after July 1, 1992.

The pension portion of any retirement allowance or death benefit of a member, or beneficiary of a member as defined in Article IV, Section 1(d) of the plan provisions, and **[Article 51.G. of the DPLSA CBA or Article 3.K. of the DPOA CBA]** (to include those members who opt out to retire under the new plan provisions) earned after **[the date of the Act 312 Award in D09 G-0786 or September 1, 2011]**, shall not be increased whatsoever, per annum or otherwise. The pension portion of any retirement allowance or death benefit of a member, or beneficiary of a member as defined herein, accrued prior to **[the date of the Act 312 Award in D09 G-0786 or September 1, 2011]**, shall still be increased as provided herein. Hence, pension benefits earned based on service rendered after **[the date of this Award or September 1, 2011]** is issued will no longer receive the 2.25% per annum escalation amount. The 2.25% per annum escalation amount shall continue to apply to pension benefits earned based on service rendered before **[the date this Award was issued or September 1, 2011]**.[73]

**[Pension benefits based on service rendered after the effective date of this Agreement shall continue to not be subject to any escalation amounts.[74]]**

---

[71]    DFFA (§ 22.A.14.a.).

[72]    DPCOA (§ 41.M.).

[73]    DPLSA (§ 51.L.) (all references to the DPLSA CBA, or "the date of the Act 312 Award in D09 G-0786," or "the date of this Award," or "the date this Award was issued" apply to this DPLSA CBA); DPOA (§ 33.K.)(all references to the CPOA CBA or the date of September 1, 2011 apply to this DPOA CBA).

[74]    DPOA (as modified by 312 Award # 1, Issue # 61, pgs. 121–24).

### Sec. 3.    Payment.

The escalation factor contained in section 2 above shall be payable to the member or beneficiary of a member as defined in article IV, section 1 (d), notwithstanding any retirement allowance or pension amount limitation provisions in this chapter to the contrary.  (As amended November 5, 1968.  In effect January 1, 1969.)  (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part C, § 3.)

## Part D — Death Benefits.

### Sec. 1.    Generally.

If a member, or a beneficiary who was a member, is killed in the performance of his duty or dies as the result of illness contracted or injuries received while in the performance of his duty and such death, illness or injuries resulting in death, be found by the board of trustees to have resulted from the performance of his duty, the following applicable benefits shall be paid, subject to part I, section 1, of this article.

(a)     His accumulated contributions standing to his credit in the Annuity Savings Fund at the time of his death shall be paid to such person or persons as he shall have nominated by written designation duly executed and filed with the board of trustees.  If there be no such designated person surviving, his said accumulated contributions shall be paid to his legal representative, subject to subsection (e) of this section.

(b)     His widow shall receive a pension of five-elevenths of the maximum earnable compensation for the rank of patrolman or fire fighter as the case may be, to continue during her widowhood.  If his child or children under age eighteen years also survive the deceased member each such child shall receive a pension of one-tenth of such maximum earnable compensation; provided, that if there be more than two such surviving children under age eighteen years each such child's pension shall be an equal share of seven thirty-thirds of such maximum earnable compensation.  Upon the death, marriage, adoption, or attainment of age eighteen years of any such child his pension shall terminate and there shall be a redistribution by the board of trustees to the deceased member's remaining eligible children, if any; provided, that in no case shall any such child's pension exceed one-tenth of such maximum earnable compensation.  In no case shall the total of the pensions, provided for in this sub-section, payable on account of the death of a member exceed two-thirds of the maximum earnable compensation for the rank of patrolman or fire fighter, as the case may be.

Effective July 1, 1986, widows of Fire Department employees who have been receiving a flat monthly benefit of $300.00 pursuant to the authority of Title IV, Chapter 15, Section 16 of the 1918 City of Detroit Charter, and Section 13-107 of the July 1, 1974 Charter should receive an increase

of $500.00 per month thereby making the flat monthly benefit $800.00. (Ord. No. 11-86, Sec. 47-10-3; Ord. No. 348-H, Sec. 54-100-3.)

Effective July 1,1986, widows of Police Department employees who have been receiving a flat monthly benefit of $300.00 pursuant to the authority of Title IV, Chapter 21, Section 19 of the 1918 City of Detroit Charter, and Section 13-107 of the July 1, 1974 Charter, should receive an Increase of $500.00 per month thereby making the flat monthly benefit $800.00. (Ord. No. 11-86, Sec. 47-10-4; Ord. No. 349-H, Sec. 54-100-4.)

(c) If no widow survives the deceased member or if his widow dies or remarries before his youngest unmarried surviving child attains age eighteen years, his unmarried child or children under age eighteen years shall each receive a pension of one-fourth of the maximum earnable compensation for the rank of patrolman or fire fighter, as the case may be; provided that if there be more than two such surviving children under age 18 years, each such child's pension shall be an equal share of one-half of such maximum earnable compensation. Upon the death, marriage, adoption, or attainment of age eighteen years of any such child his pension shall terminate and there shall be a redistribution by the board of trustees to the deceased member's remaining eligible children, if any; provided, that in no case shall any such child's pension exceed one-fourth of the maximum earnable compensation for the rank of patrolman or fire fighter, as the case may be.

(d) If there be no widow and if there be no children under age eighteen years surviving such deceased member and if he leaves surviving him either or both a father and mother, whom the board of trustees shall find to be actually dependent upon such member for financial support, such dependent father and mother shall each receive a pension of one-sixth of the maximum earnable compensation for the rank of patrolman or fire fighter, as the case may be.

(e) If a member dies intestate, without having designated a person or persons, as provided in sub-section (a) of this section, and without heirs, the amount of his accumulated contributions in the Annuity Savings Fund, not to exceed a reasonable sum, to be determined by the board of trustees, shall be used to pay his burial expenses, provided he leave no other estate sufficient for such purpose; any balance credited to such member in the Annuity Savings Fund, and not used for burial expenses shall remain a part of the funds of the retirement system and shall be credited to the Pension Accumulation Fund.

(f) If the maximum earnable compensation for the rank of patrolman or fire fighter, as the case may be, is subsequently changed, the pensions provided in this section for beneficiaries of members as defined in article IV, section 1 (a), (b), or (c) shall be proportionately changed.

(g)    The maximum earnable compensation for the rank of patrolman or fire-fighter, as the case may be, to be used in computing the pensions provided in this section for beneficiaries of members as defined in article IV, section 1 (d) shall be the maximum earnable compensation of the rank of patrolman or fire-fighter as established by the city's budget for the fiscal year of the member's death. (As amended September 1, 1964. In effect September 15, 1964. As amended November 5, 1968. In effect January 1, 1969.)

(1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part D.)

---

### By Agreement

The City agrees that in the Policemen and Firemen Retirement System Article VI, D and Article VI, E, all references to "widow" shall include "widower" and in Article VI, E, Section 2(a), the disability and dependency restrictions on widowers shall be removed.[75]

---

### DPOA

Duty and non-duty death benefits under the City of Detroit Policemen and Firemen Retirement System shall be payable to widowers in the same manner as they are now payable to widows. Widowers seeking non-duty death benefits under the system shall not be required to demonstrate any degree of dependency on their wives.[76]

---

### DFFA / DPOA

Effective July 1, 2001, **[for DPOA allied members,[77]]** the re-marriage penalty on any pension shall be removed.[78]

---

## Part E — Nonduty Death.

### Sec. 1.    Payment of accumulated contributions.

If a member, or a member who retires after June 30, 1965, under part B, section 1 of this article, dies and no pension or pensions become payable under this chapter on account of his death, his accumulated contributions standing to his credit in the Annuity Savings Fund at the time of his death shall be paid to such person or persons as he shall have nominated by written designation duly executed and filed with the board of trustees. If there be no such designated person or persons surviving the said member, his said accumulated contributions shall be paid to his legal representative. If such member dies intestate, without having designated a person as

---

[75]    DFFA (§ 22.A.14.a.); DPCOA (§ 41.A.); DPLSA (§ 51.A.).

[76]    DPOA (§ 33.C.).

[77]    DFFA (§ 42.A.14.j.).

[78]    DFFA (§ 42.A.14.i.); DPOA (§ 33.P.).

- 56 -

above provided, and without heirs, his said accumulated contributions not to exceed a reasonable sum to be determined by the board of trustees, shall be used to pay his burial expenses, provided he leaves no other estate sufficient for such purpose; and any balance credited to such member in the Annuity Savings Fund not so used for burial expenses shall be transferred to the Survivors Benefit Fund.  (As amended September 1, 1964.  In effect September 15, 1964.  As amended November 5, 1968.  In effect January 1, 1969.)  (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part E, § 1.)

### Sec. 2.    Allowances to widows, etc.

Upon the death of a member, or a member who retires after June 30, 1965, under part B, section 1 of this article, and such death was found by the board of trustees not to have resulted from the performance of his duty, the applicable retirement allowances provided in paragraphs (a), (b), (c) and (d) of this section shall be paid from the Survivors Benefit Fund and shall be subject to paragraphs (e), (f) and (g) of this section.

    (a)    His widow, or in the case of a female member, her widower, whom the board of trustees finds to be totally and permanently disabled and to have been dependent upon the said female member for at least fifty per cent of his financial support, shall receive a retirement allowance computed in the same manner in all respects as if the said member had (1) regularly retired the day preceding the date of his death, notwithstanding that he might not have acquired twenty-five years of creditable service, in the case of a member as defined in article IV, section 1 (a), (b), or (c), or notwithstanding that he might not have acquired twenty-five years of service or more and had not attained age fifty-five, in the case of a member as defined in article IV, section 1 (d), (2) elected option 2 provided for in part H of this article, and (3) nominated his said widow or widower as joint beneficiary; provided, that in no case shall the retirement allowance payable to such joint beneficiary be less than twenty per cent of said member's average final compensation.  If a member who had less than twenty-five years of creditable service dies prior to July 1, 2001, the retirement allowance payable to the widow/widower shall be terminated in the event the widow/widower remarries.

    (b)    His unmarried child or children under age eighteen years shall each receive a retirement allowance of one-seventh of the annual maximum earnable compensation of the rank of a patrolman or a fire fighter, as the case may be; provided, that if there be more than two such children, each child shall receive a retirement allowance of an equal share of two-sevenths of said annual maximum earnable compensation of a patrolman or a fire fighter.  Upon any such child's adoption, marriage, death or attainment of age eighteen years, whichever occurs first, his retirement allowance shall terminate, and there shall be a redistribution by the board of trustees to the deceased member's remaining eligible children under age eighteen years; provided, that in no case shall the retirement allowance

payable to any such child exceed one-seventh of the said annual maximum earnable compensation of a patrolman or a fire fighter.

(c)    If, at the time of the said member's death, there shall be neither a widow nor children eligible for a retirement allowance provided for in this section, each of his parents shall receive a retirement allowance of one-seventh of the annual maximum earnable compensation of a patrolman, or a fire fighter, as the case may be; provided, that the board of trustees finds that such parent was dependent upon the said member for at least fifty per cent of his financial support.  Upon the remarriage of any such parent, his retirement allowance shall thereupon terminate.

(d)    In the event all the retirement allowances, provided for in this section, payable on account of the death of a member, terminate before there has been paid an aggregate amount equal to the said member's accumulated contributions standing to his credit in the Annuity Savings Fund at the time of his death, the difference between his said accumulated contributions and the said aggregate amount of retirement allowances shall be paid to such person or persons as the said member shall have nominated by written designation duly executed and filed with the board of trustees.  If there be no such designated person or persons surviving the said member such difference, if any, shall be paid to his legal representative.

(e)    In no case shall any retirement allowance be paid under this section on account of the death of a member if any benefits are paid under part D of this article on account of his death.  The retirement allowance provided for in this section shall be subject to part I of this article.

(f)    All benefits provided in this part E for beneficiaries of members as defined in article IV, section 1 (a), (b), or (c) shall be based on the maximum earnable compensation of the rank of patrolman or fire fighter, as the case may be.  If hereafter the compensation of such rank shall be changed, the benefits provided shall be changed proportionately.  All benefits provided in this part E for beneficiaries of members as defined in article VI, section 1 (d) shall be based on the maximum earnable compensation of the rank of patrolman or fire-fighter as established in the city's budget for the fiscal year of the member's death.

(g)    In the event a member has withdrawn his accumulated contributions from the Annuity Savings Fund and has not returned in full all amounts due the fund by him, the survivors benefits provided in paragraphs (a), (b), (c) and (d) of this section shall be reduced to the proportion that the member's accumulated contributions standing to his credit in the Annuity Savings Fund, at the time of his death bears to the amount his accumulated contributions would have been had he not made a withdrawal from the Annuity Savings Fund.  (As amended September 1, 1964.  In effect

- 58 -

September 15, 1964.  As amended November 5, 1968.  In effect January 1, 1969.)

(1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part E, § 2.)

---

## By Agreement

The City agrees that in the Policemen and Firemen Retirement System Article VI, D and Article VI, E, all references to "widow" shall include "widower" and in Article VI, E, Section 2(a), the disability and dependency restrictions on widowers shall be removed.[79]

---

## DPOA

Duty and non-duty death benefits under the City of Detroit Policemen and Firemen Retirement System shall be payable to widowers in the same manner as they are now payable to widows. Widowers seeking non-duty death benefits under the system shall not be required to demonstrate any degree of dependency on their wives.[80]

---

## DFFA / DPOA

Effective July 1, 2001, [for DPOA allied members,[81]] the re-marriage penalty on any pension shall be removed.[82]

---

### Part F — Termination of Membership Otherwise than by Retirement, Death or Becoming a Beneficiary.

### Sec. 1.     Payment of benefits.

If the membership of a member as defined in article IV, section 1 (a), (b), or (c) shall terminate for any reason other than his retirement, his becoming a beneficiary, or his death, he shall be paid the accumulated contributions standing to the credit of his individual account in the Annuity Savings Fund, such payment to be made within ninety days after such termination of membership; provided, however, that if a member eligible for retirement shall resign or be dismissed from the service, the Board of Trustees, on the written petition of such member filed within one year from his separation from service and prior to the withdrawal of his accumulated contributions in the Annuity Savings Fund, shall grant such member service retirement benefits computed in accordance with article VI, part A, section 2, subject to the provisions of part G of this article.  (As amended November 5, 1968.  In effect January 1, 1969.)  (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part F, § 1.)

---

[79]     DFFA (§ 22.A.14.a.); DPCOA (§ 41.A.); DPLSA (§ 51.A.).

[80]     DPOA (§ 33.C.).

[81]     DFFA (§ 42.A.14.j.).

[82]     DFFA (§ 42.A.14.i.); DPOA (§ 33.P.).

## Sec. 2. Payment of benefits.

If the membership of a member as defined in article IV, section 1(d) shall terminate for any reason other than his retirement, his becoming a beneficiary or his death, he shall be paid the accumulated contributions standing to the credit of his individual account in the Annuity Savings Fund, such payment to be made within ninety days after such termination of membership; provided, however, that if a member having twenty-five or more years of service and having attained age fifty-five shall resign or be dismissed from the service, the Board of Trustees, on the written petition of such member filed within one year from his separation from service and prior to the withdrawal of his accumulated contributions in the Annuity Savings Fund, shall grant such members service retirement benefits computed in accordance with article VI, part A, section 2.1, subject to the provisions of part G of this article. (As amended November 5, 1968. In effect January 1, 1969.) (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part F, § 2.)

## Sec. 3. Deferred vested benefits.

A member (i) whose employment is terminated before August 28, 2003 and who is credited with eight or more years of creditable service and has attained age forty, or (ii) whose employment is terminated after August 27, 2008 and who is credited with ten or more years of creditable service, but in each case less than twenty-five years (effective as of March 8, 2007, twenty years for DPOA members and fire equivalents) of creditable service shall be eligible to receive a full retirement allowance beginning on the date upon which the member would have been eligible to commence a full retirement allowance had he continued in the service of the City until such date. Alternatively, such member may elect to receive an actuarially reduced early retirement allowance at any time following his termination of employment with the City.

## Part G — Conviction of Felony.

## Sec. 1. Forfeiture of rights.

If a member or beneficiary as defined in Article IV, section 1 (a), (b), (c) or (d) shall be convicted by a court of competent jurisdiction of a felony or high misdemeanor involving moral turpitude committed during active service, the Board of Trustees shall have the power to order the forfeiture of all rights of the member or beneficiary to benefits hereunder, except the return of his accumulated contributions. (As amended November 5, 1968. In effect January 1, 1969.) (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part G, § 1.)

## Part H — Option Elections.

## Sec. 1. Generally.

(a)     Prior to the first payment of any retirement allowance normally due, except a disability pension payable under Part B, Sections 2 and 2.1 of this article, a member may elect to receive his or her retirement allowance as a straight life retirement allowance payable throughout the member's life; or the member may elect to receive the actuarial equivalent, as of the date of the member's retirement, of his or her straight life retirement allowance in a reduced retirement allowance payable throughout the member's life and

nominate a joint beneficiary, in accordance with the provisions of Options 1, 2 or 3 as follows:

(1)     OPTION 1.  *Cash Refund Annuity*.  Under Option 1, a member will receive a reduced retirement allowance.  If a member who selected Option 1 dies before full payment of the annuity has been received, the person or persons nominated by that member's written designation duly executed by the member and filed with the Board of Trustees shall receive in a single payment the difference between the present value of the member's annuity on the date the member retired, minus the amount of annuity payments already paid to the member.  If there is no such designated person(s) surviving the retired deceased member, such difference, if any, shall be paid to the member's legal representative; or

(2)     OPTION 2.  *Joint and Last Survivorship Retirement Allowance*.  Under Option 2, upon a member's death, payment of a reduced retirement allowance shall be continued through the life of and paid the person having an insurable interest in the member's life and nominated by written designation duly executed by the member and filed with the Board of Trustees prior to the first payment of the member's retirement allowance is due; or

(3)     OPTION 3.  *Modified Joint and Last Survivorship Allowance*.  Under Option 3, upon a member's death, payment of one-half of the member's reduced retirement allowance shall be continued throughout the life of and paid to the person having an insurable interest in the member's life and nominated by that member's written designation duly executed by the member and filed with the Board of Trustees prior to the date the first payment of the retirement allowance is due.

(b)     This Section shall be applicable to those members receiving benefits on the effective date of this Section who are not covered by the arbitration decision regarding the Detroit Police Officers Association which became effective July 1, 1995, or the arbitration decision regarding the Detroit Police Lieutenant's and Sergeant's Association arbitration decision which became effective June 30, 1998.

(c)     This Section does not rescind any substantive rights of disability retirees from the Policemen and Firemen Retirement System who retired prior to the July 1,1995 arbitration award, or the substantive rights of disability retirees from the Detroit Police Lieutenant's and Sergeant's Association who retired prior to the June 30,1998 arbitration award.

(d)     This Section does not amend any computations used to determine benefits under Part B, Sections 2 and 2.1 of this Code, or result in an increase or decrease in such benefits.

(e)     Existing 1099R reporting procedures shall continue as currently in effect. A change in said procedures shall only occur as the result of an Internal Revenue Service ruling letter in favor of such change.

(Ord. 5-00, Sec. 54-2-14; Ord. 4-00, Sec. 54-2-14.)

*Joint and Survivor Optional Forms of Payment.* The Joint and Survivor Optional Forms of Payment provided under the retirement system shall be made available in either the standard form or the pop-up form, as follows:

(1)     *Standard Form.* Under the *Standard Form,* the reduced retirement allowance shall be paid throughout the lifetime of the retiree.

(2)     *Pop-up Form.* Under the *Pop-up Form,* the reduced allowance shall be paid throughout the lifetime of the retiree and the designated beneficiary. In the event of the death of the designated beneficiary during the lifetime of the retiree, the amount of the allowance shall be changed to the amount that would have been payable had the retiree elected the Straight Life Form of Payment.

In addition, a member may elect to have all or part of his accumulated contributions paid to the member in a single sum or used to purchase an annuity contract from an insurance company of his choice in which case, any annuity payments attributable to such amount under the retirement system shall not be payable from the annuity reserve fund but shall be the responsibility of the insurance company. A member' s retirement allowance shall be reduced by the actuarial equivalent of the amount so paid or used.

Effective July 1, 1992, retirees of the Policemen and Firemen Retirement System shall be entitled to change their pension option from either Option 2 or Option 3 **[or effective July 1, 2000, Option A**[83]**]** to a straight life pension after they have commenced collection of the pension if the member's beneficiary predeceases the member. The actuarial cost of the change in benefit shall be borne by the member who seeks change in his option election. The pop-up option shall be based upon the investment return assumption as recommended by the Board's actuary and adopted by the Board of Trustees. **[This provision shall be effective July 1, 1986.**[84]**]** (Ord. No. 18-93, Sec. 47-12.6H-1(A).)

---

### By Agreement

---

Effective July 1, 2000, members shall have the option of selecting a 75% surviving beneficiary option.[85]

---

[83]     DFFA (§ 22.A.14.l.).

[84]     DPOA (§ 33.M.).

[85]     DPLSA (§ 51.M.).

**Sec. 2.    Disposition of surplus benefits upon death of member and beneficiary.**

In the event a member elected Option 2 or 3 provided for in section 1 of this part H and his designated joint beneficiary die before there has been paid in retirement allowances an aggregate amount equal to his accumulated contributions standing to his credit in the Annuity Savings Fund at the time of his retirement, the difference between his said accumulated contributions and the said aggregate amount of retirement allowances paid shall be paid to the said retired member's legal representative.    (As amended September 1, 1964.    In effect September 15, 1964.)  (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part H, § 2.)

## Part I — Pension Offset by Compensation Benefits.

**Sec. 1.    Generally.**

Any amounts which may be paid under the provisions of any workmen's compensation, or pension, or similar law to a member, or to the dependents of a member on account of any disability or death, shall be offset against and payable out of funds provided by the City under the provisions of the system on account of the same disability or death.  In case the present value of the total commuted benefits under said workmen's compensation, pension, or similar law, is less than the pension reserve on benefits otherwise payable from the funds provided by the City under this System, then the present value of the commuted payments shall be deducted from the pension reserve, and such benefits as may be provided by the pension reserve, so reduced, shall be payable under the provisions of the System.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part I, § 1.)

## Part J — Monthly Payments.

Unless otherwise herein provided, all benefits payable under this system shall be paid in equal monthly installments.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part J.)

## Part K — Re-Examination of Beneficiaries.

**Sec. 1.    Authority of Board.**

(a)    Once each year during the first five years following retirement of a member on a disability pension or a disability retirement allowance and at least once in every three year period thereafter the Board of Trustees may, and upon his application, shall require any disability beneficiary, if he would not then be eligible for a service retirement allowance had he remained in active service; to undergo a medical examination:  such examination shall be made by, or under the direction of the Medical Director at a place to be fixed by the Board of Trustees.  Except when the examination is on the application of the beneficiary, if the beneficiary shall be required to travel more than twenty miles to reach such place, the Board of Trustees shall pay his reasonable traveling expenses.  Should such disability beneficiary refuse to submit to such examination his disability pension or disability retirement allowance may be discontinued until he shall submit to such examination and should such refusal continue

- 63 -

**Sec. 2.    Disposition of surplus benefits upon death of member and beneficiary.**

In the event a member elected Option 2 or 3 provided for in section 1 of this part H and his designated joint beneficiary die before there has been paid in retirement allowances an aggregate amount equal to his accumulated contributions standing to his credit in the Annuity Savings Fund at the time of his retirement, the difference between his said accumulated contributions and the said aggregate amount of retirement allowances paid shall be paid to the said retired member's legal representative.    (As amended September 1, 1964.    In effect September 15, 1964.)  (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part H, § 2.)

## Part I — Pension Offset by Compensation Benefits.

**Sec. 1.    Generally.**

Any amounts which may be paid under the provisions of any workmen's compensation, or pension, or similar law to a member, or to the dependents of a member on account of any disability or death, shall be offset against and payable out of funds provided by the City under the provisions of the system on account of the same disability or death.  In case the present value of the total commuted benefits under said workmen's compensation, pension, or similar law, is less than the pension reserve on benefits otherwise payable from the funds provided by the City under this System, then the present value of the commuted payments shall be deducted from the pension reserve, and such benefits as may be provided by the pension reserve, so reduced, shall be payable under the provisions of the System.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part I, § 1.)

## Part J — Monthly Payments.

Unless otherwise herein provided, all benefits payable under this system shall be paid in equal monthly installments.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part J.)

## Part K — Re-Examination of Beneficiaries.

**Sec. 1.    Authority of Board.**

(a)    Once each year during the first five years following retirement of a member on a disability pension or a disability retirement allowance and at least once in every three year period thereafter the Board of Trustees may, and upon his application, shall require any disability beneficiary, if he would not then be eligible for a service retirement allowance had he remained in active service; to undergo a medical examination:  such examination shall be made by, or under the direction of the Medical Director at a place to be fixed by the Board of Trustees.  Except when the examination is on the application of the beneficiary, if the beneficiary shall be required to travel more than twenty miles to reach such place, the Board of Trustees shall pay his reasonable traveling expenses.  Should such disability beneficiary refuse to submit to such examination his disability pension or disability retirement allowance may be discontinued until he shall submit to such examination and should such refusal continue

**Sec. 2.    Disposition of surplus benefits upon death of member and beneficiary.**

In the event a member elected Option 2 or 3 provided for in section 1 of this part H and his designated joint beneficiary die before there has been paid in retirement allowances an aggregate amount equal to his accumulated contributions standing to his credit in the Annuity Savings Fund at the time of his retirement, the difference between his said accumulated contributions and the said aggregate amount of retirement allowances paid shall be paid to the said retired member's legal representative.    (As amended September 1, 1964.    In effect September 15, 1964.)  (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part H, § 2.)

## Part I — Pension Offset by Compensation Benefits.

**Sec. 1.    Generally.**

Any amounts which may be paid under the provisions of any workmen's compensation, or pension, or similar law to a member, or to the dependents of a member on account of any disability or death, shall be offset against and payable out of funds provided by the City under the provisions of the system on account of the same disability or death.  In case the present value of the total commuted benefits under said workmen's compensation, pension, or similar law, is less than the pension reserve on benefits otherwise payable from the funds provided by the City under this System, then the present value of the commuted payments shall be deducted from the pension reserve, and such benefits as may be provided by the pension reserve, so reduced, shall be payable under the provisions of the System.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part I, § 1.)

## Part J — Monthly Payments.

Unless otherwise herein provided, all benefits payable under this system shall be paid in equal monthly installments.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part J.)

## Part K — Re-Examination of Beneficiaries.

**Sec. 1.    Authority of Board.**

(a)    Once each year during the first five years following retirement of a member on a disability pension or a disability retirement allowance and at least once in every three year period thereafter the Board of Trustees may, and upon his application, shall require any disability beneficiary, if he would not then be eligible for a service retirement allowance had he remained in active service; to undergo a medical examination:  such examination shall be made by, or under the direction of the Medical Director at a place to be fixed by the Board of Trustees.  Except when the examination is on the application of the beneficiary, if the beneficiary shall be required to travel more than twenty miles to reach such place, the Board of Trustees shall pay his reasonable traveling expenses.  Should such disability beneficiary refuse to submit to such examination his disability pension or disability retirement allowance may be discontinued until he shall submit to such examination and should such refusal continue

- 63 -

**Sec. 2.    Disposition of surplus benefits upon death of member and beneficiary.**

In the event a member elected Option 2 or 3 provided for in section 1 of this part H and his designated joint beneficiary die before there has been paid in retirement allowances an aggregate amount equal to his accumulated contributions standing to his credit in the Annuity Savings Fund at the time of his retirement, the difference between his said accumulated contributions and the said aggregate amount of retirement allowances paid shall be paid to the said retired member's legal representative.    (As amended September 1, 1964.    In effect September 15, 1964.)  (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part H, § 2.)

## Part I — Pension Offset by Compensation Benefits.

**Sec. 1.    Generally.**

Any amounts which may be paid under the provisions of any workmen's compensation, or pension, or similar law to a member, or to the dependents of a member on account of any disability or death, shall be offset against and payable out of funds provided by the City under the provisions of the system on account of the same disability or death.  In case the present value of the total commuted benefits under said workmen's compensation, pension, or similar law, is less than the pension reserve on benefits otherwise payable from the funds provided by the City under this System, then the present value of the commuted payments shall be deducted from the pension reserve, and such benefits as may be provided by the pension reserve, so reduced, shall be payable under the provisions of the System.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part I, § 1.)

## Part J — Monthly Payments.

Unless otherwise herein provided, all benefits payable under this system shall be paid in equal monthly installments.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part J.)

## Part K — Re-Examination of Beneficiaries.

**Sec. 1.    Authority of Board.**

(a)    Once each year during the first five years following retirement of a member on a disability pension or a disability retirement allowance and at least once in every three year period thereafter the Board of Trustees may, and upon his application, shall require any disability beneficiary, if he would not then be eligible for a service retirement allowance had he remained in active service; to undergo a medical examination:  such examination shall be made by, or under the direction of the Medical Director at a place to be fixed by the Board of Trustees.  Except when the examination is on the application of the beneficiary, if the beneficiary shall be required to travel more than twenty miles to reach such place, the Board of Trustees shall pay his reasonable traveling expenses.  Should such disability beneficiary refuse to submit to such examination his disability pension or disability retirement allowance may be discontinued until he shall submit to such examination and should such refusal continue

- 63 -

for one year, all his rights in and to a pension may be revoked by the Board of Trustees. If on medical examination of a beneficiary, the Medical Director reports, and the report is concurred in by the Board of Trustees, that the beneficiary is physically able and capable of resuming active duty as a Policeman or Fireman, he shall be restored to such duty and his disability pension or disability retirement allowance shall cease. Such member so restored to active duty shall be returned to duty in a rank or grade equivalent to or higher than the rank or grade in which he was serving at the time of his last retirement and his compensation shall be that provided for the rank or grade in which he is restored to service. It shall be the duty of the Commissioner of Police or the Board of Fire Commissioners to restore such member to duty forthwith.

(b)    If the Medical Director reports and certifies to the Board of Trustees that a disabled old plan member is engaged in a gainful occupation, paying more than the difference between his final compensation and his disability pension, or disability retirement allowance, and if the Board of Trustees concurs, the amount of his pension shall be reduced to an amount, which together with the amount earned by him, shall equal the amount of his final compensation. If the Medical Director reports and certifies to the Board of Trustees that a disabled new plan member is engaged in a gainful occupation, paying more than the difference between his base salary at the time of disability increased by two and twenty-five one hundredths percent (2.25%) for each full year from the date of disability and his disability pension, or disability retirement allowance, and if the Board of Trustees concurs, the amount of his pension shall be reduced to an amount, which together with the amount earned by him, shall equal the amount of his final compensation. Should his earnings be later changed, the amount of his pension may be further modified in like manner.

(c)    A disability beneficiary, who shall be reinstated to active service, as provided in this section, shall from the date of such restoration again become a member of the System; and he shall contribute to the System thereafter in the same manner and at the same rate as he paid prior to his disability retirement. Any prior service and membership service on the basis of which his services were computed at the time of his retirement shall be restored to full force and effect, and he shall be given service credit for the period of time he was in retirement due to such disability, except in the case of nonservice connected disability.

(1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part K, § 1.)

## Part L — Medical Board of Review

As to all applications under this Article, the medical findings of the Medical Board of Review shall be binding on the Board of Trustees. (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part L.)

## Part M — Benefit Limitations

The Defined Benefit Plan of the Retirement System is subject to Section 415 of the Internal Revenue Code. The Retirement System shall be administered, operated and limited consistent with all applicable Sections of the Internal Revenue Code (IRC) including Section 415, as described in Article IX, Section 8.

## Part N — Withdrawal of Accumulated Contributions

### Sec. 1.    Member With Twenty or Twenty-Five Years of Service.

Effective July 1, 1982, a member with twenty-five years or more of creditable service (effective as of March 8, 2007, twenty years for DPOA members and fire equivalents) shall be allowed to withdraw either a partial or the full amount of his accumulated contributions, one time only, whether or not the member retires. A member shall make such election prior to the receipt of his first retirement benefit check.

### Sec. 2.    Disabled Member

A member who is receiving disability benefits (duty or non-duty) from the System and who has twenty-five years (effective as of March 8, 2007, twenty years for DPOA members and fire equivalents) or more of creditable service shall have the right to withdraw the full amount of his accumulated contributions. If such member withdraws his accumulated contributions, his retirement benefit shall be actuarially reduced to reflect such withdrawal.

---

### By Agreement

---

(a)    Optional Annuity Withdrawal

1.    **[Effective for those retiring on or after July 1, 1974;[86]**] a member shall have the right to elect to receive on the effective date of his service retirement a partial or total refund of his accumulated contributions. If a member makes such an election, an annuity payable under any retirement allowance or reduced retirement allowance shall be reduced proportionally. If the total accumulated contributions are withdrawn, no annuity shall be payable.

The limitation of fifteen twenty-seconds of the maximum earnable compensation of a patrolman and fireman continues in effect. For purposes of determining the fifteen twenty-seconds limitation, a computation based on the annuity which is an actuarial equivalent of the accumulated contributions standing to a member's credit in the Annuity Savings Fund prior to any partial or total refund will be used.

This provision affords the members of this collective bargaining unit a similar option available to members of the General Retirement System pursuant to 1973 Amendment K. The parties agree that no other benefits or amounts payable

---

[86]    DPOA (§ 33.D.).

pursuant to the Policemen and Firemen Retirement System are affected by this contractual provision.[87]

**[On or after July 1, 1974, members or former members who are entitled to begin to receive the "40 & 8" benefit will be entitled to the annuity refund withdrawal option.**

**On or after July 1, 1974, non-duty disability retirants who retired pursuant to Title IX, Chapter VII, Article IV, Section 1, a, b or c prior to having twenty-five years of service credit, shall be entitled to the annuity refund withdrawal option on the date he/she would have had twenty-five years of service credit had he/she continued as an active member. Said option shall only apply to the balance of accumulated contributions, if any, remaining in such retirant's credit in accordance with the existing annuity refund provisions.**

**Survivor benefit beneficiaries as defined in Title IX, Chapter VII, Article VI, Part E, Section 2, parts (a), (b) and (c) of the 1918 City Charter in effect as of June 30, 1974, and continued in effect by Section 11-102 of the July 1, 1974, City Charter shall be entitled to the annuity withdrawal refund option subject to the same rules that would have been applicable to the deceased member or members had he/she not died. Said option shall only apply to the balance of accumulated contributions, if any, remaining in applicable former member's credit.**

**In any case of doubt, the Board of Trustees shall decide whether a member or beneficiary is entitled to an annuity refund withdrawal option.[88]]**

2.   In addition to the provisions of the current CET or collective bargaining agreement, pension charter and ordinance provisions and all other pension rights of members, a member shall have the right on or after the effective date of his becoming eligible for a full service retirement allowance (members who have twenty-five (25) years of creditable service) to elect to receive a partial or total refund of his accumulated contributions to the Annuity Savings Fund. If a member makes such an election, an annuity payable under any retirement allowance or reduced retirement allowance shall be reduced proportionally. If the total accumulated contributions are withdrawn, no annuity shall be payable.

If a member makes such an election, the retirement allowance shall be reduced to reflect the value of the annuity withdrawn. The amount of the annuity at the time of such election shall be the amount used at the time of retirement for purposes of computing the retirement allowance.

---

[87]   DFFA (§ 22.A.14.b.); DPCOA (§ 39.A.); DPLSA (§ 48.H.); DPOA (§ 33.D.).

[88]   DFFA (§ 22.A.14.b.); DPCOA (§ 39.B-E.); DPLSA (§ 48.H.).

[**Beginning July 1, 1982, and thereafter,[89]**] all members who complete their required years of service, shall have the right to withdraw all or part of their accumulated contributions whether they choose to retire or not. [90]

[**For members having a parity relationship with the DPOA and the DPCOA Inspector beginning July 21, 2000,[91]**] [**Effective July 1, 2003,[92]**] [**Beginning July 21, 2000,[93]**] [**a member who has elected to retire and elected to withdraw his/her annuity for the purposes of calculating his/her retirement allowance (thereby lowering the retirement allowance), may nevertheless choose to leave the annuity in the Retirement System collecting regular annuity interest with the option of a one-time withdrawal of the annuity funds at a later date.[94]**]

[**For members [or employees with a parity relationship with the DPLSA and the DPCOA Inspector[95]] who retire on or after July 1, 1990, and who have made or make an election to receive a total or partial refund of his/her accumulated contribution to the Defined Contribution Plan, there shall be no reduction of retirement allowances due to the portion of withdrawal representing interest credits.[96]**] [**This subsection shall be controlled by the requirements of the Act 312 arbitration award issued June 25, 1990 (MERC Case No. B89 C-0622, page numbers 22 and 23.[97]**]

[**Effective January 15, 2010[98] or December 15, 2008[99] or March 8, 2007,[100]**] a member [**or a DPOA, DPLSA, or DPCOA allied member of DFFA[101]**] who retires and elects to leave a balance in the Defined Contribution Plan (Annuity Savings Fund) would have the option of receiving a quarterly payment of interest earnings only or to allow periodic withdraws of principal, in addition to a one time complete withdrawal.[102] [**Members must make their selection a minimum

---

[89]    DPOA (§ 33.F.).

[90]    DFFA (§ 22.A.14.b.); DPCOA (§ 39.F.); DPLSA (§ 48.H.); DPOA (§ 33.F.).

[91]    DFFA (§ 22.A.14.b.).

[92]    DPLSA (§ 48.I.).

[93]    DPOA (§ 33.F.).

[94]    DFFA (§ 22.A.14.b.); DPLSA (§ 48.I.); DPOA (§ 33.F.).

[95]    DFFA (§ 22.A.14.b.2.).

[96]    DFFA (§ 22.A.14.b.2.); DPCOA (§ 39.H.); DPLSA (§ 48.H.).

[97]    DFFA (§ 22.A.14.b.2.); DPLSA (§ 48.H.).

[98]    DFFA (§ 22.A.14.b.)(effective date for DPCOA allied members); DPCOA (§ 39.J.)("Effective with the Act 312 Award in MERC Case No. D07 K-1456, dated January 15, 2010…")

[99]    DFFA (§ 22.A.14.b.3.)(effective date for DPLSA allied members ); DPLSA (§ 48.J.).

[100]   DFFA (§ 22.A.14.b.)(effective date for DPOA allied members); DPOA (§ 33.S.).

[101]   DFFA (§ 22A.14.b.3.)

[102]   DFFA (§ 22.A.14.b.); DPCOA (§ 39.A-H, J.); DPLSA (§ 48.A-H, J.); DPOA (§ 33.S.).

13-53846-swr    Doc 8008-1    Filed 08/25/14    Entered 08/25/14 23:27:34    Page 87 of
632

**of thirty (30) days before the beginning of a quarter; quarter defined as beginning March 1, June 1, September 1, and December 1.[103]]**

**[An employee who is entitled to a retirement allowance under Article VI, Part A, Section 4 of the Policemen and Firemen Retirement System and who leaves the employ of the Police or Fire Department of the City of Detroit on or after July 1, 1982 shall have the right to elect to receive on the effective date of termination a partial or total refund of his accumulated contributions. The pension portion of his retirement allowance shall be computed as if the member had not withdrawn his/her accumulated contributions from the Annuity Savings Fund until the date he/she was eligible to retire had he/she continued in City employment.[104]]**

---

### DPCOA

---

Effective in accordance with the specific date and terms of the Detroit Police Officers Association (DPOA) award in Act 312 No. D98 E-0840 (Chairman Donald F. Sugerman, dated July 21, 2000) the membership of this bargaining unit shall have the right to leave his/her withdrawn annuity in the pension system and accumulating interest, as provided therein.[105]

---

[103]    DFFA (§ 22.A.14.b.)(applicable to DPLSA and DPCOA allied members); DPCOA (§ 39.A-H, J.); DPLSA (§ 48.A-H, J.).

[104]    DFFA (§ 22.A.14.b.); DPCOA (§ 39.G.); DPLSA (§ 48.H.).

[105]    DPCOA (§§ 39.I.).

- 68 -

13-53846-swr   Doc 8307-1   Filed 02/25/14   Entered 02/25/14 13:09:42   Page 81 of
13-53846-swr   Doc 6908-1   Filed 08/15/14   Entered 08/15/14 13:27:34   Page 880 of
455
632

# ARTICLE VII.

## Method of Financing.

The funds of the retirement system shall be the Annuity Savings Fund, Annuity Reserve Fund, Pension Accumulation Fund, Pension Reserve Fund and the Survivors Benefit Fund.  (As amended September 1, 1964.  In effect September 15, 1964.  As amended November 5, 1968.  In effect January 1, 1969.)  (1918 Detroit City Charter, Title IX, Ch. VII, Art. VII.)

## Sec. 1.    Annuity Savings Fund.

(a)    The Annuity Savings Fund shall be the fund in which shall be accumulated at regular interest, the contributions deducted from compensation of members to provide for their annuities.    The contributions of a member as defined in article IV, section 1 (a), (b) or (c) shall be five percent of a member's compensation until the member has acquired twenty-five years of creditable service.  The contribution of a member as defined in article IV, section 1(d) shall be five per cent of his compensation until he has acquired at least twenty-five years of creditable service (effective as of March 8, 2007, twenty years for DPOA members and fire equivalents) and attained age fifty-five.  No member shall have the option of choosing to receive the compensation required to be contributed hereunder directly instead of having such amounts paid by the City to the Annuity Savings Fund.

(b)    The officer or officers responsible for making up the payroll shall cause the contributions provided for in paragraph (a) above to be deducted from the compensation of each member on each and every payroll, for each and every payroll period, from the date of his entrance in the system to the date he ceases to be a member.

(c)    The deductions provided for herein shall be made notwithstanding that the minimum compensation provided by law for any member shall be reduced thereby.  Every member shall be deemed to consent and agree to the deductions made and provided for herein, and payment of his salary or compensation, less said deduction, shall be a full and complete discharge and acquittance of all claims and demands whatsoever for the services rendered by such person during the period covered by such payments, except as to the benefits provided under this chapter.  The amounts to be deducted shall be deducted by the city treasurer and when deducted shall be paid into the Annuity Savings Fund and shall be credited to the individual account of the member from whose compensation said deduction was made.

(d)    If, under the provisions of this chapter, any person shall withdraw or be paid any part or all of his accumulated contributions and shall thereafter again become a member, he shall, in addition to the contributions provided

- 69 -

for in paragraph (a) above, redeposit in the Annuity Savings Fund, by an increased rate of contribution to be determined by the board of trustees, or by a single payment, such amount that his accumulated contributions at the date of his eligibility for retirement will be the same amount it would have been had no withdrawal or payment been made therefrom.

(e)    Except as is otherwise provided in this chapter, upon the death or retirement of a member, his accumulated contributions shall be transferred from the Annuity Savings Fund to the Annuity Reserve Fund. (As amended September 1, 1964. In effect September 15, 1964. As amended November 5, 1968. In effect January 1, 1969.)

(1918 Detroit City Charter, Title IX, Ch. VII, Art. VII, § 1.)

## Sec. 2.    Annuity Reserve Fund.

The Annuity Reserve Fund shall be the fund from which shall be paid all annuities payable as provided in this chapter, except annuities which are payable from the Survivors Benefit Fund. Should a disability beneficiary be restored to active service, his annuity reserve at the time shall be transferred from the Annuity Reserve Fund to the Annuity Savings Fund and credited to his individual account therein. (As amended September 1, 1964. In effect September 15, 1964.) (1918 Detroit City Charter, Title IX, Ch. VII, Art. VII, § 2.)

## Sec. 3.    Alternative Financing Method.

Except as provided regarding the survivors benefit fund, the pension accumulation fund shall be the fund in which shall be accumulated reserves for the pensions and other benefits payable from contributions made by the city, and from which transfers shall be made as provided in this section.

(a)    Accrued Liability Fund. Pursuant to Ordinance No. 05-05, which authorizes the creation of the Detroit Police and Fire Retirement System Service Corporation, the City has entered into a transaction ("the Pension Funding Transaction") to obtain funds as an alternative to those available through the traditional funding mechanism described in Section 4. The proceeds generated by the Pension Funding Transaction (or any Additional Pension Funding Transaction, as described below) that will be deposited into the System will be termed the "Funding Proceeds." The Funding Proceeds will be deposited into a new Fund in the System to be called the Accrued Liability Fund. The purpose of the Funding Proceeds will be to fund all or part of the heretofore unfunded accrued liabilities ("UAAL") of the System, as determined as of a date certain, i.e., the "Determination Date," pursuant to the System's actuarial valuation as of that date. The Funding Proceeds will be assets of the System and will be applied, together with all other assets of the System, to fund the System's obligation to pay accrued benefits.

This Accrued Liability Fund shall contain only the Funding Proceeds of the Pension Funding Transaction, and any earnings thereon. Should the City, by future ordinance, choose to raise additional monies by additional pension funding transactions ("Additional Pension Funding Transactions") in order to fund the then existing UAAL of the System as of a future date certain, a new and separate Accrued Liability Fund shall be created within the System to contain the proceeds, and any earnings thereon, of any Additional Pension Funding Transactions, and a new Accrued Liability Fund will be created for each successive Additional Pension Funding Transaction entered into by the City, if any. The treatment of any Additional Accrued Liability Funds shall be the same as described below.

(b)     The Funding Proceeds deposited in the applicable Accrued Liability Fund will be subject to the oversight and investment direction of the Board of Trustees of the Police and Fire Retirement System, consistent with the Board's obligations under Article VIII (Management of Funds), The Board will invest the Funding Proceeds as part of the System's overall assets, and will not differentiate the Funding Proceeds from other System assets for investment purposes.

(c)     All Interest, dividends and other income derived from the investment of the Funding Proceeds shall be credited annually to the Accrued Liability Fund on a total System rate of return basis, determined by crediting the applicable Accrued Liability Fund with the investment return experienced by the System in total for all of its investments for the year. This shall be done by first determining the rate of return for the total assets of the System for the fiscal year, and then crediting back to each Accrued Liability Fund an amount that is determined by multiplying that rate of return times the balance in the Accrued Liability Fund as of the beginning of the fiscal year.

The interest, dividends and other income derived from the investment of the Funding Proceeds deposited in any Accrued Liability Fund will not be credited to any Funds other than the Pension Accumulation Fund. Morever, because the Accrued Liability Fund has been impressed with a certain and definite purpose, it shall be accounted for separately as provided for in Section 8, Maintenance of Reserves.

(d)     Upon the creation of an Accrued Liability Fund and the deposit of the Funding Proceeds into the applicable Accrued Liability Fund, there shall be established a schedule for transferring assets of the applicable Accrued Liability Fund by crediting them to the Pension Accumulation Fund on an annual basis over the period required to fully amortize the System's UAAL determined as of the applicable Determination Date.

The System's UAAL determined as of the Determination Date shall be the "Determined Accrued Liability." The period over which the Determined

Accrued Liability is to be fully amortized, as specified in the System's actuarial valuation as of the applicable Determination Date, is the "Amortizing Period." The amount to be transferred each fiscal year to the Pension Accumulation Fund from the Accrued Liability Fund is the "Scheduled Amortizing Amount."

With respect to the Pension Funding Transaction and any Additional Pension Funding Transactions, the Scheduled Amortizing Amount will equal a level percentage of the City's payroll for each fiscal year. The level percentage of the City payroll that will be used to determine the Scheduled Amortizing Amount shall be a level percentage that is equal to the percentage that is specified in the actuarial valuation as of the applicable Determination Date as being the percentage of City's annual payroll required to amortize the Determined Accrued Liability over the Amortizing Period, multiplied by a fraction. The numerator of the fraction shall be the amount of the applicable Funding Proceeds up to the full amount of the Determined Accrued Liability as of the Determination Date. The denominator of the fraction shall be the System's Determined Accrued Liability on that date.

**Commentary**: By way of example only, the Scheduled Amortizing Amount would be determined as follows: (1) the Determination Date is June 30, 2004, (2) the Funding Proceeds are deposited into the System during the 2004-2005 Fiscal Year, (3) the June 30, 2004 actuarial valuation produced a UAAL of $600 million, (4) the City's contribution required to amortize that UAAL is 21% of the City's payroll, and (5) the Funding Proceeds are $400 million, then the Scheduled Amortizing Amount for Fiscal Year 2005-06 would be 21% times ($400 million/$600 million) times the City's payroll for 2005-2006.This would be 14% times the City's payroll for that fiscal year.

With respect to the Pension Funding Transaction or any Additional Pension Funding Transactions, where the applicable Determination Date occurs after the date of the actuarial valuation that determines the City's contribution for the fiscal year during which the applicable Funding Proceeds are deposited into the System, for each fiscal year, there will be transferred from the applicable Accrued Liability Fund to the Pension Accumulation Fund, an amount that is specified in such actuarial valuation as being the City's required contribution needed to amortize the System's UAAL as of the date of such actuarial valuation, multiplied by a fraction. The numerator of the fraction shall be the amount of the applicable Funding Proceeds up to the full amount of the UAAL specified in such actuarial valuation, and the denominator of the fraction shall be the System's total UAAL as set forth in that same actuarial valuation.

**Commentary**: By way of example only, the Scheduled Amortizing Amount in this case would be determined as follows: (1) the

Determination Date is June 30, 2004, (2) the Funding Proceeds had been deposited into the System during the 2004-2005 Fiscal Year, (3) the June 30, 2003 actuarial valuation produced a UAAL of $516 million, (4) the City's contribution required to amortize that UAAL is 19.07% of the City's payroll and (5) the Funding Proceeds are $400 million, then the Scheduled Amortizing Amount for Fiscal Year 2004-2005 would be 19.07% times ($400 milllon/$516 million) times the City's payroll for 2004-2005. This would be 14.77% times the City's payroll for that fiscal year.

Should the Board at some future time adopt a different period for amortizing the System's UAAL (a "Revised Amortizing Period"), the Scheduled Amortizing Amount for ensuing years may change. If the Revised Amortizing Period provides for a longer period during which to amortize the System's UAAL (i.e., an "Extended Amortizing Period"), then the Amortizing Period initially used to amortize the applicable Determined Accrued Liability will also be revised. There will then be established a new schedule for amortizing the Determined Accrued Liability and the Scheduled Amortizing Amount will be based on the level percentage of the City's payroll being equal to what it would be if the then unamortized balance of the Determined Accrued Liability were re-amortized over the Extended Amortizing Period. If the Revised Amortizing Period is changed so that the System's UAAL is to be amortized over a shorter period than the one initially used to amortize the applicable Determined Accrued Liability, then that Scheduled Amortizing Amount will not be changed.

(e)     Each year, when the City is required to make its annual contribution to the System — the amount of which is to be determined pursuant to Section 4 and the timing of which is set forth in Section 4(b) — the Board will transfer the Scheduled Amortizing Amount from the Accrued Liability Fund and credit it to the Pension Accumulation Fund; provided, however, that this transfer cannot occur unless and until the Board has been notified pursuant to the Pension Funding Transaction, or any Additional Pension Funding Transaction, that the City is current on the service payments required under the applicable Pension Funding Transaction.

(f)     Should the Scheduled Amortizing Amount not be available for transfer because of the City's failure to make a timely service payment as required by the applicable Pension Funding Transaction, the Board will take any permitted action, including the filing of a civil action against the City, as contemplated in Article VIII, Section 7, to effectuate the transfer of the Scheduled Amortizing Amount.

Should the City's Finance Director certify to the Board by a duly attested notice that the City has no available funds to make the service payments required by the applicable Pension Funding Transaction, in that specific circumstance, the Board shall be authorized to transfer the Scheduled

Amortizing Amount for that fiscal year to the Pension Accumulation Fund, absent the notice requirement set forth in Section 3(e).

(g)     Since the Funding Proceeds are to be considered assets of the System and are intended to fund the applicable Determined Accrued Liability, the City shall be required to make only a proportional contribution for any fiscal year ending after the date the Funding Proceeds are deposited into the applicable Accrued Liability Fund, but prior to a fiscal year whose corresponding actuarial valuation includes the Funding Proceeds in the System's total assets. The proportional contribution to fund the System's then existing UAAL, if any, shall be the level percentage of the City's payroll specified in the actuarial valuation for the applicable fiscal year as the City's required contribution needed to amortize the System's then existing UAAL, multiplied by a fraction. The numerator of the fraction shall be the amount of the System's total UAAL as determined in such actuarial valuation minus the amount of the applicable Funding Proceeds, but not less than zero. The denominator of the fraction shall be the amount of the System's total UAAL in such valuation. Actuarial valuations following the deposit of the applicable Funding Proceeds into the System shall Include the Funding Proceeds in the total assets of the System to determine any ensuing UAAL of the System, and the Funding Proceeds shall offset any such actuarial liability accordingly.

**Commentary**: By way of example, the following indicates how the procedure describe above would operate. Assume the following facts — (1) the Determination Date was June 30, 2004, (2) the June 30, 2004 actuarial valuation produced a UAAL of $600 million and a contribution toward the UAAL of 21% of the City's payroll, (3) the Funding Proceeds were $400 million and were deposited in the System during the 2004-2005 Fiscal Year, (4) the first actuarial valuation which included the Funding Proceeds in the System's assets was as of June 30, 2005 and (5) the June 30, 2003 valuation which determines the City's required contribution for fiscal 2004- 05 produced a total UAAL of $516 million and a contribution toward that UAAL of 19.07% of the City's payroll. Then:

•    The fiscal year ending after the date of deposit would be the year ending June 30, 2005, or the 2004-2005 Fiscal Year

•    The first fiscal year whose corresponding valuation reflected the Funding Proceeds in its assets would be the 2006- 2007 year.

•    Thus, the City's required UAAL. contribution for fiscal 2004-2005 would be 19.07% of the payroll times ($516 million — $400 million) divided by $516 million, or 4.3% of payroll. The City's required UAAL contribution for fiscal 2005-06 would be 21% of payroll times ($800 million — $400 million) divided by $600 million, or 7% of the City's payroll.

• Beginning with the Fiscal Year 2006- 2007, whose contribution is determined by the June 30, 2005 actuarial valuation, the City's required UAAL contribution would be the percentage of payroll developed in the corresponding actuarial valuation that included the Funding Proceeds as being part of the System's assets.

Any contribution the City has made to the System for any fiscal year prior to the date the Funding Proceeds from any applicable Pension Funding Transaction have become assets of the System. Where the amount of the contribution is equal to or less than the normal cost of that fiscal year it shall be deemed to have been made in satisfaction of the City's obligation to contribute an amount equal to the System's normal cost for that fiscal year, and not as payment towards any portion of its obligation to pay an amortized portion of the System's UAAL due in that fiscal year. The term "normal cost" as used in this Section 3(g), shall be given its generally accepted actuarial meaning.

To the extent the City's contribution for that fiscal year exceeds its required contribution for the normal cost owed in that fiscal year, its excess contributions shall be deemed as having been made for that immediately following fiscal year, and shall offset the City's normal cost contribution obligation for that immediately following fiscal year.

**Commentary**: By way of example, the following indicates how the procedure described in the preceding paragraphs would operate. Assuming the same facts as in the prior Commentary, and the City contributed $40 million for the 2004-2005 Fiscal Year and the total normal cost for that year was $40 million:

• The entire $40 million would be deemed as payment of the required normal cost for 2004-2005, and

• No part of the $40 million contribution would be deemed payment toward UAAL, as no UAAL contribution is required for that year.

Now assume that the facts remain the same, but that the City had contributed a total of $45 million for 2004-2005:

• The City's total required contribution for 2004-2005 would be deemed paid in full, and

• $5 million, i.e., $45 million minus $40 million, would be deemed prepayment of the City's required normal cost for 2005-2006 and its required normal cost contribution for 2005-2006 would be reduced accordingly.

(h)     The System's auditor shall verify (1) the assets credited to the Pension Accumulation Fund and any Accrued Liability Fund at the beginning and

end of each fiscal year, (2) that each Fund had been properly credited, and (3) that transfers from the Accrued Liability Fund(s) to the Pension Accumulation Fund had occurred as intended, under this Section 3.

(i) Should the System's auditor certify that the total assets then remaining in the System, not including the assets of any Accrued Liability Fund, together are insufficient to pay the benefits then currently due under the System, the System's auditor will then determine and certify the minimum amount needed to fund the benefits then due and owing (the "Minimum Necessary Amount"). In this limited circumstance, the Board is authorized to transfer the Minimum Necessary Amount from the Accrued Liability Fund to the Pension Accumulation Fund absent the notification required pursuant to Section 3(e).

At the end of the Amortizing Period, or the end of the Extended Amortizing Period, if applicable, should there be any moneys that remain credited to the Accrued Liability Fund, the Board may transfer, at its discretion, any such remaining funds, in whole or in part, by crediting them to the Pension Accumulation Fund. The Pension Accumulation Fund is the only Fund into which the remaining moneys credited to the Accrued Liability Fund may be transferred.

(Ord. No. 04-05, Sec. 54-43-4.)

## Sec. 4. Contributions to and payments from pension accumulation fund.

Contributions to and payments from the pension accumulation fund shall be made as follows:

(a) Upon the basis of such assumptions as to future financial experiences as the board of trustees shall from time to time adopt, the actuary shall annually compute the city's contribution, expressed as a percent of active member contributions, to provide the pension reserves covering the pensions or other city-financed benefits to which members might be entitled or which might be payable at the time of their discontinuances of city employment; provided, such contribution percents shall not be less than amounts which, expressed as percents of active member compensations, will remain level from generation to generation of Detroit citizens. Upon the retirement or death of a member, the pension reserve for any benefits payable on his behalf shall be transferred from the pension accumulation fund to the pension reserve fund, to the extent of there being assets in the pension accumulation fund.

(b) The board of trustees shall annually ascertain and report to the mayor and the council the amount of contributions due the retirement system by the city, and the council shall appropriate and the city shall pay such contributions to the retirement system during the ensuing fiscal year.

When paid, such contributions shall be credited to the pension accumulation fund.

(Ord. No. 04-05, Sec. 54-43-5; Ord. No. 76-H, Sec. 54-43-4.)

### Sec. 5.    Retiree payments from Pension Reserve Fund; reinstatement of disability retirees to active service.

Except as to the survivor's benefit fund, the pension reserve fund shall be the fund from which shall be paid pensions on account of members.  Should a disability retirant be reinstated to active service, the member's pension reserve, at that time, shall be transferred from the pension reserve fund to the pension accumulation fund.  (Ord. No. 04-05, Sec. 54-43-6; Ord. No. 76-H, Sec. 54-43-5.)

### Sec. 6.    Expense Fund.

The Expense Fund shall be the fund to which shall be credited all money provided by the City to pay the administration expenses of the system, and from which shall be paid all the expenses necessary in connection with the administration and operation of the System.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. VII, § 5.)

### Sec. 7.    Appropriations.

(a)    The Board of Trustees shall certify the amount of the appropriation necessary to pay to the various funds of the System the amounts payable by the City as enumerated in this amendment, according to legal budget procedure.

(b)    To cover the requirements of the System temporarily, such amounts as shall be necessary to cover the needs of the System shall be paid into the Pension Accumulation Fund and the Expense Fund by special appropriations or transfers to the System; provided, however that no transfers can be made from the accrued liability fund other than the annual transfer of the scheduled amortizing amount, or transfers under special circumstances pursuant to Sections 3(f) and 3(I).

(Ord. No. 04-05, Sec. 54-43-7; 1918 Detroit City Charter, Title IX, Ch. VII, Art. VII, § 6.)

### Sec. 8.    Maintenance of reserves.

The maintenance of the annuity reserves in the Annuity Reserve Fund and the pension reserves in the Pension Reserve Fund are hereby made obligations of the Pension Accumulation Fund. All income, interest, and dividends derived from deposits and investments authorized by this ordinance, excluding any amounts credited to the Accrued Liability Fund, which are not required for the allowance of interest to the funds of the System as provided herein, shall be credited to the Pension Accumulation Fund. The moneys credited to the Accrued Liability Fund shall be credited to the Pension Accumulation Fund only to the extent of the annual transfer of the Scheduled Amortizing Amount or the special circumstance transfers authorized pursuant to

Sections 3(f) and 3(i). Any contributions by the City to the System from any Fund impressed by law with a certain and definite purpose shall be accounted for separately. (Ord. No. 04-05, Sec. 54-43-8; 1918 Detroit City Charter, Title IX, Ch. VII, Art. VII, § 7.)

## Sec. 9. Survivors Benefit Fund.

(a)    The Survivors Benefit Fund shall be the fund in which shall be accumulated, at regular interest, the reserves for survivors benefits provided for in article VI, part E, section 2, hereof, and from which such benefits shall be paid.

(b)    After June 30, 1965 and prior to July 1, 1986, each member shall contribute to the Survivors Benefit Fund one per cent of his compensation paid by the city until he has acquired twenty-five years of creditable service. The officer or officers responsible for making up the payroll shall cause the said contributions to be deducted from the member's compensation, on each and every payroll, for each and every payroll period so long as he remains a member and has not acquired twenty-five years of creditable service. Each and every member shall be deemed to consent and agree to the said deductions. Said contributions, when deducted, shall be credited to the Survivors Benefit Fund and shall in no case become a part of the said member's accumulated contributions, nor be subject to refund.

(c)    Each member who retires after June 30, 1965, under part B, section 1 of article VI shall, prior to July 1, 1986, contribute to the Survivors Benefit Fund one per cent of his final compensation as defined until he would have had a total of twenty-five years of creditable service had he continued in active service. The officer or officers responsible for making up the retirement roll shall cause the said contribution to be deducted from the pension of each such retired member on each and every retirement roll, for each and every retirement roll period, so long as he is receiving a pension under part B, section 2(a) of article VI. Each and every such retired member who is receiving a pension under part B, section 2(a) of article VI shall be deemed to consent and agree to said deductions. Said contributions, when deducted, shall be credited to the Survivors Benefit Fund and shall in no case become a part of said member's accumulated contributions, nor be subject to refund.

---

**By Agreement**

---

**Survivor's Benefit Fund**

The contributions, required by Article VII, Section 8(b) and 8(c) of the Policemen and Firemen Retirement System, to the Survivor's Benefit Fund shall be eliminated for Union members.[106]
**[The City shall make the contributions necessary to maintain the benefit level by**

---

[106]    DFFA (§ 22.A.14.g.); DPCOA (§ 41.B.); DPLSA (§ 51.B.); DPOA (§ 33.L.).

**contributing that amount necessary to replace the members' contributions to the Survivor's Benefit Fund.[107]]**

**[This provision shall be effective July 1, 1986.[108]]**

---

    (d)    Upon the basis of such mortality and other tables of experience, and regular interest, as the board of trustees shall from time to time adopt, the actuary shall annually compute the liabilities for benefits being paid from the Survivors Benefit Fund. The board of trustees shall report to the mayor and the common council the amount of contributions to be made by the city to the Survivors Benefit Fund, and the council shall appropriate and the city shall pay such amount to the retirement system during the ensuing fiscal year. When paid, such appropriations shall be credited to the Survivors Benefit Fund. If the balance in the fund is not sufficient to fully cover the liabilities so computed, the city shall appropriate and pay, in the ensuing fiscal year, the amount of such insufficiency.

    (e)    Upon the death of a member, on whose account survivors benefits become payable as provided in article VI, part B, section 2, hereof, his accumulated contributions standing to his credit in the Annuity Savings Fund at the time of his death shall be transferred from the Annuity Savings Fund to, and shall become a part of, the Survivors Benefit Fund, notwithstanding any provisions in this chapter to the contrary. (As amended September 1, 1964. In effect September 15, 1964.)

    (1918 Detroit City Charter, Title IX, Ch. VII, Art. VII, § 8.)

### Sec. 10. Computation of annuity and pension reserve liabilities for members, retirants and beneficiaries.

    In computing the annuity and pension reserve liabilities for members, retirants and beneficiaries, the board of trustees shall cause the following annual decrement probabilities, salary factors and interest assumption to be used.

    (a)    The annual decrement probabilities and salary factors to be used in evaluating the annuity and pension liabilities for members shall be as shown in Tables 1 and 2 hereinafter set forth.

    (b)    The total of active member annual compensations shall be assumed to increase three percent per annum, compounded annually.

---

[107]    DFFA (§ 22.A.14.g.); DPOA (§ 33.L.).

[108]    DPOA (§ 33.L.).

(c)     The mortality assumption for retirants and beneficiaries shall be the mortality rates contained in the 1971 group annuity male mortality table, without setback for men and set back five years for women.

(d)     The investment return assumption shall be five percent per annum, compounded annually.

## TABLE 1.

### City of Detroit Policemen and Firemen
### Retirement System
### Active Member Annual Decrement Probabilities
### and Salary Factors

| Age | Withdrawal from Service | Death in Service | Salary Factors |
|-----|-------------------------|------------------|----------------|
| 18  | .04120 | .00098 | .10561 |
| 19  | .04090 | .04099 | .11327 |
| 20  | .04030 | .00100 | .12126 |
| 21  | .04000 | .00101 | .12988 |
| 22  | .03960 | .00102 | .13913 |
| 23  | .03910 | .00103 | .14913 |
| 24  | .03890 | .00104 | .15971 |
| 25  | .03840 | .00105 | .17068 |
| 26  | .03800 | .00107 | .18204 |
| 27  | .03700 | .00108 | .19347 |
| 28  | .03600 | .00111 | .20527 |
| 29  | .03480 | .00113 | .21712 |
| 30  | .03340 | .00117 | .22916 |
| 31  | .03200 | .00121 | .24124 |
| 32  | .03000 | .00126 | .25321 |
| 33  | .02730 | .00133 | .26522 |
| 34  | .02370 | .00143 | .27753 |
| 35  | .01990 | .00154 | .29015 |
| 36  | .01500 | .00168 | .30306 |
| 37  | .01160 | .00184 | .31637 |
| 38  | .00850 | .00204 | .32995 |
| 39  | .00600 | .00227 | .34405 |
| 40  | .00390 | .00252 | .35851 |
| 41  | .00210 | .00281 | .37333 |
| 42  | .00090 | .00313 | .38861 |
| 43  | .00000 | .00348 | .40435 |
| 44  | .00000 | .00387 | .42051 |
| 45  | .00000 | .00429 | .43709 |
| 46  | .00000 | .00475 | .45395 |
| 47  | .00000 | .00526 | .47144 |

| Age | Withdrawal from Service | Death in Service | Salary Factors |
|---|---|---|---|
| 48 | .00000 | .00582 | .48929 |
| 49 | .00000 | .00643 | .50750 |
| 50 | .00000 | .00710 | .52639 |
| 51 | .00000 | .00783 | .54560 |
| .52 | .00000 | .00864 | .56535 |
| 53 | .00000 | .00953 | .58548 |
| 54 | .00000 | .01051 | .60612 |
| 55 | .00000 | .01157 | .62711 |
| 56 | .00000 | .01270 | .64867 |
| 57 | .00000 | .01392 | .67066 |
| 58 | .00000 | .01520 | .69319 |
| 59 | .00000 | .01656 | .71610 |
| 60 | .00000 | .01802 | .73939 |
| 61. | .00000 | .01959 | .76316 |
| 62 | .00000 | .02133 | .78747 |
| 63 | .00000 | .02322 | .81211 |
| 64 | .00000 | .02526 | .83715 |
| 65 | .00000 | .02750 | .86258 |
| 66 | .00000 | .03000 | .88848 |
| 67 | .00000 | .03277 | .91514 |
| 68 | .00000 | .03584 | .94264 |
| 69 | .00000 | .03919 | .97094 |
| 70 | .00000 | .04278 | 1.00000 |

## TABLE 2.

### City of Detroit Policemen and Firemen Retirement System
### Annual Probabilities of Age and Service Retirement Applicable to Members Who Are Eligible to Retire

| Age | Probabilities of Retirement |
|---|---|
| 45 | 25% |
| 46 | 25 |
| 47 | 25 |
| 48 | 25 |
| 49 | 25 |
| 50 | 25 |
| 51 | 25 |
| 52 | 25 |
| 53 | 25 |
| 54 | 20 |

| 55 | 20 |
| 56 | 15 |
| 57 | 10 |
| 58 | 15 |
| 59 | 30 |
| 60 | 100 |

(Ord. No. 77-H, Sec. 54-2-2; Ord. No. 462-f, Sec. 2.)

### Sec. 11.    Determination of city's annual contribution — Disability pension liabilities.

The city's annual contribution, expressed as a percent of active member compensations, to finance disability pensions shall be determined by dividing the average of the pension reserve liabilities for disability retirements incurred, during the three fiscal years ending with the date of the valuation by one percent of the active members' annual compensation used in the valuation. (Ord. No. 77-H, Sec. 54-2-3; Ord. No. 462-F, Sec. 3.)

### Sec. 12.    Determination of city's annual contribution — Death pension liabilities.

The city's annual contribution, expressed as a percent of active member compensations, to finance death-in-service pensions shall be determined by dividing the average of the pension, reserve liabilities for death-in-service claims incurred during the three fiscal years ending with the date of the valuation by one percent of the active member's annual compensations used in the valuation.  (Ord. No. 77-H, Sec. 54-2-4; Ord. No. 462-F, Sec. 4.)

### Sec. 13.    Determination of city's annual contribution — Actuarial evaluation of annuity and pension reserve liabilities.

The annuity and pension reserve liabilities for members, retirants and beneficiaries shall be actuarially evaluated as set forth in this article.  (Ord. No. 77-H, Sec. 54-2-5.)

### Sec. 14.    Determination of city's annual contribution — Service pension liabilities.

(a)    The service pension liabilities for members shall be determined using the entry age-normal cost method of actuarial valuation.

(b)    The city's annual contribution, expressed as a percent of active member compensations, to finance the prospective service pension liabilities shall be determined by dividing the total of the individual annual normal costs of the active members by one percent (1%) of the active members' annual compensations used in the valuation.

(c)    The city's annual contribution, expressed as a percent of active member compensations, to finance any unfunded accrued service pension liabilities, including instances in which assets exceed liabilities, shall be determined by dividing such unfunded accrued service pension liabilities by one percent (1%) of the present value of future compensations payable during a period of future years.  Such period of future years shall be thirty

(30) years for the actuarial valuation as of June 30, 1974, decreasing one (1) year at each subsequent June 30th until a twenty (20) year period is reached, which twenty (20) year period shall be used in each subsequent actuarial valuation until June 30th, 2004 when the period shall again be thirty (30) years.

(Ord. No. 39-05, Sec. 54-43-3; Ord. No. 77-H, Sec. 54-2-6; Ord. No. 462-F, Secs. 5, 6.)

## Sec. 15. Board of trustees to compute city's annual contribution.

Based upon the provisions of this article, including any amendments, the board of trustees shall compute the city's annual contributions, expressed as a percent of active member compensations, to the retirement system for the fiscal year beginning July 1, 1975, using actuarial valuation data as June 30, 1974, and for each subsequent fiscal year using actuarial valuation data as of the June 30th date which date is a year and a day before the first day of such fiscal year. The board shall report to the mayor and to the city council the contribution percents so computed, and such contribution percents shall be used in determining the contribution dollars to be appropriated by the city council and paid to the retirement system. For each fiscal year beginning July 1, 1975 and each fiscal year thereafter, such contribution dollars shall be determined by multiplying the applicable contribution percent for such fiscal year by the member compensations paid for such fiscal year; provided for the one fiscal year beginning July 1, 1975 and ending June 30, 1976 such member compensations so used shall not exceed 106.09 percent of the active members' annual compensations used in the actuarial valuation determining such contribution percent. (Ord. No. 77-H, Sec. 54-2-7; Ord. No. 462-F, Sec. 8.)

## Sec. 16. Repealed. (Ordinance No. 77-H, Sec. 54-2-8).

## Sec. 17. Refunds for certain members.

Effective July 1, 1974, a member of the policemen and firemen retirement system who holds the rank of police inspector and above and who is not covered by a collective bargaining agreement shall, notwithstanding any other pension provisions to the contrary, have the right to elect to receive on the effective date of his service retirement a partial or total refund of his accumulated contributions. Effective as of March 8, 2007, a DPOA and fire equivalent retiree who elects not to withdraw his accumulated contributions as of the effective date of his service retirement shall have the option of receiving a quarterly payment of interest credited to his accumulated contributions or to receive periodic withdrawals of the contributions such retiree made to the plan. If a member makes such an election, an annuity payable under any retirement allowance or reduced retirement allowance shall be reduced proportionately. If the total accumulated contributions are withdrawn no annuity shall be payable. The limitations of fifteen twenty-seconds of the maximum earnable compensation of a patrolman and fireman continues in effect. For purposes of determining the fifteen twenty-seconds limitation, a computation based on the annuity which is an actuarial equivalent of the accumulated contributions standing to an above-defined member's credit in the annuity savings fund prior to any partial or total refund will be used. This provision affords the members as defined above a similar option available to members of the general retirement system pursuant to 1973 Charter Amendment K. No other benefits or amounts payable pursuant to other provisions of the policemen and firemen

retirement system are increased by this section. The mechanical steps involved in computing the service retirement allowance of a member as defined above shall be determined by the board of trustees of the policemen and firemen retirement system subject to approval of the law department. (Ord. No. 29-H, § 1; Sec. 54-2-9.)

---

**By Agreement**

---

## Employer Contribution

**[Effective January 1, 1987[109] or upon issuance of the 1986-89 Act 312 Award[110]]** the employee contributions to the Policemen and Firemen Retirement System Annuity Fund, although designated as employee contributions, shall be paid by the City of Detroit in lieu of contributions by the employee. The employee shall not have the option of choosing to receive the contributed amount directly instead of having them paid by the employer to the annuity fund. There shall be no additional contribution expense to the City of Detroit, and the amounts so contributed by the employer on behalf of the employee shall be treated, for tax purposes, as employer contributions and thus shall not be taxable to the employee until these amounts are distributed or made available to the employee.

This provision shall not affect the amount or benefit level of the retirement allowance, or the City of Detroit's obligation thereto.[111]

---

[109]    DFFA (§ 22.A.14.h.); DPLSA (§ 51.J.).

[110]    DPOA (§ 33.O.).

[111]    DFFA (§ 22.A.14.h.); DPCOA (§ 41.K.); DPLSA (§ 51.J.); DPOA (§ 33.O.).

# ARTICLE VIII.

## Management of Funds.

### Sec. 1.     Board named Trustees for various funds.

The Board shall be the Trustee of the several funds provided for in this Article, and shall have full power to invest and reinvest such funds subject to all terms, conditions, limitations, fiduciary duties, and restrictions imposed by The Public Employee Retirement System Investment Act, as amended, provided, that notes, bonds, or obligations of the City shall not be subject to said restrictions or limitations. The Board shall have the power to purchase notes, bonds, or obligations of the City before or after the same are offered to the public and with or without advertising for bids.  (Ord. No. 04-05, Sec. 54-43-9(a); 1918 Detroit City Charter, Title IX, Ch. VII, Art. VIII, § 1.)

### Sec. 2.     Purchase, sale, etc., of securities and investments.

The Board shall have full power to hold, purchase, sell, assign, transfer, and dispose of any of the securities and investments of the Retirement System, as well as the proceeds of said investments and any moneys belonging to the System.  (Ord. No. 04-05, Sec. 54-43-9(b); 1918 Detroit City Charter, Title IX, Ch. VII, Art. VIII, § 2.)

### Sec. 3.     Annual interest.

The Board annually shall allow Regular Interest on the mean amount of assets in each of the Funds for the preceding year. The amounts so allowed shall be due and payable to said Funds, and shall be annually credited thereto by the Board from interest and other earnings on the moneys of the System; provided, however, that the balance in any Accrued Liability Fund shall not be included in determining the mean amount of assets of the System when the Board makes this determination, and no Regular Interest on the mean amount of assets in the Accrued Liability Fund shall be credited to other Funds in the System until transferred to the Pension Accumulation Fund pursuant to Article VII, Section 3(e) or under special circumstances pursuant to Article VII, Sections 3(f) and 3(i). Any additional amount, required to meet the Regular Interest on the Funds of the System, shall be paid by the City and any excess of earnings, over such amount required, shall be a portion of the amounts to be contributed by the City.  (Ord. No. 04-05, Sec. 54-43-9(c); 1918 Detroit City Charter, Title IX, Ch. VII, Art. VIII, § 3.)

### Sec. 4.     Custodian of funds.

The City Treasurer or other person or entity designated by the Board shall be the custodian of the Funds of the Police and Fire Retirement System. All payments from such Funds shall be made by the Treasurer or other designated custodian. Payments made by the System shall be based upon vouchers signed by two persons designated by the Board. A duly attested copy of a resolution of the Board designating such persons and bearing upon its face specimen signatures of such persons, shall be filed with the Finance Director and the custodian of the Funds as their authority for making payments upon such vouchers. No voucher shall be drawn unless it shall have been previously authorized by a specific or continuing resolution adopted by

the Board.  (Ord. No. 04-05, Sec. 54-43-9(d); 1918 Detroit City Charter, Title IX, Ch. VII, Art. VIII, § 4.)

### Sec. 5.  Available funds shall be kept upon deposit.

Available funds shall be kept on deposit for the purpose of meeting disbursements for pensions, annuities, and other payments.  (Ord. No. 04-05, Sec. 54-43-9(e); 1918 Detroit City Charter, Title IX, Ch. VII, Art. VIII, § 5.)

### Sec. 6.  Prohibition against reversion of funds to the City.

This pension plan and trust has been created for the exclusive benefit of the members and beneficiaries as set forth herein.  The funds thereof have been established for the benefit of the members and for the operation of the pension system.  No part of the principal and income of any of the funds of this plan and trust shall revert to or be returned to the city prior to the satisfaction of all liabilities, hereunder to all members, beneficiaries and anyone claiming by or through them.  (Ord. No. 153-H, Sec. 54-45-6.)

### Sec. 7.  Enforcement; Civil Action.

A civil action for relief against any act or practice which violates the state law, the 1997 Detroit City Charter, the 1984 Detroit City Code or the terms of the System, may be brought by:

(a)     A member or retiree who is or may become eligible to receive a benefit under the System;

(b)     A beneficiary who is or may become eligible to receive a benefit under the System;

(c)     A Plan fiduciary, including a Trustee; or

(d)     The Finance Director, on behalf of the City as sponsor of the System.

(Ord. No. 04-05, Sec. 54-43-10.)

# ARTICLE IX.

## Miscellaneous.

### Sec. 1.　Assignments prohibited.

The right of a person to a pension, an annuity, or a retirement allowance, to return of contributions, the pension, annuity, or retirement allowance itself, an optional benefit, any other right accrued or accruing to any person under the provisions of this amendment and the moneys in the various funds created by this amendment shall not be subject to execution, garnishment, attachment, the operation of bankruptcy or insolvency law, or any other process of law whatsoever and shall be unassignable except as in this amendment specifically provided.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. IX, § 1.)

### Sec. 2.　Protection against fraud.

Whoever with intent to deceive, shall make any statement or report required under this amendment which is untrue, or shall falsify or permit to be falsified any record or records of this System, or who shall otherwise violate with intent to deceive, any of the terms or provisions of this amendment, upon conviction thereof, shall be fined not to exceed five hundred dollars or imprisoned in the Detroit House of Correction for a period not to exceed ninety days, or both. (1918 Detroit City Charter, Title IX, Ch. VII, Art. IX, § 2.)

### Sec. 3.　Errors.

Should any change or error in the records result in any member or beneficiary receiving from the System, more or less than he would have been entitled to receive had the records been correct, the Board of Trustees shall correct such error, and as far as practicable, shall adjust the payment in such a manner that the actuarial equivalent of the benefit to which such member or beneficiary was correctly entitled shall be paid.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. IX, § 3.)

### Sec. 4.　Recall of beneficiaries during emergencies.

During an emergency declared by the Commissioner of Police or the Board of Fire Commissioners, the Commissioner or the Board, as the case may be, shall have power, with the consent of a beneficiary, to recall to active duty a beneficiary for such period of service as the commissioner or the Board shall deem advisable; provided, however, that the foregoing power shall not apply in the case of a beneficiary who has reached the age of sixty-four years, and provided further, that any beneficiary so recalled may, at any time, separate from active duty on his own application or by order of the Commissioner or the Board.  A beneficiary so recalled shall serve in the rank at which he retired, or a higher rank, and shall receive the pay of such rank without deduction.  On subsequent separation from active duty, such beneficiary shall resume the beneficiary status held by him prior to such recall.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. IX, § 4.)

## Sec. 5.    Limitation of other statutes.

No other provision of law, Charter or Ordinance, which provides wholly or partly at the expense of the City for pensions or retirement benefits for Policemen or Firemen, their widows, or other dependents, shall apply to members or beneficiaries of the System established by this amendment, their widows, or other dependents.

(a)    All provisions of laws, inconsistent with the provisions of this amendment, are hereby repealed to the extent of such inconsistency.

(b)    This amendment shall not apply to any person who, at the effective date of this amendment shall be receiving a pension or other benefit from the City under the provisions of Chapter XV or XXI of Title IV of the 1918 Detroit City Charter, or who is excluded from membership in this System as provided by article IV, section 1 (a) of this amendment.

(c)    Savings clause.  If any part, article, chapter, section, subsection, sentence, clause or phrase of this amendment is for any reason held to be unconstitutional, such decision shall not affect the validity of the remaining parts, articles, chapters, sections, subsections, sentences, clauses and phrases of this amendment or the amendment as an entirety.

(d)    Effective date.  The 1940 amendments of this chapter are effective July 1, 1941.

The 1951 amendments to this chapter are effective November 15, 1951.
The 1953 amendments to this chapter are effective November 13, 1953.
The 1964 amendments to this chapter are effective July 1, 1965.
The 1968 amendments to this chapter are effective January 1, 1969.

(e)    (Adopted November 5, 1940.  In effect November 15, 1940.  As amended November 5, 1968.  In effect January 1, 1969)  (Historical Reference: Certain amendments and benefits became effective per defacto operation due to historical administration and collective bargaining agreements. Public Employment Relations Act became effective in 1965.  Supreme Court ruling that pensions are a mandatory subject of bargaining was issued on February 1, 1974.)

(1918 Detroit City Charter, Title IX, Ch. VII, Art. IX, § 5.)

(f)    System provisions are subject to Public Act 314 of 1965 as amended and applicable case law.

(g)    Distributions.    The System will apply the minimum distribution requirements of IRC 401(a)(9) in accordance with the final regulations under IRC 401(a)(9), notwithstanding any provision in the System to the contrary. Pursuant to IRC 401(a)(9), a member's interest must begin to be distributed by the later of (i) April 1 of the calendar year following the

calendar year that he attains the age of 70-1/2, or (ii) April 1 of the calendar year he retires. Distributions will be made in accordance with this Section and Regulations 1.401(a)(9)-2 through 1.401(a)(9)-9. The provisions of this Section and the regulations cited herein and incorporated by reference override any inconsistent plan distribution options. Pursuant to Code Section 401(a)(9)(H), Annuity Savings Fund minimum required contributions otherwise required for 2009 ("2009 RMDs") will not be distributed for 2009 unless the member so chooses to receive them and 2009 RMDs will be treated as eligible rollover distributions.

(h)     Termination. Upon System termination or upon complete discontinuance of contributions under the System, the rights of all employees to benefits accrued to the date of such termination or discontinuance to the extent then funded, or the amounts credited to the employees' accounts are nonforfeitable.

## Sec. 6.     Tax Qualified Plan.

The Retirement System is intended and has been administered to be a qualified pension plan under § 401 of the Internal Revenue Code, as amended ("IRC" or "Code"), or successor provisions of law, including the Tax Reform Act of 1986 (TRA '86); the Technical and Miscellaneous Revenue Act of 1988 (TAMRA); the Unemployment Compensation Amendments of 1992 (UCA); the Omnibus Budget Reconciliation Acts (OBRA); the Uniformed Service Employment and Reemployment Rights Act of 1994 (USERRA); the Uruguay Round Agreements Act of 1994 (GATT); the Small Business Job Protection Act of 1996 (SBJPA '96); the Taxpayer Relief Act of 1997 (TRA '97); the Internal Revenue Service Restructuring and Reform Act of 1998 (RRA '98); the Economic Growth and Tax Relief Reconciliation Act of 2001 (EGTRRA), and other applicable laws, regulations and administrative authority. The Retirement System is a governmental plan under IRC § 414(d) and is administered for the exclusive benefit of the plan's participants and their beneficiaries. The Retirement System trust is an exempt organization under IRC §501. All applicable provisions of the Internal Revenue Code are incorporated by herein by reference and such IRC provisions supercede any contrary provisions of the Retirement System.

## Sec. 7.     Definition of Compensation

Compensation will mean compensation as that term is defined in Article II, Sections 14 and 15 of the Plan. For any self-employed individual covered under the Plan, compensation will mean earned income. Compensation shall include only the compensation which is actually paid to the participant during the determination period. The determination period shall be the plan year.

Notwithstanding the above, compensation shall not include any amount which is contributed by the employer pursuant to a salary reduction agreement and which is not includible in the gross income of the employee under sections 125, 402(e)(3), 402(h) or 403(b) of the Internal Revenue Code.

The term compensation means the compensation of the member (participant) from the employer for the year consistent with Article II, Sections 14 and 15. The term "compensation" shall include any elective deferral (as defined in IRC Section 402(g)(3)) and any amount which is contributed or deferred by the employer at the election of the employee and which is not includible in the gross income of the employee by reason of IRC Sections 125, 132(f)(4), or 457.

For purposes of the Internal Revenue Code Section 415 limits, Compensation is defined pursuant to IRC Section 415(c)(3), by incorporating by reference the definition of Compensation pursuant to Treas. Reg. 1.415(c)-2. (Note: Notwithstanding that IRC 415(c)(3) applies only to defined contribution plans, this language is added to the defined benefit plan to satisfy the requirements of the Internal Revenue Service.)

## Sec. 8.  Limitation of Compensation

The Plan is subject to IRC 401(a)(17) and applicable regulations, as amended which currently provide:

Compensation shall not include any amount which is contributed by the employer pursuant to a salary reduction agreement and which is not includible in the gross income of the employee under sections 125, 402(e)(3), 402(h) or 403(b) or other applicable sections of the Internal Revenue Code.

For years beginning on or after January 1, 1989, and before January 1, 1994, the annual compensation of each participant taken into account for determining all benefits provided under the plan for any plan year shall not exceed $200,000. This limitation shall be adjusted by the Secretary at the same time and in the same manner as under section 415(d) of the Internal Revenue Code, except that the dollar increase in effect on January 1 of any calendar year is effective for plan years beginning in such calendar year and the first adjustment to the $200,000 limitation is effective on January 1, 1990.

For years beginning on or after January 1, 1994, the annual compensation limit of each participant taken into account for determining all benefits provided under the plan for any determination period shall not exceed $150,000, as adjusted for the cost-of-living in accordance with section 401(a)(17)(B) of the Internal Revenue Code. The cost-of-living adjustment in effect for a calendar year applies to any determination period beginning in such calendar year.

If a determination period consists of fewer than 12 months, the annual compensation limit is an amount equal to the otherwise applicable annual compensation limit multiplied by a fraction, the numerator of which is the number of months in the short determination period, and the denominator of which is 12.

If compensation for any prior determination period is taken into account in determining a participant's benefits for the current plan year, the compensation for such prior determination period is subject to the applicable annual compensation limit in effect for that prior period. For this purpose, in determining benefits in plan years beginning on or after January 1, 1989, the annual compensation limit in effect for determination periods beginning before that date is $200,000. In addition, in determining benefits in plan years beginning on or after January 1,

1994, the annual compensation limit in effect for determination periods beginning before that date is $150,000.

For year beginning on and after July 1, 2001, the annual compensation of a member taken into account for determining benefits for any plan year shall not exceed $200,000.00.

## Sec. 9.    Limitation of Benefits.

The amount of annual benefits and contributions that is credited a member in any given year shall be subject to the following limitations:

(a)    **Defined Benefit Plans.**    The maximum permissible Annual Pension Benefit with respect to any member shall be in accordance with IRC §415(b) which provides that such Annual Pension Benefit shall not exceed $90,000, as adjusted for inflation, which for 2002 is $160,000 (the "Dollar Limit").

(1)    Special Dollar Limitations.  If the benefit is payable prior to age 62, the dollar limitation shall be reduced to the actuarial equivalent of a benefit commencing at age 62.  In the case of any full-time police or fire employee who is a Qualified Participant as defined in IRC §415(b)(2)(G), there is no reduction in the dollar limitation.  If the benefit is not payable until after age 65, the dollar limitation shall be increased to the actuarial equivalent of a benefit commencing at age 65.

(2)    In the case of an employee who has less than ten (10) years of participation in the Plan, the Dollar Limitation shall be reduced 1/10 for each year of participation in accordance with IRC §415(b)(5).

(b)    **Defined Contribution Plans.**

(1)    For limitation years beginning after December 31, 1986 the term "annual addition" means, for purposes of this section the sum, credited to a participant's account for any limitation year, of:

a.    Employer contributions;

b.    Employee contributions; and

c.    Forfeitures.

(2)    Annual additions that may be contributed or allocated to a participant's account for a limitation year will not exceed the lesser of:

a.    100% percent of participant's compensation, within the meaning of IRC §415(c)(3), or

      b.    $40,000, as adjusted for increases in the cost of living pursuant to IRC §415(d).

## Sec. 10.   Direct Rollovers.

The defined benefit plan does not currently provide for lump sum payments.  However, to the extent lump sum payments are allowed, the plan will meet the following requirements regarding IRC 401(a)(31).

(a)    **Direct Rollovers.**  This section applies to distributions made on or after January 1, 1993.  Notwithstanding any provision of the plan to the contrary that would otherwise limit a distributee's election under this part, a distributee may elect, at the time and in the manner prescribed by the plan administrator, to have any portion of an eligible rollover distribution that is equal to at least $500 paid directly to an eligible retirement plan specified by the distributee in a direct rollover.

(b)    **Eligible rollover distribution**:  An eligible rollover distribution is any distribution of all or any portion of the balance to the credit of the distributee, except that an eligible rollover distribution does not include: any distribution that is one of a series of substantially equal periodic payments (not less frequently that annually) made for the life (or life expectancy) of the distributee or the joint lives (or joint life expectancies) of the distributee and the distributee's designated beneficiary, or for a specified period of ten years or more; any distribution to the extent such distribution is required under section 401(a)(9) of the Internal Revenue Code; any hardship distribution described in section 401(k)(2)(B)(i)(iv) received after 12-31-98; the portion of any other distribution(s) that is not includible in gross income (determined without regard to the exclusion for net unrealized appreciation with respect to employer securities); and any other distribution(s) that is reasonably expected to total less than $200 during a year.

(c)    **Eligible retirement plan**:  An eligible retirement plan is an individual retirement account described in section 408(a) of the Code, an individual retirement annuity described in section 408(b) of the Code, an annuity plan described in section 403(a) of the Code, or a qualified plan described in section 401(a) of the Code, that accepts the distributee's eligible rollover distribution.  However, in the case of an eligible rollover distribution to the surviving spouse, an eligible retirement plan is an individual retirement account or individual retirement annuity. On and after January 1, 2008, an eligible retirement plan, for purposes of accepting a rollover, shall include a Roth IRA to the extent permitted by Code Section 408A, and the regulations promulgated thereunder.

(d)    **Distributee**: A distributee includes an employee or former employee.  In addition, the employee's or former employee's surviving spouse and the

- 92 -

employee's or former employee's spouse or former spouse who is the alternate payee under a qualified domestic relations order, as defined in section 414(p) of the Code, are distributees with regard to the interest of the spouse or former spouse. On and after January 1, 2008, the retirement system shall allow nonspousal beneficiary transfers to an individual retirement plan in accordance with and subject to Internal Revenue Code Section 402(c)(11).

(e)     **Direct rollover**:  A direct rollover is a payment by the plan to the eligible retirement plan specified by the distributee.

# ARTICLE X.

## Collective Bargaining Agreements.

Collective Bargaining Agreement Provisions. Under Michigan Law if there is any conflict between the Retirement System provisions and collective bargaining agreement provisions, the terms of the collective bargaining agreement control.

(a)     The Board of Trustees shall administer the Retirement System consistent with the pension provisions of the 1998-2001 collective bargaining agreement between the City of Detroit and the Detroit Police Officers Association with respect to police officers covered by said collective bargaining agreement. Said provisions are attached as Exhibit A.

(b)     The Board of Trustees shall administer the Retirement System consistent with the pension provisions of the 1998-2001 collective bargaining agreement between the City of Detroit and the Detroit Police Lieutenants and Sergeants Association. Said provisions are attached as Exhibit B.

(c)     The Board of Trustees shall administer the Retirement System consistent with the pension provisions of the July 1, 1996 - June 30, 2004 collective bargaining agreement between the City of Detroit and the Detroit Police Command Officers Association. Said provisions are attached as Exhibit C.

(d)     The Board of Trustees shall administer the Retirement System consistent with the pension provisions of the July 1, 1998 - June 30, 2001 collective bargaining agreement between the City of Detroit and the Detroit Fire Fighters Association. Said provisions are attached as Exhibit D.

# ARTICLE XI.

## Compliance With USERRA.

USERRA.  The Retirement System shall comply with applicable, required provisions of Internal Revenue Code Section 414(u).  On and after January 1, 2007, notwithstanding anything to the contrary herein, if a member dies while performing qualified military service (as defined in Internal Revenue Code Section 414(u)), to the extent required by Internal Revenue Code Section 401(a)(37) the survivors of the member are entitled to any additional benefits (if any, and other than benefit accruals relating to the period of qualified military service) provided under the Retirement System as if the member had resumed and then terminated employment on account of death.

Notwithstanding anything to the contrary herein, on and after January 1, 2009, if the City decides to provide Differential Wage Payments to individuals who are performing service in the uniformed services (as defined in Chapter 43 of Title 238, United States Code) while on active duty for a period of more than 30 days, such Differential Wage Payment will be treated as compensation under Code Section 415(c)(3) limits, but not for purposes of Plan benefit accruals. For these purposes the term "Differential Wage Payment" means a payment defined in Code Section 3401(h)(2) that is made by the Retirement System to an individual who is performing service in the uniformed services while on active duty for a period of more than 30 days.

# ARTICLE XII.

## Deferred Retirement Option Plan.

The following provisions are hereby established as the Deferred Retirement Option Plan ("Drop") Program with respect to those members of the Retirement System who are covered by a collective bargaining agreement with a DROP Program (currently DPOA, DPCOA and DFFA and non-union executives of the Police Department and Fire Department).

(a)     In lieu of terminating employment and accepting a service retirement allowance under the plan provisions, any applicable member of this system who is eligible for the DROP Program and who is eligible to immediately receive a 25 year service retirement allowance may elect to participate in the Deferred Retirement Option Plan (DROP) and defer the receipt of retirement benefits in accordance with the provisions of this resolution. This DROP feature is effective for DROP eligible members retiring on or after March 1, 2002 or after IRS approval of the DROP provisions, whichever is later.

(b)     No additional service credit shall be earned by a participant in the DROP program.

(c)     There is no limit to the duration of participation in the DROP program.

(d)     Participation in the DROP program shall be consistent with applicable collective bargaining agreements. For DPOA members, Section 33N of the 1998-2001 collective bargaining agreement between the DPOA and the City of Detroit shall be controlling unless modified by future collective bargaining agreement.

(e)     Upon the effective date of the commencement of participation in the plan, active membership in the Retirement System shall terminate. However employer contributions shall continue to be paid into the Retirement System for the DROP participant as if the DROP participant was not a DROP participant. For purposes of this section, compensation and credit service shall remain as they existed on the effective date of commencement of participation in the DROP program. Seventy-five (75%) percent of the monthly retirement benefits (including applicable escalator increases) that would have been payable, had a member elected to cease employment and receive a service retirement allowance, shall be paid into the deferred retirement option plan (DROP) account. Upon termination of employment, deferred benefits (i.e. the DROP account balance) shall be paid as provided by this resolution.

(f)     The ICMA Retirement Trust has been selected as the initial DROP depository entity.

(g)     The Deferred Retirement Option Plan applicable amounts shall be invested as directed by the member within the investment choices as provided by the ICMA Retirement Trust (or substitute entity).

(h)     The fees for the DROP account shall be determined by the ICMA Retirement Trust (or substitute entity), which fees shall be paid by the DROP participant per deduction from the DROP account.

(i)     Upon termination of employment, a participant in the DROP program shall receive, at his or her option either a lump sum payment from the DROP account equal to the payments to the account plus earnings adjusted for any losses or a true annuity based upon his or her adjusted account, or he or she may elect any other method of payment allowed by the ICMA Retirement Trust (or substitute entity); provided, notwithstanding anything to the contrary herein, the Participant's adjusted DROP account balance at termination of employment shall not be less than total system DROP payments into his or her account (not including earnings and losses). The participant's monthly benefits that would have otherwise been paid at retirement prior to participation in the DROP program (i.e. 100%) shall begin to be paid to the retiree. Termination of employment includes termination of any kind, such as, resignation, discharge or disability.

(j)     If a participant dies during the period of participation in the DROP program a lump sum payment equal to his or her account balance shall be paid to his or her named beneficiary, or if none, to his or her estate; provided, notwithstanding anything to the contrary herein, the Participant's adjusted DROP account balance at death during the period of participation shall not be less than total system DROP payments into his or her account (not including earnings and losses).

(k)     In the event that a member dies prior to termination of employment while participating in the DROP, the member's designated beneficiary(ies) shall be entitled to the funds in the DROP account. In addition, the member's retirement allowance, with escalators, will be restored to one hundred percent (100%) of the amount that would have been paid, but for the member's decision to participate in the DROP program shall be paid in accordance with the deceased member's election option; provided, notwithstanding anything to the contrary herein, the Participant's adjusted DROP account balance at death shall not be less than total system DROP payments into his or her account (not including earnings and losses)..

(l)     If an employee becomes disabled after the period of participation in the DROP program but while still an employee and his employment is terminated because he is disabled, he or she (A) shall be immediately retired with the form of retirement selected by the employee at the commencement of the DROP program plus any applicable pension improvement increases, and (B) shall be entitled to the funds in the DROP account (as a lump sum or other allowed method). Such employee shall not be entitled to disability retirement benefits.

(m)     The ICMA Retirement Trust (or substitute entity), consisting of five (5) pages which are attached hereto, will receive the DROP funds and the funds of each participant shall be invested as directed by the member within the investment choices provided by the ICMA Retirement Trust (or substitute entity).

(n)     The Board of Trustees of the Policemen and Firemen Retirement System will enter into an Administrative Services Agreement with the International City Management Association Retirement Corporation "RC" (or substitute entity) which will serve as Investment Advisor to the ICMA Retirement Trust (or substitute entity).

(o) The ICMA Retirement Trust (or substitute entity) will offer a series of separate funds for the investment of DROP account assets as referenced in the ICMA Retirement Trust's (or substitute entity) disclosure documents.

(p) Any matters relating to the DROP program not covered by the July 21, 2000 DPOA Act 312 Act Award, collective bargaining provisions, the ICMA Retirement Trust (or substitute entity) or any applicable law or authority shall be resolved by decision of the Board of Trustees of the Policemen and Firemen Retirement System.

(q) The Board of Trustees may replace the ICMA Retirement Trust with an equivalent trust type vehicle subject to approval of the applicable collective bargaining associations.

(r) The effective date of the foregoing DROP Program provisions are subject to confirmation from the Internal Revenue Service that the DROP Program does not adversely affect the qualified status of the Defined Benefit Plan of the Policemen and Firemen Retirement System. The appropriate forms applying for a qualified plan determination letter with the DROP provisions shall be filed by the Retirement System and any other applicable party.

The DROP program is subject to all applicable Internal Revenue Service rules, regulations, authority and applicable provisions of the Internal Revenue Code.

---

**By Agreement**

---

**Deferred Retirement Option Program (DROP)**

**[The Deferred Retirement Option Program (DROP) plan option shall be discontinued and no longer available to members not currently enrolled in the plan. The plan shall remain in effect for all members currently enrolled.[112]]**

**[Effective July 1, 2003[113] or July 21, 2000[114]]** a Deferred Retirement Option Program (DROP) plan option shall be made available as a retirement option with the following features:

(a) **[To participate in the program a member must have at least twenty-five (25) [or twenty (20)[115]] years of [active[116]] service with the City as a member of the Policemen and Firemen Retirement System.[117]] [Members entering the DROP Plan after the date of the Award must remain in a full-duty status for the duration of their participation in the DROP Plan. If a member is not able to return to full-duty**

---

[112]    DPCOA (§ 43.A.).

[113]    DPLSA (§ 51.O.).

[114]    DPOA (§ 33.R.).

[115]    DPOA (§ 33.R.1.).

[116]    DPOA (§ 33.R.1.).

[117]    DFFA (§ 22.A.14.r.); DPLSA (§ 51.O.1.).

**status within six months, their participation in the DROP Plan shall terminate and he/she shall revert to a regular pension.[118]**

(b)    There will be no limit on the number of years a member may participate in the program. **[For members of the bargaining unit entering into the DROP Plan after the date of this Award, participation in the DROP Plan shall be limited to ten (10) years.[119]]**

(c)    If a member is injured to the point that the member is disabled and placed off on a duty disability per the Retirement System, the member will revert to his regular pension.

(d)    A DROP accumulation account will be established with an outside investment company chosen by the Union.

(e)    The amount paid into the DROP accumulation account shall be 75% of the member's regular retirement allowance plus the applicable annual escalator **[of 2.25% times that portion of any retirement allowance earned prior to the date of the Award.[120]] [applicable to the credited service years.[121]] [(applicable escalator x the full regular retirement allowance x 75%)[122]] [or (2.25% x the full regular retirement x 75%).[123]]**

(f)    Once a member has chosen to place his DROP proceeds into the DROP accumulation account, the member shall not be allowed to remove those funds until the member permanently retires.

(g)    Upon permanent retirement, the member shall be given the right to remove funds from the DROP accumulation account.

(h)    When the member permanently retires, the member will receive a regular retirement allowance calculated as if the member retired on the day the DROP account started. The member's retirement allowance shall include all annual escalator amounts **[(2.25%)[124] or subject to Article 31(K)[125]]** that would have been added while the member was participating in the DROP plan. [126]

---

[118]    DPLSA (§ 51.O.1.)(All references to "the Award" in this section mean the Act 312 Award in MERC Case No. D09 G-0786, as cited in the CBA.)

[119]    DPLSA (§ 51.O.2.).

[120]    DPLSA (§ 51.O.5.).

[121]    DPOA (312 Award # 1, Issue # 62, pgs. 120–21 deleted the reference to 2.25%; Issue # 64, pgs. 121–24 modified the language to the current version.).

[122]    DPCOA (§ 43.A.4.).

[123]    DFFA (§ 22.A.14.r.).

[124]    DFFA (§ 22.A.14.r.); DPLSA (§ 51.O.8.). Although referenced by DPOA (§ 33.R.8.), 312 Award # 1, Issue # 62, pgs. 120–21 deleted the reference to 2.25%.

[125]    DPOA (as modified by 312 Award # 1, Issue # 65, pgs. 121–24. It is unclear whether this intends to reference Section 33.K. of the DPOA CBA.).

[126]    DFFA (§ 22.A.14.r.); DPCOA (§ 43.); DPLSA (§ 51.O.); DPOA (§ 33.R.).

(i)     [This program will not be put into effect unless it is certified by the IRS that it will not affect the tax exempt status of the Retirement System under the Internal Revenue Code.

(j)     This program shall be effective only for as long as it is cost-neutral to the City, provided however, that the DROP Plan shall continue during the pendency of proceedings, described below, designed to restore the Plan to cost neutrality.

(k)     If the City contends that the program is costing it money, including, but not limited to, making the City's annual contribution to the P&F Pension System higher than it would be if the DROP Plan was not in effect, the parties, along with the Plan's actuary as well as an actuary appointed by the City, shall meet and confer in good faith regarding the cost.  If the parties are unable to reach an understanding, the matter shall be submitted to a third, independent, actuary, chosen or agreed upon by the Plan's actuary and the City's actuary who will be an associate or a fellow of the Society of Actuaries and a member of the American Academy of Actuaries.  This actuary, when rendering a decision, will be limited to ordering implementation of changes necessary to make the program cost neutral.  Upon the implementation of changes necessary to make the program cost neutral, participants shall have thirty days to elect (a) retiring from active employment or (b) withdraw from the DROP Plan, continuing active employment and resuming participation in the regular retirement plan. The Board shall notify the participant of these changes prior to implementation. Those resuming participation in the regular retirement plan shall not accumulate service credit for any time that they were participating in the DROP Plan.  Those not making either election shall remain participants in the DROP Plan.

(l)     In the event the DROP Plan cannot be changed to restore cost neutrality, it shall be discontinued and participants shall have the option of either (a) retiring, or (b) continuing active employment and resuming participation in the regular retirement plan.[127]]

---

[127]     DFFA (§ 22.A.14.r.9-12.); DPLSA (§ 51.O.9-12.); DPOA (§ 33.R.9-12.).

# ARTICLE XIII.

## Participant Annuity Savings Fund Loan Program

---
**By Agreement**
---

**Participant Annuity Savings Fund Loan Program**

The undersigned parties have agreed that a Participant Annuity Savings Fund Loan Program (Participant Loan Program) will be established and available to bargaining unit members. Its terms will be as follows:

(a) **Established:** Any loans granted or renewed shall conform to the requirements of Section 72(p) of the Internal Revenue Code, 26 U.S.C.1 et seq. Such loan program shall be established in writing by the Board of Trustees of the Police and Fire Retirement System, in conformity with the terms of this Memorandum of Agreement, and must include, but need not be limited to the following:

    1. The identity of the administrator of the Participant Loan Program;

    2. A procedure to apply for loans, the amount of loan that will be approved or denied, and limitations, if any, on the types and amount of loans offered;

    3. The procedure under the program for determining a reasonable rate of interest;

    4. The events constituting default and the steps that will be taken to preserve plan assets.

(b) **The Loan Program:** The Participant Loan Program shall be contained in a separate written document copies of which shall be made available in the offices of the City of Detroit Police and Fire Retirement System for prospective participants in the program. The Board of Trustees is authorized to adopt rules and regulations, from time to time, to govern the administration and the operation of this program. Copies of the rules shall also be made available to prospective participating members of the system in the offices of the Police and Fire Retirement System.

(c) **Eligibility:** Subject to the rules and procedures established by the Police and Fire Retirement System Board, loans may be made to bargaining unit members from such member's contributions to the Annuity Savings Fund. Former participants, spouses of participants, and beneficiaries are not eligible to receive any loans from the Plan. Subject to rules and procedures established by the Board, a participant who has been in the plan for twelve (12) months or more is eligible to apply for a loan from this plan.

(d) **Amount of Loan:** A participant who has satisfied applicable rules and procedures may borrow from his or her annuity savings fund account an amount, which does not exceed fifty percent (50%) of the participant's vested accumulated balance, up to fifteen thousand dollars ($15,000.00) reduced by the excess, if any, of: (1) the highest

outstanding balance of loans from the trust during the one (1) year period ending on the day before the date on which the loan is made, or (2) the outstanding balance of loans from the trust on the date on which the loan is made, whichever is less. The minimum loan amount shall be one thousand dollars ($1,000.00).

(e) **Terms and Conditions:** In addition to such rules and procedures that are established by the Board, all loans shall comply with the following terms and conditions:

   1.   Loan applications shall be in writing.

   2.   All loans shall be memorialized by a promissory note made to the Police and Fire Retirement System and properly executed by the participant.

   3.   Loan shall be repaid by equal payroll deductions over a period not to exceed five (5) years, or, where the loan is for the purpose of buying a principal residence, a period not to exceed fifteen (15) years. In no case shall the amount of the payroll deduction be less than twenty dollars ($20.00) for any two-week period.

   4.   Each loan shall be made against the assignment of the participant's entire right, title, and interest in and to the trust supported by the participant's collateral promissory note for the amount of the loan, including interest payable to the order of the trustee.

   5.   Each loan shall bear interest at a rate determined by the Board. The Board shall not discriminate among participants in its determination of interest rates on loans. Loans initiated at different times may bear different interest rates, where, in the opinion of the Board, the difference in rates is supported by a change in market interest rates or a change in the pension system's current assumed rate of return. The loan interest rate shall bear a reasonable relationship to market rates for secured loans of a similar duration and shall bear a reasonable relationship to the costs to the pension trust of administering the trust. The loan interest rate shall be calculated in a manner that will not negatively affect the City's costs to the trust or the return to trust members.

   6.   Loan repayments shall be suspended under this plan as permitted by Section 414(u)(4) of the Internal Revenue Code, 26 U.S.C. 414(u)(4). A participant who has an outstanding loan balance from the plan who is absent from employment with the employer, and who has satisfied the requirements of 26 USC 414(u) of the Internal Revenue Code shall not be required to make loan repayments to the fund during said periods of absence.

(f) **Renewal of Loan:** Any loans granted or renewed shall be made and administered pursuant to the participant loan program and Section 72(p) of the Internal Revenue Code, 26 U.S.C.72(p) and the regulations thereunder.

(g) **Loan Balance:** A participant's outstanding loan balance shall be considered a directed investment by the participant and interest payments shall be credited to the participant's account balance (provided that the interest credited shall be reduced appropriately to

cover the administrative cost of the loan program and avoid negatively affecting the City's costs or the trust's investment returns), and shall not be part of net investment income or part of the participant's account balance for the purpose of allocation of net investment income under [Article VII].

(h) **Distribution:**  No distributions shall be made to a participant, former participant, or beneficiary until all loan balances drawn on the applicable vested accumulated balance and applicable accrued interest have been liquidated.

(i) **Annual Report:**  The Police and Fire Retirement System shall include, in their annual report to all members, an accounting of the loan program established by this section, which contains *the* number and amount of loans made, the costs of administering the program, the amount of payments made including interest received by the trust, the amount of loans outstanding, including any defaults or delinquencies, and an evaluation as to whether the interest charged in the fiscal year covered the costs of administering the program.

The parties agree that eligibility for participation in said loan program will be in accordance with the provisions contained herein, and shall be effective immediately upon the signing of this Memorandum of Understanding.   All necessary steps shall be taken to ensure that the implementation date of the Employee Loan Program for members of this bargaining unit shall occur as soon as administratively possible so that it coincides with the initial implementation date established by the Police and Fire Retirement System.

The parties agree that this Memorandum of Understanding represents the sole and complete agreement regarding the Participant Loan Program for members of this bargaining unit, that this Agreement shall be incorporated in the Labor Agreement and shall remain in full force for the duration of said agreement, and that no modifications can be made unless collectively bargained and mutually agreed between the parties hereto.[128]

---

[128]     DPLSA (MOU, pg. 87.); DPOA (MOU, pg. 108.).

# LEGEND TO FOOTNOTES

As used in the footnotes to this compilation, the acronyms below refer to the following documents:

- **DFFA** means the Master Agreement between the City of Detroit and the Detroit Fire Fighters Association (2009–2013).  Although the CBA is expired, the Director of Labor Relations kept the current terms in place until a subsequent agreement is negotiated in a letter dated June 28, 2013, "Re: Terms and Conditions of employment following the expiration of the 09-13 Collective Bargaining Agreement (CBA)."

- **DPCOA** means the City Employment Terms Between the City of Detroit and Detroit Police Command Officers Association, executed on July 18, 2012.

- **DPLSA** means the Master Agreement Between the City of Detroit and the Detroit Police Lieutenants and Sergeants Association (2009–2013), as modified by the Act 312 Award executed March-April, 2011 in the matter of CITY OF DETROIT and DETROIT POLICE LIEUTENANTS AND SERGEANTS ASSOCIATION, MERC Case No. D09 G-0786 before Chairman Thomas W. Brookover.

- **DPOA** means the Master Agreement Between the City of Detroit and the Detroit Police Officers Association (2009–2012).

- **312 Award # 1** means the Act 312 Award effective March 25, 2013 in the Matter of CITY OF DETROIT and DETROIT POLICE OFFICERS ASSOCIATION, MERC Case No. D12 D-0354 before Chairman George T. Roumell, Jr.  This Award invalidated the City Employment Terms between the City of Detroit and Detroit Police Officers Associated, executed on July 18, 2012, and reinstated the Master Agreement Between the City of Detroit and the Detroit Police Officers Association (2009–2012), subject to the modifications made by the Award.  See pg. 6 of 312 Award # 1.

- **312 Award # 2** means the Act 312 Award effective January 15, 2010 in the Matter of CITY OF DETROIT and DETROIT COMMAND OFFICERS ASSOCIATION, MERC Case No. D07 K-1456 before Chairman Mark J. Glazer.

- **DPLSA MOU** means the Memorandum of Understanding Between the City of Detroit and Detroit Police Lieutenants and Sergeants Association regarding Adding Unused Sick Leave to Average Final Compensation, dated May 13, 2008.

LAI-3214123v5

**EXHIBIT I.A.279**

**EXHIBIT I.A.279**

RESTORATION TRUST AGREEMENT

# CITY OF DETROIT PENSION RESTORATION TRUST

THIS TRUST AGREEMENT, entered into effective _____, 2014, by and among, the City of Detroit ("Detroit" or the "City") acting by and through **[Kevyn Orr acting as the appointed Emergency Manager pursuant to PA 436, M.C.L. §141.1541 et seq./Mayor Michael E. Duggan]** and each member of the Board of Trustees named herein.

## WITNESSETH:

WHEREAS, Detroit filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code on July 18, 2013 in the United States Bankruptcy Court for the United States Bankruptcy Court Eastern District of Michigan, Case No. 13-53846 (the "Court");

WHEREAS, pursuant to the Plan for the Adjustment of Debts of the City of Detroit (as confirmed by the Court, the "Plan of Adjustment"), the City agreed to establish a trust upon the Effective Date of the Plan of Adjustment (i) to hold the DWSD CVR (as defined in the Plan of Adjustment) and enforce rights related to its terms, and to consult with the trustees and investment committee of the Police and Fire Retirement System for the City of Detroit ("PFRS") and the General Retirement System for the City of Detroit ("GRS"), respectively in connection with General Restoration and Special Restoration relating to the DWSD CVR, each as defined below;

WHEREAS, Detroit hereby establishes this City of Detroit Pension Restoration Trust (the "Trust");

WHEREAS, the Board of Trustees shall be responsible for maintaining and administering this Trust and managing the property held by this Trust;

WHEREAS, the members of the Board of Trustees are willing to exercise the authority and rights of consultation granted to it herein with regard to the Trust; and

NOW THEREFORE, in consideration of the premises and the covenants contained herein, Detroit and the members of the Board of Trustees agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    Board of Trustees or Board.  The Board of Trustees is the body described in Article VII to which Detroit has delegated responsibility for:  (i) maintaining and administering this Trust and managing the property held by this Trust; and (ii) exercising the duties and responsibilities the Board of Trustees set forth in this Trust Agreement.  The Board of Trustees shall be constituted in accordance with Article VII and shall have the duties and authorities described in Article V.

Section 1.2    Code.  Means the Internal Revenue Code of 1986, as amended, and any successor statute thereto.

Section 1.3    Beneficiaries.  Means the beneficiaries of this Trust, which beneficiaries shall be the GRS, the PFRS and the participants in GRS and PFRS entitled to the benefits of the Restoration Plan.

Section 1.4    DWSD CVR.  Has the meaning given to that term in the Plan of Adjustment.

Section 1.5    General Restoration.  Means the potential restoration or replacement of benefit reductions imposed by the Plan of Adjustment pursuant to the terms of the Restoration Plan.

Section 1.6    GRS.  Means the General Retirement System for the City of Detroit.

Section 1.7    Holder of Pension Claims.  Has the meaning given to that term in the Plan of Adjustment.

Section 1.8    Plan of Adjustment.  Means the Plan for the Adjustment of Debts of the City of Detroit, as confirmed by order of the Court dated [---], a copy of which is attached hereto as Exhibit A.

Section 1.9    PFRS.  Means the Police and Fire Retirement System for the City of Detroit.

Section 1.10    Qualifying DWSD Transaction.  Has the meaning given to that term in the Plan of Adjustment.

Section 1.11    Restoration Plan.  Means the general rules governing pension benefit restoration to the PFRS and the GRS as set forth in Exhibit II.B.3.q.ii.C and Exhibit II.B.3.r.ii.C of the Plan of Adjustment.  A copy of the Restoration Plan is attached hereto as Exhibit B.

Section 1.12    Retiree Committee.  Has the meaning given to that term in the Plan of Adjustment.

Section 1.13    Special Restoration.  Means the potential restoration or replacement of benefit reductions imposed by the Plan of Adjustment in connection with a Qualifying DWSD Transaction, as described in Section IV.F of the Plan of Adjustment.

Section 1.14    Trust Agreement.  This agreement as it may be amended hereafter from time to time by the parties hereto.

Section 1.15    Trust or Trust Fund.  The City of Detroit Pension Restoration Trust established by this Trust Agreement, comprising all property or interests in property held by, or under the custody and control of, the Board from time to time under this Trust Agreement.

## ARTICLE II
## ESTABLISHMENT OF TRUST

Section 2.1    Purpose.  The Trust is established to receive and hold the DWSD CVR and enforce rights related to its terms, and to consult with the trustees and investment committee of the PFRS and the GRS, respectively in connection with General Restoration and Special Restoration relating to the DWSD CVR.

Section 2.2    Receipt of Funds.  The Board shall accept all sums of money and other property contributed to the Trust by Detroit pursuant to Article III.  The Board shall hold, manage and administer the Trust Fund without distinction between principal and income.

Section 2.3    Inurement and Reversion Prohibited.  At no time shall any part of the principal or income of the Trust Fund be used for, or diverted to, any purpose other than distributing proceeds from the DWSD CVR in the manner described by Section IV.F of the Plan of Adjustment.  Nothing in this Trust Agreement shall be construed in such a way as to prohibit the Board from using the assets of the Trust Fund to pay reasonable fees and other expenses and obligations incurred in maintaining and administering the Trust or to maintain a reserve of funds needed to pay reasonable fees and expenses expected to be incurred in the future.

Section 2.4    No Residual Interest.  Detroit shall not have any legal or equitable interest in the assets of the Trust Fund at any time, including following the termination of the Trust.

## ARTICLE III
## CONTRIBUTIONS TO THE TRUST FUND

Section 3.1    Detroit Contributions.  The Board will accept the City's contribution of the DWSD CVR to the Trust Fund pursuant to the Plan of Adjustment.  Apart from the contribution of the DWSD CVR (and any amounts payable to the Trust Fund pursuant to the terms of the DWSD CVR), Detroit shall have no further obligation to contribute to the Trust.

## ARTICLE IV
## PAYMENTS FROM THE TRUST FUND

Section 4.1    Payments from the Trust Fund.

(a)    Subject to paragraph (b) below, the Board shall within a reasonable time after receiving proceeds from the DWSD CVR distribute such proceeds (less the amount retained by the Trust Fund in the sole discretion of the Board to pay reasonable fees and expenses previously incurred or expected to be incurred to maintain and administer the Trust) directly to the GRS and PFRS in the manner described in Section IV.F of the Plan of Adjustment.

(b)    The Board may retain or withhold all or any part of any payment as the Board in the exercise of its reasonable discretion may deem proper, to protect the Board and the Trust against any liability or claim on account of any income or other tax whatsoever; and with all or any part of any such payment so retained or withheld, may discharge any such liability. Any part of any such payment so retained or withheld by the Board that may be determined by

the Board to be in excess of any such liability will upon such determination by the Board be paid to the GRS and PFRS in the manner described in Section IV.F of the Plan of Adjustment.

Section 4.2    Excessive Payments.  If the payment of any distributions under the Trust is determined to have been excessive or improper, and the recipient thereof fails to make repayment to the Board or Board's agent of such excessive or improper payment upon the Board's request, the Board shall deduct the amount of such excessive or improper payment from any other benefits thereafter payable to such person.  Until repaid to the Board or Board's agent, the amount of said excessive or improper payment shall not be included in the Trust Fund.

## ARTICLE V
## BOARD POWERS AND DUTIES

Section 5.1    Powers of the Board Generally.  The Board has whatever lawful powers are required to discharge its obligations and to accomplish any of the purposes of this Trust Agreement, including (but not limited to) the powers specified in the following Sections of this Article, and the powers and authority granted to the Board under other provisions of this Trust Agreement.  The enumeration of any power herein shall not be by way of limitation, but shall be cumulative and construed as full and complete power in favor of the Board.

Section 5.2    Powers Exercisable by the Board.  The Board is authorized and empowered to exercise the following powers at its discretion in satisfaction of the duties imposed on it under this Trust Agreement:

(a)    To place securities orders, settle securities trades, hold securities in custody, deposit securities with custodians or securities clearing corporations or depositories or similar organizations, and other related activities as shall be necessary and appropriate in performing its duties under this Trust Agreement.  Trades and related activities conducted through a broker shall be subject to reasonable fees and commissions established by the broker, which may be paid from the Trust Fund or netted from the proceeds of trades.

(b)    To make, execute, acknowledge and deliver any and all documents of transfer and conveyance and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted.

(c)    To cause any investment in the Trust Fund to be registered in, or transferred into, the name of any institutional custodian appointed by the Board, or the name of its nominee or nominees, or to retain such investments unregistered in a form permitting transfer by delivery, but the books and records of the Board shall at all times show that all such investments are part of the Trust Fund, and the Board shall be fully responsible for any misappropriation in respect of any investment held by its nominee or held in unregistered form; and shall cause the indicia of ownership to be maintained within the jurisdiction of the district courts of the United States;

(d)    To receive, hold, invest and reinvest Trust Fund assets and income under provisions of law from time to time existing and in accordance with Article V;

(e)     To exercise or abstain from exercising any option, privilege or right attaching to any Trust Fund assets;

(f)     To make payments from the Trust Fund in accordance with Article IV and for the payment of expenses as provided in Section 5.5;

(g)     To employ suitable agents and depositaries (domestic or foreign), public accountants, brokers, custodians, ancillary trustees, appraisers, legal counsel and other expert advisors as shall be necessary and appropriate, and to pay their reasonable expenses and compensation;

(h)     To pay any income or other tax or estimated tax, charge or assessment attributable to any property or benefit out of such property or benefit in its sole discretion, or any tax on income of the Trust, if any, out of the Trust Fund;

(i)     To file all reports and returns that are required to be made with respect to the Trust:

(j)     To vote, in person or by general or limited proxy, at any election of any corporation in which the Trust Fund is invested, and similarly to exercise, personally or by a general or limited power of attorney, any right appurtenant to any investment held in the Trust Fund; and

(k)     To accept, compromise or otherwise settle any obligations or liability due to or from the Trust as the Board hereunder, including any claim that may be asserted for taxes, assessments or penalties under present or future laws, or to enforce or contest the same by appropriate legal proceedings.

Notwithstanding the foregoing, the Board shall not (i) assign, transfer, convey or sell its interest in the DWSD CVR except for an assignment due to the appointment of successors to members of the Board in accordance with Section 7.2; and (ii) invest any assets in real estate or real estate securities

Section 5.3     <u>Title to Trust Fund</u>.  All rights, title and interest in and to the Trust Fund shall at all times be vested exclusively in the Board.

Section 5.4     <u>General Duties and Obligations of Board</u>.

(a)     In accordance with Article II but subject to Section 4.1, the Board shall hold all property received by it and any income and gains thereupon.  In accordance with this Article, the Board shall manage, invest and reinvest the Trust Fund, shall collect the income therefrom, and shall make payments or disbursements in accordance with Section 4.1.

(b)     The Board shall confer with the trustees and investment committee of the GRS and PFRS, respectively, with respect to the Special Restoration and General Restoration; provided, however, that the Board shall not have any right to initiate any enforcement

proceedings against the trustees or investment committee of either GRS or PFRS with respect to Special Restoration or General Restoration.

(c)     The Board shall discharge its duties in the interests of the Beneficiaries and for the exclusive purpose of making distributions to the GRS and PFRS as provided in Section 4.1 and defraying reasonable expenses of administering the Trust and shall act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in like capacity and familiar with such matters would use in conduct of an enterprise of like character and with like aims.

Section 5.5     <u>Payment of Expenses</u>.  The Board shall apply the assets of the Trust Fund to pay all reasonable costs, charges, and expenses (including, but not limited to, all brokerage fees and transfer tax expenses and other expenses incurred in connection with the sale or purchase of investments, all real and personal property taxes, income taxes and other taxes of any kind at any time levied or assessed under any present or future law upon, or with respect to, the Trust Fund or any property included in the Trust Fund and all legal, actuarial, accounting and financial advisory expenses) reasonably incurred by the Board in connection with maintaining and administering the Trust, including attendance at meetings related thereto.  The expenses of the Board shall constitute a lien on the Trust Fund.

Section 5.6     <u>No Board Compensation</u>.  Except as provided in Section 5.5, the members of the Board shall serve without compensation.

## ARTICLE VI
## BOARD ACCOUNTS

Section 6.1     <u>Records</u>.  The Board shall maintain accurate and detailed records and accounts of all investments, receipts, disbursements, and other transactions with respect to the Trust, and all accounts, books and records relating thereto shall be open at all reasonable times to inspection and audit by interested persons at the principal office of the Trust.

Section 6.2     <u>Annual Audit</u>.  The Trust Fund shall be audited annually by an independent firm of certified public accountants, and a statement of the results of such audit shall be provided to the Board and also made available for inspection by interested persons at the principal office of the Trust.

Section 6.3     <u>No Interest by Beneficiaries</u>.  In no event shall any Beneficiary have any interest in any specific asset of the Trust Fund.  At no time shall any account or separate fund be considered a savings account or investment or asset of any particular Beneficiary, or class of Beneficiaries, and no Beneficiary shall have any right to any particular asset which the Board may have allocated to any account or separate fund for accounting purposes.

Section 6.4     <u>Accounting Year, Cash Basis</u>.  The accounting year of the Trust shall be the calendar year.  All accounts of the Board shall be kept on a cash basis.

# ARTICLE VII
## COMPOSITION OF AND PROCEDURES FOR THE BOARD OF TRUSTEES

Section 7.1    Number and Appointment of Members.  The Board of Trustees shall consist of five (5) voting members.  The Retiree Committee has selected the following initial members of the Board of Trustees:[_____, _____, _____, _____, and _____.]

By execution of this Trust Agreement each Board member hereby acknowledges his or her appointment and acceptance of the duties and responsibilities set forth in this Trust Agreement.

Section 7.2    Term of Office.  Each member of the Board shall serve a period of four years until the termination of the Trust, or if earlier, until his or her death, incapacity to serve hereunder, or resignation.  In the event of a vacancy, the replacement Board member shall be appointed pursuant to procedures established by the Board.

Section 7.3    Resignation.  A Board member may resign, and shall be fully discharged from further duty or responsibility under this Trust Agreement to the extent permitted by law, by giving at least ninety (90) days' advance written notice to the remaining Board Members stating a date when such resignation shall take effect, which notice or time period may be waived by the Board.

Section 7.4    Operation of the Board; Quorum.  The Board shall select from among its members a chair and a vice chair.  The Board shall hold regular meetings, and shall designate the time and place thereof in advance.  The Board shall adopt its own rules of procedure and shall keep a record of proceedings.  Each Board Member shall be entitled to one vote on each question before the Board.  Three (3) members shall constitute a quorum at any meeting.  A majority vote of the members present at a meeting of the Board at which a quorum exists shall be necessary for a decision by the Board.

Section 7.5    Reliance on Written Instruments.  Each member of the Board shall be fully protected in acting upon any instrument, certificate or paper believed by him or her to be genuine and to be signed or presented by a duly authorized person or persons, and shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing, but may accept the same as conclusive evidence of the truth and accuracy of the statements therein contained.

Section 7.6    No Individual Liability on Contracts.  The members of the Board shall not be liable personally for any debts, obligations, or undertakings contracted by them, or for the breach of any contracts.  Such claims and obligations shall be paid out of the Trust; provided, however, that the Board shall not be exempt from personal liability for willful misconduct, intentional wrongdoing, breach of applicable fiduciary duty, negligence or fraud, and the Trust shall not indemnify the Board for such liabilities, or to the extent that application of this sentence would violate any law.

Section 7.7    City Not Liable for Conduct of Board.  The Board is not, in its capacity as the Board of Trustees, an officer, agent, employee, or representative of Detroit.  In its capacity as the Board of Trustees, the Board is a principal acting independently of the City, which shall not be liable for any act, omission, contract, obligation, or undertaking of the Trust, the Board or its officers, agents, or representatives.

Section 7.8    Liability Insurance.  The Board may obtain and keep current a policy or policies of insurance, insuring the members of the Board from and against any and all liabilities, costs and expenses incurred by such persons as a result of any act, or omission to act, in connection with the performance of their duties, responsibilities and obligations under this Trust Agreement or the Plan.  To the extent permitted by applicable law, the premiums on such policies may be paid from the Trust Fund.

Section 7.9    Reimbursement for Defense of Claims.  To the extent permitted by applicable law and not otherwise covered by liability insurance purchased by the Trust (without regard to any non-recourse rider purchased by the insured), the Board, employees of the Board and persons acting on the Board's behalf pursuant to an express written delegation (each separately, the "Indemnified Party") shall be reimbursed by the Trust Fund for reasonable expenses, including without limitation attorneys fees, incurred in defense of any claim that seeks a recovery of any loss to the Plan or Trust Fund or for any damages suffered by any party to, or beneficiary of this Trust Agreement (a) for which the Indemnified Party is adjudged not liable, or (b) which is dismissed or compromised in a final settlement, where the Board or, where required by applicable law, an independent fiduciary determines that the settling Indemnified Party was not primarily responsible (in such cases, all or only a portion of the settling Indemnified Party's reasonable expenses may be reimbursed, as directed by the Board or an independent fiduciary), provided that, the Board shall have the right to approve of the retention of any counsel whose fees would be reimbursed by the Trust Fund, but such approval shall not be withheld unreasonably.

## ARTICLE VIII
## AMENDMENT, TERMINATION AND MERGER

Section 8.1    Duration of the Trust.  Unless terminated earlier pursuant to Section 8.3, this Trust Agreement shall terminate automatically on the earlier of:  (a) the eighth anniversary of the Effective Date of the Plan of Adjustment if the City and the Board shall have agreed in writing that no Qualifying DWSD Transaction has occurred; or (b) the later of (i) written notice from GRS and PFRS of the death of the last individual who was a participant in such pension plans on the Effective Date of the Plan of Adjustment or (ii) the 90th anniversary of the effective date of this Trust Agreement.

Section 8.2    Amendment.  The Trust Agreement may be amended at any time in writing by the Board or by Court order upon proper motion by the Board or the City, provided, however, that no amendment may impose a contribution obligation on the City beyond that specified in Section 3.1.  No amendment to the Trust Agreement shall modify the responsibilities of the Board hereunder unless the Board has first consented to such amendment.

Section 8.3    Termination.

(a)    Notwithstanding Section 8.1, the Trust and this Trust Agreement may be terminated at any time in writing by the Board with a copy of such written instrument to be provided to the City, or by Court order upon proper motion.  Upon termination of this Trust Agreement, the assets of the Trust Fund, if any, shall be paid out at the direction of the Board to the GRS and PFRS as provided in Section IV.F of the Plan of Adjustment.  Neither Detroit nor the Board shall have any beneficial interest in the Trust Fund.  If the Trust Fund has assets at the time of its termination, it shall remain in existence only until all such assets have been distributed.

(b)    Upon termination of the Trust pursuant to Section 8.1 or 8.3, the Board shall continue to have all of the powers provided in this Trust Agreement as are necessary or desirable for the orderly liquidation and distribution of the Trust Fund in accordance with the provisions hereof.

# ARTICLE IX
# MISCELLANEOUS

Section 9.1    Rights in Trust Fund.  No Beneficiary or other person shall have any right, title or interest in the Trust Fund or any legal or equitable right against the Board, the Board, or Detroit, except as may be otherwise expressly provided in this Trust Agreement.

Section 9.2    Non-Alienation.  Except to the extent required by applicable law, the rights or interest of any Beneficiary to any future distributions under the provisions of the GRS or PFRS shall not be subject to attachment or garnishment or other legal process by any creditor of any such Beneficiary, nor shall any such Beneficiary have any right to alienate, anticipate, commute, pledge, encumber or assign any of the benefits or payments which he may expect to receive, contingent or otherwise, under GRS or PFRS.

Section 9.3    Controlling Laws.  The Trust shall be construed and the terms hereof applied according to the laws of the state of Michigan to the extent not superseded by federal law.

Section 9.4    Counterparts.  This Trust Agreement may be executed in any number of counterparts, each of which shall be considered as an original.

Section 9.5    Headings.  The headings and subheadings of this Trust Agreement are for convenience of reference only and shall have no substantive effect on the provisions of this Trust Agreement.

Section 9.6    Notices.  All notices, requests, demands and other communications under this Trust Agreement shall be in writing and shall be deemed to have been duly given (a) on the date of receipt if served personally or by confirmed facsimile or other similar confirmed electronic communication; (b) on the first business day after sending if sent for guaranteed next day delivery by Federal Express or other next-day courier service; or (c) on the fourth business

day after mailing if mailed to the party or parties to whom notice is to be given by registered or certified mail, return receipt requested, postage prepaid, and properly addressed as follows:

<u>If to the City:</u>

**[insert name and address]**

<u>If to the Board:</u>

**[insert name and address]**

IN WITNESS WHEREOF, and as evidence of the establishment of the Trust created hereunder, the parties hereto have caused this instrument to be executed as of the date above first written.

**CITY OF DETROIT**

By: _____
    Print Name: _____
    Title: _____
    Date: _____

**MEMBERS OF THE BOARD OF TRUSTEES**

By: _____
Print Name: _____

    Acknowledged by me on the _____ day of _____,
    Signature_____
    Printed name_____

    Notary public, State of Michigan, County of
    My commission expires_____

By: _____
Print Name: _____

    Acknowledged by me on the _____ day of _____,
    Signature_____
    Printed name_____

    Notary public, State of Michigan, County of
    My commission expires_____

By: _____
Print Name: _____

    Acknowledged by me on the _____ day of _____,
    Signature_____
    Printed name_____

    Notary public, State of Michigan, County of
    My commission expires_____

By: _____

Print Name: _____

Acknowledged by me on the _____ day of _____,

Signature _____

Printed name _____

Notary public, State of Michigan, County of _____

My commission expires _____

By: _____

Print Name: _____

Acknowledged by me on the _____ day of _____,

Signature _____

Printed name _____

Notary public, State of Michigan, County of _____

My commission expires _____

**EXHIBIT A**

**PLAN OF ADJUSTMENT**

**EXHIBIT B**

**RESTORATION PLAN**

82645430\V-2

14

CLI-2245193v3

**EXHIBIT C**

**CONFIRMATION ORDER**

**EXHIBIT I.A.285**

RETIREE HEALTH CARE SETTLEMENT AGREEMENT

# SETTLEMENT AGREEMENT

Plaintiffs, the Official Committee of Retirees of the City of Detroit, Michigan (the "Committee"), Detroit Retired City Employees Association, Retired Detroit Police and Fire Fighters Association, and AFSCME Sub-Chapter 98, City of Detroit Retirees (collectively with the Committee, the "Plaintiffs") and Defendants, the City of Detroit, Michigan (the "City") and Kevyn Orr, individually and in his official capacity as Emergency Manager of the City of Detroit, Michigan (collectively with the City, the "Defendants"), hereby enter into this Settlement Agreement as of the 14th day of February, 2014 (the "Agreement"), which contains the following terms:

## I. GENERAL PROVISIONS

**1.** **Agreement Modifies March 1, 2014 Plan**. The City agrees to make the changes listed in Part II herein to the City of Detroit Retiree Health Care Plan for the period March 1, 2014 through December 31, 2014. The changes enumerated in Part II are modifications to the City of Detroit Retiree Health Care Plan described in the 2014 Health Care Plan Options Booklet ("Booklet") distributed approximately January 2, 2014. These modifications are premised on the terms summarized in the Booklet going into effect on March 1, 2014, subject only to the modifications set forth in this Agreement, which resolves the Plaintiffs' claims in Adversary Proceeding No. 14-04015 (the "Adversary Proceeding").

**2.** **Modifications Will Not Decrease Benefits Offered in March 1, 2014 Plan**. None of the modifications in Part II reduces or eliminates any of the benefits in the City of Detroit Retiree Health Care Plan for the period March 1, 2014 through December 31, 2014 as described in the Booklet, except as specified in Part II(4)(a) and (b) below.

**3.** **Effective Date of Plan Modifications**. The modifications listed in Part II of this Agreement shall be effective with the beginning of the plan on March 1, 2014 unless otherwise noted in the Agreement.

**4.** **Aggregate Caps**. Unless specifically noted below, there is no cap on the amount that the City will spend to fulfill the modifications listed in Part II. For the two modifications listed in Part II(3)(a)/(b) and (d)/(e) that expressly include capped funds of $2,500,000 and $3,000,000, respectively, the City shall aggregate those caps to a total of $5,500,000 such that if one capped fund is exhausted the City must draw from the other capped fund to the extent that the other capped fund has not been exhausted.

**5.** **Conditions on Agreement**. This Agreement, and the additional benefits set forth herein, are conditioned upon the City receiving debtor in possession financing that can be used for quality of life purposes on or before May 1, 2014 (the "DIP"). In the event the DIP is not in effect on or before May 1, 2014 and the City is unable to otherwise perform under this

ATI-2594662v5

13-53846-swr    Doc 8587-2    Filed 12/15/14    Entered 12/15/14 18:29:34    Page 135 of 50
13-53846-tjt    Doc 6908-2    Filed 08/20/14    Entered 08/20/14 23:27:34    Page 135 of 50

455

Agreement, this Agreement shall be null and void and the parties shall be returned to their respective positions.

## II. MODIFICATIONS TO THE CITY'S RETIREE HEALTH CARE PLAN FOR THE PERIOD MARCH 1, 2014 THROUGH DECEMBER 31, 2014

**1.** **Modification of Dental and Vision Coverage**.

**(a)** **Dental Coverage**. The City will make available an additional dental benefits option in addition to the dental benefits coverage option described in the Booklet. The additional option will be offered by Golden Dental Inc. ("Golden"). The premium charged for this group coverage option will be no greater than $23.73 per month for single coverage, $38.83 per month for two-person coverage, and $57.17 per month for family coverage, and the benefits will be as described in Exhibit 1 hereto; provided, however, that the amount charged to the retiree shall be increased to include an additional administrative charge, which administrative charge shall not exceed 20% of the applicable premium. The enrolling retiree will be fully responsible to pay the premium associated with this dental option, including the additional administrative charge, and the City shall allow the retirees to utilize the pension reduction feature for payment of the monthly premium. The City will use Reasonable Efforts to have such coverage effective June 1, 2014, including taking Reasonable Efforts to notify retirees by mail of this option as soon as practicable, and taking Reasonable Efforts to minimize the administrative charge. Reasonable Efforts, as used in this Agreement, requires the City to use good faith and reasonable diligence in light of its capabilities.

**(b)** **Vision Coverage**. The City will make available an additional vision benefits option in addition to the vision benefits coverage option described in the Booklet. The additional option will be offered by Heritage Vision Plans, Inc. ("Heritage"). The premium for this group coverage option will be no greater than $6.95 per month for single coverage and $13.75 per month for 2 or more person coverage; provided, however, that the amount charged to the retiree shall be increased to include an additional administrative charge, which administrative charge shall not exceed 20% of the applicable premium. The option shall be a national network vision option similar to the option that the City provides to active employees. The enrolling retiree will be fully responsible to pay the premium associated with this vision option, including the additional administrative charge, and the City shall allow the retirees to utilize the pension reduction feature for payment of the monthly premium. The City will use Reasonable Efforts to have such coverage effective June 1, 2014, including taking Reasonable Efforts to notify retirees by mail of this option as soon as practicable, and taking Reasonable Efforts to minimize the administrative charge.

**2.** **Modifications for Retirees Eligible for Medicare**.

**(a)** **Extension of Enrollment Deadline to Opt Out of Medicare Advantage Plan Coverage**. For retirees of the City who are enrolled in Medicare and receive

coverage under a City-sponsored Medicare Advantage Plan through February 28, 2014, the date to opt out of such coverage was extended to February 7, 2014. Such retirees may opt out by hand delivery (no later than close of business February 7) or first-class mail delivery (post-marked on or before February 7) of the designated opt out form to the City Benefits Administration Office at Suite 1026, 2 Woodward Avenue, Detroit MI 48226. Retirees were permitted to request the designated opt out form by calling the City's Benefit Administration Customer Service Line or contacting the City Benefits Administration Office at the address above. The City will use Reasonable Efforts to process any such opt outs for which it receives timely notice in a manner so as to eliminate such Medicare Advantage Plan coverage effective March 1, 2014. To the extent the City is not able to process the timely sent opt out notices in a manner so as to eliminate such coverage effective March 1, 2014, such coverage shall be eliminated effective April 1, 2014. Retirees who did not opt out by February 7, 2014 will be enrolled in a City-sponsored Medicare Advantage Plan as described in the Booklet.

(b) **HRA Contribution for Medicare-Eligible Retirees Who Opt Out**. For each Medicare-eligible retiree who opted out of coverage under the City-sponsored Medicare Advantage Plans on or prior to February 7, 2014, the City shall automatically enroll such retiree in a City-sponsored Health Reimbursement Arrangement ("HRA"). The HRA shall be administered by Flex Plan, Inc. The City will provide each electing enrollee with a vested $115 monthly contribution credit to his or her HRA during the remainder of 2014, which will carry forward until used by the retiree or otherwise forfeited under terms to be negotiated by the parties hereto. The City will make all Reasonable Efforts to implement the HRA credits effective May 1, 2014, retroactive to March 1, 2014. The initial monthly credit for May 2014 shall be in an amount equal to the total of $115 multiplied by the number of months starting March 2014 for which the enrolled retiree did not have Medicare Advantage Plan coverage (e.g., if John Smith had City-sponsored Medicare Advantage Plan coverage until February 28, 2014, the initial monthly credit for May 2014 will be $345, covering March, April, and May; thereafter, the payments shall be $115 per month for each month in 2014).

(c) **Medicare Advantage Plan Catastrophic Drug Expenses**. Each of the Medicare Advantage Plans sponsored by the City for the period March 1, 2014 through December 31, 2014 include Medicare Part D prescription drug coverage, under which, once the $4,550 out-of-pocket threshold is met, the participant's cost sharing obligation is limited to the greater of 5% of the cost of the prescription, or $2.55 per prescription for generic and preferred multi-source drugs or $6.35 per prescription for all other prescription drugs; provided, that the participant's cost sharing obligation shall never be greater than the cost sharing that applied prior to the participant meeting such threshold. For each participant who meets the $4,550 out-of-pocket threshold while enrolled in one of the City's Medicare Advantage Plans during the period March 1, 2014 through December 31, 2014, the City will reimburse the amount of this cost sharing obligation to the related

retiree.  For the avoidance of doubt, participant means both retiree and any retiree's spouse who is covered by the City's Medicare Advantage Plans.

**3.**     <u>**Modifications for Retirees Not Eligible for Medicare**</u>.

**(a)**     <u>**Additional Stipend to Retirees With $75,000 or Lower Household Income Who Acquire  Health Care Coverage  on an Exchange**</u>.  The City will provide non-duty disabled retirees who are not eligible for Medicare a $125 stipend that they may use to purchase health care coverage.  The City will increase this stipend by $50 for any non-Medicare eligible retiree who either (i) was enrolled in the City's retiree health program on December 31, 2013 or (ii) transitioned from active City benefits to retiree City benefits on or after November 1, 2013; but only to the extent such retiree described in (i) or (ii) above meets the following requirements:

i)      Not eligible for Medicare or Medicaid;

ii)     Not eligible for a benefit under Part II(4);

iii)    Not a duty-disabled retiree (duty-disabled retirees are eligible for higher stipends as provided for in the Booklet);

iv)     Under 65 years old (non-Medicare eligible retirees age 65 and older may receive an increased stipend under Part II(3)(c) below);

v)      Household income is $75,000 or less, as demonstrated by satisfaction of the process set forth in Part II(3)(b);

vi)     Does not acquire a City-offered group health plan as set forth in Part II(3)(f); and

vii)    Purchases or is covered by a health insurance policy acquired through a health insurance exchange ("Exchange") established pursuant to the Patient Protection and Affordable Care Act.

**(b)**     <u>**Process to Obtain Additional $50 Monthly Stipend.**</u>

i)      The City will retain Aon Hewitt to administer the eligibility process for the additional $50 monthly stipend set forth above in Part II(3)(a). Retirees will be given a 30-day notice period, to expire no later than April 30, 2014, during which they shall provide to Aon Hewitt the following:

(1)     Submission of having purchased an insurance policy through an Exchange that covers such retiree.  Such submission shall include information necessary to validate the retiree's eligibility, including the name of the insurer, monthly premium amount, and the amount of federal

subsidy, if any, that the retiree is to receive in connection with such Exchange-acquired coverage; and

(2)   If the proof of Exchange-acquired coverage shows that the retiree's premium does not also include a federal subsidy amount, such retiree shall also submit a copy of his or her most recently filed federal income tax return with proof of filing, but in no event a return prior to the 2011 tax year.  If such federal income tax return shows household income in excess of $75,000 and the retiree believes that household income in 2013 was below $75,000, the retiree shall also submit – along with a copy of the most recently filed federal income tax return – proof sufficient for Aon Hewitt to conclude that his or her household income in 2013 was less than $75,000.

ii)   Aon Hewitt shall submit to the City its list of retirees eligible for the additional $50 monthly stipend and the monthly stipends shall be paid to the approved eligible retirees beginning in the month of June 2014 or as soon thereafter as administratively practical, with payments retroactive to March 1, 2014.  For example, if the first payment is made in June 2014, it will be in the amount of $200 for the months of March, April, May, and June; thereafter, the payments shall be $50 per month for each succeeding month in 2014.  The list provided by Aon Hewitt shall be final and no changes shall be made to such list for the remainder of 2014.

*The City shall cap the amount that it pays for this additional $50 stipend during the period from March through December 2014 at $3,000,000.*  In the event that there are more retirees meeting the requirements in Part II(3)(a) and (b) (*i.e.*, retirees listed on the final list) than can be paid in full for $3,000,000, each retiree will have his or her stipend amount reduced pro rata, unless there are additional funds that can be used as detailed in Part I(4).

(c)   **Additional Payment to Non-Medicare Eligible Retirees Age 65 and Older**.
The City will increase the stipend that it gives non-Medicare eligible retirees who are 65-years-old and older to $300/month. For such purposes, a non-Medicare eligible retiree is any retiree age 65 or older who is not – directly or through his or her spouse – eligible to automatically enroll in and obtain premium-free coverage under Part A of Medicare as evidenced by a denial letter from the Centers for Medicare and Medicaid Services ("CMS").  Retirees who have previously submitted such a letter to the City will not be required to resubmit it.  Non-Medicare eligible retirees who are duty-disabled will not be eligible for this increase because their stipend is already $300 or more.  The City will coordinate with Blue Cross Blue Shield of Michigan to determine the number of non-Medicare eligible retirees who are eligible for this $300 stipend.  The increased stipend will apply for each month from March 2014 through December 2014.  The City will make all Reasonable Efforts to implement the $300 increased

monthly stipend beginning April 1, 2014, with payment of the increased amount over the stipend otherwise paid for prior months being retroactive to March 1, 2014; thereafter, the stipend shall be $300 per month for each succeeding month in 2014.  Such eligible retirees will not receive any other stipend amounts from the City that are described in the Booklet or this Agreement.

(d)     **$125 Monthly Stipend For City Retirees' Spouses Who are Under Age 65, With $75,000 or Lower Household Income, and Are Enrolled in Health Care Coverage on an Exchange**.  The City will provide a $125 stipend to certain married retirees whose spouses either (i) were enrolled in the City's retiree health program on December 31, 2013 or (ii) transitioned from active City benefits to retiree City benefits on or after November 1, 2013; but only to the extent such spouse described in (i) or (ii) above meets the following requirements:

i)      Not eligible to enroll in one of the City's Medicare Advantage Plans;

ii)     Not eligible for Medicaid;

iii)    Not eligible for a benefit under Part II(4);

iv)     Under 65 years old;

v)      Household income is $75,000 or less, as demonstrated by satisfaction of the process set forth in Part II(3)(e);

vi)     Does not acquire a City-offered group health plan as set forth in Part II(3)(f); and

vii)    Purchases or is covered by a health insurance policy acquired through an Exchange.

(e)     **Process to Obtain $125 Monthly Spouse Stipend.**

i)      The City will retain Aon Hewitt to administer the eligibility process for the $125 monthly spouse stipend.  Retirees will be given a 30-day notice period, to expire no later than April 30, 2014, during which they shall provide to Aon Hewitt the following proof:

(1)     Submission of proof that their spouse is covered under an insurance policy purchased through an Exchange, including information necessary to validate the retirees' eligibility, including the name of the insurer, monthly premium amount, and the amount of federal subsidy, if any, that the spouse is to receive in connection with such Exchange-acquired coverage; and

(2)     If the proof of Exchange-acquired coverage shows that the spouse's premium does not also include a federal subsidy

amount, such retiree shall also submit a copy of his or her most recently filed federal income tax return with proof of filing, but in no event a return prior to the 2011 tax year. If such federal income tax return shows household income in excess of $75,000 and the retiree believes that household income in 2013 was below $75,000, the retiree shall also submit – along with a copy of the most recently filed federal income tax return – proof sufficient for Aon Hewitt to conclude that his or her household income in 2013 was less than $75,000.

ii)   Aon Hewitt shall submit to the City its list of retirees who are eligible for this $125 monthly stipend and the monthly stipends shall be paid to the approved married retirees beginning in the month of June 2014 or as soon thereafter as administratively practical, with payments retroactive to March 1, 2014. For example, if the first payment is made in June 2014, it will be in the amount of $500 for the months of March, April, May, and June; thereafter, the payments shall be $125 per month for each succeeding month in 2014. The list provided by Aon Hewitt shall be final and no changes shall be made to such list for the remainder of 2014, except as follows:

(1)   if an eligible retiree ceases to be married (whether by death or divorce), the retiree's spouse will cease to be eligible for this stipend and the retiree shall be removed from the list effective as of the month immediately following such event; and

(2)   if a retiree's spouse transitions from active City benefits to retiree City benefits during 2014 and meets the eligibility provisions described in Part II(3)(d) and is approved as eligible pursuant to the process described in Part II(3)(e), the related retiree shall be added to the list effective as of the month in which the transition to retiree City benefits occurs, provided there is sufficient availability under the Aggregate Caps as described below.

*The City will cap the amount that it pays for spousal stipends at $2,500,000.* In the event that there are more retirees initially satisfying the requirements in Part II(3)(e) (*i.e.*, retirees listed on the first list submitted by Aon Hewitt to the City) than can be paid in full for $2,500,000, each such retiree will have his or her stipend amount reduced pro rata, provided that if there are additional funds that can be used as detailed in Part I(4), each such retiree will only have his or her stipend amount reduced pro rata to the extent the aggregate amount is not sufficient to satisfy the full amount of such stipends. Retirees who become eligible for this spousal stipend during the year, as described above, shall only be eligible for a stipend to the extent there is sufficient availability under the

Aggregate Caps detailed in Part I(4).  The addition or removal of retirees from the list shall not impact the amount of the stipend being paid to other eligible retirees.

**(f)**     **City Group Plan**.  In 2014, the City agrees to contract with Blue Cross Blue Shield of Michigan to offer a fully-insured group health plan option to retirees who are not eligible for Medicare.  Such plan option shall be reasonably equivalent to the coverage offered by the City to active employees in 2014.  The enrolling retiree will be fully responsible to pay the monthly premium associated with this option.  The premium cost to retirees of such policy will include the cost to the City of enrollment and administration related to this policy option, so that the City will not incur any additional expense in offering this policy.  The parties will use Reasonable Efforts to have such coverage effective May 1, 2014.  The City shall provide a monthly stipend of $100 to each retiree who enrolls in the City group plan, beginning with the May 1, 2014 payment.  No other stipend amounts from the City that are described in the Booklet or this Agreement shall be available to retirees enrolling in this group option, unless either (i) the retiree is duty-disabled, in which case, he or she will instead receive the stipend available to duty-disabled retirees described in the Booklet, or (ii) the retiree is eligible for the stipend described in Part II(3)I, in which case, he or she will instead receive such stipend.

**4.**     **Modifications for Retirees Below the Federal Poverty Level**.

**(a)**     **Coverage for Michigan Resident Retirees Eligible For Medicaid Coverage On or After April 1, 2014**.  The parties recognize that CMS has approved the State of Michigan's request to operate the "Healthy Michigan" program for adults who will become eligible for Medicaid under Section 1902(a)(10)(A)(i)(VIII) of the Social Security Act, and that on April 1, 2014 Michigan will provide Medicaid coverage to all adults residing in the State with income up to and including 133% of the Federal Poverty Level.  "Federal Poverty Level" means the applicable poverty guideline based on state of residence and household size issued annually by the U.S. Department of Health and Human Services.  For those retirees who are eligible for Medicaid under the scheduled April 1, 2014 expansion, the City will facilitate their  transition in the following manner:  Within 10 days of the effective date of this Agreement, the City shall contact by letter those non-Medicare eligible retirees, who, according to the Retirement Systems' records, reside in Michigan and whose annual pension income is in an amount less than 100% of the Federal Poverty Level.  Such retirees will be given a 30 day opportunity to submit to Aon Hewitt proof that their income falls below the Federal Poverty Level.  Upon receipt by Aon Hewitt of a list of such retirees falling below the Federal Poverty Level, the City shall provide payment to such retirees of the amount equal to the value of the federal subsidy for the month of March that they would have received in connection with the second lowest cost Exchange-purchased silver plan, had such retiree, and to the extent the retiree is married, such retiree's spouse, been eligible for such subsidy for the month of March 2014 for such plan based on a determination of household income at 100% of the Federal Poverty Level.  A similar payment will be made by the City in

connection with insurance coverage for April 2014 if such retiree and spouse are not covered by Medicaid. To the extent that the Medicaid expansion rules in Michigan have not provided such retirees the opportunity to migrate into the Michigan Medicaid program by May 1, 2014, the City shall cease its continued payment but the parties agree to negotiate in good faith an additional reasonable accommodation to such retirees that balances the City's and such retirees' interests. *Retirees eligible for payments under this subsection are not eligible for any other payment offered by the City as set forth in the Booklet or as set forth in this Agreement.*

**(b)** **Coverage for Non-Medicare Eligible Retirees in States that Have Not Expanded Medicaid**. The City recognizes that not all States have chosen to expand Medicaid coverage in accordance with Title II of the Patient Protection and Affordable Care Act, and certain non-Medicare eligible retirees residing outside the State of Michigan whose incomes fall below 133% of the Federal Poverty Level will not be eligible for Medicaid coverage. Accordingly, in connection with such retirees, the City will pay a monthly amount equal to the lesser of: (1) the second lowest cost monthly premium for a silver plan for such retiree and spouse purchased through an Exchange in their place of residence; or (2) the ratable monthly amount necessary to increase the retiree's annual household income to 100% of the Federal Poverty Level. Within 10 days of the effective date of this Agreement, the City shall contact by letter those retirees, who, according to the Retirement Systems' records, reside in states that do not provide Medicaid coverage to adults up to the Federal Poverty Level, and whose annual pension income is in an amount less than 100% of the Federal Poverty Level. Such retirees will be given a 30 day opportunity to submit to Aon Hewitt proof that their income falls below the Federal Poverty Level. The City shall commence such payments as soon as reasonably practicable after receiving a list of such retirees from Aon Hewitt. *Retirees eligible for payments under this subsection are not eligible for any other payment offered by the City as set forth in the Booklet or as set forth in this Agreement.*

## III. RELEASES, FUTURE LEGAL PROCEEDINGS, AND MISCELLANEOUS

**1.** **Future Claims in City Plan Confirmation Proceedings**. This Agreement is entered into without prejudice to any party to this litigation with respect to any issue involving the rights, claims, obligations, and payments of health care and other post-employment benefits ("OPEB"); provided that the City will not seek to recover directly from the retirees any postpetition OPEB payments made to or on behalf of retirees. Each party expressly reserves its rights on OPEB issues in connection with negotiations of a plan of adjustment, and the Plaintiffs are free to pursue, and the City to oppose, their position that the postpetition OPEB payments the City made to or on behalf of retirees were a business necessity.

**2.** **Release**. Following the execution of this Agreement, the Plaintiffs will promptly dismiss the lawsuit – which solely addresses 2014 retiree health care benefits – with prejudice; provided, however, that any party to the lawsuit may bring an action in the Bankruptcy Court to enforce the terms of this Agreement resolving the lawsuit (an "Enforcement Action") and if the

conditions contained in the last sentence of Part I(5) occur, then Plaintiffs are free to reinstate the Adversary Proceeding. Solely for purposes of an Enforcement Action, the City consents, pursuant to 11 U.S.C. § 904, to the Bankruptcy Court's hearing and deciding such Enforcement Action.

3. **Counterparts.** This Agreement may be signed in counterparts, and each counterpart shall be treated as an original.

4. **Good Faith.** As evidenced by the undersigned acknowledgment of Judge Wiley Daniel, Mediator, this Agreement was negotiated and entered into by all parties in good faith.

5. **Plan of Adjustment.** The terms of this Agreement, including Part III(4), shall be incorporated into any plan of adjustment filed by the City and confirmed by the Bankruptcy Court in 2014 in this bankruptcy case.

Agreed,

_____
Evan Miller, attorney for Defendants


_____
Sam J. Alberts, attorney for the Committee


_____
Brian O'Keefe, attorney for Detroit Retired City Employees Association and Retiree Police and Fire Fighters Association


_____
Richard Mack, attorney for AFSCME Sub-Chapter 98, City of Detroit Retirees


Acknowledged:


_____
Judge Wiley Daniel, Mediator

conditions contained in the last sentence of Part I(5) occur, then Plaintiffs are free to reinstate the Adversary Proceeding. Solely for purposes of an Enforcement Action, the City consents, pursuant to 11 U.S.C. § 904, to the Bankruptcy Court's hearing and deciding such Enforcement Action.

3.    **Counterparts.** This Agreement may be signed in counterparts, and each counterpart shall be treated as an original.

4.    **Good Faith.** As evidenced by the undersigned acknowledgment of Judge Wiley Daniel, Mediator, this Agreement was negotiated and entered into by all parties in good faith.

5.    **Plan of Adjustment.** The terms of this Agreement, including Part III(4), shall be incorporated into any plan of adjustment filed by the City and confirmed by the Bankruptcy Court in 2014 in this bankruptcy case.

Agreed,

_____
Evan Miller, attorney for Defendants

_____
Sam J. Alberts, attorney for the Committee

_____
Brian O'Keefe, attorney for Detroit Retired City Employees Association and Retiree Police and Fire Fighters Association

_____
Richard Mack, attorney for AFSCME Sub-Chapter 98, City of Detroit Retirees

Acknowledged:

_____
Judge Wiley Daniel, Mediator

conditions contained in the last sentence of Part I(5) occur, then Plaintiffs are free to reinstate the Adversary Proceeding. Solely for purposes of an Enforcement Action, the City consents, pursuant to 11 U.S.C. § 904, to the Bankruptcy Court's hearing and deciding such Enforcement Action.

**3.** **Counterparts.** This Agreement may be signed in counterparts, and each counterpart shall be treated as an original.

**4.** **Good Faith.** As evidenced by the undersigned acknowledgment of Judge Wiley Daniel, Mediator, this Agreement was negotiated and entered into by all parties in good faith.

**5.** **Plan of Adjustment.** The terms of this Agreement, including Part III(4), shall be incorporated into any plan of adjustment filed by the City and confirmed by the Bankruptcy Court in 2014 in this bankruptcy case.

Agreed,

_____

Evan Miller, attorney for Defendants

_____

Sam J. Alberts, attorney for the Committee

_____

Brian O'Keefe, attorney for Detroit Retired City Employees Association and Retiree Police and Fire Fighters Association

_____

Richard Mack, attorney for AFSCME Sub-Chapter 98, City of Detroit Retirees

Acknowledged:

_____

Judge Wiley Daniel, Mediator

conditions contained in the last sentence of Part I(5) occur, then Plaintiffs are free to reinstate the Adversary Proceeding. Solely for purposes of an Enforcement Action, the City consents, pursuant to 11 U.S.C. § 904, to the Bankruptcy Court's hearing and deciding such Enforcement Action.

     **3.**    **Counterparts.** This Agreement may be signed in counterparts, and each counterpart shall be treated as an original.

     **4.**    **Good Faith.** As evidenced by the undersigned acknowledgment of Judge Wiley Daniel, Mediator, this Agreement was negotiated and entered into by all parties in good faith.

     **5.**    **Plan of Adjustment.** The terms of this Agreement, including Part III(4), shall be incorporated into any plan of adjustment filed by the City and confirmed by the Bankruptcy Court in 2014 in this bankruptcy case.

Agreed,

_____

Evan Miller, attorney for Defendants

_____

Sam J. Alberts, attorney for the Committee

_____

Brian O'Keefe, attorney for Detroit Retired City Employees Association and Retiree Police and Fire Fighters Association

_____

Richard Mack, attorney for AFSCME Sub-Chapter 98, City of Detroit Retirees

Acknowledged:

_____

Judge Wiley Daniel, Mediator

ATI-2594662v5

-10-

conditions contained in the last sentence of Part I(5) occur, then Plaintiffs are free to reinstate the Adversary Proceeding. Solely for purposes of an Enforcement Action, the City consents, pursuant to 11 U.S.C. § 904, to the Bankruptcy Court's hearing and deciding such Enforcement Action.

3.     **Counterparts.** This Agreement may be signed in counterparts, and each counterpart shall be treated as an original.

4.     **Good Faith.** As evidenced by the undersigned acknowledgment of Judge Wiley Daniel, Mediator, this Agreement was negotiated and entered into by all parties in good faith.

5.     **Plan of Adjustment.** The terms of this Agreement, including Part III(4), shall be incorporated into any plan of adjustment filed by the City and confirmed by the Bankruptcy Court in 2014 in this bankruptcy case.

Agreed,

_____
Evan Miller, attorney for Defendants


_____
Sam J. Alberts, attorney for the Committee


_____
Brian O'Keefe, attorney for Detroit Retired City Employees Association and Retiree Police and Fire Fighters Association


_____
Richard Mack, attorney for AFSCME Sub-Chapter 98, City of Detroit Retirees


Acknowledged:

_____
Judge Wiley Daniel, Mediator

**EXHIBIT 1**

(See next page)

January 2014



Golden Dental Plans

# Certificate of Coverage
# City of Detroit Retirees

## CLASS I
### Diagnostic and Preventive:
Exams, X-Rays, Prophylaxis, Fluoride -up to age 19                    **100%**

## CLASS II
### Restorative:
Fillings, Root Canals, Routine Extractions                    **100%**

## CLASS III
### Prosthetics:
Crowns, Bridges, Partials, Dentures, Space Maintainers                    **80%**

## CLASS IV
### Specialty Care:
Periodontics
Endodontics
Oral Surgery                    **70%**

## ORTHODONTICS (Interceptive excluded)
Lifetime Benefit Maximum: Dependents up to age 19                    **$3,000**
Lifetime Benefit Maximum: Subscriber and Spouse                    **$3,000**

**Out-Of-Area Emergency Coverage $100 reimbursement**

**Annual Maximum:**          $1,600.00
**Annual Renewal:**          **07/01**
**Membership Card Reads:**   Detroit Retirees

| Rate Type | Current Rates |
|---|---|
| Single Person | $23.73 |
| Family of two | $38.83 |
| Family | $57.17 |

**EXHIBIT I.A.292**

SCHEDULE OF SECURED GO BOND DOCUMENTS

## SCHEDULE OF SECURED GO BOND DOCUMENTS

| Secured GO Bond Documents | Series of Secured GO Bonds | Balance as of Petition Date |
|---|---|---|
| Resolution of the City Council adopted February 23, 2010<br><br>Finance Director's Order dated March 11, 2010<br><br>Master Debt Retirement Trust Indenture dated as of March 1, 2010, as supplemented and amended (the "Master Indenture"), between the City of Detroit and U.S. Bank National Association, as trustee | Distributable State Aid General Obligation Limited Tax Bonds, Series 2010 | $252,475,366 |
| Resolution of the City Council adopted July 20, 2010<br><br>Finance Director's Order dated December 9, 2010<br><br>Master Indenture | Distributable State Aid Second Lien Bonds (Unlimited Tax General Obligation), Series 2010(A) (Taxable-Recovery Zone Economic Development Bonds – Direct Payment) | $101,707,848 |
| Resolution of the City Council adopted March 27, 2012<br><br>Finance Director's Order dated March 28, 2012 (Series 2012(A2) and Series 2012(B2))<br><br>Finance Director's Order dated July 3, 2012 (Series 2012 (A2) and  Series 2012(B2))<br><br>Finance Director's Order dated August 16, 2012 (Series 2012(A2-B), Series 2012 (A2) and Series 2012(B2))<br><br>Master Indenture | Self Insurance Distributable State Aid Third Lien Bonds (Limited Tax General Obligation), Series 2012(A2) | $39,254,171 |
| Resolution of the City adopted March 27, 2012<br><br>Finance Director's Order dated August 16, 2012 (Series 2012(A2-B), Series 2012 (A2) and Series 2012(B2))<br><br>Master Indenture | Self Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(A2-B) | $31,037,724 |

13-53846-swr  Doc 8337-1  Filed 08/15/14  Entered 08/15/14 19:29:34  Page 152 of 50

| Secured GO Bond Documents | Series of Secured GO Bonds | Balance as of Petition Date |
|---|---|---|
| Resolution of the City Council adopted March 27, 2012<br><br>Finance Director's Order dated March 28, 2012 (Series 2012(B))<br><br>Finance Director's Order dated July 3, 2012 (Series 2012(B))<br><br>Finance Director's Order dated August 16, 2012 (Series 2012(B))<br><br>Master Indenture | General Obligation Distributable State Aid Third Lien Capital Improvement Refunding Bonds (Limited Tax General Obligation), Series 2012(B) | $6,469,135 |
| Resolution of the City Council adopted March 27, 2012<br><br>Finance Director's Order dated March 28, 2012 (Series 2012(A2) and Series 2012(B2))<br><br>Finance Director's Order dated July 3, 2012 (Series 2012 (A2) and  Series 2012(B2))<br><br>Finance Director's Order dated August 16, 2012 (Series 2012(A2-B), Series 2012 (A2) and Series 2012(B2))<br><br>Master Indenture | Self Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(B2) | $54,055,927 |

# EXHIBIT I.A.318

STATE CONTRIBUTION AGREEMENT

# CONTRIBUTION AGREEMENT

This Contribution Agreement ("Agreement"), dated as of _____, 2014, is made by and among the Michigan Settlement Administration Authority, a Michigan body public corporate (the "Authority"), the General Retirement System for the City of Detroit, the Police and Fire Retirement System for the City of Detroit and the City of Detroit (the "City").

## RECITALS

A.      The City filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code on July 18, 2013 (the "Chapter 9 Case") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Court").

B.      During the course of the Chapter 9 Case, the City has asserted that the City's Police and Fire Retirement System (the "PFRS" or a "System") and the General Retirement System (the "GRS" or a "System" and collectively with the PFRS, the "Systems") are underfunded.

C.      During the course of the Chapter 9 Case, there have been suggestions that the State of Michigan (the "State") may be obligated to pay all or a portion of the underfunding of pension benefits payable to retirees, a suggestion the State vigorously disputes.

D.      As part of the mediation process in the Chapter 9 Case, the mediators asked the State and other parties to assist in reducing the amount of underfunding in the PFRS and GRS pension funds by providing settlement funds for the benefit of pensioners that would not be otherwise available.

E.      As part of its determination that the City was eligible to file the Chapter 9 Case, the Court determined that pension obligations of the City can be impaired or diminished in the Chapter 9 Case and are not protected from such impairment or diminution by the State Constitution.

F.      In support of confirmation of the City's Fourth Amended Plan of Adjustment dated May 5, 2014 (as may be further amended from time to time, the "Plan"), the State has agreed, subject to satisfaction of the terms and conditions set forth herein and in the Plan, to make a contribution to the GRS and PFRS in return for releases from, among others, the GRS and PFRS as set forth in the Support and Release Agreement entered into by the State and each of the Systems in connection with this matter.

G.      On June 20, 2014, the Authority was established as the disbursement agent for the State with respect to the State Contribution (as defined below).

H.      Capitalized terms used in this Agreement but not defined have the same meanings as set forth in the Plan.

NOW THEREFORE, THE PARTIES HERETO AGREE AS FOLLOWS:

1

1. _State Contribution_. On the later of (a) the date on which the Conditions Precedent have been satisfied, and (b) 60 days after the Effective Date of the Plan, the Authority shall disburse $98,800,000 to GRS and $96,000,000 to PFRS (collectively, the "State Contribution") for the purpose of increasing the assets of the PFRS and GRS. The total aggregate State Contribution is equal to the net present value of $350,000,000 payable over 20 years determined using a discount rate of 6.75%, which results in a total contribution by the State of $194,800,000. The State Contribution shall only be used to fund payments to holders of GRS Pension Claims and PFRS Pension Claims, each as defined in the Plan.

2. _Governance Requirements of the GRS and PFRS_. At all times during the 20 year period following the disbursement of the State Contribution to the GRS and PFRS, the GRS and PFRS each must establish an investment committee (the "Investment Committee") for the purpose of making recommendations to, and approving certain actions by, the respective System's board of trustees and/or making determinations and taking action under and with respect to Investment Management, as set forth in the terms and conditions enumerated on **Exhibit A** and **Exhibit B**, respectively, each attached to and incorporated by reference into this Agreement.

3. _Income Stabilization Funds and Income Stabilization Payments_. The City, GRS and PFRS shall establish an income stabilization program and amend the governing documents for GRS and the governing documents for PFRS to include the following:

   a.   A supplemental pension income stabilization payment (the "Income Stabilization Payments") payable on an annual basis beginning not later than 120 days after the Effective Date, to each Eligible Pensioner equal to the lesser of (a) the amount needed to restore the Eligible Pensioner's reduced pension benefit to the amount of the pension benefit that the Eligible Pensioner received from GRS or PFRS in 2013, or (b) the amount needed to bring the total annual household income of the Eligible Pensioner up to 130% of the Federal Poverty Level in 2013.

   b.   In addition, to the extent an Eligible Pension's Estimated Adjusted Annual Household Income in any calendar year is less than 105% of the Federal Poverty Level in that year, the Eligible Pensioner will receive an additional benefit ("Income Stabilization Benefit Plus"). The Income Stabilization Benefit Plus shall be equal to the lesser of either (a) 100% restoration of pension benefits, including escalators and cost of living adjustments; or (b) the amount needed to bring the Eligible Pensioner's Estimated Adjusted Annual Household Income in that calendar year up to 105% of the Federal Poverty Level in that year.

   c.   An Eligible Pensioner's "Estimated Adjusted Annual Household Income" shall be calculated as follows: (i) the annual pension benefit amount paid in 2013 shall be subtracted from the Eligible Pensioner's 2013 total household income (per their (or in the case of minor children, their legal guardian's) 2013 income tax returns or equivalent documentation) as adjusted for inflation or Social Security COLA increases to create a base

additional income amount, plus (ii) the following three items as applicable, (x) the reduced pension benefit that GRS will pay the Eligible Pensioner for that year, (y) any GRS pension restoration due to an improved GRS funding level, and (z) the Eligible Pensioner's Income Stabilization Benefit. Notwithstanding the foregoing, Income Stabilization Payments, including the Income Stabilization Benefit Plus, under both GRS and PFRS shall not exceed $20 million in aggregate.

d.  A separate recordkeeping sub-account called the "Income Stabilization Fund" will be set up under each of GRS and PFRS for the sole purpose of paying the Income Stabilization Payments to Eligible Pensioners. The assets credited to the sub-accounts will be invested on a commingled basis with the applicable System's assets and will be credited with a pro-rata portion of the System's earnings and losses.

e.  Amounts credited to the Income Stabilization Fund, including the Assigned UTGO Bond Tax Proceeds, may not be used for any purpose other than the payment of Income Stabilization Payments to Eligible Pensioners, except as expressly provided in subparagraph (f) below.

f.  In 2022, provided that the State has not issued a certificate of default with respect to a System at any time prior to 2022, the Investment Committee for that System shall conduct a valuation to determine the Income Stabilization Payments anticipated to be made from the System in the future, in order for the System to fulfill the obligation to make Income Stabilization Payments (the "Estimated Future Liability"). In the event that 75% of the independent members of the Investment Committee determine that the GRS or PFRS Income Stabilization Fund is credited with assets in excess of its Estimated Future Liability (the "Excess Assets"), the Investment Committee may, in its sole discretion, recommend to the Board of Trustees that the Excess Assets, but not more than $35 million, be used to fund that System's Adjusted Pension Benefits. The Investment Committee shall have the right to engage professionals to assist in this task as necessary, and such expenses shall be paid by the Systems. If any funds remain in the GRS or PFRS Income Stabilization Fund on the date upon which no Eligible Pensioners under their respective System are living, the remainder of that System's Income Stabilization Fund shall be used to fund that System's Adjusted Pension Benefits.

g.  "Eligible Pensioners" are those retirees or surviving spouses who are at least 60 years of age or those minor children receiving survivor benefits from GRS or PFRS, each as of the Effective Date, whose pension benefit from GRS or PFRS will be reduced by the confirmed Plan, and who have a total household income equal to or less than 140% of the Federal Poverty Line in 2013 (per their (or in the case of minor children, their legal guardian's) 2013 income tax returns or equivalent documentation).

3

No new persons will be eligible to receive an Income Stabilization Payment at any time in the future, and any minor child receiving survivor benefits shall cease to be an Eligible Pensioner after he or she turns 18 years of age.

h.   The initial determination of Eligible Pensioners, and the amounts of Income Stabilization Payments payable to Eligible Pensioners shall be made by the State in its sole discretion. The State shall transmit the list of Eligible Pensioners to the Investment Committee and the Board of Trustees of GRS and PFRS, as applicable. The Board of Trustees, with the assistance of the Investment Committee of GRS and PFRS, shall be responsible for properly administering the respective Income Stabilization Fund and annually certifying to the Treasurer that it has properly administered the requirements for eligibility and payment of benefits with respect to Eligible Pensioners.

4.   <u>Conditions Precedent</u>. The Authority's obligations under this Agreement are not effective or enforceable until each of the following conditions (the "<u>Conditions Precedent</u>") have been met to the satisfaction of the Authority and the Treasurer, unless any one or more of such conditions are waived in a writing executed by the Authority and the Treasurer:

a.   The Authority receives the State Contribution from the State.

b.   An endorsement of the Plan by the Official Retiree Committee which will include a letter from the Official Retiree Committee as part of the Plan solicitation package recommending to Classes 10 and 11 a vote in favor of the Plan, or equivalent assurances from member organizations representing a majority of retirees in the respective classes.

c.   Cessation of all litigation, including the cessation of funding of any litigation initiated by any other party, as it related to the City (a) challenging PA 436 or any actions taken pursuant to PA 436, including but not limited to, a dismissal with prejudice of the cases set forth on **Exhibit D**, or (b) seeking to enforce Article IX, Section 24 of the Michigan Constitution; provided, however, (i) until the State Contribution is received by the Systems, the Systems agree to stay any pending litigation described in this subparagraph, and (ii) that as a condition precedent to the GRS and the PFRS dismissing any pending litigation described in this subparagraph that they are prosecuting, the GRS and the PFRS have the right to receive written confirmation from the Authority that the Authority is prepared and authorized to disburse the State Contribution in accordance with this Agreement and the Plan, subject only to the dismissal by the GRS and PFRS of any pending litigation described in this subparagraph that they are prosecuting.

d.   Active support of the Plan by, a release of and covenant not to sue the State from, and an agreement not to support in any way (including

4

funding) the litigation described in subparagraph 4(c) by the parties listed on **Exhibit C**, or equivalent assurance of litigation finality (which, as to the Systems, shall be deemed satisfied by the execution of the Support and Release Agreement to be entered into by the State and each of the Systems in connection with this matter).

e.   Classes 10 and 11 accept the Plan.

f.   By December 31, 2014, the Court enters a final, non-appealable order confirming the Plan that includes, at a minimum, the following:

    i.   A release of the State and State Related Entities by each holder of a Pension Claim of all Liabilities arising from or related to the City, the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution that such party has, had or may have against the State and any State Related Entities.

    ii.   A requirement that the governing documents of GRS and the governing documents of PFRS be amended to include:

        a)   the governance terms and conditions set forth in Paragraph 2, Exhibit A and Exhibit B of this Agreement; and

        b)   the Income Stabilization Payments and Income Stabilization Fund described in Paragraph 3 of this Agreement.

    iii.   Approval of, and authority for the City to enter into, the UTGO Settlement.

    iv.   A requirement that the City irrevocably assigns the right to receive not less than an aggregate amount of $20,000,000 of the payments on the Reinstated Stub UTGO Bonds to the Income Stabilization Funds of the GRS and PFRS. Such payments will be made to the Income Stabilization Funds in the form of annual installment payments over a 14 year period, pursuant to a payment schedule approved by the State.

    v.   Approval of, and authority for the City to enter into, the DIA Settlement.

    vi.   Agreement to and compliance with MCL 141.1561 and cooperation with the transition advisory board appointed pursuant to MCL 141.1563, or compliance with any new legislation that is enacted regarding post-bankruptcy governance.

5

g.     Evidence satisfactory to the State of an irrevocable commitment by:

      i.     The Foundations to fund $366,000,000 (or the net present value thereof) as part of the DIA Settlement; and

      ii.     The DIA Corp. to fund $100,000,000 (or the net present value thereof) as part of the DIA Settlement.

h.     The Plan Effective Date occurs on or before April 1, 2015.

5.     <u>Non-occurrence of Conditions Precedent</u>.   If the Conditions Precedent are not met to the satisfaction of the Authority and the Treasurer on or before April 1, 2015, upon written request of the Treasurer, the Authority shall remit the State Contribution to the Department and shall have no further obligations under this Agreement.

6.     <u>Default by GRS and PFRS and Remedies</u>.

a.     A System will be in default if the System has not complied with any of the terms and conditions set forth in the Plan, each System's respective governing documents, or this Agreement, including but not limited to failing to make the required Income Stabilization Payments or using funds in the Income Stabilization Fund for unauthorized purposes.

b.     In the event of default by a System, and failure of the System to promptly cure such default to the satisfaction of the Treasurer within the time period reasonably established by the Treasurer, no portion of the total State Contribution to the defaulting system, as adjusted for earnings and losses, may be taken into consideration by the System during the remainder of the 20 year period following the date of such default for purposes of determining whether benefits reduced by the Plan may be restored. Notwithstanding the foregoing, in the event that a default is cured in a subsequent year, the Treasurer may determine in his or her sole discretion (taking into consideration such factors as the financial impact of the default on the System) that the defaulting system may once again include its State Contribution, as adjusted for earnings and losses, for purposes of determining whether benefits reduced by the Plan may be restored.

c.     Each Board of Trustees shall provide reports to the Treasurer on a semi-annual basis and at such other times as the Treasurer reasonably may request in order for the Treasurer to determine that the conditions set forth herein have been satisfied. The Treasurer shall provide either a certificate of compliance, or in the event of a default that has not been cured to the Treasurer's satisfaction, a notice of default, upon request of the System or any of the independent members of the Board of Trustees.

6

d.    Notwithstanding the foregoing, in the event of a default, the Treasurer and the Authority shall have the right to pursue all available legal and equitable remedies against the Board of Trustees for the defaulting System, the Investment Committee, or any other person.

7.    <u>Execution in Counterparts</u>.  This Agreement may be executed in counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.

8.    <u>Governing Law/Jurisdiction</u>.  This Agreement shall be construed in accordance with the laws of the State of Michigan, without reference to its conflict of law provisions, and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws.  The Bankruptcy Court of the Eastern District of Michigan shall have exclusive jurisdiction over any action or proceeding solely with respect to this Agreement, and each party, to the extent permitted by law, agrees to submit to such jurisdiction and to waive any defense based on venue or jurisdiction of such court.

9.    <u>Amendment</u>.  This Agreement may be amended, modified, superseded or canceled, and any of the terms, covenants, representations, warranties or conditions hereof may be waived only by an instrument in writing signed by each of the Parties.

10.    <u>Limitation of Liability</u>.  The obligation to make the State Contribution is not a general obligation or indebtedness of the State or the Authority and is subject to satisfaction of the conditions described herein.  Furthermore, neither the State nor the Authority has any liability or obligation arising from or related to the contributions and funding of the Income Stabilization Fund of each System.  Notwithstanding anything contained herein to the contrary, no State Related Entity or board member of the Authority shall have any liability for the representations, warranties, covenants, agreements or other obligations of the State or the Authority hereunder or in any of the certificates, notices or agreements delivered pursuant hereto.

11.    <u>Severability</u>.  If any one or more of the covenants, agreements or provisions of this Agreement shall be determined by a court of competent jurisdiction to be invalid, the invalidity of any such covenants, agreements and provisions shall in no way affect the validity or effectiveness of the remainder of this Agreement, and it shall continue in force to the fullest extent permitted by law.

12.    <u>Headings</u>.  Any headings preceding the text of the several articles and sections hereof, and any table of contents or marginal notes appended to copies hereof, shall be solely for convenience or reference and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect.

[Remainder of Page Intentionally Left Blank – Signatures on Following Page]

**MICHIGAN SETTLEMENT ADMINISTRATION AUTHORITY**


By: _____
Title: Authorized Officer


**GENERAL RETIREMENT SYSTEM OF THE CITY OF DETROIT**


By: _____
Title: Authorized Officer


By: _____
Title: Authorized Officer


**POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT**


By: _____
Title: Authorized Officer


By: _____
Title: Authorized Officer


**CITY OF DETROIT**

By: _____
Title: Emergency Manager

8

**EXHIBIT A – GRS Governance Terms**

# INVESTMENT COMMITTEE GOVERNANCE
## FOR GENERAL RETIREMENT SYSTEM

| | |
|---|---|
| PREAMBLE | This document was prepared to set forth the pension governance requirements under the State Contribution Agreement (as that term is defined in the City's Fourth Amended Plan for the Adjustment of Debts of the City of Detroit, as amended from time to time) applicable to the General Retirement System of the City of Detroit (GRS). |
| SCOPE OF SETTLEMENT | The GRS is currently administered by a ten (10) member Board of Trustees (the "Board") that is vested with the fiduciary authority for the general administration, management and operation of the Retirement System. The Board currently makes all administrative, actuarial and investment related decisions for the GRS. Upon the Effective Date under the POA, but subject to consummation of the State Contribution Agreement, there shall be established, by appropriate action and amendments to governing documents, an Investment Committee ("IC") at GRS which shall be vested with the authority and responsibilities as outlined herein for a period of twenty (20) years after the Effective Date of the POA. All administrative, managerial, and operational matters not addressed in this Term Sheet shall continue to be addressed by the Board in the ordinary course of its affairs. |
| INVESTMENT COMMITTEE | The IC shall consist of seven (7) voting members consisting of:<br> i. Five (5) Independent Members;<br> ii. One (1) Employee Member; and<br> iii. One (1) Retiree Member.<br>Collectively, or individually, "Members" or "Member."<br><br>At least two (2) of the five (5) Independent Members of the committee shall be residents of the State of Michigan. None of the Independent Members shall be a party in interest as defined by MCL 38.1132d (4) to the City or the GRS.<br><br>Each Independent Member of the IC shall have expert knowledge or extensive experience with respect to either: (a) economics, finance, or institutional investments; or (b) administration of public or private retirement plans, executive management, benefits administration or actuarial science. At least one (1) of the IC Independent Members shall satisfy the requirements of (a) above and at least one (1) of the IC Independent Members shall satisfy the requirements of (b) above.<br><br>The five (5) initial IC Independent Members shall be selected by mutual agreement of the appropriate representatives of the State, the City and the Board, in consultation with the Foundation for Detroit's |

Future, and named in the POA. Successor Independent Members shall be recommended by a majority of the remaining Independent Members and confirmed by the Board and the State Treasurer in consultation with the Foundation for Detroit's Future, in accordance with such rules and regulations as may be adopted by the IC, provided such rules and regulations are not inconsistent with the POA and this agreement. In the event the Board and the State Treasurer cannot agree on the successor Independent Member within thirty (30) days of the receipt of the recommendation of the IC, the remaining Independent Members of the IC shall appoint the successor Independent Member.

If no mutual agreement is reached as to the selection of one or more of the initial IC Independent Members by the time of confirmation of the City's Plan of Adjustment, then the Bankruptcy Court shall select the Independent Members necessary to fill the five (5) initial IC Independent Member positions for which no agreement has been reached.

In the event the Bankruptcy Court selects the initial Independent Members as described immediately above, successor Independent Members shall be appointed in the same manner as the Independent Member being replaced, as described immediately above, after three (3) weeks' notice to the Board of the individuals chosen, in accordance with such rules and regulations as may be adopted by the IC, provided such rules and regulations are not inconsistent with the POA and this agreement.

The Employee Member shall be an employee-elected Member from the Board appointed by the Board. The initial Employee Member will be _____.

The Retiree Member shall be a retiree-elected Member from the Board appointed by the Board. The initial Retiree Member will be _____.

The terms of office of the initial IC Independent Members shall be staggered at the time of appointment so that Independent Members shall have varying initial terms of office, with one each having a 2, 3, 4, 5 and 6 year term. Each initial Independent Member shall serve until the expiration of his/her initial term. After the initial term of office, the term of office of the IC Independent Members shall be six years. Each successor Independent Member shall be selected in accordance with the provisions above and shall serve until his or her death, incapacity, resignation or removal in accordance with the paragraph below. Upon expiration of his or her term of office, an Independent Member shall continue to serve until his or her successor is appointed. Nothing herein shall bar an initial Independent Member from becoming a successor Independent Member after his/her initial term.

The terms of office of the Employee Members and Retiree Members of

2

the IC shall conform to their respective terms of office on the Board.

A Member may be removed by the remaining Members for any of the following reasons: (a) the Member is legally incapacitated from executing his or her duties as a Member of the IC and neglects to perform those duties, (b) the Member has committed a material breach of GRS provisions, policies or procedures and the removal of the Member is in the interests of the system or its participants or its participants' beneficiaries, (c) the Member is convicted of a violation of law and the removal shall be accomplished by a vote of the IC in accordance with the voting procedures in this agreement, (d) if the Member holds a license to practice and such license is revoked for misconduct by any State or federal government, or (e) if an IC Member shall fail to attend scheduled meetings of the IC for four (4) consecutive meetings, unless in each case excused for cause by the remaining Members attending such meetings, the Member shall be considered to have resigned from the IC, and the IC shall, by resolution, declare the office of the Member vacated as of the date of adoption of such resolution. In addition, a Member of the IC may have voting privileges temporarily suspended by a 70% or higher vote of the other members if the Member is indicted or sued by a State or federal government for an alleged violation of the law that relates to his or her service on the IC, or for other alleged financial crimes, including fraud. Any vacancy occurring in the office of Member shall be filled within sixty (60) days following the date of the vacancy, for the unexpired portion of the term, in the same manner in which the office was previously filled.

All members of the IC shall be reimbursed for the reasonable, actual and necessary expenses incurred in the performance of their duties. All reasonable and proper expenses related to the administration of the IC, including but not limited to the purchase of insurance, shall be payable out of the assets of the GRS. The IC may retain actuarial, legal counsel, audit or other professional or support personnel to provide advice to the IC as it deems reasonably necessary to perform its functions and such parties or persons may be reasonably compensated from the assets of the Plan; such engagements shall not be subject to the approval of the Board.

The IC shall be an investment fiduciary to the GRS. An IC Member or other fiduciary under the GRS shall discharge his or her duties with respect to the GRS in compliance with the provisions of Public Act 314 of 1965, as amended. An IC Member shall discharge his or her duties with the care, skill, and caution under the circumstances then prevailing which a prudent person, acting in a like capacity and familiar with those matters, would use in the conduct of an activity of like character and purpose. Members of the IC shall comply with all Board governance policies and procedures, including the Ethics and Code of Conduct Policies, unless such compliance violates the Member's fiduciary duties or conflicts with the terms and conditions of this agreement.

3

| | |
|---|---|
| IC MEETINGS | The IC shall meet at least once every other month. The Members shall determine the time for the regular meetings of the IC and the place or places where such meetings shall be held. The Secretary or his or her designee shall be responsible for giving notice of the time and place of such meetings to the other Members.<br><br>Notice and conduct of all meetings of the IC, both regular and special, shall be held within the City of Detroit and in accordance with applicable law including the Michigan Open Meetings Act (MCL §15.261 et seq.).<br><br>The IC shall adopt its own rules of procedure and shall keep a record of its proceedings. Five (5) Members shall constitute a quorum at any meeting of the IC, so long as at least three (3) Independent Members are present. Each Member shall be entitled to one vote on each question before the IC and at least four (4) concurring votes shall be necessary for a decision of the committee except as otherwise provided in this Term Sheet. |
| INVESTMENT COMMITTEE - RESPONSIBILITY | The IC shall serve in a fiduciary capacity with respect to the Investment Management of all GRS Plan Assets, determination of the investment return assumption, and Board compliance with benefit plan provisions, as set forth more fully below. The IC shall have all the powers as a fiduciary under the first sentence of MCL §38.1133(5) and (6).<br><br>All Investment Management decisions approved by the Board shall require a recommendation by an affirmative vote of the IC, in accordance with the provisions of this agreement. All actions and recommendations of the IC shall be forwarded to the Board for consideration and are subject to Board approval. The Board shall take no action with respect to any matter for which the IC has responsibility and authority, including the Investment Management matters described in the next paragraph, unless and until such action has been approved by affirmative vote of the IC. If (a) the Board fails to approve or disapprove an Investment Management decision that has been recommended by an affirmative vote of the IC, and such failure continues for 45 days after the date that the recommendation was made to the Board, or (b) the Board disapproves an Investment Management decision within such 45-day period but fails to provide to the IC within such 45-day period a detailed written response outlining the reasons for such disapproval, then the IC and the Chief Investment Officer are authorized to implement the decision. If the Board disapproves an Investment Management decision within such 45-day period and provides to the IC within such 45-day period a detailed written response outlining the reasons for such disapproval, then the IC shall have 45 days after the receipt of the Board response to either (a) withdraw the recommended Investment Management decision, or |

(b) request, in writing, a conference with the Board to be held within ten (10) days, but not less than five (5) business days, of such request by the IC, unless a later date is agreed to in writing by the Board and the IC, to discuss the disapproval by the Board described in the written response. Any such conference shall be conducted with at least three (3) Independent Members present in person or by phone. Within ten (10) days of the commencement of the conference, or twenty (20) days following the IC's request for a conference if no conference is held, the IC shall either withdraw the recommended Investment Management decision or provide the Board a written explanation of the IC's decision to proceed with the recommended Investment Management decision. After delivery of such written explanation by the IC, the IC and the Chief Investment Officer are authorized to implement the decision. Any action taken by the Board or the IC in violation of the terms of this agreement shall constitute an ultra vires act and the IC or the Board, whichever is applicable, is granted the express right to seek to preliminarily enjoin such violation of the breaching party without the need to show irreparable harm.

"Investment Management" with respect to plan assets shall mean:

1. Developing an Investment Policy Statement with sound and consistent investment goals, objectives and performance measurement standards which are consistent with the needs of the Plan.

2. Within 120 days after the Effective Date of the POA, all of the plan assets not already under qualified management, if any, must be managed by qualified managers selected by the IC.

3. Evaluating, retaining, terminating, and selecting qualified managers to invest and manage the plan assets.

4. Reviewing and affirming or rejecting the correctness of any and all calculations, actuarial assumptions and/or assessments used by the Plan Actuary including, but not limited to, (i) those underlying the restoration of pension benefits, funding levels and amortization thereof, all in accordance with the Pension Restoration Program attached to the City's Plan of Adjustment, (ii) those underlying the determination of annual funding levels and amortization thereof, and (iii) on or after fiscal year 2024 the recommended annual contributions to GRS in accordance with applicable law.

5. In accordance with approved actuarial work as provided in the immediate preceding paragraph and based on the annual actuarial valuation reports and any other projections or reports as applicable from the Plan Actuary or other professional advisors, the determination of the extent of restoration of pension

5

benefits, including but not limited to the payment of a portion of the 4.5% reduction in base monthly pension amounts and the payment of lost COLA payments, all in conformance to the Pension Restoration Program between the City and the Board attached to the Plan of Adjustment.

6. Communicating the investment goals, objectives, and standards to the investment managers; including any material changes that may subsequently occur.

7. Determining and approving the Plan's investment and asset allocation guidelines, taking into account the appropriate liquidity needs of the Plan.

8. Any interpretation of Plan documents, existing law, the POA or other financial determination that could affect funding or benefit levels.

9. Taking whatever corrective action is deemed prudent and appropriate when an investment manager fails to perform as expected.

10. Complying with the provisions of pertinent federal, state, and local laws and regulations, specifically Public Act 314 and Plan Investment Guidelines.

11. Reviewing and approving, prior to final issuance, the annual audit and all financial reports prepared on behalf of the GRS and meet and confer with the Plan's outside auditor or other professional advisors as necessary prior to approving the annual audit or other financial reports.

12. Causing an asset/liability valuation study to be performed for GRS every three (3) years, or as requested by the IC or Board.

The IC shall give appropriate consideration to and have an understanding of the following prior to the adoption of the investment guidelines and asset allocation policies, the selection of manager(s), and/or the adoption of investment return assumptions:

1. The fiduciary best practices and institutional standards for the investment of public employee retirement system plan assets.

2. The objective to obtain investment returns above the established actuarial investment return assumption to support the restoration of benefits under the Pension Restoration Program, to the extent that is prudent and consistent with the overall funding, liquidity needs and actuarial assumptions governing the Plan.

3. The liquidity needs of the GRS Plan.

6

| | |
|---|---|
| CHIEF INVESTMENT OFFICER (CIO) | The IC shall evaluate and select the CIO, set and approve any and all compensation for, and terms of employment of, the CIO. With respect to plan assets, the CIO shall report directly to the IC and the Executive Director of the Board. The CIO shall be responsible for assisting the IC and the Board in overseeing the GRS's investment portfolio.<br><br>The initial CIO is Ryan Bigelow [subject to State due diligence.] |
| PLAN ACTUARY | The current Plan Actuary is Gabriel Roeder Smith & Company. In the event the Board desires to retain a new actuary, the Board and IC shall collectively participate in the evaluation and selection of a qualified Plan Actuary. The Plan Actuary shall be responsible for assisting the Board and IC in performing its actuarial duties and shall comply with all requests for information or modeling requested by the IC, and shall attend meetings of the IC as requested, so as to allow the IC to perform satisfactorily the rights and duties set forth herein. Furthermore, the Board shall not act on any recommendation made by the Plan Actuary based on any calculation, assumption or assessment rejected by the IC.<br><br>Nothing herein shall be interpreted as limiting the IC's authority to engage an actuarial consulting firm other than the Plan Actuary to perform actuarial services deemed necessary to fulfill its fiduciary duties to the GRS and other duties to GRS as set forth herein. |
| CONSISTENCY WITH PLAN OF ADJUSTMENT | Nothing herein shall be interpreted as permitting the IC or the Board to alter or depart from the requirements set forth in the confirmed Plan of Adjustment. |

DETROIT 56620-1 1315511v9

**EXHIBIT B – PFRS Governance Terms**

*In re City of Detroit, Michigan*

# INVESTMENT COMMITTEE GOVERNANCE
# FOR POLICE AND FIRE RETIREMENT SYSTEM

| | |
|---|---|
| PREAMBLE | This document was prepared to set forth the pension governance requirements under the State Contribution Agreement (as that term is defined in the City's Fourth Amended Plan for the Adjustment of Debts of the City of Detroit, as amended from time to time) applicable to the Police and Fire Retirement System of the City of Detroit (PFRS). |
| SCOPE OF SETTLEMENT | The PFRS is currently administered by a seventeen (17) member Board of Trustees (the "Board") that is vested with the fiduciary authority for the general administration, management and operation of the Retirement System.  The Board currently makes all administrative, actuarial and investment related decisions for the PFRS.  Upon the Effective Date under the POA, but subject to consummation of the State Contribution Agreement, there shall be established, by appropriate action and amendments to governing documents, an Investment Committee ("IC") at PFRS which shall be vested with the authority and responsibilities as outlined herein for a period of twenty (20) years after the Effective Date of the POA.  All administrative, managerial, and operational matters not addressed in this Term Sheet shall continue to be addressed by the Board in the ordinary course of its affairs. |
| INVESTMENT COMMITTEE | The IC shall consist of nine (9) voting members consisting of:<br>   i. Five (5) Independent Members;<br>   ii. Two (2) Employee Members; and<br>   iii. Two (2) Retiree Members.<br>Collectively, or individually, "Members" or "Member."<br><br>At least two (2) of the five (5) Independent Members of the committee shall be residents of the State of Michigan.  None of the Independent Members shall be a party in interest as defined by MCL 38.1132d (4) to the City or the PFRS.<br><br>Each Independent Member of the IC shall have expert knowledge or extensive experience with respect to either:  (a)economics, finance, or institutional investments; or (b) administration of public or private retirement plans, executive management, benefits administration or actuarial science.  At least one (1) of the IC Independent Members shall satisfy the requirements of (a) above and at least one (1) of the IC Independent Members shall satisfy the requirements of (b) above.<br><br>The five (5) initial IC Independent Members shall be selected by mutual agreement of the appropriate representatives of the State, the |

1

City and the Board, in consultation with the Foundation for Detroit's Future, and named in the POA. Successor Independent Members shall be recommended by a majority of the remaining Independent Members and confirmed by the Board and the State Treasurer in consultation with the Foundation for Detroit's Future, in accordance with such rules and regulations as may be adopted by the IC, provided such rules and regulations are not inconsistent with the POA and this agreement. In the event the Board and the State Treasurer cannot agree on the successor Independent Member within thirty (30) days of the receipt of the recommendation of the IC, the remaining Independent Members of the IC shall appoint the successor Independent Member.

If no mutual agreement is reached as to the selection of one or more of the initial IC Independent Members by the time of confirmation of the City's Plan of Adjustment, then the Bankruptcy Court shall select the Independent Members necessary to fill the five (5) initial IC Independent Member positions for which no agreement has been reached.

In the event the Bankruptcy Court selects the initial Independent Members as described immediately above, successor Independent Members shall be appointed in the same manner as the Independent Member being replaced, as described immediately above, after three (3) weeks' notice to the Board of the individuals chosen, in accordance with such rules and regulations as may be adopted by the IC, provided such rules and regulations are not inconsistent with the POA and this agreement.

The Employee Members shall consist of one active police member and one active fire member from the Board, appointed by the Board. The initial Employee Members will be _____ and _____.

The Retiree Members shall consist of one retired police member and one retired fire member from the Board, each receiving a pension from PFRS and appointed by the Board. The initial Retiree Members will be _____ and _____.

Each of the four (4) uniformed Members shall have one-half (1/2) vote.

The terms of office of the initial IC Independent Members shall be staggered at the time of appointment so that Independent Members shall have varying initial terms of office, with one each having a 2, 3, 4, 5 and 6 year term. Each initial Independent Member shall serve until the expiration of his/her initial term. After the initial term of office, the term of office of the IC Independent Members shall be six years. Each successor Independent Member shall be selected in accordance with the provisions above and shall serve until his or her death, incapacity, resignation or removal in accordance with the paragraph below. Upon expiration of his or her term of office, an

2

Independent Member shall continue to serve until his or her successor is appointed. Nothing herein shall bar an initial Independent Member from becoming a successor Independent Member after his/her initial term.

The terms of office of the Employee Members and Retiree Members of the IC shall conform to their respective terms of office on the Board.

A Member may be removed by the remaining Members for any of the following reasons: (a) the Member is legally incapacitated from executing his or her duties as a Member of the IC and neglects to perform those duties, (b) the Member has committed a material breach of PFRS provisions, policies or procedures and the removal of the Member is in the interests of the system or its participants or its participants' beneficiaries, (c) the Member is convicted of a violation of law and the removal shall be accomplished by a vote of the IC in accordance with the voting procedures in this agreement, (d) if the Member holds a license to practice and such license is revoked for misconduct by any State or federal government, or (e) if an IC Member shall fail to attend scheduled meetings of the IC for four (4) consecutive meetings, unless in each case excused for cause by the remaining Members attending such meetings, the Member shall be considered to have resigned from the IC, and the IC shall, by resolution, declare the office of the Member vacated as of the date of adoption of such resolution. In addition, a Member of the IC may have voting privileges temporarily suspended by a 70% or higher vote of the other members if the Member is indicted or sued by a State or federal government for an alleged violation of the law that relates to his or her service on the IC, or for other alleged financial crimes, including fraud. Any vacancy occurring in the office of Member shall be filled within sixty (60) days following the date of the vacancy, for the unexpired portion of the term, in the same manner in which the office was previously filled.

All members of the IC shall be reimbursed for the reasonable, actual and necessary expenses incurred in the performance of their duties. All reasonable and proper expenses related to the administration of the IC, including but not limited to the purchase of insurance, shall be payable out of the assets of the PFRS. The IC may retain actuarial, legal counsel, audit or other professional or support personnel to provide advice to the IC as it deems reasonably necessary to perform its functions and such parties or persons may be reasonably compensated from the assets of the Plan; such engagements shall not be subject to the approval of the Board.

The IC shall be an investment fiduciary to the PFRS. An IC Member or other fiduciary under the PFRS shall discharge his or her duties with respect to the PFRS in compliance with the provisions of Public Act 314 of 1965, as amended. An IC Member shall discharge his or her duties with the care, skill, and caution under the circumstances then prevailing which a prudent person, acting in a like capacity and

3

| | |
|---|---|
| | familiar with those matters, would use in the conduct of an activity of like character and purpose. Members of the IC shall comply with all Board governance policies and procedures, including the Ethics and Code of Conduct Policies, unless such compliance violates the Member's fiduciary duties or conflicts with the terms and conditions of this agreement. |
| IC MEETINGS | The IC shall meet at least once every other month. The Members shall determine the time for the regular meetings of the IC and the place or places where such meetings shall be held. The Secretary or his or her designee shall be responsible for giving notice of the time and place of such meetings to the other Members.<br><br>Notice and conduct of all meetings of the IC, both regular and special, shall be held within the City of Detroit and in accordance with applicable law including the Michigan Open Meetings Act (MCL §15.261 et seq.).<br><br>The IC shall adopt its own rules of procedure and shall keep a record of its proceedings. Five (5) Members shall constitute a quorum at any meeting of the IC, so long as at least three (3) Independent Members are present. Each Member shall be entitled to one vote on each question before the IC and at least four (4) concurring votes shall be necessary for a decision of the committee except as otherwise provided in this Term Sheet. |
| INVESTMENT COMMITTEE - RESPONSIBILITY | The IC shall serve in a fiduciary capacity with respect to the Investment Management of all PFRS Plan Assets, determination of the investment return assumption, and Board compliance with benefit plan provisions, as set forth more fully below. The IC shall have all the powers as a fiduciary under the first sentence of MCL §38.1133(5) and (6).<br><br>All Investment Management decisions approved by the Board shall require a recommendation by an affirmative vote of the IC, in accordance with the provisions of this agreement. All actions and recommendations of the IC shall be forwarded to the Board for consideration and are subject to Board approval. The Board shall take no action with respect to any matter for which the IC has responsibility and authority, including the Investment Management matters described in the next paragraph, unless and until such action has been approved by affirmative vote of the IC. If (a) the Board fails to approve or disapprove an Investment Management decision that has been recommended by an affirmative vote of the IC, and such failure continues for 45 days after the date that the recommendation was made to the Board, or (b) the Board disapproves an Investment Management decision within such 45-day period but fails to provide to the IC within such 45-day period a detailed written response outlining the reasons for such disapproval, then the IC and the Chief Investment Officer are authorized to implement the decision. If the Board disapproves an |

4

Investment Management decision within such 45-day period and provides to the IC within such 45-day period a detailed written response outlining the reasons for such disapproval, then the IC shall have 45 days after the receipt of the Board response to either (a) withdraw the recommended Investment Management decision, or (b) request, in writing, a conference with the Board to be held within ten (10) days, but not less than five (5) business days, of such request by the IC, unless a later date is agreed to in writing by the Board and the IC, to discuss the disapproval by the Board described in the written response. Any such conference shall be conducted with at least three (3) Independent Members present in person or by phone. Within ten (10) days of the commencement of the conference, or twenty (20) days following the IC's request for a conference if no conference is held, the IC shall either withdraw the recommended Investment Management decision or provide the Board a written explanation of the IC's decision to proceed with the recommended Investment Management decision. After delivery of such written explanation by the IC, the IC and the Chief Investment Officer are authorized to implement the decision. Any action taken by the Board or the IC in violation of the terms of this agreement shall constitute an ultra vires act and the IC or the Board is granted the express right to seek to preliminarily enjoin such action without the need to show irreparable harm.

"Investment Management" with respect to plan assets shall mean:

1. Developing an Investment Policy Statement with sound and consistent investment goals, objectives and performance measurement standards which are consistent with the needs of the Plan.
2. Within 120 days after the Effective Date of the POA, all of the plan assets not already under qualified management, if any, must be managed by qualified managers selected by the IC.
3. Evaluating, retaining, terminating and selecting qualified managers to invest and manage the plan assets.
4. Reviewing and affirming or rejecting the correctness of any and all calculations, actuarial assumptions and/or assessments used by the Plan Actuary including, but not limited to, (i) those underlying the restoration of pension benefits, funding levels and amortization thereof, all in accordance with the Pension Restoration Program attached to the City's Plan of Adjustment, (ii) those underlying the determination of annual funding levels and amortization thereof, and (iii) on or after fiscal year 2024, the recommended annual contributions to PFRS in accordance with applicable law.
5. In accordance with approved actuarial work as provided in the immediate preceding paragraph and

5

<table>
<tr><td></td><td>

based on the annual actuarial valuation reports and any other projections or reports as applicable from the Plan Actuary or other professional advisors, the determination of the extent of restoration of pension benefits, including but not limited to the payment of lost COLA payments, all in conformance to the Pension Restoration Program between the City and the Board attached to the Plan of Adjustment.

6. Communicating the investment goals, objectives, and standards to the investment managers; including any material changes that may subsequently occur.
7. Determining and approving the Plan's investment and asset allocation guidelines, taking into account the appropriate liquidity needs of the Plan.
8. Any interpretation of Plan documents, existing law, the POA or other financial determination that could affect funding or benefit levels.
9. Taking whatever corrective action is deemed prudent and appropriate when an investment manager fails to perform as expected.
10. Complying with the provisions of pertinent federal, state, and local laws and regulations, specifically Public Act 314 and Plan Investment Guidelines.
11. Reviewing and approving, prior to final issuance, the annual audit and all financial reports prepared on behalf of the PFRS and meet and confer with the Plan's outside auditor or other professional advisors as necessary prior to approving the annual audit or other financial reports.
12. Causing an asset/liability valuation study to be performed for PFRS every three (3) years, or as requested by the IC or Board.

The IC shall give appropriate consideration to and have an understanding of the following prior to the adoption of the investment guidelines and asset allocation policies, the selection of manager(s), and/or the adoption of investment return assumptions:

1. The fiduciary best practices and institutional standards for the investment of public employee retirement system plan assets.
2. The objective to obtain investment returns above the established actuarial investment return assumption to support the restoration of benefits under the Pension Restoration Program, to the extent that is prudent and consistent with the overall funding, liquidity needs and actuarial

</td></tr>
</table>

6

13-53846-swr    Doc 8363-1    Filed 08/15/14    Entered 08/15/14 19:29:34    Page 177 of 50
455

| | |
|---|---|
| | assumptions governing the Plan.<br>3. The liquidity needs of the PFRS Plan. |
| CHIEF INVESTMENT OFFICER (CIO) | The IC shall evaluate and select the CIO, set and approve any and all compensation for, and terms of employment of, the CIO. With respect to plan assets, the CIO shall report directly to the IC and the Executive Director of the Board. The CIO shall be responsible for assisting the IC and the Board in overseeing the PFRS's investment portfolio.<br><br>The initial CIO is Ryan Bigelow [subject to State due diligence.] |
| PLAN ACTUARY | The current Plan Actuary is Gabriel Roeder Smith & Company. In the event the Board desires to retain a new actuary, the Board and IC shall collectively participate in the evaluation and selection of a qualified Plan Actuary. The Plan Actuary shall be responsible for assisting the Board and IC in performing its actuarial duties and shall comply with all requests for information or modeling requested by the IC, and shall attend meetings of the IC as requested, so as to allow the IC to perform satisfactorily the rights and duties set forth herein. Furthermore, the Board shall not act on any recommendation made by the Plan Actuary based on any calculation, assumption or assessment rejected by the IC.<br><br>Nothing herein shall be interpreted as limiting the IC's authority to engage an actuarial consulting firm other than the Plan Actuary to perform actuarial services deemed necessary to fulfill its fiduciary duties to the PFRS and other duties to PFRS as set forth herein. |
| CONSISTENCY WITH PLAN OF ADJUSTMENT | Nothing herein shall be interpreted as permitting the IC or the Board to alter or depart from the requirements set forth in the confirmed Plan of Adjustment. |

DETROIT 56620-1 1315534v6

**EXHIBIT C**

1. General Retirement System

2. Police and Fire Retirement System

3. AFSCME

4. UAW

5. Detroit Police Officers Association

6. Detroit Police Command Officers Association

7. Detroit Police Lieutenants and Sergeants Association

8. Detroit Fire Fighters Association

9. Retired Detroit Police and Fire Fighters Association

10. Retired Detroit Police Members Association

11. Detroit Retired City Employees Association

12. Official Retirees Committee

13. City of Detroit

**EXHIBIT D**

Cases to be dismissed:

1.  GRS et al. v. Emergency Manager of Detroit (Ingham County Circuit Court)
2.  Webster et al. v. State of Michigan, Governor, and State Treasurer (Ingham County Circuit Court)
3.  Detroit Library Commission v. Governor, State Treasurer, and Detroit Public Schools Emergency Manager (Ingham County)
4.  Flowers et al. v. Governor, State Treasurer, and State of Michigan (Ingham County Circuit Court)
5.  DPOA v. City of Detroit (Michigan Court of Appeals)

The settling parties will not attempt to amend to include the City of Detroit or its Emergency Manager as a defendant, or collaterally or retroactively attack the Detroit bankruptcy or actions of Detroit or its EM, or otherwise participate, support, fund or appeal in the following cases:

1.  Phillips et al v. Governor and State Treasurer (E.D. Mich.)
2.  Michigan AFSCME Council 25 v. Governor, State Treasurer, et al. (E.D. Mich.)
3.  NAACP v. Governor, State Treasurer, and Secretary of State (E.D. Mich.)
4.  Robert Davis/Citizens United Against Corrupt Government v. Governor, State of Michigan, Dept. of Treasury, Dept. of State Police, et al. (Ingham County Circuit Court)
5.  Robert Davis/Citizens United Against Corrupt Government v. Michigan Department of Treasury and Carla Robert (Wayne County Circuit Court)
6.  Robert Davis v. Local Emergency Financial Assistance Loan Board (Ingham Court)
7.  Robert Davis v. Weatherspoon, Governor, Attorney General, and State Treasurer (E.D. Mich.)
8.  Allen Park Retirees v. EM Parker, City of Allen Park (Wayne Circuit)
9.  Allen Park Retirees v. State (Court of Claims)
10. Deborah Moore-El v. Snyder (E.D. Mich.)
11. Faith, et al. v. Snyder (E.D. Mich.)
12. Sarella Johnson, et al. v. Snyder (E.D. Mich.)
13. United Retired Government Employees (URGE) et al. v. Governor, et al. (E.D. Mich.)

**EXHIBIT I.A.334**

SCHEDULE OF UNLIMITED TAX GENERAL OBLIGATION BOND
DOCUMENTS & RELATED UNLIMITED TAX GENERAL OBLIGATION BONDS

**SCHEDULE OF UNLIMITED TAX GENERAL OBLIGATION BOND**
**DOCUMENTS & RELATED UNLIMITED TAX GENERAL OBLIGATION BONDS**

| Unlimited Tax General Obligation Bond Documents | Series of Unlimited Tax General Obligation Bonds | Balance as of Petition Date |
|---|---|---|
| Resolution of the City Council adopted March 3, 1999<br><br>Finance Director's Order dated April 1, 1999 | Series 1999-A | $18,747,364 |
| Amended and Restated Resolution of the City Council adopted April 6, 2001 and Supplement No. 1 to Amended and Restated Resolution, adopted June 13, 2001 (collectively, "2001 UTGO Resolution")<br><br>Finance Director's Order dated August 1, 2001 ("2001 UTGO Sale Order") | Series 2001-A(1) | $78,787,556 |
| 2001 UTGO Resolution<br><br>2001 UTGO Sale Order | Series 2001-B | $4,063,616 |
| Resolution of the City Council adopted July 24, 2002<br><br>Finance Director's Order dated August 2, 2002 | Series 2002 | $6,745,767 |
| Resolution of the City Council adopted September 19, 2003<br><br>Finance Director's Order dated October 9, 2003 | Series 2003-A | $34,908,150 |
| Bond Authorizing Resolution adopted June 14, 2004 ("2004 UTGO Resolution")<br><br>Finance Director's Order dated August 27, 2004 ("2004 UTGO Sale Order") | Series 2004-A(1) | $39,872,258 |
| 2004 UTGO Resolution<br><br>2004 UTGO Sale Order | Series 2004-B(1) | $38,206,678 |
| 2004 UTGO Resolution<br><br>2004 UTGO Sale Order | Series 2004-B(2) | $736,241 |
| Resolution of the City Council adopted July 6, 2005 ("2005 UTGO Resolution")<br><br>Finance Director's Order dated December 5, 2005 ("2005 UTGO Sale Order") | Series 2005-B | $45,452,501 |
| 2005 UTGO Resolution<br><br>2005 UTGO Sale Order | Series 2005-C | $18,671,105 |

| Unlimited Tax General Obligation Bond Documents | Series of Unlimited Tax General Obligation Bonds | Balance as of Petition Date |
|---|---|---|
| Resolution of the City Council adopted November 17, 2006 ("2008 UTGO Resolution")<br><br>Finance Director's Order dated May 30, 2008 ("2008 UTGO Sale Order") | Series 2008-A | $59,487,564 |
| 2008 UTGO Resolution<br><br>2008 UTGO Sale Order | Series 2008-B(1) | $28,982,532 |

**EXHIBIT I.A.341**

FORM OF UTGO SETTLEMENT AGREEMENT

# SETTLEMENT AGREEMENT

This Settlement Agreement ("**Agreement**") is entered into as of July 18, 2014, among the City of Detroit (the "**City**"), Ambac Assurance Corporation ("**Ambac**"), Assured Guaranty Municipal Corp. and Assured Guaranty Corp. (together, "**Assured**"), and National Public Finance Guarantee Corporation ("**NPFG**"). In this Agreement, each of the City, Ambac, Assured, and NPFG is referred to individually as a "**Party**"; Ambac, Assured, and NPFG (including their successors and assigns) are referred to collectively as the "**Bond Insurers**"; and the City and the Bond Insurers are referred to collectively as the "**Parties**."

## RECITALS

**WHEREAS**, as of the close of Fiscal Year 2013 (*i.e.*, June 30, 2013), the City had $369.115 million in outstanding principal amount of unlimited tax general obligations bonds, excluding the 2010 Series A Bonds hereinafter mentioned (the "**Prior UTGO Bonds**");

**WHEREAS,** more than 90% of the Prior UTGO Bonds are insured by one of the three Bond Insurers under financial guaranty insurance policies (the "**Bond Insurance Policies**") that were issued contemporaneously with the respective Prior UTGO Bonds;

**WHEREAS**, the Governor of the State of Michigan determined on March 1, 2013 that a financial emergency existed in the City, and the Emergency Manager (together with any successors, the "**Emergency Manager**") was appointed for the City on March 14, 2013;

**WHEREAS**, on July 18, 2013 (the "**Petition Date**"), the City filed a voluntary petition for relief under chapter 9 of title 11 of the United States Code (the "**Bankruptcy Code**"), thereby commencing Bankruptcy Case No. 13-53846 (the "**Bankruptcy Case**") before the United States Bankruptcy Court for the Eastern District of Michigan (the "**Bankruptcy Court**");

**WHEREAS**, as of the Petition Date, the balance due on the Prior UTGO Bonds, including prepetition interest accrued as of that date, was $374,686,297;

**WHEREAS,** on October 1, 2013, the City defaulted on its obligation to make interest payments on the Prior UTGO Bonds in the amount of $9,372,276 and the Bond Insurers paid claims and were subrogated to the rights of the owners for such payments, and the insurance documents contemplate the assignment of the Prior UTGO Bonds to the Bond Insurers upon payment of a claim;

**WHEREAS**, on April 1, 2014, the City defaulted on its obligations on the Prior UTGO Bonds to pay interest in the amount of $9,372,276 and to pay principal in the amount of $38,205,000, and the Bond Insurers paid claims and were subrogated to the

rights of the owners for such payments, and the insurance documents contemplate the assignment of the Prior UTGO Bonds to the Bond Insurers upon payment of a claim;

**WHEREAS**, on November 8, 2013, Assured and NPFG filed an adversary proceeding against the City seeking declaratory relief with regard to their rights in respect of the Prior UTGO Bonds pending before the Bankruptcy Court (Adv. Proc. No 13-05309) (the "**Assured/NPFG Action**"), and Ambac filed an adversary proceeding against the City seeking declaratory relief with regard to its rights in respect of, *inter alia*, the Prior UTGO Bonds pending before the Bankruptcy Court (Adv. Proc. No 13-05310) (the "**Ambac Action**");

**WHEREAS**, on or about February 21, 2014, each of the Bond Insurers filed proofs of claim in the Bankruptcy Case (the "**UTGO Claims**") asserting claims against the City for the full amount of principal and interest due under the documents pursuant to which the Prior UTGO Bonds were issued (including post-petition interest), amounts due the Bond Insurers for payments pursuant to the Bond Insurance Policies, and contractual reimbursements due for charges, fees, costs, losses, liabilities and expenses incurred by the Bond Insurers in connection with the Bond Insurance Policies; and

**WHEREAS**, the Parties have engaged in good faith and arms' length negotiations regarding a consensual resolution of their disputes under or in respect of the Prior UTGO Bonds, the Assured/NPFG Action, the Ambac Action, and the UTGO Claims;

**NOW, THEREFORE**, in consideration of the foregoing and the promises, mutual covenants, and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1.    Recitals.  The recitals set forth above are incorporated by reference and are explicitly made a part of this Agreement.

Section 1.2.    Definitions.  In addition to the capitalized terms defined in the preamble and recitals, the following definitions shall apply to and constitute part of this Agreement and all schedules, exhibits and annexes hereto:

"**Act 436**" shall mean the Local Financial Stability and Choice Act of the State, Act 436 of 2012, Public Acts of Michigan, 2012.

"**Additional Bonds**" shall mean any unlimited tax general obligation bonds issued on a parity with the Prior UTGO Bonds, the UTGO Bonds and the 2010 Series A Bonds as to the Aggregate UTGO Tax Levy.

"**Additional DSA Debt**" has the meaning ascribed to it in Section 2.6(a).

"**Agreement to Deposit State Aid**" shall mean the agreement, dated as of the date of the issuance of the MFA Bonds, among the City, the State Treasurer and U.S. Bank National Association, as Master Trustee, providing for the deposit of Distributable State Aid payments by the State Treasurer directly into the funds and accounts held by the Master Trustee pursuant to the Master Indenture for purposes of retiring the Municipal Obligation for so long as the Municipal Obligation remains outstanding.

"**Aggregate UTGO Tax Levy**" shall mean all proceeds of the ad valorem tax millage levies, including delinquent millage payments received from Wayne County or otherwise, on account of unlimited tax general obligation bonds of the City, including the Prior UTGO Bonds (or after the Effective Date, the UTGO Bonds), the 2010 Series A Bonds and any Additional Bonds hereafter issued by the City.

"**Allowed Claim**" has the meaning ascribed to it in the Plan.

"**Ambac Action**" has the meaning ascribed to it in the recitals hereof.

"**Approval Motion**" shall mean a motion filed by the City with the Bankruptcy Court in accordance with Section 2.8(c), seeking entry of the Approval Order pursuant to Federal Rule of Bankruptcy Procedure 9019, which motion shall be in form and substance reasonably satisfactory to the Parties.

"**Approval Order**" shall mean an order of the Bankruptcy Court (other than the Plan Confirmation Order) approving the compromise and settlement set forth in this Agreement authorizing and directing the consummation of the transactions contemplated herein, which order shall be in a form and substance reasonably satisfactory to the Parties.

"**Assigned UTGO Bond Tax Proceeds**" has the meaning ascribed to it in Section 2.1(b)(i).

"**Assured/NPFG Action**" has the meaning ascribed to it in the recitals hereof.

"**Bankruptcy Case**" has the meaning ascribed to it in the recitals hereof.

"**Bankruptcy Code**" has the meaning ascribed to it in the recitals hereof.

"**Bankruptcy Court**" has the meaning ascribed to it in the recitals hereof.

"**Bond Insurance Policies**" has the meaning ascribed to it in the recitals hereof.

"**Bond Insurer Claims**" has the meaning ascribed to it in Section 2.1.

"**Bond Insurer Exculpated Parties**" means the Bond Insurers solely in their capacity as insurers of the Prior UTGO Bonds, and their respective parents, affiliates, shareholders, directors, officers, managers, employees, agents, attorneys, advisors, accountants, restructuring consultants, financial advisors and investment bankers, solely in their capacity as such.

"**Claim**" shall mean a "claim" as defined in Section 101(5) of the Bankruptcy Code.

"**Class**" means each class of Claims established under the Plan.

"**Debt Millage Escrow Agreement**" shall mean an escrow agreement substantially in the form of Exhibit A hereto between the City and U.S. Bank National Association as escrow trustee providing, among other things, for the deposit and distribution of the Aggregate UTGO Tax Levy collected by the City, to be executed and delivered on the date of this Agreement.

"**Debt Millage Escrow Trustee**" has the meaning ascribed to it in Section 2.4(a).

"**Distributable State Aid**" shall mean the shared revenue payments that the City is entitled to receive from the State under the Michigan Constitution and the provisions of the Glenn Steil State Revenue Sharing Act, Act 140, Public Acts of Michigan, 1971, as amended ("**Act 140**") in each City fiscal year ending June 30.

"**DSA Deposit**" has the meaning ascribed to it in Section 2.5(c).

"**DSA Deposit Date**" has the meaning ascribed to it in Section 2.5(c).

"**Deposit Date Balance Requirement(s)**" has the meaning ascribed to it in Section 2.5(c).

"**Deposit Date Balance Requirement for the Municipal Obligation**" has the meaning ascribed to it in Section 2.5(e).

"**DSA Escrow Funds**" has the meaning ascribed to it in Section 2.5(b).

"**DTC System**" shall mean the system maintained by the Depository Trust Company used for trading municipal securities.

"**Effective Date**" shall mean the effective date of any Plan.

"**Emergency Manager**" has the meaning ascribed to it in the recitals hereof.

"**Emergency Manager Order**" shall mean an order of the Emergency Manager in substantially the form attached hereto as Exhibit B.

"**Event of Default**" has the meaning ascribed to it in Section 4.1.

"**Existing DSA Debt**" has the meaning ascribed to it in Section 2.6(a).

"**Final Order**" shall mean an order or judgment including any associated findings of fact and conclusions of law of the Bankruptcy Court or other court of competent jurisdiction with respect to the applicable subject matter which has not been reversed, stayed, modified or amended and as to which (a) any right to appeal or seek certiorari, review, reargument, stay or rehearing has expired and no appeal or petition for certiorari, review, reargument, stay or rehearing is pending, or (b) an appeal has been taken or petition for certiorari, review, reargument, stay or rehearing has been filed and (i) such appeal or petition for certiorari, review, reargument, stay or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which certiorari, review, reargument, stay or rehearing was sought or (ii) the time to appeal further or seek certiorari, review, reargument, stay or rehearing has expired and no such further appeal or petition for certiorari, review, reargument, stay or rehearing is pending; provided, however, that the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Federal Rule of Bankruptcy Procedure 9024 may be filed relating to such order shall not cause such order to not be a Final Order.

"**Financial Terms**" has the meaning ascribed to it in Section 2.2.

"**Hard Pay Instruments**" has the meaning ascribed to it in Section 2.11(a)(i).

"**Holders Restructured UTGO Bonds**" has the meaning ascribed to it in Section 2.1(a).

"**Holder**" shall mean the holder of a Claim under or evidenced by the Prior UTGO Bonds.

"**Impaired Financial Creditors**" has the meaning ascribed to it in Section 2.11(a).

"**Insurer Owned Restructured UTGO Bonds**" has the meaning ascribed to it in Section 2.1(a).

"**Master Indenture**" shall mean the Master Debt Retirement Trust Indenture dated as of March 1, 2010 by and between the City and U.S. Bank National Association, Detroit, Michigan, as Master Trustee, as supplemented by the First Supplemental Debt Retirement Trust Indenture dated as of March 1, 2010, by the Second Supplemental Debt Retirement Trust Indenture dated as of December 1, 2010, the Third Supplemental Debt Retirement Trust Indenture dated as of March 1, 2012, the Fourth Supplemental Debt Retirement Trust Indenture dated as of August 1, 2012 and by the Fifth Supplemental Debt Retirement Trust Indenture to be dated as of the first day of the

month of the issuance of the MFA Bonds, by and between the City and the Master Trustee.

"**Master Trustee**" shall mean U.S. Bank National Association, Detroit, Michigan, as trustee under the Master Indenture or any successor trustee appointed pursuant to the terms of the Master Indenture.

"**MFA Bonds**" has the meaning ascribed to it in Section 2.2.

"**Municipal Obligation**" has the meaning ascribed to it in Section 2.2.

"**Plan**" shall mean the chapter 9 plan of adjustment filed by the City and incorporating the terms and conditions set forth in this Agreement, in substantially the form of the draft thereof dated May 5, 2014, as such plan may be amended, modified or supplemented from time to time, which plan, as it relates to this Settlement Agreement, shall be in form and substance reasonably satisfactory to the Bond Insurers.

"**Plan Confirmation Order**" shall mean findings of fact and an order of the Bankruptcy Court confirming the Plan and meeting the requirements of Section 2.9 of this Agreement.

"**Plan Documents**" shall mean the Plan, the Plan Confirmation Order and any Plan related documents effectuating this Agreement.

"**Plan Instruments**" shall have the meaning ascribed to it in Section 2.11(a)(ii).

"**Prior UTGO Bonds**" has the meaning ascribed to it in the recitals hereof.

"**Pro Rata**" shall mean the proportion that a claim of one Holder of Restructured UTGO Bonds bears to the aggregate of all claims of all of the Holders of Restructured UTGO Bonds.

"**Restructured UTGO Bonds**" has the meaning ascribed to it in Section 2.1.

"**Series 2014 DSA Escrow Fund**" has the meaning ascribed to it in Section 2.5(d).

"**Settlement Escrow Agreement**" has the meaning ascribed to it in Section 2.8.

"**Settlement-Related Documents**" shall mean this Agreement, the Plan Documents, the Approval Order (if applicable), the Debt Millage Escrow Agreement, the Settlement Escrow Agreement, the Restructured UTGO Bonds, the Stub UTGO Bonds, the Municipal Obligation, the MFA Bonds and all documents related to the MFA Bonds

(other than a Bond Insurer's insurance policies related to the MFA Bonds, Restructured UTGO Bonds and the Stub UTGO Bonds), each of which shall be in form and substance reasonably satisfactory to the Parties (and, in the case of the Plan Documents, solely as they relate to this Agreement).

"**Shared Credit Rating Act**" shall mean the Shared Credit Rating Act, Act No. 227 of the Public Acts of 1985 of the State, as from time to time amended.

"**Soft Pay Instruments**" has the meaning ascribed to it in Section 2.11(a)(ii).

"**State**" shall mean the State of Michigan.

"**State Treasurer**" shall mean the State Treasurer of the State.

"**Stub UTGO Bonds**" has the meaning ascribed to it in Section 2.1(b).

"**Stub UTGO Challenge**" has the meaning ascribed to it in Section 6.3(b).

"**Syncora**" shall mean Syncora Capital Assurance Inc. and Syncora Guarantee Inc. as insurer of the Series 2003(A) Unlimited Tax General Obligation Bonds.

"**2010 Senior Bonds**" has the meaning ascribed to it in Section 2.3(d)(i).

"**2010 Series A Bonds**" shall mean the City's $100,000,000 Distributable State Aid Second Lien Bonds (Unlimited Tax General Obligation), Series 2010 (A) (Taxable Recovery Zone Economic Development Bonds-Direct Payment).

"**Third Lien Bonds**" has the meaning ascribed to it in Section 2.3(d)(iii).

"**Top-Off Payments**" has the meaning ascribed to it in Section 2.11(b).

"**Trigger Event**" has the meaning ascribed to it in Section 2.11(b).

"**Trigger Payments**" has the meaning ascribed to it in Section 2.11(b).

"**UTGO Bond Tax Levy**" shall mean that portion of the Aggregate UTGO Tax Levy in the amount that was allocable to the Prior UTGO Bonds.

"**UTGO Bonds**" shall mean the Municipal Obligation and the Stub UTGO Bonds.

"**UTGO Claims**" has the meaning ascribed to it in the recitals hereof.

"**UTGO Litigation**" has the meaning ascribed to it in Section 2.13.

Section 1.3.    Interpretation. The Parties have participated jointly in the negotiation and drafting of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties hereto and no presumption or burden of proof will arise favoring or disfavoring any Party hereto because of the authorship of any provision of this Agreement.

Section 1.4.    General Rules of Construction. For all purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires

(a)    Defined terms in the singular shall include the plural as well as the singular, and vice versa.

(b)    All accounting terms not otherwise defined herein shall have the meanings assigned to them, and all computations herein provided for shall be made, in accordance with generally accepted accounting principles. All references herein to "generally accepted accounting principles" refer to such principles as they exist at the date of application there.

(c)    All references in this instrument to designated "Articles", "Sections" and other subdivisions are to the designated Articles, Sections and subdivisions of this instrument as originally executed.

(d)    The terms "herein", "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision.

(e)    All references in this instrument to a separate instrument are to such separate instrument as the same may be amended or supplemented from time to time pursuant to the applicable provisions thereof.

(f)    The term "person" shall include any individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization and any government or agency or political subdivision thereof.

## ARTICLE II
## SETTLEMENT TERMS

Section 2.1.    Claim Treatment. The City hereby agrees that the total Allowed Claim relating to the Prior UTGO Bonds will be $388,000,000, allocated as follows:

(a)    $287,560,790 of the Prior UTGO Bonds which mature on or after April 1, 2015 will be restructured and allocated (i) among the Holders of the Prior UTGO Bonds which mature on or after April 1, 2015 on a Pro Rata basis, as set forth on

Schedule 1a annexed hereto (the "**Holders Restructured UTGO Bonds**") and (ii) the Bond Insurers and Syncora, as set forth on Schedule 1b (the "**Insurer Owned Restructured UTGO Bonds**" and, together with the Holders Restructured UTGO Bonds, the "**Restructured UTGO Bonds**"), and the Restructured UTGO Bonds will be restructured by delivery of the Municipal Obligation to the MFA and the delivery by the MFA of the MFA Bonds as described in Section 2.2 below, which, as restructured through the MFA, will be a full faith and credit general obligation payable from all legally available resources and secured, to the extent permitted by law, including Section 12(1)(x) of Act 436, by a lien upon the UTGO Bond Tax Levy, and payable and further secured by a lien on Distributable State Aid as provided in Section 2.3(a)(iii); and

(b)     The remainder of the Prior UTGO Bonds (the "**Stub UTGO Bonds**") which mature on or after April 1, 2015, in the principal amount of $43,349,210, will be reinstated and remain outstanding, and will be payable from the UTGO Bond Tax Levy, subject to the following terms and conditions:

(i)     The Holders' rights to the proceeds of the UTGO Bond Tax Levy in an amount equal to the principal and interest payable on the Stub UTGO Bonds (but subject to the prior rights of the holders of the Municipal Obligation) will be assigned under and pursuant to the Plan (without any consent or action on the part of, or additional consideration payable to, the Bond Insurers or the Holders) to a designee or designees of the City (the "**Assigned UTGO Bond Tax Proceeds**"), and such proceeds will not be paid to the paying agent for the UTGO Bonds.

(ii)     The obligations of the Bond Insurers to the Holders of the Prior UTGO Bonds that are not Holders Restructured UTGO Bonds under the existing applicable Bond Insurance Policies shall be unchanged.

(c)     The Bond Insurers shall be granted Allowed Claims for all amounts actually paid by the Bond Insurers to Holders of the Prior UTGO Bonds together with any policy advances made from and after the Effective Date by the Bond Insurers in respect of the Stub UTGO Bonds pursuant to this Agreement up to an aggregate amount of $100.5 million (the "**Bond Insurer Claims**"), which Allowed Claims shall receive distributions only when and if the Most Favored Nations clause set forth in Section 2.11 becomes operative and only pursuant to the terms of such Most Favored Nations clause.

Section 2.2.     Restructuring of Restructured UTGO Bonds by Delivery of Municipal Obligation to MFA and Delivery of MFA Bonds.

(a)     On or before the Effective Date (i), the Restructured UTGO Bonds will be restructured as follows:  By execution of the Emergency Manager Order the City will authorize the issuance and delivery of a local government municipal obligation (the "**Municipal Obligation**") to the Michigan Finance Authority ("**MFA**"), in accordance with applicable law, (ii) the City will request the MFA to issue its Local Government Loan Program Revenue Bonds, Series 2014 (City of Detroit Unlimited Tax General Obligation Restructured Local Project Bonds) (the "**MFA Bonds**"), and (iii) the

MFA Bonds shall be distributed Pro Rata to the Holders of the Holders Restructured UTGO Bonds as set forth on Schedule 1a annexed hereto and among the Bond Insurers and Syncora as set forth on Schedule 1b annexed hereto. The Municipal Obligation and the MFA Bonds will have the same principal amount (rounded down for each denomination to the nearest whole dollar), interest rate, payment dates, amortization schedule, prepayment terms (including first call date) and other financial terms (other than the pledge of Distributable State Aid and the priority of payment from the UTGO Bond Tax Levy relative to the Stub UTGO Bonds) as the Restructured UTGO Bonds (the "**Financial Terms**"). The MFA Bonds will be limited obligations of the MFA, payable from and secured by (i) payments made by the City on the Municipal Obligation and all right, title and interest in and to the Municipal Obligation, which shall include, to the extent permitted by applicable law, including without limitation Section 12(1)(x) of Act 436, a lien on the portion of the UTGO Bond Tax Levy allocable to the Municipal Obligation, pledged by the City to secure the Municipal Obligation as required by Section 2.3(a), and (ii) a lien, made a statutory lien as provided by the Shared Credit Rating Act, on moneys in the funds and accounts established for the MFA Bonds under the authorizing resolution for such bonds, including payments pledged by the City and received and held by the MFA or its trustee for the MFA Bonds, which include, without limitation, all payments of (x) the proceeds of the UTGO Bond Tax Levy and (y) Distributable State Aid deposited as described in Sections 2.4 and 2.5.

(b)    All documents relating to the Municipal Obligation and the MFA Bonds will be in form and substance reasonably satisfactory to the Bond Insurers. Such documentation will include that the Master Indenture will not be amended in any manner which adversely affects the MFA Bonds or the rights of the Bond Insurers. Each Bond Insurer will insure the Series of MFA Bonds relating to the Holders Restructured UTGO Bonds originally insured by such Bond Insurer set forth on Schedule 1a attached hereto by either (i) issuing a new bond insurance policy (and to the extent applicable canceling the existing policy), (ii) endorsing its existing Bond Insurance Policy or (iii) amending its existing Bond Insurance Policy.

(c)    Each of the MFA Bonds will be freely transferable through the DTC System under a unique CUSIP identification number that is separate and distinct from the CUSIP identification number for the Stub UTGO Bonds or, if the DTC System is discontinued with respect to the MFA Bonds, in such other manner as is permitted in accordance with their terms.

(d)    The paying agent for the Prior UTGO Bonds shall issue new certificates representing the Stub UTGO Bonds to the Holders in principal amounts representing the balance of each Holder's Prior UTGO Bonds not restructured through the delivery of the MFA Bonds.

Section 2.3.    The Municipal Obligation and Distributable State Aid. The City agrees, with the cooperation of the MFA, to restructure the Restructured UTGO Bonds as the Municipal Obligation as of the Effective Date. The City covenants and agrees that:

(a) The Municipal Obligation:

(i) will be approved pursuant to the Emergency Manager Order and in accordance with all applicable laws;

(ii) will be payable from the unlimited tax full faith, credit and resources of the City and the UTGO Bond Tax Levy and secured, to the extent permitted by law, including without limitation Section 12(1)(x) of Act 436, by a lien granted by the City on the UTGO Bond Tax Levy pursuant to the Emergency Manager Order, the grant of which will be confirmed by the Bankruptcy Court in the Plan Confirmation Order (or, if applicable, the Approval Order);

(iii) also will be secured by and payable from a portion of the City's Distributable State Aid, subject to a statutory lien and trust as provided in section 15(2) of the Shared Credit Rating Act;

(iv) will have the same rights (other than priority) in and to the Distributable State Aid, and have the same protections (including, without limitation, a statutory lien to the same extent the 2010 Series A Bonds are secured by a statutory lien), as the 2010 Series A Bonds, except that the City's Deposit Date Balance Requirement (as defined in Section 2.5) with respect to the Municipal Obligation shall be as described in paragraph 2.5(e) below;

(v) will have the identical Financial Terms as the Restructured UTGO Bonds; and

(vi) will be pledged by the MFA to the bond trustee for the holders of the MFA Bonds pursuant to a resolution of the MFA authorizing the issuance of the MFA Bonds.

(b) The UTGO Bond Tax Levy shall be escrowed and used to pay the Municipal Obligation prior to the use of Distributable State Aid in the same manner as provided for the 2010 Series A Bonds, as described herein.

(c) Distributable State Aid will be pledged by the City and secured by a lien under the Master Indenture to be used for the purpose of paying principal of and interest on the Municipal Obligation and any additional bonds or other future obligations issued by the City and secured by Distributable State Aid.

(d) The lien on Distributable State Aid for the Municipal Obligation will be a fourth priority lien, subordinate, as of the MFA Bonds issuance date, only to the following:

(i) the first priority lien on Distributable State Aid for the City's $249,790,000 Distributable State Aid General Obligation Limited Tax Bonds, Series 2010 (the "**2010 Senior Bonds**");

(ii)     the second priority lien on  Distributable State Aid for the City's 2010 Series A Bonds, which lien in favor of the 2010 Series A Bonds is subordinate to the lien in favor of the 2010 Senior Bonds; and

(iii)     the third priority lien on Distributable State Aid for the City's third-lien limited tax general obligations bonds (the "**Third Lien Bonds**") securing the MFA's $129,520,000 Local Government Loan Program Revenue Bonds, Series 2012C (City of Detroit Limited Tax General Obligation Local Project Bonds Third Lien), which lien in favor of the Third Lien Bonds is subordinate to the lien in favor of the 2010 Series A Bonds.

(e)     The Emergency Manager shall issue the Emergency Manager Order in substantially the form attached hereto as Exhibit B.

Section 2.4.     Escrow and Application of Aggregate UTGO Tax Levy.

(a)     The City agrees that, pursuant to documentation in form and substance satisfactory to the Parties, proceeds of the Aggregate UTGO Tax Levy collected by the City will be segregated and transmitted no less often than as provided in the schedule of Statutory Tax Collection Distribution Dates published by the Bureau of Local Government Services of the Michigan Department of Treasury, and in any event, no less often than (x) bi-monthly during the period beginning each July 1 and ending the following March 31, and (y) monthly during the period beginning April 1 and ending the following June 30 of each year, to U.S. Bank National Association as escrow trustee (the "**Debt Millage Escrow Trustee**"), to be held and distributed pursuant to the terms and conditions of the Debt Millage Escrow Agreement. The Debt Millage Escrow Trustee shall be required to allocate the revenue pro rata, as required by the Debt Millage Escrow Agreement, among the outstanding UTGO Bonds, the 2010 Series A Bonds, and any Additional Bonds.

(b)     Proceeds of the Aggregate UTGO Tax Levy allocated to the UTGO Bonds  will be transferred promptly by the Debt Millage Escrow Trustee (i) first, for deposit to the Tax Levy Account held by the Master Trustee for the Municipal Obligation in an amount sufficient, together with funds already on deposit therein to pay debt service due on the Municipal Obligation on or before the April 1  following such deposit, together with any past due debt service on the Municipal Obligation, and (ii) second, to the assignee of the rights to payment from the Assigned UTGO Bond Tax Levy of amounts payable on the Stub UTGO Bonds on or before the April 1 following such deposit, an amount equal to the scheduled debt service on the Stub UTGO Bonds. Proceeds of the Aggregate UTGO Bond Tax Levy transferred to the Master Trustee for the purpose of paying debt service on the Municipal Obligation will be held in trust under applicable State law.

(c)     Neither the Holders of the MFA Bonds nor the Bond Insurers will seek payment from the proceeds of the UTGO Bond Tax Levy in excess of the amounts necessary to pay the Municipal Obligation scheduled annual debt service

13-53846-swr   Doc 8703-3   Filed 12/15/14   Entered 12/15/14 09:07:34   Page 196 of 455

plus any amount necessary to pay past due Municipal Obligation debt service plus any amounts required by Section 2.14(b).

Section 2.5.    <u>Distributable State Aid and Flow of Funds</u>.

(a)    Pursuant to the Agreement to Deposit Distributable State Aid, the State Treasurer has agreed to deliver 100% of the Distributable State Aid due the City to the Master Trustee for deposit under the Master Indenture for as long as the Municipal Obligation is outstanding.  Payments by the State Treasurer of Distributable State Aid will be deposited directly into the funds and accounts held by the Master Trustee in accordance with and as provided by the Agreement to Deposit Distributable State Aid and  the Master Indenture.  Distributable State Aid payments made to the Master Trustee for the purpose of paying debt service on the Municipal Obligation will be held in trust and subject to a statutory lien under applicable State law.

(b)    The Master Trustee will be required to deposit all of the City's Distributable State Aid in the Debt Retirement Fund established under the Master Indenture and allocate and set aside Distributable State Aid into the various Distributable Aid Escrow Funds as provided in the Master Indenture, including, without limitation, the Series 2014 DSA Escrow Fund defined in Section 2.5(d) below (the "**DSA Escrow Funds**") created pursuant to one or more supplemental indentures to the Master Indenture for the purpose of accumulating Distributable State Aid in amounts required by such supplemental indentures to be deposited in the DSA Escrow Funds by the dates specified in such supplemental indentures to pay debt service on the bonds and obligations of the City secured by a pledge of Distributable State Aid.

(c)    On each date that the State Treasurer deposits a payment of the City's Distributable State Aid (each a "**DSA Deposit**") with the Master Trustee (each a "**DSA Deposit Date**"), the Master Trustee shall set-aside such amounts as shall be sufficient to fund the minimum balances required to be on deposit in each DSA Escrow Fund to pay the then current annual principal and interest requirements on the related obligation as provided in the Master Indenture (each, a "**Deposit Date Balance Requirement**" and collectively the "**Deposit Date Balance Requirements**").  Any amounts remaining in the Debt Retirement Fund after the setting aside of the amounts necessary to satisfy the Deposit Date Balance Requirements of all DSA Escrow Funds, shall be released to the City for deposit to the General Fund of the City.

(d)    On or before the Effective Date, the City pursuant to a supplemental indenture to the Master Indenture shall establish with the Master Trustee a Series 2014 DSA Escrow Fund (the "**Series 2014 DSA Escrow Fund**") for the purpose of accumulating Distributable State Aid in sufficient amounts to pay debt service on the Municipal Obligation.  Moneys on deposit in the Series 2014 DSA Escrow Fund shall be held and withdrawn by the Master Trustee solely for the purpose of paying to the bond trustee for the holders of the MFA Bonds (as assignee of the MFA) the principal of and interest on the Municipal Obligation when due and payable, which payments will be used to make corresponding payments of principal and interest on the MFA Bonds.  Within the

13-53846-swr   Doc 8703-3   Filed 12/15/14   Entered 12/15/14 09:47:34   Page 197 of 455

Series 2014 DSA Escrow Fund there shall be created three separate and segregated sub-accounts designated the "Distributable Aid Account," the "Tax Levy Account," and the "General Account." Proceeds of the Aggregate UTGO Tax Levy allocated to the Municipal Obligation and transferred to the Master Trustee by the Escrow Agent pursuant to Section 2.4(b)(i) shall be deposited to the Tax Levy Account and used as described in subsection (f) below. That portion of Distributable State Aid necessary to pay the principal of and interest on the Municipal Obligation when due, shall be set aside and maintained in the Distributable Aid Account and used as described in subsection (e) below. All other moneys deposited to the Series 2014 DSA Escrow Fund from time to time by the City shall be set aside and maintained in the General Account and used as described in subsection (f) below.

(e)     To the extent the Master Trustee does not have on deposit in the Tax Levy Account the required portions of principal and interest due on the next October 1 or April 1 on the first day of each month set forth below (the "**Deposit Date Balance Requirement for the Municipal Obligation**"), the Master Indenture will provide for the deposit of all, or such lesser amount as is necessary to correct the deficiency in the Deposit Date Balance Requirement for the Municipal Obligation, of that month's distribution of Distributable State Aid into the Distributable State Aid Account of the Series 2014 DSA Escrow Fund (after all deposits to DSA Escrow Funds established to pay debt service on obligations of the City having priority over the Municipal Obligation) . The Deposit Date Balance Requirement for the Municipal Obligation will be as follows:

DEPOSIT DATE BALANCE REQUIREMENT

| MONTH OF DSA PAYMENT | PORTION OF NEXT MUNICIPAL OBLIGATION INTEREST PAYMENT | PORTION OF NEXT MUNICIPAL OBLIGATION PRINCIPAL PAYMENT |
|---|---|---|
| November | 1/3 | 4/6 |
| January | 2/3 | 5/6 |
| March | 100% | 100% |
| September | 100% | 3/6 |

(f)     Amounts on deposit in the Series 2014 DSA Escrow Fund shall be withdrawn from the DSA Escrow Fund for the purpose of paying debt service on the Municipal Obligation when due to the bond trustee for the holders of the MFA Bonds (as assignee of the MFA), which payments will be used to make corresponding payments of principal and interest on the MFA Bonds. Amounts shall be debited first from the Tax Levy Account in an amount necessary to pay the principal of and interest on the

Municipal Obligation on the corresponding payment date, and thereafter, if the amount on deposit in the Tax Levy Account is not sufficient to make the payments required, the amount necessary to satisfy the deficiency shall be debited, first, from the Distributable Aid Account, and second, from the General Account.

Section 2.6. <u>Additional Indebtedness</u>. From and after the date of this Agreement and, pursuant to documentation in form and substance satisfactory to the Parties, until the MFA Bonds have been paid in full:

(a) the City shall not incur, or permit to be outstanding, debt secured by a lien on the Distributable State Aid that is senior to the lien securing the Municipal Obligation, other than debt secured by a lien on the Distributable State Aid on the date of this Agreement ("**Existing DSA Debt**") and additional debt ("**Additional DSA Debt**") secured on a second or third lien level so that the aggregate principal amount of (x) Existing DSA Debt (as of the effective date of this Agreement – i.e., $479,310,000) plus (y) the Additional DSA Debt thereafter issued will not exceed $560,000,000, provided that, with respect to any Additional Debt the existing financial covenants in the Master Indenture restricting the issuance of additional bonds under the Master Indenture are satisfied.

(b) Notwithstanding clause (a), the City may issue first, second or third lien refunding bonds secured pursuant to the Master Indenture so long as any such refunding issuance results in debt service savings by the City in each year that such refunding bonds will be outstanding (based upon the amortization schedule in effect prior to the time of such refunding) or, if the last maturity of the MFA Bonds is prior to final maturity of the refunding bonds then to be issued, then in each year during which the MFA Bonds are outstanding.

(c) The City shall not incur debt secured by a lien on the Distributable State Aid that is pari passu with the lien securing the Municipal Obligation.

(d) The City may incur debt secured by a lien on the Distributable State Aid that is junior and subordinate to the lien securing the Municipal Obligation.

Section 2.7. <u>Levy and Collection of the Ad Valorem Debt Millage</u>.

The Settlement-Related Documents will provide that:

(a) The City shall impose in each year a separate debt millage levy reasonably projected to be in an amount necessary to pay the debt service coming due on all unlimited tax general obligation bonds (including both the Municipal Obligation and the Stub UTGO Bonds) before the next annual tax levy, including any past due amounts, plus any amounts necessary to reimburse the City for other City funds used to pay prior debt service, less any millage proceeds or other funds already on deposit with the Debt Millage Escrow Trustee which are available to pay the debt service next

coming due. The City shall comply with applicable law in levying and collecting ad valorem millage levied to pay all unlimited tax general obligation bonds.

(b)     The City shall certify annually not later than June 30 in each year that it has imposed the debt millage levy as required by and in accordance with Section 2.7(a). Such annual certification shall be in the form attached hereto as Exhibit C and shall be promptly provided to the Bond Insurers.

(c)     The City shall furnish to the Bond Insurers promptly upon request such information reasonably requested by the Bond Insurers to confirm the imposition of the debt millage levy and to monitor collections. The Bond Insurers shall have the right to discuss such information with the City, and the City will use reasonable efforts to explain the collection process to the Bond Insurers, including the allocation methods used for partial property tax payments.

Section 2.8.     Plan Effectiveness and Escrowing of Payments.

(a)     If the Effective Date of the Plan does not occur on or prior to September 30, 2014 for any reason other than proximately by reason of the actions or positions taken by any of the executing Bond Insurers, or their failure to support the Plan as provided in Section 3.1 below, solely in their capacity as the insurers of the Prior UTGO Bonds and not in any other capacity (including, for the avoidance of doubt in their capacity as insurers of any other obligations of the City), the City will pay into an escrow to be established with the current paying agent for the Prior UTGO Bonds the pro rata portion of the October 2014 scheduled interest debt service payment and any pro rata payments of principal and interest due thereafter, which would otherwise be paid on the Restructured UTGO Bonds, as if the transaction contemplated by this Agreement (other than the MFA Bond issuance) had closed. Specifically, and for clarification of the City's obligation under this paragraph, the City will pay into escrow the pro rata portion of scheduled debt service payments on the $287.56 million of Restructured UTGO Bonds due after September 30, 2014 through the Effective Date of the Plan, on the same terms and schedule as set forth in the current documents governing the Prior UTGO Bonds, which, subject to Section 2.8(b) below, such escrowed funds shall be released to the Bond Insurers on the Effective Date of the Plan. Such escrow shall be pursuant to the Settlement Escrow Agreement ("**Settlement Escrow Agreement**") in the form of Exhibit D attached hereto, which will be executed and delivered on the date of the execution and delivery of this Agreement.

(b)     If the Plan is not effective by March 31, 2015, and the Bankruptcy Court has issued an Approval Order (that is not stayed pending appeal) approving the settlement embodied in this Agreement, then on [March 31, 2015] the monies in such escrow will be released to the Bond Insurers, and the City will make all subsequent debt service payments, including the payment due on April 1, 2015, directly to the paying agent for the Prior UTGO Bonds as if the Restructured UTGO Bonds transaction (other than the MFA Bond issuance) had closed. If an Approval Order is entered but is subject to a stay pending appeal, the City shall continue to pay into escrow

the scheduled debt service on the Prior UTGO Bonds for so long as such stay remains in effect, and shall release all monies in the escrow accounts as soon as such order is no longer subject to stay.

(c)    If the Plan is not effective by September 30, 2014, then within fifteen (15) days of a request by the Bond Insurers, the City shall file an Approval Motion pursuant to Bankruptcy Rule 9019 with the Bankruptcy Court. The City and the Bond Insurers may mutually make an Approval Motion pursuant to Bankruptcy Rule 9019 at any time upon mutual agreement of the City and the Bond Insurers.

Section 2.9.   <u>Confirmation Order and Findings</u>. The Plan Confirmation Order shall include provisions substantially in the form of Exhibit E. Any material modification to such provisions shall be reasonably satisfactory to the Parties.

Section 2.10.   <u>Conditions to Plan Effectiveness.</u> The Plan shall provide that the effectiveness of the Plan is subject to the following conditions:

(a)    The Michigan Finance Authority board shall have approved the issuance of the MFA Bonds and such bonds shall have been issued; and

(b)    The City shall have obtained all governmental and Emergency Manager consents and approvals required to carry out the terms of this Agreement.

Section 2.11.   <u>Most Favored Nation</u>. In recognition of the unique features of the UTGO Bonds and in consideration of the settlement, the City agrees that the Bond Insurers will benefit from a "most favored nation" provision consisting of the two fundamental protections below and that such provision will be described in the Plan. Further, the City agrees that, if a class of Impaired Financial Creditors receives treatment other than the current treatment in the *Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (May 5, 2014)* [Docket No. 4392], such class' treatment in the Plan will include the existence of this "most favored nation" provision.

(a)    <u>Recovery Percentage Projected as of Confirmation Date</u>. Under no circumstances shall the terms of the Plan permit either of the Limited Tax General Obligation Claims or the COP Claims (each as defined in the Plan and collectively, the "**Impaired Financial Creditors**") to recover more on a percentage basis than the UTGO Claims as projected at Plan confirmation. In determining whether a Class of Impaired Financial Creditors will recover more on a percentage basis than the UTGO Claims as projected at Plan confirmation, the recovery percentage for each of the Impaired Financial Creditors' Claims will be the sum of:

(i)    the percentage that any cash payments and the principal amount of any "hard pay" instrument, combination of instruments or any other evidences of indebtedness or payment obligations of any kind (collectively, the "**Hard Pay Instruments**") provided to such Impaired Financial Creditor Class under the Plan is

of the aggregate amount of all the Allowed Claims in such Impaired Financial Creditor Class; and

(ii) the percentage that the reasonably anticipated recovery (as reasonably determined by the City as of Plan confirmation and as disclosed to creditors subject to the Bond Insurers' right to contest such determination as part of the confirmation hearing) on account of any "soft pay", contingent, or similar type of instrument, combination of instruments or any other evidences of indebtedness, contracts or settlements creating payment obligations of any kind including, without limitation, payment obligations relating to a sale, lease, privatization, public private partnership or similar arrangement or the value of any assets projected to be distributed or promised revenue streams or recoveries of any kind (collectively, the "**Soft Pay Instruments**" and together with the Hard Pay Instruments, the "**Plan Instruments**") provided to such Impaired Financial Creditor Class under the Plan is of the aggregate amount of all the Allowed Claims in such Impaired Financial Creditor Class.

(b) Actual Recovery Percentage Post-Confirmation. In the event the actual recovery percentage of any Impaired Financial Creditor Class on the aggregate Plan Instruments provided to such Impaired Financial Creditor's Class would result in such Class receiving 69.5% or more of the aggregate amount of all the Allowed Claims in any such Class (the "**Trigger Event**"), then payments that contribute to the Impaired Financial Creditor Class receiving a recovery over 69.5% (the "**Trigger Payments**") shall be made under such Plan Instruments to the Bond Insurers ("**Top-Off Payments**") on account of the Bond Insurer Claims in amounts equal to the following:

(i) the amount of the Trigger Payment, multiplied by

(ii) the quotient of

(A) $100.5 million, divided by

(B) the sum of (x) 30.5% of the aggregate amount of all the Allowed Claims in the particular Impaired Financial Creditor Class, and (y) $100.5 million.

For purposes of this sub-section, all actual recoveries for Impaired Financial Creditor Classes shall be determined by discounting the payments using a 5% discount rate back to the date of Plan confirmation. Amounts payable to the Bond Insurers pursuant to the provisions of this Section 2.11 will be allocated to the Bond Insurers as set forth on Schedule 2 attached hereto.

(c) Reporting. The City shall deliver to the Bond Insurers:

(i) promptly after the first payment is made thereunder, a written notice of any payment under any Soft Pay Plan Instrument benefiting any Impaired Financial Creditor Class, including the amount and date of such payment;

13-53846-swr Doc 8703-3 Filed 12/15/14 Entered 12/15/14 09:27:34 Page 202 of 455

(ii)     on each January 15 of every year beginning in the year after the first payment is made on any Soft Pay Plan Instrument benefiting any Impaired Financial Creditor Class and until the maturity date of the Soft Pay Instrument, a written report calculating the aggregate recovery percentage of each Impaired Financial Creditor Class;

(iii)     after any Impaired Financial Creditor Class achieves a recovery percentage on the aggregate amount of all the Allowed Claims in such class equal to or greater than 60%, on each January 15 and July 15, a written report calculating the aggregate recovery percentage of each Impaired Financial Creditor Class;

(iv)     after a Trigger Event occurs, a written report on each date that a payment is made under any Plan Instruments held by or benefiting an Impaired Financial Creditor Class that explains the calculation for the Trigger Payment and the Top-Off Payment and demonstrates compliance with the terms of this Agreement; and

(v)     written notice in the event any Impaired Financial Creditor challenges or disagrees in any manner with the determination of any payments related to a Trigger Payment.

The City official executing any written notice or written report described above will respond within a reasonable time to written inquiries from any Bond Insurer regarding such notice or report. In the event any Bond Insurer or Insurers make a written request to meet with such City official, such City Official will meet within a reasonable time period with such Bond Insurer or Insurers to answer their reasonable questions regarding any such notice or report.

(d)     Dispute Resolution. In the event any of the Bond Insurers provides a written notice to the City articulating disagreement with the City's determination of whether a Trigger Event has occurred or with the amount of shared payments after a Trigger Event pursuant to subsection 2.11(c)(iv), the City will notify all Bond Insurers and meet with the Bond Insurers within 15 business days of such written notice. At the meeting the Parties will attempt in good faith to resolve the differences. If the Parties are unable to reach a resolution of the differences the Bond Insurers will have the right to bring an enforcement action in the Bankruptcy Court.

Section 2.12.  Legal Opinions.

Bond counsel will provide at closing customary legal opinions relating to the validity, priority and enforceability of any MFA transaction in form and substance reasonably satisfactory to the Bond Insurers; such opinions to include standard bankruptcy opinion exceptions. Bond counsel will also provide a customary opinion in form and substance reasonably satisfactory to the Bond Insurers, on the exemption of interest from Federal and State taxation of the MFA Bonds and the Municipal Obligation.

No opinion will be provided with respect to any aspect of any lien on the UTGO Bond Tax Levy.

Section 2.13.  Stay of Litigation, Proofs of Claim.

(a)  The Assured/NPFG Action and Ambac Action (the "**UTGO Litigation**") as it relates to the Prior UTGO Bonds shall be stayed pending the issuance of an Approval Order or Plan Confirmation Order and the occurrence of the Effective Date, whereupon the Parties shall ask the Bankruptcy Court to dismiss the UTGO Litigation without prejudice until the Approval Order or the Plan Confirmation Order, as applicable, is a Final Order, when such dismissal shall be deemed to be with prejudice.

(b)  As soon as practicable subsequent to the execution and delivery of this Agreement by each of the Parties, but in no event later than five (5) business days subsequent thereto, the Parties shall take any and all action as is appropriate to (i) stay the UTGO Litigation as provided in subsection (a) above, (ii) maintain the status quo of the Parties in the UTGO Litigation as of the execution of this Agreement, and (iii) ensure that no action (including separate litigation and any objection to proofs of claim filed by the Bond Insurers relating to the Prior UTGO Bonds) is undertaken or commenced inconsistent with seeking a stay of and maintaining the status quo of the UTGO Litigation; provided, however, that any such stay shall terminate on the first (1st) business day following termination of this Agreement.

(c)  In the event (i) an Approval Motion is made by the City and denied by the Bankruptcy Court, (ii) an Approval Order is issued but is not consistent with this Agreement in any material respect or is overturned on appeal, (iii) a Plan consistent with this Agreement in all material respects is not confirmed by the Bankruptcy Court other than changes regarding payments relating to the Stub UTGO Bonds, or (iv) a Plan Confirmation Order is entered by the Bankruptcy Court but is not consistent in all material respects with this Agreement, or is overturned on appeal, then any Party (including one or more of the Bond Insurers as to such Bond Insurer or Bond Insurers) may resume the UTGO Litigation and terminate this Agreement as to such Party by written notice to the Parties.

(d)  The Bond Insurers agree that all proofs of claims filed by any of them with respect to Prior UTGO Bonds shall be deemed resolved and fully satisfied by approval of this Agreement in the Plan Confirmation Order, which is a Final Order or an Approval Order, which is a Final Order, as applicable.

Section 2.14.  Additional Covenants

(a)  City Will Not Contest.  The City shall not contest the validity or enforceability of any of the liens or interests granted under this Agreement or any of the obligations of the City set forth in this Agreement.

(b)    Paying Agent, Master Trustee and Escrow Agent Fees.
The City shall pay the reasonable and customary fees and expenses (including reasonable attorneys' fees) of (i) the paying agent with respect to the Prior UTGO Bonds (including the paying agent relating to the Prior UTGO Bonds that are not Holders Restructured UTGO Bonds) and (ii) of the paying agent, the Master Trustee, the Debt Millage Escrow Trustee and the escrow agent identified in the Settlement Escrow Agreement in respect of all transactions contemplated by this Agreement.

(c)    Further Action. To the extent that the City has not taken all necessary action to authorize the execution, delivery and performance of this Agreement, it will do so.


# ARTICLE III
# PLAN OF ADJUSTMENT AND PLAN SUPPORT

Section 3.1.    Plan Support Commitment. From and after the date hereof, and so long as the City has complied, and is complying, with its covenants and obligations under this Agreement, the Bond Insurers will each support the treatment of the Prior UTGO Bonds in the Plan by, at a hearing or in a court filing, expressing such support solely as insurers of the Prior UTGO Bonds and, if each Bond Insurer has established its right to vote, will each vote Prior UTGO Bonds and reimbursement claims in support of such Plan treatment. The Plan shall provide that such treatment, consistent with this Agreement, is the treatment for all holders of the Prior UTGO Bonds. For the absence of doubt, nothing contained in this Agreement shall require any Bond Insurer to support or vote for the treatment of any class of claims under the Plan other than the UTGO Bonds.

Section 3.2.    Solicitation Required in Connection with Plan. Notwithstanding anything contained in this Article III or elsewhere in this Agreement to the contrary, this Agreement is not, and shall not be deemed to be, a solicitation of acceptances of the Plan. The City and the Bond Insurers acknowledge and agree that the acceptance of the Plan will not be solicited until the Bankruptcy Court has approved the Disclosure Statement and related ballots, and such Disclosure Statement and ballots have been transmitted to parties entitled to receive same.

Section 3.3.    Plan Document Provisions. All Plan Documents, as they relate to the settlement embodied in this Agreement must (i) be in form and substance reasonably satisfactory to the Bond Insurers and to the City and be consistent with this Agreement, (ii) provide that the Plan treatment for Prior UTGO Bonds is part of a settlement of the pending UTGO Litigation.

**ARTICLE IV**
**DEFAULTS AND REMEDIES**

Section 4.1.    Events of Default.  The breach by any Party of any material agreement or covenant set forth in this Agreement or the Settlement Escrow Agreement will be an event of default ("**Event of Default**") under this Agreement.

Section 4.2.    Remedies.  The Parties acknowledge and agree that a breach of the provisions of this Agreement by any Party would cause irreparable damage to the other Parties and that such other Parties would not have an adequate remedy at law for such damage.  Therefore, the obligations of the Parties set forth in this Agreement and the Settlement Escrow Agreement shall be enforceable by an order compelling specific performance issued by the Bankruptcy Court, and appropriate injunctive relief may be applied for and granted in connection therewith.  Upon an Event of Default by the City, any Bond Insurer will have the right to compel immediate payment of amounts held under the Settlement Escrow Agreement by order of the Bankruptcy Court.  Such remedies shall be cumulative and not exclusive and shall be in addition to any other remedies that the Parties may have under this Agreement, the Settlement Escrow Agreement or otherwise. Any Bond Insurer may exercise its rights hereunder on its own. Consistent with Section 904 of the Bankruptcy Code, the City hereby consents to the Bankruptcy Court enforcing the terms of this Agreement and the Settlement Escrow Agreement.

Section 4.3.    Termination.

(a)    This Agreement may be terminated by the mutual agreement of all of the Bond Insurers upon an Event of Default caused by the City.  This Agreement may be terminated by less than all of the Bond Insurers as to such Bond Insurer or Bond Insurers upon an Event of Default caused by the City  if (i) an action or proceeding seeking to enforce the material agreement or covenant purported to be breached is brought by one or more Bond Insurers before the Bankruptcy Court, (ii) the Bankruptcy Court, after notice and a hearing, finds that an Event of Default caused by the City has occurred and (iii) either (A) the Bankruptcy Court declines to issue an order compelling specific performance by the City of the applicable agreement or covenant purported to be breached or (B) the Bankruptcy Court issues such an order compelling specific performance but the City fails to comply with the order.

(b)    This Agreement may be terminated by the City if any of the Bond Insurers fails to (i) support the Plan with respect to Class 8 – UTGO Claims or (ii) if it has the right to vote its Class 8 Claims as determined by the voting procedures process approved by the Bankruptcy Court in an order entered on March 11, 2014 (Docket No. 2984) (as such order may have been amended from time to time), vote its Class 8 Claims to accept the Plan.  This Agreement may be terminated by the City upon an Event of Default caused by the Bond Insurers, or any of them, if (i) an action or proceeding seeking to enforce the material agreement or covenant purported to be breached is brought by the City before the Bankruptcy Court, (ii) the Bankruptcy Court finds, after

notice and a hearing, that an Event of Default caused by the applicable Bond Insurer has occurred and (iii) either (A) the Bankruptcy Court declines to issue an order compelling specific performance by the applicable Bond Insurer of the applicable agreement or covenant purported to be breached or (B) the Bankruptcy Court issues such an order compelling specific performance but the applicable Bond Insurer fails to comply with the order.

(c)     Upon any such termination, any Party (including one or more of the Bonds Insurers as to such Bond Insurer or Bond Insurers) may resume the UTGO Litigation unless it has been previously dismissed with prejudice or has been previously deemed dismissed with prejudice.


# ARTICLE V
# REPRESENTATIONS AND WARRANTIES

Section 5.1.     Representations and Warranties of the City.  The City represents and warrants to the Bond Insurers that:

(a)     It is a municipal corporation of the State of Michigan.

(b)     It has the power to execute and deliver this Agreement and to perform its obligations hereunder and it has taken or will take all necessary action to authorize such execution, delivery and performance.

(c)     Such execution, delivery and performance do not violate or conflict with any law applicable to it, any order or judgment of any court or other agency of government applicable to it, or any material agreements specifically applicable to it or any of its assets.

(d)     Other than (i) approvals by the MFA, the State Treasurer, the execution of the Emergency Manager Order, and the approvals required by Section 19 of Act 436 to be obtained prior to delivery of the Municipal Obligation, all of which the City reasonably expects to be obtained prior to the Effective Date, and (ii) the approval of the Bankruptcy Court, all governmental and Emergency Manager consents and approvals that are required to have been obtained by it as of the date of execution of this Agreement with respect to the execution, delivery and performance of this Agreement have been obtained and are in full force and effect and all conditions of any such consents and approvals have been complied with.

Section 5.2.     Representations and Warranties of the Bond Insurers.  Each of the Bond Insurers represents to the City that:

(a)     It is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation.

(b)     It has the power to execute and deliver this Agreement and to perform its obligations under this Agreement and it has taken all necessary corporate action to authorize such execution, delivery and performance.

(c)     Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it, or any agreements specifically applicable to it or any of its assets.

(d)     All corporate or governmental consents and approvals that are required to have been obtained by it with respect to this Agreement have been obtained and are in full force and effect and all conditions of any such consents and approvals have been complied with.

(e)     Each of the respective Bond Insurers had and has standing to bring and resolve the UTGO Litigation related to the Prior UTGO Bonds that it insures (Assured and NPFG represent that each had and has standing to bring and resolve the Assured/NPFG Action, and Ambac represents that it had and has standing to bring and resolve the Ambac Action).

Section 5.3.     Mutual Representations and Warranties.  Unless otherwise noted, each Party makes the following representations, warranties and covenants (on a several basis, with respect to such Party only) to each of the other Parties:

(a)     Each person signing this Agreement warrants that he or she is legally competent and authorized to execute this Agreement on behalf of the Party whose name is subscripted at or above such person's signature.

(b)     The Parties have not made any statement or representation to each other regarding any facts relied upon by them in entering into this Agreement, and each of them specifically does not rely upon any statement, representation or promise of the other Parties hereto or any other person in entering into this Agreement, except as expressly stated herein or in the exhibits hereto.  Each party has relied upon its own investigation and analysis of the facts and not on any statement or representation made by any other party in choosing to enter into this Agreement and the transactions contemplated herein.

(c)     The Parties and their respective attorneys have made such investigation of the facts pertaining to this Agreement and all of the matters pertaining thereto as they deem necessary.

**ARTICLE VI**
**EXCULPATION**

Section 6.1.     Exculpation.  The Plan will include the Bond Insurer Exculpated Parties as exculpated parties for acts and omissions (other than those

constituting gross negligence or willful misconduct) in connection with (i) the Plan as it relates to this Agreement and (ii) this Agreement.

Section 6.2.     Releases.  Upon the dismissal with prejudice or deemed dismissal with prejudice of the applicable UTGO Litigation, the Parties to the applicable UTGO Litigation shall be deemed to have released each other, and the Parties' officials, officers, directors, employees and representatives, of and from any and all claims and causes of action related to the applicable UTGO Litigation and the Prior UTGO Bonds.

Section 6.3.     Defense Against Challenges.  (a) Subject to the terms of Section 6.3(b) below, if, after the issuance of the Plan Confirmation Order or the Approval Order, the validity or enforceability of any term or provision of this Agreement or the Settlement-Related Documents (as they relate to the settlement set forth in this Agreement) is challenged in any action, suit or proceeding, each of the named Parties in such action, suit or proceeding shall assume its own defense of such action, suit or proceeding.

(b) If, after the issuance of the Plan Confirmation Order or the Approval Order, an action, suit or proceeding is brought, an issue in which is the validity or enforceability of the Stub UTGO Bonds, including, without limitation, a challenge to the Assigned UTGO Bond Tax Proceeds (a "**Stub UTGO Challenge**"), the City shall assume the defense of such issue in any such action, suit or proceeding.  If any of the Bond Insurers are named as a party in a Stub UTGO Challenge, the City will appoint counsel to the named Bond Insurers, which may or may not be counsel to the City.  In all events, such counsel must be reasonably acceptable to the named Bond Insurers, and the City will pay the reasonable costs of such counsel.

## ARTICLE VII
## DISMISSAL OF CASE AND TERMINATION

Section 7.1.     Effect of Dismissal of the Bankruptcy Case.  In the event the Bankruptcy Case is dismissed, any Party may at any time within 60 days after such dismissal immediately terminate this Agreement by written notice to the other Parties.

Section 7.2.     Effect of Termination.  In the event of the termination of this Agreement by any Party pursuant to any provisions of this Agreement, this Agreement shall become null and void and be deemed of no force and effect, with no liability on the part of any Party hereto (or of any of its elected or appointed officials, directors, officers, employees, consultants, contractors, agents, legal and financial advisors or other representatives) arising from such termination, and no Party shall have any obligations to any other Party arising out of this Agreement.  Upon termination, neither this Agreement nor any terms or provisions set forth herein shall be admissible in any dispute, litigation, proceeding or controversy among the Parties and nothing contained herein shall constitute or be deemed to be an admission by any Party as to any matter, it being understood that the statements and resolutions reached herein were as a result of negotiations and compromises of the respective positions of the Parties.  If this

Agreement is terminated, then no Party hereto may (i) use this Agreement, any of its terms or any discussions or negotiations conducted in respect of this Agreement, or any part of the foregoing, in the UTGO Litigation; (ii) seek discovery with respect to any of the matters described in subsection (i) in the UTGO Litigation; or (iii) seek to admit any of the matters described in subsection (i) into evidence in the UTGO Litigation.

# ARTICLE VIII
# MISCELLANEOUS

Section 8.1.    <u>Amendments</u>. This Agreement may not be modified, amended or supplemented except by a written agreement executed by each Party to be affected by such modification, amendment or supplement.

Section 8.2.    <u>No Admission of Liability</u>.

(a)    The execution of this Agreement is not intended to be, nor shall it be construed as, an admission or evidence in any pending or subsequent suit, action, proceeding or dispute of any liability, wrongdoing, or obligation whatsoever (including as to the merits of any claim or defense) by any Party to any other Party or any other person with respect to any of the matters addressed in this Agreement.

(b)    None of this Agreement (including, without limitation, the recitals and exhibits hereto), the settlement or any act performed or document executed pursuant to or in furtherance of this Agreement or the settlement:  (i) is or may be deemed to be or may be used as an admission or evidence of the validity of any claim or of any wrongdoing or liability of any Party; or (ii) is or may be deemed to be or may be used as an admission or evidence of any liability, fault or omission of any Party in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal. None of this Agreement, the settlement, or any act performed or document executed pursuant to or in furtherance of this Agreement or the settlement shall be admissible in any proceeding for any purposes, except to enforce the terms of the Agreement, and except that any Party may file this Agreement in any action for any purpose, including, but not limited to, in order to support a defense or counterclaim based on the principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense of counterclaim.

Section 8.3.    <u>Good Faith Negotiations</u>. The Parties recognize and acknowledge that each of the Parties hereto is represented by counsel, and such Party received independent legal advice with respect to the advisability of entering into this Agreement.  Each of the Parties acknowledges that the negotiations leading up to this Agreement were conducted regularly and at arm's length; this Agreement is made and executed by and of each Party's own free will; that each knows all of the relevant facts and his or its rights in connection therewith, and that he or it has not been improperly influenced or induced to make this settlement as a result of any act or action on the part of any party or employee, agent, attorney or representative of any party to this

Agreement. The Parties further acknowledge that they entered into this Agreement because of their desire to avoid the further expense and inconvenience of litigation and other disputes, and to compromise permanently and settle the claims between the Parties settled by the execution of this Agreement.

Section 8.4. <u>Rights and Remedies</u>. Nothing in this Agreement is intended to augment or impair any rights, remedies and interests, including without limitation, liens, of any of the Parties hereto other than with respect to the Prior UTGO Bonds.

Section 8.5. <u>Third Party Beneficiaries</u>. Nothing in this Agreement, express or implied, is intended or shall be construed to confer upon, or to give to, any Person other than the Parties hereto and their respective successors and assigns, any right, remedy or claim under or by reason of this Agreement or any covenant, condition or stipulation thereof; and the covenants, stipulations and agreements contained in this Agreement are and shall be for the sole and exclusive benefit of the Parties hereto and their respective successors and assigns.

Section 8.6. <u>Governing Law; Retention of Jurisdiction; Service of Process</u>. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Michigan, without giving effect to any principles of conflicts of law and applicable federal law. By its execution and delivery of this Agreement, each of the Parties hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding between any or all of the foregoing with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought in the Bankruptcy Court for that purpose only, and, by execution and delivery of this Agreement, each hereby irrevocably accepts and submits itself to the jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding. In the event any such action, suit or proceeding is commenced, the Parties hereby agree and consent that service of process may be made, and personal jurisdiction over any Party hereto in any such action, suit or proceeding may be obtained, by service of a copy of the summons, complaint and other pleadings required to commence such action, suit or proceeding upon the Party at the address of such Party set forth in Section 8.11 hereof, unless another address has been designated by such Party in a notice given to the other Parties in accordance with Section 8.11 hereof. The City agrees that the Bankruptcy Court will have exclusive post-confirmation authority and power to enforce this Agreement and all Settlement-Related Documents and to hear and adjudicate any challenge, action, suit or proceeding brought by any third party challenging the validity or enforceability of any provision of this Agreement, until all UTGO Bonds have been paid in full and all Plan Instruments are no longer outstanding. Pursuant to Section 904 of the Bankruptcy Code, the City hereby consents to the Bankruptcy Court enforcing the terms of this Agreement and the Settlement Escrow Agreement.

Section 8.7. <u>Headings</u>. The headings of the Articles and Sections of this Agreement are inserted for convenience only and are not part of this Agreement and do

not in any way limit or modify the terms or provisions of this Agreement and shall not affect the interpretation hereof.

Section 8.8.   <u>Binding Agreement Successors and Assigns; Joint and Several Obligations</u>.  This Agreement shall be binding upon the execution and delivery of this Agreement by the Parties listed on the signature pages hereto.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, administrators, constituents and representatives. The agreements, representations, covenants and obligations of the Parties under this Agreement are several only and not joint in any respect and none shall be responsible for the performance or breach of this Agreement by another.

Section 8.9.   <u>Entire Agreement</u>.  This Agreement shall constitute the full and entire agreement among the Parties with regard to the subject hereof, and supersedes all prior negotiations, representations, promises or warranties (oral or otherwise) made by any Party with respect to the subject matter hereof.  No Party has entered into this Agreement in reliance on any other Party's prior representation, promise or warranty (oral or otherwise) except for those that may be expressly set forth in this Agreement.

Section 8.10.   <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original copy of this Agreement and all of which, when taken together, shall constitute one and the same Agreement. Copies of executed counterparts transmitted by telecopy or other electronic transmission service shall be considered original executed counterparts, provided receipt of copies of such counterparts is confirmed.

Section 8.11.   <u>Notices</u>.  All demands, notices, requests, consents, and other communications hereunder shall be in writing and shall be deemed to have been duly given (a), when personally delivered by courier service or messenger, (b) upon actual receipt (as established by confirmation of receipt or otherwise) during normal business hours, otherwise on the first business day thereafter if transmitted electronically (by e-mail transmission), by facsimile or telecopier, with confirmation of receipt, or (c) three (3) Business Days after being duly deposited in the mail, by certified or registered mail, postage prepaid-return receipt requested, to the following addresses, or such other addresses as may be furnished hereafter by notice in writing, to the following Parties:

If to the City, to:

Chief Financial Officer
City of Detroit
1126 Coleman A. Young Municipal Center
Two Woodward Avenue
Detroit MI 48226
Phone: (313) 224-3382
Fax: (313) 224-2827

with a copy given in like manner to:

> Corporation Counsel
> City of Detroit Law Department
> Coleman A. Young Municipal Center
> 2 Woodward Avenue
> Detroit MI 48226
> Phone: (313) 237-3018
> Fax: (313) 224-5505

> Miller, Canfield, Paddock and Stone, PLC
> 150 West Jefferson, Suite 2500
> Detroit, MI 48226
> Attention: Jonathan Green
> Email: green@millercanfield.com
> Attention: Amanda Van Dusen
> Email: vandusen@millercanfield.com

If to the Bond Insurers, to:

> Ambac Assurance Corporation
> One State Street Plaza
> New York, New York 10004
> Attention: Surveillance Department and General Counsel's Office
> Fax: (212) 208-3384

with a copy given in like manner to:

> Arent Fox LLP
> 1675 Broadway
> New York, New York 10019
> Attention: David L. Dubrow, Esq.
> Telecopy: (212) 484-3990
> Email: david.dubrow@arentfox.com

> Assured Guaranty Municipal Corp and Assured Guaranty Corp.
> 31 West 52nd Street
> New York, NY 10019
> Attention: Kevin J. Lyons
> Email: klyons@assuredguaranty.com
> Attention: Terence Workman
> Email: tworkman@assuredguaranty.com

with a copy given in like manner to:

13-53846-swr Doc 8730-3 Filed 12/15/14 Entered 12/15/14 09:17:34 Page 213 of
455
13-53846-swr Doc 6908-3 Filed 08/20/14 Entered 08/20/14 22:27:34 Page 30 of
272

Chadbourne & Parke LLP
30 Rockefeller Plaza
New York, NY 10112
Attention: Lawrence A. Larose
Fax: (212) 541-5369
Email: llarose@chadbourne.com
Attention: Samuel S. Kohn
Fax: (212) 541-5369
Email: skohn@chadbourne.com

National Public Finance Guarantee Corporation
113 King Street
Armonk, NY 10504
Attention: Kenneth Epstein and William J. Rizzo
Telecopy: (914) 765-3259
Email: kenneth.epstein@optinuityar.com
Email: bill.rizzo@nationalpfg.com

with a copy given in like manner to:

Sidley Austin LLP
555 West 5th Street
40th Floor
Los Angeles, CA 90013
Attention: Jeffrey E. Bjork
Telecopy: (213) 896-6600
Email: jbjork@sidley.com

Sidley Austin LLP
555 California Street
Suite 2000
San Francisco, CA 94104
Attention: Eric D. Tashman
Telecopy: (415) 772-7400
Email: etashman@sidley.com

Section 8.12. <u>Further Assurances</u>. Each of the Parties hereto agrees to execute and deliver, or to cause to be executed and delivered, all such instruments, and to take all such action as the other Parties may reasonably request in order to effectuate the intent and purposes of, and to carry out the terms of, this Agreement.

Section 8.13. <u>Non-Severability of Agreement</u>. This Agreement is to be construed as a whole, and all provisions of it are to be read and construed together. Notwithstanding anything in this Agreement, the Approval Order (if applicable) or the Plan Confirmation Order to the contrary, and in light of the integrated nature of the settlements and compromises embodied in this Agreement, in the event that (i) a court of

competent jurisdiction enters a Final Order ruling that any of the transactions contemplated in this Agreement are void, invalid, illegal or unenforceable in any material respect, (ii) any of the transactions contemplated by this Agreement are reversed, vacated, overturned, voided or unwound in any material respect, or (iii) the Approval Order or Plan Confirmation Order as it relates to the transactions contemplated in this Agreement is reversed, vacated, overturned or amended in any material respect, then in each case, the entirety of this Agreement (other than this Section 8.13) shall be void ab initio and of no force and effect and, during any subsequent proceeding, the Parties shall not assert claim preclusion, issue preclusion, estoppel or any similar defense in respect of rights and claims of the Parties that were the subject of this Agreement prior to this Agreement being of no force or effect.

(Signature page follows)

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date set forth above.

THE CITY OF DETROIT, as Debtor

By: _____
    Name:
    Title:

AMBAC ASSURANCE CORPORATION

By: _____
    Name:
    Title:

ASSURED GUARANTY CORP.

By: _____
    Name:
    Title:

ASSURED GUARANTY MUNICIPAL CORP.

By: _____
    Name:
    Title:

NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION

By: _____
    Name:
    Title:

**Schedule 1**

**(Pro Rata Allowed Claims for Restructured UTGO Bonds and Stub UTGO Bonds)**

## Schedule 1a - Holders Restructured UTGO Bonds

| Series | Outstanding UTGO Bond Principal | Restructured % | Holders Restructured UTGO Bond Principal |
|---|---|---|---|
| UTGO1999A (Assured) | $15,765,000 | 84.50% | $13,321,425 |
| UTGO2001A1 (National) | 74,800,000 | 84.50% | 63,206,000 |
| UTGO2001B (National) | - | - | - |
| UTGO2002 (National) | 6,645,000 | 84.50% | 5,615,025 |
| UTGO2003A (Syncora) | 31,675,000 | 84.50% | 26,765,375 |
| UTGO2004A1 (Ambac) | 39,270,000 | 84.50% | 33,183,150 |
| UTGO2004B1 (Ambac) | 29,365,000 | 84.50% | 24,813,425 |
| UTGO2004B2 (Ambac) | 575,000 | 84.50% | 485,875 |
| UTGO2005B (Assured) | 42,615,000 | 84.50% | 36,009,675 |
| UTGO2005C (Assured) | 15,525,000 | 84.50% | 13,118,625 |
| UTGO2008A (Assured) | 55,895,000 | 84.50% | 47,231,275 |
| UTGO2008B1 (Assured) | 18,780,000 | 84.50% | 15,869,100 |
| Total | $330,910,000 | | $279,618,950 |

## Schedule 1b - Insurer Owned Restructured UTGO Bonds

| Series | UTGO Bond Principal | Restructured % | Insurer Owned Restructured UTGO Bond Principal | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Ambac | Assured | National | Syncora | Total |
| UTGO1999A (Assured) | $15,765,000 | 2.4% | - | 378,360 | - | - | $378,360 |
| UTGO2001A1 (National) | 74,800,000 | 2.4% | 249,977 | 1,545,223 | - | - | 1,795,200 |
| UTGO2001B (National) | - | 2.4% | - | - | - | - | - |
| UTGO2002 (National) | 6,645,000 | 2.4% | 22,207 | 137,273 | - | - | 159,480 |
| UTGO2003A (Syncora) | 31,675,000 | 2.4% | 99,245 | 613,476 | - | 47,479 | 760,200 |
| UTGO2004A1 (Ambac) | 39,270,000 | 2.4% | 942,480 | - | - | - | 942,480 |
| UTGO2004B1 (Ambac) | 29,365,000 | 2.4% | 704,760 | - | - | - | 704,760 |
| UTGO2004B2 (Ambac) | 575,000 | 2.4% | 13,800 | - | - | - | 13,800 |
| UTGO2005B (Assured) | 42,615,000 | 2.4% | - | 1,022,760 | - | - | 1,022,760 |
| UTGO2005C (Assured) | 15,525,000 | 2.4% | - | 372,600 | - | - | 372,600 |
| UTGO2008A (Assured) | 55,895,000 | 2.4% | - | 1,341,480 | - | - | 1,341,480 |
| UTGO2008B1 (Assured) | 18,780,000 | 2.4% | - | 450,720 | - | - | 450,720 |
| Total | $330,910,000 | | $2,032,469 | $5,861,892 | $ - | $47,479 | $7,941,840 |

**Schedule 2**

**(Pro Rata Payments to Bond Insurers)**

**Schedule 2 - Allocation of Amount Payable to Bond Insurers**

| Insurer | Pro Rata Share |
|---------|---------------|
| Ambac | 23.209% |
| Assured | 50.400% |
| National | 26.391% |
| Total | 100.000% |

## Exhibit A

## FORM OF DEBT MILLAGE ESCROW AGREEMENT

# DEBT MILLAGE DEPOSIT ESCROW AGREEMENT
# CITY OF DETROIT, COUNTY OF WAYNE
# STATE OF MICHIGAN

THIS ESCROW AGREEMENT (the "Agreement") dated as of the ___ day of _____, 2014, made by and between the City of Detroit, County of Wayne, State of Michigan (the "City") and U. S. Bank National Association, Detroit, Michigan (the "Escrow Trustee").

## WITNESSETH:

WHEREAS, on March 1, 2013, the Governor (the "Governor") of the State of Michigan (the "State") determined that a financial emergency existed within the City pursuant to the Local Government Fiscal Responsibility Act, Act 72, Public Acts of Michigan, 1990, as amended ("Act 72"); and

· WHEREAS, on March 14, 2013, the Governor confirmed that a financial emergency existed within the City and, pursuant to Act 72, assigned to the Local Emergency Financial Assistance Loan Board established pursuant to the Emergency Municipal Loan Act, Act 243 Public Acts of Michigan, 1980, as amended (the "Board") the responsibility for managing the financial emergency; and

WHEREAS, on March 14, 2013, pursuant to Act 72, the Board appointed Kevyn D. Orr as Emergency Financial Manager for the City; and

WHEREAS, by operation of law the financial emergency continues to exist within the City pursuant to the Local Financial Stability and Choice Act, Act 436, Public Acts of Michigan, 2012 ("Act 436") and the Emergency Financial Manager continues in the capacity of the Emergency Manager for the City (the "Emergency Manager"); and

WHEREAS, on July 18, 2013 (the "Petition Date"), in accordance with Act 436 and the approval of the Governor, the Emergency Manager filed on behalf of the City a petition for relief pursuant to Chapter 9 of title 11 of the United States Code, 11 U.S.C. Sections 101-1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"); and

WHEREAS, as of the close of Fiscal Year 2013 (i.e., June 30, 2013), the City had $369.115 million in outstanding principal amount of unlimited tax general obligation bonds, excluding the 2010A UTGO Bonds hereinafter mentioned (the "Prior UTGO Bonds"); and

WHEREAS the City has previously issued and delivered its Distributable State Aid Second Lien Bonds (Unlimited Tax General Obligation) Series 2010A (Taxable Recovery Zone Economic Development Bonds Direct Payment) (the "2010A UTGO Bonds") which, together

with the Prior UTGO Bonds, are outstanding in the amounts, bear interest at the rates, are payable on such dates and have the redemption provisions shown on Exhibit A hereto; and

WHEREAS, more than 90% of the Prior UTGO Bonds are insured by either Ambac Assurance Corporation, Assured Guaranty Municipal Corp. or National Public Finance Guarantee Corporation (each a "Bond Insurer" and collectively, the "Bond Insurers"), as shown on Exhibit A; and

WHEREAS, the City and the Bond Insurers have entered into a settlement agreement entered into as of July ___, 2014 (the "UTGO Settlement Agreement"); and

WHEREAS, the City intends to restructure $287,560,790 of the Prior UTGO Bonds which mature on or after April 1, 2015 (the "Restructured UTGO Bonds") as described below; and

WHEREAS, on _____, 2014, pursuant to Section 12(1) and Section 19(1) of Act 436, the Emergency Manager filed with the City Council of the City (the "City Council") his Order No. ___ Approval of _____ (Order No. ___"), in part, to accomplish the restructuring of the Restructured UTGO Bonds as the Distributable State Aid Fourth Lien Restructured Bonds (Unlimited Tax General Obligation), Series 2014 (the "Bonds" or the "Municipal Obligation") in the amounts shown on Exhibit B attached hereto; and

WHEREAS, on _____, 2014, in accordance with Section 19(1) of Act 436, the City Council adopted a resolution entitled ["Resolution of the City Council of the City of Detroit, County of Wayne, State of Michigan Approving the Emergency Manager of the City of Detroit Order No. ___ Approval of UTGO _____"] (the "Council Resolution") under which the City Council approved the issuance and delivery of the Municipal Obligation to the Michigan Finance Authority ("MFA"); and

WHEREAS, the Restructured UTGO Bonds will be restructured as described in Section 2.2 of the UTGO Settlement Agreement: and

WHEREAS, on _____, 2014, the Bankruptcy Court issued an order approving the UTGO Settlement Agreement (the "Confirmation Order"); and

WHEREAS, the portion of the Prior UTGO Bonds not restructured through the issuance of the Municipal Obligation, which mature on or after April 1, 2015, in the principal amount of $43,410,000 (the "Stub UTGO Bonds" and together with the 2010A UTGO Bonds, the Municipal Obligation and any Additional Bonds (defined below), the "UTGO Bonds") will be reinstated and shall remain Outstanding in the amounts and will remain payable as shown on Exhibit C hereto and as provided in Order No. _____; and

WHEREAS, pursuant to the Prior UTGO Bonds and the 2010A UTGO Bonds and Order No. ___ and Section 4a of Act 279, the City has pledged, and to the extent permitted by applicable law, including without limitation Section 12(1)(x) of Act 436, in Order No. __, has created a lien upon the Debt Millage Revenues (as hereinafter defined) to pay the debt service on the UTGO Bonds; and

2

WHEREAS, pursuant to Section 4a of Act 279, and Section 701 of the Revised Municipal Finance Act, Act No. 34, Public Acts of Michigan, 2001, as amended, Order No. ___ provides for the deposit of the Debt Millage Revenues into a separate escrow account to be used for the sole purpose of paying principal of and interest on the UTGO Bonds and the administrative costs related to the deposit and escrow of Debt Millage Revenues; and

WHEREAS, in order to effectuate the pledge of the Debt Millage Revenues in favor of the owners of the UTGO Bonds, it is necessary for the City to provide for the deposit with the Escrow Trustee of the proceeds of 100% of its debt millage levy to satisfy the Debt Service Requirements to be held by the Escrow Trustee in trust, to further secure payment of the debt service on the UTGO Bonds;

NOW, THEREFORE, in consideration of the mutual undertakings, provisions and agreements herein contained, the sufficiency of which are hereby acknowledged, that in order to provide for the payment of the UTGO Bonds, for the benefit of the owners thereof and the Bond Insurers, and to secure the performance and observance of the conditions and covenants herein set forth and for other valuable consideration, the receipt of which is hereby acknowledged, the City covenants and agrees with the Escrow Trustee for the benefit of the respective owners from time to time of the UTGO Bonds and the Bond Insurers as follows:

## ARTICLE I
## DEFINITIONS

Section 101.   Definitions.  In addition to the terms defined in the preambles to this Escrow Agreement , the following terms shall have, unless the context otherwise requires, the meanings herein specified:

"Act 279" means Act No. 279, Public Acts of Michigan, 1909, as amended.

"Additional Bonds" means any series of unlimited tax general obligation bonds issued by the City on a parity as to Debt Millage Revenue levies with the 2010A UTGO Bonds, the Municipal Obligation and the Stub UTGO Bonds.

"Business Day" means a day which is not (i) a Saturday, Sunday or legal holiday on which banks located in either the State of Michigan or the state or states in which the principal corporate trust office of the Escrow Trustee, is located are authorized or required by law to be closed, or (ii) a day on which the New York Stock Exchange is closed.

"Debt Millage Deposit" or "Debt Millage Deposits" means whenever used herein singularly, each payment of Debt Millage Revenues, and collectively all payments of Debt Millage Revenues by the City to the Escrow Trustee for deposit in the UTGO Debt Millage Fund in accordance with Section 204 hereof.

"Debt Millage Revenues" means the proceeds of the debt millage levies, including interest subsidy payments received by the City in respect of the 2010A UTGO Bonds, delinquent millage payments received from Wayne County, Michigan or otherwise, pledged to and on

3

account of unlimited tax general obligation bonds of the City for the payment of debt service on the Prior UTGO Bonds, or after the Effective Date of the UTGO Bonds, and the 2010A UTGO Bonds and any Additional Bonds.

"Debt Retirement Schedule" means the table attached as Exhibit D hereto, showing the dates Debt Service Requirements are due and payable on each series of the UTGO Bonds.

"Debt Service Requirement" means an amount equal to the principal of and/or interest due on any series of UTGO Bonds (including the Stub UTGO Bonds) semi-annually on each payment date as set forth in Exhibit D.

"Effective Date" mean the effective date of the City's chapter 9 plan of adjustment.

"Escrow Trustee" means initially, U.S. Bank National Association, Detroit, Michigan, or any successor in trust or assignees, as Escrow Trustee hereunder.

"Event of Default" means the breach by the City of any material agreement or covenant set forth in the UTGO Settlement Agreement or this Agreement, written notice of which has been provided by a Bond Insurer to the City and the Escrow Trustee.

"Fiscal Year" means the City's fiscal year, commencing July 1 and ending June 30.

"General Retirement System" means the General Retirement System of the City of Detroit, _____ Fund.

"Income Stabilization Funds" means the Police & Fire Retirement System of the City of Detroit, Income Stabilization Fund, and the General Retirement System of the City of Detroit, Income Stabilization Fund.

"Master Trustee" means U. S. Bank National Association, Detroit, Michigan, as trustee under the Master Debt Retirement Trust Indenture dated as of March 1, 2010, as supplemented, between the City and the Master Trustee.

"Outstanding" when used with respect to the UTGO Bonds, means, as of the date of determination, the UTGO Bonds theretofore authenticated and delivered pursuant to the resolution, indenture and/or order for that series, except:

(a) UTGO Bonds theretofore canceled by the trustee or paying agent for such UTGO Bonds or delivered to such trustee or paying agent for cancellation;

(b) UTGO Bonds for whose payment money in the necessary amount, without the need for reinvestment thereof, has been theretofore deposited with the trustee or paying agent for such UTGO Bonds in trust for the registered owners of such UTGO Bonds;

(c) UTGO Bonds delivered to the trustee or paying agent for such UTGO Bonds for cancellation in connection with (i) the exchange of such UTGO

4

Bonds for other bonds or (ii) the transfer of the registration of such UTGO Bonds;

(d)     UTGO Bonds alleged to have been destroyed, lost or stolen which have been paid or replaced pursuant to the resolution, indenture or order for that series or otherwise pursuant to law; and

(e)     UTGO Bonds deemed paid as provided in the resolution, indenture or order for that series.

"Permitted Investments" means those investments specified in Article III of this Escrow Agreement.

"Plan Assignees" means the Income Stabilization Funds and the General Retirement System.

"Set Aside Ledger" means the table attached as Exhibit D hereto, showing the allocation of each Debt Millage Deposit to the UTGO Debt Millage Fund in such fractional amounts determined in accordance with Section 204(a) herein.

"Stub UTGO Bonds Paying Agent" means U. S. Bank National Association, Detroit, Michigan.

"UTGO Debt Millage Fund" means the City of Detroit UTGO Debt Millage Fund created and described in Section 201 of this Agreement.

## ARTICLE II
## ESTABLISHMENT OF FUNDS AND ACCOUNTS

Section 201.   Establishment of UTGO Debt Millage Fund.  There is hereby created and established with the Escrow Trustee, pursuant to Order No. ___ and this Escrow Agreement, a single and common trust fund designated the "UTGO Debt Millage Fund."

Section 202.   Establishment of Accounts and Subaccounts.  (a) There are hereby created within the UTGO Debt Millage Fund three (3) separate and segregated accounts, designated as follows:

1.     "2010A UTGO Bonds Debt Millage Account" ("2010A UTGO Account").  The Escrow Trustee shall deposit Debt Millage Revenues allocable to the Debt Service Requirements on the 2010A UTGO Bonds, as set forth on Exhibit D, in the 2010A UTGO Account.

2.     "2014 UTGO Bonds Debt Millage Account" ("2014 UTGO Bonds Account").  The Escrow Trustee shall deposit Debt Millage Revenues allocable to the Debt Service Requirements on the Municipal Obligation and the Stub UTGO Bonds, as set forth on Exhibit D, in the 2014 UTGO Bonds Account.

5

3. "Additional Bonds Debt Millage Account" ("Additional Bonds Account"). The Escrow Trustee shall deposit Debt Millage Revenues allocable to the Debt Service Requirements (to be reflected in a supplement to Exhibit D) on any series of Additional Bonds in a subaccount established for such series in the Additional Bonds Account pursuant to a supplement to this Agreement.

(b) There are hereby created within the 2014 UTGO Bonds Account two separate and segregated subaccounts, designated as follows:

1. The 2014 UTGO Municipal Obligation Subaccount ("2014 Municipal Obligation Subaccount").

2. The Stub UTGO Bonds Subaccount ("Stub UTGO Bonds Subaccount").

The Escrow Trustee shall allocate and deposit Debt Millage Revenues deposited in the 2014 UTGO Bonds Account among the 2014 Municipal Obligation Subaccount and the Stub UTGO Bonds Subaccount as provided in Section 204(a).

Section 203. <u>Deposits to the UTGO Debt Millage Fund</u>. Commencing on the Effective Date, and thereafter in accordance with the distribution schedule published by the Michigan Department of Treasury, and in any event, no less often than (x) bi-monthly during the period beginning each July 1 and ending the following March 31, and (y) monthly during the period beginning April 1 and ending the following June 30 of each year, the City shall remit the Debt Millage Revenues to the Escrow Trustee for deposit in the UTGO Debt Millage Fund. In the Order, the City has covenanted that it shall cause to be deposited with the Escrow Trustee, in accordance with the terms of this Escrow Agreement, 100% of the Debt Millage Revenues received by the City for as long as the Municipal Obligation and the Stub UTGO Bonds remain outstanding. The Escrow Trustee shall deposit any Debt Millage Revenues received by it from the City into the UTGO Debt Millage Fund and allocate such deposits in accordance with the provisions of Section 204 below.

Section 204. <u>Allocation and Deposit</u>. (a) Each Fiscal Year, commencing with the Effective Date and for as long as any UTGO Bonds remain outstanding, within one (1) Business Day of receipt by the Escrow Trustee of each Debt Millage Deposit, the Escrow Trustee shall set aside in the UTGO Debt Millage Fund each Debt Millage Deposit received, and make transfers from the UTGO Debt Millage Fund, as follows:

1. FIRST, a percentage of each Debt Millage Deposit received shall be allocated and set aside in each of the 2010A UTGO Account, the 2014 UTGO Bonds Account and any Additional Bonds Account that corresponds to the percentage that the Debt Service Requirement payable on the related series of UTGO Bonds as shown on Exhibit D bears to the Debt Service Requirement payable (or past due) on all UTGO Bonds on or before May 1 of each Fiscal Year until the sum of the aggregate Debt Millage Deposits (when taken together with any investment earnings on deposit) equals the Debt Service Requirement on all UTGO Bonds for such Fiscal Year. Once the Debt Service Requirement has been satisfied for all UTGO Bonds for payments due on or before May 1 of each Fiscal Year, any excess shall be allocated to the same accounts in

6

proportion to the Debt Service Requirements payable on such UTGO Bonds in the next Fiscal Year.

2.      SECOND, the Escrow Trustee shall allocate deposits made to the 2014 UTGO Bonds Account (i) first to the 2014 Municipal Obligation Subaccount until the Debt Service Requirement payable (or past due) on the Municipal Obligation as shown on Exhibit D on or before April 1 of the then current Fiscal Year has been satisfied and (ii) second, to the Stub UTGO Bonds Subaccount until the Debt Service Requirement payable (or past due) on the Stub UTGO Bonds on or before April 1 of the then current Fiscal Year has been satisfied. Once the Debt Service Requirement for all Prior UTGO Bonds has been satisfied for the then current Fiscal Year, any excess shall be allocated first to the 2014 Municipal Obligation Subaccount for application to the next Fiscal Year's Debt Service Requirements for the Municipal Obligation and then to the next Fiscal Year's Debt Service Requirements for the Stub UTGO Bonds.

3.      THIRD, within three Business Days after a deposit is made to any account or subaccount in the UTGO Debt Millage Fund the Escrow Trustee shall transfer the funds in such account or subaccount as follows:

(a)    Funds on deposit in the 2010A UTGO Debt Millage Account shall be transferred to the Master Trustee for application to Debt Service Requirements for the 2010A UTGO Bonds.

(b)    Funds on deposit in the 2014 Municipal Obligation Subaccount shall be transferred to the Master Trustee for deposit in the Series 2014 Tax Levy Account for application to Debt Service Requirements for the Municipal Obligation.

(c)    Funds on deposit in the Stub UTGO Bonds Subaccount shall be transferred to the Plan Assignees pursuant to the direction and in the amounts shown on Exhibit F. In the event insufficient funds are on deposit in the Stub UTGO Bonds Subaccount on the date set for any transfer, the Escrow Trustee shall allocate and transfer the funds then on deposit in the Stub UTGO Bonds Subaccount to the Plan Assignees pro rata, in proportion to the amount due to each Plan Assignee on such date.

(d)    Funds on deposit in the Additional Bonds Account shall be transferred to the paying agent or trustee for the related series of Additional Bonds.

(b)    The Escrow Trustee shall keep and maintain a ledger on its books and records showing each Debt Millage Deposit into the Debt Millage Fund of the UTGO Debt Millage Fund, all transfers of funds from one account to another or from the UTGO Debt Millage Fund to the Master Trustee or the Income Stabilization Funds or the paying agent or trustee for any Additional Bonds, which ledger shall be substantially in the form attached hereto as Exhibit D-2 (the "Set Aside Ledger"). Not later than one (1) Business Days after the receipt of each Debt Millage Deposit, the Escrow Trustee shall promptly confirm electronically or in writing to the

7

City the receipt of each Debt Millage Deposit and provide with such notice a copy of the Set Aside Ledger which shall include the deposit entries for the then most recent Debt Millage Deposit, all prior deposits for the Fiscal Year and entries for any inter-fund transfers during the Fiscal Year. While any of the Municipal Obligation or the Stub UTGO Bonds remains Outstanding, upon request of the Bond Insurers, the Escrow Trustee shall furnish a copy of the Set Aside Ledger to the Bond Insurers.

(c)     Upon receipt of the Set Aside Ledger from the Escrow Trustee, the Finance Director of the City shall allocate on the books and records of the City a fractional amount of each Debt Millage Deposit shown in the Set Aside Ledger equal to the percentage of each Debt Millage Deposit that corresponds to the Debt Service Requirement by the City for the payment of that portion of debt service due on the UTGO Bonds in accordance with the ratios of the Debt Service Requirements for each series of UTGO Bonds to the total Debt Service Requirement for all UTGO Bonds set forth in Exhibit D hereto.

## ARTICLE III
## INVESTMENT OF FUNDS

Section 301.   Permitted Investments.  All money held by the Escrow Trustee pursuant to this Agreement shall be invested by the Escrow Trustee,  without the need for further direction by the City, in accordance with written instructions from the City in mutual funds registered under the investment company act of 1940, title I of chapter 686, 54 Stat. 789, 15 USC 80a-1 to 80a-3 and 80a-4 to 80a-64, that have been rated at the time of purchase within the highest classification established by not less than two standard rating services and so long as the portfolio of such mutual funds is limited to bonds, and other obligations on which the full and timely payment of principal and interest is unconditionally guaranteed by the full faith and credit of the United States. In the absence of written direction delivered to the Escrow Trustee by the City, the Escrow Trustee shall hold funds uninvested.  The Escrow Trustee shall be entitled to rely on any written direction from the City as to the suitability and legality of the directed investment.

## ARTICLE IV
## THE ESCROW TRUSTEE

Section 401.   Powers and Duties of Escrow Trustee. (a)    The Escrow Trustee may execute any of the trusts or powers hereof and perform any of its duties by or through attorneys, agents, receivers or employees, and shall be entitled to act upon the opinion or advice of its counsel concerning all matters hereof, and may in all cases be reimbursed hereunder for reasonable compensation paid to all such attorneys, agents, receivers and employees as may reasonably be employed in connection with the trust hereof.  The Escrow Trustee may act upon an opinion of counsel and shall not be responsible for any loss or damage resulting from any action or nonaction by it taken or omitted to be taken in good faith in reliance upon such opinion of counsel.

(b)     The Escrow Trustee shall not be responsible for any recital herein, or for the validity of the execution by the City of this Escrow Agreement, or of any supplements thereto or

8

instruments of further assurance, or for the validity or sufficiency of, or filing of documents related to the security for the UTGO Bonds intended to be secured hereby.

(c)     The Escrow Trustee shall not be responsible or liable for any loss suffered in connection with any investment of funds made by it in accordance with this Escrow Agreement .

(d)     The Escrow Trustee shall be protected in acting upon any notice, request, consent, certificate, order, affidavit, letter, telegram or other paper or document reasonably believed by it to be genuine and correct and to have been signed or sent by the proper person or persons.

(e)     As to the existence or non-existence of any fact or as to the sufficiency or validity of any instrument, paper or proceeding, the Escrow Trustee shall be entitled to rely upon a certificate believed in good faith to be genuine and correct, signed on behalf of the City by an authorized officer of the City as sufficient evidence of the facts therein contained. The Escrow Trustee may also accept a similar certificate to the effect that any particular dealing, transaction or action is necessary or expedient, but may at its discretion secure such further evidence deemed necessary or advisable, but shall in no case be bound to secure the same.

(f)     The permissive right of the Escrow Trustee to do things enumerated in this Escrow Agreement, as amended, shall not be construed as a duty and the Escrow Trustee shall not be answerable for other than its gross negligence or willful misconduct.  The immunities and exceptions from liability of the Escrow Trustee shall extend to its officers, directors, employees and agents.

(g)     The Escrow Trustee shall not be required to give any bond or surety in respect to the execution of its rights and obligations hereunder.

(h)     All moneys received by the Escrow Trustee shall, until used or applied or invested as herein provided, be held in trust in the manner and for the purpose for which they were received, but need not be segregated from other funds except to the extent required by this Escrow Agreement, as amended, or by law.  The Escrow Trustee shall not be under any liability for interest on any moneys received hereunder except such as may be agreed upon.

(i)     The Escrow Trustee shall not be under any obligation to initiate any suit or to take any remedial proceeding under this Escrow Agreement or to take any steps in the execution of the trusts created by this Escrow Agreement or in the enforcement of any rights and powers under this Escrow Agreement until it has been indemnified to its satisfaction against any and all fees, costs and expenses and other reasonable disbursements and against all liability.

(j)     The Escrow Trustee shall have no responsibility or liability with respect to any information, statement or recital in any official statement, offering memorandum or other disclosure material prepared or distributed with respect to the issuance of the UTGO Bonds, except for liability for its own gross negligence or willful misconduct.

(k)     The Escrow Trustee may become the holder of any of the UTGO Bonds with the same rights it would have if it were not Escrow Trustee, and, to the extent permitted by law, may act as depositary for and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, any committee formed to protect the rights of holders, whether or

9

not such committee shall represent the holders of a majority in principal amount of any of the UTGO Bonds of such series then outstanding.

(l)     The Escrow Trustee shall not be liable for any error of judgment made in good faith by any of its officers, employees, agents or representatives, unless it shall be proved that the Escrow Trustee was negligent in ascertaining the pertinent facts.

(m)     The Escrow Trustee has no obligation or liability to the holders for the payment of interest on, principal of or redemption premium, if any, with respect to the UTGO Bonds from its own funds; but rather the Escrow Trustee's obligations shall be limited to the performance of its duties hereunder.

(n)     Whether or not therein expressly so provided, every provision of this Agreement or related documents, relating to the conduct or affecting the liability of or affording protection to the Escrow Trustee shall be subject to the provisions of this Article.

Section 402.  <u>Fees and Expenses of Escrow Trustee</u>.  (a) The Escrow Trustee shall be entitled to reasonable fees for services rendered under this Escrow Agreement, as amended, and shall be reimbursed for all expenses reasonably incurred in connection with such services. Such fees and expenses shall be payable by the City and shall be determined in accordance with the Fee Schedule attached as Exhibit E of this Agreement or as otherwise may be agreed to by the City and the Escrow Trustee.

(b)     The City shall be liable for all fees, expenses, charges, losses, costs, liabilities and damages incurred by the Escrow Trustee pursuant to this Agreement except for those which are adjudicated to have resulted from the gross negligence or willful misconduct of the Escrow Trustee, and shall pay such amounts to or at the direction of the Escrow Trustee.

Section 403.  <u>Resignation; Appointment of Successor Escrow Trustee; Successor Escrow Trustee Upon Merger, Consolidation or Sale</u>. (a)  The Escrow Trustee and any successor Escrow Trustee may resign only upon giving 60 days' prior written notice to the City and, while any of the Municipal Obligation or the Stub UTGO Bonds remains Outstanding, the Bond Insurers.  Such resignation shall take effect only upon the appointment of a successor Escrow Trustee as described in Section 403(b) below and the acceptance of such appointment by the successor Escrow Trustee.  Upon appointment of a successor Escrow Trustee, the resigning Escrow Trustee shall, after payment of its fees, costs and expenses, assign all of its right, title and interest in the Debt Millage Revenues, and transfer and assign its right, title and interest in the Escrow Agreement to the successor Escrow Trustee.  The successor Escrow Trustee shall meet the requirements of Section 403(b) below and shall accept in writing its duties and responsibilities hereunder and file such acceptance with the City.

(b)     In case the Escrow Trustee shall give notice of resignation or be removed, or be dissolved, or shall be in the course of dissolution or liquidation, or otherwise become incapable of acting hereunder, or in case it shall be taken under the control of any public office or offices, or of a receiver appointed by a court, a successor may with the prior written consent of the City (so long as no Event of Default shall have occurred and be continuing under this Escrow Agreement ) and, while any of the Municipal Obligation or the Stub UTGO Bonds remains

10

Outstanding, the Bond Insurers, be appointed by the owners of a majority in aggregate principal amount of UTGO Bonds then Outstanding, by an instrument or concurrent instruments in writing signed by such owners, or by their duly authorized attorneys in fact, a copy of which shall be delivered personally or sent by first class mail, postage prepaid, to the City, the retiring Escrow Trustee, and the successor Escrow Trustee, which, while any of the Municipal Obligation or the Stub UTGO Bonds remains Outstanding must be acceptable to the Bond Insurers insuring such Outstanding Bonds. In the absence of an appointment by the bondholders, the City may appoint a successor Escrow Trustee, by an instrument in writing signed by an authorized officer of the City, a copy of which shall be delivered personally or sent by first class mail, postage prepaid, to the retiring Escrow Trustee and the successor Escrow Trustee. If the owners of the UTGO Bonds and the City fail to so appoint a successor Escrow Trustee, hereunder within thirty (30) days after the Escrow Trustee has given notice of its resignation, has been removed, has been dissolved, has otherwise become incapable of acting hereunder or has been taken under control by a public officer or receiver, the Escrow Trustee shall have the right to petition a court of competent jurisdiction to appoint a successor hereunder. Every such Escrow Trustee appointed pursuant to the provisions of this Section 403(b) (i) shall at all times be a bank having trust powers or a trust company, (ii) shall at all times be organized and doing business under the laws of the United States of America or of any state, (iii) shall have, or be wholly owned by an entity having, a combined capital and surplus of at least $75,000,000, (iv) shall be authorized under such laws to exercise corporate trust powers, and (v) shall be subject to supervision or examination by federal or state authority.

(c)     Any corporation or association into which the Escrow Trustee may be merged or converted or with or into which it may be consolidated, or to which it may sell or transfer its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any merger, conversion, sale, consolidation or transfer to which it is a party, provided such company shall be eligible under Section 403(b) hereof, shall be and become successor Escrow Trustee hereunder and shall be vested with all the trusts, powers, rights, obligations, duties, remedies, immunities and privileges hereunder as was its predecessor, without the execution or filing of any instrument or any further act on the part of any of the parties hereto.

Section 404.   Removal of Escrow Trustee. The Escrow Trustee may be removed at any time by an instrument or concurrent instruments in writing delivered to the Escrow Trustee and signed by the City; provided that if an Event of Default has occurred and is continuing hereunder, then, while any of the Municipal Obligation or the Stub UTGO Bonds remains Outstanding, the Escrow Trustee may not be removed without the consent of the holders of a majority in aggregate principal amount of the UTGO Bonds then Outstanding and the Bond Insurers. No removal of the Escrow Trustee and no appointment of a successor Escrow Trustee shall become effective until the successor Escrow Trustee has accepted its appointment in the manner provided in Section 403 hereof. Upon such removal and the payment of its fees, costs and expenses, the Escrow Trustee shall assign to the successor Escrow Trustee all of its right, title and interest in the Trust Estate in the same manner as provided in Section 403 hereof.

11

# ARTICLE V
## ADDITIONAL BONDS

Section 501.   <u>Issuance of Additional Bonds</u>.   The City reserves the right to issue unlimited tax full faith and credit bonds payable on a parity basis with the pledge of the City's unlimited tax full faith and credit as security for the UTGO Bonds.  While any of the Municipal Obligation or the Stub UTGO Bonds remains Outstanding, the debt millage levy with respect to any such parity bonds shall be subject to the terms of this Agreement.

Section 502.   <u>Notices Regarding Additional Bonds</u>.   The City hereby covenants to provide notice to the Escrow Trustee and, while any of the Municipal Obligation or the Stub UTGO Bonds remains Outstanding, the Bond Insurers, of the issuance of each series of Additional Bonds.  The City may enter into additional agreements or supplements hereto with the Escrow Trustee to provide for the remittance of Debt Millage Revenues to the Escrow Trustee to be held and transferred for the payment of principal of and interest on any Additional Bonds pursuant to this Agreement.

Section 503.  <u>Defeasance or Redemption</u>.  The City hereby covenants to provide notice to the Escrow Trustee of the defeasance or redemption of all or any portion of the UTGO Bonds.  In the event that the City issues Additional Bonds as described in Section 501 hereof, the City hereby covenants to provide notice to the Escrow Trustee of the defeasance or redemption of all or any portion of the Additional Bonds.

# ARTICLE VI
## AMENDMENTS

Section 601.   <u>Modifications and Amendments Not Requiring Consent</u>.  Any provision of this Agreement may be amended at any time by the parties hereto, and while any of the Municipal Obligation or the Stub UTGO Bonds remains Outstanding, with the prior written consent of the Bond Insurers, for any one or more of the following purposes:

(a)   To cure any ambiguity or formal defect or omission in this Agreement.

(b)   To grant to or confer upon the Escrow Trustee any additional rights, remedies, powers, authority or security that may lawfully be granted to or conferred upon the Escrow Trustee.

(c)   To accomplish, implement or give effect to any other action which is authorized or required by this Agreement.

(d)   To comply with the requirements of the Internal Revenue Code of 1986, as amended, applicable to the UTGO Bonds or any Additional Bonds.

(e)   To appoint separate or successor trustees.

(f)   To provide for the deposit of Debt Millage Revenues with respect to any Additional Bonds.

12

(g) To make any other change which, in the judgment of the Escrow Trustee, is not to the material prejudice of holders of the UTGO Bonds, upon the opinion of bond counsel or other professionals.

(h) To create obligation specific Escrow Funds and sub-accounts in accordance with Article II herein for further securing and establishing deposit and set-aside requirements of all UTGO Bonds issued by the City.

Within thirty (30) days after the execution of any amendment pursuant to this Section 601, the Escrow Trustee shall cause notice thereof to be mailed, postage prepaid to the Master Trustee, the Stub UTGO Paying Agent and the trustee or paying agent for any Additional Bonds at their addresses shown in Section 701. The notice shall briefly set forth the nature of the supplement and shall state that copies thereof are on file at the corporate trust office of the Escrow Trustee for inspection by all such holders. Any such supplement so executed shall be valid and binding notwithstanding any failure of the Escrow Trustee to mail the notice herein required and notwithstanding any objections which may be received pursuant to any mailed notice.

Upon the execution of any Amendment pursuant to the provisions of this Section, this Agreement shall be deemed to be modified and amended in accordance therewith and the respective rights, duties and obligations under this Agreement of the City, the Escrow Trustee, the Bond Insurers, and all registered holders of the UTGO Bonds shall thereafter be determined, exercised and enforced hereunder, subject in all respects to such modifications and amendments.

## ARTICLE VII
## MISCELLANEOUS

Section 701. Notices. Except as other provided, all notices, certificates, requests, complaints, demands or other communications under this Agreement shall be deemed sufficiently given when sent by first class mail or overnight mail postage prepaid, addressed as follows:

If to the City, to:

City of Detroit
Coleman A. Young Municipal Center
2 Woodward Avenue, Suite 1126
Detroit MI 48226
Attention: Chief Financial Officer

If to the Escrow Trustee, the Master Trustee or the Stub UTGO Bonds Paying Agent, to:

U.S. Bank National Association
535 Griswold, Suite 550
Detroit, Michigan 48226
Attention: Corporate Trust Services

<table>
<tr><td>If to the Bond Insurers, to:</td><td>Ambac Assurance Corporation<br>One State Street Plaza<br>New York, New York 10004<br>Attention: Surveillance Department and<br>General Counsel's Office</td></tr>
</table>

Ambac Assurance Corporation
One State Street Plaza
New York, New York 10004
Attention: Surveillance Department and
General Counsel's Office

Assured Guaranty Municipal Corp and
Assured Guaranty Corp.
31 West 52nd Street
New York, NY 10019
Attention: Kevin J. Lyons
Attention: Terence Workman

National Public Finance Guarantee
Corporation
113 King Street
Armonk, NY 10504
Attention: Kenneth Epstein and William J.
Rizzo

The City, the Escrow Trustee or the Bond Insurers may, by giving notice hereunder, in writing, designate any further or different addresses to which subsequent notices, certificates, requests, complaints, demands or other communications hereunder shall be sent.

Section 702. <u>Termination</u>. This Agreement shall terminate following delivery of written direction from the City to the Escrow Trustee to so terminate, together with written notice: (1) that all of the Municipal Obligation and the Stub UTGO Bonds have been paid in full at maturity or defeased (and for each series of UTGO Bonds that have been or are to be defeased prior to termination, such notice shall include written certification by an independent verification agent for the City that sufficient cash or obligations necessary to defease such UTGO Bonds in accordance with the applicable defeasance requirements are on deposit with the Master Trustee, in the case of the Municipal Obligation, and the Income Stabilization Funds, in the case of the Stub UTGO Bonds to be defeased, as of the date of the City's notice), and (2) that all fees owed to the Escrow Trustee have been paid in full. Upon termination of this Agreement, any money remaining on deposit in the funds and accounts created and established hereunder shall be paid to the City.

Section 703. <u>Severability</u>. If any one or more sections, clauses or provisions of this Escrow Agreement shall be determined by a court of competent jurisdiction to be invalid or ineffective for any reason, such determination shall in no way affect the validity and effectiveness of the remaining sections, clauses and provisions of the Agreement.

Section 704. <u>Headings</u>. Any headings shall be solely for convenience of reference and shall not constitute a part of the Agreement, nor shall they affect its meaning, construction or effect.

14

Section 705.  <u>Escrow Agreement Executed in Counterparts</u>.  This Escrow Agreement may be executed simultaneously in several counterparts, each of which shall be deemed an original, and such counterparts together shall and will constitute one and the same instrument.

Section 706.  <u>Parties Interested Herein</u>.  Nothing in this Escrow Agreement expressed or implied is intended or shall be construed to confer upon, or to give to, any person or entity, other than the Escrow Trustee, the City, the Bond Insurers and the registered owners of the UTGO Bonds, any right, remedy or claim under or by reason of this Escrow Agreement or any covenant, condition or stipulation hereof, and all covenants, stipulations, promises and agreements in this Agreement on behalf of the City shall be for the sole and exclusive benefit of the Escrow Trustee, the City, the Bond Insurers and the registered owners of the UTGO Bonds.

IN WITNESS WHEREOF, this Escrow Agreement has been signed on behalf of the City by its Emergency Manager and U.S. Bank National Association to evidence the acceptance of the trust, has caused this Escrow Agreement to be executed in its behalf by its authorized officer, all as of the date first above written.

CITY OF DETROIT

By _____

      Kevyn D. Orr
      Its: Emergency Manager

U.S. BANK NATIONAL ASSOCIATION,
as Escrow Trustee

By _____

    Its: _____

# EXHIBIT A
## DEBT RETIREMENT SCHEDULES
### (BY SERIES)

# UTGO Bond Series Debt Retirement Schedules

| CUSIP | Maturity Date | Rate | Principal | Insurer | | | | | | | Interest | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 10/1/14 | 4/1/15 | 10/1/15 | 4/1/16 | 10/1/16 | 4/1/17 | 10/1/17 | 4/1/18 | 10/1/18 | 4/1/19 | 10/1/19 | 4/1/20 | 10/1/20 | 4/1/21 |

| CUSIP | Maturity Date | Rate | Insurer | Principal | | | | | | | | Interest | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 10/1/14 | 4/1/15 | 10/1/15 | 4/1/16 | 10/1/16 | 4/1/17 | 10/1/17 | 4/1/18 | 10/1/18 | 4/1/19 | 10/1/19 | 4/1/20 | 10/1/20 | 4/1/21 | | |

*(Table: UTGO 2004-B(1), UTGO 2004-B, UTGO 2005-C, UTGO 2004-A, UTGO 2004-B(1) debt retirement schedules with principal amounts, interest rates, insurers Ambac/Assured/Asured, and semi-annual interest payment columns. Individual cell values not reliably legible at this resolution.)*

* Subject to Mandatory Redemption

# UTGO Bond Series Debt Retirement Schedules

| CUSIP | Maturity Date | Rate | Principal | Insurer | Interest 10/1/21 | 4/1/22 | 10/1/22 | 4/1/23 | 10/1/23 | 4/1/24 | 10/1/24 | 4/1/25 | 10/1/25 | 4/1/26 | 10/1/26 | 4/1/27 | 10/1/27 | 4/1/28 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **UTGO2004-A** | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 3.250% | $2,850,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | 4/1/16 | 5.000% | $2,950,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | 4/1/17 | 5.000% | $3,145,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | 4/1/18 | 5.000% | $3,305,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | 4/1/19 | 5.000% | $3,475,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | | | $15,765,000.00 | | | | | | | | | | | | | | | |
| **UTGO2005-A(MI)** | | | | | | | | | | | | | | | | | | |
| | 4/1/16 | 5.250% | $5,940,000.00 | NPFG | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | 4/1/17 | 3.925% | $6,260,000.00 | NPFG | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | 4/1/18 | 5.125% | $6,600,000.00 | NPFG | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | 4/1/18 | 5.125% | $14,305,000.00 | NPFG | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | 4/1/19 | 5.000% | $14,000,000.00 | NPFG | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | 4/1/20 | 5.000% | $14,000,000.00 | NPFG | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | | | $14,000,000.00 | | | | | | | | | | | | | | | |
| **UTGO2002** | | | | | | | | | | | | | | | | | | |
| | 4/1/21 | 5.125% | $3,240,000.00 | NPFG | $87,225.13 | $87,253.13 | - | - | - | - | - | - | - | - | - | - | - | - |
| | 4/1/22 | 5.125% | $3,405,000.00 | NPFG | $85,253.13 | $85,253.13 | - | - | - | - | - | - | - | - | - | - | - | - |
| | | | $6,645,000.00 | | | | | | | | | | | | | | | |
| **UTGO2003-A** | | | | | | | | | | | | | | | | | | |
| | 4/1/20 | 4.000% | $100,000.00 | Syncora | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | 4/1/15 | 5.250% | $2,330,000.00 | Syncora | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | 4/1/16 | 5.250% | $2,795,000.00 | Syncora | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | 4/1/17 | 5.250% | $3,150,000.00 | Syncora | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | 4/1/18 | 5.250% | $3,315,000.00 | Syncora | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | 4/1/19 | 5.250% | $3,490,000.00 | Syncora | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | 4/1/19 | 4.500% | $400,000.00 | Syncora | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | 4/1/20 | 5.250% | $3,150,000.00 | Syncora | $11,562.50 | $11,562.50 | - | - | - | - | - | - | - | - | - | - | - | - |
| | 4/1/21 | 5.250% | $3,000,000.00 | Syncora | $93,181.25 | $93,381.25 | - | - | - | - | - | - | - | - | - | - | - | - |
| | 4/1/22 | 4.625% | $3,350,000.00 | Syncora | $84,681.25 | $84,640.10 | $84,640.10 | - | - | - | - | - | - | - | - | - | - | - |
| | 4/1/22 | 3.250% | $500,000.00 | Syncora | $8,125.00 | $8,125.00 | $8,125.00 | - | - | - | - | - | - | - | - | - | - | - |
| | 4/1/23 | 5.350% | $2,735,000.00 | Syncora | $72,943.75 | $72,943.75 | $72,943.75 | $72,943.75 | - | - | - | - | - | - | - | - | - | - |
| | | | $31,075,000.00 | | $232,475.00 | $212,675.00 | $107,531.25 | $107,531.25 | $97,531.25 | - | - | - | - | - | - | - | - | - |
| **UTGO2004(MI-AIT)** | | | | | | | | | | | | | | | | | | |
| | 4/1/19 | 5.200% | $4,540,000.00 | Ambac | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | 4/1/20 | 4.750% | $180,000.00 | Ambac | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | 4/1/20 | 1.750% | $6,080,000.00 | Ambac | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | 4/1/21 | 3.750% | $6,240,000.00 | Ambac | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | 4/1/22 | 1.250% | $375,000.00 | Ambac | $181,512.50 | $181,512.50 | $8,437.50 | $8,437.50 | $8,437.50 | - | - | - | - | - | - | - | - | - |
| | 4/1/23 | 4.500% | $6,975,000.00 | Ambac | $6,937.50 | $8,437.50 | $181,650.00 | $181,650.00 | $181,650.00 | - | - | - | - | - | - | - | - | - |
| | 4/1/24 | 5.250% | $6,925,000.00 | Ambac | $18,055.00 | $18,055.00 | $18,055.00 | $18,055.00 | $18,055.00 | $18,055.00 | - | - | - | - | - | - | - | - |
| | 4/1/24 | 4.600% | $6,890,000.00 | Ambac | $180,807.50 | $180,862.50 | $180,862.50 | $180,862.50 | $180,807.55 | $180,852.50 | $180,852.50 | - | - | - | - | - | - | - |
| | 4/1/26 | 2.250% | $39,270,000.00 | Ambac | $570,977.50 | $570,977.50 | $389,065.00 | $389,065.00 | $199,917.50 | $198,917.50 | $198,917.50 | - | - | - | - | - | - | - |

-- = in Mandatory Redemption

# UTGO Bond Series Debt Retirement Schedules

|  | Maturity Date | Rate | Principal | Issuer | Interest | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  | 10/1/21 | 4/1/22 | 10/1/22 | 4/1/23 | 10/1/23 | 4/1/24 | 10/1/24 | 4/1/25 | 10/1/25 | 4/1/26 | 10/1/26 | 4/1/27 | 10/1/27 | 4/1/28 |

**UTGO 2001-B(1)**

| 2018 | 4/1/15 | 5.000% | $8,675,000.00 | Ambac | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2016 | 4/1/16 | 5.250% | $9,105,000.00 | Ambac | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2017 | 4/1/17 | 4.000% | $9,305,000.00 | Ambac | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2018 | 4/1/17 | 5.250% | $9,280,000.00 | Ambac | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2018 | 4/1/18 | 5.250% | $2,000,000.00 | Ambac | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
|  |  |  | **$29,365,000.00** |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |

**UTGO 2004-B(2)**

| 2X31 | 4/1/19 | 5.250% | $576,000.00 | Ambac | - | - | - | - | - | - | - | - | - | - | - | - | - | - |

**UTGO 2005-B**

| 2015 | 4/1/15 | 6.000% | $2,250,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2016 | 4/1/16 | 3.000% | $2,405,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2017 | 4/1/17 | 4.300% | $2,520,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2018 | 4/1/18 | 3.000% | $2,635,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2019 | 4/1/19 | 3.000% | $3,765,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2020 | 4/1/20 | 5.000% | $5,000,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2021 | 4/1/21 | 5.000% | $5,000,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2022 | 4/1/22 | 5.000% | $5,000,000.00 | Assured | - | - | - | $125,000.00 | $125,000.00 | $125,000.00 | - | - | - | - | - | - | - | - |
| 2023 | 4/1/23 | 5.000% | $5,000,000.00 | Assured | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | - | - | - | - | - | - | - | - |
| 2024 | 4/1/24 | 5.000% | $5,000,000.00 | Assured | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | - | - | - | - | - | - | - |
| 2025 | 4/1/25 | 5.000% | $5,000,000.00 | Assured | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | - | - | - | - | - | - |
|  |  |  | **$42,485,000.00** |  | **$500,000.00** | **$500,000.00** | **$500,000.00** | **$375,000.00** | **$375,000.00** | **$250,000.00** | **$250,000.00** | **$125,000.00** |  |  |  |  |  |  |

**UTGO 2005-C**

| 2015 | 4/1/15 | 5.000% | $3,305,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2016 | 4/1/16 | 5.000% | $2,675,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2017 | 4/1/17 | 4.300% | $2,545,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2018 | 4/1/18 | 5.000% | $2,670,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2019 | 4/1/19 | 5.000% | $3,125,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2020 | 4/1/20 | 5.000% | $3,440,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2026 | 4/1/26 | 5.250% | $2,885,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
|  |  |  | **$16,535,000.00** |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |

**UTGO 2008-A**

| 2015 | 4/1/15 | 5.000% | $2,875,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2016 | 4/1/16 | 5.000% | $3,015,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2017 | 4/1/17 | 5.000% | $3,170,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2018 | 4/1/18 | 4.000% | $3,325,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2019 | 4/1/19 | 5.000% | $3,460,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2025 | 4/1/25 | 5.000% | $3,630,000.00 | Assured | $100,125.00 | $100,125.00 | $100,125.00 | - | - | - | - | - | - | - | - | - | - | - |
| 2030 | 4/1/30 | 5.000% | $3,815,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2046 | 4/1/46 | 5.000% | $4,095,000.00 | Assured | $215,500.00 | $215,500.00 | $215,500.00 | $215,500.00 | $110,375.00 | $110,375.00 | - | - | - | - | - | - | - | - |
| 2055 | 4/1/55 | 5.600% | $8,620,000.00 | Assured | $495,500.00 | $495,500.00 | $495,500.00 | $495,500.00 | $495,500.00 | $495,500.00 | $495,500.00 | $490,500.00 | $389,625.00 | $261,875.00 | $261,875.00 | $134,125.00 | $134,125.00 | - |
|  |  |  | **$35,375,000.00** |  | **$811,125.00** | **$811,125.00** | **$811,125.00** | **$715,000.00** | **$712,000.00** | **$699,375.00** | **$495,500.00** | **$495,500.00** | **$389,625.00** | **$261,875.00** | **$261,875.00** | **$134,125.00** | **$134,125.00** |  |

**UTGO 2008-B(1)**

| 2015 | 11/1/15 | 5.000% | $7,970,000.00 | Ambac | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2016 | 11/1/16 | 5.000% | $3,440,000.00 | Ambac | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2017 | 11/1/17 | 5.000% | $2,105,000.00 | Ambac | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2018 | 11/1/18 | 5.000% | $3,780,000.00 | Ambac | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
|  |  |  | **$38,780,000.00** |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |

**UTGO 2008-A**

|  |  | 5.125% | $1,885,000.00 | Ambac | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
|  |  | 5.425% | $1,905,000.00 | Ambac | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
|  |  | 6.087% | $2,105,000.00 | Ambac | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
|  |  | 6.237% | $22,240,000.00 | Ambac | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
|  | 11/1/21 | 7.144% | $13,780,000.00 | Ambac | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
|  | 11/1/16 | 8.369% | $57,885,000.00 | Ambac | $231,570.30 | $114,828.30 | $114,828.30 | - | - | - | - | - | - | - | - | - | - | - |
|  |  |  | **$100,000,000.00** |  | $3,259,097.83 | $3,259,097.83 | $3,259,097.83 | $3,259,097.83 | $3,259,097.83 | $3,259,097.83 | $3,259,097.83 | $3,114,523.35 | $3,114,523.35 | $3,114,523.35 | $3,114,523.35 | $2,957,395.38 | $2,729,395.38 | $2,786,408.85 |
|  |  |  |  |  | $5,489,667.93 | $3,373,926.13 | $3,373,926.13 | $3,374,097.83 | $3,259,097.83 | $3,259,097.83 | $3,114,523.35 | $3,114,523.35 | $3,114,148.35 | $3,376,398.35 | $3,376,398.35 | $3,091,520.38 | $3,091,520.38 | $2,920,533.85 |

*Subject to Mandatory Redemption

# UTGO Bond Series Debt Retirement Schedules

| Case | Maturity Date | Rate | Principal | Issuer | Interest 10/1/28 | 4/1/29 | 10/1/29 | 10/1/29 | 4/1/30 | 10/1/30 | 4/1/31 | 10/1/31 | 4/1/32 | 10/1/32 | 4/1/33 | 10/1/33 | 4/1/34 | 10/1/34 | 4/1/35 | 10/1/35 | Total Interest | Total Principal & Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| UTGO2003-A | 4/1/15 | 5.250% | $2,930,000.00 | Assured | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | $149,625.00 | $2,999,625.00 |
| | 4/1/16 | 5.375% | $2,935,000.00 | Assured | | | | | | | | | | | | | | | | | $799,500.00 | $3,734,500.00 |
| | 4/1/17 | 5.000% | $3,145,000.00 | Assured | | | | | | | | | | | | | | | | | $491,750.00 | $3,636,750.00 |
| | 4/1/18 | 5.000% | $3,305,000.00 | Assured | | | | | | | | | | | | | | | | | $661,000.00 | $3,966,000.00 |
| | 4/1/19 | 5.000% | $3,470,000.00 | Assured | | | | | | | | | | | | | | | | | $867,500.00 | $4,337,500.00 |
| | | | $15,385,000.00 | | | | | | | | | | | | | | | | | | $2,469,375.00 | $18,264,375.00 |
| UTGO2003-A(1) | 4/1/15 | 5.375% | $3,940,000.00 | NPFG | | | | | | | | | | | | | | | | | $191,275.00 | $6,255,275.00 |
| | 4/1/16 | 5.375% | $6,260,000.00 | NPFG | | | | | | | | | | | | | | | | | $672,950.00 | $6,932,950.00 |
| | 4/1/17 | 5.375% | $6,600,000.00 | NPFG | | | | | | | | | | | | | | | | | $1,044,250.00 | $7,644,250.00 |
| | 4/1/18 | 5.375% | $14,000,000.00 | NPFG | | | | | | | | | | | | | | | | | $3,010,000.00 | $17,010,000.00 |
| | 4/1/19 | 5.000% | $14,000,000.00 | NPFG | | | | | | | | | | | | | | | | | $3,500,000.00 | $17,500,000.00 |
| | 4/1/20 | 5.000% | $14,000,000.00 | NPFG | | | | | | | | | | | | | | | | | $4,200,000.00 | $18,200,000.00 |
| | 4/1/20 | 5.000% | $14,000,000.00 | NPFG | | | | | | | | | | | | | | | | | $4,900,000.00 | $18,900,000.00 |
| | | | $74,800,000.00 | | | | | | | | | | | | | | | | | | $17,666,475.00 | $92,466,475.00 |
| UTGO2003-A | 4/1/21 | 5.125% | $3,340,000.00 | NPFG | | | | | | | | | | | | | | | | | $1,162,350.00 | $4,402,350.00 |
| | 4/1/22 | 5.125% | $3,405,000.00 | NPFG | | | | | | | | | | | | | | | | | $3,396,050.00 | $4,801,250.00 |
| | | | $6,645,000.00 | | | | | | | | | | | | | | | | | | $2,538,400.00 | $9,205,400.00 |
| UTGO2003-A | 4/1/15 | 4.000% | $300,000.00 | Syncora | | | | | | | | | | | | | | | | | $12,000.00 | $312,000.00 |
| | 4/1/16 | 4.250% | $2,500,000.00 | Syncora | | | | | | | | | | | | | | | | | $113,875.00 | $2,613,875.00 |
| | 4/1/16 | 5.250% | $2,995,000.00 | Syncora | | | | | | | | | | | | | | | | | $314,475.00 | $3,309,475.00 |
| | 4/1/17 | 5.250% | $3,150,000.00 | Syncora | | | | | | | | | | | | | | | | | $496,125.00 | $3,646,125.00 |
| | 4/1/18 | 5.250% | $3,315,000.00 | Syncora | | | | | | | | | | | | | | | | | $696,150.00 | $4,011,150.00 |
| | 4/1/19 | 4.500% | $500,000.00 | Syncora | | | | | | | | | | | | | | | | | $113,500.00 | $635,000.00 |
| | 4/1/20 | 5.250% | $3,175,000.00 | Syncora | | | | | | | | | | | | | | | | | $1,000,125.00 | $4,175,125.00 |
| | 4/1/21 | 5.250% | $3,360,000.00 | Syncora | | | | | | | | | | | | | | | | | $1,018,550.00 | $4,378,550.00 |
| | 4/1/22 | 4.625% | $4,500,000.00 | Syncora | | | | | | | | | | | | | | | | | $198,000.00 | $698,000.00 |
| | 4/1/22 | 4.625% | $3,565,000.00 | Syncora | | | | | | | | | | | | | | | | | $1,497,300.00 | $5,062,300.00 |
| | 4/1/23 | 4.625% | $3,550,000.00 | Syncora | | | | | | | | | | | | | | | | | $624,375.00 | $3,174,375.00 |
| | 4/1/23 | 5.250% | $1,500,000.00 | Syncora | | | | | | | | | | | | | | | | | $1,511,187.50 | $6,086,187.50 |
| | | | $34,675,000.00 | | | | | | | | | | | | | | | | | | $16,340,387.50 | $50,402,287.50 |
| UTGO2004-A(1) | 4/1/19 | 5.250% | $4,540,000.00 | Ambac | | | | | | | | | | | | | | | | | $1,181,250.00 | $5,641,250.00 |
| | 4/1/20 | 4.250% | $185,000.00 | Ambac | | | | | | | | | | | | | | | | | $127,175.00 | $312,175.00 |
| | 4/1/20 | 5.250% | $6,085,000.00 | Ambac | | | | | | | | | | | | | | | | | $1,016,275.00 | $8,301,775.00 |
| | 4/1/21 | 5.000% | $6,600,000.00 | Ambac | | | | | | | | | | | | | | | | | $2,510,000.00 | $8,910,000.00 |
| | 4/1/22 | 5.500% | $6,330,000.00 | Ambac | | | | | | | | | | | | | | | | | $531,875.00 | $8,860,875.00 |
| | 4/1/23 | 4.500% | $375,000.00 | Ambac | | | | | | | | | | | | | | | | | $151,875.00 | $526,875.00 |
| | 4/1/23 | 5.250% | $6,920,000.00 | Ambac | | | | | | | | | | | | | | | | | $3,260,700.00 | $10,180,700.00 |
| | 4/1/24 | 4.600% | $985,000.00 | Ambac | | | | | | | | | | | | | | | | | $261,100.00 | $1,246,100.00 |
| | 4/1/24 | 5.500% | $3,000,000.00 | Ambac | | | | | | | | | | | | | | | | | $3,017,250.00 | $13,017,250.00 |
| | | | $39,270,000.00 | | | | | | | | | | | | | | | | | | $15,305,725.00 | $65,055,725.00 |

* Subject to Mandatory Redemption

# UTGO Bond Series Debt Retirement Schedules

| Maturity Date | Rate | Principal | Insurer | ... | Interest | ... | Total Interest | Total Principal & Interest |
|---|---|---|---|---|---|---|---|---|

*(Table content illegible due to image quality and rotation)*

# UTGO Series – Prior Bonds

Bond Series Subject to Mandatory Redemption

## Issuance 2004-B(2)

CUSIP 25389XX1

| Date | Issuer | Mandatory Redemption Amount | Outstanding | Rate | Interest | Fiscal Year |
|---|---|---|---|---|---|---|
| 10/1/14 | Ambac | | $375,000.00 | 5.240% | $13,065.00 | 6/30/15 |
| 4/1/15 | Ambac | | $420,020.00 | 5.260% | $15,365.50 | 6/30/15 |
| 10/1/15 | Ambac | $155,000.00 | $420,000.00 | 5.240% | $11,004.00 | 6/30/16 |
| 4/1/16 | Ambac | | $253,000.00 | 5.340% | $11,004.00 | 6/30/16 |
| 10/1/16 | Ambac | $165,000.00 | $253,000.00 | 2.240% | $6,681.00 | 6/30/17 |
| 4/1/17 | Ambac | | $253,000.00 | 5.240% | $6,681.00 | 6/30/17 |
| 10/1/17 | Ambac | $170,000.00 | $85,000.00 | 5.240% | $6,681.00 | 6/30/18 |
| 4/1/18 | Ambac | | $85,000.00 | 5.240% | $2,227.00 | 6/30/18 |
| Total | | $85,500.00 | $575,000.00 | | $69,954.00 | |

## Issuance 2008-A

CUSIP 25389N5

| Date | Issuer | Mandatory Redemption Amounts | Outstanding | Rate | Interest | Fiscal Year |
|---|---|---|---|---|---|---|
| 10/1/14 | Assured | | $8,620,000.00 | 5.000% | $215,500.00 | 6/30/15 |
| 4/1/15 | Assured | | $8,620,000.00 | 5.000% | $215,500.00 | 6/30/15 |
| 10/1/15 | Assured | | $8,620,200.00 | 5.000% | $215,500.00 | 6/30/16 |
| 4/1/16 | Assured | | $8,620,000.00 | 9.000% | $215,500.00 | 6/30/16 |
| 10/1/16 | Assured | | $8,620,000.00 | 5.000% | $215,500.00 | 6/30/17 |
| 4/1/17 | Assured | | $8,620,000.00 | 9.000% | $215,500.00 | 6/30/17 |
| 10/1/17 | Assured | | $8,620,000.00 | 5.000% | $215,500.00 | 6/30/18 |
| 4/1/18 | Assured | | $8,620,000.00 | 5.000% | $215,500.00 | 6/30/18 |
| 10/1/18 | Assured | | $8,620,000.00 | 5.000% | $215,500.00 | 6/30/19 |
| 4/1/19 | Assured | | $8,620,000.00 | 5.000% | $215,500.00 | 6/30/19 |
| 10/1/19 | Assured | | $8,620,000.00 | 5.000% | $215,500.00 | 6/30/20 |
| 4/1/20 | Assured | | $8,620,000.00 | 5.000% | $215,500.00 | 6/30/20 |
| 10/1/20 | Assured | | $8,620,000.00 | 5.000% | $215,500.00 | 6/30/21 |
| 4/1/21 | Assured | | $8,620,000.00 | 5.000% | $215,500.00 | 6/30/21 |
| 10/1/21 | Assured | | $8,620,000.00 | 3.000% | $215,500.00 | 6/30/22 |
| 4/1/22 | Assured | | $8,620,000.00 | 5.000% | $215,500.00 | 6/30/22 |
| 10/1/2022 | Assured | | $8,620,000.00 | 5.000% | $215,500.00 | 6/30/23 |
| 4/1/2023 | Assured | $4,205,000.00 | $4,415,000.00 | 5.000% | $110,375.00 | 6/30/23 |
| 10/1/2023 | Assured | | $4,415,000.00 | 5.000% | $110,375.00 | 6/30/24 |
| 4/1/2024 | Assured | $4,415,000.00 | | 5.000% | $110,375.00 | 6/30/24 |
| Total | | $8,620,000.00 | | | $4,099,750.00 | |

## Issuance 2008-A

CUSIP 25389N63

| Date | Issuer | Mandatory Redemption Amounts | Outstanding | Rate | Interest | Fiscal Year |
|---|---|---|---|---|---|---|
| 10/1/14 | Assured | | $10,980,000.00 | 3.000% | $499,500.00 | 6/30/15 |
| 4/1/15 | Assured | | $10,980,000.00 | 5.000% | $499,500.00 | 6/30/15 |
| 10/1/15 | Assured | | $10,980,000.00 | 5.000% | $499,250.00 | 6/30/16 |
| 4/1/16 | Assured | | $10,980,000.00 | 5.000% | $499,500.00 | 6/30/16 |
| 10/1/16 | Assured | | $10,980,000.00 | 5.000% | $499,500.00 | 6/30/17 |
| 4/1/17 | Assured | | $10,980,000.00 | 5.020% | $499,500.00 | 6/30/17 |
| 10/1/17 | Assured | | $10,980,000.00 | 5.000% | $499,500.00 | 6/30/18 |
| 4/1/18 | Assured | | $10,980,000.00 | 3.000% | $499,500.00 | 6/30/18 |
| 10/1/18 | Assured | | $10,980,000.00 | 3.000% | $499,500.00 | 6/30/19 |
| 4/1/19 | Assured | | $10,980,000.00 | 5.000% | $499,500.00 | 6/30/19 |
| 10/1/19 | Assured | | $9,980,000.00 | 3.000% | $499,500.00 | 6/30/20 |
| 4/1/20 | Assured | | $9,980,000.00 | 5.000% | $495,500.00 | 6/30/20 |
| 10/1/20 | Assured | | $9,980,000.00 | 5.000% | $499,500.00 | 6/30/21 |
| 4/1/21 | Assured | | $9,980,000.00 | 5.000% | $499,500.00 | 6/30/21 |
| 10/1/21 | Assured | | $9,980,000.00 | 5.000% | $499,300.00 | 6/30/22 |
| 4/1/22 | Assured | $4,870,000.00 | $9,980,000.00 | 5.020% | $499,500.00 | 6/30/22 |
| 10/1/2022 | Assured | | $9,980,000.00 | 1.000% | $493,500.00 | 6/30/23 |
| 4/1/2023 | Assured | | $9,980,000.00 | 5.900% | $499,500.00 | 6/30/23 |
| 10/1/2023 | Assured | | $9,980,000.00 | 5.000% | $499,500.00 | 6/30/24 |
| 4/1/2024 | Assured | $4,870,000.00 | $9,980,000.00 | 5.030% | $495,500.00 | 6/30/24 |
| 10/1/2025 | Assured | | $9,980,000.00 | 5.000% | $498,500.00 | 6/30/26 |
| 4/1/2025 | Assured | | $15,345,000.00 | 3.000% | $499,500.00 | 6/30/26 |
| 10/1/2026 | Assured | $5,110,000.00 | $10,475,000.00 | 5.000% | $385,625.00 | 6/30/27 |
| 4/1/2027 | Assured | | $10,475,000.00 | 5.000% | $383,625.00 | 6/30/28 |
| 10/1/2027 | Assured | | $10,475,000.00 | 5.000% | $261,875.00 | 6/30/28 |
| 4/1/2028 | Assured | $3,365,000.00 | $3,365,000.00 | 5.030% | $134,125.00 | 6/30/28 |
| Total | | $19,980,000.00 | | | $12,348,250.00 | |

# UTGO Series – 2010A

Bond Series Subject to Mandatory Redemption

## Issuance 2010-A

CUSIP 59447PD84

| Date | Insurer | Fiscal Year | Mandatory Redemption Amounts | Outstanding | Rate | Interest |
|---|---|---|---|---|---|---|
| 11/1/14 | Ambac | 6/30/15 | | $1,900,000.00 | 7.188% | $499,566.00 |
| 5/1/15 | Ambac | | | $15,900,000.00 | 7.188% | $499,566.00 |
| 11/1/15 | Ambac | 6/30/16 | | $13,900,000.00 | 7.188% | $499,566.00 |
| 5/1/16 | Ambac | | | $12,900,000.00 | 7.188% | $499,504.00 |
| 11/1/16 | Ambac | 6/30/17 | | $13,900,000.00 | 7.188% | $499,566.00 |
| 5/1/17 | Ambac | | | $13,900,000.00 | 7.184% | $499,566.00 |
| 11/1/17 | Ambac | 6/30/18 | | $13,900,000.00 | 7.184% | $499,566.00 |
| 5/1/18 | Ambac | | $2,495,000.00 | $13,900,000.00 | 7.189% | $499,566.00 |
| 11/1/18 | Ambac | 6/30/19 | | $11,505,000.00 | 7.189% | $413,489.94 |
| 5/1/19 | Ambac | | | $11,505,000.00 | 7.188% | $413,489.94 |
| 11/1/19 | Ambac | 6/30/20 | $2,275,000.00 | $8,940,000.00 | 7.188% | $413,695.70 |
| 5/1/20 | Ambac | | | $8,930,000.00 | 7.189% | $320,944.20 |
| 11/1/20 | Ambac | 6/30/21 | $2,765,000.00 | $6,165,000.00 | 7.189% | $320,944.20 |
| 5/1/21 | Ambac | | | $6,165,000.00 | 7.189% | $221,570.10 |
| 11/1/21 | Ambac | 6/30/22 | $2,970,000.00 | $3,195,000.00 | 7.189% | $221,570.10 |
| 5/1/22 | Ambac | | | $3,195,000.00 | 7.188% | $114,828.30 |
| 11/1/22 | Ambac | 6/30/23 | $3,195,000.00 | | 7.188% | $114,828.30 |
| | | | **$13,900,000.00** | | | **$6,937,758.60** |

## Issuance 2010-A

CUSIP 59447PD84

| Date | Insurer | Fiscal Year | Mandatory Redemption Amounts | Outstanding | Rate | Interest |
|---|---|---|---|---|---|---|
| 11/1/14 | Ambac | 6/30/15 | | $77,985,000.00 | 8.360% | $3,259,097.83 |
| 5/1/15 | Ambac | | | $77,985,000.00 | 8.360% | $3,259,097.83 |
| 11/1/15 | Ambac | 6/30/16 | | $77,985,000.00 | 8.360% | $3,259,097.83 |
| 5/1/16 | Ambac | | | $77,985,000.00 | 8.349% | $3,259,097.83 |
| 11/1/16 | Ambac | 6/30/17 | | $77,985,000.00 | 8.360% | $3,259,097.83 |
| 5/1/17 | Ambac | | | $77,985,000.00 | 8.360% | $3,259,097.83 |
| 11/1/17 | Ambac | 6/30/18 | | $77,985,000.00 | 8.349% | $3,259,097.83 |
| 5/1/18 | Ambac | | | $77,985,000.00 | 8.360% | $3,259,097.83 |
| 5/1/18 | Ambac | 6/30/19 | | $77,880,000.00 | 8.360% | $3,259,097.83 |
| 5/1/19 | Ambac | 6/30/19 | | $1,885,000.00 | 8.360% | $3,259,097.83 |
| 5/1/19 | Ambac | 6/30/20 | $3,555,200.00 | $77,985,000.00 | 8.360% | $2,750,097.83 |
| 10/30/24 | Ambac | 6/30/24 | | $14,430,000.00 | 8.349% | $2,250,097.83 |
| 10/30/24 | Ambac | 6/30/24 | $3,755,900.00 | $14,430,000.00 | 8.349% | $3,114,523.55 |
| 11/1/24 | Ambac | 6/30/25 | | $56,675,000.00 | 8.349% | $3,114,523.55 |
| 4/1/25 | Ambac | 6/30/25 | $4,085,000.00 | $10,675,000.00 | 8.269% | $2,973,595.38 |
| 11/1/25 | Ambac | 6/30/26 | | $66,390,000.00 | 8.469% | $2,657,395.38 |
| 5/1/26 | Ambac | 6/30/26 | $6,440,000.00 | $66,390,000.00 | 8.469% | $2,186,458.55 |
| 11/1/26 | Ambac | 6/30/27 | | $60,150,000.00 | 8.349% | $2,186,938.55 |
| 5/1/27 | Ambac | 6/30/27 | | $60,150,000.00 | 8.349% | $2,600,664.75 |
| 1/1/28 | Ambac | 6/30/28 | $4,825,000.00 | $57,325,000.00 | 8.349% | $2,600,664.75 |
| 5/1/28 | Ambac | 6/30/28 | $3,750,000.00 | $57,325,000.00 | 8.330% | $2,398,764.63 |
| 11/1/28 | Ambac | 6/30/29 | $3,750,000.00 | $52,070,000.00 | 8.305% | $2,398,764.63 |
| 5/1/29 | Ambac | 6/30/29 | $5,705,000.00 | $52,015,000.00 | 8.305% | $2,159,778.38 |
| 11/1/29 | Ambac | 6/30/30 | | $46,370,000.00 | 8.349% | $3,179,778.38 |
| 3/1/30 | Ambac | 6/30/30 | | $46,370,000.00 | 8.349% | $1,940,352.65 |
| 11/1/30 | Ambac | 6/30/31 | $6,205,000.00 | $40,165,000.00 | 8.349% | $1,940,352.65 |
| 5/1/31 | Ambac | 6/30/31 | | $40,165,000.00 | 8.349% | $1,680,704.43 |
| 6/30/32 | Ambac | 6/30/32 | $6,750,000.00 | $33,415,000.00 | 8.349% | $1,680,704.43 |
| 6/1/32 | Ambac | 6/30/33 | $7,335,000.00 | $26,080,000.00 | 8.300% | $1,398,250.08 |
| 6/30/33 | Ambac | 6/30/33 | | $26,080,000.00 | 8.300% | $1,091,317.60 |
| 11/1/33 | Ambac | 6/30/34 | $7,975,000.00 | $18,105,000.00 | 8.349% | $1,091,317.60 |
| 5/1/34 | Ambac | 6/30/34 | | $18,105,000.00 | 8.349% | $757,603.13 |
| 11/1/34 | Ambac | 6/30/35 | $8,675,000.00 | $9,430,000.00 | 8.349% | $757,603.13 |
| 5/1/35 | Ambac | 6/30/35 | | $9,430,000.00 | 8.360% | $394,594.35 |
| 11/1/35 | Ambac | 6/30/36 | $9,430,000.00 | | 8.360% | $394,594.35 |
| | | **Total** | **$77,885,000.00** | | | **$100,522,267.58** |

Page 8 of 8

**EXHIBIT B**
**MUNICIPAL OBLIGATION**

# UTGO Series 2014 DSA Fourth Lien Restructured Bonds - Debt Service

| CSIP | Maturity Date | Rate | Principal | Insurer | Interest | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 10/1/14 | 4/1/15 | 10/1/15 | 4/1/16 | 10/1/16 | 4/1/17 | 10/1/17 | 4/1/18 | 10/1/18 | 4/1/19 | 10/1/19 | 4/1/20 | 10/1/20 | 4/1/21 |
| **UTGO 1999-A** | | | | | | | | | | | | | | | | | | |
| ...43 | 4/1/15 | 5.250% | $2,470,450.00 | Assured | $65,012.96 | $65,012.96 | | | | | | | | | | | | |
| ...N1 | 4/1/16 | 5.000% | $2,600,655.00 | Assured | $65,066.38 | $65,066.38 | $65,066.38 | | | | | | | | | | | |
| ...N9 | 4/1/17 | 5.000% | $2,733,605.13 | Assured | $68,325.13 | $68,325.13 | $68,325.13 | $68,325.13 | | | | | | | | | | |
| ...24 | 4/1/18 | 5.000% | $2,872,045.63 | Assured | $71,801.13 | $71,801.13 | $71,801.13 | $71,801.13 | $71,801.13 | $71,801.13 | | | | | | | | |
| ...52 | 4/1/19 | 5.000% | $3,015,450.00 | Assured | $75,385.75 | $75,385.75 | $75,385.75 | $75,385.75 | $75,385.75 | $75,385.75 | $75,385.75 | $75,385.75 | | | | | | |
| | | | $13,699,785.00 | | $345,590.44 | $345,590.44 | $280,578.36 | $280,578.36 | $215,512.00 | $215,512.00 | $147,186.88 | $147,186.88 | $75,385.75 | $75,385.75 | | | | |
| **UTGO 2001-A(1)** | | | | | | | | | | | | | | | | | | |
| ...36 | 4/1/15 | 3.375% | $3,161,860.00 | NPFG | $138,724.99 | $138,724.99 | $146,198.39 | $146,198.39 | $154,138.88 | $134,138.88 | $72,148.73 | $72,148.73 | $72,148.73 | $72,148.73 | $72,148.73 | $72,148.73 | $72,148.73 | $72,148.73 |
| ...28 | 4/1/16 | 5.375% | $3,430,940.00 | NPFG | $146,198.39 | $146,198.39 | $154,138.88 | $154,138.88 | | | | | | | | | | |
| ...43 | 4/1/17 | 5.375% | $3,735,400.00 | NPFG | $154,138.88 | $154,138.88 | $330,901.25 | $330,901.25 | $326,061.25 | $326,061.25 | $326,061.25 | $326,061.25 | | | | | | |
| ...L1 | 4/1/18 | 5.375% | $12,166,000.13 | NPFG | $330,901.25 | $330,901.25 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | | | | |
| ...N7 | 4/1/19 | 5.000% | $12,166,000.00 | NPFG | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | | |
| ...72 | 4/1/20 | 5.000% | $12,166,000.00 | NPFG | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 |
| ...Q0 | 4/1/21 | 5.000% | $13,340,000.00 | NPFG | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 |
| | | | $65,007,200.00 | | $1,678,473.50 | $1,678,473.50 | $1,539,748.51 | $1,539,748.51 | $1,393,350.13 | $1,393,350.13 | $1,239,411.25 | $1,239,411.25 | $912,450.00 | $912,450.00 | $608,300.00 | $608,300.00 | $304,150.00 | $304,150.00 |
| **UTGO 2002** | | | | | | | | | | | | | | | | | | |
| ...V6 | 4/1/21 | 5.125% | $2,851,560.00 | NPFG | $72,148.73 | $72,148.73 | $72,148.73 | $72,148.73 | $72,148.73 | $72,148.73 | $72,148.73 | $72,148.73 | $72,148.73 | $72,148.73 | $72,148.73 | $72,148.73 | $72,148.73 | $72,148.73 |
| ...W0 | 4/1/23 | 5.125% | $5,774,505.00 | NPFG | $75,822.97 | $75,822.97 | $75,822.97 | $75,822.97 | $75,822.97 | $75,822.97 | $75,822.97 | $75,822.97 | $75,822.97 | $75,822.97 | $75,822.97 | $75,922.97 | $75,922.97 | $75,922.97 |
| | | | $5,774,505.00 | | $147,971.69 | $147,971.69 | $147,971.69 | $147,971.69 | $147,971.69 | $147,971.69 | $147,971.69 | $147,971.69 | $147,971.69 | $147,971.69 | $147,971.69 | $147,971.69 | $147,971.69 | $147,971.69 |
| **UTGO 2004-A(1)** | | | | | | | | | | | | | | | | | | |
| ...15 | 4/1/15 | 4.000% | $265,300.00 | Syncora | $5,214.00 | $5,214.00 | | | | | | | | | | | | |
| ...28 | 4/1/16 | 5.250% | $2,215,950.00 | Syncora | $58,168.69 | $58,168.69 | $68,319.69 | $68,319.69 | | | | | | | | | | |
| ...36 | 4/1/16 | 5.250% | $2,602,055.00 | Syncora | $68,319.69 | $68,319.69 | $71,855.44 | $71,855.44 | $71,855.44 | $71,855.44 | | | | | | | | |
| ...72 | 4/1/18 | 5.250% | $2,737,335.00 | Syncora | $71,855.44 | $71,855.44 | $79,611.26 | $79,611.26 | $79,611.26 | $79,611.26 | $75,619.29 | $75,619.29 | $76,611.26 | $76,611.26 | | | | |
| ...W9 | 4/1/20 | 5.250% | $2,882,735.00 | Syncora | $79,611.26 | $79,611.26 | $79,611.26 | $79,611.26 | $79,611.26 | $79,611.26 | $79,611.26 | $79,611.26 | $79,776.25 | $79,776.25 | $9,776.25 | $9,776.25 | | |
| ...72 | 4/1/21 | 5.000% | $434,500.00 | Syncora | $9,776.25 | $9,776.25 | $72,425.72 | $72,425.72 | $72,425.72 | $72,425.72 | $72,425.72 | $72,425.72 | $72,425.72 | $72,425.72 | $72,425.72 | $72,425.72 | | |
| ...V7 | 4/1/22 | 3.250% | $2,759,075.00 | Syncora | $72,425.72 | $72,425.72 | $88,051.43 | $88,051.43 | $88,051.43 | $88,051.43 | $88,051.43 | $88,051.43 | $88,051.43 | $88,051.43 | $88,051.43 | $88,051.43 | $88,051.43 | |
| ...X3 | 4/1/23 | 5.250% | $3,354,140.00 | Syncora | $88,051.43 | $88,051.43 | $10,047.81 | $10,047.81 | $10,047.81 | $10,047.81 | $10,047.81 | $10,047.81 | $10,047.81 | $10,047.81 | $10,047.81 | $10,047.81 | $10,047.81 | $10,047.81 |
| ...C1 | 4/1/22 | 4.625% | $454,500.00 | Syncora | $10,047.81 | $10,047.81 | $81,322.11 | $81,322.11 | $81,322.11 | $81,322.11 | $81,322.11 | $81,322.11 | $81,322.11 | $81,322.11 | $81,322.11 | $81,322.11 | $81,322.11 | |
| ...E8 | 4/1/22 | 4.625% | $3,097,585.00 | Syncora | $81,322.11 | $81,322.11 | $30,143.44 | $30,143.44 | $30,143.44 | $30,143.44 | $30,143.44 | $30,143.44 | $30,143.44 | $30,143.44 | $30,143.44 | $30,143.44 | $30,143.44 | $30,143.44 |
| ...X5 | 4/1/23 | 4.625% | $1,303,500.00 | Syncora | $30,143.44 | $30,143.44 | $63,301.22 | $63,301.22 | $63,301.22 | $63,301.22 | $63,301.22 | $63,301.22 | $63,301.22 | $63,301.22 | $63,301.22 | $63,301.22 | $63,301.22 | $63,301.22 |
| ...06 | 4/1/23 | 5.250% | $2,611,473.00 | Syncora | $63,301.22 | $63,301.22 | | | | | | | | | | | | |
| | | | $27,525,575.00 | | $713,856.34 | $713,856.34 | $650,473.66 | $650,473.66 | $582,155.96 | $582,155.96 | $504,298.53 | $504,298.53 | $434,679.23 | $434,679.23 | $355,067.07 | $355,067.07 | $272,866.00 | $272,866.00 |
| **UTGO 2005-A** | | | | | | | | | | | | | | | | | | |
| ...32 | 4/1/19 | 5.250% | $3,910,200.00 | Ambac | $102,650.63 | $102,650.63 | $102,650.63 | $102,650.63 | $102,650.63 | $102,650.63 | $102,650.63 | $102,650.63 | $102,650.63 | $102,650.63 | $3,416.26 | $3,416.26 | | $143,385.00 |
| ...90 | 4/1/20 | 4.250% | $160,765.00 | Ambac | $3,416.26 | $3,416.26 | $3,416.26 | $3,416.26 | $3,416.26 | $3,416.26 | $3,416.26 | $3,416.26 | $3,416.26 | $3,416.26 | $138,806.46 | $138,806.46 | $138,806.46 | $143,385.00 |
| ...86 | 4/1/21 | 5.250% | $5,287,965.00 | Ambac | $138,806.46 | $138,806.46 | $138,806.46 | $138,806.46 | $138,806.46 | $138,806.46 | $138,806.46 | $138,806.46 | $143,385.00 | $143,385.00 | $143,385.00 | $143,385.00 | $143,385.00 | $143,385.00 |
| ...41 | 4/1/22 | 5.000% | $5,353,400.00 | Ambac | $143,385.00 | $143,385.00 | $156,081.96 | $156,081.96 | $156,081.96 | $156,081.96 | $158,081.96 | $158,081.96 | $158,081.96 | $158,081.96 | $158,081.96 | $158,081.96 | $158,081.96 | $158,081.96 |
| ...19 | 4/1/23 | 4.500% | $2,197,500.00 | Ambac | $7,332.19 | $7,332.19 | $7,332.19 | $7,332.19 | $7,332.19 | $7,332.19 | $7,332.19 | $7,332.19 | $7,332.19 | $7,332.19 | $7,332.19 | $7,332.19 | $7,332.19 | $7,232.19 |
| ...57 | 4/1/23 | 3.250% | $325,875.00 | Ambac | $157,853.85 | $157,853.85 | $157,853.85 | $157,853.85 | $157,853.85 | $157,853.85 | $157,853.85 | $157,853.85 | $157,853.85 | $157,853.85 | $157,853.85 | $157,853.85 | $157,853.85 | $157,853.85 |
| ...25 | 4/1/23 | 3.250% | $6,011,980.00 | Ambac | $15,689.80 | $15,689.80 | $15,689.80 | $15,689.80 | $15,689.80 | $15,689.80 | $15,689.80 | $15,689.80 | $15,689.80 | $15,689.80 | $15,689.80 | $15,689.80 | $15,689.80 | $15,689.80 |
| ...63 | 4/1/23 | 4.620% | $682,165.00 | Ambac | $157,169.51 | $157,169.51 | $157,169.51 | $157,169.51 | $157,169.51 | $157,169.51 | $157,169.51 | $157,169.51 | $157,169.51 | $157,169.51 | $157,169.51 | $157,169.51 | $157,169.51 | $157,169.51 |
| ...N0 | 4/1/24 | 5.250% | $3,067,410.00 | Ambac | $751,703.82 | | | | | | | | | | | | |
| | | | $34,725,630.00 | | $884,385.65 | $884,385.65 | $884,385.65 | $884,385.65 | $884,385.65 | $884,385.65 | $884,385.65 | $884,385.65 | $884,385.65 | $884,385.65 | $781,735.02 | $781,735.02 | $639,532.33 | $639,532.33 |

Subject to Mandatory Redemption

# UTGO Series 2014 DSA Fourth Lien Restructured Bonds - Debt Service

| CUSIP | Maturity Date | Rate | Principal | Insurer | | 10/1/14 | 4/1/15 | 10/1/15 | 4/1/16 | 10/1/16 | 4/1/17 | 10/1/17 | 4/1/18 | 10/1/18 | 4/1/19 | 10/1/19 | 4/1/20 | 10/1/20 | 4/1/21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Interest | | | | | | | | | | | | | | |
| **UTGO 2004-B(1)** | | | | | | | | | | | | | | | | | | | |
| 229F8 | 4/1/15 | 5.000% | $7,530,475.00 | Ambac | Ambac | $188,464.38 | $188,464.38 | | | | | | | | | | | | |
| 229G6 | 4/1/16 | 5.250% | $7,912,245.00 | Ambac | Ambac | $207,696.43 | $207,696.43 | $207,696.43 | | | | | | | | | | | |
| 232Q6 | 4/1/16 | 5.000% | $3,365,345.00 | Ambac | Ambac | $3,300.90 | $3,300.90 | $5,300.90 | $5,300.90 | $5,300.90 | | | | | | | | | |
| 232X4 | 4/1/17 | 5.250% | $8,064,320.00 | Ambac | Ambac | $211,688.40 | $211,688.40 | $211,688.40 | $211,688.40 | $211,688.40 | $211,688.40 | | | | | | | | |
| VZU70 | 4/1/18 | 5.250% | $1,738,020.00 | Ambac | Ambac | $45,622.50 | $45,622.50 | $45,622.50 | $45,622.50 | $45,622.50 | $45,622.50 | $45,622.50 | $45,622.50 | | | | | | |
| | | | **$28,578,185.00** | | | $658,772.61 | $658,772.61 | $470,308.23 | $470,308.23 | $262,611.80 | $262,611.80 | $45,622.50 | $45,622.50 | | | | | | |
| **UTGO 2004-B(2)** | | | | | | | | | | | | | | | | | | | |
| 232X1 | 4/1/19 | 5.240% | $499,675.00 | Ambac | Ambac | $13,091.49 | $13,091.49 | $9,562.48 | $9,562.48 | $5,895.79 | $5,895.79 | $1,935.26 | $1,935.26 | | | | | | |
| | | | **$499,675.00** | | | $13,091.49 | $13,091.49 | $9,562.48 | $9,562.48 | $5,895.79 | $5,895.79 | $1,935.26 | $1,935.26 | | | | | | |
| **UTGO 2005-B** | | | | | | | | | | | | | | | | | | | |
| 76X3 | 4/1/15 | 3.000% | $1,900,010.00 | Assured | Assured | $49,750.25 | $49,750.25 | | | | | | | | | | | | |
| 76G1 | 4/1/16 | 5.000% | $2,089,945.00 | Assured | Assured | $52,248.63 | $52,248.63 | $52,248.63 | | | | | | | | | | | |
| 79679 | 4/1/17 | 4.250% | $2,193,890.00 | Assured | Assured | $47,082.42 | $47,082.42 | $47,082.42 | $47,082.42 | $47,082.42 | | | | | | | | | |
| 76G87 | 4/1/18 | 5.000% | $2,286,815.00 | Assured | Assured | $57,245.38 | $57,245.38 | $57,245.38 | $57,245.38 | $57,245.38 | $57,245.38 | $57,245.38 | | | | | | | |
| 76H29 | 4/1/19 | 5.000% | $3,402,785.00 | Assured | Assured | $106,625.00 | $106,625.00 | $108,625.00 | $108,625.00 | $106,625.00 | $106,625.00 | $106,625.00 | $60,069.63 | $60,069.63 | | | | | |
| 76H37 | 4/1/20 | 5.000% | $4,345,000.00 | Assured | Assured | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $109,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | | | | |
| 76H45 | 4/1/21 | 5.000% | $4,345,000.00 | Assured | Assured | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $106,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | |
| 76J52 | 4/1/22 | 5.000% | $4,345,000.00 | Assured | Assured | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 |
| 76J60 | 4/1/24 | 5.000% | $4,345,000.00 | Assured | Assured | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 |
| 76J78 | 4/1/25 | 5.000% | $3,354,520.00 | Assured | Assured | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $543,125.00 |
| | | | **$32,607,655.00** | | | $935,146.30 | $935,146.30 | $885,396.05 | $885,396.05 | $816,147.42 | $816,147.42 | $769,065.00 | $711,819.63 | $711,819.63 | $651,750.00 | $651,750.00 | $543,125.00 | $543,125.00 |
| **UTGO 2005-C** | | | | | | | | | | | | | | | | | | | |
| 92V2 | 4/1/15 | 5.000% | $2,000,000.00 | Assured | Assured | $50,076.13 | $50,076.13 | $53,683.13 | | | | | | | | | | | |
| 76S53 | 4/1/16 | 5.000% | $2,102,325.00 | Assured | Assured | $52,683.13 | $52,683.13 | $47,349.51 | $47,549.51 | | | | | | | | | | |
| 76K43 | 4/1/17 | 4.500% | $2,211,405.00 | Assured | Assured | $47,349.51 | $47,349.51 | $47,549.51 | $47,549.51 | $47,549.51 | $47,549.51 | | | | | | | | |
| 76K51 | 4/1/18 | 3.000% | $2,285,470.00 | Assured | Assured | $57,136.75 | $57,136.75 | $57,136.75 | $57,136.75 | $57,136.75 | $57,136.75 | $57,136.75 | $57,136.75 | | | | | | |
| 76K69 | 4/1/19 | 5.250% | $2,376,715.00 | Assured | Assured | $62,388.77 | $62,388.77 | $62,388.77 | $62,388.77 | $62,388.77 | $62,388.77 | $62,388.77 | $62,388.77 | $62,388.77 | | | | | |
| 76L66 | 4/1/20 | 5.250% | $2,507,785.00 | Assured | Assured | $65,810.46 | $65,810.46 | $65,810.46 | $65,810.46 | $65,810.46 | $65,810.46 | $65,810.46 | $65,810.46 | $65,810.46 | $65,810.46 | $65,810.46 | | |
| | | | **$13,491,225.00** | | | $335,644.73 | $335,644.73 | $285,569.61 | $285,569.61 | $232,885.48 | $232,885.48 | $185,335.98 | $185,335.98 | $128,199.23 | $128,199.23 | $65,810.46 | $65,810.46 | |
| **UTGO 2006-A** | | | | | | | | | | | | | | | | | | | |
| 76S56 | 4/1/15 | 5.000% | $2,436,375.00 | Assured | Assured | $62,459.38 | $62,459.38 | $65,500.88 | | | | | | | | | | | |
| 76S64 | 4/1/16 | 5.000% | $2,620,035.00 | Assured | Assured | $65,500.88 | $65,500.88 | $68,868.25 | $68,868.25 | | | | | | | | | | |
| 76T72 | 4/1/17 | 4.000% | $2,734,730.00 | Assured | Assured | $68,868.25 | $68,868.25 | $57,788.50 | $57,788.50 | $68,868.25 | $68,868.25 | | | | | | | | |
| 76V80 | 4/1/18 | 3.000% | $2,889,425.00 | Assured | Assured | $57,788.50 | $57,788.50 | $75,168.50 | $75,168.50 | $57,788.50 | $57,788.50 | $57,788.50 | | | | | | | |
| 76V98 | 4/1/19 | 3.000% | $3,006,740.00 | Assured | Assured | $75,168.50 | $75,168.50 | $78,861.75 | $78,861.75 | $75,168.50 | $75,168.50 | $75,168.50 | $75,168.50 | | | | | | |
| 76W30 | 4/1/20 | 5.000% | $3,114,470.00 | Assured | Assured | $78,861.75 | $78,861.75 | $78,861.75 | $78,861.75 | $78,861.75 | $78,861.75 | $78,861.75 | $78,861.75 | $78,861.75 | $75,168.50 | | | | |
| 76X53 | 4/1/21 | 5.000% | $3,315,255.00 | Assured | Assured | $82,880.88 | $82,880.88 | $82,380.88 | $82,380.88 | $82,380.88 | $82,380.88 | $82,380.88 | $82,380.88 | $82,380.88 | $78,861.75 | $78,861.75 | | |
| 76X52 | 4/1/23 | 5.000% | $1,490,780.00 | Assured | Assured | $87,008.63 | $87,008.63 | $87,008.63 | $87,008.63 | $87,008.63 | $87,008.63 | $87,008.63 | $87,008.63 | $87,008.63 | $87,008.63 | $87,008.63 | $62,880.88 | $62,880.88 |
| 76X35 | 4/1/27 | 5.000% | $17,362,620.00 | Assured | Assured | $187,269.50 | $187,269.50 | $187,269.50 | $187,269.50 | $187,269.30 | $187,269.50 | $187,269.50 | $187,269.50 | $187,269.50 | $187,269.50 | $187,269.50 | $187,269.50 | $187,269.50 |
| 76X26 | 4/1/28 | 5.000% | $434,065.50 | Assured | Assured | $434,065.50 | $434,065.50 | $434,065.50 | $434,065.50 | $434,065.50 | $434,065.50 | $434,065.50 | $434,065.50 | $434,065.50 | $434,065.50 | $434,065.50 | $434,065.50 | $434,065.50 |
| | | | **$48,572,735.00** | | | $1,199,971.75 | $1,199,971.75 | $1,137,412.38 | $1,137,412.38 | $1,071,941.90 | $1,071,941.90 | $1,080,043.25 | $1,083,043.25 | $945,254.75 | $945,254.75 | $870,086.25 | $870,086.25 | $791,224.50 |
| **UTGO 2006-B(1)** | | | | | | | | | | | | | | | | | | | |
| 937Y5 | 4/1/15 | 5.000% | $6,925,930.00 | Assured | Assured | $173,148.25 | $173,148.25 | $74,734.00 | | | | | | | | | | | |
| 937N1 | 4/1/16 | 5.000% | $2,989,360.00 | Assured | Assured | $74,734.00 | $74,734.00 | $77,775.50 | $77,775.50 | | | | | | | | | | |
| 937V9 | 4/1/17 | 5.000% | $3,111,020.00 | Assured | Assured | $77,775.50 | $77,775.50 | $82,337.75 | $82,337.75 | $77,775.50 | $77,775.50 | | | | | | | | |
| 937J0 | 4/1/18 | 5.000% | $3,295,510.00 | Assured | Assured | $82,337.75 | $82,337.75 | $82,337.75 | $82,337.75 | $82,337.75 | $82,337.75 | $82,337.75 | $82,337.75 | | | | | | |
| | | | **$16,357,020.00** | | | $407,995.50 | $407,995.50 | $234,847.25 | $234,847.25 | $160,113.25 | $160,113.25 | $82,337.75 | $82,337.75 | | | | | |

$287,505,780.00 | | $3,303,799.99 | $3,303,799.99 | $3,090,732.06 | $3,090,732.06 | $6,909,275.84 | $5,573,048.66 | $5,773,048.66 | $5,884,721.19 | $3,680,721.19 | $3,480,721.19 | $3,400,721.19 | $3,406,893.00 | $2,696,893.00 | $2,696,895.00

Page 2 of 5

* Subject to Mandatory Redemption

# UTGO Series 2014 DSA Fourth Lien Restructured Bonds - Debt Service

| CUSIP | Maturity Date | Rate | Principal | Insurer | Interest 10/1/21 | 4/1/22 | 10/1/22 | 4/1/23 | 10/1/23 | 4/1/24 | 10/1/24 | 4/1/25 | 10/1/25 | 4/1/26 | 10/1/26 | 4/1/27 | 10/1/27 | 4/1/28 | Total Interest | Total Principal & Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **UTGO 1999-A** | | | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 3.250% | $2,476,650.00 | Assured | | | | | | | | | | | | | | | $130,029.13 | $2,606,674.13 |
| | 4/1/16 | 3.000% | $2,602,635.00 | Assured | | | | | | | | | | | | | | | $260,263.50 | $2,862,920.50 |
| | 4/1/16 | 5.000% | $2,733,105.00 | Assured | | | | | | | | | | | | | | | $409,950.75 | $3,142,353.75 |
| | 4/1/17 | 5.000% | $3,872,945.00 | Assured | | | | | | | | | | | | | | | $574,469.00 | $3,446,454.00 |
| | 4/1/19 | 5.000% | $3,015,430.00 | Assured | | | | | | | | | | | | | | | $753,857.50 | $3,769,287.50 |
| | | | **$13,699,765.00** | | | | | | | | | | | | | | | | **$2,128,596.88** | **$15,828,291.88** |
| **UTGO 2001-A(II)** | | | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 5.375% | $5,161,860.00 | NPFG | | | | | | | | | | | | | | | $277,449.98 | $5,430,309.98 |
| | 4/1/16 | 5.375% | $5,439,940.00 | NPFG | | | | | | | | | | | | | | | $384,793.55 | $6,024,733.55 |
| | 4/1/17 | 5.375% | $5,735,400.00 | NPFG | | | | | | | | | | | | | | | $370,953.25 | $6,460,353.25 |
| | 4/1/17 | 5.375% | $12,166,000.00 | NPFG | | | | | | | | | | | | | | | $2,615,690.00 | $14,781,690.00 |
| | 4/1/18 | 5.000% | $12,166,000.00 | NPFG | | | | | | | | | | | | | | | $3,041,500.00 | $15,207,500.00 |
| | 4/1/18 | 5.000% | $12,166,000.00 | NPFG | | | | | | | | | | | | | | | $3,041,500.00 | $15,315,800.00 |
| | 4/1/19 | 5.000% | $12,166,000.00 | NPFG | | | | | | | | | | | | | | | $3,049,900.00 | $16,434,100.00 |
| | 4/1/20 | 5.000% | $12,166,000.00 | NPFG | | | | | | | | | | | | | | | $4,258,100.00 | $16,424,100.00 |
| | | | **$65,001,200.00** | | | | | | | | | | | | | | | | **$13,352,566.78** | **$80,353,566.78** |
| **UTGO 2002** | | | | | | | | | | | | | | | | | | | | |
| | 4/1/21 | 5.125% | $2,815,560.00 | NPFG | $75,822.97 | $75,822.97 | | | | | | | | | | | | | $1,010,082.15 | $3,835,642.15 |
| | 4/1/22 | 5.125% | $5,959,935.00 | NPFG | | | | | | | | | | | | | | | $1,213,167.45 | $6,123,117.45 |
| | | | **$8,775,495.00** | | **$75,822.97** | **$75,822.97** | | | | | | | | | | | | | **$2,223,249.60** | **$7,997,754.60** |
| **UTGO 2003-A** | | | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 4.000% | $360,700.00 | Syncora | | | | | | | | | | | | | | | $10,428.00 | $271,128.00 |
| | 4/1/16 | 5.250% | $2,215,950.00 | Syncora | | | | | | | | | | | | | | | $116,337.38 | $2,332,287.38 |
| | 4/1/16 | 5.250% | $2,602,655.00 | Syncora | | | | | | | | | | | | | | | $273,279.78 | $2,875,933.78 |
| | 4/1/17 | 5.250% | $2,737,350.00 | Syncora | | | | | | | | | | | | | | | $431,132.63 | $3,168,482.63 |
| | 4/1/18 | 5.250% | $2,880,735.00 | Syncora | | | | | | | | | | | | | | | $604,954.35 | $3,485,689.35 |
| | 4/1/19 | 5.250% | $3,032,910.00 | Syncora | | | | | | | | | | | | | | | $796,112.63 | $3,829,922.63 |
| | 4/1/20 | 5.250% | $424,500.00 | Syncora | | | | | | | | | | | | | | | $117,315.00 | $353,815.00 |
| | 4/1/21 | 5.250% | $2,739,075.00 | Syncora | | | | | | | | | | | | | | | $869,508.63 | $3,628,583.63 |
| | 4/1/21 | 4.625% | $3,334,340.00 | Syncora | $10,047.81 | $10,047.81 | | | | | | | | | | | | | $1,232,719.95 | $4,567,059.95 |
| | 4/1/22 | 5.250% | $434,500.00 | Syncora | $81,322.11 | $81,322.11 | | | | | | | | | | | | | $160,765.00 | $595,265.00 |
| | 4/1/22 | 4.625% | $3,097,580.00 | Syncora | | | | | | | | | | | | | | | $1,301,153.70 | $4,399,138.70 |
| | 4/1/23 | 5.250% | $1,303,500.00 | Syncora | $30,143.44 | $30,143.44 | $30,143.44 | $30,143.44 | | | | | | | | | | | $542,581.88 | $1,846,081.88 |
| | 4/1/23 | 4.625% | $2,411,475.00 | Syncora | $63,301.22 | $63,301.22 | $63,301.22 | $63,301.22 | | | | | | | | | | | $1,172,425.04 | $3,569,094.04 |
| | | | **$27,525,375.00** | | **$184,814.58** | **$184,814.58** | **$53,444.66** | **$53,444.66** | | | | | | | | | | | **$7,593,309.84** | **$36,120,884.84** |
| **UTGO 2004-A(II)** | | | | | | | | | | | | | | | | | | | | |
| | 4/1/19 | 5.240% | $3,916,500.00 | Ambac | $158,085.96 | $158,085.96 | | | | | | | | | | | | | $1,036,506.25 | $4,937,006.25 |
| | 4/1/20 | 4.250% | $160,705.00 | Ambac | $7,332.19 | $7,332.19 | $7,332.19 | $7,332.19 | | | | | | | | | | | $40,096.08 | $201,701.08 |
| | 4/1/20 | 5.250% | $5,287,865.00 | Ambac | $157,853.85 | $157,853.85 | $157,853.85 | $157,853.85 | | | | | | | | | | | $1,665,677.48 | $6,953,542.48 |
| | 4/1/21 | 5.250% | $5,735,400.00 | Ambac | | | | | | | | | | | | | | | $2,007,290.00 | $7,742,790.00 |
| | 4/1/21 | 5.000% | $6,032,910.00 | Ambac | | | | | | | | | | | | | | | $2,320,311.40 | $8,351,481.40 |
| | 4/1/22 | 5.250% | $313,875.00 | Ambac | $15,689.80 | $15,689.80 | $15,689.80 | $15,689.80 | $15,689.80 | $15,689.80 | | | | | | | | | $311,979.38 | $457,854.18 |
| | 4/1/23 | 5.240% | $6,031,490.00 | Ambac | | | | | | | | | | | | | | | $2,691,169.30 | $8,584,847.30 |
| | 4/1/23 | 4.600% | $682,165.00 | Ambac | $157,169.51 | $157,169.51 | $157,169.51 | $157,169.51 | $157,169.51 | $157,169.51 | | | | | | | | | $313,705.90 | $995,961.00 |
| | 4/1/24 | 5.250% | $5,081,410.00 | Ambac | | | | | | | | | | | | | | | $3,143,390.25 | $9,130,800.25 |
| | | | **$34,125,430.00** | | **$496,127.31** | **$496,127.31** | **$338,045.35** | **$338,045.35** | **$172,859.31** | **$172,859.31** | | | | | | | | | **$53,700,415.03** | **$47,826,045.03** |

* Subject to Mandatory Redemption

|  |  |  |  |  | Interest | | | | | | | | | | | | | |  | Total | Total |
| CUSIP | Maturity Date | Rate | Insurer | Principal | 10/1/21 | 4/1/22 | 10/1/22 | 4/1/23 | 10/1/23 | 4/1/24 | 10/1/24 | 4/1/25 | 10/1/25 | 4/1/26 | 10/1/26 | 4/1/27 | 10/1/27 | 4/1/28 | Interest | Principal & Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **UTGO 2004-H(f)** | | | | | | | | | | | | | | | | | | | | |
|  | 4/1/16 | 5.000% | Ambac | $7,538,575.00 |  |  |  |  |  |  |  |  |  |  |  |  |  |  | $376,928.75 | $7,915,503.75 |
|  | 4/1/16 | 5.250% | Ambac | $7,912,245.00 |  |  |  |  |  |  |  |  |  |  |  |  |  |  | $830,785.73 | $8,743,030.73 |
|  | 4/1/17 | 4.000% | Ambac | $265,345.00 |  |  |  |  |  |  |  |  |  |  |  |  |  |  | $57,805.40 | $323,150.40 |
|  | 4/1/17 | 5.250% | Ambac | $8,064,320.00 |  |  |  |  |  |  |  |  |  |  |  |  |  |  | $1,273,187.40 | $9,334,480.40 |
|  | 4/1/17 | 5.250% | Ambac | $1,738,000.00 |  |  |  |  |  |  |  |  |  |  |  |  |  |  | $364,980.00 | $2,102,980.00 |
|  |  |  |  | **$23,518,485.00** |  |  |  |  |  |  |  |  |  |  |  |  |  |  | **$2,874,630.28** | **$28,392,815.28** |
| **UTGO 2004-B(2)** | | | | | | | | | | | | | | | | | | | | |
|  | 4/1/19 | 5.240% | Ambac | $499,675.00 |  |  |  |  |  |  |  |  |  |  |  |  |  |  | $68,790.03 | $568,465.03 |
| **UTGO 2005-B** | | | | | | | | | | | | | | | | | | | | |
|  | 4/1/15 | 5.000% | Assured | $1,990,010.00 |  |  |  |  |  |  |  |  |  |  |  |  |  |  | $95,520.50 | $2,085,530.50 |
|  | 4/1/16 | 5.000% | Assured | $2,080,940.00 |  |  |  |  |  |  |  |  |  |  |  |  |  |  | $206,994.50 | $2,298,939.50 |
|  | 4/1/17 | 4.000% | Assured | $2,189,880.00 |  |  |  |  |  |  |  |  |  |  |  |  |  |  | $282,494.52 | $2,472,374.52 |
|  | 4/1/18 | 5.000% | Assured | $2,299,815.00 |  |  |  |  |  |  |  |  |  |  |  |  |  |  | $457,263.00 | $2,747,178.00 |
|  | 4/1/19 | 5.000% | Assured | $2,402,785.00 |  |  |  |  |  |  |  |  |  |  |  |  |  |  | $600,604.25 | $3,003,481.25 |
|  | 4/1/20 | 5.000% | Assured | $4,345,000.00 |  |  |  |  |  |  |  |  |  |  |  |  |  |  | $1,303,500.00 | $5,648,500.00 |
|  | 4/1/21 | 5.000% | Assured | $4,345,000.00 | $108,625.00 |  |  |  |  |  |  |  |  |  |  |  |  |  | $1,520,750.00 | $5,865,750.00 |
|  | 4/1/22 | 5.000% | Assured | $4,345,000.00 | $108,625.00 | $108,625.00 | $108,625.00 |  |  |  |  |  |  |  |  |  |  |  | $1,738,000.00 | $6,083,000.00 |
|  | 4/1/23 | 5.000% | Assured | $4,345,000.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 |  |  |  |  |  |  |  |  |  | $1,955,250.00 | $6,300,250.00 |
|  | 4/1/24 | 5.000% | Assured | $4,345,000.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 |  |  |  |  |  |  | $2,172,500.00 | $6,517,500.00 |
|  | 4/1/25 | 5.000% | Assured | $4,335,000.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 |  |  |  |  |  | $2,389,750.00 | $5,734,750.00 |
|  |  |  |  | **$37,022,435.00** | $434,590.00 | $434,590.00 | $325,375.00 | $325,375.00 | $217,250.00 | $217,250.00 | $108,625.00 | $108,625.00 |  |  |  |  |  | **$12,728,378.77** | **$49,764,833.77** |
| **UTGO 2005-C** | | | | | | | | | | | | | | | | | | | | |
|  | 4/1/15 | 5.000% | Assured | $2,003,045.00 |  |  |  |  |  |  |  |  |  |  |  |  |  |  | $100,152.25 | $2,103,197.25 |
|  | 4/1/16 | 5.000% | Assured | $2,107,325.00 |  |  |  |  |  |  |  |  |  |  |  |  |  |  | $210,712.50 | $2,318,037.50 |
|  | 4/1/17 | 4.300% | Assured | $2,211,605.00 |  |  |  |  |  |  |  |  |  |  |  |  |  |  | $285,379.05 | $2,496,984.05 |
|  | 4/1/18 | 5.000% | Assured | $2,285,470.00 |  |  |  |  |  |  |  |  |  |  |  |  |  |  | $457,094.00 | $2,742,564.00 |
|  | 4/1/19 | 5.250% | Assured | $2,376,715.00 |  |  |  |  |  |  |  |  |  |  |  |  |  |  | $623,387.69 | $3,000,102.69 |
|  | 4/1/20 | 5.250% | Assured | $2,507,965.00 |  |  |  |  |  |  |  |  |  |  |  |  |  |  | $789,725.48 | $3,296,790.48 |
|  |  |  |  | **$13,491,225.00** |  |  |  |  |  |  |  |  |  |  |  |  |  |  | **$2,466,888.96** | **$15,958,113.96** |
| **UTGO 2008-A** | | | | | | | | | | | | | | | | | | | | |
|  | 4/1/15 | 5.000% | Assured | $2,618,375.00 |  |  |  |  |  |  |  |  |  |  |  |  |  |  | $124,918.75 | $2,612,293.75 |
|  | 4/1/16 | 5.000% | Assured | $2,620,035.00 |  |  |  |  |  |  |  |  |  |  |  |  |  |  | $262,003.50 | $2,882,038.50 |
|  | 4/1/17 | 5.000% | Assured | $2,734,730.00 |  |  |  |  |  |  |  |  |  |  |  |  |  |  | $413,200.50 | $3,147,930.50 |
|  | 4/1/18 | 4.000% | Assured | $2,889,435.00 |  |  |  |  |  |  |  |  |  |  |  |  |  |  | $462,309.80 | $3,351,733.00 |
|  | 4/1/19 | 5.000% | Assured | $3,006,740.00 |  |  |  |  |  |  |  |  |  |  |  |  |  |  | $751,685.00 | $3,729,425.00 |
|  | 4/1/20 | 5.000% | Assured | $3,154,470.00 |  |  |  |  |  |  |  |  |  |  |  |  |  |  | $946,341.00 | $4,100,811.00 |
|  | 4/1/21 | 5.000% | Assured | $3,315,245.00 | $87,008.63 |  |  |  |  |  |  |  |  |  |  |  |  |  | $1,160,332.25 | $4,475,567.25 |
|  | 4/1/22 | 5.000% | Assured | $3,480,345.00 | $87,008.63 | $87,008.63 |  |  |  |  |  |  |  |  |  |  |  |  | $1,392,138.50 | $4,872,483.00 |
|  | 4/1/23 | 5.000% | Assured | $4,190,780.00 | $187,269.50 | $187,269.50 | $187,269.50 | $95,915.88 |  |  |  |  |  |  |  |  |  | $1,846,667.75 | $5,846,673.25 |
|  | 4/1/24 | 5.000% | Assured | $17,342,620.00 | $434,065.50 | $434,065.50 | $434,065.50 | $434,065.50 | $95,915.88 | $95,915.88 |  |  |  |  |  |  |  | $10,069,443.25 | $29,207,082.25 |
|  |  |  |  | **$48,572,758.90** | $708,343.63 | $708,343.63 | $621,335.00 | $621,335.00 | $529,981.38 | $529,981.38 | $434,065.50 | $434,065.50 | $333,370.13 | $333,370.13 | $227,569.38 | $227,569.38 | $116,554.63 | **$19,990,049.00** | **$64,552,803.00** |
| **UTGO 2008-H(f)** | | | | | | | | | | | | | | | | | | | | |
|  | 4/1/15 | 5.000% | Assured | $6,925,930.00 |  |  |  |  |  |  |  |  |  |  |  |  |  |  | $346,296.50 | $7,272,226.50 |
|  | 4/1/16 | 5.000% | Assured | $2,989,360.00 |  |  |  |  |  |  |  |  |  |  |  |  |  |  | $299,536.00 | $3,288,296.00 |
|  | 4/1/17 | 5.000% | Assured | $3,111,000.00 |  |  |  |  |  |  |  |  |  |  |  |  |  |  | $466,653.00 | $3,577,673.00 |
|  | 4/1/18 | 5.000% | Assured | $3,293,520.00 |  |  |  |  |  |  |  |  |  |  |  |  |  |  | $658,702.00 | $3,952,212.00 |
|  |  |  |  | **$16,319,820.00** |  |  |  |  |  |  |  |  |  |  |  |  |  |  | **$1,770,387.50** | **$18,090,407.50** |

# UTGO Series 2014 DSA Fourth Lien Restructured Bonds - Debt Service

## Bond Series Subject to Mandatory Redemption

### Issuance: 2004-B(2)

CUSIP 25093YZX1

| Date | Insurer | Fiscal Year | Mandatory Redemption Amounts | Outstanding | Rate | Interest |
|---|---|---|---|---|---|---|
| 10/1/14 | Ambac | 6/30/15 | | $469,675.00 | 5.240% | $13,091.49 |
| 4/1/15 | Ambac | 6/30/15 | $104,695.00 | $364,980.00 | 5.240% | $13,091.49 |
| 10/1/15 | Ambac | 6/30/16 | | $364,980.00 | 5.240% | $9,363.48 |
| 4/1/16 | Ambac | 6/30/16 | $143,385.00 | $221,595.00 | 5.240% | $9,562.48 |
| 10/1/16 | Ambac | 6/30/17 | | $221,595.00 | 5.240% | $5,805.79 |
| 4/1/17 | Ambac | 6/30/17 | $187,730.00 | $33,865.00 | 5.240% | $5,805.79 |
| 10/1/17 | Ambac | 6/30/18 | | $33,865.00 | 5.240% | $1,935.26 |
| 4/1/18 | Ambac | 6/30/18 | $33,865.00 | | 5.240% | $1,935.26 |
| | | Total | $499,975.00 | | | $60,790.03 |

### Issuance: 2008-A

CUSIP 25093N5S5

| Date | Insurer | Fiscal Year | Mandatory Redemption Amounts | Outstanding | Rate | Interest |
|---|---|---|---|---|---|---|
| 10/1/14 | Assured | 6/30/15 | | $7,490,780.00 | 3.000% | $187,269.50 |
| 4/1/15 | Assured | 6/30/15 | | $7,490,780.00 | 5.000% | $187,269.50 |
| 10/1/15 | Assured | 6/30/16 | | $7,490,780.00 | 3.000% | $187,269.50 |
| 4/1/16 | Assured | 6/30/16 | | $7,490,780.00 | 5.000% | $187,269.50 |
| 10/1/16 | Assured | 6/30/17 | | $7,490,780.00 | 5.000% | $187,269.50 |
| 4/1/17 | Assured | 6/30/17 | | $7,490,780.00 | 5.000% | $187,269.50 |
| 10/1/17 | Assured | 6/30/18 | | $7,490,780.00 | 5.000% | $187,269.50 |
| 4/1/18 | Assured | 6/30/18 | | $7,490,780.00 | 5.000% | $187,269.50 |
| 10/1/18 | Assured | 6/30/19 | | $7,490,780.00 | 5.000% | $187,269.50 |
| 4/1/19 | Assured | 6/30/19 | | $7,490,780.00 | 5.000% | $187,269.50 |
| 10/1/19 | Assured | 6/30/20 | | $7,490,780.00 | 5.000% | $187,269.50 |
| 4/1/20 | Assured | 6/30/20 | | $7,490,780.00 | 3.000% | $187,269.50 |
| 10/1/20 | Assured | 6/30/21 | | $7,490,780.00 | 5.000% | $187,269.50 |
| 4/1/21 | Assured | 6/30/21 | | $7,490,780.00 | 5.000% | $187,269.50 |
| 10/1/21 | Assured | 6/30/22 | | $7,490,780.00 | 5.000% | $187,269.50 |
| 4/1/22 | Assured | 6/30/22 | | $7,490,780.00 | 5.000% | $187,269.50 |
| 10/1/2022 | Assured | 6/30/23 | $3,954,145 | $7,493,780.00 | 5.000% | $187,269.50 |
| 4/1/2023 | Assured | 6/30/23 | | $3,536,635.00 | 3.000% | $157,300.58 |
| 10/1/2023 | Assured | 6/30/24 | $3,536,635.00 | $3,536,635.00 | 5.000% | $157,300.58 |
| 4/1/2024 | Assured | 6/30/24 | | | 5.000% | $55,915.88 |
| | | Total | $7,490,780.00 | | | $3,542,482.75 |

### Issuance: 2008-A

CUSIP 25093N6G3

| Date | Insurer | Fiscal Year | Mandatory Redemption Amounts | Outstanding | Rate | Interest |
|---|---|---|---|---|---|---|
| 10/1/14 | Assured | 6/30/15 | | $7,362,620.00 | 5.000% | $434,105.50 |
| 4/1/15 | Assured | 6/30/15 | | $17,362,620.00 | 5.000% | $434,105.50 |
| 10/1/15 | Assured | 6/30/16 | | $17,362,620.00 | 5.000% | $434,105.50 |
| 4/1/16 | Assured | 6/30/16 | | $17,362,620.00 | 5.000% | $434,105.50 |
| 10/1/16 | Assured | 6/30/17 | | $17,362,620.00 | 5.000% | $434,105.50 |
| 4/1/17 | Assured | 6/30/17 | | $17,362,620.00 | 5.000% | $434,105.50 |
| 10/1/17 | Assured | 6/30/18 | | $17,362,620.00 | 5.000% | $434,105.50 |
| 4/1/18 | Assured | 6/30/18 | | $13,362,620.00 | 5.000% | $434,105.50 |
| 10/1/18 | Assured | 6/30/19 | | $13,362,620.00 | 5.000% | $434,105.50 |
| 4/1/19 | Assured | 6/30/19 | | $13,421,620.00 | 5.000% | $434,105.50 |
| 10/1/19 | Assured | 6/30/20 | | $11,362,620.00 | 5.000% | $434,105.50 |
| 4/1/20 | Assured | 6/30/20 | | $11,362,620.00 | 5.000% | $47,247.50 |
| 10/1/20 | Assured | 6/30/21 | | $73,362,620.00 | 3.600% | $473,065.50 |
| 4/1/21 | Assured | 6/30/21 | | $17,362,620.00 | 5.000% | $434,065.50 |
| 10/1/21 | Assured | 6/30/22 | | $17,362,620.00 | 5.000% | $434,062.50 |
| 4/1/22 | Assured | 6/30/22 | | $17,362,620.10 | 3.000% | $434,065.50 |
| 10/1/2022 | Assured | 6/30/23 | | $17,362,620.20 | 5.600% | $434,060.50 |
| 4/1/2023 | Assured | 6/30/23 | | $17,362,620.00 | 5.000% | $434,065.50 |
| 11/1/2023 | Assured | 6/30/24 | $4,037,815.00 | $15,362,620.00 | 5.000% | $434,065.50 |
| 4/1/2024 | Assured | 6/30/25 | | $10,336,805.00 | 5.000% | $434,065.50 |
| 10/1/2025 | Assured | 6/30/26 | $4,732,930.00 | $13,534,860.00 | 5.000% | $533,570.13 |
| 4/1/2026 | Assured | 6/30/26 | | $9,102,275.00 | 5.600% | $333,570.13 |
| 10/1/2027 | Assured | 6/30/27 | $4,440,930.00 | $9,102,275.00 | 5.000% | $223,569.38 |
| 4/1/2028 | Assured | 6/30/28 | $4,662,185.00 | $4,662,185.00 | 5.000% | $227,569.38 |
| | | Total | $4,662,185.00 | $4,662,185.00 | 1.000% | $116,554.63 |
| | | | $17,362,620.00 | | | $10,904,629.25 |

**EXHIBIT C**
**STUB UTGO BONDS**

13-53846-tjt  Doc 8737-1  Filed 12/15/14  Entered 12/15/14 09:07:34  Page 254 of
455
13-53846-swr  Doc 6903-3  Filed 08/20/14  Entered 08/20/14 23:27:34  Page 71 of
272

# UTGO Series STUB Bonds - Debt Service

| CUSIP | Maturity Date | Rate | Principal | Insurer | Interest 10/1/14 | 4/1/15 | 10/1/15 | 4/1/16 | 10/1/16 | 4/1/17 | 10/1/17 | 4/1/18 | 10/1/18 | 4/1/19 | 10/1/19 | 4/1/20 | 10/1/20 | 4/1/21 | 4/1/21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **UTGO 1999-A** | | | | | | | | | | | | | | | | | | | |
| 91XX3A3 | 4/1/15 | 5.250% | $373,330.00 | Assured | $9,800.44 | $9,800.44 | | | | | | | | | | | | | |
| 91XX5N1 | 4/1/16 | 5.000% | $392,345.00 | Assured | $9,808.63 | $9,808.63 | $9,808.63 | $9,808.63 | | | | | | | | | | | |
| 91XX896 | 4/1/17 | 5.000% | $411,995.00 | Assured | $10,299.88 | $10,299.88 | $10,299.88 | $10,299.88 | $10,299.88 | $10,299.88 | | | | | | | | | |
| 91XX747 | 4/1/18 | 5.000% | $432,955.00 | Assured | $10,823.88 | $10,823.88 | $10,823.88 | $10,823.88 | $10,823.88 | $10,823.88 | $10,823.88 | $10,823.88 | | | | | | | |
| 91XX3R2 | 4/1/19 | 5.000% | $545,570.00 | Assured | $11,364.25 | $11,364.25 | $11,364.25 | $11,364.25 | $11,364.25 | $11,364.25 | $11,364.25 | $11,364.25 | $11,364.25 | $11,364.25 | | | | | |
| | | | **$2,060,215.00** | | $52,097.06 | $52,097.06 | $42,296.63 | $42,296.63 | $32,488.00 | $32,488.00 | $22,188.13 | $22,188.13 | $11,364.25 | $11,364.25 | | | | | |
| **UTGO 2001-A(1)** | | | | | | | | | | | | | | | | | | | |
| 91XX1X6 | 4/1/16 | 5.375% | $178,140.00 | NPFG | $20,912.51 | $20,912.51 | $22,039.11 | $22,039.11 | | | | | | | | | | | |
| 91XX3 | 4/1/17 | 5.375% | $820,060.00 | NPFG | $22,039.11 | $22,039.11 | $23,236.13 | $23,236.13 | $23,236.13 | $23,236.13 | | | | | | | | | |
| 91XX3 | 4/1/18 | 5.375% | $866,040.00 | NPFG | $23,236.13 | $23,236.13 | $40,288.75 | $40,288.75 | $40,288.75 | $40,288.75 | $40,288.75 | $40,288.75 | | | | | | | |
| 91XX747 | 4/1/19 | 5.000% | $1,834,000.00 | NPFG | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | | | | | |
| 91XX3T2 | 4/1/20 | 5.000% | $1,834,000.00 | NPFG | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | | | |
| 91XXC9U0 | 4/1/21 | 5.000% | $1,834,000.00 | NPFG | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 |
| | | | **$9,798,960.00** | | $253,626.50 | $253,626.50 | $232,113.99 | $232,113.99 | $210,072.48 | $210,072.48 | $186,838.75 | $186,838.75 | $137,550.00 | $137,550.00 | $91,700.00 | $91,700.00 | $45,850.00 | $45,850.00 | |
| **UTGO 2002** | | | | | | | | | | | | | | | | | | | |
| 91XXW7X | 4/1/21 | 5.125% | $434,440.00 | NPFG | $10,876.28 | $10,876.28 | $10,876.28 | $10,876.28 | $10,876.28 | $10,876.28 | $10,876.28 | $10,876.28 | $10,876.28 | $10,876.28 | $10,876.28 | $10,876.28 | $10,876.28 | $10,876.28 | |
| 91XXW6 | 4/1/22 | 5.125% | $446,055.00 | NPFG | $11,430.16 | $11,430.16 | $11,430.16 | $11,430.16 | $11,430.16 | $11,430.16 | $11,430.16 | $11,430.16 | $11,430.16 | $11,430.16 | $11,430.16 | $11,430.16 | $11,430.16 | $11,430.16 | |
| | | | **$870,495.00** | | $22,306.43 | $22,306.43 | $22,306.43 | $22,306.43 | $22,306.43 | $22,306.43 | $22,306.43 | $22,306.43 | $22,306.43 | $22,306.43 | $22,306.43 | $22,306.43 | $22,306.43 | $22,306.43 | |
| **UTGO 2003-A** | | | | | | | | | | | | | | | | | | | |
| 91XX3N9 | 4/1/15 | 4.000% | $39,300.00 | Syncora | $786.00 | $786.00 | | | | | | | | | | | | | |
| 91XX3P4 | 4/1/16 | 5.250% | $334,050.00 | Syncora | $8,768.81 | $8,768.81 | $10,299.00 | $10,299.00 | | | | | | | | | | | |
| 91XX3Q2 | 4/1/17 | 5.250% | $392,345.00 | Syncora | $10,299.06 | $10,299.06 | $10,833.00 | $10,833.00 | $10,833.00 | $10,833.00 | | | | | | | | | |
| 91XX3S4 | 4/1/18 | 5.250% | $412,640.00 | Syncora | $10,832.06 | $10,832.06 | $11,399.46 | $11,399.46 | $11,399.46 | $11,399.46 | $11,399.46 | $11,399.46 | | | | | | | |
| 91XX3T2 | 4/1/19 | 5.250% | $434,265.00 | Syncora | $11,399.46 | $11,399.46 | $12,001.24 | $12,001.24 | $12,001.24 | $12,001.24 | $12,001.24 | $12,001.24 | $12,001.24 | $12,001.24 | | | | | |
| 91XX3U9 | 4/1/20 | 5.250% | $457,190.00 | Syncora | $12,001.24 | $12,001.24 | $1,473.75 | $1,473.75 | $1,473.75 | $1,473.75 | $1,473.75 | $1,473.75 | $1,473.75 | $1,473.75 | $1,473.75 | $1,473.75 | | | |
| 91XX3V7 | 4/1/20 | 4.500% | $65,500.00 | Syncora | $1,473.75 | $1,473.75 | $10,918.03 | $10,918.03 | $10,918.03 | $10,918.03 | $10,918.03 | $10,918.03 | $10,918.03 | $10,918.03 | $10,918.03 | $10,918.03 | | | |
| 91XX3W5 | 4/1/21 | 4.500% | $413,925.00 | Syncora | $10,918.03 | $10,918.03 | $13,273.58 | $13,273.58 | $13,273.58 | $13,273.58 | $13,273.58 | $13,273.58 | $13,273.58 | $13,273.58 | $13,273.58 | $13,273.58 | $13,273.58 | $13,273.58 | |
| 91XX3X3 | 4/1/21 | 5.250% | $305,640.00 | Syncora | $13,273.58 | $13,273.58 | $12,259.14 | $12,259.14 | $12,259.14 | $12,259.14 | $12,259.14 | $12,259.14 | $12,259.14 | $12,259.14 | $12,259.14 | $12,259.14 | $12,259.14 | $12,259.14 | |
| 91XX3Y1 | 4/1/22 | 4.625% | $65,500.00 | Syncora | $1,514.69 | $1,514.69 | $1,514.69 | $1,514.69 | $1,514.69 | $1,514.69 | $1,514.69 | $1,514.69 | $1,514.69 | $1,514.69 | $1,514.69 | $1,514.69 | $1,514.69 | $1,514.69 | |
| 91XX3Z8 | 4/1/22 | 5.250% | $467,015.00 | Syncora | $12,259.14 | $12,259.14 | $4,544.06 | $4,544.06 | $4,544.06 | $4,544.06 | $4,544.06 | $4,544.06 | $4,544.06 | $4,544.06 | $4,544.06 | $4,544.06 | $4,544.06 | $4,544.06 | |
| 91XX3A0 | 4/1/23 | 4.625% | $196,500.00 | Syncora | $4,544.06 | $4,544.06 | $9,542.53 | $9,542.53 | $9,542.53 | $9,542.53 | $9,542.53 | $9,542.53 | $9,542.53 | $9,542.53 | $9,542.53 | $9,542.53 | $9,542.53 | $9,542.53 | |
| 91XX3B0 | 4/1/23 | 5.250% | $363,525.00 | Syncora | $9,542.53 | $9,542.53 | | | | | | | | | | | | | |
| | | | **$4,159,425.00** | | $107,652.41 | $107,652.41 | $98,657.59 | $98,657.59 | $87,758.54 | $87,758.54 | $76,926.48 | $76,926.48 | $65,527.02 | $65,527.02 | $53,525.76 | $53,525.76 | $41,134.00 | $41,134.00 | |
| **UTGO 2004-A(1)** | | | | | | | | | | | | | | | | | | | |
| 91XXX2 | 4/1/19 | 5.250% | $389,500.00 | Ambac | $15,474.38 | $15,474.38 | $15,474.99 | $15,474.99 | $15,474.38 | $15,474.38 | $15,474.38 | $15,474.38 | $15,474.38 | $15,474.38 | $514.99 | $514.99 | | | |
| 91XXY0 | 4/1/20 | 4.250% | $24,235.00 | Ambac | $514.99 | $514.99 | $514.99 | $514.99 | $514.99 | $514.99 | $514.99 | $514.99 | $514.99 | $514.99 | $20,924.79 | $20,924.79 | $514.99 | $514.99 | |
| 91XXV90 | 4/1/20 | 5.250% | $797,135.00 | Ambac | $20,924.79 | $20,924.79 | $20,924.79 | $20,924.79 | $20,924.79 | $20,924.79 | $20,924.79 | $20,924.79 | $20,924.79 | $20,924.79 | $21,615.00 | $21,615.00 | $21,615.00 | $22,615.00 | |
| 91XXZ8 | 4/1/21 | 5.000% | $864,600.00 | Ambac | $21,615.00 | $21,615.00 | $21,615.00 | $21,615.00 | $21,615.00 | $21,615.00 | $21,615.00 | $21,615.00 | $21,615.00 | $21,615.00 | $23,830.54 | $23,830.54 | $23,830.54 | $23,830.54 | |
| 91XXJB0 | 4/1/22 | 5.500% | $907,830.00 | Ambac | $23,830.54 | $23,830.54 | $23,830.54 | $23,830.54 | $23,830.54 | $23,830.54 | $23,830.54 | $23,830.54 | $23,830.54 | $23,830.54 | $1,105.31 | $1,105.31 | $1,105.31 | $1,105.31 | |
| 91XXG7 | 4/1/22 | 4.300% | $49,125.00 | Ambac | $1,105.31 | $1,105.31 | $1,105.31 | $1,105.31 | $1,105.31 | $1,105.31 | $1,105.31 | $1,105.31 | $1,105.31 | $1,105.31 | $23,796.15 | $23,796.15 | $23,796.15 | $23,796.15 | |
| 91XXJC5 | 4/1/23 | 5.250% | $906,520.00 | Ambac | $23,796.15 | $23,796.15 | $23,796.15 | $23,796.15 | $23,796.15 | $23,796.15 | $23,796.15 | $23,796.15 | $23,796.15 | $23,796.15 | $2,363.21 | $2,363.21 | $2,363.21 | $2,363.21 | |
| 91XXJD3 | 4/1/24 | 4.600% | $102,835.00 | Ambac | $2,363.21 | $2,363.21 | $2,363.21 | $2,363.21 | $2,363.21 | $2,363.21 | $2,363.21 | $2,363.21 | $2,363.21 | $2,363.21 | $23,692.99 | $23,692.99 | $23,692.99 | $23,692.99 | |
| 91XXJZ9 | 4/1/24 | 5.250% | $902,200.00 | Ambac | $23,692.99 | $23,692.99 | $23,692.99 | $23,692.99 | $23,692.99 | $23,692.99 | $23,692.99 | $23,692.99 | $23,692.99 | $23,692.99 | | | | | |
| | | | **$5,344,770.00** | | $133,317.36 | $133,317.36 | $133,317.36 | $133,317.36 | $133,317.36 | $133,317.36 | $133,191.36 | $133,191.36 | $133,191.36 | $133,191.36 | $117,844.98 | $117,844.98 | $96,405.19 | $96,405.19 | |

13-53846-swr Doc 6999-3 Filed 10/10/14 Entered 10/10/14 09:47:34 Page 255 of 455

*Subject to Mandatory Redemption*

# UTGO Series STUB Bonds - Debt Service

| CUSIP | Maturity Date | Rate | Principal | Insurer | | | | | | Interest | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 10/1/14 | 4/1/15 | 10/1/15 | 4/1/16 | 10/1/16 | 4/1/17 | 10/1/17 | 4/1/18 | 10/1/18 | 4/1/19 | 10/1/19 | 4/1/20 | 10/1/20 | 4/1/21 |
| **UTGO 2004-B(1)** | | | | | | | | | | | | | | | | | | |
| 905295298 | 4/1/15 | 5.000% | $1,136,425.00 | Ambac | $26,410.63 | $28,410.63 | | | | | | | | | | | | |
| 905295Z26 | 4/1/16 | 5.250% | $1,192,735.00 | Ambac | $31,309.82 | $31,309.82 | $31,309.82 | $31,309.82 | | | | | | | | | | |
| 905295234 | 4/1/17 | 4.000% | $39,955.00 | Ambac | $799.10 | $799.10 | $799.10 | $799.10 | $799.10 | $799.10 | | | | | | | | |
| 905295Z87 | 4/1/17 | 5.250% | $1,215,680.00 | Ambac | $31,911.60 | $31,911.60 | $31,911.60 | $31,911.60 | $31,911.60 | $31,911.60 | | | | | | | | |
| 905295210 | 4/1/18 | 5.250% | $262,000.00 | Ambac | $6,877.50 | $6,877.50 | $6,877.50 | $6,877.50 | $6,877.50 | $6,877.50 | $6,877.50 | $6,877.50 | | | | | | |
| | | | $3,846,815.00 | | $99,308.64 | $99,308.64 | $70,898.02 | $70,898.02 | $39,588.20 | $39,588.20 | $201.74 | $201.74 | | | | | | |
| **UTGO 2005-B(2)** | | | | | | | | | | | | | | | | | | |
| 905295253 | 4/1/19 | 5.240% * | $75,325.00 | Ambac | $1,973.52 | $1,973.52 | $1,441.52 | $1,441.52 | $875.21 | $875.21 | $201.74 | $201.74 | | | | | | |
| **UTGO 2005-B** | | | | | | | | | | | | | | | | | | |
| 905295053 | 4/1/15 | 5.000% | $299,990.00 | Assured | $7,499.75 | $7,499.75 | | | | | | | | | | | | |
| 905295061 | 4/1/16 | 5.000% | $315,055.00 | Assured | $7,876.38 | $7,876.38 | $7,876.38 | $7,876.38 | | | | | | | | | | |
| 905295079 | 4/1/17 | 5.000% | $330,105.00 | Assured | $7,097.58 | $7,097.58 | $7,097.58 | $7,097.58 | $7,097.58 | $7,097.58 | | | | | | | | |
| 905295087 | 4/1/18 | 5.000% | $345,185.00 | Assured | $8,629.63 | $8,629.63 | $8,629.63 | $8,629.63 | $8,629.63 | $8,629.63 | $8,629.63 | $8,629.63 | | | | | | |
| 905295095 | 4/1/19 | 5.000% | $362,215.00 | Assured | $9,055.38 | $9,055.38 | $9,055.38 | $9,055.38 | $9,055.38 | $9,055.38 | $9,055.38 | $9,055.38 | $9,055.38 | $9,055.38 | | | | |
| 905295129 | 4/1/20 | 5.000% | $655,000.00 | Assured | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | | |
| 905295137 | 4/1/21 | 5.000% | $655,000.00 | Assured | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 |
| 905295145 | 4/1/22 | 5.000% | $655,000.00 | Assured | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 |
| 905295152 | 4/1/23 | 5.000% | $655,000.00 | Assured | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 |
| 905295160 | 4/1/24 | 5.000% | $655,000.00 | Assured | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 |
| 905295178 | 4/1/25 | 5.000% | $655,000.00 | Assured | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 |
| | | | $5,592,565.00 | | $138,408.71 | $138,408.71 | $130,908.96 | $130,908.96 | $123,032.58 | $123,032.58 | $115,935.00 | $115,935.00 | $107,305.38 | $107,305.38 | $98,250.00 | $98,250.00 | $81,875.00 | $81,875.00 |
| **UTGO 2005-C** | | | | | | | | | | | | | | | | | | |
| 905295331 | 4/1/15 | 5.000% | $300,955.00 | Assured | $7,548.88 | $7,548.88 | | | | | | | | | | | | |
| 905295349 | 4/1/16 | 5.000% | $317,675.00 | Assured | $7,941.88 | $7,941.88 | $7,941.88 | $7,941.88 | | | | | | | | | | |
| 905295323 | 4/1/17 | 4.300% | $333,305.00 | Assured | $7,167.99 | $7,167.99 | $7,167.99 | $7,167.99 | $7,167.99 | $7,167.99 | | | | | | | | |
| 905295B41 | 4/1/18 | 5.000% | $344,530.00 | Assured | $8,613.25 | $8,613.25 | $8,613.25 | $8,613.25 | $8,613.25 | $8,613.25 | $8,613.25 | $8,613.25 | | | | | | |
| 905295B58 | 4/1/19 | 3.250% | $358,285.00 | Assured | $9,404.98 | $9,404.98 | $9,404.98 | $9,404.98 | $9,404.98 | $9,404.98 | $9,404.98 | $9,404.98 | $9,404.98 | $9,404.98 | | | | |
| 905295B66 | 4/1/20 | 5.290% | $377,935.00 | Assured | $9,920.79 | $9,920.79 | $9,920.79 | $9,920.79 | $9,920.79 | $9,920.79 | $9,920.79 | $9,920.79 | $9,920.79 | $9,920.79 | $9,920.79 | $9,920.79 | | |
| | | | $2,033,775.00 | | $50,597.77 | $50,597.77 | $43,048.89 | $43,048.89 | $35,107.02 | $35,107.02 | $27,939.03 | $27,939.03 | $19,325.78 | $19,325.78 | $9,920.79 | $9,920.79 | | |
| **UTGO 2008-A** | | | | | | | | | | | | | | | | | | |
| 905295356 | 4/1/15 | 5.000% | $376,625.00 | Assured | $9,415.63 | $9,415.63 | | | | | | | | | | | | |
| 905295364 | 4/1/16 | 5.000% | $394,965.00 | Assured | $9,874.13 | $9,874.13 | $9,874.13 | $9,874.13 | | | | | | | | | | |
| 905295372 | 4/1/17 | 4.000% | $415,270.00 | Assured | $10,381.75 | $10,381.75 | $10,381.75 | $10,381.75 | $10,381.75 | $10,381.75 | | | | | | | | |
| 905295380 | 4/1/18 | 5.000% | $435,575.00 | Assured | $8,711.50 | $8,711.50 | $8,711.50 | $8,711.50 | $8,711.50 | $8,711.50 | $8,711.50 | $8,711.50 | | | | | | |
| 905295398 | 4/1/19 | 5.000% | $452,560.00 | Assured | $11,331.50 | $11,331.50 | $11,331.50 | $11,331.50 | $11,331.50 | $11,331.50 | $11,331.50 | $11,331.50 | $11,331.50 | $11,331.50 | | | | |
| 905295406 | 4/1/20 | 5.000% | $475,530.00 | Assured | $11,888.25 | $11,888.25 | $11,888.25 | $11,888.25 | $11,888.25 | $11,888.25 | $11,888.25 | $11,888.25 | $11,888.25 | $11,888.25 | $11,888.25 | $11,888.25 | | |
| 905295414 | 4/1/21 | 5.000% | $499,760.00 | Assured | $12,494.13 | $12,494.13 | $12,494.13 | $12,494.13 | $12,494.13 | $12,494.13 | $12,494.13 | $12,494.13 | $12,494.13 | $12,494.13 | $12,494.13 | $12,494.13 | $12,494.13 | $12,494.13 |
| 905295N84 | 4/1/22 | 5.000% | $524,635.00 | Assured | $13,116.38 | $13,116.38 | $13,116.38 | $13,116.38 | $13,116.38 | $13,116.38 | $13,116.38 | $13,116.38 | $13,116.38 | $13,116.38 | $13,116.38 | $13,116.38 | $13,116.38 | $13,116.38 |
| 905295N30 | 4/1/24 | 5.000% | $1,129,220.00 | Assured | $28,230.50 | $28,230.50 | $28,230.50 | $28,230.50 | $28,230.50 | $28,230.50 | $28,230.50 | $28,230.50 | $28,230.50 | $28,230.50 | $28,230.50 | $28,230.50 | $28,230.50 | $28,230.50 |
| 905295A65 | 4/1/25 | 5.000% | $2,017,360.00 | Assured | $65,434.50 | $65,434.50 | $65,434.50 | $65,434.50 | $65,434.50 | $65,434.50 | $65,434.50 | $65,434.50 | $65,434.50 | $65,434.50 | $65,434.50 | $65,434.50 | $65,434.50 | $65,434.50 |
| | | | $7,322,245.00 | | $180,878.25 | $180,878.25 | $171,462.63 | $171,462.63 | $161,588.50 | $161,588.50 | $151,206.75 | $151,206.75 | $142,495.25 | $142,495.25 | $131,163.75 | $131,163.75 | $119,275.50 | $119,275.50 |
| **UTGO 2008-B(1)** | | | | | | | | | | | | | | | | | | |
| 905295953 | 4/1/15 | 5.000% | $1,044,070.00 | Assured | $26,101.75 | $26,101.75 | | | | | | | | | | | | |
| 905295961 | 4/1/16 | 5.000% | $450,640.00 | Assured | $11,266.00 | $11,266.00 | $11,266.00 | $11,266.00 | | | | | | | | | | |
| 905295979 | 4/1/17 | 5.000% | $468,980.00 | Assured | $11,724.50 | $11,724.50 | $11,724.50 | $11,724.50 | $11,724.50 | $11,724.50 | | | | | | | | |
| 905295979P | 4/1/18 | 5.000% | $494,490.00 | Assured | $12,412.25 | $12,412.25 | $12,412.25 | $12,412.25 | $12,412.25 | $12,412.25 | $12,412.25 | $12,412.25 | | | | | | |
| | | | $2,460,280.00 | | $61,504.50 | $61,504.50 | $35,402.75 | $35,402.75 | $24,136.75 | $24,136.75 | $12,412.25 | $12,412.25 | | | | | | |
| **Total** | | | $43,349,210.00 | | $1,101,033.14 | $1,101,033.14 | $991,256.76 | $991,256.76 | $870,273.66 | $870,273.66 | $756,241.40 | $756,241.40 | $639,193.46 | $639,193.46 | $534,711.74 | $534,711.74 | $406,646.13 | $406,646.13 |

*Subject to Mandatory Redemption*

| CUSIP | Maturity Date | Rate | Principal | Insurer | 10/1/21 | 4/1/22 | 10/1/22 | 4/1/23 | 10/1/23 | 4/1/24 | 10/1/24 | 4/1/25 | 10/1/25 | 4/1/26 | 10/1/26 | 4/1/27 | 10/1/27 | 4/1/28 | Total Interest | Total Principal & Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **UTGO 1999-A** | | | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 5.250% | $373,350.00 | Assured | | | | | | | | | | | | | | | $19,600.88 | $392,950.88 |
| | 4/1/16 | 5.000% | $392,345.00 | Assured | | | | | | | | | | | | | | | $39,234.50 | $431,579.50 |
| | 4/1/17 | 5.000% | $411,955.00 | Assured | | | | | | | | | | | | | | | $61,799.25 | $473,784.25 |
| | 4/1/18 | 5.000% | $432,955.00 | Assured | | | | | | | | | | | | | | | $86,591.00 | $519,546.00 |
| | 4/1/19 | 5.000% | $454,570.00 | Assured | | | | | | | | | | | | | | | $113,642.50 | $568,212.50 |
| | | | $2,065,235.00 | | | | | | | | | | | | | | | | $320,868.13 | $2,386,093.13 |
| **UTGO 2001-A(1)** | | | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 5.375% | $778,140.00 | NPFG | | | | | | | | | | | | | | | $41,825.03 | $819,965.03 |
| | 4/1/16 | 5.375% | $820,060.00 | NPFG | | | | | | | | | | | | | | | $88,136.45 | $908,316.45 |
| | 4/1/17 | 5.375% | $884,600.00 | NPFG | | | | | | | | | | | | | | | $139,416.75 | $1,004,016.75 |
| | 4/1/18 | 5.375% | $1,834,000.00 | NPFG | | | | | | | | | | | | | | | $394,310.00 | $2,228,310.00 |
| | 4/1/19 | 5.000% | $1,834,000.00 | NPFG | | | | | | | | | | | | | | | $458,500.00 | $2,292,500.00 |
| | 4/1/20 | 5.000% | $1,834,000.00 | NPFG | | | | | | | | | | | | | | | $550,200.00 | $2,384,200.00 |
| | 4/1/21 | 5.000% | $1,834,000.00 | NPFG | | | | | | | | | | | | | | | $641,900.00 | $2,475,900.00 |
| | | | $9,759,900.00 | | | | | | | | | | | | | | | | $2,314,390.23 | $12,113,108.23 |
| **UTGO 2002** | | | | | | | | | | | | | | | | | | | | |
| | 4/1/21 | 5.125% | $424,440.00 | NPFG | $11,430.16 | | | | | | | | | | | | | | $122,267.85 | $536,707.85 |
| | 4/1/22 | 5.125% | $446,055.00 | NPFG | $11,430.16 | $11,430.16 | | | | | | | | | | | | | $182,982.55 | $629,037.55 |
| | | | $870,495.00 | | $11,430.16 | $11,430.16 | | | | | | | | | | | | | $335,250.40 | $1,205,745.40 |
| **UTGO 2003-A** | | | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 4.000% | $30,300.00 | Syncora | | | | | | | | | | | | | | | $1,372.00 | $40,572.00 |
| | 4/1/15 | 5.250% | $334,050.00 | Syncora | | | | | | | | | | | | | | | $17,537.63 | $351,587.63 |
| | 4/1/17 | 5.250% | $392,345.00 | Syncora | | | | | | | | | | | | | | | $41,196.23 | $433,541.23 |
| | 4/1/17 | 5.250% | $412,650.00 | Syncora | | | | | | | | | | | | | | | $64,992.38 | $477,642.38 |
| | 4/1/18 | 5.250% | $434,265.00 | Syncora | | | | | | | | | | | | | | | $91,195.65 | $525,460.65 |
| | 4/1/19 | 5.250% | $457,190.00 | Syncora | | | | | | | | | | | | | | | $120,001.38 | $577,201.38 |
| | 4/1/19 | 4.500% | $65,500.00 | Syncora | | | | | | | | | | | | | | | $17,685.00 | $83,185.00 |
| | 4/1/20 | 5.250% | $415,925.00 | Syncora | | | | | | | | | | | | | | | $131,016.38 | $546,941.38 |
| | 4/1/21 | 5.250% | $595,603.00 | Syncora | $1,514.69 | $1,514.69 | | | | | | | | | | | | | $146,941.38 | $691,493.05 |
| | 4/1/21 | 5.250% | $65,500.00 | Syncora | $12,230.14 | $12,230.14 | | | | | | | | | | | | | $165,680.05 | $89,735.00 |
| | 4/1/21 | 4.625% | $467,015.00 | Syncora | $4,544.06 | $4,544.06 | $4,544.06 | | | | | | | | | | | | $24,235.00 | $663,161.30 |
| | 4/1/22 | 5.250% | $196,500.00 | Syncora | $3,542.33 | $3,542.33 | | | | | | | | | | | | | $196,146.31 | $278,293.13 |
| | 4/1/23 | 5.250% | $565,525.00 | Syncora | | | | | | | | | | | | | | | $372,265.56 | $535,293.56 |
| | | | $4,149,425.00 | | $27,660.43 | $27,660.43 | $14,096.59 | $14,096.59 | | | | | | | | | | | $1,144,977.66 | $5,294,402.66 |
| **UTGO 2004-A(1)** | | | | | | | | | | | | | | | | | | | | |
| | 4/1/19 | 5.250% | $389,500.00 | Ambac | $23,830.54 | $23,830.54 | $1,105.31 | $1,105.31 | | | | | | | | | | | $154,743.75 | $744,243.75 |
| | 4/1/20 | 4.250% | $24,235.00 | Ambac | $1,105.31 | $1,105.31 | $1,105.31 | | | | | | | | | | | | $84,779.93 | $130,014.93 |
| | 4/1/20 | 5.250% | $397,135.00 | Ambac | $23,796.15 | $23,796.15 | $23,796.15 | | | | | | | | | | | | $263,097.53 | $1,040,232.53 |
| | 4/1/21 | 5.000% | $864,000.00 | Ambac | $2,365.21 | $2,365.21 | $2,365.21 | | | | | | | | | | | | $202,610.00 | $1,167,210.00 |
| | 4/1/22 | 5.250% | $907,830.00 | Ambac | $3,348.23 | $3,348.23 | $2,365.21 | $2,365.21 | | | | | | | | | | | $381,288.60 | $1,289,118.60 |
| | 4/1/23 | 4.500% | $49,125.00 | Ambac | | | | | | | | | | | | | | | $20,895.63 | $69,020.63 |
| | 4/1/23 | 5.250% | $906,520.00 | Ambac | | | | | | $2,365.21 | | | | | | | | | $428,330.70 | $1,334,850.70 |
| | 4/1/24 | 4.600% | $102,835.00 | Ambac | | | | $2,365.21 | | $2,365.21 | | | | | | | | | $43,304.10 | $146,139.10 |
| | 4/1/24 | 5.250% | $892,590.00 | Ambac | | | | $23,692.99 | $23,692.99 | $23,692.99 | | | | | | | | | $473,850.75 | $1,376,440.75 |
| | | | $5,144,270.00 | | $74,790.19 | $74,790.19 | $58,359.64 | $58,359.66 | $26,058.19 | $26,058.19 | | | | | | | | | $2,065,309.98 | $7,209,679.98 |

13-53846-swr   Doc 9303-3   Filed 02/05/15   Entered 02/05/15 20:27:34   Page 257 of 455

| CUSIP | Maturity Date | Rate | Principal | Insurer | Interest 10/1/21 | 4/1/22 | 10/1/22 | 4/1/23 | 10/1/23 | 4/1/24 | 10/1/24 | 4/1/25 | 10/1/25 | 4/1/26 | 10/1/26 | 4/1/27 | 10/1/27 | 4/1/28 | Total Interest | Total Principal & Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **UTGO 2004-B(1)** | | | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 5.000% | $1,136,475.00 | Ambac | | | | | | | | | | | | | | | $56,821.25 | $1,193,246.25 |
| | 4/1/16 | 5.250% | $1,192,755.00 | Ambac | | | | | | | | | | | | | | | $125,239.28 | $1,317,994.28 |
| | 4/1/17 | 4.000% | $39,955.00 | Ambac | | | | | | | | | | | | | | | $4,794.60 | $44,749.60 |
| | 4/1/18 | 5.250% | $1,215,680.00 | Ambac | | | | | | | | | | | | | | | $191,469.60 | $1,407,149.60 |
| | 4/1/18 | 5.250% | $262,000.00 | Ambac | | | | | | | | | | | | | | | $55,020.00 | $317,020.00 |
| | | | $3,846,915.00 | | | | | | | | | | | | | | | | $433,344.73 | $4,280,259.73 |
| **UTGO 2004-B(2)** | | | | | | | | | | | | | | | | | | | | |
| | 4/1/19 | 5.240% | $75,125.00 * | Ambac | | | | | | | | | | | | | | | $9,363.97 | $84,488.97 |
| **UTGO 2005-B** | | | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 5.000% | $299,090.00 | Assured | | | | | | | | | | | | | | | $14,999.50 | $314,089.50 |
| | 4/1/16 | 5.000% | $315,055.00 | Assured | | | | | | | | | | | | | | | $31,505.50 | $346,560.50 |
| | 4/1/17 | 4.300% | $330,120.00 | Assured | | | | | | | | | | | | | | | $42,085.48 | $372,205.48 |
| | 4/1/18 | 5.000% | $345,185.00 | Assured | | | | | | | | | | | | | | | $69,037.00 | $414,222.00 |
| | 4/1/19 | 5.000% | $362,215.00 | Assured | | | | | | | | | | | | | | | $90,333.75 | $452,548.75 |
| | 4/1/20 | 5.000% | $655,000.00 | Assured | | | | | | | | | | | | | | | $196,500.00 | $851,500.00 |
| | 4/1/21 | 5.000% | $655,000.00 | Assured | | | | | | | | | | | | | | | $229,250.00 | $884,250.00 |
| | 4/1/22 | 5.000% | $655,000.00 | Assured | $16,375.00 | $16,375.00 | | | | | | | | | | | | | $262,000.00 | $917,000.00 |
| | 4/1/23 | 5.000% | $655,000.00 | Assured | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | | | | | | | | | | | $294,750.00 | $949,750.00 |
| | 4/1/24 | 5.000% | $655,000.00 | Assured | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | | | | | | | | | $327,500.00 | $982,500.00 |
| | 4/1/25 | 5.020% | $655,000.00 | Assured | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | | | | | | | $360,250.00 | $1,015,250.00 |
| | | | $5,582,565.00 | | $65,500.00 | $65,500.00 | $49,125.00 | $49,125.00 | $32,750.00 | $32,750.00 | $16,375.00 | $16,375.00 | | | | | | | $1,918,931.23 | $7,501,496.23 |
| **UTGO 2005-C** | | | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 5.000% | $301,955.00 | Assured | | | | | | | | | | | | | | | $15,997.75 | $317,952.75 |
| | 4/1/16 | 5.000% | $317,675.00 | Assured | | | | | | | | | | | | | | | $31,767.50 | $349,442.50 |
| | 4/1/17 | 4.300% | $333,395.00 | Assured | | | | | | | | | | | | | | | $43,007.96 | $376,402.96 |
| | 4/1/18 | 5.000% | $344,530.00 | Assured | | | | | | | | | | | | | | | $68,906.00 | $413,436.00 |
| | 4/1/19 | 5.250% | $358,385.00 | Assured | | | | | | | | | | | | | | | $94,049.81 | $452,334.81 |
| | 4/1/20 | 5.250% | $377,958.00 | Assured | | | | | | | | | | | | | | | $121,940.53 | $459,686.53 |
| | | | $2,033,275.00 | | | | | | | | | | | | | | | | $375,478.54 | $2,408,653.54 |
| **UTGO 2006-A** | | | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 5.000% | $376,625.00 | Assured | | | | | | | | | | | | | | | $118,831.25 | $495,456.25 |
| | 4/1/16 | 5.000% | $394,565.00 | Assured | | | | | | | | | | | | | | | $39,496.50 | $434,461.50 |
| | 4/1/17 | 5.000% | $413,270.00 | Assured | | | | | | | | | | | | | | | $62,270.50 | $475,540.50 |
| | 4/1/18 | 4.000% | $433,575.00 | Assured | | | | | | | | | | | | | | | $69,692.00 | $505,267.00 |
| | 4/1/19 | 5.000% | $453,260.00 | Assured | | | | | | | | | | | | | | | $113,315.00 | $566,575.00 |
| | 4/1/20 | 5.000% | $475,530.00 | Assured | | | | | | | | | | | | | | | $142,659.00 | $618,189.00 |
| | 4/1/21 | 5.000% | $499,765.00 | Assured | | | | | | | | | | | | | | | $174,917.75 | $674,682.75 |
| | 4/1/22 | 5.000% | $526,655.00 | Assured | $13,116.38 | $13,116.38 | | | | | | | | | | | | | $209,862.00 | $736,517.00 |
| | 4/1/23 | 5.000% | $1,139,220.00 * | Assured | $28,230.50 | $28,230.50 | $28,230.50 | $14,450.13 | $14,450.13 | | | | | | | | | | $537,067.25 | ... |
| | 4/1/24 | 5.000% | $2,617,380.00 * | Assured | $65,434.50 | $65,434.50 | $65,434.50 | $65,434.50 | $79,993.63 | $79,993.63 | $65,434.50 | $65,434.50 | $50,254.88 | $50,254.88 | $34,305.63 | $34,305.63 | $17,570.38 | $17,570.38 | $1,466,267.23 | $4,263,279.75 |
| | 4/1/28 | 5.000% | | Assured | | | | | | | | | | | | | | | | |
| | | | $7,322,245.00 | | $106,781.38 | $106,781.38 | $93,665.00 | $93,665.00 | $79,993.63 | $79,993.63 | $65,434.50 | $65,434.50 | $50,254.88 | $50,254.88 | $34,305.63 | $34,305.63 | $17,570.38 | $17,570.38 | $3,011,933.00 | $10,334,197.00 |
| **UTGO 2008-B(1)** | | | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 5.000% | $1,044,070.00 | Assured | | | | | | | | | | | | | | | $52,203.50 | $1,096,273.50 |
| | 4/1/16 | 5.000% | $450,640.00 | Assured | | | | | | | | | | | | | | | $45,054.00 | $495,794.00 |
| | 4/1/17 | 5.000% | $466,080.00 | Assured | | | | | | | | | | | | | | | $70,347.00 | $539,377.00 |
| | 4/1/18 | 5.000% | $499,400.00 | Assured | | | | | | | | | | | | | | | $99,289.00 | $595,788.00 |
| | | | $2,460,180.00 | | | | | | | | | | | | | | | | $266,932.50 | $2,727,092.50 |
| **Total** | | | $43,349,210.00 | | $296,362.15 | $296,362.15 | $207,836.25 | $207,836.25 | $138,701.82 | $138,701.82 | $81,809.50 | $81,809.50 | $50,254.88 | $50,254.88 | $34,305.63 | $34,305.63 | $17,570.38 | $17,570.38 | $12,192,797.56 | $55,542,007.56 |

\* Subject to Mandatory Redemption

# UTGO Series STUB Bonds – Debt Service

## Bond Series Subject to Mandatory Redemption

### Issuance: 2004-B(2) — CUSIP 25893ZX1

| Date | Insurer | Fiscal Year | Mandatory Redemption Amounts | Outstanding | Rate | Interest |
|---|---|---|---|---|---|---|
| 10/1/14 | Ambac | 6/30/15 | - | $55,375.00 | 3.980% | $1,971.12 |
| 4/1/15 | Ambac | 6/30/15 | $20,505.00 | $55,020.00 | 5.240% | $1,973.52 |
| 10/1/15 | Ambac | 6/30/16 | - | $35,070.00 | 5.240% | $1,441.52 |
| 4/1/16 | Ambac | 6/30/16 | $35,615.00 | $35,085.00 | 5.240% | $1,441.52 |
| 10/1/16 | Ambac | 6/30/17 | - | $33,405.00 | 9.740% | $676.71 |
| 4/1/17 | Ambac | 6/30/17 | $11,335.00 | $11,535.00 | 5.240% | $875.21 |
| 10/1/17 | Ambac | 6/30/18 | - | $11,335.00 | 5.240% | $391.14 |
| 4/1/18 | Ambac | 6/30/18 | $11,335.00 | $11,335.00 | 5.360% | $391.14 |
| Total | | | $78,525.00 | | | $9,163.97 |

### Issuance: 2008-A — CUSIP 25893N55

| Date | Insurer | Fiscal Year | Mandatory Redemption Amounts | Outstanding | Rate | Interest |
|---|---|---|---|---|---|---|
| 10/1/14 | Assured | 6/30/15 | - | $1,229,220.00 | 5.000% | $28,230.30 |
| 4/1/15 | Assured | 6/30/15 | - | $1,129,270.00 | 3.000% | $28,230.30 |
| 10/1/15 | Assured | 6/30/16 | - | $1,179,290.00 | 5.000% | $28,230.30 |
| 4/1/16 | Assured | 8/20/19 | - | $1,129,220.00 | 5.000% | $28,230.30 |
| 10/1/16 | Assured | 6/20/17 | - | $1,129,220.00 | 3.000% | $28,230.30 |
| 4/1/17 | Assured | 6/30/17 | - | $1,129,220.00 | 5.000% | $28,230.30 |
| 10/1/17 | Assured | 6/20/18 | - | $1,129,220.00 | 5.000% | $28,230.30 |
| 4/1/18 | Assured | 6/30/18 | - | $1,129,220.00 | 5.000% | $28,230.30 |
| 10/1/18 | Assured | 6/30/19 | - | $1,179,270.00 | 5.000% | $28,230.30 |
| 4/1/19 | Assured | 6/30/19 | - | $1,129,220.00 | 3.000% | $28,230.30 |
| 10/1/19 | Assured | 6/30/20 | - | $1,129,220.00 | 5.000% | $28,230.30 |
| 4/1/20 | Assured | 6/30/20 | - | $1,129,220.00 | 3.000% | $28,230.30 |
| 10/1/20 | Assured | 6/30/21 | - | $1,129,220.00 | 5.000% | $28,230.30 |
| 4/1/21 | Assured | 6/30/21 | - | $1,129,220.00 | 5.000% | $28,230.30 |
| 10/1/21 | Assured | 6/30/22 | - | $1,129,220.00 | 5.000% | $28,230.30 |
| 4/1/22 | Assured | 6/30/22 | - | $1,129,220.00 | 5.000% | $28,230.30 |
| 10/1/2022 | Assured | 6/30/2023 | - | $1,129,220.00 | 5.900% | $78,230.50 |
| 4/1/2023 | Assured | 6/30/2023 | $330,955.00 | $379,365.00 | 3.000% | $28,230.50 |
| 10/1/2023 | Amended | 6/30/2024 | - | - | 3.000% | $16,459.13 |
| 4/1/2024 | Assured | 6/30/2024 | $378,365.00 | $578,365.00 | 5.000% | $14,459.13 |
| 10/1/2024 | Assured | 6/30/2025 | - | - | | |
| Total | | | $1,129,220.00 | | | $537,807.25 |

### Issuance: 2008-A — CUSIP 25893N65

| Date | Insurer | Fiscal Year | Mandatory Redemption Amounts | Outstanding | Rate | Interest |
|---|---|---|---|---|---|---|
| 10/1/14 | Assured | 6/30/15 | - | $2,617,380.00 | 3.000% | $65,434.50 |
| 4/1/15 | Assured | 6/30/15 | - | $2,617,380.00 | 5.000% | $65,434.50 |
| 10/1/15 | Assured | 6/30/16 | - | $2,617,380.00 | 3.000% | $65,434.50 |
| 4/1/16 | Assured | 6/30/16 | - | $2,617,380.00 | 5.000% | $65,434.50 |
| 10/1/16 | Assured | 6/30/17 | - | $2,617,380.00 | 3.000% | $65,434.50 |
| 4/1/17 | Assured | 6/30/17 | - | $3,617,380.00 | 5.000% | $65,434.50 |
| 10/1/17 | Assured | 6/30/18 | - | $2,617,380.00 | 3.000% | $65,434.50 |
| 4/1/18 | Assured | 6/30/18 | - | $2,617,380.00 | 5.320% | $65,434.50 |
| 10/1/18 | Assured | 6/00/19 | - | $2,617,380.00 | 5.000% | $65,434.50 |
| 4/1/19 | Assured | 6/30/19 | - | $2,617,380.00 | 5.000% | $65,434.50 |
| 10/1/20 | Assured | 6/30/20 | - | $2,617,380.00 | 5.000% | $65,434.50 |
| 10/1/20 | Assured | 6/30/21 | - | $2,617,380.00 | 5.000% | $65,434.50 |
| 4/1/21 | Assured | 6/30/21 | - | $2,617,380.00 | 3.000% | $65,434.50 |
| 10/1/21 | Assured | 6/30/22 | - | $2,617,380.00 | 5.000% | $65,434.50 |
| 4/1/22 | Assured | 6/30/22 | - | $2,617,380.00 | 3.000% | $65,434.50 |
| 10/1/2022 | Assured | 9/30/2023 | - | $2,617,380.00 | 5.000% | $65,434.50 |
| 4/1/2023 | Assured | 6/30/2024 | - | $2,617,380.00 | 5.000% | $65,434.50 |
| 10/1/2024 | Assured | 6/30/2024 | - | $2,617,380.00 | 3.000% | $65,434.50 |
| 4/1/2024 | Assured | 6/30/2025 | - | $2,617,380.00 | 5.000% | $65,434.50 |
| 10/1/2025 | Assured | 6/30/2025 | $607,185.00 | $2,004,195.00 | 5.000% | $65,434.50 |
| 4/1/2026 | Assured | 6/30/2026 | - | $2,010,195.00 | 3.000% | $50,204.88 |
| 4/1/2026 | Assured | 6/30/2026 | $435,970.00 | $1,372,235.00 | 5.000% | $50,204.88 |
| 11/1/2026 | Assured | 6/30/2027 | - | $1,317,225.00 | 5.000% | $34,305.63 |
| 4/1/2027 | Assured | 6/30/2027 | $669,410.00 | $702,815.00 | 5.000% | $34,305.63 |
| 10/1/2027 | Assured | 6/30/2028 | - | $702,815.00 | 3.000% | $17,570.38 |
| 4/1/2028 | Assured | 6/30/2028 | $702,815.00 | - | 5.000% | $17,570.38 |
| Total | | | $2,617,380.00 | | | $1,643,820.75 |

**EXHIBIT D**
**DEBT SERVICE REQUIREMENTS AND SET ASIDE LEDGER**

13-53846-swr  Doc 8303-3  Filed 12/5/14  Entered 12/5/14 19:09:34  Page 260 of
455
13-53846-swr  Doc 6903-3  Filed 08/20/14  Entered 08/20/14 23:27:34  Page 77 of
272

# UTGO Series 2014 DSA Fourth Lien Restructured Bonds
## Property Tax Set Asides

| Month | Year | Interest Set-Aside | Principal Set-Aside | Total Set-Aside | Interest Payments | Principal Payments | Balance Requirements |
|-------|------|-------------------|--------------------|-----------------|-------------------|--------------------|---------------------|
| September | 2014 | $7,303,799.99 | $15,602,895.00 | $22,906,694.99 | - | - | $22,906,694.99 |
| October | 2014 | | | | $7,303,799.99 | - | $15,602,895.00 |
| November | 2014 | $2,434,600.00 | $5,200,965.00 | $7,635,565.00 | - | - | $23,238,460.00 |
| January | 2015 | $2,434,600.00 | $5,200,965.00 | $7,635,565.00 | - | - | $30,874,024.99 |
| March | 2015 | $2,434,600.00 | $5,200,965.00 | $7,635,565.00 | - | - | $38,509,589.99 |
| April | 2015 | | | | $7,303,799.99 | $31,205,790.00 | - |
| September | 2015 | $6,509,252.86 | $14,253,772.50 | $20,763,025.36 | - | - | $20,763,025.36 |
| October | 2015 | | | | $6,509,252.86 | - | $14,253,772.50 |
| November | 2015 | $2,169,750.95 | $4,751,257.50 | $6,921,008.45 | - | - | $21,174,780.95 |
| January | 2016 | $2,169,750.95 | $4,751,257.50 | $6,921,008.45 | - | - | $28,095,789.41 |
| March | 2016 | $2,169,750.95 | $4,751,257.50 | $6,921,008.45 | - | - | $35,016,797.86 |
| April | 2016 | | | | $6,509,252.86 | $28,507,545.00 | - |
| September | 2016 | $5,773,048.66 | $14,975,042.50 | $20,748,091.16 | - | - | $20,748,091.16 |
| October | 2016 | | | | $5,773,048.66 | - | $14,975,042.50 |
| November | 2016 | $1,924,349.55 | $4,991,680.83 | $6,916,030.39 | - | - | $21,891,072.89 |
| January | 2017 | $1,924,349.55 | $4,991,680.83 | $6,916,030.39 | - | - | $28,807,103.28 |
| March | 2017 | $1,924,349.55 | $4,991,680.83 | $6,916,030.39 | - | - | $35,723,133.66 |
| April | 2017 | | | | $5,773,048.66 | $29,950,085.00 | - |
| September | 2017 | $5,016,593.72 | $15,244,432.50 | $20,261,026.22 | - | - | $20,261,026.22 |
| October | 2017 | | | | $5,016,593.72 | - | $15,244,432.50 |
| November | 2017 | $1,672,197.91 | $5,081,477.50 | $6,753,675.41 | - | - | $21,998,107.91 |
| January | 2018 | $1,672,197.91 | $5,081,477.50 | $6,753,675.41 | - | - | $28,751,783.32 |
| March | 2018 | $1,672,197.91 | $5,081,477.50 | $6,753,675.41 | - | - | $35,505,458.72 |
| April | 2018 | | | | $5,016,593.72 | $30,488,865.00 | - |
| September | 2018 | $4,240,145.92 | $14,955,490.00 | $19,195,635.92 | - | - | $19,195,635.92 |
| October | 2018 | | | | $4,240,145.92 | - | $14,955,490.00 |
| November | 2018 | $1,413,381.97 | $4,985,163.33 | $6,398,545.31 | - | - | $21,354,035.31 |
| January | 2019 | $1,413,381.97 | $4,985,163.33 | $6,398,545.31 | - | - | $27,752,580.61 |
| March | 2019 | $1,413,381.97 | $4,985,163.33 | $6,398,545.31 | - | - | $34,151,125.92 |
| April | 2019 | | | | $4,240,145.92 | $29,910,980.00 | - |
| September | 2019 | $3,480,721.39 | $15,407,370.00 | $18,888,091.39 | - | - | $18,888,091.39 |
| October | 2019 | | | | $3,480,721.39 | - | $15,407,370.00 |
| November | 2019 | $1,160,240.46 | $5,135,790.00 | $6,296,030.46 | - | - | $21,703,400.46 |
| January | 2020 | $1,160,240.46 | $5,135,790.00 | $6,296,030.46 | - | - | $27,999,430.92 |
| March | 2020 | $1,160,240.46 | $5,135,790.00 | $6,296,030.46 | - | - | $34,295,461.39 |
| April | 2020 | | | | $3,480,721.39 | $30,814,740.00 | - |
| September | 2020 | $2,698,849.50 | $15,865,767.50 | $18,564,617.00 | - | - | $18,564,617.00 |
| October | 2020 | | | | $2,698,849.50 | - | $15,865,767.50 |
| November | 2020 | $899,616.50 | $5,288,589.17 | $6,188,205.67 | - | - | $22,053,973.17 |
| January | 2021 | $899,616.50 | $5,288,589.17 | $6,188,205.67 | - | - | $28,242,178.83 |
| March | 2021 | $899,616.50 | $5,288,589.17 | $6,188,205.67 | - | - | $34,430,384.50 |
| April | 2021 | | | | $2,698,849.50 | $31,731,535.00 | - |
| September | 2021 | $1,899,608.47 | $10,169,472.50 | $12,069,080.97 | - | - | $12,069,080.97 |
| October | 2021 | | | | $1,899,608.47 | - | $10,169,472.50 |
| November | 2021 | $633,202.82 | $3,389,824.17 | $4,023,026.99 | - | - | $14,192,499.49 |
| January | 2022 | $633,202.82 | $3,389,824.17 | $4,023,026.99 | - | - | $18,215,526.48 |
| March | 2022 | $633,202.82 | $3,389,824.17 | $4,023,026.99 | - | - | $22,238,553.47 |
| April | 2022 | | | | $1,899,608.47 | $20,338,945.00 | - |
| September | 2022 | $1,378,700.00 | $9,026,737.50 | $10,405,437.50 | - | - | $10,405,437.50 |
| October | 2022 | | | | $1,378,700.00 | - | $9,026,737.50 |
| November | 2022 | $459,566.67 | $3,008,912.50 | $3,468,479.17 | - | - | $12,495,216.67 |
| January | 2023 | $459,566.67 | $3,008,912.50 | $3,468,479.17 | - | - | $15,963,695.83 |
| March | 2023 | $459,566.67 | $3,008,912.50 | $3,468,479.17 | - | - | $19,432,175.00 |
| April | 2023 | | | | $1,378,700.00 | $18,053,475.00 | - |
| September | 2023 | $920,090.68 | $7,425,605.00 | $8,345,695.68 | - | - | $8,345,695.68 |
| October | 2023 | | | | $920,090.68 | - | $7,425,605.00 |
| November | 2023 | $306,696.89 | $2,475,201.67 | $2,781,898.56 | - | - | $10,207,503.56 |

# UTGO Series 2014 DSA Fourth Lien Restructured Bonds
## Property Tax Set Asides

| Month | Year | Interest Set-Aside | Principal Set-Aside | Total Set-Aside | Interest Payments | Principal Payments | Balance Requirements |
|---|---|---|---|---|---|---|---|
| January | 2024 | $306,696.89 | $2,475,201.67 | $2,781,898.56 | - | - | $12,989,402.12 |
| March | 2024 | $306,696.89 | $2,475,201.67 | $2,781,898.56 | - | - | $15,771,300.68 |
| April | 2024 | - | - | - | $920,090.68 | $14,851,210.00 | - |
| September | 2024 | $542,690.50 | $4,186,407.50 | $4,729,098.00 | - | - | $4,729,098.00 |
| October | 2024 | - | - | - | $542,690.50 | - | $4,186,407.50 |
| November | 2024 | $180,896.83 | $1,395,469.17 | $1,576,366.00 | - | - | $5,762,773.50 |
| January | 2025 | $180,896.83 | $1,395,469.17 | $1,576,366.00 | - | - | $7,339,139.50 |
| March | 2025 | $180,896.83 | $1,395,469.17 | $1,576,366.00 | - | - | $8,915,505.50 |
| April | 2025 | - | - | - | $542,690.50 | $8,372,815.00 | - |
| September | 2025 | $333,370.13 | $2,116,015.00 | $2,449,385.13 | - | - | $2,449,385.13 |
| October | 2025 | - | - | - | $333,370.13 | - | $2,116,015.00 |
| November | 2025 | $111,123.38 | $705,338.33 | $816,461.71 | - | - | $2,932,476.71 |
| January | 2026 | $111,123.38 | $705,338.33 | $816,461.71 | - | - | $3,748,938.42 |
| March | 2026 | $111,123.38 | $705,338.33 | $816,461.71 | - | - | $4,565,400.13 |
| April | 2026 | - | - | - | $333,370.13 | $4,232,030.00 | - |
| September | 2026 | $227,569.38 | $2,220,295.00 | $2,447,864.38 | - | - | $2,447,864.38 |
| October | 2026 | - | - | - | $227,569.38 | - | $2,220,295.00 |
| November | 2026 | $75,856.46 | $740,098.33 | $815,954.79 | - | - | $3,036,249.79 |
| January | 2027 | $75,856.46 | $740,098.33 | $815,954.79 | - | - | $3,852,204.58 |
| March | 2027 | $75,856.46 | $740,098.33 | $815,954.79 | - | - | $4,668,159.38 |
| April | 2027 | - | - | - | $227,569.38 | $4,440,590.00 | - |
| September | 2027 | $116,554.63 | $2,331,092.50 | $2,447,647.13 | - | - | $2,447,647.13 |
| October | 2027 | - | - | - | $116,554.63 | - | $2,331,092.50 |
| November | 2027 | $38,851.54 | $777,030.83 | $815,882.38 | - | - | $3,146,974.88 |
| January | 2028 | $38,851.54 | $777,030.83 | $815,882.38 | - | - | $3,962,857.25 |
| March | 2028 | $38,851.54 | $777,030.83 | $815,882.38 | - | - | $4,778,739.63 |
| April | 2028 | - | - | - | $116,554.63 | $4,662,185.00 | - |
| Total | | | | | $80,881,992 | $287,560,790 | |

**EXHIBIT E**
**FEE SCHEDULE**



**U.S. Bank Customer Confidential**

### Schedule of Fees for Services as
### ESCROW TRUSTEE
### For
### City of Detroit Debt Millage Deposit Escrow Agreement

| | | |
|---|---|---|
| CTS01010A | **Acceptance Fee** The acceptance fee includes the administrative review of documents, initial set-up of the account, and other reasonably required services up to and including the closing. This is a one-time, non-refundable fee, payable at closing. | $1,000.00 |
| CTS04460 | **Escrow Trustee** Annual fee for the standard escrow agent services associated with the administration of the account. Administration fees are payable in advance. | $5,000.00 |
| | **Direct Out of Pocket Expenses** Reimbursement of expenses associated with the performance of our duties, including but not limited to publications, legal counsel after the initial close, travel expenses and filing fees. | At Cost |
| | **Extraordinary Services** Extraordinary Services are duties or responsibilities of an unusual nature, including termination, but not provided for in the governing documents or otherwise set forth in this schedule. A reasonable charge will be assessed based on the nature of the services and the responsibility involved. At our option, these charges will be billed at a flat fee or at our hourly rate then in effect. | |

Account approval is subject to review and qualification. Fees are subject to change at our discretion and upon written notice. Fees paid in advance will not be prorated. The fees set forth above and any subsequent modifications thereof are part of your agreement. Finalization of the transaction constitutes agreement to the above fee schedule, including agreement to any subsequent changes upon proper written notice. In the event your transaction is not finalized, any related out-of-pocket expenses will be billed to you directly. Absent your written instructions to sweep or otherwise invest, all sums in your account will remain uninvested and no accrued interest or other compensation will be credited to the account. Payment of fees constitutes acceptance of the terms and conditions set forth.

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT:
To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account.
For a non-individual person such as a business entity, a charity, a Trust or other legal entity we will ask for documentation to verify its formation and existence as a legal entity. We may also ask to see financial statements, licenses, identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.

**Dated: July 21, 2014**

**EXHIBIT F**
**PAYMENTS TO PLAN ASSIGNEES**

**Wire Instructions for the Plan Assignees:**

Police & Fire Retirement System of the City of Detroit, Income Stabilization Fund

General Retirement System of the City of Detroit, Income Stabilization Fund

General Retirement System of the City of Detroit, _____ Fund

**Schedule of Payments**

| Date | PFRS ISF | GRS ISF | GRS | Fund |
|------|----------|---------|-----|------|

A-6

## AGGREGATE PAYMENTS TO PLAN ASSIGNEES

| Date | Income Stabilization Funds | | GRS Pension | Total Payment |
| --- | --- | --- | --- | --- |
| | PFRS | GRS | | |
| 10/1/14 | $99,248.43 | $297,220.18 | $704,564.52 | $1,101,033.14 |
| 4/1/15 | $523,291.50 | $1,567,105.81 | $3,714,845.83 | $5,805,243.14 |
| 10/1/15 | $88,451.65 | $264,886.95 | $627,918.16 | $981,256.76 |
| 4/1/16 | $475,829.33 | $1,424,970.44 | $3,377,911.98 | $5,278,711.76 |
| 10/1/16 | $78,447.66 | $234,927.93 | $556,899.87 | $870,275.46 |
| 4/1/17 | $485,427.45 | $1,453,714.01 | $3,446,049.00 | $5,385,190.46 |
| 10/1/17 | $68,168.50 | $204,144.82 | $483,928.09 | $756,241.40 |
| 4/1/18 | $482,469.55 | $1,444,855.96 | $3,425,050.88 | $5,352,376.40 |
| 10/1/18 | $57,617.66 | $172,548.12 | $409,027.68 | $639,193.46 |
| 4/1/19 | $464,066.06 | $1,389,742.87 | $3,294,404.53 | $5,148,213.46 |
| 10/1/19 | $47,298.14 | $141,644.17 | $335,769.44 | $524,711.74 |
| 4/1/20 | $466,027.38 | $1,395,616.44 | $3,308,327.92 | $5,169,971.74 |
| 10/1/20 | $36,673.59 | $109,826.74 | $260,345.79 | $406,846.13 |
| 4/1/21 | $467,860.80 | $1,401,106.99 | $3,321,343.34 | $5,190,311.13 |
| 10/1/21 | $25,813.02 | $77,302.50 | $183,246.63 | $286,362.15 |
| 4/1/22 | $302,190.86 | $904,973.71 | $2,145,252.59 | $3,352,417.15 |
| 10/1/22 | $18,734.61 | $56,104.69 | $132,996.95 | $207,836.25 |
| 4/1/23 | $264,056.09 | $790,771.19 | $1,874,533.96 | $2,929,361.25 |
| 10/1/23 | $12,502.75 | $37,442.09 | $88,756.98 | $138,701.82 |
| 4/1/24 | $214,309.93 | $641,795.90 | $1,521,385.99 | $2,377,491.82 |
| 10/1/24 | $7,374.41 | $22,084.20 | $52,350.90 | $81,809.50 |
| 4/1/25 | $121,149.26 | $362,806.78 | $860,038.46 | $1,343,994.50 |
| 10/1/25 | $4,530.03 | $13,566.13 | $32,158.71 | $50,254.88 |
| 4/1/26 | $62,037.41 | $185,783.98 | $440,403.48 | $688,224.88 |
| 10/1/26 | $3,092.35 | $9,260.69 | $21,952.59 | $34,305.63 |
| 4/1/27 | $63,433.76 | $189,965.66 | $450,316.20 | $703,715.63 |
| 10/1/27 | $1,583.81 | $4,743.06 | $11,243.50 | $17,570.38 |
| 4/1/28 | $64,936.39 | $194,465.60 | $460,983.38 | $720,385.38 |
| | $5,006,622.37 | $14,993,377.63 | $35,542,007.36 | $55,542,007.36 |

# UTGO Series STUB Bonds - Debt Service (PFRS ISF Allocation)

| CUSIP | Maturity Date | Rate | Principal | Insurer | Interest | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 10/1/14 | 4/1/15 | 10/1/15 | 4/1/16 | 10/1/16 | 4/1/17 | 10/1/17 | 4/1/18 | 10/1/18 | 4/1/19 | 10/1/19 | 4/1/20 | 10/1/20 | 4/1/21 |
| **UTGO Series 1999-A** | | | | | | | | | | | | | | | | | | |
| 3932D3 | 4/1/15 | 5.250% | $33,654.21 | Assured | 863.42 | 863.42 | | | | | | | | | | | | |
| 3932N1 | 4/1/15 | 5.000% | $35,366.44 | Assured | 884.16 | 884.16 | 884.16 | 884.16 | | | | | | | | | | |
| 3932V6 | 4/1/17 | 5.000% | $37,337.72 | Assured | 928.44 | 928.44 | 928.44 | 928.44 | 928.44 | 928.44 | | | | | | | | |
| 3932U8 | 4/1/19 | 5.000% | $39,027.08 | Assured | 975.68 | 975.68 | 975.68 | 975.68 | 975.68 | 975.68 | 975.68 | 975.68 | | | | | | |
| 3932R2 | 4/1/19 | 5.000% | $40,973.48 | Assured | 1,024.39 | 1,024.39 | 1,024.39 | 1,024.39 | 1,024.39 | 1,024.39 | 1,024.39 | 1,024.39 | 1,024.39 | 1,024.39 | | | | |
| 0000000 | | | $186,360.93 | | $4,676.09 | $4,676.09 | $3,812.67 | $3,812.67 | $2,928.51 | $2,928.51 | $2,000.06 | $2,000.06 | $1,024.39 | $1,024.39 | | | | |
| **UTGO Series 2001-AD** | | | | | | | | | | | | | | | | | | |
| 3932C6 | 4/1/15 | 5.375% | $70,942.46 | NPFG | 1,885.08 | 1,885.08 | | | | | | | | | | | | |
| 3932K3 | 4/1/16 | 5.375% | $73,921.18 | NPFG | 1,986.63 | 1,986.63 | 1,986.63 | 1,986.63 | | | | | | | | | | |
| 3932V5 | 4/1/17 | 5.375% | $77,936.07 | NPFG | 2,094.53 | 2,094.53 | 2,094.53 | 2,094.53 | 2,094.53 | 2,094.53 | | | | | | | | |
| 3932W9 | 4/1/18 | 5.375% | $165,318.93 | NPFG | 4,442.95 | 4,442.95 | 4,442.95 | 4,442.95 | 4,442.95 | 4,442.95 | 4,442.95 | 4,442.95 | | | | | | |
| 3932V7 | 4/1/19 | 5.000% | $165,318.93 | NPFG | 4,132.97 | 4,132.97 | 4,132.97 | 4,132.97 | 4,132.97 | 4,132.97 | 4,132.97 | 4,132.97 | 4,132.97 | 4,132.97 | | | | |
| 3932Q0 | 4/1/20 | 5.000% | $165,318.93 | NPFG | 4,132.97 | 4,132.97 | 4,132.97 | 4,132.97 | 4,132.97 | 4,132.97 | 4,132.97 | 4,132.97 | 4,132.97 | 4,132.97 | 4,132.97 | 4,132.97 | | |
| 0000000 | | | $883,275.45 | | $22,808.11 | $22,808.11 | $20,923.03 | $20,923.03 | $18,936.40 | $18,936.40 | $16,841.87 | $16,841.87 | $12,398.92 | $12,398.92 | $8,265.95 | $4,132.97 | $4,132.97 | $4,132.97 |
| **UTGO Series 2002** | | | | | | | | | | | | | | | | | | |
| 3932W9 | 4/1/21 | 5.125% | $39,259.32 | NPFG | 980.40 | 980.40 | 980.40 | 980.40 | 980.40 | 980.40 | 980.40 | 980.40 | 980.40 | 980.40 | 980.40 | 980.40 | 980.40 | 980.40 |
| 3932W0 | 4/1/22 | 5.125% | $40,207.93 | NPFG | 1,030.33 | 1,030.33 | 1,030.33 | 1,030.33 | 1,030.33 | 1,030.33 | 1,030.33 | 1,030.33 | 1,030.33 | 1,030.33 | 1,030.33 | 1,030.33 | 1,030.33 | 1,030.33 |
| | | | $79,467.45 | | $2,010.73 | $2,010.73 | $2,010.73 | $2,010.73 | $2,010.73 | $2,010.73 | $2,010.73 | $2,010.73 | $2,010.73 | $2,010.73 | $2,010.73 | $2,010.73 | $2,010.73 | $2,010.73 |
| **UTGO Series 2003-A** | | | | | | | | | | | | | | | | | | |
| 3932P9 | 4/1/15 | 4.000% | $3,542.55 | Syncora | 70.85 | 70.85 | | | | | | | | | | | | |
| 3932N2 | 4/1/16 | 5.250% | $30,111.66 | Syncora | 790.43 | 790.43 | 790.43 | 790.43 | | | | | | | | | | |
| 3932J4 | 4/1/16 | 5.250% | $35,366.44 | Syncora | 928.37 | 928.37 | 928.37 | 928.37 | | | | | | | | | | |
| 3932S4 | 4/1/17 | 5.250% | $3,515.76 | Syncora | 976.41 | 976.41 | 976.41 | 976.41 | 976.41 | 976.41 | | | | | | | | |
| 3932T2 | 4/1/18 | 5.250% | $39,145.16 | Syncora | 1,027.56 | 1,027.56 | 1,027.56 | 1,027.56 | 1,027.56 | 1,027.56 | 1,027.56 | 1,027.56 | | | | | | |
| 3932L9 | 4/1/18 | 4.500% | $41,211.65 | Syncora | 1,081.81 | 1,081.81 | 1,081.81 | 1,081.81 | 1,081.81 | 1,081.81 | 1,081.81 | 1,081.81 | | | | | | |
| 3932X3 | 4/1/19 | 4.500% | $5,994.25 | Syncora | 132.85 | 132.85 | 132.85 | 132.85 | 132.85 | 132.85 | 132.85 | 132.85 | 132.85 | 132.85 | | | | |
| 3932Y1 | 4/1/20 | 5.250% | $37,491.97 | Syncora | 984.16 | 984.16 | 984.16 | 984.16 | 984.16 | 984.16 | 984.16 | 984.16 | 984.16 | 984.16 | 984.16 | | | |
| 3932X5 | 4/1/21 | 5.250% | $45,080.79 | Syncora | 1,196.50 | 1,196.50 | 1,196.50 | 1,196.50 | 1,196.50 | 1,196.50 | 1,196.50 | 1,196.50 | 1,196.50 | 1,196.50 | 1,196.50 | 1,196.50 | 1,196.50 | |
| 3932X4 | 4/1/22 | 4.625% | $5,904.25 | Syncora | 136.54 | 136.54 | 136.54 | 136.54 | 136.54 | 136.54 | 136.54 | 136.54 | 136.54 | 136.54 | 136.54 | 136.54 | 136.54 | 136.54 |
| 3932Z8 | 4/1/23 | 5.250% | $42,077.29 | Syncora | 1,105.05 | 1,105.05 | 1,105.05 | 1,105.05 | 1,105.05 | 1,105.05 | 1,105.05 | 1,105.05 | 1,105.05 | 1,105.05 | 1,105.05 | 1,105.05 | 1,105.05 | 1,105.05 |
| 3932Y0 | 4/1/23 | 4.625% | $17,712.74 | Syncora | 409.61 | 409.61 | 409.61 | 409.61 | 409.61 | 409.61 | 409.61 | 409.61 | 409.61 | 409.61 | 409.61 | 409.61 | 409.61 | 409.61 |
| 3932Y0 | 4/1/24 | 5.250% | $32,348.57 | Syncora | 860.18 | 860.18 | 860.18 | 860.18 | 860.18 | 860.18 | 860.18 | 860.18 | 860.18 | 860.18 | 860.18 | 860.18 | 860.18 | 860.18 |
| | | | $374,054.09 | | $9,700.31 | $9,700.31 | $8,859.03 | $8,859.03 | $7,909.66 | $7,909.66 | $6,934.24 | $6,934.24 | $5,906.68 | $5,906.68 | $4,824.88 | $3,707.87 | $3,707.87 | $3,707.87 |
| **UTGO Series 2004-AD** | | | | | | | | | | | | | | | | | | |
| 3937X2 | 4/1/15 | 5.250% | $53,138.23 | Ambac | 1,394.88 | 1,394.88 | | | | | | | | | | | | |
| 3937Y0 | 4/1/15 | 4.250% | $2,184.57 | Ambac | 46.42 | 46.42 | | | | | | | | | | | | |
| 3937V6 | 4/1/16 | 5.250% | $71,864.69 | Ambac | 1,886.19 | 1,886.19 | 1,886.19 | 1,886.19 | | | | | | | | | | |
| 3937Z5 | 4/1/16 | 5.000% | $77,730.07 | Ambac | 1,948.40 | 1,948.40 | 1,948.40 | 1,948.40 | | | | | | | | | | |
| 3937Z7 | 4/1/17 | 5.000% | $85,830.82 | Ambac | 2,148.11 | 2,148.11 | 2,148.11 | 2,148.11 | 2,148.11 | 2,148.11 | | | | | | | | |
| 3937Z9 | 4/1/17 | 4.500% | $4,428.19 | Ambac | 99.63 | 99.63 | 99.63 | 99.63 | 99.63 | 99.63 | | | | | | | | |
| 3932C3 | 4/1/18 | 4.500% | $91,714.79 | Ambac | 2,145.01 | 2,145.01 | 2,145.01 | 2,145.01 | 2,145.01 | 2,145.01 | 2,145.01 | 2,145.01 | | | | | | |
| 3932D3 | 4/1/19 | 5.250% | $9,203.67 | Ambac | 213.20 | 213.20 | 213.20 | 213.20 | 213.20 | 213.20 | 213.20 | 213.20 | 213.20 | 213.20 | | | | |
| 3932F0 | 4/1/24 | 4.600% | $91,360.51 | Ambac | 2,135.71 | 2,135.71 | 2,135.71 | 2,135.71 | 2,135.71 | 2,135.71 | 2,135.71 | 2,135.71 | 2,135.71 | 2,135.71 | 2,135.71 | 2,135.71 | 2,135.71 | 2,135.71 |
| | | | $469,339.61 | | $12,017.56 | $12,017.56 | $12,017.56 | $12,017.56 | $12,017.56 | $12,017.56 | $12,017.56 | $12,017.56 | $12,017.56 | $12,017.56 | $10,622.69 | $8,690.08 | $8,690.08 | $8,690.08 |

*Subject to Mandatory Redemption

| CUSIP | Maturity Date | Rate | Insurer | Principal | 10/1/14 | 4/1/15 | 10/1/15 | 4/1/16 | 10/1/16 | 4/1/17 | 10/1/17 | 4/1/18 | 10/1/18 | 4/1/19 | 10/1/19 | 4/1/20 | 10/1/20 | 4/1/21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Interest | | | | | | | |
| **2004-B(I)** | | | | | | | | | | | | | | | | | | |
| 5932J28 | 4/1/15 | 5.000% | Ambac | $102,438.70 | $2,560.97 | $2,560.97 | | | | | | | | | | | | |
| 5932J30 | 4/1/16 | 5.250% | Ambac | $105,536.35 | $2,822.30 | $2,822.30 | $2,822.30 | $2,822.30 | | | | | | | | | | |
| 5932J84 | 4/1/17 | 4.000% | Ambac | $3,661.59 | $72.03 | $72.03 | $72.03 | $72.03 | $72.03 | $72.03 | | | | | | | | |
| 5932J52 | 4/1/18 | 5.250% | Ambac | $109,580.84 | $2,876.55 | $2,876.55 | $2,876.55 | $2,876.55 | $2,876.55 | $2,876.55 | $2,876.55 | | | | | | | |
| 5932J70 | 4/1/18 | 5.250% | Ambac | $25,616.99 | $619.95 | $619.95 | $619.95 | $619.95 | $619.95 | $619.95 | $619.95 | $619.95 | | | | | | |
| | | | | $346,736.46 | $8,951.80 | $8,951.80 | $6,390.83 | $6,390.83 | $3,568.53 | $3,568.53 | $3,496.50 | $619.95 | | | | | | |
| **2004-B(2)** | | | | | | | | | | | | | | | | | | |
| 5932J21 | 4/1/19 | 5.240% | Ambac | $6,789.98 | $177.89 | $177.89 | $129.94 | $129.94 | $78.80 | $78.80 | $26.30 | $26.30 | | | | | | |
| **2005-B** | | | | | | | | | | | | | | | | | | |
| 59631K53 | 4/1/15 | 5.000% | Assured | $27,041.45 | $676.04 | $676.04 | | | | | | | | | | | | |
| 59631K61 | 4/1/16 | 5.000% | Assured | $28,399.43 | $709.99 | $709.99 | $709.99 | $709.99 | | | | | | | | | | |
| 59631K79 | 4/1/17 | 4.300% | Assured | $20,751.41 | $630.78 | $630.78 | $630.78 | $630.78 | $630.78 | $630.78 | | | | | | | | |
| 59631K87 | 4/1/18 | 5.000% | Assured | $31,135.34 | $777.88 | $777.88 | $777.88 | $777.88 | $777.88 | $777.88 | $777.88 | $777.88 | | | | | | |
| 59631K95 | 4/1/19 | 5.000% | Assured | $32,650.49 | $816.26 | $816.26 | $816.26 | $816.26 | $816.26 | $816.26 | $816.26 | $816.26 | $816.26 | | | | | |
| 59631J37 | 4/1/20 | 5.000% | Assured | $59,042.48 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | | | | |
| 59631J45 | 4/1/21 | 5.000% | Assured | $59,042.48 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | | |
| 59631J52 | 4/1/22 | 5.000% | Assured | $50,042.48 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | |
| 59631J52 | 4/1/23 | 5.000% | Assured | $59,042.48 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 |
| 59631J60 | 4/1/24 | 5.000% | Assured | $59,042.48 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 |
| 59631J78 | 4/1/25 | 5.000% | Assured | $59,042.48 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 |
| | | | | $503,209.03 | $12,476.32 | $12,476.32 | $11,800.29 | $11,800.29 | $11,090.30 | $11,090.30 | $10,459.52 | $9,672.63 | $9,672.63 | $8,856.57 | $7,380.31 | | | |
| **2005-C** | | | | | | | | | | | | | | | | | | |
| 59635C53 | 4/1/15 | 5.000% | Assured | $27,218.58 | $680.46 | $680.46 | | | | | | | | | | | | |
| 59635C25 | 4/1/16 | 5.000% | Assured | $26,635.60 | $715.89 | $715.89 | $715.89 | $715.89 | | | | | | | | | | |
| 59635C33 | 4/1/17 | 4.300% | Assured | $30,052.02 | $646.13 | $646.13 | $646.13 | $646.13 | $646.13 | $646.13 | | | | | | | | |
| 59635D41 | 4/1/18 | 5.000% | Assured | $31,026.23 | $776.41 | $776.41 | $776.41 | $776.41 | $776.41 | $776.41 | $776.41 | | | | | | | |
| 59635C58 | 4/1/19 | 3.250% | Assured | $33,296.23 | $847.78 | $847.78 | $847.78 | $847.78 | $847.78 | $847.78 | $847.78 | $847.78 | $847.78 | | | | | |
| 59635C06 | 4/1/20 | 5.250% | Assured | $34,007.51 | $894.27 | $894.27 | $894.27 | $894.27 | $894.27 | $894.27 | $894.27 | $894.27 | $894.27 | $894.27 | | | | |
| | | | | $183,309.89 | $4,540.94 | $4,540.94 | $3,880.48 | $3,880.48 | $3,164.59 | $3,164.59 | $2,518.46 | $1,742.05 | $1,742.05 | $894.27 | | | |
| **2006-A** | | | | | | | | | | | | | | | | | | |
| 593570G4 | 4/1/15 | 5.000% | Assured | $33,949.42 | $848.74 | $848.74 | | | | | | | | | | | | |
| 593570G4 | 4/1/16 | 5.000% | Assured | $35,602.61 | $890.07 | $890.07 | $890.07 | $890.07 | | | | | | | | | | |
| 593570H2 | 4/1/17 | 5.000% | Assured | $37,432.93 | $935.82 | $935.82 | $935.82 | $935.82 | $935.82 | $935.82 | | | | | | | | |
| 593570J8 | 4/1/18 | 4.000% | Assured | $39,263.73 | $785.26 | $785.26 | $785.26 | $785.26 | $785.26 | $785.26 | $785.26 | | | | | | | |
| 593570K5 | 4/1/19 | 5.000% | Assured | $40,857.39 | $1,021.43 | $1,021.43 | $1,021.43 | $1,021.43 | $1,021.43 | $1,021.43 | $1,021.43 | $1,021.43 | $1,021.43 | | | | | |
| 593570L3 | 4/1/20 | 5.000% | Assured | $42,656.84 | $1,071.62 | $1,071.62 | $1,071.62 | $1,071.62 | $1,071.62 | $1,071.62 | $1,071.62 | $1,071.62 | $1,071.62 | $1,071.62 | | | | |
| 593570M1 | 4/1/21 | 5.000% | Assured | $45,049.41 | $1,126.24 | $1,126.24 | $1,126.24 | $1,126.24 | $1,126.24 | $1,126.24 | $1,126.24 | $1,126.24 | $1,126.24 | $1,126.24 | $1,126.24 | $1,126.24 | | |
| 593570N9 | 4/1/22 | 5.000% | Assured | $47,293.02 | $1,182.33 | $1,182.33 | $1,182.33 | $1,182.33 | $1,182.33 | $1,182.33 | $1,182.33 | $1,182.33 | $1,182.33 | $1,182.33 | $1,182.33 | $1,182.33 | $1,182.33 | |
| 593570P4 | 4/1/23 | 5.000% | Assured | $101,780.23 | $2,544.73 | $2,544.73 | $2,544.73 | $2,544.73 | $2,544.73 | $2,544.73 | $2,544.73 | $2,544.73 | $2,544.73 | $2,544.73 | $2,544.73 | $2,544.73 | $2,544.73 | $2,544.73 |
| 593570Q2 | 4/1/24 | 5.000% | Assured | $219,033.74 | $5,898.34 | $5,898.34 | $5,898.34 | $5,898.34 | $5,898.34 | $5,898.34 | $5,898.34 | $5,898.34 | $5,898.34 | $5,898.34 | $5,898.34 | $5,898.34 | $5,898.34 | $5,898.34 |
| | | | | $660,035.84 | $16,304.58 | $16,304.58 | $15,453.84 | $15,453.84 | $14,565.78 | $14,565.78 | $13,629.96 | $12,844.69 | $12,844.69 | $11,823.26 | $10,751.63 | | | |
| **2006-B(I)** | | | | | | | | | | | | | | | | | | |
| 593793T3 | 4/1/15 | 5.000% | Assured | $74,113.71 | $2,352.84 | $2,352.84 | | | | | | | | | | | | |
| 593793N1 | 4/1/16 | 5.000% | Assured | $40,621.22 | $1,015.53 | $1,015.53 | $1,015.53 | $1,015.53 | | | | | | | | | | |
| 593793U0 | 4/1/17 | 4.000% | Assured | $42,274.41 | $1,056.86 | $1,056.86 | $1,056.86 | $1,056.86 | $1,056.86 | $1,056.86 | | | | | | | | |
| 593793R7 | 4/1/18 | 5.000% | Assured | $44,734.50 | $1,118.85 | $1,118.85 | $1,118.85 | $1,118.85 | $1,118.85 | $1,118.85 | $1,118.85 | $1,118.85 | | | | | | |
| | | | | $221,743.54 | $5,544.09 | $5,544.09 | $3,191.25 | $3,191.25 | $2,175.72 | $2,175.72 | $1,118.85 | $1,118.85 | | | | | |
| | | | | $3,991,549.11 | $99,246.43 | $99,246.43 | $88,435.65 | $88,435.65 | $79,347.66 | $79,347.66 | $68,168.50 | $57,617.66 | $57,617.66 | $47,296.14 | $47,296.14 | $36,673.59 | $36,673.59 | $36,673.59 |

# UTGO Series STUB Bonds - Debt Service (PFRS ISF Allocation)

|  |  |  |  |  | Interest |  |  |  |  |  | Total Interest | Total Principal & Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CUSIP | Maturity Date | Rate | Principal | Insurer | 10/1/21 | 4/1/22 | 10/1/22 | 4/1/23 | 10/1/23 | 4/1/24 | | |
| **UTGO 1999-A** | | | | | | | | | | | | |
| …A5 | 4/1/15 | 5.250% | $33,654.21 | Assured | - | - | - | - | - | - | $1,766.85 | $35,421.06 |
| …N1 | 4/1/16 | 5.000% | $35,366.44 | Assured | - | - | - | - | - | - | $3,531.64 | $38,898.09 |
| …P6 | 4/1/17 | 5.000% | $37,137.72 | Assured | - | - | - | - | - | - | $5,570.66 | $42,708.38 |
| …86 | 4/1/18 | 5.000% | $39,027.08 | Assured | - | - | - | - | - | - | $7,805.42 | $46,832.49 |
| …Q4 | 4/1/19 | 5.000% | $41,075.48 | Assured | - | - | - | - | - | - | $10,243.87 | $51,319.35 |
| | | | $186,160.93 | | | | | | | | $28,923.45 | $215,084.36 |
| **UTGO 2001-AU** | | | | | | | | | | | | |
| …06 | 4/1/15 | 5.375% | $70,142.46 | NPFG | - | - | - | - | - | - | $3,770.16 | $73,912.62 |
| …K3 | 4/1/16 | 5.375% | $73,921.18 | NPFG | - | - | - | - | - | - | $7,946.53 | $81,867.71 |
| …L1 | 4/1/17 | 5.375% | $77,936.07 | NPFG | - | - | - | - | - | - | $12,367.19 | $90,303.26 |
| …M9 | 4/1/18 | 5.375% | $165,318.93 | NPFG | - | - | - | - | - | - | $35,543.57 | $200,862.50 |
| …N7 | 4/1/19 | 5.000% | $165,318.93 | NPFG | - | - | - | - | - | - | $41,329.73 | $206,648.67 |
| …P2 | 4/1/20 | 5.000% | $165,318.93 | NPFG | - | - | - | - | - | - | $49,595.68 | $214,914.61 |
| …Q0 | 4/1/21 | 5.000% | $165,318.93 | NPFG | - | - | - | - | - | - | $57,861.63 | $223,180.56 |
| | | | $883,275.45 | | | | | | | | $206,014.49 | $1,091,489.93 |
| **UTGO 2002** | | | | | | | | | | | | |
| …W8 | 4/1/21 | 5.125% | $38,259.53 | NPFG | $1,030.33 | $1,030.33 | - | - | - | - | $13,725.60 | $51,985.13 |
| …W6 | 4/1/22 | 5.125% | $40,207.93 | NPFG | $1,030.33 | $1,030.33 | - | - | - | - | $16,485.25 | $56,693.18 |
| | | | $78,467.45 | | $1,030.33 | $1,030.33 | | | | | $30,210.85 | $108,678.31 |
| **UTGO 2003-A** | | | | | | | | | | | | |
| …P9 | 4/1/15 | 4.000% | $3,542.55 | Syncora | - | - | - | - | - | - | $141.70 | $3,684.25 |
| …Q8 | 4/1/15 | 5.250% | $30,111.44 | Syncora | - | - | - | - | - | - | $1,580.86 | $31,692.53 |
| …R6 | 4/1/16 | 5.250% | $35,366.44 | Syncora | - | - | - | - | - | - | $3,713.48 | $39,079.92 |
| …S4 | 4/1/17 | 5.250% | $37,196.76 | Syncora | - | - | - | - | - | - | $5,858.49 | $43,055.25 |
| …T2 | 4/1/18 | 5.250% | $39,145.16 | Syncora | - | - | - | - | - | - | $8,220.48 | $47,365.05 |
| …U9 | 4/1/19 | 5.250% | $41,211.65 | Syncora | - | - | - | - | - | - | $10,818.06 | $52,029.71 |
| …V7 | 4/1/20 | 4.500% | $35,904.25 | Syncora | - | - | - | - | - | - | $11,594.15 | $47,498.39 |
| …W5 | 4/1/20 | 5.250% | $37,493.97 | Syncora | - | - | - | - | - | - | $11,809.97 | $49,303.94 |
| …X3 | 4/1/21 | 5.250% | $45,389.79 | Syncora | - | - | - | - | - | - | $16,750.94 | $62,331.73 |
| …Y1 | 4/1/21 | 4.625% | $5,904.25 | Syncora | $136.54 | $136.54 | - | - | - | - | $2,184.57 | $48,088.82 |
| …Z8 | 4/1/22 | 5.250% | $42,097.29 | Syncora | $1,105.05 | $1,105.05 | - | - | - | - | $17,046.94 | $59,778.15 |
| …A2 | 4/1/22 | 4.625% | $17,712.74 | Syncora | $409.61 | $409.61 | $409.61 | - | - | - | $17,372.93 | $25,085.67 |
| …B0 | 4/1/23 | 5.350% | $32,768.57 | Syncora | $860.18 | $860.18 | $860.18 | $860.18 | - | - | $25,493.15 | $58,251.73 |
| | | | $370,034.09 | | $2,511.37 | $2,511.37 | $1,269.78 | $1,269.78 | | | $103,209.64 | $477,243.73 |
| **UTGO 2004-AU** | | | | | | | | | | | | |
| …C2 | 4/1/19 | 5.250% | $53,138.23 | Ambac | - | - | - | - | - | - | $13,948.79 | $67,087.01 |
| …V0 | 4/1/20 | 4.250% | $2,184.37 | Ambac | - | - | - | - | - | - | $557.07 | $2,741.44 |
| …V7 | 4/1/20 | 5.200% | $71,854.60 | Ambac | - | - | - | - | - | - | $22,634.23 | $94,488.92 |
| …Z1 | 4/1/21 | 5.000% | $77,936.07 | Ambac | - | - | - | - | - | - | $27,277.62 | $106,213.69 |
| …A1 | 4/1/21 | 5.250% | $81,838.87 | Ambac | $2,148.11 | $2,148.11 | - | - | - | - | $34,369.81 | $116,202.68 |
| …B9 | 4/1/22 | 5.250% | $4,428.19 | Ambac | $99.63 | $99.63 | $99.63 | $99.63 | - | - | $1,793.42 | $6,221.60 |
| …C7 | 4/1/22 | 4.500% | $81,774.79 | Ambac | $2,145.01 | $2,145.01 | $2,145.01 | $2,145.01 | - | - | $38,010.24 | $120,325.02 |
| …D5 | 4/1/23 | 5.250% | $4,264.35 | Ambac | $2,135.71 | $2,135.71 | $2,135.71 | $2,135.71 | $2,135.71 | $213.20 | $4,284.35 | $113,533.72 |
| …E3 | 4/1/23 | 4.600% | $9,269.67 | Ambac | $213.20 | $213.20 | $213.20 | $213.20 | $213.20 | $213.20 | $4,274.28 | $126,054.81 |
| …U0 | 4/1/24 | 5.200% | $81,360.53 | Ambac | $2,135.71 | $2,135.71 | $2,135.71 | $2,135.71 | $2,135.71 | $2,135.71 | | |
| | | | $663,739.61 | | $6,741.68 | $6,741.68 | $4,593.56 | $4,593.56 | $2,348.92 | $2,348.92 | $186,169.99 | $649,889.10 |

Refers to Mandatory Redemption

# UTGO Series STUB Bonds - Debt Service (PFRS ISF Allocation)

| CUSIP | Maturity Date | Rate | Principal | Insurer | Interest 10/1/21 | 4/1/22 | 10/1/22 | 4/1/23 | 10/1/23 | 4/1/24 | 10/1/24 | 4/1/25 | 10/1/25 | 4/1/26 | 10/1/26 | 4/1/27 | 10/1/27 | 4/1/28 | Total Interest | Total Principal & Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2004-B(1)** | | | | | | | | | | | | | | | | | | | | |
| ...2Z8 | 4/1/15 | 5.000% | $102,438.70 | Ambac | | | | | | | | | | | | | | | $5,121.93 | $107,560.63 |
| ...2C6 | 4/1/16 | 5.250% | $107,516.35 | Ambac | | | | | | | | | | | | | | | $11,289.22 | $118,805.57 |
| ...3Z4 | 4/1/17 | 4.000% | $3,601.59 | Ambac | | | | | | | | | | | | | | | $432.19 | $4,033.78 |
| ...3Z2 | 4/1/17 | 5.250% | $109,582.94 | Ambac | | | | | | | | | | | | | | | $17,259.30 | $126,842.13 |
| ...2U0 | 4/1/18 | 5.250% | $23,616.09 | Ambac | | | | | | | | | | | | | | | $4,959.57 | $28,570.56 |
| | | | $346,756.06 | | | | | | | | | | | | | | | | $39,062.21 | $385,818.67 |
| **2004-B(2)** | | | | | | | | | | | | | | | | | | | | |
| ...2X3 | 4/1/19 | 5.240% | $6,799.88 | Ambac | | | | | | | | | | | | | | | $826.65 | $7,625.94 |
| **2005-B** | | | | | | | | | | | | | | | | | | | | |
| ...3Z3 | 4/1/15 | 5.000% | $27,041.45 | Assured | | | | | | | | | | | | | | | $1,352.07 | $28,393.53 |
| ...3G1 | 4/1/16 | 5.000% | $28,399.43 | Assured | | | | | | | | | | | | | | | $2,839.94 | $31,239.37 |
| ...5C79 | 4/1/17 | 4.500% | $29,757.41 | Assured | | | | | | | | | | | | | | | $3,888.71 | $33,396.11 |
| ...5C87 | 4/1/17 | 5.000% | $31,115.39 | Assured | | | | | | | | | | | | | | | $6,223.08 | $37,338.46 |
| ...5C95 | 4/1/18 | 5.000% | $32,650.49 | Assured | | | | | | | | | | | | | | | $8,010.62 | $40,931.11 |
| ...5D29 | 4/1/19 | 5.000% | $39,042.48 | Assured | | | | | | | | | | | | | | | $13,713.74 | $76,755.22 |
| ...3137 | 4/1/20 | 5.000% | $39,042.48 | Assured | | | | | | | | | | | | | | | $20,664.87 | $79,707.34 |
| ...3137 | 4/1/21 | 5.020% | $59,042.48 | Assured | | | | | | | | | | | | | | | $23,614.99 | $82,659.47 |
| ...3145 | 4/1/22 | 5.080% | $59,042.48 | Assured | $1,476.06 | $1,476.06 | | | | | | | | | | | | | $26,569.11 | $85,611.39 |
| ...3152 | 4/1/23 | 5.000% | $59,042.48 | Assured | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | | | | | | | | | | | $29,521.24 | $88,563.71 |
| ...3160 | 4/1/24 | 5.000% | $59,042.48 | Assured | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | | | | | | | | | $32,473.36 | $91,513.84 |
| ...3178 | 4/1/25 | 5.000% | $59,042.48 | Assured | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | $1,476.06 | | | | | | | $35,427.36 | $670,693.76 |
| | | | $603,235.03 | | $5,904.25 | $5,904.25 | $4,428.19 | $4,428.19 | $2,952.12 | $2,952.12 | $1,476.06 | $1,476.06 | | | | | | | $273,574.74 | $876,809.76 |
| **2005-C** | | | | | | | | | | | | | | | | | | | | |
| ...3J2 | 4/1/15 | 5.000% | $27,218.58 | Assured | | | | | | | | | | | | | | | $1,360.93 | $28,579.51 |
| ...3S3 | 4/1/16 | 5.000% | $26,635.60 | Assured | | | | | | | | | | | | | | | $2,863.56 | $31,499.16 |
| ...3T2 | 4/1/17 | 4.900% | $30,052.62 | Assured | | | | | | | | | | | | | | | $3,816.79 | $33,929.41 |
| ...3U9 | 4/1/18 | 5.000% | $31,056.34 | Assured | | | | | | | | | | | | | | | $6,211.27 | $37,267.61 |
| ...3W5 | 4/1/19 | 5.250% | $32,296.23 | Assured | | | | | | | | | | | | | | | $8,477.76 | $40,774.00 |
| ...3X3 | 4/1/20 | 5.250% | $34,067.51 | Assured | | | | | | | | | | | | | | | $10,720.27 | $44,787.77 |
| | | | $183,326.99 | | | | | | | | | | | | | | | | $53,521.57 | $236,848.46 |
| **2008-A** | | | | | | | | | | | | | | | | | | | | |
| ...3T6 | 4/1/15 | 5.000% | $33,949.42 | Assured | | | | | | | | | | | | | | | $1,697.47 | $35,646.90 |
| ...3N6 | 4/1/16 | 5.000% | $35,602.61 | Assured | | | | | | | | | | | | | | | $3,560.26 | $39,162.87 |
| ...3U2 | 4/1/17 | 5.000% | $37,432.93 | Assured | | | | | | | | | | | | | | | $5,614.94 | $43,047.87 |
| ...3M8 | 4/1/18 | 4.000% | $39,360.25 | Assured | | | | | | | | | | | | | | | $6,214.35 | $45,545.37 |
| ...3S9 | 4/1/19 | 5.000% | $40,857.39 | Assured | | | | | | | | | | | | | | | $10,214.35 | $51,071.74 |
| ...3V8 | 4/1/19 | 5.000% | $42,364.94 | Assured | | | | | | | | | | | | | | | $12,859.46 | $55,224.29 |
| ...3K2 | 4/1/20 | 5.000% | $45,046.41 | Assured | | | | | | | | | | | | | | | $15,716.29 | $60,676.70 |
| ...3L0 | 4/1/21 | 5.000% | $47,251.02 | Assured | | | | | | | | | | | | | | | $18,971.22 | $66,210.23 |
| ...3J5 | 4/1/22 | 5.000% | $101,789.23 | Assured | $1,182.33 | $1,182.33 | | | | | | | | | | | | | $48,411.88 | $150,201.11 |
| ...3P1 | 4/1/28 | 5.000% | $235,933.74 | Assured | $2,544.73 | $2,544.73 | $2,544.73 | $2,544.73 | $1,203.36 | $1,203.36 | $5,898.34 | $5,898.34 | $4,530.03 | $4,530.03 | $3,092.35 | $3,092.35 | $1,583.81 | $1,583.81 | $148,175.55 | $384,109.69 |
| | | | $660,035.84 | | $9,625.40 | $9,625.40 | $8,443.07 | $8,443.07 | $7,201.71 | $7,201.71 | $5,898.34 | $5,898.34 | $4,530.03 | $4,530.03 | $3,092.35 | $3,092.35 | $1,583.81 | $1,583.81 | $271,500.92 | $931,536.77 |
| **2008-B(1)** | | | | | | | | | | | | | | | | | | | | |
| ...3F3 | 4/1/15 | 5.000% | $94,113.71 | Assured | | | | | | | | | | | | | | | $4,705.69 | $98,819.39 |
| ...3N1 | 4/1/16 | 5.000% | $40,621.22 | Assured | | | | | | | | | | | | | | | $4,062.12 | $44,683.35 |
| ...3W1 | 4/1/17 | 5.000% | $42,274.41 | Assured | | | | | | | | | | | | | | | $6,341.16 | $48,615.57 |
| ...3P9 | 4/1/18 | 5.000% | $44,734.20 | Assured | | | | | | | | | | | | | | | $8,050.84 | $52,705.04 |
| | | | $221,783.54 | | | | | | | | | | | | | | | | $24,059.81 | $245,623.55 |
| **Total** | | | $1,917,549.07 | | $25,813.04 | $35,813.02 | $18,736.64 | $32,502.78 | $12,502.78 | $7,374.41 | $7,374.41 | $4,556.03 | $4,556.03 | $3,092.35 | $3,092.35 | $1,583.81 | $1,583.81 | | $1,099,073.26 | $3,006,622.21 |

13-53846-swr Doc 13903-3 Filed 12/15/14 Entered 12/15/14 09:27:34 Page 270 of 455

Subject to Mandatory Redemption

# UTGO Series STUB Bonds - Debt Service (PFRS ISF Allocation)

Bond Series Subject to Mandatory Redemption

## Issuance 2004 B(2)

CUSIP 285093XX1

| Date | Insurer | Fiscal Year | Mandatory Redemption Amounts | Outstanding | Rate | Interest |
|---|---|---|---|---|---|---|
| 10/1/14 | Ambac | 6/30/15 | - | $6,789.88 | 5.240% | $177.89 |
| 4/1/15 | Ambac | 6/30/15 | $1,830.72 | $4,959.37 | 5.740% | $177.89 |
| 10/1/15 | Ambac | 6/30/16 | - | $4,959.37 | 5.240% | $129.94 |
| 4/1/16 | Ambac | 6/30/16 | $1,948.40 | $3,011.17 | 5.240% | $129.94 |
| 10/1/16 | Ambac | 6/30/17 | - | $3,011.17 | 1.240% | $78.89 |
| 4/1/17 | Ambac | 6/30/17 | $2,007.44 | $1,003.72 | 5.240% | $78.89 |
| 10/1/17 | Ambac | 6/30/18 | - | $1,003.72 | 5.240% | $26.30 |
| 4/1/18 | Ambac | 6/30/18 | $1,003.72 | - | 5.240% | $76.30 |
| Total | | | $6,789.88 | | | $826.05 |

## Issuance 2008-A

CUSIP 285093N63

| Date | Insurer | Fiscal Year | Mandatory Redemption Amounts | Outstanding | Rate | Interest |
|---|---|---|---|---|---|---|
| 10/1/14 | Assured | 6/30/15 | - | $101,789.23 | 5.000% | $2,544.73 |
| 4/1/15 | Assured | 6/30/15 | - | $101,789.23 | 5.000% | $2,544.73 |
| 10/1/15 | Assured | 6/30/16 | - | $101,789.23 | 5.000% | $2,544.73 |
| 4/1/16 | Assured | 6/30/16 | - | $101,789.23 | 5.000% | $2,544.73 |
| 10/1/16 | Assured | 6/30/17 | - | $101,789.23 | 5.000% | $2,544.73 |
| 4/1/17 | Assured | 6/30/17 | - | $101,789.23 | 5.000% | $2,544.73 |
| 10/1/17 | Assured | 6/30/18 | - | $101,789.23 | 5.000% | $2,544.73 |
| 4/1/18 | Assured | 6/30/18 | - | $101,789.23 | 5.000% | $2,544.73 |
| 10/1/18 | Assured | 6/30/19 | - | $101,789.23 | 5.000% | $2,544.73 |
| 4/1/19 | Assured | 6/30/19 | - | $101,789.23 | 5.000% | $2,544.73 |
| 10/1/19 | Assured | 6/30/20 | - | $101,789.23 | 5.000% | $2,544.73 |
| 4/1/20 | Assured | 6/30/20 | - | $101,789.23 | 5.000% | $2,544.73 |
| 10/1/20 | Assured | 6/30/21 | - | $101,789.23 | 5.000% | $2,544.73 |
| 4/1/21 | Assured | 6/30/21 | - | $101,789.23 | 5.000% | $2,544.73 |
| 10/1/21 | Assured | 6/30/22 | - | $101,789.25 | 5.000% | $2,544.73 |
| 4/1/22 | Assured | 6/30/22 | - | $101,789.23 | 5.000% | $2,544.73 |
| 10/1/2022 | Assured | 6/30/2023 | $40,604.72 | $12,134.51 | 5.000% | $2,544.73 |
| 4/1/2023 | Assured | 6/30/2023 | - | $12,134.51 | 5.000% | $1,303.36 |
| 10/1/2023 | Assured | 6/30/2024 | $32,134.51 | - | 5.200% | $1,303.36 |
| 4/1/2024 | Assured | 6/30/2024 | - | - | 5.000% | - |
| Total | | | $101,789.23 | | | $49,411.18 |

## Issuance 2008-A

CUSIP 285093N63

| Date | Insurer | Fiscal Year | Mandatory Redemption Amounts | Outstanding | Rate | Interest |
|---|---|---|---|---|---|---|
| 10/1/14 | Accrued | 6/30/15 | - | $235,933.74 | 5.000% | $5,898.34 |
| 4/1/15 | Assured | 6/30/15 | - | $235,933.74 | 5.000% | $5,898.34 |
| 10/1/15 | Assured | 6/30/16 | - | $235,933.74 | 5.000% | $5,898.34 |
| 4/1/16 | Assured | 6/30/16 | - | $235,933.74 | 5.000% | $5,898.34 |
| 10/1/16 | Accrued | 6/30/17 | - | $235,933.74 | 5.020% | $5,898.34 |
| 4/1/17 | Assured | 6/30/17 | - | $235,933.74 | 5.000% | $5,898.34 |
| 10/1/17 | Accrued | 6/30/18 | - | $235,933.74 | 5.000% | $5,898.34 |
| 4/1/18 | Assured | 6/30/18 | - | $235,933.74 | 5.000% | $5,898.34 |
| 10/1/18 | Assured | 6/30/19 | - | $235,933.74 | 5.000% | $5,898.34 |
| 4/1/19 | Assured | 6/30/19 | - | $235,933.74 | 5.000% | $5,898.34 |
| 10/1/19 | Assured | 6/30/20 | - | $235,933.74 | 5.000% | $5,898.34 |
| 4/1/20 | Assured | 6/30/20 | - | $235,933.74 | 1.000% | $5,898.34 |
| 10/1/20 | Assured | 6/30/21 | - | $235,933.74 | 5.020% | $5,898.34 |
| 4/1/21 | Assured | 6/30/21 | - | $235,933.74 | 5.160% | $5,898.34 |
| 10/1/2022 | Assured | 6/30/2023 | - | $255,933.74 | 5.020% | $5,898.34 |
| 4/1/2023 | Assured | 6/30/2024 | - | $255,933.74 | 5.240% | $5,898.34 |
| 10/1/2023 | Assured | 6/30/2024 | - | $335,933.74 | 3.000% | $5,898.34 |
| 4/1/2024 | Accrued | 6/30/2024 | - | $335,933.74 | 3.000% | $5,898.34 |
| 10/1/2024 | Accrued | 6/30/2025 | $54,732.38 | $335,933.74 | 3.000% | $5,898.34 |
| 4/1/2025 | Assured | 6/30/2025 | - | $335,933.74 | 5.000% | $5,898.34 |
| 10/1/2025 | Assured | 6/30/2026 | $37,503.92 | $181,201.36 | 5.000% | $4,530.03 |
| 4/1/2026 | Accrued | 6/30/2026 | - | $181,201.36 | 5.000% | $4,530.03 |
| 10/1/2026 | Accrued | 6/30/2037 | - | $172,693.99 | 5.000% | $4,310.03 |
| 4/1/2027 | Accrued | 6/30/2027 | $60,340.43 | $173,693.99 | 5.000% | $3,092.35 |
| 10/1/2027 | Accrued | 6/30/2028 | - | $63,352.58 | 5.000% | $3,092.35 |
| 4/1/2028 | Accrued | 6/30/2028 | $63,352.58 | - | 5.200% | $1,583.81 |
| Total | | | $235,933.74 | | | $184,175.95 |

The interest columns (10/1/14 through 4/1/21) are grouped under a single **Interest** heading.

| CUSIP | Maturity Date | Rate | Principal | Insurer | 10/1/14 | 4/1/15 | 10/1/15 | 4/1/16 | 10/1/16 | 4/1/17 | 10/1/17 | 4/1/18 | 10/1/18 | 4/1/19 | 10/1/19 | 4/1/20 | 10/1/20 | 4/1/21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **UTGO 1999-A** | | | | | | | | | | | | | | | | | | |
| 33M53 | 4/1/15 | 5.250% | $100,784.57 | Assured | $2,645.60 | $2,645.60 | | | | | | | | | | | | |
| 33N51 | 4/1/16 | 5.000% | $105,912.21 | Assured | $2,647.81 | $2,647.81 | $2,647.81 | $2,647.81 | | | | | | | | | | |
| 33N6K | 4/1/17 | 5.000% | $111,216.66 | Assured | $2,780.42 | $2,780.42 | $2,780.42 | $2,780.42 | $2,780.42 | $2,780.42 | | | | | | | | |
| 33N77 | 4/1/18 | 5.000% | $116,874.74 | Assured | $2,921.87 | $2,921.87 | $2,921.87 | $2,921.87 | $2,921.87 | $2,921.87 | $2,921.87 | $2,921.87 | | | | | | |
| 33N8Z | 4/1/19 | 5.000% | $122,709.64 | Assured | $3,067.74 | $3,067.74 | $3,067.74 | $3,067.74 | $3,067.74 | $3,067.74 | $3,067.74 | $3,067.74 | $3,067.74 | $3,067.74 | | | | |
| | | | $557,497.83 | | $14,063.43 | $14,063.43 | $11,417.83 | $11,417.83 | $8,770.03 | $8,770.03 | $5,989.61 | $5,989.61 | $3,067.74 | $3,067.74 | | | | |
| **UTGO 2001-A(I)** | | | | | | | | | | | | | | | | | | |
| 3XUX6 | 4/1/15 | 5.375% | $210,056.27 | NPFG | $5,645.26 | $5,645.26 | | | | | | | | | | | | |
| 3XVC3 | 4/1/16 | 5.375% | $221,372.43 | NPFG | $5,949.38 | $5,949.38 | $5,949.38 | $5,949.38 | | | | | | | | | | |
| 3XVK5 | 4/1/17 | 5.375% | $233,393.86 | NPFG | $6,272.51 | $6,272.51 | $6,272.51 | $6,272.51 | $6,272.51 | $6,272.51 | | | | | | | | |
| 3XVL3 | 4/1/18 | 5.375% | $495,082.12 | NPFG | $13,305.33 | $13,305.33 | $13,305.33 | $13,305.33 | $13,305.33 | $13,305.33 | $13,305.33 | $13,305.33 | | | | | | |
| 3XVM1 | 4/1/19 | 5.000% | $495,082.12 | NPFG | $12,377.05 | $12,377.05 | $12,377.05 | $12,377.05 | $12,377.05 | $12,377.05 | $12,377.05 | $12,377.05 | $12,377.05 | $12,377.05 | | | | |
| 3XVN9 | 4/1/20 | 5.000% | $495,082.12 | NPFG | $12,377.05 | $12,377.05 | $12,377.05 | $12,377.05 | $12,377.05 | $12,377.05 | $12,377.05 | $12,377.05 | $12,377.05 | $12,377.05 | $12,377.05 | $12,377.05 | | |
| 3XVQ9 | 4/1/21 | 5.000% | $495,082.12 | NPFG | $12,377.05 | $12,377.05 | $12,377.05 | $12,377.05 | $12,377.05 | $12,377.05 | $12,377.05 | $12,377.05 | $12,377.05 | $12,377.05 | $12,377.05 | $12,377.05 | $12,377.05 | $12,377.05 |
| | | | $2,645,153.02 | | $68,303.65 | $68,303.65 | $62,658.39 | $62,658.39 | $56,709.00 | $56,709.00 | $50,436.49 | $50,436.49 | $37,131.16 | $37,131.16 | $24,754.11 | $24,754.11 | $12,377.05 | $12,377.05 |
| **UTGO 2002** | | | | | | | | | | | | | | | | | | |
| 3YWZ3 | 4/1/20 | 5.125% | $114,576.15 | NPFG | $2,936.01 | $2,936.01 | $2,936.01 | $2,936.01 | $2,936.01 | $2,936.01 | $2,936.01 | $2,936.01 | $2,936.01 | $2,936.01 | $2,936.01 | $2,936.01 | | |
| 3YWW0 | 4/1/21 | 5.125% | $120,411.04 | NPFG | $3,085.53 | $3,085.53 | $3,085.53 | $3,085.53 | $3,085.53 | $3,085.53 | $3,085.53 | $3,085.53 | $3,085.53 | $3,085.53 | $3,085.53 | $3,085.53 | $3,085.53 | $3,085.53 |
| | | | $234,987.19 | | $6,021.55 | $6,021.55 | $6,021.55 | $6,021.55 | $6,021.55 | $6,021.55 | $6,021.55 | $6,021.55 | $6,021.55 | $6,021.55 | $6,021.55 | $6,021.55 | $3,085.53 | $3,085.53 |
| **UTGO 2003-A** | | | | | | | | | | | | | | | | | | |
| 3YV20 | 4/1/15 | 4.800% | $8,840.83 | Syncora | $212.18 | $212.18 | | | | | | | | | | | | |
| 3YV38 | 4/1/16 | 5.250% | $90,176.67 | Syncora | $2,367.11 | $2,367.11 | $2,367.11 | $2,367.11 | | | | | | | | | | |
| 3YV46 | 4/1/17 | 5.250% | $105,912.23 | Syncora | $2,780.20 | $2,780.20 | $2,780.20 | $2,780.20 | $2,780.20 | $2,780.20 | | | | | | | | |
| 3YV53 | 4/1/18 | 5.250% | $111,393.46 | Syncora | $2,924.08 | $2,924.08 | $2,924.08 | $2,924.08 | $2,924.08 | $2,924.08 | $2,924.08 | $2,924.08 | | | | | | |
| 3YV61 | 4/1/19 | 5.250% | $117,228.37 | Syncora | $3,077.24 | $3,077.24 | $3,077.24 | $3,077.24 | $3,077.24 | $3,077.24 | $3,077.24 | $3,077.24 | $3,077.24 | $3,077.24 | | | | |
| 3YV79 | 4/1/20 | 5.250% | $123,416.90 | Syncora | $3,239.69 | $3,239.69 | $3,239.69 | $3,239.69 | $3,239.69 | $3,239.69 | $3,239.69 | $3,239.69 | $3,239.69 | $3,239.69 | $3,239.69 | $3,239.69 | | |
| 3YV87 | 4/1/20 | 4.500% | $17,681.50 | Syncora | $397.83 | $397.83 | $397.83 | $397.83 | $397.83 | $397.83 | $397.83 | $397.83 | $397.83 | $397.83 | $397.83 | $397.83 | | |
| 3YV95 | 4/1/21 | 5.250% | $112,277.55 | Syncora | $2,947.29 | $2,947.29 | $2,947.29 | $2,947.29 | $2,947.29 | $2,947.29 | $2,947.29 | $2,947.29 | $2,947.29 | $2,947.29 | $2,947.29 | $2,947.29 | $2,947.29 | $2,947.29 |
| 3YVX5 | 4/1/21 | 5.250% | $136,501.21 | Syncora | $3,583.16 | $3,583.16 | $3,583.16 | $3,583.16 | $3,583.16 | $3,583.16 | $3,583.16 | $3,583.16 | $3,583.16 | $3,583.16 | $3,583.16 | $3,583.16 | $3,583.16 | $3,583.16 |
| 3YVY3 | 4/1/22 | 4.625% | $17,681.90 | Syncora | $408.88 | $408.88 | $408.88 | $408.88 | $408.88 | $408.88 | $408.88 | $408.88 | $408.88 | $408.88 | $408.88 | $408.88 | $408.88 | $408.88 |
| 3YVZ0 | 4/1/22 | 5.250% | $126,069.90 | Syncora | $3,309.31 | $3,309.31 | $3,309.31 | $3,309.31 | $3,309.31 | $3,309.31 | $3,309.31 | $3,309.31 | $3,309.31 | $3,309.31 | $3,309.31 | $3,309.31 | $3,309.31 | $3,309.31 |
| 3YVZ7 | 4/1/23 | 4.625% | $53,244.51 | Syncora | $1,226.65 | $1,226.65 | $1,226.65 | $1,226.65 | $1,226.65 | $1,226.65 | $1,226.65 | $1,226.65 | $1,226.65 | $1,226.65 | $1,226.65 | $1,226.65 | $1,226.65 | $1,226.65 |
| 3YVB0 | 4/1/23 | 5.250% | $98,132.35 | Syncora | $2,575.97 | $2,575.97 | $2,575.97 | $2,575.97 | $2,575.97 | $2,575.97 | $2,575.97 | $2,575.97 | $2,575.97 | $2,575.97 | $2,575.97 | $2,575.97 | $2,575.97 | $2,575.97 |
| | | | $1,120,023.29 | | $29,049.61 | $29,049.61 | $26,470.32 | $26,470.32 | $23,690.12 | $23,690.12 | $20,766.04 | $20,766.04 | $17,688.80 | $17,688.80 | $14,449.10 | $14,449.10 | $11,103.96 | $11,103.96 |
| **UTGO 2004-A(I)** | | | | | | | | | | | | | | | | | | |
| 3Y9X3 | 4/1/19 | 5.250% | $159,133.54 | Ambac | $4,177.26 | $4,177.26 | $4,177.26 | $4,177.26 | $4,177.26 | $4,177.26 | $4,177.26 | $4,177.26 | $4,177.26 | $4,177.26 | | | | |
| 3Y9Y1 | 4/1/20 | 4.250% | $6,542.16 | Ambac | $139.02 | $139.02 | $139.02 | $139.02 | $139.02 | $139.02 | $139.02 | $139.02 | $139.02 | $139.02 | $139.02 | $139.02 | | |
| 3Y9Z8 | 4/1/20 | 5.250% | $215,183.01 | Ambac | $5,648.58 | $5,648.58 | $5,648.58 | $5,648.58 | $5,648.58 | $5,648.58 | $5,648.58 | $5,648.58 | $5,648.58 | $5,648.58 | $5,648.58 | $5,648.58 | | |
| 3Y9A1 | 4/1/21 | 5.250% | $223,395.86 | Ambac | $5,834.90 | $5,834.90 | $5,834.90 | $5,834.90 | $5,834.90 | $5,834.90 | $5,834.90 | $5,834.90 | $5,834.90 | $5,834.90 | $5,834.90 | $5,834.90 | $5,834.90 | $5,834.90 |
| 3Y9B9 | 4/1/21 | 5.000% | $245,005.65 | Ambac | $6,432.57 | $6,432.57 | $6,432.57 | $6,432.57 | $6,432.57 | $6,432.57 | $6,432.57 | $6,432.57 | $6,432.57 | $6,432.57 | $6,432.57 | $6,432.57 | $6,432.57 | $6,432.57 |
| 3Y9C7 | 4/1/22 | 4.500% | $13,261.13 | Ambac | $298.38 | $298.38 | $298.38 | $298.38 | $298.38 | $298.38 | $298.38 | $298.38 | $298.38 | $298.38 | $298.38 | $298.38 | $298.38 | $298.38 |
| 3Y9D5 | 4/1/22 | 5.250% | $244,712.02 | Ambac | $6,423.67 | $6,423.67 | $6,423.67 | $6,423.67 | $6,423.67 | $6,423.67 | $6,423.67 | $6,423.67 | $6,423.67 | $6,423.67 | $6,423.67 | $6,423.67 | $6,423.67 | $6,423.67 |
| 3Y9E3 | 4/1/23 | 4.600% | $27,759.96 | Ambac | $638.48 | $638.48 | $638.48 | $638.48 | $638.48 | $638.48 | $638.48 | $638.48 | $638.48 | $638.48 | $638.48 | $638.48 | $638.48 | $638.48 |
| 3Y9F0 | 4/1/24 | 5.250% | $243,651.13 | Ambac | $6,395.84 | $6,395.84 | $6,395.84 | $6,395.84 | $6,395.84 | $6,395.84 | $6,395.84 | $6,395.84 | $6,395.84 | $6,395.84 | $6,395.84 | $6,395.84 | $6,395.84 | $6,395.84 |
| | | | $1,388,703.34 | | $35,989.11 | $35,989.11 | $35,989.11 | $35,989.11 | $35,989.11 | $35,989.11 | $35,989.11 | $35,989.11 | $35,989.11 | $35,989.11 | $31,811.86 | $31,811.86 | $26,024.26 | $26,024.26 |

Subject to Mandatory Redemption

# UTGO Series STUB Bonds - Debt Service (GRS ISF Allocation)

| CUSIP | Maturity Date | Rate | Insurer | Principal | Interest | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 10/1/14 | 4/1/15 | 10/1/15 | 4/1/16 | 10/1/16 | 4/1/17 | 10/1/17 | 4/1/18 | 10/1/18 | 4/1/19 | 10/1/19 | 4/1/20 | 10/1/20 | 4/1/21 |
| **UTGO 2004-B(1)** | | | | | | | | | | | | | | | | | | |
| 74737QT76 | 4/1/15 | 5.000% | Ambac | $306,774.10 | $7,669.35 | $7,669.35 | | | | | | | | | | | | |
| 74737Q2Q0 | 4/1/16 | 5.250% | Ambac | $321,980.19 | $8,451.98 | $8,451.98 | $8,451.98 | $8,451.98 | | | | | | | | | | |
| 74737Q2X4 | 4/1/17 | 4.000% | Ambac | $10,785.72 | $215.71 | $215.71 | $215.71 | $215.71 | $215.71 | $215.71 | | | | | | | | |
| 74737Q2Y2 | 4/1/18 | 5.250% | Ambac | $328,168.72 | $8,614.43 | $8,614.43 | $8,614.43 | $8,614.43 | $8,614.43 | $8,614.43 | | | | | | | | |
| 74737Q2Z1 | 4/1/18 | 5.25% | Ambac | $70,726.02 | $1,856.56 | $1,856.56 | $1,856.56 | $1,856.56 | $1,856.56 | $1,856.56 | $1,856.56 | $1,856.56 | | | | | | |
| | | | | $1,038,434.74 | $26,808.03 | | $19,138.68 | $19,138.68 | $10,686.70 | $10,686.70 | $1,856.56 | $1,856.56 | | | | | | |
| **UTGO 2004-B(2)** | | | | | | | | | | | | | | | | | | |
| 74737Q2X4 | 4/1/19 | 5.240% | Ambac | $20,333.73 | $532.74 | $532.74 | $389.13 | $389.13 | $236.26 | $236.26 | $78.75 | $78.75 | | | | | | |
| **UTGO 2005-B** | | | | | | | | | | | | | | | | | | |
| 749237C53 | 4/1/15 | 5.000% | Assured | $80,981.29 | $2,024.53 | $2,024.53 | | | | | | | | | | | | |
| 749237C61 | 4/1/16 | 5.000% | Assured | $85,046.04 | $2,126.20 | $2,126.20 | $2,126.20 | $2,126.20 | | | | | | | | | | |
| 749237C79 | 4/1/17 | 4.300% | Assured | $89,114.78 | $1,915.97 | $1,915.97 | $1,915.97 | $1,915.97 | $1,915.97 | $1,915.97 | | | | | | | | |
| 749237C87 | 4/1/18 | 5.000% | Assured | $91,181.53 | $2,329.54 | $2,329.54 | $2,329.54 | $2,329.54 | $2,329.54 | $2,329.54 | $2,329.54 | $2,329.54 | | | | | | |
| 749237C95 | 4/1/19 | 5.000% | Assured | $97,778.72 | $2,444.47 | $2,444.47 | $2,444.47 | $2,444.47 | $2,444.47 | $2,444.47 | $2,444.47 | $2,444.47 | $2,444.47 | $2,444.47 | | | | |
| 749237H37 | 4/1/20 | 5.020% | Assured | $176,815.04 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | |
| 749237H45 | 4/1/21 | 5.030% | Assured | $176,815.04 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 |
| 749237H52 | 4/1/23 | 5.050% | Assured | $176,815.04 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 |
| 749237H60 | 4/1/24 | 5.090% | Assured | $176,815.04 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 |
| 749237H78 | 4/1/25 | 5.000% | Assured | $176,815.04 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 | $4,420.38 |
| | | | | $1,396,994.60 | $37,562.96 | $37,562.96 | $35,538.43 | $35,538.43 | $33,212.23 | $33,212.23 | $31,296.26 | $31,296.26 | $26,966.72 | $26,966.72 | $22,101.88 | $22,101.88 | $22,101.88 |
| **UTGO 2005-C** | | | | | | | | | | | | | | | | | | |
| 749237G53 | 4/1/15 | 5.000% | Assured | $80,511.73 | $2,037.79 | $2,037.79 | | | | | | | | | | | | |
| 749237G61 | 4/1/16 | 5.000% | Assured | $80,755.30 | $2,143.88 | $2,143.88 | $2,143.88 | $2,143.88 | | | | | | | | | | |
| 749237G79 | 4/1/18 | 4.300% | Assured | $89,598.86 | $1,934.98 | $1,934.98 | $1,934.98 | $1,934.98 | $1,934.98 | $1,934.98 | | | | | | | | |
| 749237G87 | 4/1/19 | 5.000% | Assured | $93,004.71 | $2,325.12 | $2,325.12 | $2,325.12 | $2,325.12 | $2,325.12 | $2,325.12 | $2,325.12 | $2,325.12 | | | | | | |
| 749237G95 | 4/1/20 | 5.250% | Assured | $96,717.43 | $2,538.84 | $2,538.84 | $2,538.84 | $2,538.84 | $2,538.84 | $2,538.84 | $2,538.84 | $2,538.84 | $2,538.84 | $2,538.84 | | | | |
| 749237H29 | 4/1/20 | 5.250% | Assured | $102,022.78 | $2,678.08 | $2,678.08 | $2,678.08 | $2,678.08 | $2,678.08 | $2,678.08 | $2,678.08 | $2,678.08 | $2,678.08 | $2,678.08 | $2,678.08 | $2,678.08 | |
| | | | | $549,930.70 | $13,658.70 | $13,658.70 | $11,620.90 | $11,620.90 | $9,477.02 | $9,477.02 | $7,542.05 | $7,542.05 | $5,216.93 | $5,216.93 | $2,678.08 | $2,678.08 | |
| **UTGO 2008-A** | | | | | | | | | | | | | | | | | | |
| 749237M56 | 4/1/15 | 5.000% | Assured | $101,668.65 | $2,541.72 | $2,541.72 | | | | | | | | | | | | |
| 749237M64 | 4/1/16 | 5.000% | Assured | $106,619.47 | $2,665.49 | $2,665.49 | $2,665.49 | $2,665.49 | | | | | | | | | | |
| 749237M72 | 4/1/17 | 3.000% | Assured | $112,100.74 | $2,802.52 | $2,802.52 | $2,802.52 | $2,802.52 | $2,802.52 | $2,802.52 | | | | | | | | |
| 749237M80 | 4/1/18 | 4.000% | Assured | $117,582.00 | $2,351.64 | $2,351.64 | $2,351.64 | $2,351.64 | $2,351.64 | $2,351.64 | $2,351.64 | $2,351.64 | | | | | | |
| 749237M98 | 4/1/19 | 5.000% | Assured | $122,556.01 | $3,058.90 | $3,058.90 | $3,058.90 | $3,058.90 | $3,058.90 | $3,058.90 | $3,058.90 | $3,058.90 | $3,058.90 | $3,058.90 | | | | |
| 749237N22 | 4/1/20 | 5.000% | Assured | $128,567.72 | $3,209.19 | $3,209.19 | $3,209.19 | $3,209.19 | $3,209.19 | $3,209.19 | $3,209.19 | $3,209.19 | $3,209.19 | $3,209.19 | $3,209.19 | $3,209.19 | |
| 749237N30 | 4/1/21 | 5.000% | Assured | $134,909.88 | $3,372.75 | $3,372.75 | $3,372.75 | $3,372.75 | $3,372.75 | $3,372.75 | $3,372.75 | $3,372.75 | $3,372.75 | $3,372.75 | $3,372.75 | $3,372.75 | $3,372.75 |
| 749237N48 | 4/1/22 | 5.000% | Assured | $141,628.85 | $3,540.72 | $3,540.72 | $3,540.72 | $3,540.72 | $3,540.72 | $3,540.72 | $3,540.72 | $3,540.72 | $3,540.72 | $3,540.72 | $3,540.72 | $3,540.72 | $3,540.72 |
| 749237N55 | 4/1/24 | 5.000% | Assured | $304,820.13 | $7,620.73 | $7,620.73 | $7,620.73 | $7,620.73 | $7,620.73 | $7,620.73 | $7,620.73 | $7,620.73 | $7,620.73 | $7,620.73 | $7,620.73 | $7,620.73 | $7,620.73 |
| 749237N63 | 4/1/28 | 5.000% | Assured | $706,552.19 | $17,663.82 | $17,663.82 | $17,663.82 | $17,663.82 | $17,663.82 | $17,663.82 | $17,663.82 | $17,663.82 | $17,663.82 | $17,663.82 | $17,663.82 | $17,663.82 | $17,663.82 |
| | | | | $1,976,615.35 | $48,827.47 | $48,827.47 | $46,285.76 | $46,285.76 | $43,620.27 | $43,620.27 | $40,817.75 | $40,817.75 | $38,466.11 | $38,466.11 | $35,407.21 | $35,407.21 | $32,198.02 |
| **UTGO 2008-B(1)** | | | | | | | | | | | | | | | | | | |
| 749237P53 | 4/1/15 | 5.000% | Assured | $291,845.18 | $7,046.08 | $7,046.08 | | | | | | | | | | | | |
| 749237P61 | 4/1/16 | 5.000% | Assured | $121,648.75 | $3,041.22 | $3,041.22 | $3,041.22 | $3,041.22 | | | | | | | | | | |
| 749237P79 | 4/1/17 | 5.000% | Assured | $126,599.57 | $3,164.99 | $3,164.99 | $3,164.99 | $3,164.99 | $3,164.99 | $3,164.99 | | | | | | | | |
| 749237P87 | 4/1/18 | 5.000% | Assured | $134,025.80 | $3,350.65 | $3,350.65 | $3,350.65 | $3,350.65 | $3,350.65 | $3,350.65 | $3,350.65 | $3,350.65 | | | | | | |
| | | | | $664,117.30 | $16,602.93 | $16,602.93 | $9,556.85 | $9,556.85 | $6,515.63 | $6,515.63 | $3,350.65 | $3,350.65 | | | | | | |
| | | | | $11,705,973.69 | $297,220.18 | $297,220.18 | $254,886.59 | $254,886.59 | $234,927.93 | $234,927.93 | $204,344.82 | $204,344.82 | $172,548.12 | $172,548.12 | $141,644.17 | $141,644.17 | $109,526.74 |

* Subject to Mandatory Redemption

| CUSIP | Maturity Date | Rate | Principal | Insurer | 10/1/21 | 4/1/22 | 10/1/22 | 4/1/23 | 10/1/23 | 4/1/24 | 10/1/24 | 4/1/25 | 10/1/25 | 4/1/26 | 10/1/26 | 4/1/27 | 10/1/27 | 4/1/28 | Total Interest | Total Principal & Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Interest | | | | | | | | | | | |
| **UTGO...1999-A** | | | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 5.250% | $100,784.57 | Assured | | | | | | | | | | | | | | | $5,291.19 | $106,075.76 |
| | 4/1/16 | 5.000% | $105,912.21 | Assured | | | | | | | | | | | | | | | $10,591.22 | $116,503.43 |
| | 4/1/17 | 5.000% | $111,216.66 | Assured | | | | | | | | | | | | | | | $16,682.50 | $127,899.16 |
| | 4/1/18 | 5.000% | $116,874.74 | Assured | | | | | | | | | | | | | | | $23,374.95 | $140,249.69 |
| | 4/1/19 | 5.000% | $122,709.64 | Assured | | | | | | | | | | | | | | | $30,677.41 | $153,387.05 |
| | | | **$557,497.83** | | | | | | | | | | | | | | | | **$86,617.27** | **$644,115.10** |
| **UTGO...2000-A(II)** | | | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 5.375% | $210,036.27 | NPFG | | | | | | | | | | | | | | | $11,290.52 | $221,346.79 |
| | 4/1/16 | 5.375% | $221,372.43 | NPFG | | | | | | | | | | | | | | | $23,797.54 | $245,169.97 |
| | 4/1/17 | 5.375% | $233,393.86 | NPFG | | | | | | | | | | | | | | | $37,635.08 | $271,030.94 |
| | 4/1/18 | 5.375% | $495,082.12 | NPFG | | | | | | | | | | | | | | | $106,442.66 | $601,524.77 |
| | 4/1/19 | 5.000% | $495,082.12 | NPFG | | | | | | | | | | | | | | | $123,770.53 | $618,852.65 |
| | 4/1/20 | 5.000% | $495,082.12 | NPFG | | | | | | | | | | | | | | | $148,524.64 | $643,606.75 |
| | 4/1/21 | 5.000% | $495,082.12 | NPFG | | | | | | | | | | | | | | | $173,278.74 | $668,360.86 |
| | | | **$2,645,153.02** | | | | | | | | | | | | | | | | **$624,739.70** | **$3,269,892.73** |
| **UTGO2002** | | | | | | | | | | | | | | | | | | | | |
| | 4/1/21 | 5.125% | $114,570.15 | NPFG | | $3,085.53 | $3,085.53 | | | | | | | | | | | | $41,310.19 | $155,680.34 |
| | 4/1/22 | 5.125% | $120,411.04 | NPFG | | $3,085.53 | $3,085.53 | | | | | | | | | | | | $49,368.53 | $169,779.57 |
| | | | **$234,981.19** | | | | | | | | | | | | | | | | **$90,672.72** | **$325,459.91** |
| **UTGO...2003-A** | | | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 4.000% | $10,608.80 | Syncora | | | | | | | | | | | | | | | $424.36 | $11,033.26 |
| | 4/1/16 | 5.250% | $90,175.67 | Syncora | | | | | | | | | | | | | | | $4,734.22 | $94,909.89 |
| | 4/1/17 | 5.250% | $105,913.21 | Syncora | | | | | | | | | | | | | | | $11,120.78 | $117,033.99 |
| | 4/1/18 | 5.250% | $111,293.48 | Syncora | | | | | | | | | | | | | | | $17,584.47 | $128,877.95 |
| | 4/1/18 | 5.250% | $117,228.37 | Syncora | | | | | | | | | | | | | | | $24,417.96 | $141,646.33 |
| | 4/1/19 | 5.250% | $123,416.90 | Syncora | | | | | | | | | | | | | | | $32,396.94 | $155,813.84 |
| | 4/1/19 | 4.500% | $17,681.50 | Syncora | | | | | | | | | | | | | | | $4,774.01 | $22,455.51 |
| | 4/1/20 | 5.250% | $132,227.55 | Syncora | | | | | | | | | | | | | | | $35,367.43 | $147,594.99 |
| | 4/1/20 | 5.250% | $136,501.21 | Syncora | | | | | | | | | | | | | | | $50,164.20 | $186,665.41 |
| | 4/1/21 | 4.625% | $17,681.50 | Syncora | | $408.88 | $408.88 | | | | | | | | | | | | $6,542.16 | $24,223.66 |
| | 4/1/22 | 5.250% | $126,469.12 | Syncora | | $3,309.31 | $3,309.31 | | | | | | | | | | | | $52,940.01 | $179,018.16 |
| | 4/1/23 | 4.625% | $33,084.51 | Syncora | | $1,226.65 | $1,226.65 | $1,226.65 | | | | | | | | | | | $20,039.78 | $75,124.29 |
| | 4/1/23 | 5.250% | $98,110.35 | Syncora | | $2,575.97 | $2,575.97 | $2,575.97 | | | | | | | | | | | $46,307.53 | $144,897.88 |
| | | | **$1,120,123.29** | | | $7,520.83 | $7,520.83 | $3,802.63 | $3,802.63 | | | | | | | | | | **$309,082.86** | **$1,429,206.15** |
| **UTGO...2004-A(I)** | | | | | | | | | | | | | | | | | | | | |
| | 4/1/19 | 5.250% | $159,133.54 | Ambac | | $6,432.97 | $6,432.97 | | | | | | | | | | | | $41,772.35 | $200,906.09 |
| | 4/1/19 | 4.250% | $6,347.16 | Ambac | | | | | | | | | | | | | | | $1,863.25 | $8,210.41 |
| | 4/1/20 | 5.250% | $215,183.91 | Ambac | | | | | | | | | | | | | | | $67,782.93 | $282,966.84 |
| | 4/1/20 | 5.000% | $233,395.86 | Ambac | | | | | | | | | | | | | | | $81,688.55 | $315,084.40 |
| | 4/1/21 | 5.250% | $245,363.65 | Ambac | | | | | | | | | | | | | | | $102,927.57 | $347,991.22 |
| | 4/1/21 | 4.500% | $13,261.13 | Ambac | | $298.38 | $298.38 | $298.38 | | | | | | | | | | | $5,370.76 | $18,631.89 |
| | 4/1/22 | 5.250% | $244,712.02 | Ambac | | $6,423.60 | $6,423.60 | $6,423.60 | | | | | | | | | | | $115,626.43 | $360,338.45 |
| | 4/1/23 | 5.350% | $27,759.96 | Ambac | | $638.48 | $638.48 | $638.48 | $638.48 | $638.48 | | | | | | | | | $12,760.58 | $40,520.54 |
| | 4/1/24 | 4.600% | | Ambac | | $6,395.84 | $6,395.84 | $6,395.84 | $6,395.84 | $6,395.84 | | | | | | | | | $127,916.84 | $371,567.97 |
| | 4/1/24 | 5.350% | $243,651.13 | Ambac | | | | $13,756.39 | $13,756.39 | $7,034.32 | $7,034.32 | | | | | | | | $557,525.46 | $1,946,228.80 |
| | | | **$1,888,786.34** | | | $20,189.36 | $20,189.36 | $13,756.39 | $13,756.39 | $7,034.32 | $7,034.32 | | | | | | | | | |

# UTGO Series STUB Bonds - Debt Service (GRS ISF Allocation)

| Maturity Date | Rate | Principal | Issuer | Total Interest | Total Principal & Interest |
|---|---|---|---|---|---|
| **UTGO2004-B(1)** | | | | | |
| 4/1/15 | 5.000% | $306,774.10 | Ambac | $15,338.70 | $322,112.80 |
| 4/1/16 | 5.250% | $321,980.19 | Ambac | $33,807.92 | $355,788.11 |
| 4/1/17 | 4.000% | $10,785.72 | Ambac | $1,294.29 | $12,080.00 |
| 4/1/17 | 5.250% | $328,168.72 | Ambac | $51,686.37 | $379,855.29 |
| 4/1/19 | 5.250% | $70,726.02 | Ambac | $14,852.46 | $85,576.48 |
| | | $1,038,434.74 | | $116,979.95 | $1,155,414.69 |
| **UTGO2004-B(2)** | | | | | |
| 4/1/19 | 5.340% | $20,333.73 * | Ambac | $2,473.78 | $22,807.51 |
| **UTGO2005-B** | | | | | |
| 4/1/15 | 5.000% | $80,083.29 | Assured | $4,949.06 | $85,033.35 |
| 4/1/16 | 5.000% | $85,048.04 | Assured | $8,504.80 | $93,552.84 |
| 4/1/17 | 4.300% | $89,114.78 | Assured | $11,495.81 | $100,610.59 |
| 4/1/17 | 5.000% | $93,181.35 | Assured | $18,636.31 | $111,817.83 |
| 4/1/18 | 5.000% | $97,378.72 | Assured | $24,844.68 | $122,223.40 |
| 4/1/19 | 5.000% | $176,815.04 | Assured | $53,044.51 | $229,859.55 |
| 4/1/20 | 5.000% | $176,815.04 | Assured | $61,895.26 | $238,710.31 |
| 4/1/21 | 5.000% | $176,815.04 | Assured | $70,726.02 | $247,541.06 |
| 4/1/22 | 5.000% | $176,815.04 | Assured | $79,566.77 | $256,381.81 |
| 4/1/23 | 5.000% | $176,815.04 | Assured | $88,407.52 | $265,222.56 |
| 4/1/24 | 5.000% | $176,815.04 | Assured | $97,248.27 | $274,063.31 |
| | | $1,506,994.60 | | $519,099.62 | $2,025,260.62 |
| **UTGO2006-C** | | | | | |
| 4/1/15 | 5.000% | $81,311.73 | Assured | $4,075.59 | $85,387.32 |
| 4/1/16 | 5.000% | $85,755.50 | Assured | $8,575.53 | $94,330.82 |
| 4/1/17 | 4.300% | $89,998.86 | Assured | $11,609.85 | $101,608.71 |
| 4/1/18 | 5.000% | $93,004.71 | Assured | $18,820.94 | $111,605.65 |
| 4/1/18 | 5.250% | $96,717.83 | Assured | $25,388.43 | $122,106.26 |
| 4/1/20 | 5.250% | $102,022.08 | Assured | $32,137.02 | $134,159.30 |
| | | $549,090.70 | | $100,387.36 | $649,398.06 |
| **UTGO2006-A** | | | | | |
| 4/1/15 | 5.000% | $101,668.65 | Assured | $5,083.43 | $106,753.08 |
| 4/1/16 | 5.000% | $106,617.47 | Assured | $10,661.95 | $117,281.42 |
| 4/1/17 | 5.000% | $112,100.74 | Assured | $16,815.11 | $128,915.85 |
| 4/1/17 | 4.000% | $117,582.00 | Assured | $18,813.12 | $136,395.12 |
| 4/1/19 | 5.000% | $122,356.01 | Assured | $30,589.00 | $152,945.01 |
| 4/1/20 | 5.000% | $129,367.72 | Assured | $37,210.86 | $166,578.04 |
| 4/1/21 | 5.000% | $134,909.88 | Assured | $47,218.46 | $182,128.33 |
| 4/1/22 | 5.000% | $141,628.65 | Assured | $56,651.54 | $198,280.40 |
| 4/1/24 | 5.000% | $304,820.13 | Assured | $144,879.00 | $449,808.63 |
| 4/1/27 | 5.000% | $706,552.91 | Assured | $443,743.81 | $1,150,296.78 |
| | | $1,076,613.55 | | $813,566.29 | $2,789,861.64 |
| **UTGO2006-B(1)** | | | | | |
| 4/1/15 | 5.000% | $281,243.18 | Assured | $14,092.16 | $295,335.34 |
| 4/1/16 | 5.000% | $121,648.75 | Assured | $12,164.87 | $133,813.62 |
| 4/1/17 | 5.000% | $126,399.57 | Assured | $18,989.94 | $145,389.51 |
| 4/1/18 | 5.000% | $134,055.80 | Assured | $26,805.16 | $160,830.96 |
| | | $664,417.30 | | $72,052.13 | $736,169.43 |
| | | $11,701,074.09 | | $37,442.09 ... | $14,903,577.63 |

*Interest payment columns across dates 10/1/21, 4/1/22, 10/1/22, 4/1/23, 10/1/23, 4/1/24, 10/1/24, 4/1/25, 10/1/25, 4/1/26, 10/1/26, 4/1/27, 10/1/27, 4/1/28*

\* Prior to Mandatory Redemption

13-53846-swr Doc 8303-3 Filed 10/24/14 Entered 10/24/14 19:19:34 Page 275 of 455

# UTGO Series STUB Bonds - Debt Service (GRS ISF Allocation)

## Bond Series Subject to Mandatory Redemption

### Issuance: 2004 B(2) — CUSIP 250092ZX1

| Date | Issuer | Fiscal Year | Mandatory Redemption Amounts | Outstanding | Rate | Interest |
|---|---|---|---|---|---|---|
| 10/1/14 | Ambac | 6/30/15 | | $70,311.74 | 5.240% | $537.74 |
| 4/1/15 | Ambac | 6/30/15 | $5,481.27 | $14,352.46 | 5.240% | $537.74 |
| 10/1/15 | Ambac | 6/30/16 | | $14,352.46 | 5.240% | $389.13 |
| 4/1/16 | Ambac | 6/30/16 | $5,834.90 | $9,017.57 | 5.240% | $389.13 |
| 10/1/16 | Ambac | 6/30/17 | | $9,017.57 | 5.240% | $236.26 |
| 4/1/17 | Ambac | 6/30/17 | $6,011.71 | $3,005.86 | 5.240% | $236.26 |
| 10/1/17 | Ambac | 6/30/18 | | $3,005.86 | 5.240% | $78.75 |
| 4/1/18 | Ambac | 6/30/18 | $3,005.86 | | 5.240% | $78.75 |
| Total | | | $20,333.73 | | | $2,473.78 |

### Issuance: 2008-A — CUSIP 250095N63

| Date | Issuer | Fiscal Year | Mandatory Redemption Amounts | Outstanding | Rate | Interest |
|---|---|---|---|---|---|---|
| 10/1/14 | Assured | 6/30/15 | | $706,552.91 | 5.000% | $17,663.82 |
| 4/1/15 | Assured | 6/30/15 | | $706,552.91 | 5.000% | $17,663.82 |
| 10/1/15 | Assured | 6/30/16 | | $706,552.91 | 5.000% | $17,663.82 |
| 4/1/16 | Assured | 6/30/16 | | $706,552.91 | 5.000% | $17,663.82 |
| 10/1/16 | Assured | 6/30/17 | | $706,552.91 | 5.000% | $17,663.82 |
| 4/1/17 | Assured | 6/30/17 | | $706,552.91 | 5.000% | $17,663.82 |
| 10/1/17 | Assured | 6/30/18 | | $706,552.91 | 5.000% | $17,663.82 |
| 4/1/18 | Assured | 6/30/18 | | $706,552.91 | 5.000% | $17,663.82 |
| 10/1/18 | Assured | 6/30/19 | | $706,552.91 | 5.000% | $17,663.82 |
| 4/1/19 | Assured | 6/30/19 | | $706,552.91 | 5.000% | $17,663.82 |
| 10/1/19 | Assured | 6/30/20 | | $706,552.91 | 5.000% | $17,663.82 |
| 10/1/20 | Assured | 6/30/21 | | $706,552.91 | 5.000% | $17,663.82 |
| 4/1/21 | Assured | 6/30/21 | | $706,552.91 | 5.000% | $17,663.82 |
| 10/1/21 | Assured | 6/30/22 | | $706,552.91 | 5.000% | $17,663.82 |
| 4/1/22 | Assured | 6/30/22 | | $706,552.91 | 5.000% | $17,663.82 |
| 10/1/22 | Assured | 6/30/23 | $163,503.54 | $543,045.36 | 5.000% | $17,663.82 |
| 4/1/23 | Assured | 6/30/23 | | $543,045.36 | 5.000% | $13,669.67 |
| 10/1/23 | Assured | 6/30/24 | $112,297.95 | $370,427.55 | 5.000% | $13,669.67 |
| 4/1/24 | Assured | 6/30/24 | | $370,427.55 | 5.000% | $13,586.13 |
| 10/1/24 | Assured | 6/30/25 | | $370,427.55 | 5.000% | $13,586.13 |
| 10/1/26 | Assured | 6/30/27 | $180,101.93 | $687,227.36 | 5.000% | $9,786.09 |
| 4/1/27 | Assured | 6/30/27 | | $687,227.36 | 5.000% | $9,786.09 |
| 4/1/28 | Assured | 6/30/28 | $189,722.54 | $187,722.54 | 5.000% | $4,703.06 |
| Total | | | $706,552.91 | | | $413,743.87 |

### Issuance: 2008-A — CUSIP 250095N55

| Date | Issuer | Fiscal Year | Mandatory Redemption Amounts | Outstanding | Rate | Interest |
|---|---|---|---|---|---|---|
| 10/1/14 | Assured | 6/30/15 | | $304,829.13 | 5.000% | $7,620.73 |
| 4/1/15 | Assured | 6/30/15 | | $304,829.13 | 5.000% | $7,620.73 |
| 10/1/15 | Assured | 6/30/16 | | $304,829.13 | 5.000% | $7,620.73 |
| 4/1/16 | Assured | 6/30/16 | | $304,829.13 | 5.000% | $7,620.73 |
| 10/1/16 | Assured | 6/30/17 | | $304,829.13 | 5.000% | $7,620.73 |
| 4/1/17 | Assured | 6/30/17 | | $304,829.13 | 5.000% | $7,620.73 |
| 10/1/17 | Assured | 6/30/18 | | $304,829.13 | 5.000% | $7,620.73 |
| 4/1/18 | Assured | 6/30/18 | | $304,829.13 | 5.000% | $7,620.73 |
| 10/1/18 | Assured | 6/30/19 | | $304,829.13 | 5.000% | $7,620.73 |
| 4/1/19 | Assured | 6/30/19 | | $304,829.13 | 5.000% | $7,620.73 |
| 10/1/19 | Assured | 6/30/20 | | $304,829.13 | 5.000% | $7,620.73 |
| 4/1/20 | Assured | 6/30/20 | | $304,829.13 | 5.000% | $7,620.73 |
| 10/1/20 | Assured | 6/30/21 | | $304,829.13 | 5.000% | $7,620.73 |
| 4/1/21 | Assured | 6/30/21 | | $304,829.13 | 5.000% | $7,620.73 |
| 10/1/21 | Assured | 6/30/22 | | $304,829.13 | 5.000% | $7,620.73 |
| 4/1/22 | Assured | 6/30/22 | | $304,829.13 | 5.000% | $7,620.73 |
| 10/1/22 | Assured | 6/30/23 | $108,501.45 | $196,327.68 | 5.000% | $7,620.73 |
| 10/1/23 | Assured | 6/30/24 | $156,327.68 | | 5.000% | $5,903.19 |
| Total | | | $304,829.13 | | | $144,979.49 |

# UTGO Series STUB Bonds - Debt Service (GRS Pension Allocation)

| CUSIP | Maturity Date | Rate | Principal | Insurer | Interest 10/1/14 | 4/1/15 | 10/1/15 | 4/1/16 | 10/1/16 | 4/1/17 | 10/1/17 | 4/1/18 | 10/1/18 | 4/1/19 | 10/1/19 | 4/1/20 | 10/1/20 | 4/1/21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **UTGO 1999-A** | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 5.250% | $238,011.21 | Assured | $6,271.42 | $6,271.42 | | | | | | | | | | | | |
| | 4/1/16 | 5.030% | $251,066.35 | Assured | $6,276.66 | $6,276.66 | $6,276.66 | $6,276.66 | | | | | | | | | | |
| | 4/1/17 | 5.030% | $263,640.62 | Assured | $6,591.02 | $6,591.02 | $6,591.02 | $6,591.02 | $6,591.02 | $6,591.02 | | | | | | | | |
| | 4/1/18 | 5.000% | $277,053.16 | Assured | $6,926.33 | $6,926.33 | $6,926.33 | $6,926.33 | $6,926.33 | $6,926.33 | $6,926.33 | $6,926.33 | | | | | | |
| | 4/1/19 | 5.000% | $290,044.88 | Assured | $7,272.12 | $7,272.12 | $7,272.12 | $7,272.12 | $7,272.12 | $7,272.12 | $7,272.12 | $7,272.12 | $7,272.12 | $7,272.12 | | | | |
| | | | **$1,319,816.22** | | $33,337.55 | $33,337.55 | $27,066.13 | $27,066.13 | $20,789.47 | $20,789.47 | $14,198.45 | $14,198.45 | $7,272.12 | $7,272.12 | | | | |
| **UTGO 2001-A(D)** | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 5.375% | $497,941.27 | NPFG | $13,382.17 | $13,382.17 | | | | | | | | | | | | |
| | 4/1/16 | 5.375% | $524,766.39 | NPFG | $14,103.10 | $14,103.10 | $14,103.10 | $14,103.10 | | | | | | | | | | |
| | 4/1/17 | 5.375% | $553,268.08 | NPFG | $14,869.08 | $14,869.08 | $14,869.08 | $14,869.08 | $14,869.08 | $14,869.08 | | | | | | | | |
| | 4/1/18 | 5.375% | $1,173,598.88 | NPFG | $31,540.47 | $31,540.47 | $31,540.47 | $31,540.47 | $31,540.47 | $31,540.47 | $31,540.47 | $31,540.47 | | | | | | |
| | 4/1/19 | 5.000% | $1,173,398.95 | NPFG | $29,339.97 | $29,339.97 | $29,339.97 | $29,339.97 | $29,339.97 | $29,339.97 | $29,339.97 | $29,339.97 | $29,339.97 | $29,339.97 | | | | |
| | 4/1/20 | 5.000% | $1,173,398.95 | NPFG | $29,339.97 | $29,339.97 | $29,339.97 | $29,339.97 | $29,339.97 | $29,339.97 | $29,339.97 | $29,339.97 | $29,339.97 | $29,339.97 | $29,339.97 | $29,339.97 | | |
| | 4/1/21 | 5.000% | $1,173,508.95 | NPFG | $29,339.97 | $29,339.97 | $29,339.97 | $29,339.97 | $29,339.97 | $29,339.97 | $29,339.97 | $29,339.97 | $29,339.97 | $29,339.97 | $29,339.97 | $29,339.97 | $29,339.97 | $29,339.97 |
| | | | **$6,776,371.53** | | $161,914.74 | $161,914.74 | $148,532.57 | $148,532.57 | $134,429.47 | $134,429.47 | $119,560.39 | $119,560.39 | $88,020.92 | $88,020.92 | $58,679.95 | $58,679.95 | $29,339.97 | $29,339.97 |
| **UTGO 2002** | | | | | | | | | | | | | | | | | | |
| | 4/1/22 | 5.125% | $271,604.33 | NPFG | $6,959.86 | $6,959.86 | $6,959.86 | $6,959.86 | $6,959.86 | $6,959.86 | $6,959.86 | $6,959.86 | $6,959.86 | $6,959.86 | $6,959.86 | $6,959.86 | $6,959.86 | $6,959.86 |
| | 4/1/23 | 5.125% | $285,436.03 | NPFG | $7,314.30 | $7,314.30 | $7,314.30 | $7,314.30 | $7,314.30 | $7,314.30 | $7,314.30 | $7,314.30 | $7,314.30 | $7,314.30 | $7,314.30 | $7,314.30 | $7,314.30 | $7,314.30 |
| | | | **$557,040.36** | | $14,274.16 | $14,274.16 | $14,274.16 | $14,274.16 | $14,274.16 | $14,274.16 | $14,274.16 | $14,274.16 | $14,274.16 | $14,274.16 | $14,274.16 | $14,274.16 | $14,274.16 | $14,274.16 |
| **UTGO 2003-A** | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 4.000% | $25,145.55 | Syncora | $502.97 | $502.97 | | | | | | | | | | | | |
| | 4/1/16 | 4.250% | $264,059.76 | Syncora | $5,611.27 | $5,611.27 | $5,611.27 | $5,611.27 | | | | | | | | | | |
| | 4/1/17 | 5.290% | $251,066.35 | Syncora | $6,590.49 | $6,590.49 | $6,590.49 | $6,590.49 | $6,590.49 | $6,590.49 | | | | | | | | |
| | 4/1/18 | 5.290% | $262,101.47 | Syncora | $6,931.57 | $6,931.57 | $6,931.57 | $6,931.57 | $6,931.57 | $6,931.57 | $6,931.57 | $6,931.57 | | | | | | |
| | 4/1/19 | 5.250% | $277,691.47 | Syncora | $7,294.65 | $7,294.65 | $7,294.65 | $7,294.65 | $7,294.65 | $7,294.65 | $7,294.65 | $7,294.65 | $7,294.65 | $7,294.65 | | | | |
| | 4/1/20 | 5.250% | $292,561.45 | Syncora | $7,679.74 | $7,679.74 | $7,679.74 | $7,679.74 | $7,679.74 | $7,679.74 | $7,679.74 | $7,679.74 | $7,679.74 | $7,679.74 | $7,679.74 | $7,679.74 | | |
| | 4/1/21 | 4.500% | $41,914.25 | Syncora | $943.07 | $943.07 | $943.07 | $943.07 | $943.07 | $943.07 | $943.07 | $943.07 | $943.07 | $943.07 | $943.07 | $943.07 | $943.07 | $943.07 |
| | 4/1/22 | 5.250% | $266,335.48 | Syncora | $6,986.58 | $6,986.58 | $6,986.58 | $6,986.58 | $6,986.58 | $6,986.58 | $6,986.58 | $6,986.58 | $6,986.58 | $6,986.58 | $6,986.58 | $6,986.58 | $6,986.58 | $6,986.58 |
| | 4/1/23 | 5.250% | $323,578.00 | Syncora | $8,493.92 | $8,493.92 | $8,493.92 | $8,493.92 | $8,493.92 | $8,493.92 | $8,493.92 | $8,493.92 | $8,493.92 | $8,493.92 | $8,493.92 | $8,493.92 | $8,493.92 | $8,493.92 |
| | 4/1/24 | 4.625% | $39,314.25 | Syncora | $909.27 | $909.27 | $909.27 | $909.27 | $909.27 | $909.27 | $909.27 | $909.27 | $909.27 | $909.27 | $909.27 | $909.27 | $909.27 | $909.27 |
| | 4/1/25 | 5.850% | $209,848.59 | Syncora | $7,844.78 | $7,844.78 | $7,844.78 | $7,844.78 | $7,844.78 | $7,844.78 | $7,844.78 | $7,844.78 | $7,844.78 | $7,844.78 | $7,844.78 | $7,844.78 | $7,844.78 | $7,844.78 |
| | 4/1/26 | 4.625% | $125,742.74 | Syncora | $2,907.80 | $2,907.80 | $2,907.80 | $2,907.80 | $2,907.80 | $2,907.80 | $2,907.80 | $2,907.80 | $2,907.80 | $2,907.80 | $2,907.80 | $2,907.80 | $2,907.80 | $2,907.80 |
| | 4/1/27 | 5.250% | $232,624.08 | Syncora | $6,106.38 | $6,106.38 | $6,106.38 | $6,106.38 | $6,106.38 | $6,106.38 | $6,106.38 | $6,106.38 | $6,106.38 | $6,106.38 | $6,106.38 | $6,106.38 | $6,106.38 | $6,106.38 |
| | | | **$2,655,267.62** | | $60,862.49 | $60,862.49 | $60,246.28 | $60,246.28 | $56,357.76 | $56,357.76 | $49,226.19 | $49,226.19 | $41,935.54 | $41,935.54 | $34,251.80 | $34,251.80 | $26,782.15 | $26,782.15 |
| **UTGO 2004-A(1)** | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 5.250% | $377,228.23 | Ambac | $9,902.24 | $9,902.24 | | | | | | | | | | | | |
| | 4/1/16 | 4.250% | $15,508.27 | Ambac | $329.55 | $329.55 | $329.55 | $329.55 | | | | | | | | | | |
| | 4/1/17 | 5.250% | $510,006.60 | Ambac | $13,390.03 | $13,390.03 | $13,390.03 | $13,390.03 | $13,390.03 | $13,390.03 | | | | | | | | |
| | 4/1/18 | 5.040% | $550,268.08 | Ambac | $13,831.70 | $13,831.70 | $13,831.70 | $13,831.70 | $13,831.70 | $13,831.70 | $13,831.70 | $13,831.70 | | | | | | |
| | 4/1/19 | 5.250% | $580,932.20 | Ambac | $15,249.45 | $15,249.45 | $15,249.45 | $15,249.45 | $15,249.45 | $15,249.45 | $15,249.45 | $15,249.45 | $15,249.45 | $15,249.45 | | | | |
| | 4/1/20 | 4.500% | $31,435.69 | Ambac | $707.30 | $707.30 | $707.30 | $707.30 | $707.30 | $707.30 | $707.30 | $707.30 | $707.30 | $707.30 | $707.30 | $707.30 | | |
| | 4/1/21 | 5.250% | $580,003.20 | Ambac | $15,227.45 | $15,227.45 | $15,227.45 | $15,227.45 | $15,227.45 | $15,227.45 | $15,227.45 | $15,227.45 | $15,227.45 | $15,227.45 | $15,227.45 | $15,227.45 | $15,227.45 | $15,227.45 |
| | 4/1/22 | 4.600% | $65,805.37 | Ambac | $1,513.52 | $1,513.52 | $1,513.52 | $1,513.52 | $1,513.52 | $1,513.52 | $1,513.52 | $1,513.52 | $1,513.52 | $1,513.52 | $1,513.52 | $1,513.52 | $1,513.52 | $1,513.52 |
| | 4/1/23 | 5.250% | $573,578.34 | Ambac | $15,161.43 | $15,161.43 | $15,161.43 | $15,161.43 | $15,161.43 | $15,161.43 | $15,161.43 | $15,161.43 | $15,161.43 | $15,161.43 | $15,161.43 | $15,161.43 | $15,161.43 | $15,161.43 |
| | | | **$3,291,948.95** | | $85,322.68 | $85,322.68 | $85,322.68 | $85,322.68 | $85,322.68 | $85,322.68 | $85,322.68 | $85,322.68 | $85,322.68 | $85,322.68 | $85,322.68 | $85,322.68 | $75,410.44 | $75,410.44 |

\* Subject to Mandatory Redemption

# UTGO Series STUB Bonds - Debt Service (GRS Pension Allocation)

| CUSIP | Maturity Date | Rate | Insurer | Principal | 10/1/14 | 4/1/15 | 10/1/15 | 4/1/16 | 10/1/16 | 4/1/17 | 10/1/17 | 4/1/18 | 10/1/18 | 4/1/19 | 10/1/19 | 4/1/20 | 10/1/20 | 4/1/21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |  |  | Interest |  |  |  |  |  |  |  |

Page 12 of 415

| CUSIP | Maturity Date | Rate | Principal | Insurer | 10/1/21 | 4/1/22 | 10/1/22 | 4/1/23 | 10/1/23 | 4/1/24 | 10/1/24 | 4/1/25 | 10/1/25 | 4/1/26 | 10/1/26 | 4/1/27 | 10/1/27 | 4/1/28 | Total Interest | Total Principal & Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | Interest | | | | | | | | | | |
| **UTGO 1999-A** | | | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 5.250% | $238,911.21 | Assured | · | · | · | · | · | · | · | · | · | · | · | · | · | · | $12,542.84 | $251,454.05 |
| | 4/1/16 | 5.000% | $251,066.55 | Assured | · | · | · | · | · | · | · | · | · | · | · | · | · | · | $25,106.63 | $276,172.98 |
| | 4/1/17 | 5.000% | $263,640.62 | Assured | · | · | · | · | · | · | · | · | · | · | · | · | · | · | $39,546.09 | $303,186.71 |
| | 4/1/18 | 5.000% | $277,053.18 | Assured | · | · | · | · | · | · | · | · | · | · | · | · | · | · | $55,410.64 | $332,463.82 |
| | 4/1/19 | 5.000% | $290,894.88 | Assured | · | · | · | · | · | · | · | · | · | · | · | · | · | · | $72,711.22 | $363,606.10 |
| | | | $1,321,556.23 | | | | | | | | | | | | | | | | $205,317.42 | $1,526,483.67 |
| **UTGO 2001-A(T)** | | | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 5.375% | $497,941.27 | NPFG | · | · | · | · | · | · | · | · | · | · | · | · | · | · | $26,764.34 | $524,705.61 |
| | 4/1/16 | 5.375% | $524,766.39 | NPFG | · | · | · | · | · | · | · | · | · | · | · | · | · | · | $36,412.39 | $561,178.77 |
| | 4/1/17 | 5.375% | $563,268.98 | NPFG | · | · | · | · | · | · | · | · | · | · | · | · | · | · | $80,214.48 | $642,482.55 |
| | 4/1/18 | 5.375% | $1,173,598.95 | NPFG | · | · | · | · | · | · | · | · | · | · | · | · | · | · | $232,323.77 | $1,425,922.72 |
| | 4/1/19 | 5.000% | $1,173,598.95 | NPFG | · | · | · | · | · | · | · | · | · | · | · | · | · | · | $290,299.74 | $1,466,998.60 |
| | 4/1/20 | 5.000% | $1,173,598.95 | NPFG | · | · | · | · | · | · | · | · | · | · | · | · | · | · | $350,079.63 | $1,523,679.63 |
| | 4/1/21 | 5.000% | $1,173,598.95 | NPFG | · | · | · | · | · | · | · | · | · | · | · | · | · | · | $410,729.63 | $1,584,338.58 |
| | | | $6,270,371.53 | | | | | | | | | | | | | | | | $1,400,954.04 | $7,751,325.57 |
| **UTGO 2002** | | | | | | | | | | | | | | | | | | | | |
| | 4/1/21 | 5.125% | $271,604.33 | NPFG | $7,314.30 | $7,314.30 | · | · | · | · | · | · | · | · | · | · | · | · | $97,438.05 | $369,042.38 |
| | 4/1/22 | 5.125% | $285,436.03 | NPFG | $7,314.30 | $7,314.30 | · | · | · | · | · | · | · | · | · | · | · | · | $117,028.77 | $402,464.80 |
| | | | $557,040.36 | | $7,314.30 | $7,314.30 | | | | | | | | | | | | | $214,466.83 | $771,507.18 |
| **UTGO 2003-A** | | | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 4.000% | $23,148.83 | Syncora | · | · | · | · | · | · | · | · | · | · | · | · | · | · | $3,005.94 | $26,154.49 |
| | 4/1/15 | 5.250% | $213,762.67 | Syncora | · | · | · | · | · | · | · | · | · | · | · | · | · | · | $11,222.54 | $224,985.21 |
| | 4/1/16 | 5.250% | $235,066.35 | Syncora | · | · | · | · | · | · | · | · | · | · | · | · | · | · | $36,341.97 | $277,438.31 |
| | 4/1/16 | 5.250% | $264,059.76 | Syncora | · | · | · | · | · | · | · | · | · | · | · | · | · | · | $41,589.41 | $305,049.18 |
| | 4/1/17 | 5.250% | $277,891.47 | Syncora | · | · | · | · | · | · | · | · | · | · | · | · | · | · | $58,337.21 | $336,269.67 |
| | 4/1/18 | 5.250% | $292,561.45 | Syncora | · | · | · | · | · | · | · | · | · | · | · | · | · | · | $76,797.38 | $50,158.83 |
| | 4/1/19 | 5.250% | $41,914.25 | Syncora | · | · | · | · | · | · | · | · | · | · | · | · | · | · | $11,316.85 | $53,231.10 |
| | 4/1/20 | 4.500% | $266,355.48 | Syncora | · | · | · | · | · | · | · | · | · | · | · | · | · | · | $83,838.97 | $349,934.45 |
| | 4/1/20 | 5.250% | $313,578.00 | Syncora | · | · | · | · | · | · | · | · | · | · | · | · | · | · | $118,914.91 | $442,492.91 |
| | 4/1/21 | 5.250% | $41,914.25 | Syncora | · | $960.27 | · | · | · | · | · | · | · | · | · | · | · | · | $115,308.27 | $577,423.53 |
| | 4/1/22 | 4.625% | $298,848.59 | Syncora | $7,944.78 | $7,944.78 | · | · | · | · | · | · | · | · | · | · | · | · | $125,516.41 | $424,363.00 |
| | 4/1/23 | 4.625% | $125,742.74 | Syncora | $2,907.80 | $2,907.80 | $2,907.80 | $2,907.80 | · | · | · | · | · | · | · | · | · | · | $52,340.42 | $178,083.16 |
| | 4/1/23 | 5.250% | $322,624.08 | Syncora | $6,106.38 | $6,106.38 | $6,106.38 | $6,106.38 | · | · | · | · | · | · | · | · | · | · | $100,914.48 | $342,538.95 |
| | | | $2,655,267.62 | | $17,828.23 | $17,828.23 | $9,014.18 | $9,014.18 | | | | | | | | | | | $733,685.16 | $3,387,952.78 |
| **UTGO 2004-A(T)** | | | | | | | | | | | | | | | | | | | | |
| | 4/1/10 | 5.250% | $377,228.23 | Ambac | · | · | · | · | · | · | · | · | · | · | · | · | · | · | $99,022.41 | $476,250.65 |
| | 4/1/10 | 4.250% | $15,508.27 | Ambac | · | · | · | · | · | · | · | · | · | · | · | · | · | · | $3,954.61 | $19,462.88 |
| | 4/1/20 | 5.250% | $510,096.40 | Ambac | · | · | · | · | · | · | · | · | · | · | · | · | · | · | $160,680.37 | $670,776.77 |
| | 4/1/21 | 5.000% | $553,368.08 | Ambac | $15,349.45 | $15,349.45 | · | · | · | · | · | · | · | · | · | · | · | · | $193,449.83 | $746,991.50 |
| | 4/1/22 | 5.000% | $580,931.01 | Ambac | $707.30 | $707.30 | $707.30 | $707.30 | · | · | · | · | · | · | · | · | · | · | $243,591.22 | $824,922.30 |
| | 4/1/23 | 4.500% | $31,435.69 | Ambac | $15,227.45 | $15,227.45 | $15,227.45 | $15,227.45 | · | · | · | · | · | · | · | · | · | · | $12,731.45 | $44,167.14 |
| | 4/1/23 | 3.250% | $580,093.20 | Ambac | $1,513.52 | $1,513.52 | $1,513.52 | $1,513.52 | $1,513.52 | $1,513.52 | · | · | · | · | · | · | · | · | $274,094.03 | $854,187.23 |
| | 4/1/24 | 4.600% | $63,805.37 | Ambac | $15,161.43 | $15,161.43 | $15,161.43 | $15,161.43 | $15,161.43 | $15,161.43 | · | · | · | · | · | · | · | · | $20,270.47 | $90,075.84 |
| | 4/1/24 | 5.250% | $573,578.34 | Ambac | · | · | · | · | · | · | · | · | · | · | · | · | · | · | $303,528.63 | $680,806.97 |
| | | | $3,291,045.05 | | $47,859.16 | $47,859.16 | $32,609.70 | $32,609.70 | $16,674.95 | $16,674.95 | | | | | | | | | $1,325,617.02 | $4,615,562.08 |

\* Subject to Mandatory Redemption

| CUSIP | Maturity Date | Rate | Principal | Insurer | Total Interest | Total Principal & Interest |
|---|---|---|---|---|---|---|
| **UTGO 2004-B(T)** | | | | | | |
| ...278R | 4/1/15 | 5.000% | $737,212.21 | Ambac | $76,360.61 | $70,572.82 |
| ...2Q2x | 4/1/16 | 5.250% | $763,258.46 | Ambac | $880,142.14 | $643,401.60 |
| ...2R34 | 4/1/17 | 4.000% | $25,567.69 | Ambac | $3,068.12 | $26,635.81 |
| ...2S2x | 4/1/17 | 5.250% | $777,928.45 | Ambac | $122,232.73 | $909,452.18 |
| ...2T2D | 4/1/18 | 5.255% | $167,656.09 | Ambac | $35,207.97 | $202,864.06 |
| | | | $2,461,623.00 | | $377,302.37 | $2,738,926.37 |
| **UTGO 2004-B(2)** | | | | | | |
| ...2G2X1 | 4/1/19 | 5.340% | $40,201.39 * | Ambac | $5,864.14 | $54,065.52 |
| **UTGO 2005-B** | | | | | | |
| ...G13 | 4/1/15 | 5.000% | $191,067.26 | Assured | $9,598.36 | $201,369.62 |
| ...G41 | 4/1/16 | 5.000% | $201,607.53 | Assured | $20,160.75 | $221,768.29 |
| ...G6x | 4/1/16 | 4.300% | $211,247.81 | Assured | $27,230.97 | $238,498.78 |
| ...G79 | 4/1/17 | 5.000% | $220,888.69 | Assured | $44,177.02 | $265,065.71 |
| ...G58? | 4/1/18 | 5.000% | $231,785.79 | Assured | $57,746.45 | $289,732.24 |
| ...H29 | 4/1/19 | 5.000% | $419,142.48 | Assured | $125,742.74 | $544,885.23 |
| ...H37 | 4/1/20 | 5.000% | $419,142.48 | Assured | $146,699.87 | $565,842.35 |
| ...H45 | 4/1/22 | 5.900% | $419,142.48 | Assured | $167,656.99 | $586,799.47 |
| ...H52 | 4/1/23 | 5.000% | $419,142.48 | Assured | $188,614.12 | $607,756.60 |
| ...H60 | 4/1/24 | 5.000% | $419,142.48 | Assured | $209,571.24 | $628,713.72 |
| ...H78 | 4/1/25 | 5.000% | $419,142.48 | Assured | $230,528.37 | $649,670.85 |
| | | | $3,572,385.37 | | $1,227,947.48 | $4,800,298.85 |
| **UTGO 2005-C** | | | | | | |
| ...3Y2 | 4/1/15 | 5.000% | $193,224.68 | Assured | $9,661.23 | $202,885.92 |
| ...3Z2x | 4/1/16 | 5.000% | $203,284.10 | Assured | $20,328.41 | $223,612.51 |
| ...3X2S | 4/1/17 | 5.000% | $213,343.52 | Assured | $27,521.31 | $240,864.84 |
| ...3M72 | 4/1/18 | 5.000% | $220,468.95 | Assured | $44,093.79 | $264,562.73 |
| ...3N64 | 4/1/19 | 5.250% | $229,270.04 | Assured | $60,180.62 | $289,454.56 |
| ...3S38 | 4/1/20 | 5.250% | $241,845.21 | Assured | $76,181.24 | $318,050.45 |
| | | | $1,301,437.41 | | $237,969.61 | $1,539,407.02 |
| **UTGO 2006-A** | | | | | | |
| ...3M5x | 4/1/15 | 5.000% | $241,006.93 | Assured | $12,050.35 | $253,057.27 |
| ...3M64 | 4/1/16 | 5.000% | $352,742.97 | Assured | $25,274.29 | $378,017.21 |
| ...3M72 | 4/1/17 | 5.000% | $265,756.33 | Assured | $39,860.45 | $305,506.78 |
| ...3M80 | 4/1/18 | 4.000% | $278,729.75 | Assured | $44,596.76 | $323,326.51 |
| ...3N98 | 4/1/19 | 5.000% | $290,046.60 | Assured | $72,511.65 | $362,558.25 |
| ...3N22 | 4/1/20 | 5.000% | $304,297.64 | Assured | $91,289.23 | $395,586.67 |
| ...3N49 | 4/1/21 | 5.000% | $319,805.71 | Assured | $111,932.00 | $431,737.71 |
| ...3N4B | 4/1/22 | 5.000% | $335,733.13 | Assured | $134,520.38 | $470,026.38 |
| ...3N56 | 4/1/24 | 5.000% | $722,601.44 * | Assured | $343,675.88 | $1,066,277.52 |
| ...3N3 | 4/1/28 | 5.000% | $3,674,893.36 * | Assured | $3,051,890.93 | $6,612,978.60 |
| | | | $4,685,593.81 | | $1,927,384.79 | |
| **UTGO 2006-B(T)** | | | | | | |
| ...3P51 | 4/1/15 | 5.000% | $668,113.12 | Assured | $33,405.66 | $701,518.77 |
| ...3Q61 | 4/1/16 | 5.000% | $288,370.03 | Assured | $28,837.09 | $317,207.03 |
| ...3Q79 | 4/1/17 | 5.000% | $300,106.00 | Assured | $45,015.50 | $345,121.92 |
| ...3Q87 | 4/1/18 | 5.000% | $317,700.00 | Assured | $63,542.00 | $381,252.00 |
| | | | $1,574,299.16 | | $170,800.36 | $1,743,099.72 |

(*) Subject to Mandatory Redemption

# UTGO Series STUB Bonds – Debt Service (GRS Pension Allocation)

Bond Series Subject to Mandatory Redemption

## Issuance: 2004 B(2) — CUSIP 250893ZX1

| Date | Insurer | Fiscal Year | Mandatory Redemption Amounts | Outstanding | Rate | Interest |
|---|---|---|---|---|---|---|
| 10/1/14 | Ambac | 6/30/15 | | $48,207.59 | 5.240% | $1,262.88 |
| 4/1/15 | Ambac | | $33,207.97 | | 5.240% | $1,262.88 |
| 10/1/15 | Ambac | 6/30/16 | | $30,267.91 | 5.240% | $935.95 |
| 4/1/16 | Ambac | | $13,933.176 | | 5.240% | $922.43 |
| 10/1/16 | Ambac | 6/30/17 | | $21,356.27 | 5.240% | $600.00 |
| 4/1/17 | Ambac | | $7,173.42 | | 5.240% | $560.00 |
| 10/1/17 | Ambac | 6/30/18 | | $7,173.42 | 5.240% | $186.69 |
| 4/1/18 | Ambac | | $7,173.42 | | 5.240% | $186.69 |
| **Total** | | | **$48,280.19** | | | **$8,864.14** |

## Issuance: 2008-A — CUSIP 250893NN3

| Date | Insurer | Fiscal Year | Mandatory Redemption Amounts | Outstanding | Rate | Interest |
|---|---|---|---|---|---|---|
| 10/1/14 | Assured | 6/30/15 | | $1,674,893.36 | 5.000% | $41,872.33 |
| 4/1/15 | Assured | | | $1,674,893.36 | 5.000% | $41,872.33 |
| 10/1/15 | Assured | 6/30/16 | | $1,674,893.36 | 5.000% | $41,872.33 |
| 4/1/16 | Assured | | | $1,674,893.36 | 5.000% | $41,872.33 |
| 10/1/16 | Assured | 6/30/17 | | $1,674,893.36 | 5.000% | $41,872.33 |
| 4/1/17 | Assured | | | $1,674,893.36 | 5.000% | $41,872.33 |
| 10/1/17 | Assured | 6/30/18 | | $1,674,893.36 | 5.000% | $41,872.33 |
| 4/1/18 | Assured | | | $1,674,893.36 | 5.000% | $41,872.33 |
| 10/1/18 | Assured | 6/30/19 | | $1,674,893.36 | 5.000% | $41,872.33 |
| 4/1/19 | Assured | | | $1,674,893.36 | 5.000% | $41,872.33 |
| 10/1/19 | Assured | 6/30/20 | | $1,674,893.36 | 5.000% | $41,872.33 |
| 4/1/20 | Assured | | | $1,674,893.36 | 5.000% | $41,872.33 |
| 10/1/20 | Assured | 6/30/21 | | $1,674,893.36 | 5.000% | $41,872.33 |
| 4/1/21 | Assured | | | $1,674,893.36 | 5.000% | $41,872.35 |
| 10/1/21 | Assured | 6/30/22 | | $1,674,893.36 | 5.000% | $41,872.33 |
| 4/1/22 | Assured | | | $1,674,893.36 | 5.000% | $41,872.33 |
| 10/1/2022 | Assured | 6/30/2023 | | $1,674,893.36 | 5.030% | $41,870.36 |
| 10/1/2023 | Assured | 6/30/2024 | $405,394.78 | $1,674,893.36 | 5.030% | $41,877.33 |
| 10/1/2024 | Assured | 6/30/2025 | | $1,286,348.28 | 5.000% | $41,873.33 |
| 4/1/2025 | Assured | | | $1,286,348.28 | 5.000% | $41,873.33 |
| 10/1/2025 | Assured | 6/30/2026 | $438,363.62 | $878,103.50 | 5.000% | $22,158.71 |
| 4/1/2026 | Assured | | | $878,103.50 | 5.000% | $33,158.71 |
| 4/1/2027 | Assured | 6/30/2027 | $449,739.88 | $449,739.88 | 5.000% | $21,243.50 |
| 4/1/2028 | Assured | 6/30/2028 | $449,739.88 | | 5.000% | $11,243.50 |
| 4/1/2029 | Assured | 6/30/2029 | | | 5.300% | $11,743.50 |
| **Total** | | | **$1,674,893.36** | | | **$1,051,900.03** |

## Issuance: 2006-A — CUSIP 250893NS3

| Date | Insurer | Fiscal Year | Mandatory Redemption Amounts | Outstanding | Rate | Interest |
|---|---|---|---|---|---|---|
| 10/1/14 | Assured | 6/30/15 | | $725,603.64 | 5.000% | $18,061.04 |
| 4/1/15 | Assured | | | $722,603.64 | 5.000% | $18,065.04 |
| 10/1/15 | Assured | 6/30/16 | | $722,603.64 | 5.000% | $18,065.04 |
| 4/1/16 | Assured | | | $722,603.64 | 5.000% | $18,065.04 |
| 10/1/16 | Assured | 6/30/17 | | $722,603.64 | 5.000% | $18,065.04 |
| 4/1/17 | Assured | | | $722,603.64 | 5.000% | $18,065.04 |
| 10/1/17 | Assured | 6/30/18 | | $722,603.64 | 5.000% | $18,065.04 |
| 4/1/18 | Assured | | | $722,603.64 | 5.000% | $18,065.04 |
| 10/1/18 | Assured | 6/30/19 | | $725,603.64 | 5.300% | $18,065.04 |
| 4/1/19 | Assured | | | $725,603.64 | 5.000% | $18,065.04 |
| 10/1/19 | Assured | 6/30/20 | | $722,603.64 | 5.050% | $18,065.04 |
| 4/1/20 | Assured | | | $722,603.64 | 5.000% | $18,065.04 |
| 10/1/20 | Assured | 6/30/21 | | $725,603.64 | 5.020% | $18,065.04 |
| 6/30/21 | Assured | | | $725,603.64 | 5.000% | $18,065.04 |
| 10/1/21 | Assured | 6/30/22 | | $725,603.64 | 5.000% | $18,065.04 |
| 4/1/22 | Assured | | | $725,603.64 | 5.000% | $18,065.04 |
| 10/1/2022 | Assured | 6/30/2023 | $332,798.83 | $370,102.81 | 5.000% | $18,065.04 |
| 4/1/2023 | Assured | | | $370,102.81 | 5.000% | $9,252.57 |
| 10/1/2023 | Assured | 6/30/2024 | $370,102.81 | $370,102.81 | 5.000% | $9,252.57 |
| 10/1/2024 | Assured | 6/30/2025 | | | 5.000% | |
| **Total** | | | **$722,601.64** | | | **$343,675.88** |

**Exhibit B**

**EMERGENCY MANAGER ORDER**

B-1

ORDER NO. ____

ORDER OF THE EMERGENCY MANAGER OF THE CITY OF DETROIT, COUNTY OF WAYNE, STATE OF MICHIGAN, AUTHORIZING THE ISSUANCE AND RESTRUCTURING OF CERTAIN UNLIMITED TAX GENERAL OBLIGATION BONDS OF THE CITY OF DETROIT BY THE ISSUANCE BY THE CITY OF DETROIT OF NOT TO EXCEED $287,560,790 DISTRIBUTABLE STATE AID FOURTH LIEN RESTRUCTURED BONDS (UNLIMITED TAX GENERAL OBLIGATION), SERIES 2014 IN ONE OR MORE SUB-SERIES FOR THE PURPOSE OF PROVIDING CERTAIN BANKRUPTCY PLAN OF ADJUSTMENT FINANCING FOR THE CITY RELATED TO UNLIMITED TAX GENERAL OBLIGATION BOND CLAIMS; AUTHORIZING A FIFTH SUPPLEMENT TO THE OUTSTANDING MASTER DEBT RETIREMENT TRUST INDENTURE TO SECURE REPAYMENT OF SAID BONDS; IMPLEMENTING THE ASSIGNMENT OF PAYMENTS ON NOT TO EXCEED $43,349,210 OF THE CITY'S OUTSTANDING UNLIMITED TAX GENERAL OBLIGATION BONDS (STUB UTGO BONDS) PURSUANT TO THE PLAN OF ADJUSTMENT; AND AUTHORIZING THE AUTHORIZED OFFICERS TO MAKE CERTAIN DETERMINATIONS AND TO TAKE CERTAIN ACTIONS IN CONNECTION WITH THE TRANSFER OF A PORTION OF THE CITY'S OUTSTANDING UNLIMITED TAX GENERAL OBLIGATION BONDS IN CONSIDERATION FOR BONDS ISSUED BY THE MICHIGAN FINANCE AUTHORITY.

# TABLE OF CONTENTS

ARTICLE I      DEFINITIONS AND INTERPRETATION ................................................. 6

     Section 101. Definitions.................................................................................. 6
     Section 102. Interpretation............................................................................ 11

ARTICLE II DETERMINATIONS........................................................................... 11

     Section 201. Finding, and Declaration of Need to Issue Bonds; Authorized
             Denominations ................................................................... 11
     Section 202. Declaration of Borrowing ......................................................... 12

ARTICLE III      AUTHORIZATION, REDEMPTION AND ASSIGNMENT OF THE
             BONDS ......................................................................................... 12

     Section 301. Authorization of Bonds and Pledge ......................................... 12
     Section 302. Designations, Dates, Interest Rates, Maturities, Redemption and
             Other Terms of the Bonds and Stub UTGO Bonds ........... 13
     Section 303. Execution, Authentication and Delivery of Bonds ................... 15
     Section 304. Authentication of the Bonds .................................................... 15
     Section 305. The MFA's Depository............................................................. 15
     Section 306. Mutilated, Destroyed, Stolen or Lost Bonds............................ 15
     Section 307. Form of the Bonds ................................................................... 15

ARTICLE IV SPECIAL COVENANTS ................................................................... 19

     Section 401. Tax Exemption Covenant for Tax-Exempt Bonds.................... 19
     Section 402. Arbitrage Covenant ................................................................. 19

ARTICLE V FUNDS AND ACCOUNTS; DISPOSITION OF BOND PROCEEDS............... 19

     Section 501. Establishment of Accounts and Funds...................................... 19
     Section 502. Debt Retirement Fund-All Bonds ............................................ 20
             Section 503. Debt Retirement Fund – Series 2014 Escrow
             Fund ................................................................................. 20
     Section 504. Investment of Monies in the Funds and Accounts.................... 20

ARTICLE VI THE MASTER TRUSTEE.................................................................. 20

Section 601. Master Trustee. ......................................................................... 20

Section 602. Fifth Supplemental Indenture. ................................................... 21

ARTICLE VII SUPPLEMENTAL ORDERS OR RESOLUTIONS ......................... 21

     Section 701. Supplemental Orders or Resolutions Not Requiring Consent of
             Holders of the Bonds ....................................................... 21
     Section 702. Opinion and Filing Under Act 34 ............................................ 22

ARTICLE VIII DEFEASANCE............................................................................. 22

-i-

Section 801. Defeasance ................................................................................................ 22

ARTICLE IX     OTHER PROVISIONS OF GENERAL APPLICATION ............................ 22

Section 901. Approval of Other Documents and Actions ............................................. 22
Section 902. Continuing Disclosure Undertaking ...................................................... 23
Section 903. Delegation of City to, and Authorization of Actions of the Mayor
     and the Finance Director .......................................................... 23
Section 904. Act 34 Approval of the Bonds ................................................................. 23
Section 905. Approving Legal Opinions with Respect to the Bonds ........................... 23
Section 906. Negotiated Transaction .......................................................................... 24
Section 907. Delivery of Bonds .................................................................................. 24
Section 908. Official Statement .................................................................................. 24
Section 909. Appointment of Bond Counsel; Engagement of Other Parties................ 24
Section 910. Parties in Interest................................................................................... 24
Section 911. No Recourse Under Order ...................................................................... 24
Section 912. Severability ............................................................................................ 25
Section 913. Cover Page, Table of Contents and Article and Section Headings........... 25
Section 914. Conflict ................................................................................................. 25
Section 915. Governing Law and Jurisdiction ............................................................ 25
Section 916. Order and Supplemental Order are a Contract......................................... 25
Section 917. Effective Date ........................................................................................ 25
Section 918. Notices .................................................................................................. 25

EXHIBIT A     OUTSTANDING PRIOR UTGO BONDS ...................................................A-1

EXHIBIT B     RESTRUCTURED UTGO BONDS AND MUNICIPAL
     OBLIGATIONS.............................................................................................. B-1

EXHIBIT C     STUB UTGO BONDS................................................................................... C-1

EXHIBIT D     FORM OF CONTINUING DISCLOSURE UNDERTAKING ................. D-1

ORDER NO. \_\_\_\_

ORDER OF THE EMERGENCY MANAGER OF THE CITY OF DETROIT, COUNTY OF WAYNE, STATE OF MICHIGAN, AUTHORIZING THE ISSUANCE AND RESTRUCTURING OF CERTAIN UNLIMITED TAX GENERAL OBLIGATION BONDS OF THE CITY OF DETROIT BY THE ISSUANCE BY THE CITY OF DETROIT OF NOT TO EXCEED $287,560,790 DISTRIBUTABLE STATE AID FOURTH LIEN RESTRUCTURED BONDS (UNLIMITED TAX GENERAL OBLIGATION), SERIES 2014 IN ONE OR MORE SUB-SERIES FOR THE PURPOSE OF PROVIDING CERTAIN BANKRUPTCY PLAN OF ADJUSTMENT FINANCING FOR THE CITY RELATED TO UNLIMITED TAX GENERAL OBLIGATION BOND CLAIMS; AUTHORIZING A FIFTH SUPPLEMENT TO THE OUTSTANDING MASTER DEBT RETIREMENT TRUST INDENTURE TO SECURE REPAYMENT OF SAID BONDS; IMPLEMENTING THE ASSIGNMENT OF PAYMENTS ON NOT TO EXCEED $43,349,210 OF THE CITY'S OUTSTANDING UNLIMITED TAX GENERAL OBLIGATION BONDS (STUB UTGO BONDS) PURSUANT TO THE PLAN OF ADJUSTMENT; AND AUTHORIZING THE AUTHORIZED OFFICERS TO MAKE CERTAIN DETERMINATIONS AND TO TAKE CERTAIN ACTIONS IN CONNECTION WITH THE TRANSFER OF A PORTION OF THE CITY'S OUTSTANDING UNLIMITED TAX GENERAL OBLIGATION BONDS IN CONSIDERATION FOR BONDS ISSUED BY THE MICHIGAN FINANCE AUTHORITY.

WHEREAS, at elections held on November 7, 1978, August 5, 1980, November 4, 1986, August 2, 1988, August 4, 1992, August 5, 1996, November 4, 1997, November 7, 2000, November 6, 2001, April 29, 2003, November 2, 2004 and February 24, 2009 (the "Prior Elections"), the qualified electors of the City of Detroit, County of Wayne, State of Michigan (the "City") authorized the issuance and sale of general obligation unlimited tax bonds of the City to finance certain public capital improvement projects of the City; and

WHEREAS, pursuant to the authorizations provided by certain of the Prior Elections, the City Charter, Act 279, Public Acts of Michigan, 1909, as amended ("Act 279"), Act 202, Public Acts of Michigan, 1943, as amended ("Act 202"), and Act 34, Public Acts of Michigan, 2001, as amended ("Act 34"), the City issued certain general obligation unlimited tax bonds (collectively, but not including the 2010A UTGO Bonds, as hereinafter defined, the "Prior UTGO Bonds") outstanding in the amounts set forth on Exhibit A attached hereto; and

WHEREAS, on March 18, 2010, pursuant to Act 80, Public Acts of Michigan, 1981, as amended ("Act 80") the City issued $249,790,000 of its Distributable State Aid General Obligation Limited Tax Bonds, Series 2010 (the "DSA Bonds") secured by and payable from money received or to be received by the City derived from the imposition of taxes by the State of Michigan (the "State") and returned or to be returned to the City as provided by law ("Distributable Aid"); and

WHEREAS, in connection with the issuance of the DSA Bonds, the City entered into a Master Debt Retirement Trust Indenture (the "Master Indenture") and a First Supplemental Debt Retirement Trust Indenture, each dated as of March 1, 2010, (the "First Supplemental Indenture") between the City and U.S. Bank National Association, Detroit, Michigan, as master trustee (the "Master Trustee" or the "Trustee"), that provides for the escrow of Distributable Aid payments received by the Trustee on behalf of the City to pay the debt service on obligations of the City secured by Distributable Aid (the "Distributable Aid Obligations"); and

WHEREAS, pursuant to Act 80, the Master Indenture and the First Supplemental Indenture, the DSA Bonds have a first lien on the City's Distributable Aid to secure the payment of the DSA Bonds and to provide for the direct payment to the Master Trustee of the Distributable Aid to be held in trust and used solely for payment of principal of and interest on Distributable Aid Obligations, and for that purpose, the City, the Master Trustee and the State Treasurer of the State of Michigan (the "State Treasurer") entered into an Agreement dated as of March 1, 2010 (the "DSA Bonds Deposit Agreement"); and

WHEREAS, on December 16, 2010, pursuant to the City Charter, Act 279 and Act 34, the City issued $100,000,000 Distributable State Aid Second Lien Bonds (Unlimited Tax General Obligation), Series 2010(A) (Taxable-Recovery Zone Economic Development Bonds-Direct Payment) (the "2010A UTGO Bonds") and sold them to the Michigan Finance Authority (the "MFA") under Act 227, Public Acts of Michigan, 1985, as amended ("Act 227"); and

WHEREAS, in connection with the issuance of the 2010A UTGO Bonds, the City entered into a Second Supplemental Debt Retirement Trust Indenture, dated as of December 1, 2010 (the "Second Supplemental Indenture") with the Trustee, to further provide for the security and payment of the 2010A UTGO Bonds with the unlimited tax levy and a second lien on Distributable Aid; and

WHEREAS, pursuant to Act 227, in order to provide for the direct payment of Distributable Aid to the Trustee to pay the debt service on the 2010A UTGO Bonds, the City, the MFA and the State Treasurer entered into an Agreement to Deposit Distributable State Aid with the Master Trustee for payment of the 2010A UTGO Bonds (the "UTGO Bonds Deposit Agreement"); and

WHEREAS, pursuant to Resolutions adopted on March 27, 2012 by the City Council of the City, certain Sale Orders of the Finance Director and Act 34, the City issued: (i) $38,865,000 Self Insurance Distributable State Aid Third Lien Bonds (Limited Tax General Obligation), Series 2012(A2) (the "Series 2012(A2) Bonds"); (ii) $30,730,000 Self Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(A2-B) (the "Series 2012(A2-B) Bonds"); (iii) $6,405,000 General Obligation Distributable State Aid Third Lien Capital Improvement Refunding Bonds (Limited Tax General Obligation) Series 2012B (the "Series 2012B Bonds"); and (iv) $53,520,000 Self Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(B2) (the "Series 2012(B2) Bonds, and collectively with the Series 2012(A2) Bonds, the Series 2012(A2-B) Bonds and the Series 2012B Bonds, the "Third Lien Bonds"); and

WHEREAS, the Third Lien Bonds were sold to the MFA and pursuant to Act 227 and Act 140, in order to provide for the direct payment of Distributable Aid to the Master Trustee to

pay the debt service on the Third Lien Bonds, the City, the MFA and the State Treasurer entered into an Agreement to Deposit Distributable State Aid (as amended the "2012 Deposit Agreement") with the Master Trustee and the City and the Master Trustee entered into a Third Supplemental Debt Retirement Trust Indenture, dated as of March 1, 2012, as amended (the "Third Supplemental Indenture") and a Fourth Supplemental Debt Retirement Trust Indenture dated as of August 1, 2012 (the "Fourth Supplemental Indenture") for payment of the Third Lien Bonds on a third lien basis subordinate to the first lien on Distributable State Aid securing the DSA Bonds and subordinate to the second lien on Distributable Aid securing the Series 2010A UTGO Bonds; and

WHEREAS, on March 1, 2013, the Governor (the "Governor") of the State of Michigan (the "State") determined that a financial emergency existed within the City pursuant to the Local Government Fiscal Responsibility Act, Act 72, Public Acts of Michigan, 1990, as amended ("Act 72"); and

WHEREAS, on March 14, 2013, the Governor confirmed that a financial emergency existed within the City and, pursuant to Act 72, assigned to the Local Emergency Financial Assistance Loan Board established pursuant to the Emergency Municipal Loan Act, Act 243 Public Acts of Michigan, 1980, as amended (the "Board") the responsibility for managing the financial emergency; and

WHEREAS, on March 14, 2013, pursuant to Act 72, the Board appointed Kevyn D. Orr as Emergency Financial Manager for the City; and

WHEREAS, by operation of law the financial emergency continues to exist within the City pursuant to the Local Financial Stability and Choice Act, Act 436, Public Acts of Michigan, 2012 ("Act 436") and the Emergency Financial Manager continues in the capacity of the Emergency Manager for the City (the "Emergency Manager"); and

WHEREAS, on July 18, 2013 (the "Petition Date"), in accordance with Act 436 and the approval of the Governor, the Emergency Manager filed on behalf of the City a petition for relief pursuant to Chapter 9 of title 11 of the United States Code, 11 U.S.C. Sections 101-1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"); and

WHEREAS, on _____, 2014, the Emergency Manager filed on behalf of the City a ____ Amended Plan for the Adjustment of the Debts of the City of Detroit (now and as subsequently amended, the "Plan of Adjustment") in the Bankruptcy Court to provide for the adjustment of the debts of the City pursuant to and in accordance with Chapter 9 of the Bankruptcy Code; and

WHEREAS, more than 90% of the Prior UTGO Bonds are insured by Ambac Assurance Corporation; Assured Guaranty Municipal Corp. together with Assured Guaranty Corp.; and National Public Finance Guarantee Corporation (each a "Bond Insurer" and collectively, the "Bond Insurers"); and

WHEREAS, pursuant to the Plan of Adjustment and a settlement agreement dated July 18, 2014 among the City and the Bond Insurers (the "UTGO Settlement Agreement") the City intends to restructure a portion of the outstanding Prior UTGO Bonds (the "Restructured UTGO

Bonds") as provided in this Order; and

WHEREAS, pursuant to a bond purchase contract (the "Purchase Contract") between the City and the MFA, the City shall deliver the Bonds authorized hereunder (the "Bonds" or the "Municipal Obligation") to the MFA, and in consideration thereof, the MFA will deliver its [Local Government Loan Program Revenue Bonds, Series 2014 (City of Detroit Unlimited Tax General Obligation Local Project Bonds)] (the "MFA Bonds") to (i) the holders of the Holders Restructured UTGO Bonds (as defined in the UTGO Settlement Agreement) and (ii) the Bond Insurers and the Dissenting Bond Insurer as holders of the Insurer Owned Restructured UTGO Bonds (as defined in the UTGO Settlement Agreement) in consideration for the transfer of the Restructured UTGO Bonds to the MFA; and

WHEREAS, the MFA Bonds will be issued by the MFA in Authorized Denominations in the same aggregate principal amounts per maturity as the Restructured UTGO Bonds, rounded down as provided in this Order, for each denomination to the nearest Authorized Denomination; and on the Effective Date, as hereinafter defined, the holders of the Holders Restructured UTGO Bonds shall be paid the difference in principal amount, if any, between the Holders Restructured UTGO Bonds and the principal amount of MFA Bonds allocated and transferred to them as provided herein by the City from its General Fund or by the Master Trustee at the direction of the City from available funds on deposit in the Debt Retirement Fund (the "Debt Retirement Fund") established hereunder, as determined by an Authorized Officer; and

WHEREAS, a portion of the Prior UTGO Bonds not restructured by the Municipal Obligation which mature on or after April 1, 2015, in the principal amount of $43,349,210 (the "Stub UTGO Bonds" and collectively with the 2010A UTGO Bonds, the Municipal Obligation and any Additional Bonds (defined below), the "UTGO Bonds") shall be reinstated, remain Outstanding in the amounts and will remain payable as shown on Exhibit C hereto; and

WHEREAS, the Stub UTGO Bonds also will be in Authorized Denominations; and

WHEREAS, upon satisfaction of all of the terms and conditions required of the City related to the confirmation of the Plan of Adjustment, the City shall establish the Business Day upon which the Plan of Adjustment shall become effective (the "Effective Date"); and

WHEREAS, on or after the Effective Date, the City shall issue and deliver the Municipal Obligation to the MFA and pursuant to the Plan of Adjustment, the Assigned UTGO Bond Tax Proceeds (as hereinafter defined), will be assigned to the Income Stabilization Funds and the GRS (collectively, the "Plan Assignees") as such terms are defined in the Plan of Adjustment; and

WHEREAS, the Emergency Manager deems it necessary to authorize the issuance of the Bonds in one or more series in the aggregate principal amount of not to exceed Two Hundred Eighty-Seven Million Five Hundred Sixty Thousand Seven Hundred Ninety Dollars ($287,560,790); and

WHEREAS, pursuant to the resolutions authorizing the Prior UTGO Bonds and the 2010A UTGO Bonds, this Order and Section 4a of Act 279, the City has pledged, and to the

extent permitted by applicable law, including without limitation, Section 12(1)(x) of Act 436, will create a lien upon the Debt Millage Revenues (as hereinafter defined) to pay the debt service on the UTGO Bonds; and

WHEREAS, pursuant to Section 4a of Act 279, and Section 701 of the Revised Municipal Finance Act, Act No. 34, Public Acts of Michigan, 2001, as amended, the Emergency Manager desires to provide for the deposit of the Debt Millage Revenues into a separate escrow account to be used for the sole purpose of paying principal of and interest on the UTGO Bonds and the administrative costs related to the deposit and escrow of Debt Millage Revenues; and

WHEREAS, in order to effectuate a lien, to the extent permitted by law, upon the debt millage revenues (the "Debt Millage Revenues") derived from the unlimited tax pledge in favor of the Registered Owners of the Bonds, it is necessary for the City to provide for the deposit of the proceeds of 100% of the City's unlimited tax general obligation debt millage levy in trust to further secure payment of the debt service on the Bonds, with U.S. Bank National Association, as Debt Millage Escrow Trustee (the "Debt Millage Escrow Trustee"), pursuant to a Debt Millage Deposit Escrow Agreement (the "Debt Millage Escrow Agreement") between the City and the Debt Millage Escrow Trustee; and

WHEREAS, the Emergency Manager recommends that the Bonds be secured by a fourth lien pledge of Distributable Aid under a Fifth Supplemental Debt Retirement Trust Indenture (the "Fifth Supplemental Indenture"), in addition to a pledge of the City's unlimited tax full faith and credit; and

WHEREAS, the Emergency Manager desires the Debt Millage Revenues to constitute special revenues under Section 902 of the Bankruptcy Code and to afford the holders of the UTGO Bonds the protection provided to "pledged special revenues," as that term is used in Section 922(d) of the Bankruptcy Code.

WHEREAS, the MFA may distribute one or more preliminary official statements (together with any supplements thereto, each a "Preliminary Official Statement") and final official statements (together with any supplements thereto, each an "Official Statement") to the holders of the MFA Bonds; and

WHEREAS, the Emergency Manager also desires to authorize the submission of disclosure information to the MFA, as applicable, if necessary in connection with the issuance and delivery of the Municipal Obligation and the issuance and delivery of the MFA Bonds; and

WHEREAS, the MFA will require, as a condition precedent to accepting the Municipal Obligation, that the City agree to provide continuing disclosure as required by Section (b)(5) of Rule 15c2-12 ("Rule 15c2-12") promulgated by the Securities and Exchange Commission under the Securities and Exchange Act of 1934, as amended; and

WHEREAS, the Emergency Manager also desires to authorize the submission of disclosure information to the holders of the Stub UTGO Bonds, if necessary in connection with the secondary marketing, if any, of the Stub UTGO Bonds by the holders thereof on the Effective Date; and

WHEREAS, pursuant to the authority of Section 315(1)(d) of Act 34, the Emergency Manager desires to delegate to the Finance Director the authority to make certain determinations with respect to the Bonds, if necessary, within the parameters of this Order and to take such other actions and make such other determinations as may be necessary to accomplish the delivery of the Bonds and the transactions contemplated by this Order, as shall be confirmed by the Finance Director in the Supplemental Order; and

WHEREAS, prior to the issuance of the Bonds, pursuant to Sections 12(1) (u) and 19(1) of Act 436, the Emergency Manager must obtain the approval of the issuance of the Bonds by the City Council, and if the City Council disapproves of the issuance of the Bonds, the issuance of the Bonds must be approved by the Board.

NOW, THEREFORE, BE IT ORDERED BY THE EMERGENCY MANAGER OF THE CITY OF DETROIT, WAYNE COUNTY, MICHIGAN, PURSUANT TO THE CHARTER, ACT 34, ACT 227, ACT 279, AND ACT 436 AS FOLLOWS:

## ARTICLE I

## DEFINITIONS AND INTERPRETATION

Section 101. <u>Definitions</u>. The words and terms defined in the preambles and recitals hereof and the following words and terms as used in this Order shall have the meanings ascribed therein, herein or in the Plan of Adjustment unless a different meaning clearly appears from the context:

"Act 34" means Act 34, Public Acts of Michigan, 2001, as amended.

"Act 80" means Act 80, Public Acts of Michigan, 1981, as amended.

"Act 227" means Act 227, Public Acts of Michigan, 1985, as amended.

"Act 279" means Act 279, Public Acts of Michigan, 1909, as amended.

"Act 436" means Act No. 436, Public Acts of Michigan, 2012.

"Additional Bonds" shall mean any unlimited tax general obligation bonds issued under Act 279 on a parity with the Prior UTGO Bonds, the 2010A UTGO Bonds, the Municipal Obligation and the Stub UTGO Bonds as to the Aggregate UTGO Tax Levy.

"Aggregate UTGO Tax Levy" means all proceeds of the Debt Millage Revenues.

"Ambac" means Ambac Assurance Corporation.

"Assigned UTGO Bond Tax Proceeds" means that portion of the Aggregate UTGO Tax Levy designated to pay the principal of and interest on the Stub UTGO Bonds.

"Assured" means Assured Guaranty Municipal Corp. and Assured Guaranty Corp.

13-53846-swr   Doc 8797-13   Filed 10/15/14   Entered 10/15/14 23:27:34   Page 291 of 455

"Authorized Denominations" shall mean denominations of Bonds and Stub UTGO Bonds equal to multiples of $1.00.

"Authorized Officer" means (i) the Emergency Manager or his designee or successor, or if the City is no longer operating under a financial emergency pursuant to Act 436, the Mayor of the City, the Finance Director or his or her designee, or (ii) any other person authorized by a Certificate of an Authorized Officer to act on behalf of or otherwise represent the City in any legal capacity, which such certificate shall be delivered, if at all, in the City's sole discretion.

"Bankruptcy Case" means the City's Bankruptcy Case No. 13-53846 in the U.S. Bankruptcy Court for the Eastern District of Michigan.

"Bankruptcy Court Order" has the meaning set forth in the recitals hereto.

"Board" has the meaning set forth in the recitals hereto.

"Bond" or "Bonds" means the Municipal Obligations.

"Bond Counsel" means Miller, Canfield, Paddock and Stone, P.L.C., attorneys of Detroit, Michigan, or such other nationally recognized firm of attorneys experienced in matters pertaining to municipal bonds and appointed to serve in such capacity by the City with respect to the Bonds.

"Bond Insurer" means Ambac, Assured or NPFG, as the case may be, as an issuer of a bond insurance policy with respect to that portion of the Restructured UTGO Bonds such entity insures.

"Bond Orders" means collectively this Order and the Supplemental Order.

"Bond Registry" means the books for the registration of Bonds maintained by the Master Trustee.

"Bondowner", "Owner" or "Registered Owner" means, with respect to any Bond, the person in whose name such Bond is registered in the Bond Registry.

"Business Day" means a day which is not (i) a Saturday, Sunday or legal holiday on which banks located in either the State of Michigan or the state or states in which the principal corporate trust office of the Master Trustee, is located are authorized or required by law to be closed, or (ii) a day on which the New York Stock Exchange is closed.

"Charter" means the Charter of the City, as amended from time to time.

"City" means the City of Detroit, County of Wayne, State of Michigan.

"Closing Date" means the date or dates upon which the Restructured UTGO Bonds are transferred to the MFA in consideration for the MFA Bonds.

"Code" means the Internal Revenue Code of 1986, as amended.

"Constitution" means the Constitution of the State of Michigan of 1963, as amended.

"Council" means the City Council of the City of Detroit, Michigan.

"Debt Millage Deposit" or "Debt Millage Deposits" means whenever used herein singularly, each payment of Debt Millage Revenues, and collectively all payments of Debt Millage Revenues by the City to the Debt Millage Escrow Trustee for deposit in the UTGO Debt Millage Fund in accordance with the Debt Millage Escrow Agreement.

"Debt Millage Escrow Agreement" means the Debt Millage Deposit Escrow Agreement, between the City and the Debt Millage Escrow Trustee, for the collection of 100% of the City's unlimited tax general obligation bond debt millage.

"Debt Millage Escrow Trustee" means U.S. Bank National Association, Detroit, Michigan, as Debt Millage Escrow Trustee, and any successor to the Debt Millage Escrow Trustee substituted in its place pursuant to the provisions of the Debt Millage Escrow Agreement.

"Debt Millage Revenues" means the proceeds of the ad valorem debt millage levies, including interest subsidy payments received by the City in respect of the 2010A UTGO Bonds delinquent millage payments received from Wayne County, Michigan, or otherwise, pledged to and on account of unlimited tax general obligation bonds of the City for the payment of debt service on the Prior UTGO Bonds (or after the Effective Date, the UTGO Bonds), and the 2010A UTGO Bonds, the Municipal Obligation, the Stub UTGO Bonds and any Additional Bonds.

"Debt Retirement Fund" means the fund so designated and established under Section 501 hereof.

"Dissenting Bond Insurer" means Syncora Guarantee, Inc.

"Distributable Aid" has the meaning given in Act 80.

"DSA Bonds" means the City's $249,790,000 original principal amount Distributable State Aid General Obligation Limited Tax Bonds, Series 2010.

"Effective Date" has the meaning set forth in the recitals hereto.

"Fifth Supplemental Indenture" means the Fifth Supplemental Debt Retirement Trust Indenture, dated as of the date of issuance of the Bonds, between the City and the Master Trustee providing for the escrow of Distributable State Aid payments received by the Master Trustee on behalf of the City to pay the debt service on the Bonds.

"Finance Director" means the Finance Director of the City or his/her deputy or designee.

"First Lien Bonds" means the DSA Bonds.

"First Supplemental Indenture" means the First Supplemental Debt Retirement Trust Indenture dated as of March 1, 2010, between the City and the Master Trustee, providing for the

escrow of Distributable Aid payments received by the Master Trustee on behalf of the City to pay the debt service on the DSA Bonds.

"Fiscal Year" means the fiscal year of the City as in effect from time to time.

"Fourth Supplemental Indenture" has the meaning set forth in the recitals hereto.

"GRS" means General Retirement System for the City of Detroit.

"Income Stabilization Fund" means the Income Stabilization Funds as defined in the Plan of Adjustment.

"Interest Payment Date" has the meaning given such term in Section 302.

"Master Indenture" shall mean the Master Debt Retirement Trust Indenture dated as of March 1, 2010 by and between the City and U.S. Bank National Association, Detroit, Michigan, as Master Trustee, as supplemented by (i) the First Supplemental Indenture; (ii) the Second Supplemental Indenture; (iii) the Third Supplemental Indenture; (iv) the Fourth Supplemental Indenture; and (v) the Fifth Supplemental Indenture, by and between the City and the Master Trustee.

"Master Trustee" means U.S. Bank National Association, Detroit, Michigan, as Master Trustee under the Master Indenture, and successors to the Master Trustee substituted in its place pursuant to the provisions of the Master Indenture.

"Maximum Aggregate Principal Amount" has the meaning given such term in Section 201.

"MFA" means the Michigan Finance Authority, as successor to the Michigan Municipal Bond Authority.

"MFA Bonds" means has the meaning set forth in the recitals hereto.

"Municipal Obligation" has the meaning set forth in the recitals hereto.

"Non-Arbitrage and Tax Compliance Certificate" means the Non-Arbitrage and Tax Compliance Certificate of the City, dated the Closing Date, regarding rebate requirements and other tax responsibilities of the City relating to the Tax-Exempt Bonds under the Code.

"NPFG" means National Public Finance Guaranty Corporation.

"Order" means this Order of the Emergency Manager as supplemented by the Supplemental Order, and as amended from time to time pursuant to Article VII.

"Outstanding" when used with respect to:

(1)     the Bonds, means, as of the date of determination, the Bonds theretofore authenticated and delivered under this Order, except:

(A)   Bonds theretofore canceled by the Master Trustee or delivered to the Master Trustee for cancellation;

(B)   Bonds for whose payment money in the necessary amount, without the need for reinvestment thereof, has been theretofore deposited with the Master Trustee in trust for the registered owners of such Bonds;

(C)   Bonds delivered to the Master Trustee for cancellation in connection with (x) the exchange of such Bonds for other Bonds or (y) the transfer of the registration of such Bonds;

(D)   Bonds alleged to have been destroyed, lost or stolen which have been paid or replaced pursuant to this Order or otherwise pursuant to law; and

(E)   Bonds deemed paid as provided in Section 801.

"Permitted Investments" means those investments specified in Article III of the Debt Millage Escrow Agreement.

"Plan of Adjustment" has the meaning set forth in the recitals hereto.

"Plan Assignees" means the Income Stabilization Funds and the GRS.

"Prior DSA Bonds" means, collectively, the First Lien Bonds, the Second Lien Bonds and the Third Lien Bonds.

"Prior UTGO Bonds" has the meaning set forth in the recitals hereto.

"Pro Rata" means the proportion that a claim of one Holder of Restructured UTGO Bonds bears to the aggregate of all claims of all Holders of Restructured UTGO Bonds.

"Purchase Contract" means the purchase contract negotiated by the Finance Director between the City and the MFA, providing for the terms and conditions of the delivery of the Municipal Obligation to the MFA in anticipation of the transfer of the Restructured Bonds to the MFA in consideration for the MFA Bonds on the terms and conditions and in form and substance reasonably acceptable to the Bond Insurers.

"Regular Record Date" has the meaning given such term in Section 302.

"Restructured UTGO Bonds" has the meaning set forth in the recitals hereto.

"Second Lien Bonds" means the 2010A UTGO Bonds.

"Second Supplemental Indenture" has the meaning set forth in the recitals hereto.

"State" means the State of Michigan.

"State Treasurer" means the Treasurer of the State.

"Stub UTGO Bonds" has the meaning set forth in the recitals hereto.

"Supplemental Order" means, to the extent necessary, the order or orders of the Authorized Officer making certain determinations and/or confirming the final details of the Bonds upon the sale thereof in accordance with the parameters of this Order and the terms of the Purchase Contract.

"Tax-Exempt Bonds" means those Bonds, if any, the interest on which is excluded from gross income for federal tax purposes, as determined by the Authorized Officer in the Supplemental Order.

"Third Lien Bonds" has the meaning set forth in the recitals hereto.

"Third Supplemental Indenture" has the meaning set forth in the recitals hereto.

"UTGO Bonds" has the meaning in the recitals hereto.

"UTGO Bond Tax Levy" means that portion of the Aggregate UTGO Tax Levy at a level that was pledged to pay the Prior UTGO Bonds.

"UTGO Debt Millage Fund" means the fund so designated and authorized by Section 501 hereof and established under the Debt Millage Escrow Agreement.

"2010A UTGO Bonds" means the City's outstanding Distributable State Aid Second Lien Bonds (Unlimited Tax General Obligation), Series 2010(A).

Section 102. Interpretation. (a) Words of the feminine or masculine genders include the correlative words of the other gender or the neuter gender.

(b)      Unless the context shall otherwise indicate, words importing the singular include the plural and vice versa, and words importing persons include corporations, associations, partnerships (including limited partnerships), trusts, firms and other legal entities, including public bodies, as well as natural persons.

(c)      Articles and Sections referred to by number mean the corresponding Articles and Sections of this Order.

(d)      The terms "hereby, "hereof", "hereto", "herein", "hereunder" and any similar terms as used in this Order, refer to this Order as a whole unless otherwise expressly stated.

## ARTICLE II

## DETERMINATIONS

Section 201.    Finding, and Declaration of Need to Issue Bonds; Authorized Denominations. (a) The Emergency Manager hereby finds and declares that it is necessary for the City to restructure and refund (under applicable state law) $287,560,790 of the Prior UTGO Bonds which mature on or after April 1, 2015, by restructuring them as Restructured UTGO Bonds to be transferred to the MFA and in such form issuing them in the principal amounts as

shown on Exhibit B as Municipal Obligations, in Authorized Denominations and leaving $43,349,210 of the Prior UTGO Bonds remaining outstanding as Stub UTGO Bonds in Authorized Denominations as shown on Exhibit C, pursuant to and in accordance with the provisions of Act 34 and Act 279, for the purpose of satisfying the Class 8 claims as required by the Plan of Adjustment. The MFA Bonds will, in the aggregate, mature or be subject to mandatory redemption and optional redemption in the same principal amounts per maturity, and bear interest at the same interest rates as the Restructured UTGO Bonds.

(b)    On the Effective Date, that portion of the Aggregate UTGO Tax Levy designated to pay the principal of and interest on the Stub UTGO Bonds (but subject to the prior rights of the holders of the Municipal Obligation) (the "Assigned UTGO Bond Tax Proceeds") shall be assigned by the Plan of Adjustment (without any further consent or action on the part of, or additional consideration payable to, the Bond Insurers, the Dissenting Bond Insurer or the holders of the Stub UTGO Bonds) to the Plan Assignees, and such proceeds shall not be paid to the paying agent for the UTGO Bonds, but shall be paid to the Plan Assignees directly by the Debt Millage Escrow Trustee.

Section 202. <u>Declaration of Borrowing</u>. The City shall issue the Bonds as hereinafter provided and as finally confirmed by the Authorized Officer in the Supplemental Order, secured by the unlimited tax full faith, credit and resources of the City which will be payable from ad valorem taxes levied on all taxable property within the City without limitation as to rate or amount, for the purposes stated herein.

## ARTICLE III

## AUTHORIZATION, REDEMPTION AND ASSIGNMENT OF THE BONDS

Section 301. <u>Authorization of Bonds and Pledge</u>. (a)   The City hereby authorizes the issuance of the Bonds in such series and in such principal amounts as shall be confirmed in the Supplemental Order. The Bonds shall be payable from and secured, to the extent permitted by applicable law, including, without limitation, Section 12(1)(x) of Act 436, by a lien on the Debt Millage Revenues derived from an annual levy of ad valorem taxes on all taxable property in the City without limitation as to rate or amount. Pursuant to authorization provided in Act 227, the City hereby pledges as additional security for the payment of principal of and interest on the Bonds, Distributable Aid payments that the City is eligible to receive on a fourth lien basis subordinate to the pledge thereof for the payment of the Prior DSA Bonds. The Finance Director is hereby authorized and directed to negotiate, approve and execute the Fifth Supplemental Indenture for and on behalf of the City with U.S. Bank National Association, Detroit, Michigan, as Master Trustee, to provide for a fourth lien pledge of Distributable Aid to secure payment of the Bonds. Nothing in this Order shall restrict or be construed as restricting the City's ability to make additional pledges or assignments of Distributable Aid as security for current or future bonds or obligations of the City, subject to the requirements for the issuance of additional bonds and obligations set forth in the Master Indenture.

(b)    The Debt Millage Revenues as pledged by the City to secure payment of the Bonds, shall constitute "special revenues," as defined in Section 902 of the Bankruptcy Code and "pledged special revenues," as the term is used in Section 922(d) of the Bankruptcy Code.

Section 302.  Designations, Dates, Interest Rates, Maturities, Redemption and Other Terms of the Bonds and Stub UTGO Bonds.

(a)　　The Bonds shall be designated as "DISTRIBUTABLE STATE AID FOURTH LIEN RESTRUCTURED BONDS (UNLIMITED TAX GENERAL OBLIGATION), SERIES 2014 and may bear such later or earlier dates and additional or alternative designations as the Authorized Officer may determine in the Supplemental Order, shall be issued in fully registered form and shall be consecutively numbered from "R-1" upwards, respectively unless otherwise provided by the Authorized officer in the Supplemental Order.  The Bonds shall be dated and issued in Denominations all as determined by the Authorized Officer and confirmed by the Authorized Officer in the Supplemental Order.

(b)　　The Bonds shall be issued in multiple separate series, each one corresponding to the related series of the Prior UTGO Bonds listed on Exhibit A hereto.  Each separate series of the Municipal Obligations shall be issued in a principal amount equal to 86.9% of the outstanding principal amount of each maturity of the related series of Prior UTGO Bonds in Authorized Denominations as provided in Section 201(a).  Each series of Municipal Obligations shall be further subdivided into two subseries, with one subseries equal to 84.5% of the outstanding principal amount of each maturity of the related series of Prior UTGO Bonds, in Authorized Denominations, and the second subseries equal to 2.4% of the outstanding principal amount of each maturity of the related series of Prior UTGO Bonds, in Authorized Denominations.

(c)　　The Bonds and the Stub UTGO Bonds shall bear interest from _____, 201_, at the same interest rate per annum as the related Prior UTGO Bonds; be subject to amortization on the same schedule as the related Prior UTGO Bonds; mature on the same dates; and be subject to redemption in the same manner as the related Prior UTGO Bonds.  Unless otherwise provided by the Authorized Officer in the Supplemental Order, interest on the Bonds shall be calculated on the basis of a 360 day year consisting of twelve, 30 day months.  In the event that a calculation of interest is not an integral multiple of $0.01, the Paying Agent shall round all amounts less than or equal to $0.0049 down to the nearest $0.01 and round all amounts greater than $.0049 up to the nearest $0.01.  The Bonds shall be payable, as to principal and interest, in lawful money of the United States of America.

(d)　　On or after the Effective Date, the Municipal Obligations shall be delivered to the MFA in consideration for bonds to be issued by the MFA (the "MFA Bonds") and the following additional provisions shall apply:

(1)　　Each subseries of Municipal Obligations shall be in the form of a single fully-registered, nonconvertible bond in the denomination of the full principal amount thereof, dated as of the date of delivery of the Municipal Obligations, payable in principal installments serially shown on Exhibit B and approved by the MFA and the Authorized Officer.  The obligation to deliver the Municipal Obligations to the MFA shall be evidenced by execution of a Purchase Contract (the "Purchase Contract") between the City and the MFA providing for the transfer of the Municipal Obligations to the MFA in consideration for the MFA Bonds, and an Authorized Officer is authorized and directed to execute and deliver the Purchase Contract when it is in final form and to make the

determinations set forth above. An Authorized Officer is authorized and directed to approve of a series designation with respect to each series of Municipal Obligations.

(2) Each subseries of the Municipal Obligations shall not be convertible or exchangeable into more than one fully-registered bond. Principal of and interest on the Municipal Obligations shall be payable as provided in the Bond form in this Order as the same may be amended to conform to MFA requirements.

(3) The Master Trustee shall record on the registration books payment by the City of each installment of principal or interest or both when made and the cancelled checks or other records evidencing such payments shall be returned to and retained by the City Treasurer.

(4) Upon payment by the City of all outstanding principal of and interest on a Municipal Obligation, the MFA shall deliver the respective Municipal Obligation to the City for cancellation.

(e) Concurrently with the restructuring of a portion of the Prior UTGO Bonds and issuance of the MFA Bonds, the Stub UTGO Bonds, in Authorized Denominations as provided in Section 201(a), will be reinstated and remain Outstanding and will be payable from the UTGO Bond Tax Levy, provided that the Assigned UTGO Bond Tax Proceeds as assigned by the Plan of Adjustment shall be paid by the Debt Millage Escrow Trustee to the Plan Assignees and such proceeds shall not be paid to the paying agent for the Stub UTGO Bonds.

Section 303. Execution, Authentication and Delivery of Bonds. The Bonds shall be executed in the name of the City by the manual or facsimile signatures of the Mayor and the Finance Director and authenticated by the manual signature of the Finance Director, and the seal of the City (or a facsimile thereof) shall be impressed or imprinted on the Bonds. After the Bonds have been executed and authenticated for delivery, they shall be delivered by the Finance Director to the MFA in consideration for the issuance of the MFA Bonds.

Section 304. Authentication of the Bonds. Anything in this Order to the contrary notwithstanding, the Bonds bearing the manual or facsimile signatures of the Mayor and the Finance Director shall require no further authorization.

Section 305. The MFA's Depository. Notwithstanding any other provision herein to the contrary, as long as the MFA is the owner of the Bonds, the Bonds are payable as to principal, premium, if any, and interest at the corporate trust office of _____ _____, _____, Michigan, or such other qualified bank or financial institution as shall be designated in writing to the City by the MFA (the "Authority's Depository"). The City will deposit, or cause the Master Trustee, to deposit with the MFA's Depository payments of the principal of, premium, if any, and interest on the Bonds in immediately available funds at least five business days prior to the date on which any such payment is due whether by maturity, redemption or otherwise. Written notice of any redemption of the Bonds shall be given by the City and received by the MFA's Depository at least 40 days prior to the date on which such redemption is to be made.

Section 306. <u>Mutilated, Destroyed, Stolen or Lost Bonds</u>. (a) Subject to the provisions of Act 354, Public Acts of Michigan, 1972, as amended and any other applicable law, if (i) any mutilated Bond is surrendered to the City, and the City receives evidence to its satisfaction of the destruction, loss or theft of any Bond and (ii) there is delivered to the City such security or indemnity as may be required by it to save the City harmless, then, in the absence of notice to the City that such Bond has been acquired by a bona fide purchaser, the City shall execute and deliver in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Bond, a new Bond of like tenor and principal amount, bearing a number not contemporaneously outstanding.

(b) If any such mutilated, destroyed, lost or stolen Bond has become or is about to become due and payable, the City in its discretion may, instead of issuing a new Bond, pay such Bond.

(c) Any new Bond issued pursuant to this Section in substitution for a Bond alleged to be mutilated, destroyed, stolen or lost shall constitute an original additional contractual obligation on the part of the City, and shall be equally secured by and entitled to equal proportionate benefits with all other Bonds of like tenor issued under this Order.

Section 307. <u>Form of the Bonds</u>. The Bonds shall be in substantially the following form with such insertions, omissions, substitutions and other variations as shall not be inconsistent with this Order or required by the Michigan Attorney General and the MFA or permitted by the Supplemental Order or as approved by an Authorized Officer and Bond Counsel:

[Form of Bond]

United States of America
State of Michigan
County of Wayne

CITY OF DETROIT
DISTRIBUTABLE STATE AID FOURTH LIEN RESTRUCTURED BOND
(UNLIMITED TAX GENERAL OBLIGATION), SERIES 2014__

REGISTERED OWNER:          Michigan Finance Authority

PRINCIPAL AMOUNT:          _____ Dollars ($___,000)

DATE OF ORIGINAL ISSUE:          _____, 2014

The CITY OF DETROIT, County of Wayne, State of Michigan (the "City"), for value received, hereby promises to pay to the Michigan Finance Authority (the "Authority"), or registered assigns, the Principal Amount shown above, in lawful money of the United States of America, unless prepaid prior thereto as hereinafter provided. Capitalized terms used herein, but not defined herein, shall have the meanings ascribed to them in the Order, as hereinafter defined.

The Principal Amount shall be payable on the dates and in the annual principal installment amounts set forth in Schedule A attached hereto and made a part hereof, or if a portion of the Principal Amount is prepaid as provided below, with interest on said principal installments from the [Date of Original Issue] shown above, until paid at the rate [of interest as set forth on the attached schedule] [of _____ percent (_____%) per annum]. Interest is first payable on _____ 1, 20__, and semiannually thereafter on the first day of _____ and _____ of each year, as set forth in the Purchase Contract.

Notwithstanding any other provision of this bond, as long as the MFA is the owner of this bond, (a) this bond is payable as to principal, premium, if any, and interest at the corporate trust office of _____, _____, _____, or at such other place as shall be designated in writing to the City by the MFA (the "Authority's Depository"); (b) the City agrees that it will cause the Master Trustee to deposit with the MFA's Depository payments of the principal of, premium, if any, and interest on this bond in immediately available funds at least five business days prior to the date on which any such payment is due whether by maturity, redemption or otherwise; and (c) written notice of any redemption of this bond shall be given by the City and received by the MFA's Depository at least 40 days prior to the date on which such redemption is to be made.

Additional Interest

[In the event of a default in the payment of principal or interest hereon when due, whether at maturity, by redemption or otherwise, the amount of such default shall bear interest

-16-

(the "additional interest") at a rate equal to the rate of interest which is two percent above the MFA's cost of providing funds (as determined by the MFA) to make payment on the bonds of the MFA issued to provide funds to purchase this bond but in no event in excess of the maximum rate of interest permitted by law. The additional interest shall continue to accrue until the MFA has been fully reimbursed for all costs incurred by the MFA (as determined by the MFA) as a consequence of the City's default. Such additional interest shall be payable on the interest payment date following demand of the MFA. In the event that (for reasons other than the default in the payment of any municipal obligation purchased by the MFA) the investment of amounts in the reserve account established by the MFA for the bonds of the MFA issued to provide funds to purchase this bond fails to provide sufficient available funds (together with any other funds which may be made available for such purpose) to pay the interest on outstanding bonds of the MFA issued to fund such account, the City shall and hereby agrees to pay on demand only the City's pro rata share (as determined by the MFA) of such deficiency as additional interest on this bond.]

This bond is a single, fully-registered, non-convertible bond in the principal sum of $___,000, issued pursuant to and in accordance with Act 34, Public Acts of Michigan, 2001, as amended, and Act 279, Public Acts of Michigan, 1909, as amended, Act 227, Public Acts of Michigan, 1985, as amended ("Act 227") and pursuant to and in accordance with an Order duly adopted by the Emergency Manager of the City on _____, _____ [and a Supplemental Order of the Authorized Officer of the City issued on _____, ____ (together,] the "Order"). The Bonds are issued for the purpose of restructuring certain unlimited tax general obligation bonds of the City as described in the Order, pursuant to the City's Plan of Adjustment under the Bankruptcy Case.

[Optional and/or Mandatory Redemption Provisions]

This Bond is payable out of the City's Debt Retirement Fund for this issue (which will be held by the Master Trustee), and the City is obligated to levy annually sufficient taxes to provide for the payment of the principal of and interest on the bonds of this issue as they mature on all taxable property in the City without limitation as to rate or amount (the revenues of such levy, the "Debt Millage Revenues").

The Bonds shall be payable from and secured, to the extent permitted by applicable law, including without limitation, Section 12(1)(x) of Act 436, by a lien on the Debt Millage Revenues.

The Debt Millage Revenues as pledged by the City to secure payment of the Bonds, shall constitute "special revenues," as defined in Section 902 of the Bankruptcy Code and "pledged special revenues," as the term is used in Section 922(d) of the Bankruptcy Code.

As additional security for the City's obligation to pay the Bonds, pursuant to Act 227 the City has pledged the payments that the City is eligible to receive from the State of Michigan under Act 140, Public Acts of Michigan, 1971, as amended ("Distributable Aid"), and certain monies in the funds and accounts established by the City with U.S. Bank National Association, as master trustee (the "Trustee"), pursuant to the terms and conditions of a Master Debt Retirement Trust Indenture dated as of March 1, 2010, as supplemented, by (i) the First Supplemental Debt Retirement Trust Indenture dated as of March 1, 2010; (ii) the Second

Supplemental Debt Retirement Trust Indenture dated as of December 1, 2010; (iii) the Third Supplemental Debt Retirement Trust Indenture dated as of March 1, 2012; (iv) the Fourth Supplemental Debt Retirement Trust Indenture dated as of August 1, 2012; and (v) the Fifth Supplemental Debt Retirement Trust Indenture, dated as of _____, 2014, by and between the City and the Master Trustee (collectively, the "Trust Indenture"). The pledge and lien on Distributable Aid securing the Bonds is on a fourth lien basis to a lien on Distributable Aid securing the City's outstanding Prior DSA Bonds. The City has reserved the right to make additional pledges or assignments of Distributable Aid on a prior, parity or subordinate basis with the pledge of Distributable Aid securing the Prior DSA Bonds and the Bonds as security for future bonds or obligations of the City, subject to the requirements for the issuance of additional bonds and obligations as provided in the Trust Indenture.

This bond is transferable only upon the registration books of the City by the registered owner of record in person, or by the registered owner's attorney duly authorized in writing, upon the surrender of this bond together with a written instrument of transfer satisfactory to the City duly executed by the registered owner or the registered owner's attorney duly authorized in writing, and thereupon a new registered bond or bonds in the same aggregate principal amount and of the same maturity shall be issued to the transferee in exchange therefor as provided in the resolution authorizing this bond and upon the payment of the charges, if any, therein prescribed.

It is hereby certified and recited that all acts, conditions and things required by law to be done, precedent to and in the issuance of this bond and the series of bonds of which this is one, exist and have been done and performed in regular and due form and time as required by law, and that the total indebtedness of the City, including this bond and the series of bonds of which this is one, does not exceed any constitutional, statutory or charter debt limitation.

IN WITNESS WHEREOF, the City of Detroit by authority of its Mayor, has caused this bond to be signed for and on its behalf and in its name by the manual or facsimile signature of the Mayor of the City and the manual or facsimile signature of its Finance Director and the official seal of the City to be impressed hereon, all as of the Date of Original Issue.

**CITY OF DETROIT**
County of Wayne
State of Michigan

By_____

Its Mayor

(SEAL)

By_____

Its Finance Director

## ARTICLE IV

## SPECIAL COVENANTS

Section 401. <u>Tax Exemption Covenant for Tax-Exempt Bonds</u>. The City covenants that it will not take any action, or fail to take any action required to be taken, if taking such action or failing to take such action would adversely affect the general exclusion from gross income of interest on any Tax-Exempt Bonds, from federal income taxation under the Code.

Section 402. <u>Arbitrage Covenant</u>. (a) The City will not directly or indirectly (1) use or permit the use of any proceeds of any Tax-Exempt Bonds or other funds of the City or (2) take or omit to take any action required by Section 148(a) of the Code in order to maintain the exclusion from gross income of the interest on any Tax-Exempt Bonds for federal income tax purposes. To that end, the City will comply with all requirements of Section 148 of the Code to the extent applicable to the Tax-Exempt Bonds and the requirements set forth in the Non-Arbitrage and Tax Compliance Certificate of the City.

(b)     Without limiting the generality of subsection (a), above, the City agrees that there shall be paid by the City from time to time all amounts, if any, required to be rebated to the United States pursuant to Section 148(f) of the Code. This covenant shall survive payment in full or defeasance of the Tax-Exempt Bonds.

(c)     Notwithstanding any provision of this Section, if the City obtains an opinion of Bond Counsel to the effect that any action required under this Section is no longer required, or that some further action is required, to maintain the exclusion from gross income of the interest of any Tax-Exempt Bonds for federal income tax purposes pursuant to Section 103 of the Code, the City may conclusively rely on such opinion in complying with the provisions hereof.

## ARTICLE V

## FUNDS AND ACCOUNTS; DISPOSITION OF BOND PROCEEDS

Section 501. <u>Establishment of Accounts and Funds</u>. (a) The City hereby establishes and creates the following special, separate and segregated accounts and funds which shall be held in trust by the Master Trustee for the benefit of the Bondholders:

      A.    Debt Retirement Fund; and
      B.    Series 2014 Escrow Fund.

(b)     Pursuant to Section 201(b) of the Fifth Supplemental Indenture, the Master Trustee shall establish within the Series 2014 Escrow Fund, the separate and segregated sub-accounts designated the "Distributable Aid Account," the "Series 2014 Tax Levy Account" and the "General Account," the deposits into which and withdrawals from which shall be governed by Article II of the Fifth Supplemental Indenture.

(c)     The UTGO Debt Millage Fund shall be established with the Debt Millage Escrow Trustee by the Finance Director of the City under the Debt Millage Escrow Agreement which is

13-53846-swr   Doc 8703-13   Filed 10/15/14   Entered 10/15/14 23:27:34   Page 304 of 455

hereby authorized. The Finance Director is hereby authorized to negotiate the terms of the Debt Millage Escrow Agreement and to execute and deliver it for and on behalf of the City. The Finance Director is further hereby authorized to establish such accounts, subaccounts or other funds as shall be required for the Bonds, if any, to accommodate the requirements of such series of Bonds.

Section 502. <u>Debt Retirement Fund-All Bonds</u>. Proceeds of the Debt Millage Revenues levied pursuant to Section 301 hereof and transferred by the Debt Millage Escrow Trustee to the Master Trustee in accordance with the terms of the Debt Millage Escrow Agreement shall be used to pay the principal of and interest on the Bonds when due. The foregoing amounts shall be placed in the Debt Retirement Fund and held in trust by the Master Trustee, and so long as the principal of or interest on the Bonds shall remain unpaid, no moneys shall be withdrawn from the Debt Retirement Fund except to pay such principal and interest. Any amounts remaining in the Debt Retirement Fund after payment in full of the Bonds shall be retained by the City to be used for any lawful purpose.

Section 503. <u>Debt Retirement Fund – Series 2014 Escrow Fund</u>. As additional security for Bonds, Distributable Aid payments to be received by the City from time to time shall be distributed by the State Treasurer to the Master Trustee and deposited by the Master Trustee in the Debt Retirement Fund (designated the "Distributable State Aid – Common Debt Retirement Fund" in the Master Indenture), and allocated and set-aside by the Master Trustee into the Series 2014 Escrow Fund in accordance with the provisions of the Master Indenture and the related Fifth Supplemental Indenture for the payment of the principal of and interest on the Bonds when due. Any amounts remaining in the Debt Retirement Fund after the setting aside of the amounts necessary to satisfy the Deposit Date Balance Requirements (defined in the Master Indenture) of all DSA Escrow Funds (defined in the Master Indenture), shall be released to the City for deposit to the General Fund of the City.

Section 504. <u>Investment of Monies in the Funds and Accounts</u>. (a) The Finance Director shall direct the investment of monies on deposit in the Funds and Accounts established hereunder, and the Master Trustee, upon written direction or upon oral direction promptly confirmed in writing by the Finance Director, shall use its best efforts to invest monies on deposit in the Funds and Accounts in accordance with such direction.

(b) Monies on deposit in the Funds and Accounts may be invested in such investments and to the extent permitted by applicable law.

## ARTICLE VI

## THE MASTER TRUSTEE

Section 601. <u>Master Trustee</u>. Except as otherwise required by the MFA, the Master Trustee for the Bonds shall act as bond registrar, transfer agent and trustee for the Bonds, and shall be initially U.S. Bank National Association, Detroit, Michigan, or such other bank or trust company located in the State of Michigan which is qualified to act in such capacity under the laws of the United States of America or the State of Michigan. The Master Trustee means and includes any company into which the Master Trustee may be merged or converted or with which

it may be consolidated or any company resulting from any merger, conversion or consolidation to which it shall be a party or any company to which the Master Trustee may sell or transfer all or substantially all of its corporate trust business, provided, that such company shall be a trust company or bank which is qualified to be a successor to the Master Trustee as determined by the Finance Director, shall be authorized by law to perform all the duties imposed upon it by this Order, and shall be the successor to the Master Trustee without the execution or filing of any paper or the performance of any further act, anything herein to the contrary notwithstanding. The Finance Director is authorized to enter into a Fifth Supplement to the Master Trust Indenture in the form of a Fifth Supplemental Indenture with the Master Trustee, and from time to time as required, may designate a similarly qualified successor Master Trustee and enter into an agreement therewith for such services.

Section 602. <u>Fifth Supplemental Indenture</u>. The Authorized Officers are each hereby authorized and directed on behalf of the City to take any and all other actions and perform any and all acts that shall be required, necessary or desirable to enter into and implement the Fifth Supplemental Indenture with the Master Trustee, including, but not limited to, entering into an agreement with the State Treasurer in accordance with Act 227 to provide for the direct payment of Distributable Aid by the State Treasurer to the Master Trustee as additional security for the Bonds.

# ARTICLE VII

## SUPPLEMENTAL ORDERS OR RESOLUTIONS

Section 701. <u>Supplemental Orders or Resolutions Not Requiring Consent of Holders of the Bonds</u>. The City may with the prior written consent of the Bond Insurers, which in the opinion of the independent Bond Counsel are affected by such order or resolution, but without the consent of any Bondowner, adopt orders or resolutions supplemental to this Order for any one or more of the following purposes:

(i)     to confirm or further assure the security hereof or to grant or pledge to the holders of the Bonds any additional security;

(ii)    to add additional covenants and agreements of the City for the purposes of further securing the payment of the Bonds;

(iii)   to cure any ambiguity or formal defect or omission in this Order;

(iv)    to amend provisions in the Order relating to rebate to the United States Government or otherwise, which in the opinion of Bond Counsel are required in order to maintain the exclusion of interest on the Tax-Exempt Bonds from gross income for federal income tax purposes; and

(v)     such other action not materially, adversely and directly affecting the security of the Bonds;

provided that the effectiveness of any supplemental order or resolution is subject to Section 702 to the extent applicable.

Section 702. <u>Opinion and Filing Under Act 34</u>. Before any supplemental order or resolution under this Article shall become effective, a copy thereof shall be filed with the Master Trustee, together with an opinion of Bond Counsel that such supplemental order or resolution is authorized or permitted by this Article; provided that Bond Counsel in rendering any such opinion shall be entitled to rely upon certificates of the Finance Director or other City official, and opinions or reports of consultants, experts and other professionals retained by the City to advise it, with respect to the presence or absence of facts relative to such opinion and the consequences of such facts.

## ARTICLE VIII

## DEFEASANCE

Section 801. <u>Defeasance</u>. Bonds shall be deemed to be paid in full upon the deposit in trust of cash or direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America, or any combination thereof, not redeemable at the option of the issuer thereof, the principal and interest payments upon which, without reinvestment thereof, will come due at such times and in such amounts, as to be fully sufficient to pay when due, the principal of such Bonds and interest to accrue thereon, as confirmed by a verification report prepared by an independent certified public accountant; provided, that if any of such Bonds are to be called for redemption prior to maturing, irrevocable instructions to call such Bonds for redemption shall be given only with the prior written consent of the MFA and on such terms as may be required by the MFA. Such cash and securities representing such obligations shall be deposited with a bank or trust company and held for the exclusive benefit of the Owners of such Bonds. After such deposit, such Bonds shall no longer be entitled to the benefits of this Order (except for any rights of transfer or exchange of Bonds as therein or herein provided for) and shall be payable solely from the funds deposited for such purpose and investment earnings, if any, thereon, and the lien of this Order for the benefit of such Bonds shall be discharged.

## ARTICLE IX

## OTHER PROVISIONS OF GENERAL APPLICATION

Section 901. <u>Approval of Other Documents and Actions</u>. The Mayor, the Finance Director, the Treasurer and the City Clerk are hereby authorized and directed on behalf of the City to take any and all other actions, perform any and all acts and execute any and all documents that shall be required, necessary or desirable to implement this Order.

The Finance Director is authorized to file applications with and to pay the related fees, if any, to the Michigan Department of Treasury at his discretion under Act 34 for an Order or Orders of Approval to issue all or a portion of the Bonds, and apply for such waivers or other Treasury approvals as necessary to implement the issuance, delivery and security for the Bonds, and as required by the Michigan Department of Treasury and Act 34. The Finance Director is authorized and directed to apply for ratings on the Bonds, if necessary, and pay any post closing filing fees required by Act 34 to the Michigan Department of Treasury or other specified agency, from legally available funds.

Section 902. <u>Continuing Disclosure Undertaking</u>. The City shall enter into a continuing disclosure undertaking pursuant to Rule 15c2-12 promulgated by the Securities and Exchange Commission (the "Rule") for the benefit of the MFA and the holders and beneficial owners of the MFA Bonds in connection with the delivery of the Bonds as to which the Rule is applicable, as more specifically set forth in Exhibit D hereto (the "Undertaking"); provided, however, that the terms of the Undertaking are subject to completion and modification prior to delivery of the Bonds by the Finance Director to such extent as the Finance Director shall deem necessary to comply with law or market requirements. The Finance Director is authorized to execute and deliver the Undertaking after completion and modification as provided in this Order and the Supplemental Order.

Section 903. <u>Delegation of City to, and Authorization of Actions of the Mayor and the Finance Director</u>. (a) Prior to the delivery date for the Bonds, the Finance Director may cause the preparation and approve the form and distribution of City disclosure, if necessary, for any Preliminary Official Statement or Official Statement of the MFA and offering materials to be used in conjunction with the transfer of the Municipal Obligations to the MFA in form and substance reasonably acceptable to the Bond Insurers, and the issuance of the MFA Bonds, and the Mayor or Finance Director shall deem the City's disclosure "final" for purposes of Rule 15c2-12 of the Securities and Exchange Commission.

(b) The Finance Director is hereby authorized and directed to do and perform any and all acts and things with respect to the Bonds which are necessary and appropriate to carry into effect, consistent with this Order, the authorizations therein and herein contained, including without limitation, the securing of ratings by bond rating agencies, if cost effective, the negotiation for and acquisition of bond insurance and/or other credit enhancement, if any, to further secure the Bonds or any portions thereof, the acquisition of an irrevocable surety bond to fulfill the City's obligation to fund any reserve account, the printing of the Bonds and the incurring and paying of reasonable fees, costs and expenses incidental to the foregoing and other costs of issuance of the Bonds including, but not limited to fees and expenses of bond counsel, financial advisors, accountants and others, from Bond proceeds or other available funds, for and on behalf of the City.

(c) Except as otherwise provided herein, all determinations and decisions of the Finance Director with respect to the issuance and sale of the Bonds as permitted or required by this Order shall be confirmed by the Authorized Officer in a Supplemental Order or Supplemental Orders, and such confirmations shall constitute determinations that any conditions precedent to such determinations and decisions of the Authorized Officer have been fulfilled.

Section 904. <u>Act 34 Approval of the Bonds</u>. The Bonds shall neither be issued nor delivered unless and only so long as the issuance of the Bonds as provided herein shall have been authorized and approved in accordance with the applicable provisions of Act 34.

Section 905. <u>Approving Legal Opinions with Respect to the Bonds</u>. Transfer of the Bonds to the MFA shall be conditioned upon receiving, at the time of delivery, the approving opinion of Bond Counsel, approving legality of the Bonds and, with respect to Bonds determined by the Finance Director to be issued on a tax-exempt basis, the exclusion from gross income of the interest paid thereon from federal and State income taxation only.

Section 906. Negotiated Transaction. (a) Pursuant to Section 309(1) of Act 34 the Emergency Manager determines to negotiate the delivery of the Bonds to the MFA in consideration for the transfer by the City to the MFA of the Bonds, as provided in the Purchase Contract approved by the Finance Director within the parameters established hereby, and confirmed by the Finance Director in the Supplemental Order. The reason for choosing a negotiated transaction instead of a competitive sale is that the terms of the Plan of Adjustment and the UTGO Settlement Agreement require the City to secure the payment of the Bonds with Distributable Aid under the terms of Act 227 which may only be accomplished by a delivery of the Bonds to the MFA. The negotiated transaction will allow the Municipal Obligations to be transferred to the MFA in consideration for the MFA Bonds to successfully implement a portion of the Plan of Adjustment.

(b)     Subject to the foregoing, the Purchase Contract shall be dated the date of delivery of the Bonds. The Finance Director is hereby authorized and directed to execute the Purchase Contract for and on behalf of the City.

Section 907. Delivery of Bonds. Subject to the approval of the Supplemental Order, the Finance Director is hereby authorized to deliver the Municipal Obligations to the MFA upon the issuance and delivery of the MFA Bonds in consideration therefor.

Section 908. Official Statement. The Finance Director is hereby authorized to execute the Official Statement or other offering materials with respect to the Bonds in the form approved by him with such changes as the Finance Director may authorize. Circulation of the Preliminary Official Statement, if any, or other preliminary offering materials is hereby approved.

Section 909. Appointment of Bond Counsel; Engagement of Other Parties. The appointment by the Emergency Manager of the law firm of Miller, Canfield, Paddock and Stone, P.L.C. of Detroit, Michigan, as Bond Counsel for the Bonds is hereby ratified and confirmed, notwithstanding the periodic representation by Miller, Canfield, Paddock and Stone, P.L.C., in unrelated matters of other parties and potential parties to the issuance of the Bonds. The fees and expenses of Miller, Canfield, Paddock and Stone, P.L.C. as Bond Counsel and other accumulated bond related fees and expenses shall be payable as a cost of issuance from available funds in accordance with the agreement of such firm on file with the Emergency Manager.

Section 910. Parties in Interest. Nothing in this Order, expressed or implied, is intended or shall be construed to confer upon, or to give to, any person or entity, other than the City, the Master Trustee, the MFA, the holders of the Bonds, the holders of the MFA Bonds, the Bond Insurers, and the Dissenting Bond Insurer any right, remedy or claim under or by reason of this Order or any covenant, condition or stipulation hereof, and all covenants, stipulations, promises and agreements in this Order contained by and on behalf of the City, or the MFA shall be for the sole and exclusive benefit of the City and the MFA.

Section 911. No Recourse Under Order. All covenants, agreements and obligations of the City contained in this Order shall be deemed to be the covenants, agreements and obligations of the City and not of any councilperson, member, officer or employee of the City in his or her individual capacity, and no recourse shall be had for the payment of the principal of or interest on the Bonds or for any claim based thereon or on this Order against any councilperson, member,

officer or employee of the City or any person executing the Bonds in his or her official individual capacity.

Section 912. <u>Severability</u>. If any one or more sections, clauses or provisions of this Order shall be determined by a court of competent jurisdiction to be invalid or ineffective for any reason, such determination shall in no way affect the validity and effectiveness of the remaining sections, clauses and provisions hereof.

Section 913. <u>Cover Page, Table of Contents and Article and Section Headings</u>. The cover page, table of contents and Article and Section headings hereof are solely for convenience of reference and do not constitute a part of this Order, and none of them shall affect its meaning, construction or effect.

Section 914. <u>Conflict</u>. All resolutions or parts of resolutions or other proceedings of the City in conflict herewith shall be and the same hereby are repealed insofar as such conflict exists.

Section 915. <u>Governing Law and Jurisdiction</u>. This Order shall be governed by and construed in accordance with the laws of the State.

Section 916. <u>Order and Supplemental Order are a Contract</u>. The provisions of this Order and the Supplemental Order shall constitute a contract among the City, the MFA, the holders of the Bonds and the Bond Insurers.

Section 917. <u>Effective Date</u>. This Order shall take effect immediately upon its adoption by the Council.

Section 918. <u>Notices</u>. All notices and other communications hereunder shall be in writing and given by United States certified or registered mail, expedited courier overnight delivery service or by other means (including facsimile transmission) that provides a written record of such notice and its receipt. Notices hereunder shall be effective when received and shall be addressed to the address set forth below or to such other address as any of the below persons shall specify to the other persons:

If to the City, to:                        City of Detroit
                                           Finance Department
                                           1200 Coleman A. Young Municipal Center
                                           Detroit, Michigan 48226
                                           Attention: Finance Director

| | |
|---|---|
| If to the Master Trustee, to: | U.S. Bank National Association<br>535 Griswold, Suite 550 Buhl Bldg.<br>Detroit, MI 48226<br>Attention: Corporate Trust Dept. |
| If to the MFA, to: | Michigan Finance Authority<br>Austin Building, 1st Floor<br>430 W. Allegan<br>Lansing, MI 48922 |
| If to the Bond Insurers to: | Ambac Assurance Corporation<br>One State Street Plaza<br>New York, New York 10004<br>Attention: Surveillance Department and General<br>Counsel's Office |

Assured Guaranty Municipal Corp and Assured
Guaranty Corp.
31 West 52nd Street
New York, NY 10019
Attention: Kevin J. Lyons
Attention: Terence Workman

National Public Finance Guarantee Corporation
113 King Street
Armonk, NY 10504
Attention: Kenneth Epstein and William J. Rizzo

# EXHIBIT A

## OUTSTANDING PRIOR UTGO BONDS

# UTGO Series Prior Bonds - Debt Service

| CUSIP | Maturity Date | Rate | Principal | Insurer | 10/1/14 | 4/1/15 | 10/1/15 | 4/1/16 | 10/1/16 | 4/1/17 | 10/1/17 | 4/1/18 | 10/1/18 | 4/1/19 | 10/1/19 | 4/1/20 | 10/1/20 | 4/1/21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | Interest | | | | | | | |
| **UTGO 1999-A** | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 5.250% | $2,850,000.00 | Assured | $74,812.50 | $74,812.50 | | | | | | | | | | | | |
| | 4/1/16 | 5.000% | $2,995,000.00 | Assured | $74,875.00 | $74,875.00 | $74,875.00 | $74,875.00 | | | | | | | | | | |
| | 4/1/17 | 5.000% | $3,145,000.00 | Assured | $78,625.00 | $78,625.00 | $78,625.00 | $78,625.00 | $78,625.00 | $78,625.00 | | | | | | | | |
| | 4/1/18 | 5.000% | $3,305,000.00 | Assured | $82,625.00 | $82,625.00 | $82,625.00 | $82,625.00 | $82,625.00 | $82,625.00 | $82,625.00 | $82,625.00 | | | | | | |
| | 4/1/18 | 5.000% | $3,205,000.00 | Assured | | | | | | | | | | | | | | |
| | 4/1/19 | 5.000% | $3,675,000.00 | Assured | $86,750.00 | $86,750.00 | $86,750.00 | $86,750.00 | $86,750.00 | $86,750.00 | $86,750.00 | $86,750.00 | $86,750.00 | $86,750.00 | | | | |
| | | | **$15,765,000.00** | | $397,687.50 | $397,687.50 | $322,375.00 | $322,375.00 | $248,000.00 | $248,000.00 | $169,375.00 | $169,375.00 | $86,750.00 | $86,750.00 | | | | |
| **UTGO 2001-A(1)** | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 5.375% | $5,840,000.00 | NPFG | $159,637.50 | $159,637.50 | | | | | | | | | | | | |
| | 4/1/16 | 5.375% | $6,260,000.00 | NPFG | $168,237.50 | $168,237.50 | $168,237.50 | $168,237.50 | | | | | | | | | | |
| | 4/1/17 | 5.375% | $6,400,000.00 | NPFG | $172,375.00 | $172,375.00 | $172,375.00 | $172,375.00 | $172,375.00 | $172,375.00 | | | | | | | | |
| | 4/1/17 | 5.375% | $14,000,000.00 | NPFG | $376,250.00 | $376,250.00 | $376,250.00 | $376,250.00 | $376,250.00 | $376,250.00 | | | | | | | | |
| | 4/1/19 | 5.000% | $14,000,000.00 | NPFG | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | | | | |
| | 4/1/20 | 5.000% | $14,000,000.00 | NPFG | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | | |
| | 4/1/21 | 5.000% | $14,000,000.00 | NPFG | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 | $350,000.00 |
| | | | **$74,500,000.00** | | $1,931,500.00 | $1,931,500.00 | $1,773,862.50 | $1,773,862.50 | $1,603,625.00 | $1,603,625.00 | $1,436,250.00 | $1,436,250.00 | $1,050,000.00 | $1,050,000.00 | $700,000.00 | $700,000.00 | $350,000.00 | $350,000.00 |
| **UTGO 2002** | | | | | | | | | | | | | | | | | | |
| | 4/1/21 | 5.125% | $3,200,000.00 | NPFG | $83,025.00 | $83,025.00 | $83,025.00 | $83,025.00 | $83,025.00 | $83,025.00 | $83,025.00 | $83,025.00 | $83,025.00 | $83,025.00 | $83,025.00 | $83,025.00 | $83,025.00 | $83,025.00 |
| | 4/1/22 | 5.125% | $3,445,000.00 | NPFG | $87,253.13 | $87,253.13 | $87,253.13 | $87,253.13 | $87,253.13 | $87,253.13 | $87,253.13 | $87,253.13 | $87,253.13 | $87,253.13 | $87,253.13 | $87,253.13 | $87,253.13 | $87,253.13 |
| | | | **$6,645,000.00** | | $170,278.13 | $170,278.13 | $170,278.13 | $170,278.13 | $170,278.13 | $170,278.13 | $170,278.13 | $170,278.13 | $170,278.13 | $170,278.13 | $170,278.13 | $170,278.13 | $170,278.13 | $170,278.13 |
| **UTGO 2003-A** | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 4.000% | $300,000.00 | Syncora | $6,000.00 | $6,000.00 | | | | | | | | | | | | |
| | 4/1/16 | 3.250% | $2,550,000.00 | Syncora | $46,937.50 | $46,937.50 | $66,973.50 | | | | | | | | | | | |
| | 4/1/17 | 3.250% | $2,995,000.00 | Syncora | $78,618.75 | $78,618.75 | $78,618.75 | $78,618.75 | $78,618.75 | $78,618.75 | | | | | | | | |
| | 4/1/18 | 5.250% | $3,135,000.00 | Syncora | $87,018.75 | $87,018.75 | $82,687.50 | $82,687.50 | $82,687.50 | $82,687.50 | $87,018.75 | $87,018.75 | | | | | | |
| | 4/1/18 | 5.250% | $3,315,000.00 | Syncora | $91,612.50 | $91,612.50 | $91,612.50 | $91,612.50 | $91,612.50 | $91,612.50 | $91,612.50 | $91,612.50 | $91,612.50 | | | | | |
| | 4/1/20 | 4.500% | $500,000.00 | Syncora | $11,250.00 | $11,250.00 | $11,250.00 | $11,250.00 | $11,250.00 | $11,250.00 | $11,250.00 | $11,250.00 | $11,250.00 | $11,250.00 | $11,250.00 | | | |
| | 4/1/20 | 5.250% | $3,175,000.00 | Syncora | $83,343.75 | $83,343.75 | $83,343.75 | $83,343.75 | $83,343.75 | $83,343.75 | $83,343.75 | $83,343.75 | $83,343.75 | $83,343.75 | $83,343.75 | $83,343.75 | | |
| | 4/1/21 | 5.250% | $3,860,000.00 | Syncora | $101,325.00 | $101,325.00 | $101,325.00 | $101,325.00 | $101,325.00 | $101,325.00 | $101,325.00 | $101,325.00 | $101,325.00 | $101,325.00 | $101,325.00 | $101,325.00 | $101,325.00 | $101,325.00 |
| | 4/1/21 | 4.625% | $500,000.00 | Syncora | $11,562.50 | $11,562.50 | $11,562.50 | $11,562.50 | $11,562.50 | $11,562.50 | $11,562.50 | $11,562.50 | $11,562.50 | $11,562.50 | $11,562.50 | $11,562.50 | $11,562.50 | $11,562.50 |
| | 4/1/22 | 4.625% | $3,545,000.00 | Syncora | $93,581.25 | $93,581.25 | $93,581.25 | $93,581.25 | $93,581.25 | $93,581.25 | $93,581.25 | $93,581.25 | $93,581.25 | $93,581.25 | $93,581.25 | $93,581.25 | $93,581.25 | $93,581.25 |
| | 4/1/23 | 4.625% | $1,500,000.00 | Syncora | $34,687.50 | $34,687.50 | $34,687.50 | $34,687.50 | $34,687.50 | $34,687.50 | $34,687.50 | $34,687.50 | $34,687.50 | $34,687.50 | $34,687.50 | $34,687.50 | $34,687.50 | $34,687.50 |
| | 4/1/23 | 5.250% | $2,775,000.00 | Syncora | $72,843.75 | $72,843.75 | $72,843.75 | $72,843.75 | $72,843.75 | $72,843.75 | $72,843.75 | $72,843.75 | $72,843.75 | $72,843.75 | $72,843.75 | $72,843.75 | $72,843.75 | $72,843.75 |
| | | | **$31,675,000.00** | | $621,468.75 | $621,468.75 | $748,533.25 | $748,533.25 | $669,932.50 | $669,932.50 | $587,225.00 | $587,225.00 | $500,286.25 | $500,286.25 | $496,593.75 | $496,593.75 | $314,000.00 | $314,000.00 |
| **UTGO 2004-A(1)** | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 5.250% | $4,500,000.00 | Ambac | $118,125.00 | $118,125.00 | | | | | | | | | | | | |
| | 4/1/16 | 4.250% | $185,000.00 | Ambac | $3,931.25 | $3,931.25 | $3,931.25 | $3,931.25 | | | | | | | | | | |
| | 4/1/17 | 5.250% | $6,085,000.00 | Ambac | $159,731.25 | $159,731.25 | $159,731.25 | $159,731.25 | $159,731.25 | $159,731.25 | | | | | | | | |
| | 4/1/18 | 5.000% | $6,600,000.00 | Ambac | $165,000.00 | $165,000.00 | $165,000.00 | $165,000.00 | $165,000.00 | $165,000.00 | $165,000.00 | $165,000.00 | | | | | | |
| | 4/1/21 | 5.000% | $6,610,000.00 | Ambac | $181,912.50 | $181,912.50 | $181,912.50 | $181,912.50 | $181,912.50 | $181,912.50 | $181,912.50 | $181,912.50 | $181,912.50 | $181,912.50 | $181,912.50 | $181,912.50 | $181,912.50 | $181,912.50 |
| | 4/1/20 | 4.500% | $375,000.00 | Ambac | $8,437.50 | $8,437.50 | $8,437.50 | $8,437.50 | $8,437.50 | $8,437.50 | $8,437.50 | $8,437.50 | $8,437.50 | $8,437.50 | $8,437.50 | $8,437.50 | | |
| | 4/1/20 | 5.250% | $6,920,000.00 | Ambac | $181,650.00 | $181,650.00 | $181,650.00 | $181,650.00 | $181,650.00 | $181,650.00 | $181,650.00 | $181,650.00 | $181,650.00 | $181,650.00 | $181,650.00 | $181,650.00 | | |
| | 4/1/23 | 5.250% | $745,000.00 | Ambac | $18,055.00 | $18,055.00 | $18,055.00 | $18,055.00 | $18,055.00 | $18,055.00 | $18,055.00 | $18,055.00 | $18,055.00 | $18,055.00 | $18,055.00 | $18,055.00 | $18,055.00 | $18,055.00 |
| | 4/1/23 | 4.600% | $6,890,000.00 | Ambac | $158,862.50 | $158,862.50 | $158,862.50 | $158,862.50 | $158,862.50 | $158,862.50 | $158,862.50 | $158,862.50 | $158,862.50 | $158,862.50 | $158,862.50 | $158,862.50 | $158,862.50 | $158,862.50 |
| | 4/1/24 | 5.55% | $6,890,000.00 | Ambac | | | | | | | | | | | | | | $735,917.50 |
| | | | **$29,270,000.00** | | $1,017,705.00 | $1,017,705.00 | $1,017,705.00 | $1,017,705.00 | $1,011,705.00 | $1,011,705.00 | $1,017,705.00 | $1,017,705.00 | $1,017,705.00 | $999,580.00 | $899,580.00 | $899,580.00 | $735,917.50 | $735,917.50 |

* Subject to Mandatory Redemption

# UTGO Series Prior Bonds - Debt Service

| CUSIP | Maturity Date | Rate | Principal | Insurer | 10/1/14 | 4/1/15 | 10/1/15 | 4/1/16 | 10/1/16 | 4/1/17 | 10/1/17 | 4/1/18 | 10/1/18 | 4/1/19 | 10/1/19 | 4/1/20 | 10/1/20 | 4/1/21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | **Interest** | | | | | | | | |
| **UTGO 2004-B(1)** | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 3.000% | $8,675,000.00 | Ambac | 216,875.00 | 216,875.00 | | | | | | | | | | | | |
| | 4/1/16 | 5.250% | $3,195,000.00 | Ambac | 259,066.25 | 259,066.25 | 239,066.25 | 239,066.25 | | | | | | | | | | |
| | 4/1/17 | 4.000% | $505,000.00 | Ambac | 6,100.00 | 6,100.00 | 6,100.00 | 6,100.00 | 6,100.00 | 6,100.00 | | | | | | | | |
| | 4/1/17 | 5.250% | $9,380,000.00 | Ambac | 243,600.00 | 243,600.00 | 243,600.00 | 243,600.00 | 243,600.00 | 243,600.00 | | | | | | | | |
| | 4/1/16 | 5.250% | $2,000,000.00 | Ambac | 52,500.00 | 52,500.00 | 52,500.00 | 52,500.00 | | | | | | | | | | |
| | | 3.240% | **$23,565,000.00** | | $758,081.25 | $758,081.25 | | | | | | | | | | | | |
| **UTGO 2004-B(2)** | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 3.240% | $573,000.00 | Ambac | 15,965.00 | 15,965.00 | 11,604.00 | 11,604.00 | 6,481.00 | 6,481.00 | 2,227.00 | 2,227.00 | | | | | | |
| **UTGO 2008-B** | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 5.000% | $2,790,000.00 | Assured | 57,250.00 | 57,250.00 | 60,125.00 | 60,125.00 | 34,180.00 | 34,180.00 | | | | | | | | |
| | 4/1/16 | 5.000% | $2,405,000.00 | Assured | 60,125.00 | 60,125.00 | 60,125.00 | 60,125.00 | 54,180.00 | | | | | | | | | |
| | 4/1/17 | 4.300% | $2,525,000.00 | Assured | 54,180.00 | 54,180.00 | 54,180.00 | 54,180.00 | 65,875.00 | 65,875.00 | | | | | | | | |
| | 4/1/18 | 3.000% | $2,635,000.00 | Assured | 65,875.00 | 65,875.00 | 65,875.00 | 65,875.00 | 69,125.00 | 69,125.00 | 69,125.00 | 65,875.00 | | | | | | |
| | 4/1/19 | 5.000% | $2,765,000.00 | Assured | 69,125.00 | 69,125.00 | 69,125.00 | 69,125.00 | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 69,125.00 | | | | | |
| | 4/1/20 | 5.000% | $5,000,000.00 | Assured | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | | |
| | 4/1/21 | 5.000% | $5,000,000.00 | Assured | 175,000.00 | 175,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | |
| | 4/1/22 | 5.000% | $5,000,000.00 | Assured | 175,000.00 | 175,000.00 | 175,000.00 | 175,000.00 | 175,000.00 | 175,000.00 | 175,000.00 | 175,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 |
| | 4/1/23 | 5.000% | $5,000,000.00 | Assured | 175,000.00 | 175,000.00 | 175,000.00 | 175,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 |
| | 4/1/24 | 5.000% | $5,000,000.00 | Assured | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 |
| | | 5.000% | **$42,615,000.00** | | $1,056,555.00 | $1,056,555.00 | $999,365.00 | $999,365.00 | $939,180.00 | $939,180.00 | $885,000.00 | $885,000.00 | $819,125.00 | $819,125.00 | $750,000.00 | $750,000.00 | $625,000.00 | $625,000.00 |
| **UTGO 2008-C** | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 5.000% | $2,305,000.00 | Assured | 57,625.00 | 57,625.00 | 60,625.00 | 60,625.00 | | | | | | | | | | |
| | 4/1/16 | 5.000% | $2,425,000.00 | Assured | 60,625.00 | 60,625.00 | 60,625.00 | 60,625.00 | 54,717.50 | 54,717.50 | 54,717.50 | | | | | | | |
| | 4/1/17 | 4.300% | $3,545,000.00 | Assured | 54,717.50 | 54,717.50 | 34,717.50 | 34,717.50 | 63,750.00 | 63,750.00 | 65,750.00 | 65,750.00 | | | | | | |
| | 4/1/18 | 5.000% | $2,650,000.00 | Assured | 65,750.00 | 65,750.00 | 65,750.00 | 65,750.00 | 71,793.75 | 71,793.75 | 71,793.75 | 71,793.75 | 71,793.75 | | | | | |
| | 4/1/19 | 5.250% | $2,755,000.00 | Assured | 71,793.75 | 71,793.75 | 71,793.75 | 71,793.75 | 75,731.25 | 75,731.25 | 75,731.25 | 75,731.25 | 75,731.25 | 75,731.25 | 75,731.25 | | | |
| | 4/1/20 | 5.250% | $2,365,000.00 | Assured | 75,731.25 | 75,731.25 | 75,731.25 | 75,731.25 | | | | | | | | | | |
| | | 5.250% | **$15,826,000.00** | | $386,242.50 | $386,242.50 | $328,617.50 | $328,617.50 | $267,992.50 | $267,992.50 | $213,275.00 | $213,275.00 | $147,525.00 | $147,525.00 | $75,731.25 | $75,731.25 | | |
| **UTGO 2008-A** | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 5.000% | $2,875,000.00 | Assured | 71,875.00 | 71,875.00 | 75,375.00 | 75,375.00 | | | | | | | | | | |
| | 4/1/16 | 5.000% | $3,175,000.00 | Assured | 75,375.00 | 75,375.00 | 75,375.00 | 75,375.00 | 79,250.00 | 79,250.00 | 79,250.00 | | | | | | | |
| | 4/1/17 | 5.000% | $3,170,000.00 | Assured | 79,250.00 | 79,250.00 | 79,250.00 | 79,250.00 | 66,500.00 | 66,500.00 | 66,500.00 | 66,500.00 | | | | | | |
| | 4/1/18 | 4.000% | $3,325,000.00 | Assured | 66,500.00 | 66,500.00 | 66,500.00 | 66,500.00 | 86,500.00 | 86,500.00 | 86,500.00 | 86,500.00 | 86,500.00 | | | | | |
| | 4/1/19 | 5.000% | $3,440,000.00 | Assured | 86,500.00 | 86,500.00 | 86,500.00 | 86,500.00 | 90,750.00 | 90,750.00 | 90,750.00 | 90,750.00 | 90,750.00 | 90,750.00 | 90,750.00 | | | |
| | 4/1/20 | 5.000% | $3,630,000.00 | Assured | 90,750.00 | 90,750.00 | 90,750.00 | 90,750.00 | 95,375.00 | 95,375.00 | 95,375.00 | 95,375.00 | 95,375.00 | 95,375.00 | 95,375.00 | 95,375.00 | 95,375.00 | |
| | 4/1/21 | 5.000% | $3,815,000.00 | Assured | 95,375.00 | 95,375.00 | 95,375.00 | 95,375.00 | 100,125.00 | 100,125.00 | 100,125.00 | 100,125.00 | 100,125.00 | 100,125.00 | 100,125.00 | 101,125.00 | 101,125.00 | 101,125.00 |
| | 4/1/22 | 5.000% | $4,005,000.00 | Assured | 100,125.00 | 100,125.00 | 100,125.00 | 100,125.00 | 215,500.00 | 215,500.00 | 215,500.00 | 215,500.00 | 215,500.00 | 215,500.00 | 215,500.00 | 215,500.00 | 215,500.00 | 215,500.00 |
| | 4/1/23 | 5.000% | $8,620,000.00 | Assured | 215,500.00 | 215,500.00 | 215,500.00 | 215,500.00 | 499,500.00 | 499,500.00 | 499,500.00 | 499,500.00 | 499,500.00 | 499,500.00 | 499,500.00 | 499,500.00 | 499,500.00 | 499,500.00 |
| | 4/1/24 | 5.000% | $19,980,000.00 | Assured | 499,500.00 | 499,500.00 | 499,500.00 | 499,500.00 | | | | | | | | | | |
| | | 5.000% | **$19,980,000.00** | | $1,380,750.00 | $1,380,750.00 | $1,368,875.00 | $1,368,875.00 | $1,233,500.00 | $1,233,500.00 | $1,154,250.00 | $1,154,250.00 | $1,087,750.00 | $1,087,750.00 | $1,001,250.00 | $1,001,250.00 | $911,000.00 | $910,500.00 |
| **UTGO 2008-B(1)** | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 5.000% | $7,070,000.00 | Assured | 199,250.00 | 199,250.00 | 86,000.00 | 86,000.00 | 86,000.00 | | | | | | | | | |
| | 4/1/16 | 5.000% | $3,440,000.00 | Assured | 86,000.00 | 86,000.00 | 86,000.00 | 86,000.00 | 89,500.00 | 89,500.00 | 89,500.00 | | | | | | | |
| | 4/1/17 | 5.000% | $3,580,000.00 | Assured | 89,500.00 | 89,500.00 | 89,500.00 | 89,500.00 | 94,750.00 | 94,750.00 | 94,750.00 | 94,750.00 | | | | | | |
| | 4/1/18 | 5.000% | $3,700,000.00 | Assured | 94,750.00 | 94,750.00 | 94,750.00 | 94,750.00 | | | | | | | | | | |
| | | 5.000% | **$16,790,000.00** | | $469,500.00 | $469,500.00 | $270,250.00 | $270,250.00 | $384,250.00 | $384,250.00 | $94,750.00 | $94,750.00 | | | | | | |
| | | | **$130,709,000.00** | | $4,064,833.13 | $4,064,833.13 | $7,496,369.63 | $7,496,369.63 | $5,603,354.13 | $5,603,354.13 | $5,772,853.13 | $5,772,853.13 | $4,579,339.38 | $4,579,339.38 | $4,065,433.13 | $4,065,433.13 | $3,105,603.63 | $3,105,603.63 |

Page 2 of 5

13-53846-swr  Doc 8396-13  Filed 10/20/14  Entered 10/20/14 12:09:27.34  Page 315 of 455

# UTGO Series Prior Bonds - Debt Service

| CUSIP | Maturity Date | Rate | Principal | Insurer | 10/1/21 | 4/1/22 | 10/1/22 | 4/1/23 | 10/1/23 | 4/1/24 | 10/1/24 | 4/1/25 | 10/1/25 | 4/1/26 | 10/1/26 | 4/1/27 | 10/1/27 | 4/1/28 | Total Interest | Total Principal & Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **UTGO 1999-A** | | | | | | | | | | | | | | | | | | | | |
| 195538AJ3 | 4/1/15 | 5.250% | $2,650,000.00 | Assured | | | | | | | | | | | | | | | $149,625.00 | $2,799,625.00 |
| 195538N1 | 4/1/16 | 5.000% | $2,995,000.00 | Assured | | | | | | | | | | | | | | | $299,500.00 | $3,294,500.00 |
| 195538K | 4/1/17 | 5.000% | $3,145,000.00 | Assured | | | | | | | | | | | | | | | $471,750.00 | $3,616,750.00 |
| 195538E2 | 4/1/18 | 5.000% | $3,305,000.00 | Assured | | | | | | | | | | | | | | | $661,000.00 | $3,966,000.00 |
| 195538J2 | 4/1/19 | 5.000% | $3,470,000.00 | Assured | | | | | | | | | | | | | | | $867,500.00 | $4,337,500.00 |
| | | | **$15,765,000.00** | | | | | | | | | | | | | | | | **$2,449,375.00** | **$18,214,375.00** |
| **UTGO 2000-A(T)** | | | | | | | | | | | | | | | | | | | | |
| 195538X3 | 4/1/15 | 5.375% | $5,940,000.00 | NPFG | | | | | | | | | | | | | | | $119,353.63 | $6,059,353.63 |
| 195538V6 | 4/1/16 | 5.375% | $6,305,000.00 | NPFG | | | | | | | | | | | | | | | $627,250.00 | $6,932,250.00 |
| 195538V3 | 4/1/17 | 5.375% | $6,620,000.00 | NPFG | | | | | | | | | | | | | | | $984,250.00 | $7,604,250.00 |
| 195538L1 | 4/1/18 | 5.375% | $14,000,000.00 | NPFG | | | | | | | | | | | | | | | $3,010,000.00 | $17,010,000.00 |
| 195538V9 | 4/1/19 | 5.000% | $14,203,000.00 | NPFG | | | | | | | | | | | | | | | $3,500,000.00 | $17,500,000.00 |
| 195538V7 | 4/1/20 | 5.000% | $13,900,000.00 | NPFG | | | | | | | | | | | | | | | $4,200,000.00 | $18,200,000.00 |
| 195538VQ | 4/1/21 | 5.000% | $14,100,000.00 | NPFG | | | | | | | | | | | | | | | $4,500,000.00 | $18,500,000.00 |
| | | | **$74,900,000.00** | | | | | | | | | | | | | | | | **$17,666,475.00** | **$93,466,475.00** |
| **UTGO 2002** | | | | | | | | | | | | | | | | | | | | |
| 195538W0 | 4/1/21 | 5.125% | $3,240,000.00 | NPFG | $87,253.13 | $87,253.13 | | | | | | | | | | | | | $1,162,350.00 | $4,402,350.00 |
| 195538W0 | 4/1/22 | 5.125% | $3,405,000.00 | NPFG | | | | | | | | | | | | | | | $1,396,050.00 | $4,801,050.00 |
| | | | **$6,645,000.00** | | $87,253.13 | $87,253.13 | | | | | | | | | | | | | **$2,558,400.00** | **$9,203,400.00** |
| **UTGO 2003-A** | | | | | | | | | | | | | | | | | | | | |
| 195538X | 4/1/15 | 4.000% | $300,000.00 | Syncora | $11,562.50 | | | | | | | | | | | | | | $12,000.00 | $312,000.00 |
| 195538X | 4/1/16 | 5.250% | $2,550,000.00 | Syncora | $93,581.25 | $93,581.25 | | | | | | | | | | | | | $133,875.00 | $2,683,875.00 |
| 195538X | 4/1/17 | 5.250% | $3,095,000.00 | Syncora | | | | | | | | | | | | | | | $496,125.00 | $3,591,125.00 |
| 195538X | 4/1/18 | 5.250% | $3,150,000.00 | Syncora | | | | | | | | | | | | | | | $696,150.00 | $3,846,150.00 |
| 195538X | 4/1/19 | 5.250% | $3,375,000.00 | Syncora | | | | | | | | | | | | | | | $916,125.00 | $4,011,125.00 |
| 195538X | 4/1/20 | 4.500% | $300,000.00 | Syncora | | | | | | | | | | | | | | | $155,000.00 | $455,000.00 |
| 195538X | 4/1/21 | 5.250% | $3,175,000.00 | Syncora | | | | | | | | | | | | | | | $1,009,125.00 | $4,175,125.00 |
| 195538X3 | 4/1/21 | 3.250% | $3,060,000.00 | Syncora | | | | | | | | | | | | | | | $1,418,250.00 | $3,278,550.00 |
| 195538X1 | 4/1/22 | 4.625% | $500,000.00 | Syncora | $11,562.50 | $11,562.50 | | | | | | | | | | | | | $185,000.00 | $685,000.00 |
| 195538X7 | 4/1/22 | 5.250% | $3,565,000.00 | Syncora | $93,581.25 | $93,581.25 | | | | | | | | | | | | | $1,497,300.00 | $5,942,300.00 |
| 195538X8 | 4/1/23 | 4.625% | $1,500,000.00 | Syncora | $34,687.50 | $34,687.50 | $34,687.50 | | | | | | | | | | | | $2,134,375.00 | $2,134,375.00 |
| 195538YB0 | 4/1/23 | 5.250% | $2,775,000.00 | Syncora | $72,943.75 | $72,943.75 | $72,943.75 | | | | | | | | | | | | $1,311,187.50 | $4,086,187.50 |
| | | | **$27,340,000.00** | | $312,275.00 | $232,675.00 | $107,631.25 | | | | | | | | | | | | **$8,740,267.50** | **$40,435,267.50** |
| **UTGO 2005-A** | | | | | | | | | | | | | | | | | | | | |
| 195538X2 | 4/1/19 | 5.250% | $4,500,000.00 | Ambac | | | | | | | | | | | | | | | $1,181,250.00 | $5,681,250.00 |
| 195538Y0 | 4/1/20 | 4.250% | $185,000.00 | Ambac | | | | | | | | | | | | | | | $47,175.00 | $232,175.00 |
| 195538Y2 | 4/1/20 | 5.250% | $6,085,000.00 | Ambac | | | | | | | | | | | | | | | $1,916,775.00 | $8,001,775.00 |
| 195538Y2 | 4/1/21 | 5.000% | $6,400,000.00 | Ambac | | | | | | | | | | | | | | | $2,310,000.00 | $8,910,000.00 |
| 195538A1 | 4/1/21 | 4.500% | $375,000.00 | Ambac | $181,912.50 | $181,912.50 | $181,912.50 | | | | | | | | | | | | $2,310,600.00 | $9,460,600.00 |
| 195538Z9 | 4/1/22 | 5.250% | $6,020,000.00 | Ambac | $8,437.50 | $8,437.50 | $8,437.50 | | | | | | | | | | | | $156,875.00 | $356,875.00 |
| 195538Z5 | 4/1/23 | 4.600% | $785,000.00 | Ambac | $181,650.00 | $181,650.00 | $181,650.00 | $181,650.00 | | | | | | | | | | | $3,207,700.00 | $10,189,700.00 |
| 195538Z0 | 4/1/24 | 5.250% | $6,500,000.00 | Ambac | $18,055.00 | $18,055.00 | $18,055.00 | $18,055.00 | $18,055.00 | | | | | | | | | | $941,100.00 | $1,146,100.00 |
| 195538ZEN | | | | Ambac | $180,862.50 | $180,862.50 | $180,862.50 | $180,862.50 | $180,862.50 | | | | | | | | | | $3,617,250.00 | $10,502,250.00 |
| | | | **$39,275,000.00** | | $370,917.50 | $370,917.50 | $389,005.00 | $380,567.50 | $396,972.50 | | | | | | | | | | **$15,765,725.00** | **$55,035,725.00** |

# UTGO Series Prior Bonds - Debt Service

The columns below span: Maturity Date · Rate · Principal · Insurer · (Interest by period: 10/1/21, 4/1/22, 10/1/22, 4/1/23, 10/1/23, 4/1/24, 10/1/24, 4/1/25, 10/1/25, 4/1/26, 10/1/27, 10/1/27, 4/1/28) · Total Interest · Total Principal & Interest

**2008-H(1)** — Insurer: Ambac

| Maturity Date | Rate | Principal | Total Interest | Total Principal & Interest |
|---|---|---|---|---|
| 4/1/15 | 5.000% | $8,675,000.00 | $433,750.00 | $9,108,750.00 |
| 4/1/16 | 5.500% | $9,105,000.00 | $996,025.00 | $10,041,025.00 |
| 4/1/16 | 4.000% | $305,000.00 | $56,600.00 | $341,600.00 |
| 4/1/17 | 5.25% | $9,280,000.00 | $1,041,600.00 | $10,741,600.00 |
| 4/1/17 | 5.250% | $2,000,000.00 | $420,000.00 | $2,420,000.00 |
| **Total** | | **$29,365,000.00** | **$3,307,975.00** | **$32,672,975.00** |

**2008-B(2)** — Insurer: Ambac

| Maturity Date | Rate | Principal | Total Interest | Total Principal & Interest |
|---|---|---|---|---|
| 4/1/17 | 5.340% | $375,000.00 | $69,554.00 | $644,554.00 |
| **Total** | | **$375,000.00** | **$69,554.00** | **$644,554.00** |

**2008-B(2)** — Insurer: Assured

| Maturity Date | Rate | Principal | Total Interest | Total Principal & Interest |
|---|---|---|---|---|
| 4/1/13 | 5.000% | $2,200,000.00 | $214,500.00 | $2,404,500.00 |
| 4/1/14 | 5.000% | $2,465,000.00 | $240,500.00 | $2,645,500.00 |
| 4/1/15 | 5.000% | $2,525,000.00 | $335,080.00 | $2,845,080.00 |
| 4/1/16 | 4.300% | $2,635,000.00 | $527,000.00 | $3,162,000.00 |
| 4/1/17 | 5.000% | $2,765,000.00 | $691,250.00 | $3,456,250.00 |
| 4/1/18 | 5.000% | $2,735,000.00 | $1,050,000.00 | $6,500,000.00 |
| 4/1/19 | 5.000% | $5,000,000.00 | $1,750,000.00 | $6,750,000.00 |
| 4/1/20 | 5.000% | $5,400,000.00 | $2,000,000.00 | $7,000,000.00 |
| 4/1/21 | 5.000% | $5,000,000.00 | $2,250,000.00 | $7,250,000.00 |
| 4/1/22 | 5.000% | $5,000,000.00 | $2,500,000.00 | $7,500,000.00 |
| 4/1/23 | 5.000% | $5,000,000.00 | $2,750,000.00 | $7,750,000.00 |
| 4/1/24 | 5.090% | $5,000,000.00 | | |
| 4/1/25 | 5.090% | $5,000,000.00 | | |
| **Total** | | **$42,615,000.00** | **$14,648,330.00** | **$57,263,330.00** |

**2008-C** — Insurer: Assured

| Maturity Date | Rate | Principal | Total Interest | Total Principal & Interest |
|---|---|---|---|---|
| 4/1/15 | 5.000% | $2,355,000.00 | $113,250.00 | $2,420,250.00 |
| 4/1/16 | 5.000% | $2,435,000.00 | $242,500.00 | $2,467,500.00 |
| 4/1/17 | 4.500% | $2,545,000.00 | $328,305.00 | $2,873,305.00 |
| 4/1/18 | 5.000% | $2,635,000.00 | $526,000.00 | $3,156,000.00 |
| 4/1/19 | 5.000% | $2,235,000.00 | $717,937.50 | $4,922,937.50 |
| 4/1/20 | 5.250% | $2,235,000.00 | $908,775.00 | $3,703,775.00 |
| 4/1/20 | 5.250% | $2,985,000.00 | | |
| **Total** | | **$15,525,000.00** | **$6,838,767.50** | **$18,363,767.50** |

**2009-A** — Insurer: Assured

| Maturity Date | Rate | Principal | Total Interest | Total Principal & Interest |
|---|---|---|---|---|
| 4/1/15 | 5.000% | $2,875,000.00 | $143,750.00 | $3,018,750.00 |
| 4/1/16 | 5.000% | $3,015,000.00 | $301,500.00 | $3,316,500.00 |
| 4/1/17 | 5.000% | $3,170,000.00 | $475,500.00 | $3,645,500.00 |
| 4/1/18 | 4.000% | $3,325,000.00 | $532,000.00 | $3,857,000.00 |
| 4/1/19 | 5.000% | $3,460,000.00 | $865,000.00 | $4,325,000.00 |
| 4/1/20 | 5.000% | $3,630,000.00 | $1,089,000.00 | $4,779,000.00 |
| 4/1/21 | 5.000% | $3,855,000.00 | $1,335,250.00 | $5,190,250.00 |
| 4/1/22 | 5.000% | $4,305,000.00 | $4,099,750.00 | $5,657,000.00 |
| 4/1/22 | 5.000% | $8,620,000.00 | $12,548,250.00 | $12,719,750.00 |
| 4/1/28 | 5.000% | $10,980,000.00 | | $33,528,250.00 |
| **Total** | | **$36,975,000.00** | **$22,952,000.00** | **$79,847,000.00** |

**2009-H(1)** — Insurer: Assured

| Maturity Date | Rate | Principal | Total Interest | Total Principal & Interest |
|---|---|---|---|---|
| 4/1/15 | 5.000% | $7,970,000.00 | $598,500.00 | $8,568,500.00 |
| 4/1/16 | 5.000% | $3,440,000.00 | $344,000.00 | $3,784,000.00 |
| 4/1/17 | 5.000% | $3,580,000.00 | $537,000.00 | $4,117,000.00 |
| 4/1/18 | 5.000% | $3,730,000.00 | $738,000.00 | $4,548,000.00 |
| **Total** | | **$18,780,000.00** | **$2,817,500.00** | **$20,317,500.00** |

*Subject to Mandatory Redemption*

13-53946-swr Doc 8797-13 Filed 04/20/14 Entered 04/20/14 12:27:31 Page 316 of 455

# UTGO Series Prior Bonds - Debt Service

## Bond Series Subject to Mandatory Redemption

### Issuance: 2004-B(2)

CUSIP: 230973XX1

| Due | Insurer | Fiscal Year | Mandatory Redemption Amounts | Outstanding | Rate | Interest |
|---|---|---|---|---|---|---|
| 10/1/14 | Ambac | 6/30/15 | | $573,000.00 | 5.240% | $35,065.00 |
| 4/1/15 | Ambac | | $155,000.00 | $420,000.00 | 5.240% | $15,565.00 |
| 10/1/15 | Ambac | 6/30/16 | | $420,000.00 | 5.240% | $11,004.00 |
| 4/1/16 | Ambac | | $165,000.00 | $255,000.00 | 5.240% | $11,004.00 |
| 10/1/16 | Ambac | 6/30/17 | | $255,000.00 | 5.240% | $6,681.00 |
| 4/1/17 | Ambac | | $85,000.00 | $85,000.00 | 5.240% | $6,681.00 |
| 10/1/17 | Ambac | 6/30/18 | | $85,000.00 | 5.240% | $2,227.00 |
| 4/1/18 | Ambac | | $140,000.00 | | 5.240% | $2,227.00 |
| Total | | | $615,000.00 | | | $69,954.00 |

### Issuance: 2008-A

CUSIP: 230973N55

| Due | Insurer | Fiscal Year | Mandatory Redemption Amount | Outstanding | Rate | Interest |
|---|---|---|---|---|---|---|
| 10/1/14 | Assured | 6/30/15 | | $8,620,000.00 | 5.000% | $215,500.00 |
| 4/1/15 | Assured | | | $8,620,000.00 | 5.000% | $215,500.00 |
| 10/1/15 | Assured | 6/30/16 | | $8,620,000.00 | 5.000% | $215,500.00 |
| 4/1/16 | Assured | | | $8,620,033.00 | 5.000% | $23,500.00 |
| 10/1/16 | Assured | 6/30/17 | | $8,620,000.00 | 5.000% | $215,500.00 |
| 4/1/17 | Assured | | | $8,620,000.00 | 5.000% | $215,500.00 |
| 10/1/17 | Assured | 6/30/18 | | $8,620,000.00 | 5.000% | $215,500.00 |
| 4/1/18 | Assured | | | $8,620,000.00 | 5.000% | $215,500.00 |
| 10/1/18 | Assured | 6/30/19 | | $8,620,000.00 | 5.000% | $215,500.00 |
| 4/1/19 | Assured | | | $8,670,000.00 | 5.000% | $215,500.00 |
| 10/1/19 | Assured | 6/30/20 | | $8,620,000.00 | 5.000% | $715,580.00 |
| 4/1/20 | Assured | | | $8,620,000.00 | 5.000% | $215,500.00 |
| 10/1/20 | Assured | 6/30/21 | | $8,620,000.00 | 5.000% | $215,500.00 |
| 4/1/21 | Assured | | | $8,620,000.00 | 5.000% | $215,500.00 |
| 10/1/21 | Assured | 6/30/22 | | $8,670,000.00 | 5.000% | $215,500.00 |
| 4/1/22 | Assured | | | $8,620,000.00 | 5.000% | $215,500.00 |
| 10/1/2022 | Assured | 6/30/23 | $4,205,000.00 | $4,415,000.00 | 5.000% | $215,500.00 |
| 4/1/2023 | Assured | | | $4,415,000.00 | 5.000% | $110,375.00 |
| 10/1/2023 | Assured | 6/30/24 | | $4,415,000.00 | 5.000% | $110,375.00 |
| 4/1/2024 | Assured | | $4,415,000.00 | | 5.000% | $110,375.00 |
| Total | | | $8,620,000.00 | | | $4,699,750.00 |

### Issuance: 2008-A

CUSIP: 23097JNG1

| Due | Insurer | Fiscal Year | Mandatory Redemption Amount | Outstanding | Rate | Interest |
|---|---|---|---|---|---|---|
| 10/1/14 | Assured | 6/30/15 | | $19,980,020.05 | 5.080% | $495,500.00 |
| 4/1/15 | Assured | | | $19,980,000.00 | 5.025% | $495,500.00 |
| 10/1/15 | Assured | 6/30/16 | | $19,980,000.00 | 5.000% | $495,500.41 |
| 4/1/16 | Assured | | | $19,980,000.00 | 5.000% | $495,500.00 |
| 10/1/16 | Assured | 6/30/17 | | $19,980,000.00 | 5.000% | $494,500.00 |
| 4/1/17 | Assured | | | $19,980,000.00 | 5.000% | $499,500.01 |
| 10/1/17 | Assured | 6/30/18 | | $19,990,000.00 | 5.000% | $499,500.03 |
| 4/1/18 | Assured | | | $19,980,000.00 | 5.000% | $499,500.00 |
| 4/1/19 | Assured | 6/30/19 | | $19,980,000.00 | 5.000% | $499,500.08 |
| 10/1/19 | Assured | 6/30/20 | | $19,980,000.00 | 5.025% | $499,500.00 |
| 4/1/20 | Assured | | | $19,980,000.00 | 5.050% | $499,500.00 |
| 10/1/20 | Assured | 6/30/21 | | $19,980,000.00 | 5.000% | $499,500.05 |
| 4/1/21 | Assured | | | $19,980,000.00 | 5.000% | $499,500.03 |
| 10/1/21 | Assured | 6/30/22 | | $19,985,000.00 | 5.000% | $499,500.00 |
| 4/1/22 | Assured | | | $19,980,000.00 | 5.000% | $499,500.00 |
| 10/1/2022 | Assured | 6/30/23 | | $19,980,000.00 | 5.000% | $495,500.00 |
| 4/1/2023 | Assured | | | $19,980,000.00 | 5.000% | $495,500.00 |
| 10/1/2024 | Assured | 6/30/24 | | $19,980,000.00 | 5.000% | $499,500.00 |
| 4/1/2024 | Assured | | | $19,980,000.00 | 5.000% | $499,500.00 |
| 4/1/2025 | Assured | 6/30/25 | $4,635,000.00 | $15,345,000.00 | 5.000% | $383,625.00 |
| 10/1/2025 | Assured | 6/30/26 | $4,870,000.00 | $10,475,000.00 | 5.000% | $383,625.00 |
| 10/1/2026 | Assured | 6/30/27 | $5,110,000.00 | $10,175,000.00 | 5.000% | $261,875.00 |
| 10/1/2027 | Assured | 6/30/28 | $5,365,000.00 | $6,565,000.00 | 5.089% | $134,125.00 |
| 4/1/2028 | Assured | | $5,365,000.00 | | 5.000% | $134,125.00 |
| Total | | | $19,380,000.00 | | | $12,548,250.00 |

15-53846-swr   Doc 8708-13   Filed 12/15/14   Entered 12/15/14 23:02:44   Page 317 of 455

2252

## EXHIBIT B

## RESTRUCTURED UTGO BONDS AND MUNICIPAL OBLIGATIONS

**[including break out of subseries of Municipal Obligations as between BHs and Insurers]**

| CUSIP | Maturity Date | Rate | Principal | Issuer | Interest | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 10/1/14 | 4/1/15 | 10/1/15 | 4/1/16 | 10/1/16 | 4/1/17 | 10/1/17 | 4/1/18 | 10/1/18 | 4/1/19 | 10/1/19 | 4/1/20 | 10/1/20 | 4/1/21 |
| **UTGO 1999-A** | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 5.250% | $2,408,250.00 | Assured | $63,216.56 | $63,216.56 | $63,269.38 | $63,269.38 | | | | | | | | | | |
| | 4/1/16 | 5.000% | $2,530,375.00 | Assured | $63,269.38 | $63,269.38 | $66,438.13 | $66,438.13 | $66,438.13 | $66,438.13 | | | | | | | | |
| | 4/1/17 | 5.000% | $2,657,525.00 | Assured | $66,438.13 | $66,438.13 | $69,818.13 | $69,818.13 | $69,818.13 | $69,818.13 | $69,818.13 | $69,818.13 | | | | | | |
| | 4/1/18 | 5.000% | $2,792,725.00 | Assured | $69,818.13 | $69,818.13 | $73,303.75 | $73,303.75 | $73,303.75 | $73,303.75 | $73,303.75 | $73,303.75 | $73,303.75 | $73,303.75 | | | | |
| | 4/1/19 | 5.000% | $2,932,150.00 | Assured | $73,303.75 | $73,303.75 | | | | | | | | | | | | |
| | | | **$13,321,025.00** | | $336,045.94 | $336,045.94 | $272,829.38 | $272,829.38 | $209,560.00 | $209,560.00 | $143,121.88 | $143,121.88 | $73,303.75 | $73,303.75 | | | | |
| **UTGO 2001-A(1)** | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 5.375% | $5,019,300.00 | NPFG | $134,893.69 | $134,893.69 | | | | | | | | | | | | |
| | 4/1/16 | 5.375% | $5,289,700.00 | NPFG | $142,160.69 | $142,160.69 | $142,160.69 | $142,160.69 | | | | | | | | | | |
| | 4/1/17 | 5.375% | $5,577,000.00 | NPFG | $149,881.88 | $149,881.88 | $149,881.88 | $149,881.88 | $149,881.88 | $149,881.88 | | | | | | | | |
| | 4/1/18 | 5.375% | $11,830,000.00 | NPFG | $317,931.25 | $317,931.25 | $317,931.25 | $317,931.25 | $317,931.25 | $317,931.25 | $317,931.25 | $317,931.25 | | | | | | |
| | 4/1/19 | 5.000% | $11,630,000.00 | NPFG | $295,750.00 | $295,750.00 | $295,750.00 | $295,750.00 | $295,750.00 | $295,750.00 | $295,750.00 | $295,750.00 | $295,750.00 | $295,750.00 | | | | |
| | 4/1/20 | 5.000% | $11,830,000.00 | NPFG | $295,750.00 | $295,750.00 | $295,750.00 | $295,750.00 | $295,750.00 | $295,750.00 | $295,750.00 | $295,750.00 | $295,750.00 | $295,750.00 | $295,750.00 | $295,750.00 | | |
| | 4/1/21 | 5.000% | $11,830,000.00 | NPFG | $295,750.00 | $295,750.00 | $295,750.00 | $295,750.00 | $295,750.00 | $295,750.00 | $295,750.00 | $295,750.00 | $295,750.00 | $295,750.00 | $295,750.00 | $295,750.00 | $295,750.00 | $295,750.00 |
| | | | **$63,206,000.00** | | $1,632,217.50 | $1,632,217.50 | $1,497,223.81 | $1,497,223.81 | $1,355,063.13 | $1,355,063.13 | $1,205,181.25 | $1,203,181.25 | $887,250.00 | $887,250.00 | $591,500.00 | $591,500.00 | $295,750.00 | $295,750.00 |
| **UTGO 2002** | | | | | | | | | | | | | | | | | | |
| | 4/1/21 | 5.125% | $2,317,800.00 | NPFG | $70,156.13 | $70,156.13 | $70,156.13 | $70,156.13 | $70,156.13 | $70,156.13 | $70,156.13 | $70,156.13 | $70,156.13 | $70,156.13 | $70,156.13 | $70,156.13 | $70,156.13 | $70,156.13 |
| | 4/1/23 | 5.125% | $2,877,255.00 | NPFG | $73,728.89 | $73,728.89 | $73,728.89 | $73,728.89 | $73,728.89 | $73,728.89 | $73,728.89 | $73,728.89 | $73,728.89 | $73,728.89 | $73,728.89 | $73,728.89 | $73,728.89 | $73,728.89 |
| | | | **$5,615,055.00** | | $143,885.02 | $143,885.02 | $143,885.02 | $143,885.02 | $143,885.02 | $143,885.02 | $143,885.02 | $143,885.02 | $143,885.02 | $143,885.02 | $143,885.02 | $143,885.02 | $143,885.02 | $143,885.02 |
| **UTGO 2005-A** | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 4.000% | $253,500.00 | Syncora | $5,070.00 | $5,070.00 | | | | | | | | | | | | |
| | 4/1/16 | 5.250% | $2,154,750.00 | Syncora | $56,562.19 | $56,562.19 | $56,432.84 | $56,432.84 | | | | | | | | | | |
| | 4/1/17 | 5.250% | $2,530,375.00 | Syncora | $66,432.84 | $66,432.84 | $66,432.84 | $66,432.84 | $66,432.84 | $66,432.84 | | | | | | | | |
| | 4/1/18 | 5.250% | $2,661,750.00 | Syncora | $69,870.94 | $69,870.94 | $69,870.94 | $69,870.94 | $69,870.94 | $69,870.94 | $69,870.94 | $69,870.94 | | | | | | |
| | 4/1/19 | 5.250% | $2,840,175.00 | Syncora | $73,530.84 | $73,530.84 | $73,530.84 | $73,530.84 | $73,530.84 | $73,530.84 | $73,530.84 | $73,530.84 | $73,530.84 | $73,530.84 | | | | |
| | 4/1/20 | 5.250% | $77,412.56 | Syncora | $77,412.56 | $77,412.56 | $77,412.56 | $77,412.56 | $77,412.56 | $77,412.56 | $77,412.56 | $77,412.56 | $77,412.56 | $77,412.56 | $77,412.56 | | | |
| | 4/1/21 | 5.250% | $506.25 | Syncora | $9,506.25 | $9,506.25 | $9,506.25 | $9,506.25 | $9,506.25 | $9,506.25 | $9,506.25 | $9,506.25 | $9,506.25 | $9,506.25 | $9,506.25 | $9,506.25 | | |
| | 4/1/22 | 5.250% | $422,500.00 | Syncora | $70,425.47 | $70,425.47 | $70,425.47 | $70,425.47 | $70,425.47 | $70,425.47 | $70,425.47 | $70,425.47 | $70,425.47 | $70,425.47 | $70,425.47 | $70,425.47 | $70,425.47 | |
| | 4/1/22 | 4.625% | $3,261,700.00 | Syncora | $85,619.63 | $85,619.63 | $85,619.63 | $85,619.63 | $85,619.63 | $85,619.63 | $85,619.63 | $85,619.63 | $85,619.63 | $85,619.63 | $85,619.63 | $85,619.63 | $85,619.63 | $85,619.63 |
| | 4/1/23 | 4.625% | $422,500.00 | Syncora | $9,770.31 | $9,770.31 | $9,770.31 | $9,770.31 | $9,770.31 | $9,770.31 | $9,770.31 | $9,770.31 | $9,770.31 | $9,770.31 | $9,770.31 | $9,770.31 | $9,770.31 | $9,770.31 |
| | 4/1/23 | 4.625% | $3,014,475.00 | Syncora | $79,076.16 | $79,076.16 | $79,076.16 | $79,076.16 | $79,076.16 | $79,076.16 | $79,076.16 | $79,076.16 | $79,076.16 | $79,076.16 | $79,076.16 | $79,076.16 | $79,076.16 | $79,076.16 |
| | 4/1/23 | 4.625% | $1,267,300.00 | Syncora | $29,310.94 | $29,310.94 | $29,310.94 | $29,310.94 | $29,310.94 | $29,310.94 | $29,310.94 | $29,310.94 | $29,310.94 | $29,310.94 | $29,310.94 | $29,310.94 | $29,310.94 | $29,310.94 |
| | 4/1/23 | 3.250% | $2,743,475.00 | Syncora | $61,552.97 | $61,552.97 | $61,552.97 | $61,552.97 | $61,552.97 | $61,552.97 | $61,552.97 | $61,552.97 | $61,552.97 | $61,552.97 | $61,552.97 | $61,552.97 | $61,552.97 | $61,552.97 |
| | | | **$26,765,375.00** | | $694,141.00 | $694,141.00 | $632,968.95 | $632,968.95 | $566,076.06 | $566,076.06 | $509,263.13 | $509,263.13 | $422,674.28 | $422,674.28 | $345,261.72 | $345,261.72 | $265,330.00 | $265,330.00 |
| **UTGO 2004-A(1)** | | | | | | | | | | | | | | | | | | |
| | 4/1/20 | 5.250% | $3,603,500.00 | Ambac | $99,815.63 | $99,815.63 | $99,815.63 | $99,815.63 | $99,815.63 | $99,815.63 | $99,815.63 | $99,815.63 | $99,815.63 | $99,815.63 | $99,815.63 | | | |
| | 4/1/20 | 4.250% | $156,325.00 | Ambac | $3,321.91 | $3,321.91 | $3,321.91 | $3,321.91 | $3,321.91 | $3,321.91 | $3,321.91 | $3,321.91 | $3,321.91 | $3,321.91 | $3,321.91 | | | |
| | 4/1/21 | 5.250% | $5,141,925.00 | Ambac | $134,972.91 | $134,972.91 | $134,972.91 | $134,972.91 | $134,972.91 | $134,972.91 | $134,972.91 | $134,972.91 | $134,972.91 | $134,972.91 | $134,972.91 | $134,972.91 | | |
| | 4/1/21 | 5.000% | $5,577,000.00 | Ambac | $139,425.00 | $139,425.00 | $139,425.00 | $139,425.00 | $139,425.00 | $139,425.00 | $139,425.00 | $139,425.00 | $139,425.00 | $139,425.00 | $139,425.00 | $139,425.00 | | |
| | 4/1/22 | 4.500% | $153,716.06 | Ambac | $153,716.06 | $153,716.06 | $153,716.06 | $153,716.06 | $153,716.06 | $153,716.06 | $153,716.06 | $153,716.06 | $153,716.06 | $153,716.06 | $153,716.06 | $153,716.06 | $153,716.06 | |
| | 4/1/22 | 4.500% | $7,129.69 | Ambac | $7,129.69 | $7,129.69 | $7,129.69 | $7,129.69 | $7,129.69 | $7,129.69 | $7,129.69 | $7,129.69 | $7,129.69 | $7,129.69 | $7,129.69 | $7,129.69 | $7,129.69 | |
| | 4/1/23 | 5.250% | $5,947,400.00 | Ambac | $153,494.25 | $153,494.25 | $153,494.25 | $153,494.25 | $153,494.25 | $153,494.25 | $153,494.25 | $153,494.25 | $153,494.25 | $153,494.25 | $153,494.25 | $153,494.25 | $153,494.25 | $153,494.25 |
| | 4/1/23 | 4.600% | $603,325.00 | Ambac | $15,256.48 | $15,256.48 | $15,256.48 | $15,256.48 | $15,256.48 | $15,256.48 | $15,256.48 | $15,256.48 | $15,256.48 | $15,256.48 | $15,256.48 | $15,256.48 | $15,256.48 | $15,256.48 |
| | 4/1/24 | 5.250% | $5,823,050.00 | Ambac | $152,828.81 | $152,828.81 | $152,828.81 | $152,828.81 | $152,828.81 | $152,828.81 | $152,828.81 | $152,828.81 | $152,828.81 | $152,828.81 | $152,828.81 | $152,828.81 | $152,828.81 | $152,828.81 |
| | | | **$33,10,150.00** | | $859,960.73 | $859,960.73 | $859,960.73 | $859,960.73 | $859,960.73 | $859,960.73 | $859,960.73 | $859,960.73 | $859,960.73 | $859,960.73 | $760,145.10 | $760,145.10 | $621,850.29 | $621,850.29 |

# Reinstated to Holders: UTGO Series 2014 DSA Fourth Lien Restructured Bonds - Debt Service

| CUSIP | Maturity Date | Rate | Principal | Issuer | | Interest | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 10/1/14 | 4/1/15 | 10/1/15 | 4/1/16 | 10/1/16 | 4/1/17 | 10/1/17 | 4/1/18 | 10/1/18 | 4/1/19 | 10/1/19 | 4/1/20 | 10/1/20 | 4/1/21 | 4/1/22 | 4/1/23 | 4/1/22 |

*Table of debt service schedule with numerous interest and principal figures organized by CUSIP groupings: UTGO 2004-B(1), UTGO 2005-B, UTGO 2005-C, UTGO 2006-A, UTGO 2006-B(1).*

* Subject to Mandatory Redemption

| CUSIP | Maturity Date | Rate | Principal | Insurer | 10/1/21 | 4/1/22 | 10/1/22 | 4/1/23 | 10/1/23 | 4/1/24 | 10/1/24 | 4/1/25 | 10/1/25 | 4/1/26 | 10/1/26 | 4/1/27 | 10/1/27 | 4/1/28 | Total Interest | Total Principal & Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **UTGO 1999 A** | | | | | | | | | | | | | | | | | | | | |
| 5443 | 4/1/15 | 5.250% | $2,406,250.00 | Assured | | | | | | | | | | | | | | | $126,433.13 | $2,534,683.13 |
| 5N1 | 4/1/16 | 5.000% | $2,530,775.00 | Assured | | | | | | | | | | | | | | | $153,877.50 | $2,763,652.50 |
| 5N6 | 4/1/17 | 5.000% | $2,657,525.00 | Assured | | | | | | | | | | | | | | | $399,628.75 | $3,056,153.75 |
| 5N24 | 4/1/18 | 5.000% | $2,792,725.00 | Assured | | | | | | | | | | | | | | | $559,545.00 | $3,351,270.00 |
| 5S82 | 4/1/19 | 5.000% | $2,932,150.00 | Assured | | | | | | | | | | | | | | | $733,037.50 | $3,665,187.50 |
| | | | **$13,321,425.00** | | | | | | | | | | | | | | | | **$2,069,721.88** | **$15,391,146.88** |
| **UTGO 2001-A(I)** | | | | | | | | | | | | | | | | | | | | |
| 5S66 | 4/1/15 | 5.375% | $5,019,300.00 | NPFG | | | | | | | | | | | | | | | $269,797.38 | $5,289,097.38 |
| 5K3 | 4/1/16 | 5.375% | $5,289,200.00 | NPFG | | | | | | | | | | | | | | | $568,642.75 | $5,858,342.75 |
| 5V1 | 4/1/17 | 5.375% | $6,377,000.00 | NPFG | | | | | | | | | | | | | | | $889,291.25 | $6,476,291.25 |
| 5W9 | 4/1/18 | 5.375% | $11,830,000.00 | NPFG | | | | | | | | | | | | | | | $2,543,430.00 | $14,333,430.00 |
| 5X7 | 4/1/19 | 5.000% | $11,850,000.00 | NPFG | | | | | | | | | | | | | | | $2,951,500.00 | $14,787,500.00 |
| 5Y5 | 4/1/20 | 5.000% | $11,830,000.00 | NPFG | | | | | | | | | | | | | | | $3,549,000.00 | $15,379,000.00 |
| 5Z2 | 4/1/21 | 5.000% | $11,832,000.00 | NPFG | | | | | | | | | | | | | | | $4,140,520.00 | $15,970,520.00 |
| | | | **$63,206,000.00** | | | | | | | | | | | | | | | | **$14,938,371.38** | **$78,334,471.38** |
| **UTGO 2002** | | | | | | | | | | | | | | | | | | | | |
| 5W9 | 4/1/21 | 5.125% | $2,737,800.00 | NPFG | $73,728.89 | $73,728.89 | | | | | | | | | | | | | $982,185.75 | $3,719,985.75 |
| 5W8 | 4/1/22 | 5.125% | $2,877,225.00 | NPFG | | $73,728.89 | | | | | | | | | | | | | $1,139,642.25 | $4,016,867.25 |
| | | | **$5,615,025.00** | | **$73,728.89** | **$73,728.89** | | | | | | | | | | | | | **$2,121,846.00** | **$7,736,871.00** |
| **UTGO 2003-A** | | | | | | | | | | | | | | | | | | | | |
| 5ZP9 | 4/1/15 | 4.600% | $523,500.00 | Syncora | | | | | | | | | | | | | | | $10,140.00 | $20,540.00 |
| 5ZQ8 | 4/1/16 | 5.250% | $2,154,750.00 | Syncora | | | | | | | | | | | | | | | $113,124.38 | $2,267,874.38 |
| 5ZR6 | 4/1/17 | 5.250% | $2,330,775.00 | Syncora | | | | | | | | | | | | | | | $265,731.38 | $2,596,506.38 |
| 5ZS4 | 4/1/18 | 5.250% | $2,661,750.00 | Syncora | | | | | | | | | | | | | | | $419,225.63 | $3,080,975.63 |
| 5ZT2 | 4/1/19 | 5.250% | $2,881,175.00 | Syncora | | | | | | | | | | | | | | | $588,246.75 | $3,489,421.75 |
| 5ZU9 | 4/1/20 | 5.250% | $2,949,050.00 | Syncora | | | | | | | | | | | | | | | $774,125.63 | $3,723,175.63 |
| 5ZV7 | 4/1/21 | 4.500% | $422,500.00 | Syncora | $9,770.31 | $9,770.31 | | | | | | | | | | | | | $114,075.00 | $536,575.00 |
| 5ZW5 | 4/1/21 | 5.250% | $2,682,875.00 | Syncora | $79,076.16 | $79,076.16 | | | | | | | | | | | | | $845,105.63 | $3,527,980.63 |
| 5ZX3 | 4/1/21 | 5.250% | $3,261,700.00 | Syncora | $9,770.31 | $9,770.31 | | | | | | | | | | | | | $1,198,674.75 | $4,460,374.75 |
| 5ZY1 | 4/1/22 | 4.625% | $422,500.00 | Syncora | | $9,770.31 | | | | | | | | | | | | | $156,325.00 | $578,825.00 |
| 5ZZ8 | 4/1/22 | 5.250% | $3,012,425.00 | Syncora | $79,076.16 | $79,076.16 | | | | | | | | | | | | | $1,265,328.50 | $4,277,643.50 |
| 5YY0 | 4/1/23 | 5.250% | $1,207,500.00 | Syncora | | | | $29,310.94 | $29,310.94 | | | | | | | | | | $625,306.88 | $1,795,906.88 |
| 5YD0 | 4/1/23 | 5.250% | $2,344,375.00 | Syncora | $61,552.97 | $61,552.97 | $29,310.94 | $90,552.97 | | | | | | | | | | | $1,107,933.44 | $3,452,828.44 |
| | | | **$26,765,375.00** | | **$379,780.38** | **$379,720.38** | **$90,863.91** | **$99,863.91** | | | | | | | | | | | **$7,285,842.74** | **$34,159,077.94** |
| **UTGO 2004-A(I)** | | | | | | | | | | | | | | | | | | | | |
| 5YX2 | 4/1/19 | 6.300% | $3,802,500.00 | Ambac | | | | | | | | | | | | | | | $998,156.25 | $4,800,656.25 |
| 5YY0 | 4/1/20 | 4.350% | $156,325.00 | Ambac | | | | | | | | | | | | | | | $39,862.88 | $196,187.88 |
| 5YZ7 | 4/1/20 | 5.250% | $5,141,825.00 | Ambac | | | | | | | | | | | | | | | $1,619,754.00 | $6,761,079.88 |
| 5YA1 | 4/1/21 | 5.000% | $5,577,000.00 | Ambac | | | | | | | | | | | | | | | $1,931,950.00 | $7,526,550.00 |
| 5YB9 | 4/1/22 | 5.250% | $5,855,850.00 | Ambac | $153,716.06 | $153,716.06 | | | | | | | | | | | | | $2,459,457.00 | $8,315,307.00 |
| 5YC7 | 4/1/23 | 5.250% | $316,675.00 | Ambac | $7,129.69 | $7,129.69 | $7,129.69 | $7,129.69 | | | | | | | | | | | $128,334.38 | $445,209.38 |
| 5YD5 | 4/1/23 | 5.250% | $5,947,400.00 | Ambac | $153,494.25 | $153,494.25 | $153,494.25 | $153,494.25 | | | | | | | | | | | $2,702,896.50 | $8,650,296.50 |
| 5YE3 | 4/1/24 | 4.600% | $663,575.00 | Ambac | $15,256.48 | $15,256.48 | $15,256.48 | $15,256.48 | $15,256.48 | $15,256.48 | | | | | | | | | $305,129.90 | $968,674.50 |
| 5YF0 | 4/1/24 | 5.250% | $3,932,050.00 | Ambac | $152,828.81 | $152,828.81 | $152,828.81 | $152,828.81 | $152,828.81 | $152,828.81 | | | | | | | | | $3,026,576.25 | $8,878,626.25 |
| | | | **$31,384,450.00** | | **$482,425.29** | **$482,425.29** | **$328,709.23** | **$328,709.23** | **$168,085.29** | **$168,085.29** | | | | | | | | | **$13,322,037.63** | **$46,505,187.63** |

* Subject to Mandatory Redemption

# Reinstated to Holders: UTGO Series 2014 DSA Fourth Lien Restructured Bonds - Debt Service

| CUSIP | Maturity Due | Rate | Principal | Insurer | 10/1/21 | 4/1/22 | 10/1/22 | 4/1/23 | 10/1/23 | 4/1/24 | 10/1/24 | 4/1/25 | 10/1/25 | 4/1/26 | 10/1/26 | 4/1/27 | 10/1/27 | 4/1/28 | Total Interest | Total Principal & Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **UTGO 2004-B(1)** | | | | | Interest | | | | | | | | | | | | | | | |
| | 4/1/15 | 5.000% | $7,330,375.00 | Ambac | | | | | | | | | | | | | | | $366,518.75 | $7,696,893.75 |
| | 4/1/16 | 5.250% | $7,693,725.00 | Ambac | | | | | | | | | | | | | | | $807,241.13 | $8,500,966.13 |
| | 4/1/17 | 4.000% | $257,725.00 | Ambac | | | | | | | | | | | | | | | $30,927.00 | $288,652.00 |
| | 4/1/18 | 5.250% | $7,341,600.00 | Ambac | | | | | | | | | | | | | | | $1,235,052.00 | $9,076,632.00 |
| | 4/1/19 | 5.250% | $1,091,000.00 | Ambac | | | | | | | | | | | | | | | $354,900.00 | $2,044,900.00 |
| | | | $24,813,425.00 | | | | | | | | | | | | | | | | $2,795,258.88 | $27,608,663.88 |
| **UTGO 2004-B(2)** | | | | | | | | | | | | | | | | | | | | |
| | 4/1/19 | 5.240% | $485,875.00 | Ambac | | | | | | | | | | | | | | | $59,111.13 | $544,986.13 |
| **UTGO 2005-B** | | | | | | | | | | | | | | | | | | | | |
| | 4/1/13 | 5.000% | $1,935,950.00 | Assured | | | | | | | | | | | | | | | $56,753.50 | $2,031,802.50 |
| | 4/1/15 | 5.000% | $2,032,225.00 | Assured | | | | | | | | | | | | | | | $203,223.50 | $2,235,447.50 |
| | 4/1/17 | 4.300% | $2,127,490.00 | Assured | | | | | | | | | | | | | | | $278,692.60 | $2,404,092.60 |
| | 4/1/17 | 5.000% | $2,236,375.00 | Assured | | | | | | | | | | | | | | | $445,315.50 | $2,677,690.60 |
| | 4/1/18 | 5.000% | $2,336,425.00 | Assured | | | | | | | | | | | | | | | $854,106.25 | $3,190,531.25 |
| | 4/1/19 | 5.000% | $4,225,000.00 | Assured | | | | | | | | | | | | | | | $1,267,500.00 | $5,492,500.00 |
| | 4/1/20 | 5.000% | $4,235,000.00 | Assured | | | | | | | | | | | | | | | $1,478,750.00 | $5,703,750.00 |
| | 4/1/21 | 5.000% | $4,225,000.00 | Assured | | | $105,625.00 | | | | | | | | | | | | $1,690,000.00 | $5,915,000.00 |
| | 4/1/22 | 5.000% | $4,235,000.00 | Assured | $105,625.00 | $105,625.00 | $105,625.00 | | | | | | | | | | | | $1,901,250.00 | $6,136,250.00 |
| | 4/1/24 | 5.000% | $4,235,300.00 | Assured | $105,625.00 | $105,625.00 | $105,625.00 | $105,625.00 | $105,625.00 | | | | | | | | | | $2,112,500.00 | $6,347,800.00 |
| | 4/1/28 | 5.000% | $4,235,000.00 | Assured | $105,625.00 | $105,625.00 | $105,625.00 | $105,625.00 | $105,625.00 | $105,625.00 | $105,625.00 | $105,625.00 | | | | | | | $2,322,750.00 | $6,548,750.00 |
| | | | $36,500,675.00 | | $422,500.00 | $316,875.00 | $316,875.00 | $211,250.00 | $211,250.00 | $105,625.00 | $105,625.00 | $105,625.00 | | | | | | | $12,377,838.83 | $48,387,513.85 |
| **UTGO 2005-C** | | | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 5.000% | $1,947,125.00 | Assured | | | | | | | | | | | | | | | $97,386.75 | $2,045,311.25 |
| | 4/1/16 | 5.000% | $2,049,125.00 | Assured | | | | | | | | | | | | | | | $304,912.50 | $2,354,037.50 |
| | 4/1/17 | 5.000% | $2,385,325.00 | Assured | | | | | | | | | | | | | | | $271,417.73 | $2,437,942.73 |
| | 4/1/18 | 5.000% | $2,222,350.00 | Assured | | | | | | | | | | | | | | | $444,470.00 | $2,666,820.00 |
| | 4/1/19 | 5.250% | $2,311,075.00 | Assured | | | | | | | | | | | | | | | $606,637.19 | $2,917,712.19 |
| | 4/1/20 | 5.350% | $3,007,150.00 | Assured | | | | | | | | | | | | | | | $200,191.48 | $3,205,719.48 |
| | 4/1/24 | | | Assured | | | | | | | | | | | | | | | | |
| | | | $13,318,625.00 | | | | | | | | | | | | | | | | $2,198,758.54 | $15,377,383.54 |
| **UTGO 2006-A** | | | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 5.395% | $2,429,375.00 | Assured | | | | | | | | | | | | | | | $121,468.75 | $2,530,843.75 |
| | 4/1/16 | 5.000% | $2,347,675.00 | Assured | | | | | | | | | | | | | | | $254,767.50 | $2,602,442.50 |
| | 4/1/17 | 5.000% | $2,678,650.00 | Assured | | | | | | | | | | | | | | | $401,797.50 | $3,080,447.50 |
| | 4/1/18 | 4.000% | $2,809,625.00 | Assured | | | | | | | | | | | | | | | $449,540.00 | $3,259,165.00 |
| | 4/1/19 | 5.000% | $2,923,700.00 | Assured | | | | | | | | | | | | | | | $730,925.00 | $3,654,625.00 |
| | 4/1/20 | 5.000% | $3,007,150.00 | Assured | | | | | | | | | | | | | | | $8,920,205.00 | $3,397,955.00 |
| | 4/1/21 | 5.000% | $3,223,675.00 | Assured | | $84,095.63 | $182,097.50 | $182,097.50 | | | | | | | | | | | $1,128,296.25 | $4,351,981.25 |
| | 4/1/22 | 5.000% | $3,384,225.00 | Assured | $84,095.63 | $84,095.63 | $182,097.50 | $182,097.50 | $93,266.88 | $93,266.88 | | | | | | | | | $1,353,090.00 | $4,737,315.00 |
| | 4/1/28 | 5.000% | $7,245,100.00 | Assured | $182,097.50 | $182,097.50 | $422,077.50 | $422,077.50 | $422,077.50 | $422,077.50 | $422,077.50 | $422,077.50 | $324,163.13 | $324,163.13 | $221,284.38 | $221,284.38 | $113,335.63 | $113,335.63 | $3,464,288.75 | $10,748,188.75 |
| | | | $16,883,100.00 | | | | | | | | | | | | | | | | $10,603,371.25 | $27,486,471.25 |
| | | | $47,231,275.00 | | $688,780.63 | $604,375.00 | $604,375.00 | $515,344.38 | $515,344.38 | $422,077.50 | $422,077.50 | $422,077.50 | $324,163.13 | $324,163.13 | $221,284.38 | $221,284.38 | $113,335.63 | $113,335.63 | $73,428,240.00 | $515,915.00 |
| **UTGO 2008-B(1)** | | | | | | | | | | | | | | | | | | | | |
| | 4/1/15 | 5.000% | $6,734,250.00 | Assured | | | | | | | | | | | | | | | $336,712.50 | $7,071,382.50 |
| | 4/1/16 | 5.000% | $2,906,900.00 | Assured | | | | | | | | | | | | | | | $290,680.00 | $3,197,480.00 |
| | 4/1/17 | 5.000% | $3,025,100.00 | Assured | | | | | | | | | | | | | | | $453,565.00 | $3,478,665.00 |
| | 4/1/17 | 5.000% | $3,202,350.00 | Assured | | | | | | | | | | | | | | | $663,310.00 | $3,865,660.00 |
| | | | $15,869,500.00 | | | | | | | | | | | | | | | | $1,722,687.50 | $17,592,187.50 |
| | | | $279,018,950.00 | | $1,567,245.38 | $1,340,623.13 | $1,340,623.13 | $894,679.66 | $894,679.66 | $527,702.50 | $527,702.50 | $527,702.50 | $324,163.13 | $324,163.13 | $221,284.38 | $221,284.38 | $113,335.63 | $113,335.63 | $78,648,976.71 | $358,267,144.71 |

Bond Series Subject to Mandatory Redemption

**CUSIP 25091X2X1 — Issuance: 2004-B(2)**

| Date | Issuer | Fiscal Year | Mandatory Redemption Amount | Outstanding | Rate | Interest |
|---|---|---|---|---|---|---|
| 10/1/14 | Ambac | 6/30/15 | | $485,575.00 | 5.240% | $12,729.93 |
| 4/1/15 | Ambac | 6/30/15 | $130,975.00 | $354,500.00 | 5.240% | $32,759.93 |
| 10/1/15 | Ambac | 6/30/16 | | $354,500.00 | 5.240% | $9,299.38 |
| 4/1/16 | Ambac | 6/30/16 | $139,425.00 | $215,075.00 | 5.240% | $9,299.38 |
| 10/1/16 | Ambac | 6/30/17 | | $215,075.00 | 5.240% | $5,645.45 |
| 4/1/17 | Ambac | 6/30/17 | $123,600.00 | $91,829.00 | 5.240% | $5,645.45 |
| 10/1/17 | Ambac | 6/30/18 | | $91,829.00 | 5.240% | $1,881.85 |
| 4/1/18 | Ambac | 6/30/18 | $143,600.00 | | 5.240% | $1,881.85 |
| | | Total | $485,575.00 | | | $69,131.13 |

**CUSIP 25091X5N5 — Issuance: 2008-A**

| Date | Issuer | Fiscal Year | Mandatory Redemption Amount | Outstanding | Rate | Interest |
|---|---|---|---|---|---|---|
| 10/1/14 | Assured | 6/30/15 | | $3,283,900.00 | 5.000% | $197,057.50 |
| 4/1/15 | Assured | 6/30/15 | | $3,283,900.00 | 5.000% | $182,057.50 |
| 10/1/15 | Assured | 6/30/16 | | $3,283,900.00 | 5.000% | $182,091.50 |
| 4/1/16 | Assured | 6/30/16 | | $3,283,900.00 | 5.000% | $182,097.50 |
| 10/1/16 | Assured | 6/30/17 | | $3,283,900.00 | 5.000% | $182,097.50 |
| 4/1/17 | Assured | 6/30/17 | | $3,283,900.00 | 5.000% | $182,097.50 |
| 10/1/17 | Assured | 6/30/18 | | $3,283,900.00 | 5.000% | $182,097.50 |
| 4/1/18 | Assured | 6/30/18 | | $3,283,900.00 | 5.000% | $182,097.50 |
| 10/1/18 | Assured | 6/30/19 | | $3,283,900.00 | 5.000% | $182,097.50 |
| 4/1/19 | Assured | 6/30/19 | | $3,283,900.00 | 5.000% | $182,097.50 |
| 10/1/19 | Assured | 6/30/20 | | $3,283,900.00 | 5.000% | $182,097.50 |
| 4/1/20 | Assured | 6/30/20 | | $3,283,900.00 | 5.000% | $182,097.50 |
| 10/1/20 | Assured | 6/30/21 | | $3,283,900.00 | 5.000% | $182,097.50 |
| 4/1/21 | Assured | 6/30/21 | | $3,283,900.00 | 5.000% | $182,097.50 |
| 10/1/21 | Assured | 6/30/22 | | $3,733,900.00 | 5.000% | $182,097.50 |
| 4/1/22 | Assured | 6/30/22 | | $3,762,900.00 | 5.000% | $182,097.50 |
| 10/1/22 | Assured | 6/30/23 | | $3,393,900.00 | 5.000% | $182,097.50 |
| 4/1/23 | Assured | 6/30/23 | $3,355,325.00 | $3,730,675.00 | 5.000% | $180,093.50 |
| 10/1/23 | Assured | 6/30/24 | | $3,730,675.00 | 5.000% | $93,266.88 |
| 4/1/24 | Assured | 6/30/24 | $3,730,675.00 | | 5.000% | $93,266.88 |
| | | Total | $7,283,900.00 | | | $3,464,288.75 |

**CUSIP 25091X3N63 — Issuance: 2008-A**

| Date | Issuer | Fiscal Year | Mandatory Redemption Amount | Outstanding | Rate | Interest |
|---|---|---|---|---|---|---|
| 10/1/14 | Assured | 6/30/15 | | $16,883,100.00 | 5.000% | $422,077.50 |
| 4/1/15 | Assured | 6/30/15 | | $16,883,100.00 | 5.000% | $422,077.50 |
| 10/1/15 | Assured | 6/30/16 | | $16,883,100.00 | 5.000% | $422,077.50 |
| 4/1/16 | Assured | 6/30/16 | | $16,883,100.00 | 5.000% | $422,077.50 |
| 10/1/16 | Assured | 6/30/17 | | $16,883,100.00 | 5.000% | $422,077.50 |
| 4/1/17 | Assured | 6/30/17 | | $16,883,100.00 | 5.000% | $422,077.50 |
| 10/1/17 | Assured | 6/30/18 | | $16,883,100.00 | 5.000% | $422,077.50 |
| 4/1/18 | Assured | 6/30/18 | | $16,883,100.00 | 5.000% | $422,077.50 |
| 10/1/18 | Assured | 6/30/19 | | $16,883,100.00 | 5.000% | $422,077.50 |
| 4/1/19 | Assured | 6/30/19 | | $16,883,100.00 | 5.000% | $422,077.50 |
| 10/1/19 | Assured | 6/30/20 | | $16,883,100.00 | 5.000% | $422,077.50 |
| 4/1/20 | Assured | 6/30/20 | | $16,883,100.00 | 5.000% | $422,077.50 |
| 10/1/20 | Assured | 6/30/21 | | $16,883,100.00 | 5.000% | $422,077.50 |
| 4/1/21 | Assured | 6/30/21 | | $16,883,100.00 | 5.000% | $422,077.50 |
| 10/1/21 | Assured | 6/30/22 | | $16,883,100.00 | 5.000% | $422,077.50 |
| 4/1/22 | Assured | 6/30/22 | | $16,883,100.00 | 5.000% | $422,077.50 |
| 10/1/22 | Assured | 6/30/23 | | $16,883,100.00 | 5.000% | $422,077.50 |
| 4/1/23 | Assured | 6/30/23 | $3,919,635.00 | $12,946,595.00 | 5.000% | $330,163.13 |
| 10/1/23 | Assured | 6/30/24 | | $8,831,375.00 | 5.000% | $334,103.13 |
| 4/1/24 | Assured | 6/30/24 | $4,115,160.00 | $4,533,455.00 | 5.000% | $221,384.38 |
| 10/1/24 | Assured | 6/30/25 | | $4,533,455.00 | 5.000% | $113,355.63 |
| 4/1/25 | Assured | 6/30/25 | $4,533,455.00 | | 5.000% | $113,355.63 |
| | | Total | $16,883,100.00 | | | $10,603,271.25 |

| CUSIP | Maturity Date | Rate | Principal | Insurers | Beneficial Holder | 10/1/14 | 4/1/15 | 10/1/15 | 4/1/16 | 10/1/16 | 4/1/17 | 10/1/17 | 4/1/18 | 10/1/18 | 4/1/19 | 10/1/19 | 4/1/20 | 10/1/20 | 4/1/21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | Interest | | | | | | | |

* Subject to Mandatory Redemption

# Reinstated to Insurers: UTGO Series 2014 DSA Fourth Lien Restructured Bonds - Debt Service

| CUSIP | Maturity Date | Principal | Rate | Insurer | Beneficial Holder | Interest | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 10/1/15 | 4/1/16 | 10/1/16 | 4/1/17 | 10/1/17 | 4/1/18 | 10/1/18 | 4/1/19 | 10/1/19 | 4/1/20 | 10/1/20 | 4/1/21 |

*(Table body comprises dense numeric debt-service schedules grouped under section headings: UTGO 2004-A(1), UTGO 2004-B(1), UTGO 2004-C, UTGO 2006-A, UTGO 2006-B(1), with Insurers "Ambac" and "Assured." Individual cell values are not reliably legible at this resolution.)*

* Subject to Mandatory Redemption

# Reinstated to Insurers: UTGO Series 2014 DSA Fourth Lien Restructured Bonds - Debt Service

| CUSIP | Maturity Date | Rate | Principal | Insurers | Beneficial Holder | 10/1/22 | 4/1/23 | 10/1/23 | 4/1/24 | 10/1/24 | 4/1/25 | 10/1/25 | 4/1/26 | 10/1/26 | 4/1/27 | 10/1/27 | 4/1/28 | Total Interest | Principal & Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Interest | | | | | | | | |

# Reinstated to Insurers: UTGO Series 2014 DSA Fourth Lien Restructured Bonds - Debt Service

| CUSIP | Maturity Date | Rate | Principal | Insurers | Beneficial Holder | Interest | | | | | | | | | | | | | | Total Interest | Principal & Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 10/1/21 | 4/1/22 | 10/1/22 | 4/1/23 | 10/1/23 | 4/1/24 | 10/1/24 | 4/1/25 | 10/1/25 | 4/1/26 | 10/1/26 | 4/1/27 | 10/1/27 | 4/1/28 | | |

The dense numeric tabular data could not be transcribed reliably.

Page 9 of 10

* Subject to Mandatory Redemption

# Reinstated to Insurers: UTGO Series 2014 DSA Fourth Lien Restructured Bonds - Debt Service

Bond Series Subject to Mandatory Redemption

## Issuance: 2004 B(2) — CUSIP 259093ZX1

| Date | Insurer | Fiscal Year | Mandatory Redemption Amount | Outstanding | Rate | Interest |
|---|---|---|---|---|---|---|
| 10/1/14 | Ambac | 6/30/15 | | $13,868.00 | 3.240% | $861.56 |
| 4/1/15 | Ambac | 6/30/15 | $3,720.00 | $10,080.00 | 3.240% | $861.56 |
| 10/1/15 | Ambac | 6/30/16 | | $10,080.00 | 3.240% | $204.10 |
| 4/1/16 | Ambac | 6/30/16 | $3,960.00 | $6,120.00 | 3.240% | $266.10 |
| 10/1/16 | Ambac | 6/30/17 | | $6,120.00 | 3.240% | $160.34 |
| 4/1/17 | Ambac | 6/30/17 | $4,080.00 | $2,040.00 | 3.240% | $160.34 |
| 10/1/17 | Ambac | 6/30/18 | | $2,040.00 | 3.240% | $53.45 |
| 4/1/18 | Ambac | 6/30/18 | $3,060.00 | - | 3.240% | $53.45 |
| Total | | | $18,600.00 | | | $1,678.90 |

## Issuance: 2008-A — CUSIP 259093NK6

| Date | Insurer | Fiscal Year | Mandatory Redemption Amount | Outstanding | Rate | Interest |
|---|---|---|---|---|---|---|
| 10/1/14 | Assured | 6/30/15 | | $206,880.00 | 5.000% | $5,172.00 |
| 4/1/15 | Assured | 6/30/15 | | $206,880.00 | 5.000% | $5,172.00 |
| 10/1/15 | Assured | 6/30/16 | | $206,880.00 | 5.000% | $5,172.00 |
| 4/1/16 | Assured | 6/30/16 | | $206,880.00 | 5.000% | $5,172.00 |
| 10/1/16 | Assured | 6/30/17 | | $206,880.00 | 5.000% | $5,172.00 |
| 4/1/17 | Assured | 6/30/17 | | $206,880.00 | 5.000% | $5,172.00 |
| 10/1/17 | Assured | 6/30/18 | | $206,880.00 | 5.000% | $5,172.00 |
| 4/1/18 | Assured | 6/30/18 | | $206,880.00 | 5.000% | $5,172.00 |
| 10/1/18 | Assured | 6/30/19 | | $206,880.00 | 5.000% | $5,172.00 |
| 4/1/19 | Assured | 6/30/19 | | $206,880.00 | 5.000% | $5,172.00 |
| 10/1/19 | Assured | 6/30/20 | | $206,880.00 | 5.000% | $5,172.00 |
| 4/1/20 | Assured | 6/30/20 | | $206,880.00 | 5.000% | $5,172.00 |
| 10/1/20 | Assured | 6/30/21 | | $206,880.00 | 5.000% | $5,172.00 |
| 4/1/21 | Assured | 6/30/21 | | $206,880.00 | 5.000% | $5,172.00 |
| 10/1/21 | Assured | 6/30/22 | | $206,880.00 | 5.000% | $5,172.00 |
| 4/1/22 | Assured | 6/30/22 | | $206,880.00 | 5.000% | $5,172.00 |
| 10/1/2022 | Assured | 6/30/23 | | $206,880.00 | 5.000% | $5,172.00 |
| 4/1/2023 | Assured | 6/30/23 | $100,920.00 | $105,960.00 | 5.000% | $5,172.00 |
| 10/1/2023 | Assured | 6/30/24 | | $105,960.00 | 5.000% | $2,649.00 |
| 4/1/2024 | Assured | 6/30/24 | $105,960.00 | - | 5.000% | $2,649.00 |
| Total | | | $206,880.00 | | | $98,394.00 |

## Issuance: 2008-A — CUSIP 259093N61

| Date | Insurer | Fiscal Year | Mandatory Redemption Amount | Outstanding | Rate | Interest |
|---|---|---|---|---|---|---|
| 10/1/14 | Assured | 6/30/15 | | $419,520.00 | 5.000% | $11,988.00 |
| 4/1/15 | Assured | 6/30/16 | | $419,520.00 | 5.000% | $11,988.00 |
| 10/1/15 | Assured | 6/30/16 | | $419,520.00 | 5.000% | $11,988.00 |
| 4/1/16 | Assured | 6/30/16 | | $419,520.00 | 5.000% | $11,988.00 |
| 10/1/16 | Assured | 6/30/17 | | $419,520.00 | 5.000% | $11,988.00 |
| 4/1/17 | Assured | 6/30/17 | | $419,520.00 | 5.000% | $11,988.00 |
| 10/1/17 | Assured | 6/30/18 | | $419,520.00 | 5.000% | $11,988.00 |
| 4/1/18 | Assured | 6/30/18 | | $419,520.00 | 5.000% | $11,988.00 |
| 10/1/18 | Assured | 6/30/19 | | $419,520.00 | 5.000% | $11,988.00 |
| 4/1/19 | Assured | 6/30/19 | | $419,520.00 | 5.050% | $11,988.00 |
| 10/1/19 | Assured | 6/30/20 | | $419,520.00 | 5.000% | $11,988.00 |
| 4/1/20 | Assured | 6/30/20 | | $419,520.00 | 5.000% | $11,988.00 |
| 10/1/20 | Assured | 6/30/21 | | $419,520.00 | 5.000% | $11,988.00 |
| 4/1/2021 | Assured | 6/30/21 | | $419,520.00 | 5.000% | $11,988.00 |
| 10/1/2023 | Assured | 6/30/23 | | $475,520.00 | 5.000% | $11,988.00 |
| 4/1/2024 | Assured | 6/30/24 | | $475,520.00 | 5.000% | $11,988.00 |
| 10/1/2024 | Assured | 6/30/25 | $112,740.00 | $419,520.00 | 5.000% | $11,988.00 |
| 4/1/2025 | Assured | 6/30/25 | | $368,780.00 | 5.000% | $9,220.00 |
| 10/1/2025 | Assured | 6/30/26 | $116,080.00 | $251,400.00 | 4.000% | $9,200.00 |
| 4/1/2026 | Assured | 6/30/27 | | $251,400.00 | 3.500% | $6,285.00 |
| 10/1/2026 | Assured | 6/30/27 | $133,640.00 | $126,760.00 | 5.000% | $6,285.00 |
| 4/1/2027 | Assured | 6/30/28 | | $126,760.00 | 5.000% | $3,379.50 |
| 10/1/2027 | Assured | 6/30/28 | $126,760.00 | - | 5.000% | $3,379.50 |
| Total | | | $475,520.00 | | | $394,158.00 |

# EXHIBIT C

## STUB UTGO BONDS

# UTGO Series STUB Bonds - Debt Service

| CUSIP | Maturity Date | Rate | Principal | Insurer | Interest 10/1/14 | 4/1/15 | 10/1/15 | 4/1/16 | 10/1/16 | 4/1/17 | 10/1/17 | 4/1/18 | 10/1/18 | 4/1/19 | 10/1/19 | 4/1/20 | 10/1/20 | 4/1/21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **UTGO 1999-A** | | | | | | | | | | | | | | | | | | |
| ...3343 | 4/1/15 | 5.250% | $973,350.00 | Assured | $9,800.44 | $9,800.44 | | | | | | | | | | | | |
| ...3N1 | 4/1/16 | 5.000% | $392,345.00 | Assured | $9,808.63 | $9,808.63 | $9,808.63 | $9,808.63 | | | | | | | | | | |
| ...3P6 | 4/1/17 | 5.000% | $411,995.00 | Assured | $10,299.88 | $10,299.88 | $10,299.88 | $10,299.88 | $10,299.88 | $10,299.88 | | | | | | | | |
| ...3R2 | 4/1/18 | 5.000% | $432,955.00 | Assured | $10,823.88 | $10,823.88 | $10,823.88 | $10,823.88 | $10,823.88 | $10,823.88 | $10,823.88 | $10,823.88 | | | | | | |
| ...3S2 | 4/1/19 | 5.000% | $454,570.00 | Assured | $11,364.25 | $11,364.25 | $11,364.25 | $11,364.25 | $11,364.25 | $11,364.25 | $11,364.25 | $11,364.25 | $11,364.25 | $11,364.25 | | | | |
| | | | $2,665,215.00 | | $52,097.06 | $52,097.06 | $42,296.63 | $42,296.63 | $32,488.00 | $32,488.00 | $22,188.13 | $22,188.13 | $11,364.25 | $11,364.25 | | | | |
| **UTGO 2000-A(I)** | | | | | | | | | | | | | | | | | | |
| ...2V02 | 4/1/16 | 5.375% | $778,140.00 | NPFG | $20,912.51 | $20,912.51 | $20,912.51 | $20,912.51 | | | | | | | | | | |
| ...3VK3 | 4/1/16 | 5.375% | $820,040.00 | NPFG | $22,039.11 | $22,039.11 | $22,039.11 | $22,039.11 | | | | | | | | | | |
| ...3VL1 | 4/1/17 | 5.375% | $864,600.00 | NPFG | $23,236.13 | $23,236.13 | $23,236.13 | $23,236.13 | $23,236.13 | $23,236.13 | | | | | | | | |
| ...3VN9 | 4/1/18 | 5.375% | $1,834,000.00 | NPFG | $49,288.75 | $49,288.75 | $49,288.75 | $49,288.75 | $49,288.75 | $49,288.75 | $49,288.75 | $49,288.75 | | | | | | |
| ...3VP2 | 4/1/19 | 5.800% | $1,834,000.00 | NPFG | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | | | | |
| ...3VQ0 | 4/1/21 | 6.000% | $1,834,000.00 | NPFG | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 |
| | | | $9,799,900.00 | | $255,029.59 | $232,113.99 | $210,074.88 | $210,074.88 | $186,838.75 | $186,838.75 | $157,550.00 | $157,550.00 | $91,700.00 | $91,700.00 | $45,850.00 | $45,850.00 | $45,850.00 | $45,850.00 |
| **UTGO 2002** | | | | | | | | | | | | | | | | | | |
| ...W8 | 4/1/21 | 5.115% | $424,440.00 | NPFG | $10,876.28 | $10,876.28 | $10,876.28 | $10,876.28 | $10,876.28 | $10,876.28 | $10,876.28 | $10,876.28 | $10,876.28 | $10,876.28 | $10,876.28 | $10,876.28 | $10,876.28 | $10,876.28 |
| ...W9 | 4/1/21 | 5.125% | $440,055.00 | NPFG | $11,430.16 | $11,430.16 | $11,430.16 | $11,430.16 | $11,430.16 | $11,430.16 | $11,430.16 | $11,430.16 | $11,430.16 | $11,430.16 | $11,430.16 | $11,430.16 | $11,430.16 | $11,430.16 |
| | | | $870,495.00 | | $22,306.43 | $22,306.43 | $22,306.43 | $22,306.43 | $22,306.43 | $22,306.43 | $22,306.43 | $22,306.43 | $22,306.43 | $22,306.43 | $22,306.43 | $22,306.43 | $22,306.43 | $22,306.43 |
| **UTGO 2003-A** | | | | | | | | | | | | | | | | | | |
| ...5PO | 4/1/15 | 4.000% | $39,500.00 | Syncora | $786.00 | $786.00 | | | | | | | | | | | | |
| ...5Q8 | 4/1/16 | 5.250% | $334,050.00 | Syncora | $8,768.81 | $8,768.81 | $8,768.81 | $8,768.81 | | | | | | | | | | |
| ...5R6 | 4/1/17 | 5.250% | $392,345.00 | Syncora | $10,299.06 | $10,299.06 | $10,299.06 | $10,299.06 | $10,299.06 | $10,299.06 | | | | | | | | |
| ...5S4 | 4/1/18 | 5.250% | $412,650.00 | Syncora | $10,832.06 | $10,832.06 | $10,832.06 | $10,832.06 | $10,832.06 | $10,832.06 | $10,832.06 | $10,832.06 | | | | | | |
| ...5T2 | 4/1/19 | 5.250% | $434,265.00 | Syncora | $11,399.46 | $11,399.46 | $11,399.46 | $11,399.46 | $11,399.46 | $11,399.46 | $11,399.46 | $11,399.46 | $11,399.46 | $11,399.46 | | | | |
| ...5U9 | 4/1/20 | 5.250% | $457,190.00 | Syncora | $12,001.24 | $12,001.24 | $12,001.24 | $12,001.24 | $12,001.24 | $12,001.24 | $12,001.24 | $12,001.24 | $12,001.24 | $12,001.24 | $12,001.24 | $12,001.24 | | |
| ...5V7 | 4/1/20 | 4.500% | $65,500.00 | Syncora | $1,473.75 | $1,473.75 | $1,473.75 | $1,473.75 | $1,473.75 | $1,473.75 | $1,473.75 | $1,473.75 | $1,473.75 | $1,473.75 | $1,473.75 | $1,473.75 | | |
| ...5W5 | 4/1/21 | 5.250% | $415,975.00 | Syncora | $10,918.03 | $10,918.03 | $10,918.03 | $10,918.03 | $10,918.03 | $10,918.03 | $10,918.03 | $10,918.03 | $10,918.03 | $10,918.03 | $10,918.03 | $10,918.03 | $10,918.03 | $10,918.03 |
| ...5X3 | 4/1/21 | 5.250% | $426,560.00 | Syncora | $13,273.58 | $13,273.58 | $13,273.58 | $13,273.58 | $13,273.58 | $13,273.58 | $13,273.58 | $13,273.58 | $13,273.58 | $13,273.58 | $13,273.58 | $13,273.58 | $13,273.58 | $13,273.58 |
| ...5Y1 | 4/1/22 | 5.300% | $463,560.00 | Syncora | $12,259.14 | $12,259.14 | $12,259.14 | $12,259.14 | $12,259.14 | $12,259.14 | $12,259.14 | $12,259.14 | $12,259.14 | $12,259.14 | $12,259.14 | $12,259.14 | $12,259.14 | $12,259.14 |
| ...5Z8 | 4/1/23 | 4.625% | $467,015.00 | Syncora | $4,544.06 | $4,544.06 | $4,544.06 | $4,544.06 | $4,544.06 | $4,544.06 | $4,544.06 | $4,544.06 | $4,544.06 | $4,544.06 | $4,544.06 | $4,544.06 | $4,544.06 | $4,544.06 |
| ...5A2 | 4/1/23 | 5.250% | $106,500.00 | Syncora | $9,542.53 | $9,542.53 | $9,542.53 | $9,542.53 | $9,542.53 | $9,542.53 | $9,542.53 | $9,542.53 | $9,542.53 | $9,542.53 | $9,542.53 | $9,542.53 | $9,542.53 | $9,542.53 |
| ...5B0 | | 5.250% | $363,525.00 | Syncora | | | | | | | | | | | | | | |
| | | | $4,149,255.00 | | $107,612.41 | $107,612.41 | $98,057.59 | $98,057.59 | $87,758.54 | $87,758.54 | $76,926.48 | $76,926.48 | $65,527.02 | $65,527.02 | $53,525.78 | $53,525.78 | $41,134.00 | $41,134.00 |
| **UTGO 2006-A(I)** | | | | | | | | | | | | | | | | | | |
| ...XG2 | 4/1/16 | 5.250% | $385,500.00 | Ambac | $15,474.38 | $15,474.38 | $15,474.38 | $15,474.38 | | | | | | | | | | |
| ...XH0 | 4/1/17 | 4.250% | $36,235.00 | Ambac | $514.99 | $514.99 | $514.99 | $514.99 | $514.99 | $514.99 | | | | | | | | |
| ...XJ6 | 4/1/17 | 5.250% | $977,135.00 | Ambac | $20,934.79 | $20,934.79 | $20,934.79 | $20,934.79 | $20,934.79 | $20,934.79 | | | | | | | | |
| ...XK3 | 4/1/18 | 5.000% | $864,600.00 | Ambac | $21,615.00 | $21,615.00 | $21,615.00 | $21,615.00 | $21,615.00 | $21,615.00 | $21,615.00 | $21,615.00 | | | | | | |
| ...XL1 | 4/1/21 | 5.000% | $900,400.00 | Ambac | $23,830.54 | $23,830.54 | $23,830.54 | $23,830.54 | $23,830.54 | $23,830.54 | $23,830.54 | $23,830.54 | $23,830.54 | $23,830.54 | $23,830.54 | $23,830.54 | $23,830.54 | $23,830.54 |
| ...XM9 | 4/1/21 | 4.500% | $40,125.00 | Ambac | $1,105.31 | $1,105.31 | $1,105.31 | $1,105.31 | $1,105.31 | $1,105.31 | $1,105.31 | $1,105.31 | $1,105.31 | $1,105.31 | $1,105.31 | $1,105.31 | $1,105.31 | $1,105.31 |
| ...XN7 | 4/1/22 | 5.250% | $906,520.00 | Ambac | $23,796.15 | $23,796.15 | $23,796.15 | $23,796.15 | $23,796.15 | $23,796.15 | $23,796.15 | $23,796.15 | $23,796.15 | $23,796.15 | $23,796.15 | $23,796.15 | $23,796.15 | $23,796.15 |
| ...XP2 | 4/1/23 | 5.250% | $102,835.00 | Ambac | $2,365.21 | $2,365.21 | $2,365.21 | $2,365.21 | $2,365.21 | $2,365.21 | $2,365.21 | $2,365.21 | $2,365.21 | $2,365.21 | $2,365.21 | $2,365.21 | $2,365.21 | $2,365.21 |
| ...XT4 | 4/1/24 | 4.600% | $902,590.00 | Ambac | $23,692.99 | $23,692.99 | $23,692.99 | $23,692.99 | $23,692.99 | $23,692.99 | $23,692.99 | $23,692.99 | $23,692.99 | $23,692.99 | $23,692.99 | $23,692.99 | $23,692.99 | $23,692.99 |
| | | | $5,144,370.00 | | $133,319.36 | $133,319.36 | $133,319.36 | $133,319.36 | $117,844.98 | $117,844.98 | $96,405.19 | $96,405.19 | | | | | $96,405.19 | $96,405.19 |

*Subject to Mandatory Redemption.

13-53846-swr   Doc 3997-15   Filed 12/15/14   Entered 12/15/14 23:27:43   Page 330 of 455

# UTGO Series STUB Bonds - Debt Service

| CUSIP | Maturity Date | Rate | Principal | Insurer | Interest 10/1/14 | 4/1/15 | 10/1/15 | 4/1/16 | 10/1/16 | 4/1/17 | 10/1/17 | 4/1/18 | 10/1/18 | 4/1/19 | 10/1/19 | 4/1/20 | 10/1/20 | 4/1/21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **UTGO 2004-B(1)** | | | | | | | | | | | | | | | | | | |
| 932929E8 | 4/1/15 | 5.000% | $1,136,425.00 | Ambac | $28,410.63 | $28,410.63 | | | | | | | | | | | | |
| 9329202J6 | 4/1/16 | 5.250% | $1,012,795.00 | Ambac | $31,309.82 | $31,309.82 | $31,309.82 | $31,309.82 | | | | | | | | | | |
| 9329202K3 | 4/1/17 | 4.000% | $39,955.00 | Ambac | $799.10 | $799.10 | $799.10 | $799.10 | $799.10 | $799.10 | | | | | | | | |
| 9329202L1 | 4/1/18 | 5.000% | $1,215,040.00 | Ambac | $31,911.60 | $31,911.60 | $31,911.60 | $31,911.60 | $31,911.60 | $31,911.60 | $31,911.60 | $31,911.60 | | | | | | |
| 9329202M8 | 4/1/18 | 5.250% | $502,000.00 | Ambac | $6,877.50 | $6,877.50 | $6,877.50 | $6,877.50 | $6,877.50 | $6,877.50 | $6,877.50 | $6,877.50 | | | | | | |
| | | | $3,344,815.00 | | $99,308.64 | $99,308.64 | $70,898.02 | $70,898.02 | $39,588.20 | $39,588.20 | $38,789.10 | $38,789.10 | | | | | | |
| **UTGO 2004-B(2)** | | | | | | | | | | | | | | | | | | |
| 9329232J3 | 4/1/19 * | 5.340% | $75,355.00 | Ambac | $1,973.52 | $1,973.52 | $1,973.52 | $1,973.52 | $875.21 | $875.21 | $291.74 | $291.74 | | | | | | |
| **UTGO 2005-B** | | | | | | | | | | | | | | | | | | |
| 9329G53 | 4/1/15 | 5.000% | $295,000.00 | Assured | $7,499.75 | $7,499.75 | | | | | | | | | | | | |
| 9329G61 | 4/1/16 | 5.000% | $315,055.00 | Assured | $7,876.38 | $7,876.38 | $7,876.38 | $7,876.38 | | | | | | | | | | |
| 9329G79 | 4/1/17 | 4.300% | $330,310.00 | Assured | $7,097.58 | $7,097.58 | $7,097.58 | $7,097.58 | $7,097.58 | $7,097.58 | | | | | | | | |
| 9329G87 | 4/1/18 | 5.000% | $345,185.00 | Assured | $8,629.63 | $8,629.63 | $8,629.63 | $8,629.63 | $8,629.63 | $8,629.63 | $8,629.63 | $8,629.63 | | | | | | |
| 9329G95 | 4/1/19 | 5.000% | $362,235.00 | Assured | $9,055.38 | $9,055.38 | $9,055.38 | $9,055.38 | $9,055.38 | $9,055.38 | $9,055.38 | $9,055.38 | $9,055.38 | $9,055.38 | | | | |
| 9329H37 | 4/1/20 | 5.000% | $635,000.00 | Assured | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | | |
| 9329H45 | 4/1/21 | 5.000% | $650,000.00 | Assured | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 |
| 9329H52 | 4/1/22 | 5.000% | $655,000.00 | Assured | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 |
| 9329H60 | 4/1/23 | 5.000% | $650,000.00 | Assured | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 |
| 9329H78 | 4/1/25 | 5.000% | $655,000.00 | Assured | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 |
| | | | $5,382,565.00 | | $138,408.71 | $138,408.71 | $130,906.96 | $130,906.96 | $123,032.58 | $123,032.58 | $115,935.00 | $115,935.00 | $107,105.38 | $107,105.38 | $99,250.00 | $99,250.00 | $81,875.00 | $81,875.00 |
| **UTGO 2005-C** | | | | | | | | | | | | | | | | | | |
| 9329J92 | 4/1/15 | 5.000% | $301,955.00 | Assured | $7,548.88 | $7,548.88 | | | | | | | | | | | | |
| 9329K25 | 4/1/16 | 5.000% | $317,675.00 | Assured | $7,941.88 | $7,941.88 | $7,941.88 | $7,941.88 | | | | | | | | | | |
| 9329K33 | 4/1/17 | 4.500% | $333,595.00 | Assured | $7,167.99 | $7,167.99 | $7,167.99 | $7,167.99 | $7,167.99 | $7,167.99 | | | | | | | | |
| 9329K41 | 4/1/18 | 5.250% | $344,530.00 | Assured | $8,613.25 | $8,613.25 | $8,613.25 | $8,613.25 | $8,613.25 | $8,613.25 | $8,613.25 | $8,613.25 | | | | | | |
| 9329K58 | 4/1/19 | 5.250% | $356,285.00 | Assured | $9,404.98 | $9,404.98 | $9,404.98 | $9,404.98 | $9,404.98 | $9,404.98 | $9,404.98 | $9,404.98 | $9,404.98 | $9,404.98 | | | | |
| 9329K66 | 4/1/20 | 5.250% | $379,165.00 | Assured | $9,920.79 | $9,920.79 | $9,920.79 | $9,920.79 | $9,920.79 | $9,920.79 | $9,920.79 | $9,920.79 | $9,920.79 | $9,920.79 | $9,920.79 | $9,920.79 | | |
| | | | $2,033,775.00 | | $50,597.77 | $50,597.77 | $43,048.89 | $43,048.89 | $35,107.02 | $35,107.02 | $27,939.03 | $27,939.03 | $19,325.78 | $19,325.78 | $9,920.79 | $9,920.79 | | |
| **UTGO 2006-A** | | | | | | | | | | | | | | | | | | |
| 9329L56 | 4/1/15 | 5.000% | $376,655.00 | Assured | $9,415.63 | $9,415.63 | | | | | | | | | | | | |
| 9329L64 | 4/1/16 | 5.000% | $394,565.00 | Assured | $9,874.13 | $9,874.13 | $9,874.13 | $9,874.13 | | | | | | | | | | |
| 9329L72 | 4/1/17 | 4.000% | $415,270.00 | Assured | $10,381.75 | $10,381.75 | $10,381.75 | $10,381.75 | $10,381.75 | $10,381.75 | | | | | | | | |
| 9329L98 | 4/1/18 | 4.000% | $435,575.00 | Assured | $8,711.50 | $8,711.50 | $8,711.50 | $8,711.50 | $8,711.50 | $8,711.50 | $8,711.50 | $8,711.50 | | | | | | |
| 9329M30 | 4/1/19 | 5.000% | $453,360.00 | Assured | $11,331.50 | $11,331.50 | $11,331.50 | $11,331.50 | $11,331.50 | $11,331.50 | $11,331.50 | $11,331.50 | $11,331.50 | $11,331.50 | | | | |
| 9329M48 | 4/1/20 | 5.000% | $475,320.00 | Assured | $11,888.25 | $11,888.25 | $11,888.25 | $11,888.25 | $11,888.25 | $11,888.25 | $11,888.25 | $11,888.25 | $11,888.25 | $11,888.25 | $11,888.25 | $11,888.25 | | |
| 9329M30 | 4/1/21 | 5.000% | $499,765.00 | Assured | $12,494.13 | $12,494.13 | $12,494.13 | $12,494.13 | $12,494.13 | $12,494.13 | $12,494.13 | $12,494.13 | $12,494.13 | $12,494.13 | $12,494.13 | $12,494.13 | $12,494.13 | $12,494.13 |
| 9329M48 | 4/1/22 | 5.000% | $524,655.00 | Assured | $13,116.38 | $13,116.38 | $13,116.38 | $13,116.38 | $13,116.38 | $13,116.38 | $13,116.38 | $13,116.38 | $13,116.38 | $13,116.38 | $13,116.38 | $13,116.38 | $13,116.38 | $13,116.38 |
| 9329M55 | 4/1/24 | 5.000% | $1,129,210.00 * | Assured | $28,230.50 | $28,230.50 | $28,230.50 | $28,230.50 | $28,230.50 | $28,230.50 | $28,230.50 | $28,230.50 | $28,230.50 | $28,230.50 | $28,230.50 | $28,230.50 | $28,230.50 | $28,230.50 |
| 9329M63 | 4/1/28 | 5.000% | $2,617,980.00 * | Assured | $65,434.50 | $65,434.50 | $65,434.50 | $65,434.50 | $65,434.50 | $65,434.50 | $65,434.50 | $65,434.50 | $65,434.50 | $65,434.50 | $65,434.50 | $65,434.50 | $65,434.50 | $65,434.50 |
| | | | $7,322,245.00 | | $180,878.25 | $180,878.25 | $171,462.63 | $171,462.63 | $161,588.50 | $161,588.50 | $151,206.75 | $151,206.75 | $142,495.25 | $142,495.25 | $131,163.75 | $131,163.75 | $119,275.50 | $119,275.50 |
| **UTGO 2006-B(1)** | | | | | | | | | | | | | | | | | | |
| 9329P03 | 4/1/15 | 5.000% | $1,044,070.00 | Assured | $26,101.75 | $26,101.75 | | | | | | | | | | | | |
| 9329P60 | 4/1/16 | 5.000% | $450,640.00 | Assured | $11,266.00 | $11,266.00 | $11,266.00 | $11,266.00 | | | | | | | | | | |
| 9329P79 | 4/1/17 | 5.000% | $460,980.00 | Assured | $11,524.50 | $11,524.50 | $11,524.50 | $11,524.50 | $11,524.50 | $11,724.50 | | | | | | | | |
| 9329P87 | 4/1/18 | 5.000% | $405,400.00 | Assured | $12,412.25 | $12,412.25 | $12,412.25 | $12,412.25 | $12,412.25 | $12,412.25 | $12,412.25 | $12,412.25 | | | | | | |
| | | | $2,440,090.00 | | $61,304.50 | $61,304.50 | $35,402.75 | $35,402.75 | $24,136.75 | $24,136.75 | $12,412.25 | $12,412.25 | | | | | | |
| **Total** | | | $41,340,210.00 | | $1,110,033.14 | $1,110,033.14 | $981,256.76 | $981,256.76 | $870,275.56 | $870,275.56 | $756,341.40 | $756,341.40 | $639,335.16 | $639,335.16 | $524,711.74 | $524,711.74 | $406,846.13 | $406,846.13 |

* Subject to Mandatory Redemption

Page 2 of 5

# UTGO Series STUB Bonds - Debt Service

| CUSIP | Maturity Date | Rate | Principal | Issuer | 10/1/21 | 4/1/22 | 10/1/22 | 4/1/23 | 10/1/23 | 4/1/24 | Total Interest | Total Principal & Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **UTGO 1999-A** | | | | | | | | | | | | |
| | 4/1/15 | 5.250% | $373,150.00 | Assured | – | – | – | – | – | – | $19,600.88 | $392,750.88 |
| | 4/1/16 | 5.000% | $392,345.00 | Assured | – | – | – | – | – | – | $39,234.50 | $431,579.50 |
| | 4/1/17 | 5.375% | $411,995.00 | Assured | – | – | – | – | – | – | $61,799.25 | $473,794.25 |
| | 4/1/18 | 5.000% | $432,955.00 | Assured | – | – | – | – | – | – | $86,591.00 | $519,546.00 |
| | 4/1/19 | 5.000% | $454,570.00 | Assured | – | – | – | – | – | – | $113,642.50 | $568,212.50 |
| | | | $2,065,255.00 | | | | | | | | $320,868.13 | $2,386,083.13 |
| **UTGO 2000-A(T)** | | | | | | | | | | | | |
| | 4/1/15 | 5.375% | $778,140.00 | NPFG | – | – | – | – | – | – | $41,825.03 | $819,965.03 |
| | 4/1/16 | 5.375% | $820,060.00 | NPFG | – | – | – | – | – | – | $88,156.45 | $908,216.45 |
| | 4/1/17 | 5.375% | $864,680.00 | NPFG | – | – | – | – | – | – | $139,416.75 | $1,004,016.75 |
| | 4/1/18 | 5.375% | $1,634,000.00 | NPFG | – | – | – | – | – | – | $194,310.00 | $2,228,310.00 |
| | 4/1/19 | 5.000% | $1,834,000.00 | NPFG | – | – | – | – | – | – | $438,500.00 | $2,272,500.00 |
| | 4/1/20 | 5.000% | $1,834,000.00 | NPFG | – | – | – | – | – | – | $550,200.00 | $2,384,200.00 |
| | 4/1/21 | 5.000% | $1,834,000.00 | NPFG | – | – | – | – | – | – | $641,950.00 | $2,475,950.00 |
| | | | $9,799,980.00 | | | | | | | | $2,314,505.23 | $12,113,008.33 |
| **UTGO 2002** | | | | | | | | | | | | |
| | 4/1/21 | 5.125% | $424,440.00 | NPFG | $11,430.16 | $11,430.16 | – | – | – | – | $152,267.85 | $576,707.85 |
| | 4/1/22 | 5.125% | $446,055.00 | NPFG | – | – | – | – | – | – | $182,982.55 | $629,037.55 |
| | | | $870,495.00 | | $11,430.16 | $11,430.16 | | | | | $335,150.40 | $1,205,645.40 |
| **UTGO 2003-A** | | | | | | | | | | | | |
| | 4/1/15 | 4.000% | $39,300.00 | Syncora | – | – | – | – | – | – | $1,572.00 | $40,872.00 |
| | 4/1/15 | 3.250% | $334,950.00 | Syncora | – | – | – | – | – | – | $73,537.63 | $351,587.63 |
| | 4/1/16 | 3.250% | $392,345.00 | Syncora | – | – | – | – | – | – | $41,196.25 | $433,541.25 |
| | 4/1/17 | 3.250% | $412,650.00 | Syncora | – | – | – | – | – | – | $64,992.38 | $477,642.38 |
| | 4/1/18 | 5.250% | $434,265.00 | Syncora | – | – | – | – | – | – | $91,195.65 | $525,460.65 |
| | 4/1/19 | 5.250% | $457,109.00 | Syncora | – | – | – | – | – | – | $120,012.38 | $577,202.38 |
| | 4/1/20 | 4.500% | $65,500.00 | Syncora | – | – | – | – | – | – | $17,685.00 | $83,185.00 |
| | 4/1/20 | 5.000% | $415,975.00 | Syncora | – | – | – | – | – | – | $131,016.38 | $546,941.38 |
| | 4/1/21 | 4.625% | $505,660.00 | Syncora | – | – | – | – | – | – | $131,830.05 | $691,490.05 |
| | 4/1/22 | 5.250% | $65,300.00 | Syncora | $1,514.69 | $1,514.69 | – | – | – | – | $24,235.00 | $89,735.00 |
| | 4/1/22 | 5.250% | $467,015.00 | Syncora | $12,259.14 | $12,259.14 | – | – | – | – | $196,146.30 | $663,161.30 |
| | 4/1/23 | 4.625% | $196,500.00 | Syncora | – | – | $4,544.06 | $4,544.06 | – | – | $81,793.13 | $278,293.13 |
| | 4/1/23 | 5.250% | $63,525.00 | Syncora | $9,542.53 | $9,542.53 | $9,542.53 | $9,542.53 | – | – | $171,765.56 | $535,290.56 |
| | | | $4,149,425.00 | | $27,860.43 | $27,860.43 | $14,086.59 | $14,086.59 | | | $1,144,977.66 | $5,294,402.66 |
| **UTGO 2004-A(T)** | | | | | | | | | | | | |
| | 4/1/19 | 5.250% | $589,500.00 | Ambac | – | – | – | – | – | – | $154,743.75 | $744,243.75 |
| | 4/1/20 | 4.250% | $34,235.00 | Ambac | – | – | – | – | – | – | $6,139.93 | $40,414.93 |
| | 4/1/20 | 5.250% | $797,115.00 | Ambac | – | – | – | – | – | – | $251,097.33 | $1,048,212.53 |
| | 4/1/21 | 5.000% | $864,605.00 | Ambac | – | – | – | – | – | – | $302,610.00 | $1,167,210.00 |
| | 4/1/21 | 5.250% | $907,830.00 | Ambac | $23,830.54 | $23,830.54 | – | – | – | – | $381,288.60 | $1,289,118.60 |
| | 4/1/22 | 4.500% | $49,125.00 | Ambac | $1,105.31 | $1,105.31 | $1,105.31 | $1,105.31 | – | – | $19,895.63 | $69,020.63 |
| | 4/1/22 | 5.250% | $396,520.00 | Ambac | $23,796.15 | $23,796.15 | $23,796.15 | $23,796.15 | – | – | $428,330.70 | $1,314,850.70 |
| | 4/1/23 | 5.250% | $102,855.00 | Ambac | – | – | $2,365.21 | $2,365.21 | $2,365.21 | $2,365.21 | $47,304.10 | $150,159.10 |
| | 4/1/24 | 4.630% | $903,590.00 | Ambac | – | – | $23,692.99 | $23,692.99 | $23,692.99 | $23,692.99 | $473,869.75 | $1,376,449.75 |
| | | | $5,164,370.00 | | $74,796.19 | $74,796.19 | $80,959.66 | $80,959.66 | $24,058.19 | $24,058.19 | $2,065,349.98 | $7,209,679.98 |

Subject to Mandatory Redemption

13-53846-sif Doc 3807913 Filed 12/15/14 Entered 12/15/14 23:27:43 Page 332 of 455

| Maturity Date | Rate | Principal | Insurer | 10/1/21 | 4/1/22 | 10/1/22 | 4/1/23 | 10/1/23 | 4/1/24 | 10/1/24 | 4/1/25 | 10/1/25 | 4/1/26 | 10/1/26 | 4/1/27 | 10/1/27 | 4/1/28 | 10/1/28 | Total Interest | Total Principal & Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Interest | | | | | | | | | | | |
| **UTGO 2004-B(1)** | | | | | | | | | | | | | | | | | | | | |
| 4/1/15 | 5.000% | $1,136,425.00 | Ambac | | | | | | | | | | | | | | | | $56,821.25 | $2,193,246.25 |
| 4/1/16 | 5.250% | $1,192,755.00 | Ambac | | | | | | | | | | | | | | | | $175,239.28 | $1,317,994.28 |
| 4/1/17 | 4.000% | $39,555.00 | Ambac | | | | | | | | | | | | | | | | $4,704.60 | $44,749.60 |
| 4/1/18 | 5.250% | $1,215,680.00 | Ambac | | | | | | | | | | | | | | | | $191,469.60 | $1,407,149.60 |
| 4/1/19 | 5.250% | $262,000.00 | Ambac | | | | | | | | | | | | | | | | $55,020.00 | $317,020.00 |
| | | $3,846,415.00 | | | | | | | | | | | | | | | | | $433,344.73 | $4,280,159.73 |
| **UTGO 2004-B(2)** | | | | | | | | | | | | | | | | | | | | |
| 4/1/15 | 5.240% | $75,255.00 | Ambac | | | | | | | | | | | | | | | | $9,163.97 | $84,488.97 |
| | | $75,255.00 | | | | | | | | | | | | | | | | | $9,163.97 | $84,488.97 |
| **UTGO 2005-B** | | | | | | | | | | | | | | | | | | | | |
| 4/1/15 | 5.000% | $299,990.00 | Assured | | | | | | | | | | | | | | | | $14,099.50 | $314,993.50 |
| 4/1/16 | 5.000% | $315,055.00 | Assured | | | | | | | | | | | | | | | | $31,505.50 | $346,560.50 |
| 4/1/17 | 4.300% | $330,120.00 | Assured | | | | | | | | | | | | | | | | $42,285.48 | $372,705.48 |
| 4/1/18 | 5.000% | $345,185.00 | Assured | | | | | | | | | | | | | | | | $69,037.00 | $414,222.00 |
| 4/1/19 | 5.000% | $362,215.00 | Assured | | | | | | | | | | | | | | | | $89,553.75 | $482,268.75 |
| 4/1/20 | 5.000% | $655,000.00 | Assured | | | | | | | | | | | | | | | | $196,500.00 | $851,500.00 |
| 4/1/21 | 5.000% | $655,000.00 | Assured | | | | | | | | | | | | | | | | $229,250.00 | $884,250.00 |
| 4/1/22 | 5.000% | $655,000.00 | Assured | $16,375.00 | $16,375.00 | | | | | | | | | | | | | | $262,000.00 | $917,000.00 |
| 4/1/23 | 5.000% | $655,000.00 | Assured | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | | | | | | | | | | | | $294,750.00 | $947,750.00 |
| 4/1/24 | 5.000% | $655,000.00 | Assured | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | | | | | | | | | | $327,500.00 | $982,500.00 |
| 4/1/25 | 5.000% | $655,000.00 | Assured | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | $16,375.00 | | | | | | | | $362,250.00 | $5,015,250.00 |
| | | $5,582,565.00 | | $65,500.00 | $65,500.00 | $49,125.00 | $49,125.00 | $32,750.00 | $32,750.00 | $16,375.00 | $16,375.00 | | | | | | | | $1,918,931.23 | $7,501,496.23 |
| **UTGO 2005-C** | | | | | | | | | | | | | | | | | | | | |
| 4/1/15 | 5.000% | $301,955.00 | Assured | | | | | | | | | | | | | | | | $15,097.75 | $317,002.75 |
| 4/1/16 | 5.000% | $317,635.00 | Assured | | | | | | | | | | | | | | | | $31,767.50 | $349,442.50 |
| 4/1/17 | 4.300% | $333,395.00 | Assured | | | | | | | | | | | | | | | | $49,007.96 | $376,402.96 |
| 4/1/18 | 4.000% | $344,530.00 | Assured | | | | | | | | | | | | | | | | $68,086.00 | $413,416.00 |
| 4/1/19 | 5.250% | $358,285.00 | Assured | | | | | | | | | | | | | | | | $94,049.81 | $452,334.81 |
| 4/1/20 | 5.250% | $377,935.00 | Assured | | | | | | | | | | | | | | | | $119,049.53 | $496,984.53 |
| | | $2,033,775.00 | | | | | | | | | | | | | | | | | $371,878.54 | $2,405,653.54 |
| **UTGO 2006-A** | | | | | | | | | | | | | | | | | | | | |
| 4/1/15 | 5.000% | $376,625.00 | Assured | | | | | | | | | | | | | | | | $18,831.25 | $395,456.25 |
| 4/1/16 | 5.000% | $394,965.00 | Assured | | | | | | | | | | | | | | | | $39,496.50 | $434,461.50 |
| 4/1/17 | 5.000% | $415,270.00 | Assured | | | | | | | | | | | | | | | | $62,290.50 | $477,560.50 |
| 4/1/18 | 4.000% | $435,575.00 | Assured | | | | | | | | | | | | | | | | $80,692.00 | $505,267.00 |
| 4/1/19 | 4.000% | $453,360.00 | Assured | | | | | | | | | | | | | | | | $113,315.00 | $566,375.00 |
| 4/1/20 | 5.000% | $475,320.00 | Assured | | | | | | | | | | | | | | | | $142,659.00 | $618,189.00 |
| 4/1/21 | 5.000% | $499,765.00 | Assured | | | | | | | | | | | | | | | | $174,917.75 | $674,682.25 |
| 4/1/22 | 5.000% | $524,655.00 | Assured | $13,116.38 | $13,116.38 | | | | | | | | | | | | | | $209,862.00 | $734,517.00 |
| 4/1/23 | 5.000% | $1,129,230.50 | Assured | $28,230.50 | $28,230.50 | $14,459.13 | $14,459.13 | | | | | | | | | | | | $337,067.25 | $1,666,297.25 |
| 4/1/24 | 5.000% | $2,617,380.00 | Assured | $65,434.50 | $65,434.50 | $65,434.50 | $65,434.50 | $65,434.50 | $65,434.50 | | | | | | | | | | $643,820.75 | $4,261,200.75 |
| 4/1/25 | 5.000% | | | $65,434.50 | $65,434.50 | $65,434.50 | $65,434.50 | $65,434.50 | $65,434.50 | $65,434.50 | $65,434.50 | | | | | | | | | |
| 4/1/26 | | | | | | | | | | | | | $50,254.88 | $50,254.88 | | | | | | |
| 4/1/27 | | | | | | | | | | | | | | $34,305.63 | $34,305.63 | | | | | |
| 4/1/28 | | | | | | | | | | | | | | | $17,370.38 | $17,370.38 | | | | |
| | | $7,322,345.00 | | $106,781.38 | $106,781.38 | $93,665.00 | $93,665.00 | $79,893.63 | $79,893.63 | $65,434.50 | $65,434.50 | $50,254.88 | $50,254.88 | $34,305.63 | $34,305.63 | $17,370.38 | $17,370.38 | $3,011,932.00 | $10,334,177.00 |
| **UTGO 2006-B(1)** | | | | | | | | | | | | | | | | | | | | |
| 4/1/15 | 5.000% | $1,044,070.00 | Assured | | | | | | | | | | | | | | | | $52,203.50 | $1,096,273.50 |
| 4/1/16 | 5.000% | $430,640.00 | Assured | | | | | | | | | | | | | | | | $65,064.00 | $495,704.00 |
| 4/1/17 | 5.000% | $468,980.00 | Assured | | | | | | | | | | | | | | | | $70,347.00 | $539,327.00 |
| 4/1/18 | 5.000% | $496,490.00 | Assured | | | | | | | | | | | | | | | | $99,298.00 | $595,788.00 |
| | | $2,440,180.00 | | | | | | | | | | | | | | | | | $286,912.50 | $2,727,092.50 |
| | | $43,349,610.00 | | $286,262.15 | $286,262.15 | $207,836.25 | $207,836.25 | $156,701.82 | $156,701.82 | $81,809.50 | $81,809.50 | $50,254.88 | $50,254.88 | $34,305.63 | $34,305.63 | $17,370.38 | $17,370.38 | $12,192,797.96 | $55,542,407.96 |

† Subject to Mandatory Redemption

# UTGO Series STUB Bonds - Debt Service

## Bond Series Subject to Mandatory Redemption

### Issuance: 2004 B(2) — CUSIP 2550922X1

| Date | Insurer | Fiscal Year | Mandatory Redemption Amounts | Outstanding | Rate | Interest |
|---|---|---|---|---|---|---|
| 10/1/14 | Ambac | 6/30/15 | - | $75,325.00 | 5.240% | $3,975.52 |
| 4/1/15 | Ambac | 6/30/15 | $20,505.00 | $55,020.00 | 5.240% | $1,973.52 |
| 10/1/15 | Ambac | 6/30/16 | - | $55,020.00 | 5.240% | $1,441.52 |
| 4/1/16 | Ambac | 6/30/16 | $23,615.00 | $33,405.00 | 5.240% | $1,441.52 |
| 10/1/16 | Ambac | 6/30/17 | - | $33,405.00 | 5.240% | $876.71 |
| 4/1/17 | Ambac | 6/30/17 | $22,270.00 | $11,135.00 | 5.240% | $455.71 |
| 10/1/17 | Ambac | 6/30/18 | - | $11,135.00 | 5.240% | $291.74 |
| 4/1/18 | Ambac | 6/30/18 | $11,135.00 | - | 5.240% | $291.74 |
| **Total** | | | **$75,325.00** | | | **$9,165.97** |

### Issuance: 2008-A — CUSIP 25009sN63

| Date | Insurer | Fiscal Year | Mandatory Redemption Amounts | Outstanding | Rate | Interest |
|---|---|---|---|---|---|---|
| 10/1/14 | Assured | 6/10/15 | - | $3,617,380.00 | 5.000% | $67,434.50 |
| 4/1/15 | Assured | 6/30/15 | - | $3,617,380.00 | 5.000% | $65,434.50 |
| 10/1/15 | Assured | 6/30/16 | - | $3,617,380.00 | 5.000% | $65,434.50 |
| 4/1/16 | Assured | 6/30/16 | - | $3,617,380.00 | 5.000% | $65,434.50 |
| 10/1/16 | Assured | 6/30/17 | - | $3,617,380.00 | 5.000% | $65,434.50 |
| 4/1/17 | Assured | 6/30/17 | - | $3,617,380.00 | 5.000% | $65,434.50 |
| 10/1/17 | Assured | 6/30/18 | - | $3,617,380.00 | 5.000% | $65,434.50 |
| 4/1/18 | Assured | 6/30/18 | - | $3,617,380.00 | 5.000% | $65,434.50 |
| 10/1/18 | Assured | 6/30/19 | - | $3,617,380.00 | 5.000% | $65,434.50 |
| 4/1/19 | Assured | 6/30/19 | - | $3,617,380.00 | 5.000% | $65,434.50 |
| 10/1/19 | Assured | 6/30/20 | - | $3,617,380.00 | 5.000% | $65,434.50 |
| 4/1/20 | Assured | 6/30/20 | - | $3,617,380.00 | 5.000% | $65,434.50 |
| 10/1/20 | Assured | 6/30/21 | - | $2,617,380.00 | 5.000% | $65,434.50 |
| 4/1/21 | Assured | 6/30/21 | - | $2,617,380.00 | 5.000% | $65,434.50 |
| 10/1/21 | Assured | 6/30/22 | - | $2,617,380.00 | 5.000% | $65,434.50 |
| 4/1/22 | Assured | 6/30/22 | - | $2,617,380.00 | 5.000% | $65,434.50 |
| 10/1/22 | Assured | 6/30/23 | - | $2,617,380.00 | 5.000% | $65,434.50 |
| 1/1/2023 | Assured | 6/30/2023 | - | $2,617,380.00 | 5.000% | $65,434.50 |
| 10/1/2023 | Assured | 6/30/2024 | - | $2,617,380.00 | 5.000% | $65,434.50 |
| 4/1/2024 | Assured | 6/30/2025 | - | $2,617,380.00 | 5.000% | $65,434.50 |
| 10/1/2024 | Assured | 6/30/2025 | $607,185.00 | $2,010,195.60 | 5.000% | $65,434.50 |
| 4/1/2025 | Assured | 6/30/2026 | - | $2,010,195.60 | 5.000% | $50,254.88 |
| 10/1/2025 | Assured | 6/30/2026 | $637,970.00 | $1,372,225.16 | 5.000% | $56,255.88 |
| 10/1/2026 | Assured | 6/30/2027 | - | $1,372,225.16 | 5.000% | $34,301.63 |
| 4/1/2027 | Assured | 6/30/2027 | $669,410.00 | $702,815.00 | 5.000% | $34,301.63 |
| 10/1/2037 | Assured | 6/30/2028 | - | $702,815.00 | 3.000% | $17,570.38 |
| 4/1/2028 | Assured | 6/30/2028 | $702,815.00 | - | 5.000% | $13,576.08 |
| **Total** | | | **$2,677,580.00** | | | **$1,647,820.75** |

### Issuance: 2008-A — CUSIP 25009sN55

| Date | Insurer | Fiscal Year | Mandatory Redemption Amounts | Outstanding | Rate | Interest |
|---|---|---|---|---|---|---|
| 10/1/14 | Assured | 6/30/14 | - | $1,129,220.00 | 5.000% | $28,230.50 |
| 4/1/15 | Assured | 6/30/15 | - | $1,129,220.00 | 5.000% | $28,230.50 |
| 10/1/15 | Assured | 6/30/16 | - | $1,129,220.00 | 5.000% | $28,230.50 |
| 4/1/16 | Assured | 6/30/16 | - | $1,129,220.00 | 5.000% | $28,230.50 |
| 10/1/16 | Assured | 6/30/17 | - | $1,129,220.00 | 5.000% | $28,230.50 |
| 4/1/17 | Assured | 6/30/17 | - | $1,129,220.00 | 5.000% | $28,230.50 |
| 10/1/17 | Assured | 6/30/18 | - | $1,129,220.00 | 3.000% | $28,230.50 |
| 4/1/18 | Assured | 6/30/18 | - | $1,129,220.00 | 5.000% | $28,230.50 |
| 10/1/18 | Assured | 6/30/19 | - | $1,129,220.00 | 5.000% | $28,230.50 |
| 10/1/19 | Assured | 6/30/20 | - | $1,129,220.00 | 5.000% | $28,230.50 |
| 4/1/20 | Assured | 6/30/20 | - | $1,129,220.00 | 5.000% | $28,230.50 |
| 10/1/20 | Assured | 6/30/21 | - | $1,129,220.00 | 5.000% | $28,230.50 |
| 4/1/21 | Assured | 6/30/21 | - | $1,129,220.00 | 5.000% | $28,230.50 |
| 10/1/21 | Assured | 6/30/22 | - | $1,129,220.00 | 5.000% | $28,230.50 |
| 4/1/22 | Assured | 6/30/22 | - | $1,129,220.00 | 5.000% | $28,230.50 |
| 10/1/2022 | Assured | 6/30/2023 | - | $1,129,220.00 | 5.000% | $28,230.50 |
| 4/1/2023 | Assured | 6/30/2024 | $550,855.00 | $578,365.00 | 5.000% | $26,250.50 |
| 10/1/2023 | Assured | 6/30/2024 | - | $578,365.00 | 5.000% | $14,459.13 |
| 4/1/2024 | Assured | 6/30/2024 | $578,365.01 | - | 5.000% | $14,459.13 |
| **Total** | | | **$1,129,220.00** | | | **$537,067.25** |

## EXHIBIT D

## FORM OF CONTINUING DISCLOSURE UNDERTAKING

This Continuing Disclosure Undertaking (the "Undertaking") is executed and delivered by the City of Detroit, County of Wayne, State of Michigan (the "City") in connection with bonds issued by the City, purchased or to be purchased with funds from the Michigan Finance Authority Local Government Loan Program Revenue Bonds, Series [2014], of the Type designated City of Detroit Unlimited Tax General Obligation Local Project Bonds (the "Local Project Municipal Obligations") by the Michigan Finance Authority (the "MFA"). The City covenants and agrees for the benefit of the Bondholders, as hereinafter defined, as follows:

(a)     *Definitions*. The following terms used herein shall have the following meanings:

"Audited Financial Statements" means the annual audited financial statement pertaining to the City prepared by an individual or firm of independent certified public accountants as required by Act 2, Public Acts of Michigan, 1968, as amended, which presently requires preparation in accordance with generally accepted accounting principles.

"Bondholders" shall mean the MFA and the registered owner of any MFA Bond or any person which (a) has the power, directly or indirectly, to vote or consent with respect to, or to dispose of ownership of, any MFA Bond (including any person holding an MFA Bond through a nominee, depository or other intermediary), or (b) is treated as the owner of any MFA Bond for federal income tax purposes.

"EMMA" shall mean the MSRB's Electronic Municipal Market Access System or such other system, Internet Web Site, or repository hereafter prescribed by the MSRB for the submission of electronic filings pursuant to the Rule.

"MFA Bond" means any bond issued by the MFA which is secured in whole or in part by payments to be received on the Local Project Municipal Obligations.

"MSRB" means the Municipal Securities Rulemaking Board.

"Rule" means Rule 15c2-12 promulgated by the SEC pursuant to the Securities Exchange Act of 1934, as amended.

"SEC" means the United States Securities and Exchange Commission.

(b)     *Continuing Disclosure.* The City hereby agrees, in accordance with the provisions of the Rule, to provide or cause to be provided to the MSRB through EMMA no later than 270 days after the end of its fiscal year the following annual financial information and operating data, commencing with the fiscal year ended June 30, 20__ in an electronic format as prescribed by the MSRB, the Audited Financial Statements and updates of certain financial and operating data of the City appearing under the headings and tables in the Official Statement of

the MFA dated _____, 2014 relating to the MFA Bonds as follows: [Tables 1 through 32, inclusive, and 42 in Appendix II to the Official Statement ("Annual Financial Information").]

If the fiscal year of the City is changed, the City shall send notice of such change to the MSRB through EMMA prior to the earlier of the ending date of the fiscal year prior to such change or the ending date of the fiscal year as changed.

In the event that the Audited Financial Statements are not available by the date specified above, they will be provided when available and Unaudited Financial Statements will be filed by such date and the Audited Financial Statements will be filed as soon as available.

Such annual financial information and operating data described above are expected to be provided directly by the City by specific reference to documents available to the public through EMMA or filed with the SEC.

(c)     *Notice of Failure to Disclose.*  The City agrees to provide or cause to be provided, in a timely manner, to the MSRB through EMMA, in an electronic format as prescribed by the MSRB, notice of a failure by the City to provide the annual financial information with respect to the City described in subsection (b) above on or prior to the dates set forth in subsection (b) above.

(d)     *Occurrence of Events.*  The City agrees to provide or cause to be provided to the MSRB through EMMA, in an electronic format as prescribed by the MSRB, in a timely manner not in excess of ten business days after the occurrence of the event, notice of the occurrence of any of the following events listed in (b)(5)(i)(C) of the Rule with respect to the Local Project Municipal Obligations:

(1)     principal and interest payment delinquencies;

(2)     non-payment related defaults, if material;

(3)     unscheduled draws on debt service reserves reflecting financial difficulties;

(4)     unscheduled draws on credit enhancements reflecting financial difficulties;

(5)     substitution of credit or liquidity providers, or their failure to perform;

(6)     adverse tax opinions, the issuance by the Internal Revenue Service of proposed or final determinations of taxability, Notices of Proposed Issue (IRS Form 5701-TEB) or other material notices or determinations with respect to the tax status of the Local Project Municipal Obligations, or other material events affecting the tax status of the Local Project Municipal Obligations;

(7)     modifications to rights of Bondholders, if material;

(8)     bond calls, if material, and tender offers;

(9)     defeasances;

(10)    release, substitution, or sale of property securing repayment of the Local Project Municipal Obligations, if material;

(11)    rating changes;

(12) bankruptcy, insolvency, receivership or similar event of the City, which is considered to occur when any of the following occur: the appointment of a receiver, fiscal agent or similar officer for the City in a proceeding under the U.S. Bankruptcy Code or in any other proceeding under state or federal law in which a court or governmental authority has assumed jurisdiction over substantially all of the assets or business of the City, or if such jurisdiction has been assumed by leaving the existing governing body and officials or officers in possession but subject to the supervision and orders of a court or governmental authority, or the entry of an order confirming a plan of reorganization, arrangement or liquidation by a court or governmental authority having supervision or jurisdiction over substantially all of the assets or business of the City;

(13) the consummation of a merger, consolidation, or acquisition involving the City or the sale of all or substantially all of the assets of the City, other than in the ordinary course of business, the entry into a definitive agreement to undertake such an action or the termination of a definitive agreement relating to any such actions, other than pursuant to its terms, if material; or

(14) appointment of a successor or additional trustee or the change of name of a trustee, if material.

(e) *Materiality Determined Under Federal Securities Laws.* The City agrees that its determination of whether any event listed in subsection (d) is material shall be made in accordance with federal securities laws.

(f) *Termination of Reporting Obligation.* The City reserves the right to terminate their obligation to provide annual financial information and notices of material events, as set forth above, if and when the City is no longer an "obligated person" with respect to the MFA Bonds within the meaning of the Rule, including upon legal defeasance of all MFA Bonds.

(g) *Identifying Information.* All documents provided to the MSRB through EMMA shall be accompanied by the identifying information prescribed by the MSRB.

(h) *Benefit of Bondholders.* The City agrees that its undertaking pursuant to the Rule set forth in this Section is intended to be for the benefit of the Bondholders and shall be enforceable by any Bondholder; provided that, the right to enforce the provisions of this undertaking shall be limited to a right to obtain specific enforcement of the City's obligations hereunder and any failure by the City to comply with the provisions of this undertaking shall not constitute a default or an event of default with respect to the Bonds.

(i) *Amendments to the Undertaking.* Amendments may be made in the specific types of information provided or the format of the presentation of such information to the extent deemed necessary or appropriate in the judgment of the City, provided that the City agrees that any such amendment will be adopted procedurally and substantively in a manner consistent with the Rule, including any interpretations thereof by the SEC, which, to the extent applicable, are incorporated herein by reference. Such interpretations currently include the requirements that (a)

the amendment may only be made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the City or the type of activities conducted thereby, (b) the undertaking, as amended, would have complied with the requirements of the Rule at the time of the primary offering of the MFA Bonds, after taking into account any amendments or interpretations of the Rule, as well as any change in circumstances, and (c) the amendment does not materially impair the interests of Bondholders, as determined by parties unaffiliated with the City (such as independent legal counsel), but such interpretations may be changed in the future. If the accounting principles to be followed by the City in the preparing of the Audited Financial Statements are modified, the annual financial information for the year in which the change is made shall present a comparison between the financial statements as prepared on the prior basis and the statements as prepared on the new basis, and otherwise shall comply with the requirements of the Rule, in order to provide information to investors to enable them to evaluate the ability of the City to meet its obligations. A notice of the change in accounting principles shall be sent to the MSRB through EMMA.

(j) *Municipal Advisory Council of the State of Michigan.* The City shall also file by electronic or other means any information or notice required to be filed with the MSRB through EMMA pursuant to this Undertaking in a timely manner with the Municipal Advisory Council of the State of Michigan.

CITY OF DETROIT
County of Wayne
State of Michigan


By_____
Its: Finance Director


Dated: _____ , 2014


22059790.15\022765-00202
7/23/14 7:57 AM

## Exhibit C

## ANNUAL CERTIFICATION OF IMPOSITION OF DEBT MILLAGE LEVY

Exhibit C
ANNUAL CERTIFICATION OF IMPOSITION OF DEBT MILLAGE LEVY

# Millage Calculation

| Numerator | | |
|---|---|---|
| Fiscal Year 2015 Interest | $ | 24,753,181 |
| Fiscal Year 2015 Principal | $ | 37,795,000 |
| Projected Bond Sales - Current Year (Interest) | $ | - |
| Projected Bond Sales - Current Year (Principal) | $ | - |
| Projected Bond Sales - Next Year (Interest) | $ | - |
| Projected Bond Sales - Next Year (Principal) | $ | - |
| **Fiscal Year 2015 Debt Service** | **$** | **62,548,181** |
| | | |
| Prior Year 2010E BAB Federal Tax Rebates | $ | 3,351,142 |
| Prior Year Real Property Tax Overcollection / (Undercollection) | $ | - |
| Prior Year Personal Property Tax Overcollection / (Undercollection) | $ | - |
| Earnings in Escrow Account | $ | - |
| Change in Escrow Account Funding Balance | $ | - |
| **Total Adjustments** | **$** | **3,351,142** |
| | | |
| **Tax Levy Requirement** | **$** | **59,197,039** |

| Denominator | | |
|---|---|---|
| Total Net Tax Base | $ | 6,025,940,795 |

| Millage | | |
|---|---|---|
| Tax Rate | | 0.0098237 |
| Tax Rate (per $1000 valuation) | | 9.8237 |

Chief Financial Officer
City of Detroit

Date

## Exhibit D

## FORM OF SETTLEMENT ESCROW AGREEMENT

AFDOCS/10855025.6
CLI-2220387v14

# SETTLEMENT ESCROW AGREEMENT

THIS SETTLEMENT ESCROW AGREEMENT (the "**Agreement**" or "**Settlement Escrow Agreement**"), is dated as of the ___ day of _____, 2014, made by and among the City of Detroit, County of Wayne, State of Michigan (the "**City**"), Ambac Assurance Corporation ("**Ambac**"), Assured Guaranty Municipal Corp. and Assured Guaranty Corp. (together, "**Assured**"), and National Public Finance Guarantee Corporation ("**NPFG**"), and U. S. Bank National Association, Detroit, Michigan (in such capacity, the "**Settlement Escrow Trustee**"). In this Agreement, each of the City, Ambac, Assured, NPFG and the Settlement Escrow Trustee is referred to individually as a "**Party**"; Ambac, Assured, and NPFG (including their successors and assigns) are referred to collectively as the "**Bond Insurers**"; and the City, the Settlement Escrow Trustee and the Bond Insurers are referred to collectively as the "**Parties**."

Capitalized terms not otherwise defined herein shall have the meaning set forth in the UTGO Settlement Agreement (defined herein).

## WITNESSETH:

WHEREAS, the City and the Bond Insurers have heretofore entered into a Settlement Agreement, dated XX (the "**UTGO Settlement Agreement**") to consensually resolve their dispute under or in respect of the Prior UTGO Bonds, the Assured/NPFG Action, the AMBAC Action as it relates to the Prior UTGO Bonds, and the UTGO Claims, all arising out of a petition for relief filed by the City pursuant to Chapter 9 of title 11 of the United States Code in the United States Bankruptcy Court for the Eastern District of Michigan;

WHEREAS, if the Effective Date of the Plan does not occur on or prior to September 30, 2014, for any reason other than proximately by reason of the actions or positions taken by any of the Bond Insurers, or their failure to support the Plan as described in Section 3.1 of the UTGO Settlement Agreement, solely in their capacity as the insurers of the Prior UTGO Bonds and not in any other capacity (including, for the avoidance of doubt in their capacity as insurers of any other obligations of the City), the City will be obligated to pay into an escrow to be established with the Settlement Escrow Trustee under this Agreement the October 2014 scheduled interest debt service payment that would otherwise be made on the Restructured UTGO Bonds as if the transaction contemplated by the UTGO Settlement Agreement (other than the MFA Bond issuance) had closed (the "**Pro Forma Restructured UTGO Bonds**"), and any pro rata payments of principal and interest due thereafter, as further described in Section 2.8 of the UTGO Settlement Agreement and herein;

WHEREAS, the City has executed the Debt Millage Escrow Agreement pursuant to which the City will be required, as of the Effective Date, to segregate and deposit the UTGO Tax Levy with the Debt Millage Escrow Trustee;

NOW, THEREFORE, in consideration of the mutual undertakings, provisions and agreements herein contained, the sufficiency of which are hereby acknowledged, and in order to provide for the payment of the Pro Forma Restructured UTGO Bonds should the Effective Date

not occur on or prior to September 30, 2014, and to secure the performance and observance of the conditions and covenants herein set forth and for other valuable consideration, the receipt of which is hereby acknowledged, the City covenants and agrees with the Settlement Escrow Trustee and the Bond Insurers as follows:

## ARTICLE I.
## ESTABLISHMENT OF FUNDS AND ACCOUNTS

Section 101    Establishment of Settlement Escrow Fund.  There is hereby created and established with the Settlement Escrow Trustee, pursuant to Order No. ___ and this Agreement, a single and common trust fund designated the "Settlement Escrow Fund" (the "**Settlement Escrow Fund**").

Section 102    Deposits to the Settlement Escrow Fund.

(a)    If the Effective Date of the Plan does not occur on or prior to September 30, 2014 for any reason other than proximately by reason of the actions or positions taken by any of the Bond Insurers, or their failure to support the Plan as described in Section 3.1 of the UTGO Settlement Agreement, solely in their capacity as the insurers of the Prior UTGO Bonds and not in any other capacity (including, for the avoidance of doubt in their capacity as insurers of any other obligations of the City), the City shall pay the Settlement Escrow Trustee, from  Debt Millage Revenues,  for deposit into the Settlement Escrow Fund the October 2014 scheduled interest debt service payment with respect to  the Pro Forma Restructured UTGO Bonds, as shown on Exhibit A, and any pro rata payments of principal and interest due thereafter, as shown on Exhibit A, as if the transaction contemplated by the UTGO Settlement Agreement (other than the MFA Bond issuance) had closed.  Any such monies in the Settlement Escrow Fund which would have been payable on October 1, 2014 shall be released to the Bond Insurers on the Effective Date of the Plan.  Any other monies then on deposit in the Settlement Escrow Fund shall be transferred on the Effective Date  to the Debt Millage Escrow Trustee for deposit in the 2014 UTGO Municipal Obligation Subaccount in the 2014 UTGO Bonds Account established pursuant to the Debt Millage Escrow Agreement.

(b)    If the Plan is not effective by March 31, 2015, and the Bankruptcy Court has issued an Approval Order (that is not stayed pending appeal) approving the settlement embodied in the UTGO Settlement Agreement, the monies in the Settlement Escrow Fund  will be released and paid to the Bond Insurers in the amounts shown in Exhibit A for each prior interest payment date and the City shall make, or shall cause the Debt Millage Escrow Trustee to make, all subsequent debt service payments on each interest date payment (as shown on Exhibit A) directly to the paying agent for the Prior UTGO Bonds.  If an Approval Order is entered but is subject to a stay pending appeal, the City shall continue to pay into the Settlement Escrow Fund the scheduled debt service on the Pro Forma Restructured UTGO Bonds as shown on Exhibit A for so long as such stay remains in effect, and, as soon as such order is no longer subject to stay, shall thereafter apply all monies in the Settlement Escrow Fund first, to immediately reimburse the Bond Insurers for payments of principal and interest made on and after October 1, 2014 with respect to the Prior UTGO Bonds, and thereafter to make payments directly to the Paying Agent for the UTGO Bonds.

(c)     Notwithstanding the foregoing, if any Bond Insurer shall have defaulted in its obligation to make payments under its respective Bond Insurance Policy or Policies, any payment required to be made to such Bond Insurer shall be made to the holders of the Prior UTGOs at the direction of the City but only to the extent of any uncured failure or shortfall in the Bond Insurer's payment.

Section 103     Partial Payments; Accounting.

(a)     If on any interest payment date amounts held in the Settlement Escrow Fund are less than the amounts due with respect to all Pro Forma Restructured UTGO Bonds (as shown on Exhibit A), such payments shall distributed pro rata based upon the aggregate amount payable to each Bond Insurer.  If the City fails to deposit into the Settlement Escrow Fund, or to otherwise pay to the Bond Insurers or holders of the Prior UTGO the amounts required by this Agreement, any deficiencies shall be paid into the Settlement Escrow Fund from the first available amounts of the Aggregate UTGO Tax Levy as provided for in Section 2.4(b)(i) of the UTGO Settlement Agreement, and shall be distributed to, or at the direction of the Bond Insurers, pro rata, as soon as practicable (subject to Section 102(b)) hereof.

(b)     The Settlement Escrow Trustee shall keep and maintain a record showing each deposit into the Settlement Escrow Fund, and all transfers of funds made therefrom, which shall be provided to any Bond Insurer upon request.

(c)     Any payment to a Bond Insurer shall be paid by wire transfer in immediately available funds into the accounts as shown in Section 501.

## ARTICLE II.
## INVESTMENT OF FUNDS

Section 201     Permitted Investments.  All money held by the Settlement Escrow Fund, without the need for further direction by the City,  shall be invested by the Settlement Escrow Trustee in accordance with written instructions from the City in mutual funds registered under the investment company act of 1940, title I of chapter 686, 54 Stat. 789, 15 USC 80a-1 to 80a-3 and 80a-4 to 80a-64, that are at the time of purchase within the highest classification established by not less than two standard rating services and so long as the portfolio of such mutual funds is limited to bonds, and other obligations on which the full and timely payment of principal and interest is unconditionally guaranteed by the full faith and credit of the United States.  All investments shall mature or be redeemable at the option of the holder no later than the next interest payment date on the Pro Forma Restructured UTGO Bonds.  In the absence of any written direction delivered to the Settlement Escrow Trustee by the City, the Settlement Escrow Trustee shall hold funds uninvested.  The Settlement Escrow Trustee shall be entitled to rely on any written direction from the City as to the suitability and legality of the directed investment.

# ARTICLE III.
## THE SETTLEMENT ESCROW TRUSTEE

Section 301    Powers and Duties of Settlement Escrow Trustee.  (a)  The Settlement Escrow Trustee may execute any of the trusts or powers hereof and perform any of its duties by or through attorneys, agents, receivers or employees, and shall be entitled to act upon the opinion or advice of its counsel concerning all matters hereof, and may in all cases be reimbursed hereunder for reasonable compensation paid to all such attorneys, agents, receivers and employees as may reasonably be employed in connection with the trust hereof.  The Settlement Escrow Trustee may act upon an opinion of counsel and shall not be responsible for any loss or damage resulting from any action or nonaction by it taken or omitted to be taken in good faith in reliance upon such opinion of counsel.

(b)    The Settlement Escrow Trustee shall not be responsible for any recital herein, or for the validity of the execution by the City of this Settlement Escrow Agreement, or of any supplements thereto or instruments of further assurance, or for the validity or sufficiency of, or filing of documents related to the security for the Prior UTGO Bonds intended to be secured hereby.

(c)    The Settlement Escrow Trustee shall not be responsible or liable for any loss suffered in connection with any investment of funds made by it in accordance with this Settlement Escrow Agreement.

(d)    The Settlement Escrow Trustee shall be protected in acting upon any notice, request, consent, certificate, order, affidavit, letter, telegram or other paper or document reasonably believed by it to be genuine and correct and to have been signed or sent by the proper person or persons.

(e)    As to the existence or non-existence of any fact or as to the sufficiency or validity of any instrument, paper or proceeding, the Settlement Escrow Trustee shall be entitled to rely upon a certificate believed in good faith to be genuine and correct, signed on behalf of the City or a Bond Insurer by an authorized officer of the City or Bond Insurer, as the case may be, as sufficient evidence of the facts therein contained.  The Settlement Escrow Trustee may also accept a similar certificate to the effect that any particular dealing, transaction or action is necessary or expedient, but may at its discretion secure such further evidence deemed necessary or advisable, but shall in no case be bound to secure the same.

(f)    The permissive right of the Settlement Escrow Trustee to do things enumerated in this Settlement Escrow Agreement, as amended, shall not be construed as a duty, and the Settlement Escrow Trustee shall not be answerable for other than its gross negligence or willful misconduct.  The immunities and exceptions from liability of the Settlement Escrow Trustee shall extend to its officers, directors, employees and agents.

(g)    The Settlement Escrow Trustee shall not be required to give any note or surety in respect to the execution of its rights and obligations hereunder.

(h)    All moneys received by the Settlement Escrow Trustee shall, until used or applied or invested as herein provided, be held in trust in the manner and for the purpose for which they

4

were received, but need not be segregated from other funds except to the extent required by this Settlement Escrow Agreement, as amended, or by law. The Settlement Escrow Trustee shall not be under any liability for interest on any moneys received hereunder except such as may be agreed upon.

(i)     The Settlement Escrow Trustee shall not be under any obligation to initiate any suit or to take any remedial proceeding under this Settlement Escrow Agreement or to take any steps in the execution of the trusts created by this Settlement Escrow Agreement or in the enforcement of any rights and powers under this Settlement Escrow Agreement until it has been indemnified to its satisfaction against any and all fees, costs and expenses and other reasonable disbursements and against all liability.

(j)     The Settlement Escrow Trustee shall have no responsibility or liability with respect to any information, statement or recital in any official statement, offering memorandum or other disclosure material prepared or distributed with respect to the issuance of the Prior UTGO Bonds, except for liability for its own gross negligence or willful misconduct.

(k)     The Settlement Escrow Trustee may become the holder of any of the Prior UTGO Bonds with the same rights it would have if it were not Settlement Escrow Trustee, and, to the extent permitted by law, may act as depositary for and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, any committee formed to protect the rights of holders, whether or not such committee shall represent the holders of a majority in principal amount of any of the Prior UTGO Bonds of such series then outstanding.

(l)     The Settlement Escrow Trustee shall not be liable for any error of judgment made in good faith by any of its officers, employees, agents or representatives, unless it shall be proved that the Settlement Escrow Trustee was negligent in ascertaining the pertinent facts.

(m)     The Settlement Escrow Trustee has no obligation or liability to the holders for the payment of interest on, principal of or redemption premium, if any, with respect to the Prior UTGO Bonds from its own funds; but rather the Settlement Escrow Trustee's obligations shall be limited to the performance of its duties hereunder.

(n)     Whether or not therein expressly so provided, every provision of this Agreement or related documents, relating to the conduct or affecting the liability of or affording protection to the Settlement Escrow Trustee shall be subject to the provisions of this Article.

Section 302     Fees and Expenses of Settlement Escrow Trustee.  (a) The Settlement Escrow Trustee shall be entitled to reasonable and customary fees for services rendered under this Agreement, as amended, and shall be reimbursed for all expenses reasonably incurred in connection with such services. Such fees and expenses shall be payable by the City and shall be determined in accordance with the Fee Schedule attached as Exhibit E of this Agreement or as otherwise may be agreed to by the City and the Settlement Escrow Trustee. The Settlement Escrow Trustee shall not have a lien for the payment of its fees and expenses upon any of the money deposited with it in accordance with this Agreement.

(b)     The City shall be liable for all fees, expenses, charges, losses, costs, liabilities and damages (including reasonable attorneys' or other professional fees) incurred by the Settlement

Escrow Trustee pursuant to this Agreement except for those which are adjudicated to have resulted from the gross negligence or willful misconduct of the Settlement Escrow Trustee, and shall pay such amounts to or at the direction of the Settlement Escrow Trustee.

Section 303 Resignation; Appointment of Successor Settlement Escrow Trustee; Successor Settlement Escrow Trustee Upon Merger, Consolidation or Sale. (a) The Settlement Escrow Trustee and any successor Settlement Escrow Trustee may resign only upon giving 60 days' prior written notice to the City and the Bond Insurers. Such resignation shall take effect only upon the appointment of a successor Settlement Escrow Trustee and the acceptance of such appointment by the successor Settlement Escrow Trustee. Upon appointment of a successor Settlement Escrow Trustee, the resigning Settlement Escrow Trustee shall, after payment of its fees, costs and expenses, assign all of its right, title and interest in the Settlement Escrow Fund, and transfer and assign its right, title and interest in the Settlement Escrow Agreement to the successor Settlement Escrow Trustee. The successor Settlement Escrow Trustee shall meet the requirements of Section 303(b) below and shall accept in writing its duties and responsibilities hereunder and file such acceptance with the City.

(b) In case the Settlement Escrow Trustee shall give notice of resignation or be removed, or be dissolved, or shall be in the course of dissolution or liquidation, or otherwise become incapable of acting hereunder, or in case it shall be taken under the control of any public office or offices, or of a receiver appointed by a court, a successor may be appointed by the Bond Insurers, with the prior written consent of the City (to the extent that no breach by the City of any material agreement or covenant, i.e. an "Event of Default," shall have occurred and be continuing under this Settlement Escrow Agreement, written notice of which has been provided by the Bond Insurers to the City and the Settlement Escrow Trustee), which consent shall not be unreasonably be withheld. Every such Settlement Escrow Trustee appointed pursuant to the provisions of this Section 303(b) (i) shall at all times be a bank having trust powers or a trust company, (ii) shall at all times be organized and doing business under the laws of the United States of America or of any state, (iii) shall have, or be wholly owned by an entity having, a combined capital and surplus of at least $75,000,000, (iv) shall be authorized under such laws to exercise corporate trust powers, and (v) shall be subject to supervision or examination by federal or state authority.

(c) Any corporation or association into which the Settlement Escrow Trustee may be merged or converted or with or into which it may be consolidated, or to which it may sell or transfer its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any merger, conversion, sale, consolidation or transfer to which it is a party, provided such company shall be eligible under Section 303(b) hereof, shall be and become successor Settlement Escrow Trustee hereunder and shall be vested with all the trusts, powers, rights, obligations, duties, remedies, immunities and privileges hereunder as was its predecessor, without the execution or filing of any instrument or any further act on the part of any of the parties hereto.

Section 304 Removal of Settlement Escrow Trustee. The Settlement Escrow Trustee may be removed at any time by an instrument or concurrent instruments in writing delivered to the Settlement Escrow Trustee signed by the City and by all of the Bond Insurers. No removal of the Settlement Escrow Trustee and no appointment of a successor Settlement Escrow Trustee

shall become effective until the successor Settlement Escrow Trustee has accepted its appointment. Upon such removal and the payment of its fees, costs and expenses, the Settlement Escrow Trustee shall assign to the successor Settlement Escrow Trustee all of its right, title and interest in the Trust Estate.

## ARTICLE IV.
## MISCELLANEOUS

Section 401    Notices; Payment Accounts.  Except as other provided, all notices, certificates, requests, complaints, demands or other communications under this Agreement shall be deemed sufficiently given when sent by first class mail or overnight mail postage prepaid, addressed as follows:

| | |
|---|---|
| If to the City, to: | City of Detroit<br>Coleman A. Young Municipal Center<br>2 Woodward Avenue, Suite 1126<br>Detroit MI 48226<br>Attention: Chief Financial Officer |
| If to the Settlement Escrow Trustee, to: | [U.S. Bank National Association<br>535 Griswold, Suite 550<br>Detroit, Michigan 48226<br>Attention: Corporate Trust Services] |
| If to the Bond Insurers, to: | Ambac Assurance Corporation<br>One State Street Plaza<br>New York, New York 10004<br>Attention: Surveillance Department and<br>General Counsel's Office<br><br>Assured Guaranty Municipal Corp and<br>Assured Guaranty Corp.<br>31 West 52nd Street<br>New York, NY 10019<br>Attention: Kevin J. Lyons<br>Attention: Terence Workman<br><br>National Public Finance Guarantee Corporation<br>113 King Street<br>Armonk, NY 10504<br>Attention: Kenneth Epstein and William J. Rizzo |

The City and the Settlement Escrow Trustee may, by giving notice hereunder, in writing, designate any further or different addresses to which subsequent notices, certificates, requests, complaints, demands or other communications hereunder shall be sent.

All payments to the Bond Insurers shall be made by wire transfer to the following accounts, unless otherwise changed by any Bond Insurer by written notice to the Escrow Agent:

[TO COME]

Section 402    Termination.  This Agreement shall terminate following delivery of written direction from the City and the Bond Insurers to the Settlement Escrow Trustee to so terminate, together with written notice that all fees owed to the Settlement Escrow Trustee have been paid in full.  Upon termination of this Agreement, any money remaining on deposit in the funds and accounts created and established hereunder shall be paid to the City.

Section 403    Amendments.  This Agreement shall only be amended by the written agreement of all Parties.

Section 404    Severability.  If any one or more sections, clauses or provisions of this Settlement Escrow Agreement shall be determined by a court of competent jurisdiction to be invalid or ineffective for any reason, such determination shall in no way affect the validity and effectiveness of the remaining sections, clauses and provisions of the Agreement.

Section 405    Headings.  Any headings shall be solely for convenience of reference and shall not constitute a part of the Agreement, nor shall they affect its meaning, construction or effect.

Section 406    Settlement Escrow Agreement Executed in Counterparts.  This Settlement Escrow Agreement may be executed simultaneously in several counterparts, each of which shall be deemed an original, and such counterparts together shall and will constitute one and the same instrument.

Section 407    Parties Interested Herein.  Nothing in this Settlement Escrow Agreement expressed or implied is intended or shall be construed to confer upon, or to give to, any person or entity, other than the Settlement Escrow Trustee, the City and the Bond Insurers any right, remedy or claim under or by reason of this Settlement Escrow Agreement or any covenant, condition or stipulation hereof, and all covenants, stipulations, promises and agreements in this Agreement on behalf of the City shall be for the sole and exclusive benefit of the Settlement Escrow Trustee, the City, and the Bond Insurers.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date set forth above.

CITY OF DETROIT

By _____
    Kevyn D. Orr
    Its:  Emergency Manager

AMBAC ASSURANCE CORPORATION

By: _____
    Name:
    Title:

ASSURED GUARANTY CORP.

By: _____
    Name:
    Title:

ASSURED GUARANTY MUNICIPAL CORP.

By: _____
    Name:
    Title:

NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION

By: _____
    Name:
    Title:

U. S. BANK NATIONAL ASSOCIATION,
as Escrow Trustee

By _____

    Its: _____

ACTIVE 203366018v4    15-53846-swr    Doc 6908-13    Filed 10/15/14    Entered 10/15/14 23:27:34    Page 351 of
455

**EXHIBIT A**

**RESTRUCTURED UTGO BONDS DEBT SERVICE REQUIREMENTS
AND APPLICABLE BOND INSURER**

| CUSIP | Maturity Date | Rate | Principal | Insurer | Interest 10/1/14 | 4/1/15 | 10/1/15 | 4/1/16 | 10/1/16 | 4/1/17 | 10/1/17 | 4/1/18 | 10/1/18 | 4/1/19 | 10/1/19 | 4/1/20 | 10/1/20 | 4/1/21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **UTGO 1999-A** | | | | | | | | | | | | | | | | | | |
| ...5M3 | 4/1/15 | 5.250% | $2,476,630.00 | Assured | $65,012.06 | $65,012.06 | | | | | | | | | | | | |
| ...5N1 | 4/1/16 | 5.000% | $2,602,655.99 | Assured | $65,066.38 | $65,066.38 | $65,066.38 | $65,066.38 | | | | | | | | | | |
| ...5P5 | 4/1/17 | 5.000% | $2,733,695.00 | Assured | $68,325.13 | $68,325.13 | $68,325.13 | $68,325.13 | $68,325.13 | $68,325.13 | | | | | | | | |
| ...5Q3 | 4/1/18 | 5.000% | $2,872,645.00 | Assured | $71,801.13 | $71,801.13 | $71,801.13 | $71,801.13 | $71,801.13 | $71,801.13 | $71,801.13 | $71,801.13 | | | | | | |
| ...3X3 | 4/1/19 | 5.000% | $3,015,430.00 | Assured | $75,385.75 | $75,385.75 | $75,385.75 | $75,385.75 | $75,385.75 | $75,385.75 | $75,385.75 | $75,385.75 | $75,385.75 | $75,385.75 | | | | |
| | | | **$13,699,785.00** | | $345,590.44 | $345,590.44 | $280,578.38 | $280,578.38 | $215,512.00 | $215,512.00 | $147,186.88 | $147,186.88 | $75,385.75 | $75,385.75 | | | | |
| **UTGO 2001-A(T)** | | | | | | | | | | | | | | | | | | |
| ...M36 | 4/1/15 | 5.375% | $5,161,960.00 | NPFG | $138,724.99 | $138,724.99 | | | | | | | | | | | | |
| ...N28 | 4/1/16 | 5.375% | $5,439,740.00 | NPFG | $146,198.39 | $146,198.39 | $146,198.39 | $146,198.39 | | | | | | | | | | |
| ...P86 | 4/1/17 | 5.375% | $5,735,480.00 | NPFG | $154,138.88 | $154,138.88 | $154,138.88 | $154,138.88 | $154,138.88 | $154,138.88 | | | | | | | | |
| ...V52 | 4/1/18 | 5.375% | $12,166,000.00 | NPFG | $326,961.25 | $326,961.25 | $326,961.25 | $326,961.25 | $326,961.25 | $326,961.25 | $326,961.25 | $326,961.25 | | | | | | |
| ...W27 | 4/1/19 | 5.000% | $12,166,000.00 | NPFG | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | | | | |
| ...X22 | 4/1/20 | 5.000% | $12,166,000.00 | NPFG | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | | |
| ...X20 | 4/1/21 | 5.000% | $13,465,000.00 | NPFG | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 | $304,150.00 |
| | | | **$65,001,200.00** | | $1,678,473.59 | $1,678,473.59 | $1,539,748.51 | $1,539,748.51 | $1,393,550.13 | $1,393,550.13 | $1,239,411.25 | $1,239,411.25 | $912,450.00 | $912,450.00 | $608,300.00 | $608,300.00 | $304,150.00 | $304,150.00 |
| **UTGO 2002** | | | | | | | | | | | | | | | | | | |
| ...W6 | 4/1/22 | 5.125% | $2,815,560.00 | NPFG | $72,148.73 | $72,148.73 | $72,148.73 | $72,148.73 | $72,148.73 | $72,148.73 | $72,148.73 | $72,148.73 | $72,148.73 | $72,148.73 | $72,148.73 | $72,148.73 | $72,148.73 | $72,148.73 |
| ...V0 | 4/1/23 | 5.125% | $2,958,560.00 | NPFG | $75,822.97 | $75,822.97 | $75,822.97 | $75,822.97 | $75,822.97 | $75,822.97 | $75,822.97 | $75,822.97 | $75,822.97 | $75,822.97 | $75,822.97 | $75,822.97 | $75,822.97 | $75,822.97 |
| | | | **$5,774,905.00** | | $147,971.69 | $147,971.69 | $147,971.69 | $147,971.69 | $147,971.69 | $147,971.69 | $147,971.69 | $147,971.69 | $147,971.69 | $147,971.69 | $147,971.69 | $147,971.69 | $147,971.69 | $147,971.69 |
| **UTGO 2003-A** | | | | | | | | | | | | | | | | | | |
| ...XP0 | 4/1/15 | 4.000% | $260,700.00 | Syncora | $5,214.00 | $5,214.00 | | | | | | | | | | | | |
| ...XQ8 | 4/1/16 | 4.250% | $2,215,950.00 | Syncora | $58,168.97 | $58,168.97 | $58,168.97 | $58,168.97 | | | | | | | | | | |
| ...XR6 | 4/1/16 | 5.250% | $2,602,655.00 | Syncora | $68,319.69 | $68,319.69 | $68,319.69 | $68,319.69 | | | | | | | | | | |
| ...XS4 | 4/1/17 | 5.250% | $2,737,150.00 | Syncora | $71,655.44 | $71,655.44 | $71,655.44 | $71,655.44 | $71,655.44 | $71,655.44 | | | | | | | | |
| ...XT2 | 4/1/18 | 5.250% | $2,880,735.00 | Syncora | $75,619.29 | $75,619.29 | $75,619.29 | $75,619.29 | $75,619.29 | $75,619.29 | $75,619.29 | $75,619.29 | | | | | | |
| ...XU9 | 4/1/19 | 5.250% | $3,032,830.00 | Syncora | $79,611.26 | $79,611.26 | $79,611.26 | $79,611.26 | $79,611.26 | $79,611.26 | $79,611.26 | $79,611.26 | $79,611.26 | $79,611.26 | | | | |
| ...XV7 | 4/1/20 | 5.240% | $373,370.00 | Syncora | $9,776.25 | $9,776.25 | $9,776.25 | $9,776.25 | $9,776.25 | $9,776.25 | $9,776.25 | $9,776.25 | $9,776.25 | $9,776.25 | $9,776.25 | $9,776.25 | | |
| ...XW5 | 4/1/20 | 5.250% | $2,759,070.00 | Syncora | $72,425.72 | $72,425.72 | $72,425.72 | $72,425.72 | $72,425.72 | $72,425.72 | $72,425.72 | $72,425.72 | $72,425.72 | $72,425.72 | $72,425.72 | $72,425.72 | | |
| ...XX3 | 4/1/21 | 5.250% | $3,354,340.00 | Syncora | $88,051.43 | $88,051.43 | $88,051.43 | $88,051.43 | $88,051.43 | $88,051.43 | $88,051.43 | $88,051.43 | $88,051.43 | $88,051.43 | $88,051.43 | $88,051.43 | $88,051.43 | $88,051.43 |
| ...XY1 | 4/1/21 | 4.625% | $404,500.00 | Syncora | $10,047.81 | $10,047.81 | $10,047.81 | $10,047.81 | $10,047.81 | $10,047.81 | $10,047.81 | $10,047.81 | $10,047.81 | $10,047.81 | $10,047.81 | $10,047.81 | $10,047.81 | $10,047.81 |
| ...XZ8 | 4/1/22 | 5.250% | $3,097,985.00 | Syncora | $81,322.11 | $81,322.11 | $81,322.11 | $81,322.11 | $81,322.11 | $81,322.11 | $81,322.11 | $81,322.11 | $81,322.11 | $81,322.11 | $81,322.11 | $81,322.11 | $81,322.11 | $81,322.11 |
| ...YA2 | 4/1/23 | 5.255% | $1,147,410.00 | Syncora | $30,143.44 | $30,143.44 | $30,143.44 | $30,143.44 | $30,143.44 | $30,143.44 | $30,143.44 | $30,143.44 | $30,143.44 | $30,143.44 | $30,143.44 | $30,143.44 | $30,143.44 | $30,143.44 |
| ...YB0 | 4/1/23 | 5.240% | $2,411,475.00 | Syncora | $63,301.22 | $63,301.22 | $63,301.22 | $63,301.22 | $63,301.22 | $63,301.22 | $63,301.22 | $63,301.22 | $63,301.22 | $63,301.22 | $63,301.22 | $63,301.22 | $63,301.22 | $63,301.22 |
| | | | **$57,525,575.00** | | $713,856.34 | $659,473.64 | $659,473.64 | $582,153.96 | $582,153.96 | $510,299.53 | $510,299.53 | $434,670.23 | $434,670.23 | $355,667.97 | $355,667.97 | $272,866.00 | $272,866.00 | $272,866.00 |
| **UTGO 2004-A(T)** | | | | | | | | | | | | | | | | | | |
| ...YT2 | 4/1/19 | 5.250% | $3,919,500.00 | Ambac | $102,650.63 | $102,650.63 | $102,650.63 | $102,650.63 | $102,650.63 | $102,650.63 | $102,650.63 | $102,650.63 | $102,650.63 | $102,650.63 | | | | |
| ...YU9 | 4/1/19 | 4.250% | $160,765.00 | Ambac | $3,416.26 | $3,416.26 | $3,416.26 | $3,416.26 | $3,416.26 | $3,416.26 | $3,416.26 | $3,416.26 | $3,416.26 | $3,416.26 | | | | |
| ...YV7 | 4/1/20 | 5.250% | $5,287,865.00 | Ambac | $138,806.46 | $138,806.46 | $138,806.46 | $138,806.46 | $138,806.46 | $138,806.46 | $138,806.46 | $138,806.46 | $138,806.46 | $138,806.46 | $138,806.46 | $138,806.46 | | |
| ...YW5 | 4/1/20 | 5.000% | $5,735,400.00 | Ambac | $143,385.00 | $143,385.00 | $143,385.00 | $143,385.00 | $143,385.00 | $143,385.00 | $143,385.00 | $143,385.00 | $143,385.00 | $143,385.00 | $143,385.00 | $143,385.00 | | |
| ...YX3 | 4/1/21 | 5.250% | $6,022,170.00 | Ambac | $158,081.96 | $158,081.96 | $158,081.96 | $158,081.96 | $158,081.96 | $158,081.96 | $158,081.96 | $158,081.96 | $158,081.96 | $158,081.96 | $158,081.96 | $158,081.96 | $158,081.96 | $158,081.96 |
| ...YY1 | 4/1/21 | 5.000% | $293,319.00 | Ambac | $7,332.19 | $7,332.19 | $7,332.19 | $7,332.19 | $7,332.19 | $7,332.19 | $7,332.19 | $7,332.19 | $7,332.19 | $7,332.19 | $7,332.19 | $7,332.19 | $7,332.19 | $7,332.19 |
| ...YZ5 | 4/1/22 | 5.250% | $6,014,480.00 | Ambac | $157,853.85 | $157,853.85 | $157,853.85 | $157,853.85 | $157,853.85 | $157,853.85 | $157,853.85 | $157,853.85 | $157,853.85 | $157,853.85 | $157,853.85 | $157,853.85 | $157,853.85 | $157,853.85 |
| ...ZA3 | 4/1/22 | 4.660% | $623,165.00 | Ambac | $15,689.80 | $15,689.80 | $15,689.80 | $15,689.80 | $15,689.80 | $15,689.80 | $15,689.80 | $15,689.80 | $15,689.80 | $15,689.80 | $15,689.80 | $15,689.80 | $15,689.80 | $15,689.80 |
| ...ZE5/H7/P7 | 4/1/23 | 5.230% | $5,987,410.00 | Ambac | $157,169.51 | $157,169.51 | $157,169.51 | $157,169.51 | $157,169.51 | $157,169.51 | $157,169.51 | $157,169.51 | $157,169.51 | $157,169.51 | $157,169.51 | $157,169.51 | $157,169.51 | $157,169.51 |
| | | | **$34,125,630.00** | | $884,385.65 | $884,385.65 | $884,385.65 | $884,385.65 | $884,385.65 | $884,385.65 | $884,385.65 | $884,385.65 | $884,385.65 | $884,385.65 | $790,735.02 | $790,735.02 | $639,512.31 | $639,512.31 |

Interest

*Subject to Mandatory Redemption

15-53846-swr   Doc 7907-13   Filed 10/15/14   Entered 10/15/14 23:27:34   Page 352 of 455

# UTGO Series 2014 DSA Fourth Lien Restructured Bonds - Debt Service

| CUSIP | Maturity Date | Rate | Principal | Insurer | Interest | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 10/1/14 | 4/1/15 | 10/1/15 | 4/1/16 | 10/1/16 | 4/1/17 | 10/1/17 | 4/1/18 | 10/1/18 | 4/1/19 | 10/1/19 | 4/1/20 | 10/1/20 | 4/1/21 |
| **UTGO 2004-B(1)** | | | | | | | | | | | | | | | | | | |
| 2Z29 | 4/1/15 | 5.00% | $7,336,375.00 | Ambac | $188,464.38 | $185,464.38 | | | | | | | | | | | | |
| 2Y20 | 4/1/16 | 5.25% | $7,912,245.00 | Ambac | $207,696.43 | $207,696.43 | $207,696.43 | $207,696.43 | | | | | | | | | | |
| 2R24 | 4/1/17 | 4.00% | $826,545.00 | Ambac | $5,369.90 | $5,369.90 | $5,369.90 | $5,369.90 | $5,369.90 | $5,369.90 | | | | | | | | |
| 2T52 | 4/1/18 | 4.250% | $3,894,320.00 | Ambac | $211,688.40 | $211,688.40 | $211,688.40 | $211,688.40 | $211,688.40 | $211,688.40 | | | | | | | | |
| 2U10 | 4/1/18 | 5.250% | $1,738,000.00 | Ambac | $45,622.50 | $45,622.50 | $45,622.50 | $45,622.50 | $45,622.50 | $45,622.50 | $45,622.50 | $45,622.50 | | | | | | |
| | | | **$25,156,180.00** | | $638,772.61 | $638,772.61 | $470,388.23 | $470,388.23 | $262,621.80 | $262,621.80 | $45,622.50 | $45,622.50 | | | | | | |
| **UTGO 2005-B(2)** | | | | | | | | | | | | | | | | | | |
| 2X21 | 4/1/19 | 5.240% | $499,675.00 | Ambac | $13,091.49 | $13,091.49 | $9,562.48 | $9,562.48 | $5,805.79 | $5,805.79 | $1,935.26 | $1,935.26 | | | | | | |
| **UTGO 2005-B(2)** | | | | | | | | | | | | | | | | | | |
| 3G53 | 4/1/15 | 5.000% | $1,990,510.00 | Assured | $49,750.25 | $49,750.25 | | | | | | | | | | | | |
| 3G61 | 4/1/16 | 5.000% | $2,089,945.00 | Assured | $52,248.63 | $52,248.63 | $52,248.63 | $52,248.63 | | | | | | | | | | |
| 3G79 | 4/1/17 | 4.300% | $2,189,880.00 | Assured | $47,082.42 | $47,082.42 | $47,082.42 | $47,082.42 | $47,082.42 | $47,082.42 | | | | | | | | |
| 3G87 | 4/1/18 | 5.000% | $2,289,815.00 | Assured | $57,245.38 | $57,245.38 | $57,245.38 | $57,245.38 | $57,245.38 | $57,245.38 | $57,245.38 | $57,245.38 | | | | | | |
| 3G95 | 4/1/19 | 5.000% | $2,402,785.00 | Assured | $60,069.63 | $60,069.63 | $60,069.63 | $60,069.63 | $60,069.63 | $60,069.63 | $60,069.63 | $60,069.63 | $60,069.63 | $60,069.63 | | | | |
| 3H29 | 4/1/20 | 5.000% | $4,345,000.00 | Assured | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | | |
| 3H37 | 4/1/21 | 5.000% | $4,345,000.00 | Assured | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 |
| 3H45 | 4/1/22 | 5.000% | $4,345,000.00 | Assured | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 |
| 3H52 | 4/1/23 | 5.000% | $4,345,000.00 | Assured | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 |
| 3H60 | 4/1/24 | 5.000% | $4,345,000.00 | Assured | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 |
| 3H78 | 4/1/25 | 5.000% | $4,345,000.00 | Assured | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $651,759.00 | $651,759.00 | $543,125.00 | $543,125.00 |
| | | | **$37,032,435.00** | | $918,146.30 | $918,146.30 | $864,396.03 | $864,396.03 | $816,147.42 | $816,147.42 | $769,065.00 | $769,065.00 | $712,819.63 | $712,819.63 | $651,759.00 | $651,759.00 | $543,125.00 | $543,125.00 |
| **UTGO 2005-C** | | | | | | | | | | | | | | | | | | |
| 3J92 | 4/1/15 | 5.000% | $2,003,345.00 | Assured | $50,076.13 | $50,076.13 | | | | | | | | | | | | |
| 3K25 | 4/1/16 | 5.000% | $2,102,325.00 | Assured | $52,683.13 | $52,683.13 | $52,683.13 | $52,683.13 | | | | | | | | | | |
| 3L40 | 4/1/17 | 5.000% | $2,214,920.00 | Assured | $47,549.51 | $47,549.51 | $47,549.51 | $47,549.51 | $47,549.51 | $47,549.51 | | | | | | | | |
| 3M80 | 4/1/18 | 5.000% | $2,285,470.00 | Assured | $57,136.75 | $57,136.75 | $57,136.75 | $57,136.75 | $57,136.75 | $57,136.75 | $57,136.75 | $57,136.75 | | | | | | |
| 3N63 | 4/1/19 | 5.250% | $2,376,715.00 | Assured | $62,388.77 | $62,388.77 | $62,388.77 | $62,388.77 | $62,388.77 | $62,388.77 | $62,388.77 | $62,388.77 | $62,388.77 | $62,388.77 | | | | |
| 3N66 | 4/1/20 | 5.250% | $2,507,060.00 | Assured | $65,810.46 | $65,810.46 | $65,810.46 | $65,810.46 | $65,810.46 | $65,810.46 | $65,810.46 | $65,810.46 | $65,810.46 | $65,810.46 | $65,810.46 | $65,810.46 | | |
| | | | **$13,491,235.00** | | $335,644.73 | $335,644.73 | $285,568.61 | $285,568.61 | $232,885.48 | $232,885.48 | $185,335.98 | $185,335.98 | $128,199.23 | $128,199.23 | $65,810.46 | $65,810.46 | | |
| **UTGO 2005-A** | | | | | | | | | | | | | | | | | | |
| 3H54 | 4/1/15 | 5.000% | $2,496,375.00 | Assured | $62,459.38 | $62,459.38 | | | | | | | | | | | | |
| 3H62 | 4/1/16 | 5.000% | $2,620,355.00 | Assured | $65,508.88 | $65,508.88 | $65,508.88 | $65,508.88 | | | | | | | | | | |
| 3H70 | 4/1/17 | 5.000% | $2,754,290.00 | Assured | $68,808.25 | $68,808.25 | $68,808.25 | $68,808.25 | $68,808.25 | $68,808.25 | | | | | | | | |
| 3H88 | 4/1/18 | 5.000% | $2,891,525.00 | Assured | $57,788.50 | $57,788.50 | $57,788.50 | $57,788.50 | $57,788.50 | $57,788.50 | $57,788.50 | $57,788.50 | | | | | | |
| 3H96 | 4/1/19 | 5.000% | $3,006,240.00 | Assured | $75,168.50 | $75,168.50 | $75,168.50 | $75,168.50 | $75,168.50 | $75,168.50 | $75,168.50 | $75,168.50 | $75,168.50 | $75,168.50 | | | | |
| 3J20 | 4/1/20 | 5.000% | $3,154,970.00 | Assured | $78,861.75 | $78,861.75 | $78,861.75 | $78,861.75 | $78,861.75 | $78,861.75 | $78,861.75 | $78,861.75 | $78,861.75 | $78,861.75 | $78,861.75 | $78,861.75 | | |
| 3J30 | 4/1/21 | 5.000% | $3,315,535.00 | Assured | $82,880.88 | $82,880.88 | $82,880.88 | $82,880.88 | $82,880.88 | $82,880.88 | $82,880.88 | $82,880.88 | $82,880.88 | $82,880.88 | $82,880.88 | $82,880.88 | $82,880.88 | $82,880.88 |
| 3J40 | 4/1/22 | 5.000% | $3,480,245.00 | Assured | $87,008.63 | $87,008.63 | $87,008.63 | $87,008.63 | $87,008.63 | $87,008.63 | $87,008.63 | $87,008.63 | $87,008.63 | $87,008.63 | $87,008.63 | $87,008.63 | $87,008.63 | $87,008.63 |
| 3J55 | 4/1/23 | 5.000% | $7,490,780.00 | Assured | $187,269.50 | $187,269.50 | $187,269.50 | $187,269.50 | $187,269.50 | $187,269.50 | $187,269.50 | $187,269.50 | $187,269.50 | $187,269.50 | $187,269.50 | $187,269.50 | $187,269.50 | $187,269.50 |
| 3J63 | 4/1/24 | 5.000% | $17,362,620.00 | Assured | $434,065.50 | $434,065.50 | $434,065.50 | $434,065.50 | $434,065.50 | $434,065.50 | $434,065.50 | $434,065.50 | $434,065.50 | $434,065.50 | $434,065.50 | $434,065.50 | $434,065.50 | $434,065.50 |
| | | | **$48,572,755.00** | | $1,399,871.75 | $1,399,871.75 | $1,337,412.38 | $1,337,412.38 | $1,071,945.25 | $1,071,945.25 | $1,003,043.25 | $1,003,043.25 | $945,254.75 | $945,254.75 | $870,886.25 | $870,886.25 | $791,224.50 | $791,224.50 |
| **UTGO 2005-D(1)** | | | | | | | | | | | | | | | | | | |
| 3753 | 4/1/15 | 5.000% | $6,925,930.00 | Assured | $173,148.25 | $173,148.25 | | | | | | | | | | | | |
| 3761 | 4/1/16 | 5.000% | $2,989,360.00 | Assured | $74,734.00 | $74,734.00 | $74,734.00 | $74,734.00 | | | | | | | | | | |
| 3779 | 4/1/17 | 5.000% | $3,111,020.00 | Assured | $77,775.50 | $77,775.50 | $77,775.50 | $77,775.50 | $77,775.50 | $77,775.50 | | | | | | | | |
| 3787 | 4/1/18 | 5.000% | $3,329,510.00 | Assured | $82,337.75 | $82,337.75 | $82,337.75 | $82,337.75 | $82,337.75 | $82,337.75 | $82,337.75 | $82,337.75 | | | | | | |
| | | | **$16,319,820.00** | | $407,995.50 | $407,995.50 | $234,847.25 | $234,847.25 | $160,113.25 | $160,113.25 | $82,337.75 | $82,337.75 | | | | | | |

* Subject to Mandatory Redemption

# UTGO Series 2014 DSA Fourth Lien Restructured Bonds - Debt Service

| CUSIP | Maturity Date | Rate | Principal | Insurers | 10/1/21 | 4/1/22 | 10/1/22 | 4/1/23 | 10/1/23 | 4/1/24 | Total Interest | Total Principal & Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **UTGO 1999-A** | | | | | | | | | | | | |
| | 4/1/15 | 5.250% | $2,476,650.00 | Assured | | | | | | | $180,024.13 | $2,656,674.13 |
| | 4/1/16 | 5.375% | $2,602,655.00 | Assured | | | | | | | $260,265.50 | $2,862,920.50 |
| | 4/1/17 | 5.000% | $2,703,005.00 | Assured | | | | | | | $409,950.75 | $3,142,955.75 |
| | 4/1/18 | 5.000% | $2,972,045.00 | Assured | | | | | | | $374,409.00 | $3,346,454.00 |
| | 4/1/19 | 5.000% | $3,011,630.00 | Assured | | | | | | | $753,857.50 | $3,765,287.50 |
| | | | **$13,699,785.00** | | | | | | | | **$2,128,586.88** | **$15,828,291.88** |
| **UTGO 2001-A(T)** | | | | | | | | | | | | |
| | 4/1/15 | 5.375% | $5,161,860.00 | NPFG | | | | | | | $277,449.98 | $5,439,309.98 |
| | 4/1/16 | 5.375% | $5,439,940.00 | NPFG | | | | | | | $584,093.55 | $6,024,793.55 |
| | 4/1/17 | 5.375% | $5,735,400.00 | NPFG | | | | | | | $924,833.25 | $6,660,333.25 |
| | 4/1/18 | 3.375% | $12,168,000.00 | NPFG | | | | | | | $2,613,690.00 | $14,781,690.00 |
| | 4/1/19 | 5.000% | $12,166,000.00 | NPFG | | | | | | | $3,091,500.00 | $15,207,500.00 |
| | 4/1/20 | 5.000% | $12,166,000.00 | NPFG | | | | | | | $3,649,800.00 | $15,815,800.00 |
| | 4/1/21 | 5.000% | $12,166,000.00 | NPFG | | | | | | | $4,258,100.00 | $16,424,100.00 |
| | | | **$65,001,200.00** | | | | | | | | **$5,352,166.78** | **$89,353,366.78** |
| **UTGO 2002** | | | | | | | | | | | | |
| | 4/1/21 | 5.125% | $2,915,560.00 | NPFG | $75,822.97 | $75,822.97 | | | | | $1,010,082.15 | $3,925,642.15 |
| | 4/1/22 | 5.125% | $2,858,565.00 | NPFG | | | | | | | $1,213,547.45 | $4,172,112.45 |
| | | | **$5,774,595.00** | | $75,822.97 | $75,822.97 | | | | | **$2,223,629.60** | **$7,997,754.60** |
| **UTGO 2003-A** | | | | | | | | | | | | |
| | 4/1/15 | 4.000% | $360,700.00 | Syncora | | | | | | | $10,428.00 | $271,128.00 |
| | 4/1/16 | 5.250% | $2,215,590.00 | Syncora | | | | | | | $116,337.38 | $2,332,287.38 |
| | 4/1/17 | 5.290% | $2,602,655.00 | Syncora | | | | | | | $273,238.78 | $2,875,933.78 |
| | 4/1/18 | 5.330% | $2,737,330.00 | Syncora | | | | | | | $431,152.63 | $3,168,482.63 |
| | 4/1/19 | 5.350% | $2,880,735.00 | Syncora | | | | | | | $604,954.35 | $3,485,689.35 |
| | 4/1/20 | 5.250% | $3,030,810.00 | Syncora | | | | | | | $796,112.63 | $3,826,922.63 |
| | 4/1/21 | 5.250% | $434,300.00 | Syncora | | | | | | | $517,313.00 | $551,815.00 |
| | 4/1/22 | 5.250% | $2,350,075.00 | Syncora | $10,047.81 | $10,047.81 | | | | | $868,108.63 | $3,428,183.63 |
| | 4/1/22 | 5.250% | $3,304,340.00 | Syncora | $81,322.11 | $81,322.11 | | | | | $1,232,719.95 | $4,537,059.95 |
| | 4/1/23 | 4.025% | $434,300.00 | Syncora | $30,143.44 | $30,143.44 | $30,143.44 | | | | $160,765.00 | $595,265.00 |
| | 4/1/23 | 4.025% | $2,598,565.00 | Syncora | $81,322.11 | $81,322.11 | | | | | $1,301,153.70 | $4,399,138.70 |
| | 4/1/23 | 5.250% | $2,411,475.00 | Syncora | $63,301.22 | $63,301.22 | $63,301.22 | $63,301.22 | | | $542,393.88 | $1,846,981.88 |
| | 4/1/23 | 5.250% | | Syncora | | | | | | | $1,139,421.94 | $3,550,896.94 |
| | | | **$27,535,575.00** | | $184,814.58 | $184,814.58 | $93,444.66 | $63,301.22 | | | **$7,295,309.84** | **$35,128,884.84** |
| **UTGO 2004-A(T)** | | | | | | | | | | | | |
| | 4/1/19 | 5.250% | $3,910,500.00 | Ambac | $156,081.94 | $156,081.94 | | | | | $1,026,506.25 | $4,937,006.25 |
| | 4/1/20 | 4.250% | $160,765.00 | Ambac | | | | | | | $40,995.08 | $201,760.08 |
| | 4/1/21 | 5.250% | $5,287,865.00 | Ambac | | | | | | | $1,368,607.08 | $6,656,547.08 |
| | 4/1/22 | 5.000% | $5,735,400.00 | Ambac | $7,332.19 | $7,332.19 | $7,332.19 | | | | $2,007,390.00 | $7,742,790.00 |
| | 4/1/23 | 4.500% | $6,022,170.00 | Ambac | $156,081.94 | $156,081.94 | | | | | $2,529,311.40 | $8,551,481.40 |
| | 4/1/23 | 4.600% | $335,875.00 | Ambac | $7,332.19 | $7,332.19 | $7,332.19 | $7,332.19 | | | $131,979.38 | $457,854.38 |
| | 4/1/23 | 5.250% | $6,031,480.00 | Ambac | $157,853.85 | $157,853.85 | $157,853.85 | $157,853.85 | | | $2,941,369.30 | $8,954,899.30 |
| | 4/1/23 | 4.600% | $692,165.00 | Ambac | $15,689.80 | $15,689.80 | $15,689.80 | $15,689.80 | $15,689.80 | | $113,795.90 | $995,960.90 |
| | 4/1/24 | 5.250% | $5,985,410.00 | Ambac | $157,169.51 | $157,169.51 | $157,169.51 | $157,169.51 | $157,169.51 | $157,169.51 | $3,144,302.25 | $9,130,890.25 |
| | | | **$34,125,630.00** | | $496,277.23 | $496,277.23 | $396,827.21 | $338,045.35 | $172,859.31 | $172,859.31 | **$13,709,415.83** | **$47,826,045.03** |

* Subject to Mandatory Redemption

# UTGO Series 2014 DSA Fourth Lien Restructured Bonds - Debt Service

| CUSIP | Maturity Date | Rate | Principal | Insurer | | | | | Interest | | | | | | | | | | Total Interest | Total Principal & Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 10/1/21 | 4/1/22 | 10/1/22 | 4/1/23 | 10/1/23 | 4/1/24 | 10/1/24 | 4/1/25 | 10/1/25 | 4/1/26 | 10/1/26 | 4/1/27 | 10/1/27 | 4/1/28 | | |

## UTGO 2004-B(1)

| | 4/1/15 | 5.000% | $7,538,575.00 | Ambac | | | | | | | | | | | | | | | $376,928.75 | $7,915,503.75 |
| | 4/1/16 | 5.250% | $7,912,245.00 | Ambac | | | | | | | | | | | | | | | $830,288.73 | $8,743,030.73 |
| | 4/1/17 | 4.000% | $265,043.00 | Ambac | | | | | | | | | | | | | | | $31,605.40 | $296,650.40 |
| | 4/1/17 | 5.250% | $8,064,320.00 | Ambac | | | | | | | | | | | | | | | $1,270,130.40 | $9,334,450.40 |
| | 4/1/17 | 5.250% | $2,738,000.00 | Ambac | | | | | | | | | | | | | | | $364,980.00 | $3,102,980.00 |
| | | | **$25,538,183.00** | | | | | | | | | | | | | | | | | **$2,874,630.28** | **$28,392,852.28** |

## UTGO 2004-B(2)

| | 4/1/19 | 5.240% | $499,675.00 | Ambac | | | | | | | | | | | | | | | $60,790.03 | $560,465.03 |

## UTGO 2005-B

| | 4/1/15 | 5.000% | $1,990,010.00 | Assured | | | | | | | | | | | | | | | $99,300.50 | $2,089,310.50 |
| | 4/1/16 | 5.000% | $2,093,045.00 | Assured | | | | | | | | | | | | | | | $205,994.30 | $2,298,939.30 |
| | 4/1/17 | 4.300% | $2,130,980.00 | Assured | | | | | | | | | | | | | | | $282,494.52 | $2,412,374.53 |
| | 4/1/18 | 5.000% | $2,289,815.00 | Assured | | | | | | | | | | | | | | | $457,785.00 | $2,747,275.00 |
| | 4/1/19 | 5.000% | $2,402,785.00 | Assured | | | | | | | | | | | | | | | $600,996.25 | $3,033,491.25 |
| | 4/1/20 | 5.000% | $4,345,000.00 | Assured | | | | | | | | | | | | | | | $1,303,500.00 | $5,648,500.00 |
| | 4/1/21 | 5.000% | $4,345,000.00 | Assured | | | | | | | | | | | | | | | $1,520,750.00 | $5,865,750.00 |
| | 4/1/23 | 5.002% | $4,345,000.00 | Assured | $108,625.00 | $108,625.00 | $108,625.00 | | | | | | | | | | | | $1,738,000.00 | $6,083,000.00 |
| | 4/1/23 | 5.003% | $4,345,000.00 | Assured | $108,625.00 | $108,625.00 | $108,625.00 | | | | | | | | | | | | $1,953,250.00 | $6,300,250.00 |
| | 4/1/24 | 5.000% | $4,345,000.00 | Assured | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | | | | | | | | | | $2,172,500.00 | $6,517,500.00 |
| | 4/1/25 | 5.000% | $4,345,000.00 | Assured | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | $108,625.00 | | | | | | | | $2,389,750.00 | $6,734,750.00 |
| | | | **$37,032,435.00** | | **$434,500.00** | **$434,500.00** | **$325,875.00** | **$217,250.00** | **$217,250.00** | **$108,625.00** | **$108,625.00** | | | | | | | | **$12,729,398.77** | **$49,761,833.77** |

## UTGO 2005-C

| | 4/1/15 | 5.000% | $2,003,045.00 | Assured | | | | | | | | | | | | | | | $100,122.25 | $2,103,197.25 |
| | 4/1/16 | 5.000% | $2,107,325.00 | Assured | | | | | | | | | | | | | | | $210,732.50 | $2,318,057.50 |
| | 4/1/17 | 4.300% | $2,121,605.00 | Assured | | | | | | | | | | | | | | | $285,297.05 | $2,406,902.05 |
| | 4/1/18 | 5.000% | $2,285,470.00 | Assured | | | | | | | | | | | | | | | $457,094.00 | $2,742,564.00 |
| | 4/1/19 | 5.000% | $2,376,715.00 | Assured | | | | | | | | | | | | | | | $623,887.69 | $3,000,602.69 |
| | 4/1/19 | 5.250% | $2,507,068.00 | Assured | | | | | | | | | | | | | | | $739,723.44 | $3,246,780.44 |
| | | | **$13,491,225.00** | | | | | | | | | | | | | | | | **$2,466,888.94** | **$15,958,113.94** |

## UTGO 2006-A

| | 4/1/15 | 5.000% | $2,498,375.00 | Awarded | | | | | | | | | | | | | | | $124,918.75 | $2,623,293.75 |
| | 4/1/16 | 5.000% | $2,620,035.00 | Awarded | | | | | | | | | | | | | | | $262,003.50 | $2,882,038.50 |
| | 4/1/17 | 5.000% | $2,754,730.00 | Awarded | | | | | | | | | | | | | | | $413,209.50 | $3,167,939.50 |
| | 4/1/18 | 4.000% | $2,869,435.00 | Awarded | | | | | | | | | | | | | | | $462,308.00 | $3,331,733.00 |
| | 4/1/19 | 5.000% | $3,006,740.00 | Awarded | | | | | | | | | | | | | | | $751,685.00 | $3,758,425.00 |
| | 4/1/20 | 5.000% | $3,154,470.00 | Awarded | | | | | | | | | | | | | | | $956,541.00 | $4,102,811.00 |
| | 4/1/22 | 5.000% | $3,315,335.00 | Awarded | $87,008.63 | $87,008.63 | | | | | | | | | | | | | $1,160,133.25 | $4,475,561.25 |
| | 4/1/23 | 5.000% | $3,482,345.00 | Awarded | $87,269.50 | $187,269.50 | $187,269.50 | $95,915.88 | | | | | | | | | | | $1,972,188.00 | $5,972,483.00 |
| | 4/1/28 | 5.000% | $11,783,120.00 | Awarded | $434,065.50 | $434,065.50 | $434,065.50 | $434,065.50 | $95,915.88 | $434,065.50 | $434,065.50 | $434,065.50 | $333,370.13 | $333,370.13 | $227,569.38 | $227,569.38 | $116,554.63 | $116,554.63 | $3,542,662.75 | $15,325,782.75 |
| | | | **$37,262,620.00** | | **$788,343.63** | **$788,343.63** | **$671,335.00** | **$529,981.38** | **$329,981.38** | **$434,065.50** | **$434,065.50** | **$434,065.50** | **$333,370.13** | **$333,370.13** | **$227,569.38** | **$227,569.38** | **$116,554.63** | **$116,554.63** | **$10,004,492.25** | **$47,267,112.25** |

## UTGO 2006-B(2)

| | 4/1/15 | 5.000% | $6,935,590.00 | Assured | | | | | | | | | | | | | | | $346,296.50 | $7,273,226.50 |
| | 4/1/16 | 5.000% | $2,980,360.00 | Assured | | | | | | | | | | | | | | | $298,936.00 | $3,288,296.01 |
| | 4/1/17 | 5.000% | $3,111,020.00 | Assured | | | | | | | | | | | | | | | $466,653.00 | $3,577,673.00 |
| | 4/1/18 | 5.000% | $3,295,310.00 | Assured | | | | | | | | | | | | | | | $658,320.00 | $3,953,272.00 |
| | | | **$16,319,820.00** | | | | | | | | | | | | | | | | **$1,770,507.50** | **$18,090,407.50** |

* Subject to Mandatory Redemption

# UTGO Series 2014 DSA Fourth Lien Restructured Bonds - Debt Service

Bond Series Subject to Mandatory Redemption

## Issuance: 2004 B(2)

CUSY# 23003XX3

| Date | Interest | Fiscal Year | Mandatory Redemption Amounts | Outstanding | Rate | Interest |
|---|---|---|---|---|---|---|
| 10/1/14 | Accrue | 6/30/15 | | $459,675.00 | 5.240% | $13,091.49 |
| 4/1/15 | Amber | 6/30/15 | $134,695.00 | $364,980.00 | 5.240% | $13,091.49 |
| 10/1/15 | Amber | 6/30/16 | | $364,980.00 | 5.240% | $9,562.48 |
| 4/1/16 | Amber | 6/30/16 | $143,380.00 | $221,595.00 | 5.240% | $9,562.48 |
| 10/1/16 | Amber | 6/30/17 | | $221,595.00 | 5.210% | $5,805.79 |
| 4/1/17 | Amber | 6/30/17 | $149,730.00 | $73,865.00 | 5.240% | $5,805.79 |
| 10/1/17 | Amber | 6/30/18 | | $73,865.00 | 5.240% | $1,935.26 |
| 4/1/18 | Amber | 6/30/18 | $73,865.00 | | 5.240% | $1,935.26 |
| Total | | | $499,675.00 | | | $60,790.03 |

## Issuance: 2008 A

CUSIP 25093N65

| Date | Insure | Fiscal Year | Mandatory Redemption Amounts | Outstanding | Rate | Interest |
|---|---|---|---|---|---|---|
| 10/1/14 | Assured | 6/30/15 | | $7,490,180.00 | 5.000% | $187,269.59 |
| 4/1/15 | Assured | 6/30/15 | | $7,490,180.00 | 5.000% | $187,269.50 |
| 10/1/15 | Assured | 6/30/16 | | $7,490,180.00 | 5.000% | $187,207.50 |
| 4/1/16 | Assured | 6/30/16 | | $7,490,180.00 | 5.000% | $187,269.50 |
| 10/1/16 | Assured | 6/30/17 | | $7,490,180.00 | 5.000% | $187,769.50 |
| 4/1/17 | Assured | 6/30/17 | | $7,490,180.00 | 5.000% | $187,269.50 |
| 10/1/17 | Assured | 6/30/18 | | $7,490,180.00 | 5.000% | $187,269.50 |
| 4/1/18 | Assured | 6/30/18 | | $7,490,180.00 | 5.000% | $187,269.50 |
| 10/1/18 | Assured | 6/30/19 | | $7,490,180.00 | 5.000% | $187,269.50 |
| 4/1/19 | Assured | 6/30/19 | | $7,490,180.00 | 5.000% | $187,269.50 |
| 10/1/19 | Assured | 6/30/20 | | $7,490,280.00 | 5.000% | $187,269.50 |
| 4/1/20 | Assured | 6/30/20 | | $7,490,280.00 | 5.000% | $187,209.50 |
| 10/1/21 | Assured | 6/30/21 | | $7,490,780.00 | 5.000% | $187,269.50 |
| 4/1/21 | Assured | 6/30/21 | | $7,490,780.00 | 5.000% | $187,769.50 |
| 10/1/22 | Assured | 6/30/22 | | $7,490,780.00 | 5.000% | $181,269.50 |
| 4/1/22 | Assured | 6/30/22 | | $7,490,780.00 | 5.000% | $181,269.50 |
| 10/1/2022 | Assured | 6/30/23 | | $7,490,180.00 | 5.000% | $181,269.50 |
| 4/1/2023 | Assured | 6/30/23 | $3,654,145 | $3,836,635.00 | 5.000% | $181,769.50 |
| 10/1/2023 | Assured | 6/30/24 | | $3,836,635.00 | 5.000% | $95,915.88 |
| 4/1/2024 | Assured | 6/30/24 | $3,836,635.00 | | 5.000% | $95,915.88 |
| Total | | | $7,490,780.00 | | | $3,562,682.75 |

## Issuance: 2008 A

CUSIP 25093N65

| Date | Insure | Fiscal Year | Mandatory Redemption Amounts | Outstanding | Rate | Interest |
|---|---|---|---|---|---|---|
| 10/1/14 | Assured | 6/30/15 | | $11,362,620.00 | 5.000% | $454,965.50 |
| 4/1/15 | Assured | 6/30/15 | | $11,362,620.00 | 5.000% | $454,965.50 |
| 10/1/15 | Assured | 6/30/16 | | $11,362,620.00 | 5.000% | $454,965.50 |
| 4/1/16 | Assured | 6/30/16 | | $11,362,620.00 | 5.000% | $454,965.50 |
| 10/1/16 | Assured | 6/30/17 | | $11,362,620.00 | 5.000% | $454,965.50 |
| 4/1/17 | Assured | 6/30/17 | | $11,362,620.00 | 5.000% | $454,965.50 |
| 10/1/17 | Assured | 6/30/18 | | $11,362,620.00 | 5.000% | $454,965.50 |
| 4/1/18 | Assured | 6/30/18 | | $11,362,620.00 | 5.000% | $454,965.50 |
| 10/1/19 | Assured | 6/30/19 | | $11,362,620.00 | 5.000% | $454,965.50 |
| 4/1/19 | Assured | 6/30/19 | | $11,362,620.00 | 5.000% | $454,965.50 |
| 10/1/19 | Assured | 6/30/20 | | $11,362,620.00 | 5.000% | $454,965.50 |
| 4/1/20 | Assured | 6/30/20 | | $11,362,620.00 | 5.000% | $454,965.50 |
| 10/1/20 | Assured | 6/30/21 | | $11,362,620.00 | 5.000% | $454,965.50 |
| 4/1/21 | Assured | 6/30/21 | | $11,362,620.00 | 5.000% | $454,965.50 |
| 10/1/2022 | Assured | 6/30/22 | | $11,362,620.00 | 5.000% | $454,965.50 |
| 4/1/21 | Assured | 6/30/22 | | $11,362,620.00 | 5.000% | $454,965.50 |
| 10/1/1/2022 | Assured | 6/30/23 | $7,362,620.00 | $7,362,620.00 | 5.000% | $454,065.50 |
| 10/1/2023 | Assured | 6/30/23 | | $11,362,620.00 | 5.000% | $454,065.50 |
| 4/1/2028 | Assured | 6/30/24 | | $11,362,620.00 | 5.000% | $454,065.50 |
| 10/1/2024 | Assured | 6/30/24 | | $11,362,620.00 | 5.000% | $454,065.50 |
| 4/1/1/2025 | Assured | 6/30/25 | $4,007,815.00 | $52,254,805.00 | 5.000% | $454,065.50 |
| 4/1/2025 | Assured | 6/30/25 | | $13,354,805.00 | 5.000% | $333,370.13 |
| 4/1/2026 | Assured | 6/30/26 | $4,232,030.00 | $9,102,715.00 | 5.000% | $333,370.13 |
| 10/1/2026 | Assured | 6/30/27 | | $9,102,715.00 | 5.000% | $221,560.38 |
| 4/1/2027 | Assured | 6/30/27 | $4,440,590.00 | $4,662,185.00 | 5.000% | $221,560.38 |
| 10/1/2027 | Assured | 6/30/28 | | $4,662,185.00 | 5.000% | $272,169.38 |
| 4/1/2028 | Assured | 6/30/28 | $4,662,185.00 | | 5.000% | $116,554.63 |
| Total | | | $17,362,620.00 | | | $9,994,422.25 |

**EXHIBIT B**

**FEE SCHEDULE**

ACTIVE 202233018v.4



**U.S. Bank Customer Confidential**

## Schedule of Fees for Services as
## ESCROW AGENT
## For
## Settlement Escrow Agreement

| | | |
|---|---|---|
| CTS01010A | **Acceptance Fee** The acceptance fee includes the administrative review of documents, initial set-up of the account, and other reasonably required services up to and including the closing. This is a one-time, non-refundable fee, payable at closing. | $1,000.00 |
| CTS04460 | **Escrow Agent** Annual fee for the standard escrow agent services associated with the administration of the account. Administration fees are payable in advance. | $5,000.00 |
| | **Direct Out of Pocket Expenses** Reimbursement of expenses associated with the performance of our duties, including but not limited to publications, legal counsel after the initial close, travel expenses and filing fees. | At Cost |
| | **Extraordinary Services** Extraordinary Services are duties or responsibilities of an unusual nature, including termination, but not provided for in the governing documents or otherwise set forth in this schedule. A reasonable charge will be assessed based on the nature of the services and the responsibility involved. At our option, these charges will be billed at a flat fee or at our hourly rate then in effect. | |

Account approval is subject to review and qualification. Fees are subject to change at our discretion and upon written notice. Fees paid in advance will not be prorated. The fees set forth above and any subsequent modifications thereof are part of your agreement. Finalization of the transaction constitutes agreement to the above fee schedule, including agreement to any subsequent changes upon proper written notice. In the event your transaction is not finalized, any related out-of-pocket expenses will be billed to you directly. Absent your written instructions to sweep or otherwise invest, all sums in your account will remain uninvested and no accrued interest or other compensation will be credited to the account. Payment of fees constitutes acceptance of the terms and conditions set forth.

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT:
To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account.
For a non-individual person such as a business entity, a charity, a Trust or other legal entity we will ask for documentation to verify its formation and existence as a legal entity. We may also ask to see financial statements, licenses, identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.

**Dated: July 21, 2014**

**Exhibit E**

**CONFIRMATION ORDER INSERT**

## UTGO Settlement Agreement – Insert for Confirmation Order

## Findings of Fact and Conclusions of Law

A.  After sufficient notice and opportunity for all parties to be heard, and after due deliberation, based on the Court's thorough review and full consideration of the UTGO Settlement Agreement and good and sufficient cause appearing therefor, the Court makes the following findings of fact and conclusions of law.  Any finding of fact constitutes a finding of fact even if it is stated as a conclusion of law, and any conclusion of law constitutes a conclusion of law even if it is stated as a finding of fact.  All findings of fact and conclusions of law announced by the Court on the record in connection with confirmation of the Plan or otherwise at the Confirmation Hearing are incorporated herein by reference.[1]  The findings and conclusions set forth herein and in the record of the Confirmation Hearing constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014.

B.  The UTGO Settlement described in the Plan and the UTGO Settlement Agreement are fair, equitable, reasonable, and in the best interests of the City and its creditors and residents.[2]  The UTGO Settlement Agreement is the result of extensive arms' length negotiations among the City and the UTGO Bond Insurers – all of whom were represented by

---

[1]  The findings of fact and conclusions of law set forth herein and announced on the record during the Confirmation Hearing shall be construed in a manner consistent with each other so as to effect the purpose of each; provided, however, that if there is any direct conflict that cannot be reconciled, then, solely to the extent of such conflict, the provisions of this Confirmation Order shall govern and shall control and take precedence over any findings of fact or conclusions of law announced on the record at the Confirmation Hearing.

[2]  Capitalized terms used herein but not defined shall have the meanings ascribed to them in the Plan or the UTGO Settlement Agreement, a copy of which is attached to the Plan as Exhibit __.

sophisticated counsel. The compromises and settlements embodied in the UTGO Settlement (a) resolve all disputes with respect to claims classified in Class 8 under the Plan and the issues raised by the UTGO Bond Insurers in the UTGO Litigation and (b) are, collectively, a key compromise upon which several provisions of the Plan rest. In the absence of such compromises and settlements, the City's emergence from chapter 9 would likely have been delayed by litigation and burdened with additional expenses. The UTGO Settlement and the UTGO Settlement Agreement: (a) were negotiated and entered into in good faith, (b) comport with policies and purposes of chapter 9, (c) are fair, equitable and reasonable; (d) are in the best interests of the City and its creditors and residents as they not only fully resolve the UTGO Litigation but also permit the City's assignees to receive value from the Assigned UTGO Bond Tax Proceeds as set forth in the Plan; (e) are within the range of reasonable results if the disputes resolved by the UTGO Settlement, including the Assured/NPFG Action and the Ambac Action as they relate to the UTGO Bonds, were instead litigated to a conclusion; (f) fall above the lowest point in the range of reasonableness; and (g) meet the standards for approval under sections 105(a) and 1123(b) of the Bankruptcy Code, Bankruptcy Rule 9019(a) and other applicable law.

        C.      Without limiting any of the foregoing, the Court hereby finds that:

              a.      The Plan incorporates the UTGO Settlement Agreement, and the effectiveness of the Plan is expressly conditioned upon: (a) the Michigan Finance Authority board having approved the issuance of the MFA Bonds and such bonds having been issued; and (b) the City having obtained all governmental and Emergency Manager consents and approvals required to carry out the terms of the UTGO Settlement Agreement.

b.  As of the Effective Date, the Plan represents a full, final and complete compromise, settlement, release and resolution of, among other matters, all disputes and pending or potential litigation (including any appeals), including, without limitation, the UTGO Litigation, regarding the allowability, amount, priority and treatment of the Unlimited Tax General Obligation Bond Claims. The treatment of Class 8 UTGO Claims under the Plan is a component of a settlement and compromise of the UTGO Litigation.

c.  Good and valuable consideration has been provided for all releases and exculpations granted pursuant to the UTGO Settlement Agreement, including, without limitation, the releases and exculpations granted pursuant to sections 6.1 and 6.2 of the UTGO Settlement Agreement. Such provisions are fair, equitable, reasonable and integral elements of the UTGO Settlement Agreement.

d.  The Court confirms that as of the Effective Date and pursuant to Emergency Manager Order No. __, the Municipal Obligation shall be secured, to the extent permitted by law, including without limitation section 12(1)(x) of Act 436, by a lien granted by the City on the UTGO Bond Tax Levy for so long as either the Municipal Obligation or the Stub UTGO Bonds are outstanding.

e.  As of the Effective Date, the UTGO Bond Tax Levy shall constitute "special revenues," as defined in section 902 of the Bankruptcy Code, and

"pledged special revenues," as that term is used in section 922(d) of the Bankruptcy Code.

f.  As of the Effective Date, the MFA shall possess a valid and enforceable statutory fourth lien and trust on Distributable State Aid, as provided in section 15(2) of the Shared Credit Rating Act or as otherwise provided under applicable law.

g.  As of the Effective Date, Holders of the MFA Bonds shall possess all of the MFA's rights and interest in the Municipal Obligation including all the rights and interest provided herein and under the UTGO Settlement Agreement, subject to the reservation by the MFA of rights to indemnification and to make all determinations and approvals and receive all notices accorded to it under the Municipal Obligation and related documents. Accordingly, the MFA Bonds will be payable from and secured by (i) payments made by the City on the Municipal Obligation and to the extent permitted by law, including without limitation section 12(1)(x) of Act 436, a lien on the portion of the UTGO Bond Tax Levy allocable to the Municipal Obligation, pledged by the City to secure the Municipal Obligation and (ii) a lien, made a statutory lien as provided by the Shared Credit Rating Act, on moneys in the funds and accounts established for the MFA Bonds under the authorizing resolution for such bonds, including payments pledged by the City and received and held by the MFA or its trustee for the MFA Bonds, which include, without

limitation, all payments of (x) the proceeds of the UTGO Bond Tax Levy and (y) Distributable State Aid.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT**:

1.　　The UTGO Settlement.　Consistent with the findings herein, the UTGO Settlement and the UTGO Settlement Agreement, including without limitation all of the transactions contemplated, the liens granted, and the protections created therein, are APPROVED in their entirety as a good faith, fair, reasonable, and equitable compromise and settlement of all disputes with respect to claims classified in Class 8 under the Plan that is in the best interests of the City and its creditors and residents.　The entry of this Confirmation Order constitutes approval of the UTGO Settlement Agreement pursuant to the Bankruptcy Rules, including Bankruptcy Rule 9019, the Bankruptcy Code, including section 1123, and Act 279, Public Acts of Michigan, 1909, as amended; Act 436, Public Acts of Michigan, 2012; Act 34, Public Acts of Michigan, 2001, as amended; and Act 80, Public Acts of Michigan, 1981, as amended.　As provided in the Plan, on the Effective Date, the UTGO Settlement Agreement shall be binding on the City, Ambac, Assured and NPFG.

2.　　Approval of Exculpations and Releases.　All exculpations and releases granted pursuant to the UTGO Settlement, including, without limitation, the releases and exculpations granted pursuant to sections 6.1 and 6.2 of the UTGO Settlement Agreement, are hereby approved in their entirety.　The Court approves such settlements and releases on the grounds that good and valuable consideration has been provided therefor, and that such provisions are fair, equitable, reasonable, and integral elements of the UTGO Settlement Agreement.

13-53846-swr　　Doc 8797-13　　Filed 10/15/14　　Entered 10/15/14 12:27:34　　Page 365 of
455
13-53846-swr　Doc 6908-3　Filed 08/20/14　Entered 08/20/14 23:27:34　Page 152 of
272

3.    <u>Segregation of UTGO Bond Tax Levy</u>.  The proceeds of the UTGO Bond Tax Levy collected by the City shall be segregated and transmitted to the Debt Millage Escrow Trustee under the Debt Millage Deposit Escrow Agreement, and the Debt Millage Escrow Trustee shall segregate and transmit the proceeds allocable to the Municipal Obligation to the Master Trustee in accordance with section 2.4(a) of the UTGO Settlement Agreement.

4.    <u>Annual Certification of Debt Millage Levy</u>.  Pursuant to the Section 2.7(b) of the UTGO Settlement Agreement, the City shall certify annually, not later than June 30 of each year, that it has imposed the debt millage levy as required by and in accordance with the terms of the UTGO Settlement Agreement.

5.    <u>Retention of Jurisdiction</u>.  Pursuant to section 945(a) of the Bankruptcy Code, the Court shall retain jurisdiction over the UTGO Settlement and the UTGO Settlement Agreement and any dispute arising from or related to the UTGO Settlement Agreement.  For the avoidance of doubt and as the City has consented, the Court shall retain exclusive post-confirmation authority and power, to implement, interpret and enforce the UTGO Settlement Agreement and all Settlement-Related Documents, including, without limitation, all exhibits to the UTGO Settlement Agreement, the Restructured UTGO Bonds, the Municipal Obligation and the MFA Bonds.  As the City has consented, the Court reserves all powers as are necessary or appropriate to enforce or to give effect to the Court's retained jurisdiction under the Plan and this Confirmation Order, including by way of injunction, as long as any of the Municipal Obligation, Stub UTGO Bonds or MFA Bonds are outstanding.

## EXHIBIT II.B.3.q.ii.A

SCHEDULE OF PAYMENTS AND SOURCES OF
PAYMENTS FOR MODIFIED PFRS PENSION BENEFITS

# City of Detroit
## PFRS Pension contributions (FY14 - FY23)
*$ in millions*

| PFRS | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year |
|------|------|------|------|------|------|------|------|------|------|------|---------|
| Source: | | | | | | | | | | | |
| State | $ - | $ 96.0 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 96.0 |
| Foundations | - | 18.3 | 18.3 | 18.3 | 18.3 | 18.3 | 18.3 | 18.3 | 18.3 | 18.3 | 164.7 |
| Total | - | 114.3 | 18.3 | 18.3 | 18.3 | 18.3 | 18.3 | 18.3 | 18.3 | 18.3 | 260.7 |

<u>**EXHIBIT II.B.3.q.ii.C**</u>

TERMS OF PFRS PENSION RESTORATION

13-53846-swr   Doc 8707-13   Filed 10/15/14   Entered 10/15/14 23:27:34   Page 369 of
13-53846-swr   Doc 6908-3   Filed 08/20/14   Entered 08/20/14 19:09:43   Page 196 of
455
272

# TERMS OF PFRS PENSION RESTORATION

## *Pension Restoration Process*

The following rules shall govern how accrued pensions, including COLA benefits, that are reduced as part of the Plan of Adjustment, shall be restored during the thirty year period following the Confirmation Order.  The pension restoration process shall be supervised, and restoration decisions undertaken by the Investment Committee of PFRS and in accordance with the pension governance provisions set forth in the State Contribution Agreement and exhibits thereto.  This pension restoration program shall be deemed a part of Component II of the Combined Plan for the Police and Fire Retirement System, but in the event of any conflict between the language set forth herein and the Combined Plan the terms of this Pension Restoration Agreement will govern.

**GENERAL RESTORATION RULES**

**I.     PFRS RESTORATION**

1.     <u>Waterfall Categories</u>

There will be three Waterfall Classes:

    a.  PFRS Waterfall Class 1 – Retirees in retirement benefit pay status as of June 30, 2014, and their surviving spouses and beneficiaries

    b.  PFRS Waterfall Class 2 – Retirees, who entered into retirement benefit pay status after June 30, 2014, and their surviving spouses and beneficiaries, and who are in pay status as of the end of the PFRS Fiscal Year prior to the year in which the restoration decision is made

    c.  PFRS Waterfall Class 3 – All retirees, surviving spouses, and beneficiaries in pay status and all other PFRS participants who as of June 30, 2014  are not in retirement benefit pay status

2.     <u>General PFRS Pension Restoration Through June 30, 2023</u>

Each year in conjunction with the annual actuarial valuation report, the PFRS actuary will project the PFRS funded ratio as of 2023 based upon the market value of plan assets relative to the actuarial accrued liabilities (the "Funded Level"). This projection will be further based upon a 6.75% assumed rate of investment return which is net of expenses (administrative and investment), future employer contributions as set forth in the Plan of Adjustment (subject to conditions in the Plan of Adjustment), and such other actuarial assumptions as utilized by the PFRS actuary. For purposes of PFRS Restoration through June 30, 2023, the  Funding Target will be a 75% funded ratio, and the Restoration

CLI-2248078v1

Target will be a 78% funded ratio, both projected to June 30, 2023. For purposes of calculating the funded ratio, the assets in the Restoration Reserve Account will be excluded. Each year, if the actuary projects that the Funded Level as of 2023 (excluding Restoration Account assets to avoid double counting) exceeds the Restoration Target (i.e., exceeds 78%), a credit of assets for bookkeeping purposes will be made into a new notional Restoration Reserve Account. The notional credit will be an amount equal to the excess of assets above the amount projected to be needed to satisfy the Restoration Target. Once the Restoration Reserve Account is established, each year thereafter, Restoration Account assets will be credited with interest in an amount equal to the net return on plan investments but capped at the actuarially assumed rate of investment return (i.e., 6.75% for the period through June 30, 2023). In the event of net losses, the credited asset value of the Restoration Reserve Account will be diminished to reflect such losses and any required transfer to the PFRS Pension Reserve Account as provided herein.

Actual restoration payments and restoration credits will work as follows: each year, in conjunction with the preparation of the annual actuarial valuation report and following establishment of the Restoration Reserve Account, the PFRS actuary will determine whether there are sufficient funds in such account to restore COLA benefits in a minimum incremental amount of 10% or more. For example: If a retiree's then current COLA benefit is a 1.0% annual compounded COLA, the minimum incremental restoration would increase the COLA benefit to 1.225%. COLA restoration only will occur if the funding level in the Restoration Reserve Account can fund 100% of the COLA increase over the actuarially-projected lives of the eligible recipient PFRS Waterfall Class. If the actuary certifies that the Restoration Reserve Account as of the end of the prior PFRS fiscal year satisfies the required funding level for one or more increments of restoration, then in the next immediate PFRS fiscal year actual COLA restoration payments will be made to PFRS Waterfall Class 1 members in such increments until an amount sufficient to fund 66% of the value of their future COLA payments (e.g., a 1.5% compound COLA, or as otherwise applicable) has been funded. At that juncture, and to the extent that additional assets in the Restoration Reserve Account would fully fund COLA restoration in at least one minimum 10% increment (i.e., amounts equal to 10% of the value of future COLA payments), PFRS Waterfall Class 2 members will receive COLA restoration, until an amount sufficient to fund 66% of the value of their future COLA payments has been funded. At that juncture, and to the extent that additional assets in the Restoration Reserve Account would fully fund COLA restoration in at least one minimum 10% increment (i.e., amounts equal to 10% of the value of future COLA payments), PFRS Waterfall Class 3 members will receive COLA restoration on a pro-rata basis. For PFRS Waterfall Class 3 members who are in pay status at that time of restoration, they will receive COLA payments; for active employees at the time of restoration, they will receive credits granting them a right upon retirement to

CLI-2248078v1

receive COLA restoration equal to the 10% increments that are fully funded to PFRS Waterfall Class 3 members.  For Example: Assume there are sufficient assets credited to the Restoration Reserve Account as of the end of a fiscal year to fully fund 66% of the value of the COLA for all PFRS Waterfall Class 1 and Class 2 members for their actuarially projected lives.   To the extent additional assets remain  in the Restoration Reserve Account to fully fund at least a 10% COLA increment for PFRS Waterfall Class 3 members for their actuarially projected lives, then (i) all retirees would receive a restoration payment of 76% of the value of their COLAs (their having already received by virtue of their membership in PFRS Waterfall Classes 1 and 2 an increase to 66% of the value of their COLAs) and also a 10% COLA increment would be credited to eligible active employees which would be included in their benefit payments upon retirement (thus causing their COLAs to increase in value from 45% to 55% ). Restoration amounts actually paid from the Restoration Reserve Account will be debited from such account.   Restoration payments will be calculated and paid on a prospective basis only.

Once restoration payments and credits begin, as long as the Restoration Reserve Account continues to have assets to fund 100% of an incremental COLA restoration amount for such Waterfall Class for their actuarially projected lives, the restoration payments and credits will continue; provided, however, that in the event the Restoration Reserve Account,  after having sufficient assets to fund 100% of two or more increments, falls below 100% for the second or greater increment, the annual amounts to pay such second or greater  increment can continue  until the Restoration Reserve Account lacks any assets to fund such additional increment.  For Example, assume a 10% increment in PFRS Waterfall Class 1 requires $10 million in assets to be fully funded for the PFRS Waterfall Class' actuarially projected  lives, and that based on FY 2018 results the Restoration Reserve Account has assets of $22 million so as to fund two increments of restoration in FY 2019.  Assume further that in the following year the Restoration Reserve Account drops in value to $17 million; in such event two increments could still be paid, and the second increment would cease being paid only if the value of assets in the Restoration Reserve Account dropped to or below $10 million(in the event they dropped below $10 million, the first increment also would cease being paid).  For purposes of restoration reduction, restoration increments will be taken away in reverse order in which they were granted (i.e. last in, first out).

If the PFRS Funded Level (excluding Restoration Reserve Assets) projected to 2023 falls below 76% (hereinafter, "Restoration Reserve Suspension Trigger"), then, until such time as the projected PFRS Funded Level in 2023 is 76% or above,  further interest credits  to the notional Restoration Reserve Account will cease notwithstanding the actual net PFRS investment returns for the fiscal year in question.  Furthermore, if the PFRS Funded Level projected to 2023 falls below the Funding Target (i.e., 75%) then restoration payments to

retirees and credits to active employees in the following year will be modified in the following manner: (1) funds previously credited to the Restoration Reserve Account will be notionally transferred and credited to the PFRS Pension Reserve Account in sufficient amounts to restore the projected PFRS Funded Level in 2023 to 75%; (2) following such transfer, the remaining assets in the Restoration Reserve Account shall be applied to make restoration payments in accordance with and pursuant to the same mechanism described in the previous paragraph.

In connection with preparation of the actuarial report for FY 2023, the PFRS actuary will determine whether PFRS has satisfied the Permanent Restoration Target, which shall be 78%. Transfers from the Restoration Reserve Account for credit to the PFRS Pension Reserve Account may be made in such amounts as are necessary to satisfy the Permanent Restoration Target. If following such transfers, the PFRS Funded Level as of June 30, 2023 has satisfied the Permanent Restoration Target (*i.e.,* 78%), then the residual amounts, if any, in the Restoration Reserve Account (which will necessarily represent excess not necessary to satisfy the Permanent Restoration Target), and which fully fund one or more increments of COLA restoration payments for one or more PFRS Waterfall Classes for their actuarially projected lives, shall be transferred from the Restoration Reserve Account and credited to the PFRS Pension Reserve Account and the applicable incremental COLA payments shall be permanently restored for the applicable PFRS Waterfall Class and shall no longer be variable from year to year.

Following receipt of the actuarial reports for 2019, and in the event that the projected Funded Level of PFRS as of 2023 is less than 76%, the PFRS actuary shall revisit the restoration calculations that it made during each of the prior 4 years. It shall recalculate each such prior year's Funded Level projection, this time by assuming the lesser of (i) $4.5 million in annual administrative expenses until 2023, or (ii) an amount of annual administrative expenses until 2023 equal to the average annual administrative expenses in the prior 4 years, in addition to a net 6.75% annual investment return. If such retrospective recalculation indicates that fewer amounts would have transferred to the PFRS Restoration Reserve Account than actually were transferred during such look back period, then the PFRS Restoration Reserve Account shall be debited by the lesser of (i) this difference (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period or (ii) the dollars that were actually paid out in restoration payments during such look-back period (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period); or (iii) the amount required to increase the projected 2023 PFRS Funded Level to 76%.

3. <u>General PFRS Pension Restoration from July 1, 2023 to June 30, 2033</u>.

If and to the extent that all COLA payments have not been restored pursuant to the permanent restoration feature as of June 30, 2023 described in the immediately preceding paragraph, then during this period and for purposes of variable restoration, the Funding Target, the Restoration Target, the Permanent Restoration Target and the Restoration Reserve Suspension Trigger shall be as set forth on Exhibit A hereto, all projected as of June 30, 2033. The same rules for restoration payments that applied during the period ending June 30, 2023 shall apply (including ceasing interest credits in the event of a Restoration Reserve Suspension Trigger, and making Restoration Account asset transfers in the event the 2033 PFRS Funded Level falls below the 2033 Funding Target), except as follows. For purposes of determining whether the 2033 Restoration Target has been satisfied, the Plan actuary shall project investment returns through June 30, 2033 at the then current investment return assumption, and the then applicable actuarial assumptions as utilized in the annual actuarial valuation. Further, the Plan actuary shall assume, merely for purposes of determining whether the Restoration Target is satisfied, that the annual City contribution amount shall be the annual amount necessary to fund the PFRS based upon an amortization of the actual 2023 UAAL (using the market value of assets) over 30 years (hereinafter, the "2023 UAAL Amortization") and in such manner that the resulting annual contribution stream would achieve the applicable PFRS' Funding Target (on Exhibit A) as of 2033. (Such projected, hypothetical contributions shall be for purposes only of making restoration determinations, and shall not necessarily be the actual contributions made or required to be made by the City or recommended during such period; all of which shall be determined independent of the restoration calculation process). For purposes of calculating the funded ratio, the assets in the Restoration Reserve account will be excluded

To the extent that the City's actual contributions to the PFRS in any of the FYs 2024 (i.e., the year ending June 30, 2024) through 2033 are greater than the projected annual contribution under the 2023 UAAL Amortization, such amounts, and any investment earnings thereon, shall be notionally credited to a new bookkeeping account in PFRS called the Extra Contribution Account. In determining pension restoration during the period from FY 2024 through 2033, none of the amounts in the Extra Contribution Account shall be considered for purposes of determining the projected funded level for the Restoration Target or Permanent Restoration Target. To the extent that the City's actual contributions to the PFRS in any of the FYs 2024 through 2033 are less than the projected annual contribution under the 2023 UAAL Amortization, such difference and any investment earnings thereon shall be notionally allocated to the Restoration Reserve Account.

Each year, in addition to the crediting of assets that exceed the amount necessary to satisfy the Restoration Target, existing Restoration Account assets will be credited with interest equal to the net return on plan investments, but capped at the then actuarial investment return assumption. In the event of net losses, the credited asset value of the Restoration Reserve Account will be diminished to reflect such losses.

In connection with preparation of the annual actuarial valuation report for FY 2033, the PFRS actuary will determine whether PFRS has satisfied the applicable Permanent Restoration Target, as set forth on Exhibit A. Transfers from the Restoration Reserve Account for credit to the PFRS Pension Reserve Account may be made in such amounts as are necessary to satisfy the Permanent Restoration Target. If following such transfers the funding level as of June 30, 2033 has satisfied the applicable Permanent Restoration Target , then the residual amounts in the Restoration Reserve Account, if any (which will necessarily represent excess not necessary to satisfy the Permanent Restoration Target), and which fully fund one or more increments of COLA restoration payments for one or more PFRS Waterfall Classes, shall be transferred from the Restoration Reserve Account and credited to the PFRS Pension Reserve Account and the applicable incremental COLA payments shall be permanently restored for the applicable PFRS Waterfall Class and shall no longer be variable from year to year.

Following receipt of the actuarial reports for 2028, and in the event that the projected Funded Level of PFRS as of 2033 is less than 79%, the PFRS actuary shall revisit the restoration calculations that it made during each of the prior 4 years. It shall recalculate each such prior year's Funded Level projection, this time by assuming the lesser of (i) $4.5 million in annual administrative expenses until 2033, or (ii) an amount of annual administrative expenses until 2033 equal to the average annual administrative expenses in the prior 4 years, in addition to a net 6.75% annual investment return. If such retrospective recalculation indicates that fewer amounts would have transferred to the PFRS Restoration Reserve Account than actually were transferred during such look back period, then the PFRS Restoration Reserve Account shall be debited by the lesser of (i) this difference (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the applicable look-back period or (ii) the dollars that were actually paid out in restoration payments during such look-back period (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the applicable look-back period); or (iii) the amount required to increase the projected 2033 PFRS Funded Level to 79%.

4. <u>General PFRS Pension Restoration from July 1, 2033 to June 30, 2043</u>.

CLI-2248078v1

If and to the extent that all COLA payments have not been restored pursuant to the permanent restoration feature as of June 30, 2033 described in the immediately preceding paragraph, then during the period ending June 30, 2044 and for purposes of variable restoration, the Funding Target , the Restoration Target, the Permanent Restoration Target and the Restoration Reserve Suspension Trigger shall be as set forth on Exhibit A hereto.  The same rules for restoration that applied during the period ending June 30, 2033 shall otherwise apply (including ceasing interest credits in the event of a Restoration Reserve Suspension Trigger,  and making Restoration Account asset transfers in the event the 2043 PFRS Funded Level falls below the 2043 Funding Target), and shall be rolled forward.  For example,  for purposes of determining whether the  2043 Restoration Target has been satisfied, the Plan actuary shall project annual contributions  using the same 2023 UAAL Amortization.  For purposes of calculating the funded ratio, the assets in the Restoration Reserve account will be excluded, and no Extra Contribution Account assets shall be included for purposes of determining whether the Funded Level meets the Restoration Target or Permanent Restoration Target,  including any additions to such account after 2033.

In connection with preparation of the annual actuarial valuation report for FY 2043, the PFRS actuary will determine whether PFRS has satisfied the applicable Permanent Restoration Target, as set forth on Exhibit A.   Transfers from the Restoration Reserve Account for credit to the PFRS Pension Reserve Account may be made in such amounts as are necessary to satisfy the Permanent Restoration Target. If following such transfers the PFRS Funded Level as of June 30, 2043 is equal to or greater than the applicable Permanent Restoration Target,  then the residual amounts in the Restoration Reserve Account, if any  (which will necessarily represent  excess not  necessary to satisfy the Permanent Restoration Target), and which fully fund one or more increments of COLA restoration payments for one or more PFRS Waterfall Classes,  shall be transferred from the Restoration Reserve Account and credited to the PFRS Pension Reserve Account and the applicable incremental COLA payments shall be permanently restored for the applicable PFRS Waterfall Class and shall no longer be variable from year to year.

5.      Modification of the Pension Restoration Program

If any time after July 1, 2026, the PFRS Investment Committee (by vote of 5 of its 7 members), or the PFRS Board of Trustees (by a greater than 66% vote) determines that a change in relevant circumstances has occurred, or there was a mutual mistake of fact in developing this Pension Restoration Agreement, such that the continued operation of this Agreement without amendment will: (a) materially harm the long-term economic interests of the City or Retirement System; or (b) materially impair the City's ability to fully fund over a reasonable period the then existing frozen benefit liabilities, the Investment Committee or the Board, as the case may be, shall provide written notice to the other entity of such a determination and of the need to

CLI-2248078v1

amend this Restoration Agreement (it being understood that the post-Chapter 9, 40-year amortization period (to 2053) to full fund PFRS frozen liabilities is presumptively reasonable, but not irrebutably so). The Investment Committee and the Board shall then meet to negotiate amendments to this Agreement that address the identified risk of harm or impairment, but which also considers this Agreement's objective of providing pension restoration. Such negotiations shall take into account reasonable actions the City has pursued or could pursue to mitigate such harm or impairment. Any such amendments shall require the approval of a majority vote of the combined members of the Committee and Board (persons who sit on both the Board and Committee shall have one vote). Such parties shall consult with the Mayor, City Council and the Governor in connection with such negotiation. If the Board, acting through a majority, and the Investment Committee, acting through a majority, cannot agree to such amendments with the 90-day period following the provision of such notice by the determining party, then the Board and Investment Committee shall proceed to mediation. In this regard, within 30-days following expiration of the 90-day period the Board and the Investment Committee shall each select a mediator from the list of approved mediators for the United States District Court for the Eastern District of Michigan. The two selected mediators shall appoint a third neutral mediator from the approved list. Each party shall furnish a written statement to the mediators within 30 days of selection of the neutral mediator. Representatives of the Mayor and the Governor shall participate in such mediations. If following a 90-day mediation period following submission of the written statements the matter is not settled, then either the Investment Committee or the Board can file an action in the United Stated District Court for the Eastern District of Michigan asking it to declare, inter alia, whether or in what manner to amend this Agreement.

CLI-2248078v1

13-53846-swr    Doc 8045-13    Filed 10/22/14    Entered 10/22/14 23:27:34    Page 374 of 452
13-53846-swr    Doc 6908-13    Filed 08/20/14    Entered 08/20/14 23:00:44    Page 377 of 455

**EXHIBIT A**

**PFRS -** The 2033 and 2043 Funding Targets shall be 3.0% and 6% higher than the actual 2023 Funded Level rounded to the nearest 10th decimal. The Restoration Target shall be 3.0% higher than the Funding Target but not less than 81% and 84% in 2033 and 2043, respectively. The Permanent Restoration Targets shall be shall be equal to the Restoration Targets for all time periods. The Restoration Reserve Suspension Trigger will be set 1% higher than the projected Funding Target for all time periods.

| 2023 Funded Level | 2033 Projected Funding Target /Restoration Target | 2043 Projected Funding Target /Restoration Target |
|---|---|---|
| 78% | 81%/84% | 84%/87% |
| 77% | 80%/83% | 83%/86% |
| 76% | 79%/82% | 82%/85% |
| 75% | 78%/81% | 81%/84% |
| 74% or lower | 3% > than 2023 Funded Level %/81% | 3% > than 2023 Funded Level %/84% |

| | 2033 Permanent Restoration Target | 2043 Permanent Restoration Target |
|---|---|---|
| | Same as 2033 Restoration Target | Same as 2043 Restoration Target |

CLI-2248078v1

# EXHIBIT II.B.3.r.ii.A

SCHEDULE OF PAYMENTS AND SOURCES OF
PAYMENTS FOR MODIFIED GRS PENSION BENEFITS

# City of Detroit
## GRS Pension contributions (FY14 - FY23)
*$ in millions*

| GRS Source: | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DWSD | $ | - | $ 65.4 | $ 45.4 | $ 45.4 | $ 45.4 | $ 45.4 | $ 45.4 | $ 45.4 | $ 45.4 | $ 45.4 | $ 428.5 |
| UTGO | | - | 4.4 | 4.0 | 4.0 | 3.9 | 3.7 | 3.7 | 3.6 | 2.3 | 2.0 | 31.7 |
| State | | - | 98.8 | - | - | - | - | - | - | - | - | 98.8 |
| DIA | | - | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 45.0 |
| Other | | - | 14.6 | 22.5 | 22.5 | 22.5 | 22.5 | 2.5 | 2.5 | 2.5 | 2.5 | 114.6 |
| Total | | - | 188.2 | 76.9 | 76.9 | 76.8 | 76.6 | 56.5 | 56.5 | 55.2 | 54.9 | 718.6 |

<u>**EXHIBIT II.B.3.r.ii.C**</u>

TERMS OF GRS PENSION RESTORATION

13-53846-swr   Doc 6908-13   Filed 08/20/14   Entered 08/20/14 23:27:34   Page 381 of
455
13-53846-tjt   Doc 6707-3   Filed 08/15/14   Entered 08/15/14 19:09:74   Page 198 of
272

# TERMS OF GRS PENSION RESTORATION

## *Pension Restoration Process*

The following rules shall govern how accrued pensions, including COLA benefits, that are reduced as part of the Plan of Adjustment, shall be restored during the thirty year period following the Confirmation Order. The pension restoration process shall be supervised, and restoration decisions undertaken by the Investment Committee of GRS and in accordance with the pension governance provisions set forth in the State Contribution Agreement and exhibits thereto. This pension restoration program shall be deemed a part of Component II of the Combined Plan for the General Retirement System of the City of Detroit, but in the event of any conflict between the language set forth herein and the Combined Plan the terms of this Pension Restoration Agreement will govern.

**GENERAL RESTORATION RULES**

**I.     GRS RESTORATION**

1.     Waterfall Categories

There will be three Waterfall Classes:

   a. GRS Waterfall Class 1 – Retirees, in retirement benefit pay status as of June 30, 2014, and their surviving spouses and beneficiaries
   b. GRS Waterfall Class 2 – Retirees, who entered into retirement benefit pay status after June 30, 2014, and their surviving spouses and beneficiaries, and who are in pay status as of the end of the GRS Fiscal Year prior to the year in which the restoration decision is made
   c. GRS Waterfall Class 3 – All other GRS participants who as of June 30, 2014 are not in retirement benefit pay status

2.     General GRS Pension Restoration Through June 30, 2023

Each year in conjunction with the annual actuarial valuation report, the GRS actuary will project the GRS funded ratio as of 2023 based upon the market value of plan assets relative to the actuarial accrued liabilities (the "Funded Level"). This projection will be further based upon a 6.75% assumed rate of investment return which is net of expenses (investment and administrative), future employer contributions as set forth in the Plan of Adjustment (subject to the conditions in the Plan of Adjustment) and such other actuarial assumptions as utilized by the GRS actuary. For purposes of GRS Restoration through June 30, 2023, the Funding Target will be a 70% funded ratio, the Restoration Target will be a 75% funded ratio, and the Restoration Reserve Suspension Trigger will be a

CLI-2248166v1

71% funded ratio, all projected to June 30, 2023. For purposes of calculating the funded ratio, the assets in the Restoration Reserve account will be excluded. Each year, if the actuary projects that the projected Funded Level as of June 30, 2023 (excluding Restoration Account assets to avoid double counting) exceeds the Restoration Target (i.e., exceeds 75%), a credit of assets for bookkeeping purposes will be made into a new notional Restoration Reserve Account. The notional credit will be in an amount equal to the excess of assets above the amount projected to be needed to satisfy the Restoration Target.  Once the Restoration Reserve Account is established, each year thereafter, Restoration Account assets will be credited with interest  in an amount  equal to the net return on plan investments, but capped at the actuarially assumed rate of investment return (i.e., 6.75% for the period through June 30, 2023). In the event of net losses, the credited asset value of the Restoration Reserve Account will be diminished  to reflect such losses and any required transfer to the GRS Pension Reserve Account.

Actual restoration payments and credits will work as follows: Each year in conjunction with preparation of the annual actuarial valuation report and following establishment of the Restoration Reserve Account, the GRS actuary will determine whether there are sufficient funds in such account to restore a portion of the 4.5% across the board pension cuts in one or more minimum incremental amounts equal to ½% of the monthly benefit for each member of GRS Waterfall Class 1 (i.e. reducing the initial across the board cut to 4.0%).  This restoration only occurs if the funding level in the Restoration Reserve Account can fund 100% of each incremental increase over the remaining actuarially projected lives of the eligible recipients in GRS Waterfall Class 1.  If the Restoration Reserve Account satisfies the required funding level, then in the next GRS fiscal year, actual restoration payments will be made to GRS Waterfall Class 1 members in amounts equal to the benefit associated with each increment that have been fully funded in the Restoration Reserve Account.  Once Waterfall Class 1 has sufficient assets in the GRS Restoration Reserve Account to fully fund and restore the 4.5% cut in their monthly benefits, and to the extent that additional assets in the Restoration Reserve Account remain and will fully fund at least ½% of the monthly benefit for each member of GRS Waterfall Class 2 over their remaining actuarially projected lives, then GRS Waterfall Class 2 members will receive pension restoration in minimum ½% benefit increments until an amount equal to the 4.5% cuts in their monthly benefits has been fully funded.  At that juncture, and to the extent that additional assets in the Restoration Reserve Account remain and will fund at least a minimum ½% of the monthly benefit of each member in GRS Waterfall Class 3 over their remaining actuarially projected lives, then each such member of the class shall receive a credit granting them a right upon retirement to receive pension restoration equal to the benefit increments that are fully funded.  Restoration payments will be calculated and paid on a prospective basis only.

After the full 4.5% across the board pension cuts are restored for all three GRS Waterfall Classes, and to the extent there are additional assets in the Restoration Reserve Account to fully fund COLA benefits over the actuarially-projected lives of the eligible recipient GRS Waterfall Class, such assets will be used to fully fund and restore a portion of the COLA values that were eliminated as part of the Plan of Adjustment. COLA will be restored in minimum 10% COLA value increments up to 50% of the future COLA values for each member of GRS Waterfall Class 1 (i.e., a 50% future COLA value will constitute a 1.25% simple COLA) , then up to 50% of the future COLA values for each member of Waterfall Class 2, and then up to 50% of the future COLA values for each member of Waterfall Class 3 until all members of the three GRS Waterfall Classes have had 50% of the value of their COLAs fully funded and restored. After 50% of the future values of COLA have been fully funded and restored, and to the extent there are additional assets in the Restoration Reserve Account for each of the three GRS Waterfall Classes, then a second 50% COLA restoration will be made, first to members of GRS Waterfall Class 1, then Waterfall Class 2, and then Waterfall Class 3. Classes will be restored in minimum 10% COLA value increments. Restoration payments will be calculated and paid on a prospective basis only.

If the amounts in the Restoration Reserve Account are sufficient to fully-fund the 4.5% across the board pension cuts for all three GRS Waterfall Classes and 100% COLA restoration for all three GRS Waterfall Classes, then any additional assets in the Restoration Reserve Account shall be used to increase the frozen accrued benefits of active and other GRS participants whose ASF accounts were diminished as part of the ASF Recoupment, such that they receive treatment equal to the 20%/20% ceiling applied to retirees in pay status under the Plan of Adjustment. If after such pension restoration there are additional assets in the Restoration Reserve Account to fully fund benefit increments over their remaining actuarially projected lives, GRS Waterfall Class 1 members will receive pension restoration in ½% benefit increments of the reductions to their monthly pension due to ASF Recoupment, and once such pension benefits are restored, Waterfall Class 2 members will receive pension restoration in ½% benefit increments in connection with the reductions to their monthly pensions due to ASF Recoupment. Restoration payments will be calculated and paid on a prospective basis only.

Once restoration payments to applicable retirees and restoration credits to active employees begin, as long as the Restoration Reserve Account continues to have assets sufficient to fund 100% of an incremental pension restoration amount for such GRS Waterfall Class members for their actuarially projected lives, such restoration payments and credits will continue; provided, however, that in the event the Restoration Reserve Account , after having sufficient assets to fund 100% of two or more increments (over their actuarially projected lives), falls below 100% for the second or greater increment, the annual amounts to pay such second or other additional increment can continue until the

Restoration Reserve Account lacks any assets to fund it.  For example, assume a ½%  increment in GRS Waterfall Class 1 requires $10 million in assets to be fully funded for the GRS Waterfall Class' actuarially projected lives, and that based on FY 2018 results the Restoration Reserve Account has assets of $22 million so as to fund two increments of restoration in FY 2019, *i.e.,* a 1% pension increase. Assume further that in the following year the Restoration Reserve Account drops in value to $17 million; in such event two increments could still be paid, and the second increment of ½% would cease being paid only if the value of assets in the Restoration Reserve Account dropped to or below $10 million (in the event they dropped below $10 million, the first increment also would cease being paid). For purposes of restoration reduction, restoration increments will be taken away in reverse order in which they were granted (i.e. last in, first out).

In the event the GRS Funded Level (not including Restoration Reserve Assets) falls below 71% (hereinafter, "Restoration Reserve Suspension Trigger"),, then, until such time as the projected GRS Funded Level in 2023 is 71% or above, further interest credits to the notional Restoration Reserve Account will cease notwithstanding the actual net GRS investment returns for the fiscal year in question.  Furthermore, if the GRS Funded Level  projected to 2023 falls below the Funding Target  (i.e., 70%) then restoration payments and credits in the following year will be modified in the following manner:  (1) funds previously credited  to the Restoration Reserve Account will be notionally transferred and credited to the GRS Pension  Reserve Account in sufficient amounts to restore the projected GRS Funded Level  in 2023 to 70%;  (2) following such transfer, the remaining assets in the Restoration Reserve Account   shall be applied to make restoration payments  in accordance with and pursuant to the same mechanism described in the previous paragraph.

Following receipt of the actuarial reports for 2019,  and in the event that the projected Funded Level of GRS as of 2023 is less than 71%, the GRS actuary shall revisit the restoration calculations that it made during each of the prior 4 years. It shall recalculate each such prior year's Funded Level  projection, this time by assuming the lesser of (i) $4.5 million in annual administrative expenses until 2023, or (ii) an amount of annual administrative expenses until 2023 equal to the average annual administrative expenses in the prior 4 years, in addition to a net 6.75% annual investment return.  If such retrospective recalculation indicates that fewer amounts would have transferred to the GRS Restoration Reserve Account than actually were transferred during such look back period, then the GRS Restoration Reserve Account shall be debited by the lesser of (i) this difference (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period or (ii) the dollars that were actually paid out in restoration payments during such look-back period (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period); or (iii) the amount required to increase the projected 2023 GRS Funded Level to 71%.

CLI-2248166v1

3.     <u>General GRS Pension Restoration from July 1, 2023 to June 30, 2033</u>.

During this period, the Funding Target, the Restoration Target, the Permanent Restoration Targets and the Restoration Reserve Suspension Trigger shall be as set forth on Exhibit A hereto.  The same rules for variable restoration payments and credits that applied during the period ending June 30, 2023 shall apply during the period ending June 30, 2033 (including ceasing interest credits in the event of a Restoration Reserve Suspension Trigger,  and making Restoration Account asset transfers in the event the 2033 GRS Funded Level falls below the 2033 Funding Target), except as follows.  For purposes of determining whether the 2033 Restoration Target has been satisfied, the Plan actuary shall project investment returns through June 30, 2033 at the then current investment return assumption  and the applicable actuarial assumptions as utilized in the annual actuarial valuation.  Further, the GRS Plan actuary shall assume, merely for purposes of determining whether the Restoration Target is satisfied, that the annual City contribution amount shall be the annual amount necessary to fund the GRS based upon an amortization of the actual 2023 UAAL at market value over 30 years (hereinafter, the "2023 UAAL Amortization") and in such manner that the resulting annual contribution stream would achieve the GRS  Funding Target  (on Exhibit A) as of 2033. (Such projected, hypothetical contributions shall be for purposes only of making restoration determinations, and shall not necessarily be the actual contributions made or required to be made by the City or recommended during such period; all of which shall be determined independent of the restoration calculation process.). For purposes of calculating the funded ratio, the assets in the Restoration Reserve account will be excluded.

To the extent that the City's actual contributions to the GRS in any of the FYs 2024 (the year ending June 30, 2024) through 2033 are greater than the projected annual contribution under the 2023 UAAL Amortization, such amounts, and any investment earnings thereon, shall be notionally credited  to a new bookkeeping account in GRS called the Extra Contribution Account.  In determining pension restoration during the period from FY 2024 through 2033, none of the amounts in the Extra Contribution Account shall be considered for purposes of determining the projected funded level for the Restoration Target or Permanent Restoration Targets.   To the extent that the City's actual contributions in any of the FYs 2024 through 2033 are less than the projected annual contribution under the 2023 UAAL Amortization, such difference and any investment earnings thereon shall be notionally allocated to the Pension Fund Reserve Account.

Each year, in addition to the credit of assets that exceed the amount necessary to satisfy the Restoration Target, existing Restoration Account  assets will be credited with interest  equal to the net return on plan investments, but capped at

CLI-2248166v1

the then investment return assumption. In the event of net losses, the credited asset value of the Restoration Reserve Account will be diminished to reflect such losses.

In connection with preparation of the actuarial report for FY 2028, the GRS actuary will determine whether GRS has satisfied the applicable Permanent Restoration Target, which shall be 75%. Transfers from the Restoration Reserve Account for credit to the GRS Pension Reserve Account may be made in such amounts as are necessary to satisfy the Permanent Restoration Target. If following such transfers the GRS Funded Level as of June 30, 2028 has satisfied the Permanent Restoration Target(75%), then the amounts in the Restoration Reserve Account , if any (which will necessarily represent excess not necessary to satisfy the Permanent Restoration Target), and which fully fund one or more increments of restoration payments for one or more GRS Waterfall Classes over such GRS Waterfall Class members' actuarially projected lives, shall be transferred from the Restoration Reserve Account and credited to the GRS Pension Reserve Account and the applicable incremental payments shall be permanently restored for the applicable GRS Waterfall Class and shall no longer be variable from year to year. Variable restoration payments will continue to be paid or credited during the period from July 1, 2028 through June 30, 2033 based on the applicable Restoration Target set forth in Exhibit A and otherwise in accordance with this restoration memorandum, notwithstanding whether the Restoration Target during this period is less than the Permanent Restoration Target as of June 30, 2028 of 75%.

In connection with preparation of the annual actuarial valuation report for FY 2033, the GRS actuary will determine whether GRS has satisfied the Permanent Restoration Target for 2033, as set forth on Exhibit A. Transfers from the Restoration Reserve Account for credit to the GRS Pension Reserve Account may be made in such amounts as are necessary to satisfy the Permanent Restoration Target . If following such transfers the GRS Funded Level as of June 30, 2033 has satisfied the applicable Permanent Restoration Target, then the amounts in the Restoration Reserve Account if any (which will necessarily represent excess not necessary to satisfy the Permanent Restoration Target), and which fully fund one or more increments of restoration payments for one or more GRS Waterfall Classes over such GRS Waterfall Class members' actuarially projected lives, shall be transferred from the Restoration Reserve Account and credited to the GRS Pension Reserve Account and the applicable incremental payments shall be permanently restored for the applicable GRS Waterfall Class and shall no longer be variable from year to year.

Following receipt of the actuarial reports for 2028, and in the event that the projected Funded Level of GRS as of 2033 is less than 71%, the GRS actuary shall revisit the restoration calculations that it made during each of the prior 4 years. It shall recalculate each such prior year's Funded Level projection, this time by

CLI-2248166v1

assuming the lesser of (i) $4.5 million in annual administrative expenses until 2033, or (ii) an amount of annual administrative expenses until 2033 equal to the average annual administrative expenses in the prior 4 years, in addition to a net 6.75% annual investment return.  If such retrospective recalculation indicates that fewer amounts would have transferred to the GRS Restoration Reserve Account than actually were transferred during such look back period, then the GRS Restoration Reserve Account shall be debited by the lesser of (i) this difference (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period or (ii) the dollars that were actually paid out in restoration payments during such look-back period (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period); or (iii) the amount required to increase the projected 2033 GRS Funded Level to 71%.


4.  General GRS Pension Restoration from July 1, 2033 to June 30, 2043.

During this period,  the Funding Target,  the Restoration Target , the Permanent Restoration Target and the Restoration Reserve Suspension Trigger shall be as set forth on Exhibit A hereto.  The same rules for restoration that applied during the period ending June 30, 2033 shall otherwise apply (including ceasing interest credits in the event of a Restoration Reserve Suspension Trigger,  and making Restoration Account asset transfers in the event the 2043 GRS Funded Level falls below the 2043 Funding Target). For example, for purposes of determining whether the 2043 Restoration Target has been satisfied, the Plan actuary shall project annual contributions  using the same 2023 UAAL Amortization. For purposes of calculating the funded ratio, the assets in the Restoration Reserve account will be excluded, and no Extra Contribution Account assets shall be included for purposes of determining  whether the Funded Level meets the Restoration Target or Permanent Restoration Target, including any additions to such account after 2033.

In connection with preparation of the annual actuarial valuation report for FY 2043, the GRS actuary will determine whether GRS has satisfied the applicable Permanent Restoration Target, as set forth on Exhibit A.  Transfers from the Restoration Reserve Account for credit to the GRS Pension Reserve Account may be made in such amounts as are necessary to satisfy the Permanent Restoration Target.  If following such transfers the GRS Funded Level as of June 30, 2043 is s equal to or greater than the applicable Permanent Restoration Target , then the amounts in the Restoration Reserve Account if any (which will necessarily represent  excess not  necessary to satisfy the Permanent Restoration Target), and which  fully fund over their actuarially projected lives one or more increments of restoration payments for one or more  GRS Waterfall Classes, shall be transferred from the Restoration Reserve Account and credited to the GRS

CLI-2248166v1

Pension Reserve Account and the applicable payments for the applicable GRS Waterfall Class shall be permanently restored and shall no longer be variable.

5. <u>Modification of the Pension Restoration Program</u>

If any time after July 1, 2026, the GRS Investment Committee (by vote of 5 of its 7 members), or the GRS Board of Trustees (by a greater than 66% vote) determines that a change in relevant circumstances has occurred, or there was a mutual mistake of fact in developing this Pension Restoration Agreement, such that the continued operation of this Agreement without amendment will: (a) materially harm the long-term economic interests of the City or Retirement System; or (b) materially impair the City's ability to fully fund over a reasonable period the then existing frozen benefit liabilities, the Investment Committee or the Board, as the case may be, shall provide written notice to the other entity of such a determination and of the need to amend this Restoration Agreement (it being understood that the post-Chapter 9, 40-year amortization period (to 2053) to full fund GRS frozen liabilities is presumptively reasonable, but not irrebutably so). The Investment Committee and the Board shall then meet to negotiate amendments to this Agreement that address the identified risk of harm or impairment, but which also considers this Agreement's objective of providing pension restoration. Such negotiations shall take into account reasonable actions the City has pursued or could pursue to mitigate such harm or impairment. Any such amendments shall require the approval of a majority vote of the combined members of the Committee and Board (persons who sit on both the Board and Committee shall have one vote). Such parties shall consult with the Mayor, City Council and the Governor in connection with such negotiation. If the Board, acting through a majority, and the Investment Committee, acting through a majority, cannot agree to such amendments with the 90-day period following the provision of such notice by the determining party, then the Board and Investment Committee shall proceed to mediation. In this regard, within 30-days following expiration of the 90-day period the Board and the Investment Committee shall each select a mediator from the list of approved mediators for the United States District Court for the Eastern District of Michigan. The two selected mediators shall appoint a third neutral mediator from the approved list. Each party shall furnish a written statement to the mediators within 30 days of selection of the neutral mediator. Representatives of the Mayor and the Governor shall participate in such mediations. If following a 90-day mediation period following submission of the written statements the matter is not settled, then either the Investment Committee or the Board can file an action in the United Stated District Court for the Eastern District of Michigan asking it to declare*, inter alia*, whether or in what manner to amend this Agreement.

CLI-2248166v1

13-53846-swr   Doc 8707-13   Filed 12/15/14   Entered 12/15/14 23:27:34   Page 389 of
13-53846-swr   Doc 6908-13   Filed 08/20/14   Entered 08/20/14 19:09:06   Page 296 of
455

## EXHIBIT A

**GRS -** The 2033 and 2043 Funding Targets shall be equal to the actual 2023 Funded Level rounded to the nearest 10th decimal.  The Restoration Target shall be 3.0% higher than the Funding Target but not less than 73%.  The Permanent Restoration Targets shall be 75% in 2028, and 1% higher than the Restoration Targets in 2033 and 2024, but not less than 75%.  The Restoration Reserve Suspension Trigger will be set 1% higher than the projected Funding Target for all time periods.

| 2023 Funded Level | 2033 Funding Target/Restoration Target | 2043 Funding Target/Restoration Target |
|---|---|---|
| 75% | 75%/78% | 75%/78% |
| 74% | 74%/77% | 74%/77% |
| 73% | 73%/76% | 73%/76% |
| 72% | 72%/75% | 72%/75% |
| 71% | 71%/74% | 71%/74% |
| 70% | 70%/73% | 70%/73% |
| 69% or lower | the % = to 2023 Funded Level %/73% | the % = to 2023 Funded Level %/73% |

| 2033 Permanent Restoration Target | 2043 Permanent Restoration Target |
|---|---|
| 75% ,or if greater, 1% more  than 2033 Restoration Target | 75%, or if greater, 1% more than 2043 Restoration Target |

CLI-2248166v1

**EXHIBIT II.D.5**

SCHEDULE OF POSTPETITION COLLECTIVE BARGAINING AGREEMENTS

<u>**EXHIBIT II.D.5**</u>

<u>**SCHEDULE OF POSTPETITION COLLECTIVE BARGAINING AGREEMENTS**</u>

**I. FULLY APPROVED AGREEMENTS**[1]

**A. City of Detroit Collective Bargaining Agreements**

1) Master Agreement Between the City of Detroit and the Police Officers Association of Michigan POAM, 2013-2018, dated November 12, 2013.

2) Master Agreement Between the City of Detroit and the International Brotherhood of Teamsters Local 214 2013-2018, dated December 18, 2013.

    a.   Supplemental Agreement Between the City of Detroit Police Department and Teamsters State, County and Municipal Workers, Local 214 2013-2018, dated December 18, 2013.

    b.   Supplemental Agreement Between the Department of Public Works and Teamsters Local 214 2013-2018, dated December 18, 2013.

    c.   Supplemental Agreement Between the General Services Department and Teamsters Local 214 2013-2018, dated December 18, 2013.

    d.   Supplemental Agreement between the City of Detroit Municipal Parking Department and Local #214 Teamsters State, County and Municipal Workers, 2013-2018, dated December 18  2013.

3) Master Agreement Between the City of Detroit and the International Union of Operating Engineers IUOE Local 324 2013-2018, dated December 18, 2013.

4) Master Agreement Between the City of Detroit and the International Union of Operating Engineers IUOE Local 324 (Park Management) 2013-2018, dated December 18, 2013.

5) Master Agreement Between the City of Detroit and the International Union of Operating Engineers IUOE Local 324 (Principal Clerks) 2013-2018, dated December 18, 2013.

6) Master Agreement Between the Assistant Supervisors of Street Maintenance and Construction and the City of Detroit 2014-2018.

7) Master Agreement Between the City of Detroit and the Michigan Building and Construction Trades Council 2014-2018, dated May 1, 2014.

8) Master Agreement Between the City of Detroit and the Emergency Medical Service Officers Association 2014-2019, dated June 11, 2014.

---

[1]    "<u>Fully Approved Agreements</u>" means those collective bargaining agreements that have been (i) ratified by the applicable bargaining unit or units, as necessary (ii) approved by the applicable City or DWSD bargaining representatives, (iii) approved by the Emergency Manager and (iv) approved by the Office of the Treasurer of the State of Michigan.

CHI-1920748v6

9) Master Agreement Between the City of Detroit and Local 1863 of the American Federation of State County and Municipal Employees, AFL-CIO (Detroit Civilian Crossing Guards) 2014-2018, dated June 27, 2014.

10) Master Agreement Between the City of Detroit and Local 542 of the American Federation of State County and Municipal Employees, AFL-CIO (Motor City Seasonals) 2014-2018, dated June 27, 2014.

11) Master Agreement Between the City of Detroit and Local 1206 of the American Federation of State County and Municipal Employees, AFL-CIO (Detroit Forestry and Landscape Foreman's Union) 2014-2018, dated June 27, 2014.

12) Master Agreement Between the City of Detroit and Local 2394 of the American Federation of State County and Municipal Employees, AFL-CIO (Supervisory Unit) 2014-2018, dated June 27, 2014.

13) Master Agreement Between the City of Detroit and Local 6087 of the American Federation of State County and Municipal Employees, AFL-CIO (Paving Forepersons) 2014-2018, dated June 27, 2014.

14) Master Agreement Between the City of Detroit and the Detroit Police Command Officers Association 2014-2019, dated June 18, 2014.

15) Master Agreement Between the City of Detroit and the Detroit Income Tax Investigators Association 2014-2018.

16) Master Agreement Between the City of Detroit and the Association of Municipal Inspectors 2014-2018, dated June 27, 2014.

17) Master Agreement Between the City of Detroit and the Service Employees International Union Local 517-M (Supervisory Unit) 2014-2018, dated June 25, 2014.

18) Master Agreement Between the City of Detroit and the Service Employees International Union Local 517-M (Non-Supervisory Unit) 2014-2018, dated June 25, 2014.

19) Master Agreement Between the City of Detroit and the Service Employees International Union Local 517-M (Professional and Technical Unit) 2014-2018, dated June 25, 2014.

20) Master Agreement Between the City of Detroit and the Association of City of Detroit Supervisors 2014-2018, dated June 27, 2014.

21) Master Agreement Between the City of Detroit and the Association of Professional and Technical Employees 2014-2018, dated July 22, 2014.

22) Master Agreement Between the City of Detroit and the Senior Accountants, Analysts and Appraisers Association 2014-2018, dated May 27, 2014.

23) Master Agreement Between the City of Detroit and Michigan Council 25 of the American Federation of State, County and Municipal Employees, AFL-CIO (Non-Supervisory Bargaining Unit) 2014-2018.

## B. Detroit Water and Sewerage Department Collective Bargaining Agreements

1) 2012-2018 Master Agreement Between the Detroit Water & Sewerage Department and AFSCME, Michigan Council 25 Local 2920.

## II. RATIFIED AGREEMENTS PENDING FINAL APPROVALS[2]

### A. Ratified City of Detroit Collective Bargaining Agreements Pending Final Approvals

1)      Master Agreement Between the City of Detroit and the Detroit Police Lieutenants and Sergeants Association 2014-2019.

         a.     Tentative Agreement Between the City of Detroit and the Detroit Police Lieutenants and Sergeants Association, dated June 19, 2014.

### B. Ratified Detroit Water and Sewerage Department Collective Bargaining Agreements Pending Approvals

1)      Master Agreement Between the City of Detroit and the Michigan Building and Construction Trades Council 2013-2016, dated June 26, 2013.

         a.     Memorandum of Agreement between the Detroit Water and Sewerage Department and the Michigan Building & Construction Trades Council to amend their June 26, 2013 - June 30, 2016 collective bargaining agreement.

2)      2013-2016 Master Agreement Between the Detroit Water & Sewerage Department and the Building Trades Foremen, dated June 26, 2013.

3)      2014-2016 Master Agreement Between the Detroit Water & Sewerage Department and the Detroit Senior Water Systems Chemists Association.

4)      2014-2019 Master Agreement Between the DWSD and Teamsters State, County and Municipal Workers, Local 214.

5)      Memorandum of Agreement between the Detroit Water and Sewerage Department and the International Union of Operating Engineers, Local 324 to amend their March 25, 2013 - June 30, 2022 collective bargaining agreement.

---

[2]      "Ratified Agreements Pending Final Approvals" means those collective bargaining agreements approved by the City bargaining representatives, and  ratified by the applicable bargaining unit or units, as necessary, that remain subject to approval by either, or both, the Emergency Manager and the Office of the Treasurer of the State of Michigan.  The inclusion of such collective bargaining agreements in this Exhibit does not, and shall not be deemed to, modify or waive the requirement for such approvals in any way.

# EXHIBIT II.D.6

EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO BE REJECTED

# Exhibit II.D.6

Executory Contracts and Unexpired Leases to be Rejected

In re City of Detroit, Michigan, Case No. 13-53846 (Bankr. E.D. Mich)

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| 151 W FORT ST ASSOCIATES LLC | 1075036 | 2635434 | | INFORMATION TECHNOLOGY SERVICES |
| 1600 ASSOCIATES LLC | 20396 | 2501191 | | MUNICIPAL PARKING DEPARTMENT |
| 3M CONTRACTING INC | 1107578 | 2809948 | | HUMAN SERVICES DEPARTMENT |
| 455 ASSOCIATES LLC | 19602 | 2600416 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| 455 ASSOCIATES LLC | 19602 | 2722656 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| 660 WOODWARD ASSOCIATES LLC | 1117401 | 2604895 | | INFORMATION TECHNOLOGY SERVICES |
| 660 WOODWARD ASSOCIATES LLC | 1117401 | 2809305 | | LAW DEPARTMENT |
| 660 WOODWARD ASSOCIATES LLC | 1117401 | 2866561 | | LAW DEPARTMENT |
| A & H CONTRACTORS | 1090249 | 2797590 | ICE RINK IMPROVEMENTS | RECREATION DEPARTMENT |
| A NEW BEGINNING II INC | 1010270 | 2626822 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| AARON L FORD | 1101801 | 2759870 | | HEALTH DEPARTMENT |
| ABAYOMI CDC | 1055088 | 2597193 | | FINANCE DEPARTMENT |
| ABBOT NICHOLSON | 1064317 | 2605132 | LEGAL SERVICES | LAW DEPARTMENT |
| ACCENTURE LLP | 19843 | 2582670 | | HUMAN SERVICES DEPARTMENT |
| ACHIEVEMENT RESOURCES LLC | 1075198 | 2640120 | | DEPARTMENT OF PUBLIC WORKS |
| ADAMS HOME REPAIR SERVICE INC | 1031652 | 2532093 | HOME REPAIR FOR LOW INCOME CITIZENS. | HUMAN SERVICES DEPARTMENT |
| ADULT WELL BEING SERVICES | 17259 | 2507595 | ADULT WELL BEING SERVICES | HEALTH DEPARTMENT |
| ADULT WELL BEING SERVICES | 17259 | 2501821 | EZ-PUBLIC SERVICES | PLANNING AND DEVELOPMENT DEPARTMENT |
| ADVANCED ENGINEERING SOLUTION INC | 1043861 | 2613331 | | ENVIRONMENTAL AFFAIRS DEPARTMENT |
| AFFILIATED INTERNISTS CORPORATION | 1007088 | 2541129 | PROVIDE MEDICAL STAFF | HEALTH DEPARTMENT |
| AFL CIO COUNCIL | 9713 | 2505335 | | FINANCE DEPARTMENT |
| AFL CIO COUNCIL | 9713 | 2504234 | AFL/CIO COUNCIL-METRO COUNCIL | FINANCE DEPARTMENT |
| AGAR LAWN SPRINKLER SYSTEMS INC | 1019225 | 2871984 | FURNISH UNDERGROUND SPRINKLER MAINT. | GENERAL SERVICES DEPARTMENT |
| AIRGAS GREAT LAKES | - | 2754331 | PURCHASE ORDER FOR COMMERCIAL GASES | GENERAL SERVICES DEPARTMENT |
| AKT PEERLESS ENVIRONMENTAL SERVICES LLC | 1025663 | 2845810 | DEMOLITION OF PROPERTIES | BUILDINGS AND SAFETY DEPARTMENT |
| ALAN C YOUNG ASSOCIATES PC | 20513 | 2554416 | CONTRACTUAL RESOURCES | INFORMATION TECHNOLOGY SERVICES |
| ALAN C YOUNG ASSOCIATES PC | 20513 | 2572989 | | HEALTH DEPARTMENT |
| ALAN C YOUNG ASSOCIATES PC | 20513 | 2511247 | AUDITING SERVICES FY 98/99 FICS 78653 | HUMAN SERVICES DEPARTMENT |
| ALAN C YOUNG ASSOCIATES PC | 20513 | 2501399 | PROFESSIONAL SERVICES | FINANCE DEPARTMENT |
| ALAN C YOUNG ASSOCIATES PC | 20513 | 2507833 | AUDITING - ALAN C YOUNG | HEALTH DEPARTMENT |
| ALAN C YOUNG ASSOCIATES PC | 20513 | 2515896 | AUDIT DRUG TREATMENT/AIDS PROGRAMS | HUMAN SERVICES DEPARTMENT |
| ALAN C YOUNG ASSOCIATES PC | 20513 | 2780084 | | HEALTH DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| ALKEBU LAN VILLAGE | 1043877 | 2588741 | | HUMAN SERVICES DEPARTMENT |
| ALKEBU LAN VILLAGE | 1043877 | 2533139 | YOUTH PROGRAM | HUMAN SERVICES DEPARTMENT |
| ALKEBU LAN VILLAGE | 1043877 | 2619692 | | HUMAN SERVICES DEPARTMENT |
| ALKEBU LAN VILLAGE | 1043877 | 2804801 | | HUMAN SERVICES DEPARTMENT |
| ALKEBU LAN VILLAGE | 1043877 | 2775178 | | HUMAN SERVICES DEPARTMENT |
| ALKEBU LAN VILLAGE | 1043877 | 2772580 | PROFESSIONAL SERVICES CONTRACT | RECREATION DEPARTMENT |
| ALLEN & ASSOCIATES APPRAISAL GROUP INC | 20517 | 2502141 | PROFESSIONAL SERVICES:  CASINO APPRAISAL | LAW DEPARTMENT |
| ALLIANCE FOR A SAFER GREATER DETROIT | 1102712 | 2767089 | | POLICE DEPARTMENT |
| ALPHA ELECTRIC INC | 1026028 | 2625782 | | PUBLIC LIGHTING DEPARTMENT |
| ALPHA ELECTRIC INC | 1026028 | 2625784 | | PUBLIC LIGHTING DEPARTMENT |
| ALPHA ELECTRIC INC | 1026028 | 2625780 | | PUBLIC LIGHTING DEPARTMENT |
| ALPHA KAPPA ALPHA FOUNDATION OF DETROIT | 19649 | 2592410 | | FINANCE DEPARTMENT |
| ALTERNATIVE FOR GIRLS | 16279 | 2503526 | TRANSITIONAL HOUSING | FINANCE DEPARTMENT |
| AMERICAN INDIAN HEALTH & FAMILY | 18997 | 2500866 | SUBSTANCE ABUSE COORDINATION AGENCY | NO DEPARTMENT INDICATED |
| AMERITECH | 20497 | 2506112 | | PUBLIC LIGHTING DEPARTMENT |
| AMPCO SYSTEM PARKING | 18489 | 2501028 | PARKING SERVICES | MUNICIPAL PARKING DEPARTMENT |
| AMPCO SYSTEM PARKING | 18489 | 2501362 | KENNEDY SQUARE PARKING SERVICES | MUNICIPAL PARKING DEPARTMENT |
| AMPCO SYSTEM PARKING | 18489 | 2501356 | PARKING SERVICE FOR KENNEDY SQUARE | MUNICIPAL PARKING DEPARTMENT |
| AMPCO SYSTEM PARKING | 18489 | 2501789 | PARKING LOT MANAGEMENT | FINANCE DEPARTMENT |
| AMPRO CONSTRUCTION LLC | 1026137 | 2524825 | WEATHERIZATION PROGRAM | HUMAN SERVICES DEPARTMENT |
| AMPRO CONSTRUCTION LLC | 1026137 | 2525177 | LIHEAP | HUMAN SERVICES DEPARTMENT |
| AMPRO CONSTRUCTION LLC | 1026137 | 2544432 | HOME WEATHERIZATION | HUMAN SERVICES DEPARTMENT |
| AMPRO CONSTRUCTION LLC | 1026137 | 2607320 | | HUMAN SERVICES DEPARTMENT |
| AMPRO CONSTRUCTION LLC | 1026137 | 2789077 | | HUMAN SERVICES DEPARTMENT |
| AMPRO CONSTRUCTION LLC | 1026137 | 2761179 | | HUMAN SERVICES DEPARTMENT |
| ANACAPA SCIENCE INC | 1012433 | 2507585 | | POLICE DEPARTMENT |
| ANDREW J BEAN | 1003634 | 2530372 | LEGAL SERVICES:  DAVIS/WILLIAMS V CITY | FINANCE DEPARTMENT |
| ANDREW J BEAN | 1003634 | 2634325 | | LAW DEPARTMENT |
| ANDREW J BEAN | 1003634 | 2538079 | LEGAL SERVICES:  TOMMIE THOMAS V CITY | LAW DEPARTMENT |
| ANDREW J BEAN | 1003634 | 2561944 | LEGAL SERVICES:  MICHELLE HARPER, ET AL | LAW DEPARTMENT |
| ANDREW J BEAN | 1003634 | 2561936 | LEGAL SERVICES | LAW DEPARTMENT |
| ANDREW J BEAN | 1003634 | 2501547 | LEGAL SERVICES:  RYAN MULLINS V CITY | LAW DEPARTMENT |
| ANDREW J BEAN | 1003634 | 2545467 | LEGAL SERVICES:  BOSWELL V JORDAN/CITY | LAW DEPARTMENT |
| ANDREW J BEAN | 1003634 | 2505202 | LEGAL SERVICES | LAW DEPARTMENT |
| ANDREW J BEAN | 1003634 | 2512646 | LEGAL SERVICES | FINANCE DEPARTMENT |
| ANDREW J BEAN | 1003634 | 2505710 | LEGAL SERVICES:  KEITH THORNTON V CITY | LAW DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| ANDREW J BEAN | 1003634 | 2576673 | | LAW DEPARTMENT |
| ANDREW J BEAN | 1003634 | 2505715 | LEGAL SERVICES | FINANCE DEPARTMENT |
| ANDREW J BEAN | 1003634 | 2574494 | | LAW DEPARTMENT |
| AON RISK SERVICES INC OF MICHIGAN | 17959 | 2506866 | AUDIT | AUDITOR GENERAL |
| APCOA INC | 18982 | 2504151 | COBO COMPLEX PARKINGMANAGEMENT SERVICES | MUNICIPAL PARKING DEPARTMENT |
| ARAB AMERICAN & CHALDEAN COUNCIL | 19955 | 2546963 | PARTNERSHIP FOR ADULT LEARNING | EMPLOYMENT AND TRAINING DEPARTMENT |
| ARAB AMERICAN & CHALDEAN COUNCIL | 19955 | 2563067 | WORK FIRST & WELFARE TO WORK | EMPLOYMENT AND TRAINING DEPARTMENT |
| ARAB AMERICAN & CHALDEAN COUNCIL | 19955 | 2778448 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| ARAB AMERICAN & CHALDEAN COUNCIL | 19955 | 2797753 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| ARAB AMERICAN & CHALDEAN COUNCIL | 19955 | 2806229 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| ARAB AMERICAN & CHALDEAN COUNCIL | 19955 | 2775339 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| ARAB AMERICAN & CHALDEAN COUNCIL | 19955 | 2714444 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| ARAB AMERICAN & CHALDEAN COUNCIL | 19955 | 2717186 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| ARAB COMMUNITY CENTER | 20424 | 2549478 | ENGLISH AS A SECOND LANGUAGE | EMPLOYMENT AND TRAINING DEPARTMENT |
| ARAB COMMUNITY CENTER | 20424 | 2519169 | JOB SEARCH AND TRAINING (WORK FIRST) | EMPLOYMENT AND TRAINING DEPARTMENT |
| ARAB COMMUNITY CENTER | 20424 | 2740257 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| ARAB COMMUNITY CENTER FOR ECONOMIC SOCIAL SERVICES (ACCESS) | 1070466 | 2778446 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| ARAB COMMUNITY CENTER FOR ECONOMIC SOCIAL SERVICES (ACCESS) | 1070466 | 2797751 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| ARAB COMMUNITY CENTER FOR ECONOMIC SOCIAL SERVICES (ACCESS) | 1070466 | 2800934 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| ARAB COMMUNITY CENTER FOR ECONOMIC SOCIAL SERVICES (ACCESS) | 1070466 | 2778768 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| ARTHUR F SMITH ARCHITECTS | 19092 | 2500783 | CAMP MASTERPLAN | NO DEPARTMENT INDICATED |
| ASHPAUGH & SCULCO CPA PLC | 1026075 | 2506711 | RATE CONSULTANT | NON-DEPARTMENTAL |
| AVANCE COMMUNICATIONS INC | 1017277 | 2589125 | | DEPARTMENT OF TRANSPORTATION |
| AVANCE COMMUNICATIONS INC | 1017277 | 2544753 | COMMUNICATIONS | HUMAN SERVICES DEPARTMENT |
| B & B POOLS AND SPAS | 8897 | 2680662 | | RECREATION DEPARTMENT |
| B E I ASSOCIATES INC | 1002153 | 2500794 | PROFESSIONAL ENGINEERING SERVICES | DEPARTMENT OF PUBLIC WORKS |
| BABBIE DEVELOPERS | 1100891 | 2753822 | ROOF REPLACEMENT FORT WAYNE-QUARTERMASTER WAREHOUSE | RECREATION DEPARTMENT |
| BAPCO-SUBSTANCE ABUSE | 15997 | 2501510 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| BARNEY MCCOSKY BASEBALL LEAGUE | 17329 | 2540757 | 36-NTV-NOF PUBLIC SERVICE CONTRACT | FINANCE DEPARTMENT |
| BARTECH GROUP | 19194 | 2578539 | | FINANCE DEPARTMENT |
| BARTHEL CONTRACTING | 6174 | 2506716 | PAVEMENT RESURFACING, GROUP 95-3 | DEPARTMENT OF PUBLIC WORKS |
| BARTHEL CONTRACTING | 6174 | 2508554 | WIDENING & RESURFACING | DEPARTMENT OF PUBLIC WORKS |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| BARTHEL CONTRACTING | 6174 | 2508474 | PAVEMENT RESURFACING, GROUP 96-5 | DEPARTMENT OF PUBLIC WORKS |
| BARTHEL CONTRACTING | 6174 | 2630995 | | DEPARTMENT OF PUBLIC WORKS |
| BARTHEL CONTRACTING | 6174 | 2658806 | | DEPARTMENT OF PUBLIC WORKS |
| BDN INDUSTRIAL HYGIENE CONSULTANT | 19807 | 2502471 | ABATEMENT OF ASBESTOS | DEPARTMENT OF PUBLIC WORKS |
| BDO SEIDMAN LLP | 1073285 | 2659484 | | LAW DEPARTMENT |
| BEACON ENERGY LLC | 1088904 | 2699766 | | SEWERAGE DEPARTMENT |
| BEACON ENERGY LLC | 1088904 | 2763942 | PROVIDE CONSULTING SERVICES | PUBLIC LIGHTING DEPARTMENT |
| BEAL INC | 1104822 | 2786319 | | RECREATION DEPARTMENT |
| BEI ASSOCIATES INC | 19420 | 2586915 | | DEPARTMENT OF PUBLIC WORKS |
| BEI ASSOCIATES INC | 19420 | 2576869 | | PUBLIC LIGHTING DEPARTMENT |
| BELLANCA BEATTIE & DELISLE PC | 1002283 | 2515001 | LEGAL SERVICES | FINANCE DEPARTMENT |
| BELLANCA BEATTIE & DELISLE PC | 1002283 | 2502106 | LEGAL SERVICES | NO DEPARTMENT INDICATED |
| BELLANCA BEATTIE & DELISLE PC | 1002283 | 2618387 | LEGAL SERVICES | LAW DEPARTMENT |
| BELMARC INC | 1012648 | 2505560 | PROFESSIONAL SERVICES | LAW DEPARTMENT |
| BERG MUIRHEAD AND ASSOCIATES | 1051572 | 2758875 | | MAYOR'S OFFICE |
| BEST AMERICAN INDUSTRIAL | 17038 | 2501442 | SKILLED TRADES | NO DEPARTMENT INDICATED |
| BETTS MEDICAL GROUP LLC | 1030943 | 2531569 | PHYSICIAN SERVICES | HEALTH DEPARTMENT |
| BLACK & VEATCH | 20115 | 2501009 | PROFESSIONAL SERVICES | NO DEPARTMENT INDICATED |
| BLACK CAUCUS FOUNDATION OF MICHIGAN | 18481 | 2501792 | | HEALTH DEPARTMENT |
| BLACK FAMILY DEVELOPMENT INC | 1012009 | 2508726 | PROGRAM COORDINATION OF COOPER | FINANCE DEPARTMENT |
| BLACK FAMILY DEVELOPMENT INC | 1012009 | 2506003 | MEDICAID SUBSTANCE ABUSE | HEALTH DEPARTMENT |
| BLACK FAMILY DEVELOPMENT INC | 1012009 | 2784374 | | HUMAN SERVICES DEPARTMENT |
| BLACK FAMILY DEVELOPMENT INC | 1012009 | 2761029 | | HUMAN SERVICES DEPARTMENT |
| BLOUNT ENGINEERS INC. | 13566 | 2500972 | PROFESSIONAL SERVICES | PUBLIC LIGHTING DEPARTMENT |
| BODMAN LONGLEY DAHLING LLP | 1000341 | 2507188 | LEGAL SERVICES | LAW DEPARTMENT |
| BODMAN LONGLEY DAHLING LLP | 1000341 | 2501800 | LEGAL SERVICES | PUBLIC LIGHTING DEPARTMENT |
| BODMAN LONGLEY DAHLING LLP | 1000341 | 2505006 | LEGAL SERVICES | LAW DEPARTMENT |
| BODMAN LONGLEY DAHLING LLP | 1000341 | 2501852 | LEGAL SERVICES | PLANNING AND DEVELOPMENT DEPARTMENT |
| BONIFACE HUMAN SRVS | 19449 | 2501513 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| BOOKER T WASHINGTON | 17389 | 2517857 | PUBLIC FACILITY REHABILITATION | FINANCE DEPARTMENT |
| BOOMER CO | 19949 | 2784930 | CITY OF DETROIT CONSTRUCTION CONTRACT | RECREATION DEPARTMENT |
| BOOTH RESEARCH GROUP INC | 1058277 | 2585080 | | POLICE DEPARTMENT |
| BOOTH RESEARCH GROUP INC | 1058277 | 2759498 | DPD PROMOTIONAL EXAMINATION | POLICE DEPARTMENT |
| BRACEFUL & ASOCIATES PC | 1002357 | 2508823 | LEGAL SERVICES | FINANCE DEPARTMENT |
| BRACEFUL & ASOCIATES PC | 1002357 | 2507332 | LEGAL SERVICES:  TROMEUR V CITY | LAW DEPARTMENT |
| BRADY HATHAWAY PC | 20356 | 2505092 | LEGAL SERVICES:  VINES/CHILDS V CITY | LAW DEPARTMENT |
| BRIGHTMOOR COMMUNITY CENTER | 18407 | 2501479 | PUBLIC FACILITY REHAB | NO DEPARTMENT INDICATED |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| C & H BUILDERS | 1025257 | 2544437 | HOME WEATHERIZATION | FINANCE DEPARTMENT |
| C & H BUILDERS | 1025257 | 2524574 | WEATHERIZATION PROGRAM | HUMAN SERVICES DEPARTMENT |
| C & H BUILDERS | 1025257 | 2543531 | LIHEAP-HOME WEATHERIZATION PROGRAM | HUMAN SERVICES DEPARTMENT |
| C & H BUILDERS | 1025257 | 2793400 | | HUMAN SERVICES DEPARTMENT |
| CAASTI CONTRACTING SERVICES INC | 1066086 | 2799257 | CPATTON PARK IMPROVEMENT | RECREATION DEPARTMENT |
| CAASTI CONTRACTING SERVICES INC | 1066086 | 2799260 | BELLE ISLE - TENNIS COURT RENOVATIONS | RECREATION DEPARTMENT |
| CAASTI CONTRACTING SERVICES INC | 1066086 | 2789963 | LITTLEFIELD PLAYFIELD RENOVATIONS | RECREATION DEPARTMENT |
| CAASTI CONTRACTING SERVICES INC | 1066086 | 2798602 | WINGLE PLAYLOT IMPROVEMENTS | RECREATION DEPARTMENT |
| CADILLAC TOWER MI LLC | 1117104 | 2810553 | | BUDGET DEPARTMENT |
| CAPITAL ACCESS INC | 1033428 | 2536054 | CONSULTING AGREEMENT | PLANNING AND DEVELOPMENT DEPARTMENT |
| CAPITAL COMPUTER SOLUTIONS | 16316 | 2507466 | IMAGING SYSTEM  (FICS #76497) | HEALTH DEPARTMENT |
| CAPITAL COMPUTER SOLUTIONS | 16316 | 2760099 | | HEALTH DEPARTMENT |
| CARE GIVERS | 19339 | 2510116 | HOMELESSNESS PREVENTION | FINANCE DEPARTMENT |
| CAREERWORKS INC | 10310 | 2501469 | SUMMER PROGRAM | NO DEPARTMENT INDICATED |
| CAREERWORKS INC | 10310 | 2518192 | WORK FIRST JOB PLACEMENT | EMPLOYMENT AND TRAINING DEPARTMENT |
| CAREERWORKS INC | 10310 | 2526127 | YOUTH SERVICES PROGRAM PY2000 | EMPLOYMENT AND TRAINING DEPARTMENT |
| CAREERWORKS INC | 10310 | 2539830 | FOOD STAMP - 10/01/00 - 9/30/01 | EMPLOYMENT AND TRAINING DEPARTMENT |
| CAREERWORKS INC | 10310 | 2560643 | FOOD STAMP 2001-2002 | EMPLOYMENT AND TRAINING DEPARTMENT |
| CAREERWORKS INC | 10310 | 2553148 | WIA SUMMER COORDINATION | EMPLOYMENT AND TRAINING DEPARTMENT |
| CAREERWORKS INC | 10310 | 2530117 | WIA SUMMER - MICROSOFT PROGRAM | EMPLOYMENT AND TRAINING DEPARTMENT |
| CAREERWORKS INC | 10310 | 2536669 | WIA-ELECTRONICS & TELECOMMUNICATIONS | EMPLOYMENT AND TRAINING DEPARTMENT |
| CAREERWORKS INC | 10310 | 2740262 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| CARNEGIE MORGAN PARTNERS | 18655 | 2600434 | | FINANCE DEPARTMENT |
| CASS COMMUNITY SOCIAL SERVICES INC | 1057639 | 2539246 | PUBLIC SERVICE FOR THE HOMELESS | HUMAN SERVICES DEPARTMENT |
| CASS COMMUNITY SOCIAL SERVICES INC | 1057639 | 2521565 | FOOD PROGRAM, EASTSIDE AND WESTSIDE | HUMAN SERVICES DEPARTMENT |
| CASS COMMUNITY SOCIAL SERVICES INC | 1057639 | 2570923 | | HUMAN SERVICES DEPARTMENT |
| CASS COMMUNITY SOCIAL SERVICES INC | 1057639 | 2775168 | | HUMAN SERVICES DEPARTMENT |
| CASS COMMUNITY UNITED | 18514 | 2559508 | CASE MANAGEMENT AND COUNSELING | DEPARTMENT OF PUBLIC WORKS |
| CASS COMMUNITY UNITED | 18514 | 2515503 | WARMING CENTER FOR HOMELESS | HUMAN SERVICES DEPARTMENT |
| CASS COMMUNITY UNITED METHODIST | 7182 | 2588909 | | HUMAN SERVICES DEPARTMENT |
| CASS CORRIDOR NEIGHBORHOOD DEVELOPMENT CORP | 20452 | 2506844 | PRE-DEVELOPMENT ACTIVITIES | FINANCE DEPARTMENT |
| CATHOLIC SOCIAL SERVICES | 3536 | 2501515 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| CATHOLIC YOUTH ORGANIZATION | 1961 | 2501808 | SUBSTANCE ABUSE COORDINATION AGENCY | NO DEPARTMENT INDICATED |
| CDL TRAINING SCHOOL LLC | 1064701 | 2804809 | | HUMAN SERVICES DEPARTMENT |
| CDL TRAINING SCHOOL LLC | 1064701 | 2775174 | | HUMAN SERVICES DEPARTMENT |
| CEI MICHIGAN LLC | 1104760 | 2785400 | EASTERN MARKET SHED NO. 3 RENOVATIONS | RECREATION DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| CEI MICHIGAN LLC | 1104760 | 2785393 | CONSTRUCTION CONTRACT FOR EASTERN MARKET SHED NO. 3 | RECREATION DEPARTMENT |
| CENTRAL MAINTENANCE SERVICE | 9209 | 2501782 | 36/LS - MANAGEMENT SERVICES | PLANNING AND DEVELOPMENT DEPARTMENT |
| CENTRAL UNITY METHODIST CHURCH | 5570 | 2503083 | PUBLIC SERVICE CONTRACT | FINANCE DEPARTMENT |
| CENTURY CEMENT CO INC | 1393 | 2520066 | REPAIR OF DAMAGED SIDEWALKS | DEPARTMENT OF PUBLIC WORKS |
| CENTURY CEMENT CO INC | 1393 | 2541213 | REPAIR OF DAMAGED SIDEWALKS | DEPARTMENT OF PUBLIC WORKS |
| CHARFOOS & CHRISTENSEN | 19681 | 2599095 | LEGAL SERVICES | LAW DEPARTMENT |
| CHARLES MERZ | 19485 | 2501931 | BELLE ISLE PICNIC SHELTER | NO DEPARTMENT INDICATED |
| CHECKER CAB | 1002656 | 2533466 | | HUMAN SERVICES DEPARTMENT |
| CHECKER CAB | 1002656 | 2620877 | | HUMAN SERVICES DEPARTMENT |
| CHECKER CAB | 1002656 | 2775459 | | HUMAN SERVICES DEPARTMENT |
| CHECKER CAB | 1002656 | 2803649 | | HUMAN SERVICES DEPARTMENT |
| CHECKER CAB | 6574 | 2743785 | | HUMAN SERVICES DEPARTMENT |
| CHILD CARE COORDINATING COUNCIL OF DETROIT | 18279 | 2751505 | | HUMAN SERVICES DEPARTMENT |
| CHILD CARE COORDINATING COUNCIL OF DETROIT | 18279 | 2774001 | | HUMAN SERVICES DEPARTMENT |
| CHILDREN & YOUTH INITIATIVE OF DETROIT | 18304 | 2516007 | EMPOWERMENT ZONE- PUBLIC SERVICES | PLANNING AND DEVELOPMENT DEPARTMENT |
| CHILDREN & YOUTH INITIATIVE OF DETROIT | 18304 | 2500872 | | NO DEPARTMENT INDICATED |
| CHILDREN & YOUTH INITIATIVE OF DETROIT | 18304 | 2554216 | EMPOWERMENT ZONE- PUBLIC SERVICES | FINANCE DEPARTMENT |
| CHILDREN & YOUTH INITIATIVE OF DETROIT | 18304 | 2532118 | EMPOWERMENT ZONE - PUBLIC SERVICES | PLANNING AND DEVELOPMENT DEPARTMENT |
| CHILDRENS AID SOCIETY | 1002607 | 2618760 | | POLICE DEPARTMENT |
| CHILDRENS AID SOCIETY | 1002607 | 2620357 | | HUMAN SERVICES DEPARTMENT |
| CHILDRENS AID SOCIETY | 1002607 | 2563913 | | FINANCE DEPARTMENT |
| CHILDRENS AID SOCIETY | 1002607 | 2740222 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| CHILDRENS AID SOCIETY | 1002607 | 2775157 | | HUMAN SERVICES DEPARTMENT |
| CHILDRENS AID SOCIETY | 1049240 | 2614565 | | HUMAN SERVICES DEPARTMENT |
| CHILDRENS AID SOCIETY | 1049240 | 2778775 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| CHILDRENS AID SOCIETY | 1049240 | 2778778 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| CHILDRENS AID SOCIETY | 1049240 | 2800817 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| CHILDRENS CENTER OF WAYNE COUNTY | 12390 | 2501646 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| CHILDRENS CENTER OF WAYNE COUNTY | 12390 | 2535133 | HEAD START MENTAL CONSULTANT SERVICES | HUMAN SERVICES DEPARTMENT |
| CHILDRENS CENTER OF WAYNE COUNTY | 12390 | 2516136 | MENTAL HEALTH CONSULTANT SERVICES | HUMAN SERVICES DEPARTMENT |
| CHILDRENS CENTER OF WAYNE COUNTY | 12390 | 2569653 | | HUMAN SERVICES DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| CHILDRENS CENTER OF WAYNE COUNTY | 12390 | 2501812 | SUBSTANCE ABUSE COORDINATION AGENCY | HEALTH DEPARTMENT |
| CHRISTIAN GUIDANCE CENTER | 18739 | 2501814 | SUBSTANCE ABUSE COORDINATION AGENCY | HEALTH DEPARTMENT |
| CITY CONNECT DETROIT | 1082718 | 2796700 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| CLARK & ASSOCIATES  PC | 1008458 | 2543328 | ADDICTION TREATMENT | HEALTH DEPARTMENT |
| CLARK & ASSOCIATES  PC | 1008458 | 2539765 | TRAINING WORK FIRST PROGRAM | HEALTH DEPARTMENT |
| CLARK & ASSOCIATES  PC | 1008458 | 2539650 | YOUTH DEPARTMENT SAFETY PROGRAM | HEALTH DEPARTMENT |
| CLARK & ASSOCIATES  PC | 1008458 | 2675311 | | HUMAN SERVICES DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2625022 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2504251 | MEDICAID SUBSTANCE ABUSE | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2518285 | CLARK MASTER - SUBSTANCE ABUSE | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2588764 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2536507 | CLARK - MEDICAID | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2670290 | | HUMAN SERVICES DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2689636 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2534097 | SUBSTANCE ABUSE MASTER AGREEMENT | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2559955 | CLARK- MEDICAID | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2518292 | CLARK MEDICAID-MASTER | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2518483 | CLARK - DRUG EDUCATION | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2506642 | EDUCATE FYE 6/30/99 CLARK/POLICE | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2501252 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2557597 | CLARK MASTER - SUBSTANCE ABUSE | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2625016 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2527241 | YOUTH DEPT. SAFETY ASSESSMENT PROG. | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2618554 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2502443 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2618552 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2700218 | | RECREATION DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2515854 | CLARK - CCA- FYE 6/30/00  SPO2515857 | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2797389 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2750134 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2747666 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2779369 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2756507 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2805210 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2875766 | S.A.F.E.T.Y. PROGRAM | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2776664 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2779355 | | HEALTH DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| CLARK ASSOCIATES INC | 15176 | 2755767 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2801963 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2803778 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2786574 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2759243 | | HEALTH DEPARTMENT |
| CLARK HILL | 7778 | 2501937 | LEGAL SERVICES | LAW DEPARTMENT |
| CLARK HILL | 7778 | 2543385 | LEGAL SERVICES | LAW DEPARTMENT |
| CLARKS CONSTRUCTION | 1016952 | 2679759 | | RECREATION DEPARTMENT |
| CLARKS CONSTRUCTION | 1016952 | 2636522 | | RECREATION DEPARTMENT |
| CLARKS CONSTRUCTION | 1016952 | 2713626 | | RECREATION DEPARTMENT |
| CLARKS CONSTRUCTION | 1016952 | 2714063 | | RECREATION DEPARTMENT |
| CLARKS CONSTRUCTION | 1016952 | 2715398 | | RECREATION DEPARTMENT |
| CLARKS CONSTRUCTION | 1016952 | 2731184 | PARK & PLAYGROUND IMPROVEMENTS | RECREATION DEPARTMENT |
| CLARKS CONSTRUCTION | 1016952 | 2709777 | | RECREATION DEPARTMENT |
| CLARKS CONSTRUCTION | 1016952 | 2756725 | PARK & PLAYGROUND IMPROVEMENTS | RECREATION DEPARTMENT |
| CLARKS CONSTRUCTION | 1016952 | 2789767 | LAKER PLAYGROUND IMPROVEMENTS | RECREATION DEPARTMENT |
| CLAYTON ENVIRONMENTAL | 1002564 | 2519814 | EPA PERMITS & DEREGULATIONS | PUBLIC LIGHTING DEPARTMENT |
| CMTS INC | 18181 | 2501924 | FICS 074776  INSPECTION SERVICES | DEPARTMENT OF PUBLIC WORKS |
| COHL STOKER TOSKEY & MCCLINCHEY PC | 1081162 | 2661933 | | CITY COUNCIL |
| COMMUNITY & EDUCATIONAL SERVICES INC | 1059876 | 2777992 | EMERGENCY SHELTER SERVICES | HUMAN SERVICES DEPARTMENT |
| COMMUNITY DEVELOPMENT SOLUTIONS LLC | 1057282 | 2695015 | | RECREATION DEPARTMENT |
| COMMUNITY DEVELOPMENT SOLUTIONS LLC | 1057282 | 2675021 | | RECREATION DEPARTMENT |
| COMMUNITY HEALTH AWARENESS GROUP INC | 1051231 | 2571474 | | HEALTH DEPARTMENT |
| COMMUTER TRANSPORTATION | 15328 | 2510505 | SHUTTLE SERVICE | CIVIC CENTER DEPARTMENT |
| COMPREHENSIVE DATA PROCESSING | 11248 | 2502241 | PROGRAMMING CODING | INFORMATION TECHNOLOGY SERVICES |
| COMPUTECH CORPORATION | 1054040 | 2574424 | | NON-DEPARTMENTAL |
| COMPUTECH CORPORATION | 1054040 | 2620775 | | NON-DEPARTMENTAL |
| COMPUWARE CORPORATION | 1003122 | 2595111 | | NON-DEPARTMENTAL |
| CONNOLLY RODGERS & SCHARMAN PLLC | 1089154 | 2703083 | | LAW DEPARTMENT |
| CONSULTING ENGINEERING ASSOCIATES INC | 1806 | 2514647 | ELECTRICAL DESIGN-HIGHWAYS PROJECTS | DEPARTMENT OF PUBLIC WORKS |
| CONSULTING ENGINEERING ASSOCIATES INC | 1806 | 2508478 | ENGINEERING | WATER DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| CONSULTING ENGINEERING ASSOCIATES INC | 1806 | 2544911 | FICS CONTRACT # 064150, ELECTRICAL DESIGN | DEPARTMENT OF PUBLIC WORKS |
| CONSULTING ENGINEERING ASSOCIATES INC | 1806 | 2544914 | FICS CONTRACT 065783, ELECTRICAL DESIGN | DEPARTMENT OF PUBLIC WORKS |
| CORPORATE ASSET MANAGEMENT INC | 1022860 | 2607935 | | DEPARTMENT OF TRANSPORTATION |
| COUNCIL OF ACTION UNITED FOR SERVICE EFFORTS | 14189 | 2608202 | | FINANCE DEPARTMENT |
| COUNCIL OF ISLAMIC ORGANIZATIONS | 20305 | 2501825 | SUBSTANCE ABUSE COORDINATION AGENCY | NO DEPARTMENT INDICATED |
| COURRIER & I | - | 2506952 | | LAW DEPARTMENT |
| COUZENS LANSKY FEALK ELLIS ROEDER & LAZAR | 19705 | 2534094 | LEGAL SERVICES | LAW DEPARTMENT |
| COVENANT HOUSE OF MICHIGAN | 1049191 | 2614501 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| COVENANT HOUSE OF MICHIGAN | 1049191 | 2622827 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| COVENANT HOUSE OF MICHIGAN | 1049191 | 2563788 | SUPPORTIVE HOUSING | HUMAN SERVICES DEPARTMENT |
| CREEKSIDE COMMUNITY DEVELOPMENT CORPORATION | 1024525 | 2752940 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| CSFB 1998 P1 WOODWARD OFFICE LLC | 1074168 | 2652205 | | FINANCE DEPARTMENT |
| CUMMINGS MCCLOREY DAVIS | 19999 | 2502111 | LEGAL SERVICES: JANE DOE V P.O. JOURNEY | LAW DEPARTMENT |
| CUMMINGS MCCLOREY DAVIS | 19999 | 2502154 | LEGAL SERVICES | NO DEPARTMENT INDICATED |
| CURTIS & ASSOCIATES | 18886 | 2563163 | JOB SEARCH WORK FIRST/WTW 2001 | EMPLOYMENT AND TRAINING DEPARTMENT |
| CVS | 1026222 | 2782910 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| D A CENTRAL INC | 1020403 | 2860051 | SECURITY SURVEILLANCE SYSTEM | NO DEPARTMENT INDICATED |
| D C BYERS COMPANY DETROIT | 15847 | 2502244 | FORD RD RESERVOIR REHAB | WATER DEPARTMENT |
| D P VANBLARICOM INC | 1011787 | 2517238 | ESTATE OF LARRY BELL V CITY | LAW DEPARTMENT |
| DATA COMPRESSION TECHNOLOGY INC. | 1057080 | 2584759 | | FINANCE DEPARTMENT |
| DATA CONSULTING GROUP INC | 18268 | 2507857 | PARKING TICKETS | MUNICIPAL PARKING DEPARTMENT |
| DAVID ANDERSON & CATHY STULL | 16925 | 2500749 | | LAW DEPARTMENT |
| DBAKER SOLUTIONS | 1027729 | 2526961 | CONCESSIONS CONTRACT CONSULTANT | ZOO |
| DECISION CONSULTANTS INC | 14788 | 2502051 | PROGRAMMING CODING | INFORMATION TECHNOLOGY SERVICES |
| DELOITTE & TOUCHE LLP | 17837 | 2592267 | | CITY COUNCIL |
| DEMARIA BUILDING COMPANY | 19428 | 2819183 | SKILLED TRADES REPAIR AND MAINTENANCE | GENERAL SERVICES DEPARTMENT |
| DEMARIA BUILDING COMPANY | 19428 | 2706154 | BELLE ISLE CONSERVATORY RENOVATIONS | RECREATION DEPARTMENT |
| DEMARIA BUILDING COMPANY | 19428 | 2832912 | EQUIPMENT PURCHASE AND INSTALLATION | WATER DEPARTMENT |
| DETROIT AREA AGENCY ON AGING | 10643 | 2803629 | | HUMAN SERVICES DEPARTMENT |
| DETROIT AREA AGENCY ON AGING | 10643 | 2743788 | | HUMAN SERVICES DEPARTMENT |
| DETROIT AREA AGENCY ON AGING | 10643 | 2775457 | | HUMAN SERVICES DEPARTMENT |
| DETROIT AREA HEALTH COUNCIL INC | 1069815 | 2619988 | | RECREATION DEPARTMENT |
| DETROIT ASSOC OF WOMENS CLUBS | 14566 | 2514218 | PUBLIC FACILITY REHAB-FICS #74834 | FINANCE DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| DETROIT ASSOCIATION OF BLACK ORGANIZATIONS | 16148 | 2501915 | PUBLIC SERVICE | NO DEPARTMENT INDICATED |
| DETROIT ASSOCIATION OF BLACK ORGANIZATIONS | 16148 | 2502124 | | NO DEPARTMENT INDICATED |
| DETROIT ASSOCIATION OF BLACK ORGANIZATIONS | 16148 | 2807055 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DETROIT ASSOCIATION OF BLACK ORGANIZATIONS | 16148 | 2761547 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DETROIT ASSOCIATION OF BLACK ORGANIZATIONS | 16148 | 2740241 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DETROIT BOARD OF EDUCATION | 1569 | 2503530 | JOB SEARCH & PLACEMENT | EMPLOYMENT AND TRAINING DEPARTMENT |
| DETROIT BOARD OF EDUCATION | 1569 | 2508003 | EZ-PUBLIC SERVICE | FINANCE DEPARTMENT |
| DETROIT BOARD OF EDUCATION | 1569 | 2516130 | DISABILITY SUPPORT TEAM | HUMAN SERVICES DEPARTMENT |
| DETROIT BOARD OF EDUCATION | 1569 | 2501369 | CAREER PREP PLANNING | EMPLOYMENT AND TRAINING DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2500796 | WINTER HOLDING & LIGHTING | ZOO |
| DETROIT BUILDING AUTHORITY | 9266 | 2510115 | DPD SECURITY SYSTEM UPGRADE | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2500859 | HUBER BUILDING RESTORE | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2513351 | | INFORMATION TECHNOLOGY SERVICES |
| DETROIT BUILDING AUTHORITY | 9266 | 2593193 | | POLICE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2530203 | CENTER & SITE IMPROVE | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2526905 | FIRE DETECTION, ALARM & SUPRESSION | ZOO |
| DETROIT BUILDING AUTHORITY | 9266 | 2501859 | EASTERN MARKET RENOVATIONS | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2545275 | SECURITY SYSTEM UPGRADE | POLICE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2503827 | CUSTOMER SERVICE CENTER | FINANCE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2501051 | FIRESTATION RENOVATION PROGRAM | FIRE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2636298 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2508408 | BUILDING RENOVATIONS | FINANCE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2500748 | PARKING IMPROVEMENTS | ZOO |
| DETROIT BUILDING AUTHORITY | 9266 | 2540535 | | POLICE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2502360 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2630384 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2514346 | INFRASTRUCTURE IMPROVEMENTS | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2516282 | FIRE SUPPRESSION AND DETECTION SYSTEM | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2501977 | ADAMS BUTZEL CENTER | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2506561 | COLEMAN A. YOUNG & ROBERTO CLEMENTE CENTERS IMPROVEMENTS | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2560470 | 2001-02 CAPITAL IMPROVEMENT PROGRAM | CIVIC CENTER DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| DETROIT BUILDING AUTHORITY | 9266 | 2500743 | BIRD & TIGER RENOVATION | ZOO |
| DETROIT BUILDING AUTHORITY | 9266 | 2691117 | | FIRE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2506912 | | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2501579 | MCCABE FIELD HOUSE SITE IMPROVEMENTS | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2501961 | MADISON CTR IMPROVEMENTS | NO DEPARTMENT INDICATED |
| DETROIT BUILDING AUTHORITY | 9266 | 2653472 | | ZOO |
| DETROIT BUILDING AUTHORITY | 9266 | 2505570 | B.I. CANAL FICS CONTRACT# 073005 | FINANCE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2594879 | | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2517916 | | HUMAN SERVICES DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2600472 | | FINANCE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2544837 | PUBLIC IMPROVEMENTS AT WOODWARD | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2654364 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2532375 | | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2505579 | | FINANCE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2536241 | COBO CENTERS CAPITAL PROGRAM | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2619410 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2688656 | | FIRE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2505726 | MINATURE RAILROAD RENOVATION | ZOO |
| DETROIT BUILDING AUTHORITY | 9266 | 2531292 | ARCHITECTURAL PROGRAMMING | POLICE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2561933 | CAPITAL IMPROVEMENTS | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2517985 | | HISTORICAL |
| DETROIT BUILDING AUTHORITY | 9266 | 2638245 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2500762 | | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2545352 | | FINANCE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2706199 | | POLICE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2767791 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2630436 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2739330 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2726923 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2719133 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2630388 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2501957 | CAPITAL PROJECTS | HEALTH DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2697790 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2630408 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2626704 | | HISTORICAL |
| DETROIT BUILDING AUTHORITY | 9266 | 2675809 | | ZOO |
| DETROIT BUILDING AUTHORITY | 9266 | 2550346 | GROUND CARE PROJECT | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2675818 | | ZOO |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| DETROIT BUILDING AUTHORITY | 9266 | 2583964 | | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2627766 | | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2653471 | | ZOO |
| DETROIT BUILDING AUTHORITY | 9266 | 2710513 | | POLICE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2651003 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2697809 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2560660 | DETENTION CENTERS/POLICE HEADQUARTERS | FINANCE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2796726 | | AIRPORT DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2865303 | | DETROIT OFFICE OF HOMELAND SECURITY |
| DETROIT BUILDING AUTHORITY | 9266 | 2749361 | | PUBLIC LIGHTING DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2568320 | | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2510335 | RENOVATION AT PRECINCTS 2, 5, 7, & 11 | POLICE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2510162 | | POLICE DEPARTMENT |
| DETROIT CATHOLIC PASTORAL | 18185 | 2855625 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT CATHOLIC PASTORAL | 18185 | 2778107 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT CATHOLIC PASTORAL | 18185 | 2554997 | NEW CONTRACT SET-UP | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT CENTRAL CITY COMMUNITY | 17253 | 2501790 | PUBLIC FACILITY REHAB | NO DEPARTMENT INDICATED |
| DETROIT DISCOUNT DISTRIBUTORS INC | 1027457 | 2526361 | EMERGENCY FOOD | HUMAN SERVICES DEPARTMENT |
| DETROIT EAST COMMUNITY MENTAL | 1005394 | 2663209 | | DEPARTMENT OF TRANSPORTATION |
| DETROIT EAST COMMUNITY MENTAL | 1005394 | 2719895 | | DEPARTMENT OF TRANSPORTATION |
| DETROIT EAST INC | 13771 | 2520517 | TRANSITIONAL HOUSING | HUMAN SERVICES DEPARTMENT |
| DETROIT ECONOMIC GROWTH CORPORATION | 7662 | 2515604 | PROFESSIONAL ECONOMIC DEVELOPMENT | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT ECONOMIC GROWTH CORPORATION | 7662 | 2784670 | ECONOMIC DEVELOPMENT SERVICES | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT ECONOMIC GROWTH CORPORATION | 7662 | 2753574 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT ECONOMIC GROWTH CORPORATION | 7662 | 2809284 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT ECONOMIC GROWTH CORPORATION | 7662 | 2725283 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT EDISON COMPANY | 5636 | 2501179 | | NO DEPARTMENT INDICATED |
| DETROIT ELECTRICAL SERVICES LLC | 1059639 | 2676228 | | WATER DEPARTMENT |
| DETROIT ENTREPRENEURSHIP INST | 1036516 | 2562737 | SELF EMPLOYMENT INITIATIVE | WORKFORCE DEVELOPMENT DEPARTMENT |
| DETROIT ENTREPRENEURSHIP INST | 1036516 | 2507446 | P&DD/PS FICS CONTRACT #75285 | FINANCE DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION | - | - | GRS SERVICE CONTRACT 2005, DATED MAY 25, 2005, BY AND BETWEEN THE CITY AND THE DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION | NO DEPARTMENT INDICATED |
| DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION | - | - | GRS SERVICE CONTRACT 2006, DATED JUNE 7, 2006, BY AND BETWEEN THE CITY AND THE DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION, AS THEREAFTER AMENDED | NO DEPARTMENT INDICATED |
| DETROIT HISPANIC | 20401 | 2564466 | JOB SEARCH AND PLACEMENT | EMPLOYMENT AND TRAINING DEPARTMENT |
| DETROIT HOUSING COMMISSION | 1033965 | 2801908 | FUNDING AGREEMENT | DEPARTMENT OF PUBLIC WORKS |
| DETROIT HOUSING COMMISSION | 1033965 | 2833063 | FUNDING AGREEMENT | DEPARTMENT OF PUBLIC WORKS |
| DETROIT HOUSING COMMISSION | 1033965 | 2669571 | | HOUSING DEPARTMENT |
| DETROIT LIGHT HOUSE PROGRAM | 1001492 | 2501736 | MEDICAID SUBSTANCE ABUSE | HEALTH DEPARTMENT |
| DETROIT LIGHT HOUSE PROGRAM | 1001492 | 2515558 | SUBSTANCE ABUSE FYE 9/99 | HEALTH DEPARTMENT |
| DETROIT MEDICAL CENTER | 20097 | 2501916 | MEDICAL SERVICES | NO DEPARTMENT INDICATED |
| DETROIT METRO CONVENTION | 1027508 | 2615728 | | CIVIC CENTER DEPARTMENT |
| DETROIT NEIGHBORHOOD & FAMILY INITIATIVE | 1018914 | 2520602 | EMPOWERMENT ZONE - PUBLIC SERVICE | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT NEIGHBORHOOD DEVELOPMENT CORP | 1035571 | 2539512 | NEIGHBORHOOD REVITALIZATION | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT NONPROFIT HOUSING CORPORATION | 10641 | 2514457 | NOF PUBLIC SERVICE CONTRACT | FINANCE DEPARTMENT |
| DETROIT POLICE AND FIRE RETIREMENT SYSTEM SERVICE CORPORATION | - | - | PFRS SERVICE CONTRACT 2005, DATED MAY 25, 2005, BY AND BETWEEN THE CITY AND THE DETROIT POLICE AND FIRE RETIREMENT SYSTEM SERVICE CORPORATION | NO DEPARTMENT INDICATED |
| DETROIT POLICE AND FIRE RETIREMENT SYSTEM SERVICE CORPORATION | - | - | PFRS SERVICE CONTRACT 2006, DATED JUNE 7, 2006, BY AND BETWEEN THE CITY AND THE DETROIT POLICE AND FIRE RETIREMENT SYSTEM SERVICE CORPORATION, AS THEREAFTER AMENDED | NO DEPARTMENT INDICATED |
| DETROIT PUBLIC SCHOOLS | 1835 | 2587295 | | HUMAN SERVICES DEPARTMENT |
| DETROIT PUBLIC SCHOOLS | 1835 | 2557062 | 2001-2002 HEAD START CONTRACT | HUMAN SERVICES DEPARTMENT |
| DETROIT PUBLIC SCHOOLS | 1835 | 2532505 | HEAD START PROGRAM | HUMAN SERVICES DEPARTMENT |
| DETROIT PUBLIC SCHOOLS | 1835 | 2617076 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| DETROIT PUBLIC SCHOOLS | 1835 | 2657665 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DETROIT PUBLIC SCHOOLS | 1835 | 2663934 | | WORKFORCE DEVELOPMENT DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| DETROIT PUBLIC SCHOOLS | 1835 | 2571396 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| DETROIT PUBLIC SCHOOLS | 1835 | 2512549 | HEAD START SERVICES | HUMAN SERVICES DEPARTMENT |
| DETROIT PUBLIC SCHOOLS | 1835 | 2771471 | | HUMAN SERVICES DEPARTMENT |
| DETROIT PUBLIC SCHOOLS | 1835 | 2767770 | | HUMAN SERVICES DEPARTMENT |
| DETROIT RESCUE MISSION MINISTRIES | 14618 | 2502297 | PERMANENT SHELTER & SUPPORT | HEALTH DEPARTMENT |
| DETROIT RESCUE MISSION MINISTRIES | 14618 | 2560689 | SUPPORTIVE SERVICES | HUMAN SERVICES DEPARTMENT |
| DETROIT RESCUE MISSION MINISTRIES | 14618 | 2619840 | | HUMAN SERVICES DEPARTMENT |
| DETROIT RESCUE MISSION MINISTRIES | 14618 | 2548291 | TRANSITIONAL HOUSING (FICS #076950) | FINANCE DEPARTMENT |
| DETROIT RESCUE MISSION MINISTRIES | 14618 | 2501406 | SHELTER FOR THE HOMELESS (FICS #079045) | HUMAN SERVICES DEPARTMENT |
| DETROIT RESCUE MISSION MINISTRIES | 14618 | 2559511 | CASE MANAGEMENT AND COUNSELING | HUMAN SERVICES DEPARTMENT |
| DETROIT RESCUE MISSION MINISTRIES | 14618 | 2588816 | | HUMAN SERVICES DEPARTMENT |
| DETROIT RESCUE MISSION MINISTRIES | 14618 | 2751508 | | HUMAN SERVICES DEPARTMENT |
| DETROIT RESCUE MISSION MINISTRIES | 14618 | 2774007 | | HUMAN SERVICES DEPARTMENT |
| DETROIT SNAP INC | 19532 | 2501606 | PUBLIC SERVICE | NO DEPARTMENT INDICATED |
| DETROIT SPECTRUM PAINTERS INC | 11290 | 2785384 | EASTERN MARKET RENOVATIONS | RECREATION DEPARTMENT |
| DETROIT TIGERS BASEBALL CLUB | 1036628 | 2575026 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT TRANSPORTATION CORP DN2 | 14896 | 2624573 | | DEPARTMENT OF TRANSPORTATION |
| DETROIT URBAN LEAGUE | 1587 | 2518492 | DHS EMERGENCY NEED SERVICES PROGRAM | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2504264 | CAREER DEVELOPMENT TRAINING | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2620591 | | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2575580 | | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2563476 | WAGES AND MILEAGE WEATHERIZATION WORKERS | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2515009 | WEATHERIZATION SPECIALIST | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2512778 | WEATHERIZAITON INSPECTORS | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2672024 | | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2608694 | | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2557533 | JOB READINESS TRAINING | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2557619 | EMERGENCY NEEDS PROGRAM | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2533037 | CAREER DEVELOPMENT PROGRAM | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2620874 | | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2535487 | EMERGENCY NEEDS PROGRAM. | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2518497 | PROVIDE COMPUTER SKILS TRAINING | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2588385 | | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2804820 | | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2775162 | | HUMAN SERVICES DEPARTMENT |
| DETROIT WAYNE JOINT BUILDING AUTHORITY | 19336 | 2693328 | | BUDGET DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| DETROIT WAYNE JOINT BUILDING AUTHORITY | 19336 | 2825805 | | BUDGET DEPARTMENT |
| DETROIT WAYNE JOINT BUILDING AUTHORITY | 19336 | 2738647 | | BUDGET DEPARTMENT |
| DETROIT WAYNE JOINT BUILDING AUTHORITY | 19336 | 2770051 | | BUDGET DEPARTMENT |
| DETROIT WAYNE JOINT BUILDING AUTHORITY | 19336 | 2714701 | | BUDGET DEPARTMENT |
| DDETROIT WAYNE JOINT BUILDING AUTHORITY | 19336 | 2800319 | | BUDGET DEPARTMENT |
| DETROIT WAYNE PORT AUTHORITY | 10780 | 2501783 | | NON-DEPARTMENTAL |
| DETROIT WORKFORCE NETWORK INC | 1071709 | 2623415 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DEVELOPMENT CENTER INC | 16686 | 2563727 | JOB SEARCH AND PLACEMENT | EMPLOYMENT AND TRAINING DEPARTMENT |
| DEVELOPMENT CENTER INC | 16686 | 2597991 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DEVELOPMENT CENTER INC | 16686 | 2627616 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DEVELOPMENT CENTER INC | 16686 | 2658738 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DEVELOPMENT CENTER INC | 16686 | 2778452 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DEVELOPMENT CENTER INC | 16686 | 2725743 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DEVELOPMENT CENTER INC | 16686 | 2806231 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DFT SECURITY TEAM JV | 1081574 | 2658119 | | WATER DEPARTMENT |
| DICKINSON WRIGHT MOON VANDUSEN PLLC | 7769 | 2504635 | NEAL/WHITFIELD V ARCHER/JAMES | LAW DEPARTMENT |
| DICKINSON WRIGHT MOON VANDUSEN PLLC | 7769 | 2501914 | LEGAL SERVICES | NO DEPARTMENT INDICATED |
| DICKINSON WRIGHT MOON VANDUSEN PLLC | 7769 | 2502116 | LEGAL SERVICES:  JOAN GHOGIAN V CITY | LAW DEPARTMENT |
| DICKINSON WRIGHT MOON VANDUSEN PLLC | 7769 | 2500792 | LEGAL SERVICES | LAW DEPARTMENT |
| DICKINSON WRIGHT MOON VANDUSEN PLLC | 7769 | 2501982 | LEGAL SERVICES | NO DEPARTMENT INDICATED |
| DICKINSON WRIGHT MOON VANDUSEN PLLC | 7769 | 2502108 | NORDE JAMES V CHIEF ISIAH MCKINNON | LAW DEPARTMENT |
| DICKINSON WRIGHT MOON VANDUSEN PLLC | 7769 | 2504874 | LEGAL SERVICES:  CHILDS V CITY | LAW DEPARTMENT |
| DICKINSON WRIGHT MOON VANDUSEN PLLC | 7769 | 2502115 | LEGAL SERVICES:  TAMARA HARMON V CITY | LAW DEPARTMENT |
| DICKINSON WRIGHT MOON VANDUSEN PLLC | 7769 | 2502105 | NAOMI CONAWAY V CITY OF DETROIT | LAW DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| DICKINSON WRIGHT PLLC | 1023465 | 2522227 | ANALYSIS OF PA 374; ARCHER V STATE | LAW DEPARTMENT |
| DICKINSON WRIGHT PLLC | 1023465 | 2553236 | LEGAL SERVICES | LAW DEPARTMENT |
| DICKINSON WRIGHT PLLC | 1023465 | 2534973 | TIGER STADIUM MGMT AGREEMENT | LAW DEPARTMENT |
| DICKINSON WRIGHT PLLC | 1023465 | 2546606 | LEGAL SERVICES | LAW DEPARTMENT |
| DICKINSON WRIGHT PLLC | 1023465 | 2543718 | LEGAL SERVICES | LAW DEPARTMENT |
| DICKINSON WRIGHT PLLC | 1023465 | 2803153 | LEGAL SERVICES | LAW DEPARTMENT |
| DICKINSON WRIGHT PLLC | 1023465 | 2765485 | LEGAL SERVICES | LAW DEPARTMENT |
| DICKINSON WRIGHT PLLC | 1023465 | 2781254 | LEGAL SERVICES | LAW DEPARTMENT |
| DIVERSIFIED EDUCATIONAL SERVICE INC | 18910 | 2561519 | WORK FIRST/WELFARE TO WORK | EMPLOYMENT AND TRAINING DEPARTMENT |
| DIVERSIFIED EDUCATIONAL SERVICE INC | 18910 | 2734876 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DOGWOOD BROOKSIDE NEIGHBORHOODS | 1103646 | 2781555 | SIDEWALKS, CURBS, AND APPROACHES | PLANNING AND DEVELOPMENT DEPARTMENT |
| DOMBROWSKI, ROBERT | 20565 | 2501542 | UNIFORM RELOCATION ASSTISTANCE | LAW DEPARTMENT |
| DON BOSCO HALL | 20026 | 2501185 | | NO DEPARTMENT INDICATED |
| DON BOSCO HALL | 20026 | 2595057 | | RECREATION DEPARTMENT |
| DON BOSCO HALL | 20026 | 2622063 | | RECREATION DEPARTMENT |
| DON BOSCO HALL | 20026 | 2778547 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DON BOSCO HALL | 20026 | 2801085 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DOPAR SUPPORT SYSTEMS INC | 21284 | 2713282 | | INFORMATION TECHNOLOGY SERVICES |
| DOWNTOWN DEVELOPMENT AUTHORITY | 17716 | 2770230 | LOWER WOODWARD IMPROVEMENT | DEPARTMENT OF PUBLIC WORKS |
| DOWNTOWN DEVELOPMENT AUTHORITY | 17716 | 2563708 | EQUIPMENT INSTALLLATION | PUBLIC LIGHTING DEPARTMENT |
| DTWR LLC C/O FARBMAN GROUP | 1066425 | 2604131 | | FINANCE DEPARTMENT |
| DTWR LLC C/O FARBMAN GROUP | 1066425 | 2770218 | | BUDGET DEPARTMENT |
| DTWR LLC C/O FARBMAN GROUP | 1066425 | 2738724 | | BUDGET DEPARTMENT |
| DUREN & ASSOCIATES | 20479 | 2658590 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DYKEMA GOSSETT PLLC | 22091 | 2517349 | WASHINGTON, D.C. LEGISLATIVE SERVICES | LAW DEPARTMENT |
| DYKEMA GOSSETT PLLC | 22091 | 2518125 | U.S. DEPT OF JUSTICE DOT INVESTIGATION | LAW DEPARTMENT |
| DYKEMA GOSSETT PLLC | 22091 | 2537039 | ANDRE YOUNG A/K/A DR. DRE V CITY | LAW DEPARTMENT |
| DYKEMA GOSSETT PLLC | 22091 | 2537005 | WASHINGTON D.C. LIAISON | LAW DEPARTMENT |
| DYKEMA GOSSETT PLLC | 22091 | 2501222 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| DYKEMA GOSSETT PLLC | 22091 | 2561984 | LEGAL SERVICES | LAW DEPARTMENT |
| DYKEMA GOSSETT PLLC | 22091 | 2501872 | LEGAL SERVICES | LAW DEPARTMENT |
| DYKEMA GOSSETT PLLC | 22091 | 2550459 | EUGENE BROWN V CITY | LAW DEPARTMENT |
| DYNALECTRIC | 1103998 | 2765307 | CLOSED CIRCUIT TELEVISION FOR DOT | DEPARTMENT OF TRANSPORTATION |
| E L S CONSTRUCTION | 1098327 | 2785558 | EASTERN MARKET SHED NO. 3 RENOVATIONS | RECREATION DEPARTMENT |
| EARTH TECH INC | 20544 | 2500983 | BELT FILTER PRESSES | SEWERAGE DEPARTMENT |
| EARTH TECH INC | 20544 | 2502192 | CASINO SITE APPRAISALS | LAW DEPARTMENT |
| EARTH TECH INC | 20544 | 2510034 | ENVIRONMENTAL REAL ESTATE-FICS #71021 | FINANCE DEPARTMENT |
| EASTERN OIL CO. | - | 2809177 | LUBRICANT OIL | GENERAL SERVICES DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| EASTSIDE COMMUNITY RESOURCE | 1018050 | 2538974 | JOB ACCESS REVERSE COMMUTE | EMPLOYMENT AND TRAINING DEPARTMENT |
| EASTSIDE EMERGENCY CTR | 16519 | 2502205 | TRANSITIONAL HOUSING | HUMAN SERVICES DEPARTMENT |
| EASTSIDE EMERGENCY CTR | 16519 | 2532107 | TRANSITIONAL HOUSING | HUMAN SERVICES DEPARTMENT |
| EASTSIDE EMERGENCY CTR | 16519 | 2543569 | EMERGENCY SHELTER | HUMAN SERVICES DEPARTMENT |
| EASTWOOD CLINICS CORP OFFICE | 1000451 | 2501528 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| EASTWOOD CLINICS CORP OFFICE | 1000451 | 2501826 | SUBSTANCE ABUSE COORDINATION AGENCY | HEALTH DEPARTMENT |
| EBI DETROIT | 1000452 | 2517413 | WW-529 SCREEN HOUSE REHABILITATION | WATER DEPARTMENT |
| ECONOMIC DEVELOPMENT CORPORATION | 1000454 | 2515748 | PROFESSIONAL ECONOMIC DEVELOPMENT | PLANNING AND DEVELOPMENT DEPARTMENT |
| ECONOMIC DEVELOPMENT CORPORATION | 1000454 | 2764614 | FOX CREEK INFRASTRUCTURE PROJECT | DEPARTMENT OF PUBLIC WORKS |
| ECONOMIC DEVELOPMENT CORPORATION | 1000454 | 2818723 | EAST RIVERFRONT IMPROVEMENT PROJECT | DEPARTMENT OF PUBLIC WORKS |
| ECONOMIC DEVELOPMENT CORPORATION | 1000454 | 2641018 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| ECONOMIC DEVELOPMENT CORPORATION | 1000454 | 2784665 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| ECONOMIC DEVELOPMENT CORPORATION | 1000454 | 2753580 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| ECONOMIC DEVELOPMENT CORPORATION | 1000454 | 2809038 | ECONOMIC DEVELOPMENT SERVICES | PLANNING AND DEVELOPMENT DEPARTMENT |
| EDUCATIONAL DATA SYSTEMS INC | 20423 | 2724428 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| EDUCATIONAL DATA SYSTEMS INC | 1055746 | 2806233 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| EDUCATIONAL DATA SYSTEMS INC | 1055746 | 2778455 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| EDWARD C GEORGE | 9826 | 2502379 | | HUMAN SERVICES DEPARTMENT |
| EDWARD C LEVY CO DBA PLANT MAINTENANCE | 1020737 | 2502151 | BITUMINOUS SURFACE REMOVAL | DEPARTMENT OF PUBLIC WORKS |
| EJH CONSTRUCTION | 1020562 | 2808924 | | HUMAN SERVICES DEPARTMENT |
| ELEVATOR TECHNOLOGY | 1000471 | 2500082 | ELEVATOR MAINTENANCE SERVICE | GENERAL SERVICES DEPARTMENT |
| ELMHURST HOME INC | 10998 | 2501829 | SUBSTANCE ABUSE COORDINATION AGENCY | HEALTH DEPARTMENT |
| ELMHURST HOME INC | 10998 | 2501729 | MEDICAID SUBSTANCE ABUSE | HEALTH DEPARTMENT |
| EMERSON PROCESS MANAGEMENT POWER | 1016248 | 2847526 | GAS TURBINE UPGRADE AND REPAIR | PUBLIC LIGHTING DEPARTMENT |
| EMPCO INC | 1118906 | 2878252 | | MAYOR'S OFFICE |
| EMPOWERMENT ZONE DEVELOPMENT CORP | 19637 | 2513278 | ADMINISTRATIVE ACTIVITY | PLANNING AND DEVELOPMENT DEPARTMENT |
| EMPOWERMENT ZONE DEVELOPMENT CORP | 19637 | 2529275 | EMPOWERMENT ZONE - PUBLIC SERVICES | PLANNING AND DEVELOPMENT DEPARTMENT |
| EMPRESA | 1099489 | 2776404 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| ENERGY GROUP INC | 1017472 | 2509158 | FICS CONTRACT 076115 - TREE TRIMMING | PUBLIC LIGHTING DEPARTMENT |
| ENGINE SUPPLY OF NOVI | 1994 | 2505264 | PARTS COMPLETE ENGINES (M80372) | FINANCE DEPARTMENT |
| ENOTA INC | 1092130 | 2717072 | | POLICE DEPARTMENT |
| ENTECH PERSONNEL SERVICES INC | 1000768 | 2544596 | CLERICAL ASSISTANCE | CITY CLERK |
| ENVIRONMENTAL CONSULTING & TECHNOLOGY | 1106148 | 2551431 | ENVIRONMENTAL SVCS/GREATER RIVERFRONT | PLANNING AND DEVELOPMENT DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| ENVIRONMENTAL TESTING & CONSULTING INC | 1003675 | 2502196 | ABATEMENT OF ASBESTOS | DEPARTMENT OF PUBLIC WORKS |
| EPITEC GROUP INC | 1045979 | 2556386 | PROFESSIONAL SERVICES CONTRACT | INFORMATION TECHNOLOGY SERVICES |
| EPITEC GROUP INC | 1045979 | 2573836 | | NON-DEPARTMENTAL |
| EPITEC GROUP INC | 1045979 | 2620773 | | NON-DEPARTMENTAL |
| ESTHER LYNISE BRYANT | 1019604 | 2508103 | IUOE/GIBSON V CITY | LAW DEPARTMENT |
| EVANS GROUP | 1019232 | 2515534 | JOSEPHINE MILLS V CITY | LAW DEPARTMENT |
| EVEREST SOLUTIONS LLC | 1000830 | 2503912 | CONVERSION OF YEAR 2000 | FINANCE DEPARTMENT |
| EVO ACCOUNTING & FINANCIAL SERVICES | 1070752 | 2761823 | | FINANCE DEPARTMENT |
| FAMILY SERVICE INC | 4010 | 2541124 | CASE MANAGMENT/COUNSELING SERVICES | HUMAN SERVICES DEPARTMENT |
| FAMILY SERVICE INC | 4010 | 2508864 | P&DD PUBLIC SERVICE | FINANCE DEPARTMENT |
| FAMILY SERVICE INC | 4010 | 2559513 | ASE MANAGEMENT AND COUNSELING | HUMAN SERVICES DEPARTMENT |
| FAMILY SERVICE INC | 4010 | 2597464 | | FINANCE DEPARTMENT |
| FAMILY SERVICE INC | 4010 | 2620491 | | HUMAN SERVICES DEPARTMENT |
| FAMILY SERVICE INC | 4010 | 2588790 | | HUMAN SERVICES DEPARTMENT |
| FAMILY SERVICE INC | 4010 | 2773997 | | HUMAN SERVICES DEPARTMENT |
| FAMILY SERVICE INC | 4010 | 2751502 | | HUMAN SERVICES DEPARTMENT |
| FARBMAN DEVELOPMENT GROUP INC | 1052543 | 2574590 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| FELIX J LIDDELL MD | 9742 | 2619048 | | HUMAN SERVICES DEPARTMENT |
| FELIX J LIDDELL MD | 9742 | 2771950 | | HUMAN SERVICES DEPARTMENT |
| FEMI TALABI & ASSOCIATES IINC | 1025786 | 2693989 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| FERGUSON ENTERPRISES INC | 1002829 | 2762820 | WATER SYSTEM IMPROVEMENTS | WATER DEPARTMENT |
| FERGUSON ENTERPRISES INC | 1002829 | 2708886 | | RECREATION DEPARTMENT |
| FIRST AMERICAN EQUITY LOAN SERVICES INC | 1053418 | 2572513 | | LAW DEPARTMENT |
| FIRST TEE OF DETROIT | 1106838 | 2509532 | JUNIOR GOLF PROGRAM | RECREATION DEPARTMENT |
| FLORISE E NEVILLE EWELL | 18953 | 2511634 | LAW DEPARTMENT CONTRACTS SECTION | FINANCE DEPARTMENT |
| FOCUS HOPE | 20156 | 2595470 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| FOCUS HOPE | 20156 | 2517834 | MACHINIST TRAINING | EMPLOYMENT AND TRAINING DEPARTMENT |
| FOCUS HOPE | 20156 | 2782889 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| FOLIA INDUSTRIES INC | 1078969 | 2647895 | | RECREATION DEPARTMENT |
| FORBES MANAGEMENT INC | 13713 | 2500738 | 8TH FL 2111 WOODWARD | NO DEPARTMENT INDICATED |
| FORBES MANAGEMENT INC | 13713 | 2500736 | | NO DEPARTMENT INDICATED |
| FORENSIC EXAMINATION SERVICE | 19765 | 2511601 | ESTATE OF CARA BELL JONES | LAW DEPARTMENT |
| FORT WAYNE CONSTRUCTION INC | 1002341 | 2508445 | EMER. REPAIR OF STORM DAMAGED SIDEWALKS | DEPARTMENT OF PUBLIC WORKS |
| FOUNDATION FOR BEHAVIORAL RESOURCES | 1001251 | 2562165 | WORK FIRST & WTW | EMPLOYMENT AND TRAINING DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| FOUNDATION FOR BEHAVIORAL RESOURCES | 1001251 | 2629097 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| FOUNDATION FOR BEHAVIORAL RESOURCES | 1001251 | 2778457 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| FRANCES GREENEBAUM | 15339 | 2500958 | | HUMAN SERVICES DEPARTMENT |
| FRANCES GREENEBAUM | 15339 | 2500968 | | HUMAN SERVICES DEPARTMENT |
| FRANCES S GREENEBAUM | 1001353 | 2663660 | | HUMAN SERVICES DEPARTMENT |
| FRANKLIN WRIGHT SETTLEMENTS INC | 1001261 | 2557088 | 2001-2002 EARLY HEAD START CONTRACT | HUMAN SERVICES DEPARTMENT |
| FRANKLIN WRIGHT SETTLEMENTS INC | 1001261 | 2532391 | EARLY HEAD START 2000-2001 | FINANCE DEPARTMENT |
| FRANKLIN WRIGHT SETTLEMENTS INC | 1001261 | 2512564 | HEAD START SERVICES | HUMAN SERVICES DEPARTMENT |
| FRANKLIN WRIGHT SETTLEMENTS INC | 1001261 | 2501500 | PUBLIC FACILITY REHAB | NO DEPARTMENT INDICATED |
| FREEDOM HOUSE | 19860 | 2551708 | EMERGENCY SHELTER | HUMAN SERVICES DEPARTMENT |
| G4S SECURE SOLUTIONS USA, INC. | 1116038 | 2741015 | SECURITY SERVICES | GENERAL SERVICES DEPARTMENT |
| GARAN LUCOW MILLER PC | 1007550 | 2525486 | ELIZABETH HURD, ET AL V CITY OF DETROIT | LAW DEPARTMENT |
| GARAN LUCOW MILLER PC | 1007550 | 2540460 | LEGAL SERVICES | LAW DEPARTMENT |
| GARAN LUCOW MILLER PC | 1007550 | 2505197 | JOHNSON V JECZEN, ET AL | LAW DEPARTMENT |
| GARAN LUCOW MILLER PC | 1007550 | 2502158 | LEGAL SERVICES: TROMEUR V ADKINS | LAW DEPARTMENT |
| GARAN LUCOW MILLER PC | 1007550 | 2505077 | LEGAL SERVICES | LAW DEPARTMENT |
| GARAN LUCOW MILLER PC | 1007550 | 2574321 | | LAW DEPARTMENT |
| GARAN LUCOW MILLER PC | 1007550 | 2505187 | LEGAL SERVICES: BERNICE MARTIN V CITY | FINANCE DEPARTMENT |
| GENESIS ENERGY SOLUTIONS LLC | 1059170 | 2623273 | | PUBLIC LIGHTING DEPARTMENT |
| GENESIS ENERGY SOLUTIONS LLC | 1059170 | 2630629 | | PUBLIC LIGHTING DEPARTMENT |
| GENESIS ENERGY SOLUTIONS LLC | 1059170 | 2623274 | | PUBLIC LIGHTING DEPARTMENT |
| GENESIS ENERGY SOLUTIONS LLC | 1059170 | 2625340 | | PUBLIC LIGHTING DEPARTMENT |
| GEORGE E SANSOUCY P E LLC | 1034071 | 2537262 | PROFESSIONAL SERVICES: APPRAISALS | LAW DEPARTMENT |
| GEORGE JOHNSON & COMPANY | 1826 | 2754359 | | HUMAN SERVICES DEPARTMENT |
| GERALD K EVELYN | 1102554 | 2765473 | LEGAL SERVICES | LAW DEPARTMENT |
| GERALD K EVELYN | 1102554 | 2765475 | LEGAL SERVICES | LAW DEPARTMENT |
| GHAFARI ASSOCIATES LLC | 16840 | 2500978 | ADAMS ROAD IMPROVEMENTS | NO DEPARTMENT INDICATED |
| GHAFARI ASSOCIATES LLC | 16840 | 2520892 | ELECTRICAL SERVICES AT 2633 MICHIGAN AVE. | DEPARTMENT OF PUBLIC WORKS |
| GIORGI CONCRETE LLC | 1010405 | 2764704 | REPAIR OF WATER SYSTEM | WATER DEPARTMENT |
| GIRL SCOUTS OF METRO DETROIT | 7539 | 2588820 | | HUMAN SERVICES DEPARTMENT |
| GIRL SCOUTS OF METRO DETROIT | 7539 | 2775160 | | HUMAN SERVICES DEPARTMENT |
| GIS DATA RESOURCES INC | 1087473 | 2696020 | | POLICE DEPARTMENT |
| GLEANERS COMMUNITY FOOD BANK 1 | 16611 | 2775453 | | HUMAN SERVICES DEPARTMENT |
| GLEANERS COMMUNITY FOOD BANK 1 | 16611 | 2803612 | | HUMAN SERVICES DEPARTMENT |
| GLEANERS COMMUNITY FOOD BANK 1 | 16611 | 2778130 | | HUMAN SERVICES DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| GLEANERS COMMUNITY FOOD BANK 1 | 16611 | 2746566 | | HUMAN SERVICES DEPARTMENT |
| GLEN OLIVACHE CPA PC | 1001562 | 2507371 | | FINANCE DEPARTMENT |
| GLOBEWIDE FAVOR CONSTRUCTION CO LLC | 1085092 | 2808926 | | HUMAN SERVICES DEPARTMENT |
| GLOBEWIDE FAVOR CONSTRUCTION CO LLC | 1085092 | 2793406 | | HUMAN SERVICES DEPARTMENT |
| GODFREY J DILLARD ESQ | 1103303 | 2779417 | | LAW DEPARTMENT |
| GOODMAN & HURWITZ PC | 1101745 | 2760433 | SPECIAL COUNSEL | CITY COUNCIL |
| GOODMAN MUSCAT INC | 1015305 | 2509737 | ORGANIZATIONAL ASSESSMENT | ENVIRONMENTAL AFFAIRS DEPARTMENT |
| GOODWILL INDUSTRIES OF GREATER DETROIT | 14999 | 2563438 | WORKFIRST/WTW JS/JR | EMPLOYMENT AND TRAINING DEPARTMENT |
| GOODWILL INDUSTRIES OF GREATER DETROIT | 14999 | 2559919 | FOOD STAMPS | EMPLOYMENT AND TRAINING DEPARTMENT |
| GOODWILL INDUSTRIES OF GREATER DETROIT | 14999 | 2539285 | WORKFIRST JS/JP 10/01/00-9/30/01 | EMPLOYMENT AND TRAINING DEPARTMENT |
| GOODWILL INDUSTRIES OF GREATER DETROIT | 14999 | 2628317 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| GOODWILL INDUSTRIES OF GREATER DETROIT | 14999 | 2797757 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| GOODWILL INDUSTRIES OF GREATER DETROIT | 14999 | 2736042 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| GOODWILL INDUSTRIES OF GREATER DETROIT | 14999 | 2782892 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| GOODWILL INDUSTRIES OF GREATER DETROIT | 14999 | 2761556 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| GOODWILL INDUSTRIES OF GREATER DETROIT | 14999 | 2740308 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| GOODWILL INDUSTRIES OF GREATER DETROIT | 14999 | 2770617 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| GOODWILL INDUSTRIES OF GREATER DETROIT | 14999 | 2770613 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| GRAY & GRAY PRODUCTIONS | 18090 | 2594537 | | RECREATION DEPARTMENT |
| GREAT LAKES CENTER FOR INDEPENDENT LIVING | 19673 | 2501926 | PUBLIC SERVICE | PLANNING AND DEVELOPMENT DEPARTMENT |
| GREATER DETROIT COMMUNITY OUTREACH CENTER INC | 19466 | 2501509 | PUBLIC FACILITY REHAB | NO DEPARTMENT INDICATED |
| GREEN GREEN ADAMS PALMER & CRAIG PC | 1014038 | 2508762 | LEGAL SERVICES | CITY COUNCIL |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| GREGORY TERRELL & COMPANY | 14501 | 2506562 | AUDIT | HUMAN SERVICES DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2527604 | LEGAL SERVICES | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2546243 | SANDRA MILLER V  EUGENE BROWN, ET AL | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2502429 | CHISHOLM, ET AL V CITY | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2550395 | LEGAL SERVICES | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2548219 | LEGAL SERVICES | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2632136 | | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2545753 | BRANDON BRYANT V EUGENE BROWN/CITY | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2502093 | LEGAL SERVICES | NO DEPARTMENT INDICATED |
| GRIER & COPELAND PC | 11779 | 2502430 | LEGAL SERVICES:  MCHUGH, ET AL V CITY | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2505089 | LEGAL SERVICES | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2597158 | | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2576025 | | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2708898 | | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2634211 | | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2649862 | CONTRACT FOR LEGAL SERVICES | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2688106 | DAREL DEON CHANCELLOR V CITY | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2551543 | WILLIE BRYANT V EUGENE BROWN | LAW DEPARTMENT |
| GS EQUITIES LLC | 1088912 | 2700328 | | LAW DEPARTMENT |
| HALCROW INC | 1102933 | 2769474 | | MAYOR'S OFFICE |
| HALE CONTRACTING INC | 1025577 | 2757453 | VENTILATION SYSTEM | RECREATION DEPARTMENT |
| HALEY & ALDRICH INC | 1098676 | 2740779 | | WATER DEPARTMENT |
| HAMILTON ANDERSON ASSOCIATES | 18698 | 2507157 | BELLE ISLE MASTER PLAN | RECREATION DEPARTMENT |
| HAMILTON ANDERSON ASSOCIATES | 18698 | 2530873 | FARWELL FIELD ARCHITECTURAL SERVICES | RECREATION DEPARTMENT |
| HAMILTON ANDERSON ASSOCIATES | 18698 | 2508644 | BELLE ISLE'S LOITER WAY REFECTORY | RECREATION DEPARTMENT |
| HAMILTON ANDERSON ASSOCIATES | 18698 | 2563405 | BELLE ISLE'S MASTER PLAN | RECREATION DEPARTMENT |
| HAMPTON RIDGE PROPERTIES LLC | 1019230 | 2515341 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| HARBIN GROUP INC | 16607 | 2507665 | CASINO SITE APPRAISAL | FINANCE DEPARTMENT |
| HARPER HOUSE | 1003691 | 2501737 | | HEALTH DEPARTMENT |
| HARTFORD MEMORIAL BAPTIST CHURCH | 14442 | 2502480 | SENIOR CITIZENS MEALS | HEALTH DEPARTMENT |
| HAYES LAND DEVELOPMENT CORPORATION | 1106003 | 2613519 | | WATER DEPARTMENT |
| HEALTH MANAGEMENT SYSTEMS | 5654 | 2542966 | EMPLOYEE ASSISTANCE PROGRAM | HUMAN RESOURCES DEPARTMENT |
| HEALTH MANAGEMENT SYSTEMS | 1043088 | 2613135 | | HUMAN RESOURCES DEPARTMENT |
| HEALTH SERVICES TECHNICAL ASSISTANCE | 9042 | 2504678 | TARGET CITIES FYE 9/30/99 | FINANCE DEPARTMENT |
| HEALTH SERVICES TECHNICAL ASSISTANCE | 9042 | 2501833 | SUBSTANCE ABUSE COORDINATION AGENCY | HEALTH DEPARTMENT |
| HEALTH SERVICES TECHNICAL ASSISTANCE | 9042 | 2568871 | | HEALTH DEPARTMENT |
| HEALTH SERVICES TECHNICAL ASSISTANCE | 9042 | 2570277 | | HEALTH DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| HEALTH SERVICES TECHNICAL ASSISTANCE | 9042 | 2504742 | MEDICAID SUBSTANCE ABUSE | HEALTH DEPARTMENT |
| HEALTH SERVICES TECHNICAL ASSISTANCE | 9042 | 2512068 | SUBSTANCE ABUSE ASSESSMENT | HEALTH DEPARTMENT |
| HEAT & WARMTH FUND | 18570 | 2717114 | | WATER DEPARTMENT |
| HEIGHTS HEATING & COOLING INC | 1032472 | 2741890 | AIR CONDITIONING INSTALLATION | RECREATION DEPARTMENT |
| HENRY FORD HEALTH SYSTEM | 1012926 | 2505277 | MEDICAL SERVICES | HEALTH DEPARTMENT |
| HENRY FORD HEALTH SYSTEM | 1012926 | 2605168 | | HEALTH DEPARTMENT |
| HENRY FORD HEALTH SYSTEM | 1012926 | 2574218 | | HEALTH DEPARTMENT |
| HENRY FORD HEALTH SYSTEM | 1012926 | 2621296 | | HEALTH DEPARTMENT |
| HENRY FORD HEALTH SYSTEM | 1012926 | 2752105 | | HEALTH DEPARTMENT |
| HERBERT REALTY & MANAGEMENT | 1018769 | 2559115 | | FINANCE DEPARTMENT |
| HERITAGE OPTICAL CENTER INC | 16451 | 2515148 | OPTOMETRIC SERVICES | HEALTH DEPARTMENT |
| HERITAGE OPTICAL CENTER INC | 16451 | 2530208 | | HEALTH DEPARTMENT |
| HINES FINANCIAL SERVICES | 1059682 | 2604598 | | FINANCE DEPARTMENT |
| HINES FINANCIAL SERVICES | 1059682 | 2761160 | | HUMAN SERVICES DEPARTMENT |
| HINES FINANCIAL SERVICES | 1059682 | 2775593 | | HUMAN SERVICES DEPARTMENT |
| HINES FINANCIAL SERVICES | 1059682 | 2757513 | | HUMAN SERVICES DEPARTMENT |
| HINES FINANCIAL SERVICES | 1059682 | 2783105 | | HUMAN SERVICES DEPARTMENT |
| HINES FINANCIAL SERVICES | 1059682 | 2761157 | | HUMAN SERVICES DEPARTMENT |
| HINES FINANCIAL SERVICES | 1059682 | 2706006 | | HUMAN SERVICES DEPARTMENT |
| HINES FINANCIAL SERVICES | 1059682 | 2804847 | | HUMAN SERVICES DEPARTMENT |
| HINES FINANCIAL SERVICES | 1059682 | 2744129 | | HUMAN SERVICES DEPARTMENT |
| HNTB MICHIGAN INC | 1025696 | 2589459 | | DEPARTMENT OF PUBLIC WORKS |
| HNTB MICHIGAN INC | 1025696 | 2800235 | PROFESSIONAL SERVICES | AIRPORT DEPARTMENT |
| HOUSING & COMMUNITY DEVELOPMENT CORP OF WAYNE COUNTY | 1021017 | 2518243 | HOUSING REHABILITATION SERVICES | FINANCE DEPARTMENT |
| HOWARD & HOWARD ATTORNEYS PC | 1013410 | 2773508 | LEGAL SERIVCES | LAW DEPARTMENT |
| HTC GLOBAL SERVICES INC | 1003630 | 2501175 | | INFORMATION TECHNOLOGY SERVICES |
| HUBBARD RICHARD COMMON COUNCIL | 9225 | 2501533 | | NO DEPARTMENT INDICATED |
| HUFFMASTER ASSOCIATES LLC | 1010540 | 2506275 | INVESTIGATIVE SERVICES | FINANCE DEPARTMENT |
| HUNGER ACTION COALITION OF MICHIGAN | 16897 | 2510332 | NOF PUBLIC SERVICE CONTRACT | FINANCE DEPARTMENT |
| HUNT ASSOCIATES 1 INC | 19746 | 2537045 | WIA OUT OF SCHOOL YOUTH | EMPLOYMENT AND TRAINING DEPARTMENT |
| HUNT ASSOCIATES 1 INC | 19746 | 2628062 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| HUTZEL HOSPITAL | 15175 | 2501837 | SUBSTANCE ABUSE COORDINATION AGENCY | NO DEPARTMENT INDICATED |
| HUTZEL HOSPITAL | 15175 | 2508866 | | HEALTH DEPARTMENT |
| IBM CORPORATION | 2865 | 2505095 | | INFORMATION TECHNOLOGY SERVICES |
| ICDS | 1003163 | 2501182 | | PUBLIC LIGHTING DEPARTMENT |
| IMAGE SCAN INC | 18157 | 2512900 | DATA ENTRY SOFTWARE | INFORMATION TECHNOLOGY SERVICES |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| IMPERIAL CONSTRUCTION CO | 12464 | 2746886 | | WATER DEPARTMENT |
| IMPERIAL CONSTRUCTION CO | 12464 | 2685161 | | WATER DEPARTMENT |
| IMPERIAL CONSTRUCTION CO | 12464 | 2679721 | | WATER DEPARTMENT |
| IN LAND WATERS POLLUTION | 14434 | 2502291 | REMOVAL OF STORAGE TANKS | DEPARTMENT OF PUBLIC WORKS |
| IN LAND WATERS POLLUTION | 14434 | 2502290 | UST UPGRADES | DEPARTMENT OF PUBLIC WORKS |
| INDUSTRIAL RELATIONS INC | 1027976 | 2527324 | PERFORMANCE MANAGEMENT SYSTEM | FINANCE DEPARTMENT |
| INDUSTRIAL RELATIONS INC | 1027976 | 2513432 | EMPLOYEE DEVELOPMENT PROGRAM | HUMAN RESOURCES DEPARTMENT |
| INFRASTRUCTURE MANAGEMENT GROUP INC | 1061121 | 2634315 | | PUBLIC LIGHTING DEPARTMENT |
| INLAND WATERS POLLUTION CONTROL INC | 1055642 | 2556880 | UNDERGROUND STORAGE TANKS | DEPARTMENT OF PUBLIC WORKS |
| INTERCLEAN EQUIPMENT INC | 1011180 | 2504773 | INSTALLATION OF TRUCK WASH SYSTEMS | DEPARTMENT OF PUBLIC WORKS |
| INTERGRAPH CORPORATION | 6153 | 2516412 | 953625- COMPUTER RELATED PRODUCTS | INFORMATION TECHNOLOGY SERVICES |
| INTERNATIONAL INSTITUTE OF METROPOLITAN DETROIT INC | 9144 | 2521334 | | FINANCE DEPARTMENT |
| ISLANDVIEW VILLAGE DEVELOPMENT CORP | 20425 | 2509212 | SITE PREP/STREET IMPROVEMENT | FINANCE DEPARTMENT |
| ITW MORTAGE INVESTMENTS III INC | 1561 | 2501775 | | FINANCE DEPARTMENT |
| J & J YOUTH SERVICES | 1012849 | 2506553 | NOF PUBLIC SERVICE CONTRACT | FINANCE DEPARTMENT |
| J J ASSOCIATES | 17711 | 2589033 | | INFORMATION TECHNOLOGY SERVICES |
| J J ASSOCIATES | 17711 | 2502052 | PROGRAMMING CODING | INFORMATION TECHNOLOGY SERVICES |
| J J ASSOCIATES | 17711 | 2560948 | 2002 PROFESSIONAL SERVICES CONTRACT | INFORMATION TECHNOLOGY SERVICES |
| J O A CONSTRUCTION CO INC | 1001666 | 2642903 | | RECREATION DEPARTMENT |
| JACKETS FOR JOBS INC | 1064297 | 2778459 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| JACKETS FOR JOBS INC | 1064297 | 2754535 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| JACKSON & KELLY PLLC | 1016929 | 2511861 | LEGAL SERVICES | LAW DEPARTMENT |
| JAMES C COBB JR PC | 10571 | 2504319 | LEGAL SERVICES | PLANNING AND DEVELOPMENT DEPARTMENT |
| JAMES C COBB JR PC | 10571 | 2501780 | LEGAL SERVICES | PLANNING AND DEVELOPMENT DEPARTMENT |
| JAMES HANEY MD | 1012073 | 2544158 | DRUG TREATMENT PROGRAM PHYSICIAN | HUMAN SERVICES DEPARTMENT |
| JAMES HANEY MD | 1012073 | 2513136 | DRUG TREATMENT PROGRAM PHYSICIAN | HUMAN SERVICES DEPARTMENT |
| JAMES HANEY MD | 1012073 | 2559396 | DRUG TREATMENT PROGRAM PHYSICIAN | HUMAN SERVICES DEPARTMENT |
| JAMES HANEY MD | 1012073 | 2508122 | DRUG TREATMENT PROGRAM PHYSICIAN | FINANCE DEPARTMENT |
| JAMES HANEY MD | 1012073 | 2591486 | | HUMAN SERVICES DEPARTMENT |
| JAMES HANEY MD | 1012073 | 2746434 | | HUMAN SERVICES DEPARTMENT |
| JAMES HANEY MD | 1012073 | 2771944 | | HUMAN SERVICES DEPARTMENT |
| JAMES W BURDICK PC | 1101618 | 2760028 | | LAW DEPARTMENT |
| JEFFERSON WELLS INTERNATIONAL INC | 1032623 | 2546414 | PROFESSIONAL SERVICES | AUDITOR GENERAL |
| JEFFERSON WELLS INTERNATIONAL INC | 1032623 | 2534548 | INTERNAL AUDIT PARTNER | AUDITOR GENERAL |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| JENKINS CONSTRUCTION INC | 17037 | 2541121 | WS-621 WATER MAIN REPAIRS | WATER DEPARTMENT |
| JENKINS CONSTRUCTION INC | 17037 | 2501854 | CONSTRUCTION | DEPARTMENT OF PUBLIC WORKS |
| JENKINS CONSTRUCTION INC | 17037 | 2691365 | | WATER DEPARTMENT |
| JESSE TOLBERT MD | 1012082 | 2559428 | DRUG TREATMENT PROGRAM PHYSICIAN | HUMAN SERVICES DEPARTMENT |
| JESSE TOLBERT MD | 1012082 | 2544148 | DRUG TREATMENT PROGRAM PHYSICIAN | HUMAN SERVICES DEPARTMENT |
| JESSE TOLBERT MD | 1012082 | 2508116 | DRUG TREATMENT PROGRAM | FINANCE DEPARTMENT |
| JESSE TOLBERT MD | 1012082 | 2513142 | DRUG TREATMENT PROGRAM PHYSICIAN | HUMAN SERVICES DEPARTMENT |
| JESSE TOLBERT MD | 1012082 | 2591460 | | HUMAN SERVICES DEPARTMENT |
| JEWISH VOCATIONAL SERVICE | 1015533 | 2797759 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| JEWISH VOCATIONAL SERVICE | 1015533 | 2726449 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| JEWISH VOCATIONAL SERVICE | 1015533 | 2777965 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| JEWISH VOCATIONAL SERVICE | 1015533 | 2778659 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| JEWISH VOCATIONAL SERVICE | 11835 | 2552853 | CASE MANAGEMENT | EMPLOYMENT AND TRAINING DEPARTMENT |
| JEWISH VOCATIONAL SERVICE | 11835 | 2513901 | NO WRONG DOOR | EMPLOYMENT AND TRAINING DEPARTMENT |
| JEWISH VOCATIONAL SERVICE | 11835 | 2550062 | PAL BASIC LITERACY | EMPLOYMENT AND TRAINING DEPARTMENT |
| JEWISH VOCATIONAL SERVICE | 11835 | 2538061 | WORK FIRST JOB SEARCH & PLACEMENT | EMPLOYMENT AND TRAINING DEPARTMENT |
| JOHN KING | 1070289 | 2799418 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| JOHN KING | 1070289 | 2781812 | | |
| JOHN PETER QUINN | 1088277 | 2751148 | | LAW DEPARTMENT |
| JOHN W HEAD JR DR | 1016367 | 2544130 | DRUG TREATMENT PROGRAM PHYSICIAN | HUMAN SERVICES DEPARTMENT |
| JOHN W HEAD JR DR | 1016367 | 2559403 | MEDICAL DIRECTOR | HUMAN SERVICES DEPARTMENT |
| JOHN W HEAD JR DR | 1016367 | 2771947 | | HUMAN SERVICES DEPARTMENT |
| JOHNSON ROSATI LABARGE | 1012630 | 2577160 | | LAW DEPARTMENT |
| JOHNSON ROSATI LABARGE | 1012630 | 2600509 | | LAW DEPARTMENT |
| JOHNSON ROSATI LABARGE | 1012630 | 2508107 | LEGAL SERVICES | FINANCE DEPARTMENT |
| JORDAN CLINCS LIMITED PARTNERSHIP | 1098511 | 2770685 | | HEALTH DEPARTMENT |
| JOWA ASSOCIATES | 7422 | 2501000 | UNIFORMED GUARD SERVICE | AIRPORT DEPARTMENT |
| JOWA ASSOCIATES | 7422 | 2513434 | GUARD SERVICE FOR DEPARTMENT CLINICS | HUMAN SERVICES DEPARTMENT |
| JOYFIELD CAREGIVERS | 1048950 | 2597503 | | FINANCE DEPARTMENT |
| JOYFIELD CAREGIVERS | 1048950 | 2563712 | 36-NTV-NOF PUBLIC SERVICE CONTRACT | FINANCE DEPARTMENT |
| JVS DETROITS WORKPLACE | 1034682 | 2575844 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| JVS DETROITS WORKPLACE | 1034682 | 2592232 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| JVS DETROITS WORKPLACE | 1034682 | 2597745 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| JVS DETROITS WORKPLACE | 1034682 | 2566265 | WORK FIRST JOB SEARCH & PLACEMENT | EMPLOYMENT AND TRAINING DEPARTMENT |
| KASIBORSKI RONANYRI FLASKA PC | 19685 | 2503637 | LEGAL SERVICES | FINANCE DEPARTMENT |
| KASIBORSKI RONANYRI FLASKA PC | 19685 | 2531995 | WAYNE COUNTY V CITY OF DETROIT | LAW DEPARTMENT |
| KASIBORSKI RONANYRI FLASKA PC | 19685 | 2502453 | LEGAL SERVICES | FINANCE DEPARTMENT |
| KELLER THOMA SCHWARTZ | 1020326 | 2517263 | EMPLOYMENT-RELATED INVESTIGATIONS | LAW DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| KELLY SERVICES INC | 1000576 | 2583741 | | FINANCE DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2760784 | | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2664187 | | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2706955 | | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2755384 | ROOF PLACEMENT | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2798610 | | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2733881 | BUTZEL PLAYFIELD RENOVATIONS | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2734358 | ACTIVITIES CENTER RENOVATIONS | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2760999 | WISH-EGAN PLAYFIELD RENOVATIONS | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2761019 | MILAN PLAYFIELD RENOVATIONS | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2761662 | KRAINZ PARK RENOVATIONS | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2789769 | | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2734388 | DRAINAGE/SEWER | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2731179 | | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2712232 | | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2760990 | OPTOMIST-STOUT RENOVATIONS | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2762087 | 2008 PARK IMPROVEMENTS | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2711290 | | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2712252 | | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2714050 | | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2807770 | REPAIRS AT HENDERSON MARINA | RECREATION DEPARTMENT |
| KIDSMART SOFTWARE COMPANY | 1072607 | 2781805 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| KIMLEY-HORN OF MICHIGAN INC | 1003415 | 2502474 | CASINO SITE APPRAISER | LAW DEPARTMENT |
| KOHN FINANCIAL CONSULTING | 1014434 | 2511508 | PASSALAQUA CHOP HOUSE V DETROIT | FINANCE DEPARTMENT |
| KOHN FINANCIAL CONSULTING | 1014434 | 2537217 | PROFESSIONAL SERVICES:  STILLMON V CITY | LAW DEPARTMENT |
| KOHN FINANCIAL CONSULTING | 1014434 | 2794993 | PROVIDE ADVICE ON SOLID WASTE FUND | BUDGET DEPARTMENT |
| KPMG CONSULTING, INC | 1028311 | 2529517 | AUDITING SERVICES | AUDITOR GENERAL |
| KPMG CONSULTING, INC | 1028311 | 2552186 | AUDITING SERVICES | AUDITOR GENERAL |
| KPMG LLP | 1440 | 2510105 | IMPLEMENT TIDEMARK COMPUTER SYSTEM | BUILDINGS AND SAFETY DEPARTMENT |
| KPMG LLP | 1440 | 2513477 | AUDITING SERVICES | AUDITOR GENERAL |
| KPMG LLP | 1440 | 2504566 | CONSULTING SERVICES | BUDGET DEPARTMENT |
| KVM DOOR SYSTEMS INC | 1099793 | 2785386 | EASTERN MARKET SHED NO. 3 RESERVATIONS | RECREATION DEPARTMENT |
| L D' AGOSTINI  & SONS INC | 1000677 | 2500927 | LATERAL SEWER REPLACEMENT | NO DEPARTMENT INDICATED |
| LACEY & ASSOCIATES | 1010869 | 2590826 | | FINANCE DEPARTMENT |
| LACEY & JONES LLP | 1013697 | 2562865 | DPOA ACT 312 2001-2004 PROCEEDINGS | LAW DEPARTMENT |
| LACEY & JONES LLP | 1013697 | 2502300 | BLUE CROSS/BLUE SHIELD RESERVE FUND | LAW DEPARTMENT |
| LACEY & JONES LLP | 1013697 | 2518960 | LEGAL SERVICES | LAW DEPARTMENT |
| LACEY & JONES LLP | 1013697 | 2534969 | KELLY FOREMAN V CITY | LAW DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| LACEY & JONES LLP | 1013697 | 2518952 | LEGAL SERVICES | LAW DEPARTMENT |
| LACEY & JONES LLP | 1013697 | 2518964 | EDWARD LEWIS V P.O. STEVEN PEIL/CITY | LAW DEPARTMENT |
| LACEY & JONES LLP | 1013697 | 2539980 | LEGAL SERVICES | LAW DEPARTMENT |
| LACEY & JONES LLP | 1013697 | 2520968 | LEGAL SERVICES:  KEMP  V NOETZEL & KEMP | LAW DEPARTMENT |
| LACEY & JONES LLP | 1013697 | 2539975 | LEGAL SERVICES:  MAURICE BROWN V CITY | LAW DEPARTMENT |
| LACEY & JONES LLP | 1013697 | 2518969 | MICHAEL MCHUGH V CITY OF DETROIT | LAW DEPARTMENT |
| LACEY & JONES LLP | 1013697 | 2518967 | JESSE WILLIAMS V CITY OF DETROIT | LAW DEPARTMENT |
| LACEY & JONES LLP | 1013697 | 2501959 | LEGAL SERVICES | LAW DEPARTMENT |
| LACEY & JONES LLP | 1013697 | 2518973 | BEAUCHAMP V OWENS/CITY | LAW DEPARTMENT |
| LACEY & JONES LLP | 1013697 | 2562836 | MAXIMILIAN ENGRAM, ET AL V CITY | LAW DEPARTMENT |
| LAKESHORE ENGINEERING SERVICE INC | 19808 | 2502201 | ABATEMENT ASBESTOS | DEPARTMENT OF PUBLIC WORKS |
| LAMONT TITLE CORPORATION | 1070200 | 2501595 | 36/LS - TITLE COMMITMENTS | PLANNING AND DEVELOPMENT DEPARTMENT |
| LAMONT TITLE CORPORATION | 1070200 | 2603572 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| LANIER | 1012355 | 2533656 | EMERGENCY USE FOR POLICE PAYROLL | FINANCE DEPARTMENT |
| LANZO CONSTRUCTION CO | 13425 | 2613521 | | WATER DEPARTMENT |
| LARDNER ELEVATOR COMPANY | 24166 | 2507678 | ELEVATOR LOAD & NO-LOAD TEST | WATER DEPARTMENT |
| LASED | 11513 | 2560786 | WIA IN SCHOOL YOUTH PROGRAM | EMPLOYMENT AND TRAINING DEPARTMENT |
| LASED | 11513 | 2501749 | PUBLIC FACILITY REHAB | NO DEPARTMENT INDICATED |
| LASED | 11513 | 2740243 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| LASED | 11513 | 2719927 | | DEPARTMENT OF TRANSPORTATION |
| LASED | 11513 | 2801087 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| LASED | 11513 | 2778540 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| LATINO FAMILY SERVICES INC | 16339 | 2504667 | MEDICAID FYE 9/30/99 | HEALTH DEPARTMENT |
| LATINO FAMILY SERVICES INC | 16339 | 2501843 | SUBSTANCE ABUSE COORDINATION AGENCY | NO DEPARTMENT INDICATED |
| LAW OFFICES COLLINS EINHORN | 1049868 | 2765611 | | LAW DEPARTMENT |
| LAWTON SCHOOL | 1100766 | 2806424 | | HUMAN SERVICES DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2502307 | LEGAL SERVICES: CRUMBIE V GUYTON, ET AL | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2502427 | GAINES/HARRIS/HINES/HUGHES V CITY | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2539985 | SANDRA/DARREN MILLER  V EUGENE BROWN | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2539983 | LEGAL SERVICES | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2536840 | LEGAL SERVICES | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2553151 | BERRY/CHENAULT/CROCKETT ET AL V CITY | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2553122 | KUE/WALKER/SMITH/WIGGINS V CITY | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2634333 | | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2655854 | | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2529631 | BRAZIL/PENA V CITY/HOOD | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2561951 | ALLEN/BATTLE/COOPER/GRIFFIN V CITY | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2600494 | | LAW DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| LEWIS & MUNDAY PC | 12439 | 2774620 | LEGAL SERVICES | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2502303 | LEGAL SERVICES | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2641462 | | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2649874 | | LAW DEPARTMENT |
| LIEDEL GRINNAN & LIEDEL PC | 1007353 | 2500765 | LEGAL SERVICES:  VELA V PRICE/CITY | LAW DEPARTMENT |
| LIEDEL GRINNAN & LIEDEL PC | 1007353 | 2539960 | LEGAL SERVICES | LAW DEPARTMENT |
| LIEDEL GRINNAN & LIEDEL PC | 1007353 | 2517379 | LEGAL SERVICES | LAW DEPARTMENT |
| LIEDEL GRINNAN & LIEDEL PC | 1007353 | 2548909 | LEGAL SERVICES | LAW DEPARTMENT |
| LIFE FITNESS INC | 1085199 | 2704235 | | RECREATION DEPARTMENT |
| LIONEL SAWYER COLLINS | 19940 | 2502230 | PROFESSIONAL SERVICES | CITY COUNCIL |
| LOCAL INITIATIVES SUPPORT CORPORATION | 1014122 | 2562574 | PROFESSIONAL SERVICES | CITY COUNCIL |
| LOCAL INITIATIVES SUPPORT CORPORATION | 18595 | 2502034 | EMPOWERED ZONE | NO DEPARTMENT INDICATED |
| LOCAL INITIATIVES SUPPORT CORPORATION | 1014122 | 2592262 | | FINANCE DEPARTMENT |
| LOCAL INITIATIVES SUPPORT CORPORATION | 1014122 | 2567588 | | FINANCE DEPARTMENT |
| LOOKING FOR MY SISTER | 1104410 | 2784890 | BLOCK GRANT PROGRAM | POLICE DEPARTMENT |
| LOUIS G REDSTONE ASSCS INC | 16448 | 2502006 | DESIGN FOR ROGELL GLF CRS | NO DEPARTMENT INDICATED |
| LUXURY SEDAN VAN SERVICE | 1015148 | 2570671 | | MUNICIPAL PARKING DEPARTMENT |
| MACDERMOTT ROOFING & SHEET METAL | 16537 | 2732369 | BELLE ISLE GARAGE - ROOF REPLACEMENT | RECREATION DEPARTMENT |
| MACDERMOTT ROOFING & SHEET METAL | 16537 | 2796454 | ROOF REPAIRS | RECREATION DEPARTMENT |
| MACK ALIVE INC | 19676 | 2801089 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| MACK ALIVE INC | 19676 | 2778765 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| MAJOR CEMENT CO | 22141 | 2502189 | PW 7561 REPAIR DEMAGED | NO DEPARTMENT INDICATED |
| MAJOR CEMENT CO | 22141 | 2634038 | | DEPARTMENT OF PUBLIC WORKS |
| MARINERS INN | 5159 | 2509995 | WTW SUBSTANCE ABUSE COUNSELING | EMPLOYMENT AND TRAINING DEPARTMENT |
| MARINERS INN | 5159 | 2549595 | CAREER INITIATIVES CENTER PROJECT | HUMAN SERVICES DEPARTMENT |
| MARJORIE R MALARNEY & ASSOCIATES | 12830 | 2500751 | LANSING LOBBYIST | LAW DEPARTMENT |
| MARYGROVE COLLEGE | 6279 | 2589338 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| MARYGROVE COLLEGE | 6279 | 2629691 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| MARYGROVE COLLEGE | 6279 | 2595777 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| MARYGROVE COLLEGE | 6279 | 2627961 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| MARYGROVE NONPROFIT CORPORATION | 1014543 | 2507022 | FIC #76292 WORK FIRST | EMPLOYMENT AND TRAINING DEPARTMENT |
| MARYGROVE NONPROFIT CORPORATION | 1014543 | 2512792 | ASSESSMENT CTR TITLES IIA/IIC & III | EMPLOYMENT AND TRAINING DEPARTMENT |
| MARYGROVE NONPROFIT CORPORATION | 1014543 | 2555328 | WIA ADULT & OUT-OF-SCHOOL YOUTH | EMPLOYMENT AND TRAINING DEPARTMENT |
| MARYGROVE NONPROFIT CORPORATION | 1014543 | 2529603 | ASSESS CTR MOD#1 | FINANCE DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| MARYGROVE NONPROFIT CORPORATION | 1014543 | 2563669 | LEARNING RESOURCE CTR WORK FIRST | EMPLOYMENT AND TRAINING DEPARTMENT |
| MARYGROVE NONPROFIT CORPORATION | 1014543 | 2571652 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| MARYGROVE NONPROFIT CORPORATION | 1014543 | 2777810 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| MARYGROVE NONPROFIT CORPORATION | 1014543 | 2771650 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| MARYGROVE NONPROFIT CORPORATION | 1014543 | 2740292 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| MARYGROVE NONPROFIT CORPORATION | 1014543 | 2725976 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| MARYGROVE NONPROFIT CORPORATION | 1014543 | 2740278 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| MARYGROVE NONPROFIT CORPORATION | 1014543 | 2754537 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| MATRIX HUMAN SERVICES | 1584 | 2512563 | HEAD START SERVICES | HUMAN SERVICES DEPARTMENT |
| MATRIX HUMAN SERVICES | 1584 | 2528270 | ENPOWERMENT ZONE- PUBLIC SERVICES | PLANNING AND DEVELOPMENT DEPARTMENT |
| MATRIX HUMAN SERVICES | 1584 | 2541817 | PAROLEE EMPLOYMENT TRAINING PROGRAM | EMPLOYMENT AND TRAINING DEPARTMENT |
| MATRIX HUMAN SERVICES | 1584 | 2557083 | 2001-2002 HEAD START CONTRACT | HEALTH DEPARTMENT |
| MATRIX HUMAN SERVICES | 1584 | 2502075 | HEAD START SERVICES | HUMAN SERVICES DEPARTMENT |
| MATRIX HUMAN SERVICES | 1584 | 2532520 | HEAD START PROGRAM | HUMAN SERVICES DEPARTMENT |
| MATRIX HUMAN SERVICES | 1584 | 2501666 | JOB SEARCH AND PLACEMENT | NO DEPARTMENT INDICATED |
| MATRIX HUMAN SERVICES | 1584 | 2512181 | SHELTER FOR HOMELESS YOUTH | HUMAN SERVICES DEPARTMENT |
| MATRIX HUMAN SERVICES | 1584 | 2561392 | WORK FIRST & WTW. 2001-2002 | EMPLOYMENT AND TRAINING DEPARTMENT |
| MATRIX HUMAN SERVICES | 1584 | 2606499 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| MATRIX HUMAN SERVICES | 1584 | 2847169 | | HUMAN SERVICES DEPARTMENT |
| MATRIX HUMAN SERVICES | 1584 | 2767093 | | HUMAN SERVICES DEPARTMENT |
| MAYOR'S TIME | 1070618 | 2780286 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| METCO SERVICES INC | 13250 | 2502148 | | DEPARTMENT OF PUBLIC WORKS |
| METROPOLITAN BAPTIST CHURCH HEAD START | 9004 | 2557075 | 2001-2002 HEAD START CONTRACT | HUMAN SERVICES DEPARTMENT |
| METROPOLITAN BAPTIST CHURCH HEAD START | 9004 | 2532514 | HEAD START PROGRAM | HUMAN SERVICES DEPARTMENT |
| METROPOLITAN BAPTIST CHURCH HEAD START | 9004 | 2505351 | | HUMAN SERVICES DEPARTMENT |
| METROPOLITAN BAPTIST CHURCH HEAD START | 9004 | 2512558 | HEAD START SERVICES | HUMAN SERVICES DEPARTMENT |
| METROPOLITAN BAPTIST CHURCH HEAD START | 9004 | 2768826 | | HUMAN SERVICES DEPARTMENT |
| METRO EAST DRUG TREATMENT | 10996 | 2501534 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| METRO EMPLOYMENT SOLUTIONS | 1007722 | 2564007 | WORK FIRST & WELFARE TO WORK | EMPLOYMENT AND TRAINING DEPARTMENT |
| METRO EMPLOYMENT SOLUTIONS | 1007722 | 2626981 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| METROPOLITAN ARTS COMPLEX INC | 1001141 | 2501630 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| METROPOLITAN ARTS COMPLEX INC | 1001141 | 2501857 | SUBSTANCE ABUSE COORDINATION AGENCY | NO DEPARTMENT INDICATED |
| METROPOLITAN CHILDREN & YOUTH INC | 1082096 | 2847163 | | HUMAN SERVICES DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| METROPOLITAN DETROIT AFL-CIO | 1001142 | 2502169 | JOB SEARCH | NO DEPARTMENT INDICATED |
| METROPOLITAN DETROIT AFL-CIO | 1001142 | 2603384 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| METROPOLITAN DETROIT VISITORS | 21182 | 2530321 | ADVERTISING AND PROMTIONAL EXPERTISE | CIVIC CENTER DEPARTMENT |
| METROPOLITAN DETROIT VISITORS | 21182 | 2550871 | PROMOTION FOR COBO CENTER | CIVIC CENTER DEPARTMENT |
| METROPOLITAN DETROIT VISITORS | 21182 | 2767846 | PROFESSIONAL SERVICES CONTRACT | CIVIC CENTER DEPARTMENT |
| MGM LEGAL MGMT SOLUTIONS | 20133 | 2502235 | | NO DEPARTMENT INDICATED |
| MICHIGAN CONFERENCE SDA DETROIT/METRO | 1012847 | 2506682 | NOF PUBLIC SERVICE CONTRACT | FINANCE DEPARTMENT |
| MICHIGAN DEPARTMENT OF CAREER | 1016600 | 2511440 | EMPLOYMENT SERVICES | EMPLOYMENT AND TRAINING DEPARTMENT |
| MICHIGAN DEPARTMENT OF CAREER | 1016600 | 2620233 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2510495 | ADVANCE-TRAFFIC SIGNAL MODERNIZATION | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2517085 | BITUMINIOUS COLDMILLING WORK ALONG HWY M102 FROM HWY M53TO KELLY ROAD | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2500761 | DECK REPLACEMENT | NO DEPARTMENT INDICATED |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2518505 | COLDMILLING ALONG HWY. US-24 FROM HWY. M-5(GRAND RIVER) TO M-102 | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2501400 | RESURFACING | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2501407 | RESCONSTRUCTION OF DECK | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2511603 | TRAFFIC SIGNALS AND PAVEMENT MARKINGS | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2501807 | DECK REPLACEMENT | NO DEPARTMENT INDICATED |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2500758 | SCREENING | NO DEPARTMENT INDICATED |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2518522 | DECK REPLACEMENT | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2500787 | REPLACE BRIDGES | NO DEPARTMENT INDICATED |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2512565 | CONCRETRE OVERLAY FOR STRUCTURE WHICH CARRIES PORTER ST. OVER I-75 | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2501877 | BRIDGE | NO DEPARTMENT INDICATED |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2521604 | DECK REPLACEMENT | DEPARTMENT OF PUBLIC WORKS |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2524693 | PEDESTRAIN SCREENING FOR VARIOUS STRUCTURES | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2502178 | RECONSTRUCT HWY - I 75 SPRINGWELL | NO DEPARTMENT INDICATED |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2501411 | BRIDGE AND DECK REPLACEMENT | NO DEPARTMENT INDICATED |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2567088 | | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2502469 | RESURFACE DECK | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2538766 | TRAFFIC SIGNALWORK AT DICKERSON ROAD | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2520074 | RECONSTRUCTION OF STRUCTURE WHICH CARRIES GREENFIELD ROAD OVER HWY. M-10 | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2500781 | DECK REPLACEMENT | NO DEPARTMENT INDICATED |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2500779 | RESURFACING | NO DEPARTMENT INDICATED |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2622755 | | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2740688 | | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2517764 | DECK REPLACEMENT WORK ON BRIDGE | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2511049 | BITUMINOUS RESURFACING AND CURB WORK ALONG LIVERNOIS | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN FOOD AND BEVERAGE ASSOCIATION | 1101727 | 2759218 | PERIOD SERVICES FOR METRO YOUTH DAY | RECREATION DEPARTMENT |
| MICHIGAN FOOD AND BEVERAGE ASSOCIATION | 1101727 | 2786573 | METRO YOUTH DAY | RECREATION DEPARTMENT |
| MICHIGAN HVAC VOCATIONAL | 17478 | 2512764 | RETRAINING SERVICES | EMPLOYMENT AND TRAINING DEPARTMENT |
| MICHIGAN STATE AFL-CIO HRDI | 1027005 | 2769866 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| MICHIGAN STATE UNIVERSITY | 8167 | 2795800 | ACCIDENT INVESTIGATION COURSES | POLICE DEPARTMENT |
| MIDNIGHT GOLF PROGRAM | 1055952 | 2778544 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| MIDWEST CAREERS INSTITUTE | 1062863 | 2540054 | JOB SEARCH & PLACEMENT | EMPLOYMENT AND TRAINING DEPARTMENT |
| MIDWEST CAREERS INSTITUTE | 1062863 | 2562793 | WORK FIRST PROGRAM | EMPLOYMENT AND TRAINING DEPARTMENT |
| MIDWEST CAREERS INSTITUTE | 1062863 | 2778461 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| MIDWEST CAREERS INSTITUTE | 1062863 | 2806239 | | WORKFORCE DEVELOPMENT DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| MILWAUKEE INVESTMENT CO | 17041 | 2501818 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| MILWAUKEE INVESTMENT CO | 17041 | 2524249 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| MIRO WEINER & KRAMER PC | 1039572 | 2665562 | | LAW DEPARTMENT |
| MISDEMEANOR DEFENDERS LAW CLINIC PC | 1009823 | 2534641 | LEGAL SERVICES | NO DEPARTMENT INDICATED |
| MITCHCO | 1022053 | 2553859 | GAS, COMPRESSED NATURAL | DEPARTMENT OF TRANSPORTATION |
| MOLLY LEVITT | 1951 | 2500956 | | HUMAN SERVICES DEPARTMENT |
| MOLLY LEVITT | 1951 | 2500955 | | HUMAN SERVICES DEPARTMENT |
| MOMS & BABES TOO MSSP/ISSP INC | 1013849 | 2508892 | 25-WIC 9/99 CERTIFICATION | HEALTH DEPARTMENT |
| MONTEZ GROUP | 1100889 | 2769654 | | MAYOR'S OFFICE |
| MOORE & ASSOCIATES INC | 1001299 | 2501402 | EMPOWERMENT ZONE PROJECT | RECREATION DEPARTMENT |
| MOORISH SCIENCE TEMPLE OF AMERICA | 1003703 | 2506282 | NOF PUBLIC SERVICE | FINANCE DEPARTMENT |
| MORGAN FRAZIER SPECIALIZED SERVICES | 1001308 | 2502273 | CONSULTANT NUISANCE ABATEMENT | BUILDINGS AND SAFETY DEPARTMENT |
| MOSAIC YOUTH THEATRE OF DETROIT | 1001332 | 2543835 | THEATRICAL TRAINING | RECREATION DEPARTMENT |
| MOTOR CITY ELECTRIC CO | 13102 | 2581185 | | PUBLIC LIGHTING DEPARTMENT |
| MOTOR CITY ELECTRIC CO | 13102 | 2501432 | ELECTRICAL CONSTRUCTION PL 130 | NO DEPARTMENT INDICATED |
| MOTOR CITY ELECTRIC CO | 13102 | 2611714 | | PUBLIC LIGHTING DEPARTMENT |
| MOTOR CITY ELECTRIC CO | 13102 | 2611719 | | PUBLIC LIGHTING DEPARTMENT |
| MOTOR CITY ELECTRIC/METCO SERVICES AJV | 1033698 | 2537241 | FREQUENCY DRIVES AT WWTP'S INTERMEDIATE LIFT PUMP STATION #2 | SEWERAGE DEPARTMENT |
| MOTOR CITY PIPE | 1001344 | 2753399 | WING SEALS STAINLESS STEEL STRAPPING | GENERAL SERVICES DEPARTMENT |
| MOTOR CITY PIPE | 1001344 | 2763247 | PLUMBING & STEAM FITTING SUPPLIES | GENERAL SERVICES DEPARTMENT |
| NARDIN PARK DRUG ABUSE CENTER | 1706 | 2501540 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| NARDIN PARK DRUG ABUSE CENTER | 1706 | 2506559 | SUBSTANCE ABUSE FYE9/98 NARDIN PARK | HEALTH DEPARTMENT |
| NATIONAL COUNCIL ON ALCOHOLISM | 16455 | 2501541 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| NEIGHBORHOOD DEVELOPMENT CORPORATION | 20509 | 2501589 | LAND ACQUISITION SITE PREPARATION | PLANNING AND DEVELOPMENT DEPARTMENT |
| NEIGHBORHOOD RECONCILIATION CENTER INC | 1000268 | 2533307 | | HUMAN RIGHTS DEPARTMENT |
| NEIGHBORHOOD SERVICE ORGANIZATION | 8118 | 2547780 | WALK IN CENTER FOR THE HOMELESS | HUMAN SERVICES DEPARTMENT |
| NEIGHBORHOOD SERVICE ORGANIZATION | 8118 | 2532814 | 24 HOUR WALK IN CENTER | HUMAN SERVICES DEPARTMENT |
| NEIGHBORHOOD SERVICE ORGANIZATION | 8118 | 2527949 | 963-STAY (HOMELESS HOTLINE) | HUMAN SERVICES DEPARTMENT |
| NEIGHBORHOOD SERVICE ORGANIZATION | 8118 | 2501594 | SERVICES FOR THE HOMELESS | HUMAN SERVICES DEPARTMENT |
| NEIGHBORHOOD SERVICE ORGANIZATION | 8118 | 2557085 | 2001-2002 HEAD START (HIPPY) CONTRACT | HUMAN SERVICES DEPARTMENT |
| NEIGHBORHOOD SERVICE ORGANIZATION | 8118 | 2849011 | | HEALTH DEPARTMENT |
| NESS BORIS CORPORATION | 1087558 | 2693925 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| NETCOL ASSOCIATES INC | 1101173 | 2782059 | | HEALTH DEPARTMENT |
| NETCOL ASSOCIATES INC | 1101173 | 2756230 | | HEALTH DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| NETIMATION INC | 20384 | 2502117 | PROFESSIONAL SERVICES | NO DEPARTMENT INDICATED |
| NEW CENTER COMMUNITY | 19199 | 2502090 | | NO DEPARTMENT INDICATED |
| NEW DAY MULTI-PURPOSE COMMUNITY | 14872 | 2510758 | NUTRITIONAL MEALS, TRANSPORTATION | HUMAN SERVICES DEPARTMENT |
| NEW DAY MULTI-PURPOSE COMMUNITY | 14872 | 2533571 | SHELTER AND SUPPORTIVE SERVICES | HUMAN SERVICES DEPARTMENT |
| NEW DETROIT INC | 10869 | 2529859 | WIA CLASSROOM INSTRUCTION | EMPLOYMENT AND TRAINING DEPARTMENT |
| NEW DETROIT INC | 10869 | 2502172 | EZ-PUBLIC SERVICE | PLANNING AND DEVELOPMENT DEPARTMENT |
| NEW LIFE HOME FOR RECOVERING | 18726 | 2501457 | SUBSTANCE ABUSE COOR AGENCY 9-99 | HEALTH DEPARTMENT |
| NEW LIFE HOME FOR RECOVERING | 18726 | 2501621 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| NEW LIGHT RECOVERY CENTER INC | 1003695 | 2501638 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| NEW ST PAUL HEAD START AGENCY | 1048766 | 2620502 | | HUMAN SERVICES DEPARTMENT |
| NEW ST PAUL HEAD START AGENCY | 1048766 | 2587304 | | HUMAN SERVICES DEPARTMENT |
| NEW TECHNOLOGY LTD | 16280 | 2500969 | | SEWERAGE DEPARTMENT |
| NITRO TELECOM COMMUNICATIONS SPECIALIST | 1012632 | 2582916 | | FINANCE DEPARTMENT |
| NOETIX CORPORATION | 1067921 | 2649928 | | NON-DEPARTMENTAL |
| NORTH CENTRAL COMMUNITY MENTAL HEALTH | 1003696 | 2501657 | | NO DEPARTMENT INDICATED |
| NORTHEAST HEALTH SERVICES INC | 1003700 | 2507303 | MEDICAID SERVICES | HEALTH DEPARTMENT |
| NORTHERN AREA ASSOCIATION | 19677 | 2509233 | HOME REPAIR TECHNICAL ASSISTANCE | FINANCE DEPARTMENT |
| NORTHSTAR COMMUNITY DEVELOPMENT CORP | 1018049 | 2565847 | PREDEVELOPMENT ACTIVITIES | FINANCE DEPARTMENT |
| NORTHSTAR COMMUNITY DEVELOPMENT CORP | 1018049 | 2536554 | 36/LS-CHDO OPERATING SUPPORT | FINANCE DEPARTMENT |
| NORTHSTAR COMMUNITY DEVELOPMENT CORP | 1018049 | 2517450 | NOF PUBLIC SERVICE CONTRACT | FINANCE DEPARTMENT |
| NORTHWEST COMMUNITY PROGRAMS INC | 1062722 | 2676860 | | HUMAN SERVICES DEPARTMENT |
| NORTHWEST COMMUNITY PROGRAMS INC | 1062722 | 2765500 | PROFESSIONAL SERVICES CONTRACT | RECREATION DEPARTMENT |
| NORTHWEST DETROIT NON-PROFIT | 12557 | 2510026 | PUBLIC FACILITY REHAB.-FICS #74895 | FINANCE DEPARTMENT |
| NOVA CONTRACTING CORPORATION | 14983 | 2504312 | ENLOADER / W OPERATOR (M-80754) | SEWERAGE DEPARTMENT |
| NOVA DEVELOPMENT GROUP DETROIT LLC | 1107544 | 2809435 | | HUMAN SERVICES DEPARTMENT |
| NTH CONSULTANTS LTD | 16602 | 2504056 | CONSULTING UGS TANKS | DEPARTMENT OF PUBLIC WORKS |
| NTH CONSULTANTS LTD | 16602 | 2501727 | ENVIRONMENTAL SERVICES-FICS #73837 | PLANNING AND DEVELOPMENT DEPARTMENT |
| NTH CONSULTANTS LTD | 16602 | 2627188 | | RECREATION DEPARTMENT |
| OFFICE EXPRESS | 1105974 | 2731413 | | MAYOR'S OFFICE |
| O'LAUGHLIN CONSTRUCTION | 12053 | 2507308 | RENOVATION OF HYDRAULIC STRUCTURES | WATER DEPARTMENT |
| O'LAUGHLIN CONSTRUCTION | 12053 | 2574640 | PC-695 IN SYSTEM STORAGE | SEWERAGE DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| OLYMPIA ENTERTAINMENT | 1007150 | 2507725 | PARKING FACILITY MANAGEMENT SERVICES | MUNICIPAL PARKING DEPARTMENT |
| OMNICARE HEALTH PLAN | 1005707 | 2546137 | WIC CERTIFICATION | HEALTH DEPARTMENT |
| OMNICARE HEALTH PLAN | 1005707 | 2507763 | 25 WIC 1999 CERTIFICATION | HEALTH DEPARTMENT |
| OMNILEARN LLC | 1066579 | 2633220 | | NON-DEPARTMENTAL |
| OPERATION ABLE OF MICHIGAN | 17427 | 2519090 | BASIC SKILLS AND OCCUPATIONAL SKILLS | EMPLOYMENT AND TRAINING DEPARTMENT |
| OPERATION ABLE OF MICHIGAN | 17427 | 2519079 | BASIC SKILLS AND OCCUPATIONAL SKILLS. | EMPLOYMENT AND TRAINING DEPARTMENT |
| OPERATION ABLE OF MICHIGAN | 17427 | 2501939 | PUBLIC SERVICE EZ | NO DEPARTMENT INDICATED |
| OPERATION ABLE OF MICHIGAN | 17427 | 2797761 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| OPERATION ABLE OF MICHIGAN | 17427 | 2771757 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| OPERATION ABLE OF MICHIGAN | 17427 | 2740218 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| OPERATION GET DOWN | 3347 | 2550216 | TRANSITIONAL HOUSING | HUMAN SERVICES DEPARTMENT |
| OPERATION GET DOWN | 3347 | 2533044 | EMERGENCY NEED RESOURCES | HUMAN SERVICES DEPARTMENT |
| OPERATION GET DOWN | 3347 | 2518996 | EMERGENCY NEED RESOURCES | HUMAN SERVICES DEPARTMENT |
| OPERATION GET DOWN | 3347 | 2588310 | | HUMAN SERVICES DEPARTMENT |
| OPERATION GET DOWN | 3347 | 2557544 | FAMILY AND COMMODITY SERVICES | FINANCE DEPARTMENT |
| OPERATION GET DOWN | 3347 | 2776867 | | HUMAN SERVICES DEPARTMENT |
| OPERATION GET DOWN | 3347 | 2746767 | | HUMAN SERVICES DEPARTMENT |
| OPERATION GET DOWN | 3347 | 2810794 | | HUMAN SERVICES DEPARTMENT |
| OPERATION GET DOWN | 3347 | 2775349 | | HUMAN SERVICES DEPARTMENT |
| OPERATION GET DOWN | 3347 | 2803609 | | HUMAN SERVICES DEPARTMENT |
| OPERATION HELP INC | 1442 | 2501652 | WF EMP SKILLS & JOB PLACEMENT | EMPLOYMENT AND TRAINING DEPARTMENT |
| OPERATION HELP INC | 1442 | 2721152 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| OPERATION HELPING HAND INC | 19338 | 2511433 | EMERGENCY SHELTER | FINANCE DEPARTMENT |
| ORCHARDS CHILDRENS SERVICE | 1015406 | 2778756 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| ORDER OF THE FISHERMEN MINISTRY | 1057660 | 2557060 | 2001-2002 HEAD START CONTRACT | HUMAN SERVICES DEPARTMENT |
| ORDER OF THE FISHERMEN MINISTRY | 1057660 | 2532503 | HEAD START PROGRAM | HUMAN SERVICES DEPARTMENT |
| ORDER OF THE FISHERMEN MINISTRY | 1057660 | 2512545 | HEAD START SERVICES | RECREATION DEPARTMENT |
| ORDER OF THE FISHERMEN MINISTRY | 1057660 | 2620494 | | HUMAN SERVICES DEPARTMENT |
| ORDER OF THE FISHERMEN MINISTRY | 1057660 | 2502084 | | HUMAN SERVICES DEPARTMENT |
| ORDER OF THE FISHERMEN MINISTRY | 1057660 | 2797263 | | HUMAN SERVICES DEPARTMENT |
| ORGANIZATION & SYSTEMS CHANGE CONSULTANTS | 1101841 | 2779409 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| PARK RITE | 18490 | 2504157 | PROFESSIONAL PARKING MANAGEMENT | MUNICIPAL PARKING DEPARTMENT |
| PARK RITE | 18490 | 2570673 | | MUNICIPAL PARKING DEPARTMENT |
| PARK RITE | 18490 | 2504154 | PROFESSIONAL PARKING MANAGEMENT | MUNICIPAL PARKING DEPARTMENT |
| PARK RITE | 18490 | 2504153 | PROFESSIONAL PARKING MANAGEMENT | MUNICIPAL PARKING DEPARTMENT |
| PARK RITE | 18490 | 2501379 | EASTERN MARKET GARAGE | MUNICIPAL PARKING DEPARTMENT |
| PARKVIEW COUNSELING CENTER | 1003697 | 2501728 | MEDICAID SUBSTANCE ABUSE | HEALTH DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| PARSONS BRINCKEROFF MICHIGAN INC | 1025586 | 2531875 | DEVELOP TRAFFIC MASTER PLAN | DEPARTMENT OF PUBLIC WORKS |
| PARSONS BRINCKEROFF MICHIGAN INC | 1025586 | 2666820 | | RECREATION DEPARTMENT |
| PARTRIDGE ENTERPRISES INC | 19090 | 2515024 | REMOVAL OF DEAD ANIMALS | HEALTH DEPARTMENT |
| PARTRIDGE ENTERPRISES INC | 19090 | 2773727 | | HEALTH DEPARTMENT |
| PATTERSON PHIFER | 1007814 | 2508834 | KUE/SWANGER/ WALKER/BOONE V CITY | LAW DEPARTMENT |
| PATTERSON PHIFER | 1007814 | 2509732 | LEGAL SERVICES | LAW DEPARTMENT |
| PATTERSON PHIFER | 1007814 | 2521163 | LEGAL SERVICES | LAW DEPARTMENT |
| PATTERSON PHIFER | 1007814 | 2521178 | LEGAL SERVICES | LAW DEPARTMENT |
| PATTERSON PHIFER | 1007814 | 2513517 | MAURICE BROWN V CITY OF DETROIT, ET AL | LAW DEPARTMENT |
| PATTERSON PHIFER & PHILLIPS | 17376 | 2505725 | LEGAL SERVICES | FINANCE DEPARTMENT |
| PATTERSON PHIFER & PHILLIPS | 17376 | 2505728 | LEGAL SERVICES | LAW DEPARTMENT |
| PAYNE-PULLIAM SCHOOL OF TRADE | 7737 | 2564267 | WORKFIRST/WTW, 10/1/01 - 9/30/02, JS/JR | EMPLOYMENT AND TRAINING DEPARTMENT |
| PAYNE-PULLIAM SCHOOL OF TRADE | 7737 | 2528278 | WIA BASIC EDUCATION AGES 14-18 | EMPLOYMENT AND TRAINING DEPARTMENT |
| PAYNE-PULLIAM SCHOOL OF TRADE | 7737 | 2740260 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| PAYNE-PULLIAM SCHOOL OF TRADE AND COMMERCE | 1030662 | 2778463 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| PAYNE-PULLIAM SCHOOL OF TRADE AND COMMERCE | 1030662 | 2801097 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| PAYNE-PULLIAM SCHOOL OF TRADE AND COMMERCE | 1030662 | 2778760 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| PCT SECURITY LLC | 1107205 | 2812357 | SURVEILLANCE EQUIPMENT INSTALLATION | WORKFORCE DEVELOPMENT DEPARTMENT |
| PEGGY YOUNG & ASSOCIATES INC | 7333 | 2502363 | APPRAISAL SERVICES | PLANNING AND DEVELOPMENT DEPARTMENT |
| PEGGY YOUNG & ASSOCIATES INC | 7333 | 2763958 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| PEOPLE'S COMMUNITY SERVICES OF METROPOLITAN DETROIT | 10686 | 2501460 | SUBSTANCE ABUSE COORDINATION AGENCY | NO DEPARTMENT INDICATED |
| PEOPLE'S CREATIVE ENSEMBLE | 14786 | 2501435 | PUBLIC SERVICE | NO DEPARTMENT INDICATED |
| PEPPER HAMILTON LLP | 1009412 | 2635807 | | LAW DEPARTMENT |
| PEPPER HAMILTON LLP | 1009412 | 2719996 | | LAW DEPARTMENT |
| PERRY MATHIS MD | 1012076 | 2559401 | DRUG TREATMENT PROGRAM PHYSICIAN | FINANCE DEPARTMENT |
| PERRY MATHIS MD | 1012076 | 2544150 | DRUG TREATMENT PROGRAM PHYSICIAN | HUMAN SERVICES DEPARTMENT |
| PERRY MATHIS MD | 1012076 | 2508114 | DRUG TREATMENT PROGRAM | FINANCE DEPARTMENT |
| PERRY MATHIS MD | 1012076 | 2513140 | DRUG TREATMENT PROGRAM PHYSICIAN | HUMAN SERVICES DEPARTMENT |
| PHARMACY EMPLOYMENT SERVICE | 1053611 | 2572655 | | HEALTH DEPARTMENT |
| PHIFER & WHITE PC | 1027627 | 2537538 | LEGAL SERVICES:  SMITH/WIGGINS V CITY | LAW DEPARTMENT |
| PHIFER & WHITE PC | 1027627 | 2537563 | LEGAL SERVICES:  WOODWARD/JEAN V CITY | LAW DEPARTMENT |
| PHIFER & WHITE PC | 1027627 | 2623900 | | LAW DEPARTMENT |
| PHILLIP G CRAMER MD | 1019205 | 2527982 | TB MEDICAL SERVICES | HEALTH DEPARTMENT |
| PHILLIP G CRAMER MD | 1019205 | 2579701 | | HEALTH DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| PHOENIX SERVICES UNLIMITED INC | 19496 | 2501351 | BATTERER'S SCHOOL | NO DEPARTMENT INDICATED |
| PHOENIX SERVICES UNLIMITED INC | 19496 | 2548814 | DOMESTIC VIOLENCE COUNSELING | POLICE DEPARTMENT |
| PIERCE MONROE & ASSOCIATES INC | 18223 | 2501044 | | FINANCE DEPARTMENT |
| PIERCE MONROE & ASSOCIATES INC | 18223 | 2502104 | | FINANCE DEPARTMENT |
| PIQUETTE MARKET INC | 1072282 | 2803604 | | HUMAN SERVICES DEPARTMENT |
| PIQUETTE MARKET INC | 1072282 | 2775345 | | HUMAN SERVICES DEPARTMENT |
| PIQUETTE MARKET INC | 1072282 | 2743795 | | HUMAN SERVICES DEPARTMENT |
| PLANNED PARENTHOOD | 1012848 | 2603682 | | FINANCE DEPARTMENT |
| PLUNKETT & COONEY  PC | 10371 | 2527611 | LEGAL SERVICES | LAW DEPARTMENT |
| PLUNKETT & COONEY  PC | 10371 | 2536997 | LEGAL SERVICES | LAW DEPARTMENT |
| PLUNKETT & COONEY  PC | 10371 | 2590835 | | LAW DEPARTMENT |
| PLUNKETT & COONEY  PC | 10371 | 2540467 | LEGAL SERVICES:  ADAMS, ET AL V CITY, ET AL | LAW DEPARTMENT |
| PLUNKETT & COONEY  PC | 10371 | 2508813 | IRA LEE TODD V CITY OF DETROIT, ET AL | LAW DEPARTMENT |
| PLUNKETT & COONEY  PC | 10371 | 2508816 | GRAZES/IVERZAI/SMITH, ET AL  V CITY | LAW DEPARTMENT |
| PLUNKETT & COONEY  PC | 10371 | 2527406 | LEGAL SERVICES | LAW DEPARTMENT |
| PLUNKETT & COONEY  PC | 10371 | 2538058 | LEGAL SERVICES | LAW DEPARTMENT |
| PLUNKETT & COONEY  PC | 10371 | 2501702 | LEGAL SERVICES | LAW DEPARTMENT |
| PLUNKETT & COONEY  PC | 10371 | 2538244 | LEGAL SERVICES | LAW DEPARTMENT |
| PLUNKETT & COONEY  PC | 10371 | 2652076 | LEGAL SERVICES | LAW DEPARTMENT |
| PLUNKETT & COONEY  PC | 10371 | 2502112 | LEGAL SERVICES | LAW DEPARTMENT |
| PLUNKETT & COONEY  PC | 10371 | 2537223 | LORETTA BOOTH V CITY OF DETROIT | LAW DEPARTMENT |
| PLUNKETT & COONEY  PC | 10371 | 2569755 | | LAW DEPARTMENT |
| PLUNKETT & COONEY  PC | 10371 | 2570503 | | LAW DEPARTMENT |
| PLUNKETT & COONEY  PC | 10371 | 2774678 | | LAW DEPARTMENT |
| POLICE ATHLETIC LEAGUE INC | 3703 | 2535838 | TENNIS PROGRAM | RECREATION DEPARTMENT |
| POPKIN SOFTWARE SYSTEMS | 20304 | 2518460 | SYSTEMS ARCHITECT AND OPTIONS | INFORMATION TECHNOLOGY SERVICES |
| POSEN CONSTRUCTION CO | 20208 | 2748229 | BELLE ISLE SCOTT FOUNTAIN LAGOON PIPELINE SYSTEM CLEAN-OUT | RECREATION DEPARTMENT |
| POSEN CONSTRUCTION CO | 20208 | 2584529 | | WATER DEPARTMENT |
| POSITIVE IMAGES | 19950 | 2501495 | | HEALTH DEPARTMENT |
| POSITIVE IMAGES | 19950 | 2501653 | MEDICAID SUBSTANCE ABUSE | HEALTH DEPARTMENT |
| PREMIER STAFFING SOURCE INC | 1118976 | 2877577 | TEMPORARY STAFFING SERVICES | HUMAN RESOURCES DEPARTMENT |
| PRISM SOLUTIONS LLC | 1051836 | 2610132 | | RECREATION DEPARTMENT |
| PROBE ENVIRONMENTAL INC | 19803 | 2502194 | ABATEMENT OF ASBESTOS | DEPARTMENT OF PUBLIC WORKS |
| PROJECT GET | 20363 | 2540814 | JOB SEARCH & PLACEMENT-WORK FIRST | EMPLOYMENT AND TRAINING DEPARTMENT |
| PROJECT GET | 20363 | 2563946 | JOB SEARCH & PLACEMENT | EMPLOYMENT AND TRAINING DEPARTMENT |
| PROJECT GET | 20363 | 2501733 | JOB SEARCH | NO DEPARTMENT INDICATED |
| PROJECT GET | 20363 | 2778465 | | WORKFORCE DEVELOPMENT DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| PROJECT GET | 20363 | 2806247 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| PROVIDENCE COMMUNITY SERVICES/ROSS IES | 1095234 | 2778467 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| PROVIDENCE COMMUNITY SERVICES/ROSS IES | 1095234 | 2778477 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| PROVIDENCE COMMUNITY SERVICES/ROSS IES | 1095234 | 2761554 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| PROVIDENCE COMMUNITY SERVICES/ROSS IES | 1095234 | 2778661 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| PVS TECHNOLOGIES INC | 24231 | 2501270 | | SEWERAGE DEPARTMENT |
| R L WINIGER & COMPANY | 1033182 | 2506508 | INVESTIGATIVE SERVICES | FINANCE DEPARTMENT |
| RALPH CALDER & ASSOC | 20041 | 2502210 | PATTON PARK POOL/RECREATION FACILITY | RECREATION DEPARTMENT |
| RAM CONSTRUCTION SERVICES OF MICHIGAN | 1104845 | 2786314 | CONSTRUCTION CONTRACT | RECREATION DEPARTMENT |
| RAMA RAO & ALFRED INC | 15030 | 2502274 | A/E SERVICES  WATER WORKS | NO DEPARTMENT INDICATED |
| RAMA RAO & ALFRED INC | 15030 | 2500977 | BLUEHILL STATION ADDITIONS | NO DEPARTMENT INDICATED |
| RAMA RAO & ALFRED INC | 15030 | 2767688 | CONTRACT FOR PROFESSIONAL SERVICES | INFORMATION TECHNOLOGY SERVICES |
| RANDALL S LEVINE PC DBA LEVINE & LEVINE PC | 1017685 | 2513748 | LEGAL SERVICES | OMBUDSPERSON |
| RANDY LANE PC | 1070228 | 2879763 | CONTRACT FOR ACCOUNTING SERVICES | FINANCE DEPARTMENT |
| RAYMOND JONES MD | 10770 | 2513137 | DRUG TREATMENT PROGRAM PHYSICIAN | HUMAN SERVICES DEPARTMENT |
| RAYMOND JONES MD | 10770 | 2544138 | DRUG TREATMENT PROGRAM PHYSICIAN | HUMAN SERVICES DEPARTMENT |
| RAYMOND JONES MD | 10770 | 2508115 | SERVICES FOR DRUG TREATMENT PROGRAM | FINANCE DEPARTMENT |
| RAYMOND JONES MD | 10770 | 2559423 | PHISICIAN FOR DRUG TREATMENT PROGRAM | FINANCE DEPARTMENT |
| RAYMOND JONES MD | 10770 | 2591480 | | HUMAN SERVICES DEPARTMENT |
| REACH INC | 17260 | 2504789 | NOF-PUBLIC SERVICE CONTRACT | FINANCE DEPARTMENT |
| REACH PROJECT INC | 1048827 | 2599632 | | HEALTH DEPARTMENT |
| REDSTONE ARCHITECTS | 1001648 | 2506677 | CAMPUS MARTIUS PARK DEVELOPMENT | RECREATION DEPARTMENT |
| REID & REID PC | 1012544 | 2633008 | | LAW DEPARTMENT |
| RENAISSANCE PROPERTIES INC | 1032580 | 2562053 | | FINANCE DEPARTMENT |
| RENAISSANCE PROPERTIES INC | 1032580 | 2534576 | | HUMAN SERVICES DEPARTMENT |
| RESOURCE DATA SYSTEMS CORP | 10349 | 2500772 | LAW DEPARTMENT COMPUTER SYSTEMS | LAW DEPARTMENT |
| RESOURCE NETWORK | 1007604 | 2560345 | JOB SEARCH AND PLACEMENT | EMPLOYMENT AND TRAINING DEPARTMENT |
| RESOURCE NETWORK | 1007604 | 2726455 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| RESOURCE NETWORK | 1007604 | 2778663 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| RESPONSE NETWORK | 1103012 | 2771949 | CUSTOM SOFTWARE DEVELOPMENT | POLICE DEPARTMENT |
| RIGHT ASSOCIATES /JANNOTTA BRAY & ASSOCIATES | 20383 | 2511677 | EXECUTIVE COACHING SERVICES | HUMAN RESOURCES DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| RILEY ROUMELL & CONNOLLY PC | 1060612 | 2623897 | | LAW DEPARTMENT |
| RILEY ROUMELL & CONNOLLY PC | 1060612 | 2623906 | | LAW DEPARTMENT |
| RILEY ROUMELL & CONNOLLY PC | 1060612 | 2623942 | | LAW DEPARTMENT |
| RLI INSURANCE COMPANY | 1099957 | 2765028 | | WATER DEPARTMENT |
| ROBERT C BIRKS MD PC | 7251 | 2578999 | | HUMAN SERVICES DEPARTMENT |
| ROBERT C BIRKS MD PC | 7251 | 2592085 | | HUMAN SERVICES DEPARTMENT |
| ROBERT MATHEWS & ASSOCIATES INC | 1059586 | 2620918 | | HUMAN SERVICES DEPARTMENT |
| ROBERT SEDLER | 9851 | 2769756 | CONSULTANT SERVICES | LAW DEPARTMENT |
| ROSE & ROSE | 15597 | 2500750 | LEGAL SERVICES | NO DEPARTMENT INDICATED |
| ROSS LEARNING INC | 10675 | 2562588 | WF WTW TIREMAN/GREYDALE PY 2002 | EMPLOYMENT AND TRAINING DEPARTMENT |
| ROSS LEARNING INC | 10675 | 2562593 | WF & WTW FORT WAYNE PY 2002 | EMPLOYMENT AND TRAINING DEPARTMENT |
| ROSS LEARNING INC | 10675 | 2554055 | BASIC LITERACY & COORDINATION | EMPLOYMENT AND TRAINING DEPARTMENT |
| ROSS LEARNING INC | 10675 | 2562407 | WF & WTW LTC PY 2002 | EMPLOYMENT AND TRAINING DEPARTMENT |
| ROSS LEARNING INC | 10675 | 2549631 | WTW COMPETITIVE COORDINATION | EMPLOYMENT AND TRAINING DEPARTMENT |
| ROSS LEARNING INC | 10675 | 2537106 | WIA ITA IMPLEMENTATION PY 01 | EMPLOYMENT AND TRAINING DEPARTMENT |
| ROSS LEARNING INC | 10675 | 2540277 | WF & FOOD STAMP ITA PY 01 | EMPLOYMENT AND TRAINING DEPARTMENT |
| ROSS LEARNING INC | 10675 | 2572344 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| ROSS LEARNING INC | 10675 | 2624160 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| ROSS LEARNING INC | 10675 | 2599059 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| ROY F WESTON INC | 16868 | 2512933 | ENVIRONMENTAL SERVICES - FICS #74431 | FINANCE DEPARTMENT |
| ROY F WESTON INC | 16868 | 2501574 | WATERFRONT RECLAMATION PROJECT | LAW DEPARTMENT |
| ROYAL ROOFING CO INC | 13119 | 2730710 | ROOF REPLACEMENT | RECREATION DEPARTMENT |
| S D HAMILTON GROUP | 1019484 | 2603327 | | FINANCE DEPARTMENT |
| SABRE CONTRACTING LLC | 1106108 | 2797979 | RENOVATIONS | RECREATION DEPARTMENT |
| SACRED HEART MAJOR SEMINARY | 1576 | 2501491 | FICS CONTRACT 078684  SPO 2510159 | HEALTH DEPARTMENT |
| SACRED HEART REHABILITATION CENTER, INC | 1013401 | 2507443 | MEDICAID S.A. FYE 9/99 SACRED HEART | HEALTH DEPARTMENT |
| SAFE CENTER INC | 19547 | 2501207 | | NO DEPARTMENT INDICATED |
| SAFE CENTER INC | 19547 | 2557542 | FAMILY SERVICES AND COUNSELING | FINANCE DEPARTMENT |
| SAFE CENTER INC | 19547 | 2533141 | EMERGENCY SERVICES | HUMAN SERVICES DEPARTMENT |
| SALVATION ARMY BOOTH SERVICES | 15401 | 2510155 | TRANSITIONAL HOUSING | FINANCE DEPARTMENT |
| SANDERS & JOHNSON PLLC | 1003611 | 2538824 | LEGAL SERVICES | LAW DEPARTMENT |
| SANDERS & JOHNSON PLLC | 1003611 | 2538789 | LEGAL SERVICES | LAW DEPARTMENT |
| SANDERS & JOHNSON PLLC | 1003611 | 2538820 | LEGAL SERVICES:  CLAUDE NELSON V CITY | LAW DEPARTMENT |
| SANDERS & JOHNSON PLLC | 1003611 | 2505098 | LEGAL SERVICES | FINANCE DEPARTMENT |
| SANDERS & JOHNSON PLLC | 1003611 | 2538816 | BRADFORD ERVING V CITY/HAYWARD | LAW DEPARTMENT |
| SANDERS & JOHNSON PLLC | 1003611 | 2538794 | EST. OF TOMMIE THOMAS V CITY | LAW DEPARTMENT |
| SANDERS & JOHNSON PLLC | 1003611 | 2534988 | PATRICK HATFIELD V CITY | LAW DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| SCHINDLER ELEVATOR CORPORATION | 6926 | 2558355 | MADISON CENTER ELEVATOR MAINTENANCE | NO DEPARTMENT INDICATED |
| SCHUMAKER & COMPANY INC | 1064547 | 2689171 | | BUDGET DEPARTMENT |
| SER CASA ACADEMY | 1025139 | 2589594 | EMPOWERMENT ZONE- PUBLIC SERVICE | PLANNING AND DEVELOPMENT DEPARTMENT |
| SER METRO DETROIT - JOB FOR PROGRESS | 3369 | 2528378 | YOUTH OPPORTUNITY GRANT # 2 | EMPLOYMENT AND TRAINING DEPARTMENT |
| SER METRO DETROIT - JOB FOR PROGRESS | 3369 | 2519316 | YOUTH OPPORTUNITIES | EMPLOYMENT AND TRAINING DEPARTMENT |
| SER METRO DETROIT - JOB FOR PROGRESS | 3369 | 2622682 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| SER METRO DETROIT - JOB FOR PROGRESS | 3369 | 2536987 | INDIVIDUAL TRAINING ACCOUNTS | EMPLOYMENT AND TRAINING DEPARTMENT |
| SER METRO DETROIT - JOB FOR PROGRESS | 3369 | 2594584 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| SER METRO DETROIT - JOB FOR PROGRESS | 3369 | 2501434 | PUBLIC FACILITY REHAB | NO DEPARTMENT INDICATED |
| SER METRO DETROIT - JOB FOR PROGRESS | 3369 | 2778762 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| SER METRO DETROIT - JOB FOR PROGRESS | 3369 | 2775948 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| SER METRO DETROIT - JOB FOR PROGRESS | 3369 | 2761551 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| SERCO INC | 16569 | 2568070 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| SERCO INC | 16569 | 2623557 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| SERCO INC | 16569 | 2548196 | PARTNERSHIP FOR ADULT LEARNING | EMPLOYMENT AND TRAINING DEPARTMENT |
| SERCO INC | 16569 | 2561194 | JOB SEARCH AND JOB PLACEMENT (JSP) | EMPLOYMENT AND TRAINING DEPARTMENT |
| SERCO INC | 16569 | 2561177 | JOB SEARCH AND PLACEMENT(DEC-2K) | EMPLOYMENT AND TRAINING DEPARTMENT |
| SERCO INC | 16569 | 2778471 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| SERCO INC | 16569 | 2806253 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| SFT INCORPORATED | 1033579 | 2536333 | FOR MISTERSKI POWER PLANT PROJECT | CITY COUNCIL |
| SHAR HOUSE | 11024 | 2501503 | SUBSTANCE ABUSE COORDINATION AGENCY | NO DEPARTMENT INDICATED |
| SHAR HOUSE | 11024 | 2501501 | SUBSTANCE ABUSE COORDINATION AGENCY | NO DEPARTMENT INDICATED |
| SHAR HOUSE | 11024 | 2564200 | WOMEN AND CHILDREN EXPANSION GRANT | HEALTH DEPARTMENT |
| SHAR HOUSE | 11024 | 2501642 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| SHARON RODDY MD | 1016242 | 2544065 | | HUMAN SERVICES DEPARTMENT |
| SHEVRIN CONSULTING SERVICES | 1081120 | 2658592 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| SIEMENS BUILDING TECHNOLOGIES INC | 1080147 | 2799544 | CONTROL SYSTEM IMPROVEMENTS | RECREATION DEPARTMENT |
| SIEMENS HEALTHCARE DIAGONSTICS | 1101501 | 2849348 | ON-SITE DRUG TESTING | HEALTH DEPARTMENT |
| SILVERI ARCHITECTS | 1031901 | 2549574 | EMPOWERMENT ZONE IMPROVEMENT | RECREATION DEPARTMENT |
| SIMON HOUSE | 18009 | 2541640 | PERMANENT HOUSING (FICS#074931) | FINANCE DEPARTMENT |
| SIMON HOUSE | 18009 | 2510640 | EMERGENCY SHELTER | FINANCE DEPARTMENT |
| SIMONE CONTRACTING CORPORATION | 1000476 | 2786501 | CONSTRUCTION CONTRACT | RECREATION DEPARTMENT |
| SMITH BROS ELECTRIC INC | 1018473 | 2582919 | | FINANCE DEPARTMENT |
| SMITH BROS ELECTRIC INC | 1018473 | 2505208 | INSTALL VOICE AND DATA WIRING SERVICES | INFORMATION TECHNOLOGY SERVICES |
| SMITH GROUP JJR LLC | 1003317 | 2504102 | LONG TERM MANAGEMENT | FINANCE DEPARTMENT |
| SNELL ENVIRONMENTAL GROUP INC | 1000483 | 2502200 | ABATEMENT ASBESTOS | DEPARTMENT OF PUBLIC WORKS |
| SNELL ENVIRONMENTAL GROUP INC | 1000483 | 2500795 | ENGINEERING SERVICES FOR NEW BRIDGES | DEPARTMENT OF PUBLIC WORKS |
| SOBH PROPERTY MANAGEMENT LLC | 1018847 | 2515472 | | HEALTH DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| SOBRIETY HOUSE INC | 1797 | 2501505 | SUBSTANCE ABUSE COORDINATION AGENCY | HEALTH DEPARTMENT |
| SOBRIETY HOUSE INC | 1797 | 2501734 | MEDICAID SUBSTANCE ABUSE | HEALTH DEPARTMENT |
| SOCIETY OF ST VINCENT DE PAUL | 10460 | 2587915 | | FINANCE DEPARTMENT |
| SONDRA E JENKINS | 1013274 | 2507145 | JOINT L-M/QI PROJECT CONSULTANT | HUMAN RESOURCES DEPARTMENT |
| SOUTHEAST CHILDREN AND FAMILY DEVELOPMENT HEAD START | 10372 | 2587309 | | HUMAN SERVICES DEPARTMENT |
| SOUTHEAST CHILDREN AND FAMILY DEVELOPMENT HEAD START | 10372 | 2532516 | HEAD START PROGRAM | HUMAN SERVICES DEPARTMENT |
| SOUTHEAST CHILDREN AND FAMILY DEVELOPMENT HEAD START | 10372 | 2504138 | HEAD START PROGRAM 1998-99 | HUMAN SERVICES DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2593437 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2501895 | HEALTHY START INIT 8/98 | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2560866 | CPBC MASTER AGREEMENT | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2516778 | FIDUCIARY SERVICES | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2538658 | HEALTHY START INITIATIVE PROGRAM | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2556341 | FIDUCIARY SERVICES FOR LEAD FREE DETROIT | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2537516 | CPBC MASTER CONTRACT | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2501527 | EPSDT (HEALTHY KIDS) | NO DEPARTMENT INDICATED |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2625403 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2522514 | HEALTHY START INITIATIVE | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2507951 | HIV EMERGENCY RELIEF 2/00 | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2501918 | 25 STD CONTROL 9-98 AND 9-99 | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2501498 | HOPWA-PERSONS W/AIDS HSG | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2505868 | 25 STD & TB PHYSICIAN SERVICES | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2502007 | STD & TB PYHSICIAN | NO DEPARTMENT INDICATED |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2536778 | FETAL INFANT MORTALITY REVIEW GRANT | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2516123 | EPSDT ( HEALTHY KIDS ) | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2528888 | SEMHA - CCA ADMINISTRATION | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2538739 | HIV/AIDS PROJECT CPO | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2665698 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2587750 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2506174 | 25 TB/HIV CONTROL PROGRAM - 12/99 | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2510504 | LEAD FREE DETROIT PROJECT | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2581401 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2504657 | FISCAL MANAGEMENT SERVICES | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2614575 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2612915 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2619300 | | HEALTH DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2538646 | REFUGEE HEALTH SCREENING PROGRAM | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2613498 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2571721 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2766781 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2766314 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2793186 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2770373 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2753985 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2761660 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2788671 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2755765 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2784430 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2799776 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2796870 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2797934 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2797936 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2624694 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2799792 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2776660 | | HEALTH DEPARTMENT |
| SOUTHWEST COUNSELING | 1000589 | 2549618 | CAREER INITIATIVES CENTER PROJECT | HUMAN SERVICES DEPARTMENT |
| SOUTHWEST COUNSELING | 1000589 | 2593318 | | FINANCE DEPARTMENT |
| SOUTHWEST DETROIT BUSINESS ASSOCIATION | 19640 | 2548414 | | FINANCE DEPARTMENT |
| SOUTHWEST DETROIT COMMUNITY | 1067854 | 2606819 | | FINANCE DEPARTMENT |
| SPALDING DEDECKER ASSOCIATES INC | 1427 | 2632652 | | RECREATION DEPARTMENT |
| SPEC ASSOCIATES | 19262 | 2765376 | | HUMAN SERVICES DEPARTMENT |
| SPECTRUM HUMAN SERVICES | 20301 | 2501508 | SUBSTANCE ABUSE COORDINATION AGENCY | NO DEPARTMENT INDICATED |
| SPIEGEL & MCDIARMID | 19669 | 2501813 | LEGAL SERVICES | PUBLIC LIGHTING DEPARTMENT |
| ST GREGORY COMMUNITY CENTER | 16937 | 2511397 | P&DD PUBLIC SERVICE | FINANCE DEPARTMENT |
| ST PATRICKS SENIOR CENTER INC | 12493 | 2502481 | SENIOR CITIZENS MEAL | HEALTH DEPARTMENT |
| ST REGIS DETROIT PARTNERS LLC | 1102961 | 2770016 | | POLICE DEPARTMENT |
| STAR CENTERS INC | 1003699 | 2501619 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| STELLA B SEIDEN | 2398 | 2502097 | | NO DEPARTMENT INDICATED |
| STONE & WEBSTER MICHIGAN INC | 8561 | 2500914 | MISTERSKY PWR PLANT CONSULTING | PUBLIC LIGHTING DEPARTMENT |
| STRATEGIC STAFFING SOLUTIONS | 17268 | 2620837 | | NON-DEPARTMENTAL |
| STRATEGIC STAFFING SOLUTIONS | 17268 | 2767687 | CONTRACT FOR PROFESSIONAL SERVICES | INFORMATION TECHNOLOGY SERVICES |
| STRATEGIC STAFFING SOLUTIONS | 17268 | 2681666 | | INFORMATION TECHNOLOGY SERVICES |
| STRATEGIC STAFFING SOLUTIONS | 17268 | 2554729 | 2001/2002 CONTRACTUAL RESOURCES | INFORMATION TECHNOLOGY SERVICES |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| STRATEGIC STAFFING SOLUTIONS | 17268 | 2643900 | | INFORMATION TECHNOLOGY SERVICES |
| STROHL SYSTEMS GROUP INC | 19599 | 2514946 | 970259-COMPUTER - SOFTWARE LICENSE | INFORMATION TECHNOLOGY SERVICES |
| STS CONSULTANTS LTD | 1027626 | 2619993 | | RECREATION DEPARTMENT |
| SWORD SOLUTIONS INC | 1075932 | 2634531 | | HEALTH DEPARTMENT |
| SYNC TECHNOLOGIES INC | 1025602 | 2643904 | | INFORMATION TECHNOLOGY SERVICES |
| SYNC TECHNOLOGIES INC | 1025602 | 2681667 | | INFORMATION TECHNOLOGY SERVICES |
| SYNC TECHNOLOGIES INC | 1025602 | 2804856 | | HUMAN SERVICES DEPARTMENT |
| SYNCH SOLUTIONS | 1102866 | 2768084 | CONTRACT FOR TECHNOLOGY RESOURCES | INFORMATION TECHNOLOGY SERVICES |
| SYSTEMS CONSULTING GROUP LLC | 1021802 | 2537205 | CONSULTANT SERVICES | DEPARTMENT OF TRANSPORTATION |
| T & T BUILDERS | 1025258 | 2544439 | HOME WEATHERIZATION | HUMAN SERVICES DEPARTMENT |
| T & T BUILDERS | 1025258 | 2524579 | WEATHERIZATION PROGRAM | HUMAN SERVICES DEPARTMENT |
| T & T BUILDERS | 1025258 | 2525183 | | FINANCE DEPARTMENT |
| T & T BUILDERS | 1025258 | 2672030 | | HUMAN SERVICES DEPARTMENT |
| T & T BUILDERS | 1025258 | 2607322 | | HUMAN SERVICES DEPARTMENT |
| T & T BUILDERS | 1025258 | 2789080 | | HUMAN SERVICES DEPARTMENT |
| T & T BUILDERS | 1025258 | 2732569 | | HUMAN SERVICES DEPARTMENT |
| T & T BUILDERS | 1025258 | 2761175 | | HUMAN SERVICES DEPARTMENT |
| TARA TUOMAALA | 1047262 | 2569166 | | CULTURAL AFFAIRS DEPARTMENT |
| TC SIMMONS VISITING MINISTRY | 18571 | 2510152 | SHELTER AND SERVICE | FINANCE DEPARTMENT |
| TECH TOWN | 1107416 | 2807786 | | HUMAN SERVICES DEPARTMENT |
| TEI ENVIRONMENTAL SOLUTIONS LLC | 1109309 | 2548181 | (UNIROYAL) INTERIM RESPONSE ACTIVITIES FOR EAST JEFFERSON AT BELLE ISLE | ENVIRONMENTAL AFFAIRS DEPARTMENT |
| TEI ENVIRONMENTAL SOLUTIONS LLC | 1109309 | 2563252 | BROWNFIELD SAP PHASE I AND PHASE II | ENVIRONMENTAL AFFAIRS DEPARTMENT |
| TETRA TECH MPS | 1030048 | 2633203 | | DEPARTMENT OF PUBLIC WORKS |
| THE ARTS PLACE | 20040 | 2643815 | | RECREATION DEPARTMENT |
| THE BARTECH GROUP | 1036576 | 2681675 | | INFORMATION TECHNOLOGY SERVICES |
| THE BARTECH GROUP | 1036576 | 2643893 | | INFORMATION TECHNOLOGY SERVICES |
| THERMO JARRELL ASH CORP | 23280 | 2502432 | MAINTENANCE | FINANCE DEPARTMENT |
| THOMAS E MARSHALL PC | 17881 | 2511456 | SHAUN NEAL, ET AL V CITY OF DETROIT, ET AL | LAW DEPARTMENT |
| THOMAS E MARSHALL PC | 17881 | 2513521 | LIGENS D. MOORE V CITY OF DETROIT | LAW DEPARTMENT |
| THOMAS J WALSH APPRAISAL CO | 20198 | 2502095 | CASINO SITE APPRAISER | LAW DEPARTMENT |
| TIBURON INC | 1072420 | 2614989 | | POLICE DEPARTMENT |
| TIBURON INC | 1072420 | 2637943 | | POLICE DEPARTMENT |
| TILLMAN & TILLMAN PC | 1018624 | 2515016 | WILLIAM GRAHAM V CITY/MANSON | LAW DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2562545 | LEGAL SERVICES: LYNN/BEAUCHAMP V CITY | LAW DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2544381 | RYAN LACKIE V CITY OF DETROIT/FULKS | LAW DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2632190 | | LAW DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2534965 | ANDREOS COOPER V CITY | LAW DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| TIMMIS & INMAN LLP | 19998 | 2562570 | LEGAL SERVICES | LAW DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2508654 | SHANNON L. TROMEUR V JULIUS LIGE | HEALTH DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2502450 | LEGAL SERVICES: WILLIAM BURKES V CITY | LAW DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2544404 | TITO BURLEIGH V CITY/WILLIAMS | LAW DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2508661 | LEGAL SERVICES: TUCKER V CITY OF DETROIT | LAW DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2562575 | HENRY BROWN V CITY/JULIUS TATE | LAW DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2562563 | LEGAL SERVICES | LAW DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2544430 | TOMMIE THOMAS V CITY, ET AL | LAW DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2562559 | TORI CARTER, ET AL V CITY | LAW DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2502452 | LEGAL SERVICES | LAW DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2544420 | RUPERT/HAYES/BOWERS V BROWN | LAW DEPARTMENT |
| TISEO BROTHERS INC | 18296 | 2501389 | VIRGINIA PARK PAVING | NO DEPARTMENT INDICATED |
| TODD PHILLIPS CHILDRENS HOME | 16998 | 2501778 | | NO DEPARTMENT INDICATED |
| TRAVELLERS AID SOCIETY OF DET | 15890 | 2501964 | EMERGENCY SHELTER | HUMAN SERVICES DEPARTMENT |
| TWW & ASSOCIATES INC | 15821 | 2563101 | WORKFIRST/WELFARE TO WORK | EMPLOYMENT AND TRAINING DEPARTMENT |
| TWW & ASSOCIATES INC | 15821 | 2550329 | OPERATION FAST BREAK/ PAL | EMPLOYMENT AND TRAINING DEPARTMENT |
| TWW & ASSOCIATES INC | 15821 | 2696181 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| TWW & ASSOCIATES INC | 15821 | 2803891 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| TWW & ASSOCIATES INC | 15821 | 2778474 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| TWW & ASSOCIATES INC | 15821 | 2806255 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| TXU ENERGY SERVICE | 1021990 | 2525960 | CITY WIDE NATURAL GAS PURCHASE | PUBLIC LIGHTING DEPARTMENT |
| UNIGLOBE CONSTRUCTION CO | 19275 | 2793402 | | HUMAN SERVICES DEPARTMENT |
| UNITED COMMUNITY HOUSING COALITION | 9812 | 2510128 | HOMELESS ASSISTANCE PROGRAM | FINANCE DEPARTMENT |
| UNIVERSAL SYSTEM TECHNOLOGIES INC | 20223 | 2589037 | | INFORMATION TECHNOLOGY SERVICES |
| UNIVERSAL SYSTEM TECHNOLOGIES INC | 20223 | 2768088 | PROFESSIONAL SERVICES CONTRACT | INFORMATION TECHNOLOGY SERVICES |
| UNIVERSITY FAMILY PHYSICIANS | 1045603 | 2541597 | ENV: MEDICAL MONITORING SERVICES | ENVIRONMENTAL AFFAIRS DEPARTMENT |
| UNIVERSITY OF DETROIT MERCY | 1051358 | 2722921 | | RECREATION DEPARTMENT |
| UNIVERSITY OF MICHIGAN | 8466 | 2500990 | EMERGENCY RESPONSE PLANNING | WATER DEPARTMENT |
| UNIVERSITY PHYSICIAN GROUP | 1093137 | 2799075 | | HEALTH DEPARTMENT |
| UNIVERSITY WOMEN'S CARE | 1030044 | 2530120 | | HEALTH DEPARTMENT |
| UNIVERSITY WOMEN'S CARE | 1030044 | 2595456 | | HEALTH DEPARTMENT |
| UNIVERSITY WOMEN'S CARE | 1030044 | 2567920 | | HEALTH DEPARTMENT |
| UNIVERSITY WOMEN'S CARE | 1030044 | 2614558 | | HEALTH DEPARTMENT |
| UNLIMITED SOLUTIONS INC | 17906 | 2502050 | PROGRAMMING CODING | INFORMATION TECHNOLOGY SERVICES |
| UNLIMITED SOLUTIONS INC | 17906 | 2554534 | 2001/2001 CONTRACTUAL RESOURCES | INFORMATION TECHNOLOGY SERVICES |
| UPTOWN LAND DEVELOPMENT CORP | 18833 | 2501758 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| URBAN MANAGEMENT CORP | 20310 | 2502173 | FLEET MAINTENANCE SERVICES | DEPARTMENT OF PUBLIC WORKS |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| URBANWERKS LLC | 1083053 | 2664787 | | RECREATION DEPARTMENT |
| URS CORPORATION | 1052537 | 2607949 | | ENVIRONMENTAL AFFAIRS DEPARTMENT |
| URSO PALMER & ROSS PC | 1048532 | 2574335 | | CITY COUNCIL |
| U-SNAP BAC NON-PROFIT CORP | 20364 | 2506589 | PUBLIC SERVICE AND REHAB | FINANCE DEPARTMENT |
| U-SNAP BAC NON-PROFIT CORP | 20364 | 2584237 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| U-SNAP BAC NON-PROFIT CORP | 20364 | 2501597 | SITE IMPROVEMENTS HOUSING | NO DEPARTMENT INDICATED |
| V W PROPERTIES | 1084250 | 2531882 | | POLICE DEPARTMENT |
| V W PROPERTIES | 1084250 | 2509482 | | POLICE DEPARTMENT |
| VAN OVERBEKE & ASSOCIATES | 20121 | 2505192 | LEGAL SERVICES:  DEWOLF, ET AL V CITY | LAW DEPARTMENT |
| VAN OVERBEKE & ASSOCIATES | 20121 | 2521182 | LYNN/BEAUCHAMP V CITY/RADFORD | LAW DEPARTMENT |
| VAN OVERBEKE & ASSOCIATES | 20121 | 2505073 | LEGAL SERVICES | LAW DEPARTMENT |
| VAN OVERBEKE & ASSOCIATES | 20121 | 2539172 | LEGAL SERVICES | LAW DEPARTMENT |
| VAN OVERBEKE & ASSOCIATES | 20121 | 2515553 | LEGAL SERVICES:  KIMBER V CITY/ADUROJA | LAW DEPARTMENT |
| VAN OVERBEKE & ASSOCIATES | 20121 | 2521167 | LEGAL SERVICES:  LONGSTREET V JORDAN | LAW DEPARTMENT |
| VAN OVERBEKE & ASSOCIATES | 20121 | 2536310 | LEGAL SERVICES | LAW DEPARTMENT |
| VAN OVERBEKE & ASSOCIATES | 20121 | 2511869 | LEGAL SERVICES | LAW DEPARTMENT |
| VAN SCOYOC ASSOCIATES INC | 1070940 | 2617193 | | LAW DEPARTMENT |
| VANOVERBEKE MICHAUD & TIMMONY P C | 1026688 | 2594482 | | LAW DEPARTMENT |
| VANOVERBEKE MICHAUD & TIMMONY P C | 1026688 | 2563075 | BLUE CROSS/BLUE SHIELD RESERVE FUND | LAW DEPARTMENT |
| VANOVERBEKE MICHAUD & TIMMONY P C | 1026688 | 2544823 | LEGAL SERVICES | LAW DEPARTMENT |
| VANOVERBEKE MICHAUD & TIMMONY P C | 1026688 | 2546318 | LEGAL SERVICES | LAW DEPARTMENT |
| VANOVERBEKE MICHAUD & TIMMONY P C | 1026688 | 2591271 | | LAW DEPARTMENT |
| VANOVERBEKE MICHAUD & TIMMONY P C | 1026688 | 2563068 | TOYIA MOODY/STEPHANIE BENNETT V CITY | LAW DEPARTMENT |
| VANOVERBEKE MICHAUD & TIMMONY P C | 1026688 | 2632746 | | LAW DEPARTMENT |
| VARNUM RIDDERING SCHMIDT | 17517 | 2502367 | TELECOMMUNICATIONS/FIBER OPTICS | LAW DEPARTMENT |
| VARNUM RIDDERING SCHMIDT | 17517 | 2514143 | LEGAL SERVICES | LAW DEPARTMENT |
| VENABLE BAETJER HOWARD LLP | 20054 | 2503723 | PROFESSIONAL SERVICES | CITY COUNCIL |
| VIRCHOW KRAUSE & CO LLP | 1099691 | 2746850 | | FINANCE DEPARTMENT |
| VIRGINIA PARK CITIZENS SERVICE | 16867 | 2719711 | | DEPARTMENT OF TRANSPORTATION |
| VISION INFORMATION TECHNOLOGIES | 1011855 | 2542788 | WEB DEVELOPMENT | INFORMATION TECHNOLOGY SERVICES |
| VOICE PRINT INTERNATIONAL INC | 1045791 | 2816063 | MAINTENANCE FOR VOICE SERVICES | POLICE DEPARTMENT |
| VORHIES ESTATE INC | 1005399 | 2517975 | | HUMAN SERVICES DEPARTMENT |
| VS VISUAL STATEMENT INC | 1076618 | 2796124 | | POLICE DEPARTMENT |
| W D LEE CENTER FOR LIFE MANAGEMENT | 1003687 | 2502211 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| W-3 CONSTRUCTION COMPANY | 1022302 | 2796096 | LIGHTING IMPROVEMENTS | RECREATION DEPARTMENT |
| WALBRIDGE-ALDINGER CO | 2782 | 2588907 | | WATER DEPARTMENT |
| WALBRIDGE-ALDINGER CO | 2782 | 2529880 | PRIMARY CLARIFIER NUMBERS 17 AND 18 | SEWERAGE DEPARTMENT |
| WALBRIDGE-ALDINGER CO | 2782 | 2517999 | SECONDARY CLARIFIER IMPROVEMENTS | SEWERAGE DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| WALSH CONSTRUCTION | 1003706 | 2540999 | CONNER CREEK PILOT CSO CONTROL FACILITY | SEWERAGE DEPARTMENT |
| WARM TRAINING CENTER | 1099138 | 2798140 | | HUMAN SERVICES DEPARTMENT |
| WARM TRAINING CENTER | 1099138 | 2761360 | | HUMAN SERVICES DEPARTMENT |
| WARM TRAINING PROGRAM INC | 1001814 | 2637413 | | HUMAN SERVICES DEPARTMENT |
| WARM TRAINING PROGRAM INC | 1001814 | 2592885 | | FINANCE DEPARTMENT |
| WARM TRAINING PROGRAM INC | 1001814 | 2746897 | | HUMAN SERVICES DEPARTMENT |
| WARM TRAINING PROGRAM INC | 1001814 | 2808870 | | HUMAN SERVICES DEPARTMENT |
| WARM TRAINING PROGRAM INC | 1001814 | 2706004 | | HUMAN SERVICES DEPARTMENT |
| WARREN CONNER DEVELOPMENT COALITIONS | 1015379 | 2515838 | WARREN CONNER SA FYE 9/99 | HEALTH DEPARTMENT |
| WARREN CONNER DEVELOPMENT COALITIONS | 1015379 | 2736044 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| WAYNE COUNTY | 18789 | 2560623 | WF/WTW JOB SEARCH AND JOB PLACEMENT | EMPLOYMENT AND TRAINING DEPARTMENT |
| WAYNE COUNTY | 18789 | 2574696 | | POLICE DEPARTMENT |
| WAYNE COUNTY | 18789 | 2772891 | | POLICE DEPARTMENT |
| WAYNE COUNTY COMMUNITY COLLEGE | 1008933 | 2782908 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| WAYNE COUNTY COMMUNITY COLLEGE | 1008933 | 2782906 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| WAYNE STATE UNIVERSITY | 1015979 | 2539793 | | HEALTH DEPARTMENT |
| WAYNE STATE UNIVERSITY | 1015979 | 2539816 | PREVENTATIVE SERVICES | HEALTH DEPARTMENT |
| WAYNE STATE UNIVERSITY | 1015979 | 2539788 | TARGET CITIES | HEALTH DEPARTMENT |
| WAYNE STATE UNIVERSITY | 1015979 | 2539821 | PREVENTATIVE SERVICES | HEALTH DEPARTMENT |
| WAYNE STATE UNIVERSITY | 1015979 | 2516330 | WSU - UNIVERSITY CONSORTIUM | HUMAN RESOURCES DEPARTMENT |
| WAYNE STATE UNIVERSITY | 1015979 | 2539807 | PREVENTATIVE SERVICES | HEALTH DEPARTMENT |
| WAYNE STATE UNIVERSITY | 3116 | 2560543 | CITY/UNIVERSITY CONSORTIUM | HUMAN RESOURCES DEPARTMENT |
| WAYNE STATE UNIVERSITY | 3116 | 2532723 | WIA TITLE I OFFICE AUTOMATION TRAINING | EMPLOYMENT AND TRAINING DEPARTMENT |
| WAYNE STATE UNIVERSITY | 3116 | 2501980 | TITLE III OFFICE AUTOMATION TRAINING | EMPLOYMENT AND TRAINING DEPARTMENT |
| WAYNE STATE UNIVERSITY | 3116 | 2571280 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| WAYNE STATE UNIVERSITY | 3116 | 2552859 | OFFICE AUTOMATION & WORD PROCESSING | EMPLOYMENT AND TRAINING DEPARTMENT |
| WAYNE STATE UNIVERSITY | 3116 | 2519218 | WORD PROCESS TRAINING | EMPLOYMENT AND TRAINING DEPARTMENT |
| WAYNE STATE UNIVERSITY | 3116 | 2611249 | | POLICE DEPARTMENT |
| WAYNE STATE UNIVERSITY | 3116 | 2501174 | | NO DEPARTMENT INDICATED |
| WAYNE STATE UNIVERSITY | 3116 | 2765357 | | CITY COUNCIL |
| WAYNE STATE UNIVERSITY | 3116 | 2797492 | | HEALTH DEPARTMENT |
| WAYNE STATE UNIVERSITY COLLEGE | 19759 | 2502190 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| WAYNE STATE UNIVERSITY COLLEGE | 19759 | 2500873 | EZ PROGRAM OPERATIONS | NO DEPARTMENT INDICATED |
| WCI CONTRACTORS | 17607 | 2681202 | | RECREATION DEPARTMENT |
| WCI CONTRACTORS | 17607 | 2733883 | CONSTRUCTION CONTRACT | RECREATION DEPARTMENT |
| WCI CONTRACTORS | 17607 | 2762089 | CONSTRUCTION CONTRACT | RECREATION DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| WCI CONTRACTORS | 17607 | 2708713 | | RECREATION DEPARTMENT |
| WCI CONTRACTORS | 17607 | 2731182 | | RECREATION DEPARTMENT |
| WCI CONTRACTORS | 17607 | 2762091 | CONSTRUCTION CONTRACT | RECREATION DEPARTMENT |
| WCI CONTRACTORS | 17607 | 2729538 | CONSTRUCTION CONTRACT | RECREATION DEPARTMENT |
| WCI CONTRACTORS | 17607 | 2785381 | CONSTRUCTION CONTRACT | RECREATION DEPARTMENT |
| WCI CONTRACTORS | 17607 | 2799443 | CONSTRUCTION CONTRACT | RECREATION DEPARTMENT |
| WE CARE DEVELOPMENT CORP | 20361 | 2627183 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| WEISS CONSTRUCTION CO | 16586 | 2500908 | DWS-805 SUBURBAN METER AUTOMATION | WATER DEPARTMENT |
| WEISS CONSTRUCTION CO | 16586 | 2501482 | DWS-800 SUBURBAN WATER METERS | WATER DEPARTMENT |
| WELLSPRING | 18110 | 2597175 | | FINANCE DEPARTMENT |
| WEST DETROIT INTERFAITH | 1044949 | 2554192 | | FINANCE DEPARTMENT |
| WESTFIELD DETROIT LLC | 1021039 | 2517679 | | HUMAN SERVICES DEPARTMENT |
| WESTIN ENGINEERING INC | 14468 | 2767695 | PROFESSIONAL SERVICES CONTRACT | INFORMATION TECHNOLOGY SERVICES |
| WILDWOOD RANCH | 1012803 | 2547128 | DETROIT RESCUE MISSION | HUMAN SERVICES DEPARTMENT |
| WILDWOOD RANCH | 1012803 | 2516691 | SUMMER CAMPERSHIPS TO URBAN YOUTHS | HUMAN SERVICES DEPARTMENT |
| WILLA R WALKER LLC | 1071151 | 2618732 | | CULTURAL AFFAIRS DEPARTMENT |
| WILLIAMS ACOSTA PLLC | 1049952 | 2501454 | GRAIMARK REHAB PROJ - FICS #79019 | PLANNING AND DEVELOPMENT DEPARTMENT |
| WILLIAMS ACOSTA PLLC | 1049952 | 2501725 | ENVIRONMENTAL STATUTES & REGULATIONS | LAW DEPARTMENT |
| WILLIAMS ACOSTA PLLC | 1049952 | 2505940 | LEGAL SERVICES-ENVIRONMENTAL | PLANNING AND DEVELOPMENT DEPARTMENT |
| WILLIAMS ACOSTA PLLC | 1049952 | 2500981 | FICS #68652-MID-CITY REVITALIZATION | PLANNING AND DEVELOPMENT DEPARTMENT |
| WILLIAMS ACOSTA PLLC | 1049952 | 2559971 | ERNEST MONROE V CITY OF DETROIT | WATER DEPARTMENT |
| WILLIAMS ACOSTA PLLC | 1049952 | 2623874 | | LAW DEPARTMENT |
| WILLIAMS ACOSTA PLLC | 1049952 | 2501539 | CASINO DEVELOPMENT PROJECT | LAW DEPARTMENT |
| WILLIAMS ACOSTA PLLC | 1049952 | 2553947 | BRUSH PARK PROJECT | PLANNING AND DEVELOPMENT DEPARTMENT |
| WILLIAMS ACOSTA PLLC | 1049952 | 2641654 | LEGAL SERVICES | LAW DEPARTMENT |
| WILLIAMS ACOSTA PLLC | 1049952 | 2593326 | LEGAL SERVICES | ENVIRONMENTAL AFFAIRS DEPARTMENT |
| WILLIAMS ACOSTA PLLC | 1049952 | 2512512 | LEGAL SERVICES | LAW DEPARTMENT |
| WILLIE L MAYO CPA | 1021915 | 2518939 | AUDIT TRAINING | HUMAN SERVICES DEPARTMENT |
| WILLIE MCCORMICK ASSOCIATES INC | 1001824 | 2618093 | | WATER DEPARTMENT |
| WILLIE MCCORMICK ASSOCIATES INC | 1001824 | 2679478 | | WATER DEPARTMENT |
| WILLIE MCCORMICK ASSOCIATES INC | 1001824 | 2566621 | | WATER DEPARTMENT |
| WILLIE MCCORMICK ASSOCIATES INC | 1001824 | 2673433 | | WATER DEPARTMENT |
| WINDHAM REALTY GROUP INC | 17474 | 2500986 | VIC PARK MANAGER | PLANNING AND DEVELOPMENT DEPARTMENT |
| WOMENS JUSTICE CENTER | 14689 | 2508100 | | HUMAN SERVICES DEPARTMENT |
| WOMENS JUSTICE CENTER/MY SISTER PLACE | 1031434 | 2535491 | DOMESTIC VIOLENCE SERVICES | POLICE DEPARTMENT |
| WORKBRAIN INC | 1087022 | 2688977 | | NON-DEPARTMENTAL |
| WTF COMPANY LLC | 1009825 | 2509611 | | POLICE DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| XEROX CORPORATION | 20143 | 2527583 | PHOTOCOPIER MAINTENANCE | COMMUNICATIONS AND CREATIVE SERVICES DEPARTMENT |
| YMCA OF METRO DETROIT | 17203 | 2502285 | PUBLIC FACILITY REHABILITATION | NO DEPARTMENT INDICATED |
| YMCA OF METROPOLITAN DETROIT | 1071155 | 2801079 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| YOUNG DETROIT BUILDERS | 1008086 | 2516595 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| YOUNG DETROIT BUILDERS | 1008086 | 2797765 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| YOUNG DETROIT BUILDERS | 1008086 | 2775343 | | HUMAN SERVICES DEPARTMENT |
| YOUNG DETROIT BUILDERS | 1008086 | 2743797 | | HUMAN SERVICES DEPARTMENT |
| YOUNG DETROIT BUILDERS | 1008086 | 2803602 | | HUMAN SERVICES DEPARTMENT |
| YOUTH CONNECTION | 1054883 | 2801091 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| YOUTH LINKS USA | 1044013 | 2552463 | OPERATION FAST BREAK | EMPLOYMENT AND TRAINING DEPARTMENT |
| YWCA INTERIM HOUSE | 2143 | 2535474 | SERVICES WITH DOMESTIC VIOLENCE UNIT | POLICE DEPARTMENT |
| YWCA INTERIM HOUSE | 2143 | 2508609 | ESG CONTRACT FICS # 078503 | FINANCE DEPARTMENT |
| ZETA STORK'S NEST FOUNDATION | 13210 | 2508767 | NOF PUBLIC SERVICE CONTRACT | FINANCE DEPARTMENT |
| All collective bargaining agreements that had expired prior to confirmation to the extent that they purported to, or would be determined by applicable law to, provide continuing contractual benefits to employees or former employees of the City | | | | |

**EXHIBIT III.D.2**

RETAINED CAUSES OF ACTION

-3-

15-53846-swr   Doc 8797-13   Filed 10/15/14   Entered 10/15/14 12:09:43   Page 442 of
455
13-53846-swr   Doc 6908-3   Filed 08/20/14   Entered 08/20/14 23:27:34   Page 239 of
252

<u>**EXHIBIT III.D.2**</u>

Reference is made to Section III.D.2 of the Plan. Capitalized terms used but not defined herein shall have the meanings given to them in Section I.A of the Plan.

Without limiting any relevant provision of the Plan (including Section III.D.2 thereof), the City expressly reserves and retains, and may enforce, any and all of its rights with respect to: (i) Causes of Action related to the City's Municipal Parking Department, (ii) Causes of Action related to the City's Finance Department, (iii) Causes of Action related to the City's Airport Department, (iv) Causes of Action related to the City's Public Lighting Department, (v) Causes of Action related to the City's Planning and Development Department, (vi) Causes of Action related to the City's Building Safety, Engineering and Environmental Department, (vii) Causes of Action related to the City's Water and Sewerage Department, (viii) Causes of Action related to the City's Department of Public Works, (ix) Causes of Action related to the City's Police Department, (x) Causes of Action related to the City's Fire Department, (xi) Causes of Action related to the City's Assessment Division, (xii) Causes of Action related to the City's Law Department, (xiii) Causes of Action related to any other City department, (xiv) Causes of Action against all litigation parties listed on Schedule H of the Second Amended List of Creditors and Claims [Docket No. 1059] and (xv) the Causes of Action in the following proceedings:

1.   City of Detroit v. MTZ Incorporated, No. 05-121906, Mich. 36th Dist. Ct.;

2.   City of Detroit v. Big Daddy's Soul Food, No. 04-109681, Mich. 36th Dist. Ct.;

3.   City of Detroit v. Louie's Foods, Inc., No. 05-115153, Mich. 36th Dist. Ct.;

4.   City of Detroit v. Robinson Group Home and Rodney Robinson, No. 07-125747, Mich. 36th Dist. Ct.;

5.   City of Detroit v. Arthur R. Jett and Mildred S. Jett, No. 97-713173, Mich. 36th Dist. Ct.;

6.   City of Detroit v. Celia Y. Collins, No. 02-107182, Mich. 36th Dist. Ct.;

7.   City of Detroit v. Anthony Gillam & Kimberly Gillam, No. 01-113119, Mich. 36th Dist. Ct.;

8.   City of Detroit v. Caesar Austin and Evelyn Austin, No. 02-119500, Mich. 36th Dist. Ct.;

9.   City of Detroit v. Means Construction, Inc., Eric J. Means and Ted Smith, No. 03-105353, Mich. 36th Dist. Ct.;

10.  City of Detroit v. Eick B. Jeter and Crystal B. Jeter, No. 03-146312, Mich. 36th Dist. Ct.;

11.  City of Detroit v. Albert Green and Loretta Green, No. 06-102852, Mich. 36th Dist. Ct.;

12.  City of Detroit v. Marlon Currie, No. 04-110183-GC, Mich. 36th Dist. Ct.;

13.  City of Detroit v. Tamara Smith and James Smith, No. 04-114151, Mich. 36th Dist. Ct.;

14.  City of Detroit v. Juan Rosado and Lori Rosado, No. 04-420691, Mich. 36th Dist. Ct.;

15.  City of Detroit v. Victor Barnes and Gwendolyn Barnes, No. 04-130939, Mich. 36th Dist. Ct.;

16.  City of Detroit v. Charles Selmon, No.04-132032-GC, Mich. 36th Dist. Ct.;

CHI-1928932v1

13-53846-swr   Doc 8707-13   Filed 10/15/14   Entered 10/15/14 23:27:34   Page 443 of
13-53846-swr   Doc 6908-3   Filed 08/20/14   Entered 08/20/14 12:00:74   Page 260 of
455
272

17. City of Detroit v. Gregory Webb, No. 04-139195, Mich. 36th Dist. Ct.;

18. City of Detroit v. Alden M. Jarvis and Veronica V. Jarvis, No. 04-136449, Mich. 36th Dist. Ct.;

19. City of Detroit v. Lisa D. Bradley, No. 04-136448, Mich. 36th Dist. Ct.;

20. City of Detroit v. Jarrick F. Goldsby, No. 04-145046, Mich. 36th Dist. Ct.;

21. City of Detroit v. Edgar Butler & Quensetta Butler, No. 04-145049-GC, Mich. 36th Dist. Ct.;

22. City of Detroit v. Michael Marshall and Sheila Marshall, No. 04-415055, Mich. 36th Dist. Ct.;

23. City of Detroit v. Dwight Riddell, Mich. 36th Dist. Ct.;

24. City of Detroit v. Frank Wilson and Edwina J. Wilson, No. 04-142987-GC, Mich. 36th Dist. Ct.;

25. City of Detroit v. Sharon F. Sexton, No. 05-103709, Mich. 36th Dist. Ct.;

26. City of Detroit v. John W. & Winnie M. Plummer, No. 05-108201-GC, Mich. 36th Dist. Ct.;

27. City of Detroit v. Leon Jackson and Harvard Square Center, Mich. 36th Dist. Ct.;

28. City of Detroit v. Michael Franke, No. 05-110302-GC, Mich. 36th Dist. Ct.;

29. City of Detroit v. Caesar Austin and Evelyn Austin, No. 05-116751, Mich. 36th Dist. Ct.;

30. City of Detroit v. Steven P. Morrow and Sophia Morrow, No. 05-121904, Mich. 36th Dist. Ct.;

31. City of Detroit v. Brian L. Reese and Deborah H. Reese, No. 07-121144, Mich. 36th Dist. Ct.;

32. City of Detroit v. Lori Rosado, No. 06-105264, Mich. 36th Dist. Ct.;

33. City of Detroit v. James M. Woodget, No. 08-124280, Mich. 36th Dist. Ct.;

34. City of Detroit v. Calvin L. Hall and Juanda W. Hall, No. 06-111621, Mich. 36th Dist. Ct.;

35. City of Detroit v. Stanley T. and Linda A. Bridges, Mich. 36th Dist. Ct.;

36. City of Detroit v. Nardin Park Recovery Center, No. 07-714583, Mich. 36th Dist. Ct.;

37. City of Detroit v. Jimmie Maddix and Carolyn Maddix, No. 08-137874, Mich. 36th Dist. Ct.;

38. City of Detroit v. Adrian Austin, No. 09-123096, Mich. 36th Dist. Ct.;

39. City of Detroit v. Betty Warmack, No. 09-123865, Mich. 36th Dist. Ct.;

40. City of Detroit v. Caeser Austin and Evelyn Austin, No. 10-106506, Mich. 36th Dist. Ct.;

41. City of Detroit v. Charles & Cheryl Lasley (Moss), No. 09-130913, Mich. 36th Dist. Ct.;

42. City of Detroit v. Sterling J. Brown and Mary Lisa Brown, No. 09-131658, Mich. 36th Dist. Ct.;

CHI-1928932v1
-2-
13-53846-swr   Doc 8797-13   Filed 10/15/14   Entered 10/15/14 23:27:34   Page 441 of
455
13-53846-swr   Doc 6908-13   Filed 08/20/14   Entered 08/20/14 23:00:43   Page 261 of
272

43. City of Detroit v. Carter Stevenson and Barbara Stevenson, No. 10-106505, Mich. 36th Dist. Ct.;

44. City of Detroit v. Jacqueline Murry, Mich. 36th Dist. Ct.;

45. City of Detroit v. James Gulley and Phyllis Gulley, Mich. 36th Dist. Ct.;

46. City of Detroit v. John Reed, No.10-124047, Mich. 36th Dist. Ct.;

47. City of Detroit v. Coleman Reed and Laurine Reed, No. 11-118847-GC, Mich. 36th Dist. Ct.;

48. City of Detroit v. Ernest Gardner, No. 11-117750, Mich. 36th Dist. Ct.;

49. City of Detroit v. Ronald Carrington and Delores Carrington, No. 12-109805, Mich. 36th Dist. Ct.;

50. City of Detroit v. Lawrence Harris, Mich. 36th Dist. Ct.;

51. City of Detroit v. Raymond McMurrian, No. 12-117043, Mich. 36th Dist. Ct.;

52. City of Detroit v. Luis Arroyo and Braka Higgins a.k.a. Arroyo, Mich. 36th Dist. Ct.;

53. City of Detroit v. Adrian Austin, Mich. 36th Dist. Ct.;

54. City of Detroit v. Joel Ruffin and Willma Orange-Ruffin, Mich. 36th Dist. Ct.;

55. City of Detroit v. Paulette Cochran, Mich. 36th Dist. Ct.;

56. City of Detroit v. April Kincaid, No. 12-113636, Mich. 36th Dist. Ct.;

57. City of Detroit v. James & Adino, No. 14-10436, Mich. 36th Dist. Ct.;

58. City of Detroit v. Dennis Denmark & Elana Denmark, No. 13-102803, Mich. 36th Dist. Ct.;

59. City of Detroit v. Clarinda Barnett-Harrison, Mich. 36th Dist. Ct.;

60. City of Detroit v. Jason Jordan, Mich. 36th Dist. Ct.;

61. City of Detroit v. Mondry Hardware & Mondrey, Louis, Mich. 36th Dist. Ct.;

62. City of Detroit v. Roland, Lisa, Mich. 36th Dist. Ct.;

63. City of Detroit v. Lazana, Deandre & Natalie, No. 12-123542-GC, Mich. 36th Dist. Ct.;

64. City of Detroit v. William Landrum and Caroline Landrum, No. 13-119468, Mich. 36th Dist. Ct.;

65. City of Detroit v. James Bates and Pricilla Bates, No. 13-102805, Mich. 36th Dist. Ct.;

66. City of Detroit v. Coutia Ramsey, No. 13-102804, Mich. 36th Dist. Ct.;

67. City of Detroit v. Ann Fletcher, No. 13-108163, Mich. 36th Dist. Ct.;

68. City of Detroit v. Jackie Hunter and Mary Hunter, Mich. 36th Dist. Ct.;

69. City of Detroit v. Monica Gordon, Mich. 36th Dist. Ct.;

70. City of Detroit v. Patricia Brown, No. 13-119470, Mich. 36th Dist. Ct.;

71. City of Detroit v. Ronald Coleman & Alice Coleman, No. 13-117682 GC, Mich. 36th Dist. Ct.;

72. City of Detroit v. Rennilda Graham, No. 13-119472, Mich. 36th Dist. Ct.;

73. City of Detroit v. Kamin Davis & Tana Davis, Mich. 36th Dist. Ct.;

74. City of Detroit v. Elaine Ivery, Mich. 36th Dist. Ct.;

75. City of Detroit v. Eric Smith, No. 13-122869, Mich. 36th Dist. Ct.;

76. City of Detroit v. Mary Waters, Mich. 36th Dist. Ct.;

77. City of Detroit v. Todd Philson, Mich. 36th Dist. Ct.;

78. City of Detroit v. Kenneth Holms, Sr., Mich. 36th Dist. Ct.;

79. City of Detroit v. Jack Kene Obi, No. 05-104554-GC, Mich. 36th Dist. Ct.;

80. City of Detroit v. Brandy Marie Duke aka Brandy Niang, No. 08-124279, Mich. 36th Dist. Ct.;

81. City of Detroit v. Cevonia Cherise McClure, No. 07-110343, Mich. 36th Dist. Ct.;

82. City of Detroit v. Henry Ricardo Smith, No. 07-2093, Mich. 36th Dist. Ct.;

83. City of Detroit v. Abdul Raheem Rashed, No. 07-1556323, Mich. 36th Dist. Ct.;

84. City of Detroit v. Milton Lee Newman, No. 07-121142, Mich. 36th Dist. Ct.;

85. City of Detroit v. Andre Williams, Mich. 36th Dist. Ct.;

86. City of Detroit v. Helen Roberts, Mich. 36th Dist. Ct.;

87. City of Detroit v. Terry Darnell Jackson , No. 06-119826-GC, Mich. 36th Dist. Ct.;

88. City of Detroit v. Bushierra McDonald, No. 07-132889, Mich. 36th Dist. Ct.;

89. City of Detroit v. Denna Belton, No. 06-160876, Mich. 36th Dist. Ct.;

90. City of Detroit v. Georgianna Colston , No. 07-132886, Mich. 36th Dist. Ct.;

91. City of Detroit v. Terrance Omar Ford, No. 07-144864, Mich. 36th Dist. Ct.;

92. City of Detroit v. Jessie Al McQuarter, No. 07-127234, Mich. 36th Dist. Ct.;

93. City of Detroit v. Kevin Labrell Howell, No. 07-127238, Mich. 36th Dist. Ct.;

94. City of Detroit v. Deconte Jerdo, Mich. 36th Dist. Ct.;

95. City of Detroit v. Sheila Marie-Maxwell Coleman, Mich. 36th Dist. Ct.;

96. City of Detroit v. Jessie Crutcher and Adrienne Smith, No. 08-133795, Mich. 36th Dist. Ct.;

97. City of Detroit v. Joachba D. Hammound-Grace, Mich. 36th Dist. Ct.;

98. City of Detroit v. Lamont Street, Mich. 36th Dist. Ct.;

99. City of Detroit v. William F. & Constance Harris, No. 08-124278, Mich. 36th Dist. Ct.;

100. City of Detroit v. Shealtiel N. Moore, Mich. 36th Dist. Ct.;

CHI-1928932v1
-4-
13-53846-swr   Doc 8707-13   Filed 12/15/14   Entered 12/15/14 12:09:24   Page 446 of
13-53846-swr   Doc 6908-13   Filed 08/20/14   Entered 08/20/14 23:27:43   Page 263 of
455
252

101.  City of Detroit v. Mary Rogers, Mich. 36th Dist. Ct.;

102.  City of Detroit v. Daniel R. Tapert, Mich. 36th Dist. Ct.;

103.  City of Detroit v. Dukes, Emanuel C., Mich. 36th Dist. Ct.;

104.  City of Detroit v. Yolanda F. Brady, Mich. 36th Dist. Ct.;

105.  City of Detroit v. Erskine Wright II, Mich. 36th Dist. Ct.;

106.  City of Detroit v. Lonnie E. Coleman, Mich. 36th Dist. Ct.;

107.  City of Detroit v. Calvin Meeks, III, Mich. 36th Dist. Ct.;

108.  City of Detroit v. Neandue O. Nance, No. 09-11643, Mich. 36th Dist. Ct.;

109.  City of Detroit v. Lula M. Smith, No. 09-119723, Mich. 36th Dist. Ct.;

110.  City of Detroit v. Latasha Merriweather, No. 09-119723, Mich. 36th Dist. Ct.;

111.  City of Detroit v. Tamieka L. Norris, No. 10-125151, Mich. 36th Dist. Ct.;

112.  City of Detroit v. Franceksa Rodriquez, No. 10-124044, Mich. 36th Dist. Ct.;

113.  City of Detroit v. Laquanya Candice, No. 08-120177-GC, Mich. 36th Dist. Ct.;

114.  City of Detroit v. Latonya Katina-Foxey, No. 08-120173, Mich. 36th Dist. Ct.;

115.  City of Detroit v. Raegan Carmell Sweet, No. 08-120172, Mich. 36th Dist. Ct.;

116.  City of Detroit v. Oscar Cameron & Oscar G. Cameron II, Mich. 36th Dist. Ct.;

117.  City of Detroit v. Macia Sherrie Stokes, No. 08-120171, Mich. 36th Dist. Ct.;

118.  City of Detroit v. Angela Conley, No. 08-120174, Mich. 36th Dist. Ct.;

119.  City of Detroit v. Eugene Cole & Victory Outreach Detroit, No. 07-120608-GC, Mich. 36th Dist. Ct.;

120.  City of Detroit v. Kevin Dittich, No. 14-101640, Mich. 36th Dist. Ct.;

121.  City of Detroit v. Morgan McCrary, Mich. 36th Dist. Ct.;

122.  City of Detroit v. Twayla Lynette Larry, No. 07-120610, Mich. 36th Dist. Ct.;

123.  City of Detroit v. Deandre Lamarr Falls, Mich. 36th Dist. Ct.;

124.  City of Detroit v. Latonya Katina-Foxey, No. 08-120173, Mich. 36th Dist. Ct.;

125.  City of Detroit v. Raegan Carmell Sweet, No. 08-120172, Mich. 36th Dist. Ct.;

126.  City of Detroit v. Milton L. Newman, Mich. 36th Dist. Ct.;

127.  City of Detroit v. 3843 Biddle & Scroggins, Daisy, No. 05-122123-GC, Mich. 36th Dist. Ct.;

128.  City of Detroit v. Alexander Spencer, Jr., Mich. 36th Dist. Ct.;

129.  City of Detroit v. Tonia Williams, Mich. 36th Dist. Ct.;

130.  City of Detroit v. Mayor Rissell & Karen Russell, No. 04-113310, Mich. 36th Dist. Ct.;

131.  City of Detroit v. Minnie Lee Martin, No. 99-925205, Mich. Third Judicial Cir.;

CHI-1928932v1
-5-
13-53846-swr   Doc 8307-13   Filed 10/15/14   Entered 10/15/14 12:09:74   Page 447 of 455
13-53846-swr   Doc 6908-13   Filed 08/20/14   Entered 08/20/14 23:27:34   Page 264 of 272

132. City of Detroit v. Ambassador Nursing Home, Inc. aka Pembrook Nursing Center, No. 02-238630, Mich. Third Judicial Cir.;

133. City of Detroit v. Tyrone and Janice Winfrey, Mich. 36th Dist. Ct.;

134. City of Detroit v. Mark Kulbaba, Inc. dba Servicemaster & Mark Kulbaba, No. 03-302931, Mich. Third Judicial Cir.;

135. City of Detroit v. Nardin Park Recovery Center, Mich. Third Judicial Cir.;

136. City T Detroit v. Page Litho, Inc., No. 11-006743-CZ, Mich. Third Judicial Cir.;

137. City of Detroit v. The Printing Professionals, No. 11-006745-CZ, Mich. Third Judicial Cir.;

138. City of Detroit v. Waterman & Sons Printing Company, Inc., No. 11-007078-CZ, Mich. Third Judicial Cir.;

139. City of Detroit v. Opus One, Mich. Third Judicial Cir.;

140. City of Detroit v. Kyler Reamules, Mich. Third Judicial Cir.;

141. City of Detroit v. B & J Enameling Inc. & Holtshouser, Erin & Kownacki, Sandra, Mich. Third Judicial Cir.;

142. City of Detroit v. Jacquettier Coleman, No. 13-116327, Mich. 36th Dist. Ct.;

143. City of Detroit v. Nardin Park Drug Abuse Center et al., No. 13-011688-CZ, Mich. Third Judicial Cir.;

144. City of Detroit v. Sheila A. Kimbrough, No. 07-155641, Mich. 36th Dist. Ct.;

145. City of Detroit v. Counselo Maurico, No. 07-155674, Mich. 36th Dist. Ct.;

146. City of Detroit v. Christina Morris, No. 07-155726, Mich. 36th Dist. Ct.;

147. DuJon Johnson v. City of Detroit; No. 12-202678, Mich. 36th Dist. Ct.;

148. Bella Marshall, aka Bella Marshall Barden, No. 2012-777-270-DE (Probate);

149. William S. Jordan, No. 03-41137, Bankr. E.D. Mich.;

150. Catherine Gaskin, No. 03-67569, Bankr. E.D. Mich.;

151. Catherine Gaskin, No. 03-41232, Bankr. E.D. Mich.;

152. Dwayne Akra, No. 03-69349, Bankr. E.D. Mich.;

153. Dwayne Akra, No. 00-47216, Bankr. E.D. Mich.;

154. Diana Daniel, No. 05-56536, Bankr. E.D. Mich.;

155. Jerry Lee Miller, No. 09-62314, Bankr. E.D. Mich.;

156. Lyall T Hoggatt and Gwendolyn Hoggatt, No. 09-76296, Bankr. E.D. Mich.;

157. Terri L. Sykes, No. 11-72188, Bankr. E.D. Mich.;

158. Shanta Corporation, No. 12-43956, Bankr. E.D. Mich.;

159. Sareta Jean Cheathem, No. 12-59435, Bankr. E.D. Mich.;

160. Belinda Rochelle Sanders, No. 12-57603, Bankr. E.D. Mich.;

161. Denise Evans Whitley, No. 14-40849, Bankr. E.D. Mich.;

162. Whitley v. City of Detroit Treasurer et al, No. 14-04131 Bankr. E.D. Mich.;

163. Kimberli Powell, No. 13-40036 (Adversary Case No. 13-04134), Bankr. E.D. Mich.;

164. Ruthea Taylor:, No. 13-41265-PJS (Adversary Case No(s) 13-04235, 13-04237 and 13-04239), Bankr. E.D. Mich.;

165. Louise Williams, No. 13-40374-MBM (Adversary Case No. 13-04215), Bankr. E.D. Mich.;

166. Dorothy Wilson, No. 13-43731-WSD (Adversary Case No. 13-04296); Bankr. E.D. Mich.;

167. Carol Lowe-Redding, No. 12-60626, Bankr. E.D. Mich.;

168. Rodney A. Bowie, No. 04-40019, Bankr. E.D. Mich.;

169. Christopher D. Baty, No. 04-54408, Bankr. E.D. Mich.;

170. Tonia Howard, No. 07-58025, Bankr. E.D. Mich.;

171. Carl Barner and Yolanda Barner, No. 07-58840, Bankr. E.D. Mich.;

172. Jerome Jenkins, No. 09-67014, Bankr. E.D. Mich.;

173. Romana Bullock v. Wayne County Treasurer, et al. Mich. 36th Dist. Ct.;

174. General Shale Brick v. City of Detroit, No. 06-44397, Mich. 36th Dist. Ct.;

175. Gloria Jean McLaurin v. Detroit Parking Violations Bureau, No. 293700, Mich. Ct. App.;

176. Dennis Lynval v. City of Detroit, No. 12-012164, Mich. 36th Dist. Ct.;

177. City of Detroit v. Mdrahi, Mohamed, No. 3-005784-CC (Condemnation);

178. City of Detroit v. True Missionary Baptist Church, No. 13-005785-CC (Condemnation);

179. City of Detroit v. True Missionary Baptist Church, No. 13-005787-CC (Condemnation);

180. City of Detroit v. True Missionary Baptist Church, No. 13-005795-CC (Condemnation);

181. City of Detroit v. True Missionary Baptist Church, No. 13-005814-CC (Condemnation);

182. City of Detroit v. Khami, Issam, et al., No. 13-005816-CC (Condemnation);

183. City of Detroit v. CE Detroit, No. 13-005820-CC (Condemnation);

184. City of Detroit v. State of Michigan, No. 12-014797-CC (Condemnation);

185. City of Detroit v. Wilcox aka Albert, Martha, No. 12-014799-CC (Condemnation);

186. City of Detroit v. Wilson, Kenneth L., No. 13-005825-CC (Condemnation);

187. City of Detroit v. True Missionary Baptist Church, No. 13-05826-CC (Condemnation);

188. City of Detroit v. True Missionary Baptist Church, No. 13-005827-CC (Condemnation);

189. City of Detroit v. Wilson, Gail, et al., No. 12-015039-CC (Condemnation);

190. City of Detroit v. Wilcox, Martha, No. 12-014867-CC (Condemnation);

191. City of Detroit v. CE Detroit, LLC, No. 12-014803-CC (Condemnation);

192. City of Detroit v. Lucido, Steven J., et al., No. 13-05828-CC (Condemnation);

193. City of Detroit v. Detroit Leasing, Inc., No. 13-005829-CC (Condemnation);

194. City of Detroit v. Newell, Nema N., No. 13-005830-CC (Condemnation);

195. City of Detroit v. Jones, James N., No. 13-005831-CC (Condemnation);

196. City of Detroit v. Jones, James N., No. 13-005832-CC (Condemnation);

197. Manos, Dino v. City of Detroit and Abram, Frank H. , No. 12-011400, Mich. 36th Dist. Ct.;

198. City of Detroit v. Priscilla White, No. 06-120153-GC, Mich. 36th Dist. Ct.;

199. City of Detroit v. Tommie L. Douglas, Jr., No. 13-116328, Mich. 36th Dist. Ct.;

200. City of Detroit v. Natoshia Lane Lucas, No. GC-08H559, Mich. 36th Dist. Ct.;

201. City of Detroit v. James Strickland, No. 12-103387-GC, Mich. 36th Dist. Ct.;

202. City of Detroit v. Giant Janitorial Services Inc & Peter J. Huthwaite, No. 02-147508, Mich. 36th Dist. Ct.;

203. City of Detroit v. Deborah Davenport Bankruptcy, No. 03-65075, Bankr. E.D. Mich.;

204. City of Detroit v. Renaissance West Comental Helath Services et al., No. 04-405900-CZ, Mich. Third Judicial Cir.;

205. City of Detroit v. Ernest Karr, No. 13-009376, Mich. 36th Dist. Ct.;

206. City of Detroit v. Clarence & Marilyn Bell, Mich. 36th Dist. Ct.;

207. City of Detroit v. John W. & Martha Higgins, Mich. 36th Dist. Ct.;

208. City of Detroit v. Beverly Jeanette, Mich. 36th Dist. Ct.;

209. City of Detroit v. Gwendolyn Broadnax, Mich. 36th Dist. Ct.;

210. City of Detroit v. Emily Talbert-Holt, No. 09-003020-CZ, Mich. Third Judicial Cir.;

211. City of Detroit v. Linda Terry, No. 09-17213-GC, Mich. 36th Dist. Ct.;

212. City of Detroit v. Dwayne B. Toles, No. 07-157206-GC, Mich. 36th Dist. Ct.;

213. City of Detroit v. Victor C. Travier, No. 08-126677-GC, Mich. 36th Dist. Ct.;

214. City of Detroit v. Victoria L. Cliett, No. 13-118142, Mich. 36th Dist. Ct.;

215. City of Detroit v. Bessie Harris, No. 08-126678-GC, Mich. 36th Dist. Ct.;

216. City of Detroit v. Donald R. & Latania C. McClendon, No. 08-145303-GC, Mich. 36th Dist. Ct.;

217. City of Detroit v. Jeanette Beverly, No. 09-108564-GC, Mich. 36th Dist. Ct.;

218. City of Detroit v. Linda Terry, No. 09-17213-GC, Mich. 36th Dist. Ct.;

219. City of Detroit v. Sharon Brown, No. 09-114024-GC, Mich. 36th Dist. Ct.;

CHI-1928932v1
-8-
13-53846-swr Doc 8797-3 Filed 12/15/14 Entered 12/15/14 23:27:43 Page 450 of
13-53846-swr Doc 6908-13 Filed 08/20/14 Entered 08/20/14 23:27:43 Page 207 of
455

220. City of Detroit v. Emily Talbert-Holt, No. 09-003020-CZ, Mich. 36th Dist. Ct.;

221. City of Detroit v. Deborah Hicks, No. 13-012387, Mich. 36th Dist. Ct.;

222. City of Detroit v. Flozelle Crosby, No. 09-112041-GC, Mich. 36th Dist. Ct.;

223. City of Detroit v. Vanessa A. Hall, No. 09-112039-GC, Mich. 36th Dist. Ct.;

224. City of Detroit v. Milton s. & Brenda K. Campbell, No. 09-114017-GC, Mich. 36th Dist. Ct.;

225. City of Detroit v. Jerel Johnson & Deshawn L. Morrison, No. 09-131660-GC, Mich. 36th Dist. Ct.;

226. City of Detroit v. Will Ivey, No. 13-118143, Mich. 36th Dist. Ct.;

227. City of Detroit v. Melvin Eades and Rachel Eades, No. 09-135760, Mich. 36th Dist. Ct.;

228. City of Detroit v. James Woodget, No. 10-104902-GC, Mich. 36th Dist. Ct.;

229. City of Detroit v. Pamela Franklin and Marvin Franklin, No. 10B2476, Mich. 36th Dist. Ct.;

230. City of Detroit v. Yvette Pugh, No. 11-107209-GC, Mich. 36th Dist. Ct.;

231. City of Detroit v. Everette Driver & Sheila Driver, No. 11-107031-GC, Mich. 36th Dist. Ct.;

232. City of Detroit v. Paul Swanson, No. 1102022H-GC, Mich. 41B Dist. Ct.;

233. City of Detroit v. Gillian John, No. 13-118144, Mich. 36th Dist. Ct.;

234. City of Detroit v. Luther Gray III, No. 07-122557-GC, Mich. 36th Dist. Ct.;

235. City of Detroit v. Tony Davis Garnishment, No. 08-114619-CD, Mich. 36th Dist. Ct.;

236. City of Detroit v. Bennie Hayden, No. 13-C3512-GC, Mich. 36th Dist. Ct.;

237. City of Detroit v. Raymond McMurrian, No. 12-117043-GC, Mich. 36th Dist. Ct.;

238. City of Detroit v. Timothy Ebendick and Colleen Ebendick, No. 13-117680-gc, Mich. 36th Dist. Ct.;

239. City of Detroit v. Sea-Breeze Traing Corp dba City Laundry Pers Prop, Mich. Third Judicial Cir.;

240. City of Detroit v. Jean James, No. 13-117268-GC, Mich. 36th Dist. Ct.;

241. City of Detroit v. Chezcore Inc. & Cieskowksi, David, Mich. Third Judicial Cir.;

242. City of Detroit v. Monica Chavers, No. 13-118145, Mich. 36th Dist. Ct.;

243. City of Detroit v. Slack, Jonathon, No. 13-117270-GC, Mich. 36th Dist. Ct.;

244. City of Detroit v. Kevin Doss, No. 13-117269-GC, Mich. 36th Dist. Ct.;

245. City of Detroit v. Mack Orangelo, No. 13-39949-GC, Mich. 36th Dist. Ct.;

246. Markos Patty Store v. City of Detroit, No. 13-000003-CZ, Mich. Third Judicial Cir.;

247. City of Detroit v. Gloria Ballard, Mich. 36th Dist. Ct.;

248. City of Detroit v. Daryl Johnson & Nadeine Johnson, Mich. 36th Dist. Ct.;

249. City of Detroit v. Rebecca Shelton, Mich. 36th Dist. Ct.;

250. City of Detroit v. Cynthia Snith & Kwame Smith, No. 13-117678-GC, Mich. 36th Dist. Ct.;

251. City of Detroit v. Zeola Carey, No. 09-107281, Mich. 36th Dist. Ct.;

252. City of Detroit v. Kenneth Tinsley & Cheryl Tinsley, Mich. 36th Dist. Ct.;

253. City of Detroit v. Louis Parker, Mich. 36th Dist. Ct.;

254. City of Detroit v. Matthew Underwood & Vantress Underwood, No. 13-117679-GC, Mich. 36th Dist. Ct.;

255. City of Detroit v. James D. & Marva E. Washington, No. 03-145330-GC, Mich. 36th Dist. Ct.;

256. City of Detroit v. Belda P. Garza, No. 07-122553-GC, Mich. 36th Dist. Ct.;

257. City of Detroit v. Fred Hill, No. 14-101263-GC, Mich. 36th Dist. Ct.;

258. City of Detroit v. Kathrine Luckett, No. 13-122872-GC, Mich. 36th Dist. Ct.;

259. City of Detroit v. Mary Majek, No. 14-101262-GC, Mich. 36th Dist. Ct.;

260. City of Detroit v. Kyler Reamuless, No. 13-122874-GC, Mich. 36th Dist. Ct.;

261. City of Detroit v. Mary Waters, No. 13-121800, Mich. 36th Dist. Ct.;

262. City of Detroit v. Meal Tech Products, Inc. & Letitia Gordon, No. 14--000586-CZ, Mich. Third Judicial Cir.;

263. City of Detroit v. Davis McGill & Juwanna D. McGill, No. 13-20224-GC, Mich. 36th Dist. Ct.;

264. City of Detroit v. Majestic Theater center Inc., No. 11-007260-CZ, Mich. Third Judicial Cir.;

265. City of Detroit v. Shelbourne Group In. Y Leipsitz-Makino, Kathy, No. 14-102379-GC, Mich. 36th Dist. Ct.;

266. City of Detroit v. Ali Beidoun, No. 13-121801, Mich. 36th Dist. Ct.;

267. City of Detroit v. Marcel Maurice Moore, No. 07-04395T-GC, Mich. 41B Dist. Ct.;

268. City of Detroit v. Shashu Makeda Harris, No. 06-101803-GC, Mich. 36th Dist. Ct.;

269. City of Detroit v. Lesley Girard Gates, No. 06-120154-GC, Mich. 36th Dist. Ct.;

270. City of Detroit v. Shawn Myatt, Mich. 36th Dist. Ct.;

271. City of Detroit v. Angela Nicole Shelly, No. 07-122578-GC, Mich. 36th Dist. Ct.;

272. City of Detroit v. Ann Francine Smith, No. 07-117414-GC, Mich. 36th Dist. Ct.;

273. City of Detroit v. Saun Roland Scott, No. 07-122576-GC, Mich. 36th Dist. Ct.;

274. City of Detroit v. Faynese deeneil Robinson-Law, No. 06-101802-GC, Mich. 36th Dist. Ct.;

275. City of Detroit v. Celia Harris, No. 13-121803, Mich. 36th Dist. Ct.;

276. City of Detroit v. Delois Kirkman, No. 07-134556-GC, Mich. 36th Dist. Ct.;

277. City of Detroit v. Michael Amthony Hines, No. 06-120152-GC, Mich. 36th Dist. Ct.;

278. City of Detroit v. Derrick James McDowell, No. 07-58101-GC, Mich. 36th Dist. Ct.;

279. City of Detroit v. Tamaara Morris, No. 06-101804-GC, Mich. 36th Dist. Ct.;

280. City of Detroit v. Rhonda Joann White, No. 07-134557-GC, Mich. 36th Dist. Ct.;

281. City of Detroit v. Danetta L. Simpson, No. 12-121739-GC, Mich. 36th Dist. Ct.;

282. City of Detroit v. Kildare Clarke, No. 08-00468-GC, Mich. 36th Dist. Ct.;

283. City of Detroit v. Aretha Lula Crawford, No. 07-145090-GC, Mich. 36th Dist. Ct.;

284. City of Detroit v. Euel Kinsey, No. 14-304163, Mich. 36th Dist. Ct.;

285. City of Detroit v. Natasha Nakie-Nacole Coats, No. 08-C0945-GC, Mich. 36th Dist. Ct.;

286. City of Detroit v. Rebecca Marie Dunn, No. 07155738-GC, Mich. 36th Dist. Ct.;

287. City of Detroit v. Eve Reedy Doster, No. 08-106725-GC, Mich. 36th Dist. Ct.;

288. City of Detroit v. Barnstormer Pilot Club, LLC, No. 14-002984, Mich. 36th Dist. Ct.;

289. City of Detroit v. Virginia Francnessa Flamer, No. 07-145091-GC, Mich. 36th Dist. Ct.;

290. City of Detroit v. Gregory Lynn Delaney, No. 07-145091-GC, Mich. 36th Dist. Ct.;

291. City of Detroit v. Tyrone Jemall Peals, No. 07-117411-GC, Mich. 36th Dist. Ct.;

292. City of Detroit v. Paul Douglas Bosman, No. 07-1805-GC, Mich. 22nd Dist. Ct.;

293. City of Detroit v. Ann Francien Smith, Mich. 36th Dist. Ct.;

294. City of Detroit v. Khatoon Dawood, No. 08-C01778-GC-01, 52nd Dist. Ct.;

295. City of Detroit v. Jaroslaw Sziejter, No. 09-114019, Mich. 36th Dist. Ct.;

296. City of Detroit v. Kimberly James, Mich. 36th Dist. Ct.;

297. City of Detroit v. Rachel Erika Thomas-Sharpe, Mich. 36th Dist. Ct.;

298. City of Detroit v. Tawanda Latreese Wilder, No. 09-114021-GC, Mich. 36th Dist. Ct.;

299. City of Detroit v. Elgin R. Taylor, No. 09-114022-GC, Mich. 36th Dist. Ct.;

300. City of Detroit v. Lasonia Smith, Mich. 36th Dist. Ct.;

301. City of Detroit v. Lamont Street, Mich. 36th Dist. Ct.;

302. City of Detroit v. Shealtiel N. Moore, Mich. 36th Dist. Ct.;

303. City of Detroit v. Jaroslaw Sziejter, No. 09-114019, Mich. 36th Dist. Ct.;

304. City of Detroit v. Christine Myers, Gavin Harrison, Karen Kialka, No. 09-114016-GC, Mich. 36th Dist. Ct.;

305. City of Detroit v. Verizon, Mich. 36th Dist. Ct.;

306. City of Detroit v. Marcus Ricardo Gary, No. 09-114018-GC, Mich. 36th Dist. Ct.;

CHI-1928932v1
-11-
13-53846-swr   Doc 8797-13   Filed 12/15/14   Entered 12/15/14 23:27:43   Page 452 of
455
13-53846-swr   Doc 6908-13   Filed 08/20/14   Entered 08/20/14 23:27:43   Page 227 of
252

307. City of Detroit v. Christine Myers, Gavin Harrison, Karen Kialka, No. 09-114016-GC, Mich. 36th Dist. Ct.;

308. City of Detroit v. Derek Culver, No. 13-121802, Mich. 36th Dist. Ct.;

309. City of Detroit v. Rita Lynette Powell-Pyles, No. 09-131657-GC, Mich. 36th Dist. Ct.;

310. City of Detroit v. Kari Burge, No. 10-106504-GC, Mich. 36th Dist. Ct.;

311. City of Detroit v. Jerea Deana Jackson, No. 08-106730-GC, Mich. 36th Dist. Ct.;

312. City of Detroit v. Angelo Iafrate, Mich. 36th Dist. Ct.;

313. City of Detroit v. Jamal Anthony Gaddie, No. 07-141061-GC, Mich. 36th Dist. Ct.;

314. City of Detroit v. Sophia Hawkins, No. 07-141894-GC, Mich. 36th Dist. Ct.;

315. City of Detroit v. Terrance Thomas, No. 10-108337-GC, Mich. 36th Dist. Ct.;

316. City of Detroit v. Terrance Thomas, No. 10-108337-GC, Mich. 36th Dist. Ct.;

317. City of Detroit v. Maia Williams, Mich. 36th Dist. Ct.;

318. City of Detroit v. Frances Blue, No. 10-118297-GC, Mich. 36th Dist. Ct.;

319. City of Detroit v. Jerel D. Matthaw, No. 10-122303, Mich. 36th Dist. Ct.;

320. City of Detroit v. Ashli R. Thomas, No. 10-122302-GC, Mich. 36th Dist. Ct.;

321. City of Detroit v. George Webb, No. 10-121743-GC, Mich. 36th Dist. Ct.;

322. City of Detroit v. Elsie L. Green & Sadie Reynolds, No. 10-124040-GC, Mich. 36th Dist. Ct.;

323. City of Detroit v. Wayne County 7 Raymond J. Wojtowitcz, No. 13-000036-MZ-C30, Mich. 36th Dist. Ct.;

324. City of Detroit v. Kenneth L. Hurt, No. 11-105194-GC, Mich. 36th Dist. Ct.;

325. City of Detroit v. Tiyunna George, Mich. 36th Dist. Ct.;

326. City of Detroit v. Dejuan L. Washington, No. 11-105192-GC, Mich. 36th Dist. Ct.;

327. City of Detroit v. Marc Williams, No. 12-103384-GC, Mich. 36th Dist. Ct.;

328. City of Detroit v. Charles Williams, Mich. 36th Dist. Ct.;

329. City of Detroit v. Jennifer Bramer, No. 12-103386-GC, Mich. 36th Dist. Ct.;

330. City of Detroit v. Ronald Taylor, No. 04-117439-GC, Mich. 36th Dist. Ct.;

331. City of Detroit v. Empire Leasing, No. 14-15917-GC, Mich. 36th Dist. Ct.;

332. City of Detroit v. Wise Finley, No. 14-105916-GC, Mich. 36th Dist. Ct.;

333. City of Detroit v. John Louis Herring, Mich. 36th Dist. Ct.;

334. City of Detroit v. Damon Key, No. 14-15921-GC, Mich. 36th Dist. Ct.;

335. City of Detroit v. Claudio Lopez, Mich. 36th Dist. Ct.;

336. City of Detroit v. Michael Mingo, No. 14-105920-GC, Mich. 36th Dist. Ct.;

337. City of Detroit v. Myrtle Pasha, Mich. 36th Dist. Ct.;

338. City of Detroit v. Larry Callahan, No.  08-105046-GC, Mich. 36th Dist. Ct.;

339. City of Detroit v. Anthony Caslio, No. 07-154008-GC, Mich. 36th Dist. Ct.;

340. City of Detroit v. Antonio L. Johnson, No.  08-122838-GC, Mich. 36th Dist. Ct.;

341. City of Detroit v. Markeeda Morgan, No.  07-124692-GC, Mich. 36th Dist. Ct.;

342. City of Detroit v. 19696 Omira, No.  09-110228-GC, Mich. 36th Dist. Ct.;

343. City of Detroit v. Cadolba Management and Associates, No.  09-120755-GC, Mich. 36th Dist. Ct.;

344. City of Detroit v. Clarence Edward Key, No.  09-114023-GC, Mich. 36th Dist. Ct.;

345. Motor City Bending Inc vs City of Detroit, No.  07-729179, Mich. 36th Dist. Ct.;

346. City of Detroit v. 19696 Omira, No. 09-110228, Mich. 36th Dist. Ct.;

347. City of Detroit v. Cadpba Management and Associates, No. 09-120755, Mich. 36th Dist. Ct.;

348. City of Detroit v. Clarence Edward Key, No. 09-114023, Mich. 36th Dist. Ct.;