UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:                                          Chapter 9

City of Detroit, Michigan,                No. 13-53846

        Debtor.                         Hon. Steven W. Rhodes

_____/

**PRE-TRIAL BRIEF OF THE DETROIT PUBLIC SAFETY UNIONS, CONSISTING OF THE DETROIT FIRE FIGHTERS ASSOCIATION (THE "DFFA"), THE DETROIT POLICE OFFICERS ASSOCIATION (THE "DPOA"), THE DETROIT POLICE LIEUTENANTS & SARGEANTS ASSOCIATION (THE "DPLSA") AND THE DETROIT POLICE COMMAND OFFICERS ASSOCIATION (THE "DPCOA")**

1

13-53846-tjt  Doc 8738-7  Filed 12/15/14  Entered 12/15/1
13-53846-swr  Doc 1230   Filed 10/17/13  Entered 10/17/1  1353846131017000000000018

# TABLE OF CONTENTS

I. Statement of Facts ...................................................................................................................1

II. Legal Argument......................................................................................................................8

    A. Burden of Proof for Eligibility...................................................................................8

    B. Issues of Law.............................................................................................................8

        Issue 1: The City failed to negotiate with the Detroit Public Safety Unions in good faith, as required by 11 U.S.C. §109(c)(5)(B) ..................................8

        Issue 2: The City was not "unable to negotiate with creditors because such negotiation is impracticable," as required (in the alternative) for eligibility by 11 U.S.C. §109(c)(5)(C)........................................................11

        Other legal issues .......................................................................................12

III. Witnesses .............................................................................................................................13

IV. Key Documents ...................................................................................................................14

V. Conclusion ...........................................................................................................................15

# TABLE OF AUTHORITIES

**Cases:**

*In re City of Stockton, California,* 493 BR 772, 794 (Bankr. E.D.Cal. 2013) ..............................8

*In re Cottonwood Water and Sanitation District, Douglas County,
Colorado,*138 B.R. 973, 979 (Bankr. D.Colo. 1992) ......................................................10,11

*In re County of Orange,* 183 B.R. 594, 599 (Bankr. C.D. Cal. 1995) ............................................8

*In re Ellicot School Building Authority,* 150 B.R. 261, 266 (Bankr. D.
Colo. 1992) ...............................................................................................................................10

*In re New York City Off-Track Betting Corporation,* 427 B.R. 256, 277
(Bankr. S.D.N.Y. 2010) .............................................................................................................11

*In re Sullivan County Regional Refuse Disposal District*, 165 B.R. 60, 78, 82
(Bankr. D. N.H. 1994) .........................................................................................................10, 12

*In re Valley Health System,* 383 B.R 156, 161 (Bankr. C.D.Cal. 2008).........................................8

*In re Villages at Castle Rock Metropolitan District No. 4,*145 B.R. 76, 85
(Bankr. D. Colo. 1990) .............................................................................................................12


**Statutes:**

11 U.S.C. §362.................................................................................................................................11

11 U.S.C. §109(c) .............................................................................................................................8

11 U.S.C. §109(c)(5)(B) ........................................................................................................8, 10,16

11 U.S.C. §109(c)(5)(C) ........................................................................................................11, 12,16

**PRE-TRIAL BRIEF OF THE DETROIT PUBLIC SAFETY UNIONS, CONSISTING OF THE DETROIT FIRE FIGHTERS ASSOCIATION (THE "DFFA"), THE DETROIT POLICE OFFICERS ASSOCIATION (THE "DPOA"), THE DETROIT POLICE LIEUTENANTS & SARGEANTS ASSOCIATION (THE "DPLSA") AND THE DETROIT POLICE COMMAND OFFICERS ASSOCIATION (THE "DPCOA")**

The Detroit Public Safety Unions submit their Pre-trial Brief[1] as follows:

**I.     Statement of Facts**

1.     On March 14, 2013, the Governor appointed Kevyn Orr as Detroit's Emergency Financial Manager pursuant to 1990 PA 72, MCL 141.1201, *et seq*, Orr assumed that role on March 24, 2013 (Orr Declaration, ¶78). On March 28, 2013, PA 436, MCL 141.1541, *et seq*. became effective and Orr became the Emergency Manager under PA 436.

