UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION – DETROIT

-------------------------------------------------------- x
                :

In re:                      :    Chapter 9

CITY OF DETROIT, MICHIGAN,    :    Case No.: 13-53846
                :

          Debtor.      :    Hon. Steven W. Rhodes

-------------------------------------------------------- x

**PRE-TRIAL BRIEF OF INTERNATIONAL
UNION, UAW AND THE *FLOWERS* PLAINTIFFS
WITH RESPECT TO THE ELIGIBILITY OF THE CITY
OF DETROIT, MICHIGAN FOR AN ORDER FOR
RELIEF UNDER CHAPTER 9 OF THE BANKRUPTCY CODE**

The International Union, United Automobile, Aerospace and

Agricultural Implement Workers of America ("UAW") and Robbie Flowers,

Michael Wells, Janet Whitson, Mary Washington and Bruce Goldman, as plaintiffs

in the suit *Flowers v. Snyder*, No. 13-729 CZ (Ingham County Circuit Court) (the

"*Flowers* plaintiffs") submit this pre-trial brief in further support of their respective

August 19, 2013 and October 11, 2013 objections to the eligibility of the City of

Detroit (the "City")  for an order of relief under chapter 9 of the U.S. Bankruptcy

Code and in support of its case at trial.

## PRELIMINARY STATEMENT

UAW's objections to the City's eligibility for an order of relief involve an inter-related set of legal and factual considerations. UAW's principal factual challenge to eligibility is that the Governor and the City from the beginning intended to use chapter 9 for the purpose of reducing the pension benefits of Michigan citizens in derogation of their rights under Article 9, Section 24 of the Michigan Constitution. The governor and the City thus intentionally violated the Michigan Constitution with their chapter 9 filing. That allegation is based on the City's plan, revealed in its pre-bankruptcy proposal to creditors, to cut its pension funding obligation and force significant reductions in accrued pension benefits of City retirees – reductions which would violate the express terms of the Michigan Constitution. The City planned to pursue these cuts in bankruptcy court, where it presumed that the processes of the Bankruptcy Code would allow it to overcome the express prohibition in the Michigan Constitution against diminishment or impairment of accrued pension benefits.[1] Raising the specter of an unwieldy

---

[1] The City's strategy was telegraphed in an article authored by attorneys at Jones Day, the law firm that the City chose as restructuring counsel. *See* Jeffrey B. Ellman, Daniel J. Merrett, *Pensions and Chapter 9: Can Municipalities Use Bankruptcy to Solve Their Pension Woes?* 27 Emory Bankr. Dev. J. 365 (2011) (hereafter, "Ellman and Merrett, *Pensions and Chapter 9*") (describing how federal bankruptcy law offers "significant" sources of leverage which can be used to "force[]" pensioners to bargain and "place[] substantial pressure" on them to "reach a resolution [regarding cuts to their benefits] as quickly as possible").

underfunding obligation, the amount of which it has never determined with any degree of certainty, the City declared it would walk away from its pension funding obligation, leaving pensioners with significantly reduced benefits and a miniscule recovery on their claims. Money saved by not paying the funding obligations would be diverted to modernization projects.

In particular, less than three months after his appointment by Michigan Governor Richard Snyder ("Governor Snyder" or "Snyder"), and barely one month before filing the City of Detroit's chapter 9 petition, the City's Emergency Manager Kevyn Orr ("EM Orr" or "Orr") released a comprehensive proposal which he claimed would transform Detroit and its operations. The June 14, 2013 "Proposal for Creditors" (the "Proposal") laid out an ambitious program of upgrades and improvements for the City's residents and businesses but proposed radical changes in pension and health care benefits for City workers who had already been subjected to reductions in force and wage and benefit cuts under the City's imposed employment terms.

Orr's plan proposed drastic cuts in its retiree benefit programs. Importantly, in derogation of Article 9, Section 24 of the Michigan Constitution, which expressly prohibits the diminishment or impairment of accrued pension benefits, Orr's proposal would compel unspecified yet "significant cuts" in accrued, vested pension benefits. Under the Proposal, the City would pay no further

contributions to the retirement systems, leaving retirees with unsecured bankruptcy claims to be paid pennies on the dollar.

Under these circumstances, there could be no valid authorization for the chapter 9 filing as required by Section 109(c)(2) of the Bankruptcy Code. The Governor was well aware of Orr's plan to cut its "legacy" liabilities when he issued the authorization (which expressed his approval of Orr's "priorities" for the City, while acknowledging that public employees "now fear for the financial future in retirement"). Orr Decl. Ex. L. The Governor could not authorize a chapter 9 proceeding brought in order to force cuts in accrued pensions because the Governor had no authority to ignore, or waive, the protections of Article 9, Section 24 of the Michigan Constitution; only the people of the State of Michigan can, through the constitution's amendment procedures, change the requirements of Article 9, Section 24. Because the Governor could not validly authorize a filing in contravention of law, he was powerless to take action that would permit the City to do so through the actions of the Emergency Manager.[2]

_____

[2] Chapter 9 reflects our system of dual federal and state sovereignty. Initially declared an unconstitutional exercise of Congressional power, *see Ashton v. Cameron County Water Improvement District*, 298 U.S. 513 (1936), the lawful exercise of federal municipal bankruptcy hinges on strict adherence to deep-rooted principles of dual sovereignty. Moreover, Michigan citizens have the right under the Tenth Amendment to insist that chapter 9 not be used to deprive them of their rights under the Michigan constitution.

In addition, the City cannot meet the eligibility requirement of Section 109(c)(4) because it is evident that the plan that EM Orr desired to "effect" was one which would – unlawfully – lead to cuts in accrued pension benefits and therefore could not be approved in bankruptcy. Orr proposes that the City make no further pension contributions to the retirement system, offering only a meager recovery on a bankruptcy claim for the underfunding. The proposal flatly declares that, without the funding, accrued benefits would have to be cut significantly, although the City has (as of yet) failed to specify the level of the cuts it demands. A plan of adjustment incorporating these features could not be confirmed under Section 943 of the Bankruptcy Code, because the City could not show that "the debtor is not prohibited by law from taking any action necessary to carry out the plan." 11 U.S.C. § 943(b)(4). Such a plan would plainly run afoul of Article 9, Section 24 of the Michigan Constitution. Because EM Orr sought authorization to commence a chapter 9 case in order to effect a plan that would be patently *unlawful* for the state to implement, the City cannot meet the threshold eligibility requirement that a debtor "desire[s] to effect a plan to adjust its debts" under Section 109(c)(4).

Nor did the City comply with Sections 109(c)(5)(B) or (C) of the Code because it failed to negotiate in good faith (nor was it precluded from doing so) in its pre-bankruptcy interactions with stakeholders regarding its Proposal. The City wants to launch a comprehensive program of upgrades and "reinvent" itself without

its legacy obligations. Orr has prioritized reinvestment projects at the expense of protected pension benefits and has done so by relegating those obligations to "legacy" liabilities to be washed away in bankruptcy. *See* Orr Decl. Ex. A (June 14 Proposal to Creditors). These were choices made by the Emergency Manager even though he could have constructed a different plan that did not attack pension benefits protected by the Michigan Constitution.

Focused on using chapter 9 and the bankruptcy tools available as a chapter 9 debtor, the City simply made a radical proposal to force cuts in pension benefits and then gave itself barely a month before requesting authorization to file its chapter 9 case. Such a proposal could not have been in good faith. The City thus made the pension proposal intent on using chapter 9 rather than meaningfully engaging with stakeholders over its effort to reorder the City's priorities. A proposal the City thought it could achieve in bankruptcy and which it could not have expected the union to accept in any event (because the union could not do so – as unions are also bound by the prohibitions of Article 9, Section 24 of the Michigan Constitution) does not reflect good faith negotiations.

Moreover, the City's pension proposal was jerry-built on an incomplete and hotly contested picture of the financial condition of the pension plans, seemingly to present the scenario that the unfunded liability was too big to fund. The City's proposal called for benefit cuts that would be "significant," and – since its plan was

to implement the funding cuts through bankruptcy – offered no concrete avenue to preserve the benefits protected by the Michigan constitution. It was, therefore, not a serious basis for discussion.

After a brief period during which the City conducted stakeholder meetings designed more to give the appearance of discussions than serve as substantive negotiations (including meetings at which those in attendance were not even allowed to speak freely) Orr sought the Governor's approval for a chapter 9 filing barely 30 days after the launch of the Proposal. The evidence will show that the State and EM planned to file bankruptcy long before the purported negotiations had run their course, confirming that the "negotiations" were no more than a check-the-box exercise on the way to the courthouse.

Nor can the City demonstrate that further attempts to negotiate were impractical under Section 109(c)(5)(C). Impracticality, for purposes of Section 109(c)(5), cannot mean putting up a proposal that could not lawfully be implemented or accepted and then claiming that negotiations over it were impractical.

In sum, absent a valid and lawful state authorization for the filing, absent a plan of adjustment that the City could lawfully execute, and without the requisite showing of good faith and required pre-bankruptcy good faith negotiations,

the City of Detroit is ineligible for chapter 9 relief.  The City's chapter 9 petition

therefore must be dismissed.

