UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION – DETROIT

-----------------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 9 |
| CITY OF DETROIT, MICHIGAN, | Case No.: 13-53846 |
| Debtor. | Hon. Steven W. Rhodes |

-----------------------------------------------------------------x

## OBJECTION OF INTERNATIONAL UNION, UAW TO THE CITY OF DETROIT, MICHIGAN'S ELIGIBILITY FOR AN ORDER FOR RELIEF UNDER CHAPTER 9 OF THE BANKRUPTCY CODE

The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") hereby objects to the City of Detroit's (the "City") eligibility for an order of relief under chapter 9 of the U.S. Bankruptcy Code and states for its objection as follows:

### Preliminary Statement

1.      Less than three months after his appointment by State of Michigan Governor Richard Snyder ("Governor Snyder" or "Snyder"), and barely one month before filing the City of Detroit's chapter 9 petition, the City's Emergency Manager Kevyn Orr ("EM Orr" or "Orr") released a detailed proposal for creditors, which he claims will transform Detroit and its operations.  It became clear almost immediately that the June 14, 2013 "Proposal for Creditors" (the "Proposal"), which UAW believes was crafted by Governor Snyder and EM Orr even before the Chapter 9 filing, serves as the vehicle of Governor Snyder and EM Orr to use federal bankruptcy law to impair pensions protected from impairment under Article 9, Section 24 of the Michigan Constitution, cut retiree health benefits, and achieve further labor cost and work rule

concessions from the City's workforce. That the process quickly landed in chapter 9, where Governor Snyder and EM Orr must apparently believe their plans for Detroit's workers and retirees are somehow inoculated from challenge due to "federal supremacy,"[1] was entirely predictable. Unfortunately for Governor Snyder and his appointee EM Orr, their strategy fatally undermines the City's eligibility for chapter 9 bankruptcy.

2. Governor Snyder's appointment of EM Orr followed an extraordinary sequence of events punctuated by the enactment of Public Act 4 and — after the repeal of that law by Michigan voters in November, 2012 — the hasty passage of the Local Financial Stability and Choice Act Public Law 436 (2012) Mich. Comp. Laws § 141.1541 *et seq* ("PA 436"), signed by the Governor a month later. Governor Snyder's signing of PA 436 set in motion a whirlwind of activity leading to the Governor's appointment of EM Orr in March 2013. What followed, upon information and belief, was a collaboration between Governor Snyder and his staff that delivered a legal strategy and assembled a JonesDay legal team to conduct an end run around Article 9, Section 24 of the Michigan Constitution, despite the oath of the Governor and EM Orr to uphold the Constitution of our State on behalf of its citizens, including Detroit retirees[2]

---

[1] On June 16, 2013, in an interview with the Detroit Free Press Editorial Board, the Emergency Manager stated:

"Q.   You said in this report [the Proposal for Creditors] that you don't believe there is an obligation under our state constitution to pay pensions if the city can't afford it?

A.   The reason we said it that way is to quantify the bankruptcy question. We think federal supremacy trumps state law."

Interview with Detroit Free Press, June 16, 2013, *available at*: http://www.freep.com/article/20130616/OPINION05/306160052/kevyn-orr-detroit-emergency-manager-creditors-fiscal-crisis.

[2] Think Progress, July 23, 2013, "Banking on Bankruptcy: Emails Suggest Negotiations With Detroit Retirees Were Designed to Fail," (*e.g.*, "In one email, an assistant to Snyder promises to set a meeting with someone 'who is not FOIAble,' suggesting an intent to evade

3.     Any proposal to address the problems facing the City of Detroit should have been the product of a more deliberative and inclusive process.  Instead, the Proposal is part of a deliberate strategy mapped out by lawyers now on the City's legal team in which chapter 9 is used as "leverage" — a blunt instrument — to force retirees and pension-vested workers into negotiating away their benefits, despite the protection afforded those benefits by the Michigan Constitution, which dictates that such benefits should not be at risk in this process at all.[3]

4.     This strategy — which UAW believes was crafted by Governor Snyder and EM Orr — cannot be sustained, nor can this chapter 9 bankruptcy case.  As we demonstrate below, chapter 9, if it is constitutional, must reflect our system of dual federal and state sovereignty and must require that the bankruptcy court's authority over matters of state and local governance be severely curtailed.  Declared an unconstitutional exercise of Congressional power at least once in its history, *see Ashton v. Cameron County Water Improvement District*, 298 U.S. 513 (1936), federal municipal bankruptcy law hinges on strict adherence to the deep-rooted principles of dual sovereignty.  The lawful exercise of federal municipal bankruptcy power is critically dependent upon the municipality's adherence to state law.  Accordingly, "[b]ankruptcy

transparency laws"), *available at*:  http://www.thinkprogress.org/economy/2013/07/23/2342511/banking-on-bankruptcy-emails-suggest-negotiations-with-detroit-retirees-were-designed-to-fail/.  Discovery will be needed to further disclose the dealings between the Governor, JonesDay and EM Orr, and their staffs and representatives, including discovery of the type that the plaintiffs in the *Flowers v. Snyder* litigation, now stayed by this Court, told the Michigan trial court that they intended to pursue.  We believe that discovery will demonstrate that the dealings between these parties violated Article 9, Section 24 of the Michigan Constitution, and that such active disrespect for the Michigan Constitution by itself invalidates the City's Chapter 9 proceedings.

[3] Jeffrey B. Ellman, Daniel J. Merrett, *Pensions and Chapter 9:  Can Municipalities Use Bankruptcy to Solve Their Pension Woes?*  27 Emory Bankr. Dev. J. 365 (2011) (hereafter, "Ellman and Merrett, *Pensions and Chapter 9*") (explaining use of the automatic stay, claims allowance and other provisions of bankruptcy law as "significant" sources of leverage which can be used to "force[]" pensioners to bargain and "place[] substantial pressure" on them to "reach a resolution as quickly as possible."  *See id.* p. 388.

courts should review chapter 9 petitions with a jaded eye." *In re New York Off-Track Betting Corp.*, 427 B.R. 256, 264 (Bankr. S.D.N.Y. 2010). The City's bankruptcy filing represents a fundamental breach of sovereignty principles that renders the City ineligible for chapter 9 relief. To the extent that EM Orr and Governor Snyder are counting on federal law to sweep away Michigan's Constitutional protections afforded its citizens for their accrued public pensions, they misread municipal bankruptcy law and misapply the principles of state sovereignty embedded in the Tenth Amendment to the United States Constitution and reflected in the limited scope of chapter 9. Michigan citizens have the right under the Tenth Amendment to insist that Chapter 9 not be used to deprive them of their Michigan Constitutional rights.

