UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| In re: | ) Chapter 9 |
| | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
| | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
| | ) |

## DECLARATION OF STEVEN KREISBERG

I, Steven Kreisberg, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1.     I serve as Director of Collective Bargaining and Health Care Policy of the American Federation of State, County & Municipal Employees, AFL-CIO ("**AFSCME**"), and I submit this declaration in support of *The Michigan Council 25 Of The American Federation Of State, County & Municipal Employees, AFL-CIO And Sub-Chapter 98, City Of Detroit Retirees' Objection To The City Of Detroit's Eligibility To Obtain Relief Under Chapter 9 of The Bankruptcy Code*. Unless otherwise stated below, I have personal knowledge of the matters set forth herein and, if called, could competently testify to the information provided below.

2.     Attached hereto as Exhibit 1 is a copy of an email dated January 31, 2013 4:10:58 PM between Kevyn Orr ("**Orr**") and his colleague.

3.     Attached hereto as Exhibit 2 is a copy of an email dated January 31, 2013 10:52 between Orr and his colleague.

4.     Attached hereto as Exhibit 3 is a copy of an email dated January 31, 2013 3:45:47 PM between Orr and his colleague.

5.     Attached hereto as Exhibit 4 is a copy of an email dated January 31, 2013 5:23:09 PM between Orr and his colleagues.

6.      Attached hereto as Exhibit 5 is a copy of my June 17, 2013 letter to Miller Buckfire & Co., LLC.

7.      Attached hereto as Exhibit 6 is a copy of a June 14, 2013 letter from counsel to the City of Detroit to AFSCME.

8.      Attached hereto as Exhibit 7 is a copy of a June 27, 2013 letter from counsel to the City of Detroit to AFSCME.

9.      Attached hereto as Exhibit 8 is a copy of my July 2, 2013 letter to counsel to the City of Detroit.

10.     Attached hereto as Exhibit 9 is a copy of a July 3, 2013 letter from counsel to the City of Detroit to AFSCME.

11.     Attached hereto as Exhibit 10 is a copy of an email dated June 28, 2013 from counsel to the City of Detroit to AFSCME.

12.     Attached hereto as Exhibit 11 is a copy of my August 6, 2013 letter to counsel to the City of Detroit.

13.     Attached hereto as Exhibit 12 is a copy of an August 8, 2013 letter from counsel to the City of Detroit to AFSCME.

14.     Attached hereto as Exhibit A is a copy of a Temporary Restraining Order dated July 18, 2013.

15.     Attached hereto as Exhibit B is a copy of an Order of Declaratory Judgment dated July 19, 2013.

16.     Attached hereto as Exhibit C is a copy of the City of Detroit's "Proposal for Creditors" presented by the City of Detroit on June 14, 2013.

2

17. During the June 20, 2013 meeting with unions (including AFSCME) regarding the City's pensions, the City of Detroit represented that the meeting was "not a negotiation."

18. At the inception of the July 10, 2013 meeting between the City of Detroit and various union (including AFSCME), the City of Detroit announced that the meeting would be a discussion but not a negotiation.

19. On August 2, 2013, the City of Detroit convened a meeting of local union representatives and discussed active health insurance.

20. During the August 2, 2013 meeting, the City of Detroit specifically advised those in attendance (including AFSCME representatives) that the meeting was not a negotiation.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 19th day of August, 2013

Steven Kreisberg

4

# Exhibit 1

From: CN=Daniel T Moss/O=JonesDay
Sent: 1/31/2013 4:10:58 PM
To: Kevyn Orr/JonesDay
Subject: Re: Fw: D

That's true too - but it may be one of the less bad alternatives among the many
other bad alternatives. Is her idea that the Bloomberg Foundation would fund
part of this exercise? If so, that too only echoes the liberal talking points
(as outlined in those news articles) of a fascist takeover of a local
government by the right (not that Bloomberg is a right-winger, but,
nonetheless, he is big business). I can't see that being a politically popular
solution to an already plagued arena of options.

It seems that the ideal scenario would be that Snyder and Bing both agree that
the best option is simply to go through an orderly Chapter 9. This avoids an
unnecessary political fight over the scope / authority of any appointed
Emergency Manager appointed and, moreover, moves the ball forward on setting
Detroit on the right track. Appointing an Emergency Manager, whose ability to
actually do anything is questionable given the looming political and legal
fights, would only serve to kick the can down the wrong path and unreasonably
delay any meaningful resolution of Detroit's problems.

Dan T. Moss
Associate
51 Louisiana Ave. NW, Washington, DC 20001-2113 • Direct: 202.879.3794 • Fax:
202.626.1700 • dtmoss@jonesday.com
   Please consider the environment before printing this e-mail.

CONFIDENTIAL

JD-BR-0000900

# Exhibit 2

From: Daniel T Moss/JonesDay
To: Kevyn Orr/JonesDay
Date: 01/31/2013 10:52 AM

CONFIDENTIAL

JD-RD-0000300
13-53846-tjt Doc 8709-2 Filed 12/15/14 Entered 12/15/14 19:16:32 Page 2 of 3
13-53846-swr Doc 509-2 Filed 09/19/13 Entered 09/19/13 16:26:10 Page 2 of 3

Subject:        Re: Fw: D

Making this a national issue is not a bad idea. It provides political cover
for the state politicians. Indeed, this gives them an even greater incentive
to do this right because, if it succeeds, there will be more than enough
patronage to allow either Bing or Snyder to look for higher callings--whether
Cabinet, Senate, or Corporate. Further, this would give you cover and options
on the back end to make up for lost time there.

        Dan T. Moss
Associate
51 Louisiana Ave. NW, Washington, DC 20001-2113 · Direct: 202.879.3794 · Fax:
202.626.1700 · dtmoss@jonesday.com
        Please consider the environment before printing this e-mail.

# Exhibit 3

From: CN=Kevyn Orr/O=JonesDay
Sent: 1/31/2013 3:45:47 PM
To: CN=Corinne Ball/O=JonesDay@JonesDay
CC: "Stephen Brogan" <sjbrogan@jonesday.com>
Subject: Re: D

CB,

Thank you for thinking about alternative ways to skin this cat. But I don't think we should look at this right now for at least two reasons. First, the state already has EMs appointed or five cities and four school districts. I wouldn't want it to seem like I have a special deal. Second, in thinking about the EM position I went back and looked at the SIGTARP legislation and the federal law authorizing the creation of the D.C. Control Board in 95. Both gave those managers tremendous powers, but neither was subject to questions about the authority of the Congress to enact them and the President's authority to sign them into law. By contrast Michigan's new EM law is a clear end-around the prior initiative that was rejected by the voters in November. The new EM law gives local governments four choices to fix their financial emergency:

Consent Agreement, in which local leaders remain in charge but must meet certain conditions in an agreement negotiated with the state (Detroit is already under a CA and it sounds like it's not working);
A state appointed EM that has broad authority over local finances;
Chapter 9 bankruptcy with the Governor's approval; and
Mediation, in which the local government and interested parties meet with a neutral party to resolve financial issues, such as employee contracts (this is essentially required to file a Chapter 9 petition).

So although the new law provides the thin veneer of a revsion it is essentially a redo of the prior rejected law and appears to merely adopts the conditions necessary for a chapter 9 filing. The news reports state that opponents of the prior law are already lining up to challenge this law.

Nonetheless, I'm going to speak with Baird in a few minutes to see what his thinking is. I'll let you know how it turns out. Thanks.

Kevyn

Kevyn D. Orr
51 Louisiana Ave. NW, Washington, DC 20001-2113 · Direct: 202.879.5560 · Fax: 202.626.1700 ·
Cell: [Redacted] · korr@jonesday.com

CONFIDENTIAL

# Exhibit 4

From: CN=Kevyn Orr/O=JonesDay
Sent: 1/31/2013 5:23:09 PM
To: CN=Stephen J. Brogan/O=JonesDay;CN=Corinne Ball/O=JonesDay@JonesDay
Subject: Re: D

I had a good conversation with Rich Baird this morning. I explained that
although I was interested in the job, there are a number of reasons (not
wanting to leave the firm and familial constraints) that made it impractical
for me to do so. He suggested that I give it some additional consideration and
if, upon reflection, I could say that there was a glimmer of hope that I would
take the job, then I should at least take the next step of meeting the
Governor, Lt. Governor and the rest of the team. We agreed to get back in
touch next week. He also mentioned that irrespective of whether I take the
job, as far as he's concerned, he liked our presentation and is pulling for us
to represent the city. I then reiterated that even if I did not take the EM
position, I and the firm are committed to working in lockstep with the city and
I would be more than willing to undertake any role in this respect.

Kevyn D. Orr
51 Louisiana Ave. NW, Washington, DC 20001-2113 • Direct: 202.879.5560 • Fax:
202.626.1700 •
Cell: Redacted • korr@jonesday.com

CONFIDENTIAL

# Exhibit 5



## AFSCME.
### We Make America Happen

Lee Saunders
*President*

Laura Reyes
*Secretary-Treasurer*

**Vice Presidents**

Ken Allen
*Portland, OR*

Henry L. Bayer
*Chicago, IL*

Ken Deitz, RN
*San Dimas, CA*

Greg Devereux
*Olympia, WA*

Danny Donohue
*Albany, NY*

David R. Fillman
*Harrisburg, PA*

Michael Fox
*Harrisburg, PA*

Kathleen Garrison
*Latham, NY*

Raglan George Jr.
*New York, NY*

Mattie Harrell
*Williamstown, NJ*

Johanna Puno Hester
*San Diego, CA*

Danny J. Homan
*Des Moines, IA*

Salvatore Luciano
*New Britain, CT*

John A. Lyall
*Worthington, OH*

Kathryn Lybarger
*Oakland, CA*

Roberta Lynch
*Chicago, IL*

Christopher Mabe
*Westerville, OH*

Glenard S. Middleton Sr.
*Baltimore, MD*

Ralph Miller
*Los Angeles, CA*

Gary Mitchell
*Madison, WI*

Douglas Moore Jr.
*San Diego, CA*

Frank Moroney
*Boston, MA*

Henry Nicholas
*Philadelphia, PA*

Randy Perreira
*Honolulu, HI*

Greg Powell
*Austin, TX*

Lillian Roberts
*New York, NY*

Eddie Rodriguez
*New York, NY*

Lawrence A. Roehrig
*Lansing, MI*

Joseph P. Rugola
*Columbus, OH*

Eliot Seide
*South St. Paul, MN*

Mary E. Sullivan
*Albany, NY*

Braulio Torres
*San Juan, PR*

David Warrick
*Indianapolis, IN*

Jeanette D. Wynn
*Tallahassee, FL*

June 17, 2013

Mr. Kyle Herman
Miller Buckfire & Co., LLC
601 Lexington Avenue, 22nd Floor
New York, NY 10022
kyle.herman@millerbuckfire.com

Dear Mr. Herman:

In accordance with the instructions of the Detroit Office of the Emergency Financial Manager (EFM), I request the following information:

1. A copy of the preliminary actuarial analysis, to include a full description of all assumptions relied upon, used to support the revised cost estimates and funding condition of the PFRS and GRS pension systems. Data should show projected normal cost for each plan and the proposed UAAL amortization payment as a percent of payroll.

2. The basis for the cost estimates of retiree health care (OPEB) including a description of all assumptions relied upon (including eligibility for benefits under the plan and benefits under the plan), the annual net OPEB obligation, and projected pay-as-you-go funding requirements for the next ten years.

3. A description of the proposed retiree health care plan that will rely upon Medicare Advantage and the Exchange Marketplace under the Affordable Care Act and the basis for the estimated annual City cost of between $27.5 million and $40 million. To the extent eligibility for benefits is revised from the assumption in item 2 above, please describe the new eligibility criteria.

4. A description of all assumptions, data, and documents relied upon to support the following revenue projections:
   a. Municipal income tax
   b. Wagering taxes
   c. Property taxes
   d. State revenue sharing
   e. Utility users' and other taxes
   f. "Other revenue" (page 52 of the Proposal to Creditors)

**American Federation of State, County and Municipal Employees, AFL-CIO**
TEL (202) 429-1000   FAX (202) 429-1293   TDD (202) 659-0446   WEB www.afscme.org   1625 L Street, NW, Washington, DC 20036-5687

5. A description of all projected services and investments included in the "Reorganization (Capital investments and Professional fees)" budget line item in the ten year Restructuring Scenario (page 97 of the Proposal to Creditors). Detail related to the development of major initiatives (for example, investments on technology) should be provided as well. Documents and other supporting data that support the cost projections should be provided as well. If the identity of vendors has been established, please provide that information.

I am assisting AFSCME locals and AFSCME Council 25 with issues related to the Proposal. We have been asked to meet with the EFM's representatives on Thursday. Accordingly, information related to items 1 through 3 should be provided prior to our meeting and the remaining information as soon as possible. I appreciate your cooperation. Feel free to call me at (202)429-1237 or email skreisberg@afscme.org if you have any questions or are in need of clarification.

Sincerely,

Steven Kreisberg
Director of Collective Bargaining and
Health Care Policy

SK:tem

# Exhibit 6

JONES DAY

77 WEST WACKER · CHICAGO, ILLINOIS 60601.1692
TELEPHONE: +1.312.782.3939 · FACSIMILE: +1.312.782.8585

June 14, 2013

**VIA E-MAIL**

Ed McNeil
Assistant to the President
AFSCME, MI Council 25
600 W. Lafayette, Ste. 500
Detroit, MI 48226
emcneil@miafscme.org

Re:     Retiree Benefit Restructuring Meeting

Dear Mr. McNeil:

As a follow-up to my letter dated May 20, 2013, a meeting has been scheduled for
Thursday, June 20, 2013, at 10:00 a.m. at the Coleman A. Young Municipal Center, 2
Woodward Ave., 13th Floor Auditorium, Detroit, Michigan 48226 to review the restructuring
plan for retiree benefits developed by Emergency Manager Kevyn Orr. On behalf of the
Emergency Manager, I am inviting the American Federation of State, County and Municipal
Employees, Michigan Council 25 to attend this meeting to learn about the City's restructuring
plan. Due to space limitations, we are requesting that only **two** representatives from each union
or retiree association attend the meeting. This meeting is not open to the general public or to the
media, and no video devices, phone cameras, or other recording devices will be permitted in the
auditorium. Please arrive at least 30 minutes before the start of the meeting to allow enough time
to register. Proof of identification and your affiliation is required and will be checked prior to
entering the meeting.

Please confirm in writing (including names, contact information, and affiliation) the two
representatives of your union or association that will be attending the meeting no later than
Tuesday, June 18, 2013. To the extent one or both of your representatives will need to be
released from work to attend the meeting, please note this in your response and we will
coordinate with the City's labor and employee relations department to ensure such employees are
excused from work to attend the meeting.

We appreciate the willingness of the American Federation of State, County and
Municipal Employees, Michigan Council 25 to participate in these discussions and look forward
to your input with respect to these important issues.

ALKHOBAR · AMSTERDAM · ATLANTA · BEIJING · BOSTON · BRUSSELS · CHICAGO · CLEVELAND · COLUMBUS · DALLAS
DUBAI · DÜSSELDORF · FRANKFURT · HONG KONG · HOUSTON · IRVINE · JEDDAH · LONDON · LOS ANGELES
MADRID · MEXICO CITY · MILAN · MOSCOW · MUNICH · NEW YORK · PARIS · PITTSBURGH · RIYADH · SAN DIEGO
SAN FRANCISCO · SÃO PAULO · SHANGHAI · SILICON VALLEY · SINGAPORE · SYDNEY · TAIPEI · TOKYO · WASHINGTON

June 14, 2013
Page 2

Sincerely,

Brian West Easley

cc:   Mr. Kevyn Orr
      Mr. Lamont Satchel
      Mr. David Birnbaum

# Exhibit 7

# JONES DAY

77 WEST WACKER • CHICAGO, ILLINOIS 60601-1692
TELEPHONE: 312-782-3939 • FACSIMILE 312-782-8585

June 27, 2013

**VIA E-MAIL**

James Williams
President
AFSCME, Local 207 – Non-Supervisory Unit
600 W. Lafayette, Ste. L-106
Detroit, MI 48226
afscme207@sbcglobal.net

Re:     City of Detroit Restructuring

Dear Mr. Williams:

Thank you for participating in the June 20, 2013 informational meetings pertaining to the City of Detroit's (the "City's") proposals to restructure the City's retiree medical and pension obligations. We appreciated your questions and input and look forward to discussing these issues with the American Federation of State, County and Municipal Employees, Local 207 – Non-Supervisory Unit in the coming weeks.

The City recognizes that representatives of active and retired employees will need access to additional information to analyze the restructuring proposals outlined in the June 20 meetings. Information relevant to these proposals will be made available in the on-line data room established for creditors and other stakeholders. If you do not yet have access to the data room, please contact Dan Merrett (dmerrett@jonesday.com/ (404) 581-8476), who will provide you with further instructions.

To the extent you will need additional information beyond that provided in the data room to analyze and provide input with respect to the City's retiree benefits restructuring proposals, please forward requests for such information directly to my attention. We will make every effort to make responsive and relevant information available in a timely manner.

The City is very much looking forward to the unions' feedback with respect to the City's retiree benefits restructuring proposal. As we repeatedly stated during the meeting, to the extent that your organization has additional ideas about restructuring retiree benefits in a manner consistent with the City's financial limitations, the City will consider any such ideas. Please let me know if you would like to set up a time to further discuss these issues.

Sincerely,

Brian West Easley

cc:     Kevyn Orr, Esq.
        Mr. Lamont Satchel

ATLANTA • BEIJING • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS • DUBAI • FRANKFURT • HONG KONG • HOUSTON
IRVINE • LONDON • LOS ANGELES • MADRID • MEXICO CITY • MILAN • MOSCOW • MUNICH • NEW DELHI • NEW YORK • PARIS
PITTSBURGH • SAN DIEGO • SAN FRANCISCO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

# Exhibit 8


**We Make America Happen**

Lee Saunders
*President*

Laura Reyes
*Secretary-Treasurer*

**Vice Presidents**

Ken Allen
*Portland, OR*

Henry L. Bayer
*Chicago, IL*

Ken Deitz, RN
*San Dimas, CA*

Greg Devereux
*Olympia, WA*

Danny Donohue
*Albany, NY*

David R. Fillman
*Harrisburg, PA*

Michael Fox
*Harrisburg, PA*

Kathleen Garrison
*Latham, NY*

Raglan George Jr.
*New York, NY*

Mattie Harrell
*Williamstown, NJ*

Johanna Puno Hester
*San Diego, CA*

Danny J. Homan
*Des Moines, IA*

Salvatore Luciano
*New Britain, CT*

John A. Lyall
*Worthington, OH*

Kathryn Lybarger
*Oakland, CA*

Roberta Lynch
*Chicago, IL*

Christopher Mabe
*Westerville, OH*

Glenard S. Middleton Sr.
*Baltimore, MD*

Ralph Miller
*Los Angeles, CA*

Gary Mitchell
*Madison, WI*

Douglas Moore Jr.
*San Diego, CA*

Frank Moroney
*Boston, MA*

Henry Nicholas
*Philadelphia, PA*

Randy Perreira
*Honolulu, HI*

Greg Powell
*Austin, TX*

Lillian Roberts
*New York, NY*

Eddie Rodriguez
*New York, NY*

Lawrence A. Roehrig
*Lansing, MI*

Joseph P. Rugola
*Columbus, OH*

Eliot Seide
*South St. Paul, MN*

Mary E. Sullivan
*Albany, NY*

Braulio Torres
*San Juan, PR*

David Warrick
*Indianapolis, IN*

Jeanette D. Wynn
*Tallahassee, FL*

July 2, 2013

Mr. Brian West Easterly
Jones Day
77 West Wacker
Chicago, IL 60601

Via Fax: (312) 782-8585

Dear Mr. Easterly:

You have contacted a number of Local unions affiliated with AFSCME for the purpose of offering information and inviting "feedback" on the Emergency Financial Manager's (EFM) proposal to "restructure" retiree benefits. The undersigned, in conjunction with AFSCME Council 25 President Albert Garrett and Council 25's Assistant to the President Ed McNeil will be representing our affiliated Locals in these matters. We are not representing current retirees.

I have followed the procedures and have been provided access to the on-line data room established by the EFM. I have also been in touch with Kyle Herman from Miller Buckfire as instructed by the EFM in his "Proposal to Creditors" on June 14. As I stated in an e-mail message to Mr. Herman, the electronic data room does not have all of the information I have requested of the EFM in a letter dated June 17, 2013 (copy enclosed). To reiterate, I have requested the following:

1.  A copy of the preliminary actuarial analysis, to include a full description of all assumptions relied upon, used to support the revised cost estimates and funding condition of the PFRS and GRS pension systems. Data should show projected normal cost for each plan and the proposed UAAL amortization payment as a percent of payroll. Subsequent to June 17, I have been given access to Milliman analysis of the pension system which is partially responsive to my request.

2.  The basis for the cost estimates of retiree health care (OPEB) including a description of all assumptions relied upon (including eligibility for benefits under the plan and benefits under the plan), the annual net OPEB obligation, and projected pay-as-you-go funding requirements for the next ten years.

3.  A description of the proposed retiree health care plan that will rely upon Medicare Advantage and the Exchange Marketplace under the Affordable Care Act and the basis for the estimated annual City cost of between $27.5 million and $40 million. To the extent eligibility for benefits is revised from the assumption in item 2 above, please describe the new eligibility criteria.

**American Federation of State, County and Municipal Employees, AFL-CIO**
TEL (202) 429-1000   FAX (202) 429-1293   TDD (202) 659-0446   WEB www.afscme.org   1625 L Street, NW, Washington, DC 20036-5687

4.    A description of all assumptions, data, and documents relied upon to support the following revenue projections:
  a. Municipal income tax
  b. Wagering taxes
  c. Property taxes
  d. State revenue sharing
  e. Utility users' and other taxes
  f. "Other revenue" (page 52 of the Proposal to Creditors)

5.    A description of all projected services and investments included in the "Reorganization (Capital investments and Professional fees)" budget line item in the ten year Restructuring Scenario (page 97 of the Proposal to Creditors). Detail related to the development of major initiatives (for example, investments on technology) should be provided as well. Documents and other supporting data that support the cost projections should be provided as well. If the identity of vendors has been established, please provide that information.

To clarify, we are seeking the data relied upon by the EFM as he developed his retiree benefits restructuring proposal. Detailed information related to reorganization and restructuring initiatives consists of a one page financial summary. I am seeking the data relied upon to develop that summary, especially and including, the back-up data associated with estimated expenditures addressing "blight."

In response to your offer to provide "feedback" on the proposed restructuring of retirement benefits, we hereby request to meet with authorized representatives of the EFM on July 10, 2013 at 10:00 a.m. To date, your representatives have provided presentations, and scheduled an additional presentation on pension benefits for the afternoon of July 10, but the EFM has not provided AFSCME with a meaningful opportunity to engage in a good faith negotiation of these issues. That process should start as soon as possible. We suggest we meet at our offices in Detroit, 600 West Lafayette. It would be extremely helpful if you could provide the requested information in advance of the meeting.

Please contact me at (202)429-1237 or skreisberg@afscme.org to discuss these matters, if necessary, and to confirm our proposed meeting.

Sincerely,

Steven Kreisberg
Director of Collective Bargaining and
Health Care Policy

SK/dd

cc: Albert Garrett, AFSCME Council 25 President
   Kevyn Orr, Emergency Financial Manager

# Exhibit 9

# JONES DAY

77 WEST WACKER • CHICAGO. ILLINOIS 60601-1692
TELEPHONE: 312-782-3939 • FACSIMILE. 312-782-8585

July 3, 2013

VIA E-MAIL

Mr. Steven Kreisberg
Director of Collective Bargaining and Health Care Policy
American Federation of State, County and Municipal Employees, AFL-CIO
1625 L Street, NW
Washington, DC 20036-5687
skreisberg@afscme.org

Re:    City of Detroit Restructuring

Dear Mr. Kreisberg:

We are in receipt of your letter dated July 2, 2013 in which you, among other things, request a meeting with representatives of Emergency Manager Kevyn Orr on July 10, 2013 at 10:00 a.m. In your letter, you acknowledge that a meeting has been scheduled for July 10, 2013 at 1:00 p.m. to discuss issues related to pension restructuring. However, you suggest that the scheduled meeting will be a "presentation," and state that AFSCME would prefer a meaningful opportunity for discussion.

The meeting currently scheduled for July 10, 2013 will not be a presentation but rather will be a discussion between the Emergency Manager's advisors and a relatively small group of key stakeholders who may include, the GRS and its advisor only team, high level representatives of up to four (4) non-uniform unions, and representatives from the Detroit Retired City Employees Association. The City believes that a discussion between and among these key stakeholders will be most beneficial and efficient for all parties. As such, while we are not available to meet with AFSCME at 10:00 a.m. on July 10, 2013, we encourage AFSCME to attend and participate in the scheduled meeting. Similarly, we are hopeful that AFSCME will attend the meeting regarding retiree health restructuring currently scheduled for 10:00 a.m. on July 11, 2013.

Please confirm whether AFSCME plans to attend the July 10, 2013 meeting at 1:00 p.m. and the July 11, 2013 meeting at 10:00 a.m. and provide the names of your proposed attendees.

Sincerely,

Brian West Easley

Brian West Easley

DSB

ATLANTA • BEIJING • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS • FRANKFURT • HONG KONG • HOUSTON
IRVINE • LONDON • LOS ANGELES • MADRID • MILAN • MOSCOW • MUNICH • NEW DELHI • NEW YORK • PARIS • PITTSBURGH
SAN DIEGO • SAN FRANCISCO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

13-53846-tjt Doc 8749-9 Filed 12/05/14 Entered 12/05/14 13:36:10 Page 26 of 181

July 3, 2013
Page 2

cc:     Evan Miller, Esq.
        Kevyn Orr, Esq.
        Mr. Lamont Satchel

# Exhibit 10

Sent from my iPhone

Begin forwarded message:

> **From:** David Birnbaum <dbirnbaum@jonesday.com>
> **Date:** June 28, 2013, 4:39:23 PM EDT
> **To:** agarrett@miafscme.org, emcneil@miafscme.org
> **Cc:** Evan Miller <emiller@jonesday.com>, Brian Easley <beasley@jonesday.com>, Heather Lennox <hlennox@jonesday.com>, "David G. Heiman" <dgheiman@jonesday.com>
> **Subject: City of Detroit -- Pension Restructuring Discussions (GRS)**

Mr. Garrett and Mr. McNeil:

Following the presentations made on June 20th, outside counsel for GRS reached out to the City of Detroit for more information on, and to discuss, a pension restructuring proposal. GRS and the City of Detroit have tentatively scheduled a meeting on pension restructuring for Wednesday, July 10th, at 1 pm (location to be determined). The City will be prepared to provide more information on its developing pension restructuring proposal. Because the City expects that the proposal will impact the pension benefits of active participants of GRS, who include your members, the City would like to invite you to this meeting on July 10th, at 1 pm to participate in the discussion. We expect the meeting will last approximately 2 hours. GRS will be sending an advisor-only team (attorneys and financial advisors), and the City believes this is a good way to proceed. Please let us know at your earliest convenience if you will attend and the names of the attendees. We will contact you as soon as practicable to provide details about the meeting location.

Regards,

David



**David S. Birnbaum**

77 West Wacker Drive, Suite 3500 • Chicago, IL 60601
DIRECT 312.269.4005 • FAX 312.782.8585 • EMAIL dbirnbaum@jonesday.com

1

# Exhibit 11



Lee Saunders
President

Laura Reyes
Secretary-Treasurer

Vice Presidents
Ken Allen
Portland, OR
Henry L. Bayer
Chicago, IL
Ken Deitz, RN
San Dimas, CA
Greg Devereux
Olympia, WA
Danny Donohue
Albany, NY
David R. Fillman
Harrisburg, PA
Michael Fox
Harrisburg, PA
Kathleen Garrison
Latham, NY
Raglan George Jr.
New York, NY
Mattie Harrell
Williamstown, NJ
Johanna Puno Hester
San Diego, CA
Danny J. Homan
Des Moines, IA
Salvatore Luciano
New Britain, CT
John A. Lyall
Worthington, OH
Kathryn Lybarger
Oakland, CA
Roberta Lynch
Chicago, IL
Christopher Mabe
Westerville, OH
Glenard S. Middleton Sr.
Baltimore, MD
Ralph Miller
Los Angeles, CA
Gary Mitchell
Madison, WI
Douglas Moore Jr.
San Diego, CA
Frank Moroney
Boston, MA
Henry Nicholas
Philadelphia, PA
Randy Perreira
Honolulu, HI
Greg Powell
Austin, TX
Lillian Roberts
New York, NY
Eddie Rodriguez
New York, NY
Lawrence A. Roehrig
Lansing, MI
Joseph P. Rugola
Columbus, OH
Eliot Seide
South St. Paul, MN
Mary E. Sullivan
Albany, NY
Braulio Torres
San Juan, PR
David Warrick
Indianapolis, IN
Jeanette D. Wynn
Tallahassee, FL

August 6, 2013

Mr. Evan Miller
Jones Day
51 Louisiana Av, NW
Washington, DC 20001

Via Email: emiller@jonesday.com

Dear Mr. Miller:

On August 2, 2013 you convened a meeting among local city union representatives to convey, in your capacity as a representative of the City of Detroit, an "Active Employee Health Insurance Proposal." During that meeting, you specifically advised those of us in attendance that the meeting was not a "negotiation" but you requested "feedback" on the proposal. At the meeting, it was brought to your attention that the City of Detroit Coalition Unions (CDCU), led by AFSCME Council 25 Assistant to the President Ed McNeil, had engaged in health benefit negotiations in 2011-12 and had achieved an agreement with the city for health care concessions valued at $60 million annually (at that time). That agreement was never implemented.

In accordance with Michigan Public Employment Relations Act (MERA), MCL 423.201 et seq., AFSCME Council 25, on behalf of the CDCU, hereby demands bargaining in good faith on the City's August 2 health insurance proposal. We see no exemption under Chapter 9 of the bankruptcy code or the Emergency Financial Manager law (Public Act 436) from the City's duty to bargain in good faith with the exclusive representatives of city employees over terms and conditions of employment.

Ms. Samantha Woo from Jones Day has contacted Mr. McNeil to schedule a meeting with him, yourself and Brian West Easterly to discuss active employee health benefits. Attached for your reference is a summary of the CDCU proposal, including cost savings estimates, from the previous negotiations. We suggest we convene a meeting between you and Ed McNeil who will be accompanied by Richard Mack, on August 13, 2013 at 2:00 p.m. to discuss this matter. Msrs. McNeil and Mack were the CDCU's lead negotiators in 2011-12. Please respond to the undersigned at (202) 429-1237 or skreisberg@afscme.org or to Ed McNeil at (313)964-1711 or emcneil@miafscme.org.

Sincerely,

Steven Kreisberg
Director of Collective Bargaining
and Health Care Policy

SK/gm

**American Federation of State, County and Municipal Employees, AFL-CIO**
TEL (202) 429-1000   FAX (202) 429-1293   TDD (202) 659-0446   WEB www.afscme.org   1625 L Street, NW, Washington, DC 20036-5687

DRAFT – SUBJECT TO CHANGE

<div align="center">

**EXHIBIT A**
**MEDICAL CONCESSIONS**

</div>

| | | Union | Management[1] |
|---|---|---|---|
| **PPO plan:** | | | |
| Employee premium contribution | 20% for all plans | $ 8,100,000 | $ 8,100,000 |
| Plan deductible | $250/$500 | $ 10,310,000 | $ 10,310,000 |
| Insurance maximum | $1,000/$2,000 | $ 9,006,000 | $ - |
| Insurance maximum | $1,500/$3,000 | $ - | $ 9,480,000 |
| Office visit & urgent care co-pay | $15 | $ 656,667 | $ - |
| Office visit & urgent care co-pay | $25 | $ - | $ 1,970,000 |
| Emergency room co-pay | $100 | $ - | $ 610,000 |
| Hospital co-pay | $100 | $ - | $ 520,000 |
| Rx drugs - CVS Caremark plan | | $ 28,175,445 | $ - |
| Rx drugs - 3 tier co-pay structure | $5/$15/$30 | $ - | $ - |
| Rx drugs - 3 tier co-pay structure | $10/$20/$30 | $ - | $ 10,500,000 |
| Rx drugs - Pharmacy Initiatives | | $ - | $ 11,000,000 |
| **HMO plan:** | | | |
| Health Alliance Plan changes[2] | various | $ - | $ 3,715,000 |
| **Other changes:** | | | |
| Eliminate BCN | | $ 2,950,000 | $ 3,100,000 |
| Eliminate Total Health | | $ - | $ 900,000 |
| Eliminate US Health | | $ 1,190,000 | $ 1,190,000 |
| Dental - convert all plans to Dencap | | $ - | $ 1,215,000 |
| Dental/Vision employee contribution | 20% for all plans | $ - | $ 2,977,000 |
| Adjustment for Weiler class retirees | 45% of retirees | $ - | $ (16,527,924) |
| **Total savings** | | $ 60,388,112 | $ 49,059,076 |
| **Incremental changes to reach $60m target:** | | | |
| Plan deductible (PPO) | $750/$1500 | $ - | $ 3,744,633 |
| Insurance maximum (PPO) | $2,500/$5,000 | $ - | $ 3,744,633 |
| Health Alliance Plan changes[3] | various | $ - | $ 2,436,750 |
| *Other* | | $ | *$ 1,014,907* |
| **Total savings including incremental savings** | | $ 60,388,112 | $ 60,000,000 |

**Notes:**

1. Management estimate assumes PPO plan changes are underwritten by BCBS
2. Savings from HAP changes assumes $250 ded, 20% co-ins, $1,500 co-ins max, $1,750 OOP max, $25 OV, $75 ER, $25 UC, Rx $10/$20/$30
3. Incremental savings from HAP changes assumes $750 ded, 20% co-ins, $2,500 co-ins max, $3,250 OOP max, $25 OV, $75 ER, $25 UC, Rx $10/$20/$30

000141931\0001\1313485-1

# Exhibit 12

# JONES DAY

77 WEST WACKER • CHICAGO, ILLINOIS 60601.1692
TELEPHONE: +1.312.782.3939 • FACSIMILE: +1.312.782.8585

August 8, 2013

<u>VIA EMAIL</u>
Mr. Steven Kreisberg
Director of Collective Bargaining and Health Care Policy
AFSCME, AFL-CIO
1625 L Street, NW
Washington, D.C. 20036
SKreisberg@afscme.org

Re: <u>City of Detroit and AFSCME Council 25</u>

Dear Mr. Kreisberg:

I am in receipt of your letter dated August 6, 2013 in which AFSCME Council 25, on behalf of the City of Detroit Coalition Unions, "demand[ed] bargaining in good faith on the City's August 2 health insurance proposal." While the City of Detroit (the "City") previously was subject to a statutory duty to "bargain collectively with the representatives of its employees" pursuant to section 15(1) of the Michigan Public Employment Relations Act ("PERA"), the duty to bargain was suspended when the City was placed in receivership under Public Act 436 ("PA 436"). MICH. COMP. LAWS § 423.215(1); § 141.1567(3). Specifically, PA 436 provides that "[a] local government placed in receivership . . . is not subject to section 15(1) of 1947 PA 336, MCL 423.215, for a period of 5 years from the date the local government is placed in receivership or until the time the receivership is terminated, whichever occurs first." MICH. COMP. LAWS § 141.1567(3). As such, the City currently is not subject to a statutory duty to bargain under PERA.

