# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

-----------------------------------------------------x
:
In re                         : Chapter 9
:
CITY OF DETROIT, MICHIGAN,     : Case No. 13- 53846
:
               Debtor.         : Hon. Steven W. Rhodes
:
:
:
-----------------------------------------------------x

## MOTION OF DEBTOR FOR ENTRY OF AN ORDER, PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019, APPROVING A SETTLEMENT AND PLAN SUPPORT AGREEMENT AND GRANTING RELATED RELIEF

The City of Detroit, Michigan ("Detroit" or the "City"), as the debtor in the above-captioned case, hereby submits this motion (the "Motion") for entry of an order approving a settlement and plan support agreement (the "Agreement") pursuant to section 105(a) of title 11 of the United States Code (the "Bankruptcy Code") and Bankruptcy Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and granting related relief. In support of this Motion, the City respectfully represents as follows:

### Preliminary Statement

1.       By the time that it filed its bankruptcy case, the City was in default under certain interest rate swap agreements with UBS AG and Merrill Lynch Capital Services, Inc. (the "Swap Counterparties"). Both before and during

the bankruptcy case, the City worked diligently to reach a solution that would reduce its potential liability to the Swap Counterparties, which as of today would be approximately $288 million, and ensure continued access to critically-needed casino revenues that the City purportedly had pledged to secure these obligations. The City has now reached agreement on the principal terms of a settlement and plan support agreement that accomplishes both of those goals on favorable terms and contains other key elements that will allow the City to move forward with its rehabilitative efforts.[1] The City now requests and consents to this Court's consideration of the Motion and respectfully requests that the Court approve this Agreement.

2. Under the proposed Agreement, the City will continue to make payment to the Swap Counterparties up to the aggregate sum of $85 million in cash—less a credit of approximately $8.4 million that is currently deposited in the lockbox structure—in full satisfaction of the claims between the parties. In addition to this approximately 70 percent reduction in the payment amount, the City will make such payments in manageable amounts over time, rather than in a lump sum. Pursuant to a payment schedule described further below, the City will continue to make quarterly payments to the Swap Counterparties (as it has done to

---

[1] A detailed term sheet of the Agreement is attached to this Motion as Exhibit 6. The Agreement will be filed prior to any hearing on the Motion.

this point)[2] until the City emerges from Chapter 9, at which time—if the City is able to raise the requisite exit financing—the balance of the $85 million will be due. If not, the City will have another 180 days to pay any remaining balance. As a result of this materially reduced settlement amount and extended payment schedule, the City no longer requires incremental post-petition financing to settle its differences with the Swap Counterparties.

3.      In addition to agreeing to accept a significant impairment of their claims, the Swap Counterparties have agreed to release their claims against the City and vote in favor of a plan of adjustment proposed by the City that affords them such treatment.

4.      The Agreement provides other important benefits to the City in its overall rehabilitative efforts. In addition to providing a 70% discount off of the amount that would allegedly be payable by the City, the settlement will provide greater certainty with respect to the City's cash flows and liquidity—the City will have continued access to its casino revenues and will not have an obligation to put aside monies in a disputed claims reserve for the benefit of the Swap Counterparties. This greater certainty with respect to the City's cash flows and

---

[2]      The City and the Swap Counterparties have agreed that the quarterly payment to be made to each of the Swap Counterparties on March 14, 2014 will be held by each in segregated accounts at each of the Swap Counterparties until the earlier of (i) approval of the Agreement by this Court and (ii) further order of this Court with respect to such payment (including as such order may be modified by reconsideration, appeal or certiorari).

liquidity will simplify the City's ability to obtain quality of life financing to improve vital services for the citizens of Detroit. The Agreement also puts the City in a better position to make additional consensual deals with other creditors by expanding the options available to it during this critical time period in the case when negotiations and mediation are ongoing.

5. The Agreement also avoids the need for protracted litigation with the Swap Counterparties. Such litigation would be costly and time-consuming, and would come at a time when the City is trying to forge consensus among other creditors to confirm its plan of adjustment. And needless to say, any decision by this Court concerning a litigated dispute would not end the matter, but would be followed by a lengthy and uncertain appellate process that could last for months or longer.

6. The settlement also contains an agreement by the Swap Counterparties to vote their impaired claims in favor of a plan of adjustment. The existence of a significant impaired accepting class will, provided the City can satisfy the cramdown and other applicable confirmation standards, allow the City to confirm a plan of adjustment over a dissenting class vote. This ability will assist the City's efforts to adjust its debts and reach resolution with other creditors, which the City views as a material benefit.

7. The $85 million (or approximately $77.6 million taking into account amounts already set aside under the lockbox structure) to be paid to the Swap Counterparties reflects that their arguably secured claims are being compromised at approximately 30 cents on the dollar. The City believes that the Agreement is an appropriate compromise under the circumstances and reflects both the importance of liquidity to the City's operations and the relative strength of the City's litigation claims. For the reasons set forth herein, the City respectfully requests that the Court approve the Agreement to bring this dispute to a conclusion.

## Background

8. On July 18, 2013 (the "Petition Date"), the City filed a petition for relief in this Court, thereby commencing the largest chapter 9 case in history.

9. Incorporated in 1806, Detroit is the largest city in Michigan. As of December 2012, the City had a population of less than 685,000 (down from a peak population of nearly 2 million in 1950). Over the past several decades, the City has experienced significant economic challenges that have negatively impacted employment, business conditions and quality of life.

10. As of June 30, 2013 — the end of the City's 2013 fiscal year — the City's liabilities exceeded $18 billion (including, among other things, general obligation and special revenue bonds, unfunded actuarially accrued pension and

other postemployment benefit liabilities, pension obligation certificate liabilities and related derivative liabilities).  As of June 30, 2013, the City's accumulated unrestricted general fund deficit was approximately $237 million.

11.    In February 2013, a state review team determined that a local government financial emergency exists in the City.  Thereafter, in March 2013, Kevyn D. Orr was appointed, and now serves as, emergency manager with respect to the City (in such capacity, the "Emergency Manager") under Public Act 436 of 2012, the Local Financial Stability and Choice Act, MCL § 141.1541, et seq. ("PA 436").  Under Section 18(1) of PA 436, the Emergency Manager acts exclusively on behalf of the City in this chapter 9 case.  MCL § 141.1558.

## Jurisdiction and Authority

12.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The Court has the ability to hear and determine the Motion consistent with 28 U.S.C. § 157(b) and Stern v. Marshall, 131 S. Ct. 2594 (2011).  See, e.g., Brown v. Brown, No. 12-110-Art, 2013 WL 2338233, at *4 n.5  (E.D. Ky. May 28, 2013) (bankruptcy court can constitutionally determine 9019 motion) In re ISE Corp., No. 10-14198, 2012 WL 1377085, at *4 (Bankr. S.D. Cal.

Apr. 13, 2012) (same); <u>In re AmFin. Fin. Corp.</u>, No.09-21323, 2012 WL 893263, at *1 (Bankr. N.D. Ohio Mar. 14, 2012) (same).

13.     This Court has previously observed in this case that it may, under <u>Stern</u> and applicable Sixth Circuit precedent, decide "any and all of the legal arguments that the parties present concerning an issue that is otherwise properly before it." <u>See</u> <u>In re City of Detroit, Mich.</u>, 13-53846, 2013 WL 6331931, *23 (Bankr. E.D. Mich. Dec. 5, 2013); <u>In re City of Detroit, Mich.</u>, 498 B.R. 776, 783 (Bankr. E.D. Mich. 2013); <u>see</u> <u>also</u> <u>In re New Century TRS Holdings, Inc</u>, 13-2220, 2013 WL 5944049, at *2 (3d Cir. Nov. 7, 2013) (holding a 9019 settlement and "resolution of any disputes over the settlement," including state law claims, were "core" and could be constitutionally determined by a Bankruptcy Court under <u>Stern</u>); <u>In re RNI Wind Down Corp.</u>, 348 B.R. 286, 292, 294 (Bankr. D. Del. 2006) (determining, as part of a settlement approval, that objector was <u>not</u> a necessary party to amend the agreement and that consideration of the Rule 9019 motion was a "core" proceeding), <u>aff'd</u>, 359 Fed.Appx. 352 (3d Cir. 2009).

## **Relief Requested**

14.     By this Motion, the City respectfully requests the entry of an order (i) approving the Agreement pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019 and (ii) granting related relief.

<u>**Facts Relevant to This Motion**</u>

**I.      General Background of Transactions**

15.     While the Court is intimately familiar with the general factual background surrounding these transactions, the City repeats such background here for convenience and completeness.   The following facts are generally drawn from this Court's Opinion Regarding Eligibility, <u>In re City of Detroit, Mich.</u>, Case No. 13-53846, 2013 WL 6331931 (Bankr. E.D. Mich. Dec. 5, 2013).

**A.      The COPs and Swaps Transactions**

16.     "In 2005 and 2006, the City set out to raise $1.4 billion for its underfunded pension funds, the GRS and PFRS. The City created a non-profit Service Corporation for each of the two pension funds, to act as an intermediary in the financing. The City then entered into Service Contracts with each of the Service Corporations. The City would make payments to the Service Corporations, which had created Funding Trusts and assigned their rights to those Funding Trusts. The Funding Trusts issued debt obligations to investors called 'Pension Obligation Certificates of Participation.['] ('COPs'). [footnote omitted].  Each COP represented an undivided proportionate interest in the payments that the City would make to the Service Corporations under the Service Contracts." <u>Id.</u> at *7.

17.     "[I]nsurance [was purchased] from two monoline insurers to protect against defaults by the funding trusts that would result if the City failed to

make payments to the Service Corporations under the Service Contracts. This was intended to make the investments more attractive to potential investors. One insurer was XL Capital Assurance, Inc., now known as Syncora. The other was the Financial Guaranty Insurance Company." Id.

18.     "Some of the COPs paid a floating interest rate. To protect the Service Corporations from the risk of increasing interest rates, they entered into hedge arrangements with UBS A.G. and SBS Financial [, the latter of which later assigned its rights to Merrill Lynch Capital Services Inc. [3]] (the 'Swap Counterparties')."  Pursuant to these swaps, "the Service Corporations and the Swap Counterparties agreed to convert the floating interest rates into a fixed payment.  Under the swaps, if the floating interest rates exceeded a certain rate, the Swap Counterparties would make payments to the Service Corporations.  But if the floating interest rates sank below a certain rate, the Service Corporations would make payments to the Swap Counterparties. Specifically, there were eight pay-fixed, receive-variable interest rate swap contracts, effective as of June 12, 2006, with a total amount of $800,000,000." Id.

19.     "Under the swaps, the City was also at risk if there was an 'event of default' or a 'termination event.' In such an event, the Swap

---

[3]     (See Dkt # 2186, at 5 n.6.)

Counterparties could terminate the swaps and demand a potentially enormous termination payment." Id. at *8.

20.    "The Swap Counterparties also obtained protection against the risk that the Service Corporations would default on their quarterly swap payments. The parties purchased additional insurance against that risk from Syncora and the Financial Guaranty Insurance Company. . . . This insurance is separate from the insurance purchased to protect against a default under the COPs." Id. at *8.

21.    When interest rates dropped dramatically in 2008, the City, under the terms of the interest rate swap and related agreements, became obligated to make payments to the Swap Counterparties.  At one time, the City estimated that it would have been required to pay approximately $45,000,000 per year for the next ten years.  Id.

### B.    The Collateral Agreement

22.    "As the City's financial condition worsened, the City, the Service Corporations and the Swap Counterparties sought to restructure the swap contracts. In June 2009, they negotiated and entered into a Collateral Agreement that amended the swap agreements. The Collateral Agreement eliminated the 'Additional Termination Event' and the potential for an immediate demand for a termination payment. The City agreed to make the swap payments through a 'lockbox' arrangement and to pledge certain gaming tax revenues as collateral. The

City also agreed to increase the interest rate of the swap agreements by 10 basis points effective July 1, 2010. It also agreed to new termination events, including any downgrading of the credit ratings for the COPs." Id.

