UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re

CITY OF DETROIT, MICHIGAN,

Debtor.
_____/

Chapter 9

Case No. 13-53846

Hon. Steven W. Rhodes

JOHN P. QUINN'S OBJECTIONS TO DISCLOSURE STATEMENT

On March 8, 2014, I advised counsel for the City in writing of my request to include additional information in the disclosure statement ("disclosure"). I have had no reply to that communication. I now object to the disclosure on the grounds specified below.

I.  MISSING EXHIBITS.

Several exhibits referred to in the disclosure have not been provided, at least so far as I have been able to determine. The exhibits of particular concern to me as a General Retirement System ("GRS") retiree and annuitant include:

| | |
|---|---|
| Exhibit I.A.62 | Form of Detroit VEBA Trust Agreement |
| Exhibit I.A.140 | Material Terms Related to GRS Hybrid Pension Formula |
| Exhibit I.A.20 | Form of Plan GRS Settlement Documents |
| Exhibit II.B.3.u.i | Schedule of Reductions to Allowed GRS Claims and Related Allowed OPEB Claims |
| Exhibit II.B.3.u.ii.A | Schedule of Payments and Sources of Payments for Modified GRS Pension Benefits |
| Exhibit II.B.3.u.ii.D | Reduction Formula for Participants in Annuity Savings Fund Accounts |

The City assures us that some or all of the missing exhibits will be provided, but not until as little as a week before the deadline for voting on the plan. (See the first page of the preamble to the disclosure and page 3 of the disclosure.) That will be long after the expiration of my opportunity to object to the Plan of Adjustment (plan), but I need information that appears to be in the missing exhibits to determine what objections, if any, to file. As explained below (Section II), using Exhibit II.B.3.u.ii.D as an example, the needed information is necessary to determine whether I have grounds for objection to the plan and, if so, whether it is prudent to file one or more objections. Moreover, it is not reasonable to ask the Court to approve the disclosure and the plan before having an opportunity to examine the information the City incorporates in the disclosure by reference to exhibits the City has not shared with the Court.

II. FAILURE TO DISCLOSE FORMULAE FOR REDUCING PENSIONS OF FORMER PARTICIPANTS IN ANNUITY SAVINGS FUND AND HOW SUCH "FORMER" PARTICIPANTS ARE IDENTIFIED.

The City apparently maintains that annuities have been over-funded at the expense of funds available to pay pensions because of practices described on page 33 of the disclosure. It seems to propose remedying this by reducing "the Current Accrued Annual Pension of former participants in the Annuity Savings Fund Account now receiving monthly pensions, in accordance with the formulae set forth on Exhibit II.B.3.u.ii.D to the Plan." (See disclosure, pp. 16 and 85.) The disclosure gives me no basis upon which to determine whether I am a "former" participant in the Annuity Savings Fund Account. Is the fact that I paid into that fund while employed by the City sufficient to identify me as a "former" participant, or am I a current (and therefore

2

presumable not former) participant because I currently receive a monthly annuity payment? Assuming I am a former participant, without the formulae supposedly contained in Exhibit II.B.3.u.ii.D, I cannot determine what effect the planned adjustment might have on my pension and annuity, and without making that determination I cannot make an informed and intelligent decision whether to object to the plan. Nor is it apparent how the Court can determine whether the plan is fair and feasible without the information that is said to be included in the undisclosed exhibit.

The City goes on to disclose that "[i]n the event of any such reduction [in an annuitant's Current Accrued Annual Pension], a Holder's GRS Adjusted Pension Amount shall be increased to take into account such Annuity Savings Fund Account restitution reduction." (See disclosure, pp. 16 and 85.) I find this mystifying. It could be read to mean that if a retired annuitant's pension is reduced it will immediately be increased by an amount equal to the reduction. But that would be pointless. I do not know what other meaning this disclosure might have. Perhaps the missing exhibits might throw light on that question. In any event, I have been unable to find in the disclosure any information that enables me to make sense of the quoted sentence. The Court should require that the City promptly supplement the disclosure to include any such information that might exist.

Finally, the disclosure fails to indicate whether monthly annuity payments will be adjusted, and if so by how much, in light of the alleged overfunding of annuities.

III. FAILURE TO DISCLOSE HISTORICAL INFORMATION ON FUNDING LEVELS OF GRS.

The disclosure includes very general statements concerning the alleged underfunding of the GRS as of June 30, 2012. (See disclosure, pp. 34 - 35.) However, it omits all specific information concerning the funding level of the GRS on other dates. This missing information is essential for determining whether the plan treats GRS retirees fairly relative to one another.

