UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| In re ) | | Chapter 9 |
| ) | | |
| CITY OF DETROIT, MICHIGAN, ) | | Case No. 13-53846 |
| ) | | |
| Debtor. ) | | Hon. Steven W. Rhodes |
| ) | | |
| ) | | |

-----------------------------------------------------

**OBJECTION OF JAMIE S. FIELDS TO CITY OF DETROIT'S MOTION FOR AN ORDER APPROVING AMENDED DISCLOSURE STATEMENT WITH RESPECT TO THE PLAN OF ADJUSTMENT DATED MARCH 31, 2014, AND SETTING CONFIRMATION PROCEDURES**

**PRELIMINARY STATEMENT**

COMES NOW creditor and Detroit Police Department uniformed retiree JAMIE S. FIELDS, attorney acting *in pro per,* hereby serves and files this objection to the City of Detroit's Disclosure Statement (Doc. 3382). At this stage, Jamie S. Fields objects to the adequacy of the information in the Disclosure Statement because the City has provided misleading, incorrect and incomplete statements regarding the pre-petition state of City operations and has failed to provide certain rudimentary information that is essential for any informed judgment regarding the Plan.

Because the current date to file Objections to the City's March 31, 2014 Amended Disclosure Statement is April 4, 2014 it was not feasible to communicate with counsel for the City of my request to include additional information in the Disclosure Statement ("Disclosure"). I now object to the Disclosure on the grounds specified below:

## OBJECTION TO THE DISCLOSURE STATEMENT

"Disclosure is the 'pivotal' concept in [a bankruptcy] reorganization*," Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 54 (S.D.N.Y. 1999) (quoting 5 COLLIER ON BANKRUPTCY, ¶ 1125.03 (15th ed. 1992); accord *In re Oneida Motor Freight, Inc.*, 848 F.2d 414, 417 (3d Cir. 1988). In particular, in the context of a proposed Plan of Adjustment, section 1125 of the Bankruptcy Code requires that the plan proponent provide information that would enable a creditor of the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125(a) (1); see *Oneida,* 848 F.2d at 417 ("The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court. Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information.'").

"[T]he purpose of the disclosure statement is "to give all creditors a source of information which allows them to make an informed choice regarding the approval or rejection of a plan," In *re County of Orange*, 219 B.R. 543, 560 (Bankr. C.D. Cal. 1997). At the core, a creditor must be able to determine "what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution," *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

In assessing the adequacy of a proposed Disclosure Statement, the standard is not whether a failure to disclose certain information would harm creditors. Rather, the appropriate measure is whether creditors receive such information as will enable them to evaluate for themselves what impact the information might have on their claims and on the outcome of the case, and to decide for themselves what course of action to take." *In re Applegate Prop*., Ltd., 133 B.R. 827, 831 (Bankr. W.D. Tex. 1991), see also *In re Michelson*, 141 B.R. 715, 718-19 (Bankr. E.D. Cal. 1992)

2

13-53846-tjt  Doc 8748-6   Filed 12/15/14   Entered 12/15/14 19:46:07   Page 2 of 20
13-53846-swr  Doc 3485    Filed 04/02/14   Entered 04/02/14 19:35:47   Page 2 of 20

(at an "irreducible minimum," a disclosure statement must include an "explanation of why the proposed means of implementation [of the underlying plan] will be adequate to the task").

"[T]he plan proponent bears the ultimate risk of non-persuasion on the question of compliance with the requirement to disclose adequate information." *Michelson,* 141 B.R. at 720. The City has not met its burden with respect to its Disclosure Statement.

### A. The Disclosure Statement Must Provide Clear, Understandable Information About The Amount And Nature Of Claims To Be Allowed Under The Plan.

#### 1. PFRS Unfunded Pension Claims

The Disclosure Statement indicates that as of June 30, 2012 that PFRS Unfunded Actuarial Accrued Liability (UAAL) was according to PFRS $147.2 million and was listed by the City as a claim of $1.437.6 billion. The Disclosure Statement provides no information as to the basis of their conclusion nor do they dispute PFRS assertions other than to say they are wrong.

