# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
| | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
| | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
| | ) |

## MOTION *IN LIMINE* BARRING THE CITY FROM INTRODUCING EVIDENCE REGARDING THE COMBINED RECOVERIES OF PENSION AND OPEB CLAIMS

Syncora Capital Assurance Inc. and Syncora Guarantee Inc. ("Syncora") submit this motion *in limine* (the "Motion") to bar the the City of Detroit (the "City" or the "Debtor") from introducing evidence regarding the combined recoveries of the Pension Claims (Classes 10 and 11) and the OPEB Claims (Class 12). In support of their motion, Syncora respectfully states as follows:

## INTRODUCTION

1.    Perhaps recognizing that the significant discrimination between Class 9, on the one hand, and Classes 10 and 11, on the other, poses an insurmountable hurdle to plan confirmation, the City has taken the position that the recoveries of Pension Claims (Classes 10 and 11) and the OPEB Claims (Class 12) should be combined.    According to the City, because these classes hold "closely-related obligations," they should be considered together for purposes of any unfair

discrimination analysis.[1]  While the combination of these classes may[2] have the desired effect of reducing pensioner recoveries, evidence reflecting the combined recoveries of pensioners is not relevant to the unfair discrimination analysis and should therefore be excluded.

2.   *First*, the Bankruptcy Code requires a class-by-class analysis and not, as the City contends, a claim-holder-by-claim-holder analysis.  For example, 11 U.S.C. § 1123(a) requires that plans designate "classes of claims," not holders of "closely-related obligations."   And, under section 1129(b)(1) of the Bankruptcy Code, a court can confirm a plan only "if the plan does not discriminate unfairly, and is fair and equitable, with respect to ***each class of claims or interests*** that is impaired under, and has not accepted, the plan."  Tellingly, there is nothing in the Bankruptcy Code — or related case law — that allows a debtor to aggregate claims across class lines for purposes of determining creditor recoveries.

3.   *Second*, the City separately classified Pension and OPEB Claims, as required by the Bankruptcy Code.  It cannot now, in an attempt to defeat an unfair discrimination argument, reverse-course and ignore the classification scheme set

---

[1]  *Consolidated Reply to Certain Objections to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit* [Dkt. No. 5034], ¶ 57.

[2]  In fact, the notional recovery for OPEB creditors set forth in the Plan is understated.  As a result, aggregating the true recoveries of these classes would do little to reduce discrimination vis-à-vis classes 9 and 14.

forth in the Plan in evaluating whether any discrimination under the plan is "unfair." Rather, the City must abide by the proper classifications — as well as any implications those classifications may have for unfair discrimination.

4.     ***Third***, despite the City's representations, the Pension Claims and the OPEB Claims are not "closely-related obligations." The Pensions Claims are held by the Retirement Systems,[3] whereas the OPEB Claims are held by the individual retirees. Furthermore, as the City concedes, only 69% of PFRS retirees and 56% of GRS retirees also hold OPEB Claims. Some 11,000 retirees have no OPEB claim at all. Thus, even if the City could aggregate the recoveries of "closely-related obligations" for unfair discrimination purposes, it would not be permitted in this situation given that the claims are not held by the same creditors.

5.     ***Fourth***, Mr. Orr testified during his deposition that he could not recall whether he analyzed the combined recoveries of Classes 10, 11, and 12 when determining the appropriate level of discrimination. Furthermore, when asked to provide any written analyses of combined creditor recoveries, the City stated that it

---

[3]     Although the Pension Systems "allowed" the retirees to vote individually, even Debtor's counsel acknowledged that the claims actually belonged to the Retirement Systems. (*See, e.g.,* Ex. 6A, Eligibility Hr'g Tr. 40:2-41:6. Nov. 8, 2013 ("THE COURT: Before you go on, this question. So is it the city's position that with regard to the pension liability underfunding, the creditors— the only creditors were the two plans and not retirees themselves? MR. BENNETT: Your Honor, I think that's—at the end of the day, I think that's probably right . . . We think that's right.")).

3

could not locate any such documents. As a result, any evidence of combined creditor recoveries is not relevant to the City's justification for discrimination and is therefore inadmissible.

6. Accordingly, Syncora respectfully requests that the Court bar the City from introducing evidence regarding the combined recoveries of the Pension Claims (Classes 10 and 11) and the OPEB Claims (Class 12).

## JURISDICTION

7. The Court has jurisdiction over this matter pursuant to 38 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## RELIEF REQUESTED

8. Syncora respectfully moves the Court to bar the City from introducing evidence regarding the combined recoveries of the Pension Claims (Classes 10 and 11) and the OPEB Claims (Class 12) and enter an order substantially in the form of Exhibit 1 attached hereto.

## BACKGROUND

9. On the face of the Plan, PFRS Pension Claims are set to receive 59% recoveries and GRS Pension Claims are set to receive 60% recoveries.[4] In

---

[4] As detailed in the *Pre-Trial Brief of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. Regarding Proposed Confirmation of the Debtor's Plan of Adjustment*, the PFRS and GRS Pension Claims are actually receiving more

4

contrast, the stated plan recoveries for COP Claims is 10% — a disparity of nearly 500%.[5]

10.   In its Consolidated Reply, the City claims that this significant discrimination is not as large as it appears.  According to the City, the *Corrected Fifth Amended Plan for the Adjustment of Debts of the City of Detroit* [Dkt No. 6379] (the "Plan") "separately classifies otherwise closely-related obligations to the City's pensioners: PFRS Pension Claims (Class 10), GRS Pension Claims (Class 11), and OPEB Claims (Class 12)."[6]   The City also notes that "[a]pproximately 69% and 56% of holders of claims in Classes 10 and 11, respectively, also hold OPEB Claims."[7]  Yet rather than treat each of the classes separately, the City claims that for unfair discrimination purposes the Court should "consider the Plan's overall treatment of the *holders* of such claims"[8] and essentially aggregate the OPEB claimants' 10%-13% recovery with the Pension

---

than 59% and 60% recoveries, respectively.  As a result, the disparity between the Pension Claims and Class 9 is much greater than the City suggests.

[5]   *Fourth Amended Disclosure Statement With Respect to Fourth Amended Plan for the Adjustment of Debts of the City of Detroit* [Dkt. No. 4391], at 35.

[6]   *Consolidated Reply to Certain Objections to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit* [Dkt. No. 5034], ¶ 57.

[7]   *Id.*

[8]   *Id.*

5

Claim recoveries.[9] By doing so, the City is purportedly able to reduce the overall percentage recovery for retirees by 15%-24%, from approximately 60% to 36%-45%.[10]

11.    At his deposition, Ken Buckfire, one of the City's investment bankers, testified that he considered Classes 10, 11, and 12 together when determining the pensioners' total recovery and that he provided advice to Mr. Orr on this subject:

> Q.    I also heard you say that in deciding what recoveries were appropriate for classes 10 and 11, which are the pension classes, that you considered the fact that many of the members of those classes were also members of class 12, which is the OPEB class, and that you considered all three classes together in evaluating their total recovery; is that correct?
>
> A.    Yes.
>
> Q.    And that was advice that you gave to the EM that he accepted, correct?
>
> A.    I'm not sure whether he accepted it or not, but it was my financial observation that the people who held the pension claims were often the same people who held the healthcare claims, so they would value money coming from the City more or less in the same pot.
>
> Q.    Okay, so your testimony is that as one of the people that was playing an advisory role with respect to the POA, this was how

---

[9]    *Id.*

[10]    *Id.* Notably, the City's calculation of a lower overall percentage recovery is based on the highly dubious OPEB claim number that was "negotiated" by the City and Retiree Committee. Syncora disputes the accuracy of the City's OPEB and Pension valuations.

you looked at the appropriate recoveries for classes 10, 11, and 12, correct?

A.    That's one of way of looking at it, yes.

Q.    And did you give the EM your advice on that subject?

A.    I did.

Q.    Do you -- do you know whether he accepted your advice?

A.    I believe it was one of the factors he took into account in ultimately approving the plan.[11]

12.    During his deposition, however, Mr. Orr testified that he could not recall whether he looked at the combined recoveries of Classes 10, 11, and 12 when determining the appropriate level of discrimination:

Q.    I guess what I'm trying -- let me put it into normal language. In evaluating the level of discrimination that you were approving, did you look at classes 10 and 11, which are the -- what I call the pension classes, and class 12 in conjunction with another to understand the combined rates of recovery and then evaluate that in comparison to the COPs holders?

