## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| In re | ) Chapter 9 |
| | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
| | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
| | ) |

## MOTION *IN LIMINE* BARRING THE CITY FROM INTRODUCING COMMUNICATIONS PROTECTED BY THE COURT'S MEDIATION ORDER

Syncora Capital Assurance Inc. and Syncora Guarantee Inc. ("Syncora") submit this motion *in limine* to bar the City of Detroit (the "City" or "Debtor") from introducing evidence of any communications that are covered by the Court's Mediation Order.  In support of their motion, Syncora respectfully states as follows:

### INTRODUCTION

1.     On August 13, 2013, the Court entered an order providing that "[a]ll proceedings, discussions, negotiation, and writings incident to mediation shall be privileged and confidential, and shall not be disclosed, filed or placed in evidence." Mediation Order [Dkt. No. 322], ¶ 4.  Throughout discovery, the City and other Plan supporters have repeatedly invoked the Mediation Order in an attempt to protect a wide range of documents, information, and communications. Specifically, the City and other Plan supporters have invoked the Mediation Order

when questioned about (a) the terms, structure, and negotiations surrounding the DIA Settlement; (b) the calculation of the OPEB Claim amount; (c) the status of the negotiations surrounding the City's new collective bargaining agreements; (d) the status of negotiations with public safety groups; (e) the bases for differing treatment of COPs and LTGO, UTGO, retiree, and other creditors; and (f) the potential for asset monetization via the DWSD transaction.

2.      In addition to the above topics, the City also invoked the Mediation Order when Syncora attempted to discern the state of the mind of various participants in the mediation. In particular, during the deposition of Mr. Orr, Syncora was repeatedly barred from inquiring into Mr. Orr's understanding of the Foundations' participation in the so-called Grand Bargain — and their alleged insistence that the DIA Settlement proceeds go exclusively to retirees — on the grounds that Mr. Orr's state of mind and understanding were informed by mediation communications.

3.      In light of the City's extensive invocation of the Mediation Order, the City should not be permitted to introduce evidence of any communications incident to mediation. In addition, because the City rebuffed Syncora's attempts to delve into the state of mind of the various mediation participants, the City also should not be permitted to introduce "state of mind" evidence that is based in whole or in part on mediation communications.

4. Accordingly, Syncora respectfully requests that the Court bar the City from introducing evidence relating to (a) communications incident to the mediation and (b) the state of mind of the participants in the mediation where the state of mind was based on information or events occurring during mediation.

## JURISDICTION

5. The Court has jurisdiction over this matter pursuant to 38 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## RELIEF REQUESTED

6. Syncora respectfully moves the Court to bar the City from introducing evidence of communications covered by the Mediation Order and enter an order substantially in the form of Exhibit 1 attached hereto.

## BASIS FOR RELIEF

### I. Legal Standard

7. It is foundational that a privilege may not be used as both a sword and a shield. In other words, a party may not selectively disclose privileged communications in aid of establishing a claim or defense, but prevent other parties from seeking discovery relating to the same information. *See In re Grand Jury Proceedings*, 219 F.3d 175, 182 (2d Cir. 2000) ("In other words, a party cannot partially disclose privileged communications or affirmatively rely on privileged communications to support its claim or defense and then shield the underlying

3

communications from scrutiny by the opposing party."). Furthermore, a party may not invoke a privilege but then attempt to introduce that evidence by inquiring into the witness's state of mind vis-à-vis the privileged information. *Arista Records LLC v. Lime Grp. LLC*, 06 CV 5936 KMW, 2011 WL 1642434 (S.D.N.Y. Apr. 20, 2011) (granting a motion *in limine* seeking to preclude argument and testimony regarding a party's state of mind where defendants already blocked inquiry into the matter on the basis of privilege).

## II. The City May Not Introduce Evidence of Communications That Are Part of or Incident to the Mediation

8. The Court's August 13, 2013 Mediation Order provides that "[a]ll proceedings, discussions, negotiation, and writings incident to mediation shall be privileged and confidential, and shall not be disclosed, filed or placed in evidence."[1] Mediation Order [Dkt. No. 322], ¶ 4. The City has argued that Syncora should be precluded, on the basis of this Order, from conducting discovery on a myriad of issues, including the Foundations' contributions to the so-called Grand Bargain. *See* City's Statement in Support of Foundations' Joint Motion to Quash [Dkt. No. 5494]. Consistent with this position, the City has

---

[1] Though not at issue in the instant motion, Syncora maintains that the City's expansive interpretation and application of the Court's Mediation Order is improper.

broadly invoked the Mediation Order during the depositions of City witnesses.[2] (*See, e.g.,* Ex. 6A Bowen Dep. Tr. at 126:24-127:15, June 30, 2014 (invoking Mediation Order regarding discussions by actuarial firms regarding modeling methods for purposes of establishing benefit and liability reductions for the Retirement Systems); (Ex. 6B, Hall Dep. Tr. at 169:17-172:10, July 2, 2014 (invoking Mediation Order regarding union negotiations with the City); (Ex. 6C, Malhotra Dep. Tr. at 213:2-214:8, July 14, 2014 (invoking Mediation Order over pending settlements that would affect the content of Ernst & Young's forecasts); (Ex. 6D, Buckfire Dep. Tr. at 352:1-352:19, July 16, 2014 (invoking Mediation Order over the question of whether the City would contribute to the pension systems' underfunding through the year 2023); (Ex. 6E, Orr Dep. Tr. at 185:15– 186:23; 337:12–339:18; 349:11–351:9, July 22, 2014 (invoking Mediation Order over the subject of the creation of a regional water authority,[3] Mr. Orr's understanding of the Foundations' willingness to provide funds for the Plan of

---

[2]  Though Syncora has repeatedly requested a privilege log, the City has refused to provide one.  (Ex. 6H, Hr'g Tr. at 268:19–269:1, May 28, 2014.)  Instead, the City has simply provided a chart revealing that it has withheld more than 7,500 communications with third parties on account of the Mediation Order.  Notably though, the City has not disclosed how many internal communications it has withheld on account of the Mediation Order.

[3]  A regional water authority is a significant potential revenue source for the City that could be used to pay creditors.

Adjustment, and the basis for discriminating between the City's financial creditors).)

9.     Given the City's reliance on the Mediation Order as a shield, it should not be permitted to use the previously-withheld testimony as a sword during the trial. Nevertheless, the City has indicated that it intends to introduce evidence relating to discussions and negotiations that occurred as part of the Court-ordered mediation, including the following:

- The OPEB Settlement: The City intends to introduce evidence that the "product of the OPEB Settlement is within the range of reasonableness." (Ex. 6F, Plan Confirmation Factual Propositions at 4); Consol. Reply [Dkt. No. 5034], ¶¶ 21-28. Yet, when City witnesses were asked how the parties calculated the size of the OPEB claim — which Syncora believes is massively overstated — the City invoked the Mediation Order. (Ex. 6G, Taranto Dep. Tr. at 118:11–17, Aug. 13, 2014.)

- The size of the Pension Claims: The City intends to introduce evidence regarding the correct size of the Pension Claims — which Syncora believes are also massively overstated — and the "appropriate" discount rate. (Ex. 6F, Plan Confirmation Factual Propositions at 7); Consol. Reply [Dkt. No. 5034], ¶¶ 58-59. Yet, when City witnesses were asked how they arrived at the appropriate discount rate, the City invoked the Mediation Order. (Ex. 6A, Bowen Dep. Tr. at 130:3–10, June 30, 2014.)

- The terms of the DIA Settlement: The City intends to introduce evidence that the contributions of the State and the Foundations would not otherwise be available to the City. (Ex. 6F, Plan Confirmation Factual Propositions at 7.) Yet, when City witnesses were asked about the negotiations surrounding the DIA Settlement, the City invoked the Mediation Order. (Ex. 6E, Orr Dep. Tr. at 444:8–25, July 22, 2014.)

10.     Accordingly, the City must now be precluded from seeking to introduce, in any form, evidence or testimony of any proceeding, discussion,

negotiation, or writing that was part of the Court-ordered mediation. Allowing such evidence would be unfairly prejudicial to Syncora given its inability to obtain discovery regarding these communications and negotiations.

### III. The City May Not Introduce Evidence of States of Mind Based In Whole or In Part on Mediation Events.

11. While the City's interpretation of the Mediation Order was broad in its own right, during depositions the City also took the position that a witnesses' state of mind — to the extent that such state of mind was based on or informed by mediation events — was also protected by the Mediation Order. For example, during the deposition of Mr. Orr, counsel for the City asserted that the terms of the Mediation Order applied to Mr. Orr's state of mind regarding the Foundations' contributions to the DIA Settlement:

> Q.   Now, if I asked you your state of mind based on what you understood the foundations to be willing to do or what you thought they would be willing to do, you would also invoke the mediation order to the extent his state of mind was created by communications of the foundation, correct?
>
> MR. SHUMAKER:  I think that's right because I don't see how he could give you his impressions or his understanding without going into what was going on in the mediation.

(Ex. 6E, Orr. Dep. Tr. at 338:17–339:2, July 22, 2014.)

12. The City took a similar position during the deposition of Mr. Hall, the City's Director of Human Resources and Labor Relations:

7

> Q.  . . . Your understanding is that the unions will not come out in public support of the grand bargain until they have reached a new collective bargaining agreement with the City, correct?
>
> MS. KOVSKY-APAP:  Objection to the extent that what he understands is based on what he learned through the mediation process, it's covered by the mediation order. I direct you not to answer.
> . . .
> To the extent that his state of mind or what he understands about what the unions will or will not do is based on information that has been conveyed to him through the mediation process.  Our position is that that is covered by the mediation order.

(Ex. 6B, Hall Dep. Tr. at 170:6–171:12, July 2, 2014.)  In short, the City has used the Mediation Order to shield information relating to the states of mind of the City's agents and employees to the extent such information is based on the mediation.

13.    Yet, as in *Arista Records LLC,* 2011 WL 1642434, the City cannot shield from investigation Mr. Orr or Mr. Hall's states of mind and, at the same time, seek to introduce information of their states of mind to justify decisions regarding Plan treatment or Plan structure.  The Court in *Arista Records* made clear that a defendant will be <u>barred</u> from introducing evidence regarding its beliefs where, in a prior phase of the proceedings, the defendant sought to protect information regarding that state of mind from discovery based on an assertion of privilege.  *Arista Records LLC,* 2011 WL 1642434 ("Having blocked his adversary from conducting discovery on this issue, [the defendant] will not now be heard to

8

advance reliance on counsel." (quoting *E.G.L. Gem Lab Ltd. v. Gem Quality Inst., Inc.*, 90 F. Supp. 2d 277, 284 (S.D.N.Y. 2000), aff'd, 4 F. App'x 81 (2d Cir. 2001))).

14.     As such, the City should be precluded from introducing testimony at trial regarding the state of mind of its witnesses where the state of mind is based, in whole or in part, on events or information that are incident to mediation.  To allow otherwise would subject Syncora to unfair surprise and prejudice.

## <u>CONCLUSION</u>

15.     For the foregoing reasons, Syncora respectfully requests that the Court bar the City from introducing evidence of communications covered by the Court's Mediation Order.

*[Remainder of Page Intentionally Left Blank]*

Dated:  August 22, 2014

Respectfully submitted,

**KIRKLAND & ELLIS LLP**

By: _/s/ Stephen C. Hackney_____
James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:   (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone:  (248) 646-5070
Facsimile:   (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and
Syncora Capital Assurance Inc.*

## <u>Summary of Exhibits</u>

Exhibit 1 - Proposed Order

Exhibit 2 - Notice of Motion and Opportunity to Object

Exhibit 3 - None [Brief Not Required]

Exhibit 4 - None [Separate Certificate of Service to be Filed]

Exhibit 5 - Affidavits [Not Applicable]

Exhibit 6 A - June 30, 2014 G. Bowen Deposition Transcript

Exhibit 6 B - July 2, 2014 M. Hall Deposition Transcript

Exhibit 6 C - July 14, 2014 G. Malhotra Deposition Transcript

Exhibit 6 D - July 16, 2014 K. Buckfire Deposition Transcript

Exhibit 6 E - July 22, 2014 K. Orr Deposition Transcript

Exhibit 6 F - Plan Confirmation Factual Propositions

Exhibit 6 G - August 13, 2014 S. Taranto Deposition Transcript

Exhibit 6 H - May 28, 2014 Hearing Transcript

**<u>Exhibit 1</u>**

**Proposed Order**

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
|  | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
|  | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
|  | ) |

## ORDER GRANTING MOTION *IN LIMINE* BARRING THE CITY FROM INTRODUCING COMMUNICATIONS PROTECTED BY THE COURT'S MEDIATION ORDER

This matter having come before the Court on Syncora's Motion *in Limine* Barring the City from Introducing Communications Protected by the Court's Mediation Order (the "Motion"), the Court having reviewed Syncora's Motion, and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein;

**IT IS HEREBY ORDERED THAT:**

1.      Syncora's Motion is GRANTED.

2.      The City is barred from introducing evidence of communications covered by the Mediation Order.

3.      Syncora is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

4.      The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

5.     The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

**IT IS SO ORDERED.**

**<u>Exhibit 2</u>**

**Notice of Motion and Opportunity to Object**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|                              |     |                          |
|------------------------------|-----|--------------------------|
| In re                        | )   | Chapter 9                |
|                              | )   |                          |
| CITY OF DETROIT, MICHIGAN,   | )   | Case No. 13-53846        |
|                              | )   |                          |
| Debtor.                      | )   | Hon. Steven W. Rhodes    |
|                              | )   |                          |

## NOTICE OF MOTION *IN LIMINE* BARRING THE CITY FROM INTRODUCING COMMUNICATIONS PROTECTED BY THE COURT'S MEDIATION ORDER

**PLEASE TAKE NOTICE** that on August 22, 2014 Syncora Capital Assurance Inc. and Syncora Guarantee Inc. ("Syncora") filed the *Motion* in Limine *Barring the City from Introducing Communications Protected by the Court's Mediation Order* (the "Motion") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") seeking entry of an order to bar the City from introducing evidence of communications covered by the Mediation Order.

**PLEASE TAKE FURTHER NOTICE that your rights may be affected by the relief sought in the Motion. You should read these papers carefully and discuss them with your attorney, if you have one. If you do not have an attorney, you may wish to consult one.**

**PLEASE TAKE FURTHER NOTICE** that if you do not want the Bankruptcy Court to grant the Syncora's Motion or you want the Bankruptcy Court to consider your views on the Motion, by **September 5, 2014,** you or your attorney must:

File with the Court a written response to the Motion explaining your position with the Bankruptcy Court electronically through the Bankruptcy Court's electronic case filing system in accordance with the Local Rules of the Bankruptcy Court or by mailing any objection or response to:[1]

United States Bankruptcy Court
Theodore Levin Courthouse
231 West Lafayette Street
Detroit, MI 48226

You must also serve a copy of any objection or response upon:

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone:  (248) 646-5070
Facsimile:  (248) 646-5075

If an objection or response is timely filed and served, the clerk will schedule a hearing on the Motion and you will be served with a notice of the date, time and location of the hearing.

**PLEASE TAKE FURTHER NOTICE that if you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the Motion and may enter an order granting such relief.**

---

[1]   A response must comply with F. R. Civ. P. 8(b), (c) and (e).

