which the loan is made (under both Component I and Component II), whichever is less.  The minimum loan amount shall be one thousand dollars ($1,000.00).

(e)     In addition to such rules and procedures that are established by the Board, all loans shall comply with the following terms and conditions:

(1)     Loan applications shall be in writing.

(2)     All loans shall be memorialized by a promissory note made to the Retirement System and properly executed by the Member.

(3)     Loan shall be repaid by equal payroll deductions over a period not to exceed five (5) years, or, where the loan is for the purpose of buying a principal residence, a period not to exceed fifteen (15) years.  In no case shall the amount of the payroll deduction be less than twenty dollars ($20.00) for any two-week period.

(4)     Each loan granted under Component II shall be made against the assignment of the Member's entire right, title, and interest in and to the Annuity Savings Fund supported by the Member's collateral promissory note for the amount of the loan, including interest payable to the order of the Board of Trustees.

(5)     Each loan shall bear interest at a rate determined by the Board.  The Board shall not discriminate among Members in its determination of interest rates on loans.  Loans initiated at different times may bear different interest rates, where, in the opinion of the Board, the difference in rates is supported by a change in market interest rates or a change in the Retirement System's current assumed rate of return.  The loan interest rate shall bear a reasonable relationship to market rates for secured loans of a similar duration and shall bear a reasonable relationship to the costs to the Retirement System of administering the Retirement System.  The loan interest rate shall be calculated in a manner that will not negatively affect the City's costs relating to the Retirement System or the return to Members.

(6)     Loan repayments shall be suspended under this Retirement System as permitted by Section 414(u)(4) of the Internal Revenue Code.  A Member who has an outstanding loan balance from the Retirement System who is absent from employment with the City, and who has satisfied the requirements of Section 414(u) of the Internal Revenue Code shall not be required to make loan repayments to the Retirement System during said periods of absence.

(f)     Any loans granted or renewed shall be made and administered pursuant to the participant loan program and Section 72(p) of the Internal Revenue Code and the regulations thereunder.

(g)     A Member's outstanding loan balance shall be considered a directed investment by the Member and interest payments shall be credited to the Member's account balance (provided that the interest credited shall be reduced appropriately to cover the

13-53846-tjtwr Doc 8750-2 Filed 12/15/14 Entered 12/15/14 02:03:17 Page 1 of 150
13-53846-swr Doc 8029-2 Filed 10/24/14 Entered 10/24/14 03:03:17 Page 1 of 150
220

administrative cost of the loan program and avoid negatively affecting the City's costs or the Retirement System's investment returns), and shall not be part of net investment income or part of the Member's account balance for the purpose of allocation of net investment income under Article G.

(h) No distributions shall be made to a Member, former Member, or Beneficiary until all loan balances drawn on the applicable vested accumulated balance and applicable accrued interest have been repaid or offset against the distributable Annuity Savings Fund account balance.

(i) The Retirement System shall include, in its annual report to all Members, an accounting of the loan program established by this section, which contains the number and amount of loans made, the costs of administering the program, the amount of payments made including interest received by the Retirement System, the amount of loans outstanding, including any defaults or delinquencies, and an evaluation as to whether the interest charged in the Fiscal Year covered the costs of administering the program.

13-53846-tjt Doc 8750-2 Filed 12/15/14 Entered 12/15/14 21:29:04 Page 2 of 150
13-53846-swr Doc 8029-2 Filed 10/24/14 Entered 10/24/14 03:03:17 Page 2 of 150
220

# ARTICLE K. SPECIAL PLAN OF ADJUSTMENT PROVISIONS

**Sec. K-1.**     **Benefit Changes implemented in accordance with the terms of the Plan Of Adjustment**

Notwithstanding anything in Articles A, C, D or E to the contrary, as of the effective date of the Plan of Adjustment and during the period that ends no earlier than June 30, 2023, the following changes in benefits provided under Component II of the Combined Plan shall be implemented:

(1)     <u>Elimination or Reduction in Pension Improvement Factor (Escalator)</u>. With respect to all Pension benefits payable on or after the effective date of the Plan of Adjustment, the Pension Improvement Factor (Escalator) that will be applied to the monthly Pension benefit of a Member, Retiree, surviving Beneficiary or vested former employee will be equal to 1.0125%; provided, however, that the Board and the Investment Committee shall determine on the effective date of the Plan of Adjustment and not less frequently than annually thereafter that the "Funding Conditions" as defined herein have been satisfied, and in the event that such Funding Conditions have not been satisfied then the Pension Improvement Factor (Escalator) that will be applied to the monthly Pension benefit of a Member, Retiree, surviving Beneficiary or vested former employee will be reduced in proportion to the funding which is not received by the Retirement System ("Adjusted Pension Benefit").

For purposes of this Section K-1, the term "Funding Conditions" shall mean that (i) Class 10 and Class 11 voted in favor of the Plan of Adjustment in accordance with the procedures for such vote under the Plan of Adjustment, (ii) the Plan of Adjustment is confirmed by the U.S. Bankruptcy Court, and (iii) the funds that are pledged to be contributed to the Retirement System pursuant to the terms of the State Contribution Agreement and the DIA Settlement Documents have been received.

(2)     <u>Effect of Payment Default</u>. In the event that all or a portion of the funds pledged to be contributed to the Retirement System pursuant to the terms of the DIA Settlement Agreement are not received by the Retirement System, the Board shall proportionately reduce the Pension Improvement Factor (Escalator) to be applied to the monthly Pension benefit of any retirees, surviving beneficiaries, employees and former employees to the extent of such default.

**Sec. K-2.**     **Income Stabilization Benefits**

(1)     The provisions of this Section K-2 shall become effective only if each of the Conditions Precedent (as that term is defined in the State Contribution Agreement) have been met to the satisfaction of the Authority and the Treasurer, unless any one or more of such conditions are waived in writing executed by the Authority and the Treasurer.

13-53846-tjt Doc 8759-2 Filed 12/15/14 Entered 12/15/14 12:29:04 Page 3 of 150
13-53846-swr Doc 8029-2 Filed 10/24/14 Entered 10/24/14 03:03:17 Page 3 of 150
220

(2)     Beginning not later than 120 days after the Effective Date, Component II of the Combined Plan shall pay, in accordance with this Section K-2, an annual supplemental pension income stabilization benefit ("Income Stabilization Benefit") to each Eligible Pensioner (as defined in Section G-3(5)) equal to the lesser of either (i) the amount needed to restore an Eligible Pensioner's reduced annual pension benefit to 100% of the amount of the annual pension benefit that the Eligible Pensioner received from the Retirement System in 2013; or (ii) the amount needed to bring the total annual 2013 household income of the Eligible Pensioner up to 130% of the Federal Poverty Level for 2013. The Income Stabilization Benefit as determined under this Section K-2(2) will not increase after the date on which the Income Stabilization Benefit is determined. The Income Stabilization Benefit payable to an Eligible Pensioner will terminate immediately at such time as the Eligible Pensioner ceases to qualify as an Eligible Pensioner.

(3)     To the extent an Eligible Pensioner's Estimated Adjusted Annual Household Income (as defined in this Section K-2) in any calendar year after the first year that the Eligible Pensioner receives a benefit under this Section K-2 is less than 105% of the Federal Poverty Level in that year, the Eligible Pensioner will receive an additional "Income Stabilization Benefit Plus" benefit commencing as of the next following July 1.

   a.     The Income Stabilization Benefit Plus benefit for a calendar year will be equal to the lesser of either (i) the amount needed to restore 100% of the Eligible Pensioner's Pension benefit, as increased by any Pension Improvement Factor (Escalator), under Component II of the Combined Plan; or (ii) the amount needed to bring the Eligible Pensioner's Estimated Adjusted Annual Household Income in that calendar year up to 105% of the Federal Poverty Level in that year.

   b.     An Eligible Pensioner's "Estimated Adjusted Annual Household Income" for any year will be the sum of (i) the Eligible Pensioner's 2013 total household income (per his or her (or in the case of a minor child, his or her legal guardian's) 2013 income tax return or equivalent documentation), less the Pension benefit paid to the Eligible Pensioner by the Retirement System in 2013, as adjusted for inflation or Social Security COLA increases; (ii) the Adjusted Pension Benefit that is payable to the Eligible Pensioner for that year as determined under Section K-1, (iii) any pension restoration payment to the Eligible Pensioner as determined under Section K-3; and (iv) the Eligible Pensioner's Income Stabilization Benefit.

(4)     A separate recordkeeping fund called the "Income Stabilization Fund" shall be established by the Board for the sole purpose of paying the Income Stabilization Benefits and Income Stabilization Benefits Plus to Eligible Pensioners. Any funds received by the Retirement System that is designated by the City as UTGO Bond Tax Proceeds or a contribution to the Income Stabilization Fund shall be

13-53846-tjt Doc 8750-2 Filed 12/15/14 Entered 12/15/14 12:09:04 Page 4 of 50
13-53846-swr Doc 8029-2 Filed 10/24/14 Entered 10/24/14 03:03:17 Page 4 of 50
220

credited by the Board to the Income Stabilization Fund. The assets credited to the Income Stabilization Fund will be invested on a commingled basis with assets of the Retirement System and will be credited with a pro-rata portion of the earnings and losses of the Retirement System. Amounts credited to the Income Stabilization Fund may not be used for any purpose other than the payment of Income Stabilization Benefits and Income Stabilization Benefit Plus benefits to Eligible Pensioners, except as expressly provided in Section K-2(6).

(5)     For purposes of this Section K-2, an "Eligible Pensioner" is a retiree or surviving spouse who is at least 60 years of age or a minor child receiving survivor benefits, each as of the effective date of the Plan of Adjustment, whose benefit will be reduced as provided in Section K-1, and who is eligible to receive Income Stabilization Benefits because (i) such individual is receiving monthly pension benefits from the Retirement System as of the effective date of the Plan of Adjustment, and (ii) such individual has a total annual household income equal to or less than 140% of the federal poverty level in 2013 (per his or her (or in the case of a minor child, his or her legal guardian's) 2013 income tax return or equivalent documentation).

    a.     An eligible individual must apply for an Income Stabilization Benefit in accordance with procedures established by the Authority and provide such substantiation of the individual's aggregate annual household income as is required by the State in its sole discretion.

    b.     The initial determination of Eligible Pensioners, and amount of the Income Stabilization Benefit payable to each Eligible Pensioner shall be made by the State in its sole discretion. The State shall transmit the list of Eligible Pensioners to the Investment Committee and the Board. The Board, with the assistance of the Investment Committee shall be responsible for administering the Income Stabilization Fund and annually certifying to the State Treasurer that it has administered the requirements for eligibility and payment of benefits with respect to Eligible Pensioners in accordance with the terms of the State Contribution Agreement.

    c.     After the initial determination of Eligible Pensioners is made, no new individuals will be eligible to receive an Income Stabilization Benefit or an Income Stabilization Benefits Plus benefit at any time in the future.

    d.     An Eligible Pensioner will cease to be an Eligible Pensioner as of the earlier of (i) the Eligible Pensioner's death or (ii) with respect to any minor child receiving survivor benefits, the date the minor child reaches the age of 18 years.

(6)     For purposes of this Section K-2, the "Federal Poverty Level" means the poverty guidelines published each year in the Federal Register by the United States Department of Health and Human Resources.

13-53846-tjt Doc 8750-2 Filed 12/15/14 Entered 12/15/14 20:31:17 Page 5 of 150
13-53846-swr Doc 8029-2 Filed 10/24/14 Entered 10/24/14 03:03:17 Page 5 of 150
220

(7)     In the event that, in 2022 (provided that the State has not issued a Certificate of Default (as defined in the State Contribution Agreement) with respect to the Retirement System at any time prior to 2022), it is the opinion of at least 75% of the independent members of the Investment Committee that the assets of the Income Stabilization Fund exceed the Income Stabilization Benefits and Income Stabilization Benefits Plus benefits anticipated to be made to Eligible Pensioners by the Retirement System in the future ("Excess Assets"), the Investment Committee may, in its sole discretion, recommend to the Board that all or a portion of the Excess Assets, in an amount not to exceed $35 million, be used to fund the Adjusted Benefits payable by the Retirement System. The Investment Committee shall have the right to engage professional advisers to assist in making this determination and such expenses shall be paid by the Retirement System.

(8)     In the event that any funds remain in the Income Stabilization Fund on the date upon which there are no Eligible Pensioners under the Retirement System, such funds shall be used to fund the Adjusted Benefits payable by the Retirement System.

## Sec. K-3.     Restoration of Pension Benefits

The following rules shall govern how Pension Improvement Factor (Escalator) ("COLA") benefits, that are reduced as part of the Plan of Adjustment, shall be restored during the thirty year period following the confirmation order issued by the Bankruptcy court in *In Re City of Detroit, Michigan,* Case No. 13-53846. The pension restoration process shall be supervised, and restoration decisions undertaken by the Investment Committee and in accordance with the pension governance provisions set forth in the State Contribution Agreement and exhibits thereto. The pension restoration program shall be deemed a part of this Component II, but in the event of any conflict between the language set forth herein and the pension restoration agreement attached to and made a part of the Plan of Adjustment ("Pension Restoration Agreement"), the terms of the Pension Restoration Agreement will govern.

(1)     *Waterfall Classes.*

There will be three Waterfall Classes:

a.      Waterfall Class 1 – Retirees, in retirement benefit pay status as of June 30, 2014, and their surviving spouses and Beneficiaries.

b.      Waterfall Class 2 – Retirees, who entered into retirement benefit pay status after June 30, 2014, and their surviving spouses and Beneficiaries, and who are in pay status as of the end of the Fiscal Year prior to the year in which the restoration decision is made.

c.      Waterfall Class 3 – All retirees, surviving spouses, and beneficiaries in pay status and all other Members who as of June 30, 2014 are not in retirement benefit pay status.

13-53846-tjt Doc 8755-3 Filed 12/15/14 Entered 12/15/14 12:03:17 Page 6 of 50
13-53846-swr Doc 8029-2 Filed 10/24/14 Entered 10/24/14 03:03:17 Page 6 of 50
220

(2)     *Restoration of Benefits Through June 30, 2023.*

a.      Each year in conjunction with the annual actuarial valuation report, the Plan Actuary will project the funded ratio of the Retirement System as of 2023 based upon the market value of plan assets relative to the actuarial accrued liabilities (the "Funded Level"). This projection will be further based upon a 6.75% assumed rate of investment return which is net of expenses (administrative and investment), future employer contributions as set forth in the Plan of Adjustment (subject to conditions in the Plan of Adjustment), and such other actuarial assumptions as utilized by the Plan Actuary. For purposes of restoration of benefits through June 30, 2023, the Funding Target will be a 75% funded ratio, and the Restoration Target will be a 78% funded ratio, both projected to June 30, 2023. For purposes of calculating the funded ratio, the assets in the Restoration Reserve Account will be excluded. Each year, if the Plan Actuary projects that the Funded Level as of 2023 (excluding Restoration Reserve Account assets to avoid double counting) exceeds the Restoration Target (i.e., exceeds 78%), a credit of assets for bookkeeping purposes will be made into a new notional Restoration Reserve Account. The notional credit will be an amount equal to the excess of assets above the amount projected to be needed to satisfy the Restoration Target. Once the Restoration Reserve Account is established, each year thereafter, Restoration Account assets will be credited with interest  in an amount equal to the net return on Retirement System investments but capped at the actuarially assumed rate of investment return (i.e., 6.75% for the period through June 30, 2023). In the event of net losses, the credited asset value of the Restoration Reserve Account will be diminished to reflect such losses and any required transfer to the PFRS Pension Reserve Fund as provided herein.

b.      Actual restoration payments and restoration credits will work as follows: each year, in conjunction with the preparation of the annual actuarial valuation report and following establishment of the Restoration Reserve Account, the Plan Actuary will determine whether there are sufficient funds in such account to restore COLA benefits in a minimum incremental amount of 10% or more. For example: if a retiree's then current COLA benefit is a 1.0% annual compounded COLA, the minimum incremental restoration would increase the COLA benefit to 1.225%. COLA restoration only will occur if the funding level in the Restoration Reserve Account can fund 100% of the COLA increase over the actuarially-projected lives of the eligible recipient Waterfall Class. If the Plan Actuary certifies that the Restoration Reserve Account as of the end of the prior Fiscal Year satisfies the required funding level for one or more increments of restoration, then in the next immediate Fiscal Year actual COLA restoration payments will be made to PFRS Waterfall Class 1 members in such increments until an amount sufficient to fund 66% of the value of their future COLA payments (e.g., a 1.5% compound COLA, or as otherwise applicable) has been funded. At that juncture, and to the

13-53846-tjt  Doc 8045-2  Filed 12/15/14  Entered 12/15/14 12:29:17  Page 7 of 150
13-53846-swr  Doc 8029-2  Filed 10/24/14  Entered 10/24/14 03:03:17  Page 9 of 150
220

extent that additional assets in the Restoration Reserve Account would fully fund COLA restoration in at least one minimum 10% increment (i.e., amounts equal to 10% of the value of future COLA payments), Waterfall Class 2 members will receive COLA restoration, until an amount sufficient to fund 66% of the value of their future COLA payments has been funded. At that juncture, and to the extent that additional assets in the Restoration Reserve Account would fully fund COLA restoration in at least one minimum 10% increment (i.e., amounts equal to 10% of the value of future COLA payments), Waterfall Class 3 members will receive COLA restoration on a pro-rata basis. For Waterfall Class 3 members who are in pay status at that time of restoration, they will receive COLA payments; for active employees at the time of restoration, they will receive credits granting them a right upon retirement to receive COLA restoration equal to the 10% increments that are fully funded to Waterfall Class 3 members. For example: assume there are sufficient assets credited to the Restoration Reserve Account as of the end of a Fiscal Year to fully fund 66% of the value of the COLA for all Waterfall Class 1 and Class 2 members for their actuarially projected lives. To the extent additional assets remain in the Restoration Reserve Account to fully fund at least a 10% COLA increment for Waterfall Class 3 members for their actuarially projected lives, then (i) all retirees would receive a restoration payment of 76% of the value of their COLAs (their having already received by virtue of their membership in Waterfall Classes 1 and 2 an increase to 66% of the value of their COLAs) and also a 10% COLA increment would be credited to eligible active employees which would be included in their benefit payments upon retirement (thus causing their COLAs to increase in value from 45% to 55%). Restoration amounts actually paid from the Restoration Reserve Account will be debited from such account. Restoration payments will be calculated and paid on a prospective basis only.

c.  Once restoration payments and credits begin, as long as the Restoration Reserve Account continues to have assets to fund 100% of an incremental COLA restoration amount for such Waterfall Class for their actuarially projected lives, the restoration payments and credits will continue; provided, however, that in the event the Restoration Reserve Account, after having sufficient assets to fund 100% of two or more increments, falls below 100% for the second or greater increment, the annual amounts to pay such second or greater increment can continue until the Restoration Reserve Account lacks any assets to fund such additional increment. For example, assume a 10% increment in Waterfall Class 1 requires $10 million in assets to be fully funded for the Waterfall Class members' actuarially projected lives, and that based on Fiscal Year 2018 results the Restoration Reserve Account has assets of $22 million so as to fund two increments of restoration in Fiscal Year 2019. Assume further that in the following year the Restoration Reserve Account drops in value to $17 million; in such event two increments could still be paid, and the second

13-53846-tjt Doc 8750-2 Filed 12/15/14 Entered 12/15/14 20:03:17 Page 8 of 150
13-53846-swr Doc 8029-2 Filed 10/24/14 Entered 10/24/14 03:03:17 Page 8 of 50
220

increment would cease being paid only if the value of assets in the Restoration Reserve Account dropped to or below $10 million (in the event they dropped below $10 million, the first increment also would cease being paid). For purposes of restoration reduction, restoration increments will be taken away in reverse order in which they were granted (i.e. last in, first out).

d. If the Funded Level (excluding Restoration Reserve Assets) projected to 2023 falls below 76% (hereinafter, "Restoration Reserve Suspension Trigger"), then, until such time as the projected Funded Level in 2023 is 76% or above, further interest credits to the notional Restoration Reserve Account will cease notwithstanding the actual net Retirement System investment returns for the Fiscal Year in question. Furthermore, if the Funded Level projected to 2023 falls below the Funding Target (i.e., 75%) then restoration payments to retirees and credits to active employees in the following year will be modified in the following manner: (1) funds previously credited to the Restoration Reserve Account will be notionally transferred and credited to the Pension Reserve Fund in sufficient amounts to restore the projected Funded Level in 2023 to 75%; (2) following such transfer, the remaining assets in the Restoration Reserve Account shall be applied to make restoration payments in accordance with and pursuant to the same mechanism described in paragraph c.

e. In connection with preparation of the actuarial report for Fiscal Year 2023, the Plan Actuary will determine whether the Retirement System has satisfied the Permanent Restoration Target, which shall be 78%. Transfers from the Restoration Reserve Account for credit to the Pension Reserve Fund may be made in such amounts as are necessary to satisfy the Permanent Restoration Target. If following such transfers, the Funded Level as of June 30, 2023 has satisfied the Permanent Restoration Target (i.e., 78%), then the residual amounts, if any, in the Restoration Reserve Account (which will necessarily represent excess not necessary to satisfy the Permanent Restoration Target), and which fully fund one or more increments of COLA restoration payments for one or more Waterfall Classes for their actuarially projected lives, shall be transferred from the Restoration Reserve Account and credited to the Pension Reserve Fund and the applicable incremental COLA payments shall be permanently restored for the applicable Waterfall Class and shall no longer be variable from year to year.

f. Following receipt of the actuarial reports for 2019, and in the event that the projected Funded Level of the Retirement System as of 2023 is less than 76%, the Plan Actuary shall revisit the restoration calculations that it made during each of the prior four (4) years. It shall recalculate each such prior year's Funded Level projection, this time by assuming the lesser of (i) $4.5 million in annual administrative expenses until 2023, or (ii) an amount of annual administrative expenses until 2023 equal to the average

13-53846-tjt Doc 8750-2 Filed 12/15/14 Entered 12/15/14 02:03:17 Page 9 of 150
13-53846-swr Doc 8029-2 Filed 10/24/14 Entered 10/24/14 03:03:17 Page 9 of 50
220

annual normal course administrative expenses in the prior four (4) years applicable to Component II, in addition to a net 6.75% annual investment return. If such retrospective recalculation indicates that fewer amounts would have transferred to the Restoration Reserve Account than actually were transferred during such look back period, then the Restoration Reserve Account shall be debited by the lesser of (i) this difference (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period or (ii) the dollars that were actually paid out in restoration payments during such look-back period (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period); or (iii) the amount required to increase the projected 2023 Funded Level to 76%.

(3)     *Restoration of Benefits from July 1, 2023 to June 30, 2033*.

a.     If and to the extent that all COLA payments have not been restored as of June 30, 2023 pursuant to Section (2)(e), then during this period and for purposes of variable restoration, the Funding Target, the Restoration Target, the Permanent Restoration Target and the Restoration Reserve Suspension Trigger shall be as set forth below, all projected as of June 30, 2033:

| 2023 Funded Level | 2033 Funding Target/Restoration Target |
|---|---|
| 78% | 81%/84% |
| 77% | 80%/83% |
| 76% | 79%/82% |
| 75% | 78%/81% |
| 74% or lower | 3% >than 2023 Funded Level %/81% |

2033 Permanent Restoration Target - Same as 2033 Restoration Target

2033 Restoration Reserve Suspension Trigger – 1% higher than the projected Funding Target for all time periods

b.     The same rules for restoration payments that applied during the period ending June 30, 2023 shall apply (including ceasing interest credits in the event of a Restoration Reserve Suspension Trigger, and making Restoration Account asset transfers to the Pension Reserve Fund in the event the 2033 Funded Level falls below the 2033 Funding Target), except as follows. For purposes of determining whether the 2033 Restoration Target has been satisfied, the Plan Actuary shall project investment returns through June 30, 2033 using the then current investment return assumption which is assumed to be net of expenses (administrative and investment), and the then applicable actuarial assumptions as utilized in the annual actuarial valuation. Further, the Plan Actuary shall assume, merely for purposes of determining whether the Restoration Target is satisfied, that

the annual City contribution amount shall be the annual amount necessary to fund the Retirement System based upon an amortization of the actual 2023 UAAL (using the market value of assets) over 30 years (hereinafter, the "2023 UAAL Amortization") and in such manner that the resulting annual contributions would achieve the applicable Funding Target (pursuant to paragraph b) as of 2033. Such projected, hypothetical contributions shall be for purposes only of making restoration determinations, and shall not necessarily be the actual contributions made or required to be made by the City or recommended during such period; all of which shall be determined independent of the restoration calculation process. For purposes of calculating the funded ratio, the assets in the Restoration Reserve account will be excluded.

c.   To the extent that the City's actual contributions to the Retirement System in any of the Fiscal Years 2024 (i.e., the year ending June 20, 2024) through 2033 are greater than the projected annual contribution under the 2023 UAAL Amortization, such amounts, and any investment earnings thereon, shall be notionally credited to a new bookkeeping account in the Retirement System called the Extra Contribution Account. In determining pension restoration during the period from Fiscal Year 2024 through 2033, none of the amounts in the Extra Contribution Account shall be considered for purposes of determining the projected Funded Level for purposes of determining whether the Retirement System has attained the Restoration Target or the Permanent Restoration Target. To the extent that the City's actual contributions in any of the Fiscal Years 2024 through 2033 are less than the City's projected annual contribution under the 2023 UAAL Amortization, such difference and any investment earnings thereon shall be notionally allocated to the Pension Reserve Fund.

d.   Each year, in addition to the notional credit of amounts that exceed the amount necessary to satisfy the Restoration Target, existing notional Restoration Account assets will be credited with interest equal to the net return on Retirement System investments; however, such interest shall not exceed the then investment return assumption. In the event of net losses on the Retirement System's investments, the notional assets credited to the Restoration Reserve Account will be reduced to reflect such losses.

e.   In connection with preparation of the actuarial report for Fiscal Year 2033, the Plan Actuary will determine whether the Retirement System has satisfied the applicable Permanent Restoration Target (i.e., the 2033 Restoration Target). Transfers from the Restoration Reserve Account for credit to the Pension Reserve Fund may be made in such amounts as are necessary to satisfy the Permanent Restoration Target. If following such transfers the funding level as of June 30, 2033 has satisfied the applicable Permanent Restoration Target, then the residual amounts in the Restoration Reserve Account, if any (which will necessarily represent excess not necessary to satisfy the Permanent Restoration Target), and

which fully fund one or more increments of COLA restoration payments for one or more Waterfall Classes, shall be transferred from the Restoration Reserve Account and credited to the Pension Reserve Fund and the applicable incremental COLA payments shall be permanently restored for the applicable Waterfall Class and shall no longer be variable from year to year.

    f.    Following receipt of the actuarial report for 2028, and in the event that the projected Funded Level as of 2033 is less than 79%, the Plan Actuary shall revisit the restoration calculations that it made during each of the prior four (4) years.  It shall recalculate each such prior year's Funded Level projection, this time by assuming the lesser of (i) $4.5 million in annual administrative expenses until 2033, or (ii) an amount of annual administrative expenses until 2033 equal to the average annual normal course administrative expenses in the prior four (4) years applicable to Component II, in addition to a net 6.75% annual investment return.  If such retrospective recalculation indicates that fewer amounts would have transferred to the Restoration Reserve Account than actually were transferred during such look back period, then the Restoration Reserve Account shall be debited by the lesser of (i) this difference (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the applicable look-back period) or (ii) the dollars that were actually paid out in restoration payments during such look-back period (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the applicable look-back period); or (iii) the amount required to increase the projected 2033 Funded Level to 79%.

(4)    *Restoration of Benefits from July 1, 2033 to June 30, 2043*.

    a.    If and to the extent that all COLA payments have not been restored pursuant to Section (3)(f) as of June 30, 2033, then during the period ending June 30, 2043 and for purposes of variable restoration, the Funding Target, the Restoration Target, the Permanent Restoration Target and the Restoration Reserve Suspension Trigger shall be as set forth below, all projected as of June 30, 2043.

| 2023 Funded Level | 2043 Funding Target/Restoration Target |
|---|---|
| 78% | 84%/87% |
| 77% | 83%/86% |
| 76% | 82%/85% |
| 75% | 81%/84% |
| 74% or lower | 3% > than 2023 Funded Level %/84% |

2043 Permanent Restoration Target - Same as 2043 Restoration Target

b.      The same rules for restoration that applied during the period ending June 30, 2033 shall otherwise apply (including ceasing interest credits in the event of a Restoration Reserve Suspension Trigger, and the making of notional asset transfers from the Restoration Reserve Account to the Pension Reserve Fund in the event the 2043 Funded Level falls below the 2043 Funding Target) and shall be rolled forward.  For example,  for purposes of determining whether the 2043 Restoration Target has been satisfied, the Plan Actuary shall project annual contributions using the same 2023 UAAL Amortization.  For purposes of calculating the funded ratio, the assets in the Restoration Reserve account will be excluded, and no Extra Contribution Account assets shall be included for purposes of determining whether the Funded Level meets the Restoration Target or Permanent Restoration Target, including any additions to such account after 2033.

c.      In connection with preparation of the annual actuarial valuation report for Fiscal Year 2043, the Plan Actuary will determine whether the Retirement System has satisfied the applicable Permanent Restoration Target, as set forth in paragraph a above.  Transfers from the Restoration Reserve Account for credit to the Pension Reserve Fund may be made in such amounts as are necessary to satisfy the Permanent Restoration Target.  If following such transfers the Funded Level as of June 30, 2043 is equal to or greater than the applicable Permanent Restoration Target, then the residual amounts in the Restoration Reserve Account, if any  (which will necessarily represent excess not necessary to satisfy the Permanent Restoration Target), shall be transferred from the Restoration Reserve Account and credited to the Pension Reserve Fund and the applicable incremental COLA payments shall be permanently restored for the applicable Waterfall Class and shall no longer be variable from year to year.

(5)     *Modification of the Pension Restoration Program.*

If at any time after July 1, 2026, the Investment Committee by vote of five of its seven Members, or the Board of Trustees by a greater than 66% vote, determines that a change in relevant circumstances has occurred, or there was a mutual mistake of fact in developing the Pension Restoration Agreement attached to and made a part of the Plan of Adjustment, such that the continued operation of the Pension Restoration Agreement and this Section K-3 without amendment will: (a) materially harm the long-term economic interests of the City or Retirement System; (b) materially impair the City's ability to fully fund over a reasonable period the then existing frozen benefit liabilities; or (c) materially hinder the Restoration Program, if as of that juncture (and for purposes of applying this subsection K-3(5)(a)) annual funding levels (excluding the Extra Contribution Account) had materially exceeded the applicable Restoration Targets for a substantial period yet

without any material actual restoration of benefits as contemplated herein having been made, the Investment Committee or the Board, as the case may be, shall provide written notice to the other entity of such a determination and of the need to amend the Pension Restoration Agreement and this Section K-3 (it being understood that the post-Chapter 9, 40-year amortization period (to 2053) to fully fund frozen liabilities is, unless the relevant facts demonstrate otherwise, presumptively reasonable). The Investment Committee and the Board shall then meet to negotiate amendments to the Pension Restoration Agreement that address the identified risk of harm or impairment, but which also considers the Agreement's objective of providing pension restoration. Such negotiations shall take into account reasonable actions the City has pursued or could pursue to mitigate such harm or impairment. Any such amendments shall require the approval of a majority vote of the combined members of the Investment Committee and Board (persons who sit on both the Board and Investment Committee shall have one vote). Such parties shall consult with the Mayor, City Council and the Governor in connection with such negotiation.

If the Board, acting through a majority, and the Investment Committee, acting through a majority, cannot agree to such amendments with the 90-day period following the provision of such notice by the determining party, then the Board and Investment Committee shall proceed to mediation upon demand from either the Board or the Investment Committee. In this regard, within 30-days following expiration of the 90-day period the Board and the Investment Committee shall each select a mediator from the list of approved mediators for the United States District Court for the Eastern District of Michigan. The two selected mediators shall appoint a third neutral mediator from the approved list. Each party shall furnish a written statement to the mediators within 30 days of selection of the neutral mediator. Representatives of the Mayor and the Governor shall be consulted in connection with such mediations. If following a 90-day mediation period following submission of the written statements the matter is not settled, then either the Investment Committee or the Board can file an action in the United Stated District Court for the Eastern District of Michigan asking it to declare, *inter alia*, whether or in what manner to amend the Pension Restoration Agreement and this Section K-3.

