## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

-------------------------------------------------------------------x

In re

CITY OF DETROIT, MICHIGAN,

        Debtor.

-------------------------------------------------------------------x

:
:
:
:
:
:
:
:

Chapter 9

Case No. 13-53846

Hon. Steven W. Rhodes

## PRE-TRIAL BRIEF OF THE OFFICIAL COMMITTEE
## OF RETIREES REGARDING THE CITY OF DETROIT'S ELIGIBILITY
## TO BE A DEBTOR UNDER CHAPTER 9 OF THE BANKRUPTCY CODE

**<u>TABLE OF CONTENTS</u>**

**Page**

TABLE OF AUTHORITIES ................................................................................... iv

INTRODUCTION ............................................................................................... 1

FACTUAL BACKGROUND ................................................................................ 3

ARGUMENT ...................................................................................................... 12

I.      THE CITY CANNOT MEET ITS BURDEN OF DEMONSTRATING
        THAT IT WAS AUTHORIZED TO FILE THE PETITION ............................. 12

II.     THE CITY CANNOT MEET ITS BURDEN OF DEMONSTRATING
        THAT IT NEGOTIATED WITH CREDITORS IN GOOD FAITH OR
        THAT NEGOTIATIONS WERE IMPRACTICABLE ....................................... 13

        A.     The City Cannot Establish That it Negotiated in Good Faith Under
                Section 109(c)(5)(B) .................................................................. 15

                1.     The City Failed to set Forth a Plan of Adjustment as is
                      Required Under Section 109(c)(5)(B) ........................................ 16

                2.     The City Failed to Negotiate With the Retiree Associations
                      and Unions in Good Faith as Required Under Section
                      109(c)(5)(B) ................................................................. 19

        B.     The City Cannot Establish That Negotiations Were Impracticable
                Under Section 109(c)(5)(C) ....................................................... 20

                1.     The City Failed to set Forth a Plan of Adjustment as
                      Required Under Section 109(c)(5)(C) ........................................ 21

                2.     The City Also Fails Under Section 109(c)(5)(C) Because it
                      did not  Negotiate With Retiree Representatives ......................... 22

III.    THE CITY'S BANKRUPTCY PETITION WAS NOT FILED IN GOOD
        FAITH AS REQUIRED UNDER 11 U.S.C. § 921(c) AND SHOULD BE
        DISMISSED ................................................................................ 23

        A.     The Chapter 9 Petition was not Filed in Good Faith Because the
                Emergency Manager Intends to use Chapter 9 to Impair Pension
                Obligations in Violation of his Duty to Uphold the Michigan
                Constitution, Which Prohibits Such Impairment ........................... 25

        B.     The Chapter 9 Petition was not Filed in Good Faith Because the
                City's Assertions Regarding the Amount of its Underfunded
                Pension Obligations Were, At a Minimum, Misleading and
                Incomplete ................................................................. 28

81257447\V-3

CONCLUSION.............................................................................................................. 32

81257447\V-3

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*City of Pontiac Retired Emps. Ass'n v. Schimmel,*
767 F.3d 767 (6th Cir. 2013) ...................................................................................4, 25

*Flowers v. Michigan,*
Case No. 13-374-CZ (Ingham Cnty. Cir. Ct. July 19, 2013)...................................10

*Flowers v. Snyder,*
Case No. 13-729-CZ (Ingham Cnty. Cir. Ct. July 8, 2013)....................................10

*Gen. Ret. Sys. of Detroit v. Orr,*
Case No. 13-768-CZ (Ingham Cnty. Cir. Ct. July 17, 2013) .................................10

*In re City of Bridgeport,*
129 B.R. 332 (Bankr. D. Conn. 1991) ...................................................................24

*In re City of Wellston,*
42 B.R. 282 (Bankr. E.D. Mo. 1984) .....................................................................22

*In re Cnty. of Orange,*
183 B.R. 594 (Bankr. C.D. Cal. 1995).................................................................24

*In re Cottonwood Water and Sanitation Dist.,*
138 B.R. 973 (Bankr. D. Colo. 1992) ...............................................13, 14, 16, 17

*In re Ellicott Sch. Bldg. Auth.,*
150 B.R. 261 (Bankr. D. Colo. 1992) .............................................................16, 19

*In re Enrolled Senate Bill 1269,*
389 Mich. 659 (Mich. 1973).................................................................................26

*In re Joyce, Don & Assos. Inc.,*
No. 6:07-bk-04878-ABB, 2008 WL 343265 (Bankr. M.D. Fla. Jan. 30, 2008)....................24

*In re New York City Off-Track Betting Corp.,*
427 B.R. 256 (Bankr. S.D.N.Y. 2010)..................................................................16

*In re Panache Dev. Co., Inc.,*
123 B.R. 929 (Bankr. S.D. Fla. 1991) ..................................................................24

*In re Sullivan Cnty. Reg'l Refuse Disposal Dist.,*
165 B.R. 60 (Bankr. D.N.H. 1994) ..........................................................14, 16, 24

*In re Valley Health Sys.,*
383 B.R. 156 (Bankr. C.D. Cal. 2008)...........................................................20, 24

81257447\V-3

*Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo (In re City of Vallejo)*,
 408 B.R. 280 (9th Cir. B.A.P. 2009)...............................................................20, 24

*Pacific Rim. Invs., LLP v. Oriam, LLC (In re Pacific Rim Inves., LLP)*,
 243 B.R. 768 (D. Colo. 2000) ...................................................................................24

*Seitz v. Probate Judges Ret. Sys.*,
 189 Mich. App. 445 (Ct. App. 1991) ......................................................................6, 26

*Shelby Twp. Police and Fire Ret. Bd. v. Charter Twp. Of Shelby*,
 438 Mich. 247 (1991) ................................................................................................26

*Vills. at Castle Rock Metro. Dist. No. 4*,
 145 B.R. 76, 85 (Bankr. D. Colo. 1990) ..............................................................22, 24

*Webster v. Michigan*,
 Case No. 13-734-CZ (Ingham Cnty. Cir. Ct. July 19, 2013) .................................10

*Westamerica Bank v. Mendocino Coast Recreation and Park Dist. (In re Mendocino Coast Recreation and Park Dist.)*,
 No. 12-cv-02591-JST, 2013 WL 5423788 (Bankr. N.D. Cal. Sept. 27, 2013)........16

STATUTES

11 U.S.C. § 101.....................................................................................................................1

11 U.S.C. § 101-1532...........................................................................................................5

11 U.S.C. § 109.....................................................................................................................5

11 U.S.C. § 109(c)...........................................................................................................16, 22

11 U.S.C. § 109(c)(2)...........................................................................................................1

11 U.S.C. § 109(c)(4).........................................................................................................16

11 U.S.C. § 109(c)(5).................................................................................................. *passim*

11 U.S.C. § 109(c)(5)(A)....................................................................................................14

11 U.S.C. § 109(c)(5)(B) ............................................................................................ *passim*

11 U.S.C. § 109(c)(5)(C) ............................................................................................ *passim*

11 U.S.C. § 109(c)(5)(D)....................................................................................................14

11 U.S.C. § 921(c).................................................................................................2, 3, 23, 24

11 U.S.C. § 941............................................................................................................ *passim*

81257447\V-3

11 U.S.C. § 943(b)(4) ................................................................12, 13

M.C.L. § 141.1501...........................................................................4

M.C.L. §§ 141.1501-1531 .................................................................4

M.C.L. § 141.1549(2) ......................................................................4

M.C.L. § 141.1549(3)(d)...................................................................4

M.C.L. § 141.1558(1) ......................................................................5

Mich. Const. art. IX § 24 ......................................................... *passim*

Mich. Const. art. XI § 1 ...................................................................4

**Other Authorities**

6 Collier on Bankruptcy ¶ 903.02...........................................................5

124 Cong. Rec., H 11091 (daily ed. Sept. 28, 1978), at IX-108.................17

H.R. Rep. No. 94-938 (1976) (Conf. Rep.) ...........................................13

Pub. L. No. 94-260, 90 Stat. 315, § 84 .............................................17, 21

S. Rep. No. 95-989 (1978) ................................................................22

81257447\V-3

In accordance with the Court's order of August 2, 2013, the Official Committee of Retirees ("Committee") submits this pre-trial brief to summarize what it expects to demonstrate at the October 23, 2013 hearing concerning the eligibility of the City of Detroit, Michigan (the "City") to be a debtor under Chapter 9 of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code").[1]  The Committee adopts, except as modified herein, all of the legal arguments made in its Objection to Eligibility filed September 10, 2013 (Dkt. 805) and Supplemental Objection to Eligibility filed October 11, 2013 (Dkt. 1174).

