# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 9 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
| | ) | |
| | ) | Hon. Steven W. Rhodes |
| Debtor. | ) | |
| | ) | |

## LIST OF EXHIBITS TO:

## PRE-HEARING BRIEF OF THE DETROIT RETIREMENT SYSTEMS IN SUPPORT OF THEIR ELIGIBILITY OBJECTIONS SPECIFICALLY PURSUANT TO SECTIONS 109(c)(5) AND 921(c) OF THE BANKRUPTCY CODE

| **Exhibit** | **Description** |
|---|---|
| A. | Excerpt from Gov. Snyder 10/9/13 Deposition |
| B. | Excerpt from Kevyn D. Orr 9/16/13 Deposition |
| C. | Jones Day Presentation to the City of Detroit |
| D. | Excerpt from Charles M. Moore 9/16/13 Deposition |

CLARK HILL PLC

/s/ Robert D. Gordon
Robert D. Gordon (P48627)
Shannon L. Deeby (P60242)
Jennifer K. Green (P69019)
151 South Old Woodward Avenue, Suite 200
Birmingham, Michigan 48009
Telephone: (248) 988-5882
Facsimile: (248) 988-2502
rgordon@clarkhill.com

*Counsel to the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit*

Dated: October 17, 2013

# Exhibit A

*In Re: City of Detroit, Debtor*

*Governor Richard D. Snyder*
*October 9, 2013*

*Moretti Group*
*471 W. South Street*
*Suite 41B*
*Kalamazoo, MI 49007*
*800-536-0804*



Original File 100913RS.TXT
Min-U-Script® with Word Index

```
08:25:11  1              UNITED STATES BANKRUPTCY COURT
08:25:11  2          FOR THE EASTERN DISTRICT OF MICHIGAN
                           SOUTHERN DIVISION - DETROIT
08:25:11  3   --------------------------------
           In re:                              Chapter 9
08:25:11  4
           CITY OF DETROIT, MICHIGAN,          Case No. 13-53846
08:25:11  5
                        Debtor,                Hon. Steven W. Rhodes
08:25:11  6   --------------------------------
           V I D E O T A P E D   D E P O S I T I O N   O F
08:25:11  7
           WITNESS:      GOVERNOR RICHARD D. SNYDER
08:25:11  8
           LOCATION:     The Romney Building
08:25:11  9               111 S. Capitol Avenue
                          Lansing, Michigan
08:25:11 10
           DATE:         Wednesday, October 9, 2013
                          8:38 a.m.
08:25:11 11

08:25:11 12   APPEARANCES:
           FOR PLAINTIFFS FLOWERS:
08:25:11 13
                          LAW OFFICE OF WILLIAM A. WERTHEIMER
08:25:11 14               30515 Timberbrook Lane
                          Bingham Farms, Michigan  48025
08:25:11 15               248.644.9200
                          billwertheimer@gmail.com
08:25:11 16               BY: WILLIAM A. WERTHEIMER  (P26275)

08:25:11 17   FOR INTERNATIONAL UNION, UAW:

08:25:11 18               COHEN, WEISS and SIMON, LLP
                          330 West 42nd Street
08:25:11 19               New York, New York  10036-6976
                          212.563.4100
08:25:11 20               pdechiara@cwsny.com
                          BY: PETER D. DeCHIARA, ESQUIRE
08:25:11 21
           FOR THE RETIREES COMMITTEE:
08:25:11 22
                          DENTONS US LLP
08:25:11 23               1221 Avenue of the Americas
                          New York, New York  10020-1089
08:25:11 24               212.768.6881
                          arthur.ruegger@dentons.com
08:25:11 25               BY: ARTHUR H. RUEGGER, ESQUIRE
```

**MORETTI GROUP  800-536-0804**
**Court Reporting and Videoconferencing**

13-53846-swr  Doc 875-1  Filed 11/15/13  Entered 11/15/13 00:34:09  Page 4 of 92
13-53846-swr  Doc 1241  Filed 10/18/13  Entered 10/18/13 00:23:09  Page 3 of 6

| | | |
|---|---|---|
| 09:59:47 | 1 | be. |
| 09:59:47 | 2 | Q. Okay. Well, Mr. Orr used the word "there must be". |
| 09:59:50 | 3 | A. Uh-huh. |
| 09:59:51 | 4 | Q. Did you share that view that there had to be? |
| 09:59:53 | 5 | A. Not necessarily. |
| 09:59:55 | 6 | Q. Okay. |
| 09:59:55 | 7 | A. Just as I said. |
| 09:59:56 | 8 | Q. Okay. So did you think about this issue as of -- or |
| 10:00:01 | 9 | as of the July 18th, 2013 time frame, had you given |
| 10:00:04 | 10 | thought to whether or not there had to be cuts to |
| 10:00:10 | 11 | accrued pension benefits? |
| 10:00:12 | 12 | A. I gave thought to the issue because I have concern |
| 10:00:14 | 13 | for the retirees, and that was why one of the |
| 10:00:16 | 14 | important questions in my view was to have a retiree |
| 10:00:20 | 15 | representative in the bankruptcy. |
| 10:00:22 | 16 | Q. And what was your -- since you said you gave thought |
| 10:00:27 | 17 | to it, can you articulate what your position was as |
| 10:00:29 | 18 | to whether or not there had to be cuts in accrued |
| 10:00:33 | 19 | pension liabilities? And I'm focusing on your views |
| 10:00:36 | 20 | on the matter as of July 18th, 2013. |
| 10:00:40 | 21 | A. My view going back prior to that is is I had hoped |
| 10:00:47 | 22 | that there would be negotiations to resolve this |
| 10:00:50 | 23 | short of bankruptcy because bankruptcy was a last |
| 10:00:54 | 24 | resort; that I hoped that people could come to the |
| 10:00:57 | 25 | table and come up with a mutual understanding and |

MORETTI GROUP  800-536-0804
Court Reporting and Videoconferencing

13-53846-tit  Doc 8750-1  Filed 12/15/14  Entered 12/15/14 20:03:40  Page 5 of 92
13-53846-swr  Doc 1294-1  Filed 10/18/13  Entered 10/18/13 00:23:09  Page 4 of 6

| | | |
|---|---|---|
| 10:01:00 | 1 | negotiation that would be satisfactory to the |
| 10:01:01 | 2 | parties involved. |
| 10:01:02 | 3 | That didn't happen in terms of that regard |
| 10:01:05 | 4 | but I still had hope to say that as you go through |
| 10:01:09 | 5 | the bankruptcy process I viewed it as likelihood |
| 10:01:11 | 6 | that there was less flexibility under the bankruptcy |
| 10:01:14 | 7 | process just because of the nature of federal |
| 10:01:17 | 8 | bankruptcy law than there probably was before. |
| 10:01:19 | 9 | Q. Was it your view that as of July 18th in the |
| 10:01:28 | 10 | bankruptcy one way or another accrued pension |
| 10:01:32 | 11 | liabilities would have to be reduced? |
| 10:01:34 | 12 | A. Based on the facts going into it, it was one of |
| 10:01:37 | 13 | those questions, as you said, there was a likelihood |
| 10:01:40 | 14 | of that happening. |
| 10:01:41 | 15 | Q. That's not my question. |
| 10:01:42 | 16 | A. Yes. Yeah, I believe there's a likelihood there |
| 10:01:46 | 17 | could be reductions in unfunded pension liabilities. |
| 10:01:50 | 18 | Q. Okay. I'm not asking -- |
| 10:01:51 | 19 | A. Yeah. |
| 10:01:52 | 20 | Q. Governor, I'm not asking you to predict the |
| 10:01:55 | 21 | likelihood of what might have happened. |
| 10:01:56 | 22 | A. Okay. |
| 10:01:56 | 23 | Q. I'm asking you whether you believed that in |
| 10:02:00 | 24 | bankruptcy there would have had to be one way or |
| 10:02:03 | 25 | another reductions in Detroit's accrued pension |

**MORETTI GROUP   800-536-0804**
**Court Reporting and Videoconferencing**

13-53846-tjt   Doc 8750-1   Filed 12/15/14   Entered 12/15/14 10:34:09   Page 6 of 92
13-53846-swr   Doc 1245-1   Filed 10/18/13   Entered 10/18/13 00:23:09   Page 5 of 6

CERTIFICATE

STATE OF MICHIGAN       )
                        ) SS:
COUNTY OF OAKLAND       )


       I, LAUREL A. JACOBY, Certified Shorthand

reporter, a Notary Public, hereby certify that I recorded

in shorthand the examination of GOVERNOR RICHARD D.

SNYDER, the deponent in the foregoing deposition; and that

prior to the taking of said deposition the deponent was

first duly sworn, and that the foregoing is a true,

correct and complete transcript of the testimony of said

deponent.

       I further certify that no request was made for

submission of the transcript to the deponent for reading

and signature and that no such submission was made.

       I also certify that I am not a relative or

employee of a party or an attorney for a party; or

financially interested in the action.




_____
LAUREL A. JACOBY, CSR-5059, RPR

Notary Public, Oakland County, Michigan

My commission expires: 9/1/18

Dated:  This 11th day of October, 2013.

# Exhibit B

**Page 1**

```
 1        IN THE UNITED STATES BANKRUPTCY COURT
 2            EASTERN DISTRICT OF MICHIGAN
 3                 SOUTHERN DIVISION
 4
 5   In re                    Chapter 9
 6   CITY OF DETROIT, MICHIGAN,    Case No. 13-53846
 7            Debtor.          Hon. Steven W. Rhodes
 8   _____/
 9               VIDEOTAPED DEPOSITION
10
11   DEPONENT: KEVYN ORR
12   DATE:     Monday, September 16, 2013
13   TIME:     10:08 a.m.
14   LOCATION: MILLER CANFIELD PADDOCK & STONE PLC
15             150 West Jefferson, Suite 2500
16             Detroit, Michigan
17   REPORTER: Jeanette M. Fallon, CRR/RMR/CSR-3267
18
19
20
21
22
23
24
25
```

**Page 2**

```
 1   APPEARANCES:
 2
 3   JONES DAY
 4   By:  Gregory M. Shumaker
 5        Dan T. Moss
 6   51 Louisiana Avenue, NW
 7   Washington, D.C. 20001.2113
 8   202.879.3939
 9        Appearing on behalf of the Debtor
10
11   DENTONS
12   By:  Anthony B. Ullman
13   620 Fifth Avenue
14   New York, NY 10020.2457
15   212.632.8342
16        Appearing on behalf of Retirees Committee
17
18   COHEN WEISS AND SIMON LLP
19   By:  Peter D. DeChiara
20   330 West 42nd Street
21   New York, NY 10036.6979
22   212.356.0216
23        Appearing on behalf of UAW
24
25
```

