UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---------------------------------------------------------------x
                              :

In re                      : Chapter 9

                              :

CITY OF DETROIT, MICHIGAN,      : Case No. 13-53846

                              :

               Debtor.       : Hon. Steven W. Rhodes

                              :

                              :
---------------------------------------------------------------x

**FINANCIAL GUARANTY INSURANCE COMPANY'S MOTION
IN LIMINE TO PRECLUDE THE INTRODUCTION OF EVIDENCE
OR TESTIMONY REGARDING CERTAIN MATTERS PREVIOUSLY
<u>DEEMED IRRELEVANT BY THE COURT OR THE CITY OF DETROIT</u>**

Financial Guaranty Insurance Company ("FGIC") respectfully submits this Motion in Limine (the "Motion") to preclude at the hearing (the "Confirmation Hearing") on the *Corrected Fifth Amended Plan for the Adjustment of Debts of the City of Detroit* (July 29, 2014) [Dkt. No. 6379] (the "Plan") the introduction of evidence or testimony relating to the following matters previously deemed irrelevant by the Court and/or the City of Detroit (the "City"): (a) the validity of the COP Claims[1]; (b) the alleged needs and hardships of the Holders of Pension Claims; and (c) the terms and conditions of the settlement negotiations leading to the "Grand Bargain."

## PRELIMINARY STATEMENT

1. Despite the fact that the Court and/or the City have previously deemed certain issues irrelevant to the confirmation of the Plan, the City now appears to be relying on those issues in support of confirmation. Specifically, the Court previously ruled that the needs and hardships of the City's pensioners are irrelevant with respect to whether the Plan should be confirmed, a ruling with which the City indicated it agreed. The Court also ruled that the terms and conditions of the settlement negotiations leading to the Grand Bargain are irrelevant to the confirmation of the Plan or approval of such settlement, a ruling with which the City also indicated it agreed. Finally, the City previously represented to both the Court and the creditors that the validity of the COP Claims is irrelevant to Plan confirmation issues. As a result of these rulings and representations, FGIC and other creditors have either withdrawn discovery or been denied discovery with respect to each of these issues.

---

[1] All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Objection of Financial Guaranty Insurance Company to Plan for the Adjustment of Debts of the City of Detroit, filed May 12, 2014 [Docket No. 4660] and the Supplemental Objection of Financial Guaranty Insurance Company to Plan for the Adjustment of Debts of the City of Detroit, filed August 12, 2014 [Docket No. 6674].

2

2.     In spite of the aforementioned, the City recently made clear that it has relied on these issues in justification of its position that the Plan does not unfairly discriminate against Class 9.  The Emergency Manager for the City, Kevin Orr (the "Emergency Manager"), testified as a designee for the City that the reasons the Plan discriminates against Class 9 include, among other things: (i) the purported invalidity of the COP Claims; (ii) compassion for individual pensioners and keeping the "covenant" the City made to provide them with pension payments for the rest of their lives; and (iii) the alleged fact that third parties required their contribution to the Grand Bargain be directed solely to the Retirement Systems.   Both the City and the Retirement Systems have also raised certain of these issues in briefs filed with the Court in support of confirmation.  As has been previously recognized, however, these factors do not provide a relevant justification for the discrimination against Class 9.  Nor are they relevant to any other confirmation standard.   Moreover, because FGIC has not had an opportunity to develop the facts and prepare its witnesses with respect to these issues, the introduction of evidence on these issues will result in significant, unfair surprise and prejudice.  Accordingly, the Federal Rules of Evidence compel the exclusion of this evidence for the purposes of demonstrating that the Plan should be confirmed or that the settlements therein should be approved.[2]

### JURISDICTION

3.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409

---

[2] As discussed in Section IV, *infra*, the evidence is relevant and admissible for other narrow purposes.

# ARGUMENT

## I.  Legal Standard

4.      Motions in limine "ensure an evenhanded and expeditious trial" by permitting the court to decide evidentiary issues in advance.  *Cincinnati Ins. Co. v. Becker Ulman Const., Inc.*, 12013185, 2013 WL 5797614, at *1 (E.D. Mich. Oct. 28, 2013); *see also Dow Corning Corp. v. Weather Shield Mfg., Inc.*, 09-10429, 2011 WL 4506167, at *2 (E.D. Mich. Sept. 29, 2011).  "It performs a gatekeeping function and permits the trial judge to eliminate from further consideration evidentiary submissions that clearly ought not be presented [] because they clearly would be inadmissable for any purpose.  The prudent use of the in limine motion sharpens the focus of later trial proceedings and permits the parties to focus their preparation on those matters that will be considered." *Jonasson v. Lutheran Child & Family Servs.*, 115 F.3d 436, 440 (7th Cir. 1997).

5.      "In analyzing a motion in limine, the trial court considers issues of relevance, admissibility, and prejudice." *Bar's Prods., Inc. v. Bar's Prods. Int'l, Ltd.*, 10-14321, 2014 WL 1922764, at *1 (E.D. Mich. May 14, 2014).  Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence;" and the fact is of consequence in determining the action.  Fed. R. Evid. 401.[3]  As the Sixth Circuit has noted, "[r]elevancy is the threshold determination in any decision regarding the admissibility of evidence; if evidence is not relevant, it is not admissible." *Koloda v. Gen. Motors Parts Div., Gen. Motors Corp.*, 716 F.2d 373, 375 (6th Cir. 1983) (citing Fed. R. Evid. 402) ("Irrelevant evidence is not admissible").  Relevancy depends "not only on the character of the evidence

---

[3] Federal Rule of Bankruptcy Procedure 9017 provides that "[t]he Federal Rules of Evidence … apply in cases under the Code."

itself but on the purpose for which it is offered." Thus, "evidence which is not admissible for one purpose may be relevant and admissible for another." *U.S. v. Hughes*, 308 F. App'x 882, 887 (6th Cir. 2009).

6. Even if the Court finds evidence to be relevant, it should still exclude the evidence if the "probative value is substantially outweighed by a danger of … unfair prejudice, confusing of the issues … undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; *see also Paschal v. Flagstar Bank*, 295 F.3d 565, 577 (6th Cir. 2002). Courts have "broad discretion in determining potential prejudice based upon the full array of evidence." *In re Second Chance Body Armor, Inc.*, 421 B.R. 823, 840 (Bankr. W.D. Mich. 2010). "In connection with the underlying principle of this rule, the courts disfavor 'trials by ambush.'" *Jervis B. Webb Co. v. Kennedy Grp.*, No. 07-10571, 2008 U.S. Dist. Lexis 67941, at *4 (E.D. Mich. Sept. 5, 2008). Accordingly, "unfair surprise is a factor to be considered under Rule 403." *U.S. v. Price*, 13 F.3d 711, 719 (3d Cir. 1994).

## II. The Court Should Exclude Evidence Relating to the Validity of the COP Claims

7. On January 31, 2014, the City commenced an adversary proceeding (the "Adversary Proceeding") in the Chapter 9 Case by filing a complaint alleging, among other things, that certain service contracts related to the COPs are illegal, void and of no effect. *See* Complaint for Declaratory and Injunctive Relief, *City of Detroit v. Detroit General Retirement System Service Corporation et al.*, Adv. Proc. No. 14-04112 (Bankr. E.D. Mich. Jan. 31, 2014) [Dkt. No. 1]. At the May 28, 2014 hearing before this Court, however, the City represented that evidence regarding the validity or invalidity of the COP Claims would not be introduced at the Confirmation Hearing because validity issues are irrelevant to whether the Plan should be confirmed:

> Mr. Bennett: As to the first question, which relates to proof relating to factual issues on COPs validity, **we do not think that's part of the confirmation hearing**.… With respect to the COPs proposal to effectively bring to court a character witness for the COPs, we have said – first of all, that's the kind of thing that real time limits will eliminate because **it isn't germane to anything** – any of the business that we actually have to conduct at the confirmation hearing.

Hr'g Tr. 94:20-23; 231:4-9, May 28, 2014. The City also articulated precisely why the validity of the COP Claims is irrelevant for purposes of determining whether the Plan should be confirmed:

> Mr. Bennett: We view the confirmation hearing insofar as it relates to the COPs as dealing with the adequacy of the reserves that are in the plan for the payment of the COPs in the event that they turn out to be valid, and that's why there are no fact issues in our statement relating to the COPs…. and we have said in an effort to be constructive, in an effort to narrow issues, that **we regard the issue as the adequacy of the claims reserve, which assumes that at the end of the day the COPs claims are allowed in full**… I think that it would be also fair to instruct the city that for purposes of confirmation the COPs are assumed to be an allowed claim…

Hr'g Tr. 94:23-95:3; 231:10-13; 231:25-232:2, May 28, 2014.

8. The Court accepted these representations and, on that basis, indicated that the only way in which evidence related to the transactions pursuant to which the COPs were issued (the "COPs Transactions") might be allowed in at the Confirmation Hearing is to the extent the parties choose to "open the door" to the issue. *See* Hr'g Tr. 175:7-177:23, May 28, 2014. Accordingly, in light of the City's representations and the Court's admonitions, and in part to ensure that validity issues do not arise at the Confirmation Hearing, the parties negotiated a stipulation pursuant to which they agreed not call upon certain witnesses and to withdraw subpoenas related to the COPs Transactions. *See* Stipulation By and Between the City of Detroit, Michigan and the COPs Creditors Regarding Certain Facts and the Admission of Certain Exhibits for the Confirmation Trial, ¶¶ 5-6 [Dkt. No. 5984] ("COPs Stipulation"). The Court approved the COPs Stipulation on July 14, 2014. *See* Order Approving Stipulation By and

Between the City of Detroit, Michigan and the COPs Creditors Regarding Certain Facts and the Admission of Certain Exhibits for the Confirmation Trial [Dkt. No. 6002].

9.     Despite the City's representations, and the resulting COPs Stipulation entered into by the parties, the Emergency Manager testified on July 22, 2014, that one of the bases for the Plan's discrimination against Class 9 is the alleged invalidity of the COP Claims. Specifically, when asked why the City decided to discriminate against Class 9 in favor of the Retirement Systems, the Emergency Manager responded that one of the reasons is the "legal arguments that have been made in the papers regarding the COPs that we believe they are void ab initio and that we have no obligation."  Orr Dep. 223:16-224:10, July 22, 2014 (excerpts of which are attached hereto as Ex. 6A).  Indeed, the Emergency Manager confirmed on numerous occasions during his deposition that the purported invalidity of the COP Claims was one of the considerations he took into account in deciding to propose a plan of adjustment that discriminates against Class 9:

> Q.  And then the last issue that you identified was the invalidity of the COPs; do you remember that?
> A. Yes.
> Q.   And that was something that you factored into your decision in terms of paying the COPs less than classes 10 and 11, correct?
> A. Yes.
> ….
> Q. And I – just so I understand the way the judge – the factor plays through your judgment, you looked at the potential invalidity of the COPs and viewed that as one reason to the pay the COPs on their best day 10 cents?
> A.  Yeah … I think that's a fair statement.
> Q.  Okay, I'm talking when you were deciding how to divide the pie, the COPs best day recovery was impacted by this factor of the potential invalidity of the COPs?
> A.  Yes.

Orr Dep. 237:5-11; 239:23-240:14.

13-53846-tjt   Doc 8760-1   Filed 12/15/14   Entered 12/15/14 22:07:43   Page 7 of 118
13-53846-swr   Doc 6769   Filed 08/15/14   Entered 08/15/14 17:03:01   Page 7 of 143
US_ACTIVE:\44537941\10\45259.0089

10.    In addition to the Emergency Manager's testimony, the Retirement Systems argued in their brief in support of the Plan[4] that the Plan's discrimination is justified because "the legality of the claims of the COPs holders is subject to serious challenge, as described in the City's pending adversary proceeding.  So, to the extent that financial creditors have argued that all unsecured creditors would have the same remedies and ability to obtain a judgment for their claims outside of a chapter 9 proceeding, that argument is belied by the City's own suit…" Retirement System's Brief, 23.

11.    Given the aforementioned, it appears likely that the City, the Retirement Systems, and/or other Plan supporters will seek to introduce evidence at the Confirmation Hearing relating to the validity of the COP Claims for purposes of justifying the Plan's discrimination against Class 9.  However, as the City previously represented, the terms of the Plan are neutral with respect to the validity of the COP Claims, reserving New B Notes in a Disputed Claims Reserve on behalf of Holders of Cop Claims until such time as it may be determined that such Holders have Allowed Claims against the City.  As such, any evidence relating to validity of the COP Claims has no bearing on whether the Plan should be confirmed, rendering such evidence irrelevant and inadmissible at the Confirmation Hearing.  *See U.S. v. Cope*, 312 F.3d 757, 775 (6th Cir. 2002) ("To be relevant, evidence need have some bearing on the probability of the existence of any fact that is of consequence to the determination of the action.") (citation and internal quotations omitted); *Search Mkt. Direct, Inc. v. Jubber (In re Paige)*, 439 B.R. 786, 796-797 (D. Utah 2010) (affirming bankruptcy court's decision to exclude evidence that was irrelevant to the issues raised in connection with the confirmation of a plan of

---

[4] *See* Brief of the Detroit Retirement Systems in Support of Proposed Treatment of Pension Claims Under Proposed Treatment of Pension Claims Under "Alternative A" of the Corrected Fifth Amended Plan for the Adjustment of Debts of the City of Detroit and Statement of Reservations [Dkt. No. 6509] ("Retirement System's Brief").

adjustment because the evidence would not have required the court to make a finding one way or another with respect to those issues).

12.     Even if evidence relating to the validity of the COP Claims is minimally relevant (it is not), FGIC will incur significant prejudice and unfair surprise to the extent such evidence is introduced for the purposes of demonstrating that the Plan should be confirmed. FGIC previously agreed to withdraw discovery and potential witness testimony in reliance on the City's representations that the validity of the COP Claims was not an issue relevant to Plan confirmation. *See* COPs Stipulation, ¶¶ 5-6.  As a result, FGIC is not adequately prepared to present any evidence or testimony on the issue.  As the Ninth Circuit made clear in *Daly v. FESCO Agencies NA Inc.*, matters disclosed for the first time shortly before trial should be excluded "based on unfair surprise and prejudice" as "there ha[s] been no opportunity for discovery regarding [] those matters."  108 Fed. App'x 476, 479 (9th Cir. 2004); *see also C. Van Der Lely N.V. v. F Lli Maschi S.n.c*, 1983 U.S. Dist. Lexis 16430, at *36 (S.D. Ohio June 7, 1983) (where no discovery occurred with respect to a particular issue as a result of the defendant's representation "that it was dropping any claim or defense based on [that issue,]" the introduction of evidence at trial related to that issue would "greatly prejudice" the plaintiff because it would "permit the defendant to 'ambush' the plaintiff at trial").   Thus, in light of the significant prejudice that FGIC will otherwise incur, any evidence or testimony related to the validity of the COP Claims should be excluded for purposes of demonstrating that the Plan should be confirmed or that the settlements therein should be approved.

## III.    The Court Should Exclude Evidence Relating to the Needs or Hardships of Creditors

13.     Both the Court and the City have previously made clear that evidence relating to the needs or hardships of the creditors – including Holders of Pension Claims – is not

a relevant factor in determining whether the City's Plan should be confirmed. The Court addressed the irrelevance of this issue on several occasions:

- Court: "I've never seen a case where in deciding whether to confirm a plan, whether we're talking about best interest test or talking about unfair discrimination or fair and equitable, where the hardship or the neediness of creditors was considered." Hr'g Tr. 102:3-7, June 26, 2014.

- Court: "[I]n the case law I'm familiar with where the issue is the business justification for whatever discrimination is in the plan is determined based on the business needs of the debtor, not the business or financial needs of the creditors." *Id.* at 104:2-6.

- Court: "I'm going to say here as unequivocally as I can that **as a matter of law, creditors' needs is not an issue when it comes to determining unfair discrimination**." *Id.* at 104:14-17.

- Court: "**[T]he retirees' hardships [i]s not at all relevant to issue of either unfair discrimination or fair and equitable**…. [A]s the Court stated earlier, it is unaware of any case law interpreting section 1129 that holds that it is appropriate to consider the relative hardships of creditors in evaluating the issues under that section of the Bankruptcy Code." *Id.* at 128:16-22.

- Court: "I do not want and don't think it relevant to consider a series of retirees or employees, for that matter, testifying about their individual hardship. In my view, **neither fair and equitable nor unfair discrimination has ever in any bankruptcy case considered the impact of a plan on a creditor**; that is to say, the adverse impact of a plan on a creditor. The issue always is the business justification for the treatment from the debtor's perspective." Hr'g Tr. 81:9-17, August 6, 2014.

