# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

```
-----------------------------------------------------x
                                        :
In re                                   :        Chapter 9
                                        :
CITY OF DETROIT, MICHIGAN,              :        Case No. 13-53846
                                        :
                    Debtor.             :        Hon. Steven W. Rhodes
                                        :
                                        :
-----------------------------------------------------x
```

## ORDER PURSUANT TO (I) 11 U.S.C. §§ 105, 364(c), 364(d)(1), 364(e), 902, 904, 921, 922 AND 928 (A) APPROVING POSTPETITION FINANCING AND (B) GRANTING LIENS AND (II) BANKRUPTCY RULE 9019 APPROVING SETTLEMENT OF CONFIRMATION OBJECTIONS

THIS MATTER having come before the Court upon the motion (the "Motion") by the City of Detroit, Michigan (the "City"), as debtor in the above-captioned chapter 9 case (the "Case"), pursuant to Sections 105, 364(c), 364(d)(1), 364(e), 902, 904, 921, 922 and 928 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as amended (the "Bankruptcy Code") and Rules 2002, 4001, 9014 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules for the United States

Bankruptcy Court for the Eastern District of Michigan seeking entry of an order, *inter alia*:[1]

    (i)    authorizing the City and the Detroit Water and Sewer Department ("DWSD"), a department of the City, to:

    (a)   enter into and perform under:

    (1)   a Bond Purchase Agreement (the "Water Bond Purchase Agreement") for water supply system bonds by and among the Michigan Finance Authority (the "MFA") and Citigroup Global Markets, Inc., acting on behalf of itself and as representative of the other underwriters named therein (collectively, the "Underwriter"), attached hereto as Exhibit 1A, to which is attached a Letter of Representation of the City, and pursuant to which the MFA will issue certain bonds (the "Water MFA Bonds") to be underwritten and publicly offered by the Underwriter, the proceeds of which will be used by the MFA solely to purchase the 2014 DWSD Revenue and Revenue Refunding Bonds;

    (2)   a Bond Purchase Agreement (the "Sewer Bond Purchase Agreement" and together with the Water Bond Purchase Agreement, the "Bond Purchase Agreements") for sewage disposal system bonds by and among the MFA and the Underwriter, attached hereto as Exhibit 1B, to which is attached a Letter of Representation of the City, and pursuant to which the MFA will issue certain bonds (the "Sewer MFA Bonds" and together with the Water MFA Bonds, the "MFA Bonds") to be underwritten and publicly offered by the Underwriter, the proceeds of which will be used by the MFA solely to purchase the 2014 DWSD Revenue and Revenue Refunding Bonds (as defined below);

---

[1] Capitalized terms used but not defined herein shall have the meanings given to them in the Motion.

(3)  a purchase contract for water supply system bonds between the MFA and the City (the "Water MFA Purchase Agreement"), attached hereto as Exhibit 2A;

(4)  a purchase contract for sewage disposal system bonds between the MFA and the City (the "Sewer MFA Purchase Agreement" and together with the Water MFA Purchase Agreement, the "MFA Purchase Agreements") attached hereto as Exhibit 2B;

(5)  a bond purchase and supplemental agreement for water supply system bonds by and among the MFA, DWSD, Citibank, N.A. and certain other banks to be named, together with one or more purchasers (collectively, the "Water Direct Purchasers") (the "Water Bond Purchase Agreement (Direct Placement)"), substantially in the form attached hereto as Exhibit 3A;

(6)  a bond purchase and supplemental agreement for sewage disposal system bonds by and among the MFA, DWSD, Citibank, N.A. and certain other banks to be named, together with one or more purchasers (collectively, the "Sewer Direct Purchasers" and together with the Water Direct Purchasers, the "Direct Purchasers") (the "Sewer Bond Purchase Agreement (Direct Placement)" and together with the Water Bond Purchase Agreement (Direct Placement), the "Bond Purchase Agreements (Direct Placement)"), substantially in the form attached hereto as Exhibit 3B;

(7)  the Assured Insurance Commitment provided by Assured Guaranty Municipal Corp., formerly known as Financial Security Assurance Inc. ("Assured") on substantially the terms set forth in the term sheet attached to the Motion as Exhibit 7;

(8)  the 2014 DWSD Refunding Bonds Insurance Policies in an amount not less than the principal amount of the outstanding Assured-insured Tendered Bonds, substantially on the terms set forth in the Motion and the Assured Insurance Commitment;

(9) the 2014 DWSD Refunding Bonds Surety Policies (and together with the 2014 DWSD Refunding Bonds Insurance Policies, collectively, the "Assured Policies") as to reserve accounts that secure exclusively the Assured-insured 2014 DWSD Revenue and Revenue Refunding Bonds (defined below) in a principal amount equal to the DSRF requirement (subject to a limit of $70 million of additional surety coverage) substantially on the terms set forth in the Assured Insurance Commitment; and

(10) a commitment provided by National Public Finance Guarantee Corporation ("National") to insure certain of the 2014 DWSD Revenue and Revenue Refunding Bonds on the terms set forth in the summary of commitment attached hereto as Exhibit 4, and such other terms as agreed between National and the City (the "National Commitment");

(b) issue, via a public offering or a private placement, one or more series of Sewage Disposal System Revenue Bonds, Sewage Disposal System Revenue Refunding Bonds and Water Supply System Revenue Refunding Bonds (collectively, the "2014 DWSD Revenue and Revenue Refunding Bonds");

(c) as it relates to the transactions contemplated by this Order, perform under:

(1) Act 94, Public Acts of Michigan, 1933, as amended ("Act 94") the relevant excerpts of which are attached hereto as Exhibit 5;

(2) Act 34, Public Acts of Michigan, 2001, ("Act 34") the relevant excerpts of which are attached hereto as Exhibit 6;

(3) Ordinance No. 18-01 adopted by the City Council of the Debtor on October 18, 2001 (the "Sewer Ordinance") attached to the Motion as Exhibit 11;

(4) Amended and Restated Bond Ordinance No. 01-05 adopted by the City Council of the Debtor on January 26, 2005 (the "Water Ordinance") attached to the Motion as Exhibit 12, (the Water Ordinance together with the Sewer Ordinance, the "Bond Ordinances");

4

(5) a Trust Indenture by and among the City, DWSD and U.S. Bank National Association, as trustee (the "<u>DWSD Trustee</u>") dated as of June 1, 2012 (the "<u>DWSD Sewer Indenture</u>") and a Trust Indenture by and among the City, DWSD and the DWSD Trustee dated as of February 1, 2013 (the "<u>DWSD Water Indenture</u>" and together with the DWSD Sewer Indenture, collectively, the "<u>DWSD Indentures</u>") attached hereto as <u>Exhibits 7A</u> and <u>7B</u>, respectively;[2]

(ii) authorizing the City, acting through DWSD, to pledge and secure, by statutory lien created by the Bond Ordinances and Act 94 and the lien authorized by Sections 364(c) and 364(d) of the Bankruptcy Code on the Net Revenues (as defined in the Bond Ordinances) of the DWSD's Sewage Disposal System and Water Supply System and, to the maximum extent permitted by law, the other Pledged Assets (as defined in the Bond Ordinances), the payment of the 2014 DWSD Revenue and Revenue Refunding Bonds in favor of the holders of the 2014 DWSD Revenue and Revenue Refunding Bonds (the "<u>2014 DWSD Revenue and Revenue Refunding Bondholders</u>") pursuant to the Bond Ordinances, Act 94 and Sections 364(c) and 364(d) of the Bankruptcy Code, in each case, as, to the extent, and

---

[2] The Bond Purchase Agreements, the MFA Purchase Agreements, the 2014 DWSD Revenue and Revenue Refunding Bonds, Act 94, Act 34, the Sewer Ordinance, the Water Ordinance, the DWSD Indentures, the Bond Purchase Agreements (Direct Purchase), the Assured Insurance Commitment, the National Commitment, the policies to be issued pursuant to the National Commitment, and the Assured Policies shall be collectively referred to herein as the "<u>Transaction Documents</u>".

subject to, the priorities described in the Transaction Documents and this Order;

(iii)    finding that the pledge of DWSD revenues as security for such 2014 DWSD Revenue and Revenue Refunding Bonds constitutes a "lien" on "pledged special revenues" as contemplated by sections 101(37), 902(2), 922(d) and 928 of the Bankruptcy Code;

(iv)    authorizing the City to pay the principal, interest, fees, expenses and other amounts payable under the Transaction Documents, including (and to the extent applicable under the Transaction Documents), National's fees, Assured's fees, the DWSD Trustee's and the Underwriter's fees, the actual fees and disbursements of the DWSD Trustee's and the Underwriter's attorneys, advisers, accountants, and other consultants, and the costs of issuance of the 2014 DWSD Revenue and Revenue Refunding Bonds and the MFA Bonds, all to the extent provided in and in accordance with the terms of the Transaction Documents (as applicable) and notwithstanding Sections 943 and 1129(a)(9)(A) of the Bankruptcy Code or the confirmation of any plan of adjustment in the Case; and

(v)    approving a settlement (the "Settlement"), to be effective if and when the Tender (as defined below) closes, by and among the DWSD Settlement Parties[3],

---

[3] The term "DWSD Settlement Parties" shall include National for all purposes in this Order.  The City shall also include National in the Plan's definition of "DWSD

(a) establishing the treatment of water and sewer bond claims under the City's plan of adjustment and (b) resolving the DWSD Plan Objections on the terms and conditions set forth in the Motion and in the Assured Insurance Commitment and the National Commitment; and

The Court having considered the Motion, including the Transaction Documents, the Donner Declaration, Bateson Declaration and Brownstein Declaration, and the evidence and arguments submitted at the hearing on the Motion commencing on August 25, 2014 (the "<u>Hearing</u>"), after due deliberation and consideration, and for good and sufficient cause appearing therefor;

AND BASED UPON THE RECORD ESTABLISHED AT THE HEARING ON THE MOTION AND ALL PLEADINGS AND DOCUMENTS FILED HEREIN, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A. *Petition Date*. On July 18, 2013 (the "<u>Petition Date</u>"), the City filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Michigan (the "<u>Court</u>") commencing this Case. The order for relief in this Case was entered on December 5,

---

Settlement Parties" either by further amendment to the Plan or pursuant to this Court's order confirming the Plan.

CHI-1940093v6

2013.

B.     _Jurisdiction and Venue_.  This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and authority under 28 U.S.C. § 157 and Local Rule 83.50 of the United States District Court for the Eastern District of Michigan over these proceedings and over the persons and entities affected hereby. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue for the Case and proceedings on the Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     _Notice_.  Notice of the Motion and the Hearing (1) was served by the City on (a) the trustees, transfer agents or paying agents, as applicable, for the City's secured and unsecured bonds; (b) the City's largest unsecured creditors as identified on the list filed under Bankruptcy Rule 1007(d); (c) the Official Committee of Retirees appointed in this case; (d) the unions representing certain of the City's employees and retirees; (e) the four associations of which the City is aware representing certain retirees of the City; (f) the City's pension trusts; (g) the insurers of the City's bonds; (h) the insurers of the certificates of participation issued with respect to the City's pension funds (the "COPs"); (i) certain significant holders of the COPs; (j) the counterparties under the swap contracts entered into in connection with the COPs (collectively, the "Swaps"); (k) the insurers of the Swaps; (l) all entities that have requested notice pursuant to Bankruptcy Rule 2002, (m) counsel to

8

the Underwriter and the Direct Purchasers, (n) counsel to the DWSD Objecting Parties; (o) counsel to the State Revolving Fund and (p) Trustee for the State Revolving Fund Bonds. (2) was sufficient and proper under the circumstances; and (3) complies with Bankruptcy Rules 2002 and 4001(c) and the Local Bankruptcy Rules of the United States Bankruptcy Court for the Eastern District of Michigan. No further notice is necessary or required.

D.    *Sixth Amended Plan.*    On August 20, 2014, the City filed the Sixth Amended Plan (the "Amended Plan"), which provides that, if the City accepts some or all of the Tendered Bonds for purchase and the Settlement Date[4] occurs, the Existing DWSD Bond Claims will be unimpaired within the meaning of Section 1124 of the Bankruptcy Code, meaning that the Amended Plan shall, among other things, not eliminate call protection or reduce the interest rates of the Existing DWSD Bonds.

E.    *Authorization Appropriate*.    The authorization granted herein will benefit the City and its citizens and is a sound exercise of the City's business judgment, is in the best interest of the City and its citizens, and is based on good, sufficient, and sound business purposes and justifications.

---

[4] "Settlement Date" shall have the same meaning as the term "DWSD Settlement Date" set forth in the Amended Plan.

CHI-1940093v6

F.    *The City's Stipulations*.    The City stipulates and acknowledges that: (1) except as provided in this Order, the Transaction Documents as of the date of entry of this Order, the Pledged Assets are not subject to any pledge, lien or security interest other than the existing liens created under the Bond Ordinances and made statutory liens by Act 94 as security for all Secured Obligations (as defined in the Bond Ordinances) heretofore issued and hereafter permitted to be issued under the Bond Ordinances; (2) the City has taken or shall take or cause to be taken all actions to obtain under non-bankruptcy law (including, but not limited to, Act 94) and the Bond Ordinances, and has received or shall have received prior to the closing, all due authorizations for the approval of the Transaction Documents, including for the issuance of the 2014 DWSD Revenue and Revenue Refunding Bonds secured by the pledge of the Pledged Assets as set forth in the Transaction Documents; (3) subject to a determination in a Supplemental Action (as defined in the Bond Ordinances) that there will be the Required Combined Coverage (as defined in the Bond Ordinances) upon issuance of the 2014 DWSD Revenue and Revenue Refunding Bonds (and after giving effect to the issuance of the 2014 DWSD Revenue and Revenue Refunding Bonds), the Required Combined Coverage will not be less than 120% for the Senior Lien Bonds, 110% for the Second Lien Bonds and 100% for the SRF Junior Lien Bonds (each as defined in the Bond Ordinances), in each case when calculated in the manner and by the means prescribed by the Projected Net Revenues

10

Test and Historical Net Revenues Test set forth in Section 21(C)(b) and (c) of the Sewer Ordinance and Section 20(C)(2) and (3) of the Water Ordinance; and (4) the entry of this Order and the relief and orders granted herein is at the request, and upon the consent, of the City.

G.     *Findings Regarding the Postpetition Financing*.

(i)     *Credit Not Available on More Favorable Terms*.  The City is unable to incur the indebtedness evidenced by the 2014 DWSD Revenue and Revenue Refunding Bonds without the granting of a senior or equal lien on the Pledged Assets as set forth in the Transaction Documents.  The City has been unable to obtain unsecured credit allowable under Bankruptcy Code Section 503(b)(1) as an administrative expense, with priority over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code; credit secured by a lien on property of the City that is not otherwise subject to a lien; or credit secured by a junior lien on property of the City that is subject to a lien.  Financing on a post-petition basis is not otherwise available without granting the DWSD Trustee (1) perfected liens, equal or senior to the existing liens on the Pledged Assets securing the Existing DWSD Bonds, as security for the 2014 DWSD Revenue and Revenue Refunding Bonds with the priorities set forth herein and in the Transaction Documents, and (2) the other protections set forth in the Transaction Documents and this Order.

11

(ii) *Use of Proceeds of the DWSD Revenue and Revenue Refunding Financing.*  The City has agreed that proceeds of the DWSD Revenue and Revenue Refunding Financing shall be used in a manner consistent with the terms and conditions of the Transaction Documents, solely for purposes permitted by law, including (a) to make essential capital improvements to the City's sewerage disposal system as required under state and federal law as more fully described in the Motion (the "DWSD Revenue Financing"); (b) to finance the City's obligations to purchase certain water and sewer bonds that have been tendered in connection with a pending invitation to tender (the "Tender") to the holders of the City's outstanding water and sewer bonds (the "Existing DWSD Bonds"), also as described in greater detail in the Motion (the "Tender Offer Financing"); and (c) to pay the principal, interest, fees, expenses and other amounts payable under the Transaction Documents (to the extent applicable).

H. *Prudent Judgment and Jurisdictional Matters.*  Good cause has been shown for the entry of this Order.  The terms and conditions of the Transaction Documents and the fees to be paid thereunder are fair, reasonable, and the best available to the City under the circumstances; reflect the City's exercise of prudent judgment; are supported by reasonably equivalent value and fair consideration; are at the request, and with the consent, of the City; and, with that consent, are within the

CHI-1940093v6
13-53846-swr   Doc 2774-1   Filed 03/25/14   Entered 03/25/14 20:46:47   Page 13 of 405
135

jurisdiction and powers of the Court pursuant to Section 904 of the Bankruptcy Code.

I.  *Good Faith Under Section 364(e).*  In respect of the DWSD Revenue and Revenue Refunding Financing authorized under section 364 of the Bankruptcy Code, the City, the MFA, the Underwriter, the Direct Purchasers, National and Assured have acted in good faith, as that term in used in section 364(e) of the Bankruptcy Code, and the Transaction Documents are the result of good faith, arms-length negotiations among the City, the MFA, the Underwriter, the Direct Purchasers, National and Assured. As of the closing date, the City's issuance of the 2014 DWSD Revenue and Revenue Refunding Bonds and the purchase thereof by (i) the MFA, the MFA's issuance of the MFA Bonds pursuant to Executive Order 2010-2 and the Shared Credit Rating Act, Act 227, Public Acts of Michigan 1985, as amended, MCL 141.1051 *et seq*., the Underwriter's underwriting of the MFA Bonds and the purchase of the MFA Bonds in a public offering, thereby providing funds for the purchase by the MFA of the 2014 DWSD Revenue and Revenue Refunding Bonds and (ii) the Direct Purchasers in the event of a private placement or direct purchase of the 2014 DWSD Revenue and Revenue Refunding Bonds, and the issuance of the Assured Policies by Assured and the issuance of policies by National pursuant to the National Commitment (the "National Policies") each represents an extension of credit in "good faith" within the meaning of section 364(e) of the

Bankruptcy Code.  In addition, the grant by the City of a pledge and lien in the Pledged Assets to secure, and provide a source for the repayment of, the 2014 DWSD Revenue and Revenue Refunding Bonds and the MFA Bonds, is in "good faith" within the meaning of section 364(e) of the Bankruptcy Code. The Transaction Documents will be entered into in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, for purposes and uses that are permitted by law, and not in violation of the Bankruptcy Code or of applicable non-bankruptcy law, and the transactions contemplated by the Transaction Documents are not prohibited by applicable bankruptcy or non-bankruptcy law.  As such, the MFA (and its assignees and transferees), the Underwriter (and its assignees and transferees), each purchaser of the MFA Bonds (and their assignees and transferees) (each, including its assignees and transferees, an "MFA Bondholder" and, collectively, the "MFA Bondholders"), each holder of a 2014 DWSD Revenue and Revenue Refunding Bond, including, but not limited to the Direct Purchasers (and each of their respective assignees and transferees), National and Assured therefore qualify for the full protection and benefits of sections 364(e) and 921(e) of the Bankruptcy Code and this Order and shall not be affected by any reversal or modification on appeal of this Order, nor shall the reversal on appeal of a finding of jurisdiction affect the validity of any debt incurred pursuant to this Order.

      J.    *Act 94 Approval.*  The City has duly authorized and approved the

14

Transaction Documents pursuant to Act 94 (as described herein and in the Motion). The City is duly authorized to cause the execution of bond sale orders by the Director of the DWSD and by the Emergency Manager of the City upon the issuance of this Order.

K.     *Adequate Protection of Existing Liens.*     A determination in a Supplemental Action calculated in the manner and by the means prescribed by the Projected Net Revenues Test and the Historical Net Revenues Test set forth in the Bond Ordinances, that the resulting Required Combined Coverage, after giving effect to the issuance of the 2014 DWSD Revenue and Revenue Refunding Bonds, is not less than 120% for the Senior Lien Bonds, not less than 110% for the Second Lien Bonds and not less than 100% for the SRF Junior Lien Bonds (the "Additional Bonds Test"), together with the Alternative Refund/Debt Service Savings Test and the City's rate covenants made in Section 9 of the Bond Ordinances (the "Rate Covenant"), satisfies the bargained-for terms of the Existing Bond Documents that are applicable to the subsequent issuance of Secured Obligations, such as the 2014 DWSD Revenue and Revenue Refunding Bonds.  After taking into account the issuance of the 2014 DWSD Revenue and Revenue Refunding Bonds and the granting of the senior and equal liens in accordance with the Transaction Documents and the Bond Ordinances, under the circumstances and given that the Supplemental Action will support that the Additional Bonds Test and Alternative Refund/Debt

CHI-1940093v6

Service Savings Test, as applicable, will meet or exceed the Required Combined Coverage required under the Bond Ordinances, the Court finds that the Additional Bonds Test, the Alternative Refund/Debt Service Savings Test and the Rate Covenant constitute adequate protection of the pre-petition liens securing the Existing DWSD Bonds for purposes of section 364(d)(1) of the Bankruptcy Code. Moreover, there is no impairment to the interests of holders of Existing DWSD Bonds from the Tender Offer Financing because new bondholders will be taking the same position in the DWSD capital structure as the holders of the Existing DWSD Bonds.

L.    *Special Revenues.*  Net Revenues, as defined in the Bond Ordinances, constitute "special revenues" as that term is defined in Section 902(2) of the Bankruptcy Code, constitute "pledged special revenues" as that term is used in Section 922(d) of the Bankruptcy Code and are afforded the protections contemplated by Section 928 of the Bankruptcy Code, which have been validly pledged and become subject to a lien as defined in section 101(37) of the Bankruptcy Code and in accordance with Act 94 and the Bond Ordinances to secure the payment of the 2014 DWSD Revenue and Revenue Refunding Bonds issued under the DWSD Indentures, as more fully set forth in the Transaction Documents.

M.    *Willingness to Provide Insurance*.  Assured has indicated a willingness to issue the Assured Policies subject to: (a) the entry of this Order; (b) the approval

by this Court of the Settlement; and (c) the satisfaction of certain other commercially reasonable conditions precedent set forth in the Assured Insurance Commitment. National has indicated a willingness to issue the National Policies subject to: (a) entry of this Order; (b) the approval by this Court of the Settlement; and (c) the satisfaction of certain other commercially reasonable conditions precedent set forth in the National Commitment.

N.     *The Settlement.*  The Settlement was negotiated at arm's length and in good faith by the DWSD Settlement Parties and the settlements and compromises set forth in the Motion, the National Commitment and the Assured Insurance Commitment are fair, equitable and reasonable.  The DWSD Settlement Parties are not "insiders" (as defined in the Bankruptcy Code) of the City.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.     <u>Motion Approved</u>.  The Motion is GRANTED.

2.     <u>Objections Overruled</u>.   All objections to the Motion and to the Transaction Documents, to the extent not withdrawn, waived, or resolved by the terms hereof, and all reservations of rights included therein, are hereby denied and overruled on the merits, with prejudice.

CHI-1940093v6
13-53846-swj   Doc 2774-1   Filed 12/16/14   Entered 12/16/14 07:35:47   Page 17 of
135
13-53846-swr   Doc 7074   Filed 08/25/14   Entered 08/25/14 14:20:46   Page 17 of 405

3. _Authorization of the Financing_. Subject to the adoption of bond sale orders by the Director of the DWSD and by the Emergency Manager of the City, and subject to a determination in a Supplemental Action of the satisfaction of the Rate Covenant in accordance with the Bond Ordinances, the City is hereby authorized pursuant to sections 105(a), 364(c) and 364(d)(1) of the Bankruptcy Code, by and through DWSD, to enter into, incur the indebtedness evidenced by the 2014 DWSD Revenue and Revenue Refunding Bonds under, and perform pursuant to, the Transaction Documents, all of which that have been submitted to the Court are hereby approved, and to otherwise satisfy the requirements of Act 94, the Bond Ordinances, and applicable resolutions of the Board of Water Commissioners. The City is expressly authorized, without further authorization or approval of this Court, to perform all acts, make, execute and deliver all instruments and documents, which may be required for the performance by the City under the Transaction Documents and the creation and perfection of the liens described in and provided for by this Order and the Transaction Documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements, as applicable), and to pay all fees and expenses that may be required or reasonably necessary for the City's performance of its obligations under or related to the Transaction Documents. The Net Revenues, as defined in the Bond Ordinances, and all proceeds thereof shall be deposited and applied as required by the Transaction

Documents.  Upon execution and delivery, the Transaction Documents shall be valid and binding obligations of the City, enforceable against the City in accordance with their terms.

4.    <u>Authorization to Borrow</u>.  Immediately upon the entry of this Order, the City is authorized to issue the 2014 DWSD Revenue and Revenue Refunding Bonds to the MFA or, in the event of a private placement or direct purchase, to the MFA or to the Direct Purchasers, as applicable, pursuant to the terms of the Transaction Documents and is authorized to enter into and incur the obligations under the Transaction Documents.

5.    <u>2014 DWSD Revenue and Revenue Refunding Bonds</u>.    The Transaction Documents and this Order shall evidence the validity and binding effect of the 2014 DWSD Revenue and Revenue Refunding Bonds, which shall be effective as of the date of their issuance.  Upon entry of this Order, and effective as of the date of their issuance, the 2014 DWSD Revenue and Revenue Refunding Bonds will include all indebtedness or obligations, contingent or absolute, which may now or from time to time be owing (in each case, however, solely in connection with the 2014 DWSD Revenue and Revenue Refunding Bonds (and not in connection with other indebtedness, obligations or debt issuances, whether subject to the Transaction Documents or otherwise)) by the City to the MFA, the Underwriter, the Direct Purchasers, the DWSD Trustee, or any of the MFA

19

Bondholders under the respective Transaction Documents or this Order, including all principal, accrued interest, costs, fees, expenses and other amounts in respect of the 2014 DWSD Revenue and Revenue Refunding Bonds under the respective Transaction Documents. The 2014 DWSD Revenue and Revenue Refunding Bonds shall be due and payable, without notice or demand, in accordance with the terms of the Transaction Documents and notwithstanding Sections 943 and 1129(a)(9)(A) of the Bankruptcy Code or the confirmation of any plan of adjustment in this Case.

6. <u>Liens</u>. During the pendency of the Case and prior to the effective date of a plan of adjustment in this Case, upon issuance of the 2014 DWSD Revenue and Revenue Refunding Bonds, this Order, Act 94 and the Transaction Documents shall be conclusive evidence of the validity, perfection and priority of the liens granted by the City and encumbering the Pledged Assets to secure the 2014 DWSD Revenue and Revenue Refunding Bonds (the "<u>Liens</u>") under Act 94 and sections 101(37), 364(c) and 364(d) of the Bankruptcy Code without the necessity of (a) filing or recording any financing statement, mortgage, notice or other instrument or document that may otherwise be required under the law or regulation of any jurisdiction or (b) the taking of any other action (including taking possession or entering into any deposit account control agreement, mortgages or deeds of trust) to validate or perfect (in accordance with applicable non-bankruptcy law) the Liens.

7. <u>Lien Priority - Sewage Disposal System Revenue Bonds</u>. Pursuant to

the Sewer Ordinance and the other relevant Transaction Documents, the Liens securing the Sewage Disposal System Revenue Bonds shall be equal to the existing senior liens securing the Senior Lien Bonds, senior in priority and superior to the existing subordinate liens or any other pledge of, lien on or claim to any of the Pledged Assets under the DWSD Sewer Indenture, other than the lien securing the Senior Lien Bonds. Other than as set forth herein, the Transaction Documents and the Sewer Ordinance, the Liens securing the Sewage Disposal System Revenue Bonds shall not be made or become subject to or *pari passu* with any lien or security interest or otherwise and shall be valid, binding, fully perfected, continuing and enforceable, including against the City under sections 921(e) and 364(e) of the Bankruptcy Code, and this Order shall not be affected by any reversal or modification on appeal of this Order, nor shall the reversal on appeal of a finding of jurisdiction affect the validity of any debt incurred pursuant to this Order.

