"DWSD Trust Indenture"), (vi) a Sale Order of the Director of the Department dated August [__], 2014 and approved by the Emergency Manager on August [__], 2014 (the "Sale Order" and, collectively with the Bond Ordinance, the DWSD Bond Resolution and the DWSD Indenture, the "DWSD Authorizing Documents"); and

WHEREAS, in order to purchase the DWSD Obligations, the Authority has agreed to issue its Local Government Loan Program Revenue Bonds, Series 2014____ (Detroit Water and Sewerage Department Local Project Bonds) (the "Bonds") in the aggregate principal amount of $___,___,___, pursuant to [the Indenture dated August __, 2014 (the "Indenture"),] the Amended and Restated Resolution Establishing Michigan Finance Authority Local Government Loan Program and Providing for the Issuance of Local Government Program Revenue Bonds, adopted by the Authority on May 15, 2014 (the "General Resolution") and a Supplemental Resolution adopted by the Authority on August 12, 2014 (the "Supplemental Resolution", and together with the General Resolution, the "Authority Bond Resolution"); and

WHEREAS, the Banks have agreed to purchase the Bonds in order to provide proceeds to the Authority for the purchase of the DWSD Obligations and, as a condition to such purchase, the Banks require the Authority, the City and the DWSD to enter into this Agreement and to agree to perform the covenants and obligations stated herein; and

WHEREAS, Wilmington Trust, National Association has been appointed to act as Trustee, Depository and Bond Registrar and Paying Agent under the Supplemental Resolution with respect to the Series 2014____ Bonds and, pursuant to the Authority Bond Resolution, the Authority will pledge and assign to the Trustee, for the benefit of the Series 2014____ Bonds, (i) all of the Authority's rights and interest in the DWSD Obligations and the Collateral Documents (as defined in the Authority Bond Resolution) pertaining to the DWSD Obligations, subject to reservation by the Authority of rights to indemnification and to make all determinations and approvals and receive all notices accorded to it under the DWSD Obligations, (ii) all moneys in the Revenue Fund established for the Series 2014____ Bonds under the Authority Bond Resolution (the "Revenue Fund"), and (iii) all of the proceeds of the foregoing, including without limitation investments thereof and interest and earnings thereon,

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, including the covenants, terms and conditions hereinafter contained, and to induce the Banks to purchase the Bonds, the Banks, the Authority, the City and the DWSD agree as follows:

## ARTICLE I

## DEFINITIONS

**Section 1.01. Definitions**.  In addition to terms defined at other places in this Agreement, the following defined terms are used throughout this Agreement with the following meanings:

"*Accountant*" means an independent certified public accountant or a firm of independent certified public accountants, selected by the Authority and satisfactory to the Banks.

13-53846-tjt Doc 8752-2 Filed 12/12/14 Entered 12/12/14 07:05:67 Page 106 of 35
13-53846-swr Doc 7624-3 Filed 09/29/14 Entered 09/29/14 18:56:47 Page 265 of 45
311

"*Act 94*" has the meaning assigned to such term in the recitals to this Agreement.

"*Act 227*" has the meaning assigned to such term in the recitals to this Agreement.

"*Affiliate*" means, with respect to any Person, any other Person directly or indirectly controlling or controlled by or under common control with such Person. For purposes of this definition, "control" (including "controlled by" and "under common control with"), when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting rights, membership, the power to appoint members, trustees or directors, by contract or otherwise. Without limiting the foregoing, the definition of "*Affiliate*" of any Person shall include any subsidiary of such Person.

"*Agreement*" means this Bond Purchase and Supplemental Agreement, including such amendments, modifications or supplements permitted pursuant to the terms hereof

"*Applicable Law(s)*" means, collectively, the Constitutions of the United States and the State, all applicable common law and principles of equity and all international, foreign, federal, state and local laws, statutes, treaties, codes, acts, rules, regulations, guidelines, ordinances, resolutions, orders, judgments, decrees, injunctions, and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all administrative orders, directed duties, requests, licenses, certificates, authorizations and permits of, and agreements with, any Governmental Authority, and, with respect to any Person, the articles of incorporation, bylaws or other organizational or governing documents of such Person, in each case whether or not having the force of law, that are applicable now or are applicable at any time hereafter to (a) the Authority, (b) the City, (c) the DWSD or (d) any assets, property, operations or facilities of the Authority, the City or the DWSD, as the case may be or (e) the Transactions.

"*Authority*" means the Michigan Finance Authority, an autonomous public body corporate and politic, separate and distinct from the State of Michigan, created and existing under Executive Order 2010-2 issued by the Governor of the State of Michigan on March 4, 2010, and its successors and assigns permitted hereunder.

"*Authority Bond Resolution*" has the meaning assigned to such term in the recitals to this Agreement.

"*Authority Tax Agreement*" means the Non-Arbitrage and Tax Compliance Certificate of the Authority.

"*Authorized Denominations*" has the meaning assigned to such term in the Authority Bond Resolution.

"*Authorized Officer*" shall have the meaning assigned in the Authority Bond Resolution; provided, however, that in each case for which a certification or other statement of fact or condition is required to be submitted by an Authorized Officer pursuant to the terms of this Agreement, such certificate or statement shall be executed only by an Authorized Officer in a position to know or to obtain knowledge of the facts or conditions that are the subject of such

3

13-53846-tjt Doc 8752-2 Filed 12/06/24 Entered 12/06/24 07:05:67 Page 2 of 35
13-53846-swr Doc 6763 Filed 08/26/14 Entered 08/26/14 19:56:47 Page 6 of 105
311

certificate or statement.  Any document or certificate hereunder that is executed by an Authorized Officer shall be deemed to have been authorized by all necessary action by the Authority.

"*Banks*" means the Holder of the Bonds, provided that there is a single Holder of all of the Bonds and provided further that the Bonds are not then held under the Book-Entry System. If there is more than one Holder of the Bonds, "Banks" means Holders owning a majority of the aggregate principal amount of the Bonds then Outstanding, and "Bank" shall refer to each such Holder individually.  If the Bonds are then held under the Book-Entry System, "Banks" means the Beneficial Owner of the Bonds, provided that there is a single Beneficial Owner of all of the Bonds.  If there is more than one Beneficial Owner of the Bonds, "Banks" means Beneficial Owners who are the beneficial owners of a majority of the aggregate principal amount of the Bonds then Outstanding.  The initial Banks are Citibank, N.A. [and OTHER BANKS TBD] and upon receipt by the Authority and the Trustee of a notice described in Section 9.08(a), the "Banks" shall mean the Person identified in such notice as the Banks.

"*Bankruptcy Code*" means the United States Bankruptcy Code, Title 11 of the United States Code, as amended, or any successor act or code.

"*Bankruptcy Order*" has the meaning assigned to such term in Section 3.01(n) hereof.

"*Beneficial Owner*" means the Person in whose name a Bond is recorded as beneficial owner of such Bond by the Securities Depository or a Participant or an Indirect Participant on the records of such Securities Depository, Participant or Indirect Participant, as the case may be, or such Person's subrogee.

"*Bonds*" has the meaning assigned to such term in the recitals to this Agreement.

"*Bonds Authorizing Act*" means, collectively, Act 94, Act 227 and Executive Order 2010-2.

"*Business Day*" has the meaning assigned to such term in the Indenture.

"*Capital Lease Obligations*" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"*City*" means the City of Detroit[ and/or the Board of Water Commissioners and/or the Emergency Manager, as the context requires].

"*Closing Date*" means August __, 2014, or such later date on which this Agreement is fully executed and delivered.

"*Code*" means the Internal Revenue Code of 1986, as amended, or any successor provision or provisions thereto or any successor Federal tax code, and any regulations (including

4

13-53846-tjt  Doc 8752-3  Filed 12/16/14  Entered 12/16/14 07:05:47  Page 3 of 135
13-53846-swr  Doc 7692-3  Filed 09/23/14  Entered 09/23/14 19:56:47  Page 3 of 135
311

temporary and proposed regulations relating to the matters governed by this Agreement) thereunder or under any such provision or successor Federal tax code.

"*Contract*" means any indenture, contract, mortgage, deed of trust, guaranty, note or agreement (other than this Agreement), other contractual restriction, lease, instrument, certificate of incorporation, charter or by-law.

"*Counsel*" means an attorney duly admitted to practice law before the highest court of any state.

"*Debt*" means with respect to any Person, all items that would be classified as a liability in accordance with GAAP, including, without limitation, (a) indebtedness or liability for borrowed money including amounts drawn under a letter of credit or other credit facility, or amounts advanced under a commercial paper program, or for the deferred purchase price of property or services (including trade obligations); (b) all Capital Lease Obligations of such Person; (c) current liabilities in respect of unfunded benefits under employee benefit, retirement or pension plans; (d) obligations issued for the account of any other Person; (e) all obligations arising under acceptance facilities; (f) all Guarantees and other contingent obligations to purchase, to provide funds for payment, to supply funds to invest in any other Person or otherwise to assure a creditor against loss; (g) obligations secured by full faith and credit or by any mortgage, lien, pledge, security interest or other charge or encumbrance on property, whether or not the obligations have been assumed; (h) all unfunded amounts under a loan agreement, letter of credit, or other credit facility for which such Person would be liable, if such amounts were advanced under the credit facility; (i) obligations of such Person under Hedge Agreements; and (j) all amounts required to be paid by such Person as a guaranteed payment to partners or members or as a preferred or special dividend, including any mandatory redemption of shares or interests; and, in each case, whether such Person is liable contingently or otherwise, as obligor, guarantor or otherwise, or in respect of which obligations such Person otherwise assures a creditor against loss.

"*Debtor Relief Laws*" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws and regulations of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"*Default*" means the occurrence of any event or the existence of any condition which constitutes an Event of Default or the occurrence of any event or the existence of any condition which with the giving of notice, the passage of time, or both, would constitute an Event of Default.

"*Default Rate*" means a per annum rate of interest equal to [_____] percent (____%).

"*Determination Counsel*" means a firm of attorneys of nationally-recognized standing in matters pertaining to the validity of and tax-exempt nature of interest on bonds and other debt instruments issued by states and their political subdivisions, designated by the Authority and acceptable to the Banks in their sole and absolute discretion.

["*Determination of Taxability*" means a determination that the interest payable on the DWSD Obligations or the Bonds does not qualify as interest which is excludable from gross income of the recipient thereof for federal income tax purposes under Section 103 of the Code ("Exempt Interest") for any reason, which determination shall be deemed to have been made upon the first to occur of any of the following:

(a) the date on which (i) the Internal Revenue issues a proposed or final determination of taxability, a Notice of Proposed Issue (IRS Form 5701 TEB), a notice of deficiency or similar notice, or any other notice, determination or decision, in each case, to the effect that the interest payable on the DWSD Obligations or the Bonds or any portion thereof does not qualify as Exempt Interest, or (ii) a court of competent jurisdiction has rendered any final ruling or decision to the effect that the interest payable on the DWSD Obligations or the Bonds or any portion thereof does not qualify as Exempt Interest;

(b) the date when the Authority, the City or the DWSD files any statement, supplemental statement, or other tax schedule, return or document, which is in any respect inconsistent with interest payable on the Bonds or the DWSD Obligations, as applicable, or any portion thereof continuing to qualify as Exempt Interest;

(c) the date of any sale, lease or other deliberate action within the meaning of Treas. Reg. § 1.141-2(d), if prior to such action the Authority, the City, the DWSD and the Banks have not received an unqualified opinion of Determination Counsel to the effect that such action will not cause interest on the Bonds or the DWSD Obligations, as the case may be, to become includable in the gross income of the recipient for federal income tax purposes; or

(d) (i) the date that circumstances relating to the Authority, the City or the DWSD [or the Improvements (as defined in the _____) or any portion thereof] have occurred or changed, or any federal tax law or regulation, or any public or private final ruling, technical advice memorandum or any other written communication by the Internal Revenue Service is adopted or issued, or any final ruling or decision of a court of competent jurisdiction is rendered or any other set of circumstances has occurred, in any such case, which may adversely affect the excludability of the Exempt Interest from the gross income of the recipient for federal income tax purposes; and thereafter (ii) Determination Counsel is notified by the Banks in writing, with a copy to the Authority, the City and the DWSD, or by the Authority, the City or the DWSD, with a copy to the other parties hereto, that Determination Counsel is requested to deliver an updated approving tax-exempt opinion in form and substance acceptable to the Banks in their sole discretion ("Approving Opinion") during the 45-day period after receipt of the request and is assured as to the payment of its fees and expenses for such services; and (iii) within 45 days after such notice has been received by Determination Counsel, either (A) the Banks, the City, the DWSD and the Authority have received written communication from Determination Counsel to the effect that, based upon an analysis of the facts and applicable law, it is unable to render an updated Approving Opinion, or (B) Determination Counsel has not delivered an Approving Opinion.]

"*DWSD*" means the Detroit Water and Sewerage Department established under the City Charter.

"*DWSD Authorizing Documents*" has the meaning assigned to such term in the recitals to this Agreement.

"*DWSD Obligations*" has the meaning assigned to such term in the recitals to this Agreement.

"*DWSD Resolution*" means, collectively, the DSWD Bond Resolution, the execution and delivery by the City and the DWSD of this Agreement and the other Related Documents to which it is a party, and related matters.

"*DWSD Tax Agreement*" means the Non-Arbitrage and Tax Compliance Certificate of the DWSD.

"*DWSD Trustee*" has the meaning assigned to such term in the recitals to this Agreement.

"*DWSD Trust Indenture*" has the meaning assigned to such term in the recitals to this Agreement.

"*Emergency Manager*" means the Emergency Manager of the City, appointed under the Local Financial Stability and Choice Act, 2012 PA 436, MCL §§ 141.1541 et seq.

"*Emergency Manager Orders*" means Order Nos. \_\_\_\_ and \_\_\_\_ of the Emergency Manager dated _____ \_\_, 2014, approving certain agreements relating to the DWSD.

"*EMMA*" has the meaning assigned to such term in Section 5.02.

"*Event of Default*," in relation to this Agreement, shall have the meaning assigned to such term in Article VII, and in relation to any Related Document, shall have the meaning set forth therein.

"*Event of Insolvency*" means, with respect to any Person, the occurrence of one or more of the following events:

      (a)     the issuance, under the laws of any state or under the laws of the United States of America, of an order of rehabilitation, liquidation or dissolution of such Person;

      (b)     the commencement by or against such Person of a case or other proceeding (and in the case of the commencement against such Person, there occurs the entry of an order for relief or the appointment of a trustee, receiver, liquidator, custodian or other official for such Person, or such case or proceeding is not dismissed within sixty (60) days of such commencement) seeking liquidation, reorganization or other relief with respect to the such Person or its debts under any bankruptcy, insolvency or other similar state or federal law now or hereafter in effect, including, without limitation, the appointment of a trustee, receiver, liquidator, custodian or other similar official for such Person or any substantial part of its property or there shall be appointed or designated with respect to it, an entity such as an organization, board, commission, authority, agency or body to monitor, review, oversee, recommend or declare a financial emergency or

7

13-53846-tjt Doc 8702-1 Filed 12/16/14 Entered 12/16/14 10:55:47 Page 6 of 135
13-53846-swr Doc 8702-1 Filed 12/16/14 Entered 12/16/14 10:55:47 Page 6 of 135
311

similar state of financial distress with respect to it or there shall be declared or introduced or proposed for consideration by it or by any legislative or regulatory body with competent jurisdiction over it, the existence of a state of financial emergency or similar state of financial distress in respect of it;

(c)     the making of an assignment for the benefit of creditors by such Person;

(d)     the failure of such Person to generally pay its debts as they become due;

(e)     a debt moratorium, debt adjustment, debt restructuring or comparable restriction with respect to the payment of any Debt of such Person is declared or imposed by such Person or by any Governmental Authority having jurisdiction over such Person;

(f)     such Person shall admit in writing its inability to pay its debts when due or shall become insolvent within the meaning of Section 101(32) of the United States Bankruptcy Code (or any equivalent provision of any successor act or code); or

(g)     a case, proceeding or other action is commenced against such Person seeking issuance of a warrant or writ of attachment, execution, restraint or similar process against all or any substantial part of its assets, which results in the entry of an order for any such relief which is not vacated or discharged, or stayed or bonded pending appeal, within sixty (60) days from the entry thereof; or

(h)     the initiation of any actions to authorize, consent or acquiesce to any of the foregoing by or on behalf of such Person.

"*Excess Interest Amount*" has the meaning assigned to such term in Section 2.08.

"*Fiscal Year*" means, as applicable, the fiscal year of the Authority ending on September 30 of each calendar year, or the fiscal year of the DWSD ending on June 30 of each calendar year.

"*Fitch*" means Fitch, Inc., or any successor thereto.

"*GAAP*" means accounting principles generally accepted and consistently applied to governmental entities in the United States, as set forth in the opinions and pronouncements of the Accounting Principles Board, the American Institute of Certified Public Accountants, the Financial Accounting Standards Board and the Governmental Accounting Standards Board or in such other statements by such other entity as may be in general use by significant segments of the accounting profession as in effect on the date hereof.

"*Governmental Approvals*" means an authorization, consent, approval, permit, license, certificate of occupancy or an exemption of, a registration or filing with, or a report to, any Governmental Authority.

"*Governmental Authority*" means any national, supra-national, state or local government (whether domestic or foreign), any political subdivision thereof or any other governmental, quasi-governmental, judicial, administrative, public or statutory instrumentality, authority, body,

board, agency, department, commission, bureau, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory, fiscal, monetary or administrative powers or functions of or pertaining to government, or any arbitrator, mediator or other Person with authority to bind a party at law.

"*Guarantee*" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Debt or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Debt or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Debt or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Debt or obligation; provided, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

"*Hedge Agreement*" means any rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option, total return swap, credit default swap or any other similar transaction (including any option with respect to any of these transactions) and any other agreement or option involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions.

"*Holders*" means the Person or Persons who shall be the registered owner of any Bond, initially, Citibank, N.A.

"*Initial Purchasers*" means Citibank, N.A., and [OTHER BANKS, TBD.]

[*"Indenture"* has the meaning assigned to such term in the recitals to this Agreement.]

[*"Indirect Participant"* means _____.]

[*"Investment Policy*" means the Michigan Finance Authority – Investment Policy, dated March 1, 2011.]

"*Interest Payment Date*" has the meaning assigned to such term in the Indenture.

[*"Interest Rate"* means the LIBOR-based rate defined in the Authority Bond Resolution and/or Indenture.]

13-53846-tjt Doc 8752-1 Filed 12/06/14 Entered 12/06/14 20:35:47 Page 8 of 135
311

"*Issue Date*" means the date on which the Bonds are delivered to the purchaser or purchasers thereof upon original issuance.

"*Lien*" on or with respect to any asset means any mortgage, deed of trust, lien, pledge, charge, security interest, hypothecation, assignment, deposit arrangement or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected or effective under applicable law, as well as the interest of a vendor or lessor under any conditional sale agreement, capital or finance lease or other title retention agreement relating to such asset and, in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"*Margin Stock*" has the meaning assigned to that term in Regulation U promulgated by the Board of Directors of the Federal Reserve System, as now and hereafter from time to time in effect.

"*Material Adverse Change*" means the occurrence of any event or change which, in the sole reasonable discretion of the Banks, results in a material and adverse change in the Security or which in the sole reasonable discretion of the Banks materially and adversely affects (a) the enforceability of the Bonds Authorizing Act, the Bonds, the DWSD Obligations, this Agreement or any of the other Related Documents, (b) the ability of the Authority, the City or the DWSD to perform its obligations hereunder or under any of the Related Documents or (c) the Security, the rights of, or benefits or remedies available to, the Banks under the Indenture, this Agreement or the other Related Documents.

"*Material Adverse Effect*" means (a) a materially adverse effect upon the Security, (b) with respect to this Agreement or any of the other Related Documents or any of the Authority's obligations arising under this Agreement or any of the other Related Documents, an adverse effect upon the binding nature, validity or enforceability of such agreement or obligation, (c) an adverse effect on the exclusion of interest with respect to the Bonds or the DWSD Obligations from gross income for purposes of federal income taxation or the exemption of such interest from State personal income taxes or (d) a materially adverse effect (i) on the authority or ability of the Authority, the City or the DWSD to perform any of its respective obligations under any Related Document or the ability of the Authority, the City or the DWSD to complete the Transactions or (ii) on the rights or remedies of the Banks hereunder or under the other Related Documents or on the pledge of the Security under the Related Documents or on the priority of the Liens created thereby.

"*Material Litigation*" means any actions, suits, proceedings, inquiries or investigations against a Person or any property of the Person in any court or before any arbitrator of any kind or before or by any other Governmental Authority, (i) wherein an unfavorable decision, ruling or finding could have a Material Adverse Effect, (ii) which seek to restrain or enjoin any of the Transactions, or (iii) which may adversely affect (A) the status of the Person as a public body corporate and politic of the State, created and validly existing under the laws of the State, (B) the exclusion of interest on the Bonds or the DWSD Obligations from gross income for federal income tax purposes, (C) the validity, binding effect and perfection of the pledge of and lien on the Security or (D) the ability of the Person to perform its obligations under this Agreement, the Indenture or any other Related Document.

13-53846-tjt Doc 8752-2 Filed 12/02/14 Entered 12/02/14 17:25:47 Page 9 of 135
13-53846-swr Doc 6763-1 Filed 08/12/14 Entered 08/12/14 19:56:47 Page 10 of 135
311

"*Maximum Lawful Rate*" means the respective maximum, non-usurious, lawful rate of interest that may be contracted for, charged or received in connection with the Required Payments under this Agreement, under Applicable Law presently in effect or, to the extent permitted by law, under Applicable Law that may hereafter be in effect and that allows a higher maximum and non-usurious rate of interest than Applicable Law now allows.

"*Moody's*" means Moody's Investors Service, Inc., or any successor thereto.

"*Obligor Rating*" means any rating by a Rating Agency on any Parity Debt that is not guaranteed by any other Person or subject to any third-party credit enhancement.

"*Other Payment Obligations*" means any payment obligations due to the Banks or other Owners of the Bonds under this Agreement described in clause (b) of the definition of "*Required Payments*".

"*Other Taxes*" means any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, the Bonds or this Agreement.

"*Outstanding*" has the meaning assigned to such term in the Authority Bond Resolution.

"*Owners*" means, collectively, the Holders or Beneficial Owners of the Bonds and "Owner" means any Holder or Beneficial Owner of the Bonds.

"*Participant*" has the meaning assigned to such term in Section 9.08(c).

"*Parity Debt*" means any Debt now or hereafter issued and Outstanding by or on behalf of the Authority or the DWSD, which is equally and ratably payable from and secured by a pledge of and lien upon the Security [on a parity with or senior to that of the Bonds or the DWSD Obligations].

"*Parity Holder*" means the holder of any Parity Debt.

"*Permitted Investments*" (i) with respect to the Authority, has the meaning assigned to the term "Eligible Investments" in the Authority Bond Resolution, and (ii) with respect to the DWSD, has the meaning assigned to the term "Permitted Investments" in the DWSD Indenture.

"*Person*" means an individual, a corporation, a partnership, an association, a joint venture, a trust, a business trust, a limited liability company or any other entity or organization, including a governmental or political subdivision or an agency or instrumentality thereof.

"*Rating Agency*" means S&P, Moody's, Fitch or any successor or additional rating agency that rates the Bonds or other Parity Debt at the written request of the Authority with the written consent of the Banks.

"*Redemption Price*" means, for any redemption of the Bonds under the Indenture, 100% of the principal amount redeemed or purchased, together with all accrued and unpaid interest thereon.

"*Related Documents*" means, collectively, this Agreement, the Authority Bond Resolution, the Bonds, [the Indenture], the DWSD Resolution, the DWSD Obligations, the DWSD Trust Indenture, the Bankruptcy Order, the Emergency Manager Orders and any exhibits, instruments or agreements relating thereto, as the same may be amended from time to time in accordance with their respective terms and the terms hereof.

"*Required Payments*" means all present and future debts, obligations and liabilities of the Authority to the Banks and any other Holders or Beneficial Owners arising pursuant to, or on account of, the provisions of this Agreement, the Bonds or any of the other Related Documents to which the Authority is a party (or to the Trustee, for the benefit of any of the foregoing Persons), including the obligations: (a) to pay all principal, interest, late charges, Redemption Price, (in each case, as applicable) and other amounts due at any time under the Bonds in accordance with the provisions of the Authority Bond Resolution and Article II of this Agreement; and (b) to pay all other amounts, charges, costs, fees (including reasonable attorneys' fees), expenses, indemnification payments, fees and other amounts due and payable by the Authority at any time under any of the Related Documents whether in the form of a direct, reimbursement, or indemnity payment obligation, and including all payment obligations of the Authority to the Banks, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against the Authority or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, together with interest thereon as provided in the applicable Related Document.

"*Revenues*" means the Net Revenues of the Sewage Disposal System and amounts available in certain funds and accounts established in accordance with the DWSD Bond Ordinance, all as defined in [the DWSD Authorizing Documents].

"*S&P*" means Standard and Poor's Ratings Services, a Standard & Poor's Financial Services LLC business, or any successor thereto.

"*Section (a)(i) Proposed Determination of Taxability*" means any Determination of Taxability described under (a)(i) of the definition thereof which is a proposed and not final notice, determination or decision.

"*Securities Depository*" means The Depository Trust Company or such other securities depository which may be designated by the Authority pursuant to the Indenture, subject to the consent of the Banks, not to be unreasonably withheld.

"*Security*" means (a) the DWSD Obligations purchased by the Authority in an amount to fully secure the Bonds (b) the Trust Estate held under the DWSD Trust Indenture, (c) funds and accounts held to secure the Bonds pursuant to the Authority Bond Resolution and (d) all agreements and rights of the Authority respecting the DWSD Obligations.

13-53846-tjt Doc 6783-1 Filed 08/12/14 Entered 08/12/14 20:35:47 Page 14 of 135

"*Solvent*" means, with respect to any Person on a particular date, that on such date (a) the fair value of the property of such Person is greater than the total amount of Debts and liabilities, including contingent, subordinated, unmatured and unliquidated Debts and liabilities, of such Person; (b) the present fair salable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its Debts and liabilities as they become absolute and matured; (c) such Person does not intend to, and does not believe that it will, incur Debts or liabilities beyond such Person's ability to pay as such Debts and liabilities mature; and (d) such Person is not engaged in a business or transaction, and is not about to engage in a business or transaction, for which such Person's property would constitute an unreasonably small capital. The amount of contingent Debts or liabilities (such as litigation) at any time shall be computed as the amount that, in light of all the facts and circumstances existing at the time, represents the amount that can be reasonably be expected to become an actual or matured liability.

"*State*" means the State of Michigan.

["*Taxable Date*" means the date as of which interest on the Bonds is first includable in the gross income of the Owner, including, without limitation, any previous Owner thereof as determined pursuant to a Determination of Taxability.]

"*Taxes*" has the meaning assigned to such term in Section 2.05(b).

"*To the best knowledge of*" (or any similar knowledge qualifier) means, when modifying a representation, warranty or other statement of any Person, that the fact or situation described therein is known by the Person (or, in the case of a Person other than a natural Person, known by an authorized representative of such Person) making the representation, warranty or other statement, after such inquiry as the Person deems appropriate, and taking into account the responsibilities of the office the Person holds.

"*Transactions*" means the issuance, offering and sale of the Bonds, the execution and delivery by the Authority, the City and the DWSD of this Agreement and the other Related Documents, the performance by the Authority, the City and the DWSD of their respective obligations (including payment obligations) hereunder and thereunder, the purchase by the Banks of the Bonds and the use by the Authority of the proceeds of the Bonds, the purchase by the Authority of the DWSD Obligations and the use by the DWSD of the proceeds of the DWSD Obligations and the other transactions contemplated hereby and thereby.

"*Trustee*" means Wilmington Trust, National Association or its permitted successor as trustee under the Authority Bond Resolution.

["*Verification Report*" means _____.]

"*Written*" or "*in writing*" means any form of written communication, a communication by means of facsimile device and as described in Section 9.14.

**Section 1.02. Incorporation of Certain Definitions by Reference**. Each capitalized term used herein and not otherwise defined herein shall have the meaning provided therefor in

the Authority Bond Resolution and the Bonds, as applicable, unless the context requires otherwise.

**Section 1.03.  Accounting Matters**.  All accounting terms used herein without definition shall be interpreted in accordance with GAAP, and except as otherwise expressly provided herein all accounting determinations required to be made pursuant to this Agreement shall be made in accordance with GAAP.

**Section 1.04.  Computation of Time Periods**.  In this Agreement, in the computation of a period of time from a specified date to a later specified date, unless otherwise specified herein, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding."

**Section 1.05.  New York City Time Presumption**.  All references herein to times of the day shall be presumed to refer to New York City time unless otherwise specified.

**Section 1.06.  Relation to Other Documents**.  Nothing in this Agreement shall be deemed to amend, or relieve the Authority of any of its obligations under, any Related Document.  To the extent that the Authority undertakes in any provision of this Agreement representations, covenants or obligations which conflict with, or are more exacting than, a provision of any other Related Document to which the Authority is a party, such provisions of this Agreement shall control for all purposes of this Agreement.

**Section 1.07.  Interpretation**.  All words used herein shall be construed to be of such gender as the circumstances require.  Unless the context of this Agreement otherwise clearly requires, references to the plural include the singular, the singular includes the plural and the part includes the whole.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless otherwise specified (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth in such document or herein), (b) any reference herein to any Person shall be construed to include such Person's permitted successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not be limited to any particular provision of this Agreement, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and, when used in connection with any Person, to refer to all rights, title and interests of such Person in and to any and all property whether real, personal or mixed, or tangible or intangible, and wherever situated, including cash, securities, investment property, accounts, land, buildings, general intangibles, chattel, intellectual property, contract rights and other property and assets.

13-53846-swr   Doc 8273-3   Filed 12/12/14   Entered 12/12/14 20:35:47   Page 13 of 105

## ARTICLE II

## PURCHASE OF BONDS; PAYMENT AND REIMBURSEMENT OBLIGATIONS

**Section 2.01.      Purchase of Bonds**.  Upon and subject to the conditions precedent and the terms and conditions provided herein and based on the representations, warranties and covenants of the Authority set forth in the Related Documents and herein, the Banks hereby agree to purchase from the Authority, and the Authority agrees to sell to the Banks, all, but not less than all, of the Bonds at an aggregate purchase price of $___,___,___.  The Bonds are to be dated the date of delivery thereof, and are to mature, be subject to redemption prior to maturity and bear interest as set forth in the Authority Bond Resolution.

**Section 2.02.  Payment of Bonds**.  The Authority shall make prompt and full payment of all payment obligations owed to the Banks under the Bonds and the Related Documents and will pay any other Required Payments owing to the Banks whether now existing or hereafter arising, irrespective of their nature, whether direct or indirect, absolute or contingent, with interest thereon at the rate or rates provided in, and at the times specified in, this Agreement and the Bonds.

**Section 2.03.  Optional Redemption; Mandatory Redemption**.  In connection with any optional or mandatory redemption of all or any portion of the Bonds, the Authority shall pay to the Banks the Redemption Price in accordance with the provisions of the Authority Bond Resolution and the Bonds.

**Section 2.04.  Payments Generally**.

(a)      All Required Payments to be made by the DWSD or the Authority or on behalf of either the DWSD or the Authority to the Banks hereunder or under any of the other Related Documents shall be fully earned when due and nonrefundable when paid and made in lawful currency of the United States of America and in immediately available funds.  All such amounts, unless otherwise directed by the Banks in writing (and in the case of principal and interest on the Bonds, subject to and in accordance with the procedures of DTC, as applicable), shall be paid by wire transfer to the Bank's account at [Citibank, New York, ABA # 021-000-089, Credit to Account No. 4058-0089; Ref:_____], (or to such other account of the Banks as each Bank may specify by written notice to the Authority or the Trustee, as applicable) not later than 3:30 p.m. New York, New York time, on the date payment is due.  Any payment received by the Banks after 3:30 p.m., New York, New York time, shall be deemed to have been received by the Banks on the next Business Day.  If any payment hereunder is due on a day that is not a Business Day, then such payment shall be due on the next succeeding Business Day, and, in the case of the computation of the interest or fees hereunder, such extension of time shall, in such case, be included in the computation of the payment due hereunder.

(b)      If at any time insufficient funds are received by and available to the Banks to pay fully all amounts of principal, interest and Other Payment Obligations

then due under the Bonds or hereunder, such funds shall be applied first, to payment of that portion of the Required Payments constituting accrued and unpaid interest on the Bonds or other amount unpaid hereunder (and, in any such case, first to past due interest and second to current interest), second, to payment of that portion of the Required Payments constituting unpaid principal of the Bonds and third to payment of any unpaid Other Payment Obligations.

**Section 2.05.  Costs, Expenses and Taxes**.

(a)     The DWSD agrees to pay on demand all reasonable costs and expenses incurred by the Banks and their Counsel in connection with the preparation, negotiation, execution and delivery of this Agreement, the other Related Documents and any other documents and certificates which may be delivered in connection with this Agreement and the other Related Documents, including, without limitation, the reasonable fees, expenses and disbursements of Counsel for the Banks.  In addition, the DWSD shall pay or cause to be paid on demand, upon not less than ten (10) days prior written notice to the DWSD, the necessary and reasonable out-of-pocket expenses and disbursements of the Banks and the necessary and reasonable fees, expenses and disbursements of Counsel to the Banks in connection with (a) the administration of this Agreement including any waiver or consent under this Agreement or any other Related Document or other document or certificate delivered in connection with the Transactions or any amendment or requested amendment hereof or thereof (whether or not the transactions contemplated thereby shall be consummated) or any Default or alleged Default hereunder, (b) the preparation, execution, delivery, administration and enforcement or preservation of rights in connection with a workout, refinancing, restructuring or waiver with respect to this Agreement, or any of the other Related Documents and (c) the occurrence of an Event of Default and collection and other enforcement proceedings resulting therefrom.

(b)     Any and all payments to the Banks by or on behalf of the Authority or the DWSD hereunder shall be made free and clear of, and without deduction for, any and all taxes, levies, imposts, deductions, charges or withholdings imposed, including but not limited to as a result of a change in, law, rule, treaty, or regulation, or any policy, guideline, or directive of, or any change in the interpretation, implementation, or administration thereof by, any Governmental Authority, and all liabilities with respect thereto, excluding only taxes imposed on or measured by the net income or capital of the Banks by any jurisdiction or any political subdivision or taxing authority thereof or therein solely as a result of a connection between the Banks and such jurisdiction or political subdivision, other than a connection resulting solely from executing, delivering or performing its obligations or receiving a payment under, or enforcing, this Agreement (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities being hereinafter referred to as "Taxes").  If the Authority or the DWSD is required by law to withhold or deduct any sum from payments required under this Agreement, the Authority or the DWSD shall, to the maximum extent permitted by Applicable Law, increase the amount paid by it to the Banks so that, after all withholdings and deductions, the

13-53846-swr   Doc 6708-3   Filed 08/12/14   Entered 08/12/14 17:35:47   Page 150 of 135

amount received by the Banks shall equal the amount the Banks would have received without any such withholding or deduction.

(c)     In addition, the DWSD shall pay or cause to be paid on demand, upon not less than ten (10) days prior written notice to the DWSD, any present or future stamp, recording, or Other Taxes and fees payable or determined to be payable under Applicable Law in connection with the execution, delivery, filing and recording of this Agreement, the other Related Documents and such other documents and certificates as are referred to in clause (a) above and agrees to defend, indemnify and hold the Banks harmless from and against any and all liabilities with respect to or resulting from any failure to pay, or any delay in paying, such taxes and fees.

(d)     The DWSD shall pay the reasonable fees, costs and expenses of the Trustee incurred in connection with this Agreement and the performance of its obligations hereunder, upon notice of the amounts incurred, given to the DWSD in accordance with Section 9.04.

**Section 2.06.  Change in Law**.

(a)     If any Bank or any other Owner shall have determined that the adoption or implementation of, or any change in, any law, rule, treaty, regulation, policy, guideline, supervisory standard or directive of, or any change in the interpretation, implementation, or administration thereof by, any Governmental Authority (in each case, subsequent to the Closing Date and whether or not having the force of law), or compliance by such Bank or any Other Owner with any request by or directive of any Governmental Authority (in each case, subsequent to the Closing Date and whether or not having the force of law), including but not limited to any such changes to any law, rule, regulation, policy, guideline, standard, directive, interpretation or application implementing, invoking or in any way related to any provision (as now or hereafter amended) of the Dodd-Frank Wall Street Reform and Consumer Protection Act (or any other statute referred to therein or amended thereby) or any rules, guidelines, standards, policies, regulations, or directives promulgated by the Basel Committee on Banking Supervision or the Bank for International Settlements (BIS) (or any successor or similar organizations), shall (i) change the basis of taxation of payments to such Bank or such Participant of any amounts payable hereunder (except for taxes on the overall net income of such Bank or such other Owner), (ii) impose, modify or deem applicable any reserve, liquidity, special deposit, insurance premium, fee, financial charge, monetary burden or similar requirement in connection with complying with any term of this Agreement, or against assets held by, or deposits with or for the account of, such Bank or such other Owner or (iii) impose on such Bank or such other Owner any other condition, expense or cost regarding this Agreement, and the result of any event referred to in clause (i), (ii) or (iii) above shall be to increase the cost to such Bank or such other Owner of complying with any term of this Agreement or to reduce the amount of any sum received or receivable by the Banks or such other Owner hereunder, then, upon receipt of supported documentation from such Bank, the DWSD shall pay to each affected Bank for its own account, or for the account of such other Owner, as

17

applicable, such additional amount or amounts as will compensate such Bank or such other Owner for such increased costs or reductions in amount.

(b)     If any Bank or any other Owner shall have determined that the adoption or implementation of, or any change in, any law, rule, treaty, regulation, policy, guideline, supervisory standard or directive of, or any change in the interpretation, implementation, or administration thereof by, any Governmental Authority (in each case, subsequent to the Closing Date and whether or not having the force of law), or compliance by such Bank or any other Owner with any request by or directive of any Governmental Authority (in each case, subsequent to the Closing Date and whether or not having the force of law), including but not limited to any changes to any such law, rule, regulation, policy, guideline, standard, directive, interpretation or application implementing, invoking or in any way related to any provision (as now or hereafter amended) of the Dodd-Frank Wall Street Reform and Consumer Protection Act (or any other statute referred to therein or amended thereby) or any rules, guidelines, standards, or directives promulgated by the Basel Committee on Banking Supervision or the Bank for International Settlements (BIS) (or any successor or similar organizations), shall impose, modify or deem applicable any capital (including but not limited to contingent capital) adequacy, reserve, insurance, liquidity or similar requirement (including, without limitation, a request or requirement that affects the manner in which such Bank or any other Owner allocates capital resources or reserves to its commitments) that either (i) affects or would affect the amount of capital or reserves to be maintained by such Bank or such other Owner in connection with this Agreement or (ii) reduces or would reduce the rate of return on the affected Bank's or such other Owner's capital or reserves to a level below that which such Bank or such other Owner could have achieved but for such circumstances (taking into consideration the policies of such Bank or such other Owner with respect to capital adequacy or the maintenance of reserves) then, upon receipt of supported documentation from the affected Bank, the DWSD shall pay to such Bank for its own account, or for the account of such other Owner, as applicable, such additional amount or amounts as will compensate such Bank or such other Owner for such event.

