# EXHIBIT C

## Intellectual Property Assignment

# EXHIBIT D

## Museum Quit Claim Deed

**EXHIBIT E**

**Cultural Center Garage Quit Claim Deed**

**Form of Bill of Sale By the City of**
**Detroit in Favor of the Detroit Institute of Arts**

13-53846-swr Doc 8072-1 Filed 12/16/14 Entered 12/16/14 07:39:38 Page 4 of 301
13-53846-swr Doc 8045-1 Filed 10/22/14 Entered 10/22/14 09:48:29 Page 134 of
809

BILL OF SALE

BY

THE CITY OF DETROIT

IN FAVOR OF

THE DETROIT INSTITUTE OF ARTS

## BILL OF SALE

This Bill of Sale (this "**Bill of Sale**"), is effective as of the Effective Time, in favor of The Detroit Institute of Arts, a Michigan nonprofit corporation f/k/a Founders Society Detroit Institute of Arts ("**The DIA**"), by the City of Detroit, Michigan (the "**City**"). Capitalized terms not otherwise defined in this Bill of Sale will have the meanings given to them in the Charitable Trust Agreement (defined below).

## RECITALS

WHEREAS, the City and The DIA are parties to that certain Settlement, Conveyance and Charitable Trust Agreement (the "**Charitable Trust Agreement**") pursuant to which, as of the Effective Time, the City has irrevocably sold, transferred, conveyed, assigned and delivered to The DIA, to be held in perpetual charitable trust for the benefit of the citizens of the City and the State of Michigan (the "**State**"), all of the City's right, title and interest (including legal title it may hold as trustee and legal title and beneficial interest it otherwise holds) throughout the world in and to the Museum Assets free and clear of all security interests, liens, encumbrances, claims and interests of the City and its creditors; and

WHEREAS, this Bill of Sale is being executed and delivered pursuant to the Charitable Trust Agreement to confirm and further effectuate the Transfer as of the Effective Time.

NOW, THEREFORE, for the consideration described in the Charitable Trust Agreement, the receipt and sufficiency of which are hereby acknowledged:

1.     <u>Conveyance</u>. The City hereby irrevocably sells, transfers, conveys, assigns and delivers to The DIA, and The DIA hereby acquires, all of the City's right, title and interest (including legal title it may hold as trustee and legal title and beneficial interest it otherwise holds) throughout the world in and to the Museum Assets and not otherwise conveyed by a distinct instrument delivered pursuant to Section 3.2 of the Charitable Trust Agreement, including, without limitation, all rights to donations, gifts, bequests, grants and contributions, for the benefit of the Museum or The DIA, free and clear of all security interests, liens, encumbrances, claims and interests of the City and its creditors. All Museum Assets being transferred pursuant to this Bill of Sale shall be transferred on an "AS-IS, WHERE-IS" basis, and the City makes no representations or warranties with respect to the Museum Assets. The DIA shall hold the Museum Assets in perpetual charitable trust for the benefit of the citizens of the City and the State in accordance with the terms of the Charitable Trust Agreement.

2.     <u>Construction</u>. Nothing in this Bill of Sale, express or implied, is intended or will be construed to expand or defeat, impair or limit in any way the rights, obligations, claims or remedies of the Parties as set forth in the Charitable Trust Agreement. To the extent that any term or provision of this Bill of Sale is deemed to be inconsistent with the terms of the Charitable Trust Agreement, the terms of the Charitable Trust Agreement shall control.

3.     <u>Dispute Resolution</u>. Any dispute arising under or arising out of this Bill of Sale shall be adjudicated in accordance with and otherwise subject to the provisions of Sections 8.1 and 8.3 of the Charitable Trust Agreement.

4.    Binding Agreement.  This Bill of Sale and all of the provisions hereof will be binding upon, and inure to the benefit of, The DIA and the City and their respective successors and permitted assigns.

5.    Counterparts.  This Assignment may be executed in several counterparts, each of which shall be deemed an original and all of which shall constitute one and the same, instrument, and shall become effective when counterparts have been signed by each of the Parties and delivered to the other party; it being understood that both Parties need not sign the same counterpart.  The exchange of copies of this Assignment or of any other document contemplated by this Assignment (including any amendment or any other change thereto) and of signature pages thereof by facsimile transmission (whether directly from one facsimile device to another by means of a dial-up connection or whether otherwise transmitted via electronic transmission), by electronic mail in "portable document format" ("**.pdf**") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by a combination of such means, shall constitute effective execution and delivery of this Assignment as to the Parties and may be used in lieu of an original Assignment or other document for all purposes.  Signatures of the parties transmitted by facsimile, by electronic mail in .pdf form or by any other electronic means referenced in the preceding sentence, or by any combination thereof, shall be deemed to be original signatures for all purposes.

*[signature page follows]*

IN WITNESS WHEREOF, the undersigned has executed this Bill of Sale in favor of The DIA as of the Effective Time.

**THE CITY OF DETROIT**


By:_____
   Name:
   Its:


**THE DETROIT INSTITUTE OF ARTS**


By:_____
   Name:
   Its:

*[SIGNATURE PAGE TO BILL OF SALE]*

14875094.10

13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 09:48:29   Page 8 of 301
13-53846-swr   Doc 8372-1   Filed 11/16/14   Entered 11/16/14 07:33:23   Page 150 of 809

**Form of Intellectual Property Assignment By and
Between the City of Detroit and the Detroit Institute of Arts**

# INTELLECTUAL PROPERTY ASSIGNMENT

## BY AND BETWEEN

## THE CITY OF DETROIT

## AND

## THE DETROIT INSTITUTE OF ARTS

13-53846-tjt   Doc 8772-1   Filed 12/16/14   Entered 12/16/14 07:30:33   Page 10 of 301
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 160 of
809

# INTELLECTUAL PROPERTY ASSIGNMENT

THIS INTELLECTUAL PROPERTY ASSIGNMENT ("**Assignment**"), is effective as of the Effective Time, by and between the City of Detroit, Michigan (the "**City**"), and The Detroit Institute of Arts, a Michigan nonprofit corporation f/k/a Founders Society Detroit Institute of Arts ("**The DIA**"). The DIA and the City are referred to individually as a "**Party**" and collectively, as the "**Parties**." Capitalized terms not otherwise defined in this Assignment will have the meaning given to them in the Charitable Trust Agreement (as defined below).

# RECITALS

WHEREAS, the City and The DIA are parties to that certain Settlement, Conveyance and Charitable Trust Agreement (the "**Charitable Trust Agreement**") pursuant to which, as of the Effective Time, the City has irrevocably sold, transferred, conveyed, assigned and delivered to The DIA, to be held in perpetual charitable trust for the benefit of the citizens of the City and the State of Michigan (the "**State**"), all of the City's right, title and interest (including legal title it may hold as trustee and legal title and beneficial interest it otherwise holds) throughout the world in and to the Museum Assets free and clear of all security interests, liens, encumbrances, claims and interests of the City and its creditors;

WHEREAS, included among the Museum Assets are certain Assigned Intellectual Property (as defined below) relating to the City Art Collection (as defined below);

WHEREAS, the City desires to convey, transfer, assign and deliver to The DIA, to be held in perpetual charitable trust for the benefit of the citizens of the City and the State, and The DIA desires to accept from the City, all of the City's right, title and interest in and to the Assigned Intellectual Property (including legal title it may hold as trustee and legal title and beneficial interest it otherwise holds) throughout the world free and clear of all security interests, liens, encumbrances, claims and interests of the City and its creditors; and

WHEREAS, this Assignment is being executed and delivered pursuant to the Charitable Trust Agreement to confirm and further effectuate the Transfer as of the Effective Time.

NOW, THEREFORE, for valuable consideration, including, without limitation, the consideration received by the City under the Charitable Trust Agreement, the receipt of which is hereby acknowledged, the City and The DIA hereby agree as follows:

1.     Definitions. As used in this Agreement:

"**Assigned Intellectual Property**" shall mean the City's entire right, title and interest throughout the world in and to the Copyrights, Trademark Rights, Patent Rights and Other Rights embodied in, related to, evidenced by or are or that were inherent in, associated with, or primarily used to develop, manage or exploit the City Art Collection or operation of the Museum, and specifically including, but not limited to, the rights: (a) to seek and obtain protection therefor (including, without limitation, the right to seek and obtain copyright registrations, trademark registrations, industrial design registrations, and design and utility

13-53846-tjt   Doc 8725   Filed 12/10/14   Entered 12/10/14 07:39:33   Page 11 of 301
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 163 of
809

patents and the like) in the United States and all other countries in The DIA's name (or otherwise as The DIA may desire); (b) to sue for and collect damages and all other remedies for any current or past infringements, violations, or misappropriations of the same; and (c) to collect royalties, products and proceeds in connection with any of the foregoing.

"**City Art Collection**" shall mean the works of art owned by the City, and part of the collection of the Museum or otherwise under the auspices of the Museum (including, without limitation, any item that is still in the "City art collection" (as defined in the Operating Agreement but taking into account any additions to or subtractions from such collection over time) as of the Effective Time), the Museum's library, all related license rights and permissions in favor of the City and/or The DIA (to the full extent that they are subject to transfer), whether by (a) gift directly to The DIA or the City or to any third person or entity for the benefit of the Museum; (b) purchase; or (c) otherwise.

"**Copyrights**" shall mean the City's rights to all works of authorship under the copyright laws of the United States and all other countries and governmental divisions throughout the world for the full term or terms thereof (and including all copyright rights accruing by virtue of copyright treaties and conventions) including, but not limited to, all moral rights, all rights of attribution and integrity, any and all renewals, extensions, reversion or restoration of copyright now or hereafter provided by law and all rights to make applications for and receive copyright registrations therefor in the United States and all other countries.

"**Other Rights**" shall mean all intellectual property and proprietary rights in the United States and all other countries and governmental divisions throughout the world not otherwise included in the Copyrights, Trademark Rights and Patent Rights, and specifically including, but not limited to, worldwide rights in and to all trade secrets, trade dress, know-how, techniques, designs, concepts, confidential information and associated goodwill.

"**Patent Rights**" shall mean all patent applications and issued patents throughout the world in the United States and all foreign countries which have been or may be granted therefor and thereon, and any and all divisions, continuations, continuations-in-part, reexaminations, substitutions, reissues, extensions and renewals of such patents.

"**Trademark Rights**" shall mean all trademarks, service marks, trade names, trade dress, domain name registrations and other indicia of source, together with the goodwill associated with and symbolized by the same, including any applications, registrations, renewals and extensions thereof, and all other corresponding rights at common law or otherwise that are or may be secured under the laws of the United States or any foreign country, now or hereafter in effect.

2.    Assignment.  The City hereby irrevocably assigns, conveys, sells, grants and transfers to The DIA, and The DIA hereby acquires, the City's entire right, title and interest (including legal title it may hold as trustee and legal title and beneficial interest it otherwise holds) throughout the world in and to the Assigned Intellectual Property free and clear of all security interests, liens, encumbrances, claims and interests of the City and its creditors.  All Assigned Intellectual Property being transferred pursuant to this Assignment shall be transferred on an "AS-IS, WHERE-IS" basis, and the City makes no representations or warranties with respect to the Assigned Intellectual Property.  The DIA shall hold the Assigned Intellectual

2

13-53846-tjt   Doc 8772-1   Filed 12/10/14   Entered 12/10/14 07:39:33   Page 12 of 301
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 162 of
809

Property in a perpetual charitable trust for the benefit of the citizens of the City and the State in accordance with the terms of the Charitable Trust Agreement.

3.   <u>Construction</u>.  Nothing in this Assignment, express or implied, is intended or will be construed to expand or defeat, impair or limit in any way the rights, obligations, claims or remedies of the Parties as set forth in the Charitable Trust Agreement.  To the extent that any term or provision of this Assignment is deemed to be inconsistent with the terms of the Charitable Trust Agreement, the terms of the Charitable Trust Agreement shall control.

4.   <u>Dispute Resolution</u>.  Any dispute arising out of this Assignment shall be determined in accordance with the provisions of Sections 8.1 and 8.3 of the Charitable Trust Agreement

5.   <u>Binding Agreement</u>.  This Assignment and all of the provisions hereof will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

6.   <u>Counterparts</u>.  This Assignment may be executed in several counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument, and shall become effective when counterparts have been signed by each of the Parties and delivered to the other party; it being understood that both Parties need not sign the same counterpart.  The exchange of copies of this Assignment or of any other document contemplated by this Assignment (including any amendment or any other change thereto) and of signature pages thereof by facsimile transmission (whether directly from one facsimile device to another by means of a dial-up connection or whether otherwise transmitted via electronic transmission), by electronic mail in "portable document format" (".pdf") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by a combination of such means, shall constitute effective execution and delivery of this Assignment as to the Parties and may be used in lieu of an original Assignment or other document for all purposes.  Signatures of the parties transmitted by facsimile, by electronic mail in .pdf form or by any other electronic means referenced in the preceding sentence, or by any combination thereof, shall be deemed to be original signatures for all purposes.

*[signature pages follow]*

3

13-53846-tjt   Doc 8772   Filed 12/10/14   Entered 12/10/14 07:39:33   Page 13 of 30
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 169 of 809

IN WITNESS WHEREOF, each of the undersigned has executed this Assignment of Intellectual Property as of the Effective Time.

**THE CITY OF DETROIT**

By: _____
Name:
Title:

| | |
|---|---|
| CITY OF DETROIT | ) |
| | ) SS |
| STATE OF MICHIGAN | ) |

I, a Notary Public, certify that on the _____ day of _____, 2014 before me personally appeared _____, to me known and known to me to be of legal capacity and acknowledged his/her signature appearing on the foregoing instrument and ratified the same.

_____
Notary Public

My commission expires: _____

*[SIGNATURE PAGE TO INTELLECTUAL PROPERTY ASSIGNMENT]*

14821736.14

13-53846-tjt   Doc 8272   Filed 12/10/14   Entered 12/10/14 07:39:33   Page 14 of 301
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 164 of 809

# THE DETROIT INSTITUTE OF ARTS

By: _____
Name:
Title:

CITY OF DETROIT                )
                                   ) SS
STATE OF MICHIGAN          )

       I, a Notary Public, certify that on the _____ day of _____, 2014 before me personally appeared _____, to me known and known to me to be of legal capacity and acknowledged his/her signature appearing on the foregoing instrument and ratified the same.

_____
Notary Public

My commission expires: _____

14821736.14
13-53846-tjt  Doc 8772  Filed 12/10/14  Entered 12/10/14 07:39:33  Page 15 of 301
13-53846-swr  Doc 8045-1  Filed 10/22/14  Entered 10/22/14 03:48:29  Page 169 of 809

**Form of Foundation FDF Agreement**

---

## T E R M S   O F   G R A N T   A G R E E M E N T

I.    Acceptance of Grant

The grant to your organization from the **[INSERT NAME OF FOUNDATION]** ("Foundation") is for the explicit purposes described below and is subject to your acceptance of the terms described herein.

To accept the grant, return a signed copy of this "Terms of Grant Agreement" to the Foundation. Keep the other copy for your files.   Please refer to the grant number and title in all communications concerning the grant.

| **Grantee:** | **Date Authorized**: |
|---|---|
| **Foundation for Detroit's Future** | **[Insert Date]**, 2014 |
| **Grant Number**: | **Amount Granted**: |
| #**[Insert grant number]** | $**[Insert Grant Amount]** **(Conditional, multi-year)** |

II.    Grant

The purpose of this grant of $[INSERT GRANT AMOUNT] to the Foundation for Detroit's Future ("Grantee"), a supporting organization of the Community Foundation for Southeast Michigan, is to provide the funding, in part, for the proposed DIA Settlement found in the Corrected Fifth Amended Plan for the Adjustment of the Debts of the City of Detroit, as it may be further amended and as modified, and in a term sheet found in Exhibit I.A.102 of same, provided DIA Settlement provisions and said term sheet remain substantially unchanged ("Plan of Adjustment").  The grant and the payment of the grant installments will be conditioned upon the City of Detroit and the City of Detroit General Retirement System and Police and Fire Retirement System ("Pension Funds") being in compliance with (i) the conditions precedent for closing found in the Plan of Adjustment, and (ii) certain material grant conditions, of both an initial and ongoing nature, that are memorialized in the Omnibus Transaction Agreement ("OTA") to be entered into between the City of Detroit, the Detroit Institute of Arts, and the Grantee substantially in the form attached to this Terms of Grant Agreement as Exhibit A and incorporated herein by this reference, a copy of which will  be provided to Foundation promptly following its execution.  Any capitalized defined terms not defined herein will have the definitions found in the OTA.

This Terms of Grant Agreement is also known as a "Foundation FDF Agreement" under the OTA.

Page 1 of 7

13-53846-tjt   Doc 8772   Filed 12/16/14   Entered 12/16/14 07:39:33   Page 17 of 301
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 16 of 809

Grant payments will be made in equal annual installments over a twenty-year period, subject to those conditions and any terms and conditions of this Terms of Grant Agreement. The schedule of grant payments will be made as follows and subject to the following conditions:

a. <u>Initial Grant Payment</u>
   1. <u>Payment amount and date</u>. Foundation will make an initial grant payment to Grantee of $[INSERT 1/20 OF TOTAL GRANT AWARD] upon the later of (i) the return of this signed Terms of Grant Agreement by Grantee, and (ii) August 30, 2014.
   2. <u>Payment Conditions</u>.
   Grantee acknowledges that this initial grant payment is being made by Foundation in order to facilitate the ability of Grantee to provide, in part, the initial payment to the City of Detroit by Grantee due at Closing in the event that the DIA Settlement found in the Plan of Adjustment is approved, and both (i) the City of Detroit and the City of Detroit Pension Funds are in compliance with their material grant conditions, of both an initial and ongoing nature, that are memorialized in Article IV(E) of the Plan of Adjustment and (ii) the conditions to the Foundation's and Grantee's grant obligations set forth in the OTA and the Plan of Adjustment have been satisfied in all material respects.

   In the event that the Plan of Adjustment is not approved by the U.S. Bankruptcy Court, or the Closing is otherwise not consummated, by December 31, 2014, Grantee will return to Foundation all provided grant funds by January 31, 2015. The remaining grant installments under this Terms of Grant Agreement will likewise be cancelled and this Terms of Grant Agreement will terminate.

   3. <u>Report on City of Detroit Compliance with Initial Grant Conditions</u>
   Grantee will provide to Foundation a report within 45 days of the Closing Date documenting that the conditions precedent for Closing were met and that the initial grant payment contemplated by the OTA has been made by the Grantee to the City of Detroit. In the event the Closing does not occur by December 31, 2014, a first and final report will be provided by January 31, 2015.

b. <u>Annual Grant Payments</u>
   1. <u>Payment Amounts and Dates</u>. Commencing in 2015 and continuing until 2033 (except as otherwise provided herein), Foundation will annually make a grant payment to Grantee of $[INSERT 1/20 OF TOTAL GRANT AWARD] by September 15 of that year. Foundation intends Grantee to use these annual payments to fund, in part, the annual payments from Grantee to the City of Detroit, pursuant to and subject to the terms and conditions of the OTA, on a funding schedule commencing June 30, 2016, and each June 30 thereafter ending on June 30, 2034 (the payment dates to the City of Detroit being subject to possible extensions pursuant to the OTA).

   Foundation acknowledges that it has the right to, but is not required to, rely on any finding by the board of trustees of the Grantee that the City is in compliance with the Conditions for Funding found in Section 2.4 of the OTA and that as a result of such a finding the Foundation is obligated to make timely payment to Grantee as provided in Section 2.7 of the OTA. Foundation will not unreasonably dispute any such finding by the board of the Grantee that the City is in compliance. If (i) Foundation has failed to make an annual grant installment

Page 2 of 7

13-53846-tjt   Doc 8772-5   Filed 12/10/14   Entered 12/10/14 07:39:33   Page 18 of 301
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 16 of 301
809

payment to Grantee when due hereunder and Grantee has provided the Foundation the 30-day notice contemplated by Section 2.8(b) of the OTA, and (ii) the Foundation has not made the required grant payment by the expiration of such 30-day period, then Grantee will assign its right to enforce collection of the payment from the Foundation to the City and the City will have the right to pursue collection of that payment as provided in the OTA.  Foundation will be responsible for its own costs and attorney fees in defending any action by Grantee or City to enforce payment from Foundation, unless those costs and attorney fees are otherwise indemnified or set-off on behalf of Foundation by the provisions of the OTA or the Plan of Adjustment.

2. <u>Annual Grant Payment Conditions</u>
   Grantee agrees that any annual grant payment it receives from the Foundation will be used for the sole purpose of making the annual payments to be made by Grantee to the City of Detroit pursuant to Section 2.3 of the OTA.

   In the event the Foundation has provided (i) an annual grant payment to the Grantee prior to the date Grantee has determined that the City has complied with Section 2.4 of the OTA for the year in which the annual grant payment is to be used, or (ii) Foundation, in its sole discretion, advances any future annual grant payment to Grantee, Grantee will maintain such grant balances in conservatively invested reserves to ensure that the monies provided are available to make payment to the City when conditions have been met.  Any earnings on such early grant payments will be used to offset operational costs of Grantee relating to the purposes of this grant.  If on December 31, 2034, there remains any earnings after payment of those operational expenses, Grantee, in its discretion, may use those excess earnings (i) to make grants and/or establish endowments that will support the ongoing revitalization, or maintain and expand the quality of life of the residents, of the City of Detroit and/or (ii) return those excess earnings ratably to the Foundation Funders.

   In the event the City fails to meet the conditions for release of an annual payment to it under Section 2.4 of the OTA and all applicable cure periods available to the City pursuant to Section 2.5 of the OTA (including any periods of time necessary for dispute resolution as provided in the OTA) have expired, the Foundation may either request that the Grantee return that annual grant payment to the Foundation, at which time the Foundation's obligation to make such  annual grant payment is automatically terminated and cancelled, or request that the Grantee retain the annual grant payment for application to a future annual grant payment due to the Grantee from the Foundation.  Foundation and Grantee also acknowledge and agree that consistent with Section 2.5(b) of the OTA, the Foundation may cancel its remaining grant installments to Grantee if the City fails to meet the conditions for release of an annual payment to it under the OTA, and all applicable cure periods available to the City pursuant to Section 2.5 of the OTA (including any periods of time necessary for dispute resolution as provided in the OTA) have expired. If Foundation elects to cancel its remaining grant payments, the Foundation may either request that the Grantee return any pre-paid annual grant amount provided to Grantee that has not yet been paid or is not obligated to be paid to the City by Grantee and/or allow Grantee to retain some or all of such pre-paid grant installments to offset operational costs of Grantee relating to the purposes of this grant.

Page 3 of 7
13-53846-tjt   Doc 8772   Filed 12/10/14   Entered 12/10/14 07:39:33   Page 19 of 301
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 163 of
809

3. Present Value Election

Consistent with the OTA, Foundation has the right to elect to make early payment of any or all of its grant payment obligations to the Grantee and have its obligation under this Terms of Grant Agreement reduced by a present value discount rate of 6.75% as provided in the OTA. Grantee will transfer such early payment to the City of Detroit and elect that present value discount provided the requirements of the next paragraph are met.

Foundation agrees that it will only make the above mentioned present value election if (i) the Grantee receives confirmation from the City, in a form reasonably acceptable to Grantee, that the Grantee's future grant payment obligations to the City under the OTA will be properly reduced as a result of such present value election by Foundation, and (ii) Foundation and Grantee agree to reasonable arrangements to prevent such early payment election from Foundation jeopardizing the fiscal stability and operations of Grantee and its abilities to perform its obligations under the OTA.

## III.  Indemnification and Other Provisions

Foundation and Grantee acknowledge that Foundation is a third-party beneficiary of certain provisions contained in the OTA and the contemplated order confirming the Plan of Adjustment. Foundation's rights as a third-party beneficiary include, but are not limited to, (i) indemnification by the City of Detroit as found in Section 6.2 of the OTA, (ii) set-offs on grant installments as a result of the City of Detroit failing to pay for defense and other costs (except that Foundation is not entitled to such set-off if the Grantee has, as a result of the City failing to pay all of the defense and other costs of the Foundation, incurred those costs on behalf of Foundation and Grantee), (iii) jurisdiction and choice of law provisions, and (iv) certain injunctive and other relief as found in the Plan of Adjustment as confirmed by court order.  Foundation's obligation to make any installment payment under this Terms of Grant Agreement is expressly conditioned upon the existence of all such third-party benefits including, but not limited to, said indemnification provision, set-off provisions and injunctive relief.

This Terms of Grant Agreement, or any rights, obligations or funds awarded under this Terms of Grant Agreement, may not be assigned, unless otherwise expressly provided herein, without the prior written consent of the non-assigning party, and any purported assignment in violation of the foregoing will be void and of no effect.  This Terms of Grant Agreement will be governed by and construed in accordance with the laws of the state of Michigan, with jurisdiction in the State and Federal Courts of Michigan (as more specifically provided in the OTA and the Plan of Adjustment).

## IV.  Review of Grant Activity

Grantee will provide written annual reports to the Foundation each July 30 showing the use of the grant funds provided under this grant.  Grantee may extend the date for any annual report to no later than January 30 of the following calendar year if Grantee is unable to obtain information from the City of Detroit necessary for completing the report.  Foundation and Grantee agree that the reports to be provided will be of a standard format and content to be provided to all Foundation Funders.  The content of the annual reports will include, without limitation:

Page 4 of 7

13-53846-tjr  Doc 8772  Filed 12/10/14  Entered 12/10/14 07:39:33  Page 20 of 30
13-53846-swr  Doc 8045-1  Filed 10/22/14  Entered 10/22/14 03:48:29  Page 17 of 30
809

- Information on the Grantee's progress toward meeting the terms of this grant
- A statement of determination by the board of Grantee regarding the City's compliance with the Conditions for Funding found in Section 2.4 of the OTA
- A statement of facts regarding the accounting treatment of the remaining payments due to Grantee by the Foundation for consideration by the Foundation in preparing its statements of financial position
- Copies of any and all evaluation or similar reports, if any, provided to any other Foundation Funder or any party to the OTA
- An explanation of any significant changes in the organizational leadership of the Grantee, such information to be provided promptly to Foundation if it occurs between the filing of an annual report

A final report is due by June 30, 2035.

In addition, Grantee will furnish the Foundation with any additional information reasonably requested by the Foundation from time to time. Without limiting the generality of the foregoing, Grantee will provide the Foundation (or its designated representatives) with reasonable access to Grantee's files, records and personnel for the purpose of making financial audits, evaluations or verification, program evaluations, or other verifications concerning this grant as the Foundation reasonably deems necessary during the term of this grant and for five years thereafter. The fees and expenses of any such representative that is designated by the Foundation to undertake these tasks, and any reasonable out-of-pocket costs actually incurred by the Grantee in complying with this request, will be paid by the Foundation.

V.   Standard Provisions

In accepting this grant, the Grantee agrees to the following and certifies the following statements:

a.  Grantee will use the funds granted solely for the purpose stated and Grantee will repay any portion of the amounts granted which is not used for the purpose of the grant or not expended by the due date for the final report.
b.  Grantee is and will at all times maintain its status as (i) a nonprofit corporation in good standing under the laws of the State of Michigan, and (ii) an organization described in Section 501(c)(3) and Section 509(a)(3) of the U.S. Internal Revenue Code ("Code") that is not a "private foundation" within the meaning of Section 509(a) of the Code because it is a Type-I supporting organization of the Community Foundation for Southeast Michigan.
c.  Grantee will notify the Foundation immediately of any change in its tax status.
d.  Grantee will return any unexpended funds if the Grantee loses its exemption from Federal income taxation as a 501(c)(3) nonprofit organization pursuant to Section 509(a)(1), 509(a)(2) or 509(a)(3) of the Code.
e.  Grantee will maintain books and records adequate to verify actions related to this grant during the term of this grant and for five years thereafter.
f.  Grant funds will only be expended for charitable, educational, literary or scientific purposes within the meaning of Section 501(c)(3) of the Code, and Grantee will comply with all applicable federal and state laws and regulations that govern the use

Page 5 of 7

13-53846-tjt   Doc 8772-1   Filed 12/10/14   Entered 12/10/14 07:39:33   Page 21 of 30
13-53846-swr   Doc 8045-5   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 17 of 31
809

of funds received from private foundations.  Grantee will in no event use grant funds or any income earned thereon to:

    i.    Carry on propaganda or otherwise to attempt to influence legislation (within the meaning of Section 4945(d)(1) of the Code).

    ii.    Influence the outcome of any specific public election or carry on, directly or indirectly, any voter registration drive (within the meaning of Section 4945(d)(2) of the Code).

    iii.    Make grants to individuals or to other organizations for travel, study or similar purpose that do not comply with the requirements of Section 4945(d)(3) or (4) of the Code.

    iv.    Undertake any activity other than for a charitable, educational, literary or scientific purpose specified in Section 170(c)(2)(B) of the Code.

    v.    Inure a benefit to any private person or entity in violation of Section 501(c)(3) and 4941 of the Code, including but not limited to any Foundation trustee, officer, employee, or his/her spouse, children, grandchildren, and great grandchildren or their respective spouses for any purpose.

    vi.    Support a use that is not in compliance with all applicable anti-terrorist financing and asset control laws, regulations, rules and executive orders, including but not limited to, the USA Patriot Act of 2001 and Executive Order No. 13224. Furthermore, Grantee agrees to ensure that no Foundation funds will be disbursed to any organization or individual listed on the United States Government's Terrorist Exclusion List or the Office of Foreign Assets Control (OFAC) Specially Designated Nationals & Blocked Persons List. In addition, Grantee takes reasonable steps to ensure that its board, staff and volunteers have no dealings whatsoever with known terrorist or terrorist organizations.

g.    Grantee acknowledges and agrees that this Terms of Grant Agreement does not imply a commitment by the Foundation to continued funding beyond the express terms of this Terms of Grant Agreement.

h.    Grantee represents that this grant will not result in the private benefit of any individual or entity, including, but not limited to, the discharge of any pledge or financial obligation of any individual or entity.

## VI.   Publicity

Communications regarding this grant, the OTA and the City's compliance with the ongoing conditions of the OTA will be coordinated and made by Grantee, in consultation with Foundation and other Foundation Funders.  Foundation and Grantee will obtain the other's approval prior to making any public announcement about this grant.  Foundation may include information on this grant in its period publications without the need for Grantee approval.

## VII.   Notices and Foundation Contact Information:

All notices, demands and other communications given or delivered under this Agreement will be given in writing to the address indicated below (or such other address as the recipient specifies in writing) and will be deemed to have been given when delivered personally, three (3) Business Days after mailing by certified or registered mail, return receipt requested and postage prepaid, or when delivery is guaranteed if sent via a nationally recognized overnight carrier, or when receipt is confirmed if sent via facsimile or other electronic transmission to the recipient.

    If to Grantee:         Robin D. Ferriby

Page 6 of 7

13-53846-tjt   Doc 8772-1   Filed 12/10/14   Entered 12/10/14 07:39:33   Page 22 of 30
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 17 of 30f
809

Vice President, Philanthropic Services
Foundation for Detroit's Future
333 West Fort Street, Suite 2010
Detroit, MI 48226-3134
313-961-6675
rferriby@cfsem.org

If to Foundation:      [INSERT FOUNDATION CONTACT INFORMATION]

VIII.    Power to Amend

Grantee will (i) promptly advise Foundation in writing if Grantee enters into any agreement or amendment with any other Foundation Funder that could reasonably be expected to provide such other Foundation Funder with benefits or terms that are more favorable than those provided to the Foundation hereunder, and (ii) upon the Foundation's request, promptly amend this Terms of Grant Agreement to provide Foundation with any or all of such more favorable benefits or terms.   This Terms of Grant Agreement may be amended only by a written agreement signed by the parties.

For the **[INSERT NAME OF FOUNATION]**:

By: _____          _____
**[INSERT OFFICER NAME AND TITLE]**:                               Date

For the Foundation for Detroit's Future:

By: _____          _____
Mariam C. Noland, President                                          Date

S:\DEVELOP\Robin\Private\Art Trust\Grant terms\20140806 Foundation FDF Agreement (clean).docx

Page 7 of 7

13-53846-tjt   Doc 8772-1   Filed 12/10/14   Entered 12/10/14 07:39:33   Page 23 of 301
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 173 of 809

**EXHIBIT I.A.132**

DISMISSED FGIC/COP LITIGATION

**Schedule of Dismissed FGIC/COP Litigation**

- All objections, replies, responses, briefs, memoranda, reservations of rights or other documents filed by FGIC in opposition to the Plan or any prior version of the Plan, including: (i) the Objection of Financial Guaranty Insurance Company to Plan for the Adjustment of Debts of the City of Detroit, filed on May 12, 2014 [Docket No. 4660]; (ii) the Supplemental Objection of Financial Guaranty Insurance Company to Plan for the Adjustment of Debts of the City of Detroit, filed on August 12, 2014 [Docket No. 6674]; (iii) the Supplemental Objection to Confirmation of the Sixth Amended Plan for the Adjustment of Debts of the City of Detroit, filed on August 25, 2014 [Docket No. 7046]; (iv) Financial Guaranty Insurance Company's Pretrial Brief in Support of Objection to Plan for the Adjustment of Debts of the City of Detroit [Docket No. 7102]; (v) the Joint Pretrial Brief in Support of Objection to DIA Settlement [Docket No. 7103]; and (vi) the Third Supplemental Objection of Financial Guaranty Insurance Company to Plan for the Adjustment of Debts of the City of Detroit [Docket No. 7611], and

- The adversary proceeding styled City of Detroit, Michigan v. Detroit General Retirement System Service Corporation, et al., Case No. 14-04112 (Bankr. E.D. Mich.), commenced by the City on January 31, 2014, including all counterclaims filed in connection therewith.

**EXHIBIT I.A.133**

DISMISSED SYNCORA LITIGATION

**APPEALS TO BE VOLUNTARILY DISMISSED, AND
MOTIONS AND OBJECTIONS TO BE WITHDRAWN,
WITH PREJUDICE BY SYNCORA AS A PRECONDITION
<u>TO CONSUMMATION OF THE PLAN COP SETTLEMENT</u>**

## <u>Appeals</u>

<u>Syncora Guarantee Inc., *et al.* v. City of Detroit (In re City of Detroit)</u>,
No. 2:13-CV-14305-BAF-PJK (E.D. Mich.), filed Oct. 10, 2013

<u>Syncora Guarantee Inc., *et al.* v. City of Detroit</u>, No. 14-1864 (6th Cir.),
docketed July 14, 2014

<u>Syncora Guarantee Inc., *et al.* v. City of Detroit (In re City of Detroit)</u>,
No. 2:14-CV-10501-BAF-PJK (E.D. Mich.), filed Feb. 3, 2014

<u>Syncora Guarantee Inc., *et al.* v. City of Detroit (In re City of Detroit)</u>,
No. 2:13-CV-10509-BAF-PJK (E.D. Mich.), filed Feb. 4, 2014

<u>Syncora Guarantee Inc., *et al.* v. City of Detroit (In re City of Detroit)</u>,
No. 2:14-CV-11995-BAF-PJK (E.D. Mich.), filed May 19, 2014

<u>Syncora Guarantee Inc., *et al.* v. City of Detroit (In re City of Detroit)</u>,
No. 2:14-CV-12062-BAF-PJK (E.D. Mich.), filed May 22, 2014

<u>In re Syncora Guarantee, *et al.*</u>, No. 14-109 (6th Cir.), docketed July 24, 2014

<u>Syncora Guarantee Inc., *et al.* v. City of Detroit (In re City of Detroit)</u>,
No. 2:14-CV-13044-BAF-PJK (E.D. Mich.), filed Aug. 6, 2014

Appeal of Order Denying Motion for Clarification of Post-Confirmation
Procedures (Docket No. 7034) (<u>see</u> Notice of Appeal to the District Court,
Docket No. 7080)

## <u>Motions and Objections</u>

*Ex Parte* Emergency Motion to (I) Issue a Temporary Administrative Stay of the
DIP Order and (II) Set a Briefing and Hearing Schedule (Docket No. 2500)

Emergency Motion of Syncora Guarantee Inc. and Syncora Capital Assurance Inc.
for Stay Pending Appeal (Docket No. 2516)

Motion to Compel Responses to Interrogatories (Docket No. 4557)

CLI-2254831v2

13-53846-tjt  Doc 8724-1  Filed 12/10/14  Entered 12/10/14 07:39:33  Page 27 of 301
13-53846-swr  Doc 8045-1  Filed 10/22/14  Entered 10/22/14 08:48:29  Page 173 of
809

Syncora Capital Assurance Inc. and Syncora Guarantee Inc.'s Objection to the Debtor's Plan of Adjustment (Docket No. 4679)

Syncora's First Supplemental Objection Regarding Certain Legal Issues Relating to Confirmation (Docket No. 5706)

Syncora Guarantee Inc. and Syncora Capital Assurance Inc.'s Motion to Exclude the Testimony of John W. Hill (Docket No. 6997)

Motion to Exclude Certain of the Expert Opinions of Martha Kopacz Under Federal Rule of Evidence 702 (Docket No. 6999)

Motion to Exclude the Testimony of the City's Forecasting Experts Under Federal Rule of Evidence 702 (Docket No. 7004)

Syncora Guarantee Inc. and Syncora Capital Assurance Inc. Limited Supplemental Objection and Reservation of Rights to Debtor's Sixth Amended Plan of Adjustment (Docket No. 7041)

Syncora Guarantee Inc. and Syncora Capital Assurance Inc.'s Amended Second Supplemental Objection to the Debtor's Plan of Adjustment (Docket No. 7213)

CLI-2254831v2

-2-

13-53846-swr Doc 8772 Filed 12/10/14 Entered 12/10/14 07:39:33 Page 28 of 301
13-53846-tjt Doc 8045-1 Filed 10/22/14 Entered 10/22/14 03:48:29 Page 173 of 809

**EXHIBIT I.A.148**

SCHEDULE OF DWSD BOND DOCUMENTS & RELATED DWSD BONDS

**SCHEDULE OF (I) DWSD BOND DOCUMENTS, (II) RELATED DWSD BONDS, (III) CLASSES OF DWSD BOND CLAIMS AND (IV) ALLOWED AMOUNTS OF DWSD BOND CLAIMS**

| DWSD Bond Documents | DWSD Bond Series | CUSIP | Class | Allowed Amount of DWSD Bond Claims in Class |
|---|---|---|---|---|
| Ordinance No. 01-05 adopted January 26, 2005 ("Water Bond Ordinance")[1] Trust Indenture dated as of February 1, 2013 among the City of Detroit, Detroit Water and Sewerage Department and U.S. Bank National Association, as trustee ("Water Indenture") Bond Resolution adopted on October 14, 1993 Resolution adopted October 22, 1993 Final Report of the Finance Director delivered to City Council December 22, 1993 | Series 1993 | 251255TP0 | Class 1A-1 | $24,725,000.00 |
| Water Bond Ordinance Water Indenture Bond Resolution adopted July 9, 1997 Sale Order of the Finance Director of the City of Detroit dated August 6, 1997 | Series 1997-A | 251255XM2 | Class 1A-2 | $6,520,000.00 |
| | | 251255XN0 | Class 1A-3 | $6,910,000.00 |

---

[1]    Ordinance No. 0-05 amends and restates Ordinance No. 30-02 adopted November 27, 2002, which amended and restated Ordinance No. 06-01 adopted October 18, 2001, which amended and restated Ordinance No. 32-85, as amended.

| DWSD Bond Documents | DWSD Bond Series | CUSIP | Class | Allowed Amount of DWSD Bond Claims in Class |
|---|---|---|---|---|
| Ordinance No. 01-05 adopted January 26, 2005 ("Water Bond Ordinance")[2]<br><br>Trust Indenture dated February 1, 2013 among City of Detroit, Detroit Water and Sewage Department and U.S. Bank National Association, as trustee ("Water Indenture")<br><br>Bond Authorizing Resolution of City Council adopted January 31, 2001 and Resolution Amending Bond Authorizing Resolution, adopted April 25, 2001<br><br>Sale Order of Finance Director of City of Detroit dated May 17, 2001 | Series 2001-A | 251255A21 | Class 1A-4 | $73,790,000.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>Resolution of the City Council adopted April 25, 2001<br><br>Sale Order of the Finance Director of the City of Detroit dated May 31, 2001 and Supplement to Prior Sale Orders of Finance Director dated May 6, 2008 | Series 2001-C | 2512556U4 | Class 1A-5 | $350,000.00 |
| | | 2512556V2 | Class 1A-6 | $365,000.00 |
| | | 2512556W0 | Class 1A-7 | $380,000.00 |
| | | 2512556X8 | Class 1A-8 | $390,000.00 |
| | | 2512556Y6 | Class 1A-9 | $415,000.00 |
| | | 2512556Z3 | Class 1A-10 | $12,510,000.00 |
| | | 2512557A7 | Class 1A-11 | $13,235,000.00 |
| | | 2512557B5 | Class 1A-12 | $14,025,000.00 |
| | | 2512557C3 | Class 1A-13 | $14,865,000.00 |
| | | 2512557D1 | Class 1A-14 | $15,750,000.00 |
| | | 2512557E9 | Class 1A-15 | $16,690,000.00 |
| | | 2512557F6 | Class 1A-16 | $17,690,000.00 |
| | | 2512557G4 | Class 1A-17 | $18,735,000.00 |
| | | 2512557H2 | Class 1A-18 | $19,945,000.00 |
| | | 2512557J8 | Class 1A-19 | $4,000,000.00 |
| | | 2512557L3 | Class 1A-20 | $20,090,000.00 |
| | | 2512557K5 | Class 1A-21 | $18,815,000.00 |

---

[2]     Ordinance No. 0-05 amends and restates Ordinance No. 30-02 adopted November 27, 2002, which amended and restated Ordinance No. 06-01 adopted October 18, 2001, which amended and restated Ordinance No. 32-85, as amended.

| DWSD Bond Documents | DWSD Bond Series | CUSIP | Class | Allowed Amount of DWSD Bond Claims in Class |
|---|---|---|---|---|
| Water Bond Ordinance | Series 2003-A | 251255D77 | Class 1A-22 | $500,000.00 |
| Water Indenture | | 251255D93 | Class 1A-23 | $250,000.00 |
| Bond Authorizing Resolution of the City Council adopted Nov. 27, 2002 ("2003 Water Resolution") | | 251255E27 | Class 1A-24 | $3,550,000.00 |
| | | 2512555F8 | Class 1A-25 | $9,970,000.00 |
| Sale Order of the Finance Director of the City of Detroit dated January 24, 2003 and Supplement to Sale Order of the Finance Director – 2003 Bonds, dated February 6, 2003 (collectively, "2003 Sale Order") | | 251255K20 | Class 1A-26 | $20,955,000.00 |
| | | 251255K38 | Class 1A-27 | $21,900,000.00 |
| | | 251255E68 | Class 1A-28 | $121,660,000.00 |
| Water Bond Ordinance | Series 2003-B | 2512555H4 | Class 1A-29 | $41,770,000.00 |
| Water Indenture | | | | |
| 2003 Water Resolution | | | | |
| 2003 Sale Order | | | | |
| Water Bond Ordinance | Series 2003-C | 251255J22 | Class 1A-30 | $2,120,000.00 |
| Water Indenture | | 251255J30 | Class 1A-31 | $2,620,000.00 |
| 2003 Water Resolution | | 251255J48 | Class 1A-32 | $2,655,000.00 |
| 2003 Sale Order | | 251255J55 | Class 1A-33 | $2,930,000.00 |
| | | 251255J63 | Class 1A-34 | $2,790,000.00 |
| | | 251255J71 | Class 1A-35 | $2,965,000.00 |
| | | 251255J89 | Class 1A-36 | $4,580,000.00 |
| | | 251255J97 | Class 1A-37 | $4,665,000.00 |
| | | 251255H99 | Class 1A-38 | $2,330,000.00 |
| Water Bond Ordinance | Series 2003-D | 2512552T1 | Class 1A-39 | $325,000.00 |
| Water Indenture | | 2512552U8 | Class 1A-40 | $335,000.00 |
| Bond Authorizing Resolution of the City Council adopted November 27, 2002 | | 2512552V6 | Class 1A-41 | $350,000.00 |
| | | 2512552W4 | Class 1A-42 | $360,000.00 |
| | | 2512552X2 | Class 1A-43 | $370,000.00 |
| Sale Order of Finance Director of the City of Detroit dated February 5, 2003 | | 2512552Y0 | Class 1A-44 | $2,585,000.00 |
| | | 2512552Z7 | Class 1A-45 | $29,410,000.00 |
| | | 2512553A1 | Class 1A-46 | $23,920,000.00 |
| | | 2512553B9 | Class 1A-47 | $82,930,000.00 |

| DWSD Bond Documents | DWSD Bond Series | CUSIP | Class | Allowed Amount of DWSD Bond Claims in Class |
|---|---|---|---|---|
| Water Bond Ordinance<br>Water Indenture<br>Bond Authorizing Resolution of the City Council adopted January 21, 2004 ("2004 Bond Resolution")<br>Sale Order of Finance Director of the City of Detroit dated May 12, 2004 ("2004 Sale Order") | Series 2004-A | 2512553G8 | Class 1A-48 | $4,250,000.00 |
| | | 2512553H6 | Class 1A-49 | $4,475,000.00 |
| | | 2512553J2 | Class 1A-50 | $4,710,000.00 |
| | | 2512553K9 | Class 1A-51 | $4,955,000.00 |
| | | 2512553L7 | Class 1A-52 | $5,215,000.00 |
| | | 2512553M5 | Class 1A-53 | $5,490,000.00 |
| | | 2512553N3 | Class 1A-54 | $5,780,000.00 |
| | | 2512553P8 | Class 1A-55 | $6,085,000.00 |
| | | 2512553Q6 | Class 1A-56 | $6,400,000.00 |
| | | 2512553R4 | Class 1A-57 | $6,735,000.00 |
| | | 2512553S2 | Class 1A-58 | $14,505,000.00 |
| Water Bond Ordinance<br>Water Indenture<br>2004 Bond Resolution<br>2004 Sale Order | Series 2004-B | 2512554A0 | Class 1A-59 | $85,000.00 |
| | | 2512554B8 | Class 1A-60 | $90,000.00 |
| | | 2512554C6 | Class 1A-61 | $10,000,000.00 |
| | | 2512554D4 | Class 1A-62 | $3,545,000.00 |
| | | 2512554E2 | Class 1A-63 | $13,925,000.00 |
| | | 2512554F9 | Class 1A-64 | $350,000.00 |
| | | 2512554G7 | Class 1A-65 | $14,940,000.00 |
| | | 2512554H5 | Class 1A-66 | $15,810,000.00 |
| | | 2512554J1 | Class 1A-67 | $16,665,000.00 |
| | | 2512554K8 | Class 1A-68 | $16,085,000.00 |
| | | 2512554L6 | Class 1A-69 | $16,935,000.00 |
| | | 2512554M4 | Class 1A-70 | $6,280,000.00 |
| Water Bond Ordinance<br>Water Indenture<br>Amended and Restated Resolution of the City Council adopted January 26, 2005 ("2005-A/C Bond Resolution")<br>Sale Order of Finance Director of the City of Detroit dated March 3, 2005 (Series 2005-A) | Series 2005-A | 251255M85 | Class 1A-71 | $50,000.00 |
| | | 251255Q81 | Class 1A-72 | $2,070,000.00 |
| | | 251255M93 | Class 1A-73 | $85,000.00 |
| | | 251255Q99 | Class 1A-74 | $2,145,000.00 |
| | | 251255N27 | Class 1A-75 | $95,000.00 |
| | | 251255R23 | Class 1A-76 | $2,265,000.00 |
| | | 251255N35 | Class 1A-77 | $125,000.00 |
| | | 251255R31 | Class 1A-78 | $2,370,000.00 |
| | | 251255N43 | Class 1A-79 | $20,000.00 |
| | | 251255R49 | Class 1A-80 | $2,615,000.00 |
| | | 251255N50 | Class 1A-81 | $2,790,000.00 |
| | | 251255N68 | Class 1A-82 | $2,955,000.00 |
| | | 251255N76 | Class 1A-83 | $3,030,000.00 |
| | | 251255N84 | Class 1A-84 | $3,225,000.00 |
| | | 251255N92 | Class 1A-85 | $3,430,000.00 |
| | | 251255P25 | Class 1A-86 | $3,650,000.00 |

-4-
13-53846-swr  Doc 8045-1  Filed 10/22/14  Entered 10/22/14 03:48:29  Page 169 of
809
13-53846-tjt  Doc 8724  Filed 12/10/14  Entered 12/10/14 07:39:33  Page 32 of 301

| DWSD Bond Documents | DWSD Bond Series | CUSIP | Class | Allowed Amount of DWSD Bond Claims in Class |
|---|---|---|---|---|
| | | 251255P33 | Class 1A-87 | $3,790,000.00 |
| | | 251255P41 | Class 1A-88 | $4,080,000.00 |
| | | 251255P58 | Class 1A-89 | $4,290,000.00 |
| | | 251255P66 | Class 1A-90 | $4,615,000.00 |
| | | 251255P74 | Class 1A-91 | $4,890,000.00 |
| | | 251255P82 | Class 1A-92 | $5,145,000.00 |
| | | 251255P90 | Class 1A-93 | $5,415,000.00 |
| | | 251255Q24 | Class 1A-94 | $5,715,000.00 |
| | | 251255Q32 | Class 1A-95 | $19,525,000.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>Amended and Restated Resolution of the City Council dated March 22, 2005 (Series 2005-B)<br><br>Sale Order of Finance Director of the City of Detroit dated March 22, 2005 (Series 2005-B), Amendment No. 1 to Sale Order of the Finance Director dated April 23, 2008 and Supplement to Prior Sale Orders of Finance Director dated May 6, 2008 | Series 2005-B | 2512557R0 | Class 1A-96 | $2,125,000.00 |
| | | 2512557S8 | Class 1A-97 | $2,225,000.00 |
| | | 2512557T6 | Class 1A-98 | $2,305,000.00 |
| | | 2512557U3 | Class 1A-99 | $2,385,000.00 |
| | | 2512557V1 | Class 1A-100 | $2,465,000.00 |
| | | 2512557W9 | Class 1A-101 | $2,575,000.00 |
| | | 2512557X7 | Class 1A-102 | $2,690,000.00 |
| | | 2512557Y5 | Class 1A-103 | $2,905,000.00 |
| | | 2512557Z2 | Class 1A-104 | $3,025,000.00 |
| | | 2512558A6 | Class 1A-105 | $3,145,000.00 |
| | | 2512558B4 | Class 1A-106 | $3,270,000.00 |
| | | 2512558C2 | Class 1A-107 | $3,490,000.00 |
| | | 2512558D0 | Class 1A-108 | $3,620,000.00 |
| | | 2512558E8 | Class 1A-109 | $3,850,000.00 |
| | | 2512558F5 | Class 1A-110 | $3,980,000.00 |
| | | 2512558G3 | Class 1A-111 | $28,415,000.00 |
| | | 2512558H1 | Class 1A-112 | $57,365,000.00 |
| | | 2512558J7 | Class 1A-113 | $57,500,000.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>2005-A/C Bond Resolution<br><br>Sale Order of Finance Director of the City of Detroit dated March 3, 2005 (Series 2005-C) | Series 2005-C | 251255S63 | Class 1A-114 | $9,270,000.00 |
| | | 251255S71 | Class 1A-115 | $9,735,000.00 |
| | | 251255S89 | Class 1A-116 | $17,545,000.00 |
| | | 251255S97 | Class 1A-117 | $18,425,000.00 |
| | | 251255T21 | Class 1A-118 | $18,700,000.00 |
| | | 251255T39 | Class 1A-119 | $8,245,000.00 |
| | | 251255T47 | Class 1A-120 | $8,655,000.00 |
| | | 251255T54 | Class 1A-121 | $9,090,000.00 |
| | | 251255T62 | Class 1A-122 | $9,540,000.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>Resolution of the City Council adopted November 18, 2005 | Series 2006-A | 251255V36 | Class 1A-123 | $7,285,000.00 |
| | | 251255V44 | Class 1A-124 | $7,650,000.00 |
| | | 251255V51 | Class 1A-125 | $8,030,000.00 |
| | | 251255V69 | Class 1A-126 | $8,430,000.00 |
| | | 251255V77 | Class 1A-127 | $8,855,000.00 |

-5-

13-53846-slr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 34 of 301
13-53846-swr   Doc 8772-1   Filed 12/10/14   Entered 12/10/14 00:33:33   Page 34 of
809

| DWSD Bond Documents | DWSD Bond Series | CUSIP | Class | Allowed Amount of DWSD Bond Claims in Class |
|---|---|---|---|---|
| ("2006 Bond Resolution") Sale Order of Finance Director of the City of Detroit dated July 19, 2006 (Series 2006-A) | | 251255V85 | Class 1A-128 | $9,295,000.00 |
| | | 251255V93 | Class 1A-129 | $9,760,000.00 |
| | | 251255W27 | Class 1A-130 | $10,250,000.00 |
| | | 251255W35 | Class 1A-131 | $10,760,000.00 |
| | | 251255W43 | Class 1A-132 | $11,300,000.00 |
| | | 251255W50 | Class 1A-133 | $11,865,000.00 |
| | | 251255W68 | Class 1A-134 | $12,460,000.00 |
| | | 251255W76 | Class 1A-135 | $13,080,000.00 |
| | | 251255W84 | Class 1A-136 | $131,150,000.00 |
| Water Bond Ordinance Water Indenture 2006 Bond Resolution Sale Order of Finance Director of the City of Detroit dated August 15, 2006 (Series 2006-B) | Series 2006-B | 251256AG8 | Class 1A-137 | $100,000.00 |
| | | 251256AH6 | Class 1A-138 | $100,000.00 |
| | | 251256AJ2 | Class 1A-139 | $100,000.00 |
| | | 251256AK9 | Class 1A-140 | $100,000.00 |
| | | 251256AL7 | Class 1A-141 | $100,000.00 |
| | | 251256AM5 | Class 1A-142 | $100,000.00 |
| | | 251256AN3 | Class 1A-143 | $400,000.00 |
| | | 251256AP8 | Class 1A-144 | $56,600,000.00 |
| | | 251256AQ6 | Class 1A-145 | $62,100,000.00 |
| Water Bond Ordinance Water Indenture 2006 Bond Resolution Sale Order of Finance Director of the City of Detroit dated July 19, 2006 (Series 2006-C) | Series 2006-C | 251255X83 | Class 1A-146 | $1,100,000.00 |
| | | 251255X91 | Class 1A-147 | $3,725,000.00 |
| | | 251255Y25 | Class 1A-148 | $3,795,000.00 |
| | | 251255Y33 | Class 1A-149 | $4,010,000.00 |
| | | 251255Y41 | Class 1A-150 | $4,765,000.00 |
| | | 251255Y58 | Class 1A-151 | $5,860,000.00 |
| | | 251255Y66 | Class 1A-152 | $14,880,000.00 |
| | | 251255Y74 | Class 1A-153 | $32,045,000.00 |
| | | 251255Y82 | Class 1A-154 | 146,500,000 |
| Water Bond Ordinance Water Indenture 2006 Bond Resolution Sale Order of Finance Director of the City of Detroit dated July 19, 2006 (Series 2006-D) | Series 2006-D | 251255Z81 | Class 1A-155 | $15,000.00 |
| | | 251255Z99 | Class 1A-156 | $15,000.00 |
| | | 2512552A2 | Class 1A-157 | $15,000.00 |
| | | 2512552B0 | Class 1A-158 | $20,000.00 |
| | | 2512552C8 | Class 1A-159 | $20,000.00 |
| | | 2512552D6 | Class 1A-160 | $2,650,000.00 |
| | | 2512552E4 | Class 1A-161 | $3,200,000.00 |
| | | 2512552F1 | Class 1A-162 | $20,135,000.00 |
| | | 2512552G9 | Class 1A-163 | $27,425,000.00 |
| | | 2512552H7 | Class 1A-164 | $9,955,000.00 |
| | | 2512552J3 | Class 1A-165 | $21,105,000.00 |

-6-

13-53846-tjt   Doc 8772-1  Filed 12/10/14  Entered 12/10/14 07:39:33  Page 35 of 301
13-53846-swr   Doc 8045-1  Filed 10/22/14  Entered 10/22/14 03:48:29  Page 189 of 809

| DWSD Bond Documents | DWSD Bond Series | CUSIP | Class | Allowed Amount of DWSD Bond Claims in Class |
|---|---|---|---|---|
| | | 2512552K0 | Class 1A-166 | $57,650,000.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>Resolution of the City Council adopted April 5, 2011 ("2011 Bond Resolution")<br><br>Sale Order of the Finance Director dated as of December 15, 2011 ("2011 Sale Order") | Series 2011-A | 251256BA0 | Class 1A-167 | $3,410,000.00 |
| | | 251256BB8 | Class 1A-168 | $3,550,000.00 |
| | | 251256BC6 | Class 1A-169 | $3,695,000.00 |
| | | 251256BD4 | Class 1A-170 | $3,845,000.00 |
| | | 251256BE2 | Class 1A-171 | $4,000,000.00 |
| | | 251256BF9 | Class 1A-172 | $3,160,000.00 |
| | | 251256BG7 | Class 1A-173 | $3,225,000.00 |
| | | 251256BH5 | Class 1A-174 | $4,215,000.00 |
| | | 251256BJ1 | Class 1A-175 | $4,195,000.00 |
| | | 251256BK8 | Class 1A-176 | $4,170,000.00 |
| | | 251256BL6 | Class 1A-177 | $4,140,000.00 |
| | | 251256BM4 | Class 1A-178 | $4,085,000.00 |
| | | 251256BN2 | Class 1A-179 | $4,020,000.00 |
| | | 251256BP7 | Class 1A-180 | $3,930,000.00 |
| | | 251256BQ5 | Class 1A-181 | $14,665,000.00 |
| | | 251256BR3 | Class 1A-182 | $28,890,000.00 |
| | | 251256BT9 | Class 1A-183 | $49,315,000.00 |
| | | 251256BS1 | Class 1A-184 | $224,300,000.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>2011 Bond Resolution<br><br>2011 Sale Order | Series 2011-B | 251256AV5 | Class 1A-185 | $1,970,000.00 |
| | | 251256AW3 | Class 1A-186 | $3,760,000.00 |
| | | 251256AX1 | Class 1A-187 | $9,740,000.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>2011 Bond Resolution<br><br>2011 Sale Order | Series 2011-C | 251256BV4 | Class 1A-188 | $2,700,000.00 |
| | | 251256BW2 | Class 1A-189 | $9,965,000.00 |
| | | 251256BX0 | Class 1A-190 | $10,490,000.00 |
| | | 251256BY8 | Class 1A-191 | $11,035,000.00 |
| | | 251256BZ5 | Class 1A-192 | $11,615,000.00 |
| | | 251256CA9 | Class 1A-193 | $5,000,000.00 |
| | | 251256CC5 | Class 1A-194 | $7,230,000.00 |
| | | 251256CB7 | Class 1A-195 | $44,630,000.00 |

13-53846-tjt  Doc 8772  Filed 12/10/14  Entered 12/10/14 07:38:33  Page 36 of 301
13-53846-swr  Doc 8045-1  Filed 10/22/14  Entered 10/22/14 03:48:29  Page 180 of 809

| DWSD Bond Documents | DWSD Bond Series | CUSIP | Class | Allowed Amount of DWSD Bond Claims in Class |
|---|---|---|---|---|
| Ordinance No. 18-01 adopted October 18, 2001  ("Sewage Bond Ordinance")[3]<br><br>Trust Indenture dated as of June 1, 2012 among the City of Detroit, Detroit Water and Sewage Department and U.S. Bank National Association, as trustee ("Sewage Indenture")<br><br>Resolution of the City Council adopted May 6, 1998 ("1998 Bond Resolution")<br><br>Sale Order of the Finance Director of the City of Detroit dated December 9, 1998 ("1998 Sale Order") | Series 1998-A | 251237S87 | Class 1A-196 | $3,110,000.00 |
|  |  | 251237S95 | Class 1A-197 | $3,225,000.00 |
|  |  | 251237T29 | Class 1A-198 | $3,540,000.00 |
|  |  | 251237T37 | Class 1A-199 | $3,660,000.00 |
|  |  | 251237T45 | Class 1A-200 | $3,885,000.00 |
|  |  | 251237T52 | Class 1A-201 | $4,095,000.00 |
|  |  | 251237T60 | Class 1A-202 | $7,415,000.00 |
|  |  | 251237T78 | Class 1A-203 | $7,745,000.00 |
|  |  | 251237T86 | Class 1A-204 | $12,585,000.00 |
|  |  | 251237T94 | Class 1A-205 | $13,350,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>1998 Bond Resolution<br><br>1998 Sale Order | Series 1998-B | 251237U92 | Class 1A-206 | $3,125,000.00 |
|  |  | 251237V26 | Class 1A-207 | $3,240,000.00 |
|  |  | 251237V34 | Class 1A-208 | $3,455,000.00 |
|  |  | 251237V42 | Class 1A-209 | $3,575,000.00 |
|  |  | 251237V59 | Class 1A-210 | $3,895,000.00 |
|  |  | 251237V67 | Class 1A-211 | $4,015,000.00 |
|  |  | 251237V75 | Class 1A-212 | $7,330,000.00 |
|  |  | 251237V83 | Class 1A-213 | $7,665,000.00 |
|  |  | 251237V91 | Class 1A-214 | $12,600,000.00 |
|  |  | 251237W25 | Class 1A-215 | $13,265,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Resolution adopted on November 24, 1999<br><br>Sale Order of the City of Detroit dated December 10, 1999 | Series 1999-A | 251237VM2 | Class 1A-216 | $7,924,628.15 |
|  |  | 251237VN0 | Class 1A-217 | $7,759,578.75 |
|  |  | 251237VP5 | Class 1A-218 | 7,704,816.00 |
|  |  | 251237VQ3 | Class 1A-219 | $7,157,798.95 |
|  |  | 251237VR1 | Class 1A-220 | $6,738,459.00 |
|  |  | 251237VS9 | Class 1A-221 | $6,365,288.40 |
|  |  | 251237VT7 | Class 1A-222 | $5,690,933.60 |
|  |  | 251237VU4 | Class 1A-223 | $6,235,125.30 |

---

[3] Ordinance No. 18-01 amended and restated Ordinance No. 27-86 adopted on December  9, 1986, as amended.

| DWSD Bond Documents | DWSD Bond Series | CUSIP | Class | Allowed Amount of DWSD Bond Claims in Class |
|---|---|---|---|---|
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted on August 1, 2001 and Amendment dated October 10, 2001 (collectively, "2001 Bond Resolution")<br><br>Composite Sale Order of the Finance Director of the City of Detroit dated August 1, 2001 ("2001 Sale Order") | Series 2001-B | 251237WV1 | Class 1A-224 | $110,550,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2001 Bond Resolution<br><br>2001 Sale Order | Series 2001-C(1) | 2512376G3 | Class 1A-225 | $575,000.00 |
| | | 2512376H1 | Class 1A-226 | $600,000.00 |
| | | 2512376J7 | Class 1A-227 | $625,000.00 |
| | | 2512376K4 | Class 1A-228 | $655,000.00 |
| | | 2512376L2 | Class 1A-229 | $690,000.00 |
| | | 2512376M0 | Class 1A-230 | $720,000.00 |
| | | 2512376P3 | Class 1A-231 | $110,510,000.00 |
| | | 2512376N8 | Class 1A-232 | $38,000,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2001 Bond Resolution<br><br>2001 Sale Order and Amendment No. 1 to Sale Order of the Finance Director (2001(C-2) and (E)) dated April 23, 2008 ("2001 Sale Order Amendment") and Supplement to Prior Sale Orders (2001(C-2), 2001(E) and 2006(A)) dated May 1, 2008 ("2001/2006 Supplement to Sale Orders") | Series 2001-C(2) | 2512374G5 | Class 1A-233 | $310,000.00 |
| | | 2512374H3 | Class 1A-234 | $325,000.00 |
| | | 2512374J9 | Class 1A-235 | $345,000.00 |
| | | 2512374K6 | Class 1A-236 | $365,000.00 |
| | | 2512374L4 | Class 1A-237 | $380,000.00 |
| | | 2512374M2 | Class 1A-238 | $400,000.00 |
| | | 2512374N0 | Class 1A-239 | $4,090,000.00 |
| | | 2512374P5 | Class 1A-240 | $21,600,000.00 |
| | | 2512374Q3 | Class 1A-241 | $93,540,000.00 |

-9-

13-53846-tjt  Doc 8772  Filed 12/10/14  Entered 12/10/14 07:39:33  Page 38 of 301
13-53846-swr  Doc 8045-1  Filed 10/22/14  Entered 10/22/14 03:48:29  Page 189 of 809

| DWSD Bond Documents | DWSD Bond Series | CUSIP | Class | Allowed Amount of DWSD Bond Claims in Class |
|---|---|---|---|---|
| Ordinance No. 18-01 adopted October 18, 2001 ("Sewage Bond Ordinance")[4]<br><br>Trust Indenture dated as of June 1, 2012 among the City of Detroit, Detroit Water and Sewage Department and U.S. Bank National Association, as trustee ("Sewage Indenture")<br><br>Bond Authorizing Resolution adopted August 1, 2001; Amendment October 10, 2001<br><br>Composite Sale Order of the Finance Director of the City of Detroit dated August 1, 2001 | Series 2001-D | 251237WY5 | Class 1A-242 | $21,300,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2001 Bond Resolution<br><br>2001 Sale Order, 2001 Amendment and 2001/2006 Supplement to Sale Orders | Series 2001-E | 2512374R1 | Class 1A-243 | $136,150,000.00 |
| Sewage Bond Ordinance<br>Sewage Indenture<br>Bond Authorizing Resolution of the City Council adopted May 7, 2003 ("2003 Bond Resolution")<br>Composite Sale Order of the Finance Director of the City of Detroit dated May 14, 2003 | Series 2003-A | 251237YK3 | Class 1A-244 | $3,815,000.00 |
| | | 251237Q89 | Class 1A-245 | $10,000.00 |
| | | 251237ZE6 | Class 1A-246 | $25,000.00 |
| | | 251237ZB2 | Class 1A-247 | $50,000.00 |
| | | 251237R21 | Class 1A-248 | $180,000.00 |
| | | 251237YQ0 | Class 1A-249 | $190,000.00 |
| | | 251237YT4 | Class 1A-250 | $250,000.00 |
| | | 251237YM9 | Class 1A-251 | $275,000.00 |
| | | 251237YZ0 | Class 1A-252 | $300,000.00 |
| | | 251237YW7 | Class 1A-253 | $535,000.00 |
| | | 251237ZG1 | Class 1A-254 | $1,000,000.00 |
| | | 251237Q97 | Class 1A-255 | $3,200,000.00 |
| | | 251237K77 | Class 1A-256 | $3,225,000.00 |
| | | 251237K85 | Class 1A-257 | $3,325,000.00 |
| | | 251237ZD8 | Class 1A-258 | $4,795,000.00 |
| | | 251237ZF3 | Class 1A-259 | $5,440,000.00 |

---

[4]    Ordinance No. 18-01 amended and restated Ordinance No. 27-86 adopted on December 9, 1986, as amended.

-10-

13-53846-tjt   Doc 8772   Filed 12/10/14   Entered 12/10/14 07:39:33   Page 39 of 301
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 189 of 809

| DWSD Bond Documents | DWSD Bond Series | CUSIP | Class | Allowed Amount of DWSD Bond Claims in Class |
|---|---|---|---|---|
| | | 251237ZH9 | Class 1A-260 | $7,935,000.00 |
| | | 251237Y80 | Class 1A-261 | $9,005,000.00 |
| | | 251237YN7 | Class 1A-262 | $11,880,000.00 |
| | | 251237YR8 | Class 1A-263 | $12,535,000.00 |
| | | 251237Y72 | Class 1A-264 | $13,210,000.00 |
| | | 251237YU1 | Class 1A-265 | $13,215,000.00 |
| | | 251237YX5 | Class 1A-266 | $13,950,000.00 |
| | | 251237ZJ5 | Class 1A-267 | $18,215,000.00 |
| | | 251237Y98 | Class 1A-268 | $19,485,000.00 |
| | | 251237Z22 | Class 1A-269 | $38,290,000.00 |
| Sewage Bond Ordinance Sewage Indenture 2003 Bond Resolution Composite Sale Order of the Finance Director of the City of Detroit dated May 22, 2003 | Series 2003-B | 2512376Q1 | Class 1A-270 | $150,000,000.00 |
| Sewage Bond Ordinance Sewage Indenture Bond Authorizing Resolution of the City Council adopted May 7, 2003 Composite Sale Order of the Finance Director dated January 9, 2004 | Series 2004-A | 251237B69 | Class 1A-271 | $7,310,000.00 |
| | | 251237B77 | Class 1A-272 | $14,830,000.00 |
| | | 251237B85 | Class 1A-273 | $15,605,000.00 |
| | | 251237B93 | Class 1A-274 | $5,525,000.00 |
| | | 251237C27 | Class 1A-275 | $5,545,000.00 |
| | | 251237C35 | Class 1A-276 | $5,835,000.00 |
| | | 251237C43 | Class 1A-277 | $6,145,000.00 |
| Sewage Bond Ordinance Sewage Indenture Resolution of the City Council authorizing sale of the 2005 adopted November 17, 2004 ("2005 Bond Resolution") Sale Order of the Finance Director of the City of Detroit, Series 2005-A, dated March 9, 2005 | Series 2005-A | 251237E41 | Class 1A-278 | $625,000.00 |
| | | 251237E58 | Class 1A-279 | $490,000.00 |
| | | 251237E66 | Class 1A-280 | $510,000.00 |
| | | 251237E74 | Class 1A-281 | $545,000.00 |
| | | 251237E82 | Class 1A-282 | $555,000.00 |
| | | 251237E90 | Class 1A-283 | $830,000.00 |
| | | 251237F24 | Class 1A-284 | $860,000.00 |
| | | 251237F32 | Class 1A-285 | $905,000.00 |
| | | 251237F40 | Class 1A-286 | $925,000.00 |
| | | 251237F57 | Class 1A-287 | $970,000.00 |
| | | 251237F65 | Class 1A-288 | $490,000.00 |
| | | 251237Z55 | Class 1A-289 | $19,415,000.00 |
| | | 251237Z63 | Class 1A-290 | $24,820,000.00 |
| | | 251237F99 | Class 1A-291 | $138,945,000.00 |
| | | 251237G23 | Class 1A-292 | $47,000,000.00 |
| Sewage Bond Ordinance Sewage Indenture | Series 2005-B | 251237G64 | Class 1A-293 | $7,775,000.00 |
| | | 251237G72 | Class 1A-294 | $8,010,000.00 |

| DWSD Bond Documents | DWSD Bond Series | CUSIP | Class | Allowed Amount of DWSD Bond Claims in Class |
|---|---|---|---|---|
| 2005 Bond Resolution | | 251237G80 | Class 1A-295 | $10,420,000.00 |
| Sale Order of the Finance Director of the City of Detroit, Series 2005-B, dated March 9, 2005 | | 251237G98 | Class 1A-296 | $10,990,000.00 |
| Sewage Bond Ordinance | Series 2005-C | 251237J20 | Class 1A-297 | $4,140,000.00 |
| Sewage Indenture | | 251237J38 | Class 1A-298 | $4,345,000.00 |
| 2005 Bond Resolution | | 251237J46 | Class 1A-299 | $4,570,000.00 |
| Sale Order of the Finance Director of the City of Detroit, Series 2005-C, dated March 9, 2005 | | 251237J53 | Class 1A-300 | $4,795,000.00 |
| | | 251237J61 | Class 1A-301 | $5,030,000.00 |
| | | 251237J79 | Class 1A-302 | $5,280,000.00 |
| | | 251237J87 | Class 1A-303 | $7,355,000.00 |
| | | 251237J95 | Class 1A-304 | $7,720,000.00 |
| | | 251237K28 | Class 1A-305 | $6,345,000.00 |
| Sewage Bond Ordinance  Sewage Indenture  Resolution of the City Council adopted February 15, 2006 ("2006 Bond Resolution")  Sale Order of Finance Director of the City of Detroit, Series 2006(A), dated August 4, 2006, Amendment No. 1 to Sale Order dated  April 23, 2008 and  2001/2006 Supplement to Sale Orders | Series 2006-A | 2512373Z4 | Class 1A-306 | $123,655,000.00 |
| Sewage Bond Ordinance  Sewage Indenture  2006 Bond Resolution  Sale Order of Finance Director of the City of Detroit, Series 2006(B), dated July 27, 2006 | Series 2006-B | 251237M83 | Class 1A-307 | $1,835,000.00 |
| | | 251237M91 | Class 1A-308 | $1,825,000.00 |
| | | 251237N25 | Class 1A-309 | $1,430,000.00 |
| | | 251237N33 | Class 1A-310 | $1,505,000.00 |
| | | 251237N41 | Class 1A-311 | $1,590,000.00 |
| | | 251237N58 | Class 1A-312 | $7,515,000.00 |
| | | 251237N66 | Class 1A-313 | $6,540,000.00 |
| | | 251237N74 | Class 1A-314 | $24,400,000.00 |
| | | 251237N82 | Class 1A-315 | $40,000,000.00 |
| | | 251237N90 | Class 1A-316 | $156,600,000.00 |
| Sewage Bond Ordinance  Sewage Indenture  2006 Bond Resolution  Sale Order of Finance Director of | Series 2006-C | 251237P31 | Class 1A-317 | $8,495,000.00 |
| | | 251237P49 | Class 1A-318 | $8,915,000.00 |

-12-

13-53846-tjt  Doc 8772-1  Filed 12/10/14  Entered 12/10/14 07:39:33  Page 41 of 301
13-53846-swr  Doc 8045-1  Filed 10/22/14  Entered 10/22/14 03:48:25  Page 19 of
809

| DWSD Bond Documents | DWSD Bond Series | CUSIP | Class | Allowed Amount of DWSD Bond Claims in Class |
|---|---|---|---|---|
| the City of Detroit, Series 2006(C), dated August 4, 2006 | | 251237P56 | Class 1A-319 | $9,150,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Resolution of the City Council adopted February 15, 2006<br><br>Sale Order of Finance Director of the City of Detroit dated November 29, 2006 | Series 2006-D | 251237W66 | Class 1A-320 | $288,780,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Resolution of the City Council adopted July 19, 2011<br><br>Sale Order of the Finance Director of the City of Detroit dated June 20, 2012 | Series 2012-A | 251250AC0 | Class 1A-321 | $8,880,000.00 |
| | | 251250AE6 | Class 1A-322 | $9,750,000.00 |
| | | 251250AS5 | Class 1A-323 | $50,000,000.00 |
| | | 251250AA4 | Class 1A-324 | $5,820,000.00 |
| | | 251250AB2 | Class 1A-325 | $6,005,000.00 |
| | | 251250AD8 | Class 1A-326 | $6,430,000.00 |
| | | 251250AF3 | Class 1A-327 | $19,930,000.00 |
| | | 251250AG1 | Class 1A-328 | $13,925,000.00 |
| | | 251250AH9 | Class 1A-329 | $9,845,000.00 |
| | | 251250AJ5 | Class 1A-330 | $14,860,000.00 |
| | | 251250AK2 | Class 1A-331 | $22,275,000.00 |
| | | 251250AN6 | Class 1A-332 | $13,170,000.00 |
| | | 251250AP1 | Class 1A-333 | $9,890,000.00 |
| | | 251250AQ9 | Class 1A-334 | $120,265,000.00 |
| | | 251250AR7 | Class 1A-335 | $292,865,000.00 |
| | | 251250AL0 | Class 1A-336 | $23,630,000.00 |
| | | 251250AM8 | Class 1A-337 | $32,240,000.00 |

-13-

13-53846-tjt  Doc 8772  Filed 12/10/14  Entered 12/10/14 07:30:33  Page 42 of 301
13-53846-swr  Doc 8045-1  Filed 10/22/14  Entered 10/22/14 03:48:29  Page 192 of 809

**EXHIBIT I.A.156**

SCHEDULE OF DWSD REVOLVING SEWER BOND DOCUMENTS
& RELATED DWSD REVOLVING SEWER BONDS

13-53846-tjt   Doc 8272-5   Filed 12/10/14   Entered 12/10/14 07:39:33   Page 42 of 301
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 193 of
809

**SCHEDULE OF (I) DWSD REVOLVING SEWER BOND DOCUMENTS, (II) RELATED DWSD REVOLVING SEWER BONDS, (III) CLASSES OF DWSD REVOLVING SEWER BOND CLAIMS AND (IV) ALLOWED AMOUNTS OF DWSD REVOLVING SEWER BOND CLAIMS**

| DWSD Revolving Sewer Bonds Documents | Series of DWSD Revolving Sewer Bonds | Class | Allowed Amount of DWSD Revolving Sewer Bonds Claims in Class |
|---|---|---|---|
| Ordinance No. 18-01 adopted October 18, 2001 ("Sewage Bond Ordinance")[1]<br><br>Trust Indenture dated as of June 1, 2012 among the City of Detroit ("City"), Detroit Water and Sewage Department and U.S. Bank National Association, as trustee ("Sewage Indenture")<br><br>Bond Authorizing Resolution adopted September 9, 1992<br><br>Supplemental Agreement dated September 24, 1992, among City, Michigan Bond Authority ("Authority") and the State of Michigan acting through the Department of Natural Resources | Series 1992-B-SRF | Class 1B-1 | $115,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted September 30, 1993<br><br>Supplemental Agreement regarding $6,603,996 Sewage Disposal System Revenue Bond Series 1993-B -SRF, among the City, Authority and DEQ | Series 1993-B-SRF | Class 1B-2 | $775,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted July 30, 1997<br><br>Supplemental Agreement dated September 30, 1997, among City, the Authority and the State of Michigan acting through the Department of Environmental Quality ("DEQ") | Series 1997-B-SRF | Class 1B-3 | $1,870,000.00 |

---

[1]     Ordinance No. 18-01 amended and restated Ordinance No. 27-86 adopted on December 9, 1986, as amended.

| DWSD Revolving Sewer Bonds Documents | Series of DWSD Revolving Sewer Bonds | Class | Allowed Amount of DWSD Revolving Sewer Bonds Claims in Class |
|---|---|---|---|
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted May 12, 1999<br><br>Supplemental Agreement regarding $21,475,000 City Sewage Disposal System Revenue Bond, Series 1999-SRF1, dated June 24, 1999, among City, Authority and DEQ | Series 1999-SRF-1 | Class 1B-4 | $8,750,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted August 4, 1999 ("1999 SRF Resolution")<br><br>Supplemental Agreement regarding $46,000,000 SRF-2, $31,030,000 SRF-3, $40,655,000 SRF-4 dated September 30, 1999 ("1999 SRF Supplemental Agreement"), among City, Authority and DEQ | Series 1999-SRF-2 | Class 1B-5 | $25,860,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>1999 SRF Resolution<br><br>1999 SRF Supplemental Agreement | Series 1999-SRF-3 | Class 1B-6 | $14,295,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>1999 SRF Resolution<br><br>1999 SRF Supplemental Agreement | Series 1999-SRF-4 | Class 1B-7 | $18,725,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted February 9, 2000<br><br>Supplemental Agreement regarding Sewage Disposal System Revenue Bond (SRF Junior Lien), Series 2000-SRF1, dated March 30, 2000, among City, Authority and DEQ | Series 2000-SRF-1 | Class 1B-8 | $21,947,995.00 |

2

809

13-53846-tjt   Doc 8272   Filed 12/10/14   Entered 12/10/14 07:39:33   Page 45 of 301
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 199 of 304

| DWSD Revolving Sewer Bonds Documents | Series of DWSD Revolving Sewer Bonds | Class | Allowed Amount of DWSD Revolving Sewer Bonds Claims in Class |
|---|---|---|---|
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted July 19, 2000<br><br>Supplemental Agreement regarding Sewage Disposal System Revenue Bond (SRF Junior Lien) Series 2000-SRF2 dated September 28, 2000, among City, Authority and DEQ | Series 2000-SRF-2 | Class 1B-9 | $36,051,066.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted March 7, 2001<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System Revenue Bonds (SRF Junior Lien), Series 2001-SRF-1, dated June 28, 2001 among City, Authority and DEQ | Series 2001-SRF-1 | Class 1B-10 | $54,145,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted November 21, 2001<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2001-SRF2, dated December 20, 2001 among City, Authority and DEQ | Series 2001-SRF-2 | Class 1B-11 | $39,430,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted June 5, 2002<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2002-SRF1, dated June 27, 2002 among City, Authority and DEQ | Series 2002-SRF-1 | Class 1B-12 | $10,660,000.00 |

3
809
13-53846-tjt  Doc 8772  Filed 12/10/14  Entered 12/10/14 07:39:33  Page 46 of 301
13-53846-swr  Doc 8045-1  Filed 10/22/14  Entered 10/22/14 03:48:29  Page 198 of

| DWSD Revolving Sewer Bonds Documents | Series of DWSD Revolving Sewer Bonds | Class | Allowed Amount of DWSD Revolving Sewer Bonds Claims in Class |
|---|---|---|---|
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted June 5, 2002<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2002-SRF2, dated June 27, 2002 among City, Authority and DEQ | Series 2002-SRF-2 | Class 1B-13 | $865,369.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted November 13, 2002<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2002-SRF3, dated December 19, 2002 among City, Authority and DEQ | Series 2002-SRF-3 | Class 1B-14 | $19,189,466.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted May 14, 2003<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2003-SRF1, dated June 26, 2003 among City, Authority and DEQ | Series 2003-SRF-1 | Class 1B-15 | $34,215,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted July 9, 2003<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2003-SRF2, dated September 25, 2003 among City, Authority and DEQ | Series 2003-SRF-2 | Class 1B-16 | $16,390,370.00 |

4

13-53846-swr Doc 8045-1 Filed 10/22/14 Entered 10/22/14 03:48:29 Page 193 of 809
13-53846-tjt Doc 8272-1 Filed 12/10/14 Entered 12/10/14 07:39:33 Page 47 of 301

| DWSD Revolving Sewer Bonds Documents | Series of DWSD Revolving Sewer Bonds | Class | Allowed Amount of DWSD Revolving Sewer Bonds Claims in Class |
|---|---|---|---|
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted April 21, 2004 ("2004 SRF Resolution")<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2004-SRF1, dated June 24, 2004 among City, Authority and DEQ | Series 2004-SRF-1 | Class 1B-17 | $1,890,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2004 SRF Resolution<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2004-SRF2, dated June 24, 2004 among City, Authority and DEQ | Series 2004-SRF-2 | Class 1B-18 | $11,888,459.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2004 SRF Resolution<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2004-SRF3, dated June 24, 2004 among City, Authority and DEQ | Series 2004-SRF-3 | Class 1B-19 | $8,232,575.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted May 16, 2007<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2007-SRF1, dated September 20, 2007 among City, Authority and DEQ | Series 2007-SRF-1 | Class 1B-20 | $140,109,096.00 |

5

13-53846-tjt Doc 8272 Filed 12/10/14 Entered 12/10/14 07:39:33 Page 48 of 301
13-53846-swr Doc 8045-1 Filed 10/22/14 Entered 10/22/14 03:48:29 Page 199 of 809

| DWSD Revolving Sewer Bonds Documents | Series of DWSD Revolving Sewer Bonds | Class | Allowed Amount of DWSD Revolving Sewer Bonds Claims in Class |
|---|---|---|---|
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted November 5, 2008<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2009-SRF1, dated April 17, 2009 among City, Authority and DEQ | Series 2009-SRF-1 | Class 1B-21 | $9,806,301.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted September 29, 2009<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2010-SRF1, dated January 22, 2010 among City, Authority and DEQ | Series 2010-SRF-1 | Class 1B-22 | $3,358,917.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted December 13, 2011<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2012-SRF1, dated August 30, 2012 among City, Authority and DEQ | Series 2012-SRF | Class 1B-23 | $4,302,413.00 |

**EXHIBIT I.A.159**

SCHEDULE OF DWSD REVOLVING WATER BOND DOCUMENTS
& RELATED DWSD REVOLVING WATER BONDS

**SCHEDULE OF (I) DWSD REVOLVING WATER BOND DOCUMENTS, (II) RELATED DWSD REVOLVING WATER BONDS, (III) CLASSES OF DWSD REVOLVING WATER BOND CLAIMS AND (IV) ALLOWED AMOUNTS OF DWSD REVOLVING WATER BOND CLAIMS**

| DWSD Revolving Water Bonds Documents | Series of DWSD Revolving Water Bonds | Class | Allowed Amount of DWSD Revolving Water Bonds Claims in Class |
|---|---|---|---|
| Ordinance No. 01-05 adopted January 26, 2005 ("Water Bond Ordinance")[1]<br><br>Trust Indenture dated as of February 1, 2013 among the City of Detroit ("City"), Detroit Water and Sewerage Department and U.S. Bank National Association, as trustee ("Water Indenture")<br><br>Bond Authorizing Resolution adopted April 29, 2005 ("2005 SRF Resolution")<br><br>Supplemental Agreement dated as of September 22, 2005 among City, Michigan Municipal Bond Authority ("Authority") and Michigan Department of Environmental Quality ("DEQ") | Series 2005-SRF-1 | Class 1C-1 | $9,960,164.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>2005 SRF Resolution<br><br>Supplemental Agreement regarding the Water Supply System SRF Junior Lien Revenue Bond, Series 2005-SRF2, dated September 22, 2005 among City, Authority and DEQ | Series 2005-SRF-2 | Class 1C-2 | $6,241,730.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>Bond Authorizing Resolution adopted February 15, 2006<br><br>Supplemental Agreement regarding the Water Supply System SRF Junior Lien Revenue Bond, Series 2006-SRF1, dated September 21, 2006 among City, Authority and DEQ | Series 2006-SRF-1 | Class 1C-3 | $3,715,926.00 |

---

[1]  Ordinance No. 0-05 amends and restates Ordinance No. 30-02 adopted November 27, 2002, which amended and restated Ordinance No. 06-01 adopted October 18, 2001, which amended and restated Ordinance No. 32-85, as amended.

13-53846-tjt  Doc 8772  Filed 12/10/14  Entered 12/10/14 03:29:33  Page 51 of 301
13-53846-swr  Doc 8045-1  Filed 10/22/14  Entered 10/22/14 03:48:29  Page 52 of 301
809

| DWSD Revolving Water Bonds Documents | Series of DWSD Revolving Water Bonds | Class | Allowed Amount of DWSD Revolving Water Bonds Claims in Class |
|---|---|---|---|
| Water Bond Ordinance<br><br>Water Indenture<br><br>Bond Authorizing Resolution and Bond Ordinance, adopted July 15, 2008<br><br>Supplemental Agreement regarding Water Supply System SRF Junior Lien Revenue Bonds, Series 2008-SRF1, dated September 29, 2008 among City, Authority and DEQ | Series 2008-SRF-1 | Class 1C-4 | $1,535,941.00 |

**EXHIBIT I.A.183**

PRINCIPAL TERMS OF EXIT FACILITY

# EXIT FACILITY
## SUMMARY OF PRINCIPAL TERMS[1]

The definitive documentation governing the Exit Facility shall provide generally for the following terms:

| | |
|---|---|
| Issuer | City of Detroit. |
| Initial Bond Purchaser | The bonds will initially be sold to the Michigan Finance Authority (the "MFA").  The MFA will issue bonds secured by the City's bonds. |
| Amount and Type | $325 million, consisting of Financial Recovery Bonds issued pursuant to section 36a(7) of the Michigan Home Rule City Act, excluding any amounts raised to fund (if required) debt service reserve funds consistent with municipal markets practice. |
| Taxation | An amount up to $200 million is contemplated to be tax-exempt financing. |
| Use of Proceeds | As approved by the Local Emergency Financial Assistance Loan Board, proceeds of the exit facility will be used to fund:  (i) the retirement of the City's $120,000,000 post-petition financing, (ii) certain of the City's reinvestment and revitalization initiatives and (iii) the retirement of the City's obligations with respect to holders of Class 5 Claims (COP Swap Claims) and potentially holders of Class 7 Claims (Limited Tax General Obligation Bond Claims) under the City's Seventh Amended Plan of Adjustment. |
| Pricing on Sale to Purchaser | Tax-Exempt Bonds:  SIFMA Municipal Swap Index + 4.25% <br><br> Taxable Bonds: 1-month USD-LIBOR + 4.75% |
| Pricing on Public Offering | Tax-Exempt Bonds:  The sum of (i) the yield on Thomson Reuters Municipal Market Data 15-year AAA Index, plus (ii) the Base Spread (as set forth in the Commitment Letter, dated September 17, 2014), plus (iii) the applicable Market Flex (as set forth in the Commitment Letter, dated September 17, 2014). <br><br> Taxable Bonds:  The sum of (i) the yield on 7-year US Treasury Notes, plus (ii) the Base Spread (as set forth in the Commitment Letter, dated September 17, 2014), plus (iii) the applicable Market Flex (as set forth in the Commitment Letter, dated September 17, 2014). |
| Maturity | No longer than 15 years on Tax-Exempt Bonds; no longer than 8 years on Taxable Bonds. |
| Security | The obligations owing by the City with respect to the Exit Facility will be secured by a first priority lien on certain income tax revenues of the City. |

---

[1]     Capitalized terms not otherwise defined herein shall have the meanings given to them in the Plan.

**EXHIBIT I.A.197**

FORM OF FGIC/COP SETTLEMENT DOCUMENTS

## Settlement Agreement

This Settlement Agreement (this "<u>Agreement</u>") is entered into as of October __, 2014, by and between the City of Detroit, Michigan (the "<u>City</u>"), and Financial Guaranty Insurance Company ("<u>FGIC</u>"). The City and FGIC are referred to herein each individually as a "<u>Party</u>" and collectively as the "<u>Parties</u>".

**WHEREAS**, the Detroit General Retirement System Service Corporation, a Michigan nonprofit corporation ("<u>DGRS</u>"), and the Detroit Police and Fire Retirement System Service Corporation, a Michigan nonprofit corporation ("<u>PFRS</u>" and, together with DGRS, each a "<u>Service Corporation</u>" and collectively the "<u>Service Corporations</u>") created each of (i) the Detroit Retirement Systems Funding Trust 2005 (the "<u>2005 Pension Funding Trust</u>") pursuant to that certain Trust Agreement, dated June 2, 2005, among the Service Corporations and U.S. Bank National Association, as trustee, and (ii) the Detroit Retirement Systems Funding Trust 2006 (the "<u>2006 Pension Funding Trust</u>") pursuant to that certain Trust Agreement, dated June 12, 2006, among the Service Corporations and U.S. Bank National Association, as trustee;

**WHEREAS**, the 2005 Pension Funding Trust issued certain Taxable Certificates of Participation Series 2005 (the "<u>2005 Pension Funding Securities</u>") and the 2006 Pension Funding Trust issued certain Taxable Certificates of Participation Series 2006 (the "<u>2006 Pension Funding Securities</u>" and, collectively with the 2005 Pension Funding Securities, the "<u>Certificates of Participation</u>" or "<u>COPs</u>");

**WHEREAS**, FGIC issued certain financial guaranty insurance policies guaranteeing the payment of the principal of and interest on certain of the Certificates of Participation;

**WHEREAS**, on January 31, 2014, the City commenced the Adversary Proceeding styled, *City of Detroit, Michigan v. Detroit General Retirement System Service Corporation, Detroit Police and Fire Retirement System Service Corporation, Detroit Retirement Systems Funding Trust 2005 and Detroit Retirement Systems Funding Trust 2006*, Case No. 14-04112 (Bankr. E.D. Mich.) (the "<u>COP Litigation</u>");

**WHEREAS**, on March 17, 2014, Wilmington Trust, National Association, as Successor Trustee for the Detroit Retirement Systems Funding Trust 2005 and the Detroit Retirement Systems Funding Trust 2006 (collectively, the "<u>Trustee</u>") filed that certain *Answer to Complaint with Affirmative Defenses and Counterclaims of Defendants Detroit Retirement Systems Funding Trust 2005 and Detroit Retirement Systems Funding Trust 2006 to Complaint for Declaratory and Injunctive Relief* (the "<u>Funding Trusts' Counterclaims</u>");

**WHEREAS**, on March 17, 2014, FGIC filed that certain *Financial Guaranty Insurance Company's Motion to Intervene Pursuant to Rule 7024 of the Federal Rules of Bankruptcy Procedure and Section 1109(b) of the Bankruptcy Code* (the "<u>FGIC Motion to Intervene</u>");

1

13-53846-tjt   Doc 8725   Filed 12/10/14   Entered 12/10/14 07:39:33   Page 56 of 301
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 208 of 809

**WHEREAS**, on April 10, 2014, the City filed that certain *City of Detroit's Motion to Dismiss in Part the Funding Trusts' Counterclaims* (the "Motion to Dismiss the Funding Trusts' Counterclaims");

**WHEREAS**, on June 30, 2014, the Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") issued an Opinion and Order, among other things, granting the FGIC Motion to Intervene, subject to certain limitations;

**WHEREAS**, on July 18, 2014, FGIC filed that certain *Answer and Affirmative Defenses of Defendant Financial Guaranty Insurance Company*;

**WHEREAS**, on August 13, 2014, FGIC filed those certain *Counterclaims of Defendant Financial Guaranty Insurance Company* against the City (the "FGIC Counterclaims");

**WHEREAS**, on August 28, 2014, the City filed that certain *City of Detroit's Motion to Dismiss in Part FGIC's Counterclaims* (the "Motion to Dismiss the FGIC Counterclaims" and, together with the Motion to Dismiss the Funding Trusts' Counterclaims, the "Motions to Dismiss");

**WHEREAS**, the Motions to Dismiss have been fully briefed and argued; and

**WHEREAS**, the Parties and their representatives have engaged in good faith, arm's length settlement discussions regarding a consensual resolution of their disputes under or in respect of the COP Litigation, the Certificates of Participation and related issues.

**NOW, THEREFORE**, in consideration of the foregoing and the promises, mutual covenants, and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

**Section 1         Definitions and Interpretations.**

**1.1      Additional Definitions.**  The following terms have the respective meanings set forth below for all purposes of this Agreement.

"Approval Order" means an order confirming the Plan entered by the Bankruptcy Court, which contains provisions substantially in the form attached hereto as Schedule 1 approving this Agreement pursuant to Bankruptcy Rule 9019.

"COP Holders" means the holders of COPs originally insured by FGIC with a claim for principal or interest.

"Counterclaims" means the FGIC Counterclaims and the Funding Trusts' Counterclaims.

"Plan" means that certain Eighth Amended Plan for the Adjustment of Debts of the City of Detroit (October __, 2014), as the same may be amended consistent with the terms and conditions of the Stipulation.

2

13-53846-tjt   Doc 8772   Filed 12/10/14   Entered 12/10/14 07:39:33   Page 57 of 301
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 203 of 809

"Settlement Effective Date" means the latest date to occur of (i) the City obtaining all governmental and other consents and approvals (including the Approval Order) set forth in Section 5.1(d), and (ii) FGIC obtaining the approval of the New York State Department of Financial Services, as set forth in Section 5.2(d).

"Stipulation" means that certain Stipulation Regarding FGIC Plan COP Settlement and FGIC COP Swap Settlement, dated October [__], 2014.

**1.2    Plan Definitions.**  Capitalized terms used herein, but not otherwise defined, shall have the meanings ascribed to such terms in the Plan.

**1.3    Other Definitional and Interpretive Provisions.**  The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  References to Sections and Schedules are to Sections and Schedules of this Agreement unless otherwise specified.  Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular.  Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import.  References to any statute shall be deemed to refer to such statute as amended from time to time and to any rules or regulations promulgated thereunder.  References from or through any date mean, unless otherwise specified, from and including or through and including, respectively.  References to "law", "laws" or to a particular statute or law shall be deemed also to include any and all applicable law.

**Section 2        Global Resolution of COP Litigation.**

**2.1    Dismissal of COP Litigation.**  As soon as practicable after the occurrence of the Settlement Effective Date, the City shall dismiss the COP Litigation, with prejudice.

**2.2    Dismissal of Counterclaims.**  As soon as practicable after the occurrence of the Settlement Effective Date, FGIC shall dismiss or cause to be dismissed all Counterclaims, with prejudice.  For the avoidance of doubt, the dismissal of the COP Litigation and dismissal of all Counterclaims is intended and shall be deemed to take place contemporaneously.

**2.3    Waiver & Release of Claims.**  Effective as of the Settlement Effective Date:

(a)  FGIC shall, without further action, release unconditionally, and be deemed to forever and unconditionally release, waive and discharge all entities (including the City, the City's Related Entities, the State and the State Related Entities), of and from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or prior to the Effective Date of the Plan related to the COP Litigation (the "Released Claims"), including any claims against the Retirement Systems arising in connection with the COPs, provided, however that the Released Claims shall not include (i) any claims with respect to enforcement of this Agreement, the Stipulation or the FGIC Development Agreement, (ii) any claims with respect to the New B Notes, the New C Notes or

3

the Class 9 Settlement Credits, (iii) any claims held by FGIC against the COP Swap Counterparties or Related Entities thereof or (iv) any claims asserted against the City in the proofs of claim filed by FGIC and the Trustee; provided that, with respect to the claims described in clause (iv), for the avoidance of doubt, the Parties intend that such claims shall be subject to the treatment, discharge and injunction provisions set forth in the Plan.

(b)     The City shall provide the exculpations to FGIC, the COP Holders and the Trustee as provided under the Plan and shall have no further claims on account of the COP Litigation as set forth in Section 2.1 above.

**Section 3          Consideration.**

**3.1     Development Agreement.**  The City shall enter into the FGIC Development Agreement in the form attached hereto as Schedule 2.

**3.2     Sole Benefit.**  The consideration provided herein is solely for the benefit of FGIC and the COPs Holders, and such consideration shall be administered and distributed to FGIC and the COP Holders in a manner consistent herewith.

**Section 4          Approvals; Trustee Steps.**

**4.1     Time is of the Essence.**  The Parties hereto acknowledge and agree that time is of the essence.  The City and FGIC shall each use commercially reasonable efforts to obtain all governmental and other consents and approvals (including, in the case of the City, the Approval Order) set forth in Section 5.1(d) and Section 5.2(d), respectively.  FGIC shall use commercially reasonable efforts to support the City's efforts to obtain the Approval Order.

**4.2     Trustee.**  FGIC shall take all necessary and appropriate steps to direct the Trustee to effectuate this Agreement, including directing the Trustee to withdraw the Funding Trusts' Counterclaims.

**Section 5          Representations and Warranties.**

**5.1     Representations and Warranties of the City.**  The City represents to FGIC that:

(a)     It is a municipal corporation of the State of Michigan.

(b)     It has the power to execute and deliver this Agreement and to perform its obligations hereunder and it has taken all necessary action to authorize such execution, delivery and performance.

(c)     Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets.

(d)     Other than (i) approvals by (x) the City Council, (y) the Local Emergency Financial Assistance Loan Board created under the Emergency Municipal Loan Act, Michigan Compiled Laws §§ 141.931-141.942 and (z) the Treasurer of the State, (ii) any other approvals

4

required by Section 19 of PA 436, (iii) execution of an order by the Emergency Manager approving this Agreement and (iv) the approval of the Bankruptcy Court, all governmental and Emergency Manager consents and approvals that are required to have been obtained by it as of the date of execution of this Agreement with respect to the execution, delivery and performance of this Agreement have been obtained and are in full force and effect and all conditions of any such consents and approvals have been complied with.

**5.2    Representations and Warranties of FGIC.**  FGIC represents to the City that:

(a)    It is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and in good standing.

(b)    It has the power to execute this Agreement, to deliver this Agreement and to perform its obligations under this Agreement and it has taken all necessary action to authorize such execution, delivery and performance.

(c)    Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets.

(d)    Other than the approval or the waiver of required minimum notice of the New York State Department of Financial Services , all governmental consents and approvals that are required to have been obtained by it with respect to this Agreement have been obtained and are in full force and effect and all conditions of any such consents and approvals have been complied with.

(e)    That certain *Stipulation By and Between the City of Detroit, Michigan and the COPs Creditors Regarding Certain Facts and the Admission of Certain Exhibits for the Confirmation Trial*, dated July 13, 2014 and approved by the Bankruptcy Court on July 14, 2014, remains in effect.

**Section 6          No Admission.**

This Agreement is a proposed settlement of claims and disputes between the Parties and is the product of good faith, arm's length negotiations between the Parties hereto.  If this Agreement is terminated, this Agreement will not be an admission of any kind.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating hereto will not be admissible into evidence in any proceeding.  However, this Agreement will be admissible into evidence in any proceeding to obtain Bankruptcy Court approval of this Agreement or to enforce or interpret the terms of this Agreement, and, subject to any otherwise applicable rules in the Federal Rules of Evidence (other than Federal Rule of Evidence 408), this Agreement may be admitted into evidence in any proceeding arising as a result of or in connection with a Party's breach of this Agreement or in which breach of this Agreement is alleged as a relevant fact.  The admissibility of all negotiations related to this Agreement shall be governed by the *Mediation Order* [Docket No. 322] entered by the Bankruptcy Court, as the same has been amended and supplemented, including with respect to that *Limited Order Modifying the Mediation Order* [Docket No. 7968].  Notwithstanding the foregoing, nothing herein shall limit the scope or effect of the Mediation Order.

5

13-53846-tjt  Doc 8772  Filed 12/10/14  Entered 12/10/14 07:39:33  Page 60 of 301
13-53846-swr  Doc 8045-1  Filed 10/22/14  Entered 10/22/14 03:48:29  Page 210 of 809

**Section 7          Termination.**

Any Party may terminate this Agreement upon one Business Day's prior written notice to the other Party if: (a) the Bankruptcy Court denies approval of (x) this Agreement, (y) the Stipulation or (z) the Plan, (b) the Bankruptcy Court approves this Agreement pursuant to an order that does not constitute an Approval Order, (c) the Approval Order is vacated, reversed or modified on appeal, (d) the Effective Date of the Plan does not occur within six (6) months of the entry of the Approval Order, (e) any approval or consent sought pursuant to Section 5.1(d) or 5.2(d) of this Agreement is denied or (f) the other Party is in material breach of any provision of this Agreement, and such breach is continuing and has not been cured within 5 Business Days after written notice thereof is provided to such Party.   Absent the prior written consent of the City, this Agreement shall immediately automatically terminate if all approvals or consents sought pursuant to Section 5.2(d) of this Agreement are not obtained by November 4, 2014 at 5:00 p.m. (ET).

Notwithstanding anything herein to the contrary , in the event that this Agreement is terminated as set forth herein, then neither this Agreement, nor any document filed with the Bankruptcy Court with respect to the approval of this Agreement, will have any res judicata or collateral estoppel effect or be of any force or effect, and each of the Parties' respective interests, rights, remedies and defenses will be restored without prejudice as if this Agreement had never been executed and the Parties will be automatically relieved of any further obligations under this Agreement.  For the avoidance of doubt, in the event this Agreement is terminated, the City shall retain the right to pursue the COP Litigation and related claims and FGIC shall retain the right to make any arguments, objections, or other assertions (other than res judicata or collateral estoppel as set forth in the preceding sentence), pursue any Released Claims, Counterclaims, defenses, litigation, appeals, or disputes related to the COP Litigation or any other matter otherwise resolved by this Agreement.

**Section 8          Miscellaneous.**

**8.1     Execution of this Agreement**.  This Agreement may be executed and delivered (by facsimile, PDF, or otherwise) in any number of counterparts, each of which, when executed and delivered, will be deemed an original, and all of which together will constitute the same agreement.  Each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

**8.2     Binding Obligation; Successors and Assigns**.  This Agreement is a legally valid and binding obligation of the Parties, enforceable in accordance with its terms, and will inure to the benefit of the Parties and their respective successors, assigns and transferees.   This Agreement grants no rights to any third party, including any COP Holder or Trustee.

**8.3     Complete Agreement; Interpretation**.  This Agreement, the Plan and the Stipulation constitute the complete agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto.  This Agreement is the product of negotiation by and among the Parties.  Any Party enforcing or interpreting this Agreement will interpret it in a neutral manner.  There will be no presumption concerning whether to interpret this Agreement for or against any Party by reason

6

13-53846-tjt   Doc 8724   Filed 12/10/14   Entered 12/10/14 07:39:33   Page 61 of 301
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 213 of
809

of that Party having drafted this Agreement, or any portion thereof, or caused it or any portion thereof to be drafted.

      **8.4**    **Amendment, Modification and Waiver**.  This Agreement may be modified, altered, amended, or supplemented only by an agreement in writing signed by each Party.  No waiver of any provision of this Agreement will be effective unless made in a writing signed by the Party making the waiver, nor will the waiver be extended to any other right, claim or remedy.

      **8.5**    **Notices**.  All notices and other communications required under this Agreement will be given in writing and delivered, if sent by telecopy, electronic mail, courier, or by registered or certified mail (return receipt requested) to the following addresses and telecopier numbers (or at such other addresses or telecopier numbers as will be specified by like notice):

        <u>If to the City</u>:

        City of Detroit, Michigan
        1200 Coleman A. Young Municipal Center
        2 Woodward Avenue
        Detroit, Michigan 48226
        Attention: CFO
        Fax:
        Email:

        with copies (which shall not constitute notice) to:

        City of Detroit Law Department
        First National Building, Suite 1650
        660 Woodward Avenue
        Detroit, Michigan 48226
        Attention: Corporation Counsel
        Fax:
        Email:

        and

        Jones Day
        222 East 41st Street
        New York, NY 10017-6702
        Attn: Corinne Ball  & Benjamin Rosenblum
        Fax:    (212) 755-7306
        Email:  cball@JonesDay.com
               brosenblum@JonesDay.com

        <u>If to FGIC</u>:

        Financial Guaranty Insurance Company

7

13-53846-tjt   Doc 8772   Filed 12/10/14   Entered 12/10/14 07:39:33   Page 62 of 301
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 212 of
809

521 Fifth Avenue
New York, NY 10175
Attention: General Counsel
Fax: (212) 312-2231
Email: GeneralCounsel@fgic.com

with copies (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
700 Louisiana, Suite 1700
Houston, TX 77002
Attention: Alfredo R. Pérez
Fax: (212) 310-8007
Email: alfredo.perez@weil.com

Any notice given by delivery, mail, or courier will be effective when received. Any notice given by telecopier will be effective upon oral or machine confirmation of transmission. Any notice given by electronic mail will be effective upon oral or machine confirmation of receipt.

     **8.6**    **Headings**. The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

     **8.7**    **Governing Law and Jurisdiction**. THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF MICHIGAN, WITHOUT REGARD TO ANY PRINCIPLES OF CONFLICTS OF LAW THEREOF THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANOTHER JURISDICTION. By its execution and delivery of this Agreement, each of the Parties hereby irrevocably and unconditionally agrees that any dispute with respect to this Agreement will be resolved by the Bankruptcy Court to the extent that the Bankruptcy Court then has jurisdiction and power to enforce the terms of this Agreement and, to the extent that the Bankruptcy Court does not then have jurisdiction, to the exclusive jurisdiction of the courts of the State of Michigan and the United States District Court for the Eastern District of Michigan. Each of the Parties irrevocably consents to service of process by mail at the addresses listed for such Party in Section 8.5 hereof. Each of the Parties agrees that its submission to jurisdiction and consent to service of process by mail is made for the sole and express benefit of the other Party.

     **8.8**    **Waiver of Jury Trial**. TO THE EXTENT PERMITTED BY LAW, THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT.

[Signature Pages Follow]

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.


CITY:

City of Detroit, Michigan

By: _____
Name: _____
Title: _____

Dated: October ___, 2014

FGIC:

Financial Guaranty Insurance Company

By: _____
Name: _____
Title: _____

Dated: October __, 2014

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

-------------------------------------------------------x
:
In re                             : Chapter 9
:
CITY OF DETROIT, MICHIGAN,    : Case No. 13-53846
:
                   Debtor.     : Hon. Steven W. Rhodes
:
-------------------------------------------------------x

## STIPULATION REGARDING FGIC PLAN COP SETTLEMENT AND FGIC COP SWAP SETTLEMENT

WHEREAS, the Detroit General Retirement System Service Corporation, a Michigan nonprofit corporation ("DGRS"), and the Detroit Police and Fire Retirement System Service Corporation, a Michigan nonprofit corporation ("PFRS" and, together with DGRS, each a "Service Corporation" and collectively the "Service Corporations") created each of (i) the Detroit Retirement Systems Funding Trust 2005 (the "2005 Pension Funding Trust") pursuant to that certain Trust Agreement, dated June 2, 2005, among the Service Corporations and U.S. Bank National Association, as trustee, and (ii) the Detroit Retirement Systems Funding Trust 2006 (the "2006 Pension Funding Trust") pursuant to that certain Trust Agreement, dated June 12, 2006, among the Service Corporations and U.S. Bank National Association, as trustee;

13-53846-swr  Doc 8045-1  Filed 10/22/14  Entered 10/22/14 03:48:29  Page 216 of
809
13-53846-swr  Doc 8772  Filed 12/10/14  Entered 12/10/14 07:39:33  Page 66 of 301

WHEREAS, the 2005 Pension Funding Trust issued certain Taxable Certificates of Participation Series 2005 (the "2005 Pension Funding Securities") and the 2006 Pension Funding Trust issued certain Taxable Certificates of Participation Series 2006 (the "2006 Pension Funding Securities" and collectively with the 2005 Pension Funding Securities, the "Certificates of Participation" or "COPs");

WHEREAS, Financial Guaranty Insurance Company ("FGIC") issued certain financial guaranty insurance policies guaranteeing the payment of the principal of and interest on certain of the Certificates of Participation ("FGIC COPs Policies");

WHEREAS, in connection with the issuance of the COPs, the Service Corporations entered into certain swap transactions under certain 1992 ISDA Master Agreements (Local Currency Single Jurisdiction) (together with all ancillary and related instruments and agreements, as the same may have been subsequently amended, restated, supplemented or otherwise modified, the "COP Swap Agreements");

WHEREAS, FGIC issued certain financial guaranty insurance policies guaranteeing the payment of certain amounts owed by the Service Corporations under the COP Swap Agreements;

-2-

13-53846-tjt Doc 8772 Filed 12/10/14 Entered 12/10/14 07:39:33 Page 67 of 301
13-53846-swr Doc 8045-1 Filed 10/22/14 Entered 10/22/14 03:48:29 Page 213 of 809

WHEREAS, the City of Detroit, Michigan (the "City") has proposed a Plan for the Adjustment of Debts, as amended (the "Plan"),[1] and FGIC has opposed and objected to such Plan; and

WHEREAS, the City and FGIC (collectively, the "Parties") and their representatives have engaged in good faith, arm's length settlement discussions regarding a consensual resolution of their disputes under or in respect of the Plan, the Certificates of Participation and the COP Swap Agreements.

NOW, THEREFORE, in consideration of the foregoing and the promises, mutual covenants, and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, by and through their respective undersigned counsel, agree and stipulate as follows:

1.    The City shall (a) modify the Plan as set forth on Exhibit 1, (b) not amend the Plan in a way that would have a materially adverse effect on the class of claims ("Class 9") associated with COPs as set forth in the Plan, without the consent of FGIC, and (c) exclude the Joe Louis Arena Parking Garage from any requests for qualifications, quotations or proposals in connection with the Parking Garages.

---

[1]    Capitalized terms not defined herein have the meanings given to them in the Plan.

2.    All votes cast by FGIC to accept or reject the Plan, including any votes cast on behalf of any COP Holder, shall be deemed to have been cast as accepting the Plan.

3.    All objections by FGIC to the Plan shall be withdrawn, without prejudice to FGIC refiling such objections in the event that (i) the Plan is not confirmed, (ii) this Stipulation is not approved, or (iii) that certain Settlement Agreement, entered into as of October [___], 2014, by and between the City and FGIC in connection with the COP Litigation (the "Settlement Agreement") is not approved or is otherwise terminated in accordance with the provisions thereof (each event described in clause (i), (ii) or (iii), a "Termination Event").  Pending approval of this Stipulation, FGIC shall take no action in furtherance of any objection, joinder, reservation of rights, or opposition to the Plan.  For the avoidance of doubt, while approval for this Stipulation is pending, FGIC shall refrain from calling or examining any witnesses, introducing other evidence or advancing legal argument in connection with the confirmation trial on the Plan.

4.    FGIC, on behalf of itself and the COP Holders, shall opt into the Plan COP Settlement with respect to the COPs originally insured by FGIC (the "FGIC-Insured COPs"), without impairing the COP Holders' insurance claims against FGIC.

-4-

13-53846-tjt  Doc 8772  Filed 12/10/14  Entered 12/10/14 07:39:33  Page 69 of 301
13-53846-swr  Doc 8045-1  Filed 10/22/14  Entered 10/22/14 03:48:29  Page 219 of 809

5. The consideration provided under this Stipulation and the Plan COP Settlement is solely for the benefit of FGIC and the COP Holders, and such consideration shall be administered and distributed in a manner consistent with the Plan.

6. Subject to FGIC having obtained the consents of any and all reinsurers providing reinsurance with respect to all or a portion of the FGIC COPs Policies, FGIC may, in its sole discretion, require the insertion of the following provision in the proposed Confirmation Order:

> FGIC (irrespective of the terms of the FGIC COPs Policies, including, without limitation the definition of Due for Payment) may treat all of the outstanding principal owing on all series of the FGIC-Insured COPs as having been accelerated and currently "Due for Payment" (as such term is defined in the applicable FGIC COPs Policy for purposes of such policy) as of the Effective Date, in which case, with respect to each FGIC COPs Policy there shall be deemed a Permitted Policy Claim (as defined in the First Amended Plan of Rehabilitation for Financial Guaranty Insurance Company, dated June 4, 2013) in the amount of (i) the outstanding principal amount of the FGIC-Insured COPs in each CUSIP, as of the Effective Date, insured by such policy and (ii) interest accrued and unpaid on such principal amount of such FGIC-Insured COPs through the Effective Date, in which case no interest shall accrue on or after the Effective Date.

7. In full satisfaction and discharge of FGIC's swap insurance and related claims against the City, FGIC shall receive: (a) an Allowed Class 14 claim

-5-

13-53846-tjt  Doc 8772  Filed 12/10/14  Entered 12/10/14 07:39:33  Page 70 of 301
13-53846-swr  Doc 8045-1  Filed 10/22/14  Entered 10/22/14 03:48:29  Page 220 of 809

in the amount of $6.11 million, and (b) the Downtown Development Authority shall assign to FGIC all of the Downtown Development Authority's right, title and interest to its distribution of New B Notes under the plan on account of its $33.6 million Class 13 claim. For the avoidance of doubt, this consideration is solely for FGIC's benefit.

8.     This Stipulation shall automatically terminate upon the occurrence of a Termination Event.

9.     This Stipulation, including Exhibit 1 hereto, and the Settlement Agreement contain the entire understanding of the Parties hereto concerning the subject matter hereof and supersedes all prior understandings and agreements, whether written or oral, between the Parties hereto on such subject matter. The Parties acknowledge that they are not relying on any promises or representations not contained in this Stipulation.

10.     This Stipulation may be executed in counterparts by facsimile, email, or other similar electronic transmission, each of which shall be deemed an original and all of which when taken together shall constitute one document.

-6-

13-53846-tjt   Doc 8772   Filed 12/10/14   Entered 12/10/14 07:39:33   Page 71 of 301
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 222 of 809

Dated:  October [____], 2014

-7-

13-53846-tjt  Doc 8772  Filed 12/10/14  Entered 12/10/14 09:33:29  Page 72 of 301
13-53846-swr  Doc 8045-1  Filed 10/22/14  Entered 10/22/14 03:48:29  Page 222 of 809

**EXHIBIT I.A.198**

FORM OF FGIC DEVELOPMENT AGREEMENT

13-53846-tjr  Doc 8272-5  Filed 12/10/14  Entered 12/10/14 07:30:33  Page 72 of 301
13-53846-swr  Doc 8045-1  Filed 10/22/14  Entered 10/22/14 03:48:29  Page 229 of
809

## DEVELOPMENT AGREEMENT

## OPTION TO ACQUIRE AND DEVELOP LAND
## BY AND AMONG
## CITY OF DETROIT,
## THE STATE OF MICHIGAN
## AND
## FINANCIAL GUARANTY INSURANCE COMPANY

**THIS AGREEMENT** (referred to herein as this "<u>Agreement</u>") is entered into as of the _____ day of October, 2014 (the "<u>Effective Date</u>"), by and between the City of Detroit, a Michigan public body corporate (the "<u>City</u>"), acting through its Planning & Development Department ("<u>PDD</u>"), whose address is 2300 Cadillac Tower, Detroit, Michigan 48226, the State of Michigan (the "<u>State</u>"), whose address is P.O. Box 30013, Lansing, Michigan 48909, and Financial Guaranty Insurance Company, a New York stock insurance company ("<u>Developer</u>"), whose address is 521 Fifth Avenue – 15th Floor, New York, New York 10175. The City and Developer are sometimes referred to in this Agreement as a "Party" and, collectively, as the "Parties."

### Recitals:

A.     In consideration of the Parties' various contractual arrangements and settlements entered into contemporaneously herewith between the City and Developer, and the mutual desire of the Parties to promote economic growth in the City (the "<u>Arrangement</u>"), the City has agreed to grant an option to Developer to acquire that certain real property upon which is presently situated the improvements commonly referred to as the Joe Louis Arena, inclusive of 5.3 acres of real property located at 19 Steve Yzerman Drive, Detroit, Michigan, and the Joe Louis Arena Garage, inclusive of 3.3 acres of real property located at  900 W. Jefferson Avenue, Detroit, Michigan (collectively, the "<u>Property</u>"). As used herein, the term "Property" shall be deemed to

CHI-181944729v8

13-53846-tjr   Doc 8772   Filed 12/10/14   Entered 12/10/14 07:39:33   Page 74 of 301
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 08:48:29   Page 224 of 809

include: (i) the land described on Exhibit \_\_[1] together with all air, mineral, subsurface and riparian rights appertaining thereto, if any; (ii) the City's interest, if any, in those certain above ground pedestrian walkways and all necessary related easements located on the Property or appurtenant thereto, whether now existing or hereafter granted prior to the Closing (as hereinafter defined), allowing access from the property to COBO Center (the "COBO Interests"); (iii) the City's interest, if any, in any land lying in the bed of any street, road, alley, right-of-way or avenue, at the foot of, adjoining or dividing the Property, only to the extent such street, road, alley, right-of-way or avenue is not open for the general benefit of the public; (iv) the City's interest, if any, in the use and benefit of all easements appurtenant to the Property whether or not of record; (v) the City's interest in and development rights under all authorizations, permits and approvals with respect to the use and development of the Property; and (vi) such other rights, interests and properties as may be specified in this Agreement to be sold, transferred, assigned or conveyed by the City to Developer.

B.    The State has agreed to grant to the Developer or assist the Developer in obtaining certain economic development incentives for purposes of developing the Property upon the terms and conditions set forth herein.

C.    If Developer exercises its option with respect to the Property as set forth herein, Developer shall develop such Property in accordance with the terms and provisions of this Agreement.

Accordingly, the Parties agree as follows:

**Section 1.    DEVELOPMENT AND OPTION**

(A)    Development Proposal.

(1)    On or before a date which is thirty-six (36) months following full and complete execution of this Agreement (as the same may be extended in accordance with the terms hereof, the "Development Proposal Deadline"), the Developer shall (i) identify a developer partner that shall serve as development manager for the Development, or a development manager to be hired on a fee for service basis by Developer to manage construction of the Development (as hereinafter defined), either of which shall have significant experience in the development of large, complex mixed-use urban projects, and (ii) prepare a comprehensive development plan for the Development, and shall submit such information along with such plan (in form and substance reasonably acceptable to the City) to the City for its review and approval in the manner set forth in this Section 1(A) (the "Development Proposal"), which approval shall not be unreasonably withheld, conditioned or delayed, including, without limitation, any condition in such approval that would interfere with the eligibility of the Development for TIF Incentives (as defined in Section 5(I)(a) below) as contemplated hereby. For purposes of this Agreement, "Development" shall mean that certain mixed use project consisting of (i) a first-class hotel and related facilities including not less than 300 hotel

---

[1] The Parties should agree upon a legal description for the Property and associated easements upon receipt of Title and Survey.

2

CHI-181944729v8
13-53846-swr   Doc 8272   Filed 12/10/14   Entered 12/10/14 07:39:33   Page 75 of 301
13-53846-swr   Doc 8045   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 228 of 809

rooms, and (ii) such other office, retail, commercial, recreational, residential and/or condominium units as shall be determined by the Developer (industrial, adult entertainment and other noxious uses excepted) given prevailing market conditions, with a height above ground not to exceed 30 floors, to be constructed upon the Property by the Developer, together with all onsite improvements, site preparation, onsite infrastructure (including, without limitation, sanitary sewer, water, storm sewer, sidewalks, street lighting, driveways, storm water detention or retention facilities), related parking facilities and landscaping, necessary or appurtenant thereto; in all instances as approved by the City in accordance herewith, which approval shall not be unreasonably withheld, conditioned or delayed to the extent consistent with the City's urban planning policies and the City's comprehensive development plan as existing on the date any applicable Required Approvals (as defined below) are obtained by the Developer. For purposes of this Agreement, and without limiting the Developer's ability to identify and receive approval of a different development partner, the Detroit Regional Convention Facility Authority is deemed by the City an approved development partner. The Development Proposal shall include an application for the brownfield plan necessary for the application for TIF Incentives, and it shall also identify which components of the Development Proposal are eligible for the TIF Incentives, disbursement of which shall be governed by the Economic Incentive Agreements (as defined in Section 5(I)(a) below), and the City shall use its commercially reasonable efforts to cause the State or applicable State related entity to grant any approvals necessary for those TIF Incentives no later than one hundred twenty (120) days after the date of approval of the Development Proposal, subject to the terms hereof. The Development Proposal shall include the terms of the Guaranty (as defined in Section 5(B) below), including the identity of any guarantor thereunder, and also include the terms of any proposed equity investment and financing for the Development; provided, however, (i) the Development Proposal does not need to disclose any additional equity partners, provided that the Developer will not partner with any third party that is prohibited from doing business with the City, (ii) the Development proposal does not need to disclose the holder(s) of the COPs or holders of the beneficial interests in the COPs, and (iii) the Development Proposal does not need to identify a development partner if the rights under the Agreement have been transferred to a developer prior to the date of the Development Proposal Deadline, which transferee has previously been approved by the City, which approval shall not be unreasonably withheld, conditioned or delayed.

(2)     The City shall review any Development Proposal submitted to the City by the Developer and within ninety (90) days of receipt by the City of such Development Proposal (the "Development Proposal Review Period") the City shall either (i) approve the Development Proposal or (ii) provide the Developer with the specific reasons why the Development Proposal is not acceptable, which may include unacceptability of the proposed development partner (if required). If the City does not approve the Development Proposal, the Developer may provide a revised Development Proposal(s) to the City for its approval pursuant to the process herein, which shall continue until the earlier of (i) the date on which a Development Proposal is approved, and (ii) the Development Proposal Deadline which shall be automatically extended by the aggregate of all Development Proposal Review Periods. The City and, to the extent applicable related to the TIF Incentives, the State, shall reasonably cooperate with the Developer in

3

preparation of the Development Proposal, at no incremental cost to the City or, as applicable, the State. The Development Proposal, as approved by the City pursuant to this Section 1(A) shall be hereinafter referred to as the "Approved Development Proposal."

(3) Upon request of the Developer, the City may approve an extension of the Development Proposal Deadline by up to twenty-four (24) additional months, which approval shall not be unreasonably withheld, delayed or conditioned. The City agrees that it would be unreasonable to withhold its approval of such extension if (i) the Developer requested the extension because development in the immediate vicinity of the Property has materially decreased or the general economic condition of the City has deteriorated to such a level that it would not be economically feasible for the Developer to pursue development of the Property or (ii) it is reasonable given the complexity of the development contemplated by the Developer for the Property.

(B)     Option and Diligence Procedure.

(1) The Developer shall have until a date which is one hundred eighty (180) days prior to the Development Proposal Deadline (as may be extended) to give the City written notice of its intent to conduct the Diligence Activities (as hereinafter defined) on the Property (the "Diligence Notice"). Following receipt of the Diligence Notice, the City shall use its commercially reasonable efforts during the Diligence Period (as defined below) to provide the Developer and its contractors, consultants and their respective agents with such access to the Property as may be reasonably requested by the Developer from time to time, subject to any access limitation of that certain Sublease of Riverfront Arena between the City, Olympia Entertainment, Inc. and the Detroit Red Wings, Inc., dated June 15, 2014, and the related Parking Agreement (as may be amended, restated or modified, the "JLA Lease"). For purposes of this Agreement, "Diligence Activities" include but are not limited to the following:

(a) such physical inspections, surveys, soil borings and bearing tests and possible relocation of utilities, all as Developer deems necessary in its sole discretion, all of which shall be completed at Developer's expense;

(b) subject to the terms and provisions of Section 2 below, including giving of such Investigation Notices and obtaining City approval as may be required thereunder, investigations, environmental studies, environmental site assessments (including Phase I and Phase II site assessments, and/or sampling and invasive testing of soil, groundwater, surface water, soil vapors, indoor air, and building materials (such as Asbestos and lead-based paint)), and such other investigations and assessments as Developer may deem necessary in its sole discretion to determine the condition of the Property and the Property's compliance with Environmental Laws (as defined below) and any other federal, state and local laws, rules, regulations and orders relating in any way to protection of human health, the environment and natural resources, all of which shall be completed at Developer's expense; and

4

CHI-181944729v8
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 22 of 301
13-53846-tjt   Doc 8772   Filed 12/10/14   Entered 12/10/14 07:39:33   Page 77 of 301
809

(c)     a review of available public and private utilities and public accesses necessary for the proposed development of the Property.

(2)     <u>Title and Survey</u>.  The City shall deliver to Developer a title commitment and ALTA survey for the Property (the "<u>Title Commitment and Survey</u>") promptly following execution of this Agreement.  Within twenty (20) business days after the Developer's receipt of the Title Commitment and Survey (in form reasonably acceptable to the Developer) and copies of each of the title exceptions referenced in the Title Commitment and Survey, the Developer shall examine the Title Commitment and Survey and shall make any objections to any items therein that would cause title to the Property not to be good and marketable, free and clear of any items that, in Developer's reasonable discretion, would unreasonably interfere with the construction, use or operation of the Development for its intended purposes or impair the value of the Development to such an extent as to make such Development not commercially feasible (any of the foregoing a "<u>Title Defect</u>") by written notice to the City (the "<u>Title Objection Notice</u>").   For avoidance of doubt, the City shall not be obligated to cure, remove or bond over any objection to the Title Commitment and Survey that fails to qualify as a Title Defect hereunder.   The Title Objection Notice shall state with specificity the reasons for Developer's objection(s) and the curative steps requested by the Developer which would remove the basis for the Developer's objection(s).  The City shall cure, remove or bond over any Title Defects prior to the Closing Date.  If the Developer orders an update to the Title Commitment and Survey prior to Closing (as defined in Section 3(A) below), and such update shows any additional Title Defect not caused by the Developer or its agents, consultants or contractors, the City shall cause each such Title Defect to be cured, removed or bonded over prior to Closing.

(3)     <u>City Information</u>.  To the extent within the possession of the City and the City Parties (as defined below), as reasonably determined by the City's corporation counsel upon due inquiry, the City shall, promptly upon the written request of the Developer, provide, and shall cause all City Parties to provide, to the Developer (i) copies of all environmental studies, asbestos reports or other environmental reports on the Property, and all material documents, records or non-privileged communications related to the presence, use or release of Hazardous Materials at the Property subject to a pending claim or matter or present at concentrations exceeding those allowed by law, (ii) copies of all title reports and the underlying documents referenced therein, (iii) copies of all surveys of the Property, (iv) copies of any other records, documents, instruments, agreements or files with respect to the use or ownership of the Property, to the extent materially relevant after Closing, (v) to the extent not included in the above, copies of the correspondence to or from the City or any City Parties related to the use or ownership of the Property, to the extent materially relevant after Closing and (vi) such other documentation as is reasonably requested by Developer with respect to the Property. For purposes of this Agreement, "<u>City Parties</u>" shall mean any department, subdivision or agency of the City and/or any governmental authority within the direct or indirect control or supervision of the City.

(4)     <u>Insurance</u>.   Prior to entering onto the Property for any Diligence Activities, Developer or its contractors shall maintain the insurance coverage and comply

CHI-181944729v8
13-53846-tjt   Doc 8772-5   Filed 12/10/14   Entered 12/10/14 03:39:33   Page 78 of 301
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 228 of 809

with the insurance requirements specified in the City's Right-of-Entry, a form of which is attached as **Exhibit A** (the "<u>Right-of-Entry</u>").

(5)    <u>Indemnity</u>.  Developer shall defend, indemnify and hold harmless the City from and against any loss, liability, cost or expense incurred by the City to the extent resulting from Developer's (including its duly authorized employees, agents, engineers or other representatives) negligence or willful acts occurring in connection with the Diligence Activities; provided, however, that the Developer shall not be responsible for any loss, liability, cost, or expense resulting from the City's (or any City Parties') negligence or misconduct.

(6)    The Developer shall notify the City in writing, no less than one hundred twenty (120) days following the Diligence Notice (the "<u>Diligence Period</u>"), that either (i) the Developer intends to proceed to Closing on the Property (the "<u>Notice of Option Exercise</u>"), or (ii) the condition of the Property is such that, in Developer's reasonable judgment, the condition adversely affects Developer's ability to timely complete the Development or adversely affects the use, value or marketability of the Property (the "<u>Objection Notice</u>"), which Objection Notice shall state with reasonable specificity the particular diligence matter(s) unacceptable to the Developer, including any Title Defects ("<u>Objections</u>").  The City, in its sole discretion, shall have the option (but not the obligation) to cure, remove or bond over such Objections within sixty (60) days following receipt of the Objection Notice (the "<u>Cure Period</u>"), provided, that the City must cure, remove or bond over such Objections that (a) are encumbrances for the benefit of the City, the City Parties, their lenders or vendors, (b) are Title Defects, or (c) may reasonably be deemed to directly cause a delay in the Developer's ability to complete the Development in accordance with the terms and conditions of this Agreement more than two (2) years after the Completion Deadline; provided, however, in the event any such Objection may reasonably be deemed to directly cause a delay in the Developer's ability complete the Development in accordance with the terms and conditions of this Agreement of two (2) years or less after the Completion Deadline (a "<u>Minor Delay Defect</u>"), then the City shall not be obligated to cure, remove or bond over such Minor Delay Defect; however, the number of days of delay reasonably determined to be caused by such Minor Delay Defect shall be deemed Force Majeure Delay (as hereinafter defined) for the equivalent number of days.  Without limiting the generality of the foregoing, the City shall be obligated to cause to be cured, removed or bonded over prior to expiration of the Cure Period: (i) mechanics' liens; (ii) judgment liens against the City or any City Parties; (iii) mortgages, similar loan documents and voluntary liens with respect to indebtedness of the City or any City Party; (iv) delinquent taxes, charges, impositions or assessments; (v) fines issued by any governmental or quasi-governmental authority or other liens encumbering the Property or any portion thereof which are in liquidated amounted; and (vi) any other monetary liens against the property.  To the extent the Developer desires to proceed to Closing on the Property following delivery of an Objection Notice, the Developer must deliver to the City a Notice of Option Exercise prior to fifteen (15) days following expiration of the Cure Period.  Failure of the Developer to timely deliver a Notice of Option Exercise as provided for herein shall result in automatic termination of the Developer's rights under this Agreement and the

6

Developer shall thereafter have no further interest in the Property. Following delivery by the Developer of a Notice of Option Exercise, the City shall be bound to convey the Property, upon the terms and conditions set forth herein, and the City and the Developer shall proceed to closing on the Property on a mutually agreed upon date which is the later of (i) two (2) years following approval by the City of the Development Proposal, and (ii) six (6) months following completion of Demolition (as defined in Section 5(H)(b) below) by the City (the "Closing Date").

(7)     As Is Condition of Property; City Cooperation. The City makes no implied or express representations or warranties of any kind as to any condition that may adversely affect the development, or its fitness for absolutely any purpose whatsoever, other than with respect to the Sufficient Environmental Remediation (as defined in Section 5(H)(b) below). Upon delivery to the City of the Notice of Option Exercise, Developer will be deemed to have acknowledged that it is satisfied with the condition of the applicable Property, subject to the completion of the Sufficient Environmental Remediation, and shall be deemed to have waived any right to object to the status of title or to the condition of the Property, regardless of the result of any Diligence Activities, except as expressly provided for in this Agreement.

(8)     Release of City from Liability.  Upon Closing and subject to the City's obligation hereunder to perform Sufficient Environmental Remediation, Developer shall release the City and its officials, employees, and agents (but not any third party) from any and all claims or causes of action the Developer may have against the City for any liability, injury or loss as a result of any physical defects in or physical conditions of the Property, including but not limited to any surface, subsurface, latent or patent conditions whether naturally occurring or by action of any party.

(C)     Brokerage and Finder's Fees and Commission. Developer will defend and indemnify the City and hold it harmless with respect to any commissions, fees, judgments, or expenses of any nature and kind that the City or Developer may become liable to pay by reason of any claims by or on behalf of brokers, finders or agents claiming by, through or under Developer incident to this Agreement and the transaction contemplated hereby or any litigation or similar proceeding arising therefrom unless the City has a written agreement with a broker, finder or agent providing for such payment in which case the City shall be responsible for such broker, finder or agents' commissions, fees, judgments or expenses.  To the maximum extent permitted by applicable law, the City will defend and indemnify the Developer and hold it harmless with respect to any commissions, fees, judgments, or expenses of any nature and kind that the City or Developer may become liable to pay by reason of any claims by or on behalf of brokers, finders or agents claiming by, through or under the City incident to this Agreement and the transaction contemplated hereby or any litigation or similar proceeding arising therefrom unless the Developer has a written agreement with a broker, finder or agent providing for such payment in which case the Developer shall be responsible for such broker, finder or agents' commissions, fees, judgments or expenses.  Developer represents and warrants to the City that it has not engaged or otherwise dealt with any brokers entitled to any commissions, fees, judgments, or expenses in connection with this Agreement.

(D)     Taxes And Assessments.  All taxes and assessments which (i) have become a lien

7

CHI-181944729v8

13-53846-tjt   Doc 8772   Filed 12/10/14   Entered 12/10/14 07:39:33   Page 80 of 301
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 230 of
809

upon the Property or part thereof prior to the date of Closing, and (ii) have been discovered and specifically identified by Developer prior to the Closing, shall be paid by the City on or prior to the Closing Date; provided, further that all current property taxes shall paid by the City through the date of Closing. From and after Closing, and subject to any abatement or other tax limitation described in this Agreement, Developer shall be solely responsible for all taxes, liens, and assessments that become due and payable for the period after the Closing against the Property it acquires hereunder or any part thereof, whenever assessed, levied, or due.

**Section 2.  ENVIRONMENTAL MATTERS**

(A)  <u>Definitions</u>.  The following words and expressions shall, wherever they appear in this Agreement, be construed as follows:

(1)  "<u>Asbestos</u>" shall have the meanings provided under the Environmental Laws and shall include, but not be limited to, asbestos fibers, friable asbestos or asbestos-containing materials or presumed asbestos-containing materials, as such terms are defined under the Environmental Laws.

(2)  "<u>Environmental Claims</u>" shall mean all claims, demands, suits, proceedings, actions, whether pending or threatened, contingent or non-contingent, known or unknown, including but not limited to investigations and notices by any governmental authority or other person, brought under common law and/or under any of the Environmental Laws which can or do relate to the Property or the operations conducted thereon.

(3)  "<u>Environmental Laws</u>" shall mean all applicable federal, state, and local laws, rules, regulations, orders, judicial determinations and decisions or determinations by any judicial, legislative or executive body of any governmental or quasi-governmental entity, or any other legally binding requirement, whether in the past, present or future, with respect to or otherwise related to the environment, natural resources, pollution or contamination and human health and safety, including, but not limited to:

(a)  the installation, existence, or removal of, or exposure to, Asbestos at, on or in the Property;

(b)  the existence on, discharge from, release of, exposure to, or removal from the Property of Hazardous Materials; and

(c)  the effects on the environment of the Property or any activity conducted now, or previously or hereafter conducted, on the Property.

Without limiting the foregoing, Environmental Laws shall include, but not be limited to, the following: (i) the Michigan Natural Resources and Environmental Protection Act, 1994 Public Act 451, as amended ("<u>NREPA</u>"); the Comprehensive Environmental Response, Compensation, and Liability Act, 42 USC Sections 9601, et seq. ("<u>CERCLA</u>"); the Superfund Amendments and

8

CHI-181944729v8

13-53846-tjw  Doc 8772  Filed 12/10/14  Entered 12/10/14 07:39:33  Page 81 of 301
13-53846-swr  Doc 8045-1  Filed 10/22/14  Entered 10/22/14 03:48:29  Page 231 of 809

Reauthorization Act, Public Law 99-499, 100 Stat. 1613; the Resource Conservation and Recovery Act, 42 USC Sections 6901, et seq.; the National Environmental Policy Act, 42 USC Section 4321; the Toxic Substances Control Act, 15 USC Section 2601; the Hazardous Materials Transportation Act, 49 USC Section 1801; the Clean Air Act, 42 USC Sections 7401, et seq.; the Occupational Safety and Health Act, 29 USC Sections 651, et seq., as each have been amended and the regulations promulgated in connection therewith; (ii) Environmental Protection Agency regulations pertaining to Asbestos (including 40 CFR Part 61, Subpart M); Occupational Safety and Health Administration Regulations pertaining to Asbestos (including CFR Sections 1901.1001 and 1926.58) as each may now or hereafter be amended; and (iii) any Michigan state and local laws and regulations pertaining to any Hazardous Materials.

(4)    "Hazardous Materials" shall include any material, substance or waste classified, regulated, or otherwise characterized as "hazardous," "toxic," "radioactive," a "pollutant," "contaminant," or words of similar meaning or is otherwise regulated by Environmental Laws, including, without limitation, polychlorinated biphenyls (PCBs), paint containing lead and urea formaldehyde foam insulation, and sewage.

(B)    The City and Developer acknowledge and agree that some of the parcels to be transferred may be "facilities" pursuant to Part 201 of NREPA, whether or not as yet discovered to be such and that the obligations to perform Sufficient Environmental Remediation is the City's obligation and shall be done at its cost and expense.

(C)    The City shall authorize the Developer, through a fully executed Right-of-Entry (in the form attached), to enter upon the Property during the Diligence Period to, subject to the reasonable conditions set forth herein, make soil boring and bearing tests, undertake such surveying and environmental due diligence activities as Developer deems appropriate, including without limitation sampling and testing of soil, soil vapor, surface water, groundwater, indoor air, and the installation of groundwater wells, provided such do not materially and unreasonably interfere with demolition or site improvement activities of the City or the rightful use of the Property by a tenant in possession or other third party, if any, provided the City shall use its commercially reasonable efforts to facilitate such access to tenant spaces. All such testing and remediation shall be done at Developer's expense; provided, if sampling occurs, the City shall have the right, at its cost and expense, to obtain split samples of any environmental media to the extent reasonably practicable. During the Diligence Period, Developer shall comply with the terms and provisions of the Right-of-Entry. Developer's right to enter upon the applicable Property is subject to execution of such Right-of-Entry and subject to the prior written authorization by the tenant under the JLA Lease, which the City shall use commercially reasonable efforts to procure promptly upon receipt of the Diligence Notice from the Developer. Upon request from the City, Developer shall promptly provide the City with a copy of each final survey or environmental testing report generated as a result of such activities. Developer shall give prior written notice to the City of Developer's plan to inspect and/or investigate the environmental condition of the Property during the Diligence Period (each such notice referred to herein as an "Investigation Notice"). The Investigation Notice shall identify any agents or

9

CHI-181944729v8
13-53846-tjt   Doc 8772-1   Filed 12/10/14   Entered 12/10/14 07:39:33   Page 82 of 301
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 232 of
809

contractors that the Developer intends to use in conducting the activities covered by the Investigation Notice and the general scope of such activities; provided, the scope of any such investigations, site assessments or testing activities shall be subject to the City's prior written approval, which approval shall not be unreasonably withheld, conditioned or delayed; provided, further, Developer shall have sole discretion to determine what analysis any samples will be subjected to. Developer shall use all commercially reasonable efforts to minimize damage to the Property in connection with such entry and shall restore the Property to the condition existing prior to such entry. Developer shall indemnify, defend and hold the City harmless from and against any and all out-of-pocket loss, cost, liability and expense, including reasonable attorney fees and litigation costs, suffered or incurred by the City as a result of the Developer's (including any of its duly authorized employees, agents, engineers or other representatives) negligent acts or omissions or willful misconduct occurring in connection with the activities conducted in accordance with the Right-of-Entry.

(D)     In the event Developer elects to proceed to take title to the Property, upon the Closing and subject to the Sufficient Environmental Remediation, Developer takes such Property as it finds it, "AS IS", and the City makes no express or implied representations or warranties as to its fitness for absolutely any purpose whatsoever, including but not limited to any warranty that the Property is fit for the Developer's purpose or regarding the presence or absence of Hazardous Materials at, on, in, under, at, or from the Property and compliance with the Property with Environmental Laws, other than with respect to Sufficient Environmental Remediation. Except with respect to Sufficient Environmental Remediation, Developer acknowledges that neither the City nor any agent or employee of the City has made any representation, warranty or agreement, either express or implied, and Developer has not relied on any representation, warranty or agreement of any kind made by the City or any agent or employee of the City, concerning (a) the physical or environmental condition of the Property, or (b) the presence or absence of any condition, substance or material, including but not limited to any waste material, equipment or device at, on, in, under, about, or from the Property. Developer agrees that the disclosures of the City concerning the Property and its condition are intended to satisfy any duties the City may have under the law, including but not limited to the statutes, Environmental Laws, and common law. By executing this Agreement, Developer acknowledges that it is entitled to receive from the City Sufficient Environmental Remediation and is entitled to conduct its Diligence Activities, including but not limited to inspection of the Property, review of title, and the results of the tests, investigations and surveys permitted under this Agreement. If, prior to Closing, Developer fails to undertake such investigations and/or obtain such test results and surveys, or fails to object to the condition of the Property based on the results of its Diligence Activities, and Developer thereafter elects to proceed to Closing, Developer shall thereupon be deemed to have waived any right to object to the condition of the Property and shall be deemed to have declared its full satisfaction therewith, subject to Sufficient Environmental Remediation.

(E)     Upon Closing, Developer, for itself and its successors and assigns, expressly waives and releases all Environmental Claims (whether for personal injury, property damage or otherwise) that Developer may have against the City and its officials, employees and agents in connection with or related to such Property or any aspect thereof, except with respect to Sufficient Environmental Remediation.

CHI-181944729v8

13-53846-swr   Doc 8772   Filed 12/10/14   Entered 12/10/14 07:39:33   Page 83 of 301
13-53846-tjt   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 239 of
809

(F)	After the Closing, the City shall have no obligation or liability to Developer whatsoever to undertake any cleanup or other remedial action that may be required in connection with the Property under any Environmental Law, or to comply with any other federal, state or local requirement to attend to the physical condition of the Property, subject to the City's obligations hereunder related to Sufficient Environmental Remediation.

(G)	At its sole cost and expense, with respect to the Property for the period commencing on the Closing and ending on Commencement of Construction (as defined in Section 5(C) below), Developer shall: (a) comply with all Environmental Laws; (b) pay when due the cost of Developer's compliance with the Environmental Laws resulting out of environmental conditions caused or permitted by Developer during its period of ownership, use, possession or development of the Property; and (c) keep the Property free of any lien imposed pursuant to the Environmental Laws resulting out of Developer's ownership, use, possession, or development of the Property.

(H)	Notwithstanding anything to the contrary which may be contained in this Agreement, Developer represents and warrants and covenants to the City for the period after Developer's commencement of ownership, use, possession or development of the Property through and including Commencement of Construction, as follows:

(a)	Developer shall not use or allow the use of the Property for the purpose of storing any Hazardous Materials Developer brings into the Property, nor shall Developer use the Property in a manner which will cause or increase the likelihood of causing the release of such Hazardous Materials onto or from the Property, in each case other than those Hazardous Materials which are necessary and commercially reasonable for the conduct of Developer's development activities or the business operated on the Property and which Hazardous Materials shall be handled and disposed of in compliance with all Environmental Laws and industry standards and in a commercially reasonable manner.

(b)	Developer shall promptly notify the City of any claims or litigation against the Developer by any person (including any governmental authority), concerning the presence or possible presence of Hazardous Materials contamination at the Property or concerning any violation or alleged violation of the Environmental Laws by the Developer respecting the Property, and shall furnish the City with a copy of any such communication received by Developer.

(c)	Developer shall notify the City promptly and in reasonable detail in the event that Developer becomes aware of or suspects the presence of Hazardous Materials at levels exceeding those allowed by the Environmental Laws or contamination or a material violation of the Environmental Laws at the Property.

(d)	If Developer's operations at the Property violate the Environmental Laws so as to subject Developer or the City to a formal notice of violation by a governmental agency alleging a violation of the Environmental Laws, Developer shall promptly notify the City of the Developer's receipt of such formal notice of

11

CHI-181944729v8
13-53846-tjt  Doc 8772-5  Filed 12/10/14  Entered 12/10/14 07:39:33  Page 84 of 301
13-53846-swr  Doc 8045-1  Filed 10/22/14  Entered 10/22/14 03:48:29  Page 234 of
809

violation and shall promptly investigate the underlying circumstances and notify the City within five (5) days after the completion of its investigation of the results of its investigation. If Developer determines that an ongoing material violation by Developer is occurring or did occur, Developer shall, to the extent required by Environmental Laws, cease or cause a cessation of or take other actions to address those aspects of the use or operations causing the violation and shall remedy and cure in compliance with the Environmental Laws any conditions arising therefrom to the extent required by Environmental Laws at its own cost and expense. If Developer disputes that its activities are violating Environmental Laws, it shall expeditiously appeal and prosecute an appeal of the notice of violation or take other commercially reasonable actions to dispute such notice.

**Section 3.    CLOSING**

(A)    On the Closing Date, the City shall, subject to Developer's satisfaction of the conditions precedent set forth in Section 3(B) below, convey the Property to the Developer (the "Closing") by quit-claim deed substantially in the form of the deed set forth in **Exhibit B** (the "Deed") using legal descriptions approved by Developer and the City.  The Parties agree and acknowledge that the sole and exclusive consideration for conveyance of the Property hereunder is deemed to be the Arrangement, the sufficiency of which is hereby acknowledged.

(B)    Conditions to Closing.   The City's obligation to proceed with a Closing is conditioned on the fulfillment by Developer of each of the following conditions precedent:

a.    Resolution of Developer's Authority. Developer shall furnish to the City a certified copy of a resolution in form and substance reasonably acceptable to the City and the title company insuring title to the Property, duly authorizing the execution, delivery and performance of this Agreement and all other documents and actions contemplated hereunder.

b.    Payment of Closing Costs. Developer shall have tendered payment of the closing costs payable by Developer, which shall include all title charges, escrow, closing and recording fees associated with any conveyance hereunder except those costs expressly allocated to the City hereunder.  The City shall pay all closing costs in connection with transfer of the Property at Closing to the extent such costs are expressly allocated to sellers of real property in Detroit, Michigan pursuant to applicable law.  Each Party shall bear the cost of its own legal fees and expenses in connection with this Agreement.

(C)    Delivery of Deeds and Possession. The City will deliver to Developer at Closing the Deed with respect to the Property and possession thereof.

(D)    Recording.  Provided that Developer has complied with all conditions precedent as specified in Section 3(B) above, the Deed shall be delivered at the Closing for prompt recordation with the Register of Deeds of Wayne County, Michigan. Developer shall pay at Closing all costs for recording the Deed.  Possession of the Property shall be delivered to Developer at the Closing.

**Section 4:    NOTICES**

12

CHI-181944729v8

13-53846-tjt   Doc 8772-1   Doc 8045-1  Filed 12/10/14   Filed 10/22/14  Entered 12/10/14 07:39:33  Entered 10/22/14 03:48:29  Page 85 of 301  Page 239 of 809

All notices, demands, requests, consents, approvals or other communications (any of the foregoing, a "Notice") required, permitted, or desired to be given hereunder to any Party shall be in writing and either (a) hand delivered, (b) sent by registered or certified mail, postage prepaid, return receipt requested, (c) sent by facsimile transmission (with confirmation), or (d) sent by reputable overnight prepaid courier, addressed to the Party to be so notified at its address set forth below, or to such other address as such Party may hereafter specify in accordance with the provisions of this Section.  Any Notice shall be deemed to have been effectively given and received: (i) in the case of hand delivery, at the time of delivery if delivered prior to 5:00 P.M. New York time on a Business Day (or if delivered after 5:00 P.M. or on a day other than a Business Day, then the next succeeding Business Day); (ii) in the case of registered or certified mail, three (3) Business Days from transmittal; (iii) in the case of reputable overnight prepaid courier, one (1) Business Day subsequent to transmittal; or (iv) in the case of facsimile transmission, upon confirmation that receipt of such transmission was received, provided receipt of such transmission is confirmed prior to 5:00 P.M. New York time on the Business Day on which such confirmation is received (or if confirmed after 5:00 P.M. or on a day other than a Business Day, then the succeeding next Business Day), in each case addressed to the respective Party as follows:

|  |  |
|---|---|
| If to Developer: | Financial Guaranty Insurance Company |
|  | 521 Fifth Avenue – 15th Floor |
|  | New York, New York 10175 |
|  | Attention: General Counsel |
|  | Fax: 212-312-3221 |
| | |
| If to the City: | Director |
|  | Planning & Development Department |
|  | 65 Cadillac Square, Suite 2300 |
|  | Detroit, Michigan 48226 |
|  | Fax:_____ |
| | |
|  | With a copy to (which copy shall not constitute notice): |
| | |
|  | Corporation Counsel |
|  | City of Detroit Law Department |
|  | 2 Woodward Avenue |
|  | Suite 500 |
|  | Detroit, MI 48226 |
|  | Fax:_____ |
| | |
| If to the State: | State of Michigan |
|  | P.O. Box 30013 |
|  | Lansing, Michigan 48909 |
|  | Attention: _____ |
|  | Fax:_____ |

Any Party may notify any other Party of any changes to the address or any of the other details for Notice to such Party specified above; provided, however, that no such change shall be effective

13

earlier than the date such Notice is received or deemed to have been received in accordance with this Section.

## Section 5:    COVENANTS

(A)    Developer covenants for itself and its successors and assigns and every successor in interest to the Property, that from and after Closing on the Property, Developer and its successors and assigns shall develop such Property only to and in accordance with the Approved Development Proposal and otherwise pursuant to the terms and conditions of this Agreement, unless otherwise agreed in writing by the City.  Subject to Force Majeure Delays (as defined below), within twelve (12) months following the Closing Date (the "Commencement Deadline"), the Developer shall achieve Commencement of Construction with respect to such Property. Following Commencement of Construction, the Developer shall diligently prosecute the Development on the Property to substantial completion in material conformance with the Approved Development Proposal (which shall mean substantial completion of the Development and all improvements related thereto, exclusive of landscaping, punch list items and any tenant work for commercial or other space for which there are no tenants or for which the work is to be done by a tenant and any onsite or offsite work that is not commercially necessary for occupancy in material conformance with the Approved Development Proposal) (the date upon which such substantial completion occurs referred to herein as the "Completion Date").  Subject to Force Majeure Delays, the Completion Date shall occur within thirty-six (36) months following the Closing Date (the "Completion Deadline").  For purposes of this Agreement, "Force Majeure Delays" shall mean an event, casualty, occurrence, condition, or circumstance of any kind or nature reasonably beyond the control of the applicable party hereto which renders such party unable to perform any of its obligations contemplated hereunder, in full or in part, including, without limitation, (i) acts of declared or undeclared war by a foreign enemy; (ii) civil commotion, insurrection or riots; (iii) fire or casualty or condemnation; (iv)  floods, hurricanes or other materially adverse weather conditions; (v) earthquakes; (vi) acts of God; (vii) governmental preemption in the case of emergency; (viii) unavailability of materials to the extent not within the reasonable control of the applicable party (other than shortage of funds); (ix) strikes, lockouts or other labor trouble; (x) inability to secure labor or access to the Property including, without limitation, holdover of the tenant under the JLA Lease (as defined below) beyond any stated expiration date (inclusive of all renewal options thereunder); (xi) acts of terrorism; (xii) the suspension of government operations; (xiii) any act, omission, rule, order or regulation of any governmental authority or any department or subdivision thereof (other than, with respect to the City, the City, any department, subdivision or agency of the City or any governmental authority within the direct or indirect control or supervision of the City and other than, with respect to the Developer, the failure of the Developer to secure the Required Approvals if the Developer does not apply for and diligently prosecute the applications for such Required Approvals); (ix) the presence of hazardous materials on the Property and any related remedial action*;* and (x) any other cause, event or circumstance not within the reasonable control of the applicable party (other than shortage of funds).

(B)    The Commencement Deadline and Completion Deadline shall be extended for a period of time equal to the number of days during which Developer is prevented from proceeding with the construction of the development at the Property by reason of Force Majeure

14

CHI-181944729v8

13-53846-swr   Doc 8772   Filed 12/10/14   Entered 12/10/14 07:39:33   Page 87 of 301
13-53846-tjt   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 08:48:29   Page 23 of
809

Delays, provided that (i) Developer is otherwise in compliance with the terms and provisions of this Agreement, and (ii) Developer notifies the City of the events constituting such Force Majeure Delays no later than sixty (60) days after Developer has actual knowledge of their occurrence. At Closing, Developer shall cause the City to be provided with a commercially reasonable completion guarantee, or other assurance of completion (which other assurance of completion shall be reasonably acceptable to the City), given by an entity reasonably acceptable to the City, which guarantees for the benefit of the City substantial completion of the Development on or before the Completion Deadline (the "Guaranty").

(C)     For purposes of this Agreement, "Commencement of Construction" on the Property shall be deemed to have occurred when the Developer shall have commenced site preparation work on the Property, which site preparation work may include renovation or demolition of existing structures located on the Property by the Developer, as applicable.

(D)     Developer covenants and agrees that from and after Closing, through and including the Commencement of Construction, it will: (i) comply with all applicable zoning requirements, and all other applicable state and federal statutes and regulations and local laws and ordinances applicable to the ownership, use and/or occupancy of the Property; and (ii) except as abated in accordance with the terms hereof, pay and discharge when due without penalty, and in all events before penalty for nonpayment attaches thereto, all taxes, assessments and governmental charges, including but not limited to real estate taxes or assessments on the Property or any part thereof, except where the same may be contested in good faith.

(E)     Developer covenants and agrees to permit the City or its designee to encumber that portion of the Property depicted in the attached **Exhibit C** with an easement upon terms and conditions determined by the City in its reasonable discretion, for the purpose of constructing certain riverwalk improvements.  In the event easement contemplated above is not placed of record prior to Closing, the Developer (including any successors or assigns thereof) shall permit such easement to be placed of record following Closing free of charge.  Notwithstanding any provision hereof to the contrary, no such easement described in this paragraph, to the extent recorded prior to Closing, shall form the basis for a Title Defect or any Objection hereunder, and the City shall not be required for any reason to cure, remove or bond over such encumbrance.

(F)     Developer covenants and agrees to permit the City or its designee to maintain on the Property those certain public transportation assets of the City commonly referred to as the "people mover" and all ancillary assets related thereto free of charge (the "People Mover"). Developer further covenants and agrees to permit the City or its designee to encumber the Property with an easement upon terms and conditions determined by the City in its reasonable discretion, for the purpose of maintaining, renewing and replacing, as necessary in the City's sole discretion, the People Mover in the location on the Property in which the People Mover is situated as of the date of this Agreement.  In the event the easement contemplated above is not placed of record prior to Closing, the Developer (including any successors or assigns thereof) shall permit such easement to be placed of record following Closing free of charge. Notwithstanding any provision hereof to the contrary, no such easement described in this paragraph, to the extent recorded prior to Closing, shall form the basis for a Title Defect or any

15

Objection hereunder, and the City shall not be required for any reason to cure, remove or bond over such encumbrance.

(G) <u>Estate Conveyed</u>. Notwithstanding anything contained in this Agreement to the contrary, the estate conveyed hereby shall be deemed to be a determinable fee and only upon Commencement of Construction hereunder will the possibility of reverter retained by the City automatically expire as to that part of the applicable Property.

(H) <u>City Covenants</u>.

(a) Prior to Closing, the City shall (1) subject to Demolition, maintain the Property in at least the same condition and repair (except for environmental condition and repair thereof, which is addressed in sub-clause (2) below) as such exists on the Effective Date, (2) not, through its own action, alter the environmental condition of the Property, as such exists on the Effective Date, in a material and adverse manner, (3) not take zoning or land use action on the Property without Developer's prior written consent, and (4) not execute or grant any lease, contract, agreement, lien, security interest, encumbrance, easement, or restriction with respect to such Property, or amend, modify, renew or extend any of the foregoing, without prior written consent of the Developer, which consent shall not be unreasonably withheld, conditioned or delayed; provided, however, without the consent of the Developer, the City shall be permitted to (i) enter into, amend, modify or renew any contract, agreement or lease with respect to the Property to the extent that such instrument is terminable at will by the City and is terminated by the City prior to the Closing or the term of such instrument does not extend beyond Closing, and (ii) amend or modify the JLA Lease in any manner which would not materially, adversely alter the rights of the Developer hereunder (for avoidance of doubt, the City shall be permitted to terminate the JLA Lease without the Developer's prior consent); provided, however, in no event shall the City renew or otherwise extend the JLA Lease, subject to the right of the existing tenant thereunder to so extend the JLA Lease. The City shall pass no charter, ordinance or other provision that solely affects or primarily targets the Developer or its rights under this Agreement which charter, ordinance or other provision has a material adverse impact on the Developer or its rights under this Agreement (it being understood that a "material adverse impact" shall include any adverse financial impact on or any contradiction, or adverse impact on the enforceability of, the terms of this Agreement or the Economic Incentive Agreements). To the extent any COBO Interests are intended to benefit the owner of the Property, but are not otherwise in the name of, or held by, the City, upon written request of the Developer given to the City not less than ninety (90) days prior to Closing, the City shall use reasonable efforts to cause such COBO Interests to be conveyed to the Developer at Closing.

(b) Promptly upon expiration of the JLA Lease, but in no event more than ninety (90) days after expiration of the JLA Lease (the "<u>Demolition Commencement Date</u>"), the City shall commence or cause to be commenced the demolition of all improvements on the Property (except for those certain improvements commonly referred to as the Joe Louis Arena Garage) (the "<u>Demolition Property</u>"), which demolition shall include (i) removal and disposal of all building improvements and materials located thereon and (ii) certain excavation work to be completed at the Demolition Property, which excavation work shall include, without limitation, clearing and grubbing, soil erosion and control, and site excavation and embankment on the

CHI-181944729v8

13-53846-tjt   Doc 8772   Filed 12/10/14   Entered 12/10/14 07:39:33   Page 89 of 301
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 239 of
809

Demolition Property, all in accordance with plans and specifications reasonably acceptable to the Developer and all applicable laws, including, but not limited to Environmental Laws ("Demolition"). For the avoidance of doubt, if the City commences staging for the Demolition by the Demolition Commencement Date, the City will be deemed to have timely commenced Demolition. Notwithstanding the foregoing, Demolition shall also include (i) remediation or removal of Hazardous Materials (including, but not limited to, asbestos-containing materials, PCB-containing light fixtures, mercury-containing switches) related to the removal and disposal of materials from the Demolition Property to the extent required by or necessary to comply with applicable laws or as is customary for demolition projects of a similar scope and nature and (ii) the investigation, control or removal of any Hazardous Materials at, on or below the surface of the Property that is sufficient under and otherwise causes the Property to comply with applicable law for Developer to develop and use the Property consistent with the Development Proposal for its intended purposes as a multiuse hotel, residential condominium, office or retail development ("Sufficient Environmental Remediation"). Sufficient Environmental Remediation may, at the City's election, include controls that do not unreasonably interfere with the Development Proposal; provided such are acceptable to the governmental authorities with jurisdiction over the Property. Developer agrees that, in conjunction with Developer, the City may have prepared and submitted to the Michigan Department of Environmental Quality a Baseline Environmental Assessment (Phase II) and associated Due Care Plans approved by and for the benefit of Developer, which approval shall not be unreasonably withheld, delayed or conditioned; however, the submission of such shall not alleviate the City's obligation to undertake such other actions necessary to perform Sufficient Environmental Remediation to allow for the implementation of the Development Proposal. The Developer agrees that in conducting Sufficient Environmental Remediation, the City may rely on protective barriers to prevent contact with affected soil and deed restrictions to limit groundwater use and other due care requirements approved by the governmental authorities and reasonably acceptable to Developer. Sufficient Environmental Remediation shall not include the construction of measures adopted as controls to the extent that they are otherwise specifically part of the Development Proposal, in which case Developer shall construct them as part of the Development; however, if the costs to do so are increased as a result of government approved controls, the City shall reimburse Developer for the increased costs to satisfy any government imposed controls. Developer or any future owner will be responsible for maintaining any reasonable controls or due care measures adopted as part of the Sufficient Environmental Remediation. The Demolition Commencement Date is expected to occur on or before September 15, 2017. Demolition shall be completed within one (1) year following the Demolition Commencement Date. The State shall make available to the City and/or the City Parties certain CRP Incentives set forth below, of which up to $6,000,000 will be for the purpose of reimbursing the City for the costs and expenses incurred in connection with the Demolition (the "Demolition CRP Incentives"). For purposes of this Agreement, "CRP Incentives" shall mean incentives available from the Michigan Strategic Fund, in cooperation with the Michigan Economic Development Corporation ("MEDC"), through the Community Revitalization Program under Public Act 252 of 2011. If there are any remaining Demolition CRP Incentives following the Demolition and the Sufficient Environmental Remediation, such funds shall be made available to reimburse the Developer for other eligible costs for the Development, to the extent the Developer otherwise meets the eligibility requirements for CRP Incentives and enters into the Economic Incentive Agreements applicable to such CRP Incentives.

17

(c)     Until the earlier of Closing or termination of the Developer's rights under this Agreement, the City shall fund or cause to be funded all costs and expenses for the repairs specified on page 15 "Opinion of Expected Construction Costs – July 2014" in the Physical Conditions Due Diligence Review and Evaluation dated September 2014 prepared by Desman Associates, except for Item #3 identified therein.

(d)     The City represents to Developer that, as of the Closing Date, the City or an instrumentality of the City will have the right, power and authority to convey the Property in the manner provided for in this Agreement.

(I)     <u>Economic Incentive Covenants</u>.

(a)     In order to facilitate construction of the Development pursuant to the Approved Development Proposal on the Property, the State has agreed to reimburse the Developer for certain eligible project costs through TIF Incentives, as more particularly set forth herein. To the extent that the Approved Development Proposal meets the eligibility requirements for TIF Incentives, the Developer shall be provided up to $18,000,000 in TIF Incentives, which TIF Incentives will accrue interest at three percent (3%) per annum on any outstanding balance thereof, pursuant to one or more subsequent final written grants or loans (forgivable or otherwise), as applicable, and a development agreement or other economic assistance agreements, as applicable, which shall be entered into by the Developer and the State no later than one hundred twenty (120) following the City's approval of the Approved Development Proposal (which date may be extended by up to sixty (60) days in the event that the TIF Incentives require review by the Michigan Department of Environmental Quality) (the "<u>Economic Incentive Agreements</u>"). The Economic Incentive Agreements shall include (i) a schedule of performance- based project milestones for construction of the Development, and (ii) a pro-forma budget for the Development, as agreed upon by the City, the State and the Developer. The Economic Incentive Agreements shall be executed in accordance with the standard process, including the filing of any necessary applications. The Economic Incentive Agreements shall govern disbursement of the TIF Incentives, including those project costs related to the Development that are eligible for TIF Incentives, as well as conditions precedent, milestones and timing for such disbursement, and shall include customary periodic reporting requirements of the Developer for data related to the Development both during and after construction. For purposes of this Agreement, "<u>TIF Incentives</u>" shall mean certain redevelopment incentives awarded by the Michigan Strategic Fund (MSF) under the Brownfield Tax Increment Financing Program (Act 381 of 1996), as administered by MEDC.

(b)     To the extent the Development includes residential uses, the Economic Incentive Agreements shall also provide for designation of the Development as a Neighborhood Enterprise Zone ("<u>NEZ</u>"), and the City and each of the City Parties shall cooperate with and assist the Developer in applying for the NEZ certificate. The City and each of the City Parties shall establish either a Commercial Redevelopment Zone (as defined in the Commercial Redevelopment Act, defined below) or a Commercial Rehabilitation Zone (as defined in the Commercial Rehabilitation Act, defined below), as requested by the Developer, such that the Property will be eligible for the property tax abatements available for properties in the applicable zone. The City and each of the City Parties shall cooperate with and assist the Developer in

CHI-181944729v8

13-53846-swr   Doc 8772   Filed 12/10/14   Entered 12/10/14 07:33:33   Page 91 of 301
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 08:48:29   Page 244 of
809

applying for and obtaining the tax abatements for which the Property and any development thereon is eligible under the Commercial Rehabilitation Act or the Commercial Redevelopment Act. For purposes hereof, "Commercial Redevelopment Act" means the Public Act 255 of 1978, MCL § 207.651 *et seq*., and "Commercial Rehabilitation Act" means the Public Act 210 of 2005, MCL § 207.841 *et seq*.

(c)     The City shall use its commercially reasonable efforts to assist the Developer in obtaining any additional sources of developer financings and grants not already expressly provided for in this Agreement that are identified in writing to the City by the Developer.

(J)     Land Use Covenants.

(a)     The City shall change the zoning requirement for the Property to be designated "B-5", which will permit the Developer to develop the Property as a mixed-use development, provided that the City administratively approves the site plans, which approval will not be unreasonably withheld, delayed or conditioned.  Approval by the City of the Development Proposal shall not be deemed approval with respect to any site plan, elevation, special land use, environmental, conditional use or other municipal approvals or permits, or variances therefrom, required for the Development (the "Required Approvals"); provided, however, upon approval by the City of the Development Proposal and prior to Closing, the Developer may proceed with securing the Required Approvals at its sole cost and expense.

(b)     With respect to any formal requests made by Developer or its designee to the City or State for any Required Approvals, the City or State, as applicable: (a) agrees to process such requests promptly and to use commercially reasonable efforts to process them within thirty (30) days of submission by the Developer, (b) shall not unreasonably withhold, condition or delay approvals of the applicable requests, provided that the City or State have the legal authority to grant such approval and that such approval does not violate any applicable law, rule or regulation of general application, (c) shall not unreasonably impede or interfere with the Development, (d) shall not discriminate against Developer in the consideration or approval of such Required Approvals on account of the circumstances surrounding the Arrangement and this Agreement and the events leading up thereto, and (e) shall use reasonable efforts to facilitate such requests, taking into consideration other similar requests for approvals or inducements, as applicable, of third parties granted thereby for similarly situated developments and uses as those contemplated for the Development; provided, however, the City or State, as applicable, shall process such requests for all Required Approvals pursuant to all then applicable rules, regulations, statutes and similar requirements.

**Section 6:     REMEDIES**

(A)     City's Remedies Prior to Conveyance.  In the event that, prior to the Closing on the Property, Developer assigns or otherwise transfers this Agreement or any right therein or in the Property to any entity prohibited from doing business with the City, this Agreement and any rights of Developer in this Agreement, may, at the option of the City, be terminated by the City after thirty (30) days written notice and opportunity to cure provided by the City to Developer. In any case, the Developer shall provide written notice to the City of such assignment.

19

CHI-181944729v8

13-53846-tjt   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 08:48:29   Page 92 of 301
13-53846-swr   Doc 8772-5   Filed 12/10/14   Entered 12/10/14 07:39:33   Page 92 of 301

809

(B)     City's Remedies Subsequent to Conveyance.

(1)     Event of Default.  If, prior to the Developer achieving substantial completion of the Development, the Developer breaches any covenant set forth in this Agreement and fails to cure such breach within thirty (30) days after written demand by the City, such an event shall be deemed to constitute an "Event of Default", provided, however, that if the nature of Developer's default is such that more than the cure period provided is reasonably required for its cure, then Developer shall not be deemed to be in default if Developer commences such cure within said period and thereafter diligently pursues such cure to completion within one hundred eighty (180) days of City's initial written demand hereunder.  Notwithstanding the foregoing, Developer shall have the right to dispute that an Event of Default has occurred or that an Event of Default has not been timely cured by written notice of dispute sent to the City ("Notice of Dispute"). In the event a Notice of Dispute is sent, such Parties shall meet and in good faith work to resolve their differences.  In the event the City and Developer cannot resolve their differences as to whether an Event of Default has occurred or has been cured, then the City shall not take any action with respect to such uncured and disputed Event of Default as described in Sections 6(B)(2) or 6(B)(3) below without first bringing an action in a court of competent jurisdiction for a final judicial determination that an Event of Default occurred and was uncured. Notwithstanding the foregoing, the Developer shall not be entitled to give a Notice of Dispute and the City shall not be required to first meet in good faith with the Developer as provided for above, and may proceed directly to seek judicial relief in a court of competent jurisdiction to the extent such Event of Default arises from or relates to the imminent risk of harm to property or persons.  The City may, in its sole discretion, waive in writing any default or Event of Default by Developer.

(2)     City's Remedies.  Upon the occurrence of an Event of Default by the Developer, then after a judicial determination as required by Section 6(B)(1) above, the City shall have the right (as its sole remedy except as set forth in Section 6(B)(3) below with respect to the failure of the Developer to achieve Commencement of Construction prior to the Commencement Deadline as the same may be extended as provided herein), to seek injunctive relief, specific performance or other equitable remedies (other than the forfeiture of Developer's title to or interest in the Property) for the Developer's breach of this Agreement,.  In no event shall the City be entitled to monetary damages as a result of the Developer's breach of this Agreement.

(3)     Right of Reverter.  It is expressly understood and agreed between the Parties hereto that until Commencement of Construction, the conveyance of such Property to Developer shall be construed and interpreted as the conveyance of a fee simple determinable, and that in the event of an uncured and undisputed Event of Default caused solely by the failure of the Developer to achieve Commencement of Construction prior to the Commencement Deadline as the same may be extended as provided herein, then after a judicial determination as required by Section 6(B)(1) above, title to the Property shall automatically revest in the City. Upon such revesting of title, the City shall have the right to re-enter and take immediate possession of the Property.  While the right of reversion as to the Property automatically terminates upon Commencement of Construction, the City agrees to provide Developer with a written acknowledgement, in recordable form, that Commencement of Construction has occurred

20

and the City's right of reversion has terminated hereunder and to take such further action as may reasonably be requested by the Developer, at no incremental cost to the City, to extinguish the right of reversion of record.

(C) <u>Rights and Remedies Cumulative</u>. The rights and remedies of the City and the Developer, whether provided by law or by this Agreement, shall be cumulative, and the exercise by the City or the Developer of any one or more remedies shall not preclude the exercise by it, at the same or different times, of any other remedy for the same default or breach or any other default or breach by the Developer or the City. No waiver made by any Party shall apply to obligations beyond those expressly waived in writing.

(D) <u>Developer's Remedies</u>. If the City breaches its obligations under this Agreement after reasonable notice and opportunity to cure, Developer shall have the right to seek injunctive relief, specific performance or other equitable remedies for the City's breach of this Agreement. In no event shall the Developer be entitled to monetary damages as a result of the City's breach of this Agreement.

(E) <u>Representatives Not Individually Liable</u>. No official or employee of the City shall be personally liable to Developer or any successor in interest, in the event of any default or breach by the City or for any amount which may become due to Developer or successor or on any obligations under the terms of this Agreement. No director, officer or employee of the Developer or any successor in interest shall be personally liable to the City, in the event of any default or breach by the Developer or any successor in interest for any amount which may become due to the City or on any obligations under the terms of this Agreement.

**Section 7:        PROVISIONS NOT MERGED WITH DEEDS**

No provision of this Agreement is intended to or shall be merged into the Deed transferring title to the Property from the City to Developer or any successor in interest, and any such Deed shall not be deemed to affect or impair the provisions and covenants of this Agreement.

**Section 8:        ENTIRE AGREEMENT; AMENDMENT**

This Agreement (including all exhibits, schedules or other attachments hereto) constitutes the complete and exclusive statement of the terms of the agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, understandings, promises, and arrangements, oral or written, between or among the Parties with respect to the subject matter hereof. This Agreement may be amended or modified only by an instrument in writing signed by all of the Parties.

**Section 9:        GOVERNING LAW; JURISDICTION**

This Agreement shall be governed by and construed in accordance with the laws of the State of Michigan without regard to conflicts-of-law principles that would require the application of any other law. Any dispute between the Parties under this Agreement which cannot be resolved by informal dispute resolution by the Parties within sixty (60) days of notice to the other

21

CHI-181944729v8

13-53846-tjt   Doc 8772-1   Filed 12/10/14   Entered 12/10/14 07:39:33   Page 94 of 301
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 244 of 809

Party shall be brought in the United States Bankruptcy Court for the Eastern District of Michigan (the "<u>Bankruptcy Court</u>") for so long as it has jurisdiction, and thereafter in the United States District Court for the Eastern District of Michigan (the "<u>District Court</u>"); provided, that if the District Court does not have jurisdiction, then such legal action, suit or proceeding shall be brought in such other court of competent jurisdiction located in Wayne County, Michigan; provided, further, by execution and delivery of this Agreement, each of the Parties irrevocably accepts and submits to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding and specifically consents to the jurisdiction and authority of the Bankruptcy Court to hear and determine all such actions, suits, and proceedings under 28 U.S.C. §157(b) or (c), whichever applies.

**Section 10:     COUNTERPARTS**

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, but together such counterparts shall constitute one and the same instrument.

**Section 11:     <u>AUTHORITY OF CITY</u>.**

**Notwithstanding anything in this Agreement, in law or in equity, or otherwise to the contrary, this Agreement shall be of no force or effect and may not in any way be enforced against the City unless or until this Agreement and the transaction contemplated hereby have been: (i) approved in writing by the Emergency Manager for the City of Detroit, in accordance with Emergency Manager Order No. 5 (as modified by Order No. 42), (ii) either included in the Emergency Manager's financial and operating plan or approved in writing by the Governor of the State of Michigan or his or her designee, in accordance with Section 12(1)(k) of Public Act 436 of 2012; and (iii) either included in the Emergency Manager's financial and operating plan or approved in writing by the State Treasurer, in accordance with Section 15(1) of Public Act 436 of 2012.  The City shall provide written notice to Developer of the satisfaction of the foregoing conditions, within five (5) business days after satisfaction thereof.**

**Section 12:  CITY AGENCIES AND DEPARTMENTS**.  Whenever this Agreement requires an action or creates an obligation on behalf of the City, the City shall also be required, as applicable, to cause all of the City Parties to take such actions and perform such obligations.

**Section 13:     TRANSFERABILITY**.

(A) Developer shall be entitled to freely transfer or assign its rights and obligations hereunder at any time, as long as it provides the City written notice thereof and it does not transfer its rights hereunder to a party that is prohibited from doing business with the City, and upon such assignment and an assumption of the obligations and liabilities of the Developer by any such transferee, the Developer shall be automatically released from any of its obligations or liabilities hereunder.

(B)   Notwithstanding anything to the contrary contained herein, the COPs and any beneficial interests in COPs shall be freely transferable without restriction of any kind or notice to the City or any City Parties.

CHI-181944729v8

(signatures on following pages)

23

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

WITNESSES:                                    DEVELOPER

                                              FINANCIAL GUARANTY INSURANCE
                                              COMPANY, a New York stock insurance
                                              corporation


_____          By: _____
Print: _____          Print: _____
                                              Its: _____


STATE OF NEW YORK        )
                         ) ss.
COUNTY OF NEW YORK       )

    The foregoing instrument was acknowledged before me on October __, 2014 by _____ the _____ of Financial Guaranty Insurance Company, a New York stock insurance company, on behalf of said company.


                                              _____

                                              Notary Public, New York County, New
                                              York
                                              Acting in New York County, New York
                                              My commission expires:


                         [*signatures continue on following page*]

CHI-181944729v8
13-53846-swr  Doc 8772-5  Filed 12/10/14  Entered 12/10/14 07:33:33  Page 97 of 301
13-53846-swr  Doc 8045-1  Filed 10/22/14  Entered 10/22/14 03:48:29  Page 247 of
809

WITNESSES:                                      STATE OF MICHIGAN


_____          By:_____
Print:_____          Print: _____
                                           Its: _____


STATE OF MICHIGAN          )
                           ) ss.
COUNTY OF WAYNE            )

        The foregoing instrument was acknowledged before me on October ___ 20__ by
_____, the _____ of the State of
Michigan, on behalf of the State.



                                           _____

                                           Notary Public, Wayne County, Michigan
                                           Acting in Wayne County, Michigan
                                           My commission expires:



                    [*signatures continue on following page*]

CHI-181944729v8
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 248 of
809
13-53846-tjt   Doc 8772   Filed 12/10/14   Entered 12/10/14 07:39:33   Page 98 of 301

WITNESSES:                          CITY OF DETROIT,
                                    a Michigan public body corporate


_____     By:_____
Print:_____     Print: _____
                                    Its: _____


STATE OF MICHIGAN        )
                         ) ss.
COUNTY OF WAYNE          )

    The foregoing instrument was acknowledged before me on October ___ 20__ by _____, the _____ of the City of Detroit, a Michigan public body corporate, on behalf of the City.


                                    _____
                                    Notary Public, Wayne County, Michigan
                                    Acting in Wayne County, Michigan
                                    My commission expires:


Pursuant to § 18-5-12 of the Detroit City Code, I hereby certify that proper and fair consideration has been received by the City pursuant to this contract.

    Finance Director

Approved by the City Law Department pursuant to Sec. 7.5-206 of the Charter of the City of Detroit.

    Corporation Counsel

City Council Approval Date:


**Drafted by and when recorded return to:**

Bruce N. Goldman
Senior Assistant Corporation Counsel
City of Detroit Law Department
2 Woodward Avenue, Suite 500
Detroit, Michigan 48226

# EXHIBIT A

# RIGHT OF ENTRY

[See attached]

CHI-181944729v8

13-53846-tjt  Doc 8772  Filed 12/16/14  Entered 12/16/14 07:39:38  Page 100 of 301
13-53846-swr  Doc 3045  Filed 10/22/15  Entered 10/22/14 03:48:29  Page 259 of 809

**EXHIBIT B**

**QUIT CLAIM DEED**

The City of Detroit, a Michigan public body corporate whose address is 2 Woodward Avenue, Detroit, MI 48226 ("Grantor"), quit claims to _____, a Michigan _____ ("Grantee"), whose address is _____, the premises located in the City of Detroit, Wayne County, Michigan, described as:

A/K/A _____     Ward: _____ Item(s):

(the "Property"), for the sum of _____ ($_____), subject to and reserving to the City of Detroit its rights under public easements and rights of way, easements of record, applicable zoning ordinances, development plans pursuant to Act 344 of 1945 as amended (if any), and restrictions of record.

This Deed is given subject to the terms, covenants and conditions of a Development Agreement - Option to Purchase and Develop Land dated _____, 20___ entered into by the parties hereto and which is incorporated herein by reference and a memorandum of which was recorded on _____, 20___ in the Office of the Register of Deeds for the County of Wayne in Liber _____ on Pages _____ through _____ inclusive, none of the terms, covenants and conditions of which shall be deemed merged in this Deed. The covenants therein recited to be covenants running with the land are hereby declared to be covenants running with the land enforceable by the City as therein set forth until Commencement of Construction as defined therein.

The Grantor grants to the Grantee the right to make all divisions under Section 108 of the land division act, Act No. 288 of the Public Acts of 1967, as amended. This property may be located within the vicinity of farmland or a farm operation. Generally accepted agricultural and management practices which may generate noise, dust, odors, and other associated conditions may be used and are protected by the Michigan right to farm act.

This deed is dated as of _____.

CITY OF DETROIT,
a Michigan public body corporate


By: _____

Print: _____

Its: _____


*[acknowledgement on following page]*

CHI-181944729v8

13-53846-tjt  Doc 8772-5  Filed 12/16/14  Entered 12/16/14 20:39:38  Page 101 of 301
13-53846-swr  Doc 8045-1  Filed 10/22/14  Entered 10/22/14 03:48:29  Page 251 of 809

STATE OF MICHIGAN      )
                       ) ss.
COUNTY OF WAYNE        )

       The foregoing instrument was acknowledged before me on _____
20__, by _____, the _____ of
the City of Detroit, a Michigan public body corporate, on behalf of the City.

                                        _____

                                        Print: _____
                                        Notary Public, Wayne County, Michigan
                                        Acting in Wayne County, Michigan
                                        My commission expires:

Pursuant to § 18-5-12 of the Detroit City Code,      Approved by the City Council on.
I hereby certify that proper and fair
consideration has been received by the City          JCC pp _____ or Detroit Legal News,
pursuant to this contract.
                                                     _____, on file in my office.

       Finance Director

Approved by the City Law Department
pursuant to Sec. 7.5-206 of the Charter of           Approved by Mayor on
the City of Detroit.

       Corporation Counsel                                  City Clerk

**This Instrument Drafted by:**          **When recorded, return to:**

Bruce N. Goldman                         Grantee
Senior Assistant Corporation Counsel
City of Detroit Law Department
2 Woodward Avenue, Suite 500
Detroit, MI 48226

Exempt from transfer taxes pursuant to MCL § 207.505(h)(i) and MCL § 207.526(h)(i).

CHI-181944729v8
13-53846-tjt   Doc 8775-45   Filed 12/16/14   Entered 12/16/14 07:39:38   Page 102 of 201
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 09:48:29   Page 252 of
809

**EXHIBIT C**

**RIVERWALK EASEMENT AREA**

[See attached]

**EXHIBIT I.A.216**

SCHEDULE OF HUD INSTALLMENT NOTE DOCUMENTS
& RELATED HUD INSTALLMENT NOTES

13-53846-tjt Doc 8773-5 Filed 12/16/14 Entered 12/16/14 07:39:38 Page 104 of 301
13-53846-swr Doc 3045-1 Filed 10/22/15 Entered 10/22/14 03:48:29 Page 254 of
809

| HUD Installment Note Documents (Identified by note number. Ancillary instruments and agreements related thereto are not separately identified) | HUD Installment Notes | Estimated Allowed Amount (The estimated allowed amount is the sum of all advances and conversion date advances under the HUD Installment Notes identified in this schedule, less principal amounts paid, plus interest due on principal amounts outstanding. The estimated aggregate allowed amount is the sum of the estimated allowed amount for all the HUD Installment Notes identified in this schedule) |
|---|---|---|
| City Note No. B-94-MC-26-0006-A | Garfield Project Note[*] | $549,142.50 |
| City Note No. B-94-MC-26-0006-D | Stuberstone Project Note* | $95,929.50 |
| City Note No. B-97-MC-26-0006 | Ferry Street Project Note* | $1,837,217.00 |
| City Note No. B-98-MC-26-0006-A | New Amsterdam Project Note* | $10,371,138.25 |
| City Note No. B-98-MC-26-0006-B | Vernor Lawndale Project Note* | $1,923,209.50 |
| City Note No. B-02-MC-26-0006 | Mexicantown Welcome Center Project Note* | $4,255,498.00 |
| City Note No. B-03-MC-26-0006 | Garfield II Note 1* | $8,935,901.00 |
| City Note No. B-03-MC-26-0006 | Garfield II Note 2* | $3,071,773.50 |
| City Note No. B-03-MC-26-0006 | Garfield II Note 3[°] | $7,262,461.03 |
| City Note No. B-03-MC-26-0006 | Garfield II Note 4° | $1,554,180.43 |
| City Note No. B-05-MC-26-0006 | Woodward Garden Project 1 Note* | $8,532,290.00 |
| City Note No. B-05-MC-26-0006 | Woodward Garden Project 2 Note* | $9,324,475.35 |
| City Note No. B-05-MC-26-0006 | Woodward Garden Project 3 Note° | $6,177,291.95 |
| City Note No. B-05-MC-26-0006-A | Book Cadillac Project Note* | $10,457,437.75 |
| City Note No. B-05-MC-26-0006-A | Book Cadillac Project Note II* | $13,547,692.80 |
| City Note No. B-05-MC-26-0006-B | Fort Shelby Project Note* | $24,447,587.50 |

[*] HUD Installment Note has a fixed interest rate. Estimated allowed amount represents the aggregate of outstanding principal and fixed interest payments set forth in the amortization schedule for the HUD Installment Note.

[°] HUD Installment Note has a variable interest rate. Estimated allowed amount represents the aggregate of outstanding principal and an estimate of the variable interest payments at the rate set forth in the HUD Installment Note.

**EXHIBIT I.A.230**

SCHEDULE OF LIMITED TAX GENERAL OBLIGATION BOND DOCUMENTS
& RELATED LIMITED TAX GENERAL OBLIGATION BONDS

## SCHEDULE OF LIMITED TAX GENERAL OBLIGATION BOND
## DOCUMENTS & RELATED LIMITED TAX GENERAL OBLIGATION BONDS

| Limited Tax General Obligation Bond Documents | Series of Limited Tax General Obligation Bonds | Balance as of Petition Date |
|---|---|---|
| Bond Authorizing Resolution adopted May 26, 2004<br><br>Finance Director's Order approving sale of General Obligation Self-Insurance Bonds (Limited Tax) Series 2004, dated August 27, 2004 | Self Insurance - Series 2004 | $13,186,559 |
| Bond Authorizing Resolution adopted May 6, 2005 ("2005 LTGO Resolution")<br><br>Finance Director's Order dated June 24, 2005 ("2005 Sale Order") | Series 2005-A(1) | $60,776,168 |
| 2005 LTGO Resolution<br><br>2005 Sale Order | Series 2005-A(2) | $11,080,060 |
| 2005 LTGO Resolution<br><br>2005 Sale Order | Series 2005-B | $9,003,535 |
| Resolution of the City Council adopted November 17, 2006 ("2006 LTGO Resolution")<br><br>Finance Director's Order dated May 30, 2008 ("2008 LTGO Sale Order") | Series 2008-A(1) | $43,905,085 |
| 2006 LTGO Resolution<br><br>2008 LTGO Sale Order | Series 2008-A(2) | $25,591,781 |

**EXHIBIT I.A.237**

FORM OF LTGO SETTLEMENT AGREEMENT

# SETTLEMENT AGREEMENT
## (LTGO)

This Settlement Agreement ("**Agreement**") is entered into as of July 24, 2014, among the City of Detroit (the "**City**"), Ambac Assurance Corporation ("**Ambac**"), and BlackRock Financial Management, on behalf of certain managed funds and accounts listed on Exhibit B ("**Uninsured Bondholder**," and together with Ambac, the "**LTGO Parties**"). In this Agreement, the City and the LTGO Parties are referred to collectively as the "**Parties**."

## RECITALS

**WHEREAS**, as of the close of Fiscal Year 2013 (*i.e.*, June 30, 2013), the City had $160,970,000 in outstanding principal amount of limited tax general obligation bonds, excluding any limited tax general obligation bonds secured by distributable state aid and sold to the Michigan Finance Authority (the "**Prior LTGO Bonds**");

**WHEREAS**, more than two thirds in amount of the Prior LTGO Bonds are either insured by Ambac under financial guaranty insurance policies (the "**Bond Insurance Policies**") that were issued contemporaneously with certain Prior LTGO Bonds (the "**Insured Prior LTGO Bonds**") or held by the Uninsured Bondholder;

**WHEREAS**, the Governor of the State of Michigan determined on March 1, 2013 that a financial emergency existed in the City, and the Emergency Manager (together with any successors, the "**Emergency Manager**") was appointed for the City on March 14, 2013;

**WHEREAS**, on July 18, 2013 (the "**Petition Date**"), the City filed a voluntary petition for relief under chapter 9 of title 11 of the United States Code (the "**Bankruptcy Code**"), thereby commencing Bankruptcy Case No. 13-53846 (the "**Bankruptcy Case**") before the United States Bankruptcy Court for the Eastern District of Michigan (the "**Bankruptcy Court**");

**WHEREAS**, as of the Petition Date, the balance due on the Prior LTGO Bonds, including prepetition interest accrued as of that date, was $163,554,770;

**WHEREAS**, on October 1, 2013, the City defaulted on its obligation to make interest payments on the Prior LTGO Bonds in the amount of $4,348,211 and Ambac paid claims in the amount of $2,266,586 on account of the Insured Prior LTGO Bonds and was subrogated to the rights of the owners for such payments, and the insurance documents contemplate the assignment of the Insured Prior LTGO Bonds to Ambac upon payment of a claim;

**WHEREAS**, on April 1, 2014, the City defaulted on its obligation to make interest payments in the amount of $4,348,211 and principal payments in the amount of $43,420,000 on the Prior LTGO Bonds, and Ambac paid claims in the amount of $20,686,586 on account of the Insured Prior LTGO Bonds insured by it and was subrogated to the rights of the owners for such payments, and the insurance documents

CLI- 2233676v8

13-53846-tjt Doc 8772-5 Filed 12/16/14 Entered 12/16/14 20:29:38 Page 109 of 301
13-53846-swr Doc 6045 Filed 10/22/14 Entered 10/22/14 09:48:29 Page 255 of 809

contemplate the assignment of the Insured Prior LTGO Bonds to Ambac upon payment of a claim;

WHEREAS, on November 8, 2013, Ambac filed an adversary proceeding against the City seeking declaratory relief with regard to its rights in respect of, *inter alia*, the Prior LTGO Bonds that is pending before the Bankruptcy Court (Adv. Proc. No. 13-05310) (the "**Ambac Action**");

WHEREAS, on or before February 21, 2014, each of the LTGO Parties and other owners of Prior LTGO Bonds filed proofs of claim in the Bankruptcy Case (the "**LTGO Claims**") asserting claims against the City for the full amount of principal and interest due under the documents pursuant to which the Prior LTGO Bonds were issued (including post-petition interest), and Ambac filed a proof of claim for amounts due Ambac for payments pursuant to the Bond Insurance Policies, and contractual reimbursements due for charges, fees, costs, losses, liabilities and expenses incurred by Ambac in connection with the Bond Insurance Policies; and

WHEREAS, the Parties have engaged in good faith and arms' length negotiations regarding a consensual resolution of their disputes under or in respect of the Prior LTGO Bonds, the Ambac Action as it pertains to the Prior LTGO Bonds, and the LTGO Claims.

NOW, THEREFORE, in consideration of the foregoing and the promises, mutual covenants, and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    Recitals.  The recitals set forth above are incorporated by reference and are explicitly made a part of this Agreement.

Section 1.2    Definitions.  In addition to the capitalized terms defined in the preamble and recitals, the following definitions shall apply to and constitute part of this Agreement and all schedules, exhibits and annexes hereto:

"**Allowed Claim**" has the meaning ascribed to it in the Plan.

"**Ambac Action**" has the meaning ascribed to it in the recitals hereof.

"**Approval Motion**" shall mean a motion filed by the City with the Bankruptcy Court seeking entry of the Approval Order pursuant to Federal Rule of Bankruptcy Procedure 9019, which motion shall be in form and substance reasonably satisfactory to the Parties.

"**Approval Order**" shall mean an order of the Bankruptcy Court (other than the Plan Confirmation Order) approving the compromise and settlement set forth in

2

CLI-2233676v8

13-53846-tjt  Doc 8772-5  Filed 12/16/14  Entered 12/16/14 20:39:38  Page 110 of 301
13-53846-swr  Doc 8045-1  Filed 10/22/14  Entered 10/22/14 03:48:29  Page 260 of 809

this Agreement authorizing and directing the consummation of the transactions contemplated herein, which order shall be in a form and substance reasonably satisfactory to the Parties.

"**Bankruptcy Case**" has the meaning ascribed to it in the recitals hereof.

"**Bankruptcy Code**" has the meaning ascribed to it in the recitals hereof.

"**Bankruptcy Court**" has the meaning ascribed to it in the recitals hereof.

"**Beneficiaries**" has the meaning ascribed to it in Section 2.2.

"**Bond Insurance Policies**" has the meaning ascribed to it in the recitals hereof.

"**City Representative**" shall mean a representative chosen by the City to be on the fee committee described in Section 2.2(b).

"**Claim**" shall mean a "claim" as defined in Section 101(5) of the Bankruptcy Code.

"**Class**" means each class of Claims established under the Plan.

"**COP Claims**" shall have the meaning ascribed to it in the Plan.

"**COP Litigation**" shall have the meaning ascribed to it in the Plan.

"**Disputed COP Claims Reserve**" shall have the meaning ascribed to it in the Plan.

"**Distribution Agent**" shall mean U.S. Bank National Association, Detroit, Michigan.

"**Distribution Agreement**" shall mean the Insured Prior LTGO Bonds Distribution Agreement among the Distribution Agent the City, Ambac and the paying agent for the Insured Prior LTGO Bonds, in form and substance satisfactory to the City and Ambac, relating to the distribution of payments of principal and interest on the Insured Prior LTGO Bonds.

"**DTC**" shall mean the Depository Trust Company or any successor provider of a book entry and securities depository system for the Prior LTGO Bonds.

"**DTC System**" shall mean the system maintained by the Depository Trust Company used for trading municipal securities.

"**Effective Date**" shall mean the effective date of any Plan.

"**Emergency Manager**" has the meaning ascribed to it in the recitals hereof.

3

CLI-2233676v8

13-53846-tjt  Doc 8772  Filed 12/16/14  Entered 12/16/14 07:39:33  Page 111 of 301
13-53846-swr  Doc 8045  Filed 10/22/15  Entered 10/22/14 03:48:29  Page 261 of 809

"**Emergency Manager Order**" shall mean an order of the Emergency Manager in substantially the form attached hereto as Exhibit A.

"**Event of Default**" has the meaning ascribed to it in Section 4.1.

"**Final Order**" shall mean an order or judgment (including any associated findings of fact and conclusions of law) of the Bankruptcy Court or other court of competent jurisdiction with respect to the applicable subject matter which has not been reversed, stayed, modified or amended and as to which (a) any right to appeal or seek certiorari, review, reargument, stay or rehearing has expired and no appeal or petition for certiorari, review, reargument, stay or rehearing is pending, or (b) an appeal has been taken or petition for certiorari, review, reargument, stay or rehearing has been filed and (i) such appeal or petition for certiorari, review, reargument, stay or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which certiorari, review, reargument, stay or rehearing was sought or (ii) the time to appeal further or seek certiorari, review, reargument, stay or rehearing has expired and no such further appeal or petition for certiorari, review, reargument, stay or rehearing is pending; provided, however, that the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Federal Rule of Bankruptcy Procedure 9024 may be filed relating to such order shall not cause such order to not be a Final Order.

"**Financial Terms**" has the meaning ascribed to it in Section 2.2.

"**Holder**" shall mean the holder of a Claim.

"**Independent Party**" shall mean a party agreed to by the Retiree Committee, LTGO Representative and the City.

"**Insured Prior LTGO Bonds**" has the meaning ascribed to it in the recitals hereof.

"**LTGO Exculpated Parties**" means Ambac solely in its capacity as insurer of the Insured Prior LTGO Bonds, and the Uninsured Bondholder, solely in its capacity as an owner of a portion of the Prior LTGO Bonds, and their respective parents, affiliates, shareholders, directors, officers, managers, employees, agents, attorneys, advisors, accountants, consultants, financial advisors and investment bankers, solely in their capacity as such.

"**LTGO Claims**" has the meaning ascribed to it in the recitals hereof.

"**LTGO Claim Holders**" shall mean holders of Allowed Claims on account of Prior LTGO Bonds who are (i) the record owner of any Prior LTGO Bonds that are not Insured Prior LTGO Bonds and (ii) Ambac as to any Insured Prior LTGO Bond.

"**LTGO Parties**" has the meaning ascribed to it in the recitals hereof.

"**LTGO Representative**" shall mean Ambac.

4

CLI-2233676v8

13-53846-tjt  Doc 8772-5  Filed 12/16/14  Entered 12/16/14 20:39:38  Page 112 of 201
13-53846-swr  Doc 8045  Filed 10/22/14  Entered 10/22/14 03:48:29  Page 262 of 809

"**New B Notes**" shall have the meaning ascribed to it in the Plan.

"**New LTGO Bonds**" has the meaning ascribed to it in Section 2.2.

"**OPEB Claim**" has the meaning ascribed to it in the Plan.

"**Petition Date**" has the meaning ascribed to it in the recitals hereof.

"**Plan**" shall mean the chapter 9 plan of adjustment filed by the City and incorporating the terms and conditions set forth in this Agreement, in substantially the form of the draft thereof dated May 5, 2014, as such plan may be amended, modified or supplemented from time to time, which plan, solely as it relates to this Settlement Agreement, shall be in form and substance reasonably satisfactory to the LTGO Parties.

"**Plan Confirmation Order**" shall mean findings of fact and an order of the Bankruptcy Court confirming the Plan and meeting the requirements of Section 2.3 of this Agreement.

"**Plan Documents**" shall mean the Plan, the Plan Confirmation Order and any Plan-related documents effectuating this Agreement.

"**Prior LTGO Bonds**" has the meaning ascribed to it in the recitals hereof.

"**Pro Rata**" shall mean the proportion that a claim of one LTGO Claims Holder bears to the aggregate amount of all claims of all of the LTGO Claims Holders.

"**Reserve B Notes**" shall have the meaning ascribed to it in Section 2.2.

"**Resolved COP Claims**" has the meaning ascribed to it in Section 2.2.

"**Retiree Committee**" shall have the meaning ascribed to it in the Plan.

"**Settlement-Related Documents**" shall mean this Agreement, the Plan Documents, the Approval Order (if applicable), the New LTGO Bonds, and all documents related to the New LTGO Bonds.

"**State**" shall mean the State of Michigan.

"**State Treasurer**" shall mean the State Treasurer of the State.

"**VEBA Trust Representatives**" shall mean the chair of the Board as defined by and created by the City of Detroit Retiree Health Care Trust and the chair of the Board as defined by and created by the City of Detroit Police and Fire Retiree Health Care Trust.

Section 1.3    Interpretation.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties

5

CLI-2233676v8

13-53846-tjt  Doc 8775  Filed 12/16/14  Entered 12/16/14 09:48:29  Page 113 of 301
13-53846-swr  Doc 8045  Filed 10/22/14  Entered 10/22/14 09:48:29  Page 263 of 809

hereto and no presumption or burden of proof will arise favoring or disfavoring any Party hereto because of the authorship of any provision of this Agreement.

Section 1.4    General Rules of Construction.  For all purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)    Defined terms in the singular shall include the plural as well as the singular, and vice versa.

(b)    All accounting terms not otherwise defined herein shall have the meanings assigned to them, and all computations herein provided for shall be made, in accordance with generally accepted accounting principles.  All references herein to "generally accepted accounting principles" refer to such principles as they exist at the date of application.

(c)    All references in this instrument to designated "Articles", "Sections" and other subdivisions are to the designated Articles, Sections and subdivisions of this instrument as originally executed.

(d)    The terms "herein", "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision.

(e)    All references in this instrument to a separate instrument are to such separate instrument as the same may be amended or supplemented from time to time pursuant to the applicable provisions thereof.

(f)    The term "person" shall include any individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization and any government or agency or political subdivision thereof.

## ARTICLE II
## SETTLEMENT TERMS

Section 2.1    (a)    Claim Allowance and Treatment; Other Plan Terms. The City hereby agrees that the total Allowed Claim relating to the Prior LTGO Bonds will be $163,544,770.

(b)    Holders of Allowed Claims for Prior LTGO Bonds will be treated in the Plan as follows:

(i)    all uninsured Prior LTGO Bonds will be cancelled and discharged, and LTGO Claim Holders will receive their Pro Rata share of New LTGO Bonds and Reserve B Notes in accordance with Section 2.2(e) of this Agreement;

6

(ii)     all Insured Prior LTGO Bonds will be cancelled and discharged as to the City but deemed outstanding solely for recourse to the Bond Insurance Policies, i.e., the City will have no liability relating to the Prior LTGO Bonds, and any liability of the City in respect of Prior LTGO Bonds and Class 7 Claims in the Plan shall be cancelled and discharged; and

(iii)     a Pro Rata share of New LTGO Bonds and Reserve B Notes attributable to the Insured Prior LTGO Bonds will be delivered to a Distribution Agent in accordance with Section 2.1(d) and, for the Reserve B Notes, Section 2.2(e) of this Agreement.

(c)     The Distribution Agent shall be the beneficial owner of the Pro Rata share of the New LTGO Bonds and the Reserve B Notes attributable to the Insured Prior LTGO Bonds pursuant to the Distribution Agreement.  The Distribution Agreement shall  provide that, unless the Distribution Agent receives, no later than noon on  a principal or interest payment date for the Prior LTGO Bonds, written notice from Cede & Co., as the registered owner of the outstanding Insured Prior LTGO Bonds, or any subsequent registered owner (the "Registered Owner") that Ambac has failed to timely pay a properly submitted claim for principal and/or interest which was due and payable on the Insured Prior LTGO Bonds on that date, the Distribution Agent shall remit each payment of principal and/or interest received by it from the paying agent for the New LTGO Bonds or the paying agent for the New B Notes to Ambac.  In the event that the Distribution Agent receives, no later than noon on a principal or interest payment date for the Prior LTGO Bonds, written notice from the Registered Owner that Ambac has failed to timely pay a properly submitted claim for principal and/or interest which was due and payable on that date, the Distribution Agent shall remit the  payment of principal and/or interest received by it from the paying agent for the New LTGO Bonds or the paying agent for the New B Notes to the paying agent for the Insured Prior LTGO Bonds for payment to the Holders of the Insured Prior LTGO Bonds, and shall provide notice thereof to Ambac, the paying agent for the Insured Prior LTGO Bonds and the Holders of the Insured Prior LTGO Bonds.  The Distribution Agreement will provide that, once Ambac has paid the Holders of Insured Prior LTGO Bonds in full,  the Distribution Agent will assign its beneficial ownership interest in the New LTGO Bonds and Reserve B Bonds to Ambac.

Section 2.2     Issuance of New LTGO Bonds, Delivery of New LTGO Bonds, and Delivery of Reserve B Notes.

(a)     (i) On or before the Effective Date, by execution of the Emergency Manager Order the City will authorize the issuance and delivery of its Financial Recovery Bonds (Limited Tax General Obligation) under Section 36a of the Home Rule Act ("**New LTGO Bonds**") in accordance with applicable law, which New LTGO Bonds shall be distributed Pro Rata to the LTGO Claim Holders pursuant to the Plan. The New LTGO Bonds will have the principal amount, interest rate, amortization schedule and other financial terms as set forth in Schedule 1 (the "**Financial Terms**") and the Emergency Manager Order.  The New LTGO Bonds will be limited tax general obligations of the City issued in accordance with applicable law.  The New LTGO Bonds

7

CLI-2233676v8
13-53846-tjt   Doc 8772-5   Filed 12/16/14   Entered 12/16/14 20:39:38   Page 115 of
809
13-53846-swr   Doc 8045   Filed 10/22/14   Entered 10/22/14 09:46:29   Page 265 of

shall be taxable. The New LTGO Bonds will be callable prior to maturity at the option of the City on any date at a price of par plus accrued interest to the date of redemption and without premium or penalty. If the City intends to redeem the New LTGO Bonds during any time that the Insured Prior LTGO Bonds are outstanding as set forth in Section 2.1(b)(ii) then:

(v)     at least 35 days prior to such intended redemption, the City will direct the paying agent for the New LTGO Bonds to send a redemption notice to the New LTGO Bondholders;

(w)     at least 34 days prior to the redemption date the Distribution Agent will direct the paying agent for the Insured Prior LTGO Bonds to send a redemption notice to Insured Prior LTGO Bondholders providing for a pro rata redemption of Insured Prior LTGO Bonds in an aggregate principal amount equal to the proportion that the principal amount of the New LTGO Bonds then outstanding of which the Distribution Agent is the beneficial owner bears to the total principal amount of New LTGO Bonds then outstanding, in accordance with the procedures for redemption in the Prior LTGO Bonds documents;

(x)     no later than noon, Eastern Time, on the business day prior to the redemption date the City will pay the redemption price of the New LTGO Bonds to the paying agent for the New LTGO Bonds, and upon receipt of the redemption price of the portion of the New LTGO Bonds of which it is the beneficial owner, but no later than 10:00 a.m. Eastern Time, on the redemption date, the Distribution Agent shall promptly transfer the redemption price for the portion of the Insured Prior LTGO Bonds to be redeemed to the paying agent for the Insured Prior LTGO Bonds to effectuate the redemption of the Insured Prior LTGO Bonds on the same day;

(y)     if Ambac issues endorsements to its Bond Insurance Policies decreasing such Policies by the redemption principal amount, the holders of Insured Prior LTGO Bonds will be deemed to consent to such endorsements and such Bond Insurance Policies will be so reduced; and

(z)     the City understands that the paying agent for the Insured Prior LTGO Bonds will apply the amount received to reduce the principal amount, pro rata, of the Insured Prior LTGO Bonds which then remain outstanding as provided in Section 2.1(b) above and such reduction in principal shall be deemed a redemption, in part, of such the Insured Prior LTGO Bonds.

(ii)     Any redemption of the New LTGO Bonds will be in whole and not in part.

(iii)     In the event the City decides not to issue the New LTGO Bonds by the Effective Date but instead to pay cash to the LTGO Claim Holders, the Holders of Insured Prior LTGO Bonds which then remain outstanding as provided in Section 2.1(b) above will receive pro rata, cash equal to the Insured Prior LTGO Bonds' Pro Rata shares of such cash. The City understands that the paying agent for the Insured Prior LTGO

CLI-2233676v8

Bonds will apply such cash, pro rata, to reduce the principal of Insured Prior LTGO Bonds which then remain outstanding as provided in Section 2.1(b) and such reduction in principal shall be deemed a redemption, in part, of such Insured Prior LTGO Bonds.

(iv)     All Settlement-Related Documents will be in form and substance reasonably satisfactory to the LTGO Parties (and in the case of the Plan Documents, solely as they relate to this Agreement).

(v)     Each of the New LTGO Bonds will be freely transferable through the DTC System under a unique CUSIP identification number or, if the DTC System is discontinued with respect to the New LTGO Bonds, in such other manner as is permitted in accordance with their terms.

(vi)     The City will not optionally redeem Insured Prior LTGO Bonds except as set forth in this Agreement.

(b)     In addition to issuing and delivering the New LTGO Notes to the LTGO Claims Holders, the City shall also deliver and distribute to the LTGO Claim Holders the Pro Rata share of the Reserve B Notes in accordance with Section 2.2(e) of this Agreement.  The Plan will provide in the event the City intends to redeem all or a portion of principal amount of New B Notes during any time that the Insured Prior LTGO Bonds are outstanding pursuant to Section 2.1(b)(ii) then:

(i)     at least 35 days prior to the redemption date, the Distribution Agent will direct the paying agent for the Reserve B Notes to send a redemption notice to the New B Note Holders

(ii)     at least 34 days prior to the redemption date, the Distribution Agent will direct the paying agent for the  Insured Prior LTGO Bonds to send a redemption notice to Insured Prior LTGO Bondholders providing for a pro rata redemption of Insured Prior LTGO Bonds in an aggregate  principal amount equal to the proportion that the principal  amount of the New B Notes held by the Distribution Agent which are to be redeemed bears to the total principal amount of Insured Prior LTGO Bonds then outstanding pursuant to Section 2.1(b)(ii), in accordance with the procedures for redemption in the Prior LTGO Bonds documents;

(iii)     no later than noon, Eastern Time, on the business day prior to the redemption date the City will pay the redemption price of the New B Notes to the paying agent for the New B Notes, and upon receipt of the redemption price of the portion of the New B Notes of which it is the beneficial owner, but no later than 10:00 a.m. Eastern Time, on the redemption date the Distribution Agent shall promptly transfer the redemption price for the portion of the Insured Prior LTGO Bonds to be redeemed to the paying agent for the Insured Prior LTGO Bonds to effectuate the redemption of the Insured Prior LTGO Bonds on the same day;

(iv)     if Ambac issues endorsements to its bond Insurance Policies decreasing such Policies by the redemption principal amount, the holders of Insured Prior LTGO Bonds will be deemed to consent to such endorsements and such

9

CLI-2233676v8

13-53846-tjt   Doc 8045   Filed 12/16/14   Entered 12/16/14 09:38:29   Page 117 of 301
13-53846-swr   Doc 7045   Filed 10/22/14   Entered 10/22/14 09:38:29   Page 26 of
809

Bond Insurance Policies will re so reduced; and

(v)     the City understands that the paying agent for the Insured Prior LTGO Bonds will apply the amount received to reduce the principal amount, pro rata, of the Insured Prior LTGO Bonds which then remain outstanding as provided in Section 2.1(b) and such reduction in principal shall be deemed a redemption in part, of such Insured Prior LTGO Bonds.

(c)     The Plan will provide that, from and after the Effective Date:

(i)     The City will remain a named plaintiff and defendant in the COP Litigation but will transfer all of its rights and interests in the COP Litigation to a Litigation Trust whose beneficiaries, for the purpose of the COP Litigation, shall be the Litigation Parties and the Holders of Allowed Class 14 Claims.  The Litigation Trustee will be selected by the LTGO Representative and the Retiree Committee and must be acceptable to the City.  The document creating the Litigation Trust shall include indemnification of the Litigation Trustee by the City and will contain such other terms satisfactory to the Retiree Committee, the LTGO Representative and the City.

(ii)     The Litigation Trustee will follow the day to day direction of the VEBA Trust Representatives in prosecuting and defending the COP Litigation, including defending any counterclaims and third-party claims therein.  The Litigation Trustee and VEBA Trust Representatives will meet, in person or by phone at reasonable times and with reasonable advance notice, with all or any of the LTGO Representative, the VEBA Trust Representatives and the City (the "**Litigation Parties**") as requested to discuss the status, progress and prosecution of the COP Litigation.  The Litigation Trustee will provide copies of all court filings by any party in the COP Litigation and such other documents relating to the COP Litigation as may be reasonably requested by the Litigation Parties.  Upon request from a Litigation Party, the Litigation Trustee will provide to such Litigation Party drafts of court papers that will be filed by the Litigation Trustee as early as practicable under the circumstances to allow for comments, which may be accepted or rejected.

(iii)     The cost of all fees and expenses incurred in connection with the COP Litigation will be borne by the Disputed COP Claims Reserve, subject to the funding of the Disputed COP Claims Reserve pursuant to Section II.B.3.p.iii of the Plan.  The City will advance payment of all such fees and expenses within 30 days of receipt of the statements for the same pending reimbursement from the Disputed COP Claims Reserve.  Reimbursement of the City will be effected by an offset in the amount of fees and expenses paid to the date of such reimbursement against the amount to be paid by the City to the Disputed COP Claims Reserve on that date.  In the event that the COP Litigation is unsuccessful and a final, nonappealable judgment is entered against the City or the Litigation Trust as successor in interest to the City, such that the notes in the Disputed COP Claims Reserve are subject to release and distribution in full to the holders of Allowed Class 9 Claims in accordance with the Plan, the City will reimburse the

10

CLI-2233676v8

13-53846-tjt   Doc 8772-5   Filed 12/16/14   Entered 12/16/14 07:39:38   Page 118 of 301
13-53846-swr   Doc 8045   Filed 10/22/14   Entered 10/22/14 09:48:29   Page 265 of 809

Disputed COP Claims Reserve for any amounts withdrawn prior to the date of such adverse judgment.

(iv)   The Litigation Trustee will submit invoices for the fees and expenses incurred in connection with the COP Litigation, including for the Litigation Trustee's professional fees to the City on a monthly basis, and the City will pay such invoice within 30 days after receipt, subject to reimbursement as provided in paragraph (c)(iii) above.  The Litigation Trustee fees will be fixed and consented to by the LTGO Representative and the VEBA Trustee Representatives.

(v)   The Litigation Trustee will consult with the Litigation Parties in connection with any potential settlement of the COP Litigation. The Litigation Trustee will provide the Litigation Parties advance notice as early as practicable under the circumstances of any settlement negotiations, and the Litigation Parties and their counsel will have the right to participate in such negotiations.  Any potential settlement must resolve the settled claims in their entirety, including the release by the settling party of all counterclaims and third party claims relating to the settled claims that it made or could have made against anyone.  The Litigation Trustee will not take action on the matters set forth below unless all of the Litigation Parties agree with the decision relating to (B), (C) and (D) below, and the LTGO Representative agrees with the settlement described in (A) below:

(A)   Any settlement that releases from the Disputed COP Claims Reserve to any of the COP Holders a pro rata share of the B Notes (or equivalent currency) based on 40% or more of the face amount of their claim.

(B)   Any change of COP Litigation counsel.

(C)   Any decision not to appeal an adverse decision on any claim or defense related to the COP Litigation.

(D)   Any decision to voluntarily dismiss a substantive claim or counterclaim or to end the COP Litigation

To the extent the Litigation Parties are unable to reach agreement on the above matters, the Litigation Trustee or any Litigation Party may refer the matter to the Independent Party for mediation.  Subject to such mediation, the Litigation Trustee shall have the authority to take whatever action may be required to avoid potentially adverse or prejudicial consequences of inaction.  If a consensual resolution cannot be reached, the Independent Party will decide a substantive resolution of the issue or issues based upon the Independent Party's assessment of the merits of the legal claims, counterclaims and legal liabilities in the COP Litigation, which decision will be binding on the Litigation Parties and Litigation Trustee.

11

CLI-2233676v8

13-53846-tjt  Doc 8045  Filed 12/16/14  Entered 12/16/14 00:38:29  Page 119 of 301
13-53846-swr  Doc 7045  Filed 10/22/14  Entered 10/22/14 03:48:29  Page 269 of 809

The City, the COP Litigation counsel, the VEBA Trust Representatives and the LTGO Representative will take any steps that may be required to preserve applicable privileges of the City and the COP Litigation counsel.

(d)     In the event any Holder of a Disputed COP Claim enters into a settlement of such claim with the City prior to the Effective Date, including pursuant to the Plan, the portion of the New B Notes allocable to such Disputed COP Claim if such Disputed COP Claim had been allowed in full that is not used to satisfy the Disputed COP Claim pursuant to the terms of such settlement shall be deposited into the Disputed COP Claims Reserve and then distributed from the Disputed COP Claims Reserve pursuant to Section 2.2(e).

(e)     Following the occurrence of the Effective Date, upon a settlement, or the entry of an order by the trial court having jurisdiction over the objections to the Disputed COP Claims, resolving any objection to any disputed COP Claim ("**Resolved COP Claims**") and after all distributions on account of Allowed Claims respecting such Resolved COP Claim have been made or provided for, any and all New B Notes and distributions thereon remaining in the Disputed COP Claims Reserve with respect to such Resolved COP Claim shall be distributed as follows, and valued at face value for the purposes of the distribution:  (I) an amount of New B Notes and/or distributions thereon in an amount equal to the costs, fees and expenses related to the COP Litigation incurred from and after the Effective Date shall be distributed to the City to reimburse it for attorneys' fees relating to the COP Litigation, subject to and in accordance with the provisions of Section 2.2(c)(iii) above; (II) following such distribution, the balance of the New B Notes and any distributions thereon remaining in the Disputed COP Claims Reserve allocated to or with respect to such Resolved COP Claim shall be distributed as follows: (i) 65% to the Detroit General VEBA and the Detroit Police and Fire VEBA in proportion with the New B Notes allocated to each pursuant to Sections II.B.3.s.ii.A and II.B.3.s.ii.B of the Plan; and (ii) 20% to the LTGO Claim Holders (the "**Reserve B Notes**") to be allocated Pro Rata; and (iii) 15% is to be allocated as determined by the City.

Section 2.3     Confirmation Order and Findings.  The Plan Confirmation Order shall (i) approve the terms and conditions of this Agreement, (ii) direct that each month monies for the payment of one-sixth of the next semi-annual debt service payable on the New LTGO Bonds must be segregated and deposited into a debt service fund and not be used for any purpose other than paying debt service on the New LTGO Bonds so long as any New LTGO Bonds remain outstanding, (iii) provide that Plan treatment of the Prior LTGO Bonds is part of a settlement of the Ambac Action as it relates to the Prior LTGO Bonds, (iv) provide that the Bankruptcy Court will have exclusive  post-confirmation authority and power to enforce this Agreement and all Settlement-Related Documents and (v) be in form and substance reasonably satisfactory to the LTGO Parties.

Section 2.4     Conditions to Plan Effectiveness.  The Plan shall provide that the effectiveness of the Plan is subject to the City having obtained all governmental and Emergency Manager consents and approvals required to carry out the terms of this Agreement.

CLI-2233676v8

13-53846-tjt   Doc 8772-5   Filed 12/16/14   Entered 12/16/14 20:39:38   Page 120 of 301
13-53846-swr   Doc 8045   Filed 10/22/14   Entered 10/22/14 09:48:29   Page 27 of 94
809

Section 2.5    Stay of Litigation, Proofs of Claim.

(a)    The Ambac Action, as it pertains to the Prior LTGO Bonds, shall be stayed pending the issuance of an Approval Order or Plan Confirmation Order and the occurrence of the Effective Date, whereupon Ambac and the City shall ask the Bankruptcy Court to dismiss the Ambac Action as it pertains to the Prior LTGO Bonds without prejudice until the Approval Order or the Plan Confirmation Order, as applicable, is a Final Order, when such dismissal shall be deemed to be with prejudice. If the Ambac Action is dismissed without prejudice and subsequently refiled pursuant to this Agreement, then the statute of limitations for the causes of action asserted in the Ambac Action, and all other defenses based on the passage of time, shall be tolled for 60 days after the date of the event that would permit a refiling.

(b)    As soon as practicable subsequent to the execution and delivery of this Agreement by each of the Parties, but in no event later than five (5) business days subsequent thereto, Ambac and the City shall take any and all action as is appropriate to (i) stay the Ambac Action as provided in subsection (a) above, (ii) maintain the status quo in the Ambac Action as it pertains to the Prior LTGO Bonds as of the execution of this Agreement, and (iii) ensure that no action (including separate litigation and any objection to proofs of claim filed by the LTGO Parties relating to the Prior LTGO Bonds) is undertaken or commenced inconsistent with seeking a stay of and maintaining the status quo of the Ambac Action as it pertains to the Prior LTGO Bonds; provided, however, that any such stay shall terminate on the first (1st) business day following termination of this Agreement.

(c)    In the event (i) an Approval Motion is made by the City and denied by the Bankruptcy Court, (ii) an Approval Order is issued but is not consistent with this Agreement in any material respect or is overturned on appeal, (iii) a Plan consistent with this Agreement in all material respects is not confirmed by the Bankruptcy Court, or (iv) a Plan Confirmation Order is entered by the Bankruptcy Court but is not consistent in all material respects with this Agreement, or is overturned on appeal, then Ambac may resume the Ambac Action and terminate this Agreement by written notice to the other Parties.

(d)    The LTGO Parties agree that all proofs of claims filed by any of them with respect to Prior LTGO Bonds shall be deemed resolved and fully satisfied by approval of this Agreement in the Confirmation Order or an Approval Order, as applicable, which is a Final Order.

Section 2.6    Additional Covenants

(a)    Paying Agent and Distribution Agent. The City shall pay the reasonable and customary fees and expenses (including reasonable attorneys' fees) of (i) the paying agent with respect to the Prior LTGO Bonds, (ii) the paying agent in respect of all transactions contemplated by this Agreement, and (iii) the Distribution Agent pursuant to the Distribution Agreement.

13

CLI-2233676v8
13-53846-tjt  Doc 8772-5  Filed 12/16/14  Entered 12/16/14 20:39:38  Page 121 of 301
13-53846-swr  Doc 8045  Filed 10/22/14  Entered 10/22/14 03:48:29  Page 27 of 31
809

(b)    Further Action.  To the extent that the City has not taken all necessary action to authorize the execution, delivery and performance of this Agreement, it will do so.

## ARTICLE III
## PLAN OF ADJUSTMENT AND PLAN SUPPORT

Section 3.1    Plan Commitment Regarding Voting and Abstention From Objection.  From and after the date hereof, and so long as the City has complied, and is complying, with its covenants and obligations under this Agreement, each LTGO Party shall withdraw its objections to the Plan regarding the treatment of the Prior LTGO Bonds no later than August 1, 2014.  The Plan shall provide that such treatment, consistent with this Agreement, is the treatment for all LTGO Claim Holders.  The Uninsured Bondholder will vote its Prior LTGO Bonds and Ambac will vote its Prior LTGO Bonds and reimbursement claims in support of such Plan treatment promptly following the execution of this Agreement or as otherwise agreed by the City.  Upon the finalization of the terms of this Agreement, the Parties will file a stipulation and proposed order with the Bankruptcy Court that will permit each LTGO Party to modify its previous vote(s) and submit a vote in support of the Plan, pursuant to Federal Rule of Bankruptcy Procedure 3018.  For the absence of doubt, nothing contained in this Agreement shall require any LTGO Party to vote for the treatment of any class of claims under the Plan other than the LTGO Bonds, or refrain from objecting to the Plan with respect to issues other than the treatment of the LTGO Bonds.

Section 3.2    Solicitation Required in Connection with Plan.  Notwithstanding anything contained in this Article III or elsewhere in this Agreement to the contrary, this Agreement is not, and shall not be deemed to be, a solicitation of acceptances of the Plan.

Section 3.3    Plan Document Provisions.  All Plan Documents, as they relate to the settlement embodied in this Agreement must (i) be in form and substance reasonably satisfactory to the LTGO Parties and to the City and be consistent with this Agreement, (ii) provide that the Plan treatment for Prior LTGO Bonds is part of a settlement of the pending Ambac Action as it pertains to the Prior LTGO Bonds.

## ARTICLE IV
## DEFAULTS AND REMEDIES

Section 4.1    Events of Default.  The breach by any Party of any material agreement or covenant set forth in this Agreement will be an event of default ("**Event of Default**") under this Agreement.

Section 4.2    Remedies.  The Parties acknowledge and agree that a breach of the provisions of this Agreement by any Party would cause irreparable damage to the other Parties and that such other Parties would not have an adequate remedy at law for such damage.  Therefore, the obligations of the Parties set forth in this Agreement shall be enforceable by an order compelling specific performance issued by the

CLI-2233676v8
13-53846-tjt    Doc 8772-5    Filed 12/16/14    Entered 12/16/14 07:39:38    Page 122 of 201
13-53846-swr    Doc 8045-1    Filed 10/22/14    Entered 10/22/14 03:48:29    Page 27 of 201
809

Bankruptcy Court, and appropriate injunctive relief may be applied for and granted in connection therewith. Such remedies shall be cumulative and not exclusive and shall be in addition to any other remedies that the Parties may have under this Agreement or otherwise. Any LTGO Party may exercise its rights hereunder on its own. Consistent with Section 904 of the Bankruptcy Code, the City hereby consents to the Bankruptcy Court enforcing the terms of this Agreement.

Section 4.3    Termination.

(a)    This Agreement may be terminated by the mutual agreement of all of the LTGO Parties upon an Event of Default caused by the City. This Agreement may be terminated by less than all of the LTGO Parties as to such LTGO Party or LTGO Parties upon an Event of Default caused by the City if (i) an action or proceeding seeking to enforce the material agreement or covenant purported to be breached is brought by one or more LTGO Parties before the Bankruptcy Court, (ii) the Bankruptcy Court, after notice and a hearing, finds that an Event of Default caused by the City has occurred and (iii) either (A) the Bankruptcy Court declines to issue an order compelling specific performance by the City of the applicable agreement or covenant purported to be breached or (B) the Bankruptcy Court issues such an order compelling specific performance but the City fails to comply with the order.

(b)    This Agreement may be terminated by the City if (i) any of the LTGO Parties fails to withdraw its objections to the Plan regarding the treatment of the Prior LTGO Bonds on or before August 1, 2014, or (ii) any of the LTGO Parties fails to submit a ballot to vote its Class 7 Claims to accept the Plan promptly following the execution of this Agreement or as otherwise agreed by the City. This Agreement may be terminated by the City upon an Event of Default caused by the LTGO Parties, or any of them, if (i) an action or proceeding seeking to enforce the material agreement or covenant purported to be breached is brought by the City before the Bankruptcy Court, (ii) the Bankruptcy Court finds, after notice and a hearing, that an Event of Default caused by the applicable LTGO Party has occurred and (iii) either (A) the Bankruptcy Court declines to issue an order compelling specific performance by the applicable LTGO Party of this Agreement or the applicable covenant purported to be breached or (B) the Bankruptcy Court issues such an order compelling specific performance but the applicable LTGO Party fails to comply with the order.

(c)    Upon any such termination, Ambac may resume the Ambac Action unless it has been previously dismissed with prejudice or has been previously deemed dismissed with prejudice.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

Section 5.1    Representations and Warranties of the City.  The City represents and warrants to the LTGO Parties that:

(a)    It is a municipal corporation of the State of Michigan.

15

CLI-2233676v8

13-53846-tjt   Doc 8772-5   Filed 12/16/14   Entered 12/16/14 20:39:38   Page 123 of 301
13-53846-swr   Doc 8045   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 27 of
809

(b)　　It has the power to execute and deliver this Agreement and to perform its obligations hereunder and it has taken or will take all necessary action to authorize such execution, delivery and performance.

(c)　　Such execution, delivery and performance do not violate or conflict with any law applicable to it, any order or judgment of any court or other agency of government applicable to it, or any material agreements specifically applicable to it or any of its assets.

(d)　　Other than (i) approvals of the State Treasurer, the Emergency Loan Board and the City Council to be obtained prior to delivery of the New LTGO Bonds, which the City reasonably expects to be obtained prior to the Effective Date, and (ii) the approval of the Bankruptcy Court, all governmental and Emergency Manager consents and approvals that are required to have been obtained by it as of the date of execution of this Agreement with respect to the execution, delivery and performance of this Agreement have been obtained and are in full force and effect and all conditions of any such consents and approvals have been complied with.

Section 5.2　　<u>Representations and Warranties of the LTGO Parties</u>.  Each of the LTGO Parties represents to the City that:

(a)　　It is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation.

(b)　　It has the power to execute and deliver this Agreement and to perform its obligations under this Agreement and it has taken all necessary corporate action to authorize such execution, delivery and performance.

(c)　　Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it, or any agreements specifically applicable to it or any of its assets.

(d)　　All corporate or governmental consents and approvals that are required to have been obtained by it with respect to this Agreement have been obtained and are in full force and effect and all conditions of any such consents and approvals have been complied with.

Section 5.3　　<u>Representations and Warranties of Ambac</u>.  Ambac had and has standing to bring and resolve the Ambac Action as it pertains to the Prior LTGO Bonds that it insures.

Section 5.4　　<u>Mutual Representations and Warranties</u>.  Unless otherwise noted, each Party makes the following representations, warranties and covenants (on a several basis, with respect to such Party only) to each of the other Parties:

16

CLI-2233676v8
13-53846-tjt　Doc 8772-5　Filed 12/16/14　Entered 12/16/14 20:39:38　Page 124 of 301
13-53846-swr　Doc 8045　Filed 10/22/14　Entered 10/22/14 09:48:29　Page 27 of 31
809

(a)     Each person signing this Agreement warrants that he or she is legally competent and authorized to execute this Agreement on behalf of the Party whose name is subscripted at or above such person's signature.

(b)     The Parties have not made any statement or representation to each other regarding any facts relied upon by them in entering into this Agreement, and each of them specifically does not rely upon any statement, representation or promise of the other Parties hereto or any other person in entering into this Agreement, except as expressly stated herein or in the exhibits hereto.  Each party has relied upon its own investigation and analysis of the facts and not on any statement or representation made by any other party in choosing to enter into this Agreement and the transactions contemplated herein.

(c)     The Parties and their respective attorneys have made such investigation of the facts pertaining to this Agreement and all of the matters pertaining thereto as they deem necessary.

## ARTICLE VI
## EXCULPATION

Section 6.1     <u>Exculpation</u>.  The Plan will include the LTGO Exculpated Parties as exculpated parties for acts and omissions (other than those constituting gross negligence or willful misconduct) in connection with the Plan as it relates to this Agreement and this Agreement.

Section 6.2     <u>Releases</u>.  Upon the dismissal with prejudice or deemed dismissal with prejudice of the Ambac Action as it pertains to the Prior LTGO Bonds, Ambac and the City shall be deemed to have released each other, and each of their respective officials, officers, directors, employees and representatives, of and from any and all claims and causes of action related to the Prior LTGO Bonds and the Ambac Action.

## ARTICLE VII
## DISMISSAL OF CASE AND TERMINATION

Section 7.1     <u>Effect of Dismissal of the Bankruptcy Case</u>.  In the event the Bankruptcy Case is dismissed, any Party may at any time within 60 days after such dismissal immediately terminate this Agreement by written notice to the other Parties.

Section 7.2     <u>Effect of Termination</u>.  In the event of the termination of this Agreement by any Party pursuant to any provisions of this Agreement, this Agreement shall become null and void and be deemed of no force and effect, with no liability on the part of any Party hereto (or of any of its elected or appointed officials, directors, officers, employees, consultants, contractors, agents, legal and financial advisors or other representatives) arising from such termination, and no Party shall have any obligations to any other Party arising out of this Agreement.  Upon termination, neither this Agreement nor any terms or provisions set forth herein shall be admissible in any dispute, litigation, proceeding or controversy among the Parties and nothing

17

CLI-2233676v8

13-53846-tjt   Doc 8045   Filed 12/16/14   Entered 12/16/14 07:39:38   Page 125 of 301
13-53846-swr   Doc 8045   Filed 10/22/15   Entered 10/22/14 03:48:29   Page 27 of 51
809

contained herein shall constitute or be deemed to be an admission by any Party as to any matter, it being understood that the statements and resolutions reached herein were as a result of negotiations and compromises of the respective positions of the Parties. If the Ambac Action is reinstated, and this Agreement is terminated, then no Party hereto may (i) use this Agreement, any of its terms or any discussions or negotiations conducted in respect of this Agreement, or any part of the foregoing, in the Ambac Action; (ii) seek discovery with respect to any of the matters described in subsection (i) in the Ambac Action; or (iii) seek to admit any of the matters described in subsection (i) into evidence in the Ambac Action.

## ARTICLE VIII
## MISCELLANEOUS

Section 8.1    <u>Amendments</u>.  This Agreement may not be modified, amended or supplemented except by a written agreement executed by each Party to be affected by such modification, amendment or supplement.

Section 8.2    <u>No Admission of Liability</u>.

(a)    The execution of this Agreement is not intended to be, nor shall it be construed as, an admission or evidence in any pending or subsequent suit, action, proceeding or dispute of any liability, wrongdoing, or obligation whatsoever (including as to the merits of any claim or defense) by any Party to any other Party or any other person with respect to any of the matters addressed in this Agreement.

(b)    None of this Agreement (including, without limitation, the recitals and exhibits hereto), the settlement or any act performed or document executed pursuant to or in furtherance of this Agreement or the settlement:  (i) is or may be deemed to be or may be used as an admission or evidence of the validity of any claim or of any wrongdoing or liability of any Party; or (ii) is or may be deemed to be or may be used as an admission or evidence of any liability, fault or omission of any Party in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal. None of this Agreement, the settlement, or any act performed or document executed pursuant to or in furtherance of this Agreement or the settlement shall be admissible in any proceeding for any purposes, except to enforce the terms of the Agreement, and except that any Party may file this Agreement in any action for any purpose, including, but not limited to, in order to support a defense or counterclaim based on the principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense of counterclaim.

Section 8.3    <u>Good Faith Negotiations</u>.  The Parties recognize and acknowledge that each of the Parties hereto is represented by counsel, and such Party received independent legal advice with respect to the advisability of entering into this Agreement.  Each of the Parties acknowledges that the negotiations leading up to this Agreement were conducted regularly and at arm's length; this Agreement is made and executed by and of each Party's own free will; that each knows all of the relevant facts

CLI-2233676v8

13-53846-tjt  Doc 8772-4  Filed 12/16/14  Entered 12/16/14 07:39:33  Page 126 of 301
13-53846-swr  Doc 3045  Filed 10/22/14  Entered 10/22/14 09:48:29  Page 27 of 64
809

and his or its rights in connection therewith, and that it has not been improperly influenced or induced to make this settlement as a result of any act or action on the part of any party or employee, agent, attorney or representative of any party to this Agreement. The Parties further acknowledge that they entered into this Agreement because of their desire to avoid the further expense and inconvenience of litigation and other disputes, and to compromise permanently and settle the claims between the Parties settled by the execution of this Agreement.

Section 8.4    Rights and Remedies.  Nothing in this Agreement is intended to augment, impair any rights, remedies and interests, including without limitation, liens, of any of the Parties hereto other than with respect to the Prior LTGO Bonds.

Section 8.5    Third Party Beneficiaries.  Nothing in this Agreement, express or implied, is intended or shall be construed to confer upon, or to give to, any Person other than the Parties hereto and their respective successors and assigns, any right, remedy or claim under or by reason of this Agreement or any covenant, condition or stipulation thereof; and the covenants, stipulations and agreements contained in this Agreement are and shall be for the sole and exclusive benefit of the Parties hereto and their respective successors and assigns.

Section 8.6    Governing Law; Retention of Jurisdiction; Service of Process.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of Michigan, without giving effect to any principles of conflicts of law and applicable federal law.  By its execution and delivery of this Agreement, each of the Parties hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding between any or all of the foregoing with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought in the Bankruptcy Court for that purpose only, and, by execution and delivery of this Agreement, each hereby irrevocably accepts and submits itself to the jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding. In the event any such action, suit or proceeding is commenced, the Parties hereby agree and consent that service of process may be made, and personal jurisdiction over any Party hereto in any such action, suit or proceeding may be obtained, by service of a copy of the summons, complaint and other pleadings required to commence such action, suit or proceeding upon the Party at the address of such Party set forth in Section 8.11 hereof, unless another address has been designated by such Party in a notice given to the other Parties in accordance with Section 8.11 hereof. The City agrees that the Bankruptcy Court will have exclusive post-confirmation authority and power to enforce this Agreement and all Settlement-Related Documents and to hear and adjudicate any challenge, action, suit or proceeding brought by any third party challenging the validity or enforceability of any provision of this Agreement, until all New LTGO Bonds have been paid in full and all Plan Instruments are no longer outstanding.  Pursuant to Section 904 of the Bankruptcy Code, the City hereby consents to the Bankruptcy Court enforcing the terms of this Agreement.

19

CLI-2233676v8

13-53846-tjt   Doc 8772-5   Filed 12/16/14   Entered 12/16/14 20:39:38   Page 127 of 301
13-53846-swr   Doc 8045   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 27 of 31
809

Section 8.7    Headings.  The headings of the Articles and Sections of this Agreement are inserted for convenience only and are not part of this Agreement and do not in any way limit or modify the terms or provisions of this Agreement and shall not affect the interpretation hereof.

Section 8.8    Binding Agreement Successors and Assigns; Joint and Several Obligations.  This Agreement shall be binding upon the execution and delivery of this Agreement by the Parties listed on the signature pages hereto.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, administrators, constituents and representatives. The agreements, representations, covenants and obligations of the Parties under this Agreement are several only and not joint in any respect and none shall be responsible for the performance or breach of this Agreement by another.

Section 8.9    Entire Agreement.  This Agreement shall constitute the full and entire agreement among the Parties with regard to the subject matter hereof, and supersedes all prior negotiations, representations, promises or warranties (oral or otherwise) made by any Party with respect to the subject matter hereof.  No Party has entered into this Agreement in reliance on any other Party's prior representation, promise or warranty (oral or otherwise) except for those that may be expressly set forth in this Agreement.

Section 8.10    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original copy of this Agreement and all of which, when taken together, shall constitute one and the same Agreement. Copies of executed counterparts transmitted by telecopy or other electronic transmission service shall be considered original executed counterparts, provided receipt of copies of such counterparts is confirmed.

Section 8.11    Notices.  All demands, notices, requests, consents, and other communications hereunder shall be in writing and shall be deemed to have been duly given (a) when personally delivered by courier service or messenger, (b) upon actual receipt (as established by confirmation of receipt or otherwise) during normal business hours, otherwise on the first business day thereafter if transmitted electronically (by e-mail transmission), by facsimile or telecopier, with confirmation of receipt, or (c) three (3) business days after being duly deposited in the mail, by certified or registered mail, postage prepaid-return receipt requested, to the following addresses, or such other addresses as may be furnished hereafter by notice in writing, to the following Parties:

If to the City, to:

Chief Financial Officer
City of Detroit
1126 Coleman A. Young Municipal Center
Two Woodward Avenue
Detroit MI 48226

20

CLI-2233676v8
13-53846-tjt   Doc 8772-5   Filed 12/16/14   Entered 12/16/14 20:39:38   Page 128 of 301
13-53846-swr   Doc 8045   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 278 of 809

Phone: (313) 224-3382
Fax: (313) 224-2827

with a copy given in like manner to:

    Corporation Counsel
    City of Detroit Law Department
    Coleman A. Young Municipal Center
    2 Woodward Avenue
    Detroit MI 48226
    Phone: (313) 237-3018
    Fax: (313) 224-5505

    Miller, Canfield, Paddock and Stone, PLC
    150 West Jefferson, Suite 2500
    Detroit, MI 48226
    Attention: Jonathan Green
    Email: green@millercanfield.com
    Attention: Amanda Van Dusen
    Email: vandusen@millercanfield.com

If to the LTGO Parties, to:

    Ambac Assurance Corporation
    One State Street Plaza
    New York, New York 10004
    Attention: Surveillance Department and General Counsel's Office
    Fax: (212) 208-3384

with a copy given in like manner to:

    Arent Fox LLP
    1675 Broadway
    New York, New York 10019
    Attention: David L. Dubrow, Esq.
    Telecopy: (212) 484-3990
    Email: david.dubrow@arentfox.com

    -and

    BlackRock Financial Management
    1 University Square Drive
    Princeton, New Jersey 08540
    Attn: Jim Schwartz
    Phone: (609) 282-1784
    Email: jim.schwartz@blackrock.com

with a copy given in like manner to:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
Attn:  Amy Caton
Phone:  (212) 713-7772
Email:  acaton@kramerlevin.com

Section 8.12  <u>Further Assurances</u>.  Each of the Parties hereto agrees to execute and deliver, or to cause to be executed and delivered, all such instruments, and to take all such action as the other Parties may reasonably request in order to effectuate the intent and purposes of, and to carry out the terms of, this Agreement.

Section 8.13  <u>Non-Severability of Agreement.</u>  This Agreement is to be construed as a whole, and all provisions of it are to be read and construed together. Notwithstanding anything in this Agreement, the Approval Order (if applicable)  or the Plan Confirmation Order to the contrary, and in light of the integrated nature of the settlements and compromises embodied in this Agreement, in the event that (i) a court of competent jurisdiction enters a Final Order ruling that any of the transactions contemplated in this Agreement,  are void, invalid, illegal or unenforceable in any material respect, (ii) any of the transactions contemplated by this Agreement are reversed, vacated, overturned, voided or unwound in any material respect, or (iii) the Approval Order or Plan Confirmation Order as it relates to the transactions contemplated in this Agreement is reversed, vacated, overturned or amended in any material respect, then in each case, the entirety of this Agreement (other than this Section 8.13) shall be void ab initio and of no force and effect and, during any subsequent proceeding, the Parties shall not assert claim preclusion, issue preclusion, estoppel or any similar defense in respect of rights and claims of the Parties that were the subject of this Agreement prior to this Agreement being of no force or effect.

(Signature page follows)

22

CLI-2233676v8

13-53846-tjt  Doc 8772  Filed 12/16/14  Entered 12/16/14 07:39:38  Page 130 of 301
13-53846-swr  Doc 8045  Filed 10/22/14  Entered 10/22/14 09:48:29  Page 280 of 809

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date set forth above.

THE CITY OF DETROIT, as Debtor

By: _____
    Name:
    Title:

AMBAC ASSURANCE CORPORATION

By: _____
    Name:
    Title:

BLACKROCK FINANCIAL MANAGEMENT, on behalf of its managed funds and accounts as reflected in Exhibit B

By: _____
    Name:
    Title:

_____

CLI-2233676v8
13-53846-tjt Doc 8772-5 Filed 12/16/14 Entered 12/16/14 07:39:38 Page 131 of 301
13-53846-swr Doc 8045-1 Filed 10/22/15 Entered 10/22/14 03:48:29 Page 281 of 809

**Schedule 1**

**Financial Terms of New LTGO Bonds**

Principal:               $55 million

Interest Rate:           5.65% per annum (first 10 years, 5.00% payable in cash and 0.65% capital appreciation added to principal)

Final Maturity:          23 years

Amortization:            Interest payable semi-annually

On each anniversary from the sixth through tenth anniversary—$2 million principal due per year

On each anniversary from the eleventh through twenty-third anniversary—principal payment equal to one-thirteenth (1/13) of the principal outstanding immediately prior to the eleventh anniversary (approximately $3,735,115 per year)

| $ in MMs | 2015 Yr 1 | 2016 Yr 2 | 2017 Yr 3 | 2018 Yr 4 | 2019 Yr 5 | 2020 Yr 6 | 2021 Yr 7 | 2022 Yr 8 | 2023 Yr 9 | 2024 Yr 10 | 2025 Yr 11 | 2026 Yr 12 | 2027 Yr 13 | 2028 Yr 14 | 2029 Yr 15 | 2030 Yr 16 | 2031 Yr 17 | 2032 Yr 18 | 2033 Yr 19 | 2034 Yr 20 | 2035 Yr 21 | 2036 Yr 22 | 2037 Yr 23 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Debt Service and Amortization** | | | | | | | | | | | | | | | | | | | | | | | |
| Opening Balance | 55.0 | 55.4 | 55.7 | 56.1 | 56.4 | 56.8 | 55.2 | 53.5 | 51.9 | 50.2 | 48.6 | 44.8 | 41.1 | 37.3 | 33.6 | 29.9 | 26.1 | 22.4 | 18.7 | 14.9 | 11.2 | 7.5 | 3.7 |
| Principal | - | - | - | - | - | - | 2.0 | 2.0 | 2.0 | 2.0 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 |
| Cash Interest | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.7 | 2.6 | 2.5 | 2.7 | 2.5 | 2.3 | 2.1 | 1.9 | 1.7 | 1.5 | 1.3 | 1.1 | 0.8 | 0.6 | 0.4 | 0.2 |
| Total Cash DS | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 4.8 | 4.7 | 4.6 | 4.5 | 6.5 | 6.3 | 6.1 | 5.8 | 5.6 | 5.4 | 5.2 | 5.0 | 4.8 | 4.6 | 4.4 | 4.2 | 3.9 |
| PIK Interest | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.3 | 0.3 | 0.3 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Interest Rate** | | | | | | | | | | | | | | | | | | | | | | | |
| Cash | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.65% | 5.65% | 5.65% | 5.65% | 5.65% | 5.65% | 5.65% | 5.65% | 5.65% | 5.65% | 5.65% | 5.65% | 5.65% |
| PIK | 0.65% | 0.65% | 0.65% | 0.65% | 0.65% | 0.65% | 0.65% | 0.65% | 0.65% | 0.65% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |

**Exhibit A**

**EMERGENCY MANAGER ORDER**

AFDOCS/11065646.6
CLI-2233676v8

ORDER OF THE EMERGENCY MANAGER OF THE CITY OF DETROIT, COUNTY OF WAYNE, STATE OF MICHIGAN, AUTHORIZING THE ISSUANCE BY THE CITY OF DETROIT OF NOT TO EXCEED $55,000,000 FINANCIAL RECOVERY BONDS (LIMITED TAX GENERAL OBLIGATION) IN ONE OR MORE SERIES FOR THE PURPOSE OF SATISFYING CERTAIN CLAIMS OF THE HOLDERS AND INSURER OF CERTAIN LIMITED TAX GENERAL OBLIGATION BONDS AS PROVIDED IN THE BANKRUPTCY CASE PLAN OF ADJUSTMENT; AND AUTHORIZING THE EMERGENCY MANAGER TO MAKE CERTAIN DETERMINATIONS AND TO TAKE CERTAIN ACTIONS IN CONNECTION WITH THE DELIVERY AND EXCHANGE OF SAID BONDS TO THE HOLDERS OF SAID CLAIMS IN FULL SATISFACTION OF SAID CLAIMS.

# TABLE OF CONTENTS

**Page**

ARTICLE I         DEFINITIONS AND INTERPRETATION ............................................. 3
     Section 101. Definitions............................................................................. 3
     Section 102. Interpretation ........................................................................ 8

ARTICLE II DETERMINATIONS............................................................................. 8
     Section 201. Finding, and Declaration of Need to Issue Bonds ...................... 8

ARTICLE III AUTHORIZATION, REDEMPTION AND ASSIGNMENT OF THE
                BONDS .................................................................................. 9
     Section 301. Authorization of Bonds to Satisfy the Claims and Pledge........... 9
     Section 302. Designations, Date, Interest, Maturity and Other Terms of the Bonds
                       to Satisfy the Claims ............................................................. 9
     Section 303. Execution, Authentication and Delivery of Bonds ................... 10
     Section 304. Authentication of the Bonds ................................................. 10
     Section 305. Transfer of Registration and Exchanges on the Bonds............. 11
     Section 306. Regulations with Respect to Exchanges and Transfers ............ 11
     Section 307. Form of the Bonds ............................................................... 12
     Section 308. Registration ........................................................................ 19
     Section 309. Mutilated, Destroyed, Stolen or Lost Bonds........................... 19
     Section 310. Book-Entry-Only System Permitted ...................................... 19

ARTICLE IV FUNDS AND ACCOUNTS ................................................................ 20
     Section 401. Establishment of Accounts and Funds .................................. 20
     Section 402. Debt Retirement Fund.......................................................... 20
     Section 403. Investment of Monies in the Funds and Accounts.................... 20

ARTICLE V THE PAYING AGENT ....................................................................... 21
     Section 501. Paying Agent...................................................................... 21

ARTICLE VI SUPPLEMENTAL ORDERS AND RESOLUTIONS....................................... 22
     Section 601. Supplemental Orders and Resolutions Not Requiring Consent of
                       Holders of the Bonds ............................................................ 22
     Section 602. Bond Counsel Opinion......................................................... 22

ARTICLE VII DEFEASANCE ............................................................................... 22
     Section 701. Defeasance ........................................................................ 22

ARTICLE VIII        OTHER PROVISIONS OF GENERAL APPLICATION...................... 23
     [Section 801. RESERVED] ...................................................................... 23
     Section 802. Approval of Other Documents and Actions............................ 23
     Section 803. Delegation of City to, and Authorization of Actions of Authorized
                       Officers ............................................................................... 23
     Section 804. Approving Legal Opinions with Respect to the Bonds ............ 24
     Section 805. Appointment of Bond Counsel; Engagement of Other Parties.... 24
     Section 806. Preservation of Records ....................................................... 24
     Section 807. Parties in Interest................................................................ 24
     Section 808. No Recourse Under Order .................................................... 24

# TABLE OF CONTENTS
(continued)

**Page**

Section 809.  Severability ................................................................................................... 24
Section 810.  Cover Page, Table of Contents and Article and Section Headings............ 24
Section 811.  Conflict ........................................................................................................ 25
Section 812.  Governing Law and Jurisdiction.................................................................. 25
Section 813.  Order and Supplemental Order are a Contract............................................ 25
Section 814.  Effective Date .............................................................................................. 25
Section 815.  Notices ......................................................................................................... 25

13-53846-tjt  Doc 8045  Filed 12/16/14  Entered 12/16/14 07:39:38  Page 137 of 301
13-53846-swr  Doc 7643  Filed 10/22/15  Entered 10/22/14 03:48:29  Page 28 of 301
809

ORDER NO. ___

ORDER OF THE EMERGENCY MANAGER OF THE CITY OF DETROIT,
COUNTY OF WAYNE, STATE OF MICHIGAN, AUTHORIZING THE
ISSUANCE BY THE CITY OF DETROIT OF NOT TO EXCEED $55,000,000
FINANCIAL RECOVERY BONDS (LIMITED TAX GENERAL
OBLIGATION) IN ONE OR MORE SERIES FOR THE PURPOSE OF
SATISFYING CERTAIN CLAIMS OF THE HOLDERS AND INSURER OF
CERTAIN LIMITED TAX GENERAL OBLIGATION BONDS AS PROVIDED
IN THE BANKRUPTCY CASE PLAN OF ADJUSTMENT; AND
AUTHORIZING THE EMERGENCY MANAGER TO MAKE CERTAIN
DETERMINATIONS AND TO TAKE CERTAIN ACTIONS IN CONNECTION
WITH THE DELIVERY AND EXCHANGE OF SAID BONDS TO THE
HOLDERS OF SAID CLAIMS IN FULL SATISFACTION OF SAID CLAIMS.

WHEREAS, on March 1, 2013, the Governor (the "Governor") of the State of Michigan
(the "State") determined that a financial emergency existed within the City of Detroit, County of
Wayne, State of Michigan (the "City") pursuant to the Local Government Fiscal Responsibility
Act, Act 72, Public Acts of Michigan, 1990, as amended ("Act 72"); and

WHEREAS, on March 14, 2013, the Governor confirmed that a financial emergency ex-
isted within the City and, pursuant to Act 72, assigned to the Local Emergency Financial
Assistance Loan Board established pursuant to the Emergency Municipal Loan Act, Act 243
Public Acts of Michigan, 1980, as amended (the "Board") the responsibility for managing the
financial emergency; and

WHEREAS, on March 14, 2013, pursuant to Act 72, the Board appointed Kevyn D. Orr
as Emergency Financial Manager for the City; and

WHEREAS, by operation of law the financial emergency continues to exist within the
City pursuant to the Local Financial Stability and Choice Act, Act 436, Public Acts of Michigan,
2012 ("Act 436") and the Emergency Financial Manager continues in the capacity of the
Emergency Manager for the City (the "Emergency Manager"); and

WHEREAS, as of the close of Fiscal Year 2013 (*i.e.*, June 30, 2013), the City had
$160.97 million in outstanding principal amount of limited tax general obligation bonds,
excluding any limited general obligation bonds secured by distributable state aid and sold to the
Michigan Finance Authority (the "Prior LTGO Bonds"); and

**WHEREAS,** more than two thirds in amount of the Prior LTGO Bonds are either held by
BlackRock Financial Management (the "Uninsured Bondholder") or insured by Ambac
Assurance Corporation ("Ambac") under financial guaranty insurance policies (the "Bond
Insurance Policies") that were issued contemporaneously with certain Prior LTGO Bonds (the
"Insured Prior LTGO Bonds"); and

1

13-53846-tjt   Doc 8772   Filed 12/16/14   Entered 12/16/14 07:39:38   Page 138 of 301
13-53846-swr   Doc 8045   Filed 10/22/14   Entered 10/22/14 09:48:29   Page 268 of 809

WHEREAS, on July 18, 2013 (the "Petition Date"), in accordance with Act 436 and the approval of the Governor, the Emergency Manager filed on behalf of the City a petition for relief pursuant to Chapter 9 of title 11 of the United States Code, 11 U.S.C. Sections 101-1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"); and

WHEREAS, as of the Petition Date, the balance due on the Prior LTGO Bonds, including prepetition interest accrued as of that date, was $163,554,770; and

WHEREAS, on October 1, 2013, the City defaulted on its obligation to make interest payments on the Prior LTGO Bonds in the amount of $4,348,211, and Ambac paid claims in the amount of $2,266,586 on account of the Insured Prior LTGO Bonds and was subrogated to the rights of the owners for such payments, and the insurance documents contemplate for the assignment of the Insured Prior LTGO Bonds to Ambac upon payment of a claim; and

WHEREAS, on April 1, 2014, the City defaulted on its obligation to make interest payments in the amount of $4,348,211 and principal payments in the amount of $43,420,000 on the Prior LTGO Bonds, and Ambac paid claims in the amount of $20,686,586 on account of the Insured Prior LTGO Bonds insured by it and was subrogated to the rights of the owners for such payments, and the insurance documents contemplate for the assignment of the Insured Prior LTGO Bonds to Ambac upon payment of a claim; and

WHEREAS, on May 5, 2014, the Emergency Manager filed on behalf of the City a Fourth Amended Plan for the Adjustment of the Debts of the City of Detroit (now and as subsequently amended, the "Plan of Adjustment") in the Bankruptcy Court to provide for the adjustment of the debts of the City pursuant to and in accordance with Chapter 9 of the Bankruptcy Code; and

WHEREAS, on _____, 2014, the City, Ambac and the Uninsured Bondholder (together the "LTGO Parties") entered into a Settlement Agreement (LTGO) (the "Settlement Agreement") regarding a consensual resolution of their disputes under or in respect of the Prior LTGO Bonds, the Ambac Action (as defined in the Settlement Agreement) and the claims of the LTGO Parties (the "LTGO Claims"); and

WHEREAS, the Plan of Adjustment and the Settlement Agreement provide, among other things, for the satisfaction of the claims of the holders of Allowed Claims on account of Prior LTGO Bonds who are (i) record owners of any Prior LTGO Bonds and (ii) Ambac as to any Insured Prior LTGO Bond (each, a "LTGO Claims Holder") in exchange for the receipt of unsecured pro rata shares ( each a "Pro Rata Share") of New LTGO Notes, in the form of the Bonds authorized herein, in the form of Financial Recovery Bonds authorized for settlement of unsecured claims under the Plan of Adjustment and a portion of the New B Notes, referred to as "Reserve B Notes" in the Settlement Agreement, to be authorized by separate order of the Emergency Manager; and

WHEREAS, upon satisfaction of all of the terms and conditions required of the City related to the confirmation of the Plan of Adjustment, the City shall establish the Business Day upon which the Plan of Adjustment shall become effective (the "Effective Date"); and

2

13-53846-tjt Doc 8045 Filed 12/16/14 Entered 12/16/14 07:39:38 Page 139 of 301
13-53846-swr Doc 8045 Filed 12/16/14 Entered 12/16/14 09:46:29 Page 283 of 809

WHEREAS, on or before the Effective Date, the City shall issue Financial Recovery Bonds (Limited Tax General Obligation) (the "Bonds") under Section 36a of the Home Rule City Act, Act 279, Public Acts of Michigan, 1909, as amended ("Act 279") and this Order, and distribute Pro Rata Shares of the Bonds, to the LTGO Claim Holders as provided in the Plan of Adjustment; and

WHEREAS, the Emergency Manager of the City deems it necessary to authorize the issuance of the Bonds in one or more series, in the aggregate principal amount of not to exceed Fifty Five Million Dollars ($55,000,000) pursuant to Section 36a of Act 279; and

WHEREAS, the Bonds will be secured by a pledge of the City's limited tax full faith and credit; and

WHEREAS, Section 36a of Act 279 authorizes a city, for which a financial emergency has been determined to exist, such as the City, to borrow money and issue Financial Recovery Bonds subject to the terms and conditions approved by the Board; and

WHEREAS, the City must receive prior approval of the terms and conditions for the issuance of the Bonds from the Board in accordance with Section 36a of Act 279; and

WHEREAS, the Emergency Manager desires to submit this Order to the Board proposing the issuance by the City of the Bonds, in one or more series, under Section 36a of Act 279, to provide for a portion of the financing of the City under the Plan of Adjustment, solely to satisfy the claims of the LTGO Claim Holders; and

WHEREAS, prior to submission of this Order to the Board, pursuant to Sections 12(1)(u) and 19(i) of Act 436, the Emergency Manager must obtain approval of the issuance of the Bonds by the City Council of the City (the "City Council"), and if the City Council disapproves the issuance of the Bonds, the issuance of the Bonds must be approved by the Board.

NOW, THEREFORE, BE IT ORDERED AS FOLLOWS:


# ARTICLE I

## DEFINITIONS AND INTERPRETATION


Section 101. Definitions.     The words and terms defined in the preambles and recitals hereof and the following words and terms as used in this Order shall have the meanings ascribed therein, herein or in the Plan of Adjustment to them unless a different meaning clearly appears from the context:

"Accretion Date" means April 1 and October 1 of each year after the Date of Original Issue and the Conversion Date.

"Accretion Rate" means a rate of accretion in principal borne by the Bonds of 0.65% per annum compounded semiannually on each Accretion Date from the Date of Original Issue until the Conversion Date.

"Accretion Value" means as of any particular date of calculation, the original principal amount of the Bond, plus all accretion in principal accrued and compounded to the particular date of calculation. A table setting forth the Accreted Values per $5,000 original principal amount of the Bonds at each Accretion Date shall be set forth in the Bonds and as an exhibit to the Supplemental Order.

"Act 243" means Act No. 243, Public Acts of Michigan, 1980, as amended.

"Act 279" means Act No. 279, Public Acts of Michigan, 1909, as amended.

"Act 436" means Act No. 436, Public Acts of Michigan, 2012.

"Allowed Claims" has the meaning set forth in the Plan of Adjustment.

"Authorized Denominations" shall mean denominations of Bonds equal to multiples of $1,000 or integral multiples of $1.00 in excess thereof.

"Authorized Officer" means (i) the Emergency Manager or his designee or successor, or if the City is no longer operating under a financial emergency pursuant to Act 436, the chief administrative officer of the City, the Finance Director or his or her designee, or (ii) any other person authorized by a Certificate of an Authorized Officer to act on behalf of or otherwise represent the City in any legal capacity, which such certificate shall be delivered, if at all, in the City's sole discretion.

"Bankruptcy Case" means the City's Bankruptcy Case No. 13-53846 in the U.S. Bankruptcy Court for the Eastern District of Michigan.

"Bankruptcy Code" has the meaning ascribed to it in the recitals hereof.

"Board" has the meaning set forth in recitals hereto.

"Bond Counsel" means Miller, Canfield, Paddock and Stone, P.L.C., attorneys of Detroit, Michigan, or such other nationally recognized firm of attorneys experienced in matters pertaining to municipal bonds and appointed to serve in such capacity by the City with respect to the Bonds.

"Bond" or "Bonds" means the Financial Recovery Bonds (Limited Tax General Obligation), Series 2014 of the City authorized to be issued by the Order in the aggregate principal amount not to exceed $55,000,000, in one or more series, and bearing such other designations as determined by the Authorized Officer in the Supplemental Order.

"Bond Insurance Policies" has the meaning ascribed to it in the recitals hereof.

4

13-53846-tjt   Doc 8775   Filed 12/16/14   Entered 12/16/14 07:39:38   Page 141 of 301
13-53846-swr   Doc 8045   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 29 of 304
809

"Bond Registry" means the books for the registration of Bonds maintained by the Paying Agent.

"Bondowner", "Owner" or "Registered Owner" means, with respect to any Bond, the person in whose name such Bond is registered in the Bond Registry.

"Business Day" means any day other than (i) a Saturday, Sunday or legal holiday, (ii) a day on which the Paying Agent or banks and trust companies in New York, New York are authorized or required to remain closed, (iii) a day on which the New York Stock Exchange is closed, or (iv) a day on which the Federal Reserve is closed.

"Certificate" means (i) a signed document either attesting to or acknowledging the circumstances, representations or other matters therein stated or set forth or setting forth matters to be determined pursuant to the Indenture or (ii) the report of an Authorized Officer as to audits or other procedures called by the Indenture, as the case may be.

"Charter" means the Charter of the City, as amended from time to time.

"City" means the City of Detroit, County of Wayne, State of Michigan.

"Claim" shall mean a "claim" as defined in Section 101(5) of the Bankruptcy Code.

"Class" means each class of Claims established under the Plan.

"Closing Date" means the Date of Original Issue.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confirmation Order" has the meaning set forth in recitals hereto.

"Constitution" means the Constitution of the State of Michigan of 1963, as amended.

"Conversion Date" means the last Accretion Date on the tenth anniversary of the Date of Original Issue of the Bonds, after which the Bonds shall no longer accrete in value.

"Date of Original Issue" means the date upon which all conditions precedent set forth in the Bond Purchase Agreement to the transactions contemplated therein and herein have been satisfied and the Bonds have been issued to the Purchaser.

"Debt Retirement Fund" means the Debt Retirement Fund established under Section 501 hereof, and any subaccounts thereof established hereunder for the payment of principal of and premium and interest on the Bonds.

"Distribution Agent" shall mean U.S. Bank National Association, Detroit, Michigan.

"Distribution Agreement" shall mean the Insured Prior LTGO Bonds Distribution Agreement among the Distribution Agent the City, Ambac and the paying agent for the Insured Prior LTGO Bonds, in form and substance satisfactory to the City and Ambac, relating to the distribution of payments of principal and interest on the Insured Prior LTGO Bonds.

"DTC System" shall mean the system maintained by The Depository Trust Company used for trading municipal securities.

"Emergency Manager" has the meaning set forth in the recitals hereto.

"Final Order" has the meaning set forth in the Plan of Adjustment.

"Fiscal Year" means the period from July 1 to and including June 30 of the immediately succeeding calendar year or such other fiscal year of the City as in effect from time to time.

"Holder" shall mean the holder of a Claim under or evidenced by the Prior LTGO Bonds.

"Insured Prior LTGO Bonds" has the meaning ascribed to it in the recitals hereof.

"Interest Payment Date" means April 1 and October 1 of each year commencing with the April 1 or October 1 specified in the Supplemental Order.

"Interest Rate" means a rate of interest borne by the Bonds, payable currently on each Interest Payment Date, of 5% per annum from the Date of Original Issue until the Conversion Date, and thereafter at a rate of interest of 5.65% per annum payable currently until the Maturity Date.

"LTGO Claims" has the meaning ascribed to it in the recitals hereof.

"LTGO Claims Holder" shall mean holders of Allowed Claims on account of Prior LTGO Bonds who are (i) the record owners of any Prior LTGO Bonds and (ii) Ambac as to any Insured Prior LTGO Bond.

"LTGO Parties" has the meaning set forth in the recitals hereof.

"Maturity Date" means the twenty-third (23rd) anniversary of the Date of Original Issue or such other final date of maturity of each series of the Bonds as specified in the Supplemental Order.

"Maximum Aggregate Principal Amount" has the meaning given such term in Section 201.

"New LTGO Bonds" means the Bonds.

"Order" means this Order of the Emergency Manager as supplemented by the Supplemental Order, and as amended from time to time pursuant to Article VI.

"Outstanding" when used with respect to:

(1)     the Bonds, means, as of the date of determination, the Bonds theretofore authenticated and delivered under this Order, except:

(A)     Bonds theretofore canceled by the Paying Agent or delivered to such Paying Agent for cancellation;

<ol type="A" start="2">
<li>(B)     Bonds for whose payment money in the necessary amount has been theretofore deposited with the Paying Agent in trust for the registered owners of such Bonds;</li>

<li>(C)     Bonds delivered to the Paying Agent for cancellation in connection with (x) the exchange of such Bonds for other Bonds or (y) the transfer of the registration of such Bonds;</li>

<li>(D)     Bonds alleged to have been destroyed, lost or stolen which have been paid or replaced pursuant to this Order or otherwise pursuant to law; and</li>

<li>(E)     Bonds deemed paid as provided in Section 701.</li>
</ol>

"Paying Agent" means the bond registrar, transfer agent and paying agent for the Bonds.

"Petition Date" has the meaning set forth in the recitals hereto.

"Plan of Adjustment" has the meaning set forth in the recitals hereto.

"Prior LTGO Bonds" has the meaning ascribed to it in the recitals hereof.

"Pro Rata" shall mean the proportion that a claim of one LTGO Claims Holder bears to the aggregate amount of all claims of all of the LTGO Claims Holders.

"Registered Owner" means the registered owner of a Bond as the registered owner's name appears on the Bond Registry under Section 305.

"Regular Record Date" has the meaning given such term in Section 302.

"Reserve New B Notes" shall have the meaning set forth in the recitals hereto.

"Security Depository" has the meaning given such term in Section 310.

"State" has the meaning set forth in the recitals hereto.

"State Treasurer" means the Treasurer of the State of Michigan.

"Supplemental Order" means the order or orders of the Authorized Officer making certain determinations and confirming the final details on the Bonds upon issuance, in accordance with the parameters of this Order.

Section 102. <u>Interpretation</u>. (a) Words of the feminine or masculine genders include the correlative words of the other gender or the neuter gender.

(b)     Unless the context shall otherwise indicate, words importing the singular include the plural and vice versa, and words importing persons include corporations, associations, partnerships (including limited partnerships), trusts, firms and other legal entities, including public bodies, as well as natural persons.

(c)     Articles and Sections referred to by number mean the corresponding Articles and Sections of this Order.

(d)     The terms "hereby, "hereof", "hereto", "herein", "hereunder" and any similar terms as used in this Order, refer to this Order as a whole unless otherwise expressly stated.

## ARTICLE II

## DETERMINATIONS

Section 201.  <u>Finding, and Declaration of Need to Issue Bonds</u>. The Emergency Manager hereby finds and declares that it is necessary for the City to issue the Bonds hereunder in such sum as shall be determined and approved by the Emergency Manager, not in excess of $55,000,000 as of the Date of Original Issue (the "Maximum Aggregate Principal Amount"), and to evidence such debt by the issuance of the Bonds in one or more series not in excess of the Maximum Aggregate Principal Amount, in Authorized Denominations, pursuant to and in accordance with the provisions of Section 36a of Act 279, for the purpose of satisfying a portion of the LTGO Claims. The Maximum Aggregate Principal Amount shall not include the accretion of principal at the Accretion Rate as provided in this Order.

## ARTICLE III

## AUTHORIZATION, REDEMPTION AND ASSIGNMENT OF THE BONDS

Section 301.  <u>Authorization of Bonds to Satisfy the Claims and Pledge</u>.  The City hereby authorizes the issuance of the Bonds as hereinafter defined in such principal amount as shall be confirmed in the Supplemental Order to satisfy the LTGO Claims.  The principal of and interest on the Bonds shall hereby be secured by the limited tax full faith and credit pledge of the City. The City pledges to pay the principal of and interest on the Bonds as a first budget obligation from its general funds and in case of insufficiency thereof, from the proceeds of an annual levy of ad valorem taxes on all taxable property of the City, subject to applicable constitutional, statutory and charter tax rate limitations.

Section 302.  <u>Designations, Date, Interest, Maturity and Other Terms of the Bonds to Satisfy the Claims</u>. (a) The Bonds shall be designated "FINANCIAL RECOVERY BONDS (LIMITED TAX GENERAL OBLIGATION), SERIES 2014" and may bear such later or earlier dates and additional or alternative designations, series or subseries as the Authorized Officer may determine in the Supplemental Order, shall be issued in fully registered form and shall be consecutively numbered from "R-1" upwards, unless otherwise provided by the Authorized Officer in the Supplemental Order.  The Bonds shall be dated and issued in such denominations all as determined by the Authorized Officer and confirmed by the Authorized Officer in the Supplemental Order.

(b)     The Bonds of each series shall mature on the April 1, 2037 or such other April 1 which is not in excess of 23 years from the Date of Original Issue and shall accrete in principal amount, bear interest at the Interest Rate on a taxable or tax exempt basis, payable on the Interest

Payment Dates, all as shall be determined and confirmed by the Authorized Officer in the Supplemental Order.  The Bonds shall be subject to mandatory sinking fund redemption on April 1 in the years and in the Accretion Values set forth in the form of Bond provided in Section 307 hereof.  Unless otherwise provided by the Authorized Officer in the Supplemental Order, interest on the Bonds shall be calculated on the basis of the actual number of days elapsed in a 360 day year.  The Bonds shall be payable, as to principal and interest, in lawful money of the United States of America.

(c)     The Bonds shall also accrete in principal amount at the Accretion Rate starting from the Date of Original Issue and compounded semiannually on each Accretion Date until the Conversion Date.  Thereafter, the Bonds at their Accretion Value shall bear interest at the Interest Rate on a taxable or tax exempt basis, payable on a current basis on the Interest Payment Dates, all as shall be determined and confirmed by the Authorized Officer in the Supplemental Order.

(d)     Except as may be otherwise determined by the Authorized Officer in the Supplemental Order, interest on the Bonds shall be payable to the Registered Owner as of the 15th day of the month, whether or not a Business Day (a "Regular Record Date"), prior to each Interest Payment Date.  Interest on the Bonds shall be payable to such Registered Owners by check or draft drawn on the Paying Agent on each Interest Payment Date and mailed by first class mail or, upon the written request of the Owner of $1,000,000 or more in aggregate principal amount of Bonds (with complete wiring instructions no later than the Regular Record Date for such Interest Payment Date), by wire transfer by the Paying Agent to such Owner.  Such a request may provide that it will remain in effect with respect to subsequent Interest Payment Dates unless and until changed or revoked at any time prior to a Regular Record Date by subsequent written notice to the Paying Agent.

(e)     Interest on Bonds not punctually paid or duly provided for on an Interest Payment Date shall forthwith cease to be payable to the Registered Owners on the Regular Record Date established for such Interest Payment Date, and may be paid to the Registered Owners as of the close of business on a date fixed by the Paying Agent (a "Special Record Date") with respect to the payment of such defaulted interest to be fixed by the Paying Agent, or may be paid at any time in any other lawful manner.  The Paying Agent shall give notice to the Registered Owners at least seven days before any such Special Record Date.

(f)     The principal of the Bonds shall be payable to the Registered Owners of the Bonds upon the presentation of the Bonds to the Paying Agent at the principal corporate trust office of the Paying Agent.

(g)     The Bonds shall be subject to redemption prior to maturity or shall not be subject thereto, upon such terms and conditions as shall be determined by the Authorized Officer and confirmed in the Supplemental Order, provided, however, that redemption at the option of the City prior to maturity may occur on any Interest Payment Date for which notice is given as provided herein and such redemption shall be in whole.

Unless waived by any registered owner of Bonds to be redeemed, official notice of redemption shall be given by the Paying Agent on behalf of the City.  Such notice shall be dated

9

13-53846-tjt   Doc 8045   Filed 12/16/14   Entered 12/16/14 20:43:38   Page 146 of 301
13-53846-swr   Doc 8045   Filed 12/16/14   Entered 12/16/14 09:48:28   Page 296 of 809

and shall contain at a minimum the following information: original issue date; maturity dates; interest rates, CUSIP numbers, if any; certificate numbers, and in the case of partial redemption, the called amounts of each certificate; the redemption date; the redemption price or premium; the place where Bonds called for redemption are to be surrendered for payment; and that interest on Bonds or portions thereof called for redemption shall cease to accrue from and after the redemption date.

In addition, further notice shall be given by the Paying Agent in such manner as may be required or suggested by regulations or market practice at the applicable time, but no defect in such further notice nor any failure to give all or any portion of such further notice shall in any manner defeat the effectiveness of a call for redemption if notice thereof is given as prescribed herein.

Section 303. <u>Execution, Authentication and Delivery of Bonds</u>. The Bonds shall be executed in the name of the City by the manual or facsimile signatures of the Emergency Manager and the Finance Director of the City and authenticated by the manual signature of the Finance Director or an authorized representative of the Paying Agent, as the case may be, and a facsimile of the seal of the City shall be imprinted on the Bonds. Additional Bonds bearing the manual or facsimile signatures of the Emergency Manager or Mayor of the City and the Finance Director, and upon which the facsimile of the seal of the City is imprinted may be delivered to the Paying Agent for authentication and delivery in connection with the exchange or transfer of Bonds. The Paying Agent shall indicate on each Bond the date of its authentication.

Section 304. <u>Authentication of the Bonds</u>. (a) No Bond shall be entitled to any benefit under this Order or be valid or obligatory for any purpose unless there appears on such Bond a Certificate of Authentication substantially in the form provided for in Section 307 of this Order, executed by the manual or facsimile signature of the Finance Director or by an authorized signatory of the Paying Agent by manual signature, and such certificate upon any Bond shall be conclusive evidence, and the only evidence, that such Bond has been duly authenticated and delivered hereunder.

(b) The Paying Agent shall manually execute the Certificate of Authentication on each Bond upon receipt of a written direction of the Authorized Officer of the City to authenticate such Bond.

Section 305. <u>Transfer of Registration and Exchanges on the Bonds</u>. (a) The registration of each Bond is transferable only upon the Bond Registry by the Registered Owner thereof, or by his attorney duly authorized in writing, upon the presentation and surrender thereof at the designated corporate trust office of the Paying Agent together with a written instrument of transfer satisfactory to the Paying Agent, duly executed by the Registered Owner thereof or his attorney duly authorized in writing, and thereupon one or more fully executed and authenticated Bonds in any authorized denominations of like maturity and tenor, in equal aggregate principal amount shall be issued to the transferee in exchange therefor.

(b) Each Bond may be exchanged for one or more Bonds in equal aggregate principal amount of like maturity and tenor in one or more authorized denominations, upon the presentation and surrender thereof at the principal corporate trust office of the Paying Agent

together with a written instrument of transfer satisfactory to the Paying Agent, duly executed by the Registered Owner hereof or his attorney duly authorized in writing.

Section 306. <u>Regulations with Respect to Exchanges and Transfers</u>. (a) In all cases in which the privilege of exchanging Bonds or transferring the registration of Bonds is exercised, the City shall execute and the Paying Agent shall authenticate and deliver Bonds in accordance with the provisions of this Order. All Bonds surrendered in any such exchanges or transfers shall be forthwith canceled by the Paying Agent.

(b) For every exchange or transfer of Bonds, the City or the Paying Agent may make a charge sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect to such exchange or transfer and, except as otherwise provided in this Order, may charge a sum sufficient to pay the costs of preparing each new Bond issued upon such exchange or transfer, which shall be paid by the person requesting such exchange or transfer as a condition precedent to the exercise of the privilege of making such exchange or transfer.

(c) The Paying Agent shall not be required (i) to issue, register the transfer of or exchange any Bond during a period beginning at the opening of business 15 days before the day of the giving of a notice of redemption of Bonds selected for redemption as described in the form of Bonds contained in Section 307 of this Order and ending at the close of business on the day of that giving of notice, or (ii) to register the transfer of or exchange any Bond so selected for redemption in whole or in part, except the unredeemed portion of Bonds being redeemed in part. The City shall give the Paying Agent notice of call for redemption at least 20 days prior to the date notice of redemption is to be given.

Section 307. <u>Form of the Bonds</u>. The Bonds shall be in substantially the following form with such insertions, omissions, substitutions and other variations as shall not be inconsistent with this Order or as approved by an Authorized Officer in the Supplemental Order:

[Forms of Bonds]

[Unless this certificate is presented by an authorized representative of The Depository Trust Company, a New York corporation ("DTC") to the City (as hereinafter defined), or its agent for registration of transfer, exchange, or payment and any certificate issued is registered in the name of Cede & Co. or in such other name as is requested by an authorized representative of DTC (and any payment is made to Cede & Co. or to such other entity as is requested by an authorized representative of DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL inasmuch as the registered owner hereof, Cede & Co., has an interest herein.]

UNITED STATES OF AMERICA
STATE OF MICHIGAN
COUNTY OF WAYNE

CITY OF DETROIT

FINANCIAL RECOVERY BOND

(LIMITED TAX GENERAL OBLIGATION), SERIES 2014

| Maturity Date | Date of Original Issue | CUSIP |
|---|---|---|
| April 1, 20__ | _____, 2014 | |

Registered Owner:

Original Principal Amount:                                                                Dollars

  The City of Detroit, County of Wayne, State of Michigan (the "City"), acknowledges itself to owe and for value received hereby promises to pay to the Registered Owner specified above, or registered assigns, the Accretion Value specified below, in lawful money of the United States of America, on the Maturity Date specified above, unless prepaid prior thereto as hereinafter provided, with interest thereon at the Interest Rate of 5.0% per annum from the Date of Original Issue specified above until the tenth (10th) anniversary of the Date of Original Issue (the "Conversion Date"), and thereafter at an Interest Rate of 5.65% per annum on Accretion Value prior to the next Accretion Date, until the Maturity Date specified above or until the Accretion Value is paid in full. Interest is payable semiannually on April 1 and October 1 in each year commencing on _____ (each an "Interest Payment Date"). The interest so payable, and punctually paid or duly provided for, will be paid, as provided in the hereinafter defined Order, to the person in whose name this Bond is registered on the books maintained for such purpose by the hereinafter defined Paying Agent (the "Bond Registry"), on the close of business on the Regular Record Date for such interest payment, which shall be the fifteenth day (whether or not a Business Day) of the calendar month immediately preceding such Interest Payment Date. Any such interest not so punctually paid or duly provided for shall herewith cease to be payable to the Registered Owner on such Regular Record Date, and may be paid to

12

13-53846-tjt  Doc 8045-5  Filed 12/16/14  Entered 12/16/14 09:48:29  Page 149 of 301
13-53846-swr  Doc 7673-5  Filed 10/22/15  Entered 10/22/14 07:39:38  Page 29 of
809

the person in whose name this Bond is registered at the close of business on a Special Record Date for the payment of such defaulted interest to be fixed by the Paying Agent, notice of which shall be given to Registered Owners at least seven days before such Special Record Date, or may be paid at any time in any other lawful manner. The bonds of this series shall also accrete in value at an Accretion Rate of 0.65% per annum, compounded semiannually on each April 1 and October 1 to the Accreted Value as of any date of calculation (as hereinafter set forth), until the Conversion Date. Thereafter, the Bonds at their Accreted Value in principal amount shall pay current interest at the Interest Rate of 5.65% per annum, payable semiannually on each Interest Payment Date. Capitalized terms used herein but not defined herein, shall have the meanings ascribed to them in the Order.

THE BELOW CHART OF ACCRETION VALUES OF THIS BOND PER $5,000 ORIGINAL PRINCIPAL AMOUNT WILL REQUIRE MODIFICATION IF THE BONDS ARE ISSUED ON A DATE OTHER THAN 10/01/14 BASED ON INTEREST CALCULATIONS AT 0.65% ANNUALLY.

### Chart of Accretion Values

| Accretion Date | Accretion Amount |
| --- | --- |
| 04/01/2015 | $5,016.25 |
| 10/01/2015 | 5,032.55 |
| 04/01/2016 | 5,048.91 |
| 10/01/2016 | 5,065.32 |
| 04/01/2017 | 5,081.78 |
| 10/01/2017 | 5,098.30 |
| 04/01/2018 | 5,114.87 |
| 10/01/2018 | 5,131.49 |
| 04/01/2019 | 5,148.17 |
| 10/01/2019 | 5,164.90 |
| 04/01/2020 | 5,181.68 |
| 10/01/2020 | 5,198.52 |
| 04/01/2021 | 5,215.42 |
| 10/01/2021 | 5,232.37 |
| 04/01/2022 | 5,249.37 |
| 10/01/2022 | 5,266.43 |
| 04/01/2023 | 5,283.55 |
| 10/01/2023 | 5,300.72 |
| 04/01/2024 | 5,317.95 |
| 10/01/2024 | 5,335.23 |
| Thereafter | 5,335.23 |

The Accretion Value of this Bond is payable in lawful money of the United States of America upon presentation and surrender of this Bond at the designated corporate trust office of _____, _____, _____, as registrar, transfer agent and paying agent under the Order (such bank and any successor as paying agent, the "Paying Agent"). Interest on this Bond is payable in like money by check or draft drawn on the Paying

Agent and mailed to the Registered Owner entitled thereto, as provided above, by first class mail or, upon the written request of a Registered Owner of at least $1,000,000 in aggregate principal amount of Bonds (with complete wiring instructions no later than the Regular Record Date for such Interest Payment Date), by wire transfer by the Paying Agent to such Registered Owner, and such request may provide that it will remain in effect with respect to subsequent Interest Payment Dates unless and until changed or revoked at any time prior to a Regular Record Date by subsequent written notice to the Paying Agent. Interest shall be computed on the basis of a 360-day year consisting of twelve 30 day months. For prompt payment of this Bond, both principal and interest, the full faith, credit and resources of the City are hereby irrevocably pledged.

This bond is one of a series of bonds aggregating the principal sum of $_____, issued under and in full compliance with the Constitution and statutes of the State of Michigan, and particularly Section 36a of Act No. 279, Public Acts of Michigan, 1909, as amended ("Act 279"), for the purpose of satisfying certain LTGO Claims, as defined in the Order. Pursuant to the Order, the bonds of this series (the "Bonds") are limited tax general obligations of the City, and the City is obligated to levy annually ad valorem taxes on all taxable property in the Issuer, subject to applicable constitutional, statutory and charter tax rate limitations.

The "Order" is an Order of the Emergency Manager issued on _____, 2014, supplemented by a Supplemental Order of an Authorized Officer of the City issued on _____, 2014, authorizing the issuance of the Bonds.

The bonds of this series shall be subject to redemption prior to maturity as follows:

*(a) Optional Redemption.* The Bonds are subject to redemption prior to maturity, in whole, at the option of the Issuer, on any Interest Payment Date after the Date of Original Issue, at a redemption price equal to the Accretion Value as of the date of redemption plus accrued interest to the date fixed for redemption.

*(b) Mandatory Redemption.*

The Bonds shall be subject to mandatory redemption, in part, by lot, on the redemption dates and in the Accretion Values set forth below, and at a redemption price equal to the Accretion Value thereof as of the date of redemption, without premium, plus accrued interest to the date fixed for redemption.

14

809

13-53846-tjt    Doc 8775    Filed 12/16/14    Entered 12/16/14 07:09:38    Page 151 of 301
13-53846-swr    Doc 8045    Filed 10/22/14    Entered 10/22/14 09:48:29    Page 30 of 301

| Redemption Date October 1 | Principal Amount |
|---|---|
| 2020 | $2,000,000 |
| 2021 | 2,000,000 |
| 2022 | 2,000,000 |
| 2023 | 2,000,000 |
| 2024 | 2,000,000 |
| 2025 | 3,735,115 |
| 2026 | 3,735,115 |
| 2027 | 3,735,115 |
| 2028 | 3,735,115 |
| 2029 | 3,735,115 |
| 2030 | 3,735,115 |
| 2031 | 3,735,115 |
| 2032 | 3,735,115 |
| 2033 | 3,735,115 |
| 2034 | 3,735,115 |
| 2035 | 3,735,115 |
| 2036 | 3,735,115 |
| 2037* | 3,735,115 |

*Final Maturity

The Accretion Value of the Bonds to be redeemed on the dates set forth above shall be reduced by the Accretion Value of Term Bonds that has been redeemed (other than by mandatory sinking fund redemption) or otherwise acquired by the City and delivered to the Paying Agent prior to giving the notice of redemption described below. The City may satisfy any mandatory redemption requirement by the purchase and surrender of Term Bonds of the same maturity and interest rate in lieu of calling such Term Bonds for mandatory redemption.

*General Redemption Provisions.* In case less than the full amount of an outstanding bond is called for redemption, the Paying Agent, upon presentation of the bond called for redemption, shall register, authenticate and deliver to the registered owner of record a new bond in the principal amount of the portion of the original bond not called for redemption.

Notice of redemption shall be given to the registered owners of Bonds or portions thereof called for redemption by mailing of such notice not less than thirty (30) days but not more than sixty (60) days prior to the date fixed for redemption to the registered address of the registered owner of record. Bonds or portions thereof so called for redemption shall not bear interest after the date fixed for redemption, whether presented for redemption or not, provided funds are on hand with the Paying Agent to redeem such Bonds.

Reference is hereby made to the Order for the provisions with respect to the nature and extent of the security for the Bonds, the manner and enforcement of such security, the rights,

duties and obligations of the City, and the rights of the Paying Agent and the Registered Owners of the Bonds. As therein provided, the Order may be amended in certain respects without the consent of the Registered Owners of the Bonds. A copy of the Order is on file and available for inspection at the office of the Finance Director and at the principal corporate trust office of the Paying Agent.

The City and the Paying Agent may treat and consider the person in whose name this Bond is registered on the Bond Registry as the absolute owner hereof, whether this Bond shall be overdue or not, for the purpose of receiving payment of, or on account of, the principal hereof and interest hereon and for all other purposes whatsoever, and all such payments so made to such person or upon his order shall be valid and effectual to satisfy and discharge the liability hereon to the extent of the sum or sums so paid.

The registration of this Bond is transferable only upon the Bond Registry by the Registered Owner hereof or by his attorney duly authorized in writing upon the presentation and surrender hereof at the designated corporate trust office of the Paying Agent together with a written instrument of transfer satisfactory to the Paying Agent, duly executed by the Registered Owner hereof or his attorney duly authorized in writing, and thereupon one or more fully executed and authenticated Bonds in any authorized denominations of like maturity and tenor, in equal aggregate principal amount shall be issued to the transferee in exchange therefor as provided in the Order upon the payment of the charges, if any, therein prescribed.

It is hereby certified, recited and declared that all acts, conditions and things required by law to exist, happen and to be performed, precedent to and in the issuance of the Bonds do exist, have happened and have been performed in due time, form and manner as required by the Constitution and statutes of the State of Michigan, and that the total indebtedness of the City, including the Bonds does not exceed any constitutional, statutory or charter limitation.

This Bond is not valid or obligatory for any purpose until the Paying Agent's Certificate of Authentication on this Bond has been executed by the Paying Agent.

IN WITNESS WHEREOF, the City of Detroit, by its Emergency Manager, has caused this bond to be signed in the name of the City by the facsimile signatures of its Emergency Manager and Finance Director of the City, and a facsimile of its corporate seal to be printed hereon, all as of the Date of Original Issue.

CITY OF DETROIT

By: _____
      Emergency Manager


By: _____
      Finance Director


(SEAL)

(Form of Paying Agent's Certificate of Authentication)

DATE OF AUTHENTICATION:

CERTIFICATE OF AUTHENTICATION

This bond is one of the bonds described in the within-mentioned Order.

_____

_____

_____, Michigan

Paying Agent

By:  _____

Authorized Signatory

18

13-53846-tjt   Doc 8772-5   Filed 12/16/14   Entered 12/16/14 20:39:38   Page 155 of 301
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 303 of 809

ASSIGNMENT

FOR VALUE RECEIVED the undersigned hereby sells, assigns and transfers unto

_____

(Please print or typewrite name and address of transferee)


the within bond and all rights thereunder, and hereby irrevocably constitutes and appoints _____ attorney to transfer the within bond on the books kept for registration thereof, with full power of substitution in the premises.

Dated:                                                    _____

_____          _____

Signature Guaranteed:                                NOTICE:  The signature(s) to this assignment must correspond with the name as it appears upon the face of the within bond in every particular, without alteration or enlargement or any change whatever.  When assignment is made by a guardian, trustee, executor or administrator, an officer of a corporation, or anyone in a representative capacity, proof of such person's authority to act must accompany the bond.



Signature(s) must be guaranteed by a commercial bank or trust company or by a brokerage firm having a membership in one of the major stock exchanges.  The transfer agent will not effect transfer of this bond unless the information concerning the transferee requested below is provided.

PLEASE INSERT SOCIAL
SECURITY NUMBER OR OTHER
IDENTIFYING NUMBER OF
TRANSFEREE.

Name and Address:  _____

_____

_____

(Include information for all joint owners
if the bond is held by joint account.)

_____

(Insert number for first named
transferee if held by joint account.)

Section 308. <u>Registration</u>. The City and the Paying Agent may treat and consider the Registered Owner of any Bond as the absolute owner of such Bond, whether such Bond shall be overdue or not, for the purpose of receiving payment of, or on account of, the principal (and premium, if any) thereof and interest thereon and for all other purposes whatsoever, and all such payments so made to such Bondowner or upon his order shall be valid and effectual to satisfy and discharge the liability upon such Bond to the extent of the sum or sums so paid.

Section 309. <u>Mutilated, Destroyed, Stolen or Lost Bonds</u>. (a) Subject to the provisions of Act 354, Public Acts of Michigan, 1972, as amended and any other applicable law, if (i) any mutilated Bond is surrendered to the Paying Agent or the City and the Paying Agent and the City receive evidence to their satisfaction of the destruction, loss or theft of any Bond and (ii) there is delivered to the City and the Paying Agent such security or indemnity as may be required by them to save each of them harmless, then, in the absence of notice to the City or the Paying Agent that such Bond has been acquired by a bona fide purchaser, the City shall execute and the Paying Agent shall authenticate and deliver in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Bond, a new Bond of like tenor and principal amount, bearing a number not contemporaneously outstanding.

(b)      If any such mutilated, destroyed, lost or stolen Bond has become or is about to become due and payable, the City in its discretion may, instead of issuing a new Bond, pay such Bond.

(c)      Any new Bond issued pursuant to this Section in substitution for a Bond alleged to be mutilated, destroyed, stolen or lost shall constitute an original additional contractual obligation on the part of the City, and shall be equally secured by and entitled to equal proportionate benefits with all other Bonds issued under this Order.

Section 310. <u>Book-Entry-Only System Permitted</u>. (a) If determined by the Authorized Officer in the Supplemental Order, the Bonds or portions of the Bonds shall be issued to a securities depository selected by the Authorized Officer (the "Security Depository") to be held pursuant to the book-entry-only system maintained by the Security Depository and registered in the name of the Security Depository or its nominee. Ownership interests in Bonds held under such book-entry-only system shall be determined pursuant to the procedures of the Security Depository and Article 8 of the applicable Uniform Commercial Code (such persons having such interests, "Beneficial Owners").

(b)      If (i) the City and the Paying Agent receive written notice from the Security Depository to the effect that the Security Depository is unable or unwilling to discharge its responsibilities with respect to the Bonds under the book-entry-only system maintained by it or (ii) the Authorized Officer determines that it is in the best interests of the Beneficial Owners that they be able to obtain Bonds in certificated form, then the City may so notify the Security Depository and the Paying Agent, and, in either event, the City and the Paying Agent shall take appropriate steps to provide the Beneficial Owners with Bonds in certificated form to evidence their respective ownership interests in the Bonds. Whenever the Security Depository requests the City and the Paying Agent to do so, the Authorized Officer on behalf of the City and the Paying Agent will cooperate with the Security Depository in taking appropriate action after

reasonable notice to make available Bonds registered in whatever name or names the Beneficial Owners transferring or exchanging Bonds shall designate.

(c)     Notwithstanding any other provision of the Order to the contrary, so long as the Bonds are held pursuant to the book-entry-only system maintained by the Security Depository:

(i)     all payments with respect to the principal and interest on such Bonds and all notices with respect to such Bonds shall be made and given, respectively, to the Security Depository as provided in the representation letter from the City and the Paying Agent to the Security Depository with respect to such Bonds; and

(ii)     all payments with respect to principal of the Bonds and interest on the Bonds shall be made in such manner as shall be prescribed by the Security Depository.

## ARTICLE IV

## FUNDS AND ACCOUNTS

Section 401.  Establishment of Accounts and Funds.  (a)  The City hereby establishes and creates the Debt Retirement Fund as a special, separate and segregated account and fund which shall be held for and on behalf of the City by the Paying Agent.

(b)     The Finance Director is hereby authorized to establish such additional accounts, subaccounts or funds as shall be required for the Bonds, to accommodate the requirements of such series of Bonds.

Section 402.  Debt Retirement Fund.  General funds of the City, proceeds of all taxes levied pursuant to Section 301 hereof shall be used to pay the principal of and interest on the Bonds when due. The City shall set aside in the Debt Retirement Fund each month, (i) beginning the first day of the first month following the date of delivery of the Bonds, an amount equal to 1/6 of the interest coming due on the Bonds on the next Interest Payment Date and, (ii) beginning on the first day of the first month which is 11 months prior to the date on which the first mandatory sinking fund redemption occurs, an amount equal to 1/12 of the principal or Accretion Value coming due on the next mandatory sinking fund redemption date for the Bonds The foregoing amounts shall be placed in the Debt Retirement Fund and held in trust by the Paying Agent, and so long as the principal or Accretion Value of or interest on the Bonds shall remain unpaid, no moneys shall be withdrawn from the Debt Retirement Fund except to pay such principal or Accretion Value and interest.  Any amounts remaining in the Debt Retirement Fund after payment in full of the Bonds and the fees and expenses of the Paying Agent shall be retained by the City to be used for any lawful purpose.

Section 403.  Investment of Monies in the Funds and Accounts.  (a) The Finance Director shall direct the investment of monies on deposit in the Funds and Accounts established hereunder, and the Paying Agent, upon written direction or upon oral direction promptly confirmed in writing by the Finance Director, shall use its best efforts to invest monies on deposit in the Funds and Accounts in accordance with such direction.

(b)     Monies on deposit in the Funds and Accounts may be invested in such investments and to the extent permitted by applicable law.

## ARTICLE V

## THE PAYING AGENT

Section 501.  <u>Paying Agent</u>.  The Paying Agent for the Bonds shall act as bond registrar, transfer agent and paying agent for the Bonds and shall be initially _____ _____, Detroit, Michigan, or such other bank or trust company located in the State which is qualified to act in such capacity under the laws of the United States of America or the State.  The Paying Agent means and includes any company into which the Paying Agent may be merged or converted or with which it may be consolidated or any company resulting from any merger, conversion or consolidation to which it shall be a party or any company to which the Paying Agent may sell or transfer all or substantially all of its corporate trust business, provided, that such company shall be a trust company or bank which is qualified to be a successor to the Paying Agent as determined by an Authorized Officer, shall be authorized by law to perform all the duties imposed upon it by this Order, and shall be the successor to the Paying Agent without the execution or filing of any paper or the performance of any further act, anything herein to the contrary notwithstanding.  An Authorized Officer is authorized to enter into an agreement with such a bank or trust company, and from time to time as required, may designate a similarly qualified successor Paying Agent and enter into an agreement therewith for such services.

## ARTICLE VI

## SUPPLEMENTAL ORDERS AND RESOLUTIONS

Section 601.  <u>Supplemental Orders and Resolutions Not Requiring Consent of Holders of the Bonds</u>.  The City may without the consent of any Bondowner adopt orders or resolutions supplemental to this Order for any one or more of the following purposes:

(i)     to confirm or further assure the security hereof or to grant or pledge to the holders of the Bonds any additional security;

(ii)    to add additional covenants and agreements of the City for the purposes of further securing the payment of the Bonds;

(iii)   to cure any ambiguity or formal defect or omission in this Order; and

(iv)    such other action not materially, adversely and directly affecting the security of the Bonds.

provided that (A) no supplemental order or resolution amending or modifying the rights or obligations of the Paying Agent shall become effective without the consent of the Paying Agent and (B) the effectiveness of any supplemental resolution is subject to Section 702 to the extent applicable.

13-53846-tjt   Doc 8773-45   Filed 12/16/14   Entered 12/16/14 20:39:38   Page 159 of 301
13-53846-swr   Doc 8045-5   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 309 of
809

Section 602.  <u>Bond Counsel Opinion</u>.  Before any supplemental order or resolution under this Article shall become effective, a copy thereof shall be filed with the Paying Agent, together with an opinion of Bond Counsel that such supplemental order or resolution is authorized or permitted by this Article; provided that, Bond Counsel in rendering any such opinion shall be entitled to rely upon certificates of an Authorized Officer or other City official, and opinions or reports of consultants, experts and other professionals retained by the City to advise it, with respect to the presence or absence of facts relative to such opinion and the consequences of such facts.

## ARTICLE VII

## DEFEASANCE

Section 701.  <u>Defeasance</u>.  Bonds shall be deemed to be paid in full upon the deposit in trust of cash or direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America, or any combination thereof, not redeemable at the option of the issuer thereof, the principal and interest payments upon which, without reinvestment thereof, will come due at such times and in such amounts, as to be fully sufficient to pay when due, the principal of such Bonds and interest to accrue thereon, as confirmed by a verification report prepared by an independent certified public accountant; provided, that if any of such Bonds are to be called for redemption prior to maturity, irrevocable instructions to call such Bonds for redemption shall be given to the Paying Agent.  Such cash and securities representing such obligations shall be deposited with a bank or trust company and held for the exclusive benefit of the Owners of such Bonds.  After such deposit, such Bonds shall no longer be entitled to the benefits of this Order (except for any rights of transfer or exchange of Bonds as therein or herein provided for) and shall be payable solely from the funds deposited for such purpose and investment earnings, if any, thereon, and the lien of this Order for the benefit of such Bonds shall be discharged.

## ARTICLE VIII

## OTHER PROVISIONS OF GENERAL APPLICATION

[Section 801.  <u>Reserved</u>]

Section 802.  <u>Approval of Other Documents and Actions</u>.  The Mayor, the Finance Director, the Treasurer, the City Clerk and any written designee of the Emergency Manager are each hereby authorized and directed on behalf of the City to take any and all other actions, perform any and all acts and execute any and all documents that shall be required, necessary or desirable to implement this Order.

Section 803.  <u>Delegation of City to, and Authorization of Actions of Authorized Officers</u>.  (a)  Each Authorized Officer is hereby authorized and directed to do and perform any and all acts and things with respect to the Bonds which are necessary and appropriate to carry into effect, consistent with this Order, the authorizations therein and herein contained, including without limitation, the securing of ratings by bond rating agencies, if cost effective, the negotiation for and acquisition of bond insurance and/or other credit enhancement, if any, to further secure the

23

13-53846-tjt   Doc 8272-5 Filed 12/16/14   Entered 12/16/14 07:39:38   Page 160 of 301
13-53846-swr   Doc 3045   Filed 10/22/14   Entered 10/22/14 09:48:28   Page 31 of 301
809

Bonds or any portions thereof, the acquisition of an irrevocable surety bond to fulfill the City's obligation to fund any reserve account, the printing of the Bonds and the incurring and paying of reasonable fees, costs and expenses incidental to the foregoing and other costs of issuance of the Bonds including, but not limited to fees and expenses of bond counsel, financial advisors, accountants and others, from available funds, for and on behalf of the City.

(b)     Except as otherwise provided herein, all determinations and decisions of the Authorized Officer with respect to the issuance and sale of the Bonds or the negotiation, execution or delivery of agreements as permitted or required by this Order shall be confirmed by this Authorized Officer in a Supplemental Order or Supplemental Orders, and such confirmations shall constitute determinations that any conditions precedent to such determinations and decisions of the Authorized Officer have been fulfilled.

Section 804.  <u>Approving Legal Opinions with Respect to the Bonds</u>.  Delivery of the Bonds shall be conditioned upon receiving, at the time of delivery of the Bonds; the approving opinion of Bond Counsel, approving legality of the Bonds.

Section 805.  <u>Appointment of Bond Counsel; Engagement of Other Parties.</u>  The appointment by the Emergency Manager of the law firm of Miller, Canfield, Paddock and Stone, P.L.C. of Detroit, Michigan, as Bond Counsel for the Bonds is hereby ratified and confirmed, notwithstanding the periodic representation by Miller, Canfield, Paddock and Stone, P.L.C., in unrelated matters of other parties and potential parties to the issuance of the Bonds.  The fees and expenses of Miller, Canfield, Paddock and Stone, P.L.C. as Bond Counsel and other accumulated bond related fees and expenses shall be payable from available funds in accordance with the agreement of such firm on file with the Finance Director.

Section 806.  <u>Preservation of Records</u>.  So long as any Bond remains Outstanding, all documents received by the Paying Agent under the provisions of this Order shall be retained in its possession and shall be subject at all reasonable times to the inspection of the City, and the Bondowners, and their agents and representatives, any of whom may make copies thereof.

Section 807.  <u>Parties in Interest</u>.  Nothing in this Order, expressed or implied, is intended or shall be construed to confer upon, or to give to, any person or entity, other than the City, the Paying Agent and the Owners of the Bonds, any right, remedy or claim under or by reason of this Order or any covenant, condition or stipulation hereof, and all covenants, stipulations, promises and agreements in this Order contained by and on behalf of the City or Paying Agent shall be for the sole and exclusive benefit of the City, the Paying Agent and the Bondowners.

Section 808.  <u>No Recourse Under Order</u>.  All covenants, agreements and obligations of the City contained in this Order shall be deemed to be the covenants, agreements and obligations of the City and not of any councilperson, member, officer or employee of the City in his or her individual capacity, and no recourse shall be had for the payment of the principal of or interest on the Bonds or for any claim based thereon or on this Order against any councilperson, member, officer or employee of the City or any person executing the Bonds in his or her official individual capacity.

24
809
13-53846-tjt  Doc 8772-5  Filed 12/16/14  Entered 12/16/14 09:38:29  Page 161 of 301
13-53846-swr  Doc 8045  Filed 10/22/14  Entered 10/22/14 07:39:38  Page 31 of 104

Section 809.  Severability.  If any one or more sections, clauses or provisions of this Order shall be determined by a court of competent jurisdiction to be invalid or ineffective for any reason, such determination shall in no way affect the validity and effectiveness of the remaining sections, clauses and provisions hereof.

Section 810.  Cover Page, Table of Contents and Article and Section Headings.  The cover page, table of contents and Article and Section headings hereof are solely for convenience of reference and do not constitute a part of this Order, and none of them shall affect its meaning, construction or effect.

Section 811.  Conflict.  All orders or resolutions or parts of orders or resolutions or other proceedings of the City in conflict herewith shall be and the same hereby are repealed insofar as such conflict exists.

Section 812.  Governing Law and Jurisdiction.  This Order shall be governed by and construed in accordance with the laws of the State.

Section 813.  Order and Supplemental Order are a Contract.  The provisions of this Order and the Supplemental Order shall constitute a contract between the City, the Paying Agent,  and the Bondowners.

Section 814.  Effective Date.  This Order shall take effect immediately upon its adoption by the Council.

Section 815.  Notices.  All notices and other communications hereunder shall be in writing and given by United States certified or registered mail, expedited courier overnight delivery service or by other means (including facsimile transmission) that provides a written record of such notice and its receipt.  Notices hereunder shall be effective when received and shall be addressed to the address set forth below or to such other address as any of the below persons shall specify to the other persons:


If to the City, to:                    City of Detroit
                                       Finance Department
                                       1200 Coleman A. Young Municipal Center
                                       Detroit, Michigan 48226
                                       Attention: Finance Director


If to the Paying Agent, to:            U.S. Bank National Association
                                       _____
                                       _____
                                       Attention:  _____

SO ORDERED this _____ day of _____, 2014.

_____
Kevyn D. Orr
Emergency Manager
City of Detroit, Michigan

22545852.5\022765-00202

13-53846-tjt  Doc 8772  Filed 12/16/14  Entered 12/16/14 07:39:38  Page 163 of 301
13-53846-swr  Doc 8045-1  Filed 10/22/15  Entered 10/22/14 03:48:29  Page 31 of 301
809

**EXHIBIT I.A.246**

PRINCIPAL TERMS OF NEW B NOTES

**NEW B NOTES**
**SUMMARY OF PRINCIPAL TERMS[1]**

On the Effective Date, the City shall issue the New B Notes and distribute them as set forth in the Plan. The definitive documentation governing the New B Notes shall provide generally for the following terms:

| | |
|---|---|
| Obligation | The City's obligations with respect to the New B Notes shall be a general and unsecured obligation of the City. |
| Initial Principal Amount | $632.0 million. |
| Interest Rate | 4.0% for the first 20 years; 6.0% for years 21 through 30. |
| Maturity | 30 years. |
| Amortization | Interest only for 10 years; amortization in 20 equal annual installments beginning on the interest payment date nearest to the 11th anniversary from issuance. |
| Disclosure | The City will provide a continuing disclosure undertaking under 17 C.F.R. § 240.15c2-12 in connection with the delivery of the New B Notes. |

---

[1]    Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan.

**EXHIBIT I.A.247**

FORM OF NEW B NOTES DOCUMENTS

ORDER NO. _____

ORDER OF THE EMERGENCY MANAGER OF THE CITY OF DETROIT, COUNTY OF WAYNE, STATE OF MICHIGAN, AUTHORIZING THE ISSUANCE BY THE CITY OF DETROIT OF NOT TO EXCEED $632,000,000 FINANCIAL RECOVERY BONDS IN ONE OR MORE SERIES FOR THE PURPOSE OF SATISFYING CERTAIN UNSECURED CLAIMS AS PROVIDED IN THE BANKRUPTCY CASE PLAN OF ADJUSTMENT; AND AUTHORIZING THE EMERGENCY MANAGER TO MAKE CERTAIN DETERMINATIONS AND TO TAKE CERTAIN ACTIONS IN CONNECTION WITH THE DELIVERY AND EXCHANGE OF SAID BONDS TO THE HOLDERS OF SAID CLAIMS.

13-53846-tjt Doc 8045 Filed 10/22/14 Entered 10/22/14 03:48:29 Page 167 of 301
13-53846-swr Doc 8045-1 Filed 10/22/15 Entered 10/22/14 07:39:38 Page 31 of 301
809

# TABLE OF CONTENTS

**Page**

ARTICLE I        DEFINITIONS AND INTERPRETATION ............................................. 3
    Section 101. Definitions........................................................................... 3
    Section 102. Interpretation....................................................................... 6

ARTICLE II DETERMINATIONS........................................................................ 7
    Section 201. Finding, and Declaration of Need to Issue Bonds ..................... 7

ARTICLE III AUTHORIZATION, REDEMPTION AND ASSIGNMENT OF THE
        BONDS ............................................................................................. 7
    Section 301. Authorization of Bonds to Satisfy the Claims and Pledge........... 7
    Section 302. Designations, Date, Interest, Maturity and Other Terms of the Bonds
           to Satisfy the Claims .................................................................. 7
    Section 303. Execution, Authentication and Delivery of Bonds ..................... 9
    Section 304. Authentication of the Bonds .................................................. 9
    Section 305. Transfer of Registration and Exchanges on the Bonds.............. 9
    Section 306. Regulations with Respect to Exchanges and Transfers ............. 9
    Section 307. Form of the Bonds .............................................................. 10
    Section 308. Registration ....................................................................... 17
    Section 309. Mutilated, Destroyed, Stolen or Lost Bonds........................... 17
    Section 310. Book-Entry-Only System Permitted ...................................... 17

ARTICLE IV FUNDS AND ACCOUNTS ............................................................ 18
    Section 401. Establishment of Accounts and Funds ................................... 18
    Section 402. Debt Retirement Fund.......................................................... 18
    Section 403. Investment of Monies in the Funds and Accounts................... 19
    Section 404. Satisfaction of Claims ......................................................... 19

ARTICLE V THE PAYING AGENT ................................................................... 20
    Section 501. Paying Agent ..................................................................... 20

ARTICLE VI SUPPLEMENTAL ORDERS AND RESOLUTIONS........................... 21
    Section 601. Supplemental Orders and Resolutions Not Requiring Consent of
           Holders of the Bonds ................................................................ 21
    Section 602. Bond Counsel Opinion......................................................... 21

ARTICLE VII DEFEASANCE ............................................................................ 21
    Section 701. Defeasance ....................................................................... 21

ARTICLE VIII        OTHER PROVISIONS OF GENERAL APPLICATION...................... 22
    [Section 801. Credit Enhancement .......................................................... 22
    Section 802. Approval of Other Documents and Actions............................. 22
    Section 803. Delegation of City to, and Authorization of Actions of Authorized
           Officers ................................................................................... 22
    Section 804. Approving Legal Opinions with Respect to the Bonds ............. 23
    Section 805. Appointment of Bond Counsel; Engagement of Other Parties... 23
    Section 806. Preservation of Records ...................................................... 23
    Section 807. Parties in Interest............................................................... 23

-i-

13-53846-tjt   Doc 8272   Filed 12/16/14   Entered 12/16/14 07:39:38   Page 168 of 301
13-53846-swr   Doc 6045-1   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 315 of
809

# TABLE OF CONTENTS
### (continued)

**Page**

Section 808.  No Recourse Under Resolution .................................................. 23
Section 809.  Severability ............................................................................... 23
Section 810.  Cover Page, Table of Contents and Article and Section Headings............ 23
Section 811.  Conflict .................................................................................... 24
Section 812.  Governing Law and Jurisdiction.................................................. 24
Section 813.  Order and Supplemental Order are a Contract............................ 24
Section 814.  Effective Date .......................................................................... 24
Section 815.  Notices ..................................................................................... 24

EXHIBIT A THE UNSECURED CLAIMS......................................................... A-1

13-53846-tjt  Doc 8045  Filed 12/16/14  Entered 12/16/14 07:39:38  Page 169 of 301
13-53846-swr  Doc 7305  Filed 10/22/15  Entered 10/22/14 03:48:29  Page 31 of 301
809

ORDER NO. ___

ORDER OF THE EMERGENCY MANAGER OF THE CITY OF DETROIT, COUNTY OF WAYNE, STATE OF MICHIGAN, AUTHORIZING THE ISSUANCE BY THE CITY OF DETROIT OF NOT TO EXCEED $632,000,000 FINANCIAL RECOVERY BONDS IN ONE OR MORE SERIES FOR THE PURPOSE OF SATISFYING CERTAIN UNSECURED CLAIMS AS PROVIDED IN THE BANKRUPTCY CASE PLAN OF ADJUSTMENT; AND AUTHORIZING THE EMERGENCY MANAGER TO MAKE CERTAIN DETERMINATIONS AND TO TAKE CERTAIN ACTIONS IN CONNECTION WITH THE DELIVERY AND EXCHANGE OF SAID BONDS TO THE HOLDERS OF SAID CLAIMS.

WHEREAS, on March 1, 2013, the Governor (the "Governor") of the State of Michigan (the "State") determined that a financial emergency existed within the City of Detroit, County of Wayne, State of Michigan (the "City") pursuant to the Local Government Fiscal Responsibility Act, Act 72, Public Acts of Michigan, 1990, as amended ("Act 72"); and

WHEREAS, on March 14, 2013, the Governor confirmed that a financial emergency existed within the City and, pursuant to Act 72, assigned to the Local Emergency Financial Assistance Loan Board established pursuant to the Emergency Municipal Loan Act, Act 243 Public Acts of Michigan, 1980, as amended (the "Board") the responsibility for managing the financial emergency; and

WHEREAS, on March 14, 2013, pursuant to Act 72, the Board appointed Kevyn D. Orr as Emergency Financial Manager for the City; And

WHEREAS, by operation of law the financial emergency continues to exist within the City pursuant to the Local Financial Stability and Choice Act, Act 436, Public Acts of Michigan, 2012 ("Act 436") and the Emergency Financial Manager continues in the capacity of the Emergency Manager for the City (the "Emergency Manager"); and

WHEREAS, on July 18, 2013 (the "Petition Date"), in accordance with Act 436 and the approval of the Governor, the Emergency Manager filed on behalf of the City a petition for relief pursuant to Chapter 9 of title 11 of the United States Code, 11 U.S.C. Sections 101-1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"); and

WHEREAS, on _____, 2014, the Emergency Manager filed on behalf of the City a _____ Amended Plan for the Adjustment of the Debts of the City of Detroit (now and as subsequently amended, the "Plan of Adjustment") in the Bankruptcy Court to provide for the adjustment of the debts of the City pursuant to and in accordance with Chapter 9 of the Bankruptcy Code; and

WHEREAS, the Plan of Adjustment provides, among other things, for the satisfaction of certain claims of unsecured creditors as set out in the Plan of Adjustment in exchange for the

1

receipt of unsecured pro rata shares ( each a "Pro Rata Share") of New B Notes (the "New B Notes"); and

WHEREAS, upon satisfaction of all of the terms and conditions required of the City related to the confirmation of the Plan of Adjustment, the City shall establish the Business Day upon which the Plan of Adjustment shall become effective (the "Effective Date"); and

WHEREAS, on or as reasonably practicable after the Effective Date, the City shall execute New B Notes Documents and issue New B Notes in the form of Financial Recovery Bonds authorized under Section 36a of the Home Rule City Act, Act 279, Public Acts of Michigan, 1909, as amended ("Act 279") and this Order, and distribute the New B Notes, in the form of the Financial Recovery Bonds, to the holders of the particular unsecured claims, as provided in the Plan of Adjustment and described on Exhibit A hereto (collectively, the "Claims"); and

WHEREAS, the Emergency Manager of the City deems it necessary to authorize the issuance of Financial Recovery Bonds in one or more series (the "Bonds"), in the aggregate principal amount of not to exceed Six Hundred Thirty Two Million Dollars ($632,000,000) pursuant to Section 36a of Act 279; and

WHEREAS, the Bonds will be secured by a pledge of the City's limited tax full faith and credit; and

WHEREAS, Section 36a of Act 279 authorizes a city, for which a financial emergency has been determined to exist, such as the City, to borrow money and issue Financial Recovery Bonds subject to the terms and conditions approved by the Board; and

WHEREAS, the City must receive prior approval of the terms and conditions for the issuance of the Bonds from the Board in accordance with Section 36a of Act 279; and

WHEREAS, the Emergency Manager desires to submit this Order to the Board proposing the issuance by the City of Financial Recovery Bonds, in one or more series, under Section 36a of Act 279, to provide for a portion of the financing of the City under the Plan of Adjustment, solely to satisfy the Claims [and to pay certain administrative and other costs related to the issuance of the bonds, upon the terms and conditions and parameters approved by the Board; and]

WHEREAS, prior to submission of this Order to the Board, pursuant to Sections 12(1)(u) and 19(i) of Act 436, the Emergency Manager must obtain approval of the issuance of the Bonds by the City Council of the City (the "City Council"), and if the City Council disapproves the issuance of the Bonds, the issuance of the Bonds must be approved by the Board.

NOW, THEREFORE, BE IT ORDERED AS FOLLOWS:

13-53846-tjt  Doc 8045  Filed 12/16/14  Entered 12/16/14 20:39:38  Page 171 of 301
809
13-53846-swr  Doc 7754  Filed 10/22/14  Entered 10/22/14 09:48:29  Page 171 of 301

# ARTICLE I

## DEFINITIONS AND INTERPRETATION

Section 101. <u>Definitions</u>.    The words and terms defined in the preambles and recitals hereof and the following words and terms as used in this Order shall have the meanings ascribed therein, herein or in the Plan of Adjustment to them unless a different meaning clearly appears from the context:

"Act 243" means Act No. 243, Public Acts of Michigan, 1980, as amended.

"Act 279" means Act No. 279, Public Acts of Michigan, 1909, as amended.

"Act 436" means Act No. 436, Public Acts of Michigan, 2012.

"Allowed Claims" has the meaning set forth in the Plan of Adjustment.

"Allowed Limited Tax General Obligation Bond Claims" shall mean such claims under Class 7 of the Plan of Adjustment.

"Allowed Other Unsecured Claims" has the meaning set forth in the Plan of Adjustment.

"Authorized Denominations" shall mean denominations of Bonds equal to multiples of $1,000 or integral multiples of $1.00 in excess thereof.

"Authorized Officer" means (i) the Emergency Manager or his designee or successor, or if the City is no longer operating under a financial emergency pursuant to Act 436, the chief administrative officer of the City, the Finance Director or his or her designee, or (ii) any other person authorized by a Certificate of an Authorized Officer to act on behalf of or otherwise represent the City in any legal capacity, which such certificate shall be delivered, if at all, in the City's sole discretion.

"Bankruptcy Case" means the City's Bankruptcy Case No. 13-53846 in the U.S. Bankruptcy Court for the Eastern District of Michigan.

"Bankruptcy Court" has the meaning set forth in the Plan of Adjustment.

"Board" has the meaning set forth in recitals hereto.

"Bond Counsel" means Miller, Canfield, Paddock and Stone, P.L.C., attorneys of Detroit, Michigan, or such other nationally recognized firm of attorneys experienced in matters pertaining to municipal bonds and appointed to serve in such capacity by the City with respect to the Bonds.

3

13-53846-tjt   Doc 8045   Filed 12/16/14   Entered 12/16/14 07:39:38   Page 172 of 201
13-53846-swr   Doc 8045   Filed 12/16/14   Entered 12/16/14 09:48:29   Page 322 of 809

"Bond" or "Bonds" means the Financial Recovery Bonds, Series 2014B of the City authorized to be issued by the Order in the aggregate principal amount not to exceed $632,000,000, in one or more series, and bearing such other designations as determined by the Authorized Officer in the Supplemental Order.

"Bond Registry" means the books for the registration of Bonds maintained by the Paying Agent.

"Bondowner", "Owner" or "Registered Owner" means, with respect to any Bond, the person in whose name such Bond is registered in the Bond Registry.

"Bonds" means the City's Financial Recovery Bonds, Series 2014B, with such series designations as may be determined by the Authorized Officer in the Supplemental Order.

"Business Day" means any day other than (i) a Saturday, Sunday or legal holiday, (ii) a day on which the Paying Agent or banks and trust companies in New York, New York are authorized or required to remain closed, (iii) a day on which the New York Stock Exchange is closed, or (iv) a day on which the Federal Reserve is closed.

"Certificate" means (i) a signed document either attesting to or acknowledging the circumstances, representations or other matters therein stated or set forth or setting forth matters to be determined pursuant to this Order.

"Charter" means the Charter of the City, as amended from time to time.

"City" means the City of Detroit, County of Wayne, State of Michigan.

"Claimants" means the beneficial owners of the Claims.

"Claims" has the meaning set forth recitals hereto.

"Closing Date" means the Date of Original Issue.

"Code" means the Internal Revenue Code of 1986, as amended.

"Constitution" means the Constitution of the State of Michigan of 1963, as amended.

"Confirmation Order" has the meaning set forth in recitals hereto.

"Contingent General VEBA Claims" has the meaning set forth in the recitals and Exhibit A hereto.

"Contingent Police and Fire VEBA Claims" has the meaning set forth in the recitals and Exhibit A hereto.

"COP Litigation" has the meaning set forth in the Plan of Adjustment.

"COPs Claims" has the meaning set forth in the recitals and Exhibit A hereto.

4

"Date of Original Issue" means the date upon which all conditions precedent set forth in the Bond Purchase Agreement to the transactions contemplated therein and herein have been satisfied and the Bonds have been issued to the Purchaser.

"DDA Claims" has the meaning set forth in the recitals and Exhibit A hereto.

"Debt Retirement Fund" means the Debt Retirement Fund established under Section 501 hereof, and any subaccounts thereof established hereunder for the payment of principal of and premium and interest on the Bonds.

"Disbursing Agent" means the Registered Owner of the Bonds issued on behalf of the Claimants entitled to distributions of Bonds and/or cash from the Disputed COPs Claims Reserve.

"Disbursing Agent Agreement" means the agreement between the City and the Disbursing Agent to provide for the distributions of Bonds and/or cash to Claimants from the Disputed COPs Claims Reserve.

"Disputed COPs Claims" has the meaning set forth in the Plan of Adjustment.

"Disputed COPs Claims Reserve" means the Disputed COP Claims Reserve established under Section 401(b).

"Emergency Manager" has the meaning set forth in the recitals hereto.

"Final Order" has the meaning set forth in the Plan of Adjustment.

"Fiscal Year" means the period from July 1 to and including June 30 of the immediately succeeding calendar year or such other fiscal year of the City as in effect from time to time.

"Interest Payment Date" means April 1 and October 1 of each year commencing with the April 1 or October 1 specified in the Supplemental Order.

"Interest Rate" means 4% per annum from the Date of Original Issue until the twentieth (20th) anniversary of the Date of Original Issue, and thereafter 6% per annum until the Maturity Date, or such other interest rates as confirmed in the Supplemental Order.

"Litigation Trust" has the meaning set forth in the Plan of Adjustment.

"Maturity Date" means the thirtieth (30th) anniversary of the Date of Original Issue or such other final date of maturity of each series of the Bonds as specified in the Supplemental Order.

"Maximum Aggregate Principal Amount" has the meaning given such term in Section 201.

"Order" means this Order of the Emergency Manager as supplemented by the Supplemental Order, and as amended from time to time pursuant to Article VII.

5

13-53846-tjt  Doc 8272-5  Filed 11/16/14  Entered 11/16/14 07:39:33  Page 174 of 301
13-53846-swr  Doc 8045  Filed 10/22/15  Entered 10/22/14 09:48:29  Page 324 of 809

"Other Unsecured Claims" has the meaning set forth in the recitals hereto.

"Outstanding" when used with respect to:

(1)     the Bonds, means, as of the date of determination, the Bonds theretofore authenticated and delivered under this Order, except:

(A)     Bonds theretofore canceled by the Paying Agent or delivered to such Paying Agent for cancellation;

(B)     Bonds for whose payment money in the necessary amount has been theretofore deposited with the Paying Agent in trust for the registered owners of such Bonds;

(C)     Bonds delivered to the Paying Agent for cancellation in connection with (x) the exchange of such Bonds for other Bonds or (y) the transfer of the registration of such Bonds;

(D)     Bonds alleged to have been destroyed, lost or stolen which have been paid or replaced pursuant to this Order or otherwise pursuant to law; and

(E)     Bonds deemed paid as provided in Section 701.

"Paying Agent" means the bond registrar, transfer agent and paying agent for the Bonds.

"Petition Date" has the meaning set forth in the recitals hereto.

"Plan of Adjustment" has the meaning set forth in the recitals hereto.

"Police and Fire VEBA Claims" has the meaning set forth in the recitals and Exhibit A hereto.

"Registered Owner" means the registered owner of a Bond as the registered owner's name appears on the Bond Registry under Section 305.

"Regular Record Date" has the meaning given such term in Section 302.

"Security Depository" has the meaning given such term in Section 310.

"Settled COP Claims" has the meaning set forth in the Plan of Adjustment.

"State" has the meaning set forth in the recitals hereto.

"State Treasurer" means the Treasurer of the State of Michigan.

"Supplemental Order" means the order or orders of the Authorized Officer making certain determinations and confirming the final details on the Bonds upon issuance, in accordance with the parameters of this Order.

6

13-53846-tjt   Doc 8272-5   Filed 12/16/14   Entered 12/16/14 07:39:38   Page 175 of 301
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 323 of 809

"Unsecured Pro Rata Share" has the meaning set forth in the Plan of Adjustment.

Section 102. Interpretation. (a) Words of the feminine or masculine genders include the correlative words of the other gender or the neuter gender.

(b)        Unless the context shall otherwise indicate, words importing the singular include the plural and vice versa, and words importing persons include corporations, associations, partnerships (including limited partnerships), trusts, firms and other legal entities, including public bodies, as well as natural persons.

(c)        Articles and Sections referred to by number mean the corresponding Articles and Sections of this Order.

(d)        The terms "hereby, "hereof", "hereto", "herein", "hereunder" and any similar terms as used in this Order, refer to this Order as a whole unless otherwise expressly stated.

## ARTICLE II

## DETERMINATIONS

Section 201. Finding, and Declaration of Need to Issue Bonds. The Emergency Manager hereby finds and declares that it is necessary for the City to issue the Bonds hereunder in such sum as shall be determined and approved by the Emergency Manager, not in excess of $632,000,000 (the "Maximum Aggregate Principal Amount"), and to evidence such debt by the issuance of the Bonds in one or more series not in excess of the Maximum Aggregate Principal Amount, in Authorized Denominations, pursuant to and in accordance with the provisions of Section 36a of Act 279, for the purpose of satisfying the Claims.

## ARTICLE III

## AUTHORIZATION, REDEMPTION AND ASSIGNMENT OF THE BONDS

Section 301. Authorization of Bonds to Satisfy the Claims and Pledge. The City hereby authorizes the issuance of the Bonds as hereinafter defined in such principal amount as shall be confirmed in the Supplemental Order to satisfy the Claims as determined by the Authorized Officer in the Supplemental Order or subsequently confirmed by the Authorized Officer to Bond Counsel. The principal of and interest on the Bonds shall hereby be secured by the limited tax full faith and credit pledge of the City.

The City pledges to pay the principal of and interest on the Bonds as a first budget obligation from its general funds and in case of insufficiency thereof, from the proceeds of an annual levy of ad valorem taxes on all taxable property of the City, subject to applicable constitutional, statutory and charter tax rate limitations.

Section 302. Designations, Date, Interest, Maturity and Other Terms of the Bonds to Satisfy the Claims. (a) The Bonds shall be designated "FINANCIAL RECOVERY BONDS,

7

SERIES 2014B" and may bear such later or earlier dates and additional or alternative designations, series or subseries as the Authorized Officer may determine in the Supplemental Order, shall be issued in fully registered form and shall be consecutively numbered from "R-1" upwards, unless otherwise provided by the Authorized Officer in the Supplemental Order. The Bonds shall be dated and issued in such denominations all as determined by the Authorized Officer and confirmed by the Authorized Officer in the Supplemental Order.

(b) The Bonds of each series shall mature on such Maturity Dates not in excess of 30 years from the Date of Original Issue and shall bear interest at the Interest Rate on a taxable basis, payable on the Interest Payment Dates, all as shall be determined and confirmed by the Authorized Officer in the Supplemental Order. Unless otherwise provided by the Authorized Officer in the Supplemental Order, interest on the Bonds shall be calculated on the basis of the actual number of days elapsed in a 360 day year. The Bonds shall be payable, as to principal and interest, in lawful money of the United States of America.

(c) Except as may be otherwise determined by the Authorized Officer in the Supplemental Order, interest on the Bonds shall be payable to the Registered Owner as of the 15th day of the month, whether or not a Business Day (a "Regular Record Date"), prior to each Interest Payment Date. Interest on the Bonds shall be payable to such Registered Owners by check or draft drawn on the Paying Agent on each Interest Payment Date and mailed by first class mail or, upon the written request of the Owner of $1,000,000 or more in aggregate principal amount of Bonds (with complete wiring instructions no later than the Regular Record Date for such Interest Payment Date), by wire transfer by the Paying Agent to such Owner. Such a request may provide that it will remain in effect with respect to subsequent Interest Payment Dates unless and until changed or revoked at any time prior to a Regular Record Date by subsequent written notice to the Paying Agent.

(d) Interest on Bonds not punctually paid or duly provided for on an Interest Payment Date shall forthwith cease to be payable to the Registered Owners on the Regular Record Date established for such Interest Payment Date, and may be paid to the Registered Owners as of the close of business on a date fixed by the Paying Agent (a "Special Record Date") with respect to the payment of such defaulted interest to be fixed by the Paying Agent, or may be paid at any time in any other lawful manner. The Paying Agent shall give notice to the Registered Owners at least seven days before any such Special Record Date.

(e) The principal of the Bonds shall be payable to the Registered Owners of the Bonds upon the presentation of the Bonds to the Paying Agent at the principal corporate trust office of the Paying Agent.

(f) The Bonds shall be subject to redemption and/or tender for purchase prior to maturity or shall not be subject thereto, upon such terms and conditions as shall be determined by the Authorized Officer and confirmed in the Supplemental Order.

Unless waived by any registered owner of Bonds to be redeemed, official notice of redemption shall be given by the Paying Agent on behalf of the City. Such notice shall be dated and shall contain at a minimum the following information: original issue date; maturity dates; interest rates, CUSIP numbers, if any; certificate numbers, and in the case of partial redemption,

the called amounts of each certificate; the redemption date; the redemption price or premium; the place where Bonds called for redemption are to be surrendered for payment; and that interest on Bonds or portions thereof called for redemption shall cease to accrue from and after the redemption date.

In addition, further notice shall be given by the Paying Agent in such manner as may be required or suggested by regulations or market practice at the applicable time, but no defect in such further notice nor any failure to give all or any portion of such further notice shall in any manner defeat the effectiveness of a call for redemption if notice thereof is given as prescribed herein.

Section 303. <u>Execution, Authentication and Delivery of Bonds</u>. The Bonds shall be executed in the name of the City by the manual or facsimile signatures of the Emergency Manager and the Finance Director of the City and authenticated by the manual signature of the Finance Director or an authorized representative of the Paying Agent, as the case may be, and a facsimile of the seal of the City shall be imprinted on the Bonds. Additional Bonds bearing the manual or facsimile signatures of the Emergency Manager or Mayor of the City and the Finance Director, and upon which the facsimile of the seal of the City is imprinted may be delivered to the Paying Agent for authentication and delivery in connection with the exchange or transfer of Bonds. The Paying Agent shall indicate on each Bond the date of its authentication.

Section 304. <u>Authentication of the Bonds</u>. (a) No Bond shall be entitled to any benefit under this Order or be valid or obligatory for any purpose unless there appears on such Bond a Certificate of Authentication substantially in the form provided for in Section 307 of this Order, executed by the manual or facsimile signature of the Finance Director or by an authorized signatory of the Paying Agent by manual signature, and such certificate upon any Bond shall be conclusive evidence, and the only evidence, that such Bond has been duly authenticated and delivered hereunder.

(b) The Paying Agent shall manually execute the Certificate of Authentication on each Bond upon receipt of a written direction of the Authorized Officer of the City to authenticate such Bond.

Section 305. <u>Transfer of Registration and Exchanges on the Bonds</u>. (a) The registration of each Bond is transferable only upon the Bond Registry by the Registered Owner thereof, or by his attorney duly authorized in writing, upon the presentation and surrender thereof at the designated corporate trust office of the Paying Agent together with a written instrument of transfer satisfactory to the Paying Agent, duly executed by the Registered Owner thereof or his attorney duly authorized in writing, and thereupon one or more fully executed and authenticated Bonds in any authorized denominations of like maturity and tenor, in equal aggregate principal amount shall be issued to the transferee in exchange therefor.

(b) Each Bond may be exchanged for one or more Bonds in equal aggregate principal amount of like maturity and tenor in one or more authorized denominations, upon the presentation and surrender thereof at the principal corporate trust office of the Paying Agent together with a written instrument of transfer satisfactory to the Paying Agent, duly executed by the Registered Owner hereof or his attorney duly authorized in writing.

Section 306.  Regulations with Respect to Exchanges and Transfers.  (a)  In all cases in which the privilege of exchanging Bonds or transferring the registration of Bonds is exercised, the City shall execute and the Paying Agent shall authenticate and deliver Bonds in accordance with the provisions of this Order.  All Bonds surrendered in any such exchanges or transfers shall be forthwith canceled by the Paying Agent.

(b)      For every exchange or transfer of Bonds, the City or the Paying Agent may make a charge sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect to such exchange or transfer and, except as otherwise provided in this Order, may charge a sum sufficient to pay the costs of preparing each new Bond issued upon such exchange or transfer, which shall be paid by the person requesting such exchange or transfer as a condition precedent to the exercise of the privilege of making such exchange or transfer.

(c)      The Paying Agent shall not be required (i) to issue, register the transfer of or exchange any Bond during a period beginning at the opening of business 15 days before the day of the giving of a notice of redemption of Bonds selected for redemption as described in the form of Bonds contained in Section 307 of this Order and ending at the close of business on the day of that giving of notice, or (ii) to register the transfer of or exchange any Bond so selected for redemption in whole or in part, except the unredeemed portion of Bonds being redeemed in part. The City shall give the Paying Agent notice of call for redemption at least 20 days prior to the date notice of redemption is to be given.

Section 307.  Form of the Bonds.  The Bonds shall be in substantially the following form with such insertions, omissions, substitutions and other variations as shall not be inconsistent with this Order or as approved by an Authorized Officer in the Supplemental Order:

[Forms of Bonds]

[Unless this certificate is presented by an authorized representative of The Depository Trust Company, a New York corporation ("DTC") to the City (as hereinafter defined), or its agent for registration of transfer, exchange, or payment and any certificate issued is registered in the name of Cede & Co. or in such other name as is requested by an authorized representative of DTC (and any payment is made to Cede & Co. or to such other entity as is requested by an authorized representative of DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL inasmuch as the registered owner hereof, Cede & Co., has an interest herein.]

UNITED STATES OF AMERICA
STATE OF MICHIGAN
COUNTY OF WAYNE

CITY OF DETROIT

FINANCIAL RECOVERY BOND, SERIES 2014B

| Interest Rate | Maturity Date | Date of Original Issue | CUSIP |
|---|---|---|---|
| | | _____, 2014 | |

Registered Owner:

Principal Amount:                                                                                          Dollars

       The City of Detroit, County of Wayne, State of Michigan (the "City"), acknowledges itself to owe and for value received hereby promises to pay to the Registered Owner specified above, or registered assigns, the Principal Amount specified above, in lawful money of the United States of America, on the Maturity Date specified above, unless prepaid prior thereto as hereinafter provided, with interest thereon at the Interest Rate of 4.0% per annum from the Date of Original Issue specified above until the twentieth (20th) anniversary of the Date of Original Issue, and thereafter at 6.0% per annum, until the Maturity Date specified above or until the Principal Amount specified above is paid in full. Interest is payable semiannually on April 1 and October 1 in each year commencing on _____ (each an "Interest Payment Date"). The interest so payable, and punctually paid or duly provided for, will be paid, as provided in the hereinafter defined Order, to the person in whose name this Bond is registered on the books maintained for such purpose by the hereinafter defined Paying Agent (the "Bond Registry"), on the close of business on the Regular Record Date for such interest payment, which shall be the fifteenth day (whether or not a Business Day) of the calendar month immediately preceding such Interest Payment Date. Any such interest not so punctually paid or duly provided for shall herewith cease to be payable to the Registered Owner on such Regular Record Date, and may be paid to the person in whose name this Bond is registered at the close of business on a Special Record Date for the payment of such defaulted interest to be fixed by the Paying Agent, notice of which shall be given to Registered Owners at least seven days before such Special Record Date,

11

13-53846-tjt   Doc 8745   Filed 12/16/14   Entered 12/16/14 07:39:38   Page 180 of 301
809
13-53846-swr   Doc 8045-5   Filed 10/22/14   Entered 10/22/14 09:48:29   Page 360 of

or may be paid at any time in any other lawful manner.  Capitalized terms used herein but not defined herein, shall have the meanings ascribed to them in the Order.

The principal of this Bond is payable in lawful money of the United States of America upon presentation and surrender of this Bond at the designated corporate trust office of _____, _____, _____, as registrar, transfer agent and paying agent under the Order (such bank and any successor as paying agent, the "Paying Agent"). Interest on this Bond is payable in like money by check or draft drawn on the Paying Agent and mailed to the Registered Owner entitled thereto, as provided above, by first class mail or, upon the written request of a Registered Owner of at least $1,000,000 in aggregate principal amount of Bonds (with complete wiring instructions no later than the Regular Record Date for such Interest Payment Date), by wire transfer by the Paying Agent to such Registered Owner, and such request may provide that it will remain in effect with respect to subsequent Interest Payment Dates unless and until changed or revoked at any time prior to a Regular Record Date by subsequent written notice to the Paying Agent.  Interest shall be computed on the basis of a 360-day year consisting of twelve 30 day months.  For prompt payment of this Bond, both principal and interest, the full faith, credit and resources of the City are hereby irrevocably pledged.

This bond is one of a series of bonds aggregating the principal sum of $_____, issued under and in full compliance with the Constitution and statutes of the State of Michigan, and particularly Section 36a of Act No. 279, Public Acts of Michigan, 1909, as amended ("Act 279"), for the purpose of satisfying certain Claims, as defined in the Order.  Pursuant to the Order, the bonds of this series (the "Bonds") are limited tax general obligations of the City, and the City is obligated to levy annually ad valorem taxes on all taxable property in the Issuer, subject to applicable constitutional, statutory and charter tax rate limitations.

The "Order" is an Order of the Emergency Manager issued on _____, 2014, supplemented by a Supplemental Order of an Authorized Officer of the City issued on _____, 2014, authorizing the issuance of the Bonds.

The bonds of this series shall be subject to redemption prior to maturity as follows:

*(a) Optional Redemption.*  Bonds or portions of bonds in Authorized Denominations of multiples of $1,000 or integral multiples of $1.00 in excess thereof are subject to redemption prior to maturity, at the option of the Issuer, in such order as the Issuer may determine, and by lot within a maturity on any date after the Date of Original Issue, at a redemption price of par plus accrued interest to the date fixed for redemption.

*(b) Mandatory Redemption.*  [TO BE DETERMINED]

*General Redemption Provisions.*  In case less than the full amount of an outstanding bond is called for redemption, the Paying Agent, upon presentation of the bond called for redemption, shall register, authenticate and deliver to the registered owner of record a new bond in the principal amount of the portion of the original bond not called for redemption.

Notice of redemption shall be given to the registered owners of Bonds or portions thereof called for redemption by mailing of such notice not less than thirty (30) days but not more than

13-53846-tjt  Doc 8772-45  Filed 12/16/14  Entered 12/16/14 20:39:38  Page 181 of 301
13-53846-swr  Doc 8045  Filed 10/22/15  Entered 10/22/14 03:48:29  Page 96 of 109
809

sixty (60) days prior to the date fixed for redemption to the registered address of the registered owner of record. Bonds or portions thereof so called for redemption shall not bear interest after the date fixed for redemption, whether presented for redemption or not, provided funds are on hand with the Paying Agent to redeem such Bonds.

Reference is hereby made to the Order for the provisions with respect to the nature and extent of the security for the Bonds, the manner and enforcement of such security, the rights, duties and obligations of the City, and the rights of the Paying Agent and the Registered Owners of the Bonds. As therein provided, the Order may be amended in certain respects without the consent of the Registered Owners of the Bonds. A copy of the Order is on file and available for inspection at the office of the Finance Director and at the principal corporate trust office of the Paying Agent.

The City and the Paying Agent may treat and consider the person in whose name this Bond is registered on the Bond Registry as the absolute owner hereof, whether this Bond shall be overdue or not, for the purpose of receiving payment of, or on account of, the principal hereof and interest hereon and for all other purposes whatsoever, and all such payments so made to such person or upon his order shall be valid and effectual to satisfy and discharge the liability hereon to the extent of the sum or sums so paid.

The registration of this Bond is transferable only upon the Bond Registry by the Registered Owner hereof or by his attorney duly authorized in writing upon the presentation and surrender hereof at the designated corporate trust office of the Paying Agent together with a written instrument of transfer satisfactory to the Paying Agent, duly executed by the Registered Owner hereof or his attorney duly authorized in writing, and thereupon one or more fully executed and authenticated Bonds in any authorized denominations of like maturity and tenor, in equal aggregate principal amount shall be issued to the transferee in exchange therefor as provided in the Resolution upon the payment of the charges, if any, therein prescribed.

It is hereby certified, recited and declared that all acts, conditions and things required by law to exist, happen and to be performed, precedent to and in the issuance of the Bonds do exist, have happened and have been performed in due time, form and manner as required by the Constitution and statutes of the State of Michigan, and that the total indebtedness of the City, including the Bonds does not exceed any constitutional, statutory or charter limitation.

This Bond is not valid or obligatory for any purpose until the Paying Agent's Certificate of Authentication on this Bond has been executed by the Paying Agent.

IN WITNESS WHEREOF, the City of Detroit, by its Emergency Manager, has caused this bond to be signed in the name of the City by the facsimile signatures of its Emergency Manager and Finance Director of the City, and a facsimile of its corporate seal to be printed hereon, all as of the Date of Original Issue.

CITY OF DETROIT

By: _____
     Emergency Manager

By: _____
     Finance Director

(SEAL)

(Form of Paying Agent's Certificate of Authentication)

DATE OF AUTHENTICATION:

CERTIFICATE OF AUTHENTICATION

This bond is one of the bonds described in the within-mentioned Order.

_____

_____

_____, Michigan
Paying Agent

By: _____
    Authorized Signatory

15

13-53846-tjt  Doc 8772  Filed 12/16/14  Entered 12/16/14 07:39:38  Page 184 of 301
13-53846-swr  Doc 8045-1  Filed 10/22/15  Entered 10/22/14 03:48:29  Page 36 of 301
809

ASSIGNMENT

FOR VALUE RECEIVED the undersigned hereby sells, assigns and transfers unto

_____

(Please print or typewrite name and address of transferee)

the within bond and all rights thereunder, and hereby irrevocably constitutes and appoints _____ attorney to transfer the within bond on the books kept for registration thereof, with full power of substitution in the premises.

Dated:                                                     _____
_____          _____

Signature Guaranteed:                              NOTICE: The signature(s) to this assignment must correspond with the name as it appears upon the face of the within bond in every particular, without alteration or enlargement or any change whatever. When assignment is made by a guardian, trustee, executor or administrator, an officer of a corporation, or anyone in a representative capacity, proof of such person's authority to act must accompany the bond.

Signature(s) must be guaranteed by a commercial bank or trust company or by a brokerage firm having a membership in one of the major stock exchanges. The transfer agent will not effect transfer of this bond unless the information concerning the transferee requested below is provided.

Name and Address: _____

PLEASE INSERT SOCIAL                _____
SECURITY NUMBER OR OTHER
IDENTIFYING NUMBER OF                _____
TRANSFEREE.                                       (Include information for all joint owners
                                                               if the bond is held by joint account.)

_____
|                                                   |
|                                                   |
_____

(Insert number for first named
transferee if held by joint account.)

13-53846-tjt  Doc 8045  Filed 12/16/14  Entered 12/16/14 07:39:38  Page 185 of 301
13-53846-swr  Doc 8045  Filed 10/22/15  Entered 10/22/14 09:48:29  Page 365 of
809

Section 308. <u>Registration</u>. The City and the Paying Agent may treat and consider the Registered Owner of any Bond as the absolute owner of such Bond, whether such Bond shall be overdue or not, for the purpose of receiving payment of, or on account of, the principal (and premium, if any) thereof and interest thereon and for all other purposes whatsoever, and all such payments so made to such Bondowner or upon his order shall be valid and effectual to satisfy and discharge the liability upon such Bond to the extent of the sum or sums so paid.

Section 309. <u>Mutilated, Destroyed, Stolen or Lost Bonds</u>. (a) Subject to the provisions of Act 354, Public Acts of Michigan, 1972, as amended and any other applicable law, if (i) any mutilated Bond is surrendered to the Paying Agent or the City and the Paying Agent and the City receive evidence to their satisfaction of the destruction, loss or theft of any Bond and (ii) there is delivered to the City and the Paying Agent such security or indemnity as may be required by them to save each of them harmless, then, in the absence of notice to the City or the Paying Agent that such Bond has been acquired by a bona fide purchaser, the City shall execute and the Paying Agent shall authenticate and deliver in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Bond, a new Bond of like tenor and principal amount, bearing a number not contemporaneously outstanding.

(b)     If any such mutilated, destroyed, lost or stolen Bond has become or is about to become due and payable, the City in its discretion may, instead of issuing a new Bond, pay such Bond.

(c)     Any new Bond issued pursuant to this Section in substitution for a Bond alleged to be mutilated, destroyed, stolen or lost shall constitute an original additional contractual obligation on the part of the City, and shall be equally secured by and entitled to equal proportionate benefits with all other Bonds issued under this Order.

Section 310. <u>Book-Entry-Only System Permitted</u>. (a) If determined by the Authorized Officer in the Supplemental Order, the Bonds or portions of the Bonds shall be issued to a securities depository selected by the Authorized Officer (the "Security Depository") to be held pursuant to the book-entry-only system maintained by the Security Depository and registered in the name of the Security Depository or its nominee. Ownership interests in Bonds held under such book-entry-only system shall be determined pursuant to the procedures of the Security Depository and Article 8 of the applicable Uniform Commercial Code (such persons having such interests, "Beneficial Owners").

(b)     If (i) the City and the Paying Agent receive written notice from the Security Depository to the effect that the Security Depository is unable or unwilling to discharge its responsibilities with respect to the Bonds under the book-entry-only system maintained by it or (ii) the Authorized Officer determines that it is in the best interests of the Beneficial Owners that they be able to obtain Bonds in certificated form, then the City may so notify the Security Depository and the Paying Agent, and, in either event, the City and the Paying Agent shall take appropriate steps to provide the Beneficial Owners with Bonds in certificated form to evidence their respective ownership interests in the Bonds. Whenever the Security Depository requests the City and the Paying Agent to do so, the Authorized Officer on behalf of the City and the Paying Agent will cooperate with the Security Depository in taking appropriate action after

17

reasonable notice to make available Bonds registered in whatever name or names the Beneficial Owners transferring or exchanging Bonds shall designate.

(c)     Notwithstanding any other provision of the Order to the contrary, so long as the Bonds are held pursuant to the book-entry-only system maintained by the Security Depository:

(i)     all payments with respect to the principal and interest on such Bonds and all notices with respect to such Bonds shall be made and given, respectively, to the Security Depository as provided in the representation letter from the City and the Paying Agent to the Security Depository with respect to such Bonds; and

(ii)     all payments with respect to principal of the Bonds and interest on the Bonds shall be made in such manner as shall be prescribed by the Security Depository.

## ARTICLE IV

## FUNDS AND ACCOUNTS

Section 401.  <u>Establishment of Accounts and Funds</u>.  (a)  The City hereby establishes and creates the Debt Retirement Fund as a special, separate and segregated account and fund which shall be held for and on behalf of the City by the Paying Agent.

(b)     On the Effective Date, the City shall establish and create the Disputed COPs Claims Reserve (the "Disputed COPs Claims Reserve") which shall be held for and on behalf of the City by the Disbursing Agent under the Disbursing Agent Agreement pursuant to Section 401(d).

(c)     The Disputed COP Claims Reserve shall contain no less than (i) an Unsecured Pro Rata Share of Bonds, calculated as if such Disputed COP Claims were Allowed in an amount equal to the sum of (A) aggregate unpaid principal amount as of the Petition Date for the COPs other than those giving rise to the Settled COP Claims (or such other amount as may be required by an order of the Bankruptcy Court), and (B) with respect to the Settled COPs Claims, the aggregate unpaid principal amount as of the Petition Date for the COPs giving rise to the Settled COPs claims less the amounts expended in settlement of such Settled COP Claims; and (ii) any distributions made on account of Bonds held in the Disputed COP Claims Reserve.

(d)     An Authorized Officer is authorized and directed to designate a Disbursing Agent and negotiate and enter into a Disbursing Agent Agreement (the "Disbursing Agent Agreement") between the City and the Disbursing Agent, setting forth the duties and obligations of the Disbursing Agent with respect to the distribution of Bonds and/or cash from the Disputed COPs Claims Reserve to the Claimants thereof pursuant to Section 404(h).

(e)     The Finance Director is hereby authorized to establish such additional accounts, subaccounts or funds as shall be required for the Bonds, and the Dispute COPS Claims Reserve to accommodate the requirements of such series of Bonds and the Disputed COPS Claims Reserve.

Section 402. <u>Debt Retirement Fund</u>. General funds of the City, proceeds of all taxes levied pursuant to Section 301 hereof [and any amounts transferred from the debt retirement funds related to the COPs, if any,] shall be used to pay the principal of and interest on the Bonds when due. The foregoing amounts shall be placed in the Debt Retirement Fund and held in trust by the Paying Agent, and so long as the principal of or interest on the Bonds shall remain unpaid, no moneys shall be withdrawn from the Debt Retirement Fund except to pay such principal and interest. Any amounts remaining in the Debt Retirement Fund after payment in full of the Bonds and the fees and expenses of the Paying Agent shall be retained by the City to be used for any lawful purpose.

Section 403. <u>Investment of Monies in the Funds and Accounts</u>. (a) The Finance Director shall direct the investment of monies on deposit in the Funds and Accounts established hereunder, and the Paying Agent, upon written direction or upon oral direction promptly confirmed in writing by the Finance Director, shall use its best efforts to invest monies on deposit in the Funds and Accounts in accordance with such direction.

(b)     Monies on deposit in the Funds and Accounts may be invested in such investments and to the extent permitted by applicable law.

Section 404. <u>Satisfaction of Claims</u>. (a) On the Effective Date, the City shall issue the Bonds in an amount sufficient to satisfy the Claims. An Authorized Officer shall arrange for delivery of the Bonds to the Claimants and the Disbursing Agent to satisfy the Claims on behalf of the Claimants of each class of creditors entitled to New B Notes and/or cash as provided in the Plan of Adjustment and as set forth in this Section 404 in subsections (b) through (g), inclusive. Upon delivery of the Bonds to the Disbursing Agent and the Claimants, an Authorized Officer shall take all necessary steps to extinguish any related existing debt, including the cancellation of any related bonds or notes of the City representing portions of the Claims.

(b)     On the Effective Date, the City shall distribute to the Detroit General VEBA, Bonds in the aggregate principal amount of $218,000,000, in satisfaction of the Allowed OPEB Claims held by the Detroit General VEBA Beneficiaries. The Detroit General VEBA shall also be paid any contingent additional distributions from the Disputed COPs Claims Reserve as set forth in Section 404(g).

(c)     On the Effective Date, the City shall distribute to the Detroit Police and Fire VEBA, Bonds in the aggregate principal amount of $232,000,000, in satisfaction of the Allowed OPEB Claims held by the Detroit Police and Fire VEBA Beneficiaries. The Detroit Police and Fire VEBA shall also be paid any contingent additional distributions from the Disputed COPs Claims Reserve as set forth in Section 404(g).

(d)     On the Effective Date, the Downtown Development Authority Claims shall be allowed in the amount of $33,600,000. Unless the Holder agrees to a different treatment of its Claim, each Holder of an Allowed Downtown Development Authority Claim, in full satisfaction of such Allowed Claim, shall receive from the City, on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of the Bonds.

(e)     Unless such Holder agrees to a different treatment of such claim, each Holder of an Allowed Other Unsecured Claim, in full satisfaction of such Allowed Claim, shall receive from the Disbursing Agent, on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of Bonds.

(f)     If and to the extent that Disputed COP Claims become Allowed Claims, the Holders of such Allowed Claims shall be sent a Distribution from the Disputed COP Claims Reserve by the Disbursing Agent of no less than (i) the portion of New B Notes held in the Disputed COP Claims Reserve initially allocated to the Disputed COP Claims that became Allowed Claims; and (ii) any distributions received by the Disputed COP Claims Reserve on account of such portion of Bonds.

(g)     Upon the entry of a Final Order resolving any objection to any Disputed COP Claim and after all Distributions on account of Allowed COP Claims respecting such resolved Disputed COP Claims have been made or provided for (i) an amount of Bonds or distributions thereon in an amount equal to the costs, fees and expenses related to the COP Litigation incurred by the Litigation Trust from and after the Effective Date shall be distributed by the Disbursing Agent to the City subject to the terms of the Plan of Adjustment; (ii) following such distribution, the Bonds and any distributions thereon remaining in the Disputed COP Claims Reserve shall be distributed as follows: (A) 65% to the Detroit General VEBA and the Detroit Police and Fire VEBA in proportion with the Bonds allocated to each pursuant to Sections 404(b) and 404(c); (B) 20% to be distributed Pro Rata among holders of Allowed Limited Tax General Obligation Bond Claims in Class 7 under the Plan of Adjustment; and (C) 15% to holders of Allowed Other Unsecured Claims in Class 14 under the Plan of Adjustment.

## ARTICLE V

## THE PAYING AGENT

Section 501.  <u>Paying Agent</u>.  The Paying Agent for the Bonds shall act as bond registrar, transfer agent and paying agent for the Bonds and shall be initially _____ _____, Detroit, Michigan, or such other bank or trust company located in the State which is qualified to act in such capacity under the laws of the United States of America or the State.  The Paying Agent means and includes any company into which the Paying Agent may be merged or converted or with which it may be consolidated or any company resulting from any merger, conversion or consolidation to which it shall be a party or any company to which the Paying Agent may sell or transfer all or substantially all of its corporate trust business, provided, that such company shall be a trust company or bank which is qualified to be a successor to the Paying Agent as determined by an Authorized Officer, shall be authorized by law to perform all the duties imposed upon it by this Order, and shall be the successor to the Paying Agent without the execution or filing of any paper or the performance of any further act, anything herein to the contrary notwithstanding.  An Authorized Officer is authorized to enter into an agreement with such a bank or trust company, and from time to time as required, may designate a similarly qualified successor Paying Agent and enter into an agreement therewith for such services.

13-53846-tjt   Doc 8045   Filed 12/16/14   Entered 12/16/14 07:39:38   Page 189 of 301
809
13-53846-swr   Doc 8045-5   Filed 10/22/15   Entered 10/22/15 09:48:29   Page 333 of 301

# ARTICLE VI

## SUPPLEMENTAL ORDERS AND RESOLUTIONS

Section 601. <u>Supplemental Orders and Resolutions Not Requiring Consent of Holders of the Bonds</u>.  The City may without the consent of any Bondowner adopt orders or resolutions supplemental to this Order for any one or more of the following purposes:

(i)     to confirm or further assure the security hereof or to grant or pledge to the holders of the Bonds any additional security;

(ii)    to add additional covenants and agreements of the City for the purposes of further securing the payment of the Bonds;

(iii)   to cure any ambiguity or formal defect or omission in this Order; and

(iv)    such other action not materially, adversely and directly affecting the security of the Bonds.

provided that (A) no supplemental order or resolution amending or modifying the rights or obligations of the Paying Agent shall become effective without the consent of the Paying Agent and (B) the effectiveness of any supplemental resolution is subject to Section 702 to the extent applicable.

Section 602. <u>Bond Counsel Opinion</u>.  Before any supplemental order or resolution under this Article shall become effective, a copy thereof shall be filed with the Paying Agent, together with an opinion of Bond Counsel that such supplemental order or resolution is authorized or permitted by this Article; provided that, Bond Counsel in rendering any such opinion shall be entitled to rely upon certificates of an Authorized Officer or other City official, and opinions or reports of consultants, experts and other professionals retained by the City to advise it, with respect to the presence or absence of facts relative to such opinion and the consequences of such facts.

# ARTICLE VII

## DEFEASANCE

Section 701. <u>Defeasance</u>.  Bonds shall be deemed to be paid in full upon the deposit in trust of cash or direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America, or any combination thereof, not redeemable at the option of the issuer thereof, the principal and interest payments upon which, without reinvestment thereof, will come due at such times and in such amounts, as to be fully sufficient to pay when due, the principal of such Bonds and interest to accrue thereon, as confirmed by a verification report prepared by an independent certified public accountant; provided, that if any of such Bonds are to be called for redemption prior to maturity, irrevocable instructions to call such Bonds for redemption shall be given to the Paying Agent.  Such cash and securities representing such obligations shall be deposited with a bank or trust company and held

21

for the exclusive benefit of the Owners of such Bonds. After such deposit, such Bonds shall no longer be entitled to the benefits of this Order (except for any rights of transfer or exchange of Bonds as therein or herein provided for) and shall be payable solely from the funds deposited for such purpose and investment earnings, if any, thereon, and the lien of this Order for the benefit of such Bonds shall be discharged.

## ARTICLE VIII

## OTHER PROVISIONS OF GENERAL APPLICATION

[Section 801. <u>Credit Enhancement</u>. (a) There is hereby authorized to be obtained municipal bond insurance or other credit enhancement or a combination thereof to secure the payment of all or part of the Bonds, if, and provided that, it shall be determined by an Authorized Officer that obtaining such Municipal Bond Insurance Policy or other credit enhancement or a combination thereof is in the best interest of the City. Such municipal bond insurance or other credit enhancement providers may be afforded certain rights and remedies to direct the proceedings with respect to the enforcement of payment of the Bonds as shall be provided in the documents relating thereto. In the event a commitment for a Municipal Bond Insurance Policy is obtained or a commitment for other credit enhancement is obtained, an Authorized Officer is hereby authorized, to approve the terms, perform such acts and execute such instruments that shall be required, necessary or desirable to effectuate the terms of such commitment and the transactions described therein and in this Order and the Supplemental Order provided that such terms are not materially adverse to the City.

(b) In connection with the execution of any of the agreements authorized by this Section, an Authorized Officer is authorized to include therein such covenants as shall be appropriate.]

Section 802. <u>Approval of Other Documents and Actions</u>. The Mayor, the Finance Director, the Treasurer, the City Clerk and any written designee of the Emergency Manager are each hereby authorized and directed on behalf of the City to take any and all other actions, perform any and all acts and execute any and all documents that shall be required, necessary or desirable to implement this Order.

Section 803. <u>Delegation of City to, and Authorization of Actions of Authorized Officers</u>. (a) Each Authorized Officer is hereby authorized and directed to do and perform any and all acts and things with respect to the Bonds which are necessary and appropriate to carry into effect, consistent with this Order, the authorizations therein and herein contained, including without limitation, the securing of ratings by bond rating agencies, if cost effective, the negotiation for and acquisition of bond insurance and/or other credit enhancement, if any, to further secure the Bonds or any portions thereof, the acquisition of an irrevocable surety bond to fulfill the City's obligation to fund any reserve account, the printing of the Bonds and the incurring and paying of reasonable fees, costs and expenses incidental to the foregoing and other costs of issuance of the Bonds including, but not limited to fees and expenses of bond counsel, financial advisors, accountants and others, from Bond proceeds or other available funds, for and on behalf of the City.

(b)     Except as otherwise provided herein, all determinations and decisions of the Authorized Officer with respect to the issuance and sale of the Bonds or the negotiation, execution or delivery of agreements as permitted or required by this Order shall be confirmed by this Authorized Officer in a Supplemental Order or Supplemental Orders, and such confirmations shall constitute determinations that any conditions precedent to such determinations and decisions of the Authorized Officer have been fulfilled.

Section 804.  <u>Approving Legal Opinions with Respect to the Bonds</u>.  Delivery of the Bonds shall be conditioned upon receiving, at the time of delivery of the Bonds; the approving opinion of Bond Counsel, approving legality of the Bonds.

Section 805.  <u>Appointment of Bond Counsel; Engagement of Other Parties.</u>  The appointment by the Emergency Manager of the law firm of Miller, Canfield, Paddock and Stone, P.L.C. of Detroit, Michigan, as Bond Counsel for the Bonds is hereby ratified and confirmed, notwithstanding the periodic representation by Miller, Canfield, Paddock and Stone, P.L.C., in unrelated matters of other parties and potential parties to the issuance of the Bonds.  The fees and expenses of Miller, Canfield, Paddock and Stone, P.L.C. as Bond Counsel and other accumulated bond related fees and expenses shall be payable from available funds in accordance with the agreement of such firm on file with the Finance Director.

Section 806.  <u>Preservation of Records</u>.  So long as any Bond remains Outstanding, all documents received by the Paying Agent under the provisions of this Order shall be retained in its possession and shall be subject at all reasonable times to the inspection of the City, and the Bondowners, and their agents and representatives, any of whom may make copies thereof.

Section 807.  <u>Parties in Interest</u>.  Nothing in this Order, expressed or implied, is intended or shall be construed to confer upon, or to give to, any person or entity, other than the City, the Paying Agent and the Owners of the Bonds, any right, remedy or claim under or by reason of this Order or any covenant, condition or stipulation hereof, and all covenants, stipulations, promises and agreements in this Order contained by and on behalf of the City or Paying Agent shall be for the sole and exclusive benefit of the City, the Paying Agent and the Bondowners.

Section 808.  <u>No Recourse Under Resolution</u>.  All covenants, agreements and obligations of the City contained in this Order shall be deemed to be the covenants, agreements and obligations of the City and not of any councilperson, member, officer or employee of the City in his or her individual capacity, and no recourse shall be had for the payment of the principal of or interest on the Bonds or for any claim based thereon or on this Order against any councilperson, member, officer or employee of the City or any person executing the Bonds in his or her official individual capacity.

Section 809.  <u>Severability</u>.  If any one or more sections, clauses or provisions of this Order shall be determined by a court of competent jurisdiction to be invalid or ineffective for any reason, such determination shall in no way affect the validity and effectiveness of the remaining sections, clauses and provisions hereof.

Section 810.  <u>Cover Page, Table of Contents and Article and Section Headings</u>.  The cover page, table of contents and Article and Section headings hereof are solely for convenience

13-53846-tjt   Doc 8045   Filed 12/16/14   Entered 12/16/14 09:48:29   Page 192 of 201
13-53846-swr   Doc 7045   Filed 10/22/14   Entered 10/22/14 07:39:38   Page 34 of
809

of reference and do not constitute a part of this Order, and none of them shall affect its meaning, construction or effect.

Section 811. <u>Conflict</u>. All resolutions or parts of resolutions or other proceedings of the City in conflict herewith shall be and the same hereby are repealed insofar as such conflict exists.

Section 812. <u>Governing Law and Jurisdiction</u>. This Order shall be governed by and construed in accordance with the laws of the State.

Section 813. <u>Order and Supplemental Order are a Contract</u>. The provisions of this Order and the Supplemental Order shall constitute a contract between the City, the Paying Agent, the Bond Insurer and the Bondowners.

Section 814. <u>Effective Date</u>. This Order shall take effect immediately upon its adoption by the Council.

Section 815. <u>Notices</u>. All notices and other communications hereunder shall be in writing and given by United States certified or registered mail, expedited courier overnight delivery service or by other means (including facsimile transmission) that provides a written record of such notice and its receipt. Notices hereunder shall be effective when received and shall be addressed to the address set forth below or to such other address as any of the below persons shall specify to the other persons:

If to the City, to:
City of Detroit
Finance Department
1200 Coleman A. Young Municipal Center
Detroit, Michigan 48226
Attention: Finance Director

If to the Paying Agent, to:      _____

                                           _____

                                           _____

                                         Attention: _____

SO ORDERED this \_\_\_\_ day of _____, 2014.

_____

Kevyn D. Orr
Emergency Manager
City of Detroit, Michigan

**EXHIBIT A**

**THE UNSECURED CLAIMS**

1.      Class 7 Allowed Limited Tax General Obligation Bond Claims.

2.      Class 9 Disputed COPS Claims which become Allowed Claims.

3.      Class 12 OPEB Claims - Detroit General VEBA Claims ("General VEBA Claims") in the amount of $218,000,000, plus contingent additional distributions from the Disputed COP Claims Reserve ("Contingent General VEBA Claims");

4.      Class 12 OPEB Claims - Detroit Police and Fire VEBA Claims ("Police and Fire VEBA Claims") in the amount of $232,000,000, plus contingent additional distributions from the Disputed COP Claims Reserve ("Contingent Police and Fire VEBA Claims");

5.      Class 13 Allowed Downtown Development Authority Claims ("DDA Claims") in the amount of $33,600,000; and

6.      Class 14 Allowed Other Unsecured Claims ("Other Unsecured Claims").

22096296.5\022765-00202

A-1

13-53846-tjt Doc 8045 Filed 12/16/14 Entered 12/16/14 07:39:38 Page 195 of 301
13-53846-swr Doc 8045 Filed 10/22/15 Entered 10/22/14 03:48:29 Page 34 of
809

**EXHIBIT I.A.248**

PRINCIPAL TERMS OF NEW C NOTES

13-53846-tjt Doc 8772-5 Filed 12/16/14 Entered 12/16/14 20:39:33 Page 196 of
809
13-53846-swr Doc 8045-1 Filed 10/22/14 Entered 10/22/14 09:48:29 Page 346 of

# NEW C NOTES
## SUMMARY OF PRINCIPAL TERMS[1]

On the Effective Date, the City shall issue the New C Notes and distribute them as set forth in the Plan.  The definitive documentation governing the New C Notes shall provide generally for the following terms:

| | |
|---|---|
| Obligation | Unsecured financial recovery bonds due 2026. |
| Parking Revenues Lockbox | The City shall direct Parking Revenues into a lockbox account. |
| | Once amounts sufficient to pay the principal of or interest due on the New C Notes for the then current fiscal year (the "Annual Set Aside Requirement") have been set aside, any excess may be transferred to the City's general fund and used for other purposes. |
| Parking Violation Revenue | "Parking Revenues" shall mean (a) in the event the New C Notes are issued in a principal amount equal to or less than the $21,271,804, revenues collected from fines received by the City related to tickets issued for parking violations, other than such revenues that would otherwise be paid to the 36th District Court ("Violations Revenue"), and |
| | (b) in the event the New C Notes are issued in a principal amount in excess of $21,271,804, Violations Revenue, meter collections and revenue from garage (other than Grand Circus) and boot and tow operations. |
| Principal Amount | Not to exceed $88,430,021 |
| Interest Rate | 5%. |
| | In addition, in the event the City fails to make an interest and principal amortization payment when due (a "Payment Default"), the City shall have thirty days, following written notice of such default (the "Cure Period"), to cure such Payment Default.  Failure to cure a Payment Default within the Cure Period will result in application of additional default rate interest of 2% until such Payment Default is cured. |
| Maturity | 12 years, callable at any time for par plus accrued interest. |
| Payment Date | The City shall make interest and principal amortization payments annually on June 30. |

---

[1] Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan.

| | |
|---|---|
| Amortization | Principal amortization in accordance with the schedule hereto such that the total annual principal and interest cash payment on the bonds is $9,977,153.00 (or $2,400,000 with respect to Syncora). |
| City Parking Facilities Disposition | In the event the City disposes of some or all of the City Parking Facilities subsequent to distribution of the New C Notes, the City shall use the net proceeds from such transaction to prepay the amount owed on account of the New C Notes. |
| Effectuation of Provisions of New C Notes | The City, to the extent required to effectuate the provisions of the New C Notes, shall (i) cause the Detroit Building Authority to convey the City Parking Facilities to the City, and (ii) treat accounting of the Parking Revenues such that all Parking Revenues are deposited into a general governmental account. |

**EXHIBIT I.A.249**

FORM OF NEW C NOTES DOCUMENTS

ORDER NO. __

ORDER OF THE EMERGENCY MANAGER OF THE CITY OF DETROIT, COUNTY OF WAYNE, STATE OF MICHIGAN, AUTHORIZING THE ISSUANCE BY THE CITY OF DETROIT OF NOT TO EXCEED $88,430,021 FINANCIAL RECOVERY BONDS IN ONE OR MORE SERIES FOR THE PURPOSE OF SATISFYING CERTAIN COP CLAIMS AS PROVIDED IN THE BANKRUPTCY CASE PLAN OF ADJUSTMENT; AND AUTHORIZING THE EMERGENCY MANAGER TO MAKE CERTAIN DETERMINATIONS AND TO TAKE CERTAIN ACTIONS IN CONNECTION WITH THE DELIVERY IN PARTIAL SATISFACTION THEREOF AND EXCHANGE OF SAID BONDS TO THE HOLDERS OF SAID CLAIMS.

# TABLE OF CONTENTS

**Page**

ARTICLE I         DEFINITIONS AND INTERPRETATION ............................................. 3
    Section 101. Definitions ............................................................................. 3
    Section 102. Interpretation ......................................................................... 6

ARTICLE II DETERMINATIONS ........................................................................... 7
    Section 201. Finding, and Declaration of Need to Issue Bonds ..................... 7

ARTICLE III AUTHORIZATION, REDEMPTION AND ASSIGNMENT OF THE
                   BONDS .................................................................................. 7
    Section 301. Authorization of Bonds to Satisfy the Claims and Pledge .......... 7
    Section 302. Designations, Date, Interest, Maturity and Other Terms of the Bonds
                   to Satisfy the Claims ..................................................... 7
    Section 303. Execution, Authentication and Delivery of Bonds ..................... 9
    Section 304. Authentication of the Bonds .................................................... 9
    Section 305. Transfer of Registration and Exchanges on the Bonds .............. 9
    Section 306. Regulations with Respect to Exchanges and Transfers ............. 9
    Section 307. Form of the Bonds ................................................................. 10
    Section 308. Registration .......................................................................... 17
    Section 309. Mutilated, Destroyed, Stolen or Lost Bonds ........................... 17
    Section 310. Book-Entry-Only System Permitted ....................................... 17

ARTICLE IV FUNDS AND ACCOUNTS ................................................................ 18
    Section 401. Establishment of Accounts and Funds .................................... 18
    Section 402. Debt Retirement Fund ........................................................... 18
    Section 403. Investment of Monies in the Funds and Accounts .................... 19
    Section 404. Satisfaction of Claims ........................................................... 19

ARTICLE V THE PAYING AGENT ...................................................................... 20
    Section 501. Paying Agent ........................................................................ 20

ARTICLE VI SUPPLEMENTAL ORDERS AND RESOLUTIONS ........................... 21
    Section 601. Supplemental Orders and Resolutions Not Requiring Consent of
                   Holders of the Bonds ................................................... 21
    Section 602. Bond Counsel Opinion .......................................................... 21

ARTICLE VII DEFEASANCE ............................................................................... 21
    Section 701. Defeasance ........................................................................... 21

ARTICLE VIII        OTHER PROVISIONS OF GENERAL APPLICATION ..................... 22
    Section 801. Account Control Agreement .................................................. 22
    Section 802. Approval of Other Documents and Actions ............................. 22
    Section 803. Delegation of City to, and Authorization of Actions of Authorized
                   Officers ........................................................................ 22
    Section 804. Approving Legal Opinions with Respect to the Bonds ............. 23
    Section 805. Appointment of Bond Counsel; Engagement of Other Parties ... 23
    Section 806. Preservation of Records ........................................................ 23
    Section 807. Parties in Interest .................................................................. 23

-i-

13-53846-tjt Doc 8045 Filed 12/16/14 Entered 12/16/14 09:48:29 Page 201 of 301
13-53846-swr Doc 7039-45 Filed 10/22/14 Entered 10/22/14 07:39:38 Page 35 of 809

# TABLE OF CONTENTS
## (continued)

**Page**

Section 808. No Recourse Under Resolution ................................................................... 23
Section 809. Severability ............................................................................................... 23
Section 810. Cover Page, Table of Contents and Article and Section Headings............ 23
Section 811. Conflict ..................................................................................................... 24
Section 812. Governing Law and Jurisdiction................................................................ 24
Section 813. Order and Supplemental Order are a Contract........................................... 24
Section 814. Effective Date ........................................................................................... 24
Section 815. Notices ...................................................................................................... 24

-ii-

13-53846-tjt Doc 8045 Filed 12/16/14 Entered 12/16/14 07:39:38 Page 202 of 301
13-53846-swr Doc 7045-1 Filed 10/22/14 Entered 10/22/14 03:48:29 Page 352 of 809

ORDER NO. __

ORDER OF THE EMERGENCY MANAGER OF THE CITY OF DETROIT,
COUNTY OF WAYNE, STATE OF MICHIGAN, AUTHORIZING THE
ISSUANCE BY THE CITY OF DETROIT OF NOT TO EXCEED $88,430,021
FINANCIAL RECOVERY BONDS IN ONE OR MORE SERIES FOR THE
PURPOSE OF SATISFYING CERTAIN COP CLAIMS AS PROVIDED IN
THE BANKRUPTCY CASE PLAN OF ADJUSTMENT; AND AUTHORIZING
THE EMERGENCY MANAGER TO MAKE CERTAIN DETERMINATIONS
AND TO TAKE CERTAIN ACTIONS IN CONNECTION WITH THE
DELIVERY IN PARTIAL SATISFACTION THEREOF AND EXCHANGE OF
SAID BONDS TO THE HOLDERS OF SAID CLAIMS.

WHEREAS, on March 1, 2013, the Governor (the "Governor") of the State of Michigan
(the "State") determined that a financial emergency existed within the City of Detroit, County of
Wayne, State of Michigan (the "City") pursuant to the Local Government Fiscal Responsibility
Act, Act 72, Public Acts of Michigan, 1990, as amended ("Act 72"); and

WHEREAS, on March 14, 2013, the Governor confirmed that a financial emergency ex-
isted within the City and, pursuant to Act 72, assigned to the Local Emergency Financial
Assistance Loan Board established pursuant to the Emergency Municipal Loan Act, Act 243
Public Acts of Michigan, 1980, as amended (the "Board") the responsibility for managing the
financial emergency; and

WHEREAS, on March 14, 2013, pursuant to Act 72, the Board appointed Kevyn D. Orr
as Emergency Financial Manager for the City; And

WHEREAS, by operation of law the financial emergency continues to exist within the
City pursuant to the Local Financial Stability and Choice Act, Act 436, Public Acts of Michigan,
2012 ("Act 436") and the Emergency Financial Manager continues in the capacity of the
Emergency Manager for the City (the "Emergency Manager"); and

WHEREAS, on July 18, 2013 (the "Petition Date"), in accordance with Act 436 and the
approval of the Governor, the Emergency Manager filed on behalf of the City a petition for relief
pursuant to Chapter 9 of title 11 of the United States Code, 11 U.S.C. Sections 101-1532 (as
amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District
of Michigan (the "Bankruptcy Court"); and

WHEREAS, on August 20, 2014, the Emergency Manager filed on behalf of the City a
Sixth Amended Plan of Adjustment of the Debts of the City of Detroit (now and as subsequently
amended, the "Plan of Adjustment") in the Bankruptcy Court to provide for the adjustment of the
debts of the City pursuant to and in accordance with Chapter 9 of the Bankruptcy Code; and

WHEREAS, the Plan of Adjustment provides, among other things, for the satisfaction of
certain claims of unsecured creditors as set out in the Plan of Adjustment in exchange for the

1

13-53846-tjt Doc 8775 Filed 12/16/14 Entered 12/16/14 07:39:38 Page 203 of 301
13-53846-swr Doc 8045-1 Filed 10/22/14 Entered 10/22/14 09:48:29 Page 353 of
809

receipt of unsecured pro rata shares ( each a "Pro Rata Share") of New C Notes (the "New C Notes"); and

WHEREAS, upon satisfaction of all of the terms and conditions required of the City related to the confirmation of the Plan of Adjustment, the City shall establish the Business Day upon which the Plan of Adjustment shall become effective (the "Effective Date"); and

WHEREAS, on or as reasonably practicable after the Effective Date, the City shall execute New C Notes Documents and issue New C Notes in the form of Financial Recovery Bonds authorized under Section 36a of the Home Rule City Act, Act 279, Public Acts of Michigan, 1909, as amended ("Act 279") and this Order, and distribute the New C Notes, in the form of the Financial Recovery Bonds, through the Litigation Trust, as defined in the Plan of Adjustment, to Settling COP Claimants as provided in the Plan of Adjustment (the "Settling COP Claimants"); and

WHEREAS, the Emergency Manager of the City deems it necessary to authorize the issuance of Financial Recovery Bonds in one or more series (the "Bonds"), in the aggregate principal amount of not to exceed Eighty Eight Million Four Hundred Thirty Thousand Twenty One Dollars ($88,430,021) pursuant to Section 36a of Act 279; and

WHEREAS, the Bonds will be payable from City Parking Revenues or a portion thereof and secured by a pledge of the City's limited tax full faith and credit; and

WHEREAS, Section 36a of Act 279 authorizes a city, for which a financial emergency has been determined to exist, such as the City, to borrow money and issue Financial Recovery Bonds subject to the terms and conditions approved by the Board; and

WHEREAS, the City must receive prior approval of the terms and conditions for the issuance of the Bonds from the Board in accordance with Section 36a of Act 279; and

WHEREAS, the Emergency Manager desires to submit this Order to the Board proposing the issuance by the City of Financial Recovery Bonds, in one or more series, under Section 36a of Act 279, to provide for a portion of the financing of the City under the Plan of Adjustment, solely to satisfy the Settling COP Claimants' COP Claims; and

WHEREAS, prior to submission of this Order to the Board, pursuant to Sections 12(1)(u) and 19(i) of Act 436, the Emergency Manager must obtain approval of the issuance of the Bonds by the City Council of the City (the "City Council"), and if the City Council disapproves the issuance of the Bonds, the issuance of the Bonds must be approved by the Board.

NOW, THEREFORE, BE IT ORDERED AS FOLLOWS:

# ARTICLE I

## DEFINITIONS AND INTERPRETATION

Section 101. <u>Definitions</u>.     The words and terms defined in the preambles and recitals hereof and the following words and terms as used in this Order shall have the meanings ascribed therein, herein or in the Plan of Adjustment to them unless a different meaning clearly appears from the context:

"Account Control Agreement" means that certain Account Control Agreement by and among the City, the Paying Agent and the Depository Bank in favor of the Paying Agent with respect to the bank account that holds the City Parking Revenues.

"Act 243" means Act No. 243, Public Acts of Michigan, 1980, as amended.

"Act 279" means Act No. 279, Public Acts of Michigan, 1909, as amended.

"Act 436" means Act No. 436, Public Acts of Michigan, 2012.

"Authorized Denominations" shall mean denominations of Bonds equal to multiples of $1.00.

"Authorized Officer" means (i) the Emergency Manager or his designee or successor, or if the City is no longer operating under a financial emergency pursuant to Act 436, the chief administrative officer of the City, the Finance Director or his or her designee, or (ii) any other person authorized by a Certificate of an Authorized Officer to act on behalf of or otherwise represent the City in any legal capacity, which such certificate shall be delivered, if at all, in the City's sole discretion.

"Bankruptcy Case" means the City's Bankruptcy Case No. 13-53846 in the U.S. Bankruptcy Court for the Eastern District of Michigan.

"Bankruptcy Court" has the meaning set forth in the Plan of Adjustment.

"Board" has the meaning set forth in recitals hereto.

"Bond Counsel" means Miller, Canfield, Paddock and Stone, P.L.C., attorneys of Detroit, Michigan, or such other nationally recognized firm of attorneys experienced in matters pertaining to municipal bonds and appointed to serve in such capacity by the City with respect to the Bonds.

"Bond" or "Bonds" means the Financial Recovery Bonds, Series 2014C of the City authorized to be issued by the Order in the aggregate principal amount not to exceed $88,430,021, in one or more series, and bearing such other designations as determined by the Authorized Officer in the Supplemental Order.

3

"Bond Registry" means the books for the registration of Bonds maintained by the Paying Agent.

"Bondowner", "Owner" or "Registered Owner" means, with respect to any Bond, the person in whose name such Bond is registered in the Bond Registry.

"Business Day" means any day other than (i) a Saturday, Sunday or legal holiday, (ii) a day on which the Paying Agent or banks and trust companies in New York, New York are authorized or required to remain closed, (iii) a day on which the New York Stock Exchange is closed, or (iv) a day on which the Federal Reserve is closed.

"Certificate" means (i) a signed document either attesting to or acknowledging the circumstances, representations or other matters therein stated or set forth or setting forth matters to be determined pursuant to this Order.

"Charter" means the Charter of the City, as amended from time to time.

"City" means the City of Detroit, County of Wayne, State of Michigan.

["City Parking Facilities" means _____.]

"City Parking Revenues" means revenues collected by the City related to (i) tickets issued for parking violations, including, but not limited to, meter collections, towing, storage fees and booting fees, other than revenues that would otherwise be paid to the 36th District Court, and (ii) if the Bonds are issued in a principal amount greater than $21,271,804, garage operations at City Parking Facilities, other than the Grand Circus Park facility.

"Closing Date" means the Date of Original Issue.

"Code" means the Internal Revenue Code of 1986, as amended.

"Constitution" means the Constitution of the State of Michigan of 1963, as amended.

"Confirmation Order" has the meaning set forth in recitals hereto.

"COP Claims" has the meaning set forth in the Plan of Adjustment.

"Date of Original Issue" means the date upon which all conditions precedent set forth in the Bond Purchase Agreement to the transactions contemplated therein and herein have been satisfied and the Bonds have been issued to the Purchaser.

"Debt Retirement Fund" means the Debt Retirement Fund established under Section 501 hereof, and any subaccounts thereof established hereunder for the payment of principal of and premium and interest on the Bonds.

"Depository Bank" means a bank or banks or other financial institution which the Emergency Manager of the City designates as depository of the City.

"Emergency Manager" has the meaning set forth in the recitals hereto.

4

"Final Order" has the meaning set forth in the Plan of Adjustment.

"Fiscal Year" means the period from July 1 to and including June 30 of the immediately succeeding calendar year or such other fiscal year of the City as in effect from time to time.

"Interest Payment Date" means June 30 of each year commencing with the June 30 specified in the Supplemental Order.

"Interest Rate" means 5% per annum from the Date of Original Issue until the Maturity Date, or such other interest rates as confirmed in the Supplemental Order.

"Litigation Trust" has the meaning set forth in the Plan of Adjustment.

"Maturity Date" means June 30, 20__ or such other final date of maturity of each series of the Bonds as specified in the Supplemental Order.

"Maximum Aggregate Principal Amount" has the meaning given such term in Section 201.

"Order" means this Order of the Emergency Manager as supplemented by the Supplemental Order, and as amended from time to time pursuant to Article VII.

"Outstanding" when used with respect to:

(1)     the Bonds, means, as of the date of determination, the Bonds theretofore authenticated and delivered under this Order, except:

    (A)     Bonds theretofore canceled by the Paying Agent or delivered to such Paying Agent for cancellation;

    (B)     Bonds for whose payment money in the necessary amount has been theretofore deposited with the Paying Agent in trust for the registered owners of such Bonds;

    (C)     Bonds delivered to the Paying Agent for cancellation in connection with (x) the exchange of such Bonds for other Bonds or (y) the transfer of the registration of such Bonds;

    (D)     Bonds alleged to have been destroyed, lost or stolen which have been paid or replaced pursuant to this Order or otherwise pursuant to law; and

    (E)     Bonds deemed paid as provided in Section 701.

"Paying Agent" means the bond registrar, transfer agent and paying agent for the Bonds.

"Petition Date" has the meaning set forth in the recitals hereto.

"Plan of Adjustment" has the meaning set forth in the recitals hereto.

5

13-53846-tjt   Doc 8772-5   Filed 12/16/14   Entered 12/16/14 07:39:33   Page 207 of
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 09:48:29   Page 35 of 301
809

"Registered Owner" means the registered owner of a Bond as the registered owner's name appears on the Bond Registry under Section 305.

"Regular Record Date" has the meaning given such term in Section 302.

"Security Depository" has the meaning given such term in Section 310.

"Settling COP Claimant" has the meaning set forth in the Plan of Adjustment.

"State" has the meaning set forth in the recitals hereto.

"State Treasurer" means the Treasurer of the State of Michigan.

"Supplemental Order" means the order or orders of the Authorized Officer making certain determinations and confirming the final details on the Bonds upon issuance, in accordance with the parameters of this Order.

"Unsecured Pro Rata Share" has the meaning set forth in the Plan of Adjustment.

Section 102. <u>Interpretation</u>. (a) Words of the feminine or masculine genders include the correlative words of the other gender or the neuter gender.

(b)     Unless the context shall otherwise indicate, words importing the singular include the plural and vice versa, and words importing persons include corporations, associations, partnerships (including limited partnerships), trusts, firms and other legal entities, including public bodies, as well as natural persons.

(c)     Articles and Sections referred to by number mean the corresponding Articles and Sections of this Order.

(d)     The terms "hereby, "hereof", "hereto", "herein", "hereunder" and any similar terms as used in this Order, refer to this Order as a whole unless otherwise expressly stated.

## ARTICLE II

## DETERMINATIONS

Section 201. <u>Finding, and Declaration of Need to Issue Bonds</u>. The Emergency Manager hereby finds and declares that it is necessary for the City to issue the Bonds hereunder in such sum as shall be determined and approved by the Emergency Manager, not in excess of $88,430,021 (the "Maximum Aggregate Principal Amount"), and to evidence such debt by the issuance of the Bonds in one or more series not in excess of the Maximum Aggregate Principal Amount, in Authorized Denominations, pursuant to and in accordance with the provisions of Section 36a of Act 279, for the purpose of satisfying the Claims.

6

13-53846-tit Doc 8772-5 Filed 12/16/14 Entered 12/16/14 07:39:38 Page 208 of 301
13-53846-swr Doc 8045-1 Filed 10/22/14 Entered 10/22/14 03:48:29 Page 358 of 809

# ARTICLE III

## AUTHORIZATION, REDEMPTION AND ASSIGNMENT OF THE BONDS

Section 301. <u>Authorization of Bonds to Satisfy the Claims and Pledge</u>. The City hereby authorizes the issuance of the Bonds as hereinafter defined in such principal amount as shall be confirmed in the Supplemental Order to satisfy a portion of the COP Claims as determined by the Authorized Officer in the Supplemental Order or subsequently confirmed by the Authorized Officer to Bond Counsel. The principal of and interest on the Bonds shall hereby be payable from (i) the City Parking Revenues and (ii) secured by the limited tax full faith and credit pledge of the City.

In the event of insufficient City Parking Revenues, the City pledges to pay the principal of and interest on the Bonds as a first budget obligation from its general funds and in case of insufficiency thereof, from the proceeds of an annual levy of ad valorem taxes on all taxable property of the City, subject to applicable constitutional, statutory and charter tax rate limitations.

Section 302. <u>Designations, Date, Interest, Maturity and Other Terms of the Bonds to Satisfy the Claims</u>. (a) The Bonds shall be designated "FINANCIAL RECOVERY BONDS, SERIES 2014C" and may bear such later or earlier dates and additional or alternative designations, series or subseries as the Authorized Officer may determine in the Supplemental Order, shall be issued in fully registered form and shall be consecutively numbered from "R-1" upwards, unless otherwise provided by the Authorized Officer in the Supplemental Order. The Bonds shall be dated and issued in Authorized Denominations all as determined by the Authorized Officer and confirmed by the Authorized Officer in the Supplemental Order.

(b) The Bonds of each series shall mature on the Maturity Date not more than 13 years from the Date of Original Issue and shall bear interest at the Interest Rate on a taxable basis, payable on the Interest Payment Dates, all as shall be determined and confirmed by the Authorized Officer in the Supplemental Order. Unless otherwise provided by the Authorized Officer in the Supplemental Order, interest on the Bonds shall be calculated on the basis of a 360-day year and twelve 30-day months. The Bonds shall be payable, as to principal and interest, in lawful money of the United States of America.

(c) Except as may be otherwise determined by the Authorized Officer in the Supplemental Order, interest on the Bonds shall be payable to the Registered Owner as of the 15th day of the month, whether or not a Business Day (a "Regular Record Date"), prior to each Interest Payment Date. Interest on the Bonds shall be payable to such Registered Owners by check or draft drawn on the Paying Agent on each Interest Payment Date and mailed by first class mail or, upon the written request of the Owner of $1,000,000 or more in aggregate principal amount of Bonds (with complete wiring instructions no later than the Regular Record Date for such Interest Payment Date), by wire transfer by the Paying Agent to such Owner. Such a request may provide that it will remain in effect with respect to subsequent Interest Payment Dates unless and until changed or revoked at any time prior to a Regular Record Date by subsequent written notice to the Paying Agent.

7

(d)     Interest on Bonds not punctually paid or duly provided for on an Interest Payment Date shall forthwith cease to be payable to the Registered Owners on the Regular Record Date established for such Interest Payment Date, and may be paid to the Registered Owners as of the close of business on a date fixed by the Paying Agent (a "Special Record Date") with respect to the payment of such defaulted interest to be fixed by the Paying Agent, or may be paid at any time in any other lawful manner.  The Paying Agent shall give notice to the Registered Owners at least seven days before any such Special Record Date.

(e)     The principal of the Bonds shall be payable to the Registered Owners of the Bonds upon the presentation of the Bonds to the Paying Agent at the principal corporate trust office of the Paying Agent.

(f)     The Bonds shall be subject to optional, mandatory sinking fund and mandatory redemption prior to maturity or shall not be subject thereto, upon such terms and conditions as shall be determined by the Authorized Officer and confirmed in the Supplemental Order.

Unless waived by any registered owner of Bonds to be redeemed, official notice of redemption shall be given by the Paying Agent on behalf of the City.  Such notice shall be dated and shall contain at a minimum the following information:  original issue date; maturity dates; interest rates, CUSIP numbers, if any; certificate numbers, and in the case of partial redemption, the called amounts of each certificate; the redemption date; the redemption price or premium; the place where Bonds called for redemption are to be surrendered for payment; and that interest on Bonds or portions thereof called for redemption shall cease to accrue from and after the redemption date.

In addition, further notice shall be given by the Paying Agent in such manner as may be required or suggested by regulations or market practice at the applicable time, but no defect in such further notice nor any failure to give all or any portion of such further notice shall in any manner defeat the effectiveness of a call for redemption if notice thereof is given as prescribed herein.

Section 303.  <u>Execution, Authentication and Delivery of Bonds</u>.  The Bonds shall be executed in the name of the City by the manual or facsimile signatures of the Mayor and the Finance Director of the City and authenticated by the manual signature of the Finance Director or an authorized representative of the Paying Agent, as the case may be, and a facsimile of the seal of the City shall be imprinted on the Bonds.  The Bonds shall be delivered to the Litigation Trust for the Benefit of the Settling COP Claimants as described in the Plan of Adjustment. Additional Bonds bearing the manual or facsimile signatures of the Mayor of the City and the Finance Director, and upon which the facsimile of the seal of the City is imprinted may be delivered to the Paying Agent for authentication and delivery in connection with the exchange or transfer of Bonds.  The Paying Agent shall indicate on each Bond the date of its authentication.

Section 304.  <u>Authentication of the Bonds</u>.  (a)   No Bond shall be entitled to any benefit under this Order or be valid or obligatory for any purpose unless there appears on such Bond a Certificate of Authentication substantially in the form provided for in Section 307 of this Order, executed by the manual or facsimile signature of the Finance Director or by an authorized signatory of the Paying Agent by manual signature, and such certificate upon any Bond shall be

conclusive evidence, and the only evidence, that such Bond has been duly authenticated and delivered hereunder.

(b)     The Paying Agent shall manually execute the Certificate of Authentication on each Bond upon receipt of a written direction of the Authorized Officer of the City to authenticate such Bond.

Section 305.  Transfer of Registration and Exchanges on the Bonds.  (a)  The registration of each Bond is transferable only upon the Bond Registry by the Registered Owner thereof, or by his attorney duly authorized in writing, upon the presentation and surrender thereof at the designated corporate trust office of the Paying Agent together with a written instrument of transfer satisfactory to the Paying Agent, duly executed by the Registered Owner thereof or his attorney duly authorized in writing, and thereupon one or more fully executed and authenticated Bonds in any authorized denominations of like maturity and tenor, in equal aggregate principal amount shall be issued to the transferee in exchange therefor.

(b)     Each Bond may be exchanged for one or more Bonds in equal aggregate principal amount of like maturity and tenor in one or more authorized denominations, upon the presentation and surrender thereof at the principal corporate trust office of the Paying Agent together with a written instrument of transfer satisfactory to the Paying Agent, duly executed by the Registered Owner hereof or his attorney duly authorized in writing.

Section 306.  Regulations with Respect to Exchanges and Transfers.  (a)  In all cases in which the privilege of exchanging Bonds or transferring the registration of Bonds is exercised, the City shall execute and the Paying Agent shall authenticate and deliver Bonds in accordance with the provisions of this Order.  All Bonds surrendered in any such exchanges or transfers shall be forthwith canceled by the Paying Agent.

(b)     For every exchange or transfer of Bonds, the City or the Paying Agent may make a charge sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect to such exchange or transfer and, except as otherwise provided in this Order, may charge a sum sufficient to pay the costs of preparing each new Bond issued upon such exchange or transfer, which shall be paid by the person requesting such exchange or transfer as a condition precedent to the exercise of the privilege of making such exchange or transfer.

(c)     The Paying Agent shall not be required (i) to issue, register the transfer of or exchange any Bond during a period beginning at the opening of business 15 days before the day of the giving of a notice of redemption of Bonds selected for redemption as described in the form of Bonds contained in Section 307 of this Order and ending at the close of business on the day of that giving of notice, or (ii) to register the transfer of or exchange any Bond so selected for redemption in whole or in part, except the unredeemed portion of Bonds being redeemed in part. The City shall give the Paying Agent notice of call for redemption at least 20 days prior to the date notice of redemption is to be given.

Section 307.  Form of the Bonds.  The Bonds shall be in substantially the following form with such insertions, omissions, substitutions and other variations as shall not be inconsistent with this Order or as approved by an Authorized Officer in the Supplemental Order:

9

13-53846-tjt  Doc 8772-5  Filed 12/16/14  Entered 12/16/14 07:39:33  Page 211 of 301
13-53846-swr  Doc 8045-1  Filed 10/22/14  Entered 10/22/14 09:48:29  Page 36 of 301
809

[Form of Bonds]

[Unless this certificate is presented by an authorized representative of The Depository Trust Company, a New York corporation ("DTC") to the City (as hereinafter defined), or its agent for registration of transfer, exchange, or payment and any certificate issued is registered in the name of Cede & Co. or in such other name as is requested by an authorized representative of DTC (and any payment is made to Cede & Co. or to such other entity as is requested by an authorized representative of DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL inasmuch as the registered owner hereof, Cede & Co., has an interest herein.]

UNITED STATES OF AMERICA
STATE OF MICHIGAN
COUNTY OF WAYNE

CITY OF DETROIT

FINANCIAL RECOVERY BOND, SERIES 2014C

| Interest Rate | Maturity Date | Date of Original Issue | CUSIP |
|---|---|---|---|
| | | _____, 2014 | |

Registered Owner:

Principal Amount:                                                                                          Dollars

The City of Detroit, County of Wayne, State of Michigan (the "City"), acknowledges itself to owe and for value received hereby promises to pay to the Registered Owner specified above, or registered assigns, the Principal Amount specified above, in lawful money of the United States of America, on the Maturity Date specified above, unless prepaid prior thereto as hereinafter provided, with interest thereon at the Interest Rate specified above per annum from the Date of Original Issue specified above until the Maturity Date specified above or until the Principal Amount specified above is paid in full. Interest is payable annually on June 30 in each year commencing on June 30, 20__ (each an "Interest Payment Date"). The interest so payable, and punctually paid or duly provided for, will be paid, as provided in the hereinafter defined Order, to the person in whose name this Bond is registered on the books maintained for such purpose by the hereinafter defined Paying Agent (the "Bond Registry"), on the close of business on the Regular Record Date for such interest payment, which shall be the fifteenth day (whether or not a Business Day) of the calendar month immediately preceding such Interest Payment Date. Any such interest not so punctually paid or duly provided for shall herewith cease to be payable to the Registered Owner on such Regular Record Date, and may be paid to the person in whose name this Bond is registered at the close of business on a Special Record Date for the payment of such defaulted interest to be fixed by the Paying Agent, notice of which shall be given to Registered Owners at least seven days before such Special Record Date, or may be paid at any time in any other lawful manner.

10

Capitalized terms used herein but not defined herein, shall have the meanings ascribed to them in the Order.

The principal of this Bond is payable in lawful money of the United States of America upon presentation and surrender of this Bond at the designated corporate trust office of _____, _____, _____, as registrar, transfer agent and paying agent under the Order (such bank and any successor as paying agent, the "Paying Agent"). Interest on this Bond is payable in like money by check or draft drawn on the Paying Agent and mailed to the Registered Owner entitled thereto, as provided above, by first class mail or, upon the written request of a Registered Owner of at least $1,000,000 in aggregate principal amount of Bonds (with complete wiring instructions no later than the Regular Record Date for such Interest Payment Date), by wire transfer by the Paying Agent to such Registered Owner, and such request may provide that it will remain in effect with respect to subsequent Interest Payment Dates unless and until changed or revoked at any time prior to a Regular Record Date by subsequent written notice to the Paying Agent. Interest shall be computed on the basis of a 360-day year consisting of twelve 30 day months. For prompt payment of this Bond, both principal and interest, the full faith, credit and resources of the City are hereby irrevocably pledged.

In the event that the City fails to make a principal and interest payment when due (a "Payment Default"), the City shall have 30 days, following written notice of such default (the "Cure Period"), to cure such Payment Default. Failure to cure a Payment Default within the Cure Period will result in application of additional default rate interest at the rate of 2% per annum until such Payment Default is cured.

This bond is one of a series of bonds aggregating the principal sum of $_____, issued under and in full compliance with the Constitution and statutes of the State of Michigan, and particularly Section 36a of Act No. 279, Public Acts of Michigan, 1909, as amended ("Act 279"), for the purpose of satisfying certain Claims, as defined in the Order. The Bonds are limited tax general obligations of the City, and the City is obligated to levy annually ad valorem taxes on all taxable property in the Issuer, subject to applicable constitutional, statutory and charter tax rate limitations. Pursuant to the Authorizing Orders, the bonds of this series (the "Bonds") are payable in the first instance from the City Parking Revenues.

The "Order" is an Order of the Emergency Manager issued on _____, 2014, supplemented by a Supplemental Order of an Authorized Officer of the City issued on _____, 2014, authorizing the issuance of the Bonds.

The bonds of this series shall be subject to redemption prior to maturity as follows:

*(a) Optional Redemption.* Bonds or portions of bonds in Authorized Denominations of integral multiples of $1.00 are subject to redemption prior to maturity, at the option of the Issuer, in such order as the Issuer may determine, and by lot within a maturity on any date after the Date of Original Issue, at a redemption price of par plus accrued interest to the date fixed for redemption.

*(b) Mandatory Sinking Fund Redemption.* This bond is subject to mandatory sinking fund redemption in part prior to maturity, by lot in such manner as the Paying Agent may determine, at a redemption price of 100% of the principal amount thereof plus interest accrued to the date fixed for redemption, on the dates and in the principal amounts as follows:

| Date (June 30) | Principal Amount |
|---|---|
| 20__ | $ |
| 20__ | |
| 20__ | |
| 20__ | |
| 20__ | |
| 20__ | |
| 20__ | |
| 20__ | |
| 20__ | |
| 20__ | |
| 20__† | |

†Final Maturity

The amounts to be so redeemed may be reduced by the principal amounts of this bond theretofore redeemed (otherwise than through operation of the Mandatory Sinking Fund Redemption described above), or otherwise acquired and delivered to the Paying Agent, at least 45 days prior to the payment date for credit against the Mandatory Sinking Fund Redemption requirement described above and shall be applied in direct order of date of redemption.

*(c)   Mandatory Redemption from Proceeds of Sale of City Parking Facilities.* In the event the City sells any City Parking Facilities, this bond is subject to redemption in part at a price equal to the principal amount to be redeemed plus accrued interest to the date fixed for redemption from the net proceeds of such disposition.

*General Redemption Provisions.* In case less than the full amount of an outstanding bond is called for redemption, the Paying Agent, upon presentation of the bond called for redemption, shall register, authenticate and deliver to the registered owner of record a new bond in the principal amount of the portion of the original bond not called for redemption.

Notice of redemption shall be given to the registered owners of Bonds or portions thereof called for redemption by mailing of such notice not less than thirty (30) days but not more than sixty (60) days prior to the date fixed for redemption to the registered address of the registered owner of record. Bonds or portions thereof so called for redemption shall not bear interest after the date fixed for redemption, whether presented for redemption or not, provided funds are on hand with the Paying Agent to redeem such Bonds.

*Event of Default Provisions.* The Bonds and the Bonds are subject to, Events of Default and acceleration in the manner, at the times and subject to the conditions specified in the Indenture and incorporated herein and made a part hereof by reference.

Reference is hereby made to the Order for the provisions with respect to the nature and extent of the security for the Bonds, the manner and enforcement of such security, the rights, duties and obligations of the City, and the rights of the Paying Agent and the Registered Owners

12

13-53846-tjt   Doc 8045   Filed 12/16/14   Entered 12/16/14 09:38:29   Page 214 of 301
13-53846-swr   Doc 7765-1   Filed 10/22/14   Entered 10/22/14 20:39:28   Page 36 of
809

of the Bonds. As therein provided, the Order may be amended in certain respects without the consent of the Registered Owners of the Bonds. A copy of the Order is on file and available for inspection at the office of the Finance Director and at the principal corporate trust office of the Paying Agent.

The City and the Paying Agent may treat and consider the person in whose name this Bond is registered on the Bond Registry as the absolute owner hereof, whether this Bond shall be overdue or not, for the purpose of receiving payment of, or on account of, the principal hereof and interest hereon and for all other purposes whatsoever, and all such payments so made to such person or upon his order shall be valid and effectual to satisfy and discharge the liability hereon to the extent of the sum or sums so paid.

The registration of this Bond is transferable only upon the Bond Registry by the Registered Owner hereof or by his attorney duly authorized in writing upon the presentation and surrender hereof at the designated corporate trust office of the Paying Agent together with a written instrument of transfer satisfactory to the Paying Agent, duly executed by the Registered Owner hereof or his attorney duly authorized in writing, and thereupon one or more fully executed and authenticated Bonds in any authorized denominations of like maturity and tenor, in equal aggregate principal amount shall be issued to the transferee in exchange therefor as provided in the Resolution upon the payment of the charges, if any, therein prescribed.

It is hereby certified, recited and declared that all acts, conditions and things required by law to exist, happen and to be performed, precedent to and in the issuance of the Bonds do exist, have happened and have been performed in due time, form and manner as required by the Constitution and statutes of the State of Michigan, and that the total indebtedness of the City, including the Bonds does not exceed any constitutional, statutory or charter limitation.

This Bond is not valid or obligatory for any purpose until the Paying Agent's Certificate of Authentication on this Bond has been executed by the Paying Agent.

13

13-53846-tjt Doc 8045 Filed 12/16/14 Entered 12/16/14 09:38:29 Page 215 of 301
13-53846-swr Doc 7045 Filed 10/22/14 Entered 10/22/14 03:48:29 Page 365 of 809

IN WITNESS WHEREOF, the City of Detroit, by its Mayor, has caused this bond to be signed in the name of the City by the facsimile signatures of its Mayor and Finance Director of the City, and a facsimile of its corporate seal to be printed hereon, all as of the Date of Original Issue.

CITY OF DETROIT

By: _____
     Mayor

By: _____
     Finance Director

(SEAL)

(Form of Paying Agent's Certificate of Authentication)

DATE OF AUTHENTICATION:

CERTIFICATE OF AUTHENTICATION

This bond is one of the bonds described in the within-mentioned Order.

_____
_____
_____, Michigan
Paying Agent


By: _____
Authorized Signatory

## ASSIGNMENT

FOR VALUE RECEIVED the undersigned hereby sells, assigns and transfers unto

_____

(Please print or typewrite name and address of transferee)


the within bond and all rights thereunder, and hereby irrevocably constitutes and appoints _____ attorney to transfer the within bond on the books kept for registration thereof, with full power of substitution in the premises.

Dated:                            _____

_____     _____

Signature Guaranteed:             NOTICE: The signature(s) to this assignment must correspond with the name as it appears upon the face of the within bond in every particular, without alteration or enlargement or any change whatever. When assignment is made by a guardian, trustee, executor or administrator, an officer of a corporation, or anyone in a representative capacity, proof of such person's authority to act must accompany the bond.


Signature(s) must be guaranteed by a commercial bank or trust company or by a brokerage firm having a membership in one of the major stock exchanges. The transfer agent will not effect transfer of this bond unless the information concerning the transferee requested below is provided.

Name and Address: _____

PLEASE INSERT SOCIAL SECURITY NUMBER OR OTHER IDENTIFYING NUMBER OF TRANSFEREE.

_____

_____

(Include information for all joint owners if the bond is held by joint account.)

```
┌─────────────────────────────────┐
│                                 │
│                                 │
└─────────────────────────────────┘
```

(Insert number for first named transferee if held by joint account.)

16

Section 308. <u>Registration</u>. The City and the Paying Agent may treat and consider the Registered Owner of any Bond as the absolute owner of such Bond, whether such Bond shall be overdue or not, for the purpose of receiving payment of, or on account of, the principal (and premium, if any) thereof and interest thereon and for all other purposes whatsoever, and all such payments so made to such Bondowner or upon his order shall be valid and effectual to satisfy and discharge the liability upon such Bond to the extent of the sum or sums so paid.

Section 309. <u>Mutilated, Destroyed, Stolen or Lost Bonds</u>. (a) Subject to the provisions of Act 354, Public Acts of Michigan, 1972, as amended and any other applicable law, if (i) any mutilated Bond is surrendered to the Paying Agent or the City and the Paying Agent and the City receive evidence to their satisfaction of the destruction, loss or theft of any Bond and (ii) there is delivered to the City and the Paying Agent such security or indemnity as may be required by them to save each of them harmless, then, in the absence of notice to the City or the Paying Agent that such Bond has been acquired by a bona fide purchaser, the City shall execute and the Paying Agent shall authenticate and deliver in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Bond, a new Bond of like tenor and principal amount, bearing a number not contemporaneously outstanding.

(b)     If any such mutilated, destroyed, lost or stolen Bond has become or is about to become due and payable, the City in its discretion may, instead of issuing a new Bond, pay such Bond.

(c)     Any new Bond issued pursuant to this Section in substitution for a Bond alleged to be mutilated, destroyed, stolen or lost shall constitute an original additional contractual obligation on the part of the City, and shall be equally secured by and entitled to equal proportionate benefits with all other Bonds issued under this Order.

Section 310. <u>Book-Entry-Only System Permitted</u>. (a) If determined by the Authorized Officer in the Supplemental Order, the Bonds or portions of the Bonds shall be issued to a securities depository selected by the Authorized Officer (the "Security Depository") to be held pursuant to the book-entry-only system maintained by the Security Depository and registered in the name of the Security Depository or its nominee. Ownership interests in Bonds held under such book-entry-only system shall be determined pursuant to the procedures of the Security Depository and Article 8 of the applicable Uniform Commercial Code (such persons having such interests, "Beneficial Owners").

(b)     If (i) the City and the Paying Agent receive written notice from the Security Depository to the effect that the Security Depository is unable or unwilling to discharge its responsibilities with respect to the Bonds under the book-entry-only system maintained by it or (ii) the Authorized Officer determines that it is in the best interests of the Beneficial Owners that they be able to obtain Bonds in certificated form, then the City may so notify the Security Depository and the Paying Agent, and, in either event, the City and the Paying Agent shall take appropriate steps to provide the Beneficial Owners with Bonds in certificated form to evidence their respective ownership interests in the Bonds.  Whenever the Security Depository requests the City and the Paying Agent to do so, the Authorized Officer on behalf of the City and the Paying Agent will cooperate with the Security Depository in taking appropriate action after

17

13-53846-tjt  Doc 8772-5  Filed 12/16/14  Entered 12/16/14 07:39:38  Page 219 of 301
13-53846-swr  Doc 8045  Filed 10/22/14  Entered 10/22/14 09:48:29  Page 365 of
809

reasonable notice to make available Bonds registered in whatever name or names the Beneficial Owners transferring or exchanging Bonds shall designate.

(c)     Notwithstanding any other provision of the Order to the contrary, so long as the Bonds are held pursuant to the book-entry-only system maintained by the Security Depository:

(i)     all payments with respect to the principal and interest on such Bonds and all notices with respect to such Bonds shall be made and given, respectively, to the Security Depository as provided in the representation letter from the City and the Paying Agent to the Security Depository with respect to such Bonds; and

(ii)     all payments with respect to principal of the Bonds and interest on the Bonds shall be made in such manner as shall be prescribed by the Security Depository.

## ARTICLE IV

## FUNDS AND ACCOUNTS

Section 401.  <u>Establishment of Accounts and Funds</u>.  The City hereby establishes and creates the following special, separate and segregated accounts and funds:

(a)     City Parking Revenue Fund.  There is hereby established at the Depository Bank the City Parking Revenue Fund.  City Parking Revenues shall be directly remitted to and deposited by the Depository Bank into the City Parking Revenue Fund as provided in Section 801.

(b)     Debt Retirement Fund.  The City hereby establishes and creates the Debt Retirement Fund as a special, separate and segregated account and fund which shall be held for and on behalf of the City by the Paying Agent.

(c)     The Finance Director is hereby authorized to establish such additional accounts, subaccounts or funds as shall be required for the Bonds to accommodate the requirements of such series of Bonds.

Section 402.  <u>Debt Retirement Fund</u>.  General funds of the City, proceeds of all City Parking Revenues transferred by the Depository Bank pursuant to Section 801 and taxes levied pursuant to Section 301 hereof shall be used to pay the principal of and interest on the Bonds when due.  The foregoing amounts shall be placed in the Debt Retirement Fund and held in trust by the Paying Agent, and so long as the principal of or interest on the Bonds shall remain unpaid, no moneys shall be withdrawn from the Debt Retirement Fund except to pay such principal and interest.  Any amounts remaining in the Debt Retirement Fund after payment in full of the Bonds and the fees and expenses of the Paying Agent shall be retained by the City to be used for any lawful purpose.

Section 403.  <u>Investment of Monies in the Funds and Accounts</u>.  (a) The Finance Director shall direct the investment of monies on deposit in the Funds and Accounts established hereunder, and the Paying Agent, upon written direction or upon oral direction promptly

18

13-53846-tjt  Doc 8245  Filed 12/16/14  Entered 12/16/14 20:39:38  Page 220 of 301
13-53846-swr  Doc 8045  Filed 10/22/14  Entered 10/22/14 09:48:29  Page 37 of
809

confirmed in writing by the Finance Director, shall use its best efforts to invest monies on deposit in the Funds and Accounts in accordance with such direction.

(b)     Monies on deposit in the Funds and Accounts may be invested in such investments and to the extent permitted by applicable law.

Section 404. <u>Satisfaction of COP Claims</u>.  On the Effective Date, the City shall issue the Bonds in an amount sufficient to satisfy the portion of the COP Claims to be satisfied thereby. An Authorized Officer shall arrange for delivery of the Bonds to the Litigation Trust to be distributed to satisfy the portion of the COP Claims on behalf of the Settling COP Claimants as provided in the Plan of Adjustment.  Upon delivery of the Bonds to the Litigation Trustee, an Authorized Officer shall take all necessary steps to extinguish any related existing debt, including the cancellation of any obligation of the City representing portions of the COP Claims settled thereby.

**ARTICLE V**

**THE PAYING AGENT**

Section 501.  <u>Paying Agent</u>.  The Paying Agent for the Bonds shall act as bond registrar, transfer agent and paying agent for the Bonds and shall be initially _____, or such other bank or trust company located in the State which is qualified to act in such capacity under the laws of the United States of America or the State.  The Paying Agent means and includes any company into which the Paying Agent may be merged or converted or with which it may be consolidated or any company resulting from any merger, conversion or consolidation to which it shall be a party or any company to which the Paying Agent may sell or transfer all or substantially all of its corporate trust business, provided, that such company shall be a trust company or bank which is qualified to be a successor to the Paying Agent as determined by an Authorized Officer, shall be authorized by law to perform all the duties imposed upon it by this Order, and shall be the successor to the Paying Agent without the execution or filing of any paper or the performance of any further act, anything herein to the contrary notwithstanding.  An Authorized Officer is authorized to enter into an agreement with such a bank or trust company, and from time to time as required, may designate a similarly qualified successor Paying Agent and enter into an agreement therewith for such services.

**ARTICLE VI**

**SUPPLEMENTAL ORDERS AND RESOLUTIONS**

Section 601.  <u>Supplemental Orders and Resolutions Not Requiring Consent of Holders of the Bonds</u>.  The City may without the consent of any Bondowner adopt orders or resolutions supplemental to this Order for any one or more of the following purposes:

(i)     to confirm or further assure the security hereof or to grant or pledge to the holders of the Bonds any additional security;

19

13-53846-tjt   Doc 8045-5   Filed 12/16/14   Entered 12/16/14 09:38:29   Page 221 of 301
13-53846-swr   Doc 8045   Filed 10/22/15   Entered 10/22/14 03:48:29   Page 37 of 201
809

(ii)    to add additional covenants and agreements of the City for the purposes of further securing the payment of the Bonds;

(iii)   to cure any ambiguity or formal defect or omission in this Order; and

(iv)    such other action not materially, adversely and directly affecting the security of the Bonds.

provided that (A) no supplemental order or resolution amending or modifying the rights or obligations of the Paying Agent shall become effective without the consent of the Paying Agent and (B) the effectiveness of any supplemental resolution is subject to Section 702 to the extent applicable.

Section 602. Bond Counsel Opinion. Before any supplemental order or resolution under this Article shall become effective, a copy thereof shall be filed with the Paying Agent, together with an opinion of Bond Counsel that such supplemental order or resolution is authorized or permitted by this Article; provided that, Bond Counsel in rendering any such opinion shall be entitled to rely upon certificates of an Authorized Officer or other City official, and opinions or reports of consultants, experts and other professionals retained by the City to advise it, with respect to the presence or absence of facts relative to such opinion and the consequences of such facts.

# ARTICLE VII

# DEFEASANCE

Section 701. Defeasance. Bonds shall be deemed to be paid in full upon the deposit in trust of cash or direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America, or any combination thereof, not redeemable at the option of the issuer thereof, the principal and interest payments upon which, without reinvestment thereof, will come due at such times and in such amounts, as to be fully sufficient to pay when due, the principal of such Bonds and interest to accrue thereon, as confirmed by a verification report prepared by an independent certified public accountant; provided, that if any of such Bonds are to be called for redemption prior to maturity, irrevocable instructions to call such Bonds for redemption shall be given to the Paying Agent. Such cash and securities representing such obligations shall be deposited with a bank or trust company and held for the exclusive benefit of the Owners of such Bonds. After such deposit, such Bonds shall no longer be entitled to the benefits of this Order (except for any rights of transfer or exchange of Bonds as therein or herein provided for) and shall be payable solely from the funds deposited for such purpose and investment earnings, if any, thereon, and the lien of this Order for the benefit of such Bonds shall be discharged.

13-53846-tjt  Doc 8773-45  Filed 12/16/14  Entered 12/16/14 07:09:38  Page 222 of 301
13-53846-swr  Doc 8045  Filed 10/22/15  Entered 10/22/14 09:48:29  Page 37 of 201
809

# ARTICLE VIII

## OTHER PROVISIONS OF GENERAL APPLICATION

Section 801. <u>Account Control Agreement</u>. (a)      The City shall enter into the Account Control Agreement with the Depository Bank and the Paying Agent, pursuant to which the bank account described in Section 401(a) shall be established at the Depository Bank.  Daily, City Parking Revenues deposited in the City Parking Revenue Fund shall be remitted by the Depository Bank to the Debt Retirement Fund held by the Paying Agent until sufficient funds are on deposit therein to pay the principal and interest payable on the Bonds during that fiscal year (the "Annual Deposit Requirement").  Once the Annual Deposit Requirement is satisfied, any additional City Parking Revenues shall be remitted to the City for deposit into its general fund and used for any other purposes permitted by law.

(b)      In connection with the execution of any of the agreements authorized by this Section, an Authorized Officer is authorized to include therein such covenants as shall be appropriate.

Section 802.      <u>Agreements with Third Parties Related to Deposit of City Parking Revenues; Approval of Third Parties</u>.  The Emergency Manager  is hereby authorized and directed on behalf of the City to take any and all other actions and perform any and all acts that shall be required, necessary or desirable, including, but not limited to, negotiate the terms and enter into the Account Control Agreement in such form and with such terms as shall be subsequently approved by the Emergency Manager (such subsequent approval to be conclusively evidenced by his execution and delivery of the Account Control Agreement) as security for the Bonds.

Section 803.  <u>Approval of Other Documents and Actions</u>.  The Mayor, the Finance Director, the Treasurer, the City Clerk and any written designee of the Emergency Manager are each hereby authorized and directed on behalf of the City to take any and all other actions, perform any and all acts and execute any and all documents that shall be required, necessary or desirable to implement this Order.

Section 804.  <u>Delegation of City to, and Authorization of Actions of Authorized Officers</u>. (a)  Each Authorized Officer is hereby authorized and directed to do and perform any and all acts and things with respect to the Bonds which are necessary and appropriate to carry into effect, consistent with this Order, the authorizations therein and herein contained, including without limitation, the securing of ratings by bond rating agencies, if cost effective, the negotiation for and acquisition of bond insurance and/or other credit enhancement, if any, to further secure the Bonds or any portions thereof, the acquisition of an irrevocable surety bond to fulfill the City's obligation to fund any reserve account, the printing of the Bonds and the incurring and paying of reasonable fees, costs and expenses incidental to the foregoing and other costs of issuance of the Bonds including, but not limited to fees and expenses of bond counsel, financial advisors, accountants and others, from Bond proceeds or other available funds, for and on behalf of the City.

(b)    Except as otherwise provided herein, all determinations and decisions of the Authorized Officer with respect to the issuance and sale of the Bonds or the negotiation, execution or delivery of agreements as permitted or required by this Order shall be confirmed by this Authorized Officer in a Supplemental Order or Supplemental Orders, and such confirmations shall constitute determinations that any conditions precedent to such determinations and decisions of the Authorized Officer have been fulfilled.

Section 805.  <u>Approving Legal Opinions with Respect to the Bonds</u>.  Delivery of the Bonds shall be conditioned upon receiving, at the time of delivery of the Bonds; the approving opinion of Bond Counsel, approving legality of the Bonds.

Section 806.  <u>Appointment of Bond Counsel; Engagement of Other Parties.</u>    The appointment by the Emergency Manager of the law firm of Miller, Canfield, Paddock and Stone, P.L.C. of Detroit, Michigan, as Bond Counsel for the Bonds is hereby ratified and confirmed, notwithstanding the periodic representation by Miller, Canfield, Paddock and Stone, P.L.C., in unrelated matters of other parties and potential parties to the issuance of the Bonds.  The fees and expenses of Miller, Canfield, Paddock and Stone, P.L.C. as Bond Counsel and other accumulated bond related fees and expenses shall be payable from available funds in accordance with the agreement of such firm on file with the Finance Director.

Section 807.  <u>Preservation of Records</u>.  So long as any Bond remains Outstanding, all documents received by the Paying Agent under the provisions of this Order shall be retained in its possession and shall be subject at all reasonable times to the inspection of the City, and the Bondowners, and their agents and representatives, any of whom may make copies thereof.

Section 808.  <u>Parties in Interest</u>.  Nothing in this Order, expressed or implied, is intended or shall be construed to confer upon, or to give to, any person or entity, other than the City, the Paying Agent and the Owners of the Bonds, any right, remedy or claim under or by reason of this Order or any covenant, condition or stipulation hereof, and all covenants, stipulations, promises and agreements in this Order contained by and on behalf of the City or Paying Agent shall be for the sole and exclusive benefit of the City, the Paying Agent and the Bondowners.

Section 809.  <u>No Recourse Under Resolution</u>.  All covenants, agreements and obligations of the City contained in this Order shall be deemed to be the covenants, agreements and obligations of the City and not of any councilperson, member, officer or employee of the City in his or her individual capacity, and no recourse shall be had for the payment of the principal of or interest on the Bonds or for any claim based thereon or on this Order against any councilperson, member, officer or employee of the City or any person executing the Bonds in his or her official individual capacity.

Section 810.  <u>Severability</u>.  If any one or more sections, clauses or provisions of this Order shall be determined by a court of competent jurisdiction to be invalid or ineffective for any reason, such determination shall in no way affect the validity and effectiveness of the remaining sections, clauses and provisions hereof.

Section 811 <u>Cover Page, Table of Contents and Article and Section Headings</u>.  The cover page, table of contents and Article and Section headings hereof are solely for convenience of

13-53846-tjt  Doc 8045  Filed 12/16/14  Entered 12/16/14 20:39:38  Page 224 of 301
13-53846-swr  Doc 8045  Filed 12/16/14  Entered 12/16/14 05:48:29  Page 37 of 44
809

reference and do not constitute a part of this Order, and none of them shall affect its meaning, construction or effect.

Section 812  Conflict.  All resolutions or parts of resolutions or other proceedings of the City in conflict herewith shall be and the same hereby are repealed insofar as such conflict exists.

Section 813  Governing Law and Jurisdiction.  This Order shall be governed by and construed in accordance with the laws of the State.

Section 814  Order and Supplemental Order are a Contract.  The provisions of this Order and the Supplemental Order shall constitute a contract between the City, the Paying Agent and the Bondowners.

Section 815  Effective Date.  This Order shall take effect immediately upon its adoption by the Council.

Section 816  Notices.  All notices and other communications hereunder shall be in writing and given by United States certified or registered mail, expedited courier overnight delivery service or by other means (including facsimile transmission) that provides a written record of such notice and its receipt.  Notices hereunder shall be effective when received and shall be addressed to the address set forth below or to such other address as any of the below persons shall specify to the other persons:


If to the City, to:                    City of Detroit
                                       Finance Department
                                       1200 Coleman A. Young Municipal Center
                                       Detroit, Michigan 48226
                                       Attention: Finance Director


If to the Paying Agent, to:            _____

                                       Attention:


        SO ORDERED this ____ day of September, 2014.


                                       _____
                                       Kevyn D. Orr
                                       Emergency Manager
                                       City of Detroit, Michigan

23

13-53846-tjt  Doc 8045-5 Filed 12/16/14  Entered 12/16/14 07:39:38  Page 225 of 301
13-53846-swr  Doc 8045  Filed 10/22/14  Entered 10/22/14 03:48:29  Page 37 of 51
809

A-1

**EXHIBIT I.A.250.a**

FORM OF NEW GRS ACTIVE PENSION PLAN

# COMBINED PLAN
# FOR THE
# GENERAL RETIREMENT SYSTEM
# OF THE
# CITY OF DETROIT, MICHIGAN

**Amendment and Restatement Effective July 1, 2014**

# TABLE OF CONTENTS

**Page**

COMPONENT I ............................................................................................................. 1

ARTICLE 1.   GENERAL PROVISIONS ..................................................................... 2

Sec. 1.1.    General Retirement System Established; Adoption of 2014
             Combined Plan Document; Amendment and Restatement of 2014
             Combined Plan Document ........................................................................ 2

Sec. 1.2.    Retirement System Intended to be Tax-Qualified ................................... 2

Sec. 1.3.    Compliance With Plan of Adjustment ...................................................... 2

Sec. 1.4.    Board of Trustees ..................................................................................... 3

Sec. 1.5.    Board of Trustees – Membership; Appointment ..................................... 3

Sec. 1.6.    Board of Trustees; Retiree Member Election .......................................... 3

Sec. 1.7.    Board of Trustees; Oath; Term; Vacancies .............................................. 4

Sec. 1.8.    Board of Trustees; Officers and Employees ............................................ 4

Sec. 1.9.    Board of Trustees; Meetings; Rules of Procedure; Votes; Quorum .......... 5

Sec. 1.10.   Board of Trustees; Compensation; Expenses .......................................... 5

Sec. 1.11.   Rules for Administration of Funds .......................................................... 5

Sec. 1.12.   Board of Trustees; Certain Data to be Kept ............................................ 5

Sec. 1.13.   Board of Trustees; Annual Audit Report ................................................. 6

Sec. 1.14.   Board of Trustees; Legal Advisors .......................................................... 6

Sec. 1.15.   Designation of Actuary; Authority to Engage Additional Actuaries ......... 6

Sec. 1.16.   Board of Trustees; Adoption of Mortality and Other Tables of
             Experience and Rates of Interest; Limitations on Payments by the
             Retirement System .................................................................................. 7

Sec. 1.17.   Board of Trustees; Annual Actuarial Valuation of Assets and
             Liabilities ................................................................................................ 7

Sec. 1.18.   Board of Trustees; Powers and Duties; Fiduciary Status; Fiduciary
             Duties ...................................................................................................... 7

Sec. 1.19.   Investment Committee; Establishment; Purpose; Fiduciary Status;
             Fiduciary Duties ...................................................................................... 8

Sec. 1.20.   Investment Committee; Membership; Appointment ............................... 8

Sec. 1.21.   Investment Committee; Term; Resignation and Removal;
             Vacancies ................................................................................................ 9

Sec. 1.22.   Investment Committee; Operation; Meetings; Quorum; Voting ............. 10

-i-

13-53846-tjr   Doc 8272-5   Filed 12/16/14   Entered 12/16/14 07:39:38   Page 229 of 301
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 09:46:29   Page 37 of
809

# TABLE OF CONTENTS

(continued)

Sec. 1.23.   Investment Committee; Compensation; Expenses; Employment of Advisors .................................................................................... 11

Sec. 1.24.   Investment Committee; Special Reporting Obligations ...................... 11

ARTICLE 2.   DEFINITIONS .................................................................................. 13

Sec. 2.1.   Definitions ............................................................................... 13

ARTICLE 3.   MEMBERSHIP .................................................................................. 21

Sec. 3.1.   Eligible Employees .................................................................... 21

Sec. 3.2.   Cessation of Membership; Re-Employment by the Employer ............... 21

Sec. 3.3.   Report of the Employer ............................................................... 22

ARTICLE 4.   SERVICE CREDIT ............................................................................ 23

Sec. 4.1.   Credited Service ....................................................................... 23

Sec. 4.2.   Vesting Service ........................................................................ 23

Sec. 4.3.   Service Credit; Military Service .................................................... 23

Sec. 4.4.   Service Credit; Qualified Military Service ....................................... 24

ARTICLE 5.   ELIGIBILITY FOR RETIREMENT BENEFITS ......................................... 25

Sec. 5.1.   Eligibility for Unreduced Normal Retirement Benefit ......................... 25

Sec. 5.2.   Eligibility for Reduced Early Retirement Benefit ............................... 25

Sec. 5.3.   Eligibility for Deferred Vested Retirement Benefit ............................. 25

Sec. 5.4.   Eligibility for Retirement Benefit – Disabled Members ....................... 25

Sec. 5.5.   Return of Accumulated Mandatory Contributions to Non-Vested Member .................................................................................... 25

ARTICLE 6.   RETIREMENT ALLOWANCE; VARIABLE PENSION IMPROVEMENT FACTOR (ESCALATOR) .................................................................. 27

Sec. 6.1.   Retirement Allowance .................................................................. 27

Sec. 6.2.   Variable Pension Improvement Factor (Escalator) .............................. 27

ARTICLE 7.   DEATH BENEFITS ............................................................................ 28

Sec. 7.1.   Accidental Death Benefit; Performance of Duty ................................ 28

Sec. 7.2.   Death Benefits for Surviving Spouses Generally ............................... 28

Sec. 7.3.   Refund of Accumulated Mandatory Contributions Upon Death of Member .................................................................................... 28

Sec. 7.4.   Benefits Offset by Compensation Benefits; Subrogation ..................... 28

-ii-

13-53846-tjt   Doc 8045   Filed 12/16/14   Entered 12/16/14 07:39:38   Page 230 of 301
13-53846-swr   Doc 8045-1   Filed 10/22/15   Entered 10/22/14 09:48:29   Page 380 of 809

# TABLE OF CONTENTS
(continued)

**Page**

ARTICLE 8.   FORMS OF PAYMENT ..................................................................... 30

Sec. 8.1.        Retirement Allowance Options ............................................. 30

Sec. 8.2.        Disposition of Surplus Benefits upon Death of Retiree and
                 Beneficiary ...................................................................... 31

ARTICLE 9.   FUNDING AND RESERVES ........................................................... 32

Sec. 9.1.        Funding Objective of the Retirement System ......................... 32

Sec. 9.2.        Funds ............................................................................. 32

Sec. 9.3.        Method of Financing Retirement System Benefits .................. 33

Sec. 9.4.        Member Contributions Picked-Up ........................................ 34

Sec. 9.5.        Fiscal Responsibility: Increased Funding Obligations and Benefit
                 Reductions ....................................................................... 34

ARTICLE 10. VOLUNTARY EMPLOYEE CONTRIBUTIONS ............................. 36

Sec. 10.1.       Voluntary Employee Contributions; Amount; Vesting ............ 36

Sec. 10.2.       Changing an Election to Contribute ...................................... 36

Sec. 10.3.       Individual Member Accounting; Crediting of Earnings ............ 36

Sec. 10.4.       Distribution of Accumulated Voluntary Employee Contributions .......... 36

ARTICLE 11. LOAN PROGRAM FOR VOLUNTARY EMPLOYEE
             CONTRIBUTIONS ......................................................................... 38

Sec. 11.1.       The Loan Program ............................................................ 38

Sec. 11.2.       Eligibility for Loan ............................................................ 38

Sec. 11.3.       Amount of Loan ............................................................... 38

Sec. 11.4.       Terms and Conditions ....................................................... 38

Sec. 11.5.       Loan Balance .................................................................. 39

Sec. 11.6.       Default ............................................................................ 39

Sec. 11.7.       Distribution ..................................................................... 40

Sec. 11.8.       Annual Report ................................................................. 40

ARTICLE 12. LIMITATION ON BENEFITS AND CONTRIBUTIONS ................. 41

Sec. 12.1.       Compliance With Code Section 415(b) And Regulations ........ 41

Sec. 12.2.       Compliance with Code Section 415(c) and Regulations ........ 43

ARTICLE 13. RETIREMENT SYSTEM ADMINISTRATION .............................. 45

Sec. 13.1.       Board of Trustees as Retirement System Administrator .......... 45

# TABLE OF CONTENTS
### (continued)

**Page**

Sec. 13.2.    Powers and Duties of Board .................................................................. 45

Sec. 13.3.    Executive Director; Employees ............................................................ 47

Sec. 13.4.    Discretionary Authority ...................................................................... 47

Sec. 13.5.    Administrator's Decision Binding ........................................................ 48

ARTICLE 14. MANAGEMENT OF FUNDS ...................................................................... 49

Sec. 14.1.    Board as Trustee of Retirement System Assets ...................................... 49

Sec. 14.2.    Maintenance of Segregated Funds ........................................................ 49

Sec. 14.3.    Custodian of Funds ........................................................................... 49

Sec. 14.4.    Exclusive Purpose ............................................................................. 49

Sec. 14.5.    Prohibited Conduct ........................................................................... 49

ARTICLE 15. INVESTMENT OF RETIREMENT SYSTEM ASSETS ................................... 51

Sec. 15.1.    Investment Powers of the Board and the Investment Committee ............ 51

Sec. 15.2.    Investment Management ..................................................................... 52

Sec. 15.3.    Best Practices .................................................................................. 53

Sec. 15.4.    Chief Investment Officer ................................................................... 53

Sec. 15.5.    Investment Consultants ...................................................................... 54

ARTICLE 16. RETIREE MEDICAL ACCOUNT .............................................................. 56

Sec. 16.1.    Establishment of Account ................................................................... 56

Sec. 16.2.    Effective Date of Retiree Medical Account ........................................... 56

Sec. 16.3.    Funding of Benefits ........................................................................... 56

Sec. 16.4.    Limitation on Contributions ............................................................... 56

Sec. 16.5.    Impossibility of Diversion .................................................................. 57

Sec. 16.6.    Administration ................................................................................. 57

Sec. 16.7.    Right to Amend or Terminate Medical Plans ......................................... 57

Sec. 16.8.    Reversion ........................................................................................ 57

Sec. 16.9.    Limitation of Rights .......................................................................... 57

ARTICLE 17. MISCELLANEOUS .................................................................................. 58

Sec. 17.1.    Nonduplication of Benefits ................................................................. 58

Sec. 17.2.    Assignments Prohibited ..................................................................... 58

Sec. 17.3.    Protection Against Fraud ................................................................... 58

-iv-

13-53846-tjt  Doc 8772-5  Filed 12/16/14  Entered 12/16/14 07:39:38  Page 232 of 301
13-53846-swr  Doc 8045  Filed 10/22/14  Entered 10/22/14 09:48:29  Page 362 of 809

# TABLE OF CONTENTS
(continued)

**Page**

Sec. 17.4. Errors ........................................................................................... 58

Sec. 17.5. Amendment; Termination; Exclusive Benefit ......................................... 58

Sec. 17.6. Forfeitures Not to Increase Benefits ....................................................... 59

Sec. 17.7. Required Distributions - Compliance with Code Section 401(a)(9)
and Regulations ........................................................................................... 59

Sec. 17.8. Direct Rollovers ......................................................................................... 59

Sec. 17.9. Construction ........................................................................................... 61

Sec. 17.10. Severability ........................................................................................... 61

# COMPONENT I

# ARTICLE 1. GENERAL PROVISIONS

**Sec. 1.1.    General Retirement System Established; Adoption of 2014 Combined Plan Document; Amendment and Restatement of 2014 Combined Plan Document**

Effective July 1, 1938, a General Retirement System for the employees of the City of Detroit was established for the purpose of providing retirement and survivor benefits for eligible City employees and their beneficiaries.  The provisions of the Detroit General Retirement System, as in effect July 1, 2014, were set forth in a Combined Plan Document.  As provided in Ordinance 19-14 and Ordinance 20-14 and Section 47-1-1 of the Detroit City Code, this Combined Plan Document replaced in its entirety Chapter 47 of the Detroit City Code as in effect on June 30, 2014 and any conflicting provisions in any collective bargaining agreements covering Members (including, without limitation, the City Employment Terms that applied to Members effective July 18, 2012).  All resolutions and policies of the Retirement Board previously adopted which were inconsistent with the provisions of the Combined Plan Document were also repealed to the extent of such inconsistency.

The Combined Plan Document is hereby amended and restated effective July 1, 2014, in the form of this instrument.  Component I of the Combined Plan Document applies to benefits accrued by Members on and after July 1, 2014 and to operation of the Detroit General Retirement System on and after July 1, 2014.  Component II of the Combined Plan Document applies to benefits accrued by Members prior to July 1, 2014.  Except as specifically provided in Component II, benefits provided under Component II of the Combined Plan Document are frozen effective June 30, 2014.

**Sec. 1.2.    Retirement System Intended to be Tax-Qualified**

The Retirement System is a governmental plan under Section 414(d) of the Internal Revenue Code which is intended to be a qualified plan and trust pursuant to applicable provisions of the Internal Revenue Code.  The Board shall construe and administer the provisions of the Retirement System in a manner that gives effect to the tax-qualified status of the Retirement System.

**Sec. 1.3.    Compliance With Plan of Adjustment**

The Retirement System is intended to comply with all relevant provisions (including Exhibits) of the Plan for the Adjustment of Debts of the City of Detroit, as approved by the United States Bankruptcy Court in *In re City of Detroit, Michigan, Case No. 13-53846* ("Plan of Adjustment").  Component I and Component II of the Combined Plan shall be interpreted and construed by the City, the Board of Trustees and the Retirement System to give full effect to the Plan of Adjustment.  To the extent that a conflict arises between the Combined Plan Document and the Plan of Adjustment, the City, the Board of Trustees, the Investment Committee and the Retirement System are directed to interpret any inconsistency or ambiguity to give full effect to the Plan of Adjustment.

## Sec. 1.4.    Board of Trustees

Effective July 1, 1938, a Board of Trustees of the Detroit General Retirement System was created. The Board is vested with responsibility for the general administration, management and operation of the Detroit General Retirement System and with the trust and investment powers conferred in this Combined Plan Document.

## Sec. 1.5.    Board of Trustees – Membership; Appointment

The Board of Trustees of the Detroit General Retirement System shall consist of ten Trustees, as follows:

(1)    The Mayor, *ex officio*, or the Mayor's designee;

(2)    One City Council member, *ex officio*, who is selected by the City Council;

(3)    The City Treasurer, *ex officio*;

(4)    Five active employee Members of the Retirement System to be elected by the Members in accordance with such rules and regulations as may be adopted by the Board. No more than one Trustee shall be elected from any one City Department;

(5)    One individual, appointed by the Mayor subject to the approval of the Board, who is neither an employee of the City nor is eligible to receive benefits under the Retirement System; and

(6)    One retiree who is receiving benefits under the Retirement System and who is elected by Retirees in accordance with procedures described in Section 1.6.

## Sec. 1.6.    Board of Trustees; Retiree Member Election

The procedures for the election of the Retiree member of the Board of Trustees shall be as follows:

(1)    *Notice*. Notice of a primary election shall be sent to each Retiree by United States Mail.

(2)    *Nominating petitions*. No candidate's name shall be placed on the primary election ballot unless a nominating petition containing the signatures of at least one hundred and twenty-five Retirees is filed with the executive director of the Retirement System. The form of the nominating petition, the filing of the petition, and the procedure for verification of signatures shall be in accordance with rules and regulations adopted by the Board. Notwithstanding the foregoing, an incumbent Retiree Trustee shall not be required to submit a nominating petition but instead shall submit a written communication indicating his or her intention to seek an additional term.

(3)     *Ballot*.  Each candidate whose name appears on the ballot at any election held for the office of Retiree Trustee shall be identified by the title of the position held by the Retiree at the time of retirement and by the word "incumbent" if the candidate is a current trustee seeking re-election.  No ballot shall contain any organizational or political designation or mark.  Rotation and arrangement of names on the ballot shall be in accordance with the rules and regulations of the Board.

(4)     *Voting*.  Procedures regarding mailing of ballots, poll lists, custody of ballots, marking of ballots, return of ballots, handling of return envelopes received, and sealed ballot boxes shall be the same as those adopted and followed by the Board in the immediately preceding election of an active employee Trustee.

(5)     *Procedures*.  Procedures regarding the selection and certification of successful candidates for nomination, the selection of Trustees from nominees, tie votes, and the destruction of ballots shall be the same as those adopted and followed by the Board in the immediately preceding election of an active employee Trustee.

(6)     *Board Rules*.  Any matters relative to the election of the Retiree member of the Board not covered by this Section 1.6 shall be handled in accordance with such rules and regulations as the Board may adopt.

## Sec. 1.7.     Board of Trustees; Oath; Term; Vacancies

Within ten days after appointment or election, each Trustee shall take an oath of office to be administered by the Detroit City Clerk.

The regular term of office for the elected Member Trustees and the Trustee appointed by the Mayor under Section 1.5(5) shall be for a period of six years, one such Trustee to be elected or appointed, as the case may be, each year.  The term of office for the Retiree Trustee shall be two years.

If an active employee Trustee leaves the employ of the City, or if an elected or appointed Trustee fails to attend four consecutive scheduled Board meetings without being excused for cause by the Trustees attending such meetings, the Trustee shall be considered to have resigned from the Board.  By resolution, the Board shall declare the office vacated as of the date of adoption of such resolution.  If a vacancy occurs in the office of Trustee, the vacancy shall be filled at the next regular election held by the Board, or at any special election ordered by resolution adopted by the Board.

## Sec. 1.8.     Board of Trustees; Officers and Employees

The Board shall elect a chair and vice-chair from its members.  The executive director of the Retirement System or its designee shall serve as secretary of the Board.  The Board may employ such actuarial, medical and other contractors and employees as shall be required, subject to the powers and authority reserved to the Investment Committee and subject to the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.*

### Sec. 1.9.    Board of Trustees; Meetings; Rules of Procedure; Votes; Quorum

(1)    The Board shall hold regular meetings, at least one in each month, and shall hold special meetings as necessary.  The Board shall designate the time and place thereof in advance.  The Board shall adopt its own rules of procedure, including provisions for special meetings and notice thereof, and shall keep a record of proceedings.  All meetings of the Board shall be public and are subject to the *Michigan Open Meetings Act, MCL 15.261 et seq*.  All Board meetings shall be held within the City of Detroit.

(2)    Each Trustee shall be entitled to one vote on each question before the Board.  A majority vote of the Trustees present shall be necessary for a decision by the Trustees at any meeting of the Board.

(3)    Five Trustees shall constitute a quorum.

### Sec. 1.10.   Board of Trustees; Compensation; Expenses

Members of the Board of Trustees shall serve without additional compensation from the Employer, but they shall be compensated by the Retirement System as follows:

(1)    *Stipend.*  Trustees are eligible for a meeting stipend, provided the Trustee attends one or more regular or special Board meetings during a month.  The stipend amount shall be a minimum of sixty-seven dollars ($67.00) per week multiplied by the Trustee's years of service.  Eligibility rules and the amount of the stipend shall be set by Board resolution.  However, the amount of the weekly meeting stipend shall not exceed two hundred dollars ($200.00).

(2)    *Ex Officio Trustees*.  Ex Officio Trustees are not eligible for a stipend payment.

(3)    *Attendance*.  For purposes of this Section 1.10, attendance at a Board meeting shall include actual attendance at a meeting or being otherwise available to attend a Board meeting canceled for lack of a quorum.

Trustees shall be reimbursed from the Expense Fund for all actual, reasonable and necessary expenses incurred in the performance of their duties as Trustees.

### Sec. 1.11.   Rules for Administration of Funds

Subject to the limitations contained in this Combined Plan Document, the Board of Trustees shall, from time to time, establish rules and regulations for the administration of the funds created by this Plan document and for the transaction of its business.

### Sec. 1.12.   Board of Trustees; Certain Data to be Kept

The Board shall keep or cause to be kept, in convenient form, such data as shall be necessary for an actuarial valuation of the Retirement System and for checking and compiling

the experience of the Retirement System. The ordinary actuarial, accounting and clerical services for the operation of the Retirement System shall be performed by the employees of the Retirement System.

### Sec. 1.13.  Board of Trustees; Annual Audit Report

The Board shall render a report to the Mayor, the City Council and the Investment Committee on or before the fifteenth day of January, showing the fiscal transactions of the Retirement System for the year ending on the preceding thirtieth day of June, the amounts of accumulated cash and securities in the various funds of the System, and the last balance sheet showing the financial condition of the Retirement System by means of an actuarial valuation of the assets and liabilities of the Retirement System.

### Sec. 1.14.  Board of Trustees; Legal Advisors

(1)    The Board shall appoint legal advisors (including a general counsel) who shall be directly responsible to and shall hold office at the pleasure of the Board of Trustees. Any legal advisor to the Board of Trustees shall be an attorney licensed to practice law in the State of Michigan and shall be experienced in matters relating to pension systems. The qualifications of legal counsel shall be approved by the Board of Trustees.

(2)    Legal advisors to the Board of Trustees shall have such duties relative to pension matters as shall be assigned by the Board of Trustees.

(3)    Costs and expenses relative to the position of legal advisors to the Board shall be payable out of the assets of the Retirement System, subject to the provisions of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq*.

### Sec. 1.15.  Designation of Actuary; Authority to Engage Additional Actuaries

The Retirement System actuary as of July 1, 2014 shall continue to serve as such until resignation or removal by the Board. In the event the Board desires to retain a new actuary, the Board and the Investment Committee shall collectively participate in the evaluation and selection of a qualified actuary. The Retirement System actuary shall be responsible for assisting the Board and the Investment Committee in performing their actuarial duties and shall comply with all requests for information or modeling requested by the Board or the Investment Committee, and shall attend meetings of the Board and Investment Committee as requested, so as to allow the Board and Investment Committee to perform satisfactorily the rights and duties set forth in the Combined Plan, the term sheet regarding Investment Committee Governance for General Retirement System, attached to that certain agreement by and between the Michigan Settlement Administration Authority, a Michigan body corporation (the "Authority"), the Retirement System, the Police and Fire Retirement System for the City of Detroit, Michigan ("PFRS") and the City (the "State Contribution Agreement") as Exhibit A (the "Governance Term Sheet") and the Plan of Adjustment. Furthermore, the Board shall not act on any recommendation made by the Retirement System's actuary based on any calculation, assumption or assessment rejected by the Investment Committee.

13-53846-tjt  Doc 8272-5  Filed 12/16/14  Entered 12/16/14 07:39:38  Page 239 of 301
13-53846-swr  Doc 8045-1  Filed 10/22/14  Entered 10/22/14 03:48:29  Page 389 of
809

Nothing herein shall be interpreted as limiting the Investment Committee's authority to engage an actuarial consulting firm other than the Retirement System's actuary to perform actuarial services deemed necessary to fulfill its fiduciary and other duties to the Retirement System as set forth in the Governance Term Sheet and the Plan of Adjustment.

### Sec. 1.16. Board of Trustees; Adoption of Mortality and Other Tables of Experience and Rates of Interest; Limitations on Payments by the Retirement System

(1)     Subject to Section 15.1, the Board shall adopt such mortality and other tables of experience, and a rate or rates of interest, as shall be necessary for the operation of the System on an actuarial basis, provided, that the authority granted by this section shall not permit or be used to provide for an interest rate which would violate the prohibitions of subsection (2) or (3) of this section.

(2)     The Retirement System and the Trustees charged with management of the System shall not make any payment to active or retired Members other than payments that are required by the governing documents of the Retirement System.  This prohibition applies to all payments that are not authorized by this Combined Plan, whether such payments are those commonly referred to as a "thirteenth check" or by any other name.

(3)     Anything in this Combined Plan Document or any other document to the contrary notwithstanding, the annual actuarial interest rate assumption for the period commencing July 1, 2014 and ending June 30, 2023 shall be six and three-quarters percent (6.75%).

### Sec. 1.17. Board of Trustees; Annual Actuarial Valuation of Assets and Liabilities

Subject to Section 15.1, each year, on the basis of such mortality and other tables of experience, and such rate or rates of regular interest as the Board shall adopt pursuant to Section 1.16, the Board shall cause to be made an actuarial valuation of the assets and liabilities of the Retirement System.

### Sec. 1.18. Board of Trustees; Powers and Duties; Fiduciary Status; Fiduciary Duties

The Board of Trustees shall have such powers and duties as are necessary for the proper administration of the Retirement System and the custody and investment of Retirement System assets, other than those powers and duties reserved to the Investment Committee.  To the extent the Board exercises discretion with respect to investment of Retirement System assets, each member of the Board of Trustees shall be an investment fiduciary as defined in the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq*., and shall discharge his or her duties with respect to the Retirement System in compliance with the provisions of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq*.  A member of the Board of Trustees shall discharge his or her duties with the care, skill and caution under the circumstances then prevailing that a prudent person, acting in a like capacity and familiar with such matters, would use in the conduct of an activity of like character and purpose.  Board members shall comply with all Board governance policies and procedures, including the Ethics and Code of Conduct Policies, unless such compliance would violate the member's fiduciary duties or conflicts with the provisions set forth in this Combined Plan Document.

13-53846-tjt  Doc 8045  Filed 12/16/14  Entered 12/16/14 09:38:29  Page 240 of 301
13-53846-swr  Doc 7074-1  Filed 10/22/15  Entered 10/22/14 03:48:29  Page 339 of
809

**Sec. 1.19. Investment Committee; Establishment; Purpose; Fiduciary Status; Fiduciary Duties**

As of the effective date of the Plan of Adjustment, but subject to consummation of the State Contribution Agreement, an Investment Committee is hereby created for the purpose of making recommendations to the Board of Trustees with respect to certain investment management matters relating to the Retirement System. The creation and operation of the Investment Committee is controlled by the Governance Term Sheet. The Investment Committee shall remain in effect for a period of not less than twenty years following the date of confirmation of the Plan of Adjustment. The Investment Committee shall be an investment fiduciary as defined in the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.* and shall have all powers granted fiduciaries under the first sentence of *MCL 38.1133(5) and (6).* The Investment Committee shall serve in a fiduciary capacity with respect to the investment management of Retirement System assets, determination of the investment return assumptions, and Board compliance with provisions of the governing documents of the Retirement System. An Investment Committee member shall discharge his or her duties with respect to the Retirement System in compliance with the provisions of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.* An Investment Committee member shall discharge his or her duties with the care, skill and caution under the circumstances then prevailing that a prudent person, acting in a like capacity and familiar with such matters, would use in the conduct of an activity of like character and purpose. Investment Committee members shall comply with all Board governance policies and procedures, including the Ethics and Code of Conduct Policies, unless such compliance would violate the member's fiduciary duties or conflict with the provisions set forth in the Governance Term Sheet.

**Sec. 1.20. Investment Committee; Membership; Appointment**

The Investment Committee shall consist of seven (7) members, determined as follows:

(1)     Five independent members, two of whom must be residents of the State of Michigan, and none of whom may be a party-in-interest with respect to the Retirement System, as defined in Section 38.1132d(4) of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.* Each independent Investment Committee member shall have expert knowledge or extensive experience with respect to either (a) economics, finance, or institutional investments, or (b) administration of public or private retirement plans, executive management, benefits administration or actuarial science. At least one of the independent Investment Committee members shall satisfy the requirements of (a) above and at least one of the independent Investment Committee members shall satisfy the requirements of (b) above. The initial independent Investment Committee members shall be selected by mutual agreement of the appropriate representatives of the State of Michigan, the City and the Board, in consultation with the Foundation for Detroit's Future (the "Foundation"), and shall be named in the Plan of Adjustment. If one or more of the five initial independent Investment Committee members are not selected by mutual agreement prior to confirmation of the Plan of Adjustment, then the United States Bankruptcy Court, Eastern District of Michigan shall designate such number of independent Investment Committee members as is necessary to bring the number of independent Investment Committee members to five (5);

13-53846-tjt Doc 8772-5 Filed 12/16/14 Entered 12/16/14 20:39:38 Page 241 of 301
13-53846-swr Doc 8045-1 Filed 10/22/14 Entered 10/22/14 09:48:29 Page 39 of 84
809

(2)     One Retiree who is a Retiree member of the Board of Trustees who shall be appointed by the Board; and

(3)     One employee who is an active employee member of the Board of Trustees who shall be appointed by the Board.

**Sec. 1.21.   Investment Committee; Term; Resignation and Removal; Vacancies**

The term of office for the independent members of the Investment Committee shall be six years; provided, however, that the initial term for the independent Investment Committee members shall be determined as follows:

| Independent Member | Term of Office |
|---|---|
| (1) | 2 years |
| (2) | 3 years |
| (3) | 4 years |
| (4) | 5 years |
| (5) | 6 years |

The term of office for a Retiree or employee Investment Committee member shall be the number of years remaining on such individual's term of office as a member of the Board of Trustees.  Each Investment Committee member shall serve until his or her successor is appointed at the expiration of his or her term of office, or until his or her death, incapacity, resignation or removal, if earlier.  Notwithstanding any provision of this Combined Plan Document, an initial independent Investment Committee member shall not be prohibited from becoming a successor independent Investment Committee member after expiration of his or her initial term.

An Investment Committee member may resign at any time by giving ninety days' prior written notice to the Investment Committee, the City and the Board, which notice or time period may be waived by the Investment Committee.  An Investment Committee member may be removed from office by majority vote of the remaining Investment Committee members for any of the following reasons: (a) the member is legally incapacitated from executing his or her duties as a member of the Investment Committee and neglects to perform those duties; (b) the member has committed a material breach of the provisions of the Retirement System or the policies or procedures of the Retirement System and the removal of the member is in the interests of the Retirement System or its Members and Beneficiaries; (c) the member is convicted of a violation of law and the removal is accomplished by a vote of the members of the Investment Committee in according with the voting procedure set forth in Section 1.22; or (d) if the member holds a license to practice and such license is revoked for misconduct by any State or federal government.  A member who fails to attend four (4) consecutive scheduled meetings of the Investment Committee shall be deemed to have resigned, unless in each case his or her absence is excused for cause by the remaining members attending such meetings.  In the event of any such removal or resignation, the Investment Committee shall by resolution declare the office of the member vacated as of the date such resolution is adopted.

Any vacancy occurring on the Investment Committee shall be filled within sixty (60) days following the date of the vacancy for the unexpired portion of the term, in the same manner in which the office was previously filled.

Successor independent Investment Committee members shall be recommended by a majority of the remaining independent Investment Committee members and shall be confirmed by the Board and the Treasurer of the State of Michigan ("State Treasurer"), in consultation with the Foundation, pursuant to such rules and regulations as may be adopted by the Investment Committee (provided that such rules are not inconsistent with the Governance Term Sheet or the Plan of Adjustment). In the event the Board and the State Treasurer cannot agree on a successor independent Investment Committee member within thirty (30) days of the receipt of the recommendation of the Investment Committee, the remaining independent Investment Committee members shall appoint the successor independent Investment Committee member.

In the event the United States Bankruptcy Court, Eastern District of Michigan appoints one or more of the initial independent Investment Committee members, a successor to any such independent Investment Committee member shall be appointed in the same manner as provided in the preceding paragraph following three (3) weeks' notice to the Board of the individuals appointed, in accordance with such rules and regulations as may be adopted by the Investment Committee (provided that such rules are not inconsistent with either the Governance Term Sheet or the Plan of Adjustment).

Successor Investment Committee members shall have the powers and duties conferred on Investment Committee members herein.

## Sec. 1.22. Investment Committee; Operation; Meetings; Quorum; Voting

The Investment Committee members shall select from among the independent members a chair and a vice chair. The Investment Committee members shall select from among themselves a secretary. The Investment Committee shall hold regular meetings, not less frequently than once every other month, and shall hold special meetings as necessary. The Investment Committee shall designate the time and place thereof in advance. The secretary or his or her designee shall be responsible for providing meeting notices to the other Investment Committee members. The Investment Committee shall adopt its own rules of procedure and shall keep a record of its proceedings. Notice and conduct of all Investment Committee meetings, both regular and special, shall be subject to the *Michigan Open Meetings Act, MCL 15.261 et seq.* All Investment Committee meeting shall be held within the City of Detroit.

Five Investment Committee members shall constitute a quorum at any meeting, as long as at least three of the independent Investment Committee members are in attendance. Except as otherwise provided in the Governance Term Sheet, each Investment Committee member shall be entitled to one vote on each question before the Committee and at least four concurring votes shall be necessary for a decision by the Investment Committee.

An Investment Committee member may have his or her voting privileges temporarily suspended by a 70% or higher vote of the other members if the member is indicted or sued by a

13-53846-tjt  Doc 8045  Filed 12/16/14  Entered 12/16/14 09:48:29  Page 243 of 301
13-53846-swr  Doc 7673-5  Filed 10/02/14  Entered 10/02/14 17:39:38  Page 39 of
809

State or federal government for an alleged violation of the law that relates to his or her service on the Investment Committee, or for other alleged financial crimes, including fraud.

## Sec. 1.23.   Investment Committee; Compensation; Expenses; Employment of Advisors

Investment Committee members shall not receive any compensation from the Retirement System for their services; Investment Committee members shall, however, be reimbursed for the reasonable, actual and necessary expenses incurred in the performance of their duties.   All reasonable and proper expenses related to the administration of the Investment Committee, including but not limited to the purchase of insurance, shall be payable out of the assets of the Retirement System.   The Investment Committee may retain actuarial, legal counsel, audit or other professional or support personnel to provide advice to the Investment Committee as it deems reasonably necessary to perform its functions and such parties or persons may be reasonably compensated from the assets of the Retirement System.   Such engagements shall not be subject to approval of the Board.

## Sec. 1.24.   Investment Committee; Special Reporting Obligations

(1)     Beginning in 2015, pursuant to Section 6 of the State Contribution Agreement, the Investment Committee shall provide compliance reports to the State Treasurer on a semi-annual basis and at such other times as the State Treasurer reasonably may request (each, a "Compliance Report") that certifies that the Investment Committee is not aware of any defaults under the State Contribution Agreement, or, if the Investment Committee is aware of a default under the State Contribution Agreement, specifically identifying the facts of such default.

(2)     In the event the Retirement System receives a written notice from the State Treasurer declaring and specifically identifying the facts of an alleged default under the State Contribution Agreement ("Default Notice"), and such default is cured as provided in the State Contribution Agreement, the Investment Committee must provide to the State Treasurer a written certification that (i) the default has been cured, and (ii) that no material damages have been caused by the default that have not otherwise been remedied (the "Cure Certification").

(3)     Beginning in 2015, the Investment Committee shall provide to the City not later than December 31 of each year evidence reasonably necessary to show that the internal controls governing the investment of Retirement System assets are in compliance with the applicable provisions of the Plan of Adjustment.

(4)     Beginning in calendar year 2015 and for each calendar year thereafter, as of a date which is not later than December 31 of each such calendar year the Investment Committee shall provide to the Foundation the following information:

(a)     a copy of the audited annual financial statement and the corresponding management letter for the Retirement System for the Fiscal Year ending June 30 of such calendar year, containing a non-qualified opinion of an independent external auditor to the Retirement System;

13-53846-tjt   Doc 8772   Filed 12/16/14   Entered 12/16/14 09:38:29   Page 244 of 301
13-53846-swr   Doc 8045   Filed 10/22/14   Entered 10/22/14 09:48:29   Page 39 of 301
809

(b)    a certification from the Chair of the Investment Committee on behalf of the Investment Committee ("Pension Certificate") in a form reasonably acceptable to the Foundation that, as of the date of the annual report required to be provided by the City to the Foundation under the Omnibus Transaction Agreement by and among the City, The Detroit Institute of Arts and Foundation For Detroit's Future ("Annual Report"):

(i)    the City is current in its obligation to contribute to Component II of the Combined Plan determined in accordance with the Plan of Adjustment;

(ii)    the Investment Committee has been operated in accordance with the terms set forth in this Component I of the Combined Plan Document; and

(iii)    the City continues to maintain the pension governance terms reflected in this Component I of the Combined Plan as of the effective date of the Plan of Adjustment, without modification or amendment during the twenty (20) year period following the effective date of the Plan of Adjustment, except as required to comply with applicable federal law, including without limitation to maintain the tax qualified status of the Retirement System under the Internal Revenue Code, or to comply with the Plan of Adjustment;

(c)    a copy of (i) the Compliance Report covering the calendar year for which the Annual Report is made; (ii) any additional Compliance Reports provided during the calendar year for which the Annual Report is made as requested by the State Treasurer; (iii) either the certificate of compliance or the Default Notice, within the meaning of Section 6 of the State Contribution Agreement, as applicable, that was provided to the Investment Committee by the State Treasurer; and (iv) in the event that the State Treasurer issued a Default Notice, the Cure Certification, within the meaning of Section 6 of the State Contribution Agreement, provided by the Investment Committee.  Notwithstanding anything in this paragraph (c) to the contrary, if the parties to the State Contribution Agreement agree to revise the requirements of Section 6 of the State Contribution Agreement or the information required in the Compliance Report, in order to meet the obligations of this paragraph (c), the Investment Committee shall be required only to provide documentation to the Foundation that meets such revised requirements; and

(d)    any additional information that may be reasonably requested by the Foundation from time to time.

(5)    Beginning in calendar year 2016, before May 15th of each calendar year, the Investment Committee shall provide to the Chief Financial Officer of the City confirmation that, as of the date of the City's report to the Foundation, there has been no impairment or modification of the information contained in the most recent Pension Certificate since the date of such Pension Certificate.

13-53846-tjt  Doc 8045  Filed 12/16/14  Entered 12/16/14 07:39:38  Page 245 of 301
13-53846-swr  Doc 8045-5  Filed 12/16/14  Entered 12/22/14 03:48:29  Page 39 of 54
809

# ARTICLE 2. DEFINITIONS

**Sec. 2.1.    Definitions**

Unless a different meaning is plainly required by context, the following words and phrases have the meanings respectively ascribed to them by this section:

(1)    *Accumulated Mandatory Employee Contributions* means the sum of all amounts deducted from the compensation of a Member and credited to the Accumulated Mandatory Employee Contribution Fund for periods on and after July 1, 2014.

(2)    *Accumulated Voluntary Employee Contributions* means the total balance in a Member's individual account under Component I of the Retirement System representing after-tax amounts deducted from the compensation of the Member, together with earning on such contributions.

(3)    *Actuarial Equivalent* or *Actuarially Equivalent* means a Retirement Allowance or benefit amount having the same Actuarial Equivalent Value as another applicable benefit.  The rates of interest, tables and factors adopted by the Board from time to time to determine Actuarial Equivalence shall not violate the terms of the Plan of Adjustment.

(4)    *Actuarial Equivalent Value* means the value of an applicable Retirement Allowance or benefit amount, where values are calculated under generally accepted actuarial methods and using the applicable tables, interest rates and other factors established by the Board upon recommendation of the Investment Committee.

(5)    *Administrative Rules and Regulations* means rules and regulations promulgated by the Board of Trustees for the administration of the Retirement System and for the transaction of its business.

(6)    *Age*, *Attainment of* means the age an individual reaches on the day of his or her birthday.

(7)    *Average Final Compensation* means the average Compensation received by a Member during the ten consecutive years of Credited Service under the Retirement System (for this purpose, both before and after July 1, 2014) which immediately precede the date of the Member's last termination of employment with the Employer.  If a Member has less than ten years of Credited Service, the Member's Average Final Compensation shall be the average of the annual Compensation received by the Member during the Member's total years of Credited Service.  If a Member is absent from service with the City for a period of not less than two consecutive months during his last two years of employment because of an unpaid leave under the Family and Medical Leave Act, such Member's Average Final Compensation will mean the average Compensation received by the Member during the ten consecutive year period out of the last twelve years of Credited Service which produces the highest average.

(8)    *Beneficiary* means any person or persons (designated by a Member pursuant to procedures established by the Board) who are entitled to receive a Retirement Allowance

13-53846-tjt   Doc 8772-5   Filed 12/16/14   Entered 12/16/14 07:39:38   Page 246 of 301
13-53846-swr   Doc 8045-5   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 396 of
809

or pension payable from funds of the Retirement System due to the participation of a Member.

(9)     *Board of Trustees* or *Board* or *Retirement Board* means the Board of Trustees of the Retirement System.

(10)    *City* means the City of Detroit, Michigan, a municipal corporation.

(11)    *City Council* or *Council* means the legislative body of the City.

(12)    *Combined Plan* means the Combined Plan for the General Retirement System of the City of Detroit, Michigan, effective July 1, 2014 and as amended thereafter.

(13)    *Compensation* means a Member's base salary or wages actually paid to the Member for personal services rendered to the Employer, excluding bonuses, overtime pay, payment of unused accrued sick leave, longevity pay, payment for unused accrued vacation, the cost or value of fringe benefits provided to the Member, termination or severance pay, reimbursement of expenses, or other extra payment of any kind.  Compensation will include any amount which is contributed by the City to a plan or program pursuant to a salary reduction agreement and which is not includable in the taxable income of the Member under Sections 125, 402(e)(3), 402(h) or 403(b) of the Internal Revenue Code or which are contributed by the City on behalf of a Member as provided in Section 9.3(3) and 9.5 pursuant to a qualified "pick-up program".

For periods of time prior to July 1, 2014, the City shall provide to the Retirement System actual base salary or wages paid to Members using the best and most reliable sources of information available to the City.  In the event the City is unable to provide actual base wages to the Retirement System, the City shall make reasonable estimates of each Member's base salary or wages for purposes of determining a Member's Compensation for periods prior to July 1, 2014.

Notwithstanding the foregoing, for purposes of determining a Member's Voluntary Employee Contributions, Compensation shall mean the gross salary or wages paid to the Member for personal services rendered to the Employer on and after July 1, 2014.

The annual Compensation of each Member taken into account for the purposes of determining all benefits provided under the Retirement System for any determination period shall not exceed the limitation set forth in Code Section 401(a)(17) ($260,000 for the Plan Year commencing July 1, 2014).  Such limitation shall be adjusted for the cost-of-living in accordance with Section 401(a)(17)(B) of the Internal Revenue Code.  The cost-of-living adjustment in effect for a calendar year applies to any determination period beginning in such calendar year.  If Compensation for any prior determination period is taken into account in determining a Member's benefits for the current determination period, the Compensation for such prior determination period is subject to the applicable annual compensation limit in effect for that determination period.  If a determination period consists of fewer than 12 months, the annual compensation limit is an amount equal to the otherwise applicable annual compensation limit multiplied by a fraction, the

13-53846-tjt   Doc 8045   Filed 12/16/14   Entered 12/16/14 07:39:38   Page 247 of 301
13-53846-swr   Doc 8045   Filed 12/16/14   Entered 12/16/14 09:48:29   Page 39 of
809

numerator of which is the number of months in the short determination period, and the denominator of which is 12.

(14) *Component I* means the portion of the Retirement System described in this Combined Plan and which consists of:

    (a) the 2014 Defined Benefit Plan, which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code; and

    (b) the 2014 Defined Contribution Plan, which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code.

(15) *Component II* means the portion of the Retirement System described in this Combined Plan and which consists of:

    (1) The 1973 Defined Benefit Plan, which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code; and

    (2) the 1973 Defined Contribution Plan, which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code.

(16) *Credited Service* means service credited to a Member to the extent provided in Article 4 of Component I of this Combined Plan Document and, solely for purposes of Section 2.1(7), service credited to a Member prior to July 1, 2014 pursuant to Component II of this Combined Plan.

(17) *Disability* or *Disabled* means that a Member has been determined to be eligible to receive long term disability benefits under a policy or plan of insurance or self-insurance maintained by the Employer.

(18) *Employee* means any regular and/or permanent officer, agent, or person in the employ of the Employer, but does not include:

    (a) individuals whose services for the Employer are compensated on a contractual or fee basis;

    (b) persons who are not employed as Full-time Employees;

    (c) any person during any period when such person is classified by the Employer as a non-common-law employee or an independent contractor for federal income tax and withholding purposes whose compensation for services is reported on a form other than Form W-2 or any successor form for reporting wages paid to and taxes withheld from employees, even if a court or administrative agency determines that such person is a common-law employee of the Employer;

    (d) the medical director of the Retirement System; or

(e)      any Police or Fire employee covered by the Police and Fire Retirement System of the City of Detroit, Michigan by virtue of such employment.

If a person described in (c) above is reclassified by the Employer as a common-law employee of the Employer and otherwise meets the definition of an Employee, the person will be eligible to participate in the Retirement System prospectively as of the actual date of such reclassification only (and only to the extent such individual otherwise qualifies as an Employee).

(19)   *Employer* means the City, or any board, commission, or court serving the City, to the extent that both the City, through the action of City Council, and the governing authority of such board, commission or court, shall mutually agree to include the employees of such board, commission, or court, as Employees under the provisions of this Retirement System at such time as they are eligible.  To the extent that any employees of a board, commission, or court are considered Employees for this purpose, all employees of such board, commission, or court, shall be so included.  However, only City board members and commissioners who are also Employees are eligible to participate in the Retirement System, unless otherwise specifically provided for in the Combined Plan Document.  In all cases of doubt, the Board of Trustees shall decide who is an Employee.

(20)   *Family and Medical Leave Act* means the federal Family and Medical Leave Act of 1993, as amended, and regulations issued thereunder.

(21)   *Fiscal Year* means the twelve month period commencing each July 1 and ending on the following June 30.

(22)   *Full-time Employee* means an Employee who is employed in a position normally requiring six hundred hours of work or more per calendar year; provided, however, that an employee who is hired by an Employer as a part-time transit operator to work less than twenty-five hours per week shall not be a full-time employee under the Retirement System.  Notwithstanding the general rule, a special service employee of the City shall be considered a full-time employee under the Retirement System upon completion of fourteen hundred and forty (1440) hours or more in a Fiscal Year.  For purposes of Component I, once a special service employee has worked 1440 hours in a Fiscal Year, the employee will be deemed to be a full-time employee under the Retirement System for all subsequent Fiscal Years.

(23)   *General Retirement System* or *Retirement System* means the General Retirement System of the City of Detroit created and established by Title IX, Chapter VI, of the 1918 Detroit City Charter, as amended, continued in effect through the 1974, 1997  and 2012  Detroit City Charters, Article 47 of the Detroit City Code and this Combined Plan Document, as amended from time to time, which consists of:

(a)      The 2014 Defined Benefit Plan, the terms of which are described in Component I hereof;

(b)      The 2014 Defined Contribution Plan, consisting of the Voluntary Employee Contribution Account, the terms of which are described in Component I hereof;

13-53846-tjt  Doc 8045  Filed 12/16/14  Entered 12/16/14 09:38:29  Page 249 of 301
13-53846-swr  Doc 8045  Filed 12/16/14  Entered 12/16/14 09:38:29  Page 399 of
809

(c)   The Frozen 1973 Defined Benefit Plan, the terms of which are described in Component II hereof; and

(d)   The Frozen 1973 Defined Contribution Plan, the terms of which are described in Component II hereof.

References to the words Retirement System in Component I of the Combined Plan Document shall mean the provisions of the 2014 Defined Benefit Plan and/or the 2014 Defined Contribution Plan described in Component I, unless a different meaning is plainly required by the context.

(24)   *Hour of Service* means (i) each hour for which a Member is paid or entitled to payment by the Employer for the performance of duties, and (ii) each hour for which a Member is directly paid or entitled to payment by the Employer for reasons other than the performance of duties (such as vacation, holiday, illness or approved leave of absence).

(25)   *Internal Revenue Code* or *Code* means the United States Internal Revenue Code of 1986, as amended.

(26)   *Investment Committee* means the committee established pursuant to Section 1.19 which shall have the powers and duties described herein.

(27)   *Mandatory Employee Contributions* mean the contributions made by a Member to the Retirement System pursuant to Section 9.3(3).

(28)   *Medical Beneficiary* means a Member who has retired from employment with the Employers and the spouses and dependants of such Member who are receiving post-retirement benefits in accordance with the terms of a retiree medical plan sponsored or maintained by an Employer.

(29)   *Medical Benefits* mean the provision of payments for certain sickness, accident, hospitalization and medical benefits within the meaning of Treasury Regulation section 1.401-14(a), including dental, vision and mental health benefits, as designated by the City.

(30)   *Medical Benefits Account* means the bookkeeping account established under Section 16.1 to provide for the payment of Medical Benefits on behalf of Medical Beneficiaries.

(31)   *Member* means any Employee who is included in the membership of the Retirement System and who has not retired or died.

(32)   *Normal Retirement Age* means age sixty-two (62).  Notwithstanding the foregoing, the Normal Retirement Age of a Member who is an active Employee as of June 30, 2014 and who has 10 or more years of Vesting Service as of such date shall be as follows solely for purposes of this Component I:

13-53846-tjt   Doc 8775   Filed 12/16/14   Entered 12/16/14 09:38:29   Page 250 of 301
13-53846-swr   Doc 8045   Filed 10/22/14   Entered 10/22/14 09:48:29   Page 403 of
809

| Age as of July 1, 2014 | Normal Retirement Agee |
|---|---|
| 61 years | 60 years and 0 months |
| 60 years | 60 years and 0 months |
| 59 years | 60 years and 3 months |
| 58 years | 60 years and 6 months |
| 57 years | 60 years and 9 months |
| 56 years | 61 years and 0 months |
| 55 years | 61 years and 3 months |
| 54 years | 61 years and 6 months |
| 53 years | 61 years and 9 months |

(33) *Normal Retirement Date* means for any Member the later of the date the Member (i) attains 10 years of Vesting Service, or (ii) attains Normal Retirement Age.

Pursuant to Code Section 411(e), as in effect in 1974, a Member shall be 100% vested in his accrued benefit under the Retirement System upon attainment of his or her Normal Retirement Date while employed by an Employer.

(34) *Notice to Members, Beneficiaries, and Retirees* means a mailing using First Class United States Mail to the Members, Beneficiaries, and Retirees at their last known addresses.

(35) *Pension Reserve* means the present value of all payments to be made on account of any Retirement Allowance payable under Component I of the Combined Plan. Such Pension Reserve shall be computed upon the basis of such mortality and other tables of experience and interest, as provided herein until June 30, 2023 and, thereafter, as shall be adopted by the Board upon the recommendation of the Investment Committee.

(36) *Plan Actuary* or *Actuary* means the enrolled actuary or actuarial firm appointed as provided in Section 1.15 to serve as technical advisor to the Investment Committee and the Board on matters regarding the funding and operation of the Retirement System and to perform such other duties as the Board or the Investment Committee may direct.

(37) *Plan Document* or *Combined Plan Document* means this instrument, effective as of July 1, 2014, with all amendments hereafter adopted.

(38) *Plan of Adjustment* means the Plan for the Adjustment of Debts of the City of Detroit, which has been approved by the United States Bankruptcy Court in *In re City of Detroit, Michigan, Case No. 13-53846*.

(39) *Plan Year* means the twelve month period commencing on July 1 and ending on June 30.

(40) *Prior Service* means the service credit awarded to a Member before July 1, 2014 under the terms of Component II of the Retirement System as in effect on June 30, 2014, as certified by the Board of Trustees.

(41) *Retiree* means a former Member who is receiving a Retirement Allowance from the Retirement System.

13-53846-tjt Doc 8772-5 Filed 12/16/14 Entered 12/16/14 09:38:29 Page 251 of 301
13-53846-swr Doc 8045-1 Filed 10/22/14 Entered 10/22/14 03:48:29 Page 40 of 84
809

(42)  *Retirement* means a Member's withdrawal from the employ of the Employer with a Retirement Allowance paid by the Retirement System.

(43)  *Retirement Allowance* means an annual amount payable in monthly installments by the Retirement System, whether payable for a temporary period or throughout the future life of a Retiree or Beneficiary.

(44)  *Service* means personal services rendered to the Employer by a person as an Employee, provided such person is compensated by the Employer for such personal services.

(45)  *Spouse* means the person to whom a Member is legally married under applicable law at the time the determination is made.

(46)  *Straight Life Retirement Allowance* means payment of a Member's Retirement Allowance over the Member's lifetime.

(47)  *Vesting Service* means service credited to a Member to the extent provided in Article 4 of Component I of this Combined Plan Document.

(48)  *Voluntary Employee Contributions* mean the after-tax contributions made by a Member to the Retirement System pursuant to Section 10.1.

(49)  *Voluntary Employee Contributions Account* means the account established pursuant to Section 10.3 for a Member who elects to make Voluntary Employee Contributions.

The following terms shall have the meanings given to them in the Sections of this Combined Plan Document set forth opposite such term:

| | |
|---|---|
| Accumulated Mandatory Employee Contribution Fund | Section 9.2(1) |
| Accumulated Voluntary Employee Contribution Fund | Section 9.2(2) |
| Annual Addition | Section 12.2(1) |
| Annual Report | Section 1.24(4)(b) |
| Authority | Section 1.19 |
| compensation | Section 12.1(11) |
| Compliance Report | Section 1.24(1) |
| Cure Certification | Section 1.24(2) |
| Default Notice | Section 1.24(2) |
| Direct Rollover | Section 17.8(2)(a) |
| Distributee | Section 17.8(2)(b) |
| Dollar Limit | Section 12.1(3)(b) |
| Eligible retirement plan | Section 17.8(2)(c) |
| Eligible rollover distribution | Section 17.8(2)(d) |
| Expense Fund | Section 9.2(6) |
| Foundation | Section 1.20(1) |
| funding level | Section 9.5 |
| Governance Term Sheet | Section 1.15 |
| Income Fund | Section 9.2(7) |
| Investment management decision/investment management matter | Section 15.2 |

13-53846-tjt  Doc 8045  Filed 12/16/14  Entered 12/16/14 07:39:38  Page 252 of 301
13-53846-swr  Doc 7045-1  Filed 10/22/14  Entered 10/22/14 09:48:29  Page 402 of
809

| | |
|---|---|
| limitation year | Section 12.1(2) |
| Medical Benefit Fund | Section 9.2(5) |
| Medical Plans | Section 16.1 |
| Option "A". Joint and Seventy-Five Percent Survivor Allowance | Section 8.1(1)(c) |
| Option "B". Joint and Twenty-Five Percent Survivor Allowance | Section 8.1(1)(e) |
| Option One. Cash Refund Annuity | Section 8.1(1)(a) |
| Option Three. Joint and Fifty Percent Survivor Allowance | Section 8.1(1)(d) |
| Option Two. Joint and One Hundred Percent Survivor Allowance | Section 8.1(1)(b) |
| Pension Accumulation Fund | Section 9.2(3) |
| Pension Certificate | Section 1.24(4)(b) |
| Pension Improvement Factor (Escalator) | Section 6.2 |
| PFRS | Section 1.19 |
| Plan of Adjustment | Section 1.3 |
| Pop-up Form | Section 8.1(2)(b) |
| Rate Stabilization Fund | Section 9.2(4) |
| Standard Form | Section 8.1(2)(a) |
| State Contribution Agreement | Section 1.15 |
| State Treasurer | Section 1.21 |
| Straight Life Retirement Allowance | Section 8.1(1) |

# ARTICLE 3. MEMBERSHIP

## Sec. 3.1.     Eligible Employees

The membership of the Retirement System shall consist of all persons who are Full-time Employees, except:

(a)     persons who are members of the Police and Fire Retirement System of the City of Detroit, Michigan established under Title IX, Chapter VII of the 1918 Detroit City Charter, continued in the 1974, 1997 and 2012 Detroit City Charters, and continued in the form of the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan; and

(b)     Any person who is a member of any other public employee pension or retirement plan or retirement system adopted by the State of Michigan, other than the Michigan National Guard, or by any other political subdivision of the State of Michigan.

## Sec. 3.2.     Cessation of Membership; Re-Employment by the Employer

(1)     The following provisions shall apply to a non-vested Member who terminates employment with the Employer and is re-employed:

(a)     Except as otherwise provided in this Article 3, if any non-vested Member leaves the employment of the Employer for any reason other than Retirement or death, such person shall continue to be a Member until such time as the Member receives a total distribution of his Accumulated Mandatory Employee Contributions and Accumulated Voluntary Employee Contributions.   Upon receipt of his Accumulated Mandatory Employee Contributions, the Member's Credited Service and Vesting Service at that time shall be forfeited.

(b)     If the Member is re-employed by an Employer (other than as a part-time transit operator) within a period of six years from and after the date employment with the Employer last terminated, any forfeited Credited Service and Vesting Service rendered on and after July 1, 2014 shall be restored for purposes of determining the Member's Retirement Allowance after re-employment, provided that within the two year period beginning on the Member's re-employment date, the Member re-contributes to the Retirement System any Accumulated Mandatory Employee Contributions that were distributed to the Member pursuant to Section 5.5.

(c)     If a non-vested Member is re-employed (other than as a part-time transit operator) more than six years from and after the date employment with the Employer last terminated, the Member shall not be permitted to re-contribute to the Retirement System any Accumulated Mandatory Employee Contributions that were distributed to the Member pursuant to Section 5.5 and any forfeited Credited Service and Vesting Service shall not be restored at the time of the Member's re-employment.

(2)    A former Employee who is vested but has not yet begun to receive a Retirement Allowance and who is rehired (other than as a part-time transit operator) prior to being separated for six years shall have his benefit pertaining to his total Credited Service earned on and after July 1, 2014 calculated in accordance with the terms of Component I of the Retirement System in effect at the time of his last separation from service.

(3)    A former Employee who is vested but has not yet begun to receive a Retirement Allowance and who is rehired (other than as a part-time transit operator) after being separated for more than six years shall be entitled to two separate and distinct pension benefits under Component I, each to be calculated in accordance with the provisions of Component I of the Retirement System in effect at the time of each separation from service.

(4)    Retirement benefits for a Retiree who returns to active full time employment with an Employer shall be subject to the following provisions:

    (a)    A Retiree who returns to work will have his Retirement Allowance suspended upon re-employment. The variable pension improvement factor (escalator) shall not be added to the amount of the original Retirement Allowance during the Retiree's re-employment period.

    (b)    A Retiree who returns to work will be entitled to receive a second Retirement Allowance in accordance with the provisions of the Retirement System in effect during his re-employment period.

    (c)    A Retiree's Average Final Compensation for purposes of determining the Retiree's second Retirement Allowance will be based upon the Compensation earned by the Retiree after he returns to work.

    (d)    An individual who retires for a second time will not be allowed to change the payment option selected by the Member with respect to the original Retirement Allowance. However, the individual may select a separate payment option with respect to his second Retirement Allowance.

    (e)    The Coordination of Benefits (Equaled Social Security) option will not be available with respect to payment of the second Retirement Allowance.

### Sec. 3.3.    Report of the Employer

It shall be the duty of the Employer to submit to the Board of Trustees a statement showing the name, title, compensation, duties, date of birth, date of hire, and length of service of each Member, and such other information as the Board of Trustees may require or reasonably request for proper administration of the Retirement System.

# ARTICLE 4. SERVICE CREDIT

## Sec. 4.1.    Credited Service

(1)    The Board shall keep an accurate record of each Employee's accumulated Service credit from the date of commencement of employment with the Employer to the date of termination of employment with the Employer.

(2)    A Member shall be credited with one month of Credited Service for each calendar month during which he performs one hundred forty (140) or more Hours of Service for the Employer as an Employee, beginning on the later of July 1, 2014 or his date of hire with the Employer and ending on the date his employment with the Employer is terminated. Service shall be credited in years and twelfths $(1/12^{th})$ of a year.  Not more than one-twelfth $(1/12^{th})$ of a year of Credited Service shall be credited to a Member on account of all Service rendered to the Employer in a calendar month.  Not more than one year of Credited Service shall be credited to a Member on account of all Service rendered to the Employer in any period of 12 consecutive months.

(3)    A Member who does not perform Service for the Employer by reason of a Disability which begins on or after July 1, 2014 shall be credited with Credited Service for the period of his Disability during which he is entitled to receive long-term disability benefits under the Employer's plan or policy.

(4)    Solely for purposes of determining eligibility for a retirement benefit under Section 5.2, a Member shall be credited with the sum of his Prior Service as determined by the Board and his Credited Service on and after July 1, 2014 determined under Section 4.1(2).

## Sec. 4.2.    Vesting Service

(1)    A Member shall be credited with a year of Vesting Service for each Plan Year commencing on or after July 1, 2014 during which the Member performs 1,000 or more Hours of Service for the Employer.

(2)    A Member's total Vesting Service shall be the sum of his Prior Service and his Service determined under Section 4.2(1).

## Sec. 4.3.    Service Credit; Military Service

An Employee who enters the military service of the United States while employed by an Employer shall have the period of such military service credited as Service in the same manner as if the Employee had served the Employer without interruption, provided that (1) the Employee's entry into such military service and re-employment thereafter shall be in accordance with applicable laws, ordinances, and regulations of the State of Michigan and the Employer; (2) he or she is re-employed by the Employer upon completion of such military service; and (3) the Member contributes to the Retirement System the Mandatory Employee Contributions that would have been made by the Member but for the Member's military service.  The Member shall be permitted to make such contributions in accordance with Code Section 414(u) and regulations thereunder.  During the period of military service and until return to employment with the

Employer, the Employee's Mandatory Employee Contributions to the Retirement System shall be suspended.

### Sec. 4.4.    Service Credit; Qualified Military Service

Notwithstanding any provision of this Combined Plan Document to the contrary, contributions, benefits, and service credit with respect to qualified military service under Component I, shall be provided in accordance with Code Section 414(u).  Notwithstanding anything to the contrary herein, if a Member dies while performing qualified military service (as defined in Code Section 414(u)), to the extent required by Code Section 401(a)(37), the survivors of the Member are entitled to any additional benefits (if any, and other than benefit accruals relating to the period of qualified military service) provided under the Retirement System as if the Member had resumed and then terminated employment on account of death.

13-53846-tjt   Doc 8045   Filed 12/16/14   Entered 12/16/14 07:39:38   Page 257 of 301
13-53846-swr   Doc 7045-1   Filed 10/22/14   Entered 10/22/14 09:48:29   Page 40 of 301
809

# ARTICLE 5. ELIGIBILITY FOR RETIREMENT BENEFITS

### Sec. 5.1.    Eligibility for Unreduced Normal Retirement Benefit

Any Member who attains his Normal Retirement Date while employed by the City may retire upon written application filed with the Board setting forth the date on which the Member desires to be retired.  The date of retirement shall be effective as of the first day following the later of (i) the Member's last day on the City payroll, or (ii) the date the Member executes and files an application for retirement, notwithstanding that the Member may have separated from Service during the notification period.  Such a Member shall be entitled to receive an unreduced Retirement Allowance calculated as provided in Section 6.1 and payable in a form of payment selected by the Member pursuant to Section 8.1.

### Sec. 5.2.    Eligibility for Reduced Early Retirement Benefit

Any Member who has attained Age fifty-five, who is credited with thirty or more years of Credited Service, and who has not attained his Normal Retirement Date, shall have the option of retiring upon written application filed with the Board setting forth the date on which the Member desires to be retired.  The Retirement Allowance payable to a Member who retires early shall be the Actuarial Equivalent of the Retirement Allowance that would be payable to the Member at his Normal Retirement Date pursuant to Section 6.1, as determined by the Plan Actuary.  A Member's early retirement benefit shall be payable in accordance with a form of payment selected by the Member pursuant to Section 8.1.

### Sec. 5.3.    Eligibility for Deferred Vested Retirement Benefit

Any Member who ceases to be an employee before satisfying the requirements for receipt of a retirement benefit under Section 5.1 or Section 5.2 and who is credited with ten or more years of Vesting Service upon his or her termination of employment (regardless of age), shall be entitled to receive an unreduced Retirement Allowance commencing at any time following his attainment of Age sixty-two.  Deferred vested retirement benefits shall be payable in accordance with a form of payment selected by the Member pursuant to Section 8.1.

### Sec. 5.4.    Eligibility for Retirement Benefit – Disabled Members

Any Member who becomes Disabled prior to his Normal Retirement Date shall be entitled to receive an unreduced Retirement Allowance commencing at any time following the Member's attainment of Age sixty-two.  Disability retirement benefits shall be payable in accordance with a form of payment selected by the Member pursuant to Section 8.1.

### Sec. 5.5.    Return of Accumulated Mandatory Contributions to Non-Vested Member

If a Member ceases to be an Employee before becoming eligible for a deferred vested Retirement Allowance under Section 5.3, the Member may elect to receive distribution of the Accumulated Mandatory Employee Contributions made to the Retirement System by such Member.  If a Member elects to receive his Accumulated Mandatory Employee Contributions, such amounts shall be paid to the Member in a lump sum payment or in equal monthly

13-53846-tjt  Doc 8045  Filed 12/16/14  Entered 12/16/14 09:48:29  Page 258 of 301
13-53846-swr  Doc 8045  Filed 12/16/14  Entered 12/16/14 09:48:29  Page 408 of
809

installments for a period not to exceed three years, according to such rules and regulations as the Board may adopt from time to time.

## ARTICLE 6. RETIREMENT ALLOWANCE; VARIABLE PENSION IMPROVEMENT FACTOR (ESCALATOR)

### Sec. 6.1.    Retirement Allowance

The Retirement Allowance payable to a Member commencing at the later of his Normal Retirement Date or his actual retirement from employment with the Employer in the form of a Straight Life Retirement Allowance shall be equal to one and one-half percent (1.5%) of the Member's Average Final Compensation multiplied by the Member's years (computed to the nearest one-twelfth (1/12th) year) of Credited Service earned after June 30, 2014.

### Sec. 6.2.    Variable Pension Improvement Factor (Escalator)

Except as provided in Section 9.5, beginning July 1, 2018 and effective the first day of each Plan Year thereafter, the Board may determine that a Retiree's annual Retirement Allowance shall be increased by a factor of two percent (2.0%), computed each year on the basis of the amount of the original Retirement Allowance received at the time of Retirement; provided, that the recipient of said Retirement Allowance shall have attained Age sixty-two and shall have been receiving a Retirement Allowance for a period of not less than twelve months prior to the first day of such Plan Year.   The Pension Improvement Factor (Escalator) shall not be compounded.

13-53846-tjt   Doc 8045   Filed 12/16/14   Entered 12/16/14 20:33:29   Page 260 of 301
13-53846-swr   Doc 7645   Filed 10/22/14   Entered 10/22/14 09:48:29   Page 419 of 801
809

# ARTICLE 7. DEATH BENEFITS

## Sec. 7.1.    Accidental Death Benefit; Performance of Duty

(1)    If a Member is killed in the performance of duty in the service of the Employer, or dies as the result of illness contracted or injuries received while in the performance of duty in the service of the Employer, and such death, illness or injury resulting in death, is found by the Board to have resulted from the actual performance of duty in the service of the Employer, the Member's surviving Spouse shall be entitled to a monthly annuity benefit equal to the Member's Retirement Allowance at the time of his death, unreduced for early payment.  Such benefit shall be payable until the surviving Spouse's death.

(2)    The minimum annual Retirement Allowance payable to a surviving Spouse under this Section 7.1 shall be equal to ten percent (10%) of the Member's Average Final Compensation determined as of the date of the Member's death.

## Sec. 7.2.    Death Benefits for Surviving Spouses Generally

If any Member dies while in the employ of the Employer (other than in the performance of duty) after the date such Member has earned ten or more years of Credited Service, the Member's surviving Spouse shall receive a Retirement Allowance.  The Retirement Allowance payable to the Spouse shall be computed in the same manner in all respects as if said Member had (i) retired effective the day preceding the Member's death, notwithstanding that the Member had not attained his or her Normal Retirement Date, (ii) elected a Joint and One Hundred Percent Survivor Allowance as described in Section 8.1, and (iii) nominated the surviving Spouse as Beneficiary.

## Sec. 7.3.    Refund of Accumulated Mandatory Contributions Upon Death of Member

If a Member dies while employed by the City or following termination of employment and the Member is not eligible for a benefit under Section 7.1 or 7.2, the Member's Accumulated Mandatory Employee Contributions to the Retirement System at the time of death shall be paid to the  Beneficiary nominated in a written designation duly executed by the Member and filed with the Board.  In the event there is no such designated Beneficiary surviving, the Member's Accumulated Mandatory Employee Contributions shall be paid to the Member's estate.  If a Member who dies without a legal will has not nominated a Beneficiary, the Member's Accumulated Mandatory Employee Contributions at the time of death may be used to pay burial expenses if the Member leaves no other estate sufficient for such purpose.  Such expenses shall not exceed a reasonable amount as determined by the Board.

## Sec. 7.4.    Benefits Offset by Compensation Benefits; Subrogation

(1)    Any amounts which may be paid or payable to a  Beneficiary on account of a Member's death under the provisions of any Workers' Compensation, pension, or similar law, except federal Social Security old-age and survivors' benefits, shall be an offset against any amounts payable from funds of the Retirement System on account of the Member's death.  If the present value of the benefits payable under said Workers' Compensation, pension, or similar law, is less than the Pension Reserve for the Retirement Allowance

payable by the Retirement System, the present value of the said Workers' Compensation, pension, or similar legal benefit shall be deducted from the amounts payable by the Retirement System, and such amounts as may be provided by the Retirement System, so reduced, shall be payable as provided in this Combined Plan Document.

(2)     In the event a person becomes entitled to a pension payable by the Retirement System because of an accident or injury caused by the act of a third party, the Retirement System shall be subrogated to the rights of said person against such third party to the extent of the benefit which the Retirement System pays or becomes liable to pay.

13-53846-tjt Doc 8045 Filed 10/22/15 Entered 10/22/14 03:48:29 Page 41 of 201
13-53846-swr Doc 2770 Filed 12/16/14 Entered 12/16/14 07:39:38 Page 262 of 301
809

# ARTICLE 8. FORMS OF PAYMENT

## Sec. 8.1.    Retirement Allowance Options

(1)    Until the date the first Retirement Allowance payment check is issued, any Member may elect to receive a Straight Life Retirement Allowance payable throughout life, or the Member may elect to receive the Actuarial Equivalent of the Straight Life Retirement Allowance computed as of the effective date of retirement, in a reduced Retirement Allowance payable throughout life, and nominate a   Beneficiary to receive benefit payments following the Member's death, in accordance with the options set forth below:

(a)    *Option One.  Cash Refund Annuity*.  If a Retiree who elected a Cash Refund Annuity dies before payment of the Accumulated Contributions made to the Retirement System on and after July 1, 2014 has been received in an aggregate amount equal to, but not exceeding the Retiree's Accumulated Mandatory Employee Contributions at the time of retirement, the difference between said Accumulated Mandatory Employee Contributions and the aggregate amount of annuity payments already received, shall be paid in a single lump sum to a Beneficiary nominated by written designation duly executed by the Member and filed with the Board.  If there are no such designated Beneficiaries surviving said Retiree, any such difference shall be paid to the Retiree's estate.

(b)    *Option Two.  Joint and One Hundred Percent Survivor Allowance*.  Upon the death of a Retiree who elected a Joint and One Hundred Percent Survivor Allowance, one hundred percent of the reduced Retirement Allowance shall be paid to and continued throughout the life of the  Beneficiary nominated by written designation duly executed and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

(c)    *Option "A".  Joint and Seventy-Five Percent Survivor Allowance*.  Upon the death of a Retiree who elected a Joint and Seventy-Five Percent Survivor Allowance, seventy-five percent of the reduced Retirement Allowance shall be continued throughout the life of and paid to the Beneficiary nominated by written designation duly executed by the Member and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

(d)    *Option Three.  Joint and Fifty Percent Survivor Allowance*.  Upon the death of a Retiree who elected a Joint and Fifty Percent Survivor Allowance, fifty percent of the reduced Retirement Allowance shall be continued throughout the life of and paid to the  Beneficiary nominated by written designation duly executed by the Member and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

(e)    *Option "B".  Joint and Twenty-Five Percent Survivor Allowance*.  Upon the death of a Retiree who elected a Joint and Twenty-Five Percent Survivor Allowance, twenty-five percent of the reduced Retirement Allowance shall be paid throughout the life of the  Beneficiary nominated by written designation duly executed and

13-53846-tjt   Doc 8045   Filed 12/16/14   Entered 12/16/14 07:39:38   Page 263 of 301
13-53846-swr   Doc 8045-5   Filed 10/22/15   Entered 10/22/14 03:48:29   Page 413 of
809

filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

(2) *Joint and Survivor Optional Forms of Payment.*  The Joint and Survivor Optional Forms of Payment provided under the Retirement System shall be made available in either the standard form or the pop-up form, as follows:

(a) *Standard Form.*  Under the Standard Form, the reduced Retirement Allowance shall be paid throughout the lifetime of the Retiree.

(b) *Pop-up Form.*  Under the Pop-up Form, the reduced Retirement Allowance shall be paid throughout the lifetime of the Retiree and the designated Beneficiary.  In the event of the death of the designated Beneficiary during the lifetime of the Retiree, the amount of the Retirement Allowance shall be changed to the amount that would have been payable had the Retiree elected the Straight Life Retirement Allowance Form of Payment.

(3) *Coordination of Benefits.*  According to such rules and regulations as the Board shall adopt, until the first payment of a Retirement Allowance becomes due, but not thereafter, a Member under Age sixty-five may elect to have the Member's Straight Life Retirement Allowance provided for under Component I equated on an Actuarial Equivalent basis to provide an increased Retirement Allowance payable to Age sixty-two or Age sixty-five, and to provide a decreased Retirement Allowance thereafter.  The increased Retirement Allowance payable to such Age shall approximate the total of the decreased Retirement Allowance payable thereafter and the estimated social security benefit.  If a Member elects to receive increased and then decreased Retirement Allowance payments provided for in this paragraph, he or she may also elect to have such payments reduced by electing one of the optional forms of payment provided for in paragraph (1) of this Section 8.1. This coordination of benefits option shall not create any additional actuarial costs to the City.

### Sec. 8.2.    Disposition of Surplus Benefits upon Death of Retiree and Beneficiary

If under a Joint and One Hundred Percent Survivor allowance, a Joint and Seventy-Five Percent Survivor allowance, a Joint and Fifty Percent Survivor allowance, or a Joint and Twenty-Five Percent Survivor allowance as provided for under Section 8.1(1), both a Retiree and his Beneficiary die before they have received in Retirement Allowance payments an aggregate amount equal to the Retiree's Accumulated Mandatory Employee Contributions at the time of retirement, the difference between the said Accumulated Mandatory Employee Contributions and the aggregate amount of Retirement Allowances paid to the Retiree and Beneficiary, shall be paid in a single lump sum to such person or persons nominated by written designation of the Retiree duly executed and filed with the Board.  If there are no such person or persons surviving the Retiree and the Beneficiary, any such difference shall be paid to the estate of the second to die of the Retiree or Beneficiary.

13-53846-tjt  Doc 8045  Filed 12/16/14  Entered 12/16/14 09:48:29  Page 264 of 301
13-53846-swr  Doc 7074-5  Filed 10/22/14  Entered 10/22/14 20:09:38  Page 41 of 301
809

## ARTICLE 9. FUNDING AND RESERVES

### Sec. 9.1.  Funding Objective of the Retirement System

The funding objective of Component I of the Retirement System is to establish and receive Employer and Member contributions during each Plan Year that are sufficient to fully cover the actuarial cost of benefits anticipated to be paid on account of Credited Service rendered by Members during the Plan Year (the normal cost requirements of the Retirement System), and to amortize the unfunded actuarial costs of benefits likely to be paid on account of Credited Service rendered on or after July 1, 2014 and before the first day of the Plan Year (the unfunded actuarial accrued liability of Component I of the Retirement System).

### Sec. 9.2.  Funds

Component I of the Retirement System shall consist of the Accumulated Mandatory Employee Contribution Fund, the Accumulated Voluntary Employee Contribution Fund, the Pension Accumulation Fund, the Rate Stabilization Fund, the Medical Benefit Fund, the Expense Fund, and the Income Fund, as follows:

(1)    The Accumulated Mandatory Employee Contribution Fund shall be the Fund in which shall be accumulated the contributions of Members to provide their Retirement Allowances.  Upon the Retirement, termination, or death of a Member with a vested Retirement Allowance, the Member's Accumulated Mandatory Employee Contributions shall be deemed to be part of the Pension Reserve which shall be used to pay the Member's Retirement Allowance.

(2)    The Accumulated Voluntary Employee Contribution Fund shall be the Fund in which shall be accumulated the voluntary after-tax contributions of Members together with earnings thereon.

(3)    The Pension Accumulation Fund shall be the fund in which shall be accumulated reserves for the Retirement Allowances and other benefits payable from that portion of the Employer's annual contribution that is not credited to the Rate Stabilization Fund and amounts transferred to Component I as provided in Section E-16(c) of Component II, and from which shall be paid Retirement Allowances and other benefits on account of Members.

(4)    The Rate Stabilization Fund shall be the Fund to which shall be credited Employer annual contributions in excess of the amount of the Employer's contribution which is credited to the Pension Accumulation Fund and amounts transferred to Component I as provided in Section E-16(c) of Component II.

(5)    The Medical Benefit Fund shall be the Fund to which shall be credited contributions made for the purpose of funding Medical Benefits.

(6)    The Expense Fund shall be the fund to which shall be credited any money provided by the Employers to pay the administrative expenses of the Retirement System, and from

13-53846-tjt  Doc 8772-5  Filed 12/16/14  Entered 12/16/14 07:39:38  Page 265 of 301
13-53846-swr  Doc 3045  Filed 10/22/15  Entered 10/22/14 09:38:29  Page 415 of
809

which shall be paid certain expenses incurred in connection with the administration and operation of the Retirement System.

(7)     The Income Fund shall be the Fund to which shall be credited all interest, dividends, and other income derived from the investments of Component I of the Retirement System and any earnings thereon, all gifts and bequests received by Component I of the Retirement System, and all other moneys credited to Component I of the Retirement System, the disposition of which is not specifically provided for in this Article 9.  There shall be paid or transferred from the Income Fund, all amounts required to credit earnings and losses to the various Funds of the Retirement System in accordance with the provisions of Component I of this Combined Plan Document.  Amounts credited to the Income Fund in excess of amounts needed to credit earnings and losses of the Retirement System as provided in this Component I for any Plan Year shall be transferred to the Pension Accumulation Fund and used to pay Retirement Allowances and other benefits on account of Members.

## Sec. 9.3.     Method of Financing Retirement System Benefits

(1)     The pension liabilities for Members shall be determined by the Plan's Actuary using the entry-age normal cost method of actuarial valuation.

(2)     The Employer's annual contribution to finance the prospective pension liabilities for the nine Plan Year period commencing July 1, 2014 and ending June 30, 2023 shall be five percent (5%) of the base Compensation of active Members for the applicable Plan Year. A portion of the Employer's annual contribution for each Plan Year as determined by the City shall be credited to the Rate Stabilization Fund.  The remainder of the City's annual contribution shall be allocated to the Pension Accumulation Fund.

(3)     Except as provided in Section 9.5, for each Plan Year, a Member shall contribute to the Retirement System an amount equal to four percent (4%) of his or her base Compensation for such Plan Year.  A Member's Mandatory Employee Contributions for the Plan Year beginning July 1, 2014 and ending June 30, 2015 shall commence as of the Member's first payroll date occurring in August 2014.  The officer or officers responsible for processing the payroll shall cause a Member's Mandatory Employee Contributions to be deducted from the Member's Compensation on each and every payroll, for each and every payroll period, from the later of (i) the Member's first payroll date occurring in August 2014, and (ii) the Member's date of hire to the date he ceases to be an Employee. The contribution shall be deducted from a Member's Compensation, notwithstanding that the minimum compensation provided by law for the Member shall be reduced thereby. Payment of compensation, less said Mandatory Employee Contributions, shall be a complete discharge of all claims and demands whatsoever for the services rendered by the said Member during the period covered by such payment.  Member Mandatory Employee Contributions will be used for the purpose of funding the normal cost of the Retirement System.

13-53846-tjt   Doc 8272-5   Filed 12/16/14   Entered 12/16/14 20:39:38   Page 266 of 301
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 09:48:29   Page 418 of
809

### Sec. 9.4.  Member Contributions Picked-Up

(1)    The Employer shall pick up Member Mandatory Employee Contributions required pursuant to Sections 9.3(3) and 9.5 in accordance with Code Section 414(h).

(2)    The picked-up contributions, although designated as employee contributions shall be treated as City contributions for the purpose of determining a Member's tax treatment under the Internal Revenue Code.  The City shall pay the contributions picked-up on behalf of a Member from the same source of funds that are used for paying compensation to the Member.

(3)    The Employer shall pick up Member Mandatory Employee Contributions by a reduction in the Member's cash salary or an offset against a future salary increase, or both.  The Employer shall designate Mandatory Employee Contributions that are picked-up and paid to the Retirement System as employer contributions and not as employee contributions. No Member who participates in the Retirement System shall have the option of choosing to receive the contributed amounts directly instead of having those amounts paid by the City to the Retirement System.

### Sec. 9.5.  Fiscal Responsibility: Increased Funding Obligations and Benefit Reductions

(1)    To safeguard the long-term actuarial and financial integrity of the Retirement System, in the event the funding level of Component I of the Retirement System projected over a five year period falls below one hundred percent (100%), the following remedial action shall be required in the order set forth below, beginning with the Plan Year following the Plan Year in which such determination is made and continuing until the funding level is restored to not less than one hundred percent (100%):

(a)    the Trustee may not award the variable pension improvement factor (escalator) described in Section 6.2 to any Retiree;

(b)    all amounts credited to the Rate Stabilization Fund shall be transferred to the Pension Accumulation Fund for the purposes of funding benefits payable under Component I of the Retirement System; and

(c)    Member Mandatory Employee Contributions shall be increased from four percent (4%) of Compensation to five percent (5%) of Compensation for up to the next following five Plan Years.

(2)    In the event the funding level of Component I of the Retirement System determined as provided in Section 9.5(1) is projected to fall below eighty percent (80%), the following remedial action shall be required in the order set forth below, beginning with the Plan Year following the Plan Year in which such determination is made and continuing until the funding level is restored to not less than eighty percent (80%):

(a)    the remedial action required in Section 9.5(1) shall be implemented or continued;

13-53846-tjt   Doc 8272-5   Filed 12/16/14   Entered 12/16/14 20:38:28   Page 267 of 301
13-53846-swr   Doc 7673-5   Filed 10/22/14   Entered 10/22/14 09:48:29   Page 41 of 84
809

(b)    the Retirement Allowance payable to a Retiree shall not include the variable pension improvement factor (escalator) that was most recently added to the Retiree's Retirement Allowance for a Plan Year;

(c)    Member Mandatory Employee Contributions shall be increased from five percent (5%) of Compensation to six percent (6%) of Compensation for up to the next following five Plan Years;

(d)    the Retirement Allowance payable to a Retiree shall not include the variable pension improvement factor (escalator) that was most recently added to the Retiree's Retirement Allowance for the Plan Year preceding the Plan Year referenced in paragraph (b) above; and

(e)    the Retirement Allowance accrued by Members for up to the next five Plan-Year-period shall be determined as provided in Section 6.1, except that one percent (1%) shall be substituted for one and one-half percent (1.5%) wherever it appears in said Section 6.1.

In determining whether the eighty percent (80%) funding level under this Section 9.5(2) has been achieved, the Plan's Actuary shall calculate the funding percentage of the Retirement System after taking into account the elimination of the variable pension improvement factor (escalator) pursuant to Section 9.5(1)(a) but prior to taking into account the remedial steps provided in Sections 9.5(1)(b) and (c).

(3)    For purposes of this Section 9.5, the "funding level" of Component I of the Retirement System shall mean the ratio of the market value of the assets of Component I of the Retirement System to the actuarial accrued liability of Component I of the Retirement System.  The actuarial accrued liability shall be calculated by the Plan's Actuary utilizing an interest rate assumption of six and three-quarters percent (6.75%) and other reasonable assumptions as directed by the Board upon the recommendation of the Investment Committee.  The market value of assets shall be determined on the basis of a three-year look back period of smoothed investment returns.

13-53846-tjt   Doc 8045   Filed 12/16/14   Entered 12/16/14 09:48:29   Page 268 of 801
809
13-53846-swr   Doc 7631   Filed 10/22/14   Entered 10/22/14 07:39:38   Page 418 of

# ARTICLE 10. VOLUNTARY EMPLOYEE CONTRIBUTIONS

## Sec. 10.1.   Voluntary Employee Contributions; Amount; Vesting

Subject to procedures established by the Board, a Member may elect to reduce his Compensation for any Plan Year by a whole percentage equal to three percent (3%), five percent (5%) or seven percent (7%) and have such amount contributed by the Employer to a Voluntary Employee Contribution Account maintained on his behalf under Component I of the Retirement System.  Voluntary Employee Contributions shall be made to the Retirement System on an after-tax basis.  Amounts credited to a Member's Voluntary Employee Contribution Account shall be one hundred percent (100%) vested at all times.

## Sec. 10.2.   Changing an Election to Contribute

A Member may change or revoke an election to make Voluntary Employee Contributions to the Retirement System pursuant to this Article 10 in such manner and with such advance notice as the City shall determine.  Notwithstanding the foregoing, a Member shall be permitted to change such election not less frequently than annually.

## Sec. 10.3.   Individual Member Accounting; Crediting of Earnings

The Board shall maintain a Voluntary Employee Contribution Account on behalf of each Member who elects to make Voluntary Employee Contributions to the Retirement System.  Each Plan Year, a Member's Voluntary Employee Contribution Account shall be credited with earnings at a rate equal to the actual net investment rate of return on the assets of the Retirement System for the second Plan Year immediately preceding the Plan Year in which the earnings are credited; in no event, however, shall the earnings rate credited to a Member's Voluntary Employee Contribution Account for any Plan Year be less than zero percent (0%) nor greater than five and one-quarter percent (5.25%).

## Sec. 10.4.   Distribution of Accumulated Voluntary Employee Contributions

(1)     If a Member ceases to be an Employee other than by reason of death, the Member may elect to receive distribution of the Accumulated Voluntary Employee Contributions made to the Retirement System by such Member.  If a Member elects to receive his Accumulated Voluntary Employee Contributions, such amounts shall be paid to the Member in a lump sum payment or in equal monthly installments for a period not to exceed three years, according to such rules and regulations as the Board may adopt from time to time.

(2)     In lieu of receiving distribution of his Accumulated Voluntary Employee Contributions as provided in Section 10.4(1), a Member may elect to have the actuarial equivalent value of his Accumulated Voluntary Employee Contributions added to his Retirement Allowance and paid in the form of an annuity described in Section 8.1.

(3)     If a Member dies while employed by the Employer or following termination of employment but prior to receiving distribution of the Member's Accumulated Voluntary Employee Contributions, the amounts credited to the Member's Voluntary Employee

13-53846-tjt   Doc 8045   Filed 12/16/14   Entered 12/16/14 09:38:29   Page 269 of 301
13-53846-swr   Doc 8045   Filed 12/16/14   Entered 12/16/14 09:38:29   Page 269 of 301
809

Contribution Account at the time of death shall be paid to the Beneficiary nominated in a written designation duly executed by the Member and filed with the Board. In the event there is no such designated Beneficiary surviving the Member, the Member's Accumulated Voluntary Employee Contributions shall be paid to the Member's estate. If a Member who dies without a legal will has not nominated a Beneficiary, the Member's Accumulated Voluntary Employee Contributions at the time of death may be used to pay burial expenses if the Member leaves no other estate sufficient for such purpose. Such expenses shall not exceed a reasonable amount as determined by the Board.

# ARTICLE 11. LOAN PROGRAM FOR VOLUNTARY EMPLOYEE CONTRIBUTIONS

## Sec. 11.1.  The Loan Program

A loan program shall be available to Members who have amounts credited to a Voluntary Employee Contributions Account under Component I of the Retirement System.  The Board is authorized to adopt rules and regulations, from time to time, to govern the administration and the operation of the loan program.  Copies of the rules shall be made available to eligible Members in the offices of the Retirement System.  Any loans granted or renewed under the Retirement System shall be made and administered pursuant to and in compliance with Section 72(p) of the Internal Revenue Code and regulations thereunder.

## Sec. 11.2.  Eligibility for Loan

Subject to the rules and procedures established by the Board, loans may be made to eligible Members from such Member's Voluntary Employee Contribution Account.  An eligible Member is any Member who has participated in the Retirement System for twelve months or more.  Former Members, Spouses and Beneficiaries are not eligible to receive any loans from the Retirement System.   No Member shall have more than two outstanding loans from the Retirement System (Component I and/or Component II) at any time.  A Member who has previously defaulted on a loan (under either Component I or Component II) shall not be eligible for a loan from the Retirement System.

## Sec. 11.3.  Amount of Loan

An eligible Member who has satisfied applicable rules and procedures established by the Board may borrow from his Voluntary Employee Contribution Account an amount which does not exceed the lesser of (i) fifty percent (50%) of the Member's Voluntary Employee Contribution Account balance, and (ii) Ten Thousand Dollars ($10,000.00), in each case reduced by the excess, if any, of: (1) the Member's highest outstanding loan balance under the Retirement System (both Component I and Component II) during the one (1) year period ending on the day before the date on which the loan is made, or (2) the outstanding loan balance under the Retirement System (both Component I and Component II) on the date on which the loan is made, whichever is less.  The minimum loan amount shall be One Thousand Dollars ($1,000.00).

## Sec. 11.4.  Terms and Conditions

In addition to such rules and procedures that are established by the Board, all loans shall comply with the following terms and conditions:

(a)     Each loan application shall be made in writing.

(b)     All loans shall be memorialized by a collateral promissory note for the amount of the loan, including interest, payable to the order of the Retirement System and properly executed by the Member.

13-53846-tjt   Doc 8045   Filed 12/16/14   Entered 12/16/14 07:39:38   Page 271 of 301
13-53846-swr   Doc 8045-1   Filed 10/22/15   Entered 10/22/14 03:48:29   Page 42 of
809

(c)     Each loan shall be repaid by substantially equal payroll deductions over a period not to exceed five years, or, where the loan is for the purpose of buying a principal residence, a period not to exceed fifteen years. In no case shall the amount of the payroll deduction be less than Twenty Dollars ($20.00) for any two-week pay period. A Member receiving a loan will be required to authorize payroll deductions from his compensation in an amount sufficient to repay the loan over its term.

(d)     An amount equal to the principal amount of the loan to a Member (but not more than one half of the Member's vested interest in the Defined Contribution Plans of the Retirement System) will be designated as collateral for guaranteeing the loan.

(e)     Each loan shall bear interest at a rate determined by the Board. The Board shall not discriminate among Members in its determination of interest rates on loans. However, loans initiated at different times may bear different interest rates, where, in the opinion of the Board, the difference in rates is supported by a change in market interest rates or a change in the Retirement System's current assumed rate of return. The loan interest rate shall bear a reasonable relationship to market rates for secured loans of a similar duration and shall bear a reasonable relationship to the costs to the Retirement System of administering the loan. The loan interest rate shall be calculated in a manner that will not negatively affect either the Employers' costs with respect to the Retirement System or the investment return allocated to Members.

(f)     Loan repayments shall be suspended during a period of military service, as permitted by Section 414(u)(4) of the Internal Revenue Code. A Member who has an outstanding loan balance from the Retirement System who is absent from employment with the City, and who has satisfied the requirements of Section 414(u) of the Internal Revenue Code shall not be required to make loan repayments to the Retirement System during said periods of absence.

## Sec. 11.5.   Loan Balance

A Member's outstanding loan balance shall be considered a directed investment by the Member and interest payments shall be credited to the Member's Voluntary Employee Contribution Account (provided that the interest credited to the Member's Voluntary Employee Contribution Account shall be reduced appropriately to cover the administrative costs of the loan program and avoid negatively affecting the Employers' costs or the Retirement System's investment returns), and shall not be part of the Retirement System's net investment income or part of the Member's Voluntary Employee Contribution Account balance for the purpose of allocation of net investment income under the Retirement System.

## Sec. 11.6.   Default

In the event a Member defaults on a loan before the loan is repaid in full, the unpaid balance thereof will become due and payable and, to the extent that the outstanding amount is not repaid by the end of the calendar quarter which follows the calendar quarter in which the last

payment was received, such amount shall be deemed to have been distributed to the Member for tax purposes, consistent with Section 72(p) of the Internal Revenue Code.

## Sec. 11.7.   Distribution

No distribution shall be made to a Member, former Member, Spouse or Beneficiary from the Retirement System until all outstanding loan balances and applicable accrued interest have been repaid or offset against amounts distributable to the individual from the Retirement System.

## Sec. 11.8.   Annual Report

The Retirement System shall include, in its annual report to all Members, an accounting of the Loan Program established by this Article 11, which contains the number and amount of loans made, the costs of administering the Loan Program maintained under this Component I, the amount of payments made including interest received by Component I of the Retirement System, the amount of loans outstanding, including any defaults or delinquencies, and an evaluation as to whether the interest charged in that Fiscal Year covered the costs of administering the Loan Program under Component I.

13-53846-tjt   Doc 8045   Filed 10/22/14   Entered 10/22/14 07:39:38   Page 273 of 301
13-53846-swr   Doc 8045   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 423 of
809

# ARTICLE 12. LIMITATION ON BENEFITS AND CONTRIBUTIONS

## Sec. 12.1. Compliance With Code Section 415(b) And Regulations

(1)     Notwithstanding any other provision of this Combined Plan Document, the defined benefit component of the Retirement System shall be administered in compliance with the provisions of Code Section 415(b) and regulations thereunder that are applicable to governmental plans.

(2)     The maximum annual benefit accrued by a Member during a "limitation year" (which shall be the Plan Year) and the maximum annual benefit payable under the Retirement System to a Member at any time within a Plan Year, when expressed as an annual benefit in the form of a straight life annuity (with no ancillary benefits), shall be equal to $160,000 (as such amount is adjusted pursuant to Code Section 415(d) for such Plan Year).

(3)     Notwithstanding the foregoing:

   (a)     if the benefit under the Retirement System is payable in any form other than a straight life annuity, the determination as to whether the limitation described in Section 12.1(2) has been satisfied shall be made, in accordance with the regulations prescribed by the Secretary of the Treasury, by adjusting such benefit to the Actuarially Equivalent straight life annuity beginning at the same time, in accordance with Section 12.1(8) or (9);

   (b)     if the benefit under the Retirement System commences before Age sixty-two, the determination of whether the limitation set forth in Section 12.1(2) (the "Dollar Limit") has been satisfied shall be made, in accordance with regulations prescribed by the Secretary of the Treasury, by reducing the Dollar Limit so that the Dollar Limit (as so reduced) is equal to an annual benefit payable in the form of a straight life annuity, commencing when such benefit under the Retirement System commences, which is Actuarially Equivalent to a benefit in the amount of the Dollar Limit commencing at Age sixty-two; provided, however, if the Retirement System has an immediately commencing straight life annuity commencing both at Age sixty-two and the age of benefit commencement, then the Dollar Limit (as so reduced) shall equal the lesser of (i) the amount determined under this Section 12.1(3)(b) without regard to this proviso, or (ii) the Dollar Limit multiplied by a fraction the numerator of which is the annual amount of the immediately commencing straight life annuity under the Retirement System and the denominator of which is the annual amount of the straight life annuity under the Retirement System, commencing at Age sixty-two; and

   (c)     if the benefit under the Retirement System commences after Age sixty-five, the determination of whether the Dollar Limit has been satisfied shall be made, in accordance with regulations prescribed by the Secretary of the Treasury, by increasing the Dollar Limit so that the Dollar Limit (as so increased) is equal to an annual benefit payable in the form of a straight life annuity, commencing when

13-53846-tjt   Doc 8045   Filed 10/22/14   Entered 10/22/14 09:48:29   Page 274 of 301
13-53846-swr   Doc 7324-1   Filed 12/16/14   Entered 12/16/14 20:39:38   Page 274 of 301
809

the benefit under the Retirement System commences, which is Actuarially Equivalent to a benefit in the amount of the Dollar Limit commencing at Age sixty-five; provided, however, if the Retirement System has an immediately commencing straight life annuity commencing both at Age sixty-five and the Age of benefit commencement, the Dollar Limit (as so increased) shall equal the lesser of (i) the amount determined under this Section 12.1(3)(c) without regard to this proviso, or (ii) the Dollar Limit multiplied by a fraction the numerator of which is the annual amount of the immediately commencing straight life annuity under the Retirement System and the denominator of which is the annual amount of the immediately commencing straight life annuity under the Retirement System, commencing at Age sixty-five.

(4)     Notwithstanding the foregoing provisions of this Section 12.1, except as provided in Section 12.1(5), the maximum annual benefit specified in Section 12.1(2) above shall not apply to a particular Retirement System benefit if (a) the annual amount of such Retirement System benefit, together with the aggregate annual amount of any other pensions payable with respect to such Member under all other defined benefit plans maintained by an Employer, does not exceed $10,000 for the Plan Year or any prior Plan Year and (b) the Member was not at any time a participant in a defined contribution plan maintained by an Employer.

(5)     In the case of a Member who has less than ten years of participation in the Retirement System, the limitation set forth in Section 12.1(2) shall be such limitation (without regard to this Section 12.1(5)), multiplied by a fraction, the numerator of which is the number of years of participation in the Retirement System (or parts thereof) credited to the Member and the denominator of which is ten. In the case of a Member who has less than ten years of Vesting Service, the limitations set forth in Paragraph (b) of Section 12.1(2) and in Section 12.1(4) shall be such limitations (determined without regard to this Section 12.1(5)) multiplied by a fraction, the numerator of which is the number of years of Vesting Service, or parts thereof, credited to the Member and the denominator of which is ten.

(6)     Notwithstanding anything in this Section 12.1 to the contrary, if the annual benefit of a Member who has terminated employment with the Employer is limited pursuant to the limitations set forth in Section 12.1(2), such annual benefit shall be increased in accordance with the cost-of-living adjustments of Code Section 415(d).

(7)     For purposes of determining actuarial equivalence under Paragraph (b) or (c) of Section 12.1(3), the interest rate assumption shall be five percent (5%) and the mortality table used shall be the applicable mortality table specified by the Board.

(8)     The actuarially equivalent straight life annuity for purposes of adjusting any benefit payable in a form to which Code Section 417(e)(3) does not apply, as required by Paragraph (a) of Section 12.1(3), is equal to the greater of (a) the annual amount of the straight life annuity payable under the Retirement System commencing at the same annuity starting date as the form of benefit payable to the Member, or (b) the annual amount of the straight life annuity commencing at the same annuity starting date that has

13-53846-tjt  Doc 8272-5  Filed 12/16/14  Entered 12/16/14 09:38:29  Page 275 of 301
13-53846-swr  Doc 6055-3  Filed 10/22/14  Entered 10/22/14 09:48:29  Page 423 of
809

the same actuarial present value as the form of benefit payable to the Member, computed using the interest rate and mortality assumptions set forth in Section 12.1(7).

(9)     The actuarially equivalent straight life annuity for purposes of adjusting any benefit payable in a form to which Code Section 417(e)(3) applies, as required by Paragraph (a) of Section 12.1(3), is equal to the greatest of (a) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same Actuarial Equivalent present value as the form of benefit payable to the Member, (b) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same actuarial present value as the form of benefit payable to the Member, computed using a five and one-half percent (5.5%) interest rate assumption and the applicable mortality table specified by the Board, or (c) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same actuarial present value as the form of benefit payable to the Member, computed using the applicable interest rate and the applicable mortality table, both as specified by the Board, divided by 1.05.

(10)    For purposes of applying the limitations set forth in this Section 12.1, all qualified defined benefit plans (whether or not terminated) ever maintained by an Employer shall be treated as one defined benefit plan.

(11)    For purposes of this Section 12.1, the term "compensation" shall include those items of remuneration specified in Treasury Regulation § 1.415(c)-2(b) and shall exclude those items of remuneration specified in Treasury Regulation § 1.415(c)-2(c), taking into account the timing rules specified in Treasury Regulation § 1.415(c)-2(e), but shall not include any amount in excess of the limitation under Code Section 401(a)(17) in effect for the year. The term "compensation" as defined in the preceding sentence shall include any payments made to a Member by the later of (a) two and one-half months after the date of the Member's severance from employment with an Employer or (b) the end of the limitation year that includes the date of the Member's severance from employment with an Employer, provided that, absent a severance from employment, such payments would have been paid to the Member while the Member continued in employment with the Employer and are regular compensation for services performed during the Member's regular working hours, compensation for services outside the Member's regular working hours (such as overtime or shift differential pay), commissions, bonuses or other similar compensation.

(12)    This Section 12.1 shall be administered in conformity with the regulations issued by the Secretary of the Treasury interpreting Code Section 415 including, but not limited to, any regulation providing for the "grandfathering" of any benefit accrued prior to the effective date of such regulations or statutory provision.

## Sec. 12.2.  Compliance with Code Section 415(c) and Regulations

(1)     The "Annual Addition" with respect to a Member for a limitation year (which shall be the Plan Year) shall in no event exceed the lesser of:

13-53846-tjt   Doc 8772-5   Filed 12/16/14   Entered 12/16/14 20:39:38   Page 276 of 301
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 426 of
809

(a)        $40,000 (adjusted as provided in Code Section 415(d)); or

(b)        One hundred percent (100%) of the Member's compensation, as defined in Code Section 415(c)(3) and regulations issued thereunder, for the limitation year.

(2)        The Annual Addition with respect to a Member for a limitation year means the sum of his Voluntary Employee Contributions for such limitation year to the Retirement System, and the employer contributions, employee contributions and forfeitures allocated to his accounts under any other qualified defined contribution plan (whether or not terminated) maintained by an Employer, and the amounts described in Code Sections 415(l)(2) and 419A(d)(2) allocated to his account.

(3)        In the event the Annual Addition to the Retirement System on behalf of a Member would otherwise exceed the amount that may be applied for his benefit under the limitation contained in this Section 12.2, the limitation shall be satisfied by reducing the Member's Voluntary Employee Contributions to the extent necessary and distributing such amounts to the Member.

13-53846-tjt  Doc 8045  Filed 12/16/14  Entered 12/16/14 09:38:29  Page 277 of 301
13-53846-swr  Doc 7673  Filed 10/22/14  Entered 10/22/14 03:48:29  Page 42 of 301
809

# ARTICLE 13. RETIREMENT SYSTEM ADMINISTRATION

## Sec. 13.1.  Board of Trustees as Retirement System Administrator

(1)     The Retirement Board shall have the power and authority to manage and administer the Retirement System in accordance with the provisions of the Combined Plan Document.

(2)     The Retirement Board shall provide procedures for the processing and review of benefit claims, corrections of errors, and similar matters, as further described in Section 13.2.

(3)     The Retirement Board and the Retirement System shall not make any payment to active or retired Members or Beneficiaries other than payments that are required by the Retirement System as established by this Combined Plan Document. This prohibition applies to all payments that are not authorized by this Combined Plan Document, whether such payments are those commonly referred to as a "thirteenth check" or payments by any other name.

## Sec. 13.2.  Powers and Duties of Board

(1)     The Board shall have the following powers and duties:

(a)     exclusive authority regarding the administration, management and operation of the Retirement System, including, but not limited to, the right to contract for office space, computer hardware and software, and human resource services (any or all of which may be obtained from the City), and to make rules and regulations with respect to the operation of the Retirement System not inconsistent with the terms of the Combined Plan Document and applicable law, and to amend or rescind such rules and regulations;

(b)     to determine questions of law or fact that may arise as to the rights of any person claiming rights under the Retirement System;

(c)     to determine the contributions to the Retirement System required of the Employer and Members pursuant to the documents governing operation of the Retirement System, including the Plan of Adjustment;

(d)     to construe and interpret the provisions of the Retirement System and to reconcile any inconsistencies;

(e)     to perform ministerial functions, whether or not expressly authorized, which the Board may deem necessary or desirable in carrying out its duties under the Retirement System;

(f)     except to the extent authority is vested in the Investment Committee, authority to employ, contract and pay for professional services including, but not limited to, actuarial, investment, legal, accounting, medical, and any other services that the Board considers necessary for the proper operation of the Retirement System;

(g)     except to the extent authority or responsibility is vested in the Investment Committee, to arrange for annual audits of the records and accounts of the Retirement System by a certified public accountant or by a firm of certified public accountants pursuant to generally accepted auditing standards;

(h)     to prepare an annual report for the Retirement System for each Fiscal Year in compliance with generally accepted accounting principles.  The report shall contain information regarding the financial, actuarial, and other activities of the Retirement System during the Fiscal Year.  The Board shall furnish a copy of the annual report to the Mayor and finance director of the City, to the chair of the City Council and to the Investment Committee.  The report shall also contain a review of the latest actuarial valuation of the Retirement System;

(i)     to maintain or cause to be maintained such separate funds and accounts as are required to be maintained under the provisions of Components I and II of the Combined Plan Document and such additional accounts as the Board deems necessary or expedient for the proper administration of the Retirement System and the administration and investment of the assets of the Retirement System. The Board shall maintain suitable records, data and information in connection with the performance of its functions, including, but not limited to, accurate and detailed accounts of all investments, receipts, disbursements, and other actions, including the proportionate interest therein and Accumulated Contributions of each Member who has made contributions to the Retirement System;

(j)     to correct any error in the records of the Retirement System that results in overpayment or underpayment of contributions to the Retirement System by the Employer or a Member, or overpayment or underpayment of benefits to a Member, former Member, or  Beneficiary by the Retirement System.  In the event of overpayment to a Member, former Member or  Beneficiary, the Board may, as far as practicable, adjust future payments to such individual, in such a manner that the Actuarial Equivalent of the benefit to which such individual was entitled shall be paid;

(k)     to the extent permissible under Michigan law (and consistent with the Retirement System's favorable tax qualified status under Code Section 401(a)), purchase one or more insurance policies to indemnify any person and such person's heirs and legal representatives who is made a party to (or threatened to be made a party to) any action, suit or proceeding whether brought by or in the right of the Board, the Investment Committee or the Retirement System or otherwise, by reason of the fact that such person is or was a Board member, Investment Committee member, director, officer, employee or agent of the Board (or an advisory body or committee of the Board) or the Retirement System.  The insurance policies purchased by the Board shall not indemnify any person who is judicially determined to have incurred liability due to fraud, gross negligence or malfeasance in the performance of his duties; and

(l)     except to the extent authority or responsibility is vested in the Investment Committee, to perform any other function that is required for the proper administration of the Retirement System.

## Sec. 13.3.   Executive Director; Employees

The Board shall employ on behalf of the Retirement System an executive director and any other employees for which the Board establishes positions.  The executive director shall do all of the following:

(a)     manage and administer the Retirement System under the supervision and direction of the Board;

(b)     annually prepare and submit to the Board for review, amendment, and adoption an itemized budget projecting the amount required to pay the Retirement System's expenses for the following Fiscal Year; and

(c)     perform such other duties as the Board shall delegate to the executive director.

The executive director, unless such power is retained by the Board, shall determine the compensation of all employees of the Retirement System (except the executive director, whose compensation shall be determined by the Board; and the chief investment officer, whose compensation shall be determined by the Investment Committee) and such compensation shall be payable from the Retirement System.  Any person employed by the Retirement System may, but need not, be an employee of the City.

## Sec. 13.4.   Discretionary Authority

The Board shall have discretion to:

(a)     interpret the provisions of the Retirement System;

(b)     make factual findings with respect to any and all issues arising under the Retirement System;

(c)     determine the rights and status of Members, Retirees, Beneficiaries and other persons under the Retirement System;

(d)     decide benefit claims and disputes arising under the Retirement System pursuant to such procedures as the Board shall adopt; and

(e)     make determinations and findings (including factual findings) with respect to the benefits payable hereunder and the persons entitled thereto as may be required for the purposes of the Retirement System.

13-53846-tjt   Doc 8045   Filed 12/16/14   Entered 12/16/14 07:39:38   Page 280 of 301
13-53846-swr   Doc 7684-5   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 430 of
809

## Sec. 13.5. Administrator's Decision Binding

The Board's decision on any matter arising in connection with administration and interpretation of the Retirement System shall be final and binding on Members, Retirees and Beneficiaries.

# ARTICLE 14. MANAGEMENT OF FUNDS

## Sec. 14.1.  Board as Trustee of Retirement System Assets

The Board of Trustees shall be the trustee of the funds held under the Retirement System, shall receive and accept all sums of money and other property paid or transferred to it by or at the direction of the City and, subject to the terms of Article 15, shall have the power to hold, invest, reinvest, manage, administer and distribute such money and other property subject to all terms, conditions, limitations, and restrictions imposed on the investment of assets of public employee retirement systems or plans by *Act No. 314 of the Public Acts of 1965, being sections 38.1132 et seq.* of the *Michigan Compiled Laws, as amended*.

## Sec. 14.2.  Maintenance of Segregated Funds

The Board of Trustees shall maintain separate funds as required for the proper administration of the Retirement System and shall not commingle the assets held under the Retirement System for the purpose of funding benefits accrued by Members prior to July 1, 2014, together with earnings and losses on such assets (or replacement assets), as more fully described in Component II of this Combined Plan Document, with the assets of the Retirement System held for the purpose of paying benefits accrued by Members on and after July 1, 2014 as described in this Component I of the Combined Plan Document.  Notwithstanding the foregoing, the assets held under Components I and II of this Combined Plan Document may be commingled for investment purposes, and transferred as provided in Section E-16(c) of Component II.

## Sec. 14.3.  Custodian of Funds

The Board of Trustees shall appoint or employ custodians of the assets of the Retirement System.  The custodians shall perform all duties necessary and incidental to the custodial responsibility and shall make disbursements as authorized by the Board.

## Sec. 14.4.  Exclusive Purpose

All money and other assets of the Retirement System shall be held by the Trustees and invested for the sole purpose of paying benefits to Members and Beneficiaries and shall be used for no other purpose other than payment of the reasonable expenses of maintaining the Retirement System.  In exercising its discretionary authority with respect to the management of the money and other assets of the Retirement System, the Trustees shall exercise the care, skill, prudence and diligence under the circumstances then prevailing, that a person acting in a like capacity and familiar with such matters, would use in the conduct of an enterprise of like character with like aims.

## Sec. 14.5.  Prohibited Conduct

Members of the Board and employees of the Retirement System are prohibited from:

(1)  Having any beneficial interest, direct or indirect, in any investment of the Retirement System;

13-53846-tjt  Doc 8045-1  Filed 12/16/14  Entered 12/16/14 07:39:38  Page 282 of 301
13-53846-swr  Doc 7675-1  Filed 10/22/14  Entered 10/22/14 09:48:29  Page 462 of
809

(2)     Being an obligor or providing surety for any money loaned to or borrowed from the Retirement System;

(3)     Except as provided in Article 11, borrowing any money or other assets of the Retirement System; and

(4)     Receiving any pay or other compensation from any person, other than compensation paid by the Retirement System, with respect to investments of the Retirement System.

# ARTICLE 15. INVESTMENT OF RETIREMENT SYSTEM ASSETS

## Sec. 15.1.   Investment Powers of the Board and the Investment Committee

Subject to the requirements set forth in this Article 15, the Board shall have the power and authority to manage, control, invest and reinvest money and other assets of the Retirement System subject to all terms, conditions, limitations, and restrictions imposed on the investment of assets of public employee retirement systems or plans by *Act No. 314 of the Public Acts of 1965, being sections 38.1132 et seq.* of the *Michigan Compiled Laws, as amended.* Notwithstanding anything in this Combined Plan Document to the contrary, for the twenty year period following the effective date of the Plan of Adjustment, the Investment Committee shall make recommendations to the Board with respect to investment management matters as provided in this Article 15.

All investment management decisions made by the Board, as more fully described in Section 15.2, shall require a recommendation by an affirmative vote of the Investment Committee as provided in this Combined Plan Document.  The Board shall take no action with respect to any matter for which the Investment Committee has responsibility and authority, including the investment management matters described in Section 15.2, unless and until such action has been approved by affirmative vote of the Investment Committee.  All actions and recommendations of the Investment Committee shall be forwarded to the Board for consideration and are subject to Board approval.  If (a) the Board fails to approve or disapprove an Investment Management decision that has been recommended by an affirmative vote of the Investment Committee, and such failure continues for forty-five days after the date that the recommendation was made to the Board, or (b) the Board disapproves an Investment Management decision within such forty-five day period but fails to provide to the Investment Committee within such forty-five day period a detailed written response outlining the reasons for such disapproval, then the Investment Committee  and the Chief Investment Officer are authorized to implement the decision.

If the Board disapproves an investment management decision within such forty-five day period and provides to the Investment Committee within such forty-five day period a detailed written response outlining the reasons for such disapproval, then the Investment Committee shall have forty-five days after the receipt of the Board response to either (a) withdraw the recommended investment management decision, or (b) request, in writing, a conference with the Board to be held within ten days, but not less than five business days, of the request by the Investment Committee to discuss the disapproval by the Board described in the written response. Any such conference shall be conducted with at least three independent Investment Committee members present in person or by phone.  Within ten days of the commencement of the conference or twenty days following the Investment Committee's request for a conference if no conference is held, the Investment Committee shall either withdraw the recommended Investment Management decision or provide the Board with a written explanation of the Investment Committee's decision to proceed with the recommended Investment Management decision.  After delivery of such written explanation by the Investment Committee, the Investment Committee and the chief investment officer are authorized to implement the decision. Any action taken by the Board or the Investment Committee in violation of the terms of this Article 15 shall constitute an *ultra vires* act and the Investment Committee or the Board is

13-53846-tjt  Doc 8045  Filed 12/16/14  Entered 12/16/14 09:48:29  Page 284 of 301
13-53846-swr  Doc 7783-5  Filed 10/02/14  Entered 10/02/14 07:39:38  Page 48 of
809

granted the express right to seek to preliminarily enjoin such violation without the need to show irreparable harm.

## Sec. 15.2.   Investment Management

(1)     For purposes of this Combined Plan, "investment management decisions" and "investment management matters" shall include:

   (a)     development of an investment policy statement with sound and consistent investment goals, objectives, and performance measurement standards which are consistent with the needs of the Retirement System;

   (b)     within 120 days after the effective date of the Plan of Adjustment, placement of all of the assets of the Retirement System not already under qualified management with qualified investment managers selected by the Investment Committee;

   (c)     evaluation, retention, termination and selection of qualified managers to invest and manage the Retirement System's assets;

   (d)     review and affirmation or rejection of the correctness of any and all calculations, actuarial assumptions and/or assessments used by the Actuary including, but not limited to (i) those underlying the restoration of pension benefits, funding levels and amortization thereof, all in accordance with the pension restoration program attached to the Plan of Adjustment (as more fully described in Article G of Component II of this Combined Plan Document), (ii) those underlying the determination of annual funding levels and amortization thereof, and (iii) on or after Fiscal Year 2024, the recommended annual contributions to the Retirement System in accordance with applicable law;

   (e)     in accordance with approved actuarial work as provided in paragraph (d) above and based on the annual actuarial valuation reports and any other projections or reports as applicable from the Actuary or other professional advisors, the determination of the extent of restoration of pension benefits, including but not limited to the payment of all or a portion of the reduced base monthly pension amounts and the payment of lost COLA payments, all in conformance with the pension restoration program attached to the Plan of Adjustment;

   (f)     communication of the Retirement System's investment goals, objectives, and standards to the investment managers, including any material changes that may subsequently occur;

   (g)     determination and approval of the Retirement System's investment and asset allocation guidelines, taking into account the appropriate liquidity needs of the Retirement System;

   (h)     the taking of corrective action deemed prudent and appropriate when an investment manager fails to perform as expected;

13-53846-swr   Doc 8045   Filed 12/16/14   Entered 12/16/14 09:48:29   Page 285 of 301
13-53846-tjt   Doc 8045-5   Filed 12/16/14   Entered 12/16/14 07:39:38   Page 285 of 301
809

(i)     interpretation of Retirement System governing documents, existing law, the Plan of Adjustment and other financial information that could affect funding or benefit levels;

(j)     review and approval, prior to final issuance, of the annual audit and all financial reports prepared on behalf of the Retirement System and meet and confer with the Auditor or other professional advisors, as necessary, prior to approval of the annual audit or other financial reports;

(k)     determination of the funding status of the Retirement System and any remedial action to be taken pursuant to Section 9.5; and

(l)     performance of an asset/liability valuation study for the Retirement System every three years or, more often, as requested by the Investment Committee or the Board.

All actions of the Investment Committee shall comply with the provisions of pertinent federal, state, and local laws and regulations, specifically *Act No. 314 of the Public Acts of 1965, being Sections 38.1132 et seq.* of the *Michigan Compiled Laws*, as amended, and the Retirement System's investment guidelines.

## Sec. 15.3.   Best Practices

Prior to adopting investment guidelines and asset allocation policies, selecting investment managers or adopting investment return assumptions, the Investment Committee shall have an understanding of and shall give appropriate consideration to the following:

(a)     the fiduciary best practices and institutional standards for the investment of public employee retirement system plan assets;

(b)     the objective to obtain investment returns above the established actuarial investment return assumption to support the restoration of benefits under the pension restoration program described in the Plan of Adjustment and Component II of this Combined Plan Document, to the extent that it is prudent and consistent with the overall funding, liquidity needs and actuarial assumptions governing the Retirement System; and

(c)     the liquidity needs of the Retirement System.

## Sec. 15.4.   Chief Investment Officer

The Investment Committee shall have the exclusive power to select, retain and terminate the services of a chief investment officer for the Retirement System.  The Investment Committee shall determine any and all compensation and other terms of employment of any chief investment officer hired by it.   The chief investment officer shall report directly to the Investment Committee and the executive director of the Board.   The chief investment officer shall be responsible for assisting the Investment Committee and the Board with respect to oversight of the Retirement System's investment portfolio.   The chief investment officer shall

13-53846-tjt   Doc 8772-5   Filed 12/16/14   Entered 12/16/14 07:39:38   Page 286 of 301
13-53846-swr   Doc 8045-5   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 436 of
809

provide such periodic reports relating to the Retirement System's assets to the Investment Committee and the Board as it or they shall request.

### Sec. 15.5. Investment Consultants

The Board and/or Investment Committee may retain the services of one or more investment consultants who shall be responsible for assisting the Board and the Investment Committee with oversight of the Retirement System's investment portfolio. Any such investment consultant shall be a registered advisor with the United States Securities and Exchange Commission and shall be a nationally recognized institutional investment consultant with expertise in the investment of public pension plan assets. Any such investment consultant shall acknowledge in writing its role as investment fiduciary with respect to the Retirement System as defined in the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq*. The Board or the Investment Committee, as appropriate, shall determine the compensation and other terms of employment of any investment consultant hired by it. The duties of an investment consultant may include, but shall not be limited to:

    (a)    providing an asset/liability valuation study for the Retirement System;

    (b)    reviewing the Retirement System's asset allocation based on current market assumptions;

    (c)    identifying and recommending to the Investment Committee and the Board appropriate investment strategies based on the financial condition of the Retirement System;

    (d)    implementing the approved investment strategies, such as recommending to the Investment Committee, for Board approval, an asset allocation strategy, building an investment structure for the Retirement System, and identifying qualified investment managers (through an organized search process) to execute and implement investment strategies;

    (e)    monitoring and evaluating the ongoing progress of the investment managers toward stated investment goals and objectives;

    (f)    recommending to the Investment Committee and the Board any necessary corrective actions, including adjustments to the investment structure or investment management organizations, in the event of a deviation from expectations;

    (g)    communicating the investment policies of the Retirement System to the investment managers;

    (h)    reviewing the investment policies with the appropriate employees of the Retirement System;

    (i)    aiding the Investment Committee in providing recommendations on issues relating to rebalancing and cash flow management, securities lending, transition management, cash equalization and other investment related topics;

13-53846-tjt Doc 8272-5 Filed 12/16/14 Entered 12/16/14 07:39:38 Page 287 of 301
13-53846-swr Doc 8045 Filed 10/22/14 Entered 10/22/14 09:48:29 Page 46 of 60
809

(j)     attending Investment Committee and Board meetings in person, or telephonically, as needed or as requested;

(k)     meeting with the Investment Committee and the Board to provide detailed quarterly performance reports and executive summaries of performance;

(l)     meeting with the Investment Committee and the Board to review capital markets and inform the Board and Retirement System employees on the current investment environment; and

(m)     meeting with the Investment Committee and the Board to provide recommendations on asset allocation, investment structure, and manager selections.

# ARTICLE 16. RETIREE MEDICAL ACCOUNT

## Sec. 16.1.   Establishment of Account

A Medical Benefits Account shall be established and maintained under the Retirement System out of which the Board shall pay the cost, which would otherwise be borne by the Employers, for certain medical and related benefits provided under the plans or programs maintained by the Employers to provide Medical Benefits (the "Medical Plans") for the benefit of the Medical Beneficiaries.  The provisions of this Article 16 are intended to comply with Section 401(h) of the Code and shall be construed to comply therewith.

## Sec. 16.2.   Effective Date of Retiree Medical Account

Medical Benefits may be paid from the Medical Benefits Account beginning October ___, 2014, or such other date recommended by an enrolled actuary (within the meaning of Section 7701(a)(35) of the Code) and approved by the Board and Investment Committee.

## Sec. 16.3.   Funding of Benefits

Subject to the Plan of Adjustment and the right reserved to the City to amend or terminate the provision of Medical Benefits under its general power to amend the Plan under Section 17.5, the City expects and intends to make actuarially determined contributions under the Retirement System from time to time to fund the Medical Benefits Account.  The assets of the Medical Benefits Account may be invested together with the other assets of the Retirement System, in which case earnings of the Retirement System shall be allocated to the Medical Benefits Account on a reasonable basis, or such assets may be invested separately.  In any event, no part of the Retirement System, other than the assets of the Medical Benefits Account, shall be available to pay for any part of the cost of Medical Benefits.

The amount determined by the City to be contributed for any Plan Year by the Employers pursuant to the paragraph above shall be reasonable and ascertainable and shall not exceed the total cost for such Plan Year of providing Medical Benefits to the Medical Beneficiaries, determined in accordance with generally accepted actuarial methods and assumptions that are reasonable in view of the provisions and coverage of the medical and other welfare plans providing such benefits, the funding medium and any other applicable considerations.  At the time any Employer makes a contribution to the Trustee, the Employer shall designate the portion thereof that is allocable to the Medical Benefits Account.

## Sec. 16.4.   Limitation on Contributions

At all times the aggregate of the contributions made by the Employers to provide Medical Benefits shall not exceed twenty-five percent (25%) of the sum of the aggregate contributions made by the Employers to the Plan under Sections 9.3, 9.4 and 9.5 other than the contributions to fund past service credits, plus the aggregate contributions to the Medical Benefits Account.  In the event that a contribution under Section 16.3 shall exceed the amount described in the preceding sentence, such contribution shall be reduced by the excess amount.

13-53846-tjt   Doc 8045   Filed 12/16/14   Entered 12/16/14 09:38:29   Page 289 of 301
13-53846-swr   Doc 8045   Filed 12/16/14   Entered 12/16/14 09:38:29   Page 489 of
809

### Sec. 16.5.   Impossibility of Diversion

In no event, prior to the satisfaction of all liabilities to provide Medical Benefits, shall the Medical Benefits Account be used for, or diverted to, any purpose other than the payment of such benefits and any necessary or appropriate expenses of administration associated therewith. Any amounts credited to the Medical Benefits Account following the satisfaction of all such liabilities shall be returned to the Employers.

### Sec. 16.6.   Administration

The Medical Plans shall continue to be administered, and claims processed, under their respective terms.  The interpretation and administration of the terms of this Article 16 shall be subject to the provisions of the Combined Plan Document.

### Sec. 16.7.   Right to Amend or Terminate Medical Plans

The Employers expressly reserve the exclusive right, retroactively to the extent permitted by law, to amend, modify, change, terminate or revoke any medical or other welfare plan or policy maintained by any such Employer that provides medical or other welfare benefits, including but not limited to Medical Benefits, and to require Members, former Members, their eligible Spouses and dependents to pay all or any portion of the cost of such medical benefits.

### Sec. 16.8.   Reversion

At no time prior to the satisfaction of all liabilities under the Retirement System to provide Medical Benefits, shall any part of the Medical Benefits Account be used for any purpose other than providing Medical Benefits, and any necessary or appropriate expenses attributable to the administration of the Medical Benefits Account.  If any residual assets remain in the Medical Benefits Account after the satisfaction of all obligations of the Employers to provide Medical Benefits to the Medical Beneficiaries, such assets shall be returned to the Employers.  In the event a Medical Beneficiary's interest in the Medical Benefits Account is forfeited prior to the termination of the Retirement System, an amount equal to such forfeiture shall be applied as soon as possible to reduce the Employers' contributions to the Medical Benefits Account.

### Sec. 16.9.   Limitation of Rights

A Medical Beneficiary shall have no right, title or claim in any specific asset of the Medical Benefits Account, but shall have the right only to the Medical Benefits provided from time to time under the Medical Benefits Account.

13-53846-tjt   Doc 8045   Filed 12/16/14   Entered 12/16/14 07:39:38   Page 290 of 301
13-53846-swr   Doc 7324   Filed 10/22/14   Entered 10/22/14 09:48:29   Page 449 of
809

# ARTICLE 17. MISCELLANEOUS

## Sec. 17.1.   Nonduplication of Benefits

If any Member is a participant in another defined benefit pension plan, retirement system or annuity plan sponsored by an Employer (including Component II of this Retirement System) and the Member is or becomes entitled to accrue pension benefits under such plan or retirement system (including Component II of this Retirement System) with respect to any period of service for which he is entitled to accrue a benefit under Component I of this Retirement System, such Member shall not be eligible to accrue or receive payment of a benefit under Component I with respect to such period of service.

## Sec. 17.2.   Assignments Prohibited

The right of a person to a pension, annuity, the return of Accumulated Voluntary Employee Contributions and/or the return of Accumulated Mandatory Employee Contributions, the Retirement Allowance itself, to any optional form of payment, to any other right accrued or accruing to any person under the provisions of this Retirement System, and the monies in the various funds of the Retirement System shall not be assignable and shall not be subject to execution, garnishment, attachment, the operation of bankruptcy or insolvency law, or any other process of law whatsoever, except as specifically provided in this Combined Plan Document or by an eligible domestic relations order of a lawful court.

## Sec. 17.3.   Protection Against Fraud

A person who, with intent to deceive, makes any statements or reports required under this Retirement System that are untrue, or who falsifies or permits to be falsified any record or records of this Retirement System, or who otherwise violates, with intent to deceive, any terms or provisions of the Retirement System, shall be subject to prosecution under applicable law.

## Sec. 17.4.   Errors

If any change or error in the records results in any person receiving from the Retirement System more or less than the person would have been entitled to receive from the Retirement System had the records been correct, the Board shall correct such error and, as far as practicable, shall adjust the payment in such a manner that the actuarial equivalent of the benefit to which such person was correctly entitled shall be paid.

## Sec. 17.5.   Amendment; Termination; Exclusive Benefit

The City reserves the right to amend the Combined Plan Document created hereunder at any time; such amendments may include termination of the Retirement System; provided, however, that following the effective date of the Plan of Adjustment, no amendment other than amendments permitted under the terms of the Plan of Adjustment (including amendments contemplated in Section G-4(5) of Component II) may be made to the terms, conditions and rules of operation of the Retirement System, or any successor plan or trust, that govern the calculation of pension benefits during the period ending June 30, 2023, nor may any amendment or termination deprive any Member, former Member or Beneficiary of any then vested benefit

13-53846-tjt   Doc 8045   Filed 12/16/14   Entered 12/16/14 09:38:29   Page 291 of 301
13-53846-swr   Doc 8045-1   Filed 12/16/14   Entered 12/16/14 09:38:29   Page 44 of
809

under the Retirement System, except as provided in the Plan of Adjustment.  Notwithstanding the foregoing, the City and the Board have the authority to amend the Combined Plan Document as necessary to retain the tax qualified status of the Retirement System under the Internal Revenue Code.  The City shall make no amendment or amendments to the Retirement System which causes any part of the assets of the Retirement System to be used for, or diverted to, any purpose other than the exclusive benefit of Members, former Members or their Beneficiaries; provided, that the City may make any amendment necessary, with or without retroactive effect, to comply with applicable federal law.  Any amendment of the Retirement System by the City must be approved by the Council or person standing in the stead of the Council.

Upon termination of the Retirement System or upon complete discontinuance of contributions to the Retirement System, the rights of all Members to benefits accrued to the date of such termination or discontinuance, to the extent then funded, shall be nonforfeitable.

## Sec. 17.6.   Forfeitures Not to Increase Benefits

Any forfeitures arising under the Retirement System due to a Member's termination of employment or death, or for any other reason, shall be used to pay expenses of the Retirement System and shall not be applied to increase the benefits any Member would otherwise receive under the Retirement System at any time prior to termination of the Retirement System.

## Sec. 17.7.   Required Distributions - Compliance with Code Section 401(a)(9) and Regulations

The Retirement System will apply the minimum distribution requirements of Code Section 401(a)(9) in accordance with the final regulations issued thereunder, notwithstanding any provision in the Combined Plan Document to the contrary.   Pursuant to Code Section 401(a)(9)(A)(ii), a Member's interest must begin to be distributed by the later of (i) the April 1 of the calendar year following the calendar year in which he attains the Age of seventy and one-half (70-1/2), or (ii) April 1 of the calendar year following the year in which he retires.  Distributions will be made in accordance with Regulations Sections 1.401(a)(9)-2 through 1.401(a)(9)-9.  The provisions of this Section 17.7 and the regulations cited herein and incorporated by reference override any inconsistent plan distribution options.

## Sec. 17.8.   Direct Rollovers

(1)     For purposes of compliance with Code Section 401(a)(31), a distributee may elect, at the time and in the manner prescribed by the Board, to have any portion of an eligible rollover distribution paid directly to an eligible retirement plan specified by the distributee in a direct rollover.

(2)     For purposes of this Section 17.8, the following terms shall have the following meanings:

(a)     "Direct rollover" means a payment by the retirement system to an eligible retirement plan specified by a distributee.

(b)     "Distributee" means a Member or former Member.  It also includes the Member's or former Member's surviving Spouse, a Spouse or former spouse who is the

13-53846-tjt   Doc 8045   Filed 12/16/14   Entered 12/16/14 09:48:29   Page 292 of 301
13-53846-swr   Doc 8045   Filed 12/16/14   Entered 12/16/14 07:39:38   Page 44 of 201
809

alternate payee under an eligible domestic relations order, or a nonspouse beneficiary who is a designated beneficiary as defined by Code Section 401(a)(9)(E). However, a nonspouse beneficiary may only make a direct rollover to an individual retirement account or individual retirement annuity established for the purpose of receiving the distribution, and the account or annuity will be treated as an "inherited" individual retirement account or annuity.

(c)      "Eligible retirement plan" means any of the following that accepts a distributee's eligible rollover distribution:

    (i)      a qualified trust described in Code Section 401(a);

    (ii)      an annuity plan described in Code Section 403(a);

    (iii)      an annuity contract described in Code Section 403(b);

    (iv)      an individual retirement account described in Code Section 408(a);

    (v)      an individual retirement annuity described in Code Section 408(b);

    (vi)      a Roth IRA described in Code Section 408A; or

    (vii)      a plan eligible under Code Section 457(b) that is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or a political subdivision of a state that agrees to separately account for amounts transferred into that plan from the Retirement System.

(d)      "Eligible rollover distribution" means any distribution of all or any portion of the balance to the credit of a distribute under the Retirement System, except that an eligible rollover distribution does not include: any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or the life expectancy) of the distributee or the joint lives (or joint life expectancies) of the distributee and the distributee's designated beneficiary, or for a specified period of ten years or more; any distribution to the extent such distribution is required under Code Section 401(a)(9); the portion of any distribution that is not includible in gross income; and any other distribution which the Internal Revenue Service does not consider eligible for rollover treatment, such as any distribution that is reasonably expected to total less than $200 during the year. Notwithstanding the foregoing, a portion of a distribution will not fail to be an "eligible rollover distribution" merely because the portion consists of after-tax contributions that are not includible in Member's gross income upon distribution from the Retirement System. However, such portion may be transferred only (i) to an individual retirement account or annuity described in Code Section 408(a) or (b) or to a qualified defined contribution plan described in Code Section 401(a) that agrees to separately account for amounts so transferred (and earnings thereon), including separately accounting for the portion of the distribution that is includible in gross income and the portion of the distribution that is not so includible; (ii) to a qualified defined benefit plan

13-53846-tjt    Doc 8272-5    Filed 12/16/14    Entered 12/16/14 07:39:38    Page 293 of 301
13-53846-swr    Doc 8045    Filed 10/22/14    Entered 10/22/14 09:48:29    Page 443 of
809

described in Code Section 401(a) or to an annuity contract described in Code Section 403(b) that agrees to separately account for amounts so transferred (and earnings thereon), including separately accounting for the portion of the distribution that is includible in gross income and the portion of the distribution that is not so includible; or (iii) to a Roth IRA described in Code Section 408A.

## Sec. 17.9.   Construction

Words in the singular should be read and construed as though used in the plural, and words in the plural should be read and construed as though used in the singular, where appropriate.  The words "hereof", "herein", and "hereunder" and other similar compounds of the word "here", shall mean and refer to Component I and/or Component II of this Combined Plan Document or to the Combined Plan Document in its entirety, as the context may require, and not to any particular provision or section thereof.  The table of contents, article and section headings are included for convenience of reference, and are not intended to add to, or subtract from, the terms of the Combined Plan Document or the Retirement System created hereunder.

## Sec. 17.10.  Severability

If any section or part of a section of this Combined Plan Document or provision relating to the Retirement System is for any reason held to be invalid or unconstitutional, such holding shall not be construed as affecting the validity of the remaining sections of the Combined Plan Document or Retirement System or of the Combined Plan Document or Retirement System in its entirety.

13-53846-tjt   Doc 8045   Filed 10/22/14   Entered 10/22/14 09:48:29   Page 294 of 301
13-53846-swr   Doc 7873-5   Filed 12/16/14   Entered 12/16/14 07:39:38   Page 44 of
809

**EXHIBIT I.A.250.b**

PRINCIPAL TERMS OF NEW GRS ACTIVE PENSION PLAN

13-53846-tjt   Doc 8045   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 295 of
809
13-53846-swr   Doc 7670-5   Filed 12/16/14   Entered 12/16/14 07:39:38   Page 295 of 301

# NEW GRS ACTIVE PENSION PLAN -- MATERIAL TERMS

1.  Benefit Formula:  FAC (average base compensation over last 10 consecutive years of employment) x Years of Service  x 1.5%.  If an employee had leave of not less than 2 months without pay under the Family and Medical Leave Act in the last 2 years of employment, such employee's FAC will be determined using the highest 10 consecutive years of base compensation over the last 12 consecutive years of employment.  Average base compensation means no overtime, no unused sick leave, no longevity or any other form of bonus.

2.  Actual time for accrual is actual time served.  For vesting and eligibility, 1,000 hours for a year of service.

3.  Normal Retirement Age – age 62 with a transition period for active employees as of June 30, 2014 as follows:

    | Age as of July 1, 2014 | Normal Retirement Age |
    |---|---|
    | 61 years | 60 years |
    | 60 years | 60 years |
    | 59 years | 60.3 years |
    | 58 years | 60.6 years |
    | 57 years | 60.9 years |
    | 56 years | 61.0 years |
    | 55 years | 61.3 years |
    | 54 years | 61.6 years |
    | 53 years | 61.9 years |
    | 52 years | 62 years |

4.  10 Years of Service for vesting.

5.  Early retirement  -- Eligible at 55 & 30 years of service, with true actuarial reduction.  No pension payments allowed below age 55; terminated employees must wait until 62.

6.  Deferred Vested  -- 10 Years payable at  62.

7.  Disability  -- to be provided by commercial insurance until normal retirement age.  In applying the formula for an age 62 pension, a disabled employee will be credited with service for the period of long-term disability leave.

8.  Annuity Savings Fund - voluntary Annuity Savings Fund contributions equal to 3%, 5% or 7% of after-tax pay.  Interest will be credited at the actual net investment rate of return for GRS, but will in no event be lower than 0% or higher than 5.25%.  No in-service withdrawals permitted.

13-53846-tjt Doc 8045 Filed 12/16/14 Entered 12/16/14 07:39:38 Page 296 of 301
13-53846-swr  Doc 8045  Filed 10/22/15  Entered 10/22/14 03:48:29  Page 4 of
809

9.     Investment Return/Discount Rate – 6.75%

10.    COLA  - Variable COLA benefit payable after the hybrid plan has been in effect for
       4 full plan years, provided that the funding level is above 100%.  A simple 2%
       COLA on hybrid benefit.  Retirees become eligible for a COLA only for plan years
       after the retiree reaches age 62 and has been retired for a minimum of 12
       months.

11.    Contributions -  Employer contribution of 5% of the base compensation of
       eligible employees.  A portion of such contribution is used to fund  normal cost
       and a portion  is credited to a rate stabilization fund.  Employees contribute 4%
       of base compensation toward normal cost.

12.    If the funding level is below 100% (based on 3 year look back of smoothed
       returns),  the plan's risk-shifting levers listed below will be applied in the listed
       order, until the actuary can state that by virtue of the use of levers, and a 6.75%
       discount rate and return assumption, the funding level is projected to be 100%
       on a market value basis within the next 5 years.

       (a)     No COLAs will be paid;
       (b)     Amounts credited to the rate stabilization fund will be used to fund
               accrued benefits; and
       (c)     Employee contributions to the hybrid will increase by 1% to 5% of base
               compensation for up to a 5 year period.

       If the funding level is below 80%  (without taking into account the use of rate
       stabilization funds and the 1% increase in employee contributions):

       (d)     The steps taken in (a), (b) and (c) above will be continued;
       (e)     The most recently awarded COLA is rescinded (i.e., Members' future
               benefit payments will be not include that COLA);
       (f)     Employee contributions to the hybrid will increase to 6% of base
               compensation for up to a 5 year period;
       (g)     The  second most recently awarded COLA is rescinded; and
       (h)     The benefit accrual rate is decreased from 1.5% to 1% for up to 5 years.

-2-

13-53846-tjt   Doc 8045   Filed 12/16/14   Entered 12/16/14 09:38:29   Page 297 of 301
13-53846-swr   Doc 7624-5   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 44 of
                                      809

**EXHIBIT I.A.254.a**

FORM OF NEW PFRS ACTIVE PENSION PLAN

# COMBINED PLAN
# FOR THE
# POLICE AND FIRE
# RETIREMENT SYSTEM OF
# THE CITY OF DETROIT, MICHIGAN

**Amendment and Restatement Effective July 1, 2014**

COMPONENT I ................................................................................................. 1

ARTICLE 1. GENERAL PROVISIONS ................................................................ 1

Sec 1.1. Police and Fire Retirement System Established; Adoption of 2014 Plan Document............................................................................ 1

Sec 1.2. Retirement System Intended to be Tax-Qualified; Governmental Plan ........................................................................................ 1

Sec 1.3. Compliance With Plan of Adjustment ...................................... 1

Sec 1.4. Board of Trustees ....................................................................... 2

Sec 1.5. Board of Trustees – Membership; Appointment ...................... 2

Sec 1.6. Board of Trustees; Scheduling of Elections for Active and Retiree Trustees ....................................................................... 3

Sec 1.7. Procedures for election of Retiree Trustees ............................. 3

Sec 1.8. Board of Trustees; Oath; Term; Vacancies ............................. 4

Sec 1.9. Board of Trustees; Officers and Employees ............................ 4

Sec 1.10. Board of Trustees; Meetings; Rules of Procedure; Votes; Quorum .......... 4

Sec 1.11. Board of Trustees; Compensation; Expenses ........................... 5

Sec 1.12. Rules for Administration of Funds ............................................ 5

Sec 1.13. Board of Trustees; Certain Data to be Kept.............................. 5

Sec 1.14. Board of Trustees; Annual Audit Report .................................. 5

Sec 1.15. Board of Trustees; Legal Advisors ........................................... 5

Sec 1.16. Board of Trustees; Medical Director ........................................ 6

Sec 1.17. Designation of Actuary; Authority to Engage Additional Actuaries ......... 6

Sec 1.18. Board of Trustees; Adoption of Mortality and Other Tables of Experience and Rates of Interest; Limitations on Payments by the Retirement System ................................................................ 6

Sec 1.19. Board of Trustees; Annual Actuarial Valuation of Assets and Liabilities ....................................................................... 7

Sec 1.20. Board of Trustees; Powers and Duties; Fiduciary Status; Fiduciary Duties ............................................................................. 7

Sec 1.21. Investment Committee; Establishment; Purpose; Fiduciary Status; Fiduciary Duties............................................................ 7

Sec 1.22. Investment Committee; Membership; Appointment ................. 8

-i-

13-53846-tjt Doc 8272-5 Filed 12/16/14 Entered 12/16/14 20:39:38 Page 300 of 301
13-53846-swr Doc 8045-1 Filed 10/22/14 Entered 10/22/14 03:48:29 Page 450 of 809

# TABLE OF CONTENTS
(continued)

Sec 1.23.     Investment Committee; Term; Resignation and Removal; Vacancies ................................................................................ 9

Sec 1.24.     Investment Committee; Operation; Meetings; Quorum; Voting ............ 10

Sec 1.25.     Investment Committee; Compensation; Expenses; Employment of Advisors ..................................................................... 12

Sec 1.26.     Investment Committee; Special Reporting Obligation .......................... 12

ARTICLE 2.     DEFINITIONS ........................................................................... 14

Sec 2.1.     Definitions ........................................................................ 14

ARTICLE 3.     MEMBERSHIP .......................................................................... 22

Sec 3.1.     Eligible Employees .................................................................. 22

Sec 3.2.     Cessation of Membership; Re-Employment ............................................. 22

Sec 3.3.     Report From City ................................................................... 23

ARTICLE 4.     SERVICE CREDIT ...................................................................... 24

Sec 4.1.     Credited Service ................................................................... 24

Sec 4.2.     Vesting Service .................................................................... 24

Sec 4.3.     Service Credit; Military Service .................................................... 24

Sec 4.4.     Service Credit; Qualified Military Service ........................................... 25

ARTICLE 5.     ELIGIBILITY FOR RETIREMENT .......................................................... 26

Sec 5.1.     Eligibility for Unreduced Normal Retirement Benefit ................................. 26

Sec 5.2.     Eligibility for Deferred Vested Retirement Benefit ................................... 26

Sec 5.3.     Eligibility for Disability Retirement Benefit – Duty Disability ...................... 26

Sec 5.4.     Eligibility for Disability Retirement Benefit – Non-Duty Disability .................. 28

Sec 5.5.     Disability Retirees; Reexamination .................................................. 28

Sec 5.6.     Disability Benefits; Procedures for Determination of Disability ...................... 29

Sec 5.7.     Return of Accumulated Mandatory Contributions to Non-Vested Member .............................................................. 31

Sec 5.8.     Benefits Offset by Compensation Benefits; Subrogation .............................. 31

ARTICLE 6.     RETIREMENT ALLOWANCE; VARIABLE PENSION IMPROVEMENT FACTOR (ESCALATOR) .................................... 33

Sec 6.1.     Retirement Allowance ............................................................... 33

Sec 6.2.     Variable Pension Improvement Factor (Escalator) .................................... 33