2.     The Detroit Public Safety Unions collective members provide police and fire protection to the City on a daily basis under extremely difficult conditions. They have worked under increasingly difficult conditions, which have included fewer active members and fewer resources. At the same time, their wages and benefits, including their future pension benefits, have been unilaterally reduced by the City.

---

[1] In submitting their Pre-Trial Brief, the Detroit Public Safety Unions reserve their rights to rely on additional facts in support of their arguments based upon the evidence introduced at trial by any other objecting party, the City or the State.

1

3. Since the Emergency Manager's appointment, the City has steadfastly declined to negotiate with the Detroit Public Safety Unions, claiming it has no obligation to do so under PA 436.

4. On June 14, 2013, the Emergency Manager held a meeting at the Westin Hotel at Detroit Metropolitan Airport with the City's creditors, including the Detroit Public Safety Unions. That meeting was an en masse event at which the City presented certain general information about its restructuring intentions; questions were answered, but no negotiations took place. See "City of Detroit Proposal for Creditors" dated June 14, 2013 (the "June 14 Creditor Proposal") to all creditors in attendance [See Doc. No. 11-1] (Orr Declaration ¶ 80).

5. The June 14 Creditor Proposal was a general overview of the financial condition of the City, the condition of city services and issues regarding payment of personnel, including the members of the Detroit Public Safety Unions. It also had broad proposals for creditor treatment including proposals that would significantly impair the accrued financial benefits of the Detroit Public Safety Union members and retirees. See Restructuring Proposal, [Docket 11-1, p. 60] (attached as Exhibit to Orr Declaration).

6. On June 20, 2013, the Emergency Manager held a second meeting with various unions and their representatives, including the Detroit Public Safety

2

13-53846-tjt  Doc 8738  Filed 12/15/14  Entered 12/15/14 19:04:15  Page 5 of 19

Unions, at which the City informed the Detroit Public Safety Unions of its intent to propose steep cuts to their pension and health care benefits.

7. A third meeting took place with each of the Detroit Public Safety Unions during the week of July 12, 2013 regarding these proposed cuts. Again the City made it clear that it was not negotiating with the Detroit Public Safety Unions although they were welcome to propose their own restructuring plan. The City also indicated that it would be unwilling to negotiate any terms of such a restructuring plan unless agreement was first reached on actuarial assumptions.

8. There is no agreement about the actuarial assumptions utilized by the City.

9. On July 16, 2013, the Emergency Manager sought the Governor's authorization to file these Chapter 9 proceedings. Orr Declaration, Exhibit J [Docket 11-10].

10. On July 17, 2013, the Detroit Public Safety Unions received a letter from the Emergency Manager's counsel, which indicated that the Emergency Manager wanted to first reach agreement on actuarial assumptions and which provided no substantive proposals.

11. On July 18, 2013, the City filed its Chapter 9 Petition.

12. With regard to the Detroit Public Safety Unions, the content of the discussions at the June 14th meeting and the follow up meetings were very general,

3

13-53846-tjt  Doc 8738  Filed 12/15/14  Entered 12/15/14 19:04:15  Page 6 of 19
13-53846-swr  Doc 1287  Filed 10/17/13  Entered 10/17/13 21:08:58  Page 6 of 19

and the City continued to indicate, through the Emergency Manager, that the meetings should not be construed as negotiations.