## STATEMENT OF FACTS

UAW and the *Flowers* plaintiffs submit that the following facts will be

established at trial.

### The UAW

International Union, UAW is a labor organization headquartered in

Detroit, Michigan whose members include both City of Detroit employees and

retirees and employees and retirees of public entities related to the City of Detroit

that participate in common with City of Detroit employees in retirement benefit

plans, including the City of Detroit General Retirement System pension plan.  UAW

is representing the interests of these active and retired employees in this bankruptcy

case.  There are approximately 200 retirees from UAW-represented bargaining units

of City of Detroit component units.  There are, additionally, many active UAW-

represented employees who are vested in their retirement benefits, all of whose

pensions are at risk under EM Orr's Proposal.  UAW-represented employees and

retirees are drawn from the following units: Civilian Police Investigators, City Law

Department attorneys, City of Detroit Law Department paralegals, Water & Sewer

waste water treatment operators, Detroit librarians and associated skilled trades

workers.

Michigan's Constitution Protects Accrued Pensions

        Article 9, Section 24 of the Constitution of the State of Michigan makes clear that neither the state nor a municipality may reduce accrued pension benefits: "[t]he accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby."[3] Thus, "under this constitutional limitation the legislature cannot diminish or impair accrued financial benefits." *In re Enrolled Senate Bill 1269*, 209 N.W.2d 200, 202 (Mich. 1973). *See also In re Request for Advisory Opinion Regarding Constitutionality of 2011 PA 38*, 806 N.W.2d 683, 694 (Mich. 2011) ("The obvious intent of § 24 … was to ensure that public pensions be treated as contractual obligations that, once earned, could not be diminished."); *Detroit Police Officers Ass'n v. City of Detroit*, 214 N.W.2d 803, 816

---

[3] The address to the people accompanying the 1963 Constitution states that Article 9, Section 24 "requires that accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions be a contractual obligation *which cannot be diminished or impaired by the action of its officials or governing body*." 2 Official Record, Constitutional Convention 1961, p. 3402 (emphasis added). The Constitution also requires benefits to be funded in the year they are accrued and prohibits the legislature and municipalities from using those funds for other unfunded liabilities. Mich. Comp. Laws Const. Art. 9, § 24. The debates concerning what is now Article 9, Section 24 confirm that municipal employees have the entire assets of their employer at their disposal for these benefits: "Mr. VAN DUSEN: An employee who continued in the service of the public employer in reliance upon the benefits which the plan says he would receive would have the contractual right to receive those benefits, and would have the entire assets of the employer at his disposal from which to realize those benefits." 1 Official Record, Constitutional Convention 1961, p. 774.

- 9 -

13-53846-tjt  13-53846-swr  Doc 873  Doc 7389  Filed 10/15/14  Filed 10/15/14  Entered 10/15/14 19:41:35  Entered 10/15/14 22:41:35  Page 9 of 52  Page 9 of 52

(Mich. 1974) ("With this paramount law of the state as a protection, those already covered by a pension plan are assured that their benefits will not be diminished by future collective bargaining agreements.").

Pension Benefits Under the General Retirement System

The pension benefits afforded retired City employees are modest. According to the actuarial report prepared by the actuaries for the General Retirement System, which covers the City's non-uniformed personnel, and dated June 30, 2011, the average annual benefit received by retired pensioners or their beneficiaries was $18,955. By comparison the federal poverty threshold in 2013 for a family of two is $15,510.[4] Unlike private-sector defined benefit plans, which are insured by the federal Pension Benefit Guaranty Corporation, there is no guaranty program or insurance protection for the pension benefits paid under the General Retirement System. There is only Article 9, Section 24.

The Emergency Manager and Pre-Bankruptcy Events

The Emergency Manager serves under the Local Financial Stability and Choice Act Public Law 436 (2012) Mich. Comp. Laws § 141.1541 *et seq.* ("PA 436"). PA 436 is the most recent in a series of emergency manager laws Michigan has enacted concerning Michigan's local government units. *See City of Pontiac Retired Employees Ass'n v. Schimmel, et al*., No. 12-2087, 2013 WL 4038582, *1-

---

[4] *See* http://aspe.hhs.gov/poverty/13poverty.cfm#thresholds.

- 10 -

13-53846-swr Doc 873-9 Filed 10/15/13 Entered 10/15/13 19:41:35 Page 10 of 52
13-53846-tjt Doc 8738 Filed 12/15/14 Entered 12/15/14 22:41:45 Page 10 of 52

*2 (6th Cir. August 9, 2013) (hereafter, "*Pontiac Retired Employees Ass'n*")
(summarizing the State's Emergency Manager laws).  In 1990, Michigan enacted
Public Act 72, known as the "Local Government Fiscal Responsibility Act."  Mich.
Comp. Laws § 141.151(1)(j)(2005).

       In 2011, Public Act 72 was repealed with the enactment of Public Act
4, the "Local Government and School District Fiscal Accountability Act," Mich.
Comp. Laws §§ 141.1501-1531, in March 2011.  "Unlike P[ublic] A[ct] 72, PA 4
gave emergency managers the power to temporarily reject, modify or terminate
existing collective bargaining agreements." *Pontiac Retired Employees Ass'n*, 2013
WL 4038582, at *3.

       Pursuant to PA 4, the City entered into a Consent Agreement with the
State on April 4, 2012, under which a financial advisory board was appointed to
monitor Detroit's finances.  Orr Decl. Ex. E.  Jack Martin was appointed as the
City's Chief  Financial Manager and William "Kriss" Andrews as Program
Management Director under the Consent Agreement.

       Public Act 4 generated immediate public opposition.  It was rejected by
Michigan voters under the state's voter rejection procedures in November, 2012.  *Id.*
at 4.  In the words of the Sixth Circuit, "[a]pparently unaffected that the voters had
just rejected Public Act 4, the Michigan Legislature enacted, and the Michigan
Governor signed, Public Act 436.  Public Act 436 largely reenacted the provisions of

Public Act 4, the law that Michigan citizens had just revoked. In enacting Public

Act 436, the Michigan Legislature included a minor appropriation provision,

apparently to stop Michigan voters from putting Public Act 436 to a referendum."

*Id.* (citations omitted).[5] Public Act 436 became effective on March 28, 2013. A

number of legal challenges to Public Act 436 have been filed and remain pending.[6]

Declaration of Kevyn Orr ("Orr Decl."), Ex. A, pp. 57-59.

Retention of Jones Day and EM Orr

> Beginning in 2012, the State and the City acts with various

restructuring professionals. In late January 2013, Jones Day was one of several

firms which made presentations to State Treasurer Andy Dillon, Richard Baird, Jack

Martin, Kriss Andrews and members of the Financial Advisory Board in connection

with their efforts to be retained. Buckfire Dep. Tr. 197. Dillon requested that

Kenneth Buckfire of the Miller Buckfire investment banking firm, which had earlier

---

[5] In a contemporaneous e-mail to a Jones Day colleague Orr opined that PA 436 was a "thin veneer of a revision, it is essentially a redo of the prior rejected law." Orr Dep. Tr. at 48.

[6] The lawsuits raise serious challenges affecting the legality of the EM's appointment and other actions taken under the statute, including whether the Emergency Manager's appointment violated Michigan's Open Meetings laws, or was otherwise defective as a result of the voters' repeal of PA 4; whether PA 436 violates the U.S. Constitution and the federal Voting Rights Act. Other litigation, such as the *Pontiac Retiree Employees Association* case recently decided by the Sixth Circuit, involve challenges to emergency managers appointed in other towns. To the extent Governor Snyder's appointment of EM Orr was ineffective, as UAW believes and asserts, the City's Chapter 9 filing is void, as this Court would be bound to find.

been retained by the City on restructuring, rate each of the law firm candidates. Buckfire Dep. Tr. at 25.

In a presentation on January 29, 2013, Jones Day, among other things, opined that federal bankruptcy power would permit the City to reduce accrued pension benefits of City employees and retirees, notwithstanding the specific protections afforded those benefits under the Michigan Constitution. Orr Dep. Ex. 21 p. 41. It noted that an Emergency Manager "could be used as political cover for difficult restructuring decisions." *Id*. at p. 16. And Jones Day recommended as a part of planning for a Chapter 9 filing pursuing a consensual out-of-court restructuring that, while unlikely to be successful, could be used as a record of good faith negotiations. *Id*. at 13, 16-18, 22-23, 28. Kevyn Orr, a partner at Jones Day, was part of the firm's team that made the presentation.

Buckfire, who ranked the firms following the various presentations, gave Jones Day top marks, and shared its estimation of Jones Day with the State. Buckfire Dep. Tr. 32-33.

On January 31, just two days after Jones Day made its presentation, Richard Baird, advisor to the Governor, spoke with Orr in an attempt to recruit him to be Emergency Manager position. Baird Dep. Tr. at 19, 25. Baird was not directly employed by the State, but served as a consultant to the Governor, compensated through the Governor's non-profit New Energy To Reinvent and Diversify Fund

(the "NERD Fund"). Baird Dep. Tr. at 10. Baird told one of Orr's partners at Jones Day that Orr's decision on whether to accept the EM position would have no impact on whether the City decided to hire Jones Day. Baird Dep. Tr. at 23. Baird admitted he had no authority to make a commitment on behalf of the City that Orr's decision would have no impact on the City's decision to hire Jones Day or not. *Id.* That he nonetheless made the commitment shows how the State and its operatives were calling the shots and steering Detroit down the road to a bankruptcy filing.