5. The City's bankruptcy filing lacks good faith and fails at least three eligibility requirements under Section 109(c) of the Bankruptcy Code, 11 U.S.C. § 109(c). *See also* 11 U.S.C. § 921(c). First, there was no lawful authorization for the filing under state law, as required by Section 109(c)(2), because the Governor exceeded his authority to authorize the chapter 9 filing and cannot authorize such a filing to any extent the bankruptcy was intended to impair accrued pension benefits protected by state law. Second, because EM Orr has shown that the City desires to "effect a plan to adjust" its debts by unlawfully cutting accrued pension benefits, such a plan cannot be confirmed under Section 943 of the Bankruptcy Code. Under Section 943(b), a plan can be confirmed only if "the debtor is not prohibited by law from taking any action necessary to carry out the plan." 11 U.S.C. § 943(b)(4). The City cannot implement a plan of adjustment that impairs accrued pension benefits in violation of the Michigan Constitution. Therefore, because EM Orr intends that the City effect an *unlawful* plan to adjust its debts, the City has not met the eligibility requirement under Section 109(c)(4) that the debtor "desires to effect a plan to adjust its debts." 11 U.S.C. § 109(c)(4).

- 4 -

13-53846-tjt  Doc 8740  Filed 02/15/13  Entered 02/15/13 19:14:52  Page 4 of 28
13-53846-swr  Doc 500  Filed 02/15/13  Entered 02/15/13 19:14:52  Page 4 of 28

6.     Third, EM Orr cannot demonstrate compliance with the requirements of Section 109(c)(5) in its pre-bankruptcy interactions with creditors.  In particular, EM Orr did not engage in a good-faith negotiation with representatives of its workers or retirees.  Instead, his strategy was to release his Proposal showing the cessation in pension funding and directive that vested benefits must be cut — proposals that patently violate Michigan's constitutional prohibition on the impairment of accrued pensions and the requirement that funding for the years of such accruals be maintained.  Then once the Proposal was released, EM Orr engaged in a series of what were at best staged presentations designed to offer the appearance of engaging the City's stakeholders, but in reality were merely an exercise in "checking off the boxes" along the way to its chapter 9 filing.  And, once in bankruptcy, under the Snyder/Orr plan, the City would use the bankruptcy process as blunt force leverage, capitalizing on the legal uncertainties inherent in the chapter 9 process, particularly as applied to vested benefits. [4]

7.     EM Orr cannot demonstrate that his efforts to comply with the requirement under Section 109(c)(5)(B) to negotiate in good faith were legally sufficient, nor that further attempts to negotiate were impractical under Section 109(c)(5)(C), because it was not his intention to actually negotiate with the City's workers and retirees outside of bankruptcy in

---

4 This lack of good faith and the unvarnished politics behind its strategy was laid bare last week when Mr. Orr told the Wall Street Journal:

> For too long Detroit has been dumb, lazy, happy and rich.  Detroit has been the center of more change in the 20th Century than I dare say virtually any other city, but that wealth allowed us to have a covenant (that held) if you had an eighth-grade education, you'll get 30 years of a good job and a pension and great health care, but you don't have to worry about what's going to come.

Allysia Finley, *Kevyn Orr: How Detroit Can Rise Again*, Wall Street Journal, August 2, 2013. *Available at*:  http://online.wsj.com/article/SB10001424127887324635904578642140694511474.html.

- 5 -

13-53846-tjt   Doc 8740   Filed 02/15/13   Entered 02/15/13 19:14:52   Page 5 of 28
13-53846-swr   Doc 500   Filed 08/15/13   Entered 08/15/13 13:14:53   Page 5 of 28

the first place.  His plan was to invoke federal bankruptcy law and get there as quickly as possible.

8.     On the present record, therefore, absent lawful authority under the Michigan Constitution and state law, absent a plan of adjustment that the City can lawfully execute, and without the requisite showing that EM Orr engaged in good faith pre-bankruptcy negotiations, the City of Detroit is ineligible for chapter 9 relief.  The City's chapter 9 petition therefore must be dismissed.[5]

## Background

### The UAW

9.     International Union, UAW is a labor organization headquartered in Detroit, Michigan whose members include both City of Detroit employees and retirees and employees and retirees of public entities related to the City of Detroit that participate in common with City of Detroit employees in retirement benefit plans, including the City of Detroit General Retirement System pension plan.  UAW is representing the interests of these active and retired employees in this bankruptcy case.  There are approximately 200 retirees from UAW-represented bargaining units of City of Detroit component units.  There are, additionally, many active UAW-represented employees who are vested in their retirement benefits, all of whose pensions are at risk under EM Orr's Proposal.  UAW-represented employees and retirees are drawn from the following units: Civilian Police Investigators, City Law Department attorneys, City of Detroit Law Department paralegals, Water & Sewer waste water treatment operators, Detroit librarians and associated skilled trades workers.

---

[5] Detroit arguably qualifies as a "municipality" under Section 101(40) of the Bankruptcy Code.  Whether the City qualifies as "insolvent," as required under Section 109(c)(3), remains to be seen.  UAW reserves the right to supplement the grounds stated herein based upon the discovery process.

<u>Michigan's Constitution Protects Accrued Pensions</u>

        10.     Article 9, Section 24 of the Constitution of the State of Michigan makes clear that neither the state nor a municipality may reduce accrued pension benefits: "[t]he accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby."[6] Thus, "under this constitutional limitation the legislature cannot diminish or impair accrued financial benefits." *In re Enrolled Senate Bill 1269*, 209 N.W.2d 200, 202 (Mich. 1973). *See also In re Request for Advisory Opinion Regarding Constitutionality of 2011 PA 38*, 806 N.W.2d 683, 694 ("The obvious intent of § 24 … was to ensure that public pensions be treated as contractual obligations that, once earned, could not be diminished."); *Detroit Police Officers Ass'n v. City of Detroit*, 214 N.W.2d 803, 816 (Mich. 1974) ("With this paramount law of the state as a protection, those already covered by a pension plan are assured that their benefits will not be diminished by future collective bargaining agreements.").

<u>The Emergency Manager and Pre-Bankruptcy Events</u>

        11.     The Emergency Manager is subject to PA 436, the most recent in a series of Emergency Manager laws Michigan has enacted concerning Michigan's local government

---

[6] The address to the people accompanying the 1963 Constitution states that Article 9, Section 24 "requires that accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions be a contractual obligation *which cannot be diminished or impaired by the action of its officials or governing body*." 2 Official Record, Constitutional Convention 1961, p. 3402 (emphasis added). The Constitution also requires benefits to be funded in the year they are accrued and prohibits the legislature and municipalities from using those funds for other unfunded liabilities. Mich. Comp. Laws Const. Art. 9, § 24. The debates concerning what is not Article 9, Section 24 confirm that municipal employees have the entire assets of their employer at their disposal for these benefits: "Mr. VAN DUSEN: An employee who continued in the service of the public employer in reliance upon the benefits which the plan says he would receive would have the contractual right to receive those benefits, and would have the entire assets of the employer at his disposal from which to realize those benefits." 1 Official Record, Constitutional Convention 1961, p. 774.