Although the City will exercise its current right not to engage in collective bargaining with AFSCME Council 25, the City is more than willing to meet with representatives of your union to discuss any feedback they may have regarding its health care restructuring plans. We are available to meet with Mr. Ed McNeil and Mr. Richard Mack on Wednesday, August 14, 2013 at 2:00 p.m. to discuss the City's active employee health insurance proposal. Please let me know at your earliest convenience if this date and time are acceptable.

We look forward to working closely with your union as we attempt to restructure the City's finances and operations.

ALKHOBAR • AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS
DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • JEDDAH • LONDON • LOS ANGELES • MADRID
MEXICO CITY • MIAMI • MILAN • MOSCOW • MUNICH • NEW YORK • PARIS • PITTSBURGH • RIYADH • SAN DIEGO
SAN FRANCISCO • SÃO PAULO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

JONES DAY

Mr. Steven Kreisberg
August 8, 2013
Page 2


Sincerely,

Evan Miller/sw

Evan Miller


cc: Brian West Easley, Esq.
   Ed McNeil

# Exhibit A

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

THE GENERAL RETIREMENT SYSTEM
OF THE CITY OF DETROIT, and THE
POLICE AND FIRE RETIREMENT
SYSTEM OF THE CITY OF DETROIT,

*Gracie Webster and Veronica Thomas*

      Plaintiffs,

vs.

*State of Michigan*

~~KEVYN D. ORR, in his official capacity as the~~
EMERGENCY MANAGER OF THE CITY OF
DETROIT, and RICHARD SNYDER, in his
official capacity as the GOVERNOR OF THE
STATE OF MICHIGAN, *and Andy Dillon,*

      Defendants.

*Treasurer in his Official Capacity*

Case No. ~~13-768-CZ~~ *13-000734-CZ*
          *C30*

Hon. *Rosemarie*
       *Aquilina*

---

Ronald A. King (P45088)
Aaron O. Matthews (P64744)
Michael J. Pattwell (P72419)
CLARK HILL PLC
212 East Grand River Avenue
Lansing, Michigan 48906
(517) 318-3100
Attorneys for Plaintiffs

*John R Canzano P30417*
*McKnight, McCloy, Canzano Smith*
*+ Radtke P C*
*400 Gallera Oficenter*

---

## TEMPORARY RESTRAINING ORDER

At a session of said Court, held in the City of
Lansing, County of Ingham, State of Michigan
on     *18 July 13*

PRESENT: HON. *Rosemarie E Aquilina* *and having appeared during the hearing for a TRO in 13-000734*
      CIRCUIT COURT JUDGE

This matter having come before the Court on Plaintiffs' Complaint with verification and *Declaratory Judgment and Preliminary Injunction,* ~~Ex-Parte~~ Motion for a Temporary Restraining Order; the Court being fully advised in the premises; Plaintiffs having shown a likelihood of success on the merits of the claims in

9214431.1 14893/144127

Plaintiffs' Complaint; Plaintiff having adequately shown that a failure to immediately issue a Temporary Restraining Order will cause irreparable injury to Plaintiffs by permitting the Governor and the Emergency Manager ("Defendants") to authorize and file a Chapter 9 bankruptcy petition wherein Plaintiffs' accrued financial benefits will be impaired prior this Court's scheduled preliminary injunction hearing on Monday, July 22, 2013; and the Court being otherwise fully informed in the premises and finding good cause: *which has already occurred*

IT IS HEREBY ORDERED that Plaintiffs' Motion is granted;

IT IS FURTHER ORDERED that Defendants are immediately and temporarily enjoined and restrained from taking any action (including the authorization of an unconditional Chapter 9 bankruptcy proceeding for the City of Detroit and/or the filing of a Chapter 9 bankruptcy *or taking any further action with respect to any filing* petition) that may: (i) cause the accrued financial benefits of the Retirement Systems or their participants from in any way being diminished or impaired as mandated by Article IX, section 24, of the Michigan Constitution, or (ii) otherwise abrogate Article IX, section 24, of the Michigan Constitution;

IT IS FURTHER ORDERED that the Court shall hold a hearing on *July 22*, 2013 at *9:00* A̲M̲ *Declaratory Judgment and/or* whereby Defendants shall show cause why a Preliminary Injunction shall not issue; and

IT IS FURTHER ORDERED that this temporary restraining order shall remain in full *further order of the Court* force and effect until _____, 2013 at 5:00 p.m.

IT IS SO ORDERED.

CIRCUIT COURT JUDGE  *Rosemarie E Aquilina*

*P37670*

DATE: *18 July 13*

TIME: *4:25 p.m.*

2

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

THE GENERAL RETIREMENT SYSTEM
OF THE CITY OF DETROIT, and THE
POLICE AND FIRE RETIREMENT
SYSTEM OF THE CITY OF DETROIT,

*F lowers*
*caption*

Plaintiffs,

*789-CZ*

Case No. 13-768-CZ

vs.

Hon. *Rosemarie E. Aquilina*

KEVYN D. ORR, in his official capacity as the
EMERGENCY MANAGER OF THE CITY OF
DETROIT, and RICHARD SNYDER, in his
official capacity as the GOVERNOR OF THE
STATE OF MICHIGAN,

Defendants.

Ronald A. King (P45088)
Aaron O. Matthews (P64744)
Michael J. Pattwell (P72419)
CLARK HILL PLC
212 East Grand River Avenue
Lansing, Michigan 48906
(517) 318-3100
Attorneys for Plaintiffs

*flowers attorneys*

## TEMPORARY RESTRAINING ORDER.

At a session of said Court, held in the City of
Lansing, County of Ingham, State of Michigan
on ___18__ __July__ __13___

PRESENT: HON. *Rosemarie E Aquilina*
CIRCUIT COURT JUDGE *Amended Verified*

This matter having come before the Court on Plaintiffs' Complaint ~~with verification~~ and
~~Ex-Parte~~ Motion for a ~~Temporary Restraining Order~~ *Preliminary Injunction*; the Court being fully advised in the
premises; Plaintiffs having shown a likelihood of success on the merits of the claims in

9214431.1 14893/144127

Plaintiffs' Complaint; Plaintiff having adequately shown that a failure to immediately issue a ~~Temporary Restraining Order~~ _Final Preliminary Injunction_ will cause irreparable injury to Plaintiffs by permitting the Governor ~~and the Emergency Manager~~ _and the State Treasurer_ ("Defendants") to authorize ~~and file a~~ _or otherwise proceed with_ Chapter 9 _on behalf of The City Detroit, or to aid in such a filing_ bankruptcy petition wherein Plaintiffs' accrued financial benefits will be impaired ~~prior this~~ _proceeding_ ~~Court's scheduled preliminary injunction hearing on Monday, July 22, 2013~~; and the Court being

otherwise fully informed in the premises and finding good cause:

IT IS HEREBY ORDERED that Plaintiffs' Motion is granted;

IT IS FURTHER ORDERED that Defendants are immediately and ~~temporarily~~ _preliminarily_ enjoined

and restrained from taking any action (including the authorization of an ~~unconditional~~ Chapter 9

bankruptcy proceeding for the City of Detroit and/or the filing of a Chapter 9 bankruptcy _or any action in or aid and assistance as to the same,_ petition) ~~that may: (i) cause the accrued financial benefits of the Retirement Systems or their~~

~~participants from in any way being diminished or impaired as mandated by Article IX, section~~

~~24, of the Michigan Constitution, or (ii) otherwise abrogate Article IX, section 24, of the~~

~~Michigan Constitution;~~

IT IS FURTHER ORDERED that the Court shall hold a hearing on _____, 2013 at

_____ whereby Defendants shall show cause why a Preliminary Injunction shall not issue; and

IT IS FURTHER ORDERED that this ~~temporary restraining order~~ _preliminary injunction until further order of the court_ shall remain in full

~~force and effect until _____, 2013 at 5:00 p.m.~~

IT IS SO ORDERED.

Rosemarie E. Aquilina

CIRCUIT COURT JUDGE

P. 37670

DATE: 18 July 13

TIME: 4:25 p.M.

2

13-53846-swr    Doc 56    Filed 07/19/13    Entered 07/19/13 18:09:37    Page 67 of 82

13-53846-tjt    Doc 8749-15    Filed 12/15/14    Entered 12/15/14 19:17:32    Page 40 of 181
13-53846-swr    Doc 509-15    Filed 08/19/13    Entered 08/19/13 18:26:17    Page 40 of 181

THE GENERAL RETIREMENT SYSTEM
OF THE CITY OF DETROIT, and THE
POLICE AND FIRE RETIREMENT
SYSTEM OF THE CITY OF DETROIT,

                Plaintiffs,

vs.

KEVYN D. ORR, in his official capacity as the
EMERGENCY MANAGER OF THE CITY OF
DETROIT, and RICHARD SNYDER, in his
official capacity as the GOVERNOR OF THE
STATE OF MICHIGAN,

                Defendants.

Case No. 13-768-CZ

Hon. _Rosemarie E. Aguilina_

---

Ronald A. King (P45088)
Aaron O. Matthews (P64744)
Michael J. Pattwell (P72419)
CLARK HILL PLC
212 East Grand River Avenue
Lansing, Michigan 48906
(517) 318-3100
Attorneys for Plaintiffs

---

## TEMPORARY RESTRAINING ORDER

At a session of said Court, held in the City of
Lansing, County of Ingham, State of Michigan
on _18 July 13_

PRESENT: HON. _Rosemarie E. Aguilina_
            CIRCUIT COURT JUDGE

This matter having come before the Court on Plaintiffs' Complaint with verification and

*Ex-Parte* Motion for a Temporary Restraining Order; the Court being fully advised in the

premises; Plaintiffs having shown a likelihood of success on the merits of the claims in

9214431.1 14893/144127

Plaintiffs' Complaint; Plaintiff having adequately shown that a failure to immediately issue a Temporary Restraining Order will cause irreparable injury to Plaintiffs by permitting the Governor and the Emergency Manager ("Defendants") to authorize and file a Chapter 9 bankruptcy petition wherein Plaintiffs' accrued financial benefits will be impaired prior this Court's scheduled preliminary injunction hearing on Monday, July 22, 2013; and the Court being otherwise fully informed in the premises and finding good cause:

IT IS HEREBY ORDERED that Plaintiffs' Motion is granted;

IT IS FURTHER ORDERED that Defendants are immediately and temporarily enjoined and restrained from taking any _further_ action ~~(including the authorization of an unconditional Chapter 9~~ ~~bankruptcy proceeding for the City of Detroit and/or the filing of a Chapter 9 bankruptcy~~ ~~petition)~~ that may: (i) cause the accrued financial benefits of the Retirement Systems or their participants from in any way being diminished or impaired as mandated by Article IX, section 24, of the Michigan Constitution, or (ii) otherwise abrogate Article IX, section 24, of the Michigan Constitution;

IT IS FURTHER ORDERED that the Court shall hold a hearing on _22 July_, 2013 at _9:00 AM_ whereby Defendants shall show cause why a Preliminary Injunction shall not issue; and

IT IS FURTHER ORDERED that this temporary restraining order shall remain in full force and effect until _1 AUG_, 2013 at 5:00 p.m.

IT IS SO ORDERED.

_Rosemarie E Aguilina_
CIRCUIT COURT JUDGE    _P37670_

DATE: _18 July 13_
TIME: _4:25_

2

# Exhibit B

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

GRACIE WEBSTER and
VERONICA THOMAS,

        Plaintiffs,

vs

THE STATE OF MICHIGAN;
RICHARD SNYDER, as Governor
of the State of Michigan; and
ANDY DILLON, as Treasurer of
the State of Michigan,

        Defendants.

Case No. 13-734-CZ
Hon.  Rosemarie Aquilina

/

## ORDER OF DECLARATORY JUDGMENT

At a session of said Court held in Ingham County Circuit Court,
State of Michigan, this _19th_ day of July, 2013.

PRESENT: _Rosemarie E. Aquilina_
            Circuit Court Judge

Plaintiffs request declaratory relief pursuant to MCR 2.605 concerning (1) the

constitutionality under Article IX Section 24 of the Michigan Constitution of the Local Financial

Stability and Choice Act, 2012 PA 436, MCL 141.1541, *et seq.* ("PA 436"), insofar as PA 436

permits the Governor to authorize an emergency manager to proceed under chapter 9 of the

bankruptcy code, chapter 9 of title 11 of the United States Code, 29 USC 901 to 946 ("Chapter

9") in a manner which threatens to diminish or impair accrued pension benefits; and (2) the

authority of the Governor and/or State Treasurer to authorize an emergency manager to proceed under Chapter 9 in a manner which threatens to diminish or impair accrued pension benefits.

Plaintiffs have requested, and Defendants have agreed in their Response, that the hearing in this matter may be advanced pursuant to MCR 2.605(D) and the court finds that expedited treatment is appropriate and that final declaratory relief is proper at this time.

The Court having reviewed the parties filings and submissions, and having heard oral argument by counsel for the parties, and being otherwise fully advised in the premises, and for the reasons stated on the record,

IT IS HEREBY ORDERED:

PA 436 is unconstitutional and in violation of Article IX Section 24 of the Michigan Constitution to the extent that it permits the Governor to authorize an emergency manager to proceed under Chapter 9 in any manner which threatens to diminish or impair accrued pension benefits; and PA 436 is to that extent of no force or effect;

The Governor is prohibited by Article IX Section 24 of the Michigan Constitution from authorizing an emergency manager under PA 436 to proceed under Chapter 9 in a manner which threatens to diminish or impair accrued pension benefits, and any such action by the Governor is without authority and in violation of Article IX Section 24 of the Michigan Constitution.

On July 16, 2013, City of Detroit Emergency Manager Kevyn Orr submitted a recommendation to Defendant Governor Snyder and Defendant Treasurer Dillon pursuant to Section 18(1) of PA 436 to proceed under Chapter 9, which together with the facts presented in Plaintiffs' filings, reflect that Emergency Manager Orr intended to diminish or impair accrued pension benefits if he were authorized to proceed under Chapter 9. On July 18, 2013, Defendant

Governor Snyder approved the Emergency Manager's recommendation without placing any contingencies on a Chapter 9 filing by the Emergency Manager; and the Emergency Manager filed a Chapter 9 petition shortly thereafter. By authorizing the Emergency Manager to proceed under Chapter 9 to diminish or impair accrued pension benefits, Defendant Snyder acted without authority under Michigan law and in violation of Article IX Section 24 of the Michigan Constitution.

In order to rectify his unauthorized and unconstitutional actions described above, the Governor must (1) direct the Emergency Manager to immediately withdraw the Chapter 9 petition filed on July 18, and (2) not authorize any further Chapter 9 filing which threatens to diminish or impair accrued pension benefits.

A copy of this Order shall be transmitted to President Obama.

It is so Ordered.

*Rosemarie E. Aquilina*

P37670

Circuit Court Judge

# Exhibit C



CITY OF DETROIT
**PROPOSAL FOR CREDITORS**

JUNE 14, 2013

13-53846-swr    Doc 1509-15 Filed 07/08/19/14 Entered 07/08/19/23:48:26:10 Page 3 @ 31c65135

CITY OF DETROIT

# PROPOSAL FOR CREDITORS

JUNE 14, 2013

This proposal is based on numerous projections and assumptions concerning future uncertain events including estimates of tax revenues and forecasts of future business and economic conditions in the city, all of which are beyond the control of the city. Actual results may differ from the assumptions and projections presented herein, and such differences could be material.

Additional data are being gathered or developed, and various critical financial and operational analyses remain in process. Thus, this proposal remains subject to material change.

13-53846-swr    Doc 1509-15    Filed 08/19/14    Entered 08/19/14 23:48:26    Page 51 of 135

# CONTENTS

DETROIT FACES STRONG ECONOMIC HEADWINDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

KEY OBJECTIVES FOR A FINANCIAL RESTRUCTURING AND REHABILITATION OF DETROIT . . . . . . . 41

CURRENT FINANCIAL STATUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

THE CITY HAS TAKEN ACTION TO ADDRESS ITS FINANCIAL CHALLENGES. . . . . . . . . . . . . . . . 53

RESTRUCTURING AND REINVESTING IN CITY GOVERNMENT . . . . . . . . . . . . . . . . . . . . . . . 61

REVENUE ADJUSTMENTS AND TAX REFORM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

REALIZATION OF VALUE OF ASSETS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

TEN-YEAR PROJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

RESTRUCTURING PROPOSAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

CEMENTING THE CITY'S RESTRUCTURING: DETROIT AFTER THE EMERGENCY MANAGER . . . . . . 111

CALENDAR AND CONTACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

13-53846-tjt   Doc 1509-1   Filed 10/29/13   Entered 10/29/13 23:46:26   Page 7 of 135
13-53846-swr   Doc 1509-1   Filed 08/19/14   Entered 08/19/14 18:46:36   Page 7 of 135

# DETROIT FACES STRONG ECONOMIC HEADWINDS

## DETERIORATING MACROECONOMIC CONDITIONS.

During the past several decades, the City of Detroit (the "City") has experienced changes that have adversely affected the economic circumstances of the City and its residents.

**Declining Population.** The City's population has declined 63% since its postwar peak, including a 26% decline since 2000:

- June 1950: 1,849,600
- June 1990: 1,028,000
- June 2000: 951,270
- June 2010: 713,777
- December 2012: 684,799

**High Unemployment.** Despite some recent improvement, the City's unemployment rate has nearly tripled since 2000:

- June 2000: 6.3%
- June 2010: 23.4%
- June 2012: 18.3%

**Number of Detroit Residents Employed.**

|                   | 2000     | 2010     | 2012     |
|-------------------|----------|----------|----------|
| Labor force       | 381,498  | 361,538  | 343,856  |
| Employment        | 353,813  | 278,063  | 279,960  |
| Unemployment      | 27,685   | 83,475   | 63,896   |
| Unemployment rate | 7.3%     | 23.1%    | 18.6%    |

- The number of employed Detroit residents has dropped more than 53% since 1970.



**EMPLOYMENT IN DETROIT**

**UNEMPLOYMENT RATE IN DETROIT**

13-53846-tjt    Doc 8742    Filed 12/15/14    Entered 12/15/14 19:17:32    Page 55 of 181

**Eroding Tax Base and Reductions in State Revenue Sharing.**

- Property Taxes.

  - Property tax revenues have decreased by approximately 19.7% over the past five years as a result of declining assessed values ($1.6 billion from 2008 to 2012) and lower collection rates (from 76.6% in 2008 to 68.3% in 2011).

  - Projected FY 2013 property tax revenues are $135 million, a reduction of $13 million (or approximately 9%) from FY 2012 levels.

- Income Taxes.

  - Income tax revenues have decreased by $91 million since 2002 (approximately 30%) and by $44 million (approximately 15%) since 2008. The primary cause of these decreases has been high unemployment driving lower taxable income of City residents and non-residents working in the City.

  - Income tax revenues may be showing signs of stabilization. This results from a modest decrease in unemployment, the indefinite deferral of a previously planned decrease of the City's 2.4% resident income tax rate and an increase in the corporate income tax rate from 1% to 2% in January 2012.

  - The income tax rate for residents and non-residents was set to decrease due to criteria set by the City Income Tax Act, but legislation has been put in place to hold the tax rates at the current level (2.4% for residents and 1.2% for non-residents) in order to avoid a loss of income tax revenues.

- Utility Users' Excise Tax.

  - Revenues from the City's utility users' tax have declined from approximately $55.3 million in FY 2003 to approximately $39.8 million in FY 2012 (approximately 28%).

- Wagering Taxes.

  - Annual receipts of wagering taxes have remained steady at about $170–$180 million, but gaming tax receipts are projected to decrease through FY 2015 due to expected loss of gaming revenue to casinos opening in nearby Toledo, Ohio.

- State Revenue Sharing.

  - State revenue sharing has decreased by $161 million since FY 2002 (approximately 48%) and by $76 million (approximately 30.6%) since 2008 due to the City's declining population and significant reductions in statutory revenue sharing by the State.

  - Revenue sharing is calculated based on population; revenue sharing amounts will decrease further if the City's population continues to decline.

  - **The City is currently levying all taxes at or near statutory maximum rates.**

## RESIDENTS AND BUSINESSES ARE LEAVING DETROIT TO ESCAPE HIGH TAXES AND INSURANCE COSTS.

**Comparative Tax Burden.**

- **Per Capita Tax Burden.** Per capita tax burden on City residents is the highest in Michigan. This tax burden is particularly severe because it is imposed on a population that has relatively low levels of per capita income.

- **Resident Income Tax.** Income tax burden on residents is greater than that of residents in the surrounding area. The City's income tax — 2.4% for residents, 1.2% for nonresidents and 2.0% for businesses — is the highest in Michigan.

- **Property Taxes.** Detroit residents pay the highest total property tax rates (inclusive of property taxes paid to all overlapping jurisdictions; *e.g.*, the City, the State, Wayne County) of those paid by residents of Michigan cities having a population over 50,000. The total property tax rate (including property taxes assessed by the City, the State and various special authorities) imposed on Detroit homeowners is approximately 67.07 mills; for businesses the total property tax rate is approximately 85.35 mills.

  - At more than 19.95 mills, the City's property tax rate for general operations is close to the statutory maximum of 20.00 mills.

- **Utility Users Tax.** Detroit is the only city in Michigan that levies an excise tax on utility users (at a rate of 5%).

4

**Comparative Tax Burden.**

| City | Population | Per Capita Income | TAX BURDEN<br>Per Capita Tax Burden | TAX BURDEN<br>Resident Income Tax Rates | TAX BURDEN<br>Resident Property Tax Rates |
|---|---|---|---|---|---|
| **Detroit** | **684,799** | **$15,261** | **$1,207** | **2.4%** | **67.07 mills** |
| **Local Comparison** | | | | | |
| Dearborn | 98,153 | $22,816 | $668 | N/A | 60.23 mills |
| Livonia | 96,942 | $31,959 | $590 | N/A | 36.81 mills |
| Southfield | 71,739 | $29,228 | $930 | N/A | 60.70 mills |

**Comparative Insurance Costs.**

| City | Average Cost of Homeowner's Insurance | Average Cost of Automobile Insurance |
|---|---|---|
| **Detroit** | **$1,543** | **$3,993** |
| **Local Comparison** | | |
| Dearborn | N/A | $2,908 |
| Livonia | N/A | $2,052 |
| Southfield | N/A | $3,108 |

# CONTINUING BUDGET DEFICITS.

Excluding the effect of recent debt issuances (e.g., $75 million in FY 2008, $250 million in FY 2010 and $129.5 million in FY 2013) that funded the City's operating deficits, the City's accumulated general fund deficit has grown continuously over an extended period.



$ in Millions

| | Actual FY 2007 | Actual FY 2008 | Actual FY 2009 | Actual FY 2010 | Actual FY 2011 | Actual FY 2012 | Projected FY 2013 |

At the end of FY 2012, the City's accumulated general fund deficit was $326.6 million.

The City's operating deficit for FY 2013 (which excludes the impact of the $129.5 million debt issuance in August of 2012) is estimated to be approximately $47 million.

If not for the City's recent debt issuances, the accumulated deficit for FY 2013 would have been approximately $700 million.

6

13-53846-swr Doc 509 Filed 06/03/13 Entered 06/03/13 22:26:11 Page 13 of 135

# THE CITY IS INSOLVENT.

**Liquidity Crisis.** Absent ongoing cash intervention (primarily in the form of payment deferrals and cost cutting), the City would have run out of cash before the end of FY 2013.

- The City had negative cash flows of $115.5 million in FY 2012, excluding the impact of proceeds from short-term borrowings. In March 2012, to avoid running out of cash, the City borrowed $80 million on a secured basis (of which the City spent $50 million in FY 2012).

- The City is projecting to have positive cash flows of $4.0 million in FY 2013 after deferring approximately $120 million of current and prior year pension contributions and other payments.

- Absent intervention and/or restructuring, the City is projecting to have negative cash flows of $198.5 million in FY 2014.

- As of the end of May 2013, the City had $68 million of cash before property tax distributions, but had outstanding deferrals and amounts due to other funds and entities of approximately $216 million. These are effectively borrowings and must be repaid.

**The City is Not Paying Its Debts as They Come Due.**

- The City is not making its pension contributions as they come due. The City has deferred payment of its year-end Police and Fire Retirement System contributions (and finances such deferrals at a rate of 8%). As of May 2013, the City had deferred approximately $54 million in pension contributions related to current and prior periods and will defer approximately $50 million on June 30, 2013 for current year PFRS pension contributions. Therefore, by fiscal year end the City will have deferred over $100 million of pension contributions.

- The City will not make the scheduled $39.7 million payments due on its pension-related certificates of participation on June 14, 2013.

**Plummeting Credit Ratings.**

The City's credit ratings have continuously declined during the past decade and are well below investment grade. No major U.S. city has lower credit ratings.

**Ratings on the City's Uninsured General Obligation Bonds**

|  | Moody's | Standard & Poor's | Fitch |
|---|---|---|---|
| **June 30, 2003** | Baa1 | A- | A |
| **June 30, 2004** | Baa1 | A- | A |
| **June 30, 2005** | Baa1 | BBB+ | BBB+ |
| **June 30, 2006** | Baa2 | BBB | BBB |
| **June 30, 2007** | Baa2 | BBB | BBB |
| **June 30, 2008** | Baa2 | BBB | BBB |
| **June 30, 2009** | Ba2 | BB | BB |
| **June 30, 2010** | Ba3 | BB | BB |
| **June 30, 2011** | Ba3 | BB | BB- |
| **June 30, 2012** | B3 | B | CCC |

8

# CURRENT LEVELS OF MUNICIPAL SERVICES TO RESIDENTS AND BUSINESSES ARE SEVERELY INADEQUATE.

**The City Must Reduce High Crime Rates.**

- In 2012, the City had the highest rate of violent crime of any U.S. city having a population over 200,000 (based on the FBI's Uniform Crime Reports database). The City's violent crime rate is five times the national average.
- All crime, not just violent crime, is prevalent in the City, with more than 136,000 crimes being reported in 2011.
  - See charts on following pages.
- EMS and DFD response times are extremely slow when compared to other cities (15 minutes and 7 minutes, respectively).
- Residents and business owners have been forced to take their safety into their own hands; some relatively well-off sections of the City have created private security forces.

**Comparable Data Regarding Public Safety.**

**Crime Data – National & Local Comparables**

OFFENSES KNOWN TO LAW ENFORCEMENT
by State by City, 2011

| City | Population | Violent crime | Murder and nonnegligent manslaughter | Forcible rape | Robbery | Aggravated assault | Property crime | Burglary | Larceny-theft | Motor vehicle theft | Arson |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Detroit** | **713,239** | **15,245** | **344** | **427** | **4,962** | **9,512** | **43,818** | **15,994** | **16,456** | **11,368** | **957** |
| **Local Comparison** | | | | | | | | | | | |
| Dearborn | 98,079 | 359 | 3 | 22 | 104 | 230 | 3,757 | 612 | 2,705 | 440 | 12 |
| Livonia | 96,869 | 168 | 1 | 19 | 40 | 108 | 2,108 | 308 | 1,589 | 211 | 11 |
| Southfield | 71,685 | 377 | 4 | 33 | 116 | 224 | 2,681 | 710 | 1,592 | 379 | 5 |
| **National Comparison** | | | | | | | | | | | |
| Cleveland | 397,106 | 5,426 | 74 | 354 | 3,156 | 1,842 | 25,323 | 10,706 | 10,524 | 4,093 | 319 |
| Pittsburgh | 308,609 | 2,476 | 44 | 67 | 1,126 | 1,239 | 10,063 | 2,686 | 6,897 | 480 | 195 |
| St. Louis | 320,454 | 5,950 | 113 | 188 | 2,127 | 3,522 | 25,669 | 7,015 | 15,285 | 3,369 | 191 |
| Milwaukee | 597,426 | 5,969 | 85 | 194 | 2,963 | 2,727 | 30,097 | 6,669 | 18,890 | 4,538 | 262 |

# Incidents and Case Clearance Rates – National and Local Comparables

| City | Violent Crime | Murder | Force Rape | Robbery | Aggravated Assault | Simple Assault | Property Crime | Burglary | Larceny Theft | MV Theft | Arson | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Detroit** | | | | | | | | | | | | |
| Cases Assigned | 15,254 | 344 | 426 | 4,976 | 9,508 | 17,240 | 43,759 | 16,032 | 16,500 | 11,227 | 958 | 136,224 |
| Cleared | 2,841 | 39 | 54 | 401 | 2,347 | 2,427 | 1,844 | 730 | 578 | 536 | 57 | 11,854 |
| **Clearance Rate** | 18.6% | 11.3% | 12.7% | 8.1% | 24.7% | 14.1% | 4.2% | 4.6% | 3.5% | 4.8% | 5.9% | 8.7% |
| **Pittsburgh** | | | | | | | | | | | | |
| Cases Assigned | 2,476 | 44 | 67 | 1,126 | 1,239 | 5,619 | 10,063 | 2,686 | 6,897 | 480 | 195 | 30,892 |
| Cleared | 1,247 | 22 | 61 | 435 | 729 | 3,963 | 1,997 | 498 | 1,312 | 187 | 55 | 10,506 |
| **Clearance Rate** | 50.4% | 50.0% | 91.0% | 38.6% | 58.8% | 70.5% | 19.8% | 18.5% | 19.0% | 39.0% | 28.2% | 34.0% |
| **Milwaukee** | | | | | | | | | | | | |
| Cases Assigned | 6,637 | 86 | 205 | 3,091 | 3,255 | 7,253 | 30,669 | 7,079 | 19,030 | 4,560 | 272 | 82,137 |
| Cleared | 2,465 | 58 | 159 | 764 | 1,484 | 4,701 | 4,718 | 808 | 3,769 | 141 | 34 | 19,101 |
| **Clearance Rate** | 37.1% | 67.4% | 77.6% | 24.7% | 45.6% | 64.8% | 15.4% | 11.4% | 19.8% | 3.1% | 13% | 23.3% |
| **St. Louis** | | | | | | | | | | | | |
| Cases Assigned | 5,950 | 113 | 188 | 2,12w7 | 3,522 | 4,866 | 25,669 | 7,015 | 15,285 | 3,369 | 191 | 68,295 |
| Cleared | 2,835 | 75 | 135 | 619 | 2,006 | 3,745 | 3,296 | 1,109 | 1,987 | 200 | 19 | 16,026 |
| **Clearance Rate** | 47.6% | 66.4% | 71.8% | 29.1% | 57.0% | 77.0% | 12.8% | 15.8% | 13.0% | 5.9% | 9.9% | 23.5% |
| **Cleveland** | | | | | | | | | | | | |
| Cases Assigned | 5,431 | 74 | 356 | 3,157 | 1,844 | 16,257 | 25,418 | 10,724 | 10,598 | 4,096 | 319 | 78,274 |
| Cleared | 1,072 | 26 | 89 | 447 | 510 | 3,346 | 1,685 | 793 | 718 | 174 | 46 | 8,906 |
| **Clearance Rate** | 19.7% | 35.1% | 25.0% | 14.2% | 27.7% | 20.6% | 6.6% | 7.4% | 6.8% | 4.2% | 14.4% | 11.4% |

10

| City | Violent Crime | Murder | Force Rape | Robbery | Aggravated Assault | Simple Assault | Property Crime | Burglary | Larceny Theft | MV Theft | Arson | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Detroit** | | | | | | | | | | | | |
| Cases Assigned | 15,254 | 344 | 426 | 4,976 | 9,508 | 17,240 | 43,759 | 16,032 | 16,500 | 11,227 | 958 | 136,224 |
| Cleared | 2,841 | 39 | 54 | 401 | 2,347 | 2,427 | 1,844 | 730 | 578 | 536 | 57 | 11,854 |
| **Clearance Rate** | **18.6%** | **11.3%** | **12.7%** | **8.1%** | **24.7%** | **14.1%** | **4.2%** | **4.6%** | **3.5%** | **4.8%** | **5.9%** | **8.7%** |
| **Southfield** | | | | | | | | | | | | |
| Cases Assigned | 380 | 4 | 36 | 116 | 224 | 1178 | 2688 | 710 | 1602 | 376 | 5 | 7319 |
| Cleared | 149 | 3 | 8 | 27 | 111 | 276 | 398 | 58 | 312 | 28 | 3 | 1373 |
| **Clearance Rate** | **39.2%** | **75.0%** | **22.2%** | **23.3%** | **49.6%** | **23.4%** | **14.8%** | **8.2%** | **19.5%** | **7.4%** | **60.0%** | **18.8%** |
| **Livonia** | | | | | | | | | | | | |
| Cases Assigned | 168 | 1 | 19 | 40 | 108 | 552 | 2,114 | 309 | 1,595 | 210 | 11 | 5,127 |
| Cleared | 69 | 1 | 1 | 15 | 52 | 201 | 563 | 33 | 505 | 25 | 0 | 1,465 |
| **Clearance Rate** | **41.1%** | **100.0%** | **5.3%** | **37.5%** | **48.1%** | **36.4%** | **26.6%** | **10.7%** | **31.7%** | **11.9%** | **0.0%** | **28.6%** |
| **Dearborn** | | | | | | | | | | | | |
| Cases Assigned | 361 | 3 | 24 | 104 | 230 | 1,346 | 3,756 | 609 | 2,709 | 438 | 12 | 9,592 |
| Cleared | 180 | 3 | 6 | 37 | 134 | 419 | 1,229 | 70 | 1,124 | 35 | 3 | 3,240 |
| Clearance Rate | 49.9% | 100.0% | 25.0% | 35.6% | 58.3% | 31.1% | 32.7% | 11.5% | 41.5% | 8.0% | 25.0% | 33.8% |

# THE CITY MUST PROVIDE FUNCTIONING STREET LIGHTS.

As of April 2013, approximately 40% of the City's street lights were not functioning. The lights that are functioning are scattered across the City's historical population footprint (and thus are not focused to meet the current population's actual needs).

| City | Total Functioning Street Lights | Functioning Lights per square mile |
|---|---|---|
| **Detroit** | **52,800** | **370** |
| | | |
| **Local Comparison** | | |
| Dearborn | 6,500 | 265 |
| Livonia | 5,000 | 204 |
| Southfield | 2,356 | 90 |
| | | |
| **National Comparison** | | |
| Cleveland | 67,000 | 812 |
| Pittsburgh | 39,779 | 682 |
| St. Louis | 52,000 | 785 |
| Milwaukee | 77,000 | 795 |

As of April 2013, the City estimated there was a backlog of approximately 3,300 complaints regarding the City's street lights.