23.    "Two accounts were set up: 1) a 'Holdback Account' and 2) a 'General Receipts Subaccount.' U.S. Bank was appointed custodian of the accounts. The casinos would pay developer payments and gaming tax payments to the General Receipts Subaccount daily. The City would make monthly deposits into the Holdback Account equal to one-third of the quarterly payment that the Service Corporations owed to the Swap Counterparties. When the City made that monthly payment, U.S. Bank would release to the City the accumulated funds in the General Receipts Subaccount. If the City defaulted, the Swap Counterparties could serve notice on U.S. Bank, which would then hold or 'trap' the money in the General Receipts Subaccount and not disburse it to the City." Id.

24.    "Syncora was not a party to the Collateral Agreement." Id.

**C.    The City's Defaults Under the Collateral Agreement**

25.    "In March, 2012, the COPs were downgraded, which triggered a termination event." Id.

26.    "In March, 2013, the appointment of the emergency manager for the City was another event of default." Id.

27.    "As of June 28, 2013, the City estimated that if an event of default were declared and the Swap Counterparties chose to exercise their right to terminate, it faced a termination obligation to the Swap Counterparties of $296,500,000. This was the approximate negative fair value of the swaps at that time." Id. at *9.

28.    "On June 14, 2013, the City failed to make a required payment of approximately $40,000,000 on the COPs. This default triggered Syncora's liability as insurer on the COPs and it has apparently made the required payments. However, the City has made all of its required payments to the Swap Counterparties through the Holdback Account. The City contends that as a result, Syncora has no liability to the Swap Counterparties on its guaranty to them." Id.

**D.    The Resulting Litigation Involving Syncora**

29.    On June 17, 2013, Syncora sent a letter to U.S. Bank asserting an event of default.   "The City responded, taking the position that because it had not defaulted in its swap payments and because Syncora has no rights under the Collateral Agreement, Syncora had no right to instruct U.S. Bank to trap the funds." Id.   "U.S. Bank did trap approximately $15,000,000. This represented a significant percentage of the City's monthly revenue." Id.

30.    "As a result, on July 5, 2013, the City filed a lawsuit against Syncora in the Wayne County Circuit Court. It sought and obtained a temporary

-12-

restraining order that resulted in U.S. Bank's release of the trapped funds to the City. On July 11, 2013, Syncora removed the action to the district court in Detroit and filed a motion to dissolve the temporary restraining order. On July 31, 2013, Syncora filed a motion to dismiss the complaint. On August 9, 2013, the district referred the matter to this Court. It is now Adversary Proceeding # 13–04942. On August 28, 2013, this Court ruled that the gaming revenues are property of the City and therefore protected by the automatic stay. Tr. 9:17–21, August 28, 2013. (Dkt. # 692) As a result, on September 10, 2013, the temporary restraining order was dissolved with the City's stipulation. Syncora's motion to dismiss the adversary proceeding remains pending." Id.

31.    "[O]n July 24, 2013, Syncora filed a lawsuit against the Swap Counterparties in a state court in New York, seeking an injunction to prevent the Swap Counterparties from performing their obligations under the Forbearance and Optional Termination Agreement. The Swap Counterparties then removed the action to the United States District Court for the Southern District of New York. That court, at the request of the Swap Counterparties, transferred the case to the federal district court in Detroit, which then referred it to this Court." Id. at *10. The City filed a motion to intervene in this lawsuit because the casino revenues were at stake. This Court granted the City's motion on January 29, 2014. Less than two weeks later, on February 9, 2014, Syncora voluntarily withdrew that

adversary proceeding, without prejudice.  Syncora Guarantee Inc. v. UBS AG et al,

Adv No. 13-05395 (Bankr. E.D. Mich) (Adv. Dkt. 54).

### E.    The Forbearance and Optional Termination Agreement

32.    On July 15, 2013, the City and the Swap Counterparties entered

into a Forbearance and Optional Termination Agreement.   Under that agreement,

the Swap Counterparties promised to forbear from terminating the swaps and from

instructing U.S. Bank to trap the funds in the General Receipts Subaccount.  The

City was also permitted to effectively buy out the swaps at an 18–25% discount off

of the amount that would have been allegedly payable upon termination of the

swaps, depending on when the payment was made. At the Petition Date, the swap

termination fee was estimated at approximately $288 million and, therefore, the

buyout price for the swaps was between $216 million and $236 million.  That buy-

out would have terminated the pledge of the casino revenues. See City of Detroit,

2013 WL 6331931, at *9.

33.    On December 27, 2013, the City filed a supplement to its

motion to approve the 'Forbearance and Optional Termination Agreement,'

attaching an amendment to that agreement.  (Dkt # 2341).  As supplemented, the

motion sought approval of an agreement that would have "permit[ted] the

termination of the swap agreements upon payment by the city of $165 million plus

so-called breakage costs of $4.2 million."  Bench Op., Jan. 16, 2014, Hrg. Tr. 8:5-

-14-

13-53846-swr   Doc 8740   Filed 12/15/14   Entered 12/15/14 19:46:07   Page 14 of 79
13-53846-swr   Doc 7402   Filed 09/08/14   Entered 09/08/14 18:46:34   Page 14 of 93

8.  "The total termination liability on the swaps as of December 31st, 2013, was $247 million." Id. at 8:10-12.  And, "[t]he $165 million settlement amount represent[ed] approximately 67 percent of that amount." Id. at 8:12-13.

34.  By order dated January 17, 2014, the Court denied the City's motion to approve the Forbearance and Optional Termination Agreement, (Dkt # 2511).

35.  On February 6, 2014, the City filed a notice that the Forbearance and Optional Termination Agreement had been terminated. (Dkt. # 2655).

## II.  Settlement and Plan Support Agreement

36.  In light of this Court's denial of the motion to approve the Forbearance and Optional Termination Agreement, and informed by the Court's views with respect to the probability of success on the merits, the City and its advisors considered appropriate next steps that would safeguard the City and ensure continued access to the City's critically necessary casino revenues.

37.  The City actively prepared to pursue litigation to protect the interests of the City and its residents with respect to the swap agreements, and indeed,  by complaint dated January 31, 2014, the City filed suit before this Court seeking, among other things, a declaration that its obligations related to the COPs were illegal, unenforceable, and void *ab initio* because they contemplated and

effectuated the accrual of further indebtedness by the City in violation of Section 4a(2) of the Home Rule City Act and the creation of debt not authorized by the Revised Municipal Finance Act or any other state law. Although the City finalized a complaint and stood ready to sue the Swap Counterparties immediately if necessary, the City was also mindful of the Court's admonition to continue its efforts to reach a consensual resolution. Bench Op., Jan. 16, 2014, Hrg. Tr. 28:3-13. The City's advisors, in constant communication with and at the direction of the Emergency Manager, thus continued to engage the Swap Counterparties in discussions.

38.     The City made it clear to the Swap Counterparties that it was prepared to and would pursue litigation immediately if a favorable settlement were not reached. The City was further armed with this Court's statements that the "city is reasonably likely to succeed on its challenges to the collateral agreement under the Gaming Act and the Bankruptcy Code" as well as that "the city is reasonably likely to succeed on its challenge to the swap agreements under PA 34," Bench Op., Jan. 16, 2014 Hrg. Tr. 18:22-25 – 19:1-2. As a result of its demonstrated willingness and ability to pursue every option available against the Swap Counterparties, the City was able to secure a materially better deal from the Swap Counterparties than it had been at any time before or after its bankruptcy filing.

39.     Under the Agreement, the City has agreed to make certain manageable payments over time totaling $85 million (less than one-third the amount the Swap Counterparties argue they would be due) in exchange for, among other things, immediate access to much-needed casino revenues, the Swap Counterparties' support for the City's plan of adjustment, and the avoidance of costly and time-consuming litigation that could have impeded the City's efforts to develop a workable plan.

40.     The City has reached agreement with the Swap Counterparties on the terms of the Agreement.  The key provisions of the Agreement are as follows:[4]

| *Plan* | The City will impair the allowed swap claims pursuant to the plan of adjustment.  Upon approval of the Agreement by final order, the Swap Counterparties (in such capacities) will vote their rights and claims, subject to being properly solicited, in support of a plan of adjustment so long as their claims are treated in accordance with the Agreement and not otherwise materially adversely affected. The City will not propose a plan inconsistent with the Agreement. |
|---|---|
| *Payments to Swap Counterparties* | During the term of the Agreement, the City will timely make the monthly payments under the Collateral Agreement and the Swap Counterparties will receive the quarterly payments required thereunder.  In addition to being payments required under the Collateral Agreement, the payments to the Swap Counterparties will be considered to be adequate protection payments. |

---

[4]     The description of key provisions is qualified entirely by reference to the Settlement and Plan Support Agreement Term Sheet attached as <u>Exhibit 6</u>.

| | |
|---|---|
| *Forbearance by Swap Counterparties* | During the term of the Agreement, as long as the City is not in breach of the Agreement, the Swap Counterparties will not seek to prevent the City from obtaining the casino revenues and, subject to certain exceptions, will use their best efforts to take any action reasonably requested by the City to reverse any trapping of such monies by the Collateral Agreement Custodian. |
| *Litigation* | Unless and until the Agreement is terminated in accordance with its terms, the City (a) will not, nor will it cause any other person to, commence or prosecute any litigation against the Swap Counterparties or their affiliates relating to the swaps, the related claims, the collateral securing the claims or the COPs, and (b) if either Service Corporation or any other person commences any such litigation, will cooperate with and support the defense of the litigation by the defendant Swap Counterparties; *provided however,* that the City will remain able to defend itself against and oppose and dispute any allegations, counter-claims, cross-claims, defenses or claims for relief propounded by or on behalf of Swap Counterparties or their affiliates arising in or relating to its litigation to invalidate the COPs so long as the City is not seeking any affirmative recovery from, or otherwise advocating for any affirmative liability of, the Swap Counterparties or their affiliates. |
| *COPs Complaint/Service Corporations* | Nothing in the Agreement prohibits the City's prosecution of its complaint against the COPs structure.<br><br>To the extent that the City at any time on or after the execution of the Agreement has the ability to control the actions of either Service Corporation, the City will not cause or permit the Service Corporations to commence any litigation or take any other action that the Service Corporations would not have been able to commence or take if the Service Corporations were a party to the Agreement and obligated to the same extent as the City under the Agreement including making or pursuing any Released Claim. In addition, the order approving the Agreement will bar the Service Corporations from at any time commencing |

-18-

| | such litigation or taking any such other action. |
|---|---|
| ***Preservation of Swaps / Option to Terminate*** | Except as otherwise provided in the Agreement, (a) the swaps will not be terminated and (b) the rights of the Swap Counterparties under the swaps will remain unaltered. Each of the Swap Counterparties will retain the option at any time to terminate one or more of its swaps, either by declaring a Termination Event or Event of Default or, in consideration for the Swap Counterparties' secured claims allowed under the Agreement, by exercising the Optional Termination Provision of the swap. The termination or invalidation of any swap will not modify (a) the obligations of the Swap Counterparties pursuant to the Agreement to forbear and support the City's access to the casino revenues or (b) the amounts or timing of the City's payment obligations under the Collateral Agreement in accordance with the Agreement. |
| ***Allowed Claims*** | Upon the approval of the Agreement, each Swap Counterparty will receive an allowed claim against the City secured by valid and enforceable liens ("Liens") on the collateral pledged by the City under the Collateral Agreement and/or Ordinance No. 05-09 of the City, which, solely for purposes of distributions from the City, shall be in the aggregate principal amount equal to $42.5 million for each of the Swap Counterparties plus any interest as provided below, payable in cash. Certain other events described in the term sheet will not affect the allowance or validity of such claims or Liens or the obligations under the Agreement. The receipt by the Swap Counterparties of the claim relating to any swap will not affect any claim that it might have against any other person.