Assuming but not admitting that GRS retirees are unsecured creditors despite Mich.Const. Art. IX Sec. 24, that provision clearly imposes upon the City at least two duties owed to its employees and retirees:

(1) it has been required fully to fund each employee's pension while that employee was still working by making periodic payments to GRS, the amounts of the payments determined by several variables, including actuarial estimates of the employees' life expectancies and financial estimates of the investment returns GRS would realize from the amounts paid by the City; and

(2) it must assure that the pensions are actually paid in full by augmenting its periodic payments to GRS if it becomes apparent that the amounts previously paid to GRS and the returns realized by investing those payments are not sufficient to pay the pensions.

Once again assuming but not admitting that retirees are unsecured creditors, the second duty can be reduced or discharged in bankruptcy as to any augmented

4

payments not made before the City sought bankruptcy protection. However, as to each retiree who had retired before the City sought bankruptcy protection, the City had already fulfilled the first duty, to the extent the duty was ever to be fulfilled, while that retiree was in the City's employ. The money the City had already paid GRS to fund pensions is not an asset of the City and is not available to satisfy the claims of other claimants.

Thus, for example, if GRS was 90% funded on the day Retiree A retired, then the City has already made payments to GRS sufficient to pay 90% of A's pension; and GRS (or it successor), which is not seeking bankruptcy protection, is obligated to pay A at least 90% of A's pension, although the City may no longer be required to make up the deficiency. If Retiree B retired after A, when GRS was only 80% funded, then if the City is discharged, B is entitled to receive at least 80% of her pension from GRS.

I have used hypothetic funding levels in the immediately preceding paragraph because the City has not disclosed actual funding levels for any date other than June 30, 2012. Each GRS retiree therefore lacks the information needed to determine whether the proposed uniform pro rata reductions in GRS pensions treat her unfairly by taking money held in trust by GRS for her and using it to augment the reduced pensions of other retirees. That information is clearly necessary for a retiree to determine not only whether she should vote for the plan but also whether to object to the plan.

IV.  OMISSION OF ALL INFORMATION CONCERNING RETIREES' ELECTIONS REGARDING REDUCED PAYMENTS SO THAT PAYMENTS CONTINUE TO BENEFICIARIES AFTER RETIREE'S DEATH.

I made an election when I retired whether to accept an actuarially reduced monthly pension payment so that payments (either further reduced or not) could continue to be made to my beneficiary after my death if I predecease her. I believe but do not know that many, perhaps most, GRS retirees made similar elections at the time of their retirements. I made the election with the understanding that the base amount of my pension would remain unchanged and the annual cost of living adjustments would continue so long as I or my beneficiary continue receiving monthly pension payments. The City now proposes to violate that understanding by substantial reductions in monthly pension payments and by eliminating cost of living adjustments.

Because these proposals would result in drastic changes in the expectations that informed the election I made when I retired, it may be appropriate to permit me (and others similarly situated) to reconsider that election, especially since such reconsideration need not affect the cost to the City of the reduced pensions.

One can easily envision circumstances in which such reconsideration would be prudent. For example, a retiree may have elected to have her beneficiary receive a monthly pension payment reduced by 50%, expecting that continuation of the cost of living adjustments would, over time, augment the pension sufficiently to provide adequately for her surviving beneficiary even with the 50% reduction. Such a retiree might now conclude that it would be more prudent to have no adjustment in the monthly payment upon her death, even though this would result in a further reduction in the

6

monthly payment. Or a couple may have determined, at the time of the original election, that the voluntarily reduced pension would by sufficient to enable them to live in reasonable comfort while continuing to make the mortgage payments on their home; but that may longer be the case if the pension is further reduced in bankruptcy. Such a couple might conclude that they now prefer to take more of the pension while they both survive so that they can, health permitting, remain in the home until one of them (probably the retiree) dies, foreseeing that the survivor will then sell the home.

The disclosure and attached plan include no discussion of these elections and no indication as to how many retirees chose which options. Without that information, a retiree cannot make an intelligent and informed decision whether to object to the plan because of its failure to permit reconsideration of the elections, nor whether to vote to approve it.

Dated: March 28, 2014

*John P. Quinn*
John P. Quinn
2003 Military Street
Detroit, MI 48209
(313) 673-9548
quinjohn@umich.edu

7