The City proposes to pay nothing into PFRS for 10 years (until 2023) and very little the subsequent 10 years (until 2033). However, the Disclosure Statement, never reveals the amount of those obligations, how much they owe PFRS, and what their projected PFRS obligations would be over the next 20 years if not for the unprecedented 20 year "pension holiday" they now seek.

The wholesale assumption of what the City's purports as over a 1.4 billion dollar PFRS liability obviously is material to the decision of police and fire (Class 11) creditors regarding the Plan, Fulsome disclosure of the nature and basis for that liability must be provided.

The Disclosure states "it appears that a large portion of the assets of the respective Retirement Systems is invested in alternative investments for which no recognized market valuation exists. As of June 30, 2013, approximately 24% of PFRS assets and 33% of GRS assets had estimated, rather than readily ascertainable, market values." The Disclosure Statement should delete this as misleading because it gives an untoward appearance when in fact this investment mix is

3

consistent with pension funds throughout the country and PFRS alternative investments consist of a smaller percentage of their total portfolio than the state of Michigan's pension system (MERS).

## 2. Beneficiary Pension Election

When a member retires the member can select several different options for their retirement (Straight Life, Option II or III). This is an irrevocable choice one a member cashes his first pension check. The straight life option is the member's retirement allowance (pension + annuity) based on applying a contractual formula to the member's average final compensation (AFC).

Option II this selection would pay, upon the member's death, their beneficiary 100% of their pension allowance. Option III would pay the member's beneficiary 50% of their retirement allowance. There are also modified allowances that would pay a member's beneficiary 75% or 25%. Upon their death. When a member chooses Option II or III or a modified option they reduce their pension amount because in a sense they are paying monthly insurance premiums to provide for their beneficiary. The "premium" is the difference between straight life amount they are entitled and the amount they receive under the optional plan. The value of each option has the same actuarial value to the retirement system.

However, while each member's choice is based on their individual circumstance, if they knew their pension would be less, they may have had no choice but to elect a straight life option so they could pay for basic expenses (e.g., mortgage, food, etc.,). The Disclosure Statement lacks no information on the effects of the Plan on member's selected options and therefor does not sufficient information to make an informed judgment on the Plan.

## 3. Pensions are Deferred Compensation

4

13-53846-swr Doc 2748 Filed 02/05/14 Entered 02/05/14 09:46:07 Page 4 of 20
13-53846-tjt Doc 3485 Filed 04/02/14 Entered 04/02/14 09:35:47 Page 4 of 20

Pensions are deferred compensation and for retirees who retired from the City prior to 2011 or the date the City stopped making their required contributions to the retirement system their pension was fully funded, including COLA, and should not be reduced.

Assuming arguendo, that PFRS retirees are unsecured creditors despite Mich. Const. Article IX, Section 24, that section clearly imposes two duties on the City toward its employees and retirees. The City is required to:

a. It is required to fully fund an employee's pension while working by making periodic payments to PFRS based on actuarial variable and,
b. It must assure that the pensions are actually paid in full by augmenting its payments to PFRS if it becomes apparent that the returns on monies invested to pay those PFRS pensions are not sufficient to pay those pensions.

If retirees are in fact unsecured creditors, the second duty can be discharged in bankruptcy, as to payments not made pre-petition. However, as to each retiree who retired prior to the City seeking bankruptcy protection, the City had already fulfilled its duty, while the retiree was still employed, the money paid to PFRS is not an asset of the City, belongs to retirees, and is not available to other claimants,

B. **The Disclosure Statement Contains Misleading, Incorrect and Incomplete Statements Concerning the Pre-Petition State of City Operations**

Municipal bankruptcy laws articulate a duty to protect "basic public safety" and minimum services "consistent with public health and safety. The City presumably premised their forward

5

looking projections and the amount available for distribution to creditors based on an analysis of the adequacy of the City's pre-petition municipal services and their projected cost going forward of providing "better" municipal services.