A.    Yeah, we -- we may have, I just don't recall with specificity doing it that way. I know that, as we've discussed here this morning, just a few minutes before the break, I said I looked at 10, 11, and 12. I don't know if it was as -- as calculated as you're suggesting I look at 10, 11 and 12 and then decide that, you know -- what is the COPs, 16 or 17 -- decide that because there's this recovery we should affirmatively drive this number

---

[11]   Ex. 6B, K. Buckfire Dep. Tr. at 221:22-222:22, July 16, 2014.

down. I don't -- I don't recall it being that -- that designed, but it may have, I just don't recall.[12]

13. Similarly, when asked whether he had looked at the composite recoveries of any other creditors, Mr. Orr testified that he could not remember:

Q.   As you sit here today, though, you can't remember for sure whether you looked at the composite recoveries of creditors --

A.   Right.

Q.   -- as opposed to classes?

A.   Yeah, I don't remember.

Q.   Okay, so for example, did you consider how many UTGO holders were also LTGO holders when evaluating their combined recovery?

A.   Yeah, there may be some analysis, I just don't remember.

Q.   Did you consider whether COPs holders were also holders of other claims and consider their combined recovery in deciding what level of discrimination should be applied?

A.   I don't remember.[13]

14. Despite his inability to recall whether he considered combined creditor recoveries, Mr. Orr testified that he thought there were written "analyses done about creditor classes, in particular, obviously with the retirees and actives

---

[12]   Ex. 6C, K. Orr Dep. Tr. at 242:7-242:24, July 22, 2014.

[13]   *Id*. at 244:10-25.

and OPEB claims" and "some of the insurers."[14] Yet, when counsel for Syncora requested the "written analysis of combined creditor recoveries" that Mr. Orr referenced, the City stated that it was "unable to locate any combined creditor recovery analysis like the one you were questioning Kevyn about."[15]

## BASIS FOR RELIEF

15.     Under Federal Rule of Evidence 401, "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Whether evidence is relevant is determined in the context and arguments of a particular case.[16] Evidence that is not relevant is not admissible.[17] In this case, evidence regarding the combined recoveries of Classes 10, 11, and 12 does not constitute relevant evidence and is therefore inadmissible.

16.     *First*, the provisions of the bankruptcy code demonstrate that unfair discrimination requires a class-by-class analysis, not a claim-holder-by-claim-holder analysis. This class-by-class analysis is clearly reflected in section

---

[14]  *Id*. at 243:20-245:10.

[15] Ex. 6D, July 30, 2014 email from G. Shumaker to S. Hackney at 2.

[16]  *Sprint/United Mgmt. v. Mendelsohn*, 552 U.S. 379, 387 (2008).

[17]  FED. R. EVIDENCE 402.

9

1129(b)(1), which provides that "the court . . . shall confirm the plan . . . if the plan does not discriminate unfairly, and is fair and equitable, with respect to **each class of claims or interests** that is impaired under, and has not accepted, the plan."[18]  A class-by-class analysis is further corroborated by 11 U.S.C. § 1123(a), which requires that plans designate "classes of claims" and not holders of "closely-related obligations."[19]

17.  Tellingly, the City's reply cites no bankruptcy provisions or cases to support its argument that individual creditors' claims can be considered on an aggregate basis when evaluating unfair discrimination.  Indeed, the opposite is true — creditors often hold claims in different classes in bankruptcy, and such overlap does not result in an analysis of aggregate creditor recoveries.[20]  Thus, because the analysis that the City advocates is not permitted under the Bankruptcy Code, any evidence regarding aggregate creditor recoveries is not relevant or admissible.

---

[18]  1129(b)(1) (emphasis added).

[19]  *See also In re Griswold Bldg., LLC,* 420 B.R. 666, 707 (Bankr. E.D. Mich. 2009) ("In classifying claims, the general rules are that '[d]issimilar claims may not be classified together; [and] similar claims may be classified separately only for a legitimate reason." (citing *In re Chateaugay Corp.,* 89 F.3d 942, 949 (2d Cir. 1996))).

[20]  *See, e.g., In re Adelphia Commc'ns Corp.*, 359 B.R. 54, 65 (Bankr. S.D.N.Y. 2006).

18.   **Second**, the City's argument for the aggregation of the recoveries of Classes 10, 11, and 12 ignores the separate classification of the Pension and OPEB Claims.[21]   Notably, in its initial *Plan for the Adjustment of Debts of the City of Detroit*, the City classified Pension and OPEB Claims together.   Subsequently though, the City was forced to abandon this illegal classification scheme as part of its discussions with the Retiree Committee — and presumably had its reasons for doing so.[22]   The City must abide by the decisions reflected in the classification scheme in the Plan.

19.   **Third**, as a practical matter, the Pension Claims and OPEB Claims are not "closely-related obligations."   As counsel for the City has already conceded, the Retirement Systems — not the individual retirees — hold the Pension Claims.[23]

---

[21]  *Corrected Fifth Amended Plan for the Adjustment of Debts of the City of Detroit* [Dkt. No. 6379], Art. II.B.1.

[22]  *Id.* at 53 ("The City and the Retiree Committee have reached a settlement related to the allowance and calculation of the OPEB Claims in Class 12 and the treatment of such Allowed OPEB Claims, the terms of which settlement are reflected in the Plan.").

[23]  (Ex. 6A, Eligibility Hr'g Tr. 40:2-41:6. Nov. 8, 2013 ("THE COURT: Before you go on, this question.   So is it the city's position that with regard to the pension liability underfunding, the creditors—the only creditors were the two plans and not retirees themselves?   MR. BENNETT: Your Honor, I think that's—at the end of the day, I think that's probably right . . . We think that's right.")).

11

In contrast, individual creditors hold the OPEB Claims.[24]    Thus, they are, as counsel for the the Retiree Committee noted in response to the City's initial decision to classify Pension and OPEB Claims together, "two different claims":

> MS. NEVILLE: Your Honor, [the classification of Pension and OPEB Claims together] is a serious question for the retirees because their other post-employment benefit claims are classified in the same class as their pension claims, so we would be soliciting ballots -- if we don't resolve this issue on the disclosure statement deadline, we would be sending people ballots that wouldn't necessarily be the vote for the class or would be the vote for the class that would be inappropriate because **the OPEB claim and the pension claim are two different claims.** And at the moment, for the police and fire-fighters, the OPEB and the pension claims are classified in the same class, and the same thing is true for the General Retirement System. **They're two different claims. They get different treatment within the class**, and so I think we have to resolve at the disclosure statement stage before we solicit whether we have the proper classification.[25]

20.    Recognizing that the Pension and OPEB Claims are two different claims, the City subsequently recognized it had no choice but to separately classify them.    Thus, contrary to the City's claim,[26] there is no symmetry between the

---

[24]   *Fourth Amended Disclosure Statement With Respect to Fourth Amended Plan for the Adjustment of Debts of the City of Detroit* [Dkt. No. 4391], at 40 ("OPEB Claims: Consists of all claims against the City **held by retirees** . . .) (emphasis added).

[25]   Ex. 6E, Hr'g Tr. 41:1-16. Mar. 5, 2014.

[26]   *Id.* ("[T]he Objecting Parties fail to consider the Plan's overall treatment of the *holders* of the [Pension and OPEB Claims]." (emphasis in original).)

holders of the Pension and OPEB claims,[27] and they cannot be considered in the aggregate — even if that were permissible under the Bankruptcy Code.

21. **Fourth**, based on Mr. Orr's deposition testimony, it is not even clear that he examined the combined recoveries of the Pension and OPEB Classes when determining the appropriate level of discrimination. And, when Syncora attempted to corroborate Mr. Orr's testimony that he may have prepared written analyses regarding the combined recoveries of the Pension and OPEB Classes, the City stated that it could not locate any such analyses. If Mr. Orr did not actually consider the combined recoveries of the Pension and OPEB Classes — which appears to be the case — any testimony on this subject is necessarily irrelevant to the unfair discrimination analysis and should therefore be excluded as inadmissible.[28]

---

[27] Only 69% of PFRS retirees and 56% of GRS retirees also hold OPEB claims. *Consolidated Reply to Certain Objections to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit* [Dkt. No. 5034], ¶ 57. Furthermore, it should be noted that approximately 88% of the OPEB Class voted in favor of the Plan — a greater "landslide" than the claim receiving the supposedly more gentle treatment.