2

KE 33051856.1

13-53846-tjt  Doc 8754-3  Filed 12/15/14  Entered 12/15/14 21:21:42  Page 17 of 70
13-53846-swr  Doc 6979-3  Filed 08/22/14  Entered 08/22/14 16:13:42  Page 13 of 14

Dated: August 22, 2014

Respectfully submitted,

**KIRKLAND & ELLIS LLP**

By: */s/ Stephen C. Hackney*
James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

      - and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone: (248) 646-5070
Facsimile: (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and
Syncora Capital Assurance Inc.*

KE 33051856.1

13-53846-tjt  Doc 7547-3  Filed 09/22/14  Entered 09/22/14 16:11:42  Page 18 of 70
13-53846-swr  Doc 6979-3  Filed 08/22/14  Entered 08/22/14 21:21:34  Page 40 of 74

**<u>Exhibit 3</u>**

**None [Brief Not Required]**

**Exhibit 4**

**Certificate of Service [To be filed separately]**

**Exhibit 5**

**Affidavits**
**[Not Applicable]**

# Exhibit 6A

**June 30, 2014 G. Bowen Deposition Transcript**

GLENN BOWEN

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

In re                    ) Chapter 9
CITY OF DETROIT, MICHIGAN,    ) Case No. 13-53846
        Debtor.    ) Hon. Steven W. Rhodes

_____

The Video Deposition of GLENN BOWEN, VOLUME I,
Taken at 1114 Washington Boulevard,
Detroit, Michigan,
Commencing at 9:05 a.m.,
Monday, June 30, 2014,
Before Rebecca L. Russo, CSR-2759, RMR, CRR.

1                    GLENN BOWEN
2   APPEARANCES:
3
4   EVAN MILLER, ESQ.,
5   MIGUEL F. EATON, ESQ.
6   Jones Day
7   51 Louisiana Avenue, N.W.
8   Washington, D.C. 20001
9       Appearing on behalf of the Debtor.
10
11
12
13
14  CLAUDE D. MONTGOMERY, ESQ.
15  Dentons US LLP
16  1221 Avenue of the Americas
17  New York, New York 10020-1089
18      Appearing on behalf of the Retiree Committee.
19
20
21
22
23
24
25

1                    GLENN BOWEN
2   JENNIFER K. GREEN, ESQ.,
3   RONALD A. KING, ESQ. (Lansing office)
4   Clark Hill, PLC
5   500 Woodward venue
6   Suite 3500
7   Detroit, Michigan 48226
8       Appearing on behalf of the Retirement Systems for the
9       City of Detroit.
10
11
12
13
14  RICHARD U. S. HOWELL, ESQ.
15  Kirkland & Ellis LLP
16  300 North LaSalle
17  Chicago, Illinois 60654
18      Appearing on behalf of Syncora Guarantee Inc. and
19      Syncora Capital Assurance Inc.
20
21
22
23
24
25

1                    GLENN BOWEN
2   MARK R. JAMES, ESQ.
3   Williams, Williams, Rattner & Plunkett, P.C.
4   380 North Old Woodward Avenue
5   Suite 300
6   Birmingham, Michigan 48009
7       Appearing on behalf of the Financial Guaranty
8       Insurance Company.
9
10
11
12  DAWN R. COPLEY, ESQ.
13  Dickinson Wright, PLLC
14  500 Woodward Avenue
15  Suite 4000
16  Detroit, Michigan 48226
17      Appearing on behalf of the State of Michigan.
18
19
20
21
22
23
24
25

1               GLENN BOWEN
2    from Glenn Bowen and Kathy Warren to Evan Miller and
3    Chuck Moore, date March 6th, 2014.
4  BY MR. HOWELL:
5  Q.  Mr. Bowen, do you recognize this document?
6  A.  I do.
7  Q.  And what was the purpose of this document, to your
8    recollection?
9  A.  The purpose was to confirm to our client the
10    methodology we would be taking in doing various
11    requested models that we were preparing.
12  Q.  And did that include the methodologies that would be
13    used for the models that we just saw in the April 17,
14    2014, letters?
15  A.  Just give me a moment, please.
16  Q.  Sure.
17  A.  Yes, I believe that's included in this document.
18  Q.  In the third full paragraph under overview on the
19    first page, you list two other actuarial firms,
20    Gabriel Roeder Smith & Company and Segal Consulting
21    Do you see that?
22  A.  Yes.
23  Q.  And you say you're happy to entertain comments and
24    suggestions from either firm if they were proposing
25    different approaches or revisions to the approaches

1               GLENN BOWEN
2    stated below.
3      Can you recall whether Gabriel Roeder Smith
4    provided comments or suggestions to the proposed
5    approach for undertaking the modeling that you were
6    doing at this time?
7  A.  I can't recall if they did so specific to this
8    document.
9  Q.  Would they provide comments from time to time in
10    association with work that you were doing at the
11    direction of the city?
12  A.  I believe it was the direction of the Court that the
13    actuarial firms were asked to speak to each other.
14  Q.  Who is Segal Consulting?
15  A.  They are an actuarial firm retained by the Official
16    Committee of Retirees.
17  Q.  Do you recall whether Segal Consulting provided any
18    comments or suggestions to your valuation of the
19    accrued actuarial liability?
20  A.  I think I can characterize it most simply as all firms
21    had a discussion and provided input.  I can't specify
22    whether they responded prior to this memo or
23    subsequent to this memo.
24  Q.  Did anyone ever suggest to you that the unit credit
25    cost method should be used as opposed to the entry age

1               GLENN BOWEN
2    normal cost method in any of the work that you did at
3    the direction of the city or the pension task force?
4        MR. MILLER:  Glenn, excuse me, before you
5    respond, Rush, I think Glenn had indicated in his
6    prior testimony that there were certain communications
7    that the actuarial firms engaged in pursuant to an
8    order of mediation by the Court, and all discussions
9    that took place during any Court-ordered mediation are
10    confidential, and pursuant to the Court's mediation
11    order are not to be the subject of discovery.
12        So I would just ask the witness, in his --
13    developing his response to the question, to avoid
14    answering in a way that would reveal discussions that
15    occurred during the Court-ordered mediation.
16        MR. HOWELL:  Fair enough.
17  BY MR. HOWELL:
18  Q.  So, just for the record, let me make clear, you're
19    going to follow Mr. Miller's instruction with respect
20    to that, correct?
21  A.  Yes, I will.
22  Q.  Okay.  So taking that into account, I don't want you
23    to disclose anything that you're being instructed not
24    to disclose related to a confidential mediation
25    arrangement, but just separate and apart from that, if

1               GLENN BOWEN
2    you have an independent recollection of any time where
3    it was suggested to you by Segal Consulting or by
4    anyone else to use entry age normal -- or excuse me,
5    to use the unit credit cost method as opposed to the
6    entry age normal method, can you recall anything like
7    that?
8  A.  It was not specifically discussed.
9  Q.  I'll hand you what we will mark as 10, Bowen
10    Exhibit 10.
11        MR. HOWELL:  And for identification
12    purposes, Bowen Exhibit 10 has the Bates range
13    POA00598715 through 598718 and is a letter from Segal
14    Consulting to Claude Montgomery.
15        First of all, Mr. Bowen, have you ever seen
16    this document before?
17        MARKED FOR IDENTIFICATION:
18        DEPOSITION EXHIBIT 10
19        1:39 p.m.
20  A.  One moment, please.  Yes.
21  BY MR. HOWELL:
22  Q.  On both the first and second page of this email from
23    Segal Consulting, they lay out a range of, again,
24    discount rates from 6.5 percent to 8 percent that they
25    used in projecting actuarial accrued liabilities.  Do

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

GLENN BOWEN

2     you see that?
3  A.  I do.
4  Q.  Do you have an understanding, first of all, whether
5     this was a replication of work that you were doing or
6     had done?
7  A.  This letter -- actually, I'm sorry, I remember
8     reviewing a Segal letter, I believe, of the 2013
9     valuation. I'm not sure if I have seen this letter
10     before.
11  Q.  Okay.
12  A.  But this letter is July 1, 2014, frozen plan.
13  Q.  Okay. Well, you anticipated my next question, which
14     is, your understanding is that this letter was put
15     together when there was an anticipation of a frozen
16     plan, correct?
17  A.  From the labeling of the letter, it says frozen plan.
18  Q.  Did you ever have any discussions with Segal
19     Consulting about which the -- which investment rate
20     would be an appropriate investment rate to use when
21     performing valuations in this case?
22          MR. MILLER: And I would again caution the
23     witness in framing his response to avoid revealing any
24     confidential mediation discussions.
25  A.  Yes.

GLENN BOWEN

2  BY MR. HOWELL:
3  Q.  And you do recall those conversations? And do you
4     recall -- do you have any recollection as to what
5     Segal Consulting suggested, if they made any
6     suggestion, as to what the discount rate should be for
7     use in these calculations?
8          MR. MONTGOMERY: Again, this is Claude
9     Montgomery. I would request that you respect any
10     mediation instructions in response to that question.
11  A.  We did not discuss 2014 valuation investment of return
12     assumptions.
13  BY MR. HOWELL:
14  Q.  On the third page of this document, it's Bates-stamped
15     598717 at the bottom -- well, maybe I should, I'm
16     sorry, I should probably take you back to the prior
17     page, where there's a paragraph that says: This
18     analysis was prepared using June 30, 2013, census data
19     provided by the retirement system and the actuarial
20     assumptions, methods, and plan provisions used in
21     Gabriel Roeder Smith's June 30, 2013, actuarial
22     valuation report, except the following.
23          And then it has a series of changes that
24     they used as opposed to what Gabriel Roeder Smith had
25     done. Do you see that?

GLENN BOWEN

2  A.  I do.
3  Q.  So the first one is the wage inflation portion of the
4     salary scale is zero percent for the year ending
5     June 30, 2014. Does that indicate to you that this is
6     the valuation of a frozen plan?
7  A.  That line alone does not indicate that.
8  Q.  On the next page, the second full bullet says: The
9     cost method was changed from entry age normal to the
10     unit credit cost method. Do you see that?
11  A.  I do.
12  Q.  Did you ever have any discussions with Segal
13     Consulting in which you discussed changing from entry
14     age normal to the unit credit cost method?
15          MR. MILLER: And again, those discussions
16     would need be outside the context of mediation.
17  A.  I answered the question previously. We didn't have
18     those discussions.
19  BY MR. HOWELL:
20  Q.  Okay. So, again, respecting the instruction not to
21     bring anything in from mediation, apart from
22     mediation, you can't recall any discussions whatsoever
23     with Segal Consulting in which -- whether to use entry
24     age normal or unit credit cost method was discussed?
25  A.  No.

GLENN BOWEN

2  Q.  And do you have any opinion as to whether Segal
3     Consulting's decision to use unit credit cost method
4     instead of entry age normal cost method for this
5     frozen plan analysis was appropriate?
6          MR. MUTH: Let me object here, because now
7     I think you're asking him to provide expert testimony,
8     commenting on another actuarial firm's work.
9          He's here as a lay witness, but to ask him
10     to form an opinion about appropriateness of another
11     actuarial's work I think goes beyond the scope of this
12     deposition.
13  BY MR. HOWELL:
14  Q.  You can answer the question, unless you're being
15     instructed not to answer.
16          MR. MUTH: Can you read it back, though?
17     (The following portion of the record was
18     read by the reporter at 1:45 p.m.:
19     Q. "And do you have any opinion as to
20     whether Segal Consulting's decision to use
21     unit credit cost method instead of entry
22     age normal cost method for this frozen plan
23     analysis was appropriate?")
24          MR. MUTH: You can answer if you have an
25     opinion.

# Exhibit 6B

**July 2, 2014 M. Hall Deposition Transcript**

1  MICHAEL HALL
2  IN THE UNITED STATES BANKRUPTCY COURT
3  FOR THE EASTERN DISTRICT OF MICHIGAN
4
5
6  In re              ) Chapter 9
7  CITY OF DETROIT, MICHIGAN,    ) Case No. 13-53846
8  Debtor.  ) Hon. Steven W. Rhodes
9
10  _____
11
12
13  The Videotaped Deposition of MICHAEL HALL,
14  Taken at 1114 Washington Boulevard,
15  Detroit, Michigan,
16  Commencing at 8:57 a.m.,
17  Wednesday, July 2, 2014,
18  Before Kathryn L. Janes, CSR-3442, RMR, RPR.
19
20
21
22
23
24
25

1  MICHAEL HALL
2  MICHAEL J. PATTWELL, ESQ.
3  Clark Hill, PLC
4  212 East Grand River Avenue
5  Lansing, Michigan 48906
6      Appearing on behalf of the Retirement Systems
7      for the City of Detroit.
8
9
10
11  STEPHEN C. HACKNEY, ESQ.
12  Kirkland & Ellis LLP
13  300 North LaSalle
14  Chicago, Illinois 60654
15      Appearing on behalf of Syncora Guarantee Inc.
16      and Syncora Capital Assurance Inc.
17
18
19
20
21
22
23
24
25

1      MICHAEL HALL
2  APPEARANCES:
3
4  DEBORAH KOVSKY-APAP, ESQ.,
5  LESLEY S. WELWARTH, ESQ.
6  Pepper Hamilton LLP
7  4000 Town Center
8  Suite 1800
9  Southfield, Michigan 48075
10      Appearing on behalf of the Debtor.
11
12
13
14
15
16  DAN BARNOWSKI, ESQ.
17  Dentons US LLP
18  1301 K Street, NW
19  Suite 600, East Tower
20  Washington, DC 20005-3364
21      Appearing on behalf of the Retiree Committee.
22
23
24
25

1      MICHAEL HALL
2  VINCENT J. MARRIOTT, III, ESQ.
3  Ballard Spahr LLP
4  1735 Market Street
5  51st Floor
6  Philadelphia, Pennsylvania 19103
7      Appearing on behalf of Hypothekenbank Frankfurt
8      AG; Hypothekenbank Frankfurt International S.A.;
9      and Erste Europaische Pfandbrief
10      Kommunalkreditbank Aktiengelsellschaft in
11      Luxemburg S.A.
12
13
14
15  MARK R. JAMES, ESQ.
16  Williams, Williams, Rattner & Plunkett, P.C.
17  380 North Old Woodward Avenue
18  Suite 300
19  Birmingham, Michigan 48009
20      Appearing on behalf of the Financial Guaranty
21      Insurance Company.
22
23
24
25

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

1             MICHAEL HALL
2        had received over 2,500 applicants in connection
3        with a recent job posting: isn't that correct?
4    **A. That's correct.**
5    Q. Do you know how many applications per City
6        opening the City has been getting on average
7        since you started?
8    **A. No.**
9    Q. Is it fair to say that the City generally gets a
10       sizeable response to any openings it does post?
11   **A. It depends on the opening and the qualifications**
12       **for those people.**
13   Q. I take it, the more specialized positions, you
14       don't see the thousands of applications --
15   **A. That's correct.**
16   Q. -- is that your point?
17   **A. That's correct.**
18   Q. Have you seen any change in the numbers of
19       applications that you've been getting for similar
20       types of positions during your tenure here or has
21       it been fairly consistent?
22   **A. During my tenure, it's been fairly consistent.**
23   Q. Where do you -- and as far as you can tell, where
24       do new City employees generally come from: are
25       they coming from the private sector or are they

1             MICHAEL HALL
2        coming from other cities?
3    **A. Haven't done --**
4             MS. KOVSKY-APAP: Objection. Could you
5        just clarify, do you mean where do they live
6        geographically?
7    BY MR. HACKNEY:
8    Q. Sorry, in their prior employer?
9    **A. Okay. That would depend upon the jobs that these**
10       **people are applying for.**
11   Q. Okay. Do you have a sense of that or is it
12       something that you've just not studied?
13   **A. The majority of our jobs that we've hired for this**
14       **year have been in my police and fire, EMTs, bus**
15       **drivers. Those have been the majority of openings**
16       **in seasonal workers, so most of those people are**
17       **coming to us not from other municipalities but,**
18       **you know, from the public sector.**
19   Q. Oh, from --
20   **A. Excuse me, from the cities, not employed by the**
21       **cities, but just from the communities.**
22   Q. Okay. Let me make sure I understand. They have
23       been coming from cities --
24   **A. From all around.**
25   Q. From all around?