# APPENDIX A

The following provisions shall also have general applicability to the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan:

## MCLS Const. Art. IX, § 24 (2003)

### § 24.  Public pension plans and retirement systems, obligation.

Sec. 24.  The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby.

Financial benefits arising on account of service rendered in each Fiscal Year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities.

Relevant Provisions of
January 1, 2012
City of Detroit Charter


ARTICLE 11.
RETIREMENT PLANS


**Sec. 11-101. City's Duties**.

1.      The City shall provide, by ordinance, for the establishment and maintenance of retirement plan coverage for city employees.

2.      Financial benefits arising on account of service rendered in each Fiscal Year shall be funded during that year and that funding shall not be used for financing unfunded accrued liabilities.

3.      The accrued financial benefits of active and retired city employees, being contractual obligations of the city, shall in no event be diminished or impaired.

**Sec. 11-102. Continuation of Existing Plans**.

The retirement plans of the city existing when this Charter takes effect, including the existing governing bodies for administering those plans, the benefit schedules for those plans and the terms for accruing rights to and receiving benefits under those plans shall, in all respects, continue in existence exactly as before unless changed by this Charter or an ordinance adopted in accordance with this article.

**Relevant Provisions of the**
**Detroit City Code**

## Sec. 47-1-2. Detroit Police and Fire Retirement System.

Notwithstanding any collective bargaining agreement or other documents governing terms of employment to the contrary, effective as of July 1, 2014, the Detroit Police and Fire Retirement System shall hereinafter be memorialized in a separate written document entitled "Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan," which shall comprise the exclusive terms of the Detroit Police and Fire Retirement System and be kept in the Office of the City Clerk for the City of Detroit.

**Collective Bargaining Agreements.**

Except to the extent otherwise provided in the Plan of Adjustment, under Michigan Law if there is any conflict between the Retirement System provisions and collective bargaining agreement provisions, the terms of the collective bargaining agreement control.

(a)     The Board of Trustees shall administer the Retirement System consistent with the pension provisions of the 2014-2019 collective bargaining agreement between the City of Detroit and the Detroit Police Officers Association with respect to police officers covered by said collective bargaining agreement.

(b)     The Board of Trustees shall administer the Retirement System consistent with the pension provisions of the 2014-2019 collective bargaining agreement between the City of Detroit and the Detroit Police Lieutenants and Sergeants Association.

(c)     The Board of Trustees shall administer the Retirement System consistent with the pension provisions of the 2014-2019 collective bargaining agreement between the City of Detroit and the Detroit Police Command Officers Association.

(d)     The Board of Trustees shall administer the Retirement System consistent with the pension provisions of the 2014-2019 collective bargaining agreement between the City of Detroit and the Detroit Fire Fighters Association.

**EXHIBIT I.A.296**

RESTORATION TRUST AGREEMENT

# CITY OF DETROIT PENSION RESTORATION TRUST

THIS TRUST AGREEMENT, entered into effective _____, 2014, by and among, the City of Detroit ("Detroit" or the "City") acting by and through **[Kevyn Orr acting as the appointed Emergency Manager pursuant to PA 436, M.C.L. §141.1541 et seq./Mayor Michael E. Duggan]** and each member of the Board of Trustees named herein.

## WITNESSETH:

WHEREAS, Detroit filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code on July 18, 2013 in the United States Bankruptcy Court for the United States Bankruptcy Court Eastern District of Michigan, Case No. 13-53846 (the "Court");

WHEREAS, pursuant to the Plan for the Adjustment of Debts of the City of Detroit (as confirmed by the Court, the "Plan of Adjustment"), the City agreed to establish a trust upon the Effective Date of the Plan of Adjustment (i) to hold the DWSD CVR (as defined in the Plan of Adjustment) and enforce rights related to its terms, and to consult with the trustees and investment committee of the Police and Fire Retirement System for the City of Detroit ("PFRS") and the General Retirement System for the City of Detroit ("GRS"), respectively in connection with General Restoration and Special Restoration relating to the DWSD CVR, each as defined below;

WHEREAS, Detroit hereby establishes this City of Detroit Pension Restoration Trust (the "Trust");

WHEREAS, the Board of Trustees shall be responsible for maintaining and administering this Trust and managing the property held by this Trust;

WHEREAS, the members of the Board of Trustees are willing to exercise the authority and rights of consultation granted to it herein with regard to the Trust; and

NOW THEREFORE, in consideration of the premises and the covenants contained herein, Detroit and the members of the Board of Trustees agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    Board of Trustees or Board.  The Board of Trustees is the body described in Article VII to which Detroit has delegated responsibility for:  (i) maintaining and administering this Trust and managing the property held by this Trust; and (ii) exercising the duties and responsibilities of the Board of Trustees set forth in this Trust Agreement.  The Board of Trustees shall be constituted in accordance with Article VII and shall have the duties and authorities described in Article V.

Section 1.2    Code.  Means the Internal Revenue Code of 1986, as amended, and any successor statute thereto.

Section 1.3   Beneficiaries.  Means the beneficiaries of this Trust, which beneficiaries shall be the GRS, the PFRS and the participants in GRS and PFRS entitled to the benefits of the Restoration Plan.

Section 1.4   DWSD CVR.  Has the meaning given to that term in the Plan of Adjustment.

Section 1.5   General Restoration.  Means the potential restoration or replacement of benefit reductions imposed by the Plan of Adjustment pursuant to the terms of the Restoration Plan.

Section 1.6   GRS.  Means the General Retirement System for the City of Detroit.

Section 1.7   Holder of Pension Claims.  Has the meaning given to that term in the Plan of Adjustment.

Section 1.8   Plan of Adjustment.  Means the Plan for the Adjustment of Debts of the City of Detroit, as confirmed by order of the Court dated [---], a copy of which is attached hereto as Exhibit A.

Section 1.9   PFRS.  Means the Police and Fire Retirement System for the City of Detroit.

Section 1.10   Qualifying DWSD Transaction.  Has the meaning given to that term in the Plan of Adjustment.

Section 1.11   Restoration Plan.  Means the general rules governing pension benefit restoration to the PFRS and the GRS as set forth in Exhibit II.B.3.q.ii.C and Exhibit II.B.3.r.ii.C of the Plan of Adjustment.  A copy of the Restoration Plan is attached hereto as Exhibit B.

Section 1.12   Retiree Committee.  Has the meaning given to that term in the Plan of Adjustment.

Section 1.13   Special Restoration.  Means the potential restoration or replacement of benefit reductions imposed by the Plan of Adjustment in connection with a Qualifying DWSD Transaction, as described in Section IV.F of the Plan of Adjustment.

Section 1.14   Trust Agreement.  This agreement as it may be amended hereafter from time to time by the parties hereto.

Section 1.15   Trust or Trust Fund.  The City of Detroit Pension Restoration Trust established by this Trust Agreement, comprising all property or interests in property held by, or under the custody and control of, the Board from time to time under this Trust Agreement.

## ARTICLE II
## ESTABLISHMENT OF TRUST

Section 2.1   <u>Purpose</u>.  The Trust is established to receive and hold the DWSD CVR and enforce rights related to its terms, and to consult with the trustees and investment committee of the PFRS and the GRS, respectively in connection with General Restoration and Special Restoration relating to the DWSD CVR.

Section 2.2   <u>Receipt of Funds</u>.  The Board shall accept all sums of money and other property contributed to the Trust by Detroit pursuant to Article III.  The Board shall hold, manage and administer the Trust Fund without distinction between principal and income.

Section 2.3   <u>Inurement and Reversion Prohibited</u>.  At no time shall any part of the principal or income of the Trust Fund be used for, or diverted to, any purpose other than distributing proceeds from the DWSD CVR in the manner described by Section IV.F of the Plan of Adjustment.  Nothing in this Trust Agreement shall be construed in such a way as to prohibit the Board from using the assets of the Trust Fund to pay reasonable fees and other expenses and obligations incurred in maintaining and administering the Trust or to maintain a reserve of funds needed to pay reasonable fees and expenses expected to be incurred in the future.

Section 2.4   <u>No Residual Interest</u>.  Detroit shall not have any legal or equitable interest in the assets of the Trust Fund at any time, including following the termination of the Trust.

## ARTICLE III
## CONTRIBUTIONS TO THE TRUST FUND

Section 3.1   <u>Detroit Contributions</u>.  The Board will accept the City's contribution of the DWSD CVR to the Trust Fund pursuant to the Plan of Adjustment.  Apart from the contribution of the DWSD CVR (and any amounts payable to the Trust Fund pursuant to the terms of the DWSD CVR), Detroit shall have no further obligation to contribute to the Trust.

## ARTICLE IV
## PAYMENTS FROM THE TRUST FUND

Section 4.1   <u>Payments from the Trust Fund</u>.

(a)   Subject to paragraph (b) below, the Board shall within a reasonable time after receiving proceeds from the DWSD CVR distribute such proceeds (less the amount retained by the Trust Fund in the sole discretion of the Board to pay reasonable fees and expenses previously incurred or expected to be incurred to maintain and administer the Trust) directly to the GRS and PFRS in the manner described in Section IV.F of the Plan of Adjustment.

(b)   The Board may retain or withhold all or any part of any payment as the Board in the exercise of its reasonable discretion may deem proper, to protect the Board and the Trust against any liability or claim on account of any income or other tax whatsoever; and with all or any part of any such payment so retained or withheld, may discharge any such liability. Any part of any such payment so retained or withheld by the Board that may be determined by

the Board to be in excess of any such liability will upon such determination by the Board be paid to the GRS and PFRS in the manner described in Section IV.F of the Plan of Adjustment.

Section 4.2    Excessive Payments.  If the payment of any distributions under the Trust is determined to have been excessive or improper, and the recipient thereof fails to make repayment to the Board or Board's agent of such excessive or improper payment upon the Board's request, the Board shall deduct the amount of such excessive or improper payment from any other benefits thereafter payable to such person.  Until repaid to the Board or Board's agent, the amount of said excessive or improper payment shall not be included in the Trust Fund.

# ARTICLE V
# BOARD POWERS AND DUTIES

Section 5.1    Powers of the Board Generally.  The Board has whatever lawful powers are required to discharge its obligations and to accomplish any of the purposes of this Trust Agreement, including (but not limited to) the powers specified in the following Sections of this Article, and the powers and authority granted to the Board under other provisions of this Trust Agreement.  The enumeration of any power herein shall not be by way of limitation, but shall be cumulative and construed as full and complete power in favor of the Board.

Section 5.2    Powers Exercisable by the Board.  The Board is authorized and empowered to exercise the following powers at its discretion in satisfaction of the duties imposed on it under this Trust Agreement:

(a)    To place securities orders, settle securities trades, hold securities in custody, deposit securities with custodians or securities clearing corporations or depositories or similar organizations, and other related activities as shall be necessary and appropriate in performing its duties under this Trust Agreement.  Trades and related activities conducted through a broker shall be subject to reasonable fees and commissions established by the broker, which may be paid from the Trust Fund or netted from the proceeds of trades.

(b)    To make, execute, acknowledge and deliver any and all documents of transfer and conveyance and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted.

(c)    To cause any investment in the Trust Fund to be registered in, or transferred into, the name of any institutional custodian appointed by the Board, or the name of its nominee or nominees, or to retain such investments unregistered in a form permitting transfer by delivery, but the books and records of the Board shall at all times show that all such investments are part of the Trust Fund, and the Board shall be fully responsible for any misappropriation in respect of any investment held by its nominee or held in unregistered form; and shall cause the indicia of ownership to be maintained within the jurisdiction of the district courts of the United States;

(d)    To receive, hold, invest and reinvest Trust Fund assets and income under provisions of law from time to time existing and in accordance with Article V;

(e)     To exercise or abstain from exercising any option, privilege or right attaching to any Trust Fund assets;

(f)     To make payments from the Trust Fund in accordance with Article IV and for the payment of expenses as provided in Section 5.5;

(g)     To employ suitable agents and depositaries (domestic or foreign), public accountants, brokers, custodians, ancillary trustees, appraisers, legal counsel and other expert advisors as shall be necessary and appropriate, and to pay their reasonable expenses and compensation;

(h)     To pay any income or other tax or estimated tax, charge or assessment attributable to any property or benefit out of such property or benefit in its sole discretion, or any tax on income of the Trust, if any, out of the Trust Fund;

(i)     To file all reports and returns that are required to be made with respect to the Trust:

(j)     To vote, in person or by general or limited proxy, at any election of any corporation in which the Trust Fund is invested, and similarly to exercise, personally or by a general or limited power of attorney, any right appurtenant to any investment held in the Trust Fund; and

(k)     To accept, compromise or otherwise settle any obligations or liability due to or from the Trust as the Board hereunder, including any claim that may be asserted for taxes, assessments or penalties under present or future laws, or to enforce or contest the same by appropriate legal proceedings.

Notwithstanding the foregoing, the Board shall not (i) assign, transfer, convey or sell its interest in the DWSD CVR except for an assignment due to the appointment of successors to members of the Board in accordance with Section 7.2; and (ii) invest any assets in real estate or real estate securities

Section 5.3   <u>Title to Trust Fund</u>.  All rights, title and interest in and to the Trust Fund shall at all times be vested exclusively in the Board.

Section 5.4   <u>General Duties and Obligations of Board</u>.

(a)     In accordance with Article II but subject to Section 4.1, the Board shall hold all property received by it and any income and gains thereupon.  In accordance with this Article, the Board shall manage, invest and reinvest the Trust Fund, shall collect the income therefrom, and shall make payments or disbursements in accordance with Section 4.1.

(b)     The Board shall confer with the trustees and investment committee of the GRS and PFRS, respectively, with respect to the Special Restoration and General Restoration; provided, however, that the Board shall not have any right to initiate any enforcement

82645430\V-2

CLI-2245193v3

proceedings against the trustees or investment committee of either GRS or PFRS with respect to Special Restoration or General Restoration.

(c)     The Board shall discharge its duties in the interests of the Beneficiaries and for the exclusive purpose of making distributions to the GRS and PFRS as provided in Section 4.1 and defraying reasonable expenses of administering the Trust and shall act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in like capacity and familiar with such matters would use in conduct of an enterprise of like character and with like aims.

Section 5.5     Payment of Expenses.  The Board shall apply the assets of the Trust Fund to pay all reasonable costs, charges, and expenses (including, but not limited to, all brokerage fees and transfer tax expenses and other expenses incurred in connection with the sale or purchase of investments, all real and personal property taxes, income taxes and other taxes of any kind at any time levied or assessed under any present or future law upon, or with respect to, the Trust Fund or any property included in the Trust Fund and all legal, actuarial, accounting and financial advisory expenses) reasonably incurred by the Board in connection with maintaining and administering the Trust, including attendance at meetings related thereto.  The expenses of the Board shall constitute a lien on the Trust Fund.

Section 5.6     No Board Compensation.  Except as provided in Section 5.5, the members of the Board shall serve without compensation.

## ARTICLE VI
## BOARD ACCOUNTS

Section 6.1     Records.  The Board shall maintain accurate and detailed records and accounts of all investments, receipts, disbursements, and other transactions with respect to the Trust, and all accounts, books and records relating thereto shall be open at all reasonable times to inspection and audit by interested persons at the principal office of the Trust.

Section 6.2     Annual Audit.  The Trust Fund shall be audited annually by an independent firm of certified public accountants, and a statement of the results of such audit shall be provided to the Board and also made available for inspection by interested persons at the principal office of the Trust.

Section 6.3     No Interest by Beneficiaries.  In no event shall any Beneficiary have any interest in any specific asset of the Trust Fund.  At no time shall any account or separate fund be considered a savings account or investment or asset of any particular Beneficiary, or class of Beneficiaries, and no Beneficiary shall have any right to any particular asset which the Board may have allocated to any account or separate fund for accounting purposes.

Section 6.4     Accounting Year, Cash Basis.  The accounting year of the Trust shall be the calendar year.  All accounts of the Board shall be kept on a cash basis.

## ARTICLE VII
## COMPOSITION OF AND PROCEDURES FOR THE BOARD OF TRUSTEES

Section 7.1    Number and Appointment of Members.  The Board of Trustees shall consist of five (5) voting members.  The Retiree Committee has selected the following initial members of the Board of Trustees:[_____, _____, _____, _____, and _____.]

By execution of this Trust Agreement each Board member hereby acknowledges his or her appointment and acceptance of the duties and responsibilities set forth in this Trust Agreement.

Section 7.2    Term of Office.  Each member of the Board shall serve a period of four years until the termination of the Trust, or if earlier, until his or her death, incapacity to serve hereunder, or resignation.  In the event of a vacancy, the replacement Board member shall be appointed pursuant to procedures established by the Board.

Section 7.3    Resignation.  A Board member may resign, and shall be fully discharged from further duty or responsibility under this Trust Agreement to the extent permitted by law, by giving at least ninety (90) days' advance written notice to the remaining Board Members stating a date when such resignation shall take effect, which notice or time period may be waived by the Board.

Section 7.4    Operation of the Board; Quorum.  The Board shall select from among its members a chair and a vice chair.  The Board shall hold regular meetings, and shall designate the time and place thereof in advance.  The Board shall adopt its own rules of procedure and shall keep a record of proceedings.  Each Board Member shall be entitled to one vote on each question before the Board.  Three (3) members shall constitute a quorum at any meeting.  A majority vote of the members present at a meeting of the Board at which a quorum exists shall be necessary for a decision by the Board.

Section 7.5    Reliance on Written Instruments.  Each member of the Board shall be fully protected in acting upon any instrument, certificate or paper believed by him or her to be genuine and to be signed or presented by a duly authorized person or persons, and shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing, but may accept the same as conclusive evidence of the truth and accuracy of the statements therein contained.

Section 7.6    No Individual Liability on Contracts.  The members of the Board shall not be liable personally for any debts, obligations, or undertakings contracted by them, or for the breach of any contracts.  Such claims and obligations shall be paid out of the Trust; provided, however, that the Board shall not be exempt from personal liability for willful misconduct, intentional wrongdoing, breach of applicable fiduciary duty, negligence or fraud, and the Trust shall not indemnify the Board for such liabilities, or to the extent that application of this sentence would violate any law.

Section 7.7    City Not Liable for Conduct of Board. The Board is not, in its capacity as the Board of Trustees, an officer, agent, employee, or representative of Detroit. In its capacity as the Board of Trustees, the Board is a principal acting independently of the City, which shall not be liable for any act, omission, contract, obligation, or undertaking of the Trust, the Board or its officers, agents, or representatives.

Section 7.8    Liability Insurance. The Board may obtain and keep current a policy or policies of insurance, insuring the members of the Board from and against any and all liabilities, costs and expenses incurred by such persons as a result of any act, or omission to act, in connection with the performance of their duties, responsibilities and obligations under this Trust Agreement or the Plan. To the extent permitted by applicable law, the premiums on such policies may be paid from the Trust Fund.

Section 7.9    Reimbursement for Defense of Claims. To the extent permitted by applicable law and not otherwise covered by liability insurance purchased by the Trust (without regard to any non-recourse rider purchased by the insured), the Board, employees of the Board and persons acting on the Board's behalf pursuant to an express written delegation (each separately, the "Indemnified Party") shall be reimbursed by the Trust Fund for reasonable expenses, including without limitation attorneys fees, incurred in defense of any claim that seeks a recovery of any loss to the Plan or Trust Fund or for any damages suffered by any party to, or beneficiary of this Trust Agreement (a) for which the Indemnified Party is adjudged not liable, or (b) which is dismissed or compromised in a final settlement, where the Board or, where required by applicable law, an independent fiduciary determines that the settling Indemnified Party was not primarily responsible (in such cases, all or only a portion of the settling Indemnified Party's reasonable expenses may be reimbursed, as directed by the Board or an independent fiduciary), provided that, the Board shall have the right to approve of the retention of any counsel whose fees would be reimbursed by the Trust Fund, but such approval shall not be withheld unreasonably.

## ARTICLE VIII
## AMENDMENT, TERMINATION AND MERGER

Section 8.1    Duration of the Trust. Unless terminated earlier pursuant to Section 8.3, this Trust Agreement shall terminate automatically on the earlier of:  (a) the eighth anniversary of the Effective Date of the Plan of Adjustment if the City and the Board shall have agreed in writing that no Qualifying DWSD Transaction has occurred; or (b) the later of (i) written notice from GRS and PFRS of the death of the last individual who was a participant in such pension plans on the Effective Date of the Plan of Adjustment or (ii) the 90th anniversary of the effective date of this Trust Agreement.

Section 8.2    Amendment. The Trust Agreement may be amended at any time in writing by the Board or by Court order upon proper motion by the Board or the City, provided, however, that no amendment may impose a contribution obligation on the City beyond that specified in Section 3.1. No amendment to the Trust Agreement shall modify the responsibilities of the Board hereunder unless the Board has first consented to such amendment.

Section 8.3    Termination.

(a)    Notwithstanding Section 8.1, the Trust and this Trust Agreement may be terminated at any time in writing by the Board with a copy of such written instrument to be provided to the City, or by Court order upon proper motion. Upon termination of this Trust Agreement, the assets of the Trust Fund, if any, shall be paid out at the direction of the Board to the GRS and PFRS as provided in Section IV.F of the Plan of Adjustment. Neither Detroit nor the Board shall have any beneficial interest in the Trust Fund. If the Trust Fund has assets at the time of its termination, it shall remain in existence only until all such assets have been distributed.

(b)    Upon termination of the Trust pursuant to Section 8.1 or 8.3, the Board shall continue to have all of the powers provided in this Trust Agreement as are necessary or desirable for the orderly liquidation and distribution of the Trust Fund in accordance with the provisions hereof.

## ARTICLE IX
## MISCELLANEOUS

Section 9.1    Rights in Trust Fund. No Beneficiary or other person shall have any right, title or interest in the Trust Fund or any legal or equitable right against the Board, the Board, or Detroit, except as may be otherwise expressly provided in this Trust Agreement.

Section 9.2    Non-Alienation. Except to the extent required by applicable law, the rights or interest of any Beneficiary to any future distributions under the provisions of the GRS or PFRS shall not be subject to attachment or garnishment or other legal process by any creditor of any such Beneficiary, nor shall any such Beneficiary have any right to alienate, anticipate, commute, pledge, encumber or assign any of the benefits or payments which he may expect to receive, contingent or otherwise, under GRS or PFRS.

Section 9.3    Controlling Laws. The Trust shall be construed and the terms hereof applied according to the laws of the state of Michigan to the extent not superseded by federal law.

Section 9.4    Counterparts. This Trust Agreement may be executed in any number of counterparts, each of which shall be considered as an original.

Section 9.5    Headings. The headings and subheadings of this Trust Agreement are for convenience of reference only and shall have no substantive effect on the provisions of this Trust Agreement.

Section 9.6    Notices. All notices, requests, demands and other communications under this Trust Agreement shall be in writing and shall be deemed to have been duly given (a) on the date of receipt if served personally or by confirmed facsimile or other similar confirmed electronic communication; (b) on the first business day after sending if sent for guaranteed next day delivery by Federal Express or other next-day courier service; or (c) on the fourth business

day after mailing if mailed to the party or parties to whom notice is to be given by registered or certified mail, return receipt requested, postage prepaid, and properly addressed as follows:

<u>If to the City:</u>

**[insert name and address]**

<u>If to the Board:</u>

**[insert name and address]**

IN WITNESS WHEREOF, and as evidence of the establishment of the Trust created hereunder, the parties hereto have caused this instrument to be executed as of the date above first written.

**CITY OF DETROIT**

By: _____
Print Name: _____
Title: _____
Date: _____

**MEMBERS OF THE BOARD OF TRUSTEES**

By: _____
Print Name: _____

    Acknowledged by me on the _____ day of _____ ,
    Signature _____
    Printed name _____

    Notary public, State of Michigan, County of
    My commission expires_____

By: _____
Print Name: _____

    Acknowledged by me on the _____ day of _____ ,
    Signature_____
    Printed name _____

    Notary public, State of Michigan, County of
    My commission expires_____

By: _____
Print Name: _____

    Acknowledged by me on the _____ day of _____ ,
    Signature_____
    Printed name _____

    Notary public, State of Michigan, County of
    My commission expires_____

82645430\V-2

11

CLI-2245193v3

By: _____

Print Name: _____

      Acknowledged by me on the _____ day of _____ ,

      Signature_____

      Printed name_____

      Notary public, State of Michigan, County of _____

      My commission expires_____

By: _____

Print Name: _____

      Acknowledged by me on the _____ day of _____ ,

      Signature_____

      Printed name_____

      Notary public, State of Michigan, County of _____

      My commission expires_____

**EXHIBIT A**

**PLAN OF ADJUSTMENT**

13-53846-swr    Doc 8059-2    Filed 10/25/14    Entered 10/25/14 21:29:17    Page 322 of
13-53846-swr    Doc 8755-2    Filed 12/15/14    Entered 12/15/14 03:03:17    Page 32 of
150

**EXHIBIT B**

**RESTORATION PLAN**

82645430\V-2

CLI-2245193v3

14

**EXHIBIT C**

**CONFIRMATION ORDER**

82645430\V-2

CLI-2245193v3

## EXHIBIT I.A.302

RETIREE HEALTH CARE SETTLEMENT AGREEMENT

# SETTLEMENT AGREEMENT

**Plaintiffs, the Official Committee of Retirees of the City of Detroit, Michigan (the "Committee"), Detroit Retired City Employees Association, Retired Detroit Police and Fire Fighters Association, and AFSCME Sub-Chapter 98, City of Detroit Retirees (collectively with the Committee, the "Plaintiffs") and Defendants, the City of Detroit, Michigan (the "City") and Kevyn Orr, individually and in his official capacity as Emergency Manager of the City of Detroit, Michigan (collectively with the City, the "Defendants"), hereby enter into this Settlement Agreement as of the 14th day of February, 2014 (the "Agreement"), which contains the following terms:**

## I.  GENERAL PROVISIONS

1.      **Agreement Modifies March 1, 2014 Plan**.  The City agrees to make the changes listed in Part II herein to the City of Detroit Retiree Health Care Plan for the period March 1, 2014 through December 31, 2014.  The changes enumerated in Part II are modifications to the City of Detroit Retiree Health Care Plan described in the 2014 Health Care Plan Options Booklet ("Booklet") distributed approximately January 2, 2014.  These modifications are premised on the terms summarized in the Booklet going into effect on March 1, 2014, subject only to the modifications set forth in this Agreement, which resolves the Plaintiffs' claims in Adversary Proceeding No. 14-04015 (the "Adversary Proceeding").

2.      **Modifications Will Not Decrease Benefits Offered in March 1, 2014 Plan**. None of the modifications in Part II reduces or eliminates any of the benefits in the City of Detroit Retiree Health Care Plan for the period March 1, 2014 through December 31, 2014 as described in the Booklet, except as specified in Part II(4)(a) and (b) below.

3.      **Effective Date of Plan Modifications**.  The modifications listed in Part II of this Agreement shall be effective with the beginning of the plan on March 1, 2014 unless otherwise noted in the Agreement.

4.      **Aggregate Caps**.  Unless specifically noted below, there is no cap on the amount that the City will spend to fulfill the modifications listed in Part II.  For the two modifications listed in Part II(3)(a)/(b) and (d)/(e) that expressly include capped funds of $2,500,000 and $3,000,000, respectively, the City shall aggregate those caps to a total of $5,500,000 such that if one capped fund is exhausted the City must draw from the other capped fund to the extent that the other capped fund has not been exhausted.

5.      **Conditions on Agreement**.  This Agreement, and the additional benefits set forth herein, are conditioned upon the City receiving debtor in possession financing that can be used for quality of life purposes on or before May 1, 2014 (the "DIP").  In the event the DIP is not in effect on or before May 1, 2014 and the City is unable to otherwise perform under this

ATI-2594662v5

13-53846-swr    Doc 8755-2    Filed 12/25/14    Entered 12/25/14 08:29:14    Page 36 of
150
13-53846-swr    Doc 8055-2    Filed 10/25/14    Entered 10/25/14 23:23:14    Page 36 of

Agreement, this Agreement shall be null and void and the parties shall be returned to their respective positions.

## II. MODIFICATIONS TO THE CITY'S RETIREE HEALTH CARE PLAN FOR THE PERIOD MARCH 1, 2014 THROUGH DECEMBER 31, 2014

**1.** **Modification of Dental and Vision Coverage**.

**(a)** **Dental Coverage**. The City will make available an additional dental benefits option in addition to the dental benefits coverage option described in the Booklet. The additional option will be offered by Golden Dental Inc. ("Golden"). The premium charged for this group coverage option will be no greater than $23.73 per month for single coverage, $38.83 per month for two-person coverage, and $57.17 per month for family coverage, and the benefits will be as described in Exhibit 1 hereto; provided, however, that the amount charged to the retiree shall be increased to include an additional administrative charge, which administrative charge shall not exceed 20% of the applicable premium. The enrolling retiree will be fully responsible to pay the premium associated with this dental option, including the additional administrative charge, and the City shall allow the retirees to utilize the pension reduction feature for payment of the monthly premium. The City will use Reasonable Efforts to have such coverage effective June 1, 2014, including taking Reasonable Efforts to notify retirees by mail of this option as soon as practicable, and taking Reasonable Efforts to minimize the administrative charge. Reasonable Efforts, as used in this Agreement, requires the City to use good faith and reasonable diligence in light of its capabilities.

**(b)** **Vision Coverage**. The City will make available an additional vision benefits option in addition to the vision benefits coverage option described in the Booklet. The additional option will be offered by Heritage Vision Plans, Inc. ("Heritage"). The premium for this group coverage option will be no greater than $6.95 per month for single coverage and $13.75 per month for 2 or more person coverage; provided, however, that the amount charged to the retiree shall be increased to include an additional administrative charge, which administrative charge shall not exceed 20% of the applicable premium. The option shall be a national network vision option similar to the option that the City provides to active employees. The enrolling retiree will be fully responsible to pay the premium associated with this vision option, including the additional administrative charge, and the City shall allow the retirees to utilize the pension reduction feature for payment of the monthly premium. The City will use Reasonable Efforts to have such coverage effective June 1, 2014, including taking Reasonable Efforts to notify retirees by mail of this option as soon as practicable, and taking Reasonable Efforts to minimize the administrative charge.

**2.** **Modifications for Retirees Eligible for Medicare**.

**(a)** **Extension of Enrollment Deadline to Opt Out of Medicare Advantage Plan Coverage**. For retirees of the City who are enrolled in Medicare and receive

coverage under a City-sponsored Medicare Advantage Plan through February 28, 2014, the date to opt out of such coverage was extended to February 7, 2014. Such retirees may opt out by hand delivery (no later than close of business February 7) or first-class mail delivery (post-marked on or before February 7) of the designated opt out form to the City Benefits Administration Office at Suite 1026, 2 Woodward Avenue, Detroit MI 48226. Retirees were permitted to request the designated opt out form by calling the City's Benefit Administration Customer Service Line or contacting the City Benefits Administration Office at the address above. The City will use Reasonable Efforts to process any such opt outs for which it receives timely notice in a manner so as to eliminate such Medicare Advantage Plan coverage effective March 1, 2014. To the extent the City is not able to process the timely sent opt out notices in a manner so as to eliminate such coverage effective March 1, 2014, such coverage shall be eliminated effective April 1, 2014. Retirees who did not opt out by February 7, 2014 will be enrolled in a City-sponsored Medicare Advantage Plan as described in the Booklet.