## INTRODUCTION

1.      The Committee represents the interests of more than 23,000 retirees of the City. These individuals retired with pensions from the City that were not only vested but protected with special and specific safeguards by the Michigan Constitution itself.  Yet, in filing for bankruptcy under Chapter 9, the City's Emergency Manager has made clear that he intends to try to substantially cut the City's pensions payment obligations, notwithstanding that such action would be in plain contravention of the Michigan Constitution.

2.      Questions of the City's eligibility to file as a Chapter 9 debtor that involve factual eligibility issues will be addressed at the trial commencing on October 23.  The Committee intends to present fact-based objections to eligibility on three grounds:  (a) that the City cannot meet its burden of showing that it was authorized to file a Chapter 9 Petition as required by Section 109(c)(2) of the Bankruptcy Code; (b) that the City cannot show that it negotiated with creditors in good faith or that negotiations were impracticable, as required under Bankruptcy

---

[1] Pursuant to this Court's First Amended Order Regarding Eligibility Objections, dated September 12, 2013 (Dkt. 821), the Eligibility Objections that will be addressed on October 23, 2013 require resolution of genuine issues of material fact.  This pre-trial brief is limited to the matters identified by this Court in its September 12, 2013 order.

Code Sections 109(c)(5)(B) and (C); and (c) that, in filing its Petition, the City did not act in good faith, so that its Petition should be dismissed under Section 921(c) of the Bankruptcy Code.

3. The City cannot show that it was authorized to file the Chapter 9 Petition because, as the Emergency Manager has admitted, it did so with the intent of impairing pension rights and reneging on pension benefit obligations that are constitutionally protected under Michigan law. As the Emergency Manager is bound by the strictures of the Michigan Constitution, a bankruptcy filing that was admittedly in derogation of those strictures was unauthorized as a matter of state law and thus the petition was ineffective.

4. The City also cannot show that it meets the eligibility criteria under Sections 109(c)(5)(B) and (C), for the following reasons:

5. First, the City failed to meet the requirements of Section 109(c)(5)(B) because it did not come forward with a plan of adjustment as required by that Section, and in any event did not engage in good-faith negotiations with various unions and retiree associations as, or representing, the City's largest creditor constituency. Rather than submit a plan of adjustment, the Emergency Manager provided only a June 14, 2013 "Proposal to Creditors" which the Emergency Manager has admitted was not a plan of adjustment but rather only a "proposal." Further, even as to this proposal, the City did not engage in any actual, good faith negotiations with creditors. On the contrary, the City's discussions of this proposal with the retiree associations and unions were merely advisory, one-sided presentations by the City that offered no opportunity to negotiate. Indeed, during the period when those discussions took place, the City had not even provided the underlying data necessary for the retiree associations and unions to analyze and evaluate the City's proposal and prepare a meaningful response. Equally important, discovery has revealed that the City's proposal, and its submissions to this Court,

- 2 -

81257447\V-3

contain a misleading depiction of both the unfunded pension liability and the funds that are potentially available to the City to meet it, as well as the City's obligations in general.

6. <u>Second</u>, the City failed to meet the requirements of Section 109(c)(5)(C) because its June 14 "proposal" was admittedly not a proposed plan of adjustment, which should exist before any determination as to impracticability can be made, as required by that Section as well. Also, to show impracticability under Section 109(c)(5)(C), the City must show that negotiations were impracticable as to all classes of creditors. That showing cannot be made here because, at minimum, the retiree associations and unions were ready, willing and able to negotiate – but the City never took them up on these offers. The City may not use its own unwillingness to meaningfully engage with the various classes of creditors that were prepared to negotiate as a bootstrap to demonstrate that negotiations were "impracticable" under this Section.

7. Finally, regarding Section 921(c), the City cannot meet its burden of demonstrating that it filed its Chapter 9 Petition in good faith as required by that Section. The Emergency Manager has admitted that, notwithstanding his sworn oath to uphold the Michigan Constitution, he commenced these proceedings with the express purpose of "trumping" the Michigan Constitution in order to impair vested pension benefits that the Michigan Constitution explicitly provides cannot be impaired. Cause for dismissal under Section 921(c) further exists because, in connection with its Petition, the City made representations concerning the magnitude of its underfunded pension obligations and its potential ability to meet those obligations as well as its obligations in general, that were, at a minimum, misleading and incomplete.

## FACTUAL BACKGROUND

8. On March 14, 2013, Governor Richard D. Snyder appointed Kevyn D. Orr, a bankruptcy lawyer by training and trade, as the City's Emergency Financial Manager pursuant to

- 3 -

81257447\V-3

Public Act 72 of 1990, the Local Government Fiscal Responsibility Act, M.C.L. § 141.1201, *et seq.* 2013. On March 28, 2013, Mr. Orr automatically became emergency manager (the "Emergency Manager") upon the effectiveness of Michigan's most recent[2] emergency manager law, Public Act 436, the Local Financial Stability and Choice Act, M.C.L. § 141.1541, *et seq.* ("PA 436"). Under Public Act 436 of 2012, the City's Emergency Manager acts as its receiver, and stands in the place of its governing body and chief executive officer. M.C.L. § 141.1549(2). He is a public officer subject to the laws applicable to public servants and officers. M.C.L. § 141.1549(3)(d) and (9)(a), (b) and (c). As a public officer, and like any citizen of the State, the Emergency Manager must follow the Michigan Constitution and statutes enacted by the Legislature pursuant to its constitutional authority.

9.      At the time of the Emergency Manager's appointment, Mr. Orr swore to support and uphold the constitutions of both the State of Michigan and the United States stating: "I do solemnly swear that I will support the Constitution of the United States and the Constitution of this State, and that I will faithfully discharge the duties of the office of Emergency Financial Manager - City of Detroit according to the best of my ability." MICH. CONST. art. XI § 1.[3]

---

[2] In March 2011, Public Act 72, the "Local Government Fiscal Responsibility Act," was repealed and replaced with Public Act 4, the "Local Government and School District Fiscal Accountability Act." M.C.L. §§ 141.1501 *et seq.* "Public Act 4 is not Michigan's first law governing emergency managers, but it is the first legislation that allowed emergency managers to break collective bargaining agreements and to ignore retirement commitments." *See City of Pontiac Retired Emps. Ass'n v. Schimmel,* 767 F.3d 767, 769-70 (6th Cir. 2013) (citing M.C.L. §§ 141.1501-1531). Public Act 4 was rejected by voters in a referendum shortly after passage in March 2011. *Id.* at 770. "Apparently unaffected that the voters had just rejected Public Act 4, the Michigan Legislature enacted, and the Michigan Governor signed, Public Act 436. Public Act 436 largely reenacted the provisions of Public Act 4, the law that Michigan citizens had just revoked. In enacting Public Act 436, the Michigan Legislature included a minor appropriation provision, apparently to stop Michigan voters from putting Public Act 436 to a referendum." *Id.* (citations omitted).

[3] Governor Snyder was required to swear the same oath upon his appointment as Governor of the State of Michigan. *See* MICH. CONST. art. XI §1 (requiring oath of "[a]ll officers, legislative executive and judicial").

- 4 -

10. This inter-play of Michigan's Constitution and Public Act 436 requires that the Emergency Manager abide by all applicable laws in governing the City. The same obligation to comply with the Michigan Constitution applies to the Emergency Manager during this Chapter 9 proceeding. "Indeed, absent a specific provision to the contrary, a municipality is required to continue to comply with state law during a Chapter 9 case." 6 COLLIER ON BANKRUPTCY ¶ 903.02 (Alan N. Resnick and Henry J. Sommer eds. 16th ed. 2012). This is significant, because under Chapter 9, the City, through the Emergency Manager, is the only party with authority to propose a plan of adjustment, 11 U.S.C. § 941, and therefore controls the plan process in a way that is unique to bankruptcy law.

11. PA 436 authorizes a municipality to file a Chapter 9 Petition upon the recommendation of the emergency manager if, in his judgment, "no reasonable alternative to rectifying the financial emergency of the local government which is in receivership exists" and the governor provides written approval. M.C.L. § 141.1558(1).[4] PA 436 permits, but does not require, the governor to "place contingencies on a local government in order to proceed under chapter 9." *Id.*

---

[4] In its entirety, PA 436(18) provides:

> If, in the judgment of the emergency manager, no reasonable alternative to rectifying the financial emergency of the local government which is in receivership exists, then the emergency manager may recommend to the governor and state treasurer that the local government be authorized to proceed under chapter 9. If the governor approves of the recommendation, the governor shall inform the state treasurer and emergency manager in writing of the decision … Upon receipt of this written approval, the emergency manager is authorized to proceed under chapter 9. This section empowers the local government for which an emergency manager has been appointed to become a debtor under title 11 of the United States Code, 11 U.S.C. § 101-1532, as required by section 109 of title 11 of the United States Code, 11 U.S.C. § 109, and empowers the emergency manager to act exclusively on the local government's behalf in any such case under chapter 9.