**Page 3**

```
 1   APPEARANCES (continued):
 2
 3   LOWENSTEIN SANDLER LLP
 4   By:  Sharon L. Levine
 5   65 Livingston Avenue
 6   Roseland, NJ 07068
 7   973.597.2374
 8        -and-
 9   AFSCME
10   By:  Michael L. Artz
11        Tiffany Ricci
12   1101 17th Street, NW
13   Suite 900
14   Washington, D.C. 20036
15   202.775.5900
16        Appearing on behalf of AFSCME
17
18   CLARK HILL PLC
19   By:  Jennifer K. Green
20   500 Woodward Avenue, Suite 3500
21   Detroit, MI 48226
22   313.965.8274
23        Appearing on behalf of Retirement Systems
24
25
```

**Page 4**

```
 1   APPEARANCES (continued):
 2
 3   WILLIAMS WILLIAMS RATTNER & PLUNKETT PC
 4   By:  Ernest J. Essad, Jr.
 5   380 N Old Woodward Ave Ste 300
 6   Birmingham, MI 48009
 7   248.642.0333
 8        Appearing on behalf of FGIC
 9
10   SIDLEY AUSTIN LLP
11   By:  Guy S. Neal (appearing via LiveNote Streaming)
12   1501 K St., NW
13   Washington, D.C.
14   202.736.8000
15        Appearing on behalf of National Public Finance
16        Guarantee Corp.
17
18   WINSTON & STRAWN LLP
19   By:  Bianca M. Forde (appearing via LiveNote Streaming)
20   200 Park Avenue
21   New York, NY 10166.4193
22   212.294.4733
23        Appearing on behalf of Assured Guaranty Municipal
24        Corp.
25   ALSO PRESENT: Mark Meyers, videographer
```



Page 129

1  Q.  And this meeting took about two hours total; is that
2      right?
3  A.  Approximately that time.
4  Q.  And you indicated in your -- the declaration that you
5      filed here that at the June 14th meeting you presented
6      the proposal and you presented the executive summary
7      and people got the full proposal as they exited and I
8      think you said that you answered questions posed by
9      the attendees?
10 A.  I believe that's correct.
11 Q.  Is that an accurate and truthful description of what
12     happened at the June 14th meeting?
13 A.  Yes.
14 Q.  There were no actual negotiations at that meeting;
15     were they?
16 A.  I don't think that -- you know, be careful of the word
17     negotiations, but no, not as it's generally
18     understood.
19 Q.  Now, the next meeting that I believe took place was on
20     June 20; is that right?
21 A.  Are you reading through my declaration?
22 Q.  Uh-huh.
23 A.  Page 55 has a list of meetings, around that
24     approximate time.
25 Q.  Uh-huh.

Page 130

1  A.  Okay, yes.
2  Q.  So the next one was June 20; is that right?
3  A.  If that's what it says in my declaration, yes.
4  Q.  And there were both morning and afternoon sessions; is
5      that right?
6  A.  Yes.
7  Q.  And this was six days after the proposal had been
8      presented; correct?
9  A.  Yeah, I haven't done the counting, but 14th to 20th,
10     yeah, it would be six calendar days, yes.
11 Q.  And it was a two-hour morning session and about 90
12     minutes for the afternoon session?
13 A.  That sounds about right.
14 Q.  And in your affidavit or your declaration you
15     indicated that at this meeting, these meetings, the
16     City presented a more in-depth look at its analysis of
17     the health and pension obligations and suggested for
18     proposals -- suggested proposals for the modification
19     thereof that the City could fund within its means
20     going forward and you provided handouts of the
21     presentations.  Are those accurate descriptions of
22     what --
23 A.  Yes.
24 Q.  So there were no actual negotiations at that meeting
25     either; were there?

Page 131

1  A.  I'm going to defer as to whether or not those
2      constitute negotiations.  There was a give and take is
3      my understanding, but I'm not going to testify that
4      those did not constitute negotiations.
5  Q.  Well, was there any actual sit down, you know, and
6      bargaining as to what the City would agree to as an
7      alternative to what was put in the June 4th (sic)
8      proposal and what it would not?
9  A.  Here again, let me be careful here.  The obligation to
10     collectively bargain is suspended for five years so I
11     just want to state that for the record.  We are not in
12     any way by answering this question seeking to waive
13     that right, as it is traditionally understood.  That
14     being said, I think at those meetings and all the
15     meetings I've referenced we generally asked during
16     those meetings for proposals which could be
17     characterized as negotiations.
18 Q.  Did the City make any counterproposals to the June
19     14th proposal at the June 20 meetings?
20 A.  Well, we wouldn't bargain against ourselves.
21 Q.  It's a yes or no question; okay?
22 A.  Sir, throughout the day I'm trying to give you a
23     response.  I know you want yes or no questions for
24     purposes of your briefing, I suppose, but I'm trying
25     to give you an accurate response.

Page 132

1  Q.  I would appreciate it if you could answer the question
2      without making speeches.
3          MR. ULLMAN:  Can you have the question
4      read back, please?
5          THE WITNESS:  It's not a speech, it's a
6      response.
7          MR. ULLMAN:  Question read back.
8          (Record read back as requested.)
9          MR. SHUMAKER:  Object to the form.
10 A.  We didn't receive any counterproposals so there was
11     nothing to counter.
12 Q.  And did you make any further mod -- did you make any
13     modifications on June 20 to the proposal you had made
14     on June 14th?
15 A.  Here again, I'm going to be careful as to whether or
16     not what we discussed at the 20 referred to
17     modifications but suffice it to say we went over in
18     detail as I said in my declaration our proposal on the
19     14th and asked for responses.
20 Q.  Okay.  The next meeting I believe took place in July;
21     is that right?  July 10th and 11th?
22 A.  Yes, here again, if you're reading my declaration,
23     that's what I state.
24 Q.  Now, in this set of meetings there were -- first of
25     all, were you present there?


SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

13-53846-tjt  Doc 8725-2  Filed 12/15/14  Entered 12/15/14 21:06:44  Page 10 of 92
13-53846-swr  Doc 1248-2  Filed 10/18/13  Entered 10/18/13 00:23:09  Page 30 of 14

Page 301

1  pursuant to my contract and in fact I have not been
2  seeking any benefits under that contract such as
3  commuting expense, healthcare, malpractice insurance,
4  directors and officers insurance. In fact, I've been
5  subsidizing my efforts out of my own pocket.
6       MS. GREEN: If that situation changes and
7  private funds are provided, I would request a standing
8  request for supplementation to be made aware if that
9  happens.
10      MR. SHUMAKER: I'm sure --
11      MS. GREEN: I'm directing that to your
12 counsel. You don't have to personally let me know.
13      MR. SHUMAKER: We'll look into that if that
14 would happen.
15      MS. GREEN: I appreciate that.
16      THE WITNESS: I have not asked and there is
17 no intent or expectation in that regard.
18 Q. The -- I have one last question.
19      We talked about the draft of the petition
20 being prepared by Jones Day. There were media reports
21 that the City was planning to file on Friday, July
22 19th. Do you recall seeing those?
23 A. Yes.
24 Q. What was it that made the City -- that prompted the
25 City to file them instead on July 18th at 4:06 p.m.?

Page 302

1 A. Counselor, just because they're media reports doesn't
2  mean that that was accurate.
3 Q. Was there ever a plan to file them on the 19th?
4  Setting aside what the media reported, was there a
5  plan to file them on the 19th?
6 A. No, my plan was to have the permission, the authority,
7  to file them and make that call at some point after I
8  transmitted my letter of July 16.
9 Q. Were any of your conversations on the 18th or the 17th
10 relating to the timing of the petition?
11 A. Outside of communications with counsel?
12      MR. SHUMAKER: I'm going to object to the
13 form just -- I'm not following your question,
14 counselor.
15 Q. Were any of the conversations that you had on the 17th
16 or the 18th with, for instance, the governor, we've
17 talked about these conversations, were any of those
18 conversations relating to the timing of the filing
19 itself?
20      MR. SHUMAKER: Again, to the extent that
21 you're going to go into the content of the
22 conversations where counsel was present between
23 Mr. Orr and the governor, I'm going to instruct him
24 not to answer.
25 Q. Were there any conversations that you had without

Page 303

1  counsel present?
2 A. No.
3 Q. And are you not willing to answer even what topics --
4  in broad categories of topics that were discussed?
5      MR. SHUMAKER: Again, to the extent that
6  they reveal what the communications are, I'm going to
7  instruct him not to answer.
8 Q. Do you know if anyone else from your team had
9  conversations, outside of conversations with counsel,
10 relating to the timing of the filing?
11 A. There may have been conversations. I'm not aware of
12 any specific ones.
13      MS. GREEN: I don't have any further
14 questions. Do you have follow-up?
15      MR. SHUMAKER: Thank you, counsel.
16      THE VIDEOGRAPHER: This concludes the
17 deposition and we're going off the record at 6:12 p.m.
18      (Deposition adjourned at 6:12 p.m.)
19           *   *   *
20
21
22
23
24
25

Page 304

1  State of Michigan)
2  County of Genesee)
3           Certificate of Notary Public
4       I certify that this transcript is a complete, true and
5  correct record of the testimony of the witness held in this
6  case.
7       I also certify that prior to taking this deposition,
8  the witness was duly sworn or affirmed to tell the truth.
9       I further certify that I am not a relative or an
10 employee of or an attorney for a party; and that I am not
11 financially interested, directly or indirectly, in the
12 matter.
13      WITNESS my hand this 19th day of September,
14 2013.
15
16
17
18 Jeanette M. Fallon, CRR/RMR/CLR/CSR-3267
19 Certified Realtime Reporter
20 Registered Merit Reporter
21 Certified LiveNote Reporter
22 Certified Shorthand Reporter
23 Notary Public, Genesee, Michigan
24 Acting in Oakland County, Michigan
25 My Commission Expires: 9-19-18



# Exhibit C

JONES DAY | One Firm Worldwide℠

Presentation to The City of Detroit

January 29, 2013

Confidential

# PART I – INTRODUCTION

Confidential

2

DTMI00128732

# The Jones Day Team




**Heather Lennox**


**Aaron Agenbroad**


**Corinne Ball**


**Bruce Bennett**


**Stephen Brogan**


**Kevyn Orr**

Confidential

3

DTMI00128733

[Speaker Notes For Slide: 3]

The Jones Day Team:

Stephan Brogan
Corinne Ball
Heather Lennox
Kevyn Orr
Bruce Bennett
Aaron Agenbroad

[Brogan voiceover: Although I will not be heavily involved in the representation, I wanted to (i) provide my personal statement of Jones Day's commitment to this project and (ii) highlight the qualities of the team members that will manage this project on a day-to-day basis. ]



4

**Confidential**

DTMI00128734



# Jones Day's
# Qualifications and Commitment

- Midwestern Roots – Continuing Presence and Practice

- Substantial Ties to Michigan and the 6th Circuit

- Belief in the Importance of a Strong Detroit

- Unsurpassed Expertise Where Detroit Needs It

- Historical Focus on Teamwork and Collaboration

- Know and Work Well With City's Other Advisors

- Firm-Wide Commitment to Detroit

5

Confidential

DTMI00128735

[Speaker Notes For Slide: 5]

Jones Day's Commitment to the Detroit Project

Jones Day's roots are in the Midwest and a large part of our practice is centered there.