14. In accordance with the Court's ruling at the June 26, 2014 hearing, council for the City stated that he "can affirm that the city is **not going to be standing on the personal hardship argument**." Hr'g Tr. 104:10-11, June 26, 2014. Accordingly, in reliance on the Court's holding and the City's representations, counsel for another creditor in Class 9 agreed to withdraw discovery requests related to this issue. *Id.* at 104:25-105:4. In fact, the Court recognized that the discovery requests were withdrawn precisely because of the Court's holding on the matter. *Id.* at 128:13-18 (Court: "The Court did state on the record earlier that it would find that Syncora had withdrawn this request [related to the retirees' personal information] based

on the Court's ruling that the retirees' hardships was not at all relevant to the issue of either unfair discrimination or fair and equitable."). However, despite the Court's unequivocal ruling, the City's representations, and the resulting withdrawal of discovery requests, the Emergency Manager testified that the needs and hardships of the City's pensioners was a primary factor for the City in discriminating against Class 9:

> Q. And what was your basis for the level of discrimination you proposed in the February 21st plan?
> A. We were looking, we had been admonished I believe by the court on several occasions to be compassionate in our treatment of individuals and retirees.
> …
> Q. I want to focus on the process of deciding which creditors get which part of the pie, and I want to understand what information you relied upon in deciding to give pensioners a larger slice of the pie than you gave financial creditors –
> A… in deciding what we could pay pensioners, there were, I would say several different factors which really spurred that decision…. Two was the obligation to try to take into account the situation of these pensioners.

Orr Dep. 203:23-204:6; 209:20-210:16, July 22, 2014.[5]

15.     The Emergency Manager went on to explain that in determining the hardship to the City's pensioners, he considered "individual meetings with individual employees and pensioners who recount their stories in detail" and he met with "people on the street as well as hear[d] their accounts and press reports." *Id.* at 230:13-231:6.

16.     The Emergency Manager also testified that he took into account what he termed "covenants" to the City's pensioners, which he described as "the commitment and reliance on that commitment behind the contractual obligation that various City employees and retirees will come and express to me in very real terms what this means to them." *Id.* at 236:8-

---

[5] This testimony is consistent with the arguments the City raised in its Reply to Certain Objections to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit [Dkt. No. 5034] ("City's Reply to Confirmation Objections"), wherein it asserted "the personal hardship that pensioners will endure" as one of the justifications for the Plan's discrimination against Class 9. *See* City's Reply to Confirmation Objections, 45.

13-53846-tjt   Doc 8700-1   Filed 12/15/14   Entered 12/15/14 22:07:43   Page 11 of 24
13-53846-swr   Doc 8700   Filed 03/22/14   Entered 03/22/14 17:03:01   Page 11 of
118

12. He agreed, however, that these "covenants" were simply another element of the situation and needs of the pensioners. *Id.* at 236:23-237:4 ("Q. And isn't it fair to say that this is another element of the human dimension, which is the unfairness of cutting the pensions of people who relied on the City's covenant in making decisions about how to allocate their work time? A. You could say that.").

17. Following the Emergency Manager's testimony, council for the Retirement Systems stated that, with respect to "evidence of individual hardship… [the] parties sort of agreed that that wouldn't be relevant." Hr'g Tr. 11:4-6, August 6, 2014. However, in an abrupt change of position from the representations made at the June 26, 2014 hearing, council for the Retirement Systems argued that "if there was, you know, broad impoverishment of retirees, for example, that's something that could be considered" with respect to justifying the Plan's discrimination against Class 9. *Id.* at 82:11-15. The Retirement System's Brief raised these same arguments, alleging that the Plan does not unfairly discriminate because the City's pensioners purportedly "depend on their accrued pension benefits – often exclusively – for their livelihoods" and because of the alleged need to "avoid[] wide-scale impoverishment of the City's retirees." Retirement System's Brief, 16-17.

18. In addition, it appears as if the Retiree Committee also intends to raise these same arguments. The Retiree Committee has disclosed their intention to rely on the expert testimony of Stuart Wohl. *See* Retiree Committee's Memorandum of Law in Support of Confirmation of the Plan, [Docket No. 6508], at 27 ("The Committee is prepared to support the settlement through the testimony of fact witnesses, and expert witnesses Howard Atkinson and Stuart Wohl of the Segal Company."). Mr. Wohl's expert report is focused almost exclusively on the risks and hardships the Plan will impose on retirees with respect to their healthcare

benefits, as well as the fact that any further reductions "would have been devastating to the Retirees." Stuart Wohl's Expert Witness Report, dated July 22, 2014 (excerpts of which are attached hereto as Ex. 6B), at 5. Mr. Wohl also testified at length to this issue in his deposition, confirming that – in his opinion – "significant cuts in benefits are hardships for retirees." Wohl Dep. 24:11-16, August 13, 2014 (excerpts of which are attached hereto as Ex. 6C).

19.     Given the aforementioned, it appears likely that the City, the Retirement Systems, the Retiree Committee and/or other Plan supporters will seek to introduce evidence relating to the needs and hardships of the City's pensioners for purposes of justifying the Plan's discrimination against Class 9. The Court's prior ruling, however, dictates that this evidence is irrelevant and should be excluded from consideration at the Confirmation Hearing. *See Provident Life & Acc. Ins. Co. v. Adie Co.*, 176 F.R.D. 246, 250 (E.D. Mich. 1997 (motions in limine can "involve matters which ought to be excluded from … consideration … as a result of previous rulings by the court."). Moreover, the case law confirms that this evidence is irrelevant. *See In re Arn, Ltd. Ltd. P'ship*, 140 B.R. 5, 12 (Bankr. D.D.C. 1992) ("While the Debtors prefer to pay local businesses in full … at the expense of banks and other lenders, this treatment is not sanctioned by the Bankruptcy Code. The focus on a particular claim should not be the claimholder, but rather the legal nature of the claim… An unsecured claim is simply that, an unsecured claim.") (citation omitted); *cf. In re Graphic Commc'n, Inc.*, 200 B.R. 143, 149 (Bankr. E.D. Mich. 1996) (Rhodes, J.) ("[a]ntipathy toward a creditor is not proper basis for discrimination").

20.     In addition, given that discovery requests related to the pensioners' needs were withdrawn in reliance on the Court's ruling and the City's representations, FGIC has not had an opportunity to take discovery or prepare its witnesses on the issue. As such, the

US_ACTIVE:\44559474\10\28208.0007

introduction of evidence relating to this issue would cause unfair surprise and prejudice to FGIC, further supporting the exclusion of the evidence for purposes of demonstrating that the Plan should be confirmed or that the settlements therein should be approved. *See, e.g., Daly*, 108 Fed. App'x at 479; *C. Van Der Lely N.V. v. F Lli Maschi S.n.c, Schlossberg*, 1983 U.S. Dist. Lexis 16430, at *36.

21.     Importantly, counsel for the Retirement Systems represented at the August 6, 2014 hearing that, in their view, evidence regarding hardships to the City's pensioners is relevant to demonstrating the "hardship on a more macroscopic level to…the community as a whole." Hr'g Tr. 11:6-11, August 6, 2014.[6]     However, this position directly contradicts the Emergency Manager's testimony with respect to how the City gathered and considered information bearing on hardships to the City's pensioners. *See supra* ¶ 15. It is also an issue for which FGIC has not had an opportunity to fully develop the facts or prepare its witnesses. As such, even in this context, the evidence is both irrelevant and prejudicial, and should be excluded.[7]

## IV.     The Court Should Exclude Evidence Relating to the Terms and Conditions of the Settlement Negotiations That Led to the Grand Bargain

22.     The Court has made clear to the parties that "who said what to whom during the mediation that led to the successful settlement is irrelevant." Hr'g Tr. 49:11-14, June

---

[6] *See also id*. at 81:25-82:6 ("I just want to make sure that it was clear or understood by all parties that if there is information or an argument to be made as to the impact more broadly on retirees, not just as creditors but more specifically as a part of the entity that we are trying to rehabilitate, that that is relevant and fair game in the context of a Chapter 9.").

[7] If Plan supporters are ultimately allowed to raise the issue in this context at the Confirmation Hearing, it is critical that they be prohibited from doing so via anecdotal, episodic testimony from individual pensioners. Rather, any such evidence must be introduced solely through empirical data of sufficient magnitude in order to reduce the prejudicial impact of this evidence (even so, however, the evidence will remain prejudicial).

13-53846-tjt   Doc 8700-1   Filed 12/15/14   Entered 12/15/14 22:07:43   Page 14 of 24
13-53846-swr   Doc 6900   Filed 08/22/14   Entered 08/22/14 17:05:01   Page 14 of 24
US-DOCS\4459797\110\42269.0609

26, 2014. The Court has also articulated that "the issue of unfair discrimination is based upon not where money comes from but where money goes to." *Id.* at 40:4-5. Pursuant to these directions, the Court denied various discovery requests by creditors in Class 9 directed to the Foundations, including document requests and depositions relating to the terms of the DIA Settlement, the reasons for entering into the DIA Settlement, and the negotiations with the Foundations relating to the DIA Settlement (which is part of the Grand Bargain)[8]:

> Court: The Court concludes that none of the 30(b)(6) subjects and none of the documents that are sought from the foundations are relevant to or even arguably relevant to the issues of whether the plan is discriminatory or whether it is unfairly discriminatory, the best interest of creditors or even the extent to which the so-called grand bargain settlement protects the art of the city.

*Id.* at 126:23-127:5. The Court's ruling is consistent with the arguments raised by the City in support of the Foundation's motion to quash the discovery, wherein the City argued that the discovery sought "is far afield from what could reasonably be considered relevant in the upcoming confirmation hearing." *See* Statement in Support of Foundations' Mot. to Quash [Dkt No. 5494], at 4.

      23.    In addition to the Court's aforementioned ruling, the Mediation Order entered on August 13, 2013 [Dkt. No. 322] has prevented FGIC from obtaining discovery related to the negotiations that took place during the mediation, including details surrounding the conditions allegedly imposed by the parties with respect to the recipients of the settlement proceeds. *See* FGIC's Motion in Limine to Preclude the Introduction of Evidence or Testimony Regarding Matters Withheld from Discovery Based on the Mediation Order at 4-6 [filed

---

[8] *See, e.g.,* John S. and James L. Knight Foundation Subpoena, Schedule A at 3 [Dkt No. 5224, at p. 521]. As noted at the hearing held with respect to these discovery requests, the types of evidence sought included "whether the foundations were the ones that imposed on the city the requirement that all monies go to the retiree classes or whether the city was the one that proposed that to the foundations." Hr'g Tr. 22:22-25, June 26, 2014.

concurrently herewith] (citing the deposition testimony of various witnesses who refused to provide this information pursuant to the Mediation Order).

24.     Nevertheless, the Emergency Manager testified that in discriminating against Class 9, the City took into account the purported fact that the parties who contributed funds to the Grand Bargain insisted that, as a condition to their contribution, the proceeds of this transaction be directed solely to the Retirement Systems:

> Q.  I want to focus on the process of deciding which creditors get which part of the pie, and I want to understand what information you relied upon in deciding to give pensioners a larger slice of the pie than you gave financial creditors?
> A.  … in deciding what we could pay pensioners, there were, I would say, several different factors which really spurred that decision…. Three was that at some point, it became apparent that there was going to be additional money coming in in the form of the Grand Bargain from third-party guarantors who were – as a condition of those grants that they be dedicated solely to pension.
> …
> Q.  I am talking about, you know, your state of mind though.  I'm saying you didn't go and pick winners and losers based on what people's expectations were when they invested?
> A.  … We tried to do an analysis of what we could afford to pay based upon the factors we discussed before with an understanding that $866 million was coming in as a gift from grantors with specific condition that that money would flow to pensioners as opposed to any creditor and that we would accept that gift with that condition when those discussions were made.

Orr Dep. 209:20-210:20, 274:23-275:13, July 22, 2014.

25.     Critically, the City has also relied on similar contentions in their Motion to Strike Syncora's Second Supplemental Objection to the Plan [Dkt. No. 6845] ("Mot. to Strike Syncora's Second Supp. Obj.").  Specifically, the City repeatedly alleged throughout the motion that "[t]he Grand Bargain makes use of outside funds and charitable contributions that were available **solely for the purposes** of providing relief to pensioners or preserving the DIA in a public trust, or both.  Because **these outside donations never would have been available for any other purpose** … the Grand Bargain does not inflict any cognizable harm on Syncora or anyone else." Mot. to Strike Syncora's Second Supp. Obj. 10-11; *see also id.* at 13 ("Rosen was

simply acknowledging that there were outside donors who were willing to make charitable contributions to the City, but only if the donations were specifically earmarked to provide relief to the City's pensioners."); *id.* at 23 ("the outside donations received by the City were specifically earmarked for pension relief, and they never would have been forthcoming but for the satisfaction of that condition."); *id.* ("even if the City wanted to, it has no ability to redirect these donor-specified gifts").

26.     Given the aforementioned, it appears likely that the City and/or other Plan supporters will seek to introduce evidence relating to the conditions allegedly imposed by the parties during the settlement negotiations in support of confirmation. The Court's prior ruling, however, dictates that this evidence is irrelevant and should be excluded from consideration at the Confirmation Hearing. *See Provident Life & Acc. Ins.*, 176 F.R.D. at 250.

27.     More importantly, the City should not be allowed to rest on the allegation that parties would not have contributed funds to the Grand Bargain had those funds not been directed solely to the Retirement Systems, when FGIC has not had any opportunity to take discovery on that issue or test its truthfulness. Indeed, because FGIC has been unable to obtain discovery related to this issue, it is impossible for it to further probe this issue to test its veracity and determine who decided, at what point it was decided, and why it was decided that the settlement proceeds would be directed exclusively to the Retirement Systems.

28.     Notably, the City cites **solely** to the testimony of Rip Rapson in support of their contention that the parties who contributed funds to the Grand Bargain would never have provided those funds had they not been directed to the pensioners. *See* Mot. to Strike Syncora's Second Supp. Obj. 11 n.4, 23 n.16. But FGIC has not had an opportunity to depose witnesses from **eleven** of the twelve Foundations that contributed funds to the Grand Bargain based on the

Court's ruling at the June 26, 2014 hearing.[9]  As such, it is patently unfair for the City to make

this contention without FGIC having had an opportunity to develop the facts through discovery.

29.     Moreover, even as to Mr. Rapson himself, when further probed at his

deposition with respect to the issue, Mr. Rapson was directed not to provide **any** additional

details surrounding the conditions on which the Kresge Foundation purportedly insisted, based

on the Mediation Order:

> Q: When Judge – during your first conversation with Judge Rosen, where he
> proposed that the Kresge Foundation become involved in the process for the
> Grand Bargain, was it Judge Rosen who brought up that the involvement of the
> foundation should occur because it could soften the blow to the pensioners and
> help preserve the collection at the DIA?
> Mr. Shumaker: Objection.  This calls for communications between Judge Rosen
> and Mr. Rapson.  I believe this falls within the construct of the mediation order,
> and I would ask that the witness be instructed not to answer . . .
>  Mr. Kurzweil: Under those circumstances, I'm going to instruct the witness not
> to answer….
> ….
> Q:  To the extent I ask you about the back and forth with Mr. Rosen or any other
> parties who were involved with mediation that took place after your initial
> meeting with Judge Rosen regarding the Grand Bargain … will you be able to
> answer those questions here today?
> Mr. Shumaker:  I would be interposing an objection to all such questions, because
> I believe that back and forth would be covered by the mediation order entered by
> Judge Rosen.
> Mr. Kurzweil:  It's my intention upon request of counsel to instruct the witness
> not to answer.
> Q.  Is it fair to say that you will follow those instructions, Mr. Rapson?
> A. To a tee.

*See* Rapson Dep. 81:23-87:6, 86:14-87:6, July 31, 2014 (excerpts of which are attached hereto as

Ex. 6D).

---

[9] *See* Order Regarding Foundations' Joint Motion to Quash (Dkt. #5300), entered on June 27,
2014 [Docket No. 5623] (granting motion to quash subpoenas seeking information from the
twelve Foundations that contributed funds to the Grand Bargain).  FGIC was ultimately allowed
to depose Rip Raspon from the Kresge Foundation only because the City included him on their
witness list.

13-53846-tjt   Doc 8700-1   Filed 12/15/14   Entered 12/15/14 22:07:43   Page 18 of 24
13-53846-swr   Doc 8390   Filed 09/22/14   Entered 09/22/14 17:03:01   Page 19 of 24
118

30.     Mr. Rapson would not provide any additional testimony on this issue despite the fact that he admittedly made public statements regarding the settlement negotiations and how it came about that the Foundations would provide funds for the benefit of the pensioners.  *See id.* 83:23-85:3 (agreeing that he made statement regarding the settlement negotiations and the purpose of the settlement funding at a public address at Wayne State).   In fact, during that address at Wayne State – which has been made publicly available through a YouTube video –  Mr. Rapson emphasized that "the adjustment of long-term debt with all of the complexities of pensioners **and bondholders** and health benefits and everything else" is "terribly important" to the bankruptcy.  *See Detroit Bankruptcy & Beyond – Rip Rapson*, YouTube, https://www.youtube.com/watch?v=z7nXphsL_QA (last visited Aug. 19, 2014).   In addition, Mr. Rapson sent numerous emails to the press describing various issues being addressed during the settlement negotiations, including for instance: (a) whether to form a new entity to receive DIA assets; (b) the Foundations' commitment to provide support for the City; (c) a proposed governance structure involving the Foundations and the DIA; (d) the need for a union contribution to the settlement; and, notably (e) the "motivations driving each of the parties."  *See* K001265-1266; 1272-1273 (attached hereto as Ex. 6E).   Nevertheless, when pressed at his deposition for further details regarding the settlement negotiations such that FGIC could test the veracity of his assertions, Mr. Rapson was directed not to provide any testimony on the issue.