8.  <u>Lien Priority - Revenue Refunding Bonds</u>. Pursuant to the Bond Ordinances and the Transaction Documents, the Liens securing the Sewage Disposal System Revenue Refunding Bonds and the Water Supply System Revenue Refunding Bonds (the "<u>Refunding Bonds</u>") shall be equal to the existing senior liens or existing second liens, as the case may be, securing Tendered Bonds that are Senior Lien Bonds and Tendered Bonds that are Second Lien Bonds, respectively. The Liens securing Refunding Bonds that are Senior Lien Bonds shall be senior in

priority and superior to the existing subordinate liens or any other pledge of, lien on or claim to any of the Pledged Assets under the DWSD Indentures, other than the liens securing the Senior Lien Bonds. The Liens securing Refunding Bonds that are Second Lien Bonds shall be subordinate in priority to Senior Lien Bonds and superior to the existing subordinate liens or any other pledge of, lien on or claim to any of the Pledged Assets under the DWSD Indentures, other than the liens securing Second Lien Bonds and Senior Lien Bonds. Other than as set forth herein, the Transaction Documents and the Bond Ordinances, the Liens securing the Refunding Bonds shall not be made or become subject to or *pari passu* with any lien or security interest or otherwise and shall be valid, binding, fully perfected, continuing and enforceable, including against the City under sections 921(e) and 364(e) of the Bankruptcy Code, and this Order shall not be affected by any reversal or modification on appeal of this Order, nor shall the reversal on appeal of a finding of jurisdiction affect the validity of any debt incurred pursuant to this Order.

9. <u>No Obligation to Extend Credit</u>. None of the Direct Purchasers, the MFA or the Underwriter shall have any obligation to purchase any bond or make any other extension of credit under the Transaction Documents unless (a) all of the conditions precedent to the purchase of the 2014 DWSD Revenue and Revenue Refunding Bonds and, in the case of a public offering, the purchase of the MFA Bonds and the extension of such credit provided thereby under the Transaction

22

Documents and this Order have been satisfied in full or waived in accordance with the terms of the applicable Transaction Documents and (b) no stay of this Order pending appeal shall have been obtained by any party from this Court or any other court.

10. <u>Amendment of the Transaction Documents</u>. The City is authorized, without further approval or authorization of this Court, to perform all acts and to make, execute and deliver all instruments and documents that may be reasonably required to effect one or more amendments, modifications or supplements to any of the Transaction Documents if the amendments, modifications or supplements (a) are consistent with this Order; (b) in the good faith judgment of the City, are not amendments, modifications or supplements that are materially adverse to the interests of the holders of pre-petition liens securing the Existing DWSD Bonds under the Transaction Documents; (c) are otherwise permitted under the terms of the Bond Ordinances and the other Transaction Documents; and (d) are otherwise within the power of the City to effect without further order of the Court under Section 904 of the Bankruptcy Code or otherwise.

11. <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Order</u>. Based on the findings of fact and conclusions of law set forth in this Order and the record made during the Hearing, the City, the MFA, the Underwriter, each holder of a 2014 DWSD Revenue and Revenue

23

Refunding Bond, including, but not limited to the Direct Purchasers (and each of their respective assignees and transferees), the MFA Bondholders, National and Assured have acted in good faith, as that term is used in section 364(e) of the Bankruptcy Code, in connection with the Transaction Documents, and their reliance on this Order is also in good faith.   In accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Order are hereafter reversed or modified on appeal, the MFA, the Underwriter, each holder of a 2014 DWSD Revenue and Revenue Refunding Bond, including, but not limited to the Direct Purchasers (and each of their respective assignees and transferees), the MFA Bondholders, National and Assured are entitled to and hereby granted the protections provided in section 364(e) of the Bankruptcy Code.   Any reversal or modification of this Order on appeal shall not affect the validity or enforceability of the 2014 DWSD Revenue and Revenue Refunding Bonds or any Lien, claim, or priority authorized or created hereby or the validity or enforceability of the Assured Policies or the National Policies.   Any liens or claims granted to the MFA, the DWSD Trustee, the Underwriter, each holder of a 2014 DWSD Revenue and Revenue Refunding Bond, including, but not limited to the Direct Purchasers (and each of their respective assignees and transferees), the MFA Bondholders, National or Assured hereunder arising prior to the effective date of any such reversal or modification of this Order shall be governed in all respects by the original provisions

24

of this Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

12. **Section 921(e) of the Bankruptcy Code; No Modification or Stay of this Order.** In accordance with section 921(e) of the Bankruptcy Code, in the event any or all of the provisions of the order for relief or any order finding jurisdiction is reversed on appeal, the MFA, the DWSD Trustee, the Underwriter, each holder of a 2014 DWSD Revenue and Revenue Refunding Bond, including, but not limited to the Direct Purchasers (and each of their respective assignees and transferees), the MFA Bondholders, National and Assured are entitled to the protections provided in section 921(e) of the Bankruptcy Code. Any such reversal shall not affect the validity or enforceability of the 2014 DWSD Revenue and Revenue Refunding Bonds or the Liens or priority authorized by this Order, or the validity or enforceability of the Assured Policies or the National Policies. Any Liens granted to the DWSD Trustee authorized hereunder arising prior to the effective date of any such reversal shall be governed in all respects by the original provisions of this Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

13. **Special Revenues.** Any and all Net Revenues, as defined in the Bond Ordinances, shall be treated as "special revenues" as that term is defined in section 902(2) of the Bankruptcy Code and shall be treated as "pledged special revenues" as

that term is used in section 922(d) of the Bankruptcy Code and are afforded all applicable protections under the Bankruptcy Code and applicable law, including the protections contemplated in section 928 of the Bankruptcy Code, which have been validly pledged and become subject to a lien under Act 94 to secure the payment of the 2014 DWSD Revenue and Revenue Refunding Bonds issued under the DWSD Indentures, as fully set forth in the Transaction Documents.

14. <u>No Impairment</u>. All rights and remedies of the DWSD Trustee, MFA, the Underwriter, each holder of a 2014 DWSD Revenue and Revenue Refunding Bond, including, but not limited to the Direct Purchasers (and each of their respective assignees and transferees), the MFA Bondholders, National and Assured under the Transaction Documents, as they relate to the 2014 DWSD Revenue and Revenue Refunding Bonds, shall remain effective and, except as otherwise provided in the Transaction Documents, may not be modified, impaired, or discharged, notwithstanding the authority of the Emergency Manager of City to act on behalf of and bind the City, the dismissal of this Case, or the confirmation of, or failure to confirm, any plan of adjustment in this Case. All rights and remedies of the DWSD Trustee, MFA, the Underwriter, each holder of a 2014 DWSD Revenue and Revenue Refunding Bond, including, but not limited to the Direct Purchasers (and each of their respective assignees and transferees), the MFA Bondholders, National and Assured under this Order shall remain effective and may not, except as

26

otherwise provided herein, be modified, impaired or discharged, notwithstanding the authority of the Emergency Manager of City to act on behalf of and bind the City, during the pendency of the Case and prior to the effective date of a plan of adjustment in this Case.

15. <u>Rights Preserved</u>. Notwithstanding anything herein to the contrary, the entry of this Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the DWSD Trustee, the holders of Existing DWSD Bonds, the DWSD Bond Insurers, the MFA, the Underwriter, each holder of a 2014 DWSD Revenue and Revenue Refunding Bond, including, but not limited to the Direct Purchasers (and each of their respective assignees and transferees), the MFA Bondholders, National or Assured to seek any other or supplemental relief in respect of the City.

16. <u>No Modification of Order</u>. Following the closing date of the 2014 DWSD Revenue and Revenue Refunding Bonds and until and unless the 2014 DWSD Revenue and Revenue Refunding Bonds have been paid in full in cash (such payment being without prejudice to any terms or provisions contained in the Transaction Documents that by their terms survive such discharge) or otherwise defeased, the City irrevocably waives the right to seek and shall not seek or consent to, directly or indirectly, without the prior written consent (not to be unreasonably withheld) of (a) Assured, National, the DWSD Trustee, the Ad Hoc Committee and,

if such action is to be taken after the issuance of the 2014 DWSD Revenue and Revenue Refunding Bonds, the MFA, and (b) in the case of a direct purchase of the 2014 DWSD Revenue and Revenue Refunding Bonds, the Direct Purchasers, in each case, in the reasonable discretion of the DWSD Trustee, the MFA and the Direct Purchasers, as applicable, any modification, stay, vacatur or amendment to this Order or the order for relief in any manner.

17. <u>Exculpation</u>. Except to the extent expressly set forth in the Transaction Documents, nothing in this Order, the Transaction Documents, or any other documents related to the transactions contemplated hereby shall in any way be construed or interpreted to impose or allow the imposition upon the DWSD Trustee, Assured, National, the holders of Existing DWSD Bonds, the MFA, the Underwriter, the Direct Purchasers or the MFA Bondholders any liability for any claims arising in connection with the 2014 DWSD Revenue and Revenue Refunding Bonds. In addition, with respect to the Pledged Assets (a) except as expressly set forth in the Transaction Documents, none of Assured, National, the DWSD Trustee, the holders of Existing DWSD Bonds, the MFA, the Underwriter, the Direct Purchasers or the MFA Bondholders shall, in any way or manner, be liable or responsible for (i) the safekeeping of the Pledged Assets, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian,

CHI-1940093v6
13-53846-swr   Doc 2774-1   Filed 03/25/14   Entered 03/25/14 20:46:47   Page 28 of 405

forwarding agency, or other person, and (b) all risk of loss, damage, or destruction of the Pledged Assets shall be borne by the City.

18.     Effect of Stipulations.   The stipulations and admissions contained in this Order shall be binding upon the City and the DWSD Objecting Parties.

19.     Order Controls (Transaction Documents).   During the pendency of the Case and prior to the effective date of a plan of adjustment in this Case, in the event of any inconsistency between the terms and conditions of the Transaction Documents and this Order, the provisions of this Order shall govern and control.

20.     No Third Party Rights.   Except as explicitly provided for herein or in the Transaction Documents, this Order does not create any rights for the benefit of any third party who is not expressly referenced in this Order, any creditor or any direct, indirect or incidental beneficiary.

21.     Survival.   The Liens and indebtedness incurred under the Transaction Documents authorized by this Order and the other provisions of this Order and any actions taken pursuant hereto shall survive entry of any subsequent order that may be entered: (a) dismissing the Case; or (b) pursuant to which this Court abstains from hearing the Case.

22.     No Waiver by Seeking Relief.   Except to the extent this Order provides otherwise, (i) neither the filing of the Motion nor anything herein shall constitute a waiver of any right of the City to take any action, including with respect to the 2014

CHI-1940093v6
13-53846-swr    Doc 7074-1  Filed 08/25/14  Entered 08/25/14 14:07:35  Page 29 of 405

DWSD Revenue and Revenue Refunding Bonds, without authorization or approval of the Court, (ii) nor shall the filing of the Motion or the entry of this Order be deemed to constitute the City's consent, pursuant to Section 904 of the Bankruptcy Code, to this Court's interference with (a) any of the political powers of the City, (b) any of the property or revenues of the City or (c) the City's use or enjoyment of any income-producing property, other than as provided herein.

23. <u>The Settlement</u>. The Settlement as described in the Motion is approved in its entirety and all of its terms are incorporated herein by reference as if fully set forth herein, and the failure to specifically describe or include in this Order any particular provision of the Motion or the Assured Insurance Commitment or the National Commitment shall not diminish or impair the effectiveness of any such provision. The settlements and compromises set forth in the Assured Insurance Commitment, the National Commitment and in the Motion are fair and reasonable to, and in the best interests of, the City, its residents and its creditors, and in entering into the Settlement, the DWSD Settlement Parties have acted in a commercially reasonable manner and exercised their respective rights and powers, and used the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances.

24. <u>DWSD Contribution to GRS Pension Plan</u>. DWSD's contributions to the GRS pension plan set forth in the Plan shall be accounted for as follows: (i)

DWSD shall pay as operation and maintenance expenses, to be allocated between the Sewage Disposal System and the Water Supply System (collectively, the "Systems") consistent with the allocation of labor costs between the two Systems, no more than the aggregate sum of (a) $24 million per annum (which is payable monthly); and (b) DWSD's allocable share of its annual "defined contribution" payments related to the DWSD employees; and (ii) DWSD shall pay from the Revenues of each of the Sewage Disposal System and the Water Supply System, on the same ratable basis as set forth in (i) above, the difference between the annual allocation of the Plan GRS pension contributions provided in the Plan and $24 million in the aggregate from "pension liability payment funds" established for each of the Sewage Disposal System and the Water Supply System (such funds, the "Pension Liability Payment Funds") that will be placed in priority of payment after all of the Interest and Redemption Funds (including the Reserve Accounts, if any, therein) and before the Extraordinary Repair and Replacement Reserve Fund (all as defined in the Existing Bond Documents) for each of the Sewage Disposal System and the Water Supply System, such that the respective Pension Liability Payment Funds will be subordinated to the 2014 DWSD Revenue and Revenue Refunding Bonds and all other existing DWSD bond debt. Sufficient funds shall be allocated to each of the Pension Liability Payment Funds on a monthly basis until such time as each System's Pension Liability Payment Fund contains funds sufficient to pay the

CHI-1940093v6

13-53846-swr    Doc 7074-1   Filed 08/25/14   Entered 08/25/14 20:46:47   Page 33 of
135

difference between each System's allocable share of the annual allocation of the GRS pension contributions provided in the Plan, and each System's allocable share of $24 million. If such amounts in a Pension Liability Payment Fund are insufficient to provide for that fiscal year's requirement for the respective System's contribution to the GRS pension plan by June 30 of that fiscal year, then any amounts or securities held in the respective System's Surplus Fund, Construction Fund, Improvement and Extension Fund, Extraordinary Repair and Replacement Reserve Fund (in excess of the Extraordinary Repair and Replacement Minimum Requirement) and any other now-existing or after arising accounts under the applicable System's Indenture to which payments are subordinate to the payments to the Interest and Redemption Funds (including the Reserve Accounts, if any, therein) as listed in Section 2.02(a) – (f) of the respective System's Indenture, shall be credited or transferred from such Funds or accounts in the priority and order listed above (after satisfaction of the transfers required by Section 2.11 of each Indenture to the Operating and Maintenance Fund and the Interest and Redemption Funds) to the respective System's Pension Liability Payment Fund; provided, however, that solely for purposes of determining the crediting or transferring of funds to the respective "Pension Liability Payment Funds":  (i)(a) the formulae presently used to determine the Extraordinary Repair and Replacement Minimum Requirement and (b) the definition of "Extraordinary Repair and Replacement Minimum Requirement"

in the applicable Indentures existing as of the date of this Order will not be changed unless and until DWSD has paid in full the aggregate annual allocation of the GRS pension contributions provided in the Plan; (ii) the amount of the Extraordinary Repair and Replacement Minimum Requirement is not increased over the amount of such minimum, which as of the date of this Order is $4,693,660 for the Water Supply System and $6,725,917 for the Sewage Disposal System, until the GRS pension contributions provided in the Plan are paid in full; and (iii) provided such funds are not subject to restriction barring transfer under Section 2.11 of the respective Indenture existing as of the date hereof; and provided, further, that in no event shall any amounts held in a Construction Fund that are (x) the proceeds of any debt issued for such System pursuant to the applicable Bond Ordinance, as the same may be amended, modified or supplemented, or (y) otherwise lawfully restricted to use for capital improvements to a System be credited to the Pension Liability Payment Fund. Moreover, no amounts may be credited or transferred from a Construction Fund unless such credit or transfer (i) is approved by the Michigan Department of Treasury, if such approval is then required by law, and (ii) based upon an opinion of bond counsel, such credit or transfer will not adversely affect the exclusion from gross income for federal income tax purposes of securities the proceeds of which were deposited in such account.  In the event there is any shortfall in the annual funding of a Pension Liability Payment Fund at the end of any fiscal year, that

CHI-1940093v6

shortfall shall be paid in the next fiscal year according to the payment priorities set forth in this Paragraph 24.

25.    <u>DWSD Plan Objections</u>.  Upon the occurrence of the Settlement Date and the payment by the City of all professional fees and expenses as set forth in Paragraph 27 hereof (the "<u>Settlement Date Fee Payments</u>")[5], the DWSD Plan Objections shall be deemed to be withdrawn with prejudice; <u>provided</u>, <u>however</u>, that the DWSD Plan Objection of FGIC shall only be deemed withdrawn with prejudice with respect to FGIC's objections related to DWSD, including any matters that are the subject of the Motion and the Settlement.  The accounting treatment of DWSD's contributions to the GRS pension plan in Paragraph 24 hereof shall not constitute "impairment" of the Existing DWSD Bonds or the Existing DWSD Bond Claims in respect thereof.

26.    <u>No Amendment</u>.  From and after the occurrence of the Settlement Date, the City shall not amend, supplement or otherwise modify the Amended Plan, or participate in, support or acquiesce to any such amendment, supplement or modification (including any motion for an order seeking such amendment, supplement or modification) of the Amended Plan that would result in (i) the

---

[5] The Settlement Date Fee Payments shall not include any payments on account of the DWSD Trustee Fee Claim or any other fees or expenses of the DWSD Trustee or its professionals.

CHI-1940093v6

impairment of any Existing DWSD Bond Claim; (ii) the alteration of the accounting treatment of DWSD's contributions to the GRS pension plan as set forth in Paragraph 24 of this Order or (iii) be inconsistent with this Order.

27. <u>Reimbursement of Certain Professional Fees and Expenses</u>. On the Settlement Date, the DWSD is authorized to and shall reimburse the professional fees and expenses of certain of the DWSD Settlement Parties incurred in connection with the Case, as follows: (i) to Assured, $3,000,000; (ii) to the Ad Hoc Committee, $1,200,000; (iii) to National, $3,000,000 and (iv) to FGIC, $550,000[6]. In addition, pursuant to the Assured Insurance Commitment, in the event that the City agrees, other than solely as a result of a court order or an arbitration award (i) to pay any of the DWSD Objecting Parties other than the DWSD Trustee an amount in excess of $3 million for DWSD-related bankruptcy fees, costs and expenses or (ii) with respect to the DWSD Trustee, to establish a floor for DWSD-related bankruptcy fees, costs and expenses in excess of $3 million, then DWSD shall be required to pay to Assured $3 million plus such amount that is the greatest amount paid to any DWSD Objecting Party in excess of $3 million. The City and the DWSD Trustee shall

---

[6] The amounts set forth in (i)-(iv) do not contain any "success fees" for any DWSD creditor financial advisor. If any financial advisor for a non-settling bond insurer is paid a success fee, FGIC shall have the right to request the same treatment for its financial advisor. Additionally, the Fee Claim authorized to FGIC hereunder

resolve the DWSD Trustee Fee Claim in accordance with the DWSD Trustee Claim Arbitration as set forth in the Motion.

28. <u>All Appropriate Actions</u>. The City is authorized to execute, deliver, implement and fully perform any and all obligations, instruments, documents and papers, and to make all payments (including interest and fees, if any), and take any and all actions reasonably necessary or appropriate to consummate, complete, execute and implement the Settlement, and any actions taken heretofore in furtherance of these obligations are hereby ratified.

29. <u>Order Controls (Settlement)</u>. Unless otherwise agreed by the Parties, to the extent of any inconsistency between (i) this Order, the Assured Insurance Commitment and the National Commitment, the terms of this Order shall govern and (ii) this Order, the Assured Insurance Commitment, the National Commitment, on the one hand, and any plan of adjustment confirmed in this chapter 9 case (other than a Specified Plan), on the other hand, the terms of this Order, the Assured Insurance Commitment and the National Commitment, as applicable, shall govern.

30. <u>Survival</u>. The provisions and effect of this Order, any actions taken pursuant to this Order or the Settlement and the DWSD Settlement Parties'

---

resolves only fees and expenses incurred through the end of June 2014 in connection with the Existing DWSD Bonds and does not include any other amounts.

respective rights, obligations, remedies and protections provided for herein shall survive the dismissal or closing of this chapter 9 case, or confirmation of a plan or plans of adjustment, and the terms and provision of this Order, the National Commitment and the Assured Insurance Commitment shall continue in full force and effect notwithstanding the entry of any such order.

31. <u>Binding Effect of Order</u>. This Order shall be immediately effective upon its entry. Immediately upon entry by this Court, the terms and provisions of this Order (including the Settlement) shall become valid and binding upon all parties in interest in this Case, including but not limited to, the City, the MFA, the Underwriter, the Direct Purchasers, the MFA Bondholders, the DWSD Settlement Parties, all other creditors of the City, the City's Emergency Manager, any committee appointed in the Case and all other parties in interest and their respective successors and assigns.

32. <u>Continuing Jurisdiction</u>. This Court shall retain continuing jurisdiction through the effective date of a plan of adjustment in this Case with respect to all matters related to or arising from this Order and the relief granted herein, the implementation of the Transaction Documents, including but not limited to compliance with the Additional Bonds Test and enforcement of the Rate Covenants required under the Ordinances, and implementation and enforcement of the terms agreed to under the Settlement.

33.     Existing Bond Insurance Policies.     Nothing in this Order impairs, modifies, affects or otherwise alters the rights of Bondholders or Bond Agents with respect to claims under applicable Bond Insurance Policies or against the Bond Insurers (as those terms are defined under the Plan).

Signed on August 25, 2014

_____
        /s/ Steven Rhodes
        Steven Rhodes
        United States Bankruptcy Judge

# **EXHIBIT 1A**

CHI-1940093v3

**MICHIGAN FINANCE AUTHORITY**
**$_____**
**Local Government Loan Program Revenue Bonds, Series 2014D**
**(Detroit Water and Sewerage Department**
**Water Supply System Revenue Refunding Local Project Bonds)**

**BOND PURCHASE AGREEMENT**

**August [__], 2014**

Michigan Finance Authority
Richard H. Austin State Office Building
430 West Allegan Street
Lansing, Michigan 48922

Ladies and Gentlemen:

Citigroup Global Markets, Inc. (the "Representative"), on behalf of itself and J.P. Morgan Securities LLC, BMO Capital Markets, Loop Capital Markets LLC, [Barclays[, [PNC Capital Markets LLC], [Comerica Securities, Inc.], and [Jeffries] (collectively with the Representative, the "Underwriters"), hereby offers to enter into this Bond Purchase Agreement (this "Agreement") with the Michigan Finance Authority (the "Authority") which, upon the acceptance of this offer by the Authority acting pursuant to statutory authority, including Act 227 of the Public Acts of Michigan, 1985, as amended (the "Act"), will be binding upon the Authority and the Underwriters.  This offer is made subject to written acceptance of this Agreement by the Authority at or before 12:00 p.m., Eastern Time, on August [__], 2014, and if not so accepted will be subject to withdrawal by the Representative upon notice delivered to the Authority at any time prior to the acceptance hereof by the Authority.

1.     Upon the terms and conditions and upon the basis of the representations, warranties, and agreements set forth herein the Underwriters hereby agree to purchase from the Authority and the Authority agrees to sell to the Underwriters for $[_____] (principal amount of $[_____.00], less underwriter's discount of $[_____], minus/plus net original issue discount/premium of $[_____]), all (but not less than all) of the following bonds issued by the Authority:

$_____          Local Government Loan Program Revenue Bonds, Series 2014D-1 (Insured)
(Detroit Water and Sewerage Department
Water Supply System Revenue Refunding Senior Lien Local Project Bonds)
Type: DWSD Water Supply System Revenue Refunding Senior Lien Local Project Bonds (Insured)

$_____          Local Government Loan Program Revenue Bonds, Series 2014D-2
(Detroit Water and Sewerage Department
Water Supply System Revenue Refunding Senior Lien Local Project Bonds)
Type: DWSD Water Supply System Revenue Refunding Senior Lien Local Project Bonds

$_____       Local Government Loan Program Revenue Bonds, Series 2014D-3 (Insured)
(Detroit Water and Sewerage Department
Water Supply System Revenue Refunding Second Lien Local Project Bonds)
Type: DWSD Water Supply System Revenue Refunding Second Lien Local Project Bonds (Insured)

$_____       Local Government Loan Program Revenue Bonds, Series 2014D-4
(Detroit Water and Sewerage Department
Water Supply System Revenue Refunding Second Lien Local Project Bonds)
Type: DWSD Water Supply System Revenue Refunding Second Lien Local Project Bonds

(collectively, the "Bonds"). The Bonds are being issued to finance the purchase by the Authority, pursuant to a Local Purchase Contract between the Authority and the City of Detroit, County of Wayne, State of Michigan (the "City"), acting upon authorization from (i) the Board of Water Commissioners (the "BOWC") of the Detroit Water and Sewerage Department (the "Department") and (ii) Kevyn D. Orr, emergency manager of the City (the "Emergency Manager"), dated August [__], 2014 (the "Local Purchase Contract"), of the following bonds:

$_____       City of Detroit, Michigan, Detroit Water and Sewerage Department
Water Supply System Revenue Refunding Senior Lien Bonds, Series 2014A

$_____       City of Detroit, Michigan, Detroit Water and Sewerage Department
Water Supply System Revenue Refunding Senior Lien Bonds, Series 2014B

$_____       City of Detroit, Michigan, Detroit Water and Sewerage Department
Water Supply System Revenue Refunding Second Lien Bonds, Series 2014C

$_____       City of Detroit, Michigan, Detroit Water and Sewerage Department
Water Supply System Revenue Refunding Second Lien Bonds, Series 2014D

(collectively, the "DWSD Obligations"), to be issued by the City (i) to finance the City's purchase of its outstanding Detroit Water and Sewerage Department Water Supply System bonds that have been offered by the bondholders thereof and accepted for purchase by the City (the "Tendered DWSD Bonds") pursuant to the Invitation to Tender Bonds dated August 7, 2014 (the "Invitation") and (ii) to pay the costs of issuance of the DWSD Obligations and the Bonds.

      Payment of the principal of and interest on certain series of the Bonds (the "Insured Bonds") when due will be insured by municipal bond insurance policies (the "Bond Insurance Policies") to be issued by one or more bond insurers (the "Bond Insurers") simultaneously with the delivery of the Bonds.

      The Underwriters intend to make an initial bona fide public offering of all of the Bonds at prices not in excess of the public offering prices set forth on the inside cover pages of the official statement, dated the date hereof, with respect to the Bonds (such official statement, together with the cover pages, and all exhibits, appendices and statements included therein or attached thereto being herein called the "Official Statement") and may subsequently change such offering price without any requirement of prior notice. The Underwriters may offer and sell Bonds to certain dealers (including dealers depositing Bonds into investment trusts) and others at prices lower than the public offering price stated on the inside cover pages of the Official Statement. The

Underwriters agree to furnish to the Authority an issue price and yield certificate which will contain certifications necessary to determine the issue price and yield on the Bonds.

In the event that the Underwriters fail (other than for reasons permitted herein) to accept delivery of and pay for the Bonds at the Closing (as hereinafter defined in paragraph 7(a)), the parties hereto acknowledge that the damages that the Authority and the City may suffer as a result thereof shall be difficult to ascertain, and as a result, the parties hereby agree that as liquidated damages, and not as a penalty, for the Underwriters' failure, the Underwriters shall pay to the Authority, as liquidated damages to the Authority and to the City, an aggregate amount equal to the lesser of (i) 1% of the aggregate principal amount of the Bonds or (ii) $5,000,000. Payment of such liquidated damages to the Authority and acceptance by the Authority, on behalf of itself and the City, shall constitute a full release and discharge of all claims and damages for such failure of the Underwriters.

The Authority acknowledges and agrees that (i) the purchase and sale of the Bonds pursuant to this Agreement is an arm's-length commercial transaction between the Authority and the Underwriters, (ii) in connection therewith and with the discussions, undertakings and procedures leading up to the consummation of such transaction, the Underwriters are and have been acting solely as principals and are not acting as the agents or fiduciaries of the Authority, (iii) the Underwriters have not assumed an advisory or fiduciary responsibility in favor of the Authority with respect to the offering contemplated hereby or the discussions, undertakings and procedures leading thereto (irrespective of whether the Underwriters have provided other services or are currently providing other services to the Authority on other matters) and the Underwriters have no obligation to the Authority with respect to the offering contemplated hereby except the obligations expressly set forth in this Agreement, and (iv) the Authority has consulted its own legal, financial and other advisors to the extent it has deemed appropriate. For both subsections (ii) and (iii) herein, it is the Authority's understanding that as advisory or fiduciary relationship shall not be deemed to exist when, in the course of acting as an underwriter, broker, dealer or municipal securities dealer, a person render advice to an issuer, including advice with respect to the structure, timing, terms and other similar matters concerning a new issue of municipal securities. The Representative has been advised of the Authority's engagement of an independent registered municipal advisor. As required by Securities and Exchange Commission ("SEC") rules, the Representative discloses to you that accordingly, the Underwriters are not acting as your municipal advisor and are not subject to the fiduciary duty set forth in Section 15B(c)(1) of the Securities Exchange Act of 1934, as amended (the "Exchange Act").