(c)     All payments of amounts referred to in clauses (a) and (b) above shall be paid by the DWSD to the Banks or other Owners, as applicable, within ten Business Days of such demand. A certificate as to such increased cost, increased capital or reserves or reduction in return incurred by the Banks or any other Owner as a result of any event mentioned in clause (a) or (b) of this subsection setting forth, in reasonable detail, the basis for calculation and the amount of such calculation shall be submitted by the Banks to the DWSD simultaneously with such demand for payment and shall be conclusive as to the amount thereof absent manifest error. In making the determinations contemplated by the above-referenced certificate, the Banks or such other Owner may make such reasonable estimates, assumptions, allocations and the like that the Banks or other Owner in good faith determines to be appropriate. Other Owners entitled to the benefits of clauses (a) and (b) above shall be limited to benefits that would have been received by the Initial Purchaser.

(d)     The obligations of the DWSD under this Section shall survive the termination of this Agreement.

**Section 2.07.  Cure**.  The DWSD agrees to pay to the Banks on demand, any amounts advanced by or on behalf of the Banks, to the extent required to cure any Default or Event of Default under this Agreement or any Related Document.  The Banks shall give the DWSD and the Authority reasonably prompt notice of any such advances.  The Banks shall have the right, but not the obligation, to cure any such Default or Event of Default.

**Section 2.08.  Payment of Interest and Other Amounts**.

(a) The amount of interest required to be paid on any Interest Payment Date shall be due and payable by the Authority on such date at the Interest Rate, in accordance with the following provisions:

(i)     If the amount of interest required to be paid on any Interest Payment Date calculated in accordance with the terms hereof (together with any fees, charges, and other amounts which are treated as interest on amounts owing hereunder under Applicable Law (collectively, the "Charges")) exceeds the amount of interest that would have been payable for the applicable period had interest for such period been calculated at the Maximum Lawful Rate, then the required interest for such period (together with any Charges payable with respect thereto) shall be payable in an amount of interest calculated on the basis of the Maximum Lawful Rate.

(ii)     Any interest or Charges that would have been due and payable under any provision hereof but for the operation of subparagraph (i) immediately above, shall accrue and be payable as provided in this subparagraph (ii) and shall constitute, less interest actually paid to the Banks on such Interest Payment Date, the "Excess Interest Amount."  If there is any accrued and unpaid Excess Interest Amount as of any Interest Payment Date, then, on the current and each subsequent Interest Payment Date, interest shall be paid at the Maximum Lawful Rate rather than the otherwise applicable rate until the earliest of (x) payment to the Banks of the entire accrued Excess Interest Amount or (y) the date on which no principal amount hereunder remains unpaid.

(iii)     Notwithstanding the foregoing, all unpaid Excess Interest Amount shall be, to the fullest extent permitted by Applicable Law, due and payable by the Authority as a fee on the date on which no principal amount hereunder remains unpaid.

(b)     (i)     From and after the Taxable Date, the Bonds shall bear interest at the Default Rate.  In addition to the foregoing, (A) in the event of the occurrence of a Determination of Taxability other than a Section (a)(i) Proposed Determination of Taxability, the Authority shall pay to the Banks and any other Owner, as applicable, a tax gross-up within thirty (30) days after such occurrence by paying the amount to the Banks (or such other Owner), calculated based on the

19

outstanding principal amount of the Bonds for such period, by which (x) the Default Rate multiplied by the principal amount of the Bonds exceeds (y) the Interest Rate actually paid on the Bonds multiplied by the principal amount of the Bonds, for the period from the Taxable Date until the date the Authority begins paying current interest on the Bonds at the Default Rate, and (B) in the event of the occurrence of any Determination of Taxability, the Authority hereby agrees to pay to the Banks and any other Owner, as applicable, on demand therefor an amount equal to any interest, penalties or charges owed by the Banks and such other Owner as a result of interest on the Bonds becoming includable in the gross income of the Banks or such other Owner, together with any and all attorneys' fees, court costs, or other out of pocket costs incurred by the Banks or such other Owner in connection therewith.

(ii)     The obligations of the Authority under this Section 2.08 shall survive the termination of this Agreement and the redemption or other payment in full of the Bonds.

# ARTICLE III

## CONDITIONS PRECEDENT

**Section 3.01.  Documentary and Related Closing Conditions.**  As conditions precedent to the purchase of the Bonds by the Banks, the Banks shall have received the following items on or before the Closing Date, each in form and substance satisfactory to the Banks and its counsel and the Authority shall satisfy the Banks that the following conditions have been fulfilled:

(a)     *Issuance of Bonds*.  All conditions to the issuance of the Bonds shall have been satisfied and the Authority shall have duly executed, issued and delivered the Bonds, in form and substance satisfactory to the Banks, to the Trustee and the Trustee shall have duly authenticated and registered the Bonds in the principal amount of $___,___,___ and delivered the Bonds to the Banks.  All conditions to the issuance of the DWSD Obligations shall have been satisfied and the DWSD shall have duly executed, issued and delivered the DWSD Obligations, in form and substance satisfactory to the Banks, to the Trustee and the Trustee shall have duly authenticated and registered the DWSD Obligations in the principal amount of $___,___,___ and delivered the DWSD Obligations to the Authority.

(b)     *Agreement and Related Documents*.  The Authority and the Trustee shall have duly authorized the execution, delivery and performance of, and the Authority and the Trustee shall have duly executed and delivered the Indenture, and (in the case of the Authority) this Agreement and each of this Agreement and the Indenture is in full force and effect, and each of the other Related Documents shall have been duly authorized, executed and delivered by the respective parties thereto and shall be in full force and effect.  The Banks shall have received (i) an executed counterpart of this Agreement, duly executed by the Authority and (ii) executed originals (or, when the Banks are not a party thereto, copies thereof) of the other Related Documents and of each other agreement, document, instrument or certificate

20

required to be delivered by any Person pursuant to the Related Documents; and each of the foregoing shall be in form and substance satisfactory to the Banks, shall have been duly authorized, executed and delivered by each of the respective parties thereto, shall not have been modified, amended or rescinded, and shall be in full force and effect on and as of the Issue Date (and certified as of the Issue Date by the Authority if executed and delivered prior to the Issue Date).

(c) *Incumbency of Authority.* The Banks shall have received (i) an incumbency certificate of the Executive Director of the Authority certifying as to the name and true signature of the Authorized Officer authorized to execute this Agreement, the other Related Documents and any other document or certificate to be delivered by the Authority hereunder or under the other Related Documents and (ii) a certified copy of the Executive Order 2010-2 issued by the Governor of the State of Michigan on March 4, 2010, and certified copies of the Statutes, and organizational documents of the Authority. The Banks shall have received (i) an incumbency certificate of the Executive Director of the DWSD certifying as to the name and true signature of the representative(s) of DWSD authorized to execute this Agreement, the other Related Documents and any other document or certificate to be delivered by the Authority hereunder or under the other Related Documents and (ii) certified copies of the Statutes, and organizational documents of the DWSD.

(d) *Authority Resolution and Certificates.* (i) The Authority shall have duly adopted the Supplemental Resolution authorizing the issuance and delivery of the Bonds, the execution, delivery and performance by the Authority of this Agreement and each of the other Related Documents to which the Authority is a party and approving each such Related Document and the transactions contemplated hereby and thereby, (ii) the Banks shall have received a certificate of the Authority, in form and substance satisfactory to the Banks, executed by an Authorized Officer and dated the Issue Date, (A) to the effect that all actions required to be taken by, and all resolutions required to be adopted under Applicable Law by the Authority in connection with the authorization of the execution, delivery and performance of and under the Related Documents have been done and adopted and (B) attaching a copy of the General Resolution certified by an Authorized Officer as (x) being in full force and effect on the Issue Date, (y) not having been amended or supplemented through the Issue Date, and (z) being the only resolution adopted by the Authority relating to the issuance of the Bonds and the execution, delivery and performance by the Authority of this Agreement and each of the other Related Documents to which the Authority is a party or the transactions contemplated hereby and thereby, and (iii) the Banks shall have received a certificate or certificates of the Authority dated the date of the Closing, signed on behalf of the Authority by an authorized officer to the effect that to the best knowledge of the signer, after such inquiry as the signer deems appropriate, and taking into account the responsibilities of the office which the signer holds, and on behalf of the Authority and not in any individual capacity, the signer certifies: (A) the truthfulness in all material respects on and as of the date of Closing of all representations and warranties of the Authority contained in this Agreement; (B) the compliance by the Authority with all agreements and satisfaction of all conditions to be complied with or satisfied at or prior to the Closing; (C) since

21

the respective dates as of which information is given in the Official Statement, and except as set forth therein, there having been no material adverse change in the condition, financial or otherwise, of the Authority, (D) the Preliminary Official Statement and the Official Statement, as of their dates and as of the Closing, does not contain any untrue statements of a material fact or omit to state a material fact that is necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading (other than under the City and DWSD Portion), and (E) no litigation or other judicial proceedings have been served upon the Authority or threatened (either in State courts or in federal courts in Michigan) (w) restraining or enjoining or seeking to restrain or enjoin the issuance, sale, execution or delivery of any of the Bonds, or (x) in any way questioning or affecting the validity of any provision of the Bonds, or (y) in any way questioning or affecting the validity of any of the proceedings or the authority for the authorization, issuance, sale, execution or delivery of any of the Bonds, or the pledge or application of any money or security provided for the payment of any of the Bonds, or (z) questioning or affecting the organization or existence of the Authority or the right of any member of the Authority to their respective offices..

(e)     *DWSD Resolution and Certificates.*  (i) The City and the DWSD shall have duly adopted the DWSD Bond Resolution authorizing the issuance and delivery of the DWSD Obligations, the execution, delivery and performance by the City and the DWSD of this Agreement and each of the other Related Documents to which the City and the DWSD is a party and approving each such Related Document and the transactions contemplated hereby and thereby, (ii) the Banks shall have received a certificate of the City and the DWSD, in form and substance satisfactory to the Banks, executed by an authorized representative of the City and the DWSD and dated the Issue Date, (A) to the effect that all actions required to be taken by, and all resolutions required to be adopted under Applicable Law by the City and the DWSD in connection with the authorization of the execution, delivery and performance of and under the Related Documents have been done and adopted and (B) attaching a copy of the DWSD Bond Resolution certified by an authorized representative of the City and the DWSD as (x) being in full force and effect on the Issue Date, (y) not having been amended or supplemented through the Issue Date, and (z) being the only resolution adopted by the City and the DWSD relating to the issuance of the DWSD Obligations and the execution, delivery and performance by the City and the DWSD of this Agreement and each of the other Related Documents to which the City and the DWSD is a party or the transactions contemplated hereby and thereby, and (iii) A certificate or certificates of the DWSD dated the date of the Closing, signed on behalf of the DWSD by an authorized officer to the effect that to the best knowledge of the signer, after such inquiry as the signer deems appropriate, and taking into account the responsibilities of the office which the signer holds, and on behalf of the DWSD and not in any individual capacity, the signer certifies: (A) the truthfulness in all material respects on and as of the date of Closing of all representations and warranties of the DWSD contained in this Agreement; (B) the compliance by the DWSD with all agreements and satisfaction of all conditions to be complied with or satisfied at or prior to the Closing; (C) the conformity of the DWSD Obligations in all material respects to the description thereof in the DWSD

Resolution and the Official Statement; (D) since the respective dates as of which information is given in the Official Statement, and except as set forth therein, there having been no material adverse change in the condition, financial or otherwise, of the DWSD, (E) the Preliminary Official Statement and the Official Statement, as of their dates and as of the Closing, does not contain any untrue statements of a material fact or omit to state a material fact that is necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading (other than under the Authority Portion), and (F) no litigation or other judicial proceedings have been served upon the DWSD or threatened (either in State courts or in federal courts in Michigan) (w) restraining or enjoining or seeking to restrain or enjoin the issuance, sale, execution or delivery of any of the DWSD Obligations, or (x) in any way questioning or affecting the validity of any provision of the DWSD Obligations, or (y) in any way questioning or affecting the validity of any of the proceedings or the authority for the authorization, issuance, sale, execution or delivery of any of the DWSD Obligations, or the pledge or application of any money or security provided for the payment of any of the DWSD Obligations, or (z) questioning or affecting the organization or existence of the DWSD or the right of any member of the DWSD to their respective offices.

(f)    *Opinions*.  The Banks shall have received the following opinions, either addressed to the Banks or accompanied by a letter addressed to the Banks from the counsel rendering such opinion stating that the Banks is entitled to rely upon such opinion as if such opinion were addressed to it:

(i)    the opinion of (A) Dickinson Wright PLLC, bond counsel ("Authority Bond Counsel"), as to the validity and tax-exempt status of the Bonds and (B) Dykema Gossett PLLC, bond counsel for the DWSD Obligations ("DWSD Bond Counsel"), as to the validity and tax-exempt status of the DWSD Obligations, each dated the Issue Date and each in form and substance acceptable to the Banks, and such other opinions or supplemental opinions, which shall expressly include this Agreement within the scope of the matters opined upon and shall opine on such securities law matters as the Banks may request;

(ii)    written opinions of the Attorney General of the State and Authority Bond Counsel, dated the Issue Date and in form and substance acceptable to the Banks, opining (A) as to the due authorization, execution and delivery of this Agreement, and the other Related Documents to which the Authority is a party and (B) that this Agreement, and the other Related Documents to which the Authority is a party constitute the legal, valid and binding obligations thereof, enforceable in accordance with their respective terms (subject, as to enforceability, to applicable bankruptcy, moratorium, insolvency or similar laws affecting the rights of creditors generally and to general principles of equity), and (C) that (1) all conditions precedent to the issuance and delivery of the Bonds shall have occurred, the Authority Bond Resolution is in full force and effect and the Bonds will be entitled to the benefits of the Authority Bond Resolution and (2) all actions, filings or conditions necessary to create a valid pledge of, and security interest in, the Security created by the Authority Bond Resolution and the Bonds

23

Authorizing Act in favor of the Trustee for the benefit of the Owners to secure the payment of the Bonds and the performance by the Authority of its other obligations under the Authority Bond Resolution and in favor of the Banks to secure the Required Payments, have been taken, filed and accomplished and that such pledge is on a parity with the pledge securing any other Parity Debt, and (D) the Authority's execution and delivery of and compliance with the terms and conditions of, and the carrying out of the transactions contemplated by, the Resolutions and this Agreement do not and will not conflict with, or constitute on the part of the Authority a breach or a default under, any agreement or other instrument known to them to which the Authority is subject or by which it is or may be bound or violate any decree or order known to them or any law, rule or regulation to which the Authority is subject or by which it is bound that, in all cases, would have an adverse effect on the Bonds, and (E) the statements in the Official Statement under the captions ["INTRODUCTION," "THE MICHIGAN FINANCE AUTHORITY, "THE MICHIGAN FINANCE AUTHORITY'S LOCAL GOVERNMENT LOAN PROGRAM," "THE SERIES 2014C BONDS" (except the subsection "Book-Entry-Only System"), "SECURITY AND SOURCES OF PAYMENT FOR THE SERIES 2014C BONDS, "TAX MATTERS," "LITIGATION" (as to supplemental opinion of Attorney General only), "LEGALITY OF SERIES 2014C BONDS FOR INVESTMENT AND DEPOSIT," "STATE NOT LIABLE ON SERIES 2014C BONDS," "CONTINUING DISCLOSURE UNDERTAKING" (as it relates to the Authority), and the statements in Appendices _____,] insofar as such statements summarize the language and effect of the Resolutions, the Bonds, the Continuing Disclosure Undertaking of the Authority and the Constitution and the laws of the State and the United States, are fair and accurate summaries thereof in all material respects, and (F) with respect to such other matters relating to this Agreement, the Indenture, the Bonds or any of the other Related Documents or the proceedings of the Authority, as the Banks may reasonably request;

(iii)    a Memorandum of Law with legal conclusions from the DWSD Bond Counsel addressing whether the Bonds Authorizing Act constitutes a contract between the State and the holders of the DWSD Obligations that cannot be retroactively revoked or modified;

(iv)    opinion or opinions of the DWSD Bond Counsel, the Authority Bond Counsel, [Jones Day, Miller Canfield or the City's Corporation Counsel], as appropriate, or other counsel acceptable to the Banks to the following effect, all acceptable in form and substance to the Bank:

(A)    due organization and valid existence; due authorization, execution and delivery of the Related Documents by all parties thereto and the documents being legal, valid, binding and enforceable obligations of the City, the DWSD and the Authority, as applicable;

(B)    the City has enacted all ordinances and local laws, if any, relating to the imposition of and use of the Revenues necessary to comply

24

with the DWSD Authorizing Documents in order to permit all of the Revenues to be collected and pledged to secure the DWSD Obligations;

(C) all consents and approvals necessary to execute and deliver the Related Documents have been obtained by the DWSD, the Authority and the City, as applicable;

(D) no defaults in other contracts or statutes, rules or regulations of the DWSD or the Authority, and the City's and the DWSD's execution and delivery of and compliance with the terms and conditions of, and the carrying out of the transactions contemplated by, this Agreement and the DWSD Transaction Documents do not and will not conflict with, or constitute on the part of the City or the DWSD a breach of or a default under, any agreement or other instrument known to them to which the City is subject or by which it is or may be bound or violate any decree or order known to them or any law, rule or regulation to which the City is subject or by which it is bound that, in all cases, would have an adverse effect on the DWSD Obligations;

(E) no litigation relating to the establishment of the DWSD or the collection, pledge or application of the Revenues;

(F) the statements in the Official Statement in the [under sections "_____" and Appendices _____], insofar as such statements summarize the language and effect of the DWSD Authorizing Documents, the Continuing Disclosure Undertaking of the City and the laws of the State and the United States, are fair and accurate summaries thereof in all material respects;

(G) the validity of the trust and the Liens;

(H) (i) to the extent the DWSD owns the Revenues, the Revenues are subject to [a first security interest or Lien in favor of the Authority and the DWSD has granted a first priority security interest in the Security securing the DWSD Obligations] and (ii) the Authority has granted [a first priority security interest in the Security in favor of the Trustee for the benefit of Holders of the Bonds to secure the Bonds];

(I) the DWSD is a "municipality" and the Revenues paid and to be paid to the Authority or the Trustee under the DWSD Trust Indenture (and subsequently paid to Banks as holders of the Bonds) are pledged "special revenues" within the meaning of § 902 of the Bankruptcy Code, are entitled to the protections afforded "special revenues" under Chapter 9 of the Bankruptcy Code; and

(J) nothing has come to their attention that would lead them to believe that the Official Statement, as of its date and as of Closing (other than financial statements, other financial, statistical or quantitative

25

information, projections or estimates, and opinions of other counsel, as to all of which no opinion is expressed) contains any untrue statement of a material fact or omits to state a material fact that is necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

(v)     At the discretion of the Banks, either (A) an opinion from counsel acceptable to the Banks, or (B) a certificate from an authorized officer of the City, the DWSD or the Authority to the effect that the Bankruptcy Order is in full force and effect, is not subject to a stay and has not been modified, reversed or vacated;

(vi)     An opinion of counsel for the Trustee and the DWSD Trustee, which counsel shall be satisfactory to the Banks, as to the following: (i) due authorization, execution and delivery of the Indenture and the DWSD Trust Indenture, (ii) the Indenture and the DWSD Trust Indenture constitute the legal, valid and binding obligations thereof, enforceable in accordance with their terms (subject, as to enforceability, to applicable bankruptcy, moratorium, insolvency or similar laws affecting the rights of creditors generally and to general principles of equity) and (iii) such other matters as the Banks may reasonably request.

(vii)     each other opinion delivered by any Person pursuant to the Related Documents, each of which shall be in form and substance satisfactory to the Bank;

(g)     *No Default, Etc*.  The Banks shall have received a certificate signed by an Authorized Officer of the Authority and dated the Issue Date stating that to the best knowledge of the signer, after such inquiry as the signer deems appropriate, and taking into account the responsibilities of the office which the signer holds, and on behalf of the Authority and not in any individual capacity, the signer certifies: that the representations and warranties of the Authority contained (or incorporated by reference) in Article IV hereof are true and correct, in all material respects, on and as of the Issue Date, as though made on and as of such date; (ii) that no Material Adverse Change has occurred; (iii) that no Default or Event of Default has occurred and is continuing or would result from the issuance of the Bonds or the execution, delivery and performance by the Authority of this Agreement or any of the other Related Document to which the Authority is a party; (iv) to the same effect as subsections (a) and (d) of this Section 3.01; and (v) covering such other matters of fact as shall be reasonably requested by the Banks. The Banks shall have received a certificate signed by an authorized representative of the City and the DWSD and dated the Issue Date stating that to the best knowledge of the signer, after such inquiry as the signer deems appropriate, and taking into account the responsibilities of the office which the signer holds, and on behalf of the City and the DWSD and not in any individual capacity, the signer certifies that the representations and warranties of the City and the DWSD contained (or incorporated by reference) in Article IV hereof are true and correct, in all material respects, on and as of the Issue Date, as though made on and as of such date; (ii) that no Material Adverse Change has occurred; (iii) that no Default or Event of Default has occurred and is continuing

13-53846-swr   Doc 6008-3   Filed 12/12/14   Entered 12/12/14 17:35:47   Page 25 of 135

or would result from the issuance of the Bonds or the execution, delivery and performance by the City and the DWSD of this Agreement or any of the other Related Document to which the City and the DWSD is a party; (iv) to the same effect as subsections (a) and (e) of this Section 3.01; and (v) covering such other matters of fact as shall be reasonably requested by the Banks.

(h)     *Non-Arbitrage Certificate*. The Banks shall have received a non-arbitrage certificate, dated the date of the Closing, signed by the Board of Directors or his designee, or the Executive Director of the Authority, in a form acceptable to the Banks.

(i)     *Governmental Approvals* The Banks shall have received originals or certified copies of all approvals, authorizations, permits, licenses, or consents of, or notices to or filings or registrations with, any Governmental Authority required for the Authority, the City and the DWSD to execute, deliver or perform this Agreement or any of the other Related Documents to which the Authority, the City and the DWSD is a party, together with a list of any required approvals, permits, etc., still to be received.

(j)     *Investment Policy; Miscellaneous*.  The Banks shall have received (i) a copy of the Investment Policy of the Authority, as in effect as of the Issue Date, which policy shall be acceptable to the Bank; and (ii) such other agreements, documents, instruments, certificates (and, if requested by the Banks, certified duplicates of executed copies thereof) and opinions as the Banks may reasonably request.

(k)     *CUSIP and DTC*.  The Banks shall have received written evidence satisfactory to the Banks that the Bonds are eligible for inclusion in DTC's FAST automated transfer program ("FAST Eligible Bonds").

(l)     *Other Documents*.   The Banks shall have received such other documents, certificates, approvals, filings, and opinions as the Banks shall have reasonably requested.

(m)     *Legality*.  The Banks shall have determined (in their sole discretion) that (i) the consummation by the Authority, by the City, by the DWSD, by the Banks and by any other Person of any of the transactions contemplated by the Indenture, the Bonds, this Agreement and each other Related Document will not violate any Applicable Law and (ii) all legal requirements provided herein or by law incident to the execution, delivery and performance of the Indenture, the Bonds and the other Related Documents and the transactions contemplated hereby and thereby, shall have been satisfied.

(n)     *Trustee's Documents*.  The Banks shall have received (i) (A) copies of the resolution(s) of the Trustee authorizing the execution, delivery and performance of the Related Documents to which they are a party and the performance of any duties of the Trustee under or in connection with the other

27

Related Documents and (B) a certificate of an authorized representative of the Trustee (x) certifying as to the authority, incumbency and specimen signatures of the authorized representatives of the Trustee authorized to sign the Related Documents to which it is a party and any other documents to be delivered by it hereunder and who will be authorized to represent the Trustee in connection with this Agreement, upon which the Banks may rely until it receives a new certificate and certifying that the resolution(s) referred to under (B) is/are presently in full force and effect and (y) covering such matters relating to the other Related Documents as the Banks may reasonably request.

(o)    *Bankruptcy court order*.  The Banks shall have received a copy of the Order of the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") dated _____ ___, 2014 (the "Bankruptcy Order") (*In re City of Detroit, Michigan*, Case No. 13-53846, Doc. ____ (E.D. Mich.)) authorizing the City to enter into and perform the DWSD Authorizing Documents.

(p)    *Official Statement*. A copy of the Official Statement, signed on behalf of the Authority by the Executive Director or other authorized officer.

(q)    *Ratings*. [Only if applicable] The Banks shall have received satisfactory evidence that [Moody's/Fitch] shall have assigned to the Bonds the rating set forth on the inside cover page of the Official Statement, and that the rating shall not have been reduced or withdrawn.

(r)    *Continuing Disclosure Undertaking*. The Banks shall have received (i) an executed copy of the Authority's Continuing Disclosure Undertaking, in form and substance satisfactory to the Banks, and (ii) an executed copy of the City's/DWSD's Continuing Disclosure Undertaking, in form and substance satisfactory to the Banks.

(s)    *[Bond Insurance*. The Banks shall have received:

(i)    Certified copies of the Bond Insurance Policies issued by the Bond Insurer, if any, and certified copies of any debt service reserve fund surety insurance policies issued by the Bond Insurers, if any, and any other documents executed in connection therewith;

(ii)    An opinion of counsel to the Bond Insurers, dated the Closing Date, addressed to the Banks and in form and substance satisfactory to the Banks; and

(iii)    a Certificate of the Bond Insurers, dated the Closing Date, signed by an authorized officer of the Bond Insurers, to the effect that the information contained under the caption "Bond Insurance" in the Official Statement is true and correct in all material respects, and that the Specimen Bond Insurance Policies contained in Appendix VI to the Official Statement is a true and correct specimen of the Bond Insurance Policies being issued by the Bond Insurers.]

28

(t)  *Filings*.  The Banks shall have received evidence satisfactory to the Banks and their counsel that all applicable filings, recordings and agreements including any agreements necessary to create and perfect a valid and binding Lien on, pledge of and security interest in all of the Revenues and in any other Security pledged in the Related Documents in favor of the Trustee, for the benefit of the Owners, and perfected on a first priority basis to the extent such Lien on, pledge of and security interest can be perfected by any filings, recordings or agreements, have been filed and made or executed and delivered, as the case may be, in the appropriate governmental offices and that all filing fees, taxes or other impositions required therewith have been paid in full on or before the Closing Date.

**Section 3.02.  Credit Requirements**.  Prior to the Closing Date, the Banks shall have determined, in its sole discretion, based in part upon the information and reports submitted by the Authority, that (i) the Authority has met the Bank's credit requirements, (ii) there has been no Material Adverse Change in the financial condition, manner of operation, properties or prospects of the Authority and that all information, representations and materials submitted to the Banks by the Authority in connection with the purchase of the Bonds are accurate in all material respects, and (iii) there has been no change in any law, rule or regulation (or their interpretation or administration) nor is there any pending or threatened litigation, that, in each case, may adversely affect the consummation of the Transactions.  Provided, that, notwithstanding the foregoing terms and any investigation and/or determination by the Banks, the Authority expressly acknowledges and agrees that no such investigation or determination by the Banks shall in any respect whatsoever qualify, or release the Authority from, any representation, warranty or covenant contained in this Agreement or create or constitute any defense to the enforcement of the provisions of this Agreement.

**Section 3.03.  Additional Conditions Precedent**.  On or prior to the Closing Date, the Authority shall have paid to the Banks the reasonable fees and expenses of counsel to the Banks payable as of the Closing Date as incurred in connection with the transactions contemplated by the Related Documents.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

**A.  The Authority represents, warrants and covenants to and with the Banks and the DWSD as of the Closing Date as follows in Section 4.01 through Section 4.20. It is acknowledged and agreed by the parties hereto that all representations and warranties made by the Authority, the City and the DWSD herein and in any certificates given in compliance herewith, are made solely by the Authority, the City or the DWSD, as the case may be, and not by any individual executing this Agreement or any certificate in his or her own capacity, and no liability shall be imposed, directly or indirectly, on such individual.**

**Section 4.01.  Due Organization; Power and Authority**.  The Authority is an autonomous public body corporate and politic separate and distinct from the State of Michigan created and existing under Executive Order 2010-2, issued by the Governor of the State of Michigan on March 4, 2010 with the powers and authority, among others, set forth in the Bonds

Authorizing Act, including all requisite power and authority to execute and deliver the Related Documents to which the Authority is a party, and to perform the obligations under the Related Documents to which the Authority is a party, including the power and authority to issue and deliver the Bonds.

**Section 4.02. Authorization and Validity of Agreement, Related Documents and Borrowing**.  The execution, delivery and performance by the Authority of this Agreement and the other Related Documents to which it is a party, and the issuance and delivery of the Bonds at the direction of the Authority have been duly authorized by all necessary action of the governing body of the Authority.  Each of this Agreement and the Related Documents (other than the Bonds) to which the Authority is a party constitutes a legal, valid and binding obligation of the Authority, enforceable against the Authority in accordance with its terms, except as such enforceability may be limited by applicable reorganization, insolvency, liquidation, readjustment of debt, moratorium or other similar laws affecting the enforcement of the rights of creditors generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).  Each Bond when issued, and as authenticated and delivered by the Trustee against payment therefor will have been duly issued, authenticated and delivered under the Bonds Authorizing Act and in conformity with the Indenture and will constitute the legal, valid and binding obligations of the Authority enforceable in accordance with their terms, and will be entitled to the benefits of the Indenture.  The obligation of the Authority under the Indenture is absolute and unconditional payable solely from the Security.

**Section 4.03. Compliance of Agreement, Related Documents with Applicable Law, Organizational Documents, Etc.**  The execution, delivery and performance of this Agreement and each of the other Related Documents in accordance with its and their respective terms, the assignment and pledge of the Security and the consummation of the Transactions do not and will not (a) contravene or conflict with the Authority's by-laws or other organizational documents or with any provision of the Bonds Authorizing Act, (b) require any consent or approval of any creditor of the Authority, (c) violate any Applicable Law (including, without limitation, Regulations T, U or X of the Board of Governors of the Federal Reserve System, or any successor regulations), (d) conflict with, result in a breach of or constitute a default under any Contract relating to the Security to which the Authority is a party or by which any of its properties or assets may be bound or (e) result in or require the creation or imposition of any charge, pledge, security interest, encumbrance or other Lien upon or with respect to the Security except such Liens, if any, created by this Agreement or the Indenture.  The Authority Bond Resolution has been adopted in compliance with all requirements of Applicable Law.

**Section 4.04. Governmental Approvals**.  All authorizations, consents, and other Governmental Approvals necessary for the Authority to enter into this Agreement and the other Related Documents and perform the transactions contemplated hereby and thereby have been obtained and remain in full force and effect and are subject to no further administrative or judicial review.  No other authorization or approval or other action by, and no notice to or filing with, any Governmental Authority is required for the due execution, delivery and performance by the Authority of this Agreement or the due execution, delivery or performance by the Authority of the Related Documents to which it is a party.

13-53846-swr   Doc 6783-3   Filed 08/12/14   Entered 08/12/14 16:35:47   Page 29 of 135

**Section 4.05. Compliance with Law**.   The Authority is in compliance with all Applicable Law, including all Governmental Approvals, except for noncompliance that, singly or in the aggregate, has not had and will not have a Material Adverse Effect or have an adverse effect on the Authority's ability to perform its obligations under this Agreement and under the other Related Documents.  The Authority has not received any complaint or other notice alleging a violation of or failure to comply with, any judgment, order, writ, injunction or decree of any Governmental Authority applicable to the Authority or the Transactions or any statute, law, rule or regulation applicable to the Authority or the Transactions.  The collection of Revenues and the accounting and recordkeeping therefor are in material compliance with all Applicable Law and all applicable resolutions, ordinances and rules of the Authority.

**Section 4.06. Litigation**.   There is no Material Litigation pending nor, to the best knowledge of the Authority after due inquiry, threatened against the Authority or any property of the Authority.

**Section 4.07.  Absence of Defaults and Events of Default**.

(a)   No Default or Event of Default has occurred and is continuing.

(b)   No defaults by the Authority exist under any Contract related to the Security, except for defaults that, singly or in the aggregate, have not had and will not have (i) a Material Adverse Effect, or (ii) an adverse effect on the validity or enforceability of this Agreement or any of the other Related Documents or on the Authority's ability to perform under this Agreement or any of the other Related Documents.  The Authority is not in breach of any financial covenant or any other material provision of any Contract related to the Security entered into in connection with any Debt.

**Section 4.08. Accuracy and Completeness of Information**.   All information, reports and other papers and data furnished by the Authority to the Banks were, at the time the same were so furnished, complete and correct in all material respects, to the extent necessary to give the recipient a true and accurate knowledge of the subject matter and were provided in expectation of the Bank's reliance thereon in purchasing the Bonds.  No fact is known to the Authority which has had or, so far as the Authority can now reasonably foresee, may in the future have a Material Adverse Effect, which has not been set forth in such information, reports or other data disclosed in writing to the Banks prior to the Closing Date.  Any financial, budget and other projections furnished to the Banks by the Authority or its agents were prepared in good faith on the basis of the assumptions stated therein, which assumptions were fair and reasonable in light of the conditions existing at the time of delivery of such financial, budget or other projections, and represented, and as of the date of this representation, represent the Authority's best estimate of its future financial performance.  No document furnished nor any representation, warranty or other written statement made to the Banks in connection with the negotiation, preparation or execution of this Agreement or the Related Documents contains or will contain any untrue statement of a material fact or omits or will omit (as of the date made or furnished) to state any material fact necessary in order to make the statements contained herein or therein, in the light of the circumstances under which they were or will be made, not misleading.

13-53846-swr   Doc 6008-3   Filed 12/12/14   Entered 12/12/14 17:35:47   Page 30 of 105
13-53846-swr   Doc 8008-1   Filed 10/22/14   Entered 10/22/14 16:35:47   Page 30 of 105
315

**Section 4.09. Sovereign Immunity**.  The Authority is not entitled to claim the defense of sovereign immunity or statutory immunity in any action appropriately asserted in accordance with the Court of Claims Act, MCL 600-6401 et seq. and arising out of its obligations as set forth in this Agreement.

**Section 4.10. Incorporation of Representations and Warranties**.  The Authority hereby makes to the Banks the same representations and warranties made by the Authority in each Related Document to which it is a party, which representations and warranties, together with the related definitions of terms contained therein, are incorporated herein by this reference with the same effect as if each and every such representation and warranty and definition were set forth herein in its entirety.  No amendment to or waiver of such representations, warranties or definitions made pursuant to the relevant Related Document shall be effective to amend such representations and warranties and definitions as incorporated by reference herein without the prior written consent of the Banks.

**Section 4.11. Bonds**.  Each Bond has been or will be duly and validly issued under the Indenture and entitled to the benefits thereof.  The Bonds will be transferred and held for the benefit of the Banks, free and clear of any pledge, security interest, claim or other Lien of any Person other than the Banks.

**Section 4.12. Interest**.  None of the Related Documents to which the Authority is a party or the Bonds provide for any payments that would violate any Applicable Law regarding permissible maximum rates of interest or the calculation or collection of interest upon interest.

**Section 4.13. Investment Company Act**.  The Authority is not an "investment company" or a company "controlled" by an "investment company," as such terms are defined in the Investment Company Act of 1940 (15 U.S.C. §80a-1 et seq.), as amended.

**Section 4.14. Federal Reserve Board Regulations**.  The Authority is not engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying Margin Stock.  The Authority will not use any part of the proceeds of the Bonds or the funds advanced hereunder and has not incurred any Debt to be reduced, retired or purchased by the Authority out of such proceeds, for the purpose of purchasing or carrying any Margin Stock, and the Authority does not own and will not acquire any such Margin Stock.

**Section 4.15. No Proposed Legal Changes**.  There is no amendment, or to the best knowledge of the Authority, proposed amendment to the Constitution of the State or any State law or any published administrative interpretation of the Constitution of the State or any State law, or any proposition or referendum (or proposed proposition or referendum) or other ballot initiative or any legislation that has passed either house of the legislature of the State, or any published judicial decision interpreting any of the foregoing, the effect of which could reasonably be expected to affect adversely (a) the issuance of, or Security for, any of the Bonds, (b) the rights or remedies of the Banks or of any Owner of the Bonds, (c) the Authority's power or ability to perform its obligations under the Bonds Authorizing Act, or (d) the Authority's existence or its power or ability to perform its obligations hereunder or under any of the other

Related Documents including without limitation the Authority's ability to repay when due its obligations under this Agreement and the Bonds.

**Section 4.16. Anti-Terrorism Representation**.

(a)     The Authority is not in violation of any laws relating to terrorism or money laundering ("Anti-Terrorism Laws"), including Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (the "Executive Order"), and the USA Patriot Act, Title III of Pub. L. 107-56, 115 Stat. 272 (the "Patriot Act");

(b)     The Authority is not any of the following:

(i)     a Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(ii)     a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii)     a Person with which the Banks are prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(iv)     a Person that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order; or

(v)     a Person that is named as a "specially designated national and blocked person" on the most current list published by the Office of Foreign Asset Control ("OFAC") or any list of Persons issued by OFAC pursuant to the Executive Order at its official website or any replacement website or other replacement official publication of such list;

(c)     To its knowledge, the Authority does not (i) conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any Person described in subsection (b)(ii) above, (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law. The Authority makes no commitment to any party to this Agreement, nor shall have any obligation to any party to this Agreement, to adopt or implement compliance procedures or measures not already in place at the Authority.

**Section 4.17. Valid Lien**.   The Authority's irrevocable pledge and assignment of the Security as set forth in the Related Documents to and for the payment of the Required Payments: (i) is valid and binding as of the Issue Date and all Revenues now or hereafter received by the Authority are immediately subject to the lien thereof; (ii) requires no act, instrument, approval, filing, registration, recording or publication of the Indenture or any other instrument nor any prior separation or physical delivery of the Security or notice to any Person, other than the filings

33

and registrations accomplished by the Authority as of the Closing Date, to validly establish the pledge provided for under the Related Documents or the Bonds Authorizing Act or the pledge provided for under this Agreement or to create, attach, perfect, protect or maintain the lien and security interest created thereby and hereby on and in the Security to secure the Bonds and the Required Payments; and (iii) does not require any act of appropriation for the application thereof to the purposes for which pledged.

**Section 4.18. Obligations; Other Debt**.  The Authority hereby consents to the DWSD entering into this Agreement, which, with respect to the Other Payment Obligations, is an "Ancillary Facility" under Act 392.  The payment obligations to the Banks under this Agreement and the Bonds are secured and evidenced in accordance with the Indenture.  All obligations of the Authority under or in connection with this Agreement, the Bonds and the other Related Documents, including the Authority's obligations to pay all Required Payments are payable from the Security, are secured by a valid first lien on and pledge of the Security and are not subordinate to any payment secured by a Lien on the Security or any other claim, and are prior as against all Persons having claims of any kind in tort, contract or otherwise, whether or not such Persons have notice of the Lien established by the Indenture.  As of the Issue Date, the Authority has not incurred, issued, created or assumed (i) any Debt payable from or secured by the Security or any portion thereof which is senior in right of payment or security to any of its obligations under the Bonds, this Agreement, any of the other Related Documents or (ii) any Debt payable from or secured by the Security or any portion thereof which is pari passu in right of payment or security with the Bonds, this Agreement and the other Related Documents.

**Section 4.19. Solvency**.  Both before and after giving effect to the issuance of the Bonds and the undertaking of the other obligations contemplated by this Agreement, the Indenture and the other Related Documents, the disbursement of the proceeds of such Bonds and the payment and accrual of all transaction costs in connection with the foregoing, the Authority is and will be Solvent.