13. With regard to the DPOA, which consists of approximately 1900 active Detroit Police Officers:

a. On March 25, 2013, only days before the effective date of PA 436, the Act 312 Award memorializing the terms and conditions of employment between the City and the DPOA was issued (the "Award"). The Award becomes the collective bargaining agreement.

b. The Award recognized the record number of issues presented for arbitration were the direct result of the City's refusal to negotiate and its insistence on imposing on the DPOA a series of demoralizing and not necessarily cost-saving City Employment Terms ("CETs") under the now-repealed Public Act 4, former MCL 141.1501, *et seq*.

c. Among the Award's specific findings were:

> . . . The number of issues are as a result of the fact the City imposing in July 2012 without further negotiation the City Employment Terms which in many details had little rhyme or reason in addressing the City's financial crisis as applied to public safety and by any definition was an attempt to "gut" the Master Agreement between the City of Detroit and the Detroit Police Officers Association, a product of 40 years of negotiations and Act 312 proceedings. Such an approach brought forth approximately 37 issues proffered by the DPOA attempting to seek economic improvements in a financially distressed city, creating an unrealistic labor relations atmosphere, and had the effect of overlooking the welfare of the public, *i.e.*, the need for an efficient, effective Detroit Police

Department. This goal can best be established by the comparables, namely, the marketplace for Police Officers even among the more distressed communities and a recognition even by the Legislature that the Legislature has given special recognition to police unions of the duty to bargain in the current labor climate in Michigan. It is for this reason that the Chairman, concurred in by the Union Delegate, will address the issues based upon the expired Master Agreement and will reject in total the City Employment Terms as those terms were not negotiated terms and were terms implemented under Public Act 4, which act was rejected by the people of the State of Michigan.

      d.     The Award further found that, " . . . if there had been negotiations as in the case of the Tentative Agreement, presumably even if on an around-the-clock basis, a number of the issues would have been reduced." Award at p. 29.

      e.     The Award further provided for a 5% pay raise, effective January 1, 2014 for DPOA members and for the reopening of the Act 312 proceedings to address health care issues after June 30, 2013.

      f.     The City, through the Emergency Manager, filed a complaint for judicial review of the 5% pay raise, which remains pending but stayed by these proceedings. Diaz Declaration, ¶5.

      g.     Relying on Public Act 436, the City has declined to reopen the Act 312 proceedings to address health care issues, and instead seeks to unilaterally impose new health care terms on the DPOA. Diaz Declaration, ¶¶ 8-10.
5

13-53846-tjt   Doc 8738   Filed 12/15/14   Entered 12/15/14 19:04:15   Page 8 of 19
13-53846-swr   Doc 7387   Filed 10/15/13   Entered 10/15/13 19:08:58   Page 8 of 19

14. With regard to the DFFA, which consists of all active Detroit fire fighters of all ranks (presently just under 800 members):

    a. The DFFA's collective bargaining agreement with the City expired June 30, 2013.

    b. In reliance on PA 436, and claiming it did not have a duty to negotiate or arbitrate under Public Act 312, the City blocked the DFFA's efforts to pursue Act 312 arbitration. In a 2-1 decision, the Michigan Employment Relations Commission ruled that, as a result of the Emergency Manager's appointment, it lacked the authority to conduct Act 312 hearings.

    c. By letter dated July 25, 2013, the City informed the DFFA that, effective August 16, 2013, its members' wages would be cut by 10% across the board.

    d. At a meeting on August 2, 2013 which the City emphatically indicated was not a negotiation, the City presented the terms of new health care plans it intends to impose, which will increase the out-of-pocket health care costs to be borne by DFFA members by as much as $3000 a year for families.

15. With regard to the DPLSA:

    a. On June 25, 2013, the City notified the DPLSA of the termination of its collective bargaining agreement effective July 6, 2013, and that it was not requesting bargaining at that time.

6

b. After informing the DPLSA that it had no duty to bargain, the Emergency Manager notified the DPLSA that changes to its wages, benefits and working conditions would be forthcoming after August 1, 2013.

c. Shortly after the chapter 9 petition was filed, the City's Labor Relations Director informed the DPLSA that the City was prepared to impose terms on its members. In July 31, 2013 correspondence and without any prior negotiation, the City identified 17 terms it intended to implement. In response to an August 1, 2013 request from the DPLSA, the City has delayed imposing the 17 terms as of the date of this Objection.