Even before Orr became EM in March, while he was still a partner at Jones Day, Baird included him in decision-making about how the City would operate after the EM was appointed, and he reassured Orr that he was already acting as an "agent of the State." Baird Dep. Ex. 6 and Tr. at 38-39.

On March 11, 2013, Detroit Mayor Dave Bing announced that the City would retain Jones Day as restructuring counsel to the City. Three days after Bing's announcement, on March 14, 2013, Governor Snyder announced Orr's appointment as Emergency Manager for the City. Orr took office on or about March 25, 2013, under the predecessor Emergency Manager law and now serves under PA 436. Orr's salary is paid by the State but certain of his personal expenses are paid by the NERD Fund.

Under PA 436, the Emergency Manager exercises the power of the government of the City of Detroit. The Emergency Manager "Act[s] for and in the

place and stead of the governing body and the office of chief administrative officer of the local government." Mich. Comp. Laws § 141.1549(2).

Retention of Milliman

In conjunction with the Consent Agreement, the City retained the Milliman actuarial consulting firm to provide analysis concerning the City's two retirement systems, the General Retirement System of the City of Detroit and the Police and Fire Retirement System of the City of Detroit as reported by the plans' actuaries, Gabriel Roeder Smith. Beginning no later than July 2012, Milliman produced various analyses and opinions concerning the funding status of the plans. In July 2012, Milliman provided "very rough preliminary guesstimates ('VRPG') of the potential actual state of the systems" which it stated "are not based on any detailed calculations." Bowen Dep. Ex. 1 at p. 2.

As recently as September 24, 2013, Milliman had still not yet completed a replication of the most recent actuarial reports on the plans. It had no present estimate of when its work will be completed, having submitted its most recent request for information to the plans in August 2013. Bowen Dep. at 93-94.

Since the appointment of the EM, a "Pension Task Force" consisting of Milliman actuaries, Conway MacKenzie's Charles Moore, who is not an actuary, and with the participation of counsel has been convened to review the state of the City's retirement plans. Bowen Dep. Tr. at 59. Milliman prepared several analyses

based on different scenarios fed to the firm by this task force. Milliman did not select, nor were they asked for opinions concerning, what scenarios should be considered, rather they were directed by other members of the task force. *See* Bowen Dep. Tr. at 65-66, 72-73, 80-81.

On June 4, 2013, Milliman produced a ten year projected cost analysis with respect to each plan. Bowen Dep. Exs. 4, 12. As noted with respect to the General Retirement System, this analysis was based on the valuation results, actuarial assumptions and methods used by the plan's actuaries. Milliman used "[r]ecursive formulas, actuarial judgment and rules of thumb" to project results in future years. Bowen Dep. Ex. 12. As a "baseline" projection, Milliman adjusted the earnings assumptions the plan's actuaries made from 7.9 % to 6.3%, 7% or 7.5 % noting that 6.3% was Milliman's recommendation based on its own "capital market assumptions." *Id*. at p. 3. Milliman also modified the amortization schedule the plan used with respect to unfunded liability. *Id*. at p. 2. Milliman noted that the actuarial value of the General Retirement System's assets ($2.806 billion) exceeded the market value of the assets by $648 million as compared to liabilities of $4.433 billion. *Id*. at Ex. II-A. Its analysis projected that the General Retirement System

would be 55% funded on an actuarial basis in ten years (assuming a 7% rate of return on assets).  *Id.*[7]

In setting out the "Basis for Analysis," Milliman states that its work was "prepared exclusively for the City of Detroit for a specific and limited purpose … It is not for the use or benefit of any third party for any purpose."  Bowen Dep. Ex. 12 at p. 8.  Nonetheless and despite the fact that Milliman does not have the information to be able to replicate the work of the plans' actuaries, Milliman's work became the basis for the City's demands with respect to retirement benefits.

June 14, 2013 Creditor Proposal

The Creditor's Proposal was released by the Emergency Manager on June 14, 2013.  Orr Decl. Ex. A.  As relevant to the UAW's objection, the Proposal takes broad aim at the City's workers and retirees; city employees have already been subjected to headcount reductions and "City Employment Terms" (the "CETs") imposed a year ago which cut wages and benefits and unilaterally changed work rules.  *See* Orr Decl., Ex. A, pp. 53-54 (describing the imposition of the CETs).  The proposal indicated that these imposed changes would serve as a "baseline" for the City in its contract talks with the unions, although the City may seek cuts and

_____

[7] With respect to the Police and Fire Retirement System, the Milliman report stated that the $3.765 billion actuarial value of assets exceeded market value by $701 million as compared to total liabilities of $4.316 million.  Bowen Dep. Ex. 4 at Ex. II-A.  The Police and Fire Retirement System was projected to be 79% funded in ten years.  *Id.*

- 17 -

13-53846-swr  Doc 873-9  Filed 10/15/13  Entered 10/15/13 22:41:35  Page 17 of 52
13-53846-tjt  Doc 8738  Filed 12/15/14  Entered 12/15/14 19:41:35  Page 17 of 52

changes "beyond those included in the CETs." *Id.* p. 76.  Additional reductions in

staffing levels and outsourcing functions are also contemplated. *Id.* p. 78.

Regarding retiree obligations, the City intends to modify retiree medical benefits

through a replacement program and indicates that "claims will result from the

modification of benefits." *Id.* p. 109.

The City's pension proposal garnered immediate and significant

opposition, including at least three lawsuits commenced prior to the chapter 9 filing.[8]

Although PA 436 directs that the Emergency Manager's financial and operating plan

"shall provide for" the "timely deposit of required payments to the pension fund for

the local government or in which the local government participates," Mich. Comp.

Laws 141.1551 Sec. 11(1)(d), the Emergency Manager announced that annual

contributions required to fully fund currently accrued, vested benefits "will not be

made under the plan." Orr Decl., Ex. A, p. 109.

The Creditors' Proposal provided that the retirement system

underfunding would be "exchanged for a pro rata … principal amount of New

Notes." *Id.*  Put another way, the Emergency Manager proposed to transform the

---

[8] *Flowers, et al. v. Snyder, et al.,* No. 13-734-CZ (Ingham County Circuit Court
July 3, 2013); *General Ret. Sys. of the City of Detroit v. Kevyn D. Orr*, No. 13.768-
CZ (Ingham County Circuit Court); *Webster v. State of Michigan*, 13-734-CZ
(Ingham County Circuit Court July 3, 2013).  The City and the State make much of
the lawsuit activity in connection with the bankruptcy filing.  But Orr's proposal left
the affected parties little choice given the City's blatant disregard of the State
Constitution.

plan's underfunding into a bankruptcy claim which would share a $2 billion recovery pro-rata with billions of dollars in additional general obligation bond and other general unsecured claims. Because the City has yet to assign value to any assets it might monetize, under the proposal creditor recoveries would not be affected by any asset sales. Buckfire Dep. Tr. at 107.

The Proposal then goes on to state that "[b]ecause the amounts realized on the underfunding claims will be substantially less than the underfunding amount *there must be significant cuts in accrued, vested pension amounts* for both active and currently retired persons." Orr Decl. Ex. A at 109 (emphasis supplied).

In particular, the proposal opined that the City's actuarial valuation of pension plan underfunding was "substantially understated" and that under "more realistic assumptions" the plans were underfunded by $3.5 billion. Orr Decl. Ex. A p. 29. But the proposal contained no quantification of the "significant cuts in accrued, vested pension amounts" that would be required. Moore Dep. Tr. at 150-51.

There are substantial reasons to question the $3.5 billion estimate. First, as noted above, the City admits that its actuarial analysis is incomplete because it still lacks necessary data. Moreover, it has reviewed the actuarial assumptions at issue and the head of its Pension Task Force testified that neither the task force nor Milliman had arrived at the view that the actuarial assumptions that the Detroit

pension plans have used are inconsistent with actuarial standards of practice.  Moore Dep. Tr. at 140-41.

Moreover, apparently uncertain of the state of the plans, the Emergency Manager has not acted on Milliman's funding analysis.  Under Section 12(1)(m) of PA 436, an Emergency Manager may remove the governing body of a public retirement plan if its funding level (net of pension related indebtedness) is below 80%.  The task force asked Milliman to analyze this issue months ago and in April 2013 Milliman provided the Pension Task force with its analysis that the funding level for the General Retirement System was below 80%.  Although the Task Force was of the opinion that Milliman properly accounted for pension-related indebtedness in its analysis, no action was recommended or taken with respect to the plan's governance.  Moore Dep. Tr.  at134-35.

While the City's June 14 proposal to creditors was emphatic in its assertion that accrued pension benefits had to be reduced, discovery has shown that the City has no solid basis for insisting on such cuts.  For example, when he was deposed, EM Orr conceded that a substantial portion – approximately 62% – of the calculated actuarial underfunding of the General Retirement System is attributable to the Detroit Water and Sewerage Department which is run as a separate department of the City and is financially sound.  Orr Dep. Tr. at 369-78.  The notion that the

plans' underfunding is "substantially understated" is at best half-baked and at worse a litigation contrivance which does not bear close analysis.