- 7 -

13-53846-tjt   Doc 8740   Filed 02/15/13   Entered 02/15/13 19:14:52   Page 7 of 28
13-53846-swr   Doc 8500   Filed 02/15/13   Entered 02/15/13 19:14:52   Page 7 of 28

units.  *See City of Pontiac Retired Employees Ass'n v. Schimmel, et al.*, No. 12-2087, 2013 WL

4038582, *1-*2 (6th Cir. August 9, 2013) (hereafter, "*Pontiac Retired Employees Ass'n*")

(summarizing Emergency Manager laws).  In 1990, Michigan enacted Public Act 72, known as

the "Local Government Fiscal Responsibility Act."  Mich. Comp. Laws § 141.151(1)(j)(2005).

In 2011, Public Act 72 was repealed with the enactment of Public Act 4, the "Local Government

and School District Fiscal Accountability Act," Mich. Comp. Laws §§ 141.1501-1531, in March

2011.  "Unlike P[ublic] A[ct] 72, PA 4 gave emergency managers the power to temporarily

reject, modify or terminate existing collective bargaining agreements."  *Pontiac Retired*

*Employees Ass'n*, 2013 WL 4038582, *3.  Public Act 4 was rejected by Michigan voters under

the state's voter rejection procedures in November, 2012.  *Id.* at 4.  In the words of the Sixth

Circuit, "[a]pparently unaffected that the voters had just rejected Public Act 4, the Michigan

Legislature enacted, and the Michigan Governor signed, Public Act 436.  Public Act 436 largely

reenacted the provisions of Public Act 4, the law that Michigan citizens had just revoked.  In

enacting Public Act 436, the Michigan Legislature included a minor appropriation provision,

apparently to stop Michigan voters from putting Public Act 436 to a referendum."  *Id.* (citations

omitted).

      12.    Public Act 436 became effective on March 28, 2013.  As detailed in EM

Orr's Declaration, a number of legal challenges to Public Act 436 have been filed and remain

pending.[7]  (Declaration of Kevyn Orr ("Orr Decl."), Exhibit A, pp. 57-59).  Mr. Orr was

---

[7] The lawsuits raise serious challenges affecting the legality of the Manager's appointment
and other actions taken under the statute, including whether the Emergency Manager's
appointment violated Michigan's Open Meetings laws, or was otherwise defective as a result of
the voters' repeal of PA 4; whether PA 436 violates the U.S. Constitution and the federal Voting
Rights Act.  Other litigation, such as the *Pontiac Retiree Employees Ass'n* case recently decided
by the Sixth Circuit, involve challenges to emergency managers appointed in other towns.  To

appointed Emergency Manager and took office on or about March 25, 2013, under the predecessor Emergency Manager law and now serves under PA 436.  *Id*. at p. 57.

13.     The Creditor's Proposal was released by the Emergency Manager on June 14, 2013 (Orr Decl., Exhibit A).  As relevant to the UAW's objection, the Proposal takes broad aim at the City's workers and retirees, who have already been subjected to head count reductions and "City Employment Terms" (the "CETs") imposed a year ago which cut wages and benefits and unilaterally changed work rules.  *See* Orr Decl., Exhibit A, pp. 53-54 (describing the imposition of the CETs).  The proposal indicates that these imposed changes will serve as a "baseline" for the City in its contract talks with the unions, although the City may seek cuts and changes "beyond those included in the CETs."  *Id.* p. 76.  Additional reductions in staffing levels and outsourcing functions are also contemplated.  *Id.* p. 78.  Regarding retiree obligations, the City intends to modify retiree medical benefits through a replacement program and indicates that "claims will result from the modification of benefits."  *Id.* p. 109.

14.     The City's pension proposal garnered immediate and significant opposition, including at least three lawsuits commenced prior to the chapter 9 filing.[8]  Although PA 436 directs that the Emergency Manager's financial and operating plan "shall provide for" the "timely deposit of required payments to the pension fund for the local government or in which the local government participates," Mich. Comp. Laws 141.1551 Sec. 11 (1)(d), the Emergency Manager's proposal announced that annual contributions required to fully fund

---

the extent Governor Snyder's appointment of EM Orr was ineffective, as UAW believes and asserts, the City's Chapter 9 filing is void, as this Court would be bound to find.

    [8] *Flowers, et al. v. Snyder, et al.,* No. 13-734-CZ (Ingham County Circuit Court July 3, 2013); *General Ret. System of the City of Detroit v. Kevyn D. Orr*, No. 13.768-CZ (Ingham County Circuit Court) ; *Webster v. State of Michigan*, 13-734-CZ (Ingham County Circuit Court July 3, 2013).

currently accrued, vested benefits "will not be made under the plan." Orr Decl., Exhibit A, p. 109. Moreover, notwithstanding provisions in PA 436 that require the Emergency Manager to "comply fully" with Section 24 of Article 9 of the state constitution, *see* Mich. Comp. Laws 141.1552(m)(ii), the Creditors' Proposal provides that the retirement system underfunding, which purportedly increased under a study commissioned by EM Orr, would be "exchanged for a pro rata … principal amount of New Notes."[9] *Id.* Put another way, the Emergency Manager proposes to transform actuarial liability underfunding into a bankruptcy claim, which will share a $2 billion recovery pro-rata with billions of dollars in additional general obligation bond and other general unsecured claims. The Proposal then goes on to state that "[b]ecause the amounts realized on the underfunding claims will be substantially less than the underfunding amount there must be significant cuts in accrued, vested pension amounts for both active and currently retired persons." *Id.*

15. Labor unions and retiree organizations attended a series of presentations attended by representatives of the Emergency Manager and various stakeholders. Only a handful of presentations were scheduled with labor groups despite the breadth of the proposals affecting workers and retirees. *See* Orr Decl., ¶¶ 90-96 (describing post-June 14, 2013 meetings attended by stakeholders). Abruptly, on July 18, 2013 (and apparently only one day earlier than planned, *see* Orr Decl., Exhibit L) the City filed its chapter 9 petition following a written submission by Governor Snyder issued in response to Mr. Orr's July 16, 2013 request for approval to commence the bankruptcy. Although PA 436 expressly permits the Governor to condition the authorization for a chapter 9 filing, he did not do so. *See* Orr Decl., Exhibit L.

---

[9] EM Orr engaged a consulting firm that prepared a report based on changes to certain key actuarial assumptions. The results are controversial, at best. *See, e.g.*, Economic Policy Institute, August 1, 2013, *Detroit's Pension Problems: Not as Bad as They're Portrayed. Available at* http://www.epi.org/blog/truthiness-detroit.