12

# THE CITY MUST OVERHAUL ITS OPERATIONS.

**Police Department.**

- Over the last five years, the DPD has had five different police chiefs, all having varying approaches to DPD's operations.

- DPD's efficiency (response times), effectiveness (case closure rate, crime reduction) and employee morale are extremely low.

- Data driven policing has not been fully adopted within DPD. Compstat (i.e., data driven policing) meetings (which would enhance accountability) are not fully implemented.

- DPD receives over 700,000 calls for service annually. DPD response times are extremely high.

**Response Time Data – Detroit Police Department**

CITY OF DETROIT

**Priority One Response Time (In Minutes)**

| Precinct | 2012 | 2013 | % Change |
|---|---|---|---|
| 1 | 23 | 37 | 60.81% |
| 2 | 22 | 40 | 78.42% |
| 4 | 30 | 42 | 41.03% |
| 5 | 39 | 78 | 99.46% |
| 6 | 32 | 55 | 75.19% |
| 7 | 22 | 41 | 89.05% |
| 8 | 40 | 115 | 185.31% |
| 9 | 38 | 68 | 78.95% |
| 10 | 24 | 31 | 31.37% |
| 11 | 24 | 41 | 71.78% |
| 12 | 21 | 34 | 62.58% |
| 13 | 25 | 42 | 73.31% |
| **AGENCY** | **2012** | **2013** | |
| DPD | 30 | 58 | 94.73% |

**Priority Other Response Time (In Minutes)**

| Precinct | 2012 | 2013 | % Change |
|---|---|---|---|
| 1 | 34 | 38 | 11.57% |
| 2 | 48 | 58 | 22.56% |
| 4 | 42 | 47 | 12.19% |
| 5 | 56 | 97 | 75.20% |
| 6 | 44 | 50 | 15.36% |
| 7 | 38 | 60 | 57.05% |
| 8 | 56 | 64 | 15.93% |
| 9 | 54 | 49 | -8.45% |
| 10 | 30 | 43 | 44.28% |
| 11 | 45 | 70 | 54.82% |
| 12 | 37 | 54 | 47.35% |
| 13 | 35 | 61 | 74.89% |
| **AGENCY** | **2012** | **2013** | |
| DPD | 43 | 56 | 30.59% |

- The national average response time is 11 minutes. Police response times for Dearborn and Livonia are approximately nine minutes and 24 minutes, respectively.

- The DPD's extremely low 8.7% case clearance rate is driven by the DPD's lack of a case management system, lack of accountability for detectives, unfavorable work rules imposed by collective bargaining agreements and a high attrition rate in the investigative operations unit.

- The DPD's manpower has been reduced by approximately 40% over the last 10 years causing constant strain on the organization; the DPD needs to evaluate appropriate uniform staffing levels.

  - Over 450 uniformed DPD employees are eligible for retirement in 2013. An additional 150 officers are eligible for retirement in each of the following five years.

- The DPD has restructured its operations multiple times over the past ten years due to dwindling budgets, severely hampering its operations.

- Employee accountability is limited. Individual employee performance metrics do not exist for either positive or negative police activity. Morale is extremely low. Disciplinary processes are slow and cumbersome, preventing leadership from effectively managing the Department.

- Community policing efforts are underfunded, uncoordinated and have been deemphasized by the DPD. "Citizens Radio Patrol" participants have lost confidence in the DPD's commitment to this important effort.

**Assessor's Office and Property Tax Division.**

- The City lacks a state-required Level IV Assessor and currently has a former employee contractor in the position, whose contract expires in June 2013. Due to inadequate compensation, among other things, there are no available candidates to fill this position.

- The Assessor's Office has approximately 15,000 parcels per employee. The State recommends 4,000 parcels per employee.

- The City has not updated residential property values on a regular basis. Therefore, residential property values are likely overstated. Due to a significant number of complaints, the Michigan Tax Board is investigating Detroit's allegedly inflated property values.

14

**Detroit Department of Transportation.**

- Grant dollars are not maximized. These are typically a significant revenue source for bus transit systems.
- DDOT fares are lower than comparable bus transit systems.
- Maintenance operations are highly inefficient.
- High absenteeism among bus drivers causes inefficiencies and higher costs.

## THE PHYSICAL DETERIORATION OF THE CITY MUST BE ADDRESSED.

- There are approximately (i) 78,000 abandoned and blighted structures in the City, nearly half of which are considered "dangerous" and (ii) 66,000 blighted and vacant lots within the City limits.
- The number of City parks is dwindling, and many are in poor or fair condition as a result of neglect due to lack of funding.
  - The closure of 210 parks in the 2008-09 fiscal year reduced the City's park portfolio by 66% — from 317 parks to 107 parks.
  - The City announced in February 2013 that 50 of its remaining 107 parks would be closed, another 38 parks would shift to limited maintenance, and Belle Isle (already suffering from a lack of funding) would receive decreased services.
    - Thanks to $14 million in civic donations, the 50 parks slated to be closed will temporarily remain open through the summer of 2013.
- Approximately 70 superfund sites have been established in Detroit.
- The City's electricity grid has not been adequately maintained and is deteriorating.
- The City's fire stations are old and are not adequately maintained.
  - The average age of the City's 35 fire stations is 80 years.
  - Maintenance costs often exceed $1 million annually. Major items requiring constant repairs: apparatus doors, plumbing, electrical, boiler and roof problems.
- The vehicles and equipment employed by the City's police, fire, EMS and transportation personnel are aging, poorly maintained and lack adequate information technology.

## THE CITY HAS INCURRED AND CONTINUES TO INCUR ENORMOUS COSTS ASSOCIATED WITH UNOCCUPIED PROPERTY.

**Land and Structures.**

- The City's population decline and declining property values have resulted in large amounts of abandoned, forfeited or foreclosed land and structures within the City.

  - 85% of the City's land area has experienced population decline over the last decade.

- There are approximately 66,000 vacant and blighted lots within the City limits.

- There are approximately 78,000 vacant structures in the City.

  - Approximately 38,000 structures are considered dangerous buildings. The number of dangerous structures is constantly increasing due to vacancy (particularly foreclosures) and house fires.

    - 16,700 have been inspected and classified as dangerous.

    - 14,263 have open complaints of being dangerous.

    - 6,657 to go before City Council for order of demolition.

    - 1,159 are considered emergency demolitions.

- Blight contributes to fire, crime and depressed property values.

  - The City has seen between 11,000 – 12,000 fires each year for the past decade. Approximately 60% of these occur in blighted or unoccupied buildings.

  - The Fire Department spends a disproportionate (and arguably unnecessary) amount of time and money fighting fires in vacant structures. These incidents could be remedied by blight removal.

16

- Average cost to demolish a residential structure is approximately $8,500, with an equalized total cost of $5.74 per square foot.

| Expense | Amount |
|---|---|
| Demolition Contract | $5,000 |
| Survey and Abatement | $1,500 |
| Gas Disconnect Fee | $750 |
| Administration Costs | $720 |
| Water Disconnect Fee | $550 |
| *Lis Pendens* (interest in structure) | $15 |
| **Total Cost of Demolition** | **$8,535\*** |

\* Cost will vary depending on size of unit and construction materials used.

## ADDITIONAL CHALLENGES FACING BLIGHT REMOVAL EFFORTS.

Addressing blight will require the coordination of several state, county and local agencies (*e.g.*, the State Fast Track Land Bank Authority; Wayne County Treasurer and Land Bank; various City departments; the Detroit Land Bank Authority; the Detroit Housing Commission; and NGOs (*e.g.*, the Detroit Economic Growth Corporation and the Blight Authority)).

Blight removal is governed by multiple codes and regulations and a number of overlapping jurisdictions.

- **Code Enforcement and Adjudication** (*e.g.*, State of Michigan Housing Law; Zoning Ordinance, Chapter 61; Property Maintenance Ordinance, Chapter 9; Blight Violations Ordinance, Chapters 8.5 and 22; Sale of 1 and 2-family Ordinance).

- **Condemnation and Demolition** (*e.g.*, State of Michigan Housing Law; City Ordinance 290-H — wrecking structures; Industry Standard Building Officials Code Administration).

- **Foreclosure and Land Disposition** (*e.g.*, State of Michigan PA 123; various City codes addressing non-federal property).

- The current regulatory framework increases demolition costs and slows the process.

Ordinance and regulatory reform are needed to expedite demolition.

13-53846-swr Doc 5009 Filed 05/20/14 Entered 05/20/14 14:18:26 Page 23 of 135

17

## DETROIT HAS ENDURED INADEQUATE INVESTMENT IN INFRASTRUCTURE AND EQUIPMENT FOR YEARS.

**Fire Department.**

- **Fire Apparatus.** The Detroit Fire Department ("*DFD*") fleet includes (i) 26 engines; (ii) 15 ladder trucks; (iii) six squads (specialized rescue vehicles with no watering or laddering capacity); (iv) one hazardous material apparatus; (v) one TAC unit (a mini-pumper for use in low-clearance structures such as parking garages) and (vi) 36 ambulances and other light vehicles.

- DFD's fleet has "many mechanical issues," contains no reserve vehicles and lacks equipment ordinarily regarded as standard.

- The Apparatus Division's mechanic to vehicle ratio of 1:39 (once staffed with 63 people; currently 26) results in an inability to complete preventative maintenance on schedule.

- Detroit firefighters frequently operate shorthanded due to a lack of serviceable equipment; one DFD captain recently called his equipment "junk," and expressed frustration at the lack of working trucks, pumps and other essential equipment across many City neighborhoods.

- In February 2013, Detroit Fire Commissioner Donald Austin ordered firefighters not to use hydraulic ladders on DFD ladder trucks except in cases involving an "immediate threat to life" because the ladders had not received safety inspections "for years." On May 15, 2013, AAA Michigan donated $23,500 towards inspections of fire ladders on trucks and ground ladders because the City could not afford required inspections.

- **Fire Stations.** DFD operates 35 fire station buildings (average age = 80 years).

- DFD has difficulty accommodating the size of modern firefighting equipment in older stations.

- **EMS Fleet.**

- During the first quarter of 2013, frequently only 10 to 14 of the City's 36 ambulances were in service.

- Some of the City's EMS vehicles have been driven 250,000 to 300,000 miles, and break down frequently.

- In March 2013, a group of corporations pledged to donate $8 million to the City, a portion of which will be used to upgrade the city's fleet of EMS vehicles. The donation is expected to add 23 new leased EMS vehicles to the City's fleet as replacements for older vehicles.

18

135

**Police Department.**

- **Age of Police Cars.**

  • The DPD operates with an "extremely old fleet" of 1,291 vehicles. Most DPD police cruisers lack necessary information technology.

  • A majority of vehicles in the fleet have reached replacement age (a typical replacement cycle is three years). Operating with an aged fleet drives up maintenance costs.

  • The combination of an aging fleet of police cruisers and layoffs of city-employed auto mechanics has resulted in delayed maintenance and a reduction in the number of police cruisers on patrol.

  • As part of the approximately $8 million pledged by a group of corporations in March 2013, DPD expects to receive 100 new leased cruisers in 2013.

- **Facilities.**

  • The DPD has not invested in or maintained its facility infrastructure for many years. DPD has closed or consolidated multiple precincts.

  • The DPD's facility infrastructure has reached a critical level of disrepair and no longer meets its needs, contributing to low employee and citizen morale.

**Information Systems**

- **Challenges generally:**

  • Old and outdated technology assets and applications must be updated.

  • Information technology infrastructure is not integrated between departments and functions (*e.g.*, there is no integration between core City finance system and Department level systems) or even within Departments (*e.g.*, police precincts and districts cannot share information across their systems).

  • The City *urgently* needs to upgrade or replace the following IT systems, among others: payroll; financial; budget development; property information and assessment; income tax; and DPD operating system.

  • The City lacks a formal documented IT governance structure (development of structure in process).

- **DPD, DFD and EMS**
  - DPD, DFD and EMS information technology systems are obsolete; vendors do not provide full support; core functions are sporadic.
  - DPD, DFD and EMS have non-integrated solutions that result in redundant data entry, no meaningful reporting and limited query capabilities.
    - DPD's IT systems, in particular, are outdated with multiple disparate systems with limited information sharing capability and requiring highly manual processes. The result is highly inefficient DPD operations.
    - DPD has no IT systems for jail management, electronic ticketing and activity logs. DPD vehicles lack necessary IT infrastructure.

- **Payroll System.**
  - The City currently uses multiple, non-integrated payroll systems. A majority of employees are on an archaic payroll system that has limited reporting capability and no way to clearly track, monitor or report expenditures by category.
  - The cost of payroll administration for the City is significantly higher than for comparable entities. Current cost to process payroll is $62 per check ($19.2 million per year), which is more than 4 times more costly than the overall average of $15 per paycheck, and almost 3.5 times more costly than other public sector organizations, which average $18 per paycheck.
    - The primary driver of excess cost is labor, which is more than 70% of the total cost for the City.
    - 149 full-time employees are involved in the payroll process, 51 of which are uniformed officers (*i.e.*, high-cost personnel performing clerical duties).
  - Current process is highly manual (some done by hand) and prone to human error, including erroneous payments to individuals.

- **Income Tax Division**
  - Income tax collection and data management are highly manual.
  - The City's Income Tax System is outdated (purchased in the mid-1990s), has little to no automation capability and is "catastrophic" per an IRS audit completed in July 2012.

20

135

- Updating the current Income Tax System could (i) increase revenues for the City through improved revenue tax processing, tax compliance and collection and (ii) improve reporting, efficiency and accuracy.
  - A new tax system that allows for automated processing and e-filing capability will free up City resources to focus on compliance.

- **Property Tax Division.**
  - The City's billing, processing and collection of property taxes is inefficient.
  - Recommendations made by consultant in 2011 have not been followed, even though implementation promises to increase efficiency of collection process.

- **Budgeting, Accounting & Financial Reporting Systems.**
  - Oracle-based Financial Reporting system (DRMS) was implemented in 1999. It is not being utilized to its full capabilities and is no longer supported by its manufacturer.
  - Budget Development system (BRASS) is over ten years old and requires a manual interface with DRMS.
  - Approximately 70% of journal entries are booked manually.
  - The City lacks a true fail-over and backup system.
  - The integration of Accounting, Budget Development and Financial Reporting systems into a single process is necessary to provide for improved reporting, efficiency, accuracy and accountability.

- **Grant Management System.**
  - Grant tracking systems are fragmented. Thus, the City is unable to comprehensively track citywide grant funds and status.
  - Grant reporting is not standardized, such that the City is unable to prevent disallowed costs.

- **Permitting.**

  - The Buildings, Safety Engineering and Environmental Department's system for licensing and permitting is more than ten years old and needs to be upgraded.

  - The Fire Marshall Division's system for inspections and permitting is more than 20 years old and needs to be replaced.

  - Current information technology system deficiencies lead to bottlenecks in permit invoicing and collection of fees.

- **Department of Transportation.**

  - To improve service and safety, both on buses and at DDOT facilities, DDOT requires technology updates (*e.g.*, automatic vehicle location systems; bus cameras).

**Electrical Transmission Grid and Fixtures.**

- The City's Public Lighting Department ("*PLD*") is responsible for operating and maintaining 88,000 streetlights and owns and operates a distribution-only electricity grid providing power for lighting and serving 114 customers.

- The City-owned Mistersky power plant has been idle for 2-3 years, but has not been decommissioned. In addition, the City has 31 sub-stations that would need to be decommissioned. The City is in the process of obtaining estimates for decommissioning costs.

- Approximately 40% of Detroit's 88,000 streetlights are not functioning due, in large part, to disrepair and neglect; outages exist on both DTE Energy Company ("*DTE*") and PLD-powered lights.

- Outages affecting DTE-powered lights are primarily bulb-related. Outages on PLD-powered lights are partly bulb-related. Others are caused by problems related to PLD's obsolete grid and wiring.

## THE CITY'S DEBT AND LEGACY LIABILITIES HAVE GROWN CONSIDERABLY OVER TIME.

**Balance Sheet Liabilities.**

The City estimates that, as of the close of its 2013 fiscal year (*i.e.*, June 30, 2013), the City will have liabilities reflected on its balance sheet of approximately $9.05 billion, including approximately:

- $5.85 billion in special revenue obligations (*e.g.*, Enterprise Fund debt);
- $1.43 billion in pension-related Certificate of Participation ("*COPs*") liabilities;
- $343.6 million in marked-to-market swap liabilities related to COPs (as of May 31, 2013 valuation);
- $1.13 billion in unlimited and limited tax general obligation bond liabilities and notes and loans payable; and
- $300 million in other liabilities.

**Off-Balance Sheet Liabilities.**

- **OPEB Liabilities.** Unfunded OPEB liabilities increased from $4.8 billion to $5.7 billion from June 30, 2007 through June 30, 2011 (the most recent actuarial data available).

- **Pension Liabilities.**

  - As described in further detail below, the City's reported pension UAAL (based on 2011 actuarial valuations) of $643,754,109 is substantially understated.

    - Estimated UAAL for FY 2012 was $829.8 million (for the General Retirement System ("GRS")) and $147.2 million (for the Police and Fire Retirement System ("PFRS")), based on 2011 actuarial assumptions.

    - Further analysis by the City using more realistic assumptions (including by reducing the discount rate by one percentage point) suggests that pension UAAL will be approximately $3.5 billion as of June 30, 2013.

    - UAAL under the GRS and the PFRS increased by over $1 billion between June 30, 2007 and June 30, 2011, even (i) using the actuarial assumptions used to calculate 2011 UAAL and (ii) after consideration of the contribution of the COPs proceeds in 2005 and 2006.

13-53846-swr Doc 509 Filed 07/18/13 Entered 07/18/13 14:11:26 Page 135 of 135

- For the five years ending with FY 2012, pension payments exceeded contributions and investment income by approximately $1.7 billion for the GRS and $1.6 billion for the PFRS, resulting in liquidation of pension trust principal.

| System | Benefit Payments | Contribution / Investment Income | Net Trust Loss |
|---|---|---|---|
| GRS | $1,601,193,045 | ($60,113,101) | $1,661,306,146 |
| PFRS | $1,445,581,026 | ($127,803,339) | $1,573,384,365 |

- **Increasing Legacy Liabilities.** During FY 2012, more than 38% of the City's actual revenue was consumed servicing legacy liabilities. Going forward, legacy liabilities are expected to consume increasing portions of City revenues.

  - Projected unfunded OPEB liabilities for FY 2013 are currently being evaluated. As of the most recent valuation (June 30, 2011), OPEB unfunded liabilities totaled $5.7 billion and are expected to grow absent restructuring.

  - Required pension contributions are projected to increase in light of (i) an increasingly mature population already in pension pay status, (ii) deferral of recognition of prior losses, (iii) the anticipated revision of actuarial assumptions used in the past and (iv) past deferrals of contributions.

  - In addition, the Governmental Accounting Standards Board has issued a statement (No. 67), effective during the City's 2014 fiscal year, requiring municipalities to recognize their unfunded pension benefit obligation as a liability and to more comprehensively measure the annual costs of pension benefits.

  - Even if the City were not to change prior actuarial assumptions, pension UAAL is projected to grow to nearly $2 billion by 2017. The adoption of realistic actuarial assumptions would result in a significantly higher number for UAAL.

- Debt service for the City's general fund, including payments related to unlimited tax general obligations and COPs, is projected to exceed $240 million in FY 2013.

24

**Obligations Secured by Special Revenues**

- The City estimates that, as of the end of FY 2013 (*i.e.*, June 30, 2013), it will have:

  - $5.34 billion in outstanding principal amount of revenue bonds; and

  - $494 million in related state revolving loans.

- The revenue bonds and the revolving loans are related to the following funds:

  - Sewage Disposal Fund

    - $2.82 billion in outstanding principal amount of notes maturing July 1, 2013 through July 1, 2039, as of June 30, 2013.

    - $472.8 million in outstanding principal amount of state revolving loans, as of June 30, 2013.

    - Substantially all revenues of the sewage disposal system, net of operating expenses, pledged to secure payment of principal and interest. Net system revenues of $227,447,337 versus debt service requirements of $199,990,125 in FY 2012.

    - A schedule of the sewage disposal system bonds and related state revolving loans as of June 30, 2012 is attached hereto as Appendix A.

  - Water Fund

    - $2.52 billion in outstanding principal amount of various series of notes maturing July 1, 2013 through July 1, 2041, as of June 30, 2013.

    - $21.4 million in outstanding principal amount of state revolving loans, as of June 30, 2013.

    - Substantially all of the revenues of the City's water system, net of operating expenses, pledged to secure payment of principal and interest. Net system revenues of $178,842,057 versus debt service requirements of $153,441,666 in FY 2012.

    - A schedule of the water system bonds and related state revolving loans as of June 30, 2012 is attached hereto as Appendix B.

- Automobile Parking Fund

  - $9.3 million in outstanding principal amount of Detroit Building Authority Revenue Refunding Bonds: Parking System, Series 1998-A maturing July 1, 2013 through July 1, 2019, as of June 30, 2013.

  - Substantially all revenues of the parking system, net of operating expenses, pledged to secure payments of principal and interest.

  - Net system revenues of $2,708,223 versus debt service requirements of $2,923,454 in FY 2012.

- A chart setting forth the annual debt service on the foregoing special revenue obligations is attached hereto as Appendix F.

**General Fund Obligations**

- The City estimates that, as of the close of FY 2013 (*i.e.,* June 30, 2013), it will have $1.01 billion in outstanding principal amount of limited and unlimited tax general obligation bonds, consisting of:

  - $469.1 million in outstanding principal amount of unlimited tax general obligation ("*UTGO*") bonds maturing from April 1, 2013 through November 1, 2035.

    - $100 million of the foregoing bonds are secured by a second lien on distributable state aid.

  - $540.3 million in outstanding principal amount of limited tax general obligation ("*LTGO*") bonds maturing April 1, 2013 through November 1, 2035.

    - Issuance of LTGO bonds do not require voter approval. They are payable from general non-restricted funds.

    - $249.8 million of the LTGO bonds are secured by a first lien on distributable state aid. $129.5 million of the LTGO bonds are secured by a third lien on distributable state aid.

- The City estimates that, as of June 30, 2013, the City will have $121.5 million in other outstanding installment notes and loans payable related to various public improvement projects.

  - $87.8 million in notes payable, which notes were issued in connection with the "Section 108" HUD Loan Guarantee Program and are secured by future "Block Grant" revenues.

  - $33.7 million in loans payable ($33.6 million of which is a non-interest bearing unsecured loan payable to the Downtown Development Authority as general operating funds become available).

- On August 23, 2012, the City issued $129.5 million of LTGO bonds at a $9.1 million premium (generating $137 million in proceeds after issuance costs) in part to defease short term bonds issued March 2012. The remaining proceeds of this issuance were set aside with a trustee bank in an escrow account to provide funds for reforms and liquidity in FY 2013. The current amount of the escrow is approximately $80 million.

- A schedule of the secured general obligation bonds and secured notes and loans payable as of June 30, 2012 is attached hereto as Appendix D. A schedule of the unsecured general obligation bonds and unsecured loans payable as of June 30, 2012 is attached hereto as Appendix E. A chart setting forth the annual debt service on the foregoing general fund obligations (and other liabilities) is attached hereto as Appendix G.

**Certificates of Participation (Pension).**

- In 2005, service corporations established by the GRS and PFRS created a trust that issued the COPs. The proceeds of the COPs were contributed to the City's pension trusts.

- Principal and interest on the COPs is payable solely from payments made by the City to the service corporations pursuant to service contracts.

- The City estimates that, as of the close of FY 2013 (*i.e.*, June 30, 2013), the following amounts were outstanding under the COPs:

  - $480.3 million in outstanding principal amount of $640,000,000 Certificates of Participation Series 2005 A maturing June 15, 2013 through 2025; and

  - $948.54 million in outstanding principal amount of $948,540,000 Certificates of Participation Series 2006 A and B maturing June 15, 2019 through 2035.

13-53846-swr Doc 509 Filed 07/10/13 Entered 07/10/13 12:14:11 Page 33 of 135

- The City has allocated portions of the COP liabilities among the transportation, sewage disposal, water and library funds based on each fund's share of the aggregate UAAL determined at the time of issuance of the COPs.

- The City has identified certain issues related to the validity and/or enforceability of the COPs that may warrant further investigation.

- A schedule of the COPs and related swap liabilities as of June 30, 2012 is attached hereto as Appendix C.

**Swap Liabilities Related to Certificates of Participation.**

- In connection with the COPs, the City entered into eight pay-fixed, receive-variable interest rate swap contracts, effective as of June 12, 2006, with a total notional amount of $800 million.

- Recent valuations establish the negative fair value of the swaps at approximately $343.6 million (as of May 31, 2013).

- January 2009 — The City received notice from the swap contract counterparties that downgrading of the COPs and certain swap insurers would constitute an "Additional Termination Event" under the swap contracts if not cured.

- June 2009 — The City and the swap contract counterparties agreed on an amendment to the swap agreements, eliminating the Additional Termination Event and the potential for an immediate demand for a termination payment. Pursuant to the amendment:

  - The swap counterparties waived their right to termination payments; and

  - The City agreed to:

    - direct certain wagering tax revenues to a trust as collateral for the quarterly payments owing to the swap counterparties;

    - increase the interest rate of the swap agreements by 10 basis points effective July 1, 2010; and

    - include new termination events, including if COP ratings were withdrawn, suspended or downgraded.

- March 2012 — COPs were further downgraded which triggered another Termination Event; City and the swap counterparties are in negotiations regarding the Termination Event.

- March 2013 — Appointment of Emergency Manager constitutes an event of default triggering another Termination Event.

28

135

- Although this proposal reflects treating the swap obligations as special revenue debt secured by the wagering tax revenues, that treatment is still being reviewed by the Emergency Manager.

- A chart setting forth the annual debt service on the COPs and related swap liabilities is attached hereto as Appendix H.

## UNSUSTAINABLE RETIREE BENEFITS.

**OPEB Liabilities Are Large and Unfunded.**

- The OPEB plans consist of the Health and Life Insurance Benefit Plan and the Supplemental Death Benefit Plan.

- As of June 30, 2011 (the most recently published actuarial valuation), there were 19,389 retirees eligible to receive benefits under the City's OPEB plans. The number of retirees receiving benefits from the City is expected to increase over time.

- 99.6% of the City's OPEB liabilities are unfunded.

- **Health and Life Insurance Plan**

  - Defined benefit plan providing hospitalization, dental care, vision care and life insurance to current employees and substantially all retirees.

  - City generally pays for 80% to 100% of health care coverage for eligible retirees.

  - $5,718,286,228 in actuarial liabilities as of June 30, 2011. An updated actuarial valuation based on more recent census data is currently being developed by third party professionals.

  - The Health and Life Insurance Plan is 0% funded; financed entirely on a "pay-as-you-go" basis.

  - $177,460,627 cost to the City on account of retiree benefits during FY 2012 provided under the Health and Life Insurance Plan.

  - City's contribution is in addition to $23,516,879 in FY 2012 contributions by retirees.

- The City's OPEB costs are expected to increase as a result of the City's growing number, and young age, of retirees (pension and health care plans have no age restrictions and early vesting ages) as well as increases in health care costs, particularly hospitalization costs.

- Health and Life Insurance Plan is secondary to Medicare for eligible employees over the age of 65; however, many retired police/fire employees are *not* eligible to receive free Medicare Part A benefits due to State-regulated social security "opt-out" provisions.

- **Supplemental Death Benefit Plan**

  - Pre-funded single-employer defined benefit plan providing death benefits based upon years of creditable service.

    - $34,564,960 in actuarially accrued liabilities as of June 30, 2011.
    - 74.3% funded; UAAL of $8.9 million.

## OPEB Obligations Arise Under a Multiplicity of Plans

- The City's OPEB obligations arise under 22 different plans (15 different plans alone for medical/Rx) having varying structures and terms. This creates a high level of complexity and cost in benefit administration.

### *Weiler* Class OPEB Benefits.

- In July 2006, the City made a number of unilateral changes to the healthcare benefits for unionized police and firefighter retirees. Retiree Alan Weiler filed a class action lawsuit on behalf of approximately 7,000 retirees alleging violations of collective bargaining agreements.

- The City and the *Weiler* class settled before trial, and the court entered a Consent Judgment approving the parties' settlement agreement. The settlement agreement requires the City to provide *Weiler* class members with generous health benefits for as long as class members receive a City pension.

- The *Weiler* plaintiffs are expected to assert that the settlement restricts the ability of the City to alter the benefit provisions included in the settlement.

30

135

- The *Weller* class retirees/beneficiaries currently cost the City approximately $75 million per year, representing over 40% of retiree benefits costs under the Health and Life Insurance Plan.

## Pension Liabilities Are Not Fully Funded — Shortfall Has Been Understated.

### Aggressive Actuarial Assumptions Generate a Perception that Pensions are Modestly Underfunded.

- GRS: Reported UAAL of $639,871,444 out of $3,720,167,178 in accrued liabilities as of June 30, 2011 (82.8% funded).

- PFRS: Reported UAAL of $3,882,665 out of $3,808,642,553 in accrued liabilities as of June 30, 2011, as a result of awards received under Public Act 312 of 1969 (99.9% funded).

- These funding levels were based on the following assumptions:

|  | GRS | PFRS |
|---|---|---|
| Amortization Period | 30 years (refinanced anew each year) | 30 years |
| Asset valuation method | 7-year smoothed market | 7-year smoothed market |
| Investment rate of return (net of expenses) | 7.9% | 8.0% |
| Projected salary increases | 4.0%-8.9% | 5.0%-9.2% |
| Inflation rate | 4.0% | 0% for four years; 4.0% thereafter |
| Cost-of-living pension adjustments | 2.25% | 2.25% |

### More Realistic Assumptions Reveal That Funding Levels Have Been Overstated.

- The combined reported UAAL of approximately $644 million for the GRS/PFRS (estimated at $977 million as of June 30, 2012) is *substantially* understated.

- Current actuarial valuations project aggressive and unrealistic annual rates of return on investments net of expenses (GRS — 7.9%; PFRS — 8.0%).

31

135

- Pension plan funding levels calculated based upon assumed annual rates of return of 7%, or even 7.5%, would further reduce funding levels.

- Smoothing of funding levels over seven years masks funding shortfall — pension plan funding levels calculated based on the current market value of the plans' assets show substantially reduced funding levels (GRS – 65% funded; PFRS – 78% funded).

- A 30-year amortization period for unfunded liabilities — which in GRS is applied anew each year to the full amount of unfunded liability, akin to annually refinancing a 30-year mortgage — allows unfunded liabilities to continue to grow rapidly (due to compounding).

- Although many governmental plans have significant amortization periods for unfunded benefits (*e.g.*, MERS applies a 27-year amortization period with a goal of moving down to 20 years by the December 31, 2017 valuation), 30 years is longer than most and is far too long for these mature plans. Especially in the case of GRS, such a long period has the effect of deferring efforts to meaningfully reduce underfunding into the future.

- The City has consistently deferred payment of its year-end PFRS contributions (and finances such deferrals at a rate of 8%). As of June 30, 2012, the City owed the PFRS its full contribution for FY 2012 in the amount of approximately $50 million. As of May 2013, the City had deferred approximately $58 million in pension contributions owing for FY 2013. Contributions made in the form of notes have been treated as timely funding contributions made to the pension trust during the applicable financial year.

- The City was granted a funding credit by PFRS in the amount of $25 million for each of the fiscal years 2008 through 2010 resulting in under-contributions by the City toward its pension liabilities for each of those years.

**Past Pension Practices.** Certain past trustee practices contributed to the pension plans' significant underfunding (*e.g.*, annuity savings accounts; "13th checks"; ad hoc "sweeteners"; and various changes to eligibility (*e.g.*, lowered years of service, combined years of employment)).

- For example, in both pension plans (and especially GRS), hundreds of millions of dollars contributed by the City and invested to support the defined benefit arrangement have instead been used to fund investment returns selected (but not actually earned) on employee contributions made under a separate defined contribution arrangement known as the Annuity Savings Accounts.

13-53846-swr Doc 5091 Filed 05/05/13 Entered 06/03/13 14:41:12 Page 135 of
135

**Anticipated Increase in Pension Contributions.** Using current actuarial assumptions, the City's required pension contributions are projected to grow from 25% (for GRS) and 30% (for PFRS) of eligible payroll expenses in FY 2012 to 30% (for GRS) and 60% (for PFRS) of such expenses by FY 2017. Changes in actuarial assumptions would result in further increases to the City's required pension contributions.

## OTHER LIABILITIES

The City estimates that, as of the end of FY 2013, the City will have $300 million in other liabilities outstanding.

As of June 30, 2012, the City owed at least $264.6 million in other liabilities, consisting primarily of:

- $101.2 million in accrued compensated absences, including unpaid, accumulated vacation and sick leave balances;
- $86.5 million in accrued workers' compensation for which the City is self-insured;
- $63.9 million in claims and judgments, including lawsuits and claims other than workers' compensation claims; and
- $13.0 million in capital leases and accrued pollution remedies.

|  | FUND | | | | | |
|---|---|---|---|---|---|---|
|  | General Governmental | Sewage Disposal | Transportation | Water | Parking | Other Proprietary | Total |
| Accrued compensated absences | 82,099,713 | 5,502,481 | 3,895,416 | 9,421,311 | 276,814 | 53,442 | $101,249,177 |
| Accrued workers' compensation | 66,231,000 | 3,554,000 | 5,569,812 | 10,339,000 | 667,000 | 92,000 | $86,452,812 |
| Capital leases payable |  |  | 12,678,358 |  |  |  | $12,678,358 |
| Claims and judgments | 62,003,257 | 1,519,500 |  | 286,500 | 110,497 | 2,000 | $63,921,754 |
| Accrued pollution remediation |  | 340,613 |  |  |  |  | $340,613 |
| **Total** | **$210,333,970** | **$10,916,594** | **$22,143,586** | **$20,046,811** | **$1,054,311** | **$147,442** | **$264,642,714** |

Note: the FUND header spans the fund columns.