The City will (a) not, nor will it cause any person to, commence or prosecute any litigation to challenge any liens on the casino revenues, (b) defend the validity, perfection and priority of such liens against any challenge by any other person and (c) not permit any other liens to be senior to or *pari passu* with such liens until the unpaid balance, together with any interest thereon, has been paid in full in cash. |

| | |
|---|---|
| *Satisfaction of Secured Claim* | Unless a Liquidity Event occurs, on or promptly following the effective date of the Plan, the City will pay to the Swap Counterparties in cash, in satisfaction and discharge of the secured claims, the aggregate principal amount of $85 million less the sum of all amounts paid to the Swap Counterparties since January 1, 2014 plus interest on and after October 15, 2014 as set forth below.<br><br>Except as provided under "Liquidity Event" below, if the secured claims are not fully paid as provided above by October 15, 2014, then, on and after October 15, 2014, the unpaid portion will bear interest at the rate contemplated to be paid to the provider of the quality-of-life post-petition financing to the City, which the City expects to seek approval for prior to entry of the order approving the Agreement.<br><br>Once the claims have been satisfied and discharged, any monthly payments then held by the Custodian will be returned to the City.<br><br>The order approving the Agreement will provide that, upon full payment of the secured claims in cash, plus interest, if any, thereon, the liens granted by the City under the Collateral Agreement will be released without further action by any person. |
| *Liquidity Event* | The City will use best efforts to secure sufficient exit financing to pay such unpaid balance plus any interest accrued thereon on or promptly following the effective date of the Plan, and failing that, as soon thereafter as possible. If the unpaid balance is not paid in connection with the effective date, other than with respect to net proceeds used to repay up to $120 million principal amount (plus all interest and fees) of the City's quality-of-life post-petition financing facility, to the extent permitted by law but without taking into consideration any limitations imposed by the City, including in any ordinance or resolution of the City, the first dollars of any net cash proceeds of any financing or refinancing consummated in connection with, or subsequent |

-20-

| | |
|---|---|
| | to, the consummation of the City's plan of adjustment and either (i) supported by the full faith and credit of the City or (ii) payable from the general fund of the City shall be used to pay the unpaid balance plus any interest accrued thereon.

If the City is unable to secure sufficient exit financing to pay the unpaid balance plus any interest accrued thereon on or promptly following the effective date of the Plan notwithstanding its best efforts (such occurrence, a "Liquidity Event"), the City will so notify the Swap Counterparties at least 15 business days prior to the effective date of the Plan.

Upon the occurrence a Liquidity Event, the Swap Counterparties will defer full payment of the unpaid portion plus interest accrued thereon for 180 days following the effective date of the Plan; provided that (i) the City will continue to comply with its obligations, and the Swap Counterparties will continue to receive payment, as set forth in the Agreement, during the deferral period; (ii) the secured claims will remain secured by the casino revenues and all other collateral securing such claims; (iii) from and after the effective date of the Plan, the unpaid balance will accrue interest at 1.5% plus the rate in the post-petition financing agreement; and (iv) the Swap Counterparties will receive on the effective date of the Plan a deferral fee equal to 1% of the unpaid balance. |
| ***Termination of Agreement*** | Any party may terminate the Agreement on 3 business days' notice if the approval motion is denied, or if the order granting the motion is modified, vacated or reversed on appeal.

The City may terminate the Agreement on 3 business days' notice if the City loses access to the casino revenues due to the actions of persons other than the Swap Counterparties claiming an interest in the property pledged under the Collateral Agreement and the City's access is not restored within 20 days, or the Swap Counterparties fail to comply with their forbearance obligations set forth in the Agreement |

| | |
|---|---|
| | and such failure is not cured within 3 business days.

Upon termination of the Agreement, the parties will be restored to the status quo ante, other than with respect to their tolling obligations. |
| *Tolling* | The parties' rights with respect to claims released under the Agreement and Bankruptcy Code safe harbor rights are tolled as of January 31, 2014 until termination of the Agreement. |
| *Releases and Bar Order* | Upon the earlier of (i) the satisfaction in cash of the secured claims and the release of the Liens and (ii) the effective date of the Plan, and without further action, the City Releasors and the Counterparty Releasors will have released unconditionally, and be deemed to release unconditionally the City Releasors and the Counterparty Releasors and their respective affiliates and each of their respective related persons (other than the Service Corporations, unless the Service Corporations are collapsed into the City) of and from any and all claims related to the swaps, the COPs, the Service Corporations, any and all transactions related to the swaps, the COPs, the Service Corporations and/or the Funding Trusts, or the Chapter 9 Proceedings (excluding claims related to the enforcement of the Agreement).

To the extent any creditor of the City is exculpated under the Plan, the Plan will exculpate the Counterparty Released Parties in connection with the Agreement and the Chapter 9 Proceedings.

The order approving the Agreement shall contain a bar order that will permanently bar, enjoin and restrain all persons (the "Barred Persons") from commencing, prosecuting, or asserting in the Bankruptcy Court, in any federal or state court, or in any other court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere any claim for non-contractual indemnity or contribution against the Counterparty Releasors and their affiliates and each of their respective related persons (the |

-22-

| | |
|---|---|
| | "Counterparty Released Parties"), arising out of or relating to or reasonably flowing from the claims or allegations in any of the Released Claims, whether or not denominated as for contribution or indemnity, where the injury to the person is the liability of the person to the City, the Service Corporations or persons acting on their behalf, whether arising under state, federal or foreign law as claims, cross-claims, counterclaims, or third-party claims (collectively, the "Barred Claims"), and with respect to the Barred Claims, the Barred Persons are also entitled to judgment reduction in an amount proportionate to the Counterparty Released Party's fault. |
| **_Reservation of Rights_** | Neither the order approving the Agreement nor the Agreement will impair any rights that the Swap Counterparties or affiliates may have to intervene in the City's litigation to invalidate the COPs.<br><br>The Swap Counterparties reserve and retain all rights, claims and remedies related to the swaps or the Swap Insurance Policies against any person that is not a party to the Agreement, including without limitation, either Service Corporation or either Swap Insurer, but neither Swap Counterparty will exercise any right, claim or remedy against a Swap Insurer in connection with the Swap Insurance Policies that results in the Swap Insurer acquiring an allowed secured claim for reimbursement, or an allowed secured claim by way of subrogation, against the City. The provisions of this paragraph do not apply with respect to a Service Corporation if that Service Corporation is collapsed into, disregarded, veil-pierced, substantively consolidated with or similarly treated with respect to the City. |

## Basis for Relief Requested

### I.  Relevant Standards Governing The Relief Requested Herein

41.  The City seeks approval of the Agreement pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019.  While the City does not believe it is required to seek approval of its agreements under Bankruptcy Rule 9019, it nonetheless believes that good reason exists under the circumstances to request approval of the Agreement pursuant to Bankruptcy Rule 9019 and, thus, elects to seek such approval solely with respect to such agreement.

42.  Settlements and compromises are a "a normal part of the process of reorganization."  Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968) (quoting Case v. Los Angeles Lumber Prods. Co., 308 U.S. 106, 130 (1939)).  Bankruptcy Rule 9019, which applies to this proceeding pursuant to Bankruptcy Rule 1001, provides the procedural mechanism for approval of such compromises.  It states, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  FED. R. BANKR. P. 9019(a).

43.  A chapter 9 debtor  is entitled—but not required—to seek approval of a compromise pursuant to this mechanism.  See Ass'n of Retired Employees of the City of Stockton v. City of Stockton. (In re City of Stockton, Ca.), 486 B.R. 194, 200 (Bankr. E.D. Cal. 2012) (finding that city, while not be

-24-

obligated to seek approval pursuant to Bankruptcy Rule 9019, could choose to consent to judicial approval pursuant to that rule). While requiring a chapter 9 debtor to seek the Court's approval of a compromise would impermissibly violate the terms of section 904 of the Bankruptcy Code by interfering with the municipality's property and revenues without its consent, a municipality may consent to judicial involvement. See 11 U.S.C. § 904 ("Notwithstanding any power of the court, unless the debtor consents . . . the court may not . . . interfere with . . . any of the property or revenues of the debtor . . . .") (emphasis added).

44.     The decision to approve a compromise or settlement is subject to the sound discretion of the bankruptcy court. Engman v. Boyd, No. 09-cv-151, 2009 WL 1974460, at *2 (W.D. Mich. July 6, 2009) ("The bankruptcy court has wide discretion to approve or disapprove settlement agreements."). In evaluating whether the proposed agreement is fair and equitable, courts in this district generally consider four factors: (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises. See In re Bard, 49 Fed. Appx. 528, 530 (6th Cir. 2002); see also In re Greektown Holdings, LLC, 728 F.3d 567,

576 n.6 (6th Cir. 2013) (reciting <u>Bard</u> factors); <u>In re MQVP, Inc.</u>, 477 Fed. Appx. 310, 313 (6th Cir. 2012) (applying <u>Bard</u> factors).

45.     In applying these factors, "[a] bankruptcy judge need not conduct a mini-trial or write an extensive opinion every time he approves or disapproves a settlement. The judge need only be apprised of the relevant facts and law so that he can make an informed and intelligent decision and set out the reasons for that decision." <u>Fishell v. Soltow (In re Fishell)</u>, 47 F.3d 1168, 1995 WL 66622, at *3 (6th Cir. Feb. 16, 1995) (unpublished table decision) (<u>quoting</u> <u>LaSalle Nat'l Bank v. Holland (In re Am. Reserve Corp.)</u>, 841 F.2d 159, 163 (7th Cir. 1987)).

46.     To approve a compromise, the Court need only reach the conclusion that the City's proposed settlement represents the lowest-point in the range of reasonableness.  <u>See, e.g.</u>, <u>In re Fodale</u>, 10-69502, 2013 WL 663729 (Bankr. E.D. Mich. Feb. 21, 2013)<u>; In re Dow Corning</u>, 192 B.R. 415, 421 (Bankr. E.D. Mich. 1996) (quoting <u>In re Drexel Burnham Lambert</u>, 134 B.R. 493, 497 (Bankr. S.D. N.Y. 1991)).  And "a Court may approve a settlement even if it believes that the trustee or debtor-in-possession ultimately would be successful at trial."  <u>In re Drexel Burnham Lambert Grp.</u>, Inc., 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991).

47.     Finally, Section 105(a) of the Bankruptcy Code provides the
Bankruptcy Court with broad authority to issue any order necessary to carry out the
provisions of the Bankruptcy Code, including the issuance of injunctions.  See 11
U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is
necessary or appropriate to carry out the provisions of this title.").

## II.     Application Of The Relevant Standards

48.     The City respectfully submits that the  Agreement should be
approved under Bankruptcy Rule 9019 because it is in the best interests of the City
and its rehabilitative efforts.  The Agreement allows the City continued access to
its much needed cash flows, provides greater certainty with respect to the City's
liquidity and provides the City a means of exit from the swap agreements that will
allow the City to move forward with its other rehabilitative efforts.  It does so at a
deeply discounted price that fairly reflects the probability of success and attendant
costs, delay and expense in litigation.  It also allows the City to pay over time
rather than in a lump-sum.

49.     Under the Agreement, the City will continue to pay the Swap
Counterparties the amount due under the Collateral Agreement on a monthly basis
(approximately $4.2 million) until the City has paid the Swap Counterparties, in
the aggregate, $85 million (or approximately $77.6 million above the roughly $8.4
million already paid into the lockbox structure this year).  These payments shall

-27-

constitute adequate protection payments.[5]  During this time, the City will have

continued access to its casino revenues in the same manner that it currently does.

Upon payment of the $85 million, the lockbox structure will terminate (though, as

noted, the City will have access to the casino revenues upon the approval of the

Agreement) and upon payment of the $85 million or the Effective Date each party

will provide a comprehensive release of their claims against the other party and

related parties.