Therefore, it is important that the City accurately reflect the status of its pre-petition services so creditors have enough information as to whether the City's "reinvestment" plan is feasible and in fact provides citizens adequate municipal services. The Disclosure Statement is misleading, incorrect or incomplete in the following areas, including but not limited to:

1. **"Adequate" City Services**

    a. **Number of Police Officers Required**

    While the City argues that pension reductions among other cuts will preserve "basic services," what does that mean? If a big city has one police officer, does that constitute basic law enforcement? Surely not, but the City's Disclosure Statement has provided no rubric for quantifying what their projections of "adequate" services mean—one officer per 100,000 residents, or 10,000 officers per 100,000 residents?

    The Disclosure Statement asserts that the DPD's headcount has been reduced by approximately 40% over the last ten years and it lacks the manpower to adequately respond to the more than 700,000 calls for service it receives annually. How many officers does the City believe it needs to adequately respond to how many runs? The City itself acknowledges that the vast majority of citizens 9-1-1 calls do not require a response a police response or are requests for information, lodging a complaint or resolved vis-à-vis a telephone crime report.

    The City's Disclosure provides no information or guidelines on how many police officers they believe is necessary to provide adequate public safety. There are essentially three ways police agencies determine how many police officers are necessary. The first method is the per-capita

6

approach which requires determining an optimum number of officers per person, then calculating the number of officers needed for the total population.  One disadvantage is the failure to address how officers spend their time and the quality of their efforts.

The second method is the minimum-staffing approach which requires police decision-makers to estimate a sufficient number of patrol officers to deploy at any one time, however, there are no objective standards for setting the minimum staffing level. This may result in deploying too few officers when workload is high and too many when it is low.  The third approach is the authorized-level approach uses budget allocations to specify a number of officers needed. It does not typically reflect any identifiable criteria but rather an incremental budgeting or other political decision-making process. As such, it can become an artificial benchmark for need, creating the perception that the agency is understaffed and overworked if the actual number of officers does not meet the authorized number.

It appears that the City has developed a fourth approach in their Disclosure Statement. Determine how much money you want to spend and then "back in" by figuring out how many officers that amount of money can buy. The problem is that the City having run out of their own (taxpayers) money, appear to be seeking the Court's approval to continue spending money without a plan, much like a "drunken sailor, on the backs of those who can least afford it – retirees. The paucity of any meaningful information or long-term projections in the City's Disclosure does not provide adequate information to make an informed choice regarding the approval or rejection of a plan

The City of Detroit is the 18th largest City in the United States by population, however, out of those cities, it currently has the 3rd greatest number of police officers per capita (364.367 officers

7

13-53846-tjt    Doc 8748-6    Filed 12/15/14    Entered 12/15/14 09:46:07    Page 7 of 20
13-53846-swr    Doc 3485    Filed 04/02/14    Entered 04/02/14 09:35:47    Page 7 of 20

per 100,000 residents). Detroit with a population of under 700,000 has more officers per capita than San Diego and San Antonio together with a combined population of over 2.5 million have.

The Disclosure, other than throwing money at the problem, or in the City's word "reinvestment" does not provide any information as to how the "reinvestment" will translate into better services or why much larger City's (e.g., Phoenix, San Jose, etc.,) provide better police services with considerably fewer officers per capita. The Disclosure lacks sufficient information to make an informed judgment on the Plan.

    b. **Police Response Times**

The City's Disclosure contains an assertion that "As of the Petition Date, the DPD's average response time during 2013 for top priority emergency calls was 58 minutes (the national average police response time was 11 minutes). This assertion was oft repeated in the media and was quoted in this Court's eligibility opinion. **There is no national average for response times.** There are too many variables that would make comparisons impossible. There are no standardized requirements for what is categorized as an emergency call and departments are free to develop their own system of categorizing 9-11 calls and how their police department choses to respond nor is there any central repository or requirements that police agencies report their response times.