[28] If Mr. Orr <u>did</u> rely on the "combined class recovery" concept in determining the amount of discrimination to be practiced, this would provide another basis to deny confirmation of the Plan.

## <u>CONCLUSION</u>

22.  For the foregoing reasons, Syncora respectfully requests that the Court bar the City from introducing evidence regarding the combined recoveries of the Pension Claims (Classes 10 and 11) and the OPEB Claims (Class 12) and enter an order substantially in the form of <u>Exhibit 1</u> attached hereto.

*[Remainder of Page Intentionally Left Blank]*

13-53846-swr Doc 7597 Filed 09/15/14 Entered 09/15/14 21:24:04 Page 14 of 49

Dated:  August 22, 2014

Respectfully submitted,

**KIRKLAND & ELLIS LLP**

By: _/s/ Stephen C. Hackney_____
James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:   (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone:  (248) 646-5070
Facsimile:   (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and
Syncora Capital Assurance Inc.*

## Summary of Exhibits

Exhibit 1 - Proposed Order

Exhibit 2 - Notice of Motion and Opportunity to Object

Exhibit 3 - None [Brief Not Required]

Exhibit 4 - None [Separate Certificate of Service to be Filed]

Exhibit 5 - Affidavits [Not Applicable]

Exhibit 6 A - Nov. 8, 2013 Eligibility Hearing Transcript

Exhibit 6 B - July 16, 2014 K. Buckfire Deposition Transcript

Exhibit 6 C - July 22, 2014 K. Orr Deposition Transcript

Exhibit 6 D - July 30, 2014 email from G. Shumaker to S. Hackney

Exhibit 6 E - March 5, 2014 Hearing Transcript

**<u>Exhibit 1</u>**

**Proposed Order**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
|  | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
|  | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
|  | ) |

## ORDER GRANTING MOTION *IN LIMINE* BARRING THE CITY FROM INTRODUCING EVIDENCE REGARDING THE COMBINED RECOVERIES OF PENSION AND OPEB CLAIMS

This matter having come before the Court on Syncora's Motion *in Limine* Barring the City from Introducing Evidence Regarding the Combined Recoveries of Pension and OPEB Claims (the "Motion"), the Court having reviewed Syncora's Motion, and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein;

**IT IS HEREBY ORDERED THAT:**

1.     Syncora's Motion is GRANTED.

2.     The City is barred from introducing evidence regarding the combined recoveries of the Pension Claims (Classes 10 and 11) and the OPEB Claims (Class 12).

3.     Syncora is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

4.     The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

5.     The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

**IT IS SO ORDERED.**

<u>**Exhibit 2**</u>

**Notice of Motion and Opportunity to Object**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |  |
|---|---|---|
| In re | ) | Chapter 9 |
|  | ) |  |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
|  | ) |  |
| Debtor. | ) | Hon. Steven W. Rhodes |
|  | ) |  |

---

### NOTICE OF MOTION *IN LIMINE* BARRING THE CITY FROM INTRODUCING EVIDENCE REGARDING THE COMBINED RECOVERIES OF PENSION AND OPEB CLAIMS

---

**PLEASE TAKE NOTICE** that on August 22, 2014 Syncora Capital Assurance Inc. and Syncora Guarantee Inc. ("Syncora") filed the *Motion* in Limine *Barring the City from Introducing Evidence Regarding the Combined Recoveries of Pension and OPEB Claims* (the "Motion") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") seeking entry of an order to bar the City from introducing evidence regarding the combined recoveries of the Pension Claims (Classes 10 and 11) and the OPEB Claims (Class 12).

**PLEASE TAKE FURTHER NOTICE that your rights may be affected by the relief sought in the Motion. You should read these papers carefully and discuss them with your attorney, if you have one. If you do not have an attorney, you may wish to consult one.**

**PLEASE TAKE FURTHER NOTICE** that if you do not want the Bankruptcy Court to grant the Syncora's Motion or you want the Bankruptcy Court to consider your views on the Motion, by **September 5, 2014,** you or your attorney must:

File with the Court a written response to the Motion explaining your position with the Bankruptcy Court electronically through the Bankruptcy Court's electronic case filing system in accordance with the Local Rules of the Bankruptcy Court or by mailing any objection or response to:[1]

United States Bankruptcy Court
Theodore Levin Courthouse
231 West Lafayette Street
Detroit, MI 48226

You must also serve a copy of any objection or response upon:

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone:   (248) 646-5070
Facsimile:   (248) 646-5075

If an objection or response is timely filed and served, the clerk will schedule a hearing on the Motion and you will be served with a notice of the date, time and location of the hearing.

**PLEASE TAKE FURTHER NOTICE** that if you or your attorney do **not take these steps, the court may decide that you do not oppose the relief sought in the Motion and may enter an order granting such relief.**

---

[1]    A response must comply with F. R. Civ. P. 8(b), (c) and (e).

KE 33051861.1
13-53846-tjt   Doc 875-3   Filed 12/05/14   Entered 12/05/14 21:21:34   Page 22 of 49
13-53846-swr   Doc 69-3   Filed 08/21/14   Entered 08/21/14 16:38:59   Page 23 of 49

Dated:  August 22, 2014

Respectfully submitted,

**KIRKLAND & ELLIS LLP**

By: _/s/ Stephen C. Hackney_____
James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:   (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone:  (248) 646-5070
Facsimile:   (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and*
*Syncora Capital Assurance Inc.*

# Exhibit 3

## None [Brief Not Required]

# Exhibit 4

## Certificate of Service [To be filed separately]

**Exhibit 5**

**Affidavits**
**[Not Applicable]**

# Exhibit 6A

**Nov. 8, 2013 Eligibility Hearing Transcript**

```
 1              UNITED STATES BANKRUPTCY COURT
                EASTERN DISTRICT OF MICHIGAN
 2                    SOUTHERN DIVISION

 3  IN THE MATTER OF,          Case No. 13-53846
                               Detroit, Michigan
 4  CITY OF DETROIT, MI        November 8, 2013
    _____/     9:00 a.m.
 5
            IN RE:  ELIGIBILITY TRIAL CLOSING ARGUMENTS
 6            BEFORE THE HONORABLE STEVEN W. RHODES
            TRANSCRIPT ORDERED BY: SHANNON DEEBY, ESQ.
 7
    APPEARANCES:
 8
    For the City of Detroit, MI:  GEOFFREY IRWIN, ESQ.
 9                                 GEOFFREY STEWART, ESQ.
                                   GREGORY SHUMAKER, ESQ.
10                                 THOMAS CULLEN, JR., ESQ.
                                   MIGUEL EATON, ESQ.
11                                 Jones, Day
                                   51 Louisiana Avenue, N.W.
12                                 Washington, D.C. 20001-2113
                                   202-879-3939
13
                                   BRUCE BENNETT, ESQ.
14                                 Jones, Day
                                   555 South Flower Street
15                                 Fiftieth Floor
                                   Los Angeles, CA 90071-2452
16                                 213-243-2382

17                                 ROBERT HERTZBERG, ESQ. (P30261)
                                   DEBORAH KOVSKY-APAP, ESQ.
18                                 (P68258)
                                   Pepper, Hamilton
19                                 4000 Town Center
                                   Suite 1800
20                                 Southfield, MI 48075-1505
                                   248-359-7333
21
                                   PETER ELLSWORTH, ESQ. (P23657)
22                                 Dickinson, Wright
                                   215 S. Washington Square
23                                 Suite 200
                                   Lansing, MI 48933-1816
24                                 517-371-1730

25
```

1  anymore.

2      So with respect to this part, the city's demonstrated the

3  desires to effect the plan.  The plan is a -- is an outline --

4  that's all that's required, but it's actually more fleshed out

5  than that.  An outline of a plan that can be confirmed.  We do

6  think it's confirmable.  I've also said before, that it will

7  change, that's -- that's also clear.

8      And -- and I'm not going to come back to this point, but

9  there's a -- there's -- there's an argument actually supported

10  by the cases that when considering the requirements for good

11  faith negotiations under -- under Bankruptcy Code Section

12  109(c)(5), that you also have to demonstrate that the plan you

13  started with is a plan of adjustment that could conceivably be

14  confirmed under Chapter 9.  I think I've dealt with that

15  issue, I'm not going to return to it in the interest of time.