1             MICHAEL HALL
2    **A. Right.**
3    Q. Okay. But not from -- they've not been
4        previously employed by other cities?
5    **A. That's correct.**
6    Q. Okay. With respect to City employees that have
7        left the City, do you know generally whether
8        they're leaving the City for other municipalities
9        or for the private sector?
10            MS. KOVSKY-APAP: Objection,
11       foundation.
12   **A. Don't have the data to support an answer.**
13   BY MR. HACKNEY:
14   Q. Okay. Don't know one way or the other?
15   **A. That's correct.**
16   Q. Did Detroit eliminate the residency requirements
17       for police and fire employees?
18   **A. Yes.**
19   Q. When did it do that?
20   **A. I don't recall the date.**
21   Q. Since you've started?
22   **A. Oh, no.**
23   Q. Before?
24   **A. Yes.**
25   Q. Oh, it was something you -- you learned when you

1             MICHAEL HALL
2        came to the job?
3    **A. That's correct.**
4    Q. Do you know if it had happened in 2013 or is this
5        something that goes further --
6    **A. Goes --**
7    Q. -- back?
8    **A. -- it goes back, further back.**
9    Q. It goes before the EM even?
10   **A. Before the EM.**
11   Q. Oh, has anyone ever told you why that residency
12       requirement was changed?
13   **A. No.**
14   Q. I just want to talk briefly about union
15       negotiations if we could. Do you agree that the
16       unions carry substantial influence in the city of
17       Detroit?
18            MS. KOVSKY-APAP: Objection, form.
19   **A. Yes.**
20   BY MR. HACKNEY:
21   Q. You have personally negotiated with unions during
22       your career both here and at GM; isn't that
23       correct?
24   **A. Correct.**
25   Q. And you would agree that they fight hard for

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

```
 1              MICHAEL HALL
 2    their members in their negotiations with you,
 3    correct?
 4  A.  Correct.
 5  Q.  And you would agree they do a good job
 6    representing their membership's interests,
 7    correct?
 8  A.  They do.
 9  Q.  Isn't it true that the unions have been
10    withholding their support for the grand bargain
11    until they're able to strike a collective
12    bargaining agreement with the city?
13         MS. KOVSKY-APAP:  Objection, foundation
14    and form.
15  A.  Yes.
16  BY MR. HACKNEY:
17  Q.  Okay.  And so it's basically you can't get the
18    unions to come out publicly for the grand bargain
19    until you strike the collective bargaining
20    agreement with them, correct?
21         MS. KOVSKY-APAP:  Objection, calls for
22    speculation.
23         And I would also caution you to the
24    extent that this would call for disclosure of
25    anything that's been discussed privately in
```

```
 1              MICHAEL HALL
 2    mediation, it needs to remain confidential, and I
 3    would direct you not to answer.
 4  A.  I can't answer the question.
 5  BY MR. HACKNEY:
 6  Q.  Okay.  Well, don't tell me what people said,
 7    okay, I want to just ask your understanding.
 8    Your understanding is that the unions will not
 9    come out in public support of the grand bargain
10    until they have reached a new collective
11    bargaining agreement with the City, correct?
12         MS. KOVSKY-APAP:  Objection to the
13    extent that what he understands is based on what
14    he learned through the mediation process, it's
15    covered by the mediation order.
16         I direct you not to answer.
17         MR. HACKNEY:  Judge Rhodes has said on
18    the record that state of mind of participants in
19    the mediation is not protected by the mediation
20    order.  He said it to me at the pretrial
21    conference when we were discussing the subject of
22    how you could prove up different things about
23    different aspects of the case.  So he said on the
24    record, well, I suppose the City could ask someone
25    about their state of mind separate and apart from
```

```
 1              MICHAEL HALL
 2    the communications.
 3         MS. KOVSKY-APAP:  But his state of mind
 4    is --
 5         MR. HACKNEY:  I don't know what's
 6    informing his state of mind.
 7         MS. KOVSKY-APAP:  To the extent that
 8    his state of mind or what he understands about
 9    what the unions will or will not do is based on
10    information that has been conveyed to him through
11    the mediation process.  Our position is that that
12    is covered by the mediation order.  That's not a
13    state of mind, that's what is his understanding of
14    the facts and the facts are conveyed through the
15    mediation process.
16         MR. HACKNEY:  I -- I disagree with you
17    because I'm not asking about what created the
18    state of mind, I'm asking about the state of mind,
19    so it's a difference.  It could be that he's
20    wrongly assuming that, it could be that it's a
21    coincidence that every time the union announces a
22    collective bargaining agreement, they then support
23    the grand bargain.  But are you going to stick
24    with this instruction?
25         MS. KOVSKY-APAP:  To the extent that it
```

```
 1              MICHAEL HALL
 2    would require him to disclose and I appreciate
 3    that --
 4         MR. HACKNEY:  I'm not -- I'm not
 5    telling him to disclose anything.
 6         MS. KOVSKY-APAP:  -- to the extent that
 7    the only source of his understanding is what he
 8    has been told in mediation, I believe that that is
 9    problematic and I would -- I would ask that he not
10    answer.
11         MR. HACKNEY:  Okay.
12  BY MR. HACKNEY:
13  Q.  So are you going to follow your counsel's
14    instruction?
15  A.  Yes, sir.
16  Q.  Okay.  So I take it, you will not tell me
17    anything -- anything that you have communicated
18    as part of the mediation, correct?
19  A.  Repeat the question.
20  Q.  You will not tell me any -- any communications
21    you've had as part of the mediation, correct?
22  A.  Correct.
23  Q.  And you will also not tell me any thoughts that
24    you've had as a result of the mediation; is that
25    correct?
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

MICHAEL HALL

2  A.  That's correct.
3  Q.  So to the extent I ask you about judgments that
4      you've drawn that -- that result in part from
5      communications in the mediation, you will not
6      tell them to me, correct?
7  A.  That's correct.
8  Q.  Okay.
9          MS. KOVSKY-APAP:  I would just like to
10     clarify, if what you are asking from him is his
11     judgment that he has drawn that is separate and
12     independent of information conveyed to him
13     directly in mediation, I think that's a separate
14     issue, but we want to be cautious and mindful of
15     the Court's instruction that the mediation order
16     is an order that is not waivable.
17         MR. HACKNEY:  Right, because the City
18     has been very scrupulous about observing the
19     mediation order and it just wants to continue that
20     track record of careful adherence to the terms of
21     the mediation order.
22         MS. KOVSKY-APAP:  I don't think
23     that requires a response.
24         MR. HACKNEY:  I guess my question to
25     you, Counsel, is to the extent that he has a

MICHAEL HALL

2      judgment that's based in part on things that were
3      told to him in the mediation, I take it, you will
4      also instruct him not to respond?
5          MS. KOVSKY-APAP:  If you want to ask
6      him his state of mind as to whether he is
7      optimistic about a particular outcome or something
8      to that effect, a state of mind, but you're asking
9      him factual information as to what the unions will
10     or will not do, and the only possible source of
11     that information would be the mediation process.
12         MR. HACKNEY:  But I just want to
13     clarify so I don't have to waste the witness's
14     time.  If his state of mind is impacted in part by
15     something he was told in the mediation process,
16     you will direct him not to answer the question,
17     correct?
18         MS. KOVSKY-APAP:  If he can separate
19     his own mental impressions and his own state of
20     mind from facts that were conveyed to him and
21     information that was conveyed to him in the
22     negotiations that took place under the scope of
23     the mediation order, then certainly, he can answer
24     to that extent.  But to the extent that answering
25     would effectively reveal what he learned in

MICHAEL HALL

2      mediation and what was covered by mediation, then
3      I don't really see how he can, if he can't -- if
4      he can't separate those.
5  BY MR. HACKNEY:
6  Q.  So let me go back, Mr. Hall, do you know what the
7      grand bargain is when I refer to the grand
8      bargain?
9  A.  The grand bargain?  Yes.
10 Q.  You know that's the term that's used to describe
11     the -- the deal where the art and the Art
12     Institute is conveyed to a public trust and there
13     are monies that come in that are -- that go into
14     the -- the pensions?
15 A.  Yes.
16 Q.  Going into your negotiations with the unions,
17     prior to communicating with them, was it your
18     assumption that the unions would withhold their
19     support for the grand bargain until they were
20     able to strike a collective bargaining agreement
21     with the City?
22 A.  I had no assumptions.
23 Q.  Okay.  So is your understanding with respect to
24     whether the unions will support the grand
25     bargain, you know, only after they've struck a

MICHAEL HALL

2      collective bargaining agreement, is that based
3      exclusively on things that were told to you by
4      the union negotiators?
5  A.  All those conversations have been in the mediation
6      process.
7  Q.  I understand that, but I just want to make sure
8      your understanding of what the unions will and
9      will not do when it comes to recommending the
10     grand bargain, that's based exclusively on things
11     you've learned in the mediation?
12 A.  Correct.
13 Q.  You are aware -- isn't it correct that there has
14     been no union that has come out publicly in
15     support of the grand bargain prior to reaching an
16     agreement in principle with the City:  isn't that
17     correct?
18 A.  I'm not sure.
19 Q.  Do you agree that the unions' support of the
20     grand bargain is important to getting their
21     members to vote in favor of the Plan of
22     Adjustment --
23         MS. KOVSKY-APAP:  Objection.
24 BY MR. HACKNEY:
25 Q.  -- based on your experience with these unions?

## Exhibit 6C

**July 14, 2014 G. Malhotra Deposition Transcript**

```
 1
 2        UNITED STATES BANKRUPTCY COURT
 3      FOR THE EASTERN DISTRICT OF MICHIGAN
 4              - - -
 5   In Re:              ) Chapter 9
 6
 7   City of Detroit, Michigan,  )
 8
 9      Debtor.           ) Hon. Steven Rhodes
10   _____
11
12
13
14       The videotaped deposition of GAURAV MALHOTRA
15   Taken at 51 Louisiana Avenue, N.E.
16   Washington, D.C.
17   Commencing at 9:09 a.m.
18   Tuesday, July 15, 2014
19   Before:  Gail L. Inghram Verbano
20   Registered Diplomate Reporter,
21   Certified Realtime Reporter,
22   Certified Shorthand Reporter-CA (No. 8635)
23
24
25
```

```
 1
 2   HEATHER J. HUBBARD, ESQ.
 3   WALLER LANSDEN DORTCH & DAVIS, LLP
 4   511 Union Street, Suite 2700
 5   Nashville, Tennessee 37219
 6       Appearing on behalf of U.S. Bank.
 7
 8
 9
10   SAM J. ALBERTS, ESQ.
11   DENTONS US, LLP
12   1301 K Street, N.W.
13   Suite 600, East Tower
14   Washington, D.C. 20005
15       Appearing on behalf of the Retiree Committee.
16
17
18
19   DOUGLAS G. SMITH, P.C.
20   KIRKLAND & ELLIS, LLP
21   300 North LaSalle
22   Chicago, Illinois 60654
23       Appearing on behalf of Syncora Guarantee, Inc.,
24       and Syncora Capital Assurance, Inc..
25
```

```
 1
 2   APPEARANCES:
 3
 4   RONALD A. KING, ESQ.
 5   FRANK J. GUADAGNINO, ESQ. (Pittsburgh Office)
 6   CLARK HILL, PLC
 7   212 East Grand River Avenue
 8   Lansing, Michigan 48906
 9       Appearing on behalf of the Retirement Systems
10       for the City of Detroit.
11
12
13
14   GEOFFREY S. STEWART, ESQ.,
15   CHRISTOPHER DiPOMPEO, ESQ.,
16   SARAH A. HUNGER, ESQ.
17   JONES DAY
18   51 Louisiana Avenue, N.W.
19   Washington, D.C. 20001
20       Appearing on behalf of the Debtor and the Witness.
21
22
23
24
25
```

```
 1
 2   KELLY DiBLASI, ESQ.
 3   WEIL, GOTSHAL & MANGES, LLP
 4   767 Fifth Avenue
 5   New York City, New York 10153
 6       Appearing on behalf of Financial Guaranty
 7       Insurance Company.
 8
 9
10
11   MICHAEL BHARGAVA, ESQ.
12   CHADBOURNE & PARKE, LLP
13   1200 New Hampshire Avenue, NW
14   Washington, D.C. 20036
15       Appearing on behalf of Creditor Assured
16       Guaranty.
17
18
19
20
21
22
23
24
25
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

1          MALHOTRA
2      A.  I would have to go back and look.  But
3  on the commercial and industrial, on the corporate
4  side it would be a high number.  But I do not know
5  specifically of the exact percentage collection.
6      Q.  You don't know what the percent
7  collection is for the individual income tax;
8  correct?
9      A.  Well, even the individual income tax has
10  different components between residents working in
11  the city, residents working out of the city and
12  nonresidents.  And I do not know off the top of my
13  head what the collection rate is for each one of
14  those components.
15      Q.  Do you know how many companies actually
16  pay the corporate tax?
17      A.  I do not.  It's -- I do not.
18      Q.  Do you know if there are -- do you have
19  any information about exceptions or reductions in
20  taxes available to corporations or other entities
21  within the City?
22      A.  There is the -- the renaissance zone,
23  but that's probably more in relation to property
24  taxes.  In terms of corporate income taxes, I'm
25  not aware of any specific incentives that would be

1          MALHOTRA
2  provided by the City.
3      Q.  What is the treatment of property taxes
4  within the renaissance zone?
5      A.  I believe that it is more in the context
6  of properties that are in the renaissance zone
7  will have a slightly different taxable value that
8  is associated with it versus the properties that
9  are not in the renaissance zone.  And that,
10  however, the properties in the renaissance zone
11  make up a small component of the overall total
12  properties and the total property taxes, but I
13  would have to look through the details to kind of
14  explain the exact structure.
15      Q.  The property tax in the renaissance
16  zone, is it lower?
17      A.  Well, I don't know if it's the rate or
18  the assessed values.  I would have to go back and
19  check how the mix is built up.
20      Q.  Do you agree that under your forecast,
21  over the course of the next 10 years, the City
22  will bring in billions of dollars of revenue?
23      A.  Over the next ten years, the City's
24  projections are about $11 billion in revenue.
25      Q.  Over the course of the next ten years,

1          MALHOTRA
2  the City will also have billions of dollars in
3  expenditures; correct?
4      A.  That would be consistent with what the
5  forecasts are, yes.
6      Q.  Do you have any understanding about what
7  the amount in terms of dollars is of the reduction
8  in the COPs claim under the plan?
9          MR. STEWART:  Objection -- pardon me.
10      Objection.
11          THE WITNESS:  Well, as a part of the
12      plan, the COPs claim is -- the claim is
13      roughly a billion four forty, and the
14      estimated recovery based on the assumptions
15      in the plan are roughly 10 percent.
16  BY MR. SMITH:
17      Q.  What are the most -- what are the key
18  assumptions of your forecast being modeled?
19      A.  They are -- they're -- we can walk
20  through each one of the line items in the key
21  assumptions there.
22      Q.  Well, how about I ask you this:  Are the
23  key assumptions of your forecasting model
24  reflected in your expert report?
25          And I'll hand you a copy of it in a

1          MALHOTRA
2  second, which I will mark as Exhibit 3.
3          (Exhibit Malhotra-3 was marked for
4      identification.)
5          THE WITNESS:  Could you please repeat
6      the question.
7  BY MR. SMITH:
8      Q.  I could just ask the question again.
9          Are the key assumptions in your model
10  reflected in your expert report, or are there some
11  key assumptions that are not in the report?
12      A.  If I may, I would say the majority of
13  the assumptions are in the expert report or have
14  been mentioned in the assumptions of the model
15  that are exhibits or -- to the expert report.
16  So . . .
17      Q.  Does your expert report contain a
18  complete and accurate account of your expert
19  opinions in this case?
20      A.  Yes.
21      Q.  Do you anticipate doing any further work
22  before the confirmation hearing?
23      A.  Further work on what?
24      Q.  On the forecasts or developing any other
25  opinions?