(b) **HRA Contribution for Medicare-Eligible Retirees Who Opt Out**. For each Medicare-eligible retiree who opted out of coverage under the City-sponsored Medicare Advantage Plans on or prior to February 7, 2014, the City shall automatically enroll such retiree in a City-sponsored Health Reimbursement Arrangement ("HRA"). The HRA shall be administered by Flex Plan, Inc. The City will provide each electing enrollee with a vested $115 monthly contribution credit to his or her HRA during the remainder of 2014, which will carry forward until used by the retiree or otherwise forfeited under terms to be negotiated by the parties hereto. The City will make all Reasonable Efforts to implement the HRA credits effective May 1, 2014, retroactive to March 1, 2014. The initial monthly credit for May 2014 shall be in an amount equal to the total of $115 multiplied by the number of months starting March 2014 for which the enrolled retiree did not have Medicare Advantage Plan coverage (e.g., if John Smith had City-sponsored Medicare Advantage Plan coverage until February 28, 2014, the initial monthly credit for May 2014 will be $345, covering March, April, and May; thereafter, the payments shall be $115 per month for each month in 2014).

(c) **Medicare Advantage Plan Catastrophic Drug Expenses**. Each of the Medicare Advantage Plans sponsored by the City for the period March 1, 2014 through December 31, 2014 include Medicare Part D prescription drug coverage, under which, once the $4,550 out-of-pocket threshold is met, the participant's cost sharing obligation is limited to the greater of 5% of the cost of the prescription, or $2.55 per prescription for generic and preferred multi-source drugs or $6.35 per prescription for all other prescription drugs; provided, that the participant's cost sharing obligation shall never be greater than the cost sharing that applied prior to the participant meeting such threshold. For each participant who meets the $4,550 out-of-pocket threshold while enrolled in one of the City's Medicare Advantage Plans during the period March 1, 2014 through December 31, 2014, the City will reimburse the amount of this cost sharing obligation to the related

retiree.  For the avoidance of doubt, participant means both retiree and any retiree's spouse who is covered by the City's Medicare Advantage Plans.

3.  **Modifications for Retirees Not Eligible for Medicare**.

(a)  **Additional Stipend to Retirees With $75,000 or Lower Household Income Who Acquire  Health Care Coverage  on an Exchange**.  The City will provide non-duty disabled retirees who are not eligible for Medicare a $125 stipend that they may use to purchase health care coverage.  The City will increase this stipend by $50 for any non-Medicare eligible retiree who either (i) was enrolled in the City's retiree health program on December 31, 2013 or (ii) transitioned from active City benefits to retiree City benefits on or after November 1, 2013; but only to the extent such retiree described in (i) or (ii) above meets the following requirements:

   i)  Not eligible for Medicare or Medicaid;

   ii)  Not eligible for a benefit under Part II(4);

   iii)  Not a duty-disabled retiree (duty-disabled retirees are eligible for higher stipends as provided for in the Booklet);

   iv)  Under 65 years old (non-Medicare eligible retirees age 65 and older may receive an increased stipend under Part II(3)(c) below);

   v)  Household income is $75,000 or less, as demonstrated by satisfaction of the process set forth in Part II(3)(b);

   vi)  Does not acquire a City-offered group health plan as set forth in Part II(3)(f); and

   vii)  Purchases or is covered by a health insurance policy acquired through a health insurance exchange ("Exchange") established pursuant to the Patient Protection and Affordable Care Act.

(b)  **Process to Obtain Additional $50 Monthly Stipend.**

   i)  The City will retain Aon Hewitt to administer the eligibility process for the additional $50 monthly stipend set forth above in Part II(3)(a).  Retirees will be given a 30-day notice period, to expire no later than April 30, 2014, during which they shall provide to Aon Hewitt the following:

      (1)  Submission of having purchased an insurance policy through an Exchange that covers such retiree.  Such submission shall include information necessary to validate the retiree's eligibility, including the name of the insurer, monthly premium amount, and the amount of federal

subsidy, if any, that the retiree is to receive in connection with such Exchange-acquired coverage; and

(2)    If the proof of Exchange-acquired coverage shows that the retiree's premium does not also include a federal subsidy amount, such retiree shall also submit a copy of his or her most recently filed federal income tax return with proof of filing, but in no event a return prior to the 2011 tax year. If such federal income tax return shows household income in excess of $75,000 and the retiree believes that household income in 2013 was below $75,000, the retiree shall also submit – along with a copy of the most recently filed federal income tax return – proof sufficient for Aon Hewitt to conclude that his or her household income in 2013 was less than $75,000.

ii)    Aon Hewitt shall submit to the City its list of retirees eligible for the additional $50 monthly stipend and the monthly stipends shall be paid to the approved eligible retirees beginning in the month of June 2014 or as soon thereafter as administratively practical, with payments retroactive to March 1, 2014. For example, if the first payment is made in June 2014, it will be in the amount of $200 for the months of March, April, May, and June; thereafter, the payments shall be $50 per month for each succeeding month in 2014. The list provided by Aon Hewitt shall be final and no changes shall be made to such list for the remainder of 2014.

*The City shall cap the amount that it pays for this additional $50 stipend during the period from March through December 2014 at $3,000,000.* In the event that there are more retirees meeting the requirements in Part II(3)(a) and (b) (*i.e.*, retirees listed on the final list) than can be paid in full for $3,000,000, each retiree will have his or her stipend amount reduced pro rata, unless there are additional funds that can be used as detailed in Part I(4).

**(c)**    <u>**Additional Payment to Non-Medicare Eligible Retirees Age 65 and Older**</u>. The City will increase the stipend that it gives non-Medicare eligible retirees who are 65-years-old and older to $300/month. For such purposes, a non-Medicare eligible retiree is any retiree age 65 or older who is not – directly or through his or her spouse – eligible to automatically enroll in and obtain premium-free coverage under Part A of Medicare as evidenced by a denial letter from the Centers for Medicare and Medicaid Services ("CMS"). Retirees who have previously submitted such a letter to the City will not be required to resubmit it. Non-Medicare eligible retirees who are duty-disabled will not be eligible for this increase because their stipend is already $300 or more. The City will coordinate with Blue Cross Blue Shield of Michigan to determine the number of non-Medicare eligible retirees who are eligible for this $300 stipend. The increased stipend will apply for each month from March 2014 through December 2014. The City will make all Reasonable Efforts to implement the $300 increased

monthly stipend beginning April 1, 2014, with payment of the increased amount over the stipend otherwise paid for prior months being retroactive to March 1, 2014; thereafter, the stipend shall be $300 per month for each succeeding month in 2014. Such eligible retirees will not receive any other stipend amounts from the City that are described in the Booklet or this Agreement.

**(d)** **$125 Monthly Stipend For City Retirees' Spouses Who are Under Age 65, With $75,000 or Lower Household Income, and Are Enrolled in Health Care Coverage on an Exchange**. The City will provide a $125 stipend to certain married retirees whose spouses either (i) were enrolled in the City's retiree health program on December 31, 2013 or (ii) transitioned from active City benefits to retiree City benefits on or after November 1, 2013; but only to the extent such spouse described in (i) or (ii) above meets the following requirements:

i)  Not eligible to enroll in one of the City's Medicare Advantage Plans;

ii)  Not eligible for Medicaid;

iii)  Not eligible for a benefit under Part II(4);

iv)  Under 65 years old;

v)  Household income is $75,000 or less, as demonstrated by satisfaction of the process set forth in Part II(3)(e);

vi)  Does not acquire a City-offered group health plan as set forth in Part II(3)(f); and

vii)  Purchases or is covered by a health insurance policy acquired through an Exchange.

**(e)** **Process to Obtain $125 Monthly Spouse Stipend.**

i)  The City will retain Aon Hewitt to administer the eligibility process for the $125 monthly spouse stipend. Retirees will be given a 30-day notice period, to expire no later than April 30, 2014, during which they shall provide to Aon Hewitt the following proof:

(1)  Submission of proof that their spouse is covered under an insurance policy purchased through an Exchange, including information necessary to validate the retirees' eligibility, including the name of the insurer, monthly premium amount, and the amount of federal subsidy, if any, that the spouse is to receive in connection with such Exchange-acquired coverage; and

(2)  If the proof of Exchange-acquired coverage shows that the spouse's premium does not also include a federal subsidy

amount, such retiree shall also submit a copy of his or her most recently filed federal income tax return with proof of filing, but in no event a return prior to the 2011 tax year. If such federal income tax return shows household income in excess of $75,000 and the retiree believes that household income in 2013 was below $75,000, the retiree shall also submit – along with a copy of the most recently filed federal income tax return – proof sufficient for Aon Hewitt to conclude that his or her household income in 2013 was less than $75,000.

ii)    Aon Hewitt shall submit to the City its list of retirees who are eligible for this $125 monthly stipend and the monthly stipends shall be paid to the approved married retirees beginning in the month of June 2014 or as soon thereafter as administratively practical, with payments retroactive to March 1, 2014. For example, if the first payment is made in June 2014, it will be in the amount of $500 for the months of March, April, May, and June; thereafter, the payments shall be $125 per month for each succeeding month in 2014. The list provided by Aon Hewitt shall be final and no changes shall be made to such list for the remainder of 2014, except as follows:

(1)    if an eligible retiree ceases to be married (whether by death or divorce), the retiree's spouse will cease to be eligible for this stipend and the retiree shall be removed from the list effective as of the month immediately following such event; and

(2)    if a retiree's spouse transitions from active City benefits to retiree City benefits during 2014 and meets the eligibility provisions described in Part II(3)(d) and is approved as eligible pursuant to the process described in Part II(3)(e), the related retiree shall be added to the list effective as of the month in which the transition to retiree City benefits occurs, provided there is sufficient availability under the Aggregate Caps as described below.

*The City will cap the amount that it pays for spousal stipends at $2,500,000.* In the event that there are more retirees initially satisfying the requirements in Part II(3)(e) (*i.e.*, retirees listed on the first list submitted by Aon Hewitt to the City) than can be paid in full for $2,500,000, each such retiree will have his or her stipend amount reduced pro rata, provided that if there are additional funds that can be used as detailed in Part I(4), each such retiree will only have his or her stipend amount reduced pro rata to the extent the aggregate amount is not sufficient to satisfy the full amount of such stipends. Retirees who become eligible for this spousal stipend during the year, as described above, shall only be eligible for a stipend to the extent there is sufficient availability under the

Aggregate Caps detailed in Part I(4). The addition or removal of retirees from the list shall not impact the amount of the stipend being paid to other eligible retirees.

**(f)**     **City Group Plan**. In 2014, the City agrees to contract with Blue Cross Blue Shield of Michigan to offer a fully-insured group health plan option to retirees who are not eligible for Medicare. Such plan option shall be reasonably equivalent to the coverage offered by the City to active employees in 2014. The enrolling retiree will be fully responsible to pay the monthly premium associated with this option. The premium cost to retirees of such policy will include the cost to the City of enrollment and administration related to this policy option, so that the City will not incur any additional expense in offering this policy. The parties will use Reasonable Efforts to have such coverage effective May 1, 2014. The City shall provide a monthly stipend of $100 to each retiree who enrolls in the City group plan, beginning with the May 1, 2014 payment. No other stipend amounts from the City that are described in the Booklet or this Agreement shall be available to retirees enrolling in this group option, unless either (i) the retiree is duty-disabled, in which case, he or she will instead receive the stipend available to duty-disabled retirees described in the Booklet, or (ii) the retiree is eligible for the stipend described in Part II(3)I, in which case, he or she will instead receive such stipend.

**4.**     **Modifications for Retirees Below the Federal Poverty Level**.

**(a)**     **Coverage for Michigan Resident Retirees Eligible For Medicaid Coverage On or After April 1, 2014**. The parties recognize that CMS has approved the State of Michigan's request to operate the "Healthy Michigan" program for adults who will become eligible for Medicaid under Section 1902(a)(10)(A)(i)(VIII) of the Social Security Act, and that on April 1, 2014 Michigan will provide Medicaid coverage to all adults residing in the State with income up to and including 133% of the Federal Poverty Level. "Federal Poverty Level" means the applicable poverty guideline based on state of residence and household size issued annually by the U.S. Department of Health and Human Services. For those retirees who are eligible for Medicaid under the scheduled April 1, 2014 expansion, the City will facilitate their transition in the following manner: Within 10 days of the effective date of this Agreement, the City shall contact by letter those non-Medicare eligible retirees, who, according to the Retirement Systems' records, reside in Michigan and whose annual pension income is in an amount less than 100% of the Federal Poverty Level. Such retirees will be given a 30 day opportunity to submit to Aon Hewitt proof that their income falls below the Federal Poverty Level. Upon receipt by Aon Hewitt of a list of such retirees falling below the Federal Poverty Level, the City shall provide payment to such retirees of the amount equal to the value of the federal subsidy for the month of March that they would have received in connection with the second lowest cost Exchange-purchased silver plan, had such retiree, and to the extent the retiree is married, such retiree's spouse, been eligible for such subsidy for the month of March 2014 for such plan based on a determination of household income at 100% of the Federal Poverty Level. A similar payment will be made by the City in

connection with insurance coverage for April 2014 if such retiree and spouse are not covered by Medicaid. To the extent that the Medicaid expansion rules in Michigan have not provided such retirees the opportunity to migrate into the Michigan Medicaid program by May 1, 2014, the City shall cease its continued payment but the parties agree to negotiate in good faith an additional reasonable accommodation to such retirees that balances the City's and such retirees' interests. *Retirees eligible for payments under this subsection are not eligible for any other payment offered by the City as set forth in the Booklet or as set forth in this Agreement.*

(b) **Coverage for Non-Medicare Eligible Retirees in States that Have Not Expanded Medicaid**. The City recognizes that not all States have chosen to expand Medicaid coverage in accordance with Title II of the Patient Protection and Affordable Care Act, and certain non-Medicare eligible retirees residing outside the State of Michigan whose incomes fall below 133% of the Federal Poverty Level will not be eligible for Medicaid coverage. Accordingly, in connection with such retirees, the City will pay a monthly amount equal to the lesser of: (1) the second lowest cost monthly premium for a silver plan for such retiree and spouse purchased through an Exchange in their place of residence; or (2) the ratable monthly amount necessary to increase the retiree's annual household income to 100% of the Federal Poverty Level. Within 10 days of the effective date of this Agreement, the City shall contact by letter those retirees, who, according to the Retirement Systems' records, reside in states that do not provide Medicaid coverage to adults up to the Federal Poverty Level, and whose annual pension income is in an amount less than 100% of the Federal Poverty Level. Such retirees will be given a 30 day opportunity to submit to Aon Hewitt proof that their income falls below the Federal Poverty Level. The City shall commence such payments as soon as reasonably practicable after receiving a list of such retirees from Aon Hewitt. *Retirees eligible for payments under this subsection are not eligible for any other payment offered by the City as set forth in the Booklet or as set forth in this Agreement.*

## III. RELEASES, FUTURE LEGAL PROCEEDINGS, AND MISCELLANEOUS

1. **Future Claims in City Plan Confirmation Proceedings**. This Agreement is entered into without prejudice to any party to this litigation with respect to any issue involving the rights, claims, obligations, and payments of health care and other post-employment benefits ("OPEB"); provided that the City will not seek to recover directly from the retirees any postpetition OPEB payments made to or on behalf of retirees. Each party expressly reserves its rights on OPEB issues in connection with negotiations of a plan of adjustment, and the Plaintiffs are free to pursue, and the City to oppose, their position that the postpetition OPEB payments the City made to or on behalf of retirees were a business necessity.

2. **Release**. Following the execution of this Agreement, the Plaintiffs will promptly dismiss the lawsuit – which solely addresses 2014 retiree health care benefits – with prejudice; provided, however, that any party to the lawsuit may bring an action in the Bankruptcy Court to enforce the terms of this Agreement resolving the lawsuit (an "Enforcement Action") and if the

ATI-2594662v5

-9-

13-53846-swr    Doc 8755-2    Filed 12/15/14    Entered 12/15/14 03:29:14    Page 44 of 150
13-53846-swr    Doc 8029-2    Filed 10/25/14    Entered 10/25/14 08:03:17    Page 44 of 150

conditions contained in the last sentence of Part I(5) occur, then Plaintiffs are free to reinstate the Adversary Proceeding. Solely for purposes of an Enforcement Action, the City consents, pursuant to 11 U.S.C. § 904, to the Bankruptcy Court's hearing and deciding such Enforcement Action.

3.    **Counterparts.**  This Agreement may be signed in counterparts, and each counterpart shall be treated as an original.

4.    **Good Faith.**  As evidenced by the undersigned acknowledgment of Judge Wiley Daniel, Mediator, this Agreement was negotiated and entered into by all parties in good faith.

5.    **Plan of Adjustment.**  The terms of this Agreement, including Part III(4), shall be incorporated into any plan of adjustment filed by the City and confirmed by the Bankruptcy Court in 2014 in this bankruptcy case.

Agreed,

_____
Evan Miller, attorney for Defendants

_____
Sam J. Alberts, attorney for the Committee

_____
Brian O'Keefe, attorney for Detroit Retired City Employees Association and Retiree Police and Fire Fighters Association

_____
Richard Mack, attorney for AFSCME Sub-Chapter 98, City of Detroit Retirees

Acknowledged:

_____
Judge Wiley Daniel, Mediator

conditions contained in the last sentence of Part I(5) occur, then Plaintiffs are free to reinstate the Adversary Proceeding. Solely for purposes of an Enforcement Action, the City consents, pursuant to 11 U.S.C. § 904, to the Bankruptcy Court's hearing and deciding such Enforcement Action.

     **3.**    **Counterparts.** This Agreement may be signed in counterparts, and each counterpart shall be treated as an original.

     **4.**    **Good Faith.** As evidenced by the undersigned acknowledgment of Judge Wiley Daniel, Mediator, this Agreement was negotiated and entered into by all parties in good faith.

     **5.**    **Plan of Adjustment.** The terms of this Agreement, including Part III(4), shall be incorporated into any plan of adjustment filed by the City and confirmed by the Bankruptcy Court in 2014 in this bankruptcy case.

Agreed,

_____
Evan Miller, attorney for Defendants

_____
Sam J. Alberts, attorney for the Committee

_____
Brian O'Keefe, attorney for Detroit Retired City Employees Association and Retiree Police and Fire Fighters Association

_____
Richard Mack, attorney for AFSCME Sub-Chapter 98, City of Detroit Retirees

Acknowledged:

_____
Judge Wiley Daniel, Mediator

conditions contained in the last sentence of Part I(5) occur, then Plaintiffs are free to reinstate the Adversary Proceeding. Solely for purposes of an Enforcement Action, the City consents, pursuant to 11 U.S.C. § 904, to the Bankruptcy Court's hearing and deciding such Enforcement Action.

3. **Counterparts.** This Agreement may be signed in counterparts, and each counterpart shall be treated as an original.

4. **Good Faith.** As evidenced by the undersigned acknowledgment of Judge Wiley Daniel, Mediator, this Agreement was negotiated and entered into by all parties in good faith.

5. **Plan of Adjustment.** The terms of this Agreement, including Part III(4), shall be incorporated into any plan of adjustment filed by the City and confirmed by the Bankruptcy Court in 2014 in this bankruptcy case.

Agreed,

_____
Evan Miller, attorney for Defendants

_____
Sam J. Alberts, attorney for the Committee

_____
Brian O'Keefe, attorney for Detroit Retired City Employees Association and Retiree Police and Fire Fighters Association

_____
Richard Mack, attorney for AFSCME Sub-Chapter 98, City of Detroit Retirees

Acknowledged:

_____
Judge Wiley Daniel, Mediator

conditions contained in the last sentence of Part I(5) occur, then Plaintiffs are free to reinstate the Adversary Proceeding. Solely for purposes of an Enforcement Action, the City consents, pursuant to 11 U.S.C. § 904, to the Bankruptcy Court's hearing and deciding such Enforcement Action.

**3.** **Counterparts.** This Agreement may be signed in counterparts, and each counterpart shall be treated as an original.

**4.** **Good Faith.** As evidenced by the undersigned acknowledgment of Judge Wiley Daniel, Mediator, this Agreement was negotiated and entered into by all parties in good faith.

**5.** **Plan of Adjustment.** The terms of this Agreement, including Part III(4), shall be incorporated into any plan of adjustment filed by the City and confirmed by the Bankruptcy Court in 2014 in this bankruptcy case.

Agreed,

_____

Evan Miller, attorney for Defendants

_____

Sam J. Alberts, attorney for the Committee

_____

Brian O'Keefe, attorney for Detroit Retired City Employees Association and Retiree Police and Fire Fighters Association

_____

Richard Mack, attorney for AFSCME Sub-Chapter 98, City of Detroit Retirees

Acknowledged:

_____

Judge Wiley Daniel, Mediator

conditions contained in the last sentence of Part I(5) occur, then Plaintiffs are free to reinstate the Adversary Proceeding. Solely for purposes of an Enforcement Action, the City consents, pursuant to 11 U.S.C. § 904, to the Bankruptcy Court's hearing and deciding such Enforcement Action.

3. **Counterparts.** This Agreement may be signed in counterparts, and each counterpart shall be treated as an original.

4. **Good Faith.** As evidenced by the undersigned acknowledgment of Judge Wiley Daniel, Mediator, this Agreement was negotiated and entered into by all parties in good faith.

5. **Plan of Adjustment.** The terms of this Agreement, including Part III(4), shall be incorporated into any plan of adjustment filed by the City and confirmed by the Bankruptcy Court in 2014 in this bankruptcy case.

Agreed,

_____
Evan Miller, attorney for Defendants

_____
Sam J. Alberts, attorney for the Committee

_____
Brian O'Keefe, attorney for Detroit Retired City Employees Association and Retiree Police and Fire Fighters Association

_____
Richard Mack, attorney for AFSCME Sub-Chapter 98, City of Detroit Retirees

Acknowledged:

_____
Judge Wiley Daniel, Mediator

ATI-2594662v5

-10-

# EXHIBIT 1

(See next page)

ATI-2594662v5



January 2014

# Certificate of Coverage
# City of Detroit Retirees

## CLASS I
### Diagnostic and Preventive:
Exams, X-Rays, Prophylaxis, Fluoride -up to age 19     **100%**

## CLASS II
### Restorative:
Fillings, Root Canals, Routine Extractions     **100%**

## CLASS III
### Prosthetics:
Crowns, Bridges, Partials, Dentures, Space Maintainers     **80%**

## CLASS IV
### Specialty Care:
Periodontics
Endodontics
Oral Surgery     **70%**

## ORTHODONTICS (Interceptive excluded)
Lifetime Benefit Maximum: Dependents up to age 19     **$3,000**
Lifetime Benefit Maximum: Subscriber and Spouse     **$3,000**

**Out-Of-Area Emergency Coverage $100 reimbursement**

**Annual Maximum:**     $1,600.00
**Annual Renewal:**     **07/01**
**Membership Card Reads:**   Detroit Retirees

| Rate Type | Current Rates |
|-----------|---------------|
| Single Person | $23.73 |
| Family of two | $38.83 |
| Family | $57.17 |

## EXHIBIT I.A.309

SCHEDULE OF SECURED GO BOND DOCUMENTS

## SCHEDULE OF SECURED GO BOND DOCUMENTS

| Secured GO Bond Documents | Series of Secured GO Bonds | Balance as of Petition Date |
|---|---|---|
| Resolution of the City Council adopted February 23, 2010<br><br>Finance Director's Order dated March 11, 2010<br><br>Master Debt Retirement Trust Indenture dated as of March 1, 2010, as supplemented and amended (the "Master Indenture"), between the City of Detroit and U.S. Bank National Association, as trustee | Distributable State Aid General Obligation Limited Tax Bonds, Series 2010 | $252,475,366 |
| Resolution of the City Council adopted July 20, 2010<br><br>Finance Director's Order dated December 9, 2010<br><br>Master Indenture | Distributable State Aid Second Lien Bonds (Unlimited Tax General Obligation), Series 2010(A) (Taxable-Recovery Zone Economic Development Bonds – Direct Payment) | $101,707,848 |
| Resolution of the City Council adopted March 27, 2012<br><br>Finance Director's Order dated March 28, 2012 (Series 2012(A2) and Series 2012(B2))<br><br>Finance Director's Order dated July 3, 2012 (Series 2012 (A2) and Series 2012(B2))<br><br>Finance Director's Order dated August 16, 2012 (Series 2012(A2-B), Series 2012 (A2) and Series 2012(B2))<br><br>Master Indenture | Self Insurance Distributable State Aid Third Lien Bonds (Limited Tax General Obligation), Series 2012(A2) | $39,254,171 |
| Resolution of the City adopted March 27, 2012<br><br>Finance Director's Order dated August 16, 2012 (Series 2012(A2-B), Series 2012 (A2) and Series 2012(B2))<br><br>Master Indenture | Self Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(A2-B) | $31,037,724 |

| Secured GO Bond Documents | Series of Secured GO Bonds | Balance as of Petition Date |
|---|---|---|
| Resolution of the City Council adopted March 27, 2012<br><br>Finance Director's Order dated March 28, 2012 (Series 2012(B))<br><br>Finance Director's Order dated July 3, 2012 (Series 2012(B))<br><br>Finance Director's Order dated August 16, 2012 (Series 2012(B))<br><br>Master Indenture | General Obligation Distributable State Aid Third Lien Capital Improvement Refunding Bonds (Limited Tax General Obligation), Series 2012(B) | $6,469,135 |
| Resolution of the City Council adopted March 27, 2012<br><br>Finance Director's Order dated March 28, 2012 (Series 2012(A2) and Series 2012(B2))<br><br>Finance Director's Order dated July 3, 2012 (Series 2012 (A2) and  Series 2012(B2))<br><br>Finance Director's Order dated August 16, 2012 (Series 2012(A2-B), Series 2012 (A2) and Series 2012(B2))<br><br>Master Indenture | Self Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(B2) | $54,055,927 |

**EXHIBIT I.A.336**

STATE CONTRIBUTION AGREEMENT

## CONTRIBUTION AGREEMENT

This Contribution Agreement ("Agreement"), dated as of _____, 2014, is made by and among the Michigan Settlement Administration Authority, a Michigan body public corporate (the "Authority"), the General Retirement System of the City of Detroit, the Police and Fire Retirement System of the City of Detroit and the City of Detroit (the "City").

## RECITALS

A.     The City filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code on July 18, 2013 (the "Chapter 9 Case") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Court").

B.     During the course of the Chapter 9 Case, the City has asserted that the City's Police and Fire Retirement System (the "PFRS" or a "System") and the General Retirement System (the "GRS" or a "System" and collectively with the PFRS, the "Systems") are underfunded.

C.     During the course of the Chapter 9 Case, there have been suggestions that the State of Michigan (the "State") may be obligated to pay all or a portion of the underfunding of pension benefits payable to retirees, a suggestion the State vigorously disputes.

D.     As part of the mediation process in the Chapter 9 Case, the mediators asked the State and other parties to assist in reducing the amount of underfunding in the PFRS and GRS pension funds by providing settlement funds for the benefit of pensioners that would not be otherwise available.

E.     As part of its determination that the City was eligible to file the Chapter 9 Case, the Court determined that pension obligations of the City can be impaired or diminished in the Chapter 9 Case and are not protected from such impairment or diminution by the State Constitution.

F.     In support of confirmation of the City's Fourth Amended Plan of Adjustment dated May 5, 2014 (as may be further amended from time to time, the "Plan"), the State has agreed, subject to satisfaction of the terms and conditions set forth herein and in the Plan, to make a contribution to the GRS and PFRS in return for releases from, among others, the GRS and PFRS as set forth in the Support and Release Agreement entered into by the State and each of the Systems in connection with this matter.

G.     On June 20, 2014, the Authority was established as the disbursement agent for the State with respect to the State Contribution (as defined below).

H.     Capitalized terms used in this Agreement but not defined have the same meanings as set forth in the Plan.

1

NOW THEREFORE, THE PARTIES HERETO AGREE AS FOLLOWS:

1.    <u>State Contribution</u>.   On the later of (a) the date on which the Conditions Precedent have been satisfied, and (b) 60 days after the Effective Date of the Plan, the Authority shall disburse $98,800,000 to GRS and $96,000,000 to PFRS (collectively, the "<u>State Contribution</u>") for the purpose of increasing the assets of the PFRS and GRS. The total aggregate State Contribution is equal to the net present value of $350,000,000 payable over 20 years determined using a discount rate of 6.75%, which results in a total contribution by the State of $194,800,000. The State Contribution shall only be used to fund payments to holders of GRS Pension Claims and PFRS Pension Claims, each as defined in the Plan.

2.    <u>Governance Requirements of the GRS and PFRS</u>.  At all times during the 20 year period following the disbursement of the State Contribution to the GRS and PFRS, the GRS and PFRS each must establish an investment committee (the "<u>Investment Committee</u>") for the purpose of making recommendations to, and approving certain actions by, the respective System's board of trustees and/or making determinations and taking action under and with respect to Investment Management, as set forth in the terms and conditions enumerated on **Exhibit A** and **Exhibit B**, respectively, each attached to and incorporated by reference into this Agreement. Further, the Emergency Manager for the City and any subsequently appointed emergency manager for the City, appointed under PA 436 or under any successor or replacement statutes to PA 436, shall not seek to exercise any powers granted under section 12(1)(m) of PA 436 (or equivalent provision under any successor or replacement statute) against the Board of GRS or the Board of PFRS until the earlier of (a) one year following entry of an order confirming the Plan, and (b) December 31, 2015.

3.    <u>Income Stabilization Funds and Income Stabilization Payments</u>.  The City, GRS and PFRS shall establish an income stabilization program and amend the governing documents for GRS and the governing documents for PFRS to include the following:

    a.    A supplemental pension income stabilization payment (the "<u>Income Stabilization Payments</u>") payable on an annual basis beginning not later than 120 days after the Effective Date, to each Eligible Pensioner equal to the lesser of (a) the amount needed to restore the Eligible Pensioner's reduced pension benefit to the amount of the pension benefit that the Eligible Pensioner received from GRS or PFRS in 2013, or (b) the amount needed to bring the total annual household income of the Eligible Pensioner up to 130% of the Federal Poverty Level in 2013.

    b.    In addition, to the extent an Eligible Pension's Estimated Adjusted Annual Household Income in any calendar year is less than 105% of the Federal Poverty Level in that year, the Eligible Pensioner will receive an additional benefit ("<u>Income Stabilization Benefit Plus</u>"). The Income Stabilization Benefit Plus shall be equal to the lesser of either (a) 100% restoration of pension benefits, including escalators and cost of living adjustments; or (b) the amount needed to bring the Eligible Pensioner's Estimated Adjusted Annual Household Income in that calendar year up to 105% of the Federal Poverty Level in that year.

2

c.  An Eligible Pensioner's "Estimated Adjusted Annual Household Income" shall be calculated as follows:  (i) the annual pension benefit amount paid in 2013 shall be subtracted from the Eligible Pensioner's 2013 total household income (per their (or in the case of minor children, their legal guardian's) 2013 income tax returns or equivalent documentation) as adjusted for inflation or Social Security COLA increases to create a base additional income amount, plus (ii) the following three items as applicable, (x) the reduced pension benefit that GRS will pay the Eligible Pensioner for that year, (y) any GRS pension restoration due to an improved GRS funding level, and (z) the Eligible Pensioner's Income Stabilization Benefit.  Notwithstanding the foregoing, Income Stabilization Payments, including the Income Stabilization Benefit Plus, under both GRS and PFRS shall not exceed $20 million in aggregate.

d.  A separate recordkeeping sub-account called the "Income Stabilization Fund" will be set up under each of GRS and PFRS for the sole purpose of paying the Income Stabilization Payments to Eligible Pensioners.  The assets credited to the sub-accounts will be invested on a commingled basis with the applicable System's assets and will be credited with a pro-rata portion of the System's earnings and losses.

e.  Amounts credited to the Income Stabilization Fund, including the Assigned UTGO Bond Tax Proceeds, may not be used for any purpose other than the payment of Income Stabilization Payments to Eligible Pensioners, except as expressly provided in subparagraph (f) below.

f.  In 2022, provided that the State has not issued a certificate of default with respect to a System at any time prior to 2022, the Investment Committee for that System shall conduct a valuation to determine the Income Stabilization Payments anticipated to be made from the System in the future, in order for the System to fulfill the obligation to make Income Stabilization Payments (the "Estimated Future Liability").  In the event that 75% of the independent members of the Investment Committee determine that the GRS or PFRS Income Stabilization Fund is credited with assets in excess of its Estimated Future Liability (the "Excess Assets"), the Investment Committee may, in its sole discretion, recommend to the Board of Trustees that the Excess Assets, but not more than $35 million, be used to fund each System's payment of Adjusted Pension Amounts.  The Investment Committee shall have the right to engage professionals to assist in this task as necessary, and such expenses shall be paid by the Systems.  If any funds remain in the GRS or PFRS Income Stabilization Fund on the date upon which no Eligible Pensioners under their respective System are living, the remainder of each System's Income Stabilization Fund shall be used to fund each System's payment of Adjusted Pension Amounts.