81257447\V-3

12.     There is no question that, at the time the Emergency Manager was appointed, Detroit was under severe financial pressure.  Detroit faced substantial short and long term liabilities.  Among those liabilities were vested pension obligations owed to City retirees as well as to active employees.  The City's pension obligations, however, differed from other liabilities owed by the City in one fundamental and critical way:  unlike liabilities in general, the City's payment obligations for accrued and vested pension benefits are explicitly protected from being impaired or diminished by the state or its political subdivisions (such as Detroit) under Article IX, Section 24 of the Michigan Constitution (the "Pension Clause").  *Seitz v. Probate Judges Ret. Sys.,* 189 Mich. App. 445, 449 (Ct. App. 1991).[5]  The Pension Clause expressly provides:

> The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby.
>
> Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities.

MICH. CONST. art. IX § 24.

13.     It is undisputed that, as of the time of his appointment, the Emergency Manager was aware of the above provision of the Michigan Constitution.  Transcripts of the Kevyn Orr Deposition, dated September 16, 2013 and October 4, 2013, Case No. 13-53846 (collectively the "Orr Dep.") at 51:25-52:2; 69:16-70:2.[6]  There also is no contention that the wording of the Pension Clause is ambiguous in any way.  Manifestly, the language of that Section is clear and, as the Emergency Manager put it, "speaks for itself."  *Id.* at 51:25-52:19.

---

[5] *See also*, cases cited at n. 18, *infra.*
[6] The Orr Dep. are attached as Exhibit A to the Declaration of Claude D. Montgomery, Esq., dated October 17, 2013, filed in support of this Pre-Trial Brief ("Montgomery Dec.").

- 6 -

81257447\V-3

14.     Notwithstanding the Pension Clause's plain meaning, shortly after his appointment, the Emergency Manager informed both Detroit's creditors and the media of his intent to renege on the very pension benefits - the vested pension payments - that were protected from being diminished under that same constitutional provision.  For example, in a financial plan put forward in May 2013, the Emergency Manager expressly stated that he wanted and intended to cut vested pension rights – and to cut them **substantially**.  *See Detroit EM Releases Financial Plan; City Exceeding Budget By $100M Annually*, CBS DETROIT, (May 12, 2013), http://detroit.cbslocal.com/2013/05/12/kevin-orr-releases-finacial-plan-for-city-of-detroit/;  *see generally* Orr Dep. at 247:1-7.  Ongoing pensions payments for both retirees and active employees  would be affected.

15.     To implement his plan, the Emergency Manager still had to get around the Pension Clause of the Michigan Constitution.  Under the laws of Michigan, the path was blocked.  Therefore, the Emergency Manager decided to use a Chapter 9 filing as a vehicle to trump the very state Constitution that he had sworn to uphold.  There is no dispute about this: the Emergency Manager has publicly and freely admitted that the City's Chapter 9 filing was intended to try to trump state law.[7]  Similar admissions were made at his deposition.  Orr Dep. at 113:13-114:23.  Indeed, at his deposition, the Emergency Manager candidly admitted that the bankruptcy filing was intended, specifically, to "trump" the Michigan Constitution's Pension Clause, and no other provisions of Michigan law.  *Id.*  The Emergency Manager also admitted that he was aware of no decision that had ever upheld or allowed a municipality's using a Chapter 9 proceeding to trump the guarantees of a state Constitution and that, prior to his

---

[7] *See Q&A with Kevyn Orr: Detroit's Emergency Manager Talks About City's Future*, DETROIT FREE PRESS, (June 14, 2013),  http://www.freep.com/article/20130616/OPINION05/306160052/kevyn-orrdetroit-emergency-manager-creditors-fiscal-crisis.

- 7 -

81257447\V-3

Chapter 9 filing, the Michigan Attorney General advised him that, in the view of the Attorney General, the course of conduct being followed by the Emergency Manager was in violation of Michigan law. *Id.* at 415:13-22. The Emergency Manager's intent to attempt to override the Pension Clause is not subject to dispute: in response to a Request for Admission, the Emergency Manager has admitted this expressly. (Dkt. 849, ¶¶ 11-12).

16.     On June 14, 2013 the Emergency Manager presented his "Proposal for Creditors" (the "City Proposal"). (Dkt. 11, Ex. A). In it, the Emergency Manager stated, among other things, that the City's unfunded pension liability, based on a June 2011 actuarial valuation, was approximately $643 million and that a more recent actuarial analysis showed an unfunded pension liability of $3.5 billion. (Dkt. 11, Ex. A at 23). In the June 14 City Proposal, the Emergency Manager further indicated that he intended to cut the City's total ongoing contributions by at least 80%, and that, for retirees, he intended to cut pension contributions **entirely**. Orr Dep. at 106:19-23; 107:13-108:7. In addition to stopping on going contributions for retired City employees, the City Proposal cuts off on-going vested pension contributions for active employees in violation of the second paragraph of the Pension Clause. This paragraph protects retirees as well as active employees because failure to pay active employees means that fewer funds will be available to earn investment returns that can be used to help to pay retirees. *See* Mich. Const. art. IX § 24.

17.     The Emergency Manager has testified that his June 14 "Proposal to Creditors" was simply a proposal, and not a plan of adjustment as that term is defined under the Bankruptcy Code. Orr Dep. at 271:18-19. Nonetheless, after it was made, the Emergency Manager conducted "discussions" concerning it with certain unions and retiree associations. These discussions were nothing more than one-sided presentations by the City, and were not

- 8 -

81257447\V-3

negotiations. Indeed, at the time they were taking place, the City had not even made available the information that would have been needed by creditors to understand and evaluate the City Proposal and formulate a response. (Dkt. 509, Ex. 8) (stating access to data room does not provide requested information); (Dkt. 509, Ex. 9) (describing July 10 meeting as a "discussion between the Emergency Manager's advisors and a relatively small group of key stakeholders who may include, the GRS and its advisor only team, high level representatives of up to four (4) non uniform unions, and representatives from the Detroit Retired City Employees Association.").

18.     On July 16, 2013 the Emergency Manager submitted a recommendation to the Governor, which recommended a Chapter 9 proceeding to implement his City Proposal. (Dkt. 11, Ex. J). In that letter, the Emergency Manager represented, *inter alia*, that the City had over $18 billion in debt and that, according to an "actuarial analysis," the City's unfunded pension liability was $3.5 billion. *Id.* More generally, the letter presented the City's financial situation as dire, as it unquestionably was. *Id.* Although, the letter did not address whether the City owned assets that could be monetized to alleviate the financial stress, or parts of it, it did state squarely "[t]he City's debt and legacy liabilities must be significantly reduced to permit this reinvestment." *Id.*

19.     By letter dated July 18, 2013, the Governor purportedly authorized the Emergency Manager's request to file for bankruptcy under Chapter 9 and did not place any contingencies on such filing. (Dkt. 1 at 16). The Governor's letter did, however, state that the Bankruptcy Code itself provided a contingency on the filing, namely that there be compliance with state law. Orr Dep. at 117:19-118:6.

20.     In response to the City Proposal, and anticipating that the Emergency Manager would seek to effectuate his plan to impair pension benefits in Chapter 9, several current and

former employees of the City commenced lawsuits (collectively, the "State Court Lawsuits") in the Michigan Circuit Court seeking both declaratory and injunctive relief.[8]

21.     In one of the State Court Lawsuits, a hearing on a TRO that, if granted, would have prohibited the Emergency Manager from filing for Chapter 9, was scheduled to take place in the afternoon of July 18.  It has been reported that the state expected an adverse decision, and requested that the hearing be delayed until later that day, which it was.  During the period of that delay, and before the TRO hearing began, the Emergency Manager filed the City's bankruptcy petition.  The Emergency Manager has testified that he is aware of no particular reason for the timing of his filing other than to get a jump on the state court - which later that afternoon issued the TRO.  *Id.* at 124:18-126:4.  By the time it did, the bankruptcy petition had already been filed.[9]

---

[8] *See Flowers v. Snyder,* Case No. 13-729-CZ (Ingham Cnty. Cir. Ct. July 8, 2013) (seeking to enjoin the Governor from authorizing the Emergency Manager to file a Chapter 9 petition and other declaratory relief); *Webster v. Michigan,* Case No. 13-734-CZ (Ingham Cnty. Cir. Ct. July 19, 2013) (seeking to enjoin same and a declaration that PA 436 is unconstitutional in violation of Article IX, Section 24 of the Michigan Constitution); *Gen. Ret. Sys. of Detroit v. Orr,* Case No. 13-768-CZ (Ingham Cnty. Cir. Ct. July 17, 2013) (seeking (i) declarations that PA 436 does not permit the Governor to authorize and the Emergency Manager to take any actions to impair the City's pension obligations under Chapter 9, or in the alternative declarations that PA 436 is unconstitutional, and (ii) enjoining the Emergency Manager from acting pursuant to future unconstitutional authorization by the Governor).