Many of Jones Day's clients are based in Detroit and in Michigan.
(Over 100 Michigan-based clients in the past 2 years.)
Long-standing representation of GM.
Special benefits counsel to, and good contacts with, Blue Cross of Michigan.
25 lawyers were 6th Circuit Clerks.
27 lawyers were clerks in federal courts in the 6th Circuit (Ohio, Michigan, Tennessee, Kentucky).
28 lawyers were US Supreme Court Clerks.
116 lawyers have one or more degrees from Michigan institutions (including 98 lawyers with 111 degrees from the University of Michigan alone).

We believe that a strong Detroit is vital to the state, the region and the country.

Jones Day has unsurpassed expertise and capabilities in the areas of greatest importance to Detroit and would be honored to be called upon to help.

Jones Day has a longstanding reputation for teamwork and collaboration, both within our own organization and when working with clients, related parties and other professional firms.
This strength will be particularly important in this matter.
We know and can work well with the other advisors retained by the City and it will be critical that everyone pulls together in the same direction.

When a client engages Jones Day, it engages the entire firm, and this would be regarded as an engagement of utmost importance for the firm as a whole.
We are committed to providing whatever resources are needed to advance Detroit's restructuring goals.
The City will have the support of each and every part of the Firm.

6

**Confidential**

DTMI00128736



# PART II – GENERAL OBSERVATIONS

7

Confidential

DTMI00128737



[Speaker Notes For Slide: 7]

Jones Day's Priority for Today's Meeting

It is much more important that we discuss issues the City, the State and the FAB want to discuss rather than issues that we have identified.

We are prepared to walk through the presentation and invite dialog along the way, but are also prepared to put our presentation to one side and cover topics that interest you and address your questions and concerns.

We have studied Detroit's situation extensively and we have some preliminary views on a path forward.

8

Confidential

DTMI00128738



# Detroit's Substantial Progress

- Improved Cash Flows
- Significant Headcount Reduction
- Implementation of CETs
- Planning to Address Pension/OPEB
- Payroll Systems Outsourcing
- Public Lighting Authority
- Regional Transportation Authority
- Initiatives to Drive Revenue/Reduce Expenditures

9

Confidential

[Speaker Notes For Slide: 9]

The City, working with the FAB and the State, already has made substantial progress in addressing its financial challenges.

Improved Cash Flows (Expected improvement of ~$62MM in FY 2013)

Significant Headcount Reduction (from ~12K in Nov. 2011 to ~10K in Nov. 2012)

Implementation of CETs (Despite delays, large majority of CETs are in place)

Planning to Address Pension/OPEB (e.g., recently closed the Police & Fire Retirement System to new employees, retention of Milliman to assist in revamping benefits for retirees and active employees)

Payroll Systems Outsourced

Public Lighting (Public Lighting Authority established; rate increases)

Regional Transportation Authority (authority established; new funding committed)

Initiatives to Drive Revenue or Reduce Expenditures (Belle Isle lease to the state, funding support for new arena and commercial development via Detroit Downtown Development Authority, grant and loan support for Detroit's Eastern Market through the Community Revitalization Program)

10

Confidential

DTMI00128740

# Formidable Challenges Remain



- Substantial Debt (Bonds, POCs, Swaps)
- Pension/OPEB Liabilities
- Labor Issues (Costs, Work Rules)
- Detroiters' Quality of Life/Redevelopment of the City
- Development of Multi-Year Budget
- Reversing Economic Trends
- Encouraging New Investment in Detroit
- Political Obstacles to Reform
- EPA/Clean Water Act Case
- High Unemployment and Crime Rates

11

Confidential

DTMI00128741

[Speaker Notes For Slide: 11]

Notwithstanding the foregoing, many challenges remain.

Debt and related obligations (e.g., swaps)

Pensions and other retiree benefits (OPEB).

Labor costs, work rules and related issues.

Implementation of strategies to improve Detroiters' quality of life and redevelop the City.

Development of multi-year budget upon which restructuring can be based.

Identification of further options for saving/raising funds and stabilizing revenues (reversing trends) and encouraging new investment in Detroit.

Political obstacles to reform.

EPA and Clean Water Case before Judge Cox.

High unemployment.

High crime rate.

12

**Confidential**

DTMI00128742



# Out of Court Solutions Are Preferred

- **Benefits of Well Planned Out-Of-Court Restructuring**

  - ➢ **Less Disruptive**
  - ➢ **Less Publicity**
  - ➢ **Less Expensive**
  - ➢ **Less Reputational Damage**
  - ➢ **Less Political Impact**

- **Consensus or Near Consensus Necessary for a Successful Out-of-Court Restructuring**

  - ➢ *Extremely Difficult to Achieve in Practice*

13

Confidential

13-53846-swr  Doc 8725-3  Filed 12/16/14  Entered 12/16/14 10:23:09  Page 25 of 93
13-53846-tjt  Doc 7245-3  Filed 10/16/13  Entered 10/16/13 10:46:40  Page 25 of 93
DTMI00128743

[Speaker Notes For Slide: 13]

A well planned and carefully implemented effort to resolve Detroit's difficulties out of court is vitally important for several reasons:

An out-of-court solution is preferable for a number of reasons.
Less disruptive.
Less publicity during process.
Less expensive.
Less damage to City reputation.
Less political impact.

An out of court solution requires consensus or near consensus of affected constituencies.
This is extremely hard to achieve in practice.

Note:   Could mention the possibility of a moratorium on payments being negotiated in support of an out of court solution.

14

**Confidential**

DTMI00128744



# Impact of Possible
# Emergency Manager Appointment

- Expansive Power
  - ➤ Power of City Government
  - ➤ Ability to Reject, Modify or Terminate CBAs
  - ➤ Ability to Commence Chapter 9 Filing Quickly, if Warranted
  - ➤ *Can Create Negotiating Leverage (Negotiating with the Backdrop of Bankruptcy)*

- Hot-Button Political Issue

- Relationship With Elected Officials Must Be Established

- Possible Legal Challenges (Delay and Risk)

15

Confidential

DTMI00128745

[Speaker Notes For Slide: 15]

Appointment of an Emergency Manager may offer the City greater powers to address some issues.

The appointment of an Emergency Manager could impact the City's restructuring efforts in a number of ways:

Expansive powers over all aspects of City government could be used to promote and expedite restructuring (e.g., budget, procurement; contracts; labor negotiations; ability to adopt ordinances related to financial condition).

Could streamline certain political/bureaucratic/legal requirements to restructuring activities.

Ability to reject, modify or terminate CBAs under certain circumstances.

Ability to commence chapter 9 filing quickly under PA 72 and PA 436 (assuming State approval).

Emergency manager powers can create negotiating leverage (negotiating in the backdrop of bankruptcy).

Hot-button political issue.

Potentially unpopular option with certain segments of the public, unions, other stakeholders.

The Emergency Manager's relationship with elected officials would have to be developed.

Ultimately, the Emergency Manager could be used as political cover for difficult restructuring decisions.

Appointment of an Emergency Manager could result in legal challenges (e.g., federal & state constitutional challenges)

Could delay progress until resolved

Could lead to challenges of the legality and enforceability of any actions taken by the Emergency Manager.

16

**Confidential**

DTMI00128746



# Out-of-Court Plan Should Contemplate the Possibility of Chapter 9

- Simplify and Shorten Any Chapter 9 Case, if Out-of-Court Effort Fails

  ➢ Out-of-Court Agreements Can Be Used in Chapter 9

- Creates Leverage in Creditor Negotiations

  ➢ Negotiating in the Shadow of Chapter 9

  ➢ Motivate Municipal Bond Market Participants

- Bolster Eligibility for – and Success in – Chapter 9 By Establishing Good-Faith Record of Seeking Creditor Consensus

17

Confidential

13-53846-swr   Doc 8726-3   Filed 12/16/14   Entered 12/16/14 10:46:44   Page 29 of 93
13-53846-swr   Doc 7256-3   Filed 10/16/13   Entered 10/16/13 00:23:09   Page 28 of 33
DTMI00128747

[Speaker Notes For Slide: 17]

Any restructuring plan should be designed so that it could be implemented in a chapter 9 case, if necessary.

Even if an out-of-court plan cannot be implemented, agreements that are reached can form the basis for a chapter 9 plan of adjustment, thus simplifying and shortening any chapter 9 case.

Creditors understand that a troubled municipality has greater leverage in a chapter 9 case. Accordingly, developing an out-of-court restructuring plan that can later be implemented in chapter 9 if necessary can create leverage in favor of a negotiated deal.

This is particularly the case if an Emergency Manager is appointed because the threat of a chapter 9 filing – including a potential moratorium on payments – will be more tangible, and possibly more imminent.

The combination of an Emergency Manager and a proposal that could be implemented in chapter 9 could be the most effective way to motivate investors in the municipal bond market.

A good-faith effort to pursue an out of court restructuring plan will establish a clear record of seeking creditor consensus before seeking chapter 9 relief. This will deflect any eligibility complaints based on alleged failure to negotiate or bad faith.

18

Confidential

DTMI00128748



# If Chapter 9 Needed, Planning Is Key

- Any Bankruptcy Filing Should Be Accompanied By:

  ➢ Fully Developed Plan of Adjustment / Detailed Term Sheet

      -OR-

  ➢ Clearly Articulated, Reasonable Restructuring Plan, Already Shared with Creditors

  *This approach will help demonstrate that Chapter 9 was commenced to facilitate realistic solutions to problems. Chapter 9 is not an additional symptom of those problems.*

19

Confidential

DTMI00128749

[Speaker Notes For Slide: 19]

If a chapter 9 case becomes necessary, the commencement of a bankruptcy should be accompanied by either:

(1) A fully developed Plan of Adjustment or detailed term sheet for a Plan of Adjustment

– or –

(2) A clearly articulated, reasonable plan for resolving the City's financial difficulties – previously discussed with key constituencies – that can quickly be incorporated into a Plan of Adjustment.

~ ~

This approach is intended to allow the City to describe a chapter 9 case as facilitating realistic solutions for the City's problems and not as an additional symptom or symbol of the intractability of those problems.