31.     Moreover, as previously noted, numerous other witnesses also refused to provide details surrounding the conditions allegedly insisted on by the parties who contributed funds to the Grand Bargain.  *See, e.g.,* Muchmore Dep. 56:13-57:6, August 4, 2014 (excerpts of which are attached hereto as Ex. 6F) ("Q: Does the State have a view, to your knowledge, based

on why it is that funding will be going to pensioners versus other creditors? Ms. Nelson: I'm going to object, because that invades the confidentiality of the mediation process, and I will instruct him not to answer that question."); Orr Dep. 336:10-17 (Q. I take it if I ask you questions about your communications with the charitable foundations in connection with their agreement to contribute this money, you will refuse to answer on the grounds of the mediation order's confidentiality provisions; is that correct? A. Yes, generally for most of them, I think that's correct").[10] As a result, FGIC has been denied any and all opportunity to verify or test the allegations made by the City with respect to this issue, including whether the parties who contributed funds to the Grand Bargain in fact indicated that they would have refused to provide such funding had it not been directed solely to the Retirement Systems.

32. As the court in *International Tel. & Tel. Corp. v. United Tel. Co. of Florida* articulated, "the failure of a party to allow pre-trial discovery of confidential matter which that party intends to introduce at trial will preclude the introduction of that evidence." 60 F.R.D. 177, 186 (M.D. Fla. 1973); *see also Baxter Travenol Labs., Inc. v. Abbott Labs.,* No. 84 C 5103, 1987 WL 10988 (N.D. Ill. May 12, 1987) ("Abbott's failure to allow pretrial discovery of the privileged material [] will preclude it from using that material at trial."). The court in *International Tel. & Tel. Corp.* aptly noted that "fundamental fairness and justice requires that if [a party] intends to waive the privilege at trial by the introduction of evidence within that privilege, then the [party] will be required to allow discovery with regard to matters material to that testimony." 60 F.R.D. at 186. Because FGIC has been denied discovery time and time again with respect to the settlement negotiations, including the conditions on which the parties

---

[10] *See also* FGIC's Motion in Limine to Preclude the Introduction of Evidence or Testimony Regarding Matters Withheld from Discovery Based on the Mediation Order at 4-5 (filed concurrently herewith).

insisted during those negotiations, "fundamental fairness and justice" requires that such evidence be excluded to the extent it is introduced for purposes of demonstrating that the Plan should be confirmed or that the settlements therein should be approved.  *Id.*

## V.    The Evidence is Relevant and Admissible for Other Limited Purposes

33.    It is well settled that evidence "which is not admissible for one purpose may be relevant and admissible for another."  *Hughes*, 308 F. App'x at 887 (holding that the district court did not err in excluding evidence for purposes of negating claims that the defendant acted wilfully, while admitting the same evidence for purposes of impeachment).  As the Sixth Circuit recognized in *Shanklin v. Norfolk*, "it is preferable to admit a relevant [piece of evidence] for a limited purpose with appropriate instructions, rather than exclude admissible evidence altogether."  369 F.3d 978, 989 n. 7 (6th Cir. 2004) (holding that certain materials could not have been admitted for the purpose of establishing the defendant's duty, but were useful and admissible "for the limited purpose of establishing notice.").

34.    As discussed, evidence bearing on the validity of the COP Claims, the potential hardships of the creditors, and the terms of the settlement negotiations is irrelevant with respect to demonstrating that the Plan should be confirmed or that the settlements therein should be approved, and it should be excluded for those purposes.  However, the fact that the City relied on these factors in deciding to discriminate against Class 9 is highly relevant for the purpose of demonstrating that the Plan's discrimination is unfair under 11 U.S.C. § 1129(b).  *See In re Graphic Commc'n, Inc.*, 200 B.R. at 149 (where debtor relied on an improper basis for discrimination – antipathy towards the creditor – there was no justification for the disparate treatment between two classes and confirmation of debtor's plan was therefore denied).  Importantly, unlike the purpose for which the City and/or other Plan supporters would seek to introduce the evidence, simply demonstrating that the City relied on these factors does not

(pursuant to the City's own admissions) require any additional discovery or witness preparation. As such, the evidence should be admitted for this limited purpose.

**STATEMENT OF CONCURRENCE SOUGHT**

35.     Pursuant to Local Rule 9014-1(g), on August 18, 2014, counsel for FGIC sought the concurrence of counsel for the City in the relief sought in the Motion.  Counsel for the City has advised that they oppose the filing of the Motion.

13-53846-tjt    Doc 8700-1    Filed 12/15/14    Entered 12/15/14 22:07:13    Page 22 of 24
13-53846-swr    Doc 6760    Filed 08/22/14    Entered 08/22/14 17:03:01    Page 22 of 24
US_ACTIVE:\44599794\10\45259.0007
118

WHEREFORE, FGIC respectfully requests that the Court enter an Order granting FGIC's Motion in its entirety and excluding any evidence or testimony related to the following matters previously deemed irrelevant by the Court and/or the City: (a) the validity of the COP Claims; (b) the alleged needs and hardships of the Holders of Pension Claims; and (c) the terms and conditions of the settlement negotiations leading to the Grand Bargain, to the extent such evidence is introduced for the purpose of demonstrating that the Plan meets the requirements for confirmation under Section 1129 of the Bankruptcy Code.

DATED:        August 22, 2014

                                        /s/ Alfredo R. Pérez
                                        Alfredo R. Pérez
                                        WEIL, GOTSHAL & MANGES LLP
                                        700 Louisiana Street, Suite 1600
                                        Houston, TX  77002
                                        Telephone: (713) 546-5000
                                        Facsimile:  (713) 224-9511
                                        Email:  alfredo.perez@weil.com
                                        – and –
                                        Edward Soto
                                        WEIL, GOTSHAL & MANGES LLP
                                        1395 Brickell Avenue, Suite 1200
                                        Miami, FL  33131
                                        Telephone: (305) 577-3177
                                        Email:  edward.soto@weil.com
                                        -and-
                                        Ernest J. Essad Jr.
                                        Mark R. James
                                        WILLIAMS, WILLIAMS, RATTNER &
                                        PLUNKETT, P.C.
                                        280 North Old Woodward Avenue, Suite 300
                                        Birmingham, MI 48009
                                        Telephone:  (248) 642-0333
                                        Facsimile:  (248) 642-0856
                                        Email:  EJEssad@wwrplaw.com
                                        Email:  mrjames@wwrplaw.com

                                        *Attorneys for Financial Guaranty Insurance Company.*

US_ACTIVE:\44559774\10\45259.0007

## ATTACHMENTS

| | |
|---|---|
| Exhibit 1 | Proposed Form of Order |
| Exhibit 2 | Notice |
| Exhibit 3 | None [Brief Not Required] |
| Exhibit 4 | Certificate of Service |
| Exhibit 5 | None [No Affidavit] |
| Exhibit 6A | July 21-22, 2014, Deposition Transcript of Kevyn Orr (excerpted) |
| Exhibit 6B | July 22, 2014 Expert Witness Report of Stuart Ira Wohl (excerpted) |
| Exhibit 6C | August 13, 2014 Deposition Transcript of Stuart Ira Wohl (excerpted) |
| Exhibit 6D | July 31, 2014 Deposition Transcript of Rip Rapson (excerpted) |
| Exhibit 6E | Emails (K001265-1266; 1272-1273) |
| Exhibit 6F | August 4, 2014 Deposition Transcripts of D. Muchmore (excerpted) |

**Exhibit 1**

**Proposed Order**

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

```
-------------------------------------------------------------x
                                          :
In re                                     : Chapter 9
                                          :
CITY OF DETROIT, MICHIGAN,                : Case No. 13-53846
                                          :
                          Debtor.         : Hon. Steven W. Rhodes
                                          :
                                          :
-------------------------------------------------------------x
```

### ORDER PRECLUDING THE INTRODUCTION OF EVIDENCE
### OR TESTIMONY REGARDING CERTAIN MATTERS PREVIOUSLY
### <u>DEEMED IRRELEVANT BY THE COURT OR THE CITY OF DETROIT</u>

This matter having come before the Court on *Financial Guaranty Insurance Company's Motion* In Limine *for Entry of an Order Precluding the Introduction of Evidence or Testimony Regarding Certain Matters Previously Deemed Irrelevant by the Court or the City of Detroit Excluding* (the "**Motion**"),[11] filed by Financial Guaranty Insurance Company ("**FGIC**"); and due and proper notice of the hearing to consider the relief requested therein (the "**Hearing**") having been given to all parties registered to receive electronic notices in this matter; and the Court having held the Hearing with the appearances of interested parties noted in the record of the Hearing; and upon the entire record of all the proceedings before the Court; and the legal and factual bases set forth in the Motion establishing just and sufficient cause to grant the relief requested therein;

---

[11] All capitalized terms used but not defined herein shall have the meanings attributed to them in the Motion.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1.      The Motion is granted.

2.      All parties are precluded from introducing evidence or testimony at the Confirmation Hearing related to the following matters previously deemed irrelevant by the Court and/or the City: (a) the purported invalidity of the COPs; (b) the needs and hardships of the pensioners; and (c) the terms and conditions of the settlement negotiations leading to the Grand Bargain, to the extent such evidence is introduced for the purpose of demonstrating that the Plan meets the requirements for confirmation under Section 1129 of the Bankruptcy Code.

It is so ordered.

13-53846-tjt    Doc 8580-1    Filed 12/15/14    Entered 12/15/14 22:07:48    Page 27 of 3
13-53846-swr    Doc 6990    Filed 08/22/14    Entered 08/22/14 22:03:01    Page 27 of 31
US_ACTIVE:\44557974\10\42293.0069

**Exhibit 2**

**Notice**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

-----------------------------------------------------------------x

In re                                   :

                                       :      Chapter 9

                                       :

CITY OF DETROIT, MICHIGAN,       :      Case No. 13-53846

                                       :

                 Debtor.     :      Hon. Steven W. Rhodes

                                       :

                                       :

-----------------------------------------------------------------x

## NOTICE OF FINANCIAL GUARANTY INSURANCE COMPANY'S MOTION IN LIMINE TO PRECLUDE THE INTRODUCTION OF EVIDENCE OR TESTIMONY REGARDING CERTAIN MATTERS PREVIOUSLY DEEMED <u>IRRELEVANT BY THE COURT OR THE CITY OF DETROIT</u>

       Financial Guaranty Insurance Company has filed papers with the Court seeking entry of an order pursuant to Federal Rules of Evidence 402 and 403 to preclude the introduction of evidence or testimony regarding certain matters previously deemed irrelevant by the Court or the City of Detroit (the "**<u>Motion</u>**").

       **<u>Your rights may be affected.</u>  You should read these papers carefully and discuss them with your attorney, if you have one in this bankruptcy case.  (If you do not have an attorney, you may wish to consult one.)**

       If you do not want the court to grant the relief sought in the motion, or if you want the court to consider your views on the motion, **on or before August 27, 2014**, you or your attorney must:

        1.  File with the court a written response or an answer, explaining your position at:[1]

### United States Bankruptcy Court
211 W. Fort Street, Suite 2100
Detroit, Michigan 48266

       If you mail your response to the court for filing, you must mail it early enough so the court will **receive** it on or before the date

---

[1] Response or answer must comply with F. R. Civ. P. 8(b), (c) and (e).

1

stated above.  All attorneys are required to file pleadings electronically.

You must also mail a copy to:

Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, TX  77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511

Edward Soto
WEIL, GOTSHAL & MANGES LLP
1395 Brickell Avenue, Suite 1200
Miami, FL  33131
Telephone: (305) 577-3177

Ernest J. Essad Jr.
Mark R. James
WILLIAMS, WILLIAMS, RATTNER & PLUNKETT, P.C.
280 North Old Woodward Avenue, Suite 300
Birmingham, MI 48009
Telephone:  (248) 642-0333
Facsimile:  (248) 642-0856

2. If a response or answer is timely filed and served, the clerk will schedule a hearing on the motion and you will be served with a notice of the date, time and location of the hearing.

**If you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the motion and may enter an order granting that relief.**

US_ACTIVE:\44549466\2\45259.0007

DATED:     August 22, 2014          Respectfully submitted,

/s/  Alfredo R. Pérez
Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, TX  77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511
Email:  alfredo.perez@weil.com

– and –

Edward Soto
WEIL, GOTSHAL & MANGES LLP
1395 Brickell Avenue, Suite 1200
Miami, FL  33131
Telephone: (305) 577-3177
Email:  edward.soto@weil.com

-and-

Ernest J. Essad Jr.
Mark R. James
WILLIAMS, WILLIAMS, RATTNER &
PLUNKETT, P.C.
280 North Old Woodward Avenue, Suite 300
Birmingham, MI 48009
Telephone:  (248) 642-0333
Facsimile:  (248) 642-0856
Email:  EJEssad@wwrplaw.com
Email:  mrjames@wwrplaw.com

*Attorneys for Financial Guaranty Insurance*
*Company*

US_ACTIVE:\44549466\2\45259.0007

**Exhibit 3**

**None [Brief Not Required]**

**Exhibit 4**

**Certificate of Service**

13-53846-tjr    Doc 8730-1    Filed 12/15/14    Entered 12/15/14 22:07:43    Page 33 of
13-53846-swr    Doc 6790-90    Filed 08/22/14    Entered 08/22/14 17:03:01    Page 3 of 2
US_ACTIVE:\44579744\10\42293.0089

118

## CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2014 the *Financial Guaranty Insurance Company's Motion In Limine To Preclude The Introduction Of Evidence Or Testimony Regarding Certain Matters Previously Deemed Irrelevant By The Court Or The City Of Detroit* was filed and served via the Court's electronic case filing and noticing system to all registered users that have appeared in the main Chapter 9 proceeding.

                     /s/ Alfredo R. Pérez
                     Alfredo R. Pérez
                     WEIL, GOTSHAL & MANGES LLP
                     700 Louisiana Street, Suite 1700
                     Houston, TX  77002
                     Telephone: (713) 546-5000
                     Facsimile:  (713) 224-9511
                     Email:  alfredo.perez@weil.com

Dated: August 22, 2014

## Exhibit 5

### None [No Affidavit]

## Exhibit 6A

**July 22, 2014, Deposition Transcript of Kevyn Orr (excerpted)**

1                KEVYN ORR, VOLUME 2

2        IN THE UNITED STATES BANKRUPTCY COURT

3          FOR THE EASTERN DISTRICT OF MICHIGAN

4

5

6

7    In Re:                    )      Chapter 9

8

9    CITY of DETROIT, MICHIGAN, )   Case No. 13-53846

10

11              Debtor.    )    Hon. Steven Rhodes

12    _____

13

14                     VOLUME 2

15

16      The Videotaped Deposition of KEVYN ORR,

17      in his personal capacity and as Rule 30(b)(6) witness,

18      Taken at 2 Woodward Avenue,

19      Detroit, Michigan,

20      Commencing at 9:10 a.m.,

21      Tuesday, July 22, 2014,

22      Before Leisa M. Pastor, CSR-3500, RPR, CRR.

23

24

25

1                          KEVYN ORR, VOLUME 2

2          wanted to be sure that we addressed the human

3          dimension.

4     Q.   And you didn't have -- is it -- are you referring to

5          the fact that as of the first plan, you didn't even

6          have an impaired assenting class?

7     A.   I think it's fair to say that we did not have -- well,

8          when was the date?

9     Q.   Feb 21, 2014.

10    A.   I don't know if that's true because I don't recall the

11         dates that we may have reached agreements with the

12         financial creditors.

13    Q.   And when you're talking about the human dimension,

14         what are you talking about there?