2.      The Bonds shall otherwise be as described in the Resolutions (as hereinafter defined) and the Official Statement and shall be payable in lawful money of the United States as also described herein.

The Representative has been duly authorized to execute this Agreement and to act hereunder and on behalf of each Underwriter, each of whom represents that it has the legal capacity to enter into this Agreement and to carry out the transactions contemplated hereby.

The aggregate principal amount, the date, the dates of maturity, the interest rates per annum and the initial public offering prices of the Bonds are set forth in Item 1 of Exhibit A

Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014D

attached hereto and made a part hereof. The Bonds shall in all other respects be the same Bonds as are described in the Official Statement.

3.      The United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") has entered a final order in In re City of Detroit, Michigan, Case No. 13-53846, [a copy of which is attached hereto as [Exhibit C] (the "Bankruptcy Court Order"),] in substance (1) authorizing the City to enter into and perform the transactions contemplated under the Official Statement, including but not limited to the this Agreement and all transaction documents, (2) authorizing the City to grant a lien equal or senior to, as applicable, existing liens to secure post-petition indebtedness of the City pursuant to §§ 364(c) and 364(d) of the Bankruptcy Code, (3) finding that the Authority, the Underwriters, the Bond Insurers, the holders of the DWSD Obligations and the Bonds and all assignees and transferees of the foregoing are extending credit to the City in good faith for purposes of §§ 364(e) and 921(e) of the Bankruptcy Code, (4) finding that the Pledged Assets consisting of Net Revenues constitute "special revenues" as defined in § 902(2) of the Bankruptcy Code and "pledged special revenues" as that term is used in §§ 922(d) and 928 of the Bankruptcy Code, (5) finding (or concluding) that the satisfaction of Required Combined Coverage together with the Rate Covenant constitute adequate protection of the interests of all holders of pre-petition liens securing Secured Obligations (as defined in the Bond Ordinance) that were validly existing and outstanding as of the petition date for purposes of § 364(d)(1)(B) of the Bankruptcy Code, all as more particularly described in the Bankruptcy Court Order, and (6) approving a compromise among the City and certain parties (the "DWSD Settlement Parties") resolving objections to the City's Plan of Adjustment filed by one or more of the DWSD Settlement Parties, all as more particularly described in the Bankruptcy Court Order. Based upon the Bankruptcy Court Order, the Underwriters have determined to enter into this Agreement.

4.      The Authority has authorized the execution of the Official Statement dated the date hereof and the use of such Official Statement by the Underwriters in connection with the public offering of the Bonds. The Authority has consented to the use in accordance with law by the Underwriters on or before the date hereof of the preliminary official statement with respect to the Bonds dated August [__], 2014 (such preliminary official statement, together with the cover page, and all exhibits, appendices and statements included therein or attached thereto being herein called the "Preliminary Official Statement"), in connection with the public sale of the Bonds. The Authority deems the information set forth in the Preliminary Official Statement (other than the information set forth in the sections entitled [TO BE UPDATED TO COVER SECTIONS OF THE OS COVERING CITY AND DWSD] ["DEBT SERVICE ON THE DWSD OBLIGATIONS AND COVERAGE PROVIDED BY HISTORIC REVENUES," "SECURITY AND SOURCES OF PAYMENT FOR THE DWSD OBLIGATIONS," "OUTSTANDING INDEBTEDNESS OF THE DEPARTMENT," "DEBT SERVICE REQUIREMENTS," "THE DEPARTMENT," "THE WATER SUPPLY SYSTEM," "THE CAPITAL IMPROVEMENT PROGRAM," "DEPARTMENT FINANCIAL PROCEDURES," "DEPARTMENT FINANCIAL OPERATIONS," "PENSION PLAN CONTRIBUTIONS," "SOURCE AND PRIORITY OF PENSION PAYMENTS," "OTHER POST-EMPLOYMENT BENEFITS," "FEASIBILITY CONSULTANT'S REPORT," "CITY OF DETROIT BANKRUPTCY MATTERS" and "RISK FACTORS", and Appendices [_____])] (collectively,  the "City and DWSD Portion"), to be final as of its date, as provided in Rule 15c2-

12 of the SEC ("Rule 15c2-12") except for the omission of such information as is permitted to be omitted in accordance with paragraph (b)(1) of Rule 15c2-12. The City and the Department, in the Letter of Representations (as defined herein), has deemed the information set forth in the City and DWSD Portion of the Preliminary Official Statement final as of its date. The Authority has prepared a Continuing Disclosure Undertaking, to be dated on or before the Closing (the "Undertaking"), to provide or cause to be provided, certain annual financial information and operating data, and timely notice of the occurrence of certain material events with respect to the Bonds.

5      You hereby agree to supply, within the earlier of (i) seven business days of the date of acceptance hereof or (ii) sufficient time to accompany any confirmation requesting payment which the Underwriters might send to its customers with respect to the Bonds (which in any event shall be a time reasonably acceptable to both the Underwriters and the Authority), such number of copies of the Official Statement as to which the Underwriters will inform you prior to the printing of such Official Statement and which will not exceed [200] copies.

6.      You hereby agree that you will provide the Underwriters with information of which you have knowledge from any source concerning the occurrence of any event that impacts the accuracy and completeness of material representations contained in the Official Statement until the earlier of (a) 90 days from the end of the underwriting period, as defined below, or (b) the time when the Official Statement is available to any person from the Municipal Securities Rulemaking Board (the "MSRB"), but in no case less than 25 days following the "end of the underwriting period," as defined below. You further agree that you will cooperate with the Underwriters to the extent permitted by applicable law, in amending the Official Statement if any of such information, in the reasonable opinion of the Underwriters or the Authority, requires that the Official Statement be amended in fulfillment of the Underwriters' responsibilities pursuant to Rule 15c2-12. Except as provided in the last sentence of this paragraph, the expense of preparation (including without limitation the fees and expenses of legal counsel, financial advisors and other experts employed by the Authority) of each such amendment or supplement and the expense of printing and delivery of the first [200] copies of an amendment or supplement to the Official Statement shall be paid by the Authority. The cost of printing and delivery in excess of [200] copies of the amendment or supplement to the Official Statement shall be paid by the Underwriters. The Underwriters agree to amend or supplement the Official Statement at its own expense in the event that any information provided by the Underwriters for inclusion in the Official Statement is materially inaccurate or incomplete.

The term "end of the underwriting period" as referred to in the preceding paragraph and elsewhere herein is the later of the delivery of the Bonds by you to the Underwriters or when the Underwriters no longer retain an unsold balance of the Bonds for sale to the public. The "end of the underwriting period" shall be deemed to be 25 days after the date of Closing, unless the Representative otherwise notifies you in writing prior to such date, to the best of its knowledge, that there exists an unsold balance of the Bonds. The deemed "end of the underwriting period" may be extended for additional periods of 25 days each upon receipt of an additional written notification from the Representative that, to the best of its knowledge, there exists an unsold balance of Bonds. The Representative agrees to file the Official Statement with the MSRB on or before the date of Closing.

7. The Authority represents and warrants to, and agrees with, the Underwriters, as of the date of its acceptance of this Agreement and as of the date and time of the Closing, as follows:

(a) The Authority, has, and at the time of the Closing will have, full legal right, power and authority (i) to enter into this Agreement and the Undertaking and (ii) to sell and deliver the Bonds to the Underwriters as provided herein, in the Resolutions (as hereinafter defined) and in the Official Statement; and the Authority has, and at the time of the Closing will have, duly authorized and approved the execution and delivery of, and performance by the Authority of its obligations contained in this Agreement;

(b) No further authorization or approval of the Authority's Board of Directors (the "Board of Directors") is required for the execution and delivery of this Agreement or the Undertaking on behalf of the Authority, and this Agreement assuming due authorization, execution and delivery of the Agreement by the other party thereto, constitutes a legal, valid and binding obligation of the Authority, enforceable against the Authority in accordance with its terms except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar laws affecting the rights of creditors generally, and by principles of equity, including those related to equitable subordination, if equitable remedies are sought or if equitable defenses (based solely on facts which the Authority neither knew nor should have known at the time of execution hereof) are raised; and, except as may be required under blue sky or securities laws of any state (as to which no representation or warranty is given), the Authority is not required to obtain any further authorization or approval for the sale and delivery of the Bonds to the Underwriters or the performance by the Authority of its obligations hereunder or under the Undertaking except such authorizations or approvals as shall have been obtained at or prior to the Closing, and copies of which will be delivered to the Underwriters at the Closing;

(c) The Authority, acting through the Board of Directors, has duly authorized and approved the Preliminary Official Statement and has duly authorized and approved the execution and delivery of the Official Statement as provided in Paragraph 3 hereof;

(d) The Bonds are issued pursuant to that certain Amended and Restated Resolution Establishing Michigan Finance Authority Local Government Loan Program and Providing for the Issuance of Local Government Program Revenue Bonds adopted by the Authority on May 15, 2014 (the "General Resolution"), and the Supplemental Resolution by the Authority adopted by the Authority on August 12, 2014 (the "Supplemental Resolution" and together with the General Resolution, the "Resolutions"). The Supplemental Resolution has been duly adopted by the Authority, acting through its Board of Directors, and the Resolutions have not been modified, amended or rescinded and will be in full force and effect at the time of the Closing and will be a contract with the holders of the Bonds and a valid, legally binding act of the Authority, enforceable in accordance with the terms thereof except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar laws affecting the rights of creditors generally, and by principles of equity, including those related to equitable subordination if equitable remedies are sought or if

equitable defenses (based solely on facts which the Authority neither knew nor should have known at the time of execution hereof) are raised;

(e)     When delivered to the Underwriters and paid for in accordance with the terms of this Agreement, the Bonds (i) will have been duly authorized, executed and issued by the Authority pursuant to the Resolutions, and (ii) will constitute valid, legally binding, limited obligations of the Authority; provided, however, that the Bonds and the interest obligation thereon shall never constitute a debt or liability of the State of Michigan (the "State") or any agency or employee thereof within the meaning of any constitutional or statutory provision or limitation or a general obligation of the Authority and shall never create or constitute any indebtedness, liability or obligation of the State or constitute a pledge of the faith and credit of the State or the general funds or assets of the Authority (including funds pertaining to other loans or activities) but shall be a limited obligation of the Authority payable solely from the Security, as defined in the Resolutions;

(f)     No consent or approval of, or registration with or declaration of, any federal, State or other governmental commission, board, regulatory body or instrumentality, is or was required in connection with any of the actions of the Authority described in subparagraphs (a), (b), (c), (d) or (e) of this Paragraph 6 or the delivery of the Bonds to the Underwriters except for the filing of IRS form 8038-G (and the Authority hereby agrees to make such filing promptly after the Closing), except as may be required under blue sky or securities laws of any state (as to which no representation or warranty is given), nor is any election or referendum of voters required in connection therewith;

(g)     All legislation necessary to permit the Authority (i) to fulfill in all material respects its obligations under the Resolutions, this Agreement and the Undertaking, and (ii) to carry out the transactions contemplated in the Resolutions and the Official Statement is in full force and effect;

(h)     The execution and delivery of the Official Statement, this Agreement, and the Undertaking by the Authority, and the fulfillment of the terms and conditions of, and the carrying out of the transactions contemplated by the Resolutions, this Agreement, and the Undertaking, do not and will not conflict with, or constitute on the part of the Authority a breach of or a default under, any existing law (including, without limitation, the Constitution of the State), any court or administrative regulation, decree or order or any agreement, indenture, mortgage, lease or other instrument to which the Authority is subject or by which it is bound and which breach or default would materially affect the validity or binding effect of any of the Bonds or the ability of the Authority to pay the principal of and the interest on any of the Bonds;

(i)     The Preliminary Official Statement (other than the City and DWSD Portion), as of the date thereof, did not contain any untrue statement of a material fact or omit to state any material fact necessary to make such document, or the statements and information therein contained, in light of the circumstances under which they were made, not misleading;

13-53846-swr   Doc 7738-1   Filed 10/02/14   Entered 10/02/14 10:35:47   Page 46 of 135

(j)　The Official Statement (other than the City and DWSD Portion), does not, as of its date or will not as of the Closing, contain any untrue statement of a material fact or omit to state any material fact necessary to make such document, or the statements and information therein contained, in light of the circumstances under which it was made, not misleading;

(k)　The Bonds will conform to the terms thereof set forth in the Resolutions and described in the Official Statement; and the proceeds of the Bonds will be applied as described under the caption "THE SERIES 2014D BONDS—Sources and Uses of Funds for the Series 2014D Bonds" in the Official Statement;

(l)　Other than an appeal of the Bankruptcy Court Order, except as may have been disclosed in writing to the Underwriters before the date of this Agreement or as may be disclosed in the Official Statement, the Authority has not been served with any litigation (and to the knowledge of the Authority no litigation has been commenced or is threatened) against the Authority, in any court (i) seeking to restrain or enjoin the sale or delivery of the Bonds, or (ii) in any manner questioning the authority of the Authority to issue, or the issuance or validity of, any of the Bonds or any other indebtedness of the Authority, or (iii) questioning the constitutionality of any statute, or the validity of any proceedings, authorizing the issuance of any of the Bonds, or (iv) questioning any of the legislation referred to in subparagraph (g) of this Paragraph 6, or (v) questioning the validity or enforceability of the Resolutions or (vi) seeking to secure a lien on the Pledged Funds or the collection of the Revenues, as defined in the Resolutions, or other moneys, securities, funds and property pledged in the Resolutions that are a source of payment on the Bonds, or (vii) contesting in any way the completeness, accuracy or fairness of the Preliminary Official Statement or the Official Statement, or (viii) which might in any material respect adversely affect the transactions contemplated herein and in the Official Statement; and no right of any member of the Board of Directors to his or her office is being contested;

(m)　Any certificate or copy of any certificate signed by an official of the Authority and delivered to the Underwriters pursuant hereto or in connection herewith shall be deemed a representation by the Authority to the Underwriters as to the truth of the statements therein made;

(n)　Except as permitted by the Resolutions, from and after the time of Closing, the Authority will not create or permit the creation of, or issue any obligations or create any additional indebtedness secured by, a charge and lien on the Pledged Funds, as defined in the Resolutions, and other moneys, securities, funds and property pledged in the Resolutions;

(o)　To the extent permitted by law, the Authority will not permit any of the proceeds of the Bonds to be used directly or indirectly to acquire any securities or obligations, the acquisition of which would cause any Bond to be an "arbitrage bond" within the meaning of Section 148 of the Internal Revenue Code of 1986 or any successor provision, act or statute, and the regulations from time to time promulgated or proposed thereunder (the "Code");

(p)    To the extent permitted by law, the Authority will not permit any of the proceeds of the Bonds or any other funds of the Authority to be used directly or indirectly in a manner which would result in the exclusion of any of the Bonds from the treatment afforded by Section 103(a) of the Code for any reason, including without limitation the classification of such Bonds as "private activity bonds" within the meaning of Section 141(a) of the Code or as obligations guaranteed by the United States of America, as provided in Section 149(b) of the Code; and the Authority will not take any action or omit to take any action which, by commission or omission, would cause interest on the Bonds to be includable in gross income for federal income tax purposes pursuant to Section 103 of the Code or cause such interest to be included in any alternative minimum tax other than an alternative minimum tax which applies to all tax exempt bonds generally;

(q)    Other than a nonmonetary default resulting from the City having filed a petition for relief under Title 11 of the United States Code, the Authority is not, and historically has not been, in default in the payment of principal of, or premium, if any, or interest on any bonds, notes or contract payments pledged for the payment of notes or bonds and has not entered into any contract or arrangement that might give rise to any lien or encumbrance on the Pledged Funds other than as provided in the Resolutions;

(r)    The Authority has complied with all continuing disclosure obligations under Rule 15c2-12 during the previous five years; and

(s)    The Authority will without any cost to the Authority cooperate with the Underwriters in the qualification of the Bonds for offering and sale and the determination of their eligibility for investment under the laws of such jurisdictions as the Underwriters shall designate, provided that the Authority is not required to qualify as a foreign corporation or to consent to any general or special service of process in any jurisdiction.

It is acknowledged and agreed by the parties hereto that all covenants, representations and warranties made by the Authority herein and in any certificates given in compliance herewith, are made solely by the Authority and not by any individual executing this Agreement or any certificate in his or her own capacity, and no liability shall be imposed, directly or indirectly, on such individual.

8.    (a)    At 10:00 a.m., Eastern Time, on September [__], 2014, or such other time and date as shall be mutually agreed upon by the Authority and the Underwriters (the "Closing"), the Authority shall direct the Trustee to deliver the Bonds to the Underwriters at the offices of The Depository Trust Company, New York, New York, in definitive form, duly executed and authenticated by the Trustee.  Subject to the terms and conditions hereof, the Authority shall deliver at the offices of [Dickinson Wright PLLC, [location to be determined], the other documents and instruments to be delivered at the Closing pursuant to this Agreement (the "Closing Documents") and the Underwriters shall accept delivery of the Bonds and the Closing Documents and pay the purchase price for the Bonds as set forth in Item 2 of Exhibit A hereto by wire transfer to the Trustee, in Federal Reserve Funds immediately available, for the account of the Authority, or as the Authority shall direct.  The Bonds shall be registered in the name of Cede & Co., as nominee for The Depository Trust Company ("DTC") and there shall be one (1) typewritten Bond for each maturity as set forth in Item 1 of Exhibit A.  The Bonds shall be made

Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014D

available to the Underwriters not less than 24 hours preceding the Closing for purposes of inspection.

(b)     If the Authority shall be unable to satisfy the conditions of the obligations of the Underwriters to accept delivery of and to pay for the Bonds contained in this Agreement, the respective obligations of the Authority and the Underwriters shall be as set forth in Paragraph 10 hereof.

9.     The Underwriters have entered into this Agreement in reliance upon the representations and warranties and agreements of the Authority contained herein, upon the representations and warranties and agreements of the City contained in the Letter of Representations attached hereto as <u>Exhibit B</u> executed and delivered on behalf of the City on the date hereof (the "Letter of Representations") and in the Local Purchase Contract, and upon the representations and warranties of the Authority and the City to be contained in the Closing Documents, and upon the performance by the Authority of its obligations hereunder, upon the performance by the City of its obligations under the Letter of Representations and the Local Purchase Contract, both as of the date hereof and as of the date of Closing.  The Underwriter has received a letter from KPMG LLP, the independent accountants for the Department ("KPMG"), [in the form attached hereto as Exhibit __] [providing for its consent to the inclusion of the audited financial statements of the Water Fund for the year ended June 30, 2013 in the Preliminary Official Statement and in the Official Statement and describing agreed-upon procedures] (the "Accountant's Letter").  Accordingly, the Underwriters' obligations under this Agreement to purchase, to accept delivery of and to pay for the Bonds shall be subject to the performance by the Authority and the City of their obligations to be performed hereunder, under the Letter of Representations and the Local Purchase Contract, at or prior to the Closing, and shall also be subject to the following conditions:

(a)     The representations and warranties of the Authority contained herein shall be true, complete and correct in all material respects at the date hereof and as of the time of the Closing, as if made at and as of the time of the Closing, and the Authority shall be in compliance with each of the agreements made by it in this Agreement;

(b)     At the time of the Closing, the Official Statement shall not have been amended, modified or supplemented, except in such manner as may have been agreed to by the Underwriters;

(c)     The Underwriters shall have the right in their sole discretion (except where otherwise indicated below) to terminate their obligations under this Agreement to purchase, to accept delivery of and to pay for the Bonds by notifying the Authority of its election to do so, if after the acceptance hereof by the Authority and prior to the Closing:

(i)     any event shall occur which makes untrue or incorrect in any material respect, as of the time of such event, any statement or information contained in the Official Statement or which is not reflected in the Official Statement but should be reflected therein in order to make the statements contained therein not misleading in any material respect and, in either event, the Authority refuses to permit the Official Statement to be supplemented to supply such statement or information or the effect of the Official Statement as so

13-53846-swr   Doc 2773-1   Filed 02/21/14   Entered 02/21/14 10:35:47   Page 49 of
135

supplemented is, in the judgment of the Underwriter, to materially adversely affect the market for the Bonds or the sale, at the contemplated offering prices (or yields), by the Underwriter of the Bonds; or

(ii) the market price of the Bonds or the marketability thereof shall (in the reasonable opinion of the Underwriters) have been materially adversely affected by reason of the fact that between the date hereof and the Closing,

(A) an amendment to the Constitution of the United States or to the Constitution of the State, shall have been adopted, or

(B) legislation shall have been enacted by the Congress or by the Legislature of the State, recommended to the Congress for passage by the President of the United States or the Legislature of the State by the Governor of the State, or introduced and favorably reported for passage to either House of the Congress or of the Legislature of the State by any Committee of such House to which such legislation has been referred for consideration or by a conference committee of both Houses of the Congress; or any statement or report in respect of legislation previously introduced or favorably reported or recommended for passage shall have been made or reported to have been made by the President, any member of the Cabinet or his representative, or any agency of the Federal government, including without limitation the Internal Revenue Service, or any member or members of either House of the Congress or the members or staff of any Committee of either House of the Congress or a conference committee of both Houses of the Congress, or

(C) a decision shall have been rendered by a court established under Article III of the Constitution of the United States, or the Tax Court of the United States, or any other Federal or State court, or an order, ruling or regulation (final, temporary or proposed) shall have been made by the Treasury Department of the United States or the Internal Revenue Service or by any other Federal or State agency affecting the tax status of the Authority or its obligations for borrowed money (including the Bonds) or the interest thereon (including any such event with the purpose or effect, directly or indirectly, of imposing Federal income taxation upon, or any taxation in the State upon, such interest as would be received by the holders of the Bonds); or

(iii) a stop order, ruling, regulation, proposed regulation or statement by or on behalf of the SEC or any other governmental agency having jurisdiction of the subject matter shall be issued or made to the effect that the issuance, offering, sale or distribution of obligations of the general character of the Bonds is in violation or would be in violation of any provisions of the Securities Act of 1933, as amended (the "Securities Act"), the Exchange Act, or the Trust Indenture Act of 1939, as amended (the "Trust Indenture Act"); or

13-53846-swr Doc 7731-1 Filed 10/01/14 Entered 10/01/14 07:35:47 Page 50 of 135

(iv)   legislation introduced in or enacted (or resolution passed) by the Congress or an order, decree or injunction issued by any court of competent jurisdiction, or an order, ruling, regulation (final, temporary or proposed), press release, or other form of noticed issued or made by or on behalf of the SEC, or any other governmental agency having jurisdiction of the subject matter, to the effect that obligations of the general character of the Bonds, including any or all underlying arrangements, are not exempt from registration under or other requirements of the Securities Act, or that the Resolutions are not exempt from qualification under or other requirements of the Trust Indenture Act, or that the issuance, offering or sale of obligations of the general character of the Bonds, including any or all underlying arrangements, as contemplated hereby or by the Official Statement or otherwise, is or would be in violation of the federal securities law as amended and then in effect; or

(v)   there shall have occurred an outbreak or escalation of hostilities involving the United States or the declaration by the United States of a national emergency or war, if, in the reasonable opinion of the Underwriters, the market price of the Bonds or the marketability thereof shall be materially adversely affected thereby; or

(vi)   there shall have occurred a general suspension of trading, minimum or maximum prices for trading shall have been fixed and be in force or maximum ranges or prices for securities shall have been required on the New York Stock Exchange or other national stock exchange whether by virtue of a determination by that Exchange or by order of the SEC or any other governmental agency having jurisdiction or any national securities exchange shall have (A) imposed additional material restrictions not in force as of the date hereof with respect to trading in securities generally, or to the Bonds or similar obligations, or (B) materially increased restrictions now in force with respect to the extension of credit by or the charge to the net capital requirements of underwriters or broker-dealers such as to make it, in the judgment of the Underwriters, impractical or inadvisable to proceed with the offering of the Bonds as contemplated in the Official Statement; or

(vii)   the declaration of a general banking moratorium by United States, New York or State authorities or a major financial crisis or a material disruption in commercial banking or securities settlement clearances services shall have occurred such as to make it, in the judgment of the Underwriter, impractical or inadvisable to proceed with the offering of the Bonds as contemplated by the Official Statement; or

(viii)   the purchase of and payment for the Bonds by the Underwriters, or the resale thereof by the Underwriters, on the terms and conditions herein provided, shall be prohibited by any applicable law or governmental regulation or order of any court (other than by reason of the Underwriters' failure to comply with any applicable state blue sky or securities law); or

(ix)  the market price of the Bonds or the marketability thereof shall have been materially adversely affected by the occurrence of any event which in the reasonable opinion of the Underwriters requires or has required an amendment, modification or supplement to the Official Statement; or

(x)  The Bankruptcy Court Order shall have been subsequently vacated, reversed or modified, in whole or in part, in any manner without the consent of the Underwriter and the Authority by the Bankruptcy Court or any other court of competent jurisdiction or is the subject of a stay pending appeal.

(d)  The Authority shall not have defaulted under any of its covenants, agreements, representations or warranties under the Resolutions or this Agreement;

(e)  The City shall have issued and delivered the DWSD Obligations to be purchased with the proceeds of the Bonds.