**Section 4.20. Indenture a Contract**.  The provisions of the Indenture constitute a contract between the Authority and the Trustee, for the benefit the Banks as a holder of the Bonds, subject to the provisions of the Indenture and the Bonds may at law or in equity, by suit, action, mandamus or other proceedings, enforce and compel the performance of all duties required to be performed by the Authority under this Agreement and the other Related Documents.

**B.  The City and the DWSD represent, warrant and covenant to and with the Banks and the Authority as of the Closing Date as follows in Section 4.21 through Section 4.40:**

**Section 4.21. Due Organization; Power and Authority**.  The DWSD is an autonomous public body corporate and politic separate and distinct from the City and the State of Michigan created and existing under Act 94 with the powers and authority, among others, set forth in the Bonds Authorizing Act, including all requisite power and authority to execute and deliver the Related Documents to which the DWSD is a party, and to perform the obligations under the Related Documents to which the DWSD is a party, including the power and authority to issue and deliver the Bonds.

**Section 4.22. Authorization and Validity of Agreement, Related Documents and Borrowing**.  The execution, delivery and performance by the City and the DWSD of this Agreement and the other Related Documents to which it is a party, and the issuance and delivery of the DWSD Obligations at the direction of the DWSD have been duly authorized by all necessary action of the City and the governing body of the DWSD.  Each of this Agreement and the Related Documents (other than the DWSD Obligations) to which the City and the DWSD is a party constitutes a legal, valid and binding obligation of the City and the DWSD, enforceable against the DWSD in accordance with its terms, except as such enforceability may be limited by applicable reorganization, insolvency, liquidation, readjustment of debt, moratorium or other similar laws affecting the enforcement of the rights of creditors generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).  Each DWSD Obligation when issued, and as authenticated and delivered by the DWSD Trustee against payment therefor will have been duly issued, authenticated and delivered under the Bonds Authorizing Act and in conformity with the DWSD Trust Indenture and will constitute the legal, valid and binding obligations of the DWSD enforceable in accordance with their terms, and will be entitled to the benefits of the DWSD Trust Indenture. The obligation of the DWSD under the DWSD Trust Indenture is absolute and unconditional payable solely from the Security.

**Section 4.23. Compliance of Agreement, Related Documents with Applicable Law, Organizational Documents, Etc.**  The execution, delivery and performance of this Agreement and each of the other Related Documents in accordance with its and their respective terms, the assignment and pledge of the Security and the consummation of the Transactions do not and will not (a) contravene or conflict with the DWSD's by-laws or other organizational documents or with any provision of the Bonds Authorizing Act, (b) require any consent or approval of any creditor of the DWSD or the City, (c) violate any Applicable Law (including, without limitation, Regulations T, U or X of the Board of Governors of the Federal Reserve System, or any successor regulations), (d) conflict with, result in a breach of or constitute a default under any Contract relating to the Security to which the DWSD or the City is a party or by which any of its properties or assets may be bound or (e) result in or require the creation or imposition of any charge, pledge, security interest, encumbrance or other Lien upon or with respect to the Security except such Liens, if any, created by this Agreement or the DWSD Trust Indenture.  The DWSD Bond Resolution has been adopted in compliance with all requirements of Applicable Law.

**Section 4.24. Governmental Approvals**.  All authorizations, consents, and other Governmental Approvals necessary for the City and the DWSD to enter into this Agreement and the other Related Documents and perform the transactions contemplated hereby and thereby have been obtained and remain in full force and effect and are subject to no further administrative or judicial review.  No other authorization or approval or other action by, and no notice to or filing with, any Governmental Authority is required for the due execution, delivery and performance by the City or the DWSD of this Agreement or the due execution, delivery or performance by the City or the DWSD of the Related Documents to which it is a party.

**Section 4.25. Compliance with Law**.  The DWSD is in compliance with all Applicable Laws, including all Governmental Approvals, except for noncompliance that, singly or in the aggregate, has not had and will not have a Material Adverse Effect or have an adverse effect on the DWSD's ability to perform its obligations under this Agreement and under the other Related

Documents. The DWSD has not received any complaint or other notice alleging a violation of or failure to comply with, any judgment, order, writ, injunction or decree of any Governmental Authority applicable to the DWSD or the Transactions or any statute, law, rule or regulation applicable to the DWSD or the Transactions. The collection of Revenues and the accounting and recordkeeping therefor are in material compliance with all Applicable Law and all applicable resolutions, ordinances and rules of the City and the DWSD.

**Section 4.26. Litigation**. There is no Material Litigation pending nor, to the best knowledge of the DWSD after due inquiry, threatened against the DWSD or any property of the DWSD.

**Section 4.27. Absence of Defaults and Events of Default**.

(a) No Default or Event of Default has occurred and is continuing.

(b) No defaults by the DWSD exist under any Contract related to the Security, except for defaults that, singly or in the aggregate, have not had and will not have (i) a Material Adverse Effect, or (ii) an adverse effect on the validity or enforceability of this Agreement or any of the other Related Documents or on the City's or the DWSD's ability to perform under this Agreement or any of the other Related Documents. The DWSD is not in breach of any financial covenant or any other material provision of any Contract related to the Security entered into in connection with any Debt.

**Section 4.28. Accuracy and Completeness of Information**. All information, reports and other papers and data furnished by the City or the DWSD to the Banks or to the Authority were, at the time the same were so furnished, complete and correct in all material respects, to the extent necessary to give the recipient a true and accurate knowledge of the subject matter and were provided in expectation of the Bank's reliance thereon in purchasing the Bonds. No fact is known to the City or the DWSD which has had or, so far as the City and the DWSD can now reasonably foresee, may in the future have a Material Adverse Effect, which has not been set forth in such information, reports or other data disclosed in writing to the Banks and to the Authority prior to the Closing Date. Any financial, budget and other projections furnished to the Banks and the Authority by the DWSD or its agents were prepared in good faith on the basis of the assumptions stated therein, which assumptions were fair and reasonable in light of the conditions existing at the time of delivery of such financial, budget or other projections, and represented, and as of the date of this representation, represent the DWSD's best estimate of its future financial performance. No document furnished nor any representation, warranty or other written statement made to the Banks and the Authority in connection with the negotiation, preparation or execution of this Agreement or the Related Documents contains or will contain any untrue statement of a material fact or omits or will omit (as of the date made or furnished) to state any material fact necessary in order to make the statements contained herein or therein, in the light of the circumstances under which they were or will be made, not misleading.

**Section 4.29. Sovereign Immunity**. The DWSD is not entitled to claim the defense of sovereign immunity or statutory immunity in any action arising out of its obligations as set forth in this Agreement.

**Section 4.30. Incorporation of Representations and Warranties**.  The City and the DWSD hereby make to the Banks and the Authority the same representations and warranties made by the City or the DWSD in each Related Document to which it is a party, which representations and warranties, together with the related definitions of terms contained therein, are incorporated herein by this reference with the same effect as if each and every such representation and warranty and definition were set forth herein in its entirety.  No amendment to or waiver of such representations, warranties or definitions made pursuant to the relevant Related Document shall be effective to amend such representations and warranties and definitions as incorporated by reference herein without the prior written consent of the Banks.

**Section 4.31. DWSD Obligations**.  Each DWSD Obligation has been or will be duly and validly issued under the DWSD Trust Indenture and entitled to the benefits thereof.  The DWSD Obligations will be transferred and held for the benefit of the Authority and the Banks, free and clear of any pledge, security interest, claim or other Lien of any Person other than the Authority and the Banks.

**Section 4.32. Interest**.  None of the Related Documents to which the City or the DWSD is a party or the DWSD Obligations provide for any payments that would violate any Applicable Law regarding permissible maximum rates of interest or the calculation or collection of interest upon interest.

**Section 4.33. Investment Company Act**.  The DWSD is not an "investment company" or a company "controlled" by an "investment company," as such terms are defined in the Investment Company Act of 1940 (15 U.S.C. §80a-1 et seq.), as amended.

**Section 4.34. Federal Reserve Board Regulations**.  The DWSD is not engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying Margin Stock.  The DWSD will not use any part of the proceeds of the DWSD Obligations or the funds advanced hereunder and has not incurred any Debt to be reduced, retired or purchased by the DWSD out of such proceeds, for the purpose of purchasing or carrying any Margin Stock, and the DWSD does not own and will not acquire any such Margin Stock.

**Section 4.35. No Proposed Legal Changes**.  There is no amendment, or to the best knowledge of the City and the DWSD, proposed amendment to the Constitution of the State or any State law or any published administrative interpretation of the Constitution of the State or any State law, or any proposition or referendum (or proposed proposition or referendum) or other ballot initiative or any legislation that has passed either house of the legislature of the State, or any published judicial decision interpreting any of the foregoing, the effect of which could reasonably be expected to affect adversely (a) the issuance of, or Security for, any of the DWSD Obligations, (b) the rights or remedies of the Banks or of any Owner of the DWSD Obligations, (c) the DWSD's power or ability to perform its obligations under the Bonds Authorizing Act, or (d) the DWSD's existence or its power or ability to perform its obligations hereunder or under any of the other Related Documents including without limitation the DWSD's ability to repay when due its obligations under this Agreement and the DWSD Obligations.

**Section 4.36. Anti-Terrorism Representation**.

(a)     The DWSD is not in violation of any laws relating to terrorism or money laundering ("Anti-Terrorism Laws"), including Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (the "Executive Order"), and the USA Patriot Act, Title III of Pub. L. 107-56, 115 Stat. 272 (the "Patriot Act");

(b)     The DWSD is not any of the following:

(i)     a Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(ii)     a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii)     a Person with which the Banks are prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(iv)     a Person that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order; or

(v)     a Person that is named as a "specially designated national and blocked person" on the most current list published by the Office of Foreign Asset Control ("OFAC") or any list of Persons issued by OFAC pursuant to the Executive Order at its official website or any replacement website or other replacement official publication of such list;

(c)     To its knowledge, the DWSD does not (i) conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any Person described in subsection (b)(ii) above, (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law. The DWSD makes no commitment to any party to this Agreement, nor shall have any obligation enforceable by any party to this Agreement, to adopt or implement compliance procedures or measures not already in place at the DWSD.

**Section 4.37. Valid Lien**.     The DWSD's irrevocable pledge and assignment of the Security as set forth in Related Documents to and for the payment of the Required Payments: (i) is valid and binding as of the Issue Date and all Revenues now or hereafter received by the DWSD are immediately subject to the lien thereof; (ii) requires no act, instrument, approval, filing, registration, recording or publication of the Related Documents or any other instrument nor any prior separation or physical delivery of the Security or notice to any Person, other than the filings and registrations accomplished by the DWSD as of the Closing Date, to validly establish the pledge provided for under the Related Documents or the Bonds Authorizing Act or the pledge provided for under this Agreement or to create, attach, perfect, protect or maintain the

38

lien and security interest created thereby and hereby on and in the Security to secure the DWSD Obligations and the Required Payments; and (iii) does not require any act of appropriation for the application thereof to the purposes for which pledged.

Section 4.38. **Obligations; Other Debt**. This Agreement, with respect to the Other Payment Obligations, is an "Ancillary Facility" under Act 392. The payment obligations to the Banks under this Agreement and the DWSD Obligations are secured and evidenced in accordance with the DWSD Trust Indenture. All obligations of the DWSD under or in connection with this Agreement, the DWSD Obligations and the other Related Documents, including the DWSD's obligations to pay all Required Payments are payable from the Security, are secured by a valid first lien on and pledge of the Security and are not subordinate to any payment secured by a Lien on the Security or any other claim, and are prior as against all Persons having claims of any kind in tort, contract or otherwise, whether or not such Persons have notice of the Lien established by the DWSD Trust Indenture. As of the Issue Date, neither the City nor the DWSD has incurred, issued, created or assumed (i) any Debt payable from or secured by the Security or any portion thereof which is senior in right of payment or security to any of its obligations under the DWSD Obligations, this Agreement, any of the other Related Documents or (ii) any Debt payable from or secured by the Security or any portion thereof which is pari passu in right of payment or security with the DWSD Obligations, this Agreement and the other Related Documents.

Section 4.39. **Solvency**. Both before and after giving effect to the issuance of the DWSD Obligations and the undertaking of the other obligations contemplated by this Agreement, the DWSD Trust Indenture and the other Related Documents, the disbursement of the proceeds of such DWSD Obligations and the payment and accrual of all transaction costs in connection with the foregoing, the DWSD is and will be Solvent.

Section 4.40. **DWSD Trust Indenture a Contract**. The provisions of the DWSD Trust Indenture constitute a contract between the DWSD and the DWSD Trustee, for the benefit the Banks as holders of the DWSD Obligations, subject to the provisions of the DWSD Trust Indenture and the DWSD Obligations may at law or in equity, by suit, action, mandamus or other proceedings, enforce and compel the performance of all duties required to be performed by the DWSD under this Agreement and the other Related Documents.

## ARTICLE V

## AFFIRMATIVE COVENANTS

A. **The Authority covenants and agrees to the terms of the following Section 5.01 through Section 5.14 until all Required Payments have been indefeasibly paid in full, and all other obligations of the Authority under this Agreement and under the other Related Documents have been performed:**

Section 5.01. **Compliance With Laws and Regulations**. The Authority shall comply with all Applicable Laws, to which it or its property may be subject; provided, however, that the Authority may contest the validity or application thereof and appeal or otherwise seek relief therefrom, so long as the Authority continues to perform all of its obligations hereunder and

39

under the Related Documents and provided such acts do not affect the Authority's power and authority to execute this Agreement and the Related Documents to which it is a party or to perform its obligations and pay all amounts payable by it hereunder and thereunder, or otherwise result in a Default or Event of Default hereunder or under any of the other Related Documents.

**Section 5.02. Reporting Requirements**. The Authority shall keep proper books of record and account in which full, true and correct entries will be made of all dealings or transactions of or in relation to the affairs, operations, transactions and activities of the Authority in accordance with GAAP consistently applied. The Authority shall furnish to the Banks two copies of each of the following:

(a) *Reports related to Security.* The Authority shall promptly furnish to the Banks any financial statement or report furnished to the Authority under any Related Document.

(b) *Material Event Notices*. Immediately following any dissemination, distribution or provision thereof to any Person, a copy of any Material Event Notice, relating to the Bonds, any Parity Debt, the Security or the Bonds Authorizing Act, disseminated, distributed or provided in satisfaction of or as may be required by the provisions of Rule 15c2-12 promulgated pursuant to the Securities Exchange Act of 1934, as amended (17 C.F.R. Sec. 240.15c2-12), or any successor or similar legal requirement.

(c) *EMMA Filings*. Copies of all filings made by the Authority relating to the Bonds, any Parity Debt, the Security, or the Bonds Authorizing Act, with any Nationally Recognized Municipal Securities Information Repository (including the Municipal Securities Rulemaking Board's Electronic Market Access System ("EMMA")) promptly after such filings are made.

(d) *Other Information*. Promptly upon the request of the Banks, such other information respecting the Bonds, the DWSD Obligations, any Parity Debt, the Security or the Bonds Authorizing Act and copies of any financial statement or report furnished to any other holder of any Parity Debt pursuant to the terms of any Contract and not otherwise required to be furnished to the Banks pursuant to any other clause of this Section 5.02.

**Section 5.03. Notices**.

(a) *Notice of Default*. The Authority shall provide to the Banks immediate notice by telephone, promptly confirmed in writing, of any Default or Event of Default or any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

(b) *Litigation and other Notices*. The Authority shall provide to the Banks in writing, promptly upon learning thereof, notice of

(i)     any Material Litigation and any other action, suit, proceeding, inquiry or investigation that is commenced or threatened (A) against any part of the Security or (B) which seeks injunctive relief, and

(ii)     (A) any criminal investigation or proceeding by a Governmental Authority involving the Security; (B) the proposal of a bill or other legislation or the filing of any initiative or referendum which challenges the validity or enforceability of any of the Related Documents, the Bonds Authorizing Act, or otherwise could annul, amend, modify or replace the Bonds Authorizing Act or which could lead to a diminution or reallocation of the Security or any portion thereof; and (C) any material development in any legal proceeding or other action affecting the Authority which the Authority has, or should have, provided notice of to the Banks pursuant to clause (i) of this Section 5.03(b).

(c)     *Certain Notices under or in connection with the Related Documents.* The Authority shall furnish to the Banks a copy of any notice, certification, demand or other writing or communication given by the City, the DWSD, the Trustee or the DWSD Trustee to the Authority or by the Authority to the City, the DWSD, the Trustee or the DWSD Trustee under or in connection with any of the Related Documents, in each case promptly after the receipt or giving of the same.

(d)     *Amendments.* Promptly after the adoption thereof, copies of any amendments of or supplements to any of the Related Documents.

(e)     *Rating Agencies.* Promptly after any Rating Agency shall have announced a change in an Obligor Rating, written notice of such rating change.

(f)     *Governmental Authority Filing*s. Copies of all reports and other materials filed or delivered by the Authority to or with any Governmental Authority, if any, which has jurisdiction over the financial affairs of the Authority or which is a creditor of the Authority in respect of the Security.

(g)     *Legislation or Proposed Legislation.* Copies of (i) any amendments or modifications to the Bonds Authorizing Act and (ii) any other legislation of which the Authority has knowledge which could reasonably be expected to adversely impact the Security, the Authority's ability to perform its obligations under the Related Documents or the pledge of the Security to payments on the Bonds and the Required Payments.

**Section 5.04. Further Assurances**.   The Authority will from time to time promptly execute and deliver to the Banks (or as directed by the Banks) all further financing statements, amendments, confirmation statements and will register, record and file and re-register, re-record and re-file all such documents and instruments, at such time or times, in such manner and at such place or places, and shall take any and all other actions as may be necessary or reasonably required by the Banks to enable the Banks to (i) perfect and protect, any lien, pledge or security interest or other right or interest given, or purported to be given to the Trustee, the Banks or any other Person under or in connection with the Indenture, this Agreement or the Related

Documents or (ii) exercise and enforce its rights under this Agreement and its rights and the rights of the Owners of the Bonds, as and in the manner provided in the Indenture. Except to the extent it is exempt therefrom, the Authority will pay or cause to be paid all filing, registration and recording fees incident to such filing, registration and recording, and all expenses incident to the preparation, execution and acknowledgment of such instruments of further assurance, and all federal or state fees and other similar fees, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of such instruments of further assurance.

**Section 5.05. Right of Entry; Communication with Accountant**. The Authority shall permit or will use its best efforts to arrange access for the agents or representatives of the Banks during normal business hours and upon reasonable notice to enter the premises of the Authority, or any parts thereof, to examine and copy all financial and corporate books, records and accounts relating to the Security, and to discuss the affairs, finances, business and accounts related to the Security with the Authority's officers, employees and agents or such other officers, employees and agents of the State who have information relating to the Security. The Authority authorizes the Banks to communicate directly with its Accountant, including the Auditor General, and authorizes and shall instruct those accountants and advisors to communicate with, disclose and make available to, the Banks, any and all financial statements and other supporting financial documents, schedules and information relating to the Security.

**Section 5.06. Payment of Obligations**. The Authority will pay (a) all Parity Debt and obligations of the Authority in accordance with the terms thereof, and (b) all amounts payable by it hereunder and under the Related Documents in accordance with the terms hereof or thereof.

**Section 5.07. Incorporation of Covenants**.

(a) The covenants of the Authority set forth in the Indenture and each of the other Related Documents to which the Authority is a party, as well as related defined terms contained therein, are hereby incorporated by reference herein with the same effect as if each and every such provision were set forth herein in its entirety for the benefit of the Banks and shall be enforceable by the Banks against the Authority. All such incorporated covenants shall be in addition to the express covenants contained herein and shall not be limited by the express covenants contained herein nor shall such incorporated covenants be a limitation on the express covenants contained herein. To the extent that any such incorporated provision permits the Authority to waive compliance with or consent to such provision or requires that a document, opinion, report or other instrument or any event or condition be acceptable or satisfactory to the Authority, for purposes of this Agreement, such compliance shall be waived, or such provision shall be consented to, only if it is waived or consented to, as the case may be, by the Banks and such document, opinion, report or other instrument shall be acceptable or satisfactory to the Banks. No amendment to such covenants (or the defined terms relating thereto) made pursuant to the Related Documents shall be effective to amend such incorporated covenants without the written consent of the Banks. Notwithstanding the termination or expiration of any Related Document, the Authority shall, unless such Related Document has terminated or expired in accordance with its terms and has been replaced by a new Related Document, continue to observe the covenants

42

therein contained for the benefit of the Banks until the termination of this Agreement.

(b)     Subject to the terms of Section 9.01, the Authority shall diligently and in good faith pursue enforcement of each of the Related Documents to which it is a party against each of the other parties thereto and shall in particular and not in limitation of the foregoing cause the Trustee at all times to comply with the terms of the Authority Bond Resolution.

**Section 5.08. Disclosure to Assignees and Participants**.  The Authority agrees to permit the Banks to disclose any information received by the Banks in connection herewith, including without limitation the financial information described in Section 5.02, to any assignees or Participants of the Banks in this Agreement without notice to or further consent from the Authority.

**Section 5.09.  Maintenance of Existence**.  The Authority will continue to conduct in the ordinary course the activities in which it is presently engaged which is that of a public body corporate and politic of the State and activities ancillary thereto.

**Section 5.10.  Use of Proceeds**.  The Authority shall use the proceeds of the Bonds solely for the purposes set forth in the Authority Bond Resolution and the Indenture.  The Authority will not use the proceeds of the Bonds in a manner which violates Regulation U, as it may be amended or interpreted from time to time by the Board of Governors of the Federal Reserve System.

**Section 5.11.  Parity Creditors and Covenants**.  In the event that the Authority has previously entered into or hereafter shall enter into any agreement or instrument (or any amendment, supplement or modification thereto) providing for the incurrence of or relating to Parity Debt (each a "Relevant Agreement"), which provides to the related trustee, purchaser, credit facility provider or other obligee thereunder (each, a "Parity Creditor") (a) any preference or priority with respect to the Security or other collateral or the allocation of the Security or other collateral as compared to the pledge and allocation to, in favor, or for the benefit, of the Trustee or the Banks or (b) any additional or materially different rights and remedies as compared to the rights and remedies of the Banks as set forth in the Related Documents and this Agreement (any such provision, a "Parity Covenant") than are provided to the Banks, then each such Parity Covenant shall automatically be deemed to be incorporated into this Agreement for the duration of this Agreement and the Banks shall have the benefits of such Parity Covenant as if it were specifically set forth in this Agreement. Upon request of the Banks, the Authority shall promptly enter into an amendment to this Agreement to include the Parity Covenant (provided that the Banks shall maintain the benefit of such Parity Covenant even if the Authority fails to provide such amendment).

**Section 5.12.  CUSIP Numbers**.  The Authority shall at all times cause the Bonds to be assigned a CUSIP Number.

**Section 5.13. DWSD Financial Information**. The Authority covenants to deliver to the Banks copies of all financial information prepared by the DWSD and delivered to the Authority under any of the Related Documents

**B. The City and the DWSD covenant and agree to the terms of the following Section 5.14 through Section 5.24 until all Required Payments have been indefeasibly paid in full, and all other obligations of the DWSD under this Agreement and under the other Related Documents have been performed:**

**Section 5.14. Compliance With Laws and Regulations**. The DWSD shall comply with all Applicable Laws, to which it or its property may be subject; provided, however, that the DWSD may contest the validity or application thereof and appeal or otherwise seek relief therefrom, so long as the DWSD continues to perform all of its obligations hereunder and under the Related Documents and provided such acts do not affect the DWSD's power and authority to execute this Agreement and the Related Documents to which it is a party or to perform its obligations and pay all amounts payable by it hereunder and thereunder, or otherwise result in a Default or Event of Default hereunder or under any of the other Related Documents.

**Section 5.15. Reporting Requirements**. The DWSD shall keep proper books of record and account in which full, true and correct entries will be made of all dealings or transactions of or in relation to the affairs, operations, transactions and activities of the DWSD in accordance with GAAP consistently applied. The DWSD shall furnish to the Banks two copies of each of the following:

(a)     *Annual Financial Statements*. As soon as available, and in any event within 7 months after the close of each fiscal year of the DWSD, (i) the audited financial statements of the DWSD, including financial information therein relating to the Revenues and the other funds and accounts constituting a part of the Security and (ii) audited financial statements of the DWSD, including the balance sheet as of the end of such fiscal year of the DWSD and the related statements of revenues, expenses and changes in fund balance relating to the Security for such fiscal year of the DWSD, all in reasonable detail and as certified to by the DWSD's independent certified auditors as having been prepared in accordance with GAAP, consistently applied, such audit having been conducted in accordance with generally accepted auditing standards and the standards applicable to financial audits contained in Government Auditing Standards issued by the Comptroller General of the United States.

(b)     *Certificate of Compliance*. Simultaneously with the delivery of each set of financial statements referred to in (a) above, a certificate signed by an authorized representative of the DWSD stating (i) that under his/her supervision the DWSD has made a review of its activities during the preceding annual period for the purpose of determining whether or not the DWSD has complied with all of the terms, provisions and conditions of this Agreement and the other Related Documents and (ii) that to the best of his/her knowledge the DWSD is not in Default in the performance or observance of any of the terms, covenants, provisions or conditions of this Agreement or any of the other Related Documents, or if the DWSD shall be

in Default, such certificate shall specify each such Default, the nature and status thereof and any remedial steps taken or proposed to correct each such Default, and (iii) the amount of the Revenues in the last fiscal year.

(c)     *Auditors*.   Concurrently with any delivery of financial statements under clause (a) above, a copy of any management letter or audit report provided to the DWSD by such auditors.

(d)     *Other Reports*.   Promptly upon request by the Banks, copies of any financial statement or report furnished to any other holder of any Parity Debt pursuant to the terms of any Contract and not otherwise required to be furnished to the Banks pursuant to any other clause of this Section 5.15.

(e)     *Budget*.   As near as practicable to the beginning of each fiscal year of the DWSD, a copy of the annual budget for such upcoming fiscal year of the DWSD, and promptly, all other financial information prepared by the DWSD under any Related Document.

(f)     *Material Event Notices*.   Immediately following any dissemination, distribution or provision thereof to any Person, a copy of any Material Event Notice, relating to the DWSD Obligations, any Parity Debt, the Security or the Bonds Authorizing Act, disseminated, distributed or provided in satisfaction of or as may be required by the provisions of Rule 15c2-12 promulgated pursuant to the Securities Exchange Act of 1934, as amended (17 C.F.R. Sec. 240.15c2-12), or any successor or similar legal requirement.

(g)     *EMMA Filings*.   Copies of all filings made by the City or the DWSD relating to the DWSD Obligations, any Parity Debt, the Security, the Obligation Trust Fund or the Bonds Authorizing Act, with any Nationally Recognized Municipal Securities Information Repository (including EMMA) promptly after such filings are made.

(h)     *Other Information*.   Such other information respecting Bonds, any Parity Debt, the Security or the Bonds Authorizing Act as the Banks may from time to time reasonably request.

**Section 5.16.  Notices**.

(a)     *Notice of Default*.   The DWSD shall provide to the Banks immediate notice by telephone, promptly confirmed in writing, of any Default or Event of Default or any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

(b)     *Litigation and other Notices*.   The DWSD shall provide to the Banks in writing, promptly upon learning thereof, notice of

(i)     any Material Litigation and any other action, suit, proceeding, inquiry or investigation that is commenced or threatened (A) against any part of the Security or (B) which seeks injunctive relief, and

(ii)     (A) any criminal investigation or proceeding by a Governmental Authority involving the Security; (B) the proposal of a bill or other legislation or the filing of any initiative or referendum which challenges the validity or enforceability of any of the Related Documents, the Bonds Authorizing Act, or otherwise could annul, amend, modify or replace the Bonds Authorizing Act or which could lead to a diminution or reallocation of the Security or any portion thereof; and (C) any material development in any legal proceeding or other action affecting the DWSD which the DWSD has, or should have, provided notice of to the Banks pursuant to clause (i) of this Section 5.16(b).

(c)     *Certain Notices under or in connection with the Related Documents.* The DWSD shall furnish to the Banks a copy of any notice, certification, demand or other writing or communication given by the Authority, the DWSD Trustee or the City to the DWSD or by the DWSD to the Authority, the DWSD Trustee or the City under or in connection with any of the Related Documents, in each case promptly after the receipt or giving of the same.

(d)     *Amendments.* Promptly after the adoption thereof, copies of any amendments of or supplements to any of the Related Documents.

(e)     *Governmental Authority Filing*s. Copies of all reports and other materials filed or delivered by the DWSD to or with any Governmental Authority, if any, which has jurisdiction over the financial affairs of the DWSD or which is a creditor of the DWSD in respect of the Security.

(f)     *Legislation or Proposed Legislation.* Copies of (i) any amendments or modifications to the Bonds Authorizing Act and (ii) any other legislation of which the City or the DWSD has knowledge which could reasonably be expected to adversely impact the Security, the DWSD's ability to perform its obligations under the Related Documents or the pledge of the Security to payments on the DWSD Obligations and the Required Payments.

**Section 5.17. Further Assurances**.     The DWSD will from time to time promptly execute and deliver to the Banks (or as directed by the Banks) all further financing statements, amendments, confirmation statements and will register, record and file and re-register, re-record and re-file all such documents and instruments, at such time or times, in such manner and at such place or places, and shall take any and all other actions as may be necessary or reasonably required by the Banks to enable the Banks to (i) perfect and protect, any lien, pledge or security interest or other right or interest given, or purported to be given, to the DWSD Trustee, the Banks or any other Person under or in connection with the DWSD Trust Indenture, this Agreement or the Related Documents or (ii) exercise and enforce its rights under this Agreement and its rights and the rights of the Owners of the DWSD Obligations, as and in the manner provided in the DWSD Trust Indenture.  Except to the extent it is exempt therefrom, the DWSD will pay or

13-53846-swr   Doc 8118-3   Filed 10/22/14   Entered 10/22/14 20:35:47   Page 45 of
115

cause to be paid all filing, registration and recording fees incident to such filing, registration and recording, and all expenses incident to the preparation, execution and acknowledgment of such instruments of further assurance, and all federal or state fees and other similar fees, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of such instruments of further assurance.

**Section 5.18. Right of Entry; Communication with Accountant**.  The DWSD shall permit or will use its best efforts to arrange access for the agents or representatives of the Banks during normal business hours and upon reasonable notice to enter the premises of the DWSD, or any parts thereof, to examine and copy all financial and corporate books, records and accounts relating to the Security, and to discuss the affairs, finances, business and accounts related to the Security with the DWSD's officers, employees and agents or such other officers, employees and agents of the State who have information relating to the Security.  The DWSD authorizes the Banks to communicate directly with its accountants and authorizes and shall instruct those accountants and advisors to communicate with, disclose and make available to, the Banks, any and all financial statements and other supporting financial documents, schedules and information relating to the Security.

**Section 5.19. Payment of Obligations**.  The DWSD will pay (a) all Parity Debt and obligations of the DWSD in accordance with the terms thereof, and (b) all amounts payable by it hereunder and under the Related Documents in accordance with the terms hereof or thereof.

**Section 5.20.  Incorporation of Covenants**.

    (a)    The covenants of the DWSD set forth in the DWSD Trust Indenture and each of the other Related Documents to which the DWSD is a party, as well as related defined terms contained therein, are hereby incorporated by reference herein with the same effect as if each and every such provision were set forth herein in its entirety for the benefit of the Banks and shall be enforceable by the Banks against the DWSD.  All such incorporated covenants shall be in addition to the express covenants contained herein and shall not be limited by the express covenants contained herein nor shall such incorporated covenants be a limitation on the express covenants contained herein.  To the extent that any such incorporated provision permits the DWSD to waive compliance with or consent to such provision or requires that a document, opinion, report or other instrument or any event or condition be acceptable or satisfactory to the DWSD, for purposes of this Agreement, such compliance shall be waived, or such provision shall be consented to, only if it is waived or consented to, as the case may be, by the Banks and such document, opinion, report or other instrument shall be acceptable or satisfactory to the Banks.  No amendment to such covenants (or the defined terms relating thereto) made pursuant to the Related Documents shall be effective to amend such incorporated covenants without the written consent of the Banks.  Notwithstanding the termination or expiration of any Related Document, the DWSD shall, unless such Related Document has terminated or expired in accordance with its terms and has been replaced by a new Related Document, continue to observe the covenants therein contained for the benefit of the Banks until the termination of this Agreement.

47

(b)     The City and the DWSD shall diligently and in good faith pursue enforcement of each of the Related Documents to which it is a party against each of the other parties thereto and shall in particular and not in limitation of the foregoing cause the DWSD Trustee at all times to comply with the terms of the Related Documents to which they are a party.

**Section 5.21. Disclosure to Assignees and Participants**.  The City and the DWSD agrees to permit the Banks to disclose any information received by the Banks in connection herewith, including without limitation the financial information described in Section 5.15, to any assignees or Participants of the Banks in this Agreement without notice to or further consent from the City or the DWSD.

**Section 5.22. Maintenance of Existence**.  The DWSD will continue to conduct in the ordinary course the activities in which it is presently engaged which is that of a public municipal corporation and public body corporate of the State and activities ancillary thereto.

**Section 5.23. Use of Proceeds**.  The DWSD shall use the proceeds of the DWSD Obligations solely for the purposes set forth in the DWSD Bond Resolution and the DWSD Trust Indenture.  The DWSD will not use the proceeds of the DWSD Obligations in a manner which violates Regulation U, as it may be amended or interpreted from time to time by the Board of Governors of the Federal Reserve System.

**Section 5.24. Parity Creditors and Covenants**.  In the event that the DWSD has previously entered into or hereafter shall enter into any Relevant Agreement, which provides to a Parity Creditor (a) any preference or priority with respect to the Security or other collateral or the allocation of the Security or other collateral as compared to the pledge and allocation to, in favor, or for the benefit, of the DWSD Trustee or the Banks or (b) any Parity Covenant than are provided to the Banks, then each such Parity Covenant shall automatically be deemed to be incorporated into this Agreement for the duration of this Agreement and the Banks shall have the benefits of such Parity Covenant as if it were specifically set forth in this Agreement. Upon request of the Banks, the DWSD shall promptly enter into an amendment to this Agreement to include the Parity Covenant (provided that the Banks shall maintain the benefit of such Parity Covenant even if the DWSD fails to provide such amendment).

## ARTICLE VI

## NEGATIVE COVENANTS AND COVENANTS

**A.  The Authority covenants and agrees to the terms of the following Section 6.01 through Section 6.11 until all Required Payments have been indefeasibly paid in full, and all other obligations of the Authority under this Agreement and under the other Related Documents have been performed:**

**Section 6.01. Amendments**.  The Authority shall not amend, modify or supplement, nor agree to any amendment or modification of, or supplement to, any of the Related Documents or consent to, or permit or suffer to occur any action, course of dealing or omission which results in,

48

or is equivalent to, an amendment, supplementation, termination or modification of any of the Related Documents, but only if such amendment, supplementation, termination or modification affects the Security, without the prior written consent of the Banks and any such amendment, supplementation, termination or modification made or entered into in violation of this Section 6.01 shall be deemed a nullity and of no force and effect. The Authority shall not take any action, nor cause the Trustee to take any action under any of the Related Documents, which is inconsistent with, or could reasonably be expected to impair, the Authority's obligations, or the rights of the Banks, under this Agreement or any of the other Related Documents including, without limitation, any right or remedy of the Banks upon an Event of Default, the Authority's obligations to make payments to the Banks under Article II of this Agreement, and the pledge of the Security under the Indenture and the priority of the lien and security interest created thereby.

Section 6.02.  **Preservation of Existence, Etc**.  The Authority will not seek to directly or indirectly liquidate, wind up, terminate, reorganize, dissolve, merge or consolidate (or suffer any liquidation, winding up, termination, reorganization or dissolution), or form or acquire any subsidiary (other than in the ordinary course of business as conducted as of the Closing Date), nor shall it sell, lease, assign, transfer or otherwise dispose of (in a single transaction or a series of transactions) all or substantially all of its property.

Section 6.03.  **Certain Information**.  The Authority shall not include in an offering document or circular or reoffering supplement for the Bonds any information concerning the Banks that is not supplied in writing, or otherwise approved in writing, by the Banks expressly for inclusion therein.

Section 6.04.  **Trustee**.  The Authority shall not remove the Trustee or appoint a successor thereto without the written consent of the Banks. The Authority shall provide the Banks written notice of any change in the identity of the Trustee upon becoming aware of the same.  Upon written notice from the Banks that the Trustee is failing to perform its duties in the manner contemplated by the Indenture or the other Related Documents, the Authority shall replace or cause to be replaced the Trustee with a successor acceptable to the Banks.  If the position of Trustee becomes vacant, the Authority shall promptly appoint a successor which is reasonably acceptable to the Banks.

Section 6.05.  **Accounting Methods; Fiscal Year; Entity Classification**.  The Authority will not adopt, permit or consent to any change in accounting practices other than as required by GAAP and will not adopt, permit or consent to any change in its Fiscal Year or take (or permit to be taken) any action that results in a change to its entity classification for U.S. federal income tax purposes.

Section 6.06.  **Exempt Status**.  The Authority shall not take any action or omit to take any action, respectively, that, if taken or omitted, respectively, could cause any revocation or adverse modification of its federal income tax-exempt status or which would cause the interest with respect to the Bonds to be included in the gross income of the Owners thereof for purposes of federal income taxation under the Code.

Section 6.07.  **Defeasance**.  The Authority will not defease, nor allow the defeasance of, the Bonds without (i) procuring a Verification Report and providing a copy thereof to the Banks

13-53846-swr   Doc 8072-3   Filed 10/22/14   Entered 10/22/14 20:35:47   Page 183 of 335

and (ii) contemporaneously paying all Required Payments and satisfying all obligations of the Authority hereunder.

**Section 6.08. Investment of Funds**.  The Authority shall cause all moneys held in the Funds established under the Indenture to be invested in Permitted Investments.  The Authority shall not after the Issue Date supplement or otherwise modify or amend (except by the removal of one or more investments which are Permitted Investments as of the Issue Date) the list of Permitted Investments without the prior written consent of the Banks in their discretion.

**Section 6.09. Hedge Agreements**.  The Authority will not enter into any Hedge Agreement hedging or otherwise relating to the Bonds, the Parity Debt or this Agreement without the prior written consent of the Banks.

**Section 6.10. Investment Policy**.  The Authority shall not amend its Investment Policy in any manner that could reasonably be expected to increase the degree of risk or decrease the credit quality of any of the Security. In the case of any proposed amendment, the Authority shall provide prior written notice to the Banks stating the terms of the proposed amendment.

**Section 6.11. Additional Parity Debt.**  The Authority shall not issue any additional Parity Debt without the prior written consent of the Banks, unless all Outstanding Bonds have been redeemed or otherwise refunded.

**B.  The City and the DWSD covenant and agree to the terms of the following Section 6.12 through Section 6.22 until all Required Payments have been indefeasibly paid in full, and all other obligations of the DWSD under this Agreement and under the other Related Documents have been performed:**

**Section 6.12. Amendments**.  Neither the City nor the DWSD shall amend, modify or supplement, nor agree to any amendment or modification of, or supplement to, any of the Related Documents or consent to, or permit or suffer to occur any action, course of dealing or omission which results in, or is equivalent to, an amendment, supplementation, termination or modification of any of the Related Documents, without the prior written consent of the Banks and any such amendment, supplementation, termination or modification made or entered into in violation of this Section shall be deemed a nullity and of no force and effect.  The City and the DWSD shall not take any action, nor cause the DWSD Trustee to take any action under any of the Related Documents, which is inconsistent with, or could reasonably be expected to impair, the DWSD's obligations, or the rights of the Banks, under this Agreement or any of the other Related Documents including, without limitation, any right or remedy of the Banks upon an Event of Default, the DWSD's obligations to make payments to the Banks under Article II of this Agreement, and the pledge of the Security under the DWSD Trust Indenture and the priority of the lien and security interest created thereby.