16. In regard to the DPCOA, whose members are 9 Commanders and 23 Captions:

a. The DPCOA's last contract expired in 2009.

b. The City imposed CET as of July 2012, which were a unilaterally imposed set of working conditions, including a 10% wage cut for all DPCOA members.

c. The City successfully blocked the DPCOA's efforts to proceed to Act 312 arbitration. Following the suspension of PA 4, the DPCOA filed for Act 312 arbitration, an arbitrator was appointed, hearing dates were scheduled for March of 2013, and there were several days of productive negotiations prior to the

7

appointment of the Emergency Manager. However, all negotiations terminated with the Emergency Manager's appointment.

        d.    The Emergency Manager has consistently taken the position that there is no duty to bargain and has refused to bargain or negotiate with the DPCOA.

## II. Legal Argument

### A. Burden of Proof for Eligibility:

The City, as the proponent of the chapter 9 petition, bears the burden of proof to show that it is satisfies the elements of 11 U.S.C. §109(c) and is therefore eligible to file a chapter 9 petition. *In re City of Stockton, California,* 493 BR 772, 794 (Bankr. E.D.Cal. 2013); *In re County of Orange,* 183 B.R. 594, 599 (Bankr. C.D. Cal. 1995), *In re Valley Health System,* 383 B.R 156, 161 (Bankr. C.D.Cal. 2008).

### B. Issues of Law:

**ISSUE 1: The City failed to negotiate with the Detroit Public Safety Unions in good faith, as required by 11 U.S.C. §109(c)(5)(B).**

§109(c)(5)(B) requires the City to show that it:

> . . . has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

8

There are a number of aspects to the dealings between the City and the Detroit Public Safety Unions which demonstrate that the City did not negotiate in good faith with its creditors, and in particular with the Detroit Public Safety Unions, prior to the filing of the Chapter 9 petition. The failure of the City to negotiate is demonstrated by the City's April 18, 2013 Emergency Motion for Determination of Arbitral Jurisdiction and dismissal of Act 312 Petitions and Motion for Stay Pending Ruling, filed in the matters affecting the DPCOA (MERC Case No. D11 J-1169), the DPLSA (MERC Case No. D13 A-0005), and the POAM (Emergency Medical Technician Unit (MERC Case No. D09 F-0703). The ruling on the Emergency Motion resulted in a stay of the Act 312 proceedings, and thus a cessation to negotiations with these unions. After the cessation of the negotiations, there was no effort to engage the Detroit Public Safety Unions in conversations or negotiations about wages, hours, benefits and other terms and conditions of employment.

The next action by the City was its presentation of its June 14 Creditor Proposal, which was presented as, essentially, a "take it or leave it" proposal. All communications from the City regarding the June 14 Creditor Proposal was premised with the condition that the June 14 Creditor Proposal was not subject to negotiation. Thus, based on this premise, and the limited time between the June 14 Creditor Proposal and the July 18, 2013 filing date, there was not any reasonable

9

13-53846-tjt  Doc 8738-7  Filed 12/15/14  Entered 12/15/14 19:04:15  Page 12 of 19
13-53846-swr  Doc 1280   Filed 10/17/13  Entered 10/17/13 21:08:39  Page 12 of 19

effort by the City, or time by any party, to develop any meaningful or serious negotiations.

There are no good faith negotiations when creditors are presented a plan as a "take it or leave it" proposal. *In re Ellicot School Building Authority,* 150 B.R. 261, 266 (Bankr. D. Colo. 1992), (even though the court held that the School Building Authority was not qualified to be a chapter 9 debtor, the judge still analyzed the requirements of 11 U.S.C. §109(c)(5)(B) and stated that a "take it or leave it" approach is not a good faith negotiation). Moreover, there is no good faith negotiation if a party "chooses to ignore clear, unambiguous contractual rights of the other party" (*In re Sullivan County Regional Refuse Disposal District*, 165 B.R. 60, 78 (Bankr. D. N.H. 1994)).