Notwithstanding the substantial uncertainty with respect to the issue of pension underfunding, the EM proceeded with the June 14 proposal in the face of the constitutional prohibition. The City's Pension Task Force discussed the provisions of the Michigan constitution so that "everyone on the task force was aware of it" including the scope of an "Attorney General opinion regarding that provision back from the late 1970s … [and] how far those protections go." Moore Dep. Tr. at 154. But the Task Force did not seek to reach a consensus with respect to the effect of the provision on in event of a Chapter 9 filing, *id*. at 156, and the City proceeded with its proposal to cut pension benefits nonetheless.

Presentations to Creditors

Labor unions and retiree organizations attended a series of presentations in late June and early July made by representatives of the Emergency Manager and various stakeholders. Only a handful of presentations were scheduled with labor groups despite the breadth of the proposals affecting workers and retirees. *See* Orr Decl. ¶¶ 90-96 (describing post-June 14, 2013 meetings attended by stakeholders).

Orr refused to characterize these meetings as "bargaining" sessions. Orr Dep. Tr. at 137-38. Nor could they be deemed bargaining. For example, the

- 21 -

13-53846-tjt Doc 873-9 Filed 10/15/13 Entered 10/15/13 22:41:35 Page 21 of 52
13-53846-swr Doc 1289 Filed 10/15/13 Entered 10/15/13 19:41:35 Page 21 of 52

attendees at the meeting were not permitted to speak; to communicate with those making the presentation, attendees were required to write any questions they had on a card, which would then be read aloud. No true negotiation occurs when one side is muzzled.

With respect to the critical issue of pensions, even assuming the City could demand reductions in accrued benefits under threat of Chapter 9 – and it could not as a matter of law – there could be no negotiation since the City had not (and has yet to) quantify its demands. Rather, consistent with Jones Day's January 29, 2013 presentation these meetings were window dressing – an attempt to create a record of good faith negotiations to support a Chapter 9 filing decided upon earlier.

In this respect it is important to note that the City has for many years conducted successful collective bargaining negotiations with UAW and unions representing its other employees. While the City complains that it must negotiate with a number of labor organizations, that has not presented an insurmountable obstacle to concessionary bargaining. Most recently, in February 2012, the City reached a tentative agreement with 30 unions representing its non-uniformed employees including UAW that included substantial pay and benefit concessions. Orr was apparently unaware of this history. Orr Dep. Tr. at 236-37. Bargaining here was not an impossibility.

<u>The Filing</u>

On July 16, 2013, EM Orr wrote to the Governor and recommended pursuant to Section 18(1) of PA 436 that the Governor authorize the City to file for bankruptcy under Chapter 9. Orr Decl. Ex. J. Orr's July 16 letter contained numerous questionable or controversial assertions, claiming, for example, that the Detroit pension funds faced $3.5 billion in unfunded liability and that the EM had engaged in good faith negotiations over his proposal. *Id.* The Governor accepted these assertions at face-value, without undertaking any independent investigation to confirm their truth. At the point he received the Orr's request, the Governor acknowledged that "a lot of work still needed to be done" on determining what assets the City could monetize. Snyder Tr. at 55-56; *see* Buckfire Dep. at 107 (noting that creditor proposal structured recovery based on inability to assign value to City's assets aside from projected cash flows from operating cash flows). That, however, did not stop the Governor from writing to Orr that Orr could proceed with the filing.

Orr's letter to the Governor was clear about his plan to cut back on obligations to retirees so that a larger share of the City's revenues could be devoted to City services and reinvestment: "The City's debt and legacy liabilities must be significantly reduced to permit this reinvestment." Orr Decl. Ex. J at p. 2. In his authorization, the Governor indicates his agreement with Orr's priorities and while

- 23 -

he expresses "concern" for public employees who "now fear for their financial future in retirement" merely states that he is "confident" that all of the City's creditors will be treated fairly. Orr Decl. Ex. K at p. 3. The Governor did not attach any contingencies to the letter but cited section 943(b)(4), a provision that is only at plan confirmation. Orr Decl. Ex. K at p. 4.

In fact, the Governor rushed to respond, providing Orr the green light to file just two days after Orr's request arrived. Indeed, a schedule prepared by the Governor's staff on July 17 planned a public announcement by the Governor of authorization to file the case on Thursday July 19. Dillon Dep. at 88.

Abruptly, on July 18, 2013 the Governor authorized the filing and later that same day, the City filed its chapter 9 petition. *See* Orr Decl. Ex. L at p. 3. The Governor and Dillon discussed the pending litigation challenging the Governor's right to authorize a chapter 9 filing and knew that a hearing was scheduled for Monday, July 22. Dillon Tr. at 84-85. Although the Governor denied that pending state court litigation challenging the Governor's right to authorize a bankruptcy had anything to do with the rush to the bankruptcy court, Orr conceded in his deposition that the litigation created the risk that he would be unable to execute his plans. Orr Dep. Tr. at 220-21, 222-23. The only conclusion that can be drawn from this rush to file is that EM Orr and the state feared that the courts would enjoin a filing.

The Governor has testified that he was aware at the time he authorized the filing that Orr's June 14 proposal demanded reductions in accrued pension benefits. Snyder Dep. Tr. at 63-64. He further testified that he knew PA 436 expressly permits the Governor to condition the authorization for a chapter 9 filing, *see* Mich. Comp. Laws 141.1558(1), but that he chose not to condition Detroit's filing on a promise that the City not seek to cut vested pension benefits in violation of the Michigan Constitution. *See* Orr Decl. Ex. L.

## ARGUMENT

### THE PETITION MUST BE DISMISSED BECAUSE THE CITY IS NOT ELIGIBLE FOR CHAPTER 9 RELIEF

A.  The State's Authorization Was Unlawful
     Under Michigan's Constitution and Laws

Governor Snyder was fully aware that part of the Emergency Manager's bankruptcy authorization request was a plan to impair accrued vested pensions. Yet the Governor placed no contingencies on his July 18, 2013 bankruptcy authorization. *See* Orr Decl. Ex. J. The Governor's failure to condition his authorization on adherence to Article 9, Section 24 breached the State's constitution. *See* 2 Official Record, Constitutional Convention 1961, p. 3402 (accrued pensions are obligations "*which cannot be diminished or impaired by the action of its officials or governing body.*") (emphasis added). Governor Snyder lacks any authority to ignore Michigan's constitutional proscription against the impairment of accrued pensions, and the Michigan Supreme Court has made clear

- 25 -

that the Governor is bound by the Michigan Constitution.[9] *See Wood v. State*

*Admin. Bd.*, 238 N.W. 16 (Mich. 1931) (Governor's reduction of appropriations in

bill approved by legislature invalid due to violation of constitution's veto clause);

*Dullam v. Wilson*, 19 N.W. 112 (Mich. 1884) (Governor may not remove public

official without due process required by constitution); *see also Buback v. Romney*,

156 N.W.2d 49 (Mich. 1968) (statute permitting Governor to use judicial officers to

adjudicate removal of executive branch officials violated constitutional separation of

powers and was invalid).

The Governor's statement in his July 18, 2013 letter that the plan of

adjustment must be legally executable, under Section 943(b)(4), Orr Decl., Ex. K,

was insufficient because the Governor nonetheless authorized the filing knowing

that EM Orr was pursuing the pension proposal. The reference to Section 943(b)(4)

— which applies to confirmation of the plan — does not provide the requisite

---

[9] Indeed, the Michigan Constitution can be altered only as set forth therein,
notably, with respect to each permitted process, requiring the approval of Michigan
voters. Under Article 12, Section 1, the Legislature, by two-thirds vote of each
chamber, can place a proposed constitutional amendment on the ballot. The
proposed amendment becomes effective only if approved by a majority of the
voters. Pursuant to Article 12, Section 2, a citizen petition for a proposed
amendment can be placed on the ballot, which becomes effective only if approved
by a majority of the voters; or 3. Pursuant to Article 12, Section 3, a duly called
constitutional convention may place a proposed constitutional amendment on the
ballot. The proposed amendment becomes effective only if approved by a majority
of the voters. *See* Mich. Comp. Laws Const. Art. 12 §§ 1-3.

gatekeeping "specific authorization" that is required by Section 109(c)(2).  *See In re City of Harrisburg, PA,* 465 B.R. at 754-55.