## The Petition Must Be Dismissed Because the City Is Not Eligible For Chapter 9 Relief

The Bankruptcy Petition Must Be Dismissed
for Lack of Lawful Authorization by the State

### *Chapter 9 Reflects Our System of Dual Sovereignty*

16.     It is axiomatic that the federal government may not interfere with the internal governance of a state or its political subdivisions.  The power of the federal courts under Chapter 9 is necessarily limited by principles of federalism inherent in our Constitutional structure and reflected in the Tenth Amendment.  This dual system of sovereignty increases democratic governance:

> The federal structure allows local policies 'more sensitive to the diverse needs of a heterogeneous society,' permits 'innovation and experimentation,' enables greater citizen 'involvement in democratic processes,' and makes government 'more responsive by putting the States in competition for a mobile citizenry.' *Gregory v. Ashcroft*, 501 U.S. 452, 458, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). Federalism secures the freedom of the individual.  It allows States to respond, through the enactment of positive law, to the initiative of those who seek a voice in shaping the destiny of their own times without having to rely solely upon the political processes that control a remote central power.

*Bond v. United States*, 131 S.Ct. 2355, 2364 (2011) (emphasis added).  As the Supreme Court held in *Bond*, not only the states, but state citizens themselves have standing to assert that federal law contravenes the Tenth Amendment precisely because of the vital relationship between freedom of the individual and the federal structure of our government.  *Id.*

17.     The power of a federal bankruptcy court to entertain a municipal bankruptcy is thus constrained by dual sovereignty principles commemorated in the Tenth Amendment to the Constitution.  *United States v. Bekins*, 304 U.S. 27 (1938).[10]  As the Supreme

---

[10] The Tenth Amendment provides:

> The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.  U.S. Const. amend X.

- 11 -

13-53846-tjt   Doc 8740   Filed 02/15/13   Entered 02/15/13 19:14:52   Page 11 of 28
13-53846-swr   Doc 506   Filed 08/15/13   Entered 08/15/13 18:14:52   Page 11 of 28

Court has observed, "the Tenth Amendment confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States. The Tenth Amendment thus directs us to determine, as in this case, whether an incident of state sovereignty is protected by a limitation on an Article I power." *New York v. United States*, 505 U.S. 144, 157 (1992).

18.     For these reasons, "[p]rinciples of dual sovereignty, deeply embedded in the fabric of this nation and commemorated in the Tenth Amendment of the United States Constitution, severely curtails the power of bankruptcy courts to act once a petition is filed." *In re New York Off-Track Betting Corp.*, 427 B.R. 256 (Bankr. S.D.N.Y. 2010). Thus, as this Court has observed, "[a] primary distinction between chapter 11 and chapter 9 proceedings is that in the latter, the law must be sensitive to the issue of the sovereignty of the states." *In re Addison Community Hospital Authority*, 175 B.R. 646, 649 (Bankr. E.D. Mich. 1994). The U.S. Supreme Court has twice considered the constitutionality of federal municipal bankruptcy legislation with reference to the dual sovereignty principles embodied in the Tenth Amendment. In 1934, Congress, enacted the first federal legislation providing for municipal debt adjustments. The Supreme Court held the 1934 Act unconstitutional in *Ashton v. Cameron County Water Improvement District No. 1*, 298 U.S. 513 (1936) on the ground that the federal bankruptcy power is "impliedly limited by the necessity of preserving the independence of the States," and thus did not extend to the states or their subdivisions. *Id.* at 530. The Court held that the provisions would unconstitutionally impinge upon the "indestructible" "separate and independent existence" of the states by restricting municipal debtors' control over their fiscal affairs. *Id.* at 528, 530.

19.     Congress enacted modified municipal bankruptcy provisions in 1937 which the Court upheld in *Bekins*, rejecting a claim that the statute violated the state sovereignty principles.  The Court distinguished its earlier decision in *Ashton* by emphasizing that Congress in the 1937 Act had been "especially solicitous" to avoid interference with the autonomy of municipalities.  304 U.S. at 50.  The Court stressed that under the revised legislation, the federal bankruptcy power may be exercised only where the actions of the municipal agency are authorized by state law:

> The statute is carefully drawn so as not to impinge upon the sovereignty of the State.  The State retains control of its fiscal affairs.  The bankruptcy power is exercised in relation to a matter normally within its province and ***only in a case where the action of the taxing agency in carrying out a plan of composition approved by the bankruptcy court is authorized by state law.***

*Id*. at 51 (emphasis added).

20.     For purposes of the present case, the most significant aspect of the *Bekins* opinion is that the Court itself determined that the relief sought by the local agency was authorized by California law.  The Court's ultimate conclusion that the State had given its consent to bankruptcy proceeding was based on its own analysis of the relevant provisions of the state statute:

> [T]he State has given its consent.  We think that this sufficiently appears from the statute of California enacted in 1934. This statute (section 1) adopts the definition of taxing districts as described in an amendment of the Bankruptcy Act, to wit chapter 9 approved May 24, 1934, and further provides that the Bankruptcy Act and acts amendatory and supplementary thereto, as the same may be amended from time to time, are herein referred to as the Federal Bankruptcy Statute. Chapter 10 of the Bankruptcy Act is an amendment and appears to be embraced within the state's definition.  We have not been referred to any decision to the contrary.  Section 3 of the state act then provides that any taxing district in the State is authorized to file the petition mentioned in the Federal Bankruptcy Statute.  Subsequent sections empower the taxing district upon the conditions stated to consummate a plan of readjustment in the event of its confirmation by the federal court.

*Id.* at 47-48 (internal citations and quotations omitted).

21.     The teaching of *Bekins* is clear.  This Court's exercise of jurisdiction over the instant petition cannot rest on the mere fact that the Emergency Manager filed the petition voluntarily.  Rather, the Court must itself determine that the filing of the petition is authorized by, and consistent with, the Constitution of the State of Michigan and, to the extent consistent therewith, Michigan's laws.  If the Court finds that the petition is not so authorized and so consistent, then the further exercise of its jurisdiction is barred by the principles of sovereignty.

22.     Strict adherence to State sovereignty principles is thus intrinsic to the lawful functioning of chapter 9.  Chapter 9 "was drafted to assure that application of federal bankruptcy power would not infringe upon the sovereignty, powers and rights of the states." *In re Richmond Unified Sch. Dist.*, 133 B.R. 221, 226 (Bankr. N.D. Cal. 1991).  "Both Congress and the Supreme Court have thus been careful to stress that the federal municipal Bankruptcy Act is not in any way intended to infringe on the sovereign power of a state to control its political subdivisions; for as the Supreme Court held in the *Ashton* and *Bekins* cases, to the extent that the federal Bankruptcy Act does infringe on a state or a municipality's function it is unconstitutional." *Ropico, Inc v. City of New York*, 425 F.Supp. 970, 983 (S.D.N.Y. 1976).