# Steady State Projection of Legacy Expenditures (assuming no restructuring)

| ($ in millions) | FISCAL YEAR ENDED ACTUAL | | | | | PRELIMINARY FORECAST | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
| **Legacy expenditures** | | | | | | | | | | |
| Debt service (LTGO) | $(66.6) | $(106.2) | $(63.5) | $(64.5) | $(62.6) | $(70.8) | $(70.9) | $(61.8) | $(61.8) | $(38.5) |
| Debt service (UTGO) | (67.2) | (71.5) | (72.4) | (72.8) | (73.0) | (70.6) | (64.9) | (62.5) | (57.6) | (57.6) |
| POC - principal and interest (GF) | (24.6) | (20.9) | (23.6) | (33.5) | (33.0) | (46.8) | (51.4) | (53.3) | (55.0) | (56.9) |
| POC - principal and interest (EF, excl. DDOT) | (1.8) | (1.4) | (1.5) | (1.8) | (2.0) | (5.3) | (5.9) | (6.1) | (6.4) | (6.6) |
| POC - principal and interest (DDOT) | (3.5) | (2.8) | (3.0) | (3.6) | (4.0) | (3.3) | (3.7) | (3.8) | (3.9) | (4.1) |
| POC - swaps (GF) | (38.6) | (43.9) | (44.7) | (44.7) | (44.8) | (42.9) | (42.8) | (42.8) | (42.7) | (42.7) |
| POC - swaps (EF, excl. DDOT) | (2.3) | (2.0) | (2.0) | (2.0) | (2.0) | (4.8) | (4.8) | (4.8) | (4.9) | (4.9) |
| POC - swaps (DDOT) | (4.5) | (4.0) | (4.0) | (4.0) | (4.0) | (3.0) | (3.0) | (3.0) | (3.0) | (3.0) |
| Pension contributions - Public Safety | (58.9) | (31.4) | (32.8) | (81.6) | (49.8) | (46.1) | (139.0) | (163.0) | (180.0) | (198.0) |
| Pension contributions - Non-Public Safety | (10.6) | (27.0) | (11.1) | (28.3) | (25.4) | (19.9) | (36.9) | (42.5) | (47.7) | (53.1) |
| Pension contributions - DDOT | (6.8) | (7.3) | (6.9) | (9.5) | (10.9) | (12.3) | (23.6) | (27.7) | (31.2) | (34.8) |
| Health benefits - retiree - Public Safety | (73.7) | (80.2) | (70.4) | (79.6) | (90.6) | (91.5) | (88.6) | (95.2) | (101.7) | (108.0) |
| Health benefits - retiree - Non-Public Safety | (47.4) | (51.6) | (50.6) | (49.0) | (49.2) | (49.7) | (38.8) | (41.5) | (44.6) | (47.7) |
| Health benefits - retiree - DDOT | (8.2) | (11.8) | (11.2) | (11.1) | (10.3) | (10.4) | (13.3) | (14.3) | (15.3) | (16.3) |
| **Total legacy expenditures** | $(414.6) | $(462.0) | $(397.9) | $(486.1) | $(461.6) | $(477.3) | $(587.6) | $(622.4) | $(655.9) | $(672.3) |
| **Total revenues (excl. financing proceeds)** | $1,397.7 | $1,363.3 | $1,291.0 | $1,316.8 | $1,196.9 | $1,121.9 | $1,082.8 | $1,046.2 | $1,041.5 | $1,041.4 |
| **Total legacy expenditures as a % of total revenues** | 29.7% | 33.9% | 30.8% | 36.9% | 38.6% | 42.5% | 54.3% | 59.5% | 63.0% | 64.6% |

34

## HIGH LABOR COSTS AND RESTRICTIVE EMPLOYMENT TERMS

**High Labor Costs.**

Despite recent headcount reductions, labor costs related to General Fund active employees (*i.e.*, wages, pension and benefits) represent more than 41% of the City's estimated FY 2013 gross revenues. Accordingly, savings related to such costs are a critical component of any restructuring.

- Estimated General Fund FY 2013 Wages: $333.8 million (29.8% of estimated FY 2013 revenues).

- Estimated General Fund FY 2013 Benefit Costs (fringes including health for *active employees*): Approx. $66.5 million (5.9% of estimated FY 2013 revenues).

- Estimated General Fund FY 2013 pension contributions (including normal and UAAL portion): $66.0 million (5.9% of estimated FY 2013 revenues).

  - While pension contributions are based on active payroll, some portion of the contribution is intended to cover the unfunded actuarial accrued liability which technically benefits all participants in the plan, including retirees.

  - Benefit and pension costs per *active* employee have increased from ~$18,000 in FY 2000 to ~$24,000 in FY 2013.

- **Increasing Benefit Costs.** Some of the savings related to medical benefits achieved through the City Employment Terms (the "CETs") will be offset by anticipated medical cost inflation.

**Collective Bargaining Landscape.**

The City's unionized employees are represented by 47 discrete bargaining units. The CBAs covering 44 of those bargaining units were expired as of September 30, 2012, and the majority of the employees represented thereby are subject to the CETs. The CBAs with the three remaining bargaining units expire as of June 30, 2013, at which point the employees represented thereby will become subject to the CETs as well. *See* Appendix I (identifying all City employee bargaining units).

**Restrictive Employment Terms.**

The City's CBAs impose work rules and other restrictions that have impaired the efficient functioning of City government. The CETs provide some relief from work rules and other restrictions (in part through incorporation of a broad management rights clause).

- **"Bumping" Rights.** Employees have been permitted to transfer across departments based solely on seniority (without regard to merit, relevant qualifications or experience for the new position). The City has amended the criteria for transfers and assignments and based them upon experience, attendance, work performance, sick time use and demonstrated ability rather than seniority.

  - The CETs also negated seniority protections in various CBAs by changing shifts, hours of operation and overtime procedures; and revising or eliminating job classifications.

- **Limitations on Management Rights.** The City's ability to manage policies, goals and the scope of operations for many City departments (most notably with respect to the right to implement and modify disciplinary policies) have been impaired by limitations on management rights and responsibilities. The CETs have replaced these limitations with a broad management rights clause, granting the City broad discretion with respect to the design and implementation of work rules.

- **Arbitration Rights.** The CETs curtail the ability of arbitrators to uphold future grievances based on expired bargaining agreement provisions or past practice.

- **Lack of Reimbursement Rights.** The unions historically did not (i) reimburse the City for full-time and part-time paid union officials or (ii) pay any fees for the City's collection and remittance of union dues and service fees. Under the CETs, the City is reimbursed for paid officials and collects a 2% administrative fee in connection with efforts related to union dues/service fees.

- In addition to concessions imposed by the CETs, additional concessions have been granted through statutory interest arbitration. These concessions have not been uniformly applied to all bargaining units, and some City employees have not been affected by these measures.

- In some cases, changes to the City Charter and the City Code, or other legislative initiatives, may be necessary to support needed operational enhancements and reduce unnecessary bureaucracy.

36

135

# DETROIT WATER AND SEWERAGE DEPARTMENT MUST BE RESTRUCTURED.

The Detroit Water and Sewerage Department ("*DWSD*") is one of the largest municipal water and sewerage departments in the nation, providing water and wastewater services to the City and many suburban communities in an eight-county area, covering 1,079 square miles.

**DWSD Capital Expenditures.**

• Municipal securities broker/dealers and the City's advisors' analyses suggest that DWSD's cost of capital is inflated due to the DWSD's association with the City (and its financial circumstances). This increased cost of capital, coupled with the inability to raise rates and other factors, has resulted in significant under-spending on capital expenditures.

• DWSD's January 2013 Capital Improvement Program totals approximately $1.2 billion over the next four years with approximately $322.4 million budgeted for water and sewer projects for FY 201314 and $361.8 million budgeted for FY 2014-15.

**The EPA Litigation (E.D. Mich., Judge Cox).**

• In 1977, the United States Environmental Protection Agency sued the City and the DWSD, alleging violations of the Clean Water Act ("*CWA*"). The case remained pending in the United States District Court for the Eastern District of Michigan — and the DWSD operated under federal oversight — for more than 35 years owing to "a recurring cycle" of compliance failures with regard to the CWA and National Pollutant Discharge Elimination System ("*NPDES*") permits required by the Michigan Department of Environmental Quality ("*MDEQ*").

**Administrative Consent Order.**

• In July 2011, the DWSD agreed to undertake remedial measures pursuant to an Administrative Consent Order ("*ACO*") with the MDEQ. The ACO instituted a compliance program with regard to areas of persistent dysfunction (*e.g.,* maintenance; inadequate capital expenditures and related planning; inadequate staffing; restrictive procurement policies).

• Following the dismissal of the EPA Litigation, the ACO is the only order through which the MDEQ maintains oversight of the DWSD.

**Root Cause Committee Plan of Action.**

- Determining that the ACO, by itself, could not guarantee the DWSD's long-term compliance with CWA and NPDES standards, the district court ordered a "Root Cause Committee" comprised of City/DWSD officials to submit a plan addressing the "root causes" of the DWSD's noncompliance.

- The Root Cause Committee drafted – and the district court adopted – a "Plan of Action," which proposed to restructure the DWSD in order to address systemic dysfunction and achieve long-term compliance with federal and state standards (including, but not limited to, the imposition of changes on DWSD employees otherwise forbidden by applicable CBAs).

- A report submitted by the Root Cause Committee in March 2013 recommended an autonomous DWSD. Implementation of the Root Cause Committee's recommendation would require creation of two unique authorities (with one authority owning the assets and the other authority leasing the assets and making recurring payments to the City in lieu of taxes in the estimated annual amount of $50,000,000 in consideration for the transfer of DWSD assets.

**Order Dismissing Case.**

- By an order dated March 27, 2013, the district court closed the case, stating that it was satisfied that the court's orders and the ACO "have been substantially implemented." Closing the case was appropriate, the court said, "because the existing [ACO] is a sufficient mechanism to address any future issues regarding compliance with the DWSD's NPDES permit and the [CWA]."

- The district court did not order the implementation of the DWSD transaction proposed by the Root Cause Committee, citing its lack of authority to do so.

- The City appealed the district court's order dismissing the EPA Litigation on May 22, 2013.

38

# OTHER LITIGATION AFFECTING THE CITY'S FINANCIAL CONDITION

The City generally has been successful in defending against legal challenges to its attempts to restructure its financial affairs, but numerous cases have been filed and remain pending and additional cases may well be filed. Some of these cases could affect the ability of the City to successfully restructure its affairs.

**Litigation Challenging Consent Agreement.**

**Decision Voiding CBA-Related Sections of Consent Agreement Reversed on Procedural Grounds.**

- In September 2012, the Ingham County Circuit Court struck down Sections 4.1 and 4.3 of the Consent Agreement, which provisions (i) granted the Mayor "authority to negotiate, renegotiate, execute, amend, modify, reject or terminate collective bargaining agreements" (§ 4.1) and (ii) gave the Financial Advisory Board approval rights over CBAs and allowed the Program Management Director to impose CBAs not approved by the City Council (§ 4.3). The Court overturned these provisions on the grounds that they improperly granted powers to Mayor Bing and other officials that are reserved exclusively to emergency managers.

- In October 2012, the Court of Appeals for the State of Michigan reversed the Ingham County court. The Court of Appeals' ruling was based on procedural grounds (*i.e.*, that the Circuit Court had lacked jurisdiction where the plaintiff had failed to establish standing).

**Litigation Regarding Imposition of CETs.**

Over 15 legal challenges and grievances related to the imposition of the CETs have been filed in several state courts and before the Michigan Employment Relations Commission ("*MERC*"). These cases challenge the enforceability of the Financial Stability Agreement and, thus, the legality of the CETs. These challenges generally have not prevented the City's imposition of the CETs.

- **Imposition of CETs on Police Department.** In August of 2012, the Wayne County Circuit Court denied the Detroit Police Officers Association's request for a permanent injunction against imposition of the CETs.

- **Imposition of CETs on DWSD Employees.** In the long-standing EPA Litigation, the United States District Court for the Eastern District of Michigan (i) required that DWSD employees enter into new CBAs with the DWSD (as opposed to with the City) and (ii) clarified that, although its orders did not restrict the DWSD from implementing CETs with respect to DWSD employees prior to negotiation of new CBAs, neither did such orders enjoin employees from challenging the CETs to the extent imposition thereof was inconsistent with applicable law. AFSCME Local 207 – the largest union in the DWSD – has challenged the imposition of the CETs upon DWSD employees before the MERC.

- **Restoration of Certain Pay Cuts.** In *In re City of Detroit and Detroit Police Officers Association*, Case No. D12 D-0354, the Detroit Police Officers Association, among other things, sought the restoration of a 10% across-the-board pay cut imposed upon all City police officers pursuant to the CETs. The City argued that such wage cuts were needed in light of the City's ongoing financial emergency. The MERC panel ordered a 5% restoration of the officers' wages, effective January 1, 2014 (and encouraged the emergency manager, the Mayor and the State Treasurer to consider instituting the 5% salary restoration effective July 1, 2013).

40

# KEY OBJECTIVES FOR A FINANCIAL RESTRUCTURING AND REHABILITATION OF DETROIT

To the fullest extent possible under all of the circumstances:

- Provide incentives (and eliminate disincentives) for businesses and residents to locate and/or remain in the City.
  - The City cannot stabilize or pay creditors meaningful recoveries if it continues to shrink.
  - Achieving this goal requires improvements in City services, particularly in the area of public safety and tax reform to reduce the cost of living in the City to more closely approximate costs of living in nearby areas.
- Maximize recoveries for creditors.
  - Since the City will not generate sufficient cash to pay all liabilities, alternatives have to be considered.
- Provide affordable pension and health insurance benefits, and restructure governance of pension arrangements.
- Eliminate blight to assist in stabilizing and revitalizing neighborhoods and communities within the City.
- Reform the City government operations to improve efficiency and reduce costs.
  - In many areas, longer term benefits will require immediate increases in capital investment.
- Maximize collection of taxes and fees that are levied or imposed.
- Generate value from City assets where it is appropriate to do so.

# CURRENT FINANCIAL STATUS

## HISTORICAL REVENUE AND EXPENDITURE TRENDS, INCLUDING PRELIMINARY FY 2013.

**General Fund summary**

| ($ in millions) | FISCAL YEAR ENDED ACTUAL | | | | | PRELIM. |
|---|---|---|---|---|---|---|
| | **2008** | **2009** | **2010** | **2011** | **2012** | **2013** |
| Total revenues | $1,397.7 | $1,363.3 | $1,291.0 | $1,316.8 | $1,196.9 | $1,121.9 |
| Operating expenditures | (1,111.1) | (1,025.3) | (964.7) | (887.5) | (857.1) | (692.0) |
| Legacy expenditures | (414.6) | (462.0) | (397.9) | (486.1) | (461.6) | (477.3) |
| Deficit (excl. financing proceeds) | (127.9) | (124.1) | (71.7) | (56.9) | (121.8) | (47.4) |
| Financing proceeds | 75.0 | - | 250.0 | - | - | 137.0 |
| Total surplus (deficit) | $(52.9) | $(124.1) | $178.3 | $(56.9) | $(121.8) | $89.6 |
| **Accumulated unrestricted General Fund deficit** | $(219.2) | $(331.9) | $(155.7) | $(196.6) | $(326.6) | $(237.0) |

The City has made significant progress decreasing operating costs; however, revenues have declined more quickly and legacy costs have increased.

Excluding proceeds from debt issuances, the City's expenditures have exceeded revenues from FY 2008 to FY 2012 by an average of $100 million annually.

43

135

**Revenues**

| ($ in millions) | FISCAL YEAR ENDED ACTUAL | | | | | PRELIM. |
|---|---|---|---|---|---|---|
| | **2008** | **2009** | **2010** | **2011** | **2012** | **2013** |
| Municipal income tax | $276.5 | $240.8 | $216.5 | $228.3 | $233.0 | $238.7 |
| State revenue sharing | 249.6 | 266.6 | 263.6 | 239.3 | 173.3 | 182.8 |
| Wagering taxes | 180.4 | 173.0 | 183.3 | 176.9 | 181.4 | 173.0 |
| Sales and charges for services | 191.3 | 166.7 | 154.1 | 155.0 | 145.4 | 120.4 |
| Property taxes | 155.2 | 163.7 | 143.0 | 182.7 | 147.8 | 134.9 |
| Utility users' and other taxes | 73.0 | 71.5 | 64.8 | 64.8 | 57.1 | 54.8 |
| Other | 271.8 | 281.0 | 265.6 | 269.8 | 258.8 | 217.4 |
| **Total revenues** | $1,397.7 | $1,363.3 | $1,291.0 | $1,316.8 | $1,196.9 | $1,121.9 |

**Municipal income tax**

- Income tax revenues decreased in FY 2009 and FY 2010 primarily due to lower taxable income of City residents and non-residents working in the City as a result of the economic recession. The recovery in the last 3 years was due to increased taxable income as well as the recent increase in the corporate tax rate.

**State revenue sharing**

- State revenue sharing decreased in FY 2011 primarily due to the 2010 census population decline affecting constitutional revenue sharing payments.

- FY 2009 and FY 2010 include $15 - $20 million payments that were held from the previous year due to late CAFR submission.

- Statutory revenue sharing was replaced by the Economic Vitality Incentive Program funds. The total amount available to be paid to municipalities decreased and the payment method is now based on performance metrics to reward "best practices".

13-53846-swr Doc 5091 Filed 05/28/14 Entered 06/03/14 11:26:53 Page 135 of 135

**Wagering taxes**

- Wagering tax revenues from Detroit's three casinos have remained steady. Wagering tax receipts are projected to decrease through FY 2015 and beyond due to expected loss of gaming revenue to casinos opening in nearby Toledo, Ohio.

- Beginning January 2006, the City began receiving an additional 1% of adjusted gross receipts as percentage payment revenues. In addition, the City receives $4 million from each casino when the casino reaches $400 million in adjusted gross receipts during the calendar year.

**Property taxes**

- Property tax revenues have been decreasing primarily due to declining taxable property valuations (~12% since FY 2008) and increasing charge-backs due to delinquency rates (charge-backs have been increasing at a quicker pace than delinquent bills transferred to Wayne County).

- Delinquent property tax bills are transferred to Wayne County and the City receives payment for the full amount submitted, less charge-backs for prior period uncollectible bills, which ultimately the City has to repay.

- Revenues were higher in FY 2011 due to (non-cash) adjustments to property tax distributions and charge-back liabilities that were overstated in prior years.

**Operating expenditures**

| ($ in millions) | FISCAL YEAR ENDED ACTUAL | | | | | PRELIM. |
|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
| Salaries/overtime/fringe | $(509.9) | $(506.6) | $(466.4) | $(454.8) | $(431.5) | $(357.3) |
| Health benefits - active | (49.9) | (54.4) | (70.8) | (64.6) | (54.3) | (43.1) |
| Professional and contractual services | (66.9) | (73.5) | (54.2) | (48.5) | (43.1) | (42.7) |
| Materials & supplies | (85.8) | (70.9) | (60.1) | (67.1) | (62.2) | (63.6) |
| Utilities | (35.6) | (38.6) | (27.8) | (30.1) | (27.1) | (25.5) |
| Other | (362.9) | (281.2) | (285.4) | (222.4) | (238.9) | (159.8) |
| **Operating expenditures** | $(1,111.1) | $(1,025.3) | $(964.7) | $(887.5) | $(857.1) | $(692.0) |

**Salary/overtime/fringe**

- The City has significantly reduced its payroll related costs since the peak in FY 2009 based on a variety of cost reduction efforts, including headcount reductions, furlough days, wage reductions, etc.

**Other expenses declining**

- Other expenditures, including expenses covered by grant revenue, claims for self-insurance, professional/ contractual services and purchased electricity and gas/fuel costs have declined by more than $266 million (44%) over the past six years.

**Legacy expenditures**

| ($ in millions) | FISCAL YEAR ENDED ACTUAL | | | | | | PRELIM. |
|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | | 2013 |
| Debt service (LTGO & UTGO) | $(133.8) | $(177.6) | $(135.9) | $(137.3) | $(135.6) | | $(141.4) |
| POC - principal and interest | (29.8) | (25.1) | (28.1) | (38.9) | (39.0) | | (55.4) |
| POC swaps | (45.3) | (49.9) | (50.7) | (50.7) | (50.7) | | (50.6) |
| Pension contributions | (76.3) | (65.7) | (50.8) | (119.5) | (86.1) | | (78.3) |
| Health benefits - retiree | (129.3) | (143.7) | (132.3) | (139.7) | (150.1) | | (151.6) |
| **Legacy expenditures** | $(414.6) | $(462.0) | $(397.9) | $(486.1) | $(461.6) | | $(477.3) |

**Debt service and COP payments**

- COP-related payments include swap interest payments and principal and interest.

- COP-related payments have been increasing due to increasing scheduled maturities and increasing swap interest rates through FY 2010.

- Debt service was higher in FY 2009 due to a balloon payment due in 2009 on debt related to the Greater Detroit Resource Recovery Authority.

- COP-related payments are forecast to increase due to a back-loaded amortization schedule.

46

**Pension contributions**

- The City has consistently deferred year-end PFRS contributions by using a payment plan financing arrangement paying 8% interest (~$50 million for FY 2012).

- The City was granted a $25 million credit in each of the years 2008, 2009, and 2010. If not for these credits, the contribution would have been $25 million higher in each of those years, thereby saving the City a cumulative $75 million. Therefore, the contributions for 2008, 2009, and 2010 are effectively understated.

**Health Benefits - Retiree**

- The total cost of healthcare benefits City-wide in FY 2012 was approximately $275 million, of which approximately $177 million related to retirees.

- The General Fund's portion of healthcare costs in FY 2012 was approximately $204 million, of which approximately $150 million related to retirees.

**FY 2013 Cash Flow**

**FY 2013 Forecast.**

- At the end of FY 2012, the City held cash of $29.8 million, subject to accumulated property tax distributions in the amount of $27.9 million, or cash net of distributions of $1.9 million.

- Based upon actual results through May 31, 2013 and forecasted results through the end of FY 2013, the City is projecting positive net cash flow of $4.0 million for FY 2013.

  - However, as of June 30, 2013, the City will have accumulated deferrals of approximately $120 million, primarily related to pension contributions. If not for the deferrals of payments, the City would have already run out of cash.

- In August 2012 (FY 2013), the City issued $129.5 million in self-insurance and capital improvement bonds (proceeds of $137 million) with the assistance of the Michigan Finance Authority; however, $80 million was used to repay a short-term borrowing in FY 2012 and the balance was placed in escrow subject to State Treasury approval of withdrawal.

- In December 2012, the State authorized the City to draw an additional $10 million from the escrowed proceeds.

- The forecast assumes an additional $20 million will be drawn in June 2013.

135

**Interfund Loans and Other Outstanding Amounts Due.**

- As of May 31, 2013, the City's general fund had outstanding deferrals and amounts due to other funds and entities of approximately $202.6 million. These are effectively borrowings and must be repaid.

  - Cash owed to other funds: As of May 31, 2013, the General Fund owed approximately $41.2 million to other funds (*e.g.*, Risk Management Fund).

  - Cash commingled with General Fund: As of May 31, 2013, the General Fund held $52.6 million of other funds' cash in its operating account (*e.g.*, Major and Local Street Funds).

  - Property tax distributions: As of May 31, 2013, the General Fund owed $55.1 million to other taxing authorities (*e.g.*, Detroit Public Schools and Wayne County).

  - Deferred pension contributions: As of May 31, 2013, the General Fund owed $53.7 million in delinquent pension contributions to the GRS and PFRS systems.

  - On June 30, 2013, the City will owe an additional $50 million (estimated) related to the FY 2013 required PFRS contribution, which will increase the amount of deferred pension contributions to over $100 million.

**Cash conservation measures include:**

- Issuance of short-term (RANs & TANs) and long-term debt.

- General fund borrowing from other funds, deferrals of payments to other funds and cash pooling (as described above).

- Deferral of trade payments and management of accounts payable with reference to available cash. Current accounts payable are approximately aged 60 to 75 days. Issues related to unvouchered accounts payable could increase the aging profile of the City's A/P.

48

# FY 2013 Forecasted Cash Flow to Year End

| $ in millions | Actual FY 2012 | Actual Jul-12 | Actual Aug-12 | Actual Sep-12 | Actual Oct-12 | Actual Nov-12 | Actual Dec-12 | Actual Jan-13 | Actual Feb-13 | Actual Mar-13 | Actual Apr-13 | Actual May-13 | Forecast Jun-13 | 11A + 1F FY 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Receipts** | | | | | | | | | | | | | | |
| Property taxes | $567.0 | $34.0 | $198.0 | $14.8 | $6.9 | $4.2 | $24.4 | $139.1 | $42.3 | $5.4 | $1.3 | $3.1 | $58.0 | $531.6 |
| Income & utility taxes | 276.2 | 23.1 | 25.1 | 21.5 | 25.8 | 23.6 | 21.9 | 25.4 | 19.6 | 23.9 | 30.2 | 30.8 | 18.4 | 290.1 |
| Gaming taxes | 177.5 | 12.4 | 15.2 | 17.2 | 12.4 | 20.8 | 11.0 | 11.5 | 19.6 | 14.4 | 12.8 | 16.5 | 9.2 | 173.0 |
| Municipal service fee to casinos | 19.8 | - | 7.6 | - | 4.0 | 4.0 | 1.8 | - | - | - | - | - | - | 17.4 |
| State revenue sharing | 194.3 | 28.5 | - | 28.7 | - | 30.9 | - | 30.4 | - | 30.6 | - | 29.7 | - | 178.9 |
| Other receipts | 480.8 | 26.1 | 37.8 | 26.0 | 22.5 | 26.6 | 31.7 | 16.7 | 58.0 | 25.6 | 29.3 | 41.4 | 19.4 | 361.2 |
| Refinancing proceeds | 50.0 | - | - | - | - | - | 10.0 | - | - | - | - | - | 20.0 | 30.0 |
| **Total operating receipts** | 1,765.5 | 124.2 | 283.8 | 108.2 | 67.5 | 110.1 | 103.1 | 225.0 | 143.9 | 96.5 | 73.6 | 121.4 | 125.0 | 1,582.2 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Payroll, taxes, & deductions | (454.2) | (37.5) | (35.0) | (32.5) | (28.0) | (41.1) | (30.1) | (23.6) | (30.1) | (25.9) | (26.3) | (36.2) | (27.2) | (373.6) |
| Benefits | (203.4) | (18.3) | (21.0) | (20.4) | (16.7) | (16.2) | (19.5) | (9.7) | (15.8) | (17.7) | (4.7) | (14.9) | (16.0) | (191.0) |
| Pension contributions | (103.9) | - | (11.7) | (7.2) | - | (1.2) | (8.8) | (1.9) | - | - | - | - | - | (30.8) |
| Subsidy payments | (50.0) | (0.6) | (4.9) | (6.2) | (1.1) | (4.2) | (0.1) | (0.2) | (5.7) | (5.0) | (3.9) | (1.6) | (10.9) | (40.1) |
| Distributions - tax authorities | (374.4) | (0.9) | (110.1) | (34.3) | (2.1) | - | (1.5) | (8.1) | (79.4) | (14.7) | (0.6) | - | (27.2) | (283.2) |
| Distributions - UTGO | (8.6) | - | - | (11.0) | - | - | - | - | - | (52.1) | - | - | (5.5) | (68.6) |
| Distributions - DDA increment | (16.9) | (1.9) | (1.5) | (0.6) | (1.3) | (1.8) | (1.0) | (0.5) | (0.4) | (0.4) | (1.3) | (1.6) | - | (11.4) |
| Income tax refunds | - | - | (3.3) | - | - | - | - | (5.9) | (1.3) | - | (1.9) | - | (3.8) | (17.2) |
| A/P and other disbursements | (477.5) | (43.8) | (48.1) | (34.5) | (31.4) | (37.1) | (25.2) | (24.3) | (34.7) | (29.3) | (27.7) | (36.9) | (32.2) | (405.3) |
| Professional fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Sub-total operating disbursements** | (1,688.9) | (103.1) | (235.7) | (146.8) | (80.6) | (101.7) | (86.1) | (74.1) | (167.4) | (145.0) | (66.5) | (91.3) | (122.8) | (1,421.1) |
| POC and debt related payments | (142.1) | (4.2) | (5.4) | (4.9) | (9.0) | (7.9) | (14.9) | (3.1) | (8.5) | (4.8) | (32.2) | (25.6) | (36.6) | (157.1) |
| **Total disbursements** | (1,831.0) | (107.3) | (241.1) | (151.7) | (89.6) | (109.6) | (101.0) | (77.2) | (175.9) | (149.8) | (98.8) | (116.9) | (159.4) | (1,578.2) |
| **Net cash flow** | **(65.5)** | **16.9** | **42.6** | **(43.5)** | **(22.0)** | **0.5** | **2.1** | **147.8** | **(32.1)** | **(53.3)** | **(25.2)** | **4.6** | **(34.4)** | **4.0** |
| Cumulative net cash flow | | 16.9 | 59.5 | 16.0 | (6.0) | (5.5) | (3.4) | 144.4 | 112.3 | 59.0 | 33.9 | 38.4 | 4.0 | |
| Beginning cash balance | 95.3 | 29.8 | 46.7 | 89.3 | 45.8 | 23.8 | 24.3 | 26.4 | 174.2 | 142.1 | 88.8 | 63.7 | 68.2 | 29.8 |
| Net cash flow | (65.5) | 16.9 | 42.6 | (43.5) | (22.0) | 0.5 | 2.1 | 147.8 | (32.1) | (53.3) | (25.2) | 4.6 | (34.4) | 4.0 |
| **Cash before required distributions** | **$29.8** | **$46.7** | **$89.3** | **$45.8** | **$23.8** | **$24.3** | **$26.4** | **$174.2** | **$142.1** | **$88.8** | **$63.7** | **$68.2** | **$33.8** | **$33.8** |
| Accumulated property tax distributions | (27.9) | (48.1) | (77.8) | (31.8) | (32.9) | (31.5) | (48.0) | (149.8) | (89.5) | (26.9) | (26.0) | (28.5) | (19.7) | (19.7) |
| **Cash net of distributions** | **$1.9** | **$(1.4)** | **$11.5** | **$14.0** | **$(9.1)** | **$(7.1)** | **$(21.5)** | **$24.4** | **$52.6** | **$61.9** | **$37.6** | **$39.7** | **$14.1** | **$14.1** |
| *Memo:* | | | | | | | | | | | | | | |
| Accumulated deferrals | (64.4) | (66.2) | (56.3) | (50.9) | (52.7) | (53.2) | (46.3) | (44.2) | (53.9) | (57.7) | (61.5) | (65.8) | (118.7) | (118.7) |
| Refunding bond proceeds in escrow | 28.6 | 28.6 | 81.7 | 81.7 | 81.7 | 81.7 | 71.7 | 71.7 | 71.7 | 71.7 | 71.7 | 51.7 | 51.7 | 51.7 |
| Reimbursements owed to other funds | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd |

13-53846-tjt Doc 8742 Filed 12/15/14 Entered 12/15/14 19:17:32 Page 102 of 181

135

| $ in millions | Forecast Jul-13 | Forecast Aug-13 | Forecast Sep-13 | Forecast Oct-13 | Forecast Nov-13 | Forecast Dec-13 | Forecast Jan-14 | Forecast Feb-14 | Forecast Mar-14 | Forecast Apr-14 | Forecast May-14 | Forecast Jun-14 | Forecast FY 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Receipts** | | | | | | | | | | | | | |
| Property taxes | $37.8 | $166.6 | $13.0 | $6.6 | $3.1 | $21.5 | $139.1 | $20.8 | $4.8 | $1.3 | $2.5 | $51.1 | $468.4 |
| Income & utility taxes | 28.7 | 22.7 | 22.3 | 28.3 | 22.7 | 22.3 | 28.3 | 23.5 | 22.7 | 28.3 | 22.3 | 22.7 | 294.7 |
| Gaming taxes | 14.6 | 14.1 | 8.9 | 23.1 | 10.4 | 9.4 | 22.1 | 9.9 | 15.1 | 17.4 | 13.2 | 11.8 | 170.0 |
| Municipal service fee to casinos | 7.6 | | | 4.0 | 4.0 | 4.0 | 1.8 | | | | | | 17.4 |
| State revenue sharing | 30.7 | | 30.7 | | 30.7 | | 30.7 | | 30.7 | | 30.7 | | 184.3 |
| Other receipts | 27.2 | 25.8 | 25.9 | 32.9 | 26.3 | 25.9 | 32.9 | 27.1 | 26.3 | 32.9 | 25.9 | 26.3 | 335.9 |
| Refinancing proceeds | | | | | | | | | | | | | |
| **Total operating receipts** | **139.1** | **236.9** | **100.9** | **91.0** | **97.2** | **83.2** | **255.0** | **81.3** | **99.6** | **80.0** | **94.6** | **111.9** | **1,470.7** |
| **Operating Disbursements** | | | | | | | | | | | | | |
| Payroll, taxes, & deductions | (31.0) | (26.6) | (26.6) | (35.5) | (26.6) | (26.6) | (31.0) | (26.6) | (26.6) | (35.5) | (26.6) | (26.6) | (345.6) |
| Benefits | (15.5) | (15.5) | (15.5) | (15.5) | (15.5) | (15.5) | (15.5) | (14.0) | (14.0) | (14.0) | (14.0) | (14.0) | (178.6) |
| Pension contributions | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (175.9) |
| Subsidy payments | (7.6) | (5.0) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (75.6) |
| Distributions - tax authorities | (14.8) | (72.4) | (40.0) | (5.7) | (1.0) | (1.3) | (57.3) | (20.9) | (14.0) | (1.7) | | (24.0) | (253.1) |
| Distributions - UTGO | | (12.0) | | | | | | | (44.9) | | | | (56.9) |
| Distributions - DDA increment | | | | | (8.0) | | | | | | | (1.0) | (9.0) |
| Income tax refunds | (2.5) | (2.7) | (.06) | (0.3) | (1.5) | (1.0) | (0.6) | (0.3) | (0.4) | (2.3) | (1.2) | (3.7) | (17.0) |
| A/P and other disbursements | (36.3) | (37.9) | (29.3) | (37.1) | (30.1) | (25.6) | (40.8) | (23.0) | (33.5) | (39.7) | (30.0) | (30.0) | (393.2) |
| Sub-total operating disbursements | (122.3) | (186.7) | (132.8) | (115.1) | (95.6) | (98.9) | (166.0) | (105.8) | (154.4) | (114.3) | (92.8) | (120.3) | (1,504.9) |
| POC and debt related payments | (7.4) | (4.2) | (5.8) | (8.5) | (7.3) | (15.4) | (7.3) | (4.2) | (5.7) | (51.9) | (7.3) | (39.1) | (164.2) |
| **Total disbursements** | **(129.6)** | **(191.0)** | **(138.6)** | **(123.5)** | **(102.9)** | **(114.3)** | **(173.4)** | **(110.0)** | **(160.2)** | **(166.1)** | **(100.1)** | **(159.3)** | **(1,669.1)** |
| Net cash flow | 9.5 | 45.9 | (37.7) | (32.6) | (5.7) | (31.1) | (81.6) | (28.7) | (60.6) | (86.1) | (5.5) | (47.4) | (198.5) |
| Cumulative net cash flow | 9.5 | 55.4 | 17.7 | (14.9) | (20.6) | (51.7) | 29.9 | 1.1 | (59.4) | (145.6) | (151.0) | (198.5) | |
| Beginning cash balance | 33.8 | 43.3 | 89.2 | 51.5 | 18.9 | 13.2 | (17.9) | 81.6 | 34.9 | 25.6 | 111.8 | (117.2) | 33.8 |
| Net cash flow | 9.5 | 45.9 | (37.7) | (32.6) | (5.7) | (31.1) | 81.6 | (28.7) | (60.6) | (86.1) | (5.5) | (47.4) | (198.5) |
| **Cash before required distributions** | **$43.3** | **$89.2** | **$51.5** | **$18.9** | **$13.2** | **$(17.9)** | **$63.7** | **$34.9** | **$(25.6)** | **$(111.8)** | **$(117.2)** | **$(164.7)** | **$(164.7)** |
| Accumulated property tax distributions | (29.8) | (55.4) | (24.0) | (22.7) | (23.7) | (38.6) | (86.5) | (82.2) | (27.1) | (26.5) | (28.5) | (19.7) | (19.7) |
| **Cash net of distributions** | **$13.5** | **$33.8** | **$27.4** | **$(3.8)** | **$(10.5)** | **$(56.5)** | **$(22.8)** | **$(47.2)** | **$(52.7)** | **$(138.2)** | **$(145.7)** | **$(184.4)** | **$(184.4)** |
| *Memo:* | | | | | | | | | | | | | |
| Accumulated deferrals | (119.3) | (112.4) | (112.8) | (113.5) | (113.9) | (114.4) | (115.0) | (115.5) | (116.0) | (116.6) | (117.1) | (117.6) | (117.6) |
| Refunding bond proceeds in escrow | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 |
| Reimbursements owed to other funds | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd |

50

13-53846-swr Doc 8409 Filed 11/20/14 Entered 11/20/14 18:26:13 Page 135 of 135

## IN THE ABSENCE OF A COMPREHENSIVE FINANCIAL RESTRUCTURING, BUDGET DEFICITS WILL CONTINUE FOR THE FORESEEABLE FUTURE.

**The City Has Limited Options for Further Revenue Generation and, in the Absence of a Comprehensive Financial Restructuring, Cost-Saving Measures.**

- Legacy obligations continue to increase;
- Limited or no access to capital markets;
- Diminishing, if any, returns from further tax increases; and
- Minimal potential for further payroll related reductions.