---

[5]     To protect against the diminution in the value of the Swap Counterparties' interest in the
collateral pledged by the City under the Collateral Agreement and/or Ordinance No. 05-
09, the City requests that the monthly and quarterly payments required by the Collateral
Agreement serve as adequate protection pursuant to section 361 of the Bankruptcy Code.
Section 361 of the Bankruptcy Code sets forth the various forms of adequate protection,
which include periodic cash payments, additional liens, replacement liens and other
forms of relief.  11 U.S.C. § 361.  What constitutes adequate protection is decided on a
case-by-case basis.  See, e.g., Delbridge v. Production Credit Assoc. and Federal Land
Bank, 104 B.R. 824, 827 (E.D. Mich. 1989).  The critical purpose of adequate protection
is to guard against the diminution of a secured creditor's collateral during the period
when such collateral is being used by the debtor.  See In re Gasel Transp. Lines, Inc., 326
B.R. 683, 691-92 (6th Cir. B.A.P. 2005)  ("Adequate protection is designed to protect a
secured creditor . . . against any decrease in the value of its collateral which may result
from depreciation, destruction, or the debtor's use of the collateral."); Delbridge, 104
B.R. at 827; In re Carbone Companies, Inc., 395 B.R. 631, 635 (Bankr. N.D. Ohio 2008);
In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992).  The form of
adequate protection requested by the City here will not harm any other secured creditor of
the City or any other party in interest because, under the Collateral Agreement, (i) the
City is required to make the monthly and quarterly payments and (ii) the Swap
Counterparties, and no other party, are entitled to receive the quarterly payments  in
respect of their interest in the collateral pledged by the City under the Collateral
Agreement and/or Ordinance No. 05-09.  The continuation of such payments will protect
the Swap Counterparties' interests until the parties have fully performed their respective
obligations under the Agreement.  Accordingly, the City submits that providing adequate
protection to the Swap Counterparties in the form of the monthly and quarterly payments
under the Collateral Agreement is fair and reasonable under the circumstances and should
be approved.

50.     The City's payments to the Swap Counterparties are payable, without interest, until October 15, 2014.  On and after that date, any portion of the $85 million that remains unpaid will bear interest at the same rate as any post-petition financing of the debtor.  Importantly, because the amounts paid under the Agreement are payable over time, the City will not need to borrow at this time to fund a lump-sum payment to the Swap Counterparties.[6]  On or promptly after the Effective Date, the City will pay the balance of the unpaid portion of $85 million owed under the Agreement.  However, if the City is unable to obtain exit financing in amounts sufficient to pay such remaining amounts, the Agreement contemplates that the City may defer repayment to the Swap Counterparties for a period of time for a reasonable price.

51.     The City has also agreed it will not propose or support a plan inconsistent with the Agreement, and the Swap Counterparties have similarly agreed to support and vote in favor of a plan that is consistent with the compromise, which will facilitate the City's ability to confirm a plan of adjustment, including, if necessary, a cramdown plan of adjustment over the objection of a dissenting class or classes.

---

[6]     However, the City does intend to seek post-petition financing in order to fund City services.

-29-

52.    The City submits that the Agreement is a fair and equitable compromise under the circumstances.

A.    **Probability of Success**

53.    In light of the four-day evidentiary hearing and closing argument and more than a half-dozen pre-trial hearings and status conferences on the Forbearance and Optional Termination Agreement, along with literally hundreds of pages and numerous briefs on the merits relating to the City's potential claims and defenses against the Swap Counterparties, this Court is already familiar with the issues being compromised and claims being released through the proposed Agreement.

54.    This Court has already stated that the "city is reasonably likely to succeed on its challenges to the collateral agreement under the Gaming Act and the Bankruptcy Code" and that "the city is reasonably likely to succeed on its challenge to the swap agreements under PA 34."  Bench Op., Jan. 16, 2014 Hrg. Tr. 18:22-25 – 19:1-2.  "As to the city's other potential claims," the Court also determined, "while they are certainly not frivolous, their likelihood of success is less apparent…."  Id. at 19:3-5.  However, the City is mindful of this Court's emphasis that "it [wa]s not for the Court at th[at] time to decide these issues."  Id. at 18:17-18.  The City is also mindful that even if the City were to litigate its claims against the Swap Counterparties successfully before this Court, a protracted

and expensive appellate process, during which the City might be obligated to set aside the disputed funds, would certainly follow.

55.     The City also notes this Court's statement that "it is more likely that Section 560 of the Bankruptcy Code does require the termination claim to be paid in full even if it is unsecured." Id. at 18:1-3.  The City respectfully disagrees with the Court's conclusion on that issue and, in a litigation, would attempt to persuade the Court to reconsider its views on that point.  Nevertheless, if the City were unable to change the Court's mind on this issue, the City's arguments with respect to the wagering tax statute and "special revenues" would, essentially, fall by the wayside because an unsecured claim that must be paid in full is in many respects equivalent to a secured claim.  Instead, the entire litigation would turn on the question of whether or not the swap obligations themselves (as opposed to the lien) were void *ab initio*.

56.     While the City is confident that it is reasonably likely to succeed on the claims that the swaps are void *ab initio*, the issue is a complicated one of Michigan law and litigation is inherently costly and uncertain.  The litigation and further appellate process could take years and cost tens of millions of dollars.  Nor is the matter free from doubt.  Under the circumstances, the City does not believe that the risks associated with litigation justify the potential rewards.  For example, the City is in dire need of cash so that it can provide essential

services to residents.  In litigation, the Swap Counterparties would assert hundreds of millions of dollars of secured or effectively secured claims.  The City would vigorously dispute and defend against such claims.  However, until final resolution of these claims, the potential for several hundred million dollar secured obligations would place a cloud over the City's rehabilitative efforts that would make it more difficult for the City to incur financing or reach consensus with other creditors. The adverse effects that protracted litigation and the accompanying uncertainty could have on the City's other rehabilitative efforts are substantial.  A risk also exists that the City might either lose access to the casino revenues or have to put aside monies in a disputed claims reserve during the course of the litigation. Worse yet, the City might lose such litigation altogether.

57.     These risks are not acceptable to the City.  Paying an additional $77.6 million over a period of time appropriately obviates the risk of hundreds of millions of dollars of swap termination claims that are secured (or that are unsecured but nonetheless cannot be impaired) hanging over the City's restructuring efforts for an extended period of time.

58.     Thus, while the City believes, particularly in light of this Court's prior ruling, that it has strong claims in litigation, the economics of the Agreement—that is, the steep discount on the Swap Counterparties' claims, payable over time—fully reflect those strengths as well as the potential risk to the

-32-

City, including the risks to the City's liquidity and overall rehabilitative efforts.

Thus, the probability of success prong favors approval of the compromise reached.

### B. Matter of Collection

59.     The City does not believe that the "matter of collection" prong

of the <u>Bard</u> test is an important factor under the circumstances.  <u>See</u> Bench Op.,

Jan. 16, 2014 Hrg. Tr. 20:2-8.

### C. Complexity Of Litigation, And The Expense, Inconvenience And Delay Necessarily Attending It

60.     The complexity of litigation, expense, inconvenience and delay

weigh in favor of compromise.  This Court previously found that these were

"substantial considerations here."  Bench Op., Jan. 16, 2014 Hrg. Tr. 19:10.  And

the Court further observed that certain of the City's claims "are very fact-intensive

and would require substantial discovery, some perhaps even international in scope,

and that litigation might take years if the city decides to pursue that."  <u>Id.</u> at 19:16-

19.  Further, while certain other of the City's claims might be expeditiously

resolved at the trial court level, "[i]t is less clear, of course, how quickly appeals

would be resolved."  <u>Id.</u> at 19:13-14.

61.     The City respectfully submits that the high likelihood of a

protracted appellate process, with the attendant substantial fees and expenses,

weigh heavily in favor of compromise, particularly given the size of the claims and

the City's desire and need to effect a plan of adjustment in the immediate future.

### D.     Interests of Public and Creditors

62.     The City would not be seeking approval of the Agreement if it did not believe it was in the best interests of the City, the public and its creditors. The City will benefit greatly from certainty with respect to its cash flows and liquidity position going forward.  The uncertainty associated with protracted litigation involving the swap transactions could inhibit the City's ability to move forward with its other restructuring efforts.  Protracted litigation would impair the City's ability to raise financing and reach resolutions with other creditors.  The Agreement removes substantial cash flow and liquidity uncertainty that clouds the City's restructuring efforts and at the same provides the City with a significant impaired accepting plan for purposes of its plan of adjustment.  The City believes that these benefits will facilitate the City's ability to reach consensual resolution with other creditors and constituents.  The Agreement is a favorable compromise, and it is time for the City and its leadership to move forward from the swap transactions.

63.     The City is mindful of this Court's concern that, under the Forbearance and Optional Termination Agreement, the City anticipated borrowing additional monies during the case in order to fund the unwinding of the swaps.  See Bench Op., Jan. 16, 2014 Hrg. Tr. 20:10-16.  Here, in contrast, the City will not be seeking incremental financing to refinance the swaps.  Instead, it will pay a much

lower amount to the Swap Counterparties over a period of time during the case and satisfy the remaining obligations at the time of its exit from bankruptcy or, if it is unable to do so, at a later point in time. Given the sizable discount to the claims asserted by the Swap Counterparties, the City will be able to emerge from bankruptcy a healthier municipality and better able to serve its residents.

64. In the absence of a compromise, protracted and costly litigation, including appellate litigation, would almost certainly ensue. This, of course, would have a negative impact on the City's rehabilitative efforts and would be a distraction to the City's leadership. For example, and as noted above, during the course of protracted litigation concerning the allowance of the Swap Counterparties' claims, a risk exists that the City might be forced to place monies into a disputed claims reserve during the pendency of such litigation. If that were to occur, the City would be unable to expend such funds in furtherance of City services. Further, if the City were to lose the litigation, or if its casino revenues were to be trapped during the pendency of it, the results would be dire.

65. The City, therefore, submits that the Agreement is in the best interests of the City, the public and its creditors.

**Mutual Releases, Limited Bar Order and Service Corporation Injunction**

66. The Agreement provides for mutual releases between the City and the Swap Counterparties. Upon payment of the consideration set forth in the

Agreement, the City's potential liability on account of the Swap Agreements, which the Swap Counterparties assert would exceed $288 million, as well as any potential claim related to the COPs, will be extinguished. Likewise, the Swap Counterparties will be released from liability for any claims of the City related to the Swap Agreements or the COPs.

67. Pursuant to the Agreement, the City is also seeking entry of a contribution bar (the "Bar Order") that is integral to the compromise. The Bar Order would prevent other defendants in litigation brought by the City from asserting a claim for contribution or non-contractual indemnity against the Swap Counterparties with respect to any liability that the City is releasing under the Agreement. The Bar Order does not prejudice these other defendants because instead of a claim for contribution, the City will reduce any judgment against them to an amount that is proportionate to their fault – i.e., the same economic result for these defendants as a contribution claim. The Bar Order is limited to claims for contribution and non-contractual indemnity, and does not affect any other third-party claims against the Swap Counterparties. In essence, therefore, the Bar Order would prevent the City from indirectly obtaining relief from the Swap Counterparties through third parties on claims that would have otherwise been released by the City under the Agreement.

68.     Bar orders such as this one help to promote the settlement of complex disputes involving numerous parties.  See, e.g., In re Tribune Co., 464 B.R. 126, 176 (Bankr. D. Del. 2011) (approving bar order in contested confirmation hearing, and noting that such orders "are increasingly used to encourage partial settlement of litigation involving multiple defendants"); see also Cullen v. Riley (In re Masters Mates & Pilots Pension Plan and IRAP Litig.), 957 F.2d 1020, 1028 (2d Cir. 1992) (approving bar order and noting, "[i]f a nonsettling defendant . . . were allowed to seek payment from a defendant who had settled, the settlement would not bring the latter much peace of mind."); Eichenholtz v. Brennan, 52 F.3d 478, 487 (3d Cir. 1995) (approving bar order and noting same rationale); Harris v. Agrivest Ltd. Partnership II, 818 F.Supp. 1042, 1042 (E.D. Mich. 1993) (entering bar order that provided for proportionate fault judgment reduction, noting "terms of the settlement and conditions imposed must be fundamentally fair and equitable to the non-settling defendants"); Rebenstock v. Fruehauf Trailer Corp., Case No. 92 CV 77050 DT, 1995 U.S. Dist. LEXIS 22089, at *7 (E.D. Mich. Aug. 18, 1995). (entering bar order in class action that provided for proportionate fault judgment reduction).