Many police agencies have other options to send a response unit to different categories of calls for service, including Detroit, e.g., Differential Police Response (DPR) (e.g., telephone crime reporting, etc.). The DPD is on record stating that 80% of the 700,000 calls for service they receive a year do not require the police to dispatch a scout car.The City recently, reclassified its 9-1-1 calls. Top priority calls (priority one) involve situations that are still in progress; where a perpetrator is on the scene; where emergency medical service is needed; and where the

8

preservation of evidence is of an urgent nature. Pre-petition the DPD had a broader understanding of what constituted a "priority one" call. There are no national standards for how police response times must be calculated.

The majority of police departments, including Detroit pre-petition, calculated police "response" times as the time from when a citizen calls 9-1-1 until a police car arrives at the citizen's location. A minority of jurisdictions, including Detroit post-petition, count "response time" from the time the police dispatcher gives the call to the response unit (no matter how long the dispatcher has held the call) and only counts the time when the call is dispatched until the unit arrives at the location. With this change in policy the City was able to dramatically reduce police response time at no additional cost. The City should either delete the discussion of how poor police response time was in Detroit pre-petition or add that the problem was fixed at no additional expense to the City without additional personnel. The Disclosure Statement lacks sufficient information to make an informed judgment on the Plan.

   c. **Police Clearance Rates**

The City expended considerable effort in the Disclosure Statement discussing the DPD's clearance rates and comparing the DPD's rates with selected national and local jurisdictions. The out of state city's that were selected for comparison are much smaller than Detroit. The City's Disclosure Statement should contain a broader range of similar cities or the Disclosure Statement should delineate why those particular cities were chosen to compare the DPD's clearance rates.

The Disclosure uses clearance rate charts based on 2011 FBI Uniform Crime Reports (UCR). The 2012 FBI UCR is now available, the Disclosure should either be updated with 2012 figures. The DPD has publicly announced a clearance rate of 50% for 2013 homicides, and through the middle of March, 2014, a 92.7 homicide clearance rate. The DPD credited reorganization and

9

13-53846-tjt  Doc 8748-6   Filed 02/15/14   Entered 02/15/14 09:46:07   Page 9 of 20
13-53846-swr  Doc 3485   Filed 04/02/14   Entered 04/02/14 09:35:47   Page 9 of 20

proper deployment for these staggering improvements and were achieved without any influx of new funding. The Disclosure contains no benchmarks for acceptable clearance rates. The Disclosure lacks sufficient information to make an informed judgment on the Plan.

**d. Civilianization**

The Disclosure proposes a $78.7 million dollar investment in civilianization. The City should be lauded for this long overdue effort. Initially, civilianization costs cities money because it means hiring new personnel. However, long-term civilianization has the potential for vast cost savings because the cost of civilian are a fraction of what it costs to put a sworn officer on the street.

The Disclosure states as of the petition Date, the DPD employed approximately 2,570 sworn officers and 313 civilian employees during calendar year 2012. The DPD should also report that out of the top twenty most populous cities has the 2nd worse ratio of civilian employees to sworn officers (9.21%) and how the proposed investment with increase the DPD's percentage of civilians. Using the numbers provided by the City the rate is now 12.1% however, the national rate is 33% which if achieved by the DPD would result in tens of millions of dollars in savings annually. The Disclosure lacks sufficient information to make an informed judgment on the Plan.