16      But this brings us to an important aside.  And -- and I'm

17  not again going to repeat, but I endorse the state's argument

18  that from the very beginning of this case, or from the very

19  beginning of the -- of the Governor's administration when they

20  focused on the situation in Detroit, that it was prudent as a

21  matter of common sense, sensible planning, and because

22  everyone else in the world was talking about it, to look at

23  Chapter 9 as -- as something that might some day, if

24  circumstances didn't get better, have to be considered for the

25  City of Detroit.

1      The aside is to -- to basically inform the Court that

2   actually the law that we just talked about, the law pressed by

3   the opposition that the plan, that the -- that the city has to

4   start with, is a plan that is a plan of adjustment, or an

5   outline of a plan of adjustment that could be confirmed.

6   That's actually a legal command that when you're confronting a

7   municipality that has financial difficulties you have to start

8   with Chapter 9.

9      Because if you don't understand what the rights, and

10  powers, and obligations of a municipality are under Chapter 9,

11  and what a plan adjustment would have to look like in the case

12  of a Chapter 9 case, you can't start.  So in addition to all

13  of the, you know, very practical observations, and the fact

14  that it's very sensible to pay attention to the same law that

15  frankly your creditors are paying attention to when they're

16  thinking about what they might have to do in an out of Court

17  scenario, in this one circumstance the law actually commands

18  an early look at the statute.  So I think that if the law

19  commands an early look at the statute, an early look at the

20  statute cannot constitute evidence of a lack of good faith by

21  anybody.

22          THE COURT:  Before you go on, this question.  So is

23  it the city's position that with regard to the pension

24  liability underfunding, the creditors -- the only creditors

25  were the two plans and not the retirees themselves?

1        MR. BENNETT:  Your Honor, I think that's -- at the

2  end of the day, I think that's probably right.  We expect it

3  to be disputed, we understand it will be disputed.  I think

4  you will find that the -- the -- the -- I think you should ask

5  them when they reach the podium.

6        We think that's right.  That by the way, is the reason

7  that the first people we asked about whether they could

8  represent retirees in discussions that would ultimately affect

9  their pensions was them.  And they basically told us that we

10  can fight to preserve our claims, but we can't compromise

11  them.

12        THE COURT:  Well, all right.  I will -- I will look

13  forward to your discussion of how this impacts your argument

14  regarding impracticality.

15        MR. BENNETT:  We'll get there.  Okay.  Well, we're

16  there.  Impracticality.

17        You know, back to the -- coming back to the opening

18  argument, we started with, and we'd start with again, the

19  number of bond issues that the city has.  The fact that bond

20  holders have the right, each individually, to consent to any

21  impairment of their principal amount or of their interest.

22        And the -- the -- the one -- one place where you can

23  find, I said this at opening also, a list of all the different

24  issues, and demonstrate how numerous they are, are in the

25  appendix to the proposal for creditors.  There's a complete

1   list.

2       There's also -- it also reveals that many are insured,

3   but some are not which is an additional complication.  Mr.

4   Buckfire testified that although talking to the insurers was a

5   place to start, his -- his view was, because it's also the

6   law, that they could just make recommendations and there were

7   some issues as to which, according to this book, it's true,

8   there were no -- there -- there are no insurers.

9       And so ultimately if an insurer is going to recommend

10  something and you're going to send it out to a vote, you're

11  going to get some yes votes and that's great but there's

12  nothing you can do with respect to the no votes under

13  applicable non-bankruptcy law.

14      And so with respect to the bond holders, while there was

15  someone to talk to to get started, there was no way to get all

16  the way home.  And no one has suggested that there was a way

17  to go all the way home.

18      So -- but the -- and the second part we said at opening,

19  and again I'm -- I'm not going to repeat it here, is that

20  frankly that's the end of the inquiry.  Because

21  impracticability with any one class means that out of Court

22  negotiations are impracticable.

23      There are cases that say this, they're cited in our

24  papers.  I also spent some time thinking with the Court about

25  the problem about, you know, how you would go about it if you

<u>**Exhibit 6B**</u>

**July 16, 2014 K. Buckfire Deposition Transcript**

1          KENNETH BUCKFIRE, VOLUME 2
2      IN THE UNITED STATES BANKRUPTCY COURT
3      FOR THE EASTERN DISTRICT OF MICHIGAN
4
5
6
7    In Re:         )   Chapter 9
8
9    CITY of DETROIT, MICHIGAN, )   Case No. 13-53846
10
11       Debtor.   )  Hon. Steven Rhodes
12   _____
13
14            VOLUME 2
15
16    The Videotaped Deposition of KENNETH BUCKFIRE,
17    a Rule 30(b)(6) witness,
18    Taken at 1114 Washington Boulevard,
19    Detroit, Michigan,
20    Commencing at 8:09 a.m.,
21    Wednesday, July 16, 2014,
22    Before Leisa M. Pastor, CSR-3500, RPR, CRR.
23
24
25

1          KENNETH BUCKFIRE, VOLUME 2
2
3
4    CLAUDE D. MONTGOMERY, ESQ.
5    Dentons US LLP
6    1221 Avenue of the Americas
7    New York, New York 10020
8       Appearing on behalf of the Retirement Committee.
9
10
11
12    JENNIFER K. GREEN, ESQ.
13    Clark Hill, PLC
14    500 Woodward Avenue, Suite 3500
15    Detroit, Michigan 48226
16       Appearing on behalf of the Retirement Systems for the
17    City of Detroit.
18
19
20
21
22
23
24
25

1          KENNETH BUCKFIRE, VOLUME 2
2    APPEARANCES:
3
4    THOMAS F. CULLEN, JR., ESQ.
5    Jones Day
6    51 Louisiana Avenue, N.W.
7    Washington, D.C. 20001
8       Appearing on behalf of the Debtor.
9
10
11
12    CORINNE BALL, ESQ.,
13    BENJAMIN ROSENBLUM, ESQ.
14    Jones Day
15    222 East 41st Street
16    New York, New York 10017
17       Appearing on behalf of the Debtor.
18
19
20
21
22
23
24
25

1          KENNETH BUCKFIRE, VOLUME 2
2    ROBIN D. BALL, ESQ.
3    Chadbourne & Parke, LLP
4    350 South Grand Avenue, 32nd Floor
5    Los Angeles, California 90071
6       Appearing on behalf of Assured Guaranty Municipal
7    Corporation.
8
9
10
11    GUY S. NEAL, ESQ.
12    Sidley Austin, LLP
13    1501 K Street, N.W.
14    Washington, D.C. 20005
15       Appearing on behalf of National Public Financing.
16
17
18
19
20
21
22
23
24
25

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

KENNETH BUCKFIRE, VOLUME 2

1  logically should look at its revitalization programs
2  and decide which ones are so high priority it cannot
3  defer or delay that money and which ones can be
4  delayed for a year or six months or whatever it has to
5  be, that's the kind of flexibility I'm talking about.
6  Q.  Okay, I got it so you're not talking about flexibility
7  that means somehow after the plan you don't have to
8  live up to contracts you have to live up to contracts
9  before the plan and after the plan, correct?
10  A.  Correct.
11  Q.  You're talking about well, if it sets forth a series
12  of revitalization efforts, some would be prioritized
13  earlier than others, that's the flexibility you're
14  talking about?
15  A.  That's correct.
16  Q.  Now, in connection with revitalization, has any
17  analysis been done that does prioritize proposed
18  revitalization efforts?
19  A.  You mean a downside scenario?
20  Q.  No, I'm not even talking about a downside scenario,
21  I'm talking about specific priorities set forth in the
22  plan for certain revitalization efforts.  Have they
23  been prioritized in a way that you just testified,
24  some that would be maybe we could, you know, delay

KENNETH BUCKFIRE, VOLUME 2

1  those.
2  A.  Well, not specifically the emergency manager has said
3  numerous times that restoration of public safety is
4  the number one priority of the restructuring process,
5  and I assume it will be the number one priority of the
6  City going forward.
7  Q.  So that's a revitalization effort that is pretty firm
8  it's got to --
9  A.  As part of our overall program, I would stipulate that
10  it's collecting what the public actors have said here
11  that should be the number one priority, whether it
12  turns out to be is not my judgment call.
13  Q.  And if it -- if it doesn't turn out to be does it
14  impact the viability of the plan post emergence?
15  A.  Yes, but we have built in strong institutional
16  protections to make sure the City stays on the track
17  that we have begun here, namely, the oversight
18  commission that was established by legislation, I
19  believe, the end of June.
20  Q.  And Mr. Hackney is going to address some of those
21  issues, so I'll move on from that.  I took care of
22  that.  I -- just one sort of question that was left on
23  my DIA plate.  So when you had approached Christie's
24  and told them you wanted them to do an analysis of