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

1                MALHOTRA
2      A.  If we reach more settlements, we will
3  update the forecast as those settlements come
4  along.
5      Q.  What settlements are in process that
6  you're talking about?
7          MR. STEWART:  Before you answer,
8      Mr. Malhotra, I just simply caution you to
9      remember that you're not permitted to the
10     judge's order to disclose anything that's
11     been going on in mediations.  Subject to
12     that, please answer the question.
13         THE WITNESS:  All right.  Thank you.
14     We're working on the Detroit Police
15     Officers Association and with the Detroit
16     Fire Fighters Association to hopefully wrap
17     up those negotiations.
18  BY MR. SMITH:
19     Q.  And what are specifically the issues
20  that you're trying to wrap up there?
21     A.  That's --
22         MR. STEWART:  Once again, please answer
23     with that same admonition about mediation.
24         THE WITNESS:  That's subject to
25     mediation.

1                MALHOTRA
2  BY MR. SMITH:
3      Q.  Okay.  Is there anything that's not
4  subject to mediation that you could talk about
5  relating to settlements in the works or not?  Or
6  is it all part of mediations?
7      A.  It's generally the discussions are part
8  of mediations.
9      Q.  Okay.  In your expert report you
10  mention -- on Page 1 you say you've forecasted
11  revenues and expenses for the City's general fund;
12  correct?
13     A.  That is correct.
14     Q.  You haven't attempted to forecast
15  revenues and expenses for the entire city;
16  correct?
17     A.  That is correct.
18     Q.  And if you look at -- why did you
19  perform a 40-year forecast?
20     A.  It was to get a longer-term view of the
21  liabilities that the City was signing up for in
22  terms of the various settlements to ascertain and
23  understand the City's ability to meet the
24  obligations that it was signing up to.
25     Q.  On Page 2 of your report in the middle,

1                MALHOTRA
2  you say that your projected revenues and
3  expenditures are reasonable forecasts.
4          Do you see that?
5      A.  Yes.
6      Q.  You'd acknowledge that other independent
7  experts could come up with reasonable forecasts
8  that differ from your forecast; correct?
9      A.  I don't know what other experts would
10  come up with.  It's up to them.
11     Q.  I know.  But my only question is, there
12  could be reasonable forecasts of the general
13  fund's revenues and expenditures that are
14  different from the forecasts you put together;
15  correct?
16     A.  I don't know about that.  I feel that
17  these are reasonable forecasts, and I can't talk
18  to what other forecasts would be reasonable or not
19  reasonable that are not generally the forecasts
20  that I have in front of me.
21     Q.  You're not taking the position that your
22  forecasts are the only reasonable forecasts of
23  general fund revenues and expenditures that could
24  be made; correct?
25     A.  I am taking the position that based on

1                MALHOTRA
2  the assumptions we have in here, these are the
3  forecasts that I -- I seem or deem as reasonable.
4  So I can't talk to what other forecasts may or may
5  not be reasonable unless I understand assumptions
6  and so on and so forth.
7      Q.  My only question is, is your forecast
8  the only reasonable forecast that's possible of
9  the general fund revenues and expenditures?
10     A.  I don't know.  I can talk to those
11  forecasts being reasonable.  I don't know whether
12  other forecasts are reasonable or not.
13     Q.  Over on Page 4 of your report, you
14  identify some of the experts that you're relying
15  on; correct?  Such as Mr. Cline and Ms. Sallee.
16     A.  That's correct.
17     Q.  Page 7 of your report at the bottom of
18  the page, you talk about the assumptions, some of
19  the assumptions that you made.  Do you see that?
20  There's a section called "Assumptions."
21     A.  That's correct.
22     Q.  And it would be fair to say that your
23  forecasts are based on a series of assumptions;
24  correct?
25     A.  Yes.

<u>**Exhibit 6D**</u>

**July 16, 2014 K. Buckfire Deposition Transcript**

1    KENNETH BUCKFIRE, VOLUME 2
2    IN THE UNITED STATES BANKRUPTCY COURT
3    FOR THE EASTERN DISTRICT OF MICHIGAN
4
5
6
7    In Re:            )   Chapter 9
8
9    CITY of DETROIT, MICHIGAN, )   Case No. 13-53846
10
11        Debtor.   )   Hon. Steven Rhodes
12    _____
13
14            VOLUME 2
15
16    The Videotaped Deposition of KENNETH BUCKFIRE,
17    a Rule 30(b)(6) witness,
18    Taken at 1114 Washington Boulevard,
19    Detroit, Michigan,
20    Commencing at 8:09 a.m.,
21    Wednesday, July 16, 2014,
22    Before Leisa M. Pastor, CSR-3500, RPR, CRR.
23
24
25

1        KENNETH BUCKFIRE, VOLUME 2
2    APPEARANCES:
3
4    THOMAS F. CULLEN, JR., ESQ.
5    Jones Day
6    51 Louisiana Avenue, N.W.
7    Washington, D.C. 20001
8        Appearing on behalf of the Debtor.
9
10
11
12    CORINNE BALL, ESQ.,
13    BENJAMIN ROSENBLUM, ESQ.
14    Jones Day
15    222 East 41st Street
16    New York, New York 10017
17        Appearing on behalf of the Debtor.
18
19
20
21
22
23
24
25

1        KENNETH BUCKFIRE, VOLUME 2
2
3
4    CLAUDE D. MONTGOMERY, ESQ.
5    Dentons US LLP
6    1221 Avenue of the Americas
7    New York, New York 10020
8        Appearing on behalf of the Retirement Committee.
9
10
11
12    JENNIFER K. GREEN, ESQ.
13    Clark Hill, PLC
14    500 Woodward Avenue, Suite 3500
15    Detroit, Michigan 48226
16        Appearing on behalf of the Retirement Systems for the
17        City of Detroit.
18
19
20
21
22
23
24
25

1        KENNETH BUCKFIRE, VOLUME 2
2    ROBIN D. BALL, ESQ.
3    Chadbourne & Parke, LLP
4    350 South Grand Avenue, 32nd Floor
5    Los Angeles, California 90071
6        Appearing on behalf of Assured Guaranty Municipal
7        Corporation.
8
9
10
11    GUY S. NEAL, ESQ.
12    Sidley Austin, LLP
13    1501 K Street, N.W.
14    Washington, D.C. 20005
15        Appearing on behalf of National Public Financing.
16
17
18
19
20
21
22
23
24
25

Pages 1 to 4

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-swr   Doc 8754-10   Filed 12/15/14   Entered 12/15/14 24:31:42   Page 36 of 70

KENNETH BUCKFIRE, VOLUME 2

2  possible level despite the fact that the underfunding
3  of the plan was growing, not shrinking, and because of
4  that low contribution rate, DWSD, even though it had
5  the ability to fund at a higher level, because DWSD
6  had the ability to charge through the ratepayers their
7  appropriate expenses, was benefitting from the City's
8  own financial difficulties in a perverse way.
9  Q.  Was the contribution to the DWSD in these prior years
10    addressing any underfunding, was that calculated by
11    the City's actuaries?
12  A.  I believe so.
13  Q.  Do you know whether the City's actuaries were in
14    agreement with the amounts that were being contributed
15    by the City and or DWSD with respect to any
16    underfunding?
17  A.  My understanding was the minimum possible contribution
18    is what they were contributing.
19  Q.  All right, when you say minimum possible, minimum
20    compared to what?
21  A.  In pensions, whether they're corporate or public,
22    you're supposed to maintain them at a reasonable level
23    of funding so that you can meet your obligations as
24    they come due.
25         In the corporate world, we normally assume

KENNETH BUCKFIRE, VOLUME 2

2  that a plan that's funded 80 percent or more is
3  adequately funded.  A plan under 80 percent clearly
4  has issues because you're not contributing enough to
5  make up for the benefit expenses of that plan.
6         In the case of the Detroit plans, it was
7  clear after our initial analysis that they were
8  grossly underfunded, which implies that the pension
9  contribution rates were too low to provide adequate
10  resources of the pension plans to meet future benefit
11  costs.
12  Q.  Just so I'm clear, you're not an actuary --
13  A.  I am not.
14  Q.  -- correct?  And you're not providing an expert
15    opinion as an actuary in this case, are you?
16  A.  I'm not.
17  Q.  And you're not providing any opinion in this case as
18    to the adequacy or inadequacy of the funding of the
19    plan: is that right?
20  A.  Only to the extent that it's a fact that the plans
21    were severely underfunded and we reported that fact in
22    June of 2013.
23  Q.  There are a lot of plans out there that are
24    underfunded in the general commercial world: are there
25    not?

KENNETH BUCKFIRE, VOLUME 2

2  A.  No.
3  Q.  There are certainly some?
4  A.  There are always some.
5  Q.  This isn't the only one.
6  A.  This is not a commercial plan; it's a public plan.
7  Q.  There may be public plans that are underfunded out
8    there, as well?
9  A.  There are many worse than this one.  I'll be calling
10    them next.
11  Q.  Who determined the amount of these payments that will
12    be made by the DWSD to the pension plan?
13  A.  It was determined in a negotiation with the pension
14    fund and trustees, the retirees' committee, supported
15    by the City's own actuaries, consultants to the City,
16    and experts at Jones Day.
17  Q.  You say they were supported by actuaries to the City:
18    what do you mean by that?
19  A.  Well, the calculation of how much to contribute to get
20    to a target level of funding is something that an
21    actuary is typically employed to do.
22  Q.  Okay.  And my question isn't so much that as to
23    whether the amount of payment gets you to where you
24    want to get.  My question is who determined that it
25    would be paid over the period that it was -- that it's

KENNETH BUCKFIRE, VOLUME 2

2  being paid?
3  A.  It was negotiated.
4  Q.  All right.  It wasn't something that was recommended
5    by the City's actuaries; is that correct?
6  A.  No.
7  Q.  No, it was not?
8  A.  It was not.
9  Q.  In connection with this negotiation, was it also
10    determined that the City would not be contributing to
11    the -- the reduction of the underfunding through 2023?
12         MR. CULLEN:  Objection, I think we're
13    getting into the negotiations under the mediation
14    privilege, now we're getting into the terms of the
15    negotiation.  He was able to tell you that this was a
16    product of a negotiation.  Now you're asking him to
17    parse the negotiation, and that's beyond the pale.
18         MR. WEISBERG:  Not agreeing with it, but
19    we'll move on.
20         MR. CULLEN:  Okay.
21  BY MR. WEISBERG:
22  Q.  To what extent was -- were you or and/or Miller
23    Buckfire involved in connection with the underlying
24    assumptions that were used in order to calculate the
25    UAAL in connection with the plan of adjustment?

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 8759-10  Filed 12/15/14  Entered 12/15/14 21:34:42  Page 37 of 70
13-53846-swr  Doc 6579-10  Filed 08/22/14  Entered 08/22/14 16:31:42  Page 9 of 4

KENNETH BUCKFIRE, VOLUME 2

2    MR. CULLEN: I would just note for counsel
3    that you can answer -- ask the question, but on the
4    derivation of the -- what's been called the 428
5    figure, Mr. Moore was designated as the 30(b)6
6    witness.
7         MR. WEISBERG: Okay, and I'm not suggesting
8    that Mr. Buckfire wasn't so designated.
9    BY MR. WEISBERG:
10   Q.  I'm just asking you if you were involved in that
11       determination?
12   **A.  No.**
13   Q.  You are with Miller Buckfire?
14   **A.  Correct.**
15   Q.  And in paragraph 3 of your expert report -- and you
16       can refer to that.  You indicate that in the third --
17       third sentence starting with in addition, it says in
18       addition to other obligations, the City will have
19       addressed and brought greater certainty and
20       predictability with respect to its pension benefit and
21       OPEB obligations; do you see that?
22   **A.  I do.**
23   Q.  Okay, can you tell me what that means?
24   **A.  I answered this question yesterday.**
25   Q.  I'm sorry, I apologize.  I might have missed

KENNETH BUCKFIRE, VOLUME 2

2    something.  Could you give it to me again?
3    **A.  The City by action of the plan of adjustment is**
4    **eliminating $7 billion worth of present value of**
5    **liabilities, most of which was represented by unfunded**
6    **pension and healthcare benefit costs.  The burden of**
7    **those costs upon the City have been that the**
8    **requirement to fund them currently with substantial**
9    **cash has often been outside of the City's control, as**
10   **it's been driven by independent factors, healthcare**
11   **plans, benefit costs, pension contribution levels.**
12       **By eliminating such a large amount of the**
13   **present value and converting the balance of these**
14   **remaining claims into a debt obligation stream**
15   **represented by the contribution by DWSD for catchup**
16   **and also by the series B notes, the City will have**
17   **much greater control over it's discretionary costs and**
18   **its ability to meet its remaining contractual**
19   **obligations due.**
20   Q.  Well, okay, I certainly agree with you with respect to
21       through the years, the year 2023 that said you will
22       have virtually no obligation to pay in connection with
23       2023, correct?
24   **A.  Correct, that was an objective of our plan.**
25   Q.  So that's certainly predictable.  But what about with

KENNETH BUCKFIRE, VOLUME 2

2    respect to post-2023; is that as predictable?
3    **A.  Ten years, twenty years, anyone's guess.**
4    Q.  Okay.  All right.  It also indicates here that in that
5       same paragraph, it says that the fact that such
6       obligations are driven by actuarial analyses and
7       assumptions, such obligations have traditionally
8       served as a significant obstacle in the City's
9       financial planning effort.
10      So I'm trying to connect up those two
11      concepts.  What -- what is the connection between the
12      fact that these pension obligations are driven by
13      actuarial analyses and the fact that they create an
14      obstacle to the City's financial planning?
15   **A.  I already answered that question.  Actuarial**
16   **assumptions --**
17   Q.  Indulge me, it's been a long two days.
18   **A.  Actuarial assumptions and analysis ultimately do drive**
19   **required pension contribution costs.  There's a cash**
20   **cost associated with being required by an actuary to**
21   **make certain contributions.  That is inherently**
22   **unpredictable because it does change relative to**
23   **market asset performance and benefit costs,**
24   **themselves.  It's not something directly within the**
25   **City's control, and the larger the underfunding is,**

KENNETH BUCKFIRE, VOLUME 2

2    the more of a projected burden that will be on the
3    City because at some point, that gap has to be closed,
4    and that makes it very difficult for a City to make
5    long-term financial plans knowing that at some point
6    in the next 10 or 20 years, it will have to satisfy
7    its pension obligations whether or not it has the
8    assets to do so.
9    Q.  There's an actuarial component to what it's going to
10       have to pay down the road; is there not?
11   **A.  There is when you estimate today what your**
12   **contribution has to be to the pension fund but the**
13   **actual benefit costs, themselves, is something you**
14   **find out every year when people retire and register**
15   **for their claimant payments.  So we're talking about**
16   **the funding problem -- the funding problem, not the**
17   **benefit cost problem that drives this.**
18       **I also note your earlier point that the**
19   **ten-year period of stability is crucial because we do**
20   **assume and we have every right to do so that the**
21   **City's ability to revitalize itself be successful and,**
22   **therefore, will have the ability to be a healthy**
23   **viable City beyond year ten, which means from a**
24   **capital market's perspective, the expectation should**
25   **be that it will have no difficulty raising capital**