3

g.  "Eligible Pensioners" are those retirees or surviving spouses who are at least 60 years of age or those minor children receiving survivor benefits from GRS or PFRS, each as of the Effective Date, whose pension benefit from GRS or PFRS will be reduced by the confirmed Plan, and who have a total household income equal to or less than 140% of the Federal Poverty Line in 2013 (per their (or in the case of minor children, their legal guardian's) 2013 income tax returns or equivalent documentation). No new persons will be eligible to receive an Income Stabilization Payment at any time in the future, and any minor child receiving survivor benefits shall cease to be an Eligible Pensioner after he or she turns 18 years of age.

h.  The initial determination of Eligible Pensioners, and the amounts of Income Stabilization Payments payable to Eligible Pensioners shall be made by the State in its sole discretion.  The State shall transmit the list of Eligible Pensioners to the Investment Committee and the Board of Trustees of GRS and PFRS, as applicable. The Board of Trustees, with the assistance of the Investment Committee of GRS and PFRS, shall be responsible for properly administering the respective Income Stabilization Fund and annually certifying to the Treasurer that it has properly administered the requirements for eligibility and payment of benefits with respect to Eligible Pensioners.

4.  Conditions Precedent.  The Authority's obligations under this Agreement are not effective or enforceable until each of the following conditions (the "Conditions Precedent") have been met to the satisfaction of the Authority and the Treasurer, unless any one or more of such conditions are waived in a writing executed by the Authority and the Treasurer:

a.  The Authority receives the State Contribution from the State.

b.  An endorsement of the Plan by the Official Retiree Committee which will include a letter from the Official Retiree Committee as part of the Plan solicitation package recommending to Classes 10 and 11 a vote in favor of the Plan, or equivalent assurances from member organizations representing a majority of retirees in the respective classes.

c.  Cessation of all litigation, including the cessation of funding of any litigation initiated by any other party, as it relates to the City (a) challenging PA 436 or any actions taken pursuant to PA 436, including but not limited to, a dismissal with prejudice of the cases set forth on **Exhibit D**, or (b) seeking to enforce Article IX, Section 24 of the Michigan Constitution; provided, however, (i) until the State Contribution is received by the Systems, the Systems agree to stay any pending litigation described in this subparagraph, and (ii) that as a condition precedent to the GRS and the PFRS dismissing any pending litigation described in this subparagraph that they are prosecuting, the GRS and the PFRS have the right to receive written confirmation from the Authority

4

that the Authority is prepared and authorized to disburse the State Contribution in accordance with this Agreement and the Plan, subject only to the dismissal by the GRS and PFRS of any pending litigation described in this subparagraph that they are prosecuting.

d.   Active support of the Plan by, a release of and covenant not to sue the State from, and an agreement not to support in any way (including funding) the litigation described in subparagraph 4(c) by the parties listed on **Exhibit C**, or equivalent assurance of litigation finality (which, as to the Systems, shall be deemed satisfied by the execution of the Support and Release Agreement to be entered into by the State and each of the Systems in connection with this matter).

e.   Classes 10 and 11 accept the Plan.

f.   By December 31, 2014, the Court enters a final, non-appealable order confirming the Plan that includes, at a minimum, the following:

i.   A release of the State and State Related Entities by each holder of a Pension Claim of all Liabilities arising from or related to the City, the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution that such party has, had or may have against the State and any State Related Entities.

ii.   A requirement that the governing documents of GRS and the governing documents of PFRS be amended to include:

a)   the governance terms and conditions set forth in Paragraph 2, Exhibit A and Exhibit B of this Agreement; and

b)   the Income Stabilization Payments and Income Stabilization Fund described in Paragraph 3 of this Agreement.

iii.   Approval of, and authority for the City to enter into, the UTGO Settlement.

iv.   A requirement that the City irrevocably assigns the right to receive not less than an aggregate amount of $20,000,000 of the payments on the Reinstated Stub UTGO Bonds to the Income Stabilization Funds of the GRS and PFRS. Such payments will be made to the Income Stabilization Funds in the form of annual installment payments over a 14 year period, pursuant to a payment schedule approved by the State.

5

v. Approval of, and authority for the City to enter into, the DIA Settlement.

vi. Agreement to and compliance with MCL 141.1561 and cooperation with the transition advisory board appointed pursuant to MCL 141.1563, or compliance with any new legislation that is enacted regarding post-bankruptcy governance.

g. Evidence satisfactory to the State of an irrevocable commitment by:

i. The Foundations to fund $366,000,000 (or the net present value thereof) as part of the DIA Settlement; and

ii. The DIA Corp. to fund $100,000,000 (or the net present value thereof) as part of the DIA Settlement.

h. The Plan Effective Date occurs on or before April 1, 2015.

5. <u>Non-occurrence of Conditions Precedent</u>.   If the Conditions Precedent are not met to the satisfaction of the Authority and the Treasurer on or before April 1, 2015, upon written request of the Treasurer, the Authority shall remit the State Contribution to the Department and shall have no further obligations under this Agreement.

6. <u>Default by GRS and PFRS; Cure Period; Remedies</u>.

a. A System will be in default if the System has not materially complied with any of the terms and conditions set forth in (i) the Plan, (ii) the Governing Documents, or (iii) this Agreement, including, but not limited to, failing to make the required Income Stabilization Payments or using funds in the Income Stabilization Fund for unauthorized purposes.  For the purposes of this Agreement, "<u>Governing Documents</u>" shall mean, (x) for the GRS, the Combined Plan for the General Retirement System of the City of Detroit, Michigan, and (y) for the PFRS, the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan.  Notwithstanding subparagraph 'e' below, there shall not be an event of default for purposes of this paragraph 6 unless and until the Treasurer delivers to the alleged defaulting System a written notice declaring and specifically identifying the facts of an alleged default (the "<u>Default Notice</u>").  Nothing herein shall prohibit the subject System from contesting the alleged default; provided, however, until the contest over the alleged default is resolved, the subject System may not include its State Contribution, as adjusted for earnings and losses, for purposes of determining whether benefits reduced by the Plan may be restored.

b. In the event of  a default by a System, the System shall have 100 days after receiving the Default Notice in accordance with subparagraph 'a' above (the "<u>Cure Period</u>") to cure such default by remedying the damages sustained as a result of the default, as well as making any delinquent

6

Income Stabilization Payments, and restoring any funds improperly removed from any other fund maintained by the System, including the Income Stabilization Fund, as applicable. Prior to the expiration of the Cure Period, at least six of the seven total aggregate votes of the Investment Committee for the defaulting System must certify to the Treasurer that (i) the default has been cured, and (ii) that no material damages have been caused by the default that have not otherwise been remedied (the "Cure Certification"). During the Cure Period, the defaulting System may not include its State Contribution, as adjusted for earnings and losses, for purposes of determining whether benefits reduced by the Plan may be restored.

c.  If the Investment Committee for the defaulting System provides the Cure Certification to the Treasurer in accordance with subparagraph 'b' above, then the default will be deemed cured and the defaulting System may once again include its State Contribution, as adjusted for earnings and losses, for purposes of determining whether benefits reduced by the Plan may be restored.

d.  If the Investment Committee for the defaulting System fails to provide the Cure Certification to the Treasurer in accordance with subparagraph 'b' above, then no portion of the total State Contribution to the defaulting system, as adjusted for earnings and losses, may be taken into consideration by the System during the remainder of the 20 year period following the date of such default for purposes of determining whether benefits reduced by the Plan may be restored. Notwithstanding the foregoing, if at any time during or after the Cure Period the Investment Committee certifies by a simple majority vote, that (i) the default has been cured; and (ii) that no material damages have been caused by the default that have not otherwise been remedied, then the Treasurer may consent to the defaulting System once again including its State Contribution, as adjusted for earnings and losses, for purposes of determining whether benefits reduced by the Plan may be restored, which consent shall not be unreasonably withheld.

e.  Each Investment Committee shall provide compliance reports to the Treasurer on a semi-annual basis and at such other times as the Treasurer reasonably may request (each, a "Compliance Report") that certifies that the Investment Committee is not aware of any defaults, or, if the Investment Committee is aware of a default, specifically identifying the facts of such default. After review of a Compliance Report, the Treasurer shall provide to the System either a certificate of compliance or a Default Notice.

f.  Notwithstanding the foregoing, in the event of a default, the Treasurer and the Authority shall have the right to pursue all available legal and

equitable remedies against the Board of Trustees for the defaulting System, the Investment Committee, or any other person.

7. <u>Execution in Counterparts</u>. This Agreement may be executed in counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.

8. <u>Governing Law/Jurisdiction</u>. This Agreement shall be construed in accordance with the laws of the State of Michigan, without reference to its conflict of law provisions, and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws. The Bankruptcy Court of the Eastern District of Michigan shall have exclusive jurisdiction over any action or proceeding solely with respect to this Agreement, and each party, to the extent permitted by law, agrees to submit to such jurisdiction and to waive any defense based on venue or jurisdiction of such court.

9. <u>Amendment</u>. This Agreement may be amended, modified, superseded or canceled, and any of the terms, covenants, representations, warranties or conditions hereof may be waived only by an instrument in writing signed by each of the Parties.

10. <u>Limitation of Liability</u>. The obligation to make the State Contribution is not a general obligation or indebtedness of the State or the Authority and is subject to satisfaction of the conditions described herein. Furthermore, neither the State nor the Authority has any liability or obligation arising from or related to the contributions and funding of the Income Stabilization Fund of each System. Notwithstanding anything contained herein to the contrary, no State Related Entity or board member of the Authority shall have any liability for the representations, warranties, covenants, agreements or other obligations of the State or the Authority hereunder or in any of the certificates, notices or agreements delivered pursuant hereto.

11. <u>Severability</u>. If any one or more of the covenants, agreements or provisions of this Agreement shall be determined by a court of competent jurisdiction to be invalid, the invalidity of any such covenants, agreements and provisions shall in no way affect the validity or effectiveness of the remainder of this Agreement, and it shall continue in force to the fullest extent permitted by law.

12. <u>Headings</u>. Any headings preceding the text of the several articles and sections hereof, and any table of contents or marginal notes appended to copies hereof, shall be solely for convenience or reference and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect.

[Remainder of Page Intentionally Left Blank – Signatures on Following Page]

13-53846-swr   Doc 8755-2   Filed 12/15/14   Entered 12/15/14 21:29:17   Page 63 of
150
13-53846-swr   Doc 8055-2   Filed 10/25/14   Entered 10/25/14 08:08:14   Page 133 of

**MICHIGAN SETTLEMENT ADMINISTRATION AUTHORITY**


By: _____
Title: Authorized Officer


**GENERAL RETIREMENT SYSTEM OF THE CITY OF DETROIT**


By: _____
Title: Authorized Officer


By: _____
Title: Authorized Officer


**POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT**


By: _____
Title: Authorized Officer


By: _____
Title: Authorized Officer


**CITY OF DETROIT**

By: _____
Title: Emergency Manager

9

**EXHIBIT A – GRS Governance Terms**

*In re City of Detroit, Michigan*

# INVESTMENT COMMITTEE GOVERNANCE
# FOR GENERAL RETIREMENT SYSTEM

| | |
|---|---|
| PREAMBLE | This document was prepared to set forth the pension governance requirements under the State Contribution Agreement (as that term is defined in the City's Fourth Amended Plan for the Adjustment of Debts of the City of Detroit, as amended from time to time) applicable to the General Retirement System of the City of Detroit (GRS). |
| SCOPE OF SETTLEMENT | The GRS is currently administered by a ten (10) member Board of Trustees (the "Board") that is vested with the fiduciary authority for the general administration, management and operation of the Retirement System. The Board currently makes all administrative, actuarial and investment related decisions for the GRS. Upon the Effective Date under the POA, but subject to consummation of the State Contribution Agreement, there shall be established, by appropriate action and amendments to governing documents, an Investment Committee ("IC") at GRS which shall be vested with the authority and responsibilities as outlined herein for a period of twenty (20) years after the Effective Date of the POA. All administrative, managerial, and operational matters not addressed in this Term Sheet shall continue to be addressed by the Board in the ordinary course of its affairs. |
| INVESTMENT COMMITTEE | The IC shall consist of seven (7) voting members consisting of: <br> i. Five (5) Independent Members; <br> ii. One (1) Employee Member; and <br> iii. One (1) Retiree Member. <br> Collectively, or individually, "Members" or "Member." <br><br> At least two (2) of the five (5) Independent Members of the committee shall be residents of the State of Michigan. None of the Independent Members shall be a party in interest as defined by MCL 38.1132d (4) to the City or the GRS. <br><br> Each Independent Member of the IC shall have expert knowledge or extensive experience with respect to either: (a) economics, finance, or institutional investments; or (b) administration of public or private retirement plans, executive management, benefits administration or actuarial science. At least one (1) of the IC Independent Members shall satisfy the requirements of (a) above and at least one (1) of the IC Independent Members shall satisfy the requirements of (b) above. <br><br> The five (5) initial IC Independent Members shall be selected by mutual agreement of the appropriate representatives of the State, the City and the Board, in consultation with the Foundation for Detroit's |

Future. The initial Independent Members and their terms of office will be as follows: Ken Whipple (2 years), David Sowerby (3 years), Robert Rietz (4 years), Doris Ewing (5 years) and Kerrie VandenBosch (6 years). Successor Independent Members shall be recommended by a majority of the remaining Independent Members and confirmed by the Board and the State Treasurer in consultation with the Foundation for Detroit's Future, in accordance with such rules and regulations as may be adopted by the IC, provided such rules and regulations are not inconsistent with the POA and this agreement. In the event the Board and the State Treasurer cannot agree on the successor Independent Member within thirty (30) days of the receipt of the recommendation of the IC, the remaining Independent Members of the IC shall appoint the successor Independent Member.

If no mutual agreement is reached as to the selection of one or more of the initial IC Independent Members by the time of confirmation of the City's Plan of Adjustment, then the Bankruptcy Court shall select the Independent Members necessary to fill the five (5) initial IC Independent Member positions for which no agreement has been reached.

In the event the Bankruptcy Court selects the initial Independent Members as described immediately above, successor Independent Members shall be appointed in the same manner as the Independent Member being replaced, as described immediately above, after three (3) weeks' notice to the Board of the individuals chosen, in accordance with such rules and regulations as may be adopted by the IC, provided such rules and regulations are not inconsistent with the POA and this agreement.

The Employee Member shall be an employee-elected Member from the Board appointed by the Board. The initial Employee Member will be June Nickleberry.

The Retiree Member shall be a retiree-elected Member from the Board appointed by the Board. The initial Retiree Member will be Thomas Sheehan.

The terms of office of the initial IC Independent Members shall be staggered at the time of appointment so that Independent Members shall have varying initial terms of office, with one each having a 2, 3, 4, 5 and 6 year term. Each initial Independent Member shall serve until the expiration of his/her initial term. After the initial term of office, the term of office of the IC Independent Members shall be six years. Each successor Independent Member shall be selected in accordance with the provisions above and shall serve until his or her death, incapacity, resignation or removal in accordance with the paragraph below. Upon expiration of his or her term of office, an Independent Member shall continue to serve until his or her successor is appointed. Nothing herein shall bar an initial Independent Member from becoming a successor Independent Member after his/her initial

2

term.

The terms of office of the Employee Members and Retiree Members of the IC shall conform to their respective terms of office on the Board.

A Member may be removed by the remaining Members for any of the following reasons: (a) the Member is legally incapacitated from executing his or her duties as a Member of the IC and neglects to perform those duties, (b) the Member has committed a material breach of GRS provisions, policies or procedures and the removal of the Member is in the interests of the system or its participants or its participants' beneficiaries, (c) the Member is convicted of a violation of law and the removal shall be accomplished by a vote of the IC in accordance with the voting procedures in this agreement, (d) if the Member holds a license to practice and such license is revoked for misconduct by any State or federal government, or (e) if an IC Member shall fail to attend scheduled meetings of the IC for four (4) consecutive meetings, unless in each case excused for cause by the remaining Members attending such meetings, the Member shall be considered to have resigned from the IC, and the IC shall, by resolution, declare the office of the Member vacated as of the date of adoption of such resolution. In addition, a Member of the IC may have voting privileges temporarily suspended by a 70% or higher vote of the other members if the Member is indicted or sued by a State or federal government for an alleged violation of the law that relates to his or her service on the IC, or for other alleged financial crimes, including fraud. Any vacancy occurring in the office of Member shall be filled within sixty (60) days following the date of the vacancy, for the unexpired portion of the term, in the same manner in which the office was previously filled.

All members of the IC shall be reimbursed for the reasonable, actual and necessary expenses incurred in the performance of their duties. All reasonable and proper expenses related to the administration of the IC, including but not limited to the purchase of insurance, shall be payable out of the assets of the GRS. The IC may retain actuarial, legal counsel, audit or other professional or support personnel to provide advice to the IC as it deems reasonably necessary to perform its functions and such parties or persons may be reasonably compensated from the assets of the Plan; such engagements shall not be subject to the approval of the Board.

The IC shall be an investment fiduciary to the GRS. An IC Member or other fiduciary under the GRS shall discharge his or her duties with respect to the GRS in compliance with the provisions of Public Act 314 of 1965, as amended. An IC Member shall discharge his or her duties with the care, skill, and caution under the circumstances then prevailing which a prudent person, acting in a like capacity and familiar with those matters, would use in the conduct of an activity of like character and purpose. Members of the IC shall comply with all Board governance policies and procedures, including the Ethics and

3

| | |
|---|---|
| | Code of Conduct Policies, unless such compliance violates the Member's fiduciary duties or conflicts with the terms and conditions of this agreement. |
| IC MEETINGS | The IC shall meet at least once every other month. The Members shall determine the time for the regular meetings of the IC and the place or places where such meetings shall be held. The Secretary or his or her designee shall be responsible for giving notice of the time and place of such meetings to the other Members.<br><br>Notice and conduct of all meetings of the IC, both regular and special, shall be held within the City of Detroit and in accordance with applicable law including the Michigan Open Meetings Act (MCL §15.261 et seq.).<br><br>The IC shall adopt its own rules of procedure and shall keep a record of its proceedings. Five (5) Members shall constitute a quorum at any meeting of the IC, so long as at least three (3) Independent Members are present. Each Member shall be entitled to one vote on each question before the IC and at least four (4) concurring votes shall be necessary for a decision of the committee except as otherwise provided in this Term Sheet. |
| INVESTMENT COMMITTEE - RESPONSIBILITY | The IC shall serve in a fiduciary capacity with respect to the Investment Management of all GRS Plan Assets, determination of the investment return assumption, and Board compliance with benefit plan provisions, as set forth more fully below. The IC shall have all the powers as a fiduciary under the first sentence of MCL §38.1133(5) and (6).<br><br>All Investment Management decisions approved by the Board shall require a recommendation by an affirmative vote of the IC, in accordance with the provisions of this agreement. All actions and recommendations of the IC shall be forwarded to the Board for consideration and are subject to Board approval. The Board shall take no action with respect to any matter for which the IC has responsibility and authority, including the Investment Management matters described in the next paragraph, unless and until such action has been approved by affirmative vote of the IC. If (a) the Board fails to approve or disapprove an Investment Management decision that has been recommended by an affirmative vote of the IC, and such failure continues for 45 days after the date that the recommendation was made to the Board, or (b) the Board disapproves an Investment Management decision within such 45-day period but fails to provide to the IC within such 45-day period a detailed written response outlining the reasons for such disapproval, then the IC and the Chief Investment Officer are authorized to implement the decision. If the Board disapproves an Investment Management decision within such 45-day period and provides to the IC within such 45-day period a detailed written |

4

response outlining the reasons for such disapproval, then the IC shall have 45 days after the receipt of the Board response to either (a) withdraw the recommended Investment Management decision, or (b) request, in writing, a conference with the Board to be held within ten (10) days, but not less than five (5) business days, of such request by the IC, unless a later date is agreed to in writing by the Board and the IC, to discuss the disapproval by the Board described in the written response. Any such conference shall be conducted with at least three (3) Independent Members present in person or by phone. Within ten (10) days of the commencement of the conference, or twenty (20) days following the IC's request for a conference if no conference is held, the IC shall either withdraw the recommended Investment Management decision or provide the Board a written explanation of the IC's decision to proceed with the recommended Investment Management decision. After delivery of such written explanation by the IC, the IC and the Chief Investment Officer are authorized to implement the decision. Any action taken by the Board or the IC in violation of the terms of this agreement shall constitute an ultra vires act and the IC or the Board, whichever is applicable, is granted the express right to seek to preliminarily enjoin such violation of the breaching party without the need to show irreparable harm.

"Investment Management" with respect to plan assets shall mean:

1. Developing an Investment Policy Statement with sound and consistent investment goals, objectives and performance measurement standards which are consistent with the needs of the Plan.

2. Within 120 days after the Effective Date of the POA, all of the plan assets not already under qualified management, if any, must be managed by qualified managers selected by the IC.

3. Evaluating, retaining, terminating, and selecting qualified managers to invest and manage the plan assets.

4. Reviewing and affirming or rejecting the correctness of any and all calculations, actuarial assumptions and/or assessments used by the Plan Actuary including, but not limited to, (i) those underlying the restoration of pension benefits, funding levels and amortization thereof, all in accordance with the Pension Restoration Program attached to the City's Plan of Adjustment, (ii) those underlying the determination of annual funding levels and amortization thereof, and (iii) on or after fiscal year 2024 the recommended annual contributions to GRS in accordance with applicable law.

5. In accordance with approved actuarial work as provided in the immediate preceding paragraph and based on the annual actuarial valuation reports and

5

any other projections or reports as applicable from the Plan Actuary or other professional advisors, the determination of the extent of restoration of pension benefits, including but not limited to the payment of a portion of the 4.5% reduction in base monthly pension amounts and the payment of lost COLA payments, all in conformance to the Pension Restoration Program between the City and the Board attached to the Plan of Adjustment.

6. Communicating the investment goals, objectives, and standards to the investment managers; including any material changes that may subsequently occur.

7. Determining and approving the Plan's investment and asset allocation guidelines, taking into account the appropriate liquidity needs of the Plan.

8. Any interpretation of Plan documents, existing law, the POA or other financial determination that could affect funding or benefit levels.

9. Taking whatever corrective action is deemed prudent and appropriate when an investment manager fails to perform as expected.

10. Complying with the provisions of pertinent federal, state, and local laws and regulations, specifically Public Act 314 and Plan Investment Guidelines.

11. Reviewing and approving, prior to final issuance, the annual audit and all financial reports prepared on behalf of the GRS and meet and confer with the Plan's outside auditor or other professional advisors as necessary prior to approving the annual audit or other financial reports.

12. Causing an asset/liability valuation study to be performed for GRS every three (3) years, or as requested by the IC or Board.

The IC shall give appropriate consideration to and have an understanding of the following prior to the adoption of the investment guidelines and asset allocation policies, the selection of manager(s), and/or the adoption of investment return assumptions:

1. The fiduciary best practices and institutional standards for the investment of public employee retirement system plan assets.

2. The objective to obtain investment returns above the established actuarial investment return assumption to support the restoration of benefits under the Pension Restoration Program, to the extent that is prudent and consistent with the overall funding, liquidity needs and actuarial

6

| | |
|---|---|
| | assumptions governing the Plan.<br>3. The liquidity needs of the GRS Plan. |
| CHIEF INVESTMENT OFFICER (CIO) | The IC shall evaluate and select the CIO, set and approve any and all compensation for, and terms of employment of, the CIO. With respect to plan assets, the CIO shall report directly to the IC and the Executive Director of the Board. The CIO shall be responsible for assisting the IC and the Board in overseeing the GRS's investment portfolio.<br><br>The initial CIO is Ryan Bigelow [subject to State due diligence.] |
| PLAN ACTUARY | The current Plan Actuary is Gabriel Roeder Smith & Company. In the event the Board desires to retain a new actuary, the Board and IC shall collectively participate in the evaluation and selection of a qualified Plan Actuary. The Plan Actuary shall be responsible for assisting the Board and IC in performing its actuarial duties and shall comply with all requests for information or modeling requested by the IC, and shall attend meetings of the IC as requested, so as to allow the IC to perform satisfactorily the rights and duties set forth herein. Furthermore, the Board shall not act on any recommendation made by the Plan Actuary based on any calculation, assumption or assessment rejected by the IC.<br><br>Nothing herein shall be interpreted as limiting the IC's authority to engage an actuarial consulting firm other than the Plan Actuary to perform actuarial services deemed necessary to fulfill its fiduciary duties to the GRS and other duties to GRS as set forth herein. |
| CONSISTENCY WITH PLAN OF ADJUSTMENT | Nothing herein shall be interpreted as permitting the IC or the Board to alter or depart from the requirements set forth in the confirmed Plan of Adjustment. |

DETROIT 56620-1 1315511v11

**EXHIBIT B – PFRS Governance Terms**

*In re City of Detroit, Michigan*

# INVESTMENT COMMITTEE GOVERNANCE
# FOR POLICE AND FIRE RETIREMENT SYSTEM

| PREAMBLE | This document was prepared to set forth the pension governance requirements under the State Contribution Agreement (as that term is defined in the City's Fourth Amended Plan for the Adjustment of Debts of the City of Detroit, as amended from time to time) applicable to the Police and Fire Retirement System of the City of Detroit (PFRS). |
|---|---|
| SCOPE OF SETTLEMENT | The PFRS is currently administered by a seventeen (17) member Board of Trustees (the "Board") that is vested with the fiduciary authority for the general administration, management and operation of the Retirement System.  The Board currently makes all administrative, actuarial and investment related decisions for the PFRS.  Upon the Effective Date under the POA, but subject to consummation of the State Contribution Agreement, there shall be established, by appropriate action and amendments to governing documents, an Investment Committee ("IC") at PFRS which shall be vested with the authority and responsibilities as outlined herein for a period of twenty (20) years after the Effective Date of the POA.  All administrative, managerial, and operational matters not addressed in this Term Sheet shall continue to be addressed by the Board in the ordinary course of its affairs. |
| INVESTMENT COMMITTEE | The IC shall consist of nine (9) voting members consisting of:<br> i. Five (5) Independent Members;<br> ii. Two (2) Employee Members; and<br> iii. Two (2) Retiree Members.<br>Collectively, or individually, "Members" or "Member."<br><br>At least two (2) of the five (5) Independent Members of the committee shall be residents of the State of Michigan.  None of the Independent Members shall be a party in interest as defined by MCL 38.1132d (4) to the City or the PFRS.<br><br>Each Independent Member of the IC shall have expert knowledge or extensive experience with respect to either:  (a)economics, finance, or institutional investments; or (b) administration of public or private retirement plans, executive management, benefits administration or actuarial science.  At least one (1) of the IC Independent Members shall satisfy the requirements of (a) above and at least one (1) of the IC Independent Members shall satisfy the requirements of (b) above.<br><br>The five (5) initial IC Independent Members shall be selected by mutual agreement of the appropriate representatives of the State, the |

1

City and the Board, in consultation with the Foundation for Detroit's Future. The initial Independent Members and their terms of office will be as follows: Rebecca Sorenson (2 years), Joseph Bogdahn (3 years), Robert C. Smith (4 years), McCullough Williams III (5 years) and Woodrow S. Tyler (6 years). Successor Independent Members shall be recommended by a majority of the remaining Independent Members and confirmed by the Board and the State Treasurer in consultation with the Foundation for Detroit's Future, in accordance with such rules and regulations as may be adopted by the IC, provided such rules and regulations are not inconsistent with the POA and this agreement. In the event the Board and the State Treasurer cannot agree on the successor Independent Member within thirty (30) days of the receipt of the recommendation of the IC, the remaining Independent Members of the IC shall appoint the successor Independent Member.

If no mutual agreement is reached as to the selection of one or more of the initial IC Independent Members by the time of confirmation of the City's Plan of Adjustment, then the Bankruptcy Court shall select the Independent Members necessary to fill the five (5) initial IC Independent Member positions for which no agreement has been reached.

In the event the Bankruptcy Court selects the initial Independent Members as described immediately above, successor Independent Members shall be appointed in the same manner as the Independent Member being replaced, as described immediately above, after three (3) weeks' notice to the Board of the individuals chosen, in accordance with such rules and regulations as may be adopted by the IC, provided such rules and regulations are not inconsistent with the POA and this agreement.

The Employee Members shall consist of one active police member and one active fire member from the Board, appointed by the Board. The initial Employee Members will be Mark Diaz and Sean Neary.

The Retiree Members shall consist of one retiree-elected police member and one retiree-elected fire member from the Board, each receiving a pension from PFRS and appointed by the Board. The initial elected Retiree Members will be Michael Simon and Louis Sinagra.

Each of the four (4) uniformed Members shall have one-half (1/2) vote.

The terms of office of the initial IC Independent Members shall be staggered at the time of appointment so that Independent Members shall have varying initial terms of office, with one each having a 2, 3, 4, 5 and 6 year term. Each initial Independent Member shall serve until the expiration of his/her initial term. After the initial term of office, the term of office of the IC Independent Members shall be six years. Each successor Independent Member shall be selected in

accordance with the provisions above and shall serve until his or her death, incapacity, resignation or removal in accordance with the paragraph below. Upon expiration of his or her term of office, an Independent Member shall continue to serve until his or her successor is appointed. Nothing herein shall bar an initial Independent Member from becoming a successor Independent Member after his/her initial term.

The terms of office of the Employee Members and Retiree Members of the IC shall conform to their respective terms of office on the Board.

A Member may be removed by the remaining Members for any of the following reasons: (a) the Member is legally incapacitated from executing his or her duties as a Member of the IC and neglects to perform those duties, (b) the Member has committed a material breach of PFRS provisions, policies or procedures and the removal of the Member is in the interests of the system or its participants or its participants' beneficiaries, (c) the Member is convicted of a violation of law and the removal shall be accomplished by a vote of the IC in accordance with the voting procedures in this agreement, (d) if the Member holds a license to practice and such license is revoked for misconduct by any State or federal government, or (e) if an IC Member shall fail to attend scheduled meetings of the IC for four (4) consecutive meetings, unless in each case excused for cause by the remaining Members attending such meetings, the Member shall be considered to have resigned from the IC, and the IC shall, by resolution, declare the office of the Member vacated as of the date of adoption of such resolution. In addition, a Member of the IC may have voting privileges temporarily suspended by a 70% or higher vote of the other members if the Member is indicted or sued by a State or federal government for an alleged violation of the law that relates to his or her service on the IC, or for other alleged financial crimes, including fraud. Any vacancy occurring in the office of Member shall be filled within sixty (60) days following the date of the vacancy, for the unexpired portion of the term, in the same manner in which the office was previously filled.

All members of the IC shall be reimbursed for the reasonable, actual and necessary expenses incurred in the performance of their duties. All reasonable and proper expenses related to the administration of the IC, including but not limited to the purchase of insurance, shall be payable out of the assets of the PFRS. The IC may retain actuarial, legal counsel, audit or other professional or support personnel to provide advice to the IC as it deems reasonably necessary to perform its functions and such parties or persons may be reasonably compensated from the assets of the Plan; such engagements shall not be subject to the approval of the Board.