[9] On July 19, 2013, Judge Rosemarie Aquilina issued an Order of Declaratory Judgment finding: (a) PA 436 is unconstitutional and violates the Michigan Constitution to the extent that it permits the Governor to authorize and Emergency Manager to proceed under Chapter 9 in any manner which threatens to diminish or impair accrued pension benefits; (b) the Governor is prohibited by the Michigan Constitution from authorizing an Emergency Manager under PA 436 to proceed under Chapter 9 in a manner which threatens to diminish or impair accrued pension benefits, and any such action by the Governor is without authority and in violation of the Michigan Constitution; and (c) by authorizing the Emergency Manager to proceed under Chapter 9 to diminish or impair accrued pension benefits, the Governor acted without authority under Michigan law and in violation of the Michigan Constitution.  *Flowers v. Michigan,* Case No. 13-374-CZ (Order of Declaratory Judgment dated July 19, 2013).  Judge Aquilina further issued an injunction (1) directing the Emergency Manager "to immediately withdraw the Chapter 9 petition filed on July 18," and (2) to "not authorize any further Chapter 9 filing which threatens to diminish or impair

81257447\V-3

22.     In connection with his Chapter 9 filing, the Emergency Manager represented, without qualification, that the City has over $18 billion in "accrued obligations" and that the City's current unfunded pension liability is $3.5 billion. He also represented that, according to a June 2011 actuarial valuation, the City's unfunded pension liability was, as of that date, $643.8 million. Discovery has revealed that those statements were, at a minimum, misleading and incomplete. In fact, and as discussed at ¶¶ 58-63 below, the evidence is undisputed that (a) of the asserted approximately $18 billion in debt, at least $6 billion pertains to bonds that were issued by the Detroit Water and Sewer Department ("DWSD"), a self sustaining enterprise which bears financial responsibility for those bonds and is able to pay them, and (b) no current actuarial analysis calculating the City's unfunded pension liability had yet been done, thus the City does not really know what the amount of the unfunded pension liability is or what future cash flows are available to meet it. It likewise is admitted that, for the $643.8 million unfunded pension liability valuation that was done in 2011, only $250 million of that liability was allocable to the City's General Fund. A very substantial portion of the balance was allocable to the DWSD - which is responsible for meeting those obligations and is financially capable of so doing. It is admitted that these same points would apply even if the total unfunded pension liability were even greater. *See* ¶ 62 below. None of this, however, was disclosed in the Emergency Manager's bankruptcy filings, nor was it disclosed to creditors during the discussions held prior to that filing.

23.     Further, the City owns numerous assets that can be monetized, some of which are identified in the City Proposal. Probably the most significant of these is the City-owned art

---

accrued pension benefits." *Id.* Notwithstanding, the Emergency Manager has refused to withdraw his bankruptcy filing. Orr Dep. at 126:22-127:4.

81257447\V-3

maintained at the Detroit Institute of Arts, which according to press reports could well be worth billions of dollars, and is currently being appraised by Christie's. Orr Dep. at 168:25-170:9. The Emergency Manager's bankruptcy filings, however, do not account for this available cash source, which, if monetized, would obviously change the City's financial picture as regards its ability to meet not only pension obligations but obligations in general. *See* Transcript of Deposition of Gaurav Malhotra, dated September 20, 2013, Case No. 13-53846 ("Malhotra Dep.") at 52:13-55-12.[10] This highly significant potential cash source was not discussed during the City's discussions with creditors either.

## ARGUMENT

### I. THE CITY CANNOT MEET ITS BURDEN OF DEMONSTRATING THAT IT WAS AUTHORIZED TO FILE THE PETITION

24. The Emergency Manager's July 16 letter to the Governor requesting authorization to file for Chapter 9 did not explicitly state that the Emergency Manager intended to take actions in contravention of the Pension Clause of the Michigan Constitution. The Governor's July 18 response letter likewise did not explicitly state that the Emergency Manager could violate the Pension Clause.

25. Moreover, the Governor's response letter by its terms (as opposed to the Governor's existing but unstated intent)[11] contemplated that there would be no such violations. In his letter, the Governor wrote that, as he understood it, Section 943(b)(4) of the Bankruptcy Code was a **contingency for the filing of a Chapter 9 petition**. (Dkt. 11, Ex. K at 5; Orr Dep.

---

[10] The Malhotra Dep. is attached as Exhibit B to the Montgomery Dec.

[11] The Governor has admitted that he was aware that the Emergency Manager was taking the position that there had to be significant pension cuts. Transcript of Deposition of Richard Snyder, dated October 9, 2013, Case No. 13-53846 ("Snyder Dep."), at 64:14-18. The Snyder Dep. is attached as Exhibit C to the Montgomery Dec.

- 12 -

at 120:7-121:9). The Emergency Manager testified that his understanding was the same. Orr Dep. at 121:10-12. Section 943(b)(4) of the Bankruptcy Code requires that, for a plan to be legally executable, it must not violate state law. Thus, as the Emergency Manager testified, both he and the Governor in fact acknowledged that compliance with state law was a contingency to the City's Chapter 9 filing.

26. Notwithstanding, the evidence is clear that, in filing for Chapter 9, the Emergency Manager, as well as the Governor, intended to affect and violate accrued and vested rights to pension payments that are expressly protected under the Pension Clause. *See* ¶12 above and ¶¶ 54-57 below. Accordingly, in filing the Petition, the Emergency Manager went far beyond what was permitted by the Governor's July 18 letter. Therefore, the filing that the Emergency Manager did make was not authorized, and, lacking authorization, was void *ab initio*.

## II. THE CITY CANNOT MEET ITS BURDEN OF DEMONSTRATING THAT IT NEGOTIATED WITH CREDITORS IN GOOD FAITH OR THAT NEGOTIATIONS WERE IMPRACTICABLE

27. Recognizing that "[i]mportant constitutional issues arise when a municipality enters the bankruptcy arena . . . Congress consciously sought to 'limit accessibility to the bankruptcy court' by municipalities." *In re Cottonwood Water and Sanitation Dist.*, 138 B.R. 973, 979 (Bankr. D. Colo. 1992) (quoting H.R. REP. NO. 94-938, at 10 (1976) (Conf. Rep.)). Certain of these limits are set forth in 11 U.S.C. § 109(c)(5). In particular, Section 109(c)(5) requires, as a precondition for eligibility to proceed under Chapter 9, that a municipal debtor affirmatively establish that it:

> (A) has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

- 13 -

81257447\V-3

> (B) has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;
>
> (C) is unable to negotiate with creditors because such negotiation is impracticable; or
>
> (D) reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title.

11 U.S.C. § 109(c)(5). The "negotiation" requirements contained in Section 109(c)(5) are intended to provide "creditor protection" by "insur[ing] that the creditors have an opportunity to negotiate concerning a plan on a level playing field with the debtor before their rights are further impaired." *Cottonwood*, 138 B.R. at 979.

28.    In this case, the City does not assert that it obtained agreement from creditors (Section 109(c)(5)(A)) or that it sought to prevent a preferential transfer (Section 109(c)(5)(D)); instead, the City contends that it satisfied the conditions of Section 109(c)(5)(B) and/or (C) because it purports to have attempted to negotiate with its creditors in good faith and, in any event, contends that negotiation with creditors was impracticable. However, as set forth below, the City did not in fact meet the requirements of either of those subsections. Specifically: (i) the City failed to meet the requirements of Section 109(c)(5)(B) because it did not come forward with a plan of adjustment as required by that subsection, and in any event did not engage in good faith negotiations with various unions and retiree associations; and, (ii) the City failed to meet the requirements of Section 109(c)(5)(C) because it did not come forward with a plan of adjustment as required by that subsection as well and has not shown that negotiations with various of the unions and retiree associations were impracticable.

29.    The City bears the burden of proof on showing that it meets the standards set forth in Sections 109(c)(5)(B) and (C). *In re Sullivan Cnty. Reg'l Refuse Disposal Dist.*, 165 B.R. 60,

- 14 -

79 (Bankr. D.N.H. 1994). Having failed to meet its burden on eligibility, the City's petition for bankruptcy must be denied.