20

Confidential

DTMI00128750



# Part III – Initial Planning Considerations

Confidential

21

DTMI00128751



# Establish Long-Term
# Goals and Promote Inclusiveness

- Reach Consensus of City Team on Long-Term Goals and Steps to Achieve Them

- Then, Include All Constituents in Planning and Negotiations
  - ➢ Obtain – and Seriously Consider – Input From All Sources
  - ➢ Defuse Political Opposition Through Listening and Documentation
  - ➢ Establish Sub-Teams for Key Issues
  - ➢ Coordinated "Hub-and-Spoke" Approach: Sub-Teams Report to Central Hub
  - ➢ Establish a Strong Record of Inclusiveness and Consideration of All Options

- *The City (both the Office of the Mayor and City Council), the State and the FAB should strive to coordinate their efforts in all respects. Any differences and tensions among these groups can and will be exploited by adversaries.*

22

Confidential

[Speaker Notes For Slide: 22]

Set Long-Term Goals and Build a Strategy of Inclusiveness

A key to a comprehensive restructuring plan will be to reach consensus at the City (in consultation with its advisors, the FAB and the State) on the restructuring steps needed to achieve a durable long-term solution to the City's issues.

Thereafter, as many constituents as possible should be included in planning and negotiations.

Input should be obtained from all sources, documented and treated seriously, even if proposals appear unrealistic. Good listening skills are helpful. This can help defuse political opposition.

Sub-teams can be established by the City and its advisors to address particular issues (labor, pension/benefits, asset sales, redevelopment, capital markets, etc.).

Individual groups can report regularly to central core team of key officials and advisors (i.e., the Hub).

Jones Day often uses this Hub-and spokes approach to manage a complex restructuring efficiently and in a coordinated manner.

Establish a strong record (i.e., for future litigation) of (i) inclusiveness with respect to all constituencies and (ii) consideration of all options and proposals received.

The City (both the Office of the Mayor and City Council), the State and the FAB should strive to coordinate their efforts in all respects. Any differences and tensions among these groups can and will be exploited by adversaries.

23

**Confidential**

DTMI00128753

# Multi-Year Budget: Set Spending Priorities Within Realistic Revenue Projections

- Basis for Any Restructuring Agreements

  ➤ Build on Budget Work to Date

  ➤ Identify All Revenue Sources (Including Future Sources)

  ➤ Strive for Conservative/Achievable Revenue Estimates

  ➤ Incorporate Cost Savings from Outsourcing and Other Initiatives

- *The Budget should include funds needed to assure the proper functioning of the City and appropriate investments to revitalize the City over the long term.*

24

Confidential

DTMI00128754

[Speaker Notes For Slide: 24]

Set spending priorities within realistic revenue projections.

A multi-year budget that includes revenue and expense projections will be the basis for determining amounts available for distribution to creditors – critical to any restructuring agreements in or out of court.

Jones Day understands that substantial work has been done in this area, and that this is a major challenge.

The City must create credibility in the face of an unsettled revenue picture.

All revenue sources should be identified, including future sources (such as monetizing assets or reallocation of state/county revenue).

At the same time, the City should strive for realistic (conservative) revenue projections to assist in planning and build credibility.

Cost savings through additional outsourcing and other initiatives should be incorporated where reasonable (e.g., exploration of regionally-based options/alternatives).

This Budget should include funds needed to assure the proper functioning of the City and appropriate investments to revitalize the City over the long term.

Projected revenues should be targeted to reinvestment where possible, with a mechanism to cover shortfalls as necessary (e.g., business, state or federal partnerships).

25

**Confidential**

DTMI00128755

![JONES DAY]

# Prepare to Defend the Budget

- Defend Spending at Levels Needed to Assure Long–Term Viability

  ➢ Focus on "Who Does Detroit Serve?"
  ➢ Establish Case for Reinvestment
  ➢ Defend Against Calls for Expense Reduction and Monetizing
    Assets to Pay Creditors

- Characterize Detroiters as "Customers "

  ➢ Must Treat Citizens with Respect
  ➢ Attractiveness of City to Residents and Businesses is Key

- Restructuring is About Revitalization, Not Just Creditor
  Recoveries

26

DTMI00128756

[Speaker Notes For Slide: 26]

Prepare to Defend the Budget.

The Budget will have to be defended against creditor criticism that it provides for excessive expenditures in light of the city's financial circumstances.
We are prepared to build this case and address any concerns, including Constitutional or other legal challenges.

Although there is not much law in this area, Jones Day believes that the City can defend a decision to spend revenues at a level necessary to assure that the City functions properly and can attract residents and businesses.
Focus on "Who does Detroit serve?"
The citizens of Michigan benefit from a revitalized Detroit serving as an engine/economic driver for the state economy.
Need to establish a credible case that stability and restoration are key elements of reinvestment in Detroit.
At the same time, need to defend against approaches that focus on expense reduction and monetizing assets to pay creditors.
This will require daily coordinated effort of the City and its advisors, in further collaboration with the State.
We learned this lesson from Orange County – daily collection of information, discussion of core group, documentation of actions taken or considered and communication are key.

City should characterize its residents as "customers," a class of constituents that ordinarily is accorded significant benefits in business reorganizations.

Creditors may attempt to characterize residents as the "owners" or "voters" who should make sacrifices to facilitate payment of creditor claims.
The changes in the population of the City indicates that citizens can "vote with their feet" by leaving. A viable restructuring for a strong and vibrant Detroit must treat its citizens with respect, just as a successful business in the private sector treats its customers.
But also must focus on "absentee" customers to obtain City services without contributing sufficiently to the City.

27

Confidential

# Explore All Avenues to Pay Creditors

- Creditors (and any Bankruptcy Court) Expect Reasonable Efforts to Minimize Shortfalls to Creditors

- Must Explore Long List of Options for Saving or Raising Money

  - ➢ Raising Taxes and Fees
  - ➢ Non-Core Asset Sales
  - ➢ Reducing Expenses

  - ➢ Borrowing Options
  - ➢ Pay-Per-Use Taxation
  - ➢ Regional Solutions

- Any Savings Must Be Consistent with the City's Revitalization Plans

  *A record should be established that all avenues have been explored to minimize the concessions sought from stakeholders, to bolster the notion of shared sacrifice and to support the City's case for debt reduction if a Chapter 9 ultimately is commenced.*

28

Confidential

DTMI00128758

[Speaker Notes For Slide: 28]

Creditors – and ultimately the Bankruptcy Court if a chapter 9 case is filed – will expect that the City exert reasonable efforts to reduce or eliminate any shortfall in amounts available to pay creditors.

Must find the right way to fix the deterioration in the City's balance sheet, including the rate and maturity of debt.
Recent events have driven to too much short term debt (for a municipality).
Must be able to assure both municipal debtholders and legacy creditors that this is not just a process of imposing more undesirable terms.

In practice, the City will be required to develop long lists of options for saving or raising money, evaluate the practicality of each of the options identified and pursue promising approaches.

In past cases, creditors have suggested:
Raising taxes and fees.
Selling assets creditors deemed to be excess or not required.
Reducing expenses.
Borrowing against revenue streams generated by municipal assets.
Borrow surplus amounts in funds administered by the municipality

Revenue enhancement alternatives should be explored, encouraged and defended, even in a chapter 9 setting. For example:
Pay-Per-Use Taxation. Consider implement pay-per-use taxation model as (1) impetus for voluntary compliance with "Core Detroit" infrastructure and service rationalization initiatives and/or (2) means to capture revenue from surrounding suburban communities that have historically expanded as Detroit's city center shrunk.

Regional cooperation/solutions also should be explored.

Any savings ultimately must be consistent with the plans to revitalize Detroit.

A record should be established that all avenues have been explored to minimize the concessions sought from stakeholders, to bolster the notion of shared sacrifice and to support the City's case for debt reduction if a chapter 9 ultimately is commenced.
Even in chapter 9, all pre-bankruptcy efforts should be highlighted to demonstrate the City's good faith efforts to resolve issues.
This also will help drive a model of equitable shared sacrifice of all stakeholders.
Given initiatives underway relating to labor and benefits, it appears that the municipal bondholders, swap participants and monoline insurers likely will be the last contributor and must understand the entire picture of sacrifices obtained over time.

29

**Confidential**

DTMI00128759



# Exploring Creditor Recoveries: Challenges and Lessons Learned

- Raising Taxes: Difficult and Possibly Counterproductive

  ➢ Tax Relief May Be Needed to Promote Investment

- Asset Sales Pose Challenges to Generating Substantial Revenue

  ➢ Sales of Assets to Pay Creditors May Not Promote Revitalization

- Reducing Expenditures Should Not Undermine Restructuring Goals

- Borrowing May Be Limited by Legal Restrictions

*Notwithstanding any challenges, the City will have to demonstrate to interested parties that all of these alternatives, and perhaps others, have been fully and fairly evaluated.*

30

Confidential

13-53846-swr   Doc 8726-3   Filed 12/15/14   Entered 12/15/14 20:46:40   Page 42 of 93
13-53846-swr   Doc 7235-3   Filed 10/16/13   Entered 10/16/13 10:23:09   Page 43 of 93
DTMI00128760

[Speaker Notes For Slide: 30]

In Jones Day's experience:

Raising additional taxes, particularly given the economic hardship in Detroit, may be difficult (if not impossible) and may be counterproductive. In fact, an evaluation of means to increase private investment dollars in Detroit suggest the need for tax relief and incentives.

Efforts by municipalities to sell or monetize asset often pose challenges to generating material value.

Disputes over the use of proceeds can undermine the benefits of an asset sale, while eroding the municipality's asset base.

Notwithstanding the foregoing, there are exceptions and unique and creative structures for asset monetization can and should be explored.

Working with the State to maximize asset revenues and cut costs could be a viable alternative to asset sales.

Regional initiatives also could be explored (joint redevelopment, sharing of services, joint purchasing arrangements).

Note: Asset monetization outside of bankruptcy may implicate eligibility requirement that City be insolvent (e.g., measured by short-term cash).

Troubled municipalities have reduced expenditures repeatedly even before financial difficulties become acute. That is true in Detroit, but additional reductions should be evaluated where feasible without undermining the City's restructuring goals.

Given the recent sacrifices already imposed on employees and legacy creditors, the City should focus prompt attention on municipal debtholders and investors who have in some cases improved their positions.

Borrowing surplus amounts in funds administered by the municipality is complicated by State and/or Federal restrictions encumbering such funds.

Using proceeds of borrowings against revenue streams to pay City obligations is also affected by laws restricting use of the underlying assets and revenue streams.

Notwithstanding any challenges, the City will have to demonstrate to interested parties that all of these alternatives, and perhaps others, have been fully and fairly evaluated.