15    A.   Very simply, and I think I've said this before, the --

16         the pensioners are people many of whom are in their

17         sixties, seventies, and eighties and don't have an

18         option.  They have worked for the City, most of them

19         have done nothing wrong.  They are -- the covenant

20         that the City had with its employees and retirees was

21         that if they perform work for the City that upon their

22         retirement they'd be taken care of for the rest of

23         their natural life, that some of this came as quite a

24         shock to them because they had planned their affairs

25         accordingly.  Many of them, like my own family members

```
 1                    KEVYN ORR, VOLUME 2

 2           or grandmother, wouldn't have options of going back

 3           into the job market to supplement income or make up

 4           for some of the cuts and that there were -- there was

 5           a real-world dimension impact to the people that were

 6           going to be affected by these cuts.

 7    Q.     Putting aside the human dimension, if you'd had an

 8           impaired assenting class do you believe that you could

 9           have crammed down the first plan on the pensioners?

10                    MR. SHUMAKER:  Object to the form.

11    A.     Yeah, I don't know, I'd have to consult with my

12           attorneys.

13    BY MR. HACKNEY:

14    Q.     Okay, and I mean back at the time.  Did you believe

15           you could or could not?

16    A.     To be honest with you Mr. Hartley (sic), I don't -- I

17           don't -- I don't really recall.  I don't really recall

18           that being the crux of the discussion, but it might

19           have been true.

20    Q.     Okay.  You may have thought you could cram them down,

21           you may have thought you couldn't, you just don't

22           know?

23    A.     I just don't remember.

24    Q.     Okay.  You previously called me Hartley --

25    A.     Did I call you Hartley?
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-swr   Doc 8760-6   Filed 08/25/14   Entered 08/25/14 22:03:63   Page 39 of 44
118

1                    KEVYN ORR, VOLUME 2

2    Q.   There is something in your brain --

3    A.   No, I --

4    Q.   -- that says Hartley when you see me.

5    A.   This is going to be surprising, I have a friend named

6         Hartley, and he reminds me of you.

7    Q.   And he's like a handsome, suave guy?

8    A.   Let's not get carried away.

9    Q.   Now, you did understand that the February 21st plan of

10        adjustment still discriminated in favor of retirees as

11        compared to COPs holders in terms of their respective

12        recoveries, correct?

13   A.   Yes, I understand that there were -- there were a lot

14        of reports and the financial community was taking the

15        position that there was discrimination in the plan.

16   Q.   But there was objectively discrimination in that first

17        plan, correct?

18   A.   There was a higher percentage recovery relative to

19        some of the financial creditors.

20   Q.   And you were aware of that discrimination at the time

21        you proposed that plan, correct?

22   A.   Yes.

23   Q.   And what was your basis for the level of

24        discrimination you proposed in the February 21st plan?

25   A.   Well, I believe at that point, we were looking at some

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 8760-6   Filed 08/25/14   Entered 08/25/14 22:03:03   Page 40 of 44
118

1               KEVYN ORR, VOLUME 2

2        contribution from third parties, meaning the

3        foundations, the benefactors and others.  We were

4        looking, we had been admonished I believe by the court

5        on several occasions to be compassionate in our

6        treatment of individuals and retirees.  And unlike

7        financial creditors, the GRS and PFRS unlike some

8        financial creditors actually had assets in their

9        pension fund, so there was an existing basis by which

10        those assets would allow for a higher rate of recovery

11        ab initio, that is, from the start, as opposed to the

12        financial creditors to whom we owed money but did not

13        have a cache of money available to pay them.

14    Q.   So there -- let me break down what I heard.  You tell

15         me if I got it right.

16    A.   Mm-hmm.

17    Q.   I heard that the basis for the decision to

18         discriminate in the first plan was in part the

19         compassion for retirees, but it was also in part the

20         fact that there were assets in the retirement systems?

21    A.   Yes.

22    Q.   Okay, anything other than those two things?

23    A.   No, as I said, there are a number of other factors in

24         trying to incentivize a workforce, in trying to keep

25         the covenant that the City made, a number of other

1                    KEVYN ORR, VOLUME 2

2          factors, but generally those are the ones that seem to

3          be driving a sort of the treatment of those classes.

4     Q.   Okay, so I heard compassion, the fact that assets

5          exist in the retirement trust, trying to incentivize

6          City workers.  Anything else that justified that level

7          of discrimination?

8     A.   There may have been other things that I said in terms

9          of the level of different treatment, you call

10         discrimination.  That was reported out in the first

11         plan, but generally speaking, the principal driving

12         force was that the retirement systems had assets in

13         them and we were trying to bring levels down below to

14         the predictable funding level verse -- based upon the

15         unfunded actuarial liability of those funds.  You

16         start with a cache of money in those funds that are

17         available conceivably to pay pensions if you are able

18         to adjust the payment levels, whereas with financial

19         creditors, we didn't have a cache of money available

20         to them.  We're paying them out of existing City cash

21         flow going forward.

22    Q.   But you understand that the amount of assets in the

23         pension systems, the difference between the amount of

24         assets and what is needed to fully fund pensions is

25         called the UAAL?

```
 1                    KEVYN ORR, VOLUME 2

 2    A.    Yes.

 3    Q.    And you understand that the pension class sizes were

 4          for the UAAL, correct?

 5    A.    Well, the pension class sizes were for the UAAL but

 6          they took into account that those funds had assets in

 7          them, as well, so you're trying to determine the

 8          unfunded actuarial liability, but when you try to

 9          determine the pension payments you also include the

10          amount of assets in the funds.

11    Q.    So the existence of assets in the retirement systems

12          was something that you considered in your

13          discrimination analysis, in your decision to propose a

14          plan that discriminated?

15    A.    In my decision to propose a plan that provided

16          different payout levels for creditors, yes.

17    Q.    And it weighed in favor of it?

18    A.    It weighed in -- not so much in favor, I'm -- favor of

19          what?

20    Q.    Well, in favor of paying pensioners more than

21          financial creditors?

22    A.    The fact that there are assets in the funds assisted

23          us in paying them more than financial creditors, yes.

24    Q.    Okay.  What information did you base that -- that

25          decision to provide differing levels of recoveries on?
```

1                    KEVYN ORR, VOLUME 2

2      A.    Well, there is a number of information.  Generally, we

3            would go through the expected debt service of the

4            City, what anticipated revenue streams would be going

5            forward, what the City would need for reinvestment and

6            revitalization, what the funding levels of the pension

7            funds were, amongst others, there was a number of

8            information and -- and it was a very dynamic and fluid

9            process as we examined a number of different potential

10           outcomes and scenarios.

11     Q.    I understand that there is an enormous amount of

12           information that implicates what the City has to give

13           to creditors at all, okay?  And I heard your answer to

14           relate to that subject, correct?

15     A.    Right.

16     Q.    I'm asking a more specific question, which is with

17           respect to your decision to pay classes 10 and 11 more

18           than financial creditors, what information did you

19           rely on in making that decision?  So this is more not

20           how much money is there but who will get what money is

21           available.

22     A.    All of the information I just mentioned.  I mean,

23           there is a number of different factors that go into

24           what we can potentially pay financial creditors, and

25           we took all that information in on a number of

1          KEVYN ORR, VOLUME 2

2          different scenarios and reduced.

3     Q.   But what information did you rely upon in deciding how

4          to allocate the money that could be paid in terms of

5          whether it went to pensioners or whether it went to

6          financial creditors?

7     A.   I think we're discussing the same answer.  We would

8          look at information regarding the unfunded liability

9          of the funds, the amount of anticipated revenue the

10         City could take in and could expect to take in, the

11         obligations that the City could afford, the potential

12         obligations of the City going forward for retiree

13         healthcare, for instance, as well as for current

14         employee, active employee healthcare obligations, just

15         a number of different information that we could

16         provide, we could analyze to try to get at a

17         determination of what we could pay different classes

18         of creditors.

19    Q.   But that tells you what the total size of the pie is,

20         correct?

21    A.   But it also tells us what we think we can pay.

22    Q.   Right, to creditors?

23    A.   Right, there's an analysis of the total debt load

24         which we published in the June 14th proposal, and then

25         there is analysis of the revenue streams that come

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-swr  Doc 8700-6  Filed 12/15/14  Entered 12/15/14 22:07:43  Page 45 of 44
13-53846-swr  Doc 8700-6  Filed 12/15/14  Entered 12/15/14 22:07:43  Page 45 of 44
118

```
 1                    KEVYN ORR, VOLUME 2

 2          into the City that we could use to service those

 3          obligations, not just financial creditors but

 4          pensioners, and then there's an analysis of what we

 5          would need to do to take the revenue stream to address

 6          the unfunded actuarial liability and other obligations

 7          that we would have with financial creditors, and we

 8          would run different scenarios as to how that could be

 9          done --

10     Q.   Okay.

11     A.   -- in this environment.

12     Q.   I'm looking -- I don't think -- we may not be

13          communicating well, I'm sure I'm not asking my

14          questions correctly, but once you've determined how

15          much you have in theory to distribute to creditors

16          there's a separate decision that has to be made as to

17          which creditors should get what parts of that pie; do

18          you agree with that statement?

19     A.   Yes, I think that's fair.

20     Q.   And I want to focus on the process of deciding which

21          creditors get which part of the pie, and I want to

22          understand what information you relied upon in

23          deciding to give pensioners a larger slice of the pie

24          than you gave financial creditors --

25     A.   Yeah.
```

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-swr  Doc 8700-6  Filed 12/15/14  Entered 12/15/14 22:07:43  Page 46 of 44
118

1                    KEVYN ORR, VOLUME 2

2    Q.    -- in the first plan.

3    A.    Yeah, let's do it this way:  There are factors that

4          you're considering, and I think what you're trying to

5          get at is judgment, which is different than the

6          factors that come in to what you have and who you can

7          pay.  And the judgment decisions about what we could

8          pay took into account a number of these other factors

9          regarding revenue streams, but ultimately in deciding

10         what we could pay pensioners, there were, I would say,

11         several different factors which really spurred that

12         decision.

13                    One was the amount of funds that were in

14         the various pension funds.  Two was the obligation to

15         try to take into account the situation of these

16         pensioners.  Three was that at some point, it became

17         apparent that there was going to be additional money

18         coming in in the form of the Grand Bargain from

19         third-party guarantors who were -- as a condition of

20         those grants that they be dedicated solely to pension.

21                    Three was that at some point, it became

22         clear that the pension funds, themselves, were

23         performing better over the year and had experienced

24         better rate of returns than in prior years, and, in

25         fact, the asset values went up.  All of those factors

```
1                        KEVYN ORR, VOLUME 2

2          went into the decision to decide how much we could pay

3          pensioners.

4    Q.    Any other factors than that?

5    A.    Probably, but I don't recall them sitting here today.

6    Q.    And when you say the obligation to take into account

7          the pensioner situation, that's referring to the human

8          dimension that we talked about earlier, correct?

9    A.    Yes, I think that's fair.

10   Q.    Now, let's go forward in time from the first plan

11         of -- that we've just been talking about, which is

12         February 21?

13   A.    Yes, mm-hmm.

14   Q.    Okay.  Let's go forward in time to April 1, 2014,

15         which is about 40 days later, okay?  April Fools' Day.

16   A.    I wasn't going to say that but --

17   Q.    You know I picked it.  Now, let's -- so put yourself

18         back in your state of mind as of April 1, 2014, okay?

19   A.    Right.

20   Q.    As of that time, you still didn't have agreement with

21         any of the retiree associations or committees or

22         retirement systems with respect to the proposed

23         pension cuts, correct?

24   A.    The reason I'm not recalling whether or not that's

25         accurate, at some point in the spring -- we did not
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-swt  Doc 8700-6  Filed 12/15/14  Entered 12/15/14 22:07:43  Page 48 of 44
118

KEVYN ORR, VOLUME 2

2    have publicly announced agreements, I think that's

3    fair.

4  Q.   You didn't have any publicly announced agreements with

5       anyone I don't believe until April 15th, 2014; is that

6       correct?

7  A.   When -- you may have information regarding -- when you

8       say anyone, you mean any creditors?

9  Q.   I mean any of these retiree representative --

10 A.   Okay.

11 Q.   -- bodies that --

12 A.   Okay.

13 Q.   -- or that I take to mean retiree associations,

14       pension systems official committee.

15 A.   Okay.  And so you're taking out the swaps, for

16       instance, you're not including --

17 Q.   Oh, absolutely.

18 A.   Okay.

19 Q.   Yeah, I'm just talking about what the pensioners --

20 A.   Okay, yes, I think that's fair.

21 Q.   Okay.  And just to get the record clear, as of -- your

22       recollection as you sit here today is that as of

23       April 1st, you did not have agreements with any of the

24       retiree representative parties, correct?

25 A.   Yes, I don't think we have formally announced

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-swr  Doc 8700-6  Filed 12/15/14  Entered 12/15/14 22:07:43  Page 49 of 44
118

1                    KEVYN ORR, VOLUME 2

2         plan are different from the pension cuts we've been

3         discussing up until this point?

4    A.   Yes.

5    Q.   The pension cuts are reduced to 4-1/2 percent for GRS,

6         with the elimination of COLA, and 0 percent for PFRS

7         with the elimination of approximately 45 percent of

8         the COLA, correct?

9    A.   I think that's accurate.

10   Q.   There are also additional nuances with respect to the

11        possibility for restoration and ASF recoupment that

12        were parts of both of those deals, correct?

13   A.   ASF is part of GRS but restoration is part of GRS and

14        PFRS.

15   Q.   Okay, but I just want to basically get on the same

16        page with you that the deals that you ultimately got

17        the retiree representative groups to buy into were at

18        the 4-1/2 percent cut level on the GRS pension and the

19        0 percent cut level on the PFRS pension, correct?

20   A.   Yes.

21   Q.   And that represented a substantial improvement in the

22        deal from the prior proposed cuts of 26 percent and 6

23        percent, correct?

24   A.   I think that's fair.

25   Q.   And you understand that at the current proposed rates

```
 1                      KEVYN ORR, VOLUME 2

 2           of recovery in the plan that is currently on file,

 3           classes 10 and 11 are being paid more than the COP

 4           holders; isn't that correct?

 5    A.     Yeah, are being paid more than as proposed to the COP

 6           holders, yes.

 7    Q.     Okay.  And they're being paid substantially more,

 8           correct?

 9    A.     I think it's a significant difference.

10    Q.     Okay.  Now, in fact, under the current plan, according

11           to the disclosure statement the GRS and PFRS classes

12           recover approximately 59 cents on the dollar, correct?

13    A.     Yeah, I think in the plan, obviously, there's a

14           schedule that shows percentage, but if that's the

15           schedule, yes.

16    Q.     I think it's actually technically 60 cents for GRS and

17           59 cents for PFRS?

18    A.     Yeah, that's --

19    Q.     That's about correct, right?

20    A.     That's about correct, maybe a little bit lower on the

21           PFR -- but that's about correct.

22    Q.     Okay, and the COPs recover at most 10 cents on the

23           dollar, correct?

24    A.     Yeah, there's a range of potential recovery for the

25           certificates of participation but it's stated at 10
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-swr   Doc 8700-6   Filed 12/15/14   Entered 12/15/14 22:07:43   Page 51 of 44
13-53846-swr   Doc 8700-6   Filed 09/25/14   Entered 09/25/14 17:08:01   Page 51 of 44
118

1                    KEVYN ORR, VOLUME 2

2          percent.

3     Q.   That's based, in part, on the fact that there is an

4          invalidity lawsuit against the certificates and the

5          potential to settle that as part of the plan, correct?

6     A.   Yes, I think that's fair.

7     Q.   The 10 cents that's in the disclosure statement

8          represents the best the COPs can do if they are

9          vindicated in the invalidity lawsuit, meaning that the

10         certificates are found to be valid?

11    A.   Well, no, that's why I said I think there's a range.

12         The --

13    Q.   I mean the 10 cents is the best they can do?

14    A.   Yeah, I -- okay, 10 cent -- the 10 cents is our

15         estimate of the best they could do.

16    Q.   Okay, so with respect to the plan that is on file, and

17         that you're seeking to confirm, with respect to

18         classes 10 and 11 on the one hand and the COPs holder

19         class on the other hand, why did you decide to

20         discriminate in favor of classes 10 and 11 as compared

21         to the COPs holders?  And by discriminate, I mean pay

22         them more recovery than you've paid to the COPs holder

23         class?

24    A.   Right.  As we said earlier this morning, in addition

25         to, you know, the assets that the retirement funds had

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-swr   Doc 8700-6   Filed 12/15/14   Entered 12/15/14 22:07:43   Page 52 of 44
13-53846-swr   Doc 8700-6   Filed 09/25/14   Entered 09/25/14 17:08:01   Page 52 of 44
118

```
 1                    KEVYN ORR, VOLUME 2

 2          in them, which would mean we'd have less ground to

 3          make up as opposed to the liability of the

 4          certificates which is a -- an ongoing liability, as

 5          between the concerns that the obligations, the human

 6          dimension, the responsibility the City had to try to

 7          keep its covenant with its employees and retirees as

 8          opposed to legal arguments that have been made in the

 9          papers regarding the COPs that we believe they are

10          void ab initio and that we have no obligation and

11          probably a number of other factors that I'm just not

12          recalling as I sit here today, that resulted in us

13          proposing in the plan that the GRS and PFRS

14          beneficiaries receive a higher recovery than the COPs.

15     Q.   Okay.  So my question is trying to drive on the

16          factors that you considered in exercising your

17          judgment to discriminate between these two classes.