(f)  At or prior to the Closing, the Underwriters shall have received each of the following documents (the "Closing Documents"):

(i)  A copy of the Official Statement, signed on behalf of the Authority by its Chairperson or other member of the Authority or its Executive Director or other authorized officer;

(ii)  The opinion of the Attorney General of the State of Michigan, dated the date of Closing, substantially in the form set forth in Appendix III to the Official Statement and the opinion of Dickinson Wright PLLC ("Bond Counsel"), dated the date of the Closing and addressed to the Authority, substantially in the form set forth in Appendix III to the Official Statement;

(iii)  Supplemental opinions of Bond Counsel and the Attorney General of the State of Michigan, each dated the date of the Closing and addressed to the Underwriters, to the effect that (A) at the times of execution of this Agreement the Authority had, and on the date of the Closing has, full legal right, power and authority to execute and deliver this Agreement and to cause the Bonds to be delivered to the Underwriters as provided in this Agreement and in the Resolutions, and the Authority at the times of execution of this Agreement had, and on the date of the Closing has, duly authorized and approved the execution and delivery of, and the performance of its obligations contained in this Agreement, (B) no further authorization or approval not already obtained is required by the Authority in connection with the delivery of the Bonds to the Underwriters or entering into or performing its obligations under the Resolutions or this Agreement, except for such approvals, consents or authorizations as are required by blue sky or securities laws of any state (as to which no opinion need be expressed) and, assuming due authorization, execution and delivery thereof by the other party thereto, this Agreement constitutes a legal, valid and binding obligation of the Authority enforceable against the Authority in accordance with its terms, subject to the application of general principles of equity, including equitable subordination and to bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar laws affecting creditors'

rights, (C) the Authority has duly authorized and approved the distribution and use in accordance with applicable law of the Preliminary Official Statement and has duly authorized, approved and executed the Official Statement, (D) the Authority's execution and delivery of and compliance with the terms and conditions of, and the carrying out of the transactions contemplated by, the Resolutions and this Agreement do not and will not conflict with, or constitute on the part of the Authority a breach of or a default under, any agreement or other instrument known to them to which the Authority is subject or by which it is or may be bound or violate any decree or order known to them or any law, rule or regulation to which the Authority is subject or by which it is bound that, in all cases, would have an adverse effect on the Bonds, (E) the statements in the Official Statement under the captions [TO BE UPDATED] ["INTRODUCTION," "THE MICHIGAN FINANCE AUTHORITY," "THE MICHIGAN FINANCE AUTHORITY'S LOCAL GOVERNMENT LOAN PROGRAM," "THE SERIES 2014D BONDS" (except the subsection "Book-Entry-Only System"), "SECURITY AND SOURCES OF PAYMENT FOR THE SERIES BONDS," "TAX MATTERS," "LITIGATION" (as to supplemental opinion of Attorney General only), "LEGALITY OF SERIES BONDS FOR INVESTMENT AND DEPOSIT," "STATE NOT LIABLE ON SERIES BONDS," "CONTINUING DISCLOSURE UNDERTAKING" (as it relates to the Authority), and the statements in Appendices [_____], insofar as such statements summarize the language and effect of the Resolutions, the Bonds, the Continuing Disclosure Undertaking of the Authority and the Constitution and the laws of the State and the United States, are fair and accurate summaries thereof in all material respects, (F) the Bonds are exempt from the registration requirements of the Securities Act, and the Resolutions are exempt from qualification as an indenture under the Trust Indenture Act, and (G) nothing has come to their attention that would lead them to believe that the Official Statement (other than the City or DWSD Portion) as of its date and as of Closing (other than the financial statements, other financial, statistical or quantitative information, projections or estimates, and opinions of other counsel, as to all of which no opinion is expressed) contains any untrue statement of a material fact or omits to state a material fact that is necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(iv) An opinion, dated the date of the Closing and addressed to and solely for the benefit of the Underwriters, of Kutak Rock LLP, counsel to the Underwriters, in form and substance satisfactory to the Underwriters;

(v) A non-arbitrage certificate, dated the date of the Closing, signed by the Chairperson of the Board of Directors or his designee, or the Executive Director of the Authority, in a form acceptable to the Underwriters;

(vi) A certificate or certificates of the Authority dated the date of the Closing, signed on behalf of the Authority by an authorized officer to the effect that to the best knowledge of the signer, after such inquiry as the signer deems

13-53846-swr Doc 2773-1 Filed 03/12/14 Entered 03/12/14 10:35:47 Page 53 of 135

appropriate, and taking into account the responsibilities of the office which the signer holds, and on behalf of the Authority and not in any individual capacity, the signer certifies: (A) the truthfulness in all material respects on and as of the date of Closing of all representations and warranties of the Authority contained in this Agreement; (B) the compliance by the Authority with all agreements and satisfaction of all conditions to be complied with or satisfied at or prior to the Closing; (C) the conformity of the Bonds in all material respects to the description thereof in the Resolutions and the Official Statement; (D) since the respective dates as of which information is given in the Official Statement, and except as set forth therein, there having been no material adverse change in the condition, financial or otherwise, of the Authority, (E) the Preliminary Official Statement and the Official Statement, as of their dates and as of the Closing, does not contain any untrue statements of a material fact or omit to state a material fact that is necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading (other than under the City and DWSD Portion), and (F) other than an appeal of the Bankruptcy Court Order or a motion seeking a stay of the Bankruptcy Court Order pending appeal, no litigation or other judicial proceedings have been served upon the Authority or threatened (either in State courts or in federal courts in Michigan) (w) restraining or enjoining or seeking to restrain or enjoin the issuance, sale, execution or delivery of any of the Bonds, or (x) in any way questioning or affecting the validity of any provision of the Bonds, or (y) in any way questioning or affecting the validity of any of the proceedings or the authority for the authorization, issuance, sale, execution or delivery of any of the Bonds, or the pledge or application of any money or security provided for the payment of any of the Bonds, or (z) questioning or affecting the organization or existence of the Authority or the right of any member of the Authority to their respective offices;

     (vii)    A certified copy of each of the Resolutions comprising the Resolutions;

     (viii)    A copy of the Bankruptcy Court Order, as described in Section 3 hereof;

     (ix)    Satisfactory evidence that Standard and Poor's Ratings Services, Fitch Ratings and Moody's Investors Services shall have assigned to the Bonds the rating set forth on the inside cover page of the Official Statement, and that the rating shall not have been reduced or withdrawn;

     (x)    A copy of the fully executed Letter of Representations from the City and the Department;

     (xi)    The opinion of Dykema Gossett PLLC ("DWSD Bond Counsel"), dated the date of the Closing and addressed to the Authority and the Underwriters, as to the validity and tax-exempt status of the DWSD Bonds, in form and substance satisfactory to the Underwriters;

(xii) Opinions of DWSD Bond Counsel, Miller Canfield as counsel to the Emergency Manager of the City, and Jones Day as Bankruptcy Counsel to the City dated the date of the Closing and addressed to the Underwriters, to the effect, in the aggregate, that (A) at the times of execution of this Agreement the City had, and on the date of the Closing has, full legal right, power and authority to execute and deliver the Letter of Representations and the Local Purchase Contract and other transaction documents (the "DWSD Transaction Documents") and to cause the DWSD Obligations to be delivered to the Authority as provided in this Agreement and pursuant to the DWSD Authorizing Documents (as defined in the Letter of Representations), and the City at the time of execution of this Agreement had, and on the date of the Closing has, duly authorized and approved the execution and delivery of, and the performance of its obligations contained in the DWSD Transaction Documents, (B) no further authorization or approval not already obtained is required by the City in connection with the delivery of the DWSD Obligations to the Authority or entering into or performing its obligations under the DWSD Transaction Documents, except for such approvals, consents or authorizations as are required by blue sky or securities laws of any state (as to which no opinion need be expressed) and, assuming due authorization, execution and delivery thereof by the other party thereto, the DWSD Transaction Documents constitute legal, valid and binding obligations of the City enforceable against the City in accordance with their terms, subject to the application of general principles of equity, including equitable subordination and to bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar laws affecting creditors' rights, (C) the City has duly authorized and approved the distribution and use in accordance with applicable law of the Preliminary Official Statement and the Official Statement, (D) the City's execution and delivery of and compliance with the terms and conditions of, and the carrying out of the transactions contemplated by, the DWSD Transaction Documents do not and will not conflict with, or constitute on the part of the City a breach of or a default under, any agreement or other instrument known to them to which the City is subject or by which it is or may be bound or violate any decree or order known to them or any law, rule or regulation to which the City is subject or by which it is bound that, in all cases, would have an adverse effect on the Bonds, (E) the statements in the Official Statement in the [TO BE UPDATED] [under sections "_____" and Appendices _____], insofar as such statements summarize the language and effect of the DWSD Authorizing Documents, the Continuing Disclosure Undertaking of the City and the laws of the State and the United States, are fair and accurate summaries thereof in all material respects, (F) the DWSD Obligations are exempt from the registration requirements of the Securities Act, and the DWSD Authorizing Documents are exempt from qualification as an indenture under the Trust Indenture Act, and (G) nothing has come to their attention that would lead them to believe that the Official Statement, as of its date and as of Closing (other than financial statements, other financial, statistical or quantitative information, projections or estimates, and opinions of other counsel, as to all of which no opinion is expressed) contains any untrue

statement of a material fact or omits to state a material fact that is necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(xii)   Certificates of the City [, the Department and the Emergency Manager] dated as of the date of the Closing to the effect that the representations and warranties included in the Letter of Representations and Local Purchase Contract are true and correct in all material respects as of the date of the Closing and all obligations to be performed by the City under the Letter of Representations and the Local Purchase Contract referenced above on or prior to the date of closing have been performed;

(xiii)   A letter from Bond Counsel to the effect that the opinion referred to in clause (ii) of this subparagraph may be relied upon by the Underwriters as though such opinion was addressed to them;

(xiv)   An executed copy of the Authority's Continuing Disclosure Undertaking, in the form and content set forth in Appendix IV to the Official Statement;

(xv)   An executed copy of the City and the Department's Continuing Disclosure Undertaking, in the form and content set forth in Appendix IV to the Official Statement;

(xvi)   Such additional legal opinions, signatures, delivery and other certificates, and other instruments and documents as required under the Local Purchase Contract;

(xvii)   [A letter from KPMG, dated the Closing Date, to the effect that it reaffirms as of the Closing Date the statements made in the Accountant's Letter (describing agreed-upon procedures and stating no material adverse change in the financial position or results of operations of the Water Fund except as set forth in or contemplated by the Official Statement or as described in such letter), in form and substance satisfactory to the Underwriters];

(xviii)  Immediately before the release of the Bonds, on the Settlement Date evidence satisfactory to Underwriters that the City has filed with the Bankruptcy Court an amended Plan of Adjustment of the City removing all provisions contained in the current Plan of Adjustment impairing any DWSD Bonds;

(xix)   Certified copies of the Bond Insurance Policies issued by the Bond Insurers and certified copies of any debt service reserve fund surety insurance policies issued by the Bond Insurers and any other documents executed in connection therewith;

(xx)   An opinion of counsel to the Bond Insurers, dated the Closing Date, addressed to the Underwriters and in form and substance satisfactory to the Representative;

(xxi)  A certificate of the Bond Insurers, dated the Closing Date, signed by an authorized officer of the Bond Insurers, to the effect that the information contained under the caption ["Bond Insurance"] in the Official Statement is true and correct in all material respects, and that the specimen of the Bond Insurance Policies contained in Appendix VI to the Official Statement is a true and correct specimen of the Bond Insurance Policies being issued by the Bond Insurers; and

(xxii)  Such additional legal opinions, signatures, delivery and other certificates, and other instruments and documents as the Underwriters may reasonably request to evidence the truth, accuracy and completeness, as of the date hereof and as of the date of the Closing, of the representations and warranties of the Authority and of the City contained herein and of the statements and information contained in the Official Statement and the due performance or satisfaction by the Authority and the City at or prior to the Closing of all agreements then to be performed and all conditions then to be satisfied by the Authority and the City.

All of the opinions, letters, certificates, instruments and other documents mentioned above or elsewhere in this Agreement shall be deemed to be in compliance with the provisions hereof if, but only if, they are in form and substance reasonably satisfactory to the Underwriters.

If the Authority shall be unable to satisfy the conditions to the obligations of the Underwriters to accept delivery of and to pay for the Bonds contained in this Agreement, or if the obligations of the Underwriters to accept delivery of and to pay for the Bonds shall be terminated for any reason permitted by this Agreement, this Agreement shall terminate and neither the Underwriters nor the Authority shall be under further obligation hereunder, except that the respective obligations of the Authority and the Underwriters set forth in Paragraphs 10 and 12 hereof shall continue in full force and effect.

10.    (a)    The Underwriters shall be under no obligation to pay, and the Authority shall pay, all expenses incident to the performance of the obligations of the Authority hereunder, including, but not limited to: (i) the cost of preparation and printing the definitive Bonds; (ii) the cost of the preparation and printing the Preliminary Official Statement, including the appendices and any amendments or supplements thereto; (iii) the fees and disbursements of the financial advisor and Bond Counsel to the Authority; (iv) the fees and disbursements of any consultants or advisors retained by the Authority; (v) fees charged by rating agencies in connection with the Bonds; (vi) the cost of preparation and printing of the Official Statement, up to the number of copies specified in Paragraph 4 hereof, including the appendices thereto; (vii) subject to the provisions of Paragraph 5 above, the cost of preparation of any amendment or supplement to the Official Statement and the costs of printing and delivery of up to [200] copies of any amendment or supplement to the Official Statement, including the reasonable fees and disbursements of counsel to the Underwriters and to the Authority with respect to any supplements or amendments to the Official Statement (all such costs to be paid by the Authority subject to the provisions of Paragraph 5 above); (viii) the fees and disbursements of counsel retained by the Underwriters; (ix) the fees of Digital Assurance Certification, L.L.C. for a continuing disclosure undertaking compliance review; (x) any

initial fees and charges of the Trustee and its counsel (including the first annual payment due the Trustee), the Bond Registrar, the Paying Agent and Co-Paying Agent, if any; and (xi) the fees and disbursements of the Bond Insurers and their counsel.

(b) The Underwriters shall pay (i) the cost of preparation and reproduction of this Agreement and the other underwriting documents; (ii) all advertising expenses in connection with the offering of the Bonds; (iii) the cost of printing and delivering more than [200] copies of the Official Statement; (iv) the cost of printing and delivery of more than [200] copies of any supplement or amendment of the Official Statement; (v) the cost of amending or supplementing the Official Statement in the event that any information provided by the Underwriters for inclusion in the Official Statement is materially inaccurate or incomplete; and (vi) all other expenses incurred by the Underwriters in connection with the Bonds.

11. Any notice or other communication to be given to the Authority under this Agreement shall be given by delivering the same in writing to its address set forth above, and any notice or other communication to be given to the Underwriters under this Agreement shall be given by delivering the same in writing to Citigroup Global Markets, Inc., [390 Greenwich Street, New York, NY 10013], Attention: [_____], Telephone: [_____], Fax: [_____].

12. This Agreement is made solely for the benefit of the Authority and the Underwriters (including the successors or assigns of the Underwriters); no other person shall acquire or have any right or liability hereunder or by virtue hereof. All of the representations, warranties and agreements of the Authority contained in this Agreement and in the certificates delivered pursuant hereto shall remain operative and in full force and effect, regardless of (i) any investigations made by or on behalf of the Underwriters, (ii) delivery of and payment for the Bonds hereunder, and (iii) any termination of this Agreement.

**(Signatures on Next Page)**

Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014D

13-53846-swr Doc 2773-1 Filed 03/12/14 Entered 03/12/14 10:35:47 Page 58 of 135

13.     This Agreement shall become effective upon the acceptance hereof by the Authority as aforesaid and shall be valid and enforceable as of the time of such acceptance. This Agreement may be executed in several counterparts, each of which shall be regarded as an original and all of which shall constitute one and the same document.

Very truly yours,

CITIGROUP GLOBAL MARKETS, INC., As Representative

By: _____
       [Name]
       [Title]

Accepted and Agreed to this
__th day of August, 2014

MICHIGAN FINANCE AUTHORITY

By: _____
       Joseph L. Fielek
       Executive Director

**EXHIBIT A**

Item 1 (a)  Aggregate principal amount of the Bonds:  $[_____]

(b)  Date of the Bonds:  August __, 2014

(c)  Years of maturities, interest rates, principal amounts and initial public offering prices:

Local Government Loan Program Revenue Bonds, Series 2014D-1 (Insured)
(Detroit Water and Sewerage Department
Water Supply System Revenue Refunding Senior Lien Local Project Bonds)

$_____ Serial Bonds

| Maturity (July 1) | Principal Amount | Interest Rate | Price or Yield |
|---|---|---|---|
| | | | |

$_____ Term Bonds

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

Exhibit A, Page 1
Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014D

Local Government Loan Program Revenue Bonds, Series 2014D-2
(Detroit Water and Sewerage Department
Water Supply System Revenue Refunding Senior Lien Local Project Bonds)

$_____ Serial Bonds

| Maturity (July 1) | Principal Amount | Interest Rate | Price or Yield |
|---|---|---|---|
| | | | |

$_____ Term Bonds

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

$_____ ____% Term Bonds
Due July 1, 20__, Price _____% CUSIP[†] _____

Local Government Loan Program Revenue Bonds, Series 2014D-3 (Insured)
(Detroit Water and Sewerage Department
Water Supply System Revenue Refunding Second Lien Local Project Bonds)

$_____ Serial Bonds

| Maturity (July 1) | Principal Amount | Interest Rate | Price or Yield |
|---|---|---|---|

$_____ Term Bonds

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

Exhibit A, Page 3
Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014D

Local Government Loan Program Revenue Bonds, Series 2014D-4
(Detroit Water and Sewerage Department
Water Supply System Revenue Refunding Second Lien Local Project Bonds)

$_____ Serial Bonds

| Maturity (July 1) | Principal Amount | Interest Rate | Price or Yield |
|---|---|---|---|
| | | | |

$_____ Term Bonds

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

(d)  The Bonds are subject to optional and mandatory redemption prior to maturity as described in the Official Statement.

Item 2.  Purchase Price.  The purchase price shall be $[_____] (principal amount of $[_____.00], less underwriter's discount of $[_____], minus net original issue discount of $[_____]).

EXHIBIT B

LETTER OF REPRESENTATIONS

August [__], 2014

Citigroup Global Markets, Inc.
[Additional Underwriters]

Michigan Finance Authority

Ladies and Gentlemen:

The City of Detroit, Michigan (the "City"), acting upon authorization from (i) the Board of Water Commissioners (the "BOWC") of the Detroit Water and Sewerage Department (the "Department") and (ii) Kevyn D. Orr, emergency manager of the City (the "Emergency Manager"), proposes to participate in the Michigan Finance Authority (the "Authority") Local Government Loan Program Revenue Bonds, Series 2014D (the "Authority Bonds") program (the "Program") by issuing, in the aggregate, $_____ City of Detroit, Michigan, Detroit Water and Sewerage Department Water Supply System Revenue Refunding Senior Lien Bonds and Water Supply System Revenue Refunding Second Lien Bonds, in one or more series (the "DWSD Obligations"). Proceeds of the DWSD Obligations will be used (i) to finance the City's purchase of its outstanding Detroit Water and Sewerage Department Water Supply System bonds that have been offered by the bondholders thereof and accepted for purchase by the City (the "Tendered DWSD Bonds") pursuant to the Invitation to Tender Bonds dated August 7, 2014 (the "Invitation") and (ii) to pay the costs of issuance of the DWSD Obligations and the Bonds. The City will sell the DWSD Obligations to the Authority pursuant to a Local Purchase Contract between the Authority and the City dated August [__], 2014 (the "Local Purchase Contract"). The City's participation in the Program and execution of the Local Purchase Contract and other related documents have been approved by the City and the Bankruptcy Court Order (as defined below).

The Authority Bonds will be sold by the Authority pursuant to a Bond Purchase Agreement dated the date hereof (the "Purchase Agreement") between the Authority and the Underwriters listed thereunder (the "Underwriters"). All capitalized terms not defined herein shall have the meaning ascribed to them in the Purchase Agreement.

The City acknowledges and agrees that (i) the purchase of the Authority Bonds pursuant to the Purchase Agreement, providing proceeds for the purchase of the DWSD Obligations are arm's-length commercial transactions among the City, the Authority and the Underwriters, (ii) in connection therewith and with the discussions, undertakings and procedures leading up to the consummation of such transaction, the Underwriters are and have been acting solely as principals and are not acting as the agents or fiduciaries of the City, (iii) the Underwriters have not assumed an advisory or fiduciary responsibility in favor of the City with respect to the offering contemplated by the Purchase Agreement and the Local Purchase Contract or the discussions,

undertakings and procedures leading thereto (irrespective of whether the Underwriters have provided other services or are currently providing other services to the City on other matters) and the Underwriters have no obligation to the City with respect to the offering contemplated by the Purchase Agreement and the Local Purchase Contract except the obligations expressly set forth in the Purchase Agreement, and (iv) the City has consulted its own legal, financial and other advisors to the extent it has deemed appropriate. For both subsections (ii) and (iii) herein, it is the City's understanding that as advisory or fiduciary relationship shall not be deemed to exist when, in the course of acting as an underwriter, broker, dealer or municipal securities dealer, a person render advice to an issuer, including advice with respect to the structure, timing, terms and other similar matters concerning a new issue of municipal securities. The Representative has been advised of the City's engagement of an independent registered municipal advisor. As required by Securities and Exchange Commission ("SEC") rules, the Representative discloses to you that accordingly, the Underwriters are not acting as your municipal advisor and are not subject to the fiduciary duty set forth in Section 15B(c)(1) of the Securities Exchange Act of 1934, as amended (the "Exchange Act").

The City acknowledges and agrees to the terms of the liquidated damages provision in Section 1 of the Purchase Agreement, including the full release and discharge of any claims by the City against the Underwriters upon any payment of liquidated damages pursuant thereto.

Section 1. <u>Representations and Warranties</u>. In order to induce the Underwriters and the Authority to enter into the Purchase Agreement and to sell the Authority Bonds, and to induce the Authority to enter into the Local Purchase Contract with the City, the City represents and warrants, and agrees with the Underwriters and the Authority as follows:

(a) The City has full right, power and authority to (i) execute and deliver the Local Purchase Contract and this Letter of Representations, and (ii) perform its obligations under, and carry out and consummate all other transactions described in the Purchase Agreement, the Local Purchase Contract and this Letter of Representations, all pursuant to Act 94, Public Acts of Michigan, 1933, as amended ("Act 94"); Bond Ordinance No. 30-02, as amended and restated, adopted by the City Council of Detroit (the "City Council") on January 26, 2005, as thereafter amended (the "Bond Ordinance"); the Orders of the United States District Court in *United States v. City of Detroit, et al.*, 77-71100, E.D. Michigan; the Resolution and Ordinance Authorizing the Issuance and Sale of Water Supply System Revenue Refunding Senior Lien Bonds of the City of Detroit and of Water Supply System Revenue Refunding Second Lien Bonds of the City of Detroit, adopted by the BOWC on August 13, 2014 and approved by the Emergency Manager on August 16, 2014 (the "DWSD Bond Resolution"); a Trust Indenture by and among the City, the Department and U.S. Bank National Association, as trustee (the "DWSD Trustee") dated as of February 1, 2013 (the "DWSD Indenture"); and a Sale Order of the Director of the Department dated August [__], 2014 and approved by the Emergency Manager on August [__], 2014 (the "Sale Order" and, collectively with the Bond Ordinance, the DWSD Bond Resolution, and the DWSD Indenture, the "DWSD Authorizing Documents"). The City has complied with or will comply with on or prior to the date of Closing all provisions of applicable law (specifically including, without limiting the generality of the forgoing, the Constitution and laws of the State of Michigan) and all matters relating to such transactions.

(b)     The United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") has entered a final order in In re City of Detroit, Michigan, Case No. 13-53846, a copy of which is attached as [Exhibit C to the Purchase Agreement] (the "Bankruptcy Court Order"), in substance (1) authorizing the City to enter into and perform the transactions contemplated under the Official Statement, including but not limited to the Purchase Agreement and all transaction documents, (2) authorizing the City to grant a lien equal or senior to, as applicable, existing liens to secure post-petition indebtedness of the City pursuant to §§ 364(c) and 364(d) of the Bankruptcy Code, (3) finding that the Authority, the Underwriters, the Bond Insurers, the holders of the DWSD Obligations and the Bonds and all assignees and transferees of the foregoing are extending credit to the City in good faith for purposes of §§ 364(e) and 921(e) of the Bankruptcy Code, (4) finding that the Pledged Assets consisting of Net Revenues constitute "special revenues" as defined in § 902(2) of the Bankruptcy Code and "pledged special revenues" as that term is used in §§ 922(d) and 928 of the Bankruptcy Code, (5) finding (or concluding) that the satisfaction of Required Combined Coverage together with the Rate Covenant constitute adequate protection of the interests of all holders of pre-petition liens securing Secured Obligations (as defined in the Bond Ordinance) that were validly existing and outstanding as of the petition date for purposes of § 364(d)(1)(B) of the Bankruptcy Code, all as more particularly described in the Bankruptcy Court Order, and (6) approving a compromise among the City and certain parties (the "DWSD Settlement Parties") resolving objections to the City's Plan of Adjustment filed by one or more of the DWSD Settlement Parties, all as more particularly described in the Bankruptcy Court Order.

(c)     No further authorization or approval of the City's Emergency Manager, the City Council or the BOWC is required for the execution and delivery of the DWSD Obligations, this Letter of Representations, the Local Purchase Contract, the continuing disclosure undertaking (the "Undertaking") on behalf of the City, and any other transaction documents related thereto (collectively, the "DWSD Transaction Documents") and the DWSD Transaction Documents constitute a legal, valid and binding obligations of the City, enforceable against the City in accordance with its terms except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar laws affecting the rights of creditors generally, and by principles of equity, including those related to equitable subordination, if equitable remedies are sought or if equitable defenses (based solely on facts which the City neither knew nor should have known at the time of execution hereof) are raised; and, except as may be required under blue sky or securities laws of any state (as to which no representation or warranty is given), the City is not required to obtain any further authorization or approval for the sale and delivery of the DWSD Obligations to the Authority or the performance by the City of its obligations under the DWSD Transaction Documents except such authorizations or approvals as shall have been obtained at or prior to the Closing, and copies of which will be delivered to the Underwriters at the Closing.

(d)     The City, acting through the BOWC and the Emergency Manager, has duly authorized and approved the Preliminary Official Statement and has duly authorized and approved the execution and delivery of the Official Statement.

(e)     The DWSD Obligations are issued pursuant to that Act 94 and the DWSD Authorizing Documents.  The DWSD Authorizing Documents have not been modified, amended or rescinded and will be in full force and effect at the time of the Closing and will be a contract with the holders of the DWSD Obligations and a valid, legally binding act of the City, enforceable in accordance with the terms thereof except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar laws affecting the rights of creditors generally, and by principles of equity, including those related to equitable subordination if equitable remedies are sought or if equitable defenses (based solely on facts which the City neither knew nor should have known at the time of execution hereof) are raised.

(f)     When delivered to the Authority and paid for in accordance with the terms of this Agreement, the DWSD Obligations (i) will have been duly authorized, executed and issued by the City pursuant to the DWSD Authorizing Documents, and (ii) will constitute valid, legally binding, limited obligations of the City.

(g)     No consent or approval of, or registration with or declaration of, any federal, State or other governmental commission, board, regulatory body or instrumentality, is or was required in connection with any of the actions of the City described herein or the delivery of the DWSD Obligations to the Authority except for the filing of IRS form 8038-G (and the City hereby agrees to make such filing promptly after the Closing), except as may be required under blue sky or securities laws of any state (as to which no representation or warranty is given), nor is any election or referendum of voters required in connection therewith.

(h)     All legislation necessary to permit the City (i) to fulfill in all material respects its obligations under the DWSD Authorizing Documents and the DWSD Transaction Documents and (ii) to carry out the transactions contemplated in the DWSD Authorizing Documents and the DWSD Transaction Documents is in full force and effect.

(i)     The execution and delivery of the Official Statement, the DWSD Transaction Documents, and the fulfillment of the terms and conditions of and the carrying out of the transactions contemplated by the DWSD Transaction Documents, do not and will not conflict with, or constitute on the part of the City a breach of or a default under, any existing law (including, without limitation, the Constitution of the State), any court or administrative regulation, decree or order or any agreement, indenture, mortgage, lease or other instrument to which the City is subject or by which it is bound and which breach or default would materially affect the validity or binding effect of any of the DWSD Obligations or the ability of the City to pay the principal of and the interest on any of the DWSD Obligations.

(j)     The City has duly authorized the use of the information contained in [TO BE UPDATED TO COVER SECTIONS OF THE OS COVERING CITY AND DWSD] ["DEBT SERVICE ON THE DWSD OBLIGATIONS AND COVERAGE PROVIDED BY HISTORIC REVENUES," "SECURITY AND SOURCES OF PAYMENT FOR THE DWSD OBLIGATIONS," "OUTSTANDING INDEBTEDNESS OF THE DEPARTMENT," "DEBT SERVICE REQUIREMENTS," "THE DEPARTMENT," "THE WATER SUPPLY SYSTEM," "THE CAPITAL IMPROVEMENT PROGRAM," "DEPARTMENT FINANCIAL PROCEDURES," "DEPARTMENT FINANCIAL OPERATIONS," "PENSION PLAN

CONTRIBUTIONS," "SOURCE AND PRIORITY OF PENSION PAYMENTS," "OTHER POST-EMPLOYMENT BENEFITS," "FEASIBILITY CONSULTANT'S REPORT," "CITY OF DETROIT BANKRUPTCY MATTERS" and "RISK FACTORS", and Appendices [_____])] (collectively, the "City and DWSD Portion") of the Preliminary Official Statement and the Official Statement, to be used by the Underwriters in connection with the public sale of the Authority Bonds. The City has ratified and consented to such use of the Preliminary Official Statement and the Official Statement in accordance with law by the Underwriters in connection with the public sale of the Authority Bonds and the City deems the information set forth in the City and DWSD Portion of the Preliminary Official Statement to be "final" as of its date, as provided in Rule 15c2-12 of the SEC ("Rule 15c2-12") except for the omission of such information as is permitted to be omitted in accordance with paragraph (b)(1) of Rule 15c2-12.

(k)    The information set forth in the City and DWSD Portion of the Preliminary Official Statement and the Official Statement is true and correct in all material respects and the City and DWSD Portion of the Preliminary Official Statement and the Official Statement does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading.

(l)    The financial statements of the City's Water Fund as of June 30, 2013, including the notes thereof, included in Appendix II-D of the Official Statement, present fairly the financial position of the City's Water Fund as of the date indicated and the results of its operations and changes in fund balances and financial position for the year specified, and such financial statements have been prepared in the conformity with generally accepted accounting principles consistently applied in all material respects.

(m)    Except as set forth in the Preliminary Official Statement and the Official Statement, subsequent to the respective dates of which information is given in the Preliminary Official Statement and the Official Statement, the City has not incurred any liabilities, direct or contingent, or entered into any transactions, not in the ordinary course of business, that are material to the business and affairs of the City and there has not been any material change in the condition, results of operation or general affairs of the City (financial or otherwise).