**Section 6.13. Preservation of Existence, Etc**.  The DWSD will not seek to directly or indirectly liquidate, wind up, terminate, reorganize, dissolve, merge or consolidate (or suffer any liquidation, winding up, termination, reorganization or dissolution), or form or acquire any subsidiary (other than in the ordinary course of business as conducted as of the Closing Date),

nor shall it sell, lease, assign, transfer or otherwise dispose of (in a single transaction or a series of transactions) all or substantially all of its property.

**Section 6.14. Certain Information**. The DWSD shall not include in an offering document or circular or reoffering supplement for the DWSD Obligations any information concerning the Banks that is not supplied in writing, or otherwise approved in writing, by the Banks expressly for inclusion therein.

**Section 6.15. DWSD Trustee**. The DWSD shall not remove the DWSD Trustee or appoint a successor thereto without the written consent of the Banks. The DWSD shall provide the Banks written notice of any change in the identity of the DWSD Trustee upon becoming aware of the same. Upon written notice from the Banks that the DWSD Trustee is failing to perform its duties in the manner contemplated by the DWSD Trust Indenture or the other Related Documents, the DWSD shall replace or cause to be replaced the DWSD Trustee with a successor acceptable to the Banks. If the position of Trustee becomes vacant, the DWSD shall promptly appoint a successor which is reasonably acceptable to the Banks.

**Section 6.16. Accounting Methods; Fiscal Year; Entity Classification**. The DWSD will not adopt, permit or consent to any change in accounting practices other than as required by GAAP and will not adopt, permit or consent to any change in its fiscal year or take (or permit to be taken) any action that results in a change to its entity classification for U.S. federal income tax purposes.

**Section 6.17. Exempt Status**. The City and the DWSD shall not take any action or omit to take any action, respectively, that, if taken or omitted, respectively, could cause any revocation or adverse modification of its federal income tax-exempt status or which would cause the interest with respect to the DWSD Obligations to be included in the gross income of the Owners thereof for purposes of federal income taxation under the Code.

**Section 6.18. Defeasance**. The City and the DWSD will not defease, nor allow the defeasance of, the DWSD Obligations without (i) procuring a Verification Report and providing a copy thereof to the Banks and (ii) contemporaneously paying all Required Payments and satisfying all obligations of the DWSD hereunder.

**Section 6.19. Investment of Funds**. The City and the DWSD shall cause all moneys held in the Funds established under the DWSD Trust Indenture and the Related Documents to which it is a party to be invested in Permitted Investments. The City and the DWSD shall not after the Issue Date supplement or otherwise modify or amend (except by the removal of one or more investments which are Permitted Investments as of the Issue Date) the list of Permitted Investments without the prior written consent of the Banks in its discretion.

**Section 6.20. Hedge Agreements**. The City and the DWSD will not enter into any Hedge Agreement hedging or otherwise relating to the DWSD Obligations, the Parity Debt or this Agreement without the prior written consent of the Banks.

**Section 6.21. Additional Parity Debt.** The City and the DWSD shall not issue any additional Parity Debt without the prior written consent of the Banks, unless all Outstanding DWSD Obligations have been redeemed or otherwise refunded.

13-53846-swr Doc 6708-4 Filed 08/12/14 Entered 08/12/14 20:35:47 Page 50 of
135

## ARTICLE VII

## EVENTS OF DEFAULT

**Section 7.01. Events of Default**. The occurrence of any of the following events shall constitute an "Event of Default":

(a)      Failure by (i) the Authority to pay or cause to be paid when due any principal, premium or interest, of or on, the Bonds, or any other amount owed by the Authority hereunder or under any of the other Related Documents or (ii) the DWSD to pay or cause to be paid when due any principal, premium or interest, of or on, the DWSD Obligations, or any other amount owed by the DWSD hereunder or under any of the other Related Documents;

(b)      Failure of the Authority to observe or perform the covenants set forth in any of Sections 5.02, 5.03, 5.06, 5.07, 5.10, 5.11, 5.13, 6.01, 6.02, 6.04, 6.06, 6.07, 6.08 or 6.11, or failure of the City and the DWSD to observe or perform the covenants set forth in any of Sections 5.15, 5.16, 5.19, 5.20, 5.23, 5.24, 6.12, 6.13, 6.15, 6.17, 6.18, or 6.19;

(c)      Failure of the Authority, the City or the DWSD to observe or perform any covenant, condition or provision of this Agreement (other than as specified in (a) or (b) above) and such failure remains uncured 10 Business Days after written notice of such failure from the Banks to the Authority, the City, the DWSD and the Trustee, or failure to observe or perform any covenant, condition or provision contained in any other Related Document as incorporated by reference pursuant to Sections 5.07 and 5.20 hereof;

(d)      Any representation or warranty made or deemed made by or on behalf of the Authority, the City or the DWSD in this Agreement or any other Related Document or in any amendment of, or waiver under, this Agreement or other Related Document, or in any certificate, financial statement or other document furnished by or on behalf of the Authority, the City or the DWSD pursuant to or in connection with this Agreement or any of the other Related Documents shall have been inaccurate or incomplete in any material respect when made or deemed to have been made;

(e)      The occurrence and continuation of a default, event of default or termination event under any of the other Related Documents, irrespective of whether said default, event of default or termination event is declared, undeclared or has been waived under the terms of such respective document, or a mandatory redemption, prepayment or acceleration has occurred with respect to the Bonds, the DWSD Obligations or any other Parity Debt;

(f)      Failure by the Authority or the DWSD to make a payment of the principal of, or premium or interest on, any Parity Debt (other than the Bonds and the DWSD Obligations) or other Debt payable from or secured by a Lien on Revenues, when and as the same shall become due and payable (whether by

52

scheduled maturity, required prepayment or redemption, acceleration, demand or otherwise);

(g)    (i) Failure by the Authority or the DWSD or any Affiliate of either thereof to make any payment (whether of principal, redemption price, interest or other amount) due in respect of (x) any other Parity Debt owed to a Bank or any Affiliate of a Bank or (y) any other Parity Debt having an aggregate outstanding principal amount in excess of $5,000,000, in any such case, as and when the same shall become due, and provided that any applicable notice or grace period shall not apply; or (ii) the occurrence or existence of a default or event of default (other than a payment default) or other similar condition by or on the part of the Authority or the DWSD (or any Affiliate of either thereof), under any Contract evidencing, issuing, securing or relating to such Parity Debt and continuance of such default or event of default or similar condition beyond the period of grace, if any, allowed with respect thereto, which results in such Parity Debt becoming, or being capable of becoming, due and payable or subject to mandatory prepayment or purchase prior to its scheduled maturity and regardless of whether any such right is exercised;

(h)    The entry or filing of one or more judgments or orders or of any similar decrees or decisions for the payment of money which, individually or in the aggregate, equals or exceeds $5,000,000 (each, a "Judgment") shall be rendered against the Authority or the DWSD or any Affiliate of either thereof or against any of its or their respective properties or assets and (x) such Judgment shall be undischarged, unstayed or unbonded (by property other than any of the Security) for a period of 30 consecutive days, or (y) any action shall be taken by a judgment creditor by which such judgment creditor attaches, executes or levies upon the Security to enforce any such Judgment;

(i)    The occurrence of an Event of Insolvency with respect to the Authority or the DWSD;

(j)    This Agreement, any other Related Document or any provision of this Agreement or any of the other Related Documents shall cease to be valid and binding on the Authority, or a Governmental Authority with jurisdiction to rule on the validity of this Agreement, the Authority Bond Resolution or any other Related Document shall so find, announce or rule, or the Authority, the DWSD, the City or any Person on its or their behalf shall (i) contest the validity or enforceability of this Agreement or any Related Document or any provision of this Agreement or any such Related Document, (ii) deny that the Authority or the DWSD has any further liability under one or more provisions of this Agreement or any of the other Related Documents or (iii) seek an adjudication that (y) this Agreement or (z) a provision of this Agreement or of the Authority Bond Resolution or any other Related Document relating to, or the absence or invalidity of which could adversely affect, the security for the Bonds, the DWSD Obligations or the other Parity Debt, or the Authority's or the DWSD's ability to pay the Bonds, the DWSD Obligations or the other Parity Debt or perform its respective obligations under this Agreement or any of the other

13-53846-swr   Doc 6773-3   Filed 08/12/14   Entered 08/12/14 20:33:47   Page 52 of 105
13-53846-swr   Doc 6058-4   Filed 08/12/14   Entered 08/12/14 16:33:47   Page 52 of 105
335

Related Documents or the rights and remedies of the Banks, is not valid and binding on the Authority;

(k)     Any Security or any of the other funds or accounts established under the Authority Bond Resolution or any of the other Related Documents shall become subject to any writ, judgment, warrant or attachment, execution or similar process;

(l)     (i) any Lien created by the Related Documents in favor of  the Trustee, the DWSD Trustee or the Banks, at any time and for any reason (except as expressly permitted to be released by the terms of such governing document) shall not constitute a valid and perfected Lien or shall fail to have the priority required by the Related Documents or, except as permitted under the Related Documents, the Authority or the DWSD shall so assert in writing, (ii) any legislation is enacted, repealed, reenacted, amended or otherwise modified, and such repeal, enactment, reenactment, amendment or modification, in the opinion of the Banks, has a Material Adverse Effect on the validity, enforceability or priority of the Lien on the Revenues in favor of the Banks or the other Parity Holders or (iii) any rescission of or amendment to or any other action under or in connection with any legislation, law or regulation relating to the Revenues which would (A) materially reduce the amount of the Revenues or the allocation of the Revenues to the payment of the Bonds, the DWSD Obligations or the other Parity Debt or (B) impair or adversely affect (x) the rights of the Authority or the DWSD to any or all of the Security or (y) the rights or security of (1) the Trustee or the Owners, or of any other Parity Holder under the Authority Bond Resolution, or (2) the DWSD Trustee under the DWSD Trust Indenture;

(m)     An event (separately or in the aggregate with other events) occurs which constitutes a Material Adverse Change;

(n)     Any event (other than the exercise of an optional call or optional tender right by the holder thereof or of a right of optional redemption by the Authority or the DWSD, in each case in the absence of a default or event of default) occurs or condition exists that results in any Parity Debt becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) any Parity Holder, or any trustee or agent on its or their behalf, to exercise any right to accelerate any Parity Debt or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity;

(o)     A repudiation by the Authority, the City or the DWSD of the payment when due of the principal of or premium or interest on the Bonds, the DWSD Obligations or any Parity Debt;

(p)     The Bankruptcy Order shall cease to be fully effective, in whole or in part, for any reason;

13-53846-tjt   Doc 6773-1   Filed 08/12/14   Entered 08/12/14 20:35:47   Page 53 of
135

(q) The commencement of any action by the City, the DWSD, the Authority or any third party challenging the Bonds Authorizing Act, or the validity or effect of either the Bonds Authorizing Act or the validity of the transactions contemplated by this Agreement; provided, however, that a direct appeal of the Bankruptcy Order shall not constitute an Event of Default hereunder.

**Section 7.02. Rights and Remedies; Consequences of an Event of Default**. If an Event of Default specified in Section 7.01 hereof shall occur, then in addition to any other rights or remedies available to the Trustee or the Banks under any other Related Documents or under Applicable Law, the Banks may exercise any one or more of the following rights and remedies:

(a) by notice to the Authority or the DWSD, accelerate all of the Required Payments (other than the Bonds, which are subject to acceleration as provided in Section 7.02(c)) whereupon such Required Payments shall become immediately due and payable without presentment, demand for payment, protest or notice of nonpayment or dishonor, or other notice of any kind or character, all of which are hereby expressly waived, and an action therefor shall immediately accrue; provided that (i) upon the occurrence of any Event of Default described in Sections 7.01(i) or 7.01(o) above, or (ii) upon any payment by the Authority of all or any portion of the principal amount of any Parity Debt that is accelerated due to the occurrence of an event of default or similar event, or any deposit to a cash collateral account in respect of, or as security for, any Parity Debt due to the occurrence of an event of default or similar event (other than a posting of collateral pursuant to a Hedge Agreement in the absence of a default or termination event or the posting of collateral to secure all Parity Debt pari passu), the Required Payments under this Agreement and the other Related Documents shall automatically mature and be due and payable on the date of the occurrence of such event described under (i) or (ii) without presentment, demand, protest, notice of default or intention to accelerate, notice of acceleration or other notice of any kind to the Authority or any other Person, all of which are hereby expressly waived;

(b) (i) apply to any court of competent jurisdiction for, and obtain appointment of, a receiver, (ii) either personally or by attorney or agent and without bringing any action or proceeding, or by such a receiver, take whatever action at law or in equity may appear necessary or desirable to collect the amounts due and payable under the Related Documents or to enforce performance or observance of any of the Required Payments under the Related Documents, whether for specific performance of any agreement or covenant of the Authority or in aid of the execution of any power granted to the Banks in the Related Documents or as otherwise available at law or in equity;

(c) deliver a notice to the Trustee, the Authority and the DWSD that an Event of Default has occurred and is continuing and instructing the Trustee to take all actions required as provided under the Indenture;

13-53846-swr    Doc 6093-1    Filed 07/18/14    Entered 07/18/14 20:33:47    Page 55 of 105
13-53846-swr    Doc 8066-4    Filed 10/20/14    Entered 10/20/14 16:35:47    Page 160 of 135

(d)     cure any Default, Event of Default or event of nonperformance hereunder or under any other Related Document; provided, however, that the Banks shall have no obligation to effect such a cure; and

(e)     exercise, or cause to be exercised, any and all remedies as it may have to realize on the Security under the other Related Documents including, without limitation, any rights it holds as a holder singly or together with other holders of Parity Debt to accelerate the Bonds and the other Parity Debt as provided in the Authority Bond Resolution and the Related Documents and to take any and all actions otherwise available under the Authority Bond Resolution and the Related Documents and any and all remedies as are otherwise available at law or in equity.

**Section 7.03. Remedies Cumulative; Solely for the Benefit of the Banks**.  To the extent permitted by, and subject to the mandatory requirements of, Applicable Law, each and every right, power and remedy specifically given to the Banks herein or in the other Related Documents shall be cumulative, concurrent and nonexclusive and shall be in addition to every other right, power and remedy herein specifically given or now or hereafter existing at law, in equity or by statute, and each and every right, power and remedy (whether specifically herein given or otherwise existing) may be exercised from time to time and as often and in such order as may be deemed expedient by the Banks, and the exercise or the beginning of the exercise of any power or remedy shall not be construed to be a waiver of the right to exercise at the same time or thereafter any other right, power or remedy.

The rights and remedies of the Banks specified herein are for the sole and exclusive benefit, use and protection of the Banks, and the Banks are entitled, but shall have no duty or obligation to the Authority, the City, the DWSD, the Trustee or any other Person or otherwise, to exercise or to refrain from exercising any right or remedy reserved to the Banks hereunder or under any of the other Related Documents.

**Section 7.04. Waivers or Omissions**.  No delay or omission by the Banks in the exercise of any right, remedy or power or in the pursuit of any remedy shall impair any such right, remedy or power or be construed to be a waiver of any default on the part of the Banks or to be acquiescence therein.  No express or implied waiver by the Banks of any Event of Default shall in any way be a waiver of any future or subsequent Event of Default.  No delay or omission on the part of the Banks (or the Trustee) in exercising any right to acceleration of the maturity of the Bonds or any of the other Required Payments, or any remedy under the Related Documents following any Event of Default as aforesaid, or any other option granted to the Banks (or the Trustee) hereunder in any one or more instances, or the acceptance by the Banks (or the Trustee) of any partial payment on account of the Required Payments shall constitute a waiver of any such Event of Default and each such option shall remain continuously in full force and effect.

**Section 7.05. Discontinuance of Proceedings**.  In case the Banks shall proceed to invoke any right, remedy or recourse permitted hereunder or under the Related Documents and shall thereafter elect to discontinue or abandon the same for any reason, the Banks shall have the unqualified right so to do and, in such event, the Authority, the DWSD and the Banks shall be restored to their former positions with respect to the Required Payments, the Related Documents

and otherwise, and the rights, remedies, recourse and powers of the Banks hereunder shall continue as if the same had never been invoked.

**Section 7.06. Injunctive Relief**. The Authority, the City and the DWSD recognize that in the event an Event of Default occurs, any remedy of law may prove to be inadequate relief to the Banks; therefore, the Authority, the City and the DWSD agree that the Banks, if the Banks so request, shall be entitled to temporary and permanent injunctive relief in any such case.

## ARTICLE VIII

## NATURE OF OBLIGATIONS; INDEMNIFICATION

**Section 8.01. Obligations Absolute**. The obligations of the Authority and the DWSD to pay all Required Payments under this Agreement and the other Related Documents shall be absolute, unconditional and irrevocable, subject, however to Section 8.05 hereof, notwithstanding any other provision of this Agreement or any other Related Document, and shall not be subject to any right of setoff, recoupment or counterclaim against the Banks or any other Owner and shall be paid and performed strictly in accordance with the terms of this Agreement under all circumstances whatsoever. Until the principal of and interest on the Bonds and all Required Payments, have been indefeasibly paid in full and all other obligations of the Authority and the DWSD hereunder and under the Related Documents have been performed and discharged, the Authority, the City and the DWSD each waive and covenant not to assert any right of setoff or recoupment against its obligation to make all payments of principal, interest and all other Required Payments due hereunder and under the other Related Documents in the amounts and at the times required hereby and thereby, and without abatement, diminution, deduction, counterclaim or defense for any reason, including, without limitation, in the following circumstances:

> (a)    any lack of validity or enforceability of any of the Related Documents;

> (b)    any amendment or waiver of any provision, term or condition of any of the Related Documents;

> (c)    the existence of any dispute with, or any claim, right of setoff or recoupment, defense or other rights which the Authority, the City and the DWSD may have at any time against the Trustee, the DWSD Trustee, the Banks (other than the defense of payment to the Banks in accordance with the terms of this Agreement), any Owner or any other Person, whether in connection with this Agreement, the Related Documents or any transaction contemplated thereby or any unrelated transaction; and

> (d)    any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section, constitute a legal or equitable discharge of, or provide a right of setoff or recoupment against, the Authority's or the DWSD's obligations hereunder or under any of the other Related Documents.

**Section 8.02. Continuing Obligation**.  All covenants, agreements, representations and warranties made by the Authority, the City and the DWSD in this Agreement and in the certificates or other instruments  delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the Banks and shall survive the execution and delivery of this Agreement and the issuance and purchase by the Banks of the  Bonds, regardless of any investigation made by the Banks or on its behalf and notwithstanding that the Banks may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the Bonds or any Required Payments remain outstanding and unpaid. The obligations of the Authority, the City and the DWSD under this Agreement shall survive and continue until the date upon which all amounts due and owing to the Banks hereunder and under any Bonds shall have been indefeasibly paid in full; *provided, however,* that the obligations of the Authority, the City and the DWSD pursuant to Sections 2.06, 8.03, 8.04, 9.12 and 9.13 hereof shall survive any expiration or termination of this Agreement.

**Section 8.03. Liability of the Banks**.  The Authority, the City and the DWSD each hereby unconditionally and irrevocably releases and discharges the Banks, its Affiliates and each other Owner, and each of their respective officers, directors, employees and agents (each, a "Releasee"), from all liability or responsibility for any losses, liabilities, damages, claims, costs (including attorneys' fees), judgments or causes of action (collectively, "Liabilities") arising out of or in connection with any of the following: (a) the use that may be made of the proceeds of the Bonds or for any acts or omissions of the Authority, the City, the DWSD or the Trustee; (b) any of the acts, omissions, agreements, circumstances or conditions covered by the indemnification provided in Section 8.04 and (c) any other circumstance whatsoever in connection with the purchase and holding by the Banks (or other Owner) of the Bonds or the enforcement of this Agreement or the exercise of any rights or remedies hereunder, under any other Related Document or under law or in equity by the Banks (or other Owner); provided that, the Authority and the DWSD shall have a claim against the Banks (or other Owner) and the Banks (or other Owner) shall be liable to the Authority and the DWSD  to the extent, but only to the extent, of any direct, actual damages suffered or incurred by the Authority and the DWSD, and not required to be mitigated by the Authority, the City and the DWSD, which direct, actual damages are determined by a final and nonappealable judgment of a court of competent jurisdiction to have been directly caused by the Bank's willful misconduct or gross negligence in the performance or non-performance of a duty owed to the Authority and the DWSD.  The Authority, the City and the DWSD further unconditionally and irrevocably release the Releasees from all Liabilities for or constituting lost profits and from all Liabilities for or constituting consequential, special, indirect or punitive (or exemplary) damages (the right to recover or receive lost profits, consequential, special, indirect or punitive (or exemplary) damages being hereby waived), suffered or incurred by the Authority, the City and the DWSD.

**Section 8.04. Indemnification; Taxes, Etc.**  (a)  In addition to any and all rights of reimbursement, indemnification, subrogation or any other rights pursuant hereto or under law or equity, only to the extent permitted by applicable law, the Authority hereby agrees to defend, indemnify and hold harmless each of the Banks, their Affiliates, each other Owner and each Participant and each of the respective officers, directors, employees and agents of the foregoing Persons (each an "Indemnified Party") from and against any and all claims, damages, losses, liabilities, reasonable costs or expenses whatsoever (including reasonable attorneys' fees) that an

13-53846-tjt   Doc 8008-1   Filed 10/22/14   Entered 10/22/14 07:35:47   Page 57 of 135

Indemnified Party may incur (or which may be claimed against an Indemnified Party by any Person whatsoever) that arises out of or in connection with any of the transactions contemplated by this Agreement or the Related Documents, including, without limitation, (i) the issuing, offering or sale of the Bonds; (ii) the proposed or actual use of the proceeds of the Bonds; (iii) the untruth or material inaccuracy of any warranty or representation undertaken or given by the Authority in this Agreement or any Related Document or in any certificate furnished hereunder or thereunder or the breach or nonperformance by any Person of any covenant of this Agreement or any other Related Document; (iv) any act or omission of the Authority or any imposition arising from, burden imposed by, violation of, or failure to comply with, any Applicable Law by the Authority; (v) any Taxes or Other Taxes; or (vi) the involvement of any Indemnified Party in any legal suit, investigation, proceeding, inquiry or action as a consequence, direct or indirect, of the purchase or holding of the Bonds, the entering into of this Agreement or any action taken or omitted to be taken hereunder or under any of the other Related Documents or any other event or transaction contemplated by any of the foregoing; provided, in each case, that the Authority shall not be required to indemnify the Banks for any claims, damages, losses, liabilities, costs or expenses to the extent, but only to the extent, directly caused by the willful misconduct or gross negligence of the Banks, to the extent that there has been a final and nonappealable judgment of a court of competent jurisdiction that such claims, damages, losses, liabilities, costs and expenses were directly caused by the willful misconduct or gross negligence of the Banks. If any proceeding shall be brought or threatened against an Indemnified Party by reason of or in connection with the events described in (i), (ii), (iii), (iv), (v) or (vi), such Indemnified Party shall promptly notify the Authority in writing and the Authority shall assume the defense thereof, including the employment of counsel and the payment of all costs of litigation.

(b)  In addition to any and all rights of reimbursement, indemnification, subrogation or any other rights pursuant hereto or under law or equity, only to the extent permitted by applicable law, the DWSD hereby agrees to defend, indemnify and hold harmless each Indemnified Party from and against any and all claims, damages, losses, liabilities, reasonable costs or expenses whatsoever (including reasonable attorneys' fees) that an Indemnified Party may incur (or which may be claimed against an Indemnified Party by any Person whatsoever) that arises out of or in connection with any of the transactions contemplated by this Agreement or the Related Documents, including, without limitation, (i) the issuing, offering or sale of the Bonds; (ii) the proposed or actual use of the proceeds of the Bonds; (iii) the untruth or material inaccuracy of any warranty or representation undertaken or given by the DWSD in this Agreement or any Related Document or in any certificate furnished hereunder or thereunder or the breach or nonperformance by any Person of any covenant of this Agreement or any other Related Document; (iv) any act or omission of the DWSD or any imposition arising from, burden imposed by, violation of, or failure to comply with, any Applicable Law by the DWSD; (v) any Taxes or Other Taxes; or (vi) the involvement of any Indemnified Party in any legal suit, investigation, proceeding, inquiry or action as a consequence, direct or indirect, of the purchase or holding of the Bonds, the entering into of this Agreement or any action taken or omitted to be taken hereunder or under any of the other Related Documents or any other event or transaction contemplated by any of the foregoing; provided, in each case, that the DWSD shall not be required to indemnify the Banks for any claims, damages, losses, liabilities, costs or expenses to the extent, but only to the extent, directly caused by the willful misconduct or gross negligence of the Banks, to the extent that there has been a final and nonappealable judgment of a court of competent jurisdiction that such claims, damages, losses, liabilities, costs and expenses were

directly caused by the willful misconduct or gross negligence of the Banks. If any proceeding shall be brought or threatened against an Indemnified Party by reason of or in connection with the events described in (i), (ii), (iii), (iv), (v) or (vi), such Indemnified Party shall promptly notify the DWSD in writing and the DWSD shall assume the defense thereof, including the employment of counsel and the payment of all costs of litigation.

(c)     Neither the Authority nor the DWSD will settle or compromise any such action or claim without the prior written consent of the relevant Indemnified Party if the settlement or compromise would require any act or admission by such Indemnified Party or any of its Affiliates, or impose any cost or expense on the Indemnified Party or its Affiliates or impose any limitation on the business or future actions of the Indemnified Party or its Affiliates. Notwithstanding the preceding sentence, an Indemnified Party shall have the right to employ its own counsel and to determine its own defense of such action in any such case, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party unless (x) the employment of such counsel has been authorized in writing by the Authority or the DWSD, as applicable or (y) the Authority or the DWSD, as applicable, after due notice of the action, shall not have employed counsel to have charge of such defense, in either of which events the reasonable fees and expenses of counsel for such Indemnified Party shall be borne by the Authority or the DWSD, as applicable. The Authority and the DWSD shall not be liable for any settlement of any such action effected without its consent. Nothing under this Section 8.04 shall or shall be construed to limit the Authority's or the DWSD's payment obligations under Article II.

(d)     The provisions of this Section 8.04 shall survive the termination of this Agreement and the payment in full of the Bonds and the obligations of the Authority and the DWSD thereunder and hereunder.

**Section 8.05. Limited Obligations.** Notwithstanding anything in this Agreement to the contrary, the Authority and the DWSD are obligated to pay their obligations under this Agreement only from the Security. The State is not obligated to pay any such obligation and neither the faith and credit nor the taxing power of the State is pledged to the payment of such obligations. The Authority and the DWSD have no taxing power. **NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, THIS AGREEMENT IS NOT A DEBT OR LIABILITY OF THE STATE OR OF ANY AGENCY OR INSTRUMENTALITY OF THE STATE, OTHER THAN THE AUTHORITY AND THE DWSD AS SET FORTH IN THE BONDS AUTHORIZING ACT, EITHER LEGAL, MORAL OR OTHERWISE. THIS AGREEMENT DOES NOT CREATE OR CONSTITUTE AN INDEBTEDNESS, LIABILITY OR OBLIGATION OF THE STATE OR CONSTITUTE A PLEDGE OF THE FULL FAITH AND CREDIT OF THE STATE. NOTHING IN THE BONDS AUTHORIZING ACT SHALL BE CONSTRUED TO AUTHORIZE THE AUTHORITY AND THE DWSD TO INCUR ANY INDEBTEDNESS OR LIABILITY ON BEHALF OF THE STATE.**

**ARTICLE IX**

**MISCELLANEOUS**

13-53846-swr   Doc 8273-3   Filed 11/12/14   Entered 11/12/14 17:35:47   Page 59 of 105
13-53846-swr   Doc 8068-4   Filed 10/20/14   Entered 10/20/14 14:26:33   Page 49 of 105
335

**Section 9.01.  Assignment of Rights to the Banks.**  The Authority appoints the Banks as its representative for all purposes of enforcing the rights of the owners of the DWSD Obligations as set forth in the DWSD Trust Indenture.

**Section 9.02.  Right of Setoff**.  Upon the occurrence of an Event of Default, the Banks and their Affiliates may, at any time and from time to time, without notice to the Authority and the DWSD or any other Person (any such notice being expressly waived), set off and appropriate and apply, against and on account of, any obligations and liabilities of the Authority and the DWSD to the Banks or their Affiliates, whether or not arising under or connected with this Agreement or the Related Documents and without regard to whether or not the Banks shall have made any demand therefor and although such obligations and liabilities may be contingent or unmatured and regardless of currency, place of payment or booking office thereof, any and all deposits (general or special, including but not limited to Debt evidenced by certificates of deposit, but not including trust accounts) and any other Debt or other payment obligation at any time held or owing by the Banks or their Affiliates to or for the credit or the account of the Authority and the DWSD, whether or not arising under or connected with this Agreement or the Related Documents, whether or not matured, whether or not contingent and regardless of the currency, place of payment or booking office thereof. The rights of the Banks under this Section are in addition to other rights and remedies (including other rights of setoff) which the Banks may have at law or in equity.

**Section 9.03.  Amendments and Waivers; Remedies Cumulative**.  No amendment or waiver of any provision of this Agreement nor consent to any departure by the Authority, the City or the DWSD from any such provision shall in any event be effective unless the same shall be in writing and signed by the Banks.  Any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  In the event any covenant or agreement contained in this Agreement should be breached by the Authority, the City or the DWSD and thereafter waived by the Banks, such waiver shall be limited to the particular breach so waived for the specific period set out in such waiver and such waiver shall not constitute a waiver of such breach for any other period and shall not waive any other or similar breach hereunder.  Specifically and not in limitation of the foregoing, this Agreement may not be amended or modified by course of dealing, oral acknowledgement or agreement or by any writing, unless it is a writing which is expressly stated to constitute an amendment of this Agreement and is signed by an authorized officer for the Banks and an Authorized Officer and an authorized representative of the Authority, the City and the DWSD.  The rights and remedies of the Banks hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have.

**Section 9.04.  Notices**.  All notices, requests, demands, directions and other communications (collectively "notices") under the provisions of this Agreement shall be in writing (including facsimile communication), unless otherwise expressly permitted hereunder, and shall be properly addressed and sent by registered or certified mail or by express courier for next Business Day delivery and shall be deemed received as follows:  (a) if by registered or certified mail, five (5) days after mailing; (b) if by express courier for next Business Day delivery, on the next Business Day; and (c) if by facsimile, when confirmation of transmission is obtained if prior to 5:00 p.m. local time on a Business Day, and otherwise, on the next Business Day; provided that service of a notice prescribed by any applicable statute shall be considered

61

complete when the requirements of that statute are met. Notices by electronic mail (e-mail) shall not constitute notice under this Agreement and are only to be used in addition to notice given as prescribed under (a), (b) or (c) of this Section 9.04. All notices shall be sent to the applicable party at the following address or in accordance with the last unrevoked written direction from such party to the other parties hereto:

if to the Authority, addressed to the Authority at:

> Michigan Finance Authority
> 430 W. Allegan Street
> Lansing, Michigan 48922
> Attention: Executive Director
> Telephone: (517) 335-0994
> Facsimile: (517) 241-1233
> Email: treas_bondfinance@michigan.gov

if to the DWSD, addressed to the DWSD at:

> Detroit Water and Sewerage Department
> _____
> Detroit, MI _____
> Attention: Executive Director
> Telephone: 313-324-8290
> Facsimile: 313-638-2805
> Email: _____

if to the City, addressed to the City at:

> City of Detroit
> _____
> Detroit, MI _____
> Attention: _____
> Telephone: _____
> Facsimile: _____
> Email: _____

or if to the Banks, addressed to them at:

> For Administrative Matters:

> Citibank, N.A.
> 390 Greenwich Street, 2nd Flood
> New York, New York 10013
> Attention: _____
> Telephone: 212-723-5577

13-53846-swr Doc 8228-3 Filed 11/12/14 Entered 11/12/14 14:26:35 Page 61 of 135

Facsimile: 866-914-8193
Email: _____

For Credit Matters:

Citibank, N.A.
390 Greenwich Street, 8th Floor
New York, New York 10013
Attention: Municipal Credit Surveillance
Telephone: 212-723-4339
Facsimile: 212-723-8592
Email: munisurveillance@citi.com

[INSERT NOTICE ADDRESSES FOR OTHER BANKS]

or if to the Trustee, addressed to it at:

Wilmington Trust, National Association
Corporate Trust Services
25 South Charles Street, 11th Floor
Baltimore, MD 21201
Attention: _____
Telephone: 410-545-2193
Facsimile: 410-244-4236

or as to each party at such other address as shall be designated by such party in a written notice to the other parties.

Any notice or other communication shall be sufficiently given and shall be deemed given when delivered to the addressee in writing or when given by telephone immediately confirmed in writing by electronic mail or other telecommunication device.

**Section 9.05. Severability.** Each of the parties to this Agreement intends that each provision in this Agreement comport with all applicable requirements of law. However, if all or any portion of any provision or provisions in this Agreement is or are found by a court of competent jurisdiction to be in violation of any applicable statute, regulation, administrative or judicial decision or public policy, and if such court should declare such portion, provision or provisions of this Agreement to be invalid, unlawful, void or unenforceable as written, then it is the express intent of each of the parties hereto that the obligations, rights and interests of the respective parties under the remainder of this Agreement shall continue in full force and effect and such portion, provision or provisions which is held or determined to be invalid, unlawful, void or unenforceable as written shall, nonetheless, be enforced and binding to the fullest extent permitted by law as though such portion, provision or provisions had been written in such a manner and to such an extent as to be valid, lawful and enforceable under the circumstances.

**Section 9.06. GOVERNING LAW.** THIS AGREEMENT SHALL BE DEEMED TO BE A CONTRACT UNDER, AND TOGETHER WITH ANY DISPUTES OR CONTROVERSIES ARISING OUT OF OR RELATING TO THIS AGREEMENT, SHALL BE

63

GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK AND APPLICABLE FEDERAL LAW, WITHOUT REGARD TO CHOICE OF LAW RULES OTHER THAN NEW YORK GENERAL OBLIGATIONS LAW SECTION 5-1401 (OR ANY SUCCESSOR STATUTE THERETO); PROVIDED THAT THE OBLIGATIONS OF THE AUTHORITY, THE CITY AND THE DWSD AND LEGAL AUTHORITY AND CAPACITY OF THE AUTHORITY, THE CITY AND THE DWSD UNDER THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE.

**Section 9.07. Headings**. Section headings in this Agreement are included herein for convenience of reference only and shall not have any effect for purposes of interpretation or construction of the terms of this Agreement.

**Section 9.08. Successors and Assigns**. (a) (i) This Agreement is a continuing obligation and shall be binding upon and inure to the benefit of the Authority, DWSD, the Banks and their respective successors, endorsees and assigns; provided, that, the Authority and the DWSD shall not assign, transfer or delegate all or any portion of their rights or obligations hereunder or under the other Related Documents without the prior written consent of the Banks. The Banks may from time to time and without the consent of the Authority, the City or the DWSD or any other Person assign, sell or transfer in whole or in part, this Agreement and any of its rights or interests hereunder and all or any part of its interest in the Bonds and the Related Documents.

> (ii)     Any successor to, or assignee of, Citibank, N.A. [or OTHER BANKS, TBD] as the initial Banks shall give written notice to the Authority and the DWSD and the Trustee identifying the assignee or successor as the Banks for all purposes of this Agreement and the other Related Documents. Insofar as the successor Bank is not the sole Owner of the Bonds, the group of Owners then owning a majority of the aggregate principal amount of the Bonds then Outstanding shall give notice to the Authority and the DWSD and the Trustee that they constitute the Banks as herein defined and, provided any such notice on its face establishes the requisite ownership of a majority of the aggregate principal amount of the Bonds then Outstanding by the Owners identified therein, such Owners shall thereupon constitute the Banks and shall succeed to and become vested with all of the rights, powers, privileges and responsibilities of the Banks in this Agreement and each of the other Related Documents. The predecessor Bank shall be discharged from its duties and obligations hereunder, provided that the predecessor Bank shall continue to be entitled to the benefits of Article II and Sections 8.03, 8.04, 9.12 and 9.13 hereof and of each other provision of any Related Document granting a right of payment, indemnity or reimbursement in favor of the Banks.

> (iii)     Each Bank may designate any nominee, designee or agent to act for and in the name of the Bank by written notice to the Authority, the DWSD and the Trustee and any such duly designated nominee, designee or agent shall thereupon be empowered to act for and on behalf of the Bank and exercise the rights, powers, privileges and responsibilities of a Bank in this Agreement and each of the other Related Documents.

(iv)     The Authority and the DWSD agree to provide to the Banks, promptly upon request, a copy of the most recent financial information concerning the Authority and the DWSD in connection with any assignment or prospective assignment.  A Bank may disclose to any assignees or prospective assignees any information or data in the Bank's possession relating to this Agreement, the Bonds or any other Related Document, without the consent of or notice to the Authority, the City or the DWSD.

(b)     **Certain Pledges**.  The Banks, and each of them, may at any time, without notice to, or any requirement to seek the consent of, the Authority, the City or the DWSD, pledge or grant a security interest in all or any portion of its rights under the Bonds, this Agreement and the other Related Documents (including without limitation rights to payment under the Bonds and this Agreement) to secure obligations of the Banks, including any pledge or assignment to secure obligations to a Federal Reserve Banks.

(c)     **Participations**.  The Authority, the City and the DWSD acknowledge and agree that the Banks shall have the right to grant participations in all or a portion of a Bank's interest in the Bonds, this Agreement and the other Related Documents to one or more other banking institutions (each Person granted such participation to be a "Participant"), and such Participants shall, except as set forth in the following clause (ii), be entitled to the benefits of this Agreement and the Related Documents to the same extent as if they were a direct party to this Agreement; provided, however, that (i) no such participation by any such Participant shall in any way affect the obligations of the Banks hereunder and (ii) the Authority, the City, the DWSD and the Trustee shall be required to deal only with the Banks, with respect to any matters under this Agreement, the Bonds and the other Related Documents and no such Participant shall be entitled to enforce against the Authority and the DWSD any provision hereunder.  The Authority and the DWSD agree to provide to the Banks, promptly upon request, a copy of the most recent financial information concerning the Authority and the DWSD in connection with any such participation or prospective participation.  The Banks may disclose to any Participants or prospective Participants any information or data in a Bank's possession relating to this Agreement, the Bonds or any other Related Document, without the consent of or notice to the Authority, the City and the DWSD.  The Authority, the City and the DWSD further acknowledge and agree that upon any such participation the Participants will become owners of a pro rata portion of the participated obligations and the Authority, the City and the DWSD waive any right of setoff it may at any time have against the Banks or any Participant with regard to the participated obligations.

**Section 9.09.  Counterparts; Complete and Controlling Agreement**.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Related Documents completely set forth the agreements between the Banks and the Authority and between the Banks and the DWSD and supersede all prior and contemporaneous understandings, agreements and contracts, both written

13-53846-swr   Doc 8008-3   Filed 10/22/14   Entered 10/22/14 16:35:47   Page 105 of
135

and oral, between the Banks and the Authority and between the Banks and the DWSD relating to the issuance, sale and purchase of the Bonds and all matters set forth herein and in the Related Documents.