Creditors need a sufficient time to evaluate a proposed plan in order to satisfy 11 U.S.C. §109(c)(5)(B). Moreover, prior to the filing of the Chapter 9 petition, the creditors and debtor can negotiate on a level playing field, without the Debtor having the benefit of Section 362 of the Bankruptcy Code. *In re Cottonwood Water and Sanitation District, Douglas County, Colorado,* 138 B.R. 973, 979 (Bankr. D.Colo. 1992).

> In general, the Bankruptcy Code, as remedial legislation, should be broadly construed in order to provide the intended relief. However, municipal bankruptcies involve significant problems which are not encountered in the private sector. Important constitutional issues arise when a municipality enters the bankruptcy arena. Recognizing these

10

problem, Congress consciously sought to 'limit accessibility to the bankruptcy court' by municipalities. . . .One way to do so was to require the municipal entity, before rushing to this Court, to first seek to negotiate in good faith concerning the treatment the creditors may be expected to receive under a plan to be filed under section 941 of the Code. (internal citations omitted)

*In re Cottonwood Water and Sanitation District,* 138 B.R. at 979.

Even before the filing of the Chapter 9 petition, the Emergency Manager used the provisions of Public Act 436 to exert leverage on the bargaining process and end Act 312 arbitration, and the negotiations and conversations that go along with the arbitration process. Thus, the City took two different approaches to changing the "playing field"—the first with regard to the cessation of the Act 312 arbitration process, and the second with the imposition of the automatic stay of 11 U.S.C. § 362 as a result of the Chapter 9 filing. The fact that the filing occurred, and the stay was imposed, so soon after the Emergency Manager was appointed further points to the lack of interest in the City to engage in meaningful negotiations.

**ISSUE 2: The City was not "unable to negotiate with creditors because such negotiation is impracticable," as required (in the alternative) for eligibility by 11 U.S.C. §109(c)(5)(C).**

11 U.S.C. §109(c)(5)(C) provides: "[the entity] is unable to negotiate with creditors because such negotiation is impracticable."

A determination of "impracticability" must be made on a case-by case basis, and requires a "fact sensitive inquiry". *In re New York City Off-Track Betting*

11

13-53846-tjt Doc 87387 Filed 10/15/14 Entered 10/15/14 19:04:15 Page 14 of 19
13-53846-swr Doc 1280 Filed 10/17/13 Entered 10/17/13 21:08:38 Page 14 of 19

*Corporation,* 427 B.R. 256, 277 (Bankr. S.D.N.Y. 2010). In the instant case, the limited time between the June 14 Creditor Proposal and the July 18, 2013 filing date did not provide sufficient time for meaningful negotiations with creditors. However, this was a "self-imposed" time-limit by the Emergency Manager. The assertion that there was an inability to engage in negotiations with the various creditor constituents, as a result of acts on the Emergency Manager's own making, does not support that such negotiations are impracticable. See *In re Sullivan County Regional Refuse Disposal District*, 165 B.R. 60, 82 (Bankr. D. N.H. 1994) "the decision [to file chapter 9] appears to be a late hour litigation tactic to hold off Wheelabrator's threatened shut-out and an attempt to position the Districts to force some compromises."

It should also be axiomatic that an entity should not be able to claim that it is impracticable to negotiate if, as here, there is no sincere intent to negotiate or there was such a limited time for negotiations. (*In re Villages at Castle Rock Metropolitan District No. 4,* 145 B.R. 76, 85 (Bankr. D. Colo. 1990), six months of conceptual discussions with largest bondholder was sufficient to satisfy §109(c)(5)(C).)