Nor did PA 436 authorize EM Orr to contravene Article 9, Section 24 in issuing his request to file the chapter 9 case.[10]  The power of the Emergency Manager is defined by Michigan law and is subject to the Michigan Constitution as well.  Under PA 436, the Emergency Manager exercises the power of the government of the City of Detroit.  The Emergency Manager "Act[s] for and in the place and stead of the governing body and the office of chief administrative officer of the local government."  Mich. Comp. Laws § 141.1549(2).  Like the Governor, EM Orr has no authority to pursue cuts in accrued pension benefits through chapter 9 nor, consistent with the Michigan Constitution, could the Michigan legislature lawfully have given him such authority.  *See In re Enrolled Senate Bill 1269*, 209 N.W.2d 200, 202 (Mich. 1973) ("under this constitutional limitation the legislature cannot diminish or impair accrued financial benefits"); *see also Pontiac Retired Employees Ass'n*, No. 12-2087, 2013 WL 4038582, *1-*2 (6th Cir. August 9, 2013)

---

[10] The Governor's authorization does not – and cannot – increase the Emergency Manager's powers and the Governor has no authority to disregard the Michigan Constitution or to change Michigan's laws. Indeed, the Governor has sworn to *uphold* the state Constitution.  As mandated by Article XI, section 1 of the Michigan Constitution and section 64 of the Michigan Election Law, 1954 P.A. 116, M.C.L. §168.1 *et seq.*, the Governor swore the following oath, later filed with the Michigan Secretary of State:  *"I do solemnly swear that I will support the Constitution of the United States and the Constitution of this State, and that I will faithfully discharge the duties of the office of Governor according to the best of my ability."*

(noting that State Legislature could not end the Michigan Constitution's two-thirds vote requirement to give PA 4 immediate effect because "[t]o conclude otherwise would effectively allow the Michigan Legislature to unilaterally amend the Michigan Constitution."); *Webster v. State of Michigan*, No. 13-734-CZ (Ingham County Circuit Court July 19, 2013) (order declaring "PA 436 is unconstitutional and in violation of Article 9 Section 24 of the Michigan Constitution to the extent that it permits the Governor to authorize an emergency manager to proceed under Chapter 9 in any manner which threatens to diminish or impair accrued pension benefits").[11]

Indeed, PA 436 itself expressly references Article 9, Section 24 in requiring that the financial plan developed by the EM require the "timely deposit" of pension contributions, Mich. Comp. Laws §141.1551(1)(d) and in enumerating the Emergency Manager powers in the event a municipality's pension fund became underfunded (authority EM Orr has not exercised, notwithstanding his team's view of the underfunding). Under Section 141.1552(1)(m), "[t]he emergency manager shall fully comply with the public employee retirement system investment act, 1965 PA 314, Mich. Comp. Laws § 38.1132 to 38.1140m, *and section 24 of article IX of the state constitution of 1963,* and any actions taken shall be consistent with the

---

[11] The *Webster* lawsuit is stayed as a result of this Court's July 25, 2013 order. Nevertheless, the ruling was issued by a court of competent jurisdiction as a result of litigation in which those in privity with the City and EM Orr participated.

pension fund's qualified plan status under the federal internal revenue code."  Mich. Comp. Laws § 141.1552(1)(m)(ii)(emphasis added).  And, in authorizing the EM to suspend certain compensation of local officials, the statute also makes clear that "[t]his section does not authorize the impairment of vested pension benefits."  Mich. Comp. Laws §141.1553.

Thus, in the exercise of their respective authority under Michigan law, Governor Snyder and EM Orr are bound by the prohibition against impairment of accrued pensions set forth in the Michigan Constitution.  And, because the state legislature could not permit otherwise, the state legislature necessarily must limit the circumstances under which a chapter 9 filing could be pursued under the financial emergency laws.  Thus the legislature could not purport to authorize either the Governor nor the Emergency Manager to take steps in contravention of the Michigan State Constitution.  Nevertheless, both EM Orr and Governor Snyder unlawfully acted beyond those limits in seeking and granting, respectively, authorization for the chapter 9 filing.

Accordingly, because the Emergency Manager has sought to use chapter 9 to impair accrued pensions and because the Governor's authorization did not condition the bankruptcy filing on adherence to Article 9, Section 24 of the Michigan Constitution, the authorization was invalid under Michigan law.  The authorization is, therefore, of no force and is ineffective under Section 109(c)(2).

*See In re Harrisburg*, 465 B.R. at 765 (dismissing petition because the City of

Harrisburg was not "specifically authorized under state law to be a debtor" under

Chapter 9).[12]

      B.      The Bankruptcy Petition Must be Dismissed Because
                 the City Seeks to Effect an Unlawful Plan to Adjust Debts

        To be eligible for Chapter 9, a debtor must demonstrate that it "desires

to effect a plan to adjust [its] debts."  11 U.S.C. § 109(c)(4).  For purposes of Section

109(c)(4), the debts intended for adjustment are to be measured as of the petition

date.  *See In re Town of Westlake, Tex.*, 211 B.R. 860, 867 (Bankr. N.D. Tex. 1997).

Here, well before the petition date, the Emergency Manager made known that his

plan was to use chapter 9 bankruptcy to turn the retirement system underfunding

obligations into bankruptcy claims, pay them on a pro-rata basis with other

unsecured debt and, based on the shortfall created in the retirement system, cut

vested pension benefits and accruals.  *See* Orr Decl. Ex. A, p. 109.

        This strategy plainly violates the Michigan Constitution's prohibition

under Article 9, Section 24 against the impairment of accrued pensions, and, as we

show above, invalidates the Governor's authorization and the chapter 9 petition.  As

such, it also violates the eligibility requirement that the debtor must "desire[] to

---

[12] UAW intends to submit a supplemental brief in support of its objection under Section 109(c)(2) to address issues raised at the oral argument on October 15-16, 2013.

effect a plan of adjustment" under Section 109(c)(4), in that a plan that the City

pursues in order to impair accrued pensions that are protected against impairment by

the Michigan Constitution could not be confirmed in any event because such a plan

would require that debtor take an action that is "prohibited by law." *See Bekins*, 304

U.S. at 815 (approving municipality's bankruptcy plan where action of the taxing

agency in carrying out the plan "is authorized by state law."); *see also In re Sanitary*

*& Improvement Dist.*, # 7, 98 B.R. at 975-76; *In re City of Colorado Springs Spring*

*Creek General Improvement District*, 177 B.R. at 694. Arguably, a proposal is a

proposal and not the plan of adjustment and courts have permitted various forms of

plans or indicia of proposed plans to fulfill their requirements. *E.g., In re Stockton,*

*Cal.,* 973 B.R. 772, 791 (Bankr. E.D. Cal. 2013). But here, the City devised a

pension proposal that it could not ultimately achieve under Section 943(b). The City

gave no indication that its proposal was hypothetical or tentative; instead it was

determined to fulfill it, the confirmation issue notwithstanding.[13] Accordingly, the

City cannot be said to desire to effect a *lawful* plan of adjustment. The City thus

fails to meet the requirement of Section 109(c)(4).

---

[13] The City's Proposal reflects deliberate steps leading to the forced cuts in
benefits. *See* Orr Decl. Ex. A p. 109. Although, as has become clear in discovery,
the legwork under pinning the proposal was incomplete at best, the City's intent was
clear: show the underfunding to be prohibitively larger than expected, and stop the
funding.

C.     The Bankruptcy Petition Must Be Dismissed
for Lack of Lawful Authorization By the State

1.     *Chapter 9 Reflects Our System of Dual Sovereignty*

In deference to dual sovereignty principles, "[b]ankruptcy courts should review chapter 9 petitions with a jaded eye." *In re N.Y. Off-Track Betting Corp.*, 427 B.R. 256, 264 (Bankr. S.D.N.Y. 2010). The debtor bears the burden of proof as to each element of eligibility under Section 109(c). *See In re City of Harrisburg, PA,* 465 B.R. 744, 752 (Bankr. M.D. Penn. 2011). *See also id*. at 754 (when authority to file is questioned, "bankruptcy courts exercise jurisdiction carefully, 'in light of the interplay between Congress' bankruptcy power and the limitations on federal power under the Tenth Amendment'"). Under Section 109(c)(2), to qualify for Chapter 9 protection, a debtor must be "specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter." 11 U.S.C. § 109(c)(2). *See In re City of Harrisburg, PA,* 465 B.R. at 754. ("Express authority is defined as that which confers power to do a particular identical thing set forth and declared exactly, plainly and directly with well-defined limits").

Because the Governor's authorization of Detroit's chapter 9 petition did not require adherence to Article 9, Section 24 of the Michigan Constitution, the state's authorization is invalid. In the absence of a valid state authorization duly

recognizing the protections of Article 9, Section 24, chapter 9 as applied here is unconstitutional.

The power of the federal courts under chapter 9 is necessarily limited by principles of federalism inherent in our Constitutional structure and reflected in the Tenth Amendment.[14] "Principles of dual sovereignty, deeply embedded in the fabric of this nation and commemorated in the Tenth Amendment of the United States Constitution, severely curtails the power of bankruptcy courts to act once a petition is filed." *In re N.Y. Off-Track Betting Corp.*, 427 B.R. 256 (Bankr. S.D.N.Y. 2010). Thus, as this Court has observed, "[a] primary distinction between chapter 11 and chapter 9 proceedings is that in the latter, the law must be sensitive to the issue of the sovereignty of the states." *In re Addison Cmty. Hosp. Auth.*, 175 B.R. 646, 649 (Bankr. E.D. Mich. 1994).

The U.S. Supreme Court has twice considered the constitutionality of federal municipal bankruptcy legislation with reference to the dual sovereignty principles embodied in the Tenth Amendment. In 1934, Congress, enacted the first federal legislation providing for municipal debt adjustments. The Supreme Court held the 1934 Act unconstitutional in *Ashton v. Cameron County Water*

---

[14] The Tenth Amendment provides:

The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people. U.S. Const. Amend X.