23.     The municipal bankruptcy provisions of the Bankruptcy Code chart a carefully circumscribed course limiting the power that can be lawfully exercised by the federal bankruptcy court.  First, the municipality must be "specifically authorized" to be a debtor under *State* law "or by a governmental officer or organization *empowered by State law* to authorize such entity to be a debtor under" chapter 9.  11 U.S.C. § 109(c)(2) (emphasis added).  *See In re City of Bridgeport*, 128 B.R. 688, 692 (Bankr. D. Conn. 1991).  In addition, Section 903 of the Bankruptcy Code establishes that chapter 9 "does not impair the power of a State to control, by legislation or otherwise, a municipality of or in such State in the exercise of the political or

governmental powers of such municipality including expenditures by such exercise.…" 11 U.S.C. § 903.  Section 903 "'is the constitutional mooring' for municipal debt adjustment and makes clear that nothing in chapter 9 should be construed to limit a State's power to control its municipalities." *In re N.Y. City Off-Track Betting Corp.*, 434 B.R. 131, 144 (Bankr. S.D.N.Y. 2010); *see also City of Richmond*, 133 B.R. at 226 (describing Section 903 as a "reaffirmation that Chapter 9 does not limit or impair the power of the states to control municipalities").

24.     Similarly, section 904 prevents the bankruptcy court  from interfering with "any of the political or governmental powers of the debtor" or "any of the property or revenues of the debtor" or "the debtor's use and enjoyment of any income-producing property." 11 U.S.C. § 904; *see In re Addison Community Hospital Auth.*, 175 B.R. at 649 (the "foundation" of Section 904 "is the doctrine that neither Congress nor the courts can change the existing system of government in this country" and that, in recognition of the Constitutional limitations on the power of the federal government, "chapter 9 was created to give courts only enough jurisdiction to provide meaningful assistance to municipalities that require it, not to address the policy matters that such municipalities control.").[11]

25.     State sovereignty interests also operate to require that the bankruptcy court find that the debtor's plan of adjustment be consistent with state law.  The bankruptcy court shall only confirm the plan if, among other requirements, "the debtor is not prohibited by law from taking any action necessary to carry out the plan." 11 U.S.C. § 943(b)(4).  *See In re Sanitary & Improvement Dist.*, # 7, 98 B.R. 970, 975-76 (Bankr. D. Neb. 1989) (court held that plan of adjustment could not be confirmed because it conflicted with the terms of state law that required

---

[11] "The effect [of Sections 903 and 904] is to preserve the power of political authorities to set their own domestic spending priorities, without restraint from the bankruptcy court." M. McConnel, *When Cities Go Broke: A Conceptual Introduction to Municipal Bankruptcy*, 60 U. Chi. L. Rev. 425, 462-63 (1993).

that bondholders be paid in full before warrantholders could receive compensation);[12] *In re City of Colorado Springs Spring Creek General Improvement District*, 177 B.R. 684, 694 (Bankr. D. Colo.1995), (ruling that plan of adjustment could not be confirmed unless and until it was approved under the elections provisions of state law: "[w]here a plan proposes action not authorized by state law, or without satisfying state law requirements, the plan cannot be confirmed." ).[13] *See also* 11 U.S.C. § 943(b)(6) (stating as additional plan confirmation requirement that "any regulatory approval or electoral approval necessary under applicable nonbankruptcy law in order to carry out any provision of the plan has been obtained, or such provision is expressly conditioned on such approval"). The Bankruptcy Code recognizes both that the state necessarily controls the actions of its subdivisions and the content of the any plan of adjustment.

26. The state sovereignty principles that form the fabric of chapter 9 are thus at the core of the bankruptcy court's constitutional exercise of authority over a municipal debtor. Moreover, dual sovereignty principles are not merely the states' province to enforce. The Supreme Court has extended the protections of federalism to individual citizens: "An individual has a direct interest in objecting to laws that upset the constitutional balance between the National Government and the States when enforcement of those laws causes injury that is

---

[12] Thus, even though the debtor's plan clearly effected a restructuring of the municipality's debts — which is the aim of Chapter 9 — the reorganization power is necessarily confined by the state's paramount authority over the governance of the municipality itself, and by such state constitutional limits as the state's citizens have placed on the power of the state itself.

[13] The court further explained that this is because "[u]nlike any other chapter of the Bankruptcy Code, Chapter 9 places federal law in juxtaposition to the rights of states to create and govern their own subdivisions." *Id*. at 693. "Though Congress intended Chapter 9 to be a forum for reorganization of municipalities, it is clear that Congress did not intend for federal bankruptcy law to supersede or impair the power of the state to create, limit, authorize or control a municipality in the exercise of its political or governmental powers." *Id*.

concrete, particular, and redressable. Fidelity to principles of federalism is not for the States alone to vindicate." *Bond v. United States*, 131 S.Ct. at 2364.

*The State's Authorization Was Unlawful Under Michigan's Constitution and Laws*

27.     The debtor bears the burden of proof as to each element of eligibility under Section 109(c). *See In re City of Harrisburg, PA,* 465 B.R. 744, 752 (Bankr. M.D. Penn. 2011). *See also id*., at 754 (when authority to file is questioned, "bankruptcy courts exercise jurisdiction carefully, 'in light of the interplay between Congress' bankruptcy power and the limitations on federal power under the Tenth Amendment'").

28.     Under Section 109(c)(2), to qualify for Chapter 9 protection, a debtor must be "specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter." 11 U.S.C. § 109(c)(2). *See In re City of Harrisburg, PA,* 465 B.R. at 754. ("Express authority is defined as that which confers power to do a particular identical thing set forth and declared exactly, plainly and directly with well-defined limits").

29.     The Emergency Manager, who under Michigan law, exercises the powers of the legislative and executive branches of the government of the City of Detroit, has made it clear that he intends through this bankruptcy filing to impair the accrued retirement benefits of both active and retired employees of the City. Moreover, in his pre-Chapter 9 proposal, EM Orr made it clear that this was his intent, an intent that Governor Snyder knew of before he authorized the City's Chapter 9 filing.[14] Such actions — including the Governor's authorization in the face of this knowledge — are not only contrary to Article 9, Section 24 of the Michigan

---

[14] *See, e.g.*, Docket Entry No. 11, Exhibit J, in this proceeding, EM Orr's letter of July 16,2013 to Governor Snyder and Michigan Treasurer Dillon, p. 8.