**Absent Structural Changes, the City's Accumulated Deficit is Expected to Grow to Unprecedented Levels.**

- At the City's current run rate, its accumulated deficit could grow to 3-4 times its current level of $326.6 million to over $1.35 billion by FY 2017.

# A Look at the Future in the Absence of Restructuring Initiatives

**Note:** The following projections were prepared based solely on the City's current levels of operating expenses and capital expenditures and do *not* account for (i) increases in expenditures necessary to restore City services to adequate levels, (ii) additional investment by the City in services, assets or infrastructure or (iii) any changes to legacy liabilities.

| ($ in millions) | FISCAL YEAR ENDED ACTUAL | | | | | PRELIMINARY FORECAST | | | | | 5-YEAR TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | |
| **Revenues** | | | | | | | | | | | |
| Municipal income tax | $276.5 | $240.8 | $216.5 | $228.3 | $233.0 | $238.7 | $243.4 | $247.3 | $249.0 | $250.7 | $1,229.1 |
| State revenue sharing | 249.6 | 266.6 | 263.6 | 239.3 | 173.9 | 182.8 | 184.3 | 186.1 | 187.9 | 189.5 | 930.4 |
| Wagering taxes | 180.4 | 173.0 | 183.3 | 176.9 | 181.4 | 173.0 | 170.0 | 168.3 | 170.0 | 171.7 | 853.0 |
| Sales and charges for services | 191.3 | 166.7 | 154.1 | 155.0 | 145.4 | 120.4 | 124.8 | 119.4 | 118.2 | 117.0 | 599.7 |
| Property taxes | 155.2 | 163.7 | 143.0 | 182.7 | 147.8 | 134.9 | 118.4 | 110.2 | 105.7 | 100.8 | 570.0 |
| Utility users' and other taxes | 73.0 | 71.5 | 64.8 | 64.8 | 57.1 | 54.8 | 47.2 | 40.9 | 40.9 | 41.3 | 225.0 |
| Other revenue | 156.9 | 142.7 | 134.2 | 152.4 | 125.5 | 93.4 | 75.6 | 55.8 | 55.8 | 55.9 | 336.4 |
| General Fund reimbursements | 34.7 | 55.7 | 47.6 | 32.3 | 47.6 | 31.2 | 30.3 | 30.3 | 30.3 | 30.3 | 152.2 |
| Transfers in (UTGO millage & non-General Fund POCs) | 80.1 | 82.5 | 83.8 | 85.1 | 85.8 | 92.8 | 89.0 | 87.9 | 83.8 | 84.4 | 438.0 |
| **Total revenues** | 1,397.7 | 1,363.3 | 1,291.0 | 1,316.8 | 1,196.9 | 1,121.9 | 1,082.8 | 1,046.2 | 1,041.5 | 1,041.4 | 5,333.8 |
| **Expenditures** | | | | | | | | | | | |
| Salaries/overtime/fringe | (509.9) | (506.6) | (466.4) | (454.8) | (431.5) | (357.3) | (341.5) | (341.9) | (346.4) | (352.5) | (1,739.7) |
| Health benefits - active | (49.9) | (54.4) | (70.8) | (64.6) | (54.3) | (43.1) | (51.2) | (54.0) | (57.4) | (61.0) | (266.7) |
| Other operating expenses | (551.2) | (464.3) | (427.5) | (368.2) | (371.3) | (291.6) | (292.9) | (288.2) | (295.9) | (301.5) | (1,470.2) |
| Operating expenditures | (1,111.1) | (1,025.3) | (964.7) | (887.5) | (857.1) | (692.0) | (685.7) | (684.1) | (699.7) | (715.0) | (3,476.6) |
| **Net operating surplus** | 286.7 | 338.0 | 326.3 | 429.2 | 339.8 | 429.9 | 397.2 | 362.0 | 341.8 | 326.3 | 1,857.2 |
| Debt service (LTGO & UTGO) | (133.8) | (177.6) | (135.9) | (137.3) | (135.6) | (141.4) | (135.9) | (124.4) | (119.4) | (96.1) | (617.2) |
| POC - principal and interest | (29.8) | (25.1) | (28.1) | (38.9) | (39.0) | (55.4) | (61.0) | (63.2) | (65.4) | (67.6) | (312.6) |
| POC swaps | (45.3) | (49.9) | (50.7) | (50.7) | (50.7) | (50.6) | (50.6) | (50.6) | (50.6) | (50.6) | (253.1) |
| Pension contributions | (76.3) | (65.7) | (50.8) | (119.5) | (86.1) | (78.3) | (199.5) | (233.1) | (258.9) | (285.9) | (1,055.8) |
| Health benefits - retiree | (129.3) | (143.7) | (132.3) | (139.7) | (150.1) | (151.6) | (140.7) | (151.1) | (161.6) | (172.0) | (776.9) |
| Legacy expenditures | (414.6) | (462.0) | (397.9) | (486.1) | (461.6) | (477.3) | (587.6) | (622.4) | (655.9) | (672.3) | (3,015.6) |
| **Deficit (excl. financing proceeds)** | (127.9) | (124.1) | (71.7) | (56.9) | (121.8) | (47.4) | (190.5) | (260.4) | (314.1) | (346.0) | (1,158.4) |
| Financing proceeds | 75.0 | - | 250.0 | - | - | 137.0 | - | - | - | - | 137.0 |
| **Total surplus (deficit)** | $(52.9) | $(124.1) | $178.3 | $(56.9) | $(121.8) | $89.6 | $(190.5) | $(260.4) | $(314.1) | $(346.0) | $(1,021.4) |
| Accumulated unrestricted General Fund deficit | $(219.2) | $(331.9) | $(155.7) | $(196.6) | $(326.6) | $(237.0) | $(427.5) | $(687.9) | $(1,002.0) | $(1,348.0) | |

52

# THE CITY HAS TAKEN ACTION TO ADDRESS ITS FINANCIAL CHALLENGES

The City has already taken numerous steps to improve its financial position including expense savings and revenue increases. These initiatives save the City an estimated $200 million per year but they also impose substantial burdens on the City's workforce and residents.

**Headcount Reductions.**

- Since 2011, the City has reduced its headcount by more than 2,700 employees (from 12,302 employees as of close of FY 2010 to approximately 9,560 as of May 31, 2013).

- The City's headcount reductions have resulted in annual savings of over $100 million.

**Reductions of Labor Costs through Implementation of City Employment Terms.**

- On July 12, 2012, the Financial Advisory Board approved the CETs for (i) employees in unions with expired CBAs and (ii) nonunion employees, effective as of July 17, 2012.

- Among other things, the CETs provide for (i) wage reductions (implemented through imposition of furlough days); (ii) caps/reductions on vacation/holiday pay/overtime/sick days; (iii) the reduction of pension multipliers; and (iv) changes to healthcare coverage.

- Implementation of the CETs provides for an estimated $102 million in annual savings.
  - $25 million in savings attributable to wage reductions (24% of savings).
  - $59 million in savings attributable to reduced active and retiree benefits (59% of savings).
  - $9 million in savings attributable to reduced pension costs (9% of savings).
  - $8 million in savings attributable to changes to work rules (8% of savings).

- **Police Work Rules.** The CETs implement a number of changes to work rules governing the DPD. For example, the CETs implement changes related to (i) the establishment of a joint labor/management committee to determine the assignment of civilians to certain job functions (*i.e.*, "civilianization"); (ii) the ability of the chief of police to hire and deploy personnel; (iii) limitations on court time pay, holiday pay, eligibility for overtime pay, holiday pay and bonus vacation days; (iv) elimination of educational reimbursement programs; (v) elimination of "wage differential" compensation while employees are on roster for promotion; and (vi) delaying separation payments.

- **Other Union Rules.** The CETs also implement a number of changes to work rules governing those unions with contracts that expired on or before June 30, 2012. For example, the CETs implement changes related to (i) freezing sick leave banks and eliminating reserve sick leave accrual; (ii) elimination of sick time cash payouts for future earned time; (iii) reserving the City's right to reinstate furlough days; (iv) elimination of the $3-per-day allowance for daily car usage; (v) elimination of four to six annual bonus vacation days; and (vi) reduced vacation accrual to 160 hours from 320 hours.

### Revenue Generating Initiatives.

- **Increased Corporate Tax Rate.** In January 2012, the City's corporate income tax rate was raised to 2.0% from 1.0%. This increased rate was projected to generate an estimated $6 million in additional annual revenue.

- **Enhanced Tax Collection Initiatives.** The City has implemented, and is implementing, initiatives designed to (i) improve collection of past due taxes and (ii) enhance collection efforts on a prospective basis. These efforts to enhance collection of taxes could generate an estimated $13 million in additional annual revenue.

- **Increased Lighting Rates.** In January 2013, the PLD increased its rates to more closely align with market rates/ eliminate practice of charging customers less for power than the City itself was paying. Increased PLD rates could generate an estimated $9 million in additional annual revenue.

### Significantly Reduced Operating Expenses.

- **Reductions in Vendor Costs.** The City is implementing an initiative to reduce its vendor-related costs by 10%. Reductions in vendor costs are expected to save an estimated $10 million annually.

- **Reduction in Subsidy to DDOT.** In 2012, the City undertook steps to improve the efficiency of the Detroit Dep't of Transportation (*e.g.*, through route rationalization), thereby reducing the subsidy from the City's General Fund to the DDOT enterprise fund by approximately $15 million annually.

54

13-53846-swd Doc 509 Filed 05/03/13 Entered 05/03/13 12:14:18 Page 61 of 135

**Deferred Capital Expenditures.**

- The City has deferred capital expenditures.

  - Average aggregate capital outlays for the fiscal years 2008 – 2012 were only $82.98 million. Average aggregate capital outlays for the preceding fiscal years 2003 – 2007 were $151.94 million.

  - For fiscal years 2014 – 2023, it is estimated that General Fund necessary capital expenditures will average approximately $145 million.

**Demolition Initiative.**

Program launched in April 2010 with the goal of demolishing 10,000 vacant structures in 3 years.

- Over 5,000 structures have been demolished; the remaining portion of the 10,000 structures in the program are planned to be demolished by December 2013.

- Despite $72 million in committed and expended funds for this initiative, there is a funding gap of $40 million to complete the demolition of 10,000 structures and achieve the program's goal.

- Demolition initiative only addresses 13% of the vacant buildings in the City and 26% of such buildings that are classified as dangerous.

  - Ancillary demolition initiative in partnership with State allocated $10 million related to mortgage-related settlement to targeted demolition of 1,234 structures around schools. 179 structures demolished as of February, 28, 2013 (with another 56 under contract).

**Execution of Consent Agreement/Creation of Financial Advisory Board.**

- **Early 2012:** City and State negotiate a "Financial Stability Agreement" (often referred to as the "Consent Agreement") in an effort to achieve (i) financial stability for the City and (ii) a stable platform for future growth.

- The City Council approved the Consent Agreement on April 4, 2012. The Consent Agreement was executed by the Mayor, the members of a State-appointed Financial Review Team, the State Treasurer and the Governor as of April 5, 2012.

- The Consent Agreement created a "Financial Advisory Board" (the "*FAB*"), of nine members selected by the Governor, the State Treasurer, the Mayor and City Council.

  - Under the Consent Agreement, the FAB had an oversight role and limited powers over certain City reform and budget activities.

  - The FAB has held, and continues to hold, regular public meetings and continues to exercise its oversight functions consistent with the Consent Agreement.

- To implement the reform efforts set forth in the Consent Agreement, the positions of "Chief Financial Officer" and "Program Management Director "were established. Each report to the Mayor.

**Legislation Authorizing Appointment of an Emergency Manager ("*EM*").**

- In 1990, the Michigan Legislature enacted Public Act 72 ("*PA 72*"), which empowered the State to intervene in municipalities facing financial crisis through the appointment of an EM who, once appointed, assumed many of the powers ordinarily held by local elected officials.

- Effective March 16, 2011, the Legislature repealed PA 72 and enacted Public Act 4 ("*PA 4*"). PA 4 enhanced the State's power to intervene in financially troubled municipalities by, for example, giving EMs the authority to unilaterally modify, reject or terminate municipal contracts.

- Michigan voters rejected PA 4 by referendum on November 5, 2012.

- The Michigan Court of Appeals ruled that the rejection of PA 4 automatically revived PA 72.

- Effective March 28, 2013, the Legislature enacted Public Act 436 ("*PA 436*"), which repealed and replaced the revived PA 72.

  - Like PA 4, PA 436 empowers EMs to modify, reject or terminate municipal contracts.

  - PA 436 contains an appropriations provision that immunizes the law from referendum.

56

**Appointment of EM.**

- Pursuant to PA 72, on December 19, 2012, Governor Snyder appointed a Financial Review Team to examine the City's financial situation.

- On February 19, 2013, the Financial Review Team issued a report concluding that Detroit was in a state of financial emergency.

- Based upon the Financial Review Team's findings, on March 1, 2013, the Governor determined that a financial emergency existed in Detroit — a determination that, under PA 72, required the Local Emergency Financial Assistance Loan Board ("LEFALB") to appoint an EM for Detroit.

- On March 14, 2013, the LEFALB appointed Kevyn Orr as EM for Detroit.

  - Mr. Orr's first employment contract became effective on March 25, 2013, the day Mr. Orr began work as EM. Three days later, on the date PA 436 repealed and replaced PA 72, Mr. Orr and the State entered into a second contract.

**Litigation Relating to Detroit EM Appointment.**

- In *Davis v. Local Emergency Financial Assistance Loan Board*, pending in the Ingham County Circuit Court, the plaintiff (i) alleges violations of Michigan's Open Meetings Act by the LEFALB in connection with Mr. Orr's appointment as Detroit EM and (ii) requests that the court invalidate that appointment.

  - Case law indicates that the LEFALB is not a public body subject to the Open Meetings Act.

  - Parties are currently engaged in various discovery disputes and dispositive motion practice; answer yet to be filed.

- In *Citizens United Against Corrupt Government v. Local Emergency Financial Assistance Loan Board*, pending in the U.S. District Court for the Eastern District of Michigan, the plaintiff (i) argues that Mr. Orr could not have been appointed under PA 72, because that law could not have been in effect and (ii) asks the court to reverse its previous opinion that voter rejection of PA 4 revived PA 72.

## Litigation Challenging PA 436

- In *Phillips v. Snyder*, pending in the U.S. District Court for the Eastern District of Michigan, the plaintiffs seek, among other things, (i) declaratory relief that PA 436 violates, among other things, the U.S. Constitution and the Voting Rights Act; and (ii) injunctive relief, among other things, preventing the Defendants and any EMs from exercising rights under PA 436. A hearing on the defendants' motion to dismiss is scheduled for August 21, 2013.

- In Detroit NAACP v. Snyder, pending in the U.S. District Court for the Eastern District of Michigan, the plaintiffs seek an order declaring that PA 436 violates the Due Process and Equal Protection clauses of the U.S. Constitution. The plaintiffs assert that the Michigan Legislature violated the pre-clearance requirement of section 5 of the Voting Rights Act in passing PA 436. The plaintiffs seek injunctive relief against any actions taken pursuant to PA 436, including all actions initiated by EMs.

## Litigation Concerning Actions Taken by Other EMs.

- Since 1990, EMs have been appointed to restructure the finances of Hamtramck, Highland Park, Flint, Three Oaks, Pontiac, Ecorse, Benton Harbor, Allen Park — and now Detroit. Except for Hamtramck, Highland Park, Ecorse and Three Oaks, each of these municipalities remains under the control of an EM. The school districts of Detroit, Highland Park and Muskegon Heights also are currently operating under EM control.

- Opponents have challenged various EM actions in administrative proceedings, arbitration and lawsuits with mixed results.

  - **Litigation Relating to Actions Affecting CBAs.** Under PA 4, EMs have ordered unilateral modifications to CBA provisions. Plaintiffs have challenged such modifications on federal and state law grounds, including constitutional challenges based on Contracts Clause and Due Process arguments.

    - **Limitation on EM Power to Modify CBAs.** On March 29, 2013, the United States District Court for the Eastern District of Michigan enjoined an EM's unilateral modifications to CBAs with unions representing municipal retirees. The EM had shifted certain health care costs from the municipality to retirees. The court granted the plaintiffs' motion for a preliminary injunction on Contracts Clause and Due Process Clause grounds. An appeal is pending before the Sixth Circuit Court of Appeals.

58

- **Litigation Relating to Changes in Salaries of Local Elected Officials.**

  - EMs have reduced the compensation paid to mayors and city council members, at least on a temporary basis. Courts have held that local elected officials do not have property rights to continued compensation at a pre-existing level, and that an EM can eliminate elected officials' salaries entirely.

- **Litigation in Connection with Termination of Unelected Municipal Employees with "For Cause" Contracts.**

  - While an EM's broad power to hire and terminate at-will municipal employees has not been subject to any legal challenges, the Sixth Circuit Court of Appeals recently affirmed a ruling that, under PA 72, an EM did not have authority to fire a municipal employee who was not a department head, and whose employment contract provided for dismissal only "for cause," without first providing notice and an opportunity to be heard.

- **Litigation in Connection with Modification or Termination of Municipal Contracts.**

  - PA 4 contained a provision authorizing an EM to "[r]eject, modify, or terminate 1 or more terms and conditions of an existing contract." PA 436 contains identical language.

  - Although no ruling to date has invalidated the statutory authority of an EM to modify or reject contracts, a Michigan circuit court recently ruled PA 4's contract-modification provision unconstitutional as applied.

  - The U.S. District Court for the Eastern District of Michigan recently rejected cross-motions for summary judgment and scheduled a bench trial to resolve a claim that an EM's termination of real estate leases violated the Contracts Clause of the U.S. Constitution.

- **Litigation in Connection with Bidding Processes for Municipal Contracts.**

  - Recent litigation regarding the fairness and transparency of a contract bidding process instituted by an EM was settled prior to decision (and after denial of injunctive relief).

- **Litigation Concerning Michigan's Open Meetings Act.**

  - The Michigan Court of Appeals has held that an EM is not subject to the state Open Meetings Act, even when the EM assumes the duties of a body that is subject to the act (*e.g.*, the city council).

- **Litigation Concerning Restructuring a Municipal Pension Board.**

  - In a case that may be particular to PA 72, displaced pension board members and others obtained an injunction staying an EM's decision to restructure a city's largest pension board (reducing its membership from 11 to 5) in Michigan circuit court. The defendants have moved for leave to appeal in the Michigan Court of Appeals.

## Continuing Role of Mayor and City Council.

- Under PA 436, Mr. Orr acts for and in the place of the Detroit mayor and city council.

- PA 436 prohibits Detroit's local elected officials from exercising any powers except as expressly authorized by PA 436 or as authorized in writing by Mr. Orr and subject to any conditions he may impose.

- Nevertheless, both the Mayor and the City Council have continuing legal roles and rights under PA 436. Maintaining such offices should help ensure that the executive and legislative branches of City government can resume full functioning upon the City's transition out of receivership.

- On March 25, 2013, Mr. Orr issued an order restoring the full salaries and benefits of the mayor and city council, which compensation otherwise would have been automatically eliminated on PA 436's effective date of March 28, 2013.

- On April 11, 2013, Mr. Orr issued an order authorizing the mayor and city council to continue conducting the day-to-day business of the City, subject to limitations imposed by PA 436 and Mr. Orr's ultimate approval.

- Since Mr. Orr's appointment, the FAB continues to serve, but its responsibilities and powers remain subject to modification.

60

# RESTRUCTURING AND REINVESTING IN CITY GOVERNMENT

To address the crises confronting the City and remedy the deficiencies in services addressed above (including, in particular, deficiencies in services relating to public safety), and to achieve a sustainable restructuring that promotes the longterm health, safety and growth of the City, the City must aggressively pursue – and devote substantial resources to – the objectives described below.

The City proposes to spend approximately $1.25 billion over the next ten years to, among other things, (i) improve the performance and infrastructure of its Police, Fire, EMS and Transportation Departments, (ii) comprehensively address and remediate urban blight, (iii) modernize its information technology systems on a City-wide basis and (iv) address lingering issues plaguing the City's electrical grid and lighting.

A detailed summary of the reinvestments to be made in the City — and the associated costs — is attached hereto as Appendix J.

## PUBLIC SAFETY

**Police.**

- **Key Issues and Deficiencies to Be Addressed.**
  - Exceedingly high crime rates.
  - Outdated and obsolete information technology.
  - Poor quantitative performance (*e.g.*, low response times; low case closure rates)
  - Inadequate staffing, low employee morale and lack of employee accountability.
  - Aging infrastructure (*e.g.*, fleet and facilities).

- **Measurable Objectives.**

  - Reduce response times to the national average.

  - Improve closure rates and first responder investigations.

  - Update and overhaul police fleet and facilities.

  - Modernize the Department's information technology.

  - Achieve compliance with federal consent decrees.

  - Refine structure, staffing and organization of department to better serve citizens; hold all members (sworn and civilian) of the department accountable to effectively maintain core responsibilities of policing.

- **Expected impact on restructuring/reinvestment expenses in FY 2014 and going forward**
  *(numbers in brackets represent increases in expenditures)*:

| ($ in millions) | FY 2014 | FY 2015 | FY 2016 | FY 2017 | FY 2018 |
|---|---|---|---|---|---|
| Total Restructuring/Reinvestment | | | | | |
| Facility Costs | (5.7) | (5.5) | (4.3) | (3.4) | (3.9) |
| Fleet Update - Repairs & Maintenance | (11.6) | (11.0) | (10.7) | (10.6) | (9.8) |
| Technology/Other | (9.0) | (6.2) | (1.1) | (1.1) | (1.1) |
| Total | (26.3) | (22.7) | (16.1) | (15.1) | (14.8) |

- **Initiatives To Be Undertaken to Achieve Objectives.**

  - Hiring of new police chief to drive DPD restructuring (in process).

  - Implement Compstat (*i.e.*, data-driven policing) model to increase accountability of command staff; evaluate outsourcing crime analysis to a third party with deep statistical analysis capabilities; implement key performance metrics driven by crime data.

  - Restructure department and streamline cumbersome processes to improve operational efficiency; evaluate precincts, districts and special units; utilize accountability metrics and IT systems to eliminate non-productive policing time.

  - Enhance DPD collaboration with all facets of community (*e.g.*, individuals, neighborhood groups, clergy, schools, private social service agencies); facilitate relationships with all facets of government.

  - Expand "Citizens Radio Patrol" to serve as extended eyes and ears of the DPD, thereby increasing law enforcement effectiveness; deploy to all areas of Detroit. A recently-implemented "Broken Windows" pilot project has achieved positive results in the 8th Precinct's Rosedale Park neighborhood. This pilot project could be expanded City-wide.

  - Restructured operations and deficient sworn staffing levels will be addressed by a comprehensive workload analysis and crime statistics trends; redeploy sworn members based on data-driven approach.

  - Civilianize eligible administrative functions and redeploy sworn officers.

  - Hold all members (sworn and civilian) of the department accountable; redesign disciplinary process and ensure it is transparent, consistent and effective.

  - Develop strategy to address low employee morale.

  - Provide adequate operational and technological resources to officers (*e.g.*, uniforms, vests, tasers, vehicles, IT, etc.).

  - Better utilize police reserves.

  - Develop detailed recruiting strategy (with respect to both new recruits and experienced hires); explore outsourcing all or a portion of Police Academy training to local MCOLES certified academic institutions; continue to provide training courses on DPD rules, regulations, policies, and City ordinances; develop overall training plans for metrics, financials and operations.

- Evaluate location, number and condition of facilities (owned and leased); refresh vehicle fleet; increase facility and fleet maintenance expenditures to appropriate levels.

- Select and implement a fully integrated IT system; implement Jail Management System.

- Develop contracts and memoranda of understanding with neighboring law enforcement agencies for the sharing of resources (police, fire and EMS); enhance regional public safety with local and state public safety community cooperation.

- Increase fees for service ($2-3 million potential opportunity); expedite Eticketing implementation; identify additional grant funding to support public safety initiatives; pursue opportunities for donations; evaluate improving/outsourcing collections efforts.

- Restructure budget process to eliminate silos; implement budget to actual process; transfer budget and actual financial ownership to Command officers.

- Implement outsourcing contract with the Michigan Department of Corrections ("MDOC") to consolidate all DPD pre-arraignment jail operations into one centralized jail.

**Fire and EMS.**

- **Key Issues and Deficiencies to Be Addressed.**

  - Aging infrastructure (*e.g.*, fleet and facilities).

    - Inadequate maintenance and faulty equipment.

    - Outdated and obsolete information technology.

  - **Measurable Objectives.**

    - Modernize fleet and facilities to ensure that DFD has adequate and reliable infrastructure and equipment to perform its duties.

    - Modernize information technology.

    - Improve operating efficiency and cost structure.

13-53846-sw
13-53846-tjt
Doc 8742
Doc 7-9 Filed 12/15/14
Filed 08/31/19
Entered 12/15/14 19:17:32
Entered 08/31/13 23:41:20
Page 117 of 181
Page 71 of 135

64

- **Expected impact on restructuring/reinvestment expenses in FY 2014 and going forward** *(numbers in brackets represent increases in expenditures)*:

| ($ in millions) | FY 2014 | FY 2015 | FY 2016 | FY 2017 | FY 2018 |
|---|---|---|---|---|---|
| Total Restructuring/Reinvestment | | | | | |
| Facility Costs | (4.5) | (4.0) | (4.1) | (18.4) | (1.1) |
| Fleet Update - Repairs & Maintenance | (0.6) | (1.9) | (2.0) | (2.0) | (2.1) |
| Technology/Other | (1.3) | (0.2) | (0.2) | (0.2) | (0.2) |
| Total | (6.3) | (6.1) | (6.2) | (20.6) | (3.4) |

- **Initiatives To Be Undertaken to Achieve Objectives.**

  - Substantial investments in assets and new information technology are required to improve delivery of services.

  - Evaluate and implement revenue enhancements to improve and streamline billing and collections processes, increase charges and fees and enhance grant identification and management.

  - Take steps to improve operating efficiency and cost structure, including:

    - Implementing flexible labor work rules and employment terms;

    - Evaluating opportunities to more fully integrate fire-fighting and EMS;

    - Civilianizing administrative functions;

    - Transferring apparatus maintenance to General Services Department in an effort to more efficiently manage the fleet; and

    - Increasing the use of technology to drive efficiencies.

  - Seek assistance from independent experts to assist with designing and vetting DFD-specific restructuring plan.

  - Evaluate opportunities to share administrative costs within public safety structure.

  - Evaluate opportunities to combine fire and/or EMS services with other local municipalities.

**Blight Removal.**

- **Key Issues and Deficiencies to Be Addressed.**

  - Large numbers of abandoned and blighted structures.

  - Contribution of blight to high fire and crime levels and depressed property values.

  - High cost of demolition of blighted structures.

  - Cumbersome statutes and regulations governing blight removal efforts.

- **Measurable Objectives.**

  - Stabilize and revitalize neighborhoods and communities within the City and improve quality of life.

  - Decrease incidence of crime and fire in blighted buildings and areas.

  - Increase property values and property taxes.

  - Improvement in appearance of City.

  - Reduce migration from City.

- **Expected impact on restructuring/reinvestment expenses in FY 2014 and going forward**

  - Costs associated with blight removal include demolition, brush removal, recycling centers, disposal of debris, logistics, administration, and legal costs associated with clearing title and preserving the City's right to reimbursement of costs.

| ($ in millions) | FY 2014 | FY 2015 | FY 2016 | FY 2017 | FY 2018 |
|---|---|---|---|---|---|
| Total Blight Costs | 50.0 | 50.0 | 100.0 | 100.0 | 100.0 |

- **Initiatives to Be Undertaken to Achieve Objectives.**

  - The City has begun and will continue to remediate blight within the City by partnering with public and private initiatives and utilizing a mix of Federal, State, municipal and private (commercial and non-profit) resources.

  - The City's will participate in broader State initiatives coordinated by the Michigan State Housing Development Authority (MSHDA) and focus on collaboration across public entities holding underutilized lands; effective and appropriate blight removal policies and regulation; efficient and safe demolition and clearing activities from publicly owned properties; and returning properties to the private tax base to create value.

  - To the extent that resources become available to remediate blight within the City, the City may be able to accelerate its residential, commercial and industrial blight remediation, or reallocate budgeted resources to other initiatives or spending items, including supporting its liabilities.

  - Pursue grant funds to pay for the demolition of abandoned structures.

  - Review and, where appropriate, revise ordinances and regulations to speed and reduce the cost of the demolition process.

  - Support construction of recycling centers for local demolition materials via volume or other commitments.

  - Consolidate and integrate Police and Fire activity data to use strategic demolition activities as a means to reduce crime and arson.

**Electrical Transmission Grid.**

- **Key Issues and Deficiencies to Be Addressed.**
  - Inadequate maintenance and deterioration of grid.
  - Need to de-commission segments of the grid, sub-stations and the Mistersky power plant.
  - Inefficient billing and collection efforts.

- **Measurable Objectives.**
  - Improvement in performance of grid and services to citizens.
  - Decommissioning of grid, sub-stations and power plant.
  - Increased revenue collection from customers.

- **Initiatives to Be Undertaken to Achieve Objectives.**
  - The City is considering alternatives to exit the electricity business.
  - An alternative being considered consists of migrating customers to an alternative provider over a five-to seven-year period with the alternative provider providing reimbursement to the City to maintain the distribution grid on the provider's behalf.
    - Five- to seven-year build-out:
      - i. Year 1 — meters changed to alternative provider's system and customers transitioned. PLD continues to operate and maintain the system during the transition period.
      - ii. Years 2-7 — customers migrate to alternative provider's grid on a substation by substation basis as the PLD operation is simultaneously scaled down.
    - Customers (including City) would pay alternative provider's rate book (which could be higher than the current rate charged/incurred by City).
    - PLD workers and/or third party contractors will operate and maintain City grid until build-out is finished (cost reimbursed by alternative provider subject to negotiation). Requires regulatory approval.

68

**Street lights**

- **Key Issues and Deficiencies to Be Addressed.**
  - High percentage of non-functioning streetlights.
  - Working lights not adequately serving current population footprint.
  - Dated infrastructure requiring upgrade and modernization.

- **Measurable Objectives.**
  - Implementation current population-based streetlight footprint.
  - Outsource operations and maintenance to the newly-created Public Lighting Authority structure (in consultation with the City).
  - Improved service to citizens and better cost management.

- **Initiatives to Be Undertaken to Achieve Objectives.**
  - Short term: address outages systematically in an effort to restore light and facilitate the transition of streetlights to the new structure.
  - Long term: newly-established authority to upgrade, operate and maintain streetlights, resulting in an approximately 46,000-55,000 light footprint servicing today's Detroit.
    - Three year build-out (1/3 of lights each year).
    - Alternative provider will potentially manage project for Authority (subject to competitive bid).
    - Authority or City will negotiate special rate for operations and maintenance/electricity of lights as no regulated rate exists for operations and maintenance of municipal-owned system.

- **Expected impact on restructuring/reinvestment expenses in FY 2014 and going forward.**
  - Under the proposed structure, the PLD's net tax cost is expected to be approximately $12 million annually.
  - The $12.5 million of utility users' tax will be directed to the Authority as per statute. The Authority may seek to issue debt of $160 million secured by tax receipts to fund its activities.

**Information Systems Upgrades**

- Investment by the City in upgraded information technology is an indispensable aspect of the restructuring and reinvestment proposals and is critical to achieving almost all of the objectives described herein.

- **Key Issues and Deficiencies to Be Addressed.**

  - Old and outdated technology assets and applications.

  - Lack of integration of IT infrastructure between departments and functions.