69.     It is important to note that the Bar Order is narrowly tailored because it contains a judgment reduction provision and thus does not prejudice third parties.  As the Sixth Circuit noted in a recent decision, "when the scope of a

bar order is limited to claims for contribution or indemnity, the court can compensate the non-settling defendants for the loss of those claims by reducing any future judgment against them." Papas v. Buchwald Capital Advisors, LLC (In re Greektown Holdings, LLC), 728 F.3d 567, 579 (6th Cir. 2013). The Sixth Circuit further noted that a bar order containing a judgment reduction provision that is calibrated to a non-settling defendant's proportionate share of fault – like the Bar Order here – is inherently fair and "no evidentiary fairness hearing is necessary." Id. at 576 n.7; see also In re Tribune Co., 464 B.R. at 177 (explaining that the proportionate fault method was the "fairest method to ensure that non-settling defendants were not prejudiced by a bar order" and explaining that such method is the equivalent of a contribution claim).

70.     The Bar Order is also closely related to the bankruptcy in that it will govern the City's conduct and potential recoveries in any future litigation with non-settling defendants. See Greektown, 728 F.3d at 577 (bankruptcy court has jurisdiction to enter bar order "where the outcome of the claims would affect the estate") (citing Feld v. Zale Corp., 62 F.3d 746 (5th Cir. 1995); see also Matter of Munford, Inc., 97 F.3d 449, 455 (11th Cir. 1996) (bankruptcy courts are authorized to enter bar orders under section 105(a) of the Bankruptcy Code and Rule 16); In re Tribune Co., 464 B.R. at 176 ("Bankruptcy courts have authority to enter settlement bar orders"). For these reasons, the Court has jurisdiction and authority

to approve the Bar Order, which is narrowly tailored, fair and does not prejudice non-settling defendants.

71.     In addition to the Bar Order, the Agreement contemplates that an order will be entered approving the Agreement that also provides for a limited injunction with respect to the Service Corporations.  In order to effectively implement the Agreement, it is necessary to enjoin the Service Corporations from commencing any litigation or taking any other action that the City is prohibited from taking against the Swap Counterparties.  Without the injunction, the Swap Counterparties would remain exposed to the claims the City has agreed to release in exchange for, among other things, the discount in price, immediate access to casino revenues, the Swap Counterparties' support for the City's plan of adjustment, and the avoidance of costly and time-consuming litigation.  The limited injunction is thus a necessary and integral component of the Agreement.

## **Shortening of Notice/Interim Arrangement**

72.     While contemporaneously herewith the City is seeking an order shortening notice and expedited hearing with respect to the Motion, it acknowledges that resolution of the Motion prior to the March 14 quarterly due date under the Collateral Agreement is likely not feasible under the circumstances.

73.     If the compromise described herein is approved, the Swap Counterparties would continue to receive quarterly payments under the Collateral

Agreement until they received, in the aggregate, $85 million as described in greater detail above. Given the timing of the resolution of the Motion, the City has requested, and the Swap Counterparties have agreed, that the quarterly payment to be made to each of the Swap Counterparties on March 14, 2014 will be held by each in segregated accounts at each of the Swap Counterparties until the earlier of (i) approval of the Agreement by this Court and (ii) further order of this Court with respect to such payment (including as such order may be modified by reconsideration, appeal or certiorari).

## Notice

74.     Notice of this Motion has been given to the U.S. Trustee, counsel to all official committees, and all entities that have requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure (or their counsel if known). The City submits that no other or further notice need be provided.

## Statement of Concurrence

75.     Local Rule 9014-1(g) provides that "in a bankruptcy case unless it is unduly burdensome, the motion shall affirmatively state that concurrence of opposing counsel in the relief sought has been requested on a specified date and that the concurrence was denied." Local Rule 9014-1(g). Given the number of parties and potential parties involved in this case and the lack of known opposing parties who would be adversely impacted by the relief requested herein, it would be impracticable (and, with regard to unknown parties, impossible) for the City to affirmatively seek the concurrence of each opposing counsel interested in the relief sought herein. Accordingly, the City submits that imposing the requirements of Local Rule 9014-1(g) in this matter would be "unduly burdensome" and requests that its requirements be waived.

WHEREFORE, the City respectfully requests that this Court: (a) enter an order substantially in the form attached hereto as Exhibit 1 granting the relief sought herein; and (b) grant such other and further relief to the City as the Court may deem proper.

Dated: March 3, 2014                    Respectfully submitted,


                                        Robert S. Hertzberg
                                        Robert S. Hertzberg (P30261)
                                        Deborah Kovsky-Apap (P68258)
                                        PEPPER HAMILTON LLP
                                        4000 Town Center, Suite 1800
                                        Southfield, MI 48075
                                        (248) 359-7300 - Telephone
                                        (248) 359-7700 - Fax
                                        hertzbergr@pepperlaw.com
                                        kovskyd@pepperlaw.com

                                        Corinne Ball
                                        JONES DAY
                                        222 East 41st Street
                                        New York, New York 10017
                                        Telephone: (212) 326-3939
                                        Facsimile:  (212) 755-7306
                                        cball@jonesday.com

                                        Thomas F. Cullen, Jr.
                                        Gregory M. Shumaker
                                        Geoffrey S. Stewart
                                        JONES DAY
                                        51 Louisiana Avenue, N.W.
                                        Washington, D.C. 20001.2113
                                        Telephone:  (202) 879-3939
                                        Facsimile:   (202) 626-1700
                                        tfcullen@jonesday.com
                                        gshumaker@jonesday.com
                                        gstewart@jonesday.com


                                        ATTORNEYS FOR THE CITY OF DETROIT

# SUMMARY OF ATTACHMENTS

The following documents are attached to this Motion, labeled in accordance with Local Rule 9014-1(b).

| Exhibit 1 | Proposed Form of Order |
| Exhibit 2 | Notice |
| Exhibit 3 | None |
| Exhibit 4 | Certificate of Service |
| Exhibit 5 | None |
| Exhibit 6 | Settlement and Plan Support Agreement Term Sheet |

# EXHIBIT 1

# Proposed Order

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| In re: | Chapter 9 |
| CITY OF DETROIT, MICHIGAN, | Case No. 13-53846 |
| Debtor. | Hon. Steven W. Rhodes |

## ORDER (I) APPROVING SETTLEMENT AND PLAN SUPPORT AGREEMENT WITH UBS AG AND MERRILL LYNCH CAPITAL SERVICES, INC. PURSUANT TO BANKRUPTCY RULE 9019 AND (II) GRANTING RELATED RELIEF

This matter coming before the Court on the motion (the "<u>Motion</u>") for entry of an order (i) approving, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), the terms of the City's[1] settlement and plan support agreement with UBS AG ("<u>UBS</u>") and Merrill Lynch Capital Services, Inc. ("<u>MLCS</u>" and, together with UBS and the City, the "<u>Parties</u>"), as more fully set forth in the Motion, and (ii) granting related relief; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided, and it appearing that no other or further notice need be provided, and the Court having reviewed the Motion and any opposition thereto and statements submitted in connection therewith; and upon the hearing held before the Court (the "<u>Hearing</u>"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish

---

[1] Unless otherwise defined herein, each capitalized term shall have the meaning ascribed to such term in, as applicable, the Motion or the Agreement (as defined below).

just cause for the relief granted herein; and the Court having determined that the City was authorized, but not required, to seek approval of the settlements set forth in the Agreement (as defined below) pursuant to Bankruptcy Rule 9019; and the Court having determined that the Agreement was negotiated at arm's length and in good faith by the Parties and that the Agreement is fair, equitable and reasonable; and the Court having determined that UBS and MLCS are not "insiders" (as defined in the Bankruptcy Code) of the City; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor; it is

1. ORDERED that the Motion is granted in its entirety, and any objections to the Motion not previously withdrawn, waived or settled, and all reservations of rights included therein, are hereby overruled with prejudice; and it is further

2. ORDERED that the Motion seeking approval of the settlement and plan support agreement substantially in the form filed in this case (the "Agreement") is approved in its entirety and all of its terms are incorporated herein by reference as if fully set forth herein, and the failure to specifically describe or include in this Order any particular provision of the Agreement shall not diminish or impair the effectiveness of any such provision; and it is further

3. ORDERED that the City is authorized to execute, deliver, implement and fully perform any and all obligations, instruments, documents and papers, and to make all payments (including interest and fees, if any), and take any and all actions reasonably necessary or appropriate to consummate, complete, execute and implement the Agreement in accordance with the terms and conditions thereof, and any actions taken heretofore in furtherance of these obligations are hereby ratified; and it is further

4.     ORDERED that the manner in which notice of the Motion was provided to all parties entitled to such notice was adequate, appropriate, reasonable and sufficient for all purposes and is approved; and it is further

5.     ORDERED that this Order (including the Agreement incorporated herein) is and shall be binding on all parties in interest in the City's chapter 9 case; and it is further

6.     ORDERED that the settlements and compromises set forth in the Agreement are fair and reasonable to, and in the best interests of, the City, its residents and its creditors, and in entering into the Agreement, the Parties have acted in a commercially reasonable manner and exercised their respective rights and powers, and used the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances, and such settlements and compromises are hereby approved; and it is further

7.     ORDERED that, during the term of the Agreement and until the Net Amount (as defined below) is paid in full in cash, the City shall (i) timely make the monthly Holdback Requirement (as defined in the Collateral Agreement) payments in the manner provided by and on the terms set forth under Section 5.2(a)(1) and (b) of the Collateral Agreement (the "Monthly Payments"), and (ii) allow UBS and MLCS to timely receive the quarterly payments in an amount equal to all Hedge Periodic Payables (as defined in the Collateral Agreement) required to be paid to them in the manner provided by and on the terms set forth under Section 5.7(a)(i) of the Collateral Agreement (the "Quarterly Payments"); *provided*, that for purposes of the Agreement and this Order, neither (i) any subsequent termination or invalidation of any Swap Agreement nor (ii) the subsequent occurrence of any Hedge Event (as defined Collateral Agreement) will modify the amounts or timing of the City's payment obligations under the Agreement, this Order or the Collateral Agreement, and for such purposes all Monthly Payments

4

and all Quarterly Payments shall be made in the manner provided by and in accordance with the terms of the Collateral Agreement as if such Swap Agreement had not been terminated or invalidated, or such Hedge Event had not occurred; and it is further

8.      ORDERED that, during the term of the Agreement and so long as the City is not in breach of the Agreement, UBS and MLCS shall (a) not seek to prevent the City from obtaining payments from the General Receipts Subaccount (as defined in the Collateral Agreement) and (b) except as set forth in the Agreement, use best efforts to take any action reasonably requested by the City to reverse any action by the custodian under the Collateral Agreement (the "Custodian") to withhold or delay the payments to the City; and it is further

9.      ORDERED that, in addition to constituting amounts paid and payable under and pursuant to the Collateral Agreement, the Monthly Payments and the Quarterly Payments shall be adequate protection payments pursuant to section 361 of the Bankruptcy Code to protect against diminution of UBS's and MLCS's interest in the collateral (the "Pledged Property") pledged by the City under the Collateral Agreement and/or Ordinance No. 05-09 of the City; and it is further

10.      ORDERED that each of UBS and MLCS is hereby granted an allowed claim (collectively, the "Secured Claims") against the City secured by liens on the Pledged Property (the "Liens"), which, solely for purposes of distributions from the City, shall be deemed to be in the aggregate principal amount of $42,500,000.00 for each of UBS and MLCS plus any interest as provided in the Agreement (together, the "Distribution Amount"), payable in cash; and it is further