**e. Police Officers Secondary (Off Duty) Employment**

The Disclosure states "it has been reported that in recent years certain business owners have taken the extraordinary step of hiring off-duty police officers and renting police cruisers to patrol sections of the City underserved by the DPD." This is a misleading statement. This is a very common practice in municipalities often with full-time officers assigned to facilitate the practice. The Mayor and Detroit's City Council publically advocated this practice as a way to both increase city security but to allow officers, that they recognized were underpaid, an opportunity to earn
10

13-53846-tjt  Doc 8748-6   Filed 12/05/14   Entered 12/05/14 19:46:07   Page 10 of 20
13-53846-swr  Doc 3485    Filed 04/02/14   Entered 04/02/14 09:35:42   Page 10 of 20

additional money. The Disclosure Statement should delete the misleading statement that this is "extraordinary." Since this is a common practice the City should either survey other departments for comparable practices or remove the statement. The Disclosure lacks sufficient information to make an informed judgment on the Plan.

   f. **Police Vehicles**

The City fails to state if it purchases or leases its police fleet. The normal or "generally accepted" practice of purchased vehicles is to rotate them out of service based on mileage (e.g., commonly 75,000 – 100,000) miles and not years (three year) rotation cycle as the City's Disclosure Statement proposes. The reasoning is that while patrol vehicles (especially is the same vehicle is used 24/7) rapidly need replacement (conceivably prior to three years) other patrol vehicles utilized by police supervisors, police executives, or community policing officers, etc., age better and are serviceable for longer periods.

Additionally, it is common practice to extend a vehicles life by rotating to a less stressful unit (e.g., from patrol to crime prevention). In any event, the Disclosure Statement lacks sufficient information to make an informed judgment on the Plan.

   g. **Police Helicopter**

The Disclosure Statement financial projections includes 2.8 million for maintenance of the police helicopter. In 2012 when the DPD reinstituted its Aviation Section with a donated (grant) military helicopter and the then City Council voted to approve it, their vote was predicated on the Police Foundation (a private non-profit organization) absorbing the cost of maintenance. The Disclosure Statement is silent as to the Police Foundation's responsibilities toward maintenance, if any. The Disclosure lacks sufficient information to make an informed judgment on the Plan.

   h. **Police Foundation**

11

13-53846-tjt / 13-53846-swr    Doc 8748-6 / Doc 2485    Filed 12/05/14 / Filed 02/05/14    Entered 12/05/14 09:46:07 / Entered 02/05/14 09:35:42    Page 11 of 20

The Police Foundation was established in 2009 to provide a private source of funding for the DPD for necessary equipment or items not be available through the normal city's budgetary process. The Disclosure is silent as to the Foundation, their sources of revenue or expenditures.. The Disclosure lacks sufficient information to make an informed judgment on the Plan.

**C. The Disclosure Statement Must Provide Clear, Understandable Information About the Amount and Nature of Claims To Be Allowed Under The Plan.**

One elemental aspect of adequate disclosure is an identification of the nature of the debtor's liabilities, particularly the amount of claims and the basis for the liabilities. See, e.g., *In re Oxford Homes, Inc.*, 204 B.R. 264, 269 n.17 (Bankr. D. Me. 1997) (disclosure must include "[i]nformation regarding claims against the estate, including those allowed, disputed, and estimated."); *Ferretti,* 128 B.R. at 18; *Jeppson,* 66 B.R. at 292. In order, for creditors to have sufficient knowledge so that they can intelligently vote on a Plan of Adjustment it must be necessarily predicated on knowledge of the assets and liabilities being dealt with. The City's Disclosure fails to provide this basic information, including, but not limited to:

### 1. Pension Assumptions

Pension plan assets can be calculated at either their market value or their actuarial value. The City used a market value analysis which is merely a snapshot in time. Calculations of assets' actuarial value vary, but they generally recognize realized and/or unrealized gains and losses in the market value versus book value over a period of years (seven years), rather than immediately.