KENNETH BUCKFIRE, VOLUME 2

1  subset of art, so to speak, correct?
2  A.  Correct.
3  Q.  Who did you go to to determine what was the City owned
4  art versus what was not the City owned art?
5  A.  Well, first of all, the published catalogs of the
6  collection often indicate source of the art, who will
7  pay for it, so it's actually fairly easy even as a
8  layperson to look at the catalogs because they always
9  stipulate whether it's a gift or paid for by the City
10  or paid for by donors.
11  Q.  So did Christie's make that determination
12  independently on its own or did --
13  A.  No they actually asked the DIA itself it had to
14  identify works that are paid for in whole or in part
15  by the City.
16  Q.  And the DIA was the same DIA that had called the
17  govern nor and didn't want to have anything to do with
18  this plan, correct?
19  A.  They did cooperate in the end.
20  Q.  Do you know if they were the ones who identified what
21  they thought was City owned and not City owned?
22  A.  I already testified that, I believe that Christie's
23  asked them to identify it.
24  Q.  And they did it?

KENNETH BUCKFIRE, VOLUME 2

1  A.  And they did it.
2       MR. SOTO:  Okay, I have no other questions
3  at this time, and I appreciate your patience with me.
4  Thank you.
5       THE WITNESS:  You're welcome.
6             EXAMINATION
7  BY MR. HACKNEY:
8  Q.  Mr. Buckfire, good afternoon, it's nice to see you
9  again.
10  A.  Nice to see you.
11  Q.  I have to tell you at the outset I have a hell of an
12  ear infection going on in my right ear, and I cannot
13  hear out of it, and so I'm doing the best I can, but
14  I'm struggling a little bit to hear.  So if I ask you
15  a question five times in a row, it would be only
16  because I didn't hear your answer, because I didn't
17  even hear my own question.  I actually learned before
18  this deposition that Mr. Soto can't hear out of his
19  right ear just as a matter of course, anyway, but he's
20  used to it and I'm not so...
21       MR. SOTO:  That's why I always put my
22  special friends to my right.
23  BY MR. HACKNEY:
24  Q.  So it means you and I can say whatever we want about

Pages 217 to 220

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt  Doc 8752-8  Filed 12/05/14  Entered 12/05/14 16:38:59  Page 35 of 49

1    KENNETH BUCKFIRE, VOLUME 2
2    Soto here.
3        I want to go back to some testimony that
4    you gave with Mr. Soto that was on the subject of
5    advice that you rendered about the recoveries of
6    classes 10, 11, and 12, vis-a-vis other general
7    unsecured creditors like COPs holders; do you remember
8    discussing that with him?
9  A.  I do, but can you be more specific?
10 Q.  Yeah, let me -- I'm going to ask you what I understood
11    you to say so you should listen carefully to whether I
12    get this right.
13 A.  Okay.
14 Q.  I heard you say that -- number one that you provided
15    advice to the EM on what different recoveries could be
16    amongst different classes; is that correct?
17 A.  Yes.
18 Q.  I --
19        (Electronic phone announcement:  Has joined
20        the conference.)
21 BY MR. HACKNEY:
22 Q.  I also heard you say that in deciding what recoveries
23    were appropriate for classes 10 and 11, which are the
24    pension classes, that you considered the fact that
25    many of the members of those classes were also members

1    KENNETH BUCKFIRE, VOLUME 2
2    of class 12, which is the OPEB class, and that you
3    considered all three classes together in evaluating
4    their total recovery: is that correct?
5  A.  Yes.
6  Q.  And that was advice that you gave to the EM that he
7    accepted, correct?
8  A.  I'm not sure whether he accepted it or not, but it was
9    my financial observation that the people who held the
10    pension claims were often the same people who held the
11    healthcare claims, so they would value money coming
12    from the City more or less in the same pot.
13 Q.  Okay, so your testimony is that as one of the people
14    that was playing an advisory role with respect to the
15    POA, this was how you looked at the appropriate
16    recoveries for classes 10, 11, and 12, correct?
17 A.  That's one of way of looking at it, yes.
18 Q.  And did you give the EM your advice on that subject?
19 A.  I did.
20 Q.  Do you -- do you know whether he accepted your advice?
21 A.  I believe it was one of the factors he took into
22    account in ultimately approving the plan.
23 Q.  Did you undertake an effort to determine the amount of
24    overlap between classes 10 and 12 on the one hand or
25    classes 11 and 12 on the other hand?

1    KENNETH BUCKFIRE, VOLUME 2
2  A.  That was not an analysis done by Miller Buckfire.
3  Q.  Do you believe that one of the other professionals did
4    that?
5  A.  I know we looked at this issue many months ago.  It's
6    an obvious question to address particularly between
7    actives and retirees, and if anybody did it it would
8    have been Ernst & Young.
9  Q.  You're saying if anyone did.  I take it from your
10    answer that you have never seen such an analysis,
11    correct?
12 A.  No, not on an individual basis, which is what I think
13    you're getting to.
14 Q.  Right.  So you have never seen on -- an individual
15    analysis of what individuals have claims in both
16    classes 10 and 12 or 11 and 12, correct?
17 A.  Correct, I've never seen it.
18 Q.  Have you ever seen it on a broader basis like
19    approximately 32 percent of class 10 members are also
20    in class 12, have you seen that type of analysis?
21 A.  No.
22 Q.  Were you aware of this concept of looking at these
23    three types of class in advance of the June 2013
24    proposal to creditors?
25 A.  Yes.

1    KENNETH BUCKFIRE, VOLUME 2
2  Q.  And you were obviously aware of it -- okay, strike
3    that.
4        I wanted to ask you, I saw yesterday that
5    you said that you have -- you have not authored any
6    publications in the last ten years, you testified to
7    that fact I think with counsel for the DWSD parties.
8    I read that quickly today; is that correct?
9  A.  To the best of my knowledge that's correct.
10 Q.  I was a little surprised by that, you're a fairly
11    well-known player in the field and I thought you
12    haven't written any op. ed. pieces, Wall Street
13    Journal, New York Times, TMA, any of those things
14    where you've written an article for any of those?
15 A.  That's correct.
16 Q.  Well, you got to do more writing then, I think.
17 A.  I try to keep a very low profile.
18 Q.  Well, you're not doing a good job of that in this
19    case.  Now, I wanted to ask you about your testimony
20    in -- as an expert in deposition or at trial in the
21    last four years.  Have you given any expert testimony
22    in a deposition or at trial in the last four years
23    other than in the Calpine, GGP, Dow Chemical, and City
24    of Detroit cases?
25 A.  Well, Calpine was 2008, so that's not the last four

## Exhibit 6C

**July 22, 2014 K. Orr Deposition Transcript**

1            KEVYN ORR, VOLUME 2

2      IN THE UNITED STATES BANKRUPTCY COURT

3       FOR THE EASTERN DISTRICT OF MICHIGAN

4

5

6

7    In Re:          )   Chapter 9

8

9    CITY of DETROIT, MICHIGAN, )  Case No. 13-53846

10

11       Debtor.  )  Hon. Steven Rhodes

12   _____

13

14            VOLUME 2

15

16    The Videotaped Deposition of KEVYN ORR,

17   in his personal capacity and as Rule 30(b)(6) witness,

18   Taken at 2 Woodward Avenue,

19   Detroit, Michigan,

20   Commencing at 9:10 a.m.,

21   Tuesday, July 22, 2014,

22   Before Leisa M. Pastor, CSR-3500, RPR, CRR.

23

24

25

1          KEVYN ORR, VOLUME 2

2  APPEARANCES:

3

4  GREGORY M. SHUMAKER, ESQ.,

5  DAN T. MOSS, ESQ.

6  Jones Day

7  51 Louisiana Avenue, N.W.