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 8757-4  Filed 12/15/14  Entered 12/15/14 21:31:42  Page 38 of 70
13-53846-swr  Doc 6579-10  Filed 08/22/14  Entered 08/22/14 16:31:42  Page 4 of 4

# Exhibit 6E

**July 22, 2014 K. Orr Deposition Transcript**

```
1              KEVYN ORR, VOLUME 2
2     IN THE UNITED STATES BANKRUPTCY COURT
3     FOR THE EASTERN DISTRICT OF MICHIGAN
4
5
6
7     In Re:          )   Chapter 9
8
9     CITY of DETROIT, MICHIGAN, )   Case No. 13-53846
10
11        Debtor.   )   Hon. Steven Rhodes
12     _____
13
14              VOLUME 2
15
16     The Videotaped Deposition of KEVYN ORR,
17     in his personal capacity and as Rule 30(b)(6) witness,
18     Taken at 2 Woodward Avenue,
19     Detroit, Michigan,
20     Commencing at 9:10 a.m.,
21     Tuesday, July 22, 2014,
22     Before Leisa M. Pastor, CSR-3500, RPR, CRR.
23
24
25
```

```
1              KEVYN ORR, VOLUME 2
2     APPEARANCES:
3
4     GREGORY M. SHUMAKER, ESQ.,
5     DAN T. MOSS, ESQ.
6     Jones Day
7     51 Louisiana Avenue, N.W.
8     Washington, D.C. 20001
9        Appearing on behalf of the Debtor.
10
11
12
13
14     ROBERT HERTZBERG, ESQ.
15     Pepper Hamilton, LLP
16     4000 Town Center, Suite 1800
17     Southfield, Michigan 48075
18        Appearing on behalf of Debtor.
19
20
21
22
23
24
25
```

```
1              KEVYN ORR, VOLUME 2
2     STEPHEN C. HACKNEY, ESQ.
3     Kirkland & Ellis, LLP
4     300 North Lasalle Street
5     Chicago, Illinois 60654
6        Appearing on behalf of Syncora.
7
8
9
10     JEFFREY BEELAERT, ESQ.
11     Sidley Austin, LLP
12     1501 K Street, N.W.
13     Washington, D.C. 20005
14        Appearing on behalf of National Public Financing.
15
16
17
18     ERNEST J. ESSAD, JR., ESQ.
19     Williams, Williams, Rattner & Plunkett, P.C.
20     380 North Old Woodward Avenue, Suite 300
21     Birmingham, Michigan 48009
22        Appearing on behalf of Financial Guaranty Insurance
23        Company.
24
25
```

```
1              KEVYN ORR, VOLUME 2
2     ALFREDO R. PEREZ, ESQ.
3     Weil, Gotshal & Manges, LLP
4     700 Louisiana Street, Suite 1700
5     Houston, Texas 77002
6        Appearing on behalf of Financial Guaranty Insurance
7        Company.
8
9
10
11     LISA SCHAPIRA, ESQ.
12     Chadbourne & Parke, LLP
13     30 Rockefeller Plaza
14     New York, New York 10112
15        Appearing on behalf of Assured Guaranty Municipal
16        Corporation.
17
18
19
20
21
22
23
24
25
```

Pages 162 to 165

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-swr   Doc 8754-11   Filed 12/15/14   Entered 12/15/14 21:24:42   Page 40 of 70

KEVYN ORR, VOLUME 2

1  it's fair to say that they built on a lot of the other
2  work that had been done in the prior almost year and a
3  half.
4  Q.  That may be true, but you agree that they had a huge
5  amount of work to do in a short period of time.
6       MR. SHUMAKER:  Object to form.
7  A.  Yeah, I think that he had -- you know, the adjectives
8  can change.  I think they had a significant amount of
9  work to do, but I think they built on a lot of work
10  that had already been done.
11  BY MR. HACKNEY:
12  Q.  And you agree they had a relatively short period of
13  time to do it?
14  A.  Relative -- and this is why I'm trying to relay the
15  time frame.  If you go back to 2011 and this is all a
16  continuum of time, then no, that's not accurate.  If
17  you talk about solely from the formal retention of
18  Conway MacKenzie till June, depending upon the amount
19  of work that they had to do, I want to be very careful
20  not to follow your characterization because the
21  reality may be some of the work that they did was an
22  extrapolation of work that had already been done.
23  Q.  If Chuck Moore testified that Conway MacKenzie was
24  drinking from a fire hose, would you have a basis to

KEVYN ORR, VOLUME 2

1  disagree with that characterization?
2  A.  No.
3       MR. SHUMAKER:  Object to form.
4  A.  No, I think we all were.
5  BY MR. HACKNEY:
6  Q.  Okay, what -- isn't it true that you negotiated the
7  first swaps agreement in a two-week period in early
8  June of 2013?
9  A.  Yes, I think that's fair.
10  Q.  Okay.  That was the one where you agreed to pay
11  something in the neighborhood of $265 million,
12  correct?
13  A.  Yeah, I -- I think that's about the right amount.
14  Q.  Mr. Orr, do you agree that the bankruptcy and your
15  appointment as emergency manager represent an historic
16  opportunity for the City to revitalize itself?
17  A.  Yeah, I think that's fair.
18  Q.  Now, when the City went into bankruptcy, it had 13
19  units in 47 total bargaining -- 13 unions and 47 total
20  bargaining unions -- units; is that correct?
21  A.  Well, if you count the subunions and locals, it was
22  significantly more than that, but that's -- that's
23  approximately correct.
24  Q.  Okay, and that's how many it will have when it comes

KEVYN ORR, VOLUME 2

1  out, correct?
2  A.  Roughly the same, yes.
3  Q.  You have not altered the City charter; isn't that
4  correct?
5  A.  I cannot alter the City charter.
6  Q.  Okay, and the City does not have any specific proposed
7  changes to the City charter that are to be implemented
8  in the near term, correct?
9  A.  Well, two things.  The charter reformed process is
10  extensive and expensive, the charter was just reformed
11  in 2012, so that's difficult.  The statute does -- 436
12  does provide me with the opportunity to recommend
13  either charter reforms or adoption of model charter
14  provisions, which we may do.
15  Q.  Okay, you haven't as you sit here today, correct?
16  A.  I can't, I can't make any charter changes.
17  Q.  But you haven't made any proposed changes, correct?
18       MR. SHUMAKER:  Object to the form.
19  BY MR. HACKNEY:
20  Q.  You haven't proposed any changes?
21  A.  I haven't formally proposed any changes.
22  Q.  Okay, you haven't are disclosed to creditors your
23  proposed changes?
24  A.  That is true, yes, mm-hmm.

KEVYN ORR, VOLUME 2

1  Q.  Okay, and you're not aware of any other proposed
2  changes to the City charter that have been made public
3  to the creditors?
4  A.  Yes, I think that's true.
5  Q.  At the outset of the bankruptcy you believe that a
6  regional water authority was in the best interests of
7  the City and the DWSD's customers, correct?
8  A.  Yes.
9  Q.  As things stand today, you have not been able to
10  achieve that goal; isn't that correct?
11  A.  As things stands today, yes, that's correct.
12  Q.  Okay.  And you have not had sufficient time to reach
13  agreement on a regional water authority; is that a
14  fair statement?
15  A.  The -- I continue to believe that a regional water
16  authority is in the best interests of the City and its
17  customers, including the Counties.  The issues
18  regarding those negotiations are involved in
19  mediation, so I want to be very careful --
20  Q.  Yeah.
21  A.  -- about where things -- but I think it is fair to say
22  that as it stands here today we have not reached
23  agreement on a regional water authority.
24  Q.  You don't have to tell me what the discussions are at

Pages 182 to 185

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 8754-11   Filed 12/15/14   Entered 12/15/14 21:31:42   Page 41 of 70
13-53846-swr   Doc 6574-11   Filed 08/22/14   Entered 08/22/14 16:21:42   Page 9 of 9

1          KEVYN ORR, VOLUME 2
2    a specific level and I think you can't under the
3    mediation order --
4    **A.   Right.**
5    Q.   -- but is it fair to say that the -- that the concept
6    of a regional authority is currently the subject of
7    mediation and explains why you can't talk about it?
8            MR. SHUMAKER:  I think that gets into the
9    content of the mediation and, therefore, I think falls
10   within the mediation --
11           MR. HACKNEY:  I mean, I think that any --
12   any fair privilege invocation, which is what the
13   mediation order is like, typically involves a
14   disclosure of the general subject matter of the
15   mediation without the specific communications.
16           MR. SHUMAKER:  Well, the question is
17   whether that's the only topic of the mediation or that
18   there are other alternatives.  If -- if, for example,
19   that was the only thing going on, that would perhaps
20   reveal too much.  You could -- you could say --
21           MR. HACKNEY:  Okay.
22           MR. SHUMAKER:  -- what different
23   alternatives are being considered.
24   BY MR. HACKNEY:
25   Q.   That's fine.  What different alternatives are being

1          KEVYN ORR, VOLUME 2
2    considered or being negotiated?
3    **A.   Let me be clear.  We -- we have -- there is a common**
4    **interest privilege between my office and the City and**
5    **the State.  There is the August 13th, 2013 order by**
6    **Judge Rhodes's mediation.  There is an April 7th, 2013**
7    **order appointing Judge Sean Cox as the mediator, and**
8    **paragraph 4 of that order specifically obligates me to**
9    **keep those discussions confidential.  And so I want to**
10   **state very clearly I intend to observe the**
11   **confidentiality, and the judge has since admonished**
12   **all parties to make sure they observe confidentiality**
13   **within those orders.**
14   **     That being said, I think what I can say is**
15   **that the concept of a regional water authority and**
16   **discussions have been fairly widely reported in the**
17   **press, and so I have no reason to disagree.  Those**
18   **reports, while they may be inaccurate, I have no**
19   **reason to disagree with the subject matter of those**
20   **reports.**
21   Q.   Do you remember that the prior theory around a
22   regional water authority was that it might both
23   improve governance and unlock a payment stream for the
24   City, correct?  That was what was disclosed in the
25   June 2013 proposal to creditors?

1          KEVYN ORR, VOLUME 2
2    **A.   I think that's fair.**
3    Q.   Okay.
4    **A.   Mm-hmm.**
5    Q.   Does that remain a possibility as you stand here today
6    that the plan may include a regional water authority
7    that does those two things?
8    **A.   I think I need to be a little careful on those issues.**
9    Q.   Okay.
10   **A.   So I'm going to defer from answering that question.**
11   Q.   Okay.  On the grounds of the mediation order or --
12   **A.   Yes.**
13   Q.   Okay.  So you don't know or you can't answer?
14   **A.   I can't answer.**
15   Q.   Okay.  You do know the answer to the question?
16   **A.   Yes.**
17   Q.   But you cannot provide the answer?
18   **A.   Yes.**
19   Q.   Okay.  Now, isn't it true there has been no reduction
20   in the number of City departments from the time the
21   City went into bankruptcy to when it will come out,
22   correct?
23   **A.   I think that's true.**
24   Q.   There has been no reduction in the number of City
25   employees, correct?

1          KEVYN ORR, VOLUME 2
2    **A.   No, that is untrue.**
3    Q.   Okay, the number of City employees has gone down?
4    **A.   Yes.**
5    Q.   Isn't it true that the plan anticipates that the City
6    will increase the total number of City employees as
7    compared to the level when it filed for bankruptcy?
8    **A.   You -- generally speaking, that's true.  There are**
9    **aspects in the plan that are speaking about optimum**
10   **staffing levels that may not have taken into account**
11   **the reduction of force, but generally that's true.**
12   Q.   Okay.  Just to put it in plain English, the -- if the
13   plan is confirmed and the restructuring and
14   reinvestment initiatives are implemented as
15   anticipated, the City will have more employees
16   postconfirmation than it had when it went into
17   bankruptcy, correct?
18   **A.   I'm not sure that's accurate.  I'd have to go back and**
19   **look at the numbers.**
20   Q.   Okay.
21   **A.   Okay.**
22   Q.   So --
23   **A.   I'm just not sure that's an accurate -- I have no**
24   **reason to believe that's an inaccurate statement.**
25   Q.   Well, that's okay, I'm not trying to sharp shoot you.

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

KEVYN ORR, VOLUME 2

1
2    A.   Yes, I think Mr. Buckfire is an expert in that area.
3    Q.   And in this subject matter we're discussing of likely
4         rates of return, likely levels of risk, would you tend
5         to defer to him in terms of his view?
6    A.   I would certainly solicit his view.  His view is very
7         informed and very capable, but having been in the City
8         now for over a year, I certainly want to be
9         informed but ultimately it's -- I'd have to make a
10        call of keeping my own counsel.
11   Q.   Would you agree that lenders are tripping over
12        themselves to lend the City money?
13             MR. SHUMAKER:  Object to the form.
14   A.   I think we've had -- you know, every time I use a
15        literation (sic) or metaphor, you quote it back to me,
16        so I'm going to say that I think we've had a healthy
17        amount of interest, and some people might well
18        characterize that as tripping over themselves.
19   BY MR. HACKNEY:
20   Q.   And there's a great deal of enthusiasm that you're
21        finding from both investors and lenders, correct?
22   A.   That appears to be the case.
23   Q.   And that's based on the substantial deleveraging that
24        the City's achieving through this plan, correct?
25   A.   I think that --

KEVYN ORR, VOLUME 2

1
2    Q.   In part?
3    A.   I think that is fair.
4    Q.   You know, Mr. Orr, I've reached a good stopping point,
5         I think.
6             MR. SHUMAKER:  Sure.
7             MR. HACKNEY:  There's a lot of people in
8         the room, but I kind of defer to you.
9             THE WITNESS:  No, I'm good, but if you guys
10        think that makes sense, we have a thing that we need
11        to do.
12             MR. HACKNEY:  What time?
13             MR. HERTZBERG:  At 1:15 for 5 minutes.
14             THE WITNESS:  Okay.
15             MR. HACKNEY:  That will be perfect then,
16        we'll take an hour for lunch, and then I'll see you at
17        1:30.
18             THE WITNESS:  Okay.
19             VIDEO TECHNICIAN:  The time is now 12:31
20        p.m., we are now off the record.
21             (Recess taken at 12:31 p.m.)
22             (Back on the record at 1:36 p.m.)
23             VIDEO TECHNICIAN:  The time is 1:36 p.m.,
24        we are back on the record.
25   BY MR. HACKNEY:

KEVYN ORR, VOLUME 2

1
2    Q.   Mr. Orr, welcome back from lunch.
3    A.   Thank you, Mr. Hackney.
4    Q.   Okay.  So Mr. Orr, you're aware that certain
5         charitable foundations have agreed to contributed
6         money to the City's pension obligations in exchange
7         for the City conveying its art collection into a
8         public trust; is that correct?
9    A.   Yes.
10   Q.   And I take it if I ask you questions about your
11        communications with the charitable foundations in
12        connection with their agreement to contribute this
13        money, you will refuse to answer on the grounds of the
14        mediation order's confidentiality provisions; is that
15        correct?
16   A.   Yes, generally for most of them, I think that's
17        correct.
18   Q.   And just for the record, you didn't have any such
19        conversations prior to the entry of the mediation
20        order which was at some point in September of 2013?
21   A.   Yes, that's correct.
22   Q.   Okay.
23   A.   Well, let me think.  I think I had one meeting with
24        Darren Walker at Ford Foundation, but it was not about
25        a contribution, it was just a meet and greet.