The IC shall be an investment fiduciary to the PFRS. An IC Member or other fiduciary under the PFRS shall discharge his or her duties with respect to the PFRS in compliance with the provisions of Public Act

3

| | |
|---|---|
| | 314 of 1965, as amended. An IC Member shall discharge his or her duties with the care, skill, and caution under the circumstances then prevailing which a prudent person, acting in a like capacity and familiar with those matters, would use in the conduct of an activity of like character and purpose. Members of the IC shall comply with all Board governance policies and procedures, including the Ethics and Code of Conduct Policies, unless such compliance violates the Member's fiduciary duties or conflicts with the terms and conditions of this agreement. |
| IC MEETINGS | The IC shall meet at least once every other month. The Members shall determine the time for the regular meetings of the IC and the place or places where such meetings shall be held. The Secretary or his or her designee shall be responsible for giving notice of the time and place of such meetings to the other Members.<br><br>Notice and conduct of all meetings of the IC, both regular and special, shall be held within the City of Detroit and in accordance with applicable law including the Michigan Open Meetings Act (MCL §15.261 et seq.).<br><br>The IC shall adopt its own rules of procedure and shall keep a record of its proceedings. Five (5) Members shall constitute a quorum at any meeting of the IC, so long as at least three (3) Independent Members are present. Each Member shall be entitled to one vote on each question before the IC and at least four (4) concurring votes shall be necessary for a decision of the committee, except as otherwise provided in this Term Sheet. |
| INVESTMENT COMMITTEE - RESPONSIBILITY | The IC shall serve in a fiduciary capacity with respect to the Investment Management of all PFRS Plan Assets, determination of the investment return assumption, and Board compliance with benefit plan provisions, as set forth more fully below. The IC shall have all the powers as a fiduciary under the first sentence of MCL §38.1133(5) and (6).<br><br>All Investment Management decisions approved by the Board shall require a recommendation by an affirmative vote of the IC, in accordance with the provisions of this agreement. All actions and recommendations of the IC shall be forwarded to the Board for consideration and is subject to Board approval. The Board shall take no action with respect to any matter for which the IC has responsibility and authority, including the Investment Management matters described in the next paragraph, unless and until such action has been approved by affirmative vote of the IC. If (a) the Board fails to approve or disapprove an Investment Management decision that has been recommended by an affirmative vote of the IC, and such failure continues for 45 days after the date that the recommendation was made to the Board, or (b) the Board disapproves an Investment Management decision within such 45-day period but fails to provide to the IC within |

4

such 45-day period a detailed written response outlining the reasons for such disapproval, then the IC and the Chief Investment Officer are authorized to implement the decision. If the Board disapproves an Investment Management decision within such 45-day period and provides to the IC within such 45-day period a detailed written response outlining the reasons for such disapproval, then the IC shall have 45 days after the receipt of the Board response to either (a) withdraw the recommended Investment Management decision, or (b) request, in writing, a conference with the Board to be held within ten (10) days, but not less than five (5) business days, of such request by the IC, unless a later date is agreed to in writing by the Board and the IC, to discuss the disapproval by the Board described in the written response. Any such conference shall be conducted with at least three (3) Independent Members present in person or by phone. Within ten (10) days of the commencement of the conference, or twenty (20) days following the IC's request for a conference if no conference is held, the IC shall either withdraw the recommended Investment Management decision or provide the Board a written explanation of the IC's decision to proceed with the recommended Investment Management decision. After delivery of such written explanation by the IC, the IC and the Chief Investment Officer are authorized to implement the decision. Any action taken by the Board or the IC in violation of the terms of this agreement shall constitute an ultra vires act and the IC or the Board is granted the express right to seek to preliminarily enjoin such action without the need to show irreparable harm.

"Investment Management" with respect to plan assets shall mean:

1. Developing an Investment Policy Statement with sound and consistent investment goals, objectives and performance measurement standards which are consistent with the needs of the Plan.
2. Within 120 days after the Effective Date of the POA, all of the plan assets not already under qualified management, if any, must be managed by qualified managers selected by the IC.
3. Evaluating, retaining, terminating and selecting qualified managers to invest and manage the plan assets.
4. Reviewing and affirming or rejecting the correctness of any and all calculations, actuarial assumptions and/or assessments used by the Plan Actuary including, but not limited to, (i) those underlying the restoration of pension benefits, funding levels and amortization thereof, all in accordance with the Pension Restoration Program attached to the City's Plan of Adjustment, (ii) those underlying the determination of annual funding levels and amortization thereof, and (iii) on or after fiscal year 2024, the recommended annual contributions to PFRS in accordance with applicable law.

5

5. In accordance with approved actuarial work as provided in the immediate preceding paragraph and based on the annual actuarial valuation reports and any other projections or reports as applicable from the Plan Actuary or other professional advisors, the determination of the extent of restoration of pension benefits, including but not limited to the payment of lost COLA payments, all in conformance to the Pension Restoration Program between the City and the Board attached to the Plan of Adjustment.

6. Communicating the investment goals, objectives, and standards to the investment managers; including any material changes that may subsequently occur.

7. Determining and approving the Plan's investment and asset allocation guidelines, taking into account the appropriate liquidity needs of the Plan.

8. Any interpretation of Plan documents, existing law, the POA or other financial determination that could affect funding or benefit levels.

9. Taking whatever corrective action is deemed prudent and appropriate when an investment manager fails to perform as expected.

10. Complying with the provisions of pertinent federal, state, and local laws and regulations, specifically Public Act 314 and Plan Investment Guidelines.

11. Reviewing and approving, prior to final issuance, the annual audit and all financial reports prepared on behalf of the PFRS and meet and confer with the Plan's outside auditor or other professional advisors as necessary prior to approving the annual audit or other financial reports.

12. Causing an asset/liability valuation study to be performed for PFRS every three (3) years, or as requested by the IC or Board.

The IC shall give appropriate consideration to and have an understanding of the following prior to the adoption of the investment guidelines and asset allocation policies, the selection of manager(s), and/or the adoption of investment return assumptions:

1. The fiduciary best practices and institutional standards for the investment of public employee retirement system plan assets.

2. The objective to obtain investment returns above the established actuarial investment return assumption to support the restoration of benefits under the Pension Restoration Program, to the

6

| | |
|---|---|
| | extent that is prudent and consistent with the overall funding, liquidity needs and actuarial assumptions governing the Plan.<br>3. The liquidity needs of the PFRS Plan. |
| CHIEF INVESTMENT OFFICER (CIO) | The IC shall evaluate and select the CIO, set and approve any and all compensation for, and terms of employment of, the CIO. With respect to plan assets, the CIO shall report directly to the IC and the Executive Director of the Board. The CIO shall be responsible for assisting the IC and the Board in overseeing the PFRS's investment portfolio.<br><br>The initial CIO is Ryan Bigelow [subject to State due diligence.] |
| PLAN ACTUARY | The current Plan Actuary is Gabriel Roeder Smith & Company. In the event the Board desires to retain a new actuary, the Board and IC shall collectively participate in the evaluation and selection of a qualified Plan Actuary. The Plan Actuary shall be responsible for assisting the Board and IC in performing its actuarial duties and shall comply with all requests for information or modeling requested by the IC, and shall attend meetings of the IC as requested, so as to allow the IC to perform satisfactorily the rights and duties set forth herein. Furthermore, the Board shall not act on any recommendation made by the Plan Actuary based on any calculation, assumption or assessment rejected by the IC.<br><br>Nothing herein shall be interpreted as limiting the IC's authority to engage an actuarial consulting firm other than the Plan Actuary to perform actuarial services deemed necessary to fulfill its fiduciary duties to the PFRS and other duties to PFRS as set forth herein. |
| CONSISTENCY WITH PLAN OF ADJUSTMENT | Nothing herein shall be interpreted as permitting the IC or the Board to alter or depart from the requirements set forth in the confirmed Plan of Adjustment. |

DETROIT 56620-1 1315534v8

**EXHIBIT C**

1. General Retirement System

2. Police and Fire Retirement System

3. AFSCME

4. UAW

5. Detroit Police Officers Association

6. Detroit Police Command Officers Association

7. Detroit Police Lieutenants and Sergeants Association

8. Detroit Fire Fighters Association

9. Retired Detroit Police and Fire Fighters Association

10. Retired Detroit Police Members Association

11. Detroit Retired City Employees Association

12. Official Retirees Committee

13. City of Detroit

# EXHIBIT D

Cases to be dismissed:

1.    GRS et al. v. Emergency Manager of Detroit (Ingham County Circuit Court)
2.    Webster et al. v. State of Michigan, Governor, and State Treasurer (Ingham County Circuit Court)
3.    Detroit Library Commission v. Governor, State Treasurer, and Detroit Public Schools Emergency Manager (Ingham County)
4.    Flowers et al. v. Governor, State Treasurer, and State of Michigan (Ingham County Circuit Court)
5.    DPOA v. City of Detroit (Michigan Court of Appeals)

The settling parties will not attempt to amend to include the City of Detroit or its Emergency Manager as a defendant, or collaterally or retroactively attack the Detroit bankruptcy or actions of Detroit or its EM, or otherwise participate, support, fund or appeal in the following cases:

1.    Phillips et al v. Governor and State Treasurer (E.D. Mich.)
2.    Michigan AFSCME Council 25 v. Governor, State Treasurer, et al. (E.D. Mich.)
3.    NAACP v. Governor, State Treasurer, and Secretary of State (E.D. Mich.)
4.    Robert Davis/Citizens United Against Corrupt Government v. Governor, State of Michigan, Dept. of Treasury, Dept. of State Police, et al. (Ingham County Circuit Court)
5.    Robert Davis/Citizens United Against Corrupt Government v. Michigan Department of Treasury and Carla Robert (Wayne County Circuit Court)
6.    Robert Davis v. Local Emergency Financial Assistance Loan Board (Ingham Court)
7.    Robert Davis v. Weatherspoon, Governor, Attorney General, and State Treasurer (E.D. Mich.)
8.    Allen Park Retirees v. EM Parker, City of Allen Park (Wayne Circuit)
9.    Allen Park Retirees v. State (Court of Claims)
10.   Deborah Moore-El v. Snyder (E.D. Mich.)
11.   Faith, et al. v. Snyder (E.D. Mich.)
12.   Sarella Johnson, et al. v. Snyder (E.D. Mich.)
13.   United Retired Government Employees (URGE) et al. v. Governor, et al. (E.D. Mich.)

**EXHIBIT I.A.343**

FORM OF SYNCORA DEVELOPMENT AGREEMENT

<u>**DEVELOPMENT AGREEMENT**</u>

**OPTION TO PURCHASE AND DEVELOP LAND**

**BY AND BETWEEN**

**CITY OF DETROIT**

**AND**

**PIKE POINTE HOLDINGS, LLC**

      **THIS AGREEMENT** (referred to herein as the "<u>Agreement</u>") is entered into as of the ____ day of September, 2014 (the "<u>Effective Date</u>"), by and between the City of Detroit, a Michigan public body corporate (the "<u>City</u>"), acting through its Planning & Development Department ("<u>PDD</u>"), whose address is 2300 Cadillac Tower, Detroit, Michigan 48226, and Pike Pointe Holdings, LLC, a Delaware limited liability company ("<u>Developer</u>"), whose address is [ _____ ].  The City and Developer are sometimes referred to in this Agreement as a "Party" and, collectively, as the "Parties."

<strong>Recitals:</strong>

      A.    In consideration of the Parties' various contractual arrangements entered into contemporaneously herewith, including without limitation, extension of the lease of the Windsor Tunnel between the City and affiliates of Developer, and the mutual desire of the Parties to promote economic growth in the City (the "<u>Arrangement</u>"), the City has agreed to grant an option to Developer to acquire various parcels of land located in the City of Detroit as described in the attached **Exhibit A** (each a "<u>Property</u>" and, collectively, the "<u>Properties</u>").  Unless otherwise set forth herein, references in this Agreement to a Property shall apply only to the applicable Property and not the other Properties.

1

B.     If Developer exercises its option with respect to one or more of parcels of the Property as set forth herein, Developer shall develop such Property in accordance with the terms and provisions of this Agreement.

Accordingly, the Parties agree as follows:

## Section 1.     TERMS OF OPTION

(A)     <u>Grant of Option</u>. The City hereby grants to Developer an option (the "<u>Option</u>") to, from time to time, acquire any or all of the Properties from the City upon the terms and conditions set forth in this Agreement.  The Option shall be effective for five (5) years from the Effective Date, except with respect to that certain Property located at 2200 Franklin for which the Option shall be effective for seven (7) years from the Effective Date (the "<u>Option Period</u>"). The Parties agree and acknowledge that the sole and exclusive consideration for the Option and any subsequent acquisition of any Property hereunder is deemed to be the Arrangement, the sufficiency of which is hereby acknowledged.  The City shall cause to be recorded and maintained of record against the Properties in the appropriate land records for the duration of the Option Period the memorandum of option attached hereto as **Exhibit B**. Notwithstanding the foregoing, the Option Period may be extended for a period not to exceed two (2) years upon written consent of the City, which consent shall not be unreasonably withheld, conditioned or delayed (the "<u>Option Extension</u>").   For purposes of the Option Extension, it shall be unreasonable for the City to withhold consent thereto to the extent that, (i) on the date of Developer's request therefor, development in the immediate vicinity of the Property has materially decreased or the general economic condition of the City or geographic region in which the Property is located has deteriorated, in either instance from and after the Effective Date to such a level that it would not be economically feasible for the Developer to pursue development of the Property and/or (ii) the Option Extension is reasonable given the complexity of the development contemplated by the Developer.  Any dispute between the Parties with regard to a request for Option Extension which cannot be resolved by the Parties within sixty (60) days following the Developer's request therefor shall be brought in the Bankruptcy Court for so long as it has jurisdiction, and thereafter in the United States District Court for the Eastern District of Michigan; provided, that if the United States District Court for the Eastern District of Michigan does not have jurisdiction, then such legal action, suit or proceeding shall be brought in such other court of competent jurisdiction located in Wayne County, Michigan; provided, further, by execution and delivery of this Agreement, each of the Parties irrevocably accepts and submits to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding and specifically consents to the jurisdiction and authority of the Bankruptcy Court to hear and determine all such actions, suits, and proceedings under 28 U.S.C. §157(b) or (c), whichever applies.

2

(B)   Diligence Notice.  If the Developer desires (in its sole discretion) to undertake Due Diligence Activities (as hereinafter defined) with respect to one or more of the Properties, the Developer shall, from time to time, give prior written notice of its intent thereof to the City not less than sixty (60) days prior to the expiration of the Option Period (each, a "Diligence Notice").  The Developer shall be entitled to deliver any number of Diligence Notices with respect to the various Properties during the Option Period; provided, however, that any such Diligence Notice shall indicate reference to the Property the Developer intends to subject to the Due Diligence Activities hereunder.

(C)   Condition of Property.

(1)   Due Diligence Activities. Subject to the requirements of Section 2 below, upon delivery of the Diligence Notice to the City with respect to any Property, Developer shall have a period commencing on the date of the Diligence Notice and continuing through and including the date that is sixty (60) days prior to the expiration of the Option Period (the "Due Diligence Period") to conduct its due diligence activities on any Property that is the subject of a Diligence Notice.   For purposes of this Agreement, "Due Diligence Activities" include but are not limited to the following:

(a)   such physical inspections, surveys, soil borings and bearing tests, possible relocation of utilities, and such environmental due diligence on or for the Property as Developer deems appropriate, all of which shall be completed at Developer's expense;

(b)   investigations, environmental site assessments, including Phase I and Phase II site assessments, sampling and testing of soil, groundwater, surface water, soil vapors, indoor air, and building materials (such as Asbestos and lead-based paint), and/or a Baseline Environmental Assessment, ("BEA"), as defined in Part 201 of the Natural Resources and Environmental Protection Act ("NREPA"), being MCL 324.20101 *et seq*., and such other investigations and assessments as Developer may deem needed in its sole discretion to determine the condition of the Property and the Property's compliance with Environmental Law and any other federal, state and local laws, rules, regulations and orders relating in any way to protection of human health, the environment and natural resources, all of which shall be completed at Developer's expense; and

(c)   a review of the title evidence, survey, entitlements, and payment of taxes and assessments, all of which shall be completed at Developer's expense.

(d)   a review of financing sources related to Developer's proposed development and use of the Property, or any other matter that in Developer's sole discretion is relevant to Developer's acquisition of the Property.

(e)   a review of all City Information and all publicly-available information with respect to the Property.

(f)   a review of available public and private utilities and public accesses necessary for the proposed development of the Property.

3

(f)     application and procurement of any zoning, site plan, elevation, special land use, environmental, conditional use or other municipal approvals or permits, or variances therefrom, required or appropriate for the proposed development of the Property.  The City hereby authorizes the Developer to submit and apply for all such approvals, permits, and variances upon the commencement of the Due Diligence Period.

(2)     City Information.  The City shall use reasonable efforts to make available to Developer all information in the City's (or the City's agencies' or departments') possession or control related to the applicable Property within thirty (30) days following delivery to the City of a Diligence Notice for the applicable Property, including but not limited to existing leases, licenses, permits, approvals, contracts, warranties, title searches and policies, surveys, appraisals, environmental audits, Phase I environmental site assessments, Phase II reports or other testing or sampling data, asbestos surveys, reports, specifications, from the Planning, Building, Assessing, Environmental Affairs and Fire Departments, notices of violations of applicable laws, regulations and ordinances or other documents in the City's possession or control related to the applicable Property (collectively, the "City Information").  The City shall cooperate with the Developer and use reasonable efforts to facilitate the Developer's Due Diligence Activities, all at no material incremental cost to the City, including providing information, coordinating with tenants or other third party users of the Property as applicable, and executing such documentation as may be reasonable and necessary for Developer's access to the site and completion of the Due Diligence Activities including the preparation of a BEA.

(3)     Insurance.  Prior to entering onto any Property for any Due Diligence Activities, Developer or its contractors shall maintain the insurance coverage and comply with the insurance requirements specified in the City's Right-of-Entry, a form of which is attached as **Exhibit C** (the "Right-of-Entry").

(4)     Indemnity.  Developer shall defend, indemnify and hold harmless the City from and against any loss, liability, cost or expense incurred by the City to the extent resulting from Developer's (including its duly authorized employees, agents, engineers or other representatives) negligence or willful acts occurring in connection with the Due Diligence Activities; provided, however, that (i) in the event Developer provides an Objection Notice or otherwise elects not to proceed to Closing, the Developer shall in no circumstance have any obligation or liability with respect to any conditions pre-existing at the Property including without limitation any environmental condition, soil or groundwater contamination or other environmental conditions that may discovered in the course of the Developer's Due Diligence Activities and thereafter disclosed to the City as required hereunder, except to the extent such conditions are materially exacerbated due to the negligence or willful acts of Developer or any of its duly authorized employees, agents, engineers or other representatives, and (ii) the Developer shall not be responsible for any loss, liability, cost, or expense resulting from the discovery of any adverse information or condition regarding the applicable Property or from the City's (or the City's agencies' or departments') negligence or misconduct.

(5)     Results of Due Diligence Activities. If Developer concludes, in Developer's sole discretion, that a particular Property is satisfactory, then Developer shall so

4

notify the City in writing on or before the last day of the Due Diligence Period, by sending an "Election Notice," and the parties shall proceed to closing the applicable Property subject to other terms and conditions of this Agreement. If Developer concludes, in Developer's sole discretion, that, for any reason or for no reason, a particular Property is not satisfactory, then Developer shall so notify the City in writing on or before the last day of the Due Diligence Period, by sending a "Rejection Notice," and the parties shall not proceed to Closing with respect to the applicable Property at such time. In the event the Developer issues a Rejection Notice with respect to any Property, Developer may not later elect to re-commence Due Diligence Activities with respect to the same Property and the Option granted hereunder with respect to such Property will be thereafter deemed released and of no further force or effect. If Developer concludes, in Developer's sole discretion, as a result of the Due Diligence Activities that the condition of the Property is not satisfactory but Developer wants the City to cure such unsatisfactory conditions, then Developer shall notify the City in writing on or before the last day of the Due Diligence Period, by sending an "Objection Notice" setting forth with reasonable specificity the particular condition of the applicable Property which is unacceptable to Developer (each such condition referred to as a "Defect"). The City shall have the right, but not the obligation, within sixty (60) days of the Objection Notice (the "City Cure Period"), to cure such Defects; provided, however, that the City shall be required to cure any liens or encumbrances (collectively, a "Mandatory Cure") (x) in favor of the City or any agency or department of the City or (y) result from a violation of Section 5(G) of this Agreement. If the City is unable or unwilling to cause any or all of the Defects (other than Mandatory Cures which the City shall be obligated to cure) during such City Cure Period, Developer shall have the right to either (i) elect not to exercise the Option with respect to the applicable Property by sending written notice to City of such election within two (2) days after the expiration of the City Cure Period, in which event the Developer may later elect to commence Due Diligence Activities with respect to the same Property by delivery of a Diligence Notice pursuant to the terms of Section 1(B) above; or (ii) waive its objection to such Defects and accept the Property subject to those Defects (Developer being deemed to have elected this option (ii) if it fails to make the election in the preceding option (i)). If Developer fails to provide an Election Notice or an Objection Notice within the Due Diligence Period, then Developer shall be deemed to have delivered a Rejection Notice with respect to the applicable Property. Notwithstanding any provision herein to the contrary, the City agrees to (1) cooperate with the Developer in clearing title to the Property to the extent that the title related Defects described in the Objection Notice are within the reasonable control of the City to address or eliminate and (2) cure all Mandatory Cure Defects. In the event that the expiration of the City Cure Period for a particular Property occurs (or would occur) after the expiration of the Option Period, the Option Period shall be extended for such Property until the date that is fifteen (15) days after the expiration of the applicable City Cure Period.

(6)     As Is Condition of Property; City Cooperation. From time to time with respect to each Property, subject to the earliest to occur of (i) delivery by Developer of an Election Notice, (ii) written notice to Developer that the City has cured all Defects set forth in an Objection Notice provided prior to the expiration of the City Cured Period, or (iii) waiver by Developer of any Defects, each pursuant to Section 1(C)(5) above, closing of the transactions contemplated hereby with respect to a particular Property (each, a "Closing") shall be on an "as-is, where-is" basis and the Developer shall take the applicable Property as it finds it at Closing

5

other than a matter resulting from a violation of the covenant set forth in Section 5(G) of this Agreement. The City makes no implied or express representations or warranties of any kind as to its condition, including its environmental condition and any other condition that may adversely affect the development, or its fitness for absolutely any purpose whatsoever. By proceeding to Closing after completion of its Due Diligence Activities, Developer will acknowledge that it is satisfied with the condition of the applicable Property, except as otherwise provided in this Agreement. By accepting title to the applicable Property at Closing, Developer shall be deemed to have waived any right to object to the status of title or to the condition of the applicable Property, regardless of the result of any Due Diligence Activities, and shall be deemed to have declared its full satisfaction with the status of title to and condition of the applicable Property, except as otherwise provided in this Agreement.

(7) <u>Release of City from Liability</u>. Upon Closing on any particular Property, Developer shall release the City and its officials, employees, and agents (but not any third party) from any and all claims or causes of action the Developer may have against the City for any liability, injury or loss as a result of any physical defects in or physical conditions of the applicable Property, including but not limited to any surface, subsurface, latent or patent conditions whether naturally occurring or by action of any party, including but not limited to environmental condition, other than a matter resulting from a violation of the City's covenant set forth in Section 5(G)(ii) of this Agreement.

(8) <u>Security of Properties</u>. In the event that a Property is vacant or otherwise not being utilized by the City, without imposing any liability or obligation with respect thereto, commencing on the commencement of Due Diligence Activities with respect to such Property, Developer shall have the right, but not the obligation, it is sole and absolute discretion, at Developer's cost and expense, to undertake any actions it deems reasonably necessary to secure the Property and prevent damage or unauthorized access to the applicable Property, including, without limitation, installing and maintaining fencing and/or signage on the applicable Property. As a condition to Developer exercising its right hereunder to secure any Property, the Developer must first obtain a general liability policy of insurance in connection with such activities in form and amount reasonably satisfactory to the City, with the City named as an additional insured thereto. In addition, Developer shall not be deemed to be in control of or operating the applicable Property as a result of Developer's undertaking of any security measures with respect to this section. Notwithstanding the foregoing, in exercising its right to secure the Property provided for herein, Developer shall not be deemed to have warranted to the City the effectiveness of the security measures so implemented.

(D) <u>Manner of Conveyance</u>. At the Closing, the applicable Property shall be conveyed to Developer (or its designee) by one or more quit claim deeds substantially in the form of the deed set forth in **Exhibit D** (the "<u>Deeds</u>") using legal descriptions approved by Developer and the City.

(E) <u>Brokerage and Finder's Fees and Commission</u>. Developer will defend and indemnify the City and hold it harmless with respect to any commissions, fees, judgments, or expenses of any nature and kind that the City or Developer may become liable to pay by reason of any claims by or on behalf of brokers, finders or agents claiming by, through or under Developer incident to this Agreement and the transaction contemplated hereby or any litigation

6

or similar proceeding arising therefrom unless the City has a written agreement with a broker, finder or agent providing for such payment in which case the City shall be responsible for such broker, finder or agents' commissions, fees, judgments or expenses. To the maximum extent permitted by applicable law, the City will defend and indemnify the Developer and hold it harmless with respect to any commissions, fees, judgments, or expenses of any nature and kind that the City or Developer may become liable to pay by reason of any claims by or on behalf of brokers, finders or agents claiming by, through or under the City incident to this Agreement and the transaction contemplated hereby or any litigation or similar proceeding arising therefrom unless the Developer has a written agreement with a broker, finder or agent providing for such payment in which case the Developer shall be responsible for such broker, finder or agents' commissions, fees, judgments or expenses.

    (F)    <u>Taxes And Assessments</u>.

    (1)  <u>Property on Tax Rolls at Closing</u>. All taxes and assessments which (i) have become a lien upon the Property or part thereof prior to the date of Closing, and (ii) have been discovered and specifically identified by Developer prior to the applicable Closing, shall be paid by the City and shall be a Mandatory Cure; provided, however, that all current property taxes shall be prorated and adjusted to the date of Closing on a due date basis. From and after each Closing, Developer shall be solely responsible for all taxes, liens, and assessments that become due and payable for the period after the applicable Closing against the applicable Property it acquires hereunder or any part thereof, whenever assessed, levied, or due, and shall have no claim against the City on account thereof.

    (2) <u>Approval of Requests for Economic Incentives/Entitlements and Land Use Approvals</u>.

    (i)    The City agrees to consider any requests by Developer or its designee for any development or economic inducements (including tax abatements, tax credits, tax increment financing, grants, loans, cost reimbursements and like development incentives) for which any of the Properties are eligible, whether or not such requests are made as part of Developer's Due Diligence Activities or thereafter. The City also agrees to cooperate with and support Developer or its designee in any request to procure such development or economic inducements from other governmental authorities (whether or not related to or controlled by City).

    (ii)    The City agrees to consider requests or applications by Developer or its designee for approvals relating to zoning, site plans, special use permits, uses, variances or other municipal approvals that are necessary or appropriate to develop the Properties, provided that if the requests pertain to any of the Properties other than 1300 Beaubien, such requests are for uses that are consistent with the SD4 zoning classification as of the Effective Date or otherwise are consistent with residential, parking, retail or commercial uses permitted within the SD4 zoning classification as currently in effect or other uses suitable for the location.

    (iii)  The following shall apply to any consideration or cooperation by the City with respect to any formal requests made by Developer or its designee to the City, described in subsections (i) or (ii) of this Section: (a) the City agrees to process such requests pursuant

7

to its ordinary processes for the applicable requests, (b) the City shall not unreasonably withhold, condition or delay approvals of the applicable requests, and shall not unreasonably impede or interfere with development activities consistent with this Agreement, (c) the City shall not discriminate against Developer or its designee in the consideration or approval of such requests on account of the Arrangement, the events leading up to the Arrangement or this Agreement, and (d) the City shall use reasonable efforts to facilitate such requests, taking into consideration other similar requests for approvals or inducements, as applicable, of third parties granted by the City for similarly situated developments and uses as those contemplated by Developer for the Property; provided, however, the City shall process such requests pursuant to all then applicable rules, regulations, statutes and similar requirements.

(G)     Inability to Convey.  Subject to the Developer's rights under Section 6(D) below, if, for any reason, the City is unable to convey title to a particular Property to the Developer upon exercise of the Option and Developer's election to proceed to Closing with respect to the applicable Property pursuant to the terms of this Agreement, which shall include (i) if the City (or an agency or department of the City) does not own title to such Property, (ii) there is a Defect that is not cured or removed as of the Closing and such Defect materially hinders Developer's ability to develop the applicable Property in an economically viable manner, (iii) there are any uncured Mandatory Cure items, or (iv) if Developer determines that the scope or expense of any environmental remediation necessary to develop the applicable Property would make the development thereof, as contemplated by the Developer, economically unfeasible, the Developer and the City shall mutually agree upon alternate consideration commensurate to the undeveloped, fair-market value of the applicable Property (the "Alternate Consideration"); provided, however, that such value shall assume that any applicable Defects have been removed; provided, further, that, with respect to the applicable Property, the reasonable, actual and out-of-pocket acquisition and development costs incurred by Developer or its designee after the Effective Date and prior to the date upon which Developer or its designee obtains actual knowledge of the existence of the particular Defect or condition of such Property giving rise to Alternate Consideration, including, without limitation, costs associated with Due Diligence Activities, remediation activities, and architect, engineering, and design activities, shall be included in the amount of Alternate Consideration to the extent Alternate Consideration is required pursuant to Section 1(G)(i) or 1(G)(iii) above.

To the extent the Parties do not agree on the Alternate Consideration within sixty (60) days of establishing that Alternative Consideration is required, then, within thirty (30) days thereafter, the Developer and the City shall deliver to each other Developer's or City's, as the case may be, determination of the Alternate Consideration (which shall be in the form of an alternate parcel of real property or cash payment amount).  Within ten (10) days after each Party delivers to the other party such Party's determination of the Alternate Consideration, the Developer and the City shall each appoint one disinterested appraiser having the qualifications set forth herein.  Each such appraiser must be a Member of the Appraisal Institute (MAI) and have at least ten (10) years of experience appraising commercial or industrial property in the Detroit metropolitan area as a MAI appraiser.  If either the Developer or the City fails to appoint an appraiser within such ten (10) day period, the appraiser appointed by the Developer or the City, as the case may be, shall appoint an appraiser having the qualifications set forth herein.  As promptly as possible, but in no event later than thirty (30) days after the appointment of both

8

appraisers, the appraisers shall notify the Developer and the City in writing of their determination of which of the Developer's or the City's determination more closely approximates Alternate Consideration (all as valued as of the determination date). The Alternate Consideration so selected by the two appraisers will constitute the Alternate Consideration for purposes of this section, and will be binding upon the Developer and the City. If the two appraisers are unable to agree as to the Alternate Consideration, then the two appraisers shall promptly agree upon and appoint a third appraiser having the qualifications set forth herein. The third appraiser shall, within thirty (30) days of appointment, determine which of the two determinations of the Developer or the City more closely approximates Alternate Consideration, and shall notify the Developer and the City thereof. The Alternate Consideration selected by the third appraiser will constitute the Alternate Consideration for purposes of this section, and will be binding upon the Developer and the City. To the extent the Alternate Consideration selected by the appraisers hereunder is real property, (i) such real property shall be reasonably acceptable to Developer, and (ii) the City may elect in its sole discretion to satisfy such Alternate Consideration in the form of a cash payment to the Developer in an amount equal to the appraisers' determination of the cash value of the Alternate Consideration selected. To the extent the Alternate Consideration to be given to the Developer hereunder is real property, the City shall be deemed to be have granted Developer an option with respect to such Alternative Consideration property pursuant to the same terms as this Agreement; provided, however, that the time periods with respect to such option, including without limitation, the Option Period, shall commence upon the date that such new option with respect to the Alternative Consideration is granted to Developer and not as of the Effective Date.