### A. The City Cannot Establish That it Negotiated in Good Faith Under Section 109(c)(5)(B)

30. The City asserts that its June 14th City Proposal and certain discussion sessions with creditors prior to the Petition Date are sufficient to constitute good faith negotiations under Section 109(c)(5)(B). However, the City's assertion **ignores** the fundamental point that, in order to come within the scope of Section 109(c)(5)(B) in the first place, the City must show that it put forward a **plan of adjustment** to be negotiated. The evidence is undisputed that the City intends to try to use its Chapter 9 filing as a vehicle to impair protected pension benefits. Indeed, the City has expressly admitted this. (Dkt. 849, ¶¶ 11-12).

31. At the same time, the evidence also is undisputed that, prior to its filing, the City did not submit an actual plan of adjustment to creditors. The Emergency Manager has admitted that the "proposal to creditors" that it submitted on June 14, 2013 was **not** a plan of adjustment, but was rather a mere "proposal" intended to elicit "feedback" from creditors. Orr Dep. at 271:18-19.

32. Moreover, even if the City had proposed a plan of adjustment, as more fully set forth in the objections filed by certain Committee members and their affiliated organizations,[12]

---

[12] Certain members of the Committee, including the (i) Michigan Council 25 of the American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees and (ii) International Union, UAW to the City of Detroit, filed their own objections to the City of Detroit's Eligibility Under Chapter 9 on behalf of their constituents. Other members of the Committee, including (i) Shirley V. Lightsey (Detroit Retired City Employees Association), (ii) Robert A. Shinske (Detroit Fire Fighters Association), (iii) Donald Taylor (Detroit Police and Fire Fighters Association) and (iv) Gail Turner (Detroit Police Members Association) are constituents of organizations that filed objections to the City of Detroit's eligibility. The Committee joins in the submissions of co-objector unions and retiree associations and refers the Court to such submissions for the facts relating to communications between the City and retiree representatives prior to the petition.

- 15 -

the City's discussion sessions did not in any event constitute good-faith negotiations because they were merely advisory, did not afford retiree representatives a meaningful opportunity to respond, and in fact presented what discovery has uncovered to be a misleading depiction of both the unfunded pension liability and the funds potentially available to meet it.

### 1. The City Failed to set Forth a Plan of Adjustment as is Required Under Section 109(c)(5)(B)

33. It is the "near-unanimous" consensus of bankruptcy courts that, to meet the requirements of Section 109(c)(5)(B), it is not enough that, prior to filing a bankruptcy petition, a municipality merely "negotiate" in the abstract; rather, Section 109(c)(5)(C) requires that a municipality must, specifically, negotiate over the substantive terms of a proposed "plan of adjustment."  *See Westamerica Bank v. Mendocino Coast Recreation and Park Dist. (In re Mendocino Coast Recreation and Park Dist.)*, No. 12-cv-02591-JST, 2013 WL 5423788, at \*4 (Bankr. N.D. Cal. Sept. 27, 2013) (citing *Sullivan*, 165 B.R. at 79; *In re Ellicott Sch. Bldg. Auth.*, 150 B.R. 261, 266 (Bankr. D. Colo. 1992); *In re N.Y.C. Off-Track Betting Corp.*, 427 B.R. 256, 275-76 (Bankr. S.D.N.Y. 2010)).

34. The conclusion that Section 109(c)(5)(B) requires a municipal debtor to set forth what is, in substance, a plan of adjustment under Section 941 is supported by both Section 109(c)'s text and legislative history.  *See Sullivan*, 165 B.R. at 78 (citing *Cottonwood*, 138 B.R. at 974).

35. The requirements of Section 109(c)(5) are appropriately read together in conjunction with Section 109(c)(4), which requires that a municipality must "desire[] to effect a plan to adjust [its] debts" to be eligible for Chapter 9.  *Cottonwood*, 138 B.R. at 975 (citing 11 U.S.C. § 109(c)(4)).  The term "plan to adjust [a municipality's] debts" is in turn defined in 11 U.S.C. § 941.  Read together, "the concept is that the entity must desire to effect a 'plan' within

- 16 -

81257447\V-3

the meaning of section 941 and must have negotiated in good faith concerning that proposed plan." *Id.*

36.     The legislative history to Section 109(c)(5)(B) requires a municipal debtor to set forth a plan of adjustment as a prerequisite to good faith negotiations.  Under federal bankruptcy law as it existed in 1946,  in order to be eligible for bankruptcy under the Bankruptcy Act, municipalities had "to come to the court with a 'plan of composition' which had been approved by creditors owning not less than 51 per centum in amount of the securities affected by the plan." *Id.* at 976 (quoting Bankruptcy Act § 84, as amended by 60 Stat. 410 (1946)).  In 1976, Congress enacted the predecessor statute to Section 109(c)(5) under the Bankruptcy Act, which modified the requirement that a municipality obtain creditor consent and permitted a municipality to file for bankruptcy if it could show that it had "negotiated in good faith with its creditors and has failed to obtain, *with respect to a plan of adjustment of its debts*, the agreement of creditors holding at least a majority in amount of the claims *of each class* which are claims affected by that plan." Pub. L. No. 94-260, 90 Stat. 315, § 84 (emphasis added).  It thus "is clear from the provisions of Public Law 94-260 that a municipality seeking to file a petition under Chapter IX had to have negotiations concerning the 'plan of adjustment' which was to have been the 'plan' to be filed under section 90 of the Act." *Cottonwood*, 138 B.R. at 977.  When Section 109(c)(5)(B) was enacted in 1978,[13] Congress expressly indicated that it was intended to follow prior law and that any changes to the text were "stylistic" only.[14]  Accordingly, the weight of authority is

---

[13] As set forth above, 11 U.S.C. § 109(c)(5)(B) now sets forth that a debtor can satisfy the negotiation requirement of Section 109(c)(5) if it "has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter…."

[14] 124 CONG. REC., H 11091 (daily ed. Sept. 28, 1978), at IX-108 (stating with respect to the 1978 changes that Chapter 9 "follows current law with respect to the adjustment of debts of a municipality.

81257447\V-3

consistent with Congress' intent that the current version of Section 109(c)(5)(B) should be construed in the same way as its predecessor, which expressly stated that a debtor must negotiate a "plan of adjustment."

37.     The City admits that it did not propose a plan of adjustment under the Bankruptcy Code and therefore cannot satisfy the "negotiation" requirement of Section 109(c)(5)(B).  For example, the Emergency Manager testified explicitly that the proposal that the City  presented to creditors on June 14, 2013 was merely a "proposal" - not a plan.  The Emergency Manager thus emphasized in his deposition testimony that, as regards the June 14th City Proposal, "we never called this a plan, we never called this a deal, we always called it a proposal."  Orr Dep. at 271:18-19.  The Emergency Manager further testified that the City does not know whether it will ever present the June 14 City Proposal as such to the Bankruptcy Court.  *See id.* at 279:2-6.

38.     The Emergency Manager's concession that at the time of filing the City had only a proposal, and not a plan, is hardly surprising.  With respect to pensions in particular, discovery has established that, notwithstanding the City's avowed and admitted intent to cut both retirees' and active employees' pension payment rights (discussed further at ¶¶ 54-57 below), the City does not know the true amount of the unfunded pension liability or scope of the cash flows it has to work with.  *See* ¶ 59 below.  Likewise, and more generally, as the Emergency Manager presumably understood, it would have been premature to prepare a plan of adjustment when the City lacked information about funds that could be made available to pay its debts through the monetization of existing assets, including, but not limited to, the City-owned art maintained at the Detroit Institute of Arts.  Orr Dep. at 170:10-172:18.

---

Stylistic and minor substantive revisions have been made in order to conform this chapter with other new chapters of the bankruptcy code.")

81257447\V-3

39.     Because the City admittedly did not present a plan of adjustment to creditors prior to its July 18, 2013 bankruptcy filing, the City cannot satisfy the eligibility condition set forth in 11 U.S.C. § 109(c)(5)(B).

### 2.     The City Failed to Negotiate With the Retiree Associations and Unions in Good Faith as Required Under Section 109(c)(5)(B)

40.     Even assuming, *arguendo*, that the City had filed a plan of adjustment (which the Emergency Manager admits it did not), the City still cannot meet its burden under Section 109(c)(5)(B) because the City in all events failed to negotiate in good faith with retiree representatives.  As more fully addressed in papers submitted by co-objector unions and retiree associations, the City's discussions with creditors were non-interactive, one-way presentations.  Such a "take it or leave it" approach cannot satisfy Section 109(c)(5)(B).  *See Ellicott*, 150 B.R. at 266.