31

Confidential

DTMI000128761

# Equitable Shared
# Sacrifice Among Creditor Groups

- **Equitable Does Not Mean Equal**
  - ➤ Parties Have Different Rights and Protections (Constitutional, Contractual, Legal)

- **Tension Between Employees/Retirees and Bondholders/Investors**
  - ➤ Employee/Retiree Sacrifices Must Be Sufficient, but Should Not Undermine Ability to Recruit and Retain
  - ➤ Employees and Retirees Already Have Made Sacrifices, While Municipal Debtholders Have Improved Position
  - ➤ Should Look at Entire Restructuring Process: Equality of Sacrifice Cannot Be Measured at a Single Point in Time

- **Legal Uncertainty Regarding Sixth Circuit Treatment of Legacy Claims**

- **Consider Expanding Sacrifices Regionally**

*The City will have to develop a proposal for dealing effectively with the issues of equitable sacrifice.*

32

Confidential

[Speaker Notes For Slide: 32]

Allocation of Sacrifice Among Competing Creditor Groups

In general, under United States bankruptcy law, including chapter 9 of the Bankruptcy Code, amounts available for distribution to creditors must be allocated in an equitable manner. "Equitable" generally means equally unless there are meaningful distinctions among the rights of competing creditors.

Recent chapter 9 cases and out of court negotiations involving troubled municipalities have involved significant disputes about whether or not workforce related claims (including claims for pension and other retiree benefits) should have some form of priority over claims for borrowed money and other commercial claims.

Pension and employee benefit commitments often are included in executory contracts. This reality may also permit some kinds of distinctive treatment from other creditor claims. In that regard, cuts in employee benefits and wages should be reasonably calibrated so that Detroit civil service compensation is market appropriate: cuts should not be so severe that the City cannot attract and retain qualified civil servants.

While legacy creditors are already being asked to make sacrifices, and have done so over the past number of months, municipal debt investors have been improving their positions. Municipal bondholders, swap participants and monoline insurers must be asked to make sacrifices compared to legacy creditors over an extended look back period. Equality of sacrifice cannot fairly be measured at a single point in time.

Tensions between statutes that protect the rights of municipal employees and the ability of municipal debtors to impair collective bargaining agreements have led to differing outcomes in bankruptcy court.

Outside of bankruptcy, Michigan employees enjoy certain constitutional protections for benefits (primarily accrued pension benefits). These protections have analogues in Michigan statutes and Detroit regulations, separate and apart from protections that may be included in CBAs, but are nevertheless considered "contractual" promises. Section 365 of the Bankruptcy Code – which is applicable to Chapter 9 proceedings – would provide Detroit with the ability to evaluate all of its "executory contracts" (including CBAs). Moreover, certain stringent restrictions on the rejection of CBAs otherwise applicable in bankruptcy do not apply in chapter 9. Sections 903 and 904 of the Bankruptcy Code protect the power of a State to control municipalities and prohibit bankruptcy courts from interfering with the governmental power of the debtor. These provisions can be read to limit the ability of bankruptcy courts to disregard state law within chapter 9. Thus, bankruptcy courts presiding over chapter 9 proceedings have reached differing conclusions with respect to the extent to which state laws protecting employees impact a debtor's ability to address CBA or other contractual benefits issues.

    >> For example, in Orange County, certain county employee coalitions successfully prevented the debtor from modifying CBAs in a manner inconsistent with California law in connection with certain seniority rights.

    >> On the other hand, in Vallejo, the bankruptcy court held that the filing of a Chapter 9 petition effectively foreclosed the application of state law in the CBA context. The Stockton court generally seconded Vallejo's approach regarding the primacy of federal law in chapter 9 in upholding the debtor's ability to reduce contractual OPEB benefits.

It is unclear whether bankruptcy courts within the Sixth Circuit – perhaps the most pro-union Circuit in the nation – would adopt the Orange County or the Vallejo/Stockton approach to incorporation of state law into chapter 9 proceedings.

The City also could look to expand sacrifices regionally, particularly in connection with shared services and shared benefits. Pursuing regional sacrifice may generate untested legal issues.

The City will have to develop a proposal for dealing effectively with the issues of equitable sacrifice.

DTMI00128763



# PART IV – COMPONENTS AND CONSIDERATIONS FOR RESTRUCTURING PLAN

34

Confidential

DTMI00128764



# Key Plan Components

- ## Pensions and Benefits

- ## Labor

- ## Municipal Debt

- ## Funds for Reinvestment

35

Confidential

DTMI00128765

# Contrasting Approaches in Recent Chapter 9 Cases



- **Stockton, California**
  - ➤ Continued Pension Contributions to CalPERS as Protected by State Law
  - ➤ Ceased Retiree Health Plan Premiums
  - ➤ Proposed Impairment of Certain Bond Debt, Pensions Unimpaired
  - ➤ Restructuring Opposed by Municipal Bondholders

- **San Bernardino, California**
  - ➤ Ceased Pension Contributions to CalPERS, Seeking Impairment
  - ➤ Restructuring Opposed by CalPERS and Labor, and Supported by Municipal Bondholders

- **Central Falls, Rhode Island**
  - ➤ New State Law Created Lien in Favor of Municipal Debt Service Payments
  - ➤ Bondholders Paid 100%; Pensions/Benefits Sharply Cut
  - ➤ Policy to Favor Investors and Protect Credit Ratings

36

Confidential

13-53846-swr  Doc 8756-3  Filed 12/16/14  Entered 12/16/14 20:46:44  Page 48 of 93
13-53846-swr  Doc 7245-3  Filed 10/16/13  Entered 10/16/13 20:23:09  Page 48 of 93
DTMI00128766

[Speaker Notes For Slide: 36]

Pensions and Benefits in pending California cases

The City of Stockton (population 300,000) and the City of San Bernardino (population 215,000) filed chapter 9 cases within a month of each other in mid-2012.

Like many California municipalities, both cities have very large liabilities in respect of unfunded pension and employee benefit obligations. However, each has a taken a different course of action with respect to those liabilities.

Upon filing for bankruptcy, San Bernardino ceased contributions to the California Public Employee Retirement System (CalPERS) for amounts due in respect of unfunded pension obligations (both pre- and post-bankruptcy filing), and indicated that it intends to impair the claims of CalPERS like any other unsecured claim in the bankruptcy case.

Stockton, on the other hand, has continued making contributions to CalPERS and vowed to leave all CalPERS claims (the largest claims in the case) unimpaired under any plan of adjustment.

Stockton – supported by CalPERS – asserts that its obligations to CalPERS are mandated by state law and cannot be impaired in a chapter 9 case due to the limitations of sections 903 and 904 of the Bankruptcy Code.

Interestingly, Stockton has ceased paying retiree health care premiums related to promised health care benefits. Upon motion by the retirees to seek to force the city to resume such payments, the bankruptcy court issued a lengthy and important opinion touching on many questions of state sovereignty and supremacy of bankruptcy law, ultimately holding that section 904 of the Bankruptcy Code prohibited the court from granting the requested injunction against the city. In re City of Stockton, 478 B.R. 8 (Bankr. E.D. Cal. 2012). The effect of the court's opinion was to leave the retirees without a remedy, except for negotiating their treatment under the chapter 9 plan of adjustment.

The Stockton and San Bernardino cases are proceeding along parallel but opposite tracks.

In San Bernardino, due to the city's cessation of contributions to CalPERS, both CalPERS and labor groups have objected to the city's chapter 9 petition and argued, among other things, that the city will be incapable of confirming a plan of adjustment that impairs the CalPERS claims. Bondholders and bond insurers have responded in support of the city and in opposition to the CalPERS and labor objections.

In Stockton, due to the city's statement that it will not seek to impair CalPERS (and instead will seek only to impair bondholders and other unsecured creditors), it is the bondholders and bond insurers who have objected to the city's chapter 9 petition, arguing among other things that the city will be unable to confirm a chapter 9 plan of adjustment that does not impair the CalPERS claim. CalPERS has responded in support of the city and in opposition to the bondholders and bond insurers.

The cases will likely produce one or more decisions that touch upon the role and efficacy of state pension and labor law in a chapter 9 case and, when appeals ensue, ultimately may produce circuit-level authority regarding whether or not federal bankruptcy law governs in this context.

~ ~ ~

In Rhode Island, a municipality effectively accorded priority to borrowed money creditors.

Central Falls, Rhode Island filed for chapter 9 protection in August 2011, suffering from structural budget deficits and burdensome/unpayable pension and retiree benefit obligations.

DTMI00128767

# Legacy Creditors – Pensions and OPEB

- **Unfunded OPEB and Pension Liabilities Pose Challenges**

  ➢ Unfunded OPEB Liabilities Pose the Greater Challenge

- **Pensions Have Substantial Underfunding, but Also Significant Plan Assets**

  ➢ OPEB is Much Larger and Unfunded
  ➢ Health Premiums Exceed Debt Service on General Obligations

- **Equitable Restructuring of Legacy Obligations Possible**

  ➢ Fewer Legal Protections for OPEB Than Pensions
  ➢ Pensions Constitutionally Protected, but Reasonable Changes Possible

- *Formulation of Unified Labor Negotiation Strategy Critical to Success*

JONES DAY

38

Confidential

DTMI00128768

[Speaker Notes For Slide: 38]

Legacy Creditors (Pensions and OPEB)

Detroit has significant OPEB liabilities and unfunded pension liabilities reported as approximately $5.7 billion and $643 million, respectively).
Recent work by Milliman suggests that unfunded pension liabilities are substantially greater than $643 million and may exceed $2 billion.

Given the magnitude of these liabilities, sound and long-term restructuring of Detroit's obligations will require sacrifice across the board from legacy creditors.

As between pension and retiree health (OPEB), OPEB poses the greater liability challenge. Pensions have substantial underfunding, but also significant plan assets; by contrast, there is no funding of OPEB and it is a significant cash drain. The City's annual health premiums far exceed principal and interest payments on general obligations.

Tools are available for an equitable restructuring.
OPEB has less legal protections under state law than pensions, providing a greater ability to cut and equitably restructure.
Pensions have certain state constitutional protections, but reasonable pension changes may be made that avoid the legal strategy of having to argue that federal bankruptcy law under chapter 9 overrides state constitutional protections.

Formulating a unified labor negotiation strategy will be critical to success. The benefit structure should be holistically analyzed to determine what changes are appropriate and necessary and can be rationally justified by other retained benefits.

39

Confidential

DTMI00128769

# Potential Pension Reform Initiatives



- Jones Day Has Significant Public and Private Pension Experience

  ⋏ We Know, Respect and Are Prepared to Work with the City's Other Advisors on Benefit Issues

  ⋏ Plan Must Be Developed Collaboratively Between City and Its Advisors

- A Framework for Pension Reform Could Include the Following Elements:

  ⋏ Require All New Employees to Participate in DCPs, Rather than DBPs

  ⋏ Prospectively Eliminate COLAs for active members

  ⋏ Raise Retirement Ages, Reduce Early Retirement Subsidies

  ⋏ Consider Changes to Secondary/Ancillary Features of DBPs

- *We believe that existing basic pension formulas can be preserved for current active members while saving significant sums for Detroit*

40

Confidential

13-53846-tjr  Doc 8756-4  Filed 12/15/14  Entered 12/15/14 20:40:49  Page 52 of 92
13-53846-swr  Doc 1545-4  Filed 10/18/13  Entered 10/18/13 00:23:09  Page 52 of 92
DTMI00128770

[Speaker Notes For Slide: 40]

Potential Pension Reform Initiatives.