18     A.   Right.

19     Q.   Do you understand that?

20     A.   Yes.

21     Q.   And you identified four, the existence of assets held

22          in the trusts --

23     A.   Mm-hmm.

24     Q.   -- the human dimension that we've discussed earlier,

25          the City's covenant to pay retirees their pensions --
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-swr  Doc 8790-6  Filed 12/15/14  Entered 12/15/14 22:07:43  Page 53 of 44
118

```
 1                    KEVYN ORR, VOLUME 2

 2    A.    Mm-hmm.

 3    Q.    -- and the invalidity of the COPs?

 4    A.    Yeah, the legal position of the COPs, but there may

 5          be -- there may be other factors that go into that

 6          analysis.  I'm just trying to give you off the top of

 7          my head sitting here today some of the factors that we

 8          considered in terms of proposing the plan.

 9    Q.    Well --

10    A.    There may be --

11    Q.    Oh, sorry.

12    A.    There may be factors having to do with negotiated

13          positions, with a number of other issues, so I don't

14          want to give you the impression that the only thing

15          are the factors you're writing down, there may be

16          other considerations we took into account.

17    Q.    Well, I guess I'll say understood, but you are the

18          decider, right?

19    A.    Yes, I am.

20    Q.    Okay, and so --

21    A.    I am the -- the decider has a different connotation to

22          it, so I'm the emergency manager.

23    Q.    You're talking what, the "W" connotation?

24    A.    Yeah.

25    Q.    Oh, okay.
```

```
 1                      KEVYN ORR, VOLUME 2

 2    A.    I don't want to --

 3    Q.    How easy (ph.) do you think I'm going to get on cross?

 4    A.    Yeah, yeah, I don't want to read in the paper Kevyn

 5          Orr --

 6    Q.    Okay.

 7    A.    -- thinks he's the decider.

 8    Q.    Kevyn Orr --

 9    A.    I'm the emergency manager who's charged under 436 with

10          discharging certain obligations in a sole discretion

11          including making decisions regarding proposals to

12          classes of creditors.

13    Q.    You are the man.  No.  Okay.  They were ready to hang

14          up.

15                    (Whereupon conference phone makes noise.)

16    BY MR. HACKNEY:

17    Q.    I'm out of here, they said, okay, this deposition is

18          off the rails.  Hang up and...

19                    MR. ALBERTS:  Should we go off the record

20          for a minute?

21    BY MR. HACKNEY:

22    Q.    Hold on, let me just finish this.  It's just a couple

23          more questions, then perhaps we can take a break.

24          Then we can reconnect our friends on the phone and...

25                    Okay, so you are the emergency manager that
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-swr  Doc 8700-6  Filed 12/15/14  Entered 12/15/14 22:07:43  Page 55 of 44
118

1                    KEVYN ORR, VOLUME 2

2          correct?

3     A.   Yeah, I don't want to give you the impression that,

4          you know, I say something, and next thing I know,

5          there's a discovery request well, prove that you

6          considered this or any -- there are many other factors

7          that went into the decision; those are the ones I can

8          remember sitting here today.

9     Q.   Okay.  But is it fair to say that you can remember all

10         of the important factors?

11    A.   Those are the ones that I can remember today, there

12         may be other ones that are important that I'm just

13         simply not remembering.

14    Q.   So there may be important factors that went into your

15         decision that you can't recall as you sit here today?

16    A.   As I sit here today.

17    Q.   Okay.  This is a good time to take a break, so

18         especially with this phone thing.

19    A.   I'm -- do you want to take?  I'm good to go.

20    Q.   No, I know you are, but I got to --

21    A.   Okay, you want to take a break, okay.

22                    MR. SHUMAKER:  Let's take a break.

23                    VIDEO TECHNICIAN:  The time is 10:16 a.m.,

24         we are now off the record.

25                    (Recess taken at 10:16 a.m.)

1                    KEVYN ORR, VOLUME 2

2              (Back on the record at 10:35 a.m.)

3              VIDEO TECHNICIAN:  The time is now 10:35

4         a.m., we are back on record.

5    BY MR. HACKNEY:

6    Q.   Mr. Orr, did you discuss your testimony with your

7         counsel at the break?

8    A.   No.

9    Q.   Okay, I want to talk about with respect to the four

10        grounds that you can recall, the information that you

11        relied upon with respect to each.

12   A.   Mm-hmm, yes.

13   Q.   And I wanted to start with the assets held in the

14        trusts.

15   A.   Mm-hmm.

16   Q.   That was the first ground you mentioned.  For that, I

17        take it you relied upon data from the retirement trust

18        regarding the various levels of their assets?

19   A.   We relied on data from the retirement trust including

20        reports by Gabriel Roeder, their actuary, as well as

21        their own documents but we also relied upon data from

22        Milliman, which was the actuary hired by the City, and

23        analyses prepared by E & Y, Miller Buckfire, and

24        Conway MacKenzie, as well.

25   Q.   Is it fair to say that to describe the body of

1                    KEVYN ORR, VOLUME 2

2           information that you relied upon with respect to this

3           first ground which are assets held in the trust that

4           you relied on either financial information from the

5           trusts about their assets or expert analysis relating

6           to appropriate discount and other actuarial rates to

7           be applied to those assets and liabilities?

8     A.    Yes, I relied on things other than my own analysis

9           from professionals who do this.

10    Q.    But did I accurately describe kind of the body of

11          information?

12    A.    Yeah, you did.  Yes, you did.

13    Q.    Okay.  Now, with respect to the human dimension that

14          we talked about, with respect to the classes 10 and

15          11, what type of information did you rely upon in

16          connection with that judgment?

17    A.    Well, I think some of the information we just

18          discussed is captured within that, as well as the

19          representatives on the art -- on the retiree

20          committee, the pension boards, as well, as well as

21          individual meetings with individual employees and

22          pensioners who recount their stories in detail, as

23          well as statements made in court by the court itself

24          as well as others.  I listened to the September 19th,

25          2013 tape of the meeting of creditors.  I listened to

1                    KEVYN ORR, VOLUME 2

2          the blog of last -- was it last Monday or Tuesday's

3          objectors meeting, general objectors meeting as well

4          as far as the impact, and from time to time obviously

5          I meet people on the street as well as hear their

6          accounts and press reports.

7     Q.   Is it fair to describe this body of information as,

8          you know, oral testimonies to you about the personal

9          hardship people will endure if there are -- if steeper

10         cuts are imposed?

11    A.   Yeah, I think it's fair to say oral testimony as well

12         as, as I said, the actual analyses that are provided

13         that, for instance, will tell you that general

14         retirement system employees get an average of 19,400

15         approximately in their pension, whereas PFRS may be in

16         the neighborhood of the mid-thirties.  So it's

17         actually analyses as well as oral testimony, oral

18         statements, written statements, and press reports.

19    Q.   Okay.  So you relied on aggregate financial data about

20         the approximate average size of pensions as well as

21         oral testimonies to you about how steeper cuts would

22         impose personal hardship on the pensioners?

23    A.   Yeah, the approximate average size -- you know,

24         included in this documentation for instance, I've

25         reviewed rolls of information regarding the actual

1                          KEVYN ORR, VOLUME 2

2          amount of pensions that thousands of pensioners have,

3          which have been provided to me by professionals.  So

4          it's not just summary information, it's actually

5          sometimes raw data discussions with -- with my

6          advisors, including attorneys, as well as discussions

7          with representatives including depositions of the --

8          of the -- some of whom are here today, representatives

9          of the various funds.

10    Q.    The financial data that you relied upon, though, was

11          the -- was limited to the size of their pensions,

12          whether it was aggregate or individual pensions,

13          right?

14    A.    No.

15    Q.    You didn't review personal financial information of

16          any of the retirees, did you?

17    A.    No, we didn't review -- I didn't review financial

18          statements of retirees but I did review reports as

19          indexed by account number on the pensions of

20          individual retirees.

21    Q.    Yes.

22    A.    Yeah.  I did review things like that.

23    Q.    I'm trying to say that when it came to the financial

24          information you considered, it related to the size of

25          the pensions, correct?

```
 1                    KEVYN ORR, VOLUME 2

 2   A.   As opposed to the personal financial situation of each

 3        individual pensioner?

 4   Q.   Right.

 5   A.   No, I have seen no information like that.

 6   Q.   And you haven't seen that in the aggregate, either,

 7        correct?

 8   A.   Well, let's be careful with aggregate.  I mean, you

 9        know, 14,000 approximately pensioners live within the

10        City of Detroit and/or Wayne County, I believe, so a

11        significant percentage live here, and when you look at

12        aggregate demographic data, you know, 40 percent of

13        our residents live at or below the poverty line per

14        capita GDP, all of this, I have reviewed aggregate

15        data, U.S. Census Bureau --

16   Q.   But this is stuff -- sorry to interrupt you.

17   A.   Yeah.

18   Q.   This is stuff that relates generally to the

19        population?

20   A.   Right.

21   Q.   It's not specific data to the retirees?

22   A.   No, but there was aggregate data that I did review

23        regarding retirees as a group but not their personal

24        financial information.

25   Q.   Right, the aggregate data on the retirees was with
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-swr  Doc 8700-6  Filed 12/15/14  Entered 12/15/14 22:07:43  Page 61 of 44
13-53846-swr  Doc 8700-6  Filed 12/15/14  Entered 12/15/14 17:08:01  Page 61 of 44
118

1                    KEVYN ORR, VOLUME 2

2        respect to their mean pensions.

3    A.  No, it was also with probable -- it wasn't just

4        pensions, it also -- there was aggregate data

5        regarding healthcare, there's aggregate data regarding

6        an alternative savings fund recoupment.  So I know

7        you're focusing principally on pensions, but I looked

8        at a number of data as a composite of what the impact

9        would be to these pensioners from a human dimension.

10   Q.  Okay, and evaluating the personal hardship they would

11       suffer?

12   A.  Correct.

13   Q.  Okay.  And that was -- was that one of the most

14       important things that drove you in connection with

15       this decision?  It seems like it's moved you.

16   A.  Well, I don't know if it's one of the most important,

17       but it -- all of them are important, the amount of

18       money, the Grand Bargain, the -- the grantors have

19       given us $866 million we didn't have seven months ago,

20       so that's pretty important.

21            The human dimension certainly is something

22       that you have to take into account.  These are real

23       people with real consequences.  So all of it's fairly

24       important to me.

25   Q.  Okay.  Now, you -- the third thing you talked about

1                    KEVYN ORR, VOLUME 2

2          was the City's covenant, which I understood you to

3          mean the City's promise that it would pay these people

4          their pensions?

5      A.  Yes.

6      Q.  And I take it from that the information you would have

7          relied upon was just the contract saying that folks

8          were entitled to these pensions?

9      A.  No, you know, we -- I also had access -- you know, I

10         talked with some City employees, for instance, who

11         currently work for the City, Gary Brown, who is a

12         retired Detroit police officer but is on a personal

13         service contract here in the City now, PSC, and I

14         talked to him about the historical commitments that

15         the City has made, he's a lifetime resident, been here

16         a long time.  Chief Craig, who was born here, for

17         instance, and his parents have been in the City, I

18         talked to him.  I talked to individuals.

19              So it's not just an analysis of, say, raw

20         data.  I mean, I have communications with people on

21         staff here in the City who will ask me if they can

22         come in and talk to me, and I'll listen to them.

23     Q.  I guess what I meant here is one of the factors you

24         identified as -- as informing your judgment with

25         respect to what to pay classes 10 and 11 versus COPs

```
 1                    KEVYN ORR, VOLUME 2

 2         holders, you identified was the City's covenant.

 3    A.   Yes.

 4    Q.   And I took that to mean the fact that the City had a

 5         contractual obligation to pay these people?

 6    A.   Right, and what I'm trying to relay to you is it's not

 7         just a fact that the City had a contractual

 8         obligation; it is the commitment and reliance on that

 9         commitment behind that contractual obligation that

10         various City employees and retirees will come and

11         express to me in very real terms what this means to

12         them.

13    Q.   I see.

14    A.   And so the covenant is not just a technical document,

15         it is also an expectation, a reliance, a commitment

16         the City has made, and employees and retirees express

17         it to me in very -- sometimes very candid terms.

18    Q.   I see.  What you're saying is you relied not only the

19         existence of the legal obligation to pay but also

20         testimonies you got from people that they had relied

21         on that?

22    A.   Yes.

23    Q.   And isn't it fair to say that this is another element

24         of the human dimension, which is the unfairness of

25         cutting the pensions of people who relied on the
```

13-53846-swt  Doc 8700-6  Filed 12/15/14  Entered 12/15/14 22:07:43  Page 64 of 44

```
 1                     KEVYN ORR, VOLUME 2

 2          City's covenant in making decisions about how to

 3          allocate their work time?

 4     A.   You could say that.

 5     Q.   And then the last issue that you identified was the

 6          invalidity of the COPs; do you remember that?

 7     A.   Yes.

 8     Q.   And that was something that you factored into your

 9          decision in terms of paying the COPs less than classes

10          10 and 11, correct?

11     A.   Yes.

12     Q.   And I take it you relied upon legal analysis from your

13          counsel about the potential invalidity of the COPs,

14          correct?

15     A.   Yes.

16     Q.   And I know that there had been a lawsuit filed prior

17          to the time of the current plan being filed, but I

18          assume that if I asked you questions about what your

19          attorneys had advised you with respect to the

20          invalidity of the COPs you'll invoke the

21          attorney-client privilege and decline to answer?

22     A.   Yes.

23     Q.   Okay, so I hope we can stipulate that if I ask a bunch

24          of questions about how the COPs analysis factored into

25          the decision that the attorney-client privilege will
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-swr  Doc 8700-6  Filed 12/15/14  Entered 12/15/14 22:07:43  Page 65 of 44
118

```
 1                    KEVYN ORR, VOLUME 2

 2         be invoked?

 3                    MR. SHUMAKER:  Assuming your question gets

 4         to communications between counsel and Mr. Orr, yes.

 5   BY MR. HACKNEY:

 6   Q.    Well, I mean, did you -- did you -- in assessing the

 7         invalidity of the COPs as a factor justifying the

 8         level of discrimination, did you consider anything

 9         other than legal advice around the invalidity of the

10         COPs?  It seems like a legal question.

11   A.    It's a legal question, but in an effort to be

12         forthcoming and fair to you, I'd have to say yes, and

13         I'll try to tell you, for instance, without discussing

14         the -- and going afield of many discussions, legal

15         opinions, analyses, meetings, written opinions, that I

16         received from counsel.

17                    So for instance, in looking at the COPs, in

18         addition to those things, you know, I examined news

19         reports about that transaction, I think I've even

20         examined those -- some of those before I got here.

21         Reports, for instance, by the auditor general that it

22         questioned the propriety and validity of the COPs

23         reports at that time when -- I think it was Auditor

24         General Hart (ph.) back in 2005, City Council

25         statements that were made.  Statements made by the
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-swr   Doc 8790-6   Filed 12/15/14   Entered 12/15/14 22:07:03   Page 66 of 44
118

1                          KEVYN ORR, VOLUME 2

2          City treasurer back then that it was invalid and

3          inappropriate to enter into the COPs and that it would

4          make the City bankrupt and that the City should have

5          declared bankruptcy in 2005.

6                    So there's other data that I looked at to

7          inform myself, just not the legal analyses about

8          position of the COPs, and some of that data was

9          contemporaneous with when they were initially entered

10         into and some of that was subsequent to that.

11    Q.   And you identified a number of individuals or reports

12         that you had read; I didn't hear any lawyers in any of

13         those things.  Were there?

14    A.   None of my lawyers were in those things, so there

15         was -- there's, you know, document -- documentary

16         evidence that is short of the legal opinions I got

17         from my counsel.

18    Q.   Okay, so but to tie it up, was the principal

19         information that you relied upon legal advice conveyed

20         to you by your lawyers about the invalidity of the

21         COPs?

22    A.   Yes.

23    Q.   And I -- just so I understand the way the judge -- the

24         factor plays through your judgment, you looked at the

25         potential invalidity of the COPs and viewed that as

1                    KEVYN ORR, VOLUME 2

2           one reason to pay the COPs on their best day 10 cents?

3    A.    Yeah, I don't know -- I don't want to give the

4          impression that it was that binary, you know, a number

5          of issues, as I said before, went into what we could

6          afford to pay --

7    Q.    Yes.

8    A.    -- the validity of the claim, which is pretty typical

9          in bankruptcies, all that stuff, but I think that's a

10         fair statement.

11   Q.    Okay, I'm talking when you were deciding how to divide

12         the pie, the COPs best day recovery was impacted by

13         this factor of the potential invalidity of the COPs?

14   A.    Yes.

15   Q.    Now, with respect to the information in these four

16         areas that we've just talked about, the information

17         that relates to each of the four factors you

18         identified --

19   A.    Mm-hmm.

20   Q.    -- was there a material change in this body of

21         information between April 1 and April 15 of 2014?

22   A.    I don't know, you say material change, what are you --

23         what do you mean?

24   Q.    Is there anything that sticks out to you with respect

25         to any of your four factors and the information

```
 1                    KEVYN ORR, VOLUME 2

 2          associated with each that changed materially between

 3          April 1 and April 15?

 4    A.    To be frank with you, I can't -- I can't recall if

 5          there was, but I don't -- nothing jumps out at me.

 6    Q.    Okay.  Now, in structuring the plan, did you take

 7          advice from Miller Buckfire?

 8    A.    Yes.

 9    Q.    And in deciding what levels of discrimination between

10          creditors was appropriate, did you also take advice

11          from Miller Buckfire?

12    A.    Yes.

13    Q.    And did you specifically take advice from Ken

14          Buckfire?

15    A.    I -- I would have regular restructions (sic) with Ken

16          and other members of his team, so I think it's fair to

17          say yes.

18    Q.    Did Mr. Buckfire recommend to you that when it came to

19          evaluating the recovery of the retirees that the City

20          should consider the pension recoveries in combination

21          with the OPEB recoveries in making a determination as

22          to what the level of discrimination was?

23                    MR. SHUMAKER:  Object to the form.

24    BY MR. HACKNEY:

25    Q.    Do you understand my question?
```

1                    KEVYN ORR, VOLUME 2

2          listening to some of the statements that were made,

3          looking at some of the representations that have been

4          made by the City over the years, I think it's fair to

5          say there is a number of different information that

6          came in concerning the obligations to retirees.