(n)    Except as disclosed in the Preliminary Official Statement and the Official Statement, and other than an appeal of the Bankruptcy Court Order or a motion seeking a stay of the Bankruptcy Court Order pending appeal, there is no action, suit, proceeding, inquiry or investigation at law or in equity by or before any court or public board or body pending or threatened against or affecting the City (or, the knowledge of the City, any basis therefor) (i) seeking to restrain or enjoin the sale or delivery of the DWSD Obligations, or (ii) in any manner questioning the authority of the City to issue, or the issuance or validity of, any of the DWSD Obligations or any other indebtedness of the City, or (iii) questioning the constitutionality of any statute, or the validity of any proceedings, authorizing the issuance of any of the DWSD Obligations, or (iv) questioning any of the DWSD Authorizing Documents or Act 94, or (v) questioning the validity or enforceability of the DWSD Authorizing Documents or (vi) seeking to secure a lien on the Pledged Assets or the collection of the Net Revenues, as defined in the DWSD Authorizing Documents, or other moneys, securities, funds and property pledged in the

DWSD Authorizing Documents that are a source of payment on the DWSD Obligations, or (vii) contesting in any way the completeness, accuracy or fairness of the Preliminary Official Statement or the Official Statement, or (viii) which might in any material respect adversely affect the transactions contemplated herein and in the Official Statement; and no right of any member of the BOWC to his or her office is being contested;

(o)     Other than as a result of the of the City's chapter 9 bankruptcy proceedings, the City is not in breach of or in default under any existing law, court or administrative regulation, decree, order, agreement, indenture, mortgage, lease, sublease or other instrument to which they are a party or by which they are bound, and no event has occurred or is continuing which, with the passage of time or the giving of notice, or both, would constitute a default or an event of default thereunder, except as set forth in the Preliminary Official Statement and the Official Statement and except (in each case) for such minor breaches, defaults or potential defaults or event of default, if any, which individually and in the aggregate would have no material adverse effect on the City's financial condition, operations or properties.

(p)     The City has provided the following statement to the Authority for use in the Preliminary Official Statement and the Official Statement relating to the requirements described in Rule 15c2-12 (the "Rule") promulgated by the Securities and Exchange Commission:

"*Prior Continuing Disclosure Non-Compliance by the City*

The City has entered into a number of continuing disclosure undertakings required by Rule 15c2-12 (the "Rule") promulgated by the Securities and Exchange Commission in connection with bonds previously issued by the City to finance improvements to the Water Supply System. During the past five years, the City has not complied in all material respects with its obligations under such continuing disclosure undertakings, including filings of its annual financial information and updates to certain financial and operating data.

Specifically, from Fiscal Years 1996 through 2013, the City was unable to provide annual financial information within the time periods specified in the applicable agreements. The continuing disclosure undertakings entered into by the City in connection with its prior bond issuances to finance improvements to the Water Supply System required filing of annual financial information within a specified time period ranging from 180 to 360 days of the City's Fiscal Year end. The audited financial statement for Fiscal Year 2009 was filed on June 4, 2010. The audited financial statement for Fiscal Year 2010 was filed on December 28, 2010. The audited financial statement for Fiscal Year 2011 was filed on January 30, 2013. The audited financial statement for Fiscal Year 2012 was filed on January 27, 2013. The audited financial statement for Fiscal Year 2013 was filed on July 29, 2014.

From Fiscal Years 1996 through 2013, the City failed to file required updates to the financial and operating data in connection with its prior bond issuances to finance improvements to the Water Supply System. On July 29, 2014 the City filed updates to such financial and operating data, but such filing was incomplete in certain respects.

A failure by the City to comply with the undertakings must be reported by the City in accordance with the Rule and must be considered by any broker, dealer or municipal securities dealer before recommending the purchase or sale in the secondary market of bonds issued by the City. Consequently, such failure may adversely affect the marketability and liquidity of bonds issued by the City and the market price thereof."

(q)     Any certificate signed by an authorized officer of the City delivered to the Underwriters and the Authority shall be deemed a representation and warranty by the City to such parties as to the statements made therein.

Section 2.  <u>Special Covenants</u>.  The City covenants and agrees with the Underwriters and the Authority as follows:

(a)     The City will provide the Underwriters with information concerning the occurrence of any event that impacts the accuracy and completeness of material representations contained in the Official Statement until the earlier of (a) 90 days from the end of the underwriting period, as defined below, or (b) the time when the Official Statement is available to any person from the Municipal Securities Rulemaking Board (the "MSRB"), but in no case less than 25 days following the "end of the underwriting period," as described in Section 6 of the Purchase Agreement. The City agrees to cooperate with the Underwriters to the extent permitted by applicable law, in amending the Official Statement if any of such information, in the reasonable opinion of the Underwriters and the Authority, requires that the Official Statement be amended in fulfillment of the Underwriters' responsibilities pursuant to Rule 15c2-12. The expense of preparation (including without limitation the fees and expenses of legal counsel, financial advisors and other experts employed by the City) of each such amendment or supplement and the expense of printing and delivery of the first [200] copies of an amendment or supplement to the Official Statement shall be paid by the City.

(b)     Between the date hereof and the date of the Closing, the City will not take any action which would cause the representations and warranties contained in Section 1 to be untrue on the date of the Closing. On the date of the Closing, the City shall deliver or cause to be delivered all opinions, certificates and other documents to be delivered by it or on its behalf as provided for in the Purchase Agreement and the Local Purchase Contract and to deliver such additional certificates and other documents as the Underwriters may reasonably request to evidence performance of or compliance with the provisions of the Purchase Agreement and the DWSD Transaction Documents, all such certificates and other documents to be satisfactory in form and substance to the Underwriters.

Section 3.  <u>Survival of Representations and Warranties</u>.  All representations, warranties, covenants and agreements contained in this Letter of Representations or contained in certificates of officers of the City submitted pursuant hereto or pursuant to the Purchase Agreement, or the Local Purchase Contract at the dates made shall remain operative and in full force and effect regardless of any investigation made by or on behalf of the Underwriters or any other person, and shall survive (i) delivery of the Authority Bonds to the Underwriters and payments by the Underwriters therefor pursuant to the Purchase Agreement, (ii) any termination of the Purchase Agreement by the Underwriters pursuant to the provisions thereof or (iii) any failure on the part of the City by the Authority to satisfy any condition to the obligations of the Underwriters specified in the Purchase Agreement, which failure results in a refusal by the Underwriters to purchase and pay for the Authority Bonds.

Section 4.  <u>Parties in Interest</u>.  This Letter of Representations shall be binding upon the City and shall inure solely to the benefit of the Underwriters and the Authority and, to the extent set forth herein, officers, directors and employees of and persons controlling the Underwriters and the Authority, and their respective personal representatives, successors and assigns, and no other person or firm shall acquire or have any right under or by virtue of this Letter of Representations.

Section 5.  <u>Indemnification</u>.  The City agrees to indemnify and hold harmless the Underwriters, the directors, officers, employees and  agents of each Underwriter and each person who controls any Underwriter within the meaning of either the Securities Act or the Exchange Act against any and all losses, claims, damages or liabilities, joint or several, to which they or any them may become subject under the Securities Act, the Exchange Act or other Federal or State statutory law or regulation, at common law or otherwise, insofar as such losses, claims, damages or liabilities arise out of or are based upon any untrue statement or alleged untrue statement of a material fact contained in the Preliminary Official Statement, the Final Official Statement (or in any amendment or supplement thereto), or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading. This indemnity agreement will be in addition to any liability which the City may otherwise have.

Promptly after receipt by an indemnified party of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party, notify the indemnifying party in writing of the commencement thereof; but the failure so to notify the indemnifying party (i) will not relieve it from liability unless and to the extent it did not otherwise learn of such action and such failure results in the forfeiture by the indemnifying party of substantial rights and defenses; and (ii) will not, in any event, relieve the indemnifying party from any obligations to any indemnified party other than the indemnification obligation. The indemnifying party shall be entitled to appoint counsel of the indemnifying party's choice at the indemnifying party's expense to represent the indemnified party in any action for which indemnification is sought provided, however, that such counsel shall be satisfactory to the indemnified party. Notwithstanding the indemnifying party's election to appoint counsel to represent the indemnified party in an action, the indemnified party shall have

the right to employ separate counsel (including local counsel), and the indemnifying party shall bear the reasonable fees, costs and expenses of such separate counsel if (i) the use of counsel chosen by the indemnifying party to represent the indemnified party would present such counsel with a conflict of interest; (ii) the actual or potential defendants in, or targets of, any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there may be legal defenses available to it and/or other indemnified parties which are different from or additional to those available to the indemnifying party; (iii) the indemnifying party shall not have employed counsel satisfactory to the indemnified party to represent the indemnified party within a reasonable time after notice of the institution of such action; or (iv) the indemnifying party shall authorize the indemnified party to employ separate counsel at the expense of the indemnifying party. An indemnifying party will not, without the prior written consent of the indemnified parties, settle or compromise or consent to the entry of any judgment with respect to any pending or threatened claim, action, suit or proceeding in respect of which indemnification or contribution may be sought hereunder (whether or not the indemnified parties are actual or potential parties to such claim or action) unless such settlement, compromise or consent includes an unconditional release of each indemnified party from all liability arising out of such claim, action, suit or proceeding.

In the event that the indemnity provided herein is unavailable or insufficient to hold harmless an indemnified party for any reason, the City and the Underwriter agree to contribute to the aggregate losses, claims, damages and liabilities (including legal or other expenses reasonably incurred in connection with investigating or defending the same) to which the City and one or more of the Underwriters may be subject in such proportion as is appropriate to reflect the relative benefits received by the City on the one hand and by the Underwriters on the other from the offering. If the allocation provided by the immediately preceding sentence is unavailable for any reason, the City and the Underwriters shall contribute in such proportion as is appropriate to reflect not only such relative benefits, but also the relative fault of the City on the one hand and of the Underwriters on the other in connection with the statements or omissions which resulted in such Losses, as well as any other relevant equitable considerations. In no case shall any Underwriter (except as may be provided in any agreement among the Underwriters relating to the offering) be responsible for any amount in excess of the purchase discount or fee applicable to the Authority Bonds purchased by such Underwriter hereunder. Benefits received by the City shall be deemed to be equal to the total net proceeds from the offering (before deducting expenses) received by it, and benefits received by the Underwriters shall be deemed to be equal to the total purchase discounts and commissions in each case set forth on the cover of the Final Official Statement. Relative fault shall be determined by reference to, among other things, whether any untrue or any alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information provided by the City on the one hand or the Underwriters on the other, the intent of the parties and their relative knowledge, information and opportunity to correct or prevent such untrue statement or omission. The City and the Underwriters agree that it would not be just and equitable if contribution were determined by pro rata allocation or any other method of allocation which does not take account of the equitable considerations referred to above. Notwithstanding the provisions of this paragraph, no person guilty of fraudulent misrepresentation (within the meaning of Section 11(f)

of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. Each person who controls an Underwriter within the meaning of either the Securities Act or the Exchange Act and each director, officer, employee and agent of an Underwriter shall have the same rights to contribution as such Underwriter, and each person who controls the City within the meaning of either the Securities Act or the Exchange Act and each official, director, officer and employee of the City shall have the same rights to contribution as the City, subject in each case to the applicable terms and conditions of this paragraph.

Very truly yours,

CITY OF DETROIT, MICHIGAN

By: _____

DETROIT WATER AND SEWERAGE DEPARTMENT

By: _____

# **EXHIBIT 1B**

CHI-1940093v3

**MICHIGAN FINANCE AUTHORITY**
$_____
**Local Government Loan Program Revenue Bonds, Series 2014C**
**(Detroit Water and Sewerage Department**
**Sewage Disposal System Revenue and Revenue Refunding Local Project Bonds)**

**BOND PURCHASE AGREEMENT**

**August [__], 2014**

Michigan Finance Authority
Richard H. Austin State Office Building
430 West Allegan Street
Lansing, Michigan 48922

Ladies and Gentlemen:

Citigroup Global Markets, Inc. (the "Representative"), on behalf of itself and J.P. Morgan Securities LLC, BMO Capital Markets, Loop Capital Markets LLC, [Barclays], [PNC Capital Markets LLC], [Comerica Securities, Inc.], and [Jeffries] (collectively with the Representative, the "Underwriters"), hereby offers to enter into this Bond Purchase Agreement (this "Agreement") with the Michigan Finance Authority (the "Authority") which, upon the acceptance of this offer by the Authority acting pursuant to statutory authority, including Act 227 of the Public Acts of Michigan, 1985, as amended (the "Act"), will be binding upon the Authority and the Underwriters. This offer is made subject to written acceptance of this Agreement by the Authority at or before 12:00 p.m., Eastern Time, on [August __], 2014, and if not so accepted will be subject to withdrawal by the Representative upon notice delivered to the Authority at any time prior to the acceptance hereof by the Authority.

1. Upon the terms and conditions and upon the basis of the representations, warranties, and agreements set forth herein, the Underwriters hereby agree to purchase from the Authority and the Authority agrees to sell to the Underwriters for $[_____] (principal amount of $[_____.00], less underwriter's discount of $[_____], minus/plus net original issue discount/premium of $[_____]), all (but not less than all) of the following bonds to be issued by the Authority:

$_____      Local Government Loan Program Revenue Bonds, Series 2014C-1 (Insured)
(Detroit Water and Sewerage Department
Sewage Disposal System Revenue Senior Lien Local Project Bonds)
Type: DWSD Sewage Disposal System Revenue Senior Lien Local Project Bonds (Insured)

$_____      Local Government Loan Program Revenue Bonds, Series 2014C-2
(Detroit Water and Sewerage Department
Sewage Disposal System Revenue Senior Lien Local Project Bonds)
Type: DWSD Sewage Disposal System Revenue Senior Lien Local Project Bonds (Uninsured)

$_____       Local Government Loan Program Revenue Bonds, Series 2014C-3
(Detroit Water and Sewerage Department
Sewage Disposal System Revenue Senior Lien Local Project Bonds)
Type: DWSD Sewage Disposal System Revenue Senior Lien Local Project Bonds

$_____       Local Government Loan Program Revenue Bonds, Series 2014C-4 (Insured)
(Detroit Water and Sewerage Department
Sewage Disposal System Revenue Refunding Senior Lien Local Project Bonds)
Type: DWSD Sewage Disposal System Revenue Refunding Senior Lien Local Project Bonds
(Insured)

$_____       Local Government Loan Program Revenue Bonds, Series 2014C-5
(Detroit Water and Sewerage Department
Sewage Disposal System Revenue Refunding Senior Lien Local Project Bonds)
Type: DWSD Sewage Disposal System Revenue Refunding Senior Lien Local Project Bonds
(Uninsured)

$_____       Local Government Loan Program Revenue Bonds, Series 2014C-6 (Insured)
(Detroit Water and Sewerage Department
Sewage Disposal System Revenue Refunding Second Lien Local Project Bonds)
Type: DWSD Sewage Disposal System Revenue Refunding Second Lien Local Project Bonds
(Insured)

$_____       Local Government Loan Program Revenue Bonds, Series 2014C-7
(Detroit Water and Sewerage Department
Sewage Disposal System Revenue Refunding Second Lien Local Project Bonds)
Type: DWSD Sewage Disposal System Revenue Refunding Second Lien Local Project Bonds
(Uninsured)

(the "Bonds"). The Bonds are being issued to finance the purchase by the Authority, pursuant to a Local Purchase Contract between the Authority and the City of Detroit, County of Wayne, State of Michigan (the "City"), acting upon authorization from (i) the Board of Water Commissioners (the "BOWC") of the Detroit Water and Sewerage Department (the "Department") and (ii) Kevyn D. Orr, emergency manager of the City (the "Emergency Manager"), dated [August __], 2014 (the "Local Purchase Contract"), of the following bonds:

$_____       City of Detroit, Michigan, Detroit Water and Sewerage Department
Sewage Disposal System Revenue Senior Lien Bonds, Series 2014A

$_____       City of Detroit, Michigan, Detroit Water and Sewerage Department
Sewage Disposal System Revenue Senior Lien Bonds, Series 2014B

$_____       City of Detroit, Michigan, Detroit Water and Sewerage Department
Sewage Disposal System Revenue Senior Lien Bonds, Series 2014C

$_____       City of Detroit, Michigan, Detroit Water and Sewerage Department
Sewage Disposal System Revenue Refunding Senior Lien Bonds, Series 2014D

$_____       City of Detroit, Michigan, Detroit Water and Sewerage Department
Sewage Disposal System Revenue Refunding Senior Lien Bonds, Series 2014E

$_____            City of Detroit, Michigan, Detroit Water and Sewerage Department
                      Sewage Disposal System Revenue Refunding Second Lien Bonds, Series 2014F

$_____            City of Detroit, Michigan, Detroit Water and Sewerage Department
                      Sewage Disposal System Revenue Refunding Second Lien Bonds, Series 2014G

(the "DWSD Obligations") to be issued by the City (i) to finance certain capital expenditures of the Department for its Sewage Disposal System (the "System"), (ii) to finance the City's purchase of its outstanding Detroit Water and Sewerage Department Sewage Disposal System bonds that have been offered by the bondholders thereof and accepted for purchase by the City (the "Tendered DWSD Bonds") pursuant to the Invitation to Tender Bonds dated August 7, 2014 (the "Invitation") and (iii) to pay the costs of issuance of the DWSD Obligations and the Bonds.

Payment of the principal of and interest on certain series of the Bonds (the "Insured Bonds") when due will be insured by municipal bond insurance policies (the "Bond Insurance Policies") to be issued by one or more bonds insurers (the "Bond Insurers") simultaneously with the delivery of the Bonds.

The Underwriters intend to make an initial bona fide public offering of all of the Bonds at prices not in excess of the public offering prices set forth on the inside cover pages of the official statement, dated the date hereof, with respect to the Bonds (such official statement, together with the cover pages, and all exhibits, appendices and statements included therein or attached thereto being herein called the "Official Statement") and may subsequently change such offering price without any requirement of prior notice. The Underwriters may offer and sell Bonds to certain dealers (including dealers depositing Bonds into investment trusts) and others at prices lower than the public offering price stated on the inside cover pages of the Official Statement. The Underwriters agree to furnish to the Authority an issue price and yield certificate which will contain certifications necessary to determine the issue price and yield on the Bonds.

In the event that the Underwriters fail (other than for reasons permitted herein) to accept delivery of and pay for the Bonds at the Closing (as hereinafter defined in paragraph 7(a)), the parties hereto acknowledge that the damages that the Authority and the City may suffer as a result thereof shall be difficult to ascertain, and as a result, the parties hereby agree that as liquidated damages, and not as a penalty, for the Underwriters' failure, the Underwriters shall pay to the Authority, as liquidated damages to the Authority and to the City, an aggregate amount equal to the lesser of (i) 1% of the aggregate principal amount of the Bonds or (ii) $5,000,000. Payment of such liquidated damages to the Authority and acceptance by the Authority, on behalf of itself and the City, shall constitute a full release and discharge of all claims and damages for such failure of the Underwriters.

The Authority acknowledges and agrees that (i) the purchase and sale of the Bonds pursuant to this Agreement is an arm's-length commercial transaction between the Authority and the Underwriters, (ii) in connection therewith and with the discussions, undertakings and procedures leading up to the consummation of such transaction, the Underwriters are and have been acting solely as principals and are not acting as agents or fiduciaries of the Authority, (iii) the Underwriters have not assumed an advisory or fiduciary responsibility in favor of the Authority with respect to the offering contemplated hereby or the discussions, undertakings and procedures leading thereto (irrespective of whether the Underwriters have provided other

services or are currently providing other services to the Authority on other matters) and the Underwriters have no obligation to the Authority with respect to the offering contemplated hereby except the obligations expressly set forth in this Agreement, and (iv) the Authority has consulted its own legal, financial and other advisors to the extent it has deemed appropriate. For both subsections (ii) and (iii) herein, it is the Authority's understanding that as advisory or fiduciary relationship shall not be deemed to exist when, in the course of acting as an underwriter, broker, dealer or municipal securities dealer, a person render advice to an issuer, including advice with respect to the structure, timing, terms and other similar matters concerning a new issue of municipal securities. The Representative has been advised of the Authority's engagement of an independent registered municipal advisor. As required by Securities and Exchange Commission ("SEC") rules, the Representative discloses to you that accordingly, the Underwriters are not acting as your municipal advisor and are not subject to the fiduciary duty set forth in Section 15B(c)(1) of the Securities Exchange Act of 1934, as amended (the "Exchange Act").

2.    The Bonds shall otherwise be as described in the Resolutions (as hereinafter defined) and the Official Statement and shall be payable in lawful money of the United States as also described herein.

The Representative has been duly authorized to execute this Agreement and to act hereunder and on behalf of each Underwriter, each of whom represents that it has the legal capacity to enter into this Agreement and to carry out the transactions contemplated hereby.

The aggregate principal amount, the date, the dates of maturity, the interest rates per annum and the initial public offering prices of the Bonds are set forth in Item 1 of Exhibit A attached hereto and made a part hereof. The Bonds shall in all other respects be the same Bonds as are described in the Official Statement.

3.    The United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") has entered a final order in In re City of Detroit, Michigan, Case No. 13-53846, [a copy of which is attached hereto as [Exhibit C] (the "Bankruptcy Court Order"),] in substance (1) authorizing the City to enter into and perform the transactions contemplated under the Official Statement, including but not limited to this Agreement and all transaction documents, (2) authorizing the City to grant a lien equal or senior to, as applicable, existing liens to secure post-petition indebtedness of the City pursuant to §§ 364(c) and 364(d) of the Bankruptcy Code, (3) finding that the Authority, the Underwriters, the Bond Insurers, the holders of the DWSD Obligations and the Bonds and all assignees and transferees of the foregoing are extending credit to the City in good faith for purposes of §§ 364(e) and 921(e) of the Bankruptcy Code, (4) finding that the Pledged Assets consisting of Net Revenues constitute "special revenues" as defined in § 902(2) of the Bankruptcy Code and "pledged special revenues" as that term is used in §§ 922(d) and 928 of the Bankruptcy Code, (5) finding (or concluding) that the satisfaction of Required Combined Coverage together with the Rate Covenant constitute adequate protection of the interests of all holders of pre-petition liens securing Secured Obligations (as defined in the Bond Ordinance) that were validly existing and outstanding as of the petition date for purposes of § 364(d)(1)(B) of the Bankruptcy Code, all as more particularly described in the Bankruptcy Court Order, and (6) approving a compromise among the City and certain parties (the "DWSD Settlement Parties") resolving objections to the City's Plan of Adjustment filed by one or more of the DWSD Settlement Parties, all as more particularly

described in the Bankruptcy Court Order. Based upon the Bankruptcy Court Order, the Underwriters have determined to enter into this Agreement.

4.    The Authority has authorized the execution of the Official Statement dated the date hereof and the use of such Official Statement by the Underwriters in connection with the public offering of the Bonds. The Authority has consented to the use in accordance with law by the Underwriters on or before the date hereof of the preliminary official statement with respect to the Bonds dated August [__], 2014 (such preliminary official statement, together with the cover page, and all exhibits, appendices and statements included therein or attached thereto being herein called the "Preliminary Official Statement"), in connection with the public sale of the Bonds. The Authority deems the information set forth in the Preliminary Official Statement (other than the information set forth in the sections entitled [TO BE UPDATED TO COVER SECTIONS OF THE OS COVERING CITY AND DWSD] ["DEBT SERVICE ON THE DWSD OBLIGATIONS AND COVERAGE PROVIDED BY HISTORIC REVENUES," "SECURITY AND SOURCES OF PAYMENT FOR THE DWSD OBLIGATIONS," "OUTSTANDING INDEBTEDNESS OF THE DEPARTMENT," "DEBT SERVICE REQUIREMENTS," "THE DEPARTMENT," "THE SEWAGE DISPOSAL SYSTEM," "THE CAPITAL IMPROVEMENT PROGRAM," "DEPARTMENT FINANCIAL PROCEDURES," "DEPARTMENT FINANCIAL OPERATIONS," "PENSION PLAN CONTRIBUTIONS," "SOURCE AND PRIORITY OF PENSION PAYMENTS," "OTHER POST-EMPLOYMENT BENEFITS," "FEASIBILITY CONSULTANT'S REPORT," "CITY OF DETROIT BANKRUPTCY MATTERS" and "RISK FACTORS", and Appendices [_____])] (collectively,  the "City and DWSD Portion"), to be final as of its date, as provided in Rule 15c2-12 of the SEC ("Rule 15c2-12") except for the omission of such information as is permitted to be omitted in accordance with paragraph (b)(1) of Rule 15c2-12. The City and the Department, in the Letter of Representations (as defined herein), has deemed the information set forth in the City and DWSD Portion of the Preliminary Official Statement final as of its date. The Authority has prepared a Continuing Disclosure Undertaking, to be dated on or before the Closing (the "Undertaking"), to provide or cause to be provided, certain annual financial information and operating data, and timely notice of the occurrence of certain material events with respect to the Bonds.

5    You hereby agree to supply, within the earlier of (i) seven business days of the date of acceptance hereof or (ii) sufficient time to accompany any confirmation requesting payment which the Underwriters might send to its customers with respect to the Bonds (which in any event shall be a time reasonably acceptable to both the Underwriters and the Authority), such number of copies of the Official Statement as to which the Underwriters will inform you prior to the printing of such Official Statement and which will not exceed [200] copies.

6.    You hereby agree that you will provide the Underwriters with information of which you have knowledge from any source concerning the occurrence of any event that impacts the accuracy and completeness of material representations contained in the Official Statement until the earlier of (a) 90 days from the end of the underwriting period, as defined below, or (b) the time when the Official Statement is available to any person from the Municipal Securities Rulemaking Board (the "MSRB"), but in no case less than 25 days following the "end of the underwriting period," as defined below. You further agree that you will cooperate with the Underwriters to the extent permitted by applicable law, in amending the Official Statement if any

of such information, in the reasonable opinion of the Underwriters or the Authority, requires that the Official Statement be amended in fulfillment of the Underwriters' responsibilities pursuant to Rule 15c2-12. Except as provided in the last sentence of this paragraph, the expense of preparation (including without limitation the fees and expenses of legal counsel, financial advisors and other experts employed by the Authority) of each such amendment or supplement and the expense of printing and delivery of the first [200] copies of an amendment or supplement to the Official Statement shall be paid by the Authority. The cost of printing and delivery in excess of [200] copies of the amendment or supplement to the Official Statement shall be paid by the Underwriters. The Underwriters agree to amend or supplement the Official Statement at its own expense in the event that any information provided by the Underwriters for inclusion in the Official Statement is materially inaccurate or incomplete.

The term "end of the underwriting period" as referred to in the preceding paragraph and elsewhere herein is the later of the delivery of the Bonds by you to the Underwriters or when the Underwriters no longer retain an unsold balance of the Bonds for sale to the public. The "end of the underwriting period" shall be deemed to be 25 days after the date of Closing, unless the Representative otherwise notifies you in writing prior to such date, to the best of its knowledge, that there exists an unsold balance of the Bonds. The deemed "end of the underwriting period" may be extended for additional periods of 25 days each upon receipt of an additional written notification from the Representative that, to the best of its knowledge, there exists an unsold balance of Bonds. The Representative agrees to file the Official Statement with the MSRB on or before the date of Closing.