**Section 9.10.  Waiver of Rule of Construction**.  The Authority, the City and the DWSD hereby waive any and all provisions of law to the effect that an ambiguity in a contract or agreement should be interpreted against the party responsible for its drafting.

**Section 9.11. WAIVER OF JURY TRIAL**.  THE AUTHORITY, THE CITY, THE DWSD AND THE BANKS EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION (WHETHER AS CLAIM, COUNTER-CLAIM, AFFIRMATIVE DEFENSE OR OTHERWISE) BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH, THIS AGREEMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF THE AUTHORITY, THE CITY, THE DWSD OR THE BANKS.  THE AUTHORITY, THE CITY AND THE DWSD EACH ACKNOWLEDGE AND AGREE THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND RECOGNIZES AND AGREES THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE BANKS ENTERING INTO THIS AGREEMENT AND PURCHASING THE BONDS.  THE AUTHORITY, THE CITY AND THE DWSD REPRESENT AND ACKNOWLEDGE THAT EACH HAS REVIEWED THIS PROVISION WITH ITS LEGAL COUNSEL AND THAT EACH HAS KNOWINGLY AND VOLUNTARILY WAIVED ANY JURY TRIAL RIGHTS EACH MAY HAVE FOLLOWING CONSULTATION WITH SUCH LEGAL COUNSEL.

**Section 9.12.  Payments Set Aside**.  To the extent that any payment by or on behalf of the Authority and the DWSD is made to the Banks, or the Banks exercise their right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Banks in their discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred.

**Section 9.13.  Usury**.  If notwithstanding the application of Section 2.08 of this Agreement, Applicable Law shall be interpreted by a court of competent jurisdiction to render usurious any amount or amounts payable to the Banks under this Agreement or under the Bonds, or contracted for, charged or received by the Banks with respect to the obligations of the Authority and the DWSD hereunder or under the Bonds, or if any acceleration or optional or extraordinary prepayment results in the Authority and the DWSD having paid any interest (together with any Charges) in excess of that permitted by Applicable Law, then it is the Bank's express intent that all excess amounts theretofore collected by the Banks shall be credited against the principal balance of the Authority's and the DWSD's obligations to the Banks and the provisions of this Agreement and the other Related Documents shall immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder modified, without the

necessity of the execution of any new documents, so as to comply with the Applicable Law, but so as to permit the recovery of the fullest amount otherwise called for hereunder or thereunder. All sums paid or agreed to be paid to the Banks, which may be characterized as interest under Applicable Law shall, to the extent permitted thereby, be amortized, prorated, allocated, and spread throughout the full stated term of the Bonds or other obligations of the Authority and the DWSD until payment in full so that the rate or amount of interest on account of such obligations does not exceed the Maximum Lawful Rate from time to time in effect and applicable to such obligations for so long as the obligations are outstanding.

Section 9.14. **Electronic Signature; Electronically Signed Document**. For purposes hereof, "electronic signature" means a manually-signed original signature that is then transmitted by electronic means; "transmitted by electronic means" means sent in the form of a facsimile or sent via the Internet as a pdf (portable document format) or other replicating image attached to an e-mail message; and, "electronically signed document" means a document transmitted by electronic means and containing, or to which there is affixed, an electronic signature. The parties agree that the electronic signature of a party to this Agreement (or any amendment or supplement of this Agreement) shall be as valid as an original signature of such party and shall be effective to bind such party to this Agreement. The parties agree that any electronically signed document (including this Agreement) shall be deemed (i) to be "written" or "in writing," (ii) to have been signed, and (iii) to constitute a record established and maintained in the ordinary course of business and an original written record when printed from electronic files. Such paper copies or "printouts", if introduced as evidence in any judicial, arbitral, mediation or administrative proceeding, will be admissible as between the parties to the same extent and under the same conditions as other original business records created and maintained in documentary form. Neither party shall contest the admissibility of true and accurate copies of electronically signed documents on the basis of the best evidence rule or as not satisfying the business records exception to the hearsay rule.

Section 9.15. **No Advisory or Fiduciary Responsibility**. In connection with all aspects of the transactions contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Related Document), the Authority, the City and the DWSD acknowledge and agree that: (a) (i) the services, if any, regarding this Agreement provided by the Banks and any of their Affiliates are arm's-length commercial transactions between the Authority, the City, the DWSD and its Affiliates, on the one hand, and the Banks and their Affiliates, on the other hand, (ii) the Authority, the City and the DWSD each have consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (iii) the Authority, the City and the DWSD are each capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Related Documents; (b) (i) the Banks and each of its Affiliates is and has been acting solely as a principal and has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Authority, the City, the DWSD or any of its Affiliates, or any other Person and (ii) neither the Banks nor any of their Affiliates has any obligation to the Authority, the City the DWSD or any of its Affiliates with respect to the Transactions, except those obligations expressly set forth herein; and (c) the Banks and each of their Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Authority, the DWSD and its Affiliates, and neither the Banks nor any of their Affiliates has any obligation to disclose any of such interests to the Authority, the DWSD or its Affiliates. To the fullest extent

permitted by Applicable Law, the Authority and the DWSD hereby waive and release any claims that it may have against the Banks and each of their Affiliates with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this Bond Purchase and Supplemental Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

MICHIGAN FINANCE AUTHORITY

By _____
Name       Joseph      L.      Fielek
Title Executive DirectorCITY OF DETROIT, MICHIGAN

By _____
Name
Title_____

DETROIT WATER AND SEWERAGE DEPARTMENT

By _____
Name Odis Jones
Title Executive Director

[Signatures continued on next page]

[Signature page to Bond Purchase and Supplemental Agreement]

CITIBANK, N.A.

By _____
Name _____
Title <u>Vice-President</u>

**EXHIBIT [A]**
**BANKRUPTCY ORDER**

# SCHEDULE I

# BOND PURCHASE PRICE

**EXHIBIT 3B**

CHI-1940093v3

13-53846-swr Doc 8208-3 Filed 10/22/14 Entered 10/22/14 20:33:47 Page 72 of 105
13-53846-swr Doc 8208-4 Filed 10/22/14 Entered 10/22/14 07:35:47 Page 72 of 105
315

**BOND PURCHASE AND SUPPLEMENTAL AGREEMENT**

among

**MICHIGAN FINANCE AUTHORITY**

and

**DETROIT WATER AND SEWERAGE DEPARMENT**

and

**CITIBANK, N.A.**

and

**[OTHER BANKS TBD]**

Relating to

**Local Government Loan Program Revenue Bonds, Series 2014____**
**(Detroit Water and Sewerage Department Local Project Bonds)**

Dated August __, 2014

# TABLE OF CONTENTS

Page

## ARTICLE I
## DEFINITIONS

Section 1.01.    Definitions................................................................................ 2
Section 1.02.    Incorporation of Certain Definitions by Reference ..................... 14
Section 1.03.    Accounting Matters..................................................................... 14
Section 1.04.    Computation of Time Periods...................................................... 14
Section 1.05.    New York City Time Presumption .............................................. 14
Section 1.06.    Relation to Other Documents...................................................... 14
Section 1.07.    Interpretation............................................................................... 14

## ARTICLE II
## PURCHASE OF BONDS; PAYMENT AND REIMBURSEMENT OBLIGATIONS

Section 2.01.    Purchase of Bonds........................................................................ 15
Section 2.02.    Payment of Bonds ........................................................................ 15
Section 2.03.    Optional Redemption; Mandatory Redemption ........................... 15
Section 2.04.    Payments Generally...................................................................... 15
Section 2.05.    Costs, Expenses and Taxes .......................................................... 16
Section 2.06.    Change in Law .............................................................................. 17
Section 2.07.    Cure............................................................................................... 18
Section 2.08.    Payment of Interest and Other Amounts...................................... 19

## ARTICLE III
## CONDITIONS PRECEDENT

Section 3.01.    Documentary and Related Closing Conditions............................. 20
Section 3.02.    Credit Requirements ..................................................................... 27
Section 3.03.    Additional Conditions Precedent ................................................. 27

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES

Section 4.01.    Due Organization; Power and Authority ...................................... 27
Section 4.02.    Authorization and Validity of Agreement, Related Documents and
                 Borrowing .................................................................................... 27
Section 4.03.    Compliance of Agreement, Related Documents with Applicable Law,
                 Organizational Documents, Etc .................................................... 28
Section 4.04.    Governmental Approvals.............................................................. 28
Section 4.05.    Compliance with Law ................................................................... 28
Section 4.06.    Litigation....................................................................................... 29
Section 4.07.    Absence of Defaults and Events of Default.................................. 29
Section 4.08.    Accuracy and Completeness of Information.................................. 29
Section 4.09.    Sovereign Immunity...................................................................... 29
Section 4.10.    Incorporation of Representations and Warranties......................... 29
Section 4.11.    Bonds ............................................................................................ 30
Section 4.12.    Interest........................................................................................... 30
Section 4.13.    Investment Company Act ............................................................. 30

| | | |
|---|---|---|
| Section 4.14. | Federal Reserve Board Regulations | 30 |
| Section 4.15. | No Proposed Legal Changes | 30 |
| Section 4.16. | Anti-Terrorism Representation | 30 |
| Section 4.17. | Valid Lien | 31 |
| Section 4.18. | Obligations; Other Debt | 31 |
| Section 4.19. | Solvency | 32 |
| Section 4.20. | Indenture a Contract | 32 |
| Section 4.21. | Due Organization; Power and Authority | 32 |
| Section 4.22. | Authorization and Validity of Agreement, Related Documents and Borrowing | 32 |
| Section 4.23. | Compliance of Agreement, Related Documents with Applicable Law, Organizational Documents, Etc | 33 |
| Section 4.24. | Governmental Approvals | 33 |
| Section 4.25. | Compliance with Law | 33 |
| Section 4.26. | Litigation | 33 |
| Section 4.27. | Absence of Defaults and Events of Default | 33 |
| Section 4.28. | Accuracy and Completeness of Information | 34 |
| Section 4.29. | Sovereign Immunity | 34 |
| Section 4.30. | Incorporation of Representations and Warranties | 34 |
| Section 4.31. | DWSD Obligations | 34 |
| Section 4.32. | Interest | 35 |
| Section 4.33. | Investment Company Act | 35 |
| Section 4.34. | Federal Reserve Board Regulations | 35 |
| Section 4.35. | No Proposed Legal Changes | 35 |
| Section 4.36. | Anti-Terrorism Representation | 35 |
| Section 4.37. | Valid Lien | 36 |
| Section 4.38. | Obligations; Other Debt | 36 |
| Section 4.39. | Solvency | 37 |
| Section 4.40. | DWSD Trust Indenture a Contract | 37 |

ARTICLE V
AFFIRMATIVE COVENANTS

| | | |
|---|---|---|
| Section 5.01. | Compliance With Laws and Regulations | 37 |
| Section 5.02. | Reporting Requirements | 37 |
| Section 5.03. | Notices | 38 |
| Section 5.04. | Further Assurances | 39 |
| Section 5.05. | Right of Entry; Communication with Accountant | 39 |
| Section 5.06. | Payment of Obligations | 40 |
| Section 5.07. | Incorporation of Covenants | 40 |
| Section 5.08. | Disclosure to Assignees and Participants | 40 |
| Section 5.09. | Maintenance of Existence | 40 |
| Section 5.10. | Use of Proceeds | 40 |
| Section 5.11. | Parity Creditors and Covenants | 41 |
| Section 5.12. | CUSIP Numbers | 41 |
| Section 5.13. | DWSD Financial Information | 41 |
| Section 5.14. | Compliance With Laws and Regulations | 41 |
| Section 5.15. | Reporting Requirements | 42 |

ii

| Section 5.16. | Notices | 43 |
|---|---|---|
| Section 5.17. | Further Assurances | 44 |
| Section 5.18. | Right of Entry; Communication with Accountant | 44 |
| Section 5.19. | Payment of Obligations | 44 |
| Section 5.20. | Incorporation of Covenants | 45 |
| Section 5.21. | Disclosure to Assignees and Participants | 45 |
| Section 5.22. | Maintenance of Existence | 45 |
| Section 5.23. | Use of Proceeds | 45 |
| Section 5.24. | Parity Creditors and Covenants | 45 |

ARTICLE VI

NEGATIVE COVENANTS AND COVENANTS

| Section 6.01. | Amendments | 46 |
|---|---|---|
| Section 6.02. | Preservation of Existence, Etc | 46 |
| Section 6.03. | Certain Information | 47 |
| Section 6.04. | Trustee | 47 |
| Section 6.05. | Accounting Methods; Fiscal Year; Entity Classification | 47 |
| Section 6.06. | Exempt Status | 47 |
| Section 6.07. | Defeasance | 47 |
| Section 6.08. | Investment of Funds | 47 |
| Section 6.09. | Hedge Agreements | 47 |
| Section 6.10. | Investment Policy | 48 |
| Section 6.11. | Additional Parity Debt. | 48 |
| Section 6.12. | Amendments | 48 |
| Section 6.13. | Preservation of Existence, Etc | 48 |
| Section 6.14. | Certain Information | 48 |
| Section 6.15. | DWSD Trustee | 48 |
| Section 6.16. | Accounting Methods; Fiscal Year; Entity Classification | 49 |
| Section 6.17. | Exempt Status | 49 |
| Section 6.18. | Defeasance | 49 |
| Section 6.19. | Investment of Funds | 49 |
| Section 6.20. | Hedge Agreements | 49 |
| Section 6.21. | Additional Parity Debt | 49 |

ARTICLE VII
EVENTS OF DEFAULT

| Section 7.01. | Events of Default | 50 |
|---|---|---|
| Section 7.02. | Rights and Remedies; Consequences of an Event of Default | 53 |
| Section 7.03. | Remedies Cumulative; Solely for the Benefit of Banks | 54 |
| Section 7.04. | Waivers or Omissions | 54 |
| Section 7.05. | Discontinuance of Proceedings | 54 |
| Section 7.06. | Injunctive Relief | 54 |

ARTICLE VIII
NATURE OF OBLIGATIONS; INDEMNIFICATION

Section 8.01.	Obligations Absolute ............................................................................. 55
Section 8.02.	Continuing Obligation ........................................................................... 55
Section 8.03.	Liability of the Banks ........................................................................... 56
Section 8.04.	Indemnification; Taxes, Etc .................................................................. 56
Section 8.05.	Limited Obligations ............................................................................. 57

## ARTICLE IX

Section 9.01.	Assignment of Rights to the Banks ........................................................ 58
Section 9.02.	Right of Setoff ..................................................................................... 58
Section 9.03.	Amendments and Waivers; Remedies Cumulative ................................. 58
Section 9.04.	Notices ................................................................................................ 58
Section 9.05.	Severability ......................................................................................... 60
Section 9.06.	GOVERNING LAW .............................................................................. 60
Section 9.07.	Headings ............................................................................................. 61
Section 9.08.	Successors and Assigns ......................................................................... 61
Section 9.09.	Counterparts; Complete and Controlling Agreement .............................. 62
Section 9.10.	Waiver of Rule of Construction ............................................................ 62
Section 9.11.	WAIVER OF JURY TRIAL ..................................................................... 63
Section 9.12.	Payments Set Aside .............................................................................. 63
Section 9.13.	Usury .................................................................................................. 63
Section 9.14.	Electronic Signature; Electronically Signed Document ......................... 64
Section 9.15.	No Advisory or Fiduciary Responsibility ............................................... 64

# BOND PURCHASE AND SUPPLEMENTAL AGREEMENT

This **BOND PURCHASE AND SUPPLEMENTAL AGREEMENT** (the "Agreement") dated August __, 2014, is among the **MICHIGAN FINANCE AUTHORITY**, a public body corporate and politic existing under the laws of the State of Michigan (the "Authority"), [the **CITY OF DETROIT, MICHIGAN,**] the **DETROIT WATER AND SEWERAGE DEPARTMENT**, a public body corporate and politic existing under the laws of the State of Michigan ("DWSD") and **CITIBANK, N.A.**, a national banking association organized under the laws of the United States of America, [and OTHER BANKS, TBD] (collectively, the "Banks").

W I T N E S S E T H :

**WHEREAS**, pursuant to the provisions of Resolution 1989-15, as amended and supplemented, (the "1989 Resolution") the Michigan Municipal Bond Authority (the "MMBA") established the Local Government Loan Program for the purpose of making loans to governmental units as defined in Act 227, Public Acts of Michigan, 1985, as amended ("Act 227"); and

**WHEREAS**, the MMBA pursuant to Supplemental Resolution No. 2007-07, amended the 1989 Resolution to provide for the use of Supplemental Indentures as a means of amending the 1989 Resolution and further provided that Supplemental Indentures shall be treated the same as Supplemental Resolutions under the terms of the 1989 Resolution; and

**WHEREAS,** the Authority has been established by Executive Order 2010-2 issued by the Governor on March 4, 2010, and effective by its terms on May 30, 2010, as supplemented, as successor to the MMBA; and

**WHEREAS**, the City, upon authorization from the Board of Water Commissioners and the emergency manager for the City ("Emergency Manager"), is issuing its [$_____ City of Detroit, Michigan, Detroit Water and Sewerage Department Sewage Disposal System Revenue Senior Lien Bonds, Series 2014__ (the "DWSD Senior Lien Revenue Obligations"), [$_____ City of Detroit, Michigan, Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Senior Lien Bonds, Series 2014__ (the "DWSD Senior Lien Refunding Obligations"), and its $_____ City of Detroit, Michigan, Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Second Lien Bonds, Series 2014____ (the "DWSD Second Lien Refunding Obligations" and, collectively with the DWSD Senior Lien Revenue Obligations and the DWSD Senior Lien Refunding Obligations, the "DWSD Obligations")pursuant to (i) the provisions of Act 94, Public Acts of Michigan, 1933, as amended ("Act 94"), (ii) Ordinance No. 18-01 adopted by the City Council of Detroit on October 18, 2001 (the "Bond Ordinance"), (iii) the Orders of the United States District Court in *United States v. City of Detroit, et al.*, 77-71100, E.D. Michigan, (iv) the Resolution and Ordinance Authorizing the Issuance and Sale of Sewage Disposal System Revenue and Revenue Refunding Senior Lien Bonds of the City of Detroit, Sewage Disposal System Revenue Refunding Second Lien Bonds of the City of Detroit and/or Sewage Disposal System Revenue SRF Junior Lien Bonds of the City of Detroit, adopted by the Board of Water

Commissioners on August 13, 2014 and approved by the emergency manager of the City (the "Emergency Manager") on August 16, 2014 (the "DWSD Bond Resolution"), (v) a Trust Indenture by and among the City, the DWSD and U.S. Bank National Association, as trustee (the "DWSD Trustee") dated as of June 1, 2012 (the "DWSD Trust Indenture"), (vi) a Sale Order of the Director of the Department dated August [__], 2014 and approved by the Emergency Manager on August [__], 2014 (the "Sale Order" and, collectively with the Bond Ordinance, the DWSD Bond Resolution and the DWSD Indenture, the "DWSD Authorizing Documents"); and

WHEREAS, in order to purchase the DWSD Obligations, the Authority has agreed to issue its Local Government Loan Program Revenue Bonds, Series 2014____ (Detroit Water and Sewerage Department Local Project Bonds) (the "Bonds") in the aggregate principal amount of $___,___,___, pursuant to [the Indenture dated August __, 2014 (the "Indenture"),] the Amended and Restated Resolution Establishing Michigan Finance Authority Local Government Loan Program and Providing for the Issuance of Local Government Program Revenue Bonds, adopted by the Authority on May 15, 2014 (the "General Resolution") and a Supplemental Resolution adopted by the Authority on August 12, 2014 (the "Supplemental Resolution", and together with the General Resolution, the "Authority Bond Resolution"); and

WHEREAS, the Banks have agreed to purchase the Bonds in order to provide proceeds to the Authority for the purchase of the DWSD Obligations and, as a condition to such purchase, the Banks require the Authority, the City and the DWSD to enter into this Agreement and to agree to perform the covenants and obligations stated herein; and

WHEREAS, Wilmington Trust, National Association has been appointed to act as Trustee, Depository and Bond Registrar and Paying Agent under the Supplemental Resolution with respect to the Series 2014____ Bonds and, pursuant to the Authority Bond Resolution, the Authority will pledge and assign to the Trustee, for the benefit of the Series 2014____ Bonds, (i) all of the Authority's rights and interest in the DWSD Obligations and the Collateral Documents (as defined in the Authority Bond Resolution) pertaining to the DWSD Obligations, subject to reservation by the Authority of rights to indemnification and to make all determinations and approvals and receive all notices accorded to it under the DWSD Obligations, (ii) all moneys in the Revenue Fund established for the Series 2014____ Bonds under the Authority Bond Resolution (the "Revenue Fund"), and (iii) all of the proceeds of the foregoing, including without limitation investments thereof and interest and earnings thereon,

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, including the covenants, terms and conditions hereinafter contained, and to induce the Banks to purchase the Bonds, the Banks, the Authority, the City and the DWSD agree as follows:

13-53846-swr   Doc 6703-3   Filed 08/12/14   Entered 08/12/14 20:35:47   Page 79 of
135

# ARTICLE I

## DEFINITIONS

**Section 1.01. Definitions**.    In addition to terms defined at other places in this Agreement, the following defined terms are used throughout this Agreement with the following meanings:

"*Accountant*" means an independent certified public accountant or a firm of independent certified public accountants, selected by the Authority and satisfactory to the Banks.

"*Act 94*" has the meaning assigned to such term in the recitals to this Agreement.

"*Act 227*" has the meaning assigned to such term in the recitals to this Agreement.

"*Affiliate*" means, with respect to any Person, any other Person directly or indirectly controlling or controlled by or under common control with such Person.  For purposes of this definition, "control" (including "controlled by" and "under common control with"), when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting rights, membership, the power to appoint members, trustees or directors, by contract or otherwise.  Without limiting the foregoing, the definition of "*Affiliate*" of any Person shall include any subsidiary of such Person.

"*Agreement*" means this Bond Purchase and Supplemental Agreement, including such amendments, modifications or supplements permitted pursuant to the terms hereof

"*Applicable Law(s)*" means, collectively, the Constitutions of the United States and the State, all applicable common law and principles of equity and all international, foreign, federal, state and local laws, statutes, treaties, codes, acts, rules, regulations, guidelines, ordinances, resolutions, orders, judgments, decrees, injunctions, and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all administrative orders, directed duties, requests, licenses, certificates, authorizations and permits of, and agreements with, any Governmental Authority, and, with respect to any Person, the articles of incorporation, bylaws or other organizational or governing documents of such Person, in each case whether or not having the force of law, that are applicable now or are applicable at any time hereafter to (a) the Authority, (b) the City, (c) the DWSD or (d) any assets, property, operations or facilities of the Authority, the City or the DWSD, as the case may be or (e) the Transactions.

"*Authority*" means the Michigan Finance Authority, an autonomous public body corporate and politic, separate and distinct from the State of Michigan, created and existing under Executive Order 2010-2 issued by the Governor of the State of Michigan on March 4, 2010, and its successors and assigns permitted hereunder.

"*Authority Bond Resolution*" has the meaning assigned to such term in the recitals to this Agreement.

"*Authority Tax Agreement*" means the Non-Arbitrage and Tax Compliance Certificate of the Authority.

"*Authorized Denominations*" has the meaning assigned to such term in the Authority Bond Resolution.

"*Authorized Officer*" shall have the meaning assigned in the Authority Bond Resolution; provided**,** however, that in each case for which a certification or other statement of fact or condition is required to be submitted by an Authorized Officer pursuant to the terms of this Agreement, such certificate or statement shall be executed only by an Authorized Officer in a position to know or to obtain knowledge of the facts or conditions that are the subject of such certificate or statement. Any document or certificate hereunder that is executed by an Authorized Officer shall be deemed to have been authorized by all necessary action by the Authority.

"*Banks*" means the Holder of the Bonds, provided that there is a single Holder of all of the Bonds and provided further that the Bonds are not then held under the Book-Entry System. If there is more than one Holder of the Bonds, "Banks" means Holders owning a majority of the aggregate principal amount of the Bonds then Outstanding, and "Bank" shall refer to each such Holder individually. If the Bonds are then held under the Book-Entry System, "Banks" means the Beneficial Owner of the Bonds, provided that there is a single Beneficial Owner of all of the Bonds. If there is more than one Beneficial Owner of the Bonds, "Banks" means Beneficial Owners who are the beneficial owners of a majority of the aggregate principal amount of the Bonds then Outstanding. The initial Banks are Citibank, N.A. [and OTHER BANKS TBD] and upon receipt by the Authority and the Trustee of a notice described in Section 9.08(a), the "Banks" shall mean the Person identified in such notice as the Banks.

"*Bankruptcy Code*" means the United States Bankruptcy Code, Title 11 of the United States Code, as amended, or any successor act or code.

"*Bankruptcy Order*" has the meaning assigned to such term in Section 3.01(n) hereof.

"*Beneficial Owner*" means the Person in whose name a Bond is recorded as beneficial owner of such Bond by the Securities Depository or a Participant or an Indirect Participant on the records of such Securities Depository, Participant or Indirect Participant, as the case may be, or such Person's subrogee.

"*Bonds*" has the meaning assigned to such term in the recitals to this Agreement.

"*Bonds Authorizing Act*" means, collectively, Act 94, Act 227 and Executive Order 2010-2.

"*Business Day*" has the meaning assigned to such term in the Indenture.

"*Capital Lease Obligations*" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount

of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"*City*" means the City of Detroit[ and/or the Board of Water Commissioners and/or the Emergency Manager, as the context requires].

"*Closing Date*" means August __, 2014, or such later date on which this Agreement is fully executed and delivered.

"*Code*" means the Internal Revenue Code of 1986, as amended, or any successor provision or provisions thereto or any successor Federal tax code, and any regulations (including temporary and proposed regulations relating to the matters governed by this Agreement) thereunder or under any such provision or successor Federal tax code.

"*Contract*" means any indenture, contract, mortgage, deed of trust, guaranty, note or agreement (other than this Agreement), other contractual restriction, lease, instrument, certificate of incorporation, charter or by-law.

"*Counsel*" means an attorney duly admitted to practice law before the highest court of any state.

"*Debt*" means with respect to any Person, all items that would be classified as a liability in accordance with GAAP, including, without limitation, (a) indebtedness or liability for borrowed money including amounts drawn under a letter of credit or other credit facility, or amounts advanced under a commercial paper program, or for the deferred purchase price of property or services (including trade obligations); (b) all Capital Lease Obligations of such Person; (c) current liabilities in respect of unfunded benefits under employee benefit, retirement or pension plans; (d) obligations issued for the account of any other Person; (e) all obligations arising under acceptance facilities; (f) all Guarantees and other contingent obligations to purchase, to provide funds for payment, to supply funds to invest in any other Person or otherwise to assure a creditor against loss; (g) obligations secured by full faith and credit or by any mortgage, lien, pledge, security interest or other charge or encumbrance on property, whether or not the obligations have been assumed; (h) all unfunded amounts under a loan agreement, letter of credit, or other credit facility for which such Person would be liable, if such amounts were advanced under the credit facility; (i) obligations of such Person under Hedge Agreements; and (j) all amounts required to be paid by such Person as a guaranteed payment to partners or members or as a preferred or special dividend, including any mandatory redemption of shares or interests; and, in each case, whether such Person is liable contingently or otherwise, as obligor, guarantor or otherwise, or in respect of which obligations such Person otherwise assures a creditor against loss.

"*Debtor Relief Laws*" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws and regulations of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"*Default*" means the occurrence of any event or the existence of any condition which constitutes an Event of Default or the occurrence of any event or the existence of any condition which with the giving of notice, the passage of time, or both, would constitute an Event of Default.

"*Default Rate*" means a per annum rate of interest equal to [_____] percent (_____%).

"*Determination Counsel*" means a firm of attorneys of nationally-recognized standing in matters pertaining to the validity and tax-exempt nature of interest on bonds and other debt instruments issued by states and their political subdivisions, designated by the Authority and acceptable to the Banks in their sole and absolute discretion.

["*Determination of Taxability*" means a determination that the interest payable on the DWSD Obligations or the Bonds does not qualify as interest which is excludable from gross income of the recipient thereof for federal income tax purposes under Section 103 of the Code ("Exempt Interest") for any reason, which determination shall be deemed to have been made upon the first to occur of any of the following:

(a)     the date on which (i) the Internal Revenue issues a proposed or final determination of taxability, a Notice of Proposed Issue (IRS Form 5701 TEB), a notice of deficiency or similar notice, or any other notice, determination or decision, in each case, to the effect that the interest payable on the DWSD Obligations or the Bonds or any portion thereof does not qualify as Exempt Interest, or (ii) a court of competent jurisdiction has rendered any final ruling or decision to the effect that the interest payable on the DWSD Obligations or the Bonds or any portion thereof does not qualify as Exempt Interest;

(b)     the date when the Authority, the City or the DWSD files any statement, supplemental statement, or other tax schedule, return or document, which is in any respect inconsistent with interest payable on the Bonds or the DWSD Obligations, as applicable, or any portion thereof continuing to qualify as Exempt Interest;

(c)     the date of any sale, lease or other deliberate action within the meaning of Treas. Reg. § 1.141-2(d), if prior to such action the Authority, the City, the DWSD and the Banks have not received an unqualified opinion of Determination Counsel to the effect that such action will not cause interest on the Bonds or the DWSD Obligations, as the case may be, to become includable in the gross income of the recipient for federal income tax purposes; or

(d)     (i) the date that circumstances relating to the Authority, the City or the DWSD [or the Improvements (as defined in the _____) or any portion thereof] have occurred or changed, or any federal tax law or regulation, or any public or private final ruling, technical advice memorandum or any other written communication by the Internal Revenue Service is adopted or issued, or any final ruling or decision of a court of competent jurisdiction is rendered or any other set of circumstances has occurred, in any such case, which may adversely affect the excludability of the Exempt Interest from the gross income of the recipient for federal income tax purposes; and thereafter (ii) Determination Counsel is notified by the Banks in writing, with a copy to the Authority, the City and the DWSD, or by the Authority, the City or the DWSD, with a copy to the other parties hereto, that Determination Counsel is requested to deliver an updated

approving tax-exempt opinion in form and substance acceptable to the Banks in their sole discretion ("Approving Opinion") during the 45-day period after receipt of the request and is assured as to the payment of its fees and expenses for such services; and (iii) within 45 days after such notice has been received by Determination Counsel, either (A) the Banks, the City, the DWSD and the Authority have received written communication from Determination Counsel to the effect that, based upon an analysis of the facts and applicable law, it is unable to render an updated Approving Opinion, or (B) Determination Counsel has not delivered an Approving Opinion.]

*"DWSD"* means the Detroit Water and Sewerage Department established under the City Charter.

*"DWSD Authorizing Documents"* has the meaning assigned to such term in the recitals to this Agreement.

*"DWSD Obligations"* has the meaning assigned to such term in the recitals to this Agreement.

*"DWSD Resolution*" means, collectively, the DSWD Bond Resolution, the execution and delivery by the City and the DWSD of this Agreement and the other Related Documents to which it is a party, and related matters.

*"DWSD Tax Agreement*" means the Non-Arbitrage and Tax Compliance Certificate of the DWSD.

*"DWSD Trustee"* has the meaning assigned to such term in the recitals to this Agreement.

*"DWSD Trust Indenture"* has the meaning assigned to such term in the recitals to this Agreement.

*"Emergency Manager*" means the Emergency Manager of the City, appointed under the Local Financial Stability and Choice Act, 2012 PA 436, MCL §§ 141.1541 et seq.

*"Emergency Manager Orders*" means Order Nos. ____ and ____ of the Emergency Manager dated _____ __, 2014, approving certain agreements relating to the DWSD.

*"EMMA*" has the meaning assigned to such term in Section 5.02.

*"Event of Default*," in relation to this Agreement, shall have the meaning assigned to such term in Article VII, and in relation to any Related Document, shall have the meaning set forth therein.

*"Event of Insolvency*" means, with respect to any Person, the occurrence of one or more of the following events:

       (a)      the issuance, under the laws of any state or under the laws of the United States of America, of an order of rehabilitation, liquidation or dissolution of such Person;

(b)     the commencement by or against such Person of a case or other proceeding (and in the case of the commencement against such Person, there occurs the entry of an order for relief or the appointment of a trustee, receiver, liquidator, custodian or other official for such Person, or such case or proceeding is not dismissed within sixty (60) days of such commencement) seeking liquidation, reorganization or other relief with respect to the such Person or its debts under any bankruptcy, insolvency or other similar state or federal law now or hereafter in effect, including, without limitation, the appointment of a trustee, receiver, liquidator, custodian or other similar official for such Person or any substantial part of its property or there shall be appointed or designated with respect to it, an entity such as an organization, board, commission, authority, agency or body to monitor, review, oversee, recommend or declare a financial emergency or similar state of financial distress with respect to it or there shall be declared or introduced or proposed for consideration by it or by any legislative or regulatory body with competent jurisdiction over it, the existence of a state of financial emergency or similar state of financial distress in respect of it;

(c)     the making of an assignment for the benefit of creditors by such Person;

(d)     the failure of such Person to generally pay its debts as they become due;

(e)     a debt moratorium, debt adjustment, debt restructuring or comparable restriction with respect to the payment of any Debt of such Person is declared or imposed by such Person or by any Governmental Authority having jurisdiction over such Person;

(f)     such Person shall admit in writing its inability to pay its debts when due or shall become insolvent within the meaning of Section 101(32) of the United States Bankruptcy Code (or any equivalent provision of any successor act or code); or

(g)     a case, proceeding or other action is commenced against such Person seeking issuance of a warrant or writ of attachment, execution, restraint or similar process against all or any substantial part of its assets, which results in the entry of an order for any such relief which is not vacated or discharged, or stayed or bonded pending appeal, within sixty (60) days from the entry thereof; or

(h)     the initiation of any actions to authorize, consent or acquiesce to any of the foregoing by or on behalf of such Person.

"*Excess Interest Amount*" has the meaning assigned to such term in Section 2.08.

"*Fiscal Year*" means, as applicable, the fiscal year of the Authority ending on September 30 of each calendar year, or the fiscal year of the DWSD ending on June 30 of each calendar year.

"*Fitch*" means Fitch, Inc., or any successor thereto.

"*GAAP*" means accounting principles generally accepted and consistently applied to governmental entities in the United States, as set forth in the opinions and pronouncements of the Accounting Principles Board, the American Institute of Certified Public Accountants, the

Financial Accounting Standards Board and the Governmental Accounting Standards Board or in such other statements by such other entity as may be in general use by significant segments of the accounting profession as in effect on the date hereof.

"*Governmental Approvals*" means an authorization, consent, approval, permit, license, certificate of occupancy or an exemption of, a registration or filing with, or a report to, any Governmental Authority.

"*Governmental Authority*" means any national, supra-national, state or local government (whether domestic or foreign), any political subdivision thereof or any other governmental, quasi-governmental, judicial, administrative, public or statutory instrumentality, authority, body, board, agency, department, commission, bureau, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory, fiscal, monetary or administrative powers or functions of or pertaining to government, or any arbitrator, mediator or other Person with authority to bind a party at law.

"*Guarantee*" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Debt or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Debt or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Debt or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Debt or obligation; provided, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

"*Hedge Agreement*" means any rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option, total return swap, credit default swap or any other similar transaction (including any option with respect to any of these transactions) and any other agreement or option involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions.

"*Holders*" means the Person or Persons who shall be the registered owner of any Bond, initially, Citibank, N.A.

"*Initial Purchasers*" means Citibank, N.A., and [OTHER BANKS, TBD.]

["*Indenture*" has the meaning assigned to such term in the recitals to this Agreement.]

[*"Indirect Participant"* means _____.]

[*"Investment Policy"* means the Michigan Finance Authority – Investment Policy, dated March 1, 2011.]

*"Interest Payment Date"* has the meaning assigned to such term in the Indenture.

[*"Interest Rate"* means the LIBOR-based rate defined in the Authority Bond Resolution and/or Indenture.]

*"Issue Date"* means the date on which the Bonds are delivered to the purchaser or purchasers thereof upon original issuance.

*"Lien"* on or with respect to any asset means any mortgage, deed of trust, lien, pledge, charge, security interest, hypothecation, assignment, deposit arrangement or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected or effective under applicable law, as well as the interest of a vendor or lessor under any conditional sale agreement, capital or finance lease or other title retention agreement relating to such asset and, in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

*"Margin Stock"* has the meaning assigned to that term in Regulation U promulgated by the Board of Directors of the Federal Reserve System, as now and hereafter from time to time in effect.

*"Material Adverse Change"* means the occurrence of any event or change which, in the sole reasonable discretion of the Banks, results in a material and adverse change in the Security or which in the sole reasonable discretion of the Banks materially and adversely affects (a) the enforceability of the Bonds Authorizing Act, the Bonds, the DWSD Obligations, this Agreement or any of the other Related Documents, (b) the ability of the Authority, the City or the DWSD to perform its obligations hereunder or under any of the Related Documents or (c) the Security, the rights of, or benefits or remedies available to, the Banks under the Indenture, this Agreement or the other Related Documents.

*"Material Adverse Effect"* means (a) a materially adverse effect upon the Security, (b) with respect to this Agreement or any of the other Related Documents or any of the Authority's obligations arising under this Agreement or any of the other Related Documents, an adverse effect upon the binding nature, validity or enforceability of such agreement or obligation, (c) an adverse effect on the exclusion of interest with respect to the Bonds or the DWSD Obligations from gross income for purposes of federal income taxation or the exemption of such interest from State personal income taxes or (d) a materially adverse effect (i) on the authority or ability of the Authority, the City or the DWSD to perform any of its respective obligations under any Related Document or the ability of the Authority, the City or the DWSD to complete the Transactions or (ii) on the rights or remedies of the Banks hereunder or under the other Related Documents or on the pledge of the Security under the Related Documents or on the priority of the Liens created thereby.

"*Material Litigation*" means any actions, suits, proceedings, inquiries or investigations against a Person or any property of the Person in any court or before any arbitrator of any kind or before or by any other Governmental Authority, (i) wherein an unfavorable decision, ruling or finding could have a Material Adverse Effect, (ii) which seek to restrain or enjoin any of the Transactions, or (iii) which may adversely affect (A) the status of the Person as a public body corporate and politic of the State, created and validly existing under the laws of the State, (B) the exclusion of interest on the Bonds or the DWSD Obligations from gross income for federal income tax purposes, (C) the validity, binding effect and perfection of the pledge of and lien on the Security or (D) the ability of the Person to perform its obligations under this Agreement, the Indenture or any other Related Document.

"*Maximum Lawful Rate*" means the respective maximum, non-usurious, lawful rate of interest that may be contracted for, charged or received in connection with the Required Payments under this Agreement, under Applicable Law presently in effect or, to the extent permitted by law, under Applicable Law that may hereafter be in effect and that allows a higher maximum and non-usurious rate of interest than Applicable Law now allows.

"*Moody's*" means Moody's Investors Service, Inc., or any successor thereto.

"*Obligor Rating*" means any rating by a Rating Agency on any Parity Debt that is not guaranteed by any other Person or subject to any third-party credit enhancement.

"*Other Payment Obligations*" means any payment obligations due to the Banks or other Owners of the Bonds under this Agreement described in clause (b) of the definition of "*Required Payments*".

"*Other Taxes*" means any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, the Bonds or this Agreement.

"*Outstanding*" has the meaning assigned to such term in the Authority Bond Resolution.