Moreover, the City's refusal to reopen Act 312 proceedings demonstrates its unwillingness to negotiate.

**Other legal issues:**

12

13-53846-swr Doc 7887 Filed 10/15/14 Entered 10/15/14 19:04:15 Page 15 of 19
13-53846-tjt Doc 1280 Filed 10/17/13 Entered 10/17/13 21:08:58 Page 15 of 19

The Detroit Public Safety Unions reserve the right to rely on any legal argument of other objecting parties in this matter.

### III. Witnesses

1. <u>Daniel F. McNamara</u>: President of the Detroit Fire Fighters Association ("DFFA"), Local 344, IAFF, AFL – CIO. Mr. McNamara will testify about his duties as president of the DFFA, his responsibilities and the responsibilities of the DFFA on behalf of its members, and his dealings with representatives of the City prior to and after the filing of the chapter 9 petition. In particular, he will testify about correspondence with Lamont Satchel, the city's Labor Relations Director, that addressed the termination of 2009 – 2013 Collective Bargaining Agreement effective 11:59 p.m. June 30, 2013; the City's terms and conditions of employment following the expiration of the CBA; and follow up meetings. Mr. McNamara will testify about the City's unilateral imposition of wage cuts, cuts to health care benefits and pension restructuring proposals, and that there were no negotiations between the City and the DFFA, despite the DFFA's willingness to participate at meetings.

2. <u>Mark Diaz</u>: President of the Detroit Police Officers Association ("DPOA") since Jan. 1, 2013. Mr. Diaz will testify about his duties as president, his responsibilities and the responsibilities of the DPOA on behalf of its members, and his efforts to negotiate and arbitrate labor matters with the City. In particular, Mr. Diaz will testify about the Act 312 Arbitration and the awards that were issued as a result of same. He will testify that the City's lack of negotiations; the City's announcement of its intention to impose new health care plans on the DPOA and other Detroit Public Safety Unions which significantly increase the members' out of pocket medical costs; and about the "informational meetings" in June and July 2013, at which representatives from Jones Day presented very general outlines of the City's restructuring proposal.

3. <u>Mark Young</u>: President of the Detroit Police Lieutenants & Sergeants Association ("DPLSA"). Mr. Young will testify about his duties as president, his responsibilities and the responsibilities of the DPLSA on behalf of its members. Mr. Young will testify about the DPLSA Feb. 4, 2013 Petition for Act 312 arbitration and the subsequent action of the City claiming it was not obligated to

13

13-53846-tjt  Doc 8738  Filed 12/15/14  Entered 12/15/14 19:04:15  Page 16 of 19
13-53846-swr  Doc 1280  Filed 10/17/13  Entered 10/17/13 21:03:39  Page 16 of 19

engage in bargaining under the Public Employment Relations Act, MCL 423.201 et seq as a result of Section 27(3) of Public Act 436; the decision of the MERC on July 14, 2013 granting the City's motion to dismiss the Act 312 arbitration; and the City's subsequent statements that it had no obligation to bargain with the DPLSA. He will also testify about the City's actions in June and July 2013 relative to the termination of the CBA, the City's intent to impose changes to wages, benefits and working conditions, and correspondence with Lamont Satchel, the City Labor Relations Director. Mr. Young will testify about presentations made by the City in June and July 2013 relative to pension restructuring and health plan changes for DPLSA members, other meetings with the City/Emergency Manager to talk about employment issues for DPLSA members, and the City's statement that the meetings should not be categorized as negotiations.

4. <u>Mary Ellen Gurewitz</u> Labor counsel for the Detroit Police Command Officers Association ("DPCOA"). Ms. Gurewitz will testify about the lack of negotiations between the DPCOA and the City, the terms that have been imposed by the City, and, in particular, the lack of negotiations with the City prior to the chapter 9 filing.