- 33 -

13-53846-swr  Doc 8739   Filed 10/15/14   Entered 10/15/14 19:41:45   Page 33 of 52
13-53846-tjt  Doc 8288   Filed 11/07/14   Entered 11/07/14 22:41:45   Page 33 of 52

*Improvement District No. 1*, 298 U.S. 513 (1936) on the ground that the federal bankruptcy power is "impliedly limited by the necessity of preserving the independence of the States," and thus did not extend to the states or their subdivisions. *Id.* at 530. The Court held that the provisions would unconstitutionally impinge upon the "indestructible" "separate and independent existence" of the states by restricting municipal debtors' control over their fiscal affairs. *Id.* at 528, 530.

Congress enacted modified municipal bankruptcy provisions in 1937 which the Court upheld in *Bekins*, rejecting a claim that the statute violated the Tenth Amendment and state sovereignty principles. The Court distinguished its earlier decision in *Ashton* by emphasizing that Congress in the 1937 Act had been "especially solicitous" to avoid interference with the autonomy of municipalities. *Bekins*, 304 U.S. at 50. The Court stressed that under the revised legislation, the federal bankruptcy power may be exercised only where the actions of the municipal agency are authorized by state law:

> The statute is carefully drawn so as not to impinge upon the sovereignty of the State. The State retains control of its fiscal affairs. The bankruptcy power is exercised in relation to a matter normally within its province and ***only in a case where the action of the taxing agency in carrying out a plan of composition approved by the bankruptcy court is authorized by state law.***

*Id.* at 51 (emphasis added).

- 34 -

13-53846-tjt   Doc 8738   Filed 10/15/13   Entered 10/15/13 22:41:35   Page 34 of 52
13-53846-swr   Doc 1389   Filed 10/15/14   Entered 10/15/14 22:41:35   Page 34 of 52

For purposes of the present case, the most significant aspect of the *Bekins* opinion is that the Court itself determined that the relief sought by the local agency was authorized by California law. The Court's ultimate conclusion that the State had given its consent to the bankruptcy proceeding was based on its own analysis of the relevant provisions of the state statute:

> [T]he State has given its consent. We think that this sufficiently appears from the statute of California enacted in 1934. St. of 1934, Ex. Sess., c. 4, p. 5. This statute (section 1) adopts the definition of 'taxing districts' as described in an amendment of the Bankruptcy Act, to wit chapter 9 approved May 24, 1934, 11 U.S.C. §§ 301-303, and further provides that the Bankruptcy Act and 'acts amendatory and supplementary thereto,' as the same may be amended from time to time, are herein referred to as the 'Federal Bankruptcy Statute.' Chapter 10 of the Bankruptcy Act is an amendment and appears to be embraced within the state's definition. We have not been referred to any decision to the contrary. Section 3 of the state act then provides that any taxing district in the State is authorized to file the petition mentioned in the Federal Bankruptcy Statute. Subsequent sections empower the taxing district upon the conditions stated to consummate a plan of readjustment in the event of its confirmation by the federal court.

*Id.* at 47-48 (internal citations and quotations omitted).

The teaching of *Bekins* is clear. This Court's exercise of jurisdiction over the City's petition cannot rest on the mere fact that the Emergency Manager (and based upon the Governor's authorization) filed the petition voluntarily. Rather, the Court must itself determine that the filing of the petition is authorized by, *and consistent with*, the law of Michigan, in this case, the Constitution of the State of

- 35 -

Michigan. If the Court finds that the petition is inconsistent with state law, then the further exercise of its jurisdiction is barred by the Then Amendment.

The City has sought to draw a distinction between the filing of the instant petition, which must admittedly be authorized by state law, and any subsequent relief granted by the Court. It supports this distinction by citing *In re Sanitary & Improvement Dist., No. 7*, 98 B.R. 970, 973 (Bankr. D. Neb. 1989) for the proposition that the Bankruptcy Code permits federal courts through confirmation of a Chapter 9 plan to impair contract rights and "such impairment is not a violation by the state or the municipality of [the Contracts Clause] which prohibits a state from impairing such contract rights." (Consolidated Reply, pp. 24-25).

But this attempt to analogize the Contracts Clause with the Tenth Amendment is wholly unavailing. The Contracts Clause of the U.S. Constitution applies solely to the States.[15] By contrast, the Tenth Amendment is an explicit limitation <u>on the power of the Federal Government, including this Court</u>, to displace state law. As the Supreme Court has put it, "the Tenth Amendment confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States. The Tenth Amendment thus directs us to

---

[15] U.S. Const., Art. I, Sec. 10 provides: "No state shall … pass any … Law impairing the Obligation of Contracts."

- 36 -

13-53846-swr   Doc 8738   Filed 10/15/13   Entered 10/15/14 29:41:35   Page 36 of 52
13-53846-tjt   Doc 8738   Filed 10/15/14   Entered 10/15/14 29:41:35   Page 36 of 52

determine, as in this case, whether an incident of state sovereignty is protected by a limitation on an Article I power." *New York v. United States*, 505 U.S. 144, 157 (1992).

The Court's Tenth Amendment decisions clearly show that the power of the federal courts under Chapter 9 is necessarily limited by principles of federalism inherent in our Constitutional structure and reflected in the Tenth Amendment. This dual system of sovereignty increases democratic governance:

> The federal structure allows local policies 'more sensitive to the diverse needs of a heterogeneous society,' permits 'innovation and experimentation,' enables greater citizen 'involvement in democratic processes,' and makes government 'more responsive by putting the States in competition for a mobile citizenry.' *Gregory v. Ashcroft,* 501 U.S. 452, 458, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). Federalism secures the freedom of the individual. It allows States to respond, through the enactment of positive law, to the initiative of those who seek a voice in shaping the destiny of their own times without having to rely solely upon the political processes that control a remote central power.

*Bond v. United States*, 131 S.Ct. 2355, 2364 (2011). Accordingly, as the Court held in *Bond*, not only the states, but state citizens themselves have standing to assert that federal law contravenes the Tenth Amendment precisely because of the vital relationship between freedom of the individual and the federal structure of our government. *Id*.

Under the Bankruptcy Code, strict adherence to State sovereignty principles is intrinsic to the lawful functioning of chapter 9. Chapter 9 "was drafted

to assure that application of federal bankruptcy power would not infringe upon the sovereignty, powers and rights of the states." *In re Richmond Unified Sch. Dist.*, 133 B.R. 221, 226 (Bankr. N.D. Cal. 1991). "Both Congress and the Supreme Court have thus been careful to stress that the federal municipal Bankruptcy Act is not in any way intended to infringe on the sovereign power of a state to control its political subdivisions; for as the Supreme Court held in the *Ashton* and *Bekins* cases, to the extent that the federal Bankruptcy Act does infringe on a state or a municipality's function it is unconstitutional." *Ropico, Inc. v. City of N.Y.*, 425 F.Supp. 970, 983 (S.D.N.Y. 1976).

The municipal bankruptcy provisions of the Bankruptcy Code chart a carefully circumscribed course limiting the power that can be lawfully exercised by the federal bankruptcy court. First, the municipality must be "specifically authorized" to be a debtor under *State* law "or by a governmental officer or organization *empowered by State law* to authorize such entity to be a debtor under" chapter 9. 11 U.S.C. § 109(c)(2) (emphasis added). *See In re City of Bridgeport*, 128 B.R. 688, 692 (Bankr. D. Conn. 1991). In addition, Section 903 of the Bankruptcy Code establishes that chapter 9 "does not impair the power of a State to control, by legislation or otherwise, a municipality of or in such State in the exercise of the political or governmental powers of such municipality including expenditures by such exercise .…" 11 U.S.C. § 903. Section 903 "'is the constitutional mooring'

for municipal debt adjustment and makes clear that nothing in chapter 9 should be construed to limit a State's power to control its municipalities." *In re N.Y. City Off-Track Betting Corp.*, 434 B.R. 131, 144 (Bankr. S.D.N.Y. 2010); *see also City of Richmond*, 133 B.R. at 226 (describing Section 903 as a "reaffirmation that Chapter 9 does not limit or impair the power of the states to control municipalities").

Similarly, Section 904 prevents the bankruptcy court from interfering with "any of the political or governmental powers of the debtor" or "any of the property or revenues of the debtor" or "the debtor's use and enjoyment of any income-producing property." 11 U.S.C. § 904; *see In re Addison Cmty. Hosp. Auth.*, 175 B.R. at 649 (the "foundation" of Section 904 "is the doctrine that neither Congress nor the courts can change the existing system of government in this country" and that, in recognition of the Constitutional limitations on the power of the federal government, "chapter 9 was created to give courts only enough jurisdiction to provide meaningful assistance to municipalities that require it, not to address the policy matters that such municipalities control.").[16]

State sovereignty interests also operate to require that the bankruptcy court find that the debtor's plan of adjustment be consistent with state law. The

---

[16] "The effect [of Sections 903 and 904] is to preserve the power of political authorities to set their own domestic spending priorities, without restraint from the bankruptcy court." M. McConnell, *When Cities Go Broke: A Conceptual Introduction to Municipal Bankruptcy*, 60 U. Chi. L. Rev. 425, 462-63 (1993).