Constitution, but also contravene the Emergency Manager's authority under PA 436. The Governor's authorization for this filing does not — and cannot — change this: Governor Snyder has no authority to disregard the Michigan Constitution or to change Michigan's laws.[15] The Emergency Manager thus has no authority under state law to pursue through Chapter 9 federal bankruptcy a restructuring of accrued pension benefits nor, consistent with the Michigan Constitution, could the Michigan legislature lawfully have given him such authority. *In re Enrolled Senate Bill 1269*, 209 N.W.2d 200, 202 (Mich. 1973) ("under this constitutional limitation the legislature cannot diminish or impair accrued financial benefits"). *See also Webster v. State of Michigan*, No. 13-734-CZ (Ingham County Circuit Court July 19, 2013) (order declaring "PA 436 is unconstitutional and in violation of Article 9 Section 24 of the Michigan Constitution to the extent that it permits the Governor to authorize an emergency manager to proceed under Chapter 9 in any manner which threatens to diminish or impair accrued pension benefits").[16]

30. Absent a clear exclusion of accrued pensions protected by Article 9, section 24, from the chapter 9 authorization, the filing has not been lawfully authorized as required by Section 109(c)(2) and the petition must be dismissed. Moreover, the filing is also void because, on information and belief, the appointment of the Emergency Manager, the Emergency Manager's Proposal, and the Governor's authorization of the Chapter 9 filing were

_____

[15] Indeed, the Governor has sworn to *uphold* the state Constitution. As mandated by Article XI, section 1 of the Michigan Constitution and section 64 of the Michigan Election Law, 1954 P.A. 116, M.C.L. §168.1 *et seq.*, the Governor swore the following oath, later filed with the Michigan Secretary of State: *"I do solemnly swear that I will support the Constitution of the United States and the Constitution of this State, and that I will faithfully discharge the duties of the office of Governor according to the best of my ability."*

[16] The *Webster* lawsuit is stayed as a result of this Court's July 25, 2013 order. Nevertheless, the ruling was issued by a court of competent jurisdiction as a result of litigation in which those in privity with the City and EM Orr participated.

all designed, with the active participation of the Governor and other State of Michigan officials, to unconstitutionally circumvent Article 9, Section 24 of the Michigan Constitution, in violation of the rights of Michigan citizens thereunder.

31. Here, the power of the Emergency Manager is defined in Michigan law and the Michigan Constitution, which the Emergency Manager swore to uphold. Under the statute, the emergency manager exercises the power of the government of the City of Detroit. The Emergency Manager "Act[s] for and in the place and stead of the governing body and the office of chief administrative officer of the local government." Mich. Comp. Laws § 141.1549(2).

32. Under Section 141.1552(1)(m), the manager has specified powers in the event a municipality's pension fund is underfunded (as defined in that section). That authority is limited. Among other things, "[t]he emergency manager shall fully comply with the public employee retirement system investment act, 1965 PA 314, Mich. Comp. Laws § 38.1132 to 38.1140m, and section 24 of article IX of the state constitution of 1963, and any actions taken shall be consistent with the pension fund's qualified plan status under the federal internal revenue code." Mich. Comp. Laws § 141.1552(1)(m)(ii).

33. Under section 24 of the Article 9 of the Michigan Constitution "[t]he accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby." Thus, "the legislature cannot diminish or impair accrued financial benefits." *In re Enrolled Senate Bill 1269*, 209 N.W.2d 200, 202 (Mich. 1973); *see also In re Request for Advisory Opinion Regarding Constitutionality of 2011 PA 38*, 806 N.W.2d 683, 694 ("The obvious intent of § 24 … was to ensure that public pensions be treated as contractual obligations

- 19 -

13-53846-tjt   Doc 8760   Filed 02/15/13   Entered 02/15/13 18:14:52   Page 19 of 28
13-53846-swr   Doc 506    Filed 08/15/13   Entered 08/15/13 19:14:52   Page 19 of 28

that, once earned, could not be diminished."); *Detroit Police Officers Ass'n v. City of Detroit*, 214 N.W.2d 803, 816 (Mich. 1974) ("With this paramount law of the state as a protection, those already covered by a pension plan are assured that their benefits will not be diminished by future collective bargaining agreements.").

34. In the exercise of the respective authority of each under PA 436, Governor Snyder and EM Orr must comport with the prohibition against impairment of accrued pensions set forth in the Michigan Constitution. Because the state legislature could not permit otherwise, the state legislature necessarily limited the circumstances under which a Chapter 9 filing could be pursued by the Emergency Manager and the content of any eventual plan of adjustment. The Governor's authorization of the Emergency Manager's filing of this petition does not — and cannot — increase the Emergency Manager's powers under PA 436. The Governor's authorization was granted with full knowledge of EM Orr's intent to impair pension benefits and does not reference the requirement under Mich. Comp Laws Section 141.1549(2) that the manager must comport with Section 24 of Article 9 of the state constitution. It does note that any plan of adjustment must, under Section 943(b)(4), comport with the requirements of state law. Thus it could not purport to authorize the Emergency Manager to take steps in contravention of the legislation defining the Emergency Manager's role. Indeed, the Governor could not do so as a matter of law since such a direction would be contrary to legislation that bars the Emergency Manager from acting to reduce or modify the constitutionally-protected pension of employees and retirees of the City of Detroit. Accordingly, the Governor's authorization for the chapter 9 filing cannot and could not override the state law protection of Article 9 Section 24. Yet EM Orr's course of action here ignores these limits.

35. Contrary to the Emergency Manager's assertion, "Federal supremacy" does not negate or override the State's Constitutional prohibition against impairment of accrued pensions. The Chapter 9 filing does not "preempt" or otherwise displace the positive requirements of Michigan's Constitution or its laws. Indeed, as shown above, because of core federalism concerns, state law defining the governmental powers of a municipality *must be honored* under Chapter 9 to preserve the constitutionality of municipal reorganizations. This is reflected in those specific provisions of Chapter 9, *e.g.*, Sections 903 and 904, and the applicable plan confirmation requirements which plainly refute the notion that the limits on the bankruptcy court's authority imposed by the reservation of state sovereignty are somehow *superseded* with a Chapter 9 filing.[17]

36. Aside from Tenth Amendment and other federal Constitutional limitations, "[i]n determining whether a state statute is pre-empted by federal law" the analysis follows three tracks, where the touchstone "is to ascertain the intent of Congress." *California Federal Sav. and Loan Ass'n v. Guerra*, 479 U.S. 272, 280 (1987).

> First, when acting within constitutional limits, Congress is empowered to pre-empt state law by so stating in express terms. Second, congressional intent to pre-empt state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation….