  - Deficiencies in IT infrastructure present throughout City government.

- **Measurable Objectives.**

  - Enhance City-wide IT infrastructure to assist with effectuating change and augmenting workflows.

  - Increase integration between finance and operational systems City-wide resulting in lower labor costs and improved efficiencies.

  - Improve financial and operational reporting, resulting in:

    - Ability to monitor and improve operating performance.

    - More timely and accurate financial reporting to interested parties.

    - Improve revenue and collection efforts as a result of streamlined processes.

- **Initiatives to Be Undertaken to Achieve Objectives.**

  - **DPD, DFD & EMS.**

    - DPD has identified a fully integrated public safety solution (SunGard/OSSI) that can provide DPD, DFD and EMS (all of which support the solution) with integrated computer aided dispatch, records management and reporting.

    - Regional solution that integrates the City of Detroit with Wayne County, Detroit Public Schools, Wayne State University, Down River communities, etc.

    - Costs to implement Public Safety IT solution: approximately $5 million.

    - An integrated product will allow for much-needed data exchanges between agencies and will improve efficiency and operations.

70

- **Payroll System Upgrade.**
  - In November 2012, the City contracted to transition its payroll (and benefits and human resources) operations to ADP Payroll Services. The transition is expected to be complete in March 2014.
  - Benefits of payroll system upgrade:
    - Approximately $10 million annual reduction in payroll processing costs.
    - Approximately $10 million annual reduction to payroll inflation from errors.
    - Improved reporting, efficiency and accuracy.
    - Approximately 50+ uniformed policemen to be re-deployed.
- **Overhaul and Centralize Grant Management System.**
  - City receives approximately $293 million in grants related to its services each year.
  - City may invest in an overhaul of the administration of its grant management system, including centralizing oversight and support and standardizing information technology.
  - City may appoint an auditor general to screen for potential mismanagement of grant funding.
  - Benefits:
    - Implementing a centralized and standardized grant IT system is expected to result in the City receiving more grant funds with better compliance at a lower cost.
    - Ability to comprehensively track Citywide grant funds and status.
    - Citywide accountability structure to prevent disallowed costs and improve service delivery.
    - Improved relations with federal, state and private funders.
    - Ability to discover and apply for more grant opportunities.

- Costs:
  - Training modules to migrate system (cost TBD).
  - Implementation of grants IT module and related training.
  - Potential operating costs for grants management operating unit are approximately $700,000.

- **Assessor's Office and Property Tax Division.**
  - Recommendations made by consultant in 2011 have not been followed, even though implementation promises to increase efficiency of collection process.
  - A consultant is currently engaged to identify issues and make recommendations at Assessor's Office Division. The consultant's Property Tax Transformation Project engagement includes a review and assessment of operations and related recommendations, assistance with the Property Tax software upgrade and assistance with the preparation of the Summer Tax Bill for mail and distribution on July 1, 2013.
  - Preliminary recommendations to improve the Assessor's Office functionality include additional resources to create a more robust valuation function, additional employee training and updated technology to increase efficiency and improve customer service.

- **Integrate Budgeting, Accounting & Financial Reporting Systems.**
  - Integration of Accounting, Budget Development and Financial Reporting systems into a single process would provide for improved reporting, efficiency, accuracy and accountability.
  - Costs to implement such an integration initiative are not currently known.

- **Permitting.**

  - Implement "Enterprise Resource Planning" system to replace the two systems currently being utilized.

  - Total costs to implement Enterprise Resource Planning system: approximately $3 million.

- **36th District Court.**

  - State legislature is currently evaluating ability of all courts to go paperless; if accepted, paperless solution would provide many advantages to 36th District Court.

  - Transition to paperless court requires substantial investments in assets and new information technology.

  - Perform process mapping to determine workflow improvements and implement full use of JIS.

- **Income Tax Division.**

  - Update the current Income Tax System, which will result in (i) increased revenues for the City through improved revenue tax processing, tax compliance and collection; and (ii) improved reporting, efficiency and accuracy.

    - A new tax system that allows for automated processing and e-filing capability will free up City resources to focus on compliance.

**Detroit Department of Transportation.**

- **Key Issues and Deficiencies to Be Addressed.**
  - Grant dollars not maximized.
  - Poor maintenance.
  - Relatively low rate for fares.
  - High employee absenteeism.
- **Measurable Objectives.**
  - Reduce general fund subsidy through increased revenue and reduced costs.
  - Determine best strategic direction for DDOT.
- **Initiatives to Be Undertaken to Achieve Objectives**
  - A consultant is currently identifying short and long-term efficiencies. Preliminary identified efficiencies include:
    - Grants for preventative maintenance (Summer 2013).
    - Increased fares (long-term potential).
    - Less overtime in vehicle maintenance (long-term potential).
    - Less bus operator overtime (long-term potential).
  - City could transition DDOT to new Regional Transit Authority ("RTA") at some point in the future.
  - No change in DDOT's status is currently included in restructuring plan or budget; foregoing discussion contemplates restructuring of DDOT as a continuing Department within the City.
  - DDOT could be merged with SMART or another private carrier prior to potential transition into RTA.
  - Outsourcing certain portions or all of DDOT operations:
    - Would likely require certain regulatory approvals.
    - City of Detroit would have to subsidize third party operations, which subsidy may be less than current general fund subsidy.

74

- Outsourcing could assist in creating appropriate incentive structure to discourage status quo operations.
- Some City employees would still be required to oversee transferred bus operations.
- Allow for easier potential transition to RTA.
- Limited labor and financial resources could be deployed to other city core services.
- Bus service could improve for residents (*e.g.*, on-time; safety) at lower cost to the City.

- Expected impact on restructuring/reinvestment expenses in FY 2014 and going forward – not including outsourcing of operations or transition to a regional authority (*numbers in brackets represent increases in expenditures*):

| ($ in millions) | FY 2014 | FY 2015 | FY 2016 | FY 2017 | FY 2018 |
|---|---|---|---|---|---|
| Total Restructuring/Reinvestment | | | | | |
| Facility Costs | (6.3) | (8.0) | (1.5) | (2.0) | |
| Fleet Update - Repairs & Maintenance | (1.0) | (1.0) | (1.0) | | |
| Technology/Other | (3.5) | | | | |
| Total | (10.8) | (9.0) | (2.5) | (2.0) | – |

**Leases and Contracts.**

- The City's restructuring will entail a comprehensive review of the City's contracts (vendor; employee; construction; financial) and recommendations regarding modification/termination in various restructuring contexts.
- The City will review its key leases and contracts to determine if such agreements are the most cost-effective approach to managing Detroit's infrastructure
  - City currently working to assemble database of unexpired contracts and leases.
  - City to analyze and overhaul procurement process to ensure ability to acquire goods and services necessary to restructuring initiatives.

**Labor Costs and Terms and Conditions.**

As part of the City's overall financial restructuring, reductions in costs associated with represented and unrepresented workers will be necessary. The adoption of modifications to wages and work rules similar to those imposed pursuant to the CETs will serve as a baseline position for the City in its union negotiations (although the City may seek (i) cuts/ changes beyond those included in the CETs and (ii) different language that used in the CETs). Key elements of the strategy for making these modifications include the following:

- **Collective Bargaining Agreements.**

  • Significant modifications to CBAs and labor-related obligations will be necessary to optimize staffing and reduce employment costs.

  • The City currently does not have agreements with the majority of labor unions representing its employees. Instead, most employees are working under the CETs. As part of its restructuring effort, the City will work cooperatively with organized labor to improve existing relationships and, where possible, reach agreements to implement changes in terms and conditions of employment that mirror the changes included in the CETs.

  • The City will attempt to structure all new labor agreements using a common form of agreement that will promote ease of administration and enable a known, measurable basis for cost evaluation and comparison.

  • If it is not possible to reach agreements with labor representatives to restructure employment liabilities, the City will retain the authority to unilaterally implement restructuring initiatives pursuant to the emergency manager powers established under PA 436.

  • Pursuant to Section 13(c) of the Federal Transit Act, the City is required to engage in collective bargaining with labor unions representing transportation workers and has certain limitations in terms of its rights to make unilateral changes to employment terms. The City will work within the framework established by the FTA to achieve any labor cost reductions for these workers through collective bargaining.

76

- **Salaries and Wages.**

  - The City must reduce employment costs for both represented and unrepresented workers as part of its restructuring. However, the potential for reductions in wages and salaries must be balanced against likely reductions in benefits and the City's need to attract and retain skilled workers.

  - Both represented and unrepresented City workers have already been subjected to salary and wage reductions; most City workers covered by CETs already have taken 5-10% salary and/or wage reductions. As a result, the City will need to carefully evaluate the utility of any additional reductions.

  - Reductions in non-wage compensation, overtime and premium payments may be achievable.

  - Other areas where the City is evaluating potential cost reductions include: (i) attendance policies; (ii) leaves of absence; (iii) vacation days; (iv) holidays; (v) union reimbursement of City costs associated with paid union time and dues check off; (vi) tuition reimbursement and other loan programs; (vii) overtime; (viii) shift scheduling; (ix) shift premiums; (x) creation of new positions (and establishment of wage scale for new positions); and (xi) temporary assignments.

- **Operational Efficiencies/Work Rules.**

  - Significant labor cost reductions may be possible by restructuring jobs and streamlining work rules for both represented and unrepresented workers using the work rule changes implemented pursuant to the CETs as a template.

  - The City will work with labor representatives to make these improvements, including restructuring the Police Department, Fire Department, and other groups to improve operating efficiency and effectiveness.

  - Dispute resolution procedures under the City's CBAs will be simplified and expedited to achieve predictability for both sides. Further, the City will attempt to eliminate undesirable practices and assure that these practices cannot be revived through dispute resolution procedures.

  - The City will attempt to restructure CBAs so that employment decisions including promotions, transfers and assignments will be based upon the quality of the employee (*e.g.*, performance, attendance, experience, skill, ability, etc.) rather than by seniority.

- The City will attempt to (i) reduce lateral transfers by limiting bumping rights in its CBAs to job classifications that an employee currently holds or held within the prior year and (ii) increase flexibility to assign employees to work out of classification.

- Joint labor-management committees, if any, will be patterned in structure and role after the committees included in the State's CBAs.

- **Staffing Levels and Headcount.**

- Significant labor cost savings may be achievable by rationalizing staffing levels and reducing employee headcounts. Consolidation of departments and elimination of redundant functions will be implemented where service improvements or cost savings can be achieved.

- If necessary, the City will retain the right to reduce salary and wage costs by implementing unpaid furlough days.

- The City will work with labor representatives to minimize the effects of any headcount reductions and enter into effects bargaining agreements in connection with headcount reductions when appropriate.

- **Outsourcing.**

- Where cost savings or service improvements can be achieved, the City will explore potential outsourcing of functions.

- The City will provide unions with advance notice of competitive bids and allow the unions to bid on the work.

- The City will work with labor representatives to minimize the effects of any headcount reductions resulting from outsourcing initiatives and enter into effects bargaining agreements when appropriate.

# REVENUE ADJUSTMENTS AND TAX REFORM

## EXPANDING THE TAX BASE.

- The personal income tax base can be increased through economic growth, for example, more people working, higher wages, or both.

- Expansion of the property tax base results from appreciation in the value of existing real estate, adding newly constructed buildings to the tax rolls, or expanding the universe of property included in the base (*e.g.*, parcels that are currently exempt, such as churches and public schools).

## RATIONALIZING NOMINAL TAX RATES.

- The City's already high tax rates are widely believed to have contributed to its population loss and economic decline. For a number of reasons, higher tax rates could have a negative effect on revenue.

- The City is currently levying taxes at or near the statutory maximums.

- The City believes that lowering selected tax rates – primarily income and property tax rates – to levels that are at least competitive with surrounding jurisdictions is critical to reversing the City's crippling population and job losses.

- Although tax rate reform will likely lead to decreased revenue in the short term (which decreases may be partially offset by improved collection efforts), the City anticipates that the long term benefits promise to render such reform at least revenue neutral over a reasonable time frame.

- The City's analysis of necessary tax reforms is ongoing.

# INCREASING COLLECTION RATES.

- The City is implementing and will continue to implement initiatives designed to (i) improve collection of past due taxes and (ii) enhance collection efforts on a prospective basis.

  - **Income Tax Collection Initiatives:**

    - **Efforts to Improve Collection of Past Due Taxes**

      - Compuware has identified historical non-filers with outstanding tax obligations totaling approximately $250 million. The City is pursuing the collection of these taxes.

      - The City loses approximately $30 million to $45 million of income tax revenue annually (approximately 15% to 20% of the total tax collected) from reverse commuter non-filers.

      - As of March 2013, approximately 50,000 letters were sent to individual and business nonfilers. Goal is to send 100,000 letters total by the end of FY 2013.

      - As of January 31, 2013, the City had received approximately $870,000 in collections as a result of letters sent to non-filers.

      - Income Tax Amnesty Program: between January 22, 2013 and March 2, 2013, parties with outstanding income tax balances for tax years 2011 and prior could pay their back taxes without penalty.

        - Expected to result in $3 million in collections and $1.5 million in payment agreements as of March 2013.

    - **Efforts to Enhance Collection Going Forward**

      - Tax Compliance & Enforcement Unit created in October 2012.

      - Business on-line registration initiative to electronically capture W-2 data from employers launched in January 2013.

      - City considering purchasing a new tax system and moving to a common form.

        - Purchase of new income tax system — $2 million to $3 million one-time cost — would improve reporting, efficiency and accuracy.

80

- 19 of 22 cities in Michigan that collect taxes currently are using the "common form." Moving to the common form could result in a potentially smoother transition to a new income tax system, although the cost of such a move presently is unknown.

- City also intends to pass legislation to require withholding of City income taxes for reverse commuters.

- **Property Tax Collection Initiatives:**

- Only 53% of City property owners paid their 2011 property taxes. Approximately $246.5 million in taxes and fees went uncollected for 2011, of which $131 million was due to the City.

- Treasury Department received recommendations for process improvements from an outside consultant and the City's own audit department in 2011.

- Subsequently, the City engaged a consultant to conduct a four-week *pro bono* review of the City's property tax process. The consultant recommended that the City create an actionable work place using existing recommendations supplemented with the consultant's recommendations.

- As described above, in December 2012, the City engaged a different consultant to implement improvements in the Property Tax and Assessors Offices.

- **Permitting and Licensing Collection Initiatives:**

  - **Efforts to Collect on Past Due Invoices**

    - City is developing a structured collection effort for the $50 million outstanding accounts receivable owed to the Buildings, Safety Engineering and Environmental Department (BSEED).

    - City has identified, and is seeking payment of, approximately $8 million due from Wayne County for past due bills for permits and licenses (among other similar fees).

    - Updates to information technology systems (discussed earlier) should alleviate bottlenecks in invoicing and collections for permitting and licensing.

  - **Efforts to Improve Going Forward**

    - The goal is to increase the revenues derived from permits and licenses issued by the City.

      - City ceased waiving permit fees in March 2012.

    - City is developing recommendations for action, including a possible survey of businesses operating in the City and their outstanding permit and license requirements.

      - Currently, only 30% of businesses operating in the City have valid licenses. As of July 26, 2012, approximately 2,000 businesses were identified as being without a proper license.

82

# REALIZATION OF VALUE OF ASSETS

## DETROIT WATER AND SEWERAGE DEPARTMENT.

*The form of transaction described herein is based upon the form of transaction contemplated in the Root Cause Committee report. Any transaction would be contingent upon the City and relevant third parties reaching agreement on many matters, including, but not limited to, governance, amounts to be paid to the City, and the form and terms and conditions of such transaction. Thus, all of the terms and conditions of the transaction described below may change and it is possible that the current structure will not change.*

**Creation of New Metropolitan Area Water and Sewer Authority.** The City may form an authority (the Metropolitan Area Water and Sewer Authority, or "*MAWSA*") to conduct the operations currently conducted by the Detroit Water and Sewerage Department ("*DWSD*").

- MAWSA would operate as a standalone public authority and, depending on the form of any transaction, may be the employer of the employees engaged in operating the water/sewer systems who are employed by DWSD as of the effective date of any DWSD Transaction (defined below).

- MAWSA would be governed by a Board of Commissioners. The Mayor would have the authority to appoint four of the Board's members in accordance with the provisions of the February 2011 stipulated order entered in the EPA Litigation (the "*February Order*"), except that one of the four mayoral appointments would be made from a list of three names presented by the Detroit City Council. The other three Board members would be appointed as set forth in the February Order. The bylaws of MAWSA would include provisions to allow major customers to appoint additional Board members upon a super-majority vote of MAWSA's Board.

- MAWSA would have all of the powers of a public body corporate in Michigan including, but not limited to, the power to:

  - Hold property in its own name;

  - Contract in its own name;

  - Collect water and sewer fees;

  - Issue taxable and tax exempt revenue bonds or incur other indebtedness;

13-53846-swDoc 4-509 Filed Filed 08/31/14 Enter 07/6103/13 19:14:18 12/11 26 Page Page 136 of 135

- Apply for and receive loans from local, private, State and/or Federal sources including SRF loans;

- Sue and be sued in its own name;

- Subject to applicable approvals, apply for NPDES and any and all other permits required to operate the water and sewer systems;

- Subject to applicable approvals, if any, implement the powers delegated by prior Court orders; and

- Act on its own with respect to local ordinances and regulations that impact MAWSA operations (*i.e.*, downspout disconnects, etc.).

- All other powers granted or reserved to the City, the Mayor or the City Council with respect to DWSD under the State constitution, State statutes, the City's Charter (as it may be revised as part of the City's comprehensive restructuring) or Court orders that are not expressly continued would be eliminated for as long as MAWSA continues to operate.

- The Detroit City Council would have the authority to appoint each year an individual to serve as a customer advocate for Detroit retail customers. The advocate's compensation would be set by the director of MAWSA or MAWSA's Board of Commissioners in accordance with MAWSA's procurement policy.

**Benefits and Legacy Liability Treatment** (*applicable where MAWSA is the employer of persons operating the water and sewer system*).

- From and after the effective date of the City's comprehensive restructuring plan, for new hires and current employees, MAWSA would establish and serve as its own plan sponsor and administrator with respect to the establishment of a new, separate pension or retirement plan. The new pension or retirement arrangement would govern the future pension or retirement rights of current DWSD employees and the pension or retirement rights of future MAWSA employees, consistent with applicable future CBAs and/or other terms and conditions of employment.

- From and after the effective date of the City's comprehensive restructuring plan, for new hires and current employees, MAWSA would determine whether to provide healthcare to future retirees, and at what level.

84

- From and after the effective date of the City's comprehensive restructuring plan, current DWSD retirees and beneficiaries who have vested benefits in the City's General Retirement System would remain in GRS and receive the same treatment afforded to all other retirees in the GRS as part of the City's comprehensive restructuring plan. Current DWSD active employees who have accrued vested pensions in GRS would, as to those accrued pensions, receive the same treatment afforded to all other active participants in the GRS as part of the City's comprehensive restructuring plan. GRS would continue to be liable for pension benefits accrued as of the date of the effective date of the City's comprehensive restructuring plan, consistent with that restructuring plan.

- From and after the effective date of the City's comprehensive restructuring plan, current DWSD retirees and beneficiaries who are receiving, or entitled to receive in the future, retiree healthcare benefits from the City would receive the treatment afforded to all other similarly-situated participants as part of the City's comprehensive restructuring plan. Current DWSD employees who are entitled to receive in the future retiree healthcare benefits from the City would no longer be entitled to such healthcare as of the Effective Date of the comprehensive restructuring plan, and would receive whatever retiree healthcare program is established by MAWSA from and after the effective date of the City's comprehensive restructuring plan.

- As indicated above, the City would retain DWSD's accrued pension liabilities and retiree healthcare liabilities as of the effective date of the City's restructuring plan, as both will be modified by such plan (collectively with DWSD's allocable portion of the COP payments, "*DWSD Legacy Benefits Obligations*"). As consideration for being relieved of those obligations, from and after the effective date of the City's comprehensive restructuring plan, MAWSA would include an amount attributable to the value of such relief from the DWSD Legacy Benefits Obligations as part of the Transaction Payment (as defined below).

**Potential Asset Transaction.**

- The City would either permit MAWSA to operate the DWSD assets through a concession agreement or lease the assets of DWSD to MAWSA pursuant to a lease agreement (either form of agreement for purposes of this document will be referred to as the "*City/MAWSA Agreement*"). If a transaction were effected pursuant to a lease agreement rather than a concession agreement, the City/MAWSA Agreement would be structured as a capital lease, and the initial term of the City/MAWSA Agreement would (i) be tied to the length of MAWSA's bonded indebtedness (but would not exceed 40 years) and (ii) automatically be extended as new bonds are issued by MAWSA as long as MAWSA remains in compliance with the terms of the City/MAWSA Agreement. To the extent that additional value may be obtained for the City, MAWSA could accept the sewer or water assets of other governmental entities. All of the foregoing is collectively referred to herein as the "*DWSD Transaction*."

- In exchange for the concession for/lease of the DWSD assets in favor of MAWSA and for the relief from DWSD Legacy Benefits Obligations, MAWSA would pay to the City a monthly PILOT, lease or other form of payment (the "*Transaction Payment*").

- The Transaction Payment would be paid to the City monthly and would be an amount equal to the sum of (i) an amount calculated on either the basis of the value of the DWSD assets or a percentage of water and sewer rates plus (ii) an amount calculated by reference to the value of the relief from DWSD Legacy Benefits Obligations plus (iii) any other amount based on relevant factors as agreed to by the parties in connection with the negotiation of the DWSD Transaction.

- The City would have customary market remedies in the event that MAWSA fails to make payment or otherwise defaults under the City/MAWSA Agreement.

- The City's use of the new payment stream from the Transaction Payment would be unrestricted, and the City could encumber or otherwise monetize all or a portion of that revenue stream.

- The effective date of the DWSD Transaction would be the effective date of the City's comprehensive restructuring plan.

- On the effective date of the DWSD Transaction, the existing bond debt of the DWSD would either be refinanced and redeemed or holders of the existing bond debt would receive new or restructured tax-exempt bonds. *See* Section IX (Restructuring Proposal) *infra*.

## COLEMAN A. YOUNG AIRPORT.

- Coleman A. Young International Airport is a two-runway general aviation airport located within and operated by the City. It includes approximately 263 acres.

- The airport has not offered commercial passenger service since 2000 (runways are too short to serve standard economic carrier traffic); approximately 225 corporate and private flights originate from, or terminate at, the airport daily.

- The airport's 2012-13 annual budget was $275,000.

86

- In November 2012, a consultant prepared a 10-year capital improvement program for the airport which included several rehabilitation plans, ranging from approximately $55 million (for upgrades to facilities other than runways) to $273 million (for a rehabilitation including a replacement runway funded in part by federal grants).

- Revitalization of the airport is a long-term project that will be addressed at a later date. The City will continue to subsidize operations as closing of airport would terminate certain federal subsidies and require the repayment of certain FAA grant monies previously received.

## DETROIT-WINDSOR TUNNEL.

- The 83-year-old Detroit-Windsor Tunnel is an automotive tunnel (*i.e.*, cars only; no trucks) connecting Detroit and Windsor, Ontario. Approximately 2 million vehicles pass through the tunnel annually.

- The City of Detroit owns the U.S. portion of the tunnel; the City of Windsor owns the portion located in Canada.

- Detroit Windsor Tunnel LLC leases the City's portion of the tunnel for an annual rental payment equal to 20% of the average annual revenue derived from the operations of the Detroit side of the tunnel over the most recent five years, which recently has been less than $1 million per year. Operating revenue for the Detroit side of the tunnel is less than $5 million per year. The lease runs through 2020.

## BELLE ISLE PARK.

- The City owns Belle Isle Park, a 982-acre park on an island in the Detroit River featuring a museum, a conservatory, golf courses and other attractions. The Detroit Recreation Department manages Belle Isle Park at a cost of approximately $6 million per year in maintenance and operating expenses.

- In January 2013, Governor Snyder proposed that the City lease Belle Isle Park to the State of Michigan, turning it into a state park and charging an admission fee to cover maintenance costs. Mayor Bing supported the proposal, but the offer was rescinded after the Detroit City Council failed to vote on the proposal.

- The City intends to enter into lease transaction with State on generally the same terms as the State's prior proposal.

# DETROIT INSTITUTE OF ARTS.

- As has been widely reported, representatives of the Emergency Manager met with representatives of the nonprofit corporation ("*DIA Corp.*") that currently operates the Detroit Institute of Arts to discuss the art collection exhibited there.

- It has also been reported that DIA Corp. contends that the collection is held by a public trust and cannot be used for any purpose other than exhibition or to maintain and enhance the collection itself.

- Further dialogue is anticipated.

# CITY OWNED LAND.

- An estimated 22 square miles of land within City limits is government-owned, including parcels owned by the City, Wayne County and the State of Michigan. The vast majority of this property has limited current commercial value.

- The City will continue to participate in broader initiatives consistent with the Consent Agreement, focusing on collaboration across public and private entities, blight removal and returning properties to the private tax base to create value.

# PARKING OPERATIONS.

**Parking Garages/Lots.**

- The City's Municipal Parking Department ("MPD") manages nine parking garages containing a total of 8,688 spaces, and two public parking lots together containing 1,240 spaces.

- The City owns certain of these parking facilities; others are owned by the Detroit Building Authority.

**Parking Meters.**

- MPD also operates 3,404 on-street metered parking spaces; tickets collected through a private vendor.

88

- MPD's projected revenue for 2012-13 is $12,900,314. Expenses are projected to be approximately $19 million (with the General Fund's portion being approximately $6 million).

- The City intends to market its parking related assets to private operators through a sale, long term lease or concession arrangements (and shutter the related departments) and use any proceeds that may be received to pay down $10 million in related special revenue debt.

- Transaction involving parking assets could potentially be consummated within six months of commencement of marketing process.

## JOE LOUIS ARENA.

- Joe Louis Arena is an indoor arena located in downtown Detroit, Michigan and is the home to the Detroit Red Wings of the National Hockey League. Completed in 1979, the 20,058 seat arena is Detroit's largest indoor venue and regularly hosts professional sports, college hockey, concerts, ice shows, circuses and other entertainment.

- It has been reported that the Illitch Holdings, owner of the Detroit Red Wings, is looking to build a new downtown arena for the team.

- The City is evaluating alternatives for Joe Louis Arena.

# TEN-YEAR PROJECTIONS

**(General Fund Only)**

($ in millions)

| | PRELIMINARY FORECAST | | | | | | | | | | 10-YEAR TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | |
| **Revenues** | | | | | | | | | | | |
| Municipal income tax | $243.4 | $247.3 | $249.0 | $250.7 | $252.4 | $254.0 | $255.6 | $257.8 | $260.9 | $264.0 | $2,535.0 |
| State revenue sharing | 184.3 | 186.1 | 187.9 | 189.5 | 191.2 | 193.0 | 194.8 | 188.3 | 190.0 | 191.7 | 1,896.4 |
| Wagering taxes | 170.0 | 168.3 | 170.0 | 171.7 | 173.4 | 175.1 | 176.9 | 178.7 | 180.4 | 182.2 | 1,746.7 |
| Sales and charges for services | 124.8 | 119.4 | 118.2 | 117.0 | 115.7 | 114.5 | 113.4 | 112.3 | 113.2 | 114.2 | 1,162.6 |
| Property taxes | 118.4 | 110.2 | 105.7 | 100.8 | 100.5 | 99.6 | 99.7 | 100.2 | 100.8 | 102.1 | 1,038.0 |
| Utility users' and other taxes | 47.2 | 40.9 | 40.9 | 41.3 | 41.7 | 42.1 | 42.5 | 43.0 | 43.4 | 43.8 | 426.8 |
| Other revenue | 75.6 | 55.8 | 55.8 | 55.9 | 55.9 | 56.0 | 56.0 | 56.0 | 56.1 | 56.1 | 579.2 |
| General Fund reimbursements | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 302.6 |
| Transfers in (UTGO millage & non-General Fund POCs) | 89.0 | 87.9 | 83.8 | 84.4 | 83.9 | 81.2 | 80.6 | 80.0 | 65.0 | 61.2 | 797.1 |
| **Total revenues** | 1,082.8 | 1,046.2 | 1,041.5 | 1,041.4 | 1,045.0 | 1,045.7 | 1,049.8 | 1,046.3 | 1,040.1 | 1,045.7 | 10,484.5 |
| **Expenditures** | | | | | | | | | | | |
| Salaries/overtime/fringe | (341.5) | (341.9) | (346.4) | (352.5) | (358.8) | (365.1) | (371.4) | (378.4) | (386.0) | (393.7) | (3,635.7) |
| Health benefits - active | (51.2) | (54.0) | (57.4) | (61.0) | (64.5) | (67.9) | (71.2) | (74.6) | (78.4) | (82.3) | (662.5) |
| Other operating expenses | (292.9) | (288.2) | (295.9) | (301.5) | (309.7) | (313.5) | (320.0) | (326.5) | (335.3) | (339.7) | (3,123.2) |
| Operating expenditures | (685.7) | (684.1) | (699.7) | (715.0) | (733.1) | (746.5) | (762.5) | (779.5) | (799.6) | (815.7) | (7,421.5) |
| **Net operating surplus** | 397.2 | 362.0 | 341.8 | 326.3 | 311.9 | 299.2 | 287.2 | 266.8 | 240.5 | 230.0 | 3,063.0 |

90

**Ten-Year Projections – Continued**

| ($ in millions) | PRELIMINARY FORECAST | | | | | | | | | | 10-YEAR TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | |
| Debt service (LTGO & UTGO) | (135.9) | (124.4) | (119.4) | (96.1) | (95.0) | (92.5) | (91.8) | (91.5) | (74.8) | (70.9) | (992.4) |
| POC - principal and interest | (61.0) | (63.2) | (65.4) | (67.6) | (69.9) | (68.1) | (69.0) | (69.9) | (70.7) | (71.4) | (676.3) |
| POC swaps | (50.6) | (50.6) | (50.6) | (50.6) | (50.6) | (50.6) | (49.8) | (48.9) | (48.1) | (47.4) | (498.0) |
| Pension contributions | (199.5) | (233.1) | (258.9) | (285.9) | (314.7) | (321.4) | (331.5) | (337.2) | (339.5) | (343.0) | (2,964.8) |
| Health benefits - retiree | (140.7) | (151.1) | (161.6) | (172.0) | (182.3) | (192.3) | (201.9) | (212.0) | (222.6) | (233.7) | (1,870.0) |
| Legacy expenditures | (587.6) | (622.4) | (655.9) | (672.3) | (712.6) | (725.0) | (744.0) | (759.5) | (755.8) | (766.4) | (7,001.5) |
| **Deficit (excl. financing proceeds)** | (190.5) | (260.4) | (314.1) | (346.0) | (400.7) | (425.8) | (456.8) | (492.6) | (515.3) | (536.4) | (3,938.5) |
| Financing proceeds | - | - | - | - | - | - | - | - | - | - | - |
| **Total surplus (deficit)** | $(190.5) | $(260.4) | $(314.1) | $(346.0) | $(400.7) | $(425.8) | $(456.8) | $(492.6) | $(515.3) | $(536.4) | $(3,938.5) |
| Accumulated unrestricted General Fund deficit | (427.5) | (687.9) | (1,002.0) | (1,348.0) | (1,748.7) | (2,174.5) | (2,631.3) | (3,123.9) | (3,639.2) | (4,175.6) | |
| **Reinvestment in the City** | | | | | | | | | | | |
| Department revenue initiatives | $22.9 | $22.1 | $24.4 | $24.2 | $24.5 | $24.7 | $25.0 | $25.3 | $25.6 | $25.9 | $244.6 |
| Additional operating expenditures | (53.7) | (37.0) | (21.3) | (22.0) | (21.7) | (22.7) | (29.3) | (29.3) | (29.7) | (30.7) | (297.4) |
| Capital investments | (107.1) | (74.5) | (38.8) | (51.9) | (33.3) | (30.8) | (28.4) | (29.5) | (28.5) | (29.0) | (452.3) |
| Blight (excludes heavy commercial) | (50.0) | (50.0) | (100.0) | (100.0) | (100.0) | (100.0) | - | - | - | - | (500.0) |
| Total reinvestment in the City | (188.5) | (139.3) | (135.7) | (149.7) | (130.5) | (128.8) | (32.8) | (33.4) | (32.6) | (33.8) | (1,005.2) |
| **Adjusted surplus (deficit)** | $(379.0) | $(399.7) | $(449.8) | $(495.6) | $(531.2) | $(554.6) | $(489.6) | $(526.1) | $(547.9) | $(570.2) | $(4,943.7) |
| Adj. accumulated unrestricted General Fund deficit | (615.9) | (1,015.6) | (1,465.4) | (1,961.0) | (2,492.2) | (3,046.8) | (3,536.4) | (4,062.5) | (4,610.4) | (5,180.6) | |

# ASSUMPTIONS IN TEN-YEAR PROJECTIONS

**Revenues**

- Municipal Income Tax.
  - Based on State employment, wage and corporate income tax growth estimates adjusted for Detroit specific trends; population estimates considered as well. Increases due to improved employment outlook. Income tax policy is under review and income tax rate could be reduced as a part of the final restructuring plan.

- State Revenue Sharing.
  - Increases due to anticipation of higher taxes collected/distributed by State; based on estimates provided by the State.

- Wagering Taxes.
  - Decreases through FY 2015 due to competition from Ohio casinos and recovers thereafter due to improved economic outlook.

- Sales and Charges for Services.
  - Primarily consists of court fees, public safety service charges, electrical and personal service fees. Declines primarily due to transition of Health and Wellness and Public Lighting Department Distribution business.

- Property Taxes.
  - Based on Michigan home sales, new construction and population data adjusted for Detroit specific trends. Decreases through FY 2017 due to declining values and collection rate with modest increases beginning FY 2021.

- Utility Users' & Other Taxes.
  - Decreases beginning FY 2014 due to the annual allocation of $12.5 million to the Public Lighting Authority (half-year impact in FY 14). 1% annual increase beginning FY 2017 due to assumed increase in utility usage and inflation.

135

92

13-53846-swr Doc 509 Filed 01/19/15 Entered 01/19/15 14:18:26 Page 99 of
13-53846-tjt Doc 8742 Filed 12/15/14 Entered 12/15/14 19:17:32 Page 145 of 181

- Other revenue.

  - **Licenses/Permits/Inspection Charges.** Primarily consists of business licenses, street use permits and fire marshal and construction inspections charges. Based on recent trends. FY 2013 includes one-time permit and inspection revenues from utility providers.

  - **Revenue from Use/Sale Assets.** FY 2012 includes loss from sale of asset. FY 2014 includes proceeds from sale of Veteran's building.