11.      ORDERED that, except as reduced by payments as set forth herein or in the Agreement, the Secured Claims and the Liens (i) are valid, binding, perfected and enforceable

5

without further action by, or notice to, any party and (ii) shall not be subject to avoidance, reduction, subordination, reconsideration, merger, recharacterization, consolidation, recoupment, recovery, deduction, attack, offset, objection, defense, claim (as defined in the Bankruptcy Code) or counterclaim under applicable provisions of the Bankruptcy Code or state law or in equity; and shall not be subject to disallowance under any provision of the Bankruptcy Code, including section 502(d) thereof; and it is further

12.     ORDERED that, except in the case of a Liquidity Event (as defined in the Agreement), on or promptly following the effective date of the City's plan of adjustment (the "Plan"), the City shall pay to UBS and MLCS in cash, in satisfaction and discharge of the Secured Claims, the Distribution Amount less the sum of all Quarterly Payments received by UBS and MLCS since January 1, 2014 (the "Net Amount"), and any Monthly Payments held by the Custodian after such satisfaction and discharge shall be returned to the City; and it is further

13.     ORDERED that the Secured Claims shall also be satisfied and discharged if, prior to the effective date of the Plan or following dismissal of the City's chapter 9 case, UBS and MLCS shall have received, in cash, Quarterly Payments since January 1, 2014 equal to the Distribution Amount; and it is further

14.     ORDERED that, upon full payment by the City to UBS and MLCS of the Distribution Amount, all liens on the Pledged Property, including without limitation the Liens, shall be released without any further action or agreement by UBS, MLCS, the Custodian or any other person; and it is further

15.     ORDERED that the City shall use best efforts to secure sufficient exit financing to pay the Net Amount on or promptly following the Effective Date, and failing that, as soon thereafter as possible; and it is further

6

16.     ORDERED that, if the Net Amount is not paid in connection with the Effective Date, other than with respect to net proceeds used to repay up to $120 million principal amount (plus all interest and fees) of the City's quality-of-life post-petition financing facility [Order to refer to docket number of motion or order regarding facility], to the extent permitted by law but without taking into consideration any limitations imposed by the City, including in any ordinance or resolution of the City, the first dollars of any net cash proceeds of any financing or refinancing consummated in connection with, or subsequent to, the consummation of the City's plan of adjustment and either (i) supported by the full faith and credit of the City or (ii) payable from the general fund of the City shall be used to pay the Net Amount; and it is further

17.     ORDERED that no termination, invalidation or avoidance of any Swap Agreement, Service Contract obligation, lien securing any Service Contract obligation or lien granted by either of the Service Corporations, disregard or veil piercing of either Service Corporation, substantive consolidation of either Service Corporation with the City, invalidation or avoidance of any of the Certificates of Participation or any similar or other event or circumstance shall affect the allowance, amount, validity or enforceability of the Secured Claims, the Liens or the Parties' obligations hereunder or in the Agreement; and it is further

18.     ORDERED that the provisions and effect of this Order and the Agreement, and any actions taken by the Parties pursuant to this Order or the Agreement, including, without limitation, the (i) allowance of the Secured Claims; (ii) payment of the Monthly Payments and the Quarterly Payments; (iii) payment of the Distribution Amount or the Net Amount and (iv) release of the Liens, shall not impair the rights of UBS and MLCS to terminate any Swap Agreement in accordance with the terms and conditions of such Swap Agreement and applicable law; and it is further

7

19.     ORDERED that UBS and MLCS reserve and retain all rights, claims and remedies related to the Swap Agreements or the Swap Insurance Policies against any person that is not a Party, including, without limitation, against either Service Corporation, Syncora Guarantee Inc., Syncora Capital Assurance Inc. (together with Syncora Guarantee Inc., "Syncora") or Financial Guaranty Insurance Company (together with Syncora, the "Swap Insurers"); *provided* that neither UBS nor MLCS will exercise any right, claim or remedy against a Swap Insurer in connection with the Swap Insurance Policies that results in the Swap Insurer acquiring an allowed secured claim for reimbursement, or an allowed secured claim by way of subrogation, against the City; *provided further* that the provisions of this paragraph shall not apply with respect to a Service Corporation if such Service Corporation is collapsed into, disregarded, veil-pierced, substantively consolidated with or similarly treated with respect to the City; and it is further

20.     ORDERED that the Service Corporations are hereby barred from commencing any litigation or taking any other action that the Service Corporations would not have been able to commence or take if the Service Corporations were a party to the Agreement and obligated to the same extent as the City under the Agreement, including making or pursuing any Released Claim; *provided* that this paragraph shall not apply to any actions taken by the Service Corporations in respect of Hedge Receivables (as defined in the Service Contracts) that, on or after the date of entry of this Order, become due and payable to the Service Corporations from UBS or MLCS pursuant to any Swap Agreement; *provided, further* that each of UBS and MLCS shall retain its right to terminate any Swap Agreement in accordance with the terms and conditions of such Swap Agreement and applicable law; and it is further

8

21. ORDERED that, as and to the extent set forth in the Agreement, UBS and MLCS shall vote the Secured Claims in support of, and shall not (in their capacity as holders of the Secured Claims) object to, a plan of adjustment proposed by the City so long as (i) the rights and claims of UBS and MLCS are treated in accordance with the Agreement and (ii) UBS and MLCS are properly solicited by the City after approval of a disclosure statement; and it is further

22. ORDERED that the City shall not propose or support a plan of adjustment that (i) treats the Secured Claims any less favorably than as provided in the Agreement or that (ii) otherwise has a material adverse effect on UBS or MLCS or any of UBS's or MLCS's affiliates or any of their respective Related Persons (as defined below) with respect to the Secured Claims, the Swap Agreements, or the Certificates of Participation; *provided* that the Agreement and this Order shall be and hereby are independently effective without the necessity of any plan of adjustment; and it is further

23. ORDERED that, unless and until the Agreement is terminated, (i) the City shall not commence or prosecute any litigation (or directly or indirectly cause either Service Corporation or any other person to or support either Service Corporation or any other person in commencing or prosecuting any litigation) against UBS, MLCS or any of their affiliates or any of their respective (a) officers, (b) directors, (c) employees, (d) members, (e) managers, (f) partners and (g) attorneys and other advisors (collectively, subclauses (a) through (g), "Related Persons"), relating to the Swap Agreements, the Secured Claims, the collateral securing the Secured Claims or the Certificates of Participation and (ii) if either Service Corporation or any other person commences any such litigation, the City shall cooperate with and support the defense of the litigation by the UBS or MLCS defendant; *provided, however*, that the City will remain able to defend itself against, oppose or dispute any allegations, counterclaims, cross

9

claims, defenses or claims for relief propounded by or on behalf of UBS, MLCS or any of their affiliates or any of their respective Related Persons arising in or relating to the City's litigation to invalidate the Certificates of Participation [Adv. Pro. Case No. 14-04112] so long as the City is not seeking any affirmative recovery from, or otherwise advocating for any affirmative liability of, UBS, MLCS or any of their affiliates or any of their respective Related Persons; and it is further

24. ORDERED that the Custodian is hereby authorized to rely upon the terms of this Order and the Agreement, and directed to take any action requested by any of the Parties to effectuate the transactions contemplated by this Order or the Agreement and no other or further consents are required; and it is further

25. ORDERED that the automatic stay imposed pursuant to section 362 of the Bankruptcy Code, to the extent it applies, is modified solely to permit UBS and MLCS to enforce the terms of the Agreement; and it is further

26. ORDERED that the City will (i) not commence or prosecute any litigation (or directly or indirectly cause or support any other person in commencing or prosecuting any litigation) to challenge any liens on the Pledged Property; (ii) defend the validity, perfection and priority of such liens against any challenge by any other person and (iii) not cause or permit any other liens to be senior to or *pari passu* with such liens until the Net Amount has been paid in cash in full; and it is further

27. ORDERED that the Custodian shall not be liable to any party on account of actions taken by the City, UBS, MLCS or the Custodian in good faith to effectuate the transactions contemplated by the Agreement, including, without limitation, the payment of the

10

Monthly Payments and Quarterly Payments and the release of the liens on the Pledged Property, each as provided in the Agreement; and it is further

28.     ORDERED that, unless otherwise agreed by the Parties, to the extent of any inconsistency between this Order and the Agreement, on the one hand, and any plan of adjustment confirmed in this chapter 9 case, on the other hand, the terms of this Order and the Agreement, as applicable, shall govern; and it is further

29.     ORDERED that this Order shall be immediately effective and enforceable upon its entry; and it is further

30.     ORDERED that the provisions and effect of this Order, any actions taken pursuant to this Order or the Agreement and the Parties' respective rights, obligations, remedies and protections provided for herein and in the Agreement shall survive the dismissal or closing of this chapter 9 case, or confirmation of a plan or plans of adjustment, and the terms and provision of this Order and the Agreement shall continue in full force and effect notwithstanding the entry of any such order; and it is further

31.     ORDERED that the Agreement and this Order constitute and evidence the valid and binding obligations of the Parties, which obligations shall be enforceable against each Party and each of their successors and assigns in accordance with the terms of the Agreement and this Order; and it is further

32.     ORDERED that, upon the earlier of the (i) effective date of the Plan and (ii) satisfaction and discharge of the Secured Claims and the release of the Liens, and without further action, for good and valuable consideration, the adequacy of which is hereby confirmed, (a) the City and, if and at any time, any entity, including either Service Corporation, is collapsed into, disregarded, veil-pierced, substantively consolidated with or similarly treated with respect

11

to the City, that entity (collectively, the "City Releasors"), shall release unconditionally, and be deemed to forever and unconditionally release, waive and discharge UBS and MLCS and their affiliates and each of their respective present and former Related Persons (collectively, the "Counterparty Released Parties") and (b) UBS and MLCS shall release unconditionally, and be deemed to forever and unconditionally release, waive and discharge the City Releasors and the City Releasors' affiliates and each of their respective present and former Related Persons (excluding, in all cases, to the extent not a City Releasor, the Service Corporations), of and from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including, without limitation, all claims relating to the Swap Agreements, the Certificates of Participation or the Service Corporations) whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or prior to the effective date of the Plan related to the Swap Agreements, the Certificates of Participation, the Service Corporations, any and all transactions related to the Swap Agreements, the Certificates of Participation, the Service Corporations and/or the Funding Trusts, or the chapter 9 proceedings or the Plan (collectively, the "Released Claims"); *provided* that the Released Claims shall not include any claims with respect to enforcement of the Agreement; and it is further

33.    ORDERED that neither this Order nor the Agreement shall impair any rights that UBS, MLCS or any of UBS's or MLCS's affiliates may have to intervene in the City's litigation to invalidate the Certificates of Participation [Adv. Pro. Case No. 14-04112]; and it is further

34.     ORDERED that all persons (the "Barred Persons") are hereby permanently

barred, enjoined and restrained from commencing, prosecuting, or asserting in this Court, in any

federal or state court, or in any other court, arbitration proceeding, administrative agency, or

other forum in the United States or elsewhere any claim for non-contractual indemnity or

contribution against any Counterparty Released Party, arising out of or relating to or reasonably

flowing from the claims or allegations in any of the Released Claims, whether or not

denominated as for contribution or indemnity, where the injury to the person is the liability of

such person to any Plaintiff (as defined below), whether arising under state, federal or foreign

law as claims, cross-claims, counterclaims, or third-party claims (collectively, the "Barred

Claims"); and if a court or tribunal determines that Barred Claims exist that would have given

rise to liability of any Counterparty Released Party to a Barred Person but for this Order, the

Barred Persons shall be entitled to the judgment reduction provisions set forth in this Order; and

it is further

35.     ORDERED that in the event that the City or either Service Corporation, or any

person acting on behalf of, or asserting derivative claims of, the City or either Service

Corporation, including any successor to the City or either Service Corporation, including any

trustee, any committee appointed in the Chapter 9 case, any trustee of a litigation trust or any

estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy

Code (any of the above, a "Plaintiff"), asserts a claim against any Barred Person based upon,

arising from, or related to the facts, allegations, or transactions underlying any Released Claim