The use of the actuarial value of assets (rather than the market value) in financial statements and cost calculations is a technique known as smoothing. Smoothing helps plan sponsors reduce variability in their reporting of asset values (i.e., smoothed asset values do not immediately adjust according to market changes). This reduced variability then allows for a more stable environment

12

in which to plan pension funding over the long term. How can retirees be asked to vote on a Plan when the City is relying on a "snapshot" on time when they may have to rely on their pensions for thirty years or more as their only source of income? The Disclosure should state why the City used a market value analysis on what basis the City picked 6.5% as an assumed rate of return when the Emergency Manager has said 7% "is more realistic" (Detroit News, August 2, 2013).

If the City wishes to say that a lower assumed rate of return would mean less risk than 8% the Disclosure should reflect that the 10 year actual average of the S&P over any 10 year period since 1954 the rate of return was never below 8.41% (National Association of Retirement System Administrators). The Disclosure Statement should also state that other parties believe a higher than 7% assumed rate of return is appropriate. The Disclosure should also include the dollar amount and percentage that the City's lack of required funding contributed to PFRS unfunded liabilities. The Disclosure lacks sufficient information to make an informed judgment on the Plan.

**2. Revenue Assumptions**

**a. Property Tax Revenues**

The Disclosure states that the Detroit population decline has and will result in losses in general fund property tax revenues which totaled $131.7 million for Fiscal Year 2013, accounting for approximately 12.5% of total Fiscal Year 2013 General Fund revenues. However, it has been estimated that in recent years, only about half of the property taxes in Detroit have been paid in full. Some officials say the city's government has grown so dysfunctional, people who want to pay taxes sometimes have no place to do it (National Public Radio Detroit, July 25, 2013).

Even if the population loss projections are accurate it is likely the better collection procedures would result in greater revenue than is currently yielded. The Disclosure should contain the current percentage of property tax collections and projections of property tax revenue should the

13

13-53846-tjt    Doc 2748-6    Filed 02/05/14    Entered 02/05/14 19:46:07    Page 13 of 20

City be as successful as surrounding suburbs in their collection efforts. The Disclosure lacks sufficient information to make an informed judgment on the Plan.

### b. Parking Revenues

The Disclosure states the Parking Violations Bureau (PVB) was projected to issue 323,000 tickets and immobilize 2,760 vehicles with parking boots during 2013, yielding projected revenues of approximately $11.4 million. It has been widely report that approximately one-half or "roughly 3,400 of Detroit's parking meters do not work." In addition, it has been reported that two-thirds of the revenue from parking violations that Detroit is entitled to is not collected. The Disclosure Statement should compare Detroit's percentage of collections with other similar sized cities and provide projections as to what additional monies could be generated by meeting those benchmarks. The Disclosure lacks sufficient information to make an informed judgment on the Plan.

### c. Towing

The Disclosure does not mention the towing revenues currently generated by the City for abandoned vehicles or police tows. The City receives $75 per vehicle towed for approximately 30,000 tows yearly or approximately 2.25 million dollars a year. This revenue should be disclosed. The DPD is planning on operating their own impound lots. With the average scrapped vehicle worth over $500 with 10,000 abandoned cars a year being towed the City will generate $5 million dollars' worth of yearly revenue. The Disclosure lacks any information or projections

14

regarding this revenue and contains insufficient information to make an informed judgment on the Plan.

**D. The Disclosure Statement Must Contain Accurate Projections**

　1.　**Financial Projections**

The financial projections intended to establish the feasibility of the Plan, in the form of the Long Range Financial Plan of City of Detroit, are inadequate, not limited to:

　　a.　**Plan liabilities**

The projections are presented in a misleading manner. It is simply impossible to determine from the projections the actual nature and extent of the City's post-confirmation revenues or expenses. What is needed is a straightforward projection of the City's post-confirmation revenues compared against its post-confirmation expenses. *In re Malek*, 35 B.R. 443, 444 (Bankr. E.D. Mich. 1983) ("The Debtor should provide the projection of operations subsequent to confirmation so that the Court may determine the feasibility of the plan. The Debtor is required to make a full, clear, and complete disclosure of all underlying assumptions."). If the City desires to demonstrate the savings it allegedly has achieved through the bankruptcy process, it should do in the Disclosure or in projections presented to establish the feasibility of the Plan.