8  Washington, D.C. 20001

9    Appearing on behalf of the Debtor.

10

11

12

13

14  ROBERT HERTZBERG, ESQ.

15  Pepper Hamilton, LLP

16  4000 Town Center, Suite 1800

17  Southfield, Michigan 48075

18    Appearing on behalf of Debtor.

19

20

21

22

23

24

25

1          KEVYN ORR, VOLUME 2

2  STEPHEN C. HACKNEY, ESQ.

3  Kirkland & Ellis, LLP

4  300 North Lasalle Street

5  Chicago, Illinois 60654

6    Appearing on behalf of Syncora.

7

8

9

10  JEFFREY BEELAERT, ESQ.

11  Sidley Austin, LLP

12  1501 K Street, N.W.

13  Washington, D.C. 20005

14    Appearing on behalf of National Public Financing.

15

16

17

18  ERNEST J. ESSAD, JR., ESQ.

19  Williams, Williams, Rattner & Plunkett, P.C.

20  380 North Old Woodward Avenue, Suite 300

21  Birmingham, Michigan 48009

22    Appearing on behalf of Financial Guaranty Insurance

23    Company.

24

25

1          KEVYN ORR, VOLUME 2

2  ALFREDO R. PEREZ, ESQ.

3  Weil, Gotshal & Manges, LLP

4  700 Louisiana Street, Suite 1700

5  Houston, Texas 77002

6    Appearing on behalf of Financial Guaranty Insurance

7    Company.

8

9

10

11  LISA SCHAPIRA, ESQ.

12  Chadbourne & Parke, LLP

13  30 Rockefeller Plaza

14  New York, New York 10112

15    Appearing on behalf of Assured Guaranty Municipal

16    Corporation.

17

18

19

20

21

22

23

24

25

KEVYN ORR, VOLUME 2

2  be invoked?
3           MR. SHUMAKER: Assuming your question gets
4  to communications between counsel and Mr. Orr, yes.
5  BY MR. HACKNEY:
6  Q.  Well, I mean, did you -- did you -- in assessing the
7     invalidity of the COPs as a factor justifying the
8     level of discrimination, did you consider anything
9     other than legal advice around the invalidity of the
10    COPs?  It seems like a legal question.
11 A.  It's a legal question, but in an effort to be
12    forthcoming and fair to you, I'd have to say yes, and
13    I'll try to tell you, for instance, without discussing
14    the -- and going afield of many discussions, legal
15    opinions, analyses, meetings, written opinions, that I
16    received from counsel.
17         So for instance, in looking at the COPs, in
18    addition to those things, you know, I examined news
19    reports about that transaction, I think I've even
20    examined those -- some of those before I got here.
21    Reports, for instance, by the auditor general that I
22    questioned the propriety and validity of the COPs
23    reports at that time when -- I think it was Auditor
24    General Hart (ph.) back in 2005, City Council
25    statements that were made.  Statements made by the

KEVYN ORR, VOLUME 2

2     City treasurer back then that it was invalid and
3     inappropriate to enter into the COPs and that it would
4     make the City bankrupt and that the City should have
5     declared bankruptcy in 2005.
6          So there's other data that I looked at to
7     inform myself, just not the legal analyses about
8     position of the COPs, and some of that data was
9     contemporaneous with when they were initially entered
10    into and some of that was subsequent to that.
11 Q.  And you identified a number of individuals or reports
12    that you had read; I didn't hear any lawyers in any of
13    those things.  Were there?
14 A.  None of my lawyers were in those things, so there
15    was -- there's, you know, document -- documentary
16    evidence that is short of the legal opinions I got
17    from my counsel.
18 Q.  Okay, so but to tie it up, was the principal
19    information that you relied upon legal advice conveyed
20    to you by your lawyers about the invalidity of the
21    COPs?
22 A.  Yes.
23 Q.  And I -- just so I understand the way the judge -- the
24    factor plays through your judgment, you looked at the
25    potential invalidity of the COPs and viewed that as

KEVYN ORR, VOLUME 2

2     one reason to pay the COPs on their best day 10 cents?
3  A.  Yeah, I don't know -- I don't want to give the
4     impression that it was that binary, you know, a number
5     of issues, as I said before, went into what we could
6     afford to pay --
7  Q.  Yes.
8  A.  -- the validity of the claim, which is pretty typical
9     in bankruptcies, all that stuff, but I think that's a
10    fair statement.
11 Q.  Okay, I'm talking when you were deciding how to divide
12    the pie, the COPs best day recovery was impacted by
13    this factor of the potential invalidity of the COPs?
14 A.  Yes.
15 Q.  Now, with respect to the information in these four
16    areas that we've just talked about, the information
17    that relates to each of the four factors you
18    identified --
19 A.  Mm-hmm.
20 Q.  -- was there a material change in this body of
21    information between April 1 and April 15 of 2014?
22 A.  I don't know, you say material change, what are you --
23    what do you mean?
24 Q.  Is there anything that sticks out to you with respect
25    to any of your four factors and the information

KEVYN ORR, VOLUME 2

2     associated with each that changed materially between
3     April 1 and April 15?
4  A.  To be frank with you, I can't -- I can't recall if
5     there was, but I don't -- nothing jumps out at me.
6  Q.  Okay.  Now, in structuring the plan, did you take
7     advice from Miller Buckfire?
8  A.  Yes.
9  Q.  And in deciding what levels of discrimination between
10    creditors was appropriate, did you also take advice
11    from Miller Buckfire?
12 A.  Yes.
13 Q.  And did you specifically take advice from Ken
14    Buckfire?
15 A.  I -- I would have regular restructions (sic) with Ken
16    and other members of his team, so I think it's fair to
17    say yes.
18 Q.  Did Mr. Buckfire recommend to you that when it came to
19    evaluating the recovery of the retirees that the City
20    should consider the pension recoveries in combination
21    with the OPEB recoveries in making a determination as
22    to what the level of discrimination was?
23         MR. SHUMAKER: Object to the form.
24 BY MR. HACKNEY:
25 Q.  Do you understand my question?

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

KEVYN ORR, VOLUME 2

A. I understand your question and he may well have, I
just don't recall a specific conversation. I have no
reason to believe that he did not --

Q. Okay.

A. -- but I just don't recall whether or not he did.

Q. I guess what I'm trying -- let me put it into normal
language. In evaluating the level of discrimination
that you were approving, did you look at classes 10
and 11, which are the -- what I call the pension
classes, and class 12 in conjunction with another to
understand the combined rates of recovery and then
evaluate that in comparison to the COPs holders?

A. Yeah, we -- we may have, I just don't recall with
specificity doing it that way. I know that, as we've
discussed here this morning, just a few minutes before
the break, I said I looked at 10, 11, and 12. I don't
know if it was as as -- as calculated as you're
suggesting I look at 10, 11 and 12 and then decide
that, you know -- what is the COPs, 16 or 17 -- decide
that because there's this recovery we should
affirmatively drive this number down. I don't -- I
don't recall it being that -- that designed, but it
may have, I just don't recall.

Q. Okay, so I guess -- well, let me just -- you don't

KEVYN ORR, VOLUME 2

know whether you considered the combined recoveries of
classes 10, 11, and 12 in analyzing the level of
discrimination; is that correct?

A. No, what I'm saying is I don't recall. We may have, I
just don't recall.

Q. Yeah, I think my question was you don't recall?

A. Yeah.

Q. Oh, I said you don't know.

A. Yeah.

Q. Okay. If Mr. Buckfire said that that's how he looked
at it and recommended that that's how you look at it
and that he understood that you accepted his
recommendation, do you have a basis to disagree with
that?

A. Absolutely --

MR. SHUMAKER: Object to the form.

A. No.

BY MR. HACKNEY:

Q. Now, with respect to any other classes of creditors,
did you attempt to learn whether or not there were
creditors who held claims in multiple classes in
attempting to perform a recovery analysis?

A. Yeah, I -- I think there was analyses done about
creditor classes, in particular, obviously, with the

KEVYN ORR, VOLUME 2

retirees and actives and OPEB claims, and we may have
looked -- I'm trying to think. I think we did, I'm
just not recalling specifically whether we looked at
other unsecured classes, whether or not they held
claims with any of the unsecured class or secured
class. Obviously, some of the insurers, I think we
looked at that.

BY MR. HACKNEY:

Q. As you sit here today, though, you can't remember for
sure whether you looked at the composite recoveries of
creditors --

A. Right.

Q. -- as opposed to classes?

A. Yeah, I don't remember.

Q. Okay, so for example, did you consider how many UTGO
holders were also LTGO holders when evaluating their
combined recovery?