KEVYN ORR, VOLUME 2

1
2    Q.   Okay.
3    A.   Okay?
4    Q.   Yeah, I saw that in the documents, and there were some
5         issues about the Ford Foundation and the building that
6         they owned or something that --
7    A.   I didn't even get into all that.
8    Q.   Okay.
9    A.   It was just hi, how are you, they were helping us with
10        some grants, helping us stand up a grants
11        administrator.
12   Q.   So I guess I want to make a record of something I
13        understand from the City's position but it is the
14        City's position that communications with the
15        foundation are either part of or incidental to the
16        mediation, correct?
17             MR. SHUMAKER:  I believe that's correct.
18        Again, I think you could fish outside the contours of
19        those mediation talks but my understanding is that all
20        those talks were within the context of mediation.
21   BY MR. HACKNEY:
22   Q.   Yeah, I mean, I don't want to ask a hundred questions
23        today to establish what I think is relatively well
24        established, which is that you're not, generally
25        speaking, going to discuss your conversations with the

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

1    KEVYN ORR, VOLUME 2
2  foundations, correct?
3  **A.  That is correct.  You know, I may -- let me say this**
4     **generally.  I may have had meetings with foundation**
5     **principals outside of the confines of the mediation,**
6     **just hail-fellow-well-met, saw them at an event, how**
7     **are you.  There were no substantive conversations**
8     **about the contribution that did not occur outside of**
9     **the mediation order.**
10 Q.  And that's fine, because the only ones that I really
11    want to ask you about are ones that relate to the
12    Grand Bargain?
13 **A.  Right, right.**
14 Q.  And those would fall under the gambit of the
15    mediation?
16 **A.  Those would fall under the gambit of mediation.**
17 Q.  Now, if I asked you your state of mind based on what
18    you understood the foundations to be willing to do or
19    what you thought they would be willing to do, you
20    would also invoke the mediation order to the extent
21    his state of mind was created by communications of the
22    foundation, correct?
23       MR. SHUMAKER:  I think that's right because
24    I don't see how he could give you his impressions or
25    his understanding without going into what was going on

1    KEVYN ORR, VOLUME 2
2  in the mediation.
3       MR. HACKNEY:  Right, because he lacks
4    foundation to speak to what the foundations thought.
5    If I asked him what he understood them to have
6    thought, you'll take the position that it would be
7    based on what they told him?
8       MR. SHUMAKER:  Correct, it all would have
9    been derived from the mediation discussions.
10      MR. HACKNEY:  Okay, and I'll just note
11    for the record, Mr. Shumaker, that this is the
12    position that Ms. Kofsky (ph.), a cop, took in a prior
13    deposition, and I understand the basis for it.  I will
14    let you know that I don't necessarily agree with it
15    based on comments that Judge Rhodes made about how
16    state of mind might work in the mediation context, but
17    it doesn't matter because I feel like we're not going
18    to work that out today anyway.
19      MR. SHUMAKER:  Understood.
20 BY MR. HACKNEY:
21 Q.  And I just want to understand you all's position on
22    it.  So just a couple big ones, if I ask you did you
23    ever ask the foundations to contribute money with no
24    strings attached you'll decline to ask answer that
25    question, correct?

1    KEVYN ORR, VOLUME 2
2  **A.  I think I have to.**
3  Q.  If I ask you did the foundations ever offer to
4     contribute money without insisting on transfer of the
5     art institute, you'll decline to answer that question,
6     correct?
7  **A.  I think I have to.**
8  Q.  And if I ask you hey, who is it that imposed the
9     condition on the Grand Bargain that the art institute
10    would be transferred, was it you, or was it them, or
11    was it Judge Rosen, you'll decline to answer those
12    questions, correct?
13 **A.  I believe so.**
14 Q.  Mr. Orr, has the Grand Bargain -- which you know what
15    I'm talking about, right?
16 **A.  Yes, the money we talked about before, the 366 million**
17    **from the foundations, a $350 million value settlement**
18    **from the State, and $100 million from the DIA**
19    **benefactors as funneled through the Founders' Society.**
20 Q.  Correct, in exchange for the art -- in connection with
21    the art being -- the DIA being conveyed into a public
22    trust, correct?
23 **A.  Contributions targeted towards the two pension funds**
24    **with the condition that not one piece of art be sold**
25    **or de-assessed as a result of this process.**

1    KEVYN ORR, VOLUME 2
2  Q.  And the purpose of the transfer to a public trust is
3     to ensure that the art is never sold to satisfy the
4     claims of the City's creditors, correct?
5  **A.  Yes, now and forever, yes.**
6  Q.  Not only current creditors but future ones, as well?
7  **A.  Correct.**
8  Q.  So has the Grand Bargain, Mr. Orr, helped the COPs
9     holders to achieve a higher recovery?
10 **A.  I don't think so.**
11 Q.  Mr. Orr, what are the principal terms of the LTGO
12    settlement?
13 **A.  The LTGO settlement centers around a dedicated millage**
14    **that's to extend for the next approximately 13 years,**
15    **and the terms of a settlement that roughly 26**
16    **percent -- oh, the LTGO, I'm sorry --**
17 Q.  Yeah.
18 **A.  Okay, I'm sorry, I'm going -- I thought you were just**
19    **talking about -- I'm doing it temporally --**
20 Q.  That's okay.
21 **A.  I'm sorry.**
22 Q.  I'm hopping around.
23 **A.  Okay.**
24 Q.  Let's start over.
25 **A.  Let's start over.**

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

KEVYN ORR, VOLUME 2

1
2  subject -- it was one of the drivers of our motion to
3  continue, but in fairness like I really may need to
4  come back and re-depose you on this when it's been
5  public for at least some period of time because it was
6  in flux.
7  A.  Let me say this, like I said, whatever's public I have
8     no reason to believe whatever's been made public is
9     inaccurate, but I do know that they're continuing
10    discussions regarding details of the settlement, so I
11    just want to be very careful.
12 Q.  And you're also -- fair to say you're unwilling to say
13    that the 55 million I alluded to represents the full
14    amount of what they're getting, correct?
15 A.  I have no reason to believe that's not -- there is
16    anything in addition to what you may have heard
17    economically.
18 Q.  Okay.  But are they only getting 55 million or not?
19 A.  I have no reason to believe there's anything more than
20    that.
21 Q.  Okay.  Well --
22 A.  Based upon published reports.
23 Q.  What is the basis for paying the LTGO 34 cents and
24    paying COPs holders 10 cents?
25 A.  Now, I do think we are getting into the mediation

KEVYN ORR, VOLUME 2

1
2  order.
3  Q.  Okay, so you're -- you'll decline to answer questions
4     about your basis for discriminating between those two
5     classes?
6  A.  I think I have to.
7  Q.  Okay.
8         MR. SHUMAKER:  Well, you don't have to --
9     you don't have to reveal the terms of the settlement.
10        THE WITNESS:  Right.
11        MR. SHUMAKER:  But I think you could talk
12    in abstract, in the abstract about comparing the LTGO
13    settlement with the COPs holders, which I think is
14    what Mr. Hackney is getting at.
15 A.  Well, let's do this, see if I can talk about it
16    generally and I'll try to just step it as we go
17    through it to see.  I mean, I think it's fair to say
18    that that is a result of a negotiated solution in the
19    mediation process.  I think it's fair to say there was
20    some give and take between the parties as to what
21    potential claim was.  I think it's been reported that
22    there was an argument made that that particular class
23    of creditors had a different status than just general
24    unsecured, and that that status should have some level
25    of recognition.  I think that's about all I can say.

KEVYN ORR, VOLUME 2

1
2  BY MR. HACKNEY:
3  Q.  Okay, you do agree that the City has classified the
4     LTGO creditors as general unsecured?
5  A.  I believe that's our last classification, yes.
6  Q.  Okay, and that's the same classification as the COPs
7     holders?
8  A.  Yes.
9  Q.  And you also agree that the LTGO bondholders are
10    financial creditors like the COPs holders?
11 A.  Yes, I believe there's financial creditors as opposed
12    to pensioners, for instance, yes.
13 Q.  Right, and in fact, many of them have monoline
14    insurers standing behind the bond, correct?
15 A.  Yes.
16 Q.  So you would agree there are a lot of similarities
17    between the COP holder and the LTGO correct?
18 A.  There are a lot of perhaps superficial similarities
19    but I think the allegations that have been made
20    against the COP holders in the litigation raise other
21    dissimilarities between them.
22 Q.  And you're talking about the invalidity suit?
23 A.  Yes.
24 Q.  Okay, and you understand that the way the plan works
25    is that the -- a reserve is set up for the COP holders

KEVYN ORR, VOLUME 2

1
2  that represents what their total recovery could be?
3  A.  Yes.
4  Q.  And that's what their total recovery could be if they
5     prevail in the invalidity suit, correct?
6  A.  Yes, a reserve over a period of time as opposed to a
7     hundred-and-X-million dollars of cash, yes.
8  Q.  Yeah.  Well, it's actually a bunch of B notes that go
9     into the reserve.
10 A.  That's what I said time, time wise, yes.
11 Q.  Okay, yeah.  Now, are you aware of any other basis to
12    distinguish the LTGO from the COPs other than the
13    potential invalidity of the COPs and this argument
14    that the LTGO have made that they are not an unsecured
15    creditor?
16 A.  Am I aware?
17 Q.  Yeah.
18        THE WITNESS:  Am I aware?
19 BY MR. HACKNEY:
20 Q.  Or do you have any other basis for discriminating
21    other than those two things?
22        MR. SHUMAKER:  I think you can answer that.
23 A.  Yes.
24 BY MR. HACKNEY:
25 Q.  What is it?

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 8757-11  Filed 12/15/14  Entered 12/15/14 21:24:42  Page 45 of 70
13-53846-swr  Doc 6579-1  Filed 08/22/14  Entered 08/22/14 16:21:42  Page 7 of 9

KEVYN ORR, VOLUME 2

1
2  A.  I think that's caught up in the mediation.
3  Q.  I'm not sure how that could be.
4  A.  Well, as I think I've said, there were negotiations,
5      there were positions taken.  The awareness of what
6      those other bases could be came about typically as a
7      result of the mediation and reports provided to me out
8      of the mediation so I want to be careful about talking
9      about them, because that, I think is covered by the
10     mediation order.
11 Q.  Okay, so the two grounds that I identified, invalidity
12     and the arguable not unsecuredness of the LTGO are the
13     only two that you can publicly discuss?
14 A.  I believe so.
15 Q.  You would agree that the LTGO were not granted a lien
16     in any City property, correct?
17 A.  I would agree that I have seen no documents
18     memorializing a lien.
19 Q.  The difference between -- the difference that they
20     allege is relevant is that they are to be considered
21     quote/unquote a first budget item: isn't that correct?
22 A.  Here again, I think now we're starting to bump up
23     against the mediation.
24 Q.  So you're not able to answer that question either?
25 A.  If -- I'd be happy to validate any public statements

KEVYN ORR, VOLUME 2

1
2      that you have, but I don't think I should be the one
3      speaking to that.
4  Q.  It's the subject of a declaratory complaint and like a
5      pretty extensive motion to dismiss argument?
6  A.  Yeah, but I haven't necessarily been involved in the
7      legal aspects of that argument.  Most of my
8      information comes as a result of communications that
9      occur in the mediation.
10 Q.  Okay.  All right, so you have not followed the give
11     and take in the legal issue litigation?
12 A.  As you might imagine I have not been keeping up with
13     the over, as I understand it, almost 8,000 documents
14     filed in the bankruptcy, but I have no -- let me ask
15     answer it this way.  I have no reason to dispute the
16     allegations that are contained in the filings.
17 Q.  By whom?
18 A.  By any party, whatever their allegations are, they
19     are.
20 Q.  Other than the reasons that you've put in your own
21     filings?
22 A.  Yes, whatever -- whatever's a public record, I have no
23     reason -- in the bankruptcy case, there's no reason
24     for me to dispute that parties have taken those
25     positions, I just can't speak to it of my own

KEVYN ORR, VOLUME 2

1
2      independent knowledge once it comes as a result of the
3      mediation.
4  Q.  Understood, and you also can't say as to whether or
5      not it's been a factor in your decision?
6  A.  I -- I don't think I can other than what we've talked
7      about.
8  Q.  Mr. Orr, how did the City arrive at the calculation of
9      the size of the OPEB claim that is contained in the
10     current plan?
11 A.  As contained in the current plan?  Well, we did --
12     well, the City and our advisors in conjunction with
13     the advisors of the -- of the funds did an analysis of
14     the potential liability for retiree healthcare based
15     upon a number of factors including actuarial rates,
16     longevity, objective factors such as anticipated rates
17     of healthcare spend as published by Michigan State
18     institutions and Federal Government institutions and
19     healthcare providers, number of objective criteria as
20     calculated with the number of retirees that we have
21     and anticipate will have in the future.
22 Q.  And ultimately the ultimate number was the product
23     negotiation between the City and the retiree
24     representative parties, correct?
25 A.  Correct.

KEVYN ORR, VOLUME 2

1
2  Q.  Now, you know that in connection with the City's
3      bankruptcy petition that it stated that it had $5.7
4      billion in OPEB: do you remember that number?
5  A.  Yes, I do.
6  Q.  And do you agree that the $5.7 billion number includes
7      the present value of anticipated OPEB not only for
8      retirees but also for active employees, right?
9  A.  Active employees who will retire.
10 Q.  Right, it's sort of like it was the analog of the
11     pension UAAL --
12 A.  Right.
13 Q.  -- which is it looked not just at retirees but it also
14     looked at active employees, what their costs will be
15     when they retire?
16 A.  And yes --
17         MR. ALBERTS:  Objection to form.
18 A.  In the out-years, so for instance, someone who is an
19     active employee today but will retire in 2015 will
20     become a retiree in the out-years, yes.
21 BY MR. HACKNEY:
22 Q.  And that OPEB number was in the 5.7 billion?
23 A.  I believe so.
24 Q.  Does the City believe that its retirees have a vested
25     right to healthcare benefits?