(H)    Use of the Properties During the Due Diligence Period.  Commencing on the commencement of the Due Diligence Period, Developer shall have the right (but not the obligation), in its sole discretion, to elect to utilize all or a portion of the Properties identified on Schedule 1(H) prior to acquiring title of the Use Property for the operations of a surface lot parking facility and ancillary uses (collectively, the "Parking Use") by providing thirty (30) days' prior written notice thereof to City (a "Use Notice"). The Use Notice shall identify the Properties that will be used by Developer for the Parking Use (collectively, the "Use Property"). Developer's right to utilize the Use Property for the Parking Use shall commence as a license from the City upon the expiration of thirty (30) days following the delivery of the Use Notice to the City. Developer shall have the right to enter into an agreement with a third party to operate the Parking Use on the Use Property. Developer shall pay all costs associated with the Parking Use of the Use Property (including all federal, state and local taxes and charges as may be applicable thereto; however, Developer shall not be responsible for ad valorem property taxes during the Use Period) and shall receive all revenue with respect thereto. In the event that Developer delivers a Use Notice, Developer shall be required to deliver an Election Notice with respect to the Use Property; provided however, Developer shall have the right to elect at what point during the Due Diligence Period such Election Notice is given by providing written notice of such election prior to the expiration of the Due Diligence Period. The period between a Use Notice and Closing shall be referred to herein as the "Use Period." If Developer fails to deliver such election prior to the expiration of the Due Diligence Period, Developer shall be deemed to have delivered an Election Notice with respect to the Use Property on the last day of the Due Diligence Period. Developer shall maintain such commercially reasonable insurance as is customary for operations similar to the Parking Use on the Use Property and shall defend,

9

indemnify and hold harmless the City from and against any loss, liability, cost or expense incurred by the City to the extent resulting from the Parking Use; provided, however, that the Developer shall not be responsible for any loss, liability, cost, or expense resulting from the City's (or of the City's agencies' or departments') negligence or misconduct. Developer shall at all times keep the Use Property clean and free of debris and shall not permit any area of the Use Property to be littered with refuse during the Use Period. The City disclaims all representations and warranties as to the condition of the Use Property, including, but not limited to, any implied or express warranty of fitness of the Use Property for the Parking Use. Developer covenants and agrees that it shall not use the Use Property during the Use Period in any manner which violates the laws of the United States of America, the laws of the State of Michigan or any ordinances or other regulations of any governing municipality or other political subdivision. Developer's use of the Use Property and any activities or actions of Developer or its designee in connection therewith shall not be deemed a violation of the City's covenants under Section 5(G) below.

**Section 2.    ENVIRONMENTAL MATTERS**

(A)    <u>Definitions</u>.  The following words and expressions shall, wherever they appear in this document, be construed as follows:

(1)    "Asbestos" shall have the meanings provided under the Environmental Laws and shall include, but not be limited to, asbestos fibers and friable asbestos as such terms are defined under the Environmental Laws.

(2)    "Environmental Claims" shall mean all claims, demands, suits, proceedings, actions, whether pending or threatened, contingent or non-contingent, known or unknown, including but not limited to investigations and notices by any governmental authority, brought under common law and/or under any of the Environmental Laws which can or do relate to the Property.

(3)    "Environmental Laws" shall mean all applicable federal, state, and local laws, rules, regulations, orders, judicial determinations and decisions or determinations by any judicial, legislative or executive body of any governmental or quasi-governmental entity, whether in the past, present or future, with respect to:

(i)    the installation, existence, or removal of, or exposure to, Asbestos on the Property;

(ii)    the existence on, or discharge from, or removal from the Property of Hazardous Materials; and

(iii)    the effects on the environment of the Property or any activity conducted now, previously or hereafter conducted on the Property.

Environmental Laws shall include, but are not limited to, the following: (i) the Michigan Natural Resources and Environmental Protection Act, 1994 Public Act 451, as amended ("<u>NREPA</u>"); the Comprehensive Environmental Response,

10

Compensation, and Liability Act, 42 USC Sections 9601, et seq. ("CERCLA"); the Superfund Amendments and Reauthorization Act, Public Law 99-499, 100 Stat. 1613; the Resource Conservation and Recovery Act, 42 USC Sections 6901, et seq.; the National Environmental Policy Act, 42 USC Section 4321; the Toxic Substances Control Act, 15 USC Section 2601; the Hazardous Materials Transportation Act, 49 USC Section 1801; the Clean Air Act, 42 USC Sections 7401, et seq.; and the regulations promulgated in connection therewith; (ii) Environmental Protection Agency regulations pertaining to Asbestos (including 40 CFR Part 61, Subpart M); Occupational Safety and Health Administration Regulations pertaining to Asbestos (including CFR Sections 1901.1001 and 1926.58) as each may now or hereafter be amended; and (iii) any Michigan state and local laws and regulations pertaining to any Hazardous Materials.

(4)     "Hazardous Materials" shall mean any of the following as defined by the Environmental Laws:  Asbestos; hazardous wastes; solid wastes; toxic or hazardous substances, wastes or contaminants (including but not limited to polychlorinated biphenyls (PCBs), paint containing lead and urea formaldehyde foam insulation), and sewage.

(B)     The City and Developer acknowledge and agree that some of the parcels to be transferred may be "facilities" pursuant to Part 201 of NREPA, whether or not as yet discovered to be such, and that given the number of parcels being transferred, the 100-year period over which the parcels were developed, numerous changes in uses, and the City's lack of knowledge about the condition or history of most of the parcels, it may not be practicable or possible to identify all pre-existing contamination or conditions on the parcels which may strictly violate Environmental Laws.  Further, the City and Developer acknowledge that although the Developer can give its general undertaking to comply with Environmental Laws with regard to its conduct of future activities on the parcels, at the time of Closing, neither City nor Developer will be able to estimate exactly what such compliance may involve with regard to existing contamination and other existing conditions on the parcels that may violate Environmental Laws.  The City acknowledges that the Developer may conduct a BEA and CERCLA "All Appropriate Inquiry" assessment activities respecting the Property, the results of which assessments may be reported to federal and state authorities at such time as Developer issues an Election Notice to proceed to Closing with respect to such Property, in order to seek the associated protections from liability with respect to pre-existing environmental conditions at the Property ("Liability Protection"), or such earlier date as required pursuant to Environmental Laws or in order to preserve Liability Protection.

(C)  The City shall authorize the Developer, through a fully executed Right-of-Entry (in the form attached), to enter upon the applicable Property during the Due Diligence Period to, subject to the conditions set forth herein, undertake environmental remediation activities approved by the City hereunder, and make soil boring and bearing tests, undertake such surveying and environmental due diligence activities as Developer deems appropriate, including without limitation sampling and testing of soil, soil vapor, surface water, groundwater, indoor air, and the installation of groundwater wells, provided such do not materially and permanently interfere with demolition or site improvement activities of the City or the rightful use of the

11

CHI-1941899v10

13-53846-swr    Doc 8755-2    Filed 12/25/14    Entered 12/25/14 23:23:14    Page 94 of
150
13-53846-tjt    Doc 8059-2    Filed 10/25/14    Entered 10/25/14 03:23:17    Page 164 of

Property by a tenant in possession or other third party, if any. All such testing and remediation shall be done at Developer's expense. Developer shall at all times during the Due Diligence Period comply with the terms and provisions of the Right-of-Entry, and Developer's right to enter upon the applicable Property is subject to execution of such Right-of-Entry. To the extent any provision of such Right-of-Entry conflicts with the terms set forth herein, the terms of this Agreement shall govern. Developer shall upon request submit to the City a copy of each final survey or environmental testing report generated as a result of such activities. Developer shall give prior written notice to the City to inspect, investigate and/or remediate the condition of the Property during the Due Diligence Period, including any investigation of the environmental condition (each such notice referred to herein as an "Investigation Notice"). To the extent the Investigation Notice includes a request to perform any environmental remediation activities upon the applicable Property, prior to undertaking such remediation, the Developer shall submit to the City in writing (i) the scope of remediation activities contemplated by the Developer, (ii) evidence of commercially reasonable insurance appropriate for the scope of remediation contemplated by the Developer, and (iii) evidence that the Developer has the financial resources to complete the scope of remediation contemplated, each of which shall be subject to the prior written approval of the City, which approval shall not be unreasonably withheld, conditioned or delayed. Upon written request of Developer, the City shall provide an electronic mail address for delivery of any Investigation Notice; provided, Developer shall mail a copy of any Investigation Notice sent via electronic mail to the City pursuant to the provisions of Section 4 below. Developer shall use all commercially reasonable efforts to minimize damage to the Property in connection with such entry and shall restore the Property to substantially the condition existing prior to such entry, provided that the City acknowledges that soil borings and groundwater well sampling may be conducted, and it may not be practicable to fully restore the Property to the exact same condition. Developer shall indemnify, defend and hold the City harmless from and against any and all loss, cost, liability and expense, including reasonable attorney fees and litigation costs, suffered or incurred by the City as a result of the Developer's (including any of its duly authorized employees, agents, engineers or other representatives) negligent acts or omissions or willful misconduct occurring in connection with the activities conducted in accordance with the Right-of-Entry; provided however that (A) in the event Developer provides an Objection Notice or otherwise elects not to proceed to Closing, the Developer shall in no circumstance have any indemnity obligation or other liability with respect to any environmental conditions pre-existing at the Property including without limitation any soil or groundwater contamination or other environmental conditions that may discovered in the course of the Developer's Due Diligence Activities and thereafter disclosed to the City as required hereunder, except to the extent such environmental conditions are materially exacerbated due to the negligence or willful misconduct of Developer or any of its duly authorized employees, agents, engineers or other representatives, and (B) in no event shall Developer have any indemnity obligation or other liability with respect to any loss, cost, liability or expense incurred by the City as the result of the gross negligence or willful misconduct of the City or its agents.

(D)     In the event Developer elects to proceed to take title to any Property, upon the Closing, Developer takes such Property as it finds it, "AS IS", and the City makes no express or implied representations or warranties as to its fitness for absolutely any purpose whatsoever, including but not limited to any warranty that the Property is fit for the Developer's purpose or

regarding the presence or absence of Hazardous Materials at, on, in, under, about, or from the Property and compliance with the Property with Environmental Laws. Developer acknowledges that neither the City nor any agent or employee of the City has made any representation, warranty or agreement, either express or implied, and Developer has not relied on any representation, warranty or agreement of any kind made by the City or any agent or employee of the City, concerning (a) the physical or environmental condition of the Property, or (b) the presence or absence of any condition, substance or material, including but not limited to any waste material, equipment or device at, on, in, under, about, or from the Property. Developer agrees that the disclosures of the City concerning the Property and its condition are intended to satisfy any duties the City may have under the law, including but not limited to the statutes, Environmental Laws, and common law. Developer shall rely solely on its own due diligence with respect to such inquiries, investigations and assessments. By executing this Agreement, Developer acknowledges that it is satisfied with the condition of the Property, subject only to its Due Diligence Activities, including but not limited to inspection of the Property, review of title, and the results of the tests, investigations and surveys permitted under this Agreement. If, prior to Closing, Developer fails to undertake such investigations and/or obtain such test results and surveys, or fails to object to the condition of the Property based on the results of its Due Diligence Activities, and Developer thereafter elects to proceed to Closing, Developer shall thereupon be deemed to have waived any right to object to the condition of the Property and shall be deemed to have declared its full satisfaction therewith.

(E)     Upon Closing on any particular Property, subject to the City's covenant set forth in Section 5(G)(ii) below, Developer, for itself and its successors and assigns, expressly waives and releases all Environmental Claims (whether for personal injury, property damage or otherwise) that Developer may have against the City and its officials, employees and agents in connection with or related to such Property or any aspect thereof except for Environmental Claims arising out of actions by the City of its employees or agents that caused the release or threatened release of hazardous substances on the parcels being transferred. Upon Closing on any particular Property, Developer releases and discharges the City from all Environmental Claims that Developer may have against the City in connection with or arising out of the present condition of the Property.

(F)     Intentionally omitted.

(G)     Subject to the City's covenant set forth in Section 5(G)(ii) below, after the Closing with respect to a Property, the City shall have no obligation or liability to Developer whatsoever to undertake any cleanup or other remedial action that may be required in connection with the Property under any Environmental Law, or to comply with any other federal, state or local requirement to attend to the physical condition of the Property.

(H)     At its sole cost and expense, with respect to an applicable Property for the period commencing on the applicable Closing and ending on the applicable Commencement of Construction, Developer shall: (a) comply with all Environmental Laws; (b) pay when due the cost of Developer's compliance with the Environmental Laws resulting directly or indirectly out of environmental conditions caused or permitted by Developer during its period of ownership, use, possession or development of the Property; and (c) keep the Property free of any lien

13

CHI-1941899v10

imposed pursuant to the Environmental Laws resulting out of Developer's ownership, use, possession, or development of the Property.

(I)     During the earliest of the date that Developer (a) receives title to the Property, (b) receives possession of the Property or (c) performs any removal or remedial activities on the Property, Developer shall comply with all Environmental Laws and will undertake to complete any further investigation and remediation of the environmental conditions, if any, necessary to permit the intended use of the Property in accordance with the Environmental Laws.  As between the City and Developer but not as to third parties, Developer assumes the risk of liability for any and all Hazardous Materials, whether known or unknown, which may have been or may be present in, at, on, under about or from the Property except for hazardous materials released by the City or its agents, employees, or contractors.

(J)     Notwithstanding anything to the contrary which may be contained in this Agreement, Developer represents and warrants and covenants to the City for the period after Developer's commencement of ownership, use, possession or development of the Property and terminating upon the Commencement of Construction at an applicable Property, as follows:

(i)     Developer shall not directly or indirectly use or allow the use of the Property for the purpose of storing any Hazardous Materials Developer brings into the Property, nor shall Developer directly or indirectly use the Property in a manner which will cause or increase the likelihood of causing the release of such Hazardous Materials onto or from the Property, other than those Hazardous Materials which are necessary and commercially reasonable for the conduct of Developer's development activities or the business operated on the Property and which Hazardous Materials shall be, handled and disposed of in compliance with all Environmental Laws and industry standards and in a commercially reasonable manner.

(ii)     Developer shall promptly notify the City of any claims or litigation against the Developer by any person (including any governmental authority), concerning the presence or possible presence of Hazardous Materials contamination at the Property or concerning any violation or alleged violation of the Environmental Laws by the Developer respecting the Property, and shall furnish the City with a copy of any such communication received by Developer.

(iii)     Developer shall notify the City promptly and in reasonable detail in the event that Developer becomes aware of or suspects the presence of Hazardous Materials contamination or a violation of the Environmental Laws at the Property.

(iv)     If Developer's operations at the Property violate the Environmental Laws so as to subject Developer or the City to a formal notice of violation by a governmental agency alleging a violation of the Environmental Laws, Developer shall promptly investigate the underlying circumstances and notify the City within fourteen (14) days of the results of its investigation. If Developer determines that an ongoing violation by Developer is occurring or did occur,  Developer shall, to

14

the extent required by Environmental Laws, cease or cause a cessation of or take other actions to address those aspects of the use or operations causing the violation and shall remedy and cure in compliance with the Environmental Laws any conditions arising therefrom to the extent required by Environmental Laws at its own cost and expense. If Developer disputes that its activities are violating Environmental Laws, it shall expeditiously appeal and prosecute an appeal of the notice of violation or take other commercially reasonable actions to dispute such notice.

**Section 3.** **CLOSING**

(A)    Time and Place of Closing. The closing with respect to a particular Property shall take place at the office of the PDD, or such other location designated by the City and acceptable to Developer.  Each Closing will take place within fifteen (15) days following the earliest to occur of (i) delivery by Developer of a Election Notice with respect to a particular Property, (ii) written notice to Developer that the City has cured all Defects set forth in an Objection Notice provided prior to the expiration of the City Cured Period with respect to a particular Property, or (iii) waiver by Developer of any Defects with respect to a particular Property, each pursuant to Section 1(C)(5) above.  For the avoidance of doubt, no additional consideration shall be due from the Developer to the City at any Closing.

(B)    Conditions to Closing.   The City's obligation to proceed with a Closing is conditioned on the fulfillment by Developer of each of the following conditions precedent:

a.    Resolution of Developer's Authority. Developer shall furnish to the City a certified copy of a resolution in form and substance as set forth on **Exhibit E**, duly authorizing the execution, delivery and performance of this Agreement and all other documents and actions contemplated hereunder with respect to a particular Property.

b.    Intentionally Omitted.

c.    Payment of Closing Costs. Developer shall have tendered payment of the closing costs payable by Developer, which shall include all title charges, escrow, closing and recording fees associated with any conveyance hereunder.  For avoidance of doubt, the City shall not be responsible for any closing charges or transaction fees in connection with any Closing hereunder other than the payment of its own legal fees and expenses.

(C)    Delivery of Deeds and Possession. The City will deliver to Developer at each Closing the Deeds with respect to the particular Property that is subject of such Closing to and possession of the applicable Property.

(D)    Recording.  Provided that Developer has complied with all conditions precedent as specified herein, the Deeds with respect to a particular Property shall be delivered at the applicable Closing for prompt recordation with the Register of Deeds of Wayne County, Michigan. Developer shall pay at each Closing all costs for recording the Deeds.  Possession of the applicable Property shall be delivered to Developer at the applicable Closing.

**Section 4:**    **NOTICES**

15

A notice, demand or other communication under this Agreement by either Party to the other shall be sufficiently given if it is dispatched by certified or registered mail, postage prepaid, return receipt requested, or sent by recognized overnight delivery service, or hand delivered, with receipt obtained, and addressed as follows:

       If to Developer:     _____

                               _____

                               _____

       If to the City:      Director
                               Planning & Development Department
                               65 Cadillac Square, Suite 2300
                               Detroit, Michigan 48226

                               With a copy to (which copy shall not constitute notice):

                               Corporation Counsel
                               City of Detroit Law Department
                               2 Woodward Avenue
                               Suite 500
                               Detroit, MI 48226

All notices shall be deemed given on the day of mailing. Either Party to this Agreement may change its address for the receipt of notices at any time by giving notice thereof to the other as provided in this section. Any notice given by a Party hereunder must be signed by an authorized representative of such Party.

## Section 5:    COVENANTS

(A)    Developer covenants for itself and its successors and assigns and every successor in interest to any Property constituting a part of the Properties, that from and after Closing on such Property, Developer and its successors and assigns shall develop such Property only to and in accordance with the uses specified in this Agreement, unless otherwise agreed in writing by the City. The uses specified in this Agreement are for development and use of such Property into parking facilities, residential housing, commercial, retail space or any other use suitable for the location, consistent with the City's urban planning policies and the City's comprehensive development plan in effect as of the date the Developer seeks zoning and land use approval for such development. Subject to force majeure delays, within fifteen (15) months following Closing (the "Commencement Deadline") on any Property, the Developer shall achieve Commencement of Construction (as defined below) with respect to such Property. Following Commencement of Construction, the Developer shall diligently prosecute such development on the Property to substantial completion (which shall mean substantial completion of such development and all material improvements related thereto, exclusive of landscaping, punch list items and any tenant work for commercial or other space for which there are no tenants or for which the work is to be done by a tenant and any onsite or offsite work that is not commercially

16

necessary for occupancy) (the date upon which such substantial completion occurs referred to herein as the "Completion Date"). Subject to force majeure delays, the Completion Date shall occur within thirty nine (39) months following Closing for the applicable Property, or such longer period of time as may be reasonably necessary for Developer or its designee to actually achieve substantial completion of the applicable development or improvements, provided Developer is diligently pursuing such completion (the "Completion Deadline"). For purposes hereof, "force majeure delays" shall mean acts of God, terrorism, flooding, strikes, lockouts or other labor trouble, materially adverse weather conditions, fire or other casualty, governmental preemption in connection with an emergency, any rule, order or regulation of any governmental authority or any department or subdivision thereof and any other cause or event beyond the reasonable control of Developer (other than failure of Developer to secure necessary land use or zoning approvals from any governmental authority), or inability to secure materials, labor or access to the Property because of any such emergency, rule, order, regulation, war, civil disturbance, terrorist act or other emergency, or inability to secure materials, labor or access to the Property because of any other cause or event beyond the reasonable control of Developer (other than shortage of funds). In the event that the Developer elects to undertake environmental remediation of the Property after the Closing, "force majeure delays" also shall include the time reasonably necessary for the proper completion of all applicable remediation activities. In the event that Developer ceases, delays, or slows its development activities for a particular Property as a result of any claim or cause of action filed, threatened or asserted by the City (or any of its agencies or departments) and, (1) a court of competent jurisdiction dismisses such action or rules in favor of Developer with respect thereto or (2) the City withdraws its claims or causes of actions, the delay associated with such reduction or cessation in the development shall be deemed a "force majeure delay." The Commencement Deadline and Completion Deadline shall be extended for a period of time equal to the number of days during which Developer is prevented from proceeding with the construction of the development at the Property by reason of force majeure, provided that (i) Developer is otherwise in material compliance with the terms and provisions of this Agreement, and (ii) Developer notifies the City of the events constituting such force majeure upon the later of (i) Closing with respect to the applicable Property and (ii) sixty (60) days after Developer has actual knowledge of their occurrence.

(B)     For purposes of this Agreement, "Commencement of Construction" on a Property shall be deemed to have occurred when the Developer shall have commenced foundation or other equivalent site preparation work on the Property, which site preparation work may include renovation or demolition of existing buildings located on the Property, as applicable.

(C)     If the development plan for a Property calls for development of improvements on the Property in two or more discrete phases, the requirements set forth in this Agreement relative to the Completion of Construction, as well as the remedies of the City applicable thereto, shall be satisfied upon Completion of Construction of the initial phase.

(D)     Developer covenants and agrees that from and after Closing it will: (i) comply with all zoning requirements, and all other applicable state and federal statutes and regulations and local laws and ordinances applicable to the ownership, use and/or occupancy of the Property; and (ii) pay and discharge when due without penalty, and in all events before penalty for nonpayment attaches thereto, all taxes, assessments and governmental charges, including but not

CHI-1941899v10
13-53846-swr   Doc 8752-2   Filed 12/15/14   Entered 12/15/14 13:29:17   Page 100 of 150

limited to real estate taxes or assessments on the Property or any part thereof, except where the same may be contested in good faith.

(E)    <u>Certificate of Completion</u>. The Developer shall give the City prompt written notice of the Completion Date.  The City agrees that the PDD shall inspect the Property for purposes of issuance of the Certificate of Completion promptly following the Completion Date, and shall provide Developer with notice of any deficiencies in compliance with this Agreement, and an opportunity for cure and re-inspection.   If, as of the Completion Deadline, PDD determines that Developer is in compliance with all provisions and requirements of this Agreement, PDD shall issue a "<u>Certificate of Completion</u>."  The Certificate of Completion shall be a conclusive acknowledgment by PDD of satisfaction by Developer of its obligations under this Agreement for the applicable Property or portion of the applicable Property addressed by the Certificate of Completion.  The Certificate of Completion shall not, however, constitute evidence of compliance with or satisfaction of the requirements of any department, agency or entity with respect to any building, occupancy, or other permits, to the extent such departments are exercising their regulatory authority.  The Certificate of Completion shall be in such form as can be recorded against the Property, or portion thereof, and shall release the Property, or portion thereof, from the City's rights under this Agreement.  The cost of recording the Certificate of Completion shall be the responsibility of Developer.

(F)    <u>Estate Conveyed</u>.  Notwithstanding anything contained in this Agreement to the contrary, the estate conveyed hereby shall be deemed to be a determinable fee and only upon the Commencement of Construction on the Property will the possibility of reverter retained by the City automatically expire as to that part of the applicable Property.

(G)    <u>City Covenants</u>.  During the Option Period and prior to a Closing with respect each Property, the City shall (i) maintain such Property in at least the same condition and repair (except for environmental condition and repair thereof, which is addressed in sub-clause (ii) below) as of the Effective Date, (ii) not, through its own action (or the action of any agency, department, employee, agent, or contractor), alter the environmental condition of the Property, as such exists as of the Effective Date, in a material and adverse manner, (iii) not "down zone" the Property or take zoning or land use action on the Property that would materially and adversely affect Developer's ability to develop the Property for the uses otherwise permitted in this Agreement, and (iv) not execute or grant any lease, contract, agreement, lien, security interest, encumbrance, easement, or restriction with respect to such Property, or amend, modify, renew, extend or terminate any of the foregoing, without prior written consent of the Developer, which consent shall not be unreasonably withheld, conditioned or delayed.

## Section 6:    REMEDIES

(A)    <u>City's Remedies Prior to Conveyance</u>.  Except with respect to assignment to a Permitted Entity (as defined below), in the event that, prior to the conveyance of the Property, Developer assigns this Agreement or any right therein or in a Property without the prior written approval of the City, this Agreement and any rights of Developer in this Agreement, may, at the option of the City, be terminated by the City after thirty (30) days written notice and opportunity to cure provided by the City to Developer.  Notwithstanding the foregoing, the Developer's rights and obligations under this Agreement may be assigned: (i) to a wholly owned subsidiary

of Developer, or (ii) to a joint venture, limited liability company, partnership, limited partnership or other entity formed to develop or finance a Property or the Properties, provided that the Developer retains a direct or indirect interest in such entity (any such assignee being referred to as a "Permitted Entity").  In any case, the Developer shall provide written notice to the City of such assignment.

      (B)    City's Remedies Subsequent to Conveyance.

      (1)  Event of Default.  If, prior to the issuance of a Certificate of Completion on a Property, Developer breaches any covenant set forth in Sections 5(A) or (D) hereof applicable to such Property and fails to cure such breach within ninety (90) days after written demand by the City, such an event shall be deemed to constitute an **Event of Default**, provided, however, that if the nature of Developer's default is such that more than the cure period provided is reasonably required for its cure, then Developer shall not be deemed to be in default and an Event of Default shall not have occurred if Developer commences such cure within said period and thereafter diligently pursues such cure to completion within two hundred seventy (270) days of City's initial written demand hereunder.  Notwithstanding the foregoing, Developer shall have the right to dispute that an Event of Default has occurred or that an Event of Default has not been timely cured by written notice of dispute sent to the City ("Notice of Dispute"). In the event a Notice of Dispute is sent, the parties shall meet and in good faith work to resolve their differences.  In the event the City and Developer cannot resolve their differences as to whether an Event of Default has occurred or has been cured, then the City shall not record a notice of an uncured and undisputed Event of Default as described in Section 6(B)(2) below without first bringing an action in a court of competent jurisdiction for a final judicial determination that an Event of Default occurred and was uncured.  To the extent a court of competent jurisdiction deems that an Event of Default occurred prior to the Commencement of Construction and such cause of action was filed with the court of competent jurisdiction prior to the Commencement of Construction, irrespective of the date the court makes such determination, the City shall have all rights and remedies available to it hereunder as if such Event of Default was undisputed prior to the Commencement of Construction in the first instance. The City may, in its sole discretion, waive in writing any Default or Event of Default by Developer.  Notwithstanding any provision contained herein to the contrary, any lender of Developer that has a security interest in a Property, shall have an additional notice and cure right that should provide such lender with a reasonable period of time after the expiration of any cure periods available to Developer in which to cure any Event of Default prior to the City enforcing its remedies hereunder.

      (2)    Right of Reverter.  It is expressly understood and agreed between the Parties hereto that until the Commencement of Construction on a particular Property, the conveyance of such Property to Developer shall be construed and interpreted as the conveyance of a fee simple determinable, and that such conveyance shall endure only so long as subsequent to the conveyance and prior to the Commencement of Construction there has been no uncured or undisputed Event of Default with respect to such Property and such Event of Default results from a failure of the Commencement of Construction to have occurred prior to the Commencement Deadline (a "Reverter Event of Default").  In the event of an uncured and undisputed Reverter Event of Default and the City's recording of a notice thereof, after a judicial determination as required by Section 6(B)(1) above and written notice from the City to Developer of the City's election to enforce the reverter set forth in this Section, title to the applicable Property (and only

CHI-1941899v10
13-53846-swr   Doc 9755-2   Filed 12/15/14   Entered 12/15/14 23:03:47   Page 102 of 150

the applicable Property) shall revest in the City, except for parcels of Property previously conveyed where Commencement of Construction has already been achieved.  Upon such revesting of title, the City shall have the right to re-enter and take immediate possession of the applicable Property.  Upon an uncured and undisputed Reverter Event of Default as to a Property occurring prior to the Commencement of Construction and expiration of the cure period, this Agreement and any rights of Developer arising hereunder with respect to the Property subject to the reverter, may, at the option of the City, be terminated by the City by the City providing written notice of such termination to the Developer prior to the cure of such Reverter Event of Default, and the Developer shall thereafter have no further interest in the reverted Property.  In such case Developer agrees to promptly execute and deliver a quit claim deed for any such portion of reverted Property to the City.  While the right of reversion as to a Property automatically terminates upon Commencement of Construction on such Property, the City agrees to provide Developer with a written acknowledgement, in recordable form, that the Commencement of Construction has occurred and the City's right of reversion has terminated as to such Property.

(3)     Intentionally Omitted.

(C)     Rights and Remedies Cumulative.  The rights and remedies of the City, whether provided by law or by this Agreement, shall be cumulative, and the exercise by the City of any one or more remedies shall not preclude the exercise by it, at the same or different times, of any other remedy for the same default or breach or any other default or breach by the Developer. No waiver made by either Party shall apply to obligations beyond those expressly waived in writing.

(D)     Developer's Remedies.  If the City breaches its obligations under this Agreement after reasonable notice and opportunity to cure, Developer shall have the right to seek injunctive relief, specific performance or other equitable remedies for the City's breach of this Agreement. In no event shall the Developer be entitled to monetary damages as a result of the City's breach of this Agreement, except to the extent such damages arise out of the City's uncured breach of the covenant set forth in Section 5(G) above.

(E)     City's Representatives Not Individually Liable.  No official or employee of the City shall be personally liable to Developer or any successor in interest, in the event of any default or breach by the City or for any amount which may become due to Developer or successor or on any obligations under the terms of this Agreement.

20

**Section 7:      PROVISIONS NOT MERGED WITH DEEDS**

No provision of this Agreement is intended to or shall be merged into the Deeds transferring title to each Property from the City to Developer or any successor in interest, and any such Deeds shall not be deemed to affect or impair the provisions and covenants of this Agreement.

**Section 8:      ENTIRE AGREEMENT; AMENDMENT**

This Agreement (including all exhibits, schedules or other attachments hereto) constitutes the complete and exclusive statement of the terms of the agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, understandings, promises, and arrangements, oral or written, between the Parties with respect to the subject matter hereof.  This Agreement may be amended or modified only by an instrument in writing signed by both of the Parties.

**Section 9:      GOVERNING LAW**

This Agreement shall be governed by and construed in accordance with the laws of the State of Michigan without regard to conflicts-of-law principles that would require the application of any other law.

**Section 10:     COUNTERPARTS**

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, but together such counterparts shall constitute one and the same instrument.

**Section 11:     <u>AUTHORITY OF CITY</u>.**

**Notwithstanding anything in this Agreement, in law or in equity, or otherwise to the contrary, this Agreement shall be of no force or effect and may not in any way be enforced against the City unless or until this Agreement and the transaction contemplated hereby have been: (i) approved in writing by the Emergency Manager for the City of Detroit, in accordance with Emergency Manager Order No. 5, (ii) either included in the Emergency Manager's financial and operating plan or approved in writing by the Governor of the State of Michigan or his or her designee, in accordance with Section 12(1)(k) of Public Act 436 of 2012; and (iii) either included in the Emergency Manager's financial and operating plan or approved in writing by the State Treasurer, in accordance with Section 15(1) of Public Act 436 of 2012.**

**Section 12:  CITY AGENCIES AND DEPARTMENTS**.  Whenever this Agreement requires an action or creates an obligation on behalf of the City, the City shall also be required, as applicable, to cause all of its agencies and departments to undertake such obligations.

(signatures on following pages)

CHI-1941899v10

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

WITNESSES:                          DEVELOPER

                                    PIKE POINTE HOLDINGS, LLC, a
                                    Delaware limited liability company


_____       By: _____
Print: _____       Print: _____
                                    Its: _____


STATE OF MICHIGAN          )
                           ) ss.
COUNTY OF WAYNE            )

The foregoing instrument was acknowledged before me on September __, 2014 by _____ the _____ of Pike Pointe Holdings, LLC, a Delaware limited liability company, on behalf of said company.