41.     Moreover, any purported "negotiations" with unions and retiree associations were not in good faith because the City failed to disclose that, *inter alia*:

(a) the City did not know the amount of the unfunded pension liability;

(b) the figures the City cited for high-end actuarial estimates of the unfunded pension liability were in truth founded only on "rough guesses"; and

(c) a substantial percentage of the amount the City was representing to be "unfunded" pension liability was in fact allocable not to the City's general fund but instead to individual City agencies or departments that, themselves, had or could raise sufficient cash to cover the required pension contributions.  *See* ¶¶ 58-63 below.

42.     The City's lack of good faith in its purported negotiations is further demonstrated by its failure to acknowledge, during its discussions with creditors, that the retirees have rights that are clearly and constitutionally protected under Michigan law.  Orr Dep. at 144:10-145:24.

43.     The City's failure to engage in good faith negotiations is shown by the fact that, as the Emergency Manager has admitted, it never provided creditors with information sufficient to

- 19 -

81257447\V-3

allow them to know the actual monetary impact, on creditors, of the cuts the City stated that it wanted to impose, which is a prerequisite for any meaningful discussion. Orr Dep. at 111:2-24; Transcript of Deposition of Lamont Satchel, dated September 19, 2013 ("Satchel Dep."), Case No. 13-53846, at 88:14-89:18;[15] (Dkt. 509, Ex. 8) (stating access to data room does not provide requested information).

### B. The City Cannot Establish That Negotiations Were Impracticable Under Section 109(c)(5)(C)

44.     The City alternatively asserts that good faith negotiations with creditors were not necessary because such negotiations were rendered "impracticable" under section 109(c)(5)(C) by the following four circumstances: (i) the City is a major American city; (ii) the City's creditors are numerous and fragmented; (iii) in many instances, the City was unable to negotiate with representatives with authority to bind creditors; and (iv) the City did not have time to conduct extended creditor negotiations.    (Dkt. 14, at 40-53).    The City's purported impracticability justifications ignore the clear intent of Congress that Section 109(c)(5)(C) requires that the City both set forth a plan of adjustment and negotiate with impaired creditor classes for which negotiations **are** practicable.[16]

---

[15] The Satchel Dep. is attached as Exhibit D to the Montgomery Dec.

[16] The Committee recognizes that other bankruptcy courts have decided this issue differently. *E.g. Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo (In re City of Vallejo)*, 408 B.R. 280 (9th Cir. B.A.P. 2009); *In re Valley Health Sys.*, 383 B.R. 156, 161-62 (Bankr. C.D. Cal. 2008). None of those decisions are binding upon this Court. Moreover, the Committee submits that its interpretation of Section 109(c)(5)(C) is textually accurate and in accordance with Congress' specific intent as reflected by legislative history.

81257447\V-3

**1.    The City Failed to set Forth a Plan of Adjustment as Required Under Section 109(c)(5)(C)**

45.    Like Section 109(c)(5)(B), Section 109(c)(5)(C) requires that a municipal debtor put forward a plan of adjustment under Section 941 of the Bankruptcy Code as a prerequisite to assessing whether good faith negotiations are practicable.

46.    Congress' intent in this respect is clear from Section 109(c)(5)(C)'s legislative history.  As noted above, in 1976, Congress modified the requirement that a municipal debtor must receive 51% creditor consent as a condition of eligibility.  The creditor consent requirement was replaced with the following four prong eligibility test:

> An entity is not eligible for relief under this chapter unless:
>
> …
>
> (1) it has successfully negotiated a plan of adjustment of its debts with creditors holding at least a majority in amount of the claims of each class which are claims affected by that plan;
>
> (2) it has negotiated in good faith with its creditors and has failed to obtain, with respect to a plan of adjustment of its debts, the agreement of creditors holding at least a majority in amount of the claim of each class which are claims affected by that plan;
>
> (3) such negotiation is impracticable; or
>
> (4) it has a reasonable fear that a creditor may attempt to obtain a preference.

Pub. L. No. 94-260, 90 Stat. 315, § 84.  The third prong of the test that "**such** negotiation is impracticable" (emphasis added) necessarily referred back to and incorporated the antecedent good faith negotiation clause in the preceding subsection (2), which specifically contemplated negotiation with each class of claims affected by a **plan of adjustment**.  *See* discussion at ¶ 36 above.  As set forth above, the post-1976 amendments to subsection (3), now codified as Section 109(c)(5)(C), were merely "stylistic" and intended to remain consistent with prior law.  Thus,

- 21 -

81257447\V-3

Congress intended that, in accordance with its predecessors, Section 109(c)(5)(C) requires that a municipal debtor first present a plan of adjustment.

47.     As set forth in ¶¶ 37-38 above, the City admits that it did not propose a plan of adjustment under Section 941 of the Bankruptcy Code.   Therefore, it cannot satisfy the "impracticability" criterion of Section 109(c)(5)(C).

### 2.     The City Also Fails Under Section 109(c)(5)(C) Because it did not Negotiate With Retiree Representatives

48.     Even if a plan of adjustment were not required for an "impracticability" finding under Section 109(c)(5)(C), the City cannot establish "impracticability" because it failed to negotiate with representatives of the retirees and unions, classes of creditors for which negotiation **was** practicable.  Section 109(c)(5)(C) only excuses a debtor from negotiating with those individual classes of impaired creditors for which good faith negotiation would be impracticable. It does not eliminate the requirement that the City negotiate in good faith with classes of creditors with which negotiation **is** practicable.  *See In re City of Wellston*, 42 B.R. 282, 285 (Bankr. E.D. Mo. 1984) (stating that "the Bankruptcy Code anticipates that a municipality will have attempted to negotiate in good faith with its creditors prior to the filing of a Chapter 9 petition"); *see also Vills. at Castle Rock Metro. Dist. No. 4*, 145 B.R. 76, 85 (Bankr. D. Colo. 1990) (eligibility upheld where debtor showed on a class by class basis either good-faith negotiation or impracticability).

49.     Section 109(c)(5)(C)'s legislative history confirms that the eligibility test set forth therein is intended to require a debtor to negotiate in good faith to the extent practicable.  In discussing enactment of Section 109(c), which as set forth above only made "stylistic" changes to the predecessor Bankruptcy Act provision, Senator DeConcini stated, without qualification, that the "creditor protection provision, requiring a municipality to attempt a good faith

- 22 -

81257447\V-3

negotiation with its creditors before a petition is filed, is retained."  S. REP. NO. 95-989, at 8-9 (1978).

50.     The City cannot meet its burden under section 109(c)(5)(C) because it cannot show that negotiations with associations representing the retiree class of creditors were impracticable or that negotiations with unions were impracticable.  For example,  although the City has not put forward a plan of adjustment, the economic rights and interests of retiree claims are clearly distinct from other creditors in that, at a minimum, retiree claims are protected from impairment by the Pension Clause of the Michigan Constitution.  MICH. CONST. art. IX § 24. Further, in its course of dealings following the June 14 proposals, the City itself treated retiree organizations and unions separately and distinctly, holding separate meetings and discussions apart from meetings and discussions with other creditors.  Recognizing the distinct rights and interests of the retiree creditors in particular, this Court ordered the appointment of an Official Committee of Retirees.

51.     Notwithstanding the City's conclusory assertions, at least two retiree associations, constituting the natural representatives of retiree creditors, stood ready, willing, and able to negotiate with the City.  (Dkt. 497 at ¶¶ 69-72).  So did the unions.  (Dkt. 505, Dkt. 506). Regrettably, the City never pursued or even allowed good faith negotiations with those organizations.  (Dkt. 497 at ¶ 71).  Having failed to even attempt to negotiate with a ready and willing creditor class, the City cannot now take the bootstrap position that the negotiations called for under 11 U.S.C. § 109(c)(5)(C) were "impracticable."