We understand that the City has engaged other pension and benefit experts on these issues.
We know, regularly work with and respect the City's other advisors and would look forward to working with them to refine the recommendations to fit within a restructuring or chapter 9 strategy.
We have significant public pension experience, and well know the differences between federally-regulated private sector arrangements and public plans.

We have begun the process of evaluating the pension issues facing the City. Any plan would need to developed based on the collaborative work of the City and its advisors after further review. Based on what we know, and our experience in other matters, we believe a framework for pension could include the following elements:
Require all new employees to participate in defined contribution plans, rather than defined benefits plans.
Prospectively eliminate COLAs for all active members.
Raise retirement ages for certain employees, reduce early retirement subsidies.
Additional changes to secondary and ancillary features of defined benefit pension arrangements.

Proposed changes could allow most existing basic pension formulas to be preserved for current active members while saving significant sums for the City. But legislative action – e.g., amendment to the City Charter and Ordinances – may be necessary to achieve certain of these changes.
If needed, chapter 9 could be used as a means to further cut back or compromise "accrued financial benefits" otherwise protected under the Michigan Constitution.

41

Confidential

DTMI00128771

# Potential OPEB Reform Initiatives

- Evaluate Benefits of De-linking Retiree Health Plan from Active Employee Health Plan Design and Contribution Structure

- Design of a New Replacement OPEB Plan Could Include the Following:
  - Increase Retirement Age
  - Transition Younger Retirees to State-Based Exchanges and Federal Subsidies under Affordable Care Act
  - Increase Use of the Medicare Programs – Part A, Part B, and Part D
  - Impose Reasonable Retiree Premiums (For Existing Retirees, Link to COLAs)
  - Audit Records to Cut Off Funding to Unqualified Dependants
  - Consider Defined Contribution Model for Future Retirees

- Consider Funding of OPEB through Tax-Exempt Trust

- Evaluate Required Scope of Coverages under City Code

- Be Prepared for Argument that Adverse 6th Circuit Law Applies
  - 6th Circuit Adverse Cases Involve Private Sector Plans, but Unions Likely Will Argue They Are Applicable Here

42

Confidential

DTMI00128772

[Speaker Notes For Slide: 42]

Potential OPEB Reform Initiatives.

We have begun the process of evaluating the OPEB issues facing the City. Any plan needs to address both the long-term OPEB liability, and the significant annual cost for coverage. This would need to be developed based on the collaborative work of the City and its advisors after further review. Based on what we know, and our experience in other matters, we believe a framework for OPEB obligations could include some or all of the following elements:

The City Should Evaluate "De-Linking" of Benefits Under Retiree Health Plans from Plan Design and Contribution Structure for Active Employees.
Linking OPEB benefits to plan for active employees generates large inefficiencies and costs. It will be more difficult to address the $5.7 billion underfunding of OPEB benefits without severing this link.

Design New Replacement OPEB Plan
Retiree healthcare currently is provided to many younger individuals who are not objectively recognized as retirees. Modifications could increase retirement age to cover only "true" retirees (as opposed to persons in their 40s), to decrease costs and transition younger retirees to state-based exchanges (based on residence) and available federal subsidies under Affordable Care Act.
Better use of the Medicare programs – Part A, Part B, and Part D (drug benefits) to provide the fundamental coverage to true retirees.
Impose reasonable retiree premiums; link retiree premiums to pension COLAs.
Audit records to cut off funding of benefits to ineligible dependents.
Consider defined contribution model for retirees.

Also Consider Funding of OPEB through a Tax Exempt Trust
Available in the non-ERISA, governmental plan setting based on existing IRS guidance (e.g., Private Letter Ruling 201136007; September 9, 2011).
Provides more flexibility than a VEBA, but still need cash or other assets to fund such a trust, so this may not be a viable approach.

Language in the Detroit City Code establishing the OPEB obligations may allow argument that the scope of currently offered coverages is not required.

Also, unlike accrued pension benefits, OPEB obligations are not constitutionally protected.

Must be aware, and wary, of Sixth Circuit law that is favorable to unions/retirees and adverse to actions the City may wish to take.
Much of the most concerning Sixth Circuit law is predicated on federal ERISA and the Labor Management Relations Act (relating to private sector plans), which are inapplicable to municipal plans.
But we should anticipate an argument that this reasoning should be applied as a matter of state law to municipal plans, and the City should be prepared for that.

Chapter 9 could be used, or threatened, as a means to accomplish a compromise of benefit costs (rejecting contracts or compromising claims).

43

Confidential



# Labor Issues

- Renegotiation of CBAs Must Focus on Economic Stability

- Immediately Conduct Supporting Financial Analysis

  ➤ Establish Necessary Savings

  ➤ Demonstrate Fair Allocation Between Personnel and Non-Personnel Costs

- Demonstrate a Commitment to the Unions That They Are Partners

  ➤ Demonstrate That Near-Term Sacrifices Provide Long-Term Benefits

- Formulate Easy-to-Understand Messages for Membership/Public

- Consider Need to Amend City Charter and Code, or other Legislative Action, for Pension/OPEB Changes

44

Confidential

DTMI00128774

[Speaker Notes For Slide: 44]

Labor

Renegotiating collective bargaining agreements to terms that provide economic sustainability will be key to the City's recovery.

Financial analysis must be conducted at the outset – and must be unimpeachable – to show the savings needed and how those necessary savings are being allocated between personnel vs. non-personnel related costs.

Will need to demonstrate a commitment to unions that they are partners in this process and the near term sacrifices will provide longer term benefits to their members (preservation of jobs – a return to financial health for Detroit).

In addition to conveying these economic needs at the bargaining table, we must be prepared to provide simple, easy to understand messaging to the membership and the public.

City charter and ordinances governing pensions may provide an additional hurdle that will need to be overcome via legislative amendment. Renegotiating collective bargaining agreements will not automatically supersede ordinances and charter. There appears to be somewhat more flexibility on the retiree medical expenses, but here too there may be a need for legislative action.

45

**Confidential**

DTMI00128775

# Municipal Debt – Overview of Approach

- Viable Threat of Chapter 9 is Critical

  - Only Chapter 9 Allows Non-Consensual Impairment of Municipal Debt

- Fair Sacrifice Needed from Municipal Debtholders

  - Employees/Retirees Already Sacrificed (and May Again)
  - Investors Accepted City's Credit and Were Compensated for Risk
  - Investors Have Adjusted Credit Terms to Their Benefit as City's Finances Worsened

- City Should Make Clear That It is Not Prepared to Dedicate Scarce Resources to Prefer Debtholders over Residents, Businesses and Revenue-Driving Activities

- Refinanceable Bond Debt Presents a Unique Opportunity

  - Potential for Advantageous Fixed Rates Over an Extended Term

46

Confidential

DTMI00128776

[Speaker Notes For Slide: 46]

Municipal Debt  [Emphasize Jones Day's significant expertise/experience with respect to municipal finance, a core competency that may separate Jones Day from other firms.]

Chapter 9 is only real mechanism to impair significant debt without consent, so the viable threat of chapter 9 is critical especially to deal with municipal debtholders.  This creates real leverage.

Sacrifice by municipal debtholders is important, especially since employees and retirees have already made real personal sacrifices, and may be asked for more.

Providers and investors in funded debt accepted the City's credit and were compensated for the risk.

We are prepared to deal with these parties as creditors of the City in transparent and fair manner.

It should be made clear that the City is not prepared to dedicate scarce resources to prefer debtholders over residents, businesses and revenue driving activities.

Any effort of General Obligation creditors to obtain the collateral protections of special revenue bonds should be approached with caution.

Different types of debt receive different treatment in municipal bankruptcy cases.

General obligation bonds are treated as general debt in chapter 9.  A municipality is not required to make payments of either principal or interest on account of such bonds during the case.

Certain restrictions on how debt may be readjusted in traditional bankruptcy proceedings do not apply in chapter 9.  Thus, Detroit would be able to impose favorable terms upon general obligation bonds (e.g., the imposition of non market interest; drastically extended repayment terms; delays in cash payments) pursuant to a Plan of Adjustment, the only caveat being that such terms are consistent with State law.

Chapter 9, however, provides certain protections to creditors holding liens upon special project revenues.  This may be of particular importance to Detroit, given the scope of its special project debt (e.g., bonds issued in connection with the construction/overhaul of water and sewer plants, collateralized with the revenues and fees earned by such projects).

Specifically, the "special revenues" from these projects remain subject to the liens of the bondholders in the specific projects and those revenues (1) must be used to fund the "necessary operating expenses" of the special project or to pay back bondholders and (2) may not be diverted to support the general obligations of the municipality. Defining what constitutes the "necessary operating expenses" of a given special project has been the subject of litigation in other chapter 9 cases (most recently, Jefferson County); courts appear inclined to interpret the phrase narrowly.  The Jefferson County case is for review by the Eleventh Circuit.

With a credible threat of chapter 9, the City has leverage:

Cramdown in chapter 9 is possible if there is one accepting impaired class, meaning that a non-accepting class of debtholders could be bound by the Plan of Adjustment to compromise their debt.

Amortizations of debt suggest that municipal debt holders have been adjusting their credit terms to their benefit as the City's finances have worsened.  This supports a greater sacrifice at this point by debtholders.

This also appears to a readily re-financeable structure, and there is a unique opportunity to obtain advantageous fixed rates for an extended period if the negotiations are conducted properly.

47

Confidential

DTMI00128777



# Municipal Debt – Other Issues

- Carefully Evaluate POC Debt and Related Swaps
  - ⋏ Unique Structure Could Raise Restructuring Issues

- Swap Termination Issues
  - ⋏ Termination Rights Generally Protected in Bankruptcy
  - ⋏ Recent Grant of Collateral Still Can Be Evaluated for Fraudulent Transfer
  - ⋏ Consider Other Market Transactions to Address Swaps

- Engage Monoline Insurers Promptly with Coordinated Message

- Coordinate Funding Solutions with State
  - ⋏ State Likely Instrumental in Financing, Revenue-Generating and Cost-Cutting Transactions
  - ⋏ Several Recent Examples
  - ⋏ Consider Eligibility Ramifications

- Should Pursue Achieving Some Excess Debt Capacity, Flexibility

48

Confidential

DTMI00128778

[Speaker Notes For Slide: 48]

Treatment of POC debt and related swaps should be carefully evaluated because the unique structure could raise issues in a restructuring.

Swap counterparties may assert termination rights and must be addressed promptly.
Can build on negotiations that have been ongoing.
Termination rights not impacted by bankruptcy do to safe harbors, but treatment of claims may remain an issue.
Notwithstanding safe harbors, recent granting of collateral on swap debt could be avoidable if there was fraud. LIBOR rate cases may be relevant.
City should consider addressing swaps through market transactions.