7     BY MR. HACKNEY:

8     Q.   Now, did you -- did you attempt to determine what

9          other creditors' expectations were vis-a-vis the City?

10    A.   Oh, I certainly heard from other creditors,

11         expectations from rating agencies, from financial

12         publications, from statements made in the press from

13         them, as well, that their expectation was that they

14         were going to be paid.

15    Q.   For example, did you talk to any of the -- of the COPs

16         holders to determine what their expectations were

17         about when they invested?

18    A.   I know I talked to some of their representatives.  I

19         don't know if I talked to any of the principals or any

20         of the individual holders.

21    Q.   Okay.  Fair to say that you haven't talked to any COPs

22         holder who told you that they expected not to be

23         repaid, correct?

24    A.   I think that's fair.

25    Q.   And you haven't talked to any other financial creditor

```
1                    KEVYN ORR, VOLUME 2

2          who told you that their expectation was that they

3          would not be repaid, correct?

4      A.  There was a conference in New York last fall where

5          some creditors as identified who represented that they

6          had interest in Detroit's debt said that they knew

7          that the City probably would not be able to pay this

8          debt but nonetheless they expected to be paid and they

9          were going to punish the City.  They came up to me at

10         the conference with their finger in my face about

11         that.  But I can't -- I don't know -- I didn't take

12         their card, I don't know their name, but generally

13         speaking, I -- I was -- excluding conversations we've

14         had in mediation discussions, which are protected by

15         the order, I don't recall with specificity any

16         particular creditor principal coming up to me and

17         saying they did not expect to be paid.

18     Q.  I mean, let me try to tie it up this way.  By the way,

19         I can't believe that thing actually happened to you,

20         only in New York.

21     A.  No, it's happened to me many times --

22     Q.  No offense to New Yorkers --

23     A.  Oh, it was ugly.

24     Q.  We don't do that in Chicago but...

25                    MR. PEREZ:  I thought you were a Michigan
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-swr  Doc 8706-6  Filed 12/15/14  Entered 12/15/14 17:08:03  Page 71 of 44
118

1                    KEVYN ORR, VOLUME 2

2          boy.

3                    MR. HACKNEY:  I am, born and raised, but

4          I've actually lived in Chicago now --

5                    THE WITNESS:  Are you coming back?  Are you

6          coming back?

7                    MR. HACKNEY:  No, no, I'm a Chicagoan.

8                    THE WITNESS:  Okay.

9                    MR. HACKNEY:  You lost me.

10    BY MR. HACKNEY:

11    Q.   Let me see if I can tie it up this way.  You did not

12         attempt to undertake a systematic analysis of what all

13         the creditors thought that they were going to get when

14         they made their respective investment decisions to

15         decide who should get what?

16    A.   I did not poll all of the creditors regarding what

17         they thought they were going to get.

18    Q.   Okay, and you didn't factor that into your conclusion,

19         correct?

20    A.   No.  Not at least that I can say -- I can't say what

21         discussions were made in mediation, but I -- publicly

22         the answer would be no.

23    Q.   I am talking about, you know, your state of mind,

24         though.  I'm saying that you didn't go and pick

25         winners and losers based on what people's expectations

1                    KEVYN ORR, VOLUME 2

2          were when they invested?

3    A.    No, I don't view it as picking winners and losers

4          because I don't think anybody here has said to me that

5          they think of themselves as winners.

6                    We tried to do an analysis of what we could

7          afford to pay based upon the factors we discussed

8          before with an understanding that $866 million was

9          coming in as a gift from grantors with specific

10         condition that that money would flow to pensioners as

11         opposed to any other creditor class and that we would

12         accept that gift with that condition when those

13         discussions were made.

14   Q.    Understood, I'm just trying to say -- picking winners

15         and losers was a euphemism, I didn't mean to be

16         casual.  You didn't set respective recovery levels

17         based on the fact that you thought some creditors

18         should be paid less based on their expectations when

19         they invested as opposed to others?

20   A.    No, that really wasn't a factor.  I mean, did I

21         personally believe that there may have been creditors

22         who were more capable of doing underwriting about the

23         City's debt condition has been -- as had been reported

24         in various publications that I'd read, yes, I

25         understood that but I didn't sit down and say, you

1          KEVYN ORR, VOLUME 2

2          know, based upon your expectation of being paid, you

3          know, this is what we can pay.  We generally drove the

4          determinations based upon the revenue stream and the

5          strengths and weaknesses and negotiations with any

6          particular creditor group?

7     Q.   And I take it you did not, for example, go back and

8          review the due diligence materials that were provided

9          to the COPs creditors in the 2005 and 2006

10         transactions, correct?

11    A.   I didn't do it personally but some of my advisors did.

12    Q.   Okay.  But, I mean, you don't know what was in those

13         due diligence materials?

14    A.   No, some of those materials, I -- I did see some of

15         those materials and I saw some of the legal opinions

16         that were provided back then.

17    Q.   In fact, the legal opinions that were provided back

18         then told COPs holders that the COPs were legal,

19         correct?

20    A.   Some of them did, there was one law firm in the City

21         that refused to do the transaction because they opined

22         or at least informed people that they thought it was

23         illegal.

24    Q.   And do you recall what the COPs holders were told

25         about the nature of the remedy that would exist if the

1                        KEVYN ORR, VOLUME 2

2          City failed to pay the service corps?

3     A.   No.

4     Q.   Do you know who the COPs holders were at the time of

5          the COPs offering?

6     A.   There was a list of who they were, but sitting here

7          off the top of my head, no.

8                    MR. HACKNEY:  Let's mark this as our next

9          exhibit.

10                   MARKED FOR IDENTIFICATION:

11                   DEPOSITION EXHIBIT 21

12                   11:29 a.m.

13   BY MR. HACKNEY:

14    Q.   Mr. Orr, is this the offering memorandum that was put

15         out in connection with the 2005 COPs?

16    A.   Without sitting here and reading through it, to the

17         best of my knowledge, this appears like a document

18         I've seen before as the offering document.

19    Q.   And have you read this document before?

20    A.   I have not read the document in total; I have read

21         pieces of it.

22    Q.   Okay.  You didn't just sit down and one day say, I

23         want to read the offering memorandum?

24    A.   I did not read through the whole document.

25    Q.   Now, if you look at page 8, I want to read you a

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-swr  Doc 8700-6  Filed 12/15/14  Entered 12/15/14 22:07:43  Page 75 of
118
13-53846-swr  Doc 8700-6  Filed 12/15/14  Entered 12/15/14 17:07:03  Page 76 of 44

```
 1                    KEVYN ORR, VOLUME 2

 2   Q.   In part?

 3   A.   I think that is fair.

 4   Q.   You know, Mr. Orr, I've reached a good stopping point,

 5        I think.

 6                 MR. SHUMAKER:  Sure.

 7                 MR. HACKNEY:  There's a lot of people in

 8        the room, but I kind of defer to you.

 9                 THE WITNESS:  No, I'm good, but if you guys

10        think that makes sense, we have a thing that we need

11        to do.

12                 MR. HACKNEY:  What time?

13                 MR. HERTZBERG:  At 1:15 for 5 minutes.

14                 THE WITNESS:  Okay.

15                 MR. HACKNEY:  That will be perfect then,

16        we'll take an hour for lunch, and then I'll see you at

17        1:30.

18                 THE WITNESS:  Okay.

19                 VIDEO TECHNICIAN:  The time is now 12:31

20        p.m., we are now off the record.

21                 (Recess taken at 12:31 p.m.)

22                 (Back on the record at 1:36 p.m.)

23                 VIDEO TECHNICIAN:  The time is 1:36 p.m.,

24        we are back on the record.

25   BY MR. HACKNEY:
```

1                    KEVYN ORR, VOLUME 2

2    Q.    Mr. Orr, welcome back from lunch.

3    A.    Thank you, Mr. Hackney.

4    Q.    Okay.  So Mr. Orr, you're aware that certain

5          charitable foundations have agreed to contributed

6          money to the City's pension obligations in exchange

7          for the City conveying its art collection into a

8          public trust; is that correct?

9    A.    Yes.

10   Q.    And I take it if I ask you questions about your

11         communications with the charitable foundations in

12         connection with their agreement to contribute this

13         money, you will refuse to answer on the grounds of the

14         mediation order's confidentiality provisions; is that

15         correct?

16   A.    Yes, generally for most of them, I think that's

17         correct.

18   Q.    And just for the record, you didn't have any such

19         conversations prior to the entry of the mediation

20         order which was at some point in September of 2013?

21   A.    Yes, that's correct.

22   Q.    Okay.

23   A.    Well, let me think.  I think I had one meeting with

24         Darren Walker at Ford Foundation, but it was not about

25         a contribution, it was just a meet and greet.

```
 1                    KEVYN ORR, VOLUME 2

 2    Q.   Okay.

 3    A.   Okay?

 4    Q.   Yeah, I saw that in the documents, and there were some

 5         issues about the Ford Foundation and the building that

 6         they owned or something that --

 7    A.   I didn't even get into all that.

 8    Q.   Okay.

 9    A.   It was just hi, how are you, they were helping us with

10         some grants, helping us stand up a grants

11         administrator.

12    Q.   So I guess I want to make a record of something I

13         understand from the City's position but it is the

14         City's position that communications with the

15         foundation are either part of or incidental to the

16         mediation, correct?

17              MR. SHUMAKER:  I believe that's correct.

18         Again, I think you could fish outside the contours of

19         those mediation talks but my understanding is that all

20         those talks were within the context of mediation.

21    BY MR. HACKNEY:

22    Q.   Yeah, I mean, I don't want to ask a hundred questions

23         today to establish what I think is relatively well

24         established, which is that you're not, generally

25         speaking, going to discuss your conversations with the
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-swr  Doc 8096-1  Filed 10/25/14  Entered 10/25/14 22:07:43  Page 78 of
118

```
 1                    KEVYN ORR, VOLUME 2

 2        foundations, correct?

 3   A.   That is correct.  You know, I may -- let me say this

 4        generally.  I may have had meetings with foundation

 5        principals outside of the confines of the mediation,

 6        just hail-fellow-well-met, saw them at an event, how

 7        are you.  There were no substantive conversations

 8        about the contribution that did not occur outside of

 9        the mediation order.

10   Q.   And that's fine, because the only ones that I really

11        want to ask you about are ones that relate to the

12        Grand Bargain?

13   A.   Right, right.

14   Q.   And those would fall under the gambit of the

15        mediation?

16   A.   Those would fall under the gambit of mediation.

17   Q.   Now, if I asked you your state of mind based on what

18        you understood the foundations to be willing to do or

19        what you thought they would be willing to do, you

20        would also invoke the mediation order to the extent

21        his state of mind was created by communications of the

22        foundation, correct?

23                  MR. SHUMAKER:  I think that's right because

24        I don't see how he could give you his impressions or

25        his understanding without going into what was going on
```

## Exhibit 6B

**July 22, 2014 Expert Witness Report of Stuart Ira Wohl (excerpted)**

In re

City of Detroit, Michigan
    Debtor

Chapter 9
Case No. 13-53846

REPORT OF
**<u>STUART I. WOHL</u>**

I, STUART I. WOHL, subject to the penalties provided by law for perjury, do hereby declare the following to be true and correct based on my personal knowledge and upon information provided by the City of Detroit.

1.      I am currently a Senior Vice President, East Region Health Practice Leader and National Retiree Health Practice Leader of The Segal Company.  I have more than 26 years of health consulting experience with The Segal Company.  I have been Segal's Retiree Health Practice Leader for more than ten years and the East Region's Health Practice Leader for more than six years.  Prior to The Segal Company, I worked in the Actuarial and/or Underwriting Departments at two insurance companies.

2.      The Segal Company was founded in 1939 and is one of the nation's leading actuarial and employee benefit plan consulting firms.  The Segal Company provides pension and health benefit consulting services.  Segal maintains a staff of approximately 1,000 and has offices in 22 cities in the United States and Canada.  Segal provides employee

benefits and human resource consulting to more than 2,500 clients. We consult on the full range of health and welfare, retirement and human resources-related issues.

3. As Segal's Retiree Health Practice Leader, I provide thought leadership and guidance to our actuaries and staff regarding retiree health benefits and retiree health valuations. I also help with developing policies, procedures, and guidelines for use in retiree health consulting.

4. As the East Region's Health Practice Leader, I provide thought leadership, guidance, and management of the health consulting practice within Segal's East Region. I also provide direct consulting services to certain Segal clients including a number of retiree-only plans, some of which maintain Voluntary Employee Beneficiary Associations (VEBAs), and a number of large Public Sector clients including the health plans for active and retired employees for the State of Delaware, the retiree health plan offered through the Pennsylvania School Employee Retirement System and the New Mexico Retiree Health Care Authority.

5. During my 26 years at The Segal Company, I have provided support in many bankruptcies, usually in Bankruptcy Code Section 1114 matters. In such instances, I was part of the team providing support to a Section 1114 Committee or a union. I was part of the team providing support to Section 1114 Committees in bankruptcies of: Eastern Airlines; Pan Am Airways; United Airlines; Northwest Airlines; American Airlines; Federated Department Stores; Lone Star Industries; Solutia; Eastman Kodak; Copperweld Steel; LTV Steel; Bethlehem Steel; Bonwit Teller; HK Porter, and Dana Corporation.

6. I have spoken numerous times on retiree health benefits and other health topics including:

- Teamster Trustees Benefits and Capital Strategies Session, November 2, 2007 "Retiree Health VEBAs – Are they the Solution?"

2

118

13-53846-tjr   Doc 8790-1   Filed 12/15/14   Entered 12/15/14 22:07:43   Page 82 of 6
13-53846-swr   Doc 6990-7   Filed 08/22/14   Entered 08/22/14 17:03:41   Page 82 of 116

- American Bankruptcy Institute's 19th Annual Winter Leadership Conference, December 2, 2007, "Section 1114 Issues in Large and Middle-Market Cases."

- American Bar Association, Section of Labor and Employment Law, Employee Benefits Committee, March 1, 2008, "New Developments in Funding Retiree Medical with a VEBA."

- Pensions and Capital Stewardship Project, Labor and Worklife Program, Harvard Law School, Capital Matters: Managing Labor's Capital Conference, April 18, 2008, "What to Do While Waiting for Universal Health Insurance:  Are VEBAs and Other Pre-Funded Schemes Part of the Solution or Part of the Problem?"

- 2010 CONNPELRA Annual Conference, June 4, 2010, "Health Care Reform: First Steps for Public Sector Plans."

- Graphic Communications Conference, September 23, 2011, "Health Care Reform:  Issues for Multi-Employer Plans and for Collective Bargaining."

7.  I was the primary author of Segal's Winter 2008 Survey, "*Study of Retiree Health VEBAs,*" as well as the author of a March 2008 article for Employee Benefit News, "*Retiree Health VEBAs: A Brief Profile.*"

8.  The Segal Company has been retained by the Official Retiree Committee in the City of Detroit Bankruptcy and is being compensated for my time in this matter at the rate of $535 per hour.   Segal's compensation in this matter is not, in any way, contingent upon the outcome of the case.

9.  I have prepared Affidavits, Declarations and/or provided Deposition testimony in the following matters during the previous four years:

- AMR Corporation, et al,, (Chapter 11 Case No. 11-15463) (United States Bankruptcy Court – Southern District of New York)

3

118

13-53846-swr   Doc 8730-1   Filed 12/15/14   Entered 12/15/14 22:07:43   Page 83 of 6
13-53846-swr   Doc 6990-7   Filed 08/22/14   Entered 08/22/14 17:03:61   Page 83 of 6

- City of Detroit, Michigan (Chapter 9 Case No. 13-53846) (United States Bankruptcy Court – Eastern District of Michigan, Southern Division)
- Michael Merrill et al. v. Briggs & Stratton Corporation (Case No. 10-C-700-LA – United States District Court, Eastern District of Wisconsin)

10. I have also prepared affidavits, declarations and/or provided deposition testimony in the following matters more than 4 years ago:

- Peter A. Raetsch, et al v. Lucent Technologies (Civil Action No. 2:05-cv-5134 (PGS) United States District Court, District of New Jersey)
- <u>Beaty et al v. Continental Automotive Systems U.S., Inc.</u>, Case 5:11-cv-00890-CLS (N.D. Ala.)
- Joseph Tourangeu, Molly Cobbol, Robert Lowell, Robert Frank on behalf of themselves and all others similarly situated v. Uniroyal Inc. (Civ. Act. No. N-28-208 (ANH) – United States District Court, District of Connecticut)
- Trull v. Dayco Prod LLC (Case No. 1:02-cv-243-LHT), United States District Court, Western District of North Carolina
- Diehl v. Twin Disc, Inc. (Case No. 3:94-cv-50031), United States District Court, Northern District of Illinois
- International Association of Machinists and Aerospace Workers and its Affiliated District Lodges, v. The Boeing Company (Charge NOS 19-CA-24154 before the National Labor Relations Board)

**OPINION**

11. The purpose of my testimony is to describe the impact of the City's Plan of Adjustment ("POA") upon the health care benefits previously received by the City's retired workers. As I will describe, the funding available through the POA for Retiree Health Benefits is very limited and will result in significant reductions in the subsidies that were provided

prior to the bankruptcy. It will also expose them to significant risks. The Official Committee of Retirees is supporting the POA, including as to OPEB, despite these risks and funding reductions because any further reductions would have been devastating to Retirees.