7.     The Authority represents and warrants to, and agrees with, the Underwriters, as of the date of its acceptance of this Agreement and as of the date and time of the Closing, as follows:

(a)     The Authority, has, and at the time of the Closing will have, full legal right, power and authority (i) to enter into this Agreement and the Undertaking and (ii) to sell and deliver the Bonds to the Underwriters as provided herein, in the Resolutions (as hereinafter defined) and in the Official Statement; and the Authority has, and at the time of the Closing will have, duly authorized and approved the execution and delivery of, and performance by the Authority of its obligations contained in this Agreement;

(b)     No further authorization or approval of the Authority's Board of Directors (the "Board of Directors") is required for the execution and delivery of this Agreement or the Undertaking on behalf of the Authority, and this Agreement assuming due authorization, execution and delivery of the Agreement by the other party thereto, constitutes a legal, valid and binding obligation of the Authority, enforceable against the Authority in accordance with its terms except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar laws affecting the rights of creditors generally, and by principles of equity, including those related to equitable subordination, if equitable remedies are sought or if equitable defenses (based solely on facts which the Authority neither knew nor should have known at the time of execution hereof) are raised; and, except as may be required under blue sky or securities laws of any state (as to which no representation or warranty is given), the Authority is not required to obtain any further authorization or approval for the sale and delivery of the Bonds to the Underwriters or the performance by the

Authority of its obligations hereunder or under the Undertaking except such authorizations or approvals as shall have been obtained at or prior to the Closing, and copies of which will be delivered to the Underwriters at the Closing;

(c)     The Authority, acting through the Board of Directors, has duly authorized and approved the Preliminary Official Statement and has duly authorized and approved the execution and delivery of the Official Statement as provided in Paragraph 3 hereof;

(d)     The Bonds are issued pursuant to that certain Amended and Restated Resolution Establishing Michigan Finance Authority Local Government Loan Program and Providing for the Issuance of Local Government Program Revenue Bonds adopted by the Authority on May 15, 2014 (the "General Resolution"), and the Supplemental Resolution by the Authority adopted by the Authority on August 12, 2014 (the "Supplemental Resolution" and together with the General Resolution, the "Resolutions"). The Supplemental Resolution has been duly adopted by the Authority, acting through its Board of Directors, and the Resolutions have not been modified, amended or rescinded and will be in full force and effect at the time of the Closing and will be a contract with the holders of the Bonds and a valid, legally binding act of the Authority, enforceable in accordance with the terms thereof except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar laws affecting the rights of creditors generally, and by principles of equity, including those related to equitable subordination if equitable remedies are sought or if equitable defenses (based solely on facts which the Authority neither knew nor should have known at the time of execution hereof) are raised;

(e)     When delivered to the Underwriters and paid for in accordance with the terms of this Agreement, the Bonds (i) will have been duly authorized, executed and issued by the Authority pursuant to the Resolutions, and (ii) will constitute valid, legally binding, limited obligations of the Authority; provided, however, that the Bonds and the interest obligation thereon shall never constitute a debt or liability of the State of Michigan (the "State") or any agency or employee thereof within the meaning of any constitutional or statutory provision or limitation or a general obligation of the Authority and shall never create or constitute any indebtedness, liability or obligation of the State or constitute a pledge of the faith and credit of the State or the general funds or assets of the Authority (including funds pertaining to other loans or activities) but shall be a limited obligation of the Authority payable solely from the Security, as defined in the Resolutions;

(f)     No consent or approval of, or registration with or declaration of, any federal, State or other governmental commission, board, regulatory body or instrumentality, is or was required in connection with any of the actions of the Authority described in subparagraphs (a), (b), (c), (d) or (e) of this Paragraph 6 or the delivery of the Bonds to the Underwriters except for the filing of IRS form 8038-G (and the Authority hereby agrees to make such filing promptly after the Closing), except as may be required under blue sky or securities laws of any state (as to which no representation or warranty is given), nor is any election or referendum of voters required in connection therewith;

(g)     All legislation necessary to permit the Authority (i) to fulfill in all material respects its obligations under the Resolutions, this Agreement and the Undertaking, and (ii) to carry out the transactions contemplated in the Resolutions and the Official Statement is in full force and effect;

(h)     The execution and delivery of the Official Statement, this Agreement, and the Undertaking by the Authority, and the fulfillment of the terms and conditions of, and the carrying out of the transactions contemplated by the Resolutions, this Agreement, and the Undertaking, do not and will not conflict with, or constitute on the part of the Authority a breach of or a default under, any existing law (including, without limitation, the Constitution of the State), any court or administrative regulation, decree or order or any agreement, indenture, mortgage, lease or other instrument to which the Authority is subject or by which it is bound and which breach or default would materially affect the validity or binding effect of any of the Bonds or the ability of the Authority to pay the principal of and the interest on any of the Bonds;

(i)     The Preliminary Official Statement (other than the City and DWSD Portion), as of the date thereof, did not contain any untrue statement of a material fact or omit to state any material fact necessary to make such document, or the statements and information therein contained, in light of the circumstances under which they were made, not misleading;

(j)     The Official Statement (other than the City and DWSD Portion), does not, as of its date or will not as of the Closing, contain any untrue statement of a material fact or omit to state any material fact necessary to make such document, or the statements and information therein contained, in light of the circumstances under which it was made, not misleading;

(k)     The Bonds will conform to the terms thereof set forth in the Resolutions and described in the Official Statement; and the proceeds of the Bonds will be applied as described under the caption "THE SERIES 2014C BONDS —Sources and Uses of Funds for the Series 2014C Bonds" in the Official Statement;

(l)     Other than an appeal of the Bankruptcy Court Order, except as may have been disclosed in writing to the Underwriters before the date of this Agreement or as may be disclosed in the Official Statement, the Authority has not been served with any litigation (and to the knowledge of the Authority no litigation has been commenced or is threatened) against the Authority, in any court (i) seeking to restrain or enjoin the sale or delivery of the Bonds, or (ii) in any manner questioning the authority of the Authority to issue, or the issuance or validity of, any of the Bonds or any other indebtedness of the Authority, or (iii) questioning the constitutionality of any statute, or the validity of any proceedings, authorizing the issuance of any of the Bonds, or (iv) questioning any of the legislation referred to in subparagraph (g) of this Paragraph 6, or (v) questioning the validity or enforceability of the Resolutions or (vi) seeking to secure a lien on the Pledged Funds or the collection of the Revenues, as defined in the Resolutions, or other moneys, securities, funds and property pledged in the Resolutions that are a source of payment on the Bonds, or (vii) contesting in any way the completeness, accuracy or fairness of the Preliminary Official Statement or the Official Statement, or (viii) which

might in any material respect adversely affect the transactions contemplated herein and in the Official Statement; and no right of any member of the Board of Directors to his or her office is being contested;

(m)  Any certificate or copy of any certificate signed by an official of the Authority and delivered to the Underwriters pursuant hereto or in connection herewith shall be deemed a representation by the Authority to the Underwriters as to the truth of the statements therein made;

(n)  Except as permitted by the Resolutions, from and after the time of Closing, the Authority will not create or permit the creation of, or issue any obligations or create any additional indebtedness secured by, a charge and lien on the Pledged Funds, as defined in the Resolutions, and other moneys, securities, funds and property pledged in the Resolutions;

(o)  To the extent permitted by law, the Authority will not permit any of the proceeds of the Bonds to be used directly or indirectly to acquire any securities or obligations, the acquisition of which would cause any Bond to be an "arbitrage bond" within the meaning of Section 148 of the Internal Revenue Code of 1986 or any successor provision, act or statute, and the regulations from time to time promulgated or proposed thereunder (the "Code");

(p)  To the extent permitted by law, the Authority will not permit any of the proceeds of the Bonds or any other funds of the Authority to be used directly or indirectly in a manner which would result in the exclusion of any of the Bonds from the treatment afforded by Section 103(a) of the Code for any reason, including without limitation the classification of such Bonds as "private activity bonds" within the meaning of Section 141(a) of the Code or as obligations guaranteed by the United States of America, as provided in Section 149(b) of the Code; and the Authority will not take any action or omit to take any action which, by commission or omission, would cause interest on the Bonds to be includable in gross income for federal income tax purposes pursuant to Section 103 of the Code or cause such interest to be included in any alternative minimum tax other than an alternative minimum tax which applies to all tax exempt bonds generally; [ADJUST IF PRIVATE ACTIVITY BONDS WILL BE ISSUED]

(q)  Other than a nonmonetary default resulting from the City having filed a petition for relief under Title 11 of the United States Code, the Authority is not, and historically has not been, in default in the payment of principal of, or premium, if any, or interest on any bonds, notes or contract payments pledged for the payment of notes or bonds and has not entered into any contract or arrangement that might give rise to any lien or encumbrance on the Pledged Funds other than as provided in the Resolutions;

(r)  The Authority has complied with all continuing disclosure obligations under Rule 15c2-12 during the previous five years; and

(s)  The Authority will without any cost to the Authority cooperate with the Underwriters in the qualification of the Bonds for offering and sale and the determination of their eligibility for investment under the laws of such jurisdictions as the Underwriters

shall designate, provided that the Authority is not required to qualify as a foreign corporation or to consent to any general or special service of process in any jurisdiction.

It is acknowledged and agreed by the parties hereto that all covenants, representations and warranties made by the Authority herein and in any certificates given in compliance herewith, are made solely by the Authority and not by any individual executing this Agreement or any certificate in his or her own capacity, and no liability shall be imposed, directly or indirectly, on such individual.

8.    (a)    At 10:00 a.m., Eastern Time, on September [__], 2014, or such other time and date as shall be mutually agreed upon by the Authority and the Underwriters (the "Closing"), the Authority shall direct the Trustee to deliver the Bonds to the Underwriters at the offices of The Depository Trust Company, New York, New York, in definitive form, duly executed and authenticated by the Trustee.  Subject to the terms and conditions hereof, the Authority shall deliver at the offices of [Dickinson Wright PLLC, [location to be determined], the other documents and instruments to be delivered at the Closing pursuant to this Agreement (the "Closing Documents") and the Underwriters shall accept delivery of the Bonds and the Closing Documents and pay the purchase price for the Bonds as set forth in Item 2 of Exhibit A hereto by wire transfer to the Trustee, in Federal Reserve Funds immediately available, for the account of the Authority, or as the Authority shall direct. The Bonds shall be registered in the name of Cede & Co., as nominee for The Depository Trust Company ("DTC") and there shall be one (1) typewritten Bond for each maturity as set forth in Item 1 of Exhibit A.  The Bonds shall be made available to the Underwriters not less than 24 hours preceding the Closing for purposes of inspection.

(b)    If the Authority shall be unable to satisfy the conditions of the obligations of the Underwriters to accept delivery of and to pay for the Bonds contained in this Agreement, the respective obligations of the Authority and the Underwriters shall be as set forth in Paragraph 10 hereof.

9.    The Underwriters have entered into this Agreement in reliance upon the representations and warranties and agreements of the Authority contained herein, upon the representations and warranties and agreements of the City contained in the Letter of Representations attached hereto as <u>Exhibit B</u> executed and delivered on behalf of the City on the date hereof (the "Letter of Representations") and in the Local Purchase Contract, and upon the representations and warranties of the Authority and the City to be contained in the Closing Documents, and upon the performance by the Authority of its obligations hereunder, upon the performance by the City of its obligations under the Letter of Representations and the Local Purchase Contract, both as of the date hereof and as of the date of Closing.  The Underwriter has received a letter from KPMG LLP, the independent accountants for the Department ("KPMG"), [in the form attached hereto as Exhibit __] [providing for its consent to the inclusion of the audited financial statements of the Sewage Disposal Fund for the year ended June 30, 2013 in the Preliminary Official Statement and in the Official Statement and describing agreed-upon procedures] (the "Accountant's Letter").  Accordingly, the Underwriters' obligations under this Agreement to purchase, to accept delivery of and to pay for the Bonds shall be subject to the performance by the Authority and the City of their obligations to be performed hereunder, under the Letter of Representations and the Local Purchase Contract, at or prior to the Closing, and shall also be subject to the following conditions:

(a)     The representations and warranties of the Authority contained herein shall be true, complete and correct in all material respects at the date hereof and as of the time of the Closing, as if made at and as of the time of the Closing, and the Authority shall be in compliance with each of the agreements made by it in this Agreement;

(b)     At the time of the Closing, the Official Statement shall not have been amended, modified or supplemented, except in such manner as may have been agreed to by the Underwriters;

(c)     The Underwriters shall have the right in their sole discretion (except where otherwise indicated below) to terminate its obligations under this Agreement to purchase, to accept delivery of and to pay for the Bonds by notifying the Authority of their election to do so, if after the acceptance hereof by the Authority and prior to the Closing:

(i)     any event shall occur which makes untrue or incorrect in any material respect, as of the time of such event, any statement or information contained in the Official Statement or which is not reflected in the Official Statement but should be reflected therein in order to make the statements contained therein not misleading in any material respect and, in either event, the Authority refuses to permit the Official Statement to be supplemented to supply such statement or information or the effect of the Official Statement as so supplemented is, in the judgment of the Underwriter, to materially adversely affect the market for the Bonds or the sale, at the contemplated offering prices (or yields), by the Underwriter of the Bonds; or

(ii)     the market price of the Bonds or the marketability thereof shall (in the reasonable opinion of the Underwriters) have been materially adversely affected by reason of the fact that between the date hereof and the Closing,

(A) an amendment to the Constitution of the United States or to the Constitution of the State, shall have been adopted, or

(B) legislation shall have been enacted by the Congress or by the Legislature of the State, recommended to the Congress for passage by the President of the United States or the Legislature of the State by the Governor of the State, or introduced and favorably reported for passage to either House of the Congress or of the Legislature of the State by any Committee of such House to which such legislation has been referred for consideration or by a conference committee of both Houses of the Congress; or any statement or report in respect of legislation previously introduced or favorably reported or recommended for passage shall have been made or reported to have been made by the President, any member of the Cabinet or his representative, or any agency of the Federal government, including without limitation the Internal Revenue Service, or any member or members of either House of the Congress or the members or staff of any Committee of either House of the Congress or a conference committee of both Houses of the Congress, or

(C) a decision shall have been rendered by a court established under Article III of the Constitution of the United States, or the Tax Court of the United States, or any other Federal or State court, or an order, ruling or regulation (final, temporary or proposed) shall have been made by the Treasury Department of the United States or the Internal Revenue Service or by any other Federal or State agency affecting the tax status of the Authority or its obligations for borrowed money (including the Bonds) or the interest thereon (including any such event with the purpose or effect, directly or indirectly, of imposing Federal income taxation upon, or any taxation in the State upon, such interest as would be received by the holders of the Bonds); or

(iii) a stop order, ruling, regulation, proposed regulation or statement by or on behalf of the SEC or any other governmental agency having jurisdiction of the subject matter shall be issued or made to the effect that the issuance, offering, sale or distribution of obligations of the general character of the Bonds is in violation or would be in violation of any provisions of the Securities Act of 1933, as amended (the "Securities Act"), Exchange Act, or the Trust Indenture Act of 1939, as amended (the "Trust Indenture Act"); or

(iv) legislation introduced in or enacted (or resolution passed) by the Congress or an order, decree or injunction issued by any court of competent jurisdiction, or an order, ruling, regulation (final, temporary or proposed), press release, or other form of noticed issued or made by or on behalf of the SEC, or any other governmental agency having jurisdiction of the subject matter, to the effect that obligations of the general character of the Bonds, including any or all underlying arrangements, are not exempt from registration under or other requirements of the Securities Act, or that the Resolutions are not exempt from qualification under or other requirements of the Trust Indenture Act, or that the issuance, offering or sale of obligations of the general character of the Bonds, including any or all underlying arrangements, as contemplated hereby or by the Official Statement or otherwise, is or would be in violation of the federal securities law as amended and then in effect; or

(v) there shall have occurred an outbreak or escalation of hostilities involving the United States or the declaration by the United States of a national emergency or war, if, in the reasonable opinion of the Underwriters, the market price of the Bonds or the marketability thereof shall be materially adversely affected thereby; or

(vi) there shall have occurred a general suspension of trading, minimum or maximum prices for trading shall have been fixed and be in force or maximum ranges or prices for securities shall have been required on the New York Stock Exchange or other national stock exchange whether by virtue of a determination by that Exchange or by order of the SEC or any other governmental agency having jurisdiction or any national securities exchange shall have (A) imposed additional material restrictions not in force as of the date hereof with respect to trading in securities generally, or to the Bonds or similar obligations, or (B)

materially increased restrictions now in force with respect to the extension of credit by or the charge to the net capital requirements of underwriters or broker-dealers such as to make it, in the judgment of the Underwriters, impractical or inadvisable to proceed with the offering of the Bonds as contemplated in the Official Statement; or

(vii) the declaration of a general banking moratorium by United States, New York or State authorities or a major financial crisis or a material disruption in commercial banking or securities settlement clearances services shall have occurred such as to make it, in the judgment of the Underwriter, impractical or inadvisable to proceed with the offering of the Bonds as contemplated by the Official Statement; or

(viii) the purchase of and payment for the Bonds by the Underwriters, or the resale thereof by the Underwriters, on the terms and conditions herein provided, shall be prohibited by any applicable law or governmental regulation or order of any court (other than by reason of the Underwriters' failure to comply with any applicable state blue sky or securities law); or

(ix) the market price of the Bonds or the marketability thereof shall have been materially adversely affected by the occurrence of any event which in the reasonable opinion of the Underwriters requires or has required an amendment, modification or supplement to the Official Statement; or

(x) The Bankruptcy Court Order shall have been subsequently vacated, reversed or modified, in whole or in part, in any manner without the consent of the Underwriter and the Authority by the Bankruptcy Court or any other court of competent jurisdiction or is the subject of a stay pending appeal.

(d) The Authority shall not have defaulted under any of its covenants, agreements, representations or warranties under the Resolutions or this Agreement;

(e) The City shall have issued and delivered the DWSD Obligations to be purchased with the proceeds of the Bonds.

(f) At or prior to the Closing, the Underwriters shall have received each of the following documents (the "Closing Documents"):

(i) A copy of the Official Statement, signed on behalf of the Authority by its Chairperson or other member of the Authority or its Executive Director or other authorized officer;

(ii) The opinion of the Attorney General of the State of Michigan, dated the date of Closing, substantially in the form set forth in Appendix III to the Official Statement and the opinion of Dickinson Wright PLLC ("Bond Counsel"), dated the date of the Closing and addressed to the Authority, substantially in the form set forth in Appendix III to the Official Statement;

(iii) Supplemental opinions of Bond Counsel and the Attorney General of the State of Michigan, each dated the date of the Closing and addressed to the Underwriters, to the effect that (A) at the times of execution of this Agreement the

- 13 -

Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014C
13-53846-swr Doc 7674-1 Filed 09/23/14 Entered 09/23/14 10:36:47 Page 87 of 135

Authority had, and on the date of the Closing has, full legal right, power and authority to execute and deliver this Agreement and to cause the Bonds to be delivered to the Underwriters as provided in this Agreement and in the Resolutions, and the Authority at the times of execution of this Agreement had, and on the date of the Closing has, duly authorized and approved the execution and delivery of, and the performance of its obligations contained in this Agreement, (B) no further authorization or approval not already obtained is required by the Authority in connection with the delivery of the Bonds to the Underwriters or entering into or performing its obligations under the Resolutions or this Agreement, except for such approvals, consents or authorizations as are required by blue sky or securities laws of any state (as to which no opinion need be expressed) and, assuming due authorization, execution and delivery thereof by the other party thereto, this Agreement constitutes a legal, valid and binding obligation of the Authority enforceable against the Authority in accordance with its terms, subject to the application of general principles of equity, including equitable subordination and to bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar laws affecting creditors' rights, (C) the Authority has duly authorized and approved the distribution and use in accordance with applicable law of the Preliminary Official Statement and has duly authorized, approved and executed the Official Statement, (D) the Authority's execution and delivery of and compliance with the terms and conditions of, and the carrying out of the transactions contemplated by, the Resolutions and this Agreement do not and will not conflict with, or constitute on the part of the Authority a breach of or a default under, any agreement or other instrument known to them to which the Authority is subject or by which it is or may be bound or violate any decree or order known to them or any law, rule or regulation to which the Authority is subject or by which it is bound that, in all cases, would have an adverse effect on the Bonds, (E) the statements in the Official Statement under the captions [TO BE UPDATED] ["INTRODUCTION," "THE MICHIGAN FINANCE AUTHORITY," "THE MICHIGAN FINANCE AUTHORITY'S LOCAL GOVERNMENT LOAN PROGRAM," "THE SERIES 2014C BONDS" (except the subsection "Book-Entry-Only System"), "SECURITY AND SOURCES OF PAYMENT FOR THE SERIES BONDS," "TAX MATTERS," "LITIGATION" (as to supplemental opinion of Attorney General only), "LEGALITY OF SERIES BONDS FOR INVESTMENT AND DEPOSIT," "STATE NOT LIABLE ON SERIES BONDS," "CONTINUING DISCLOSURE UNDERTAKING" (as it relates to the Authority), and the statements in Appendices [_____], insofar as such statements summarize the language and effect of the Resolutions, the Bonds, the Continuing Disclosure Undertaking of the Authority and the Constitution and the laws of the State and the United States, are fair and accurate summaries thereof in all material respects, (F) the Bonds are exempt from the registration requirements of the Securities Act, and the Resolutions are exempt from qualification as an indenture under the Trust Indenture Act, and (G) nothing has come to their attention that would lead them to believe that the Official Statement (other than the City or DWSD Portion) as of its

date and as of Closing (other than the financial statements, other financial, statistical or quantitative information, projections or estimates, and opinions of other counsel, as to all of which no opinion is expressed) contains any untrue statement of a material fact or omits to state a material fact that is necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(iv)     An opinion, dated the date of the Closing and addressed to and solely for the benefit of the Underwriters, of Kutak Rock LLP, counsel to the Underwriters, in form and substance satisfactory to the Underwriters;

(v)     A non-arbitrage certificate, dated the date of the Closing, signed by the Chairperson of the Board of Directors or his designee, or the Executive Director of the Authority, in a form acceptable to the Underwriters;

(vi)     A certificate or certificates of the Authority dated the date of the Closing, signed on behalf of the Authority by an authorized officer to the effect that to the best knowledge of the signer, after such inquiry as the signer deems appropriate, and taking into account the responsibilities of the office which the signer holds, and on behalf of the Authority and not in any individual capacity, the signer certifies: (A) the truthfulness in all material respects on and as of the date of Closing of all representations and warranties of the Authority contained in this Agreement; (B) the compliance by the Authority with all agreements and satisfaction of all conditions to be complied with or satisfied at or prior to the Closing; (C) the conformity of the Bonds in all material respects to the description thereof in the Resolutions and the Official Statement; (D) since the respective dates as of which information is given in the Official Statement, and except as set forth therein, there having been no material adverse change in the condition, financial or otherwise, of the Authority, (E) the Preliminary Official Statement and the Official Statement, as of their dates and as of the Closing, does not contain any untrue statements of a material fact or omit to state a material fact that is necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading (other than under the City and DWSD Portion), and (F) other than an appeal of the Bankruptcy Court Order or a motion seeking a stay of the Bankruptcy Court Order pending appeal, no litigation or other judicial proceedings have been served upon the Authority or threatened (either in State courts or in federal courts in Michigan) (w) restraining or enjoining or seeking to restrain or enjoin the issuance, sale, execution or delivery of any of the Bonds, or (x) in any way questioning or affecting the validity of any provision of the Bonds, or (y) in any way questioning or affecting the validity of any of the proceedings or the authority for the authorization, issuance, sale, execution or delivery of any of the Bonds, or the pledge or application of any money or security provided for the payment of any of the Bonds, or (z) questioning or affecting the organization or existence of the Authority or the right of any member of the Authority to their respective offices;

(vii)     A certified copy of each of the Resolutions comprising the Resolutions;

(viii)   A copy of the Bankruptcy Court Order, as described in Section 3 hereof;

(ix)   Satisfactory evidence that Standard and Poor's Ratings Services, Fitch Ratings and Moody's Investors Services shall have assigned to the Bonds the rating set forth on the inside cover page of the Official Statement, and that the rating shall not have been reduced or withdrawn;

(x)   A copy of the fully executed Letter of Representations from the City and the Department;

(xi)   The opinion of Dykema Gossett PLLC ("DWSD Bond Counsel"), dated the date of the Closing and addressed to the Authority and the Underwriters, as to the validity and tax-exempt status of the DWSD Bonds, in form and substance satisfactory to the Underwriters;

(xii)   Opinions of DWSD Bond Counsel, Miller Canfield as counsel to the Emergency Manager of the City, and Jones Day as Bankruptcy Counsel to the City dated the date of the Closing and addressed to the Underwriters, to the effect, in the aggregate, that (A) at the times of execution of this Agreement the City had, and on the date of the Closing has, full legal right, power and authority to execute and deliver the Letter of Representations and the Local Purchase Contract and other transaction documents (the "DWSD Transaction Documents") and to cause the DWSD Obligations to be delivered to the Authority as provided in this Agreement and pursuant to the DWSD Authorizing Documents (as defined in the Letter of Representations), and the City at the time of execution of this Agreement had, and on the date of the Closing has, duly authorized and approved the execution and delivery of, and the performance of its obligations contained in the DWSD Transaction Documents, (B) no further authorization or approval not already obtained is required by the City in connection with the delivery of the DWSD Obligations to the Authority or entering into or performing its obligations under the DWSD Transaction Documents, except for such approvals, consents or authorizations as are required by blue sky or securities laws of any state (as to which no opinion need be expressed) and, assuming due authorization, execution and delivery thereof by the other party thereto, the DWSD Transaction Documents constitute legal, valid and binding obligations of the City enforceable against the City in accordance with their terms, subject to the application of general principles of equity, including equitable subordination and to bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar laws affecting creditors' rights, (C) the City has duly authorized and approved the distribution and use in accordance with applicable law of the Preliminary Official Statement and the Official Statement, (D) the City's execution and delivery of and compliance with the terms and conditions of, and the carrying out of the transactions contemplated by, the DWSD Transaction Documents do not and will not conflict with, or constitute on the part of the City a breach of or a default under, any agreement or other instrument known to them to which the City is subject or by which it is or may be bound or violate any decree or order known to them or any law, rule or regulation to which the City is subject or by which it is

bound that, in all cases, would have an adverse effect on the Bonds, (E) the statements in the Official Statement in the [TO BE UPDATED] [under sections "[_____]" and Appendices [_____]], insofar as such statements summarize the language and effect of the DWSD Authorizing Documents, the Continuing Disclosure Undertaking of the City and the laws of the State and the United States, are fair and accurate summaries thereof in all material respects, (F) the DWSD Obligations are exempt from the registration requirements of the Securities Act, and the DWSD Authorizing Documents are exempt from qualification as an indenture under the Trust Indenture Act, and (G) nothing has come to their attention that would lead them to believe that the Official Statement, as of its date and as of Closing (other than financial statements, other financial, statistical or quantitative information, projections or estimates, and opinions of other counsel, as to all of which no opinion is expressed) contains any untrue statement of a material fact or omits to state a material fact that is necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(xii)    Certificates of the City [, the Department and the Emergency Manager] dated as of the date of the Closing to the effect that the representations and warranties included in the Letter of Representations and Local Purchase Contract are true and correct in all material respects as of the date of the Closing and all obligations to be performed by the City under the Letter of Representations and the Local Purchase Contract referenced above on or prior to the date of closing have been performed;

(xiii)   A letter from Bond Counsel to the effect that the opinion referred to in clause (ii) of this subparagraph may be relied upon by the Underwriters as though such opinion was addressed to them;

(xiv)    An executed copy of the Authority's Continuing Disclosure Undertaking, in the form and content set forth in Appendix IV to the Official Statement;

(xv)    An executed copy of the City and the Department's Continuing Disclosure Undertaking, in the form and content set forth in Appendix IV to the Official Statement;

(xvi)    Such additional legal opinions, signatures, delivery and other certificates, and other instruments and documents as required under the Local Purchase Contract;

(xvii)   [A letter from KPMG, dated the Closing Date, to the effect that it reaffirms as of the Closing Date the statements made in the Accountant's Letter (describing agreed-upon procedures and stating no material adverse change in the financial position or results of operations of the Sewage Disposal Fund except as set forth in or contemplated by the Official Statement or as described in such letter), in form and substance satisfactory to the Underwriters];

(xviii) Immediately before the release of the Bonds, on the Settlement Date evidence satisfactory to Underwriters that the City has filed with the Bankruptcy Court an amended Plan of Adjustment of the City removing all provisions contained in the current Plan of Adjustment impairing any DWSD Bonds;

(xix) Certified copies of the Bond Insurance Policies issued by the Bond Insurers and certified copies of any debt service reserve fund surety insurance policies issued by the Bond Insurers and any other documents executed in connection therewith;

(xx) An opinion of counsel to the Bond Insurers, dated the Closing Date, addressed to the Underwriters and in form and substance satisfactory to the Representative;

(xxi) A certificate of the Bond Insurers, dated the Closing Date, signed by an authorized officer of the Bond Insurers, to the effect that the information contained under the caption ["Bond Insurance"] in the Official Statement is true and correct in all material respects, and that the specimen of the Bond Insurance Policies contained in Appendix VI to the Official Statement is a true and correct specimen of the Bond Insurance Policies being issued by the Bond Insurers; and

(xxii) Such additional legal opinions, signatures, delivery and other certificates, and other instruments and documents as the Underwriters may reasonably request to evidence the truth, accuracy and completeness, as of the date hereof and as of the date of the Closing, of the representations and warranties of the Authority and of the City contained herein and of the statements and information contained in the Official Statement and the due performance or satisfaction by the Authority and the City at or prior to the Closing of all agreements then to be performed and all conditions then to be satisfied by the Authority and the City.

All of the opinions, letters, certificates, instruments and other documents mentioned above or elsewhere in this Agreement shall be deemed to be in compliance with the provisions hereof if, but only if, they are in form and substance reasonably satisfactory to the Underwriters.