"*Owners*" means, collectively, the Holders or Beneficial Owners of the Bonds and "Owner" means any Holder or Beneficial Owner of the Bonds.

"*Participant*" has the meaning assigned to such term in Section 9.08(c).

"*Parity Debt*" means any Debt now or hereafter issued and Outstanding by or on behalf of the Authority or the DWSD, which is equally and ratably payable from and secured by a pledge of and lien upon the Security [on a parity with or senior to that of the Bonds or the DWSD Obligations].

"*Parity Holder*" means the holder of any Parity Debt.

"*Permitted Investments*" (i) with respect to the Authority, has the meaning assigned to the term "Eligible Investments" in the Authority Bond Resolution, and (ii) with respect to the DWSD, has the meaning assigned to the term "Permitted Investments" in the DWSD Indenture.

"*Person*" means an individual, a corporation, a partnership, an association, a joint venture, a trust, a business trust, a limited liability company or any other entity or organization, including a governmental or political subdivision or an agency or instrumentality thereof.

"*Rating Agency*" means S&P, Moody's, Fitch or any successor or additional rating agency that rates the Bonds or other Parity Debt at the written request of the Authority with the written consent of the Banks.

"*Redemption Price*" means, for any redemption of the Bonds under the Indenture, 100% of the principal amount redeemed or purchased, together with all accrued and unpaid interest thereon.

"*Related Documents*" means, collectively, this Agreement, the Authority Bond Resolution, the Bonds, [the Indenture], the DWSD Resolution, the DWSD Obligations, the DWSD Trust Indenture, the Bankruptcy Order, the Emergency Manager Orders and any exhibits, instruments or agreements relating thereto, as the same may be amended from time to time in accordance with their respective terms and the terms hereof.

"*Required Payments*" means all present and future debts, obligations and liabilities of the Authority to the Banks and any other Holders or Beneficial Owners arising pursuant to, or on account of, the provisions of this Agreement, the Bonds or any of the other Related Documents to which the Authority is a party (or to the Trustee, for the benefit of any of the foregoing Persons), including the obligations: (a) to pay all principal, interest, late charges, Redemption Price, (in each case, as applicable) and other amounts due at any time under the Bonds in accordance with the provisions of the Authority Bond Resolution and Article II of this Agreement; and (b) to pay all other amounts, charges, costs, fees (including reasonable attorneys' fees), expenses, indemnification payments, fees and other amounts due and payable by the Authority at any time under any of the Related Documents whether in the form of a direct, reimbursement, or indemnity payment obligation, and including all payment obligations of the Authority to the Banks, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against the Authority or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, together with interest thereon as provided in the applicable Related Document.

"*Revenues*" means the Net Revenues of the Sewage Disposal System and amounts available in certain funds and accounts established in accordance with the DWSD Bond Ordinance, all as defined in [the DWSD Authorizing Documents].

"*S&P*" means Standard and Poor's Ratings Services, a Standard & Poor's Financial Services LLC business, or any successor thereto.

"*Section (a)(i) Proposed Determination of Taxability*" means any Determination of Taxability described under (a)(i) of the definition thereof which is a proposed and not final notice, determination or decision.

"*Securities Depository*" means The Depository Trust Company or such other securities depository which may be designated by the Authority pursuant to the Indenture, subject to the consent of the Banks, not to be unreasonably withheld.

"*Security*" means (a) the DWSD Obligations purchased by the Authority in an amount to fully secure the Bonds (b) the Trust Estate held under the DWSD Trust Indenture, (c) funds and accounts held to secure the Bonds pursuant to the Authority Bond Resolution and (d) all agreements and rights of the Authority respecting the DWSD Obligations.

"*Solvent*" means, with respect to any Person on a particular date, that on such date (a) the fair value of the property of such Person is greater than the total amount of Debts and liabilities, including contingent, subordinated, unmatured and unliquidated Debts and liabilities, of such Person; (b) the present fair salable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its Debts and liabilities as they become absolute and matured; (c) such Person does not intend to, and does not believe that it will, incur Debts or liabilities beyond such Person's ability to pay as such Debts and liabilities mature; and (d) such Person is not engaged in a business or transaction, and is not about to engage in a business or transaction, for which such Person's property would constitute an unreasonably small capital. The amount of contingent Debts or liabilities (such as litigation) at any time shall be computed as the amount that, in light of all the facts and circumstances existing at the time, represents the amount that can be reasonably be expected to become an actual or matured liability.

"*State*" means the State of Michigan.

[*"Taxable Date"* means the date as of which interest on the Bonds is first includable in the gross income of the Owner, including, without limitation, any previous Owner thereof as determined pursuant to a Determination of Taxability.]

"*Taxes*" has the meaning assigned to such term in Section 2.05(b).

"*To the best knowledge of*" (or any similar knowledge qualifier) means, when modifying a representation, warranty or other statement of any Person, that the fact or situation described therein is known by the Person (or, in the case of a Person other than a natural Person, known by an authorized representative of such Person) making the representation, warranty or other statement, after such inquiry as the Person deems appropriate, and taking into account the responsibilities of the office the Person holds.

"*Transactions*" means the issuance, offering and sale of the Bonds, the execution and delivery by the Authority, the City and the DWSD of this Agreement and the other Related Documents, the performance by the Authority, the City and the DWSD of their respective obligations (including payment obligations) hereunder and thereunder, the purchase by the Banks of the Bonds and the use by the Authority of the proceeds of the Bonds, the purchase by the Authority of the DWSD Obligations and the use by the DWSD of the proceeds of the DWSD Obligations and the other transactions contemplated hereby and thereby.

"*Trustee*" means Wilmington Trust, National Association or its permitted successor as trustee under the Authority Bond Resolution.

["*Verification Report*" means _____.]

"*Written*" or "*in writing*" means any form of written communication, a communication by means of facsimile device and as described in Section 9.14.

**Section 1.02. Incorporation of Certain Definitions by Reference**. Each capitalized term used herein and not otherwise defined herein shall have the meaning provided therefor in the Authority Bond Resolution and the Bonds, as applicable, unless the context requires otherwise.

**Section 1.03. Accounting Matters**. All accounting terms used herein without definition shall be interpreted in accordance with GAAP, and except as otherwise expressly provided herein all accounting determinations required to be made pursuant to this Agreement shall be made in accordance with GAAP.

**Section 1.04. Computation of Time Periods**. In this Agreement, in the computation of a period of time from a specified date to a later specified date, unless otherwise specified herein, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding."

**Section 1.05. New York City Time Presumption**. All references herein to times of the day shall be presumed to refer to New York City time unless otherwise specified.

**Section 1.06. Relation to Other Documents**. Nothing in this Agreement shall be deemed to amend, or relieve the Authority of any of its obligations under, any Related Document. To the extent that the Authority undertakes in any provision of this Agreement representations, covenants or obligations which conflict with, or are more exacting than, a provision of any other Related Document to which the Authority is a party, such provisions of this Agreement shall control for all purposes of this Agreement.

**Section 1.07. Interpretation**. All words used herein shall be construed to be of such gender as the circumstances require. Unless the context of this Agreement otherwise clearly requires, references to the plural include the singular, the singular includes the plural and the part includes the whole. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless otherwise specified (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth in such document or herein), (b) any reference herein to any Person shall be construed to include such Person's permitted successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not be limited to any particular provision of this Agreement, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same

13-53846-swr   Doc 8288-3   Filed 12/12/14   Entered 12/12/14 20:35:47   Page 21 of 105
13-53846-swr   Doc 8288-3   Filed 12/12/14   Entered 12/12/14 20:35:47   Page 21 of 105

meaning and effect and, when used in connection with any Person, to refer to all rights, title and interests of such Person in and to any and all property whether real, personal or mixed, or tangible or intangible, and wherever situated, including cash, securities, investment property, accounts, land, buildings, general intangibles, chattel, intellectual property, contract rights and other property and assets.

## ARTICLE II

## PURCHASE OF BONDS; PAYMENT AND REIMBURSEMENT OBLIGATIONS

**Section 2.01.    Purchase of Bonds**.  Upon and subject to the conditions precedent and the terms and conditions provided herein and based on the representations, warranties and covenants of the Authority set forth in the Related Documents and herein, the Banks hereby agree to purchase from the Authority, and the Authority agrees to sell to the Banks, all, but not less than all, of the Bonds at an aggregate purchase price of $___,___,___.  The Bonds are to be dated the date of delivery thereof, and are to mature, be subject to redemption prior to maturity and bear interest as set forth in the Authority Bond Resolution.

**Section 2.02.  Payment of Bonds**.  The Authority shall make prompt and full payment of all payment obligations owed to the Banks under the Bonds and the Related Documents and will pay any other Required Payments owing to the Banks whether now existing or hereafter arising, irrespective of their nature, whether direct or indirect, absolute or contingent, with interest thereon at the rate or rates provided in, and at the times specified in, this Agreement and the Bonds.

**Section 2.03.  Optional Redemption; Mandatory Redemption**.  In connection with any optional or mandatory redemption of all or any portion of the Bonds, the Authority shall pay to the Banks the Redemption Price in accordance with the provisions of the Authority Bond Resolution and the Bonds.

**Section 2.04.  Payments Generally**.

(a)    All Required Payments to be made by the DWSD or the Authority or on behalf of either the DWSD or the Authority to the Banks hereunder or under any of the other Related Documents shall be fully earned when due and nonrefundable when paid and made in lawful currency of the United States of America and in immediately available funds.  All such amounts, unless otherwise directed by the Banks in writing (and in the case of principal and interest on the Bonds, subject to and in accordance with the procedures of DTC, as applicable), shall be paid by wire transfer to the Bank's account at [Citibank, New York, ABA # 021-000-089, Credit to Account No. 4058-0089; Ref:_____], (or to such other account of the Banks as each Bank may specify by written notice to the Authority or the Trustee, as applicable) not later than 3:30 p.m. New York, New York time, on the date payment is due.  Any payment received by the Banks after 3:30 p.m., New York, New York time, shall be deemed to have been received by the Banks on the next Business Day.  If any payment hereunder is due on a day that is not a Business Day, then such payment shall be due on the next succeeding Business Day,

15

and, in the case of the computation of the interest or fees hereunder, such extension of time shall, in such case, be included in the computation of the payment due hereunder.

(b)    If at any time insufficient funds are received by and available to the Banks to pay fully all amounts of principal, interest and Other Payment Obligations then due under the Bonds or hereunder, such funds shall be applied first, to payment of that portion of the Required Payments constituting accrued and unpaid interest on the Bonds or other amount unpaid hereunder (and, in any such case, first to past due interest and second to current interest), second, to payment of that portion of the Required Payments constituting unpaid principal of the Bonds and third to payment of any unpaid Other Payment Obligations.

**Section 2.05.  Costs, Expenses and Taxes**.

(a)    The DWSD agrees to pay on demand all reasonable costs and expenses incurred by the Banks and their Counsel in connection with the preparation, negotiation, execution and delivery of this Agreement, the other Related Documents and any other documents and certificates which may be delivered in connection with this Agreement and the other Related Documents, including, without limitation, the reasonable fees, expenses and disbursements of Counsel for the Banks.  In addition, the DWSD shall pay or cause to be paid on demand, upon not less than ten (10) days prior written notice to the DWSD, the necessary and reasonable out-of-pocket expenses and disbursements of the Banks and the necessary and reasonable fees, expenses and disbursements of Counsel to the Banks in connection with (a) the administration of this Agreement including any waiver or consent under this Agreement or any other Related Document or other document or certificate delivered in connection with the Transactions or any amendment or requested amendment hereof or thereof (whether or not the transactions contemplated thereby shall be consummated) or any Default or alleged Default hereunder, (b) the preparation, execution, delivery, administration and enforcement or preservation of rights in connection with a workout, refinancing, restructuring or waiver with respect to this Agreement, or any of the other Related Documents and (c) the occurrence of an Event of Default and collection and other enforcement proceedings resulting therefrom.

(b)    Any and all payments to the Banks by or on behalf of the Authority or the DWSD hereunder shall be made free and clear of, and without deduction for, any and all taxes, levies, imposts, deductions, charges or withholdings imposed, including but not limited to as a result of a change in, law, rule, treaty, or regulation, or any policy, guideline, or directive of, or any change in the interpretation, implementation, or administration thereof by, any Governmental Authority, and all liabilities with respect thereto, excluding only taxes imposed on or measured by the net income or capital of the Banks by any jurisdiction or any political subdivision or taxing authority thereof or therein solely as a result of a connection between the Banks and such jurisdiction or political subdivision, other than a connection resulting solely from executing, delivering or performing its obligations or receiving

a payment under, or enforcing, this Agreement (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities being hereinafter referred to as "Taxes"). If the Authority or the DWSD is required by law to withhold or deduct any sum from payments required under this Agreement, the Authority or the DWSD shall, to the maximum extent permitted by Applicable Law, increase the amount paid by it to the Banks so that, after all withholdings and deductions, the amount received by the Banks shall equal the amount the Banks would have received without any such withholding or deduction.

(c)     In addition, the DWSD shall pay or cause to be paid on demand, upon not less than ten (10) days prior written notice to the DWSD, any present or future stamp, recording, or Other Taxes and fees payable or determined to be payable under Applicable Law in connection with the execution, delivery, filing and recording of this Agreement, the other Related Documents and such other documents and certificates as are referred to in clause (a) above and agrees to defend, indemnify and hold the Banks harmless from and against any and all liabilities with respect to or resulting from any failure to pay, or any delay in paying, such taxes and fees.

(d)     The DWSD shall pay the reasonable fees, costs and expenses of the Trustee incurred in connection with this Agreement and the performance of its obligations hereunder, upon notice of the amounts incurred, given to the DWSD in accordance with Section 9.04.

## Section 2.06.  Change in Law.

(a)     If any Bank or any other Owner shall have determined that the adoption or implementation of, or any change in, any law, rule, treaty, regulation, policy, guideline, supervisory standard or directive of, or any change in the interpretation, implementation, or administration thereof by, any Governmental Authority (in each case, subsequent to the Closing Date and whether or not having the force of law), or compliance by such Bank or any Other Owner with any request by or directive of any Governmental Authority (in each case, subsequent to the Closing Date and whether or not having the force of law), including but not limited to any such changes to any law, rule, regulation, policy, guideline, standard, directive, interpretation or application implementing, invoking or in any way related to any provision (as now or hereafter amended) of the Dodd-Frank Wall Street Reform and Consumer Protection Act (or any other statute referred to therein or amended thereby) or any rules, guidelines, standards, policies, regulations, or directives promulgated by the Basel Committee on Banking Supervision or the Bank for International Settlements (BIS) (or any successor or similar organizations), shall (i) change the basis of taxation of payments to such Bank or such Participant of any amounts payable hereunder (except for taxes on the overall net income of such Bank or such other Owner), (ii) impose, modify or deem applicable any reserve, liquidity, special deposit, insurance premium, fee, financial charge, monetary burden or similar requirement in connection with complying with any term of this Agreement, or against assets held by, or deposits with or for the account of, such Bank or such other Owner or (iii) impose on such Bank or such other Owner any other condition,

13-53846-swr   Doc 6073-3   Filed 07/18/14   Entered 07/18/14 14:27:47   Page 24 of 45
13-53846-tjt   Doc 8069-3   Filed 10/22/14   Entered 10/22/14 16:53:47   Page 94 of 135

expense or cost regarding this Agreement, and the result of any event referred to in clause (i), (ii) or (iii) above shall be to increase the cost to such Bank or such other Owner of complying with any term of this Agreement or to reduce the amount of any sum received or receivable by such Bank or such other Owner hereunder, then, upon receipt of supported documentation from such Bank, the DWSD shall pay to each affected Bank for its own account, or for the account of such other Owner, as applicable, such additional amount or amounts as will compensate such Bank or such other Owner for such increased costs or reductions in amount.

(b)　　If any Bank or any other Owner shall have determined that the adoption or implementation of, or any change in, any law, rule, treaty, regulation, policy, guideline, supervisory standard or directive of, or any change in the interpretation, implementation, or administration thereof by, any Governmental Authority (in each case, subsequent to the Closing Date and whether or not having the force of law), or compliance by such Bank or any other Owner with any request by or directive of any Governmental Authority (in each case, subsequent to the Closing Date and whether or not having the force of law), including but not limited to any changes to any such law, rule, regulation, policy, guideline, standard, directive, interpretation or application implementing, invoking or in any way related to any provision (as now or hereafter amended) of the Dodd-Frank Wall Street Reform and Consumer Protection Act (or any other statute referred to therein or amended thereby) or any rules, guidelines, standards, or directives promulgated by the Basel Committee on Banking Supervision or the Bank for International Settlements (BIS) (or any successor or similar organizations), shall impose, modify or deem applicable any capital (including but not limited to contingent capital) adequacy, reserve, insurance, liquidity or similar requirement (including, without limitation, a request or requirement that affects the manner in which such Bank or any other Owner allocates capital resources or reserves to its commitments) that either (i) affects or would affect the amount of capital or reserves to be maintained by such Bank or such other Owner in connection with this Agreement or (ii) reduces or would reduce the rate of return on the affected Bank's or such other Owner's capital or reserves to a level below that which such Bank or such other Owner could have achieved but for such circumstances (taking into consideration the policies of such Bank or such other Owner with respect to capital adequacy or the maintenance of reserves) then, upon receipt of supported documentation from the affected Bank, the DWSD shall pay to such Bank for its own account, or for the account of such other Owner, as applicable, such additional amount or amounts as will compensate such Bank or such other Owner for such event.

(c)　　All payments of amounts referred to in clauses (a) and (b) above shall be paid by the DWSD to the Banks or other Owner, as applicable, within ten Business Days of such demand. A certificate as to such increased cost, increased capital or reserves or reduction in return incurred by the Banks or any other Owner as a result of any event mentioned in clause (a) or (b) of this subsection setting forth, in reasonable detail, the basis for calculation and the amount of such calculation shall be submitted by the Banks to the DWSD simultaneously with such demand for payment and shall be conclusive as to the amount thereof absent manifest error. In

13-53846-swr   Doc 6883-3   Filed 08/22/14   Entered 08/22/14 20:33:47   Page 25 of 105
13-53846-tjt   Doc 7031-3   Filed 08/22/14   Entered 08/22/14 17:35:47   Page 25 of
135

making the determinations contemplated by the above-referenced certificate, the Banks or such other Owner may make such reasonable estimates, assumptions, allocations and the like that the Banks or other Owner in good faith determines to be appropriate. Other Owners entitled to the benefits of clauses (a) and (b) above shall be limited to benefits that would have been received by the Initial Purchaser.

(d) The obligations of the DWSD under this Section shall survive the termination of this Agreement.

**Section 2.07. Cure**. The DWSD agrees to pay to the Banks on demand, any amounts advanced by or on behalf of the Banks, to the extent required to cure any Default or Event of Default under this Agreement or any Related Document. The Banks shall give the DWSD and the Authority reasonably prompt notice of any such advances. The Banks shall have the right, but not the obligation, to cure any such Default or Event of Default.

**Section 2.08. Payment of Interest and Other Amounts**.

(a) The amount of interest required to be paid on any Interest Payment Date shall be due and payable by the Authority on such date at the Interest Rate, in accordance with the following provisions:

(i) If the amount of interest required to be paid on any Interest Payment Date calculated in accordance with the terms hereof (together with any fees, charges, and other amounts which are treated as interest on amounts owing hereunder under Applicable Law (collectively, the "Charges")) exceeds the amount of interest that would have been payable for the applicable period had interest for such period been calculated at the Maximum Lawful Rate, then the required interest for such period (together with any Charges payable with respect thereto) shall be payable in an amount of interest calculated on the basis of the Maximum Lawful Rate.

(ii) Any interest or Charges that would have been due and payable under any provision hereof but for the operation of subparagraph (i) immediately above, shall accrue and be payable as provided in this subparagraph (ii) and shall constitute, less interest actually paid to the Banks on such Interest Payment Date, the "Excess Interest Amount." If there is any accrued and unpaid Excess Interest Amount as of any Interest Payment Date, then, on the current and each subsequent Interest Payment Date, interest shall be paid at the Maximum Lawful Rate rather than the otherwise applicable rate until the earliest of (x) payment to the Banks of the entire accrued Excess Interest Amount or (y) the date on which no principal amount hereunder remains unpaid.

(iii) Notwithstanding the foregoing, all unpaid Excess Interest Amount shall be, to the fullest extent permitted by Applicable Law, due and payable by the Authority as a fee on the date on which no principal amount hereunder remains unpaid.

(b)    (i)    From and after the Taxable Date, the Bonds shall bear interest at the Default Rate. In addition to the foregoing, (A) in the event of the occurrence of a Determination of Taxability other than a Section (a)(i) Proposed Determination of Taxability, the Authority shall pay to the Banks and any other Owner, as applicable, a tax gross-up within thirty (30) days after such occurrence by paying the amount to the Banks (or such other Owner), calculated based on the outstanding principal amount of the Bonds for such period, by which (x) the Default Rate multiplied by the principal amount of the Bonds exceeds (y) the Interest Rate actually paid on the Bonds multiplied by the principal amount of the Bonds, for the period from the Taxable Date until the date the Authority begins paying current interest on the Bonds at the Default Rate, and (B) in the event of the occurrence of any Determination of Taxability, the Authority hereby agrees to pay to the Banks and any other Owner, as applicable, on demand therefor an amount equal to any interest, penalties or charges owed by the Banks and such other Owner as a result of interest on the Bonds becoming includable in the gross income of the Banks or such other Owner, together with any and all attorneys' fees, court costs, or other out of pocket costs incurred by the Banks or such other Owner in connection therewith.

(ii)    The obligations of the Authority under this Section 2.08 shall survive the termination of this Agreement and the redemption or other payment in full of the Bonds.

## ARTICLE III

## CONDITIONS PRECEDENT

**Section 3.01.  Documentary and Related Closing Conditions.**  As conditions precedent to the purchase of the Bonds by the Banks, the Banks shall have received the following items on or before the Closing Date, each in form and substance satisfactory to the Banks and its counsel and the Authority shall satisfy the Banks that the following conditions have been fulfilled:

(a)    *Issuance of Bonds*.  All conditions to the issuance of the Bonds shall have been satisfied and the Authority shall have duly executed, issued and delivered the Bonds, in form and substance satisfactory to the Banks, to the Trustee and the Trustee shall have duly authenticated and registered the Bonds in the principal amount of $___,___,___ and delivered the Bonds to the Banks. All conditions to the issuance of the DWSD Obligations shall have been satisfied and the DWSD shall have duly executed, issued and delivered the DWSD Obligations, in form and substance satisfactory to the Banks, to the Trustee and the Trustee shall have duly authenticated and registered the DWSD Obligations in the principal amount of $___,___,___ and delivered the DWSD Obligations to the Authority.

(b)    *Agreement and Related Documents*.  The Authority and the Trustee shall have duly authorized the execution, delivery and performance of, and the Authority and the Trustee shall have duly executed and delivered the Indenture, and (in the case of the Authority) this Agreement and each of this Agreement and the

Indenture is in full force and effect, and each of the other Related Documents shall have been duly authorized, executed and delivered by the respective parties thereto and shall be in full force and effect. The Banks shall have received (i) an executed counterpart of this Agreement, duly executed by the Authority and (ii) executed originals (or, when the Banks are not a party thereto, copies thereof) of the other Related Documents and of each other agreement, document, instrument or certificate required to be delivered by any Person pursuant to the Related Documents; and each of the foregoing shall be in form and substance satisfactory to the Banks, shall have been duly authorized, executed and delivered by each of the respective parties thereto, shall not have been modified, amended or rescinded, and shall be in full force and effect on and as of the Issue Date (and certified as of the Issue Date by the Authority if executed and delivered prior to the Issue Date).

(c) *Incumbency of Authority*. The Banks shall have received (i) an incumbency certificate of the Executive Director of the Authority certifying as to the name and true signature of the Authorized Officer authorized to execute this Agreement, the other Related Documents and any other document or certificate to be delivered by the Authority hereunder or under the other Related Documents and (ii) a certified copy of the Executive Order 2010-2 issued by the Governor of the State of Michigan on March 4, 2010, and certified copies of the Statutes, and organizational documents of the Authority. The Banks shall have received (i) an incumbency certificate of the Executive Director of the DWSD certifying as to the name and true signature of the representative(s) of DWSD authorized to execute this Agreement, the other Related Documents and any other document or certificate to be delivered by the Authority hereunder or under the other Related Documents and (ii) certified copies of the Statutes, and organizational documents of the DWSD.

(d) *Authority Resolution and Certificates*. (i) The Authority shall have duly adopted the Supplemental Resolution authorizing the issuance and delivery of the Bonds, the execution, delivery and performance by the Authority of this Agreement and each of the other Related Documents to which the Authority is a party and approving each such Related Document and the transactions contemplated hereby and thereby, (ii) the Banks shall have received a certificate of the Authority, in form and substance satisfactory to the Banks, executed by an Authorized Officer and dated the Issue Date, (A) to the effect that all actions required to be taken by, and all resolutions required to be adopted under Applicable Law by the Authority in connection with the authorization of the execution, delivery and performance of and under the Related Documents have been done and adopted and (B) attaching a copy of the General Resolution certified by an Authorized Officer as (x) being in full force and effect on the Issue Date, (y) not having been amended or supplemented through the Issue Date, and (z) being the only resolution adopted by the Authority relating to the issuance of the Bonds and the execution, delivery and performance by the Authority of this Agreement and each of the other Related Documents to which the Authority is a party or the transactions contemplated hereby and thereby, and (iii) the Banks shall have received a certificate or certificates of the Authority dated the date of the Closing, signed on behalf of the Authority by an authorized officer to the effect that to the best knowledge of the signer, after such inquiry as the signer deems

appropriate, and taking into account the responsibilities of the office which the signer holds, and on behalf of the Authority and not in any individual capacity, the signer certifies: (A) the truthfulness in all material respects on and as of the date of Closing of all representations and warranties of the Authority contained in this Agreement; (B) the compliance by the Authority with all agreements and satisfaction of all conditions to be complied with or satisfied at or prior to the Closing; (C) since the respective dates as of which information is given in the Official Statement, and except as set forth therein, there having been no material adverse change in the condition, financial or otherwise, of the Authority, (D) the Preliminary Official Statement and the Official Statement, as of their dates and as of the Closing, does not contain any untrue statements of a material fact or omit to state a material fact that is necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading (other than under the City and DWSD Portion), and (E) no litigation or other judicial proceedings have been served upon the Authority or threatened (either in State courts or in federal courts in Michigan) (w) restraining or enjoining or seeking to restrain or enjoin the issuance, sale, execution or delivery of any of the Bonds, or (x) in any way questioning or affecting the validity of any provision of the Bonds, or (y) in any way questioning or affecting the validity of any of the proceedings or the authority for the authorization, issuance, sale, execution or delivery of any of the Bonds, or the pledge or application of any money or security provided for the payment of any of the Bonds, or (z) questioning or affecting the organization or existence of the Authority or the right of any member of the Authority to their respective offices..

(e)     *DWSD Resolution and Certificates.*  (i) The City and the DWSD shall have duly adopted the DWSD Bond Resolution authorizing the issuance and delivery of the DWSD Obligations, the execution, delivery and performance by the City and the DWSD of this Agreement and each of the other Related Documents to which the City and the DWSD is a party and approving each such Related Document and the transactions contemplated hereby and thereby, (ii) the Banks shall have received a certificate of the City and the DWSD, in form and substance satisfactory to the Banks, executed by an authorized representative of the City and the DWSD and dated the Issue Date, (A) to the effect that all actions required to be taken by, and all resolutions required to be adopted under Applicable Law by the City and the DWSD in connection with the authorization of the execution, delivery and performance of and under the Related Documents have been done and adopted and (B) attaching a copy of the DWSD Bond Resolution certified by an authorized representative of the City and the DWSD as (x) being in full force and effect on the Issue Date, (y) not having been amended or supplemented through the Issue Date, and (z) being the only resolution adopted by the City and the DWSD relating to the issuance of the DWSD Obligations and the execution, delivery and performance by the City and the DWSD of this Agreement and each of the other Related Documents to which the City and the DWSD is a party or the transactions contemplated hereby and thereby, and (iii) A certificate or certificates of the DWSD dated the date of the Closing, signed on behalf of the DWSD by an authorized officer to the effect that to the best knowledge of the signer, after such inquiry as the signer deems appropriate, and taking into account the responsibilities of the office which the signer holds, and

on behalf of the DWSD and not in any individual capacity, the signer certifies: (A) the truthfulness in all material respects on and as of the date of Closing of all representations and warranties of the DWSD contained in this Agreement; (B) the compliance by the DWSD with all agreements and satisfaction of all conditions to be complied with or satisfied at or prior to the Closing; (C) the conformity of the DWSD Obligations in all material respects to the description thereof in the DWSD Resolution and the Official Statement; (D) since the respective dates as of which information is given in the Official Statement, and except as set forth therein, there having been no material adverse change in the condition, financial or otherwise, of the DWSD, (E) the Preliminary Official Statement and the Official Statement, as of their dates and as of the Closing, does not contain any untrue statements of a material fact or omit to state a material fact that is necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading (other than under the Authority Portion), and (F) no litigation or other judicial proceedings have been served upon the DWSD or threatened (either in State courts or in federal courts in Michigan) (w) restraining or enjoining or seeking to restrain or enjoin the issuance, sale, execution or delivery of any of the DWSD Obligations, or (x) in any way questioning or affecting the validity of any provision of the DWSD Obligations, or (y) in any way questioning or affecting the validity of any of the proceedings or the authority for the authorization, issuance, sale, execution or delivery of any of the DWSD Obligations, or the pledge or application of any money or security provided for the payment of any of the DWSD Obligations, or (z) questioning or affecting the organization or existence of the DWSD or the right of any member of the DWSD to their respective offices.

(f)     *Opinions*.   The Banks shall have received the following opinions, either addressed to the Banks or accompanied by a letter addressed to the Banks from the counsel rendering such opinion stating that the Banks is entitled to rely upon such opinion as if such opinion were addressed to it:

(i)     the opinion of (A) Dickinson Wright PLLC, bond counsel ("Authority Bond Counsel"), as to the validity and tax-exempt status of the Bonds and (B) Dykema Gossett PLLC, bond counsel for the DWSD Obligations ("DWSD Bond Counsel"), as to the validity and tax-exempt status of the DWSD Obligations, each  dated the Issue Date and each in form and substance acceptable to the Banks, and such other opinions or supplemental opinions, which shall expressly include this Agreement within the scope of the matters opined upon and shall opine on such securities law matters as the Banks may request;

(ii)     a written opinion of the Attorney General of the State and Authority Bond Counsel, dated the Issue Date and in form and substance acceptable to the Banks, opining (A) as to the due authorization, execution and delivery of this Agreement, and the other Related Documents to which the Authority is a party and (B) that this Agreement, and the other Related Documents to which the Authority is a party constitute the legal, valid and binding obligations thereof, enforceable in accordance with their respective terms (subject, as to enforceability, to applicable bankruptcy, moratorium, insolvency or

similar laws affecting the rights of creditors generally and to general principles of equity), and (C) that (1) all conditions precedent to the issuance and delivery of the Bonds shall have occurred, the Authority Bond Resolution is in full force and effect and the Bonds will be entitled to the benefits of the Authority Bond Resolution and (2) all actions, filings or conditions necessary to create a valid pledge of, and security interest in, the Security created by the Authority Bond Resolution and the Bonds Authorizing Act in favor of the Trustee for the benefit of the Owners to secure the payment of the Bonds and the performance by the Authority of its other obligations under the Authority Bond Resolution and in favor of the Banks to secure the Required Payments, have been taken, filed and accomplished and that such pledge is on a parity with the pledge securing any other Parity Debt, and (D) the Authority's execution and delivery of and compliance with the terms and conditions of, and the carrying out of the transactions contemplated by, the Resolutions and this Agreement do not and will not conflict with, or constitute on the part of the Authority a breach or a default under, any agreement or other instrument known to them to which the Authority is subject or by which it is or may be bound or violate any decree or order known to them or any law, rule or regulation to which the Authority is subject or by which it is bound that, in all cases, would have an adverse effect on the Bonds, and (E) the statements in the Official Statement under the captions ["INTRODUCTION," "THE MICHIGAN FINANCE AUTHORITY, "THE MICHIGAN FINANCE AUTHORITY'S LOCAL GOVERNMENT LOAN PROGRAM," "THE SERIES 2014C BONDS" (except the subsection "Book-Entry-Only System"), "SECURITY AND SOURCES OF PAYMENT FOR THE SERIES 2014C BONDS, "TAX MATTERS," "LITIGATION" (as to supplemental opinion of Attorney General only), "LEGALITY OF SERIES 2014C BONDS FOR INVESTMENT AND DEPOSIT," "STATE NOT LIABLE ON SERIES 2014C BONDS," "CONTINUING DISCLOSURE UNDERTAKING"] (as it relates to the Authority), and the statements in Appendices _____, insofar as such statements summarize the language and effect of the Resolutions, the Bonds, the Continuing Disclosure Undertaking of the Authority and the Constitution and the laws of the State and the United States, are fair and accurate summaries thereof in all material respects, and (F) with respect to such other matters relating to this Agreement, the Indenture, the Bonds or any of the other Related Documents or the proceedings of the Authority, as the Banks may reasonably request;

(iii)     a Memorandum of Law with legal conclusions from the DWSD Bond Counsel addressing whether the Bonds Authorizing Act constitutes a contract between the State and the holders of the DWSD Obligations that cannot be retroactively revoked or modified;

(iv)     opinion or opinions of the DWSD Bond Counsel, the Authority Bond Counsel, [Jones Day, Miller Canfield or the City's Corporation Counsel], as appropriate, or other counsel acceptable to the Banks to the following effect, all acceptable in form and substance to the Bank:

13-53846-swr   Doc 7774-2   Filed 10/01/14   Entered 10/01/14 10:35:47   Page 101 of 135

(A)     due organization and valid existence; due authorization, execution and delivery of the Related Documents by all parties thereto and the documents being legal, valid, binding and enforceable obligations of the City, the DWSD and the Authority, as applicable;

(B)     the City has enacted all ordinances and local laws, if any, relating to the imposition of and use of the Revenues necessary to comply with the DWSD Authorizing Documents in order to permit all of the Revenues to be collected and pledged to secure the DWSD Obligations;

(C)     all consents and approvals necessary to execute and deliver the Related Documents have been obtained by the DWSD, the Authority and the City, as applicable;

(D)     no defaults in other contracts or statutes, rules or regulations of the DWSD or the Authority, and the City's and the DWSD's execution and delivery of and compliance with the terms and conditions of, and the carrying out of the transactions contemplated by, this Agreement and the DWSD Transaction Documents do not and will not conflict with, or constitute on the part of the City or the DWSD a breach of or a default under, any agreement or other instrument known to them to which the City is subject or by which it is or may be bound or violate any decree or order known to them or any law, rule or regulation to which the City is subject or by which it is bound that, in all cases, would have an adverse effect on the DWSD Obligations;

(E)     no litigation relating to the establishment of the DWSD or the collection, pledge or application of the Revenues;

(F)     the statements in the Official Statement in the [under sections "_____" and Appendices _____], insofar as such statements summarize the language and effect of the DWSD Authorizing Documents, the Continuing Disclosure Undertaking of the City and the laws of the State and the United States, are fair and accurate summaries thereof in all material respects;

(G)     the validity of the trust and the Liens;

(H)     (i) to the extent the DWSD owns the Revenues, the Revenues are subject to [a first security interest or Lien in favor of the Authority and the DWSD has granted a first priority security interest in the Security securing the DWSD Obligations] and (ii) the Authority has granted [a first priority security interest in the Security in favor of the Trustee for the benefit of Holders of the Bonds to secure the Bonds];

(I)     the DWSD is a "municipality" and the Revenues paid and to be paid to the Authority or the Trustee under the DWSD Trust Indenture (and subsequently paid to Banks as holders of the Bonds) are

13-53846-swr   Doc 2774-1   Filed 02/21/14   Entered 02/21/14 16:36:47   Page 102 of
135

pledged "special revenues" within the meaning of § 902 of the Bankruptcy Code, are entitled to the protections afforded "special revenues" under Chapter 9 of the Bankruptcy Code; and

(J)     nothing has come to their attention that would lead them to believe that the Official Statement, as of its date and as of Closing (other than financial statements, other financial, statistical or quantitative information, projections or estimates, and opinions of other counsel, as to all of which no opinion is expressed) contains any untrue statement of a material fact or omits to state a material fact that is necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

(v)     At the discretion of the Banks, either (A) an opinion from counsel acceptable to the Banks, or (B) a certificate from an authorized officer of the City, the DWSD or the Authority to the effect that the Bankruptcy Order is in full force and effect, is not subject to a stay and has not been modified, reversed or vacated;

(vi)     An opinion of counsel for the Trustee and the DWSD Trustee, which counsel shall be satisfactory to the Banks, as to the following:  (i) due authorization, execution and delivery of the Indenture and the DWSD Trust Indenture, (ii) the Indenture and the DWSD Trust Indenture constitute the  legal, valid and binding obligations thereof, enforceable in accordance with their terms (subject, as to enforceability, to applicable bankruptcy, moratorium, insolvency or similar laws affecting the rights of creditors generally and to general principles of equity) and (iii) such other matters as the Banks may reasonably request.

(vii)     each other opinion delivered by any Person pursuant to the Related Documents, each of which shall be in form and substance satisfactory to the Bank;

(g)     *No Default, Etc*.  The Banks shall have received a certificate signed by an Authorized Officer of the Authority and dated the Issue Date stating that to the best knowledge of the signer, after such inquiry as the signer deems appropriate, and taking into account the responsibilities of the office which the signer holds, and on behalf of the Authority and not in any individual capacity, the signer certifies: that the representations and warranties of the Authority contained (or incorporated by reference) in Article IV hereof are true and correct, in all material respects, on and as of the Issue Date, as though made on and as of such date; (ii) that no Material Adverse Change has occurred; (iii)  that no Default or Event of Default has occurred and is continuing or would result from the issuance of the Bonds or the execution, delivery and performance by the Authority of this Agreement or any of the other Related Document to which the Authority is a party; (iv) to the same effect as subsections (a) and (d) of this Section 3.01; and (v) covering such other matters of fact as shall be reasonably requested by the Banks. The Banks shall have received a certificate signed by an authorized representative of the City and the DWSD and dated the Issue Date stating that to the best knowledge of the signer, after such

13-53846-swr   Doc 2771-2   Filed 02/21/14   Entered 02/21/14 10:36:47   Page 103 of
135

inquiry as the signer deems appropriate, and taking into account the responsibilities of the office which the signer holds, and on behalf of the City and the DWSD and not in any individual capacity, the signer certifies that the representations and warranties of the City and the DWSD contained (or incorporated by reference) in Article IV hereof are true and correct, in all material respects, on and as of the Issue Date, as though made on and as of such date; (ii) that no Material Adverse Change has occurred; (iii) that no Default or Event of Default has occurred and is continuing or would result from the issuance of the Bonds or the execution, delivery and performance by the City and the DWSD of this Agreement or any of the other Related Document to which the City and the DWSD is a party; (iv) to the same effect as subsections (a) and (e) of this Section 3.01; and (v) covering such other matters of fact as shall be reasonably requested by the Banks.

(h)     *Non-Arbitrage Certificate*. The Banks shall have received a non-arbitrage certificate, dated the date of the Closing, signed by the Board of Directors or his designee, or the Executive Director of the Authority, in a form acceptable to the Banks.