**IV. Key Documents**

A. Declaration of Dan McNamara (subject to reaching an agreement with the City) [Doc. No. 512-6]
B. Declaration of Mark Diaz (subject to reaching an agreement with the City) [Doc. No. 512-1]
C. Declaration of Mark Young (subject to reaching an agreement with the City) [Doc. No. 512-7]
D. Declaration of Mary Ellen Gurewitz(subject to reaching an agreement with the City) [Doc. No. 512-8]
E. DFFA letter dated July 12, 2013 [Doc. No. 512-6, p. 8]
F. Jones Day letter of July 17, 2013 [Doc. No. 512-6, p. 10]
G. <u>City of Detroit and Detroit Police Officers Association</u>, MERC Case No. D12 D-0354 Panel's Findings, Opinion and Orders [Doc. No. 512-2, 512-3, 512-4]
H. <u>City of Detroit and Detroit Police Officers Association</u>, MERC Case No. D12 D-0354, Supplemental Award [Doc. No. 512-5]

14

I.  City of Detroit v. DPOA  MERC Case No. D12 D-0354
    Chairman's Partial Award on Health Insurance [Doc. No. 512-5]
J.  Letter from Jones Day, Brian West Easley, dated June 14, 2013
K.  Letter from Jones Day, Brian West Easley, dated June 27, 2013
L.  DFFA Master Agreement, 2001-2009
M.  DFFA Act 312 Award dated October 31, 2011
N.  DFFA Supplemental Act 312 Award dated October 31, 2011
O.  DFFA Temporary Agreement
P.  DPLSA Master Agreement, 2009
Q.  DPCOA Master Agreement,
R.  DPCOA Temporary Agreement
S.  MERC Opinion City of Detroit v. POAM/DPCOA/DPLSA

**V.  Conclusion**

The City, prior to and through Mr. Orr as the Emergency Manager, established a clear picture that prior to the filing of the chapter 9 petition it was not interested in negotiating with the Detroit Public Safety Unions. This is demonstrated by the imposition of the City Employment Terms in 2012, by the City's successful blocking of the Act 312 arbitrations (that were in process at the time of the Emergency Manager's appointment) after the Emergency Manager was appointed, and by the June 14 Creditor Proposal, which was presented as a "take it or leave it" proposition to creditors, with no opportunity for discussion or negotiation.

Moreover, the Detroit Public Safety Unions had, and continue to have, the authority to negotiate on behalf of their respective members. The City cannot

15

13-53846-tjt  Doc 8738-7  Filed 12/15/14  Entered 12/15/14 19:04:15  Page 18 of 19
13-53846-swr  Doc 1280  Filed 10/17/13  Entered 10/17/13 21:08:58  Page 18 of 19

reasonably claim that negotiations were or would have been impracticable—the City never engaged in negotiations, so not having tried, it cannot say that it could not be done.

Based on the actions, and lack of actions by the City, the Detroit Public Safety Unions assert that the City has not satisfied the conditions of 11 U.S.C. §109(c)(5)(B) and (C) and therefore, do not satisfy the conditions for eligibility under Chapter 9 of the Bankruptcy Code. The Detroit Public Safety Unions therefore request that this Chapter 9 petition be dismissed.

> Respectfully submitted,
>
> ERMAN, TEICHER, MILLER,
> ZUCKER & FREEDMAN, P.C.
>
> By: /s/ Barbara A. Patek
>     Earle I. Erman (P24296)
>     Craig E. Zucker (P39907)
>     Barbara A. Patek (P34666)
>     Counsel for the Detroit Public Safety Unions
>     400 Galleria Officentre, Suite 444
>     Southfield, MI 48034
>     Telephone: (248) 827-4100
>     Facsimile: (248) 827-4106
>     E-mail: bpatek@ermanteicher.com

DATED: October 17, 2013

16

13-53846-tjt / 13-53846-swr  Doc 8738-7 / Doc 1280  Filed 10/15/14 / Filed 10/17/13  Entered 10/15/14 19:04:15 / Entered 10/17/13 21:08:58  Page 19 of 19