- 39 -

13-53846-tjt  Doc 8738  Filed 18/15/13  Entered 18/15/14 19:41:35  Page 39 of 52
13-53846-swr  Doc 8738  Filed 18/15/13  Entered 18/15/14 19:41:35  Page 39 of 52

bankruptcy court shall only confirm the plan if, among other requirements, "the debtor is not prohibited by law from taking any action necessary to carry out the plan." 11 U.S.C. § 943(b)(4). Indeed, in *In re Sanitary & Improvement District, # 7*, 98 B.R. 970, 975-76 (Bankr. D. Neb. 1989) cited by the City, the court held that a plan of adjustment could not be confirmed because it conflicted with the terms of state law that required that bondholders be paid in full before warrantholders could receive compensation.[17] *See also In re City of Colorado Springs Spring Creek Gen. Improvement Dist.*, 177 B.R. 684, 694 (Bankr. D. Colo. 1995) (ruling that plan of adjustment could not be confirmed unless and until it was approved under the elections provisions of state law: "[w]here a plan proposes action not authorized by state law, or without satisfying state law requirements, the plan cannot be confirmed.").[18] *See also* 11 U.S.C. § 943(b)(6) (stating as additional plan confirmation requirement that "any regulatory approval or electoral approval

---

[17] Thus, contrary to the City's assertions, the reorganization power is necessarily confined by the state's paramount authority over the governance of the municipality itself, and by such state constitutional limits as the state's citizens have placed on the power of the state itself.

[18] The court further explained that this is because "[u]nlike any other chapter of the Bankruptcy Code, Chapter 9 places federal law in juxtaposition to the rights of states to create and govern their own subdivisions." *Id.* at 693. "Though Congress intended Chapter 9 to be a forum for reorganization of municipalities, it is clear that Congress did not intend for federal bankruptcy law to supersede or impair the power of the state to create, limit, authorize or control a municipality in the exercise of its political or governmental powers." *Id.*

necessary under applicable nonbankruptcy law in order to carry out any provision of the plan has been obtained, or such provision is expressly conditioned on such approval"). The Bankruptcy Code recognizes both that the state necessarily controls the actions of its subdivisions and the content of the any plan of adjustment.

In sum, the Tenth Amendment case law belies the City's contention that the Bankruptcy Court is free to set aside the protections of a state's constitution. The state sovereignty principles that form the fabric of chapter 9 are at the core of the bankruptcy court's constitutional exercise of authority over a municipal debtor, whether as a matter of eligibility or otherwise.[19]

Moreover, dual sovereignty principles are not merely the states' province to enforce. The Supreme Court has extended the protections of federalism to individual citizens: "An individual has a direct interest in objecting to laws that upset the constitutional balance between the National Government and the States when enforcement of those laws causes injury that is concrete, particular, and

---

[19] The State of Michigan makes a similarly unavailing argument that because it is not the filing of the petition itself that impairs the pension benefits, the Governor's authorization was valid. However, for chapter 9 to be applied in a manner consistent with the federal Constitution, specifically, the Tenth Amendment, there is no lawful or practical distinction between disregarding state law for purposes of the City's authorization to file the petition and disregarding state law with respect to the plan that it may lawfully pursue while in chapter 9. If the City's filing is not properly authorized, then each day the City remains in chapter 9 is a day it is not authorized to be there.

redressable. Fidelity to principles of federalism is not for the States alone to vindicate." *Bond v. United States*, 131 S.Ct. at 2364.

2.     *The City's Reliance on Federal Preemption is Unavailing*

Apart from misreading *Bekins*, the City also relies on a line of pre-emption cases to justify its position. But the pre-emption case law actually shows that there is no legal basis for setting aside the protections of Article 9, Section 24 of the Michigan Constitution. Chapter 9 does not "preempt" or otherwise displace the positive requirements of Michigan's Constitution or its laws. Indeed, as shown above, because of core federalism concerns, state law defining the governmental powers of a municipality *must be honored* under chapter 9 to preserve the constitutionality of municipal reorganizations. Indeed the "authorization" requirement under Section 109(c)(2) expressly requires that the municipality be "specifically authorized" to be a debtor "by State law" or by a governmental officer "empowered by State law" to authorize the entity to be a debtor. *See In re Harrisburg, PA,* 465 B.R. at 755 (rejecting City Council's contention that Supremacy Clause to bar state law prohibition filing and motive that the state "serves as a municipality as gatekeeper into Chapter 9"). The City's contention is fundamentally undermined by those specific provisions of chapter 9, *e.g.*, Sections 903 and 904, and the applicable plan confirmation requirements which plainly refute

- 42 -

13-53846-tjt  Doc 873-9   Filed 10/15/13   Entered 10/15/13 22:41:35   Page 42 of 52
13-53846-swr  Doc 1388    Filed 10/25/13   Entered 10/25/13 19:41:35   Page 42 of 52

the notion that the limits on the bankruptcy court's authority imposed by the reservation of state sovereignty are somehow *superseded* with a chapter 9 filing.[20]

Aside from Tenth Amendment and other federal constitutional limitations, "[i]n determining whether a state statute is pre-empted by federal law" the analysis follows three tracks, where the touchstone "is to ascertain the intent of Congress." *California Federal Sav. and Loan Ass'n v. Guerra*, 479 U.S. 272, 280 (1987). Under *Guerra:*

> First, when acting within constitutional limits, Congress is empowered to pre-empt state law by so stating in express terms. Second, congressional intent to pre-empt state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation….
>
> As a third alternative, in those areas where Congress has not completely displaced state regulation, federal law may nonetheless pre-empt state law to the extent it actually conflicts with federal law. Such a conflict occurs either because "compliance with both federal and state regulations is a physical impossibility," or because the state law stands "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Nevertheless, pre-emption is not to be lightly presumed.

*Id.* at 280-82.

---

[20] *See* Thomas Moers Mayer, *State Sovereignty, State Bankruptcy, and a Reconsideration of Chapter 9*," 85 Am. Bankr. L. J. 363, 384-5 (Fall, 2011) (raising the "serious question" whether an interpretation of chapter 9 that renders section 903 a "dead letter" is "consistent with" the Tenth Amendment and state sovereignty). To the extent that it were do so, chapter 9 would be unconstitutional under the Tenth Amendment, and we ask the Court to so find.

Here, as shown above, federal displacement of the power of the State of Michigan and its citizens – through the State Constitution and otherwise – to control the authority of Governor Snyder and the discretion of the Emergency Manager should not "be lightly presumed" because it would violate the sovereignty of the state. Nothing in chapter 9 provides for an express federal displacement of the prerogative of the state and its citizens to define the powers of its Governor and the Emergency Manager. *Cf. Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 557 (6th Cir. 2012) (express federal preemption of state law claims which relate to an employee benefit plan under 29 U.S.C. §1144(a)).

Indeed, Sections 903 and 904 are to the contrary because they expressly recognize that the Code does not "impair the power of a State to control, by legislation or otherwise, a municipality of or in such State in the exercise of the political or governmental powers of such municipality[.]" Under Section 943(b)(4), the terms of the plan of adjustment must comport with the terms of state law. Nothing in chapter 9 supports an express preemption of the state law defining the scope and authority of Governor Snyder and EM Orr.[21]

---

[21] The City's reliance on *In re City of Stockton, California,* 478 B.R. 8 (Bankr. E.D. Cal. 2012) and *In re City of Vallejo,* 403 B.R. 72 (Bankr. E.D. Cal. 2009) is misplaced. The Supremacy clause analysis in these cases is turned on its head: fundamentally, chapter 9 reflects *dual* sovereignty and must be applied with due regard for the sovereignty of *the state*. Neither federal supremacy nor the Uniformity Clause operate to negate state sovereignty principles which, as we show above, must be given effect for chapter 9 to operate constitutionally. Indeed, the

- 44 -

13-53846-tjt  Doc 8738  Filed 10/15/14  Entered 10/15/14 19:41:15  Page 44 of 52
13-53846-swr  Doc 873889  Filed 10/15/13  Entered 10/15/13 22:41:35  Page 44 of 52

For the same reason, there is no basis to conclude from chapter 9 that Congress left no room for the operation of the constitutions of the several states, and of their legislation. This, too, is recognized in Sections 903 and 904 expressly recognize the continued vitality of state law. Indeed, in *Faitoute Iron & Steel Company v. City of Asbury Park*, 316 U.S. 502, 508 (1942), the Supreme Court held that Congress has not completely dominated the field of municipal reorganization as to preclude the operation of a state municipal insolvency statute. See also *Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection*, 474 U.S. 494, 505 (1986) (noting that "Congress did not intend for the Bankruptcy Code to pre-empt all state laws"); *Cf. Molosky v. Washington Mutual, Inc.*, 664 F.2d 109, 113-14 (6th Cir. 2011) (federal Home Owners' Loan Act preempts claim under Michigan statute because Congress intended the federal act to occupy the entire field of lending regulation for federal savings associations and leave no room for state regulatory control); *Modin v. New York Cent. Co.*, 650 F.2d 829, 835 (6th Cir. 1981) (Interstate Commerce Commission creates a comprehensive scheme of federal regulation of railroads that preempts state law).