> As a third alternative, in those areas where Congress has not completely displaced state regulation, federal law may nonetheless pre-empt state law to the extent it actually conflicts with federal law. Such a conflict occurs either because "compliance with both federal and state regulations is a physical impossibility," or because the state law stands "as an obstacle to the accomplishment and

---

[17] *See* Thomas Moers Mayer, *State Sovereignty, State Bankruptcy, and a Reconsideration of Chapter 9*," 85 Am. Bankr. L. J. 363, 384-5 (Fall, 2011) (raising the "serious question" whether an interpretation of chapter 9 that renders section 903 a "dead letter" is "consistent with" the Tenth Amendment and state sovereignty). To the extent that it were do so, Chapter 9 would be unconstitutional under the Tenth Amendment, and we ask the Court to so find.

execution of the full purposes and objectives of Congress." Nevertheless, pre-emption is not to be lightly presumed.

*Id*. at 280-82.

37. Here, as shown above, federal displacement of the power of the State of Michigan and its citizens — through the State Constitution and otherwise — to control the authority of Governor Snyder and the discretion of the Emergency Manager should not "be lightly presumed" because it would violate the sovereignty of the state. Nothing in Chapter 9 provides for an express federal displacement of the prerogative of the state and its citizens to define the powers of its Governor and the Emergency Manager. *Cf*., *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 557 (6th Cir. 2012) (express federal preemption of state law claims which relate to an employee benefit plan under 29 U.S.C. §1144(a)).

38. Indeed, Sections 903 and 904 are to the contrary because they expressly recognize that the Code does not "impair the power of a State to control, by legislation or otherwise, a municipality of or in such State in the exercise of the political or governmental powers of such municipality[.]" Under Section 943(b)(4), the terms of the plan of adjustment must comport with the terms of state law. Nothing in Chapter 9 supports an express preemption of the state law defining the scope and authority of Governor Snyder and EM Orr.

39. For the same reason, there is no basis to conclude from Chapter 9 that Congress left no room for the operation of the constitutions of the several states, and of their legislation. This, too, is recognized in Sections 903 and 904 expressly recognize the continued vitality of state law. Indeed, in *Faitoute Iron & Steel Company v. City of Asbury Park*, 316 U.S. 502, 508 (1942), the Supreme Court held that Congress has not completely dominated the field of municipal reorganization as to preclude the operation of a state municipal insolvency statute. *Cf. Molosky v. Washington Mutual, Inc.*, 664 F.2d 109, 113-14 (6th Cir. 2011) (federal Home

- 22 -

13-53846-tjt  Doc 8740  Filed 12/15/13  Entered 12/15/13 19:14:52  Page 22 of 28
13-53846-swr  Doc 506  Filed 08/15/13  Entered 08/15/13 19:14:52  Page 22 of 28

Owners' Loan Act preempts claim under Michigan statute because Congress intended the federal act to occupy the entire field of lending regulation for federal savings associations and leave no room for state regulatory control); *Modin v. New York Cent. Co.*, 650 F.2d 829, 835 (6th Cir. 1981) (Interstate Commerce Commission creates a comprehensive scheme of federal regulation of railroads that preempts state law).

40.     Compliance with the limitations of Article 9, Section 24 of the Michigan Constitution and Mich. Comp. Laws Section 141.1552(1)(m) is not "physically impossible," nor would it stand as an obstacle to the achievement of the ends of Chapter 9.  There is no basis to conclude that a plan of adjustment that preserves pension benefits protected by the Michigan Constitution is impossible.  The objectives of Chapter 9 must be read consistently with basic constitutional principles that recognize the autonomy of the state and its citizens to control the political affairs of its subdivision as reflected in Sections 903 and 904.  While the Michigan Constitution and the law empowering the Governor and the Emergency Manager each limits their ability to restructure Detroit's finances by reducing accrued pension benefits, the choice of the citizens who enacted Article 9, Section 24 of the Constitution and of the elected legislature of the state which enacted the state's statute must be honored consistent with Sections 903, 904 and 943 of the Code and the Tenth Amendment.[18]  Accordingly, because the Governor's authorization did not condition the bankruptcy filing on a prohibition against impairment of accrued pension benefits, and because the Governor's approval of the filing was designed to circumvent the Michigan Constitution, the authorization was invalid under Michigan law.  The authorization is, therefore, of no force and ineffective under Section 109(c)(2).  *See In re Harrisburg*, 465 B.R. at

_____

[18] Article 9, Section 24 of the Michigan Constitution is plainly an exercise by its citizens of their Tenth Amendment-based right "to control a municipality of or in such state in the exercise of the political or governmental powers of such municipality" under Section 903.

- 23 -

13-53846-tjt   Doc 8700   Filed 12/15/13   Entered 12/15/13 19:14:52   Page 23 of 28
13-53846-swr   Doc 506   Filed 08/19/13   Entered 08/19/13 18:14:52   Page 23 of 28

765 (dismissing petition because the City of Harrisburg was not "specifically authorized under state law to be a debtor" under Chapter 9).

The Bankruptcy Petition Must be Dismissed Because
the City Seeks to Effect an Unlawful Plan to Adjust Debts

41.    To be eligible for Chapter 9, a debtor must demonstrate that it "desires to effect a plan to adjust [its] debts." 11 U.S.C. § 109(c)(4). For purposes of Section 109(c)(4), the debts intended for adjustment are to be measured as of the petition date. *See In re Town of Westlake, Tex.*, 211 B.R. 860, 867 (Bankr. N.D. Tex. 1997). Here, well before the petition date, the Emergency Manager made known that his plan was to use chapter 9 bankruptcy to turn the retirement system underfunding obligations into bankruptcy claims, pay them on a pro-rata basis with other unsecured debt and, based on the shortfall created in the retirement system, cut vested pension benefits and accruals. *See* Orr Decl., Exhibit A, p. 109.

42.    This strategy plainly violates the Michigan Constitution's prohibition under Article 9, Section 24 against the impairment of accrued pensions, and, as we show above, invalidates the Governor's authorization and the EM Orr's chapter 9 petition under the dual sovereignty principles embedded in chapter 9. As such, it also violates the eligibility requirement that the debtor must "desire[] to effect a plan of adjustment" under Section 109(c)(4), in that a plan that impairs accrued pensions protected by the Michigan Constitution could not be confirmed under Section 943(b)(4) because such a plan would require that debtor take an action that is "prohibited by law." *See Bekins*, 304 U.S. at 815 (approving municipality's bankruptcy plan where action of the taxing agency in carrying out the plan "is authorized by state law."); *see also In re Sanitary & Improvement Dist.*, # 7, 98 B.R. at 975-76; *In re City of Colorado Springs Spring Creek General Improvement District*, 177 B.R. at 694. Accordingly, the eligibility requirement of Section 109(c)(4) cannot be deemed to be met.