  - **Parking/Court Fines & Other Revenue.** Primarily consists of traffic, criminal and parking fines. Based on recent trends.

  - **Grant Revenue.** Decreases in FY 2014 due to transition of Health and Wellness department and expiration of certain public safety grants.

  - **General Fund reimbursements.** Reflects reimbursements from other departments for expenses incurred by the General Fund. FY 2012 includes $16 million one-time contribution from DDOT.

  - **UTGO Property Tax Millage.** Property tax millage for UTGO debt service. Revenues and associated expenses offset.

  - **COP Allocation (Governmental).** Transfer from general City, non General Fund for allocated COP debt service. Revenues and associated expenses offset.

  - **COP Allocation (Enterprise Funds (excl. DDOT)).** Transfer from enterprise funds for allocated COP debt service. Revenues and associated expenses offset.

**Operating Expenditures**

• Salaries & Wages.

  ◦ Includes CET changes implemented in FY 2013 and continuing through the projection period. 10% wage reduction for uniformed employees beginning FY 2014 for contracts expiring FY 2013; 2% wage inflation assumed for all City employees beginning FY 2015. Headcount changes in projection period primarily due to PLD transaction and transition to ADP payroll and benefits administration services.

• Overtime.

  ◦ Decreases due to wage cuts and FY 2013 run rates. Increases beginning FY 2015 due to wage inflation.

• Health Benefits (Actives).

  ◦ Includes CET changes implemented in FY 2013 and continuing during the projection period. Average 6% inflation assumed annually for hospitalization costs.

• Other operating expenses

  ◦ **Other Benefits.** Based on recent trends.

  ◦ **Professional/Contractual Services.** Assumes higher costs in election years (FY 2014 and every four years thereafter).

  ◦ **Materials/Supplies.** Decreases due to transition of PLD distribution business. 1% cost inflation assumed beginning in FY 2015.

  ◦ **Utilities.** Based on recent trends with minimal changes with 1% cost inflation assumed beginning in FY 2015.

  ◦ **Purchased Services.** Increases beginning in FY 2014 due to costs associated with payroll processing management and prisoner pre-arraignment functions. 1% cost inflation assumed beginning in FY 2015.

  ◦ **Risk Management/Insurance.** Includes costs related to worker's compensation, litigation and other claims. 1% cost inflation assumed beginning in FY 2015.

  ◦ **Maintenance Capital (current run rate).** Represents the General Fund payment for capital expenditures based on recent spend levels. 1% cost inflation assumed beginning in FY 2015.

- **Other Expenses.** Primarily includes printing, rental and other operating costs. 1.0% cost inflation assumed to certain costs beginning FY 2015.

- **Contributions to Non-Enterprise Funds.** Represents General Fund transfers to Municipal parking, the vehicle fund, Museum of African American History, etc. Increases beginning FY 2014 primarily due to contributions to operations to the Public Lighting Authority.

- **DDOT Subsidy.** Reflects the General Fund contribution to cover the DDOT deficit. Excludes DDOT related legacy expenditures shown below the line. Increases primarily due to personnel and operating cost inflation.

- **Grant-Related Expenses.** Decreases in FY 2014 due to transition of Health and Wellness Department. Increases primarily due to wage and operating cost inflation.

**Legacy Expenditures**

- Debt Service (UTGO & LTGO).

- Reflects currently scheduled principal and interest payments.

- COPs (Principal, Interest & Swaps).

- Reflects principal, interest and swap payments as currently scheduled.

- Pension.

- Per preliminary actuarial analysis. Subject to further analysis. Starting in FY 2014, significant increases attributable to use of more realistic actuarial assumptions and use of closed, 15-year amortization period for PFRS and closed, 18-year period for GRS rather than current open 30-year amortization period.

- Retiree Health Benefits.

- Includes impact of CET changes implemented in FY 2013 and continuing during the projection period. Average 6% inflation assumed annually for hospitalization costs.

**Financing Proceeds.**

- FY 2013 includes $137 million in refunding bond proceeds.

**Operational Restructuring Initiatives/Reinvestment in the City.**

- Department revenues initiatives.
  - Reflects increases to fees, improved billing and collection efforts and collection of past due receivables.
- Additional Operating Expenditures.
  - Primarily reflects increases to headcount in order to improve and provide adequate level of City services. Potential efficiencies not reflected.
- Capital investments (Technology).
  - Reflects costs associated with information systems upgrades and maintenance.
- Capital investments (Capital Expenditures).
  - Primarily reflects City's capital improvement plan to invest in facilities and vehicles.
- Capital investments (Implementation Costs).
  - Primarily reflects non-recurring costs associated with implementing technology initiatives.
- Blight.
  - Reflects costs associated with demolition and clean-up efforts of residential and light commercial. Heavy commercial blight removal would require significant additional funding.

RESTRUCTURING SCENARIO.

($ in millions)

| | PRELIMINARY FORECAST | | | | | | | | | | 10-YEAR TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | |
| Total revenues | $1,082.8 | $1,046.2 | $1,041.5 | $1,041.4 | $1,045.0 | $1,045.7 | $1,049.8 | $1,046.3 | $1,040.1 | $1,045.7 | $10,484.5 |
| Department revenue initiatives | 22.9 | 22.1 | 24.4 | 24.2 | 24.5 | 24.7 | 25.0 | 25.3 | 25.6 | 25.9 | 244.6 |
| Operating expenditures | (685.7) | (684.1) | (699.7) | (715.0) | (733.1) | (746.5) | (762.5) | (779.5) | (799.6) | (815.7) | (7,421.5) |
| Additional operating expenditures | (53.7) | (37.0) | (21.3) | (22.0) | (21.7) | (22.7) | (29.3) | (29.3) | (29.7) | (30.7) | (297.4) |
| Net operating surplus | $366.4 | $347.2 | $344.9 | $328.5 | $314.6 | $301.2 | $282.9 | $262.9 | $236.4 | $225.2 | $3,010.2 |
| Reinvestment expenditures/adjustments | | | | | | | | | | | |
| Reorganization (Capital investments & Professional fees) | (167.0) | (111.7) | (38.8) | (51.9) | (33.3) | (30.8) | (28.4) | (29.5) | (28.5) | (29.0) | (548.8) |
| Blight (excludes heavy commercial) | (50.0) | (50.0) | (100.0) | (100.0) | (100.0) | (100.0) | - | - | - | - | (500.0) |
| DC Pension contribution (10% Police/Fire, 5% other) | (25.4) | (25.7) | (26.2) | (26.6) | (27.2) | (27.7) | (28.2) | (28.7) | (29.3) | (29.9) | (274.8) |
| POC reimbursements | (24.1) | (25.4) | (26.2) | (26.8) | (27.5) | (27.1) | (27.3) | (27.4) | (27.4) | (27.4) | (266.7) |
| PLD decommission | - | (25.0) | (25.0) | (25.0) | - | - | - | - | - | - | (75.0) |
| Increased tax revenues | 7.4 | 12.2 | 16.4 | 23.8 | 28.3 | 36.0 | 42.0 | 48.5 | 56.3 | 63.8 | 334.5 |
| Total restructuring | (259.1) | (225.6) | (199.8) | (206.6) | (159.6) | (149.6) | (42.0) | (37.1) | (29.0) | (22.6) | (1,330.9) |
| Funds available for legacy liabilities | 107.3 | 121.6 | 145.2 | 122.0 | 155.0 | 151.6 | 240.9 | 225.7 | 207.4 | 202.6 | 1,679.3 |

# Restructuring Scenario – Continued

($ in millions)

| | PRELIMINARY FORECAST | | | | | | | | | | 10-YEAR TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | |
| **Payments to secured claims (subject to review/negotiation)** | | | | | | | | | | | |
| LTGO - secured | (18.7) | (29.2) | (29.2) | (29.2) | (29.2) | (29.2) | (29.2) | (29.2) | (29.2) | (29.2) | (281.6) |
| UTGO - secured | (8.0) | (9.8) | (9.8) | (9.8) | (9.8) | (9.8) | (9.8) | (9.8) | (9.8) | (9.8) | (96.4) |
| POC swaps[1] | (50.6) | (50.6) | (50.6) | (50.6) | (50.6) | (50.6) | (49.8) | (48.9) | (48.1) | (47.4) | (498.0) |
| Notes/loans payable | - | - | - | - | - | - | - | - | - | - | - |
| **Total payments to secured claims** | (77.3) | (89.7) | (89.7) | (89.7) | (89.7) | (89.7) | (88.9) | (88.0) | (87.2) | (86.4) | (876.0) |
| Funds available for unsecured claims | $30.0 | $31.9 | $55.5 | $32.3 | $65.4 | $62.0 | $152.1 | $137.7 | $120.2 | $116.2 | $803.3 |
| Asset monetization / revenue opportunities | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | - |
| Funds available for unsecured claims w/opportunities | $30.0 | $31.9 | $55.5 | $32.3 | $65.4 | $62.0 | $152.1 | $137.7 | $120.2 | $116.2 | $803.3 |

| Estimated unsecured claims | |
|---|---|
| **Unsecured debt** | |
| Unsecured debt | $161.0 |
| LTGO - unsecured | 369.1 |
| UTGO - unsecured | 1,428.8 |
| POC principal balance | 33.6 |
| Sub-total: Unsecured debt | 1,992.5 |
| **Unsecured pension & OPEB** | |
| OPEB liability | 5,718.3 |
| Pension unfunded liability (PFRS) | 1,437.0 |
| Pension unfunded liability (DGRS) | 2,037.0 |
| Sub-total: Pension & OPEB | 9,192.3 |
| **Other unsecured items** | |
| Other liabilities (FY 2012 CAFR) | 264.6 |
| Other potential claims | tbd |
| Sub-total: Other | 264.6 |
| **Estimated total unsecured claims** | $11,449.4 |

Footnote:
(1) Assumes continued payments as scheduled. Treatment to be determined.

98

135

- Reorganization (capital investment and professional fees).
  - Consistent with above Technology, Capital Expenditures, and Implementation Costs.
- Blight.
  - Consistent with above.
- DC Pension contribution.
  - Preliminary estimates to be further refined by additional analysis. Assumes new DC plans with employer contributions equal to 10% of wages for uniformed employed and 5% of wages for non-uniform employed.
- POC reimbursements.
  - Represents reversal of revenue received from enterprise and other Non-General Fund agencies.
- PLD decommission.
  - Represents preliminary estimate of cost required to decommission existing substations and Mistersky Plant (to be further refined by additional analysis).
- Increased Tax Revenues.
  - Represents potential revenue opportunities primarily due to increased property values and employment conditions resulting from restructuring efforts.
- Payments on Secured Claims.
  - Includes the unaltered payment schedules of secured debt, COP related swaps and other notes payable. There are no scheduled payments on secured notes payable.

# CONCLUSIONS BASED UPON PROJECTIONS.

- The City acknowledges that it must exert reasonable efforts to maximize recoveries for all creditors.

- As demonstrated by the 10-year projections, however, the City's expected revenues will fall significantly short of the levels required to fund the City's operations and fully satisfy its liabilities.

- Given the City's (i) substantial debt levels (LTGO; UTGO; COPs; Swaps), (ii) significant labor related liabilities and (iii) continuing operating expenses, shared sacrifice will be required from all stakeholders to achieve the City's dual (and complementary) goals of maximizing returns for its stakeholder constituencies while simultaneously establishing the framework for a healthy and growing Detroit moving forward.

- All of the City's stakeholders can benefit from a restructured and revitalized Detroit.

100

135

# RESTRUCTURING PROPOSAL

SUMMARY OF TREATMENT OF DEBT.

**Secured Debt.**

**DWSD Debt.** The existing DWSD water and sewer bond debt may be divided into two classes, if applicable:

- **DWSD Class A Debt Claims.**

  - DWSD Class A Debt Claims shall consist of claims under or evidenced by certain debt that may be paid prior to the effective date of the City's comprehensive restructuring plan without incurring a material premium or penalty.

  - On the effective date of the City's comprehensive restructuring plan, accrued principal and interest for DWSD Class A Debt Claims accrued through the restructuring plan's effective date will either (i) be repaid in full in cash or (ii) receive such treatment as may be agreed upon by the parties.

  - **Source of funds for repayment:** New longterm bond issuances with MAWSA as the issuer.

    - **New Series A Bond Principal**: An amount equal to the sum of the principal of the outstanding debt that was issued to redeem the DWSD Class A Debt Bonds plus interest thereon accrued through the restructuring plan effective date and fees incurred in connection with the new financings.

    - **New Series A Bond Collateral**: Lien on net revenues generated by MAWSA assets with the same priorities as the DWSD Class A Debt, but subordinate to the operating and maintenance costs of the system, including the Transaction Payment.

    - **New Series A Bond Interest Rate**: Prevailing market rate for similar long-term municipal bonds at the time of issuance.

    - **New Series A Bond Maturities**: The various series of new municipal bonds would have long-term maturities determined at the time of issuance on the basis of then-existing market conditions.

- **DWSD Class B Debt Claims.**

  - DWSD Class B Debt Claims shall consist of all claims under or evidenced by each series of existing water or sewer bond debt (whether callable or not) that are not DWSD Class A Debt Claims.

    - On the effective date of the City's comprehensive restructuring plan, holders of DWSD Class B Debt Claims shall receive Series B Restructured Bonds or such treatment as may be agreed upon by the parties.

  - **Series B Restructured Bond Terms:** Series B Restructured Bonds would be issued by MAWSA to holders of outstanding DWSD Class B Debt Claims.

    - **Series B Restructured Bond Principal:** For each series of Series B Restructured Bonds, an amount equal to the sum of the principal of the outstanding DWSD Class B Debt Bonds for which such Series B Restructured Bonds are to be exchanged plus interest thereon accrued through the restructuring plan Effective Date.

    - **Series B Restructured Bond Collateral:** Lien on net revenues generated by MAWSA assets in the same priorities as currently exist for the DWSD Class B Debt Bonds for which such Series B Restructured Bonds are to be exchanged, subordinate to the operating and maintenance costs of the system, including the Transaction Payment.

    - **Series B Restructured Bond Interest Rate:** Prevailing market rate for similar long-term municipal bonds at the time of issuance.

    - **Series B Restructured Bond Maturities:** The same maturity dates as the DWSD Class B Debt Bonds for which the Series B Restructured Bonds will be exchanged.

**Secured General Obligation Debt.**

- There are six series of secured General Obligation Debt:

  - $100,000,000 original principal amount Distributable State Aid Second Lien Bonds (Unlimited Tax General Obligation), Series 2010(A) (Taxable-Recovery Zone Economic Development Bonds-Direct Payment).

  - $249,790,000 original principal amount Distributable State Aid General Obligation Limited Tax Bonds, Series 2010.

  - $38,865,000 original principal amount Self-Insurance Distributable State Aid Third Lien Bonds (Limited Tax General Obligation), Series 2012(A)(2).

  - $30,730,000 original principal amount Self-Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(B2).

  - $6,405,000 original principal amount General Obligation Distributable State Aid Third Lien Capital Improvement Refunding Bonds (Limited Tax General Obligation), Series 2012(B).

  - $53,520,000 original principal amount Self-Insurance Distributable State Aid Third Lien Bonds (Limited Tax General Obligation), Series 2012(A2-B).

- Total annual debt service is approximately $39 million per year from FY 2015 through FY 2033.

| $ in millions | FISCAL YEAR | | | | | | Total for Period |
|---|---|---|---|---|---|---|---|
| | 2013 | 2014 | 2015 - 2033 | 2034 | 2035 | 2036 | |
| $100,000,000 original principal amount Distributable State Aid Second Lien Bonds (Unlimited Tax General Obligation), Series 2010(A) (Taxable - Recovery Zone Economic Development Bonds-Direct Payment) | 4.0 | 8.0 | 9.8 | 9.8 | 9.8 | 9.8 | 228.2 |
| $249,790,000 original principal amount Distributable State Aid General Obligation Limited Tax Bonds, Series 2010 | 6.3 | 12.6 | 18.9 | 18.8 | 18.8 | 18.8 | 433.5 |
| $129,520,000 aggregate original principal amount of Distributable State Aid Third Lien Bonds (Limited Tax General Obligation), Series 2012(A)(2), (A2-B), (B) & (B)(2) (Combined) | 4.2 | 6.1 | 10.4 | | | | 207.2 |
| **Annual Total** | 14.5 | 26.7 | 39.0 | 28.7 | 28.7 | 28.7 | 868.9 |

- Treatment: Subject to negotiation with holders.

**Secured Claims Arising in Connection with Installment Notes Payable.**

- The City has issued $87.8 million in installment notes related to various public improvement projects, which notes were issued in connection with the "Section 108" HUD Loan Guarantee Program and are secured by future "Block Grant" revenues.

- Treatment: Subject to negotiation with holders.

**Secured Claims Arising under Service Agreements Related to COP-Related Interest Rate Swaps.**

- Eight interest rate swaps (the "COP Swaps") were entered into by the Service Corporations in reference to the COPs.

- The City entered into Service Contracts with the Service Corporations that purport to obligate the City to pay the Service Corporations, among other things, amounts equal to the amounts the Service Corporations are obligated to pay under the COP Swaps.

- The following table shows the estimated amounts due annually under the COP Swaps to maturity:

$ in millions

| | | | | FISCAL YEAR(S) | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **2013** | **2014** | **2015** | **2016** | **2017** | **2018-2022** | **2023-2027** | **2028-2032** | **2033-2035** | **Total** |
| 50.7 | 50.6 | 50.6 | 50.6 | 50.6 | 248.0 | 226.9 | 135.6 | 15.1 | 878.7 |

- Treatment: Subject to negotiation with holders.

**Secured Automobile Parking Fund Claims.**

- $9.3 million in outstanding principal amount of Detroit Building Authority Revenue Refunding Bonds: Parking System, Series 1998-A are secured by a pledge of all revenues of the parking system, net of operating expenses.

- Treatment: In the event that the City executes a sale of its parking-related assets, principal and interest accrued through the effective date will be paid in full in cash using proceeds of sales of City's parking-related assets. In the event that sales are not negotiated and consummated prior to the effective date, treatment of such claims will be subject to negotiations with holders.

**Unsecured Debt.**

**Consideration for Unsecured Claims.**

- Limited Recourse Participation Notes (the "*Notes*").

- **Relevant Definitions:**

  - "Adjusted Base Covered Revenues" means for a Fiscal Year following the Initial Revenue Participation Year, Base Covered Revenues adjusted for inflation for the period beginning on the first day of the Initial Revenue Participation Year and ending on the first day of the Fiscal Year using the positive change, if any, in the Consumer Price Index during such period.

  - "Base Covered Revenues" means one half of the sum of Covered Revenues for the first two Fiscal Years beginning after the Effective Date.

  - "Covered Revenues" means amounts actually collected by the City's General Fund in a Fiscal Year on account of (a) Property Taxes, Income Taxes and Gaming Taxes levied for such Fiscal Year and (b) Revenue Sharing Payments, determined based upon the City's audited financial statements.

  - "Dutch Auction" means a method for pricing the Notes whereby the price of the Notes offered by the City is the lowest price (the "Auction Price") at which there are bids to sell Notes for an aggregate purchase price equal to the amount the City is required to pay in respect of Revenue Participation Payments and/or Asset Disposition Proceeds then due and payable. During bidding, each Noteholder will indicate how many Notes it is willing to sell to the City and the price such Noteholder is willing to accept. All Notes offered at the Auction Price or at a lower price will be sold to the City at the Auction Price.

- "Effective Date" means the closing date of a comprehensive restructuring of the City's finances on which the Notes shall be issued.

- "Final Participation Year" means the Fiscal Year beginning on the 20th anniversary of the first day of the Initial Participation Year.

- "Fiscal Year" means a period commencing on July 1 of a year and ending on June 30 of the following year. For greater certainty, the Fiscal Year beginning on July 1, 2014 and ending on June 30, 2015 is the 2015 Fiscal Year.

- "Initial Participation Year" means the second full Fiscal Year following the Effective Date.

- "Trustee" means an indenture trustee or other agent for the Noteholders as defined in definitive documentation for the Notes.

- **Terms:**

  - Initial Principal Amount: $2,000,000,000.00.

  - Interest Rate: 1.5% per annum on the outstanding principal amount of the Notes, payable semiannually. No interest shall be paid or accrued for any period following the end of the Final Participation Year.

  - Maturity Date: The first September 30 following the Final Participation Year. The City shall have no obligation to pay any amounts other than the Revenue Participation Payment in respect of the Final Participation Year on the maturity date. The Notes may be prepaid in whole or in part at any time without premium or penalty.

  - Revenue Participation Payments: On the September 30 after the end of each Fiscal Year beginning with the Initial Participation Year, an amount equal to the product of (a) 30% (0.30), multiplied by (b) (i) the amount by which Covered Revenues for such Fiscal Year exceed (ii) Adjusted Base Covered Revenues shall be applied to reduce the principal amount of the Notes. No Revenue Participation Payments shall be made for any Fiscal Year after the Final Participation Year.

- Grants and Other Amounts Received to Offset Costs of Addressing Blight: If the City receives any cash grants or other cash payments after the Effective Date and before the Maturity Date from the State of Michigan, the Federal government, or any other government or nonprofit entity not affiliated in any way with the City for the purpose of funding programs or activities to address blight that are included in the 10 Year Plan ("Blight Revenues") and that can be utilized in place of the General Fund sums in the 10 Year Plan projections, an amount equal to 75% of the General Fund revenues that would otherwise be spent on blight but for the outside funds shall be applied to reduce the principal amount of the Notes.

- Asset Disposition Proceeds: If the City receives cash consideration in connection with the transfer of Specified Assets after the Effective Date and before the Maturity Date, an amount equal to 75% of such cash shall be applied to reduce the principal amount of the Notes. For greater certainty, the assumption of indebtedness shall not constitute cash consideration.

- The City shall make distributions of Blight Revenues and Asset Disposition Proceeds when the amount of such payments that are due equal or exceed $50 million or at the time a Revenue Participation Payment is due, whichever is sooner.

- **Dutch Auctions.** Any Revenue Participation Payment, Blight Revenues, Asset Disposition Proceeds and other amount made available by the City may be used to fund offers to purchase Notes through a Dutch Auction process. The City shall give notice of its intent to conduct a Dutch Auction using a Revenue Participation Payment on or before the July 15th following the end of the pertinent Fiscal Year and shall conclude the auction and purchase notes offered and accepted in the auction no later than the 90 days following the date such notice is given. The City shall give notice of its intent to conduct such a Dutch Auction using Asset Disposition Proceeds or Blight Revenues on or before the 30 days following the date when the City becomes obligated to make apply Asset Distribution Proceeds and shall conclude the auction and purchase notes offered and accepted in the auction no later than 90 days following the date such notice is given. The City may give notice of its intent to conduct a Dutch Auction using funds provided by the City which are not otherwise required to be applied to repayment of the Notes at any time.

- **Limited Recourse.** The City's obligation to pay interest on the Notes shall be a general obligation of the City. The City shall have no obligation to pay the principal amount of the Notes except to the extent that Revenue Participation Payments, Blight Revenues, or Asset Disposition Proceeds become due in accordance with the terms hereof.

- **Requirements of Law.** The terms of the Notes may be revised to conform with requirements of law.

**Claims Under Unsecured General Obligation Bonds/Notes.**

- Aggregate amount: Approximately $650 million.

- Treatment: Exchanged for a pro rata (relative to all unsecured claims) principal amount of new Notes.

**Claims of Service Corporations (or affiliated trusts) on Account of COPs.**

- Aggregate amount: Approximately $1.4 billion.

- Treatment: Exchanged for a pro rata (relative to all unsecured claims) principal amount of new Notes

**Claims for Unfunded OPEB Liabilities.**

- Current retirees will receive modified medical benefits plans utilizing either the exchanges to be created by January 1, 2014 under the Patient Protection and Affordable Care Act or Medicare, as applicable. The proposed replacement program is preliminarily estimated to have a cost to the City of between $27.5 million and $40 million annually depending on choices to be made.

- Claims will result from the modification of benefits. The amount of such claims has not been finally determined.

- Treatment for Allowed Claim: Exchanged for a pro rata (relative to all unsecured claims) principal amount of new Notes.

**Claims for Unfunded Pension Liabilities.**

- As set forth above, preliminary analysis indicates that the underfunding in the GRS and the PFRS is approximately $3.5 billion. At this level of underfunding, the City would have to contribute approximately $200 million to $350 million annually to fully fund currently accrued, vested benefits. Such contributions will not be made under the plan.

- Claims for the underfunding will be exchanged for a pro rata (relative to all unsecured claims) principal amount of new Notes.

- Because the amounts realized on the underfunding claims will be substantially less than the underfunding amount, there must be significant cuts in accrued, vested pension amounts for both active and currently retired persons.

**Claims on account of Other Liabilities.**

- Aggregate Amount: Approximately $300 million.

- Treatment: Exchanged for a pro rata (relative to all unsecured claims) principal amount of new Notes.

# CEMENTING THE CITY'S RESTRUCTURING: DETROIT AFTER THE EMERGENCY MANAGER

In accordance with PA 436 – and similar to post-receivership governance structures established in other municipalities (*e.g.*, New York) – Emergency Manager Orr intends to adopt various measures and impose certain requirements to ensure that the restructuring achieved by the City is sustainable.

## APPOINTMENT OF "TRANSITION ADVISORY BOARD"

In accordance with Section 23(1) of PA 436, the Emergency Manager may recommend that the Governor appoint a "receivership transition advisory board" (a "*Transition Advisory Board*") to monitor the affairs of the City prior to removing it from receivership.

- The Transition Advisory Board would consist of (i) the State Treasurer (or his/her designee), (ii) the director of the Department of Technology, Management and Budget (or his/her designee) and (iii) in the Governor's discretion, one or more individuals with relevant professional experience.

- The Transition Advisory Board would be empowered to do any of the following:

  - Require the City to annually convene a consensus revenue estimating conference for the ensuing fiscal year;

  - Require the City to provide monthly cash flow projections and a comparison of actual and budgeted revenues and expenditures;

  - Review and approve the City's proposed and amended budgets;

  - Review requests by the City to issue debt under applicable law;

  - Review and approve proposed CBAs negotiated under applicable law;.

  - Review the City's compliance with any deficit elimination plan; and

  - Perform any other duties assigned by the Governor at the time the Transition Advisory Board is appointed.

**Revisions to Model Charter.**

- Consistent with Section 22(4)(b) of PA 436, the Emergency Manager may recommend that the Governor require the City to adopt a model City Charter or model charter provisions developed by the Emergency Manager.

**Development of Two-Year Budget.**

- Pursuant to Section 21 of PA 436, before the conclusion of the Emergency Manager's term (or before the appointment of a Transition Advisory Board), the Emergency Manager must adopt and implement a two-year budget (including all contractual and employment agreements) for the City, which budget commences upon the termination of the City's receivership.

- The City Council is prohibited by Section 21(2) of PA 436 from

  - amending the Emergency Manager's two-year budget (absent the approval of the State Treasurer); and

  - revising any order or ordinance implemented by the Emergency Manager prior to one year after termination of the receivership.

**Potential Appointment of New Emergency Manager.**

- Pursuant to Section 24 of PA 436, the Governor may, at his own initiative or at the recommendation of a Transition Advisory Board, determine that the City's financial condition has not been corrected in a sustainable fashion and appoint a new emergency manager.

# CALENDAR AND CONTACTS

**Requests for additional information:** June 17, 2013 - June 24, 2013

**Initial round of discussions with stake holders:** June 17, 2013 - July 12, 2013

**Evaluation:** July 15, 2013 - July 19, 2013.

## CONTACTS

MILLER BUCKFIRE & CO., LLC

601 Lexington Avenue, 22nd Floor
New York, NY 10022
(212) 895-1800

Kenneth Buckfire
Co-President & Managing Director

James Doak
Managing Director

JONES DAY

David G. Heiman, Esq.
901 Lakeside Avenue
North Point
Cleveland, Ohio 44114-1190
(216) 586-3939

Bruce Bennett, Esq.
555 South Flower Street,
50th Floor
Los Angeles, CA 90071
(213) 489-3939

Heather Lennox, Esq.
222 East 41st Street
New York, NY 10017
(212) 326-3939

# Appendix A — Schedule of the sewage disposal system bonds and related state revolving loans as of June 30, 2012

| | Bond Date | Amount Issued | Range of Interest Rates | Maturity Date | Balance June 30, 2012 | Insurer | |
|---|---|---|---|---|---|---|---|
| **Sewage Disposal System Revenue Bonds:** | | | | | | | |
| Series 1998-A | 12-14-06 | $18,540,000 | 5.50 % | 7/1/12-17 | $ 16,440,000 | MBIA | |
| Series 1998-A | 12-14-06 | 49,075,000 | 5.25 | 7/1/18-23 | 49,075,000 | MBIA | b |
| Series 1998-B | 12-14-06 | 18,750,000 | 5.50 | 7/1/12-17 | 16,510,000 | MBIA | |
| Series 1998-B | 12-14-06 | 48,770,000 | 5.25 | 7/1/18-23 | 48,770,000 | MBIA | b |
| Series 1999-A ( * ) | 12-1-99 | 33,510,118 | 0.00 | 7/1/12-21 | 69,931,075 | FGIC | |
| Series 2001-B | 9-15-01 | 110,550,000 | 5.50 | 7/1/23-29 | 110,550,000 | FGIC | |
| Series 2001-C (1) | 6-5-09 | 6,360,000 | 5.25 | 7/1/12-19 | 4,930,000 | Assured Guaranty | |
| Series 2001-C (1) | 6-5-09 | 148,510,000 | 6.50 to 7.00 | 7/1/20-27 | 148,510,000 | Assured Guaranty | b |
| Series 2001-C (2) | 5-8-08 | 3,275,000 | 3.50 to 4.00 | 7/1/12-18 | 2,305,000 | FGIC/Berkshire Hathaway | |
| Series 2001-C (2) | 5-8-08 | 119,630,000 | 4.00 to 5.25 | 7/1/19-29 | 119,630,000 | FGIC/Berkshire Hathaway | b |
| Series 2001-D | 9-23-01 | 92,450,000 | Variable (a) | 7/1/32 | 21,315,000 | MBIA | b |
| Series 2001-E | 5-8-08 | 136,150,000 | 5.75 | 7/1/24-31 | 136,150,000 | FGIC/Berkshire Hathaway | b |
| Series 2003-A | 5-22-03 | 158,000,000 | 3.30 to 5.00 | 7/1/12-13 | 84,125,000 | Assured Guaranty | |
| Series 2003-A | 5-22-03 | 441,380,000 | 3.50 to 5.50 | 7/1/14-32 | 128,940,000 | Assured Guaranty | b |
| Series 2003-B | 6-5-09 | 150,000,000 | 7.50 | 7/1/32-33 | 150,000,000 | Assured Guaranty | b |
| Series 2004-A | 1-09-04 | 101,435,000 | 5.00 to 5.25 | 7/1/12-24 | 74,380,000 | Assured Guaranty | |
| Series 2005-A | 3-17-05 | 3,765,000 | 3.40 to 3.70 | 7/1/12-15 | 2,495,000 | MBIA | |
| Series 2005-A | 3-17-05 | 269,590,000 | 3.75 to 5.125 | 7/1/16-35 | 236,770,000 | MBIA | b |
| Series 2005-B | 3-17-05 | 40,215,000 | 3.40 to 5.50 | 7/1/12-22 | 40,215,000 | MBIA | |
| Series 2005-C | 3-17-05 | 22,065,000 | 5.00 | 7/1/12-15 | 16,185,000 | MBIA | |
| Series 2005-C | 3-17-05 | 41,095,000 | 5.00 | 7/1/16-25 | 41,095,000 | MBIA | b |
| Series 2006-A | 5-8-08 | 123,655,000 | 5.50 | 7/1/34-36 | 123,655,000 | FGIC/Berkshire Hathaway | b |
| Series 2006-B | 8-10-06 | 11,850,000 | 4.00 to 5.00 | 7/1/12-16 | 7,960,000 | FGIC | |
| Series 2006-B | 8-10-06 | 238,150,000 | 4.25 to 5.00 | 7/1/17-36 | 238,150,000 | FGIC | b |
| Series 2006-C | 8-10-06 | 8,495,000 | 5.25 | 7/1/16 | 8,495,000 | FGIC | |
| Series 2006-C | 8-10-06 | 18,065,000 | 5.00 | 7/1/17-18 | 18,065,000 | FGIC | b |
| Series 2006-D | 12-14-06 | 370,000,000 | Variable (a) | 7/1/12-32 | 289,430,000 | Assured Guaranty/FSA | b |
| Series 2012-A | 6-26-12 | 95,445,000 | 5.00 | 7/1/14-22 | 95,445,000 | Assured Guaranty | b |
| Series 2012-A | 6-26-12 | 564,335,000 | 5.00 to 5.50 | 7/1/23-39 | 564,335,000 | Assured Guaranty | b |

**Total Sewage Disposal System Revenue Bonds**          $ 2,863,856,075

* - Capital Appreciation Bonds
a - Interest rates are set periodically at the stated current market interest rate.
b - Indicates bonds are callable under terms specified in the indenture; all other bonds are noncallable.