(the "Action"), then, prior to entry of any judgment or arbitration award ("Judgment") in the

Action, the Plaintiff shall provide notice of this Order to the court or tribunal hearing the Action;

and such court or tribunal shall determine whether the Action gives rise to Barred Claims on

which Counterparty Released Parties would have been liable to the Barred Persons in the absence of this Order; and, if the court or tribunal so determines, it shall reduce any Judgment against such Barred Person in an amount equal to (a) the amount of the Judgment against any such Barred Person times (b) the aggregate proportionate share of fault (expressed as a percentage) of the Counterparty Released Party or Parties that would have been liable on a Barred Claim in the absence of this Order expressed as a percentage of the aggregate fault of (i) the Barred Person; (ii) such Counterparty Released Party or Parties and (iii) all other persons determined by such court or tribunal to be liable to the Barred Person in connection with the Action, whether or not such Persons are sued in such Action; and it is further

36.     ORDERED that if any Plaintiff enters into a settlement with any person with respect to one or more causes of action based upon, arising from, or related to the Released Claims or any transaction underlying any Released Claim, then such Plaintiff shall cause to be included, and in all events, the settlement shall be deemed to include, a dismissal, release and waiver of any Barred Claims with respect to such settlement; and it is further

37.     ORDERED that each Plaintiff is hereby enjoined and restrained from seeking relief or collecting judgments against any non-settling party in any manner that fails to conform to the terms of this Order, including, without limitation, the proportionate judgment reduction provision set forth in this Order; and it is further

38.     ORDERED that, from January 31, 2014, until termination of the Agreement, all statutes of limitation on Released Claims and any limitation on the time in which UBS or MLCS may exercise contractual rights under the Bankruptcy Code "safe harbors" related to the Swap Agreements shall be tolled; and it is further

14

39.     ORDERED that, notwithstanding anything in this Order or the Agreement to the contrary but subject to the continued effectiveness of the tolling in the preceding paragraph of this Order, if, and only if, a Party terminates the Agreement as set forth therein, the Parties will be restored to their respective positions with respect to all rights, claims, remedies and defenses, which shall be restored as if the Agreement were never effective, including, without limitation, the allowance of the Secured Claims and the releases and injunctions set forth herein and in the Agreement, which shall be nullified; and it is further

40.     ORDERED that this Court shall retain continuing jurisdiction with respect to all matters related to or arising from this Order and the Agreement or their implementation, including, without limitation, hearing a petition for relief by a Barred Person or any other party in interest in the event that a court or tribunal hearing the Action fails to apply the judgment reduction provisions of this Order.

# EXHIBIT 2

# Notice

In re

CITY OF DETROIT, MICHIGAN,

Debtor.

Chapter 9

Case No. 13-53846

Hon. Steven W. Rhodes

## NOTICE OF MOTION AND OPPORTUNITY TO RESPOND

**PLEASE TAKE NOTICE** that on March 3, 2014, the Debtor, City of Detroit, filed its *Motion for Entry of an Order, Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, Approving a Settlement and Plan Support Agreement and Granting Related Relief* (the "**Motion**") in the United States Bankruptcy Court for the Eastern District of Michigan (the "**Bankruptcy Court**").

**PLEASE TAKE FURTHER NOTICE** that **your rights may be affected by the relief sought in the Motion. You should read these papers carefully and discuss them with your attorney, if you have one. If you do not have an attorney, you may wish to consult one.**

**PLEASE TAKE FURTHER NOTICE** that if you do not want the Bankruptcy Court to grant the Debtor's Motion, or you want the Bankruptcy Court to consider your views on the Motion, within **24 days**[1] you or your attorney must:

---

[1] Concurrently herewith, the Debtor has filed a motion seeking to shorten the notice period and expedite the hearing, if any, on the Motion. If that motion is

-2-

13-53846-swr   Doc 87082-2   Filed 12/05/14   Entered 12/05/14 18:48:54   Page 60 of 79
13-53846-swr   Doc 2802-2   Filed 03/03/14   Entered 03/03/14 18:48:54   Page 2 of 74

1. File a written objection or response to the Motion explaining your position with the Bankruptcy Court electronically through the Bankruptcy Court's electronic case filing system in accordance with the Local Rules of the Bankruptcy Court or by mailing any objection or response to:[2]

**United States Bankruptcy Court**
Theodore Levin Courthouse
231 West Lafayette Street
Detroit, MI 48226

You must also serve a copy of any objection or response upon:

**Jones Day**
222 East 41st Street
New York, New York 10017
Attn: Corinne Ball and Benjamin Rosenblum

-and-

**Pepper Hamilton LLP**
Suite 1800, 4000 Town Center
Southfield, Michigan 48075
Attn: Robert Hertzberg and Deborah Kovsky-Apap

2. If an objection or response is timely filed and served, the clerk will schedule a hearing on the Motion and you will be served with a notice of the date, time and location of the hearing.

**PLEASE TAKE FURTHER NOTICE that if you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the Motion and may enter an order granting such relief.**

---

granted, the Court will enter an order on the docket setting the deadline to respond to the Motion.

[2] A response must comply with F. R. Civ. P. 8(b), (c) and (e).

Dated:  March 3, 2014

Respectfully submitted,

/s/ Robert S. Hertzberg
Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap (P68258)
PEPPER HAMILTON LLP
4000 Town Center, Suite 1800
Southfield, MI  48075
Telephone:  (248) 359-7300
Fax:  (248) 359-7700
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

Corinne Ball
JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile:  (212) 755-7306
cball@jonesday.com

Thomas F. Cullen, Jr.
Gregory M. Shumaker
Geoffrey S. Stewart
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001.2113
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

**ATTORNEYS FOR THE CITY OF DETROIT**

# EXHIBIT 3

# Brief (Not Applicable)

# EXHIBIT 4

# Certificate of Service

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

### SOUTHERN DIVISION

| | |
|---|---|
| In re | Chapter 9 |
| | Case No. 13-53846 |
| CITY OF DETROIT, MICHIGAN, | |
| | Hon. Steven W. Rhodes |
| Debtor. | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 3, 2014, I electronically filed the

Motion of Debtor for Entry of an Order, Pursuant to Section 105(a) of the

Bankruptcy Code and Bankruptcy Rule 9019, Approving a Settlement and Plan

Support Agreement and Granting Related Relief, which sends notice by operation

of the Court's electronic filing service to all ECF participants registered to receive

notice in this case.


Dated: March 3, 2014                     /s/ Robert S. Hertzberg
                                         Robert S. Hertzberg (P30261)

# EXHIBIT 5

# Affidavits (Not Applicable)

# EXHIBIT 6

# Settlement and Plan Support Agreement
# Term Sheet

For Settlement Purposes
Subject to FRE 408

CITY OF DETROIT

Term Sheet
For Agreement with UBS and MLCS

This is a term sheet for discussion purposes.  It is not intended to be a commitment by any Party unless reduced to a definitive written agreement signed by all Parties.  No right, claim, remedy or defense is being waived.

| | |
|---|---|
| Parties: | The City, UBS AG ("UBS") and Merrill Lynch Capital Services, Inc. ("MLCS") (together, the "Parties"). |
| Plan: | Upon approval by the Bankruptcy Court by final order in form and substance satisfactory to the Parties under Bankruptcy Rule 9019 of a definitive agreement (the "Agreement") implementing the terms set forth in this term sheet, UBS and MLCS will agree to vote the Secured Claims (as defined below), subject to being properly solicited, in support of, and not (in their capacity as holders of the Secured Claims) object to, a plan of adjustment (the "Plan") proposed by the City so long as the rights and claims of UBS and MLCS are treated in accordance with the Agreement as contemplated by this term sheet.  The City will not propose or support a Plan that (a) treats the Secured Claims (as defined below) any less favorably than contemplated by this term sheet or (b) otherwise has a material adverse effect on UBS or MLCS or any of UBS's or MLCS's affiliates or affiliated persons with respect to the Secured Claims, the Swaps or the Certificates of Participation as compared to this term sheet. |
| Payments to UBS and MLCS: | During the term of the Agreement and until the Net Amount (as defined below), together with any interest thereon as provided below, is paid in full in cash, the City will timely make the monthly Holdback Requirement (as defined in the Collateral Agreement) payments in the |

-1-

13-53846-swr   Doc 2802-6  Filed 03/03/14  Entered 03/03/14 16:48:54   Page 2 of 23
13-53846-swr   Doc 8702-6  Filed 12/05/14  Entered 12/05/14 19:46:07   Page 68 of 79

manner provided by and on the terms set forth under Section 5.2(a)(1) and (b) of the Collateral Agreement (the "Monthly Payments") and UBS and MLCS will timely receive the quarterly payments in an amount equal to all Hedge Periodic Payables (as defined in the Collateral Agreement) required to be paid to them in the manner provided by and on the terms set forth under Section 5.7(a)(i) of the Collateral Agreement. In addition to being payments required under the Collateral Agreement, the payments to UBS and MLCS will be considered to be adequate protection payments pursuant to section 361 of the Bankruptcy Code to protect against diminution of UBS's and MLCS's interest in the Pledged Property (as defined below).

The quarterly payment to be made to each of UBS and MLCS on March 14, 2014, will be held by each in segregated accounts at UBS and MLCS, respectively, until the earlier of (i) approval of the Agreement by the Bankruptcy Court and (ii) further order of the Bankruptcy Court with respect to such payment (including as such order may be modified by reconsideration, appeal or certiorari).

Forbearance by UBS and MLCS:

During the term of the Agreement and so long as the City is not in breach of the Agreement, UBS and MLCS will (a) not seek to prevent the City from obtaining payments from the General Receipts Subaccount and (b) subject to such exceptions as will be set forth in the Agreement, use best efforts to take any action reasonably requested by the City to reverse any action by the Collateral Agreement Custodian to withhold or delay the payments to the City.

City's Undertaking re Litigation:

Unless and until the Agreement is terminated as set forth below, the City will (a) not commence or prosecute any litigation (or directly or indirectly cause either Service Corporation or any other person to or support either Service Corporation or any other person

in commencing or prosecuting any litigation) against UBS, MLCS or any of UBS's or MLCS's affiliates or affiliated persons relating to the Swaps, the Secured Claims, the collateral securing the Secured Claims or the Certificates of Participation and (b) if either Service Corporation or any other person commences any such litigation, cooperate with and support the defense of the litigation by the UBS or MLCS defendant; *provided however*, that the City will remain able to defend itself against, oppose and dispute any allegations, counter-claims, cross-claims, defenses or claims for relief propounded by or on behalf of UBS, MLCS or any of UBS's or MLCS's affiliates or affiliated persons arising in or relating to its litigation to invalidate the Certificates of Participation[1] so long as the City is not seeking any affirmative recovery from, or otherwise advocating for any affirmative liability of, UBS, MLCS or any of UBS's or MLCS's affiliates or affiliated persons.

Preservation of Swaps:

Except as contemplated by this term sheet, (a) the Swaps will not be terminated and (b) the rights of UBS and MLCS under the Swaps will remain unaltered.

Options to Terminate Swaps:

Each of UBS and MLCS will retain the option at any time to terminate one or more of its Swaps, either by declaring a Termination Event or Event of Default or, in consideration for the Secured Claims relating to the Swap, by exercising the Optional Termination Provision of the Swap.

The termination or invalidation of any Swap (or occurrence of any Hedge Event (as defined in the Collateral Agreement)) will not modify (a) the obligations of UBS and MLCS set forth above under "Forbearance by UBS and MLCS", even though a termination amount is then owed under the Swap or (b) the amounts

---

[1] *City of Detroit, Michigan v. Detroit General Retirement System Service Corporation et al.* **[Ad. Proc. No. 14-04112].**

-3-
13-53846-swr   Doc 8702-6   Filed 12/05/14   Entered 12/05/14 19:46:07   Page 70 of 79
13-53846-swr   Doc 2802-6   Filed 03/03/14   Entered 03/03/14 16:48:54   Page 4 of 13

or timing of the City's payment obligations in respect of the Swap set forth above under "Payments to UBS and MLCS", which would continue to be made as if such termination, invalidation or Hedge Event had not occurred.