**E. The Disclosure Statement Must Provide Clear, Understandable Information about the Value of the Distributions to be made under the Plan.**

It is axiomatic that a disclosure statement must explain and value the recoveries to be provided to creditors, and that failure to do so renders a disclosure statement inadequate. See, e.g., *In re Prudential Energy Co.*, 58 B.R. 857, 868 (Bankr. S.D.N.Y. 1986) (disclosure

15

inadequate where statement failed to identify "the value of the stock that is to be distributed"); *In re Ligon*, 50 B.R. 127, 130 (Bankr. M.D. Tenn. 1985) ("A description of available assets and their value is a vital element of necessary disclosure."); *In re Polytherm Indus., Inc.*, 33 B.R. 823, 830 (Bankr. W.D. Wis. 1983) (disclosure inadequate where statement failed to provide a "present value analyses of proposed payments to creditors").

The inadequate disclosure regarding the nature of the City's liabilities, as described above, is compounded by the fact that the Disclosure Statement also fails to explain or value of City owned property or assets that are available to be distributed or monetized to creditors.

**1. City Owned Assets**

The City "cherry-picked" certain assets and left out other relevant assets in their Disclosure discussion of City assets that have the potential to increase creditor's recoveries and are material to creditors being able to decide their best course of action.

- The Disclosure Statement mentions the City's property interest in the Detroit-Windsor International Tunnel and states its revenues from the tunnel are less than 1 million dollars a year. The Disclosure Statement does not mention that the City of Detroit owns half of the Tunnel which Detroit's ownership was estimated in 2010 as being worth 100 million (Detroit News, Windsor Mayor: We would consider buying tunnel to Canada if it is sold in bankruptcy, July 19, 2013.

- The Detroit Zoo sits on 122 valuable acres in suburban Detroit. The fact that the Zoo is the top tourist attraction in Michigan by number of visitors and has over 1,000 volunteers shows its potential. If monetizing proves not feasible there are numerous alternatives that could be explored similar to Belle Isle that would alleviate the City of their $900,000 annual subsidy to Zoo operations.

- Historic Fort Wayne – prime riverfront property made more valuable by recent announcement of a second international bridge crossing to be built nearby. The current international bridge crossing is the largest source of trade between the United States and Canada in North America.

16

- Historical Museum – Contains a multi-million dollar trove of classic automobiles.

- African-American Museum. – Largest African-American Museum in the country.

- Golf Courses including Rackham in suburban Huntington Woods, Michigan.

- Detroit Institute of Art (DIA) - Although facially addressed in the city's Disclosure Statement, the city's due diligence was lacking in the fact the city only appraises 2,600 of 66,000 city owned art. At a public forum at the University of Michigan in Ann Arbor on March 27, 2013, Emergency Manager Kevyn Orr stated he had been contacted by a wealthy Russian who inquired about buying art. He did not disclose the art involved or the offering price, if any, but subsequently said it was not true but was meant as "a metaphor."

- Belle Isle – Although the management of Belle Isle has been transferred to the state, Emergency Manager, Kevyn Orr in addressing a forum at the University of Michigan in Ann Arbor on March 26, 2013 state he had been offered 100 million dollars from a developer for the eastern part of the island.

- Coleman A. Young Municipal Airport – In December of 2013 the Detroit Aircraft Corporation (DAC) that builds drones discussed developing the nearly vacant airport to build drones to fly law enforcement reconnaissance and build drones to deliver packages for companies such as UPS and FedEx.

- Veterans Building – The Disclose mentions that the City is negotiating with the UAW to sell the building but provides no further information on the proposed sale.