A. Yeah, there may be some analysis, I just don't
remember.

Q. Did you consider whether COPs holders were also
holders of other claims and consider their combined
recovery in deciding what level of discrimination
should be applied?

A. I don't remember.

KEVYN ORR, VOLUME 2

Q. If you did, I take it that would be written analysis,
it's not something you really do kind of in your head?

A. Well, nowadays, I don't write anything --

Q. I noticed.

A. -- lest it be discovered, so that would have been
provided to me by my -- by my consultants.

Q. You do agree it would be a written analysis?

A. I believe it would -- in some form, it would have been
written, yes.

Q. Okay, so to the extent there is written analysis of
these things, we would ask for its production. I
haven't seen anything --

MR. SHUMAKER: To the extent it hasn't been
produced and that it exists --

MR. HACKNEY: Yeah.

MR. SHUMAKER: -- we'll look into it.

MR. HACKNEY: I appreciate that,
Mr. Shumaker.

BY MR. HACKNEY:

Q. Mr. Orr, the City's director of labor relations and
interim director of human relations is Michael Hall;
is that correct?

A. Yes.

Q. And Mr. Hall was hired by you back in October of 2013;

Pages 242 to 245

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt Doc 7572-9 Filed 09/21/14 Entered 09/21/14 16:38:59 Page 40 of 49

1        KEVYN ORR, VOLUME 2
2   isn't that right?
3   **A.  I believe that's right.**
4   Q.  And he's an individual with deep experience in the
5        area of human resources and labor relations, correct?
6   **A.  I believe he's experienced in those areas.**
7   Q.  Doesn't he have like three decades of experience with
8        GM?
9   **A.  Yeah, I just -- I stay away from, you know, adjectives**
10      **but I believe he's experienced and qualified in those**
11      **areas.**
12  Q.  Okay, I seem to recall some adjectives here or there
13      from you in your testimony.  And is part of his core
14      function in human resources to monitor issues
15      affecting the retention and hiring of employees?
16  **A.  I would say that's fair, but we -- you know, we all**
17      **are concerned about retention and hiring.**
18  Q.  Okay.
19  **A.  But yes, I think that's a function in HR.**
20  Q.  And I take it you have confidence in Mr. Hall?
21  **A.  I do.**
22  Q.  And you have confidence in his judgment?
23  **A.  I do.**
24  Q.  Okay.  Do you know that there are certain active
25      employees that are members of classes 10 and 11

1        KEVYN ORR, VOLUME 2
2   because they have earned a pension to a certain
3   extent?
4   **A.  Yes.**
5   Q.  Okay.  Whereas with respect to a prospective employee
6        to the City that the City hopes to attract, do you
7        understand that that person is unlikely to be a member
8        of class 10 or 11 unless they were in the unique
9        situation where they had previously worked for the
10      City and earned a pension?
11  **A.  I -- I think that's fair.**
12  Q.  Do you know what percentage of classes 10 and 11 are
13      active employees?
14  **A.  Do I know which percentage?**
15  Q.  Yes.
16  **A.  Yeah, I believe there's an analysis of which ones are**
17      **active.  Do I know it sitting here today?**
18  Q.  Yes.
19  **A.  No, I'd have to go look at documents to figure it out.**
20  Q.  Do you think that someone wrote that down, though?
21  **A.  I think I -- I've -- what percentage of 10 and 11 are**
22      **active employees?  Yeah, I think we have that.**
23          MR. HACKNEY:  Okay, that's something we
24      would definitely ask for --
25          THE WITNESS:  Okay.

1        KEVYN ORR, VOLUME 2
2          MR. HACKNEY:  -- if it exists.
3          THE WITNESS:  Okay.
4   BY MR. HACKNEY:
5   Q.  Okay, and do you know what the percentage is?
6   **A.  I don't -- I know there are ratios, and I forget**
7       **sitting here today, I think one is 3 to 1, roughly, if**
8       **you do the numbers of active employees at 9,800 FTEs.**
9       **I think one is roughly -- to retirees is 3 to 1, and I**
10      **think over on the PFRS side, it may be 5 to 1 or maybe**
11      **one way or the other, but yeah, I've seen that ratio**
12      **and seen those numbers before.**
13  Q.  I take it you're uncertain as to whether -- what the
14      exact ratios are?
15  **A.  Yeah, just sitting here, I just haven't reviewed it.**
16      **You know, it's been a week since I've reviewed it, so**
17      **I just haven't sat here today, but there is a ratio**
18      **and there are numbers that split up the difference**
19      **between active and retirees in classes 10 and 11.**
20  Q.  The -- just so we have the ratios that you do kind of
21      recall correctly, the larger number, the 3 to 1 or the
22      5 to 1 is retirees over actives, correct?
23  **A.  Oh, yeah, yeah, yeah.  It's not actives.  We don't**
24      **have 2,000 retirees --**
25  Q.  If we did, we wouldn't have a problem.

1        KEVYN ORR, VOLUME 2
2   **A.  Yeah, we wouldn't have a problem, right --**
3   Q.  Okay.
4   **A.  -- if that's the ratio.**
5   Q.  Now, do you know what percentage of the dollar amount
6        of recovery under the plan to classes 10 and 11 is
7        going to go into the pockets of active employees
8        bearing in mind that the percentage of the class is
9        not the same as the dollar size --
10  **A.  Yeah.**
11  Q.  -- of the class?
12  **A.  I'm not sure we know that.  I know the -- I know the**
13      **percentage of the class and I probably know the**
14      **percentage of the claim that voted, I don't know the**
15      **dollar amount because it depends upon the obligation**
16      **of any particular pension.**
17  Q.  Right, right.
18  **A.  Right.**
19  Q.  So as you sit here today, you don't know the
20      percentage of dollars in the class 10 and 11
21      recoveries that are flowing to active employees,
22      correct?
23  **A.  That is correct.  Percentage of dollars?**
24  Q.  The percentage --
25  **A.  Sitting here today, I don't know that, that is**

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

# Exhibit 6D

## July 30, 2014 email from G. Shumaker to S. Hackney

| | |
|---|---|
| **From:** | Gregory Shumaker <gshumaker@JonesDay.com> |
| **Sent:** | Wednesday, July 30, 2014 9:12 AM |
| **To:** | Hackney, Stephen C. |
| **Cc:** | dmoss@JonesDay.com; Arnault, Bill; Geoffrey S Irwin |
| **Subject:** | Re: Follow up on Orr |

Steve:  Took a little bit longer than I had hoped to track things down but my responses to your inquiries are below in <span style="color:red">red.</span>

Best regards, Greg


Gregory M. Shumaker
Partner
**JONES DAY® - One Firm Worldwide℠**
51 Louisiana Avenue, NW
Washington, DC  20001
Office:  +1.202.879.3679
Email:  gshumaker@jonesday.com



| | |
|---|---|
| From: | "Hackney, Stephen C." <shackney@kirkland.com> |
| To: | Gregory Shumaker <gshumaker@JonesDay.com>, "dmoss@JonesDay.com" <dmoss@JonesDay.com>, |
| Cc: | "Arnault, Bill" <warnault@kirkland.com> |
| Date: | 07/24/2014 02:22 PM |
| Subject: | Follow up on Orr |

---

Greg,

I hope this email finds you well.  I wanted to follow up on the items we discussed in the Orr deposition that I requested production of.  They are:

1.        The Goldman Sachs valuation referenced in the Cherukuri email I described to Dan.  <span style="color:red">We have consulted with our advisers and attempted to locate the referenced Goldman Sachs valuation without success.</span>

2.        The pre-mediation memorandum that Kevyn remembers seeing that involved analysis of DWSD options that included spinning it off as an Investor Owned Utility.  <span style="color:red">We have located the documents that Kevyn remembered seeing but they contain commercially sensitive information from the ongoing bidding process involving the DWSD and the RFI for Potential Operators of the Detroit Water and Sewage Disposal Systems.  Because of this, and in light of Judge Rhodes' earlier rulings that this type of information be kept confidential, we are unable to produce them to you.</span>

3.        The analysis Orr saw regarding the likelihood that pensioners achieve restoration.  <span style="color:red">After checking, the City did not undertake any analysis of the likelihood that pensioners would achieve restoration.  We have confirmed that during the course of mediation Kevyn did see modelling that showed whether pension restoration could occur at different investment returns but that modelling was done by another party, was generated in the context of mediation and therefore is subject to the mediation order and will not be produced.</span>

4.        Document relating to the Illitch settlement, including the contract in question, the settlement documents, and any non-

privileged analysis of the issue   These documents were produced to you on Thursday, July 24.