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

KEVYN ORR, VOLUME 2

1
2  **A.** Yes.
3  **Q.** Okay. So it's fair to say that the Grand Bargain was
4     Judge Rosen's idea from your vantage point?
5     MR. SHUMAKER: Again, I think we're getting
6  into --
7     MR. HACKNEY: Well, but --
8     MR. SHUMAKER: -- the guts of the
9  mediation.
10    MR. HACKNEY: I'm asking him about a public
11 statement that the mediator made.
12    MR. SHUMAKER: If you're asking did the
13 public statement reflect that, he can answer that.
14    MR. HACKNEY: I'm asking if the public
15 statement was true.
16    MR. SHUMAKER: Then that goes to what
17 actually occurred in the mediation and --
18    MR. HACKNEY: Well, Mr. Shumaker, now I
19 think you're being too selective about the mediation
20 order. I mean, you have the mediator standing up and
21 saying boom, and now I'm saying is that true, and
22 everyone says oh.
23    MR. SHUMAKER: And I'm fine with you asking
24 about the statements made in public by Judge Rosen.
25 What I have an issue with is then asking the witness

KEVYN ORR, VOLUME 2

1
2  whether it reflects what was occurring in the
3  mediation. There's a --
4     MR. HACKNEY: Okay.
5     MR. SHUMAKER: -- a clear divide there.
6  BY MR. HACKNEY:
7  **Q.** So are you going to decline to answer that?
8  **A.** Yes, and I would say I have no reason to dispute any
9     published reports and statements made by Judge Rosen.
10 **Q.** Okay, and Judge Rosen also described in that statement
11    that he had run into a member of -- of the -- a
12    foundation member in a deli near the courthouse: do
13    you remember that, too?
14 **A.** Yes, Miriam Nolan.
15 **Q.** Yes, and had talked to her about this idea, correct?
16 **A.** Yes, I believe he said that.
17 **Q.** Do you remember witnessing Judge Rosen saying that?
18 **A.** Yes.
19 **Q.** And Ms. Nolan has been quoted as saying that on the
20    basis of her conversation with Judge Rolan (sic), she
21    began to engage efforts to find whether other
22    foundations might contribute money, you're aware of
23    her statements?
24 **A.** Yes, I'm aware of those statements.
25 **Q.** Okay, do you have any reason to dispute those

KEVYN ORR, VOLUME 2

1
2  statements?
3  **A.** No.
4  **Q.** And do you remember that Judge Rosen also said that --
5     for example, that Shirley Lightsey was one of the
6     heroes of the bankruptcy?
7  **A.** Yes.
8  **Q.** If I ask for the specifics of -- with respect to the
9     foundations, who was approached, what they were asked,
10    which ones declined, which entities were approached,
11    who said yes, and the negotiations over the amount of
12    any contribution, is it correct that you would decline
13    to answer those questions on the basis of the
14    mediation order?
15 **A.** Yes.
16 **Q.** And if I asked you questions about the way the Grand
17    Bargain was structured, you'll similarly decline,
18    correct?
19 **A.** Yes.
20 **Q.** And that would also apply with respect to DIA Corp.
21    contributions, as well, correct?
22 **A.** Yes.
23 **Q.** And that also would apply to the State contribution
24    that is connected to the Grand Bargain, correct?
25 **A.** Yes, except for any public statements.

KEVYN ORR, VOLUME 2

1
2  **Q.** Have you ever visited the Charles H. Wright Museum
3     here in the City of Detroit?
4  **A.** Yes.
5  **Q.** Do you consider that museum critical to the economic
6     revitalization of the City?
7  **A.** I consider it critical to the cultural and historical
8     revitalization of the City, yes, I do.
9  **Q.** I was talking to the economic revitalization.
10 **A.** It might well include the economic revitalization.
11 **Q.** Is the DIA critical to the economic revitalization of
12    the City?
13 **A.** Yes, I believe it is.
14 **Q.** Okay, and which one's more important between the two,
15    the Charles H. Wright Museum or the DIA museum when it
16    comes to the economic revitalization of the City?
17 **A.** I don't -- I've done no analysis as to whether one is
18    more important than the other. I think they are both
19    important to the cultural and economic vitality of the
20    City.
21 **Q.** Which one has more visitors?
22 **A.** I think the DIA does.
23 **Q.** Has more than the Charles H. Wright?
24 **A.** Yes.
25 **Q.** Do you know if it has substantially more visitors?

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 8754-11  Filed 12/15/14  Entered 12/15/14 14:21:42  Page 47 of 70
13-53846-swr  Doc 6579-11  Filed 08/22/14  Entered 08/22/14 16:21:42  Page 9 of 70

# Exhibit 6F

**Plan Confirmation Factual Propositions**

# PLAN CONFIRMATION FACTUAL PROPOSITIONS

## 1. REVENUE PROJECTIONS ARE REASONABLE

    a. All material revenue streams are included in the Plan projections (**Robert Cline (EY); Caroline Sallee (EY); John Hill (City)**)

        i. Income tax
        ii. Property tax
        iii. Casino tax
        iv. State revenue sharing
        v. Utility tax/ users taxes
        vi. Fines and fees

    b. Revenue forecasts and assumptions reflected in the Plan projections are reasonable (**Gaurav Malhotra (EY); Robert Cline (EY)**)

        i. City is unable and it is impractical to raise taxes (**Kevyn Orr (EM); Michael Duggan (City); Robert Cline (EY); Caroline Sallee (EY)**)

        ii. State revenue sharing contributions are expected to be consistent with assumptions in the Plan (**Robert Cline (EY); Caroline Sallee (EY); Gaurav Malhotra (EY)**)

        iii. Restructuring and reinvestment initiatives are reasonably expected to lead to slightly increased revenues and decreased expenses over the next 10 years (**Gaurav Malhotra (EY); Charles Moore (Conway); John Hill (City); Michael Duggan (City); Beth Niblock (City)**)

        iv. Plan projections are generally consistent with the City's internal forecasts (**John Hill (City)**)

        v. The City reasonably expects to be able to obtain required exit financing (**Gaurav Malhotra (EY); Kenneth Buckfire (Miller Buckfire)**)

1

## 2. FEASIBILITY (11 U.S.C. § 943(b)(7))

a. The Plan projections present a realistic picture of the City's ability to pay its expenses and obligations under the Plan and fund reinvestment and revitalization programs (**Gaurav Malhotra (EY); John Hill (City); Michael Duggan (City)**)

    i. City is able to fund normal municipal operations and provide adequate services post-confirmation (**Gaurav Malhotra (EY); John Hill (City); Michael Duggan (City); Brenda Jones (City); Rip Rapson (Kresge); Dan Gilbert (Rock Ventures); Roger Penske (Penske Corp.)**)

        1. The City's restructuring and reinvestment initiatives are necessary:
           a. Blight (**Kevyn Orr (EM); Michael Duggan (City); Rip Rapson (Kresge); Dan Gilbert (Rock Ventures)**)
           b. Public Safety (Police, Fire, EMS) (**Kevyn Orr (EM); Michael Duggan (City); James Craig (City)**)
           c. Finance (**John Hill (City)**)
           d. Information Technology (**Beth Niblock (City)**)

    ii. City is able to also satisfy obligations under the Plan ( **Gaurav Malhotra (EY); John Hill (City); Michael Duggan (City)**)

        1. Grand Bargain facilitates payment of City's pension obligations (**Kevyn Orr (EM); John Hill (City); Gaurav Malhotra (EY)**)
        2. City's restructured legacy costs are reasonable and manageable (**Gaurav Malhotra (EY); John Hill (City); Glenn Bowen (Milliman)**)
        3. City can afford to issue new B-notes to non-pension unsecured creditors (**Gaurav Malhotra (EY); John Hill (City)**)
        4. The City can afford exit financing (**Gaurav Malhotra (EY); Kenneth Buckfire (Miller Buckfire)**)

b. Plan is likely to be sustainable for the long-run (**Michael Duggan (City)**)

    i. Post-confirmation City governance is sustainable (**Michael Duggan (City); Brenda Jones (City)**)
        1. The City will be subject to certain ongoing State oversight (**Michael Duggan (City); Brenda Jones (City)**)

    ii. Plan provides the City Council and Mayor with tools that were previously unavailable to the City prior to the Chapter 9 Case to implement and build upon revitalization efforts developed under the Plan (**Michael Duggan (City); Brenda Jones (City)**)

    iii. Community and business leaders have faith in the Plan and have planned complementary projects to enhance the City's reinvestment and restructuring efforts (**Rip Rapson (Kresge); Dan Gilbert (Rock Ventures); Roger Penske (Penske Corp.)**)

2

iv. Plan has been designed to work whether or not the City obtains access to the capital markets in the near future, nevertheless, it is more likely than not that the City will secure access to the capital markets, particularly for DWSD and other special revenue secured debt, post-confirmation (**John Hill (City); Kenneth Buckfire (Miller Buckfire)**))

3

13-53846-swr   Doc 8579-12   Filed 12/05/14   Entered 12/05/14 21:21:34   Page 51 of 70
13-53846-swr   Doc 6579-12   Filed 08/22/14   Entered 08/22/14 16:11:42   Page 4 of 14

# 3. REASONABLENESS OF FED. R. BANKR. P. 9019 SETTLEMENTS IN THE PLAN

a. Settlements in the Plan are: (1) fair, equitable and reasonable settlements of complex issues; (2) are agreements reached in mediation supervised by distinguished judicial officers and thus should be presumed to be the product of good faith arm's length bargaining; (3) further the policies and purposes of chapter 9; and (4) are in the best interests of the City, its creditors and all other parties in interest. (**Kevyn Orr (EM)**)

    i. UTGO Settlement (**Kevyn Orr (EM); Gaurav Malhotra (EY)**)
1. The City will establish the range of reasonableness
2. The product of the UTGO Settlement is within the range of reasonableness in that it provides economic benefit (preservation of *ad valorem* taxes) to the City

    ii. OPEB Settlement (**Kevyn Orr (EM); Gaurav Malhotra (EY); Suzanne Taranto (Milliman)**)
1. The City will establish the range of reasonableness
2. The product of the OPEB Settlement is within the range of reasonableness in that it is between the parties' respective litigation positions and represents a fair compromise of the factual and legal arguments

    iii. Grand Bargain Settlement (**Kevyn Orr (EM); Michael Duggan (City); Rip Rapson (Kresge); Dan Gilbert (Rock Ventures); Roger Penske (Penske Corp.); Vanessa Fuco (Christie's); [DIA]**)
1. ***Foundation and DIA Contributions in Exchange for Settling City's DIA Ownership Claims***
   a. The City will establish the range of reasonableness
   b. Christie's valuation and State AG opinion informs the range of reasonableness; the City is currently seeking expert evaluation of value of the entire collection
   c. Values contributed by State, DIA, Foundations and unions falls within the range of reasonableness
   d. Preserves cultural asset of the City that also provides economic benefit and provides the City with a unique and practical opportunity to obtain significant value from third parties on account of its interest in the collection
2. ***State Contribution in Exchange for Release of Claims***
   a. The consideration provided by the State is reasonable in view of the scope of releases
   b. Legislation and other conditions precedent that must be satisfied by the time of confirmation are on track to be satisfied (e.g. recent passage of contribution legislation by the Michigan House of Representatives

4

## 4. BEST INTERESTS (11 U.S.C. § 943(b)(7) / FAIR AND EQUITABLE (11 U.S.C. § 1129(b)(1))

a. There is no requirement to sell City assets, whether assets are characterized as core or non-core (**Kevyn Orr (EM)**)

b. DIA is a "core" asset (**Kevyn Orr (EM); [DIA]**)
   i. The DIA provides an economic contribution to the City (**Kevyn Orr; [State]; [DIA]; Rip Rapson (Kresge)**)
   ii. The DIA provides a cultural contribution to the City (**[DIA]**)

c. Creditors are receiving all they can reasonably expect under the circumstances (**Kevyn Orr (EM); Gaurav Malhotra (EY)**)

d. No creditor will do better outside chapter 9 (**Gaurav Malhotra (EY); Kenneth Buckfire (Miller Buckfire)**)

e. City is unable and it is impractical to raise taxes (**Kevyn Orr (EM); Michael Duggan (City); Robert Cline (EY); Caroline Sallee (EY)**)

f. Restructuring and reinvestment initiatives help the City provide adequate levels of municipal services (**Kevyn Orr (EM); Charles Moore (Conway); Michael Duggan (City); Brenda Jones (City); Beth Niblock (City); Rip Rapson (Kresge); Dan Gilbert (Rock Ventures); Roger Penske (Penske Corp.)**)

   i. The needs City's residents are legitimately given priority over payment of debts (**Kevyn Orr (EM); Michael Duggan (City); Brenda Jones (City); Rip Rapson (Kresge); Dan Gilbert (Rock Ventures); Roger Penske (Penske Corp.)**)

   ii. The City's reinvestment initiatives are necessary to provide adequate levels of municipal services, helping to stabilize declining population and are primarily devoted to the following (**Kevyn Orr (EM); Charles Moore (Conway); Michael Duggan (City); Brenda Jones (City); John Hill (City); Beth Niblock (City); Rip Rapson (Kresge); Dan Gilbert (Rock Ventures); Roger Penske (Penske Corp.)**)
      1. Blight
      2. Public Safety (Police, Fire, EMS)
      3. Finance
      4. Information Technology
   iii. The City's restructuring and reinvestment initiatives cannot be achieved with less money (**Kevyn Orr (EM); Charles Moore (Conway); Michael Duggan (City)**)

g. DWSD-related issues are treated fairly (**Sue McCormick (DWSD); Kenneth Buckfire (Miller Buckfire)**)
   i. The modification to the DWSD-related bond claims are fair and equitable
   ii. DWSD is in need of capital improvements

## 5. RESET OF DWSD INTEREST RATES IS CONSISTENT WITH REQUIREMENTS OF BANKRUPTCY CODE SECTION 1129(b)

a. Proposed interest rates for impaired issues of DWSD-debt give holders payments having a present value equal to the allowed amount of their claims **(Kenneth Buckfire (Miller Buckfire))**

b. No liens have been modified
   i. The payments to GRS are operating and maintenance expenses

c. Modification of call protection is appropriate and does not result in any additional allowed claims

# 6. NO UNFAIR DISCRIMINATION (11 U.S.C. § 1129(b)(1))

a. The Plan provides an augmented recovery for pensioners while respecting the Bankruptcy Code's prohibition against unfair discrimination between creditor classes (**Kevyn Orr (EM); Michael Duggan (City)**)

b. The Plan's distributions on account of pension claims are, in part, made up with non-debtor contributions
   i. State contribution funds are not the City's funds and would not otherwise be available to the City (**Kevyn Orr (EM); Rip Rapson (Kresge); [DIA]; Dan Gilbert (Rock Ventures); Roger Penske (Penske Corp.)**)

   ii. Foundations and DIA funds are not the City's funds and would not otherwise be available to the City (**Kevyn Orr (EM); [DIA]; Dan Gilbert (Rock Ventures); Roger Penske (Penske Corp.)**)

   iii. The Plan's distribution percentages should be regarded as lower than calculated based on settlement assumption of 6.75%; the remaining difference in treatment is justified by the unique aspects of pension claims (**Charles Moore (Conway); Glenn Bowen (Milliman)**)

   iv. Purpose of chapter 9 is to help municipalities restore adequate services, and funding pensions over bondholders will further facilitate this purpose (**Kevyn Orr (EM); Michael Duggan (City); Brenda Jones (City); Charles Moore (Conway); John Hill (City)**)

   v. Providing better treatment to pensioners will promote relationships with those whose ongoing cooperation is vital to the City's recovery (**Kevyn Orr (EM); Michael Duggan (City); Brenda Jones (City); Rip Rapson (City)**)

   vi. Comparative harm to individuals versus institutions (**Kevyn Orr (EM); Michael Duggan (City)**)

# 7.  PROPOSED IN GOOD FAITH (11 U.S.C. § 1129(a)(3))

a. Good faith should be measured based on the totality of the circumstances (**All City Witnesses**)

    i. Settlements were achieved with numerous and distinct parties (e.g., secured v. unsecured; labor v. non-labor; individuals v. institutions)

    ii. General consensus among all the parties is that the City is in need of reinvestment and restructuring

    iii. The Plan requires shared sacrifices from all interested parties

    iv. Mediated settlements included in Plan have to be presumed to be in good faith

## 8. DWSD-RELATED ISSUES

a. The DWSD pension funding proposed under the Plan is lawful (**Glenn Bowen (Milliman)**)

b. The Plan's allocation of proceeds from a potential DWSD transaction is lawful (**Gaurav Malhotra (EY); John Hill (City)**)

9

## 9. ALTERNATIVE SAVINGS FUND RECOUPMENT

a. Explanation of program and its impact (**Charles Moore (Conway)**)

b. Explanation of how the City determined its calculations and caps (**Charles Moore (Conway); Glenn Bowen (Milliman)**)

## 10. NONCONSENSUAL THIRD PARTY RELEASES

a. The City has identified "unusual circumstances" that satisfy some or all of the seven factors identified in *Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 658 (6th Cir. 2002) (**Kevyn Orr (EM)**)

    i. The failure to obtain approval of and effect the release, injunction, exculpation and discharge provisions of the Plan would seriously impair the City's ability to confirm the Plan (**Kevyn Orr (EM)**)

    ii. The contributions and concessions by the third party releasees are an essential component to the reorganization of the City and its future success and to the feasibility of the Plan. (**Kevyn Orr (EM)**)

## 11.      36TH DISTRICT COURT

a. Explanation of the City's ownership of property related to and the financial relationship with the 36th District Court (**Gaurav Malhotra (EY); John Hill (City)**).