                                    _____
                                    Notary Public, Wayne County, Michigan
                                    Acting in Wayne County, Michigan
                                    My commission expires:


[*signatures continue on following page*]

CHI-1941899v10

WITNESSES:                                    CITY OF DETROIT,
                                              a Michigan public body corporate


_____          By:_____
Print:_____          Print: _____
                                              Its: _____


STATE OF MICHIGAN          )
                           ) ss.
COUNTY OF WAYNE            )

        The foregoing instrument was acknowledged before me on September ___ 20__ by
_____, the _____ of the City of
Detroit, a Michigan public body corporate, on behalf of the City.



                                              _____

                                              Notary Public, Wayne County, Michigan
                                              Acting in Wayne County, Michigan
                                              My commission expires:


Pursuant to § 18-5-12 of the Detroit City Code,    Approved by the City Law Department
I hereby certify that proper and fair              pursuant to Sec. 7.5-206 of the Charter of the
consideration has been received by the City        City of Detroit.
pursuant to this contract.
                                                          Corporation Counsel
        Finance Director
                                                   City Council Approval Date:


**Drafted by and when recorded return to:**

Bruce N. Goldman
Senior Assistant Corporation Counsel
City of Detroit Law Department
2 Woodward Avenue, Suite 500
Detroit, Michigan 48226


23

**EXHIBIT A**

**LEGAL DESCRIPTION**

1. The contiguous parcels of (2.701 acres):

   1303 E Atwater  .908

   1365 E Atwater  .220

   1364 Franklin  .337

   1310 Franklin  .145

   1399 E Atwater  .287

   1325 E Atwater .707

   1370 Gloin St .097

2. The contiguous parcels of (3.545):

   2200 Franklin (3.545)

3. The contiguous parcels of (2.108 acres) :

   2290 E Jefferson (1.199)

   [2310 E Jefferson (.730)] **SUBJECT TO CITY APPROVAL**

   301 Chene  (.179)

4. 1300 Beaubein (Former Police HQ)

5. Parcel(s) mutually agreeable to the Parties which parcels shall:

   a. have reasonably equivalent value to the aggregate value of 2263 E Atwater (2.812 acres) and 281 Chene St (.430 acres);

   b. be consistent with the Developer's development scheme; and

   c. be identified within forty-eight (48) hours following the September 15, 2014 bankruptcy court hearing related to the Arrangement.

[legal descriptions of the above parcels to be attached based on mutual agreement by the parties hereto following the Effective Date]

**EXHIBIT B**

**MEMORANDUM OF OPTION**

[the form of which shall be mutually agreed upon by the parties hereto promptly following the
Effective Date hereof]

**EXHIBIT C**

**RIGHT OF ENTRY**

[the form of which shall be mutually agreed upon by the parties hereto promptly following the Effective Date hereof]

**EXHIBIT D**

**QUIT CLAIM DEED**

The City of Detroit, a Michigan public body corporate whose address is 2 Woodward Avenue, Detroit, MI 48226 ("Grantor"), quit claims to _____, a Michigan _____ ("Grantee"), whose address is _____, the premises located in the City of Detroit, Wayne County, Michigan, described as:

A/K/A _____ Ward: _____ Item(s):

(the "Property"), for the sum of _____ ($_____), subject to and reserving to the City of Detroit its rights under public easements and rights of way, easements of record, applicable zoning ordinances, development plans pursuant to Act 344 of 1945 as amended (if any), and restrictions of record.

This Deed is given subject to the terms, covenants and conditions of a Development Agreement - Option to Purchase and Develop Land dated _____, 20___ entered into by the parties hereto and which is incorporated herein by reference and a memorandum of which was recorded on _____, 20___ in the Office of the Register of Deeds for the County of Wayne in Liber _____ on Pages _____ through _____ inclusive, none of the terms, covenants and conditions of which shall be deemed merged in this Deed. The covenants therein recited to be covenants running with the land are hereby declared to be covenants running with the land enforceable by the City as therein set forth until issuance of a Certificate of Completion.

The Grantor grants to the Grantee the right to make all divisions under Section 108 of the land division act, Act No. 288 of the Public Acts of 1967, as amended. This property may be located within the vicinity of farmland or a farm operation. Generally accepted agricultural and management practices which may generate noise, dust, odors, and other associated conditions may be used and are protected by the Michigan right to farm act.

This deed is dated as of _____.

CITY OF DETROIT,
a Michigan public body corporate

By: _____
Print: _____
Its: _____

*[acknowledgement on following page]*

STATE OF MICHIGAN )
) ss.
COUNTY OF WAYNE )

     The foregoing instrument was acknowledged before me on _____ 20__, by _____, the _____ of the City of Detroit, a Michigan public body corporate, on behalf of the City.

                    _____

                    Print: _____
                    Notary Public, Wayne County, Michigan
                    Acting in Wayne County, Michigan
                    My commission expires:

---

| | |
|---|---|
| Pursuant to § 18-5-12 of the Detroit City Code, I hereby certify that proper and fair consideration has been received by the City pursuant to this contract. | Approved by the City Council on. <br><br> JCC pp _____ or Detroit Legal News, <br><br> _____, on file in my office. |
|        Finance Director | |
| Approved by the City Law Department pursuant to Sec. 7.5-206 of the Charter of the City of Detroit. | Approved by Mayor on |
|        Corporation Counsel |        City Clerk |

---

**This Instrument Drafted by:**       **When recorded, return to:**

Bruce N. Goldman               Grantee
Senior Assistant Corporation Counsel
City of Detroit Law Department
2 Woodward Avenue, Suite 500
Detroit, MI 48226

Exempt from transfer taxes pursuant to MCL § 207.505(h)(i) and MCL § 207.526(h)(i).

2

**EXHIBIT E**

**CERTIFICATE OF AUTHORITY FOR LIMITED LIABILITY COMPANY**

I, _____, Manager of
_____, a _____ limited liability company
(the "Company")

DO HEREBY CERTIFY that the following is a true and correct excerpt from *[check appropriate box]*

☐ the minutes of a meeting of the Members of the Company duly called and held on

☐ a consent in lieu of a meeting, with signed consents received from all of the [Members] of the Company on

and that the same is now in full force and effect:

"RESOLVED, that any [Manager of the Company], is hereby authorized to execute and deliver, in the name and on behalf of the Company, any agreement or other instrument or document in connection with any matter or transaction with the City of Detroit that shall have been duly approved; the execution and delivery of any agreement, document, or other instrument by any of such [Managers] to be conclusive evidence of such approval."

I FURTHER CERTIFY that the following persons are [Managers]:

I FURTHER CERTIFY that any of the aforementioned managers of the Company are authorized to execute or guarantee and commit the Company to the conditions, obligations, stipulations and undertakings contained in the attached Agreement, and that all necessary approvals have been obtained in relationship thereto.

IN WITNESS WHEREOF, I have set my hand this _____ day of _____, 20__.

_____
Print: _____
Its: Manager

*Schedule 1(H)*

1365 E Atwater St, 48207

1325 E Atwater St, 48207

1399 E Atwater, 48207

1370 Gloin St, 48207

1310 Franklin St, 48207

1364 Franklin St, 48207

**EXHIBIT I.A.347**

FORM OF SYNCORA SETTLEMENT DOCUMENTS

# SETTLEMENT AGREEMENT

This SETTLEMENT AGREEMENT (this "Agreement") is entered into as of September __, 2014, among the City of Detroit, Michigan (the "City"), Syncora Guarantee, Inc. and Syncora Capital Assurance Inc. (collectively, "Syncora").  The City and Syncora are referred to herein each individually as a "Party" and collectively as the "Parties".

**WHEREAS**, the Detroit General Retirement System Service Corporation, a Michigan nonprofit corporation ("DGRS"), and the Detroit Police and Fire Retirement System Service Corporation, a Michigan nonprofit corporation ("PFRS" and, together with DGRS, each a "Service Corporation" and collectively the "Service Corporations") created each of (i) the Detroit Retirement Systems Funding Trust 2005 (the "2005 Pension Funding Trust") pursuant to the Trust Agreement, dated June 2, 2005, among the Service Corporations and U.S. Bank National Association as trustee and (ii) the Detroit Retirement Systems Funding Trust 2006 (the "2006 Pension Funding Trust") pursuant to the Trust Agreement, dated June 12, 2006, among the Service Corporations and U.S. Bank National Association as trustee;

**WHEREAS**, the 2005 Pension Funding Trust issued certain Taxable Certificates of Participation Series 2005 (the "2005 Pension Funding Securities") and the 2006 Pension Funding Trust issued certain Taxable Certificates of Participation Series 2006 (the "2006 Pension Funding Securities" and collectively with the 2005 Pension Funding Securities, the "Certificates of Participation");

**WHEREAS**, the Service Corporations are parties to swap transactions under certain ISDA Master Agreements referred to as the COP Swap Agreements;

**WHEREAS**, the City issued $44,020,000 in General Obligation Bonds (Unlimited Tax), Series 2003-A;

**WHEREAS**, Syncora has issued insurance policies in respect of certain of the Certificates of Participation;

**WHEREAS**, Syncora has issued insurance policies in respect of certain of the Swap Agreements;

**WHEREAS**, Syncora has issued insurance policies in respect of certain of the General Obligation Bonds (Unlimited Tax), Series 2003-A;

**WHEREAS**, Syncora beneficially owns or insures Certificates of Participation in the amounts set forth herein;

**WHEREAS**, the Parties and their representatives have engaged in good faith, arm's length settlement discussions regarding a consensual resolution of their disputes under or in respect of the Certificates of Participation and the COP Swap Agreements;

1

**NOW, THEREFORE**, in consideration of the foregoing and the promises, mutual covenants, and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

**Section 1          Definitions and Interpretations.**

**1.1     Plan Definitions.**  Capitalized terms used herein, but not otherwise defined, shall have the meaning ascribed to such terms in the POA.

**1.2     Additional Definitions.**  The following terms have the respective meanings set forth below for all purposes of this Agreement.

"Class 9" means that class of claims associated with COPs as set forth in the Sixth Amended POA.

"POA" means that certain Plan for the Adjustment of Debts of the City of Detroit, as amended in accordance herewith.

"Sixth Amended POA" shall mean that certain Sixth Amended Plan for the Adjustment of Debts of the City of Detroit, as filed with the Bankruptcy Court.

**1.3     Other Definitional and Interpretive Provisions.**  The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  References to Sections and Schedules are to Sections and Schedules of this Agreement unless otherwise specified.  Any singular term in this Agreement shall be deemed to include the plural, and any plural term in the singular.  Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import.  References to any statute shall be deemed to refer to such statute as amended from time to time and to any rules or regulations promulgated thereunder.  References from or through any date mean, unless otherwise specified, from and including or through and including, respectively.  References to "law", "laws" or to a particular statute or law shall be deemed also to include any and all applicable law.

**Section 2          Plan.**

**2.1     Proofs of Claim.**  The Parties agree Section 2, Section 4 and Section 5 hereof fully resolve, address, satisfy and discharge Proofs of Claim # 1352 and 1354; provided that, except as expressly provided to the contrary herein, this Agreement shall have no effect regarding any UTGO Claims asserted in such Proofs of Claim or otherwise held or insured by Syncora, and any such UTGO Claims shall receive the treatment provided for all UTGO Claims by the POA and the UTGO Settlement Agreement.  The City shall not file or otherwise assert any objection to such Proofs of Claim.

**2.2     Voting.**  All votes cast by Syncora to accept or reject the Sixth Amended POA shall be deemed to have been cast as accepting the POA.

**2.3     Approval.**  The City shall (i) use its best efforts to seek approval of this Agreement in connection with confirmation of the POA, and (ii) seek a Confirmation Order, which Confirmation Order shall be in form and substance reasonably acceptable to Syncora (solely with respect to any terms thereof that affect the rights of Syncora or any Related Entity with respect to Syncora), that approves (A) this Agreement and all transactions contemplated hereby, (B) the Development Agreement and all transactions contemplated thereby, and (C) the assumption of the Tunnel Lease, as amended pursuant to the First Amendment to Lease dated as of ___, 2014 between the City of Detroit and the Detroit Windsor Tunnel LLC.

**2.4     Plan Support.**

(a)     Syncora shall (i) use commercially reasonable efforts to support the City's efforts to seek approval of this Agreement in connection with confirmation of the proposed POA, (ii) support confirmation of the POA, and (iii) not object to confirmation of the POA and withdraw all objections, oppositions and reservations of rights to confirmation of the POA (collectively, the "Syncora Plan Objections"), including those objections filed with the Bankruptcy Court at ECF #'s 4679, 5706, 6009, 6651, 7041, 7150 and its participation in 7103 (A) without prejudice (and subject to Syncora's retaining the right to assert such objections in the event this Agreement is terminated) as soon as reasonably practicable after execution of this Agreement and (B) with prejudice as soon as reasonably practicable after Bankruptcy Court approval of this Agreement and confirmation of the POA.

(b)     Without limiting the foregoing, Syncora shall withdraw all objections to the UTGO Settlement Agreement (including those contained in Syncora's objections to the Plan) (i) without prejudice (and subject to Syncora's retaining the right to assert such objections in the event this Agreement is terminated) as soon as reasonably practicable after execution of this Agreement and (ii) with prejudice as soon as reasonably practicable after Bankruptcy Court approval of this Agreement and confirmation of the POA. The City shall not alter or amend the treatment provided to holders of Allowed Class 8 Claims in the Plan.

(c)     Without limiting the foregoing, Syncora shall not object to inclusion of the COP Swap Counterparties in the definition of "Exculpated Parties" under the POA.

**2.5     Plan Amendment.**  The City shall not, without Syncora's prior written consent, amend the POA in a manner that (a) would have a materially adverse effect on Class 9 or (b) adversely affect Syncora.

**Section 3     Global Resolution; Litigation Support; Etc.**

**3.1     Global Resolution.**  The Parties agree that this Agreement shall constitute a global resolution of all matters among the Parties as and to the extent set forth herein, and all litigation (including appeals) outstanding between the City and Syncora arising out of or related to the City's Chapter 9 Case shall be dismissed as and to the extent set forth herein.

**3.2     Withdrawal of Syncora Plan Objections.**  Syncora shall withdraw the Syncora Plan Objections as set forth in Section 2.4 hereof.

**3.3     Stay and Withdrawal or Dismissal of Appeals.**   As soon as reasonably practicable after execution of this Agreement, Syncora and the City shall file joint motions with the applicable courts requesting stays of those certain appeals styled: 2:14-cv-10501-BAF-PJK (PLA appeal); 2:14-cv-11995-BAF-PJK (PPF appeal); 2:14-cv-12062-BAF-PJK (COP Swap Settlement appeal); 2:13-cv-14305-BAF-PJK (property of the debtor appeal); and 2:14-cv-13044-BAF-PJK (Mediation Order Appeal) (collectively, the "<u>Syncora Appeals</u>").  As soon as reasonably practicable after Bankruptcy Court approval of this Agreement and the occurrence of the Effective Date with respect to the POA, Syncora will voluntarily dismiss with prejudice the Syncora Appeals.

**3.4     Litigation Support.**   Syncora shall provide such reasonable, active support as may be reasonably requested by the City, the Litigation Trust or any successor plaintiffs in the COP Litigation.

**3.5     Retention of Counsel.**   Syncora shall continue to retain Kirkland & Ellis LLP in connection with satisfying the support obligations set forth in Sections 2.4(a) and 3.2 hereof.

**Section 4          <u>Class 9 Treatment</u>.**

**4.1     Amendment to Sixth Amended POA.**   The City shall amend the Sixth Amended POA as set forth on Schedule 1.

**Section 5          <u>Swap Related Claims; Etc</u>.**

**5.1     Swap Related Claims.**   On the Effective Date or as soon thereafter as practical, the City shall pay the sum of $5 million in full satisfaction of all of Claims filed or asserted against the City by Syncora relating to the COP Swap Agreements and any agreements related thereto, including the COP Swap Insurance Policies and the COP Swap Collateral Agreement.

**Section 6          <u>Representations and Warranties</u>.**

**6.1     Representations and Warranties of the City.**   The City represents to Syncora that:

    (a)     It is a municipal corporation of the State of Michigan.

    (b)     It has the power to execute and deliver this Agreement and to perform its obligations hereunder and it has taken all necessary action to authorize such execution, delivery and performance.

    (c)     Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets.

    (d)     Other than (i) approvals by the City Council, the Emergency Loan Board, the State Treasurer, the execution of the  Emergency Manager Order, and the approvals required by Section 19 of Act 436, and (ii) the approval of the Bankruptcy Court, all governmental and Emergency Manager consents and approvals that are required to have been obtained by it as of

4

the date of execution of this Agreement with respect to the execution, delivery and performance of this Agreement have been obtained and are in full force and effect and all conditions of any such consents and approvals have been complied with.

**6.2    Representations and Warranties of Syncora.**  Syncora represents to the City that:

(a)    It is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and in good standing.

(b)    It has the power to execute this Agreement, to deliver this Agreement and to perform its obligations under this Agreement and it has taken all necessary action to authorize such execution, delivery and performance.

(c)    Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets.

(d)    All governmental consents that are required to have been obtained by it with respect to this Agreement have been obtained and are in full force and effect and all conditions of any such consents have been complied with.

(e)    Syncora owns or insures COPs in the principal amount of $299,155,000.00; Syncora paid insured principal claims in an amount not less than $52,750,000.00; and, as of the Petition Date, Syncora paid insured interest claims in an amount not less than $1,649,692.00.

(f)    The *Stipulation by and Between the City of Detroit, Michigan and the COPs Creditors Regarding Certain Facts and the Admission of Certain Exhibits for the Confirmation Trial* remains in effect.

**Section 7        No Admission.**

This Agreement is a proposed settlement of claims and disputes among the Parties and is the product of good faith, arm's length negotiations among the Parties hereto.  If this Agreement is terminated, this Agreement will not be an admission of any kind.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating hereto will not be admissible into evidence in any proceeding.  However, this Agreement will be admissible into evidence in any proceeding to obtain court approval of this Agreement or to enforce or interpret the terms of this Agreement, and, subject to any otherwise applicable rules in the Federal Rules of Evidence (other than Federal Rule of Evidence 408), this Agreement may be admitted into evidence in any proceeding arising as a result of or in connection with a Party's breach of this Agreement or in which breach of this Agreement is alleged as a relevant fact.  The admissibility of all negotiations related to this Agreement shall be governed by the *Mediation Order* [Docket No. 322] entered by the Bankruptcy Court, as the same has been amended and supplemented.  Notwithstanding the foregoing, nothing herein shall limit the scope or effect of the Mediation Order.

**Section 8** **Termination.**

Any Party may terminate this Agreement upon one Business Day's prior written notice to the other Party if: (a) the Bankruptcy Court denies approval of this Agreement or the transactions contemplated hereby, the Development Agreement or the transactions contemplated thereby, or the assumption of the Tunnel Lease, as amended pursuant to the First Amendment to Lease dated as of ___, 2014 between the City of Detroit and the Detroit Windsor Tunnel LLC, or confirmation of the POA; (b) if the Confirmation Order is not in form and substance reasonably acceptable to Syncora (solely with respect to any terms thereof that affect the rights of Syncora or any Related Entity with respect to Syncora) or is vacated or reversed on appeal or, after entry, is modified without the terminating Party's consent, in any matter considered by the terminating Party to be adverse to the terminating Party; or (c) the other Party is in material breach of any provision of this Agreement, and such breach is continuing and has not been cured within 5 Business Days.

In the event that this Agreement is terminated as set forth herein, then neither this Agreement, nor any document filed with the Bankruptcy Court with respect to the approval of this Agreement, will have any res judicata or collateral estoppel effect or be of any force or effect, and each of the Parties' respective interests, rights, remedies and defenses will be restored without prejudice as if this Agreement had never been executed and the Parties will be automatically relieved of any further obligations under this Agreement. For the avoidance of doubt, in the event this Agreement is terminated, Syncora shall retain the right to make any arguments, objections, or other assertions (other than res judicata or collateral estoppel as set forth in the preceding sentence), pursue any litigation, appeals, or other disputes related to confirmation of the POA (or any other plan) or any other matter otherwise resolved by this Agreement.

**Section 9** **Miscellaneous.**

**9.1** **Execution of this Agreement**. This Agreement may be executed and delivered (by facsimile, PDF, or otherwise) in any number of counterparts, each of which, when executed and delivered, will be deemed an original, and all of which together will constitute the same agreement. Each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

**9.2** **Binding Obligation; Successors and Assigns**. This Agreement is a legally valid and binding obligation of the Parties, enforceable in accordance with its terms, and will inure to the benefit of the Parties and their respective successors, assigns and transferees. This Agreement grants no rights to any third party.

**9.3** **Complete Agreement; Interpretation**. This Agreement and the POA constitute the complete agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto. This Agreement is the product of negotiation by and among the Parties. Any Party enforcing or interpreting this Agreement will interpret it in a neutral manner. There will be no presumption concerning whether to interpret this Agreement for or against any Party by reason of that Party

6

having drafted this Agreement, or any portion thereof, or caused it or any portion thereof to be drafted.

      **9.4**    **Costs**.  Each Party will bear its own costs and expenses (including legal and other professional fees and expenses) incurred in connection with all matters set forth herein, including in connection with Sections 2 and 3 of this Agreement.  Syncora agrees to pay any Allowed Claim for COP Agent Fees held by the COP Agent in accordance with and as set forth in the POA.

      **9.5**    **Amendment, Modification and Waiver**.  This Agreement may be modified, altered, amended, or supplemented only by an agreement in writing signed by each Party.  No waiver of any provision of this Agreement will be effective unless made in a writing signed by the Party making the waiver, nor will the waiver be extend to any other right, claim or remedy.

      **9.6**    **Notices**.  All notices and other communications required under this Agreement will be given in writing and delivered, if sent by telecopy, electronic mail, courier, or by registered or certified mail (return receipt requested) to the following addresses and telecopier numbers (or at such other addresses or telecopier numbers as will be specified by like notice):

                If to the City:

                City of Detroit, Michigan
                1200 Coleman A. Young Municipal Center
                2 Woodward Avenue
                Detroit, Michigan 48226
                Attention: CFO

                with copies (which shall not constitute notice) to:

                City of Detroit Law Department
                First National Building, Suite 1650
                660 Woodward Avenue
                Detroit, Michigan 48226
                Attention: Corporation Counsel

                and

                Jones Day
                222 East 41st Street
                New York, NY 10017-6702
                Attn: Corinne Ball (cball@JonesDay.com)

                If to Syncora:

                Syncora Guarantee, Inc.
                Syncora Capital Assurance Inc.
                Attn: Claude LeBlanc
                135 West 50th Street, 20th Floor

New York, NY 10020
claude.leblanc@scafg.com

with copies (which shall not constitute notice) to:

Kirkland & Ellis LLP
Attn: Ryan B. Bennett
300 N. LaSalle
Chicago, IL 60654
rbennett@kirkland.com

Any notice given by delivery, mail, or courier will be effective when received.  Any notice given by telecopier will be effective upon oral or machine confirmation of transmission.  Any notice given by electronic mail will be effective upon oral or machine confirmation of receipt.

      **9.7**    **Headings**.  The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

      **9.8**    **Governing Law and Jurisdiction**.  THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF MICHIGAN, WITHOUT REGARD TO ANY PRINCIPLES OF CONFLICTS OF LAW THEREOF THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANOTHER JURISDICTION.  By its execution and delivery of this Agreement, each of the Parties hereby irrevocably and unconditionally agrees that any dispute with respect to this Agreement will be resolved by the Bankruptcy Court to the extent that the Bankruptcy Court then has jurisdiction and power to enforce the terms of this Agreement.  Each of the Parties irrevocably consents to service of process by mail at the addresses listed for such Party in Section 9.6 hereof.  Each of the Parties agrees that its submission to jurisdiction and consent to service of process by mail is made for the sole and express benefit of each of the other Parties to this Agreement.

      **9.9**    **Waiver of Jury Trial**.  TO THE EXTENT PERMITTED BY LAW, THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT.

[Signature Pages Follow]

8

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.


THE CITY OF DETROIT


By:_____
   Name:
   Title:

SYNCORA GUARANTEE, INC.

By:_____
    Name:
    Title:

SYNCORA CAPITAL ASSURANCE INC.

By: _____
    Name:
    Title:

TUNNEL LEASE AMENDMENT

# FIRST AMENDMENT TO LEASE

THIS FIRST AMENDMENT TO LEASE (this "**Amendment**") is made and entered into as of the ___ day of _____, 2014 (the "**Date Hereof**"), by and between the City of Detroit, a Michigan municipal corporation (the "**City**"), and Detroit Windsor Tunnel LLC, a Michigan limited liability company ("**Tenant**").

## R E C I T A L S

A.    The City, as landlord, and Tenant, as successor-in-interest to Detroit & Canada Tunnel Corporation ("**DCTC**"), as tenant, are parties to the Tube Lease, dated March 20, 1978 (the "**Tube Lease**"), whereby the City leases to Tenant the portion of the Detroit Windsor Tunnel (the entire such tunnel, the "**Tunnel**") located in Detroit, which portion is more particularly defined in the Tube Lease and referenced herein as the "**Tube**."

B.    The City, as landlord, as successor-in-interest to Ford Motor Properties, Inc. as sublandlord, and Tenant, as tenant, as successor-in-interest to DCTC as subtenant, are parties to the Sublease, dated March 20, 1978 (the "**Plaza Lease**"; together with the Tube Lease, the "**Lease**"), whereby the City leases to Tenant certain property defined in the Plaza Lease as the "New Tunnel Plaza" (such premises, the "**Plaza Premises**"; together with the Tube, the "**Property**").

C.    The term of the Lease (the "**Term**") expires on November 3, 2020, and the period commencing on the Effective Date through and including November 3, 2020 shall be referenced herein as the "**Existing Remainder Term**".

D.    The City desires to enter into a long-term agreement regarding the operation of the Property to assure that (i) the Tunnel will continue to provide to residents of Detroit and to other Tunnel passengers a safe and efficient route between Detroit and Windsor; (ii) the Property will be maintained and enhanced; and (iii), to promote such goals, there is transparency to the City regarding the operation of the Property.

E.    In furtherance of the goals of the City, the Tenant desires to enter into a long-term agreement with the City regarding the leasing and operation of the Property.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    <u>Capitalized Terms; Effective Date</u>.  Any capitalized term used herein and not otherwise defined shall have the meaning ascribed to such term in the Plaza Lease.  "**Effective Date**" means the first day of the month next succeeding the month in which occurs the Date Hereof.

2.    <u>Extension of Term</u>.  The term of the Tube Lease is extended for the period beginning November 4, 2020 and ending on December 31, 2040 (such period, the "**Extension Term**"), upon all the terms and conditions as contained in the Tube Lease and applicable during the Third Renewal Option (as defined in the Plaza Lease), except as amended hereby.  The term

of the Plaza Lease is extended for the Extension Term, upon all the terms and conditions as contained in the Plaza Lease and applicable during the Third Renewal Option (as defined in the Plaza Lease), except as amended hereby.

3.      <u>Existing Term CapEx Credit; CapEx Schedule</u>.

(a)      For any Capital Expenditures (as defined below) paid by Tenant during the Existing Remainder Term (the "**Existing Remainder Term Capital Expenditures**"), Tenant shall receive a credit equal to the amount of such Existing Remainder Term Capital Expenditures (a "**CapEx Credit**") against the aggregate rentals payable by Tenant pursuant to Article IV of the Plaza Lease (such amounts, the "**Rent**") during the Existing Remainder Term; *provided, however*, that the aggregate CapEx Credit to which Tenant is entitled pursuant to this Paragraph 3 shall not exceed the aggregate Rent payable by Tenant during the Existing Remainder Term. Tenant shall not claim a CapEx Credit for any Capital Expenditures paid in advance of the performance of the related work, other than for progress payments customary in the industry (or payments required due to emergency) without the City's prior written approval, which shall not be unreasonably withheld, delayed or conditioned. Subject to Paragraph 5, Tenant may not take a CapEx Credit during the Extension Term for an Existing Remainder Term Capital Expenditure.

(b)      "**Capital Expenditures**" means (i) capital expenditures, as determined by generally accepted accounting principles consistently applied in the United States ("**GAAP**"), paid for work to or at the Plaza Premises and (ii) (x) while the Existing JOA (as defined herein) or any successor agreement between Tenant (or its affiliate) and the City of Windsor (or its instrumentality) (any such agreement, a "**D/W Agreement**") is in effect, 50% of the total capital expenditures, determined in accordance with GAAP, paid by Tenant (or its affiliate) and the City of Windsor (or its instrumentality) pursuant to a D/W Agreement for work to or at all or any portion of the underground tube of the Tunnel (i.e., the tube from and including the Detroit portal to and including the Windsor portal; such tube, the "**Underground Portion**"); provided, however, that Capital Expenditures made to the Underground Portion while a D/W Agreement is in effect shall be made such that the Detroit side of the Underground Portion is in a condition commensurate with the condition of the Windsor side of the Underground Portion; or (y) if no D/W Agreement is in effect, 100% of the capital expenditures, determined in accordance with GAAP, paid by Tenant for work to or at all or any portion for the Tube.

(c)      Within ninety (90) days after the Effective Date, Tenant shall provide the City a detailed plan and schedule for the capital improvements planned to be made to the Tunnel during the year in which the Effective Date occurs and the approximately five (5) years following the Effective Date. On or before each January 31st during the Term, Tenant shall deliver to the City an annual update of such plan together with a plan for the succeeding five (5) years.

4.    Extension Term CapEx Credit.

(a)    For any Capital Expenditures paid by Tenant during the Extension Term (the "**Extension Term Capital Expenditures**"), Tenant shall receive a CapEx Credit against the Rent payable by Tenant during the Extension Term equal to the amount of such Extension Term Capital Expenditures; *provided, however*, the aggregate CapEx Credit to which Tenant is entitled during the Extension Term pursuant to this Paragraph 4 shall not exceed $8,000,000; and *provided, further,* that the annual CapEx Credit claimed by Tenant under this Paragraph 4 in any given calendar year of the Extension Term shall not exceed 75% of the Rent payable for such calendar year (but such annual limitation shall not in any way reduce the aggregate CapEx Credit to which Tenant is entitled under this Paragraph 4). If the Lease (as amended from time to time) terminates prior to December 31, 2040, other than due to a default by Tenant, then the City shall pay to Tenant, on thirty (30) days' written notice from Tenant, the amount of CapEx Credits that have accrued to Tenant but have not been applied against the Rent.

(b)    No more than sixty (60) days prior to November 4, 2020, Tenant shall provide the City a high-level, strategic plan for the capital improvements that may be made to the Tunnel during the Extension Term to the extent such plan is known or is customary in the tunnel operations field.

5.    CapEx Credit Documentation.

(a)    Tenant may offset the amount of any accrued but uncredited CapEx Credits against any monthly payments of Rent, subject to the limitations in Paragraphs 3 and 4. On or prior to the date of claiming any CapEx Credit (i.e., on or before the date of payment of any monthly installment of Rent, or if none is payable, on or before the date such monthly installment of Rent would otherwise have been payable) or requesting payment pursuant to the last sentence of Paragraph 4(a), Tenant shall submit to the City a notice setting forth the amount of the claimed CapEx Credit, together with reasonably detailed written documentation of the Capital Expenditures (and the work associated therewith) for which Tenant is entitled to a CapEx Credit (such notice, a "**CapEx Notice**"). Within five (5) days after receipt of any CapEx Notice, the City shall have the right to ask for reasonable additional information to verify such Capital Expenditures were paid and to determine the nature of work associated with such Capital Expenditure. If the City in good faith believes that a CapEx Credit was claimed for an expenditure that does not fall within the definition of "Capital Expenditure," as such term is defined in Paragraph 3(b) above, then the City shall give Tenant notice thereof (a "**Dispute Notice**") within fifteen (15) days after receipt of the applicable CapEx Notice, and the date on which Rent is due shall be extended by fifteen (15) days. If the City timely delivers a Dispute Notice, Tenant shall receive the portion of the CapEx Credit that is undisputed, if any, and shall pay the amount of disputed Rent, subject to the provisions of Article XVIII(2) of the Plaza Lease regarding disputed payments.