## III.    THE CITY'S BANKRUPTCY PETITION WAS NOT FILED IN GOOD FAITH AS REQUIRED UNDER 11 U.S.C. § 921(C) AND SHOULD BE DISMISSED

52.     The City's Petition is subject to dismissal pursuant to section 921(c) of the Bankruptcy Code because the filing was in bad faith, and not in compliance with section

- 23 -

81257447\V-3

109(c)(5). *See* 11 U.S.C. § 921(c).[17] The good faith requirement is intended to "prevent abuse of the bankruptcy process." *Vills. at Castle Rock*, 145 B.R. at 81. Moreover, there is no good faith negotiation if a party "chooses to ignore clear, unambiguous contractual rights of another party." *Sullivan,* 165 B.R. at 78. A debtor's "honesty and candor" are factors in determining whether a petition is filed in good faith. *See, e.g.*, *Pacific Rim. Invs., LLP v. Oriam, LLC (In re Pacific Rim Inves., LLP)*, 243 B.R. 768, 773 (D. Colo. 2000); *see also In re Joyce, Don & Assos. Inc.*, No. 6:07-bk-04878-ABB, 2008 WL 343265, at *3 (Bankr. M.D. Fla. Jan. 30, 2008) (court dismissed chapter 11 petition in part due the debtor's vice president's "lack of candor in his testimony"); *In re Panache Dev. Co., Inc.*, 123 B.R. 929, 932-33 (Bankr. S.D. Fla. 1991) (misstatements and omissions in debtor's schedules constituted "cause" for dismissal of Chapter 11 petition). The City bears the burden of demonstrating that it filed its petition in "good faith." *In re City of Bridgeport*, 129 B.R. 332, 334 (Bankr. D. Conn. 1991) (holding that the City failed to meet its burden of proving insolvency).

53.     Here, the City's burden of showing that it filed in good faith cannot be met, both because (a) there can be no finding of good faith when the Emergency Manager, an appointed state official, intentionally sought to use this Chapter 9 filing as a vehicle to take actions that are prohibited by the Pension Clause he swore to uphold and (b) in connection with the filing of the City's Petition, the Emergency Manager made representations that were, at a minimum, misleading and incomplete.

---

[17] While this section of the Bankruptcy Code provides that a court "may" dismiss the petition if the debtor did not file the petition in good faith, many courts have held that this section requires dismissal if the Chapter 9 Petition was not filed in good faith or if the debtor does not meet the requirements of chapter 9. *Valley Health Sys.*, 383 B.R. at 160; *In re Cnty. of Orange*, 183 B.R. 594, 599 (Bankr. C.D. Cal. 1995); *City of Vallejo*, 408 B.R. at 289.

81257447\V-3

**A. The Chapter 9 Petition was not Filed in Good Faith Because the Emergency Manager Intends to use Chapter 9 to Impair Pension Obligations in Violation of his Duty to Uphold the Michigan Constitution, Which Prohibits Such Impairment**

54.     The Pre-Petition actions of the Emergency Manager show that, at all times since his appointment, the City was on a path careening towards a Chapter 9 filing in order to impair pension benefits and renege on pension payment obligations in violation of the Michigan Constitution. Both the Governor and Emergency Manager evidenced a desire to achieve a result that they knew was unconstitutional as a matter of Michigan law. Even before his appointment as Emergency Manager, Mr. Orr recognized that PA 436, the act pursuant to which he purported to act, was only a "thin veneer of a revision" to PA 4 - which as stated by the Sixth Circuit in *City of Pontiac Retired Emps. Ass'n.* court, had been crafted with the intent of impairing retirement compensation owed to retired municipal employees, 767 F.3d at 769-70, and had been repealed by voter referendum - and was essentially an "end-run" around and "a redo of the prior rejected law." Orr Dep. at 44:17-24; 48:21-49:1, Ex. 4. In a June 13, 2013 interview with the Detroit Free Press, the Emergency Manager admitted that he believes accrued pension benefits could be impaired in a Chapter 9 proceeding:

> Q: You said in this report that you don't believe there is an obligation under our state constitution to pay pensions if the city can't afford it?
>
> A: The reason we said it that way is to quantify the bankruptcy question. We think federal supremacy trumps state law.

*See Q&A with Kevyn Orr: Detroit's Emergency Manager Talks About City's Future*, DETROIT FREE PRESS, (June 14, 2013), http://www.freep.com/article/20130616/OPINION05/306160052 /kevyn-orrdetroit-emergency-manager-creditors-fiscal-crisis. He further confirmed this view in his June 14, 2013 City Proposal when he specifically stated "there *must be significant cuts in*

- 25 -

81257447\V-3

*accrued, vested pension amounts for both active and currently retired persons*." (Dkt. 11, Ex A

at 116) (emphasis added).

55.    Mr. Orr's deposition testimony again demonstrates that the Emergency Manager

intended to use the Chapter 9 filing to avoid the City's constitutional obligations to protect the

pension benefits of the City's employees.  He testified that he had read Article IX, Section 24 of

the Michigan Constitution prior to becoming Emergency Manager.  Orr Dep. at 69:16-70:2.  Mr.

Orr further testified that the language of the Pension Clause is unambiguous and speaks for itself.

*Id.* at 51:25-52:19.[18]    After becoming Emergency Manager, he had discussions with the

Governor about using a Chapter 9 filing  to "get out of the pensions obligations that the City

owed."  Orr Dep. at 84:13-18.  The Emergency Manager admitted that using Chapter 9 to try to

"trump" the Pension Clause of the Michigan Constitution in order to impair pension rights and

obligations was one of his "objectives" in filing the City's Chapter 9 petition and that it was this

specific provision of the Michigan Constitution, and no other provisions of Michigan law, that he

was seeking to trump.  *Id.* at 113:13-114:23.  He went on to state that impairing the pension

rights referred to in the Pension Clause was, in his view a necessary part of any restructuring

plan.  *Id.* at 322:3-7.  He testified that he was unaware of any court decision upholding the use of

Chapter 9 to "trump" a state constitution and was aware, at a minimum, that the Michigan

Attorney General believed that the course of action he was charting was contrary to Michigan

---

[18] Michigan courts have repeatedly upheld the validity and scope of the Pension Clause.  *See, e.g., Shelby Twp. Police and Fire Ret. Bd. v. Charter Twp. Of Shelby*, 438 Mich. 247, 254 (1991) ("Our interpretation of the constitutional framers' intent compelled us to conclude that the Legislature could not diminish or impair accrued financial benefits."); *In re Enrolled Senate Bill 1269*, 389 Mich. 659, 663 (Mich. 1973) ("Under this constitutional limitation [i.e. the Pension Clause] the legislature cannot diminish or impair accrued financial benefits . . . ."); *Seitz v. Probate Judges Ret. Sys.*, 189 Mich. App. 445, 449, 474 N.W.2d 125, 127 (Ct. App. 1991) ("Article 9, § 24 protects those persons covered by a state or local pension or retirement plan from having their benefits reduced.").  "Accrued financial benefits" are "the right to receive certain pension payments on the basis of service performed."  *Shelby Twp. Police and Fire Ret. Bd.*, 438 Mich. at 254 n. 3.

- 26 -

81257447\V-3

law.  *Id.* at 192:2-8; 415:13-22.  As noted above, in these proceedings the Emergency Manager has expressly admitted his intent to impair the very pension rights that are protected by the Pension Clause.  *See* ¶ 30 above.

56.    The ability to impair pensions rights and payment obligations was both a motivation for, and also a "but for" of, the Chapter 9 filing.  The Emergency Manager testified that he would have had no alternative plan had the Governor made a filing contingent upon the preservation of pension benefits.  *Id.* at 120:1-5.  He did not recall that there was any analysis done of how to impair pensions outside a bankruptcy context and purely as a matter of state law. *Id.* at 87:8-11. As of June 14, other than a consensual reduction, the City had not identified any other manner of implementing the Emergency Manager's proposal to cut pension benefits.  *Id.* at 112:21-113:2.  As evident from his testimony, the Emergency Manager maintained his belief that there would have to be "significant cuts" in pension benefits both as of the petition and thereafter:

> Q: At the time the City filed for bankruptcy, was it your view that there had to be significant cuts in accrued vested pension amounts for both active and currently retired person?
>
> A: Yes.
>
> Q: And is it still -- still your view today?
>
> A: Yes, based upon our analysis, yes.

*Id.* at 247:1-7.  The City has stated that it wants to cease pension contributions for current retirees. *Id.* at 128:9-11; 155:11-15.  It also wants to substantially cut the City's Constitutionally-enshrined obligation to make ongoing pension contributions for active employees.  Orr Dep. at 106:19-:23; 107:13-108:7.

- 27 -

57.    The Emergency Manager has also admitted that state court proceedings challenging the constitutionality of PA 436 were part of the motivation for the Chapter 9 filing. During his deposition, the Emergency Manager explained that to the "best of [his] knowledge," there was no particular reason that the Chapter 9 petition was filed in the afternoon of July 18th, other than to file before the commencement of a TRO hearing being held in the Michigan Circuit Court in which the legitimacy of PA 436 was being challenged. *Id*. at 125:24-127:4. He acknowledged that petition was made at that time in order to get a jump on the expected decision by the state court. *Id*. Mr. Orr further admitted that notwithstanding the state court ruling that PA 436 is unconstitutional, he has not taken any steps to withdraw the bankruptcy petition from filing. *Id*.