For substantial insured debt, the credit insurers will have to be engaged in a meaningful way at the outset.
Jones Day is experienced dealing with monoline insurers with the economic interest relating to insured debt.
Monolines are involved in both bond and POC debt.

Funding solutions should be coordinated with the State, which is expected to be an instrumental party in any new financing transaction or other revenue generating or cost cutting transactions (e.g. Belle Isle lease, regional transportation authority, funding to support Detroit Downtown Development Authority and possible new arena and commercial developments).
Again, receipt of State funding out-of-court may implicate eligibility concerns.

Debt negotiations should account for need for some excess debt capacity to cover potential shortfalls, provide flexibility and, if needed, fund any legacy debt solutions.

49

Confidential

DTMI00128779



# PART V –
# ADDITIONAL PROCESS POINTS

50

Confidential

DTMI00128780



# Pay Careful Attention to Political Implications of Restructuring

- All Decisions and Actions Will Have Political Implications and Consequences

- Political Implications of Proposals Should Be Identified and Vetted as Early as Possible

- Ensure that All Statements Are Consistent with Overall Communications Plan

*The Jones Day team has extensive experience in cases of national significance and understands this imperative.*

51

Confidential

[Speaker Notes For Slide: 51]

Every decision and action taken by the City in responding to its financial crises will have political implications and, potentially, political consequences.

Political aspects of all proposed actions have to be identified and vetted as early as possible.

Every statement (including any court filings or arguments in court) must be consistent with an overall communications plan.

Statements made in collective bargaining must be carefully considered. Prospect of negotiation positions and statements being leaked to media outlets is significant.

Must be strong sensitivity to public relations campaigns by various constituencies.

The Jones Day team has extensive experience in cases of national significance and interest and understands these imperatives.

52

Confidential

DTMI00128782

# Understand and Anticipate Positions of Creditors



- Employees/Retirees Will Argue:
  - ➢ Obligations Cannot Be Modified as a Matter of Law
  - ➢ Modifications Make City Less Attractive to Qualified Job Candidates
  - ➢ Continuing Contractual Relationship Should Be Preferred over Debt

- Debtholders/Monoline Insurers Will Argue:
  - ➢ Repayment of Debt Essential to Continuing Access to Credit Markets
  - ➢ State Has a Moral/Practical Obligation to Ensure Repayment
  - ➢ Defer – and Provide Security for – Obligations Instead of Impairment

- City Responses Must Be Reasoned and Consistent

- Concessions Will Not Be Made to Give Any Group an Unfair Advantage

- Critically, New Revenues Must Be Preserved for Reinvestment
  - ➢ New Funders Cannot Be Compelled to Accede to Creditor Demands
  - ➢ Earmark New Money for Legally/Politically Sound Revitalization Activities

53

Confidential

DTMI00128783

[Speaker Notes For Slide: 53]

Anticipated Positions of Creditors:

Municipal employees and their representatives will contend:
Obligations to them cannot be modified as a matter of law.
Obligations to employees should not be modified because the City has to be able to attract job candidates and cannot fall behind pay and benefit packages provided by either nearby municipalities or other unionized businesses.
Obligations to employees do not have to be impaired to the same extent as borrowed money creditors because their claims are connected to contracts that have to continue in effect.

Debt holders and insurers will contend:
Repayment of borrowed money claims is essential to access to financing markets going forward. This argument is used to justify extreme budget austerity and asset sales, whether or not beneficial on a long term basis.
The State of Michigan has a moral or practical obligation to ensure repayment of City debt. This argument is used to attempt to convince the State to contribute State resources to the satisfaction of City debt and to induce the State to pressure the City to make choices favoring debt repayment over other priorities.
Deferral of obligations, even if ability to pay in the future is uncertain or questionable, is a preferred approach to deal with inability to satisfy obligations. Usually this approach is coupled with demands for security that will improve the position of borrowed money creditors in any subsequent debt restructuring.

The City must be prepared to respond to these competing points of view in a reasoned and consistent manner.

Concessions should not be made to one group – such as debtholders – to give them an unfair advantage.

Most critically, as the City gains access to new revenues, it must develop an approach that preserves those revenues for reinvestment in the City and not just to pay off preexisting debts.
As seen in the Chrysler case, new funders or buyers cannot be compelled to accede to creditor demands.
New money may be earmarked for revitalization activities as long as the transaction is legally and politically sound.

54

Confidential

DTMI00128784



# Plan of Adjustment Issues

- Enabling Legislation May Be Necessary

  ➢ E.g., Authorization of Financing Techniques
  ➢ Identify and Draft Necessary Legislation Early to Avoid Delays

- Best Interests Test

  ➢ Demonstrate Reasonable Efforts to Satisfy Debts to the Extent Possible

- Cram Down:  Impose Terms of Plan on Dissenting Creditor Classes

  ➢ A Municipality Must Raise Taxes to the Extent Possible Without Triggering a "Death Spiral"
  ➢ Expert Testimony on Tax Burdens May Be Needed

*It is crucial to focus on the plan approval standards throughout the debt adjustment process in case a Chapter 9 case is required.*

55

Confidential

13-53846-swr   Doc 8756-34   Filed 12/16/14   Entered 12/16/14 20:46:44   Page 67 of 92
13-53846-swr   Doc 7256-1   Filed 10/16/13   Entered 10/16/13 20:23:09   Page 67 of 92
DTMI00128785

[Speaker Notes For Slide: 55]

Plan of Adjustment

The goal of a chapter 9 filing for Detroit would be to emerge with a successful "Plan of Adjustment," in which the City's debts are reduced and/or restructured in a manner that is feasible given its budget and consistent with its long term revitalization strategy

The Plan of Adjustment is a document that would establish the treatment of the various classes of creditors' claims against Detroit.

Enabling Legislation May Be Necessary

Often, transactions contemplated by or specified in a Plan of Adjustment must be also authorized by legislation.

Examples of such legislation include authorization of financing techniques.

Needed legislation should be identified and drafted as early in the process as possible to avoid delays as bills move their way through the legislature.

Key Confirmation Standards

Best Interests Test

Applicable to all creditors, whether or not the creditor is in a class that has accepted the plan.

As generally applied, requires a troubled municipality to make reasonable efforts under all the circumstances to satisfy its debts to the greatest extent possible. The strategy outlined above should help us support this finding.

Cram Down

Confirmation of a non-consensual plan is possible under chapter 9.

Senior classes must be paid before more junior classes can receive any distribution.

Applied to municipalities with unlimited taxing power, a municipality must use its ability to raise taxes the extent possible without triggering a "death spiral" that would ultimately destroy the municipality.

Traditionally, this question has been determined based upon expert testimony.

Tax burdens in other comparable municipalities should be important as well.

It is crucial to focus on these standards through the debt adjustment process and continuing to build the case that if necessary, the City can confirm a Plan of Adjustment that does not provide for payment in full of all indebtedness.

DTMI00128786

# Any Chapter 9 Process Should Be Comprehensive

- Plans of Adjustment Address Narrow Range of Economic Compromises

- Other Fundamental Changes Must Occur Outside the Plan Context

- Any Chapter 9 Process Should Pursue as Many Revitalization Initiatives as Possible

- Negotiating in Chapter 9 – or Its Shadow – Is a Powerful Tool for Revitalization

- The City Should Take Advantage of Its Opportunity for Long-Term, Comprehensive Solutions

JONES DAY

57

Confidential

DTMI00128787

[Speaker Notes For Slide: 57]

Any Chapter 9 Process Should Be Comprehensive

A chapter 9 Plan of Adjustment can only accomplish a narrow band of economic compromises.

This type of debt restructuring is critical, but other fundamental changes of great importance can only occur outside of the Plan of Adjustment.

If a chapter 9 case is commenced, the City should use the process to address as many additional items as possible, not just the core debt readjustment issues in a Plan of Adjustment.

Negotiating in the chapter 9 environment – or even in the shadow of chapter 9 – is a powerful tool to pursue the City's revitalization agenda.

58

**Confidential**

DTMI00128788



# Key Restructuring Lessons

- **Develop Comprehensive Plan, Supported by Defensible Budget and Assumptions**

- **Develop Out-of-Court Approach That Translates to Chapter 9**

- **Set Clear Positions Early**

- **Be Inclusive and Communicate**

- **Pursue Shared Sacrifice Without Compromising Long-Term Revitalization Goals**

59

Confidential

DTMI00128789

[Speaker Notes For Slide: 59]

Key Restructuring Lessons

Develop comprehensive plan, supported by defensible budget and assumptions.

Develop out-of-court approach that will work if needed in chapter 9.

Set positions early.

Be inclusive and communicate.

Pursue shared sacrifice without compromising long-term revitalization goals.

60

**Confidential**

DTMI00128790



# PART VI – OTHER ISSUES

Confidential

61

DTMI00128791

# Select Asset Monetization Issues

- Evaluate Impact of Any Asset Sale on Chapter 9 Eligibility

- Water and Sewer
  - Various Legal and Practical Challenges Facing Monetization of DWSD Assets
  - Regional Stakeholders Will Seek Input
  - Consider Collaboration with EPA and Regional Partners to Develop Creative Solutions

- Lease/Operating Agreements
  - Could Evaluate for Airport or Other Assets
  - Recent Collaborations with State Could Be a Model

- Airport Privatization Under FAA Pilot Program

62

Confidential

DTMI00128792

Asset Sale/Privatization/Monetization Issues (Select Issues)
Concerns regarding eligibility for Chapter 9 may be implicated by asset monetization.
Any transaction should be reviewed and structured to address any eligibility issues (e.g., earmarking of funds).

Water and Sewer
Detroit Water and Sewer Department services much of southeast Michigan (Wayne, Oakland, Macomb counties).
Much of the DWSD's infrastructure is owned and operated by these surrounding counties (and the communities located therein), complicating efforts at restructuring.
DWSD services nearly 100 "first-tier" and "second-tier" customers (e.g., from the surrounding counties), all of whom would seek input with respect to restructuring.

Monetization of assets could be challenging.
The Detroit City Charter prohibits the sale of "any city-owned public utility furnishing water and sewerage services, unless approved by a majority of city voters voting on the question at a regular or special election."
Statutes/codes/caselaw may require that funds received from disposition be allocated (e.g., to pension/OPEB liabilities) in a fashion that frustrates ability to allocate funds towards restructuring initiatives.
Monetization of assets may trigger consequences under existing debt and derivative documents.
Open question whether limited universe of "purchasers" could assume liabilities.
An emergency manager, a chapter 9 proceeding or changes to law could be required to overcome obstacles.

Consider different rate structures, regional authority.

EPA litigation complicates the circumstances.

Possibly could explore with EPA and other recipients of services how to make this self-sustaining and profitable.

Negotiating in the shadow of bankruptcy could provide useful leverage for creative solutions.