## BACKGROUND

12. Before the bankruptcy filing and post-filing until February 28, 2014, the City of Detroit (the City) offered health insurance coverage to approximately 17,000 retirees and surviving spouses, plus approximately 7,400 dependent spouses. Not only did the City offer these benefits, the City paid the majority of the costs of such benefits. In many instances, the City paid 100% of the cost of these benefits. Of the approximately 24,700 retirees and spouses, approximately 6,000 are under age 65 and I have been told that approximately 650 are age 65 and older but are not, and will never be, eligible for Medicare.

13. Until February 28, 2014, the City offered retirees a choice of plans. For example, according to the 2012-2013 City of Detroit Retiree Modified Option III Plan Enrollment Guide, retirees had as many as five plans from which to choose. Some of the contracts with retirees required monthly contributions, with the actual amount dependent on the Collective Bargaining Agreement and the choice of plan.

14. According to a City-provided document titled "City of Detroit, Retiree Legacy Cost Restructuring" dated September 11, 2013, the City projected a net cost for retiree health benefits of around $176 million for the Fiscal Year Ending in 2014. The City proposed to reduce annual City spending for postretirement health care benefits by $144 million for FYE 2014 or more than 80% -- from approximately $176 million per year (per the September 11, 2013 document) to approximately $31.3 million (per the 6/30/2012 Actuarial Valuation prepared by Milliman).

**Exhibit 6C**

**August 13, 2014 Deposition Transcript of Stuart Ira Wohl (excerpted)**

1       STUART IRA WOHL

2      IN THE UNITED STATES BANKRUPTCY COURT

3       FOR THE EASTERN DISTRICT OF MICHIGAN

4

5

6   In re:                    ) Chapter 9

7   CITY OF DETROIT, MICHIGAN,     ) Case No. 13-53846

8              Debtor.   ) Hon. Steven W. Rhodes

9

10   _____

11

12

13       The Videotaped Deposition of STUART IRA WOHL,

14       Taken at 1114 Washington Boulevard,

15       Detroit, Michigan,

16       Commencing at 2:32 p.m.,

17       Wednesday, August 13, 2014,

18       Before Kathryn L. Janes, CSR-3442, RMR, RPR.

19

20

21

22

23

24

25

1          STUART IRA WOHL

2          team members actually took a prior deposition and

3          copied into for the background for my introduction

4          about myself.

5     Q.   It's fair to say that the work done by your team

6          was at your direction, right?

7     A.   Correct.

8     Q.   And did you have an opportunity to review the

9          final report before it was served on the other

10         parties in this case?

11    A.   I reviewed it and then signed it.

12    Q.   Got it.  And so it's -- it's fair to say that you

13         had an opportunity -- you had the last

14         opportunity to make changes; is that right?

15    A.   Correct.

16    Q.   Is there anything today after having completed

17         and -- and signed the report, is there anything

18         today that you want to change about the report?

19    A.   No.

20    Q.   Is it fair to say you stand behind the report

21         completely?

22    A.   Yes.

23    Q.   And you understand that when you submitted your

24         report, it was important for your report to

25         contain all of your opinions that you -- all of

1                        STUART IRA WOHL

2          the opinions you were providing in connection

3          with this case?

4     A.   Yes.

5     Q.   Which is to say, you are not providing opinions

6          other than what is contained in your report,

7          correct?

8     A.   Correct.

9     Q.   And when you prepared the report, you made your

10         best efforts to assure that the opinions and data

11         contained in the report are accurate and

12         truthful, correct?

13    A.   Yes.

14    Q.   If you -- if you can, would you give me a brief

15         summary of the opinions that you're offering in

16         this case?

17              MR. BARNOWSKI:  Object to form.

18    A.   I am offering an opinion that says that the

19         plan -- the POA requires significant cutbacks and

20         benefits of retirees, and even within the POA,

21         there is further risk that aspects that are being

22         relied upon in the POA may not come to fruition.

23    BY MR. BERNBROCK:

24    Q.   Any other opinions that you're offering like

25         macro opinions?

```
 1              STUART IRA WOHL
 2              MR. BARNOWSKI:  Object to form.
 3    BY MR. BERNBROCK:
 4    Q.    Other than that?
 5    A.    I also describe the impact of some individual
 6          class members, just to show the impact how -- the
 7          changes could impact the expense, I think it's for
 8          six or seven folks, which are just one very small
 9          subset of the 17,000 retirees and their 7,000,
10          8,000 dependents.
11    Q.    And you're not offering your opinions in this
12          case to demonstrate the hardship on retirees, are
13          you?
14              MR. BARNOWSKI:  Object to form.
15    A.    I think I said that, that significant cuts in
16          benefits are hardships for retirees.
17    BY MR. BERNBROCK:
18    Q.    Okay.  The -- we're going to do this -- this
19          laundry list again of things that you're not, and
20          you'll pardon me, I hope.  I want to be clear
21          that you are not offering opinions about the
22          General Retirement System or the Police and Fire
23          Retirement System Pensions; is that correct?
24    A.    Correct.
25    Q.    You are not offering an opinion regarding the
```

1              STUART IRA WOHL

2         claims held by the pension systems; is that

3         correct?

4    A.   Correct.

5    Q.   You are not offering your opinion as to whether

6         the POA contains unfair discrimination as that

7         term is understood under the bankruptcy laws?

8              MR. BARNOWSKI:  Object to form.

9    BY MR. BERNBROCK:

10   Q.   Is that correct?

11   A.   Correct.

12   Q.   You're not offering an opinion that the plan --

13        the POA is fair and equitable as that term is

14        used in connection with bankruptcy law?

15             MR. BARNOWSKI:  Object to form.

16   A.   Correct.

17   BY MR. BERNBROCK:

18   Q.   You're not offering an opinion that the plan --

19        the POA -- I'm going to do that all day.

20   A.   I got mine right before.

21   Q.   You did, I know.

22             MR. BARNOWSKI:  Then it's definitely

23        not simplifying things here.

24             MR. BERNBROCK:  Yeah, that's right.

25   BY MR. BERNBROCK:

1                    STUART IRA WOHL

2    Q.    You're not offering any legal opinion as to

3          whether the plan -- POA is in the best interest

4          of creditors, correct?

5    A.    Correct.

6    Q.    You're not offering any legal opinion regarding

7          whether the POA has been proposed in good faith,

8          correct?

9    A.    Correct.

10   Q.    And you're not offering an opinion to demonstrate

11         that the POA has satisfied the confirmation

12         standards under Chapter 9 or Chapter 11 of the

13         bankruptcy code, correct?

14                    MR. BARNOWSKI:  Object to form.

15   A.    Correct.  Correct.

16   BY MR. BERNBROCK:

17   Q.    So if we could, sir, just turning to your report

18         and how I intend to proceed, so that you have an

19         idea here, is I really want to just walk through

20         the various sections of your report, and ask

21         questions along the way, ask you to explain

22         various things in your report.  I think that your

23         report lends itself to a sort of chronological

24         review and so that's -- that's what I'm going to

25         do.

**<u>Exhibit 6D</u>**

**July 31, 2014 Deposition Transcript of Rip Rapson (excerpted)**

RIP RAPSON

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| In re | ) Chapter 9 |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
| Debtor. | ) Hon. Steven W. Rhodes |

_____


     The Videotaped Deposition of RIP RAPSON,

Taken at 1114 Washington Boulevard,

Detroit, Michigan,

Commencing at 9:02 a.m.,

Thursday, July 31, 2014,

Before Rebecca L. Russo, CSR-2759, RMR, CRR.

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

```
 1                        RIP RAPSON

 2    Q.   Let me be a little bit more specific with it.  From

 3         the time that the bankruptcy filing occurred, Detroit

 4         bankruptcy occurred, and up until the time where you

 5         believe your conversations regarding the mediation,

 6         the mediation back and forth started --

 7    A.   Mmm-hmm.

 8    Q.   -- we're not talking about those, did you have any

 9         conversations with the folks -- did you have any

10         conversations with anyone that you can remember

11         regarding whether Kresge would get involved in the

12         bankruptcy --

13    A.   Oh, I see.

14    Q.   -- in order to, one, preserve the collection at the

15         DIA?

16    A.   No, no.

17    Q.   And prior to -- after the filing of the City of

18         Detroit's bankruptcy and prior to the time that Kresge

19         became involved in conversations back and forth

20         regarding the Grand Bargain mediation, were you

21         involved with any discussions regarding Kresge

22         becoming involved in the bankruptcy to soften the blow

23         to the pensioners?

24    A.   No.

25    Q.   When did, when did you first become aware of what's
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 8760-9   Filed 08/25/14   Entered 08/25/14 22:03:63   Page 95 of 13
118

00000000-0000-0000-0000-000000000000

1                          RIP RAPSON

2          now become known as the Grand Bargain or the process

3          leading towards the Grand Bargain?

4     A.   I think it was at the time that Judge Rosen asked the

5          group of foundations together and hear him out on an

6          idea he had.

7     Q.   So I take it that the way you and your organization

8          became involved with the Grand Bargain was by Judge

9          Rosen reaching out to you and not the opposite, you

10         actually reaching out to Judge Rosen?

11    A.   That's correct.

12    Q.   And when did Judge Rosen reach out to you directly to

13         get involved in the Grand Bargain?

14    A.   I'm sorry, I don't recall what that date was, but it

15         was, it was right at the same time that he was

16         gathering -- I wasn't able to attend that first

17         meeting, but I think -- didn't he gather people in his

18         chambers?  The foundation community in his chambers.

19         I think that was really, it was in that time slot that

20         I first became aware of it.

21    Q.   And did Judge -- is the first time you considered

22         becoming involved in the Grand Bargain, was that on a

23         phone call where Judge Rosen contacted you personally?

24    A.   No.

25    Q.   When was it?

1                              RIP RAPSON

2    A.    It was in a, a dinner conversation I had with him.

3    Q.    And during this dinner conversation, this is when

4          Judge Rosen proposed that the Kresge Foundation become

5          involved with the Grand Bargain, is that fair?

6    A.    Yes.

7    Q.    And I've reviewed on YouTube, of all places, a speech

8          that you gave at Wayne State University -- maybe not a

9          speech, but it certainly was a formal type speech, and

10         do you remember that, that address?

11   A.    I do.

12   Q.    Okay.  Do you remember when that was?

13   A.    It was, what, I don't know, two-and-a-half months ago,

14         I think.

15   Q.    And during that address to the audience, you

16         referenced your initial conversations with Mr. Rosen,

17         is that fair, with Judge Rosen?

18   A.    I don't recall, but if it's on YouTube, I'll take your

19         word for it.

20   Q.    And we thought about bringing it in and playing it for

21         you.

22   A.    Oh, that would have really been torture.

23   Q.    Tell me if I'm right.  When Judge -- during your first

24         conversation with Judge Rosen, where he proposed that

25         the Kresge Foundation become involved in the process

00000000-0000-0000-0000-000000000000

```
 1                         RIP RAPSON
 2        for the Grand Bargain, was it Judge Rosen who brought
 3        up that the involvement of the foundation should occur
 4        because it could soften the blow to the pensioners and
 5        help preserve the collection at the DIA?
 6                  MR. SHUMAKER:  Objection.  This calls for
 7        communications between Judge Rosen and Mr. Rapson.  I
 8        believe this falls within the construct of the
 9        mediation order, and I would ask that the witness be
10        instructed not to answer.
11                  If you have specific parts of the YouTube
12        video or Mr. Rapson's statements you would want to ask
13        him about, that's a different story.  But I think when
14        you get to the back and forth between Mr. Rapson and
15        Judge Rosen, you are intruding into the area protected
16        by the mediation order.
17                  MR. KURZWEIL:  Under those circumstances,
18        I'm going to instruct the witness not to answer that
19        specific question.
20   BY MR. MCCARTHY:
21   Q.   And is it fair to assume that you will follow those
22        instructions and not answer questions based on the
23        mediation order with respect to your initial
24        back-and-forth conversations with Judge Rosen at your
25        initial meeting with him?
```

```
 1                          RIP RAPSON

 2    A.   Yes.

 3    Q.   Let me try to reframe it and see if we can do it that

 4         way.  If not, I understand.

 5              At 10 minutes and 45 seconds into the

 6         speech that you gave at Wayne State University on the

 7         topic of the bankruptcy, you noted to the audience

 8         that Judge Rosen asked you specifically to get

 9         involved within the Grand Bargain in order to, quote,

10         soften the blow that pensioners might be forced to

11         take.

12              Do you remember that?

13              MR. SHUMAKER:  I'm going to object on the

14         same line.  You can ask whether he made that statement

15         at Wayne State, but you cannot ask whether in fact

16         that was something that Judge Rosen said to him.

17              MR. KURZWEIL:  I'll instruct the witness

18         not to answer that particular question.

19    BY MR. MCCARTHY:

20    Q.   And you'll follow those instructions based on the

21         mediation order?