If the Authority shall be unable to satisfy the conditions to the obligations of the Underwriters to accept delivery of and to pay for the Bonds contained in this Agreement, or if the obligations of the Underwriters to accept delivery of and to pay for the Bonds shall be terminated for any reason permitted by this Agreement, this Agreement shall terminate and neither the Underwriters nor the Authority shall be under further obligation hereunder, except that the respective obligations of the Authority and the Underwriters set forth in Paragraphs 10 and 12 hereof shall continue in full force and effect.

10.    (a)    The Underwriters shall be under no obligation to pay, and the Authority shall pay, all expenses incident to the performance of the obligations of the Authority hereunder, including, but not limited to: (i) the cost of preparation and printing the definitive Bonds; (ii) the cost of the preparation and printing the Preliminary Official Statement, including the appendices and any amendments or supplements thereto; (iii) the

fees and disbursements of the financial advisor and Bond Counsel to the Authority; (iv) the fees and disbursements of any consultants or advisors retained by the Authority; (v) fees charged by rating agencies in connection with the Bonds; (vi) the cost of preparation and printing of the Official Statement, up to the number of copies specified in Paragraph 4 hereof, including the appendices thereto; (vii) subject to the provisions of Paragraph 5 above, the cost of preparation of any amendment or supplement to the Official Statement and the costs of printing and delivery of up to [200] copies of any amendment or supplement to the Official Statement, including the reasonable fees and disbursements of counsel to the Underwriters and to the Authority with respect to any supplements or amendments to the Official Statement (all such costs to be paid by the Authority subject to the provisions of Paragraph 5 above); (viii) the fees and disbursements of counsel retained by the Underwriters; (ix) the fees of Digital Assurance Certification, L.L.C. for a continuing disclosure undertaking compliance review; (x) any initial fees and charges of the Trustee and its counsel (including the first annual payment due the Trustee), the Bond Registrar, the Paying Agent and Co-Paying Agent, if any; and (xi) the fees and disbursements of the Bond Insurers and their counsel.

(b)     The Underwriters shall pay (i) the cost of preparation and reproduction of this Agreement and the other underwriting documents; (ii) all advertising expenses in connection with the offering of the Bonds; (iii) the cost of printing and delivering more than [200] copies of the Official Statement; (iv) the cost of printing and delivery of more than [200] copies of any supplement or amendment of the Official Statement; (v) the cost of amending or supplementing the Official Statement in the event that any information provided by the Underwriters for inclusion in the Official Statement is materially inaccurate or incomplete; and (vi) all other expenses incurred by the Underwriters in connection with the Bonds.

11.     Any notice or other communication to be given to the Authority under this Agreement shall be given by delivering the same in writing to its address set forth above, and any notice or other communication to be given to the Underwriters under this Agreement shall be given by delivering the same in writing to Citigroup Global Markets, Inc., [390 Greenwich Street, New York, NY 10013], Attention: [_____], Telephone: [_____], Fax: [_____].

12.     This Agreement is made solely for the benefit of the Authority and the Underwriters (including the successors or assigns of the Underwriters); no other person shall acquire or have any right or liability hereunder or by virtue hereof. All of the representations, warranties and agreements of the Authority contained in this Agreement and in the certificates delivered pursuant hereto shall remain operative and in full force and effect, regardless of (i) any investigations made by or on behalf of the Underwriters, (ii) delivery of and payment for the Bonds hereunder, and (iii) any termination of this Agreement.

**(Signatures on Next Page)**

Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014C

13.     This Agreement shall become effective upon the acceptance hereof by the Authority as aforesaid and shall be valid and enforceable as of the time of such acceptance. This Agreement may be executed in several counterparts, each of which shall be regarded as an original and all of which shall constitute one and the same document.

Very truly yours,

CITIGROUP GLOBAL MARKETS, INC., As Representative

By: _____
    [Name]
    [Title]

Accepted and Agreed to this
__th day of August, 2014

MICHIGAN FINANCE AUTHORITY

By: _____
    Joseph L. Fielek
    Executive Director

**EXHIBIT A**

Item 1 (a)  Aggregate principal amount of the Bonds:  $[_____]

(b)  Date of the Bonds:  August __, 2014

(c)  Years of maturities, interest rates, principal amounts and initial public offering prices:

Local Government Loan Program Revenue Bonds, Series 2014C-1 (Insured)
(Detroit Water and Sewerage Department
Sewage Disposal System Revenue Senior Lien Local Project Bonds)

$_____ Serial Bonds

| Maturity (July 1) | Principal Amount | Interest Rate | Price or Yield |
|---|---|---|---|
| | | | |

$_____ Term Bonds

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

Local Government Loan Program Revenue Bonds, Series 2014C-2
(Detroit Water and Sewerage Department
Sewage Disposal System Revenue Senior Lien Local Project Bonds)

$_____ Serial Bonds

| Maturity (July 1) | Principal Amount | Interest Rate | Price or Yield |
|---|---|---|---|
|  |  |  |  |

$_____ Term Bonds

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

$_____

Local Government Loan Program Revenue Bonds, Series 2014C-3
(Detroit Water and Sewerage Department
Sewage Disposal System Revenue Senior Lien Local Project Bonds)

$_____ Serial Bonds

| Maturity (July 1) | Principal Amount | Interest Rate | Price or Yield |
| --- | --- | --- | --- |
| | | | |

$_____ Term Bonds

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

Local Government Loan Program Revenue Bonds, Series 2014C-4 (Insured)
(Detroit Water and Sewerage Department
Sewage Disposal System Revenue Refunding Senior Lien Local Project Bonds)

$_____ Serial Bonds

| Maturity (July 1) | Principal Amount | Interest Rate | Price or Yield |
|---|---|---|---|
| | | | |

$_____ Term Bonds

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

Local Government Loan Program Revenue Bonds, Series 2014C-5
(Detroit Water and Sewerage Department
Sewage Disposal System Revenue Refunding Senior Lien Local Project Bonds)

$_____ Serial Bonds

| Maturity (July 1) | Principal Amount | Interest Rate | Price or Yield |
|---|---|---|---|

$_____ Term Bonds

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

Local Government Loan Program Revenue Bonds, Series 2014C-6 (Insured)
(Detroit Water and Sewerage Department
Sewage Disposal System Revenue Refunding Second Lien Local Project Bonds)

$_____ Serial Bonds

| Maturity (July 1) | Principal Amount | Interest Rate | Price or Yield |
|---|---|---|---|
| | | | |

$_____ Term Bonds

$_____ \_\_\_\_% Term Bonds
Due July 1, 20\_\_, Price _____%

$_____ \_\_\_\_% Term Bonds
Due July 1, 20\_\_, Price _____%

Local Government Loan Program Revenue Bonds, Series 2014C-7
(Detroit Water and Sewerage Department
Sewage Disposal System Revenue Refunding Second Lien Local Project Bonds)

$_____ Serial Bonds

| Maturity (July 1) | Principal Amount | Interest Rate | Price or Yield |
|---|---|---|---|
|  |  |  |  |

$_____ Term Bonds

$_____ \_\_\_\_% Term Bonds
Due July 1, 20\_\_, Price _____%

$_____ \_\_\_\_% Term Bonds
Due July 1, 20\_\_, Price _____%

(d)  The Bonds are subject to optional and mandatory redemption prior to maturity as described in the Official Statement.

Item 2.  Purchase Price.  The purchase price shall be $[_____] (principal amount of $[_____.00], less underwriter's discount of $[_____], minus net original issue discount of $[_____]).

EXHIBIT B

LETTER OF REPRESENTATIONS

August [__], 2014

Citigroup Global Markets, Inc.
[Additional Underwriters]

Michigan Finance Authority

Ladies and Gentlemen:

The City of Detroit, Michigan (the "City"), acting upon authorization from (i) the Board of Water Commissioners (the "BOWC") of the Detroit Water and Sewerage Department (the "Department") and (ii) Kevyn D. Orr, emergency manager of the City (the "Emergency Manager"), proposes to participate in the Michigan Finance Authority (the "Authority") Local Government Loan Program Revenue Bonds, Series 2014C (the "Authority Bonds") program (the "Program") by issuing, in the aggregate, $_____ City of Detroit, Michigan, Detroit Water and Sewerage Department Sewage Disposal System Revenue Senior Lien Bonds, Sewage Disposal System Revenue Refunding Senior Lien Bonds and Sewage Disposal System Revenue Refunding Second Lien Bonds, in one or more series (the "DWSD Obligations"). Proceeds of the DWSD Obligations will be used (i) to finance certain capital expenditures of the Department for its Sewage Disposal System (the "System"), (ii) to finance the City's purchase of its outstanding Detroit Water and Sewerage Department Sewage Disposal System bonds that have been offered by the bondholders thereof and accepted for purchase by the City (the "Tendered DWSD Bonds") pursuant to the Invitation to Tender Bonds dated August 7, 2014 (the "Invitation") and (iii) to pay the costs of issuance of the DWSD Obligations and the Bonds. The City will sell the DWSD Obligations to the Authority pursuant to a Local Purchase Contract between the Authority and the City dated August [__], 2014 (the "Local Purchase Contract"). The City's participation in the Program and execution of the Local Purchase Contract and other related documents have been approved by the City and the Bankruptcy Court Order (as defined below).

The Authority Bonds will be sold by the Authority pursuant to a Bond Purchase Agreement dated the date hereof (the "Purchase Agreement") between the Authority and the Underwriters listed thereunder (the "Underwriters"). All capitalized terms not defined herein shall have the meaning ascribed to them in the Purchase Agreement.

The City acknowledges and agrees that (i) the purchase of the Authority Bonds pursuant to the Purchase Agreement, providing proceeds for the purchase of the DWSD Obligations are arm's-length commercial transactions among the City, the Authority and the Underwriters, (ii) in connection therewith and with the discussions, undertakings and procedures leading up to the consummation of such transaction, the Underwriters are and have been acting solely as principals and are not acting as agents or fiduciaries of the City, (iii) the Underwriters have not assumed an advisory or fiduciary responsibility in favor of the City with respect to the offering contemplated by the Purchase Agreement and the Local Purchase Contract or the discussions, undertakings and

13-53846-swr Doc 7031-1 Filed 08/22/14 Entered 08/22/14 10:36:47 Page 102 of 135

procedures leading thereto (irrespective of whether the Underwriters have provided other services or are currently providing other services to the City on other matters) and the Underwriters have no obligation to the City with respect to the offering contemplated by the Purchase Agreement and the Local Purchase Contract except the obligations expressly set forth in the Purchase Agreement, and (iv) the City has consulted its own legal, financial and other advisors to the extent it has deemed appropriate. For both subsections (ii) and (iii) herein, it is the City's understanding that as advisory or fiduciary relationship shall not be deemed to exist when, in the course of acting as an underwriter, broker, dealer or municipal securities dealer, a person render advice to an issuer, including advice with respect to the structure, timing, terms and other similar matters concerning a new issue of municipal securities. The Representative has been advised of the City's engagement of an independent registered municipal advisor. As required by Securities and Exchange Commission rules, the Representative discloses to you that accordingly, the Underwriters are not acting as your municipal advisor and are not subject to the fiduciary duty set forth in Section 15B(c)(1) of the Securities Exchange Act of 1934, as amended (the "Exchange Act").

The City acknowledges and agrees to the terms of the liquidated damages provision in Section 1 of the Purchase Agreement, including the full release and discharge of any claims by the City against the Underwriters upon any payment of liquidated damages pursuant thereto.

Section 1. <u>Representations and Warranties</u>. In order to induce the Underwriters and the Authority to enter into the Purchase Agreement and to sell the Authority Bonds, and to induce the Authority to enter into the Local Purchase Contract with the City, the City represents and warrants, and agrees with the Underwriters and the Authority as follows:

(a)     The City has full right, power and authority to (i) execute and deliver the Local Purchase Contract and this Letter of Representations, and (ii) perform its obligations under, and carry out and consummate all other transactions described in the Purchase Agreement, the Local Purchase Contract and this Letter of Representations, all pursuant to Act 94, Public Acts of Michigan, 1933, as amended ("Act 94"); Ordinance No. 18-01 adopted by the City Council of Detroit on October 18, 2001 (the "Bond Ordinance"); the Orders of the United States District Court in *United States v. City of Detroit, et al.*, 77-71100, E.D. Michigan; the Resolution and Ordinance Sewage Disposal System Revenue and Revenue Refunding Senior Lien Bonds of the City of Detroit, Sewage Disposal System Revenue Refunding Second Lien Bonds of the City of Detroit and/or Sewage Disposal System Revenue SRF Junior Lien Bonds of the City of Detroit, adopted by the BOWC on August 13, 2014 and approved by the Emergency Manager on August 16, 2014 (the "DWSD Bond Resolution"); a Trust Indenture by and among the City, the Department and U.S. Bank National Association, as trustee (the "DWSD Trustee") dated as of June 1, 2012, as amended (the "DWSD Indenture"); and a Sale Order of the Director of the Department dated August [__], 2014 and approved by the Emergency Manager on August [__], 2014 (the "Sale Order" and, collectively with the Bond Ordinance, the DWSD Bond Resolution, and the DWSD Indenture, the "DWSD Authorizing Documents"). The City has complied with or will comply with on or prior to the date of Closing all provisions of applicable law (specifically including, without limiting the generality of the forgoing, the Constitution and laws of the State of Michigan) and all matters relating to such transactions.

(b)     The United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") has entered a final order in <u>In re City of Detroit, Michigan,</u> Case No. 13-

53846, a copy of which is attached as [Exhibit C to the Purchase Agreement] (the "Bankruptcy Court Order"), in substance (1) authorizing the City to enter into and perform the transactions contemplated under the Official Statement, including but not limited to the Purchase Agreement and all transaction documents, (2) authorizing the City to grant a lien equal and senior to existing liens to secure post-petition indebtedness of the City pursuant to §§ 364(c) and 364(d) of the Bankruptcy Code, (3) finding that the Authority, the Underwriters, the Bond Insurers, the holders of the DWSD Obligations and the Bonds and all assignees and transferees of the foregoing are extending credit to the City in good faith for purposes of §§ 364(e) and 921(e) of the Bankruptcy Code, (4) finding that the Pledged Assets consisting of Net Revenues constitute "special revenues" as defined in § 902(2) of the Bankruptcy Code and "pledged special revenues" as that term is used in §§ 922(d) and 928 of the Bankruptcy Code, (5) finding (or concluding) that the satisfaction of Required Combined Coverage together with the Rate Covenant constitute adequate protection of the interests of all holders of pre-petition liens securing Secured Obligations (as defined in the Bond Ordinance) that were validly existing and outstanding as of the petition date for purposes of § 364(d)(1)(B) of the Bankruptcy Code, all as more particularly described in the Bankruptcy Court Order, and (6) approving a compromise among the City and certain parties (the "DWSD Settlement Parties") resolving objections to the City's Plan of Adjustment filed by one or more of the DWSD Settlement Parties, all as more particularly described in the Bankruptcy Court Order.

(c)        No further authorization or approval of the City's Emergency Manager, the City Council or the BOWC is required for the execution and delivery of the DWSD Obligations, this Letter of Representations, the Local Purchase Contract, the continuing disclosure undertaking (the "Undertaking") on behalf of the City, and any other transaction documents related thereto (collectively, the "DWSD Transaction Documents") and the DWSD Transaction Documents constitute a legal, valid and binding obligations of the City, enforceable against the City in accordance with its terms except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar laws affecting the rights of creditors generally, and by principles of equity, including those related to equitable subordination, if equitable remedies are sought or if equitable defenses (based solely on facts which the City neither knew nor should have known at the time of execution hereof) are raised; and, except as may be required under blue sky or securities laws of any state (as to which no representation or warranty is given), the City is not required to obtain any further authorization or approval for the sale and delivery of the DWSD Obligations to the Authority or the performance by the City of its obligations under the DWSD Transaction Documents except such authorizations or approvals as shall have been obtained at or prior to the Closing, and copies of which will be delivered to the Underwriters at the Closing.

(d)        The City, acting through the BOWC and the Emergency Manager, has duly authorized and approved the Preliminary Official Statement and has duly authorized and approved the execution and delivery of the Official Statement.

(e)        The DWSD Obligations are issued pursuant to that Act 94 and the DWSD Authorizing Documents.  The DWSD Authorizing Documents have not been modified, amended or rescinded and will be in full force and effect at the time of the Closing and will be a contract with the holders of the DWSD Obligations and a valid, legally binding act of the City, enforceable in accordance with the terms thereof except as such enforceability may be limited by

bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar laws affecting the rights of creditors generally, and by principles of equity, including those related to equitable subordination if equitable remedies are sought or if equitable defenses (based solely on facts which the City neither knew nor should have known at the time of execution hereof) are raised.

(f)     When delivered to the Authority and paid for in accordance with the terms of this Agreement, the DWSD Obligations (i) will have been duly authorized, executed and issued by the City pursuant to the DWSD Authorizing Documents, and (ii) will constitute valid, legally binding, limited obligations of the City.

(g)     No consent or approval of, or registration with or declaration of, any federal, State or other governmental commission, board, regulatory body or instrumentality, is or was required in connection with any of the actions of the City described herein or the delivery of the DWSD Obligations to the Authority except for the filing of IRS form 8038-G (and the City hereby agrees to make such filing promptly after the Closing), except as may be required under blue sky or securities laws of any state (as to which no representation or warranty is given), nor is any election or referendum of voters required in connection therewith.

(h)     All legislation necessary to permit the City (i) to fulfill in all material respects its obligations under the DWSD Authorizing Documents and the DWSD Transaction Documents and (ii) to carry out the transactions contemplated in the DWSD Authorizing Documents and the DWSD Transaction Documents is in full force and effect.

(i)     The execution and delivery of the Official Statement, the DWSD Transaction Documents, and the fulfillment of the terms and conditions of and the carrying out of the transactions contemplated by the DWSD Transaction Documents, do not and will not conflict with, or constitute on the part of the City a breach of or a default under, any existing law (including, without limitation, the Constitution of the State), any court or administrative regulation, decree or order or any agreement, indenture, mortgage, lease or other instrument to which the City is subject or by which it is bound and which breach or default would materially affect the validity or binding effect of any of the DWSD Obligations or the ability of the City to pay the principal of and the interest on any of the DWSD Obligations.

(j)     The City has duly authorized the use of the information contained in [TO BE UPDATED TO COVER SECTIONS OF THE OS COVERING CITY AND DWSD] ["DEBT SERVICE ON THE DWSD OBLIGATIONS AND COVERAGE PROVIDED BY HISTORIC REVENUES," "SECURITY AND SOURCES OF PAYMENT FOR THE DWSD OBLIGATIONS," "OUTSTANDING INDEBTEDNESS OF THE DEPARTMENT," "DEBT SERVICE REQUIREMENTS," "THE DEPARTMENT," "THE SEWAGE DISPOSAL SYSTEM," "THE CAPITAL IMPROVEMENT PROGRAM," "DEPARTMENT FINANCIAL PROCEDURES," "DEPARTMENT FINANCIAL OPERATIONS," "PENSION PLAN CONTRIBUTIONS," "SOURCE AND PRIORITY OF PENSION PAYMENTS," "OTHER POST-EMPLOYMENT BENEFITS," "FEASIBILITY CONSULTANT'S REPORT," "CITY OF DETROIT BANKRUPTCY MATTERS" and "RISK FACTORS", and Appendices [_____])] (collectively, the "City and DWSD Portion") of the Preliminary Official Statement and the Official Statement, to be used by the Underwriters in connection with the public sale of the Authority Bonds.  The City has ratified and consented to such use of the Preliminary Official

Statement and the Official Statement in accordance with law by the Underwriters in connection with the public sale of the Authority Bonds and the City deems the information set forth in the City and DWSD Portion of the Preliminary Official Statement to be "final" as of its date, as provided in Rule 15c2-12 of the SEC ("Rule 15c2-12") except for the omission of such information as is permitted to be omitted in accordance with paragraph (b)(1) of Rule 15c2-12.

(k)     The information set forth in the City and DWSD Portion of the Preliminary Official Statement and the Official Statement is true and correct in all material respects and the City and DWSD Portion of the Preliminary Official Statement and the Official Statement does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading.

(l)     The financial statements of the City's Sewage Disposal Fund as of June 30, 2013, including the notes thereof, included in Appendix II-D of the Official Statement, present fairly the financial position of the City's Sewage Disposal Fund as of the date indicated and the results of its operations and changes in fund balances and financial position for the year specified, and such financial statements have been prepared in the conformity with generally accepted accounting principles consistently applied in all material respects.

(m)     Except as set forth in the Preliminary Official Statement and the Official Statement, subsequent to the respective dates of which information is given in the Preliminary Official Statement and the Official Statement, the City has not incurred any liabilities, direct or contingent, or entered into any transactions, not in the ordinary course of business, that are material to the business and affairs of the City and there has not been any material change in the condition, results of operation or general affairs of the City (financial or otherwise).

(n)     Except as disclosed in the Preliminary Official Statement and the Official Statement, and other than an appeal of the Bankruptcy Court Order or a motion seeking a stay of the Bankruptcy Court Order pending appeal, there is no action, suit, proceeding, inquiry or investigation at law or in equity by or before any court or public board or body pending or threatened against or affecting the City (or, the knowledge of the City, any basis therefor) (i) seeking to restrain or enjoin the sale or delivery of the DWSD Obligations, or (ii) in any manner questioning the authority of the City to issue, or the issuance or validity of, any of the DWSD Obligations or any other indebtedness of the City, or (iii) questioning the constitutionality of any statute, or the validity of any proceedings, authorizing the issuance of any of the DWSD Obligations, or (iv) questioning any of the DWSD Authorizing Documents or Act 94, or (v) questioning the validity or enforceability of the DWSD Authorizing Documents or (vi) seeking to secure a lien on the Pledged Assets or the collection of the Net Revenues, as defined in the DWSD Authorizing Documents, or other moneys, securities, funds and property pledged in the DWSD Authorizing Documents that are a source of payment on the DWSD Obligations, or (vii) contesting in any way the completeness, accuracy or fairness of the Preliminary Official Statement or the Official Statement, or (viii) which might in any material respect adversely affect the transactions contemplated herein and in the Official Statement; and no right of any member of the BOWC to his or her office is being contested;

(o)     Other than as a result of the of the City's chapter 9 bankruptcy proceedings, the City is not in breach of or in default under any existing law, court or administrative regulation,

decree, order, agreement, indenture, mortgage, lease, sublease or other instrument to which they are a party or by which they are bound, and no event has occurred or is continuing which, with the passage of time or the giving of notice, or both, would constitute a default or an event of default thereunder, except as set forth in the Preliminary Official Statement and the Official Statement and except (in each case) for such minor breaches, defaults or potential defaults or event of default, if any, which individually and in the aggregate would have no material adverse effect on the City's financial condition, operations or properties.

(p)     The City has provided the following statement to the Authority for use in the Preliminary Official Statement and the Official Statement relating to the requirements described in Rule 15c2-12 (the "Rule") promulgated by the Securities and Exchange Commission:

"*Prior Continuing Disclosure Non-Compliance by the City*

The City has entered into a number of continuing disclosure undertakings required by Rule 15c2-12 (the "Rule") promulgated by the Securities and Exchange Commission in connection with bonds previously issued by the City to finance improvements to the Sewage Disposal System. During the past five years, the City has not complied in all material respects with its obligations under such continuing disclosure undertakings, including filings of its annual financial information and updates to certain financial and operating data.

Specifically, from Fiscal Years 1996 through 2013, the City was unable to provide annual financial information within the time periods specified in the applicable agreements. The continuing disclosure undertakings entered into by the City in connection with its prior bond issuances to finance improvements to the Sewage Disposal System required filing of annual financial information within a specified time period ranging from 180 to 360 days of the City's Fiscal Year end. The audited financial statement for Fiscal Year 2009 was filed on June 4, 2010. The audited financial statement for Fiscal Year 2010 was filed on December 28, 2010. The audited financial statement for Fiscal Year 2011 was filed on January 30, 2013. The audited financial statement for Fiscal Year 2012 was filed on January 27, 2013. The audited financial statement for Fiscal Year 2013 was filed on July 29, 2014.

From Fiscal Years 1996 through 2013, the City failed to file required updates to the financial and operating data in connection with its prior bond issuances to finance improvements to the Sewage Disposal System. On July 29, 2014 the City filed updates to such financial and operating data, but such filing was incomplete in certain respects.

A failure by the City to comply with the undertakings must be reported by the City in accordance with the Rule and must be considered by any broker, dealer or municipal securities dealer

before recommending the purchase or sale in the secondary market of bonds issued by the City. Consequently, such failure may adversely affect the marketability and liquidity of bonds issued by the City and the market price thereof."

(q) Any certificate signed by an authorized officer of the City delivered to the Underwriters and the Authority shall be deemed a representation and warranty by the City to such parties as to the statements made therein.

Section 2. <u>Special Covenants</u>. The City covenants and agrees with the Underwriters and the Authority as follows:

(a) The City will provide the Underwriters with information concerning the occurrence of any event that impacts the accuracy and completeness of material representations contained in the Official Statement until the earlier of (a) 90 days from the end of the underwriting period, as defined below, or (b) the time when the Official Statement is available to any person from the Municipal Securities Rulemaking Board (the "MSRB"), but in no case less than 25 days following the "end of the underwriting period," as described in Section 6 of the Purchase Agreement. The City agrees to cooperate with the Underwriters to the extent permitted by applicable law, in amending the Official Statement if any of such information, in the reasonable opinion of the Underwriters and the Authority, requires that the Official Statement be amended in fulfillment of the Underwriters' responsibilities pursuant to Rule 15c2-12. The expense of preparation (including without limitation the fees and expenses of legal counsel, financial advisors and other experts employed by the City) of each such amendment or supplement and the expense of printing and delivery of the first [200] copies of an amendment or supplement to the Official Statement shall be paid by the City.

(b) Between the date hereof and the date of the Closing, the City will not take any action which would cause the representations and warranties contained in Section 1 to be untrue on the date of the Closing. On the date of the Closing, the City shall deliver or cause to be delivered all opinions, certificates and other documents to be delivered by it or on its behalf as provided for in the Purchase Agreement and the Local Purchase Contract and to deliver such additional certificates and other documents as the Underwriters may reasonably request to evidence performance of or compliance with the provisions of the Purchase Agreement and the DWSD Transaction Documents, all such certificates and other documents to be satisfactory in form and substance to the Underwriters.

Section 3. <u>Survival of Representations and Warranties</u>. All representations, warranties, covenants and agreements contained in this Letter of Representations or contained in certificates of officers of the City submitted pursuant hereto or pursuant to the Purchase Agreement, or the Local Purchase Contract at the dates made shall remain operative and in full force and effect regardless of any investigation made by or on behalf of the Underwriters or any other person, and shall survive (i) delivery of the Authority Bonds to the Underwriters and payments by the Underwriters therefor pursuant to the Purchase Agreement, (ii) any termination of the Purchase Agreement by the Underwriters pursuant to the provisions thereof or (iii) any failure on the part of the City by the Authority to satisfy any condition to the obligations of the Underwriters specified in the Purchase Agreement, which failure results in a refusal by the Underwriters to purchase and pay for the Authority Bonds.

Section 4. <u>Parties in Interest</u>. This Letter of Representations shall be binding upon the City and shall inure solely to the benefit of the Underwriters and the Authority and, to the extent set forth herein, officers, directors and employees of and persons controlling the Underwriters and the Authority, and their respective personal representatives, successors and assigns, and no other person or firm shall acquire or have any right under or by virtue of this Letter of Representations.

Section 5. <u>Indemnification</u>. The City agrees to indemnify and hold harmless the Underwriters, the directors, officers, employees and agents of each Underwriter and each person who controls any Underwriter within the meaning of either the Securities Act or the Exchange Act against any and all losses, claims, damages or liabilities, joint or several, to which they or any them may become subject under the Securities Act, the Exchange Act or other Federal or State statutory law or regulation, at common law or otherwise, insofar as such losses, claims, damages or liabilities arise out of or are based upon any untrue statement or alleged untrue statement of a material fact contained in the Preliminary Official Statement, the Final Official Statement (or in any amendment or supplement thereto), or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading. This indemnity agreement will be in addition to any liability which the City may otherwise have.