(i)     *Governmental Approvals* The Banks shall have received originals or certified copies of all approvals, authorizations, permits, licenses, or consents of, or notices to or filings or registrations with, any Governmental Authority required for the Authority, the City and the DWSD to execute, deliver or perform this Agreement or any of the other Related Documents to which the Authority, the City and the DWSD is a party, together with a list of any required approvals, permits, etc., still to be received.

(j)     *Investment Policy; Miscellaneous*. The Banks shall have received (i) a copy of the Investment Policy of the Authority, as in effect as of the Issue Date, which policy shall be acceptable to the Bank; and (ii) such other agreements, documents, instruments, certificates (and, if requested by the Banks, certified duplicates of executed copies thereof) and opinions as the Banks may reasonably request.

(k)     *CUSIP and DTC*. The Banks shall have received written evidence satisfactory to the Banks that the Bonds are eligible for inclusion in DTC's FAST automated transfer program ("FAST Eligible Bonds").

(l)     *Other Documents*. The Banks shall have received such other documents, certificates, approvals, filings, and opinions as the Banks shall have reasonably requested.

(m)     *Legality*. The Banks shall have determined (in their sole discretion) that (i) the consummation by the Authority, by the City, by the DWSD, by the Banks and by any other Person of any of the transactions contemplated by the Indenture, the Bonds, this Agreement and each other Related Document will not violate any Applicable Law and (ii) all legal requirements provided herein or by law incident to the execution, delivery and performance of the Indenture, the Bonds and the other

Related Documents and the transactions contemplated hereby and thereby, shall have been satisfied.

(n)     *Trustee's Documents*.  The Banks shall have received (i) (A) copies of the resolution(s) of the Trustee authorizing the execution, delivery and performance of the Related Documents to which they are a party and the performance of any duties of the Trustee under or in connection with the other Related Documents and (B) a certificate of an authorized representative of the Trustee (x) certifying as to the authority, incumbency and specimen signatures of the authorized representatives of the Trustee authorized to sign the Related Documents to which it is a party and any other documents to be delivered by it hereunder and who will be authorized to represent the Trustee in connection with this Agreement, upon which the Banks may rely until it receives a new certificate and certifying that the resolution(s) referred to under (B) is/are presently in full force and effect and (y) covering such matters relating to the other Related Documents as the Banks may reasonably request.

(o)     *Bankruptcy court order*.  The Banks shall have received a copy of the Order of the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") dated _____ ___, 2014 (the "Bankruptcy Order") (*In re City of Detroit, Michigan*, Case No. 13-53846, Doc. ____ (E.D. Mich.)) authorizing the City to enter into and perform the DWSD Authorizing Documents.

(p)     *Official Statement*. A copy of the Official Statement, signed on behalf of the Authority by the Executive Director or other authorized officer.

(q)     *Ratings*. [Only if available] The Banks shall have received satisfactory evidence that [Moody's/Fitch] shall have assigned to the Bonds the rating set forth on the inside cover page of the Official Statement, and that the rating shall not have been reduced or withdrawn.

(r)     *Continuing Disclosure Undertaking*. The Banks shall have received (i) an executed copy of the Authority's Continuing Disclosure Undertaking, in form and substance satisfactory to the Banks, and (ii) an executed copy of the City's/DWSD's Continuing Disclosure Undertaking, in form and substance satisfactory to the Banks.

(s)     *[Bond Insurance*. The Banks shall have received:

(i)     Certified copies of the Bond Insurance Policies issued by the Bond Insurer, if any, and certified copies of any debt service reserve fund surety insurance policies issued by the Bond Insurers, if any, and any other documents executed in connection therewith;

(ii)     An opinion of counsel to the Bond Insurers, dated the Closing Date, addressed to the Banks and in form and substance satisfactory to the Banks; and

(iii)    a Certificate of the Bond Insurers, dated the Closing Date, signed by an authorized officer of the Bond Insurers, to the effect that the information contained under the caption "Bond Insurance" in the Official Statement is true and correct in all material respects, and that the Specimen Bond Insurance Policies contained in Appendix VI to the Official Statement is a true and correct specimen of the Bond Insurance Policies being issued by the Bond Insurers.]

(t)    *Filings*.  The Banks shall have received evidence satisfactory to the Banks and their counsel that all applicable filings, recordings and agreements including any agreements necessary to create and perfect a valid and binding Lien on, pledge of and security interest in all of the Revenues and in any other Security pledged in the Related Documents in favor of the Trustee, for the benefit of the Owners, and perfected on a first priority basis to the extent such Lien on, pledge of and security interest can be perfected by any filings, recordings or agreements, have been filed and made or executed and delivered, as the case may be, in the appropriate governmental offices and that all filing fees, taxes or other impositions required therewith have been paid in full on or before the Closing Date.

**Section 3.02.  Credit Requirements**.  Prior to the Closing Date, the Banks shall have determined, in its sole discretion, based in part upon the information and reports submitted by the Authority, that (i) the Authority has met the Bank's credit requirements, (ii) there has been no Material Adverse Change in the financial condition, manner of operation, properties or prospects of the Authority and that all information, representations and materials submitted to the Banks by the Authority in connection with the purchase of the Bonds are accurate in all material respects, and (iii) there has been no change in any law, rule or regulation (or their interpretation or administration) nor is there any pending or threatened litigation, that, in each case, may adversely affect the consummation of the Transactions.  Provided, that, notwithstanding the foregoing terms and any investigation and/or determination by the Banks, the Authority expressly acknowledges and agrees that no such investigation or determination by the Banks shall in any respect whatsoever qualify, or release the Authority from, any representation, warranty or covenant contained in this Agreement or create or constitute any defense to the enforcement of the provisions of this Agreement.

**Section 3.03.  Additional Conditions Precedent**.  On or prior to the Closing Date, the Authority shall have paid to the Banks the reasonable fees and expenses of counsel to the Banks payable as of the Closing Date as incurred in connection with the transactions contemplated by the Related Documents.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

**A.  The Authority represents, warrants and covenants to and with the Banks and the DWSD as of the Closing Date as follows in Section 4.01 through Section 4.20. It is acknowledged and agreed by the parties hereto that all representations and warranties made by the Authority, the City and the DWSD herein and in any certificates given in**

**compliance herewith, are made solely by the Authority, the City or the DWSD, as the case may be, and not by any individual executing this Agreement or any certificate in his or her own capacity, and no liability shall be imposed, directly or indirectly, on such individual.**

Section 4.01. **Due Organization; Power and Authority**.  The Authority is an autonomous public body corporate and politic separate and distinct from the State of Michigan created and existing under Executive Order 2010-2, issued by the Governor of the State of Michigan on March 4, 2010 with the powers and authority, among others, set forth in the Bonds Authorizing Act, including all requisite power and authority to execute and deliver the Related Documents to which the Authority is a party, and to perform the obligations under the Related Documents to which the Authority is a party, including the power and authority to issue and deliver the Bonds.

Section 4.02. **Authorization and Validity of Agreement, Related Documents and Borrowing**.  The execution, delivery and performance by the Authority of this Agreement and the other Related Documents to which it is a party, and the issuance and delivery of the Bonds at the direction of the Authority have been duly authorized by all necessary action of the governing body of the Authority.  Each of this Agreement and the Related Documents (other than the Bonds) to which the Authority is a party constitutes a legal, valid and binding obligation of the Authority, enforceable against the Authority in accordance with its terms, except as such enforceability may be limited by applicable reorganization, insolvency, liquidation, readjustment of debt, moratorium or other similar laws affecting the enforcement of the rights of creditors generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).  Each Bond when issued, and as authenticated and delivered by the Trustee against payment therefor will have been duly issued, authenticated and delivered under the Bonds Authorizing Act and in conformity with the Indenture and will constitute the legal, valid and binding obligations of the Authority enforceable in accordance with their terms, and will be entitled to the benefits of the Indenture.  The obligation of the Authority under the Indenture is absolute and unconditional payable solely from the Security.

Section 4.03. **Compliance of Agreement, Related Documents with Applicable Law, Organizational Documents, Etc.**  The execution, delivery and performance of this Agreement and each of the other Related Documents in accordance with its and their respective terms, the assignment and pledge of the Security and the consummation of the Transactions do not and will not (a) contravene or conflict with the Authority's by-laws or other organizational documents or with any provision of the Bonds Authorizing Act, (b) require any consent or approval of any creditor of the Authority, (c) violate any Applicable Law (including, without limitation, Regulations T, U or X of the Board of Governors of the Federal Reserve System, or any successor regulations), (d) conflict with, result in a breach of or constitute a default under any Contract relating to the Security to which the Authority is a party or by which any of its properties or assets may be bound or (e) result in or require the creation or imposition of any charge, pledge, security interest, encumbrance or other Lien upon or with respect to the Security except such Liens, if any, created by this Agreement or the Indenture.  The Authority Bond Resolution has been adopted in compliance with all requirements of Applicable Law.

Section 4.04. **Governmental Approvals**.  All authorizations, consents, and other Governmental Approvals necessary for the Authority to enter into this Agreement and the other

Related Documents and perform the transactions contemplated hereby and thereby have been obtained and remain in full force and effect and are subject to no further administrative or judicial review. No other authorization or approval or other action by, and no notice to or filing with, any Governmental Authority is required for the due execution, delivery and performance by the Authority of this Agreement or the due execution, delivery or performance by the Authority of the Related Documents to which it is a party.

**Section 4.05. Compliance with Law**. The Authority is in compliance with all Applicable Law, including all Governmental Approvals, except for noncompliance that, singly or in the aggregate, has not had and will not have a Material Adverse Effect or have an adverse effect on the Authority's ability to perform its obligations under this Agreement and under the other Related Documents. The Authority has not received any complaint or other notice alleging a violation of or failure to comply with, any judgment, order, writ, injunction or decree of any Governmental Authority applicable to the Authority or the Transactions or any statute, law, rule or regulation applicable to the Authority or the Transactions. The collection of Revenues and the accounting and recordkeeping therefor are in material compliance with all Applicable Law and all applicable resolutions, ordinances and rules of the Authority.

**Section 4.06. Litigation**. There is no Material Litigation pending nor, to the best knowledge of the Authority after due inquiry, threatened against the Authority or any property of the Authority.

**Section 4.07. Absence of Defaults and Events of Default**.

(a) No Default or Event of Default has occurred and is continuing.

(b) No defaults by the Authority exist under any Contract related to the Security, except for defaults that, singly or in the aggregate, have not had and will not have (i) a Material Adverse Effect, or (ii) an adverse effect on the validity or enforceability of this Agreement or any of the other Related Documents or on the Authority's ability to perform under this Agreement or any of the other Related Documents. The Authority is not in breach of any financial covenant or any other material provision of any Contract related to the Security entered into in connection with any Debt.

**Section 4.08. Accuracy and Completeness of Information**. All information, reports and other papers and data furnished by the Authority to the Banks were, at the time the same were so furnished, complete and correct in all material respects, to the extent necessary to give the recipient a true and accurate knowledge of the subject matter and were provided in expectation of the Bank's reliance thereon in purchasing the Bonds. No fact is known to the Authority which has had or, so far as the Authority can now reasonably foresee, may in the future have a Material Adverse Effect, which has not been set forth in such information, reports or other data disclosed in writing to the Banks prior to the Closing Date. Any financial, budget and other projections furnished to the Banks by the Authority or its agents were prepared in good faith on the basis of the assumptions stated therein, which assumptions were fair and reasonable in light of the conditions existing at the time of delivery of such financial, budget or other projections, and represented, and as of the date of this representation, represent the Authority's

13-53846-swr Doc 2774-2 Filed 04/24/14 Entered 04/24/14 10:56:47 Page 108 of 135

best estimate of its future financial performance. No document furnished nor any representation, warranty or other written statement made to the Banks in connection with the negotiation, preparation or execution of this Agreement or the Related Documents contains or will contain any untrue statement of a material fact or omits or will omit (as of the date made or furnished) to state any material fact necessary in order to make the statements contained herein or therein, in the light of the circumstances under which they were or will be made, not misleading.

**Section 4.09. Sovereign Immunity**. The Authority is not entitled to claim the defense of sovereign immunity or statutory immunity in any action appropriately asserted in accordance with the Court of Claims Act, MCL 600-6401 et seq. and arising out of its obligations as set forth in this Agreement.

**Section 4.10. Incorporation of Representations and Warranties**. The Authority hereby makes to the Banks the same representations and warranties made by the Authority in each Related Document to which it is a party, which representations and warranties, together with the related definitions of terms contained therein, are incorporated herein by this reference with the same effect as if each and every such representation and warranty and definition were set forth herein in its entirety. No amendment to or waiver of such representations, warranties or definitions made pursuant to the relevant Related Document shall be effective to amend such representations and warranties and definitions as incorporated by reference herein without the prior written consent of the Banks.

**Section 4.11. Bonds**. Each Bond has been or will be duly and validly issued under the Indenture and entitled to the benefits thereof. The Bonds will be transferred and held for the benefit of the Banks, free and clear of any pledge, security interest, claim or other Lien of any Person other than the Banks.

**Section 4.12. Interest**. None of the Related Documents to which the Authority is a party or the Bonds provide for any payments that would violate any Applicable Law regarding permissible maximum rates of interest or the calculation or collection of interest upon interest.

**Section 4.13. Investment Company Act**. The Authority is not an "investment company" or a company "controlled" by an "investment company," as such terms are defined in the Investment Company Act of 1940 (15 U.S.C. §80a-1 et seq.), as amended.

**Section 4.14. Federal Reserve Board Regulations**. The Authority is not engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying Margin Stock. The Authority will not use any part of the proceeds of the Bonds or the funds advanced hereunder and has not incurred any Debt to be reduced, retired or purchased by the Authority out of such proceeds, for the purpose of purchasing or carrying any Margin Stock, and the Authority does not own and will not acquire any such Margin Stock.

**Section 4.15. No Proposed Legal Changes**. There is no amendment, or to the best knowledge of the Authority, proposed amendment to the Constitution of the State or any State law or any published administrative interpretation of the Constitution of the State or any State law, or any proposition or referendum (or proposed proposition or referendum) or other ballot

13-53846-swr Doc 2774-2 Filed 02/26/14 Entered 02/26/14 10:36:47 Page 109 of
135

initiative or any legislation that has passed either house of the legislature of the State, or any published judicial decision interpreting any of the foregoing, the effect of which could reasonably be expected to affect adversely (a) the issuance of, or Security for, any of the Bonds, (b) the rights or remedies of the Banks or of any Owner of the Bonds, (c) the Authority's power or ability to perform its obligations under the Bonds Authorizing Act, or (d) the Authority's existence or its power or ability to perform its obligations hereunder or under any of the other Related Documents including without limitation the Authority's ability to repay when due its obligations under this Agreement and the Bonds.

**Section 4.16.  Anti-Terrorism Representation**.

(a)     The Authority is not in violation of any laws relating to terrorism or money laundering ("Anti-Terrorism Laws"), including Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (the "Executive Order"), and the USA Patriot Act, Title III of Pub. L. 107-56, 115 Stat. 272 (the "Patriot Act");

(b)     The Authority is not any of the following:

(i)     a Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(ii)     a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii)     a Person with which the Banks are prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(iv)     a Person that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order; or

(v)     a Person that is named as a "specially designated national and blocked person" on the most current list published by the Office of Foreign Asset Control ("OFAC") or any list of Persons issued by OFAC pursuant to the Executive Order at its official website or any replacement website or other replacement official publication of such list;

(c)     To its knowledge, the Authority does not (i) conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any Person described in subsection (b)(ii) above, (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law. The Authority makes no commitment to any party to this Agreement, nor shall have any obligation to any party to this Agreement, to adopt or implement compliance procedures or measures not already in place at the Authority.

1de19124631f2be1   Doc 3773-2  Filed 12/27/24  Entered 12/27/24 17:36:47  Page 110 of 135

**Section 4.17. Valid Lien.** The Authority's irrevocable pledge and assignment of the Security as set forth in the Related Documents to and for the payment of the Required Payments: (i) is valid and binding as of the Issue Date and all Revenues now or hereafter received by the Authority are immediately subject to the lien thereof; (ii) requires no act, instrument, approval, filing, registration, recording or publication of the Indenture or any other instrument nor any prior separation or physical delivery of the Security or notice to any Person, other than the filings and registrations accomplished by the Authority as of the Closing Date, to validly establish the pledge provided for under the Related Documents or the Bonds Authorizing Act or the pledge provided for under this Agreement or to create, attach, perfect, protect or maintain the lien and security interest created thereby and hereby on and in the Security to secure the Bonds and the Required Payments; and (iii) does not require any act of appropriation for the application thereof to the purposes for which pledged.

**Section 4.18. Obligations; Other Debt.** The Authority hereby consents to the DWSD entering into this Agreement, which, with respect to the Other Payment Obligations, is an "Ancillary Facility" under Act 392. The payment obligations to the Banks under this Agreement and the Bonds are secured and evidenced in accordance with the Indenture. All obligations of the Authority under or in connection with this Agreement, the Bonds and the other Related Documents, including the Authority's obligations to pay all Required Payments are payable from the Security, are secured by a valid first lien on and pledge of the Security and are not subordinate to any payment secured by a Lien on the Security or any other claim, and are prior as against all Persons having claims of any kind in tort, contract or otherwise, whether or not such Persons have notice of the Lien established by the Indenture. As of the Issue Date, the Authority has not incurred, issued, created or assumed (i) any Debt payable from or secured by the Security or any portion thereof which is senior in right of payment or security to any of its obligations under the Bonds, this Agreement, any of the other Related Documents or (ii) any Debt payable from or secured by the Security or any portion thereof which is pari passu in right of payment or security with the Bonds, this Agreement and the other Related Documents.

**Section 4.19. Solvency.** Both before and after giving effect to the issuance of the Bonds and the undertaking of the other obligations contemplated by this Agreement, the Indenture and the other Related Documents, the disbursement of the proceeds of such Bonds and the payment and accrual of all transaction costs in connection with the foregoing, the Authority is and will be Solvent.

**Section 4.20. Indenture a Contract.** The provisions of the Indenture constitute a contract between the Authority and the Trustee, for the benefit the Banks as a holder of the Bonds, subject to the provisions of the Indenture and the Bonds may at law or in equity, by suit, action, mandamus or other proceedings, enforce and compel the performance of all duties required to be performed by the Authority under this Agreement and the other Related Documents.

**B. The City and the DWSD represent, warrant and covenant to and with the Banks and the Authority as of the Closing Date as follows in Section 4.21 through Section 4.40:**

**Section 4.21. Due Organization; Power and Authority.** The DWSD is an autonomous public body corporate and politic separate and distinct from the City and the State of Michigan

created and existing under Act 94 with the powers and authority, among others, set forth in the Bonds Authorizing Act, including all requisite power and authority to execute and deliver the Related Documents to which the DWSD is a party, and to perform the obligations under the Related Documents to which the DWSD is a party, including the power and authority to issue and deliver the Bonds.

**Section 4.22. Authorization and Validity of Agreement, Related Documents and Borrowing**.  The execution, delivery and performance by the City and the DWSD of this Agreement and the other Related Documents to which it is a party, and the issuance and delivery of the DWSD Obligations at the direction of the DWSD have been duly authorized by all necessary action of the City and the governing body of the DWSD.  Each of this Agreement and the Related Documents (other than the DWSD Obligations) to which the City and the DWSD is a party constitutes a legal, valid and binding obligation of the City and the DWSD, enforceable against the DWSD in accordance with its terms, except as such enforceability may be limited by applicable reorganization, insolvency, liquidation, readjustment of debt, moratorium or other similar laws affecting the enforcement of the rights of creditors generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).  Each DWSD Obligation when issued, and as authenticated and delivered by the DWSD Trustee against payment therefor will have been duly issued, authenticated and delivered under the Bonds Authorizing Act and in conformity with the DWSD Trust Indenture and will constitute the legal, valid and binding obligations of the DWSD enforceable in accordance with their terms, and will be entitled to the benefits of the DWSD Trust Indenture. The obligation of the DWSD under the DWSD Trust Indenture is absolute and unconditional payable solely from the Security.

**Section 4.23. Compliance of Agreement, Related Documents with Applicable Law, Organizational Documents, Etc.**  The execution, delivery and performance of this Agreement and each of the other Related Documents in accordance with its and their respective terms, the assignment and pledge of the Security and the consummation of the Transactions do not and will not (a) contravene or conflict with the DWSD's by-laws or other organizational documents or with any provision of the Bonds Authorizing Act, (b) require any consent or approval of any creditor of the DWSD or the City, (c) violate any Applicable Law (including, without limitation, Regulations T, U or X of the Board of Governors of the Federal Reserve System, or any successor regulations), (d) conflict with, result in a breach of or constitute a default under any Contract relating to the Security to which the DWSD or the City is a party or by which any of its properties or assets may be bound or (e) result in or require the creation or imposition of any charge, pledge, security interest, encumbrance or other Lien upon or with respect to the Security except such Liens, if any, created by this Agreement or the DWSD Trust Indenture.  The DWSD Bond Resolution has been adopted in compliance with all requirements of Applicable Law.

**Section 4.24. Governmental Approvals**.  All authorizations, consents, and other Governmental Approvals necessary for the City and the DWSD to enter into this Agreement and the other Related Documents and perform the transactions contemplated hereby and thereby have been obtained and remain in full force and effect and are subject to no further administrative or judicial review.  No other authorization or approval or other action by, and no notice to or filing with, any Governmental Authority is required for the due execution, delivery and performance

by the City or the DWSD of this Agreement or the due execution, delivery or performance by the City or the DWSD of the Related Documents to which it is a party.

**Section 4.25.  Compliance with Law**.  The DWSD is in compliance with all Applicable Laws, including all Governmental Approvals, except for noncompliance that, singly or in the aggregate, has not had and will not have a Material Adverse Effect or have an adverse effect on the DWSD's ability to perform its obligations under this Agreement and under the other Related Documents.  The DWSD has not received any complaint or other notice alleging a violation of or failure to comply with, any judgment, order, writ, injunction or decree of any Governmental Authority applicable to the DWSD or the Transactions or any statute, law, rule or regulation applicable to the DWSD or the Transactions.  The collection of Revenues and the accounting and recordkeeping therefor are in material compliance with all Applicable Law and all applicable resolutions, ordinances and rules of the City and the DWSD.

**Section 4.26.  Litigation**.    There is no Material Litigation pending nor, to the best knowledge of the DWSD after due inquiry, threatened against the DWSD or any property of the DWSD.

**Section 4.27.  Absence of Defaults and Events of Default**.

(a)     No Default or Event of Default has occurred and is continuing.

(b)     No defaults by the DWSD exist under any Contract related to the Security, except for defaults that, singly or in the aggregate, have not had and will not have (i) a Material Adverse Effect, or (ii) an adverse effect on the validity or enforceability of this Agreement or any of the other Related Documents or on the City's or the DWSD's ability to perform under this Agreement or any of the other Related Documents.  The DWSD is not in breach of any financial covenant or any other material provision of any Contract related to the Security entered into in connection with any Debt.

**Section 4.28.  Accuracy and Completeness of Information**.  All information, reports and other papers and data furnished by the City or the DWSD to the Banks or to the Authority were, at the time the same were so furnished, complete and correct in all material respects, to the extent necessary to give the recipient a true and accurate knowledge of the subject matter and were provided in expectation of the Bank's reliance thereon in purchasing the Bonds.  No fact is known to the City or the DWSD which has had or, so far as the City and the DWSD can now reasonably foresee, may in the future have a Material Adverse Effect, which has not been set forth in such information, reports or other data disclosed in writing to the Banks and to the Authority prior to the Closing Date.  Any financial, budget and other projections furnished to the Banks and the Authority by the DWSD or its agents were prepared in good faith on the basis of the assumptions stated therein, which assumptions were fair and reasonable in light of the conditions existing at the time of delivery of such financial, budget or other projections, and represented, and as of the date of this representation, represent the DWSD's best estimate of its future financial performance.  No document furnished nor any representation, warranty or other written statement made to the Banks and the Authority in connection with the negotiation, preparation or execution of this Agreement or the Related Documents contains or will contain

any untrue statement of a material fact or omits or will omit (as of the date made or furnished) to state any material fact necessary in order to make the statements contained herein or therein, in the light of the circumstances under which they were or will be made, not misleading.

**Section 4.29. Sovereign Immunity**.  The DWSD is not entitled to claim the defense of sovereign immunity or statutory immunity in any action arising out of its obligations as set forth in this Agreement.

**Section 4.30. Incorporation of Representations and Warranties**.  The City and the DWSD hereby make to the Banks and the Authority the same representations and warranties made by the City or the DWSD in each Related Document to which it is a party, which representations and warranties, together with the related definitions of terms contained therein, are incorporated herein by this reference with the same effect as if each and every such representation and warranty and definition were set forth herein in its entirety.  No amendment to or waiver of such representations, warranties or definitions made pursuant to the relevant Related Document shall be effective to amend such representations and warranties and definitions as incorporated by reference herein without the prior written consent of the Banks.

**Section 4.31. DWSD Obligations**.  Each DWSD Obligation has been or will be duly and validly issued under the DWSD Trust Indenture and entitled to the benefits thereof.  The DWSD Obligations will be transferred and held for the benefit of the Authority and the Banks, free and clear of any pledge, security interest, claim or other Lien of any Person other than the Authority and the Banks.

**Section 4.32. Interest**.  None of the Related Documents to which the City or the DWSD is a party or the DWSD Obligations provide for any payments that would violate any Applicable Law regarding permissible maximum rates of interest or the calculation or collection of interest upon interest.

**Section 4.33. Investment Company Act**.  The DWSD is not an "investment company" or a company "controlled" by an "investment company," as such terms are defined in the Investment Company Act of 1940 (15 U.S.C. §80a-1 et seq.), as amended.

**Section 4.34. Federal Reserve Board Regulations**.  The DWSD is not engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying Margin Stock.  The DWSD will not use any part of the proceeds of the DWSD Obligations or the funds advanced hereunder and has not incurred any Debt to be reduced, retired or purchased by the DWSD out of such proceeds, for the purpose of purchasing or carrying any Margin Stock, and the DWSD does not own and will not acquire any such Margin Stock.

**Section 4.35. No Proposed Legal Changes**.  There is no amendment, or to the best knowledge of the City and the DWSD, proposed amendment to the Constitution of the State or any State law or any published administrative interpretation of the Constitution of the State or any State law, or any proposition or referendum (or proposed proposition or referendum) or other ballot initiative or any legislation that has passed either house of the legislature of the State, or any published judicial decision interpreting any of the foregoing, the effect of which could

reasonably be expected to affect adversely (a) the issuance of, or Security for, any of the DWSD Obligations, (b) the rights or remedies of the Banks or of any Owner of the DWSD Obligations, (c) the DWSD's power or ability to perform its obligations under the Bonds Authorizing Act, or (d) the DWSD's existence or its power or ability to perform its obligations hereunder or under any of the other Related Documents including without limitation the DWSD's ability to repay when due its obligations under this Agreement and the DWSD Obligations.

**Section 4.36. Anti-Terrorism Representation**.

(a)     The DWSD is not in violation of any laws relating to terrorism or money laundering ("Anti-Terrorism Laws"), including Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (the "Executive Order"), and the USA Patriot Act, Title III of Pub. L. 107-56, 115 Stat. 272 (the "Patriot Act");

(b)     The DWSD is not any of the following:

(i)     a Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(ii)     a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii)     a Person with which the Banks are prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(iv)     a Person that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order; or

(v)     a Person that is named as a "specially designated national and blocked person" on the most current list published by the Office of Foreign Asset Control ("OFAC") or any list of Persons issued by OFAC pursuant to the Executive Order at its official website or any replacement website or other replacement official publication of such list;

(c)     To its knowledge, the DWSD does not (i) conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any Person described in subsection (b)(ii) above, (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law. The DWSD makes no commitment to any party to this Agreement, nor shall have any obligation enforceable by any party to this Agreement, to adopt or implement compliance procedures or measures not already in place at the DWSD.

**Section 4.37. Valid Lien**.     The DWSD's irrevocable pledge and assignment of the Security as set forth in Related Documents to and for the payment of the Required Payments: (i)

is valid and binding as of the Issue Date and all Revenues now or hereafter received by the DWSD are immediately subject to the lien thereof; (ii) requires no act, instrument, approval, filing, registration, recording or publication of the Related Documents or any other instrument nor any prior separation or physical delivery of the Security or notice to any Person, other than the filings and registrations accomplished by the DWSD as of the Closing Date, to validly establish the pledge provided for under the Related Documents or the Bonds Authorizing Act or the pledge provided for under this Agreement or to create, attach, perfect, protect or maintain the lien and security interest created thereby and hereby on and in the Security to secure the DWSD Obligations and the Required Payments; and (iii) does not require any act of appropriation for the application thereof to the purposes for which pledged.

**Section 4.38. Obligations; Other Debt**. This Agreement, with respect to the Other Payment Obligations, is an "Ancillary Facility" under Act 392. The payment obligations to the Banks under this Agreement and the DWSD Obligations are secured and evidenced in accordance with the DWSD Trust Indenture. All obligations of the DWSD under or in connection with this Agreement, the DWSD Obligations and the other Related Documents, including the DWSD's obligations to pay all Required Payments are payable from the Security, are secured by a valid first lien on and pledge of the Security and are not subordinate to any payment secured by a Lien on the Security or any other claim, and are prior as against all Persons having claims of any kind in tort, contract or otherwise, whether or not such Persons have notice of the Lien established by the DWSD Trust Indenture. As of the Issue Date, neither the City nor the DWSD has incurred, issued, created or assumed (i) any Debt payable from or secured by the Security or any portion thereof which is senior in right of payment or security to any of its obligations under the DWSD Obligations, this Agreement, any of the other Related Documents or (ii) any Debt payable from or secured by the Security or any portion thereof which is pari passu in right of payment or security with the DWSD Obligations, this Agreement and the other Related Documents.

**Section 4.39. Solvency**. Both before and after giving effect to the issuance of the DWSD Obligations and the undertaking of the other obligations contemplated by this Agreement, the DWSD Trust Indenture and the other Related Documents, the disbursement of the proceeds of such DWSD Obligations and the payment and accrual of all transaction costs in connection with the foregoing, the DWSD is and will be Solvent.

**Section 4.40. DWSD Trust Indenture a Contract**. The provisions of the DWSD Trust Indenture constitute a contract between the DWSD and the DWSD Trustee, for the benefit the Banks as holders of the DWSD Obligations, subject to the provisions of the DWSD Trust Indenture and the DWSD Obligations may at law or in equity, by suit, action, mandamus or other proceedings, enforce and compel the performance of all duties required to be performed by the DWSD under this Agreement and the other Related Documents.

**ARTICLE V**

**AFFIRMATIVE COVENANTS**

**A. The Authority covenants and agrees to the terms of the following Section 5.01 through Section 5.14 until all Required Payments have been indefeasibly paid in full, and**

**all other obligations of the Authority under this Agreement and under the other Related Documents have been performed:**

**Section 5.01. Compliance With Laws and Regulations**. The Authority shall comply with all Applicable Laws, to which it or its property may be subject; provided, however, that the Authority may contest the validity or application thereof and appeal or otherwise seek relief therefrom, so long as the Authority continues to perform all of its obligations hereunder and under the Related Documents and provided such acts do not affect the Authority's power and authority to execute this Agreement and the Related Documents to which it is a party or to perform its obligations and pay all amounts payable by it hereunder and thereunder, or otherwise result in a Default or Event of Default hereunder or under any of the other Related Documents.

**Section 5.02. Reporting Requirements**. The Authority shall keep proper books of record and account in which full, true and correct entries will be made of all dealings or transactions of or in relation to the affairs, operations, transactions and activities of the Authority in accordance with GAAP consistently applied. The Authority shall furnish to the Banks two copies of each of the following:

      (a)    *Reports related to Security*. The Authority shall promptly furnish to the Banks any financial statement or report furnished to the Authority under any Related Document.

      (b)    *Material Event Notices*. Immediately following any dissemination, distribution or provision thereof to any Person, a copy of any Material Event Notice, relating to the Bonds, any Parity Debt, the Security or the Bonds Authorizing Act, disseminated, distributed or provided in satisfaction of or as may be required by the provisions of Rule 15c2-12 promulgated pursuant to the Securities Exchange Act of 1934, as amended (17 C.F.R. Sec. 240.15c2-12), or any successor or similar legal requirement.

      (c)    *EMMA Filings*. Copies of all filings made by the Authority relating to the Bonds, any Parity Debt, the Security, or the Bonds Authorizing Act, with any Nationally Recognized Municipal Securities Information Repository (including the Municipal Securities Rulemaking Board's Electronic Market Access System ("EMMA")) promptly after such filings are made.

      (d)    *Other Information*. Promptly upon the request of the Banks, such other information respecting the Bonds, the DWSD Obligations, any Parity Debt, the Security or the Bonds Authorizing Act and copies of any financial statement or report furnished to any other holder of any Parity Debt pursuant to the terms of any Contract and not otherwise required to be furnished to the Banks pursuant to any other clause of this Section 5.02.

**Section 5.03. Notices**.

      (a)    *Notice of Default*. The Authority shall provide to the Banks immediate notice by telephone, promptly confirmed in writing, of any Default or

13-53846-swr Doc 2773-2 Filed 01/20/14 Entered 01/20/14 10:35:47 Page 117 of 135

Event of Default or any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

(b) *Litigation and other Notices*. The Authority shall provide to the Banks in writing, promptly upon learning thereof, notice of

(i) any Material Litigation and any other action, suit, proceeding, inquiry or investigation that is commenced or threatened (A) against any part of the Security or (B) which seeks injunctive relief, and

(ii) (A) any criminal investigation or proceeding by a Governmental Authority involving the Security; (B) the proposal of a bill or other legislation or the filing of any initiative or referendum which challenges the validity or enforceability of any of the Related Documents, the Bonds Authorizing Act, or otherwise could annul, amend, modify or replace the Bonds Authorizing Act or which could lead to a diminution or reallocation of the Security or any portion thereof; and (C) any material development in any legal proceeding or other action affecting the Authority which the Authority has, or should have, provided notice of to the Banks pursuant to clause (i) of this Section 5.03(b).

(c) *Certain Notices under or in connection with the Related Documents*. The Authority shall furnish to the Banks a copy of any notice, certification, demand or other writing or communication given by the City, the DWSD, the Trustee or the DWSD Trustee to the Authority or by the Authority to the City, the DWSD, the Trustee or the DWSD Trustee under or in connection with any of the Related Documents, in each case promptly after the receipt or giving of the same.

(d) *Amendments*. Promptly after the adoption thereof, copies of any amendments of or supplements to any of the Related Documents.

(e) *Rating Agencies*. Promptly after any Rating Agency shall have announced a change in an Obligor Rating, written notice of such rating change.

(f) *Governmental Authority Filing*s. Copies of all reports and other materials filed or delivered by the Authority to or with any Governmental Authority, if any, which has jurisdiction over the financial affairs of the Authority or which is a creditor of the Authority in respect of the Security.

(g) *Legislation or Proposed Legislation*. Copies of (i) any amendments or modifications to the Bonds Authorizing Act and (ii) any other legislation of which the Authority has knowledge which could reasonably be expected to adversely impact the Security, the Authority's ability to perform its obligations under the Related Documents or the pledge of the Security to payments on the Bonds and the Required Payments.

**Section 5.04. Further Assurances**. The Authority will from time to time promptly execute and deliver to the Banks (or as directed by the Banks) all further financing statements, amendments, confirmation statements and will register, record and file and re-register, re-record

and re-file all such documents and instruments, at such time or times, in such manner and at such place or places, and shall take any and all other actions as may be necessary or reasonably required by the Banks to enable the Banks to (i) perfect and protect, any lien, pledge or security interest or other right or interest given, or purported to be given to the Trustee, the Banks or any other Person under or in connection with the Indenture, this Agreement or the Related Documents or (ii) exercise and enforce its rights under this Agreement and its rights and the rights of the Owners of the Bonds, as and in the manner provided in the Indenture. Except to the extent it is exempt therefrom, the Authority will pay or cause to be paid all filing, registration and recording fees incident to such filing, registration and recording, and all expenses incident to the preparation, execution and acknowledgment of such instruments of further assurance, and all federal or state fees and other similar fees, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of such instruments of further assurance.

Section 5.05. **Right of Entry; Communication with Accountant**. The Authority shall permit or will use its best efforts to arrange access for the agents or representatives of the Banks during normal business hours and upon reasonable notice to enter the premises of the Authority, or any parts thereof, to examine and copy all financial and corporate books, records and accounts relating to the Security, and to discuss the affairs, finances, business and accounts related to the Security with the Authority's officers, employees and agents or such other officers, employees and agents of the State who have information relating to the Security. The Authority authorizes the Banks to communicate directly with its Accountant, including the Auditor General, and authorizes and shall instruct those accountants and advisors to communicate with, disclose and make available to, the Banks, any and all financial statements and other supporting financial documents, schedules and information relating to the Security.

Section 5.06. **Payment of Obligations**. The Authority will pay (a) all Parity Debt and obligations of the Authority in accordance with the terms thereof, and (b) all amounts payable by it hereunder and under the Related Documents in accordance with the terms hereof or thereof.

Section 5.07. **Incorporation of Covenants**.

(a)     The covenants of the Authority set forth in the Indenture and each of the other Related Documents to which the Authority is a party, as well as related defined terms contained therein, are hereby incorporated by reference herein with the same effect as if each and every such provision were set forth herein in its entirety for the benefit of the Banks and shall be enforceable by the Banks against the Authority. All such incorporated covenants shall be in addition to the express covenants contained herein and shall not be limited by the express covenants contained herein nor shall such incorporated covenants be a limitation on the express covenants contained herein. To the extent that any such incorporated provision permits the Authority to waive compliance with or consent to such provision or requires that a document, opinion, report or other instrument or any event or condition be acceptable or satisfactory to the Authority, for purposes of this Agreement, such compliance shall be waived, or such provision shall be consented to, only if it is waived or consented to, as the case may be, by the Banks and such document, opinion, report or other instrument shall be acceptable or satisfactory to the Banks. No amendment to such covenants (or the defined terms relating thereto)

made pursuant to the Related Documents shall be effective to amend such incorporated covenants without the written consent of the Banks. Notwithstanding the termination or expiration of any Related Document, the Authority shall, unless such Related Document has terminated or expired in accordance with its terms and has been replaced by a new Related Document, continue to observe the covenants therein contained for the benefit of the Banks until the termination of this Agreement.

(b)     Subject to the terms of Section 9.01, the Authority shall diligently and in good faith pursue enforcement of each of the Related Documents to which it is a party against each of the other parties thereto and shall in particular and not in limitation of the foregoing cause the Trustee at all times to comply with the terms of the Authority Bond Resolution.

**Section 5.08. Disclosure to Assignees and Participants**.   The Authority agrees to permit the Banks to disclose any information received by the Banks in connection herewith, including without limitation the financial information described in Section 5.02, to any assignees or Participants of the Banks in this Agreement without notice to or further consent from the Authority.

**Section 5.09.  Maintenance of Existence**.   The Authority will continue to conduct in the ordinary course the activities in which it is presently engaged which is that of a public body corporate and politic of the State and activities ancillary thereto.

**Section 5.10.  Use of Proceeds**.   The Authority shall use the proceeds of the Bonds solely for the purposes set forth in the Authority Bond Resolution and the Indenture.   The Authority will not use the proceeds of the Bonds in a manner which violates Regulation U, as it may be amended or interpreted from time to time by the Board of Governors of the Federal Reserve System.