---

Uniformity requirement does *not* mean that bankruptcy must look alike in every state, and the courts have so held. *E.g., Schultz v. United States*, 529 F.3d 343, 351 (6th Cir. 2008) (rejecting uniformity challenge based on means-test tied to median income in debtor's state). *In re Kulp*, 949 F.2d 1106, 1103 n.3 (10th Cir. 1991) (no uniformity violation where "11 U.S.C. § 522 expressly delegates to states the power to create bankruptcy exemptions.").

Adherence to the impairment prohibition in Article 9, Section 24 of the Michigan Constitution is not "physically impossible," nor would it stand as an obstacle to a successful chapter 9 plan (where, in fact, state law compliance is *required* for confirmation). The objectives of chapter 9 must be read consistently with basic constitutional principles that recognize the autonomy of the state and its citizens to control the political affairs of its subdivision as reflected in Sections 903 and 904. Here, the Michigan Constitution requires that the choice of its citizens in enacting Article 9, Section 24 of the Michigan Constitution must be honored, admitting of no exception.[22]

D.    The Bankruptcy Petition Must be Dismissed Because "the Petition Was Not Filed in Good Faith and the City Cannot Demonstrate That It Has Complied With Section 109(c)(5)

The Court must dismiss a chapter 9 petition "if the debtor did not file the petition in good faith" or otherwise meet the requirements of Title 11. 11 U.S.C. § 921(c). The Bankruptcy Code specifically requires the municipality to demonstrate (as relevant here) that it "has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan," or that it

---

[22] Article 9, Section 24 of the Michigan Constitution is plainly an exercise by its citizens of their Tenth Amendment-based right "to control a municipality of or in such state in the exercise of the political or governmental powers of such municipality" under Section 903.

is "unable to negotiate with creditors because such negotiation is impracticable[.]"
11 U.S.C. § 109(c)(5).

Enforcing the "good faith" requirement serves "[i]mportant constitutional issues that arise when a municipality enters the bankruptcy arena" by requiring that, "before rushing to" bankruptcy court, the municipality first sought to negotiate in good faith concerning the treatment the creditors may be expected to receive under a plan. *In re Cottonwood Water and Sanitation Dist.,* 138 B.R. 973, 979 (Bankr. D. Colo. 1992). Thus, a debtor who adopts a "take it or leave it" approach to prepetition negotiations fails to satisfy the good faith element. *In re Ellicott School Bldg. Auth.*, 150 B.R. 261, 266 (Bankr. D. Colo. 1992). There, the court noted that the debtor "h[e]ld three public meetings at which it 'explained' its proposed plan of restructuring to the bondholders" but creditors "were advised that the 'economic provisions' of that proposed plan were not negotiable." *Id.* at 266. *See also id.* (court reasoned that "[i]t is difficult to imagine that any true negotiations [can] take place in an environment where the substantive terms of a proposal were not open to discussion" and dismissed the petition in part because the good faith requirement was not satisfied.). *Id.* In other words, there must be genuine substantive negotiations over the terms of a repayment plan, and Section 109(c)(5)(B) will not be satisfied where a debtor fails to negotiate prepetition over "a comprehensive workout plan dealing with all of their liabilities and all of their

- 47 -

assets in terms comparable to a plan of adjustment that could be effectuated under Chapter 9 of the Bankruptcy Code." *See also In re Pierce County Housing Auth.*, 414 B.R. 702 (Bankr. W.D. Wash. 2009) (requirement not met where "there is no evidence that the Debtor ever negotiated prepetition with any of its creditors over the possible terms of a plan of adjustment").

The City's efforts to negotiate with stakeholders over their pension proposal fall far short of the "good faith" requirement under Section 109(c)(5) and manifestly show that the filing was not in good faith under Section 921(c). First, as noted above, the City clearly crafted the pension proposal with chapter 9 in mind and with no effort whatsoever to acknowledge the legitimacy of Article 9, Section 24 of the Michigan Constitution. By completely disregarding the State Constitution's prohibition on impairing vested benefits, the City signaled that it was prepared to achieve the funding cuts through bankruptcy, thus short-circuiting any meaningful effort to negotiate with stakeholders over alternatives. As noted above, the funding figures were soft in any event, and more indicative of an effort to walk away from its pension obligations than negotiate to maintain them. Moreover, the City tendered a proposal that the affected stakeholders could not possibly accept consistent with applicable State law.

The evidence will show that Orr, aided by the Governor, embarked on a direct path to chapter 9 to implement a proposal designed to shed its pension and

retiree health obligations as general unsecured claims and promote an ambitious program of improvements for the City.[23]  As shown above this gamble plays havoc with core principles of federalism and the right of the citizenry to enact State Constitutional provisions – a right protected by the Tenth Amendment.

In addition, because of the City's rush to file, its Proposal was deeply flawed.  For example, the City had barely identified certain assets that might be available either for creditors or for its program of improvements.  *See* Orr Decl. Ex. A, pp. 83-89.  The pension funding estimate, likewise, requires additional work that is to this day not yet complete because the City's actuaries lack necessary data.  As such, the Emergency Manager's Proposal and short march toward chapter 9 indicate that the City's efforts were not intended to engage in a good faith process with their stakeholders but to "mark time" until the chapter 9 filing some 34 days later.  Instead, the use of bankruptcy specifically to achieve its transformation proposal was always the intended goal of the process.  The Proposal was not designed as a plan for discussion among stakeholders but a milepost in the road to chapter 9.  The City's filing cannot be said to have fulfilled a good faith requirement to negotiate with stakeholders over its plan of adjustment where the bankruptcy filing is, in

---

[23] A different choice by the City regarding its expenditures – to honor the pension obligations and protect the benefits covered by Article 9, Section 24 – would be well within the City's prerogative as a chapter 9 debtor under Sections 903 and 904.  The City is not forced to treat these obligations in the manner it has proposed; it has *chosen* to renege on the funding obligations and use the money for other purposes.

effect, the intended result and vehicle for achieving its pension funding proposal. The process set up by the State with the appointment of the Emergency Manager and the City's focus on getting to chapter 9 to achieve a plan to cut its pension funding obligation and force cuts to accrued pensions cannot be deemed to be a filing in good faith.[24]

The City relies upon the impracticability of negotiations available as an alternative grounds under Section 109(c)(5)(C). *See* Consolidated Reply, pp. 45-53. But the issues cited by the City, *i.e.*, who to identify as "representatives" of various retiree groups, competing bargaining authority, or the extent to which legal authority would be considered binding, are by-products of the proposals that involved forced cuts in accrued pensions protected from impairment under the Michigan State Constitution. The City cannot, on the one hand, tender a proposal designed to yield an unlawful result and then attempt to shield itself behind "impracticability" to claim eligibility under Section 109. The City has been able to negotiate concessionary agreements in collective bargaining with multiple unions. The purported "impracticability" did not so much stem from the unwieldy size and scope of the

_____

[24] *See* Ellman and Merrett, *Pensions and Chapter 9* at 370 (noting that "there are many unanswered questions about what can and cannot be achieved in a chapter 9 case" and "the reality that this area of the law [whether chapter 9 is an available means to address protected pensions] is largely untested in the courts and very little is certain."); *see also id.* at 391 (noting that through the use of bankruptcy tools, such as the automatic stay "chapter 9 debtors have exerted substantial pressure on retirees to negotiate over a reduction in benefits.").

stakeholder population, as from the impossibility of lawfully engaging in negotiations over the pension proposal.

Accordingly, the City cannot show that its filing was made in good faith, or that is has complied with the requirements of Section 109(c)(5).  Where the debtor is unable to demonstrate that all elements have been satisfied, "[t]he petition must be dismissed."  *In re Harrisburg*, 465 B.R. at 752.

## CONCLUSION

For the foregoing reasons,[25] the City of Detroit, Michigan's Chapter 9 Petition should be dismissed.

Dated:  New York, New York
     October 17, 2013

          Respectfully submitted,

          International Union, UAW

     By: /s/ Babette A. Ceccotti
        Cohen, Weiss and Simon LLP
        Babette A. Ceccotti
        Keith E. Secular
        Thomas N. Ciantra
        Peter D. DeChiara
        Joshua J. Ellison
        330 West 42nd Street
        New York, New York 10036-6979
        T: 212-563-4100

---

[25] UAW and the *Flowers* plaintiffs reserve their right to further supplement their presentation at trial in light of continuing discovery and potential challenges UAW and the *Flowers* plaintiffs may pursue with respect to material withheld on the grounds of attorney-client and other privileges.

F: 212-695-5436
bceccotti@cwsny.com

-   and -

Niraj R. Ganatra (P63150)
8000 East Jefferson Avenue
Detroit, Michigan 48214
T: (313) 926-5216
F: (313) 926-5240
nganatra@uaw.net


*Attorneys for International Union, UAW*

-   and -


/s/ William A. Wertheimer

William A. Wertheimer
30515 Timberbrook Lane
Bingham Farms, Michigan 48025
T: (248) 644-9200
billwertheimer@gmail.com

Andrew A. Nickelhoff
Sachs Waldman, P.C.
2211 East Jefferson Avenue
Detroit, Michigan 48207
T: (313) 965-3464
F: (313) 965-0268
anickelhoff@sachswaldman.com


*Attorneys for Flowers Plaintiffs*