- 24 -

13-53846-tjt  Doc 8740  Filed 02/15/13  Entered 02/15/13 19:14:52  Page 24 of 28
13-53846-swr  Doc 506  Filed 08/19/13  Entered 08/19/13 18:14:51  Page 24 of 28

The Bankruptcy Petition Must be Dismissed Because the Petition Was Not Filed in
Good Faith and the City Cannot Demonstrate That It Has Complied With Section 109(c)(5)

43.     The Court must dismiss a chapter 9 petition "if the debtor did not file the

petition in good faith" or otherwise meet the requirements of Title 11. 11 U.S.C. § 921(c).

Specifically with respect to the eligibility requirements, where a municipality has not obtained

the agreement of creditors holding at least a majority in amount of the claims of each class that it

intends to impair under its adjustment plan — which is the case here — then, in order to be

eligible for Chapter 9, the municipality must demonstrate (as relevant here) that it "has

negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding

at least a majority in amount of the claims of each class that such entity intends to impair under a

plan," or that it is "unable to negotiate with creditors because such negotiation is

impracticable[.]" 11 U.S.C. § 109(c)(5).

44.     Enforcing the "good faith" requirement serves "[i]mportant constitutional

issues that arise when a municipality enters the bankruptcy arena" by requiring that, "before

rushing to" bankruptcy court, the municipality first sought to negotiate in good faith concerning

the treatment the creditors may be expected to receive under a plan. *In re Cottonwood Water

and Sanitation Dist.*, 138 B.R. 973, 979 (Bankr. D. Colo. 1992). Thus, a debtor who adopts a

"take it or leave it" approach to prepetition negotiations fails to satisfy the good faith element. *In

re Ellicott School Bldg. Auth.*, 150 B.R. 261, 266 (Bankr. D. Colo. 1992). There, the court noted

that the debtor "h[e]ld three public meetings at which it 'explained' its proposed plan of

restructuring to the bondholders" but creditors "were advised that the 'economic provisions' of

that proposed plan were not negotiable." *Id.* at 266. *See also id.* (court reasoned that "[i]t is

difficult to imagine that any true negotiations [can] take place in an environment where the

substantive terms of a proposal were not open to discussion" and dismissed the petition in part

- 25 -

13-53846-tjt   Doc 8740   Filed 12/15/13   Entered 12/15/13 19:14:52   Page 25 of 28
13-53846-swr   Doc 506   Filed 08/19/13   Entered 08/19/13 18:14:54   Page 25 of 28

because the good faith requirement was not satisfied.).  *Id.*  In other words, there must be

genuine substantive negotiations over the terms of a repayment plan, and Section 109(c)(5)(B)

will not be satisfied where a debtor fails to negotiate prepetition over "a comprehensive workout

plan dealing with all of their liabilities and all of their assets in terms comparable to a plan of

adjustment that could be effectuated under Chapter 9 of the Bankruptcy Code."  *See also In re*

*Pierce County Housing Auth.*, 414 B.R. 702 (Bankr. W.D. Wash. 2009) (requirement not met

where "there is no evidence that the Debtor ever negotiated prepetition with any of its creditors

over the possible terms of a plan of adjustment").

45.     Certainly with respect to the pensions, the Emergency Manager's pre-

bankruptcy engagement with the affected stakeholders does not, as a matter of law, fulfill the

"good faith" requirement.  As shown above, the Emergency Manager crafted a proposal to freeze

the City's defined benefit plans, stop funding the plans' unfunded liabilities and (using

assumptions that ballooned the actuarial unfunded liability) force cuts in vested pension benefits.

Whether or not this bold stance would withstand legal scrutiny was essentially beside the point

— the object is, apparently, to "exert substantial pressure" on the retirees in a bankruptcy

scenario to force them to capitulate.  This is the program devised by the Emergency Manager's

legal team.  The uncertainties of the legal outcome in chapter 9 are part of the strategy.  *See*

Ellman and Merrett, *Pensions and Chapter 9* at 370 (noting that "there are many unanswered

questions about what can and cannot be achieved in a chapter 9 case" and "the reality that this

area of the law [whether chapter 9 is an available means to address protected pensions] is largely

untested in the courts and very little is certain.").  Using bankruptcy tools, such as the automatic

stay (or, as here, the City's so far successful motion to extend the stay to the pre-petition lawsuits

commenced by the *Flowers* and *Webster* plaintiffs and the two retirement systems) "chapter 9

- 26 -

13-53846-tjr   Doc 8740   Filed 02/15/13   Entered 02/15/13 19:14:52   Page 26 of 28
13-53846-swr   Doc 506   Filed 08/19/13   Entered 08/19/13 18:14:52   Page 26 of 28

debtors have exerted substantial pressure on retirees to negotiate over a reduction in benefits."
*Id.* at 391. *See also id* at 405 ("Where pension liabilities (or the calculation of these liabilities) are disputed, the bar date process may exert further pressure on affected claimants by forcing them to defend their position, and it brings the claims dispute into the bankruptcy court (at least in the first instance);" *id.* at 412 (noting that chapter 9 "may provide a municipal debtor with helpful tools to significantly improve its negotiation position with respect to its pension obligations").

46.     It is difficult to look at the pre-bankruptcy record and not conclude that EM Orr — and, on information and belief Governor Snyder and other State actors — embarked on a direct path to chapter 9, using their legal team's playbook designed to employ the features of Bankruptcy Code to force pensioners to accept cuts in their already modest pension benefits. We show above how this gamble plays havoc with core principles of federalism and the jurisdiction of the bankruptcy court. Similarly, viewed with this lens, the Emergency Manager's Creditors' Proposal and the activities following its release, demonstrate that the City's efforts were not intended to engage in a good faith process with their stakeholders. Instead, bankruptcy—used as leverage-- was always the intended goal of the process.[19]

47.     Accordingly, the City cannot show that its filing was made in good faith, or that is has complied with the requirements of Section 109(c). Where the debtor is unable to demonstrate that all elements have been satisfied, "The petition must be dismissed." *In re Harrisburg*, 465 B.R. at 752.

---

[19] For the same reason, the City's protestations that it was "unable to negotiate with creditors because such negotiation is impracticable" under Section 109(c)(5)(C) should be rejected.

## Conclusion

For the foregoing reasons, the City of Detroit, Michigan's Chapter 9 Petition should be dismissed.

Dated: New York, NY
August 19, 2013

Respectfully submitted,

International Union, UAW

By: /s/ Babette A. Ceccotti
Cohen, Weiss and Simon LLP
Babette A. Ceccotti
Keith E. Secular
Thomas N. Ciantra
Joshua J. Ellison
330 West 42nd Street
New York, New York 10036-6976
T: 212-563-4100
F: 212-695-5436
bceccotti@cwsny.com

-   and -

Niraj R. Ganatra (P63150)
Michael Nicholson (P33421)
8000 East Jefferson Avenue
Detroit, Michigan 48214
T: (313) 926-5216
F: (313) 926-5240
nganatra@uaw.net
mnicholson@uaw.net

*Attorneys for International Union, UAW*