114

135

13-53846-swr Doc 509 Filed 07/03/13 Entered 07/03/13 14:45:26 Page 123 of 135

## Appendix A — Continued

| | Bond Date | Amount Issued | Range of Interest Rates | Maturity Date | Balance June 30, 2012 |
|---|---|---|---|---|---|
| **State Revolving Loans:** | | | | | |
| Series 1992-A-SRF | 6-25-92 | $ 4,360,000 | 2.00% | 4/1/13 | $ 260,000 |
| Series 1992-B-SRF | 9-10-92 | 1,915,000 | 2.00 | 10/1/12-13 | 230,000 |
| Series 1993-B-SRF | 9-30-93 | 6,603,996 | 2.00 | 10/1/12-14 | 1,150,000 |
| Series 1997-B-SRF | 9-30-97 | 5,430,174 | 2.25 | 10/1/12-18 | 2,160,000 |
| Series 1999-SRF-1 | 6-24-99 | 21,475,000 | 2.50 | 4/1/15-20 | 9,880,000 |
| Series 1999-SRF-2 | 9-30-99 | 46,000,000 | 2.50 | 10/1/12-22 | 28,110,000 |
| Series 1999-SRF-3 | 9-30-99 | 31,030,000 | 2.50 | 10/1/12-20 | 15,890,000 |
| Series 1999-SRF-4 | 9-30-99 | 40,655,000 | 2.50 | 10/1/12-20 | 20,815,000 |
| Series 2000-SRF-1 | 3-30-00 | 44,197,995 | 2.50 | 10/1/12-22 | 23,947,995 |
| Series 2000-SRF-2 | 9-28-00 | 64,401,066 | 2.50 | 10/1/12-22 | 39,191,066 |
| Series 2001-SRF-1 | 6-28-01 | 82,200,000 | 2.50 | 10/1/12-24 | 57,965,000 |
| Series 2001-SRF-2 | 12-20-01 | 59,850,000 | 2.50 | 10/1/12-24 | 42,210,000 |
| Series 2002-SRF-1 | 6-27-02 | 18,985,000 | 2.50 | 4/1/13-23 | 11,590,000 |
| Series 2002-SRF-2 | 6-27-02 | 1,545,369 | 2.50 | 4/1/13-23 | 935,369 |
| Series 2002-SRF-3 | 12-19-02 | 31,549,466 | 2.50 | 10/1/12-24 | 20,554,466 |
| Series 2003-SRF-1 | 6-28-03 | 48,520,000 | 2.50 | 10/1/12-25 | 36,415,000 |
| Series 2003-SRF-2 | 9-25-03 | 25,055,370 | 2.50 | 4/1/13-25 | 17,550,370 |
| Series 2004-SRF-1 | 6-24-04 | 2,910,000 | 2.125 | 10/1/12-24 | 2,025,000 |
| Series 2004-SRF-2 | 6-24-04 | 18,353,459 | 2.125 | 4/1/13-25 | 12,748,459 |
| Series 2004-SRF-3 | 6-24-04 | 12,722,575 | 2.125 | 4/1/13-25 | 8,832,575 |
| Series 2007-SRF-1 | 9-20-07 | 156,687,777 | 1.625 | 10/1/12-29 | 142,272,777 |
| Series 2009-SRF-1 | 4-17-09 | 22,684,557 | 2.50 | 4/1/13-30 | 10,164,557 |
| Series 2010-SRF-1 | 1-22-10 | 6,793,631 | 2.50 | 4/1/13-31 | 3,338,631 |
| **Total State Revolving Loans Payable** | | | | | **$ 508,236,265** |

# Appendix B — Schedule of water system bonds and related state revolving loans as of June 30, 2012

| | Bond Date | Amount Issued | Range of Interest Rates | Maturity Date | Balance June 30, 2012 | Insurer | |
|---|---|---|---|---|---|---|---|
| **Water Supply System Revenue Bonds:** | | | | | | | |
| Series 1993 | 10-15-93 | $ 38,225,000 | 6.50% | 7/1/14-15 | $ 24,725,000 | FGIC | |
| Series 1995-B | 10-15-95 | 60,485,000 | 5.55 | 7/1/12 | 8,480,000 | MBIA | |
| Series 1997-A | 8-01-97 | 186,220,000 | 6.00 | 7/1/14-15 | 13,430,000 | MBIA | |
| Series 2001-A | 5-01-01 | 301,165,000 | 5.00 | 7/1/29-30 | 73,790,000 | FGIC | b |
| Series 2001-C | 5-08-08 | 4,055,000 | 3.50 to 4.25 | 7/1/12-18 | 2,565,000 | FGIC | |
| Series 2001-C | 5-08-08 | 186,350,000 | 4.50 to 5.75 | 7/1/19-29 | 186,350,000 | FGIC | b |
| Series 2003-A | 1-28-03 | 234,805,000 | 4.50 to 5.00 | 7/1/19-34 | 178,785,000 | MBIA | b |
| Series 2003-B | 1-28-03 | 41,770,000 | 5.00 | 7/1/34 | 41,770,000 | MBIA | b |
| Series 2003-C | 1-28-03 | 4,335,000 | Variable(a) | 7/1/13-14 | 4,335,000 | MBIA | |
| Series 2003-C | 1-28-03 | 25,325,000 | 4.25 to 5.25 | 7/1/15-22 | 25,325,000 | MBIA | b |
| Series 2003-D | 8-14-06 | 3,180,000 | 4.00 to 4.20 | 7/1/12-16 | 1,625,000 | MBIA | |
| Series 2003-D | 8-14-06 | 139,575,000 | 4.25 to 5.00 | 7/1/17-33 | 139,575,000 | MBIA | b |
| Series 2004-A | 8-14-06 | 17,600,000 | 3.75 to 5.25 | 7/1/12-16 | 17,580,000 | MBIA | |
| Series 2004-A | 8-14-06 | 55,165,000 | 4.50 to 5.25 | 7/1/17-25 | 55,165,000 | MBIA | b |
| Series 2004-B | 8-14-06 | 52,840,000 | 4.00 to 5.00 | 7/1/12-16 | 35,740,000 | MBIA | |
| Series 2004-B | 8-14-06 | 100,990,000 | 4.25 to 5.00 | 7/1/17-23 | 100,990,000 | MBIA | b |
| Series 2005-A | 3-11-05 | 20,965,000 | 3.40 to 5.00 | 7/1/12-15 | 8,445,000 | FGIC | |
| Series 2005-A | 3-11-05 | 84,035,000 | 3.90 to 5.00 | 7/1/16-35 | 84,035,000 | FGIC | b |
| Series 2005-B | 5-08-08 | 19,070,000 | 4.00 to 5.50 | 7/1/12-18 | 15,465,000 | FGIC | |
| Series 2005-B | 5-08-08 | 175,830,000 | 4.75 to 5.50 | 7/1/19-35 | 175,830,000 | FGIC | b |
| Series 2005-C | 3-11-05 | 36,405,000 | 5.00 | 7/1/12-15 | 23,175,000 | FGIC | |
| Series 2005-C | 3-11-05 | 90,200,000 | 5.00 | 7/1/16-22 | 90,200,000 | FGIC | b |
| Series 2006-A | 8-14-06 | 42,795,000 | 5.00 | 7/1/13-16 | 26,900,000 | Assured Guaranty/FSA | |
| Series 2006-A | 8-14-06 | 237,205,000 | 5.00 | 7/1/17-34 | 237,205,000 | Assured Guaranty/FSA | b |
| Series 2006-B | 4-1-09 | 900,000 | 3.00 to 5.00 | 7/1/12-19 | 800,000 | Assured Guaranty/FSA | |
| Series 2006-B | 4-1-09 | 119,100,000 | 5.50 to 7.00 | 7/1/20-36 | 119,100,000 | Assured Guaranty/FSA | b |
| Series 2006-C | 8-14-06 | 12,585,000 | 4.00 to 5.00 | 7/1/12-16 | 10,650,000 | Assured Guaranty/FSA | |
| Series 2006-C | 8-14-06 | 208,060,000 | 5.00 | 7/1/17-33 | 208,060,000 | Assured Guaranty/FSA | b |

135

## Appendix B — Continued

| | Bond Date | Amount Issued | Range of Interest Rates | Maturity Date | Balance June 30, 2012 | Insurer | |
|---|---|---|---|---|---|---|---|
| Series 2006-D | 8-14-06 | 4,430,000 | 4.00 to 5.00 | 7/1/12-16 | 3,465,000 | Assured Guaranty/FSA | |
| Series 2006-D | 8-14-06 | 142,160,000 | 4.25 to 5.00 | 7/1/17-32 | 142,160,000 | Assured Guaranty/FSA | b |
| Series 2011-A | 12-22-11 | 37,880,000 | 3.00 to 5.00 | 7/1/12-21 | 37,880,000 | N/A | |
| Series 2011-A | 12-22-11 | 341,710,000 | 5.00 to 5.75 | 7/1/22-41 | 341,710,000 | N/A | b |
| Series 2011-B | 12-22-11 | 7,455,000 | 2.496 to 5.00 | 7/1/12-21 | 7,455,000 | N/A | |
| Series 2011-B | 12-22-11 | 9,740,000 | 6.00 | 7/1/22-33 | 9,740,000 | N/A | b |
| Series 2011-C | 12-22-11 | 3,925,000 | 3.00 to 5.00 | 7/1/12-21 | 3,925,000 | N/A | |
| Series 2011-C | 12-22-11 | 99,965,000 | 4.50 to 5.25 | 7/1/23-41 | 99,965,000 | N/A | b |

**Total Water Supply System Revenue Bonds**   $ 2,556,395,000

**State Revolving Loans:**

| | Bond Date | Amount Issued | Range of Interest Rates | Maturity Date | Balance June 30, 2012 |
|---|---|---|---|---|---|
| Series 2005 SRF-1 | 9-22-05 | $ 13,805,164 | 2.125% | 10/1/12-26 | $ 10,575,164 |
| Series 2005 SRF-2 | 9-22-05 | 8,891,730 | 2.125 | 10/1/12-26 | 6,621,730 |
| Series 2006 SRF-1 | 9-21-06 | 5,180,926 | 2.125 | 10/1/12-26 | 3,945,926 |
| Series 2008 SRF-1 | 9-29-08 | 2,590,941 | 2.500 | 10/1/12-26 | 1,810,941 |

**Total State Revolving Loans Payable**   $ 22,953,761

a - Interest rates are set periodically at the stated current market interest rate.
b - Indicates bonds are callable under terms specified in the indenture; all other bonds are noncallable.

# Appendix C — Schedule of COPs and related swap liabilities as of June 30, 2012

| | Bond Date | Amount Issued | Range of Interest Rates | Maturity Date | Balance June 30, 2012 | Insurer |
|---|---|---|---|---|---|---|
| **Pension Obligation Certificates:** | | | | | | |
| Series 2005-A | 6/2/05 | $ 640,000,000 | 4.00 to 4.95% | 6/15/13-25 | $ 503,365,000 | FGIC/Syncora |
| Series 2006-A | 6/12/06 | 148,540,000 | 5.989% | 6/15/34-35 | 148,540,000 | FGIC |
| Series 2006-B | 6/12/06 | 800,000,000 | Variable | 6/15/19-34 | 800,000,000 | FGIC/Syncora |
| **Total Pension Obligation Certificates** | | | | | $ 1,451,905,000 | |

| Cash-Flow Hedges, Pay-Fixed Interest Rate Swaps | Notional Amount | Effective Date | Fixed Rate Paid | Rate Received | Maturity Date | Fair Value | Swap Termination Date | Final Maturity of Bonds |
|---|---|---|---|---|---|---|---|---|
| **Taxable Certificate of Participation:** | | | | | | | | |
| SBSFPC-0009 | $ 96,621,000 | 6/12/06 | 6.36% | 3mth LIBOR + .34% | | (57,173,124) | 6/15/2034 | 6/15/2034 |
| SBSFPC-0012 | 45,252,000 | 6/12/06 | 6.32 | 3mth LIBOR + .30% | | (23,055,836) | 6/15/2029 | 6/15/2029 |
| 37380341 | 96,621,000 | 6/12/06 | 6.36 | 3mth LIBOR + .34% | | (57,181,711) | 6/15/2034 | 6/15/2034 |
| 37380291 | 45,252,000 | 6/12/06 | 6.32 | 3mth LIBOR + .30% | | (23,056,802) | 6/15/2029 | 6/15/2029 |
| SBSFPC-0010 | 153,801,500 | 6/12/06 | 6.35 | 3mth LIBOR + .34% | | (91,309,463) | 6/15/2034 | 6/15/2034 |
| SBSFPC-0011 | 104,325,500 | 6/12/06 | 6.32 | 3mth LIBOR + .30% | | (48,098,696) | 6/15/2029 | 6/15/2029 |
| 37380313 | 153,801,500 | 6/12/06 | 6.35 | 3mth LIBOR + .34% | | (91,322,376) | 6/15/2034 | 6/15/2034 |
| 37380351 | 104,325,500 | 6/12/06 | 6.32 | 3mth LIBOR + .30% | | (48,104,661) | 6/15/2029 | 6/15/2029 |
| **Total** | $ 800,000,000 | | | | | (439,302,669) | | |

# Appendix D — Schedule of secured general obligation liabilities as of June 30, 2012

| | Issue Date | Amount Issued | Range of Interest Rates | Maturity Date | Balance June 30, 2012 | Insurer |
|---|---|---|---|---|---|---|
| **General Obligation Bonds -** | | | | | | |
| Unlimited Tax Series 2010-E | 12/16/10 | 100,000,000 | 5.129 to 8.369 | 11/1/14-35 | 100,000,000 | N/A |
| Limited Tax Distributable State Aid 2010 | 3/18/10 | 249,790,000 | 4.25 to 5.25 | 11/1/14-35 | 249,790,000 | N/A |
| **Total General Obligation Bonds** | | | | | 349,790,000 | |
| | | | | | | |
| **Notes and Loans -** | | | | | | |
| Ferry Street Project | 6/12/08 | | 2.62 to 4.62 | 8/1/12-18 | 2,041,000 | N/A |
| Garfield Project | 6/12/08 | | 2.62 to 4.62 | 8/1/13-15 | 750,000 | N/A |
| Stuberstone Project | 6/12/08 | | 2.62 to 4.62 | 8/1/13-16 | 120,000 | N/A |
| Vernon Lawndale Project | 9/14/06 | | 5.05 to 5.74 | 8/1/13-25 | 1,800,000 | N/A |
| New Amsterdam Project | 8/1/02 | | 4.67 to 6.12 | 8/1/12-22 | 8,480,000 | N/A |
| Mexicantown Welcome Center Project | 9/14/06 | | 5.03 to 5.70 | 8/1/13-24 | 3,600,000 | N/A |
| Book Cadillac Project | 9/14/06 | | 5.07 to 5.77 | 8/1/14-26 | 7,300,000 | N/A |
| Book Cadillac Project Note 1 | 6/12/08 | | 4.00 to 5.38 | 8/1/13-29 | 10,700,000 | N/A |
| Garfield II Note 1 | 9/14/06 | | 3.44 to 5.30 | 8/1/13-25 | 6,422,000 | N/A |
| Garfield II Note 2 | 9/14/06 | | 5.07 to 5.77 | 8/1/14-26 | 2,058,000 | N/A |
| Garfield II Note 3 | 9/16/09 | | LIBOR + 0.2 | 8/1/12-29 | 1,723,000 | N/A |
| Garfield II Note 4 | 9/16/09 | | LIBOR + 0.2 | 8/1/17-29 | 6,697,000 | N/A |
| Fort Shelby Project | 6/12/08 | | 3.82 to 5.34 | 8/1/12-26 | 18,700,000 | N/A |
| Woodward Garden Project 1 | 6/12/08 | | 4.48 to 5.05 | 8/1/16-21 | 7,050,000 | N/A |
| Woodward Garden Project 2 | 12/9/08 | | LIBOR + 0.2 | 8/1/16-28 | 6,197,000 | N/A |
| Woodward Garden Project 3 | 4/20/12 | | LIBOR + 0.2 | 8/1/16-31 | 5,753,000 | N/A |
| Loan Payable GE Capital Schedule –013 | 4/9/04 | | 4.07 | 7/1/12-6/1/14 | 248,289 | N/A |
| Loan Payable GE Capital Schedule – 030 | 4/30/08 | | 4.57 | 8/1/12 | 358,928 | |
| **Total Notes and Loans** | | | | | 89,998,217 | |
| **Total Secured General Obligation Liabilities** | | | | | $439,788,217 | |

135

# Appendix E — Schedule of unsecured general obligation liabilities as of June 30, 2012

**GOVERNMENTAL ACTIVITIES**

**General Obligation Bonds –**

Unlimited Tax:

| | Bond Date | Amount Issued | Range of Interest Rates | Maturity Date | Balance June 30, 2012 | Insurer | |
|---|---|---|---|---|---|---|---|
| Series 1999-A | 4-1-99 | $ 28,020,000 | 5.00 to 5.25% | 4/1/13-19 | $ 21,040,000 | Assured Guaranty | b |
| Series 2001-A(1) | 7-15-01 | 83,200,000 | 5.0 to 5.375 | 4/1/13-21 | 80,400,000 | MBIA | b |
| Series 2001-B | 7-15-01 | 23,235,000 | 5.375 | 4/1/13-14 | 13,680,000 | MBIA | b |
| Series 2002 | 8-2-02 | 29,205,000 | 4.00 to 5.13 | 4/1/13-22 | 6,645,000 | MBIA | b |
| Series 2003-A | 10-21-03 | 9,640,000 | 3.70 to 5.00 | 4/1/2013 | 2,575,000 | Syncora | |
| Series 2003-A | 10-21-03 | 34,380,000 | 4.00 to 5.25 | 4/1/14-23 | 34,380,000 | Syncora | b |
| Series 2004-A(1) | 9-9-04 | 39,270,000 | 4.25 to 5.25 | 4/1/19-24 | 39,270,000 | Ambac | b |
| Series 2004-B(1) | 9-9-04 | 23,720,000 | 3.75 to 5.00 | 4/1/13-14 | 16,175,000 | Ambac | |
| Series 2004-B(1) | 9-9-04 | 29,365,000 | 4.0 to 5.25 | 4/1/15-18 | 29,365,000 | Ambac | b |
| Series 2004-B(2) | 9-9-04 | 17,270,000 | 4.16 to 5.24 | 4/1/13-18 | 865,000 | Ambac | |
| Series 2005-B | 12-1-05 | 13,840,000 | 4.00 to 5.00 | 4/1/13-16 | 8,955,000 | Assured Guaranty | |
| Series 2005-B | 12-1-05 | 37,920,000 | 4.30 to 5.00 | 4/1/17-25 | 37,920,000 | Assured Guaranty | b |
| Series 2005-C | 12-1-05 | 20,010,000 | 4.00 to 5.00 | 4/1/13-16 | 12,230,000 | Assured Guaranty | a |
| Series 2005-C | 12-1-05 | 10,795,000 | 4.30 to 5.25 | 4/1/17-20 | 10,795,000 | Assured Guaranty | b |
| Series 2008-A | 6-9-08 | 15,120,000 | 5.00 | 4/1/14-18 | 15,120,000 | Assured Guaranty | |
| Series 2008-A | 6-9-08 | 43,510,000 | 4.00 to 5.00 | 4/1/19-28 | 43,510,000 | Assured Guaranty | b |
| Series 2008-B(1) | 6-9-08 | 66,475,000 | 5.00 | 4/1/13-18 | 37,905,000 | Assured Guaranty | |

**Total General Obligation Bonds - Unlimited Tax**  $ 410,830,000

135

120

# Appendix E — Continued

## GOVERNMENTAL ACTIVITIES (continued)

### General Obligation Bonds –
#### Limited Tax:

| | Bond Date | Amount Issued | Range of Interest Rates | Maturity Date | Balance June 30, 2012 | Insurer | |
|---|---|---|---|---|---|---|---|
| **Self-Insurance Bonds:** | | | | | | | |
| Series 2003 | 10-2-03 | $ 98,895,000 | 4.32 to 4.97% | 5/1/2013 | $ 17,770,000 | Assured Guaranty | |
| Series 2004 | 9-9-04 | 62,285,000 | 4.16 to 4.85 | 4/1/13-14 | 25,405,000 | Ambac | |
| **General Obligation:** | | | | | | | |
| Series 2005-A(1) | 6-24-05 | 21,325,000 | 4.27 to 4.53 | 4/1/13-15 | 11,320,000 | Ambac | |
| Series 2005-A(1) | 6-24-05 | 52,175,000 | 4.61 to 5.15 | 4/1/16-25 | 52,175,000 | Ambac | b |
| Series 2005-A(2) | 6-24-05 | 4,055,000 | 3.50 to 4.50 | 4/1/12-15 | 2,145,000 | Ambac | |
| Series 2005-A(2) | 6-24-05 | 9,475,000 | 4.00 to 5.00 | 4/1/16-25 | 9,475,000 | Ambac | b |
| Series 2005-B | 6-24-05 | 4,845,000 | 3.50 to 5.00 | 4/1/13-15 | 2,835,000 | Ambac | |
| Series 2005-B | 6-24-05 | 6,940,000 | 5.00 | 4/1/16-21 | 6,940,000 | Ambac | b |
| Series 2008-A(1) | 6-9-08 | 43,443,278 | 5.00 | 4/1/13-16 | 43,443,278 | N/A | |
| Series 2008-A(2) | 6-9-08 | 25,000,000 | 8.00 | 4/1/2014 | 25,000,000 | N/A | |
| **Total General Obligation Bonds - Limited Tax** | | | | | 196,508,278 | | |
| Loans - Downtown Development Authority | 1991-1997 | | | | 33,600,000 | | |
| **Total Unsecured General Obligation Liabilities** | | | | | $ 640,938,278 | | |

a - Indicates interest rates are reset periodically at the stated market interest rates.
b - Indicates bonds are callable under terms specified in the indenture; all other bonds are noncallable.

## Appendix F – Annual Debt Service on Special Revenue Obligations ($ in millions).

| Fiscal Year | Sewage Disposal Fund | | Water Fund | | Parking Fund | | Total Special Revenue |
|---|---|---|---|---|---|---|---|
| | Principal | Interest | Principal | Interest | Principal | Interest | |
| 2013 | 76.58 | 123.42 | 33.20 | 120.25 | 1.17 | 0.50 | $355.12 |
| 2014 | 78.39 | 143.45 | 41.46 | 131.24 | 1.22 | 0.44 | $396.20 |
| 2015 | 86.66 | 140.42 | 53.43 | 129.31 | 1.29 | 0.38 | $411.49 |
| 2016 | 89.28 | 137.53 | 58.75 | 126.49 | 1.35 | 0.31 | $413.71 |
| 2017 | 91.58 | 134.41 | 61.81 | 123.38 | 1.42 | 0.24 | $412.84 |
| 2018-22 | 503.05 | 621.32 | 353.35 | 568.23 | 4.03 | 0.30 | $2,050.28 |
| 2023-27 | 584.93 | 515.60 | 447.03 | 468.72 | | | $2,016.28 |
| 2028-32 | 733.64 | 380.44 | 555.24 | 344.23 | | | $2,013.55 |
| 2033-37 | 810.06 | 220.48 | 656.86 | 193.56 | | | $1,880.96 |
| 2037-42 | 338.56 | 35.90 | 318.25 | 51.62 | | | $ 744.33 |
| **Total** | **$3,392.73** | **$2,452.97** | **$2,579.38** | **$2,257.03** | **$ 10.48** | **$ 2.17** | **$10,694.76** |

122

135

**Appendix G – Annual Debt Service on General Obligation Debt & Other Liabilities ($ in millions).**

| Fiscal Year | General Obligation Bonds | | Notes and Loans Payable | | Transportation Fund Liabilities | | Total |
|---|---|---|---|---|---|---|---|
| | Principal | Interest | Principal | Interest | Principal | Interest | |
| 2013 | $82.71 | $51.81 | $1.56 | $3.85 | $0.81 | $0.31 | $141.07 |
| 2014 | $81.63 | $47.73 | $3.25 | $3.76 | $0.00 | $0.27 | $136.64 |
| 2015 | $68.36 | $42.72 | $3.38 | $3.62 | $2.66 | $0.27 | $121.02 |
| 2016 | $66.87 | $39.27 | $3.65 | $3.46 | $2.80 | $0.14 | $116.19 |
| 2017 | $49.89 | $35.87 | $6.09 | $3.24 | $0.00 | $0.00 | $95.10 |
| 2018-22 | $254.12 | $139.73 | $31.33 | $12.03 | $0.00 | $0.00 | $437.21 |
| 2023-27 | $150.59 | $81.99 | $30.46 | $4.61 | $0.00 | $0.00 | $267.65 |
| 2028-32 | $101.54 | $47.46 | $10.26 | $0.24 | $0.00 | $0.00 | $159.50 |
| 2033-37 | $101.43 | $13.26 | $33.60 | $0.00 | $0.00 | $0.00 | $148.29 |
| Total | $957.13 | $499.84 | $123.60 | $34.83 | $6.27 | $1.00 | $1,622.67 |

Figures above do NOT include $129.5 million in general fund refunding bonds issued in FY 2013, which have increased outstanding debt balance further from FY 2012 balances.

**Appendix H – Annual Debt Service on Pension Obligation Certificates and Related Swap Liabilities ($ in millions).**

| Fiscal Year | Principal | Interest | Swap Liability | Total |
|---|---|---|---|---|
| 2013 | 23.1 | 39.6 | 50.7 | 113.4 |
| 2014 | 29.6 | 38.5 | 50.6 | 118.8 |
| 2015 | 33.3 | 37.2 | 50.6 | 121.1 |
| 2016 | 37.0 | 35.7 | 50.6 | 123.2 |
| 2017 | 41.0 | 33.9 | 50.6 | 125.4 |
| 2018-22 | 242.8 | 140.5 | 248.0 | 631.3 |
| 2023-27 | 311.2 | 88.3 | 226.9 | 626.5 |
| 2028-32 | 416.3 | 61.8 | 135.6 | 613.7 |
| 2033-35 | 317.6 | 26.4 | 15.1 | 359.1 |
| **Total** | **1,451.9** | **501.9** | **878.7** | **2,832.5** |

**APPENDIX I – City Bargaining Units**

| Category | Name of Bargaining Unit | Active CBA? | CBA Expiration | Subject to CETS? | No. of Employees Represented |
|---|---|---|---|---|---|
| Uniform | AFSCME - ESOs | Yes | 6/30/13 | No | 93 |
| | Detroit Fire Fighters Ass'n | Yes | 6/30/13 | No | 927 |
| | Detroit Police Command Officers Ass'n | | As of 9/30/12 | Yes | 24 |
| | Detroit Police Lieutenants and Sergeants Ass'n | Yes | 6/30/13 | No | 530 |
| | Detroit Police Officers Ass'n | | 6/30/12 | Yes | 1,991 |
| | Emergency Medical Service Officers Ass'n (EMS) | | As of 9/30/12 | Yes | 10 |
| | Police Officers Ass'n of Michigan (EMS) | | As of 9/30/12 | Yes | 187 |
| Coalition and other nonuniform | AFSCME Crossing Guards | | 6/30/12 | Yes | 157 |
| | AFSCME Forestry and Landscape Foreman | | 6/30/12 | Yes | 4 |
| | AFSCME Motor City Seasonals | | 6/30/12 | Yes | 240 |
| | AFSCME Non-Supervisory | | 6/30/12 | No | 1,656 |
| | AFSCME Paving Foreperson's | | 6/30/12 | Yes | 9 |
| | AFSCME Supervisory, Local 2394 | | 6/30/12 | Yes | 47 |
| | Assist. Supervisors of Street Maint. & Constr. | | 6/30/12 | Yes | 4 |
| | Ass'n of Munic. Engineers (Supervisors of ADE) | | 6/30/12 | Yes | 15 |
| | Ass'n of City of Detroit Supervisors | | 6/30/12 | Yes | 35 |
| | Ass'n of Detroit Engineers | | As of 9/30/12 | Yes | 82 |
| | Ass'n of Municipal Inspectors | | 6/30/12 | Yes | 12 |
| | Ass'n of Prof. & Technical Employees | | As of 9/30/12 | Yes | 102 |
| | Ass'n of Prof. Construction Inspectors | | 6/30/12 | Yes | 37 |
| | Building Construction Trades – Foreman | | 6/30/12 | Yes | 14 |
| | Building Construction Trades - Non-Supervisory | | 6/30/12 | Yes | 172 |
| | Building Construction Trades - Special Service | | 6/30/12 | Yes | 26 |
| | Buildings and Safety Inspectors – Tripartite | | 6/30/12 | Yes | 19 |
| | Detroit Income Tax Investigators Ass'n | | 6/30/12 | Yes | 15 |
| | Detroit License Investigators Ass'n | | 6/30/12 | Yes | 0 |
| | Field Engineers Ass'n | | 6/30/12 | Yes | 2 |

13-53846-swr Doc 8742-1 Filed 07/18/14 Entered 07/18/14 11:26:13 Page 132 of
135

**Appendix I — Continued**

| Category | Name of Bargaining Unit | Active CBA? | CBA Expiration | Subject to CETS? | No. of Employees Represented |
|---|---|---|---|---|---|
| | International Union of Op. Engineers - Local 324 | | 9/30/12 | Yes | 27 |
| | Local 324 Park Management Ass'n | | 6/30/12 | Yes | 7 |
| | Local 324 Principal Clerks Unit | | 6/30/12 | Yes | 64 |
| | Police Officers Labor Council (Detroit Fac. Officers) | | 6/30/12 | Yes | 9 |
| | Police Officers Labor Council (Health Department) | | 6/30/12 | Yes | 1 |
| | SEIU Local 517M - Non-Supervisory | | 6/30/12 | Yes | 5 |
| | SEIU Local 517M – Prof. & Tech. Unit | | 6/30/12 | Yes | 22 |
| | SEIU Local 517M - Supervisory | | 6/30/12 | Yes | 11 |
| | Senior Accountants, Analysts & Appraisers | | 6/30/12 | Yes | 141 |
| | Teamsters, Local 214 | | 6/30/12 | Yes | 430 |
| | UAW Local 212 (Civilian Police Investigators) | | 6/30/12 | Yes | 14 |
| | UAW Local 2211 (Public Attorneys Ass'n) | | 6/30/12 | Yes | 37 |
| | UAW Local 412-Unit 86 (Law Dep't Paralegals) | | 6/30/12 | Yes | 8 |
| 13(c) protected employees | AFSCME Non-supervisory Locals 214 & 312 | | 6/30/12 | No | 317 |
| | Amalgamated Transit Union (ATU) | | 6/30/12 | No | 622 |
| | Building Construction Trades – Non-supervisory | | 6/30/12 | No | 4 |
| | DOT Foreman's Ass'n | | 6/30/12 | No | 6 |
| | International Union of Op. Engineers | | 9/30/12 | No | 2 |
| | Supervisor Chapter of DOT Foreman's Ass'n | | 6/30/12 | No | 24 |
| | Teamsters, Local 214 | | 6/30/12 | No | 9 |
| **Total** | | | | | **8,270** |

126

135

13-53846-tjt  Doc 8742  Filed 12/15/14  Entered 12/15/14 19:17:32  Page 179 of 181

# Appendix J – Summary of Capital Improvements in 10-Year Plan

| Department / Category | Project | Total Budget Impact | Start Date | Duration |
|---|---|---|---|---|
| Non-Departmental / Citywide (Included in GSD) | Elevator Improvements Program | $3,503,911 | FY 2014 | 10 years |
| | Space Consolidation Improvements | $16,118,541 | FY 2014 | 10 years |
| | Other | $1,517,528 | FY 2014 | 10 years |
| | **Subtotal** | **$21,139,980** | | |
| Manoogian Mansion | Roof Replacement | $114,643 | FY 2020 | 2 years |
| | **Subtotal** | **$114,643** | | |
| Police | Police Academy Improvements | $1,255,932 | FY 2014 | 4 years |
| | Existing District/Precinct Improvements | $2,896,861 | FY 2014 | 9 years |
| | New PCT #1 & 2 | $6,000,000 | FY 2014 | 2 years |
| | New PCT #3 & 4 | $6,000,000 | FY 2016 | 2 years |
| | New PCT #5 & 6 | $6,000,000 | FY 2018 | 2 years |
| | Electrical Improvements | $2,000,000 | FY 2014 | 2 years |
| | Contingent Projects | $14,000,000 | FY 2014 | 10 years |
| | Other | $2,027,887 | FY 2014 | 9 years |
| | **Subtotal** | **$40,180,681** | | |
| Fire | Fire Training Building Replacement | $17,010,540 | FY 2016 | 2 years |
| | Fire Apparatus | $543,525 | FY 2014 | 5 years |
| | Engine House Improvements | $2,022,077 | FY 2014 | 10 years |
| | Structural Improvements | $6,000,000 | FY 2014 | 6 years |
| | Electrical Improvements | $4,000,000 | FY 2014 | 2 years |
| | Exhaust System Improvements | $4,500,000 | FY 2014 | 10 years |
| | Contingent Projects | $17,300,000 | FY 2016 | 8 years |
| | **Subtotal** | **$51,376,142** | | |
| DDOT | Facility Improvements | $20,800,000 | FY 2014 | 4 years |
| | **Subtotal** | **$20,800,000** | | |
| Airport | Facility Improvements/Expansion | $13,264,808 | FY 2014 | 10 years |
| | **Subtotal** | **$13,264,808** | | |
| Public Lighting | PLD HQ HVAC System Replacement | $1,500,000 | FY 2015 | 1 year |
| | Other | $243,432 | FY 2014 | 10 years |
| | **Subtotal** | **$1,743,432** | | |
| Municipal Parking | Facility Improvements | $382,698 | FY 2014 | 5 years |
| | **Subtotal** | **$382,698** | | |
| Health (transferred to DPD) | Animal Control Building Replacement | $10,899,020 | FY 2014 | 2 years |
| | **Subtotal** | **$10,899,020** | | |

# Appendix J — Continued

| Department / Category | Project | Total Budget Impact | Start Date | Duration |
|---|---|---|---|---|
| Elections | Facility Improvements | $1,275,000 | FY 2014 | 1 year |
| | Contingent Projects | $2,000,000 | FY 2020 | 4 years |
| | **Subtotal** | **$3,275,000** | | |
| Fleet Purchases | Police Fleet Purchases | $102,597,588 | FY 2014 | 10 years |
| | Fire Fleet Purchases | $19,059,144 | FY 2014 | 10 years |
| | Grounds Maintenance Fleet Purchases | $11,872,447 | FY 2014 | 10 years |
| | Municipal Parking Fleet Purchases | $3,532,245 | FY 2015 | 9 years |
| | **Subtotal** | **$137,061,424** | | |
| Information Technology | Administrative Hearings | $500,000 | FY 2014 | 1 year |
| | Finance / Budget | $50,500,000 | FY 2014 | 10 years |
| | Fire | $1,800,000 | FY 2014 | 10 years |
| | Grants | $400,000 | FY 2014 | 10 years |
| | Human Resources | $300,000 | FY 2014 | 1 year |
| | Law | $100,000 | FY 2014 | 1 year |
| | Police | $19,900,000 | FY 2013 | 11 years |
| | Ombudsperson | $7,900,000 | FY 2014 | 10 years |
| | 36th District Court | $2,200,000 | FY 2014 | 10 years |
| | **Subtotal** | **$83,600,000** | | |
| General Services | Facility Improvements | $3,420,151 | FY 2014 | 8 years |
| | Contingent Projects | $17,500,000 | FY 2015 | 9 years |
| | **Subtotal** | **$20,920,151** | | |
| **General Fund Capital Improvement Project Total** | | **$404,757,979** | | |
| Reorganization Costs | | $45,800,000 | | |
| Training Costs | HR Training (catch-up costs) | $1,300,000 | | |
| | DDOT Training | $500,000 | | |
| **Total Including Reorganization and Training Costs** | | **$452,357,979** | | |
| Blight | | $500,000,000 | FY 2014 | 6 years |
| Additional Operating Expenditures | | $297,400,000 | | |
| **GRAND TOTAL** | | **$1,249,757,979** | | |