Secured Claims:

Upon the approval of the Agreement by the Bankruptcy Court, each of UBS and MLCS will receive an allowed claim (collectively, the "Secured Claims") against the City secured by valid and enforceable liens ("Liens") on the collateral (the "Pledged Property") pledged by the City under the Collateral Agreement and/or Ordinance No. 05-09 of the City, which, solely for purposes of distributions from the City, shall be in the aggregate principal amount equal to $42.5 million for each of UBS and MLCS, payable in cash, plus any interest as provided below. The receipt by UBS or MLCS of a Secured Claim relating to any Swap will not affect any claim that it might have against any other person (including the Service Corporation that is party to the Swap).

No termination, invalidation or avoidance of any Swap, Service Contract obligation, lien securing any Service Contract obligation or lien granted by either Service Corporation, disregard or veil piercing of either Service Corporation, substantive consolidation of either Service Corporation with the City, invalidation or avoidance of any of the Certificates of Participation or any similar or other event or circumstance will affect the allowance and continued validity of the Secured Claims, the Liens or the Parties' obligations under the Agreement. Except as reduced by payments as set forth in the Agreement, the Secured Claims and Liens will (i) be valid, binding perfected and enforceable and (ii) not be subject to avoidance, reduction, subordination, reconsideration, merger, recharacterization, consolidation, recoupment, recovery, deduction, attack, offset, objection, defense, claim (as defined in the Bankruptcy Code) or counterclaim under applicable

provisions of the Bankruptcy Code or state law or in equity; and shall not be subject to disallowance under any provision of the Bankruptcy Code, including section 502(d) thereof.

The City will (a) not commence or prosecute any litigation (or directly or indirectly cause or support any other person in commencing or prosecuting any litigation) to challenge any liens on the Pledged Property, (b) defend the validity, perfection and priority of such liens against any challenge by any other person and (c) not cause or permit any other liens to be senior to or *pari passu* with such liens until the Net Amount, together with any interest thereon, has been paid in full in cash.

Satisfaction of Secured Claims:

Unless a Liquidity Event (as defined below) occurs, on or promptly following the effective date of the Plan, the City will pay to UBS and MLCS in cash, in satisfaction and discharge of the Secured Claims, the aggregate principal amount of $85 million less the sum of all amounts paid to UBS and MLCS under the Collateral Agreement since January 1, 2014 (the "Net Amount"), plus any interest on the Net Amount as provided below.

The Secured Claims will also be satisfied and discharged if, prior to the effective date of the Plan or following dismissal of the Bankruptcy Case, UBS and MLCS have received under the Collateral Agreement the aggregate principal amount of $85 million since January 1, 2014, plus any interest on the Net Amount as provided below.

Once the Secured Claims have been satisfied and discharged, any Monthly Payments then held by the Custodian will be returned to the City.

Except as provided under "Liquidity Event" below, if the Secured Claims are not fully paid as provided above by October 15, 2014, then,

on and after October 15, 2014, the unpaid Net Amount will bear interest at the rate contemplated to be paid to the provider of the quality-of-life post-petition financing to the City (such rate, the "Post-Petition Rate"), which the City expects to seek approval for prior to entry of the order approving the Agreement.

The order approving the Agreement will provide that, upon full payment of the Secured Claims in cash, plus interest, if any, thereon, the liens granted by the City under the Collateral Agreement will be released without further action by UBS, MLCS, the Collateral Agreement Custodian or any other person.

Liquidity Event:

If the Net Amount plus interest accrued thereon is not paid in connection with the effective date of the Plan, other than with respect to net proceeds used to repay up to $120 million principal amount (plus all interest and fees) of the City's quality-of-life post-petition financing facility,[2] to the extent permitted by law but without taking into consideration any limitations imposed by the City, including in any ordinance or resolution of the City, the first dollars of any net cash proceeds of any financing or refinancing consummated in connection with, or subsequent to, the consummation of the City's plan of adjustment and either (i) supported by the full faith and credit of the City or (ii) payable from the general fund of the City shall be used to pay the Net Amount plus any interest accrued thereon. The City will use best efforts to secure sufficient exit financing to pay the Net Amount plus any interest accrued thereon on or promptly following the effective date of the Plan, and failing that, as soon thereafter as possible. If, notwithstanding its best efforts, the City is unable to secure sufficient exit financing to pay the Net Amount plus any interest accrued thereon on or

---

[2] The order approving the Agreement will refer to the docket number of the motion or order regarding quality-of-life post-petition financing facility.

promptly following the effective date of the Plan (such occurrence, a "Liquidity Event"), the City will so notify UBS and MLCS in writing at least 15 business days prior to the effective date of the Plan.

Upon the occurrence a Liquidity Event, UBS and MLCS will defer full payment of the Net Amount plus interest accrued thereon for 180 days following the effective date of the Plan; provided that (i) the City will continue to comply with its obligations, and UBS and MLCS will continue to receive the payments, set forth in "Payments to UBS and MLCS" above during the deferral period; (ii) the Secured Claims will remain secured by the Pledged Property and all other collateral securing the Secured Claims; (iii) from and after the effective date of the Plan, the Net Amount will accrue interest at 1.5% plus the Post-Petition Rate; and (iv) UBS and MLCS will receive on the effective date of the Plan a deferral fee equal to 1% of the Net Amount.

Termination of Agreement:

Any Party may terminate the Agreement upon three business days' notice to the other Parties if the Bankruptcy Court denies the Approval Motion, or if a Bankruptcy Court order granting the Approval Motion is modified, vacated or reversed on appeal.

The City may terminate the Agreement upon three business days' notice to UBS and MLCS if:

(a) the City is prevented from obtaining payments from the General Receipts Subaccount because of the actions of any person, other than UBS or MLCS, claiming an interest in the Pledged Property on account of the liens granted by the City thereon under the Collateral Agreement and the City's access to the payments is not subsequently restored within a period of 20 days after access was prevented; or

(b) UBS or MLCS fails to comply with its obligations set forth above under "Forbearance by UBS and MLCS" and the failure has not been cured by the end of the three business day period.

Upon termination of the Agreement as provided above, the allowance of the Secured Claims and the releases contemplated below will be nullified, and the Parties will be restored to their prior positions with all rights, claims, remedies and defenses restored as if the Agreement were never effective, subject to the provisions set forth below under "Tolling of Certain Periods".

Tolling of Certain Periods:

From January 31, 2014, until termination of the Agreement, all statutes of limitation on Released Claims (as defined below) and any limitation on the time in which UBS or MLCS may exercise contractual rights under the Bankruptcy Code "safe harbors" for swap agreements will be tolled.

Releases:

As used herein, the term "City Releasors" means the City and, if and at any time, any entity, including either Service Corporation, is collapsed into, disregarded, veil-pierced, substantively consolidated with or similarly treated with respect to the City, that entity; and the term "Counterparty Releasors" means UBS and MLCS.

The following releases will be approved upon the approval of the Agreement by the Bankruptcy Court and will not be subject to further modification without the consent of the Parties.

Upon the earlier of (i) the satisfaction in cash of the Secured Claims and the release of the Liens and (ii) the effective date of the Plan, and without further action, (a) the City Releasors will have released unconditionally, and be deemed to release unconditionally the Counterparty Releasors and their affiliates and

each of their respective present and former Related Persons (as defined below) (collectively, the "Counterparty Released Parties") and (b) the Counterparty Releasors will have released unconditionally, and be deemed to release unconditionally the City Releasors and their affiliates and each of their respective present and former Related Persons (other than, to the extent not a City Releasor, the Service Corporations) from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including, without limitation, all claims relating to the Swaps, the Certificates of Participation or the Service Corporations) whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or prior to the effective date of the Plan related to the Swaps, the Certificates of Participation, the Service Corporations, any and all transactions related to the Swaps, the Certificates of Participation, the Service Corporations and/or the Funding Trusts, or the Chapter 9 Proceedings (the "Released Claims"), provided, however, that the Released Claims shall not include any claims with respect to enforcement of the Agreement. To the extent any creditor of the City is exculpated under the Plan, the Plan shall also exculpate the Counterparty Released Parties in connection with the Agreement or the Chapter 9 Proceedings. Until approval of the Agreement by the Bankruptcy Court, all rights, claims, remedies and defenses of the Released Parties are preserved. "Related Persons" means officers, directors, employees, members, managers, partners and attorneys and other advisors.

The order approving the Agreement shall contain a bar order that will permanently bar,

-9-

13-53846-swr    Doc 2702-6    Filed 12/15/14    Entered 12/15/14 19:16:07    Page 76 of 79
13-53846-swr    Doc 2862-2    Filed 03/03/14    Entered 03/03/14 19:46:54    Page 60 of 73

enjoin and restrain all persons (the "Barred Persons") from commencing, prosecuting, or asserting in the Bankruptcy Court, in any federal or state court, or in any other court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere any claim for non-contractual indemnity or contribution against any Counterparty Released Party arising out of or relating to or reasonably flowing from the claims or allegations in any of the Released Claims, whether or not denominated as for contribution or indemnity, where the injury to the person is the liability of the person to the City or the Service Corporations (or any person acting on behalf of, or asserting derivative claims of, the City or either Service Corporation, including any successor to the City or either Service Corporation, including any trustee, any committee appointed in the Chapter 9 case, any trustee of a litigation trust or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code), whether arising under state, federal or foreign law as claims, cross-claims, counterclaims, or third-party claims (collectively, the "Barred Claims"), and with respect to the Barred Claims, the Barred Persons are also entitled to judgment reduction in an amount proportionate to the Counterparty Released Parties' fault.

Concerning the Service Corporations:

The Agreement will not preclude the City from continuing to assert in its litigation to invalidate the Certificates of Participation that the City has no obligation to the Service Corporations under the Service Contracts or that the Service Corporation should be disregarded entities.

However, to the extent that the City at any time on or after the execution of the Agreement has the ability to control the actions of either Service Corporation, the City will not cause or permit the Service Corporation to commence any litigation or take any other action that the

Service Corporation would not have been able to commence or take if the Service Corporation were a party to the Agreement and obligated to the same extent as the City under the Agreement including making or pursuing any Released Claim. In addition, in any event, the order approving the Agreement will bar either Service Corporation from at any time commencing such litigation or taking any such other action.

Reservation of Certain Rights:

Neither the order approving the Agreement nor the Agreement will impair any rights that UBS, MLCS or any of UBS's or MLCS's affiliates may have to intervene in the City's litigation to invalidate the Certificates of Participation.

UBS and MLCS will reserve and retain all rights, claims and remedies related to the Swaps or the Swap Policies against any person that is not a party to the Agreement, including without limitation, either Service Corporation or either Swap Insurer, but neither UBS nor MLCS will exercise any right, claim or remedy against a Swap Insurer in connection with the Swap Policies that results in the Swap Insurer acquiring an allowed secured claim for reimbursement, or an allowed secured claim by way of subrogation, against the City. The provisions of this paragraph shall not apply with respect to a Service Corporation if that Service Corporation is collapsed into, disregarded, veil-pierced, substantively consolidated with or similarly treated with respect to the City.

The Agreement will not affect any intercreditor arrangements between UBS and MLCS *inter se*.

Public Statements:

The City agrees that neither it nor its professionals nor its emergency manager will make any disparaging or negative statements or comments to the press regarding UBS or MLCS, including with respect to the claims

that are being settled against UBS or MLCS pursuant to the Agreement.

-12-

13-53846-swr    Doc 8732-6  Filed 12/15/14  Entered 12/15/14 19:46:07  Page 79 of 79
13-53846-swr    Doc 2302-6  Filed 03/03/14  Entered 03/03/14 16:48:54  Page 19 of 13