## 2. Retiree Health Care

The Disclosure Statement memorializes the substantial reductions to retiree healthcare particularly those under 65 who are not Medicare eligible. However, the Disclosure Statement does not satisfy the Code's requirement of sufficient data for a retiree to make a decision. The Disclosure Plan should include the costs of the different healthcare plans for the actives per officer and/or family as compared to the surrounding Michigan communities.

The Disclosure Statement should also include what the cost would be of extending that same coverage to retirees and offer supporting documentation including should be the cost of individual and family of retirees of surrounding Michigan communities.

17

The City has also limited the amount of the stipend for retirees who have a family income of greater than $75,000 per year. The Disclosure should discuss how the $75,000 was arrived at and their rational or support for the City's Plan providing dissimilar benefits to members of the same class. The Disclosure lacks sufficient information to make an informed judgment on the Plan.

### 3. Blight Removal

The City's Disclosure calls for the "reinvestment" of 500 million dollars over 10 years for "blight" removal but provides no information of how much Neighborhood Stabilization Program (NSP) funds, which provide states and cities money for blight removal was received, how it was spent, of if the money received was in addition to the 500 million "reinvestment" mentioned in the Disclosure, or did it supplant city monies that were already earmarked for blight removal.

The Detroit Free Press reported that in fiscal year 2011-2012 the city of Detroit received $42,925,981 from the federal government for blight removal and 80% through the fiscal year the city had only spent $5,994,409 or 14% of the funding and was in danger of having to return almost 37 million dollars back to the federal government. The City's Disclosure Statement does not plainly spell out the blight removal revenues (e.g., grants, foundations, etc.,) nor the City's proposed expenses (e.g., average cost per house to remove, total number of houses anticipated to be torn down, etc.,) The Disclosure lacks sufficient information to make an informed judgment on the Plan.

### 4. New Development Projections

The Disclosure contains projections of revenue and population loss but t contains no projections on new developments. There are several major luxury apartments in the development stages and well as the first mid-town office project since 2006, and major new riverfront and

18

lower eastside projects. The Disclosure lacks sufficient information to make an informed judgment on the Plan.

   5. **Government Aid**

In September, 2013, President Obama announced 300 million in federal aid to Detroit for blight removal, hiring firefighters and other projects. The City's Disclosure does not discuss these monies or if it does it is not obvious. The Disclosure Statement should spell out in simple terms how this money will be used and if it is addition or is supplanting city funding. The City's Disclosure Statement lacks sufficient information to make an informed judgment on the Plan.

   6. **Future City**

The Detroit Future City (DFC) is the strategic framework that was supposed to guide the City's revitalization, and was funded through the support of the Kresge and Knight Foundations, and the Detroit Economic Growth Corporation.

The City, conducted community surveys over 300,000 residents along with the DFC. The City relies heavily on DFC in terms of blight removal has stated they will lean heavily on the DFC blueprint for the city, which envisions widespread greening strategies such as urban farming, and on-going City Mapping to identify every blighted structures in the city. Therefore, it was curious as to why DFC was not mentioned in the Disclosure or whether the proposed 500 million for blight removal was compatible and not inconsistent with the DFC blueprint. The Disclosure lacks sufficient information to make an informed judgment on the Plan.

**RESERVATION OF RIGHTS**

Jamie S. Fields reserves all rights to object to the Plan on any and all grounds, including, without limitation, those not mentioned in this Objection.

19

13-53846-tjt·swr  Doc 8748·5   Filed 02/05/14·   Entered 02/05/14 09:46:07·   Page 19 of 20

## CONCLUSION

For the reasons set forth above, the Disclosure Statement lacks adequate information., therefore, Jamie S. Fields respectfully requests that the Court deny the approval of the Motion unless the modifications to the Disclosure Statement and notice and objection procedures identified herein are corrected by the City and grant any other and further relief as this Court may deem just, proper and equitable.

/S/ Jamie S Fields_____

Jamie S. Fields (P-52808)
555 Brush #2409
Detroit, Michigan 48226
(313) 570-3906
jeansartre@msn.com