5.     The written analysis of combined creditor recoveries referenced at pages 244-245 of the transcript.   We have been unable to locate any combined creditor recovery analysis like the one you were questioning Kevyn about on pages 244-245 of the transcript.

Let me know when you think you can get these for us.

Best,

Steve

**Stephen C. Hackney**
Kirkland & Ellis LLP
300 N. LaSalle St.
Chicago, IL  60654
T: (312) 862-2157
F:  (312) 862-2200

********************************************************
The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return e-mail or by e-mail to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.
********************************************************


==========
This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege.  If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.
==========

# Exhibit 6E

## March 5, 2014 Hearing Transcript

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

```
IN RE:  CITY OF DETROIT,       .       Docket No. 13-53846
        MICHIGAN,              .
                               .       Detroit, Michigan
                               .       March 5, 2014
                Debtor.        .       2:30 p.m.
. . . . . . . . . . . . . . . .
```

        HEARING RE. MOTION OF THE CITY OF DETROIT FOR ENTRY OF
    AN ORDER (I) ESTABLISHING PROCEDURES FOR SOLICITATION
    AND TABULATION OF VOTES TO ACCEPT OR REJECT PLAN OF
    ADJUSTMENT AND (II) APPROVING NOTICE PROCEDURES RELATED
    TO CONFIRMATION OF THE PLAN OF ADJUSTMENT (DKT#2789);
    CONCURRENCE OF THE RETIREE ASSOCIATION PARTIES IN THE
    SUPPLEMENTAL COMMENTS OF THE OFFICIAL COMMITTEE OF
    RETIREES TO THE FIRST AMENDED ORDER ESTABLISHING
    PROCEDURES, DEADLINES AND HEARING DATES RELATING TO THE
    DEBTOR'S PLAN OF ADJUSTMENT (DKT#2781) (DKT#2793);
    RESPONSE OF INTERNATIONAL UNION, UAW, TO FIRST AMENDED
    ORDER ESTABLISHING PROCEDURES, DEADLINES AND HEARING DATES
    RELATING TO THE DEBTOR'S PLAN OF ADJUSTMENT (DKT#2791);
        COMMENT TO THE FIRST AMENDED ORDER ESTABLISHING
    PROCEDURES, DEADLINES AND HEARING DATES RELATING TO THE
DEBTOR'S PLAN OF ADJUSTMENT (DKT#2780); SUPPLEMENTAL COMMENTS
    OF THE OFFICIAL COMMITTEE OF RETIREES TO THE FIRST AMENDED
    ORDERS ESTABLISHING PROCEDURES, DEADLINES AND HEARING
    DATES RELATING TO THE DEBTOR'S PLAN OF ADJUSTMENT
    (DKT#2781); RESPONSE OF THE CITY OF DETROIT TO THE COURT'S
    FIRST AMENDED ORDER ESTABLISHING PROCEDURES, DEADLINES
    AND HEARING DATES RELATING TO THE DEBTOR'S PLAN OF
    ADJUSTMENT (DKT#2787); OBJECTION TO THE COURT'S FIRST
    AMENDED ORDER ESTABLISHING PROCEDURES, DEADLINES AND
    HEARING DATES RELATING TO THE DEBTOR'S PLAN OF
    ADJUSTMENT (DKT#2778); THE WATER AND SEWER BOND
    TRUSTEE'S LIMITED OBJECTION TO THE FIRST AMENDED
    ORDER ESTABLISHING PROCEDURES, DEADLINES AND HEARING
    DATES RELATING TO THE DEBTOR'S PLAN OF ADJUSTMENT
    (DKT#2794); JOINDER OF WILMINGTON TRUST, NATIONAL
    ASSOCIATION, AS SUCCESSOR CONTRACT ADMINISTRATOR, TO
    (A) COMMENT TO THE FIRST AMENDED ORDER ESTABLISHING
    PROCEDURES, DEADLINES AND HEARING DATES AND (B) THE
    WATER AND SEWER BOND TRUSTEE'S LIMITED OBJECTION TO
    THE FIRST AMENDED ORDER ESTABLISHING PROCEDURES,
    DEADLINES AND HEARING DATES RELATING TO THE DEBTOR'S
    PLAN OF ADJUSTMENT (DKT#2796); STATUS HEARING RE.
    MOTION OF DEBTOR FOR ENTRY OF AN ORDER, PURSUANT TO
    SECTION 105(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY
    RULE 9019, APPROVING A SETTLEMENT AND PLAN SUPPORT
    AGREEMENT AND GRANTING RELATED RELIEF (DKT#2802)

1          THE COURT:  Okay.

2          MS. NEVILLE:  We are getting to that point.  The

3    actuaries are meeting.  They have a timetable to agree on

4    numbers on the 21st of March.  It's not such an easy process.

5          THE COURT:  Right.

6          MS. NEVILLE:  So that's number one.  Number two, I

7    want to -- I want to focus again --

8          THE COURT:  So it's 60 days from what to what that

9    you're asking for?

10         MS. NEVILLE:  I think I would concur with the

11   bondholders on the deadline, so I think what that means is

12   it's -- the voting deadline would be moved to the 23rd of

13   June, to 60 days from --

14         THE COURT:  Right, but it's 60 days from --

15         MS. NEVILLE:  The mailing of the solicitation

16   package.

17         THE COURT:  Package.  Okay.

18         MS. NEVILLE:  The 24th.  The second thing I wanted

19   to address with your Honor is this issue of unconfirmable on

20   its face.

21         THE COURT:  Which I already said I'm not going to

22   do.

23         MS. NEVILLE:  I know, but I'm going to try and lobby

24   you a little bit, if I may.

25         THE COURT:  You may make your record.

 1          MS. NEVILLE:  Your Honor, this is a serious question

 2     for the retirees because their other post-employment benefit

 3     claims are classified in the same class as their pension

 4     claims, so we would be soliciting ballots -- if we don't

 5     resolve this issue on the disclosure statement deadline, we

 6     would be sending people ballots that wouldn't necessarily be

 7     the vote for the class or would be the vote for the class

 8     that would be inappropriate because the OPEB claim and the

 9     pension claim are two different claims.  And at the moment,

10     for the police and fire-fighters, the OPEB and the pension

11     claims are classified in the same class, and the same thing

12     is true for the General Retirement System.  They're two

13     different claims.  They get different treatment within the

14     class, and so I think we have to resolve at the disclosure

15     statement stage before we solicit whether we have the proper

16     classification.

17          THE COURT:  Any other issues?

18          MS. NEVILLE:  There are other issues, but I think

19     this is the one that just really leaps out because it

20     involves solicitation as well as confirmation.  You have to

21     have -- you'd have to design the --

22          THE COURT:  You may have opened the door a crack.

23          MS. NEVILLE:  I opened the door a crack.  All right.

24          THE COURT:  You may have.

25          MS. NEVILLE:  Thank you.  Well, that's all I have to

1    say.

2            THE COURT:  All right.

3            MR. LEMKE:  Your Honor, David Lemke on behalf of US

4    Bank as trustee for the water and sewer bonds.  I don't have

5    anything to really disagree with here, and we support the

6    schedule that was laid out with maybe one exception, and that

7    is -- you referenced it -- that the -- what we would ask for

8    was a 30-day deadline to vote and to object to the plan so

9    that the objection date and the voting date would run

10   simultaneously for the bondholders.  If the solicitation

11   package goes out on April the 24th, as is indicated, then

12   that would be a June 23rd deadline.  We did actually ask for

13   June --

14           THE COURT:  You said 30, but you meant 60.

15           MR. LEMKE:  Sixty.  I'm sorry.  Yes.  Sixty.  We did

16   ask for June the 30th -- that's where I got the 30 -- June

17   the 30th to be that deadline.  That gives us another seven

18   days.  It's really 67 days.  And then we felt like if you had

19   June 30th, that would give adequate time for the balloting

20   agent to do their tabulation, the ten days, and then if the

21   confirmation hearing started on July the 14th or someday

22   after that, there would be adequate time to get whatever

23   additional pretrial issues needed to be addressed, but I did

24   want to make sure that we were clear on what we were asking

25   for there.