## Will Call Witnesses

| 1 | Glenn | Bowen | Milliman |
|---|---|---|---|
| 2 | Ken | Buckfire | Miller Buckfire |
| 3 | Robert | Cline | EY |
| 4 | James | Craig | Detroit Police Chief |
| 5 | Michael | Duggan | Detroit Mayor |
| 6 | Vanessa | Fuco | Christie's |
| 7 | Dan | Gilbert | Rock Ventures |
| 8 | John | Hill | Detroit Chief Financial Officer |
| 9 | Brenda | Jones | City Council President |
| 10 | Gaurav | Malhotra | EY |
| 11 | Sue | McCormick | DWSD |
| 12 | Charles | Moore | Conway MacKenzie |
| 13 | Beth | Niblock | Detroit Chief Information Officer |
| 14 | Kevyn | Orr | Detroit Emergency Manager |
| 15 | Roger | Penske | Penske Corp. |
| 16 | Rip | Rapson | Kresge |
| 17 | Caroline | Sallee | EY |
| 18 | Suzanne | Taranto | Milliman |

## Conditional Call Witness List

| 1 | Tonya | Allen | Skillman |
|---|---|---|---|
| 2 | Graham | Beal | DIA |
| 3 | Ryan | Bigelow | Retirement Systems' Chief Investment Officer |
| 4 | Annmarie | Erickson | DIA |
| 5 | Eugene | Gargano | DIA |
| 6 | Edsel | Jenkins | Detroit Executive Fire Commissioner |
| 7 | Susan | Mosey | DIA-related |
| 8 | Michael | Paque | KCC |
| 9 | Marc | Schwartz | DIA-related |
| 10 | Cynthia | Thomas | Retirement Systems' Administrator |
| 11 | Peter | Walsh | KCC |

13-53846-swr  Doc 8757-1  Filed 12/15/14  Entered 12/15/14 21:26:34  Page 61 of 70

# Exhibit 6G

**August 13, 2014 S. Taranto Deposition Transcript**

- SUZANNE TARANTO -

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

In Re:           ) Chapter 9

CITY of DETROIT, MICHIGAN,     ) Case No. 13-53846

      Debtor.     ) Hon. Steven Rhodes


DATE: August 13, 2014
TIME: 1:11 p.m.


      VIDEOTAPED DEPOSITION OF SUZANNE
TARANTO, held at the offices of Jones Day,
222 East 41st Street, New York, New York, pursuant
to Order, before Hope Menaker, a Shorthand
Reporter and Notary Public of the State of New
York.

1         - SUZANNE TARANTO -
2  A P P E A R A N C E S:
3  MIGUEL F. EATON, ESQ.
4  Jones Day
5  51 Louisiana Avenue N.W.
6  Washington D.C. 20001-2113
7     Appearing for The Debtor
8
9  RICHARD U. S. HOWELL, ESQ.
10  Kirkland & Ellis, LLP
11  300 North LaSalle Street
12  Chicago, Illinois 60654
13     Appearing on behalf of Syncora
14
15  DANIEL MORRIS, ESQ.
16  Dentons US LLP
17  1301 K Street, N.W.
18  Suite 600, East Tower
19  Washington, D.C. 20005
20     Appearing on behalf of the Retiree Committee
21
22
23
24
25

1       - SUZANNE TARANTO -
2
3  ELLIOT G. CROWDER, ESQ. (Via Telephone)
4  Stevenson & Bullock, PLC
5  26100 American Drive
6  Suite 500
7  Southfield, Michigan 48034
8     Appearing on behalf of Gabriel Roeder Smith
9
10  ALSO PRESENT:
11     Kristen Zarnetske, Videographer
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1      - SUZANNE TARANTO -
2
           INDEX
3
WITNESS: SUZANNE TARANTO
4
EXAMINATION BY            PAGE
5
MR. HOWELL            6
6
7
EXHIBITS FOR IDENTIFICATION
8
NUMBER    DESCRIPTION        PAGE
9
1      Expert report of Suzanne     10
10       Taranto
11  2      POA 00260505 - 522     38
12  3      POA 00260853 - 856     60
13  4      Proof of Claim        127
14
15
16
17
18
19
20
21
22
23
24
25

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-swr  Doc 8574-13  Filed 12/15/14  Entered 12/15/24 14:31:42  Page 63 of 70

- SUZANNE TARANTO -

1    first paragraph under D on Page 5 from Ms.
2    Taranto's report.
3         MR. EATON:  Okay.  Thanks.
4         Q.   Did you perform any other work in
5    association with calculating the OPEB claim in
6    this bankruptcy?
7         MR. MORRIS:  Object to form.
8         A.   We performed the allocation of the
9    claim by individual.
10        Q.   Can you describe to me what you mean
11   by "the allocation of the claim by individual"?
12        A.   We performed -- we developed a
13   calculation of individual claims based on the
14   settlement amount.
15        Q.   So you took the settlement amount and
16   then from that amount were able to come up with a
17   calculation of the amount of claim for each
18   individual based on that amount?
19        A.   Yes.
20        Q.   Other than the calculation of
21   individual claims once having a settlement claim
22   amount and other than modeling the present value
23   of the City's liabilities to current retirees
24   under the different discount rates in the table at

*(page numbering in original: lines 1-25)*

- SUZANNE TARANTO -

1    case?
2         A.   No.
3         Q.   The numbers in the table on Page 6 of
4    your report represent, based on your calculations,
5    the total amount of benefits that would be owed
6    over time to all of the OPEB eligible retirees
7    present valued back to July 1, 2012, correct?
8         A.   Correct.
9         Q.   In your report, you also assume that
10   -- or you also opine that $751 million of the --
11   of benefits will be paid under the 2014 retiree
12   healthcare -- health plan from the City to the
13   OPEB eligible retirees, correct?
14        MR. MORRIS:  Object to form.
15        A.   That's the calculation of the present
16   value of the new plan, yes.
17        Q.   I'm correct that that number
18   represents your calculation of the amount of
19   benefits that will be paid present valued to July
20   1, 2012, to the OPEB retirees under the 2014
21   retiree health plan?
22        MR. MORRIS:  Object to form.
23        A.   Based on the 2014 plan continuing,
24   yes.

- SUZANNE TARANTO -

1    the top of page 6, did you do any other work in
2    association with the calculation of the OPEB claim
3    in bankruptcy?
4         A.   No.
5         Q.   The settled OPEB claim amount is not
6    any of the present value of benefits amounts
7    listed on the chart on the top of page 6 of your
8    report, correct?
9         A.   It's my understanding.
10        Q.   And do you have an understanding as
11   to how the OPEB claim amount that is the claim
12   amount in class 12 of the plan of adjustment was
13   calculated?
14        MR. MORRIS:  I'm going to object.
15        Are you asking for the details of the
16        mediation that led to that settlement?
17        Q.   We can have a standing understanding
18   that I'm not asking you to divulge any material
19   that is covered by mediation privilege in this
20   case.  And I'm sure counsel will point out to you
21   if they feel that you're treading close to that.
22        So what I am asking is, I'm asking
23   for whether you have independent understanding of
24   how the OPEB claim amount was calculated in this

- SUZANNE TARANTO -

1         Q.   Do you have any basis to think that
2    the benefits are expected to change from the 2014
3    retiree health plan going forward?
4         MR. MORRIS:  Object to form.
5         A.   I have no opinion as to what may
6    happen in the future with respect to retiree
7    benefits.
8         Q.   Fair enough.  You're not offering any
9    opinion regarding changes that may occur to the
10   2014 retiree health plan going forward, right?
11        MR. MORRIS:  Object to form.
12        Misstates her testimony.
13        A.   I have not offered any opinion as to
14   the future of these benefits.
15        Q.   In your view, the difference between
16   what the City would have paid under the 2013 plan,
17   present valued back to July 1, 2012, and the
18   amount that the City will pay under the 2014 plan
19   present valued back to July 1, 2012, would be
20   derived by selecting one of the numbers on the
21   chart on Page 6 and subtracting the $751 million,
22   correct?
23        MR. MORRIS:  Object to form.
24        A.   I don't understand the purpose of the

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

# Exhibit 6H

**May 28, 2014 Hearing Transcript**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,       .        Docket No. 13-53846
        MICHIGAN,               .
                               .        Detroit, Michigan
                               .        May 28, 2014
                Debtor.         .        10:01 a.m.
. . . . . . . . . . . . . . . . .

          HEARING RE. (#4508) ORDER REGARDING HEARING ON
       OUTSTANDING OBJECTIONS TO WRITTEN DISCOVERY (RE:
          RELATED DOCUMENT(S) 4202 ORDER ESTABLISHING
       PROCEDURES, DEADLINES AND HEARING DATES RELATING TO
      THE DEBTOR'S PLAN OF ADJUSTMENT); (#3929) MOTION OF THE
          CITY OF DETROIT WATER & SEWERAGE DEPARTMENT FOR AN
       ORDER AMENDING AND CLARIFYING FEE REVIEW ORDER FILED
          BY INTERESTED PARTY CITY OF DETROIT WATER AND
       SEWERAGE DEPARTMENT; (#5011) LETTER FILED BY STEPHEN D.
       LERNER, COUNSEL TO THE COURT-APPOINTED EXPERT; (#4202)
          STATUS CONFERENCE REGARDING CONFIRMATION PROCESS
           BEFORE THE HONORABLE STEVEN W. RHODES
           UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:      Jones Day
                     By:  BRUCE BENNETT
                     555 South Flower Street, Fiftieth Floor
                     Los Angeles, CA  90071
                     (213) 243-2382

                     Jones Day
                     By:  HEATHER LENNOX
                     222 East 41st Street
                     New York, NY  10017
                     (212) 326-3837

                     Jones Day
                     By:  GEOFFREY IRWIN
                          GREGORY SHUMAKER
                          GEOFFREY STEWART
                     51 Louisiana Avenue, N.W.
                     Washington, D.C.  20001-2113
                     (202) 879-3768

1   impacted, and the extent to which they could sustain the

2   changes to them because of the fact that they're cutting

3   deals.  I don't know.  But it puts us in an impossible

4   position when they use their prior decisions to say, "Well,

5   we really shouldn't have to do anything more because we got

6   to keep the trial date, and we don't want to move the

7   schedule."

8           THE COURT:  Well, it's a close question, but I must

9   side with Mr. Hackney here that the additional production

10  through the second plan should have been provided here, and

11  the Court will request that and order that.

12          MR. HACKNEY:  Your Honor, points three and four I'll

13  be very brief.  I think point four was that we'd actually ask

14  there to be an order that they get us our interrogatories by

15  Friday so that we can have a date certain.  It sounds like

16  Mr. Irwin is going to do that anyway.  Point three is an

17  important one for --

18          THE COURT:  I'll agree with that.  You may submit an

19  order.

20          MR. HACKNEY:  Your Honor, point three is an

21  important one given our colloquy earlier.  I'd like you to

22  consider it.  The Hale affidavit says that they are

23  construing the mediation privilege broadly.  You can also

24  imagine nuanced questions about who is covered by the

25  mediation privilege, the most obvious of which being that the

1  charitable foundations weren't actually creditors in the case

2  at the time they were invoked, so there are questions about

3  the scope of the privilege, questions about the application

4  of it by the city.  It is my view that the city should log

5  documents that they're withholding on the basis of this

6  mediation privilege for two reasons.  Number one, it may be

7  something -- this is definitely a log where you can see

8  looking at it and saying, wait a second, that's from a time

9  period before the mediation order, wait a second, that's not

10  a person involved the mediation, point one, but point two, I

11  think that you're going to want to have this log whether it's

12  for in camera review or for issues that come up down the road

13  at trial.  And so my suggestion is one that I'm sure the city

14  is gritting its teeth over, but this is one of those things

15  that I think if they start doing now we're all going to be

16  very glad that it exists when the trial comes along because

17  if we hit one of these issues and it's not all prepared, that

18  could be a real delay.

19       MR. IRWIN:  Your Honor, the issue of privilege logs

20  I think was one that we discussed with multiple parties at

21  the outset of discovery.  I don't understand what purpose is

22  served to see if the city executed on its understanding of

23  the mediation order.  It is yet another potentially --

24       THE COURT:  Yeah.  I agree that the burden involved

25  in this is much greater than any potential value of it, so I

1   will not order this.

2         MR. HACKNEY:  Your Honor, if I could briefly speak

3   to the schedule and then sit down, I think that our argument

4   is pretty simple, which is we have proposed in the fifth

5   amended scheduling order -- the proposed fifth amended

6   scheduling order something that I think is unremarkable and

7   also fair and sort of charitable to the situation that we, as

8   creditors, find ourselves in, which is we've proposed to move

9   fact discovery cutoff and all the associated dates back three

10  weeks from June 27 to July 18.  Okay.  That is 22 days, I

11  should say, to be precise.

12        Now, I woke up at four in the morning again today.

13  I always know that you want to know what time I wake up.  But

14  I think part of the reason that I was -- I don't understand

15  why it's so controversial where the city is four weeks, five

16  weeks behind in its written discovery, you know, obligations.

17  The order said comply with written discovery by May 6.  Here

18  we are almost into early June.  I don't have interrogatory

19  responses.  We're talking about important people that have

20  not been searched.  We're talking about date limitations that

21  don't make sense.  For me to come back and for the DTEC and

22  the other members of the creditors to come back and say,

23  "We're going to take the city's efforts to remedy this in

24  good faith.  We see what Mr. Irwin is trying to do here.

25  We'll only move the schedule three weeks," to me seems like

1   the height of reasonableness, point one.  Point two, your

2   Honor, it still allows for a trial schedule that I think gets

3   the trial done before September 30.  So to the extent that

4   Mayor Duggan is going to fire Kevyn Orr and fire Jones Day as

5   soon as he possibly can, which I think was reported in the

6   press and in some respects I think raised sort of larger and

7   more troubling questions about why that would be the case --

8         THE COURT:  Well, let's pause here.  Has that issue

9   been resolved?

10         MR. SHUMAKER:  It has not, your Honor.  There's been

11   no final answer in that regard.

12         MR. HACKNEY:  Respectfully, your Honor, I don't

13   think that Mayor Duggan gets to -- he has his powers, but I'm

14   not sure that he gets to effectively dictate to you when you

15   have to have a trial by.  And I also want to note that you

16   see a number of warning signs blinking.

17         THE COURT:  Well, I just want to say for the record

18   that it would be a really bad idea for the city, the mayor,

19   to terminate Jones Day's services at such a critical phase in

20   this process.  I don't exactly know where we will be on

21   September 30th or in the few days before or after that, but

22   whatever phase it is, it will be a critical phase because

23   we'll either be in the process of negotiating and drafting a

24   confirmation order or an order of dismissal and dealing with

25   the consequences of that, or we'll be dealing with how to get