(b) Notwithstanding anything to the contrary in the Lease, as amended hereby, if the City timely provides a Dispute Notice in connection with a CapEx Credit claimed for Existing Remainder Term Capital Expenditures, and if and to the extent such dispute is resolved in Tenant's favor, then the City shall promptly pay an amount equal to the formerly disputed CapEx Credit to Tenant, or at Tenant's option, Tenant may credit such formerly disputed CapEx Credit against the Rent next coming due; provided, however, if (i) the aggregate accrued but unapplied CapEx Credit to which Tenant is entitled under Paragraph 3, plus the formerly disputed CapEx Credit, exceed the aggregate Rent payable during the portion of the Existing Remainder Term commencing at the time the dispute is resolved; or (ii) at the time the dispute is resolved, the Existing Remainder Term has ended; then in addition to, and without in any way reducing, the CapEx Credits to which Tenant is entitled under Paragraph 4, Tenant may take such formerly disputed CapEx Credit as a credit against the Rents payable during the Extension Term. Notwithstanding the foregoing, in no event shall Tenant be entitled to aggregate CapEx Credits for the Existing Remainder Term Capital Expenditures in excess of the aggregate Rent payable during the Existing Remainder Term.

(c) Notwithstanding anything to the contrary in the Lease, as amended hereby, if the City timely delivers a Dispute Notice in connection with a CapEx Credit claimed for Extension Term Capital Expenditures, and if and to the extent such dispute is resolved in Tenant's favor, then the City shall promptly pay an amount equal to the formerly disputed CapEx Credit to Tenant, or at Tenant's option, Tenant may credit such formerly disputed CapEx Credit against the Rent next coming due (in addition to, and not in limitation of, any CapEx Credit due under Paragraph 4). Notwithstanding the foregoing, in no event shall Tenant be entitled to aggregate CapEx Credits for Extension Term Capital Expenditures in excess of $8,000,000.

(d) The provisions of this Paragraph 5 shall survive the expiration or sooner termination of the Lease, as amended hereby.

6. <u>Repair and Maintenance Standards</u>. Notwithstanding anything to the contrary in the Lease, but subject to the casualty and condemnation provisions therein, Tenant shall maintain the Property in a good and safe condition and repair, in compliance with all applicable laws, and in accordance with the following sections of the Existing JOA (as defined below): Sections 8.1(d), (e) and (f), and the first grammatical paragraph of Section 8.1; Sections 8.3(a), (b) and (c); Section 8.4; Section 8.6; Section 9; Exhibit 8.1 and Sections 1, 2 and the first paragraph of Section 3 of Exhibit 9.1, provided that the second sentence of that first paragraph of Section 3 of Exhibit 9.1 shall be replaced with "The program shall include regular and customary cleaning and grounds maintenance." In the event that the Existing JOA is terminated or amended, these standards shall continue to apply (to the extent applicable).

7. <u>Reporting</u>. In addition to its reporting obligations under the Lease, but subject to Paragraph 10 hereof, Tenant shall deliver, at its sole cost and expense, the following reports and information to the City:

(a)     Within one hundred eighty (180) days following the end of each calendar year ending during the term of the Lease: (i) a copy of the audited balance sheets of Tenant at the end of each such calendar year and the related audited statements of income, calculation of annual rental, changes in equity and cash flows for such year, including, in each case, the notes thereto, together with the report thereon of the independent certified public accountants of Tenant, in each case in a manner and containing information consistent with Tenant's current practices and certified by Tenant's chief financial officer that such financial statements fairly present the financial condition and the results of operations, changes in equity and cash flows of Tenant as at the respective dates of and for the periods referred to in such financial statements, all in accordance with generally accepted accounting principles in the United States consistently applied; (ii) a report, in a format reasonably acceptable to the City, certified by the Tenant's chief financial officer, providing reasonably detailed information regarding any work associated with Capital Expenditures undertaken by the Tenant with respect to the Property, including such information as may be reasonably requested by the City, which shall include the type of work associated with such Capital Expenditures, the expected cost therefor, the expected completion date, the contractor engaged to perform such work associated with such Capital Expenditures, and any expected disruption of traffic in the Property as a result of the work associated with such Capital Expenditures; and (iii) a report, in a format reasonably acceptable to the City, detailing the amount of traffic through the Property on a weekly, monthly and quarterly basis, the make-up of that traffic and the Tenant's projections for the traffic in the upcoming calendar year and the Tenant's basis therefor;

(b)     Within thirty (30) days after the end of each six-month period, commencing with the six-month period ending June 30, 2015, a report, in a format reasonably acceptable to the City, detailing all material incidents that occurred in the Tunnel, including, but not limited to, vehicular accidents and hazardous material releases, but in each case only if such incidents materially impeded the normal operations of the Tunnel;

(c)     promptly after the occurrence thereof, an email  report on any incident occurring in the Tunnel and causing material damage to property or injury to persons, if such incident results in the closure of any portion of the Tunnel for at least an hour;

(d)     within thirty (30) days after receipt by Tenant, a copy of (i) the engineering reports required by Sections 8.7 and 8.8 of the Joint Operating Agreement by and among the Corporation of the City of Windsor, the Windsor Tunnel Commission and Tenant (as successor-in-interest to DCTC and The Detroit and Windsor Subway Company, Ltd.)  dated November 1, 1997 (the "**Existing JOA**"); or (ii) if the Existing JOA is amended or modified to change the requirements for those reports, (x) every year, an engineering report based on visual inspection of the Tunnel made by an independent, licensed engineer reasonably acceptable to Tenant and (y) every five (5) years a comprehensive engineering report on the Tunnel prepared by an independent, licensed engineer reasonably acceptable to

the City, which report shall include, but not be limited to, an analysis of the structural integrity of the Tunnel, a description of the current state of the Tunnel, including its fixtures and mechanical systems, recommended capital expenditures for the Tunnel and such other information as the City may reasonably request; and

(e)     Within thirty (30) days after such request, any information regarding the Property reasonably requested by the City, provided that such information is in the possession or control of Tenant.

8.     <u>Right to Inspect</u>.  The City shall have the right, upon at least three (3) business days' written notice to Tenant, at reasonable times, provided that such inspection does not unreasonably interfere with the normal operation of the Property (and as to any portion of the Property subleased as of the date hereof or subsequently subleased to a governmental authority, does not violate the applicable sublease) and at the City's sole cost and expense, to have the Property inspected by an engineer, who is (i) either employed directly by the City or with whom the City has contracted; and (ii) licensed and has at least ten (10) years' experience in engineering matters related to construction, maintenance and repair of infrastructure projects or tunnels.  Inspections made pursuant to this Paragraph 8 may only be performed once in each calendar year, except such limitation shall not apply when Tenant is in default of its obligations under Paragraph 6 of this Amendment or any other of its obligations regarding the repair, maintenance and operation of the Tunnel.  Tenant shall make the Property and a senior officer who is responsible for maintenance and/or operations of the Property reasonably available to such engineer for the purposes of such inspection and shall provide such engineer any documentation in Tenant's possession or control, reasonably requested by such engineer, subject to Paragraph 10.  Without limiting any provision hereof, any such engineering inspections conducted by or on behalf of the City shall be performed in accordance with all applicable laws and with all reasonable operating rules and regulations applicable to the Property.   The City shall cause any individual or firm performing an inspection pursuant to this Paragraph 8 to be bound by the confidentiality obligations of the City pursuant to the provisions of Paragraph 10 hereof.

9.     <u>Calculation of Net Operating Income</u>.  For the avoidance of doubt, in calculating "net operating income" as defined in Section IV(2)(b) of the Plaza Lease, Tenant shall not include any expenses that are not attributable to the operation, maintenance and repair of the Property or to Tenant's obligations under the Lease; and, to the extent Tenant or Tenant's affiliates incur costs that are only partially attributable to the Property, Tenant shall not include as an expense for Section IV(2)(b) of the Plaza Lease the portion of those costs that are not attributable to the Property.  Allocations will be prepared consistent with GAAP and the specific methodology and allocation shall be reflected and set forth in the companies' audited financial statements.

10.     <u>Confidentiality</u>.

(a)     Notwithstanding anything to the contrary in the Lease, no information or document provided by Tenant to the City pursuant to or in connection with the Lease, as amended hereby, shall be subject to any confidentiality restrictions, and the City may publicly disclose such information or disclose such information to

third parties as it deems appropriate in its sole discretion; *provided, however*, that Tenant shall have no obligation to deliver to the City (and Tenant may redact from information it delivers to the City) any Confidential Information (as defined below); and *provided, further*, that if Tenant delivers to the City any Confidential Information (and labels it as such), then the City shall not disclose such information to third parties (other than to its professional advisors, employees, third-party report providers, affiliates, officers, members, underwriters, agents, consultants, lenders, investors and legal counsel and as to those, only on a need-to-know basis, as reasonably determined by the City, provided such parties are bound by the confidentiality obligations of the City set forth in this Paragraph 10).

(b) "**Confidential Information**" means information that (i) relates to maintaining national security and/or to maintaining security at the Tunnel; (ii) is required to be kept confidential by applicable law, regulation or order; or (iii) is a trade secret or is other information that is proprietary to Tenant (including, without limitation, information regarding Tenant's proprietary toll and revenue collecting and accounting system and Tenant's mobile app for express payments, and other technical and business information relating to Tenant's proprietary ideas, patentable ideas, copyrights, and other proprietary systems and software).

(c) If Tenant chooses to withhold Confidential Information from the City, Tenant shall promptly provide written notice that it has done so. The City, through its authorized representative, shall have the right, upon reasonable advance written notice to Tenant, to inspect any Confidential Information, which shall not be redacted, at the offices of Tenant within the City to verify during customary business hours that such information is Confidential Information and to review such Confidential Information, provided that the City may not make a copy of such Confidential Information.

(d) Notwithstanding anything to the contrary in Lease (as amended hereby), in an effort to ensure that the City, Tenant and the City of Windsor can effectively and efficiently operate the Tunnel in an integrated and seamless manner, the City shall have the right to share with Windsor all information regarding the Tunnel it receives, and Tenant shall cause it and its affiliates to not restrict the City of Windsor, or its affiliates, from providing the City any information related to the Tunnel.

(e) Nothing contained in this Lease (as amended hereby) shall be construed to limit or reduce the rights and powers of the State of Michigan or the United States of America.

11. <u>Ineligible Parties</u>. It shall be a default under the Lease, as amended hereby, if any Ineligible Party (as defined below) shall be involved in the operation, financing, construction or management of the Property or the improvements thereon, or if such Ineligible Party has a direct or indirect beneficial interest in Tenant. "**Ineligible Party**" means any individual or entity, or any entity controlled by, controlling or under common control with any individual or entity, maintaining a controlling interest in any crossing of the border between the State of Michigan

and Canada, such as any tunnel, bridge or other similar infrastructure; *provided, however* that the term "Ineligible Party" shall not include Pike Pointe Holdings, LLC; any entity controlled, controlling or under common control with Pike Pointe Holdings LLC; or Windsor.

12.     Operation of an Integrated Tunnel.   The parties acknowledge that it is in their respective and joint interests to cause the entire Tunnel to be operated in a harmonious and integrated manner.   The City understands that to effect such operation, Tenant intends to negotiate a new or amended operating agreement with the City of Windsor (or an agency or instrumentality thereof), and that Tenant will negotiate such agreement in good faith (but that Tenant shall have no obligation to enter into such an agreement).   The City also understands that achieving such purpose may require amendments to the Lease  (as amended hereby) and agrees to be reasonable, and to act in good faith, in discussing and considering any such amendments. For avoidance of doubt, (i) Tenant will not have any obligation to enter into any such amendment that would (x) adversely affect (other than in a de minimis manner) its rights under the Lease, as amended hereby, (y) increase (other than in a de minimis manner) its obligations under the Lease, as amended from time to time or (z) decrease (other than in a de minimis manner) the City's obligations under the Lease, as amended from time to time; and (ii) the City will not have any obligation to enter into any such amendment that would (x) adversely affect (other than in a de minimis manner) its rights under the Lease, as amended hereby, (y) increase (other than in a de minimis manner) its obligations under the Lease, as amended from time to time or (z) decrease (other than in a de minimis manner) Tenant's obligations under the Lease, as amended from time to time.

13.     Notices.     Article XVIII(3) of the Plaza Lease and Article XV(3) of the Tube Lease are each amended and restated as follows:

3. All notices and other communications authorized or required hereunder, to be given to the City or the Tenant, shall be in writing and shall be given by hand delivery or by nationally recognized overnight courier to the following addresses:

If to the City, to

> **The City of Detroit**
> Office of the Mayor
> Coleman A. Young Municipal Center
> 2 Woodward Avenue, Suite 1126
> Detroit, MI 48226
> Attn: Mayor

with a copy to (which will not constitute notice):

> **The City of Detroit**
> Law Department
> Coleman A. Young Municipal Center
> 2 Woodward Avenue, 5th Floor
> Detroit, MI 48226
> Attention: Corporation Counsel

If to Tenant, to

> Detroit Windsor Tunnel LLC
> 100 East Jefferson Avenue
> Detroit, MI 48226
> Attn: Neal Belitsky

with a copy to

> Dykema Law Firm
> 400 Renaissance Center
> Detroit, MI 48243
> Sherrie L Farrell, Esq.

Notices shall be effective if given by a party's attorneys. Any party may change its address for notices by a notice given in accordance with this section. Notices shall be deemed given and received on the date received, as evidenced by receipt.

14. <u>Counterparts</u>. This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

15. <u>Conflict</u>. In the event the terms of the Lease conflict with the terms of this Amendment, the terms of this Amendment shall control and govern in all instances.

16. <u>Full Force and Effect</u>. The Lease, as modified hereby, remains in full force and effect.

17. <u>Severability</u>. If any provision of this Amendment or the application thereof to any person or circumstances shall, to any extent, be declared invalid, illegal or unenforceable by a court of competence jurisdiction, all other provisions and applications hereof shall remain in full force and effect.

18. <u>Inter-Governmental Authority</u>. Expressly subject and subordinate to the terms of the Lease (as amended hereby and as amended from time to time), the City may enter into an agreement with Windsor to establish an intergovernmental authority concerning the Tunnel. For avoidance of doubt, no such agreement shall adversely affect (other than in a de minimis manner) Tenant's rights nor increase (other than in a de minimis manner) its obligations under the Lease, as amended from time to time.

19. <u>Memorandum of Lease</u>. This Amendment shall not be recorded; *provided, however,* that upon the request of either party, the other party shall join in the execution of a memorandum or short form of the Lease, as amended hereby, which shall describe the parties, the Demised Premises, the term of the Lease, and special provisions and shall incorporate the Lease, as amended hereby, only by reference.

*[**Signature page follows**]*

CHI-1941736v5

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first above written.

**CITY:**

CITY OF DETROIT

By: _____

   Name:

   Title:


**TENANT:**

DETROIT WINDSOR TUNNEL LLC

By: _____

   Name:

   Title:

OPTION AGREEMENT

# OPTION AGREEMENT

THIS OPTION AGREEMENT (this "**Agreement**") is made and entered into as of the ___ day of _____, 2014, by and between Pike Pointe Holdings, LLC ("**Pike Pointe**") and the City of Detroit, a Michigan municipal corporation (the "**City**").

R E C I T A L S

A.     The City owns that certain parking garage, commonly known as the Grand Circus Parking Garage, located at 1600-01 Woodward Avenue, Detroit, Michigan, as more particularly described in Exhibit 1 (the "**Circus Garage**").

B.     The Detroit Building Authority (the "**DBA**") had previously owned the Circus Garage and had leased it to the City pursuant to the Contract of Lease No. 2 by and between the City and the DBA, dated October 1985, (as amended, the "**DBA Lease**").

C.     The DBA Lease has previously terminated pursuant to its terms, and pursuant to the terms of the DBA Lease, title to the property leased thereunder, including the Circus Garage, reverted back to the City.

D.     Syncora Capital Assurance Inc. and Syncora Guarantee Inc. (collectively, "**Syncora**") own the entire beneficial interest in Pike Pointe.

E.     Syncora, through one or more of its affiliates, including Pike Pointe, owns and operates certain public infrastructure projects.

F.     In connection with the continued improvement of the City, the City desires to grant an option to Pike Pointe with respect to the possibility of negotiating and entering into a mutually agreeable concession agreement for the operation and maintenance of the Circus Garage pursuant to the terms of this Agreement, and Pike Pointe desires to accept such option.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties agree as follows:

1.     Option.  Pike Pointe shall have the option, in its sole discretion, to enter into a concession for the Circus Garage (the "**Option**") on the terms set forth herein.  In order to exercise the Option, Pike Pointe must deliver written notice to the City notifying the City that Pike Pointe has exercised the Option (the "**Exercise Notice**"), which Exercise Notice must be delivered within one (1) year from the effective date of the Seventh Amended Plan for the Adjustment of Debts of the City of Detroit, as it may be further amended and as modified (the "**Plan of Adjustment**").  After delivery of the Exercise Notice, the City and Pike Pointe shall promptly and in good faith, negotiate a concession agreement in accordance with the terms set forth in Exhibit 2; provided, however, that neither party shall be obligated to execute a concession agreement.  If, within ninety (90) days following the delivery of the Exercise Notice, an agreement has not been reached between the City and Pike Pointe regarding the Circus Garage, either party may, by delivery of notice to the other party, terminate this Option, and thereafter Pike Pointe shall have no right with respect to the Circus Garage.

2.     Failure to Exercise.  If Pike Pointe fails to send the Exercise Notice within one (1) year after the effective date of the Plan of Adjustment, Pike Pointe will be deemed to have not exercised the Option and will have no further right to do so nor shall it have any interest in the Circus Garage.  At such time, this Agreement and the Option will have no further force or effect.

3.     Anti-Assignment.  Pike Pointe may not assign to any third party (other than a wholly owned subsidiary or other affiliate of Syncora in which Syncora is the direct or indirect beneficial owner (a "**Pike Pointe Affiliate**"), any interest in this Agreement or the Option without the City's prior written consent, which consent may be withheld in the City's sole discretion.  Any attempted assignment without the City's consent shall be void ab initio and of no force and effect, and such purported transferee shall have no right to exercise the Option nor shall it have any interest in the Circus Garage.  Notwithstanding anything to the contrary in this Agreement, Pike Pointe shall have no right to exercise the Option if, at the time of such exercise and the execution of the Concession Agreement, Syncora is not a direct or indirect beneficial owner of Pike Pointe.

4.     Title to Circus Garage.   The City shall cause the DBA to execute such documentation as is necessary to confirm the transfer of ownership of the Circus Garage to the City promptly after execution of this Agreement.   The City shall retain title to the Circus Garage during such time as Pike Pointe has the right to exercise the Option and shall maintain the Circus Garage in at least the same condition and repair as of the date hereof.

5.     Development Agreements.  Pike Pointe hereby acknowledges that the City has entered into certain development agreements with third party developers, which agreements contemplate that those developers will have the right to use parking spots within the Circus Garage at fair market rates (as determined by Pike Pointe from time to time and consistent with the rates provided to other patrons of the Circus Garage), and Pike Pointe agrees that it shall execute leases, licenses or other usage agreements with such developers on those terms.  The City will provide the material terms and conditions of those development agreements with respect to developers' use of Circus Garage as soon as is reasonably practicable following execution of this Agreement.

6.     Due Diligence Activities.

(a)     Prior to delivery of the Exercise Notice, Pike Pointe shall have a period commencing on the date hereof and continuing through and including the date of the delivery of the Exercise Notice or the expiration or termination of this Option, whichever is sooner, (the "Due Diligence Period") to conduct its due diligence activities on the Circus Garage, which shall not unreasonably interfere with the use and operation of the Circus Garage.   For purposes of this Agreement, "Due Diligence Activities" include but are not limited to the following:

(A)     such physical inspections, soil borings and bearing tests, surveys, and possible relocation of utilities on or for the Circus Garage as Pike Pointe deems appropriate, all of which shall be completed at Pike Pointe's expense;

(B)     investigations, environmental site assessments, including Phase I and Phase II site assessments, sampling and testing of soil, groundwater, surface water, soil vapors, indoor air, and building materials (such as Asbestos and lead-based paint), and/or a Baseline Environmental Assessment, ("**BEA**"), as defined in Part 201 of the Natural Resources and Environmental Protection Act ("**NREPA**"), being MCL 324.20101 et seq., and such other investigations and assessments as Pike Pointe may deem needed in its sole discretion to determine the condition of the Circus Garage and the Circus Garage's compliance with applicable law, all of which shall be completed at Pike Pointe's expense; and

(C)     a review of the title evidence, survey, entitlements, and payment of taxes and assessments, all of which shall be completed at Pike Pointe's expense;

(D)     a review of financing sources related to Pike Pointe's proposed use of the Circus Garage, or any other matter that in Pike Pointe's sole discretion is relevant to Pike Pointe's use of the Circus Garage;

(E)     a review of all City Information and all publicly-available information with respect to the Circus Garage;

(F)     a review of available public and private utilities and public accesses necessary for the proposed use of the Circus Garage; and

(G)     application and procurement of any zoning, site plan, elevation, special land use, environmental, conditional use or other municipal approvals or permits, or variances therefrom, required or appropriate for the proposed use of the Circus Garage.  The City hereby authorizes Pike Pointe to submit and apply for all such approvals, permits, and variances upon the commencement of the Due Diligence Period.

(b)     <u>Restoration of City Property</u>.  Promptly following completion of a Due Diligence Activity, Pike Pointe shall restore the Circus Garage and all property therein to the state in which it existed prior to the commencement of the Due Diligence Activity.

(c)     <u>City Information</u>.  The City shall use reasonable efforts to make available to Pike Pointe all information in the City's (or the City's agencies' or departments') possession or control related to the Circus Garage within thirty (30) days following the effective date of the Plan of Adjustment, including but not limited to existing leases, licenses, permits, approvals, contracts, warranties, title searches and policies, surveys, appraisals, environmental audits, Phase I environmental site assessments, Phase II reports or other testing or sampling data, asbestos surveys, reports, specifications, from the Planning, Building, Assessing, Environmental

Affairs and Fire Departments, notices of violations of applicable laws, regulations and ordinances or other documents in the City's possession or control related to the Circus Garage, to the extent the City is not required by law or applicable agreement to keep such information confidential (collectively, the "**City Information**"). The City shall cooperate with Pike Pointe and use reasonable efforts to facilitate Pike Pointe's Due Diligence Activities, all at no material incremental cost to the City, including providing information, coordinating with third party users of the Circus Garage as applicable, and executing such documentation as may be reasonable and necessary for Pike Pointe's access to the site and completion of the Due Diligence Activities including the preparation of a BEA.

(d)     <u>Insurance</u>. Prior to entering onto the Circus Garage for any Due Diligence Activities, Pike Pointe or its contractors shall enter into a right-of-entry agreement regarding the entry into the Circus Garage to be reasonably agreed to by the City and Pike Pointe.

(e)     <u>Indemnity</u>. Pike Pointe shall defend, indemnify and hold harmless the City from and against any loss, liability, cost or expense incurred by the City to the extent resulting from Pike Pointe's (including its duly authorized employees, agents, engineers or other representatives) negligence or willful acts occurring in connection with the Due Diligence Activities; provided, however, that Pike Pointe shall in no circumstance have any obligation or liability with respect to any conditions pre-existing at the Circus Garage including without limitation any environmental condition, soil or groundwater contamination or other environmental conditions that may be discovered in the course of the Pike Pointe's Due Diligence Activities and thereafter disclosed to the City, except to the extent such conditions are materially exacerbated due to the negligence or willful acts of Pike Pointe or any of its duly authorized employees, agents, engineers or other representatives, and (ii) Pike Pointe shall not be responsible for any loss, liability, cost, or expense resulting from the discovery of any adverse information or condition regarding the Circus Garage or from the City's (or the City's agencies' or departments') negligence or misconduct.

7.     <u>Notices</u>. All notices, demands and other communications given or delivered under this Agreement shall be given in writing to the address indicated below (or such other address as the recipient specifies in writing) and will be deemed to have been given when delivered personally, three (3) business days after mailed by certified or registered mail, return receipt requested and postage prepaid, or when delivery is guaranteed if sent via a nationally recognized overnight carrier, or when receipt is confirmed if sent via facsimile or other electronic transmission to the recipient with telephonic confirmation by the sending party.

**[The City of Detroit**
Office of the Mayor
Coleman A. Young Municipal Center
2 Woodward Avenue, Suite 1126
Detroit, Michigan 48226

Facsimile: (313)224-4128
Attention: Mayor ]


with a copy to (which will not constitute notice):

The City of Detroit
Law Department
Coleman A. Young Municipal Center
2 Woodward Avenue, 5th Floor
Detroit, Michigan 48226
Telephone: (313)224-1352
Facsimile: (313)224-5505
Attention: Corporation Counsel

with a copy to (which will not constitute notice):

The City of Detroit
Municipal Parking Department
1600 W. Lafayette
Detroit, Michigan 48216
Telephone: (313)221-2500
Facsimile: (313)221-2501
Attention: Director of Municipal Parking

**[Pike Pointe]**

_____
_____
_____
_____

8.   Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

9.   Time of Essence.  Time is of the essence of this Agreement.

10.   Severability.  If any provision of this Agreement or the application thereof to any person or circumstances shall, to any extent, be declared invalid, illegal or unenforceable by a court of competence jurisdiction, all other provisions and applications hereof shall remain in full force and effect.

11.   Merger of Prior Agreements.  This Agreement supersedes all prior agreements and understandings between the parties hereto relating to the subject matter hereof.

12.   Governing Law; Venue.  This Agreement shall be governed by and construed in accordance with the laws of the State of Michigan.  By its execution and delivery of this

Agreement, each of the City and Pike Pointe irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement, or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding shall be brought in the Bankruptcy Court for so long as it has jurisdiction, and thereafter in the United States District Court for the Eastern District of Michigan; provided that if the United States District Court for the Eastern District of Michigan does not have jurisdiction, then such legal action, suit or proceeding shall be brought in such other court of competent jurisdiction located in Wayne County, Michigan. By execution and delivery of this Agreement, each of the City and Pike Pointe irrevocably accepts and submits to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding and specifically consents to the jurisdiction and authority of the Bankruptcy Court to hear and determine all such actions, suits, and proceedings under 28 U.S.C. §157(b) or (c), whichever applies.

13.    <u>Amendments</u>.   Except as otherwise provided herein, this Agreement may be amended or modified by, and only by, a written instrument executed by the parties hereto.

14.    <u>Captions</u>.   The captions used in this Agreement are for convenience of reference only and do not constitute a part of this Agreement and will not be deemed to limit, characterize or in any way affect any provision of this Agreement, and all provisions of this Agreement will be enforced and construed as if no caption had been used in this Agreement.

15.    <u>Successors and Assigns</u>.   This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their permitted respective successors, heirs, administrators and assigns.

16.    <u>No Strict Construction</u>.   The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent. In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties, and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

[*Signature page follows*]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**CITY:**

CITY OF DETROIT

_____

By:
Its:


**TENANT:**

[PIKE POINTE]

_____

By_____
Its _____

## EXHIBIT 1

## DESCRIPTION OF GRAND CIRCUS PARKING GARAGE

Grand Circus is a three level underground parking structure, situated below the two parcels described below. Grand Circus includes all ramps, walkways, stairwells and other ingress and egress points to the parking structure existing as of the date hereof.

**Parcel 02001886: 1883 Woodward Ave**
Legal Description: W WOODWARD ALL THAT PT OF GOVERNOR AND JUDGES PLAN BOUNDED BY WOODWARD AVE, E ADAMS ST & PARK AVE A K A WLY PT OF GRAND CIRCUS PARK2/--- 357 IRREG
**Parcel 01004139: 1600 Woodward Ave**
Legal Description: E WOODWARD ALL THAT PT OF GOVERNOR & JUDGES PLAN BOUNDED BY WOODWARD AVE, E ADAMS AND WITHERELL STS A K A ELY PT OF GRAND CIRCUS PARK1/--- 357 IRREG

# EXHIBIT 2

## CONCESSION AGREEMENT TERMS

- 30 year term, structured as a concession agreement
- Pike Pointe (or a Pike Pointe Affiliate) is obligated to operate and maintain the Circus Garage during the term at its sole cost and expense and has the right to collect all parking revenue derived from the Circus Garage
- Pike Pointe (or a Pike Pointe Affiliate) shall be responsible, at its sole cost and expense, for all necessary capital expenditures to the Circus Garage, including, without limitation, $13.5 million in capital expenditures during the first 5 years of the term.
- Rent to the City will be calculated as 25% of Free Cash Flow. Free Cash Flow is defined as revenue collected from the Circus garage minus operating expenses minus capital expenditures, which shall not include the $13.5 million in initial capital expenditures made by Pike Pointe.
- No Rent shall be due to the City until Pike Pointe has received a return of 140% on its initial capital expenditures of $13.5 million.
- Pike Pointe (or a Pike Pointe Affiliate) will enter into market-rate long term leases, licenses or usage agreements with the developers of properties adjacent to the Circus Garage pursuant to existing development agreements between the City and such developers.

# EXHIBIT I.A.357

SCHEDULE OF UNLIMITED TAX GENERAL OBLIGATION BOND DOCUMENTS
& RELATED UNLIMITED TAX GENERAL OBLIGATION BONDS

## SCHEDULE OF UNLIMITED TAX GENERAL OBLIGATION BOND
## DOCUMENTS & RELATED UNLIMITED TAX GENERAL OBLIGATION BONDS

| Unlimited Tax General Obligation Bond Documents | Series of Unlimited Tax General Obligation Bonds | Balance as of Petition Date |
| --- | --- | --- |
| Resolution of the City Council adopted March 3, 1999<br><br>Finance Director's Order dated April 1, 1999 | Series 1999-A | $18,747,364 |
| Amended and Restated Resolution of the City Council adopted April 6, 2001 and Supplement No. 1 to Amended and Restated Resolution, adopted June 13, 2001 (collectively, "2001 UTGO Resolution")<br><br>Finance Director's Order dated August 1, 2001 ("2001 UTGO Sale Order") | Series 2001-A(1) | $78,787,556 |
| 2001 UTGO Resolution<br><br>2001 UTGO Sale Order | Series 2001-B | $4,063,616 |
| Resolution of the City Council adopted July 24, 2002<br><br>Finance Director's Order dated August 2, 2002 | Series 2002 | $6,745,767 |
| Resolution of the City Council adopted September 19, 2003<br><br>Finance Director's Order dated October 9, 2003 | Series 2003-A | $34,908,150 |
| Bond Authorizing Resolution adopted June 14, 2004 ("2004 UTGO Resolution")<br><br>Finance Director's Order dated August 27, 2004 ("2004 UTGO Sale Order") | Series 2004-A(1) | $39,872,258 |
| 2004 UTGO Resolution<br><br>2004 UTGO Sale Order | Series 2004-B(1) | $38,206,678 |
| 2004 UTGO Resolution<br><br>2004 UTGO Sale Order | Series 2004-B(2) | $736,241 |
| Resolution of the City Council adopted July 6, 2005 ("2005 UTGO Resolution")<br><br>Finance Director's Order dated December 5, 2005 ("2005 UTGO Sale Order") | Series 2005-B | $45,452,501 |
| 2005 UTGO Resolution<br><br>2005 UTGO Sale Order | Series 2005-C | $18,671,105 |

| Unlimited Tax General Obligation Bond Documents | Series of Unlimited Tax General Obligation Bonds | Balance as of Petition Date |
|---|---|---|
| Resolution of the City Council adopted November 17, 2006 ("2008 UTGO Resolution")<br><br>Finance Director's Order dated May 30, 2008 ("2008 UTGO Sale Order") | Series 2008-A | $59,487,564 |
| 2008 UTGO Resolution<br><br>2008 UTGO Sale Order | Series 2008-B(1) | $28,982,532 |