### B.    The Chapter 9 Petition was not Filed in Good Faith Because the City's Assertions Regarding the Amount of its Underfunded Pension Obligations Were, At a Minimum, Misleading and Incomplete

58.    In his Declaration in support of the Chapter 9 Petition, the Emergency Manager states that the City has approximately "$3.5 billion in underfunding pension liabilities." (Dkt. 11 at 6 n. 3.) The Emergency Manager reiterated that the City maintained approximately $3.5 billion in "unfunded liability" in discussions with City officials, even going so far as to say that the estimate had been shown through an actuarial valuation. Transcript of Deposition of David Bing, dated October 14, 2013, Case No. 13-53846 ("Bing Dep."), at 68:4-9.[19] These statements were consistent with the Emergency Manager's prior representation to the Governor, made in the Emergency Manager's letter of July 16, 2013, also attached to his Declaration, that the City has "$3.5 billion in underfunding pension liabilities based on the most recent actuarial analysis." (Dkt. 11, Ex. J at 2.) Similar statements have been made to this Court in pleadings filed with this

---

[19] The Bing Dep. is attached as Exhibit E to the Montgomery Dec.

81257447\V-3

Court. (Dkt. 14 at 2). In his June 14, 2013 proposal to creditors, attached to his Declaration, the Emergency Manager stated that "there must be significant cuts in accrued, vested pension amounts for both active and currently retired persons." (Dkt. 11, Ex. A at 109.)

59. Deposition discovery has revealed that the Emergency Manager's representations regarding the magnitude of the City's unfunded liability, and its ability to meet that liability, were, at a minimum, misleading and incomplete. Charles Moore, a principal of Conway MacKenzie, Inc., the City's restructuring advisor, and a 30(b)(6) witness for the City, has testified that, contrary to the Emergency Manager's representations, there has been no reliable actuarial analysis placing the City's unfunded pension liability at $3.5 billion. Transcript of Deposition of Charles Moore, dated September 18, 2013, Case No. 13-53846 ("Moore Dep."), at 61:18-62:7.[20] In fact, Mr. Moore testified that, as of his September 18, 2013 deposition, the actuarial firm retained by the City (Milliman) had not completed its actuarial analysis of the unfunded pension liabilities and did not even have the information to undertake such an analysis. *Id.* Mr. Moore further testified that, for this reason, the City did not know the actual size of the unfunded pension liability. *Id.* at 150:24-151:24. Mr. Moore continued that the City did not know what assets were available to pay pensions. *Id.* Further, Charles Bowen of Milliman, the City's actuary, testified that the figures the City has cited for the high-end estimates of unfunded pension liability were predicated only on "rough guesses." Transcript of Deposition of Glenn Bowen, dated September 24, 2013, Case No. 13-53846 ("Bowen Dep."), at 146:8-18.[21] Similarly, State Treasurer Andrew Dillon testified in his deposition that the actual size of the underfunded pension liability was not known. Transcript of Deposition of Andrew Dillon, dated

---

[20] The Moore Dep. is attached as Exhibit F to the Montgomery Dec.
[21] The Bowen Dep. is attached as Exhibit G to the Montgomery Dec.

- 29 -

81257447\V-3

October 10, 2013, Case No. 13-53846 ("Dillon Dep."), at 68:23-71:12; 94:11-95-19; 119:1-120:14.[22]

60.     Along similar lines, in his Declaration in support of the Petition, the Emergency Manager represented that the City's total liability exceeded $18 billion, but omitted to state that approximately $6 billion of that was allocable to DWSD bonds for which the DWSD was responsible and that the obligations on the bonds were paid by the DWSD from its own, separate funds.  Bing Dep. at 60:11-61:8.

61.     The Emergency Manager has also admitted that the City has numerous assets that could be monetized to provide additional cash and that he was exploring ways to achieve monetization.[23]  Yet, none of these potential cash infusions were factored into the City's assessment of whether it could meet is unfunded pension liabilities (which would not be payable until some time in the future), or indeed its liabilities in general.  Orr Dep. at 166:12-24; Malhotra Dep. at 52:13-55:12.

62.     In addition, in his June 14 Creditor Proposal, attached to his Declaration filed with the Court, the Emergency Manager represented that the unfunded pension liability calculated under the actuarial valuation done in 2011 (which the City believes was understated) was approximately $644 million. (Dkt. 11, Ex. A at 23.)  However, during his deposition, Mr. Orr testified that only $250 million of that $644 million total was allocable to the City and its general fund and that the approximately $400 million balance was allocable to other City funds or Departments, such as the DWSD.  Orr Dep. at 369:12-375:7.  The Emergency Manager

---

[22] The Dillon Dep. is attached as Exhibit H to the Montgomery Dec.

[23] These assets include, but are not limited to, the City-owned art that is maintained at the Detroit Institute of Arts, which, according to press reports, could be worth billions of dollars.  Orr Dep. at 170: 10-21 (art collection of Detroit Institute of Arts); 174:10-20 (Detroit Water & Sewer Department) ("DWSD"); 183:19-184:10 (City-owned land).

81257447\V-3

further testified that the DWSD in fact bears financial responsibility for a substantial portion of the $644 million total (which the Emergency Manager testified at his deposition was on the order of 62%), and that the DWSD, which is run as an independent department, is financially sound and has the ability to pay its share of the pension obligations. Orr Dep. at 377:21-378:22; 479:13-21.[24] The Emergency Manager further testified that, if the unfunded pension liability were subsequently determined to be more than $644 million, including as much as $3.5 billion, these same principles - that DWSD would be responsible for its ratable share of the increased amount - would continue to apply. *Id.* at 377:21- 378:22.

63. As a result, the facts demonstrate that a significant portion of the City's asserted unfunded pension liability is allocable to a source that has the financial wherewithal to meet it. Yet, none of this information was disclosed in the City's Petition or made known to the City's creditors, including the retirees whose pension rights the City is threatening to eliminate entirely. In filing its Petition, the City failed to provide a complete or accurate picture of its financial condition.[25] Worse yet, it made representations that were, at a minimum, misleading and incomplete. The City has not acted with good faith, and its petition must therefore be dismissed.

---

[24] Mr. Orr further testified that "some portion" of total unfunded other post-employment benefits might be allocable to DWSD, but he did not recall the percentage. Orr Dep. at 480:10-481:22.

[25] The City also failed to disclose that the Emergency Manager had failed to pursue additional revenue sources that had been identified by Mayor Bing prior to the appointment of the Emergency Manager and that were still available following such appointment and had chosen not to pursue, or delayed, other restructuring initiatives that would have helped improve the City's financial situation. *See generally* Bing Dep. at 48:16-51:25; Bing Dep., Ex. 5.

- 31 -

81257447\V-3

## CONCLUSION

Wherefore, for the above reasons, the City of Detroit, Michigan's Chapter 9 petition should be dismissed and the Committee afforded all further relief that is just and equitable.

Dated: October 17, 2013
      New York, New York

| | | |
|---|---|---|
| Carole Neville | Sam J. Alberts | By: /s/ Claude D. Montgomery |
| DENTONS US LLP | DENTONS US LLP | Claude D. Montgomery (P29212) |
| 1221 Avenue of the Americas | 1301 K. Street, NW | DENTONS US LLP |
| New York, New York 10020 | Suite 600, East Tower | 1221 Avenue of the Americas |
| Tel:   (212) 768-6700 | Washington, DC 2005-3364 | New York, New York 10020 |
| Fax:  (212) 768-6800 | Tel:   (202) 408-6400 | Tel:   (212) 768-6700 |
| carole.neville@dentons.com | Fax:  (202) 408-6399 | Fax:  (212) 768-6800 |
| | sam.alberts@dentons.com | claude.montgomery@dentons.com |

Matthew E. Wilkins (P56697)
Paula A. Hall (P61101)
BROOKS WILKINS SHARKEY & TURCO PLLC
401 South Old Woodward, Suite 400
Birmingham, Michigan 48009
Direct: (248) 971-1711
Cell: (248) 882-8496
Fax: (248) 971-1801
wilkins@bwst-law.com
hal@bwst-law.com

*Counsel for the Official Committee of Retirees*

81257447\V-3

## CERTIFICATE OF SERVICE

I, Claude D. Montgomery, hereby certify that service of the Supplemental Objection of the Official Committee of Retirees to Eligibility of the City of Detroit, Michigan to be a Debtor Under Chapter 9 of the Bankruptcy Code was filed and served via the Court's electronic case filing and noticing system on October 17, 2013.

/s/ Claude D. Montgomery