Combination Lease/Operating Agreement
Could be used for airport or other assets.
The proposed Belle Isle lease may be a model for this kind of transaction.
With respect to the Coleman Young airport, for example, Detroit could evaluate entering into an arrangement combining a lease of airport property with an airfield operating agreement, with the end result being similar to the transfer of possession and operating responsibility to a private operator while falling short of a full lease of the airport.
Under this model, Detroit would remain responsible for major operating and development decisions, but the burden of operating the airport on a daily basis would be alleviated.
Might be more attractive to airport than FAA pilot program to sell asset that we can discuss (comes with various conditions).

Airport Privatization Under FAA Pilot Program [De-emphasize in light of potential unavailability of program]
Privatization of Detroit airports historically impeded by federal aviation law preventing cities from retaining the proceeds of an airport sale or transfer.
A recent FAA pilot program – adopted by Congress in 1996 – for the privatization of airports, however, may allow Detroit to privatize an airport freed from federal restrictions on the use of proceeds.
Program recently used to sell Midway Airport, with cash value going to the City of Chicago
Under the program, the FAA is authorized to exempt up to ten airports from the relevant federal statutory and regulatory requirements (i.e., to repay Federal grants; return

DTMI00128793



# Prepare for Legal Challenges

- In a Chapter 9 Setting, Legal Challenges of Various Actions Are Inevitable

  - Jones Day Is Well Positioned to Address These Challenges
  - Substantial 6th Circuit Experience
  - Knows How to Expedite Review

- Various Challenges to PA 436/Emergency Manager Authority Possible

  - Challenges at Ballot Box: Renewed Referendum Process
  - Other Legal Challenges in Court
  - Challenges Could Cause Delay, Threaten Progress
  - Jones Day Can Work With the City's Current Advisors to Address Efficiently

64

Confidential

DTMI00128794

[Speaker Notes For Slide: 64]

Prepare for Legal Challenges

If a chapter 9 case is commenced, it is anticipated that parties will to raise numerous legal challenges to the City's efforts. Jones Day is well prepared and positioned to address these challenges.
We have substantial 6th Circuit experience.
Also know how to expedite proceedings.

The City also should be prepared to address expected challenges to PA 436 and the Authority of any Emergency Manager. These challenges could delay restructuring initiatives or threaten to overturn progress made under these authorities.

Challenges could include:
Challenges at Ballot Box. Critics of PA 436 have already indicated that legal challenges to the law will be forthcoming. Stand Up for Democracy (which led the effort to reject PA 4) has suggested that it will begin a similar referendum process with respect to PA 436 (although appropriation component of PA 436 may insulate it).
Legal Challenges. Critics of PA 436 are likely to challenge the statute on grounds that the powers over contracts granted to emergency managers (including the power to reject, modify or terminate CBAs) violate the Contracts Clause of the U.S. Constitution.
Further challenges could include (1) whether PA 436 can be insulated from the referendum process through inclusion of a minor appropriation, (2) whether the law properly grants unelected emergency managers the power to displace elected officials/disenfranchise the electorate and (3) whether PA 436 was properly enacted in light of the voter rejection of PA 4 (which has been characterized by some as "substantially similar").

65

Confidential



# EPA Litigation Issues

- **Restructuring Strategy Must Account for EPA Litigation and Rulings of Judge Cox**

- **Consider Approaches to Consolidate Issues with the Rest of the Restructuring Process**

- **Consider How EPA Litigation Could Impede or Assist Detroit in Chapter 9**

66

Confidential

DTMI00128796

[Speaker Notes For Slide: 66]

Other EPA Litigation Issues

Need to coordinate strategy with relevant aspects of EPA litigation, including rulings regarding CBAs and bargaining

Consider approaches to consolidate these discrete issue with the rest of the restructuring process.

Consider how EPA case could impede or be used to assist in any chapter 9 case.

67

Confidential

DTMI00128797



# PART VII – CONCLUSION

68

Confidential

13-53846-swr   Doc 7246-31   Filed 12/15/14   Entered 12/15/14 10:46:34   Page 80 of 92
13-53846-swr   Doc 1234-3   Filed 10/16/13   Entered 10/16/13 00:23:09   Page 80 of 92

DTMI00128798

# Jones Day Is the Right Choice for Detroit

- We are committed to this project, which we view as a matter of particular importance given our Midwestern, industrial roots

- We are committed to working with the City and its advisors and stakeholders to find and pursue real solutions that will revitalize the City of Detroit

- We have a wealth of experience, expertise, creativity and energy throughout our firm

- We are here to help, as part of the team, in whatever way we can

JONES DAY®

69

Confidential

[Speaker Notes For Slide: 69]

Jones Day Is the Right Choice for Detroit:

We are committed to this project, which we view as a matter of particular importance given our Midwestern, industrial roots.

We are committed to working with the City and its advisors and stakeholders to find and pursue real solutions that will revitalize the City of Detroit.

We have a wealth of experience, expertise, creativity and energy throughout our firm.

We are here to help, as part of the team, in whatever way we can.

70

**Confidential**

DTMI00128800



# Annex A:

## The Rest of the Jones Day Team

71

Confidential

# The Jones Day Team



**Jeffrey Ellman**
**Restructuring**

**Evan Miller**
**Employee Benefits**

**Sarah Heck Griffin**
**Public Pensions**

**David Kates**
**Public Finance**



**Brian Sedlak**
**Public Projects**
**& Infrastructure**



**Peter Clarke**
**Public Projects**
**& Infrastructure**



**Rebecca MacPherson**
**Public Projects**
**& Infrastructure**



**Naveen Rao**
**Public Projects**
**& Infrastructure**

JONES DAY®

72

13-53846-swr   Doc 7256-1   Filed 12/15/14   Entered 12/15/14 10:46:40   Page 85 of 93
13-53846-swr   Doc 7256-1   Filed 12/15/14   Entered 12/15/14 10:23:09   Page 85 of 93
DTMI00128802

# The Jones Day Team



**Lawrence DiNardo**
Labor



**Wesley Johnson, Jr.**
Mergers & Acquisitions



**Beth Heifetz**
Issues & Appeals



**Robert Louis Ford**
Labor



**Yvette McGee Brown**
Litigation



**Jayant Tambe**
Litigation



**Richard Deane**
Litigation



**Chad Readler**
Litigation

JONES DAY

73

Confidential

13-53846-swr   Doc 8726-3   Filed 12/16/13   Entered 12/16/13 20:46:34   Page 85 of 93
13-53846-swr   Doc 7256-1   Filed 10/16/13   Entered 10/16/13 20:23:09   Page 85 of 93
DTMI00128803



# Annex B:
# Certain References

Confidential

74



# References

The Honorable John E. Ryan (Retired)
United States Bankruptcy Court for the Central District of California
760-522-6016

Thomas W. Hayes
Former Treasurer and Director of Finance, State of California
916-806-6200

Chris Varelas
Founding Partner, Riverwood Capital
650-618-7377

75

Confidential

# Exhibit D

13-53846-tjt Doc 8752-3 Filed 12/15/14 Entered 12/15/14 21:46:44 Page 88 of 92
13-53846-swr Doc 1245-5 Filed 10/18/13 Entered 10/18/13 00:23:09 Page 1 of 3

**In the Matter Of:**

CITY OF DETROIT, MICHIGAN

Case No. 13-53846

---

**CHARLES M. MOORE**

*September 18, 2013*

---



ESQUIRE
S O L U T I O N S

800.211.DEPO (3376)
EsquireSolutions.com

1        IN THE UNITED STATES BANKRUPTCY COURT

2            EASTERN DISTRICT OF MICHIGAN

3               SOUTHERN DIVISION

4

5   In re                        Chapter 9

6   CITY OF DETROIT, MICHIGAN,    Case No. 13-53846

7            Debtor.             Hon. Steven W. Rhodes

8   _____/

9

10  DEPONENT:   CHARLES M. MOORE

11  DATE:       Wednesday, September 18, 2013

12  TIME:       10:02 a.m.

13  LOCATION:   MILLER CANFIELD PADDOCK & STONE PLC

14              150 West Jefferson, Suite 2500

15              Detroit, Michigan

16  REPORTER:   Jeanette M. Fallon, CRR/RMR/CSR-3267

17

18

19

20

21

22

23

24

25


800.211.DEPO (3376)
EsquireSolutions.com

13-53846-tjt Doc 8275-3 Filed 12/15/14 Entered 12/15/14 21:46:44 Page 90 of 92
13-53846-swr Doc 1243-5 Filed 10/18/13 Entered 10/18/13 00:23:09 Page 3 of 3

```
 1        would be -- that in the City's view must occur;
 2        correct?
 3   A.   Correct.
 4   Q.   Has there been a specification of those level of cuts
 5        that the City contends must occur?
 6              MR. MILLER:  Object to form.
 7   Q.   I mean, have you put a dollar amount on it?
 8   A.   No, and our analysis of this continues.  Right now we
 9        still don't know what assets could be available to put
10        towards the pensions.  We still have not had the type
11        of dialogue that we would like to have related to the
12        calculation of the unfunded amount, so because of
13        those two uncertainties among others we don't know
14        what cuts, if any, there may need to be.
15   Q.   Well, doesn't it say there must be significant cuts?
16        Am I -- are you saying that there's some -- that the
17        City's position may be that there are no cuts that are
18        necessary in accrued vested pension amounts?
19              MR. MILLER:  Object to form.
20   A.   We don't know.  That's where we want to continue to
21        engage in discussions and negotiations with the
22        parties, but depending on what the unfunded amount is
23        and what assets may be available for those claims, it
24        certainly is possible.
25   Q.   So maybe that should have been worded there may be
```



13-53846-tjt  Doc 7558-5  Filed 12/05/14  Entered 12/05/14 21:06:24  Page 91 of 92
13-53846-swr  Doc 1248-5  Filed 10/18/13  Entered 10/18/13 00:23:09  Page 91 of 93

1    State of Michigan)

2    County of Genesee)

3                    Certificate of Notary Public

4        I certify that this transcript is a complete, true and

5    correct record of the testimony of the witness held in this

6    case.

7        I also certify that prior to taking this deposition,

8    the witness was duly sworn or affirmed to tell the truth.

9        I further certify that I am not a relative or an

10   employee of or an attorney for a party; and that I am not

11   financially interested, directly or indirectly, in the

12   matter.

13                   WITNESS my hand this 20th day of September,

14   2013.

15

16

17

18            Jeanette M. Fallon, CRR/RMR/CLR/CSR-3267

19            Certified Realtime Reporter

20            Registered Merit Reporter

21            Certified LiveNote Reporter

22            Certified Shorthand Reporter

23            Notary Public, Genesee, Michigan

24            Acting in Oakland County, Michigan

25            My Commission Expires:  9-19-18



800.211.DEPO (3376)
EsquireSolutions.com