22    A.   Yes.

23    Q.   Okay.  Did you make the following statement at Wayne

24         State in your address regarding, in part, the Detroit

25         bankruptcy, quote:  So he said, and he being Judge
```

00000000-0000-0000-0000-000000000000

1              RIP RAPSON

2         Rosen, what I want to propose is that the foundations

3         come to the table with a solution that helps avoid

4         having to litigate those two issues, and the solution,

5         of course, that you all have become familiar with

6         since then is sort of the Grand Bargain, or what he

7         for a while was calling the art trust, in which we

8         would try to identify an amount of money that would be

9         sufficient to help soften the blow that the pensioners

10        might be forced to take, and we would also try to

11        figure out an amount that would be -- constitute

12        sufficient consideration for the transfer of the art

13        into a new non-profit and sort of take those issues

14        off the table.

15                  MR. KURZWEIL:  Counsel, without asking to

16        let me see a copy, are you representing that that's a

17        complete recitation of the words spoken by the

18        witness?

19                  MR. MCCARTHY:  I am, Counsel.  We attempted

20        to do our best to translate what was said at that

21        YouTube in to this direct quote, and the direct quote

22        was written for me from the good folks at my office.

23                  MR. SHUMAKER:  Then I would suggest that

24        the witness can answer whether he recalls making the

25        statement as Mr. McCarthy has articulated.

00000000-0000-0000-0000-000000000000

1                          RIP RAPSON

2    A.   I don't, I don't recall word-for-word, but that

3         certainly sounds like my words.

4    BY MR. MCCARTHY:

5    Q.   What did you do to prepare for your address at Wayne

6         State, and specifically with respect to the statement

7         that I just read?  Did you do anything to prepare to

8         make that particular statement?

9    A.   If I recall correctly, I was working off of a series

10        of schematic diagrams and I was talking to the

11        diagrams.  So I, I don't believe I was working from

12        notes, and I know I was not working from a script.

13   Q.   And those diagrams that you're referencing now, are

14        those the diagrams you referenced that you reviewed in

15        preparation for today's testimony?

16   A.   Yes.

17   Q.   And you mentioned you believe those diagrams have been

18        produced in this case?

19   A.   Yes.

20   Q.   To the extent they haven't been, and I don't know,

21        I've reviewed them, we'd ask that they be produced.

22        We'll follow up with your counsel.

23             MR. SHUMAKER:  I can state that they have

24        been produced by the City.

25             MR. MCCARTHY:  Okay.

1                           RIP RAPSON

2                   MR. SHUMAKER:  At least I should say the

3           schematics from Mr. Rapson have been produced.

4           Whether they are in fact the exact same ones that he

5           had at Wayne State, I do not know.

6                   THE WITNESS:  I think they are the same.

7      BY MR. MCCARTHY:

8      Q.   Mr. Rapson, so that I can maybe streamline some of the

9           additional questions I have, as you sit here today,

10          will you -- and I don't want you to answer this

11          question, I want to find out whether you believe these

12          questions, line of questions is covered by the

13          mediation privilege.

14                  So to the extent I ask you about the back

15          and forth with Mr. Rosen or any other parties who were

16          involved with the mediation that took place after your

17          initial meeting with Judge Rosen regarding the Grand

18          Bargain, which was at a dinner, as you referenced,

19          will you be able to answer those questions here today?

20                  MR. SHUMAKER:  I would be interposing an

21          objection to all such questions, because I believe

22          that back and forth would be covered by the mediation

23          order entered by Judge Rosen.

24                  MR. KURZWEIL:  It's my intention upon

25          request of counsel to instruct the witness not to

1                        RIP RAPSON

2          answer.

3    BY MR. MCCARTHY:

4    Q.   Is it fair to say that you will follow those

5          instructions, Mr. Rapson?

6    A.   To a tee.

7    Q.   Prior to your meeting with Mr. Rosen that you've

8          talked about here today, your initial meeting, did you

9          have any opinion one way or the other whether

10         softening the blow to the pensioners or transferring

11         the art at the DIA to a new non-profit entity were

12         issues that could tie up the bankruptcy?

13   A.   Yes.

14   Q.   And when did, when did you personally come to that

15         realization?

16   A.   There was so much writing in the, in the public press

17         about the constitutional protection of the pensions

18         and the likelihood that any diminution of their value

19         would be litigated extensively, and that there were a

20         series of issues surrounding the Detroit Institute's

21         art collection, and whether they were held in trust or

22         whether they were reachable by creditors, that whole

23         suite of issues, that in turn appeared from the

24         popular accounts to suggest that these would be issues

25         that would be litigated for quite some time.

     1                        RIP RAPSON

     2              It certainly struck me at a very lay

     3     person's level of understanding that those two issues

     4     were going to be tough issues to mud wrestle through

     5     the bankruptcy.

     6  Q.  Prior to your meeting with Judge Rosen, had you had

     7     any discussions with anybody regarding how the Kresge

     8     Foundation might get involved in the bankruptcy at all

     9     in order to help address either of those issues, that

    10     being softening the blow to the pensioners or

    11     preserving the collection at the DIA?

    12  A.  There were, there were no serious conversations about

    13     specific ideas to resolve either issue.

    14  Q.  So I take it, then, the point in time where you did

    15     meet with Judge Rosen regarding potentially getting

    16     involved with the Grand Bargain, that was the first

    17     time that you at the Kresge Foundation gave any

    18     serious consideration or had a serious conversation

    19     about how the Kresge Foundation might get involved

    20     with the bankruptcy in order to either soften the blow

    21     to the pensioners or preserve the collection at the

    22     DIA?

    23              MR. SHUMAKER:  Object to the form.

    24  A.  Yeah, or to expedite the resolution of the bankruptcy,

    25     yes, that was the first time.

00000000-0000-0000-0000-000000000000

1                          RIP RAPSON

2    BY MR. MCCARTHY:

3    Q.    Prior to the Grand Bargain, are you aware of any other

4          attempts that the City made or the DIA made in order

5          to transfer part or all of the collection at the DIA

6          in order to preserve the collection?

7    A.    No.

8    Q.    And prior to the Grand Bargain, had anybody -- to your

9          knowledge, has anybody reached out to you or the folks

10         at Kresge in order to contribute money in order to

11         support a transfer of part or all of the collection at

12         the DIA?

13   A.    No.

14   Q.    I want to talk about -- moving aside from this and

15         talk a little bit about some of the essential services

16         that the City of Detroit specifically provides.

17               Does the City of Detroit need to provide

18         decent housing to its residents, in Kresge's view?

19   A.    Yes.

20   Q.    And is the City currently providing decent housing?

21   A.    It is, it is providing some decent housing.  It is

22         providing a lot of indecent housing, and the level of

23         decent housing is insufficient.

24   Q.    Is it fair to say that improving the level of decent

25         housing that the City is providing to its residents is

**Exhibit 6E**

**Emails (K001265-1266; 1272-1273)**

13-53846-tjt   Doc 8700-10 Filed 12/15/14 Entered 12/15/14 22:07:43   Page 106 of
13-53846-swr   Doc 8980-10 Filed 08/22/14 Entered 08/22/14 17:05:01   Page 106 of 5
118

**Sharon Zimmerman**

| | |
|---|---|
| **From:** | Rip Rapson |
| **Sent:** | Tuesday, January 21, 2014 6:36 PM |
| **To:** | daniel.howes@detroitnews.com |
| **Subject:** | FW: DIA governance |

**From:** Rip Rapson
**Sent:** Monday, January 20, 2014 8:23 PM
**To:** Darren Walker
**Subject:** FW: DIA governance

Greetings Darren:

Thank you for your thoughtful response. As Laura, Rob, Steve Hamp, and I have tossed this around, it strikes us that a more active, facilitative approach - rather than a harder stance - seems appropriate and might serve to help unify the philanthropic community. Our thought is that we might engage more actively with the DIA's leadership to help surface ideas that ensure the best possible future governance of the institution.

With apologies, let me try out on you how I think we might position this.

**A Frame**

We start from the proposition that the DIA's leadership is - understandably and rigidly - in a defensive crouch. The DIA has been in survival mode for many years, warding off first the challenges of fiscal instability and then the serious threat of art sales (or worse) from the bankruptcy. This has been compounded by being located in a declining city and depressed economic environment.

If the ArtTrust effort is successful, all of these factors will change, opening up the opportunity for the DIA to enter an entirely new chapter of its future. It will be freed from dire, constant funding challenges and from the doomsday threat of city bankruptcy for the city. It would be liberated to appreciate the new reality that its location in Detroit can be a positive factor in its future success. Just as the City is hitting the re-set button, so too would the DIA.

I think it will be important to convey to the DIA's leadership our belief that the DIA has the opportunity to re-imagine what it wants to become next. A stronger driver of efforts to restore the City to greatness. A more engaged partner in community redevelopment efforts. An emblematic institution for museums across the country who now view the DIA as perilously close to collapse.

But that re-imagination requires a reconceptualization of the governance model. A revitalized, renewed, and re-positioned DIA won't emerge automatically, but instead through a carefully crafted redefinition of mission and direction. Changes in governance will be essential to that task.

It's not the foundations' remit to define for the DIA how all of this plays out - or even exactly what elements it has to buy lock, stock, and barrel. But we do have a stake - one far more substantial than I think Gene and his colleagues have contemplated. I would accordingly propose that we open the conversation with them as a way of helping them stand outside of their received perspective and take in input they are unaccustomed to hearing. My hope is that this could be done in a way that is neither directive nor presumptuous, but is instead suggestive and supportive. And it would, I believe, lead naturally to the questions of how to build the kind of board, structures, and team the DIA will need to move forward most fruitfully.

**Kresge's Conversations with the DIA**

1

As I mentioned in my earlier note, Laura and Rob (who sits on the DIA's Investment Committee) have had a number of conversations with the DIA's leadership over the last weeks. Laura spoke with Gene Gargaro this afternoon. She reminded Gene that our Legal Committee had begun its work by analyzing Judge Rosen's proposal to form a entirely new entity to receive the DIA's assets. The Committee chose not to go that route, advocating instead with the Judge to keep the DIA in the ownership role. Laura assured Gene that the foundations don't want to dictate a structure, but rather to ensure a form of future governance is fully able to encompass future realities. Gene agreed with this wholeheartedly and assured her the DIA will welcome this kind of dialogue.

Laura and Gene agreed that the foundations and DIA have to move forward in full partnership on all fronts -- mutually committed to providing support for the city in its time of crisis and helping the pensioners who could lose much of their livelihood. We might start by establishing, much as we did with the Legal Committee, some first principles on which both sides could agree. We could then actively raise and assess options. But at some point, the process will need to be handed off to the DIA for them to design a governance structure that ultimately serves their needs.

Because that couldn't be ironed out before tomorrow's release to the creditors of the Plan of Adjustment, Laura and Gene agree to meet later this week and think through what this kind of process might look like and how best to move it forward.

I'd suggest that Laura carry into that meeting a suggestion that the process include several foundation partners (perhaps the members of Judge Rosen's steering committee?), as well as a couple of other entities that have a stake in the outcome, particularly the City of Detroit and State of Michigan. In the meantime, we might ask for a seat or two on the DIA Board until this process has been completed.

I have no sense of whether this approach would be well-received by our other funder colleagues. But I think we might propose it to them and see if there are others who see this as beneficial or have other suggestions for how we might proceed.

Again, sorry for the length. But thanks for listening.

Very best,

Rip

2

**Sharon Zimmerman**

| | |
|---|---|
| **From:** | Howes, Daniel <Daniel.Howes@detroitnews.com> |
| **Sent:** | Monday, May 12, 2014 10:50 AM |
| **To:** | Rip Rapson |
| **Subject:** | RE: Your column |

Rip:

Let's discuss. Have a few thoughts. Can we chat today? Think I see fodder for another column in this issue.

-- DCH

**Daniel Howes**
Business Columnist & Associate Business Editor
The Detroit News
615 W. Lafayette Blvd.
Detroit, MI. 48124

W: +1.313.222.2106
Mobile: +1.313.632.1945
E-mail: daniel.howes@detroitnews.com
My webpage: http://detroitnews.com\howes

**From:** Rip Rapson <RRapson@kresge.org>
**Sent:** Friday, May 9, 2014 8:08 PM
**To:** Howes, Daniel
**Subject:** Your column

What a masterful column Daniel. Congratulations - the clearest statement we've had on the true implications of what we've navigated and on the potential for where we might land.

I've been in quite a tizzy, together with a great number of others, by the news today that Bolger is, in fact, not willing to compromise on his demand for a union contribution to the bargain. When I last heard this discussed among people in a position to know - Wednesday night - it seemed as if some options were being generated to permit Bolger to save face and move the package forward. But the Governor and Judge Rosen are of the view - as of today - that the bills will not be permitted to the floor without a union contribution. Evidently, the amount can be relatively *de minimus* to satisfy Bolger and his caucus. But it's very hard for me to see how even a $5 million contribution comes together - what the source would be, how the unions would stomach it, and on and on.

Darren Walker and I have had conversations all around the horn, and creativity seems to be in remarkably short supply. I do have some confidence that Mayor Duggan may have an angle in on this - earlier this week, he suggested that something was in the works. But it struck me reading your piece that I would be crazy not to ask your advice - less as a journalist than as someone who knows all the players, has deep insight about the motivations driving each of the parties, and might see a path out of this that the rest of us haven't thought about. Any thoughts?

1

Thanks,

Rip

**Exhibit 6F**

**August 4, 2014 Deposition Transcript of D. Muchmore (excerpted)**

DENNIS MUCHMORE

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| In re | ) | Chapter 9 |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
| Debtor. | ) | Hon. Steven W. Rhodes |

_____

The Videotaped Deposition of DENNIS MUCHMORE,

a 30(b)(6) witness,

Taken at 215 South Washington Square, Suite 200,

Lansing, Michigan,

Commencing at 9:00 a.m.,

Monday, August 4, 2014,

Before Rebecca L. Russo, CSR-2759, RMR, CRR.

00000000-0000-0000-0000-000000000000

1                    DENNIS MUCHMORE

2    Q.   Thank you.  Within your role within the executive

3         office, would you say that you take part in most

4         formal meetings that relate to the City of Detroit and

5         its bankruptcy?

6    A.   Yes, I would.

7    Q.   Are you typically made aware of any formal press

8         releases that come from the governor's office that

9         relate to the City of Detroit's bankruptcy?

10   A.   Typically.  It's kind of a general word.

11   Q.   It is, and I apologize for that.

12   A.   That's all right.

13   Q.   But what is the process when the governor's office is

14        going to make a formal statement in the press,

15        specifically with respect to the City of Detroit's

16        bankruptcy over the last year?

17   A.   We would talk about it at comms.  Comms, I mean, we

18        have a comms meeting, as I described earlier.  We'd

19        talk about it at comms.  We typically run the content

20        of that press release past our legal counsels, and we

21        typically run that content of that past Kevyn Orr.

22        And sometimes we may give the mayor a heads-up if it

23        deals with his, you know, the political machinations

24        of the city.

25   Q.   And if -- did the State have any view -- moving on to

00000000-0000-0000-0000-000000000000

1                    DENNIS MUCHMORE

2           a different topic.

3      A.   Okay.

4      Q.   Prior to the mediation, did the State have any view,

5           to your knowledge, based on what the priority of the

6           pensioners -- based on the priority the pensioners

7           should receive any funds that come from the State,

8           vis-a-vis other creditors in the Detroit bankruptcy?

9      A.   No, not to my knowledge.

10                    MR. MORRIS:  Objection, form.

11                    THE WITNESS:  What was that?

12                    MS. NELSON:  Somebody on the telephone had

13          an objection.

14                    THE WITNESS:  Oh, okay.

15     BY MR. MCCARTHY:

16     Q.   That's what I mentioned earlier, someone objects and

17          we have a few people --

18     A.   Okay.

19     Q.   -- on the phone that represent other -- I believe they

20          represent other parties, not the State, but you can go

21          ahead and answer the question, if you can, with that

22          objection, which you did.  Thank you.

23                    Prior to the mediation, did the State have

24          any view, to your knowledge, with respect to whether

25          any funds that would be coming from the State should

00000000-0000-0000-0000-000000000000

1                              DENNIS MUCHMORE

2          go solely to the benefit of the pensioners versus

3          other creditors in the bankruptcy?

4    A.    No.

5    Q.    Has that view changed since the onset of mediation,

6          from the State's perspective?

7    A.    No, not really, no.  I don't think the view has

8          changed on that.  It's not a focus on one thing.  It's

9          a focus on a comprehensive solution of the whole City

10         bankruptcy.  We spend a lot of time with creditors.

11         We spend a lot of time with pensioners.  We spend a

12         lot of time with judges.

13   Q.    Funding for the State under the Grand Bargain, as it's

14         been described, will be going to pensioners,

15         specifically, as opposed to certain other groups of

16         creditors, is that fair?

17   A.    I think that's fair, yes.

18   Q.    Does the State have a view, to your knowledge, based

19         on why it is that that funding will be going to

20         pensioners versus other creditors?

21                   MS. NELSON:  I'm going to object, because

22         that invades the confidentiality of the mediation

23         process, and I will instruct him not to answer that

24         question.

25   BY MR. MCCARTHY:

00000000-0000-0000-0000-000000000000

1                    DENNIS MUCHMORE

2    Q.   I assume you will follow those instructions, but let

3         me ask you, just to be sure.  Will you follow those

4         instructions from your counsel and not answer the

5         question?

6    A.   I always do.

7                   MR. GADOLA:  Always?

8                   THE WITNESS:  Generally, when I agree with

9         it, I do.

10                   MR. MCCARTHY:  I'm going to ask another

11        question, Margaret, that may call for the same answer,

12        and that's absolutely fine and appropriate, I'm sure,

13        but let me -- just so we can streamline some of the

14        other material.

15   BY MR. MCCARTHY:

16   Q.   Since the mediation has started, has the State --

17        earlier we talked about that, to your knowledge, you

18        weren't aware of the State having any view as to the

19        priority of pensioners, as to who should get paid when

20        or what they should get paid within the State's

21        bankruptcy.

22                   I want to ask now, since the mediation,

23        does the State have a view, with respect to the

24        priority that pensioners should be paid, vis-a-vis

25        other creditors in the Detroit bankruptcy?

00000000-0000-0000-0000-000000000000

1                        DENNIS MUCHMORE

2                MS. NELSON:  I'm going to assert the same

3        objection.

4                MR. MORRIS:  Objection, form.

5                MS. NELSON:  Thank you.  I was going to

6        object as to form and foundation, as well, and also

7        that it invades the confidentiality of the mediation

8        process, and instruct him not to answer.

9                MR. MCCARTHY:  And so I'm --

10               MS. NELSON:  Also, attorney-client

11       privilege.

12               MR. MCCARTHY:  And so I'm clear, any

13       information that I might be able to gather from that

14       that is not based on attorney-client, should I still

15       expect an objection based on the mediation order if it

16       gets into the substance of the State's view with

17       respect to priority of the pensioners or whether --

18       why it is that -- if the State has a view as to why

19       money should go to the benefit of the pensioners after

20       the August mediation began?

21               MS. NELSON:  Correct.  It invades the

22       confidentiality of the mediation process.

23   BY MR. MCCARTHY:

24   Q.  Prior to the mediation, to your knowledge, did the

25       State ever make any statements with respect to whether

1                           DENNIS MUCHMORE

2          the pensioners might have to face reductions in the

3          benefits that they receive under their pensions for

4          the City of Detroit?

5     A.   Yes, I believe so.

6     Q.   And prior to the mediation, did the -- to your

7          knowledge, was it the State's view that that could

8          happen, that the pensioners for the City of Detroit

9          might face reductions in the amount that they receive

10         under their pensions?

11    A.   Yes.

12    Q.   What was the basis for that view, as you understand

13         it, coming from the State?  And again, if this only

14         comes from information from your lawyers, I'd like to

15         try to stay away from that.

16              MR. MORRIS:  Objection, form.

17    A.   There are only so many ways to get to an overall

18         comprehensive settlement of this, and each party in

19         the settlement was going to have to take a reduction

20         in what they felt they were being owed, regardless of

21         who it was, and there was just no way around it, from

22         our point of view.

23    BY MR. MCCARTHY:

24    Q.   Has that -- moving forward.  For whatever reason, has

25         that viewpoint from the State that every party,

00000000-0000-0000-0000-000000000000