Promptly after receipt by an indemnified party of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party, notify the indemnifying party in writing of the commencement thereof; but the failure so to notify the indemnifying party (i) will not relieve it from liability unless and to the extent it did not otherwise learn of such action and such failure results in the forfeiture by the indemnifying party of substantial rights and defenses; and (ii) will not, in any event, relieve the indemnifying party from any obligations to any indemnified party other than the indemnification obligation. The indemnifying party shall be entitled to appoint counsel of the indemnifying party's choice at the indemnifying party's expense to represent the indemnified party in any action for which indemnification is sought provided, however, that such counsel shall be satisfactory to the indemnified party. Notwithstanding the indemnifying party's election to appoint counsel to represent the indemnified party in an action, the indemnified party shall have the right to employ separate counsel (including local counsel), and the indemnifying party shall bear the reasonable fees, costs and expenses of such separate counsel if (i) the use of counsel chosen by the indemnifying party to represent the indemnified party would present such counsel with a conflict of interest; (ii) the actual or potential defendants in, or targets of, any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there may be legal defenses available to it and/or other indemnified parties which are different from or additional to those available to the indemnifying party; (iii) the indemnifying party shall not have employed counsel satisfactory to the indemnified party to represent the indemnified party within a reasonable time after notice of the institution of such action; or (iv) the indemnifying party shall authorize the indemnified party to employ separate counsel at the expense of the indemnifying party. An indemnifying party will not, without the prior written consent of the indemnified parties, settle or compromise or consent to the entry of any judgment with respect to any pending or threatened claim, action, suit or

13-53846-swr  Doc 2373-1  Filed 12/27/14  Entered 12/27/14 20:36:47  Page 109 of 135

proceeding in respect of which indemnification or contribution may be sought hereunder (whether or not the indemnified parties are actual or potential parties to such claim or action) unless such settlement, compromise or consent includes an unconditional release of each indemnified party from all liability arising out of such claim, action, suit or proceeding.

In the event that the indemnity provided herein is unavailable or insufficient to hold harmless an indemnified party for any reason, the City and the Underwriter agree to contribute to the aggregate losses, claims, damages and liabilities (including legal or other expenses reasonably incurred in connection with investigating or defending the same) to which the City and one or more of the Underwriters may be subject in such proportion as is appropriate to reflect the relative benefits received by the City on the one hand and by the Underwriters on the other from the offering. If the allocation provided by the immediately preceding sentence is unavailable for any reason, the City and the Underwriters shall contribute in such proportion as is appropriate to reflect not only such relative benefits, but also the relative fault of the City on the one hand and of the Underwriters on the other in connection with the statements or omissions which resulted in such Losses, as well as any other relevant equitable considerations. In no case shall any Underwriter (except as may be provided in any agreement among the Underwriters relating to the offering) be responsible for any amount in excess of the purchase discount or fee applicable to the Authority Bonds purchased by such Underwriter hereunder. Benefits received by the City shall be deemed to be equal to the total net proceeds from the offering (before deducting expenses) received by it, and benefits received by the Underwriters shall be deemed to be equal to the total purchase discounts and commissions in each case set forth on the cover of the Final Official Statement. Relative fault shall be determined by reference to, among other things, whether any untrue or any alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information provided by the City on the one hand or the Underwriters on the other, the intent of the parties and their relative knowledge, information and opportunity to correct or prevent such untrue statement or omission. The City and the Underwriters agree that it would not be just and equitable if contribution were determined by pro rata allocation or any other method of allocation which does not take account of the equitable considerations referred to above. Notwithstanding the provisions of this paragraph, no person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. Each person who controls an Underwriter within the meaning of either the Securities Act or the Exchange Act and each director, officer, employee and agent of an Underwriter shall have the same rights to contribution as such Underwriter, and each person who controls the City within the meaning of either the Securities Act or the Exchange Act and each official, director, officer and employee of the City shall have the same rights to contribution as the City, subject in each case to the applicable terms and conditions of this paragraph.

Very truly yours,

CITY OF DETROIT, MICHIGAN

By: _____


DETROIT WATER AND SEWERAGE DEPARTMENT


By: _____

# EXHIBIT 2A

CHI-1940093v3

**PURCHASE CONTRACT**

**City of Detroit, County of Wayne, State of Michigan ("Issuer")**  ·  **Detroit Water and Sewerage Department**
**Water Supply System Revenue Refunding**
**Local Project Bonds**

The Michigan Finance Authority (the "Authority") a public body corporate, separate and distinct from the State of Michigan hereby offers to enter into this Purchase Contract with the Issuer which, upon the acceptance of this offer by the Issuer and ratification by the Authority, will be binding upon the Authority and the Issuer.

Upon the terms and conditions and upon the basis of the representations, warranties, and agreements set forth herein, the Authority hereby agrees to purchase from the Issuer, and the Issuer hereby agrees to sell and deliver, or cause to be assigned, to the Authority, obligations (the "Obligations") in the principal amounts, and with the maturities and interest rates as shown on Exhibit A, and with redemption provisions acceptable to the Authority. The purchase price for the Obligations shall be as set forth on Exhibit A.

The Issuer represents and warrants to, and agrees with, the Authority that (a) the Issuer has, and at time of the Closing will have, full legal right, power and authority (i) to enter into this Purchase Contract, and (ii) to sell and deliver the Obligations to the Authority or cause the Obligations to be assigned to the Authority as provided herein and in the Resolution authorizing the Obligations and the Issuer has duly authorized and approved the execution and delivery of and the performance by the Issuer of its obligations contained in this Purchase Contract; (b) the Issuer shall promptly pay its pro rata share of all transfer agent fees, trustee fees and paying agent fees of the Authority to be paid upon notification of such costs by the Authority; (c) the Issuer shall pay as and when due any rebate and/or penalty payments with respect to the Obligations required to maintain the exclusion of interest on the Obligations, or on the Authority bonds issued to provide funds to purchase the Obligations, from gross income for federal income tax purposes; (d) the Issuer will notify the Authority at least 40 days (or such lesser number of days as shall be acceptable to the Authority) prior to the effective date of any refunding, refinancing, defeasance or redemption of the Obligations; and (e) the Issuer will execute and deliver a certificate of the Issuer constituting an undertaking to provide ongoing disclosure about the Issuer for the benefit of the Authority and the holders of the Obligations and the holders of the Authority's bonds issued to provide funds to purchase the Obligations as required under paragraph (b)(5) of Rule 15c2-12 issued under the Securities Exchange Act of 1934, as amended, in form and substance satisfactory to the Authority (the "Continuing Disclosure Undertaking") and the Issuer will comply with and carry out the provisions of the Continuing Disclosure Undertaking.

*On _____, 2014, the local preclosing date, the Issuer shall make available for inspection by the Authority at the offices of Dickinson Wright PLLC, _____, Michigan, the Obligations, together with such other documents, certificates and closing opinions as the Authority shall require (the "Closing Documents"). On _____, 2014 (the "Closing Date") the Authority shall accept delivery of the Obligations and the Closing Documents and pay the purchase price for the Obligations.*

*The Authority shall have the right in its sole discretion to terminate the Authority's obligations under this Purchase Contract to purchase, to accept delivery of, and to pay for the Obligations if the Authority is unable, after reasonable effort, to sell and deliver its bonds on or prior to the Closing Date.*

This Purchase Contract shall become effective upon the execution of and the acceptance and ratification hereof by the Authority as aforesaid and shall be valid and enforceable as of the time of such acceptance and ratification.

**Michigan Finance Authority**

By: _____
    Authorized Officer

Accepted and Agreed to as of
_____, 2014

**City of Detroit,**
**County of Wayne, State of Michigan**

By: _____
    Director, Detroit Water and Sewerage Department

**Exhibit A**
**Sources and Uses of Funds**

Michigan Finance Authority
Local Government Loan Program Revenue Bonds, Series 2014D
(Detroit Water and Sewerage Department Water Supply System Revenue Refunding Local
Project Bonds)

Borrower:   City of Detroit, County of Wayne, State of Michigan

Consisting of the following local obligations:

$_____  Water Supply System Revenue Refunding Senior Lien Bonds, Series 2014A

$_____ Water Supply System Revenue Refunding Senior Lien Bonds, Series 2014B

$_____ Water Supply System Revenue Refunding Second Lien Bonds, Series 2014C

$_____ Water Supply System Revenue Refunding Second Lien Bonds, Series 2014D


Sources of Funds:
Par Amount                                                          $
Net Original Issue Premium/Discount
      Total Sources of Funds                          $

Uses of Funds:
Computation of Purchase Price:
  Deposit to [_____] Fund              $
  Deposit to Borrower's Debt Service Reserve Account    $
    **Total Purchase Price**                            $
Costs of Issuance and Additional Proceeds                   $
Underwriters' Discount
    Total Uses of Funds                                 $

# Exhibit A
# Bond Debt Service Schedule

## Michigan Finance Authority
### Local Government Loan Program Revenue Bonds, Series 2014D
### (Detroit Water and Sewerage Department Water Supply System Revenue Refunding Local Project Bonds)

$_____ Water Supply System Revenue Refunding Senior Lien Bonds, Series 2014A

| Period Ending | Principal | Coupon | Interest | Debt Service | Annual Debt Service |
|---|---|---|---|---|---|

$_____Water Supply System Revenue Refunding Senior Lien Bonds, Series 2014B

| Period Ending | Principal | Coupon | Interest | Debt Service | Annual Debt Service |
|---|---|---|---|---|---|

$_____Water Supply System Revenue Refunding Second Lien Bonds, Series 2014C

| Period Ending | Principal | Coupon | Interest | Debt Service | Annual Debt Service |
|---|---|---|---|---|---|

$_____ Water Supply System Revenue Refunding Second Lien Bonds, Series 2014D

| Period Ending | Principal | Coupon | Interest | Debt Service | Annual Debt Service |
|---|---|---|---|---|---|

LANSING 40432-39 494618v2

**EXHIBIT 2B**

CHI-1940093v3

**PURCHASE CONTRACT**

**City of Detroit, County of Wayne, State of Michigan ("Issuer")**

**Detroit Water and Sewerage Department
Sewage Disposal System Revenue and
Revenue Refunding Local Project Bonds**

The Michigan Finance Authority (the "Authority") a public body corporate, separate and distinct from the State of Michigan hereby offers to enter into this Purchase Contract with the Issuer which, upon the acceptance of this offer by the Issuer and ratification by the Authority, will be binding upon the Authority and the Issuer.

Upon the terms and conditions and upon the basis of the representations, warranties, and agreements set forth herein, the Authority hereby agrees to purchase from the Issuer, and the Issuer hereby agrees to sell and deliver, or cause to be assigned, to the Authority, obligations (the "Obligations") in the principal amounts, and with the maturities and interest rates as shown on Exhibit A, and with redemption provisions acceptable to the Authority. The purchase price for the Obligations shall be as set forth on Exhibit A.

The Issuer represents and warrants to, and agrees with, the Authority that (a) the Issuer has, and at time of the Closing will have, full legal right, power and authority (i) to enter into this Purchase Contract, and (ii) to sell and deliver the Obligations to the Authority or cause the Obligations to be assigned to the Authority as provided herein and in the Resolution authorizing the Obligations and the Issuer has duly authorized and approved the execution and delivery of and the performance by the Issuer of its obligations contained in this Purchase Contract; (b) the Issuer shall promptly pay its pro rata share of all transfer agent fees, trustee fees and paying agent fees of the Authority to be paid upon notification of such costs by the Authority; (c) the Issuer shall pay as and when due any rebate and/or penalty payments with respect to the Obligations required to maintain the exclusion of interest on the Obligations, or on the Authority bonds issued to provide funds to purchase the Obligations, from gross income for federal income tax purposes; (d) the Issuer will notify the Authority at least 40 days (or such lesser number of days as shall be acceptable to the Authority) prior to the effective date of any refunding, refinancing, defeasance or redemption of the Obligations; and (e) the Issuer will execute and deliver a certificate of the Issuer constituting an undertaking to provide ongoing disclosure about the Issuer for the benefit of the Authority and the holders of the Obligations and the holders of the Authority's bonds issued to provide funds to purchase the Obligations as required under paragraph (b)(5) of Rule 15c2-12 issued under the Securities Exchange Act of 1934, as amended, in form and substance satisfactory to the Authority (the "Continuing Disclosure Undertaking") and the Issuer will comply with and carry out the provisions of the Continuing Disclosure Undertaking.

*On _____, 2014, the local preclosing date, the Issuer shall make available for inspection by the Authority at the offices of Dickinson Wright PLLC, _____, Michigan, the Obligations, together with such other documents, certificates and closing opinions as the Authority shall require (the "Closing Documents"). On _____, 2014 (the "Closing Date") the Authority shall accept delivery of the Obligations and the Closing Documents and pay the purchase price for the Obligations.*

*The Authority shall have the right in its sole discretion to terminate the Authority's obligations under this Purchase Contract to purchase, to accept delivery of, and to pay for the Obligations if the Authority is unable, after reasonable effort, to sell and deliver its bonds on or prior to the Closing Date.*

This Purchase Contract shall become effective upon the execution of and the acceptance and ratification hereof by the Authority as aforesaid and shall be valid and enforceable as of the time of such acceptance and ratification.

**Michigan Finance Authority**

By: _____
       Authorized Officer

Accepted and Agreed to as of
_____, 2014

**City of Detroit,
County of Wayne, State of Michigan**

By: _____
       Director, Detroit Water and Sewerage Department

**Exhibit A**
**Sources and Uses of Funds**

Michigan Finance Authority
Local Government Loan Program Revenue Bonds, Series 2014C
(Detroit Water and Sewerage Department Sewage Disposal System Revenue and Revenue
Refunding Local Project Bonds)

Borrower:    City of Detroit, County of Wayne, State of Michigan

Consisting of:

$_____ Sewage Disposal System Revenue Senior Lien Bonds, Series 2014A


$_____ Sewage Disposal System Revenue Senior Lien Bonds, Series 2014B


$_____ Sewage Disposal System Revenue Refunding Senior Lien Bonds, Series 2014C

$_____ Sewage Disposal System Revenue Refunding Senior Lien Bonds, Series 2014D

$_____ Sewage Disposal System Revenue Refunding Second Lien Bonds, Series 2014E

$_____ Sewage Disposal System Revenue Refunding Second Lien Bonds, Series 2014F

<u>Sources of Funds:</u>

Par Amount                                                            $

Net Original Issue Premium/Discount

        Total Sources of Funds                              <u>$</u>


<u>Uses of Funds:</u>

Computation of Purchase Price:

  Deposit to [_____] Fund                  $

  Deposit to Borrower's Debt Service Reserve Account       $

        **Total Purchase Price**                   $

Costs of Issuance and Additional Proceeds                             $

Underwriters' Discount

        Total Uses of Funds                                <u>$</u>

**Exhibit A**
**Bond Debt Service Schedule**

Michigan Finance Authority
Local Government Loan Program Revenue Bonds, Series 2014C
(Detroit Water and Sewerage Department Sewage Disposal System Revenue and Revenue
Refunding Local Project Bonds)

$_____ Sewage Disposal System Revenue Senior Lien Bonds, Series 2014A

| Period Ending | Principal | Coupon | Interest | Debt Service | Annual Debt Service |
|---|---|---|---|---|---|

$_____ Sewage Disposal System Revenue Senior Lien Bonds, Series 2014B

| Period Ending | Principal | Coupon | Interest | Debt Service | Annual Debt Service |
|---|---|---|---|---|---|

$_____ Sewage Disposal System Revenue Refunding Senior Lien Bonds, Series 2014C

| Period Ending | Principal | Coupon | Interest | Debt Service | Annual Debt Service |
|---|---|---|---|---|---|

$_____ Sewage Disposal System Revenue Refunding Senior Lien Bonds, Series 2014D

| Period Ending | Principal | Coupon | Interest | Debt Service | Annual Debt Service |
|---|---|---|---|---|---|

$_____ Sewage Disposal System Revenue Refunding Second Lien Bonds, Series 2014E

| Period Ending | Principal | Coupon | Interest | Debt Service | Annual Debt Service |
|---|---|---|---|---|---|

$_____ Sewage Disposal System Revenue Refunding Second Lien Bonds, Series 2014F

| Period Ending | Principal | Coupon | Interest | Debt Service | Annual Debt Service |
|---|---|---|---|---|---|

LANSING 40432-39 493428v2

# **EXHIBIT 3A**

CHI-1940093v3

**BOND PURCHASE AND SUPPLEMENTAL AGREEMENT**

among

**MICHIGAN FINANCE AUTHORITY**

and

**DETROIT WATER AND SEWERAGE DEPARMENT**

and

**CITIBANK, N.A.**

and

**[OTHER BANKS TBD]**

Relating to

**Local Government Loan Program Revenue Bonds, Series 2014\_\_\_\_
(Detroit Water and Sewerage Department Local Project Bonds)**

Dated August \_\_, 2014

TABLE OF CONTENTS

Page

ARTICLE I<br>DEFINITIONS

| | | |
|---|---|---|
| Section 1.01. | Definitions | 2 |
| Section 1.02. | Incorporation of Certain Definitions by Reference | 13 |
| Section 1.03. | Accounting Matters | 14 |
| Section 1.04. | Computation of Time Periods | 14 |
| Section 1.05. | New York City Time Presumption | 14 |
| Section 1.06. | Relation to Other Documents | 14 |
| Section 1.07. | Interpretation | 14 |

ARTICLE II<br>PURCHASE OF BONDS; PAYMENT AND REIMBURSEMENT OBLIGATIONS

| | | |
|---|---|---|
| Section 2.01. | Purchase of Bonds | 15 |
| Section 2.02. | Payment of Bonds | 15 |
| Section 2.03. | Optional Redemption; Mandatory Redemption | 15 |
| Section 2.04. | Payments Generally | 15 |
| Section 2.05. | Costs, Expenses and Taxes | 16 |
| Section 2.06. | Change in Law | 17 |
| Section 2.07. | Cure | 19 |
| Section 2.08. | Payment of Interest and Other Amounts | 19 |

ARTICLE III<br>CONDITIONS PRECEDENT

| | | |
|---|---|---|
| Section 3.01. | Documentary and Related Closing Conditions | 20 |
| Section 3.02. | Credit Requirements | 29 |
| Section 3.03. | Additional Conditions Precedent | 29 |

ARTICLE IV<br>REPRESENTATIONS AND WARRANTIES

| | | |
|---|---|---|
| Section 4.01. | Due Organization; Power and Authority | 30 |
| Section 4.02. | Authorization and Validity of Agreement, Related Documents and Borrowing | 30 |
| Section 4.03. | Compliance of Agreement, Related Documents with Applicable Law, Organizational Documents, Etc | 30 |
| Section 4.04. | Governmental Approvals | 30 |
| Section 4.05. | Compliance with Law | 31 |
| Section 4.06. | Litigation | 31 |
| Section 4.07. | Absence of Defaults and Events of Default | 31 |
| Section 4.08. | Accuracy and Completeness of Information | 31 |
| Section 4.09. | Sovereign Immunity | 32 |
| Section 4.10. | Incorporation of Representations and Warranties | 32 |
| Section 4.11. | Bonds | 32 |
| Section 4.12. | Interest | 32 |
| Section 4.13. | Investment Company Act | 32 |

| | | |
|---|---|---|
| Section 4.14. | Federal Reserve Board Regulations | 32 |
| Section 4.15. | No Proposed Legal Changes | 32 |
| Section 4.16. | Anti-Terrorism Representation | 33 |
| Section 4.17. | Valid Lien | 34 |
| Section 4.18. | Obligations; Other Debt | 34 |
| Section 4.19. | Solvency | 34 |
| Section 4.20. | Indenture a Contract | 34 |
| Section 4.21. | Due Organization; Power and Authority | 34 |
| Section 4.22. | Authorization and Validity of Agreement, Related Documents and Borrowing | 35 |
| Section 4.23. | Compliance of Agreement, Related Documents with Applicable Law, Organizational Documents, Etc | 35 |
| Section 4.24. | Governmental Approvals | 35 |
| Section 4.25. | Compliance with Law | 36 |
| Section 4.26. | Litigation | 36 |
| Section 4.27. | Absence of Defaults and Events of Default | 36 |
| Section 4.28. | Accuracy and Completeness of Information | 36 |
| Section 4.29. | Sovereign Immunity | 37 |
| Section 4.30. | Incorporation of Representations and Warranties | 37 |
| Section 4.31. | DWSD Obligations | 37 |
| Section 4.32. | Interest | 37 |
| Section 4.33. | Investment Company Act | 37 |
| Section 4.34. | Federal Reserve Board Regulations | 37 |
| Section 4.35. | No Proposed Legal Changes | 37 |
| Section 4.36. | Anti-Terrorism Representation | 38 |
| Section 4.37. | Valid Lien | 38 |
| Section 4.38. | Obligations; Other Debt | 39 |
| Section 4.39. | Solvency | 39 |
| Section 4.40. | DWSD Trust Indenture a Contract | 39 |

ARTICLE V
AFFIRMATIVE COVENANTS

| | | |
|---|---|---|
| Section 5.01. | Compliance With Laws and Regulations | 40 |
| Section 5.02. | Reporting Requirements | 40 |
| Section 5.03. | Notices | 40 |
| Section 5.04. | Further Assurances | 41 |
| Section 5.05. | Right of Entry; Communication with Accountant | 42 |
| Section 5.06. | Payment of Obligations | 42 |
| Section 5.07. | Incorporation of Covenants | 42 |
| Section 5.08. | Disclosure to Assignees and Participants | 43 |
| Section 5.09. | Maintenance of Existence | 43 |
| Section 5.10. | Use of Proceeds | 43 |
| Section 5.11. | Parity Creditors and Covenants | 43 |
| Section 5.12. | CUSIP Numbers | 44 |
| Section 5.13. | DWSD Financial Information | 44 |
| Section 5.14. | Compliance With Laws and Regulations | 44 |
| Section 5.15. | Reporting Requirements | 44 |

Section 5.16.    Notices ........................................................................................ 45
Section 5.17.    Further Assurances ...................................................................... 46
Section 5.18.    Right of Entry; Communication with Accountant ........................ 47
Section 5.19.    Payment of Obligations ................................................................ 47
Section 5.20.    Incorporation of Covenants ......................................................... 47
Section 5.21.    Disclosure to Assignees and Participants .................................... 48
Section 5.22.    Maintenance of Existence ............................................................ 48
Section 5.23.    Use of Proceeds ........................................................................... 48
Section 5.24.    Parity Creditors and Covenants ................................................... 48

## ARTICLE VI

## NEGATIVE COVENANTS AND COVENANTS

Section 6.01.    Amendments ................................................................................. 48
Section 6.02.    Preservation of Existence, Etc ..................................................... 49
Section 6.03.    Certain Information ...................................................................... 49
Section 6.04.    Trustee .......................................................................................... 49
Section 6.05.    Accounting Methods; Fiscal Year; Entity Classification .............. 49
Section 6.06.    Exempt Status .............................................................................. 49
Section 6.07.    Defeasance ................................................................................... 49
Section 6.08.    Investment of Funds ..................................................................... 50
Section 6.09.    Hedge Agreements ........................................................................ 50
Section 6.10.    Investment Policy ......................................................................... 50
Section 6.11.    Additional Parity Debt. ................................................................ 50
Section 6.12.    Amendments ................................................................................. 50
Section 6.13.    Preservation of Existence, Etc ..................................................... 50
Section 6.14.    Certain Information ...................................................................... 51
Section 6.15.    DWSD Trustee .............................................................................. 51
Section 6.16.    Accounting Methods; Fiscal Year; Entity Classification .............. 51
Section 6.17.    Exempt Status .............................................................................. 51
Section 6.18.    Defeasance ................................................................................... 51
Section 6.19.    Investment of Funds ..................................................................... 51
Section 6.20.    Hedge Agreements ........................................................................ 51
Section 6.21.    Additional Parity Debt ................................................................. 51

## ARTICLE VII
## EVENTS OF DEFAULT

Section 7.01.    Events of Default .......................................................................... 52
Section 7.02.    Rights and Remedies; Consequences of an Event of Default ....... 55
Section 7.03.    Remedies Cumulative; Solely for the Benefit of Banks ............... 56
Section 7.04.    Waivers or Omissions ................................................................... 56
Section 7.05.    Discontinuance of Proceedings .................................................... 56
Section 7.06.    Injunctive Relief ........................................................................... 57

## ARTICLE VIII
## NATURE OF OBLIGATIONS; INDEMNIFICATION

Section 8.01.    Obligations Absolute ......................................................... 57
Section 8.02.    Continuing Obligation ........................................................ 58
Section 8.03.    Liability of the Banks ......................................................... 58
Section 8.04.    Indemnification; Taxes, Etc ............................................... 58
Section 8.05.    Limited Obligations ........................................................... 60

## ARTICLE IX

Section 9.01.    Assignment of Rights to the Banks .................................... 61
Section 9.02.    Right of Setoff .................................................................. 61
Section 9.03.    Amendments and Waivers; Remedies Cumulative ............... 61
Section 9.04.    Notices .............................................................................. 61
Section 9.05.    Severability ....................................................................... 63
Section 9.06.    GOVERNING LAW ............................................................ 63
Section 9.07.    Headings ............................................................................ 64
Section 9.08.    Successors and Assigns ...................................................... 64
Section 9.09.    Counterparts; Complete and Controlling Agreement ........... 65
Section 9.10.    Waiver of Rule of Construction .......................................... 66
Section 9.11.    WAIVER OF JURY TRIAL ............................................... 66
Section 9.12.    Payments Set Aside ........................................................... 66
Section 9.13.    Usury ................................................................................ 66
Section 9.14.    Electronic Signature; Electronically Signed Document ........ 67
Section 9.15.    No Advisory or Fiduciary Responsibility ............................ 67

# BOND PURCHASE AND SUPPLEMENTAL AGREEMENT

This **BOND PURCHASE AND SUPPLEMENTAL AGREEMENT** (the "Agreement") dated August __, 2014, is among the **MICHIGAN FINANCE AUTHORITY**, a public body corporate and politic existing under the laws of the State of Michigan (the "Authority"), [the **CITY OF DETROIT, MICHIGAN**,] the **DETROIT WATER AND SEWERAGE DEPARTMENT**, a public body corporate and politic existing under the laws of the State of Michigan ("DWSD") and **CITIBANK, N.A.**, a national banking association organized under the laws of the United States of America, [and OTHER BANKS, TBD] (collectively, the "Banks").

W I T N E S S E T H :

**WHEREAS**, pursuant to the provisions of Resolution 1989-15, as amended and supplemented, (the "1989 Resolution") the Michigan Municipal Bond Authority (the "MMBA") established the Local Government Loan Program for the purpose of making loans to governmental units as defined in Act 227, Public Acts of Michigan, 1985, as amended ("Act 227"); and

**WHEREAS**, the MMBA pursuant to Supplemental Resolution No. 2007-07, amended the 1989 Resolution to provide for the use of Supplemental Indentures as a means of amending the 1989 Resolution and further provided that Supplemental Indentures shall be treated the same as Supplemental Resolutions under the terms of the 1989 Resolution; and

**WHEREAS,** the Authority has been established by Executive Order 2010-2 issued by the Governor on March 4, 2010, and effective by its terms on May 30, 2010, as supplemented, as successor to the MMBA; and

**WHEREAS**, the City, upon authorization from the Board of Water Commissioners and the emergency manager for the City ("Emergency Manager"), is issuing its [$_____ City of Detroit, Michigan, Detroit Water and Sewerage Department Water Supply System Revenue Refunding Senior Lien Bonds, Series 2014__ (the "DWSD Senior Lien Refunding Obligations"), and its $_____ City of Detroit, Michigan, Detroit Water and Sewerage Department Water Supply System Revenue Refunding Second Lien Bonds, Series 2014____ (the "DWSD Second Lien Refunding Obligations" and, together with the DWSD Senior Lien Refunding Obligations, the "DWSD Obligations")pursuant to (i) the provisions of Act 94, Public Acts of Michigan, 1933, as amended ("Act 94"), (ii) Ordinance No. 30-02, as amended and restated, adopted by the City Council of Detroit on January 26, 2005 (the "Bond Ordinance"), (iii) the Orders of the United States District Court in *United States v. City of Detroit, et al*., 77-71100, E.D. Michigan, (iv) the Resolution and Ordinance Authorizing the Issuance and Sale of Water Supply System Revenue Refunding Senior Lien Bonds of the City of Detroit and of Water Supply System Revenue Refunding Second Lien Bonds of the City of Detroit, adopted by the Board of Water Commissioners on August 13, 2014 and approved by the emergency manager of the City (the "Emergency Manager") on August 16, 2014 (the "DWSD Bond Resolution"), (v) a Trust Indenture by and among the City, the DWSD and U.S. Bank National Association, as trustee (the "DWSD Trustee") dated as of February 1, 2013 (the