**Section 5.11.  Parity Creditors and Covenants**.   In the event that the Authority has previously entered into or hereafter shall enter into any agreement or instrument (or any amendment, supplement or modification thereto) providing for the incurrence of or relating to Parity Debt (each a "Relevant Agreement"), which provides to the related trustee, purchaser, credit facility provider or other obligee thereunder (each, a "Parity Creditor") (a) any preference or priority with respect to the Security or other collateral or the allocation of the Security or other collateral as compared to the pledge and allocation to, in favor, or for the benefit, of the Trustee or the Banks or (b) any additional or materially different rights and remedies as compared to the rights and remedies of the Banks as set forth in the Related Documents and this Agreement (any such provision, a "Parity Covenant") than are provided to the Banks, then each such Parity Covenant shall automatically be deemed to be incorporated into this Agreement for the duration of this Agreement and the Banks shall have the benefits of such Parity Covenant as if it were specifically set forth in this Agreement. Upon request of the Banks, the Authority shall promptly enter into an amendment to this Agreement to include the Parity Covenant (provided that the Banks shall maintain the benefit of such Parity Covenant even if the Authority fails to provide such amendment).

13-53846-swr   Doc 2774-2   Filed 01/24/14   Entered 01/24/14 10:36:47   Page 120 of
135

**Section 5.12. CUSIP Numbers**.  The Authority shall at all times cause the Bonds to be assigned a CUSIP Number.

**Section 5.13. DWSD Financial Information**.  The Authority covenants to deliver to the Banks copies of all financial information prepared by the DWSD and delivered to the Authority under any of the Related Documents

**B.  The City and the DWSD covenant and agree to the terms of the following Section 5.14 through Section 5.24 until all Required Payments have been indefeasibly paid in full, and all other obligations of the DWSD under this Agreement and under the other Related Documents have been performed:**

**Section 5.14. Compliance With Laws and Regulations**.  The DWSD shall comply with all Applicable Laws, to which it or its property may be subject; provided, however, that the DWSD may contest the validity or application thereof and appeal or otherwise seek relief therefrom, so long as the DWSD continues to perform all of its obligations hereunder and under the Related Documents and provided such acts do not affect the DWSD's power and authority to execute this Agreement and the Related Documents to which it is a party or to perform its obligations and pay all amounts payable by it hereunder and thereunder, or otherwise result in a Default or Event of Default hereunder or under any of the other Related Documents.

**Section 5.15. Reporting Requirements**.  The DWSD shall keep proper books of record and account in which full, true and correct entries will be made of all dealings or transactions of or in relation to the affairs, operations, transactions and activities of the DWSD in accordance with GAAP consistently applied. The DWSD shall furnish to the Banks two copies of each of the following:

>    (a)    *Annual Financial Statements*.  As soon as available, and in any event within 7 months after the close of each fiscal year of the DWSD, (i) the audited financial statements of the DWSD, including financial information therein relating to the Revenues and the other funds and accounts constituting a part of the Security and (ii) audited financial statements of the DWSD,  including the balance sheet as of the end of such fiscal year of the DWSD and the related statements of revenues, expenses and changes in fund balance relating to the Security for such fiscal year of the DWSD, all in reasonable detail and as certified to by the DWSD's independent certified auditors as having been prepared in accordance with GAAP, consistently applied, such audit having been conducted in accordance with generally accepted auditing standards and the standards applicable to financial audits contained in Government Auditing Standards issued by the Comptroller General of the United States.

>    (b)    *Certificate of Compliance*.  Simultaneously with the delivery of each set of financial statements referred to in (a) above, a certificate signed by an authorized representative of the DWSD stating (i) that under his/her supervision the DWSD has made a review of its activities during the preceding annual period for the purpose of determining whether or not the DWSD has complied with all of the terms, provisions and conditions of this Agreement and the other Related Documents

and (ii) that to the best of his/her knowledge the DWSD is not in Default in the performance or observance of any of the terms, covenants, provisions or conditions of this Agreement or any of the other Related Documents, or if the DWSD shall be in Default, such certificate shall specify each such Default, the nature and status thereof and any remedial steps taken or proposed to correct each such Default, and (iii) the amount of the Revenues in the last fiscal year.

(c)     *Auditors*.   Concurrently with any delivery of financial statements under clause (a) above, a copy of any management letter or audit report provided to the DWSD by such auditors.

(d)     *Other Reports*.  Promptly upon request by the Banks, copies of any financial statement or report furnished to any other holder of any Parity Debt pursuant to the terms of any Contract and not otherwise required to be furnished to the Banks pursuant to any other clause of this Section 5.15.

(e)     *Budget*.  As near as practicable to the beginning of each fiscal year of the DWSD, a copy of the annual budget prepared in accordance with Act 94 for such upcoming fiscal year of the DWSD, and promptly, all other financial information prepared by the DWSD under any Related Document.

(f)     *Material Event Notices*.  Immediately following any dissemination, distribution or provision thereof to any Person, a copy of any Material Event Notice, relating to the DWSD Obligations, any Parity Debt, the Security or the Bonds Authorizing Act, disseminated, distributed or provided in satisfaction of or as may be required by the provisions of Rule 15c2-12 promulgated pursuant to the Securities Exchange Act of 1934, as amended (17 C.F.R. Sec. 240.15c2-12), or any successor or similar legal requirement.

(g)     *EMMA Filings*.  Copies of all filings made by the City or the DWSD relating to the DWSD Obligations, any Parity Debt, the Security, the Obligation Trust Fund or the Bonds Authorizing Act, with any Nationally Recognized Municipal Securities Information Repository (including EMMA) promptly after such filings are made.

(h)     *Other Information*.  Such other information respecting Bonds, any Parity Debt, the Security or the Bonds Authorizing Act as the Banks may from time to time reasonably request.

**Section 5.16.  Notices**.

(a)     *Notice of Default*.  The DWSD shall provide to the Banks immediate notice by telephone, promptly confirmed in writing, of any Default or Event of Default or any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

(b)     *Litigation and other Notices*.  The DWSD shall provide to the Banks in writing, promptly upon learning thereof, notice of

(i)     any Material Litigation and any other action, suit, proceeding, inquiry or investigation that is commenced or threatened (A) against any part of the Security or (B) which seeks injunctive relief, and

(ii)     (A) any criminal investigation or proceeding by a Governmental Authority involving the Security; (B) the proposal of a bill or other legislation or the filing of any initiative or referendum which challenges the validity or enforceability of any of the Related Documents, the Bonds Authorizing Act, or otherwise could annul, amend, modify or replace the Bonds Authorizing Act or which could lead to a diminution or reallocation of the Security or any portion thereof; and (C) any material development in any legal proceeding or other action affecting the DWSD which the DWSD has, or should have, provided notice of to the Banks pursuant to clause (i) of this Section 5.16(b).

(c)     *Certain Notices under or in connection with the Related Documents.* The DWSD shall furnish to the Banks a copy of any notice, certification, demand or other writing or communication given by the Authority, the DWSD Trustee or the City to the DWSD or by the DWSD to the Authority, the DWSD Trustee or the City under or in connection with any of the Related Documents, in each case promptly after the receipt or giving of the same.

(d)     *Amendments.* Promptly after the adoption thereof, copies of any amendments of or supplements to any of the Related Documents.

(e)     *Governmental Authority Filing*s. Copies of all reports and other materials filed or delivered by the DWSD to or with any Governmental Authority, if any, which has jurisdiction over the financial affairs of the DWSD or which is a creditor of the DWSD in respect of the Security.

(f)     *Legislation or Proposed Legislation.* Copies of (i) any amendments or modifications to the Bonds Authorizing Act and (ii) any other legislation of which the City or the DWSD has knowledge which could reasonably be expected to adversely impact the Security, the DWSD's ability to perform its obligations under the Related Documents or the pledge of the Security to payments on the DWSD Obligations and the Required Payments.

**Section 5.17. Further Assurances**.   The DWSD will from time to time promptly execute and deliver to the Banks (or as directed by the Banks) all further financing statements, amendments, confirmation statements and will register, record and file and re-register, re-record and re-file all such documents and instruments, at such time or times, in such manner and at such place or places, and shall take any and all other actions as may be necessary or reasonably required by the Banks to enable the Banks to (i) perfect and protect, any lien, pledge or security interest or other right or interest given, or purported to be given to the DWSD Trustee, the Banks or any other Person under or in connection with the DWSD Trust Indenture, this Agreement or the Related Documents or (ii) exercise and enforce its rights under this Agreement and its rights and the rights of the Owners of the DWSD Obligations, as and in the manner provided in the DWSD Trust Indenture.   Except to the extent it is exempt therefrom, the DWSD will pay or

cause to be paid all filing, registration and recording fees incident to such filing, registration and recording, and all expenses incident to the preparation, execution and acknowledgment of such instruments of further assurance, and all federal or state fees and other similar fees, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of such instruments of further assurance.

**Section 5.18. Right of Entry; Communication with Accountant**.  The DWSD shall permit or will use its best efforts to arrange access for the agents or representatives of the Banks during normal business hours and upon reasonable notice to enter the premises of the DWSD, or any parts thereof, to examine and copy all financial and corporate books, records and accounts relating to the Security, and to discuss the affairs, finances, business and accounts related to the Security with the DWSD's officers, employees and agents or such other officers, employees and agents of the State who have information relating to the Security.  The DWSD authorizes the Banks to communicate directly with its accountants and authorizes and shall instruct those accountants and advisors to communicate with, disclose and make available to, the Banks, any and all financial statements and other supporting financial documents, schedules and information relating to the Security.

**Section 5.19. Payment of Obligations**.  The DWSD will pay (a) all Parity Debt and obligations of the DWSD in accordance with the terms thereof, and (b) all amounts payable by it hereunder and under the Related Documents in accordance with the terms hereof or thereof.

**Section 5.20. Incorporation of Covenants**.

(a)    The covenants of the DWSD set forth in the DWSD Trust Indenture and each of the other Related Documents to which the DWSD is a party, as well as related defined terms contained therein, are hereby incorporated by reference herein with the same effect as if each and every such provision were set forth herein in its entirety for the benefit of the Banks and shall be enforceable by the Banks against the DWSD.  All such incorporated covenants shall be in addition to the express covenants contained herein and shall not be limited by the express covenants contained herein nor shall such incorporated covenants be a limitation on the express covenants contained herein.  To the extent that any such incorporated provision permits the DWSD to waive compliance with or consent to such provision or requires that a document, opinion, report or other instrument or any event or condition be acceptable or satisfactory to the DWSD, for purposes of this Agreement, such compliance shall be waived, or such provision shall be consented to, only if it is waived or consented to, as the case may be, by the Banks and such document, opinion, report or other instrument shall be acceptable or satisfactory to the Banks.  No amendment to such covenants (or the defined terms relating thereto) made pursuant to the Related Documents shall be effective to amend such incorporated covenants without the written consent of the Banks.  Notwithstanding the termination or expiration of any Related Document, the DWSD shall, unless such Related Document has terminated or expired in accordance with its terms and has been replaced by a new Related Document, continue to observe the covenants therein contained for the benefit of the Banks until the termination of this Agreement.

(b)     The City and the DWSD shall diligently and in good faith pursue enforcement of each of the Related Documents to which it is a party against each of the other parties thereto and shall in particular and not in limitation of the foregoing cause the DWSD Trustee at all times to comply with the terms of the Related Documents to which they are a party.

**Section 5.21. Disclosure to Assignees and Participants**.  The City and the DWSD agrees to permit the Banks to disclose any information received by the Banks in connection herewith, including without limitation the financial information described in Section 5.15, to any assignees or Participants of the Banks in this Agreement without notice to or further consent from the City or the DWSD.

**Section 5.22. Maintenance of Existence**.  The DWSD will continue to conduct in the ordinary course the activities in which it is presently engaged which is that of a public municipal corporation and public body corporate of the State and activities ancillary thereto.

**Section 5.23. Use of Proceeds**.  The DWSD shall use the proceeds of the DWSD Obligations solely for the purposes set forth in the DWSD Bond Resolution and the DWSD Trust Indenture.  The DWSD will not use the proceeds of the DWSD Obligations in a manner which violates Regulation U, as it may be amended or interpreted from time to time by the Board of Governors of the Federal Reserve System.

**Section 5.24. Parity Creditors and Covenants**.  In the event that the DWSD has previously entered into or hereafter shall enter into any Relevant Agreement, which provides to a Parity Creditor (a) any preference or priority with respect to the Security or other collateral or the allocation of the Security or other collateral as compared to the pledge and allocation to, in favor, or for the benefit, of the DWSD Trustee or the Banks or (b) any Parity Covenant than are provided to the Banks, then each such Parity Covenant shall automatically be deemed to be incorporated into this Agreement for the duration of this Agreement and the Banks shall have the benefits of such Parity Covenant as if it were specifically set forth in this Agreement. Upon request of the Banks, the DWSD shall promptly enter into an amendment to this Agreement to include the Parity Covenant (provided that the Banks shall maintain the benefit of such Parity Covenant even if the DWSD fails to provide such amendment).

## ARTICLE VI

## NEGATIVE COVENANTS AND COVENANTS

**A.  The Authority covenants and agrees to the terms of the following Section 6.01 through Section 6.11 until all Required Payments have been indefeasibly paid in full, and all other obligations of the Authority under this Agreement and under the other Related Documents have been performed:**

**Section 6.01. Amendments**.  The Authority shall not amend, modify or supplement, nor agree to any amendment or modification of, or supplement to, any of the Related Documents or consent to, or permit or suffer to occur any action, course of dealing or omission which results in,

48

or is equivalent to, an amendment, supplementation, termination or modification of any of the Related Documents, but only if such amendment, supplementation, termination or modification affects the Security, without the prior written consent of the Banks and any such amendment, supplementation, termination or modification made or entered into in violation of this Section 6.01 shall be deemed a nullity and of no force and effect. The Authority shall not take any action, nor cause the Trustee to take any action under any of the Related Documents, which is inconsistent with, or could reasonably be expected to impair, the Authority's obligations, or the rights of the Banks, under this Agreement or any of the other Related Documents including, without limitation, any right or remedy of the Banks upon an Event of Default, the Authority's obligations to make payments to the Banks under Article II of this Agreement, and the pledge of the Security under the Indenture and the priority of the lien and security interest created thereby.

Section 6.02. **Preservation of Existence, Etc**. The Authority will not seek to directly or indirectly liquidate, wind up, terminate, reorganize, dissolve, merge or consolidate (or suffer any liquidation, winding up, termination, reorganization or dissolution), or form or acquire any subsidiary (other than in the ordinary course of business as conducted as of the Closing Date), nor shall it sell, lease, assign, transfer or otherwise dispose of (in a single transaction or a series of transactions) all or substantially all of its property.

Section 6.03. **Certain Information**. The Authority shall not include in an offering document or circular or reoffering supplement for the Bonds any information concerning the Banks that is not supplied in writing, or otherwise approved in writing, by the Banks expressly for inclusion therein.

Section 6.04. **Trustee**. The Authority shall not remove the Trustee or appoint a successor thereto without the written consent of the Banks. The Authority shall provide the Banks written notice of any change in the identity of the Trustee upon becoming aware of the same. Upon written notice from the Banks that the Trustee is failing to perform its duties in the manner contemplated by the Indenture or the other Related Documents, the Authority shall replace or cause to be replaced the Trustee with a successor acceptable to the Banks. If the position of Trustee becomes vacant, the Authority shall promptly appoint a successor which is reasonably acceptable to the Banks.

Section 6.05. **Accounting Methods; Fiscal Year; Entity Classification**. The Authority will not adopt, permit or consent to any change in accounting practices other than as required by GAAP and will not adopt, permit or consent to any change in its Fiscal Year or take (or permit to be taken) any action that results in a change to its entity classification for U.S. federal income tax purposes.

Section 6.06. **Exempt Status**. The Authority shall not take any action or omit to take any action, respectively, that, if taken or omitted, respectively, could cause any revocation or adverse modification of its federal income tax-exempt status or which would cause the interest with respect to the Bonds to be included in the gross income of the Owners thereof for purposes of federal income taxation under the Code.

Section 6.07. **Defeasance**. The Authority will not defease, nor allow the defeasance of, the Bonds without (i) procuring a Verification Report and providing a copy thereof to the Banks

13858846v1  Doc 2778-2  Filed 04/24/14  Entered 04/24/14 14:26:47  Page 126 of 135

and (ii) contemporaneously paying all Required Payments and satisfying all obligations of the Authority hereunder.

**Section 6.08. Investment of Funds**.  The Authority shall cause all moneys held in the Funds established under the Indenture to be invested in Permitted Investments.  The Authority shall not after the Issue Date supplement or otherwise modify or amend (except by the removal of one or more investments which are Permitted Investments as of the Issue Date) the list of Permitted Investments without the prior written consent of the Banks in their discretion.

**Section 6.09. Hedge Agreements**.  The Authority will not enter into any Hedge Agreement hedging or otherwise relating to the Bonds, the Parity Debt or this Agreement without the prior written consent of the Banks.

**Section 6.10. Investment Policy**.  The Authority shall not amend its Investment Policy in any manner that could reasonably be expected to increase the degree of risk or decrease the credit quality of any of the Security. In the case of any proposed amendment, the Authority shall provide prior written notice to the Banks stating the terms of the proposed amendment.

**Section 6.11. Additional Parity Debt.**    The Authority shall not issue any additional Parity Debt without the prior written consent of the Banks, unless all Outstanding Bonds have been redeemed or otherwise refunded.

**B.  The City and the DWSD covenant and agree to the terms of the following Section 6.12 through Section 6.22 until all Required Payments have been indefeasibly paid in full, and all other obligations of the DWSD under this Agreement and under the other Related Documents have been performed:**

**Section 6.12. Amendments**.  Neither the City nor the DWSD shall amend, modify or supplement, nor agree to any amendment or modification of, or supplement to, any of the Related Documents or consent to, or permit or suffer to occur any action, course of dealing or omission which results in, or is equivalent to, an amendment, supplementation, termination or modification of any of the Related Documents, without the prior written consent of the Banks and any such amendment, supplementation, termination or modification made or entered into in violation of this Section shall be deemed a nullity and of no force and effect.  The City and the DWSD shall not take any action, nor cause the DWSD Trustee to take any action under any of the Related Documents, which is inconsistent with, or could reasonably be expected to impair, the DWSD's obligations, or the rights of the Banks, under this Agreement or any of the other Related Documents including, without limitation, any right or remedy of the Banks upon an Event of Default, the DWSD's obligations to make payments to the Banks under Article II of this Agreement, and the pledge of the Security under the DWSD Trust Indenture and the priority of the lien and security interest created thereby.

**Section 6.13. Preservation of Existence, Etc**.  The DWSD will not seek to directly or indirectly liquidate, wind up, terminate, reorganize, dissolve, merge or consolidate (or suffer any liquidation, winding up, termination, reorganization or dissolution), or form or acquire any subsidiary (other than in the ordinary course of business as conducted as of the Closing Date),

nor shall it sell, lease, assign, transfer or otherwise dispose of (in a single transaction or a series of transactions) all or substantially all of its property.

**Section 6.14. Certain Information**. The DWSD shall not include in an offering document or circular or reoffering supplement for the DWSD Obligations any information concerning the Banks that is not supplied in writing, or otherwise approved in writing, by the Banks expressly for inclusion therein.

**Section 6.15. DWSD Trustee**. The DWSD shall not remove the DWSD Trustee or appoint a successor thereto without the written consent of the Banks. The DWSD shall provide the Banks written notice of any change in the identity of the DWSD Trustee upon becoming aware of the same. Upon written notice from the Banks that the DWSD Trustee is failing to perform its duties in the manner contemplated by the DWSD Trust Indenture or the other Related Documents, the DWSD shall replace or cause to be replaced the DWSD Trustee with a successor acceptable to the Banks. If the position of Trustee becomes vacant, the DWSD shall promptly appoint a successor which is reasonably acceptable to the Banks.

**Section 6.16. Accounting Methods; Fiscal Year; Entity Classification**. The DWSD will not adopt, permit or consent to any change in accounting practices other than as required by GAAP and will not adopt, permit or consent to any change in its fiscal year or take (or permit to be taken) any action that results in a change to its entity classification for U.S. federal income tax purposes.

**Section 6.17. Exempt Status**. The City and the DWSD shall not take any action or omit to take any action, respectively, that, if taken or omitted, respectively, could cause any revocation or adverse modification of its federal income tax-exempt status or which would cause the interest with respect to the DWSD Obligations to be included in the gross income of the Owners thereof for purposes of federal income taxation under the Code.

**Section 6.18. Defeasance**. The City and the DWSD will not defease, nor allow the defeasance of, the DWSD Obligations without (i) procuring a Verification Report and providing a copy thereof to the Banks and (ii) contemporaneously paying all Required Payments and satisfying all obligations of the DWSD hereunder.

**Section 6.19. Investment of Funds**. The City and the DWSD shall cause all moneys held in the Funds established under the DWSD Trust Indenture and the Related Documents to which it is a party to be invested in Permitted Investments. The City and the DWSD shall not after the Issue Date supplement or otherwise modify or amend (except by the removal of one or more investments which are Permitted Investments as of the Issue Date) the list of Permitted Investments without the prior written consent of the Banks in its discretion.

**Section 6.20. Hedge Agreements**. The City and the DWSD will not enter into any Hedge Agreement hedging or otherwise relating to the DWSD Obligations, the Parity Debt or this Agreement without the prior written consent of the Banks.

**Section 6.21. Additional Parity Debt.** The City and the DWSD shall not issue any additional Parity Debt without the prior written consent of the Banks, unless all Outstanding DWSD Obligations have been redeemed or otherwise refunded.

# ARTICLE VII

## EVENTS OF DEFAULT

**Section 7.01. Events of Default**.  The occurrence of any of the following events shall constitute an "Event of Default":

      (a)     Failure by (i) the Authority to pay or cause to be paid when due any principal, premium or interest, of or on, the Bonds, or any other amount owed by the Authority hereunder or under any of the other Related Documents or (ii) the DWSD to pay or cause to be paid when due any principal, premium or interest, of or on, the DWSD Obligations, or any other amount owed by the DWSD hereunder or under any of the other Related Documents;

      (b)     Failure of the Authority to observe or perform the covenants set forth in any of Sections 5.02, 5.03, 5.06, 5.07, 5.10, 5.11, 5.13, 6.01, 6.02, 6.04, 6.06, 6.07, 6.08 or 6.11, or failure of the City and the DWSD to observe or perform the covenants set forth in any of Sections 5.15, 5.16, 5.19, 5.20, 5.23, 5.24, 6.12, 6.13, 6.15, 6.17, 6.18, or 6.19;

      (c)     Failure of the Authority, the City or the DWSD to observe or perform any covenant, condition or provision of this Agreement (other than as specified in (a) or (b) above) and such failure remains uncured 10 Business Days after written notice of such failure from the Banks to the Authority, the City, the DWSD and the Trustee, or failure to observe or perform any covenant, condition or provision contained in any other Related Document as incorporated by reference pursuant to Sections 5.07 and 5.20 hereof;

      (d)     Any representation or warranty made or deemed made by or on behalf of the Authority, the City or the DWSD in this Agreement or any other Related Document or in any amendment of, or waiver under, this Agreement or other Related Document, or in any certificate, financial statement or other document furnished by or on behalf of the Authority, the City or the DWSD pursuant to or in connection with this Agreement or any of the other Related Documents shall have been inaccurate or incomplete in any material respect when made or deemed to have been made;

      (e)     The occurrence and continuation of a default, event of default or termination event under any of the other Related Documents, irrespective of whether said default, event of default or termination event is declared, undeclared or has been waived under the terms of such respective document, or a mandatory redemption, prepayment or acceleration has occurred with respect to the Bonds, the DWSD Obligations or any other Parity Debt;

      (f)     Failure by the Authority or the DWSD to make a payment of the principal of, or premium or interest on, any Parity Debt (other than the Bonds and the DWSD Obligations) or other Debt payable from or secured by a Lien on Revenues, when and as the same shall become due and payable (whether by

scheduled maturity, required prepayment or redemption, acceleration, demand or otherwise);

(g)    (i) Failure by the Authority or the DWSD or any Affiliate of either thereof to make any payment (whether of principal, redemption price, interest or other amount) due in respect of (x) any other Parity Debt owed to a Bank or any Affiliate of a Bank or (y) any other Parity Debt having an aggregate outstanding principal amount in excess of $5,000,000, in any such case, as and when the same shall become due, and provided that any applicable notice or grace period shall not apply; or (ii) the occurrence or existence of a default or event of default (other than a payment default) or other similar condition by or on the part of the Authority or the DWSD (or any Affiliate of either thereof), under any Contract evidencing, issuing, securing or relating to such Parity Debt and continuance of such default or event of default or similar condition beyond the period of grace, if any, allowed with respect thereto, which results in such Parity Debt becoming, or being capable of becoming, due and payable or subject to mandatory prepayment or purchase prior to its scheduled maturity and regardless of whether any such right is exercised;

(h)    The entry or filing of one or more judgments or orders or of any similar decrees or decisions for the payment of money which, individually or in the aggregate, equals or exceeds $5,000,000 (each, a "Judgment") shall be rendered against the Authority or the DWSD or any Affiliate of either thereof or against any of its or their respective properties or assets and (x) such Judgment shall be undischarged, unstayed or unbonded (by property other than any of the Security) for a period of 30 consecutive days, or (y) any action shall be taken by a judgment creditor by which such judgment creditor attaches, executes or levies upon the Security to enforce any such Judgment;

(i)    The occurrence of an Event of Insolvency with respect to the Authority or the DWSD;

(j)    This Agreement, any other Related Document or any provision of this Agreement or any of the other Related Documents shall cease to be valid and binding on the Authority, or a Governmental Authority with jurisdiction to rule on the validity of this Agreement, the Authority Bond Resolution or any other Related Document shall so find, announce or rule, or the Authority, the DWSD, the City or any Person on its or their behalf shall (i) contest the validity or enforceability of this Agreement or any Related Document or any provision of this Agreement or any such Related Document, (ii) deny that the Authority or the DWSD has any further liability under one or more provisions of this Agreement or any of the other Related Documents or (iii) seek an adjudication that (y) this Agreement or (z) a provision of this Agreement or of the Authority Bond Resolution or any other Related Document relating to, or the absence or invalidity of which could adversely affect, the security for the Bonds, the DWSD Obligations or the other Parity Debt, or the Authority's or the DWSD's ability to pay the Bonds, the DWSD Obligations or the other Parity Debt or perform its respective obligations under this Agreement or any of the other

13-53846-swr   Doc 2774-2   Filed 04/24/14   Entered 04/24/14 16:36:47   Page 130 of
135

Related Documents or the rights and remedies of the Banks, is not valid and binding on the Authority;

(k)     Any Security or any of the other funds or accounts established under the Authority Bond Resolution or any of the other Related Documents shall become subject to any writ, judgment, warrant or attachment, execution or similar process;

(l)     (i) any Lien created by the Related Documents in favor of  the Trustee, the DWSD Trustee or the Banks, at any time and for any reason (except as expressly permitted to be released by the terms of such governing document) shall not constitute a valid and perfected Lien or shall fail to have the priority required by the Related Documents or, except as permitted under the Related Documents, the Authority or the DWSD shall so assert in writing, (ii) any legislation is enacted, repealed, reenacted, amended or otherwise modified, and such repeal, enactment, reenactment, amendment or modification, in the opinion of the Banks, has a Material Adverse Effect on the validity, enforceability or priority of the Lien on the Revenues in favor of the Banks or the other Parity Holders or (iii) any rescission of or amendment to or any other action under or in connection with any legislation, law or regulation relating to the Revenues which would (A) materially reduce the amount of the Revenues or the allocation of the Revenues to the payment of the Bonds, the DWSD Obligations or the other Parity Debt or (B) impair or adversely affect (x) the rights of the Authority or the DWSD to any or all of the Security or (y) the rights or security of (1) the Trustee or the Owners, or of any other Parity Holder under the Authority Bond Resolution, or (2) the DWSD Trustee under the DWSD Trust Indenture;

(m)     An event (separately or in the aggregate with other events) occurs which constitutes a Material Adverse Change;

(n)     Any event (other than the exercise of an optional call or optional tender right by the holder thereof or of a right of optional redemption by the Authority or the DWSD, in each case in the absence of a default or event of default) occurs or condition exists that results in any Parity Debt becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) any Parity Holder, or any trustee or agent on its or their behalf, to exercise any right to accelerate any Parity Debt or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity;

(o)     A repudiation by the Authority, the City or the DWSD of the payment when due of the principal of or premium or interest on the Bonds, the DWSD Obligations or any Parity Debt;

(p)     The Bankruptcy Order shall cease to be fully effective, in whole or in part, for any reason;

13-53846-swr   Doc 2771-2   Filed 02/21/14   Entered 02/21/14 10:36:47   Page 26 of 45

(q)    The commencement of any action by the City, the DWSD, the Authority or any third party challenging the Bonds Authorizing Act, or the validity or effect of either the Bonds Authorizing Act or the validity of the transactions contemplated by this Agreement; provided, however, that a direct appeal of the Bankruptcy Order shall not constitute an Event of Default hereunder.

**Section 7.02. Rights and Remedies; Consequences of an Event of Default**.  If an Event of Default specified in Section 7.01 hereof shall occur, then in addition to any other rights or remedies available to the Trustee or the Banks under any other Related Documents or under Applicable Law, the Banks may exercise any one or more of the following rights and remedies:

(a)    by notice to the Authority or the DWSD, accelerate all of the Required Payments (other than the Bonds, which are subject to acceleration as provided in Section 7.02(c)) whereupon such Required Payments shall become immediately due and payable without presentment, demand for payment, protest or notice of nonpayment or dishonor, or other notice of any kind or character, all of which are hereby expressly waived, and an action therefor shall immediately accrue; provided that (i) upon the occurrence of any Event of Default described in Sections 7.01(i) or 7.01(o) above, or (ii) upon any payment by the Authority of all or any portion of the principal amount of any Parity Debt that is accelerated due to the occurrence of an event of default or similar event, or any deposit to a cash collateral account in respect of, or as security for, any Parity Debt due to the occurrence of an event of default or similar event (other than a posting of collateral pursuant to a Hedge Agreement in the absence of a default or termination event or the posting of collateral to secure all Parity Debt pari passu), the Required Payments under this Agreement and the other Related Documents shall automatically mature and be due and payable on the date of the occurrence of such event described under (i) or (ii) without presentment, demand, protest, notice of default or intention to accelerate, notice of acceleration or other notice of any kind to the Authority or any other Person, all of which are hereby expressly waived;

(b)    (i) apply to any court of competent jurisdiction for, and obtain appointment of, a receiver, (ii) either personally or by attorney or agent and without bringing any action or proceeding, or by such a receiver, take whatever action at law or in equity may appear necessary or desirable to collect the amounts due and payable under the Related Documents or to enforce performance or observance of any of the Required Payments under the Related Documents, whether for specific performance of any agreement or covenant of the Authority or in aid of the execution of any power granted to the Banks in the Related Documents or as otherwise available at law or in equity;

(c)    deliver a notice to the Trustee, the Authority and the DWSD that an Event of Default has occurred and is continuing and instructing the Trustee to take all actions required as provided under the Indenture;

13-53846-swr   Doc 7074-2   Filed 08/26/14   Entered 08/26/14 10:36:47   Page 132 of 135

(d)    cure any Default, Event of Default or event of nonperformance hereunder or under any other Related Document; provided, however, that the Banks shall have no obligation to effect such a cure; and

(e)    exercise, or cause to be exercised, any and all remedies as it may have to realize on the Security under the other Related Documents including, without limitation, any rights it holds as a holder singly or together with other holders of Parity Debt to accelerate the Bonds and the other Parity Debt as provided in the Authority Bond Resolution and the Related Documents and to take any and all actions otherwise available under the Authority Bond Resolution and the Related Documents and any and all remedies as are otherwise available at law or in equity.

**Section 7.03. Remedies Cumulative; Solely for the Benefit of the Banks**.    To the extent permitted by, and subject to the mandatory requirements of, Applicable Law, each and every right, power and remedy specifically given to the Banks herein or in the other Related Documents shall be cumulative, concurrent and nonexclusive and shall be in addition to every other right, power and remedy herein specifically given or now or hereafter existing at law, in equity or by statute, and each and every right, power and remedy (whether specifically herein given or otherwise existing) may be exercised from time to time and as often and in such order as may be deemed expedient by the Banks, and the exercise or the beginning of the exercise of any power or remedy shall not be construed to be a waiver of the right to exercise at the same time or thereafter any other right, power or remedy.

The rights and remedies of the Banks specified herein are for the sole and exclusive benefit, use and protection of the Banks, and the Banks are entitled, but shall have no duty or obligation to the Authority, the City, the DWSD, the Trustee or any other Person or otherwise, to exercise or to refrain from exercising any right or remedy reserved to the Banks hereunder or under any of the other Related Documents.

**Section 7.04. Waivers or Omissions**.    No delay or omission by the Banks in the exercise of any right, remedy or power or in the pursuit of any remedy shall impair any such right, remedy or power or be construed to be a waiver of any default on the part of the Banks or to be acquiescence therein.    No express or implied waiver by the Banks of any Event of Default shall in any way be a waiver of any future or subsequent Event of Default.    No delay or omission on the part of the Banks (or the Trustee) in exercising any right to acceleration of the maturity of the Bonds or any of the other Required Payments, or any remedy under the Related Documents following any Event of Default as aforesaid, or any other option granted to the Banks (or the Trustee) hereunder in any one or more instances, or the acceptance by the Banks (or the Trustee) of any partial payment on account of the Required Payments shall constitute a waiver of any such Event of Default and each such option shall remain continuously in full force and effect.

**Section 7.05. Discontinuance of Proceedings**.    In case the Banks shall proceed to invoke any right, remedy or recourse permitted hereunder or under the Related Documents and shall thereafter elect to discontinue or abandon the same for any reason, the Banks shall have the unqualified right so to do and, in such event, the Authority, the DWSD and the Banks shall be restored to their former positions with respect to the Required Payments, the Related Documents

13-53846-swr   Doc 7078-2   Filed 04/24/14   Entered 04/24/14 10:36:47   Page 126 of 135

and otherwise, and the rights, remedies, recourse and powers of the Banks hereunder shall continue as if the same had never been invoked.

Section 7.06. **Injunctive Relief**. The Authority, the City and the DWSD recognize that in the event an Event of Default occurs, any remedy of law may prove to be inadequate relief to the Banks; therefore, the Authority, the City and the DWSD agree that the Banks, if the Banks so request, shall be entitled to temporary and permanent injunctive relief in any such case.

## ARTICLE VIII

## NATURE OF OBLIGATIONS; INDEMNIFICATION

Section 8.01. **Obligations Absolute**. The obligations of the Authority and the DWSD to pay all Required Payments under this Agreement and the other Related Documents shall be absolute, unconditional and irrevocable, subject, however to Section 8.05 hereof, notwithstanding any other provision of this Agreement or any other Related Document, and shall not be subject to any right of setoff, recoupment or counterclaim against the Banks or any other Owner and shall be paid and performed strictly in accordance with the terms of this Agreement under all circumstances whatsoever. Until the principal of and interest on the Bonds and all Required Payments, have been indefeasibly paid in full and all other obligations of the Authority and the DWSD hereunder and under the Related Documents have been performed and discharged, the Authority, the City and the DWSD each waive and covenant not to assert any right of setoff or recoupment against its obligation to make all payments of principal, interest and all other Required Payments due hereunder and under the other Related Documents in the amounts and at the times required hereby and thereby, and without abatement, diminution, deduction, counterclaim or defense for any reason, including, without limitation, in the following circumstances:

(a) any lack of validity or enforceability of any of the Related Documents;

(b) any amendment or waiver of any provision, term or condition of any of the Related Documents;

(c) the existence of any dispute with, or any claim, right of setoff or recoupment, defense or other rights which the Authority, the City and the DWSD may have at any time against the Trustee, the DWSD Trustee, the Banks (other than the defense of payment to the Banks in accordance with the terms of this Agreement), any Owner or any other Person, whether in connection with this Agreement, the Related Documents or any transaction contemplated thereby or any unrelated transaction; and

(d) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section, constitute a legal or equitable discharge of, or provide a right of setoff or recoupment against, the Authority's or the DWSD's obligations hereunder or under any of the other Related Documents.

13-53846-swr Doc 2771-2 Filed 12/26/14 Entered 12/26/14 07:56:47 Page 24 of 25
135

**Section 8.02. Continuing Obligation**.  All covenants, agreements, representations and warranties made by the Authority, the City and the DWSD in this Agreement and in the certificates or other instruments  delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the Banks and shall survive the execution and delivery of this Agreement and the issuance and purchase by the Banks of the  Bonds, regardless of any investigation made by the Banks or on its behalf and notwithstanding that the Banks may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the Bonds or any Required Payments remain outstanding and unpaid. The obligations of the Authority, the City and the DWSD under this Agreement shall survive and continue until the date upon which all amounts due and owing to the Banks hereunder and under any Bonds shall have been indefeasibly paid in full; *provided, however,* that the obligations of the Authority, the City and the DWSD pursuant to Sections 2.06, 8.03, 8.04, 9.12 and 9.13 hereof shall survive any expiration or termination of this Agreement.

**Section 8.03. Liability of the Banks**.  The Authority, the City and the DWSD each hereby unconditionally and irrevocably releases and discharges the Banks, its Affiliates and each other Owner, and each of their respective officers, directors, employees and agents (each, a "Releasee"), from all liability or responsibility for any losses, liabilities, damages, claims, costs (including attorneys' fees), judgments or causes of action (collectively, "Liabilities") arising out of or in connection with any of the following: (a) the use that may be made of the proceeds of the Bonds or for any acts or omissions of the Authority, the City, the DWSD or the Trustee; (b) any of the acts, omissions, agreements, circumstances or conditions covered by the indemnification provided in Section 8.04 and (c) any other circumstance whatsoever in connection with the purchase and holding by the Banks (or other Owner) of the Bonds or the enforcement of this Agreement or the exercise of any rights or remedies hereunder, under any other Related Document or under law or in equity by the Banks (or other Owner); provided that, the Authority and the DWSD shall have a claim against the Banks (or other Owner) and the Banks (or other Owner) shall be liable to the Authority and the DWSD  to the extent, but only to the extent, of any direct, actual damages suffered or incurred by the Authority and the DWSD, and not required to be mitigated by the Authority, the City and the DWSD, which direct, actual damages are determined by a final and nonappealable judgment of a court of competent jurisdiction to have been directly caused by the Bank's willful misconduct or gross negligence in the performance or non-performance of a duty owed to the Authority and the DWSD.  The Authority, the City and the DWSD further unconditionally and irrevocably release the Releasees from all Liabilities for or constituting lost profits and from all Liabilities for or constituting consequential, special, indirect or punitive (or exemplary) damages (the right to recover or receive lost profits, consequential, special, indirect or punitive (or exemplary) damages being hereby waived), suffered or incurred by the Authority, the City and the DWSD.

**Section 8.04. Indemnification; Taxes, Etc.**   (a)  In addition to any and all rights of reimbursement, indemnification, subrogation or any other rights pursuant hereto or under law or equity, only to the extent permitted by applicable law, the Authority hereby agrees to defend, indemnify and hold harmless each of the Banks, their Affiliates, each other Owner and each Participant and each of the respective officers, directors, employees and agents of the foregoing Persons (each an "Indemnified Party") from and against any and all claims, damages, losses, liabilities, reasonable costs or expenses whatsoever (including reasonable attorneys' fees) that an