THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT MAY BE REVISED TO REFLECT EVENTS THAT OCCUR AFTER THE DATE HEREOF BUT PRIOR TO THE BANKRUPTCY COURT'S APPROVAL OF THE DISCLOSURE STATEMENT.

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

-------------------------------------------------------------x
:
In re : Chapter 9
:
CITY OF DETROIT, MICHIGAN, : Case No. 13-53846
:
Debtor. : Hon. Steven W. Rhodes
:
-------------------------------------------------------------x

---

### AMENDED DISCLOSURE STATEMENT WITH RESPECT TO
### AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT

---

DAVID G. HEIMAN
HEATHER LENNOX
THOMAS A. WILSON
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com
tawilson@jonesday.com

BRUCE BENNETT
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

JONATHAN S. GREEN
STEPHEN S. LAPLANTE
MILLER, CANFIELD,
    PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE DEBTOR

**AMENDED DISCLOSURE STATEMENT, DATED MARCH 31, 2014
SOLICITATION OF VOTES WITH RESPECT TO
AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT, MICHIGAN**

—————————————————

**Preamble**

The City of Detroit ("Detroit" or the "City") believes that the Plan for the Adjustment of Debts of the City of Detroit (the "Plan") attached as Exhibit A to this Disclosure Statement (this "Disclosure Statement") is in the best interests of creditors. All creditors entitled to vote thereon are urged to vote in favor of the Plan. A summary of the voting instructions is set forth beginning on page 1 of this Disclosure Statement. Additional instructions are contained on the ballots distributed to the creditors entitled to vote on the Plan. To be counted, your ballot must be duly completed, executed and received by the City at or before 5:00 p.m., Eastern Time, on June 30, 2014 (the "Voting Deadline"), unless the Voting Deadline is extended.

—————————————————

The effectiveness of the proposed Plan is subject to material conditions precedent, some of which may not be satisfied. See Section III.D.1 of this Disclosure Statement. There is no assurance that these conditions will be satisfied or waived.

—————————————————

All capitalized terms used in this Disclosure Statement and not otherwise defined herein shall have the meanings given to them in the Plan.

——————————

This Disclosure Statement is the only document that the Bankruptcy Court has approved for use in connection with the solicitation of votes on the Plan. No entity is authorized by the City to give any information or to make any representation other than as contained in this Disclosure Statement and the exhibits attached hereto or incorporated by reference or referred to herein in connection with the Plan or the solicitation of acceptances of the Plan. Information or representations derived from any other source may not be relied upon as having been authorized by the City.

—————————————————

ALL CREDITORS (INCLUDING RETIREES) ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE PLAN ATTACHED AS EXHIBIT A AND THE RISK FACTORS DESCRIBED UNDER SECTION VI, PRIOR TO SUBMITTING BALLOTS IN RESPONSE TO THIS SOLICITATION.

RETIREES ARE FURTHER ENCOURAGED TO READ AND CAREFULLY CONSIDER THE "NOTICE REGARDING PROPOSED NEW PENSION AND POST-EMPLOYMENT HEALTHCARE BENEFITS" ENCLOSED WITH THIS DISCLOSURE STATEMENT PRIOR TO SUBMITTING BALLOTS IN RESPONSE TO THIS SOLICITATION.

—————————————————

The summaries of the Plan and other documents contained in this Disclosure Statement are qualified by reference to the Plan itself, the exhibits and supplemental documents thereto (collectively, the "Plan Supplement Documents") and documents described therein as Filed prior to approval of this Disclosure Statement. In the event that any inconsistency or conflict exists between this Disclosure Statement and the Plan, the terms of the Plan will control. Except as otherwise indicated, the City will File all Plan Supplement Documents with the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") and make them available for review on the Document Website (*www.kccllc.net/detroit*) prior to the Confirmation Hearing. A Plan Supplement or Plan Supplements containing Exhibits I.A.148.a, I.A.202.a, I.A.210 and II.D.6 to the Plan will be Filed no later than five Business Days prior to the Voting Deadline. All other Plan Supplements will be Filed no later than ten days before the Confirmation Hearing.

This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Plan. The City reserves the right to modify the Plan consistent with section 942 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 3019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and other applicable law.

The statements contained in this Disclosure Statement are made as of the date of this Disclosure Statement, and there can be no assurance that the statements contained herein will be correct at any time after this date. The information contained in this Disclosure Statement, including the information regarding the history and operations of the City and any financial information regarding the City, is included for the purpose of soliciting acceptances of the Plan. As to contested matters, adversary proceedings or any other litigation, the statements made in this Disclosure Statement are not to be construed as admissions or stipulations, but rather as statements made in settlement negotiations as part of the City's attempt to settle and resolve its Liabilities pursuant to the Plan. This Disclosure Statement shall not be admissible in any non-bankruptcy proceeding, nor shall it be construed to be conclusive advice on the tax, securities or other legal effects of the Plan as to any party, including any Holder of a Claim against the City. Except where specifically noted, the financial information contained in this Disclosure Statement and in its Exhibits has not been audited by a certified public accountant and may not have been prepared in accordance with standards promulgated by the Government Accounting Standards Board or generally accepted accounting principles in the United States.

---

### FORWARD-LOOKING STATEMENTS

This Disclosure Statement contains forward-looking statements based primarily on the current expectations of the City and projections about future events and financial trends affecting the financial condition of the City and its assets. The words "believe," "may," "estimate," "continue," "anticipate," "intend," "expect" and similar expressions identify these forward-looking statements. These forward-looking statements are subject to a number of risks, uncertainties and assumptions, including those described below under the caption "Risk Factors" in Section VI. In light of these risks and uncertainties, the forward-looking events and trends discussed in this Disclosure Statement may not occur, and actual results could differ materially from those anticipated in the forward-looking statements. The City does not undertake any obligation to update or revise publicly any forward-looking statements, whether as a result of new information, future events or otherwise.

**This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC"), any state securities commission or any securities exchange or association nor has the SEC, any state securities commission or any securities exchange or association passed upon the accuracy or adequacy of the statements contained herein.**

---

**TABLE OF CONTENTS**

                                                                                      **Page**

I. INTRODUCTION ............................................................................................................... 1

    A.    Voting Procedures ................................................................................................. 1

        1.    Parties Entitled to Vote on the Plan ............................................... 1

        2.    Voting Record Dates ....................................................................... 2

        3.    Vote Required for Acceptance by a Class ..................................... 3

        4.    Solicitation Package ........................................................................ 3

        5.    How to Vote .................................................................................... 4

        6.    Voting Transferred Claims ............................................................. 5

        7.    Voting Dispute Resolution Procedures........................................... 5

    B.    Convenience Claims ........................................................................................... 6

    C.    Special Procedures for Securities Claims .......................................................... 6

    D.    Special Procedures for Pension Claims and OPEB Claims ............................... 7

    E.    Plan Supplement Documents .............................................................................. 7

    F.    Confirmation Hearing and Deadline for Objections to Confirmation ................ 8

II. SUMMARY OF CLASSIFICATION  AND TREATMENT OF CLAIMS UNDER THE PLAN ................................... 8

    A.    Overview ............................................................................................................ 8

        1.    Introduction to the Plan .................................................................. 8

        2.    Special Information Regarding Pension Claims ............................. 8

    B.    Classification and Treatment of Claims Under the Plan .................................... 16

III. THE PLAN........................................................................................................................ 27

    A.    General................................................................................................................ 27

    B.    Classification and Treatment of Claims ............................................................ 27

        1.    Unclassified Claims........................................................................ 27

        2.    Classified Claims ........................................................................... 28

    C.    Treatment of Executory Contracts and Unexpired Leases................................. 37

        1.    Assumption..................................................................................... 37

        2.    Assumption of Ancillary Agreements ........................................... 37

        3.    Approval of Assumptions and Assignments.................................. 37

        4.    Payments Related to the Assumption of Executory Contracts and Unexpired Leases .............. 37

        5.    Contracts and Leases Entered Into After the Petition Date .......... 37

        6.    Rejection of Executory Contracts and Unexpired Leases............. 38

        7.    Rejection Damages Bar Date.......................................................... 38

        8.    Preexisting Obligations to the City Under Rejected Executory Contracts and Unexpired Leases........................................................................ 38

        9.    Insurance Policies............................................................................ 38

    D.    Effectiveness of the Plan.................................................................................... 38

        1.    Conditions Precedent to the Effective Date ................................... 38

| | | | |
|---|---|---|---|
| | 2. | Waiver of Conditions to the Effective Date | 39 |
| | 3. | Effect of Nonoccurrence of the Effective Date | 39 |
| | 4. | Request for Waiver of Automatic Stay of Confirmation Order | 39 |
| E. | | Effects of Confirmation | 40 |
| | 1. | Binding Effect | 40 |
| | 2. | Dissolution of Official Committees | 40 |
| | 3. | Preservation of Rights of Action by the City | 40 |
| | 4. | Comprehensive Settlement of Claims and Controversies | 40 |
| | 5. | Discharge of Claims | 40 |
| | 6. | Injunction | 41 |
| | 7. | Exculpation | 42 |
| | 8. | Releases | 42 |
| F. | | Retention of Jurisdiction by the Bankruptcy Court | 42 |
| **IV. MEANS OF IMPLEMENTATION OF THE PLAN** | | | 44 |
| A. | | The New Notes | 44 |
| | 1. | The New B Notes | 44 |
| B. | | Alternatives Related to DWSD | 44 |
| | 1. | DWSD Remains a Department of the City | 44 |
| | 2. | Potential DWSD Transaction | 45 |
| C. | | The Plan COP Settlement | 47 |
| D. | | The State Contribution Agreement | 47 |
| E. | | The DIA Settlement | 47 |
| | 1. | Funding Contributions | 47 |
| | 2. | Transfer of DIA Assets | 47 |
| | 3. | Conditions to the Foundations' Participation | 47 |
| F. | | Issuance of the New Securities | 48 |
| G. | | Cancellation of Existing Bonds and Bond Documents | 48 |
| H. | | Release of Liens | 48 |
| I. | | Professional Fee Reserve | 48 |
| J. | | Assumption of Indemnification Obligations | 49 |
| K. | | Incorporation of Retiree Health Care Settlement | 49 |
| L. | | Payment of Workers' Compensation Claims | 49 |
| M. | | Exit Facility | 49 |
| N. | | Provisions Regarding Distributions Under the Plan | 49 |
| | 1. | Appointment of Disbursing Agent | 49 |
| | 2. | Distributions on Account of Allowed Claims | 49 |

|  | 3. | Certain Claims to Be Expunged | 50 |
|  | 4. | Record Date for Distributions; Exception for Bond Claims | 50 |
|  | 5. | Means of Cash Payments | 50 |
|  | 6. | Selection of Distribution Dates for Allowed Claims | 50 |
|  | 7. | Limitations on Amounts to Be Distributed to Holders of Allowed Claims Otherwise Insured | 50 |
|  | 8. | City's Rights of Setoff Preserved | 50 |
|  | 9. | Delivery of Distributions and Undeliverable or Unclaimed Distributions. | 51 |
|  | 10. | Other Provisions Applicable to Distributions in All Classes | 51 |
| O. | | Procedures for Resolving Disputed Claims | 53 |
|  | 1. | Treatment of Disputed Claims | 53 |
|  | 2. | Disputed Claims Reserve | 53 |
|  | 3. | Objections to Claims | 54 |
| **V. CONFIRMATION OF THE PLAN** | | | 55 |
| A. | | Confirmation Hearing | 55 |
| B. | | Deadlines to Object to Confirmation | 55 |
| C. | | Requirements for Confirmation of the Plan | 56 |
|  | 1. | Acceptance or Cramdown | 56 |
|  | 2. | Alternatives to Confirmation and Consummation of the Plan | 59 |
| **VI. CERTAIN RISK FACTORS TO BE CONSIDERED** | | | 59 |
| A. | | Non-Confirmation of the Plan | 60 |
| B. | | Nonconsensual Confirmation | 60 |
| C. | | Inability to Confirm Plan Prior to Potential Removal of Emergency Manager | 60 |
| D. | | Conditions to Effectiveness of the Plan | 60 |
| E. | | Non-Occurrence of DIA Settlement or Non-Receipt of the Full Amount of the DIA Proceeds or the State Contribution | 60 |
| F. | | Failure to Secure Exit Facility | 60 |
| G. | | Inability to Raise Tax Revenue | 61 |
| H. | | Failure to Achieve Projected Financial Performance | 61 |
| I. | | Unforeseen Financial Circumstances Affecting the City's Future Financial Performance | 61 |
| J. | | Litigation if Unlimited Tax General Obligation Bonds Are Impaired | 61 |
| K. | | Other Litigation | 61 |
| L. | | City Credit May be Viewed Negatively By The Market | 62 |
| M. | | Population Loss | 62 |
| N. | | The City Has No Duty to Update | 62 |
| O. | | No Representations Outside This Disclosure Statement Are Authorized | 62 |
| P. | | Nature and Amount of Allowed Claims | 62 |

VII. EVENTS PRECEDING THE CITY'S CHAPTER 9 CASE..................................................................... 63

    A.    Background ........................................................................................................................ 63

        1.    General Information ......................................................................................... 63

        2.    Municipal Services ......................................................................................... 64

        3.    City Funds ....................................................................................................... 64

        4.    Sources of General Fund Revenue ................................................................ 71

        5.    Assets .............................................................................................................. 74

    B.    Outstanding Financial Obligations of the City as of the Petition Date ........................ 76

        1.    Revenue Bonds ............................................................................................... 76

        2.    General Fund Obligations ............................................................................... 77

        3.    Certificates of Participation ........................................................................... 79

        4.    Swap Liabilities .............................................................................................. 80

        5.    Pension Obligations ........................................................................................ 81

        6.    Other Post-Employment Benefit Obligations ............................................... 83

        7.    Other Liabilities ............................................................................................. 85

    C.    The City's Steady Operational and Financial Decline ................................................... 86

        1.    Declines in Population and the City's Manufacturing Base .......................... 87

        2.    Declining Revenues ........................................................................................ 88

        3.    Eroding Tax Base ........................................................................................... 89

        4.    High Labor Costs/Restrictive Employment Terms ....................................... 91

        5.    Growing Budget Deficits ............................................................................... 92

        6.    Declining Credit Ratings ................................................................................ 92

        7.    Inadequate Municipal Services ...................................................................... 92

        8.    Obsolete Information Technology ................................................................. 99

        9.    Steady State Prepetition Financial Projections ............................................ 100

    D.    Prepetition Measures Taken by City to Address Challenges ........................................ 100

        1.    Consent Agreement/Creation of Financial Advisory Board ...................... 100

        2.    Headcount Reductions .................................................................................. 101

        3.    Imposition of City Employment Terms ...................................................... 102

        4.    Revenue Generating Initiatives ................................................................... 102

        5.    Reduced Operating Expenditures ................................................................ 102

        6.    Deferred Capital Expenditures .................................................................... 102

        7.    Cash Conservation Measures ....................................................................... 102

        8.    Demolition Initiatives .................................................................................. 103

        9.    Appointment of the Emergency Manager ................................................... 103

        10.    The June 14 Creditor Proposal .................................................................... 104

| | | | |
|---|---|---|---|
| | 11. | Barriers to Out-of-Court Restructuring | 105 |
| | 12. | Insolvency | 107 |
| **VIII.** | **THE CHAPTER 9 CASE** | | 107 |
| A. | Commencement of the Chapter 9 Case | | 107 |
| B. | Retiree Committee | | 107 |
| C. | Unsecured Creditors' Committee | | 109 |
| D. | Eligibility | | 109 |
| E. | Swap Settlement | | 111 |
| | 1. | Forbearance and Optional Termination Agreement | 111 |
| | 2. | Litigation Regarding the Casino Revenues and the FOTA | 112 |
| | 3. | Litigation Regarding the COPs | 114 |
| F. | Mediation | | 115 |
| | 1. | Restructuring Mediation | 115 |
| | 2. | Labor/OPEB Mediation | 115 |
| | 3. | Other Mediation | 116 |
| G. | Postpetition Financing | | 116 |
| H. | Claims Process and Establishment of Bar Dates | | 117 |
| | 1. | Section 924/925 Lists | 117 |
| | 2. | Bar Date Order | 118 |
| | 3. | ADR Procedures | 118 |
| I. | Chapter 9 Stay Matters | | 120 |
| | 1. | Generally | 120 |
| | 2. | Challenges to PA 436 (Phillips) | 120 |
| J. | Fee Matters | | 121 |
| K. | Operational Restructuring Initiatives/Asset Dispositions | | 121 |
| | 1. | DWSD Transaction | 121 |
| | 2. | Modification of Retiree Benefits/Healthcare Redesign | 123 |
| | 3. | Transition of Lighting Grid to DTE | 126 |
| | 4. | Transition of Lighting Work to PLA | 126 |
| | 5. | Belle Isle Lease | 127 |
| | 6. | Detroit Institute of Arts | 127 |
| | 7. | Joe Louis Arena | 129 |
| | 8. | Sale of Veterans' Memorial Building | 129 |
| | 9. | Coleman A. Young Airport | 129 |
| **IX.** | **REINVESTMENT INITIATIVES** | | 129 |
| A. | Overview | | 129 |

## TABLE OF CONTENTS
(continued)

| | | | |
|---|---|---|---|
| | 1. | Blight Removal | 130 |
| | 2. | Public Safety (Police, Fire and EMS) | 131 |
| | 3. | General Services | 133 |
| | 4. | Finance | 133 |
| | 5. | DDOT | 134 |
| | 6. | Other Reinvestment Initiatives | 134 |
| B. | | Labor Costs & Terms and Conditions | 135 |

X. REVENUE ADJUSTMENTS AND TAX REFORM ... 136
  A. Expansion of the Tax Base ... 137
  B. Rationalization of Nominal Tax Rates ... 137
  C. Increasing Collection Rates ... 137

XI. PROJECTED FINANCIAL INFORMATION ... 138
  A. Projections ... 138
    1. Assumptions ... 139

XII. FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN ... 141
  A. Exchange of Property Differing Materially in Kind or Extent, Generally ... 142
  B. Treatment of Claim Holders Receiving Distributions Under the Plan ... 143
    1. Holders Whose Existing Bonds or Other Debt Obligations Will Be Exchanged for Property Including New Securities ... 143
    2. PFRS Claims and GRS Claims ... 144
  C. Certain Other Tax Considerations for Holders of Claims ... 145
    1. Accrued but Unpaid Interest ... 145
    2. Post-Effective Date Distributions ... 145
    3. Bad Debt and/or Worthless Securities Deduction ... 145
    4. Information Reporting and Backup Withholding ... 145
    5. Importance of Obtaining Professional Tax Assistance ... 145

XIII. APPLICABILITY OF CERTAIN FEDERAL AND STATE SECURITIES LAWS ... 146
  A. General ... 146
    1. Registration Of Securities ... 146
    2. Market Disclosure ... 146

XIV. ADDITIONAL INFORMATION ... 147

XV. RECOMMENDATION AND CONCLUSION ... 148

# TABLE OF EXHIBITS

**Exhibit A:**   Plan for the Adjustment of Debts of the City of Detroit

**Exhibit B:**   DWSD Sewer Bonds & DWSD Revolving Sewer Bonds

**Exhibit C:**   DWSD Water Bonds & DWSD Revolving Water Bonds

**Exhibit D:**   Unlimited Tax General Obligation Bonds

**Exhibit E:**   Limited Tax General Obligation Bonds

**Exhibit F:**   Prepetition Steady State Projection of Legacy Expenditures

**Exhibit G:**   Prepetition Fiscal Year 2014 Forecasted Cash Flow

**Exhibit H:**   Prepetition Projected Revenues, Expenditures, Operating Surpluses, Legacy Obligations & Deficits Through Fiscal Year 2017

**Exhibit I:**   Ten-Year Plan of Adjustment Restructuring and Reinvestment Initiatives

**Exhibit J:**   Ten-Year Financial Projections

**Exhibit K:**   DWSD Current and Historical Financial Information

**Exhibit L:**   DWSD Financial Projections

# INDEX OF DEFINED TERMS

1983 Claims .......................................... 120
2005 COPs ............................................ 79
2005 Funding Trust ................................ 79
2005 Service Contracts ........................... 79
2006 COPs ............................................ 79
2006 Funding Trust ................................ 79
2013 Financial Review Team Report ................... 103
2014 Retiree Health Care Plan ............................. 124
ACO ..................................................... 70
Act 392 Bonds ...................................... 126
Actual Return ....................................... 14
Actuary Application .............................. 108
Ad Hoc Committee of
   Water and Sewer Bondholders ........................... 5
ADR Procedures ................................... 116
ADR Procedures Motion ....................... 118
ADR Procedures Order ......................... 120
Affected Holder ...................................... 5
Affordable Care Act ............................. 124
AFSCME ............................................. 108
Allowed Pension Claims ......................... 11
Ambac .................................................. 78
Ambac Complaint .................................. 78
Amended List of Creditors ..................... 76
Amended Quality of Life Loan ............... 117
American Roads ..................................... 75
Annuity Savings Fund Excess Amount ................... 14
Annuity Savings Plan ............................. 82
Appointment Order .............................. 108
Appraised Art ....................................... 127
APS ...................................................... 71
ASF ...................................................... 14
Asset Proceeds Collateral ..................... 116
Asset Transfer ...................................... 74
Assured ................................................ 77
Automobile Parking Fund ...................... 71
Balloting Agent ...................................... 3
Bankruptcy Code ......................... preamble
Bankruptcy Court ......................... preamble
Bankruptcy Rules .......................... preamble
Bar Date Order ..................................... 118
Barclays .............................................. 116
Belle Isle Agreement ............................ 127
Bench Decision .................................... 110
Beneficial Ballots ................................... 6
Beneficial Holder ................................... 6
Benefit Supplement ................................. 1
Berkshire Hathaway ............................... 77
BLS Detroit Unemployment Charts .................... 89
Briefing Letter ..................................... 110
Brooks Wilkins .................................... 108
BSEED ................................................ 100
C&F Agreement ................................... 126
Case Evaluation ................................... 118
Casino Revenue Proceeding .................. 112
Casino Revenue Stay Order ................... 113

Casino Revenues ................................... 80
CBAs ................................................... 85
Certification Order ............................... 110
CETs .................................................... 92
cfs ........................................................ 68
Chapter 9 Stay .................................... 106
Christie's .............................................. 74
City .............................................. preamble
City Charter .......................................... 63
City Facilities ...................................... 122
Claiming Party ....................................... 5
COLA ................................................... 12
Collateral Agreement ............................. 80
Confirmation Hearing .............................. 8
Confirmation Hearing Notice .................... 3
Consent Agreement ............................. 101
Convenience Class Election ...................... 6
COP Settlement Election ........................... 6
COPs .................................................... 79
COPs Trustee ......................................... 5
Counties ............................................. 121
Creditors' Committee ........................... 109
CSO ...................................................... 67
CWA ..................................................... 70
DDA ...................................................... 76
DDOT ................................................... 70
Debt Instruments .................................... 6
Dentons .............................................. 108
Designated Claims ............................... 119
Detroit ......................................... preamble
DFD ...................................................... 84
DFFA ................................................... 84
DIA ........................................................ 8
DIA Collection ...................................... 74
DIA Corp. ............................................. 74
Disclosure Statement .................... preamble
Disk ....................................................... 3
Distribution Elections ............................. 7
District Court ....................................... 70
Document Website ................................... 1
DPD ...................................................... 84
DPOA ................................................... 84
DRCEA ................................................ 110
DTE ...................................................... 95
DWSD ................................................... 65
DWSD Revolving Bonds ......................... 76
DWSD RFI .......................................... 122
DWSD Sewer Bonds ............................... 77
DWSD Transaction ............................. 121
DWSD Water Bonds ............................... 77
ECF ........................................................ 5
Elections ................................................. 7
Eligibility ............................................ 109
Eligibility Objection ............................. 109
Eligibility Order ................................... 110
Eligibility Proceedings ......................... 109

-viii-

13-53846-swr   Doc 8372   Filed 12/31/14   Entered 12/31/14 18:36:58   Page 11 of 602
13-53846-swr   Doc 8372   Filed 12/31/14   Entered 12/31/14 18:36:58   Page 11 of 602

# INDEX OF DEFINED TERMS

| | |
|---|---|
| Eligibility Trial | 110 |
| Emergency Manager | 104 |
| EMS | 98 |
| Enterprise Funds | 64 |
| EPA | 70 |
| EVIP | 73 |
| FAB | 101 |
| FBI | 82 |
| Fee Examiner | 121 |
| Fee Review Order | 108 |
| FGIC | 77 |
| Final Report | 128 |
| Financial and Operating Plan | 104 |
| Financial Review Team | 100 |
| Financing Motion | 116 |
| First Retiree Proceeding | 125 |
| Fitch | 92 |
| Flowers Plaintiffs | 106 |
| FMV | 127 |
| Forbearance Period | 111 |
| FOTA | 111 |
| Foundation Funds | 128 |
| Foundations | 128 |
| FSA | 125 |
| FTA | 135 |
| Funding Trusts | 79 |
| General Bar Date | 118 |
| General Fund | 64 |
| General Obligation Bonds | 77 |
| General Receipts Account | 80 |
| GLWA | 121 |
| Governor | 92 |
| Group Objection | 117 |
| GRS | 81 |
| GRS Hybrid Pension Formula | 13 |
| GRS Trustees | 81 |
| GSD | 133 |
| Health & Wellness Department | 139 |
| Health/Life Benefit Plan | 83 |
| Holdback Account | 80 |
| Home Rule City Act | 63 |
| HUD | 97 |
| IG/AG Report | 82 |
| Ingham County Court | 106 |
| Initial Swap Settlement | 116 |
| Injunction Orders | 106 |
| Insurers | 4 |
| IPH | 140 |
| IRC | 141 |
| IRS | 142 |
| IT | 99 |
| Judge Perris | 113 |
| Judge Rosen | 113 |
| Judicature Act | 86 |
| June 14 Creditor Proposal | 104 |
| Lazard | 108 |
| LEFALB | 64 |
| Legislature | 61 |
| Limited Tax General Obligation Bonds | 77 |
| List of Claims | 76 |
| Lockbox Accounts | 80 |
| LTGO Litigation | 79 |
| Master Ballot | 6 |
| MCR | 118 |
| MDEQ | 70 |
| Mediation Order | 115 |
| MGD | 66 |
| Michigan Constitution | 9 |
| MLCS | 80 |
| Monthly Invoices | 121 |
| Moore Declaration | 82 |
| Most Valuable Works | 128 |
| Motion to Disband | 109 |
| Motion to Withdraw | 109 |
| MPD | 71 |
| MTA | 118 |
| Municipal Finance Act | 78 |
| NAACP Lawsuit | 120 |
| NAACP Plaintiffs | 120 |
| National/Assured Complaint | 78 |
| New Debt Securities | 144 |
| New JLA Sublease | 129 |
| Nominees | 6 |
| NOP | 117 |
| NPDES | 70 |
| NPFGC | 77 |
| Objections | 117 |
| OID | 144 |
| Olympia | 76 |
| OPEB | 4 |
| OPEB Claim | 4 |
| OPEB Plans | 83 |
| Optional Termination Payment | 112 |
| Optional Termination Right | 112 |
| Order Appointing Fee Examiner | 108 |
| Order for Relief | 110 |
| Original JLA Lease | 76 |
| Original List of Creditors | 76 |
| Orr Declaration | 57 |
| PA 100 | 72 |
| PA 392 | 126 |
| PA 4 | 100 |
| PA 436 | 64 |
| PA 436 Challenge Stay Order | 120 |
| PA 72 | 103 |
| Parking Bonds | 77 |
| PDD | 135 |
| Pension Claim | 4 |
| Pension and OPEB Tabulation Rules | 3 |
| Pensions Clause | 9 |
| Petition Date | 16 |
| PFRS | 81 |
| PFRS Hybrid Pension Formula | 13 |
| Phillips Lawsuit | 120 |
| Phillips Plaintiffs | 120 |
| Phillips Stay Relief Motion | 120 |
| PLA | 72 |
| PLA Bonds | 91 |

# INDEX OF DEFINED TERMS

PLA Order ....................................................... 126
Plan............................................................. *preamble*
Plan Supplement Documents......................*preamble*
PLD .............................................................. 95
Pledged Income Tax Revenue ............................ 116
Pledged Revenues ........................................... 126
Pledged Wagering Tax Revenue ........................ 116
Preliminary Report ......................................... 127
Primary Tabulation Rules.................................... 3
Professionals ................................................. 121
Projections .................................................... 138
PVB .............................................................. 71
QOL Financing Collateral .................................. 116
Quality of Life Loan ........................................ 116
RDPFFA......................................................... 110
RDPMA.......................................................... 110
Recent Debt Issuances...................................... 92
Red Wings ..................................................... 76
Retiree Committee........................................... 108
Retiree Representatives .................................... 125
Retirees......................................................... 107
Retirement Systems............................................ 8
Retirement Systems Objection ............................ 117
Revenue Bonds................................................ 76
RTBs ............................................................. 67
Rule .............................................................. 147
Ruling ........................................................... 116
S&P .............................................................. 92
Scheduling Order............................................. 55
SEC .............................................................. *preamble*
Second Retiree Proceeding................................. 126
Second Swap Settlement Motion.......................... 114
Securities Claim ................................................ 6
SEIU ............................................................. 116
Service Contracts............................................. 79
Service Corporations ....................................... 79
Sewage Disposal Fund ...................................... 65
Sixth Circuit Court of Appeals ............................. 9
Sixth Circuit Eligibility Appeals .......................... 110
Solicitation Materials ......................................... 1
Solicitation Package .......................................... 3
Solicitation Procedures Order ............................... 1
State................................................................ 8
State Treasurer ............................................... 101
Stay Relief Motion ........................................... 119
Supplemental Plan ............................................ 83
Supplemental Solicitation Procedures Motion .......... 1
Swap Contracts................................................ 80
Swap Counterparties ........................................ 80
Swap Insurers ................................................. 80
Swap Settlement Agreement ............................... 114
Swap Settlement Motion .................................... 111
Swap Settlement Proceeding ............................... 112
Swap Termination Financing Collateral................. 116
Swap Termination Loan ..................................... 116
Swap Termination Payment ................................ 80
Syncora.......................................................... 75
Third Mediation Order ...................................... 115
Transferred Art ................................................ 74

Transportation Fund ......................................... 70
Treasury ........................................................ 73
Trustee .......................................................... 126
Tunnel Leases ................................................. 75
U.S. Bank......................................................... 5
U.S. Trustee...................................................... 4
UAAL ............................................................ 10
UAW ............................................................. 108
Unlimited Tax General Obligation Bonds .............. 77
UTGO Litigation .............................................. 88
Voting Deadline................................................*preamble*
Voting Dispute Resolution Procedures.................... 5
Voting Record Date ............................................ 2
Water and Sewer Bond Trustee ............................ 5
Water Fund ..................................................... 65

-x-

13-53846-swr    Doc 8332    Filed 03/31/14    Entered 03/31/14 14:08:24    Page 13 of 602
13-53846-swr    Doc 8382    Filed 03/31/14    Entered 03/31/14 18:36:58    Page 13 of 162

# I.

## INTRODUCTION

The City, as the debtor in the above-captioned chapter 9 case pending before the United States Bankruptcy Court, has prepared this Disclosure Statement to solicit votes of creditors to accept the Plan proposed by the City. A copy of the Plan is attached as Exhibit A to this Disclosure Statement.

This Disclosure Statement contains information regarding the City's prepetition operating and financial history, significant events leading up to the commencement of the City's chapter 9 case, significant events that have occurred during the City's chapter 9 case and the restructuring transactions that will take place if the Plan is confirmed and becomes effective. This Disclosure Statement also describes the terms and conditions of the Plan, including certain effects of Confirmation of the Plan, certain risk factors (including those associated with securities to be issued under the Plan) and the manner in which Distributions will be made under the Plan. In addition, this Disclosure Statement describes the Plan Confirmation process and the voting procedures that Holders of Claims entitled to vote on the Plan must follow for their votes to be counted. If you are an active or terminated employee, or a retiree of the City, a supplement summarizing important information relevant to your entitlement to pension and retiree health benefits has been enclosed with the Plan and Disclosure Statement. Additional copies of all of these documents are available at no charge via the internet at *http://www.kccllc.net/detroit* (the "Document Website") or by written request to: City of Detroit c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245.

On [_____], 2014, the Bankruptcy Court entered an order approving this Disclosure Statement as containing "adequate information," *i.e.*, information of a kind and in sufficient detail to enable a hypothetical reasonable investor typical of the Holders of Claims to make an informed judgment about the Plan. THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT CONSTITUTES NEITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN NOR AN ENDORSEMENT OF THE MERITS OF THE PLAN BY THE BANKRUPTCY COURT.

## A.    Voting Procedures

On March 11, 2014, the Bankruptcy Court entered the Order (I) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plan of Adjustment and (II) Approving Notice Procedures Related to Confirmation of the Plan of Adjustment (Docket No. 2984) (including all exhibits attached thereto, the "Solicitation Procedures Order") establishing certain procedures for the solicitation of votes to accept or reject the Plan.

The City intends to file a motion with the Bankruptcy Court (the "Supplemental Solicitation Procedures Motion") seeking approval of certain special procedures for the solicitation and tabulation of votes to accept or reject the Plan cast by Holders of Pension Claims and OPEB Claims in Classes 10, 11 and 12 under the Plan. Among other things, in addition to the package of materials described below (the "Solicitation Materials"), the City intends to provide the Holders of Pension Claims and OPEB Claims with a notice giving a clear, concise summary of (1) the process for obtaining approval of the Plan; (2) the likely effect of the Plan on retiree pension and other post-employment benefits; and (3) instructions on how to vote on the Plan (the "Benefit Supplement").

### 1.    Parties Entitled to Vote on the Plan

In general, a holder of a claim may vote to accept or reject a plan if: (a) the claim is "allowed," which means generally that it is not disputed, contingent or unliquidated, and (b) the claim is impaired by a plan. Under the provisions of the Bankruptcy Code, however, not all creditors are entitled to vote on a chapter 9 plan. Creditors whose Claims are not impaired by a plan are deemed to accept the plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote. In addition, creditors whose Claims are impaired by a plan and who will receive no distribution under such plan also are not entitled to vote because they are deemed to have rejected the plan under section 1126(g) of the Bankruptcy Code. For a discussion of these and other legal standards governing the plan confirmation process, see Section V, "Confirmation of the Plan."

The following sets forth which Classes are entitled to vote on the Plan and which are not:

- The City is not seeking votes from the Holders of Claims in Classes 2A (Secured GO Series 2010 Claims), 2B (Secured GO Series 2010(A) Claims), 2C (Secured GO Series 2012(A2) Claims),

2D (Secured GO Series 2012(A2-B) Claims), 2E (Secured GO Series 2012(B) Claims), 2F (Secured GO Series 2012(B2) Claims), 3 (Other Secured Claims), 4 (HUD Installment Notes Claims) and 6 (Parking Bond Claims) because the City believes those Claims are not impaired by the Plan. Pursuant to section 1126(f) of the Bankruptcy Code, Holders of these Claims are conclusively presumed to have accepted the Plan. Accordingly, Holders of Claims in these classes will not have the right to vote with respect to the Plan.

- Holders of Claims in Class 16 (Subordinated Claims) will be impaired under the Plan. Because the City does not anticipate that such Holders will receive any Distributions pursuant to the Plan, and consistent with the language of section 1126(g) of the Bankruptcy Code, each Holder of a Claim in this Class will be deemed to have rejected the Plan and will not have the right to vote with respect to the Plan.

- The City is seeking votes from the Holders of Allowed Claims in Class 1A (DWSD Class A Water Claims), Class 1B (DWSD Class B Water Claims), Class 1C (DWSD Class A Sewer Claims), Class 1D (DWSD Class B Sewer Claims), Class 1E (DWSD Revolving Sewer Bonds Claims), Class 1F (DWSD Revolving Water Bonds Claims), Class 5 (COP Swap Claims), Class 7 (Limited Tax General Obligation Bond Claims), Class 8 (Unlimited Tax General Obligation Bond Claims), Class 9 (COP Claims), Class 10 (PFRS Pension Claims), Class 11 (GRS Pension Claims), Class 12 (OPEB Claims), Class 13 (Downtown Development Authority Claims), Class 14 (Other Unsecured Claims) and Class 15 (Convenience Claims) because those Claims are impaired under the Plan, and the Holders of Allowed Claims in such Classes are receiving a distribution under the Plan on account of such Allowed Claims. The Holders of such Claims will have the right to vote to accept or reject the Plan.

- **IF YOU ARE RETIRED OR SEPARATED FROM THE CITY OF DETROIT AND ARE RECEIVING OR ENTITLED TO RECEIVE A PENSION, OR ARE AN ACTIVE EMPLOYEE ENTITLED TO A PENSION UPON YOUR RETIREMENT, OR ARE RECEIVING RETIREE HEALTH BENEFITS FROM THE CITY, YOU ARE A HOLDER OF A CLAIM IN CLASS 10, CLASS 11 AND/OR CLASS 12 AND YOU ARE ENTITLED TO VOTE ON THIS PLAN OF ADJUSTMENT. FOR FURTHER INFORMATION, PLEASE SEE THE "NOTICE REGARDING PROPOSED NEW PENSION AND POST-EMPLOYMENT HEALTHCARE BENEFITS" ENCLOSED WITH THIS DISCLOSURE STATEMENT.**

For a detailed description of the Classes of Claims and their treatment under the Plan, see Section II of this Disclosure Statement, "Summary of Classification and Treatment of Claims Under the Plan."

Under section 1124 of the Bankruptcy Code, a class of claims is deemed to be "impaired" under a plan unless (a) the plan leaves unaltered the legal, equitable and contractual rights to which such claim entitles the holder thereof; or (b) notwithstanding any legal right to an accelerated payment of such claim, the plan (i) cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy), (ii) reinstates the maturity of such claim as it existed before the default, (iii) compensates the holder of such claim for any damages resulting from such holder's reasonable reliance on such legal right to an accelerated payment, and (iv) does not otherwise alter the legal, equitable or contractual rights to which such claim entitles the holder of such claim.

Except as otherwise provided in the Plan and/or any applicable orders of the Bankruptcy Court, the Holder of a Claim that is "impaired" under the Plan is entitled to vote to accept or reject the Plan if (a) the Plan provides a distribution in respect of such Claim, (b) the Claim has been scheduled by the City (and is not scheduled as disputed, contingent, or unliquidated), (c) the Holder of such Claim has timely filed a proof of Claim or (d) a proof of Claim was deemed timely filed by an order of the Bankruptcy Court prior to the Voting Deadline.

**2.     Voting Record Dates**

The record date for purposes of determining which creditors are entitled to vote on the Plan (the "Voting Record Date") is April 14, 2014. The City intends to request that a separate voting record date be established for Pension Claims and OPEB Claims.

3. **Vote Required for Acceptance by a Class**

A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds in amount and more than one-half in number of the Allowed Claims in such Class that have voted on the Plan in accordance with the Disclosure Statement Order.

4. **Solicitation Package**

(a) **Contents of the Solicitation Package**

The general package of materials (the "Solicitation Package") to be sent to Holders of Claims entitled to vote on the Plan will contain:

- A paper copy of the notice of the Confirmation Hearing (the "Confirmation Hearing Notice");

- A computer disk (the "Disk") which includes the Plan, the Disclosure Statement and all exhibits thereto that have been filed in this case prior to the date of the mailing of the Solicitation Package;

- For Holders of Claims in voting Classes, an appropriate form of Ballot, instructions on how to complete the Ballot and a Ballot return envelope;

- A copy of the rules pursuant to which Ballots will be tabulated (for Classes 10, 11 and 12, the "Pension and OPEB Tabulation Rules"; for all other Classes, the "Primary Tabulation Rules");

- A notice summarizing the dispute resolution procedures to be employed with respect to voting;

- A cover letter (i) describing the contents of the Solicitation Package, (ii) describing the contents of the Disk and instructions for using the Disk and (iii) providing information about how to obtain, at no charge, hard copies of any materials provided on the Disk; and

- If applicable, the Benefit Supplement.

In addition to the procedures outlined above: (i) the Plan, the Disclosure Statement and, once they are filed, all exhibits to both documents will be made available at no charge at the Document Website at *http://www.kccllc.net/detroit*; and (ii) the City will provide parties in interest (at no charge) with paper copies of the Plan and/or Disclosure Statement upon written request.

(b) **Who Will Receive a Solicitation Package**

In accordance with the Solicitation Procedures Order, the City, through Kurtzman Carson Consultants LLC (the "Balloting Agent"), will send a Solicitation Package, no later than April 28, 2014, to the following parties:

- Any party (or such party's transferee, if such transferee is entitled to vote on the Plan) that is entitled to vote on the Plan and that has filed a timely proof of claim (or that is excused from filing a proof of claim under the Bar Date Order), if such Claim has not been disallowed, waived or withdrawn prior to the date of the mailing of the Solicitation Packages;

- Any party that is entitled to vote on the Plan and that the City listed as holding a Claim in the List of Claims (see Section VII.B of this Disclosure Statement), attached as Exhibit A to the Notice of Filing of Second Amended List of Creditors and Claims, Pursuant to Sections 924 and 925 of the Bankruptcy Code (Docket No. 1059), if such Claim (i) is not listed as a contingent, unliquidated or disputed Claim, and (ii) has not been disallowed, waived or withdrawn prior to the date of the mailing of the Solicitation Packages;

- All Nominees of Beneficial Holders of Impaired Claims in Classes 1A, 1B, 1C, 1D, 7, 8 or 9 under the Plan;

-3-

13-53846-swr   Doc 3382   Filed 03/31/14   Entered 03/31/14 40824648   Page 16 of 602
13-53846-swr   Doc 3382   Filed 03/31/14   Entered 03/31/14 20:36:58   Page 16 of 162

- All insurers of securities giving rise to Impaired Claims in Classes 1A, 1B, 1C, 1D, 1E, 7, 8 or 9 under the Plan (collectively, the "<u>Insurers</u>");

- Any known participant in the GRS or the PFRS (as such terms are defined in Section VII.B.5.a of this Disclosure Statement) (the Claim of any such claimant, a "<u>Pension Claim</u>"), and all related known Holders of Claims for retiree health care benefits, also known as other post-employment benefits ("<u>OPEB</u>" benefits) (the Claim of any such claimant, an "<u>OPEB Claim</u>"), regardless of whether such person is identified on the List of Claims or has filed a proof of claim;

- All known counterparties to unexpired leases and executory contracts as of the Petition Date; and

- The United States Trustee for the Eastern District of Michigan (the "<u>U.S. Trustee</u>").

**5.      How to Vote**

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan.

All votes to accept or reject the Plan with respect to any Class of Claims must be cast by properly submitting the duly completed and executed form of Ballot designated for such Class.  Holders of Impaired Claims voting on the Plan should complete and sign the Ballot in accordance with the instructions thereon, being sure to check the appropriate box entitled "Accept the Plan" or "Reject the Plan."  After carefully reviewing:  (a) the Plan; (b) this Disclosure Statement; and (c) all other documents and instructions included in the Solicitation Package, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan.  For your vote to be counted, you must complete and sign your original Ballot (copies will not be accepted) and return it so that it is actually received at either of the addresses set forth below by the Voting Deadline.

In accordance with Bankruptcy Rule 3018(c), the Ballots are based on Official Form No. 14, but have been modified to meet the particular needs of this chapter 9 case.  PLEASE CAREFULLY FOLLOW THE DIRECTIONS CONTAINED ON EACH ENCLOSED BALLOT.

Each Ballot has been coded to reflect the Class of Claims it represents.  Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement.  To be counted, all Ballots must be properly completed in accordance with the voting instructions on the Ballot and received no later than the Voting Deadline (*i.e.*, June 30, 2014, 2014 at 5:00 p.m. (Eastern Time)) via regular mail, overnight courier or personal delivery at the "Detroit Ballot Processing Center" address set forth on your Ballot.  Ballots may <u>not</u> be submitted by facsimile or electronic mail, and any Ballots submitted by facsimile or electronic mail will <u>not</u> be accepted or counted.  Ballots sent to any other address will not be counted.

EXCEPT AS OTHERWISE PROVIDED IN THE SOLICITATION PROCEDURES ORDER, ANY BALLOT RECEIVED WHICH DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR WHICH INDICATES BOTH ACCEPTANCE AND REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF DETERMINING ACCEPTANCE OR REJECTION OF THE PLAN.

ANY BALLOT RECEIVED WHICH IS NOT SIGNED OR WHICH CONTAINS INSUFFICIENT INFORMATION TO PERMIT THE IDENTIFICATION OF THE CLAIMANT WILL BE AN INVALID BALLOT AND WILL NOT BE COUNTED FOR PURPOSES OF DETERMINING ACCEPTANCE OR REJECTION OF THE PLAN.

If you are a Holder of a Claim who is entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the Disclosure Statement, the Plan, the Ballot or the procedures for voting on the Plan, please contact the Balloting Agent:  (a) by telephone (i) for U.S. and Canadian callers toll-free at 877-298-6236 and (ii) for international callers at +1 310-751-2658; or (b) in writing at City of Detroit c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245.

Before voting on the Plan, each creditor should read this Disclosure Statement, the Plan, the Disclosure Statement Order, the Confirmation Hearing Notice and the other documents and instructions accompanying the Ballots.  These documents contain important information concerning how Claims are classified for voting purposes and how votes will be tabulated.

A vote on the Plan may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code. The Solicitation Procedures Order also sets forth assumptions and procedures for tabulating Ballots that are not completed fully or correctly.

### 6. Voting Transferred Claims

With respect to any Claim that is transferred prior to the Voting Record Date, the transferee will be entitled to vote on the Plan on account of such transferred Claim only if both of the following conditions are satisfied prior to the Voting Record Date: (a) the transferee files a notice of the transfer pursuant to Bankruptcy Rule 3001(e); and (b) (i) the objection deadline with respect to such transfer has passed and no party has objected to the transfer, (ii) if there are any objections to the transfer, such objections have been resolved or (iii) the transferor has signed a sworn statement confirming the validity of the transfer.

### 7. Voting Dispute Resolution Procedures

Disputes regarding a party's right to vote on the Plan will be resolved pursuant to the dispute resolution procedures approved by the Bankruptcy Court and set forth in the Solicitation Procedures Order (the "Voting Dispute Resolution Procedures") as follows:

- If a party is not identified in the Plan or in the Solicitation Procedures Order as having the right to vote on the Plan, and if that party believes it has a right to vote on the Plan, then, by May 13, 2014, the party (the "Claiming Party") must electronically file and properly serve via the Bankruptcy Court's electronic case filing system ("ECF") a "Notice of Asserted Right to Vote a Claim" and a brief in support of the rights asserted therein, which brief shall identify (a) the Claim(s) (and Classes or subclasses, as applicable) with respect to which the Claiming Party asserts voting rights, (b) whether the Claiming Party possesses the right to make an Election (as such term is defined below) with respect to such Claim(s), (c) the legal and factual support for asserting such voting and/or Election rights and (d) the proper treatment of the Claiming Party's vote(s) for purposes of section 1126(c) of the Bankruptcy Code.

- The Claiming Party's Notice of Asserted Right to Vote a Claim and supporting brief will be made available on the Balloting Agent's website.

- Any Holder affected by a Claiming Party's Notice of Asserted Right to Vote a Claim (any such Holder, an "Affected Holder"), U.S. Bank National Association ("U.S. Bank"), in its capacity as trustee for those certain bonds issued by the City for the Detroit Water and Sewerage Department (the "Water and Sewer Bond Trustee"), those certain Holders of Detroit water and sewer revenue bonds represented by Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. and Kramer Levin Naftalis & Frankel LLP (the "Ad Hoc Committee of Water and Sewer Bondholders"), Wilmington Trust, National Association, as Successor Trustee for the Detroit Retirement Systems Funding Trust 2005 and the Detroit Retirement Systems Funding Trust 2006 (the "COPs Trustee"), or any representative thereof will each be permitted to file and serve on the ECF noticing list a brief in response to any Notice of Asserted Right to Vote by June 12, 2014.

- Any Claiming Party that files Notice of Asserted Right to Vote a Claim will be permitted to file and serve any reply brief in support of such notice on the ECF noticing list by June 20, 2014.

- A hearing will be held on June 26, 2014 at which the Court will hear and determine any disputes arising in connection with a Notice of Asserted Right to Vote a Claim.

- Any determination by the Court as to who has the right to vote, who has the right to make Elections and how the votes will be treated for purposes of section 1126(c) of the Bankruptcy Code for a particular CUSIP of securities giving rise to Claims in Classes 1A, 1B, 1C or 1D or for a particular Class or subclass of securities giving rise to Claims in Classes 1E or 9, as applicable, will be applicable to all Affected Holders and the Claiming Party with respect to that particular CUSIP of securities, Class or subclass, as applicable.

- Any Claiming Party that does not assert any alleged voting rights pursuant to the Voting Dispute Resolution Procedures will be barred from asserting such rights at any later date.

- If neither (a) an Affected Holder nor (b) (i) the Water and Sewer Bond Trustee, (ii) the COPs Trustee or (iii) the Ad Hoc Committee of Water and Sewer Bondholders (as applicable) contests a Notice of Asserted Right to Vote a Claim, the Claiming Party will be granted the relief sought in its Notice of Asserted Right to Vote a Claim.

- If the Voting Deadline is altered, the City, the Insurers, any Claiming Parties, the Water and Sewer Bond Trustee, the Ad Hoc Committee of Water and Sewer Bondholders and the COPs Trustee may, by mutual agreement, seek a further order of the Court that correspondingly alters the deadlines established in the Voting Dispute Resolution Procedures.

## B. Convenience Claims

As set forth in the Solicitation Procedures Order, each Holder of a Class 14 Other Unsecured Claim is permitted to elect to reduce its Claim to $25,000 in the aggregate and obtain treatment of such reduced Claim as a Class 15 Convenience Claim (the "Convenience Class Election"). The Bankruptcy Court has authorized the City to use the Class 14 Ballots as the mechanism for Class 14 creditors to make the Convenience Class Election. The Convenience Class Elections made on the Ballots will be deemed irrevocable and legally binding obligations of the electing creditors upon (1) the execution of the Ballots and (2) the confirmation of the Plan. A Class 14 Ballot that (1) neither accepts nor declines the Convenience Class Election, (2) elects both to accept and decline the Convenience Class Election or (3) otherwise attempts to partially accept and partially decline the Convenience Class Election will be deemed to decline the Convenience Class Election.

## C. Special Procedures for Securities Claims

The vast majority of the creditors possessing an economic stake in Claims (any such Claim, a "Securities Claim") in Classes 1A, 1B, 1C, 1D, 1E, 1F, 7, 8 and 9 under the Plan (each, a "Beneficial Holder") are not known by the City. As is typical with publicly-traded securities, many of the City's bond and other debt instruments (collectively, the "Debt Instruments") are held in the name of institutional banks, brokers and other customers (the "Nominees"). The Nominees, in turn, hold the Debt Instruments in "street name" on behalf of the Beneficial Holders. Accordingly, pursuant to Bankruptcy Rule 3017(e) and the Solicitation Procedures Order, the City will utilize certain special procedures to ensure that Beneficial Holders of Impaired Claims in Classes 1A, 1B, 1C, 1D, 1E, 1F, 7, 8 and 9 are able to vote on the Plan.

The City will obtain a listing from the Balloting Agent of all Nominees as of the Voting Record Date. On or before April 28, 2014, the Balloting Agent will send the Solicitation Packages to the Nominees with instructions to (1) forward the applicable Solicitation Packages to the Beneficial Holders, (2) collect Ballots from the Beneficial Holders (the "Beneficial Ballots"), (3) prepare a master ballot (the "Master Ballot") based on the contents of the Beneficial Ballots and (4) return the Master Ballot to the Balloting Agent by the Voting Deadline. Any Beneficial Holder that holds Debt Instruments in its own name, as opposed to through a Nominee, will submit a Ballot directly to the Balloting Agent and will not vote through the Master Ballot process.

Additional procedures applicable to Securities Claims are set forth in the Solicitation Procedures Order and the Primary Tabulation Rules filed therewith, including but not limited to the following procedures:

- Each Insurer shall receive a Ballot from the Balloting Agent that is required to be returned directly to the Balloting Agent by the Voting Deadline.

- Each Beneficial Holder and each Insurer of securities giving rise to Impaired Claims in Classes 1A, 1B, 1C, 1D, 1E or 1F (or any subclass thereof) will receive separate ballots for each CUSIP or series of securities giving rise to Impaired Claims in Classes or subclasses in which it holds or insures Impaired Claims.

- Each of the Beneficial Holders of securities giving rise to Impaired Claims in Classes 1E and 1F shall receive a Ballot from the Balloting Agent that is required to be returned directly to the Balloting Agent by the Voting Deadline.

- Each Beneficial Holder or each Insurer of securities giving rise to a Class 9 COP Claim is permitted to elect to participate in the Plan COP Settlement (as such term is defined in the Plan) (the "COP Settlement Election"). The Bankruptcy Court has authorized the City to use the Class 9 Ballots as the mechanism for each Class 9 Beneficial Holder and Insurer to make the COP Settlement Election.

- Each Beneficial Holder or each Insurer of securities giving rise to an Impaired Claim in Classes 1A, 1B, 1C or 1D (or any subclass thereof) is permitted to elect the form of payment they are entitled to receive under the Plan (the "Distribution Elections"). The Bankruptcy Court has authorized the City to use the Ballots for Classes 1A, 1B, 1C and 1D (and any subclass thereof) for each Beneficial Holder and each Insurer of these Classes as the mechanism for each such Beneficial Holder and Insurer to make the Distribution Elections. The Distribution Elections will be made for each individual CUSIP of securities giving rise to Impaired Claims in such Classes which each Beneficial Holder or each Insurer holds or insures.

- The COP Settlement Elections and Distribution Elections (collectively with the Convenience Class Elections, the "Elections") made on the Ballots will be deemed irrevocable and legally binding obligations of the electing creditors, each Beneficial Holder or each Insurer, as applicable, upon the execution of the Ballots and confirmation of the Plan.

- A Class 1A, 1B, 1C or 1D Ballot that (1) neither accepts nor declines its respective Election, (2) elects both to accept and decline the Election or (3) otherwise attempts to partially accept and partially decline the Election will be deemed to decline the Election.

- A Class 9 Ballot that (1) neither accepts nor declines the COP Settlement Election or (2) elects both to accept and decline the COP Settlement Election with respect to all Class 9 Claims voted thereon will be deemed to decline the COP Settlement Election.

## D. Special Procedures for Pension Claims and OPEB Claims

Holders of Pension Claims and OPEB Claims will receive the Benefit Supplement in addition to the general Solicitation Materials. Additionally, in the Supplemental Solicitation Procedures Motion, the City intends to seek authorization to establish certain special procedures governing the solicitation and tabulation of votes to accept or reject the Plan cast by Holders of Pension Claims and OPEB Claims, including but not limited to the following procedures:

- Unless otherwise provided in the Pension and OPEB Tabulation Rules, and regardless of any proofs of claim that actually may have been, or may be, filed with respect to a Pension Claim or OPEB Claim, the Pension Claim or OPEB Claim will be deemed temporarily allowed for voting purposes in the amount calculated pursuant to certain claim estimation procedures to be described in the Supplemental Solicitation Procedures Motion.

- Any Holder of a Pension Claim or OPEB Claim with more than one Claim in a particular Class (*e.g.*, a surviving spouse who is receiving a survivor's pension from the City, but who also worked for and is retired from the City and receives his or her own separate City pension) must vote all such Claims in that Class either to accept the Plan or to reject the Plan. If any such Holder casts a Ballot or Ballots purporting to split its vote with respect to Claims in the same Class, the Ballot or Ballots would not be counted.

- Any Holder of a Pension Claim or OPEB Claim with Claims in more than one Class must submit a separate Ballot for each Class. If such a Holder uses a single Ballot to vote Claims in more than one Class, that Ballot would not be counted. Thus, a retiree who receives both a pension and retiree health insurance benefits from the City would be required to submit a separate Ballot for his or her Pension Claim and OPEB Claim.

The Supplemental Solicitation Procedures Motion further contemplates that, in addition to the Pension and OPEB Tabulation Rules, certain of the Primary Tabulation Rules also would apply to Pension Claims and OPEB Claims.

## E. Plan Supplement Documents

The Plan Supplement Documents consist of all exhibits to the Plan not Filed as of the date of the entry of the Disclosure Statement Order on the docket of the City's chapter 9 case. A Plan Supplement or Plan Supplements containing Exhibits I.A.148.a, I.A.202.a, I.A.210 and II.D.6 to the Plan will be Filed no later than five business days prior to the Voting Deadline. All other Plan Supplements will be Filed no later than ten days before the Confirmation Hearing. All Plan Supplement Documents will be made available on the Document Website at *http://www.kccllc.net/detroit* once

-7-

13-53846-swr Doc 8372 Filed 03/61/14 Entered 03/61/14 08:24:68 Page 20 of 602
13-53846-swr Doc 8372 Filed 03/31/14 Entered 03/31/14 18:36:58 Page 20 of 162

they are Filed.  The City reserves the right to modify, amend, supplement, restate or withdraw any of the Plan Supplement Documents after they are Filed and shall promptly make such changes available on the Document Website.

**F.      Confirmation Hearing and Deadline for Objections to Confirmation**

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on whether the City has fulfilled the confirmation requirements of sections 943 and 1129 of the Bankruptcy Code (the "Confirmation Hearing"). The Confirmation Hearing has been scheduled to commence on July 16, 2014 at 9:00 a.m., Eastern Time, before the Honorable Steven W. Rhodes, United States Bankruptcy Judge for the Eastern District of Michigan, at Courtroom 100, Theodore Levin United States Courthouse, 231 West Lafayette Boulevard, Detroit, Michigan 48226.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

Any objection to Confirmation must (1) be in writing, (2) state the name and address of the objecting party and the nature of the Claim of such party and (3) state with particularity the basis and nature of such objection.  Any such objections must be Filed and served upon the persons designated in the Confirmation Hearing Notice in the manner and by the deadline described therein.

## II.

## SUMMARY OF CLASSIFICATION
## AND TREATMENT OF CLAIMS UNDER THE PLAN

*The following Plan summary is a general overview only, which is qualified in its entirety by, and should be read in conjunction with, the more detailed information appearing elsewhere in this Disclosure Statement and the Plan.*

**A.      Overview**

**1.      Introduction to the Plan**

The Plan provides for the resolution of a variety of complex financial and operational issues faced by the City. The City believes that adjustment of the City's debts pursuant to the Plan will provide the greatest recovery for creditors of the City, while simultaneously allowing for meaningful and necessary investment in the City.  The Plan contemplates the City's emergence from chapter 9 this year and represents a crucial step toward the City's rehabilitation and recovery from a decades-long downward spiral.

The Plan includes settlements that the City believes will inure to the benefit of the City's creditors and its residents. The City settled controversial and sensitive issues relating to the Detroit Institute of Arts (the "DIA"), which settlement is expected to yield at least $466 million to provide a source of recovery for the approximately 33,000 individuals who participate in the City's retirement systems – the General Retirement System and the Police and Fire Retirement System (together, the "Retirement Systems") and which will free up other funds for distribution to other creditors – and negotiated a settlement with the State of Michigan (the "State") for the benefit of Holders of Pension Claims.

Except in the case of Subordinated Claims, the Plan provides a recovery to all classes of Claims.  The Plan also allows for investment in the City of approximately $1.5 billion over ten years, which the City believes is critical and meaningful, in order to, among other things:  (a) provide basic, essential services to City residents; (b) attract new residents and businesses to foster growth and redevelopment; (c) reduce crime; (d) demolish blighted and dangerous properties; (e) provide functional streetlights that are aligned with the current population footprint; (f) improve information technology systems, thereby increasing efficiency and decreasing costs; and (g) otherwise set the City on a path toward a better future.

The City believes that the Plan gives the City the best chance of effectively adjusting its debts and reestablishing itself as a prosperous and productive American city.  All creditors entitled to vote are encouraged to vote in favor of the Plan.

**2.      Special Information Regarding Pension Claims**

THE PLAN, AND THE TREATMENT OF ALLOWED PENSION CLAIMS IN THE PLAN, ASSUME THE EXISTENCE AND THE IMPLEMENTATION OF THE DIA SETTLEMENT AND THE RECEIPT OF THE FULL

AMOUNT OF THE STATE CONTRIBUTION. IF THE DIA SETTLEMENT DOES NOT, IN FACT, OCCUR, OR IF THE FULL AMOUNT OF THE STATE CONTRIBUTION IS NOT, IN FACT, RECEIVED, THEN THE TREATMENT OF ALLOWED PENSION CLAIMS IN CLASSES 10 AND 11 WILL BE AT THE LOWER END OF THE TREATMENT PROVIDED FOR CLASSES 10 AND 11 IN THE PLAN. THE TREATMENT OF ALLOWED CLAIMS IN CLASSES 10 AND 11, AND THE SOURCES OF FUNDING FOR SUCH TREATMENT, ARE DISCUSSED BELOW.

In connection with the Bankruptcy Court's determination that the City is eligible to be a debtor under chapter 9 of the Bankruptcy Code, numerous City retirees, employees, their representatives (including the Retiree Committee) and other parties (including the Attorney General of the State of Michigan) advanced the argument that the Bankruptcy Court may not impair pension benefits because they are protected under Article IX, Section 24 (the "Pensions Clause") of Michigan's State Constitution of 1963 (the "Michigan Constitution"). As more fully described in Section VIII.D of this Disclosure Statement, however, on December 3, 2013, in a bench decision, the Bankruptcy Court ruled that the federal Bankruptcy Code authorizes impairment of the City's pension obligations, notwithstanding the Pensions Clause. Several objectors, including the Retiree Committee, have requested and obtained permission to appeal the Bankruptcy Court's eligibility ruling directly to the United States Court of Appeals for the Sixth Circuit (the "Sixth Circuit Court of Appeals"). It is uncertain what would be the effect of a reversal or modification of the Eligibility Order. In that event, the range of potential outcomes might include dismissal of City's chapter 9 case or a determination that the chapter 9 case may not impose reductions in accrued vested pension benefits for retirees or active employees even if assets sufficient to pay vested benefits in full did not exist.

The Plan provides that, on the Effective Date, the City will assume the obligations related to the already accrued benefits under the GRS pension plan and the PFRS pension plan *as those benefits will have been modified in the Plan*. This means that the City will not seek to terminate the GRS or the PFRS, although their respective pension plans will be closed to new participants and vested active employees will not continue to accrue additional pension benefits under the terms and conditions of the current plans, *i.e.*, the two plans will be "frozen." For a discussion of benefits to be accrued by active employees on or after July 1, 2014, see Sections I.A.201 and I.A.147 of the Plan, regarding the PFRS Hybrid Pension Formula and the GRS Hybrid Pension Formula. The City will continue to retain the responsibility to fund all amounts necessary to provide the adjusted (reduced) pension benefits to its employees and retirees who will have accrued benefits in either of the GRS or PFRS pension plans as of the Effective Date, although the City's contributions will be fixed during the period ending June 30, 2023. Thereafter, the City will be required to contribute all amounts necessary to fund the modified accrued pensions regardless of the actual future investment performance of the pension plan assets. Although, pursuant to the Plan, the City will provide necessary funding to support the reduced pension benefit levels after 2023, the level of funding necessary to support those reduced pension benefits will depend upon, among other things, future actuarial assumptions, changes in retiree mortality and investment returns. Using the assumptions adopted by the City in proposing the Plan, between 2023 and 2053 the City will contribute $2.698 billion, the present value of which is $992 million.

Based on reports prepared by the Retirement Systems' independent auditors, as of June 30, 2013, there were approximately 32,427 individuals who are entitled to benefits under the GRS and PFRS. As of June 30, 2013, in the PFRS pension plan there were 3,272 active employee members, 9,054 retiree members receiving benefits, and 111 members who are neither working for the City nor yet receiving benefits. As of June 30, 2013, in the GRS pension plan, there were 5,658 active employee members, 12,118 retiree members receiving benefits and 2,214 terminated plan members who are entitled to but not yet receiving benefits. The total number of current retirees is approximately 21,172. As of June 30, 2012, there were approximately 7,200 retirees in both systems over age 75. There were approximately 6,500 retirees who are age 65 or younger. According to the most recent annual reports published by the Retirement Systems, the average annual pension for a GRS retiree or beneficiary as of June 30, 2012 was $19,213, and the average annual pension for a PFRS retiree or beneficiary as of June 30, 2012 was $30,607.

In the past, the Retirement Systems engaged in a variety of practices that contributed considerably to the underfunding of the pension plans, particularly with respect to the GRS pension plan. As more fully discussed in Section VII.B.5.b, these practices included: (a) consuming pension fund assets to pay promised returns under the separate "annuity savings plan," whether or not such returns actually were realized; (b) dissipating pension fund assets during the years when returns on investment exceeded expectations through the so-called "13th check" program and (c) deferring required pension fund contributions from the City each year and financing the deferred amounts at a rate of 8%. Serious allegations also have been made that former officials of the Retirement Systems accepted bribes and misappropriated assets of the Retirement Systems for their own personal gain. In addition, the Retirement Systems have made many poor investments that have reduced the funded status of the two pension plans. Finally, it appears that a large portion of the assets of the respective Retirement Systems is invested in alternative investments for which no recognized market exists,

requiring valuation methodologies that generate estimates of value rather than prices drawn from active markets. As of June 30, 2013, approximately 24% of PFRS assets and 33% of GRS assets had estimated, rather than readily ascertainable, market values.

As a result of, among other things, these past practices, both the GRS and the PFRS are underfunded. Each of the Retirement Systems has reported unfunded actuarial accrued liabilities ("UAAL") that are substantially lower than the amounts disclosed by the City in the List of Claims. In particular, as of June 30, 2012, the GRS reported that it was 77.0% funded with a UAAL of $837.7 million out of $3.644 billion in accrued liabilities. As of June 30, 2012, the PFRS reported that it was 96.2% funded with a UAAL of $147.2 million out of $3.823 billion in accrued liabilities. Thus, based on actuarial assumptions and methods employed by the Retirement Systems prior to the commencement of the City's chapter 9 case, the estimated UAAL as of the end of Fiscal Year 2012 for both Retirement Systems combined was $984.9 million.

The City believes that the UAAL figures reported by the Retirement Systems were substantially understated because they were based upon various actuarial assumptions and methods that substantially understate the Retirement Systems' UAAL. The assumptions and methods included: (a) annual net rates of return on investments (GRS – 7.9%; PFRS – 8.0%) that were and are unrealistic in light of the Retirement Systems' demographics and the average of actual returns realized by both pension plans over the past 10-15 years, the targeted mix of the Retirement Systems' assets and the inability of the City to budget for and fund pension investment loss in the event the sought-after returns were not achieved; (b) the "smoothing" (reallocation over several years) of asset gains and losses over a seven year period, which masks the funding shortfall; and (c) the use of 29-year (PFRS) and 30-year (GRS) amortization periods for funding UAAL – which is applied anew each year to the full amount of unfunded liability – that allows unfunded liabilities to continue to grow rapidly as a result of compounding.

In the List of Claims, the City set forth what it believes is a more realistic total UAAL for the Retirement Systems of $3.474 billion, consisting of $2.037 billion in UAAL owed to the GRS and $1.437 billion in UAAL owed to the PFRS. The City's actuary, Milliman Inc., calculated this UAAL figure where by substituting the estimated market value of the Retirement Systems' assets for their actuarial value and using a more achievable assumed rate of return of 7.0% instead of the rates of return of 7.9% or 8.0% assumed by the Retirement Systems. If one were to apply even more realistic assumed rates of return of 6.25% for GRS and 6.50% for PFRS, respectively, the UAAL totals increase to $2.299 billion for the GRS, and $1.588 billion for the PFRS, as of the end of Fiscal Year 2012

To reduce the risk that the City has experienced from the past investment and discretionary benefit allowance practices of the GRS and PFRS pension funds, which contributed to the current underfunding in each of the pension funds, and to ensure that pension funding obligations do not impair the crucial Plan objective of assuring that the City will have sufficient funds to operate and to improve infrastructure and public safety, the City has developed the following pension restructuring approach: (a) the City has set a goal of achieving a 70% and 75% funded status for GRS and PFRS, based upon assumed investment rates of return of 6.25% and 6.50%, respectively, by June 30, 2023 (based on the market value of assets, not a smoothed value of assets); (b) the City has determined the cash contributions it can reasonably afford to make to each pension plan during the period ending June 30, 2023; and (c) the City has utilized a conservative investment return rate for each pension plan (discussed below). Based on these parameters, which were chosen to achieve predictable pension contributions over the long term and sufficient pension funding to provide benefits as modified, and to align the City's required future cash contributions to the plans with its reasonably projected revenues, the City has determined what pension benefit cuts are necessary from the participants in each pension plan.

Specifically, the calculation of the aggregate amount of the Allowed PFRS Claims in Class 10 utilizes, among other assumptions, a 6.50% discount rate to value liabilities and a 6.50% investment return rate for future growth of assets. This investment return rate is less than the net 8% investment return rate historically utilized by PFRS in calculating the actuarial underfunding of the PFRS pension plan. The calculation of the aggregate amount of the Allowed GRS Claims in Class 11 utilizes, among other assumptions, a 6.25% discount rate to value liabilities and a 6.25% investment return rate for future growth of assets. This investment return rate is less than the net 7.9% investment return rate historically utilized by GRS in calculating the actuarial underfunding of the GRS pension plan. In both cases, the City has utilized the lower rate as a measure to ensure that both GRS and PFRS utilize prudent and conservative investment policies going forward to protect the assets in both pension plans from unnecessary and imprudent risk of depletion to the detriment of the plan beneficiaries and also to insulate the City – given its extremely limited cash resources – from unforeseen and unbudgeted increases in required future contributions to the pension plans that could cause the City to experience budget deficits in the future. The Retiree Committee specifically disputes the City's contention that the proposed investment return and discount rates are appropriate given the asset allocation targets of the plans. The City's use of these revised investment return assumptions, however, is consistent with the trend by governmental entities to reduce pension investment return

assumptions, and (b) the particular rates used in the Plan – although lower than most jurisdictions – nonetheless align with the unique financial inability of the City to weather unanticipated pension investment loss. The City further believes that these conservative assumptions are also appropriate given the large percentage of investments held by the pension funds that do not have a readily determinable market value and the uncertainty to actual asset values held by the pension plans as a result.

Based on the City's projected cash flows, as more fully discussed in Section XI and Exhibit J, there is insufficient funding generated *solely* by projected City revenues in the first 10 years after the Effective Date to provide the returns to all creditors – including the higher returns to Holders of GRS Pension Claims and PFRS Pension Claims – that are contemplated in the Plan. As noted above, the Plan, and the higher level of treatment of Allowed GRS Claims and Allowed PFRS Claims (together, the "Allowed Pension Claims"), assume the existence and the implementation of the DIA Settlement and the receipt of the full amount of the State Contribution. If the DIA Settlement does not occur, or if the full amount of the State Contribution is not received, then the recoveries on account of all Unsecured Claims, including Pension Claims, will be materially diminished to the lower level of recoveries set forth in the Plan for Classes 10 and 11. See Comparison Chart, below.

Because the higher recoveries specified in the Plan for Classes 10 and 11 assume the existence of the DIA Settlement, and the State Contribution, the Plan assumes that, through June 30, 2023, the sole sources of funding for Allowed Pension Claims in Classes 10 and 11 consist of: (a) for PFRS, certain DIA Proceeds and certain funds from the State Contribution Agreement; and (b) for GRS, amounts received on an accelerated basis from DWSD for its portion of the GRS pension plan underfunding and certain proceeds from the DIA Settlement. *There is no funding available to the pension funds from the City's General Fund through June 30, 2023.* Instead, any excess cash not required for City operations in this time frame will be utilized for reinvestment in City services and payments to the Holders of Allowed Unsecured Claims in Classes 7, 9, 12, 13 and 14. For the 10 years following June 30, 2023, the Plan assumes that the sources of funding for Allowed Pension Claims in Classes 10 and 11 consist of: (a) for PFRS, amounts received from the City's General Fund; and (b) for GRS, amounts received from the DIA Settlement and the remaining portion of the State Contribution, as well as amounts from the City's General Fund. Importantly, the Plan assumes that DWSD will accelerate, or prefund, the majority of its full allocable share of the GRS UAAL such that, after the initial 10 year period through June 30, 2023 is completed and the unused DIA Settlement and State settlement moneys are received by the GRS, DWSD will have very small contributions, if any, to make to the GRS. The City believes that such prefunding is consonant with applicable state and local law that permits DWSD to be charged, and pay directly to the GRS, its allocable share of the periodic contributions required to be made to the GRS as a cost and expense of operating the City's water and sewer systems. Although DWSD will be prefunding most or all of its full allocable share of the City's GRS pension funding obligations (*i.e.*, funding the majority of such share over 10 years instead of a longer period), it will not be funding any more than its full actual, allocable share of the GRS UAAL. If DWSD cannot prefund its actual allocable share to the GRS pension fund, then the cuts to GRS pension beneficiaries would have to be higher than those contemplated in the Plan.

After 2033, the GRS and PFRS pension plans will no longer receive funds arising from the DIA Settlement, the State Contribution Agreement or the prefunding provided by DWSD. After 2033, the City itself will bear the obligation of making required contributions to the GRS and PFRS pension plans.

**If the pension plan contribution amounts through June 30, 2023 are not approved as part of confirming the Plan, then the cuts to accrued pension benefits will be at the higher levels of the cuts set forth in the treatment of Classes 10 and 11 in the Plan. See Comparison Chart, below.**

*Holders of PFRS Pension Claims and GRS Pension Claims will generally receive the following amounts:*

| Estimated Adjustments to Pension Benefits if Classes 10 and 11 Vote Yes on the Plan and DIA Settlement and State Contribution Funding is Received | |
|---|---|
| **PFRS** | **GRS** |
| 6% reduction in current and future monthly pension payments + elimination of cost of living adjustment ("COLA") (*i.e.*, receipt of 94% of current pension but no COLA adjustments)<br><br>COLA is approximately 18% of benefits | 26% reduction in current and future monthly pension payments + elimination of COLA (*i.e.*, receipt of 74% of current pension but no COLA adjustments)<br><br>COLA is approximately 13% of benefits |
| Estimated Adjustments to Pension Benefits if either Class 10 or Class 11 Votes No on the Plan and the DIA Settlement and State Contribution Funding is <u>NOT</u> Received | |
| **PFRS** | **GRS** |
| 14% reduction in current and future monthly pension payments + elimination of COLA (*i.e.*, receipt of 86% of current pension but no COLA adjustments)<br><br>COLA is approximately 18% of benefits | 34% reduction in current and future monthly pension payments + elimination of COLA (*i.e.*, receipt of 66% of current pension but no COLA adjustments)<br><br>COLA is approximately 13% of benefits |

### (a)     PFRS Pension Claim Holders

*Retired Beneficiaries.* A Holder of a PFRS Pension Claim who is retired from the City, or disabled, or who is a surviving beneficiary and is drawing a monthly pension from PFRS will have his or her pension *reduced by an estimated 14%,* and will receive a monthly pension equal to an estimated 86% of the amount currently being received. In addition, such Holder will not receive the value of any future cost of living adjustments – also known as COLA payments – to his or her monthly pension. In Fiscal Year 2013, COLA payments amounted to approximately 18% of the value of PFRS retirees' pension benefit. *If at least one half in number and two thirds in amount of Holders of PFRS Pension Claims and Holders of GRS Pension Claims separately vote in favor of the Plan, then the Holders of all such Claims shall be deemed to have entered into a timely settlement with the City and the State. In this event, the monthly pension of Holders of PFRS Pension Claims would be reduced by an estimated 6% (instead of 14%), and such Holders would receive a monthly pension equal to an estimated 94% of the current monthly amount, with no future COLA payments.* The Plan also contemplates that benefits may be reduced more than 6% if one of the Foundations or the DIA Corp. does not make its promised contribution. It cannot be predicted with any certainty at this time how much of a reduction may occur if such a funding default were to happen.

*Active and Terminated Vested Beneficiaries.* A Holder of a PFRS Pension Claim who is an active employee of the City, or who is a former employee who is not yet receiving a pension, and who has accrued a pension from PFRS as of July 1, 2014 will have such accrued pension frozen and then *reduced by an estimated 14%.* In addition, he or she will not receive COLA payments. *If at least one half in number and two thirds in amount of Holders of PFRS Pension Claims and Holders of GRS Pension Claims separately vote in favor of the Plan, then the Holders of all such Claims shall be deemed to have entered into a timely settlement with the City and the State. In this event, the monthly pension of Holders of PFRS Pension Claims would be reduced by an estimated 6% (instead of 14%), and such Holders would receive a monthly pension equal to an estimated 94% of the current monthly amount, with no future COLA payments.* The Plan also contemplates that benefits may be reduced more than 6% if one of the Foundations or the DIA Corp. does not make its promised contribution. It cannot be predicted with any certainty at this time how much of a reduction may occur if such a funding default were to happen. Moreover, in the event the unfunded liabilities of the PFRS for the Fiscal Year ending June 30, 2014 exceed the unfunded PFRS liabilities as of June 30, 2013, active employees who are Holders of PFRS Pension Claims will have their monthly pension amounts further reduced to take account of the increase in the unfunded liabilities.

These reductions for both retired beneficiaries and active beneficiaries will remain in effect for the 10-year period ending June 30, 2023. If, during this 10-year period, the returns on PFRS' invested assets, other actuarial experience or other contributions result in an improvement to the funding level (based on the market value of assets) of PFRS so that PFRS is projected to have a funding level of more than 80% by June 30, 2023 (based on the market value of assets), modified accrued benefits reduced as described herein – including future COLA payments – may be restored, but only by an amount such that, when taking into account the value of the restored benefits, PFRS will still have a projected 80% funding level. Any pension restoration will first be used to increase the PFRS Adjusted Pension Amount to existing retirees; additional pension restoration will be used to increase the PFRS Adjusted Pension Amount to terminated vested employees and active employees. Any additional pension restoration beyond increasing the PFRS Adjusted Pension Amount will then be used to provide a COLA. The precise amount of the restoration within these categories will be determined by the PFRS trustees, and at least a majority of such trustees will be independent trustees. Under the Plan, the PFRS trustees may not increase the PFRS Adjusted Pension Amount if it causes PFRS to fall below an 80% funding level determined as of June 30, 2023. On or after June 30, 2023, the City and the applicable unions representing safety employees, with the consent of the PFRS trustees, may restore any pension cuts without regard to the 80% funding level and increase the PFRS Adjusted Pension Amount to the extent it is prudent to do so and such increase is legally permitted. ***Restoration of benefits, particularly until 2023, cannot be assured. After 2023, restoration of certain benefits may be possible, but it cannot be predicted at this time whether or when any restoration will occur.***

Members of PFRS who are active employees and who continue to work for the City after July 1, 2014, will earn a new monthly pension under a new hybrid pension plan (the "PFRS Hybrid Pension Formula") that will be paid at retirement along with the PFRS Adjusted Pension Amount. The pension formula for years of service after July 1, 2014 will be less generous than the formula that currently applies to PFRS pensions. For further information regarding the PFRS Hybrid Pension Formula, see Section I.A.201 of the Plan.

**(b)        GRS Pension Claim Holders**

*Retired Beneficiaries.* A Holder of a GRS Pension Claim who is retired from the City, or disabled, or a surviving beneficiary, and is drawing a monthly pension from GRS will have such pension *reduced by an estimated 34%*, and will receive a monthly pension equal to an estimated 66% of the amount currently being received. In addition, such Holder will lose eligibility for, and will not receive the value of, any future cost of living adjustments – also known as COLA payments – to his or her monthly pension. In Fiscal Year 2013, COLA payments amounted to approximately 13% of the value of each GRS retirees' pension benefit. ***If at least one half in number and two thirds in amount of Holders of PFRS Pension Claims and Holders of GRS Pension Claims separately vote in favor of the Plan, then the Holders of all such Claims shall be deemed to have entered into a timely settlement with the City and the State. In this event, the monthly pension of Holders of GRS Pension Claims would be reduced by an estimated 26% (instead of 34%), and such Holders would receive a monthly pension equal to an estimated 74% of the current monthly amount, with no future COLA payments.*** The Plan also contemplates that benefits may be reduced more than 26% if one of the Foundations or the DIA Corp. does not make its promised contribution. It cannot be predicted with any certainty at this time how much of a reduction may occur if such a funding default were to happen.

*Active and Terminated Vested Beneficiaries.* A Holder of a GRS Pension Claim who is an active employee of the City, or who is a former employee who is not yet receiving a pension, and who has accrued a pension from the GRS as of July 1, 2014, will have such accrued pension frozen and then *reduced by an estimated 34%* and will not receive COLA payments. ***If at least one half in number and two thirds in amount of Holders of PFRS Pension Claims and Holders of GRS Pension Claims separately vote in favor of the Plan, then the Holders of all such Claims shall be deemed to have entered into a timely settlement with the City and the State. In this event, the reduction to the pension that will be earned as of July 1, 2014 would be 26% (instead of 34%), and such Holder will receive a monthly pension at retirement equal to an estimated 74% of the amount earned as of July 1, 2014, with no COLA payments.*** The Plan also contemplates that benefits may be reduced more than 26% if one of the Foundations or the DIA Corp. does not make its promised contribution. It cannot be predicted with any certainty at this time how much of a reduction may occur if such a funding default were to happen. Moreover, in the event the unfunded liabilities of the GRS for the Fiscal Year ending June 30, 2014 exceed the unfunded GRS liabilities as of June 30, 2013, active employees who are Holders of GRS Pension Claims will have their monthly pension amounts further reduced to take account of the increase in the unfunded liabilities.

Members of GRS who are active employees and who continue to work for the City after July 1, 2014, will earn a new monthly pension under a new hybrid pension plan (the "GRS Hybrid Pension Formula") that will be paid at retirement along with the GRS Adjusted Pension Amount. The pension formula for years of service after July 1, 2014 will be less

-13-

13-53846-swr   Doc 8372   Filed 03/31/14   Entered 03/31/14 18:36:38   Page 26 of 602

generous than the formula that currently applies to GRS pensions. For further information regarding the GRS Hybrid Pension Formula, see Section I.A.147 of the Plan.

The City believes that allocations to the Annuity Savings Fund ("ASF") accounts maintained by GRS participants during the period beginning July 1, 2003 and ending June 30, 2013, were imprudent and excessive, draining GRS assets that should have been used to fund accrued GRS pensions. GRS employees who maintained ASF accounts during the period July 1, 2003 through June 30, 2013 received annual interest credits to their respective accounts of no less than 7.9%, and in some years more than 7.9%. This was true regardless of the actual investment returns on the assets in the ASF accounts. Consequently, to shore up GRS' underfunding, the Plan also provides for a recoupment of a portion of such excess. GRS members who maintained an ASF account at any time during the period July 1, 2003 through June 30, 2013 will be subject to a pension adjustment. As part of the Plan, the City will seek to recoup certain amounts related to the ASF program in addition to the other reductions to GRS pensions, as follows:

- Active or Terminated Employee Recoupment. For each active employee, or terminated employee, who continues to maintain an ASF account in GRS, the City will recalculate that employee's ASF account value by applying the "Actual Return." The "Actual Return" means the actual net return percentage on invested GRS assets for each year from July 1, 2003 through June 30, 2013 unless the return is greater than 7.9% (in which case 7.9% will be used) or less than 0% (in which case 0% will be used). The difference between the value of such participant's re-calculated ASF account using the Actual Return and the actual value of such participant's ASF account as of June 30, 2013 is the "Annuity Savings Fund Excess Amount." The Annuity Savings Fund Excess Amount will then be deducted from such GRS participant's ASF account and contributed to the pool of all GRS assets. The pool of all GRS assets can be used to fund all GRS pensions. Class 10 GRS Ballots will show any Annuity Savings Fund Excess Amount. *Even with the recouped amount, the value of each Annuity Savings Fund account after recoupment will be greater than the amounts actually contributed by the holder of such Annuity Savings Fund account into the Annuity Savings Fund.*

- Recoupment from Persons who Previously Took Annuity Savings Fund Account Distributions. For each GRS participant who participated in the ASF at any time during the period from July 1, 2003 through June 30, 2013, but who has already received a distribution from the ASF, the City will re-calculate that participant's ASF account value by applying the Actual Return, as defined above. The difference between the value of such participant's re-calculated ASF account using the Actual Return and the actual value of such participant's ASF account as of June 30, 2013 is the Annuity Savings Fund Excess Amount, as defined above. For each such GRS participant, the Annuity Savings Fund Excess Amount will then be converted into an annual annuity amount based on such participant's life expectancy and other factors. This Annuity Savings Fund Excess Amount – expressed in the form of an annual annuity – will then be recouped by deducting it from such participant's annual pension amount. Class 10 GRS Ballots will show (i) the difference between the ASF payout received and the Annuity Savings Fund Excess Amount and (ii) the converted lifetime annuity equal in value to Annuity Savings Fund Excess Amount (expressed in a monthly amount), which monthly amount will then be deducted from such participant's monthly GRS pension payments.

*Restoring Reduced Pensions.* These reductions for both retired beneficiaries and active beneficiaries will remain in effect for the 10-year period ending June 30, 2023. If, during this 10 year period, the returns on GRS' invested assets, other actuarial experience or other contributions result in an improvement of the funding level (based on the market value of assets) of GRS so that GRS is projected to have a funding level of more than 80% by June 30, 2023 (based on the market value of assets), modified accrued benefits reduced as described herein – including future COLA payments – may be restored, but only by an amount such that, when taking into account the value of the restored benefits, GRS will still have a projected 80% funding level. Any pension restoration will first be used to increase the GRS Adjusted Pension Amount to existing retirees; additional pension restoration will be used to increase the GRS Adjusted Pension Amount to terminated vested employees and active employees. Any additional pension restoration beyond increasing the GRS Adjusted Pension Amount will then be used to provide a COLA. The precise amount of the restoration within these categories will be determined by the GRS trustees, and at least a majority of such trustees will be independent. Under the Plan, the GRS trustees may not increase the GRS Adjusted Pension Amount if it causes GRS to fall below an 80% funding level determined as of June 30, 2023. On or after June 30, 2023, the City and the applicable unions representing GRS employees, with the consent of the GRS trustees, may restore any pension cuts and increase the GRS Adjusted Pension Amount without regard to the 80% funding level to the extent it is prudent to do so and such increase is legally permitted.

*Restoration of benefits, particularly until 2023, cannot be assured. After 2023, restoration of certain benefits may be possible, but it cannot be predicted at this time whether or when any restoration will occur.*

      (c)      **All Holders of Pension Claims**

<u>Hardship Fund for Pensioners.</u> Additional benefits may be provided to those Holders of PFRS Pension Claims and GRS Pension Claims who are most in need.

<u>RELEASE OF STATE.</u> WITHOUT LIMITING ANY OTHER APPLICABLE PROVISIONS OF, OR RELEASES CONTAINED IN, THE PLAN OR ANY CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS OR DOCUMENTS TO BE ENTERED INTO OR DELIVERED IN CONNECTION WITH THE PLAN, AS OF THE EFFECTIVE DATE, IN CONSIDERATION FOR THE OBLIGATIONS OF THE CITY UNDER THE PLAN AND THE CONSIDERATION AND OTHER CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS OR DOCUMENTS TO BE ENTERED INTO OR DELIVERED IN CONNECTION WITH THE PLAN (INCLUDING THE STATE CONTRIBUTION AGREEMENT), IF THE STATE CONTRIBUTION AGREEMENT IS CONSUMMATED AND THE RELEASE SET FORTH AT SECTION III.D.7.b OF THE PLAN IS APPROVED BY THE BANKRUPTCY COURT, EACH HOLDER OF A PENSION CLAIM WILL BE DEEMED TO FOREVER RELEASE, WAIVE AND DISCHARGE ALL LIABILITIES ARISING FROM OR RELATED TO THE CITY, THE CHAPTER 9 CASE, THE PLAN, ALL EXHIBITS, THE DISCLOSURE STATEMENT, PA 436 AND ITS PREDECESSOR OR REPLACEMENT STATUTES, AND ARTICLE IX, § 24 OF THE MICHIGAN CONSTITUTION THAT SUCH PARTY HAS, HAD OR MAY HAVE AGAINST THE STATE AND ANY STATE RELATED ENTITIES. <u>See</u> Section III.D.7 of the Plan.

THE LOWER LEVELS OF ESTIMATED PENSION REDUCTIONS DESCRIBED ABOVE FOR CLASSES 10 AND 11 ASSUME THE EXISTENCE AND THE IMPLEMENTATION OF THE DIA SETTLEMENT AND THE RECEIPT OF THE FULL AMOUNT OF THE STATE CONTRIBUTION AS WELL AS DWSD'S MAKING ACCELERATED PENSION CONTRIBUTIONS TO THE GRS OVER THE FISCAL PERIOD ENDING JUNE 30, 2023. IN THE EVENT THAT ANY OF THESE EVENTS DO NOT OCCUR, THE REDUCTIONS TO ACCRUED BENEFITS DESCRIBED IN THIS SECTION WILL BE MATERIALLY GREATER AS DESCRIBED IN THE HIGHER LEVEL OF ESTIMATED PENSION REDUCTIONS DESCRIBED ABOVE FOR CLASSES 10 AND 11. <u>See</u> Section VI of this Disclosure Statement.

## B.     Classification and Treatment of Claims Under the Plan

Except for Administrative Claims, which are not required to be classified, all Claims that existed on July 18, 2013 (the "Petition Date") are divided into classes under the Plan.  The following summarizes the treatment of the classified Claims under the Plan.

| Description and Amount of Claims | Treatment |
|---|---|
| **Class 1A - DWSD Class A Water Claims (with subclasses for each CUSIP of DWSD Class A Water Bonds)**:  Consists of all Claims arising under or evidenced by the DWSD Class A Water Documents, including a Claim for principal and interest on the DWSD Class A Water Bonds.<br><br>Estimated Aggregate Allowed Amount: $322,000,000 | Impaired.  Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed DWSD Class A Water Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as reasonably practicable after the Effective Date, New Water/Sewer Bonds having a principal amount equal to the principal amount of the DWSD Class A Water Bonds held by such Holder; provided that, in lieu of the foregoing treatment, the City alternatively may elect to:  (1) if a DWSD Transaction is consummated on the Effective Date, provide a Holder of an Allowed DWSD Class A Water Claim with Cash in the full amount of such Allowed DWSD Class A Water Claim; or (2) if a DWSD Transaction is not consummated on the Effective Date, Reinstate any DWSD Class A Water Bonds by filing a notice of such Reinstatement prior to the commencement of the Confirmation Hearing.<br><br>Treatment Option for Classes that Accept the Plan:  Each Holder of an Allowed DWSD Class A Water Claim in a Class of DWSD Class A Water Claims that accepts the Plan may elect to receive New Existing Rate Water/Sewer Bonds having a principal amount equal to the principal amount of the DWSD Class A Water Bonds held by such Holder in lieu of New Water/Sewer Bonds.  An election to receive New Existing Rate Water/Sewer Bonds pursuant to the foregoing sentence constitutes an irrevocable waiver of any and all rights to object to the Plan on any grounds, and any such objection may be disregarded by the Bankruptcy Court solely on the basis of such election.<br><br>Estimated Percentage Recovery:  100% of principal amount |
| **Class 1B - DWSD Class B Water Claims (with subclasses for each CUSIP of DWSD Class B Water Bonds)**:  Consists of all Claims arising under or evidenced by the DWSD Class B Water Documents, including a Claim for principal and interest on the DWSD Class B Water Bonds.<br><br>Estimated Aggregate Allowed Amount: $2,162,925,000 | Impaired.  Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed DWSD Class B Water Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as reasonably practicable after the Effective Date, New Water/Sewer Bonds having a principal amount equal to the principal amount of the DWSD Class B Water Bonds held by such Holder; provided that, in lieu of the foregoing treatment, the City alternatively may elect to:  (1) if a DWSD Transaction is consummated on the Effective Date, provide a Holder of an Allowed Class B Water Claim with Cash in the full amount of such Allowed DWSD Class B Water Claim; or (2) if a DWSD Transaction is not consummated on the Effective Date, Reinstate any DWSD Class B Water Bonds by filing a notice of such Reinstatement prior to the commencement of the Confirmation Hearing.<br><br>Treatment Option for Classes that Accept the Plan:  Each Holder of an Allowed DWSD Class B Water Claim in a Class of DWSD Class B Water Claims that accepts the Plan may elect to receive New Existing Rate Water/Sewer Bonds having a principal amount equal to the principal amount of the DWSD Class B Water Bonds held by such Holder in lieu of New Water/Sewer Bonds.  An election to receive New Existing Rate Water/Sewer Bonds pursuant to the foregoing sentence constitutes an irrevocable waiver of any and all rights to object to the Plan on any grounds, and any such objection may be disregarded by the Bankruptcy Court solely on the basis of such election.<br><br>Estimated Percentage Recovery:  100% of principal amount |

-16-

13-53846-swr   Doc 8330   Filed 03/31/14   Entered 03/31/14 18:36:38   Page 29 of 602
13-53846-swr   Doc 8330   Filed 03/31/14   Entered 03/31/14 08:24:00   Page 29 of 182

| Description and<br>Amount of Claims | Treatment |
|---|---|
| **Class 1C - DWSD Class A Sewer Claims (with subclasses for each CUSIP of DWSD Class A Sewer Bonds)**: Consists of all Claims arising under or evidenced by the DWSD Class A Sewer Documents, including a Claim for principal and interest on the DWSD Class A Sewer Bonds.<br><br>Estimated Aggregate Allowed Amount: $439,035,000 | Impaired. Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed DWSD Class A Sewer Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as reasonably practicable after the Effective Date, New Water/Sewer Bonds having a principal amount equal to the principal amount of the DWSD Class A Sewer Bonds held by such Holder; provided that, in lieu of the foregoing treatment, the City alternatively may elect to: (1) if a DWSD Transaction is consummated on the Effective Date, provide a Holder of an Allowed DWSD Class A Sewer Claim with Cash in the full amount of such Allowed DWSD Class A Sewer Claim; or (2) if a DWSD Transaction is not consummated on the Effective Date, Reinstate any DWSD Class A Sewer Bonds by filing a notice of such Reinstatement prior to the commencement of the Confirmation Hearing.<br><br>Treatment Option for Classes that Accept the Plan: Each Holder of an Allowed DWSD Class A Sewer Claim in a Class of DWSD Class A Sewer Claims that accepts the Plan may elect to receive New Existing Rate Water/Sewer Bonds having a principal amount equal to the principal amount of the DWSD Class A Sewer Bonds held by such Holder in lieu of New Water/Sewer Bonds. An election to receive New Existing Rate Water/Sewer Bonds pursuant to the foregoing sentence constitutes an irrevocable waiver of any and all rights to object to the Plan on any grounds, and any such objection may be disregarded by the Bankruptcy Court solely on the basis of such election.<br><br>Estimated Percentage Recovery: 100% of principal amount |
| **Class 1D - DWSD Class B Sewer Claims (with subclasses for each CUSIP of DWSD Class B Sewer Bonds)**: Consists of all Claims arising under or evidenced by the DWSD Class B Sewer Documents, including a Claim for principal and interest on the DWSD Class B Sewer Bonds.<br><br>Estimated Aggregate Allowed Amount: $2,348,280,054 | Impaired. Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed DWSD Class B Sewer Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as reasonably practicable after the Effective Date, New Water/Sewer Bonds having a principal amount equal to the principal amount of the DWSD Class B Sewer Bonds held by such Holder; provided that, in lieu of the foregoing treatment, the City alternatively may elect to: (1) if a DWSD Transaction is consummated on the Effective Date, provided a Holder of an Allowed DWSD Class B Sewer Claim with Cash in the full amount of such Allowed DWSD Class B Sewer Claim; or (2) if a DWSD Transaction is not consummated on the Effective Date, Reinstate any DWSD Class B Sewer Bonds by filing a notice of such Reinstatement prior to the commencement of the Confirmation Hearing.<br><br>Treatment Option for Classes that Accept the Plan: Each Holder of an Allowed DWSD Class B Sewer Claim in a Class of DWSD Class B Sewer Claims that accepts the Plan may elect to receive New Existing Rate Water/Sewer Bonds having a principal amount equal to the principal amount of the DWSD Class B Sewer Bonds held by such Holder in lieu of New Water/Sewer Bonds. An election to receive New Existing Rate Water/Sewer Bonds pursuant to the foregoing sentence constitutes an irrevocable waiver of any and all rights to object to the Plan on any grounds, and any such objection may be disregarded by the Bankruptcy Court solely on the basis of such election.<br><br>Estimated Percentage Recovery: 100% of principal amount |

| Description and<br>Amount of Claims | Treatment |
|---|---|
| **Class 1E - DWSD Revolving Sewer Bond Claims (with subclasses for each DWSD Series of DWSD Revolving Sewer Bonds)**: Consists of all Claims arising under or evidenced by the DWSD Revolving Sewer Bond Documents, including a Claim for principal and interest on the DWSD Revolving Sewer Bonds.<br><br>Estimated Aggregate Allowed Amount: $486,047,364 | Impaired. If a DWSD Transaction is not consummated on the Effective Date, each Holder of an Allowed DWSD Revolving Sewer Bond Claim shall have its Allowed DWSD Revolving Sewer Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.<br><br>If a DWSD Transaction is consummated on the Effective Date, each Holder of an Allowed DWSD Revolving Sewer Bond Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as reasonably practicable after the Effective Date, New GLWA Revolving Bonds having a principal amount equal to the principal amount of the DWSD Revolving Sewer Bonds held by such Holder, unless such Holder agrees to a different treatment of such Claim.<br><br>Estimated Percentage Recovery: 100% of principal amount |
| **Class 1F - DWSD Revolving Water Bond Claims (with subclasses for each DWSD Series of DWSD Revolving Water Bond)**: Consists of all Claims arising under or evidenced by the DWSD Revolving Water Bond Documents, including a Claim for principal and interest on the DWSD Revolving Water Bonds.<br><br>Estimated Aggregate Allowed Amount: $21,589,986 | Impaired. If a DWSD Transaction is not consummated on the Effective Date, each Holder of an Allowed DWSD Revolving Water Bond Claim shall have its Allowed DWSD Revolving Water Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.<br><br>If a DWSD Transaction is consummated on the Effective Date, each Holder of an Allowed DWSD Revolving Water Bond Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as reasonably practicable after the Effective Date, New GLWA Revolving Bonds having a principal amount equal to the principal amount of the DWSD Revolving Water Bonds held by such Holder, unless such Holder agrees to a different treatment of such Claim.<br><br>Estimated Percentage Recovery: 100% of principal amount |
| **Class 2A - Secured GO Series 2010 Claims**: Consists of all Claims arising under or evidenced by the Secured GO Series 2010 Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010 Bonds.<br><br>Estimated Aggregate Allowed Amount: $252,475,366 | Unimpaired. On the Effective Date, each Holder of an Allowed Secured GO Series 2010 Claim shall have its Allowed Secured GO Series 2010 Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.<br><br>Estimated Percentage Recovery: 100% |
| **Class 2B - Secured GO Series 2010(A) Claims**: Consists of all Claims arising under or evidenced by the Secured GO Series 2010(A) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010(A) Bonds.<br><br>Estimated Aggregate Allowed Amount: $101,707,848 | Unimpaired. On the Effective Date, each Holder of an Allowed Secured GO Series 2010(A) Claim shall have its Allowed Secured GO Series 2010(A) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.<br><br>Estimated Percentage Recovery: 100% |

-18-

13-53846-swr  Doc 8372  Filed 03/31/14  Entered 03/31/14 08:24:08  Page 31 of 162
13-53846-swr  Doc 8372  Filed 03/31/14  Entered 03/31/14 10:36:38  Page 31 of 602

| Description and Amount of Claims | Treatment |
|---|---|
| **Class 2C - Secured GO Series 2012(A)(2) Claims**: Consists of all Claims arising under or evidenced by the Secured GO Series 2012(A)(2) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010(A)(2) Bonds.<br><br>Estimated Aggregate Allowed Amount: $39,254,171 | Unimpaired. On the Effective Date, each Holder of an Allowed Secured GO Series 2012(A)(2) Claim shall have its Allowed Secured GO Series 2012(A)(2) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.<br><br>Estimated Percentage Recovery: 100% |
| **Class 2D - Secured GO Series 2012(A2-B) Claims**: Consists of all Claims arising under or evidenced by the Secured GO Series 2012(A2-B) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(A2-B) Bonds.<br><br>Estimated Aggregate Allowed Amount: $54,055,927 | Unimpaired. On the Effective Date, each Holder of an Allowed Secured GO Series 2012(A2-B) Claim shall have its Allowed Secured GO Series 2012(A2-B) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.<br><br>Estimated Percentage Recovery: 100% |
| **Class 2E - Secured GO Series 2012(B) Claims**: Consists of all Claims arising under or evidenced by the Secured GO Series 2012(B) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(B) Bonds.<br><br>Estimated Aggregate Allowed Amount: $6,469,135 | Unimpaired. On the Effective Date, each Holder of an Allowed Secured GO Series 2012(B) Claim shall have its Allowed Secured GO Series 2012(B) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.<br><br>Estimated Percentage Recovery: 100% |
| **Class 2F - Secured GO Series 2012(B2) Claims**: Consists of all Claims arising under or evidenced by the Secured GO Series 2012(B2) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(B2) Bonds.<br><br>Estimated Aggregate Allowed Amount: $31,037,724 | Unimpaired. On the Effective Date, each Holder of an Allowed Secured GO Series 2012(B2) Claim shall have its Allowed Secured GO Series 2012(B2) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.<br><br>Estimated Percentage Recovery: 100% |
| **Class 3 - Other Secured Claims**: Consists of all Secured Claims, other than COP Swap Claims, DWSD Class A Sewer Claims, DWSD Class A Water Claims, DWSD Class B Sewer Claims, DWSD Class B Water Claims, DWSD Revolving Bond Claims, HUD Installment Note Claims, Parking Bond Claims or Secured GO Bond Claims.<br><br>Estimated Aggregate Allowed Amount: $8,855,456 | Unimpaired. On the Effective Date, each Holder of an Allowed Other Secured Claim shall have its Allowed Other Secured Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.<br><br>Estimated Percentage Recovery: 100% |

| Description and Amount of Claims | Treatment |
|---|---|
| **Class 4 - HUD Installment Note Claims**: Consists of all Claims arising under or evidenced by the HUD Installment Note Documents, including a Claim for principal and interest on the HUD Installment Notes.<br><br>Estimated Aggregate Allowed Amount: $90,075,004 | Unimpaired. On the Effective Date, each Holder of a HUD Installment Note Claim shall have its Allowed HUD Installment Note Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.<br><br>Estimated Percentage Recovery: 100% |
| **Class 5 - COP Swap Claims**: Consists of all Claims by the Swap Counterparties arising under the COP Swap Documents.<br><br>Estimated Aggregate Allowed Amount: $288,000,000 | Impaired. The COP Swap Claims shall be deemed Allowed as Secured Claims, which, solely for purposes of distributions from the City, will be equal to the Distribution Amount. Each Holder of an Allowed COP Swap Claim, in full satisfaction of such Allowed Claim, shall receive, either: (1) within thirty days following the Effective Date, the Net Amount in full in cash, provided that until paid in cash in full, such Secured Claims will remain secured by the Pledged Property; or (2) solely in the case of a Liquidity Event, the Net Amount in cash in full within 180 days following the Effective Date, provided that (a) other than with respect to net proceeds used to repay the Postpetition Financing Agreement, to the extent permitted by law but without taking into consideration any limitations imposed by the City, including in any ordinance or resolution of the City, the first dollars of any net cash proceeds of any financing or refinancing consummated in connection with, or subsequent to, the consummation of such Plan and either (i) supported by the full faith and credit of the City or (ii) payable from the general fund of the City, will be used to pay the Net Amount, (b) the City will continue to comply with its obligations under the COP Swap Settlement and the COP Swap Settlement Approval Order until the Net Amount is paid in cash in full, (c) until paid in cash in full, such Secured Claims will remain secured by the Pledged Property, (d) from and after the Effective Date, the unpaid Net Amount will accrue interest at the rate applicable to obligations under the Postpetition Financing Agreement plus 1.5% with the interest obligation likewise being secured by the Pledged Property, and (e) the COP Swap Counterparties will receive from the City on the Effective Date a deferral fee in cash equal to 1.0% of the Net Amount to be shared equally between them.<br><br>Estimated Percentage Recovery: 30% of the Swap Termination Payment |
| **Class 6 – Parking Bonds Claims**: Consists of all Claims arising under or evidenced by the Parking Bond Documents, including a Claim for principal and interest on the Parking Bonds.<br><br>Estimated Aggregate Allowed Amount: $8,099,287 | Unimpaired. On the Effective Date, each Holder of an Allowed Parking Bonds Claim shall have its Allowed Parking Bonds Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.<br><br>Estimated Percentage Recovery: 100% |
| **Class 7 – Limited Tax General Obligation Bond Claims**: Consists of all Claims arising under or evidenced by the Limited Tax General Obligation Bond Documents, including a Claim for principal and interest on the Limited Tax General Obligation Bonds.<br><br>Estimated Aggregate Allowed Amount: $163,543,187 | Impaired. Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Limited Tax General Obligation Bond Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of New B Notes.<br><br>Estimated Percentage Recovery: 15% |

| Description and<br>Amount of Claims | Treatment |
|---|---|
| **Class 8 – Unlimited Tax General Obligation Bond Claims**: Consists of all Claims arising under or evidenced by the Unlimited Tax General Obligation Bond Documents, including a Claim for principal and interest on the Unlimited Tax General Obligation Bonds.<br><br>Estimated Aggregate Allowed Amount: $374,661,332 | Impaired.  Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Unlimited Tax General Obligation Bond Claim, in full satisfaction of such Allowed Claim, shall receive its Pro Rata share of Plan UTGO Notes on or as soon as reasonably practicable after the Effective Date.  The maturity(ies) of the Plan UTGO Notes shall be no longer than the existing maturity(ies) of each series of Unlimited Tax General Obligation Bonds receiving Plan UTGO Notes.  The Plan UTGO Notes shall contain such other terms as will result in each Holder of an Allowed Unlimited Tax General Obligation Bond Claim receiving a payment stream, the present value of which is equal to approximately 15% of such Holder's Allowed Unlimited Tax General Obligation Bond Claim as of the Effective Date.<br><br>Estimated Percentage Recovery:  15% |

13-53846-swr   Doc 3382   Filed 03/31/14   Entered 03/31/14 16:36:58   Page 34 of 162

| Description and<br>Amount of Claims | Treatment |
|---|---|
| **Class 9 - COP Claims**: Consists of all Claims under or evidenced by the COP Service Contracts.<br><br>Estimated Aggregate Allowed Amount: *To Be Determined* | *The COP Claims are Disputed Claims and are not Allowed by the Plan, and the City reserves all rights to (1) object to, avoid or subordinate such Claims on any and all available grounds, including through the assertion of any and all grounds asserted in the COP Litigation, and (2) assign the right to object to, avoid or subordinate such Claims or the City's rights in the COP Litigation to the Creditor Representative. The treatment set forth below in respect of the COP Claims is afforded only if and to the extent that such Claims ultimately become Allowed Claims.*<br><br>Impaired. Solely for purposes of facilitating Distributions under this Plan and for no other purpose, on and as of the Effective Date, those portions of COP Claims that relate to, and are measured by, the payment schedule under the COPs shall be deemed assigned to the beneficial holders of the COPs on a Pro Rata basis, with each beneficial holder deemed to receive such portions of COP Claims in an amount equal to the proportion that the unpaid principal amount of such holder's COPs bears to the aggregate unpaid principal amount of all COPs. Each beneficial holder of COPs may elect to participate in the Plan COP Settlement in respect of some or all of those portions of COP Claims that would be deemed assigned to it and its Affiliates in the event that the Effective Date occurs.<br><br>Each beneficial holder of COPs may settle issues relating to allowance of the COP Claims that are deemed assigned to it and become a Settling COP Claimant as to some or all COPs held by it and its Affiliates by electing to participate in the Plan COP Settlement on a timely-returned Ballot accepting the Plan. Each Settling COP Claimant shall have its COP Claims deemed to be Allowed Claims in an amount equal to 40% of the aggregate unpaid principal amount of COPs held by such Settling COP Claimant and shall receive, on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of New B Notes.<br><br>Each beneficial holder of COPs shall receive the following treatment on account of its COP Claims unless such holder agrees to a different treatment of such Claims:<br><br>On the Effective Date, the City shall establish the Disputed COP Claims Reserve. The Disputed COP Claims Reserve shall contain no less than (1) an Unsecured Pro Rata Share of New B Notes, calculated as if such Disputed COP Claims were Allowed in an amount equal to the aggregate unpaid principal amount as of the Petition Date for the COPs not subject to the Plan COP Settlement or (b) in such lesser amount as may be required by an order of the Bankruptcy Court, and (2) any distributions made on account of New B Notes held in the Disputed COP Claims Reserve.<br><br>If and to the extent that Disputed COP Claims become Allowed Claims, the Holders of such Allowed Claims shall be sent a Distribution from the Disputed COP Claims Reserve of no less than (1) the portion of New B Notes held in the Disputed COP Claims Reserve initially allocated to the Disputed COP Claims that became Allowed Claims; and (2) any distributions received by the Disputed COP Claims Reserve on account of such portion of New B Notes. Upon the entry of an order by the trial court having jurisdiction over the objections to the Disputed COP Claims resolving all objections to the Disputed COP Claims and after all Distributions on account of Allowed COP Claims have been made or provided for, 70% of any New B Notes and distributions thereon remaining in the Disputed COP Claims Reserve shall be distributed to holders of Claims entitled to receive New B Notes under the Plan, each of which shall receive their Unsecured Pro Rata Share of such property. The remaining 30% of any New B Notes and distributions thereon shall be cancelled (with respect to the New B Notes) or revert to the City and be transferred to the General Fund (with respect to the distributions on such portion of New B Notes).<br><br>Estimated Percentage Recovery: *Unknown* |

-22-

13-53846-swr Doc 8372 Filed 11/21/14 Entered 11/21/14 20:36:38 Page 35 of 602
13-53846-swr Doc 8372 Filed 11/21/14 Entered 11/21/14 20:36:38 Page 35 of 602

| Description and Amount of Claims | Treatment |
|---|---|
| **Class 10 - PFRS Pension Claims**: Consists of all Claims (other than OPEB Claims), whether asserted by current or former employees of the City, their heirs or beneficiaries or by the PFRS or any trustee thereof or any other Entity acting on the PFRS's behalf, against the City or any fund managed by the City (including, but not limited to, the General Fund, the Police and Fire Retirement System Service Corporation fund or the pension funds) based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law for (1) any pension, disability, or other post retirement payment or distribution in respect of the employment of such current or former employees or (2) the payment by the PFRS to persons who at any time participated in, were beneficiaries of or accrued post-retirement pension or financial benefits under the PFRS.<br><br>Estimated Aggregate Allowed Amount: $1,588,000,000 | Impaired. During the Fiscal Years from the Effective Date through Fiscal Year 2023, annual contributions shall be made to the PFRS only in the amounts identified on Exhibit II.B.3.t.ii.A to the Plan. The exclusive source for such contributions shall be certain DIA Proceeds and certain funds from the State Contribution Agreement. After June 30, 2023, the City will contribute sufficient funds required to pay each Holder of a PFRS Pension Claim his or her PFRS Adjusted Pension Amount in accordance with and as modified by the terms and conditions contained in the Plan.<br><br>During the period that ends on June 30, 2023, the trustees of the PFRS, or the trustees of any successor trust or pension plan, shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the PFRS that shall not be higher than 6.50%.<br><br>During the period that ends no earlier than June 30, 2023, the pension benefits payable to each Holder of a PFRS Pension Claim shall be equal to the PFRS Adjusted Pension Amount for such Holder, provided that such PFRS Adjusted Pension Amount shall be (1) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (2) increased by any PFRS Restoration Payment.<br><br>Each Holder of a PFRS Pension Claim who is an Active Employee shall receive, in addition to his or her PFRS Adjusted Pension Amount, as may be modified herein, such additional pension benefit for service on or after July 1, 2014 consistent with the terms and conditions of the PFRS Hybrid Pension Formula and the PFRS Hybrid Pension Plan.<br><br>The composition of the board of trustees of the PFRS and the manner in which it is operated and administered shall be consistent with the terms of the PFRS Trust Agreement.<br><br>The Confirmation Order shall include an injunction against the subsequent amendment of the terms and conditions, and rules of operation, of the PFRS, or any successor plan or trust, that governs the calculation of pension benefits (including the PFRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, the PFRS Restoration Payment and the PFRS Hybrid Pension Formula and terms of the PFRS Hybrid Pension Plan) or against any action that governs the selection of the investment return assumption described in Section II.B.3.t.ii.B of the Plan, the contribution to the PFRS or the calculation or amount of PFRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.<br><br>The State Contribution Agreement, the effectiveness of which is contingent upon the acceptance of the Plan by Classes 10 and 11, shall include the following principal terms: (1) the State will distribute the State Contribution for the benefit of Holders of Pension Claims; and (2) if the release set forth at Section III.D.7.b of the Plan is not approved by the Bankruptcy Court, Non-Accepting Holders shall not be entitled to the State Settlement Benefit Amount as part of such Holder's PFRS Adjusted Pension Amount.<br><br>*If the release set forth at Section III.D.7.b of the Plan is approved by the Bankruptcy Court, each Holder of a PFRS Pension Claim shall release the State from all Liabilities related to PFRS Pension Claims, as more particularly described in the State Contribution Agreement and as set forth at Section III.D.7.b of the Plan.*<br><br>Estimated Percentage Recovery: 31-49% |

| Description and Amount of Claims | Treatment |
|---|---|
| **Class 11 – GRS Pension Claims**: Consists of all Claims (other than OPEB Claims), whether asserted by current or former employees of the City, their heirs or beneficiaries or by the GRS or any trustee thereof or any other Entity acting on the GRS's behalf, against the City or any fund managed by the City (including, but not limited to, the General Fund, the water fund, the sewage disposal fund, the Detroit General Retirement System Service Corporation fund or the pension funds) based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law for (1) any pension, disability or other post retirement payment or distribution in respect of the employment of current or former employees or (2) the payment by the GRS to persons who at any time participated in, were beneficiaries of or accrued post-retirement pension or financial benefits under the GRS.<br><br>Estimated Aggregate Allowed Amount: $2,299,000,000 | Impaired. During the Fiscal Years from the Effective Date through Fiscal Year 2023, annual contributions shall be made to the GRS only in the amounts identified on Exhibit II.B.3.u.ii.A to the Plan. The exclusive sources for such contributions shall be accelerated pension-related payments received from the DWSD equal to approximately $675,000,000, and certain DIA Proceeds. After June 30, 2023, (1) certain DIA Proceeds and certain funds from the State Contribution Agreement shall be contributed to the GRS and (2) the City will contribute such additional funds as are necessary to pay each Holder of a GRS Pension Claim his or her GRS Adjusted Pension Amount in accordance with and as modified by the terms and conditions contained in the Plan.<br><br>During the period that ends on June 30, 2023, the board of trustees of the GRS, or the trustees of any successor trust or pension plan, shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the GRS that shall not be higher than 6.25%.<br><br>During the period that ends no earlier than June 30, 2023, subject to the Annuity Savings Fund recoupment set forth in Section II.B.3.u.ii.D of the Plan, the pension benefits payable to each Holder of a GRS Pension Claim shall be equal to the GRS Adjusted Pension Amount for such Holder, _provided_ that such GRS Adjusted Pension Amount shall be (1) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (2) increased by any GRS Restoration Payment.<br><br>The value of Annuity Savings Fund accounts maintained by Holders of GRS Pension Claims who are Active ASF Participants will be recalculated by applying the Actual Return. The difference between (1) the value of an Active ASF Participant's Annuity Savings Fund account after application of the Actual Return and (2) the actual value of an Active ASF Participant's Annuity Savings Fund account as of June 30, 2014, shall be deducted from the Active ASF Participant's Annuity Savings Fund account and included in GRS assets to support and pay GRS Adjusted Pension Amounts.<br><br>The value of Annuity Savings Fund accounts of Holders of GRS Pension Claims who are ASF Distribution Recipients will be recalculated by applying the Actual Return. The difference between (1) the value of an ASF Distribution Recipient's Annuity Savings Fund account after application of the Actual Return and (2) the actual value of an ASF Distribution Recipient's Annuity Savings Fund account as of June 30, 2013, will be converted into an annual annuity amount based on the ASF Distribution Recipient's life expectancy and other actuarial factors, and then deducted from the ASF Distribution Recipient's GRS Adjusted Pension Amount.<br><br>Each Holder of a GRS Pension Claim who is an Active Employee shall receive, in addition to his or her GRS Adjusted Pension Amount, as may be modified herein, such additional pension benefit for service on or after July 1, 2014 consistent with the terms and conditions of the GRS Hybrid Pension Formula and the GRS Hybrid Pension Plan.<br><br>The composition of the board of trustees of the GRS and the manner in which it is operated and administered shall be consistent with the terms of the GRS Trust Agreement.<br><br>If the City consummates a DWSD Transaction on or prior to the Effective Date, the GLWA will assume the pension liability associated with DWSD employees and retirees as accrued through the closing date of the DWSD Transaction. A pro rata share of the existing GRS assets and liabilities will be transferred to a successor pension fund managed by the GLWA. The successor pension plan will be closed to new GLWA employees and benefit levels frozen.<br><br>[CONTINUED ON FOLLOWING PAGE] |

-24-

13-53846-swr Doc 8372 Filed 11/21/14 Entered 11/21/14 18:24:08 Page 37 of 602
13-53846-swr Doc 8382 Filed 11/21/14 Entered 11/21/14 18:36:58 Page 37 of 162

| Description and Amount of Claims | Treatment |
|---|---|
| **Class 11 – GRS Pension Claims** (continued) | The Confirmation Order shall include an injunction against the subsequent amendment of the terms and conditions, and rules of operation, of the GRS, or any successor plan or trust, that govern the calculation of pension benefits (including the GRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, GRS Restoration Payment and the GRS Hybrid Pension Formula and terms of the GRS Hybrid Pension Plan) or against any action that governs the selection of the investment return assumption described in Section II.B.3.u.ii.B of the Plan, the contribution to the GRS, or the calculation or amount of GRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law. |
| | The State Contribution Agreement, the effectiveness of which is contingent upon the acceptance of the Plan by Classes 10 and 11, shall include the following principal terms: (1) the State will distribute the State Contribution for the benefit of Holders of Pension Claims; and (2) if the release set forth at Section III.D.7.b of the Plan is not approved by the Bankruptcy Court, Non-Accepting Holders shall not be entitled to the State Settlement Benefit Amount as part of such Holder's GRS Adjusted Pension Amount. |
| | *If the release set forth at Section III.D.7.b of the Plan is approved by the Bankruptcy Court, each Holder of a GRS Pension Claim shall release the State from all Liabilities related to GRS Pension Claims, as more particularly described in the State Contribution Agreement and as set forth at Section III.D.7 of the Plan.* |
| | Estimated Percentage Recovery: 36-45% |
| **Class 12 – OPEB Claims**: Consists of all Claims against the City for post-retirement health, vision, dental, life and death benefits provided to retired employees of the City and their dependents (including surviving spouses) pursuant to the Employee Health and Life Insurance Benefit Plan and the Employee Death Benefit Plan, including the members of the certified class in the action captioned *Weiler et. al. v. City of Detroit*, Case No. 06 619737-CK (Wayne County Circuit Court), pursuant to the "Consent Judgment and Order of Dismissal" entered in that action on August 26, 2009. Estimated Aggregate Allowed Amount: $3,184,900,000 | Impaired. <u>Establishment of VEBA</u>: On or as soon as practicable following the Effective Date, the City will establish the Detroit VEBA to provide health care, life and other legally authorized welfare benefits to Detroit VEBA Beneficiaries and certain of their dependents and future City retirees. The Detroit VEBA will be governed by a board of trustees that will be responsible for, among other things, management of property held by the Detroit VEBA, administration of the Detroit VEBA and determination of the level of and distribution of benefits to Detroit VEBA Beneficiaries. The Detroit VEBA Trust Agreement and related plan documentation will be substantially in the form set forth on Exhibit I.A.71 to the Plan, and shall, among other things, identify the members of the Detroit VEBA's initial board of trustees. <u>Distributions to VEBA</u>: Promptly after the Detroit VEBA is established, the City shall: (1) distribute an Unsecured Pro Rata Share of New B Notes to the Detroit VEBA in full satisfaction of the Allowed OPEB Claims, provided that the value of the Unsecured Pro Rata Share of New B Notes to be distributed to the Detroit VEBA shall be reduced by the amount of the Postpetition OPEB Payments; and (2) direct the trustees of the Employee Death Benefit Plan to terminate that plan and transfer all assets (net of expenses of termination) to the Detroit VEBA. The City shall have no responsibility following the Effective Date to provide life insurance or death benefits to current or former employees. Estimated Percentage Recovery: 15% |
| **Class 13 - Downtown Development Authority Claims**: Consists of all Claims in respect of the Downtown Development Authority Loans. Estimated Aggregate Allowed Amount: $33,600,000 | Impaired. Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Downtown Development Authority Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of New B Notes. Estimated Percentage Recovery: 15% |

| Description and Amount of Claims | Treatment |
|---|---|
| **Class 14 - Other Unsecured Claims**: Consists of all Claims that are unpaid as of the Effective Date and that are not Administrative Claims, Convenience Claims, COP Claims, Downtown Development Authority Claims, General Obligation Bond Claims, GRS Pension Claims, GRS Pension/ASF Claims, OPEB Claims, PFRS Pension Claims, Secured Claims or Subordinated Claims. For the avoidance of doubt, Section 1983 Claims are included within the definition of Other Unsecured Claims.<br><br>Estimated Aggregate Allowed Amount: *Unknown* | Impaired. Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Other Unsecured Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of New B Notes.<br><br>Estimated Percentage Recovery: 15% |
| **Class 15 - Convenience Claims**: Consists of all Claims that would otherwise be Other Unsecured Claims that are (1) Allowed Claims in an amount less than or equal to $25,000; or (2) in an amount that has been reduced to $25,000 pursuant to an election made by the Holder of such Claim; *provided* that, where any portion(s) of a single Claim has been transferred, (a) the amount of all such portions will be aggregated to determine whether a Claim qualifies as a Convenience Claim and for purposes of the Convenience Claim election and (b) unless all transferees make the Convenience Claim election on the applicable Ballots, the Convenience Claim election will not be recognized for such Claim.<br><br>Estimated Aggregate Allowed Amount: *Unknown* | Impaired. Each Holder of an Allowed Convenience Claim, in full satisfaction of such Allowed Claim, shall receive Cash equal to the amount of 25% of such Allowed Claim (as reduced, if applicable, pursuant to an election by such Holder in accordance with Section I.A.50 of the Plan) on or as soon as reasonably practicable after the Effective Date, unless such Holder agrees to a different treatment of such Claim.<br><br>Estimated Percentage Recovery: 25% |
| **Class 16 - Subordinated Claims**: Consists of all Claims of the kind described in sections 726(a)(3) or 726(a)(4) of the Bankruptcy Code and/or Claims subordinated under sections 510(b) or 510(c) of the Bankruptcy Code.<br><br>Estimated Aggregate Allowed Amount: *Unknown* | Impaired. On the Effective Date, all Subordinated Claims shall be disallowed, extinguished and discharged without Distribution under the Plan, and Holders of Subordinated Claims shall not receive or retain any property on account of such Claims. Pursuant to section 1126(g) of the Bankruptcy Code, Class 16 is deemed to have rejected the Plan and Holders of Subordinated Claims are not entitled to cast a Ballot in respect of such Claims.<br><br>Estimated Percentage Recovery: 0% |

# III.

# THE PLAN

## A.    General

THE FOLLOWING SUMMARY HIGHLIGHTS CERTAIN OF THE SUBSTANTIVE PROVISIONS OF THE PLAN, AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OR A SUBSTITUTE FOR A FULL AND COMPLETE REVIEW OF THE PLAN.  THE CITY URGES ALL HOLDERS OF CLAIMS TO CAREFULLY READ AND STUDY THE PLAN, A COPY OF WHICH IS ATTACHED HERETO AS <u>EXHIBIT A</u>.

Section 1123 of the Bankruptcy Code provides that, except for administrative claims, a plan of adjustment must categorize claims against a debtor into individual classes.  Although the Bankruptcy Code gives a chapter 9 debtor significant flexibility in classifying claims, section 1122 of the Bankruptcy Code dictates that a plan of adjustment may only place a claim into a class containing claims that are substantially similar.

The Plan identifies 384 Classes of Claims (certain of which encompass numerous separate classes comprised of individual series of the relevant debt, as set forth on the Exhibits to the Plan.  These Classes take into account the differing nature and priority of Claims against the City.  Administrative Claims are not classified for purposes of voting or receiving distributions under the Plan (as is permitted by section 1123(a)(1) of the Bankruptcy Code) but are treated separately as unclassified Claims.

The Plan provides specific treatment for each Class of Claims.  Only certain Holders of Claims that are impaired under the Plan are entitled to vote and receive Distributions under the Plan.

Unless otherwise provided in the Plan or the Confirmation Order, the treatment of any Claim under the Plan will be in full satisfaction, settlement, release and discharge of, and in exchange for, such Claim.  Upon Confirmation, the Plan will be binding on all Holders of a Claim regardless of whether such Holders voted to accept the Plan.

The following discussion sets forth the classification and treatment of all Claims against the City.  It is qualified in its entirety by the terms of the Plan, which is attached hereto as Exhibit A, and which should be read carefully by you in considering whether to vote to accept or reject the Plan.

## B.    Classification and Treatment of Claims

If the Plan is confirmed by the Bankruptcy Court, each Allowed Claim in a particular Class will receive the same treatment as the other Allowed Claims in such Class, whether or not the Holder of such Claim voted to accept the Plan.

### 1.    Unclassified Claims

An Administrative Claim is a Claim against the City arising on or after the Petition Date and prior to the Effective Date for a cost or expense of administration related to the City's chapter 9 case that is entitled to priority or superpriority under sections 364(c)(1), 503(b) or 507(a)(2) of the Bankruptcy Code and, in any event does not include any claim for professional fees or any other costs or expenses incurred by the Creditors' Committee.  Administrative Claims may include: (a) the actual and necessary costs and expenses incurred by the City in the ordinary course of its operations after the Petition Date (*e.g.*, wages, salaries, payments for services and lease payments); (b) Claims under any Postpetition Financing Agreement; (c) any Allowed Claims for reclamation under section 546(c)(1) of the Bankruptcy Code; and (d) Claims, pursuant to section 503(b)(9) of the Bankruptcy Code, for the value of goods received by the City in the 20 days immediately prior to the Petition Date and sold to the City in the ordinary course of its operations.  In addition, section 503(b) of the Bankruptcy Code provides for payment of compensation or reimbursement of expenses to creditors and other entities making a "substantial contribution" to a chapter 9 case and to attorneys for, and other professional advisors to, such entities.  The amounts, if any, that such Entities may seek for such compensation or reimbursement are not known by the City at this time.  Requests for such compensation or reimbursement must be approved by the Bankruptcy Court after notice and a hearing at which the City and other parties in interest may participate and, if appropriate, object to the allowance of any such compensation or reimbursement.

-27-

13-53846-swr   Doc 8372   Filed 11/21/14   Entered 11/21/14 08:24:48   Page 40 of 62
13-53846-tjt   Doc 8372   Filed 11/21/14   Entered 11/21/14 08:36:08   Page 40 of 162

Except as specified in Section II.A.1 of the Plan, and subject to the bar date provisions therein, unless otherwise agreed by the Holder of an Administrative Claim and the City, or ordered by the Bankruptcy Court, each Holder of an Allowed Administrative Claim will receive, in full satisfaction of such Allowed Administrative Claim, Cash in an amount equal to such Allowed Administrative Claim either: (a) on the Effective Date or as soon as reasonably practicable thereafter; or (b) if the Administrative Claim is not Allowed as of the Effective Date, 30 days after the date on which such Administrative Claim becomes an Allowed Claim. No Claim of any official or unofficial creditors' committee (other than the Retiree Committee) or any member thereof for professionals' fees or other costs and expenses incurred by such creditors' committee or by a member of such creditors' committee shall constitute an Allowed Administrative Claim.

Unless otherwise agreed by the Postpetition Lenders pursuant to the Postpetition Financing Agreement, on or before the Effective Date, Postpetition Lender Claims that are Allowed Administrative Claims will be paid in Cash equal to the amount of those Allowed Administrative Claims.

Except as otherwise provided in Section II.A.2 of the Plan or in the Bar Date Order or other order of the Bankruptcy Court, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the City pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than 30 days after the Effective Date. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date will be forever barred from asserting such Administrative Claims against the City or its property, and such Administrative Claims will be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the City and the requesting party by the later of (a) 150 days after the Effective Date, (b) 60 days after the Filing of the applicable request for payment of Administrative Claims or (c) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Administrative Claims.

Holders of Administrative Claims that are Postpetition Lender Claims will not be required to File or serve any request for payment or application for allowance of such Claims. Such Administrative Claims will be satisfied pursuant to Section II.A.1.b of the Plan.

Allowed Administrative Claims based on liabilities incurred by the City in the ordinary course of its business, including Administrative Claims arising from or with respect to the sale of goods or provision of services on or after the Petition Date in the ordinary course of the City's business and Administrative Claims arising from those contracts and leases of the kind described in Section II.D of the Plan, will be paid by the City, pursuant to the terms and conditions of the particular transaction giving rise to those Administrative Claims, without further action by the holders of such Administrative Claims or further approval by the Bankruptcy Court.

The Plan does not modify any Bar Date Order already in place, including Bar Dates for Claims entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

**2.     Classified Claims**

*Class 1:  Secured DWSD-Related Claims*, subclassified as follows:

> *Class 1A:  DWSD Class A Water Claims (One Class for each CUSIP of DWSD Class A Water Bonds, as set forth on Exhibit I.A. to the Plan).*
>
> Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed DWSD Class A Water Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as reasonably practicable after the Effective Date, New Water/Sewer Bonds having a principal amount equal to the principal amount of the DWSD Class A Water Bonds held by such Holder; provided that, in lieu of the foregoing treatment, the City alternatively may elect to: (a) if a DWSD Transaction is consummated on the Effective Date, provide a Holder of an Allowed DWSD Class A Water Claim with Cash in the full amount of such Allowed DWSD Class A Water Claim; or (b) if a DWSD Transaction is not consummated on the Effective Date, Reinstate any DWSD Class A Water Bonds by filing a notice of such Reinstatement prior to the commencement of the Confirmation Hearing.
>
> <u>Treatment Option for Classes that Accept the Plan</u>:  Each Holder of an Allowed DWSD Class A Water Claim in a Class of DWSD Class A Water Claims that accepts the Plan may elect to receive New Existing Rate Water/Sewer Bonds having a principal amount equal to the principal amount of the DWSD Class A

-28-

13-53846-swr   Doc 8372   Filed 11/21/14   Entered 11/21/14 18:36:38   Page 41 of 602
13-53846-swr   Doc 8372   Filed 11/21/14   Entered 11/21/14 18:36:38   Page 41 of 602

Water Bonds held by such Holder in lieu of New Water/Sewer Bonds. An election to receive New Existing Rate Water/Sewer Bonds pursuant to the foregoing sentence constitutes an irrevocable waiver of any and all rights to object to the Plan on any grounds, and any such objection may be disregarded by the Bankruptcy Court solely on the basis of such election.

Class 1A Claims are impaired.

*Class 1B: DWSD Class B Water Claims (One Class for each CUSIP of DWSD Class B Water Bonds, as set forth on Exhibit I.A. to the Plan).*

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed DWSD Class B Water Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as reasonably practicable after the Effective Date, New Water/Sewer Bonds having a principal amount equal to the principal amount of the DWSD Class B Water Bonds held by such Holder; provided that, in lieu of the foregoing treatment, the City alternatively may elect to: (a) if a DWSD Transaction is consummated on the Effective Date, provide a Holder of an Allowed Class B Water Claim with Cash in the full amount of such Allowed DWSD Class B Water Claim; or (b) if a DWSD Transaction is not consummated on the Effective Date, Reinstate any DWSD Class B Water Bonds by filing a notice of such Reinstatement prior to the commencement of the Confirmation Hearing.

<u>Treatment Option for Classes that Accept the Plan</u>: Each Holder of an Allowed DWSD Class B Water Claim in a Class of DWSD Class B Water Claims that accepts the Plan may elect to receive New Existing Rate Water/Sewer Bonds having a principal amount equal to the principal amount of the DWSD Class B Water Bonds held by such Holder in lieu of New Water/Sewer Bonds. An election to receive New Existing Rate Water/Sewer Bonds pursuant to the foregoing sentence constitutes an irrevocable waiver of any and all rights to object to the Plan on any grounds, and any such objection may be disregarded by the Bankruptcy Court solely on the basis of such election.

Class 1B Claims are impaired.

*Class 1C: DWSD Class A Sewer Claims (One Class for each CUSIP of DWSD Class A Sewer Bonds, as set forth on Exhibit I.A. to the Plan).*

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed DWSD Class A Sewer Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as reasonably practicable after the Effective Date, New Water/Sewer Bonds having a principal amount equal to the principal amount of the DWSD Class A Sewer Bonds held by such Holder; provided that, in lieu of the foregoing treatment, the City alternatively may elect to: (a) if a DWSD Transaction is consummated on the Effective Date, provide a Holder of an Allowed DWSD Class A Sewer Claim with Cash in the full amount of such Allowed DWSD Class A Sewer Claim; or (b) if a DWSD Transaction is not consummated on the Effective Date, Reinstate any DWSD Class A Sewer Bonds by filing a notice of such Reinstatement prior to the commencement of the Confirmation Hearing.

<u>Treatment Option for Classes that Accept the Plan</u>: Each Holder of an Allowed DWSD Class A Sewer Claim in a Class of DWSD Class A Sewer Claims that accepts the Plan may elect to receive New Existing Rate Water/Sewer Bonds having a principal amount equal to the principal amount of the DWSD Class A Sewer Bonds held by such Holder in lieu of New Water/Sewer Bonds. An election to receive New Existing Rate Water/Sewer Bonds pursuant to the foregoing sentence constitutes an irrevocable waiver of any and all rights to object to the Plan on any grounds, and any such objection may be disregarded by the Bankruptcy Court solely on the basis of such election.

Class 1C Claims are impaired.

*Class 1D: DWSD Class B Sewer Claims (One Class for each CUSIP of DWSD Class B Sewer Bonds, as set forth on Exhibit I.A. to the Plan).*

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed DWSD Class B Sewer Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as

reasonably practicable after the Effective Date, New Water/Sewer Bonds having a principal amount equal to the principal amount of the DWSD Class B Sewer Bonds held by such Holder; provided that, in lieu of the foregoing treatment, the City alternatively may elect to: (a) if a DWSD Transaction is consummated on the Effective Date, provided a Holder of an Allowed DWSD Class B Sewer Claim with Cash in the full amount of such Allowed DWSD Class B Sewer Claim; or (b) if a DWSD Transaction is not consummated on the Effective Date, Reinstate any DWSD Class B Sewer Bonds by filing a notice of such Reinstatement prior to the commencement of the Confirmation Hearing.

<u>Treatment Option for Classes that Accept the Plan</u>:  Each Holder of an Allowed DWSD Class B Sewer Claim in a Class of DWSD Class B Sewer Claims that accepts the Plan may elect to receive New Existing Rate Water/Sewer Bonds having a principal amount equal to the principal amount of the DWSD Class B Sewer Bonds held by such Holder in lieu of New Water/Sewer Bonds.  An election to receive New Existing Rate Water/Sewer Bonds pursuant to the foregoing sentence constitutes an irrevocable waiver of any and all rights to object to the Plan on any grounds, and any such objection may be disregarded by the Bankruptcy Court solely on the basis of such election.

Class 1D Claims are impaired.

*Class 1E:  DWSD Revolving Sewer Bond Claims (One Class for each DWSD Series of DWSD Revolving Sewer Bonds, as set forth on Exhibit I.A. to the Plan).*

If a DWSD Transaction is not consummated on the Effective Date, each Holder of an Allowed DWSD Revolving Sewer Bond Claim shall have its Allowed DWSD Revolving Sewer Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

If a DWSD Transaction is consummated on the Effective Date, each Holder of an Allowed DWSD Revolving Sewer Bond Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as reasonably practicable after the Effective Date, New GLWA Revolving Bonds having a principal amount equal to the principal amount of the DWSD Revolving Sewer Bonds held by such Holder, unless such Holder agrees to a different treatment of such Claim.

Class 1E Claims are impaired.

*Class 1F:  DWSD Revolving Water Bond Claims (One Class for each DWSD Series of DWSD Revolving Water Bonds, as set forth on Exhibit I.A. to the Plan).*

If a DWSD Transaction is not consummated on the Effective Date, each Holder of an Allowed DWSD Revolving Water Bond Claim shall have its Allowed DWSD Revolving Water Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

If a DWSD Transaction is consummated on the Effective Date, each Holder of an Allowed DWSD Revolving Water Bond Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as reasonably practicable after the Effective Date, New GLWA Revolving Bonds having a principal amount equal to the principal amount of the DWSD Revolving Water Bonds held by such Holder, unless such Holder agrees to a different treatment of such Claim.

Class 1F Claims are impaired.

<u>*Class 2:  Secured GO Debt Claims*</u>, subclassified as follows:

*Class 2A:  Secured GO Series 2010 Claims.*

On the Effective Date, (a) the Secured GO Series 2010 Claims shall be deemed Allowed in the aggregate amount of $252,475,366 and (b) each Holder of an Allowed Secured GO Series 2010 Claim shall have its Allowed Secured GO Series 2010 Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

Class 2A Claims are unimpaired.

*Class 2B:  Secured GO Series 2010(A) Claims.*

On the Effective Date, (a) the Secured GO Series 2010(A) Claims shall be deemed Allowed in the aggregate amount of $101,707,848 and (b) each Holder of an Allowed Secured GO Series 2010(A) Claim shall have its Allowed Secured GO Series 2010(A) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

Class 2B Claims are unimpaired.

*Class 2C:  Secured GO Series 2012(A)(2) Claims.*

On the Effective Date, (a) the Secured GO Series 2012(A)(2) Claims shall be deemed Allowed in the aggregate amount of $39,254,171 and (b) each Holder of an Allowed Secured GO Series 2012(A)(2) Claim shall have its Allowed Secured GO Series 2012(A)(2) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

Class 2C Claims are unimpaired.

*Class 2D:  Secured GO Series 2012(A2-B) Claims.*

On the Effective Date, (a) the Secured GO Series 2012(A2-B) Claims shall be deemed Allowed in the aggregate amount of $54,055,927 and (b) each Holder of an Allowed Secured GO Series 2012(A2-B) Claim shall have its Allowed Secured GO Series 2012(A2-B) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

Class 2D Claims are unimpaired.

*Class 2E:  Secured GO Series 2012(B) Claims.*

On the Effective Date, (a) the Secured GO Series 2012(B) Claims shall be deemed Allowed in the aggregate amount of $6,469,135 and (b) each Holder of an Allowed Secured GO Series 2012(B) Claim shall have its Allowed Secured GO Series 2012(B) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

Class 2E Claims are unimpaired.

*Class 2F:*  Secured GO Series 2012(B2) Claims.

On the Effective Date, (a) the Secured GO Series 2012(B2) Claims shall be deemed Allowed in the aggregate amount of $31,037,724 and (b) each Holder of an Allowed Secured GO Series 2012(B2) Claim shall have its Allowed Secured GO Series 2012(B2) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

Class 2F Claims are unimpaired.

## Class 3:  Other Secured Claims

On the Effective Date, each Holder of an Allowed Other Secured Claim shall have its Allowed Other Secured Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

Class 3 Claims are unimpaired.

## Class 4:  HUD Installment Note Claims

On the Effective Date, (a) the HUD Installment Note Claims shall be deemed Allowed in the aggregate amount of $90,075,004 and (b) each Holder of a HUD Installment Note Claim shall have its Allowed

HUD Installment Note Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

Class 4 Claims are unimpaired.

*Class 5: COP Swap Claims*

The COP Swap Claims shall be deemed Allowed as Secured Claims, which, solely for purposes of distributions from the City, will be equal to the Distribution Amount.

Each Holder of an Allowed COP Swap Claim, in full satisfaction of such Allowed Claim, shall receive, either: (a) within thirty days following the Effective Date, the Net Amount in full in cash, provided that until paid in cash in full, such Secured Claims will remain secured by the Pledged Property; or (b) solely in the case of a Liquidity Event, the Net Amount in cash in full within 180 days following the Effective Date, provided that (i) other than with respect to net proceeds used to repay the Postpetition Financing Agreement, to the extent permitted by law but without taking into consideration any limitations imposed by the City, including in any ordinance or resolution of the City, the first dollars of any net cash proceeds of any financing or refinancing consummated in connection with, or subsequent to, the consummation of such Plan and either (A) supported by the full faith and credit of the City or (B) payable from the general fund of the City, will be used to pay the Net Amount, (ii) the City will continue to comply with its obligations under the COP Swap Settlement and the COP Swap Settlement Approval Order until the Net Amount is paid in cash in full, (iii) until paid in cash in full, such Secured Claims will remain secured by the Pledged Property, (iv) from and after the Effective Date, the unpaid Net Amount will accrue interest at the rate applicable to obligations under the Postpetition Financing Agreement plus 1.5% with the interest obligation likewise being secured by the Pledged Property, and (v) the COP Swap Counterparties will receive from the City on the Effective Date a deferral fee in cash equal to 1.0% of the Net Amount to be shared equally between them.

Class 5 Claims are impaired.

*Class 6: Parking Bond Claims*

On the Effective Date, (a) the Parking Bond Claims shall be deemed Allowed in the amount of $8,099,287 and (b) each Holder of an Allowed Parking Bond Claim shall have its Allowed Parking Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

Class 6 Claims are unimpaired.

*Class 7: Limited Tax General Obligation Bond Claims*

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Limited Tax General Obligation Bond Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of New B Notes.

Class 7 Claims are impaired.

*Class 8: Unlimited Tax General Obligation Bond Claims*

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Unlimited Tax General Obligation Bond Claim, in full satisfaction of such Allowed Claim, shall receive its Pro Rata share of Plan UTGO Notes on or as soon as reasonably practicable after the Effective Date. The maturity(ies) of the Plan UTGO Notes shall be no longer than the existing maturity(ies) of each series of Unlimited Tax General Obligation Bonds receiving Plan UTGO Notes. The Plan UTGO Notes shall contain such other terms as will result in each Holder of an Allowed Unlimited Tax General Obligation Bond Claim receiving a payment stream, the present value of which is equal to approximately 15% of such Holder's Allowed Unlimited Tax General Obligation Bond Claim as of the Effective Date.

Class 8 Claims are impaired.

-32-

13-53846-swr   Doc 8372   Filed 11/21/14   Entered 11/21/14 00:24:40   Page 45 of 602
13-53846-swr   Doc 8372   Filed 03/31/14   Entered 03/31/14 18:36:38   Page 45 of 162

<u>Class 9: COP Claims</u>

*The COP Claims are Disputed Claims and are not Allowed by the Plan, and the City reserves all rights to (a) object to, avoid or subordinate such Claims on any and all available grounds, including through the assertion of any and all grounds asserted in the COP Litigation, and (b) assign the right to object to, avoid or subordinate such Claims or the City's rights in the COP Litigation to the Creditor Representative. The treatment set forth below in respect of the COP Claims is afforded only if and to the extent that such Claims ultimately become Allowed Claims.*

Solely for purposes of facilitating Distributions under this Plan and for no other purpose, on and as of the Effective Date, those portions of COP Claims that relate to, and are measured by, the payment schedule under the COPs shall be deemed assigned to the beneficial holders of the COPs on a Pro Rata basis, with each beneficial holder deemed to receive such portions of COP Claims in an amount equal to the proportion that the unpaid principal amount of such holder's COPs bears to the aggregate unpaid principal amount of all COPs. Each beneficial holder of COPs may elect to participate in the Plan COP Settlement in respect of some or all of those portions of COP Claims that would be deemed assigned to it and its Affiliates in the event that the Effective Date occurs.

Each beneficial holder of COPs may settle issues relating to allowance of the COP Claims that are deemed assigned to it and become a Settling COP Claimant as to some or all COPs held by it and its Affiliates by electing to participate in the Plan COP Settlement on a timely-returned Ballot accepting the Plan. Each Settling COP Claimant shall have its COP Claims deemed to be Allowed Claims in an amount equal to 40% of the aggregate unpaid principal amount of COPs held by such Settling COP Claimant and shall receive, on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of New B Notes.

Each beneficial holder of COPs shall receive the following treatment on account of its COP Claims unless such holder agrees to a different treatment of such Claims:

On the Effective Date, the City shall establish the Disputed COP Claims Reserve. The Disputed COP Claims Reserve shall contain no less than (a) an Unsecured Pro Rata Share of New B Notes, calculated as if such Disputed COP Claims were Allowed (i) in an amount equal to the aggregate unpaid principal amount as of the Petition Date for the COPs not subject to the Plan COP Settlement or (ii) in such lesser amount as may be required by an order of the Bankruptcy Court, and (b) any distributions made on account of New B Notes held in the Disputed COP Claims Reserve.

If and to the extent that Disputed COP Claims become Allowed Claims, the Holders of such Allowed Claims shall be sent a Distribution from the Disputed COP Claims Reserve of no less than (a) the portion of New B Notes held in the Disputed COP Claims Reserve initially allocated to the Disputed COP Claims that became Allowed Claims; and (b) any distributions received by the Disputed COP Claims Reserve on account of such portion of New B Notes. Upon the entry of an order by the trial court having jurisdiction over the objections to the Disputed COP Claims resolving all objections to the Disputed COP Claims and after all Distributions on account of Allowed COP Claims have been made or provided for, 70% of any New B Notes and distributions thereon remaining in the Disputed COP Claims Reserve shall be distributed to holders of Claims entitled to receive New B Notes under the Plan, each of which shall receive their Unsecured Pro Rata Share of such property. The remaining 30% of any New B Notes and distributions thereon shall be cancelled (with respect to the New B Notes) or revert to the City and be transferred to the General Fund (with respect to the distributions on such portion of New B Notes).

Class 9 Claims are impaired.

<u>Class 10: PFRS Pension Claims</u>

During the Fiscal Years from the Effective Date through Fiscal Year 2023, annual contributions shall be made to the PFRS only in the amounts identified on Exhibit II.B.3.t.ii.A to the Plan. The exclusive source for such contributions shall be certain DIA Proceeds and certain funds from the State Contribution Agreement. After June 30, 2023, the City will contribute sufficient funds required to pay each Holder of

-33-

13-53846-swr   Doc 8372   Filed 12/16/14   Entered 12/16/14 08:24:40   Page 46 of 602
13-53846-swr   Doc 8382   Filed 12/31/14   Entered 12/31/14 16:36:58   Page 46 of 162

a PFRS Pension Claim his or her PFRS Adjusted Pension Amount in accordance with and as modified by the terms and conditions contained in the Plan.

During the period that ends on June 30, 2023, the trustees of the PFRS, or the trustees of any successor trust or pension plan, shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the PFRS that shall not be higher than 6.50%.

During the period that ends no earlier than June 30, 2023, the pension benefits payable to each Holder of a PFRS Pension Claim shall be equal to the PFRS Adjusted Pension Amount for such Holder, provided that such PFRS Adjusted Pension Amount shall be (a) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (b) increased by any PFRS Restoration Payment.

Each Holder of a PFRS Pension Claim who is an Active Employee shall receive, in addition to his or her PFRS Adjusted Pension Amount, as may be modified herein, such additional pension benefit for service on or after July 1, 2014 consistent with the terms and conditions of the PFRS Hybrid Pension Formula and the PFRS Hybrid Pension Plan.

The composition of the board of trustees of the PFRS and the manner in which it is operated and administered shall be consistent with the terms of the PFRS Trust Agreement. The PFRS Trust Agreement shall provide, inter alia, for a new seven-person board of trustees, five of whom will be independent fiduciaries with appropriate qualifications to serve as trustees to a multi-billion dollar pension fund, as well as a retiree representative and active employee representative trustee.

The Confirmation Order shall include an injunction against the subsequent amendment of the terms and conditions, and rules of operation, of the PFRS, or any successor plan or trust, that governs the calculation of pension benefits (including the PFRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, the PFRS Restoration Payment and the PFRS Hybrid Pension Formula and terms of the PFRS Hybrid Pension Plan) or against any action that governs the selection of the investment return assumption described in Section II.B.3.t.ii.B of the Plan, the contribution to the PFRS or the calculation or amount of PFRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.

The State Contribution Agreement, the effectiveness of which is contingent upon the acceptance of the Plan by Classes 10 and 11, shall include the following principal terms: (a) the State will distribute the State Contribution for the benefit of Holders of Pension Claims; and (b) if the release set forth at Section III.D.7.b of the Plan is not approved by the Bankruptcy Court, Non-Accepting Holders shall not be entitled to the State Settlement Benefit Amount as part of such Holder's PFRS Adjusted Pension Amount.

Class 10 Claims are impaired.

### Class 11: GRS Pension Claims

During the Fiscal Years from the Effective Date through Fiscal Year 2023, annual contributions shall be made to the GRS only in the amounts identified on Exhibit II.B.3.u.ii.A to the Plan. The exclusive sources for such contributions shall be accelerated pension-related payments received from the DWSD equal to approximately $675,000,000, and certain DIA Proceeds. After June 30, 2023, (a) certain DIA Proceeds and certain funds from the State Contribution Agreement shall be contributed to the GRS and (b) the City will contribute such additional funds as are necessary to pay each Holder of a GRS Pension Claim his or her GRS Adjusted Pension Amount in accordance with and as modified by the terms and conditions contained in the Plan.

During the period that ends on June 30, 2023, the board of trustees of the GRS, or the trustees of any successor trust or pension plan, shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the GRS that shall not be higher than 6.25%.

During the period that ends no earlier than June 30, 2023, subject to the Annuity Savings Fund recoupment set forth in Section II.B.3.u.ii.D of the Plan, the pension benefits payable to each Holder of a GRS Pension Claim shall be equal to the GRS Adjusted Pension Amount for such Holder, provided that such GRS Adjusted Pension Amount shall be (a) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (b) increased by any GRS Restoration Payment.

The value of Annuity Savings Fund accounts maintained by Holders of GRS Pension Claims who are Active ASF Participants will be recalculated by applying the Actual Return. The difference between (a) the value of an Active ASF Participant's Annuity Savings Fund account after application of the Actual Return and (b) the actual value of an Active ASF Participant's Annuity Savings Fund account as of June 30, 2014, shall be deducted from the Active ASF Participant's Annuity Savings Fund account and included in GRS assets to support and pay GRS Adjusted Pension Amounts.

The value of Annuity Savings Fund accounts of Holders of GRS Pension Claims who are ASF Distribution Recipients will be recalculated by applying the Actual Return. The difference between (a) the value of an ASF Distribution Recipient's Annuity Savings Fund account after application of the Actual Return and (b) the actual value of an ASF Distribution Recipient's Annuity Savings Fund account as of June 30, 2013, will be converted into an annual annuity amount based on the ASF Distribution Recipient's life expectancy and other actuarial factors, and then deducted from the ASF Distribution Recipient's GRS Adjusted Pension Amount.

Each Holder of a GRS Pension Claim who is an Active Employee shall receive, in addition to his or her GRS Adjusted Pension Amount, as may be modified herein, such additional pension benefit for service on or after July 1, 2014 consistent with the terms and conditions of the GRS Hybrid Pension Formula and the GRS Hybrid Pension Plan.

The composition of the board of trustees of the GRS and the manner in which it is operated and administered shall be consistent with the terms of the GRS Trust Agreement. The GRS Trust Agreement shall provide, inter alia, for a new seven-person board of trustees, five of whom are independent fiduciaries with appropriate qualifications to serve as trustees to a multi-billion dollar pension fund, as well as a retiree representative and active employee representative trustee.

If the City consummates a DWSD Transaction on or prior to the Effective Date, the GLWA will assume the pension liability associated with DWSD employees and retirees as accrued through the closing date of the DWSD Transaction. A pro rata share of the existing GRS assets and liabilities will be transferred to a successor pension fund managed by the GLWA. The successor pension plan will be closed to new GLWA employees and benefit levels frozen.

The Confirmation Order shall include an injunction against the subsequent amendment of the terms and conditions, and rules of operation, of the GRS, or any successor plan or trust, that govern the calculation of pension benefits (including the GRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, GRS Restoration Payment and the GRS Hybrid Pension Formula and terms of the GRS Hybrid Pension Plan) or against any action that governs the selection of the investment return assumption described in Section II.B.3.u.ii.B of the Plan, the contribution to the GRS, or the calculation or amount of GRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.

The State Contribution Agreement, the effectiveness of which is contingent upon the acceptance of the Plan by Classes 10 and 11, shall include the following principal terms: (a) the State will distribute the State Contribution for the benefit of Holders of Pension Claims; and (b) if the release set forth at Section III.D.7.b of the Plan is not approved by the Bankruptcy Court, Non-Accepting Holders shall not be entitled to the State Settlement Benefit Amount as part of such Holder's GRS Adjusted Pension Amount.

-35-

13-53846-swr   Doc 8372   Filed 03/31/14   Entered 03/31/14 08:24:68   Page 48 of 602
13-53846-tjt   Doc 3392   Filed 03/31/14   Entered 03/31/14 16:36:58   Page 48 of 162

Class 11 Claims are impaired.

*Class 12:  OPEB Claims*

Establishment of VEBA:  On or as soon as practicable following the Effective Date, the City will establish the Detroit VEBA to provide health care, life and other legally authorized welfare benefits to Detroit VEBA Beneficiaries and certain of their dependents and future City retirees.  The Detroit VEBA will be governed by a board of trustees that will be responsible for, among other things, management of property held by the Detroit VEBA, administration of the Detroit VEBA and determination of the level of and distribution of benefits to Detroit VEBA Beneficiaries.  The Detroit VEBA Trust Agreement and related plan documentation will be substantially in the form set forth on Exhibit I.A.71 to the Plan, and shall, among other things, identify the members of the Detroit VEBA's initial board of trustees.

Distributions to VEBA:  Promptly after the Detroit VEBA is established, the City shall:  (a) distribute an Unsecured Pro Rata Share of New B Notes to the Detroit VEBA in full satisfaction of the Allowed OPEB Claims, provided that the value of the Unsecured Pro Rata Share of New B Notes to be distributed to the Detroit VEBA shall be reduced by the amount of the Postpetition OPEB Payments; and (b) direct the trustees of the Employee Death Benefit Plan to terminate that plan and transfer all assets (net of expenses of termination) to the Detroit VEBA.  The City shall have no responsibility following the Effective Date to provide life insurance or death benefits to current or former employees.

Class 12 Claims are impaired.

*Class 13:  Downtown Development Authority Claims*

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Downtown Development Authority Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of New B Notes.

Class 13 Claims are impaired.

*Class 14:  Other Unsecured Claims*

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Other Unsecured Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of New B Notes.

Class 14 Claims are impaired.

*Class 15:  Convenience Claims*

Each Holder of an Allowed Convenience Claim, in full satisfaction of such Allowed Claim, shall receive Cash equal to the amount of 25% of such Allowed Claim (as reduced, if applicable, pursuant to an election by such Holder in accordance with Section I.A.50 of the Plan) on or as soon as reasonably practicable after the Effective Date, unless such Holder agrees to a different treatment of such Claim.

Class 15 Claims are impaired.

*Class 16:  Subordinated Claims*

On the Effective Date, all Subordinated Claims shall be disallowed, extinguished and discharged without Distribution under the Plan, and Holders of Subordinated Claims shall not receive or retain any property on account of such Claims.  Pursuant to section 1126(g) of the Bankruptcy Code, Class 16 is deemed to have rejected the Plan and Holders of Subordinated Claims are not entitled to cast a Ballot in respect of such Claims.

Class 16 Claims are impaired.

C.    **Treatment of Executory Contracts and Unexpired Leases**

1.    **Assumption**

Except as otherwise provided in the Plan, in any contract, instrument, release or other agreement or document entered into in connection with the Plan or in a Final Order of the Bankruptcy Court, or as requested in any motion Filed by the City on or prior to the Effective Date, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the City will be deemed to assume all Executory Contracts and Unexpired Leases to which it is a party.

2.    **Assumption of Ancillary Agreements**

Each Executory Contract and Unexpired Lease assumed pursuant to Section II.D.1 of the Plan will include any modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such Executory Contract or Unexpired Lease, unless any such modification, amendment, supplement, restatement or other agreement is rejected pursuant to Section II.D.6 of the Plan or designated for rejection in accordance with Section II.D.3 of the Plan.

3.    **Approval of Assumptions and Assignments**

The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumption of Executory Contracts and Unexpired Leases pursuant to Sections II.D.1 and II.D.2 of the Plan (and any related assignment) as of the Effective Date, except for Executory Contracts or Unexpired Leases that (a) have been rejected pursuant to a Final Order of the Bankruptcy Court, (b) are subject to a pending motion for reconsideration or appeal of an order authorizing the rejection of such Executory Contract or Unexpired Lease, (c) are subject to a motion to reject such Executory Contract or Unexpired Lease Filed on or prior to the Effective Date, (d) are rejected pursuant to Section II.D.6 of the Plan or (e) are designated for rejection in accordance with the last sentence of this paragraph. An order of the Bankruptcy Court (which may be the Confirmation Order) entered on or prior to the Confirmation Date will specify the procedures for providing notice to each party whose Executory Contract or Unexpired Lease is being assumed pursuant to the Plan of:  (a) the Executory Contract or Unexpired Lease being assumed; (b) the Cure Amount Claim, if any, that the City believes it would be obligated to pay in connection with such assumption; (c) any assignment of an Executory Contract or Unexpired Lease; and (d) the procedures for such party to object to the assumption of the applicable Executory Contract or Unexpired Lease, the amount of the proposed Cure Amount Claim or any assignment of an Executory Contract or Unexpired Lease.  If an objection to a proposed assumption, assumption and assignment or Cure Amount Claim is not resolved in favor of the City, the applicable Executory Contract or Unexpired Lease may be designated by the City for rejection, which shall be deemed effective as of the Effective Date.

4.    **Payments Related to the Assumption of Executory Contracts and Unexpired Leases**

To the extent that such Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract or Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the City:  (a) by payment of the Cure Amount Claim in Cash on the Effective Date or (b) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease.  If there is a dispute regarding:  (a) the amount of any Cure Amount Claim, (b) the ability of the City or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to the assumption of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code will be made within 30 days following the entry of a Final Order resolving the dispute and approving the assumption.

5.    **Contracts and Leases Entered Into After the Petition Date**

Contracts, leases and other agreements entered into after the Petition Date by the City, including (a) any Executory Contracts or Unexpired Leases assumed by the City and (b) the collective bargaining agreements identified on Exhibit II.D.5 to the Plan, will be performed by the City in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts or Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

-37-

13-53846-swr   Doc 8372   Filed 12/16/14   Entered 12/16/14 08:24:08   Page 50 of 602
13-53846-swr   Doc 8372   Filed 12/16/14   Entered 12/16/14 08:26:58   Page 50 of 602

### 6. Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, each Executory Contract and Unexpired Lease that is listed on Exhibit II.D.6 to the Plan shall be deemed rejected pursuant to section 365 of the Bankruptcy Code. The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the later of: (a) the Effective Date or (b) the resolution of any objection to the proposed rejection of an Executory Contract or Unexpired Lease. Each contract or lease listed on Exhibit II.D.6 to the Plan shall be rejected only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease. The City reserves its right, at any time on or prior to the Effective Date, to amend Exhibit II.D.6 to the Plan to delete any Executory Contract or Unexpired Lease therefrom, thus providing for its assumption pursuant to Section II.D.1 of the Plan, or add any Executory Contract or Unexpired Lease thereto, thus providing for its rejection pursuant to this Section II.D.6 of the Plan. The City will provide notice of any amendments to Exhibit II.D.6 to the Plan to the parties to the Executory Contracts or Unexpired Leases affected thereby and to the parties on the then applicable service list in the Chapter 9 Case. Listing a contract or lease on Exhibit II.D.6 to the Plan shall not constitute an admission by the City that such contract or lease is an Executory Contract or Unexpired Lease or that the City has any liability thereunder. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan shall be treated as Class 14 Claims (Other Unsecured Claims), subject to the provisions of section 502 of the Bankruptcy Code.

### 7. Rejection Damages Bar Date

Except as otherwise provided in a Final Order of the Bankruptcy Court approving the rejection of an Executory Contract or Unexpired Lease, Claims arising out of the rejection of an Executory Contract or Unexpired Lease must be Filed with the Bankruptcy Court and served upon counsel to the City on or before the later of: (a) 30 days after the Effective Date; or (b) 30 days after such Executory Contract or Unexpired Lease is rejected pursuant to a Final Order or designated for rejection in accordance with Section II.D.3 of the Plan. Any Claims not Filed within such applicable time periods will be forever barred from receiving a Distribution from, and shall not be enforceable against, the City.

### 8. Preexisting Obligations to the City Under Rejected Executory Contracts and Unexpired Leases

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the City under such contract or lease. Notwithstanding any applicable non-bankruptcy law to the contrary, the City expressly reserves and does not waive any right to receive, or any continuing obligation of a non-City party to provide, warranties, indemnifications or continued maintenance obligations on goods previously purchased, or services previously received, by the City from non-City parties to rejected Executory Contracts or Unexpired Leases, and any such rights shall remain vested in the City as of the Effective Date.

### 9. Insurance Policies

From and after the Effective Date, each of the City's insurance policies (other than welfare benefits insurance policies) in existence as of or prior to the Effective Date shall be reinstated and continue in full force and effect in accordance with its terms and, to the extent applicable, shall be deemed assumed by the City pursuant to section 365 of the Bankruptcy Code and Section II.D.1 of the Plan. Nothing contained herein shall constitute or be deemed a waiver of any Causes of Action that the City may hold against any Entity, including any insurer under any of the City's insurance policies. For the avoidance of doubt, no bond insurance policies shall be construed as City insurance policies. For the avoidance of doubt, nothing contained in Section II.D.9 of the Plan shall apply to reinstate or continue any obligation of the City or any fund thereof to any Bond Insurer.

## D. Effectiveness of the Plan

The Plan shall become effective on the Effective Date. Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

### 1. Conditions Precedent to the Effective Date

The Effective Date will not occur, and the Plan will not be consummated, unless and until the City has determined that all of following conditions have been satisfied or waived in accordance with Section III.B of the Plan:

-38-

13-53846-swr   Doc 8372   Filed 11/21/14   Entered 11/21/14 18:36:58   Page 51 of 602
13-53846-swr   Doc 8372   Filed 11/21/14   Entered 11/21/14 18:36:58   Page 51 of 602

- The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the City.

- The Bankruptcy Court shall have entered an order (which may be included in the Confirmation Order) approving and authorizing the City to take all actions necessary or appropriate to implement the Plan, including the transactions contemplated by the Plan and the implementation and consummation of the contracts, instruments, settlements, releases and other agreements or documents entered into or delivered in connection with the Plan.

- The Confirmation Order shall not be stayed in any respect.

- All actions and all contracts, instruments, settlements, releases and other agreements or documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable, in form and substance satisfactory to the City.

- All authorizations, consents and regulatory approvals, if any, required in connection with the consummation of the Plan have been obtained and not revoked.

- Any legislation that must be passed by the Michigan Legislature to effect any term of the Plan shall have been enacted.

- The Plan and all Exhibits shall have been Filed and shall not have been materially amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with Section VIII.A of the Plan.

- If Classes 10 and 11 have accepted the Plan, all conditions to the effectiveness of the State Contribution Agreement and the DIA Settlement Documents have been satisfied.

- The Effective Date shall have occurred within 180 days of the entry of the Confirmation Order, unless the City requests an extension of such deadline and such deadline is extended by the Bankruptcy Court.

## 2. Waiver of Conditions to the Effective Date

The conditions to the Effective Date set forth in Section III.A of the Plan may be waived in whole or part at any time by the City in its sole and absolute discretion.

## 3. Effect of Nonoccurrence of the Effective Date

If each of the conditions to the Effective Date is not satisfied, or duly waived in accordance with Section III.B of the Plan, then upon motion by the City made before the time that each of such conditions has been satisfied and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order will be vacated by the Bankruptcy Court; provided, however, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is satisfied before the Bankruptcy Court enters an order granting such motion. If the Confirmation Order is vacated pursuant to Section III.C of the Plan: (a) the Plan will be null and void in all respects, including with respect to (i) the discharge of Claims pursuant to section 944(b) of the Bankruptcy Code, (ii) the assumptions, assignments or rejections of Executory Contracts and Unexpired Leases pursuant to Section II.D of the Plan and (iii) the releases described in Section III.D.7 of the Plan; and (b) nothing contained in the Plan, nor any action taken or not taken by the City with respect to the Plan, the Disclosure Statement or the Confirmation Order, will be or will be deemed to be (i) a waiver or release of any Claims by or against the City, (ii) an admission of any sort by the City or any other party in interest or (iii) prejudicial in any manner the rights of the City or any other party in interest.

## 4. Request for Waiver of Automatic Stay of Confirmation Order

The Plan shall serve as a motion seeking a waiver of the automatic stay of the Confirmation Order imposed by Bankruptcy Rule 3020(e). Any objection to this request for waiver shall be Filed and served on the parties listed in Section VIII.L of the Plan on or before the Voting Deadline.

-39-

13-53846-swr Doc 8372 Filed 03/61/14 Entered 12/16/14 08:24:68 Page 52 of 682
13-53846-swr Doc 8372 Filed 03/31/14 Entered 12/16/14 08:36:38 Page 52 of 682

## E. Effects of Confirmation

### 1. Binding Effect

Pursuant to section 944(a) of the Bankruptcy Code, on and after the Effective Date, the provisions of the Plan shall bind all Holders of Claims, and their respective successors and assigns, whether or not the Claim of any such Holder is Impaired under the Plan and whether or not such Holder has accepted the Plan. The releases and settlements effected under the Plan will be operative, and subject to enforcement by the Bankruptcy Court, from and after the Effective Date, including pursuant to the injunctive provisions of the Plan. Once approved, the compromises and settlements embodied in the Plan, along with the treatment of any associated Allowed Claims, shall not be subject to any collateral attack or other challenge by any Entity in any court or other forum. As such, any Entity that opposes the terms of any compromise and settlement set forth in the Plan must (a) challenge such compromise and settlement prior to Confirmation of the Plan and (b) demonstrate appropriate standing to object and that the subject compromise and settlement does not meet the standards governing bankruptcy settlements under Bankruptcy Rule 9019 and other applicable law.

### 2. Dissolution of Official Committees

Following the Effective Date, the Retiree Committee, to the extent not previously dissolved or disbanded, will dissolve and disband, and the members of the Retiree Committee and their respective professionals will cease to have any role arising from or related to the Chapter 9 Case, provided, however, that, if and only if the Retiree Committee is the Creditor Representative under the Plan, the Retiree Committee shall continue to exist solely for the purposes of objecting to or otherwise asserting the City's or its creditors' rights with respect to Disputed COP Claims pursuant to Section II.B.3.s.i of the Plan. If the Retiree Committee is the Creditor Representative, it shall be disbanded upon the final resolution of all Disputed COP Claims or pursuant to an order of the Bankruptcy Court, which order may be sought by the City for good cause shown. All fees and expenses of the Creditor Representative shall be subject to the approval of the City. All disputes relating to the approval of fees and expenses shall be determined by the Bankruptcy Court. No party to any such dispute shall have any right to appeal an order of the Bankruptcy Court resolving any such dispute.

### 3. Preservation of Rights of Action by the City

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code, the City will retain and may enforce any claims, demands, rights, defenses and Causes of Action that it may hold against any Entity, to the extent not expressly released under the Plan or pursuant to any Final Order of the Bankruptcy Court. A nonexclusive schedule of currently pending actions and claims brought by the City is attached as Exhibit III.D.2 to the Plan. The City's inclusion of, or failure to include, any right of action or claim on Exhibit III.D.2 to the Plan shall not be deemed an admission, denial or waiver of any claims, demands, rights or Causes of Action that the City may hold against any Entity, and all Entities are hereby notified that the City intends to preserve all such claims, demands, rights or Causes of Action.

### 4. Comprehensive Settlement of Claims and Controversies

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all claims or controversies relating to the rights that a holder of a Claim may have with respect to any Allowed Claim or any Distribution to be made pursuant to the Plan on account of any Allowed Claim. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements are (a) in the best interests of the City, its property and Claim Holders and (b) fair, equitable and reasonable. For the avoidance of doubt, Section III.D.3 of the Plan shall not affect or limit the application of section 509 of the Bankruptcy Code or any similar doctrine to Bond Insurance Policy Claims.

### 5. Discharge of Claims

#### (a) Complete Satisfaction, Discharge and Release.

Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims arising on or before the Effective Date, including any interest accrued on Claims from and after the Petition Date. Except as provided

-40-

13-53846-swr   Doc 8372   Filed 03/31/14   Entered 03/31/14 03:24:40   Page 53 of 602
13-53846-swr   Doc 8372   Filed 03/31/14   Entered 03/31/14 03:36:38   Page 53 of 162

in the Plan or in the Confirmation Order, Confirmation will, as of the Effective Date, discharge the City from all Claims or other debts that arose on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (iii) the Holder of a Claim based on such debt has accepted the Plan.

(b)     **Discharge**

In accordance with Section III.D.4.a of the Plan, except as expressly provided otherwise in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination, as of the Effective Date, of a discharge of all Claims and other debts and Liabilities against the City, pursuant to sections 524(a)(1), 524(a)(2) and 944(b) of the Bankruptcy Code, and such discharge will void any judgment obtained against the City at any time, to the extent that such judgment relates to a discharged Claim; provided that such discharge will not apply to (i) Claims specifically exempted from discharge under the Plan; and (ii) Claims held by an Entity that, before the Confirmation Date, had neither notice nor actual knowledge of the Chapter 9 Case.

**6.     Injunction**

**On the Effective Date, except as otherwise provided herein or in the Confirmation Order,**

- **All Entities that have been, are or may be holders of Claims against the City, Indirect 36th District Court Claims or Indirect Employee Indemnity Claims, along with their Related Entities, shall be permanently enjoined from taking any of the following actions against or affecting the City or its property, DIA Corp. or its property, the DIA Assets, the Released Parties or their respective property, the GLWA and its property (if a DWSD Transaction is consummated on or prior to the Effective Date) and the Related Entities of each of the foregoing, with respect to such claims (other than actions brought to enforce any rights or obligations under the Plan and appeals, if any, from the Confirmation Order):**

  - **commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against or affecting the City or its property (including (a) all suits, actions and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice, (b) Indirect 36th District Court Claims and (c) Indirect Employee Indemnity Claims).  For the avoidance of doubt, because, under Michigan law, the City is solely responsible for funding the 36th District Court and because the City owns certain property located in the 36th District Court, actions taken against the 36th District Court and/or its property constitute indirect actions against the City and/or its property.**

  - **enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order against the City or its property.**

  - **creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the City or its property.**

  - **asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the City or its property.**

  - **proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan or the settlements set forth herein to the extent such settlements have been approved by the Bankruptcy Court in connection with Confirmation of the Plan.**

  - **taking any actions to interfere with the implementation or consummation of the Plan.**

- **All Entities that have held, currently hold or may hold any Liabilities released or exculpated pursuant to the Plan will be permanently enjoined from taking any of the following actions against the State, the State Related Entities and the Released Parties or any of their respective property on account of such released Liabilities:  (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (b) enforcing, levying,**

attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien; (d) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the State, a State Related Entity or a Released Party; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

7.     **Exculpation.**

From and after the Effective Date, to the fullest extent permitted under applicable law, neither the City, its Related Entities (including the members of the City Council, the Mayor and the Emergency Manager), to the extent a claim arises from actions taken by such Related Entity in its capacity as a Related Entity of the City, the State, the State Related Entities, nor the Released Parties shall have or incur any liability to any person or Entity for any act or omission in connection with, relating to or arising out of the City's restructuring efforts and the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the formulation, preparation, negotiation, dissemination, consummation, implementation, confirmation or approval (as applicable) of the Plan, the property to be distributed under the Plan, the settlements implemented under the Plan, the Exhibits, the Disclosure Statement, any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan or the management or operation of the City; provided, however, that the foregoing provisions shall not affect the liability of the City, its Related Entities, the State, the State Related Entities and the Released Parties that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct or any act or omission occurring before the Petition Date. The City, its Related Entities (with respect to actions taken by such Related Entities in their capacities as Related Entities of the City), the State, the State Related Entities and the Released Parties shall be entitled to rely upon the advice of counsel and financial advisors with respect to their duties and responsibilities under, or in connection with, the Chapter 9 Case, the administration thereof and the Plan.

8.     **Releases.**

Without limiting any other applicable provisions of, or releases contained in, the Plan or any contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, as of the Effective Date, in consideration for the obligations of the City under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan (including the State Contribution Agreement):

- each holder of a Claim that votes in favor of the Plan, to the fullest extent permissible under law, will be deemed to forever release, waive and discharge all Liabilities in any way relating to the City, the Chapter 9 Case, the Plan, the Exhibits or the Disclosure Statement that such entity has, had or may have against the City, its Related Entities, the State, the State Related Entities and the Released Parties (which release will be in addition to the discharge of Claims provided herein and under the Confirmation Order and the Bankruptcy Code), provided, however, that the foregoing provisions shall not affect the liability of the City, its Related Entities and the Released Parties that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted gross negligence or willful misconduct; and

- if the State Contribution Agreement is consummated, each holder of a Pension Claim will be deemed to forever release, waive and discharge all Liabilities arising from or related to the City, the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, § 24 of the Michigan Constitution that such party has, had or may have against the State and any State Related Entities.

The City believes that the provisions of the releases contemplated in this Section III.E comply with applicable Sixth Circuit law.

F.     **Retention of Jurisdiction by the Bankruptcy Court**

Pursuant to sections 105(c), 945 and 1142(b) of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over

-42-

13-53846-tjt   Doc 8372   Filed 11/21/14   Entered 11/21/14 18:24:48   Page 55 of 602
13-53846-swr   Doc 8372   Filed 11/21/14   Entered 11/21/14 18:36:58   Page 55 of 162

all matters arising out of, and related to, the City's chapter 9 case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

- Allow, disallow, estimate, determine, liquidate, reduce, classify, re-classify, estimate or establish the priority or secured or unsecured status of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the amount, allowance, priority or classification of Claims;

- Enforce the term (maturity) of the collective bargaining agreements identified on Exhibit II.D.5 to the Plan, notwithstanding any state law to the contrary;

- Resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including claims for payment of any cure amount;

- Ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

- Adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving the City that may be pending on the Effective Date or brought thereafter;

- Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

- Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents;

- Approve any modification of the Plan or approve any modification of the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any order, the Plan, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, or enter any order in aid of confirmation pursuant to sections 945 and 1142(b) of the Bankruptcy Code, in such manner as may be necessary or appropriate to consummate the Plan;

- Issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

- Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or Distributions pursuant to the Plan are enjoined or stayed;

- Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

- Enforce or clarify any orders previously entered by the Bankruptcy Court in the Chapter 9 Case;

- Enter a final decree closing the Chapter 9 Case pursuant to section 945(b) of the Bankruptcy Code; and

- Hear any other matter over which the Bankruptcy Court has jurisdiction under the provisions of the Bankruptcy Code and the Bankruptcy Rules subject to any limits on the Bankruptcy Court's jurisdiction and powers under sections 903 and 904 of the Bankruptcy Code.

# IV.

## MEANS OF IMPLEMENTATION OF THE PLAN

### A. The New Notes

#### 1. The New B Notes

On the Effective Date, the City shall issue the New B Notes and distribute them as set forth in the Plan. The definitive documentation governing the New B Notes shall provide generally for the following terms:

- *Obligation*: The City's obligations with respect to the New B Notes shall be a general and unsecured obligation of the City.

- *Initial Principal Amount*: $650.0 million.

- *Interest Rate*: 4.0%.

- *Maturity*: 30 years.

- *Amortization*: Interest only for 10 years; amortization in 20 equal annual installments beginning on the interest payment date nearest to the 11th anniversary from issuance.

### B. Alternatives Related to DWSD

#### 1. DWSD Remains a Department of the City

##### (a) Rates and Revenues

The DWSD will maintain Fiscal Year 2015 rate setting protocols for a minimum of five years, subject to certain changes necessary to stabilize water and sewer revenues. Immediately following the Effective Date, the City will begin planning a rate stability program for City residents. Such program may provide for affordability of retail rates to be taken into account in the development of wholesale rates across the system.

##### (b) DWSD CBAs

Collective bargaining agreements with respect to current DWSD employees that are in effect and not expired as of the Effective Date will be assumed by the City.

##### (c) The New DWSD Bonds

If a DWSD transaction is not consummated, on the Effective Date, DWSD shall, as necessary, issue the New DWSD Bonds and distribute them as set forth in the Plan. The definitive documentation governing the New DWSD Bonds shall be filed with the Plan Supplement, and shall provide generally for the following:

- *Principal*: Equal to the amount of DWSD Bonds receiving New DWSD Bonds, plus amounts necessary to pay expenses of the financing.

- *Interest rate*: Calculated by reference to the Interest Rate Reset Chart attached as Exhibit I.A.159 to the Plan.

- *Maturity Dates*: Equal to the existing maturity(ies) of each CUSIP of DWSD Bonds receiving New DWSD Bonds.

-44-

13-53846-swr   Doc 8379   Filed 03/31/14   Entered 12/16/14 08:24:40   Page 57 of 608
13-53846-swr   Doc 9382   Filed 03/31/14   Entered 03/31/14 18:36:38   Page 57 of 162

- *Prepayment*: The City may prepay or redeem all or any portion of the New DWSD Bonds at any time at its option and without penalty or premium.

- *Transfer of Assets*: The City shall have the authority to permit the lease or transfer of assets currently used in DWSD's operations to one or more new authorities formed to provide water and/or sewer services provided that such transferee(s) assume the applicable portion of the then outstanding New DWSD Bonds. In the event that such DWSD assets are leased or transferred, the definition of "operations and maintenance expenses" in the documentation for the New DWSD Bonds shall be amended to (i) include the amount of any lease payment payable to the City's General Fund; and (ii) exclude such amount from the liens securing the New DWSD Bonds.

- *Other Terms*: The New DWSD Bonds otherwise shall have the same terms and conditions as the applicable CUSIP of DWSD Bonds receiving New DWSD Bonds.

### (d)    The New Existing Rate DWSD Bonds

If a DWSD transaction is not consummated, on the Effective Date, the City shall, as necessary, issue the New Existing Rate DWSD Bonds and distribute them as set forth in the Plan. The definitive documentation governing the New Existing Rate DWSD Bonds shall be filed with the Plan Supplement, and shall provide generally for the following:

- *Principal*: Equal to the amount of DWSD Bonds receiving New Existing Rate DWSD Bonds, plus amounts necessary to pay expenses of the financing.

- *Interest rate*: Equal to the existing interest rates of each CUSIP of DWSD Bonds receiving New Existing Rate DWSD Bonds.

- *Maturity Dates*: Equal to the existing maturity(ies) of each CUSIP of DWSD Bonds receiving New Existing Rate DWSD Bonds.

- *Prepayment*: The City may prepay or redeem all or any portion of the New Existing Rate DWSD Bonds at any time at its option and without penalty or premium.

- *Transfer of Assets*: The City shall have the authority to permit the lease or transfer of assets currently used in DWSD's operations to one or more new authorities formed to provide water and/or sewer services provided that such transferee(s) assume the applicable portion of the then outstanding New Existing Rate DWSD Bonds. In the event that such DWSD assets are leased or transferred, the definition of "operations and maintenance expenses" in the documentation for the New Existing Rate DWSD Bonds shall be amended to (i) include the amount of any lease payment payable to the City's General Fund; and (ii) exclude such amount from the liens securing the New Existing Rate DWSD Bonds.

- *Other Terms*: The New Existing Rate DWSD Bonds otherwise shall have the same terms and conditions as the applicable CUSIP of DWSD Bonds receiving New Existing Rate DWSD Bonds.

### 2.    Potential DWSD Transaction

As more fully described in Section VIII.K.1 of this Disclosure Statement, the Plan contemplates that the City may enter into a DWSD Transaction that would include the formation of the GLWA to conduct the operations currently conducted by the DWSD.

### (a)    The New GLWA Bonds

If a DWSD Transaction is consummated, on the Effective Date, the GLWA shall, as necessary, issue the New GLWA Bonds and distribute them as set forth in the Plan. The definitive documentation governing the New GLWA Bonds shall be filed with the Plan Supplement, and shall provide generally for the following:

- *Obligation*: The New GLWA Bonds shall be obligations of GLWA.

-45-

- *Principal*:  Equal to the amount of DWSD Bonds receiving New GLWA Bonds, plus amounts necessary to pay expenses of the financing.

- *Interest rate*:  Calculated by reference to the Interest Rate Reset Chart attached as Exhibit I.A.159 to the Plan.

- *Maturity Dates*:  Equal to the existing maturity(ies) of each CUSIP of DWSD Bonds receiving New GLWA Bonds.

- *Prepayment*:  GLWA may prepay or redeem all or any portion of the New GLWA Bonds at any time at its option and without penalty or premium.

- *Operations and Maintenance Expenses*:  The "operations and maintenance expenses" of GLWA shall (i) include the amount of any lease payment payable to the City's General Fund; and (ii) be excluded from the liens securing the New GLWA Bonds.

- *Other Terms*:  The New GLWA Bonds otherwise shall have the same terms and conditions as the applicable CUSIP of DWSD Bonds receiving New GLWA Bonds.

**(b)**      **The New Existing Rate GLWA Bonds**

If a DWSD Transaction is consummated, on the Effective Date, GLWA shall, as necessary, issue the New Existing Rate GLWA Bonds and distribute them as set forth in the Plan.  The definitive documentation governing the New Existing Rate GLWA Bonds shall be filed with the Plan Supplement, and shall provide generally for the following:

- *Obligation*:  The New Existing Rate GLWA Bonds shall be obligations of GLWA.

- *Principal*:  Equal to the amount of DWSD Bonds receiving New Existing Rate GLWA Bonds, plus amounts necessary to pay expenses of the financing.

- *Interest rate*:  Equal to the existing interest rates of each CUSIP of DWSD Bonds receiving New Existing Rate GLWA Bonds.

- *Maturity Dates*:  Equal to the existing maturity(ies) of each CUSIP of DWSD Bonds receiving New Existing Rate GLWA Bonds.

- *Prepayment*:  GLWA may prepay or redeem all or any portion of the New Existing Rate GLWA Bonds at any time at its option and without penalty or premium.

- *Operations and Maintenance Expenses*:  The "operations and maintenance expenses" of GLWA shall (i) include the amount of any lease payment payable to the City's General Fund; and (ii) be excluded from the liens securing the New Existing Rate GLWA Bonds.

- *Other Terms*:  The New Existing Rate GLWA Bonds otherwise shall have the same terms and conditions as the applicable CUSIP of DWSD Bonds receiving New Existing Rate GLWA Bonds (to the extent not otherwise negotiated).

**(c)**      **The New GLWA Revolving Bonds**

If a DWSD Transaction is consummated, on the Effective Date, the GLWA shall, as necessary, issue the New GLWA Revolving Bonds and distribute them as set forth in the Plan.  The definitive documentation governing the New GLWA Revolving Bonds shall be filed with the Plan Supplement, and shall provide generally for the following:

- *Obligation*:  The New GLWA Revolving Bonds shall be obligations of GLWA.

- *Principal*:  Equal to the outstanding principal on the relevant existing DWSD Revolving Bonds.

-46-

13-53846-swr   Doc 8372   Filed 03/31/14   Entered 03/31/14 10:36:38   Page 59 of 162
13-53846-swr   Doc 8372   Filed 03/31/14   Entered 03/31/14 10:36:38   Page 59 of 162

- *Interest rate*: Equal to the existing interest rates of each DWSD Series of DWSD Revolving Bonds receiving New GLWA Revolving Bonds.

- *Maturity Dates*: 30 years.

- *Other Terms*: The New GLWA Revolving Bonds otherwise shall have the same terms and conditions as the applicable DWSD Series of DWSD Revolving Bonds receiving New GLWA Revolving Bonds.

## C. The Plan COP Settlement

The City shall consummate the Plan COP Settlement on the Effective Date, substantially on the terms set forth on Exhibit I.A.208 to the Plan. Settling COP Claimants shall receive the treatment described in Section II.B.3.s.iii.A of the Plan.

## D. The State Contribution Agreement

On the Effective Date, if Classes 10 and 11 vote to accept the Plan, the City and the State will enter into the State Contribution Agreement, substantially on the terms set forth on Exhibit I.A.255 to the Plan. During the 20-year period following the Effective Date, the State will make periodic payments in an aggregate nominal amount of $350 million for the benefit of Holders of Pension Claims on a Pro Rata basis.

## E. The DIA Settlement

On the Effective Date, the City and the DIA Funding Parties will enter into the DIA Settlement, pursuant to which (1) the DIA Funding Parties have committed to assist in the funding of the City's restructured legacy pension obligations and (2) the City has agreed to enter into certain transactions that will cause the DIA Assets to remain in the City in perpetuity and to otherwise make the DIA Assets available for the benefit of the residents of the City and the Counties and the citizens of the State. The definitive documentation governing the DIA Settlement, the material terms of which are attached as Exhibit I.A.80 to the Plan, provides generally for, and entirely qualifies, both the following and the material terms attached to the Plan as Exhibit I.A.79:

### 1. Funding Contributions

The DIA Settlement will be funded as follows: (a) an irrevocable commitment of at least $366 million by the Foundations; and (b) in addition to its continuing commitments outside of the DIA Settlement, an irrevocable commitment from DIA Corp. to raise at least $100 million from its donors (subject to certain adjustments as set forth in the DIA Settlement Documents), the payment of which $100 million will be guaranteed by DIA Corp., subject to the terms of the DIA Settlement Documents. The foregoing commitments shall be funded over the course of the 20-year period immediately following the Effective Date (subject to the annual confirmation of the City's continuing compliance with the terms of the DIA Settlement). Amounts committed by the Foundations will be paid to the CFSEM Supporting Organization, which will (a) transfer such amounts for the purpose of funding the Retirement Systems upon the City's satisfaction of certain conditions and (b) not be subject to claims of creditors of the Community Foundation for Southeast Michigan.

### 2. Transfer of DIA Assets

Upon closing of the DIA Settlement transaction, the City shall irrevocably transfer the DIA Assets to DIA Corp., as trustee, to be held in perpetual charitable trust, and within the City limits, for the primary benefit of the residents of the City and the Counties and the citizens of the State.

### 3. Conditions to the Foundations' Participation

The Foundations' participation in the DIA Settlement is conditioned upon, among other things, the following: (a) execution of the DIA Settlement Documents by each Foundation; (b) the irrevocable commitment from the DIA Corp. described in Section IV.E.1 of the Plan; (c) the acceptance of the Plan by Classes 10 and 11; (d) the irrevocable transfer by the City of the DIA Assets described in Section IV.E.2 of the Plan; (e) the existence of appropriate governance and oversight structures at DIA Corp. that include representation of the City, the DIA Funding Parties and other stakeholders; (f) the earmarking of all funds provided by the DIA Funding Parties towards the recoveries upon Pension Claims under the

-47-

13-53846-swr  Doc 8372  Filed 11/21/14  Entered 11/21/14 00:24:40  Page 60 of 602
13-53846-tjt  Doc 8272  Filed 11/05/14  Entered 11/05/14 16:36:38  Page 60 of 182

Plan for Holders of Claims in Classes 10 and 11; (g) the existence of appropriate prospective governance and financial oversight mechanisms for the Retirement Systems; (h) the affirmation by County authorities of certain existing funding obligations with respect to DIA Corp.; (i) the approval of the DIA Settlement by the Attorney General for the State; (j) the agreement of the State to provide the State Contribution in an aggregate amount up to $350 million; (k) the occurrence of the Effective Date no later than December 31, 2014; and (l) the City's agreement to indemnify and hold harmless the Foundations and the CFSEM Supporting Organization pursuant to, and in accordance with, the terms of the DIA Settlement Documents.

## F.     Issuance of the New Securities

The City shall issue the New Securities on the Effective Date or a subsequent Distribution Date, as applicable. To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non bankruptcy law, the issuance of New Securities will be exempt from registration under the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder and any other applicable non-bankruptcy law or regulation.

## G.     Cancellation of Existing Bonds and Bond Documents

Except (1) as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan, (2) for purposes of evidencing a right to Distribution under the Plan or (3) as specifically provided otherwise in the Plan, on the Effective Date, the Bonds and the Bond Documents will be deemed automatically cancelled, terminated and of no further force or effect against the City without any further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the parties, as applicable, under the Bonds and the Bond Documents shall be discharged; provided, however, that the Bond Documents shall continue in effect solely to (a) to allow the Disbursing Agent to make any Distributions as set forth in the Plan and to perform such other necessary administrative or other functions with respect thereto, (b) for any trustee, agent or similar entity under the Bond Documents to have the benefit of all the rights and protections and other provisions of the Bond Documents and all other related agreements with respect to priority in payment and lien rights with respect to any Distribution and (c) as may be necessary to preserve any claim by a Bondholder and/or Bond Agent under a Bond Insurance Policy or against any Bond Insurer. Nothing in the Plan is intended to impair, modify, affect or otherwise alter the rights of (a) Bondholders and/or Bond Agents with respect to claims under applicable Bond Insurance Policies and/or against the Bond Insurers or (b) Holders of COP Claims with respect to claims under applicable policies and/or other instruments insuring the COPs and obligations related thereto.

## H.     Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date, all Liens against the City's property will be deemed fully released and discharged, and all of the right, title and interest of any holder of such Liens, including any rights to any collateral thereunder, will revert to the City. As of the Effective Date, (1) the holders of such Liens will be authorized and directed to release any collateral or other property of the City (including any cash collateral) held by such Holder and to take such actions as may be requested by the City to evidence the release of such Lien, including the execution, delivery, filing or recording of such releases as may be requested by the City, and (2) the City shall be authorized to execute and file on behalf of creditors Form UCC-3 Termination Statements or such other forms as may be necessary or appropriate to implement the provisions of Section IV.H of the Plan.

## I.     Professional Fee Reserve

On the Effective Date, the City shall establish and fund the Professional Fee Reserve. The Professional Fee Reserve shall be funded in an amount sufficient to pay the Fee Review Professional Fees that remain unpaid as of the Effective Date. The funds held in the Professional Fee Reserve may not be used for any purpose other than the payment of Fee Review Professional Fees until any and all disputes regarding the Fee Review Professional Fees, including any disputes arising under the Fee Review Order, have been fully and finally resolved pursuant to a Final Order or a stipulation between the disputing parties. Any amounts remaining in the Professional Fee Reserve after final resolution of all such disputes and the payment of all Fee Review Professional Fees determined to be reasonable in accordance with the Fee Review Order shall be released to the General Fund.

-48-

13-53846-swr   Doc 8372   Filed 11/21/14   Entered 11/21/14 18:24:48   Page 61 of 162
13-53846-swr   Doc 8372   Filed 11/21/14   Entered 11/21/14 18:36:38   Page 61 of 162

**J.       Assumption of Indemnification Obligations**

Notwithstanding anything otherwise to the contrary in the Plan, nothing in the Plan shall discharge or impair the obligations of the City as provided in the City Charter of the City or other organizational documents, resolutions, employment contracts, applicable law or other applicable agreements as of the Petition Date to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of officers and employees of the City (consistent with the injunction provisions of Section III.D.5 of the Plan and including the members of the City Council, the Mayor and the Emergency Manager) and their Related Entities, in each case to the extent such Entities were acting in such capacity, against any claims or causes of action whether direct or derivative, liquidated or unliquidated, foreseen or unforeseen, asserted or unasserted; provided that Section IV.J of the Plan shall be read in conjunction with the provisions for Indirect Employee Indemnity Claims set forth in Section III.D.5 of the Plan.  For the avoidance of doubt, no indemnification provision in any loan document, bond document, Bond Insurance Policy or other agreement with a Bond Insurer is exempted from discharge by reason of Section IV.J of the Plan.

**K.       Incorporation of Retiree Health Care Settlement**

The terms of the Retiree Health Care Settlement Agreement resolving the Retiree Health Care Litigation, which agreement is attached as Exhibit I.A.227 to the Plan, are incorporated into the Plan by reference and shall be binding upon the parties thereto.

**L.       Payment of Workers' Compensation Claims**

From and after the Effective Date, (1) the City will continue to administer and pay all valid claims for benefits and liabilities for which the City is responsible under applicable State workers' compensation law, regardless of when the applicable injuries were incurred, in accordance with the City's prepetition practices and procedures and governing State workers' compensation law, and (2) nothing in the Plan shall discharge, release or relieve the City from any current or future liability under applicable State workers' compensation law.  The City expressly reserves the right to challenge the validity of any claim for benefits or liabilities arising under applicable State workers' compensation law.

**M.       Exit Facility**

On the Effective Date, the City shall enter into the Exit Facility, as well as any ancillary notes, documents or agreements in connection therewith, including, without limitation, any documents required in connection with the creation or perfection of the liens securing the Exit Facility.

**N.       Provisions Regarding Distributions Under the Plan**

**1.       Appointment of Disbursing Agent**

The City may act as Disbursing Agent or may employ or contract with other Entities to act as the Disbursing Agent or to assist in or make the Distributions required by the Plan.  Any Disbursing Agent appointed by the City will serve without bond.  Other than as specifically set forth in the Plan, the Disbursing Agent shall make all Distributions required to be made under the Plan.

**2.       Distributions on Account of Allowed Claims**

Except as otherwise provided in the Plan, on the Effective Date or as soon as practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive from the Disbursing Agent the Distributions that the Plan provides for Allowed Claims in the applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Section VI.B of the Plan.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the Distributions provided for in the Plan, regardless of whether such Distributions are delivered on or at any time after the Effective Date.  Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Distribution in excess of the Allowed amount of such Claim.

-49-

13-53846-swr   Doc 8372   Filed 12/16/14   Entered 12/16/14 08:36:38   Page 62 of 602
13-53846-swr   Doc 8372   Filed 12/16/14   Entered 12/16/14 08:36:38   Page 62 of 602

3. **Certain Claims to Be Expunged**

Any Claim that has been or is hereafter listed in the List of Creditors as contingent, unliquidated or disputed, and for which no proof of Claim is or has been timely Filed, is not considered to be an Allowed Claim and shall be expunged without further action by the City and without further notice to any party or any action, approval or order of the Bankruptcy Court.

4. **Record Date for Distributions; Exception for Bond Claims**

With the exception of Bond Claims, neither the City nor any Disbursing Agent will have any obligation to recognize the transfer of, or the sale of any participation in, any Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute only to those Holders of Allowed Claims (including Holders of Claims that become Allowed after the Distribution Record Date) that are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date. With the exception of the Bond Claims, the City and any Disbursing Agent shall instead be entitled to recognize and deal for all purposes under the Plan with only those record Holders stated on the official Claims Register as of the close of business on the Distribution Record Date. Unless otherwise set forth in the Confirmation Order, the City shall not establish a record date for Distributions to Holders of Bond Claims.

5. **Means of Cash Payments**

Except as otherwise specified herein, all Cash payments made pursuant to the Plan shall be in U.S. currency and made by check drawn on a domestic bank selected by the Disbursing Agent or, at the option of the Disbursing Agent, by wire transfer, electronic funds transfer or ACH from a domestic bank selected by the Disbursing Agent; provided, however, that Cash payments to foreign Holders of Allowed Claims may be made, at the option of the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

6. **Selection of Distribution Dates for Allowed Claims**

Except where the Plan requires the making of a Distribution on account of a particular Allowed Claim within a particular time, the Disbursing Agent shall have the authority to select Distribution Dates that, in the judgment of the Disbursing Agent, provide Holders of Allowed Claims with payments as quickly as reasonably practicable while limiting the costs incurred in the distribution process. Upon the selection of a Distribution Date by the Disbursing Agent, the Disbursing Agent shall File a notice of such Distribution Date that provides information regarding the Distribution to be made.

7. **Limitations on Amounts to Be Distributed to Holders of Allowed Claims Otherwise Insured**

No Distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the City's insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy; provided that, if the City believes a Holder of an Allowed Claim has recourse to an insurance policy and intends to direct the Disbursing Agent to withhold a Distribution pursuant to Section V.G of the Plan, the City shall provide written notice to such Holder regarding what the City believes to be the nature and scope of applicable insurance coverage. To the extent that one or more of the City's insurance carriers agrees to satisfy a Claim in full, then immediately upon such agreement such Claim may be expunged without a Claims objection having to be Filed and without any further notice or any action, order or approval of the Bankruptcy Court. Nothing in the Plan, including Section V.G of the Plan, shall constitute a waiver of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities that any Entity may hold against any other Entity other than the City, including the City's insurance carriers. For the avoidance of doubt, Section V.G of the Plan shall not apply to Bond Insurance Policies or Swap Insurance Policies.

8. **City's Rights of Setoff Preserved**

Notwithstanding anything to the contrary in the Plan, pursuant to section 553 of the Bankruptcy Code or otherwise applicable non-bankruptcy law, the City may set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Allowed Claim the claims, rights and Causes of Action of any nature that the City may assert against the Holder of such Claim; provided, however, that neither the failure to effect a setoff nor the allowance of any Claim pursuant to the terms of the Plan shall constitute a waiver or release by the City of any claims, rights and Causes of Action that the City may assert against such Holder, all of which are expressly preserved.

-50-

13-53846-swr   Doc 8372   Filed 11/21/14   Entered 11/21/14 18:23:40   Page 63 of 602
13-53846-swr   Doc 8372   Filed 11/21/14   Entered 11/21/14 18:36:58   Page 63 of 162

9. **Delivery of Distributions and Undeliverable or Unclaimed Distributions.**

(a) **Delivery of Distributions Generally**

Except as set forth in Section V.I.2 of the Plan, Distributions to Holders of Allowed Claims shall be made at the addresses set forth in the City's records unless such addresses are superseded by proofs of Claim or transfers of Claim Filed pursuant to Bankruptcy Rule 3001.

(b) **Delivery of Distributions on Account of Bond Claims**

Distributions on account of the Bond Claims shall (i) be made by the Disbursing Agent to the Bond Agent under the applicable Bond Documents for the benefit of Holders of Bond Claims and (ii) be deemed completed when made by the Disbursing Agent to the Bond Agent as if such Distributions were made directly to the Holders of such Claims. The applicable Bond Agent, in turn, shall make such distributions to the applicable Holders pursuant to the terms and conditions of the applicable Bond Documents and subject to the respective rights, claims and interests, if any, that the Bond Agent may have under the applicable Bond Documents or otherwise to the recovery and/or reimbursement of their fees, costs and expenses (including the fees, costs and expenses of counsel and financial advisors) from any distribution hereunder, whether such rights, claims or interests are in the nature of a charging lien or otherwise. The Bond Agent shall not be required to give any bond, surety or other security for the performance of its duties with respect to such Distributions.

(c) ***De Minimis*** **Distributions / No Fractional New Securities**

No distribution shall be made by the Disbursing Agent on account of an Allowed Claim if the amount to be distributed to the specific Holder of an Allowed Claim on the applicable Distribution Date has an economic value of less than $25.00. No fractional New Securities shall be distributed. Where a fractional portion of a New Security otherwise would be called for under the Plan, the actual issuance shall reflect a rounding down to the nearest whole New Security.

(d) **Undeliverable or Unclaimed Distributions**

In the event that any Distribution to any Holder is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such Distribution shall be made to such Holder without interest.

Any Holder of an Allowed Claim that does not claim an undeliverable or unclaimed Distribution within six months after the Effective Date shall be deemed to have forfeited its claim to such Distribution and shall be forever barred and enjoined from asserting any such claim against the City or its property. In such cases, any Cash held by the City on account of such undeliverable or unclaimed Distributions shall become the property of the City free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary. Any New Securities held for distribution on account of such Claims shall be canceled and of no further force or effect. Nothing contained in the Plan shall require any Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

(e) **Time Bar to Cash Payment Rights**

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof. Requests for reissuance of any check shall be made to the Disbursing Agent by the Holder of the Allowed Claim to whom such check originally was issued within 180 days after the date of the original check issuance. After such date, the Claim of any Holder to the amount represented by such voided check shall be released and forever barred from assertion against the City and its property.

10. **Other Provisions Applicable to Distributions in All Classes**

(a) **No Postpetition Interest**

Except as otherwise specifically provided for in the Plan, or required by applicable bankruptcy law, the City shall have no obligation to pay any amount that constitutes or is attributable to interest on an Allowed Claim accrued after the Petition Date and no Holder of a Claim shall be entitled to be paid any amount that constitutes or is attributable to interest accruing on or after the Petition Date on any Claim without regard to the characterization of such amounts in any document

or agreement or to whether such amount has accrued for federal income tax purposes. Any such amount that constitutes or is attributable to interest that has been accrued and has not been paid by the City shall be cancelled as of the Effective Date for federal income tax purposes.

### (b) Compliance with Tax Requirements

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the City and any Disbursing Agent shall comply with all Tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions under the Plan shall be subject to such withholding and reporting requirements. All such amounts withheld and paid to the appropriate governmental unit shall be treated as if made directly to the Holder of an Allowed Claim. The City and the Disbursing Agent shall be authorized to take any actions that they determine, in their reasonable discretion, to be necessary or appropriate to comply with such withholding and reporting requirements, including withholding Distributions pending receipt of information necessary to facilitate such Distributions, or establishing any other mechanisms they believe are reasonable and appropriate.

Notwithstanding any other provision of the Plan, each Entity receiving or deemed to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any Tax imposed on such Entity on account of such Distribution, including income, withholding and other Tax obligations. The City has the right, but not the obligation, to refuse, or to direct a Disbursing Agent to refuse, to make a Distribution until a Holder of an Allowed Claim has made arrangements satisfactory to the City and any Disbursing Agent for payment of any such Tax obligations. The City may require, as a condition to making a Distribution, that the Holder of an Allowed Claim provide the City or any Disbursing Agent with a completed Form W-8, W-9 and/or other Tax information, certifications and supporting documentation, as applicable.

If the City makes such a request and the Holder of an Allowed Claim fails to comply before the date that is 180 days after the initial request is made, the amount of such Distribution shall irrevocably revert to the City and any Claim in respect of such Distribution shall be released and forever barred from assertion against the City and its property.

### (c) Allocation of Distributions

All Distributions to Holders of Allowed Claims that have components of principal and interest shall be deemed to apply first to the principal amount of such Claim until such principal amount is paid in full, and then the remaining portion of such Distributions, if any, shall be deemed to apply to any applicable accrued interest included in such Claim to the extent interest is payable under the Plan.

### (d) Surrender of Instruments

As a condition to participation under this Plan, the Holder of a note, debenture or other evidence of indebtedness of the City that desires to receive the property to be distributed on account of an Allowed Claim based on such note, debenture or other evidence of indebtedness shall surrender such note, debenture or other evidence of indebtedness to the City or its designee (unless such Holder's Claim will not be Impaired by the Plan, in which case such surrender shall not be required), and shall execute and deliver such other documents as are necessary to effectuate the Plan; provided, however, that, if a claimant is a Holder of a note, debenture or other evidence of indebtedness for which no physical certificate was issued to the Holder but which instead is held in book-entry form pursuant to a global security held by the Depository Trust Company or other securities depository or custodian thereof, the City or the applicable Bond Agent for such note, debenture or other evidence of indebtedness may waive the requirement of surrender. In the City's sole discretion, if no surrender of a note, debenture or other evidence of indebtedness occurs and the Holder of Claim does not provide an affidavit and indemnification agreement, in form and substance reasonably satisfactory to the City, that such note, debenture or other evidence of indebtedness was lost, then no distribution may be made to such Holder in respect of the Claim based on such note, debenture or other evidence of indebtedness. For the avoidance of doubt, (i) no Bond, note, debenture or other evidence of indebtedness of the City shall be surrendered or deemed surrendered hereby to the extent necessary to make and/or preserve a claim under any Bond Insurance Policy or against any Bond Insurer and (ii) no COP shall be surrendered or deemed surrendered hereby to the extent necessary to make and/or preserve a claim under any applicable policies and/or other instruments insuring the COPs and obligations related thereto or against any party, other than the City, that insures the COPs.

## O. Procedures for Resolving Disputed Claims

### 1. Treatment of Disputed Claims

#### (a) General

No Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order (including the Confirmation Order) allowing such Claim. Notwithstanding any other provision of the Plan, no payments or Distributions shall be made on account of a Disputed Claim until such Claim becomes an Allowed Claim. Without limiting the foregoing in any way, no partial payments and no partial Distributions will be made with respect to a disputed, contingent or unliquidated Claim, or with respect to any Claim for which a proof of Claim has been Filed but not Allowed, until the resolution of such disputes or estimation or liquidation of such Claim by settlement or by Final Order.

#### (b) ADR Procedures

At the City's option, any Disputed Claim designated or eligible to be designated for resolution through the ADR Procedures may be submitted to the ADR Procedures in accordance with the terms thereof and the ADR Procedures Order. For the avoidance of doubt, the designation of a Disputed Claim for resolution through the ADR Procedures, either prior to or after the Effective Date, will not modify, and will not be deemed to have modified, the terms of the ADR Injunction imposed pursuant to the ADR Procedures Order. Disputed Claims not resolved through the ADR Procedures will be resolved pursuant to the Plan.

#### (c) Tort Claims

At the City's option, any unliquidated Tort Claim (as to which a proof of Claim was timely Filed in the Chapter 9 Case) not resolved through the ADR Procedures or pursuant to a Final Order of the Bankruptcy Court will be determined and liquidated in the administrative or judicial tribunal(s) in which it is pending on the Effective Date (subject to the City's right to seek removal or transfer of venue) or, if no action was pending on the Effective Date, in an administrative or judicial tribunal of appropriate jurisdiction selected by the City that (i) has personal jurisdiction over the parties, (ii) has subject matter jurisdiction over the Tort Claim and (iii) is a proper venue. The City may exercise the above option by service upon the holder of the applicable Tort Claim of a notice informing such holder that the City has exercised such option (which notice shall be deemed to satisfy the notice requirements of Section I.B of the ADR Procedures). Upon the City's service of such notice, the automatic stay imposed pursuant to sections 362 and 922 of the Bankruptcy Code (along with any extension of such stay pursuant to the terms of the Stay Extension Order) or, after the Effective Date, the injunction set forth at Section III.D.5 of the Plan, will be deemed modified, without the necessity for further Bankruptcy Court approval or any further action by the City, solely to the extent necessary to allow the parties to determine or liquidate the Tort Claim in the applicable administrative or judicial tribunal(s); provided that nothing contained in this Section will modify, or will be deemed to have modified, the terms of the Stay Extension Order with respect to any Tort Claim prior to the City having served notice of its intent to determine and liquidate such Tort Claim pursuant to this Section. If the City does not serve such a notice upon a holder of a Tort Claim by the Claims Objection Bar Date, such holder may file a motion with the Bankruptcy Court seeking relief from the discharge injunction imposed pursuant to Section III.D.5 of the Plan in order to liquidate and determine its Claim.

Any Tort Claim determined and liquidated pursuant to a judgment obtained in accordance with Section VI.A.3 of the Plan and applicable non-bankruptcy law that is no longer appealable or subject to review will be deemed an Allowed Claim, provided that only the amount of such Allowed Tort Claim that is not satisfied from proceeds of insurance payable to the holder of such Allowed Tort Claim will be treated as an Allowed Claim for the purposes of distributions under the Plan. Distributions on account of any such Allowed Tort Claim shall be made in accordance with the Plan. Nothing contained in this Section will constitute or be deemed a waiver of any claim, right or Cause of Action that the City may have against any Entity in connection with or arising out of any Tort Claim, including any rights under section 157(b)(5) of title 28 of the United States Code. All claims, demands, rights, defenses and Causes of Action that the City may have against any Entity in connection with or arising out of any Tort Claim are expressly retained and preserved.

### 2. Disputed Claims Reserve

On and after the Effective Date, until such time as all Disputed Claims have been compromised and settled or determined by Final Order and before making any Distributions, consistent with and subject to section 1123(a)(4) of the

-53-

13-53846-swr   Doc 8372   Filed 03/31/14   Entered 03/31/14 10:24:48   Page 66 of 602
13-53846-swr   Doc 8372   Filed 03/31/14   Entered 03/31/14 10:36:38   Page 66 of 162

Bankruptcy Code, the City shall establish and maintain a reserve of property equal to (a) the Distributions to which Holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims in the Face Amount of such Disputed Claims or (b) such lesser amount as required by an order of the Bankruptcy Court. On the first Distribution Date that is at least 30 days (or such fewer days as may be agreed to by the City in its sole discretion) after the date on which a Disputed Claim becomes an Allowed Claim, the Disbursing Agent shall remit to the Holder of such Allowed Claim any Distributions such Holder would have been entitled to under the Plan on account of such Allowed Claim had such Claim been Allowed as of the Effective Date. If a Disputed Claim is disallowed by Final Order, the property reserved on account shall become available for Distribution to the Holders of Allowed Claims within the Class(es) entitled to receive such property. Each Holder of a Disputed Claim that ultimately becomes an Allowed Claim will have recourse only to the assets held in the disputed claims reserve and not to any other assets held by the City, its property or any property previously distributed on account of any Allowed Claim. Notwithstanding the foregoing, the disputed claims reserve established pursuant to Section VI.B of the Plan shall not include any reserve of property on account of Disputed COP Claims, which shall receive the treatment set forth in Section II.B.3.s.iii of the Plan.

### 3. Objections to Claims

#### (a) Authority to Prosecute, Settle and Compromise

The City's rights to object to, oppose and defend against all Claims on any basis are fully preserved. Except as otherwise provided in Section II.B.3.s.i of the Plan with respect to Disputed COP Claims, as of the Effective Date, only the City shall have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims, including pursuant to the ADR Procedures or any similar procedures approved by the Bankruptcy Court. On and after the Effective Date, the City may settle or compromise any Disputed Claim or any objection or controversy relating to any Claim without any further notice or any action, order or approval of the Bankruptcy Court.

#### (b) Application of Bankruptcy Rules

To facilitate the efficient resolution of Disputed Claims, the City shall be permitted to File omnibus objections to claims notwithstanding Bankruptcy Rule 3007(c).

#### (c) Expungement or Adjustment of Claims Without Objection

Any Claim that has been paid, satisfied or superseded shall be expunged from the Claims Register by the Claims and Balloting Agent at the request of the City, and any Claim that has been amended by the Holder of such Claim shall be adjusted on the Claims Register by the Claims and Balloting Agent at the request of the City, without the Filing of an objection and without any further notice or any action, order or approval of the Bankruptcy Court.

#### (d) Extension of Claims Objection Bar Date

Upon motion by the City to the Bankruptcy Court, the City may request, and the Bankruptcy Court may grant, an extension to the Claims Objection Bar Date generally or with respect to specific Claims. Any extension granted by the Bankruptcy Court shall not be considered to be a modification to the Plan under section 1127 of the Bankruptcy Code

#### (e) Authority to Amend List of Creditors

The City will have the authority to amend the List of Creditors with respect to any Claim and to make Distributions based on such amended List of Creditors without approval of the Bankruptcy Court. If any such amendment to the List of Creditors reduces the amount of a Claim or changes the nature or priority of a Claim, the City will provide the Holder of such Claim with notice of such amendment and such Holder will have 20 days to File an objection to such amendment with the Bankruptcy Court. If no such objection is Filed, the Disbursing Agent may proceed with Distributions based on such amended List of Creditors without approval of the Bankruptcy Court.

#### (f) Deadline to File Objections to Claims

Any objections to Claims shall be Filed no later than the Claims Objection Bar Date. Upon motion to the Bankruptcy Court, the City may request, and the Bankruptcy Court may grant, an extension to the Claims Objection Bar Date generally or with respect to specific Claims. Any extension granted by the Bankruptcy Court shall not be considered to be a modification to the Plan under section 1127 of the Bankruptcy Code.

-54-

13-53846-swr   Doc 8372   Filed 11/21/14   Entered 11/21/14 10:24:40   Page 67 of 162
13-53846-tjt   Doc 9392   Filed 03/31/15   Entered 03/31/15 16:36:38   Page 67 of 162

### (g) Claims Estimation

At any time the City may request that the Bankruptcy Court estimate (i) any Disputed Claim pursuant to applicable law and (ii) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, regardless of whether the City has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection.

Notwithstanding any other provision of the Plan, a Claim that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. Except as set forth below with respect to reconsideration under section 502(j) of the Bankruptcy Code, in the event that the Bankruptcy Court estimates any Disputed Claim, contingent Claim or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan, including for purposes of Distributions. If the estimated amount constitutes a maximum limitation on such Claim, the City may elect to pursue any supplemental proceedings to object to any ultimate Distribution on account of such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

# V.

# CONFIRMATION OF THE PLAN

## A.  Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to conduct a Confirmation Hearing at which it will hear objections and consider evidence with respect to whether the Plan should be confirmed. At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 943(b) of the Bankruptcy Code described below are met.

On March 6, 2014, the Bankruptcy Court entered the Second Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's Plan of Adjustment (Docket No. 2937) (the "Scheduling Order"). By the Scheduling Order, the Bankruptcy Court scheduled various deadlines and events relating to the confirmation of the Plan. In particular, the Scheduling Order provides that the Confirmation Hearing will begin on July 16, 2014, at 9:00 a.m., Eastern Time, before the Honorable Steven W. Rhodes, United States Bankruptcy Judge, United States Bankruptcy Court for the Eastern District of Michigan, at Courtroom 100, Theodore Levin United States Courthouse, 231 West Lafayette Boulevard, Detroit, Michigan 48226. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

## B.  Deadlines to Object to Confirmation

The Scheduling Order establishes the following deadlines with respect to objections to the Plan:

- April 28, 2014 is the deadline for parties other than individual bondholders (but including any Bond Insurers that may hold bonds) and individual retirees to file objections to the Plan;

- June 30, 2014 is the deadline for individual bondholders (not including any Bond Insurers that may hold bonds) and individual retirees to file objections to the Plan; and

- July 7, 2014 is the deadline for any party that filed a timely objection to the Plan to file a supplemental objection, but only to the extent that discovery, or the results of plan voting, give rise to additional or modified objections to the Plan.

-55-

13-53846-swr   Doc 3382   Filed 03/31/14   Entered 03/31/14 08:24:48   Page 68 of 602
13-53846-tjt   Doc 8372   Filed 11/21/14   Entered 11/21/14 10:36:58   Page 68 of 162

Objections to the confirmation of the Plan must: (1) be in writing; (2) state the name and address of the objecting party and the nature of the Claim of such party; (3) state with particularity the basis and nature of any objection; and (4) be filed with the Bankruptcy Court, and served on the following parties so that they are received no later than the applicable deadline set forth above: (a) the City, c/o Kevyn D. Orr, Emergency Manager, 2 Woodward Avenue, Suite 1126, Detroit, Michigan 48226; (b) counsel to the City, JONES DAY, 555 South Flowers Street, Fiftieth Floor, Los Angeles, California 90071 (Attn: Bruce Bennett, Esq.); JONES DAY, North Point, 901 Lakeside Avenue, Cleveland, Ohio 44114 (Attn: David G. Heiman, Esq., Heather Lennox, Esq. and Thomas A. Wilson, Esq.); (c) counsel to the City, MILLER, CANFIELD, PADDOCK AND STONE, P.L.C., 150 West Jefferson, Suite 2500, Detroit, Michigan 48226 (Attn: Jonathan S. Green, Esq. and Stephen S. LaPlante, Esq.). For purposes of filing objections in these cases, the address of the Bankruptcy Court is 211 West Fort Street, Detroit, Michigan 48226. Attorneys may also file pleadings on the Bankruptcy Court's Document Filing System (ECF) by completing and submitting the Electronic Filing Registration Form, available at *http://www.mieb.uscourts.gov/ecf-registration*.

## C. Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 943(b) of the Bankruptcy Code are met. Among the requirements for Confirmation are that the Plan (1) is accepted by the requisite Holders of impaired Classes of Claims or, if not so accepted, is "fair and equitable" and does not discriminate unfairly as to the non-accepting class, (2) is in the "best interests" of each Holder of a Claim and each impaired Class under the Plan, (3) is feasible, and (4) complies with the applicable provisions of the Bankruptcy Code.

### 1. Acceptance or Cramdown

A plan is accepted by an impaired class of claims if holders of two-thirds in dollar amount and a majority in number of allowed claims of that class vote to accept the plan. Only those holders of claims who actually vote to accept or reject the plan count in the tabulation. The impaired classes must accept the plan in order for the plan to be confirmed without application of the "cramdown" test contained in sections 1129(b)(i), (b)(2)(A) and (b)(2)(B) of the Bankruptcy Code.

#### (a) Cramdown

The Bankruptcy Code provides that the Bankruptcy Court may confirm a plan that is not accepted by all impaired classes if at least one impaired class of claims accepts the plan and the so-called "cramdown" provisions set forth in sections 1129(b)(l), (b)(2)(A) and (b)(2)(B) of the Bankruptcy Code are satisfied. The plan may be confirmed under the cramdown provisions if, in addition to satisfying the other requirements of section 943(b) of the Bankruptcy Code, it (i) is "fair and equitable" and (ii) does not discriminate unfairly with respect to each class of claims that is impaired under and has not accepted the plan. The City believes that the Plan and the treatment of all Classes of Claims under the Plan satisfy the following requirements for nonconsensual confirmation of the Plan.

##### i. "Fair and Equitable"

Uncertainty exists as to the contours of the "fair and equitable" requirement in chapter 9. Outside of the chapter 9 context, the "fair and equitable" requirement generally requires, among other things, that, unless a dissenting unsecured class of claims receives payment in full for its allowed claims, no holder of allowed claims in any class junior to that class may receive or retain any property on account of such claims. This is known as the "absolute priority rule." Few published opinions have addressed the meaning of the "fair and equitable" requirement in chapter 9 cases. Some courts have suggested that, because there are no equity holders in chapter 9 cases (who, in theory, would be junior in priority to a municipal debtor's general unsecured creditors), the absolute priority rule serves no function in chapter 9 cases and, thus, in chapter 9 cases, the "fair and equitable" requirement should not be interpreted as synonymous with the absolute priority rule. In light of the scarcity of case law addressing the "fair and equitable" requirement in chapter 9, a leading commentator has suggested that, in chapter 9, the "fair and equitable" requirement is properly understood as requiring that, where a municipal debtor seeks nonconsensual confirmation of a plan of adjustment, the impaired creditors of such debtor, under the proposed plan, will receive all that they can reasonably expect under the circumstances.

The City believes that the Plan is "fair and equitable" with respect to Holders of Claims against the City because it provides such Holders of Claims with all they reasonably can expect under the circumstances of this chapter 9 case. The commencement of the City's chapter 9 case was precipitated by the City's untenable debt burden, a severe cash shortage and the City's increasing inability to provide reasonable levels of even the most basic services to City residents.

-56-

13-53846-swr Doc 8332 Filed 03/31/14 Entered 03/31/14 08:36:38 Page 69 of 162
13-53846-tjt Doc 8272 Filed 11/21/14 Entered 11/21/14 02:46:08 Page 69 of 602

The City believes that the Plan is "fair and equitable" because the creditor recoveries proposed therein have been calculated – and, in certain cases, negotiated – to reasonably compensate Holders of Claims while enabling the City to (A) avoid a recurrence of the financial difficulties that led to the City's bankruptcy and (B) institute desperately-needed reinvestment initiatives to ensure the City's ability to provide the adequate levels of services City residents can reasonably expect.

### ii.    Unfair Discrimination

A plan of reorganization does not "discriminate unfairly" if a dissenting class is treated substantially equally with respect to other classes similarly situated, and no class receives more than it is legally entitled to receive for its claims. The City does not believe that the Plan discriminates unfairly against any impaired Class of Claims.

**IN THE EVENT OF REJECTION OF THE PLAN BY ONE OR MORE IMPAIRED CLASSES, THE CITY RESERVES THE RIGHT TO REQUEST THE BANKRUPTCY COURT TO CONFIRM THE PLAN IN ACCORDANCE WITH SECTION 1129(b)(1), (b)(2)(A) AND (b)(2)(B) OF THE BANKRUPTCY CODE. THE CITY HAS RESERVED THE RIGHT TO MODIFY THIS PLAN TO THE EXTENT, IF ANY, THAT CONFIRMATION OF THIS PLAN UNDER SECTIONS 943 AND 1129(b) OF THE BANKRUPTCY CODE REQUIRES MODIFICATION.**

### (b)    The "Best Interests of Creditors" Test

Notwithstanding acceptance of the Plan by each impaired Class of Claims, the Bankruptcy Court also must determine that the Plan is in the best interests of creditors pursuant to section 943(b)(7) of the Bankruptcy Code. To satisfy this "best interests of creditors" test, a chapter 9 debtor must establish that confirmation of its proposed plan of adjustment, more likely than not, would leave the debtor's creditors in a better position than would dismissal of the debtor's chapter 9 bankruptcy case. Because the failure of plan confirmation and dismissal of a chapter 9 debtor's bankruptcy case, in most instances, would result in a race to the courthouse that would leave many creditors with no recovery at all, the best interests of creditors test is a flexible standard that is less stringent than a test requiring that a plan be "fair and equitable."

A chapter 9 debtor satisfies the best interests of creditors test if its plan of adjustment makes a reasonable effort to provide a recovery for creditors. The best interests of creditors test does not require a chapter 9 debtor to increase taxes above reasonable levels to maximize creditor recoveries. Similarly, the best interest of creditors test does not prohibit a municipal debtor from retaining sufficient levels of cash and other assets that it may reasonably require to (i) provide adequate levels of services, (ii) make necessary improvements and (iii) maintain its property and continue normal operations. Although the debtor bears the burden of proving, by a preponderance of the evidence, that its plan of adjustment satisfies the best interests of creditors test, the Bankruptcy Court must limit any examination of a municipal debtor's ability to pay creditors so as to not "interfere with" the "political or governmental powers of the debtor," the debtor's "property or revenues" or "the debtor's use or enjoyment of any income producing property," as directed by section 904 of the Bankruptcy Code.

The City believes that its Plan satisfies the best interest of creditors test set forth at section 943(b)(7) of the Bankruptcy Code. Confirmation of the Plan relieves the City of a substantial portion of its crushing debt burden and provides the City with the opportunity to implement the restructuring initiatives (as discussed at Section IX and described in detail at Exhibit I). In the absence of confirmation and the fresh start it promises, the City, its stakeholders and, importantly, its residents are compelled to return to the downward spiral that produced this chapter 9 filing. The adverse consequences attendant upon a dismissal of the chapter 9 case are legion, and moreover ensure continued deterioration of the City:

- Recoveries for the City's stakeholders would diminish to practically nothing. As set forth in the Declaration of Kevyn D. Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (Docket No. 10) (the "Orr Declaration"), filed contemporaneously with the City's chapter 9 petition on July 18, 2013, in the absence of financial restructuring, (i) payments due on the City's general obligation debt, the COPs and retiree pension and health obligations will consume approximately 65% of the City's General Fund revenues by Fiscal Year 2017 and (ii) the City's net cash position will be hundreds of millions of dollars in the red in the coming Fiscal Years, among sundry other negative economic consequences. Under such dire circumstances, recoveries may be denied altogether for substantial portions of the City's creditor constituency. Put simply, the City cannot distribute cash it does not have to its creditors. As but one example, if the Plan is not confirmed and the City's chapter 9 case is

dismissed, the City projects that the assets of the Retirement Systems will be exhausted within 10 to 13 years, effectively depriving the City's active and retired employees of all accrued pension benefits.

- The $1.5 billion in gross reinvestment contemplated by the City discussed in Section IX could not be made, and the substantial benefits promised thereby would be lost to the City and its 685,000 residents. Proposed investments in and improvements to the DPD, the DFD, lighting, the City's information technology infrastructure and its tax collection abilities (to name just a few) would be lost. The absence of this reinvestment would deprive the City both of badly needed short-term relief and the opportunity to lay the foundation for long-term prosperity, thus ensuring inadequate provision of municipal services to the City's residents for the foreseeable future.

- The City would continue to be an unattractive investment for financial, business and human capital. The City's access to further financing would be severely restricted if it would be available at all, and both business owners and residents would be reluctant to stay in, or relocate to, the City. Detroit has been experiencing the consequences of similar disincentives for decades, with a dwindling population and business base resulting in a diminished tax base and plummeting revenue, which in turn lead to draconian cuts in City services.

The foregoing demonstrates the simple proposition that prompted the City's chapter 9 filing in the first instance: *there is no non-bankruptcy solution to the problems facing the City, its stakeholders and its residents*. The Plan embodies the City's attempt to provide claimants with the highest possible recovery (consistent with their relative rights against the City) while allowing for the reinvestment that is the foundation of a revitalized City able to pay its adjusted debts and provide basic services to its citizens going forward. Accordingly, the City believes that the Plan satisfies the "best interest of creditors" test set forth at section 943(b)(7) of the Bankruptcy Code.

### (c) Feasibility

Section 943(b)(7) of the Bankruptcy Code also requires that a plan of adjustment be feasible. While the best interests of creditors test establishes a "floor" with respect to how much a chapter 9 debtor can be expected to pay creditors under a plan of adjustment, the feasibility standard of section 943(b)(7) of the Bankruptcy Code imposes a "ceiling" on creditor recoveries under such a plan. To satisfy the feasibility requirement, a chapter 9 debtor must demonstrate, by a preponderance of the evidence, that it has the ability to make the payments set forth in the proposed plan of adjustment while also maintaining sufficient assets to (i) provide adequate levels of municipal services, (ii) fund normal municipal operations and (iii) remain financially viable after the conclusion of the chapter 9 case and during the contemplated payment period.

To determine whether a proposed plan of adjustment satisfies the feasibility standard of section 943(b)(7) of the Bankruptcy Code, a bankruptcy court must analyze the debtor's income and expense projections. A plan of adjustment is feasible if the debtor's income and expense projections (i) are realistic, reliable and not unreasonably optimistic and (ii) the plan is workable and appears to have a reasonable prospect of success; *i.e.*, it appears reasonably probable that the debtor will be able to make the payments to creditors contemplated in the plan of adjustment while maintaining adequate levels of municipal services. As with the determination of whether a plan of adjustment satisfies the best interests of creditors test, the scope of the bankruptcy court's inquiry into the feasibility of a plan of adjustment is limited by section 904 of the Bankruptcy Code. Accordingly, the feasibility inquiry is relatively narrow. The bankruptcy court simply must (i) determine whether the debtor's projected revenues and expenses are reasonable and (ii) if so, decide whether the debtor will be able to make the contemplated payments while providing adequate services to residents and avoiding a recurrence of the type of financial distress that caused the debtor to commence its chapter 9 case.

For purposes of determining whether the Plan meets this requirement, the City has prepared (i) a detailed analysis of its proposed ten-year, $1.5 billion reinvestment in various City departments and infrastructure (as more fully described in Section IX and set forth on Exhibit I hereto), which reinvestment lays the long-term foundation for a prosperous Detroit and enables the City to once again provide its residents with adequate levels of municipal services; and (ii) ten-year financial projections (as set forth in greater detail in Section XI ("Projected Financial Information") and Exhibit J) that demonstrate the City's ability to fulfill its obligations under the Plan – and to its residents – during that period. The City believes that (i) its reinvestment initiative is indispensable to fulfilling the purpose of this chapter 9 case and (ii) its financial projections (and its underlying assumptions) are reasonable and demonstrate a probability that the City will be able to satisfy its obligations under the Plan and otherwise while avoiding financial distress. Accordingly, the City believes that the Plan meets the feasibility requirement of section 943(b)(7) of the Bankruptcy Code.

-58-

13-53846-swr    Doc 8392    Filed 03/31/14    Entered 03/31/14 16:34:48    Page 71 of 602
13-53846-tjt    Doc 8372    Filed 03/31/14    Entered 03/31/14 18:36:58    Page 71 of 162

**(d)     Compliance With Applicable Provisions of the Bankruptcy Code**

In addition to the foregoing, the Plan must comply with other applicable provisions of the Bankruptcy Code, as follows:

- The Plan must comply with the provisions of the Bankruptcy Code made applicable by sections 103(e) and 901 of the Bankruptcy Code (11 U.S.C. § 943(b)(l));

- The Plan must comply with the provisions of chapter 9 (11 U.S.C. § 943(b)(2));

- All amounts to be paid by the City or by any person for services or expenses in the City's chapter 9 case or incident to the Plan must be fully disclosed and must be reasonable (11 U.S.C. § 943(b)(3));

- The City must not be prohibited by law from taking any action necessary to carry out the Plan (11 U.S.C. § 943(b)(4));

- Except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the Plan must provide that, on the Effective Date, each Holder of a Claim of a kind specified in section 507(a)(2) of the Bankruptcy Code will receive on account of such Claim cash equal to the allowed amount of such Claim (11 U.S.C. § 943(b)(5));

- Any regulatory or electoral approval necessary under applicable non-bankruptcy law in order to carry out any provision of the Plan must be obtained, or such provision must be expressly conditioned upon such approval (11 U.S.C. § 943(b)(6));

- The City, as the proponent of the Plan, must have complied with all provisions of the Bankruptcy Code (11 U.S.C. § 1129(a)(2));

- The Plan must have been proposed in good faith and not by any means forbidden by law (11 U.S.C. § 1129(a)(3)); and

- Any governmental regulatory commission with jurisdiction, after confirmation of the Plan, over the rates of the City must have approved any rate change provided for in the Plan, or such rate change is expressly conditioned on such approval (11 U.S.C. § 1129(a)(6)).

**2.      Alternatives to Confirmation and Consummation of the Plan**

The City has evaluated numerous alternatives to the Plan, including alternative structures and terms of the Plan and delaying the adoption thereof. While the City has concluded that the Plan is the best alternative and will maximize recoveries by Holders of Claims, if the Plan is not confirmed, the City could attempt to formulate and propose a different plan of adjustment. The Plan was formulated after months of difficult negotiations among numerous creditor constituencies, including in connection with numerous mediation sessions ordered by the Bankruptcy Court (see Section VIII.F). The formulation of an alternative plan of adjustment can be expected to consume additional time. Furthermore, there can be no assurance that the City can formulate and propose an acceptable alternative plan of adjustment. If no plan of adjustment can be confirmed, the Bankruptcy Court may dismiss the City's chapter 9 case, in which event, multi-party, multifaceted litigation likely would ensue, as holders of claims compete for the limited City resources available to pay those claims. The City, therefore, believes that Confirmation and consummation of the Plan is preferable to the alternatives described above.

# VI.

## CERTAIN RISK FACTORS TO BE CONSIDERED

The implementation of the Plan, and the New Securities to be issued on the Effective Date, are subject to a number of material risks. Prior to voting on the Plan, each party entitled to vote should carefully consider these risks, as well as all of the information contained in this Disclosure Statement, including the Exhibits hereto. If any of these risks are actually realized, the City's financial condition and operations could be seriously harmed. In addition to the risks set forth below,

-59-

13-53846-swr   Doc 8372   Filed 11/16/14   Entered 11/16/14 08:24:08   Page 72 of 602
13-53846-swr   Doc 8372   Filed 03/31/14   Entered 03/31/14 16:36:58   Page 72 of 162

risks and uncertainties not presently known to the City, or risks that the City currently considers immaterial, may also impair the City's financial condition and operations.

## A.    Non-Confirmation of the Plan

Even if all impaired Classes accept or could be deemed to have accepted the Plan, the Plan may not be confirmed by the Bankruptcy Court. As set forth above, section 943(b) of the Bankruptcy Code identifies the requirements for plan Confirmation. Although the City believes that the Plan will meet all applicable requirements, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

## B.    Nonconsensual Confirmation

As described above, pursuant to the "cramdown" provisions of section 1129(b) of the Bankruptcy Code, the Bankruptcy Court can confirm the Plan at the City's request if at least one impaired Class has accepted the Plan and, as to each impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such impaired Class. The City reserves the right to modify the terms of the Plan as necessary for Confirmation without the acceptance of all impaired Classes. Such modification could result in less favorable treatment for any non-accepting Classes than the treatment currently provided for in the Plan.

## C.    Inability to Confirm Plan Prior to Potential Removal of Emergency Manager

Pursuant to Section 9(6)(c) of PA 436, if an emergency manager has served for at least 18 months after his or her appointment under PA 436, such emergency manager may, by resolution, be removed by a two-thirds vote of the City Council. The Emergency Manager was appointed on March 14, 2013. As of September 14, 2013, therefore, the City Council may resolve to remove the Emergency Manager pursuant to PA 436. In the event that the Emergency Manager is removed prior to confirmation of the Plan, the City may decide to propose a different Plan or be unable to confirm the Plan.

## D.    Conditions to Effectiveness of the Plan

Section III.A of the Plan provides for certain conditions that must be satisfied (or waived) prior to the Effective Date. Many of the conditions are outside of the control of the City. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions to effectiveness of the Plan will be satisfied (or waived). Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the adjustment of the City's debts completed. See Section III.D.1 of this Disclosure Statement for a description of the conditions to the effectiveness of the Plan.

## E.    Non-Occurrence of DIA Settlement or Non-Receipt of the Full Amount of the DIA Proceeds or the State Contribution

The Plan and the higher recoveries estimated for Classes 10 and 11 in the Plan assume the existence and the implementation of the DIA Settlement and the receipt of the full amounts of the DIA Proceeds and the State Contribution. If the DIA Settlement does not occur, or if the full amounts of the DIA Proceeds and the State Contribution are not received, then the recoveries on account of all Unsecured Claims, including Pension Claims, will be the lower recoveries estimated in the Plan, including for Classes 10 and 11. Consummation of the DIA Settlement depends upon the execution of the DIA Settlement Documents by each Foundation; absent this condition precedent, the DIA Settlement would not occur.

## F.    Failure to Secure Exit Facility

The City will seek to enter into a $300 million Exit Facility on the Effective Date of the Plan. The purpose of the Exit Facility would be to refinance any indebtedness under a Postpetition Financing Agreement, provide the City with necessary cash to satisfy its near-term obligations and begin to implement its proposed reinvestment initiatives. In the event that the City fails to obtain an Exit Facility, the City's ability to fulfill its obligations under the Plan may be compromised.

-60-

13-53846-swr   Doc 8372   Filed 03/61/14   Entered 12/61/14/02464:08   Page 73 of 682
13-53846-swr   Doc 3382   Filed 03/31/14   Entered 03/31/14 16:36:38   Page 73 of 162

## G. Inability to Raise Tax Revenue

As discussed above, the City currently levies all taxes at the statutory maximum levels. In particular, as of the Petition Date: (1) Michigan Public Act 394 of 2012, an amendment to the City Income Tax Act, fixed the City's maximum income tax rates at their current levels so long as PLA Bonds remain outstanding; (2) state law limited municipalities' property tax rates to 20 mills and a constitutionally required "Headlee rollback" further limited that rate to 19.952 mills (which was the rate charged by the City as of the Petition Date); and (3) the utility users' tax and casino wagering tax were fixed at their 5% and 10.9% levels, respectively, by the state statutes authorizing these Detroit specific taxes. In proposing the Plan, the City has assumed that the Michigan Legislature (the "Legislature") will not approve either the increase of any existing taxes currently levied by the City or the imposition of any new taxes by the City because City residents cannot bear a further tax increase, and any such increase only would accelerate the City's population decline. Moreover, as described in Section X.B, the City may rationalize the nominal tax rates currently assessed by the City to bring them in line with those assessed by surrounding localities. If the City's revenues are less than its total obligations, the City's ability to perform its obligations under the Plan could be jeopardized.

## H. Failure to Achieve Projected Financial Performance

The Projections are dependent upon the successful implementation of the City's budget and the reliability of other estimates and assumptions accompanying the Projections. The Projections are based on estimates and assumptions relating to the City's projected revenues and expenditures and prevailing economic conditions. In addition, the Projections assume that the Plan will be confirmed in accordance with its terms. However, these estimates and assumptions may not be realized and are inherently subject to significant economic uncertainties and contingencies, many of which are beyond the City's control. No representations can be or are made as to whether the actual results will be within the range set forth in the Projections. Some assumptions inevitably will not materialize, and events and circumstances occurring subsequent to the date on which the Projections were prepared may be different from those assumed or may be unanticipated and, therefore, may affect financial results in a material and possibly adverse manner. The Projections, therefore, may not be relied upon as a guarantee or other assurance of the actual results that will occur.

## I. Unforeseen Financial Circumstances Affecting the City's Future Financial Performance

The Plan and the Projections underlying the Plan are based on certain assumptions about the City's future financial performance. Unforeseen events and circumstances may occur affecting the City's future financial performance, resulting in those assumptions proving inaccurate and the City being unable to fulfill its obligations under the Plan. No guarantee can be made as to the City's future financial performance due to a variety of unforeseeable circumstances that may affect such performance.

## J. Litigation if Unlimited Tax General Obligation Bonds Are Impaired

Pursuant to the Home Rule City Act (see Section VII.A.1 of this Disclosure Statement), the City, with the approval of the electorate, levies the taxes used to pay debt service charges or obligations on Unlimited Tax General Obligation Bonds. The amount of taxes levied to service Unlimited Tax General Obligation Bonds is in addition to other taxes that the City is authorized to levy, without limitation as to rate and amount and without regard to any City Charter, statutory or constitutional caps on taxation. If: (1) the Bankruptcy Court determines in the UTGO Litigation that Unlimited Tax General Obligation Bond Claims may be impaired pursuant to the Plan; and (2) the Plan, which proposes to impair Unlimited Tax General Obligation Bond Claims, is confirmed, litigation against the City could ensue regarding the existing levy of additional taxes to service the Unlimited Tax General Obligation Bonds. In the event the City is precluded from levying these taxes, it anticipates borrowing funds sufficient to replace this lost revenue. In that event, there can be no assurance that the City will be successful in obtaining the financing.

## K. Other Litigation

The City will be subject to various claims and legal actions arising in the ordinary course of its operations, including, but not limited to, personal injury actions. The City is not able to predict the nature and extent of any such claims and actions and cannot guarantee that the ultimate resolution of such claims and actions will not have a material adverse effect on the City after its emergence from chapter 9.

L.      **City Credit May be Viewed Negatively By The Market**

Holders of the New Securities may encounter limited market acceptance of City credit upon any attempt to sell City debt obligations, making sales at or near par potentially difficult. Holders of City debt after the Effective Date may not be able to sell such debt for any price for some time. Alternatively, potential purchasers may demand discounts to the par amount of obligations before a potential purchaser would be willing to purchase City debt of any kind. There can be no assurance that a secondary market will exist for any City debt.

M.      **Population Loss**

The City has experienced steady population loss for over a half-century. Since its peak in the 1950s, the City has been losing both people and jobs. The City's population declined by nearly 45% to just over one million as of June 1990. In the 23 years since, this population decline has continued unabated. The City's population stood at 684,799 as of December of 2012, representing a 63% decline from its postwar peak of 1.85 million residents. The City has gone from the fifth largest city in America in 1950 to the eighteenth largest today. No other American city has experienced a comparable decline in population over a similar period of time. In addition to its inability to increase tax rates, the steady population loss experience by the City over the last 50 years limits the City's ability to grow tax revenues. Although the City intends to increase the revenues it receives from personal income taxes by broadening the City's tax base and creating conditions that are likely to foster economic growth, there can be no guarantee that these efforts will be successful.

N.      **The City Has No Duty to Update**

The statements contained in this Disclosure Statement are made by the City as of March 31, 2014, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The City has no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

O.      **No Representations Outside This Disclosure Statement Are Authorized**

No representations concerning or related to the City, the City's chapter 9 case or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement and any other Solicitation Materials that accompany this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should be relied upon by you at your own risk in arriving at your decision.

P.      **Nature and Amount of Allowed Claims**

The ultimate amount of Allowed Claims against the City is unknown. If the amount of Allowed Claims is higher than expected or predicted, recoveries for Holders of Claims in certain Classes may be negatively impacted. In addition, given the sheer volume of Claims expected to be filed against the City, the cost of administering such Claims will be substantial and may also adversely impact recoveries for Holders of Claims in certain Classes. Any such adverse effects could be material.

-62-

13-53846-swr   Doc 8332   Filed 03/31/14   Entered 03/31/14 08:24:08   Page 75 of 602
13-53846-swr   Doc 8332   Filed 03/31/14   Entered 03/31/14 16:36:58   Page 75 of 162

# VII.

## EVENTS PRECEDING THE CITY'S CHAPTER 9 CASE

**A.    Background**

**1.    General Information**

Founded in 1701 and incorporated in 1806, Detroit is a political subdivision of the State of Michigan and is its largest city.  Detroit is located on an international waterway, which is linked via the St. Lawrence Seaway to seaports around the world.  As of December 2012, the City had a population of approximately 685,000 (down from a peak population of nearly 2 million in 1950).

The City is a home rule city and body corporate organized under Michigan Public Act 279 of 1909 (as amended), the Home Rule City Act, MCL §§ 117.1 *et seq.* (the "Home Rule City Act").  The City has comprehensive home rule power under the Michigan Constitution, the Home Rule City Act and the 2012 Charter of the City of Detroit (the "City Charter"), subject to the limitations on the exercise of that power contained in the Michigan Constitution, the City Charter or applicable Michigan statutes.

Ordinarily, the City is managed by an executive branch and a legislative branch.  The organization of City agencies within the executive and legislative branches of government is set forth below.



The Mayor heads the executive branch. The citizens of Detroit elect the Mayor to a four-year term. The City Charter grants the Mayor broad managerial powers including the authority to appoint department directors, deputy directors and other executive branch officials. The responsibility to implement most programs, provide services and manage day-to-day operations is delegated by the City Charter to the executive branch. The legislative branch is comprised of the City Council and its agencies. The nine members of City Council also are elected to four-year terms. Many significant decisions, including budget appropriations, procurement of goods and services and certain policy matters must be approved by the City Council.

Since March 14, 2013, the City has been operating under the authority of an Emergency Manager (as defined in Section VII.D.9.c), originally appointed by the State of Michigan Local Emergency Financial Assistance Loan Board (the "LEFALB"). Pursuant to Section 9(1) of Michigan Public Act 436 of 2012, the Local Financial Stability and Choice Act, MCL §§ 141.1541 *et seq.* ("PA 436"), the Emergency Manager acts "for and in the place and stead of the governing body and the office of chief administrative officer of the local government" and possesses "broad powers in receivership to rectify the financial emergency and to assure the fiscal accountability of the local government and the local government's capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare." As such, during the Emergency Manager's appointment, the executive and legislative branches of City government generally are prohibited by Section 9(1) of PA 436 from exercising any of their usual powers except as may be specifically authorized in writing by the Emergency Manager. For additional information see Section VII.D.9 of this Disclosure Statement.

2.      **Municipal Services**

Pursuant to the City Charter, the City is responsible for providing for the public peace, health and safety of persons and property within its jurisdictional limits. The City provides the following major services to City residents and businesses: police and fire protection, sanitation and streets, parks and recreation, health, planning and development, public lighting, transportation, water supply, sewage disposal and parking. In addition, the City is the "District Control Unit" responsible for certain duties and costs relating to the 36th District Court, a unit of the judicial branch of the State.

The preamble to the City Charter describes certain expectations of City residents with respect to municipal services that the City provides. These expectations include: (a) decent housing; (b) job opportunities; (c) reliable, convenient and comfortable transportation; (d) recreational facilities and activities; (e) cultural enrichment; (f) clean air and waterways; (g) safe drinking water; and (h) a sanitary, environmentally sound City.

3.      **City Funds**

The City uses various accounting funds to keep track of specific sources of funding and spending for particular purposes. The City's funds are divided into three categories – governmental, proprietary and fiduciary. Most of the City's basic services are reported in the governmental funds, which focus on cash flows related to such services and funds available for future spending. Proprietary funds report services for which the City charges customers, including individuals, outside entities and other agencies within the City. Fiduciary funds are funds with respect to which the City acts as a trustee or fiduciary, including pension (and other employee benefit) funds and agency funds.

(a)      **General Fund**

The primary governmental fund and the chief operating fund of the City is the General Fund (the "General Fund"). Many key services of the City are paid for from the General Fund (including, among others, police, fire, public works, community and youth services), which is comprised of 28 discrete departments. During the City's 2013 Fiscal Year, which began on July 1, 2012 and ended on June 30, 2013, the General Fund had total revenues of $1,047.1 million and the General Fund had total expenditures of $867.2 million.

(b)      **Enterprise Funds**

Proprietary funds that are used to provide supplies and services to the general public are referred to as "Enterprise Funds." During Fiscal Year 2013, the various Enterprise Funds collectively had total operating revenues of $839.8 million and had total operating expenses in the total amount of $831.5 million. The following paragraphs describe the major Enterprise Funds reported by the City and any related City departments.

### i.      Water Fund and Sewage Disposal Fund/DWSD

The Detroit Water and Sewerage Department ("<u>DWSD</u>") is far and away the largest Enterprise Fund managed by the City. Detroit's water fund (the "<u>Water Fund</u>") and sewage disposal fund (the "<u>Sewage Disposal Fund</u>") account for the water and sewage systems, which are owned by the City and administered by DWSD. DWSD is a department of the City and is responsible for the water supply and the control and treatment of wastewater for most of southeastern Michigan. DWSD traces its roots to 1836, when the City purchased a private water works and began maintaining, improving and expanding the City's water distribution system. Since 1853, DWSD has been governed by the Board of Water Commissioners which, today, is a seven-member board appointed by the Mayor and comprised of four residents of the City and three representatives representing, respectively, the Counties of Macomb, Oakland and Wayne. The Board of Water Commissioners has overseen construction of, among other innovations, the City's first reservoir (completed in 1857), its first public drinking fountains (completed in 1871) and what was, upon its opening in 1923, the largest water filtration plant in the world. DWSD's wastewater treatment plant, which began operating in 1940, is the largest single-site wastewater treatment facility in the nation; its construction, during the Great Depression, is widely viewed as one of the most notable engineering accomplishments of the twentieth century in Michigan. DWSD operates, and the Board of Water Commissioners oversees DWSD, pursuant to chapter 12 of section 7 of the City Charter.

Today, DWSD is one of the largest municipal water and sewerage departments in the nation. DWSD serves residential, commercial, governmental, institutional and industrial customers at a retail level within the City and over 125 wholesale suburban customers. Customer entities served by DWSD are located in Wayne, Oakland, Macomb, St. Clair, Genesee, Washtenaw and Monroe Counties.

As of the Petition Date, DWSD had commenced capital improvement programs with respect to the water system and the sewage disposal system calling for DWSD to invest a total of approximately $1.4 billion in infrastructure improvements and necessary repairs, technological upgrades and systems rationalization over a five-year period from 2014 to 2018. DWSD's combined budgeted revenues for Fiscal Year 2014 is $934.7 million. Current and historical financial information for DWSD is attached as Exhibit K to this Disclosure Statement, and future financial projections for DWSD are attached to this Disclosure Statement as Exhibit L.

### (A)      The Water System

DWSD's water system supplies a 1,079-square-mile region serving approximately 40% of the State's population. The system's water network consists of 3,438 miles of transmission and distribution mains within Detroit and 403 miles of transmission mains in the remaining service areas.

In Fiscal Year 2012, DWSD exhibited operating margins of 22% for the water system. The water system's Fiscal Year 2012 current ratio was 1.90. DWSD's Fiscal Year 2012 interest expense as a percent of operating revenue, at approximately 32% for the water system, is slightly above its peer group average of 25%. Also in Fiscal Year 2012, DWSD initiated a performance benchmarking program to evaluate financial conditions and establish realistic goals.

| Historical Revenues and Expenses ($MM) | | | | | | |
|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| Operating Revenues | | | | | | |
| Water Sales - Detroit | $57.9 | $74.4 | $65.4 | $70.0 | $74.8 | $71.5 |
| Water Sales - Suburban | 208.0 | 216.9 | 206.3 | 210.7 | 237.1 | 258.6 |
| Other | 2.3 | 1.7 | 2.5 | 4.8 | 4.1 | 6.0 |
| **Total Operating Revenue** | **$268.3** | **$293.0** | **$274.1** | **$285.5** | **$316.0** | **$336.1** |
| Operation & Maintenance Expense[1] | (146.3) | (141.4) | (149.9) | (146.6) | (146.9) | (165.1) |
| **Net Operating Revenues** | **$122.0** | **$151.6** | **$124.2** | **$138.9** | **$169.1** | **$171.0** |
| Non Operating Revenues | 34.1 | 29.3 | 13.7 | 7.1 | 4.3 | |
| **Net Revenues** | **$156.0** | **$180.9** | **$138.0** | **$146.0** | **$173.4** | **N/A** |

*Source: DWSD Offering Memorandum dated December 20, 2011; Audited Financial Statements for the period ended June 30, 2012*

(1) Excludes OPEB and other "non-cash" items that do not impact net revenues for debt service

The main water supply sources are the Detroit River, to the south, and Lake Huron, to the north. DWSD's five water treatment plants include: the Lake Huron Water Treatment Plant, the Northeast Water Treatment Plant, the Southwest Water Treatment Plant, the Springwells Water Treatment Plant and the Water Works Park.

- The Lake Huron Water Treatment Plant began full-scale operations in 1974. The Lake Huron plant is located at 3993 Metcalf Road in Fort Gratiot, Michigan. This plant was designed to be easily expandable to meet the needs of growing populations in the communities it serves to the north of Detroit. The plant has a current pumping capacity of 400 million gallons per day ("MGD").

- Dedicated in 1956, the Northeast Water Treatment Plant, at 11000 E. Eight Mile Road in Detroit, was part of an expansion program that included the construction of transmission mains, a reservoir and booster station. The plant was built to meet the needs of suburban communities located north of the city and has a current pumping capacity of 300 MGD.

- The Southwest Water Treatment Plant, located at 14700 Moran Road in Allen Park, became operational in 1964. The plant was acquired by the City from the Wayne County Road Commission in a lease-purchase agreement as part of a consolidation of water services in southeast Michigan. The plant has a current pumping capacity of 240 MGD, but it currently operates at an MDEQ-approved capacity of 160 MGD.

- The Springwells Water Treatment Plant at 8300 W. Warren Avenue in Dearborn became operational in 1931. At the time of its dedication in 1935, the plant was the largest water treatment facility in the world. The facility later went under a major addition in 1959 to double its capacity.

- Water Works Park is DWSD's newest water treatment plant and is located at 10100 E. Jefferson Avenue in Detroit. Water Works Park is the largest plant in Michigan to use ozone. A $35 million expansion program increased the plant's pumping capacity to 320 MGD. Today, the plant operates at a capacity of 240 MGD.

| Water Sales & Non-Revenue Water (Mcf) | | | | |
|---|---|---|---|---|
| | Water Sales | | | Total |
| | Suburban Wholesale | Detroit Retail | Total | Water Produced |
| 2007 | 18,417,900 | 4,927,000 | 23,344,900 | 28,063,000 |
| 2008 | 18,405,500 | 4,145,500 | 22,551,000 | 29,360,700 |
| 2009 | 16,682,100 | 4,138,100 | 20,820,200 | 27,180,700 |
| 2010 | 15,676,300 | 3,924,000 | 19,600,300 | 25,142,700 |
| 2011 | 16,094,683 | 4,176,600 | 20,271,283 | 26,513,000 |

*Source: DWSD Offering Memorandum dated December 20, 2011*

Suburban customers receive the same water treatment provided to Detroit retail customers. However, these customers' municipalities operate additional facilities to bring these services to their homes. DWSD provides and bills Detroit retail customers on an individual basis, while the system provides services to and bills wholesale suburban customers at a municipal level.

-66-

13-53846-swr   Doc 8379   Filed 11/21/14   Entered 11/21/14 10:24:48   Page 79 of 602
13-53846-swr   Doc 8332   Filed 11/11/14   Entered 11/11/14 18:36:38   Page 79 of 162

| Historic Water Rates | | |
|---|---|---|
| Rates (as of July 1) | Retail Detroit[1] | Average Wholesale |
| 2002 | $10.69 | $8.48 |
| 2003 | 11.65 | 9.25 |
| 2004 | 12.58 | 10.20 |
| 2005 | 12.63 | 10.61 |
| 2006 | 12.69 | 11.24 |
| 2007 | 13.56 | 11.81 |
| 2008 | 14.42 | 12.86 |
| 2009 | 15.17 | 13.68 |
| 2010 | 16.59 | 14.43 |
| 2011 | 18.09 | 15.72 |

*Source: DWSD Offering Memorandum dated December 20, 2011*

(1) Reflects rate charged to first 3,000 cubic feet per month

The water system's capital improvement program focuses on maintaining the quality of water provided to customers, improving system reliability by replacing aging infrastructure to reduce the growing incidence of main breaks, ensuring environmental protection for all customers through upgraded infrastructure, improving employee safety through system modifications and increasing efficiency of services to all customers by taking advantage of new technologies. Major projects in the capital improvement program include replacement of aging water mains and rehabilitation and/or upgrades to water treatment plants, pumping stations and reservoirs.

| Water System Capital Improvement Projections ($MM) | | | | | |
|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 |
| Total Financing for CIP | $137.5 | $137.5 | $144.4 | $144.4 | $132.8 |

*Source: Conway Mackenzie presentation dated October 2, 2013*

**(B)      The Sewage Disposal System**

DWSD's sewage disposal system covers a 946-square-mile area that encompasses 35 percent of Michigan's population in Detroit and 76 neighboring communities. The system originated in 1836 and today consists of 10 pump stations, six combined sewer overflow ("CSO") retention treatment basins ("RTBs"), three screening and disinfection facilities and a total of 3,433 miles of sewer lines that carry rainwater and wastewater to the Wastewater Treatment Plant.

In Fiscal Year 2012, DWSD exhibited operating margins of 20% for the Sewer System. The sewage disposal system's Fiscal Year 2012 current ratio was 2.21. DWSD's Fiscal Year 2012 interest expense as a percent of operating revenue, at approximately 25% for the system, is comparable to its peer group average of 25%. Also in Fiscal Year 2012, DWSD initiated a performance benchmarking program to evaluate financial condition and establish realistic goals.

-67-

13-53846-swr   Doc 8332   Filed 11/16/14   Entered 11/16/14 18:24:48   Page 80 of 162
13-53846-swr   Doc 7392   Filed 09/11/14   Entered 12/31/14 10:36:38   Page 80 of 602

| Historical Revenues and Expenses ($MM) | | | | | | |
|---|---|---|---|---|---|---|
| | **2007** | **2008** | **2009** | **2010**[1] | **2011**[2] | **2012** |
| Operating Revenues | | | | | | |
| Retail Billings[3] | $130.6 | $136.0 | $162.8 | $168.0 | $188.9 | $186.6 |
| Wholesale Billings[3] | 192.0 | 201.7 | 219.6 | 187.9 | 213.9 | 242.8 |
| **Subtotal** | **$322.6** | **$337.7** | **$382.5** | **$355.9** | **$402.8** | **$429.3** |
| Other | 24.3 | 9.2 | 7.7 | 9.7 | 7.9 | 8.3 |
| **Total Operating Revenue** | **$346.9** | **$346.9** | **$390.1** | **$365.6** | **$410.7** | **$437.7** |
| Operation & Maintenance Expense[4] | (200.0) | (202.3) | (195.5) | (197.3) | (230.8) | (217.0) |
| **Net Operating Revenues** | **$147.0** | **$144.6** | **$194.6** | **$168.3** | **$179.9** | **$220.6** |
| Non Operating Income | 33.6 | 27.6 | 11.5 | 5.9 | 12.2 | |
| **Net Revenues** | **$180.5** | **$172.2** | **$206.1** | **$174.1** | **$192.1** | **N/A** |

*Source: DWSD Offering Memorandum dated June 20, 2012; Audited Financial Statements for the period ended June 30, 2012*

(1) Fiscal Year 2010 Revenue includes Fiscal Year 2007 look-back adjustment

(2) Fiscal Year 2011 Revenue includes $20 million in initial allotment of look-back adjustments for Fiscal Years 2008 through 2010

(3) Net of Bad Debt Expense

(4) Excludes OPEB and other elements that do not impact net revenues for the purpose of debt service calculations

The Wastewater Treatment Plant, located at 9300 W. Jefferson Avenue in Detroit, is one of the largest single-site wastewater treatment facilities in the United States. The treatment plant was originally designed to provide primary treatment (screening of solids and chlorination) for the wastewater generated by 2.4 million people and, with modifications, as many as 4.0 million people. The plant's service area in 1940 included Detroit and 11 nearby suburban communities. Secondary treatment (more rigorous screening and treating and disinfection of biodegradable solids to produce a cleaner effluent) was introduced in the 1960s. The Wastewater Treatment Plant continues to be the recipient of continual upgrades in order to ensure it is capable of staying abreast of ever more stringent regulatory standards. In 1999, the Michigan section of the American Society of Civil Engineers named the Wastewater Treatment Plant one of the top 10 engineering projects of the 20th century.

The system's three screening and disinfection facilities are the Baby Creek, Leib and St. Aubin facilities.

- The Baby Creek facility uses fine screens and disinfection to treat combined sewage flows that pass through it. It is located at Miller and Industrial Drive in southwest Detroit at the city limit shared with Dearborn. The facility is rated for 5,100 cubic feet per second ("cfs"). The site area includes the Woodmere Pumping Station that services a 450-acre portion of the Baby Creek tributary area.

- The Leib facility was constructed to address a large outfall on the Detroit River and to demonstrate that fine screening (horizontal and vertical) in combination with 10 minutes of disinfection time is effective at meeting public health standards. High-energy mixers are used to mix sodium hypochlorite to maximize bacterial kill and minimize discharge of residual chlorine to the Detroit River. The facility can treat a flow rate of up to 1,500 cfs. It began operation in 2002 and successfully achieved the required treatment levels during the demonstration period.

- The St. Aubin facility was undertaken at the same time as the Leib facility; it uses the same technology but utilizes a different type of screen. While St. Aubin is much smaller, with about one fifth of the treatment capacity of Leib, it is important in addressing water quality along Chene Park that frequently hosts concerts and other events. This facility has operated successfully since 2002.

The System's six CSO RTBs include the Belle Isle, Conner Creek, Hubbell-Southfield, Oakwood, Puritan-Fenkell and Seven Mile combined sewer overflow retention treatment basins.

- The Belle Isle CSO RTB is the smallest CSO facility and was sized to provide 10 minutes of detention for the peak flow of the 10-year, 1-hour storm. Located on Belle Isle along the Detroit River, this RTB has a storage capacity of 300,000 gallons. It eliminated one untreated CSO outfall and has been operational since March 2008.

- Detroit's largest CSO facility, the Conner Creek CSO RTB, eliminated three outfalls and has dramatically improved water quality in Conner Creek and the Detroit River since going into operation in November 2005. This facility provides 62 million gallons of total storage, with 30 million gallons in the retention treatment basin and 32 million gallons in upstream structures. High-speed mixers are used to rapidly disinfect flows and achieve the required fecal coliform limits. This facility was sized to provide 5 minutes of detention for settling and disinfection for the peak flow from the 10-year, 1-hour storm.

- The Hubbell-Southfield CSO RTB is one of DWSD's most active, longest operating CSO facilities and the largest on the Rouge River. Since August 1999, it has been effectively capturing and treating combined sewage through screening, settling and disinfection to meet discharge permit requirements that protect public health. Sized to fit into the available land and site constraints, the basin has a 22 million gallon storage capacity. The facility is located next to the Tournament Players Championship Golf Course in Dearborn and features innovative design components that enable three different operational modes and prevent resuspension of solids during large storms.

- Located on the lower portion of the Rouge River, immediately south of I-75, the 9 million-gallon Oakland RTB is designed to provide CSO treatment through storage plus fine screening and disinfection. This facility includes a major influent pumping station with capacity to pump 1,800 cfs.

- Located in Eliza Howell Park, the Puritan-Fenkell CSO RTB is the third Rouge River CSO RTB. This facility successfully demonstrated that a facility sized to provide 20 minutes of detention time for settling and disinfection of the 1-year, 1-hour storm event peak flow is sufficient to meet protection of public health standards. The 2.8 million-gallon facility became operational in August 1999 and eliminated two untreated CSO outfalls.

- DWSD's Seven Mile CSO RTB was constructed at the same time as the Hubbell-Southfield and Puritan-Fenkell CSO RTBs with funding from the Rouge River National Wet Weather Demonstration Program. The RTB is located on the northeast corner of West Seven Mile Road and is sized to provide 30 minutes of detention time for settling and disinfection of the 1-year, 1-hour storm event peak flow. It has a 2.2 million gallon storage capacity.

| Treated and Billed Wastewater Volumes (Million Cubic Feet) | | | | |
|---|---|---|---|---|
| | Billed Volume | | | Annual |
| | Suburban Wholesale | Detroit Retail | Total | Wastewater Treated |
| 2007 | 15,707,500 | 4,331,200 | 20,038,700 | 32,725,000 |
| 2008 | 15,266,300 | 3,716,300 | 18,982,600 | 33,233,000 |
| 2009 | 16,469,400 | 3,956,900 | 20,426,300 | 35,452,100 |
| 2010 | 13,448,300 | 3,622,700 | 17,071,000 | 30,185,100 |
| 2011 | 15,065,800 | 3,743,100 | 18,808,900 | 34,476,200 |

*Source: DWSD Offering Memorandum dated June 20, 2012*

The sewage disposal system also has a capital improvement program, similar to that of the water system. Some capital improvement program initiatives include upgrades to wastewater treatment plants; rehabilitation or replacement of sewer lines and outfall; and construction of combined sewer overflow control facilities to ensure that the system effectively handles storm water flows and protects the environment.

| Sewer System Capital Improvement Projections ($MM) | | | | | |
|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 |
| Total Financing for CIP | $160.2 | $160.2 | $140.0 | $139.9 | $96.5 |

*Source: Conway Mackenzie presentation dated October 2, 2013*

During Fiscal Year 2013, the City received payments into the Water Fund and the Sewage Disposal Fund in the total amounts of $370.4 million and $451.8 million, respectively, and made payments from the Water Fund and Sewage Disposal Fund in the total amounts of $327.1 million and $409.6 million, respectively.

As more fully described in Section VIII.K.1 of this Disclosure Statement, the Plan contemplates that the City may enter into a transaction that would include the transfer of the functions of DWSD to another entity.

### (C)    DWSD Litigation

For more than 35 years, DWSD was a defendant in a lawsuit initiated by the United States Environmental Protection Agency (the "EPA").  In 1977, the EPA sued the City and DWSD, alleging violations of the federal Clean Water Act (the "CWA").  See United States v. City of Detroit, No. 77-71100, 2013 WL 1282021, at *3 (E.D. Mich. Mar. 27, 2013).  The case was pending in the United States District Court for the Eastern District of Michigan (the "District Court") – and DWSD operated under federal court oversight – until March of 2013 due to "a recurring cycle" of compliance failures with regard to the CWA and National Pollutant Discharge Elimination System ("NPDES") permits required by the Michigan Department of Environmental Quality (the "MDEQ").  See United States v. City of Detroit, No. 77-71100, 2011 WL 4014409, at *1 (E.D. Mich. Sept. 9, 2011).  Pursuant to an Administrative Consent Order (the "ACO") with the MDEQ, in July 2011 DWSD agreed to undertake certain remedial measures to address what the District Court had identified as areas of persistent noncompliance, including deficiencies in maintenance, capital expenditures, planning, staffing and procurement.  See United States v. City of Detroit, Exhibit A to Motion to Dismiss, No. 77-71100 (E.D. Mich. July 25, 2011) (Docket No. 2365).  As of the Petition Date, the ACO remained effective, allowing the MDEQ to continue its oversight of DWSD.

Determining that the ACO, standing alone, was insufficient to guarantee DWSD's long-term compliance with the CWA and NPDES standards, in 2011 the District Court ordered a "Root Cause Committee" comprised of City and DWSD officials to formulate a plan to address the root causes of DWSD's persistent noncompliance.  See City of Detroit, Order, at 3, No. 77-71100 (Nov. 4, 2011) (Docket No. 2410).  The Root Cause Committee drafted – and the District Court adopted – a "Plan of Action," which proposed to restructure DWSD to address systemic dysfunction and achieve long-term compliance with federal and state environmental standards.  Id. at 3-4.  In March 2013, the Root Cause Committee submitted a plan to the District Court recommending the creation of an autonomous DWSD.  See City of Detroit, Director's Compliance Report, at 23, No. 77-71100 (E.D. Mich. Mar. 18, 2013) (Docket No. 2526).  On March 27, 2013, the District Court issued an order closing the case and declining to address the Root Cause Committee's recommendation for the further restructuring of DWSD.  See City of Detroit, 2013 WL 1282021, at *2.  In its order dismissing the case, the District Court stated that it was satisfied that the court's orders and the ACO "have been substantially implemented."  Id. at *13.  Closing the case was appropriate, the District Court said, "because the existing [ACO] is a sufficient mechanism to address any future issues regarding compliance with DWSD's NPDES permit and the [CWA]."  Id. at *17.  On April 8, 2013, the Sixth Circuit Court of Appeals issued a ruling in favor of certain unions that had sought to intervene in the case prior to the dismissal, reversing the District Court's denial of certain motions to intervene and remanding for a limited grant of intervention.  See United States v. City of Detroit, 712 F.3d 925, 926 (6th Cir. 2013).  On June 5, 2013, the District Court issued an order to show cause regarding the question of whether the District Court is divested of jurisdiction to address the remanded issues as a result of the order of dismissal.  See City of Detroit, Order to Show Cause, at 4, No. 77-71100 (E.D. Mich. June 5, 2013) (Docket No. 2535).  The City also has commenced an appeal in this case.  See City of Detroit, Notice of Appeal, at 1, No. 77-71100 (E.D. Mich. May 22, 2013) (Docket No. 2532).  On July 30, 2013, the Sixth Circuit Court of Appeals stayed the City's appeal pending resolution of the City's chapter 9 case.  See United States v. City of Detroit, Order, at 1, No. 13-1708 (6th Cir. July 30, 2013).

### ii.    Transportation Fund/DDOT

Detroit's transportation fund (the "Transportation Fund") accounts for the City's mass transit system, which is administered by the Detroit Department of Transportation ("DDOT").  Established in 1922 as the Department of Street Railways and providing mass transit bus service to City residents since 1925, DDOT is the largest public transit provider in Michigan.  A municipal department of the City, DDOT operates a fleet of more than 400 buses on 36 routes daily and serving riders at approximately 6,000 bus stops throughout the City and in some nearby suburban communities.  DDOT employed 1,198 workers during Fiscal Year 2012 and, as of the Petition Date, consisted of 13 divisions: an Administrative Division, a Capital Projects Division, a Customer Relations and Communications Division, a Finance Division, a Human Resources Division, a Transportation Operations Division, a Management Information Services Division, a Materials Management Division, a Building Maintenance Division, a Purchasing and Contract Administration Division, a Security and Risk Management Division, a Strategic Planning Division and a Vehicle Maintenance Division.  DDOT ranks 39th in ridership among public transit agencies nationwide; it provided 32.8 million passenger trips during Fiscal Year 2012.

-70-

13-53846-swr   Doc 8372   Filed 03/61/14   Entered 12/31/14 18:24:48   Page 83 of 602
13-53846-swr   Doc 8372   Filed 03/51/14   Entered 12/31/14 18:36:58   Page 83 of 602

During Fiscal Year 2013, the City received payments into the Transportation Fund in the total amount of approximately $148.0 million (including a General Fund subsidy of approximately $47.2 million) and made payments from the Transportation Fund in the total amount of $175.7 million.

### iii.  Automobile Parking Fund/MPD

The City's Municipal Parking Department ("MPD") consists of two divisions which include the Auto Parking System ("APS") and the Parking Violations Bureau ("PVB"). APS is primarily responsible for the operation and maintenance of seven parking garages and certain on-street parking spaces. The activities of APS are accounted for in the "Automobile Parking Fund," which is an Enterprise Fund that services the City's Parking Bonds. PVB is primarily responsible for the enforcement of on-street parking ordinances, including the issuance, processing and collection of parking tickets. PVB's revenues net of expenses are accounted for in the General Fund.

As of the Petition Date, APS managed seven parking garages containing a total of 6,793 spaces and approximately 3,404 on-street metered parking spaces. As of the Petition Date, projected revenue of APS for Fiscal Year 2013 was approximately $12.9 million. Expenses were projected to be approximately $12.9 million for the same period, with any "due to/due from" activity with the General Fund projected to net out to zero.

PVB was projected to issue 323,000 tickets and immobilize 2,760 vehicles with parking boots during Fiscal Year 2013, yielding projected revenues of approximately $11.4 million. Expenses were projected to be approximately $7.8 million for the same period, with the projected surplus of $3.6 million inuring to the General Fund. As of the end of Fiscal Year 2013, MPD's headcount totaled 90 full-time employees, with 35 such employees allocated to APS and 55 allocated to the PVB (including four full-time contractors).

Several factors have limited the MPD's ability to raise revenues in recent years. Budgetary cuts, headcount reductions and unfavorable work rules have reduced the number and frequency of parking violation patrols and have contributed to a sharp decline in the number of tickets issued by the MPD, from 535,000 tickets in Fiscal Year 2002 to 323,000 in Fiscal Year 2012. Budget constraints have prevented the MPD from repairing or replacing broken parking meters, towing boots and vehicles used by parking enforcement officers. Certain parking spaces that require structural repairs have been taken out of service indefinitely. Meter rates and parking violation fines are underpriced in comparison with those of other large cities and frequently are considerably lower than parking rates charged by neighboring privately-operated garages and lots. The MPD also has been hampered by inefficient and ineffective collection practices in recent years, much of which is now uncollectible due to the age of the violations. In addition, the MPD's information technology systems are outdated and offer little or no meaningful real-time financial metrics.

During Fiscal Year 2013, the City received payments into the Automobile Parking Fund in the total amount of approximately $11.1 million and made payments from the Automobile Parking Fund in the total amount of $11.2 million.

At the request of the Emergency Manager, the City has been exploring a potential monetization of the assets constituting the Automobile Parking Fund. To this end, the City has retained a parking specialist to conduct due diligence and produce a report on the long-term value potential of the parking assets currently held by the City. This report is expected to serve as a basis for the solicitation of potentially interested bidders for the parking assets, and the City anticipates that the transaction may close during Fiscal Year 2015.

### 4.  Sources of General Fund Revenue

The City's principal sources of General Fund tax revenues are (a) municipal income taxes, (b) property taxes, (c) casino wagering taxes, (d) state shared tax revenues and (e) taxes on utility users. These sources of revenue collectively account for approximately $774.6 million for Fiscal Year 2013, an amount that is almost three fourths of the City's aggregate Fiscal Year 2013 General Fund revenues of $1.05 billion. In addition, the City's General Fund receives revenue from, among other sources: (a) fees for services directly provided by the City; (b) licenses, permits and inspection charges; (c) grants and contributions from federal and state intergovernmental sources (principally the State); and (d) ordinance fines and forfeitures.

The City currently levies all taxes at or near statutory maximum levels. As described in Section VII.C.3.c, the comparative tax burden imposed on residents of the City is one of the highest in the State. Consequently, the Emergency Manager has determined that the City cannot gain additional revenue through the imposition of increased rates or additional taxes on City residents.

#### (a)    Income Taxes

Income tax revenues totaled $248.0 million for Fiscal Year 2013, an amount that accounts for approximately 23.7% of total Fiscal Year 2013 General Fund revenues.  Income tax revenues totaled $233.0 million during Fiscal Year 2012.  Michigan Public Act 284 of 1964, the City Income Tax Act, MCL §§ 141.501 *et seq.*, authorizes Michigan cities to impose a municipal income tax.  Detroit has taxed incomes since 1964 and is one of only 22 Michigan municipalities to do so.  The City taxes the incomes of individuals who are Detroit residents, nonresident individuals who work in Detroit and resident businesses.  Income taxes traditionally have constituted the City's largest single source of revenue.  Further details regarding the City's historic income tax revenues and projected future revenues as of the Petition Date are provided in Section VII.C.2 of this Disclosure Statement.

#### (b)    Property Taxes

Detroit levies *ad valorem* property taxes to fund general operations (19.9520 mills) and to support unlimited tax debt (9.6136 mills).  Detroit residents also pay property taxes to a number of additional entities including the Detroit Public Library, Detroit Public Schools, Wayne County, Wayne County Community College, a number of special authorities and the State.  The total tax rate on homeowners in Detroit is 67.5159 mills and the rate on non-homestead property is 85.3467 mills.  Detroit residents face one of the highest property tax rates in Michigan, but much of the property tax paid by Detroit residents does not support City services, and instead supports the other entities listed above.

Although Detroit's property tax rate of 19.9520 mills for general operations is constitutionally capped close to the statutory maximum of 20 mills, Detroit has the third lowest per capita taxable value of Michigan's largest cities.  As a result, Detroit's property tax revenue *per capita* ranks 18th highest of the State's 24 largest cities.  For Fiscal Year 2013, the general operating levy on the *ad valorem* tax roll was $156.1 million, and the levy for debt service was $80.8 million.

General Fund property tax revenues totaled $131.7 million for Fiscal Year 2013, accounting for approximately 12.5% of total Fiscal Year 2013 General Fund revenues.  General Fund property tax revenues for Fiscal Year 2012 totaled $147.8 million.  Further details regarding the City's historic and projected future property tax revenues as of the Petition Date are provided in Section VII.C.3.b of this Disclosure Statement.

#### (c)    Casino Wagering Taxes

Casino wagering taxes totaled $174.6 million for Fiscal Year 2013, accounting for approximately 16.7% of total Fiscal Year 2013 General Fund revenues.  Casino wagering tax revenues for Fiscal Year 2012 totaled $181.4 million.  Michigan Initiated Law 1 of 1996, the Michigan Gaming Control and Revenue Act, MCL §§ 432.201 *et seq.*, as amended by Michigan Public Act 306 of 2004, authorizes the City to impose a 10.9% wagering tax on casinos operating within City limits.  In addition to wagering taxes, the City collects certain other fees from casinos operating within the City, including a municipal services fee – $17.5 million in Fiscal Year 2013 (from $17.9 million in Fiscal Year 2012) – and a fee based on a percentage payment from the casino development agreements, which totaled $24.2 million in Fiscal Year 2013 (from $25.1 million in Fiscal Year 2012).  Further details regarding the City's historic and projected future wagering tax revenues as of the Petition Date are provided in Section VII.C.2 of this Disclosure Statement.

#### (d)    Utility Users' Tax

Taxes collected from utility users are expected to total $35.3 million during Fiscal Year 2013, accounting for approximately 3.4% of total Fiscal Year 2013 General Fund revenues.  Utility users' tax revenues for Fiscal Year 2012 totaled $39.8 million.  Pursuant to Michigan Public Act 100 of 1990, the City Utility Users' Tax Act, MCL §§ 141.1151 *et seq.* ("PA 100"), Detroit is the only city in Michigan authorized to impose a 5% utility users' excise tax.  The City imposes this tax on consumers of telephone, electric, steam and gas services.  The utility users' tax appears as a charge on consumers' utility bills.  Utility companies remit the proceeds of the tax to a trustee who distributes such proceeds to the City and the PLA (as defined below).  As originally enacted, PA 100 required that all revenues from the utility users' tax be used for the hiring or retention of police officers.  Michigan Public Act 392 of 2012, the Municipal Lighting Authority Act, MCL §§ 123.1261 *et seq.*, however, authorized the City to use up to $12.5 million of utility users' tax revenues per year  to retire debt issued by a newly-formed Public Lighting Authority (the "PLA").  As more fully discussed in Section VIII.K.4 of this Disclosure Statement, the PLA has been formed during the course of this chapter 9 case, and the $12.5 million in utility users' tax revenues has been utilized.  Further details regarding the City's historic and projected future utility users' tax revenues as of the Petition Date are provided in Section VII.C.2 of this Disclosure Statement.

**(e)** **State Revenue Sharing**

As of the Petition Date, Detroit received unrestricted aid from the State in connection with constitutional and statutory sharing of sales tax revenue and economic vitality incentive payments ("EVIP"). The State has shared a portion of state sales tax revenues with Michigan municipalities since the 1930s. In particular, pursuant to Article IX Section 10 of the Michigan Constitution, the State is required to distribute 15% of all state taxes imposed on retailers on taxable sales at retail of tangible personal property at a rate of not more than 4% to its townships, cities and villages based on their population. The amount of constitutional state revenue sharing received by the City, therefore, is a function of amount of qualifying tax revenues and the population of the City relative to other municipalities eligible to receive revenue sharing payments and cannot easily be modified.

In addition to constitutional revenue sharing provided to the City, the State provides certain funds to cities, villages and townships (and, under a separate program, counties) by statute. The statutory distribution is authorized by legislative action and is subject to annual appropriation by the Legislature. Beginning with the State's Fiscal Year 2012, the State has replaced the prior statutory revenue sharing distribution (determined by a formula based on a municipality's taxable value and population) with incentive-based EVIP payments that are distributed to municipalities that comply with certain "best practices" and reporting requirements. Most recently, under Michigan Public Act 59 of 2013, the EVIP requirements for Fiscal Year 2014 are separated into three categories. A municipality receives one-third of the maximum EVIP distribution for which it is eligible for satisfying each of three categories of requirements, as follows:

- Category 1 - Accountability and Transparency. Each eligible city, village, township or county is required to certify by October 1, or the first day of a payment month, that it has produced a citizen's guide of its most recent local finances, including a recognition of its unfunded liabilities; a performance dashboard; a debt service report containing a detailed listing of its debt service requirements, including, at a minimum, the issuance date, issuance amount, type of debt instrument, a listing of all revenues pledged to finance debt service by debt instrument, and a listing of the annual payment amounts; and a projected budget report, including, at a minimum, the current fiscal year and a projection for the immediately following fiscal year.

- Category 2 - Consolidation of Services. Each eligible city, village, township or county is required to certify by February 1, or the first day of a payment month for this category, that it has produced a service consolidation plan and submit a copy of the consolidation plan to the Michigan Department of the Treasury (the "Treasury"). The consolidation plan is required to include details of any previous service cooperations, collaborations, consolidations, innovations or privatizations with an estimated cost savings amount for each cooperation, collaboration, consolidation, innovation or privatization. In addition, the consolidation plan is required to include at least one new proposal to increase its existing level of cooperation, collaboration, consolidation, innovation or privatization either within the jurisdiction or with other jurisdictions, an estimate of the potential savings amount and an estimated timeline for implementing the new proposal or proposals.

- Category 3 – Unfunded Accrued Liability Plan. Each eligible city, village, township or county with unfunded accrued liabilities as of its most recent audited financial report is required to submit, by June 1, a plan to lower all such unfunded accrued liabilities. The plan is required to include a listing of all previous actions taken to reduce its unfunded accrued liabilities with an estimated cost savings of those actions; a detailed description of how it will continue to implement and maintain previous actions taken; and a listing of additional actions it could take. If no actions have been taken to reduce the municipality's unfunded accrued liabilities, it is required to provide a detailed explanation of why no actions have been taken and a listing of actions it could implement to reduce unfunded accrued liabilities. Actuarial assumption changes and issuance of debt instruments do not qualify as a new proposal.

Because EVIP funds are appropriated by the Legislature and not constitutionally mandated, they are subject to change and inherently less certain than constitutional revenue sharing funds. The City's total portion of state shared revenue totaled $182.5 million for Fiscal Year 2013, accounting for approximately 17.4% of total Fiscal Year 2013 General Fund revenues. During Fiscal Year 2012, the City's portion of state shared revenue was $172.7 million. Further details regarding the City's historic and projected future state revenue sharing revenues as of the Petition Date are provided in Section VII.C.2 of this Disclosure Statement.

### (f)    Other Revenue

In addition to the tax revenue streams described above, the City receives revenues from fees for City-provided services, permits, licenses and parking fines. General Fund revenues from these sources totaled approximately $166.4 million in Fiscal Year 2013 (from approximately $171.1 million in Fiscal Year 2012). The City also receives revenue from grants and programs subsidized by other governments (including, for example, the federal government, the State and Wayne County) and non-profit organizations, such as funding for community development and blight elimination projects. General Fund revenues from these sources totaled approximately $61.1 million during Fiscal Year 2013 (from $81.0 million in Fiscal Year 2012). The City is generally precluded from charging fees that exceed the costs of providing the relevant services under the decision of the Michigan Supreme Court in <u>Bolt v. City of Lansing</u>, 587 N.W.2d 264 (Mich. 1998), in addition to other statutory or regulatory provisions applicable in specific cases.

### 5.    Assets

### (a)    Art Housed at Detroit Institute of Arts

The DIA houses an art collection (the "<u>DIA Collection</u>") that has been described as one of the top six art collections in the United States. The DIA Collection consists of, among other things, works by European masters as well as significant pieces of African, Asian, Native American, Oceanic, Islamic, Ancient and Contemporary art. The City owns a significant portion of the DIA Collection comprised of (i) some portion of the art collection transferred to the City in 1919 (the "<u>Transferred Art</u>") pursuant to an asset transfer (the "<u>Asset Transfer</u>") between the City and an entity then-incorporated as the "Detroit Museum of Art;" (ii) certain art purchased by the City following the Asset Transfer; and (iii) certain art donated after the Asset Transfer. From its inception in 1885 until the Asset Transfer, the corporation then-known as the Detroit Museum of Art owned the Transferred Art and the original museum building. Pursuant to the Asset Transfer – which was specifically authorized by Michigan Public Act 67 of 1919 and Section 7(c) of Chapter 19 of the Detroit City Charter of 1918 – the Detroit Museum of Art conveyed the Transferred Art, along with the museum building and certain real property, to the City in 1919.

Today, the DIA Collection is considerably larger than was the collection of Transferred Art in 1919. The City has purchased numerous works of art since the Asset Transfer and, in particular, acquired many of the DIA Collection's most notable pieces between 1922 and 1930. Prior to the Asset Transfer, in 1915, the Detroit Museum of Art owned approximately 4,400 works of art; by 1930, the DIA Collection contained nearly 12,000 works. To house the rapidly-growing DIA Collection, the City financed the construction of the current DIA museum building, which opened in 1927 and cost an estimated $4 million. The DIA Collection also has been augmented by many gifts acquired during the 95-year period since the Asset Transfer. As of the Petition Date, the DIA Collection consisted of approximately 65,000 works of art. The corporation formerly known as the Detroit Museum of Art continued to exist after the Asset Transfer. Today, that corporation – which has changed its name several times since 1919 and now bears the name "The Detroit Institute of Arts" and is referred to in this Disclosure Statement as the "<u>DIA Corp.</u>" – contracts with the City to operate the museum building and manage, preserve and display the DIA Collection. In August of 2012, the voters of each of Macomb, Oakland and Wayne Counties approved the levying of real and personal property taxes at a rate of 0.2 mills for a period of 10 years by their respective art institute authorities, which were established pursuant to Michigan Public Act 296 of 2010, the Art Institute Authorities Act, MCL §§ 123.1201 *et seq.*

In an opinion dated June 13, 2013 (Opinion No. 7272), the Michigan Attorney General asserted that the DIA Collection is held in charitable trust and stated that the City may not transfer any portion of the DIA Collection because the City is a mere trustee of the works that comprise the DIA Collection. A position paper commissioned by the DIA in 2013 took the same position and also advanced an alternative argument that the DIA Collection is subject to the public trust doctrine, a legal doctrine that protects public rights in natural resources. The Retiree Committee and other parties in interest in the City's chapter 9 case dispute these positions.

As discussed in greater detail in Section VIII.K.6.a of this Disclosure Statement, in 2013, the City engaged Christie's Inc. ("<u>Christie's</u>") to appraise the portion of the DIA Collection that was acquired using City funds. On December 17, 2013, Christie's issued its final appraisal, estimating the aggregate fair market value of the Appraised Art (as defined in Section VIII.K.6.a) to be between $454 million and $867 million.

### (b) City-Owned Land

An estimated 22 square miles of land within City limits is government-owned, including parcels owned by the City, Wayne County and the State. Many of these parcels are vacant overgrown lots with illegal dumping or contain abandoned buildings in need of demolition. It has been estimated that the City owns approximately 60,000 parcels of vacant land and approximately 10% of the estimated 78,000 vacant structures within City limits. The vast majority of City-owned parcels have limited present commercial value. The City's efforts to address blight, remove vacant structures and encourage beneficial uses of City-owned land – which measures include initiatives involving the Detroit Land Bank Authority and the Michigan Land Bank – are addressed in Section IX.A.1 of this Disclosure Statement.

### (c) Belle Isle Park

The City owns Belle Isle Park, a 982-acre park situated on an island in the Detroit River designed by Frederick Law Olmsted. Belle Isle Park features numerous historical and recreational attractions, including the James Scott Memorial Fountain (designed by Cass Gilbert, architect of the United States Supreme Court building), the Anna Scripps Whitcomb Conservatory (also known as the Belle Isle Conservatory, a greenhouse and botanical garden built in 1904, designed by Detroit architect Albert Kahn and modeled after a portion of Thomas Jefferson's Monticello), the Belle Isle Casino building (built in 1908 and which, despite its name, is used for special events rather than gambling), the Dossin Great Lakes Museum, the Livingstone Memorial Lighthouse (the only lighthouse in the United States made entirely of marble), the Nancy Brown Peace Carillon, the Detroit Yacht Club, an aquarium, golf courses and a swimming beach. Belle Isle Park is larger than New York City's Central Park. As of the Petition Date, Belle Isle Park was the nation's largest municipally-operated island park.

In recent years, the City's Recreation Department has maintained and operated Belle Isle Park at an annual cost of approximately $6 million. Pursuant to a lease agreement between the City and the State approved by the LEFALB on November 12, 2013 (discussed in greater detail in Section VIII.K.5 of this Disclosure Statement), as of February 10, 2014, Belle Isle Park is being operated as a state park.

### (d) Detroit-Windsor Tunnel

The Detroit-Windsor Tunnel is an 84-year-old automotive tunnel beneath the Detroit River that connects Detroit and Windsor, Ontario. The City owns the portion of the tunnel located in the United States and is currently leasing it to Detroit Windsor Tunnel LLC. Approximately two million vehicles pass through the tunnel annually. Detroit Windsor Tunnel LLC leases the City's portion of the tunnel for an annual rental payment equal to 20% of the average annual net operating income, excluding income taxes and operating expenses for the City's portion of the tunnel, derived from the operations of the Detroit side of the tunnel over the most recent five years, which recently has been less than $1 million per year, as operating revenue for the Detroit side of the tunnel has totaled less than $5 million annually during recent years. The governing Tube Lease and Sublease (the "Tunnel Leases") run through 2020.

On July 25, 2013, American Roads Alabama Holdings, LLC (f/k/a American Roads LLC) ("American Roads") – an affiliate of Detroit Windsor Tunnel LLC – commenced a chapter 11 bankruptcy case in the United States Bankruptcy Court for the Southern District of New York. See In re Am. Roads LLC, Chapter 11 Petition, No. 13-12412 (Bankr. S.D.N.Y. July 25, 2013) (Docket No. 1). On August 21, 2013, the bankruptcy court issued an order authorizing American Roads and its debtor-affiliates to assume the Tunnel Leases. Am. Roads, Order Authorizing the Debtors to Assume the Detroit-Windsor Tunnel Leases with the City of Detroit (Bankr. S.D.N.Y. Aug. 21, 2013) (Docket No. 97). The bankruptcy court approved American Roads' prepackaged plan of reorganization on August 28, 2013, pursuant to which plan Syncora Guarantee Inc. (together with its affiliates, "Syncora") became the owner of American Roads and its debtor-affiliates, including Detroit Windsor Tunnel LLC. See Am. Roads, Order Approving Debtors' Disclosure Statement for, and Confirming, Debtors' Joint Prepackaged Chapter 11 Plan (Bankr. S.D.N.Y. Aug. 30, 2013) (Docket No. 129).

### (e) Coleman A. Young Airport

The City owns Coleman A. Young International Airport, a two-runway general aviation airport located on approximately 263 acres within the City limits. Average total operations in Detroit airspace represent approximately 225 flights daily, which include instrument flight rules and visual flight rules. The airport features a 53,000-square-foot passenger terminal with space available for restaurants, retail concessions, passenger lounges, ticketing desks and baggage claims. The airport has not offered commercial carrier service since 2000 in part due to the fact that the airport's runways lack the length required to accommodate many types of commercial passenger jets. The City has subsidized the airport in

-75-

13-53846-tjt   Doc 8372   Filed 03/31/14   Entered 03/31/14 16:34:58   Page 88 of 602
13-53846-swr   Doc 4391   Filed 05/05/14   Entered 05/05/14 18:36:58   Page 88 of 162

recent years because the airport's revenues have fallen far short of expenses. In Fiscal Year 2013, the City's General Fund contributed $0.3 million to fund the airport's operations and maintenance. The airport's General Fund contribution for Fiscal Year 2014 was increased to $0.6 million.

### (f)     Joe Louis Arena

The City owns Joe Louis Arena, a 20,058-seat indoor arena that is home to the Detroit Red Wings of the National Hockey League (the "Red Wings"). Completed in 1979, Joe Louis Arena is the City's largest indoor entertainment venue. In addition to professional hockey, Joe Louis Arena hosts concerts, circuses, ice shows and various occasional professional and college sporting events.

In 2009, Olympia Entertainment ("Olympia"), the parent of the Red Wings, declined to renew its lease of Joe Louis Arena (the "Original JLA Lease"). The 30-year term of the Original JLA Lease expired on July 1, 2010; since that date, the Red Wings have occupied Joe Louis Arena as a holdover tenant. As of the Petition Date, certain disputes existed between the parties with respect to amounts the City maintained it was due under the Original JLA Lease.

In July 2013, Olympia proposed a project to build a new arena in downtown Detroit – which would replace Joe Louis Arena as the home of the Red Wings – along with a mixed-use residential, retail and entertainment district. The proposed project involves a cooperative arrangement between Olympia and the City of Detroit Downtown Development Authority (the "DDA"). The DDA was created by the Detroit City Council by Ordinance No. 119-H on May 20, 1976, under the provisions of Michigan Public Act 197 of 1975, the Downtown Development Authority Act, MCL §§ 125.1651 *et seq.* The DDA was established for the purpose of promoting and developing economic growth in Detroit's downtown business district. The DDA funds its activities by an *ad valorem* tax of one mill on real and tangible personal property not exempt by laws in the downtown development district, and the issuance of negotiable revenue and tax increment obligations. For financial reporting purposes, the DDA is a component unit of the City because the members of the DDA's Board of Directors are appointed by the City's mayor and are confirmed by the Detroit City Council, which approves the DDA's budget. Further developments during this chapter 9 case regarding this transaction are provided in Section VIII.K.7 of this Disclosure Statement.

### B.     Outstanding Financial Obligations of the City as of the Petition Date

On the Petition Date, the City filed its List of Creditors Pursuant to Section 924 of the Bankruptcy Code and Bankruptcy Rule 1007 (Docket No. 16) (the "Original List of Creditors"). On August 1, 2013, the City filed its Amended List of Creditors Pursuant to Section 924 of the Bankruptcy Code and Bankruptcy Rule 1007 (Docket No. 258) (the "Amended List of Creditors"), which replaced the Original List of Creditors and redacted certain personal information contained in the Original List of Creditors. On September 30, 2013, the City filed its Second Amended List of Creditors and Claims, Pursuant to Sections 924 and 925 of the Bankruptcy Code (Docket No. 1059), which supplemented and amended the information in the Amended List of Creditors. The Second Amended List of Creditors is the currently effective list of the Claims against the City under section 925 of the Bankruptcy Code (as amended or supplemented from time to time, the "List of Claims").

In the List of Claims, the City identified a total of approximately $17.976 billion in prepetition obligations, including approximately $17.914 billion in long-term obligations described in the paragraphs below.

### 1.     Revenue Bonds

Michigan Public Act 94 of 1933, the Revenue Bond Act, MCL §§ 141.101 *et seq.*, authorizes the City to issue bonds secured by the property and revenues of certain City enterprises ("Revenue Bonds"). Revenue Bonds issued by the City are not included in the general limit of indebtedness prescribed by Michigan law so long as they do not impose any liability upon the City itself. As of the Petition Date, the City owed approximately $5.359 billion in outstanding principal and interest amount of Revenue Bonds which includes approximately $504.3 million in outstanding principal and interest amount of related revolving bonds (collectively, the "DWSD Revolving Bonds"). The Revenue Bonds and the DWSD Revolving Bonds are serviced from the following Enterprise Funds:

### (a)     Sewage Disposal Fund Revenue Bonds & DWSD Revolving Sewer Bonds

As of the Petition Date, the City owed approximately $2.826 billion in outstanding principal and interest amount of Revenue Bonds (consisting of first lien bonds totaling approximately $1.861 billion and second lien bonds totaling

approximately $965 million) serviced from the City's Sewage Disposal Fund (the "DWSD Sewer Bonds").  The DWSD Sewer Bonds consist of 19 series of Revenue Bonds issued between 1998 and 2012, bearing interest rates between 1.625% and 7.50% and maturing July 1, 2014 through July 1, 2039.  The 19 series of DWSD Sewer Bonds outstanding as of the Petition Date are insured by various entities, including National Public Finance Guarantee Corporation ("NPFGC") (12 series), Assured Guaranty Municipal Corporation ("Assured") (six series) and Financial Guaranty Insurance Company ("FGIC") (one series).  Berkshire Hathaway Assurance Corporation ("Berkshire Hathaway") is a secondary reinsurer of the scheduled payment when due of the principal of and interest on three series of DWSD Sewer Bonds.

The City used the proceeds of the DWSD Sewer Bonds for the construction and maintenance of the sewage disposal system as well as the refunding of other liabilities.  Revenues of the sewage disposal system, net of operating expenses, were pledged to secure payment of principal and interest on the DWSD Sewer Bonds.

In addition, as of the Petition Date, the City owed approximately $482.9 million in outstanding principal and interest amount of DWSD Revolving Sewer Bonds related to the DWSD Sewer Bonds.  During Fiscal Year 2013, the sewage disposal system received net system revenues of approximately $461.8 million versus expected debt service requirements of approximately $200.0 million.

A schedule of the DWSD Sewer Bonds and related DWSD Revolving Sewer Bonds is attached hereto as Exhibit B.

**(b)     Water Fund Revenue Bonds & DWSD Revolving Water Bonds**

The City also owed approximately $2.525 billion in outstanding principal and interest amount of Revenue Bonds (consisting of first lien bonds totaling approximately $1.884 billion and second lien bonds totaling approximately $641 million) serviced from the City's Water Fund as of the Petition Date (the "DWSD Water Bonds").  The DWSD Water Bonds consist of 20 series of Revenue Bonds issued between 1993 and 2011, bearing interest rates between 2.496% and 7.00% and maturing July 1, 2014 through July 1, 2041.  Of the 20 series of DWSD Water Bonds outstanding as of the Petition Date, 17 are insured by various entities, including by NPFGC (10 series), Assured (four series) and FGIC (three series).  Berkshire Hathaway is a secondary reinsurer of the scheduled payment when due of the principal of and interest on two series of DWSD Water Bonds.

The City used the proceeds of the DWSD Water Bonds for the construction and maintenance of the water supply system as well as the refunding of certain other liabilities.  Revenues of the City's water supply system, net of operating expenses, were pledged to secure payment of principal and interest on the DWSD Water Bonds.

The City also owed approximately $21.5 million in outstanding principal and interest amount of DWSD Revolving Water Bonds related to the DWSD Water Bonds as of the Petition Date.  During Fiscal Year 2013, the water system received net system revenues of approximately $370.1 million versus expected debt service requirements of approximately $153.4 million.

A schedule of the DWSD Water Bonds and related DWSD Revolving Water Bonds is attached hereto as Exhibit C.

**(c)     Automobile Parking Fund Revenue Bonds**

As of the Petition Date, the City owed approximately $9.3 million in outstanding principal and interest amount of Detroit Building Authority Revenue Refunding Bonds:  Parking System, Series 1998-A, bearing interest rates between 4.70% and 5.125% and maturing July 1, 2014 through July 1, 2019 (the "Parking Bonds").  Substantially all revenues of the City's parking system, net of operating expenses, were pledged to secure payments of principal and interest on the Parking Bonds.  During Fiscal Year 2013, the parking system received net system revenues of approximately $11.1 million versus expected debt service requirements of approximately $1.7 million.

**2.     General Fund Obligations**

The City issues general obligation bonds (collectively, "General Obligation Bonds") to provide funds for the acquisition and construction of major capital facilities and equipment.  General Obligation Bonds have been issued for both governmental and business-type activities.  As of the Petition Date, the City had a total of $1.023 billion in outstanding principal and interest amount of unlimited tax general obligation bonds (collectively, "Unlimited Tax General Obligation Bonds") and limited tax general obligation bonds (collectively, "Limited Tax General Obligation Bonds").  In addition,

certain of the Unlimited Tax General Obligation Bonds and the Limited Tax General Obligation Bonds are secured by a lien in or other rights to distributable state aid. The General Obligation Bonds consist of the following:

### (a) Unlimited Tax General Obligation Bonds

Pursuant to the Home Rule City Act, the City levies the taxes used to pay debt service charges or obligations (including (i) principal and interest due during the current tax year, (ii) amounts necessary to fund deposits into sinking funds with respect to any mandatory redemptions and (iii) amounts due but unpaid from the immediately preceding year) on Unlimited Tax General Obligation Bonds issued with the approval of the electorate. The amount of taxes levied to service Unlimited Tax General Obligation Bonds is in addition to other taxes that the City is authorized to levy, without limitation as to rate and amount and without regard to any City Charter, statutory or constitutional caps on taxation.

As of the Petition Date, the City owed approximately $479.4 million in outstanding principal and interest amount of 13 series of Unlimited Tax General Obligation Bonds maturing from April 1, 2014 through November 1, 2035 and bearing interest rates between 3.70% and 5.375%. Of this amount approximately $101.7 million in outstanding principal and interest amount of one series of Unlimited Tax General Obligation Bonds issued in 2010 is secured by or has a right to be paid from distributable state aid held by the State and not disbursed to the City. Each series of unsecured Unlimited Tax General Obligation Bonds is insured by National, Assured, Syncora or Ambac Assurance Corporation ("Ambac").

On November 8, 2013, National and Assured filed a joint complaint (the "National/Assured Complaint") and Ambac filed a complaint (the "Ambac Complaint") against the City commencing adversary proceeding numbers 13-05309 and 13-05310 in the Bankruptcy Court. The National/Assured Complaint and the Ambac Complaint each allege that the City's Unlimited Tax General Obligation Bond debt is entitled to special treatment in the City's chapter 9 case (the "UTGO Litigation"). National and Assured and Ambac seek declaratory judgments and orders that the City must segregate certain tax revenues from the City's other sources of revenue and apply them solely for the purpose of servicing the City's obligations under the Unlimited Tax General Obligation Bonds. National, Assured and Ambac allege that the Unlimited Tax General Obligation Bonds are secured obligations of the City.

In papers filed with the Bankruptcy Court, the City has disputed the plaintiffs' characterization of the City's obligations with respect to the Unlimited Tax General Obligation Bonds. The City took the position that the Unlimited Tax General Obligation Bond debt is a general unsecured obligation. The City also took the position that the bondholders are precluded from seeking relief, both because there is no private right of action under Revised Municipal Finance Act of 2001, MCL §§ 141.2101 *et seq.* (the "Municipal Finance Act") and because section 904 of the Bankruptcy Code bars the Bankruptcy Court from entering an order that would interfere with the City's political or governmental powers or with its property or revenues. Further, the City argued that the Unlimited Tax General Obligation Bonds are backed only by a promise to repay them either from general revenue or *ad valorem* taxes, and that this does not grant the bondholders a lien on tax revenue. Finally, the City has contested the plaintiffs' assertion of a property interest in the *ad valorem* tax revenues. The UTGO Litigation, or the settlement thereof, may have an effect on the City's ability to continue to collect the *ad valorem* tax related to the Unlimited Tax General Obligation Bond debt. As of the date of this Disclosure Statement, the UTGO Litigation remains pending.

A schedule of the secured and unsecured Unlimited Tax General Obligation Bonds is attached hereto as Exhibit D.

### (b) Limited Tax General Obligation Bonds

In addition to Unlimited Tax General Obligation Bonds, the City is authorized under Michigan law to issue Limited Tax General Obligation Bonds without the approval of the electorate. Limited Tax General Obligation Bonds are serviced from the City's General Fund, including *ad valorem* taxes levied for general operations purposes as a general obligation of the City.

As of the Petition Date, the City owed approximately $546.8 million in outstanding principal and interest amount of nine series of Limited Tax General Obligation Bonds maturing April 1, 2014 through November 1, 2035. Of this amount, (i) approximately $252.5 million in outstanding principal and interest amount of one series of Limited Tax General Obligation Bonds issued in 2010 is secured by a first lien on distributable state aid and (ii) approximately $130.8 million in outstanding principal and interest amount of one series of Limited Tax General Obligation Bonds issued in 2012 is has the right to be paid by the State using distributable state aid held by the State and not disbursed to the City. Four of the six series of unsecured Limited Tax General Obligation Bonds are insured by Ambac. The other two series of unsecured Limited Tax General Obligation Bonds are not insured.

The Ambac Complaint alleges that the City is obligated to use general tax revenues collected within the City's charter, statutory or constitutional limitations to service the Limited Tax General Obligation Bonds (the "LTGO Litigation"). The City disputes Ambac's characterization of the City's obligations with respect to the Limited Tax General Obligation Bonds. The City believes that the Limited Tax General Obligation Bonds merely create a "first budget obligation" under the Municipal Finance Act, which creates a priority inconsistent with chapter 9 distribution rules (and therefore is ineffective in chapter 9) and does not create a lien or trust. Moreover, although Ambac contends that all other Unsecured Claims are subordinated to the Limited Tax General Obligation Bond debts, the City's position is that such subordination can be accomplished only through an inter-creditor agreement; *i.e.*, the City cannot agree to make certain creditors' claims subordinate to the claims of another creditor. As of the date of this Disclosure Statement, the LTGO Litigation remains pending.

A schedule of the secured and unsecured Limited Tax General Obligation Bonds is attached hereto as Exhibit E.

**(c)     Outstanding Installment Notes and Loans**

As of the Petition Date, the City owed approximately $123.8 million in other outstanding installment notes and loans payable related to various public improvement projects. These obligations included: (i) an Estimated Aggregate HUD Installment Note Amount of $90.1 million in notes payable, which notes were issued in connection with the "Section 108" HUD Loan Guarantee Program and are secured by (A) present and future "Block Grant" revenues, (B) other revenues in the form of program income generated from the use of proceeds from the issuance of HUD Installment Notes, (C) funds in accounts created in accordance with HUD Installment Note Documents and (D) certain other pledged collateral; and (ii) approximately $33.7 million in loans payable ($33.6 million of which is a non-interest bearing unsecured loan, with flexible maturity, payable to the DDA as general operating funds become available).

**3.     Certificates of Participation**

In 2005, the City entered into a series of transactions involving the issuance to investors of approximately $1.4 billion of instruments known as certificates of participation (the "2005 COPs"). Pursuant to City Ordinance No. 05-05, the City established two nonprofit entities known as "service corporations" – the Detroit General Retirement System Service Corporation and the Detroit Police and Fire Retirement System Service Corporation (together, the "Service Corporations") – to provide "services," including providing funding to the Retirement Systems by facilitating the financing of the 2005 COPs. The Service Corporations in turn created a funding trust (the "2005 Funding Trust") to issue and sell the 2005 COPs. The 2005 Funding Trust issued the 2005 COPs in 2005. The City entered into a separate service contract with each of the Service Corporations (the "2005 Service Contracts") pursuant to which the City agreed to make certain payments in return for the Service Corporations' future assistance in funding transactions for the Retirement Systems.

The Service Corporations are Michigan nonprofit corporations incorporated by the City pursuant to state law. Both of the Service Corporations, however, are fiscally dependent upon and provide services entirely to the City. The governing body of each Service Corporation is its Board of Directors, each of which consists of three officials of the City, the Finance Director, the Budget Director and the Corporation Counsel, plus two members of the City Council, selected and appointed by the City Council.

In 2006, the Service Corporations established another funding trust (the "2006 Funding Trust" and, together with the 2005 Funding Trust, the "Funding Trusts") and entered into a trust agreement with U.S. Bank, as trustee, pursuant to which agreement the 2006 Funding Trust issued the "2006 COPs" (together with the 2005 COPs, the "COPs"). One series of 2006 COPs had a fixed interest rate and was issued in the original aggregate principal amount of $148.54 million; the other series of 2006 COPs was issued in the original aggregate principal amount of $800 million and had a floating interest rate. The proceeds of the 2006 COPs were used, in large part, to fund the optional redemption and cancellation of certain of the 2005 COPs. As of June 7, 2006, the Service Corporations each entered into a service contract with the City in connection with the issuance of the 2006 COPs (together with the 2005 Service Contracts, the "Service Contracts").

As of the Petition Date, there were three series of COPs outstanding in the aggregate amount of approximately $1.473 billion, as follows: (a) the Series 2005-A COPs in the aggregate amount of approximately $517.6 million, bearing interest at 4.50 to 4.95%; (b) the Series 2006-A COPs in the aggregate amount of $153.7 million, bearing interest at 5.989%; and (c) the Series 2006-B COPs in the aggregate amount of $801.6 million, bearing interest at a floating rate.

The COPs may not be authorized under Michigan law. The City is subject to both the Home Rule City Act and the Municipal Finance Act. Section 117.4a(2) of the Home Rule City Act prescribes certain limitations on the amount of

-79-

13-53846-swr   Doc 8372   Filed 03/31/14   Entered 03/31/14 10:36:38   Page 92 of 602
13-53846-swr   Doc 8372   Filed 03/31/14   Entered 03/31/14 10:24:48   Page 92 of 162

"indebtedness" that the City may incur. If the City's obligations under the Service Contracts constitute "indebtedness" within the meaning of the Home Rule City Act, then the issuance of the COPs may have exceeded the limitations on indebtedness imposed by the Home Rule City Act and, thus, may not have been authorized under applicable Michigan law. Similarly, Sections 301 and 103 of the Municipal Finance Act prohibit a "municipality" from issuing a "municipal security," except in accordance with the provisions of the Municipal Finance Act. In addition, the issuance of some or all of the COPs may have constituted the issuance of a municipal security by a municipality other than in conformity with the Municipal Finance Act.

###   4.        Swap Liabilities

The City faced the risk of rising interest rates on the floating-rate COPs (the 2006-B COPs). In order to protect against this risk, in 2006, the Service Corporations entered into pay fixed, receive variable interest rate swap transactions with an aggregate notional amount equal to the then-outstanding amount of the 2006-B COPS, or $800 million, under eight separate master agreements (collectively, the "Swap Contracts") with either (a) UBS AG and (b) SBS Financial Products Company LLC, who was succeeded by Merrill Lynch Capital Services, Inc. ("MLCS" and, together with UBS AG, the "Swap Counterparties"). MLCS provided credit support to SBS with respect to the transaction. The swaps effectively fixed the Service Corporations' interest rate costs. The Corporations paid the same amount with respect to the floating rate COPs every quarter, regardless of whether interest rates moved up or down.

The Service Corporations' sole source of funding for payments owed under the Swap Contracts is payments owed by the City under the Service Contracts.

As part of the transaction, insurance policies were issued by FGIC and Syncora (together with FGIC, the "Swap Insurers"), as successor to XL Capital Assurance Inc. The policies insure the quarterly payments owed under the Swap Contracts as well as a certain portion of the termination payments that may be owed thereunder. In certain circumstances, there is no cap on the amount the Swap Insurer would owe with respect to a Claim based on a termination payment. In certain other circumstances, Syncora's and FGIC's maximum exposure is capped under their respective policies relating to the Swap Contracts. Each of the policies is unconditional and irrevocable, and may not be cancelled for any reason.

In or around January 2009, downgrades of the 2006 COPs' debt rating, in conjunction with the prior downgrade of FGIC and Syncora, provided the Swap Counterparties the right, pursuant to the Swap Contracts, to designate an early termination date under the Swap Contracts. Given the low prevailing interest rates in 2009, such early termination would have resulted in a lump-sum payment owed to the Swap Counterparties of between approximately $300 million and $400 million. To avoid such an early termination payment (any such payment, a "Swap Termination Payment"), the City provided collateral to the Swap Counterparties for amounts owed to them under the Swap Contracts pursuant to a collateral agreement dated June 15, 2009 (the "Collateral Agreement"), among the City, the Service Corporations, the Swap Counterparties and U.S. Bank, as custodian. In addition, the City, the Service Corporations, the Swap Counterparties and the Swap Insurers agreed to amend the Swap Contracts. To secure the obligations to the Swap Counterparties and pursuant to the Collateral Agreement, the City agreed to direct certain taxes wagering taxes and developer payments (together, the "Casino Revenues") into a lockbox account (the "General Receipts Account") pending payment each month into a second lockbox account (the "Holdback Account" and, together with the General Receipts Account, the "Lockbox Accounts") of one third of the quarterly payment next due to the Swap Counterparties. The City also passed legislation creating a first priority lien and pledge on the Casino Revenues.

As of the Petition Date, each day, on average, approximately $0.5 million in Casino Revenues was deposited into the General Receipts Account which, at the end of each 30-day period, amounted to approximately $15 million. Under the Collateral Agreement, U.S. Bank releases the funds accumulating in the General Receipts Account to the City only after the City deposits approximately $4 million – one-third of its quarterly swap payment – into the Holdback Account. Once the City makes this deposit into the Holdback Account, U.S. Bank gives the City complete access to the Casino Revenues in the General Receipts Account, as it is deposited, until the beginning of the next payment period. If the City fails to make a quarterly swap payment or certain other events take place, the Swap Counterparties are empowered under the Collateral Agreement to, among other things, notify U.S. Bank that it should not release – or should "trap" – the Casino Revenues owed to the City. The Swap Counterparties are permitted to do this even if the amounts in the General Receipts Account exceed the amount of the missed swap payment. As of the Petition Date, the City had continued to make its payments to the Swap Counterparties through the Holdback Account.

Section VIII.E of this Disclosure Statement summarizes litigation and settlement efforts regarding the City's swap obligations.

5.        **Pension Obligations**

        (a)        **Description of Retirement Systems**

        The Retirement Systems consist of the General Retirement System of the City of Detroit (the "GRS") and the Police & Fire Retirement System of the City of Detroit (the "PFRS"). For financial statement purposes, the Retirement Systems are included as fiduciary trust funds of the City. Each system is a single-employer plan composed of a defined benefit plan and a defined contribution annuity program. The plans provide retirement, disability and pre-retirement death benefits to plan members and beneficiaries. The plans are administered in accordance with the City Charter, the Detroit City Code and union contracts, which assign the authority to establish and amend contributions and benefit provisions to each plan's Board of Trustees. As of the Petition Date, Section 11-103(1) of the City Charter established the composition of the GRS Board of Trustees, as follows, although the actual composition has been changed pursuant to certain collective bargaining dispute arbitration awards: (i) the Mayor; (ii) one City Council member selected by the City Council; (iii) the City Treasurer; (iv) five members of the GRS, elected by the GRS membership; (v) one City resident who is neither a City employee nor eligible to receive GRS benefits, appointed by the Mayor and approved by the GRS Board of Trustees; and (vi) one current GRS retiree who is receiving benefits under the GRS, elected by "retired City employees." Section 11-103(2) of the City Charter provided, as of the Petition Date, that the PFRS Board of Trustees shall consist of: (i) the Mayor or a designee of the Mayor; (ii) one City Council member selected by the City Council; (iii) the City Treasurer; (iv) the Chief of Police; (v) the Fire Commissioner; (vi) three firefighters who are PFRS members, elected by PFRS members who are firefighters; (vii) three police officers who are PFRS members, elected by PFRS members who are police officers; and (viii) two current PFRS retirees who are residents of the City and are receiving benefits under the PFRS, with one such retiree elected by "retired firefighters" and one elected by "retired police officers." The Retirement Systems' investment policies are governed in accordance with Michigan Public Act 314 of 1965 (as amended), the Public Employee Retirement System Investment Act, MCL §§ 38.1121 *et seq*.

        (b)        **Underfunding**

                i.        **Retirement Systems' Prepetition Estimates**

        Each of the Retirement Systems has reported UAAL totals that are substantially lower than the amounts disclosed by the City in the List of Claims. In particular, as of June 30, 2012, the GRS reported that it was 77.0% funded with a UAAL of $837.7 million out of $3.644 billion in accrued liabilities. As of June 30, 2012, the PFRS reported that it was 96.2% funded with a UAAL of $147.2 million out of $3.823 billion in accrued liabilities. Thus, based on actuarial assumptions and methods employed by the Retirement Systems prior to the commencement of the chapter 9 case, the estimated UAAL as of the end of Fiscal Year 2012 for both Retirement Systems combined was $984.9 million.

                ii.        **Unrealistic Assumptions**

        The City believes that the UAAL figures reported by the Retirement Systems were substantially understated because they were based upon various actuarial assumptions and methods that served to substantially understate the Retirement Systems' UAAL. The assumptions and methods included: (A) annual net rates of return on investments (GRS – 7.9%; PFRS – 8.0%) that were unrealistic in light of the Retirement Systems' demographics, the targeted mix of the Retirement Systems' assets and the inability of the City to budget for and fund pension investment loss in the event the sought-after returns were not achieved; (B) the "smoothing" (reallocation over a period of years) of asset gains and losses over a seven-year period, which masks the funding shortfall; and (C) the use of 29-year (PFRS) and 30-year (GRS) amortization periods for funding UAAL – which is applied anew each year to the full amount of unfunded liability – that allows unfunded liabilities to continue to grow rapidly as a result of compounding.

                iii.        **Past Pension Practices**

        The Retirement Systems' trustees and certain City officials also have engaged in a variety of practices that exacerbated and, in certain cases, masked the extent of the Retirement Systems' UAAL, particularly with respect to the GRS.

                (A)        **Annuity Savings Plan and 13th Check Program**

        Perhaps most damaging to the fiscal health of the Retirement Systems was the GRS board of trustees' (the "GRS Trustees") actions in connection with the "annuity savings plan" offered to certain beneficiaries of the GRS (the "Annuity

Savings Plan"). Under the terms of the Annuity Savings Plan, active City employees were allowed to elect to invest zero, three, five or seven percent of their salaries on an after-tax basis into a discrete defined contribution plan that earned interest based on a rate of return established at the discretion of the GRS Trustees. These employee contributions were aggregated and invested with the other assets of the GRS on a commingled basis. In many years, however, the GRS Trustees chose to credit employees' Annuity Savings Plan accounts with rates of return that were far greater than the actual rate of return earned on investments by the GRS. For a long period of time, the GRS Trustees essentially operated the Annuity Savings Plan as a guaranteed investment contract with a guaranteed floor investment return approaching 7.9%. For example, in 2009, the GRS lost 24.1% of the value of its assets, yet the GRS Trustees credited Annuity Savings Plan accounts with a positive investment return of approximately 7.9%.

These inflated rates of return on Annuity Savings Plan accounts were funded with GRS assets attributable to the City's contributions to fund the GRS's defined benefit pension. Hundreds of millions of dollars of GRS plan assets intended to support the traditional defined benefit pensions that the City had promised were reallocated to the Annuity Savings Plan and provided a windfall to the Annuity Savings Plan accounts of active employees outside of the defined benefit pension plan. According to the "Initial 60 Day Report" issued by the Office of the Auditor General and the Office of the Inspector General on August 20, 2013 (the "IG/AG Report"), this practice resulted in an effective rate of return of over 20% on Annuity Savings Plan accounts for Fiscal Years 1984-86, 1995-2000 and 2005-07. The IG/AG Report also revealed that interest dividend credits were given disproportionately to employees with Annuity Savings Plan accounts, resulting in "excessively disproportionate" annuity refund amounts to such employees.

For the GRS, the transfer of assets that were otherwise intended to fund defined benefit pensions was not limited to practices involving Annuity Savings Plan accounts. For example, in years in which the actual investment return exceeded the assumed rate of return, the GRS Trustees paid out a portion of the excess to already retired pensioners. Referred to as the "13th check" program – because the additional pension check would be in excess of the 12 monthly pension checks the retiree normally received in that year – these payments were made in excess of the pensioner's earned pension and to the detriment of the Retirement Systems.

An average of nearly 55% of earnings over and above assumed rates of return were diverted from GRS defined benefit pension plans into the Annuity Savings Plan accounts of active employees. An additional 17% of any such earnings on average was distributed to retirees directly via the "13th check" program. Instead of being retained by the GRS, the remaining 28% of these "excess" earnings on average was used to discount the City's forthcoming required pension contributions, thus ensuring that the net performance of the GRS would never exceed the assumed rate of return in any given year and that UAAL would continue to increase. These practices deprived the GRS of assets that would be needed to support liabilities, especially in light of the fact that in certain years, the GRS' investment returns inevitably would fall short of their assumed rates of return. See Declaration of Charles M. Moore in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (Docket No. 13) (the "Moore Declaration"), at ¶ 19.

According to a report that was provided to City Council members by the Fiscal Analysis Division on November 21, 2011, the total cost to the City of the GRS practices of distributing pension-fund earnings over assumed rates of return to retirees and active employees – whether by direct payment via a "13th check" or through excess contributions to employees' Annuity Savings Plan accounts – as of June 30, 2008, was $1.92 billion. See Report of Joseph Esuchanko dated March 8, 2011, at 9.

### (B)  Fiduciary Malfeasance

There are also serious allegations that former Retirement Systems officials have engaged in additional fiduciary misconduct that has harmed the Retirement Systems. For example, in January 2012, a trustee of the Retirement Systems was indicted by a federal grand jury on charges that he conspired with others to personally enrich himself and his co-conspirators by accepting bribes from individuals who conducted business with the Retirement Systems. These bribes took the form of cash, travel, meals, golf clubs, drinks, gambling money, hotel stays, entertainment, Las Vegas concert tickets, massages, limousine service, private plane flights, and other things of value. According to a Federal Bureau of Investigation ("FBI") Press Release dated February 28, 2012, the Retirement Systems suffered more than $84 million in losses from investments associated with the charged-trustee's alleged bribery conspiracy. In March 2013, the former general counsel of both Retirement Systems and a former PFRS trustee were also indicted for having participated in the aforementioned bribery and kickback conspiracy, which involved steering more than $200 million in Retirement System investments. According to an FBI Press Release dated March 20, 2013, these Retirement Systems officials and others collectively conspired to defraud current and retired employees of the City of their right to the honest services of Retirement Systems officials free from bribery and corruption.

In 2009, it was reported that certain Retirement System trustees and their lawyers and staff billed the Retirement Systems $380,000 for traveling around the world to attend conferences. The GRS trustee who spent the most time traveling to such conferences reportedly billed the GRS for $105,000 in travel expenses, including three trips to Singapore and one trip to Hong Kong. Some of this travel occurred during an 18-month period during which the Retirement Systems lost billions of dollars in investments. The misconduct of these Retirement System officials has contributed, in a not insignificant way, to the underfunding of the Retirement Systems.

<p align="center">(C)      <b>Deferrals of Current Contributions</b></p>

The City also periodically deferred payment of its year-end PFRS contributions (and financed such deferrals at a rate of 8%). As of May 2013, the City had deferred approximately $58 million in pension contributions owing for Fiscal Year 2013. Contributions made in the form of notes were treated as timely funding contributions made to the pension trust during the applicable financial year. In addition, the City was granted a funding credit by PFRS in the amount of $25 million for each of the Fiscal Years 2008 through 2010, resulting in under-contributions by the City toward its pension liabilities for each of those years.

<p align="center">iv.      <b>Pre-Chapter 9 Estimates of Extent of Underfunding Using Realistic Assumptions</b></p>

In the List of Claims, the City set forth what it believes it a more realistic total UAAL for the Retirement Systems of $3.474 billion, consisting of $2.037 billion in UAAL owed to the GRS and $1.437 billion in UAAL owed to the PFRS. As set forth in the Moore Declaration, which was filed on the Petition Date, the City's actuary, Milliman Inc., calculated this UAAL figure merely by substituting the estimated market value of the Retirement Systems' assets for their actuarial value and using a somewhat more achievable assumed rate of return of 7.0% instead of the rates of return of 7.9% or 8.0% assumed by the GRS and the PFRS, respectively. If one were to apply assumed rates of return of 6.25% for GRS and 6.50% for PFRS – which under the Plan are more reasonable discount rates in light of relevant circumstances – the UAAL totals increase to $2.299 billion for the GRS, and $1.588 billion for the PFRS, as of the end of Fiscal Year 2012.

<p align="center">6.      <b>Other Post-Employment Benefit Obligations</b></p>

<p align="center">(a)      <b>General</b></p>

Prior to the Petition Date, the City provided substantial post-retirement health benefits – also known as OPEB benefits – to current and future retirees and their dependents. The City provides OPEBs under two umbrella plans – the Health and Life Insurance Benefit Plan (the "Health/Life Benefit Plan") and the City of Detroit Employee Benefit Plan, which operates and administers the Employee Supplemental Death Benefit Plan (the "Supplemental Plan" and, together with the Health/Life Plan, the "OPEB Plans").

The List of Claims estimated liabilities in the aggregate amount of $5.718 billion for UAAL associated with the OPEB Plans. This amount included the present value of OPEB liabilities for active employees of the City not yet retired. The OPEB liability amount for former employees retired from the City and continuing to obtain retiree health and life insurance is approximately $3.185 billion. In the aggregate, 99.6% of the City's OPEB liabilities were unfunded as of the Petition Date. As of June 30, 2011 (the most recently published actuarial valuation), there were 19,389 retirees eligible to receive benefits under the City's OPEB Plans. The number of retirees receiving benefits from the City is expected to increase over time.

The City's OPEB liabilities are particularly high due to, among other things: (i) the fact that retirees can choose from 22 different plan options with varying structures and terms, which creates a high level of complexity and cost in benefit administration; and (ii) the extremely generous benefit features of the programs, especially for dependent coverage, which create high costs to the City on a per retiree basis.

<p align="center">(b)      <b>Health/Life Benefit Plan</b></p>

The Health/Life Benefit Plan is a single-employer defined benefit plan that provides hospitalization, dental care, vision care and life insurance to all officers and employees of the City who were employed on the day preceding the effective date of the Health/Life Benefit Plan and who continue in the employ of the City on and after the effective date of the Health/Life Benefit Plan. Retirees were allowed to enroll in any of the group plans offered by the City to active employees. The City provides health care coverage for substantially all retirees in accordance with terms set forth in union contracts.

General City employees hired before 1995 were eligible for health care benefits if they satisfy any of the following criteria: (i) 30 years of creditable service (or 25 years of creditable service for an EMS member), (ii) 10 years of creditable service having attained age 60 or (iii) 8 years of creditable service having attained age 65. The health care benefit eligibility conditions for general City employees hired on or after 1995 are (i) 30 years of creditable service having attained age (55, 60 or 65, as applicable), (ii) 10 years of creditable service (having attained age (55, 60 or 65, as applicable) or (iii) 8 years of creditable service (having attained age (55, 60 or 65, as applicable). The City provided full health care coverage to general City employees who retired prior to January 1, 1984 (except for a "Master Medical" benefit that was added on to the coverage after that date). The City pays up to 90 percent of health care coverage for employees who retired after January 1, 1984; however, for employees who retired between January 1, 1984 and June 30, 1994, the retiree share had been reduced by 50 percent by appropriations from City Council. The City also paid health coverage for an eligible retiree's spouse that was married to the retiree as of the date of retirement, under the same formulas noted above, as long as the retiree continued to receive a pension, and for dependents. Dental and vision coverage also were provided for retirees, spouses and dependents.

The health care benefit eligibility conditions for employees of the Detroit Police Department ("DPD") and the Detroit Fire Department ("DFD") were (i) any age with 25 years of creditable service or (ii) any age with 20 years of service for Detroit Police Officers Association ("DPOA") members, effective March 8, 2007, and Allied Detroit Fire Fighters Association ("DFFA") members, effective March 8, 2008. The City paid up to 90 percent of health care coverage for the retiree and any eligible spouse. Spouses (widows or widowers) of "Straight Life Option" retirees who retired prior to July 1, 1987 continued to receive hospitalization coverage. Coverage also was provided to dependents. Dental and vision coverage were also provided for retirees, spouses and dependents.

The City also provided health care coverage to general City employees and DPD and DFD employees that opted for early retirement. For general City employees hired before 1995, the health care benefit eligibility conditions were 25 years of creditable service; for employees hired after 1995, the health care benefit eligibility conditions were 25 years of creditable service (having attained age 55). The coverage began when the retiree would have been eligible for ordinary retirement. The City paid up to 90 percent of health care coverage for the retiree and any eligible spouse. For DPD and DFD employees, the health care coverage began when (i) the retiree reached the date he/she would have completed 25 years of creditable service or (ii) for DPOA and DFFA member, the retiree would have completed 20 years of creditable service (effective March 8, 2007). The City paid up to 90 percent of health care coverage for the retiree and any eligible spouse. Spouses (widows or widowers) of Straight Life Option retirees who retired prior to July 1, 1987 received hospitalization coverage, as did dependents. Dental and vision coverage were also provided for retirees, spouses and dependents.

The City also provided health care coverage at reduced rates to general City employees and DPD and DFD employees who met certain health care benefit eligibility conditions and retired under the "Deferred Retirement Benefits (Vested)," the "Death-in-Service Retirement Benefits Duty and Non-Duty Related" and the "Disability Retirement Benefits Duty and Non-Duty Related" programs. Complementary health care coverage was provided by the City for those retirees that are Medicare-Eligible. Retirees who opted out of the retiree health care coverage could have obtained coverage at a later date.

In addition to health care coverage, the City allowed its retirees to continue life insurance coverage under the "Group Insurance Protection Plan" offered to active employees in accordance with Section 13, Article 9 of the Detroit City Code. The basic life insurance coverage for general City employees and Police and Fire employees was based on the employee's basic annual earnings to the next higher thousand dollars. The life insurance benefit amounts ranged from $3,750 to $12,500.

The Health/Life Benefit Plan is financed entirely on a "pay-as-you-go" basis and is 0% funded. As of June 30, 2011, the City had $5,718,286,228 in actuarial liabilities under the Health/Life Benefit Plan. The cost to the City on account of retiree benefits provided under the Health/Life Benefit Plan in Fiscal Year 2012 was $177,460,627. This contribution by the City was in addition to $23,516,879 contributed by retirees during Fiscal Year 2012.

As of the Petition Date, the City's OPEB costs were expected to increase as a result of the growing number, and relatively young age, of City retirees (pension and health care plans have no age restrictions and early vesting ages) as well as increases in health care costs, particularly hospitalization costs.

-84-

13-53846-swr Doc 8379 Filed 11/21/14 Entered 11/21/14 08:24:49 Page 97 of 602
13-53846-swr Doc 8379-2 Filed 03/31/14 Entered 03/31/14 08:36:58 Page 97 of 162

In addition, although the Health/Life Benefit Plan is secondary to Medicare for eligible employees over the age of 65, many retired DPD and DFD employees are not eligible to receive free Medicare Part A benefits due to state-regulated Social Security "opt-out" provisions.

### (c)    Supplemental Plan

The Supplemental Plan is a pre-funded single-employer defined benefit plan providing death benefits based upon the retiree's years of City service ranging from $1,860 (for 8 to 10 years of service) to $3,720 (for 30 years of service, with $93.00 per year added for each additional year of service beyond the 30th year).  As of June 30, 2011, the City had $34,564,960 in actuarially accrued liabilities under the Supplemental Plan.  As of the Petition Date, the Supplemental Plan was 74.3% funded, with approximately $8.9 million in UAAL.  In Fiscal Year 2012, the cost to the City on account of benefits provided under the Supplemental Plan was $131,116.  This contribution by the City was in addition to $15,944 contributed by retirees during Fiscal Year 2012.

### (d)    *Weiler* Class

In July 2006, the City made a number of unilateral changes to healthcare benefits for unionized police and firefighter retirees, including increases to co-payments and deductibles and higher contributions for monthly healthcare premiums.  On July 12, 2006, retiree Alan Weiler filed a class action lawsuit against the City on behalf of approximately 8,000 retirees alleging violations of various collective bargaining agreements ("CBAs").  Mr. Weiler contended that the relevant CBAs promised vested, lifetime and unalterable healthcare benefits.  The Wayne County Circuit Court certified the case as a class action.  During litigation, the City maintained that it had the right to change retiree health benefits.

On March 14, 2007, the Wayne County Circuit Court denied the plaintiffs' motion to reverse the City's changes to healthcare benefits.  Ultimately, the Court concluded that the relevant CBAs were ambiguous as to whether the retirees had been promised vested lifetime retiree health benefits.  Accordingly, the Court concluded that a trial was necessary.  Before the trial occurred, the City and plaintiffs agreed to settle the case.  On August 26, 2009, the Court approved and entered the parties' settlement agreement, reducing it to a binding consent judgment, *i.e.*, a judgment of the Court that is fully enforceable by either party to the agreement.

The settlement agreement requires the City to provide *Weiler* class members with generous health benefits for as long as class members receive a City pension.  The cost to the City of the benefits payable to the *Weiler* class retirees/beneficiaries currently is approximately $75 million per year, representing over 40% of retiree benefits costs under the Health/Life Benefit Plan.  The *Weiler* plaintiffs are expected to assert that the settlement restricts the ability of the City to alter the benefit provisions included in the settlement.  The City believes that the Claims of the *Weiler* plaintiffs are no different than other unsecured Claims that are asserted by creditors of the City and that such Claims can be modified in the City's chapter 9 case.

### 7.    Other Liabilities

In addition to the liabilities described herein at Sections VII.B.1 through VII.B.6, as of June 30, 2013, the City had approximately $374 million in other outstanding liabilities, including, among other obligations:  (a) outstanding trade debt of approximately $148.8 million; (b) liability for accrued compensated absences (including unpaid and accumulated vacation and sick leave balances) of approximately $82.0 million; (c) accrued workers' compensation claims, for which the City is self-insured, of approximately $79.7 million; (d) various claims and judgments (including lawsuits and claims other than workers' compensation claims but excluding disputed or unliquidated claims) of approximately $55.0 million; and (e) capital leases payable totaling approximately $8.2 million.  The City has been administering and paying all undisputed workers' compensation claims during the pendency of this chapter 9 case, regardless of when the applicable injuries were incurred, in accordance with the City's prepetition practices and procedures and governing State workers' compensation law.

In addition to the above liabilities, the City estimates that, as of June 30, 2013, the General Fund had outstanding interfund payables and amounts due to Enterprise Funds and other governmental funds, including the Service Corporations and certain fiduciary funds, of approximately $221.3 million.  These amounts included: (a) approximately $26.0 million due to Enterprise Funds; (b) approximately $141.3 million due to fiduciary funds; (c) approximately $32.6 million due to the Service Corporations; and (d) approximately $21.4 million due to other governmental funds.

In addition to these liabilities, the City is required under state law to fund the operations of the 36th District Court, which is located within the City. The 36th District Court is one of the largest and busiest courts in the United States, processing more than 500,000 cases annually. The 36th District Court has original jurisdiction over (a) all City traffic and ordinance violations, (b) all criminal misdemeanor cases, (c) preliminary examinations for felony cases, (d) small claims suits, (e) civil lawsuits up to $25,000 and (f) real estate matters involving rent and land contract disputes.

Pursuant to section 8101 of Michigan Public Act 236 of 1961, the Revised Judicature Act, MCL §§ 600.101 *et seq.* (the "Judicature Act"), the State is divided into judicial districts under the superintending control of the Michigan Supreme Court. The Judicature Act categorizes districts into three classes. The thirty-sixth district consists solely of the City of Detroit and is a district of the third class. MCL § 600.8121a(1). The City is the district funding unit of the thirty-sixth district and, therefore, is required to appropriate funds for the operation of the 36th District Court. MCL § 600.8104; MCL § 600.8271(1). As the political subdivision solely comprising the thirty-sixth district, the City has sole responsibility for financing the 36th District Court. MCL § 600.8103(3). The 36th District Court does not receive advance funding from the City; rather, the City provides funding on an ongoing basis according to the needs and requirements of the 36th District Court by directly paying creditors of the 36th District Court. The City's funding responsibility for the 36th District Court includes responsibility for satisfying the claims of judgment creditors who receive monetary judgments or other awards that are entered against the 36th District Court. Because the City is required under the Judicature Act to fund the 36th District Court, the claims of judgment creditors who receive monetary judgments or other awards that are entered against the 36th District Court effectively constitute claims against the City. The City spent approximately $34.0 million to finance the 36th District Court during Fiscal Year 2013.

In connection with its operations and administrative functions and pursuant to MCL § 600.8379(1), the 36th District Court collects fines, revenues and other charges which are deposited by the 36th District Court into one or more bank accounts maintained by the 36th District Court. These accounts are swept monthly, with all funds in them going to the State, the county and a portion of them to the City. The City does not segregate funds received from the 36th District Court. Rather, the funds are absorbed by the City into the City's general operating accounts. The funds that the 36th District Court pays to the City total approximately $14.5 million on an annual basis.

Although the 36th District Court receives funding from the City and much of its property is owned by the City, it is an arm of the State and not a City department. As such, the City is not involved in managing, and thus cannot restructure, the 36th District Court's operations. As set forth in Section XI.A.1, the estimates and assumptions with respect to the 36th District Court contained in the Projections are subject to economic uncertainties and contingencies. Nothing contained herein, in the Plan, the Confirmation Order or any other document is intended to determine or adjudicate the actual and necessary expenses of the 36th District Court.

There are numerous inefficiencies in the 36th District Court's operation, such as: (a) low fine collection rates and ineffective collection practices; (b) an overreliance on, and redundant checks relating to, paper documents and physical case files; (c) inefficient docket management systems; (d) limited use of operating performance metrics; (e) obsolete computer hardware and software; and (f) pervasive overstaffing. In May 2013, the administrative office of the Michigan Supreme Court appointed a "Special Judicial Administrator" to restructure the 36th District Court. To date, the Special Judicial Administrator has, among other things, (a) reduced the 36th District Court's employee headcount, (b) instituted a 10% pay cut, (c) procured a $1 million grant from the State to upgrade the court's information technology systems, (d) transitioned employees to a more cost-effective healthcare program and (e) initiated various pilot projects – such as electronic ticketing – to increase fine collection rates. See Section IX.A.6 for further detail regarding restructuring initiatives related to the 36th District Court.

## C.     The City's Steady Operational and Financial Decline

The circumstances that led the City to commence its chapter 9 case were not of recent origin. Rather, they were the product of demographic and economic forces that had been mounting for decades. In 1952, at the height of its prosperity and prestige, Detroit – frequently referred to as the cradle of the American automobile industry – had a population of approximately 1.85 million, a 600% increase from the population in 1900. Detroit's expansion coincided with the rise of the automakers. From 1900 to 1930, Detroit was the fastest growing city in the world, and by 1929 it was the fourth largest city in America. In 1950, Detroit was building half of the world's cars. During that period, half a million people came to Detroit looking for work.

1.      **Declines in Population and the City's Manufacturing Base**

From the 1950s to the Petition Date, Detroit lost both residents and a significant percentage of its manufacturing base.  Detroit's population declined by nearly 45% to just over one million as of June 1990.  In the following 23 years, the population decline continued, falling by a further 25% between 2000 and 2010.  Detroit's population stood at 684,799 as of December 2012, a 63% decline from its postwar peak of 1.85 million residents.  Detroit has gone from the fourth largest city in America in 1929 to the eighteenth largest today.  No other American city has experienced a comparable decline in population over a similar period of time.

A considerable amount of migration out of the City was a result of economic dislocation.  In particular, changes in the auto industry over the years had an outsized impact on Detroit's economy.  Almost immediately after World War II, Detroit began to lose manufacturing jobs as the auto companies automated their facilities and moved their remaining jobs out of the City.  Between 1947 and 1963, Detroit lost approximately 150,000 manufacturing jobs as smaller auto manufacturers disappeared (*e.g.*, Packard and Studebaker), and the "Big Three" began to move operations to the suburbs and out of the State.

These trends only accelerated as the Detroit automakers began to lose ground to international competitors.  Foreign automakers entered the U.S. market during the 1950s with fuel-efficient vehicles and, when the oil crisis of 1973 hit, U.S. automakers were unprepared.  Automobile production fell nearly 30% in the next two years, and the market share of U.S. automobile companies declined from 95% in 1955 to 75% in 1980.  By 2008, Detroit's share of U.S. auto sales had declined to 47%.

The collapse of Detroit's manufacturing industry during the second half of the 20th century was not limited to the automobile sector.  Non-auto companies also shuttered operations.  In the 1970s and 1980s, companies such as Uniroyal, Vernor's Ginger Ale and Revere Copper closed their plants and left abandoned sites behind.  From 1972 to 2007, the City lost approximately 80% of its manufacturing establishments and 78% of its retail establishments, many of which relocated from the City to its suburbs, beyond the reach of public transportation.

**Population**



Source:  City of Detroit Financial and Operating Plan (May 12, 2013), at 22.

-87-

13-53846-swr   Doc 8379   Filed 12/16/14   Entered 12/16/14 08:24:40   Page 100 of 602
13-53846-swr   Doc 8379   Filed 12/16/14   Entered 12/16/14 13:36:03   Page 100 of 602

## 2. Declining Revenues

Declines in both population and the economy were mutually reinforcing trends. As more people left the City, there was less economic activity and, thus, a decreased need for workers. Less economic activity and fewer jobs induced yet more people to leave, thus further reducing economic activity and exacerbating job losses. This decades-long vicious spiral took a tremendous toll on the City's ability to generate revenue. Detroit's municipal income tax receipts – traditionally the City's largest source of revenue – have decreased by approximately $95 million (or 30%) since 2002 and by $43 million (or more than 15%) since 2008, driven lower primarily by high unemployment and declining *per capita* income. See Financial and Operating Plan, at 24. Despite a small recovery in municipal income tax revenues since 2010, as of the Petition Date, the City projects that by 2023 it will not have received income tax revenues matching 2008 levels.

**Income Tax Revenues**



Source: Financial and Operating Plan, at 24.

Ancillary taxes imposed by the City likewise either had declined or were expected to decline on a prospective basis as of the Petition Date. Detroit is the only city in Michigan to impose a "utility users' tax" on its citizens. The City's receipts from this utility users' tax decreased approximately 28% over the last decade (from approximately $55.3 million in Fiscal Year 2003 to approximately $39.8 million in Fiscal Year 2012). As of the Petition Date, the City projected that utility users' tax revenues would remain approximately flat with projected revenues of approximately $40.4 million by Fiscal Year 2023.

Detroit is also the only municipality in Michigan authorized to levy a casino wagering tax. These wagering tax revenues recently have remained steady at approximately $180 million per year. As a result of expected loss of market share to casinos opening in nearby locations (*e.g.*, Toledo and Cleveland, Ohio), the City estimates that its wagering tax revenues would decrease in Fiscal Year 2013 by approximately 5% and continue to decline to approximately $168.2 million in Fiscal Year 2015, failing to recover their Fiscal Year 2012 level until Fiscal Year 2023.

Due to the City's declining population and significant cuts by the State, Detroit's share of distributed state revenue for Fiscal Year 2012 had decreased by more than $161 million (or approximately 48%) since Fiscal Year 2002 and by approximately $76 million (or approximately 31%) since 2008. See Financial and Operating Plan, at 23. Although higher projected tax revenues collected by the State are expected to halt the decline in the City's receipt of shared revenue over the coming Fiscal Years, revenue sharing payments: (a) remain at risk of further decrease given the City's declining population; and (b) are projected to remain approximately 20% below Fiscal Year 2011 levels for the foreseeable future.



**State Shared Revenues**

Source: Financial and Operating Plan, at 23.

**3.    Eroding Tax Base**

**(a)    Unemployment**

The demise of Detroit's industrial sector proved catastrophic for its citizens' employment prospects.  The number of jobs in Detroit (for residents and non-residents) declined from 735,104 in 1970, to 562,120 in 1980, to 412,490 in 1990, to 346,545 in 2012.  See United States Bureau of Labor Statistics, Local Area Unemployment Statistics, Data Chart Nos. LAUPS26025003, LAUPS26025004, LAUPS26025005 and LAUPS26025006 (the "BLS Detroit Unemployment Charts").  The "Great Recession" of the past decade dealt an especially punishing blow.  Detroit's unemployment rate already stood at an alarming 16% as of June 2008.  Financial and Operating Plan, at 23.  When the recession took hold, the production and sales of automobiles in the U.S. cratered.  Combined sales for Detroit's automakers fell from 8.1 million in 2007 to 4.6 million in 2009, with two of the Big Three and numerous parts suppliers filing for bankruptcy in 2009.  The decline in production and the restructuring of Detroit's auto industry resulted in massive job cuts.  Detroit's unemployment rate skyrocketed to 23.4% as of June 2010 and remained above 18% well into 2012.  See id.  The number of employed Detroit residents fell sharply, from approximately 353,000 in 2000 to fewer than 280,000 in 2012.  See BLS Detroit Unemployment Charts.

**Unemployment**



Source: Financial and Operating Plan, at 23.

Detroiters' average *per capita* annual income from 2007 to 2011 was $15,261; the median household income for that same period was $27,862. During that period, an estimated 36% of Detroiters were living below the poverty line. Only 54% of Detroiters owned a home, the median value of which was $71,100. To put these numbers in perspective, the average *per capita* annual income in Michigan from 2007 to 2011 was $25,482, the median household income was $48,669 and only 16% of Michigan citizens lived below the poverty line. The state-wide home ownership rate was 74%, and the median home value was $137,300.

**(b)    Assessor's Office and Property Tax Division**

Detroit's property tax receipts likewise suffered. Between 1970 and 1990, the real value of the City's property tax base declined by nearly two thirds. This trend reasserted itself in earnest in the wake of the Great Recession. According to the Citizens' Research Council of Michigan, over the last five years, Detroit's assessed property values have decreased by approximately $1.6 billion. In addition, collection rates declined from 92.64 percent in Fiscal Year 2008 to 83.68 percent in Fiscal Year 2012. Property tax revenues for Fiscal Year 2013 were $131.7 million, a $16.1 million (or approximately 11%) reduction from Fiscal Year 2012 and $26.8 million (or approximately 17%) lower than the average property tax revenue for the preceding five Fiscal Years. As of the Petition Date, the City projected that property tax would continue to decline to as low as $84.2 million by Fiscal Year 2020 before recovering to approximately $85.3 million by Fiscal Year 2023. Further information regarding the City's property tax reassessment initiative is provided in Section X.B of this Disclosure Statement.

**(c)    Comparative Tax Burden**

A number of factors render the challenges posed by the City's declining tax revenue essentially intractable. The *per capita* tax burden on Detroit residents is one of the highest in Michigan, which burden is made heavier still by the residents' relative inability to pay given their level of *per capita* income. In addition to the utility users' tax and wagering tax discussed above, the City's income tax – 2.4% for residents, 1.2% for nonresidents and 2.0% for businesses – is the highest in Michigan, and Detroiters pay the highest total property tax rates of residents of Michigan cities with a population over 50,000 (inclusive of property taxes paid to overlapping jurisdictions (*e.g.*, the State, Wayne County)). City property owners are burdened with high total property tax rates in part because Detroit residents pay property taxes imposed by the Detroit Public Library, the Detroit Public Schools, Wayne County, Wayne County Community College, the State and

-90-

13-53846-swr   Doc 8372   Filed 12/16/14   Entered 12/16/14 08:24:48   Page 103 of 602
13-53846-swr   Doc 8372   Filed 12/16/14   Entered 12/16/14 18:36:08   Page 103 of 602

various other special authorities in addition to the property taxes imposed by the City. As of the Petition Date, the total property tax rate imposed upon City homeowners was 67.5159 mills; for business property, the total property tax rate was 85.3467 mills.

The City currently levies all taxes at the statutory maximum levels. In particular, as of the Petition Date: (i) Michigan Public Act 394 of 2012, an amendment to the City Income Tax Act, fixed the City's maximum income tax rates at their current levels as long as bonds issued by the PLA ("PLA Bonds") remain outstanding; (ii) state law limited municipalities' property tax rates to 20 mills and a constitutionally required "Headlee rollback" further limited that rate to 19.952 mills (which was the rate charged by the City as of the Petition Date); and (iii) the utility users' tax and casino wagering tax were fixed at their 5% and 10.9% levels, respectively, by the State statutes authorizing these Detroit-specific taxes. Even absent such limitations, however, it would not be practical for the City to raise taxes at this time. Increasing Detroit's already high tax rates would deter individuals and businesses from relocating to, or remaining in, Detroit at precisely the time at which the City most needs to retain and attract taxpayers and capital investment. Moreover, even if the City raised taxes, it is uncertain whether it would be able to collect any additional revenues. Nearly half of all Detroit property owners failed to pay property taxes assessed by the City in 2011.

### 4.  High Labor Costs/Restrictive Employment Terms

Despite recent headcount reductions, labor costs related to General Fund active employees (*i.e.*, wages, pension and benefits) represent more than 41% of the City's estimated gross revenues for Fiscal Year 2013 as set forth below:

| Labor Cost | Estimated cost to General Fund in Fiscal Year 2013 | Percentage of estimated gross revenues for Fiscal Year 2013 |
|---|---|---|
| Wages | $333.8 million | 29.8% |
| Benefits (fringes including health for active employees) | $66.5 million | 5.9% |
| Pension Contributions (including normal and UAAL portion) | $66.0 million | 5.9% |

Although pension contributions are based on active payroll, some portion of the contribution is intended to cover the UAAL, which technically benefits all participants in the plan, including retirees. Benefit and pension costs per active employee have increased by approximately 33% in the last thirteen years, from approximately $18,000 in Fiscal Year 2000 to approximately $24,000 in Fiscal Year 2013.

The City's unionized employees are represented by 47 bargaining units. The City's pre-bankruptcy CBAs with these bargaining units imposed work rules and other restrictions that impaired the efficient functioning of City government. These onerous work rules and other restrictions include the following, among others:

- **Staffing**. In many circumstances, staffing is based solely on seniority, rather than merit, qualifications or experience.

- **"Bumping" Rights**. Historically, employees were permitted to transfer across departments based solely on seniority (without regard to merit, relevant qualifications or experience for the new position).

- **Limitations on Management Rights**. The CBAs contained limitations on management rights and responsibilities, which impaired the City's ability to manage policies, goals and the scope of operations for many City departments (most notably with respect to the right to implement and modify disciplinary policies).

- **Arbitration Rights**. Historically, arbitrators were able to uphold future grievances based on expired bargaining agreement provisions or past practice.

- **Lack of Reimbursement Rights**. Historically, the unions did not (a) reimburse the City for full-time and part-time paid union officials or (b) pay any fees for the City's collection and remittance of union dues and service fees.

The CBAs covering 44 bargaining units were expired as of September 30, 2012, and the majority of the employees represented thereby are subject to the City Employment Terms (the "CETs").  The CBAs with the three remaining bargaining units expired as of June 30, 2013, at which point the affected employees became subject to the CETs.

The CETs provide some relief from the work rules and restrictions described above, in part through incorporation of a broad management rights clause.  In addition to concessions imposed by the CETs, other concessions have been granted through statutory interest arbitration.  These concessions have not been uniformly applied to all bargaining units, and some City employees have not been affected by these measures.  In some cases, changes to the City Charter and the Detroit City Code, or other legislative initiatives, may be necessary to support needed operational enhancements and reduce unnecessary bureaucracy.  The City estimates that it has been able to realize more than $200 million in annual savings as a result of the CETs.  Orr Declaration, at ¶ 14.  However, these savings have not been sufficient to balance the City's budget.

### 5. Growing Budget Deficits

The City incurred substantial deficits (excluding financing proceeds) for the six Fiscal Years preceding the Petition Date of approximately $128 million (2008), $124 million (2009), $72 million (2010), $57 million (2011), $122 million (2012) and $34 million (2013).  Including the effect of recent debt issuances (e.g., $75 million in Fiscal Year 2008; $250 million in Fiscal Year 2010; $129.5 million in Fiscal Year 2013) (the "Recent Debt Issuances"), the City's accumulated General Fund deficit stood at approximately $327 million as of the end of Fiscal Year 2012 and $217 million as of the end of Fiscal Year 2013.  *Excluding* the effect of the Recent Debt Issuances (which, as an accounting matter, reduce the amount of the accumulated deficit by an amount equal to the funds borrowed), the City's accumulated General Fund deficit:  (a) has grown continuously over an extended period; and (b) would have been over $650 million for Fiscal Year 2012 and approximately $700 million for Fiscal Year 2013.  Without structural changes, the City projects that its accumulated deficit would grow to approximately $1.3 billion by Fiscal Year 2017.  The City funded its continuing deficits in a variety of ways, including:  (a) deferral of pension contributions (resulting in larger funding deficits and requirements for additional contributions in later periods); (b) issuance of short-term and long-term debt; (c) deferral of trade payments; and (d) borrowing by the General Fund from other funds, deferrals and cash pooling.

### 6. Declining Credit Ratings

Prior to the Petition Date, the City's ability to access the credit markets to satisfy its cash needs was compromised by plummeting credit ratings that had reached historic lows and were below investment grade.  No major U.S. city had a lower credit rating than Detroit.  Financial and Operating Plan, at 3.  As of June 17, 2013, following the City's announcement of a moratorium on the payment of unsecured debt and its non-payment of amounts owing with respect to the COPs, Fitch Ratings, Inc. ("Fitch"), Standard and Poor's Financial Services LLC ("S&P") and Moody's Investors Service, Inc. lowered the credit ratings on the City's general obligation debt to "C", "CC" and "Caa3," respectively.  Following the City's postpetition default on certain General Fund obligations, Fitch and S&P both further downgraded the City's general obligation debt to "D" on September 30, 2013 and October 2, 2013, respectively.

### 7. Inadequate Municipal Services

#### (a) Detroit Police Department

The DPD was established in 1861 by a four-member Police Commission appointed by the Governor of Michigan (the "Governor").  During the first decades of the twentieth century, the DPD was notable for its early adoption of new technologies.  For example, the DPD was one of the first police departments in the country to use automobiles for neighborhood patrols and, in 1922, it became the first police force in the nation to dispatch officers via radio.  Historically, the DPD patrolled several neighborhood precincts.  In 2005, due to budget constraints, the DPD consolidated its 13 precincts into six larger districts and closed some precinct facilities.  In recent years, however, the DPD has reopened certain precinct stations.  As of the Petition Date, the DPD divided its operations geographically into four districts and four neighborhood precincts.  The DPD employed approximately 2,570 sworn officers and 313 civilian employees during calendar year 2012.  In recent years, the DPD has received more than 700,000 calls for service annually.  General Fund expenditures for the DPD totaled $397.0 million during Fiscal Year 2012.

As crime rates have increased in recent years, the DPD has faced numerous administrative, operational and technological challenges that have limited the DPD's effectiveness and efficiency.

### i. Administrative Obstacles

In recent years, the DPD has faced obstacles with respect to manpower, continuity of leadership, morale and efficiency, among other problems. Five different police chiefs have led the DPD during the last five years. These leadership changes contributed to low employee morale, a problem made worse by dwindling budgets, layoffs, unfavorable work rules imposed by CBAs, pay reductions and periods during which officers have been required to work 12-hour shifts. The DPD's headcount has been reduced by approximately 40% over the last ten years. Consequently, it lacks the manpower to adequately respond to the more than 700,000 calls for service it receives annually. In addition, over 450 uniformed DPD officers were eligible for retirement in 2013. An additional 150 officers are eligible for retirement in each of the years from 2014 through 2019. As of the Petition Date, the DPD had not yet fully implemented the type of data-driven policing that has become standard in many other large cities. The DPD's information technology infrastructure is outdated and, as of the Petition Date, was not integrated between departments and functions, meaning that the DPD's various precincts had no ability to share information with one another electronically and in real time. The DPD had no central case management system as of the Petition Date, and systems to ensure the accountability of officers and detectives were inadequate. In recent years, community policing efforts have been underfunded, uncoordinated and have been deemphasized by the DPD. The DPD's many administrative challenges have contributed to its widely publicized operational difficulties. As of the Petition Date, the DPD's average response time during 2013 for top priority emergency calls was 58 minutes (the national average police response time was 11 minutes).

### ii. Facilities/Fleet

As of the Petition Date, the DPD operated with an extremely old fleet of 1,291 vehicles, a majority of which had reached replacement age and lacked modern information technology. In 2013, the DPD was forced to accept charitable donations to upgrade its fleet of police cars. In March 2013, a group of corporations pledged to donate approximately $8 million to the City, a portion of which was used to replace one hundred DPD police cruisers.

### iii. High Crime Rate

As the DPD struggled to overcome the obstacles described immediately above, the crime rate in Detroit – and violent crime in particular – increased to unacceptable levels. During calendar year 2012, the City recorded 15,011 violent crimes (such as murder, rape, robbery and aggravated assault) and 40,956 property crimes. Federal Bureau of Investigation, Offenses Known to Law Enforcement, Table 8 (2012). While the total number of violent crimes reported in Detroit dropped slightly in 2012 (15,245 violent crimes were reported in 2011), the number of homicides rose sharply, from 344 in 2011 to 386 in 2012. See id. Detroit's murder rate for calendar year 2012 was 54.6 per 100,000 residents, a figure that was the highest in the nation among large cities and more than ten times the national average. See id. In 2012, the number of violent crimes in Detroit exceeded that of Cleveland, Pittsburgh and St. Louis combined. See id. The City's 2011 case clearance rates for violent crimes and all crimes (18.6% and 8.7%, respectively) were substantially below those of comparable municipalities nationally and surrounding local municipalities. See Federal Bureau of Investigation, Incidents and Case Clearance Rates (2011). It has been reported that in recent years certain business owners have taken the extraordinary step of hiring off-duty police officers and renting police cruisers to patrol sections of the City underserved by the DPD. Orr Declaration, at ¶ 32.

## iv. Comparables Data

### Offenses Known to Law Enforcement, Local & National Comparables – 2012 (Most Recent Data Available)

| City | Population | Violent Crime | Murder/ Non-negligent Manslaughter | Forcible Rape | Robbery | Aggravated Assault | Property Crime | Burglary | Larceny/ Theft | Motor Vehicle Theft | Arson |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Detroit | 707,096 | 15,011 | 386 | 441 | 4,843 | 9,341 | 40,956 | 13,488 | 15,968 | 11,500 | 562 |
| **Local Comparison** | | | | | | | | | | | |
| Dearborn | 97,215 | 322 | 1 | 24 | 107 | 190 | 3,282 | 462 | 2,463 | 357 | 20 |
| Livonia | 96,028 | 146 | 3 | 19 | 32 | 92 | 2,124 | 323 | 1,601 | 200 | 13 |
| Southfield | 72,253 | 352 | 2 | 34 | 136 | 180 | 2,549 | 625 | 1,530 | 394 | 9 |
| **National Comparison** | | | | | | | | | | | |
| Cleveland | 393,781 | 5,449 | 84 | 363 | 3,252 | 1,750 | 24,309 | 9,740 | 10,808 | 3,761 | 302 |
| Pittsburgh | 312,112 | 2,347 | 41 | 47 | 1,134 | 1,125 | 10,691 | 2,537 | 7,610 | 544 | 248 |
| St. Louis | 318,667 | 5,661 | 113 | 199 | 1,778 | 3,571 | 21,995 | 4,986 | 13,520 | 3,489 | 196 |
| Milwaukee | 599,395 | 7,759 | 91 | 230 | 3,027 | 4,411 | 30,228 | 6,977 | 18,448 | 4,803 | 306 |

Source: Federal Bureau of Investigation, Offenses Known to Law Enforcement (2012)

### Incidents & Case Clearance Rates, National Comparables – 2011 (Most Recent Data Available)

| City | Violent Crime | Murder | Force Rape | Robbery | Aggravated Assault | Simple Assault | Property Crime | Burglary | Larceny/ Theft | Motor Vehicle Theft | Arson | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Detroit** | | | | | | | | | | | | |
| Cases Assigned | 15,254 | 344 | 426 | 4,976 | 9,508 | 17,240 | 43,759 | 16,032 | 16,500 | 11,227 | 958 | 136,224 |
| Cleared | 2,841 | 39 | 54 | 401 | 2,347 | 2,427 | 1,844 | 730 | 578 | 536 | 57 | 11,854 |
| **Clearance Rate** | **18.6%** | **11.3%** | **12.7%** | **8.1%** | **24.7%** | **14.1%** | **4.2%** | **4.6%** | **3.5%** | **4.8%** | **5.9%** | **8.7%** |
| **Pittsburgh** | | | | | | | | | | | | |
| Cases Assigned | 2,476 | 44 | 67 | 1,126 | 1,239 | 5,619 | 10,063 | 2,686 | 6,897 | 480 | 195 | 30,892 |
| Cleared | 1,247 | 22 | 61 | 435 | 729 | 3,963 | 1,997 | 498 | 1,312 | 187 | 55 | 10,506 |
| **Clearance Rate** | **50.4%** | **50.0%** | **91.0%** | **38.6%** | **58.8%** | **70.5%** | **19.8%** | **18.5%** | **19.0%** | **39.0%** | **28.2%** | **34.0%** |
| **Milwaukee** | | | | | | | | | | | | |
| Cases Assigned | 6,637 | 86 | 205 | 3,091 | 3,255 | 7,253 | 30,669 | 7,079 | 19,030 | 4,560 | 272 | 82,137 |
| Cleared | 2,465 | 58 | 159 | 764 | 1,484 | 4,701 | 4,718 | 808 | 3,769 | 141 | 34 | 19,101 |
| **Clearance Rate** | **37.1%** | **67.4%** | **77.6%** | **24.7%** | **45.6%** | **64.8%** | **15.4%** | **11.4%** | **19.8%** | **3.1%** | **13%** | **23.3%** |
| **St. Louis** | | | | | | | | | | | | |
| Cases Assigned | 5,950 | 113 | 188 | 2,127 | 3,522 | 4,866 | 25,669 | 7,015 | 15,285 | 3,369 | 191 | 68,295 |
| Cleared | 2,835 | 75 | 135 | 619 | 2,006 | 3,745 | 3,296 | 1,109 | 1,987 | 200 | 19 | 16,026 |
| **Clearance Rate** | **47.6%** | **66.4%** | **71.8%** | **29.1%** | **57.0%** | **77.0%** | **12.8%** | **15.8%** | **13.0%** | **5.9%** | **9.9%** | **23.5%** |
| **Cleveland** | | | | | | | | | | | | |
| Cases Assigned | 5,431 | 74 | 356 | 3,157 | 1,844 | 16,257 | 25,418 | 10,724 | 10,598 | 4,096 | 319 | 78,274 |
| Cleared | 1,072 | 26 | 89 | 447 | 510 | 3,346 | 1,685 | 793 | 718 | 174 | 46 | 8,906 |
| **Clearance Rate** | **19.7%** | **35.1%** | **25.0%** | **14.2%** | **27.7%** | **20.6%** | **6.6%** | **7.4%** | **6.8%** | **4.2%** | **14.4%** | **11.4%** |

Source: Federal Bureau of Investigation, Incidents and Case Clearance Rates (2011)

**Incidents & Case Clearance Rates, Local Comparables – 2011 (Most Recent Data Available)**

| City | Violent Crime | Murder | Force Rape | Robbery | Aggravated Assault | Simple Assault | Property Crime | Burglary | Larceny Theft | Motor Vehicle Theft | Arson | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Detroit** | | | | | | | | | | | | |
| Cases Assigned | 15,254 | 344 | 426 | 4,976 | 9,508 | 17,240 | 43,759 | 16,032 | 16,500 | 11,227 | 958 | 136,224 |
| Cleared | 2,841 | 39 | 54 | 401 | 2,347 | 2,427 | 1,844 | 730 | 578 | 536 | 57 | 11,854 |
| **Clearance Rate** | **18.6%** | **11.3%** | **12.7%** | **8.1%** | **24/%** | **141%** | **4.2%** | **4.6%** | **3.5%** | **4.8%** | **5.9%** | **8.7%** |
| **Southfield** | | | | | | | | | | | | |
| Cases Assigned | 380 | 4 | 36 | 116 | 224 | 1178 | 2688 | 710 | 1602 | 376 | 5 | 7,319 |
| Cleared | 149 | 3 | 8 | 27 | 111 | 276 | 398 | 58 | 312 | 28 | 3 | 1,373 |
| **Clearance Rate** | **39.2%** | **75.0%** | **22.2%** | **23.3%** | **49.6%** | **23.4%** | **14.8%** | **8.2%** | **19.5%** | **7.4%** | **60.0%** | **18.8%** |
| **Livonia** | | | | | | | | | | | | |
| Cases Assigned | 168 | 1 | 19 | 40 | 108 | 552 | 2,114 | 309 | 1,595 | 210 | 11 | 5,127 |
| Cleared | 69 | 1 | 1 | 15 | 52 | 201 | 563 | 33 | 505 | 25 | 0 | 1,465 |
| **Clearance Rate** | **41.1%** | **100.0%** | **5.3%** | **37.5%** | **48.1%** | **36.4%** | **26.6%** | **10.7%** | **31.7%** | **11.9%** | **0.0%** | **28.6%** |
| **Dearborn** | | | | | | | | | | | | |
| Cases Assigned | 361 | 3 | 24 | 104 | 230 | 1,346 | 3,756 | 609 | 2,709 | 438 | 12 | 9,592 |
| Cleared | 180 | 3 | 6 | 37 | 134 | 419 | 1,229 | 70 | 1,124 | 35 | 3 | 3,240 |
| **Clearance Rate** | **49.9%** | **100.0%** | **25.0%** | **35.6%** | **58.3%** | **31.1%** | **32.7%** | **11.5%** | **41.5%** | **8.0%** | **25.0%** | **33.8%** |

Source:  Federal Bureau of Investigation, <u>Incidents and Case Clearance Rates</u> (2011)

      **(b)**         **Lighting**

The City's Public Lighting Department (the "<u>PLD</u>"), formerly known as the Public Lighting Commission, was created in March 1893 to supply power to the City's street lighting system and public buildings.  Today, the PLD is responsible for operating and maintaining 88,000 streetlights and owns and operates a distribution-only electricity grid.  The PLD provides power to more than 890 public buildings.  Among the PLD's 114 customers are City departments, the Detroit Board of Education, Wayne State University, Joe Louis Arena, Wayne County Community College District, Cobo Conference/Exhibit Center, Coleman A. Young Municipal Center, Detroit Public Library and other federal, state and county agencies.

In addition to providing power to its customers and powering and maintaining the City's streetlights, the PLD: (i) inspects and regulates the use of utility poles in the City; (ii) maintains the City's traffic signal system, which includes approximately 1,286 intersections; and (iii) maintains the Detroit Police Department and Detroit Fire Department communications network, which includes the extended 911 and automated dispatch systems.

      **i.**         **Non-Functioning Streetlights**

As of April 2013, about 40% of the approximately 88,000 streetlights operated and maintained by the PLD were not working, primarily due to disrepair, vandalism, component theft and neglect.  Outages exist on both lights powered by DTE Energy Company ("<u>DTE</u>") and PLD-powered lights.  Many outages are attributable to burned-out bulbs, but others are the result of the obsolescence of the grid maintained by the PLD.  The total of functioning streetlights per square mile in the City generally was less than half that of comparable national municipalities.  These shortages are compounded by the fact that many of the streetlights that were working did not meet the residents' actual needs.  Functioning street lights often served underpopulated sections of the City's historical population footprint, and there was a backlog of approximately 3,300 complaints related to the City's lighting.

## ii. Inadequately Maintained Grid/Fixtures

In addition, the PLD's electricity grid has not been adequately maintained and is deteriorating. To repair and modernize the grid, the City would need to incur the significant expense of decommissioning a number of segments and stations (*e.g.*, the City-owned Mistersky power plant, which has been idle for two to three years; 31 substations).

### (c) Blight

#### i. Scope

Perhaps no issue has been as fundamental to – or emblematic of – Detroit's decline as its extensive urban blight. The City's long-term population decline and falling property values has resulted in large numbers of abandoned, forfeited or foreclosed land and structures within the City. As of the Petition Date, there were approximately 78,000 abandoned and blighted residential structures in the City, which number encompassed approximately 20% of the City's housing stock. 80% of these structures are privately-owned, and 10% are owned by the City. As of the Petition Date, 16,700 of these structures had been inspected by the City and classified as dangerous, 14,263 had open complaints of being dangerous, 6,657 were scheduled to go before the City Council for orders of demolition and 1,159 were considered emergency demolitions. The number of these dangerous structures continues to increase steadily due to vacancy (particularly foreclosures) and fires, among other things. In addition to blighted structures, there are approximately 66,000 parcels of blighted land within the City limits. Approximately 60,000 of these parcels of land (representing 15% of all publicly and privately owned land parcels in Detroit) are owned by the City.

Blighted and abandoned parcels and structures dramatically undermine the City's efforts to maintain public safety, because they contribute to the proliferation of crime and arson. For example, approximately 60% of the 11,000 to 12,000 fires that the City experiences each year occur in blighted and unoccupied buildings, forcing the DFD to expend a disproportionate amount of time and resources fighting fires in vacant structures. Attending to callouts at vacant blighted structures results in injuries and occasionally fatalities among DFD employees. Moreover, the existence of blighted properties reinforces a vicious cycle: declining property values lead to increased blight, which in turn contributes to further declines in property values.

#### ii. Obstacles to Solutions

##### (A) Cost

The City's ability to arrest and alleviate its crippling urban blight is limited by the fact that removing such blight is an expensive and time-consuming endeavor. As set forth below, the average cost to demolish a residential structure has been estimated at approximately $8,500, with an equalized cost of $5.74 per square foot (with costs varying depending on the size of, and the materials used to construct, the structure). Recent demolition costs have averaged approximately $10,000 per structure, due predominately to hazardous material remediation.

| AVERAGE COST OF RESIDENTIAL DEMOLITION | |
|---|---|
| **Expense** | **Amount** |
| Demolition Contract | $5,000 |
| Survey and Abatement | $1,500 |
| Gas Disconnect Fee | $750 |
| Administration Costs | $720 |
| Water Disconnect Fee | $550 |
| *Lis Pendens* | $15 |
| **Total Cost of Demolition** | **$8,535** |

### (B) Regulation & Agency Coordination

The intractability of blight removal is compounded by the complex regulatory framework that such removal necessarily implicates. This framework increases demolition costs and slows the removal process. Blight removal is governed by multiple codes and regulations and a number of overlapping jurisdictions. Examples include:

- *Code Enforcement and Adjudication*: implicating the State of Michigan Housing Law; Zoning Ordinance, Chapter 61; Property Maintenance Ordinance, Chapter 9; Blight Violations Ordinance, Chapters 8.5 and 22; Sale of One- and Two-Family Home Ordinance;

- *Condemnation and Demolition*: implicating the State of Michigan Housing Law; City Ordinance 290-H – Wrecking Structures; Industry Standard Building Officials Code Administration; and

- *Foreclosure and Land Disposition*: implicating Michigan Public Act 123 and various City codes addressing non-federal property.

Moreover, addressing blight requires the coordination of several state, City, county and federal agencies, as well as various non-governmental stakeholders, including:

- at the state level: the State Fast Track Land Bank Authority, the Michigan Department of Transportation (which coordinates graffiti removal), the Michigan Land Bank, the Michigan State Housing Development Authority and the Treasury;

- at the City level: the Building Safety Engineering and Environmental Department (which enforces building and construction codes), the Planning and Development Department (which designates sites for removal and allocates funds received from the United States Department of Housing and Urban Development ("HUD")), the General Services Department (which is responsible for maintenance of vacant lots), the Department of Administrative Hearings (which adjudicates blight violations and, where appropriate, imposes civil penalties), the DFD, the DPD, the Detroit Land Bank Authority and the Detroit Housing Commission (one of the largest landlords);

- at the county level: the Wayne County Treasurer (which controls the inventory of tax foreclosed properties) and the Wayne County Land Bank;

- at the federal level, HUD, the EPA and the United States Department of the Treasury; and

- with respect to non-governmental stakeholders: the Detroit Economic Growth Corporation (a section 501(c)(3) entity contracted by the City to provide real estate, development and fiduciary services), the Blight Authority (a Michigan non-profit entity specializing in scale and brush clearing) and DTE (responsible for supplying or cutting power to blighted structures/parcels), among numerous other interested parties.

### (d) Detroit Fire Department

The DFD was established in 1860 when the City hired its first paid firefighters and purchased its first steam-powered fire engine. As of the Petition Date, the DFD employed approximately 780 firefighters and consisted of eight battalions operating out of 41 fire stations. Administratively, the DFD is comprised of ten divisions: an Administration Division, a Firefighting Division, a Fire Marshal Division, a Community Relations Division, an Emergency Medical Services Division, an Apparatus Division, a Communications Division, a Medical Division, a Research and Development Division and a Training Academy. The DFD responds to approximately 165,000 emergency calls – including medical emergencies and fires – annually. In recent years, the DFD annually has responded to approximately 11,000 to 12,000 fires. General Fund expenditures for the DFD totaled $178.0 million during Fiscal Year 2012.

As of the Petition Date, the stations, equipment and vehicle fleet of the DFD were old and in states of disrepair. Budget cuts in recent years necessitated the closure of numerous engine and ladder companies, reduced the DFD's manpower and forced firefighters to rely upon aged and unreliable equipment at a time when the DFD is required to respond to, among other emergencies, approximately 5,000 arsons per year. As of the Petition Date, fire and Emergency

Medical Service ("EMS") response times had increased to 7 minutes and 15 minutes respectively, times well above national averages.

### i.  Fire Stations

The average age of the City's 41 fire stations was 80 years as of the Petition Date.  In recent years, maintenance costs have exceeded $1 million annually.  Due to lack of funding, Detroit's firefighters frequently have been forced to make necessary repairs to the fire stations themselves, and the fire stations often lack basic supplies.

### ii.  Apparatus/Equipment

Detroit firefighters frequently have operated shorthanded in recent years due to a lack of serviceable vehicles and equipment.  As of the Petition Date, the DFD's fire apparatus fleet included 38 engines, 27 ladder trucks, seven squads (specialized rescue vehicles with no watering or laddering capacity), one hazardous material apparatus and one TAC unit (a mini-pumper for use in low-clearance structures such as parking garages).  In recent years, the DFD fleet has been plagued with mechanical issues, contained no reserve vehicles and lacked equipment ordinarily regarded as standard.  With less than half of its original staff as of the Petition Date, the DFD's Apparatus Division (which services the City's EMS fleet as well) had a vehicle to mechanic ratio of 39 to 1, resulting in an inability to complete preventative maintenance on schedule.  In May of 2013, the City received a donation to fund inspections of fire ladders on trucks and ground ladders because it could not afford the required inspections.  This donation was offered after it was reported, in February of 2013, that then Detroit Fire Commissioner Donald Austin ordered firefighters not to use hydraulic ladders on DFD ladder trucks except in cases involving an "immediate threat to life" because the ladders had not received safety inspections "for years."

### iii.  EMS Fleet

The City's EMS vehicles also were aged, obsolete and unreliable as of the Petition Date.  During the first quarter of 2013, frequently only 10 to 14 of the City's 31 ambulances were in service.  Some of the City's EMS vehicles had been driven 250,000 to 300,000 miles and suffered frequent breakdowns.  The City accepted charitable donations to upgrade its EMS fleet.  In March 2013, a group of corporations pledged to donate approximately $8 million to the City, a portion of which was used to purchase 23 new ambulances.

### (e)  DDOT

DDOT is plagued by a variety of problems.  For example, while grant monies typically are a significant revenue source for bus transit systems, DDOT has not been able to maximize the grant dollars available to it.  In addition, DDOT's bus fares are lower than comparable bus transit systems by approximately 30% on average, and its bus transfers are offered at significantly reduced rates, both of which result in decreased revenues.  DDOT also experiences high absenteeism among its bus drivers, which causes inefficiencies, disrupted transit service, poor customer service and higher costs.  For example, in January 2013, DDOT experienced 35% absenteeism for bus operations. Even without long-term disability, occupational injury, illness and accidents, absenteeism would have been 21%.

DDOT's maintenance operations also are highly inefficient (58% less efficient) as compared with similar bus transit systems.  DDOT vehicle maintenance relies heavily (31% of hours) on overtime and other time premiums to conduct maintenance, and its maintenance union has been resistant to initiatives that would improve maintenance service at a lower cost.  In addition, poor service and operating performance has led to dissatisfied riders and low morale among employees.  These factors are believed to be contributors to an increase in safety incidents on buses and at transportation facilities.  DDOT historically has not maintained a police presence on buses, which likely would have reduced crime and other safety issues.  Likewise, DDOT only recently began to install security cameras on buses, which would have assisted with prosecution of past crimes.

### (f)  Parks

The number of open City parks dwindled in the years leading up to the Petition Date, with many considered to be in poor or fair condition due to lack of funding.  The City closed 210 parks during Fiscal Year 2009, reducing its park portfolio by 66%, from 317 parks to 107 parks.  The City announced in February 2013 that (i) 50 of its remaining 107 parks would need to be closed, (ii) another 38 parks would shift to limited maintenance and (iii) the already underserved Belle Isle Park would receive decreased services.  Thanks to $14 million in civic donations, the 50 parks slated to be closed

remained open temporarily through the summer of 2013. Belle Isle was recently leased to the State (see Section VIII.K.5 of this Disclosure Statement).

### 8. Obsolete Information Technology

As of the Petition Date, nearly all of the City's departments were saddled with an obsolete information technology ("IT") infrastructure and software in urgent need of upgrade or replacement. The City's IT infrastructure was not integrated between departments and functions (e.g., there was no integration between core City financial systems and department level operating systems) or even within departments (e.g., police precincts and districts could not share information across their systems), and the City lacked a formal documented IT governance structure, although one was established after the Petition Date. The following paragraphs provide illustrations of the IT challenges faced by specific City departments and divisions.

#### (a) DPD, DFD & EMS

The IT systems used by the DPD, DFD and EMS: (i) were outdated to the point that the system vendors no longer provided full support; and (ii) lacked integrated solutions, resulting in redundant data entry, no meaningful reporting and limited query capabilities. DPD's IT systems, in particular, were highly manual, poorly implemented and non-integrated, resulting in highly inefficient operations. As of the Petition Date, the DPD had no IT systems in place at all for such functions as jail management, electronic ticketing and activity logs. The vehicles and equipment employed by DPD, DFD and EMS personnel likewise lacked adequate information technology.

#### (b) Payroll Systems

The City's payroll systems were similarly anachronistic, resulting in massive inefficiencies and excessive costs. As of the Petition Date, the City used multiple, non-integrated payroll systems that were highly manual (70% of the City's payroll costs were attributable to labor) and prone to human error and erroneous payments. A majority of the City's employees were on an archaic payroll system that had limited reporting capabilities and no way to clearly track, monitor or report expenditures by category. Accordingly, the City's cost of payroll administration was significantly higher than for comparable entities. For example, the cost to the City to process payroll was $62 per check (or approximately $19.2 million per year) more than four times the general average of $15 per paycheck, and almost 3.5 times the average of $18 per paycheck for other public sector organizations. The payroll process involved 149 full-time employees, 51 of whom were uniformed officers (i.e., highly and expensively trained and high cost personnel assigned to perform clerical duties).

#### (c) Income Tax & Property Tax Divisions

Similar IT issues handicapped the City's tax collection systems. As of the Petition Date, the City's highly manual income tax collection and data management systems were simply outdated (having been purchased in the mid-1990s) with little to no automation capability; in July 2012, they were characterized as "catastrophic" by the IRS. The billing, processing and collection of property taxes likewise was inefficient. Recommendations received from a third party consultant designed to increase the efficiency of the City's property tax collection process had not been implemented, and the City was forced to rely on Wayne County for the funding and collection of delinquent property taxes.

#### (d) Budgeting, Accounting & Financial Reporting Systems

The City's core financial, accounting and budgeting systems likewise suffered from the lack of modern IT. As of the Petition Date, the City's financial reporting and budget development systems: (i) were 10 to 15 years old; (ii) required a manual interface (70% of journal entries were booked manually); (iii) lacked reliable fail-over and back-up systems; and (iv) lacked a formal, documented IT governance structure, all of which impaired the reporting, efficiency and accuracy of the data and the accountability of the systems.

#### (e) Grant Management System

As of the Petition Date, the City's grant tracking systems were fragmented, such that the City was unable to comprehensively track City-wide grant funds and status. In addition, the City's grant reporting was not standardized, such that the City was unable to prevent disallowed costs.

### (f)    Permitting

Aged IT infrastructure within the City's Buildings, Safety Engineering and Environmental Department ("BSEED") and the DFD led to bottlenecks in both permit invoicing and the collection of fees. BSEED's system for licensing and permitting is more than ten years old, and the DFD's system for inspections and permitting is more than 20 years old. Both systems required replacement.

### 9.    Steady State Prepetition Financial Projections

Exhibits F, G and H contain projections (developed by the City in the months immediately preceding the Petition Date) demonstrating the City's financial condition in the absence of any restructuring initiatives. Specifically: (a) Exhibit F projects the amount of the City's legacy expenditures (*i.e.*, debt service on its UTGO Debt, LTGO Debt and COPs; pension contributions and retiree benefit obligations) through its 2017 Fiscal Year and expresses those legacy expenditures as a percentage of anticipated revenues; (b) Exhibit G projects the City's cash flow for its 2014 Fiscal Year; and (c) Exhibit H projects the City's anticipated revenues, expenditures, operating surpluses, legacy obligations and annual and accumulated deficits through the 2017 Fiscal Year.

## D.    Prepetition Measures Taken by City to Address Challenges

The City took numerous steps to improve its financial condition prior to commencing its chapter 9 case, by adopting various measures to reduce expenses and increase revenues. These initiatives saved the City an estimated $200 million per year, but they also imposed substantial burdens on the City's workforce and residents. The following paragraphs provide detail on certain of the key actions taken by the City to alleviate its liquidity pressures, redress its lopsided balance sheet and address its operational challenges in the period leading up to the commencement of the City's chapter 9 case.

### 1.    Consent Agreement/Creation of Financial Advisory Board

### (a)    Finding of "Probable Financial Stress"

On December 6, 2011, the Treasury initiated a preliminary review of the City's financial condition pursuant to former Michigan Public Act 4 of 2011, the Local Government and School District Fiscal Accountability Act, MCL §§ 141.1501 *et seq.* ("PA 4"). On December 21, 2011, having completed its preliminary review, the Treasury reported to the Governor that "probable financial stress" existed in Detroit and recommended the appointment of a "Financial Review Team" pursuant to PA 4. The Treasury's finding of "probable financial stress" was based upon the following considerations, among others:

- Violation of Uniform Budget and Accounting Act. Detroit arguably had violated Section 17 of Michigan Public Act 2 of 1968 (as amended), the Uniform Budget and Accounting Act, MCL §§ 141.421 *et seq.* by failing to amend the City's general appropriations act when it became apparent that various line items in the City's budget for Fiscal Year 2010 exceeded appropriations by an aggregate of nearly $58 million (and that unaudited Fiscal Year 2011 figures indicated that expenditures would exceed appropriations by $97 million).

- Inadequate Deficit Elimination Efforts. City officials did not file an adequate or approved "deficit elimination plan" with the Treasury for Fiscal Year 2010. The Treasury found that the City's recent efforts at deficit reduction had been "unrealistic" and that "[c]ity officials either had been incapable or unwilling to manage the finances of the City."

- Mounting Debt Problems. The City had a "mounting debt problem" with debt service requirements exceeding $597 million in 2010 and long-term debt exceeding $8 billion as of June 2011 (excluding the City's then-estimated $615 million in unfunded actuarial pension liabilities, $4.9 billion in OPEB liability and other "discretely presented component" debt). The ratio of the City's total long-term debt to total net assets for 2010 was 32.64 to 1.

- Risk of Termination Payment Under Swap Contracts. The Treasury identified a significant risk that the City would become subject to a demand for a termination payment (estimated at the time to be in the range of $280 million to $400 million) under its Swap Contracts.

- Falling Credit Ratings.  The City's long-term bond ratings had fallen below the BBB category and were considered "junk," speculative or highly speculative.

- Cash Flow Shortages.  The City was experiencing significant cash flow shortages.  The City projected that its cash balance of $96.1 million as of October 28, 2011 (which was nearly $20 million lower than the City's previous estimates) would quickly be eroded and that the City would experience a cash shortage of $1.6 million in April 2012 and would end Fiscal Year 2012 with a cash shortfall of $44.1 million absent remedial action.

       (b)       **Financial Review Team Finding of "Severe Financial Stress"**

On March 26, 2012, the Financial Review Team appointed by the Governor pursuant to PA 4 submitted its report to the Governor, finding that "the City of Detroit is in a condition of severe financial stress … and that a consent agreement has not been adopted [pursuant to PA 4]."  The Financial Review Team's finding of "severe financial stress" was based upon the following considerations, among others:

- Increasing Budget Deficit.  The City's cumulative General Fund deficit for Fiscal Year 2011 had increased from $91 million to $148 million, primarily as a result of transfers made from the General Fund to support other operations, such as transportation.  The City had not experienced a positive year-end fund balance since 2004.  The City was predicting a $270 million General Fund deficit for Fiscal Year 2012.

- Variances from Budgets.  Audits for the City's previous nine Fiscal Years reflected significant variances between budgeted and actual revenues and expenditures, owing primarily to the City's admitted practice of knowingly overestimating revenues and underestimating expenditures.

- Cash Crisis.  The City was continuing to experience significant cash depletion.  The City had proposed adjustments to CBAs to save $102 million in Fiscal Year 2012 and $258 million in Fiscal Year 2013, but the tentative CBAs negotiated as of the date of the report were projected to yield savings of only $219 million.

- Debt Downgrades.  The City's existing debt had suffered significant downgrades.

- Failure to File Adequate Deficit Elimination Plans.  The City had not filed adequate or approvable deficit elimination plans for the 2010 or 2011 Fiscal Years.

       (c)       **Entry Into the Consent Agreement**

Contemporaneously with the investigation of Detroit's financial condition by the Financial Review Team, in early 2012, the City and the State negotiated a "Financial Stability Agreement" (the "Consent Agreement") in an effort to achieve (i) financial stability for the City and (ii) a stable platform for the City's future growth.  The City Council approved the Consent Agreement on April 4, 2012.  The Consent Agreement subsequently was executed by the Mayor, the members of the Financial Review Team, the Treasurer of the State of Michigan (the "State Treasurer") and the Governor as of April 5, 2012.  Having negotiated and executed a "consent agreement" within the meaning of PA 4, no emergency manager was appointed for the City despite the Financial Review Team's finding of "severe financial stress."

The Consent Agreement created a "Financial Advisory Board" (the "FAB") of nine members selected by the Governor, the State Treasurer, the Mayor and City Council.  The Consent Agreement granted the FAB an oversight role and limited powers over certain City reform and budget activities.  The FAB has held, and continues to hold, regular public meetings and to exercise its oversight functions consistent with the Consent Agreement.  To implement the reform efforts set forth in the Consent Agreement, the positions of "Chief Financial Officer" and "Program Management Director" were established, each reporting to the Mayor.

       2.       **Headcount Reductions**

Between 2010 and the Petition Date, the City reduced its employee headcount by more than 2,700 (from 12,302 employees as of the close of Fiscal Year 2010 to approximately 9,591 as of June 30, 2013).  The City estimated that its headcount reductions resulted in annual savings of over $100 million.

### 3. Imposition of City Employment Terms

On July 12, 2012, the FAB approved certain CETs effective as of July 17, 2012 for: (a) employees in unions with expired CBAs; and (b) non-union employees. The CETs were imposed on union employees with expired CBAs pursuant to the Consent Agreement. PA 4 suspended the City's obligation to engage in collective bargaining upon entry of the Consent Agreement. CBAs for approximately 80% of union employees expired as of June 30, 2012; the remaining CBAs expired as of June 13, 2013.

Among other things, the CETs provided for (a) wage reductions (implemented through the imposition of furlough days), (b) caps/reductions on vacation/holiday pay/overtime/sick days, (c) the reduction of pension multipliers and (d) changes to healthcare coverage. The City estimated that implementation of the CETs resulted in $102 million in annual savings ($25 million in savings attributable to wage reductions; $59 million in savings attributable to reduced active and retiree benefits; $9 million in savings attributable to reduced pension costs; and $8 million in savings attributable to changes to work rules).

### 4. Revenue Generating Initiatives

#### (a) Increased Corporate Tax Rate

In January 2012, the City's corporate income tax rate was raised to 2.0% from 1.0%. This increased rate was projected to generate an estimated $6 million in additional annual revenue for the City.

#### (b) Enhanced Tax Collection Initiatives

The City implemented – and continues to implement – initiatives designed to (i) improve collection of past due taxes and (ii) enhance collection efforts on a prospective basis. These efforts to enhance collection of taxes were expected to generate an estimated $13 million in additional annual revenue for the City.

#### (c) Increased Lighting Rates

In January 2013, the PLD increased its rates to more closely align with market rates and eliminate the practice of charging customers less for power than the City itself was paying. The increased rates will likely have a short-term impact on revenues given the planned transition of the City's electricity grid to a third party provider.

### 5. Reduced Operating Expenditures

The City implemented an initiative to reduce certain vendor costs by 10%. Reductions in these vendor costs were expected to save the City an estimated $10 million annually.

### 6. Deferred Capital Expenditures

The City deferred capital expenditures on a number of its assets (notably its public lighting and its water and sewer system). The City's average aggregate capital outlays for the five Fiscal Years from 2008 to 2012 ($82.98 million) was less than 55% of the average aggregate capital outlays for the five Fiscal Years preceding that period (2003 to 2007; $151.94 million).

### 7. Cash Conservation Measures

In the weeks preceding the commencement of its chapter 9 case, the City was forced to suspend payments on unsecured debt to conserve its dwindling cash. Specifically, on June 14, 2013, the City (a) did not make a $39.7 million payment due and owing to the Service Corporations in connection with the COPs and (b) publicly declared a moratorium on principal and interest payments related to unsecured debt going forward. The City also had deferred and not paid required pension contributions and other payments (including approximately $37 million in pension contributions for Fiscal Year 2012 and an estimated $71 million in such contributions for Fiscal Year 2013).

### 8. Demolition Initiatives

In April 2010, the City launched a program to take initial steps toward addressing urban blight within the City. This program had the goal of demolishing 10,000 vacant structures (*i.e.*, approximately 13% of the vacant structures within the City and 26% of such buildings classified as dangerous) within three years. Over 5,000 structures had been demolished, but the City lacked sufficient funding to complete the project by its target date of December 2013. The City also commenced an ancillary demolition initiative in partnership with the State, pursuant to which $10 million has been allocated to the targeted demolition of 1,234 structures located in the vicinity of schools. As of February 28, 2013, 179 structures had been demolished pursuant to this ancillary initiative (and another 56 were under contract to be demolished).

### 9. Appointment of the Emergency Manager

#### (a) Legislation Authorizing Emergency Manager

In 1990, the Legislature enacted Michigan Public Act 72 of 1990, the Local Government Fiscal Responsibility Act, MCL §§ 141.1201 *et seq.* ("PA 72"), which empowered the State to intervene with respect to municipalities facing financial crisis through the appointment of an emergency manager who, once appointed, would assume many of the powers ordinarily held by local elected officials. Effective March 16, 2011, the Legislature repealed PA 72 and enacted PA 4. On November 5, 2012, Michigan voters rejected PA 4 by referendum, which rejection automatically revived PA 72.

#### (b) 2013 Financial Review Team Report

On December 11, 2012, because of the City's diminishing liquidity, the FAB requested that the State initiate a preliminary review of the City's financial condition pursuant to PA 72. The Treasury reported to the Governor on December 14, 2012 that, based on its preliminary review, a "serious financial problem" existed within the City.

On December 18, 2012, pursuant to PA 72, the Governor appointed another Financial Review Team to review the City's financial condition. On February 19, 2013, the Financial Review Team submitted its report (the "2013 Financial Review Team Report") to the Governor, concluding that a "local government financial emergency" existed with the City because no satisfactory plan existed to resolve a serious financial problem.

The Financial Review Team's finding of a "local government financial emergency" was based primarily upon the following considerations:

- Cash Crisis. The City continued to experience a significant depletion of its cash, with a projected $100 million cumulative cash deficit as of June 30, 2013. Cost-cutting measures undertaken by the Mayor and City Council were characterized as too heavily weighted to one-time savings and non-union personnel.

- General Fund Deficits. The City's cumulative General Fund deficit had not experienced a positive year-end fund balance since 2004 and stood at $326.6 million as of June 30, 2012. If the City had not issued substantial debt to reduce the cumulative fund balance over the prior ten years, the accumulated General Fund deficit would have been $936.8 million for Fiscal Year 2012.

- Long-term Liabilities. The City's long-term liabilities (calculated by the Financial Review Team using the City's then-estimated pension UAAL) exceeded $14 billion as of June 30, 2013, with approximately $1.9 billion coming due over the next five years and the City had not devised a satisfactory plan to address these liabilities.

- Bureaucratic Structure. The City Charter contained numerous restrictions and structural details that made it extremely difficult to restructure the City's operations in a meaningful or timely manner.

- Variances from Budgets. Audits for the City's previous six Fiscal Years reflected significant variances between budgeted and actual revenues and expenditures, owing primarily to the City's admitted practice of knowingly overestimating revenues and underestimating expenditures.

- <u>Weaknesses in Internal Controls</u>. The management letter accompanying the City's Fiscal Year 2012 financial audit report identified numerous material weaknesses and significant deficiencies in the City's financial and accounting operations.

### (c) Appointment of Kevyn D. Orr

On March 1, 2013, in response to the 2013 Financial Review Team Report and in accordance with Section 15(1) of PA 72, the Governor announced his determination that a "financial emergency" existed within the City. After a public hearing to consider the City Council's appeal of the Governor's determination, on March 14, 2013, the Governor confirmed his determination of a "financial emergency" within the City in accordance with Section 15(2) of PA 72 and requested that the LEFALB appoint an emergency manager. On March 14, 2013, pursuant to Section 18(1) of PA 72, the LEFALB appointed Kevyn D. Orr as the "emergency financial manager" in accordance with the Governor's request, and Mr. Orr formally took office on March 25, 2013. On March 28, 2013, upon the effectiveness of PA 436 and in accordance with Section 9(10) thereof, Mr. Orr became the "emergency manager" with respect to the City under PA 436 (in such capacity, the "<u>Emergency Manager</u>").

### (d) Financial and Operating Plan

On May 12, 2013, the Emergency Manager submitted the Financial and Operating Plan (the "<u>Financial and Operating Plan</u>") to the State Treasurer in accordance with Section 11(2) of PA 436. The Financial and Operating Plan summarized the financial condition of the City and the strategic and operational considerations facing the Emergency Manager and presented the Emergency Manager's preliminary views on the development of a restructuring plan with respect to the City.

## 10. The June 14 Creditor Proposal

Immediately following his appointment, the Emergency Manager began to focus on developing a comprehensive restructuring plan to: (a) ensure that the City is able to provide or procure governmental services essential to the public health, safety and welfare of its citizens; (b) assure the fiscal accountability and stability of the City; and (c) promote investment in the City and revitalization of the community in a sustainable fashion. On June 14, 2013 (*i.e.*, less than three months after formally assuming the position of Emergency Manager), at a meeting in the Detroit area, the Emergency Manager presented this restructuring plan (the "<u>June 14 Creditor Proposal</u>") to approximately 150 invited representatives of the City's creditors, including representatives of (a) all of the City's funded debt, (b) the insurers of such debt, (c) all of the City's unions, (d) certain retiree associations, (e) the Retirement Systems and (f) many individual bondholders.

At this meeting, the Emergency Manager presented an executive summary of the June 14 Creditor Proposal, and attendees received the full proposal as they exited. The Emergency Manager also caused the full proposal and the executive summary to be posted on the City's publicly accessible website the same day. The meeting lasted approximately two hours, and the Emergency Manager and his advisors answered all questions posed by attendees. At the conclusion of the meeting, all creditor representatives were invited to meet and engage in a dialogue with City representatives regarding the proposal. The Emergency Manager also indicated that he would welcome proposed modifications and alternative ideas consistent with the City's (a) urgent need for reinvestment to improve essential City services and (b) then-current and projected cash flows.

In addition to describing the economic circumstances that resulted in Detroit's current financial condition, the 128-page June 14 Creditor Proposal described a thorough overhaul and restructuring of the City's operations, finances and capital structure, as well as proposed recoveries for each creditor group. The Bankruptcy Court later found, however, that the June 14 Creditor Proposal "did not provide creditors with sufficient information to make meaningful counter-proposals, especially in the very short amount of time that the City allowed for the 'discussion' period." Eligibility Order, at 116.

Among other things, the June 14 Creditor Proposal discussed:

### (a) Investment in Infrastructure

The June 14 Creditor Proposal outlined the City's plans to achieve a sustainable restructuring through investing approximately $1.25 billion over ten years to improve basic and essential City services to citizens, including: (i) substantial investment in, and/or the restructuring of, various City departments; (ii) substantial investment in the City's blight removal efforts; (iii) the transition of the City's electricity transmission business to an alternative provider; (iv) the implementation

of a population-based streetlight footprint and the outsourcing of lighting operations to the newly-created PLA; (v) substantial investments in upgraded information technology for police, fire, EMS, transportation, payroll, grant management, tax collection, budgeting and accounting and the City's court system; (vi) a comprehensive review of the City's leases and contracts; and (vii) a proposed overhaul of the City's labor costs and related work rules.

### (b) Increased Revenues

The June 14 Creditor Proposal also set forth the City's intention to increase revenues to the City through: (i) the expansion of its income and property tax bases, rationalization and adjustment of its nominal tax rates and various initiatives to improve and enhance its tax and fee collection efforts; (ii) its intention to potentially realize value from the DWSD through the creation of the GLWA to conduct the operations currently conducted by the DWSD pursuant to the City's concession or lease of the DWSD's assets in exchange for a recurring (and unrestricted) payment in lieu of taxes, lease payment or other form of payment; (iii) the potential realization of value from City-owned assets currently exhibited and/or housed at the DIA; and (iv) the commitment to evaluate what value may be realized from other City assets (*e.g.*, City-owned real property; municipal parking operations; the Detroit-Windsor Tunnel; and Belle Isle Park).

### (c) Financial Statements

The June 14 Creditor Proposal also set forth: (i) the City's projected financial statements over a ten-year period, as well as the assumptions underlying those projections; and (ii) the City's actual and forecasted cash flows for the 2013 and 2014 Fiscal Years in the absence of restructuring.

### (d) Potential Creditor Recoveries

The June 14 Creditor Proposal further estimated creditor recoveries based upon the City's actual and projected financial condition.

Having provided the facts and strategies contained in the June 14 Creditor Presentation to its creditor body *en masse*, the City followed up with individual meetings with certain attendees during the period between June 14, 2013 and the commencement of this case. At these meetings, further data and legal viewpoints were exchanged and many questions were answered; however, no meaningful progress toward a comprehensive resolution of the City's obligations occurred. Importantly, following the June 14 Creditor Presentation, the City: (i) sought a resolution of various issues related to its pension-related Swap Contracts through extensive negotiations with the Swap Counterparties thereto and the insurers of the Swap Obligations; and (ii) held several follow-up meetings with various creditor representatives.

## 11. Barriers to Out-of-Court Restructuring

### (a) Negotiations with Creditors

The Bankruptcy Court later found that the City could not practicably negotiate a consensual restructuring with its creditor constituencies in an out-of-court setting. The pool of potential creditors in the City's chapter 9 case was vast. The City estimated that the number of employees, retirees, vendors, bondholders, insurers and other parties in interest in this case reached into the many tens of thousands (and that many of these creditors were unknown and unidentified). Collectively, the City's creditors held up to an estimated $18 billion in Claims against the City. Moreover, some of the largest components of the City's debt including, for example, the City's actuarially accrued $6.4 billion in unfunded OPEB obligations were fragmented among thousands of individuals.

With respect to the City's retirees, many of the unions took the position that they did not and could not represent their former members who are current retirees. Although many retirees of the approximately 20,000 retirees entitled to receive retiree healthcare and pension benefits from the City are members of voluntary organizations such as the DRCEA and RDPFFA, the City understood that, absent their consent, the retirees cannot be bound by out-of-court negotiations between the City and these bargaining units or other representatives. Moreover, even if such retirees had been willing to be bound by the City's negotiations with the bargaining units or other representatives (which would have been unlikely), the majority of those units refused to represent such retirees. Despite the City's best efforts to organize the retirees prior to the commencement of the City's chapter 9 case, most retirees remained unrepresented in negotiations. Accordingly, the negotiation of changes to pension and retiree benefits with the City's retiree constituency – changes that are critical to any restructuring of the City given the amounts owed to these constituencies – were impracticable (if not impossible) outside of

the chapter 9 context. Even now, no retiree representative can bind retirees in this chapter 9 case, and all retirees will be permitted to vote his or her Claims to accept or reject the Plan.

With respect to the City's bond debt, certain of the City's bond issuances permitted a majority of Holders to agree to certain amendments to the terms of such bonds. However, in many, if not all, cases, an extension of the maturity date of the indebtedness or an agreement to reduce its principal amount required the consent of all outstanding bondholders. In many instances, the City was unable to negotiate with a single contact with the authority to bind bondholders of a particular series of debt, thus rendering negotiations regarding the out-of-court restructuring of such bonds impracticable. In any event, as of the Petition Date, no bondholder group holding a majority of any of the 60 series of debt issued by the City had organized so that the City could negotiate with it.

The City's restructuring proposals to its creditor constituencies were met with resistance. The feedback received from creditors led the City to determine that a comprehensive agreement was unlikely in the near term without the commencement of this chapter 9 case. On July 8, 2013, for example, a bond insurer serving as surety for approximately $170 million of the City's limited and unlimited tax general obligation debt issued a public statement declaring that the June 14 Creditor Proposal was "harmful to Detroit and the interests of the taxpayers in Michigan" and "necessarily imperiled" the City's access to cost effective financing. Further negotiations with all of the City's various stakeholders was impracticable in light of the City's cash crisis and the urgent need to move forward with its restructuring. The City required a clear and centralized forum within which parties could negotiate and ultimately be bound.

### (b)      Prepetition Litigation

Several lawsuits were filed against various entities (including, among others, the Governor, the Emergency Manager and the State Treasurer) during the period immediately prior to the Petition Date effectively seeking to bar the commencement of a chapter 9 case by the City. On July 3, 2013, certain current and former employees of the City filed a complaint against the State, the Governor and the State Treasurer seeking: (i) a declaratory judgment that PA 436 violated the Michigan Constitution to the extent that it purported to authorize chapter 9 cases within which vested pension benefits might be compromised; and (ii) an injunction preventing the defendants from authorizing any chapter 9 case for the City within which vested pension benefits might be adjusted. Webster v. State, No. 13-734-CZ (Ingham Cnty. Cir. Ct. July 3, 2013). Also on July 3, 2013, a separate complaint was filed by certain current and former employees of the City (the "Flowers Plaintiffs") against the State, the Governor and the State Treasurer seeking relief similar to that sought in Webster. Flowers v. Snyder, No. 13-729-CZ (Ingham Cnty. Cir. Ct. July 3, 2013). In addition, on July 17, 2013, the Retirement Systems commenced a lawsuit against the Emergency Manager and the Governor seeking declaratory judgments that PA 436 (i) does not authorize them to take any action that may result in the compromise of the City's pension obligations; and (ii) when read in conjunction with applicable provisions of the Michigan Constitution, requires the defendants to refrain from attempting to compromise pension obligations in a chapter 9 case (or, alternatively, that PA 436 violates the Michigan Constitution). Gen. Ret. Sys. v. Orr, No. 13-768-CZ (Ingham Cnty. Cir. Ct. Jul. 17, 2013).

Had the City not sought the protections of chapter 9 and the automatic stay (the "Chapter 9 Stay") on the Petition Date or sooner, these lawsuits could have significantly delayed the City's restructuring process at a time when the City was in a state of financial emergency, was insolvent and was failing to provide an adequate level of even the most basic services to the residents of Detroit. The plaintiffs in each of these lawsuits sought *ex parte* orders (the "Injunction Orders") from the Circuit Court of Ingham County, Michigan (the "Ingham County Court") temporarily or preliminarily enjoining the defendants from (i) taking certain actions toward authorizing a chapter 9 filing by the City; and (ii) with respect to the City, availing itself of the protections and powers of chapter 9 in any case actually commenced. On the Petition Date – but after the filing of the City's petition – the Ingham County Court entered the Injunction Orders sought by the plaintiffs in each of these cases. Each of these actions is stayed by the automatic stay in this chapter 9 case and pursuant to the Bankruptcy Court's Order Pursuant to Section 105(a) of the Bankruptcy Code Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non-Officer Employees and (C) Agents and Representatives of the Debtor (Docket No. 166), entered on July 25, 2013.

In addition to the Webster, Flowers and General Retirement System lawsuits, certain other prepetition litigation threatened to impede the City's attempts to restructure out-of-court pursuant to PA 436 or, at a minimum, distract the City's leadership from focusing on uncovering the nature and extent of the City's financial problems and implementing urgently-needed reforms. E.g., Phillips v. Snyder, No. 2:13-cv-11370 (E.D. Mich.) (lawsuit against the Governor and State Treasurer seeking (i) a declaratory judgment that PA 436 violates, among other things, the United States Constitution and the Voting Rights Act; (ii) injunctive relief, among other things, preventing the defendants and any emergency managers from exercising rights under PA 436; and (iii) liquidated, compensatory and punitive damages and attorneys' fees and costs); NAACP v. Snyder, No. 2:13-cv-12098 (E.D. Mich.) (seeking the same relief as was sought in Phillips – except making no

prayer for damages – on substantially similar grounds); <u>Citizens United Against Corrupt Gov't v. Local Emergency Fin. Assistance Loan Bd.</u>, No. 13-281-NZ (Ingham Cnty. Cir. Ct.) (lawsuit against the LEFALB, the Governor and the State Treasurer seeking, among other things, to invalidate the appointment of the Emergency Manager).

### 12. Insolvency

#### (a) Not Paying Debts as They Come Due

As of the Petition Date, the City was generally not paying its debts as they became due. As described above, the City's cash crisis had become particularly acute in the weeks preceding the commencement of this chapter 9 case and, in response, the City was forced to suspend payments on unsecured debt including payments of $37 million to the Service Corporations on account of the COPs and deferral of required pension contributions. As of June 30, 2013, the City had only $36 million in cash on hand (net of accumulated property tax distributions), but had outstanding deferrals (including the $108 million in deferred pension contributions referenced above) and amounts due to other funds and entities of approximately $274.3 million.

#### (b) Cash Flow Insolvency

The City also was unlikely to be able to service its debts in the foreseeable future. The City had negative cash flows of $115.5 million in Fiscal Year 2012. The City's preliminary estimates showed positive cash flows of $31.5 million (excluding the impact of borrowings) for Fiscal Year 2013, but only as a result of, among other things, the deferral of nearly $108 million in pension contributions and the City's decision, on June 14, 2013, not to make $39.7 million in payments due and owing to the Service Corporations. Absent restructuring, the City projected cash flows of negative $198.5 million in Fiscal Year 2014 and negative $260.4 million in Fiscal Year 2015. This cash depletion would have left the City in a net cash position (after required property tax distributions) of negative $11.6 million as early as December 2013. In the absence of restructuring, the City's net negative cash position (after required property tax distributions) would have continued its downward spiral, reaching negative $143.3 million as of the end of Fiscal Year 2014 and negative $404.5 million as of the end of Fiscal Year 2015.

#### (c) Bankruptcy Court Ruling on Insolvency

On December 5, 2013, in connection with the issuance of the Eligibility Order, the Bankruptcy Court ruled that the City was insolvent as of the Petition Date. <u>See</u> Eligibility Order, at 110.

## VIII.

## THE CHAPTER 9 CASE

### A. Commencement of the Chapter 9 Case

After more than one month of negotiations with its creditor constituencies, the City was unable to negotiate – and saw no prospect of negotiating – an out-of-court resolution that would address the City's financial situation and lay a foundation for a strong and prosperous City going forward. Accordingly, on July 16, 2013, and in accordance with section 18(1) of PA 436, the Emergency Manager submitted a written recommendation to the Governor and the State Treasurer that the City seek relief under chapter 9 of the Bankruptcy Code. The Emergency Manager's recommendation was based on his judgment that no reasonable alternative to rectifying the financial emergency of the City existed because the City could not adopt a feasible financial plan that could satisfactorily rectify the financial emergency in a timely manner. On July 18, 2013, in accordance with section 18(1) of PA 436, the Emergency Manager received the written authorization of the Governor to commence a chapter 9 case. On July 18, 2013, consistent with the Governor's written approval, the Emergency Manager issued an order directing the City to commence a chapter 9 case, and the City's petition for relief was filed at 4:06 p.m., Eastern Time, that day.

### B. Retiree Committee

Prior to the Petition Date, no single party was empowered to represent retired employees of the City entitled to receive pension benefits and health and other post-employment welfare benefits (collectively, the "<u>Retirees</u>") regarding the billions of dollars of legacy claims that must be addressed in the City's restructuring. Anticipating the necessity of negotiations regarding the treatment of the legacy claims of Retirees and their beneficiaries under a plan of adjustment, on

July 19, 2013 (*i.e.*, the day after the Petition Date), the City filed a motion (Docket No. 20) requesting the appointment of an official committee (the "Retiree Committee") to act as the Retirees' authorized representative in the City's chapter 9 case. On August 2, 2013, the Bankruptcy Court entered an order (Docket No. 279) (the "Appointment Order") directing the U.S. Trustee to appoint the Retiree Committee pursuant to section 1102(a)(2) of the Bankruptcy Code. On August 22, 2013, the U.S. Trustee filed its Corrected Appointment of Official Committee of Retirees (Docket No. 575) with the Bankruptcy Court, appointing the following individuals to the Retiree Committee: (1) Edward L. MacNeil (on behalf of Detroit, Michigan, Retiree Sub-Chapter 98 of the American Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME")); (2) Michael J. Karwoski; (3) Shirley V. Lightsey; (4) Terri Renshaw; (5) Robert A. Shinske; (6) Donald Taylor; (7) Gail Wilson Turner; (8) Gail M. Wilson; and (9) Wendy Fields-Jacobs on behalf of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW")).

The Retiree Committee retained Dentons US LLP ("Dentons"), an international law firm created by the combination of SNR Denton, Fraser Milner Casgrain and Salans. The retention of Dentons included the retention of Dentons's affiliate Salans FMC SNR Denton Europe LLP and lawyers and staff in its New York office, who joined Dentons effective October 1, 2013. On August 29, 2013, Dentons filed a notice of appearance (Docket No. 683) on behalf of the Retiree Committee. On October 21, 2013, the Retiree Committee filed its application (Docket No. 1299) seeking to retain Dentons as counsel, effective as of August 28, 2013, and seeking to retain The Segal Company as actuary consultants. The City filed a limited objection to Dentons's retention, primarily based on Dentons's proposed retention of The Segal Company (Docket No. 1527). The objection was resolved with the Retiree Committee's agreement to retain The Segal Company directly and, on November 12, 2013, the Bankruptcy Court entered an order (Docket No. 1668) approving the retention of Dentons.

On September 5, 2013, the law firm Brooks Wilkins Sharkey & Turco PLLC ("Brooks Wilkins") filed notices of appearance (Docket Nos. 716; 718) on behalf of the Retiree Committee. On October 25, 2013, the Retiree Committee filed its application (Docket No. 1392) seeking to retain Brooks Wilkins as counsel, effective as of September 3, 2013. On November 12, 2013, the Bankruptcy Court entered an order (Docket No. 1664) approving the retention of Brooks Wilkins.

On October 31, 2013, the Retiree Committee filed its application (Docket No. 1476) to employ Lazard Freres & Co. LLC ("Lazard") as financial advisor to the Retiree Committee. The Retiree Committee proposed that Lazard be paid $175,000 per month plus expenses and an undetermined transaction fee upon the approval of a settlement of retiree Claims or the consummation of the City's chapter 9 case. Following the City's filing of a limited objection (Docket No. 1703) and the submission of a stipulated proposed order resolving the City's concerns (Docket No. 1832), on November 27, 2013, the Bankruptcy Court entered an interim order (Docket No. 1854) (1) continuing the hearing on the Retiree Committee's application to December 16, 2013 (to allow testimony from Lazard) and (2) approving the retention of Lazard on an interim basis through the date of the continued hearing. On December 19, 2013, the Bankruptcy Court entered an order (Docket No. 2250) approving the retention of Lazard effective as of September 3, 2013.

On December 2, 2013, the Retiree Committee filed its application (Docket No. 1882) to employ The Segal Company as actuarial consultant to the Retiree Committee (the "Actuary Application"). The City responded informally to the Actuary Application by raising certain concerns directly with the Retiree Committee. On December 26, 2013, the parties submitted a stipulated proposed order resolving the City's concerns (Docket No. 2330), and on January 21, 2014, the Bankruptcy Court entered an order (Docket No. 2528) authorizing the Retiree Committee's retention of The Segal Company.

Paragraph 5 of the Appointment Order (1) acknowledged the City's agreement to pay the reasonable professional expenses of the Retiree Committee and (2) noted that such expenses would be subject to any order appointing a fee examiner entered by the Court. Paragraph 2 of the Bankruptcy Court's "Order Appointing Fee Examiner" (Docket No. 383), entered on August 19, 2013, provided that "Professional Fee Expenses" incurred by the City subject thereto (and to any subsequent "Fee Review Order") would include "Fees payable to the professionals of any official committee." Paragraph 24 of the "Fee Review Order" (Docket No. 810) entered by the Bankruptcy Court on September 11, 2013, acknowledged the City's agreement to pay "the reasonable fees and expenses" of the Retiree Committee's professionals and the "reasonable expenses" of the members of the Retiree Committee, subject to the City's right to seek a judicial determination of reasonableness. In compliance with, and in accordance with the terms of, the Appointment Order, the Order Appointing Fee Examiner and the Fee Review Order, the City has paid the reasonable fees and expenses of the Retiree Committee's professionals and the reasonable expenses of the Retiree Committee's members. See Section VIII.J of this Disclosure Statement for a more detailed discussion of the fee process prevailing in the City's chapter 9 case.

Following its appointment, the Retiree Committee has been an active participant with respect to various matters before the Bankruptcy Court, and the City has conducted continuous discussions with the Retiree Committee and its professionals regarding the City's restructuring and the Retirees' Claims. See Sections VIII.D (describing the Retiree Committee's role in the litigation regarding the City's eligibility to be a chapter 9 debtor); VIII.F (describing the Retiree Committee's participation in Court-ordered mediation); VIII.K.2.c (describing certain litigation initiated by the Retiree Committee in connection with modifications to retiree health benefits proposed by the City).

## C. Unsecured Creditors' Committee

On December 23, 2013, the U.S. Trustee filed the Appointment of Committee of Unsecured Creditors (Docket No. 2290), appointing an official committee of unsecured creditors in the City's bankruptcy case (the "Creditors' Committee").  On December 24, 2013, the City sent a letter to the U.S. Trustee expressing its opposition to the formation and composition of the Creditors' Committee and reiterating its decision not to fund any professional fees or costs incurred by such committee.  On January 8, 2014, the U.S. Trustee sent a letter to counsel for the City confirming its decision to form the Creditors' Committee.  On January 31, 2014, the City filed a motion for entry of an order vacating the appointment of the Creditors' Committee (Docket No. 2626) (the "Motion to Disband").  Objections to the Motion to Disband were filed by the U.S. Trustee (Docket No. 2688) and the Creditors' Committee (Docket No. 2687) on February 14, 2014.  A hearing was held on the Motion to Disband on February 19, 2014, and, on February 28, 2014, the Bankruptcy Court entered an order granting the Motion to Disband and vacating the appointment of the Creditors' Committee (Docket No. 2784).

## D. Eligibility

The primary issue before the Bankruptcy Court since the commencement of the City's chapter 9 case has been the determination of the City's eligibility to be a debtor under chapter 9 of the Bankruptcy Code (such issue, "Eligibility"). The determination of Eligibility is governed by sections 109(c) and 921(c) of the Bankruptcy Code, which provisions require the Bankruptcy Court, among other things, to determine whether:  (1) the City is a municipality (11 U.S.C. § 109(c)(1)); (2) the City was specifically authorized to be a debtor by state law (11 U.S.C. § 109(c)(2)); (3) the City was insolvent as of the Petition Date (11 U.S.C. § 109(c)(3)); (4) the City desires to effectuate a plan to adjust its debts (11 U.S.C. § 109(c)(4)); (5) either (a) the City negotiated in good faith with its various creditor constituencies (11 U.S.C. § 109(c)(5)(B)) or (b) it was impracticable for the City to do so (11 U.S.C. § 109(c)(5)(C)); and (6) the City's petition was filed in good faith (11 U.S.C. § 921(c)).  On the Petition Date, in support of Eligibility, the City filed its (1) Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (Docket No. 10) and (2) Memorandum in Support of Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (Docket No. 14), demonstrating its satisfaction of the requirements set forth at section 109(c) of the Bankruptcy Code.  To resolve the threshold issue of Eligibility as promptly as possible, the City filed a motion (Docket No. 18) on the Petition Date seeking an order establishing a schedule for, and expediting the process of, identifying and adjudicating any objections to Eligibility. On August 6, 2013, the Bankruptcy Court entered an order (Docket No. 296) establishing a deadline of August 19, 2013 for the filing of objections to Eligibility and a schedule for the adjudication of such objections.

Approximately 110 objections to Eligibility (each, an "Eligibility Objection") were filed prior to the deadline established by the Bankruptcy Court (or deemed timely filed).  The majority of such Eligibility Objections were filed by individuals.  The Eligibility Objections (1) raised numerous issues of law and fact (including threshold challenges to the constitutionality of chapter 9 and PA 436 and the City's power to impair pension benefits in chapter 9) and (2) challenged (a) the City's satisfaction of all subsections of section 109(c)(5) of the Bankruptcy Code (with the exception of subsection 109(c)(1)) and (b) the "good faith" of the City's chapter 9 petition within the meaning of section 921(c) of the Bankruptcy Code.  In addition to the Objections, Michigan Attorney General Bill Schuette filed a "Statement Regarding the Michigan Constitution and the Bankruptcy of the City of Detroit" (Docket No. 481), arguing that, although the City was eligible to be a chapter 9 debtor, the Pensions Clause of the Michigan Constitution barred the City from impairing its obligations to pensioners.

On September 11, 2013, the Retiree Committee filed a motion to withdraw the reference (Docket No. 806) (the "Motion to Withdraw") of certain state law and constitutional issues raised in its Eligibility Objection from the Bankruptcy Court to the District Court.  The Retiree Committee's filing of the Motion to Withdraw initiated a separate proceeding before the District Court captioned as Official Committee of Retirees v. City of Detroit (In re City of Detroit), No. 13-cv-13873 (E.D. Mich.).  The Motion to Withdraw was fully briefed by the City and the Retiree Committee as of October 5, 2013.  Shortly after filing the Motion to Withdraw, on September 13, 2013, the Retiree Committee filed a motion (Docket No. 837) with the Bankruptcy Court seeking a stay of all deadlines and the trial related to Eligibility (the "Eligibility Proceedings") pending the District Court's disposition of the Motion to Withdraw.  Following briefing and a

hearing, on September 26, 2013, the Bankruptcy Court entered an opinion and order (Docket No. 1039) denying the Retiree Committee's motion to stay the Eligibility Proceedings, finding, among other things, that the Retiree Committee was unlikely to succeed on the merits of the Motion to Withdraw. The District Court has not taken any action to withdraw the reference of the Eligibility Proceedings.

Following the filing of the Eligibility Objections, and pursuant to certain scheduling orders entered by the Bankruptcy Court (Docket Nos. 642; 821), the Bankruptcy Court conducted hearings related to the City's Eligibility, including (1) a hearing on September 19, 2013, at which all individual objectors were provided the opportunity to be heard on their Eligibility Objections (and at which approximately 50 such individual objectors appeared before the Bankruptcy Court); (2) hearings on October 15, 2013 and October 16, 2013, at which the Bankruptcy Court heard oral argument on portions of the Eligibility Objections that raised strictly legal issues; (3) various hearings on motions raising certain discovery and privilege disputes; and (4) a nine-day bench trial (the "Eligibility Trial") spanning the period October 23, 2013 to November 8, 2013 at which argument and testimony were presented with respect to Eligibility Objections requiring the resolution of genuine issues of material fact. Sixteen witnesses – including the Governor, the former State Treasurer and the Emergency Manager – testified at the Eligibility Trial and 310 exhibits were introduced into evidence.

On December 3, 2013, the Bankruptcy Court issued a bench decision determining that the City was eligible to be a chapter 9 debtor (the "Bench Decision"). On December 5, 2013, the Bankruptcy Court entered its Opinion Regarding Eligibility (Docket No. 1945) (the "Eligibility Order") memorializing the Bench Decision. Also on December 5, 2013, the Bankruptcy Court entered an Order for Relief Under Chapter 9 of the Bankruptcy Code (Docket No. 1946) (the "Order for Relief"), determining that the City (1) met all of the applicable requirements under section 109(c) of the Bankruptcy Code, (2) is eligible to be a debtor under chapter 9 of the Bankruptcy Code and (3) filed its chapter 9 petition in good faith. In the Bench Decision and Eligibility Order, the Bankruptcy Court further held that, notwithstanding the state law protections afforded by the Pensions Clause, the City may impair its pension obligations under chapter 9 of the federal Bankruptcy Code. Notices of appeal of the Eligibility Order were filed by: (1) AFSCME (Docket No. 1907); (2) the Retirement Systems (Docket No. 1930); (3) the Retiree Committee (Docket No. 2057); (4) the Retired Detroit Police & Fire Fighters Association (the "RDPFFA"), the Detroit Retired City Employees Association (the "DRCEA") and affiliated individuals (Docket No. 2070); (5) the Retired Detroit Police Members Association (the "RDPMA") (Docket No. 2111); (6) the DFFA and the DPOA (Docket No. 2137); and (7) the UAW together with the Flowers Plaintiffs (Docket No. 2165).

Motions for certification of direct appeal of the Order for Relief to the Sixth Circuit Court of Appeals were filed by: (1) the Retirement Systems (Docket No. 1933); (2) the Retiree Committee (Docket No. 2060); (3) the RDPFFA, the DRCEA and affiliated individuals (Docket No. 2068); (4) the RDPMA (Docket No. 2113); (5) the DFFA and the DPOA (Docket No. 2139); (6) the UAW and the Flowers Plaintiffs (Docket No. 2192); and (7) AFSCME (Docket No. 2376). After a hearing, on December 20, 2013, the Bankruptcy Court issued an order certifying to the Sixth Circuit Court of Appeals that appeals of the Eligibility Order "involve a 'matter of public importance'" (Docket No. 2268, as amended by Docket No. 2274) (the "Certification Order"). In a memorandum issued contemporaneously with the Certification Order (Docket No. 2269), the Bankruptcy Court recommended that (1) notwithstanding the fact that appeals of the Eligibility Order involve "a matter of public importance," authorization for direct appeals to the Sixth Circuit Court of Appeals should be denied; and (2) should the Sixth Circuit Court of Appeals authorize a direct appeal of the Eligibility Order, such an appeal should not be expedited and, in considering requests to expedite any such an appeal, the Sixth Circuit Court of Appeals should consult with the mediator in the City's chapter 9 case to determine whether expediting such an appeal "is in the best interest of the City, its creditors and its residents."

Petitions for permission to appeal the Eligibility Order directly to the Sixth Circuit Court of Appeals were filed with the Sixth Circuit Court of Appeals by each of the entities that filed a notice of appeal of the Eligibility Order with the Bankruptcy Court. On February 21, 2014, the Sixth Circuit Court of Appeals entered an order granting all of these petitions and stating that the appeals (collectively, the "Sixth Circuit Eligibility Appeals") were "not expedited at this time." On March 18, 2014 and March 19, 2014, certain of the appellants filed motions to expedite the oral argument in their respective Sixth Circuit Eligibility Appeals. The City filed responses to these motions to expedite on March 20, 2014 and March 21, 2014. Also on March 18, 2014, the City filed, in each of the Sixth Circuit Eligibility Appeals, a motion to (1) consolidate the Sixth Circuit Eligibility Appeals and (2) extend the briefing deadlines that were established by the Sixth Circuit Court of Appeals pursuant to a letter to the parties dated March 12, 2014 (the "Briefing Letter"). Responses to the City's motions to consolidate the Sixth Circuit Eligibility Appeals were filed by the appellants in their respective Sixth Circuit Eligibility Appeals on March 20, 2014 and March 21, 2014. As of the date hereof, the City's motions to consolidate the Sixth Circuit Eligibility Appeals remain pending. Pursuant to the Briefing Letter, the appellants' briefs must be filed in their respective Sixth Circuit Eligibility Appeals by April 24, 2014, and the City's reply briefs must be filed by May 27,

2014. All appeals of the Eligibility Order pending in the District Court are indefinitely stayed in light of the pending Sixth Circuit Eligibility Appeals.

## E.    Swap Settlement

As described in greater detail in Section VII.B.4, in 2009, the City entered into the Collateral Agreement with the Swap Counterparties, the Service Corporations and U.S. Bank, whereby the City avoided a $300-$400 million early termination payment under the Swap Contracts, in return for securing its quarterly swap payments with collateral consisting of the Casino Revenues. In March 2012, the City suffered ratings downgrades with respect to its Unlimited Tax General Obligation Bonds that again gave rise to the risk that the Swap Counterparties could, among other things, terminate the Swap Contracts and seek a termination payment from the City. The City then commenced negotiations with the Swap Counterparties to resolve issues arising in connection with the credit rating downgrade.

Despite the significant time and effort devoted to reaching a resolution that would permit the City access to the Casino Revenues, following the assertion of alleged rights by insurer Syncora, the City's access to those funds was blocked. Accordingly, the City acted to protect its interests and preserve its access to the Casino Revenues – a critical funding source for the City – by commencing litigation against Syncora (among others) in the Circuit Court for Wayne County, Michigan to seek (1) the release of Casino Revenues held by U.S. Bank as custodian and (2) the recovery of damages suffered by the City due to Syncora's interference with its banking relationships. In that proceeding, the Emergency Manager submitted an affidavit in support of the City's Verified Complaint for Declaratory and Injunctive Relief, which contains additional factual background concerning the Swap Contracts, related Collateral Agreement and other matters. On July 5, 2013, the City obtained a temporary restraining order against Syncora and U.S. Bank, thus temporarily preserving the City's access to the Casino Revenues. Following those activities, the City was able to make timely payment on its swap obligations, making the required deposit into the Holdback Account and triggering the release of Casino Revenues to the City.

### 1.    Forbearance and Optional Termination Agreement

Prior to and concurrently with the litigation against Syncora, the City engaged in negotiations with the Swap Counterparties. These negotiations culminated three days prior to the Petition Date, when the Emergency Manager reached an agreement with the Swap Counterparties to eliminate one of the City's largest secured obligations at a substantial discount and ensure ongoing access to critical Casino Revenues that previously had been pledged to support obligations under the Swap Contracts. This agreement was evidenced by the Forbearance and Optional Termination Agreement, dated July 15, 2013, by and among the City, the Emergency Manager, the Swap Counterparties and the Service Corporations (the "FOTA").

On the Petition Date, the City filed a motion with the Bankruptcy Court to assume the FOTA under section 365 of the Bankruptcy Code and further requesting that the Bankruptcy Court approve the parties' settlement under Bankruptcy Rule 9019 (Docket No. 17) (the "Swap Settlement Motion"). The principal terms of the FOTA were as follows:

- Forbearance. The FOTA provided for a period (the "Forbearance Period") during which the Swap Counterparties would forbear from (a) terminating the Swap Contracts and (b) blocking the City's access to the Casino Revenues in the General Receipts Account. In addition, the FOTA required the Swap Counterparties to use their best efforts to ensure the City's continued access to the Casino Revenues and to support the City's efforts to obtain the Casino Revenues in the event of a chapter 9 filing. Following the Forbearance Period, the Swap Counterparties would no longer be obligated to forbear from exercising their rights and the City would no be longer be entitled to exercise its option to terminate the Swap Contracts. In certain situations, the covenants of the City, the Service Corporations and the Emergency Manager contained in the FOTA would survive if the Swap Counterparties terminated the Forbearance Period based on certain occurrences. In other instances, a termination of the Forbearance Period would revert the parties' rights to the *status quo ante*.

- Forbearance Period. The Forbearance Period would end upon the earliest of: (a) June 30, 2014; (b) a payment default under the Swap Contracts or the voluntary bankruptcy filing of the Service Corporations; (c) an involuntary bankruptcy filing of the Service Corporations; (d) certain credit support defaults under the Swap Contracts; (e) certain Additional Termination Events under the Swap Contracts – specifically including third party challenges to validity or the City's attempt to reduce the casino taxes; (f) breach of the covenants or representations in the FOTA; (g) a judgment of a court rendering documents relating to the transaction invalid or holding the certain COPs should be paid prior to maturity; (h) certain legislative

acts with similar effects; (i) the failure to obtain a final, non-appealable order approving the FOTA within 60 days of any bankruptcy filing, the denial of the Swap Settlement Motion, the dismissal of the City's chapter 9 case (if not re-filed within 30 days), and a failure to include a stay waiver within the approval order; or (j) the occurrence of the effective date of the City's plan of adjustment. In addition, the City was authorized to terminate the Forbearance Period if the City did not receive the Casino Revenues from the General Receipts Account by July 31, 2013 nor had reasonable grounds to believe that its access to the Casino Revenues would be blocked.

- Optional Termination Payment. The FOTA further provided the City with the right, under certain condition, to direct the Swap Counterparties to exercise their optional early right of termination of the Swap Contracts (the "Optional Termination Right"). In the event the City exercised the Optional Termination Right, the Service Corporations would be relieved of any payment obligations to the Swap Counterparties under the Swap Contracts. In addition, no Swap Counterparty would present any payment notice to a Swap Insurer as a result of the exercise of the Optional Termination Right and the Swap Counterparties would irrevocably waive all future rights to do so.

  As a termination payment (the "Optional Termination Payment") the City would pay: (a) 75% of the then mid-market value of the Swap Contracts, if the option was exercised between the date of the Agreement and October 31, 2013; (b) 77% if the option was exercised after October 31, 2013 but on or before November 15, 2013; or (c) 82% if exercised after November 15, 2013 and on or before March 13, 2014. In addition, the City would pay any unpaid amounts then owing under the Swap Contracts. As of the end of June 2013, 18 days before the Petition Date, the City estimated the negative value of the Swap Contracts at $296.5 million. In addition to unhindered access to the Casino Revenues, therefore, the FOTA offered the City a potential savings in excess of $70 million as of the Petition Date.

## 2. Litigation Regarding the Casino Revenues and the FOTA

The City has been party to litigation relating to the Casino Revenues and the FOTA both before and during the pendency of the City's chapter 9 case. On July 11, 2013, Syncora removed a lawsuit commenced in Wayne County Circuit Court (the "Casino Revenue Proceeding") to the District Court. The Casino Revenue Proceeding was referred to the Bankruptcy Court on August 8, 2013 and is now called City of Detroit v. Syncora Guarantee Inc., et al., Adv. Proc. No. 13-04942. On November 25, 2013, the Bankruptcy Court entered a stipulated order that, among other things, stayed the Casino Revenue Proceeding for a period of 60 days from the date of the Bankruptcy Court's order. The stipulated stay expired on January 24, 2014 and, on January 27, 2014, Syncora filed a motion to withdraw the reference of the Casino Revenue Proceeding to the Bankruptcy Court. As of the date hereof, Syncora's motion has been fully briefed but has not been determined by the District Court.

On July 24, 2013, six days after the Petition Date, Syncora commenced a lawsuit against the Swap Counterparties in New York state court (the "Swap Settlement Proceeding") seeking to enjoin the Swap Counterparties from entering into the FOTA. The Swap Settlement Proceeding, captioned as Syncora Guarantee Inc. v. UBS AG, et al., Adv. Proc. No. 13-05395, was removed to the United States District Court for the Southern District of New York, transferred to the District Court and then referred to the Bankruptcy Court. In the Swap Settlement Proceeding, Syncora alleged that the Swap Counterparties may not exercise any optional right of termination of the Swap Contracts – at the City's direction, as envisaged by the FOTA - without Syncora's prior written consent. Syncora sought declaratory and injunctive relief, including a declaration that the Swap Counterparties may not terminate the Swap Contracts without Syncora's consent (and that any such termination will be void ab initio) and an injunction permanently enjoining the Swap Counterparties from terminating the Swap Contracts. On October 10, 2013, the City filed a motion to intervene in the Swap Settlement Proceeding. On January 29, 2014, the Bankruptcy Court granted the City's motion to intervene. The Swap Counterparties filed a motion to dismiss the Swap Settlement Proceeding, and Syncora filed (a) a motion seeking a determination that the proceeding was a non-core proceeding with respect to which the Bankruptcy Court lacks authority to enter a final judgment and (b) a motion for summary judgment. On February 9, 2014, Syncora filed a notice with the Bankruptcy Court dismissing the Swap Settlement Proceeding without prejudice.

There were also multiple objections to the Swap Settlement Motion in the City's chapter 9 case, including from Syncora and other monoline insurers and retiree representatives, including the Retiree Committee. See, e.g., Docket Nos. 246, 259, 329, 343, 348, 353, 357, 360, 361, 362, 364, 366, 370, 434, 874. These objections included arguments and allegations (disputed by the City) that: (a) the City failed to satisfy the requirements for approval of the Swap Settlement Motion under Bankruptcy Rule 9019, because the FOTA allegedly was not a settlement or compromise and was not fair

and equitable or in the best interests of the City's creditors; (b) assumption of the FOTA was improper because the City allegedly (i) was not seeking to assume the FOTA *cum onere*, (ii) failed to satisfy the appropriate standard for assumption under section 365 of the Bankruptcy Code and (iii) could not assume the FOTA because, absent Syncora's and FGIC's consent, the FOTA was not a valid and enforceable contract; (c) the FOTA improperly elevated the Swap Counterparties to the status of secured creditors when it is not clear that (i) they are secured creditors of the City or (ii) if they are creditors of the City, their Claims are secured; (d) the provisions of the FOTA improperly insulated the Swap Contracts from all challenges as to their validity, by any party; and (e) the City failed to provide adequate information to evaluate the FOTA because, to make the Optional Termination Payment, the City would need to secure postpetition financing, the terms of which were not available at that time.

Certain parties also argued that the Casino Revenues were not subject to the Chapter 9 Stay or, alternatively, that they were excepted from the Chapter 9 Stay by operation of either section 362(b)(17) or Section 922(d) of the Bankruptcy Code. At a hearing on August 28, 2013, the Court ruled that the Casino Revenues are property of the City and that the application of the Casino Revenues was not excepted from the Chapter 9 Stay either by section 362(b)(17) or section 922(d) of the Bankruptcy Code. That same day, the Court entered an order (Docket No. 670) (the "Casino Revenue Stay Order") providing that the Casino Revenues are property of the City and subject to the Chapter 9 Stay for the reasons set forth at the hearing. On September 10, 2013, Syncora filed a notice of appeal of the Casino Revenue Stay Order (Docket No. 797). As of the date hereof, the appeal has been fully briefed but has not been determined by the District Court.

On August 22, 2013, the Bankruptcy Court entered its "Second Order Referring Matters to Facilitative Mediation" (Docket No. 562), which referred all disputes arising in connection with the FOTA for facilitative mediation. Mediation regarding the Swap Settlement Motion and the FOTA was conducted before District Court Chief Judge Gerald E. Rosen ("Judge Rosen") and Judge Elizabeth Perris ("Judge Perris") of the United States Bankruptcy Court for the District of Oregon.

An evidentiary hearing to consider the Swap Settlement Motion (in addition to the Postpetition Financing, as described in Section IX.F) was commenced on December 17, 2013. On December 18, 2013, Judge Rhodes ordered the parties back to mediation to discuss a reduction of the Optional Termination Payment.

Additional mediation sessions were convened on December 23, 2013 and December 24, 2013. These discussions led to an agreement to fix the Optional Termination Payment at the reduced amount of $165 million. The hearings on the Swap Settlement Motion and the Financing Motion concluded on January 13, 2014. On January 16, 2014, the Bankruptcy Court declined to approve the Swap Settlement Motion. According to the Bankruptcy Court, the proposed reduced Optional Termination Payment of $165 million exceeded the range of reasonableness because the City had a reasonable likelihood of success on certain legal defenses. The Bankruptcy Court stated that "the city had entered into a series of bad deals to solve its financial problems. The law says that when the City filed this bankruptcy, that must stop. It also says that this Court must be the one to stop it, if necessary." Tr. of Jan. 16, 2014 Hr'g, at 22:5-9. On January 17, 2014, the Bankruptcy Court issued its order (Docket No. 2511) declining to approve the Swap Settlement Motion or the portion of the Postpetition Financing that was to be used to finance the payment of the Optional Termination Payment. The City filed a notice of termination of the FOTA (Docket No. 2655) on February 6, 2014.

In light of the Bankruptcy Court's denial of the Swap Settlement Motion, and informed by the Court's views with respect to the probability of success on certain legal defenses, the City and its advisors considered appropriate next steps that would safeguard the City and ensure continued access to the City's critically necessary Casino Revenues. The City actively prepared to pursue litigation against the Swap Counterparties to protect the interests of the City and its residents with respect to the Swap Contracts, and, by complaint dated January 31, 2014, the City commenced an adversary proceeding in the Bankruptcy Court seeking, among other things, a declaration that its obligations related to the COPs were illegal, unenforceable and void *ab initio* because they constituted and effectuated the accrual of further indebtedness by the City in violation of Section 4a(2) of the Home Rule City Act and the creation of debt not authorized by the Municipal Finance Act or any other state law. At the same time as it prepared for litigation with the Swap Counterparties, however, at the direction of the Emergency Manager, the City continued to engage the Swap Counterparties in settlement discussions.

The City made it clear to the Swap Counterparties that it was prepared to and would pursue litigation immediately if a favorable settlement were not reached. As a result of its demonstrated willingness and ability to pursue every option available against the Swap Counterparties, the City was able to secure a materially better deal from the Swap Counterparties than those that had been submitted to the Bankruptcy Court for approval. Consequently, on March 3, 2014, the City filed the Motion of Debtor for Entry of an Order, Pursuant to Section 105(a) of the Bankruptcy Code and

Bankruptcy Rule 9019, Approving a Settlement and Plan Support Agreement and Granting Related Relief (Docket No. 2802) (the "Second Swap Settlement Motion").

Under the agreement proposed in the Second Swap Settlement Motion (the "Swap Settlement Agreement"), the City would continue to make quarterly payments to the Swap Counterparties up to the aggregate sum of $85 million in cash – less a credit of approximately $12.6 million that is currently being held by the Swap Counterparties in segregated accounts – in full satisfaction of the claims between the parties. In addition to this approximately 70 percent reduction in the payment amount, the City would make such payments in manageable amounts over time, rather than in a lump sum. The City would continue to make quarterly payments to the Swap Counterparties (as it has done to this point) until the City emerges from chapter 9, and 30 days after the Effective Date – if the City is able to raise the requisite exit financing – the balance of the $85 million would be due. If not, the City would have another 180 days to pay any remaining balance under certain conditions. As a result of this materially reduced settlement amount and extended payment schedule, the City no longer would require incremental post-petition financing to settle its differences with the Swap Counterparties. In addition to agreeing to accept a significant impairment of their Claims, the Swap Settlement Agreement contemplated that the Swap Counterparties would release their claims against the City and vote in favor of a plan of adjustment proposed by the City that affords them with the treatment described above.

The Swap Settlement Agreement promises to provide other important benefits to the City in its overall rehabilitative efforts. In addition to providing a 70% discount off of the amount that would allegedly be payable by the City, the settlement will provide greater certainty with respect to the City's cash flows and liquidity by ensuring that the City will have continued access to its Casino Revenues and will not have an obligation to put aside monies in a disputed claims reserve for the benefit of the Swap Counterparties. This greater certainty with respect to the City's cash flows and liquidity will simplify the City's ability to obtain quality of life financing to improve vital services for the citizens of Detroit. The Swap Settlement Agreement also puts the City in a better position to make additional consensual deals with other creditors by expanding the options available to it during ongoing negotiations and mediation. A number of objections and other responses were filed to the Second Swap Settlement Motion (*e.g.*, Docket Nos. 3028, 3032-34, 3037, 3040, 3043, 3049-51), and discovery is underway. On March 26, 2014, the City filed a supplement to the Second Swap Settlement Motion attaching the Swap Settlement Agreement and a revised proposed form of order. The Bankruptcy Court has scheduled a hearing on the Second Swap Settlement Motion for April 3, 2014.

### 3. Litigation Regarding the COPs

On January 31, 2014, the City filed a complaint against the Service Corporations and the Funding Trusts alleging that the 2005 and 2006 transactions and agreements resulting in the sale of the COPs to the public was invalid, illegal and unenforceable because the $1.5 billion of debt incurred by the City exceeded the City's statutory debt limit and was not incurred in conformity with other state laws. The complaint alleges that, to eliminate a large portion of the underfunding existing in the City's two public employee pension plans, the City borrowed approximately $1.5 billion through the sale of the COPs to the public – even though it had only $660 million remaining under its statutory debt limit at the time – by engaging in a series of transactions aimed at effectively circumventing the debt limit. To do this, the City created two non-profit shell corporations with which it entered into the Service Contracts, whereby the City promised to make periodic payments to the Service Corporations in amounts identical to the debt service owing on the COPs (which COPs were to be issued by the discrete Funding Trusts that were created for that purpose). Through the establishment of this structure and payment mechanism, the City was advised that it could call the payments it made to the Service Corporations "contractual obligations" rather than "debt," thereby avoiding the statutory debt limit. In its complaint, however, the City has alleged that the purpose and effect of the COPs transactions was the incurrence of debt in excess of the debt limit because the Service Corporations have provided no ongoing services to the City that would justify treating the City's payments as contractual obligations instead of debt. As a result, any amount of indebtedness in excess of the City's statutory debt limit is illegal and unenforceable. Moreover, the complaint alleges that, to avoid characterizing the COPs payments as debt, the City failed to comply with other requirements of state law for the issuance of debt, including obtaining required approvals from the State Treasurer. These failures render the entirety of the debt incurred by the City in the COPs transactions illegal and unenforceable. The complaint seeks (a) a declaratory judgment that the COPs transactions are illegal, void and of no effect whatsoever; (b) a declaratory judgment that any Claims based on the City's obligations under the Service Contracts on account of the COPs should be disallowed pursuant to 11 U.S.C. § 502(b)(1); and (c) an injunction prohibiting the defendants from taking any action to require the City to make payments or provide distributions under a plan of adjustment on account of the COPs.

The Funding Trusts answered the complaint on March 17, 2014, through Wilmington Trust, N.A., the Trustee of the Funding Trusts and Contract Administrator for the 2005 and 2006 transactions. In their answer, the Funding Trusts

deny the City's allegations that the COPs transactions caused the City to exceed its statutory debt limit and created debt not in conformity with other state laws. The Funding Trusts also raised several affirmative defenses, including that (a) the complaint fails to state a claim for relief; (b) the claims are barred for failure to name the two Retirement Systems, which are indispensable parties; (c) the claims are barred by the statute of limitations, and the doctrines of laches, waiver, estoppel, unclean hands, in pari delicto, and consent; (d) the claims are barred by the City's representations and warranties, the principles of quasi-contract or unjust enrichment, and public policy; (e) the City has failed to demonstrate that a declaratory judgment or injunction is appropriate; (f) recovery by the City would violate several constitutional limitations, including the doctrines of constitutional supremacy, due process, and unconstitutional takings; (g) any recovery by the City would be fraudulent and amount to unlawful conversion; and (h) the City lacks standing to pursue its claims. The Funding Trusts also asserted several counterclaims against the City, for which they seek damages plus costs and attorneys' fees, including (a) breach of contract, (b) breach of warranties, (c) fraudulent inducement, (d) fraudulent misrepresentation, (e) negligent misrepresentation, (f) unjust enrichment, (g) unconstitutional takings, (h) violations of due process, and (i) unlawful conversion. On the same day that the Funding Trusts answered the complaint – March 17, 2014 – motions to intervene in the adversary proceeding were filed by Financial Guarantee Insurance Company, an insurer of the COPs, and several COPs holders. The parties seeking to intervene attached proposed answers to the City's complaint, in which they assert many of the same affirmative defenses and propose many of the same counterclaims against the City. Both proposed intervenors also included a third-party complaint against the Retirement Systems, seeking recovery of the proceeds of the COPs under theories of unjust enrichment and constructive trust in the event that the COPs transactions are declared invalid. Finally, although the Service Corporations initially failed to file a timely answer to the complaint, they have since retained counsel and are due to file an answer by April 10, 2014.

## F.       Mediation

In addition to mediation of the Swap Settlement Motion disputes, the City has devoted substantial time and effort to negotiating other key restructuring issues through a mediation program established by the Bankruptcy Court to facilitate these efforts. On August 13, 2013, the Bankruptcy Court entered its "Mediation Order" (Docket No. 322), stating the Bankruptcy Court's belief that "it is necessary and appropriate to order the parties to engage in the facilitative mediation of any matters that the [Bankruptcy] Court refers in this case." Paragraph 2 of the Mediation Order appointed (with his consent) Judge Rosen to serve as the primary mediator for purposes of such facilitative mediation and authorized Judge Rosen "to enter any order necessary for the facilitation of mediation proceedings." Paragraph 3 of the Mediation Order further authorized Judge Rosen to direct the parties to engage in facilitative mediation of any substantive, process or discovery issue (as such issues were referred by the Bankruptcy Court) before any mediators (judicial or non-judicial) as Judge Rosen might appoint. Judge Rosen appointed the following individuals to assist him with the mediation of various issues that might be referred by the Bankruptcy Court: (1) Judge Victoria Roberts (E.D. Mich.) (lead mediator on labor issues); (2) Judge Perris (lead mediator on borrowed money and swap issues); (3) Judge Wiley Daniel (D. Colo.) (lead mediator on OPEB issues); (4) former Judge David Coar (N.D. Ill.); (5) Eugene Driker (lead mediator on pension issues); and (6) Professor Gina Torielli (Thomas Cooley Law School) (consultant to the mediators on public finance issues).

### 1.       Restructuring Mediation

On August 16, 2013, the Bankruptcy Court entered its First Order Referring Matters to Facilitative Mediation (Docket No. 333), referring (a) the treatment of the Claims of the various creditor classes in a plan of adjustment and (b) the negotiation and renegotiation of CBAs for facilitative mediation. Pursuant to certain orders of the District Court (Docket Nos. 334; 527; 704), the initial facilitative mediation session on such issues – involving the City, the Emergency Manager, the Retiree Committee, the Retirement Systems, AFSCME, the UAW, U.S. Bank, certain public safety unions, certain insurers, certain holders of the City's debt obligations, the DDA, the State and the Michigan Attorney General – was scheduled for, and held on, September 17, 2013. Numerous additional mediation sessions among the foregoing parties, or subsets of that group, followed.

### 2.       Labor/OPEB Mediation

On October 7, 2013, the Bankruptcy Court entered its Third Order Referring Matters to Facilitative Mediation (Docket No. 1101) (the "Third Mediation Order"), referring for facilitative mediation all disputes between the City, on one hand, and the following unions on the other: (a) Assistant Supervisors of Street Maintenance & Construction Association; (b) Association of City of Detroit Supervisors; (c) Association of Detroit Engineers; (d) Association of Municipal Engineers; (e) Association of Municipal Inspectors; (f) Association of Professional Construction Inspectors; (g) Association of Professional & Technical Employees; (h) Building & Construction Trades Council; (i) Detroit Income Tax Investigators Association; (j) Emergency Medical Service Officers Association (EMSOA); (k) Field Engineers Association;

(l) International Union of Operating Engineers Local 324 – Operating Engineers, Detroit Principal Clerks & Park Management; (m) Police Officers Association of Michigan; (n) Police Officers Labor Council; (o) Police Officers Labor Council – Health Department; (p) Police Officers Labor Council – Detention Facility Officers; (q) Senior Accountants, Analysts & Appraisers Association; (r) Service Employees International Union ("SEIU") Local 517M – Supervisory & Non Supervisory Units; (s) SEIU Local 517M – Professional & Technical Unit; and (t) Teamsters, Local 214. The City has participated in numerous mediation sessions with these unions – as well as several other unions not specifically referenced in the Third Mediation Order.

### 3.      Other Mediation

In addition to facilitative mediation proceedings under the Mediation Order, the City obtained approval of certain alternative dispute resolution procedures (the "ADR Procedures") to assist in liquidating certain contingent, unliquidated or disputed Claims designated by the City for resolution through the ADR Procedures. Outside of the facilitative mediation sessions and the ADR Procedures throughout the process of developing the Plan, the City has engaged in dialogues with unions, pension systems, debtholders (trustees, individual holders and *ad hoc* groups), the Retiree Committee and other interested parties.

### G.      Postpetition Financing

As described in more detail below, in order to fund the proposed settlement with the Swap Counterparties and obtain monies necessary to make critical reinvestments in the City, the City determined to obtain postpetition financing. On November 5, 2013, the City moved the Bankruptcy Court (Docket No. 1520) (the "Financing Motion") for entry of an order authorizing the City to, among other things, obtain senior secured postpetition financing on a superpriority basis and on the terms and conditions set forth in (1) the Commitment Letter dated October 6, 2013 by and among the City and Barclays Capital Inc. ("Barclays"), (2) those certain Bond Purchase Agreements by and among the City and Barclays Capital Inc., as Purchaser and (3) the Financial Recovery Bond Trust Indenture by and among the City and the indenture trustee to be named thereunder.

The Financing Motion originally sought approval of $350 million in secured postpetition financing, of which $230 million was to be used to fund the settlement (the "Initial Swap Settlement") with the Swap Counterparties (the "Swap Termination Loan") and $120 million was to be used to advance certain key investment initiatives of the City (the "Quality of Life Loan"), as described in more detail below. After filing the Financing Motion, the City renegotiated the settlement with the Swap Counterparties, which resulted in the requested Swap Termination Loan being reduced to $165 million (with the requested Quality of Life Loan remaining at $120 million). Thus, as a result of the renegotiated settlement, the total amount of secured postpetition financing sought by the City pursuant to the Financing Motion was reduced to $285 million, with Barclays' consent.

The City proposed securing the Quality of Life Loan by granting Barclays (1) a first priority lien on (a) taxes owing to the City in respect of the gross receipts earned by each of the City's casinos (the "Pledged Wagering Tax Revenue") and (b) all net proceeds derived from a transaction or series of related transactions involving the voluntary disposition or monetization of any City owned asset that generates net cash proceeds from such transaction or series of transactions exceeding $10,000,000 (the "Asset Proceeds Collateral") and (2) a second priority lien on the income tax revenues of the City (the "Pledged Income Tax Revenue"), and together with the Pledged Wagering Tax Revenue and the Asset Proceeds Collateral, the "QOL Financing Collateral").

Importantly, the Swap Counterparties assert, as a result of a 2009 collateral agreement, a first lien on the Pledged Wagering Revenues. Following termination of the Swap Agreements as contemplated in the Initial Swap Settlement, the Swap Counterparties asserted liens in the Pledged Wagering Revenues would have been released, thus allowing the City to pledge a first lien in the Pledged Wagering Revenues to Barclays in connection with the Quality of Life Loan.

The City proposed securing the Swap Termination Loan by granting Barclays a first priority lien on: (1) Asset Proceeds Collateral (on a pari passu basis with the liens granted in connection with the Quality of Life Loan) and (2) Pledged Income Tax Revenue (collectively, the "Swap Termination Financing Collateral").

As discussed in Section VIII.E.2, on January 17, 2014, the Bankruptcy Court issued an order (Docket No. 2511) declining to approve the Swap Settlement Motion or the portion of the Postpetition Financing that was to be used to finance the payment of the Optional Termination Payment. In its ruling on the Financing Motion and the Swap Settlement Motion on January 16, 2014 (the "Ruling"), however, the Bankruptcy Court stated that it would approve in principle the Financing

Motion with respect to the Quality of Life Loan, thereby potentially authorizing the City to obtain postpetition secured financing of up to $120 million, subject to certain conditions, including that, so long as Pledged Wagering Revenues were used as collateral to secure the Quality of Life Loan, the proceeds of the Quality of Life Loan could only be used for functions enumerated in the Michigan Gaming Act and may not be used for working capital.

On January 17, 2014, Syncora filed a notice of appeal (Docket No. 2515) to the Ruling. Also on January 17, 2014, Syncora filed an emergency motion for a stay pending its appeal (Docket No. 2516), as well as an ex parte motion to expedite the hearing thereon (Docket No. 2518). On January 21, 2014, Hypothekenbank Frankfurt AG; Hypothekenbank Frankfurt International S.A.; Erste Europaische Pfandbrief- und Kommunalkreditbank Aktiengesellschaft in Luxemburg S.A. also filed a joint notice of appeal (Docket No. 2529) of the Ruling and joined Syncora's motion for a stay pending appeal (Docket No. 2530). The Bankruptcy Court has taken the position that its Ruling is not an "order" subject to appeal, and as such, the appeals have not yet proceeded.

Following the Ruling, the City and Barclays engaged in discussions about proceeding with only the Quality of Life Financing. With the denial of the Swap Settlement Motion, the previous structure of the Quality of Life Loan was no longer viable because the City would not be in a position to deliver an undisputed first lien in the Pledged Wagering Revenues. Consequently, Barclays would no longer be agreeable to lending against the Pledged Wagering Tax Revenue as collateral.

As a result, the City and Barclays agreed to an amended structure for the Quality of Life Loan (the "Amended Quality of Life Loan"). The key change to the structure of the financing was to the collateral securing the Amended Quality of Life Loan, which is now comprised of (1) the Pledged Income Tax Revenues and (2) Asset Proceeds Collateral. The Asset Proceeds Collateral expressly excludes assets owned by the City, or assets in which the City holds an interest, which are held by the Detroit Institute of Arts. The other material terms of the Amended Quality of Life Loan are substantially similar to those proposed in the Financing Motion.

On March 6, 2014, the City filed the Notice of Presentment of Final Order to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921, and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Status and (III) Modifying Automatic Stay (Docket No. 2921) (the "NOP"). Through the NOP, the City sought entry of a final order approving the Amended Quality of Life Loan.

On or around March 13, 2014 the following objections were filed in opposition to the NOP:

- the Objection of Hypothekenbank Frankfurt AG; Hypothekenbank Frankfurt International S.A.; Erste Europaische Pfandbrief- und Kommunalkreditbank Aktiengesellschaft in Luxemburg S.A.; FMS Wertmanagement AoR; Syncora Guarantee Inc.; Syncora Capital Assurance Inc.; and Wilmington Trust, National Association, as Successor Contract Administrator (Docket No. 3012) (the "Group Objection"); and

- the Limited Objection of the Detroit Retirement Systems (Docket No. 3015) (the "Retirement Systems Objection" and together with the Group Objection, collectively, the "Objections").

On March 28, 2014, the City filed its reply to the Objections. A hearing to consider entry of a final order approving the Amended Quality of Life Loan is scheduled for April 2, 2014 at 9:00 a.m. (Eastern Time). Although the funds sought via the Postpetition Financing would not address all of the City's reinvestment initiatives, the Postpetition Financing would kick-start this long-term reinvestment process. Without borrowed funds, there is a material risk that the City would have to substantially cut back or eliminate certain reinvestment efforts in the near-term.

## H.     Claims Process and Establishment of Bar Dates

### 1.     Section 924/925 Lists

Section 924 of the Bankruptcy Code requires the City to file a list of creditors. Section 925 of the Bankruptcy Code provides that "[a] proof of claim is deemed filed" for claims set forth on the list of creditors required by section 924 of the Bankruptcy Code except as to claims that are "listed as disputed, contingent, or unliquidated." 11 U.S.C. § 925. As discussed in greater detail in Section VII.B of this Disclosure Statement, the City has filed a List of Claims which satisfies the requirements of sections 924 and 925 of the Bankruptcy Code.

## 2.    Bar Date Order

Pursuant to an order dated November 21, 2013 (Docket No. 1782) (the "Bar Date Order"), the Bankruptcy Court established the following bar dates for filing proofs of claim in this chapter 9 case:

- February 21, 2014 at 5:00 p.m., Eastern Time, as the general bar date for the filing of all proofs of claim (the "General Bar Date"), except as noted below;

- 5:00 p.m. on the date that is 180 days after the date of entry of an order for relief in the City's chapter 9 case (*i.e.*, June 3, 2014) as the bar date for government units holding Claims against the City;

- the later of (a) the General Bar Date or (b) 5:00 p.m., Eastern Time, on the date that is 30 days after the date of entry of the applicable order rejecting an executory contract or unexpired lease as the bar date for any Claims arising from the rejection of such executory contract or unexpired lease;

- the later of (a) the General Bar Date or (b) 5:00 p.m., Eastern Time, on the date that is 30 days after the date that a notice of an amendment to the List of Claims is served on a claimant as the bar date for any Claims relating to such amendment to the List of Claims.

Pursuant to the Bar Date Order, parties holding the following Claims, among others, were not required to file proofs of claim in the City's chapter 9 case on account of such Claims:

- any Claim for liabilities associated with post-employment benefits under the Health/Life Plan, the Supplemental Plan or other non-pension post-employment welfare benefits, including unfunded actuarially accrued liabilities;

- any Claim by present or potential future beneficiaries of GRS and PFRS for pension benefits or unfunded pension liabilities;

- any Claim of (or on behalf of) an active employee for ordinary course compensation and employment benefits, including, without limitation, wages, salaries, employee medical benefits and/or insurance;

- any Claim by a Holder for the repayment of principal, interest and/or other applicable fees and charges on or under (a) various bonds and (b) the COPs; and

- any Claim arising from an ordinary course entitlement to an income tax refund (to the extent of such claimed entitlement) asserted through the City's established income tax refund procedures.

In addition, under the Bar Date Order, the Retiree Committee was authorized to file one or more protective proofs of claim on behalf of Retirees and their beneficiaries on account of Pension Claims and OPEB Claims, subject to the City's rights to object to such Claims on all available grounds.

## 3.    ADR Procedures

On November 12, 2013, the City filed the Motion of Debtor, Pursuant to Sections 105 and 502 of the Bankruptcy Code, for Entry of an Order Approving Alternative Dispute Resolution Procedures to Promote the Liquidation of Certain Prepetition Claims (Docket No. 1665) (the "ADR Procedures Motion") seeking the approval of the ADR Procedures to facilitate the resolution of certain contingent, unliquidated and/or disputed prepetition Claims. The City developed the ADR Procedures in consultation with the Wayne County Mediation Tribunal Association (the "MTA"). The MTA is an independent nonprofit organization created in 1979 by the Third Judicial Circuit Court of Michigan to provide a pool of mediators and to administer procedures for the out-of-court resolution of certain cases brought in the Circuit Court. Since that time, the MTA's role has expanded to include varied alternative dispute resolution services including, as applicable herein, case evaluation ("Case Evaluation") and arbitration services. The MTA's leading role in providing Case Evaluation services in the Detroit area is recognized by Local Rule 16.3 of the United States District Court for the Eastern District of Michigan, which also incorporates Rule 2.403 of the Michigan Court Rules of 1985 ("MCR") setting forth various procedures for Case Evaluation. In addition, where Case Evaluation alone is unsuccessful in resolving a Claim, the MTA has substantial experience facilitating and coordinating binding arbitration proceedings.

As proposed by the City in the ADR Procedures Motion, the ADR Procedures contemplate the imposition of mandatory alternative dispute resolution procedures on certain Claims designated by the City, in its sole discretion (collectively, the "Designated Claims").  During the period prior to the completion of the ADR Procedures, the Holders of Designated Claims are enjoined from filing or prosecuting any motion (any such motion, a "Stay Relief Motion") for relief from the Chapter 9 Stay, or otherwise seeking to establish, liquidate, collect on or enforce the applicable Designated Claim(s).  In addition, the City proposed that certain types of Claims including:  (a) personal injury tort or wrongful death Claims; (b) property damage Claims; or (c) Claims relating to the operation of motor vehicles for which the City is self-insured pursuant to chapter 31 of Michigan's Insurance Code of 1956, MCL §§ 500.3101 et seq. are appropriate for liquidation through the ADR Procedures should be considered to be Designated Claims even in advance of the City serving notice of their designation on the applicable claimant.  The ADR Procedures, therefore, contemplate that, for the period commencing on the date of entry of an order approving the relief requested in the ADR Procedures Motion until the date that is 119 days after the General Bar Date, any claimant holding an Initial Designated Claim (and any other person or entity asserting an interest in such Claim) will be enjoined from filing or prosecuting, with respect to such Initial Designated Claim, any Stay Relief Motion or similar motion for relief from any injunction that may be imposed upon the confirmation or effectiveness of a Plan.

Throughout the ADR Procedures, the City retains the authority to settle any Designated Claim by agreement or to terminate the ADR Procedures with respect to any Designated Claim and proceed to liquidation of the Designated Claim in an appropriate forum.  The ADR Procedures proposed by the City generally consist of three phases, as follows:

- Offer Exchange.  Pursuant to the ADR Procedures, the City is required to make an offer to liquidate the claimant's Designated Claim in the notice informing a claimant that its Claim has been designated to the ADR Procedures.  The claimant has a period of 28 days to respond to the City's offer and is permitted to make a counteroffer.  The City then has a period of 14 days to respond to the claimant's counteroffer. The ADR Procedures contemplate further periods of negotiation and offer exchange, where appropriate.

- Case Evaluation.  If the Designated Claim is not resolved through the offer exchange phase of the ADR Procedures then the Designated Claim proceeds to Case Evaluation before the MTA under the procedures set forth in MCR §§ 2.403 and 2.404.  Following Case Evaluation, the parties have a period of 28 days to accept or reject the valuation provided by the MTA.  If the City and the claimant do not both accept the MTA's valuation of the Designated Claim, then the parties have a further 28 days to negotiate a resolution of the Claim.

- Optional Binding Arbitration.  The final phase of the ADR Procedures is binding arbitration, if previously consented to by the Holder of a Designated Claim in writing as a means to resolve its Designated Claim (either in its response to the City's notice designating the Designated Claim or by the terms of a separate written agreement either before or after the Petition Date), and if the City agrees to binding arbitration.

Several parties filed responses to the ADR Procedures Motion (see Docket Nos. 1763, 1765, 1828, 1834, 1866, 1902, 1915, 2211).  In addition, the City received informal responses to the ADR Procedures Motion from a number of parties.  These responses generally (a) sought clarification that the ADR Procedures would not apply to certain specific classes of Claims or else (b) special accommodations with respect to certain types of Claim.  The City worked with these parties and, where possible, incorporated their suggestions into the ADR Procedures.  In connection with the resolution of the responses to the ADR Procedures Motion, among other modifications to the ADR Procedures, the City agreed that the following types of Claim would not be subject to the ADR Procedures:

- Claims solely for unpaid pension contributions, unfunded actuarially accrued pension liabilities and/or unpaid pension benefits (whether asserted by the PFRS, the GRS or directly or derivatively by or on behalf of Retirees or active employees, and whether filed by the applicable claimant or scheduled by the City);

- Claims for liabilities associated with post-employment benefits under the Health/Life Benefit Plan, the Supplemental Plan or other non-pension post employment welfare benefits, including unfunded actuarially accrued liabilities;

- Claims arising from labor-related grievances;

- Claims solely asserting workers' compensation liabilities against the City;

- Claims, if any, arising from or related to the Service Contracts;

- Claims by Holders for amounts owed under the City's Unlimited Tax General Obligation Bonds, Limited Tax General Obligation Bonds and General Fund bonds and related Claims by bond insurers; and

- Claims filed by the United States government.

On December 24, 2013, the Bankruptcy Court entered an order (Docket No. 2302) (the "ADR Procedures Order") granting the relief requested in the ADR Procedures Motion and approving the ADR Procedures, as modified, except with respect to lawsuits alleging claims against the City, its employees or both under 42 U.S.C. § 1983 that are pending in the District Court (collectively, the "1983 Claims"). Pursuant to the ADR Procedures Order, all pending 1983 Claims were referred to Judge Rosen for mediation under such procedures as he determines.

## I. Chapter 9 Stay Matters

### 1. Generally

Since the Petition Date, the Emergency Manager has taken various steps to preserve the benefits and protections afforded by the Chapter 9 Stay. For example, at the outset of this chapter 9 case, the City obtained orders of the Bankruptcy Court: (a) confirming the application of the Chapter 9 Stay to the City and its officers and inhabitants; and (b) extending the protections of the Chapter 9 Stay to, among others, (i) non-officer City employees, (ii) certain state officials and (iii) the 36th District Court (a non-debtor entity for which the City generally is financially responsible). The Chapter 9 Stay has provided the City with an important "breathing spell" to address the City's financial circumstances and craft a plan of adjustment without interference from adverse creditor actions.

### 2. Challenges to PA 436 (Phillips)

Several parties have filed Stay Relief Motions to allow them to continue their prepetition challenges to the constitutionality of PA 436. In particular, on March 27, 2013, Catherine Phillips and several other plaintiffs (collectively, the "Phillips Plaintiffs") filed a lawsuit (the "Phillips Lawsuit") in the District Court against the Governor and the State Treasurer, asserting that PA 436 is unconstitutional. The lawsuit seeks damages, declaratory relief and injunctive relief, including relief "restraining the Defendants and any present and future [emergency managers] from implementing or exercising authority and powers purportedly conveyed by [PA 436]." Following the commencement of the City's chapter 9 case, the Phillips Plaintiffs filed a motion (Docket No. 1004) (the "Phillips Stay Relief Motion") seeking relief from the Chapter 9 Stay to allow them to continue the Phillips Lawsuit.

In addition, on May 13, 2013, various plaintiffs related to the NAACP (collectively, the "NAACP Plaintiffs") commenced a lawsuit (the "NAACP Lawsuit") in the District Court against the Governor, the State Treasurer and the Michigan Secretary of State, Ruth Johnson, in their official capacities, alleging that PA 436 violates constitutional voting rights under the Equal Protection and Due Process Clauses of the 14th Amendment to the United States Constitution. In their first amended complaint, filed June 27, 2013, the plaintiffs sought (a) to enjoin the defendants and others from implementing or enforcing PA 436, (b) an order prohibiting any emergency manager appointed under PA 436 from exercising any authority, (c) an order that actions exercised by any emergency manager are unenforceable and (d) preclearance of the cities and school districts currently with emergency managers under Section 3(c) of the Voting Rights Act. On September 6, 2013, the NAACP Plaintiffs filed a motion (Docket No. 740) for relief from the Chapter 9 Stay to allow the NAACP Lawsuit to continue in the District Court.

On November 6, 2013, the Court entered an order (Docket No. 1536) (the "PA 436 Challenge Stay Order") granting the relief requested by the Phillips Plaintiffs with respect to the Phillips Stay Relief Motion and thereby allowing the Phillips Lawsuit to continue. In addition, the Court denied the relief requested by the NAACP Plaintiffs with respect to the NAACP Lawsuit. According to the Court, the primary, if not sole, objective of the NAACP Lawsuit was the removal of the Emergency Manager. As such, the continuation of the NAACP Lawsuit would interfere with the City's chapter 9 case. The PA 436 Challenge Stay Order has been appealed by the NAACP, the State and the City, and each of these appeals is currently pending before the District Court.

## J.    Fee Matters

A municipality may retain professionals in its discretion to assist with a chapter 9 case, and those professionals may be paid their customary fees without the need to file applications for compensation with the bankruptcy court and await court approval.  One of the requirements for the confirmation of a plan of debt adjustment in chapter 9, however, is that all amounts paid by the debtor for services in connection with the plan have to be fully disclosed and reasonable.

A chapter 9 debtor is not required to pay the fees and expenses of professionals that represent an official committee.  Although chapter 9 incorporates the provision of the Bankruptcy Code that provides for the potential appointment of an official committee, it does not incorporate the provision of the Bankruptcy Code that requires the debtor to pay the professional fees and other costs of an official committee.  As a practical matter, however, a municipality may agree – as the City did in this case, as discussed below – to pay the reasonable professional fees of an official committee to facilitate the negotiation of a consensual plan of adjustment.

In the City's chapter 9 case, the Bankruptcy Court appointed a fee examiner (the "Fee Examiner") to review professional fees for reasonableness on an ongoing basis pursuant to the Order Appointing Fee Examiner entered on August 18, 2013 (Docket No. 383).  Consistent with this order, the City's attorneys and the Fee Examiner negotiated and submitted to the Bankruptcy Court a proposed order establishing a protocol for the Fee Examiner's review of professional fees, the Fee Review Order.  Comments on the proposed Fee Review Order were solicited, and a hearing on the Fee Review Order was held on September 10, 2013.  On September 11, 2013, the Bankruptcy Court entered the Fee Review Order (Docket No. 810).

The Fee Review Order establishes procedures for, among other things, (1) the City to publicly disclose its professional fee expenses, (2) the Fee Examiner to review the City's professional fee expenses and to file reports addressing whether such expenses have been fully disclosed and are reasonable and (3) periodically disclosing and paying the Fee Examiner's fees and expenses.  Pursuant to the Fee Review Order, the City agreed to pay the reasonable fees and expenses of the professionals retained by the Retiree Committee to render services in connection with the City's chapter 9 case (together with the professionals retained by the City to render services in connection with the case, the "Professionals").

Among other things, the Fee Review Order provides that each Professional must provide to the Fee Examiner and its respective client a complete copy of its respective monthly invoice, including detailed descriptions of the services rendered and costs advanced and a summary description, by category, of the work performed (the "Monthly Invoices"), within 49 days after the end of each calendar month.  The Fee Review Order establishes a process by which the Fee Examiner and the Professionals may resolve any issues raised by the Fee Examiner regarding the reasonableness of any fees or expenses set forth in the Monthly Invoices, as well as a process for the City's payment of the Monthly Invoices.

Ordinary course professionals hired by the City not in conjunction with its chapter 9 case, but rather in the same contexts and capacities as they typically were hired by the City prior to the Petition Date, are not "Professionals" within the meaning of the Fee Review Order and their invoices are not subject to review thereunder.  Consistent with the Fee Review Order, the City submitted a list of ordinary course professionals to the Fee Examiner, which list the Fee Examiner determined to be reasonably acceptable.

## K.    Operational Restructuring Initiatives/Asset Dispositions

### 1.    DWSD Transaction

The Plan contemplates that the City may enter into a transaction (the "DWSD Transaction") that would include the transfer of the functions of the DWSD to a to-be-formed Great Lakes Water Authority (the "GLWA").  The City will enter into a DWSD Transaction only if it enables the City to make larger, more rapid or more certain distributions to at least some of its creditors as compared to the distributions specified in the Plan and described in this Disclosure Statement.  The City anticipates, however, that the impairment of Claims under the Plan will permit DWSD to conduct substantial and necessary revenue enhanced capital improvements using revenues that would otherwise have been unavailable to DWSD and applied instead to service the City's debt.

#### (a)    Potential Formation of the GLWA

The City has engaged in negotiations with the Counties of Macomb, Oakland and Wayne (the "Counties") regarding the potential formation of the GLWA, which would be created by agreement among the City and the Counties.

Upon confirmation of the Plan, the GLWA would assume operating control of most of the assets (including wholesale water and sewer service contracts) currently owned and operated by DWSD.

The GLWA would provide water and sewer services to the City's present retail customers and wholesale customers in the region and would be authorized to provide service to new customers. The City contemplates that it would lease DWSD water and sewer assets that serve wholesale customers to the GLWA. The term of the lease would be 40 years to be continued thereafter for so long as the GLWA has debt outstanding. The City would not lease to the GLWA assets that serve exclusively City retail customers (the "City Facilities"). The GLWA would enter into a contract with the City to undertake activities pertaining to the maintenance, operation, improvement and financing of the City Facilities. The term of the contract would be 20 years, to renew automatically until certain specified conditions are met.

The City would become a wholesale customer of the GLWA for water and sewer services as of the effective date of the DWSD Transaction. To assure all customers of rate stability, the GLWA would maintain Fiscal Year 2014-15 rate setting protocols for a minimum of five years, subject to certain changes intended to stabilize water and sewer revenues. Retail/wholesale rate adjustments presently in the Fiscal Year 2013-14 rates would be frozen for 10 years and then phased out. The City would immediately begin planning a rate stability program for Detroit residents.

The GLWA would make annual payments to the City for the term of the lease in an amount equal to DWSD's total allocable share of the City's liabilities under the COPs and OPEB liabilities. In addition, the GLWA would assume the net pension liability associated with DWSD employees and retirees, as accrued through the date of the DWSD Transaction. A pro rata share of the existing GRS assets and liabilities would be transferred to a retirement plan to be established and managed by the GLWA. The City and the GLWA would take all necessary actions to freeze, as of the date of the DWSD Transaction, the accruals for transferred DWSD employees. The City and the GLWA would take all necessary actions to effect the asset and liability transfer as of the date of the DWSD Transaction (or as soon as practicable thereafter). The GLWA, after the DWSD Transaction, as the plan sponsor, would have the discretion to amend, modify or terminate the successor retirement plan. The Counties would be able to undertake an independent valuation of the allocation of liabilities and assets to the GLWA.

The GLWA would not assume any City/DWSD liabilities except wholesale water and sewer contracts, those DWSD-specific trade, service and construction contracts it chooses to accept, all new labor contracts (*i.e.*, those entered into since July 1, 2012), and the net pension liability for DWSD employees and retirees. In exchange for the GLWA's payments on the lease, its assumption of DWSD's net pension liability, among other consideration, the City would not impose any other charge on the GLWA, except as may be negotiated in a specific services contract

DWSD's existing debt would be exchanged for new debt on the same terms and duration except that the new debt may have a market rate of interest and may have an immediate call "window." If possible, MDEQ will permit the refinancing of existing Drinking Water Revolving Fund and State Revolving Fund debt with a 30-year amortization. The GLWA would provide bond covenants comparable to present bond covenants. All wholesale revenue and City retail collections would be intercepted by a trustee on behalf of bondholders to hold bond payment reserves in trust and distribute the balance to the GLWA.

The new debt would be issued by the GLWA under Act 94 and would be self-liquidating revenue bonds, secured by net revenues of the systems and otherwise in the same manner as the existing water and sewer revenue bond debt of the City. The GLWA bonds would not constitute a general obligation of any member of the GLWA, and the bonds would not be secured by a pledge of the full faith and credit or taxing power of any member of the GLWA.

Benefits from the refinancing of existing debt would flow to Detroit retail and wholesale customers in proportion to their present allocated share of the existing debt service. The GLWA would establish independent capital reserves for each customer class.

To date, negotiations among the City and the Counties have not yet resulted in any agreement with respect to the formation of the GLWA.

### (b) Potential Public-Private Partnership

As a potential alternative to the DWSD Transaction described in the Plan, the City also has been in contact with 41 potentially interested parties regarding a recent request for information (the "DWSD RFI") for a discrete DWSD Transaction that would not involve the creation of a regional authority. To date, 16 parties have indicated that they intend

to submit a proposal in accordance with the DWSD RFI. The DWSD RFI provides that the Emergency Manager is considering a potential public-private partnership for the operation and management of the water system and sewage disposal system currently operated by DWSD. The DWSD RFI states that the DWSD Transaction could take the form of an operating and management agreement and would be effectuated in conjunction with confirmation of the Plan. The DWSD RFI further provides, however, that the Emergency Manager will also consider responses that contemplate alternative transaction structures, *e.g.*, a long-term lease and concession arrangement or a sale that meets the bid criteria incorporated in the DWSD RFI, while maximizing the value to the City, maintaining or enhancing the Systems' operational viability and capital needs and complying with applicable law. The DWSD RFI requires that any DWSD Transaction include a commitment to limit rate increases to no more than 4% per year for the first 10 years.

To move forward in the process, responders to the DWSD RFI must demonstrate the technical capability to operate the water system and sewage disposal system including, in particular, the following areas of expertise:

- Operation and maintenance of water and/or sewer systems.

- Customer service improvements and enhancements.

- Customer safety, security and environmental responsibilities.

- Ability to execute an efficient, timely and seamless transition plan.

- Capability to undertake required capital improvements.

- Ability to offer other system enhancements with a demonstrated knowledge of technologies.

- Applicable licenses held by the team or its members for operation of a Michigan water and sewer utility.

- Ability to comply with all applicable laws, regulations, ordinances and court orders.

In addition, responders to the DWSD RFI must demonstrate the financial capability with respect to the following areas:

- Proposed financing and, if other than internal funds, sources of such financing, including the expected schedule of commitments of funds and the steps required to secure the necessary funds.

- Financial ability related to maintaining and upgrading the assets of the systems.

- Adequate sources of operating capital.

- Ability to finance future DWSD expansion, if applicable.

- Ability to comply with all applicable state and local tax obligations.

- Collection plan for retail and wholesale customer accounts.

2.     **Modification of Retiree Benefits/Healthcare Redesign**

(a)     **Modification of Retiree Benefits**

As set forth above, the City is obligated to provide OPEB benefits expected to cost approximately $3.185 billion in current dollars to existing retirees. Essentially all of these obligations are unfunded. The City has determined that its successful restructuring must include modification to retiree health benefits. Accordingly, the City has proposed to make the following changes to the health benefits that it provides to its retired employees.

Effective March 1, 2014, the City of Detroit changed the health insurance coverage offered to Retirees. As described in more detail below, the health benefits a Retiree receives from the City effective March 1, 2014 depends

upon whether the Retiree is "Medicare eligible." Generally a Retiree is Medicare eligible if he or she is age 65 or older and has worked to earn Medicare coverage or has eligibility through a spouse.

Claims related to the City's obligations to provide OPEB benefits to retirees are further addressed by the Plan. See Section III.B.2 of this Disclosure Statement.

Effective March 1, 2014, Medicare eligible Retirees were able to select one of three Medicare Advantage insurance plans that included health and drug benefits for which the City pays most or all of the premium. Except for one of the Medicare Advantage Plan (BCBSM Medicare Plus Blue PPO), the monthly premium cost to the Medicare eligible retiree was zero. These new options were available to all City Retirees who were Medicare eligible whether or not the Retiree (i) worked as a general employee or uniformed employee prior to retirement or (ii) was part of the *Weiler* class action. If the individual was a Medicare-eligible Retiree, these were the only choices that the City offered for health coverage for 2014.

Effective March 1, 2014, non-Medicare eligible Retirees were required to obtain their own health insurance coverage (for themselves or their dependent family members). Under the Patient Protection and Affordable Care Act (the "Affordable Care Act," sometimes referred to as "Obamacare"), Health Insurance Marketplaces – also known as "exchanges" – were to be made available in every state, including Michigan. Non-Medicare eligible Retirees were permitted to enroll in and obtain an individual insurance policy to cover the Retiree and his or her family from the Health Insurance Marketplace that served the state where the Retiree lived. A non-Medicare eligible Retiree also may have been eligible to enroll in coverage offered by their current employer or their spouse's employer. For most non-Medicare eligible Retirees, effective March 1, 2014, the City agreed to provide a stipend of $125 per month ($300 or $400 per month for duty disabled non-Medicare retirees, depending upon whether the disabled person is a uniform retiree). Eligible Retirees were permitted to use this stipend for any purpose, including to defray the cost of premiums for health insurance coverage acquired through a Health Insurance Marketplace, through the Retiree's or the Retiree's spouse's employer or through other available health insurance programs.

The City no longer subsidized dental and vision coverage effective March 1, 2014 for all Retirees. All Retirees, regardless of age or Medicare eligibility, who wanted dental and vision coverage were required to pay the full cost of such coverage. The City offered Blue Cross Blue Shield of Michigan dental and Heritage Vision plan options. All other plan options were eliminated. For more information regarding modifications to retiree health benefits, please refer to the March 1, 2014 Through December 31, 2014 City of Detroit Retiree Health Care Plan (the "2014 Retiree Health Care Plan"), available at *http://www.detroitmi.gov/EmergencyManager.aspx*.

     **(b)**       **Healthcare Redesign for Active Employees**

Due to the City's need to act quickly to alleviate its dire financial situation and cash position, the City determined that it needed to make changes to the benefit plan options and health insurance benefits that it would offer to active employees in 2014. The revised medical, dental, vision, life insurance and flexible spending account benefit options described below applied to all active City employees, regardless of whether they were uniformed or non-uniformed. These benefit options also applied to any new employee enrolling in the City's medical, dental, vision, life insurance and flexible spending account benefits for the first time. In general, the City made changes to medical coverage in 2014 designed to provide active employees with coverage that would be equivalent to "Gold" level coverage under the Affordable Care Act. Previously, most active employees in the City were receiving coverage that would be equivalent to "Platinum" level coverage under the Affordable Care Act.

In general, the changes for 2014 are summarized as follows:

- The City offered a PPO from Blue Cross Blue Shield of Michigan, and an HMO option from Health Alliance Plan.

- The PPO and HMO options increased the annual deductible amount to $750.

- The PPO and HMO options increased the out-of-pocket annual coinsurance maximum payment for family coverage to $4,500. The out-of-pocket annual coinsurance maximum excluded the deductible.

- All active employees were required to pay 20% of the premium cost for health care coverage. This share is the same percentage that most active employees paid in 2013, generally for higher cost coverage.

- In 2014, most employees will pay less than they did in 2013.

Beginning January 1, 2014, the City offered all health care plan eligible employees the option to elect participation in a Flexible Spending Account ("FSA"). There were three pre-tax options available with the FSA – health care, day care, and commuter benefit.

Also in 2014, there was one dental and one vision benefit option available. The dental option will be Traditional Blue Cross Blue Shield of Michigan and the vision option will be Heritage Vision Plans. The life insurance plan remained unchanged.

If the City employs more than one member of a family, or the family unit includes a Retiree of the City, the spouse and eligible dependents of that family were covered by one City employee – no duplicate coverage was permitted. Furthermore, a Retiree of the City was prohibited from being enrolled as a spouse of an active employee. Only a Retiree could receive Retiree health coverage. It was the responsibility of the family to select a single health plan. Under no circumstances was the City obligated to provide more than one health policy or plan, or duplicate coverage for any employee or dependent.

Active employees were required to enroll for coverage. If an active employee who was enrolled in health care coverage failed to complete the mandatory enrollment process, the employee (i) defaulted to single medical only coverage, as described in the chart below, and (ii) was not enrolled in dental or vision. In addition, that employee's spouse and children did not have coverage from the City in 2014. If an active employee who was not enrolled in health care coverage does not complete the mandatory enrollment process, that employee did not have medical, dental or vision coverage from the City in 2014. If an active employee did nothing, he or she automatically became enrolled for 2014 as set forth below:

| Current (2013 Plan) | NEW 2014 Carrier | NEW 2014 Coverage Level |
|---|---|---|
| Community Blue PPO | Community Blue PPO | SINGLE |
| Blue Care Network HMO | Community Blue PPO | SINGLE |
| HAP HMO | HAP HMO | SINGLE |
| Total Health Care HMO | Community Blue PPO | SINGLE |
| US Health (COPS Trust) | Community Blue PPO | SINGLE |
| Any Dental Plan | BCBS Dental | NO COVERAGE |
| Any Vision Plan | Heritage Vision | NO COVERAGE |
| Not Enrolled in Medical, Dental or Vision | NO COVERAGE | NO COVERAGE |

For more information regarding modifications to active employee benefits, please refer to the 2014 City of Detroit Active Employee Benefits booklet, available at *http://www.detroitmi.gov/EmergencyManager.aspx*.

**(c)      Litigation with Retiree Representatives**

On October 22, 2013, the Retiree Committee, the DRCEA, the RDPFFA and AFSCME Subchapter 98, City of Detroit Retirees (collectively, the "Retiree Representatives") filed a complaint against the City and Kevyn Orr, individually and in his official capacity as Emergency Manager, thereby commencing an adversary proceeding in the Bankruptcy Court (Adv. Proc. No. 13-05244) (the "First Retiree Proceeding"), together with a motion for: (i) a preliminary injunction to enjoin the defendants from modifying retiree benefits or; (ii) in the alternative, relief from the automatic stay to seek the requested injunctive relief a non-bankruptcy forum (Adv. Proc. Docket No. 3). The City and Mr. Orr disputed the relief sought in the preliminary injunction motion on the grounds that, among other things, the Bankruptcy Court lacks jurisdiction – as a result of section 904 of the Bankruptcy Code and as affirmed in a recent decision from the bankruptcy court in the chapter 9 case of the City of Stockton, California – to enjoin the City from modifying retiree benefits.

Initially, the City had proposed that the modifications to retiree health benefits set forth in the 2014 Retiree Health Care Plan would take effect on January 1, 2014. Due to delays associated with the roll out of the federal government's Health Insurance Marketplace website, however, the City decided to delay the effective date of its modifications for non-

Medicare-eligible retirees until January 31, 2014. In its negotiations with the Retiree Committee regarding the preliminary injunction motion, the City agreed to further extend the effective date of the modifications for all retirees until February 28, 2014, as set forth above. As a result, on November 8, 2013, prior to the filing of the defendants' objection to the preliminary injunction motion, the Retiree Representatives voluntarily dismissed without prejudice all claims pending against the City in the First Retiree Proceeding (Adv. Proc. Docket No. 34).

On January 9, 2014, the Retiree Representatives commenced a second proceeding against the City and the Emergency Manager (the "Second Retiree Proceeding"), captioned as Official Committee of Retirees of the City of Detroit, Michigan, et al. v. City of Detroit, Michigan, et al., (Adv. Proc. No. 14-04015), seeking a preliminary injunction to enjoin the defendants from implementing the retiree healthcare modifications announced by the Emergency Manager effective March 1, 2014 and described in Section VIII.K.2.a of this Disclosure Statement. By a settlement agreement effective February 14, 2014, the parties agreed to certain modifications to the changes to retiree health benefits set forth in the 2014 Retiree Health Care Plan. The settlement agreement modifications include an obligation by the City to provide additional stipend amounts during a portion of 2014 to Non-Medicare eligible Retirees and to offer Medicare eligible retirees certain additional options. The complete terms and conditions of the settlement agreement are set forth in Exhibit I.A.227 to the Plan. On March 28, 2014, the parties to the Second Retiree Proceeding filed a stipulated proposed order of dismissal (Adv. Proc. Docket No. 48) with the Bankruptcy Court.

3.      Transition of Lighting Grid to DTE

The City's proposed restructuring/reinvestment initiatives with respect to its electricity grid are focused on the following objectives: (a) improving the performance of the grid and the services provided to the citizens of Detroit; (b) decommissioning, as necessary, certain segments of the grid, certain substations and the Mistersky power plant; and (c) increasing revenue collection from customers. To achieve these objectives, the City has entered into an "Energy Services Delivery Agreement" with DTE, whereby the City will exit the electricity business by migrating customers to DTE over a seven-year period, with DTE paying capital and transition costs. In year one of this seven-year build-out, meters will be changed to DTE's system and customers will be transitioned to DTE. In years two to seven of the build-out, customers will migrate to DTE's grid on a substation by substation basis as the PLD operation is simultaneously scaled down. Customers (including the City) will pay DTE's rate book, which could be higher than the current rate charged/incurred by City. Subject to regulatory approval, PLD workers and/or third party contractors will operate and maintain the City's electrical grid until the build-out is finished, with DTE reimbursing the City for the costs of such operation and maintenance.

4.      Transition of Lighting Work to PLA

The City's proposed restructuring/reinvestment initiatives with respect to its lighting work are focused on the following objectives: (a) implementing a current population-based streetlight footprint, (b) outsourcing operations and maintenance to the newly-created PLA structure, (c) improving service to citizens and (d) achieving better cost management. To achieve these objectives, the City has begun a systematic effort to address bulb outages and restore light. In addition, the City has obtained an order of the Bankruptcy Court (Docket No. 1955) (the "PLA Order") authorizing the City to enter into and perform under certain transaction documents with the PLA, as described below. On December 20, 2013, Syncora filed a notice of appeal of the PLA Order (Docket No. 2273).

On February 5, 2013, the City created the PLA, a separate municipal corporation, pursuant to Michigan Public Act 392 of 2012 (as amended), the Municipal Lighting Authority Act, MCL §§ 123.1261 et seq. ("PA 392") and the PLA Order, to manage and maintain the City's public lighting system. Pursuant to PA 392, the PLA has issued bonds (the "Act 392 Bonds"), the proceeds of which the PLA will use to construct and improve the public street lighting system of the City, pursuant to the terms of the "Interlocal Agreement for the Construction and Financing of a Public Lighting System" between the City and the PLA (the "C&F Agreement"). The PLA also will bear responsibility for the operation and maintenance of the portion of the City's public lighting system that the PLA has constructed and improved, in accordance with the terms of the "Interlocal Agreement for the Operation, Maintenance and Management of a Public Lighting System" between the City and the PLA. Under PA 392 and the various agreements with the PLA, the City has no liability for, and undertakes no full faith and credit obligation in connection with, the Act 392 Bonds or the C&F Agreement.

In connection with the transition of the City's lighting work to the PLA, the City is required to cause the existing and future revenue generated from the utility tax that it will continue to levy (the "Pledged Revenues") to be directed to Wilmington Trust, National Association, as trustee (the "Trustee") under a trust agreement by and among the City, the PLA, the Michigan Finance Authority and the Trustee, as security for, and the primary source for the repayment of, the Act 392

Bonds.  The total amount of the Pledged Revenues to which the PLA is entitled, in any calendar year, is the lesser of (a) $12.5 million and (b) the total revenues generated by the utility tax levied by the City (*i.e.*, the Trustee must disburse to the City all amounts in excess of $12.5 million).

The City believes that the transition of the City's lighting work to the PLA and the transactions described above are the City's best viable option to fix its public lighting system and provide the level of lighting services that the City's residents expect.

5.      **Belle Isle Lease**

In September 2013, the City reached an agreement with the State (the "Belle Isle Agreement") whereby the State agreed to lease Belle Isle Park for 30 years, with two optional 15-year renewals.  The Governor authorized the Belle Isle Agreement on October 1, 2013.  The Belle Isle Agreement was not immediately effective upon its signing, or upon the Governor's authorization, because pursuant to sections 12(1)(r) and 19 of PA 436, the Emergency Manager is required to submit any proposed lease of City property to the City Council for approval.  If the City Council rejects such a proposal and offers a competing proposal, section 19 of PA 436 provides that the LEFALB is empowered to review the competing proposals and issue final authorization to the proposal "that best serves the interest of the public."  MCL § 141.1559(2).  On October 14, 2013, the City Council voted to reject the Belle Isle Agreement and proposed an alternative plan involving a ten-year lease of Belle Isle Park to the State.  The LEFALB considered both proposals and, on November 12, 2013, unanimously approved the Belle Isle Agreement.

Pursuant to the Belle Isle Agreement, the State agreed to invest between $10 million and $20 million to upgrade and repair portions of Belle Isle Park during the first three years of the lease.  The City will continue to pay for Belle Isle Park's water and sewer services – costs that in recent years have totaled between $1.5 million and $2.5 million annually – but the State will pay to maintain and operate Belle Isle Park in all other respects during the lease term.  On February 10, 2014, the State began operating Belle Isle Park as a state park.  While pedestrians and bicyclists will continue to be able to access Belle Isle Park free of charge, visitors arriving by motor vehicle will be required to purchase an annual $11-per-vehicle "Recreation Passport" from the State that will provide access to all Michigan state parks.

6.      **Detroit Institute of Arts**

(a)      **Appraisal**

As discussed in Section VII.A.5.a, the City engaged Christie's to appraise the value of the DIA Collection.  On December 3, 2013, Christie's issued a preliminary report (the "Preliminary Report") (i) describing the methodology used in making the appraisal; (ii) providing a preliminary aggregate valuation of certain works in the DIA Collection; and (iii) recommending various options the City could pursue to generate revenue from the DIA Collection not involving the outright sale of any works in the DIA Collection.  As explained in the Preliminary Report, Christie's appraised a portion of the DIA Collection consisting of those works that "were either purchased entirely by the City, or in part with City funds" (the "Appraised Art").  As of the date of the Preliminary Report, the Appraised Art consisted of 2,781 works.  Both the preliminary and final appraisals conducted by Christie's were based on a fair market value ("FMV") analysis of the Appraised Art.  According to the Preliminary Report, "FMV is the price at which a work would change hands between a willing buyer and a willing seller in the relevant marketplace.  It is determined by using the market data approach which compares the subject work to similar works sold in the marketplace, makes appropriate adjustments to allow for any differences between the subject work and the comparables, and reflects the current market place."  In the Preliminary Report, Christie's estimated the aggregate value of the Appraised Art to be between $452 million and $866 million, with "the lower number represent[ing] a conservative price, and the higher number represent[ing] the most advantageous price at which the property would likely change hands."

The Preliminary Report recommended consideration of five potential strategies for revenue generation not involving the outright sale of any of the works in the DIA Collection.  First, Christie's proposed that the City could pledge some or all of the Appraised Art as collateral for a loan or line of credit.  According to the Preliminary Report, "[t]he current robust global art market coupled with the fact that the [C]ity-owned collection contains some high-quality and valuable works, suggest this could be an effective financing arrangement."  Second, Christie's suggested that "[r]evenue could be generated from a partnership agreement with another museum or museums whereby masterpieces from the DIA would be leased on a long-term basis."  Third, Christie's proposed that the City consider establishing a "masterpiece trust," an arrangement that is "[u]nprecedented in the art world."  The Preliminary Report described this concept as follows: "City-owned art would be transferred into the Trust and minority interests would be sold to individual museums, making

them a member of a larger consortium of institutions. Revenue generated by the sale of shares in the Trust would be paid to the City. Ownership of shares in the Trust would entitle members to borrow works for predetermined periods of time." Fourth, Christie's suggested that the City could consider selling one or more works in the DIA Collection to a philanthropist or charitable organization on the condition that the buyer agree to permanently lend the purchased work(s) to the DIA. Finally, the Preliminary Report discussed the possibility of mounting a traveling exhibition of works in the DIA Collection. Although Christie's described this option as potentially "the least viable in terms of generating a revenue stream for the City" because traveling exhibitions generally "are not a substantial revenue generator," it concluded that "[t]he media attention the DIA has received in connection with Detroit's bankruptcy filing and the accompanying outpouring of public support for the City's artworks could help to generate interest, and thereby revenue, from tour sponsors and patrons."

Christie's issued its final report on December 17, 2013 (the "Final Report"). For purposes of the Final Report, the Appraised Art consisted of 2,773 works. In the Final Report, Christie's stated that the aggregate FMV of the Appraised Art was between $454 million and $867 million. Christie's performed a detailed appraisal of only 1,741 of the 2,773 works consisting of the Appraised Art (the "Most Valuable Works"), explaining in the Final Report that the Most Valuable Works accounted for "over 99% of the total projected value" of the Appraised Art. Christie's attached to the Final Report an itemized list of 406 of the Most Valuable Works with individual values exceeding $50,000. Of these, 11 works accounted for 75% percent of the total estimated value of the Appraised Art:

- Pieter Bruegel the Elder, *The Wedding Dance*                $100-200 million
- Vincent van Gogh, *Self Portrait with Straw Hat*            $80-150 million
- Rembrandt, *The Visitation*                                 $50-90 million
- Henri Matisse, *Le Guéridon*                                $40-80 million
- Edgar Degas, *Danseuses au Foyer (La Contrebasse)*          $20-40 million
- Claude Monet, *Gladioli*                                    $12-20 million
- Michelangelo, *Scheme for the Decoration of the Ceiling of the Sistine Chapel*                              $12-20 million
- Neri di Bicci, *The Palla Alterpiece: Tobias and Three Archangels*   $8-15 million
- Giovanni Bellini and Workshop, *Madonna and Child*          $4-10 million
- Frans Hals, *Portrait of Hendrik Swalmius*                  $6-10 million
- Michiel Sweerts, *In the Studio*                            $5-10 million

According to the Final Report, each of the 1,032 works of Appraised Art not given detailed, individual appraisals are items currently held in storage which have "modest commercial value." These items include, among other things, various textile fragments, coins, pieces of furniture and works of art by artists "who command only very low prices."

        **(b)**        **The DIA Settlement**

On January 13, 2014, mediators in the City's chapter 9 case announced that certain charitable foundations and other entities (collectively, the "Foundations") had agreed in principle to pledge certain funds (the "Foundation Funds") as part of a potential multiparty settlement that, if finalized, would (i) shield the DIA Collection from potential sales to satisfy creditors of the City and (ii) reduce the Retirement Systems' current levels of underfunding. As of the date of filing of this Disclosure Statement, 12 Foundations had pledged funds toward this effort: the Ford Foundation, the Kresge Foundation, the W. K. Kellogg Foundation, the John S. and James L. Knight Foundation, the Community Foundation for Southeast Michigan, the William Davidson Foundation, the Fred A. and Barbara M. Erb Family Foundation, the Hudson-Webber Foundation, the McGregor Fund, the Charles Stewart Mott Foundation, the Max M. and Marjorie S. Fisher Foundation and the A. Paul and Carol C. Schaap Foundation. As of the date of filing of this Disclosure Statement, the Foundations had tentatively agreed to pledge at least $366 million in Foundation Funds, payable over a period of 20 years, in support of this arrangement.

On January 22, 2014, the Governor announced a plan pursuant to which the State would potentially pledge up to $350 million in state funds in support of the DIA Settlement and certain creditor recoveries in exchange for releases to be contained in the Plan. As settlement negotiations continued, on January 29, 2014, DIA Corp. pledged to raise an additional $100 million over 20 years to "ensure long-term support for the City's pension funds and sustainability for the DIA." More specific detail regarding the DIA Settlement is provided in Section IV.E of this Disclosure Statement. Further details regarding the potential for State funding are provided in connection with the description of the State Contribution Agreement in Section IV.D of this Disclosure Statement.

### 7. Joe Louis Arena

Olympia, the Red Wings and the City have resolved all of their issues under the Original JLA Lease and agreed to enter into a new lease of Joe Louis Arena (the "New JLA Sublease") and a related parking agreement. The term of the New JLA Sublease will be five years, retroactive to July 1, 2010, the date of expiration of the Original JLA Lease. The initial term of the New JLA Sublease will therefore end on June 30, 2015. Thereafter, Olympia and the Red Wings will have five one-year options to extend the New JLA Lease. Olympia will pay the City rent of $1 million per year during the term of the New JLA Sublease and any extensions thereof. In addition to rent, the parties have agreed that Olympia and the Red Wings will provide total consideration valued at over $12 million to the City over the next three years.

The project to develop and construct a replacement venue for the Red Wings will continue while the team continues to play at Joe Louis Arena. As of the date hereof, it is estimated that the new arena will be completed in 2016 or 2017. Under the proposed plan, the DDA will own the new arena, and the arena will be managed by Olympia. Olympia and the DDA have proposed funding the project with a combination of private monies and private activity bonds which would be issued by the Michigan Strategic Fund (an entity created pursuant to Michigan Public Act 270 of 1984, the Michigan Strategic Fund Act, MCL §§ 125.2001 *et seq.*, to support economic development and job creation projects).

### 8. Sale of Veterans' Memorial Building

The City owns the building originally built, and commonly referred to, as the Veterans' Memorial Building. The building, located at 151 West Jefferson Avenue in Detroit, currently houses the UAW-Ford National Programs Center operated by UAW-Ford, a non-profit social welfare organization jointly created by the Ford Motor Company and the UAW and organized pursuant to section 501(c)(4) of the United States Internal Revenue Code. The City and UAW-Ford currently are negotiating a potential sale of the building to UAW-Ford, which sale would contain a deed restriction with respect to the property's use and maintenance of the building's exterior. Any final agreement will be submitted to City Council for approval under section 19 of PA 436.

### 9. Coleman A. Young Airport

The City is investigating various alternatives for generating revenue with respect to Coleman A. Young International Airport, including possible sale or lease transactions, modernization initiatives designed to attract core users of the airport and/or reducing airport costs by outsourcing certain functions. In November 2012, a consultant prepared a ten-year capital improvement program for the airport which included several rehabilitation plans, ranging from approximately $55 million (for upgrades to facilities other than runways) to $273 million (for a rehabilitation including a replacement runway funded in part by federal grants). The City plans to continue to subsidize and operate the airport until a viable transaction or rehabilitation plan is identified, in part because closing the airport would terminate certain federal subsidies and would require the City to repay certain grant monies previously received by the City from the Federal Aviation Administration.

<div align="center">

### IX.

### REINVESTMENT INITIATIVES

</div>

### A. Overview

The City proposes to invest approximately $1.50 billion over the next ten years to revitalize the City and, among other things, (1) comprehensively address and remediate residential urban blight, (2) improve the operating performance and infrastructure of its police, fire, EMS and transportation departments (among other matters), (3) modernize its information technology systems on a City-wide basis and (4) improve services to at all levels to Detroit's citizens. The assumptions and forecasts underlying the City's proposed reinvestment initiatives were developed using a "bottom-up," department-level review that identified, among other things, (1) opportunities and initiatives to enhance revenues and improve the collection of accounts receivable, (2) reinvestment in labor to improve City services and operations, (3) capital expenditures for necessary information technology, fleet and facility improvements and (4) various department-specific expenditures necessary to facilitate the City's restructuring.

Although, as provided in Section VII.D.10, the June 14 Creditor Proposal contemplated investment by the City in the total amount of approximately $1.25 billion, the City has expanded its planned expenditures through the period ending June 30, 2023 based on further needed spending on infrastructure as well as enhanced services for residents. Specifically,

the City plans to spend approximately $148 million on technology investments, an increase of approximately $65 million from the June 14 Creditor Proposal. Spending on capital expenditures and other infrastructure items, namely fleet and facilities, are projected to be approximately $447 million for the period ending June 30, 2023, an increase of approximately $123 million from the June 14 Creditor Proposal. The additional expenditures relate mainly to facility costs for police, fire and recreation, along with fleet costs for police and fire. Lastly, operating expenditures related to the restructuring initiatives are projected to be approximately $868 million for the period ending June 30, 2023, an increase of approximately $72 million from the June 14 Creditor Proposal. The increase relates primarily to grant administration expenditures and added costs for recreation.

As a result of these expenditures, as well as operating expenditures related to restructuring, the City anticipates it will be able to realize additional revenue of approximately $477 million through the period ending June 30, 2023, an increase of approximately $233 million from the June 14 Creditor Presentation. The net amount of reinvestment and restructuring expenditures, after taking into account anticipated revenue enhancement from restructuring initiatives, will be approximately $1.0 billion, similar to the net amount contained in the June 14 Creditor Proposal.

In addition to the $1.50 billion in reinvestment summarized above, the City anticipates that the impairment of Claims under the Plan will permit DWSD to conduct substantial and necessary revenue enhanced capital improvements using revenues that would otherwise have been unavailable to DWSD and applied instead to service the City's debt.

As more fully described in Exhibit I, the City intends to distribute the $1.50 billion in reinvestment as follows:

| Department/Matter | Aggregate Reinvestment (Savings) | Department/Matter | Aggregate Reinvestment (Savings) |
|---|---|---|---|
| Blight Remediation | $520.3 million | Auditor General/Inspector General | $4.7 million |
| Public Safety (Police, Fire and EMS) | $463.8 million | MPD | $4.4 million |
| General Services | $201.1 million | Department of Elections | $2.9 million |
| Finance | $143.5 million | Administrative Hearings | $0.4 million |
| DDOT | $44.1 million | Mayor's Office | $0.3 million |
| Recreation | $40.4 million | Public Works | $0.3 million |
| Human Resources | $34.4 million | Board of Zoning Appeals | $0.2 million |
| Airport | $28.5 million | Law Department | ($0.2 million) |
| Planning and Development | $19.7 million | City Clerk | ($2.2 million) |
| Office of the Ombudsperson | $17.2 million | City Council | ($4.2 million) |
| Labor Relations | $7.1 million | 36th District Court | ($16.9 million) |
| Health and Wellness | $6.9 million | BSEED | ($25.3 million) |
| Board of Ethics (Human Rights) | $5.8 million | **TOTAL** | **$1.5 billion** |

### 1. Blight Removal

Reduction of urban blight is among the City's highest reinvestment priorities. The City anticipates that a substantial reduction in blighted structures and properties would, among other things: (a) stabilize the City's eroding property values and property tax base; (b) allow the City to more efficiently and effectively deliver municipal services; (c) improve the health, safety and quality of life for City residents; (d) foster increased land utilization within the City; and (e) dramatically improve the national perception of the City.

To this end, the City proposes to invest a total of $520.3 million over the course of the next six Fiscal Years to remediate residential blight within the City. Among other things, this investment will allow the BSEED to increase the rate of residential demolitions from an average of 450 demolitions per month to an average of approximately 725 per month. The City intends to focus its initial demolition efforts around schools and other areas identified by the Detroit Works Project and the Detroit Future City project. The City estimates that it will invest the following amounts toward blight removal during each of Fiscal Years 2014 through 2019:

| Fiscal Year | Expenditure |
|-------------|-------------|
| 2014 | $7.3 million |
| 2015 | $113.0 million |
| 2016 | $100.0 million |
| 2017 | $100.0 million |
| 2018 | $100.0 million |
| 2019 | $100.0 million |

These efforts currently are – and will continue to be – complemented by discrete blight remediation efforts. For example, the Michigan State Housing Development Authority has allocated $52 million to the City (out of $100 million received from the U.S. Treasury from its "Hardest Hit Fund"). These funds – administered through the Detroit Land Bank Authority (in conjunction with the Michigan Land Bank) – will allow for blight elimination on 4,000 to 6,000 publicly owned residential structures over a 15-month period. Other complementary blight elimination efforts include: (a) a pilot program implemented by a nongovernmental non-profit agency (addressing blight in the Eastern Market and Brightmoor sections of the City); (b) the "Hantz Woodlands" urban farming project, in connection with which a 150-acre, 1,500-parcel tract of land on the City's lower east side has been acquired by a private party and is being cleared of blight and maintained; and (c) the devotion of $12 million in recently repurposed HUD funds for the targeting of commercial demolition during Fiscal Year 2014.

As set forth at Section VII.C.7.c, remediating blight requires the coordination of – and the City intends to coordinate with – a multiplicity of government agencies at the local, state and federal levels, and certain interested nongovernmental organizations. Coordination and cooperation among these entities is critical to the success of the City's reinvestment efforts. Among other things, an uncoordinated effort would result in the inefficient application of scarce resources, fragmented remediation activities and investments and duplicative investments in tools and technology, all resulting in slowed and more costly re-development. By coordinating the efforts of all interested stakeholders, the City can leverage multiple resources to target specific areas for improvement, leverage existing technology investments and maximize the potential for the long-term success of its remediation efforts. In so doing, the City can raise investor confidence and effect lasting change in economic growth and quality of life.

## 2. Public Safety (Police, Fire and EMS)

A significant percentage of the funds to be devoted to reinvestment will be used to improve the performance and infrastructure of the City's police, fire and EMS services. The City believes that its reorganization and successful redevelopment depends upon its ability to offer adequate public safety services to existing City residents and those who may consider relocating to Detroit in the future.

### (a) Police

As discussed in Section VII.C.7.a, the DPD has been plagued in recent years with debilitating problems including (i) obsolete information technology; (ii) poor performance, as evidenced by high response times and low case clearance rates; (iii) chronic understaffing; (iv) low employee morale; (v) a lack of employee accountability; and (vi) an aging and unreliable fleet and facilities. These difficulties have contributed to the DPD's inability to reduce Detroit's exceedingly high crime rate.

To combat these problems, the City has proposed to make targeted investments in the DPD totaling $311.2 million. These investments are intended to: (i) reduce response times to the national average; (ii) improve case clearance rates and first responder investigations; (iii) update the DPD's fleet and facilities; (iv) modernize the DPD's information technology systems; (v) achieve compliance with federal consent decrees; (vi) overhaul the structure, staffing and organization of the DPD to better serve the citizens of Detroit; and (vii) improve employee morale and accountability.

The City intends to make the following investments in DPD over the next 10 years:

- $129.3 million to initiate and maintain a fleet vehicle replacement program on a three-year cycle;

- $78.7 million to hire, employ and provide benefits to 250 additional civilian personnel, which will allow the City to redeploy uniformed personnel to more appropriate functions;

- $38.9 million to provide or replace vital equipment, materials and supplies, including in-car and handheld radios ($22.0 million), tasers and cartridges ($5.2 million), bulletproof vests ($3.3 million), body cameras ($2.4 million) and other items ($6.0 million);

- $36.2 million in capital expenditures and other expenses related to DPD facilities (partially offset by $10.5 million in savings associated with the termination of certain facility leases), including department-wide projects ($14.0 million), the build out of new precincts and a training facility ($12.0 million), other precinct or facility improvements ($6.1 million) and annual costs associated with new facilities ($4.1 million);

- $17.3 million to improve the DPD's technology infrastructure, through the implementation of a fully integrated public safety IT system that will provide DPD, DFD and EMS with integrated computer aided dispatch, records management and reporting and allow for much-needed data exchanges between agencies and will improve efficiency and operations ($13.8 million), the employment of related temporary personnel ($1.0 million) and other technology infrastructure items ($2.5 million);

- $13.0 million to implement a "shot spotter" system ($11.0 million) and other items ($2.0 million). The "shot spotter" system enables department managers to make more informed decisions, increasing safety and optimizing deployment and situational response in the field by pinpointing gunfire, immediately reporting the location of the gunfire to DPD and, in the case of multiple shots, identifying the caliber of the weapon or weapons involved and the direction of travel;

- $5.4 million in training costs for all DPD civilian employees;

- $2.8 million in increased helicopter maintenance costs; and

- $0.2 million in costs related to citizen patrol programs and DPD reserves.

In the aggregate, the City estimates that it will make the following investments in DPD over the next five years beginning in Fiscal Year 2014:

| Fiscal Year | Expenditure |
|---|---|
| 2014 | $29.6 million |
| 2015 | $49.4 million |
| 2016 | $44.9 million |
| 2017 | $25.9 million |
| 2018 | $25.2 million |

**(b)      Fire and EMS**

As discussed in Section VII.C.7.d, the City's fire and EMS services have struggled – and have frequently failed – to provide prompt and reliable service due to broken and outdated equipment, aging and inadequately-maintained facilities and vehicles and an obsolete information technology system. To remedy these problems, the City has proposed to invest a total of $152.6 million. These investments are intended to, among other things, (i) modernize the City's fleet of fire and EMS vehicles, fire apparatus equipment (such as ladders and pumping equipment) and facilities; (ii) update the DFD's computer hardware and software; (iii) improve the DFD's operating efficiency and cost structure; and (iv) implement revenue enhancements such as improvements to billing and collection procedures and grant identification and management.

Specifically, the City intends to make the following investments with respect to the City's fire and EMS services over the next 10 years:

- $60.0 million for the implementation of a program to replace apparatus at a rate of 18 vehicles per year and to provide related preventative maintenance;

- $55.0 million in facility-related capital expenditures, including repair and maintenance of existing facilities ($34.0 million) and construction of seven new firehouses ($21.0 million);

- $19.0 million in other capital expenditures relating to programs for the replacement of fleet equipment (such as hoses, nozzles, ladders, axes and wrenches), turnout gear and breathing apparatus;

- $14.4 million in net labor and training costs relating to the training of civilian personnel and the cross-training of uniformed personnel and labor increases to reach ideal staffing levels; and

- $3.9 million in other expenditures, including $3.6 million in incremental technology infrastructure costs relating to dispatch and a records management system and $0.3 million in reorganization costs.

The City projects that it will make the following investments in fire and EMS services over the next five years beginning in Fiscal Year 2014:

| Fiscal Year | Expenditure |
|---|---|
| 2014 | $18.9 million |
| 2015 | $32.8 million |
| 2016 | $23.3 million |
| 2017 | $24.4 million |
| 2018 | $12.4 million |

### 3.      General Services

The General Services Department (the "GSD") supports other departments of the City by managing and maintaining much of the City's property including: (a) parks; (b) City-owned, vacant lots; (c) many islands, boulevards and freeway berms; (d) all municipal facilities; and (e) all City-operated fleet vehicles. The City intends to make the following investments in the GSD totaling $201.1 million (after savings of $4.8 million):

- $70.7 million in additional labor, benefits and training costs to improve service delivery;

- $69.5 million in materials and supplies to achieve required levels of service, including fleet maintenance supplies and expenses ($4.3 million), building and grounds maintenance materials ($1.7 million), building supplies ($1.0 million) and fuel ($0.4 million);

- $46.6 million in facility improvements and repairs including facility upgrades ($27.8 million) and space consolidation ($18.7 million);

- $16.4 million in expenditures to replace or update vehicles and equipment and improve and upgrade parks; and

- $2.8 million in other expenditures including utilities ($2.4 million) and reorganization costs ($0.4 million).

### 4.      Finance

The City's Finance Department manages the financial aspects of City government. The Finance Department consists of the following nine divisions: finance administration, accounting, assessing, debt management, income tax, pensions, purchasing, risk management and treasury. All purchases, payments, payroll, pension administration, risk management and debt management for the City of Detroit government are managed by the Finance Department. The City intends to invest a total of $143.5 million to improve the services provided by the Finance Department, after a total of $65.8 million in savings relating to: (a) the purchasing of materials and supplies, including process enhancements and vendor consolidation ($35.8 million); (b) savings related to improved risk management and workers' compensation processes and claims management ($18.0 million); and (c) the reduction of certain outsourced income tax services due to the implementation of new income tax software ($7.6 million) and reduction of third party accounting services that will be performed in-house ($4.4 million). The investments planned by the City consist of the following:

- $101.3 million in additional labor, benefits and training costs to improve service delivery;

- $90.6 million in incremental IT costs primarily related to the implementation of (a) a new enterprise resource planning system ($29.0 million), (b) data-center back-up services ($10.9 million), (c) software

upgrades ($10.3 million), (d) hardware upgrades ($9.5 million), (e) new income tax processing software ($5.6 million), (f) a document management system ($5.4 million), (g) enhanced security ($3.8 million), (h) upgrades to the City's workforce management software ($3.6 million) and (i) other infrastructure ($3.3 million); and

- $17.4 million in other expenditures including reorganization costs primarily relating to the implementation of a corrective action plan with respect to the assessing division and a treasury division restructuring project (together, $17.1 million), grant related utilities expenditures ($0.2 million) and other expenditures ($0.1 million).

## 5.    DDOT

The City seeks to minimize its annual General Fund subsidy to DDOT while improving service levels by targeting reinvestment to address the key issues limiting DDOT's revenues, including, as discussed in Section VII.C.7.e, (a) an ongoing failure to maximize grant opportunities; (b) poor maintenance of vehicles and facilities; (c) high employee absenteeism (causing service disruptions) and low employee morale; (d) low fare rates; (e) a lack of adequate security on buses, which has suppressed ridership; and (f) higher-than-average risk management costs (including workers' compensation and related costs).   The City also is investigating certain other restructuring alternatives, including transitioning DDOT to the new Regional Transit Authority and/or outsourcing certain aspects – or all – of DDOT's operations.

To this end, the City intends to invest primarily in the expansion of transportation services, an increase in the size of the DDOT workforce and the establishment of a dedicated transit security force.  These investments total $44.1 million including projected savings of approximately $65 million relating to reductions in overtime ($51.0 million) and workers' compensation liabilities ($14.0 million), as follows:

- $58.2 million in labor costs to improve service delivery, including establishing the DDOT security force ($25.0 million), expanding service ($15.0 million), retaining an operational consultant to achieve revenue, implementing cost and service improvements ($5.8 million), and certain related benefits and training costs ($12.4 million);

- $40.2 million to expand DDOT's service network; and

- $10.3 million in capital expenditures arising from non-grant funded facility improvements and upgrades ($8.3 million) and vehicles and equipment for the transit police force ($1.2 million).

## 6.    Other Reinvestment Initiatives

In addition to the foregoing, the City intends to invest a further $124.2 million (after savings of $94.1 million) over the course of the next ten years as follows:

- $40.4 million toward recreation projects, including park and recreation facility improvements and upgrades ($34.5 million), emergency repairs required for recreation centers ($5.0 million) and training of department employees ($0.9 million);

- $34.4 million in expenses relating to the Human Resources Department, including the recruiting, hiring and training of additional employees ($29.7 million), the engagement of a cultural change agent ($2.4 million), one-time learning-center IT costs and maintenance ($1.3 million) and capital expenditures related to a training location ($1.0 million);

- $28.5 million in investment in Coleman A. Young airport, including capital expenditures relating primarily to executive bay upgrades, new T-hangars, terminal upgrades and a new jet way ($20.7 million); increased investment in labor, benefits and training ($6.5 million); additional purchased services including a master plan study of the airport and additional security ($1.2 million); and additional maintenance costs ($0.2 million);

- $19.7 million in investment (after savings of $2.2 million) in the Planning and Development Department (the "PDD"), including increased labor, training and benefits costs ($12.3 million), reorganization costs ($8.9 million) and IT infrastructure investment ($0.8 million);

- $17.2 million toward improving the services provided by the Office of the Ombudsperson in responding to complaints against City departments and agencies, including increased labor, training and benefits costs ($9.5 million) and technology infrastructure investment ($7.6 million); and

- $76 million in other investments offset by $91.9 million in aggregate savings (yielding a net investment of negative $15.9 million) among the City's other departments as follows:

  - Labor Relations ($7.1 million);
  - Health and Wellness ($6.9 million);
  - Board of Ethics/Human Rights ($5.8 million);
  - Auditor General/Inspector General ($4.7 million);
  - MPD ($4.5 million offset by $0.1 million in savings);
  - Department of Elections ($2.9 million);
  - Administrative Hearings ($0.5 million, offset by $0.1 million in savings);
  - Office of the Mayor ($0.3 million);
  - Department of Public Works ($0.3 million);
  - Board of Zoning Appeals ($0.2 million);
  - Law Department ($24.6 million in investment relating primarily to the addition of 17 full-time employees offset by $24.8 million in projected savings associated with reduced legal settlements and reduced outside legal costs);
  - City Clerk ($0.3 million offset by $2.5 million in savings relating to headcount reductions);
  - City Council ($0.1 million in investments offset by $4.3 million in savings relating to the transfer of certain contractors to the PDD);
  - 36th District Court ($17.4 million in investments relating to technology upgrades, capital expenditures, the addition of certain contract employees and employee training offset by savings of $34.3 million relating primarily to headcount reductions); and
  - BSEED ($0.5 million in investments offset by $25.8 million in savings relating primarily to the pay-back of a $25 million General Fund loan made to BSEED).

## B. Labor Costs & Terms and Conditions

As part of the City's overall financial restructuring, reductions in costs associated with represented and unrepresented workers will be necessary. The adoption of modifications to wages and work rules similar to those imposed pursuant to the CETs will serve as a baseline position for the City in its union negotiations, although the City may seek (1) cuts/changes beyond those included in the CETs and (2) different language that that used in the CETs.

Key elements of the strategy for making these modifications include the following:

- Collective Bargaining Agreements. Significant modifications to CBAs and labor-related obligations will be necessary to optimize staffing and reduce employment costs. The City currently does not have agreements with the majority of labor unions representing its employees. Instead, most employees are working under the CETs. As part of its restructuring effort, the City will work cooperatively with organized labor to improve existing relationships and, where possible, reach agreements to implement changes in terms and conditions of employment that mirror the changes included in the CETs. The City will attempt to structure all new labor agreements using a common form of agreement that will promote ease of administration and enable a known, measurable basis for cost evaluation and comparison. If it is not possible to reach agreements with labor representatives to restructure employment liabilities, the City will retain the authority to unilaterally implement restructuring initiatives pursuant to the emergency manager powers established under PA 436. Pursuant to Section 13(c) of the Federal Transit Act (the "FTA"), the City is required to engage in collective bargaining with labor unions representing transportation workers and has certain limitations in terms of its rights to make unilateral changes to employment terms including, but not limited to, wages, work rules and benefits (including health benefits and pensions). The City will work within the framework established by the FTA to achieve any labor cost reductions for these workers through collective bargaining. The City's failure to comply with the

terms of Section 13(c) of the FTA with respect to these transportation workers' employment terms could result in the loss of hundreds of millions of dollars in Federal transit grants.

- **Salaries and Wages.** The City must reduce employment costs for both represented and unrepresented workers as part of its restructuring. However, the potential for reductions in wages and salaries must be balanced against likely reductions in benefits and the City's need to attract and retain skilled workers. Both represented and unrepresented City workers have already been subjected to salary and wage reductions; most City workers covered by CETs already have taken 5-10% salary and/or wage reductions. As a result, the City will need to carefully evaluate the utility of any additional reductions. Reductions in non-wage compensation, overtime and premium payments may be achievable. Other areas where the City is evaluating potential cost reductions include: (1) attendance policies; (2) leaves of absence; (3) vacation days; (4) holidays; (5) union reimbursement of City costs associated with paid union time and dues check off; (6) tuition reimbursement and other loan programs; (7) overtime; (8) shift scheduling; (9) shift premiums; (10) creation of new positions (and establishment of wage scale for new positions); and (11) temporary assignments.

- **Operational Efficiencies/Work Rules.** Significant labor cost reductions may be possible by restructuring jobs and streamlining work rules for both represented and unrepresented workers using the work rule changes implemented pursuant to the CETs as a template. The City will work with labor representatives to make these improvements, including structuring the DPD, DFD, and other groups to improve operating efficiency and effectiveness. Dispute resolution procedures under the City's CBAs will be simplified and expedited to achieve predictability for both sides. Further, the City will attempt to eliminate undesirable practices and assure that these practices cannot be revived through dispute resolution procedures. The City will attempt to restructure CBAs so that employment decisions including promotions, transfers and assignments will be based upon the quality of the employee (*e.g.*, performance, attendance, experience, skill, ability, etc.) rather than by seniority. The City will attempt to (1) reduce lateral transfers by limiting bumping rights in its CBAs to job classifications that an employee currently holds or held within the prior year and (2) increase flexibility to assign employees to work out of classification. Joint labor management committees, if any, will be patterned in structure and role after the committees included in the State's CBAs.

- **Staffing Levels and Headcount.** Significant labor cost savings may be achievable by rationalizing staffing levels and reducing employee headcounts. Consolidation of departments and elimination of redundant functions will be implemented where service improvements or cost savings can be achieved. If necessary, the City will retain the right to reduce salary and wage costs by implementing unpaid furlough days. The City will work with labor representatives to minimize the effects of any headcount reductions and enter into effects bargaining agreements in connection with headcount reductions when appropriate.

- **Outsourcing.** Where cost savings or service improvements can be achieved, the City will explore potential outsourcing of functions. The City will provide unions with advance notice of competitive bids and allow the unions to bid on the work. The City will work with labor representatives to minimize the effects of any headcount reductions resulting from outsourcing initiatives and enter into effects bargaining agreements when appropriate.

## X.

## REVENUE ADJUSTMENTS AND TAX REFORM

As part of its broader restructuring effort, the City seeks to increase tax revenues – and thus strengthen its long-term cash position and its ability to reliably provide adequate municipal services – by implementing certain necessary, strategic reforms involving the assessment and collection of municipal taxes. Such reforms include: (A) expanding the City's tax base; (B) rationalizing nominal tax rates currently assessed by the City; and (C) improving the City's tax collection system to increase collection rates.

## A.      Expansion of the Tax Base

The City seeks to increase the revenues it receives from personal income taxes by broadening the City's tax base and creating conditions that are likely to foster economic growth.  By reducing crime and blight, providing adequate levels of services and rationalizing the City's bureaucratic and tax structures, the City believes that, going forward, it can attract and retain employers – and encourage the growth of local startup ventures – that will expand (or, at a minimum, arrest the shrinkage of) the City's income tax base by providing more jobs, higher wages, or both.  Fostering conditions that promote economic growth also could help to expand the City's property tax base by encouraging both new construction and the appreciation in value of existing real estate**.**

## B.      Rationalization of Nominal Tax Rates

As discussed in Sections VI.G, VII.A.4 and VII.C.3.c, the City currently is levying taxes at or near the maximum levels permitted by statute.  The City believes that the imposition of comparatively high and ever-increasing individual and corporate tax rates, in recent decades, has contributed to the City's population loss, dwindling tax base and overall economic decline.  Even if applicable statutes did not prevent the City from increasing tax rates (which they do), the City believes that increasing its already-high tax rates would have a negative impact on the City's revenue going forward and would inhibit efforts to revive economic growth.  The City is considering the possibility of lowering selected income and property tax rates to levels that are competitive with surrounding localities in order to reverse the City's population decline, foster job growth and expand the overall tax base.  Although tax rate reform likely would cause tax revenues to decrease somewhat in the near term – which decreases may be partially offset by improved collection efforts – the City believes that such reform would encourage long-term growth and anticipates that such reform would be revenue-neutral within a reasonable period of time.

On January 27, 2014, the City announced a major reform in property assessments that will reduce the residential property assessment for the great majority of Detroiters and result in a tax cut ranging from 5 to 20 percent in 2014.  The purpose of the property tax reassessment initiative is to make the City more appealing to current and prospective residents.  It is based on a comprehensive review of current assessments and actual home sales between October 1, 2011 and September 30, 2013.  This review revealed, for example, that, with the exception of some neighborhoods that have maintained their sales value, nearly the entire northwest side of the city was over-assessed by a minimum of 20 percent.

In addition, over the next three to five years, the city intends to conduct individual assessments of single family homes across the City to further improve evaluations.  The City anticipates a reduction in property tax revenue of about 13% for Fiscal Year 2015, and the assessment reductions are in line with those estimates.  The City projects, however, that fairer assessments will lead to an increase in the number of people paying their property taxes.  As discussed in Section X.C, the City also is evaluating strategies to increase property tax collection rates.

## C.      Increasing Collection Rates

The City is implementing and will continue to implement initiatives designed to (1) identify and collect taxes from individual and business non-filers, (2) improve the collection of past-due taxes and (3) enhance tax collection efforts on a prospective basis.

In an effort to collect taxes from individuals that did not file a tax return between 2006 and 2011, the City has mailed approximately 181,000 letters to individuals as of January 2014.  As of January 31, 2014, this collection effort, along with a March 2013 tax amnesty program, has yielded approximately $3.8 million in additional collections from these non-filers.  Additionally the Income Tax Division is pursing, likely through a third-party collection agency, the collection of $42 million in past due income taxes.

Prior to the Petition Date, the City also had commenced the implementation of initiatives designed to enhance tax collection rates going forward.  In October 2012, the City created a Tax Compliance & Enforcement Unit for this purpose.  In January 2013, the City launched an online registration system for businesses which, among other things, automatically captures employers' W-2 form data, enabling more accurate tracking of income taxes owed to the City.

In 2011, only 53% of City residents and businesses owning taxable property paid property taxes.  Approximately $246.5 million in taxes and fees owed by City Residents (of which approximately $131.0 million was owed to the City itself) went uncollected during Fiscal Year 2011.  In addition to the property tax reassessment efforts described in

Section X.B, the City continues to explore potential reforms and initiatives specifically designed to increase property tax collection rates.

In addition to tax reform initiatives, as of the Petition Date, the City had commenced efforts to collect on significant past-due invoices and improve invoice-collection procedures going forward. For example, the City is currently seeking payment of approximately $50 million in outstanding accounts receivable owed to the BSEED. The City anticipates that necessary upgrades to its IT systems will alleviate bottlenecks that have inhibited the efficient collection of such invoices in recent years. In addition, the City seeks to increase the revenues derived from permits and licenses issued by the City.

Prior to the Petition Date, the City also had commenced the implementation of initiatives designed to enhance tax collection rates going forward. In October 2012, the City created a Tax Compliance & Enforcement Unit for this purpose. In January 2013, the City launched an online registration system for businesses which, among other things, automatically captures employers' W-2 form data, enabling more accurate tracking of income taxes owed to the City. As of the Petition Date, the City also was considering the purchase of a new income tax system and upgrading to a "common form" that would be compatible with such new system and which currently is used by 19 of the 22 Michigan cities that collect income taxes.

In addition to the property tax reassessment efforts described in Section X.B, the City continues to explore potential reforms and initiatives specifically designed to increase property tax collection rates. In 2011, only 53% of City residents and businesses owning taxable property paid property taxes. Approximately $246.5 million in taxes and fees owed by City Residents (of which approximately $131.0 million was owed to the City itself) went uncollected during Fiscal Year 2011. Prior to the Petition Date, the City engaged consultants to conduct two separate reviews of the City's property tax collections system. The City's review of these studies, and its consideration of available reform options, remains ongoing.

In addition to tax reform initiatives, as of the Petition Date, the City had commenced efforts to collect on significant past-due invoices and improve invoice-collection procedures going forward. For example, as of the Petition Date, the City was seeking payment of approximately $50 million in outstanding accounts receivable owed to the BSEED, and approximately $8 million in past-due permitting, licensing and other fees owed to the City by Wayne County. The City anticipates that necessary upgrades to its IT systems will alleviate bottlenecks that have inhibited the efficient collection of such invoices in recent years. In addition, the City seeks to increase the revenues derived from permits and licenses issued by the City. As of the Petition Date, only 30% of businesses operating within City limits had valid licenses. To increase revenues from licensing and fee collection, the City ceased its practice of waiving certain permit fees, in March 2012, and is considering strategies to identify, and collect fees from, unlicensed businesses.

## XI.

## PROJECTED FINANCIAL INFORMATION

### A.    Projections

Attached to this Disclosure Statement as Exhibit I and Exhibit J are certain financial documents (together, the "Projections"), which provide details regarding the City's projected operations under the Plan, subject to the assumptions set forth below. In particular, the Projections consist of:

- A ten-year summary of restructuring initiatives, attached hereto as Exhibit I

- A ten-year statement of projected cash flows, attached hereto as Exhibit J

THE PROJECTIONS WERE NOT PREPARED TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, THE FINANCIAL ACCOUNTING STANDARDS BOARD, THE GOVERNMENTAL ACCOUNTING STANDARDS BOARD OR THE RULES AND REGULATIONS OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION. THE CITY'S INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM HAS NEITHER COMPILED NOR EXAMINED THE ACCOMPANYING PROJECTIONS AND, ACCORDINGLY, DOES NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE PROJECTIONS, ASSUMES NO RESPONSIBILITY FOR THE PROJECTIONS AND DISCLAIMS ANY

ASSOCIATION WITH THE PROJECTIONS.  EXCEPT FOR PURPOSES OF THIS DISCLOSURE STATEMENT, THE CITY DOES NOT PUBLISH PROJECTIONS OF ITS ANTICIPATED FINANCIAL POSITION.  THE CITY DOES NOT INTEND TO UPDATE OR OTHERWISE REVISE THESE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE OF THIS DISCLOSURE STATEMENT OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS.

WHILE PRESENTED WITH NUMERICAL SPECIFICITY, THE PROJECTIONS ARE BASED UPON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT THE CITY BELIEVES ARE REASONABLE (WHICH ASSUMPTIONS ARE DESCRIBED IN FURTHER DETAIL IMMEDIATELY BELOW).  THE ESTIMATES AND ASSUMPTIONS MAY NOT BE REALIZED, HOWEVER, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT ECONOMIC UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE CITY'S CONTROL.  NO REPRESENTATIONS CAN BE OR ARE MADE AS TO WHETHER THE ACTUAL RESULTS WILL BE WITHIN THE RANGE SET FORTH IN THE PROJECTIONS.  SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE, AND EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED, OR MAY BE UNANTICIPATED, AND THEREFORE MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER.  THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

1.      **Assumptions**

The Projections were prepared by the City with the assistance of its professionals to present the anticipated impact of the Plan.  The Projections all assume that the Plan will be confirmed before and implemented on the Effective Date in accordance with its stated terms.  In addition, the Projections and the Plan are premised upon other assumptions, including the anticipated future performance of the City, general economic and business conditions, no material changes in the laws and regulations applicable to the operation of municipalities such as the City, and other matters largely or completely outside of the City's control.  Each of the Projections should be read in conjunction with the significant assumptions, qualifications, and notes set forth in the Disclosure Statement, the Plan, the Plan Supplement, the Projections themselves, the historical financial information for the County contained or referenced herein, and other information submitted to the Bankruptcy Court during the course of the City's chapter 9 case.

(a)      **Revenue Assumptions**

- Municipal Income Tax.  Municipal income tax revenues increase over the period of the Projections due to (i) a general improved employment outlook and (ii) anticipated wage inflation.  Projected revenues for Fiscal Year 2013 reflect the impact of certain one-time items, including a tax amnesty program and a one-time benefit from an increase in the capital gains tax rate.

- State Revenue Sharing.  Projected revenues for state revenue sharing were developed in consultation with the Treasury.  These revenues increase due to anticipated higher tax revenue collections and distribution by the State.

- Wagering Tax.  The Projections assume that wagering tax revenues will decrease through Fiscal Year 2015 due to competition from other casinos, primarily those in Ohio, before recovering as a result of an improved general economic outlook.

- Sales and Charges for Services.  Revenues from sales and charges for services are projected to decline primarily as a result of the transfer of: (i) vital records operations from the City's Department of Health and Wellness Promotion (the "Health & Wellness Department") to Wayne County effective December 2013; and (ii) electricity distribution services from the Public Lighting Department to third party provider.

- Property Tax.  The City projects that property tax revenues will continue to decline through Fiscal Year 2020 as a result of ongoing reductions in assessed property values with modest increases beginning in Fiscal Year 2021.

- Utility Users Tax.  The Projections assume that utility users tax revenues will decrease from Fiscal Year 2013 as a result of the transfer of lighting operation, service and repair to the PLA and the related

allocation of $12.5 million of utility users tax revenues to the PLA. Inflationary revenue increases have been assumed beginning in Fiscal Year 2017.

- <u>Other Taxes</u>. Inflationary revenue increases have been assumed for all other taxes, beginning in Fiscal Year 2017.

- <u>Parking/Court Fines and Other Revenue</u>. The amounts provided in the Projections for parking and court fines and other revenue are derived from recent trends.

- <u>Grant Revenue</u>. The City projects that grant revenues will decrease as a result of the (i) transition of the Health & Wellness Department to the Institute for Population Health ("<u>IPH</u>") and (ii) expiration of certain public safety grants.

- <u>Licenses, Permits and Inspection Charges</u>. The amount provided in the Projections for licenses, permits and inspection charges is derived primarily from recent trends. The City's projection for Fiscal Year 2013 includes one-time permit and inspection revenues from utility providers.

- <u>Revenue from Use of Assets</u>. The City's projected revenue for Fiscal Year 2014 includes proceeds from sale of Veteran's Memorial Building.

- <u>Street Fund Reimbursement</u>. Street Fund reimbursement from solid waste revenues are projected to decline beginning Fiscal Year 2015 due to the assumed outsourcing of solid waste operations. The solid waste portion of the Street Fund, therefore, would no longer reimburse the General Services Department (a department accounted for in the General Fund) for maintenance costs.

- <u>DDOT Risk Management Reimbursement</u>. The projected revenues for DDOT risk management reimbursement are based on recent trends. No reimbursement is reflected in Fiscal Year 2013 because, as set forth in subsection (b) below, in Fiscal Year 2013, the General Fund made risk management payments from refunding proceeds.

- <u>Parking and Vehicle Fund Reimbursement</u>. Based on recent trends and scheduled debt service for the Vehicle Fund through Fiscal Year 2016 with revenues and associated expenses being offset.

- <u>UTGO Property Tax Millage</u>. The Projections assume treatment consistent with the Plan.

**(b)     Operating Expenditure Assumptions**

- <u>Salaries and Wages</u>. The Projections assume a 10% wage reduction for uniformed employees beginning in Fiscal Year 2014 for contracts expiring during Fiscal Year 2013. Headcount is assumed to increase beginning in Fiscal Year 2015 to allow for improved levels of services to City residents. Wage inflation of 2.0% has been assumed beginning in Fiscal Year 2015. A 5% wage increase is assumed for uniformed employees beginning in Fiscal Year 2020.

- <u>Overtime</u>. The projected future costs of overtime are based upon recent trends.

- <u>Health Benefits (Active Employees)</u>. The projected cost of health benefits for active employees is based upon the healthcare plan designs being offered for 2014 enrollment and assumes an average rate of healthcare inflation of 6.5%.

- <u>Other Employment Benefits</u>. The City has calculated the Projections for other employment benefits separately by specific benefit based upon recent trends.

- <u>Professional and Contractual Services</u>. The Projections assume a decrease in costs incurred for professional and contractual services beginning Fiscal Year 2014 primarily due to the transition of the Health & Wellness Department to IPH. Cost inflation in the amount of 1.0% has been assumed beginning in Fiscal Year 2015.

- **Materials and Supplies**.  The Projections provide for decreases in expenditures beginning in Fiscal Year 2015 due to the transition of the PLD distribution business to third party provider.  Cost inflation of 1.0% has been assumed beginning in Fiscal Year 2015.

- **Utilities**.  The City's projected utility cost is based on recent trends and assumes cost inflation of 1.0% beginning in Fiscal Year 2015.  Average cost inflation of 3.5% has been assumed for water and sewer rates beginning in Fiscal Year 2015.

- **Purchased Services**.  The Projections assume increased costs beginning in Fiscal Year 2014 due to prisoner pre-arraignment function costs and beginning in Fiscal Year 2015 as a result of outsourced payroll processing management.  In addition, cost inflation of 1.0% has been assumed beginning in Fiscal Year 2015.

- **Risk Management and Insurance**.  Cost inflation of 1.0% has been assumed beginning in Fiscal Year 2015.

- **Maintenance Capital (Current Run Rate)**.  Fiscal Year 2013 includes one-time capital outlays.  Cost inflation of 1.0% has been assumed beginning in Fiscal Year 2015.

- **Other Expenses**.  Cost inflation of 1.0% has been assumed beginning in Fiscal Year 2015 with respect to certain costs.

- **Contributions to Non-Enterprise Funds**.  Assumed contributions are projected to increase in Fiscal Years 2015 and 2016 primarily due to scheduled vehicle fund debt service.  In addition, contributions for the operations of PLA begin in Fiscal Year 2015.

- **DDOT Subsidy**.  The General Fund's subsidy to DDOT is projected to increase primarily due to personnel and operating cost inflation.  A one-time contribution to the General Fund of $16 million has been included for Fiscal Year 2012.  The costs for Fiscal Year 2013 exclude a risk management payment, made from refunding proceeds.

- **Grant Related Expenses**.  Projected grant expenses have been captured within the specific expense line items.

### (c)    Legacy Expenditure Assumptions

- **Debt Service**.  The Projections assume treatment consistent with the Plan.

- **COP and Swap Service**.  The Projections assume treatment consistent with the Plan.

- **Pension Contributions**.  The Projections assume treatment consistent with the Plan.

- **Health Benefits (Retirees)**.  The Projections assume treatment consistent with the Plan.

# XII.

## FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN

Circular 230 Disclosure: TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, EACH HOLDER OF A CLAIM IS HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER OF A CLAIM FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED UNDER THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "IRC"); (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE CONFIRMATION OF THE PLAN TO WHICH THE TRANSACTIONS DESCRIBED IN THIS DISCLOSURE STATEMENT ARE ANCILLARY; AND (C) ANY HOLDER OF A CLAIM SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

-141-

13-53846-swr   Doc 8332   Filed 03/31/14   Entered 03/31/14 03:24:40   Page 154 of 602
13-53846-swr   Doc 7392   Filed 09/16/14   Entered 09/16/14 18:36:08   Page 154 of 162

A DESCRIPTION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO HOLDERS OF CERTAIN CLAIMS IS PROVIDED BELOW. THE DESCRIPTION IS BASED ON THE IRC, TREASURY REGULATIONS, JUDICIAL DECISIONS AND ADMINISTRATIVE DETERMINATIONS, ALL AS IN EFFECT ON THE DATE OF THIS DISCLOSURE STATEMENT AND ALL SUBJECT TO CHANGE, POSSIBLY WITH RETROACTIVE EFFECT. CHANGES IN ANY OF THESE AUTHORITIES OR IN THEIR INTERPRETATION COULD CAUSE THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO DIFFER MATERIALLY FROM THE CONSEQUENCES DESCRIBED BELOW.

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. NO RULING HAS BEEN REQUESTED FROM THE INTERNAL REVENUE SERVICE (THE "IRS"); NO OPINION HAS BEEN REQUESTED FROM THE CITY'S COUNSEL CONCERNING ANY TAX CONSEQUENCE OF THE PLAN; AND NO TAX OPINION IS GIVEN BY THIS DISCLOSURE STATEMENT.

THE DESCRIPTION THAT FOLLOWS DOES NOT COVER ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO HOLDERS OF CLAIMS. FOR EXAMPLE, THE DESCRIPTION DOES NOT ADDRESS ISSUES OF SPECIAL CONCERN TO CERTAIN TYPES OF TAXPAYERS, SUCH AS DEALERS IN SECURITIES, FINANCIAL INSTITUTIONS, INSURANCE COMPANIES, PASS-THROUGH ENTITIES AND INVESTORS THEREIN, TAX-EXEMPT ORGANIZATIONS, PERSONS SUBJECT TO THE ALTERNATIVE MINIMUM TAX AND NON-U.S. TAXPAYERS. IN ADDITION, THE DESCRIPTION DOES NOT DISCUSS STATE, LOCAL OR NON-U.S. INCOME OR OTHER TAX CONSEQUENCES (INCLUDING ESTATE OR GIFT TAX CONSEQUENCES).

FOR THESE REASONS, THE DESCRIPTION THAT FOLLOWS IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND PROFESSIONAL TAX ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM. HOLDERS OF CLAIMS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.

The federal income tax consequences of the Plan to a Holder of a Claim will depend, in part, on the nature of the Claim, what type of consideration was received in exchange for the Claim, whether the Holder reports income on the accrual or cash basis, whether the Holder has taken a bad debt deduction or worthless security deduction with respect to the Claim and whether the Holder receives Distributions under the Plan in more than one taxable year.

A.      **Exchange of Property Differing Materially in Kind or Extent, Generally**

An exchange of property for other property differing materially either in kind or extent generally is considered a taxable exchange for U.S. federal income tax purposes, and the holder of such property generally will realize gain or loss on such exchange for U.S. federal income tax purposes. In the case of an exchange of a new debt instrument for an existing debt instrument, such an exchange is considered to be an exchange of property differing materially in kind or extent if the terms of the new debt instrument are considered to be a "significant modification" of the terms of the existing debt instrument.

Various changes in the terms of a debt instrument can constitute a "modification" of the terms of an existing debt instrument for U.S. federal income tax purposes, such as a change in the amount or yield of the instrument, a change in the term of the instrument, a change in the obligor of the instrument, a change in the security or credit enhancement of the instrument or a change in the nature of the instrument. A modification may be considered to be "significant" for U.S. federal income tax purposes if, based on all the facts and circumstances, the legal rights or obligations that are altered and the degree to which they are altered are economically significant. When making such a determination, all modifications to the debt instrument generally are considered collectively, subject to certain exclusions.

A change in the yield of a debt instrument is considered to be a significant modification of the debt instrument if the yield of the modified instrument, as computed in accordance with the Treasury Regulations, varies from the annual yield of the unmodified instrument by more than the greater of one quarter of one percent or five percent of the annual yield of the unmodified instrument. A change in the timing of payments of a debt instrument, including an extension of the final maturity date, may be a considered a significant modification if it results in a material deferral of scheduled payments under the relevant facts and circumstances. A deferral of one or more scheduled payments will not be considered material if the payment is deferred no longer than the lesser of five years or fifty percent of the original term of the debt instrument. A substitution of a new obligor on a recourse obligation generally is considered a significant modification, but in the case

of a tax-exempt bond, such a substitution is not a significant modification if the old and new obligors are both governmental units, agencies or instrumentalities that derive their powers, rights and duties in whole or part from the same sovereign authority (such as a state), and if the collateral securing the instrument continues to include the original collateral. The substitution of a new obligor on a nonrecourse debt instrument is not a significant modification. A change in the security or credit enhancement of a recourse debt instrument that releases, substitutes, adds or otherwise alters the collateral for, a guarantee on, or other form of credit enhancement is a significant modification if it results in a change in payment expectations from adequate to primarily speculative, or from primarily speculative to adequate. A change in the security or credit enhancement of a nonrecourse debt instrument generally is a significant modification if it releases, substitutes, adds or otherwise alters the collateral for, a guarantee on, or other form of credit enhancement, unless the collateral is fungible. A change in the nature of an instrument, from recourse (or substantially all recourse) to nonrecourse (or substantially all nonrecourse), or from nonrecourse (or substantially all nonrecourse) to recourse (or substantially all recourse), is generally a significant modification. Likewise, a change in the nature of an instrument that results in an instrument or property right that is not debt for U.S. federal income tax purposes is a significant modification. Other changes to an instrument, such as a change in the status of the debt instrument from being a tax-exempt obligation to a taxable obligation, may be considered to be a material modification if such a change is considered to be economically significant.

Holders of Claims are urged to consult their tax advisors regarding the application of the above rules to any Distributions they may receive pursuant to the Plan.

**B.      Treatment of Claim Holders Receiving Distributions Under the Plan**

**1.      Holders Whose Existing Bonds or Other Debt Obligations Will Be Exchanged for Property Including New Securities**

The U.S. federal income tax treatment of Holders who hold Claims with respect to existing Bonds or other debt obligations and who receive Distributions of property, including New Securities, pursuant to the Plan (which may include Holders of the DWSD Bonds, Holders of COP Claims, Holders of Limited Tax General Obligation Bonds, Holders of Unlimited Tax General Obligation Bonds, and, to the extent such Claims are for existing Bonds or other debt obligations, Holders of Unsecured Claims) will depend upon whether the terms of the New Securities received differ materially in kind or extent from the terms of the existing Bonds or other debt obligations relinquished by such Holder pursuant to the Plan, as discussed above under "Exchange of Property Differing Materially in Kind or Extent, Generally." If the terms of such New Securities do not differ materially from the terms of the existing Bonds or other debt obligations relinquished, then the U.S. federal income tax consequences should be as described below under "Holders of Allowed Claims Receiving New Securities that are Not Materially Different." If the terms of such New Securities differ materially from the terms of the Claims relinquished, then the U.S. federal income tax consequences should be as described below under "Holders of Allowed Claims Receiving Cash, Other Property or New Debt Securities with Materially Different Terms."

It is anticipated that interest on the New DWSD Bonds or, if the DWSD Transaction is consummated, the New GLWA Bonds, will be tax-exempt for U.S. federal income tax purposes. The City intends to seek opinions of nationally recognized bond counsel addressing the tax status of the interest payable on the New DWSD Bonds (or, if the DWSD Transaction is consummated, the New GLWA Bonds), which are expected to be delivered with such New DWSD Bonds (or such New GLWA Bonds) on the Effective Date. Recipients of such bonds should refer to such opinions for more information as to the tax status of the interest payable on such bonds.

As of the date of this Disclosure Statement, it is not known whether interest on any New Securities other than the New DWSD Bonds or the New GLWA Bonds will be taxable or tax-exempt for U.S. federal income tax purposes.

Holders of Claims are urged to consult their tax advisors regarding whether the terms of any New Securities received pursuant to the Plan differ materially from the terms of any Claims relinquished pursuant to the Plan.

**(a)      Holders of Allowed Claims Receiving New Securities that are Not Materially Different**

A Holder of an Allowed Claim who receives New Securities that are not materially different in kind or extent from the Claims for existing Bonds relinquished by such Holder pursuant to the Plan, generally should not recognize gain, loss or other taxable income for U.S. federal income tax purposes upon the receipt of such New Securities in exchange for their Claims under the Plan. Such Holder's holding period for the New Securities will include its holding period for the Claims exchanged therefor, and such Holder's basis in the New Securities will be the same as its basis in the Claims immediately before the exchange.

Taxable income, however, may be recognized by those Holders for U.S. federal income tax purposes if such Holders are considered to receive interest, damages or other income in connection with the exchange, as described in "Holders of Allowed Claims Receiving Cash, Other Property or New Debt Securities with Materially Different Terms," below.

**(b)      Holders of Allowed Claims Receiving Cash, Other Property or New Debt Securities with Materially Different Terms**

A Holder of an Allowed Claim who receives cash, other property or New Securities that are treated as debt for U.S. federal income tax purposes ("New Debt Securities") with materially different terms from the Claims relinquished by such Holder pursuant to the Plan, in exchange for such Holder's Claim, would recognize gain or loss in an amount equal to the difference between (i) the amount realized under the Plan in respect of its Claim, which will generally equal (A) the amount of any cash received, plus (B) the fair market value of any property received (including any New Securities that are not treated as debt for U.S. federal income tax purposes) and (C) the issue price of any New Debt Security received by the Holder with respect to its Claim and (ii) the Holder's adjusted tax basis, if any, in its Allowed Claim (other than any Claim for accrued but unpaid interest).

As a general matter, the "issue price" of a New Debt Security should equal its fair market value, if treated as "publicly traded" within the meaning of the IRC and applicable Treasury Regulations, or, if the New Debt Securities are not publicly traded, but the existing Bonds are publicly traded, the fair market value of the existing Bond as of the day immediately prior to the effective date of the Plan. Debt instruments generally will be treated as "publicly traded" if they are traded on an established securities market or if certain firm or indicative price quotes are available for such debt instruments, or if other conditions are satisfied. If neither the existing Bonds nor the New Debt Securities are considered to be publicly traded, the issue price of the New Debt Securities will equal their stated principal amount.

In addition, the New Debt Securities may be treated as issued with original issue discount ("OID") for U.S. federal income tax purposes in an amount equal to the excess of their stated principal amount and any PIK interest over their "issue price" (subject to a *de minimis* exception). A Holder of a New Debt Security that is not a tax-exempt bond generally will be required to include any OID in gross income as it accrues over the term of the New Debt Securities based on a constant yield to maturity method, regardless of the U.S. Holder's method of tax accounting. However, if the Holder's basis in the New Debt Security equals or exceeds the issue price of the New Security, the amount of OID that has to be included in income may be reduced or eliminated. As a result, the Holder generally will include OID that is not otherwise offset on such taxable New Debt Securities in gross income in advance of the receipt of cash payments attributable to that income.

The tax basis of a New Debt Security received in the hands of a Holder will be equal to the "issue price" of the New Debt Security received in the exchange. The holding period of the New Debt Security will commence on the day after the exchange date and it will not include the U.S. Holder's holding period of the existing Bond deemed surrendered in the exchange.

Any gain or loss recognized would be capital or ordinary, depending on the status of the Claim in the Holder's hands, including whether the Claim constitutes a market discount bond in the Holder's hands. Generally, any gain or loss recognized by a Holder of a Claim would be a long-term capital gain if the Claim is a capital asset in the hands of the Holder and the Holder has held such Claim for more than one year, unless the Holder had previously claimed a bad debt or worthless securities deduction or the Holder had accrued market discount, which is generally treated as ordinary income, with respect to such Claim. If the Holder realizes a capital loss, the Holder's deduction for the loss may be subject to limitation.

**2.      PFRS Claims and GRS Claims**

Holders of PFRS Claims and Holders of GRS Claims who receive any PFRS Adjusted Pension Amount, GRS Adjusted Pension Amount, or other future benefit payments, as applicable, generally will recognize taxable, ordinary income to the extent of such amounts received, which amounts may be treated as compensation income to them, depending on the nature of the Claims and the payments received.

## C. Certain Other Tax Considerations for Holders of Claims

### 1. Accrued but Unpaid Interest

In general, a Claim Holder that was not previously required to include in taxable income any accrued but unpaid interest on a Claim that is not a tax-exempt Bond may be required to take such amount into income as taxable interest for U.S. federal income tax purposes upon receipt of a Distribution with respect to such interest. A Claim Holder that was previously required to include in taxable income any accrued but unpaid interest on the Claim may be entitled to recognize a deductible loss to the extent that such interest is not satisfied under the Plan. The Plan provides that, to the extent applicable, all Distributions to a Holder of an Allowed Claim will apply first to the principal amount of such Claim until such principal amount is paid in full and then to any applicable accrued interest included in such Claim to the extent that interest is payable under the Plan. There is no assurance, however, that the IRS will respect this treatment and will not determine that all or a portion of amounts distributed to such Holder and attributable to principal under the Plan is properly allocable to interest. Each Holder of a Claim on which interest has accrued is urged to consult its tax advisor regarding the tax treatment of Distributions under the Plan and the deductibility of any accrued but unpaid interest for U.S. federal income tax purposes.

### 2. Post-Effective Date Distributions

Holders of Claims may receive Distributions of Cash or property, including New Securities, subsequent to the Effective Date. The imputed interest provisions of the IRC may apply to treat a portion of any post-Effective Date distribution as imputed interest for U.S. federal income tax purposes. Imputed interest may, with respect to certain Holders, accrue over time using the constant interest method, in which event the Holder may, under some circumstances, be required to include imputed interest in income prior to receipt of a Distribution.

In addition, because additional Distributions may be made to Holders of Claims after the initial Distribution, any loss and a portion of any gain realized by a Holder may be deferred until the Holder has received its final Distribution. All Holders are urged to consult their tax advisors regarding the possible application of, or ability to elect out of, the "installment method" of reporting gain that may be recognized in respect of a Claim.

### 3. Bad Debt and/or Worthless Securities Deduction

A Holder who, under the Plan, receives in respect of an Allowed Claim an amount less than the Holder's tax basis in the Allowed Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under section 166(a) of the IRC or a worthless securities deduction under section 165(g) of the IRC. The rules governing the character, timing and amount of bad debt or worthless securities deductions place considerable emphasis on the facts and circumstances of the Holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

### 4. Information Reporting and Backup Withholding

All Distributions under the Plan will be subject to applicable U.S. federal income tax reporting and withholding. The IRC imposes "backup withholding" (currently at a rate of 28%) on certain "reportable" payments to certain taxpayers, including payments of interest. Under the IRC's backup withholding rules, a Holder of a Claim may be subject to backup withholding with respect to Distributions or payments made pursuant to the Plan, unless the Holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional federal income tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of income tax. A Holder of a Claim may be required to establish an exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

### 5. Importance of Obtaining Professional Tax Assistance

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX OR LEGAL ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY

VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## XIII.

## APPLICABILITY OF CERTAIN FEDERAL AND STATE SECURITIES LAWS

### A.      General

#### 1.      Registration Of Securities

In general, securities issued by the City, such as the New Securities are exempt from the registration requirements of the Securities Act under section 3(a)(2) of the Securities Act.

In addition to exemptions provided to local governments such as the City under the Securities Act, section 1145(a)(1) of the Bankruptcy Code provides an exemption to all kinds of debtors from the registration requirements of the Securities Act and from any requirements arising under state securities laws in conjunction with the offer or sale of securities of the debtor under a plan of adjustment where such securities are issued to a creditor of the debtor. The Bankruptcy code provides that certain creditors, which are deemed "underwriters" within the meaning of the Bankruptcy Code, may not resell obligations of a debtor, which they receive pursuant to a plan of adjustment without registration. Since obligations of the City are exempt from registration under generally applicable securities law, this exception is not relevant to securities of the City, although the provisions of section 1145 of the Bankruptcy Code which suspend the operation of securities laws may not be available to "underwriters" within the meaning of the Bankruptcy Code. Creditors of the City who believe they meet the definition of "underwriter" within the meaning of the Bankruptcy Code should consult qualified counsel with respect to their obligations under relevant federal and state securities laws.

Because the Exit Facility is not being issued directly to the creditors of the City in connection with the Plan, but will be publically offered, the City intends to rely on generally applicable securities law exemptions for the offering and sale of the Exit Facility. The City does not expect to offer the Exit Facility in states where registration of City securities may be required by the applicable state securities law, unless first registered. The New Securities issued under the Plan of Adjustment will also be exempt from registration under federal or state securities law to the maximum extent provided under section 1145 of the Bankruptcy Code. The remainder of the City's publicly traded securities will not be exchanged, reoffered or refinanced by the Plan, and therefore, the City does not expect implementation of the Plan to implicate federal securities laws with respect to those obligations. Holders of the City's publicly traded securities not specifically mentioned in this paragraph should consult with qualified counsel to determine if any state securities laws may be implicated in connection with the Plan.

Like the exemption from registration provided by the City under section 3(a)(2) of the Securities Act, generally applicable securities laws provide an exemption from qualification for certain trust indentures entered into by governmental entities. Therefore, each trust indenture, ordinance and resolution relating to DWSD Bonds or the Bonds will be exempt from qualification under section 304(a)(4) of the Trust Indenture Act.

#### 2.      Market Disclosure

#### (a)      Initial Offer and Sale

Although exempt from registration, securities issued by the City are subject to the anti-fraud provisions of federal securities laws. Section 10(b) of the Securities Act and Rule 10b-5 promulgated by the SEC under the Securities Act generally prohibit fraud in the purchase and sale of securities. Therefore, each publicly offered sale of City obligations typically is accompanied by an offering document that is referred to as an "Official Statement" and contains disclosure of material information regarding the issuer and the securities being sold so that investors may make an informed investment decisions as to whether to purchase the securities being offered. Section 1125(d) of the Bankruptcy Code provides that the adequacy of any disclosure to creditors and hypothetical investors typical of Holders of Claims in this case is not subject to principals of any otherwise applicable non-bankruptcy law, rule or regulation, which includes federal securities laws. Instead, section 1124(d) of the Bankruptcy Code provides disclosure regulation by requiring that adequate information be provided to the various classes of creditors of the City and to hypothetical investors in obligations of the City through a disclosure statement such as this.

However, as described in the Plan, the City will issue bonds pursuant to the Exit Facility. In connection with the sale of the Exit Facility bonds in a public offering, the City will prepare an Official Statement

### (b) Continuing Disclosure

Publicly offered securities of the City generally are subject to the requirements of Rule 15c2-12 (the "Rule"), promulgated by the SEC under the Securities Act, unless such securities meet certain exemptions provided for in the Rule. Among other requirements, the Rule requires underwriters participating in an offering to obtain an agreement imposing ongoing market disclosure requirements upon an issue of municipal securities, such as the City. The Rule will apply to the issuance and sale of the Exit Facility by the City, and the City intends to comply with the Rule by delivering a continuing disclosure undertaking in customary form contemporaneously with the delivery of the Exit Facility.

The delivery of the New Securities pursuant to the Plan is not covered by the Rule because the New Securities are proposed to be issued in exchange for a claimholder's Claim without the involvement of an underwriter as defined in the Rule. However, the City intends to voluntarily execute and deliver for the benefit of Holders of the New Securities, a new continuing Disclosure Undertaking containing certain disclosure obligations to be delivered on the Plan of Adjustment Effective Date.

State securities laws generally provide registration exemptions for subsequent transfers by a bona fide owner for the owner's own account and subsequent transfers to institutional or accredited investors. Such exemptions generally are expected to be available for subsequent transfers of the New Securities.

## XIV.

## ADDITIONAL INFORMATION

Any statements in this Disclosure Statement concerning the provisions of any document are not necessarily complete, and in each instance reference is made to such document for the full text thereof. Certain documents described or referred to in this Disclosure Statement have not been attached as Exhibits because of the impracticability of furnishing copies of these documents to all recipients of this Disclosure Statement. All Exhibits to the Plan will be Filed with the Bankruptcy Court and available for review, free of charge, on the Document Website at *http://www.kccllc.net/detroit* prior to the Voting Deadline. Copies of all Exhibits to the Plan also may be obtained, free of charge, by contacting the Solicitation and Tabulation Agent (A) by telephone (1) for U.S. and Canadian callers toll-free at 877-298-6236 and (2) for international callers at +1 310-751-2658; or (B) in writing at City of Detroit c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245. All parties entitled to vote on the Plan are encouraged to obtain and review all Exhibits to the Plan prior to casting their vote.

# XV.

## RECOMMENDATION AND CONCLUSION

The City believes that the Confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the City urges all parties entitled to vote to accept the Plan and to evidence their acceptance by duly completing and returning their Ballots so that they will be received on or before the Voting Deadline.

Dated: March 31, 2014

Respectfully submitted,

City of Detroit, Michigan

By:     /s/  Kevyn D. Orr

       Name:   Kevyn D. Orr

       Title:     Emergency Manager

COUNSEL:


  /s/ David G. Heiman
David G. Heiman
Heather Lennox
Thomas A. Wilson
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Bruce Bennett
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243 2382
Facsimile:  (213) 243 2539

Jonathan S. Green
Stephen S. LaPlante
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500

ATTORNEYS FOR THE DEBTOR

-149-
13-53846-swr   Doc 8372   Filed 12/16/14   Entered 12/16/14 08:24:40   Page 162 of 602
13-53846-tjt   Doc 3392   Filed 03/31/14   Entered 03/31/14 18:36:08   Page 162 of 162

# EXHIBIT A

PLAN OF ADJUSTMENT

THE BANKRUPTCY COURT HAS NOT APPROVED THE PROPOSED DISCLOSURE STATEMENT TO ACCOMPANY THIS PLAN. THE DISTRIBUTION OF THIS PLAN AND THE DISCLOSURE STATEMENT IS NOT INTENDED TO BE, AND SHOULD NOT BE CONSTRUED AS, A SOLICITATION OF VOTES ON THIS PLAN. THE CITY OF DETROIT, MICHIGAN RESERVES THE RIGHT TO MODIFY, AMEND, SUPPLEMENT, RESTATE OR WITHDRAW THIS PLAN, THE DISCLOSURE STATEMENT AND ALL ANCILLARY DOCUMENTS AT ANY TIME.

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

```
-------------------------------------------------------- x
                                                         :
In re                                                    :     Chapter 9
                                                         :
CITY OF DETROIT, MICHIGAN,                                :     Case No. 13-53846
                                                         :
          Debtor.                                        :     Hon. Steven W. Rhodes
                                                         :
                                                         :
-------------------------------------------------------- x
```

---

### AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT
(March 31, 2014)

---

DAVID G. HEIMAN
HEATHER LENNOX
THOMAS A. WILSON
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

BRUCE BENNETT
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 489-3939
Facsimile: (213) 243-2539
bbennett@jonesday.com

JONATHAN S. GREEN
STEPHEN S. LAPLANTE
MILLER, CANFIELD,
    PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE DEBTOR

# TABLE OF CONTENTS

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME .................. 1

    A.     Defined Terms. ........................................................................................................... 1

    B.     Rules of Interpretation and Computation of Time. ..................................................... 22

          1.    Rules of Interpretation. ................................................................................ 22

          2.    Computation of Time. ................................................................................... 23

ARTICLE II CLASSIFICATION OF CLAIMS; CRAMDOWN;  EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........................................................................................................ 23

    A.     Unclassified Claims. .................................................................................................. 23

          1.    Payment of Administrative Claims. .............................................................. 23

          2.    Bar Dates for Administrative Claims. .......................................................... 24

    B.     Classified Claims. ...................................................................................................... 24

          1.    Designation of Classes. ................................................................................. 24

          2.    Subordination; Reservation of Rights to Reclassify Claims. ........................ 25

          3.    Treatment of Claims. .................................................................................... 26

    C.     Confirmation Without Acceptance by All Impaired Classes ...................................... 36

    D.     Treatment of Executory Contracts and Unexpired Leases ......................................... 36

          1.    Assumption. .................................................................................................. 36

          2.    Assumption of Ancillary Agreements. ......................................................... 36

          3.    Approval of Assumptions and Assignments. ................................................ 36

          4.    Payments Related to the Assumption of Executory Contracts and Unexpired Leases ........................................................................................... 37

          5.    Contracts and Leases Entered Into After the Petition Date........................... 37

          6.    Rejection of Executory Contracts and Unexpired Leases. ........................... 37

          7.    Rejection Damages Bar Date. ....................................................................... 37

          8.    Preexisting Obligations to the City Under Rejected Executory Contracts and Unexpired Leases. ................................................................................... 37

          9.    Insurance Policies. ........................................................................................ 38

ARTICLE III CONFIRMATION OF THE PLAN........................................................................ 38

    A.     Conditions Precedent to the Effective Date. .............................................................. 38

    B.     Waiver of Conditions to the Effective Date. .............................................................. 39

    C.     Effect of Nonoccurrence of Conditions to the Effective Date. .................................. 39

    D.     Effect of Confirmation of the Plan. ........................................................................... 39

          1.    Dissolution of Retiree Committee. ............................................................... 39

          2.    Preservation of Rights of Action by the City. .............................................. 39

          3.    Comprehensive Settlement of Claims and Controversies. ............................ 39

          4.    Discharge of Claims. .................................................................................... 40

| | | |
|---|---|---|
| 5. | Injunction. | 40 |
| 6. | Exculpation. | 41 |
| 7. | Releases | 41 |
| E. | Effectiveness of the Plan. | 42 |
| F. | Binding Effect of Plan. | 42 |

ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN .......................... 42

| | | |
|---|---|---|
| A. | Alternatives Related to the DWSD. | 42 |
| | 1. DWSD Remains a Department of the City. | 42 |
| | 2. Potential DWSD Transaction. | 43 |
| B. | The New Securities. | 43 |
| C. | The Plan COP Settlement. | 43 |
| D. | The State Contribution Agreement. | 43 |
| E. | The DIA Settlement. | 43 |
| | 1. Funding Contributions. | 43 |
| | 2. Transfer of DIA Assets. | 44 |
| | 3. Conditions to the Foundations' Participation. | 44 |
| F. | Issuance of the New Securities. | 44 |
| G. | Cancellation of Existing Bonds and Bond Documents. | 44 |
| H. | Release of Liens. | 45 |
| I. | Professional Fee Reserve | 45 |
| J. | Assumption of Indemnification Obligations. | 45 |
| K. | Incorporation of Retiree Health Care Settlement Agreement. | 45 |
| L. | Payment of Workers' Compensation Claims. | 45 |
| M. | Exit Facility. | 46 |

ARTICLE V PROVISIONS REGARDING DISTRIBUTIONS UNDER THE PLAN .......................... 46

| | | |
|---|---|---|
| A. | Appointment of Disbursing Agent. | 46 |
| B. | Distributions on Account of Allowed Claims. | 46 |
| C. | Certain Claims to Be Expunged. | 46 |
| D. | Record Date for Distributions; Exception for Bond Claims. | 46 |
| E. | Means of Cash Payments. | 46 |
| F. | Selection of Distribution Dates for Allowed Claims. | 47 |
| G. | Limitations on Amounts to Be Distributed to Holders of Allowed Claims Otherwise Insured. | 47 |
| H. | City's Rights of Setoff Preserved. | 47 |
| I. | Delivery of Distributions and Undeliverable or Unclaimed Distributions. | 47 |
| | 1. Delivery of Distributions Generally. | 47 |
| | 2. Delivery of Distributions on Account of Bond Claims. | 47 |

|   |   | 3. | De Minimis Distributions / No Fractional New Securities. | 48 |
|---|---|---|---|---|
|   |   | 4. | Undeliverable or Unclaimed Distributions. | 48 |
|   |   | 5. | Time Bar to Cash Payment Rights. | 48 |
|   | J. | | Other Provisions Applicable to Distributions in All Classes | 48 |
|   |   | 1. | No Postpetition Interest. | 48 |
|   |   | 2. | Compliance with Tax Requirements. | 48 |
|   |   | 3. | Allocation of Distributions. | 49 |
|   |   | 4. | Surrender of Instruments. | 49 |

ARTICLE VI PROCEDURES FOR RESOLVING DISPUTED CLAIMS ............ 50

|   | A. | | Treatment of Disputed Claims. | 50 |
|---|---|---|---|---|
|   |   | 1. | General. | 50 |
|   |   | 2. | ADR Procedures. | 50 |
|   |   | 3. | Tort Claims. | 50 |
|   | B. | | Disputed Claims Reserve. | 51 |
|   | C. | | Objections to Claims. | 51 |
|   |   | 1. | Authority to Prosecute, Settle and Compromise. | 51 |
|   |   | 2. | Application of Bankruptcy Rules. | 51 |
|   |   | 3. | Expungement or Adjustment of Claims Without Objection. | 51 |
|   |   | 4. | Extension of Claims Objection Bar Date. | 51 |
|   |   | 5. | Authority to Amend List of Creditors. | 51 |

ARTICLE VII RETENTION OF JURISDICTION ............ 52

ARTICLE VIII MISCELLANEOUS PROVISIONS ............ 53

|   | A. | Modification of the Plan. | 53 |
|---|---|---|---|
|   | B. | Revocation of the Plan. | 53 |
|   | C. | Disclosure of Amounts to Be Paid for Chapter 9 Case Services. | 53 |
|   | D. | Severability of Plan Provisions. | 53 |
|   | E. | Effectuating Documents and Transactions. | 54 |
|   | F. | Successors and Assigns. | 54 |
|   | G. | Plan Controls. | 54 |
|   | H. | Notice of the Effective Date. | 54 |
|   | I. | Governing Law. | 54 |
|   | J. | Request for Waiver of Automatic Stay of Confirmation Order. | 54 |
|   | K. | Term of Existing Injunctions and Stays. | 54 |
|   | L. | Service of Documents | 55 |
|   |   | 1. | The City | 55 |
|   |   | 2. | The Retiree Committee | 55 |

## TABLE OF EXHIBITS

| | |
|---|---|
| Exhibit I.A.56 | Schedule of COP Swap Agreements |
| Exhibit I.A.71 | Form of Detroit VEBA Trust Agreement |
| Exhibit I.A.79 | Principal Terms of DIA Settlement |
| Exhibit I.A.80 | Form of DIA Settlement Documents |
| Exhibit I.A.98 | Schedule of DWSD Class A Sewer Documents & Related DWSD Class A Sewer Bonds |
| Exhibit I.A.101 | Schedule of DWSD Class A Water Documents & Related DWSD Class A Water Bonds |
| Exhibit I.A.104 | Schedule of DWSD Class B Sewer Documents & Related DWSD Class B Sewer Bonds |
| Exhibit I.A.107 | Schedule of DWSD Class B Water Documents & Related DWSD Class B Water Bonds |
| Exhibit I.A.112 | Schedule of DWSD Revolving Sewer Bond Documents & Related DWSD Revolving Sewer Bonds |
| Exhibit I.A.115 | Schedule of DWSD Revolving Water Bond Documents & Related DWSD Revolving Water Bonds |
| Exhibit I.A.127 | Principal Terms of Exit Facility |
| Exhibit I.A.148.a | Form of GRS Hybrid Pension Plan |
| Exhibit I.A.148.b | Principal Terms of GRS Hybrid Pension Plan |
| Exhibit I.A.151 | Form of GRS Trust Agreement |
| Exhibit I.A.154 | Schedule of HUD Installment Note Documents & Related HUD Installment Notes |
| Exhibit I.A.159 | Interest Rate Reset Chart |
| Exhibit I.A.163 | Schedule of Limited Tax General Obligation Bond Documents & Related Limited Tax General Obligation Bonds |
| Exhibit I.A.171 | Principal Terms of New B Notes |
| Exhibit I.A.172 | Form of New B Notes Documents |
| Exhibit I.A.173 | Form of New DWSD Bond Documents |
| Exhibit I.A.174 | Principal Terms of New DWSD Bonds |
| Exhibit I.A.175 | Form of New Existing Rate DWSD Bond Documents |
| Exhibit I.A.176 | Principal Terms of New Existing Rate DWSD Bonds |

| | |
|---|---|
| Exhibit I.A.177 | Form of New Existing Rate GLWA Bond Documents |
| Exhibit I.A.178 | Principal Terms of New Existing Rate GLWA Bonds |
| Exhibit I.A.180 | Form of New GLWA Bond Documents |
| Exhibit I.A.181 | Principal Terms of New GLWA Bonds |
| Exhibit I.A.182 | Form of New GLWA Revolving Bond Documents |
| Exhibit I.A.183 | Principal Terms of New GLWA Revolving Bonds |
| Exhibit I.A.202.a | Form of PFRS Hybrid Pension Plan |
| Exhibit I.A.202.b | Principal Terms of PFRS Hybrid Pension Plan |
| Exhibit I.A.205 | Form of PFRS Trust Agreement |
| Exhibit I.A.208 | Form of Plan COP Settlement Documents |
| Exhibit I.A.210 | Principal Terms of Plan UTGO Notes |
| Exhibit I.A.211 | Form of Plan UTGO Note |
| Exhibit I.A.227 | Retiree Health Care Settlement Agreement |
| Exhibit I.A.232 | Schedule of Secured GO Bond Documents |
| Exhibit I.A.255 | State Contribution Agreement |
| Exhibit I.A.268 | Schedule of Unlimited Tax General Obligation Bond Documents & Related Unlimited Tax General Obligation Bonds |
| Exhibit II.B.3.t.ii.A | Schedule of Payments and Sources of Payments for Modified PFRS Pension Benefits |
| Exhibit II.B.3.u.ii.A | Schedule of Payments and Sources of Payments for Modified GRS Pension Benefits |
| Exhibit II.D.5 | Schedule of Postpetition Collective Bargaining Agreements |
| Exhibit II.D.6 | Executory Contracts and Unexpired Leases to Be Rejected |
| Exhibit III.D.2 | Retained Causes of Action |

# INTRODUCTION

The City of Detroit proposes the following plan for the adjustment of its debts pursuant to and in accordance with chapter 9 of the Bankruptcy Code.

A discussion of the City's organizational structure, operations, capital structure and events leading to the commencement of the City's Chapter 9 Case, as well as a summary and description of the Plan, risk factors and other related matters, is included in the Disclosure Statement. Retirees of the City will receive a supplement summarizing important information relevant to their entitlement to benefits (the "Retiree Supplement"). Other agreements and documents, which have been or will be Filed with the Bankruptcy Court, are referenced in the Plan or the Disclosure Statement and are available for review.

The City encourages all of its creditors to read the Plan, the Disclosure Statement and the other material that has been approved for use in soliciting votes on the Plan and encourages holders of claims for pensions and other post-employment benefits to read the Retiree Supplement and to consider the information included on the Ballot before casting a vote to accept or reject the Plan and before choosing among available treatment options.

## ARTICLE I
## DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME

**A.** **Defined Terms.**

Capitalized terms used in the Plan have the meanings set forth in this Section I.A. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules.

1. "2005 COPs" means, collectively, the Detroit Retirement Systems Funding Trust 2005 Certificates of Participation Series 2005-A, issued by the Detroit Retirement Systems Funding Trust 2005 pursuant to the 2005 COPs Agreement, in an initial principal amount of $640 million, bearing interest at 4.0% to 4.948%.

2. "2005 COPs Agreement" means the Trust Agreement by and between the COP Service Corporations and U.S. Bank National Association, as trustee, dated June 2, 2005, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments.

3. "2006 COPs" means, collectively, the (a) Detroit Retirement Systems Funding Trust 2006 Certificates of Participation Series 2006-A, issued by the Detroit Retirement Systems Funding Trust 2006 pursuant to the 2006 COPs Agreement, in an initial principal amount of $148.5 million, bearing interest at 5.989%; and (b) Detroit Retirement Systems Funding Trust 2006 Certificates of Participation Series 2006-B, issued by the Detroit Retirement Systems Funding Trust 2006 pursuant to the 2006 COPs Agreement, in an initial principal amount of $800 million, bearing interest at a floating rate.

4. "2006 COPs Agreement" means the Trust Agreement by and between the COP Service Corporations and U.S. Bank National Association, as trustee, dated June 12, 2006, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments.

5. "36th District Court" means the district court for the thirty-sixth judicial district of the State.

6. "Accepting Holder" means any Holder of a Pension Claim who votes to accept the Plan on a timely-returned Ballot.

7. "Actual Return" means, for each Fiscal Year during the period beginning July 1, 2003 and ending June 30, 2014, the actual net return percentage on invested GRS assets for that Fiscal Year; provided that, if the actual net return percentage on invested GRS assets for any given Fiscal Year is greater than 7.9%, the Actual

Return for that Fiscal Year shall be 7.9%, and if the actual net return percentage on invested GRS assets for any given Fiscal Year is less than 0.0%, the Actual Return for that Fiscal Year shall be 0.0%.

8.      "Active ASF Participant" means an active or terminated employee of the City who presently maintains an Annuity Savings Fund account.

9.      "Active Employee" means an active employee of the City on and after the Confirmation Date.

10.     "Adjusted Pension Amount" means the GRS Adjusted Pension Amount and/or the PFRS Adjusted Pension Amount, as applicable.

11.     "Administrative Claim" means a Claim against the City arising on or after the Petition Date and prior to the Effective Date for a cost or expense of administration related to the Chapter 9 Case that is entitled to priority or superpriority under sections 364(c)(1), 503(b) or 507(b)(2) of the Bankruptcy Code; provided that no claim for professional fees or any other costs or expenses incurred by the Creditors' Committee shall be considered an Administrative Claim.

12.     "ADR Injunction" means the injunction set forth at Section I.B of the ADR Procedures.

13.     "ADR Procedures" means the alternative dispute resolution procedures approved by the ADR Procedures Order, as such procedures may be modified by further order of the Bankruptcy Court.

14.     "ADR Procedures Order" means the Order, Pursuant to Sections 105 and 502 of the Bankruptcy Code, Approving Alternative Dispute Resolution Procedures to Promote the Liquidation of Certain Prepetition Claims (Docket No. 2302), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on December 24, 2013, as it may be subsequently amended, supplemented or otherwise modified.

15.     "Affiliate" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

16.     "Allowed Claim(s)" means: (a) a Claim, proof of which has been timely Filed by the applicable Bar Date (or for which Claim under express terms of the Plan, the Bankruptcy Code or a Final Order of the Bankruptcy Court, a proof of Claim is not required to be Filed); (b) a Claim (i) that is listed in the List of Creditors, (ii) that is not identified on the List of Creditors as contingent, unliquidated or disputed and (iii) for which no proof of Claim has been timely Filed; (c) a Claim allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; (d) a Claim designated as allowed in a stipulation or agreement between the City and the Holder of the Claim that is Filed; or (e) a Claim designated as allowed in a pleading entitled "Designation of Allowed Claims" (or a similar title of the same import) that is Filed; provided that with respect to any Claim described in clauses (a) or (b) above, such Claim shall be considered allowed only if and to the extent that (x) no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or (y) if an objection is so interposed, the Claim shall have been allowed by a Final Order. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed to be an Allowed Claim unless and until such Entity pays in full the amount that it owes the City.  "Allow" and "Allowing" shall have correlative meanings.

17.     "Annuity Savings Fund" means that sub-account and pension benefit arrangement that is part of the GRS and operated by the trustees of the GRS.

18.     "ASF Recoupment Percentage" means a percentage that will represent the impact on GRS' assets and liabilities of the total deductions from the Annuity Savings Fund accounts of Active ASF Participants, and the total actuarial present value of the aggregate deductions from the Current Accrued Annual Pensions of ASF Distribution Recipients, all as described in Section II.B.3.u.ii.D.

19.     "ASF Distribution Recipient" means a person who participates in the GRS and who participated in the Annuity Savings Fund at any time during the period beginning July 1, 2003 and ending June 30, 2013, and who has already received a distribution from the Annuity Savings Fund.

20. "Ballot" means the ballot upon which a Holder of an Impaired Claim entitled to vote shall cast its vote to accept or reject the Plan and make certain elections provided for in the Plan.

21. "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as now in effect or hereafter amended.

22. "Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Michigan having jurisdiction over the Chapter 9 Case, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to § 151 of title 28 of the United States Code, the District Court.

23. "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the general, local and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended, as applicable to the Chapter 9 Case.

24. "Bar Date" means the applicable bar date by which a proof of Claim must be or must have been Filed, as established by an order of the Bankruptcy Court, including a Bar Date Order and the Confirmation Order.

25. "Bar Date Order" means any order of the Bankruptcy Court establishing Bar Dates for Filing proofs of Claim in the Chapter 9 Case, including the Order, Pursuant to Sections 105, 501 and 503 of the Bankruptcy Code and Bankruptcy Rules 2002 and 3003(c), Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof (Docket No. 1782), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on November 21, 2013, as it may be amended, supplemented or otherwise modified.

26. "Bond Agent" means a trustee, paying agent or similar Entity, as applicable, under the Bond Documents.

27. "Bond Claims" means, collectively, the DWSD Class A Sewer Claims, the DWSD Class A Water Claims, the DWSD Class B Sewer Claims, the DWSD Class B Water Claims, the DWSD Revolving Bond Claims, the General Obligation Bond Claims, the HUD Installment Note Claims, the Parking Bond Claims and the Secured GO Bond Claims.

28. "Bond Documents" means, collectively, the DWSD Class A Sewer Documents, the DWSD Class A Water Documents, the DWSD Class B Sewer Documents, the DWSD Class B Water Documents, the DWSD Revolving Bond Documents, the General Obligation Bond Documents, the HUD Installment Note Documents, the Parking Bond Documents and the Secured GO Bond Documents.

29. "Bond(s)" means, individually or collectively, the DWSD Class A Sewer Bonds, the DWSD Class A Water Bonds, the DWSD Class B Sewer Bonds, the DWSD Class B Water Bonds, the DWSD Revolving Sewer Bonds, the DWSD Revolving Water Bonds, the General Obligation Bonds, the HUD Installment Notes, the Parking Bonds and/or the Secured GO Bonds.

30. "Bondholder" means any beneficial or record holder of a Bond.

31. "Bond Insurance Policies" means those policies and/or other instruments insuring any Bond and obligations related thereto, including all ancillary and related documents that may obligate the City to pay any amount to a Bond Insurer for any reason.

32. "Bond Insurance Policy Claim" means a Claim held by a Bond Insurer arising under or in connection with a Bond Insurance Policy.

33. "Bond Insurer" means any party, other than the City, that has issued a Bond Insurance Policy.

34. "Business Day" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

-3-

13-53846-tjt Doc 8773-2 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 172 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 18:36:58 Page 90 of 602
236

35.     "Cash" means legal tender of the United States of America and equivalents thereof.

36.     "Causes of Action" means, without limitation, any and all actions, causes of action, controversies, liabilities, obligations, rights, suits, damages, judgments, claims and demands whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Effective Date, including without limitation (a) claims and causes of action under sections 502(d), 510, 544, 545, 547, 548, 549(a), 549(c), 549(d), 550, 551 and 553 of the Bankruptcy Code and (b) any other avoidance or similar claims or actions under the Bankruptcy Code or under similar or related state or federal statutes or common law, and, in the case of each Cause of Action, the proceeds thereof, whether received by judgment, settlement or otherwise.

37.     "CFSEM Supporting Organization" means the Foundation for Detroit's Future, a supporting organization of, and an Entity legally separate from, the Community Foundation for Southeast Michigan, solely in its capacity as a participant in the DIA Settlement.

38.     "Chapter 9 Case" means the bankruptcy case commenced by the City under chapter 9 of the Bankruptcy Code, captioned as *In re City of Detroit, Michigan*, Case No. 13-53846 (Bankr. E.D. Mich.), and currently pending before the Bankruptcy Court.

39.     "City" means the City of Detroit, Michigan.

40.     "City Council" means the duly-elected City Council of the City.

41.     "Claim" means a claim, as defined in section 101(5) of the Bankruptcy Code, against the City.

42.     "Claims and Balloting Agent" means Kurtzman Carson Consultants, LLC, in its capacity as Bankruptcy Court-appointed claims and balloting agent for the Chapter 9 Case.

43.     "Claims Objection Bar Date" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) one year after the Effective Date, subject to extension by an order of the Bankruptcy Court, (b) 90 days after the Filing of a proof of Claim for such Claim and (c) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court.

44.     "Claims Register" means the official register of Claims maintained by the Claims and Balloting Agent.

45.     "Class" means a class of Claims, as described in Section II.B.

46.     "Confirmation" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 9 Case.

47.     "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket in the Chapter 9 Case, within the meaning of Bankruptcy Rules 5003 and 9021.

48.     "Confirmation Hearing" means the hearing held by the Bankruptcy Court on Confirmation of the Plan, as such hearing may be continued.

49.     "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 943 of the Bankruptcy Code, as it may be subsequently amended, supplemented or otherwise modified.

50.     "Convenience Claim" means a Claim that would otherwise be an Other Unsecured Claim that is (a) an Allowed Claim in an amount less than or equal to $25,000.00; or (b) in an amount that has been reduced to $25,000.00 pursuant to an election made by the Holder of such Claim; provided that, where any portion(s) of a single Claim has been transferred, (y) the amount of all such portions will be aggregated to determine whether a

-4-

13-53846-tjt  Doc 8772  Filed 12/10/14  Entered 12/10/14 08:24:40  Page 173 of 602
13-53846-swr  Doc 6382  Filed 03/31/14  Entered 03/31/14 8:36:58  page 91 of
236

Claim qualifies as a Convenience Claim and for purposes of the Convenience Claim election and (z) unless all transferees make the Convenience Claim election on the applicable Ballots, the Convenience Claim election will not be recognized for such Claim.

51. "COPs" means, collectively, the 2005 COPs and the 2006 COPs.

52. "COP Claim" means a Claim under or evidenced by the COP Service Contracts.

53. "COP Litigation" means the adversary proceeding captioned as *City of Detroit, Michigan v. Detroit General Retirement System Service Corporation, Detroit Police and Fire Retirement System Service Corporation, Detroit Retirement Systems Funding Trust 2005 and Detroit Retirement Systems Funding Trust 2006*, Case No. 14-04112 (Bankr. E.D. Mich.), filed in the Chapter 9 Case on January 31, 2014.

54. "COP Service Contracts" means, collectively, the (a) the GRS Service Contract 2005, dated May 25, 2005, by and between the City and the Detroit General Retirement System Service Corporation; (b) the PFRS Service Contract 2005, dated May 25, 2005, by and between the City and the Detroit Police and Fire Retirement System Service Corporation; (c) the GRS Service Contract 2006, dated June 7, 2006, by and between the City and the Detroit General Retirement System Service Corporation; and (d) the PFRS Service Contract 2006, dated June 7, 2006, by and between the City and the Detroit Police and Fire Retirement System Service Corporation, as each of the foregoing may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments.

55. "COP Service Corporations" means, collectively, the Detroit General Retirement System Service Corporation and the Detroit Police and Fire Retirement System Service Corporation.

56. "COP Swap Agreements" means the 1992 ISDA Master Agreements (Local Currency Single Jurisdiction) between the COP Service Corporations and the COP Swap Counterparties, as set forth on Exhibit I.A.56, together with all ancillary and related instruments and agreements, as the same may have been subsequently amended, restated, supplemented or otherwise modified.

57. "COP Swap Claim" means a Claim by the COP Swap Counterparties arising under the COP Swap Documents.

58. "COP Swap Collateral Agreement" means the Collateral Agreement among the City, the COP Service Corporations, the COP Swap Collateral Agreement Custodian and the COP Swap Counterparties, together with all ancillary and related instruments and agreements.

59. "COP Swap Collateral Agreement Custodian" means U.S. Bank National Association as custodian under the COP Swap Collateral Agreement or any successor custodian.

60. "COP Swap Counterparties" means UBS AG or Merrill Lynch Capital Services, Inc., as successor to SBS Financial Products Company LLC, under the COP Swap Documents.

61. "COP Swap Documents" means the COP Swap Agreements and the COP Swap Collateral Agreement.

62. "COP Swap Settlement" means that Settlement and Plan Support Agreement among the City and the COP Swap Counterparties filed with the Bankruptcy Court on the docket of the Chapter 9 Case on March 26, 2014 (Docket No. 3234), as it may be subsequently amended, supplemented or otherwise modified in accordance therewith.

63. "COP Swap Settlement Approval Order" means an order entered by the Bankruptcy Court approving the COP Swap Settlement.

64. "Counties" means, collectively, Macomb County, Oakland County and Wayne County.

-5-
236
13-53846-swr Doc 8772 Filed 12/10/14 Entered 12/10/14 09:24:43 Page 174 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 18:36:58 Page 92 of 92

65. "Creditor Representative" means (a) if all Retiree Classes accept the plan, the Retiree Committee, (b) if any Retiree Class rejects the Plan and Class 7 accepts the Plan, a person or committee of persons appointed by the five largest beneficial holders of Class 7 Claims other than the LTGO Insurer and (c) if any Retiree Class rejects the plan and Class 7 rejects the plan, a person or committee of persons appointed by the Emergency Manager.

66. "Cure Amount Claim" means a Claim based upon the City's defaults under an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the City under section 365 of the Bankruptcy Code to the extent such Claim is required to be cured by section 365 of the Bankruptcy Code.

67. "Current Accrued Annual Pension" means, with respect to any Holder of a Pension Claim, the amount of annual pension benefits that the applicable Retirement System (a) is obligated to pay to such Holder as of June 30, 2014 to the extent such Holder is retired and receiving, or terminated from City employment and eligible to receive, a monthly pension as of such date or (b) would be obligated to pay such Holder upon his or her future retirement to the extent such Holder is actively employed by the City on June 30, 2014, assuming such Holder's annual pension is frozen as of June 30, 2014, and such Holder is no longer able to accrue pension benefits after such date under the current terms and conditions of the applicable Retirement System, in either case as reflected on the books and records of the applicable Retirement System as of June 30, 2014, but in no case shall such Current Accrued Annual Pension include a right to supplemental pension benefits to be paid after July 1, 2014 in respect of cost of living adjustments.

68. "CUSIP" means the nine-character identifier (consisting of letters and numbers) that uniquely identifies any particular issue of DWSD Bonds.

69. "Detroit VEBA" means a voluntary employees' beneficiary association established in accordance with section 501(c)(9) of the Internal Revenue Code of 1986 and regulations thereunder that provides life, sickness, accident or other similar benefits to Detroit VEBA Beneficiaries, certain of their dependents and future retirees of the City.

70. "Detroit VEBA Beneficiary" means a Holder of an Allowed OPEB Claim.

71. "Detroit VEBA Trust Agreement" means the definitive documentation to be executed in connection with the formation of the Detroit VEBA, in substantially the form attached hereto as Exhibit I.A.71.

72. "DIA" means The Detroit Institute of Arts, a museum and cultural facility located at 5200 Woodward Avenue, Detroit, Michigan 48202.

73. "DIA Assets" means the assets identified on Exhibit A to the summary of the material terms of the DIA Settlement, which is attached hereto as Exhibit I.A.79, to the extent that the City holds title to any such assets as of the Effective Date.

74. "DIA Corp." means The Detroit Institute of Arts, a Michigan non-profit corporation.

75. "DIA Funding Parties" means the Foundations and DIA Corp.

76. "DIA Proceeds" means, collectively, the irrevocable funding commitments described in Section IV.E.1.

77. "DIA Proceeds Default Amount" means a reduction in the Adjusted Pension Amount of a Holder of a Pension Claim (or a surviving spouse thereof, if applicable) by virtue of a DIA Proceeds Payment Default, as determined by the trustees of the GRS or the PFRS, the aggregate amount of which shall be commensurate with the pertinent DIA Proceeds Payment Default.

78. "DIA Proceeds Payment Default" means a default that has not been cured during any applicable grace period, as determined by the trustees of the GRS or PFRS, by one or more DIA Funding Parties respecting

-6-

13-53846-tjt   Doc 8773   Filed 12/10/14   Entered 12/10/14 09:24:03   Page 175 of 602
13-53846-swr   Doc 6382   Filed 03/31/14   Entered 03/31/14 18:36:58   Page 93 of 236

material amounts scheduled to be paid to the City in accordance with the DIA Settlement that the City, in turn, is required to pay over to the GRS or the PFRS in accordance with the terms and conditions of the Plan.

79. "DIA Settlement" means the comprehensive settlement regarding the DIA Assets, as described at Section IV.E and as definitively set forth in the DIA Settlement Documents, the principal terms of which are attached hereto as Exhibit I.A.79.

80. "DIA Settlement Documents" means the definitive documentation, including grant award letters, to be executed in connection with the DIA Settlement, in substantially the form attached hereto as Exhibit I.A.80, which documents will substantially conform to the term sheet attached hereto as Exhibit I.A.79.

81. "Disbursing Agent" means the disbursing agent(s) appointed pursuant to Section V.A.

82. "Disclosure Statement" means the disclosure statement (including all exhibits and schedules thereto or referenced therein) that relates to the Plan and has been prepared and distributed by the City and approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, as the same may be amended, supplemented or otherwise modified.

83. "Disclosure Statement Order" means the [_____] (Docket No. [___]), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on [_____], 2014, approving the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, as it may have been subsequently amended, supplemented or otherwise modified.

84. "Disputed Claim" means any Claim that is not Allowed.

85. "Disputed COP Claims Reserve" means the reserve for Disputed COP Claims established pursuant to Section II.B.3.s.iii.B.1.

86. "Distribution" means any initial or subsequent payment or transfer made on account of an Allowed Claim under or in connection with the Plan.

87. "Distribution Amount" means the principal amount of $42,500,000 for each of the COP Swap Counterparties, plus interest, on and after October 15, 2014, on the unpaid Net Amount at the rate applicable to obligations under the Postpetition Financing Agreement, payable in cash in the manner set forth in the COP Swap Settlement Agreement.

88. "Distribution Date" means any date on which a Distribution is made.

89. "Distribution Record Date" means 5:00 p.m., Eastern Time, on the Confirmation Date.

90. "District Court" means the United States District Court for the Eastern District of Michigan.

91. "Document Website" means the internet site address http://www.kccllc.net/Detroit, at which the Plan, the Disclosure Statement and all Filed Exhibits to the Plan shall be available to any party in interest and the public, free of charge.

92. "Downtown Development Authority Claims" means Claims in respect of the Downtown Development Authority Loans.

93. "Downtown Development Authority Loans" means loans made pursuant to that certain Loan Agreement, dated August 26, 1991, by and between the City and the City of Detroit Downtown Development Authority, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements.

94. "DWSD" means the Detroit Water and Sewerage Department, which is a department of the City.

-7-
236
13-53846-tjt Doc 8732 Filed 12/16/14 Entered 12/16/14 09:24:03 Page 176 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 18:36:38 Page 94 of 402

95. "DWSD Bonds" means, collectively, the DWSD Class A Sewer Bonds, the DWSD Class B Sewer Bonds, the DWSD Class A Water Bonds and the DWSD Class B Water Bonds.

96. "DWSD Class A Sewer Bonds" means the secured notes issued pursuant to the DWSD Class A Sewer Documents, as set forth on Exhibit I.A.98.

97. "DWSD Class A Sewer Claims" means any Claim against the City arising under or evidenced by the DWSD Class A Sewer Documents, including a Claim for principal and interest on the DWSD Class A Sewer Bonds.

98. "DWSD Class A Sewer Documents" means the ordinances passed, resolutions adopted, orders issued and/or indentures executed with respect to the DWSD Class A Sewer Bonds, as set forth on Exhibit I.A.98, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

99. "DWSD Class A Water Bonds" means the secured notes issued pursuant to the DWSD Class A Water Documents, as set forth on Exhibit I.A.101.

100. "DWSD Class A Water Claims" means any Claim against the City arising under or evidenced by the DWSD Class A Water Documents, including a Claim for principal and interest on the DWSD Class A Water Bonds.

101. "DWSD Class A Water Documents" means the ordinances passed, resolutions adopted, orders issued and/or indentures executed with respect to the DWSD Class A Water Bonds, as set forth on Exhibit I.A.101, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

102. "DWSD Class B Sewer Bonds" means the secured notes issued pursuant to the DWSD Class B Sewer Documents, as set forth on Exhibit I.A.104.

103. "DWSD Class B Sewer Claims" means any Claim against the City arising under or evidenced by the DWSD Class B Sewer Documents, including a Claim for principal and interest on the DWSD Class B Sewer Bonds.

104. "DWSD Class B Sewer Documents" means the ordinances passed, resolutions adopted, orders issued and/or indentures executed with respect to the DWSD Class B Sewer Bonds, as set forth on Exhibit I.A.104, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

105. "DWSD Class B Water Bonds" means the secured notes issued pursuant to the DWSD Class B Water Documents, as set forth on Exhibit I.A.107.

106. "DWSD Class B Water Claims" means any Claim against the City arising under or evidenced by the DWSD Class B Water Documents, including a Claim for principal and interest on the DWSD Class B Water Bonds.

107. "DWSD Class B Water Documents" means the ordinances passed, resolutions adopted, orders and reports issued and/or indentures executed with respect to the DWSD Class B Water Bonds, as set forth on Exhibit I.A.107, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

108. "DWSD Revolving Bond Claims" means, collectively, the DWSD Revolving Sewer Bond Claims and the DWSD Revolving Water Bond Claims.

109. "DWSD Revolving Bond Documents" means, collectively, the DWSD Revolving Sewer Bond Documents and the DWSD Revolving Water Bond Documents.

110. "DWSD Revolving Bonds" means, collectively, the DWSD Revolving Sewer Bonds and the DWSD Revolving Water Bonds.

111. "DWSD Revolving Sewer Bond Claims" means any Claim against the City arising under or evidenced by the DWSD Revolving Sewer Bond Documents, including a Claim for principal and interest on the DWSD Revolving Sewer Bonds.

112. "DWSD Revolving Sewer Bond Documents" means the ordinances passed, resolutions adopted and/or indentures or agreements executed with respect to the DWSD Revolving Sewer Bonds, as set forth on Exhibit I.A.112, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

113. "DWSD Revolving Sewer Bonds" means the secured notes issued pursuant to the DWSD Revolving Sewer Bond Documents, as set forth on Exhibit I.A.112.

114. "DWSD Revolving Water Bond Claims" means any Claim against the City arising under or evidenced by the DWSD Revolving Water Bond Documents, including a Claim for principal and interest on the DWSD Revolving Water Bonds.

115. "DWSD Revolving Water Bond Documents" means the ordinances passed, resolutions adopted and/or indentures or agreements executed with respect to the DWSD Revolving Water Bonds, as set forth on Exhibit I.A.115, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

116. "DWSD Revolving Water Bonds" means the secured notes issued pursuant to the DWSD Revolving Water Bond Documents, as set forth on Exhibit I.A.115.

117. "DWSD Series" means an individual issue of DWSD Revolving Bonds having the same lien priority, issue date and series designation.

118. "DWSD Transaction" means the potential formation (including the transfer of certain assets owned by the DWSD) of the GLWA, as described in Section IV.A.2.

119. "Effective Date" means the Business Day, as determined by the City, on which each applicable condition contained in Section III.A has been satisfied or waived.

120. "Emergency Manager" means Kevyn D. Orr, in his capacity as emergency manager for the City serving in accordance with PA 436 or any successor emergency manager.

121. "Employee Health and Life Insurance Benefit Plan" means the Employee Health and Life Insurance Benefit Plan, a welfare benefit plan sponsored and administered by the City, which provides health, dental, vision care and life insurance benefits to (a) all officers and employees of the City who were employed on the day preceding the effective date of the benefit plan, and who continued to be employed by the City on and after the Effective Date and (b) substantially all retired officers and employees of the City.

122. "Employees Death Benefit Board of Trustees" means the governing board of the City of Detroit Employee Benefit Plan, which operates and administers the Employee Death Benefit Plan.

123. "Employees Death Benefit Plan" means the City of Detroit Employee Death Benefit Plan, a pre-funded defined benefit plan and trust administered by the Employee Death Benefit Board of Trustees that provides supplemental death benefits to retired officers and employees of the City.

13-53846-tjt Doc 8772 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 178 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 18:36:38 Page 96 of 90

124.     "Entity" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

125.     "Executory Contract" means a contract to which the City is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code.

126.     "Exhibits" means, collectively, the documents listed on the "Table of Exhibits" included herein, all of which will be made available on the Document Website once they are Filed.  The City reserves the right, in accordance with the terms hereof, to modify, amend, supplement, restate or withdraw any of the Exhibits after they are Filed and shall promptly make such changes available on the Document Website.  For the avoidance of doubt, Exhibits I.A.80, I.A.127 and I.A.255 will be Filed only if the transactions related to and/or underlying such Exhibits are to be consummated by the City.

127.     "Exit Facility" means a credit facility that will be entered into by the City, the Exit Facility Agent and the other financial institutions party thereto on the Effective Date on substantially the terms set forth on Exhibit I.A.127.

128.     "Exit Facility Agent" means the agent under the Exit Facility.

129.     "Face Amount" means (a) if a proof of Claim has been Filed by the applicable Bar Date:  (i) if only a liquidated amount is provided on the proof of Claim, the full stated amount claimed by the Holder in such proof of Claim, and (ii) if a portion of the Claim is stated as unliquidated, the liquidated amount, if any, claimed by the Holder in such proof of Claim; or (b) if a proof of Claim has not been Filed, the liquidated, undisputed, non-contingent amount, if any, set forth for a Claim in the List of Creditors.

130.     "Fee Examiner" means Robert M. Fishman, in his capacity as the fee examiner appointed pursuant to the Fee Examiner Order.

131.     "Fee Examiner Order" means the Order Appointing Fee Examiner (Docket No. 383), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on August 19, 2013, as it may have been amended, supplemented or otherwise modified.

132.     "Fee Examiner Parties" means, collectively, (a) the Fee Examiner and (b) all counsel and other professionals advising the Fee Examiner whose fees and expenses are subject to the Fee Review Order.

133.     "Fee Review Order" means the Fee Review Order (Docket No. 810), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on September 11, 2013, as it may have been amended, supplemented or otherwise modified.

134.     "Fee Review Professionals" means, collectively, (a) those professionals retained by the City and the Retiree Committee to render services in connection with the Chapter 9 Case who seek payment of compensation and reimbursement of expenses from the City for postpetition services pursuant to and in accordance with the Fee Review Order and (b) the Fee Examiner Parties.  For the avoidance of doubt, any professionals retained by any official committee appointed in the Chapter 9 Case other than the Retiree Committee are not Fee Review Professionals.

135.     "Fee Review Professional Fees" means the fees and expenses of the Fee Review Professionals incurred during the period beginning on the Petition Date and ending on the Effective Date.

136.     "File," "Filed," or "Filing" means file, filed or filing with the Bankruptcy Court or the Claims and Balloting Agent, as applicable, in the Chapter 9 Case.

137.     "Final Order" means an order or judgment of the Bankruptcy Court, or any other court of competent jurisdiction, as entered on the docket in the Chapter 9 Case or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move, under Bankruptcy Rule 9023 and/or Rule 59 of the Federal Rules of Civil Procedure, for a new

-10-

13-53846-tjt   Doc 8773   Filed 12/10/14   Entered 12/10/14 08:24:40   Page 179 of 602
13-53846-swr   Doc 6382   Filed 03/31/14   Entered 03/31/14 23:36:38   Page 9 of 76
236

trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied or resulted in no modification of such order; <u>provided</u> that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed shall not prevent such order from being a Final Order.

138.    "Fiscal Year" means a fiscal year for the City, commencing on July 1 of a year and ending on June 30 of the following year.  A Fiscal Year is identified by the calendar year in which the Fiscal Year ends, such that, for example, the 2015 Fiscal Year is the Fiscal Year commencing on July 1, 2014, and ending on June 30, 2015.

139.    "Foundations" means those entities identified on Exhibit B to the summary of the material terms of the DIA Settlement, which is attached hereto as Exhibit I.A.79, solely in their capacity as participants in the DIA Settlement.

140.    "General Fund" means the primary governmental fund and the chief operating fund of the City, which fund accounts for several of the City's primary services, including police, fire, public works, community and youth services.

141.    "General Obligation Bond Claims" means, collectively, the Limited Tax General Obligation Bond Claims and the Unlimited Tax General Obligation Bond Claims.

142.    "General Obligation Bond Documents" means, collectively, the Limited Tax General Obligation Bond Documents and the Unlimited Tax General Obligation Bond Documents.

143.    "General Obligation Bonds" means, collectively, the Limited Tax General Obligation Bonds and the Unlimited Tax General Obligation Bonds.

144.    "GLWA" means the Great Lakes Water and Sewer Authority, which may be formed pursuant to a DWSD Transaction to conduct the operations currently conducted by the DWSD as described in Section IV.A.2.

145.    "GRS" means the General Retirement System for the City of Detroit.

146.    "GRS Adjusted Pension Amount" means, with respect to a Holder of a GRS Pension Claim, the Current Accrued Annual Pension payable to such Holder as adjusted in accordance with the following formulas:

(a)  If Classes 10 and 11 vote to accept the Plan, and funding is received from the DIA Settlement and the State Contribution Agreement (but for Non-Accepting Holders, subject to further reduction by the State Settlement Benefit Amount):  (i) for a Holder of a GRS Pension Claim who is either retired and receiving a monthly pension or a surviving beneficiary, elimination of a right to supplemental pension benefits to be paid after July 1, 2014 in respect of cost of living adjustments and an additional 26% reduction in the Current Accrued Annual Pension amount; and (ii) for a Holder of a GRS Pension Claim who is an Active Employee or a terminated employee with a right to receive a GRS pension in the future, elimination of a right to supplemental pension benefits to be paid after July 1, 2014 in respect of cost of living adjustments and an additional 26% reduction in the Current Accrued Annual Pension amount; <u>provided</u>, <u>however</u>, that such 26%  reduction in the Current Accrued Annual Pension amounts of Holders of GRS Pension Claims shall itself be reduced by the ASF Recoupment Percentage; and <u>provided further</u>, that with respect to Holders who are Active Employees, in the event the unfunded liabilities of the GRS for the plan year ending June 30, 2014 are greater than the unfunded liabilities of the GRS as of June 30, 2013, the reduction in the Current Accrued Annual Pension amount shall be increased to the extent necessary to ensure that there is no change in the amount of the underfunding between Fiscal Years 2013 and 2014; and

-11-
236

13-53846-tjt    Doc 8772    Filed 12/10/14    Entered 12/10/14 09:24:43    Page 180 of 602
13-53846-swr    Doc 6382    Filed 03/31/    Entered 03/31/14 18:36:58    Page 180 of 602

(b) If Classes 10 and 11 do **not** vote to accept the Plan, and funding is **not** received from the DIA Settlement and the State Contribution Agreement: (i) for a Holder of a GRS Pension Claim who is either retired and receiving a monthly pension or a surviving beneficiary, elimination of a right to supplemental pension benefits to be paid after July 1, 2014 in respect of cost of living adjustments and an additional 34% reduction in the Current Accrued Annual Pension amount; and (ii) for a Holder of a GRS Pension Claim who is an Active Employee or a terminated employee with a right to receive a GRS pension in the future, elimination of a right to supplemental pension benefits to be paid after July 1, 2014 in respect of cost of living adjustments and an additional 34% reduction in the Current Accrued Annual Pension amount; provided, however, that such 34% reduction in Current Accrued Annual Pension amounts of Holders of GRS Pension Claims shall itself be reduced by the ASF Recoupment Percentage; and provided further, that with respect to Holders who are Active Employees, in the event the unfunded liabilities of the GRS for the plan year ending June 30, 2014 are greater than the unfunded liabilities of the GRS as of June 30, 2013, the reduction in the monthly pension amount shall be increased to the extent necessary to ensure that there is no change in the amount of the underfunding between Fiscal Years 2013 and 2014.

147. "GRS Hybrid Pension Formula" means an accrual rate for active employee participants in the GRS for benefits earned for service on or after July 1, 2014 that equals the product of (a) 1.5% multiplied by (b) such employee's average base compensation over an employee's final 10 years of service, multiplied by (c) such employee's years of service after July 1, 2014. For purposes of this definition, base compensation will exclude overtime, longevity or other bonuses, and unused sick leave, and the GRS Hybrid Pension Formula will be part of a hybrid program that will contain rules to shift funding risk to participants in the event of underfunding of hybrid pensions, and mandate minimum retirement ages for unreduced pensions.

148. "GRS Hybrid Pension Plan" means the terms and conditions for future accrual and payment of pensions for active non-public safety employees of the City of Detroit in connection with employment service performed on and after July 1, 2014, the form documentation of which is attached hereto as Exhibit I.A.148.a and the material terms of which are attached hereto as Exhibit I.A.148.b.

149. "GRS Pension Claim" means any Claim (other than an OPEB Claim), whether asserted by current or former employees of the City, their heirs or beneficiaries or by the GRS or any trustee thereof or any other Entity acting on the GRS's behalf, against the City or any fund managed by the City (including, but not limited to, the General Fund, the water fund, the sewage disposal fund, the Detroit General Retirement System Service Corporation fund or the pension funds) based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law for (a) any pension, disability or other post-retirement payment or distribution in respect of the employment of current or former employees or (b) the payment by the GRS to persons who at any time participated in, were beneficiaries of or accrued post-retirement pension or financial benefits under the GRS.

150. "GRS Restoration Payment" means an addition to the pension benefits that comprise the GRS Adjusted Pension Amount during the period ending June 30, 2023. A GRS Restoration Payment may be made and approved only by the trustees of the GRS, or of any successor trust or pension plan, and only in the event that the funding level of the GRS for Fiscal Year 2023 is projected to exceed 80%, based on the then market value of assets projected forward using an assumed 6.25% investment return and future benefit discount rate. For purposes of calculating a GRS Restoration Payment, market value of assets shall not include any City contributions other than those listed on Exhibit II.B.3.u.ii.A. A GRS Restoration Payment may be made in amounts, and only to the extent, that the projected funding level of the GRS for Fiscal Year 2023 as an immediate consequence of such GRS Restoration Payment is not less than 80%.

151. "GRS Trust Agreement" means that certain Trust Agreement, by and between the City and the individual trustees identified therein, establishing an irrevocable trust to which assets currently held by the GRS and future contributions to the GRS, together with all earnings and losses thereon, will be transferred and held by an independent board of trustees for the exclusive benefit of members of the GRS and their beneficiaries, substantially in the form attached hereto as Exhibit I.A.151.

152. "Holder" means an Entity holding a Claim.

153. "HUD Installment Note Claims" means any Claim against the City arising under or evidenced by the HUD Installment Note Documents, including a Claim for principal and interest on the HUD Installment Notes.

154. "HUD Installment Note Documents" means the promissory notes executed with respect to the HUD Installment Notes, as set forth on Exhibit I.A.154, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

155. "HUD Installment Notes" means, collectively, the secured notes issued under the HUD Installment Note Documents, as set forth on Exhibit I.A.154.

156. "Impaired" means, with respect to a Class or a Claim, that such Class or Claim is impaired within the meaning of section 1124 of the Bankruptcy Code.

157. "Indirect 36th District Court Claim" means any claim arising in connection with a Cause of Action against the 36th District Court, solely to the extent that (a) the 36th District Court is entitled to receive funding from the City to satisfy any such claim and (b) any Claim for such funding by the 36th District Court is resolved pursuant to the Plan and the treatment accorded to any Allowed Other Unsecured Claims held by the 36th District Court pursuant to Section II.B.3.x.

158. "Indirect Employee Indemnity Claim" means any claim against an employee or former employee of the City with respect to which such employee has an Allowed Claim against the City for indemnification and/or payment or advancement of defense costs based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law.

159. "Interest Rate Reset Chart" means a chart identifying interest rates for the New DWSD Bonds and the New GLWA Bonds, attached as Exhibit I.A.159.

160. "Liabilities" means any and all claims, obligations, suits, judgments, damages, demands, debts, rights, derivative claims, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, arising in law, equity or otherwise, that are based in whole or in part on any act, event, injury, omission, transaction, agreement, employment, exposure or other occurrence taking place on or prior to the Effective Date.

161. "Lien" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

162. "Limited Tax General Obligation Bond Claims" means any Claim against the City arising under or evidenced by the Limited Tax General Obligation Bond Documents, including a Claim for principal and interest on the Limited Tax General Obligation Bonds.

163. "Limited Tax General Obligation Bond Documents" means the resolutions adopted and orders issued with respect to the Limited Tax General Obligation Bonds, as set forth on Exhibit I.A.163, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

164. "Limited Tax General Obligation Bonds" means, collectively, the unsecured notes issued under the Limited Tax General Obligation Bond Documents, as set forth on Exhibit I.A.163.

165. "List of Creditors" means the Second Amended List of Creditors and Claims, Pursuant to Sections 924 and 925 of the Bankruptcy Code (together with the summaries and schedules attached thereto), attached as Exhibit A to the Notice of Filing of Second Amended List of Creditors and Claims, Pursuant to Sections 924 and 925 of the Bankruptcy Code (Docket No. 1059), Filed by the City on September 30, 2013, as such list, summaries and/or schedules may be amended, restated, supplemented or otherwise modified.

-13-

13-53846-tjt Doc 8772 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 182 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 18:36:38 Page 26 of 94
236

166.     "Liquidity Event" shall be deemed to occur only if the City has at all times complied with its obligations under the COP Swap Settlement to use its best efforts to secure sufficient exit financing to pay the Net Amount on or promptly following the Effective Date, and failing that, as soon thereafter as possible, but, notwithstanding such compliance, is unable to secure sufficient exit financing to pay the Net Amount on or promptly following the Effective Date.

167.     "LTGO Insurer" means Ambac Assurance Corp., solely in its capacity as insurer of certain of the City's obligations with respect to the Limited Tax General Obligation Bonds.

168.     "Macomb County" means the County of Macomb, Michigan.

169.     "Mayor" means the duly-elected mayor of the City.

170.     "Net Amount" means the Distribution Amount less the sum of all quarterly payments under the COP Swap Collateral Agreement received by the COP Swap Counterparties since January 1, 2014.

171.     "New B Notes" means the unsecured notes to be issued by the City pursuant to the New B Notes Documents, substantially on the terms set forth on Exhibit I.A.171.

172.     "New B Notes Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued and/or indentures to be executed with respect to the New B Notes, in substantially the form attached hereto as Exhibit I.A.172.

173.     "New DWSD Bond Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued and/or indentures to be executed with respect to the New DWSD Bonds if a DWSD Transaction is not consummated, in substantially the form attached hereto as Exhibit I.A.173.

174.     "New DWSD Bonds" means the secured notes to be issued by the City pursuant to the New DWSD Bond Documents if a DWSD Transaction is not consummated, substantially on the terms set forth on Exhibit I.A.174.

175.     "New Existing Rate DWSD Bond Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued and/or indentures to be executed to be executed with respect to the New Existing Rate DWSD Bonds if a DWSD Transaction is not consummated, in substantially the form attached hereto as Exhibit I.A.175.

176.     "New Existing Rate DWSD Bonds" means the secured notes to be issued by the City pursuant to the New Existing Rate DWSD Bond Documents if a DWSD Transaction is not consummated, substantially on the terms set forth on Exhibit I.A.176.

177.     "New Existing Rate GLWA Bond Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued and/or indentures to be executed with respect to the New Existing Rate GLWA Bonds if a DWSD Transaction is consummated, in substantially the form attached hereto as Exhibit I.A.177.

178.     "New Existing Rate GLWA Bonds" means the secured notes to be issued by the GLWA pursuant to the New Existing Rate GLWA Bond Documents if a DWSD Transaction is consummated, substantially on the terms set forth on Exhibit I.A.178.

179.     "New Existing Rate Water/Sewer Bonds" means, the New Existing Rate DWSD Bonds or the New Existing Rate GLWA Bonds, as applicable.

180.     "New GLWA Bond Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued and/or indentures to be executed with respect to the New GLWA Bonds if a DWSD Transaction is consummated, in substantially the form attached hereto as Exhibit I.A.180.

181.    "New GLWA Bonds" means the secured notes to be issued by the GLWA pursuant to the New GLWA Bond Documents if a DWSD Transaction is consummated, substantially on the terms set forth on Exhibit I.A.181.

182.    "New GLWA Revolving Bond Documents" means the ordinances to be passed, resolutions to be adopted and/or indentures or agreements to be executed with respect to the New GLWA Revolving Bonds if a DWSD Transaction is consummated, in substantially the form attached hereto as Exhibit I.A.182.

183.    "New GLWA Revolving Bonds" means the secured notes to be issued by the GLWA pursuant to the New GLWA Revolving Bond Documents if a DWSD Transaction is consummated, on substantially the terms set forth on Exhibit I.A.183.

184.    "New Securities" means, collectively, the New DWSD Bonds, the New Existing Rate DWSD Bonds, the New Existing Rate GLWA Bonds, the New GLWA Bonds, the New GLWA Revolving Bonds, the New B Notes and the Plan UTGO Notes.

185.    "New Water/Sewer Bonds" means the New DWSD Bonds or the New GLWA Bonds, as applicable.

186.    "Non-Accepting Holder" means any Holder of a Pension Claim who (a) votes to reject the Plan or (b) fails to cast a valid Ballot to either accept or reject the Plan.

187.    "Oakland County" means the County of Oakland, Michigan.

188.    "OPEB Benefits" means, collectively, post-retirement health, vision, dental, life and death benefits provided to retired employees of the City and their dependents (including surviving spouses) pursuant to the Employee Health and Life Insurance Benefit Plan and the Employee Death Benefit Plan, including the members of the certified class in the action captioned *Weiler et. al. v. City of Detroit*, Case No. 06-619737-CK (Wayne County Circuit Court), pursuant to the "Consent Judgment and Order of Dismissal" entered in that action on August 26, 2009.

189.    "OPEB Claim" means any Claim against the City for OPEB Benefits.

190.    "Other Secured Claim" means a Secured Claim, other than a COP Swap Claim, a DWSD Class A Sewer Claim, a DWSD Class A Water Claim, a DWSD Class B Sewer Claim, a DWSD Class B Water Claim, a DWSD Revolving Bond Claim, a HUD Installment Note Claim, a Parking Bond Claim or a Secured GO Bond Claim.

191.    "Other Unsecured Claim" means any Claim that is not an Administrative Claim, a Convenience Claim, a COP Claim, a Downtown Development Authority Claim, a General Obligation Bond Claim, a GRS Pension Claim, an OPEB Claim, a PFRS Pension Claim, a Secured Claim or a Subordinated Claim. For the avoidance of doubt, Section 1983 Claims are included within the definition of Other Unsecured Claim.

192.    "PA 436" means Public Act 436 of 2012 of the State, also known as the Local Financial Stability and Choice Act, Michigan Compiled Laws §§ 141.1541-141.1575.

193.    "Parking Bond Documents" means the resolutions adopted, ordinances passed and orders issued with respect to the Parking Bonds, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

194.    "Parking Bonds" means the secured $9,300,000 Outstanding Principal Amount City of Detroit Building Authority Revenue Bonds (Parking and Arena System), Series 1998A, issued pursuant to the Parking Bond Documents.

-15-
236
13-53846-tjt   Doc 8772   Filed 12/10/14   Entered 12/10/14 09:24:49   Page 184 of 602
13-53846-swr   Doc 6382   Filed 03/31/14   Entered 03/31/14 18:36:38   Page 22 of 92

195.     "Parking Bonds Claim" means any Claim against the City arising under or evidenced by the Parking Bond Documents, including a Claim for principal and interest on the Parking Bonds.

196.     "Patient Protection and Affordable Care Act" means Public Law 111-148, 111th Congress, 42 U.S.C. §§ 18001, *et seq.*

197.     "Pension Claim" means a GRS Pension Claim or a PFRS Pension Claim.

198.     "Petition Date" means July 18, 2013.

199.     "PFRS" means the Police and Fire Retirement System for the City of Detroit.

200.     "PFRS Adjusted Pension Amount" means, with respect to a Holder of a PFRS Pension Claim, the Current Accrued Annual Pension payable to such Holder as adjusted in accordance with the following formulas:

(a)  If Classes 10 and 11 vote to accept the Plan, and funding is received from the DIA Settlement and the State Contribution Agreement (but for Non-Accepting Holders, subject to further reduction by the State Settlement Benefit Amount):  (i) for a Holder of a PFRS Pension Claim who is either retired and receiving a monthly pension or a surviving beneficiary, elimination of a right to supplemental pension benefits to be paid after July 1, 2014 in respect of cost of living adjustments and an additional 6% reduction in the Current Accrued Annual Pension amount; (ii) for a Holder of a PFRS Pension Claim who is a terminated employee with a right to receive a PFRS pension in the future, elimination of a right to supplemental pension benefits to be paid after July 1, 2014 in respect of cost of living adjustments and an additional 6% reduction in the Current Accrued Annual Pension amount; and (iii) for a Holder of a PFRS Pension Claim who is an Active Employee, elimination of a right to supplemental pension benefits to be paid after July 1, 2014 in respect of cost of living adjustments, elimination of the deferred retirement option plan feature of PFRS, and an additional 6% reduction in the Current Accrued Annual Pension amount; <u>provided</u> that, with respect to Holders who are Active Employees, in the event the unfunded liabilities of the PFRS for the plan year ending June 30, 2014 are greater than the unfunded liabilities of the PFRS as of June 30, 2013, the reduction in the monthly pension amount shall be increased to the extent necessary to ensure that there is no change in the amount of the underfunding between plan years ending 2013 and 2014; and

(b)  If Classes 10 and 11 do <u>**not**</u> vote to accept the Plan, and funding is <u>**not**</u> received from the DIA Settlement and the State Contribution Agreement:  (i) for a Holder of a PFRS Pension Claim who is either retired and receiving a monthly pension or a surviving beneficiary, elimination of a right to supplemental pension benefits to be paid after July 1, 2014 in respect of cost of living adjustments and an additional 14% reduction in the Current Accrued Annual Pension amount; (ii) for a Holder of a PFRS Pension Claim who is a terminated employee with a right to receive a PFRS pension in the future, elimination of a right to supplemental pension benefits to be paid after July 1, 2014 in respect of cost of living adjustments and an additional 14% reduction in the Current Accrued Annual Pension amount; and (iii) for a Holder of a PFRS Pension Claim who is an Active Employee, elimination of a right to supplemental pension benefits to be paid after July 1, 2014 in respect of cost of living adjustments, elimination of the deferred retirement option plan feature of PFRS, and an additional 14% reduction in the Current Accrued Annual Pension amount; <u>provided</u> that, with respect to Holders that are Active Employees, in the event the unfunded liabilities of the PFRS for the plan year ending June 30, 2014 are greater than the unfunded liabilities of the PFRS as of June 30, 2013, the reduction in the monthly pension amount shall be increased to the extent necessary to ensure that there is no change in the amount of the underfunding between plan years ending 2013 and 2014.

201.     "PFRS Hybrid Pension Formula" means an accrual rate for active employee participants in the PFRS for benefits earned on or after July 1, 2014 that equals the product of (a) 2.0% multiplied by (b) an employee's average base compensation over the employee's final 10 years of service, multiplied by (c) such employee's years of service after July 1, 2014.  For purposes of this definition, base compensation will mean the actual employee's base compensation and will exclude overtime, longevity or other bonuses, and unused sick leave, and the PFRS Hybrid Pension Formula will be part of a hybrid program that will contain rules to shift funding risk to participants in the event of underfunding of hybrid pensions, and mandate minimum retirement ages for unreduced pensions.

-16-

13-53846-tjt   Doc 8772   Filed 12/10/14   Entered 12/10/14 09:24:40   Page 185 of 602
13-53846-swr   Doc 6382   Filed 03/31/14   Entered 03/31/14 18:36:38   Page 235 of
236

202. "PFRS Hybrid Pension Plan" means the terms and conditions for future accrual and payment of pensions for active public safety employees of the City of Detroit in connection with employment service performed on and after July 1, 2014, the form documentation of which is attached hereto as Exhibit I.A.202.a and the material terms of which are set forth at Exhibit I.A.202.b.

203. "PFRS Pension Claim" means any Claim (other than an OPEB Claim), whether asserted by current or former employees of the City, their heirs or beneficiaries or by the PFRS or any trustee thereof or any other Entity acting on the PFRS's behalf, against the City or any fund managed by the City (including, but not limited to, the General Fund, the Police and Fire Retirement System Service Corporation fund or the pension funds) based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law for (a) any pension, disability, or other post-retirement payment or distribution in respect of the employment of such current or former employees or (b) the payment by the PFRS to persons who at any time participated in, were beneficiaries of or accrued post-retirement pension or financial benefits under the PFRS.

204. "PFRS Restoration Payment" means an addition to the pension benefits that comprise the PFRS Adjusted Pension Amount during the period ending June 30, 2023. A PFRS Restoration Payment may be made and approved only by the trustees of the PFRS, or of any successor trust or pension plan, and only in the event that the funding level of the PFRS for Fiscal Year 2023 is projected to exceed 80%, based on the then market value of assets projected forward using an assumed 6.50% investment return and future benefit discount rate. For purposes of calculating a PFRS Restoration Payment, market value of assets shall not include any City contributions other than those listed on Exhibit II.B.3.t.ii.A. A PFRS Restoration Payment may be made in amounts, and only to the extent, that the projected funding level of the PFRS for Fiscal Year 2023 as an immediate consequence of such PFRS Restoration Payment is not less than 80%.

205. "PFRS Trust Agreement" means that certain Trust Agreement, by and between the City and the individual trustees identified therein, establishing an irrevocable trust to which assets currently held by the PFRS and future contributions to the PFRS, together with all earnings and losses thereon, will be transferred and held by an independent board of trustees for the exclusive benefit of members of the PFRS and their beneficiaries, substantially in the form attached hereto as Exhibit I.A.205.

206. "Plan" means this plan of adjustment and all Exhibits attached hereto or referenced herein, as the same may be amended, restated, supplemented or otherwise modified.

207. "Plan COP Settlement" means the comprehensive settlement regarding COP Claims on terms and conditions described in Section II.B.3.s.iii.A and more definitively set forth in the Plan COP Settlement Documents.

208. "Plan COP Settlement Documents" means the definitive documentation to be executed in connection with the Plan COP Settlement, in substantially the form attached hereto as Exhibit I.A.208.

209. "Plan Supplement" means any supplement to the Plan containing Exhibits that were not Filed as of the date of the entry of the Disclosure Statement Order. A Plan Supplement or Plan Supplements containing Exhibits I.A.148.a, I.A.202.a, I.A.210 and II.D.6 will be Filed no later than five Business Days prior to the Voting Deadline. All other Plan Supplements will be Filed no later than ten days before the Confirmation Hearing.

210. "Plan UTGO Notes" means the notes to be issued by the City pursuant to the Plan UTGO Notes Documents, substantially on the terms set forth on Exhibit I.A.210.

211. "Plan UTGO Notes Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued and/or indentures to be executed with respect to the Plan UTGO Notes, in substantially the form attached hereto as Exhibit I.A.211.

212. "Pledged Property" means the collateral pledged by the City under the COP Swap Collateral Agreement and/or Ordinance No. 05-09 of the City.

213.    "Postpetition Financing Agreement" means any financing agreement (a) entered into by the City and the Postpetition Lenders after the Petition Date but prior to the Effective Date and (b) approved by the Bankruptcy Court.

214.    "Postpetition Financing Order" means an order entered by the Bankruptcy Court on the docket of the Chapter 9 Case approving the Postpetition Financing Agreement.

215.    "Postpetition Lender Claims" means any Claim against the City under or evidenced by (a) the Postpetition Financing Agreement and (b) the Postpetition Financing Order.

216.    "Postpetition Lenders" means those entities identified as lenders in the Postpetition Financing Agreement and their respective permitted successors and assigns (solely in their capacity as lenders under the Postpetition Financing Agreement).

217.    "Postpetition OPEB Payments" means any and all payments made by the City between the Petition Date and the Effective Date to or on behalf of Holders of OPEB Claims on account of OPEB Benefits.

218.    "Pro Rata" means, when used with reference to a distribution of property to Holders of Allowed Claims in a particular Class or other specified group of Claims, proportionately so that with respect to a particular Allowed Claim in such Class or in such group, the ratio of (a)(i) the amount of property to be distributed on account of such Claim to (ii) the amount of such Claim, is the same as the ratio of (b)(i) the amount of property to be distributed on account of all Allowed Claims in such Class or group of Claims to (ii) the amount of all Allowed Claims in such Class or group of Claims.  Until all Disputed Claims in a Class or other specified group of Claims are resolved, Disputed Claims shall be treated as Allowed Claims in their Face Amount for purposes of calculating a Pro Rata distribution of property to holders of Allowed Claims in such Class or group of Claims.

219.    "Professional Fee Reserve" means the reserve for Fee Review Professional Fees established pursuant to Section IV.I.

220.    "Reinstated" means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the Holder or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) the cure of any such default other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) the reinstatement of the maturity of such Claim as such maturity existed before such default; (iii) compensation of the Holder of such Claim for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim arises from any failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensation of the Holder of such Claim for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the Holder.  "Reinstate" and "Reinstatement" shall have correlative meanings.

221.    "Related Entity" means, with respect to any Entity, such Entity's Affiliates, predecessors, successors and assigns (whether by operation of law or otherwise), and with respect to any of the foregoing their respective present and former Affiliates and each of their respective current and former officials, officers, directors, employees, managers, attorneys, advisors and professionals, each acting in such capacity, and any Entity claiming by or through any of them (including their respective officials, officers, directors, employees, managers, advisors and professionals).

222.    "Released Parties" means, collectively and individually, the Retiree Committee, the members of the Retiree Committee, the Retiree Committee Professionals, the Foundations and their Related Entities and the CFSEM Supporting Organization and its Related Entities.

223.    "Retiree Classes" means Classes 10, 11 and 12, as set forth in Section II.B.

-18-

13-53846-tjt   Doc 8772   Filed 12/10/14   Entered 12/10/14 09:24:40   Page 187 of 602
13-53846-swr   Doc 6382   Filed 03/31/14   Entered 03/31/14 18:36:58   Page 25 of
236

224. "Retiree Committee" means the official committee of retired employees first appointed by the United States Trustee in the Chapter 9 Case on August 22, 2013 (Docket No. 566), as such committee may be reconstituted, solely in its capacity as such.

225. "Retiree Committee Professionals" means those professionals retained by the Retiree Committee to render services in connection with the Chapter 9 Case that seek payment of compensation and reimbursement of expenses from the City for postpetition services pursuant to and in accordance with the Fee Review Order, solely in their capacity as such.

226. "Retiree Health Care Litigation" means the adversary proceeding captioned as *Official Committee of Retirees of the City of Detroit, Michigan, et al. v. City of Detroit, Michigan, et al.*, Case No. 14-04015 (Bankr. E.D. Mich.), filed in the Chapter 9 Case on January 9, 2014.

227. "Retiree Health Care Settlement Agreement" means the Settlement Agreement, effective February 14, 2014, between the parties to the Retiree Health Care Litigation, pursuant to which such parties agreed to certain modifications to the changes in retiree health care benefits that the City was otherwise to implement on March 1, 2014, a copy of which is attached hereto as Exhibit I.A.227.

228. "Retirement Systems" means, collectively, the GRS and the PFRS.

229. "Section 1983 Claim" means any Claim against the City, its employees or both arising under 42 U.S.C. § 1983 that has not been settled, compromised or otherwise resolved and with respect to which Claim a lawsuit was pending before the District Court on or prior to the Petition Date.

230. "Secured Claim" means a Claim that is secured by a Lien on property in which the City has an interest or that is subject to valid setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the City's interest in such property or to the extent of the amount subject to valid setoff, as applicable, as determined pursuant to section 506 of the Bankruptcy Code.

231. "Secured GO Bond Claims" means, collectively, the Secured GO Series 2010 Claims, the Secured GO Series 2010(A) Claims, the Secured GO Series 2012(A)(2) Claims, the Secured GO Series 2012(A2-B) Claims, the Secured GO Series 2012(B) Claims and the Secured GO Series 2012(B2) Claims.

232. "Secured GO Bond Documents" means, collectively, the Secured GO Series 2010 Bond Documents, the Secured GO Series 2010(A) Bond Documents, the Secured GO Series 2012(A)(2) Bond Documents, the Secured GO Series 2012(A2-B) Bond Documents, the Secured GO Series 2012(B) Bond Documents and the Secured GO Series 2012(B2) Bond Documents.

233. "Secured GO Bonds" means, collectively, the Secured GO Series 2010 Bonds, the Secured GO Series 2010(A) Bonds, the Secured GO Series 2012(A)(2) Bonds, the Secured GO Series 2012(A2-B) Bonds, the Secured GO Series 2012(B) Bonds and the Secured GO Series 2012(B2) Bonds.

234. "Secured GO Series 2010 Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2010 Bonds, as set forth on Exhibit I.A.232, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

235. "Secured GO Series 2010 Bonds" means the secured $249,790,000 Distributable State Aid General Obligation (Limited Tax) Bonds, Series 2010, issued pursuant to the Secured GO Series 2010 Bond Documents.

236. "Secured GO Series 2010 Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2010 Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010 Bonds.

-19-

236
13-53846-tjt  Doc 8773  Filed 12/10/14  Entered 12/10/14 09:24:40  Page 188 of 602
13-53846-swr  Doc 6382  Filed 03/31/14  Entered 03/31/14 18:36:38  Page 26 of 92

237.    "Secured GO Series 2010(A) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2010(A) Bonds, as set forth on Exhibit I.A.232, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

238.    "Secured GO Series 2010(A) Bonds" means the secured $100,000,000 Distributable State Aid Second Lien Bonds (Unlimited Tax General Obligation), Series 2010(A) (Taxable-Recovery Zone Economic Development Bonds – Direct Payment), issued pursuant to the Secured GO Series 2010(A) Bond Documents.

239.    "Secured GO Series 2010(A) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2010(A) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010(A) Bonds.

240.    "Secured GO Series 2012(A)(2) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(A)(2) Bonds, as set forth on Exhibit I.A.232, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

241.    "Secured GO Series 2012(A)(2) Bonds" means the secured $38,865,000 Outstanding Principal Amount Self-Insurance Distributable State Aid Third Lien Bonds (Limited Tax General Obligation), Series 2012(A)(2), issued pursuant to the Secured GO Series 2012(A)(2) Bond Documents.

242.    "Secured GO Series 2012(A)(2) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(A)(2) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010(A)(2) Bonds.

243.    "Secured GO Series 2012(A2-B) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(A2-B) Bonds, as set forth on Exhibit I.A.232, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

244.    "Secured GO Series 2012(A2-B) Bonds" means the secured $53,520,000 Self-Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(A2-B), issued pursuant to the Secured GO Series 2012(A2-B) Bond Documents.

245.    "Secured GO Series 2012(A2-B) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(A2-B) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(A2-B) Bonds.

246.    "Secured GO Series 2012(B) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(B) Bonds, as set forth on Exhibit I.A.232, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

247.    "Secured GO Series 2012(B) Bonds" means the $6,405,000 General Obligation Distributable State Aid Third Lien Capital Improvement Refunding Bonds (Limited Tax General Obligation), Series 2012(B), issued pursuant to the Secured GO Series 2012(B) Bond Documents.

248.    "Secured GO Series 2012(B) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(B) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(B) Bonds.

249.    "Secured GO Series 2012(B2) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(B2) Bonds, as set forth on Exhibit I.A.232, as the

-20-

236

13-53846-tjt   Doc 8773   Filed 12/10/14   Entered 12/10/14 09:24:05   Page 189 of 602
13-53846-swr   Doc 6382   Filed 03/31/14   Entered 03/31/14 18:36:58   Page 27 of 91

same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

250. "Secured GO Series 2012(B2) Bonds" means the $30,730,000 Self-Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(B2), issued pursuant to the Secured GO Series 2012(B2) Bond Documents.

251. "Secured GO Series 2012(B2) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(B2) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(B2) Bonds.

252. "Settling COP Claimant" means a beneficial holder of a COP Claim that elects to participate in the Plan COP Settlement as to some or all COP Claims held by or assigned to it and its Affiliates by so indicating on a timely-returned Ballot.

253. "State" means the state of Michigan.

254. "State Contribution" means periodic payments to be made by the State for the benefit of Holders of Pension Claims in an aggregate nominal amount of $350 million over the 20-year period immediately following the Effective Date pursuant to the terms of the State Contribution Agreement.

255. "State Contribution Agreement" means the definitive documentation to be executed in connection with the comprehensive settlement regarding Pension Claims as described in Section IV.D, in substantially the form attached hereto as Exhibit I.A.255.

256. "State Limited Release" means, if the release set forth at Section III.D.7.b is not approved by the Bankruptcy Court, and the State agrees to accept it, a release of the State as described in Section III.D.7.a by Accepting Holders.

257. "State Related Entities" means, collectively: (a) all officers, legislators, judges and justices of the State; (b) the Governor of the State; (c) the Treasurer of the State; (d) all members of the Local Emergency Financial Assistance Loan Board created under the Emergency Municipal Loan Act, Michigan Compiled Laws §§ 141.931-141.942; (e) each of the State's agencies and departments; and (f) the Related Entities of each of the foregoing.

258. "State Settlement Benefit Amount" means, with respect to any Non-Accepting Holder, if the release set forth at Section III.D.7.b is not approved by the Bankruptcy Court and the State agrees to accept the State Limited Release, an amount equal to such Holder's Pro Rata share (calculated by reference to all Non-Accepting Holders) of the percentage of the State Contribution that is equal to the ratio of Non-Accepting Holders to all Holders of Pension Claims.

259. "Stay Extension Order" means the Order Pursuant to Section 105(a) of the Bankruptcy Code Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non-Officer Employees and (C) Agents and Representatives of the Debtor (Docket No. 166), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on July 25, 2013, as it may be amended, supplemented or otherwise modified.

260. "Subordinated Claim" means a Claim of the kind described in sections 726(a)(3) or 726(a)(4) of the Bankruptcy Code and/or Claims subordinated under sections 510(b) or 510(c) of the Bankruptcy Code.

261. "Swap Insurance Policies" means those policies and/or other instruments insuring the COP Swap Agreements and obligations related thereto.

262. "Tax" means: (a) any net income, alternative or add-on minimum, gross income, gross receipts, gross margins, sales, use, stamp, real estate transfer, mortgage recording, ad valorem, value added, transfer, franchise, profits, license, property, payroll, employment, unemployment, occupation, disability, excise, severance,

-21-

13-53846-tjt Doc 8773 Filed 12/10/14 Entered 12/10/14 09:24:03 Page 190 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 18:36:38 Page 26 of 236
236

withholding, environmental or other tax, assessment or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any federal, state, local or foreign taxing authority; or (b) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a transferee or successor or a party to any agreement or arrangement whereby liability for payment of any such amounts is determined by reference to the liability of any other Entity.

263. "Tort Claim" means any Claim that has not been settled, compromised or otherwise resolved that arises out of allegations of personal injury or wrongful death claims and is not a Section 1983 Claim.

264. "Unexpired Lease" means a lease to which the City is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code.

265. "Unimpaired" means, with respect to a Class or a Claim, that such Class or Claim is not Impaired.

266. "United States Trustee" means the Office of the United States Trustee for the Eastern District of Michigan.

267. "Unlimited Tax General Obligation Bond Claims" means any Claim against the City arising under or evidenced by the Unlimited Tax General Obligation Bond Documents, including a Claim for principal and interest on the Unlimited Tax General Obligation Bonds.

268. "Unlimited Tax General Obligation Bond Documents" means the resolutions passed and orders issued with respect to the Unlimited Tax General Obligation Bonds, as set forth on Exhibit I.A.268, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all instruments and agreements related thereto.

269. "Unlimited Tax General Obligation Bonds" means, collectively, the notes issued under the Unlimited Tax General Obligation Bond Documents, as set forth on Exhibit I.A.268.

270. "Unsecured Claim" means a Claim that is not a Secured Claim or an Administrative Claim.

271. "Unsecured Pro Rata Share" means, when used with reference to a Distribution of New B Notes to Holders of Allowed Claims within Classes 7, 9, 12, 13 and 14 entitled to receive a distribution of New B Notes, the proportion that an Allowed Claim bears to the sum of all Allowed Claims and Disputed Claims within such Classes. Until all Disputed Claims in a Class are resolved, Disputed Claims shall be treated as Allowed Claims in their Face Amount for purposes of calculating the Unsecured Pro Rata Share of property to be distributed to Holders of Allowed Claims in such Class, unless otherwise ordered by the Bankruptcy Court.

272. "Voting Deadline" means the deadline fixed by the Bankruptcy Court in the Disclosure Statement Order for submitting Ballots to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code.

273. "Voting Record Date" means the record date fixed by the Bankruptcy Court in the Disclosure Statement Order establishing the Holders of Claims entitled to vote to accept or reject the Plan.

274. "Wayne County" means the Charter County of Wayne, Michigan.

**B. Rules of Interpretation and Computation of Time.**

**1. Rules of Interpretation.**

For purposes of the Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in

a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference herein to an existing document or Exhibit Filed or to be Filed shall mean such document or Exhibit, as it may have been or may be amended, restated, supplemented or otherwise modified pursuant to the Plan, the Confirmation Order or otherwise; (d) any reference to an Entity as a Holder of a Claim includes that Entity's successors, assigns and Affiliates; (e) all references to Sections or Exhibits are references to Sections and Exhibits of or to the Plan; (f) the words "herein," "hereunder," "hereof" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (h) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; and (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the extent not inconsistent with any other provision of this Section.

## 2. Computation of Time.

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

## ARTICLE II
## CLASSIFICATION OF CLAIMS; CRAMDOWN;
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims are classified under the Plan for all purposes, including voting, Confirmation and Distribution. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, as described in Section II.A, have not been classified and thus are excluded from the Classes described in Section II.B.1. A Claim shall be deemed classified in a particular Class only to the extent that the Claim qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim qualifies within the description of such other Class. Notwithstanding the foregoing, in no event shall any Holder of an Allowed Claim be entitled to receive payments or Distributions under the Plan that, in the aggregate, exceed the Allowed amount of such Holder's Claim.

## A. Unclassified Claims.

### 1. Payment of Administrative Claims.

#### a. Administrative Claims in General.

Except as specified in this Section II.A.1, and subject to the bar date provisions herein, unless otherwise agreed by the Holder of an Administrative Claim and the City, or ordered by the Bankruptcy Court, each Holder of an Allowed Administrative Claim will receive, in full satisfaction of such Allowed Administrative Claim, Cash in an amount equal to such Allowed Administrative Claim either: (1) on the Effective Date or as soon as reasonably practicable thereafter; or (2) if the Administrative Claim is not Allowed as of the Effective Date, 30 days after the date on which such Administrative Claim becomes an Allowed Claim. No Claim of any official or unofficial creditors' committee (other than the Retiree Committee) or any member thereof for professionals' fees or other costs and expenses incurred by such creditors' committee or by a member of such creditors' committee shall constitute an Allowed Administrative Claim.

#### b. Claims Under the Postpetition Financing Agreement.

Unless otherwise agreed by the Postpetition Lenders pursuant to the Postpetition Financing Agreement, on or before the Effective Date, Postpetition Lender Claims that are Allowed Administrative Claims will be paid in Cash equal to the amount of those Allowed Administrative Claims.

-23-

13-53846-tis Doc 8772 Filed 12/10/14 Entered 12/10/14 08:24:03 Page 192 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 18:36:58 Page 90 of 236

2.      **Bar Dates for Administrative Claims.**

a.      **General Bar Date Provisions**

Except as otherwise provided in Section II.A.2.b or in a Bar Date Order or other order of the Bankruptcy Court, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the City pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than 30 days after the Effective Date. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date will be forever barred from asserting such Administrative Claims against the City or its property, and such Administrative Claims will be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the City and the requesting party by the later of (i) 150 days after the Effective Date, (ii) 60 days after the Filing of the applicable request for payment of Administrative Claims or (iii) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Administrative Claims.

b.      **Claims Under the Postpetition Financing Agreement.**

Holders of Administrative Claims that are Postpetition Lender Claims will not be required to File or serve any request for payment or application for allowance of such Claims. Such Administrative Claims will be satisfied pursuant to Section II.A.1.b.

c.      **No Modification of Bar Date Order.**

The Plan does not modify any other Bar Date Order, including Bar Dates for Claims entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

B.      **Classified Claims.**

1.      **Designation of Classes.**

The following table designates the Classes and specifies whether such Classes are Impaired or Unimpaired by the Plan.

| CLASS | NAME | IMPAIRMENT |
|---|---|---|
| | *Secured Claims* | |
| 1A | All Classes of DWSD Class A Water Claims (One Class for each CUSIP of DWSD Class A Water Bonds, as set forth on Exhibit I.A.101) | Impaired/Voting |
| 1B | All Classes of DWSD Class B Water Claims (One Class for each CUSIP of DWSD Class B Water Bonds, as set forth on Exhibit I.A.107) | Impaired/Voting |
| 1C | All Classes of DWSD Class A Sewer Claims (One Class for each CUSIP of DWSD Class A Sewer Bonds, as set forth on Exhibit I.A.98) | Impaired/Voting |
| 1D | All Classes of DWSD Class B Sewer Claims (One Class for each CUSIP of DWSD Class B Sewer Bonds, as set forth on Exhibit I.A.104) | Impaired/Voting |
| 1E | All Classes of DWSD Revolving Sewer Bond Claims (One Class for each DWSD Series of DWSD Revolving Sewer Bonds, as set forth on Exhibit I.A.112) | Impaired/Voting |

-24-

13-53846-tjt  Doc 8773  Filed 12/10/14  Entered 12/10/14 09:24:40  Page 193 of 602
13-53846-swr  Doc 6382  Filed 03/31/14  Entered 03/31/14 13:36:58  Page 192 of 236

| CLASS | NAME | IMPAIRMENT |
|---|---|---|
| 1F | All Classes of DWSD Revolving Water Bond Claims (One Class for each DWSD Series of DWSD Revolving Water Bonds, as set forth on Exhibit I.A.115) | Impaired/Voting |
| 2A | Secured GO Series 2010 Claims | Unimpaired/Nonvoting |
| 2B | Secured GO Series 2010(A) Claims | Unimpaired/Nonvoting |
| 2C | Secured GO Series 2012(A)(2) Claims | Unimpaired/Nonvoting |
| 2D | Secured GO Series 2012(A2-B) Claims | Unimpaired/Nonvoting |
| 2E | Secured GO Series 2012(B) Claims | Unimpaired/Nonvoting |
| 2F | Secured GO Series 2012(B2) Claims | Unimpaired/Nonvoting |
| 3 | Other Secured Claims | Unimpaired/Nonvoting |
| 4 | HUD Installment Notes Claims | Unimpaired/Nonvoting |
| 5 | COP Swap Claims | Impaired/Voting |
| 6 | Parking Bond Claims | Unimpaired/Nonvoting |
| | *Unsecured Claims* | |
| 7 | Limited Tax General Obligation Bond Claims | Impaired/Voting |
| 8 | Unlimited Tax General Obligation Bond Claims | Impaired/Voting |
| 9 | COP Claims | Impaired/Voting |
| 10 | PFRS Pension Claims | Impaired/Voting |
| 11 | GRS Pension Claims | Impaired/Voting |
| 12 | OPEB Claims | Impaired/Voting |
| 13 | Downtown Development Authority Claims | Impaired/Voting |
| 14 | Other Unsecured Claims | Impaired/Voting |
| 15 | Convenience Claims | Impaired/Voting |
| 16 | Subordinated Claims | Impaired/Nonvoting |

2.      **Subordination; Reservation of Rights to Reclassify Claims.**

Except with respect to Bond Insurance Policy Claims, the allowance, classification and treatment of Allowed Claims and the respective Distributions and treatments specified in the Plan take into account the relative priority and rights of the Claims in each Class and all contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise. Pursuant to section 510 of the Bankruptcy Code, the City reserves the right to re-classify any Disputed Claim in accordance with any applicable contractual, legal or equitable subordination. For the avoidance of doubt, this Section II.B.2 shall not affect or limit the application of section 509 of the Bankruptcy Code or any similar doctrine to Bond Insurance Policy Claims, which are preserved for enforcement by the City or by the relevant Bond Insurer.

3. **Treatment of Claims.**

   a. **Class 1A – DWSD Class A Water Claims.**

      i. **Classification and Allowance.**

      DWSD Class A Water Claims relating to each CUSIP of DWSD Class A Water Bonds shall be separately classified, as reflected on Exhibit I.A.101, with each Class receiving the treatment set forth below. On the Effective Date, the DWSD Class A Water Claims shall be deemed Allowed in the amounts set forth on Exhibit I.A.101.

      ii. **Treatment**

      Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed DWSD Class A Water Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as reasonably practicable after the Effective Date, New Water/Sewer Bonds having a principal amount equal to the principal amount of the DWSD Class A Water Bonds held by such Holder; provided that, in lieu of the foregoing treatment, the City alternatively may elect to: (A) if a DWSD Transaction is consummated on the Effective Date, provide a Holder of an Allowed DWSD Class A Water Claim with Cash in the full amount of such Allowed DWSD Class A Water Claim; or (B) if a DWSD Transaction is not consummated on the Effective Date, Reinstate any DWSD Class A Water Bonds by filing a notice of such Reinstatement prior to the commencement of the Confirmation Hearing.

      <u>Treatment Option for Classes that Accept the Plan</u>: Each Holder of an Allowed DWSD Class A Water Claim in a Class of DWSD Class A Water Claims that accepts the Plan may elect to receive New Existing Rate Water/Sewer Bonds having a principal amount equal to the principal amount of the DWSD Class A Water Bonds held by such Holder in lieu of New Water/Sewer Bonds. An election to receive New Existing Rate Water/Sewer Bonds pursuant to the foregoing sentence constitutes an irrevocable waiver of any and all rights to object to the Plan on any grounds, and any such objection may be disregarded by the Bankruptcy Court solely on the basis of such election.

   b. **Class 1B – DWSD Class B Water Claims.**

      i. **Classification and Allowance.**

      DWSD Class B Water Claims relating to each CUSIP of DWSD Class B Water Bonds shall be separately classified, as reflected on Exhibit I I.A.107, with each Class receiving the treatment set forth below. On the Effective Date, the DWSD Class B Water Claims shall be deemed Allowed in the amounts set forth on Exhibit I.A.107.

      ii. **Treatment.**

      Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed DWSD Class B Water Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as reasonably practicable after the Effective Date, New Water/Sewer Bonds having a principal amount equal to the principal amount of the DWSD Class B Water Bonds held by such Holder; provided that, in lieu of the foregoing treatment, the City alternatively may elect to: (A) if a DWSD Transaction is consummated on the Effective Date, provide a Holder of an Allowed Class B Water Claim with Cash in the full amount of such Allowed DWSD Class B Water Claim; or (B) if a DWSD Transaction is not consummated on the Effective Date, Reinstate any DWSD Class B Water Bonds by filing a notice of such Reinstatement prior to the commencement of the Confirmation Hearing.

      <u>Treatment Option for Classes that Accept the Plan</u>: Each Holder of an Allowed DWSD Class B Water Claim in a Class of DWSD Class B Water Claims that accepts the Plan may elect to receive New Existing Rate Water/Sewer Bonds having a principal amount equal to the principal amount of the DWSD Class B Water Bonds held by such Holder in lieu of New Water/Sewer Bonds. An election to receive New Existing Rate Water/Sewer Bonds pursuant to the foregoing sentence constitutes an irrevocable waiver of any and all rights to

-26-

236

13-53846-tjt Doc 8782 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 195 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 18:36:38 Page 05 of 92

object to the Plan on any grounds, and any such objection may be disregarded by the Bankruptcy Court solely on the basis of such election.

### c. Class 1C – DWSD Class A Sewer Claims.

#### i. Classification and Allowance.

DWSD Class A Sewer Claims relating to each CUSIP of DWSD Class A Sewer Bonds shall be separately classified, as reflected on Exhibit I.A.98, with each Class receiving the treatment set forth below. On the Effective Date, the DWSD Class A Sewer Claims shall be deemed Allowed in the amounts set forth on Exhibit I.A.98.

#### ii. Treatment.

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed DWSD Class A Sewer Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as reasonably practicable after the Effective Date, New Water/Sewer Bonds having a principal amount equal to the principal amount of the DWSD Class A Sewer Bonds held by such Holder; provided that, in lieu of the foregoing treatment, the City alternatively may elect to: (A) if a DWSD Transaction is consummated on the Effective Date, provide a Holder of an Allowed DWSD Class A Sewer Claim with Cash in the full amount of such Allowed DWSD Class A Sewer Claim; or (B) if a DWSD Transaction is not consummated on the Effective Date, Reinstate any DWSD Class A Sewer Bonds by filing a notice of such Reinstatement prior to the commencement of the Confirmation Hearing.

<u>Treatment Option for Classes that Accept the Plan</u>: Each Holder of an Allowed DWSD Class A Sewer Claim in a Class of DWSD Class A Sewer Claims that accepts the Plan may elect to receive New Existing Rate Water/Sewer Bonds having a principal amount equal to the principal amount of the DWSD Class A Sewer Bonds held by such Holder in lieu of New Water/Sewer Bonds. An election to receive New Existing Rate Water/Sewer Bonds pursuant to the foregoing sentence constitutes an irrevocable waiver of any and all rights to object to the Plan on any grounds, and any such objection may be disregarded by the Bankruptcy Court solely on the basis of such election.

### d. Class 1D – DWSD Class B Sewer Claims.

#### i. Classification and Allowance.

DWSD Class B Sewer Claims relating to each CUSIP of DWSD Class B Sewer Bonds shall be separately classified, as reflected on Exhibit I.A.104, with each Class receiving the treatment set forth below. On the Effective Date, the DWSD Class B Sewer Claims shall be deemed Allowed in the amounts set forth on Exhibit I.A.104.

#### ii. Treatment.

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed DWSD Class B Sewer Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as reasonably practicable after the Effective Date, New Water/Sewer Bonds having a principal amount equal to the principal amount of the DWSD Class B Sewer Bonds held by such Holder; provided that, in lieu of the foregoing treatment, the City alternatively may elect to: (A) if a DWSD Transaction is consummated on the Effective Date, provided a Holder of an Allowed DWSD Class B Sewer Claim with Cash in the full amount of such Allowed DWSD Class B Sewer Claim; or (B) if a DWSD Transaction is not consummated on the Effective Date, Reinstate any DWSD Class B Sewer Bonds by filing a notice of such Reinstatement prior to the commencement of the Confirmation Hearing.

<u>Treatment Option for Classes that Accept the Plan</u>: Each Holder of an Allowed DWSD Class B Sewer Claim in a Class of DWSD Class B Sewer Claims that accepts the Plan may elect to receive New Existing Rate Water/Sewer Bonds having a principal amount equal to the principal amount of the DWSD Class B Sewer Bonds held by such Holder in lieu of New Water/Sewer Bonds. An election to receive New Existing Rate

Water/Sewer Bonds pursuant to the foregoing sentence constitutes an irrevocable waiver of any and all rights to object to the Plan on any grounds, and any such objection may be disregarded by the Bankruptcy Court solely on the basis of such election.

### e. Class 1E – DWSD Revolving Sewer Bond Claims

#### i. Classification and Allowance.

DWSD Revolving Sewer Bond Claims relating to each DWSD Series of DWSD Revolving Sewer Bonds shall be separately classified, as reflected on Exhibit I.A.112, with each Class receiving the treatment set forth below. On the Effective Date, the DWSD Revolving Sewer Bond Claims shall be deemed Allowed in the aggregate amounts set forth on Exhibit I.A.112.

#### ii. Treatment.

If a DWSD Transaction is not consummated on the Effective Date, each Holder of an Allowed DWSD Revolving Sewer Bond Claim shall have its Allowed DWSD Revolving Sewer Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

If a DWSD Transaction is consummated on the Effective Date, each Holder of an Allowed DWSD Revolving Sewer Bond Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as reasonably practicable after the Effective Date, New GLWA Revolving Bonds having a principal amount equal to the principal amount of the DWSD Revolving Sewer Bonds held by such Holder, unless such Holder agrees to a different treatment of such Claim.

### f. Class 1F – DWSD Revolving Water Bond Claims

#### i. Classification and Allowance.

DWSD Revolving Water Bond Claims relating to each DWSD Series of DWSD Revolving Water Bonds shall be separately classified, as reflected on Exhibit I.A.115, with each Class receiving the treatment set forth below. On the Effective Date, the DWSD Revolving Water Bond Claims shall be deemed Allowed in the amounts set forth on Exhibit I.A.115.

#### ii. Treatment.

If a DWSD Transaction is not consummated on the Effective Date, each Holder of an Allowed DWSD Revolving Water Bond Claim shall have its Allowed DWSD Revolving Water Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

If a DWSD Transaction is consummated on the Effective Date, each Holder of an Allowed DWSD Revolving Water Bond Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as reasonably practicable after the Effective Date, New GLWA Revolving Bonds having a principal amount equal to the principal amount of the DWSD Revolving Water Bonds held by such Holder, unless such Holder agrees to a different treatment of such Claim.

### g. Class 2A – Secured GO Series 2010 Claims.

On the Effective Date, (i) the Secured GO Series 2010 Claims shall be deemed Allowed in the aggregate amount of $252,475,366 and (ii) each Holder of an Allowed Secured GO Series 2010 Claim shall have its Allowed Secured GO Series 2010 Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

h.     **Class 2B – Secured GO Series 2010(A) Claims.**

On the Effective Date, (i) the Secured GO Series 2010(A) Claims shall be deemed Allowed in the aggregate amount of $101,707,848 and (ii) each Holder of an Allowed Secured GO Series 2010(A) Claim shall have its Allowed Secured GO Series 2010(A) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

i.     **Class 2C – Secured GO Series 2012(A)(2) Claims.**

On the Effective Date, (i) the Secured GO Series 2012(A)(2) Claims shall be deemed Allowed in the aggregate amount of $39,254,171 and (ii) each Holder of an Allowed Secured GO Series 2012(A)(2) Claim shall have its Allowed Secured GO Series 2012(A)(2) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

j.     **Class 2D – Secured GO Series 2012(A2-B) Claims.**

On the Effective Date, (i) the Secured GO Series 2012(A2-B) Claims shall be deemed Allowed in the aggregate amount of $54,055,927 and (ii) each Holder of an Allowed Secured GO Series 2012(A2-B) Claim shall have its Allowed Secured GO Series 2012(A2-B) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

k.     **Class 2E - Secured GO Series 2012(B) Claims.**

On the Effective Date, (i) the Secured GO Series 2012(B) Claims shall be deemed Allowed in the aggregate amount of $6,469,135 and (ii) each Holder of an Allowed Secured GO Series 2012(B) Claim shall have its Allowed Secured GO Series 2012(B) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

l.     **Class 2F – Secured GO Series 2012(B2) Claims.**

On the Effective Date, (i) the Secured GO Series 2012(B2) Claims shall be deemed Allowed in the aggregate amount of $31,037,724 and (ii) each Holder of an Allowed Secured GO Series 2012(B2) Claim shall have its Allowed Secured GO Series 2012(B2) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

m.     **Class 3 – Other Secured Claims.**

On the Effective Date, each Holder of an Allowed Other Secured Claim shall have its Allowed Other Secured Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

n.     **Class 4 – HUD Installment Note Claims.**

On the Effective Date, (i) the HUD Installment Note Claims shall be deemed Allowed in the aggregate amount of $90,075,004 and (ii) each Holder of a HUD Installment Note Claim shall have its Allowed HUD Installment Note Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

o.     **Class 5 – COP Swap Claims.**

i.     **Allowance.**

The COP Swap Claims shall be deemed Allowed as Secured Claims, which, solely for purposes of distributions from the City, will be equal to the Distribution Amount.

-29-
13-53846-tjt   Doc 8772   Filed 12/10/14   Entered 12/10/14 09:24:43   Page 198 of 602
13-53846-swr   Doc 6382   Filed 03/31/14   Entered 03/31/14 18:36:38   Page 96 of
236

### ii.    Treatment.

Each Holder of an Allowed COP Swap Claim, in full satisfaction of such Allowed Claim, shall receive, either:  (A) within thirty days following the Effective Date, the Net Amount in full in cash, _provided_ that until paid in cash in full, such Secured Claims will remain secured by the Pledged Property; or (B) solely in the case of a Liquidity Event, the Net Amount in cash in full within 180 days following the Effective Date, _provided_ that (1) other than with respect to net proceeds used to repay the Postpetition Financing Agreement, to the extent permitted by law but without taking into consideration any limitations imposed by the City, including in any ordinance or resolution of the City, the first dollars of any net cash proceeds of any financing or refinancing consummated in connection with, or subsequent to, the consummation of such Plan and either (A) supported by the full faith and credit of the City or (B) payable from the general fund of the City, will be used to pay the Net Amount, (2) the City will continue to comply with its obligations under the COP Swap Settlement and the COP Swap Settlement Approval Order until the Net Amount is paid in cash in full, (3) until paid in cash in full, such Secured Claims will remain secured by the Pledged Property, (4) from and after the Effective Date, the unpaid Net Amount will accrue interest at the rate applicable to obligations under the Postpetition Financing Agreement plus 1.5% with the interest obligation likewise being secured by the Pledged Property and (5) the COP Swap Counterparties will receive from the City on the Effective Date a deferral fee in cash equal to 1.0% of the Net Amount to be shared equally between them.

### p.    Class 6 – Parking Bond Claims.

On the Effective Date, (i) the Parking Bond Claims shall be deemed Allowed in the amount of $8,099,287 and (ii) each Holder of an Allowed Parking Bond Claim shall have its Allowed Parking Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### q.    Class 7 – Limited Tax General Obligation Bond Claims.

### i.    Allowance.

On the Effective Date, the Limited Tax General Obligation Bond Claims shall be deemed Allowed in the amount of $163,543,187.86.

### ii.    Treatment.

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Limited Tax General Obligation Bond Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of New B Notes.

### r.    Class 8 – Unlimited Tax General Obligation Bond Claims.

### i.    Allowance.

On the Effective Date, the Unlimited Tax General Obligation Bond Claims shall be deemed Allowed in the amount of $374,661,332.97.

### ii.    Treatment.

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Unlimited Tax General Obligation Bond Claim, in full satisfaction of such Allowed Claim, shall receive its Pro Rata share of Plan UTGO Notes on or as soon as reasonably practicable after the Effective Date.  The maturity(ies) of the Plan UTGO Notes shall be no longer than the existing maturity(ies) of each series of Unlimited Tax General Obligation Bonds receiving Plan UTGO Notes.  The Plan UTGO Notes shall contain such other terms as will result in each Holder of an Allowed Unlimited Tax General Obligation Bond Claim receiving a payment stream, the present value of which is equal to approximately 15% of such Holder's Allowed Unlimited Tax General Obligation Bond Claim as of the Effective Date.

-30-

236

13-53846-tjt   Doc 8772   Filed 12/10/14   Entered 12/10/14 09:24:40   Page 199 of 602
13-53846-swr   Doc 6382   Filed 03/31/14   Entered 03/31/14 18:36:38   Page 97 of 97

s.      **Class 9 – COP Claims.**

i.      **Disputed.**

The COP Claims are Disputed Claims and are not Allowed by the Plan, and the City reserves all rights to (A) object to, avoid or subordinate such Claims on any and all available grounds, including through the assertion of any and all grounds asserted in the COP Litigation, and (B) assign the right to object to, avoid or subordinate such Claims or the City's rights in the COP Litigation to the Creditor Representative.

ii.      **Assignment.**

Solely for purposes of facilitating Distributions under this Plan and for no other purpose, on and as of the Effective Date, those portions of COP Claims that relate to, and are measured by, the payment schedule under the COPs shall be deemed assigned to the beneficial holders of the COPs on a Pro Rata basis, with each beneficial holder deemed to receive such portions of COP Claims in an amount equal to the proportion that the unpaid principal amount of such holder's COPs bears to the aggregate unpaid principal amount of all COPs. Each beneficial holder of COPs may elect to participate in the Plan COP Settlement in respect of some or all of those portions of COP Claims that would be deemed assigned to it and its Affiliates in the event that the Effective Date occurs.

iii.      **Treatment.**

A.      **Plan COP Settlement Option.**

Each beneficial holder of COPs may settle issues relating to allowance of the COP Claims that are deemed assigned to it and become a Settling COP Claimant as to some or all COPs held by it and its Affiliates by electing to participate in the Plan COP Settlement on a timely-returned Ballot accepting the Plan. Each Settling COP Claimant shall have its COP Claims deemed to be Allowed Claims in an amount equal to 40% of the aggregate unpaid principal amount of COPs held by such Settling COP Claimant and shall receive, on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of New B Notes.

B.      **Non-Settling Holders.**

Each beneficial holder of COPs shall receive the following treatment on account of its COP Claims unless such holder agrees to a different treatment of such Claims:

1.      **Disputed COP Claims Reserve.**

On the Effective Date, the City shall establish the Disputed COP Claims Reserve. The Disputed COP Claims Reserve shall contain no less than (a) an Unsecured Pro Rata Share of New B Notes, calculated as if such Disputed COP Claims were Allowed (i) in an amount equal to the aggregate unpaid principal amount as of the Petition Date for the COPs not subject to the Plan COP Settlement or (ii) in such lesser amount as may be required by an order of the Bankruptcy Court, and (b) any distributions made on account of New B Notes held in the Disputed COP Claims Reserve.

2.      **Distributions From The Disputed COP Claims Reserve.**

If and to the extent that Disputed COP Claims become Allowed Claims, the Holders of such Allowed Claims shall be sent a Distribution from the Disputed COP Claims Reserve of no less than (a) the portion of New B Notes held in the Disputed COP Claims Reserve initially allocated to the Disputed COP Claims that became Allowed Claims; and (b) any distributions received by the Disputed COP Claims Reserve on account of such portion of New B Notes. Upon the entry of an order by the trial court having jurisdiction over the objections to the Disputed COP Claims resolving all objections to the Disputed COP Claims and after all Distributions on account of Allowed COP Claims have been made or provided for, 70% of any New B Notes and distributions thereon

-31-
236
13-53846-tjt  Doc 8772  Filed 12/10/14  Entered 12/10/14 09:24:40  Page 200 of 602
13-53846-swr  Doc 6382  Filed 03/31/14  Entered 03/31/14 18:36:58  Page 98 of 92

remaining in the Disputed COP Claims Reserve shall be distributed to holders of Claims entitled to receive New B Notes under the Plan, each of which shall receive their Unsecured Pro Rata Share of such property. The remaining 30% of any New B Notes and distributions thereon shall be cancelled (with respect to the New B Notes) or revert to the City and be transferred to the General Fund (with respect to the distributions on such portion of New B Notes).

        **t.**        **Class 10 – PFRS Pension Claims.**

              **i.**        **Allowance.**

The PFRS Pension Claims shall be allowed in an aggregate amount equal to the sum of approximately $1,588,000,000.

              **ii.**        **Treatment.**

                    **A.**        **Contributions to PFRS.**

During the Fiscal Years from the Effective Date through Fiscal Year 2023, annual contributions shall be made to the PFRS only in the amounts identified on Exhibit II.B.3.t.ii.A. The exclusive source for such contributions shall be certain DIA Proceeds and certain funds from the State Contribution Agreement. After June 30, 2023, the City will contribute sufficient funds required to pay each Holder of a PFRS Pension Claim his or her PFRS Adjusted Pension Amount in accordance with and as modified by the terms and conditions contained in the Plan.

                    **B.**        **Investment Return Assumption.**

During the period that ends on June 30, 2023, the trustees of the PFRS, or the trustees of any successor trust or pension plan, shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the PFRS that shall not be higher than 6.50%.

                    **C.**        **Modification of Benefits for PFRS Participants.**

During the period that ends no earlier than June 30, 2023, the pension benefits payable to each Holder of a PFRS Pension Claim shall be equal to the PFRS Adjusted Pension Amount for such Holder, <u>provided</u> that such PFRS Adjusted Pension Amount shall be (1) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (2) increased by any PFRS Restoration Payment.

                    **D.**        **Accrual of Future Benefits.**

Each Holder of a PFRS Pension Claim who is an Active Employee shall receive, in addition to his or her PFRS Adjusted Pension Amount, as may be modified herein, such additional pension benefit for service on or after July 1, 2014 consistent with the terms and conditions of the PFRS Hybrid Pension Formula and the PFRS Hybrid Pension Plan.

                    **E.**        **Governance.**

The composition of the board of trustees of the PFRS and the manner in which it is operated and administered shall be consistent with the terms of the PFRS Trust Agreement.

                    **F.**        **No Changes in Terms for Ten Years.**

The Confirmation Order shall include an injunction against the subsequent amendment of the terms and conditions, and rules of operation, of the PFRS, or any successor plan or trust, that governs the calculation of pension benefits (including the PFRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, the PFRS Restoration Payment and the PFRS Hybrid Pension Formula and terms of the PFRS Hybrid Pension Plan) or against any action that governs the selection of the investment return assumption described

-32-
236

13-53846-tjt  Doc 8772  Filed 12/10/14  Entered 12/10/14 08:24:03  Page 201 of 602
13-53846-swr  Doc 6382  Filed 03/31/14  Entered 03/31/14 13:36:58  Page 99 of 91

in Section II.B.3.t.ii.B, the contribution to the PFRS or the calculation or amount of PFRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.

### G. State Contribution Agreement.

The State Contribution Agreement, the effectiveness of which is contingent upon the acceptance of the Plan by Classes 10 and 11, shall include the following principal terms: (1) the State will distribute the State Contribution for the benefit of Holders of Pension Claims; and (2) if the release set forth at Section III.D.7.b is not approved by the Bankruptcy Court, Non-Accepting Holders shall not be entitled to the State Settlement Benefit Amount as part of such Holder's PFRS Adjusted Pension Amount.

### u. Class 11 – GRS Pension Claims.

#### i. Allowance.

The GRS Pension Claims shall be allowed in an aggregate amount equal to the sum of approximately $2,299,000,000.

#### ii. Treatment.

##### A. Contributions to GRS.

During the Fiscal Years from the Effective Date through Fiscal Year 2023, annual contributions shall be made to the GRS only in the amounts identified on Exhibit II.B.3.u.ii.A. The exclusive sources for such contributions shall be accelerated pension-related payments received from the DWSD equal to approximately $675,000,000 and certain DIA Proceeds. After June 30, 2023, (1) certain DIA Proceeds and certain funds from the State Contribution Agreement shall be contributed to the GRS and (2) the City will contribute such additional funds as are necessary to pay each Holder of a GRS Pension Claim his or her GRS Adjusted Pension Amount in accordance with and as modified by the terms and conditions contained in the Plan.

##### B. Investment Return Assumption.

During the period that ends on June 30, 2023, the board of trustees of the GRS, or the trustees of any successor trust or pension plan, shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the GRS that shall not be higher than 6.25%.

##### C. Modification of Benefits for GRS Participants.

During the period that ends no earlier than June 30, 2023, subject to the Annuity Savings Fund recoupment set forth in Section II.B.3.u.ii.D, the pension benefits payable to each Holder of a GRS Pension Claim shall be equal to the GRS Adjusted Pension Amount for such Holder, underlined provided that such GRS Adjusted Pension Amount shall be (1) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (2) increased by any GRS Restoration Payment.

##### D. Annuity Savings Fund Recoupment.

###### 1. Active ASF Participants.

The value of Annuity Savings Fund accounts maintained by Holders of GRS Pension Claims who are Active ASF Participants will be recalculated by applying the Actual Return. The difference between (a) the value of an Active ASF Participant's Annuity Savings Fund account after application of the Actual Return and (b) the actual value of an Active ASF Participant's Annuity Savings Fund account as of June 30, 2014, shall be

-33-
13-53846-tjt Doc 8772 Filed 12/10/14 Entered 12/10/14 00:24:40 Page 202 of 602
13-53846-swr Doc 6382 Filed 03/31/ Entered 03/31/14 08:36:38 Page 406 of
236

deducted from the Active ASF Participant's Annuity Savings Fund account and included in GRS assets to support and pay GRS Adjusted Pension Amounts.

### 2. ASF Distribution Recipients.

The value of Annuity Savings Fund accounts of Holders of GRS Pension Claims who are ASF Distribution Recipients will be recalculated by applying the Actual Return. The difference between (a) the value of an ASF Distribution Recipient's Annuity Savings Fund account after application of the Actual Return and (b) the actual value of an ASF Distribution Recipient's Annuity Savings Fund account as of June 30, 2013, will be converted into an annual annuity amount based on the ASF Distribution Recipient's life expectancy and other actuarial factors, and then deducted from the ASF Distribution Recipient's GRS Adjusted Pension Amount.

### E. Accrual of Future Benefits.

Each Holder of a GRS Pension Claim who is an Active Employee shall receive, in addition to his or her GRS Adjusted Pension Amount, as may be modified herein, such additional pension benefit for service on or after July 1, 2014, consistent with the terms and conditions of the GRS Hybrid Pension Formula and the GRS Hybrid Pension Plan.

### F. Governance.

The composition of the board of trustees of the GRS and the manner in which it is operated and administered shall be consistent with the terms of the GRS Trust Agreement.

### G. Potential Transfer of DWSD-Related Pension Liabilities.

If the City consummates a DWSD Transaction on or prior to the Effective Date, the GLWA will assume the pension liability associated with DWSD employees and retirees as accrued through the closing date of the DWSD Transaction. A pro rata share of the existing GRS assets and liabilities will be transferred to a successor pension fund managed by the GLWA. The successor pension plan will be closed to new GLWA employees and benefit levels frozen.

### H. No Changes in Terms for Ten Years.

The Confirmation Order shall include an injunction against the subsequent amendment of the terms and conditions, and rules of operation, of the GRS, or any successor plan or trust, that govern the calculation of pension benefits (including the GRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, GRS Restoration Payment and the GRS Hybrid Pension Formula and terms of the GRS Hybrid Pension Plan) or against any action that governs the selection of the investment return assumption described in Section II.B.3.u.ii.B, the contribution to the GRS, or the calculation or amount of GRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.

### I. State Contribution Agreement

The State Contribution Agreement, the effectiveness of which is contingent upon the acceptance of the Plan by Classes 10 and 11, shall include the following principal terms: (1) the State will distribute the State Contribution for the benefit of Holders of Pension Claims; and (2) if the release set forth at Section III.D.7.b is not approved by the Bankruptcy Court, Non-Accepting Holders shall not be entitled to the State Settlement Benefit Amount as part of such Holder's GRS Adjusted Pension Amount.

-34-
236
13-53846-tjt Doc 8772 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 203 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 18:36:38 Page 202 of 602

### v. Class 12 – OPEB Claims.

#### i. Allowance.

The OPEB Claims shall be allowed in an aggregate amount equal to approximately $3,184,900,000.

#### ii. Treatment.

Establishment of VEBA:  On or as soon as practicable following the Effective Date, the City will establish the Detroit VEBA to provide health care, life and other legally authorized welfare benefits to Detroit VEBA Beneficiaries and certain of their dependents and future City retirees.  The Detroit VEBA will be governed by a board of trustees that will be responsible for, among other things, management of property held by the Detroit VEBA, administration of the Detroit VEBA and determination of the level of and distribution of benefits to Detroit VEBA Beneficiaries.  The Detroit VEBA Trust Agreement and related plan documentation will be substantially in the form set forth on Exhibit I.A.71, and shall, among other things, identify the members of the Detroit VEBA's initial board of trustees.

Distributions to VEBA:  Promptly after the Detroit VEBA is established, the City shall: (A) distribute an Unsecured Pro Rata Share of New B Notes to the Detroit VEBA in full satisfaction of the Allowed OPEB Claims, provided that the value of the Unsecured Pro Rata Share of New B Notes to be distributed to the Detroit VEBA shall be reduced by the amount of the Postpetition OPEB Payments; and (B) direct the trustees of the Employee Death Benefit Plan to terminate that plan and transfer all assets (net of expenses of termination) to the Detroit VEBA.  The City shall have no responsibility following the Effective Date to provide life insurance or death benefits to current or former employees.

### w. Class 13 – Downtown Development Authority Claims.

#### i. Allowance.

On the Effective Date, the Downtown Development Authority Claims shall be deemed Allowed in the amount of $33,600,000.

#### ii. Treatment.

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Downtown Development Authority Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of New B Notes.

### x. Class 14 – Other Unsecured Claims.

#### i. Treatment.

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Other Unsecured Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of New B Notes.

### y. Class 15 – Convenience Claims.

#### i. Treatment.

Each Holder of an Allowed Convenience Claim, in full satisfaction of such Allowed Claim, shall receive Cash equal to the amount of 25% of such Allowed Claim (as reduced, if applicable, pursuant to an election by such Holder in accordance with Section I.A.49) on or as soon as reasonably practicable after the Effective Date, unless such Holder agrees to a different treatment of such Claim.

z.  **Class 16 – Subordinated Claims.**

i.  **Treatment.**

On the Effective Date, all Subordinated Claims shall be disallowed, extinguished and discharged without Distribution under the Plan, and Holders of Subordinated Claims shall not receive or retain any property on account of such Claims. Pursuant to section 1126(g) of the Bankruptcy Code, Class 16 is deemed to have rejected the Plan and Holders of Subordinated Claims are not entitled to cast a Ballot in respect of such Claims.

## C.  Confirmation Without Acceptance by All Impaired Classes

The City requests Confirmation under section 1129(b) of the Bankruptcy Code in the event that any impaired Class does not accept or is deemed not to accept the Plan pursuant to section 1126 of the Bankruptcy Code. The Plan shall constitute a motion for such relief.

## D.  Treatment of Executory Contracts and Unexpired Leases

1.  **Assumption.**

Except as otherwise provided in the Plan, in any contract, instrument, release or other agreement or document entered into in connection with the Plan or in a Final Order of the Bankruptcy Court, or as requested in any motion Filed by the City on or prior to the Effective Date, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the City will be deemed to assume all Executory Contracts and Unexpired Leases to which it is a party.

2.  **Assumption of Ancillary Agreements.**

Each Executory Contract and Unexpired Lease assumed pursuant to Section II.D.1 will include any modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such Executory Contract or Unexpired Lease, unless any such modification, amendment, supplement, restatement or other agreement is rejected pursuant to Section II.D.6 or designated for rejection in accordance with Section II.D.3.

3.  **Approval of Assumptions and Assignments.**

The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumption of Executory Contracts and Unexpired Leases pursuant to Sections II.D.1 and II.D.2 (and any related assignment) as of the Effective Date, except for Executory Contracts or Unexpired Leases that (a) have been rejected pursuant to a Final Order of the Bankruptcy Court, (b) are subject to a pending motion for reconsideration or appeal of an order authorizing the rejection of such Executory Contract or Unexpired Lease, (c) are subject to a motion to reject such Executory Contract or Unexpired Lease Filed on or prior to the Effective Date, (d) are rejected pursuant to Section II.D.6 or (e) are designated for rejection in accordance with the last sentence of this paragraph. An order of the Bankruptcy Court (which may be the Confirmation Order) entered on or prior to the Confirmation Date will specify the procedures for providing notice to each party whose Executory Contract or Unexpired Lease is being assumed pursuant to the Plan of: (a) the Executory Contract or Unexpired Lease being assumed; (b) the Cure Amount Claim, if any, that the City believes it would be obligated to pay in connection with such assumption; (c) any assignment of an Executory Contract or Unexpired Lease; and (d) the procedures for such party to object to the assumption of the applicable Executory Contract or Unexpired Lease, the amount of the proposed Cure Amount Claim or any assignment of an Executory Contract or Unexpired Lease. If an objection to a proposed assumption, assumption and assignment or Cure Amount Claim is not resolved in favor of the City, the applicable Executory Contract or Unexpired Lease may be designated by the City for rejection, which shall be deemed effective as of the Effective Date.

-36-

13-53846-tjt  Doc 8773  Filed 12/10/14  Entered 12/10/14 09:24:46  Page 205 of 602
13-53846-swr  Doc 6382  Filed 03/31/14  Entered 03/31/14 18:36:38  Page 43 of 367
236

4. **Payments Related to the Assumption of Executory Contracts and Unexpired Leases**

        To the extent that such Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract or Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the City:  (a) by payment of the Cure Amount Claim in Cash on the Effective Date or (b) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease.  If there is a dispute regarding:  (a) the amount of any Cure Amount Claim, (b) the ability of the City or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to the assumption of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code will be made within 30 days following the entry of a Final Order resolving the dispute and approving the assumption.

5. **Contracts and Leases Entered Into After the Petition Date**

        Contracts, leases and other agreements entered into after the Petition Date by the City, including (a) any Executory Contracts or Unexpired Leases assumed by the City and (b) the collective bargaining agreements identified on Exhibit II.D.5, will be performed by the City in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts or Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

6. **Rejection of Executory Contracts and Unexpired Leases.**

        On the Effective Date, each Executory Contract and Unexpired Lease that is listed on Exhibit II.D.6 shall be deemed rejected pursuant to section 365 of the Bankruptcy Code.  The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the later of:  (a) the Effective Date or (b) the resolution of any objection to the proposed rejection of an Executory Contract or Unexpired Lease.  Each contract or lease listed on Exhibit II.D.6 shall be rejected only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease.  The City reserves its right, at any time on or prior to the Effective Date, to amend Exhibit II.D.6 to delete any Executory Contract or Unexpired Lease therefrom, thus providing for its assumption pursuant to Section II.D.1, or add any Executory Contract or Unexpired Lease thereto, thus providing for its rejection pursuant to this Section II.D.6.  The City will provide notice of any amendments to Exhibit II.D.6 to the parties to the Executory Contracts or Unexpired Leases affected thereby and to the parties on the then-applicable service list in the Chapter 9 Case.  Listing a contract or lease on Exhibit II.D.6 shall not constitute an admission by the City that such contract or lease is an Executory Contract or Unexpired Lease or that the City has any liability thereunder.  Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan shall be treated as Class 14 Claims (Other Unsecured Claims), subject to the provisions of section 502 of the Bankruptcy Code.

7. **Rejection Damages Bar Date.**

        Except as otherwise provided in a Final Order of the Bankruptcy Court approving the rejection of an Executory Contract or Unexpired Lease, Claims arising out of the rejection of an Executory Contract or Unexpired Lease must be Filed with the Bankruptcy Court and served upon counsel to the City on or before the later of:  (a) 30 days after the Effective Date; or (b) 30 days after such Executory Contract or Unexpired Lease is rejected pursuant to a Final Order or designated for rejection in accordance with Section II.D.3.  Any Claims not Filed within such applicable time periods will be forever barred from receiving a Distribution from, and shall not be enforceable against, the City.

8. **Preexisting Obligations to the City Under Rejected Executory Contracts and Unexpired Leases.**

        Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the City under such contract or lease. Notwithstanding any applicable non-bankruptcy law to the contrary, the City expressly reserves and does not waive

any right to receive, or any continuing obligation of a non-City party to provide, warranties, indemnifications or continued maintenance obligations on goods previously purchased, or services previously received, by the City from non-City parties to rejected Executory Contracts or Unexpired Leases, and any such rights shall remain vested in the City as of the Effective Date.

**9.    Insurance Policies.**

From and after the Effective Date, each of the City's insurance policies (other than welfare benefits insurance policies) in existence as of or prior to the Effective Date shall be reinstated and continue in full force and effect in accordance with its terms and, to the extent applicable, shall be deemed assumed by the City pursuant to section 365 of the Bankruptcy Code and Section II.D.1. Nothing contained herein shall constitute or be deemed a waiver of any Causes of Action that the City may hold against any Entity, including any insurer under any of the City's insurance policies. For the avoidance of doubt, nothing contained in this Section II.D.9 shall apply to reinstate or continue any obligation of the City or any fund thereof to any Bond Insurer.

<div align="center">

**ARTICLE III**
**CONFIRMATION OF THE PLAN**

</div>

**A.    Conditions Precedent to the Effective Date.**

The Effective Date will not occur, and the Plan will not be consummated, unless and until the City has determined that all of following conditions have been satisfied or waived in accordance with Section III.B:

1.    The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the City.

2.    The Bankruptcy Court shall have entered an order (which may be included in the Confirmation Order) approving and authorizing the City to take all actions necessary or appropriate to implement the Plan, including the transactions contemplated by the Plan and the implementation and consummation of the contracts, instruments, settlements, releases and other agreements or documents entered into or delivered in connection with the Plan.

3.    The Confirmation Order shall not be stayed in any respect.

4.    All actions and all contracts, instruments, settlements, releases and other agreements or documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable, in form and substance satisfactory to the City.

5.    All authorizations, consents and regulatory approvals, if any, required in connection with the consummation of the Plan have been obtained and not revoked.

6.    Any legislation that must be passed by the Michigan Legislature to effect any term of the Plan shall have been enacted.

7.    The Plan and all Exhibits shall have been Filed and shall not have been materially amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with Section VIII.A.

8.    If Classes 10 and 11 have accepted the Plan, all conditions to the effectiveness of the State Contribution Agreement and the DIA Settlement Documents have been satisfied.

9.    The Effective Date shall have occurred within 180 days of the entry of the Confirmation Order, unless the City requests an extension of such deadline and such deadline is extended by the Bankruptcy Court.

-38-

13-53846-tjt   Doc 8773   Filed 12/10/14   Entered 12/10/14 09:24:40   Page 207 of 602
13-53846-swr   Doc 6382   Filed 03/31/14   Entered 03/31/14 23:36:38   Page 45 of
236

**B.    Waiver of Conditions to the Effective Date.**

The conditions to the Effective Date set forth in Section III.A may be waived in whole or part at any time by the City in its sole and absolute discretion.

**C.    Effect of Nonoccurrence of Conditions to the Effective Date.**

If each of the conditions to the Effective Date is not satisfied, or duly waived in accordance with Section III.B, then upon motion by the City made before the time that each of such conditions has been satisfied and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order will be vacated by the Bankruptcy Court; provided, however, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is satisfied before the Bankruptcy Court enters an order granting such motion. If the Confirmation Order is vacated pursuant to this Section III.C:  (1) the Plan will be null and void in all respects, including with respect to (a) the discharge of Claims pursuant to section 944(b) of the Bankruptcy Code, (b) the assumptions, assignments or rejections of Executory Contracts and Unexpired Leases pursuant to Section II.D and (c) the releases described in Section III.D.7; and (2) nothing contained in the Plan, nor any action taken or not taken by the City with respect to the Plan, the Disclosure Statement or the Confirmation Order, will be or will be deemed to be (a) a waiver or release of any Claims by or against the City, (b) an admission of any sort by the City or any other party in interest or (c) prejudicial in any manner the rights of the City or any other party in interest.

**D.    Effect of Confirmation of the Plan.**

**1.    Dissolution of Retiree Committee.**

Following the Effective Date, the Retiree Committee, to the extent not previously dissolved or disbanded, will dissolve and disband, and the members of the Retiree Committee and their respective professionals will cease to have any role arising from or related to the Chapter 9 Case, provided, however, that, if and only if the Retiree Committee is the Creditor Representative under the Plan, the Retiree Committee shall continue to exist solely for the purposes of objecting to or otherwise asserting the City's or its creditors' rights with respect to Disputed COP Claims pursuant to Section II.B.3.s.i.  If the Retiree Committee is the Creditor Representative, it shall be disbanded upon the final resolution of all Disputed COP Claims or pursuant to an order of the Bankruptcy Court, which order may be sought by the City for good cause shown.  All fees and expenses of the Creditor Representative shall be subject to the approval of the City.  All disputes relating to the approval of fees and expenses shall be determined by the Bankruptcy Court.  No party to any such dispute shall have any right to appeal an order of the Bankruptcy Court resolving any such dispute.

**2.    Preservation of Rights of Action by the City.**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code, the City will retain and may enforce any claims, demands, rights, defenses and Causes of Action that it may hold against any Entity, to the extent not expressly released under the Plan or pursuant to any Final Order of the Bankruptcy Court.  A nonexclusive schedule of currently pending actions and claims brought by the City is attached as Exhibit III.D.2.  The City's inclusion of, or failure to include, any right of action or claim on Exhibit III.D.2 shall not be deemed an admission, denial or waiver of any claims, demands, rights or Causes of Action that the City may hold against any Entity, and all Entities are hereby notified that the City intends to preserve all such claims, demands, rights or Causes of Action.

**3.    Comprehensive Settlement of Claims and Controversies.**

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all claims or controversies relating to the rights that a holder of a Claim may have with respect to any Allowed Claim or any Distribution to be made pursuant to the Plan on account of any Allowed Claim.  The entry of the Confirmation

-39-
13-53846-tjt   Doc 8773   Filed 12/10/14   Entered 12/10/14 09:24:40   Page 208 of 602
13-53846-swr   Doc 6382   Filed 03/31/14   Entered 03/31/14 18:36:38   Page 46 of
236

Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements are (a) in the best interests of the City, its property and Claim Holders and (b) fair, equitable and reasonable. For the avoidance of doubt, this Section III.D.3 shall not affect or limit the application of section 509 of the Bankruptcy Code or any similar doctrine to Bond Insurance Policy Claims.

4.    **Discharge of Claims.**

a.    **Complete Satisfaction, Discharge and Release.**

Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims arising on or before the Effective Date, including any interest accrued on Claims from and after the Petition Date. Except as provided in the Plan or in the Confirmation Order, Confirmation will, as of the Effective Date, discharge the City from all Claims or other debts that arose on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (iii) the Holder of a Claim based on such debt has accepted the Plan.

b.    **Discharge.**

In accordance with Section III.D.4.a, except as expressly provided otherwise in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination, as of the Effective Date, of a discharge of all Claims and other debts and Liabilities against the City, pursuant to sections 524(a)(1), 524(a)(2) and 944(b) of the Bankruptcy Code, and such discharge will void any judgment obtained against the City at any time, to the extent that such judgment relates to a discharged Claim; provided that such discharge will not apply to (i) Claims specifically exempted from discharge under the Plan; and (ii) Claims held by an Entity that, before the Confirmation Date, had neither notice nor actual knowledge of the Chapter 9 Case.

5.    **Injunction.**

**On the Effective Date, except as otherwise provided herein or in the Confirmation Order,**

a.    **all Entities that have been, are or may be holders of Claims against the City, Indirect 36th District Court Claims or Indirect Employee Indemnity Claims, along with their Related Entities, shall be permanently enjoined from taking any of the following actions against or affecting the City or its property, DIA Corp. or its property, the DIA Assets, the Released Parties, their respective property, the GLWA and its property (if a DWSD Transaction is consummated on or prior to the Effective Date) and the Related Entities of each of the foregoing, with respect to such claims (other than actions brought to enforce any rights or obligations under the Plan and appeals, if any, from the Confirmation Order):**

1.    **commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against or affecting the City or its property (including (A) all suits, actions and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice, (B) Indirect 36th District Court Claims and (C) Indirect Employee Indemnity Claims);**

2.    **enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order against the City or its property;**

3.    **creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the City or its property;**

-40-
236
13-53846-tjt  Doc 8773  Filed 12/10/14  Entered 12/10/14 09:24:03  Page 209 of 602
13-53846-swr  Doc 6382  Filed 03/31/14  Entered 03/31/14 18:36:38  Page 47 of 101

4.      asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the City or its property;

5.      proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan or the settlements set forth herein to the extent such settlements have been approved by the Bankruptcy Court in connection with Confirmation of the Plan; and

6.      taking any actions to interfere with the implementation or consummation of the Plan.

b.      All Entities that have held, currently hold or may hold any Liabilities released or exculpated pursuant to the Plan will be permanently enjoined from taking any of the following actions against the State, the State Related Entities and the Released Parties or any of their respective property on account of such released Liabilities:  (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien; (iv) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the State, a State Related Entity or a Released Party; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

6.      Exculpation.

From and after the Effective Date, to the fullest extent permitted under applicable law, neither the City, its Related Entities (including the members of the City Council, the Mayor and the Emergency Manager), to the extent a claim arises from actions taken by such Related Entity in its capacity as a Related Entity of the City, the State, the State Related Entities, nor the Released Parties shall have or incur any liability to any person or Entity for any act or omission in connection with, relating to or arising out of the City's restructuring efforts and the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the formulation, preparation, negotiation, dissemination, consummation, implementation, confirmation or approval (as applicable) of the Plan, the property to be distributed under the Plan, the settlements implemented under the Plan, the Exhibits, the Disclosure Statement, any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan or the management or operation of the City; provided, however, that the foregoing provisions shall not affect the liability of the City, its Related Entities, the State, the State Related Entities and the Released Parties that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct or any act or omission occurring before the Petition Date.  The City, its Related Entities (with respect to actions taken by such Related Entities in their capacities as Related Entities of the City), the State, the State Related Entities and the Released Parties shall be entitled to rely upon the advice of counsel and financial advisors with respect to their duties and responsibilities under, or in connection with, the Chapter 9 Case, the administration thereof and the Plan.

7.      Releases.

Without limiting any other applicable provisions of, or releases contained in, the Plan or any contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, as of the Effective Date, in consideration for the obligations of the City under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan (including the State Contribution Agreement):

a.      each holder of a Claim that votes in favor of the Plan, to the fullest extent permissible under law, will be deemed to forever release, waive and discharge all Liabilities in any way relating to the City, the Chapter 9 Case, the Plan, the Exhibits or the Disclosure Statement that such entity has, had or may have against the City, its Related Entities, the State, the State Related Entities and the Released Parties (which release will be in addition to the discharge of Claims provided herein and under the Confirmation Order

-41-

13-53846-tjt  Doc 8772  Filed 12/10/14  Entered 12/10/14 00:24:40  Page 210 of 602
13-53846-swr  Doc 6382  Filed 03/31/14  Entered 03/31/14 13:06:58  Page 45 of
236

and the Bankruptcy Code), <u>provided</u>, <u>however</u>, that the foregoing provisions shall not affect the liability of the City, its Related Entities and the Released Parties that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted gross negligence or willful misconduct; and

b.     if the State Contribution Agreement is consummated, each holder of a Pension Claim will be deemed to forever release, waive and discharge all Liabilities arising from or related to the City, the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, § 24 of the Michigan Constitution that such party has, had or may have against the State and any State Related Entities.

## E.     Effectiveness of the Plan.

The Plan shall become effective on the Effective Date.  Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

## F.     Binding Effect of Plan.

Pursuant to section 944(a) of the Bankruptcy Code, on and after the Effective Date, the provisions of the Plan shall bind all Holders of Claims, and their respective successors and assigns, whether or not the Claim of any such Holder is Impaired under the Plan and whether or not such Holder has accepted the Plan.  The releases and settlements effected under the Plan will be operative, and subject to enforcement by the Bankruptcy Court, from and after the Effective Date, including pursuant to the injunctive provisions of the Plan.  Once approved, the compromises and settlements embodied in the Plan, along with the treatment of any associated Allowed Claims, shall not be subject to any collateral attack or other challenge by any Entity in any court or other forum.  As such, any Entity that opposes the terms of any compromise and settlement set forth in the Plan must (1) challenge such compromise and settlement prior to Confirmation of the Plan and (2) demonstrate appropriate standing to object and that the subject compromise and settlement does not meet the standards governing bankruptcy settlements under Bankruptcy Rule 9019 and other applicable law.

# ARTICLE IV
# MEANS FOR IMPLEMENTATION OF THE PLAN

## A.     Alternatives Related to the DWSD.

### 1.     DWSD Remains a Department of the City.

#### a.     Rates and Revenues.

The DWSD will maintain Fiscal Year 2015 rate setting protocols for a minimum of five years, subject to certain changes necessary to stabilize water and sewer revenues.  Immediately following the Effective Date, the City will begin planning a rate stability program for City residents. Such program may provide for affordability of retail rates to be taken into account in the development of wholesale rates across the system.

#### b.     DWSD CBAs.

Collective bargaining agreements with respect to current DWSD employees that are in effect and not expired as of the Effective Date will be assumed by the City.

#### c.     The New DWSD Bonds and New Existing Rate DWSD Bonds.

If a DWSD Transaction is not consummated, the DWSD shall, as necessary:  (1) execute the New DWSD Bond Documents, issue the New DWSD Bonds substantially on the terms set forth on Exhibit I.A.174, and

-42-

236

13-53846-tjt  Doc 8772  Filed 12/10/14  Entered 12/10/14 09:24:43  Page 211 of 602
13-53846-swr  Doc 6382  Filed 03/31/14  Entered 03/31/14 03:36:58  Page 49 of 60

distribute the New DWSD Bonds as set forth in the Plan; and (2) execute the New Existing Rate DWSD Bond Documents, issue the New Existing Rate DWSD Bonds substantially on the terms set forth on Exhibit I.A.176, and distribute the New Existing Rate DWSD Bonds as set forth in the Plan.

### 2.     Potential DWSD Transaction.

The City may enter into a DWSD Transaction that will include the formation of the GLWA to conduct the operations currently conducted by the DWSD.

#### a.     The New GLWA Bonds, New Existing Rate GLWA Bonds and New GLWA Revolving Bonds.

If the City enters into a DWSD Transaction, the GLWA shall, as necessary:  (a) execute the New GLWA Bond Documents, issue the New GLWA Bonds substantially on the terms set forth on Exhibit I.A.181 and distribute the New GLWA Bonds as set forth in the Plan; (b) execute the New Existing Rate GLWA Bond Documents, issue the New Existing Rate GLWA Bonds substantially on the terms set forth on Exhibit I.A.178, and distribute the New Existing Rate GLWA Bonds as set forth in the Plan; and (c) execute the New GLWA Revolving Bond Documents, issue the New GLWA Revolving Bonds substantially on the terms set forth on Exhibit I.A.183, and distribute the New GLWA Revolving Bonds as set forth in the Plan.

### B.     The New Securities.

On the Effective Date, the City shall (1) execute the New B Notes Documents, issue the New B Notes, substantially on the terms set forth on Exhibit I.A.171, and distribute the New B Notes as set forth in the Plan; and (2) execute the Plan UTGO Notes Documents, issue the Plan UTGO Notes substantially on the terms set forth on Exhibit I.A.210, and distribute the Plan UTGO Notes as set forth in the Plan.

### C.     The Plan COP Settlement.

The City shall consummate the Plan COP Settlement on the Effective Date, substantially on the terms set forth on Exhibit I.A.208.  Settling COP Claimants shall receive the treatment described in Section II.B.3.s.iii.A.

### D.     The State Contribution Agreement.

On the Effective Date, if Classes 10 and 11 vote to accept the Plan, the City and the State will enter into the State Contribution Agreement, substantially on the terms set forth on Exhibit I.A.255.  During the 20-year period following the Effective Date, the State will make periodic payments in an aggregate nominal amount of $350 million for the benefit of Holders of Pension Claims on a Pro Rata basis.

### E.     The DIA Settlement.

On the Effective Date, the City and the DIA Funding Parties will enter into the DIA Settlement, pursuant to which (1) the DIA Funding Parties have committed to assist in the funding of the City's restructured legacy pension obligations and (2) the City has agreed to enter into certain transactions that will cause the DIA Assets to remain in the City in perpetuity and to otherwise make the DIA Assets available for the benefit of the residents of the City and the Counties and the citizens of the State.  The definitive documentation governing the DIA Settlement, the material terms of which are attached hereto at Exhibit I.A.79, provides generally for, and entirely qualifies, both the following and the material terms attached hereto at Exhibit I.A.79:

#### 1.     Funding Contributions.

The DIA Settlement will be funded as follows:  (a) an irrevocable commitment of at least $366 million by the Foundations; and (b) in addition to its continuing commitments outside of the DIA Settlement, an irrevocable commitment from DIA Corp. to raise at least $100 million from its donors (subject to certain

-43-

13-53846-tjt  Doc 8773  Filed 12/10/14  Entered 12/10/14 09:24:36  Page 212 of 602
13-53846-swr  Doc 6382  Filed 03/31/14  Entered 03/31/14 18:36:38  Page 90 of
236

adjustments as set forth in the DIA Settlement Documents), the payment of which $100 million will be guaranteed by DIA Corp., subject to the terms of the DIA Settlement Documents. The foregoing commitments shall be funded over the course of the 20-year period immediately following the Effective Date (subject to the annual confirmation of the City's continuing compliance with the terms of the DIA Settlement). Amounts committed by the Foundations will be paid to the CFSEM Supporting Organization, which will (a) transfer such amounts for the purpose of funding the Retirement Systems upon the City's satisfaction of certain conditions and (b) not be subject to claims of creditors of the Community Foundation for Southeast Michigan.

### 2. Transfer of DIA Assets.

On the Effective Date, the City shall irrevocably transfer the DIA Assets to DIA Corp., as trustee, to be held in perpetual charitable trust, and within the City limits, for the primary benefit of the residents of the City and the Counties and the citizens of the State.

### 3. Conditions to the Foundations' Participation.

The Foundations' participation in the DIA Settlement is conditioned upon, among other things, the following: (a) execution of the DIA Settlement Documents by each Foundation; (b) the irrevocable commitment from the DIA Corp. described in Section IV.E.1; (c) the acceptance of the Plan by Classes 10 and 11; (d) the irrevocable transfer by the City of the DIA Assets described in Section IV.E.2; (e) the existence of appropriate governance and oversight structures at DIA Corp. that include representation of the City, the DIA Funding Parties and other stakeholders; (f) the earmarking of all funds provided by the DIA Funding Parties towards the recoveries upon Pension Claims under the Plan for Holders of Claims in Classes 10 and 11; (g) the existence of appropriate prospective governance and financial oversight mechanisms for the Retirement Systems; (h) the affirmation by County authorities of certain existing funding obligations with respect to DIA Corp.; (i) the approval of the DIA Settlement by the Attorney General for the State; (j) the agreement of the State to provide the State Contribution in an aggregate amount up to $350 million; (k) the occurrence of the Effective Date no later than December 31, 2014; and (l) the City's agreement to indemnify and hold harmless the Foundations and the CFSEM Supporting Organization pursuant to, and in accordance with, the terms of the DIA Settlement Documents.

### F. Issuance of the New Securities.

The City shall issue the New Securities on the Effective Date or a subsequent Distribution Date, as applicable. To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the issuance of New Securities will be exempt from registration under the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder and any other applicable non-bankruptcy law or regulation.

### G. Cancellation of Existing Bonds and Bond Documents.

Except (a) as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan, (b) for purposes of evidencing a right to Distribution under the Plan or (c) as specifically provided otherwise in the Plan, on the Effective Date, the Bonds and the Bond Documents will be deemed automatically cancelled, terminated and of no further force or effect against the City without any further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the parties, as applicable, under the Bonds and the Bond Documents shall be discharged; provided, however, that the Bond Documents shall continue in effect solely (i) to allow the Disbursing Agent to make any Distributions as set forth in the Plan and to perform such other necessary administrative or other functions with respect thereto, (ii) for any trustee, agent or similar entity under the Bond Documents to have the benefit of all the rights and protections and other provisions of the Bond Documents and all other related agreements with respect to priority in payment and lien rights with respect to any Distribution and (iii) as may be necessary to preserve any claim by a Bondholder and/or Bond Agent under a Bond Insurance Policy or against any Bond Insurer. Nothing in the Plan is intended to impair, modify, affect or otherwise alter the rights of (a) Bondholders and/or Bond Agents with respect to claims under applicable Bond Insurance Policies and/or against the Bond Insurers or (b) Holders of COP Claims with respect to claims under applicable policies and/or other instruments insuring the COPs and obligations related thereto.

-44-

13-53846-tjt Doc 8772 Filed 12/10/14 Entered 12/10/14 18:36:58 Page 213 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 08:24:03 Page 91 of 169
236

**H.      Release of Liens.**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date, all Liens against the City's property will be deemed fully released and discharged, and all of the right, title and interest of any holder of such Liens, including any rights to any collateral thereunder, will revert to the City.  As of the Effective Date, (1) the holders of such Liens will be authorized and directed to release any collateral or other property of the City (including any cash collateral) held by such Holder and to take such actions as may be requested by the City to evidence the release of such Lien, including the execution, delivery, filing or recording of such releases as may be requested by the City, and (2) the City shall be authorized to execute and file on behalf of creditors Form UCC-3 Termination Statements or such other forms as may be necessary or appropriate to implement the provisions of this Section IV.H.

**I.      Professional Fee Reserve**

On the Effective Date, the City shall establish and fund the Professional Fee Reserve.  The Professional Fee Reserve shall be funded in an amount sufficient to pay the Fee Review Professional Fees that remain unpaid as of the Effective Date.  The funds held in the Professional Fee Reserve may not be used for any purpose other than the payment of Fee Review Professional Fees until any and all disputes regarding the Fee Review Professional Fees, including any disputes arising under the Fee Review Order, have been fully and finally resolved pursuant to a Final Order or a stipulation between the disputing parties.  Any amounts remaining in the Professional Fee Reserve after final resolution of all such disputes and the payment of all Fee Review Professional Fees determined to be reasonable in accordance with the Fee Review Order shall be released to the General Fund.

**J.      Assumption of Indemnification Obligations.**

Notwithstanding anything otherwise to the contrary in the Plan, nothing in the Plan shall discharge or impair the obligations of the City as provided in the City Charter of the City or other organizational documents, resolutions, employment contracts, applicable law or other applicable agreements as of the Petition Date to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of officers and employees of the City (consistent with the injunction provisions of Section III.D.5 and including the members of the City Council, the Mayor and the Emergency Manager) and their Related Entities, in each case to the extent such Entities were acting in such capacity, against any claims or causes of action whether direct or derivative, liquidated or unliquidated, foreseen or unforeseen, asserted or unasserted; provided that this Section IV.J shall be read in conjunction with the provisions for Indirect Employee Indemnity Claims set forth in Section III.D.5.  For the avoidance of doubt, no indemnification provision in any loan document, bond document, Bond Insurance Policy or other agreement with a Bond Insurer is exempted from discharge by reason of this Section IV.J.

**K.      Incorporation of Retiree Health Care Settlement Agreement.**

The terms of the Retiree Health Care Settlement Agreement resolving the Retiree Health Care Litigation, which agreement is attached hereto as Exhibit I.A.227, are incorporated herein by reference and shall be binding upon the parties thereto.

**L.      Payment of Workers' Compensation Claims.**

From and after the Effective Date, (a) the City will continue to administer and pay all valid claims for benefits and liabilities for which the City is responsible under applicable State workers' compensation law, regardless of when the applicable injuries were incurred, in accordance with the City's prepetition practices and procedures and governing State workers' compensation law, and (b) nothing in the Plan shall discharge, release or relieve the City from any current or future liability under applicable State workers' compensation law.  The City expressly reserves the right to challenge the validity of any claim for benefits or liabilities arising under applicable State workers' compensation law.

-45-

13-53846-tjt   Doc 8772   Filed 12/10/14   Entered 12/10/14 09:24:03   Page 214 of 602
13-53846-swr   Doc 6382   Filed 03/31/   Entered 03/31/14 8:36:38   Page 92 of
236

**M.**     **Exit Facility.**

On the Effective Date, the City shall enter into the Exit Facility, as well as any ancillary notes, documents or agreements in connection therewith, including, without limitation, any documents required in connection with the creation or perfection of the liens securing the Exit Facility.

# ARTICLE V
## PROVISIONS REGARDING DISTRIBUTIONS UNDER THE PLAN

**A.**     **Appointment of Disbursing Agent.**

The City may act as Disbursing Agent or may employ or contract with other Entities to act as the Disbursing Agent or to assist in or make the Distributions required by the Plan. Any Disbursing Agent appointed by the City will serve without bond. Other than as specifically set forth in the Plan, the Disbursing Agent shall make all Distributions required to be made under the Plan.

**B.**     **Distributions on Account of Allowed Claims.**

Except as otherwise provided in the Plan, on the Effective Date or as soon as practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive from the Disbursing Agent the Distributions that the Plan provides for Allowed Claims in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Section VI.B. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the Distributions provided for in the Plan, regardless of whether such Distributions are delivered on or at any time after the Effective Date. Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Distribution in excess of the Allowed amount of such Claim.

**C.**     **Certain Claims to Be Expunged.**

Any Claim that has been or is hereafter listed in the List of Creditors as contingent, unliquidated or disputed, and for which no proof of Claim is or has been timely Filed, is not considered to be an Allowed Claim and shall be expunged without further action by the City and without further notice to any party or any action, approval or order of the Bankruptcy Court.

**D.**     **Record Date for Distributions; Exception for Bond Claims.**

With the exception of Bond Claims, neither the City nor any Disbursing Agent will have any obligation to recognize the transfer of, or the sale of any participation in, any Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute only to those Holders of Allowed Claims (including Holders of Claims that become Allowed after the Distribution Record Date) that are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date. With the exception of the Bond Claims, the City and any Disbursing Agent shall instead be entitled to recognize and deal for all purposes under the Plan with only those record Holders stated on the official Claims Register as of the close of business on the Distribution Record Date. Unless otherwise set forth in the Confirmation Order, the City shall not establish a record date for Distributions to Holders of Bond Claims.

**E.**     **Means of Cash Payments.**

Except as otherwise specified herein, all Cash payments made pursuant to the Plan shall be in U.S. currency and made by check drawn on a domestic bank selected by the Disbursing Agent or, at the option of

the Disbursing Agent, by wire transfer, electronic funds transfer or ACH from a domestic bank selected by the Disbursing Agent; provided, however, that Cash payments to foreign Holders of Allowed Claims may be made, at the option of the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

**F.      Selection of Distribution Dates for Allowed Claims.**

Except where the Plan requires the making of a Distribution on account of a particular Allowed Claim within a particular time, the Disbursing Agent shall have the authority to select Distribution Dates that, in the judgment of the Disbursing Agent, provide Holders of Allowed Claims with payments as quickly as reasonably practicable while limiting the costs incurred in the distribution process.  Upon the selection of a Distribution Date by the Disbursing Agent, the Disbursing Agent shall File a notice of such Distribution Date that provides information regarding the Distribution to be made.

**G.      Limitations on Amounts to Be Distributed to Holders of Allowed Claims Otherwise Insured.**

No Distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the City's insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy; provided that, if the City believes a Holder of an Allowed Claim has recourse to an insurance policy and intends to direct the Disbursing Agent to withhold a Distribution pursuant to this Section V.G, the City shall provide written notice to such Holder regarding what the City believes to be the nature and scope of applicable insurance coverage.  To the extent that one or more of the City's insurance carriers agrees to satisfy a Claim in full, then immediately upon such agreement such Claim may be expunged without a Claims objection having to be Filed and without any further notice or any action, order or approval of the Bankruptcy Court. Nothing in the Plan, including this Section V.G, shall constitute a waiver of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities that any Entity may hold against any other Entity other than the City, including the City's insurance carriers.  For the avoidance of doubt, this Section shall not apply to Bond Insurance Policies or Swap Insurance Policies.

**H.      City's Rights of Setoff Preserved.**

Notwithstanding anything to the contrary in the Plan, pursuant to section 553 of the Bankruptcy Code or otherwise applicable non-bankruptcy law, the City may set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Allowed Claim the claims, rights and Causes of Action of any nature that the City may assert against the Holder of such Claim; provided, however, that neither the failure to effect a setoff nor the allowance of any Claim pursuant to the terms of the Plan shall constitute a waiver or release by the City of any claims, rights and Causes of Action that the City may assert against such Holder, all of which are expressly preserved.

**I.      Delivery of Distributions and Undeliverable or Unclaimed Distributions.**

**1.      Delivery of Distributions Generally.**

Except as set forth in Section V.I.2, Distributions to Holders of Allowed Claims shall be made at the addresses set forth in the City's records unless such addresses are superseded by proofs of Claim or transfers of Claim Filed pursuant to Bankruptcy Rule 3001.

**2.      Delivery of Distributions on Account of Bond Claims.**

Distributions on account of the Bond Claims shall (a) be made by the Disbursing Agent to the Bond Agent under the applicable Bond Documents for the benefit of Holders of Bond Claims and (b) be deemed completed when made by the Disbursing Agent to the Bond Agent as if such Distributions were made directly to the Holders of such Claims.  The applicable Bond Agent, in turn, shall make such distributions to the applicable Holders pursuant to the terms and conditions of the applicable Bond Documents and subject to the respective rights, claims and interests, if any, that the Bond Agent may have under the applicable Bond Documents or otherwise to the

-47-

236

13-53846-tjt   Doc 8272   Filed 12/10/14   Entered 12/10/14 08:24:40   Page 216 of 602
13-53846-swr   Doc 6382   Filed 03/31/14   Entered 03/31/14 18:36:58   Page 54 of

recovery and/or reimbursement of their fees, costs and expenses (including the fees, costs and expenses of counsel and financial advisors) from any distribution hereunder, whether such rights, claims or interests are in the nature of a charging lien or otherwise. The Bond Agent shall not be required to give any bond, surety or other security for the performance of its duties with respect to such Distributions.

### 3. De Minimis Distributions / No Fractional New Securities.

No distribution shall be made by the Disbursing Agent on account of an Allowed Claim if the amount to be distributed to the specific Holder of an Allowed Claim on the applicable Distribution Date has an economic value of less than $25.00. No fractional New Securities shall be distributed. Where a fractional portion of a New Security otherwise would be called for under the Plan, the actual issuance shall reflect a rounding down to the nearest whole New Security.

### 4. Undeliverable or Unclaimed Distributions.

In the event that any Distribution to any Holder is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such Distribution shall be made to such Holder without interest.

Any Holder of an Allowed Claim that does not claim an undeliverable or unclaimed Distribution within six months after the Effective Date shall be deemed to have forfeited its claim to such Distribution and shall be forever barred and enjoined from asserting any such claim against the City or its property. In such cases, any Cash held by the City on account of such undeliverable or unclaimed Distributions shall become the property of the City free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary. Any New Securities held for distribution on account of such Claims shall be canceled and of no further force or effect. Nothing contained in the Plan shall require any Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

### 5. Time Bar to Cash Payment Rights.

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof. Requests for reissuance of any check shall be made to the Disbursing Agent by the Holder of the Allowed Claim to whom such check originally was issued within 180 days after the date of the original check issuance. After such date, the Claim of any Holder to the amount represented by such voided check shall be released and forever barred from assertion against the City and its property.

## J. Other Provisions Applicable to Distributions in All Classes

### 1. No Postpetition Interest.

Except as otherwise specifically provided for in the Plan, or required by applicable bankruptcy law, the City shall have no obligation to pay any amount that constitutes or is attributable to interest on an Allowed Claim accrued after the Petition Date and no Holder of a Claim shall be entitled to be paid any amount that constitutes or is attributable to interest accruing on or after the Petition Date on any Claim without regard to the characterization of such amounts in any document or agreement or to whether such amount has accrued for federal income tax purposes. Any such amount that constitutes or is attributable to interest that has been accrued and has not been paid by the City shall be cancelled as of the Effective Date for federal income tax purposes.

### 2. Compliance with Tax Requirements.

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the City and any Disbursing Agent shall comply with all Tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions under the Plan shall be subject to such withholding and reporting requirements. All such amounts withheld and paid to the appropriate governmental unit shall be treated as if made directly to the Holder of an Allowed Claim. The City and the Disbursing Agent shall be

authorized to take any actions that they determine, in their reasonable discretion, to be necessary or appropriate to comply with such withholding and reporting requirements, including withholding Distributions pending receipt of information necessary to facilitate such Distributions, or establishing any other mechanisms they believe are reasonable and appropriate.

Notwithstanding any other provision of the Plan, each Entity receiving or deemed to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any Tax imposed on such Entity on account of such Distribution, including income, withholding and other Tax obligations. The City has the right, but not the obligation, to refuse, or to direct a Disbursing Agent to refuse, to make a Distribution until a Holder of an Allowed Claim has made arrangements satisfactory to the City and any Disbursing Agent for payment of any such Tax obligations. The City may require, as a condition to making a Distribution, that the Holder of an Allowed Claim provide the City or any Disbursing Agent with a completed Form W-8, W-9 and/or other Tax information, certifications and supporting documentation, as applicable.

If the City makes such a request and the Holder of an Allowed Claim fails to comply before the date that is 180 days after the initial request is made, the amount of such Distribution shall irrevocably revert to the City and any Claim in respect of such Distribution shall be released and forever barred from assertion against the City and its property.

### 3. Allocation of Distributions.

All Distributions to Holders of Allowed Claims that have components of principal and interest shall be deemed to apply first to the principal amount of such Claim until such principal amount is paid in full, and then the remaining portion of such Distributions, if any, shall be deemed to apply to any applicable accrued interest included in such Claim to the extent interest is payable under the Plan.

### 4. Surrender of Instruments.

As a condition to participation under this Plan, the Holder of a note, debenture or other evidence of indebtedness of the City that desires to receive the property to be distributed on account of an Allowed Claim based on such note, debenture or other evidence of indebtedness shall surrender such note, debenture or other evidence of indebtedness to the City or its designee (unless such Holder's Claim will not be Impaired by the Plan, in which case such surrender shall not be required), and shall execute and deliver such other documents as are necessary to effectuate the Plan; provided, however, that, if a claimant is a Holder of a note, debenture or other evidence of indebtedness for which no physical certificate was issued to the Holder but which instead is held in book-entry form pursuant to a global security held by the Depository Trust Company or other securities depository or custodian thereof, the City or the applicable Bond Agent for such note, debenture or other evidence of indebtedness may waive the requirement of surrender. In the City's sole discretion, if no surrender of a note, debenture or other evidence of indebtedness occurs and the Holder of Claim does not provide an affidavit and indemnification agreement, in form and substance reasonably satisfactory to the City, that such note, debenture or other evidence of indebtedness was lost, then no distribution may be made to such Holder in respect of the Claim based on such note, debenture or other evidence of indebtedness. For the avoidance of doubt, (a) no Bond, note, debenture or other evidence of indebtedness of the City shall be surrendered or deemed surrendered hereby to the extent necessary to make and/or preserve a claim under any Bond Insurance Policy or against any Bond Insurer and (b) no COP shall be surrendered or deemed surrendered hereby to the extent necessary to make and/or preserve a claim under any applicable policies and/or other instruments insuring the COPs and obligations related thereto or against any party, other than the City, that insures the COPs.

-49-

13-53846-tjt  Doc 8773  Filed 12/10/14  Entered 12/10/14 09:24:40  Page 218 of 602
13-53846-swr  Doc 6382  Filed 03/31/14  Entered 03/31/14 18:36:38  Page 96 of 236

# ARTICLE VI
# PROCEDURES FOR RESOLVING DISPUTED CLAIMS

## A. Treatment of Disputed Claims.

### 1. General.

No Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order (including the Confirmation Order) allowing such Claim. Notwithstanding any other provision of the Plan, no payments or Distributions shall be made on account of a Disputed Claim until such Claim becomes an Allowed Claim. Without limiting the foregoing in any way, no partial payments and no partial Distributions will be made with respect to a disputed, contingent or unliquidated Claim, or with respect to any Claim for which a proof of Claim has been Filed but not Allowed, until the resolution of such disputes or estimation or liquidation of such Claim by settlement or by Final Order.

### 2. ADR Procedures.

At the City's option, any Disputed Claim designated or eligible to be designated for resolution through the ADR Procedures may be submitted to the ADR Procedures in accordance with the terms thereof and the ADR Procedures Order. For the avoidance of doubt, the designation of a Disputed Claim for resolution through the ADR Procedures, either prior to or after the Effective Date, will not modify, and will not be deemed to have modified, the terms of the ADR Injunction imposed pursuant to the ADR Procedures Order. Disputed Claims not resolved through the ADR Procedures will be resolved pursuant to the Plan.

### 3. Tort Claims.

At the City's option, any unliquidated Tort Claim (as to which a proof of Claim was timely Filed in the Chapter 9 Case) not resolved through the ADR Procedures or pursuant to a Final Order of the Bankruptcy Court will be determined and liquidated in the administrative or judicial tribunal(s) in which it is pending on the Effective Date (subject to the City's right to seek removal or transfer of venue) or, if no action was pending on the Effective Date, in an administrative or judicial tribunal of appropriate jurisdiction selected by the City that (a) has personal jurisdiction over the parties, (b) has subject matter jurisdiction over the Tort Claim and (c) is a proper venue. The City may exercise the above option by service upon the holder of the applicable Tort Claim of a notice informing such holder that the City has exercised such option (which notice shall be deemed to satisfy the notice requirements of Section I.B of the ADR Procedures). Upon the City's service of such notice, the automatic stay imposed pursuant to sections 362 and 922 of the Bankruptcy Code (along with any extension of such stay pursuant to the terms of the Stay Extension Order) or, after the Effective Date, the injunction set forth at Section III.D.5, will be deemed modified, without the necessity for further Bankruptcy Court approval or any further action by the City, solely to the extent necessary to allow the parties to determine or liquidate the Tort Claim in the applicable administrative or judicial tribunal(s); provided that nothing contained in this Section will modify, or will be deemed to have modified, the terms of the Stay Extension Order with respect to any Tort Claim prior to the City having served notice of its intent to determine and liquidate such Tort Claim pursuant to this Section. If the City does not serve such a notice upon a holder of a Tort Claim by the Claims Objection Bar Date, such holder may file a motion with the Bankruptcy Court seeking relief from the discharge injunction imposed pursuant to Section III.D.5 in order to liquidate and determine its Claim.

Any Tort Claim determined and liquidated pursuant to a judgment obtained in accordance with this Section VI.A.3 and applicable non-bankruptcy law that is no longer appealable or subject to review will be deemed an Allowed Claim, provided that only the amount of such Allowed Tort Claim that is not satisfied from proceeds of insurance payable to the holder of such Allowed Tort Claim will be treated as an Allowed Claim for the purposes of distributions under the Plan. Distributions on account of any such Allowed Tort Claim shall be made in accordance with the Plan. Nothing contained in this Section will constitute or be deemed a waiver of any claim, right or Cause of Action that the City may have against any Entity in connection with or arising out of any Tort Claim, including any rights under section 157(b)(5) of title 28 of the United States Code. All claims, demands, rights, defenses and Causes of Action that the City may have against any Entity in connection with or arising out of any Tort Claim are expressly retained and preserved.

**B. Disputed Claims Reserve.**

On and after the Effective Date, until such time as all Disputed Claims have been compromised and settled or determined by Final Order and before making any Distributions, consistent with and subject to section 1123(a)(4) of the Bankruptcy Code, the City shall establish and maintain a reserve of property equal to (1) the Distributions to which Holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims in the Face Amount of such Disputed Claims or (2) such lesser amount as required by an order of the Bankruptcy Court. On the first Distribution Date that is at least 30 days (or such fewer days as may be agreed to by the City in its sole discretion) after the date on which a Disputed Claim becomes an Allowed Claim, the Disbursing Agent shall remit to the Holder of such Allowed Claim any Distributions such Holder would have been entitled to under the Plan on account of such Allowed Claim had such Claim been Allowed as of the Effective Date. If a Disputed Claim is disallowed by Final Order, the property reserved on account shall become available for Distribution to the Holders of Allowed Claims within the Class(es) entitled to receive such property. Each Holder of a Disputed Claim that ultimately becomes an Allowed Claim will have recourse only to the assets held in the disputed claims reserve and not to any other assets held by the City, its property or any property previously distributed on account of any Allowed Claim. Notwithstanding the foregoing, the disputed claim reserve established pursuant to this Section shall not include any reserve of property on account of Disputed COP Claims, which shall receive the treatment set forth in Section II.B.3.s.iii.

**C. Objections to Claims.**

**1. Authority to Prosecute, Settle and Compromise.**

The City's rights to object to, oppose and defend against all Claims on any basis are fully preserved. Except as otherwise provided in Section II.B.3.s.i with respect to Disputed COP Claims, as of the Effective Date, only the City shall have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims, including pursuant to the ADR Procedures or any similar procedures approved by the Bankruptcy Court. Any objections to Claims shall be Filed no later than the Claims Objection Bar Date. On and after the Effective Date, the City may settle or compromise any Disputed Claim or any objection or controversy relating to any Claim without any further notice or any action, order or approval of the Bankruptcy Court.

**2. Application of Bankruptcy Rules.**

To facilitate the efficient resolution of Disputed Claims, the City shall be permitted to File omnibus objections to claims notwithstanding Bankruptcy Rule 3007(c).

**3. Expungement or Adjustment of Claims Without Objection.**

Any Claim that has been paid, satisfied or superseded shall be expunged from the Claims Register by the Claims and Balloting Agent at the request of the City, and any Claim that has been amended by the Holder of such Claim shall be adjusted on the Claims Register by the Claims and Balloting Agent at the request of the City, without the Filing of an objection and without any further notice or any action, order or approval of the Bankruptcy Court.

**4. Extension of Claims Objection Bar Date.**

Upon motion by the City to the Bankruptcy Court, the City may request, and the Bankruptcy Court may grant, an extension to the Claims Objection Bar Date generally or with respect to specific Claims. Any extension granted by the Bankruptcy Court shall not be considered to be a modification to the Plan under section 1127 of the Bankruptcy Code.

**5. Authority to Amend List of Creditors.**

The City will have the authority to amend the List of Creditors with respect to any Claim and to make Distributions based on such amended List of Creditors without approval of the Bankruptcy Court. If any such

-51-

13-53846-tjt Doc 8772 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 220 of 602
13-53846-swr Doc 6382 Filed 03/31/ Entered 03/31/14 18:36:38 Page 98 of 236

amendment to the List of Creditors reduces the amount of a Claim or changes the nature or priority of a Claim, the City will provide the Holder of such Claim with notice of such amendment and such Holder will have 20 days to File an objection to such amendment with the Bankruptcy Court. If no such objection is Filed, the Disbursing Agent may proceed with Distributions based on such amended List of Creditors without approval of the Bankruptcy Court.

## ARTICLE VII
## RETENTION OF JURISDICTION

Pursuant to sections 105(c), 945 and 1142(b) of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 9 Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

A.　　Allow, disallow, estimate, determine, liquidate, reduce, classify, re-classify, estimate or establish the priority or secured or unsecured status of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the amount, allowance, priority or classification of Claims;

B.　　Enforce the term (maturity) of the collective bargaining agreements identified on Exhibit II.D.5 of the Plan, notwithstanding any state law to the contrary;

C.　　Resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including claims for payment of any cure amount;

D.　　Ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

E.　　Adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving the City that may be pending on the Effective Date or brought thereafter;

F.　　Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

G.　　Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents;

H.　　Approve any modification of the Plan or approve any modification of the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any order, the Plan, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, or enter any order in aid of confirmation pursuant to sections 945 and 1142(b) of the Bankruptcy Code, in such manner as may be necessary or appropriate to consummate the Plan;

I.　　Issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

J.　　Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or Distributions pursuant to the Plan are enjoined or stayed;

K.        Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

L.        Enforce or clarify any orders previously entered by the Bankruptcy Court in the Chapter 9 Case;

M.        Enter a final decree closing the Chapter 9 Case pursuant to section 945(b) of the Bankruptcy Code; and

N.        Hear any other matter over which the Bankruptcy Court has jurisdiction under the provisions of the Bankruptcy Code and the Bankruptcy Rules subject to any limits on the Bankruptcy Court's jurisdiction and powers under sections 903 and 904 of the Bankruptcy Code.

## ARTICLE VIII
## MISCELLANEOUS PROVISIONS

**A.        Modification of the Plan.**

Subject to section 942 and 1127(d) of the Bankruptcy Code, the City may alter, amend or modify the Plan or the Exhibits at any time prior to or after the Confirmation Date but prior to the substantial consummation of the Plan.  A Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as altered, amended or modified so long as the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

**B.        Revocation of the Plan.**

The City reserves the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the City revokes or withdraws the Plan, or if the Confirmation Date does not occur, then the Plan shall be null and void in all respects, and nothing contained in the Plan, nor any action taken or not taken by the City with respect to the Plan, the Disclosure Statement or the Confirmation Order, shall be or shall be deemed to be:  (1) a waiver or release of any claims by or against the City; (2) an admission of any sort by the City or any other party in interest, or (3) prejudicial in any manner to the rights of the City or any other party in interest.

**C.        Disclosure of Amounts to Be Paid for Chapter 9 Case Services.**

No later than five days before the Confirmation Hearing, (1) the City shall File a statement of all amounts to be paid by it for services or expenses in the Chapter 9 Case or incident to the Plan; and (2) as applicable, all other persons shall File statements of all amounts to be paid by them for services or expenses in the Chapter 9 Case or incident to the Plan.  Pursuant to section 943(b)(3) of the Bankruptcy Code, the Bankruptcy Court must approve such amounts as reasonable as a condition to Confirmation.

**D.        Severability of Plan Provisions.**

If any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, in each case at the election of and with the consent of the City, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the City's consent; and (3) non-severable and mutually dependent.

-53-

13-53846-tjt  Doc 8772  Filed 12/10/14  Entered 12/10/14 09:24:46  Page 222 of 602
13-53846-swr  Doc 6382  Filed 03/31/14  Entered 03/31/14 13:36:38  Page 60 of 92
236

E.      **Effectuating Documents and Transactions.**

The City is authorized to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and any notes or securities issued pursuant to the Plan. All such actions shall be deemed to have occurred and shall be in effect pursuant to applicable non-bankruptcy law and the Bankruptcy Code, without any requirement of further action by the City Council, the Emergency Manager, the Mayor or any employees or officers of the City. On the Effective Date, the appropriate employees and officers of the City are authorized and directed to execute and deliver the agreements, documents and instruments contemplated by the Plan, and to take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan, in the name and on behalf of the City.

F.      **Successors and Assigns.**

Except as expressly provided otherwise in the Plan, the rights, benefits and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, representative, beneficiary or guardian, if any, of each Entity.

G.      **Plan Controls.**

In the event and to the extent that any provision of the Plan is inconsistent with the provisions of the Disclosure Statement, the provisions of the Plan shall control and take precedence.

H.      **Notice of the Effective Date.**

On or before ten Business Days after occurrence of the Effective Date, the City shall mail or cause to be mailed to all Holders of Claims a notice that informs such Holders of (1) entry of the Confirmation Order; (2) the occurrence of the Effective Date; (3) the assumption and rejection of Executory Contracts and Unexpired Leases pursuant to the Plan, as well as the deadline for the filing of Claims arising from such rejection; (4) the deadline for the filing of Administrative Claims; and (5) such other matters as the City deems to be appropriate.

I.      **Governing Law.**

Unless (1) a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or (2) otherwise specifically stated herein or in any contract, articles or certificates of incorporation, bylaws, codes of regulation, ordinance, similar constituent documents, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the laws of the State of Michigan, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction and implementation of the Plan and any contract, articles or certificates of incorporation, bylaws, codes of regulation, similar constituent documents, instrument, release or other agreement or document entered into or delivered in connection with the Plan.

J.      **Request for Waiver of Automatic Stay of Confirmation Order.**

The Plan shall serve as a motion seeking a waiver of the automatic stay of the Confirmation Order imposed by Bankruptcy Rule 3020(e). Any objection to this request for waiver shall be Filed and served on the parties listed in Section VIII.L on or before the Voting Deadline.

K.      **Term of Existing Injunctions and Stays.**

All injunctions or stays provided for in the Chapter 9 Case under sections 105, 362 or 922 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

-54-

236

13-53846-tjt    Doc 8773  Filed 12/10/14  Entered 12/10/14 09:24:03  Page 223 of 602
13-53846-swr    Doc 6382  Filed 03/31/14  Entered 03/31/14 18:36:58  Page 61 of 107

L.      **Service of Documents**

Any pleading, notice or other document required by the Plan or the Confirmation Order to be served on or delivered to (1) the City and (2) the Retiree Committee must be sent by overnight delivery service, facsimile transmission, courier service or messenger to:

1.      **The City**

David G. Heiman, Esq.
Heather Lennox, Esq.
Thomas A. Wilson, Esq.
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Bruce Bennett, Esq.
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243 2382
Facsimile:  (213) 243 2539

Jonathan S. Green, Esq.
Stephen S. LaPlante, Esq.
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500

(Counsel to the City)

2.      **The Retiree Committee**

Claude Montgomery, Esq.
Carole Neville, Esq.
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 768-6700
Facsimile:  (212) 768-6800

Matthew E. Wilkins, Esq.
Paula A. Hall, Esq.
BROOKS WILKINS SHARKEY & TURCO PLLC
401 South Old Woodward, Suite 400
Birmingham, Michigan 48009
Telephone:  (248) 971-1711
Facsimile:  (248) 971-1801

(Counsel to the Retiree Committee)

Dated:  March 31, 2014

Respectfully submitted,

The City of Detroit, Michigan

By:     /s/  Kevyn D. Orr
Name:   Kevyn D. Orr
Title:   Emergency Manager for the City of Detroit, Michigan

-56-

13-53846-tjt   Doc 8739   Filed 12/10/14   Entered 12/10/14 09:24:40   Page 225 of 602
13-53846-swr   Doc 3382   Filed 03/31/14   Entered 03/31/14 18:36:38   Page 63 of 236

COUNSEL:


  /s/ David G. Heiman
David G. Heiman
Heather Lennox
Thomas A. Wilson
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Bruce Bennett
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243 2382
Facsimile:  (213) 243 2539

Jonathan S. Green
Stephen S. LaPlante
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500

ATTORNEYS FOR THE DEBTOR

-57-
13-53846-tjt  Doc 8773  Filed 12/10/14  Entered 12/10/14 09:24:40  Page 226 of 602
13-53846-swr  Doc 6382  Filed 03/31/  Entered 03/31/14 18:36:38  Page 6469 of
236

**EXHIBIT I.A.56**

SCHEDULE OF COP SWAP AGREEMENTS

13-53846-tjt Doc 8739 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 227 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 13:36:38 Page 65 of
236

## SCHEDULE OF COP SWAP AGREEMENTS

| COP Swap Agreements |
|---|
| ISDA Master Agreement (including the Schedule thereto) dated as of May 25, 2005, between Detroit Police and Fire Retirement System Service Corporation ("DPFRS Service Corporation") and Merrill Lynch Capital Services, Inc. (as successor to SBS Financial Products Company LLC) ("Merrill Lynch") and the Confirmation thereunder dated June 7, 2006 (bearing Reference No. SBSFPC-0010) (as amended, modified or supplemented). |
| ISDA Master Agreement (including the Schedule thereto) dated as of May 25, 2005 between DFPRS Service Corporation and Merrill Lynch and the Confirmation thereunder dated June 7, 2006 (bearing Reference No. SBSFPC-0011) (as amended, modified or supplemented). |
| ISDA Master Agreement (including the Schedule thereto) dated as of May 25, 2005 between Detroit General Retirement System Service Corporation ("DGRS Service Corporation") and Merrill Lynch and the Confirmation thereunder dated June 7, 2006 (bearing Reference No. SBSFPC-0009) (as amended, modified or supplemented). |
| ISDA Master Agreement (including the Schedule thereto) dated as of June 7, 2006 between DGRS Service Corporation and Merrill Lynch and the Confirmation thereunder dated June 7, 2006 (bearing Reference No. SBSFPC-0012) (as amended, modified or supplemented). |
| ISDA Master Agreement between DGRS Service Corporation and UBS AG, dated as of June 7, 2006, including the Schedule and Credit Support Annex thereto and the Confirmations thereunder, dated June 7, 2006, bearing UBS AG Reference No. 37380291 (as amended, modified or supplemented). |
| ISDA Master Agreement between DFPRS Service Corporation and UBS AG, dated as of May 25, 2005, including the Schedule and Credit Support Annex thereto and the Confirmations thereunder, dated June 7, 2006, bearing UBS AG Reference No. 37380351 (as amended, modified or supplemented). |
| ISDA Master Agreement between DFPRS Service Corporation and UBS AG, dated as of May 25, 2005, including the Schedule and Credit Support Annex thereto and the Confirmations thereunder, dated June 7, 2006, bearing UBS Reference No. 37380313 (as amended, modified or supplemented). |
| ISDA Master Agreement between DGRS Service Corporation and UBS AG, dated as of May 25, 2005, including the Schedule and Credit Support Annex thereto and the Confirmations thereunder, dated June 7, 2006, bearing UBS Reference No. 37380341 (as amended, modified or supplemented). |

# EXHIBIT I.A.71

FORM OF DETROIT VEBA TRUST AGREEMENT

13-53846-tjt Doc 8773-2 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 229 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 13:36:58 Page 67 of
236

# CITY OF DETROIT RETIREE HEALTH AND WELFARE TRUST

THIS TRUST AGREEMENT, entered into effective _____, 2014, by and among, the City of Detroit ("Detroit" or the "City") and [_____Bank] (the "Trustee").

### W I T N E S S E T H:

WHEREAS, the City of Detroit ("Detroit") filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code on July 18, 2013 in the United States Bankruptcy Court for the United States Bankruptcy Court Eastern District of Michigan (the "Court");

WHEREAS, pursuant to the Plan for the Adjustment of Debts of the City of Detroit (the "Plan of Adjustment"), the City agreed to establish a voluntary employees beneficiary association ("VEBA") to provide health care and life insurance benefits to certain retirees and their Eligible Dependents;

WHEREAS, Detroit hereby establishes this City of Detroit Retiree Health and Welfare Trust (the "Trust");

WHEREAS, the Committee shall be responsible for: (i) managing the property held by, and administration of, this Trust; and (ii) designing, adopting, maintaining and administering the "Health and Welfare Plan for Retirees of the City of Detroit" (the "Plan"), through which all benefits to the Trust's beneficiaries shall be provided;

WHEREAS, the Committee is willing to exercise the authority granted to it herein with regard to the Trust and Plan;

WHEREAS, through this Trust Agreement, Detroit intends to designate the Trustee to serve in such capacity and to maintain custody of the Trust assets;

WHEREAS, the Trustee is willing to receive, hold, and invest the assets of the Trust in accordance with the terms of this Trust Agreement; and

WHEREAS, the Trust and the interdependent Plan are intended to comply with the requirements of section 501(c)(9) of the Internal Revenue Code of 1986, as amended (the "Code"), and are together intended to constitute a "governmental plan" within the meaning of section 3(32) of the Employee Retirement Income Security Act of 1974;

NOW THEREFORE, in consideration of the premises and the covenants contained herein, Detroit and the Trustee agree as follows:

13-53846-tjt   Doc 8773   Filed 12/10/14   Entered 12/10/14 08:24:43   Page 230 of 602
13-53846-swr   Doc 6382   Filed 03/31/14   Entered 03/31/14 13:36:38   Page 65 of
236

# ARTICLE I
## DEFINITIONS

**Section 1.1** <u>Code</u>.  The Internal Revenue Code of 1986, as amended, and any successor statute thereto.

**Section 1.2** <u>Committee</u>.  The Committee is the body described in Article VIII to which Detroit has delegated responsibility for: (i) managing the property held by, and administering, this Trust; and (ii) designing, adopting, maintaining and administering the Plan, through which all benefits to the Trust's beneficiaries shall be provided.  It shall be constituted and operated in accordance with Article IX.

**Section 1.3** <u>Eligible Dependent</u>.  Means an Eligible Retiree Member's dependent, within the meaning of Code section 501(c)(9) and the regulations promulgated thereunder, who is eligible to receive benefits under the Plan in accordance with its terms.

**Section 1.4** <u>Eligible Retiree Member</u>.  Means a former employee of Detroit who either: (i) was enrolled in the Original Plan on March 1, 2014; or (ii) opted out of the Original Plan but was drawing a pension on March 1, 2014, under either the General Retirement System for the City of Detroit or the Police and Fire Retirement System for the City of Detroit.

**Section 1.5** <u>Investment Act.</u>  Means Act No. 314 of the Public Acts of 1965, being sections 38.1132 et seq. of the Michigan Compiled Laws, as amended, which governs the investment of assets of public employee retirement systems or plans.

**Section 1.6** <u>Investment Manager</u>.  An investment manager appointed by the Committee or its successor in accordance with the provisions of Section 9.4 hereof.

**Section 1.7** <u>OPEB Claims Note.</u>  Means an unsecured note to be issued by the City substantially on the terms set forth in Exhibit I.A. of the Plan of Adjustment.

**Section 1.8** <u>Original Plan</u>.  The City of Detroit Retiree Health Care Plan, as effective on March 1, 2014.

**Section 1.9** <u>Participant</u>.  An Eligible Retiree Member or Eligible Dependent who is entitled to health care or life insurance benefits pursuant to the terms of the Plan.

**Section 1.10** <u>Plan</u>.  The Health and Welfare Plan for Retirees of the City of Detroit, to be adopted and thereafter amended from time to time by the Committee, as specified herein, and which will provide health care and life insurance benefits permitted to be provided by a VEBA under Code section 501(c)(9).

**Section 1.11** <u>Plan of Adjustment</u>.  The Plan for the Adjustment of Debts of the City of Detroit.

**Section 1.12** <u>Trust Agreement</u>.  This agreement as it may be amended thereafter from time to time by the parties hereto.

13-53846-tjwr Doc 8773 Filed 12/10/14 Entered 12/10/14 08:24:36 Page 231 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 13:36:38 Page 09 of 60
236

Section 1.13    Trust or Trust Fund.  The Detroit Retiree Health and Welfare Trust established by this Trust Agreement, comprising all property or interests in property held by the Trustee from time to time under this Trust Agreement.

Section 1.14    Trustee.  The entity referred to in the Preamble to this Trust Agreement named to perform the duties set forth in this Trust Agreement, or any successor thereto appointed by Detroit in accordance with Section 7.3.  Any corporation continuing as the result of any merger or consolidation to which the Trustee is a party, or any corporation to which substantially all the business and assets of the Trustee may be transferred, will be deemed automatically to be continuing as the Trustee.

13-53846-tjt   Doc 8772   Filed 12/10/14   Entered 12/10/14 09:24:43   Page 232 of 602
13-53846-swr   Doc 8382   Filed 03/31/14   Entered 03/31/14 18:36:58   Page 70 of
236

# ARTICLE II
## ESTABLISHMENT OF TRUST

Section 2.1    Purpose.  The Trust is established for the purpose of providing health and welfare benefits, directly or through the purchase of insurance, to the Participants in accordance with the Plan and consistent with Section 501(c)(9) of the Code and the regulations and other guidance promulgated thereunder.  The Trust, together with the Plan, is intended to constitute a VEBA under Section 501(c)(9) of the Code.

Section 2.2    Receipt of Funds.  The Trustee shall accept all sums of money and other property contributed to the Trust by Detroit pursuant to Article III.  The Trustee shall hold, manage and administer the Trust Fund without distinction between principal and income.  The Trustee shall be accountable for the contributions or transfers it receives, but shall not be responsible for the collection of any contributions or transfers to the Trust or enforcement of the terms of the OPEB Claims Note.

Section 2.3    Inurement and Reversion Prohibited.  At no time shall any part of the principal or income of the Trust Fund be used for, or diverted to, any purpose other than sponsoring, operating and administering the Plan and Trust to provide benefits that are permitted under Code section 501(c)(9) to Participants.  Nothing in this Trust Agreement shall be construed in such a way as to prohibit the use of assets of the Trust Fund to pay reasonable fees and other expenses and obligations incurred in maintaining, administering and investing the Trust Fund or in sponsoring, administering and operating the Plan in accordance with the provisions of this Trust Agreement.  At no time shall any part of the net earnings inure to the benefit of any individual other than through the provision of benefits as permitted under Code section 501(c)(9) and the regulations promulgated thereunder.  In no event will the assets held in the Trust Fund revert to Detroit.  Upon termination of the Trust Fund, any assets remaining upon satisfaction of all liabilities to existing Participants shall be applied, either directly or through the purchase of insurance, to provide life, sick accident or other permissible benefits under Code section 501(c)(9) and the rules and regulations promulgated thereunder, pursuant to criteria consistent with such rules and regulations.

Section 2.4    No Guarantee.  Nothing contained in the Trust or the Plan shall constitute a guarantee that the assets of the Trust Fund will be sufficient to pay any benefit to any person or make any other payment.  The obligation of the Plan to pay any benefit provided under the Plan is expressly conditioned on the availability of cash in the Trust to pay the benefit, and no plan fiduciary or any other person shall be required to liquidate the OPEB Claims Note or any other Plan asset in order to generate cash to pay benefits.  Detroit shall not have any obligation to contribute any amount to the Trust except as provided in Article III.  Except for payments of benefits under the Plan, no Participant shall receive any distribution of cash or other thing of current or exchangeable value, either from the Committee or the Trustee, on account of or as a result of the Trust Fund created hereunder.

Section 2.5    No Interest.  Detroit shall not have any legal or equitable interest in the assets of the Trust Fund at any time, including following the termination of the Trust.

13-53846-tjt  Doc 8739-2  Filed 12/10/14  Entered 12/10/14 00:24:06  Page 233 of 602
13-53846-swr  Doc 6382  Filed 03/31/14  Entered 03/31/14 18:36:38  Page 9 of 160
236

## ARTICLE III
## CONTRIBUTIONS TO THE TRUST FUND

Section 3.1     <u>Detroit Contributions</u>.  The Trust Fund shall accept from Detroit the OPEB
Claims Note, as defined in the Plan of Adjustment.  Apart from contribution of the OPEB Claims
Note, Detroit shall have no further obligation to contribute to the Trust or otherwise fund the
Plan.

13-53846-tsw   Doc 8773   Filed 12/10/14   Entered 12/10/14 09:24:40   Page 234 of 602
13-53846-swr   Doc 6382   Filed 03/31/14   Entered 03/31/14 18:36:38   Page 72 of
236

# ARTICLE IV
## PAYMENTS FROM THE TRUST FUND

Section 4.1    <u>Payments from the Trust Fund</u>.

(a)    Subject to paragraph (b) below, the Trustee shall make payments from the Trust Fund to provide, directly or through the purchase of insurance, benefits under the Plan as directed by the Committee.

(b)    To the extent permitted by law, the Trustee shall be fully protected in making payments out of the Trust Fund, and shall have no responsibility to see to the application of such payments or to ascertain whether such payments comply with the terms of the Plan, and shall not be liable for any payment made by it in good faith and in the exercise of reasonable care without actual notice or knowledge of the impropriety of such payments hereunder.  The Trustee may withhold all or any part of any payment as the Trustee in the exercise of its reasonable discretion may deem proper, to protect the Trustee and the Trust against any liability or claim on account of any income or other tax whatsoever; and with all or any part of any such payment so withheld, may discharge any such liability.  Any part of any such payment so withheld by the Trustee that may be determined by the Trustee to be in excess of any such liability will upon such determination by the Trustee be paid to the person or entity from whom or which it was withheld.

Section 4.2    <u>Method of Payments</u>.  The Trustee may make any payment required to be made by it hereunder, unless directed otherwise by the Committee, by direct electronic deposit of the amount thereof to the financial institution where the person or entity to whom or to which such payment is to be made maintains an account, or by mailing a check in the amount thereof by first class mail in a sealed envelope addressed to such person or entity to whom or to which such payment is to be made, according to the direction of the Committee.  If any dispute arises as to the identity or rights of persons who may be entitled to benefits hereunder, the Trustee may withhold payment until such dispute is resolved by a court of competent jurisdiction or, at the discretion of the Committee, is settled by written stipulation of the parties concerned.

Section 4.3    <u>Excessive Payments</u>.  If the payment of any benefit under the Plan is determined to have been excessive or improper, and the recipient thereof fails to make repayment to the Trustee or Trustee's agent of such excessive or improper payment upon the Trustee's request, the Trustee shall deduct the amount of such excessive or improper payment from any other benefits thereafter payable to such person.  Until repaid to the Trustee or Trustee's agent, the amount of said excessive or improper payment shall not be included in the Trust Fund.

13-53846-tjt  Doc 8773-2  Filed 12/10/14  Entered 12/10/14 09:24:40  Page 235 of 602
13-53846-swr  Doc 6382  Filed 03/31/14  Entered 03/31/14 16:36:38  Page 73 of 102
236

# ARTICLE V
# TRUSTEE POWERS AND DUTIES

Section 5.1     Powers of the Trustee Generally.  The Trustee has whatever powers are required to discharge its obligations and to accomplish any of the purposes of this Trust Agreement, including (but not limited to) the powers specified in the following Sections of this Article, and the powers and authority granted to the Trustee under other provisions of this Trust Agreement. The enumeration of any power herein shall not be by way of limitation, but shall be cumulative and construed as full and complete power in favor of the Trustees.

Section 5.2     Powers Exercisable by the Trustee in Its Discretion.  The Trustee is authorized and empowered to exercise the following powers at its discretion in satisfaction of the duties imposed on it under this Trust Agreement:

> (a)     To place securities orders, settle securities trades, hold securities in custody, deposit securities with custodians or securities clearing corporations or depositories or similar organizations, and other related activities as shall be necessary and appropriate in performing its duties under this Trust Agreement.  Any indicia of ownership of any Trust Fund assets, however, shall not be maintained outside the jurisdiction of the district courts of the United States.  Trades and related activities conducted through a broker shall be subject to reasonable fees and commissions established by the broker, which may be paid from the Trust Fund or netted from the proceeds of trades.

> (b)     To make, execute, acknowledge and deliver any and all documents of transfer and conveyance and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted.

> (c)     To cause any investment in the Trust Fund to be registered in, or transferred into, its name as Trustee or the name of its nominee or nominees, or to retain such investments unregistered in a form permitting transfer by delivery, but the books and records of the Trustee shall at all times show that all such investments are part of the Trust Fund, and the Trustee shall be fully responsible for any misappropriation in respect of any investment held by its nominee or held in unregistered form and shall cause the indicia of ownership to be maintained within the jurisdiction of the district courts of the United States;

> (d)     To deliver to the Committee, or the person or persons identified by the Committee, on a timely basis as required under Section 5.5, proxies and powers of attorney and related informational material, for any shares or other property held in the Trust.

Section 5.3     Powers Exercisable by the Trustee Only Upon the Direction of the Committee. The Trustee shall exercise the following powers only upon the direction of the Committee (or, in the case of subparagraphs (a) and (b)), a duly appointed Investment Manager):

> (a)     To receive, hold, invest and reinvest Trust Fund assets and income under provisions of law from time to time existing and in accordance with Article IX.

(b)     To exercise or abstain from exercising any option, privilege or right attaching to any Trust Fund assets.

(c)     To make payments from the Trust Fund for the provision of benefits in accordance with Article IV and for the payment of expenses as provided in Section 5.8.

(d)     To employ suitable agents and depositaries (domestic or foreign), public accountants, brokers, custodians, ancillary trustees, appraisers, enrolled actuaries, and legal counsel as shall be necessary and appropriate, and to pay their reasonable expenses and compensation.

(e)     To pay any income or other tax or estimated tax, charge or assessment attributable to any property or benefit out of such property or benefit in its sole discretion, or any tax on unrelated business income of the Trust, if any, out of the Trust Fund.

(f)     To vote, in person or by general or limited proxy, at any election of any corporation in which the Trust Fund is invested, and similarly to exercise, personally or by a general or limited power of attorney, any right appurtenant to any investment held in the Trust Fund.

(g)     To accept, compromise or otherwise settle any obligations or liability due to or from them as Trustees hereunder, including any claim that may be asserted for taxes, assessments or penalties under present or future laws, or to enforce or contest the same by appropriate legal proceedings.

Section 5.4     Title to Trust Fund.  All rights, title and interest in and to the Trust Fund shall at all times be vested exclusively in the Trustee.

Section 5.5     General Duties and Obligations of Trustee.

(a)     In accordance with Article II, the Trustee shall hold all property received by it and any income and gains thereupon.  In accordance with this Article and Article IX, the Trustee shall manage, invest and reinvest the Trust Fund following the directions of the Committee or a duly appointed Investment Manager, shall collect the income therefrom, and shall make payments or disbursements as directed by the Committee.

(b)     Subject to the provisions of Article X, the Trustee shall comply with any directive issued by the Committee to withdraw and transfer all or any part of the Trust Fund to another trustee or a funding agent.

(c)     The Committee shall have responsibility for directing the Trustee as to the voting (by proxy or in person) of any shares or other property held in the Trust. Accordingly, the Trustee shall deliver to the Committee (or the person or persons identified by the Committee), on a timely basis, proxies, powers of attorney and related informational material that are necessary for the Committee to fulfill its

13-53846-tsw   Doc 8382   Filed 12/10/14   Entered 12/10/14 09:24:43   Page 237 of 602
13-53846-swr   Doc 6382   Filed 03/31/14   Entered 03/31/14 18:36:58   Page 75 of 92
236

responsibility.  The Trustee may use agents to effect such delivery to the Committee (or the person or persons identified by the Committee).

(d)     The Trustee shall discharge its duties in the interests of Participants and for the exclusive purpose of providing benefits to Participants and defraying reasonable expenses of administering the Trust and the Plan and shall act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in like capacity and familiar with such matters would use in conduct of an enterprise of like character and with like aims.  The Trustee will be under no liability or obligation to anyone with respect to any failure of the Committee to perform any of its obligations under the Plan or Trust Agreement or for any error or omission of the Committee.

Section 5.6     Determination of Rights.  The Trustee shall have no power, authority, or duty hereunder in respect to the determination of the eligibility of any person to coverage under the Plan, or the entitlement of any person to any benefit payments under the Plan.

Section 5.7     Continuance of Plan; Availability of Funds.  Neither the Committee, the Trustee nor Detroit assumes any contractual obligation as to the continuance of the Plan and shall not be responsible for the adequacy of the Trust Fund to meet and discharge any liabilities under the Plan, and the Trustee's obligation to make any payment shall be limited to amounts held in the Trust Fund at the time of the payment.

Section 5.8     Payment of Expenses.  The Trustee shall apply the assets of the Trust Fund to pay all reasonable costs, charges, and expenses (including, but not limited to, all brokerage fees and transfer tax expenses and other expenses incurred in connection with the sale or purchase of investments, all real and personal property taxes, income taxes and other taxes of any kind at any time levied or assessed under any present or future law upon, or with respect to, the Trust Fund or any property included in the Trust Fund and all legal, actuarial, accounting and financial advisory expenses) reasonably incurred  by the Trustee or the Committee in connection with establishing, sponsoring, administering or operating the Trust or Plan.  The Committee shall by written certificate provided to the Trustee request payment for any expenses related to the administration of the Trust and/or the Plan.  Upon receipt of the written certificate, the Trustee may make the payment requested by the Committee.  The expenses of the Trustee shall constitute a lien on the Trust Fund.

Section 5.9     Trustee Compensation.  The Trustee will apply the assets of the Trust Fund to pay its own fees in the amounts and on the dates [set forth in Exhibit A].  The Trustee's compensation shall constitute a lien on the Trust Fund.

Section 5.10     Reliance on Written Instruments.  The Trustee shall be fully protected in acting upon any instrument, certificate or paper believed by it to be genuine and to be signed or presented by a duly authorized person or persons, and shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing, but may accept the same as conclusive evidence of the truth and accuracy of the statements therein contained.

13-53846-tsw  Doc 8773-2  Filed 12/10/14  Entered 12/10/14 09:24:06  Page 238 of 602
13-53846-swr  Doc 6382  Filed 03/31/14  Entered 03/31/14 18:36:58  Page 76 of 92
236

# ARTICLE VI
## TRUSTEE ACCOUNTS

Section 6.1 <u>Records</u>. The Trustee shall maintain accurate and detailed records and accounts of all investments, receipts, disbursements, and other transactions with respect to the Trust, and all accounts, books and records relating thereto shall be open at all reasonable times to inspection and audit by the Committee or such person or persons as the Committee may designate.

Section 6.2 <u>Annual Audit</u>. The Trust Fund shall be audited annually, and a statement of the results of such audit shall be provided to the Trustee and also made available for inspection by interested persons at the principal office of the Trust.

Section 6.3 <u>No Interest by Participants</u>. In no event shall any Participant or beneficiary have any interest in any specific asset of the Trust Fund. At no time shall any account or separate fund be considered a savings account or investment or asset of any particular Participant, beneficiary, or class of Participants and beneficiaries, and no Participant or beneficiary shall have any right to any particular asset which the Committee or Trustee may have allocated to any account or separate fund for accounting purposes.

Section 6.4 <u>Furnishing Written Accounts</u>. The Trustee shall file with the Committee a written account setting forth a description of all securities and other property purchased and sold, and all receipts, disbursements, and other transactions effected by it during the accounting period to which the Committee and the Trustee have agreed, and showing the securities and other properties held, and their fair market values at such times and as of such dates as may be agreed by the Committee and the Trustee in writing. Such written account shall be filed with the Committee within thirty (30) days after the close of each calendar quarter.

Section 6.5 <u>Accounting Year, Cash Basis</u>. The accounting year of the Trust shall be the calendar year. All accounts of the Trustee shall be kept on a cash basis.

Section 6.6 <u>Judicial Proceedings</u>. If the Trustee and the Committee cannot agree with respect to any act or transaction reported in any statement, the Trustee shall have the right to have its accounts settled by judicial proceedings in which only the Trustee and the Committee shall be necessary parties. No Participant shall have any right to compel an accounting, judicial or otherwise, by the Trustee.

13-53846-tjt Doc 8773-2 Filed 12/10/14 Entered 12/10/14 09:24:36 Page 239 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 18:36:58 Page 7 of 9
236

## ARTICLE VII
## PROCEDURES FOR THE TRUSTEE

Section 7.1    Removal.  The Trustee may be removed by Detroit at any time upon thirty (30) days' advance written notice.  Such removal shall be effective on the date specified in such written notice, provided that notice has been given to the Trustee of the appointment of a successor Trustee in the manner set forth in Section 7.3 below.

Section 7.2    Resignation.  The Trustee may resign by filing with Detroit a written resignation that shall take effect ninety (90) days after the date of such filing, unless prior thereto a successor Trustee has been appointed by the Committee.  In no event may the Trustee's resignation take effect before a successor Trustee has been appointed.  If Detroit fails to appoint a successor Trustee, the retiring Trustee may seek the appointment of a successor Trustee in the manner set forth in Section 7.3

Section 7.3    Successor Trustee.

> (a)    Detroit may appoint a successor Trustee by delivering to the successor Trustee an instrument in writing, executed by an authorized representative of Detroit, appointing such successor Trustee, and by delivering to the removed or resigning Trustee an acceptance in writing, executed by the successor Trustee so appointed.  Such appointment shall take effect upon the date specified in Section 7.1 or 7.2 above, as applicable.

> (b)    Alternatively, Detroit may appoint a successor Trustee by securing from the successor Trustee an amendment to this Trust Agreement, executed by both the successor Trustee and an authorized representative of Detroit, which replaces the current Trustee with the successor Trustee, appointing such successor Trustee, and by delivering to the removed or resigning Trustee an executed copy of the amendment.  Such appointment shall take effect upon the date specified in the amendment

> (c)    If no appointment of a successor Trustee is made by Detroit within a reasonable time after such resignation, removal or other event, any court of competent jurisdiction may, upon application by the retiring Trustee, appoint a successor Trustee after such notice to Detroit and the retiring Trustee, as such court may deem suitable and proper.

Section 7.4    Effect of Removal or Resignation of Trustee.  Upon the removal or resignation of the Trustee in accordance with Section 7.1 or 7.2 above, the Trustee shall be fully discharged from further duty or responsibility under this Trust Agreement to the extent permitted by law.

Section 7.5    Merger or Consolidation of the Trustee.  Any corporation continuing as the result of any merger or resulting from any consolidation, to which merger or consolidation the Trustee is a party, or any corporation to which substantially all the business and assets of the Trustee may be transferred, will be deemed to be continuing as the Trustee.

13-53846-tjt  Doc 8772  Filed 12/10/14  Entered 12/10/14 08:24:36  Page 240 of 602
13-53846-swr  Doc 6382  Filed 03/31/14  Entered 03/31/14 18:36:38  Page 240 of 602
236

## ARTICLE VIII
## COMPOSITION OF AND PROCEDURES FOR COMMITTEE

Section 8.1    Number and Appointment of Members.  The Committee shall consist of five (5) voting members, who are selected by the Mayor of Detroit and by the Eligible Retiree Members (directly or indirectly through a representative) as provided below.

> (a)    The Mayor of Detroit shall appoint two (2) voting members, both of whom shall be residents of the State of Michigan and neither of whom may be an employee, contractor, agent or affiliate of the City or any labor union representing employees of the City, a member of any such labor union, or a Participant.  One (1) of the such independent members shall have expert knowledge or extensive experience with respect to economics, finance, or institutional investments, and one (1) of such independent members shall have expert knowledge or extensive experience with respect to administration of public or private health and welfare benefit plans, executive management, benefits administration or actuarial science.  The voting members of the Committee selected by the Mayor as of the Effective Date shall be [_____ and _____.]

> (b)    The Eligible Retiree Member's shall select three (3) voting members pursuant to procedures established by the Committee; provided, however, that two (2) of such voting members shall initially be designated by the Official Committee of Retirees of the City of Detroit, Michigan on behalf of such Eligible Retiree Members.  The members initially selected on behalf of the Eligible Retiree Members are [_____ and _____.]

Each Committee member shall acknowledge his or her appointment and acceptance of the duties and responsibilities set forth in this Trust Agreement in writing.

Section 8.2    Term of Office.  Each member of the Committee shall serve a period of four (4) years, or if earlier, until his or her death, incapacity to serve hereunder, or resignation.  In the event of a vacancy, the replacement Committee member shall be appointed as provided in Section 8.1.

Section 8.3    Resignation.  A Committee member may resign, and shall be fully discharged from further duty or responsibility under this Trust Agreement to the extent permitted by law, by giving at least ninety (90) days' advance written notice to Detroit stating a date when such resignation shall take effect, which notice or time period may be waived by the Committee.

Section 8.4    Fees and Expenses.  The Committee members appointed by the Mayor shall each be paid a stipend of [$12,000] per year (payable ratably on a monthly basis).  The Committee members selected by the Eligible Retiree Members shall each be paid a stipend of [$_____] per year (payable ratably on a monthly basis.  Each Committee member may be reimbursed by the Trust for reasonable expenses properly and actually incurred in the performance of its duties.  Compensation payable to the Committee members and all reimbursed expenses shall be payable out of the Trust.

13-53846-tjt-swr  Doc 8773-2  Filed 12/10/14  Entered 12/10/14 03:24:36  Page 241 of 602
13-53846-swr  Doc 6382  Filed 07/31/14  Entered 07/31/14 18:36:58  Page 75 of 92
236

Section 8.5     <u>Operation of the Committee; Quorum</u>.  The Committee shall select from among its members a chair and a vice chair.   The Committee shall hold regular meetings, and shall designate the time and place thereof in advance. The Committee shall adopt its own rules of procedure and shall keep a record of proceedings.  Each Committee Member shall be entitled to one vote on each question before the Committee.  Three (3) members shall constitute a quorum at any meeting.  A majority vote of the members present at a meeting of the Committee at which a quorum exists shall be necessary for a decision by the Committee.

13-53846-tjt  Doc 8773  Filed 12/16/14  Entered 12/16/14 08:24:36  Page 242 of 602
13-53846-swr  Doc 6382  Filed 03/31/14  Entered 03/31/14 18:36:38  Page 90 of 91
236

# ARTICLE IX
## POWERS AND DUTIES OF THE COMMITTEE

Section 9.1 <u>General</u>. The Committee shall be responsible for designing, adopting, maintaining and administering the Plan, as well as administering the Trust and managing the Trust assets as provided herein. Subject to the provisions of this Trust Agreement, the Plan documents and applicable laws, the Committee shall have sole, absolute and discretionary authority to adopt such rules and regulations and take all actions that it deems desirable for the administration of the Plan and Trust, and to interpret the terms of the Plan and Trust. The decisions of the Committee will be final and binding on all Participants and all other parties to the maximum extent allowed by law.

Section 9.2 <u>Plan Design and Administration</u>.

(a) <u>Adoption of Plan</u>. The Committee shall adopt a Plan to offer health and welfare benefits to Participants. All terms of the Plan shall be determined by the Committee; provided that such terms shall be consistent with this Trust Agreement, Code section 501(c)(9) and the regulations promulgated therender. The Committee shall be under no obligation to design the Plan to assure that the assets of the Trust Fund are sufficient to provide benefits to all potential Participants of the Plan in subsequent years.

(b) <u>Benefits</u>. The Plan shall include benefits and any other features including, without limitation, premium-sharing or other cost-sharing, that the Committee from time to time determines appropriate or desirable in its sole discretion. The Plan may provide for different benefit structures or programs for different groups of Participants, as determined by the Committee in its sole discretion. In designing the Plan and the benefits to be provided thereunder, the Committee may take into account relevant circumstances, including, without limitation, the degree to which Participants may have alternative resources or coverage sources, as well as the resources of the Trust Fund. Benefits provided under the Plan shall be limited to those health and welfare benefits permitted by Code Section 501(c)(9), and any Plan eligibility restrictions established by the Committee shall conform with the requirements set forth in Treasury Regulation Section 1.501(c)(9)-2.

(c) <u>Method of Providing Benefits</u>. Benefits under the Plan may be fully insured, partially insured or self-insured, as determined by the Committee from time to time in its sole discretion. The expected cost of benefits under the Plan shall not exceed the amount expected to be available under the Trust.

(d) <u>Plan Documentation</u>. The Committee shall be responsible for creating, adopting and/or executing any documents necessary to set forth the Plan's governing terms, and shall be responsible for communicating the terms of the Plan to the Eligible Retiree Members and Eligible Dependents in accordance with applicable law.

13-53846-tjt Doc 8739 Filed 12/10/14 Entered 12/10/14 09:24:43 Page 243 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 08:36:38 Page 9 of 16
236

Section 9.3     Investment of the Trust.  The Committee shall have full power and authority to manage, control, invest and reinvest the money and other assets of the Trust Fund subject to all terms, conditions, limitations, and restrictions imposed on the investment of assets of public employee retirement systems or plans by the Investment Act, and the Trustee shall comply with the proper written direction of the Committee concerning those assets.  The Committee may employ outside advisors, including investment advisors, to advise it with regard to the investment of the assets of the Trust Fund.  Any outside advisors who are investment fiduciaries (as defined in the Investment Act) shall satisfy any applicable requirements of the Investment Act.

Section 9.4     Appointment of Investment Managers.  The Committee, from time to time, may appoint one or more independent Investment Managers, pursuant to a written investment management agreement describing the powers and duties of the Investment Manager, to direct the investment and reinvestment of all or a portion of the Trust (hereinafter referred to as an "Investment Account").   The Committee shall determine that each Investment Manager satisfies the requirements of section 38.1133(11) of the Investment Act and, is entitled (under its investment management agreement) to direct the investment and reinvestment of the Investment Account for which it is responsible, in its sole and independent discretion and without limitation, except for any limitations which from time to time the Committee determines shall modify the scope of such authority.  If an Investment Manager is appointed, it shall have the authority of the Trustee specified in Section 5.1 hereof with respect to the Investment Account over which it has investment discretion and the Trustee's duties with respect to such Investment Account shall be limited to following the instructions of the Investment Manager.  Provided that an Investment Manager is prudently selected and monitored by the Committee, the Committee shall have no liability (a) for the acts or omissions of such Investment Manager; (b) for following directions of such Investment Manager which are given in accordance with this Trust Agreement; or (c) for any loss of any kind which may result by reason of the manner of division of the Trust into Investment Accounts.

Section 9.5     Government Reports and Returns.  The Committee shall file all reports and returns that are required to be made with respect to the Trust and the Plan.

Section 9.6     Compromise or Settle Claims.  The Committee may compromise, settle and release claims or demands in favor of or against the Trust or the Committee on such terms and conditions as the Committee may deem advisable.

Section 9.7     Appointment of Administrator.  The Committee may appoint a third party to perform any administrative functions it has with regard to the Trust or Plan.

Section 9.8     Employment of Assistance.  The Committee has the exclusive authority to employ, contract and pay for all professional services including, but not limited to, actuarial, investment, legal, accounting, medical, and any other services that the Committee considers necessary for the proper operation and administration of the Plan and Trust. The powers granted to the Committee in this subparagraph include complete control of the procurement process, including contracts for office space, computer hardware and software, and human resource services.  In accordance with the provisions of Section 5.3 hereof, the Committee may direct the Trustee to pay reasonable compensation therefor from the Trust Fund.  The Committee may take

13-53846-tjt   Doc 8382   Filed 12/10/14   Entered 12/10/14 18:36:38   Page 244 of 602
13-53846-swr   Doc 6382   Filed 03/31/14   Entered 03/31/14 18:36:39   Page 92 of 97
236

or may refrain from taking any action in accordance with or reliance upon the opinion of counsel or such expert advisors.

Section 9.9     Reliance on Written Instruments.  The Committee shall be fully protected in acting upon any instrument, certificate or paper believed by him or her to be genuine and to be signed or presented by a duly authorized person or persons, and shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing, but may accept the same as conclusive evidence of the truth and accuracy of the statements therein contained.

Section 9.10    No Individual Liability on Contracts.  The Committee shall not be liable personally for any debts, obligations, or undertakings contracted by them, or for the breach of any contracts.  Such claims and obligations shall be paid out of the Trust; provided, however, that the Committee shall not be exempt from personal liability for willful misconduct, intentional wrongdoing, breach of applicable fiduciary duty, or fraud, and the Trust shall not indemnify the Committee for such liabilities, or to the extent that application of this sentence would violate any law.

Section 9.11    Detroit Not Liable for Conduct of Committee.  The Committee is not in its capacity as Committee an officer, agent, employee, or representative of Detroit.  In its capacity as Committee, the Committee is a principal acting independently of Detroit, which shall not be liable for any act, omission, contract, obligation, or undertaking of the Committee or its officers, agents, or representatives.

Section 9.12    Liability Insurance.   The Committee may obtain and keep current a policy or policies of insurance, insuring the members of the Committee from and against any and all liabilities, costs and expenses incurred by such persons as a result of any act, or omission to act, in connection with the performance of their duties, responsibilities and obligations under this Trust Agreement or the Plan.  To the extent permitted by applicable law, the premiums on such policies may be paid from the Trust Fund.

Section 9.13    Reimbursement for Defense of Claims.  To the extent permitted by applicable law and not otherwise covered by liability insurance purchased by the Trust (without regard to any non-recourse rider purchased by the insured), the Committee, employees of the Committee and persons acting on the Committee's behalf pursuant to an express written delegation (each separately, the "Indemnified Party") shall be reimbursed by the Trust Fund for reasonable expenses, including without limitation attorneys fees, incurred in defense of any claim that seeks a recovery of any loss to the Plan or Trust Fund or for any damages suffered by any party to, or beneficiary of this Trust Agreement (a) for which the Indemnified Party is adjudged not liable, or (b) which is dismissed or compromised in a final settlement, where the Committee – or, where required by applicable law, an independent fiduciary – determines that the settling Indemnified Party was not primarily responsible (in such cases, all or only a portion of the settling Indemnified Party's reasonable expenses may be reimbursed, as directed by the Committee or an independent fiduciary), provided that, the Committee shall have the right to approve of the retention of any counsel whose fees would be reimbursed by the Trust Fund, but such approval shall not be withheld unreasonably.

13-53846-tjt  Doc 8773-2  Filed 12/10/14  Entered 12/10/14 03:24:36  Page 245 of 602
13-53846-swr  Doc 6382  Filed 03/31/14  Entered 03/31/14 18:36:58  Page 93 of 94
236

Section 9.14 <u>Subrogation and Reimbursement</u>.  If the Plan is self-insured, the following provisions regarding subrogation and third-party reimbursement will apply.

(a)     If the Trust Fund pays, or is obligated to pay, any amount to or on behalf of an individual ("Benefit Recipient"), the Trust Fund shall be subrogated as provided in this Section 9.14 to all the Benefit Recipient's rights of recovery with respect to the illness or injury for which the payment of benefits is made by the Trust Fund.  The right of recovery referred to in the preceding sentence shall include the right to make a claim, sue, and recover against any person or entity from the first dollars of any funds which are paid or payable as a result of a personal injury claim or any reimbursement of health care expenses.  If requested in writing by the Committee, the Benefit Recipient shall take, through any representative designated by the Committee, such action as may be necessary or appropriate to recover such payment from any person or entity, said action to be taken in the name of the Benefit Recipient.  In the event of a recovery or settlement, the Trust Fund shall be reimbursed in full on a first priority basis out of such recovery or settlement for expenses, costs, and attorneys' fees incurred by it in connection therewith.

(b)     If the Trust Fund pays, or is obligated to pay, any amount to or on behalf of a Benefit Recipient for an illness or injury, the Trust Fund shall be entitled to, and shall have a first priority equitable lien on, the proceeds of any recovery, by judgment, settlement or otherwise, with respect to the illness or injury, and if paid to the Benefit Recipient, the Benefit Recipient shall immediately pay any such proceeds to the Trust Fund.  If the Benefit Recipient fails to pay such proceeds, or does not cause such proceeds to be paid, to the Trust Fund, the Committee may, in addition to any other remedy to which it may be entitled, recover the proceeds directly or by offset against claims for benefits under the Plan and Trust made with respect to the affected Benefit Recipient (or such Benefit Recipient's beneficiaries, heirs, attorneys, agents, representatives, or estate).

(c)     The Trust Fund shall have the right of subrogation and reimbursement set forth in this Section 9.14 regardless of whether the Benefit Recipient is made whole and regardless of whether the recovery, or any part thereof, is designated as payment for health care expenses, pain and suffering, loss of income or any other specified or unspecified damages or reason, and without regard to whether recovery is designated as including or excluding the health care expenses covered by the Plan and Trust.  Any recovery by a Benefit Recipient, an attorney or other third party shall be deemed to be for the benefit of the Plan and Trust and shall be held in constructive trust for the Trust Fund until the Trust Fund is reimbursed in full for all amounts paid by the Trust Fund.  The subrogation and reimbursement rights of the Trust Fund described in this Section 9.14 include all rights against, and include all rights with respect to, proceeds from or held by any attorney, third party, insurance carrier or payer of medical benefits, including an uninsured or under-insured motorist carrier, a no-fault carrier and a school insurance carrier, even if such coverage was purchased by the Benefit Recipient, and without regard to whether the proceeds have been paid or are payable.

(d)     By participating in the Plan, each Benefit Recipient agrees to cooperate fully with the Plan and Trust and to execute and deliver agreements, liens and other documents and

13-53846-tjt  Doc 8373-2  Filed 12/01/14  Entered 12/01/14 03:24:03  Page 246 of 602
13-53846-swr  Doc 6382  Filed 03/31/14  Entered 03/31/14 18:36:58  Page 246 of 602
236

do whatever else the Committee deems necessary to enable and assist the Trust Fund in exercising its rights under this Section 9.14, but the Trust Fund's rights under this Section 9.14 shall be effective regardless of whether the Benefit Recipient actually signs any agreements, liens or other documents. By participating in the Plan, each Benefit Recipient also agrees (i) that he or she will not make or maintain any make whole, common trust fund or apportionment action or claim in contravention of the subrogation and reimbursement provisions of this Section 9.14; and (ii) that he or she will not oppose any proceeding by the Trust Fund to obtain reimbursement on procedural grounds. The Benefit Recipient, directly or through his or her representatives, shall not do anything to impair the Trust Fund's rights. If the Committee determines that any Trust Fund recovery rights under Section 9.14 have been impaired by any action of the Benefit Recipient or his or her representatives or by the Benefit Recipient's or such other person's failure to comply with the Benefit Recipient's obligations under Section 9.14, the Committee may, in addition to any other remedy to which it may be entitled, determine the amount by which the Trust Fund's recovery rights have been impaired and recover such amount directly or by offset against claims for benefits under the Trust Fund made with respect to the affected Benefit Recipient.

(e)     This Section 9.14 entitles the Trust Fund to subrogation and reimbursement equal to the entire amount paid by the Trust Fund for the illness or injury to which the subrogation or reimbursement relates, including related expenses, costs and attorneys' fees, which shall be from the first dollars payable to or received by the Benefit Recipient, his representatives, heirs, legal counsel, estate or any other third party from any settlement, judgment or other payment, without reduction for attorneys' fees or for any other reason. The common fund, make-whole, apportionment or any similar doctrines shall not apply to any amounts received. Any attorneys' fees shall be the responsibility solely of the Benefit Recipient, and the Trust Fund shall not pay any attorneys' fees or costs associated with a Benefit Recipient's claim or lawsuit without the Committee's prior written authorization.

(f)     The intention of this Section 9.14 is to give the Trust Fund the first right of subrogation and reimbursement in full with respect to the first dollars paid or payable, even though the Benefit Recipient is not made whole. Each Benefit Recipient agrees that as a condition to receiving benefits under the Plan and from the Trust Fund, the Benefit Recipient shall comply with the requirements of this Section 9.14.

18-53846-tjt  Doc 8783  Filed 12/10/14  Entered 12/10/14 09:24:46  Page 247 of 602
13-53846-swr  Doc 6382  Filed 03/31/14  Entered 03/31/14 18:36:58  Page 95 of
236

# ARTICLE X
## AMENDMENT, TERMINATION AND MERGER

Section 10.1 <u>Amendment</u>. The Trust Agreement may be amended at any time in writing by Detroit or by Court order upon proper motion, provided, however, that no amendment may impose a contribution obligation on Detroit; and provided further that no amendment shall adversely affect the exempt status of the Trust or Plan under Section 501(c)(9) of the Code. No amendment to the Trust Agreement shall modify the responsibilities of the Trustee hereunder unless the Trustee has first consented to such amendment.

Section 10.2 <u>Termination</u>.

   (a)     The Trust and this Trust Agreement may be terminated at any time in writing by Detroit with a copy of such written instrument to be provided to the Trustee, or by Court order upon proper motion. Upon termination of this Trust Agreement, the assets of the Trust Fund shall be paid out at the direction of the Committee in the following order of priority: (i) the payment of reasonable and necessary administrative expenses (including taxes); (ii) the payment of benefits to Participants entitled to payments for claims arising prior to such termination; and (iii) upon satisfaction of all liabilities to existing Participants, either directly or through the purchase of insurance, to provide life, sick accident or other permissible benefits in accordance with Code section 501(c)(9) and the rules and regulations promulgated thereunder. Neither Detroit nor the Committee shall have any beneficial interest in the Trust Fund. The Trust Fund shall remain in existence until all assets have been distributed.

   (b)     Upon termination, the Trustee and the Committee shall continue to have all of the powers provided in this Trust Agreement as are necessary or desirable for the orderly liquidation and distribution of the Trust Fund in accordance with the provisions hereof.

Section 10.3 <u>Transfer of Assets and/or Liabilities</u>. To the extent permitted by Code section 501(c)(9) and other applicable law, some or all of the assets and/or liabilities of the Trust Fund may at the discretion of the Committee be transferred directly to another trust for the purpose of providing health or welfare benefits to some or all of the Participants on such terms and conditions as the Committee may determine.

13-53846-tjt Doc 8739 Filed 12/10/14 Entered 12/10/14 08:24:46 Page 248 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 18:36:58 Page 96 of
236

## ARTICLE XI
## MISCELLANEOUS

**Section 11.1**  <u>Rights in Trust Fund</u>.  No Participant or other person shall have any right, title or interest in the Trust Fund or any legal or equitable right against the Trustee, the Committee, or Detroit, except as may be otherwise expressly provided in the Plan or in this Trust Agreement.

**Section 11.2**  <u>Non-Alienation</u>.  Except to the extent required by applicable law, the rights or interest of any Participant to any benefits or future payments hereunder or under the provisions of the Plan shall not be subject to attachment or garnishment or other legal process by any creditor of any such Participant, nor shall any such Participant have any right to alienate, anticipate, commute, pledge, encumber or assign any of the benefits or payments which he may expect to receive, contingent or otherwise, under this Trust Agreement.

**Section 11.3**  <u>Controlling Laws</u>.  The Trust shall be construed and the terms hereof applied according to the laws of the state of Michigan to the extent not superseded by federal law.

**Section 11.4**  <u>Counterparts</u>.  This Trust Agreement may be executed in any number of counterparts, each of which shall be considered as an original.

**Section 11.5**  <u>Headings</u>.  The headings and subheadings of this Trust Agreement are for convenience of reference only and shall have no substantive effect on the provisions of this Trust Agreement.

**Section 11.6**  <u>Notices</u>.  All notices, requests, demands and other communications under this Trust Agreement shall be in writing and shall be deemed to have been duly given (a) on the date of receipt if served personally or by confirmed facsimile or other similar communication; (b) on the first business day after sending if sent for guaranteed next day delivery by Federal Express or other next-day courier service; or (c) on the fourth business day after mailing if mailed to the party or parties to whom notice is to be given by registered or certified mail, return receipt requested, postage prepaid, and properly addressed as follows:

<u>If to the Trustee</u>:

 [**insert name and address**]


<u>If to the Committee</u>:

[**insert name and address**]

13-53846-tjt  Doc 8773  Filed 12/10/14  Entered 12/10/14 09:24:40  Page 249 of 602
13-53846-swr  Doc 6382  Filed 03/31/14  Entered 03/31/14 18:36:58  Page 97 of
236

IN WITNESS WHEREOF, and as evidence of the establishment of the Trust created hereunder, the parties hereto have caused this instrument to be executed as of the date above first written.

_____     Dated: _____
[**insert name**]


TRUSTEE
[_____ Bank]

By:     _____

        _____
        Print Name

        _____
        Title
Dated: _____

13-53846-tsw Doc 8739-2 Filed 12/10/14 Entered 12/10/14 09:24:43 Page 250 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 18:36:38 Page 99 of
236

**EXHIBIT A**

**Trustee Compensation**

13-53846-tsw Doc 8739 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 251 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 13:36:38 Page 99 of

236

**EXHIBIT I.A.79**

PRINCIPAL TERMS OF DIA SETTLEMENT

13-53846-tsw Doc 8739 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 252 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 13:36:38 Page 90 of 692
236

# Term Sheet

| | |
|---|---|
| **Definitions** | For the purposes of this Term Sheet the following terms have the meanings provided below:<br><br>**CFSEM** means Community Foundation for Southeast Michigan.<br><br>**City** means the City of Detroit.<br><br>**Closing** means the closing of the transactions contemplated herein.<br><br>**Definitive Documentation** means the definitive agreements and other transaction documents to be executed and delivered at Closing.<br><br>**DIA Funders** means those persons, businesses, business-affiliated foundations and other foundations that are listed on Exhibit C to this Term Sheet and all additional persons, businesses, business-affiliated foundations and any other foundations from which The DIA secures commitments to contribute monies as "DIA Funders" in furtherance of the transactions contemplated by this Term Sheet.<br><br>**Foundation Funders** means the foundations that are listed on Exhibit B to this Term Sheet and any additional foundations (other than foundations that are DIA Funders) that, subsequent to the date of this Term Sheet, agree to contribute monies as "Foundation Funders" in furtherance of the transactions contemplated by this Term Sheet.<br><br>**Funder** means a Foundation Funder, a DIA Funder, or The DIA (collectively, the "**Funders**").<br><br>**Museum** means the museum that is commonly referred to as the Detroit Institute of Arts.<br><br>**Museum Assets** means the Museum art collection, operating assets, buildings, parking lots and structures, and any other assets having title vested in the City that are used primarily in servicing the Museum, including those covered by the 1997 Operating Agreement between the City and The DIA (the "**Operating Agreement**") all as more particularly described on Exhibit A to this Term Sheet.<br><br>**Payment Amount** means at least $815 million without interest and, to the extent applicable, reduced by any Present Value Discount. |

13-53846-tjt-swr Doc 8773-82 Filed 12/10/14 Entered 12/10/14 08:24:40 Page 253 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 03:36:58 Page 9 of 102
236

| | |
|---|---|
| | **Payment Period** means the twenty year period commencing on and immediately following the date of the Closing.<br><br>**State** means the State of Michigan.<br><br>**Supporting Organization** means the Foundation for Detroit's Future, a Michigan nonprofit corporation, which is a supporting organization of CFSEM, which was established to accommodate the contribution and payment of monies from the Funders, as contemplated under this Term Sheet, and will obtain 501(c)(3) status prior to the Closing.<br><br>**The DIA** means The Detroit Institute of Arts, a Michigan not-for-profit corporation.<br><br>**Tri-Counties** means the Counties of Macomb, Oakland and Wayne, all in the State.<br><br>Other capitalized terms are defined elsewhere in this Term Sheet. |
| **Scope of Settlement** | The consummation of the transactions contemplated in this Term Sheet shall be in full and final settlement of all disputes relating to the rights of the City, the Police and Fire Retirement System and the General Retirement System for the City (collectively, the "**Pensions**"), The DIA, and the State with respect to the Museum, including the Museum Assets. Disputes held by other of the City's creditors pertaining to the foregoing subject matter shall be resolved by confirmation of the Plan of Adjustment (defined below). |
| **Reservation of Rights** | This Term Sheet proposes a settlement of disputed factual and legal issues. Nothing in this Term Sheet constitutes an admission as to any factual or legal issue or a waiver of any claim or defense, and all rights of the City, The DIA, the Funders and all other parties in the City's bankruptcy case regarding the Museum and the Museum Assets are fully preserved until the Closing. |
| **Treatment of Museum Assets** | As a result of this settlement, at Closing, all right, title and interest in and to the Museum Assets shall be conveyed to The DIA to be held in perpetual charitable trust for the benefit of the people of the City and the State, including the citizens of the Tri-Counties, permanently free and clear of all liens, encumbrances, claims and interests of the City and its creditors (the "**Transfer**"). |

13-53846-tjt Doc 8773 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 254 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 18:36:58 Page 92 of 92
236

| | |
|---|---|
| **Funding Commitments** | All commitments of the Funders shall, subject to the terms and conditions of this Term Sheet and the Definitive Documentation, be the irrevocable, authorized, valid and binding commitments by the Funders, enforceable against such Funders, except that the commitment of The DIA as to any DIA Deficiency will be subject to its right of substitution as discussed in "*DIA Commitment Regarding Funding*" below. Exhibit B and Exhibit C, as applicable, set forth the commitment amount and, to the extent known prior to the date of this Term Sheet, the payment schedule for each Funder. Prior to execution of the Definitive Documentation, each Funder with respect to which the payment schedule was not known as of the date of this Term Sheet (unless such party becomes a "**Funder**" only after the date of the Definitive Documentation) shall agree to a payment schedule. Each Funder shall have the right to prepay its commitment in whole or in part at any time without penalty and no interest will be owed on any Funder's payments.

All payments by the Funders shall be made as set forth in "*Payment Mechanism*" of this Term Sheet. (The mechanics, timing and terms of all payments by the State shall be determined between the State and the City.)

The parties acknowledge that Funder payments are conditioned on the City meeting certain conditions both initially and on a continuing basis. See "*Conditions to Future Funding Obligations*" of this Term Sheet. Failure of the City to meet those conditions in any material respect may result in the delay of a scheduled payment by the Funders to the Supporting Organization and a delay of a scheduled payment by the Supporting Organization to the City until (i) all material requisite conditions for that payment are met; or (ii) cancellation of that payment if the material requisite conditions are not met within any established cure period.

Funding commitments of the following amounts (before giving effect to any Present Value Discount, as applicable) are required as a condition to Closing:

    Foundation Funders (net)     $366 million
    DIA Funders and DIA     $100 million*
    State     $350 million

        *inclusive of the intended funding amounts for the indentified Foundation Funders |

13-53846-tjt Doc 8772 Filed 12/10/14 Entered 12/10/14 08:24:36 Page 255 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 13:36:38 Page 93 of
236

| | |
|---|---|
| | listed in Exhibit B |
| | To the extent the City fails to meet its indemnity obligations further described in Exhibit D, the Funders', the Supporting Organization's and The DIA's (with respect to a DIA Deficiency or under the Guaranty) funding commitments will be reduced by any litigation or defense costs, damages or settlement costs incurred by the applicable Funder, the Supporting Organization or The DIA in connection therewith. Similarly, the Funders, the Supporting Organization and The DIA may reduce their funding commitments to the extent that any litigation or defense costs, damages or settlement costs incurred by them and arising from the transactions contemplated by this Term Sheet and the Definitive Documentation are not otherwise covered by the City's indemnity obligations described in Exhibit D. |
| **Present Value Discount** | To the extent that the DIA Funders and The DIA have agreed upon an aggregate payment schedule (determined as of the Closing and adjusted after the Closing for any New Donor Commitments), that provides for the payment of greater than an aggregate of $5 million per year during the Payment Period (the "**Agreed Required Minimum Schedule**"), the amount and timing of such annual excess in commitments shall, applying a discount rate to be agreed upon hereafter but prior to Closing, which may or may not be the same earnings rate that the Pensions use as provided for in the confirmed Plan of Adjustment as the Pensions' assumed future investment return, result in a present value discount in an amount which reflects the payments required to be made being instead made more rapidly than required by the Agreed Required Minimum Payment Schedule, which present value discount shall reduce the aggregate amount of the commitments that The DIA is required to secure or, as to any DIA Deficiency, undertake itself (the "**Present Value Discount**"). |
| | Each Foundation Funder which funds its commitment more rapidly than ratably over twenty years shall likewise be entitled to a Present Value Discount determined in the same manner as set forth in the preceding paragraph. |
| | Any disputes regarding the calculation or application of a Present Value Discount will be irrevocably determined, |

13-53846-tjt Doc 8772 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 256 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 18:36:38 Page 94 of 492
236

| | |
|---|---|
| | based upon the formula described in this Term Sheet, by an independent auditing firm to be agreed upon in the Definitive Documentation. |
| **The DIA Commitment Regarding Funding** | The DIA undertakes to secure commitments for contributions of $100 million (subject to the Present Value Discount) from the business community (and their related foundations), other foundations and individuals. As of the Closing, The DIA shall be responsible for any portion of the $100 million (subject to the Present Value Discount) for which it has not secured commitments from DIA Funders as of the Closing (the "**DIA Deficiency**"). However, The DIA shall have the right after the Closing to substitute for its obligation to pay any or all of the DIA Deficiency commitments from new DIA Funders or an increased funding commitment from an existing DIA Funder (each a "**New Donor Commitment**") for such amount of the DIA Deficiency. Subject to the terms of this Term Sheet, all New Donor Commitments shall be payable according to payment schedules which shall not run later than the end of the Payment Period. In addition, The DIA agrees that it will have no claims against the Foundation Funders for failure to fund their commitments and that the Foundation Funders have made no commitments beyond those set forth in this Term Sheet (as will be reflected in the Definitive Documentation). |
| **DIA Guaranty** | Subject to the terms and conditions of this Term Sheet, The DIA shall guaranty (the "**Guaranty**") the payment by all DIA Funders of all amounts such DIA Funders pledge against the $100 million (subject to the Present Value Discount) commitment of The DIA under the "*Funding Commitment*" section of this Term Sheet. The City may take action to collect Default Amounts under the Guaranty as permitted under the "*Default and Remedies*" section of this Term Sheet. The City shall not otherwise take action to collect any amounts under the Guaranty, and under no circumstances will anyone other than the City have any right to take any action to collect any amounts under the Guaranty. The DIA Guaranty shall be in form and substance acceptable to the City and the Funders. |
| **Default and Remedies** | All Funders (including The DIA, both as to any DIA Deficiency and with respect to the Guaranty) shall have the right to rely upon the determination of the Board of Directors of the Supporting Organization as to whether the conditions |

13-53846-tjt Doc 8739 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 257 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 18:36:38 Page 95 of 142
236

to a scheduled payment have been satisfied and, if not initially satisfied, whether they have been timely cured. In the event that the Supporting Organization has determined that the conditions have not been satisfied (or timely cured) and the City disputes that determination, the City's only recourse shall be to dispute the Supporting Organization's determination. The City shall have no claim against any Funder (or under the Guaranty) for such Funder's reliance upon the determination of the Board of Directors of the Supporting Organization. Any dispute between the City and the Supporting Organization regarding whether the conditions had been satisfied or timely cured shall be determined in accordance with the "*Dispute Resolution*" section of this Term Sheet.

In the event it is determined by the Supporting Organization or through arbitration that the conditions to a scheduled payment have been satisfied or timely cured, all Funders shall be required to make their scheduled payments to the Supporting Organization (or, as to DIA Funders that so elect in accordance with the "*Payment Mechanism*" section of this Term Sheet, to The DIA, which will be required to make its scheduled payments to the Supporting Organization). If a Foundation Funder, a DIA Funder or The DIA (either with respect to a Deficiency Amount or on behalf of a DIA Funder who elects to make its payments to The DIA) has made its scheduled payment to the Supporting Organization, the City shall have recourse only to the Supporting Organization (and not any Funder that made its scheduled payment) for such payment. If a Foundation Funder, a DIA Funder or The DIA (either with respect to a Deficiency Amount or on behalf a DIA Funder who elects to make its payments to The DIA) has not made its scheduled payment after it is determined by the Supporting Organization or through arbitration that the conditions to such payment have been satisfied or timely cured, the Supporting Organization shall, after making reasonable efforts to collect the scheduled payment from the Funder (the "**Non-funding Party**"), assign its right to enforce payment of that scheduled payment (the "**Default Amount**") to the City in full satisfaction of the Supporting Organization's obligation to make such payment to the City.

If the Supporting Organization assigns to the City, in accordance with the preceding paragraph, the Supporting Organization's right to enforce payment of a Default Amount from a DIA Funder (a "**Defaulted DIA Funder**"), during the twelve-month period following the assignment of the claim

13-53846-tjt Doc 8772 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 258 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 03:36:38 Page 96 of
236

| | |
|---|---|
| | to the City (the "**City Collection Period**"), the City shall exercise commercially reasonable efforts to collect the Default Amount from that Defaulted DIA Funder, and any amounts collected from that Defaulted DIA Funder shall reduce the amount subject to the Guaranty.  If the City is unable to collect the Default Amount from a Defaulted DIA Funder during the City Collection Period, upon the expiration of the City Collection Period, the City may collect the Default Amount from The DIA under the Guaranty and, in such event, assign to The DIA all right and title to (and exclusive authority to collect) the Default Amount.

In no event will any Funder other than the Non-funding Party have any responsibility for the payment or obligations of such Non-funding Party (except, as to The DIA, under the Guaranty), and the City will not have any right to collect any amounts from any Funder except as set forth above.  Moreover, there will be no third-party beneficiaries to the rights of the City or the Supporting Organization, and no party other than the City or the Supporting Organization (or The DIA in respect of the Guaranty), as applicable, shall have the right to assert any claim against any Funder in respect of the obligations arising under the Definitive Documentation. Without limiting the foregoing, the failure of any Funder or the Supporting Organization to make a scheduled payment shall give rise to a claim by the City against such Non-funding Party, as set forth above, and not against any other Funder, the Supporting Organization, The DIA or the Museum Assets; provided, however, (i) as contemplated in "*The DIA Commitment Regarding Funding*" above, The DIA will be obligated for any DIA Deficiency except to the extent the DIA Deficiency is replaced during the Payment Period with a New Donor Commitment, and (ii) The DIA will have its obligations under the Guaranty.

The City will be responsible for all costs of its enforcement against the Non-funding Party and will not seek reimbursement of costs of enforcement from any other party or the Supporting Organization.  No other person or entity shall have the right to enforce payment. |
| **Initial Payment** | At and as a condition to the Closing (a) each of the Foundation Funders and the State shall pay at least 5% of its commitment under this Term Sheet and (b) The DIA and the DIA Funders in the aggregate shall pay at least $5 million. |

13-53846-tjt Doc 8773-2 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 259 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 18:36:38 Page 9 of 64
236

| | |
|---|---|
| **Transfer on Initial Payment** | The Transfer shall be irrevocably consummated upon the Initial Payment to the City Account (defined in "*Conditions to Future Funding Obligations*" of this Term Sheet) (which shall be made at the Closing). In addition, at the Closing, the City and The DIA will enter into an agreement that (1) terminates the Operating Agreement, (2) includes a mutual release of pre-Closing claims, and (3) assigns (without recourse) from the City to The DIA all current and future commitments or gifts made or intended for the benefit of the Museum or The DIA, including without limitation money and works of art. The City will not, however, make any representations or warranties relating to the condition of, or title to, the Museum Assets or such commitments and will not have any liability with respect thereto. |
| **Payment Mechanism** | All payments by the Funders shall be made directly to the Supporting Organization which shall hold such payments in a segregated account (the "**Account**") pending payment to the City. Notwithstanding the foregoing, any DIA Funder may make its payments to The DIA instead of to the Supporting Organization; payments by The DIA (either with respect to a Deficiency Amount or on behalf a DIA Funder who elects pursuant to the preceding sentence to make its payments to The DIA) to the Supporting Organization shall be pursuant to the terms of an agreement which will be entered into between The DIA and the Supporting Organization in connection with the execution of the Definitive Documentation. As set forth under "*Default and Remedies*" above, only the City will have recourse or claims against the Account, provided all conditions specified in "Conditions to Future Funding Obligations" of this Term Sheet have been satisfied and as otherwise provided in this Term Sheet, and the City shall be paid when due, directly from the Account for the exclusive payment of the Pensions. The City will not be entitled to any interest or earnings on the balances of the Account. The City shall then pay such amounts to and for the exclusive payment of the Pensions in accordance with the allocation determined by the City and agreed by the Funders. |
| **DIA Commitment for State-wide Services for State Contribution** | In addition to continuing to operate the Museum for the benefit of the City and the State, including the citizens of the Tri-Counties, and continuing to provide the special services to the residents of the Tri-Counties during the millage term that are provided for in the millage |

13-53846-tjt   Doc 8772   Filed 12/10/14   Entered 12/10/14 18:34:36   Page 260 of 602
13-53846-swr   Doc 6382   Filed 03/31/14   Entered 03/31/14 23:36:58   Page 98 of 236

agreements, during the Payment Period The DIA will provide an array of art programs at no or discounted costs to the residents of the State. In determining which programs to offer, both the cost to The DIA of developing and operating these programs and The DIA's other fundraising obligations, including its need to raise funds for general operations and its stated goal of building endowment funds, as well as any fundraising obligation under this settlement, will be taken into account. As appropriate, The DIA will collaborate with its Michigan museum colleagues in the development of these programs. Given the length of the Payment Period, it is expected that these programs would be developed and adjusted over time. Such programs could include at the outset:

- Two exhibitions in each twelve-month period, with the first such period beginning six months after the Closing, of objects from the Museum collection that would rotate through museums and art centers around the State on a schedule to be determined by The DIA and the recipient museums. Each exhibition will be developed and organized by The DIA and will include installation and de-installation of the objects, a marketing package (logo and advertising template) and, possibly, input on programming and education opportunities.

- An annual professional development program coordinated with the Michigan Museums Association designed to strengthen museum professionals and introduce museum job opportunities to student audiences.

- An expansion of the Museum's popular Inside/Out program (during the tenure of the program), which places high-quality art reproductions in Southeast Michigan communities, to include two additional outstate locations annually, supporting tourism, cultural awareness and life-long learning.

- Art object conservation services at a discounted rate to Michigan museums conducted in consultation with the Museum conservators and the curatorial staff of the requesting museum.

- The development of an educational program based on the Museum collection that supports National Common Core Standards, to be offered in two

13-53846-tjt Doc 8772 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 261 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 18:36:38 Page 99 of 91
236

|  | Michigan communities annually and to include follow-up support for educators. |
|---|---|
| **DIA Operating and Maintenance Commitments** | (1) Subject to the terms set forth herein and the Definitive Documentation, The DIA shall have complete responsibility for and control over Museum operations, capital expenditures, collection management, purchase or sale of assets, *etc*. and will be responsible for all related liabilities, including existing liabilities of The DIA to its employees, contractors and vendors.<br><br>(2) The permanent primary situs of The DIA and its art collection will remain in the City in perpetuity. This Term Sheet and the Definitive Documentation will not otherwise restrict the ability of The DIA to lend or to otherwise allow works to travel outside of the City or the State, consistent with ordinary Museum operations and the state-wide services proposed under this settlement. Notwithstanding anything to the contrary set forth in this Term Sheet, The DIA acknowledges and agrees that the Museum shall be operated primarily for the benefit of the people of the City and the State, including the citizens of the Tri-Counties.<br><br>(3) The DIA will be required to operate the Museum as an encyclopedic art museum in the City, in accordance with changing future demands in the operation of such a Museum. The DIA will not deaccession from its collection or sell, lease, pledge, mortgage, or otherwise encumber art that is accessioned to or otherwise held in its collection except in accordance with the code of ethics or applicable standards for museums published by the American Alliance of Museums (the "**AAM**") as amended or modified by the accreditation organization. If the AAM ceases to exist or to be generally regarded by leading American art museums as the preeminent American art museum accreditation organization, then the AAM's successor organization or such other organization that is at that time generally regarded by leading American art museums as the preeminent American art museum accreditation organization shall be substituted for the AAM. |

| | |
|---|---|
| | (4) In the event of a liquidation of The DIA, the Museum Assets will be transferred only to another not-for-profit entity (which entity shall be subject to the reasonable approval of the City and the Supporting Organization, if then in existence, and otherwise by majority vote of the City and the then-existing Foundation Funders). Such successor entity would subject itself to the same conditions as set forth in this Term Sheet and the Definitive Documentation, including but not limited to holding the Museum Assets in perpetual charitable trust for the people of the City and the State, including the citizens of the Tri-Counties. For the purposes of determining the majority vote described above, and for the avoidance of doubt, the parties agree that the City and each of the then-existing Foundation Funders shall each have one vote with respect to such approval. |
| **City Commitments Relating to Pensions** | (1) The City will adopt and maintain pension governance mechanisms that meet or exceed commonly accepted best practices reasonably satisfactory to the Funders and the State to ensure acceptable fiscal practices and procedures for management and investment of pensions and selection of acceptable pension boards to ensure the foregoing. |
| | (2) The City will establish, by the Effective Date (as defined below), a Receivership Transition Review Board ("**Review Board**") or other independent fiduciary that is independent of the City and any association of City employees or retirees for future supervision of the Pensions' management, administration and investments for at least twenty years after the Effective Date. |
| | (3) Any commitments by the City to make payments hereunder, or cause payments to be made, to the Pensions shall be subject to receipt of the related payment amount from the Supporting Organization which, in turn, will be conditioned on the City's compliance with the above. |
| | (4) The Pension funds themselves shall agree as part of the settlements approved through the confirmed Plan of Adjustment that they waive and release |

| | |
|---|---|
| | any and all claims against, and shall have no recourse directly against, the Funders or the Supporting Organization with respect to enforcement of the City's commitment to make payments to the Pensions or any such party, nor for any matter arising from the contemplated transaction. The agreement of the Pension funds, as implemented through the Plan of Adjustment and any associated court orders shall be binding on the Pensions and all entities or persons claiming through the Pensions, including without limitation any successors or assigns and any plan participants, and any of their representatives, successors or assigns. |
| **Other City Commitments** | (1) The City shall pass no charter, ordinance or other provision that solely affects or primarily targets the Museum, The DIA or museums within the City generally which such charter, ordinance or other provision has a material adverse impact on the Museum or The DIA (it being understood that a "material adverse impact" shall include any adverse financial impact or any contradiction, or adverse impact on the enforceability, of the terms of this settlement), except pursuant to State-enabling legislation, and the City agrees that the Detroit Arts Commission will henceforth have no oversight of The DIA, the Museum or the Museum Assets.<br><br>(2) The City shall not impose any fee, tax or other cost on the Museum or The DIA that solely affects or primarily targets the Museum, The DIA or museums within the City generally.<br><br>(3) The City shall provide (or cause to be provided) utilities and other City services to The DIA at the same pricing and on the same terms upon which the City offers to provide utilities and such other City services to arm's-length third parties generally.<br><br>(4) The City agrees that there are no further commitments from the Funders, the Supporting Organization, The DIA or the State relating to the Museum or the Museum Assets beyond those contained in the Term Sheet or the Definitive |

13-53846-tjt Doc 8772 Filed 12/16/14 Entered 12/16/14 08:24:49 Page 264 of 602
13-53846-swr Doc 3382-1 Filed 03/31/14 Entered 03/31/14 16:36:38 Page 102 of
236

| | |
|---|---|
| | Documentation. |
| | (5) The City agrees to the indemnification, jurisdiction, venue and choice of law language contained in Exhibit D for the benefit of the Funders. |
| **Bankruptcy Court Approval Process** | The settlement between the City and The DIA over the Transfer in exchange for the Funders' and the State's commitments for the Payment Amount and The DIA's commitment to provide for the operation and maintenance of the Museum is subject to the Bankruptcy Court's approval in a manner acceptable to the parties hereto, which the City shall seek promptly after the signing of the Definitive Documentation for the settlement. |
| **Conditions to The DIA's, the City's and the Funders' Commitments and Initial Payments under the Settlement** | The City's and the Funders' obligations under the settlement will become binding only upon: |
| | (1) execution of Definitive Documentation acceptable in all respects to The DIA, the City, the State and the Funders, memorializing the terms of this Term Sheet, including irrevocable commitments (subject to The DIA's right of substitution as to the DIA Deficiency) of the Funders, in the aggregate, for the full Payment Amount, |
| | (2) Bankruptcy Court entry of an order confirming the Plan of Adjustment of Debts of the City of Detroit, Michigan (the "**Plan of Adjustment**") that is binding on The DIA, the City and all of the City's creditors and provides, among other things, for approval and inclusion of all of the terms of this settlement, including treatment of the Payment Amount in accordance with this Term Sheet and protection of the Museum Assets as provided in "*Treatment of Museum Assets*" of this Term Sheet, and not stayed on appeal, |
| | (3) occurrence of the Effective Date, |
| | (4) approval of the settlement by the Michigan Attorney General as consistent with Michigan law and with Attorney General Opinion No. 7272, |
| | (5) agreement by the millage authorities for each of the Tri-Counties to the settlement for protection of the three-county millage payable to the Museum for the balance of the millage period approved in 2012, |

| | |
|---|---|
| | (6) approval of the relevant City and State persons or entities specified in the Local Financial Stability and Choice Act (PA 436) to the extent applicable, including, but not limited to, the Emergency Manager, the Governor of the State and/or the Treasurer of the State and (if needed) the Detroit City Council and/or Detroit Arts Commission, in each case, for the Transfer, |
| | (7) The DIA, the Foundation Funders, the City and the State being satisfied with The DIA's governance structure, mechanisms and documents, program for provision of statewide services, multi-year fundraising plan, insurance coverage, policies, practices and procedures and such other matters as the Funders determine are critical to their decision to fund and the City determines are critical to its decision to execute the Definitive Documentation, |
| | (8) Closing occurring no later than December 31, 2014, |
| | (9) All existing agreements and other arrangements between the City and The DIA are either affirmed, modified or terminated, as provided in this Term Sheet or as otherwise agreed between the City and The DIA. |
| | (10) The DIA agrees to indemnify and hold harmless the Foundation Funders, the City and the Supporting Organization from any and all claims against them (together with all reasonable associated costs and expenses) that result from The DIA's failure to perform any of its obligations under the Definitive Documentation.  The DIA acknowledges that the Foundation Funders and the Supporting Organization have no financial obligations other than, in the case of the Foundation Funders, the amount specified in the "*Funding Commitments*" of this Term Sheet and are not guaranteeing payment to the City of any amount committed by the DIA Funders or The DIA. |
| **Closing of Settlement** | Upon satisfaction of all "*Conditions to The DIA's, the City's, the State's and the Funders' Commitments and Initial Payments under the Settlement*" under this Term Sheet (any of which may be waived by agreement of all parties to this Term Sheet for whose benefit the condition exists) and the occurrence of the |

13-53846-tjt  Doc 8772  Filed 12/16/14  Entered 12/16/14 10:24:49  Page 266 of 602
13-53846-swr  Doc 7382  Filed 09/11/14  Entered 09/11/14 16:56:38  Page 104 of 434
236

| | |
|---|---|
| | effective date of the Plan of Adjustment ("**Effective Date**"). |
| **Conditions to Future Funding Obligations** | The Funders' obligations to continue to fund the settlement (and the Supporting Organization's obligation to continue to pay funds provided by the Funders to the City) are conditioned on the following:<br><br>(1)  all amounts paid by the Funders shall be used only to pay Pensions as provided in this Term Sheet and the confirmed Plan of Adjustment,<br><br>(2)  the Funders' receipt of an annual certification from the Review Board or other oversight authority reasonably acceptable to the Funders that the City is in compliance with its obligation to use the amounts paid by the Funders solely for the benefit of the pensioners and that the amounts received from the Funders are unencumbered by the City or any other entity,<br><br>(3)  the amounts paid by the Funders and transmitted by the Supporting Organization to the City are placed into a segregated account to be used for payments to the Pensions only and shown separately on the City's books ("**City Account**"),<br><br>(4)  the Funders' receipt of an annual reconciliation report of the City Account prepared by external auditors reasonably satisfactory to the Funders at the City's expense, certifying use of funds in a manner consistent with the settlement,<br><br>(5)  full compliance by the City with the terms of the funding agreements with the Funders or the Supporting Organization, and<br><br>(6)  the City's continued compliance with the first two commitments set forth above in the provision entitled "*City Commitments Relating to Pensions*" of this Term Sheet.<br><br>The City shall have the opportunity to cure any breach or failure of these conditions within 180 days of issuance of notice of the same by the Funders or the Supporting Organization  Notwithstanding the foregoing, to the extent that the applicable event of default cannot reasonably be cured within the period specified above, and as long as the City has commenced to cure, and diligently pursues the cure of such default in good faith, such cure period shall be |

| | |
|---|---|
| | extended by a reasonable period of time to permit the City to cure such event of default; provided, however, such additional extended cure period shall not extend beyond the later of: (i) 180 days beyond the initial cure period; and (ii) the date that the next applicable payment is due the City by the Supporting Organization. The City's ability to receive the benefit of the extended cure period, beyond the initial cure period, shall be subject to the approval of the Supporting Organization upon receipt of a written request from the City setting forth why the City is entitled to such extended cure period by meeting the requirements set forth above, which approval shall not be unreasonably withheld, conditioned or delayed.    All obligations of the Funders and Supporting Organization to make payments shall be suspended for the duration of the cure period.  If the City fails to cure a breach or failure during the cure period each Funder and the Supporting Organization shall have the right to cancel its remaining commitments. |
| **Changes in DIA Governance** | The DIA shall establish an ad-hoc committee (the "**Governance Committee**") to review best practices in museum governance, gather input from the parties to this Term Sheet and the State, and make recommendations regarding the future governance of The DIA.  In addition to three members representing the perspective of The DIA, The DIA shall appoint to the Governance Committee one member representing each of the following perspectives: 1) the Foundation Funders; 2) the City; and 3) the State.    In addition, The DIA shall appoint to the Governance Committee one person who is selected by agreement of the millage authorities of the Tri-Counties**.**  The parties believe the proposed make-up of the Governance Committee will appropriately represent the perspectives of The DIA, the City, the State, the millage authorities and the Foundation Funders, but The DIA will consider adjustments to the proposed membership to the extent necessary to address any concerns raised by the State.  Susan Nelson, principal of Technical Development Corporation, will facilitate and advise the process, with funding as required from the Foundation Funders.   The process will be completed as quickly as possible but in any event prior to the Closing, with the Governance Committee's recommendations taking effect upon their approval by The DIA's Board of Directors and prior to Closing.  The goal of the Governance Committee will be to ensure that The DIA has the best possible governance |

| | |
|---|---|
| | structure for maintaining its position as one of America's great art museums. |
| **Future Obligations of The DIA** | The DIA will provide to the other Funders and the City, or their representatives, on an annual basis, a narrative report covering overall operations, fundraising and state services, as well as audited financial statements. |
| **Dispute Resolution** | In connection with the negotiation of the Definitive Documentation, the parties shall use good faith efforts to work with the State to identify and agree upon alternative dispute resolution mechanisms that provide a process for resolution of disputes surrounding whether conditions to a scheduled payment have been satisfied or cured while considering the ability of the public, Pensions and other stakeholders to monitor such alternative dispute resolution process. |

13-53846-tjt Doc 8773 Filed 12/16/14 Entered 12/16/14 08:24:49 Page 269 of 602
13-53846-swr Doc 7382 Filed 09/11/14 Entered 09/11/14 16:36:38 Page 10 of 104
236

# EXHIBIT A

## MUSEUM ASSETS

1. The Museum building and grounds, and the employee parking lot located at 5200 Woodward Avenue, Detroit, Michigan, comprised of land and improvements bounded by Woodward Avenue as widened, existing John R Street, existing East Kirby Avenue and the South line of Farnsworth Avenue, depicted on the attached Exhibit A-1 AERIAL PHOTO MAP, and more particularly described in Commitment for Title Insurance No. 58743275 revision 5, with an effective date of December 16, 2013, and Commitment for Title Insurance No. 58781215, with an effective date of December 26, 2013, (collectively, the "Title Commitment") issued by Title Source Inc., as follows:

   PARCEL 1:  Block A; together with the Northerly half of vacated Frederick Douglass Avenue adjacent thereto, of Ferry's Subdivision of Park Lot 40 and of Lots 1 to 18 inclusive of Farnsworth's Subdivision of Park Lots 38 and 39, according to the recorded plat thereof, as recorded in Liber 18 of Plats, Page 71, Wayne County Records.

   PARCEL 6:  Lots 43 through 78, both inclusive, together with the Southerly half of vacated Frederick Douglass Avenue adjacent to Lots 43 through 58, and the Northerly half of vacated Farnsworth Avenue adjacent to Lots 63 through 78, and together with vacated alleys appurtenant to said lots.

   PARCEL 11:  Lots 103 through 120, both inclusive, together with the Southerly half of vacated Farnsworth Avenue adjacent to Lots 103 through 118, and vacated portions of Farnsworth Avenue adjacent to the South of Lots 103 through 117 and Lot 120, and vacated alleys appurtenant to said lots, of Farnsworth Subdivision of Park Lots 38 and 39, according to the recorded plat thereof, as recorded in Liber 1, Page 16, Wayne County Records.

2. The Frederick Lot (across from the Museum, Easterly from existing John R to existing Brush) located, in the City of Detroit, Wayne County, Michigan, depicted on the attached Exhibit A-1 AERIAL PHOTO MAP, and more particularly described in the Title Commitment as follows:

   PARCEL 4:  Lots 31 to 37 of Farnsworth Subdivision of Park Lots 38 and 39, together with the southerly half of vacated Frederick Douglass Avenue adjacent to said lots and together with the vacated alley appurtenant to said lots, according to the recorded plat thereof, as recorded in Liber 1, Page 16, Wayne County Records.

   PARCEL 7:  Lots 79 and 80 of Farnsworth Subdivision of Park Lots 38 and 39, together with the Northerly half of vacated Farnsworth Avenue adjacent to said lots and together with the vacated alley appurtenant to said lots, as recorded in Liber 1, Page 16 of Plats, Wayne County Records.

13-53846-tjt   Doc 8738-2   Filed 12/16/14   Entered 12/16/14 08:24:06   Page 270 of 602
13-53846-swr   Doc 3382   Filed 03/31/14   Entered 03/31/14 16:36:38   Page 106 of
236

PARCEL 9:  The East 5 feet of Lot 85 and Lots 86 and 87 and the West 16 feet of Lot 88, together with the Northerly half of vacated Farnsworth Avenue adjacent to said lots and together with the vacated alley appurtenant to said lots of Farnsworth Subdivision of Park Lots 38 and 39, as recorded in Liber 1, Page 16 of Plats, Wayne County Records.

PARCEL 12:  Lots 1 through 5, both inclusive, and Lots 10 through 14, both inclusive, Block 25, together with the Southerly half of vacated Frederick Douglass Avenue adjacent to Lots 1 through 5, Block 25, and the Northerly half of vacated Farnsworth Avenue adjacent to Lots 10 through 14, Block 25 and together with the vacated alley appurtenant to said lots of Brush's Subdivision of that part of the Brush Farm lying between the North line of Farnsworth Street and South line of Harper Avenue, as recorded in Liber 17, Page 28 of Plats, Wayne County Records.

3.      The cultural center underground garage[1] *i.e.*, the parking garage with all appurtenant utilities, equipment, drives, pedestrian and vehicular entrances and easements therefor, on the south side of the Museum building located at 40 Farnsworth, Detroit, Michigan, depicted on the attached Exhibit A-1 AERIAL PHOTO MAP, and more particularly described in the Title Commitment as follows:

PARCEL 14:  A parking structure in the City of Detroit occupying space under and on the following described parcel of land.  Land in the City of Detroit, being a part of Lots 62 through 68 inclusive;  parts of Lot 112 and 118 through 120 inclusive; all that part of Lots 113 through 117 inclusive not set aside as a part of Farnsworth Avenue, parts of public alleys and Farnsworth Avenue (60 feet wide) vacated by the Common Council on October 7, 1924 and January 11, 1927; all as platted in "Farnsworth's Subdivision of Park Lots 38 and 39, City of Detroit" recorded in Liber 1, Page 16 of Plats, Wayne County Records and also a portion of the Northerly 49 feet of Farnsworth Avenue (70 feet wide), which was opened as a public street by action of the Common Council on October 7, 1924. Being more particularly described as follows:  Commencing at the intersection of the South line of Farnsworth Avenue 70 feet wide and the East line of Woodward Avenue as widened August 2, 1932, J.C.C. Page 1279, thence North 29 degrees 42 minutes 10 seconds West 22.17 feet, thence North 60 degrees 17 minutes 50 seconds East 6.00 feet to the point of beginning of this parcel, thence North 29 degrees 42 minutes 10 seconds West 248.16 feet; thence North 60 degrees 11 minutes 50 seconds East 268.00 feet; thence South 29 degrees 42 minutes 10 seconds East 15.79 feet; thence North 60 degrees 17 minutes 50 seconds East 1.00 feet to a point of curve; thence 11.77 feet along the arc of a curve concave to the Northeast with a Radius of 14.00 feet, a Delta of 48 degrees 11 minutes 23 seconds with a Long Chord of 11.43 feet which bears South 53 degrees 47 minutes 52 seconds East to a point of reverse curve; thence 26.07 feet along the arc of curve concave to the Southwest, with a Radius of 31 feet, a Delta 48

---

[1] In connection with the preparation for Closing, the City will advise on the mechanics for the release of existing encumbrances on title to the garage.

degrees 11 minutes 23 seconds with a Long Chord of 25.31 feet which bears South 53 degrees 47 minutes 52 seconds East; thence South 29 degrees 42 minutes 10 seconds East 140.50 feet; thence 78.54 feet along the arc of a curve concave to the Northwest, with a Radius of 50.00 feet, a Delta of 90 degrees with a Long Chord of 70.71 feet which bears South 15 degrees 17 minutes 50 seconds West; thence South 60 degrees 17 minutes 50 seconds West 0.50 feet; thence South 29 degrees 42 minutes 10 seconds East 4.00 feet; thence South 60 degrees 17 minutes 50 seconds West 4.00 feet; thence South 29 degrees 42 minutes 10 seconds East 6.00 feet; thence South 60 degrees 17 minutes 50 seconds West 39.50 feet; thence North 29 degrees 42 minutes 10 seconds West 1.67 feet; thence South 60 degrees 17 minutes 50 seconds West 190 feet to the point of beginning.

The bottom floor of this structure is at elevation 129.10 feet as related to the City of Detroit Datum Plane; the structure has two (2) floors of vehicle parking with the top of the roof at elevation 149.34 feet. The structure has three (3) pedestrian exit buildings, four (4) air exhaust shafts and a vehicular ramp all of which extend upwards from the garage roof to the ground surface at elevations varying from 150.6 to 153.7 feet.

Together with the Easements created in Liber 20846, Page 762, Wayne County Records.

4.      The collection of works of art owned by the City and located primarily at the Museum, the Museum's off-site warehouse or the Josephine Ford Sculpture Garden located at or about 201 East Kirby Street, Detroit, Michigan (which included at the effective date of the Operating Agreement the items listed in Exhibit 2 to the Operating Agreement) or included in the Museum collection (whether or not accessioned), whether or not reflected on any inventory and irrespective of the manner in which acquired by the City.

5.      All assets of any kind located on or within the real estate described in items 1-4 above and used in the operations of the Museum, as well as any easements or other property rights benefiting such real estate.

6.      All intangible property solely to the extent used in connection with the Museum and its art collection, including trademarks, copyrights and intellectual property, whether or not related to collection pieces.

7.      All City records, books, files, records, ledgers and other documents (whether on paper, computer, computer disk, tape or other storage media) presently existing to the extent relating to the Museum, its art collection or its operations or to The DIA (other than those documents which are confidential to the City and not The DIA).

8.      All monies held by the City that are designated for The DIA or the Museum or that were raised for the benefit of, or express purpose of supporting, The DIA or the Museum, including the approximately $900,000 balance of proceeds of bonds issued for the benefit of The DIA by the City in 2010.

13-53846-tjt Doc 8738-2 Filed 12/16/14 Entered 12/16/14 08:24:40 Page 272 of 602
13-53846-swr Doc 7382-1 Filed 09/11/15 Entered 09/11/14 16:36:38 Page 21 of 60
236

# EXHIBIT B

# FOUNDATION FUNDERS

**NOTE:  The list of Foundation Funders below is being provided based on information known as of March 27, 2014.  Foundation Funder commitments remain subject to: (i) final approval of the commitments by the appropriate governing body of the respective foundation listed below; (ii) all conditions otherwise contained in the Term Sheet and Definitive Documentation being met; (iii) approval of the Definitive Documentation by the Foundation Funder; and (iv) approval of the Plan of Adjustment through the bankruptcy proceedings.**

| Foundation Funder | Intended Funding Amount |
|---|---|
| Community Foundation for Southeast Michigan | $10,000,000 |
| William Davidson Foundation | 25,000,000 |
| The Fred A. and Barbara M. Erb Family Foundation | 10,000,000 |
| Max M. and Marjorie S. Fisher Foundation | 2,500,000* |
| Ford Foundation | 125,000,000 |
| Hudson-Webber Foundation | 10,000,000 |
| The Kresge Foundation | 100,000,000 |
| W. K. Kellogg Foundation | 40,000,000 |
| John S. and James L. Knight Foundation | 30,000,000 |
| McGregor Fund | 6,000,000 |
| Charles Stewart Mott Foundation | 10,000,000 |
| A. Paul and Carol C. Schaap Foundation | 5,000,000* |
| **Total** | **$373,500,000** |
| Less Credits to DIA Commitments | (7,500,000) |
| **Net Total** | **$366,000,000** |

*The payment of the intended funding amount by these Foundation Funders will be credited against the $100 million to be paid by DIA Funders and the DIA provided under *Funding Commitments* of the Term Sheet.

## Payment Schedule

Each Foundation Funder intends to make payments available at 5% of the total intended funding amount per year over the 20 year term, subject to the right of any Foundation Funder to pay early without penalty and as otherwise provided in the Term Sheet and Definitive Documentation.   Collectively, this will result in an annual payment of **$18,300,000** (exclusive of Foundation Funder commitments credited to the DIA) to the City of Detroit as provided in the Term Sheet and Definitive Documentation.

13-53846-tjt  Doc 8772  Filed 12/16/14  Entered 12/16/14 10:24:49  Page 273 of 602
13-53846-swr  Doc 3382-1  Filed 03/31/14  Entered 03/31/14 16:56:38  Page 11 of 14
236

**EXHIBIT C**

**DIA FUNDERS**

**[to be provided]**

13-53846-tjt Doc 8772 Filed 12/16/14 Entered 12/16/14 08:24:49 Page 274 of 602
13-53846-swr Doc 7382 Filed 09/11/14 Entered 09/11/14 16:06:38 Page 112 of
236

# EXHIBIT D

## INDEMNIFICATION, JURISDICTION, VENUE AND CHOICE OF LAW

*All capitalized terms used but not defined in this Exhibit D are defined in the Term Sheet.*

(a)    To the maximum extent permitted by law, the City shall indemnify, defend, and hold the Foundation Funders, the DIA Funders, The DIA and the Supporting Organization and their affiliates and all their respective shareholders, officers, directors, members, managers, employees, successors, assigns, representatives, attorneys and agents (the "**Indemnified Parties**") harmless from, against, and with respect to any claim, liability, obligation, loss, damage, assessment, judgment, cost and expense (including, without limitation, actual out-of-pocket attorney fees and actual expenses incurred in investigating, preparing, defending against, or prosecuting any litigation or claim, action, suit, hearing, proceeding or demand) of any kind or character, arising out of or in any manner, incident, relating or attributable to the following (provided indemnification will not be available to an Indemnified Party to the extent resulting from such Indemnified Party's breach of contract, sole ordinary negligence, gross negligence or intentional wrongful acts):

(i)    *Any claims by third parties or the City arising out of any action properly taken by the Indemnified Parties under the Definitive Documentation with respect to the contemplated transaction including, but not limited to, any payment, non-payment or other obligation of the Indemnified Parties permitted thereunder;*

(ii)    *Any breach or failure of any representation or warranty of the City contained in the Definitive Documentation between the City and the Indemnified Parties and/or other parties related to the contemplated transaction;*

(iii)    *Any failure by the City to perform, satisfy or comply with any covenant, agreement or condition to be performed, satisfied or complied with by the City under the Definitive Documentation with the Indemnified Parties or under agreements with any third parties contemplated by this transaction;*

(iv)    *Reliance by the Indemnified Parties upon any books or records of the City or reliance by them on any written information furnished by the City or any of the City's employees, officials or agents to them to the extent any such information should prove to be false or materially inaccurate or misleading (including, without limitation, by omission), but only to the extent that such books, records or written information was furnished by the City in connection with the City showing its compliance with the conditions to initial or future funding as set forth in the Term Sheet;*

(v)    *Any claim or objection made in the City's Chapter 9 Bankruptcy (Case No. 13-53846) or any other action brought against, or involving, the Indemnified Parties with respect to their participation in any transaction contemplated by the proposed or confirmed Plan of Adjustment;*

A-1

13-53846-tjt  Doc 8772  Filed 12/16/14  Entered 12/16/14 08:24:40  Page 275 of 602
13-53846-swr  Doc 7382  Filed 09/11/14  Entered 09/11/14 18:36:38  Page 11 of 14
236

(vi)     *The transfer, assignment or sale by the City to The DIA of any assets or property (real or personal) and any rights, title and interests therein including, but not limited to, the Museum and all of the Museum Assets;*

(vii)     *Any action or claim against the Indemnified Parties made by the Pensions, including any successors or assigns and any plan participants, or their representatives, successors or assigns (collectively, the "Pension Funds"), as nothing under the Term Sheet or the Definitive Documentation is intended to, nor are they to be construed or interpreted to, make the Indemnified Parties a party in privity with, or having an obligation in any capacity to the Pension Funds. By way of illustration and not limitation, the following statements apply:*

    *First, the Indemnified Parties have no responsibility for the operation or administration of the Pension Funds and have no fiduciary responsibility for the Pension Funds as plan sponsor, plan administrator, investment advisor or otherwise.*

    *Second, the Indemnified Parties have no obligation to contribute towards the funding of the Pension Funds and are not a funding guarantor.*

(viii)     *Any action or claim brought by the City, The DIA, the Pension Funds or any other party concerning non-payment of the contributions pursuant to the contemplated transaction by the Indemnified Parties due to the breach of the Definitive Documentation by the City, the DIA, the Pension Funds or any other party, so long as the Indemnified Parties have made a good faith determination of the breach of the Definitive Documentation or payment condition.*

(b)     An Indemnified Party shall notify the City in a timely manner of any matters as to which the Indemnified Party is entitled to receive indemnification and shall set forth in such notice reasonable detail regarding specific facts and circumstances then known by the Indemnified Party which pertain to such matters. Failure or delay in providing such notice shall not relieve the City of its defense or indemnity obligations except to the extent the City's defense of an applicable claim against an Indemnified Party is actually prejudiced by such Indemnified Party's failure or delay.

(c)     The City shall not contest on any grounds the enforceability of its indemnification obligations hereunder.

(d)     Notwithstanding the foregoing, the parties acknowledge that the City is not making any representations to The DIA regarding the City's title to the Museum Assets prior to the Closing and that The DIA will not be entitled to indemnification in connection with its defense of any post-Closing claims by third parties challenging The DIA's title to any Museum Asset to the extent that such claim is based on an allegation that the City did not have legal title to the particular Museum Asset prior to the Closing (a "**Quitclaim Challenge**"). To be clear, however, The DIA will be entitled to indemnification by the City under this Exhibit D in connection with any post-Closing challenges to The DIA's title to Museum Assets that are in any way based upon a claim that the title that the City

C-2

13-53846-tjt Doc 8772 Filed 12/16/14 Entered 12/16/14 08:24:49 Page 276 of 602
13-53846-swr Doc 7382 Filed 09/11/14 Entered 09/11/14 16:06:38 Page 11 of 407
236

had to the Museum Assets prior to Closing was not effectively conveyed to The DIA at and as a result of the Closing.

**Defense of Indemnity Claims**

(a)  To the extent the City is notified of claim for which it is required to indemnify an Indemnified Party, the City shall be solely responsible for responding to or otherwise defending such claim. In such event, the City shall assume exclusive control of the defense of such claim at its sole expense using counsel of its sole choosing and may settle such claim in its sole discretion; provided, however, that (i) with respect to any claim that involves allegations of criminal wrongdoing, the City shall not settle such claim without the prior written approval of the Indemnified Party, which approval may be withheld in such Indemnified Party's sole discretion, and (ii) with respect to any other claim, the City shall not settle such claim in a manner that requires the admission of liability, fault, or wrongdoing on the part of an Indemnified Party, that fails to include a release of all covered claims pending against the Indemnified Party, or that imposes any obligation on the Indemnified Party without the prior written approval of the Indemnified Party, which approval may be withheld in such Indemnified Party's sole discretion.  The City will keep the Indemnified Party reasonably informed of the status of any negotiations or legal proceedings related to any claim, and the Indemnified Party shall be entitled to engage counsel (at its own expense) to monitor the handling of any claim by the City.  Notwithstanding the foregoing, other than as relates to a Quitclaim Challenge (for which The DIA will not be entitled to indemnification, as set forth above), The DIA shall be entitled to defend on its own behalf any claims regarding title to, interest in or control of the Museum Assets or operation of the Museum.  To the extent The DIA intends to exercise such right, the City and The DIA shall use their commercially reasonable efforts in good faith to coordinate a joint defense of such claim (including as to selection of joint counsel).  If the City and The DIA cannot agree on a joint defense of the claim, each party shall undertake its own defense, reserving all rights against the other for indemnification hereunder with respect to such claim, but, in such case, The DIA shall not be entitled to indemnification of its defense costs in connection therewith.

(b)  Notwithstanding anything to the contrary set forth in this Exhibit D or the Term Sheet, to the extent that the City is required to indemnify an Indemnified Party hereunder, and the underlying claim being indemnified does not arise out of the City's breach of contract, sole ordinary negligence, gross negligence or intentional wrongful acts and is not due to a claim brought by the City, the City may reimburse itself for the costs of such indemnity out of the payments from the Supporting Organization, in which case the amount payable by the City to the Pensions shall be reduced by the amount reimbursed to the City for such indemnity.

**Jurisdiction/Venue/Choice of Law**

The parties agree that, except as to disputes that are subject to arbitration in accordance with the "*Dispute Resolution*" section of the Term Sheet, jurisdiction shall be retained by

C-3

13-53846-tjt Doc 8772-2 Filed 12/16/14 Entered 12/16/14 10:24:49 Page 277 of 602
13-53846-swr Doc 3382 Filed 03/31/15 Entered 03/31/15 16:36:39 Page 119 of 236

the United States Bankruptcy Court for the Eastern District of Michigan for all matters related to the contemplated transaction and venue shall be in Detroit.  The parties agree that this agreement is to be governed by Michigan law.

**EXHIBIT I.A.98**

SCHEDULE OF DWSD CLASS A SEWER
DOCUMENTS & RELATED DWSD CLASS A SEWER BONDS

13-53846-tj   Doc 8739   Filed 12/16/14   Entered 12/16/14 08:44:40   Page 279 of 602
13-53846-swr   Doc 3382-1   Filed 03/31/15   Entered 03/31/14 19:56:38   Page 11 of 37
236

## SCHEDULE OF (I) DWSD CLASS A SEWER DOCUMENTS, (II) RELATED DWSD CLASS A SEWER BONDS, (III) CLASSES OF DWSD CLASS A SEWER CLAIMS AND (IV) ALLOWED AMOUNTS OF DWSD CLASS A SEWER CLAIMS

| DWSD Class A Sewer Documents | DWSD Series of DWSD Class A Sewer Bonds | CUSIP | Class | Allowed Amount of DWSD Class A Sewer Claims in Class |
|---|---|---|---|---|
| Ordinance No. 18-01 adopted October 18, 2001 ("Sewage Bond Ordinance")[2] Trust Indenture dated as of June 1, 2012 among the City of Detroit, Detroit Water and Sewage Department and U.S. Bank National Association, as trustee ("Sewage Indenture") Bond Authorizing Resolution adopted on August 1, 2001 and Amendment dated October 10, 2001 Composite Sale Order of the Finance Director of the City of Detroit dated August 1, 2001 | Series 2001-D | 251237WY5 | Class 1C-1 | $21,315,000.00 |
| Sewage Bond Ordinance Sewage Indenture Bond Authorizing Resolution of the City Council adopted May 7, 2003 Composite Sale Order of the Finance Director of the City of Detroit dated May 14, 2003 | Series 2003-A | 251237K77 | Class 1C-2 | $3,225,000.00 |
| | | 251237YM9 | Class 1C-3 | $275,000.00 |
| | | 251237K85 | Class 1C-4 | $3,325,000.00 |
| | | 251237YQ0 | Class 1C-5 | $190,000.00 |
| | | 251237Q89 | Class 1C-6 | $10,000.00 |
| | | 251237YT4 | Class 1C-7 | $250,000.00 |
| | | 251237Q97 | Class 1C-8 | $3,200,000.00 |
| | | 251237YW7 | Class 1C-9 | $535,000.00 |
| | | 251237R21 | Class 1C-10 | $180,000.00 |
| | | 251237YZ0 | Class 1C-11 | $300,000.00 |
| | | 251237ZB2 | Class 1C-12 | $50,000.00 |
| | | 251237ZD8 | Class 1C-13 | $4,795,000.00 |
| | | 251237ZE6 | Class 1C-14 | $25,000.00 |
| | | 251237ZF3 | Class 1C-15 | $5,440,000.00 |
| | | 251237ZG1 | Class 1C-16 | $1,000,000.00 |
| | | 251237ZH9 | Class 1C-17 | $7,935,000.00 |
| | | 251237ZJ5 | Class 1C-18 | $18,215,000.00 |
| | | 251237Y72 | Class 1C-19 | $13,210,000.00 |
| | | 251237Y80 | Class 1C-20 | $9,005,000.00 |
| | | 251237Y98 | Class 1C-21 | $19,485,000.00 |

---

[2] Ordinance No. 18-01 amended and restated Ordinance No. 27-86 adopted on December 9, 1986, as amended.

13-53846-tjt Doc 8773-2 Filed 12/16/14 Entered 12/16/14 08:24:49 Page 280 of 602
13-53846-swr Doc 7382 Filed 09/11/14 Entered 09/11/14 16:36:36 Page 116 of
236

| DWSD Class A Sewer Documents | DWSD Series of DWSD Class A Sewer Bonds | CUSIP | Class | Allowed Amount of DWSD Class A Sewer Claims in Class |
|---|---|---|---|---|
| | | 251237Z22 | Class 1C-22 | $38,290,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Resolution of the City Council adopted February 15, 2006<br><br>Sale Order of Finance Director of the City of Detroit dated November 29, 2006 | Series 2006-D | 251237W66 | Class 1C-23 | $288,780,000.00 |

2

236

13-53846-tjt Doc 8733 Filed 12/16/14 Entered 12/16/14 08:24:49 Page 281 of 602
13-53846-swr Doc 3382-1 Filed 03/31/15 Entered 03/31/14 18:56:36 Page 115 of

**EXHIBIT I.A.101**

SCHEDULE OF DWSD CLASS A WATER
DOCUMENTS & RELATED DWSD CLASS A WATER BONDS

## SCHEDULE OF (I) DWSD CLASS A WATER DOCUMENTS, (II) RELATED DWSD CLASS A WATER BONDS, (III) CLASSES OF DWSD CLASS A WATER CLAIMS AND (IV) ALLOWED AMOUNTS OF DWSD CLASS A WATER CLAIMS

| DWSD Class A Water Documents | DWSD Series of DWSD Class A Water Bonds | CUSIP | Class | Allowed Amount of DWSD Class A Water Claims in Class |
|---|---|---|---|---|
| Ordinance No. 01-05 adopted January 26, 2005 ("Water Bond Ordinance")[1]<br><br>Trust Indenture dated as of February 1, 2013 among the City of Detroit, Detroit Water and Sewage Department and U.S. Bank National Association, as trustee ("Water Indenture")<br><br>Bond Authorizing Resolution of the City Council adopted January 31, 2001 and a Resolution Amending the Bond Authorizing Resolution, adopted April 25, 2001<br><br>Sale Order of Finance Director of the City of Detroit dated May 17, 2001 | Series 2001-A | 251255A21 | Class 1A-1 | $73,790,000.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>Bond Authorizing Resolution of the City Council adopted Nov. 27, 2002 ("2003 Water Resolution")<br><br>Sale Order of the Finance Director of the City of Detroit dated January 24, 2003 and Supplement to Sale Order of the Finance Director – 2003 Bonds, dated February 6, 2003 (collectively, "2003 Sale Order") | Series 2003-A | 251255D77 | Class 1A-2 | $500,000.00 |
| | | 251255D93 | Class 1A-3 | $250,000.00 |
| | | 251255E27 | Class 1A-4 | $3,550,000.00 |
| | | 2512555F8 | Class 1A-5 | $9,970,000.00 |
| | | 251255K20 | Class 1A-6 | $20,955,000.00 |
| | | 251255K38 | Class 1A-7 | $21,900,000.00 |
| | | 251255E68 | Class 1A-8 | $121,660,000.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>2003 Water Resolution<br><br>2003 Sale Order | Series 2003-B | 2512555H4 | Class 1A-9 | $41,770,000.00 |

---

[1] Ordinance No. 0-05 amends and restates Ordinance No. 30-02 adopted November 27, 2002, which amended and restated Ordinance No. 06-01 adopted October 18, 2001, which amended and restated Ordinance No. 32-85, as amended.

13-53846-tjt Doc 8738 Filed 12/16/14 Entered 12/16/14 08:24:49 Page 283 of 602
13-53846-swr Doc 7382-5 Filed 09/11/14 Entered 09/11/14 16:56:38 Page 122 of
236

| DWSD Class A Water Documents | DWSD Series of DWSD Class A Water Bonds | CUSIP | Class | Allowed Amount of DWSD Class A Water Claims in Class |
|---|---|---|---|---|
| Water Bond Ordinance<br><br>Water Indenture<br><br>2003 Water Resolution<br><br>2003 Sale Order | Series 2003-C | 251255J22 | Class 1A-10 | $2,120,000.00 |
| | | 251255J30 | Class 1A-11 | $2,620,000.00 |
| | | 251255J48 | Class 1A-12 | $2,655,000.00 |
| | | 251255J55 | Class 1A-13 | $2,930,000.00 |
| | | 251255J63 | Class 1A-14 | $2,790,000.00 |
| | | 251255J71 | Class 1A-15 | $2,965,000.00 |
| | | 251255J89 | Class 1A-16 | $4,580,000.00 |
| | | 251255J97 | Class 1A-17 | $4,665,000.00 |
| | | 251255H99 | Class 1A-18 | $2,330,000.00 |

2

236

13-53846-tjt   Doc 8732   Filed 12/16/14   Entered 12/16/14 10:24:49   Page 284 of 602
13-53846-swr   Doc 3382   Filed 03/31/14   Entered 03/31/14 18:56:36   Page 122 of

**EXHIBIT I.A.104**

SCHEDULE OF DWSD CLASS B SEWER
DOCUMENTS & RELATED DWSD CLASS B SEWER BONDS

**SCHEDULE OF (I) DWSD CLASS B SEWER DOCUMENTS, (II) RELATED
DWSD CLASS B SEWER BONDS, (III) CLASSES OF DWSD CLASS B SEWER CLAIMS
AND (IV) ALLOWED AMOUNTS OF DWSD CLASS B SEWER CLAIMS**

| DWSD Class B Sewer Documents | DWSD Series of DWSD Class B Sewer Bonds | CUSIP | Class | Allowed Amount of DWSD Class B Sewer Claims in Class |
|---|---|---|---|---|
| Ordinance No. 18-01 adopted October 18, 2001 ("Sewage Bond Ordinance")[1] | Series 1998-A | 251237S87 | Class 1D-1 | $3,110,000.00 |
| | | 251237S95 | Class 1D-2 | $3,225,000.00 |
| Trust Indenture dated as of June 1, 2012 among the City of Detroit, Detroit Water and Sewage Department and U.S. Bank National Association, as trustee ("Sewage Indenture") | | 251237T29 | Class 1D-3 | $3,540,000.00 |
| | | 251237T37 | Class 1D-4 | $3,660,000.00 |
| | | 251237T45 | Class 1D-5 | $3,885,000.00 |
| | | 251237T52 | Class 1D-6 | $4,095,000.00 |
| Resolution of the City Council adopted May 6, 1998 ("1998 Bond Resolution") | | 251237T60 | Class 1D-7 | $7,415,000.00 |
| | | 251237T78 | Class 1D-8 | $7,745,000.00 |
| Sale Order of the Finance Director of the City of Detroit dated December 9, 1998 ("1998 Sale Order") | | 251237T86 | Class 1D-9 | $12,585,000.00 |
| | | 251237T94 | Class 1D-10 | $13,350,000.00 |
| Sewage Bond Ordinance | Series 1998-B | 251237U92 | Class 1D-11 | $3,125,000.00 |
| | | 251237V26 | Class 1D-12 | $3,240,000.00 |
| | | 251237V34 | Class 1D-13 | $3,455,000.00 |
| Sewage Indenture | | 251237V42 | Class 1D-14 | $3,575,000.00 |
| | | 251237V59 | Class 1D-15 | $3,895,000.00 |
| 1998 Bond Resolution | | 251237V67 | Class 1D-16 | $4,015,000.00 |
| | | 251237V75 | Class 1D-17 | $7,330,000.00 |
| 1998 Sale Order | | 251237V83 | Class 1D-18 | $7,665,000.00 |
| | | 251237V91 | Class 1D-19 | $12,600,000.00 |
| | | 251237W25 | Class 1D-20 | $13,265,000.00 |
| Sewage Bond Ordinance | Series 1999-A | 251237VM2 | Class 1D-21 | $7,924,628.15 |
| | | 251237VN0 | Class 1D-22 | $7,759,578.75 |
| Sewage Indenture | | 251237VP5 | Class 1D-23 | 7,704,816.00 |
| | | 251237VQ3 | Class 1D-24 | $7,157,798.95 |
| Bond Resolution adopted on November 24, 1999 | | 251237VR1 | Class 1D-25 | $6,738,459.00 |
| | | 251237VS9 | Class 1D-26 | $6,365,288.40 |
| Sale Order of the Finance Director of the City of Detroit dated December 10, 1999 | | 251237VT7 | Class 1D-27 | $5,690,933.60 |
| | | 251237VU4 | Class 1D-28 | $6,235,125.30 |

---

[1]      Ordinance No. 18-01 amended and restated Ordinance No. 27-86 adopted on December 9, 1986, as amended.

13-53846-tjt  Doc 8783  Filed 12/16/14  Entered 12/16/14 10:24:49  Page 286 of 602
13-53846-swr  Doc 7382  Filed 09/11/14  Entered 09/11/14 16:36:38  Page 124 of
236

| DWSD Class B Sewer Documents | DWSD Series of DWSD Class B Sewer Bonds | CUSIP | Class | Allowed Amount of DWSD Class B Sewer Claims in Class |
|---|---|---|---|---|
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted on August 1, 2001 and Amendment dated October 10, 2001 (collectively, "2001 Bond Resolution")<br><br>Composite Sale Order of the Finance Director of the City of Detroit dated August 1, 2001 ("2001 Sale Order") | Series 2001-B | 251237WV1 | Class 1D-29 | $110,550,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2001 Bond Resolution<br><br>2001 Sale Order | Series 2001-C(1) | 2512376G3 | Class 1D-30 | $575,000.00 |
| | | 2512376H1 | Class 1D-31 | $600,000.00 |
| | | 2512376J7 | Class 1D-32 | $625,000.00 |
| | | 2512376K4 | Class 1D-33 | $655,000.00 |
| | | 2512376L2 | Class 1D-34 | $690,000.00 |
| | | 2512376M0 | Class 1D-35 | $720,000.00 |
| | | 2512376P3 | Class 1D-36 | $110,510,000.00 |
| | | 2512376N8 | Class 1D-37 | $38,000,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2001 Bond Resolution<br><br>2001 Sale Order and Amendment No. 1 to Sale Order of the Finance Director (2001(C-2) and (E)) dated April 23, 2008 ("2001 Sale Order Amendment") and Supplement to Prior Sale Orders (2001(C-2), 2001(E) and 2006(A)) dated May 1, 2008 ("2001/2006 Supplement to Sale Orders") | Series 2001-C(2) | 2512374G5 | Class 1D-38 | $310,000.00 |
| | | 2512374H3 | Class 1D-39 | $325,000.00 |
| | | 2512374J9 | Class 1D-40 | $345,000.00 |
| | | 2512374K6 | Class 1D-41 | $365,000.00 |
| | | 2512374L4 | Class 1D-42 | $380,000.00 |
| | | 2512374M2 | Class 1D-43 | $400,000.00 |
| | | 2512374N0 | Class 1D-44 | $4,090,000.00 |
| | | 2512374P5 | Class 1D-45 | $21,600,000.00 |
| | | 2512374Q3 | Class 1D-46 | $93,540,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2001 Bond Resolution<br><br>2001 Sale Order, 2001 Sale Order Amendment and 2001/2006 Supplement to Sale Orders | Series 2001-E | 2512374R1 | Class 1D-47 | $136,150,000.00 |

| DWSD Class B Sewer Documents | DWSD Series of DWSD Class B Sewer Bonds | CUSIP | Class | Allowed Amount of DWSD Class B Sewer Claims in Class |
|---|---|---|---|---|
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution of the City Council adopted May 7, 2003 ("2003 Bond Resolution")<br><br>Composite Sale Order of the Finance Director of the City of Detroit dated May 14, 2003 | Series 2003-A | 251237YK3 | Class 1D-48 | $3,815,000.00 |
| | | 251237YN7 | Class 1D-49 | $11,880,000.00 |
| | | 251237YR8 | Class 1D-50 | $12,535,000.00 |
| | | 251237YU1 | Class 1D-51 | $13,215,000.00 |
| | | 251237YX5 | Class 1D-52 | $13,950,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2003 Bond Resolution<br><br>Composite Sale Order of the Finance Director of the City of Detroit dated May 22, 2003 | Series 2003-B | 2512376Q1 | Class 1D-53 | $150,000,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution of the City Council adopted May 7, 2003<br><br>Composite Sale Order of the Finance Director dated January 9, 2004 | Series 2004-A | 251237B69 | Class 1D-54 | $7,310,000.00 |
| | | 251237B77 | Class 1D-55 | $14,830,000.00 |
| | | 251237B85 | Class 1D-56 | $15,605,000.00 |
| | | 251237B93 | Class 1D-57 | $5,525,000.00 |
| | | 251237C27 | Class 1D-58 | $5,545,000.00 |
| | | 251237C35 | Class 1D-59 | $5,835,000.00 |
| | | 251237C43 | Class 1D-60 | $6,145,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Resolution of the City Council authorizing sale of the 2005 adopted November 17, 2004 ("2005 Bond Resolution")<br><br>Sale Order of the Finance Director of the City of Detroit, Series 2005-A, dated March 9, 2005 | Series 2005-A | 251237E41 | Class 1D-61 | $625,000.00 |
| | | 251237E58 | Class 1D-62 | $490,000.00 |
| | | 251237E66 | Class 1D-63 | $510,000.00 |
| | | 251237E74 | Class 1D-64 | $545,000.00 |
| | | 251237E82 | Class 1D-65 | $555,000.00 |
| | | 251237E90 | Class 1D-66 | $830,000.00 |
| | | 251237F24 | Class 1D-67 | $860,000.00 |
| | | 251237F32 | Class 1D-68 | $905,000.00 |
| | | 251237F40 | Class 1D-69 | $925,000.00 |
| | | 251237F57 | Class 1D-70 | $970,000.00 |
| | | 251237F65 | Class 1D-71 | $490,000.00 |
| | | 251237Z55 | Class 1D-72 | $19,415,000.00 |
| | | 251237Z63 | Class 1D-73 | $24,820,000.00 |
| | | 251237F99 | Class 1D-74 | $138,945,000.00 |
| | | 251237G23 | Class 1D-75 | $47,000,000.00 |

13-53846-tjt Doc 8733-2 Filed 12/16/14 Entered 12/16/14 08:24:49 Page 288 of 602
13-53846-swr Doc 7382 Filed 09/11/14 Entered 09/11/14 18:56:38 Page 126 of
3
236

| DWSD Class B Sewer Documents | DWSD Series of DWSD Class B Sewer Bonds | CUSIP | Class | Allowed Amount of DWSD Class B Sewer Claims in Class |
|---|---|---|---|---|
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2005 Bond Resolution<br><br>Sale Order of the Finance Director of the City of Detroit, Series 2005-B, dated March 9, 2005 | Series 2005-B | 251237G64 | Class 1D-76 | $7,775,000.00 |
| | | 251237G72 | Class 1D-77 | $8,010,000.00 |
| | | 251237G80 | Class 1D-78 | $10,420,000.00 |
| | | 251237G98 | Class 1D-79 | $10,990,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2005 Bond Resolution<br><br>Sale Order of the Finance Director of the City of Detroit, Series 2005-C, dated March 9, 2005 | Series 2005-C | 251237J20 | Class 1D-80 | $4,140,000.00 |
| | | 251237J38 | Class 1D-81 | $4,345,000.00 |
| | | 251237J46 | Class 1D-82 | $4,570,000.00 |
| | | 251237J53 | Class 1D-83 | $4,795,000.00 |
| | | 251237J61 | Class 1D-84 | $5,030,000.00 |
| | | 251237J79 | Class 1D-85 | $5,280,000.00 |
| | | 251237J87 | Class 1D-86 | $7,355,000.00 |
| | | 251237J95 | Class 1D-87 | $7,720,000.00 |
| | | 251237K28 | Class 1D-88 | $6,345,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Resolution of the City Council adopted February 15, 2006 ("2006 Bond Resolution")<br><br>Sale Order of Finance Director of the City of Detroit, Series 2006(A), dated August 4, 2006, Amendment No. 1 to Sale Order dated April 23, 2008 and 2001/2006 Supplement to Sale Orders | Series 2006-A | 2512373Z4 | Class 1D-89 | $123,655,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2006 Bond Resolution<br><br>Sale Order of Finance Director of the City of Detroit, Series 2006(B), dated July 27, 2006 | Series 2006-B | 251237M83 | Class 1D-90 | $1,835,000.00 |
| | | 251237M91 | Class 1D-91 | $1,825,000.00 |
| | | 251237N25 | Class 1D-92 | $1,430,000.00 |
| | | 251237N33 | Class 1D-93 | $1,505,000.00 |
| | | 251237N41 | Class 1D-94 | $1,590,000.00 |
| | | 251237N58 | Class 1D-95 | $7,515,000.00 |
| | | 251237N66 | Class 1D-96 | $6,540,000.00 |
| | | 251237N74 | Class 1D-97 | $24,400,000.00 |
| | | 251237N82 | Class 1D-98 | $40,000,000.00 |
| | | 251237N90 | Class 1D-99 | $156,600,000.00 |

4

236

13-53846-tjt Doc 8772 Filed 12/16/14 Entered 12/16/14 08:21:49 Page 289 of 602
13-53846-swr Doc 7382-5 Filed 09/11/14 Entered 09/11/14 18:06:38 Page 12 of 64

| DWSD Class B Sewer Documents | DWSD Series of DWSD Class B Sewer Bonds | CUSIP | Class | Allowed Amount of DWSD Class B Sewer Claims in Class |
|---|---|---|---|---|
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2006 Bond Resolution<br><br>Sale Order of Finance Director of the City of Detroit, Series 2006(C), dated August 4, 2006 | Series 2006-C | 251237P31 | Class 1D-100 | $8,495,000.00 |
| | | 251237P49 | Class 1D-101 | $8,915,000.00 |
| | | 251237P56 | Class 1D-102 | $9,150,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Resolution of the City Council adopted July 19, 2011<br><br>Sale Order of the Finance Director of the City of Detroit dated June 20, 2012 | Series 2012-A | 251250AC0 | Class 1D-103 | $8,880,000.00 |
| | | 251250AE6 | Class 1D-104 | $9,750,000.00 |
| | | 251250AS5 | Class 1D-105 | $50,000,000.00 |
| | | 251250AA4 | Class 1D-106 | $5,820,000.00 |
| | | 251250AB2 | Class 1D-107 | $6,005,000.00 |
| | | 251250AD8 | Class 1D-108 | $6,430,000.00 |
| | | 251250AF3 | Class 1D-109 | $19,930,000.00 |
| | | 251250AG1 | Class 1D-110 | $13,925,000.00 |
| | | 251250AH9 | Class 1D-111 | $9,845,000.00 |
| | | 251250AJ5 | Class 1D-112 | $14,860,000.00 |
| | | 251250AK2 | Class 1D-113 | $22,275,000.00 |
| | | 251250AN6 | Class 1D-114 | $13,170,000.00 |
| | | 251250AP1 | Class 1D-115 | $9,890,000.00 |
| | | 251250AQ9 | Class 1D-116 | $120,265,000.00 |
| | | 251250AR7 | Class 1D-117 | $292,865,000.00 |
| | | 251250AL0 | Class 1D-118 | $23,630,000.00 |
| | | 251250AM8 | Class 1D-119 | $32,240,000.00 |

**EXHIBIT I.A.107**

SCHEDULE OF DWSD CLASS B WATER
DOCUMENTS & RELATED DWSD CLASS B WATER BONDS

13-53846-tjt Doc 8738 Filed 12/16/14 Entered 12/16/14 08:49:32 Page 291 of 602
13-53846-swr Doc 3382-1 Filed 03/31/15 Entered 03/31/14 18:36:36 Page 129 of
236

**SCHEDULE OF (I) DWSD CLASS B WATER DOCUMENTS, (II) RELATED
DWSD CLASS B WATER BONDS, (III) CLASSES OF DWSD CLASS B WATER CLAIMS
AND (IV) ALLOWED AMOUNTS OF DWSD CLASS B WATER CLAIMS**

| DWSD Class B Water Documents | DWSD Series of DWSD Class B Water Bonds | CUSIP | Class | Allowed Amount of DWSD Class B Water Claims in Class |
|---|---|---|---|---|
| Ordinance No. 01-05 adopted January 26, 2005 ("Water Bond Ordinance")[1]<br><br>Trust Indenture dated as of February 1, 2013 among the City of Detroit, Detroit Water and Sewerage Department and U.S. Bank National Association, as trustee ("Water Indenture")<br><br>Bond Resolution adopted on October 14, 1993<br><br>Resolution adopted October 22, 1993<br><br>Final Report of the Finance Director delivered to City Council December 22, 1993 | Series 1993 | 251255TP0 | Class 1B-1 | $24,725,000.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>Bond Resolution adopted July 9, 1997<br><br>Sale Order of the Finance Director of the City of Detroit dated August 6, 1997 | Series 1997-A | 251255XM2 | Class 1B-2 | $6,520,000.00 |
| | | 251255XN0 | Class 1B-3 | $6,910,000.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>Resolution of the City Council adopted April 25, 2001<br><br>Sale Order of the Finance Director of the City of Detroit dated May 31, 2001 and Supplement to Prior Sale Orders of Finance Director dated May 6, 2008 | Series 2001-C | 2512556U4 | Class 1B-4 | $350,000.00 |
| | | 2512556V2 | Class 1B-5 | $365,000.00 |
| | | 2512556W0 | Class 1B-6 | $380,000.00 |
| | | 2512556X8 | Class 1B-7 | $390,000.00 |
| | | 2512556Y6 | Class 1B-8 | $415,000.00 |
| | | 2512556Z3 | Class 1B-9 | $12,510,000.00 |
| | | 2512557A7 | Class 1B-10 | $13,235,000.00 |
| | | 2512557B5 | Class 1B-11 | $14,025,000.00 |
| | | 2512557C3 | Class 1B-12 | $14,865,000.00 |
| | | 2512557D1 | Class 1B-13 | $15,750,000.00 |
| | | 2512557E9 | Class 1B-14 | $16,690,000.00 |
| | | 2512557F6 | Class 1B-15 | $17,690,000.00 |
| | | 2512557G4 | Class 1B-16 | $18,735,000.00 |
| | | 2512557H2 | Class 1B-17 | $19,945,000.00 |
| | | 2512557J8 | Class 1B-18 | $4,000,000.00 |

---

[1]   Ordinance No. 0-05 amends and restates Ordinance No. 30-02 adopted November 27, 2002, which amended and restated Ordinance No. 06-01 adopted October 18, 2001, which amended and restated Ordinance No. 32-85, as amended.

| DWSD Class B Water Documents | DWSD Series of DWSD Class B Water Bonds | CUSIP | Class | Allowed Amount of DWSD Class B Water Claims in Class |
|---|---|---|---|---|
| | | 2512557L3 | Class 1B-19 | $20,090,000.00 |
| | | 2512557K5 | Class 1B-20 | $18,815,000.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>Bond Authorizing Resolution of the City Council adopted November 27, 2002<br><br>Sale Order of Finance Director of the City of Detroit dated February 5, 2003 | Series 2003-D | 2512552T1 | Class 1B-21 | $325,000.00 |
| | | 2512552U8 | Class 1B-22 | $335,000.00 |
| | | 2512552V6 | Class 1B-23 | $350,000.00 |
| | | 2512552W4 | Class 1B-24 | $360,000.00 |
| | | 2512552X2 | Class 1B-25 | $370,000.00 |
| | | 2512552Y0 | Class 1B-26 | $2,585,000.00 |
| | | 2512552Z7 | Class 1B-27 | $29,410,000.00 |
| | | 2512553A1 | Class 1B-28 | $23,920,000.00 |
| | | 2512553B9 | Class 1B-29 | $82,930,000.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>Bond Authorizing Resolution of the City Council adopted January 21, 2004 ("2004 Bond Resolution")<br><br>Sale Order of Finance Director of the City of Detroit dated May 12, 2004 ("2004 Sale Order") | Series 2004-A | 2512553G8 | Class 1B-30 | $4,250,000.00 |
| | | 2512553H6 | Class 1B-31 | $4,475,000.00 |
| | | 2512553J2 | Class 1B-32 | $4,710,000.00 |
| | | 2512553K9 | Class 1B-33 | $4,955,000.00 |
| | | 2512553L7 | Class 1B-34 | $5,215,000.00 |
| | | 2512553M5 | Class 1B-35 | $5,490,000.00 |
| | | 2512553N3 | Class 1B-36 | $5,780,000.00 |
| | | 2512553P8 | Class 1B-37 | $6,085,000.00 |
| | | 2512553Q6 | Class 1B-38 | $6,400,000.00 |
| | | 2512553R4 | Class 1B-39 | $6,735,000.00 |
| | | 2512553S2 | Class 1B-40 | $14,505,000.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>2004 Bond Resolution<br><br>2004 Sale Order | Series 2004-B | 2512554A0 | Class 1B-41 | $85,000.00 |
| | | 2512554B8 | Class 1B-42 | $90,000.00 |
| | | 2512554C6 | Class 1B-43 | $10,000,000.00 |
| | | 2512554D4 | Class 1B-44 | $3,545,000.00 |
| | | 2512554E2 | Class 1B-45 | $13,925,000.00 |
| | | 2512554F9 | Class 1B-46 | $350,000.00 |
| | | 2512554G7 | Class 1B-47 | $14,940,000.00 |
| | | 2512554H5 | Class 1B-48 | $15,810,000.00 |
| | | 2512554J1 | Class 1B-49 | $16,665,000.00 |
| | | 2512554K8 | Class 1B-50 | $16,085,000.00 |
| | | 2512554L6 | Class 1B-51 | $16,935,000.00 |

13-53846-tjt Doc 8772-1 Filed 12/16/14 Entered 12/16/14 08:21:49 Page 293 of 602
13-53846-swr Doc 7382 Filed 09/11/14 Entered 09/11/14 19:36:38 Page 18 of 47
2
236

| DWSD Class B Water Documents | DWSD Series of DWSD Class B Water Bonds | CUSIP | Class | Allowed Amount of DWSD Class B Water Claims in Class |
|---|---|---|---|---|
| | | 2512554M4 | Class 1B-52 | $6,280,000.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>Amended and Restated Resolution of the City Council adopted January 26, 2005 ("2005-A/C Bond Resolution")<br><br>Sale Order of Finance Director of the City of Detroit dated March 3, 2005 (Series 2005-A) | Series 2005-A | 251255M85 | Class 1B-53 | $50,000.00 |
| | | 251255Q81 | Class 1B-54 | $2,070,000.00 |
| | | 251255M93 | Class 1B-55 | $85,000.00 |
| | | 251255Q99 | Class 1B-56 | $2,145,000.00 |
| | | 251255N27 | Class 1B-57 | $95,000.00 |
| | | 251255R23 | Class 1B-58 | $2,265,000.00 |
| | | 251255N35 | Class 1B-59 | $125,000.00 |
| | | 251255R31 | Class 1B-60 | $2,370,000.00 |
| | | 251255N43 | Class 1B-61 | $20,000.00 |
| | | 251255R49 | Class 1B-62 | $2,615,000.00 |
| | | 251255N50 | Class 1B-63 | $2,790,000.00 |
| | | 251255N68 | Class 1B-64 | $2,955,000.00 |
| | | 251255N76 | Class 1B-65 | $3,030,000.00 |
| | | 251255N84 | Class 1B-66 | $3,225,000.00 |
| | | 251255N92 | Class 1B-67 | $3,430,000.00 |
| | | 251255P25 | Class 1B-68 | $3,650,000.00 |
| | | 251255P33 | Class 1B-69 | $3,790,000.00 |
| | | 251255P41 | Class 1B-70 | $4,080,000.00 |
| | | 251255P58 | Class 1B-71 | $4,290,000.00 |
| | | 251255P66 | Class 1B-72 | $4,615,000.00 |
| | | 251255P74 | Class 1B-73 | $4,890,000.00 |
| | | 251255P82 | Class 1B-74 | $5,145,000.00 |
| | | 251255P90 | Class 1B-75 | $5,415,000.00 |
| | | 251255Q24 | Class 1B-76 | $5,715,000.00 |
| | | 251255Q32 | Class 1B-77 | $19,525,000.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>Amended and Restated Resolution of the City Council dated March 22, 2005 (Series 2005-B)<br><br>Sale Order of Finance Director of the City of Detroit dated March 22, 2005 (Series 2005-B), Amendment No. 1 to Sale Order of the Finance Director dated April 23, 2008 and Supplement to Prior Sale Orders of Finance Director dated | Series 2005-B | 2512557R0 | Class 1B-78 | $2,125,000.00 |
| | | 2512557S8 | Class 1B-79 | $2,225,000.00 |
| | | 2512557T6 | Class 1B-80 | $2,305,000.00 |
| | | 2512557U3 | Class 1B-81 | $2,385,000.00 |
| | | 2512557V1 | Class 1B-82 | $2,465,000.00 |
| | | 2512557W9 | Class 1B-83 | $2,575,000.00 |
| | | 2512557X7 | Class 1B-84 | $2,690,000.00 |
| | | 2512557Y5 | Class 1B-85 | $2,905,000.00 |
| | | 2512557Z2 | Class 1B-86 | $3,025,000.00 |
| | | 2512558A6 | Class 1B-87 | $3,145,000.00 |
| | | 2512558B4 | Class 1B-88 | $3,270,000.00 |
| | | 2512558C2 | Class 1B-89 | $3,490,000.00 |
| | | 2512558D0 | Class 1B-90 | $3,620,000.00 |
| | | 2512558E8 | Class 1B-91 | $3,850,000.00 |

3
236
13-53846-tjt Doc 8738 Filed 12/16/14 Entered 12/16/14 10:24:49 Page 294 of 602
13-53846-swr Doc 7382-1 Filed 09/11/14 Entered 09/11/14 19:36:38 Page 13 of 20

| DWSD Class B Water Documents | DWSD Series of DWSD Class B Water Bonds | CUSIP | Class | Allowed Amount of DWSD Class B Water Claims in Class |
|---|---|---|---|---|
| May 6, 2008 | | 2512558F5 | Class 1B-92 | $3,980,000.00 |
| | | 2512558G3 | Class 1B-93 | $28,415,000.00 |
| | | 2512558H1 | Class 1B-94 | $57,365,000.00 |
| | | 2512558J7 | Class 1B-95 | $57,500,000.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>2005-A/C Bond Resolution<br><br>Sale Order of Finance Director of the City of Detroit dated March 3, 2005 (Series 2005-C) | Series 2005-C | 251255S63 | Class 1B-96 | $9,270,000.00 |
| | | 251255S71 | Class 1B-97 | $9,735,000.00 |
| | | 251255S89 | Class 1B-98 | $17,545,000.00 |
| | | 251255S97 | Class 1B-99 | $18,425,000.00 |
| | | 251255T21 | Class 1B-100 | $18,700,000.00 |
| | | 251255T39 | Class 1B-101 | $8,245,000.00 |
| | | 251255T47 | Class 1B-102 | $8,655,000.00 |
| | | 251255T54 | Class 1B-103 | $9,090,000.00 |
| | | 251255T62 | Class 1B-104 | $9,540,000.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>Resolution of the City Council adopted November 18, 2005 ("2006 Bond Resolution")<br><br>Sale Order of Finance Director of the City of Detroit dated July 19, 2006 (Series 2006-A) | Series 2006-A | 251255V36 | Class 1B-105 | $7,285,000.00 |
| | | 251255V44 | Class 1B-106 | $7,650,000.00 |
| | | 251255V51 | Class 1B-107 | $8,030,000.00 |
| | | 251255V69 | Class 1B-108 | $8,430,000.00 |
| | | 251255V77 | Class 1B-109 | $8,855,000.00 |
| | | 251255V85 | Class 1B-110 | $9,295,000.00 |
| | | 251255V93 | Class 1B-111 | $9,760,000.00 |
| | | 251255W27 | Class 1B-112 | $10,250,000.00 |
| | | 251255W35 | Class 1B-113 | $10,760,000.00 |
| | | 251255W43 | Class 1B-114 | $11,300,000.00 |
| | | 251255W50 | Class 1B-115 | $11,865,000.00 |
| | | 251255W68 | Class 1B-116 | $12,460,000.00 |
| | | 251255W76 | Class 1B-117 | $13,080,000.00 |
| | | 251255W84 | Class 1B-118 | $131,150,000.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>2006 Bond Resolution<br><br>Sale Order of Finance Director of the City of Detroit dated August 15, 2006 (Series 2006-B) | Series 2006-B | 251256AG8 | Class 1B-119 | $100,000.00 |
| | | 251256AH6 | Class 1B-120 | $100,000.00 |
| | | 251256AJ2 | Class 1B-121 | $100,000.00 |
| | | 251256AK9 | Class 1B-122 | $100,000.00 |
| | | 251256AL7 | Class 1B-123 | $100,000.00 |
| | | 251256AM5 | Class 1B-124 | $100,000.00 |
| | | 251256AN3 | Class 1B-125 | $400,000.00 |
| | | 251256AP8 | Class 1B-126 | $56,600,000.00 |
| | | 251256AQ6 | Class 1B-127 | $62,100,000.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>2006 Bond Resolution<br><br>Sale Order of Finance Director of the City | Series 2006-C | 251255X83 | Class 1B-128 | $1,100,000.00 |
| | | 251255X91 | Class 1B-129 | $3,725,000.00 |
| | | 251255Y25 | Class 1B-130 | $3,795,000.00 |
| | | 251255Y33 | Class 1B-131 | $4,010,000.00 |
| | | 251255Y41 | Class 1B-132 | $4,765,000.00 |

4

236

13-53846-tjt  Doc 8732  Filed 12/16/14  Entered 12/16/14 10:24:49  Page 295 of 602
13-53846-swr  Doc 7382-5  Filed 09/11/14  Entered 09/11/14 16:36:38  Page 18 of 604

| DWSD Class B Water Documents | DWSD Series of DWSD Class B Water Bonds | CUSIP | Class | Allowed Amount of DWSD Class B Water Claims in Class |
|---|---|---|---|---|
| of Detroit dated July 19, 2006 (Series 2006-C) | | 251255Y58 | Class 1B-133 | $5,860,000.00 |
| | | 251255Y66 | Class 1B-134 | $14,880,000.00 |
| | | 251255Y74 | Class 1B-135 | $32,045,000.00 |
| | | 251255Y82 | Class 1B-136 | 146,500,000 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>2006 Bond Resolution<br><br>Sale Order of Finance Director of the City of Detroit dated July 19, 2006 (Series 2006-D) | Series 2006-D | 251255Z81 | Class 1B-137 | $15,000.00 |
| | | 251255Z99 | Class 1B-138 | $15,000.00 |
| | | 2512552A2 | Class 1B-139 | $15,000.00 |
| | | 2512552B0 | Class 1B-140 | $20,000.00 |
| | | 2512552C8 | Class 1B-141 | $20,000.00 |
| | | 2512552D6 | Class 1B-142 | $2,650,000.00 |
| | | 2512552E4 | Class 1B-143 | $3,200,000.00 |
| | | 2512552F1 | Class 1B-144 | $20,135,000.00 |
| | | 2512552G9 | Class 1B-145 | $27,425,000.00 |
| | | 2512552H7 | Class 1B-146 | $9,955,000.00 |
| | | 2512552J3 | Class 1B-147 | $21,105,000.00 |
| | | 2512552K0 | Class 1B-148 | $57,650,000.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>Resolution of the City Council adopted April 5, 2011 ("2011 Bond Resolution")<br><br>Sale Order of the Finance Director dated as of December 15, 2011 ("2011 Sale Order") | Series 2011-A | 251256BA0 | Class 1B-149 | $3,410,000.00 |
| | | 251256BB8 | Class 1B-150 | $3,550,000.00 |
| | | 251256BC6 | Class 1B-151 | $3,695,0000.00 |
| | | 251256BD4 | Class 1B-152 | $3,845,000.00 |
| | | 251256BE2 | Class 1B-153 | $4,000,000.00 |
| | | 251256BF9 | Class 1B-154 | $3,160,000.00 |
| | | 251256BG7 | Class 1B-155 | $3,225,000.00 |
| | | 251256BH5 | Class 1B-156 | $4,215,000.00 |
| | | 251256BJ1 | Class 1B-157 | $4,195,000.00 |
| | | 251256BK8 | Class 1B-158 | $4,170,000.00 |
| | | 251256BL6 | Class 1B-159 | $4,140,000.00 |
| | | 251256BM4 | Class 1B-160 | $4,085,000.00 |
| | | 251256BN2 | Class 1B-161 | $4,020,000.00 |
| | | 251256BP7 | Class 1B-162 | $3,930,000.00 |
| | | 251256BQ5 | Class 1B-163 | $14,665,000.00 |
| | | 251256BR3 | Class 1B-164 | $28,890,000.00 |
| | | 251256BT9 | Class 1B-165 | $49,315,000.00 |
| | | 251256BS1 | Class 1B-166 | $224,300,000.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>2011 Bond Resolution<br><br>2011 Sale Order | Series 2011-B | 251256AV5 | Class 1B-167 | $1,970,000.00 |
| | | 251256AW3 | Class 1B-168 | $3,760,000.00 |
| | | 251256AX1 | Class 1B-169 | $9,740,000.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>2011 Bond Resolution<br><br>2011 Sale Order | Series 2011-C | 251256BV4 | Class 1B-170 | $2,700,000.00 |
| | | 251256BW2 | Class 1B-171 | $9,965,000.00 |
| | | 251256BX0 | Class 1B-172 | $10,490,000.00 |
| | | 251256BY8 | Class 1B-173 | $11,035,000.00 |
| | | 251256BZ5 | Class 1B-174 | $11,615,000.00 |
| | | 251256CA9 | Class 1B-175 | $5,000,000.00 |
| | | 251256CC5 | Class 1B-176 | $7,230,000.00 |

5

236

13-53846-tjt Doc 8783 Filed 12/16/14 Entered 12/16/14 08:24:49 Page 296 of 602
13-53846-swr Doc 7382 Filed 09/11/14 Entered 09/11/14 16:56:38 Page 30 of 64

| DWSD Class B Water Documents | DWSD Series of DWSD Class B Water Bonds | CUSIP | Class | Allowed Amount of DWSD Class B Water Claims in Class |
|---|---|---|---|---|
| | | 251256CB7 | Class 1B-177 | $44,630,000.00 |

6

236

13-53846-tjt Doc 8772 Filed 12/16/14 Entered 12/16/14 08:24:49 Page 297 of 602
13-53846-swr Doc 3382 Filed 03/31/14 Entered 03/31/14 16:56:38 Page 183 of

**EXHIBIT I.A.112**

SCHEDULE OF DWSD REVOLVING SEWER BONDS
DOCUMENTS & RELATED DWSD REVOLVING SEWER BONDS

13-53846-tjt Doc 8772 Filed 12/16/14 Entered 12/16/14 08:40:40 Page 298 of 602
13-53846-swr Doc 3382-1 Filed 03/31/14 Entered 03/31/14 18:36:38 Page 186 of
236

**SCHEDULE OF (I) DWSD REVOLVING SEWER BOND DOCUMENTS, (II) RELATED DWSD REVOLVING SEWER BONDS, (III) CLASSES OF DWSD REVOLVING SEWER BOND CLAIMS AND (IV) ALLOWED AMOUNTS OF DWSD REVOLVING SEWER BOND CLAIMS**

| DWSD Revolving Sewer Bond Documents | Series of DWSD Revolving Sewer Bonds | Class | Allowed Amount of DWSD Revolving Sewer Bond Claims in Class |
|---|---|---|---|
| Ordinance No. 18-01 adopted October 18, 2001 ("Sewage Bond Ordinance")[1]<br><br>Trust Indenture dated as of June 1, 2012 among the City of Detroit ("City"), Detroit Water and Sewage Department and U.S. Bank National Association, as trustee ("Sewage Indenture")<br><br>Bond Authorizing Resolution adopted September 9, 1992<br><br>Supplemental Agreement dated September 24, 1992, among City, Michigan Bond Authority ("Authority") and the State of Michigan acting through the Department of Natural Resources | Series 1992-B-SRF | Class 1E-1 | $115,679.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted September 30, 1993<br><br>Supplemental Agreement regarding $6,603,996 Sewage Disposal System Revenue Bond Series 1993-B -SRF, among the City, Authority and DEQ | Series 1993-B-SRF | Class 1E-2 | $779,574.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted July 30, 1997<br><br>Supplemental Agreement dated September 30, 1997, among City, the Authority and the State of Michigan acting through the Department of Environmental Quality ("DEQ") | Series 1997-B-SRF | Class 1E-3 | $1,882,416.00 |

---

[1]    Ordinance No. 18-01 amended and restated Ordinance No. 27-86 adopted on December 9, 1986, as amended.

13-53846-tjt   Doc 8738   Filed 12/16/14   Entered 12/16/14 08:24:49   Page 299 of 602
13-53846-swr   Doc 7382-1   Filed 09/11/14   Entered 09/11/14 16:56:38   Page 18 of 64
236

| | | | |
|---|---|---|---|
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted May 12, 1999<br><br>Supplemental Agreement regarding $21,475,000 City Sewage Disposal System Revenue Bond, Series 1999-SRF1, dated June 24, 1999, among City, Authority and DEQ | Series 1999-SRF-1 | Class 1E-4 | $8,814,549.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted August 4, 1999 ("1999 SRF Resolution")<br><br>Supplemental Agreement regarding $46,000,000 SRF-2, $31,030,000 SRF-3, $40,655,000 SRF-4 dated September 30, 1999 ("1999 SRF Supplemental Agreement"), among City, Authority and DEQ | Series 1999-SRF-2 | Class 1E-5 | $26,050,770.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>1999 SRF Resolution<br><br>1999 SRF Supplemental Agreement | Series 1999-SRF-3 | Class 1E-6 | $14,400,455.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>1999 SRF Resolution<br><br>1999 SRF Supplemental Agreement | Series 1999-SRF-4 | Class 1E-7 | $18,863,135.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted February 9, 2000<br><br>Supplemental Agreement regarding Sewage Disposal System Revenue Bond (SRF Junior Lien), Series 2000-SRF1, dated March 30, 2000, among City, Authority and DEQ | Series 2000-SRF-1 | Class 1E-8 | $22,109,906.00 |

2

13-53846-tjt Doc 8732 Filed 12/16/14 Entered 12/16/14 08:24:49 Page 300 of 602
13-53846-swr Doc 7382 Filed 09/11/14 Entered 09/11/14 16:36:38 Page 186 of
236

| | | | |
|---|---|---|---|
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted July 19, 2000<br><br>Supplemental Agreement regarding Sewage Disposal System Revenue Bond (SRF Junior Lien) Series 2000-SRF2 dated September 28, 2000, among City, Authority and DEQ | Series 2000-SRF-2 | Class 1E-9 | $36,317,016.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted March 7, 2001<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System Revenue Bonds (SRF Junior Lien), Series 2001-SRF-1, dated June 28, 2001 among City, Authority and DEQ | Series 2001-SRF-1 | Class 1E-10 | $54,544,430.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted November 21, 2001<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2001-SRF2, dated December 20, 2001 among City, Authority and DEQ | Series 2001-SRF-2 | Class 1E-11 | $39,720,877.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted June 5, 2002<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2002-SRF1, dated June 27, 2002 among City, Authority and DEQ | Series 2002-SRF-1 | Class 1E-12 | $10,738,639.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted June 5, 2002<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2002-SRF2, dated June 27, 2002 among City, Authority and DEQ | Series 2002-SRF-2 | Class 1E-13 | $871,753.00 |

3

236

13-53846-tjt-swr  Doc 8739-2  Filed 12/16/14  Entered 12/16/14 08:24:49  Page 301 of 602
13-53846-swr  Doc 7382-1  Filed 09/11/14  Entered 09/11/14 16:36:38  Page 189 of 607

| | | | |
|---|---|---|---|
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted November 13, 2002<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2002-SRF3, dated December 19, 2002 among City, Authority and DEQ | Series 2002-SRF-3 | Class 1E-14 | $19,331,028.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted May 14, 2003<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2003-SRF1, dated June 26, 2003 among City, Authority and DEQ | Series 2003-SRF-1 | Class 1E-15 | $34,467,406.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted July 9, 2003<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2003-SRF2, dated September 25, 2003 among City, Authority and DEQ | Series 2003-SRF-2 | Class 1E-16 | $16,511,283.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted April 21, 2004 ("2004 SRF Resolution")<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2004-SRF1, dated June 24, 2004 among City, Authority and DEQ | Series 2004-SRF-1 | Class 1E-17 | $1,901,851.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2004 SRF Resolution<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2004-SRF2, dated June 24, 2004 among City, Authority and DEQ | Series 2004-SRF-2 | Class 1E-18 | $11,963,005.00 |

4
236

| | | | |
|---|---|---|---|
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2004 SRF Resolution<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2004-SRF3, dated June 24, 2004 among City, Authority and DEQ | Series 2004-SRF-3 | Class 1E-19 | $8,284,197.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted May 16, 2007<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2007-SRF1, dated September 20, 2007 among City, Authority and DEQ | Series 2007-SRF-1 | Class 1E-20 | $140,784,514.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted November 5, 2008<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2009-SRF1, dated April 17, 2009 among City, Authority and DEQ | Series 2009-SRF-1 | Class 1E-21 | $9,878,643.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted September 29, 2009<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2010-SRF1, dated January 22, 2010 among City, Authority and DEQ | Series 2010-SRF-1 | Class 1E-22 | $3,383,696.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted December 13, 2011<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2012-SRF1, dated August 30, 2012 among City, Authority and DEQ | Series 2012-SRF | Class 1E-23 | $4,332,541.00 |

5
236
13-53846-tjt Doc 8738 Filed 12/16/14 Entered 12/16/14 08:24:49 Page 303 of 602
13-53846-swr Doc 7382-1 Filed 06/31/14 Entered 06/31/14 18:56:38 Page 14 of 07

# EXHIBIT I.A.115

SCHEDULE OF DWSD REVOLVING WATER BOND
DOCUMENTS & RELATED DWSD REVOLVING WATER BONDS

**SCHEDULE OF (I) DWSD REVOLVING WATER BOND DOCUMENTS, (II) RELATED DWSD REVOLVING WATER BONDS, (III) CLASSES OF DWSD REVOLVING WATER BOND CLAIMS AND (IV) ALLOWED AMOUNTS OF DWSD REVOLVING WATER BOND CLAIMS**

| DWSD Revolving Water Bond Documents | Series of DWSD Revolving Water Bonds | Class | Allowed Amount of DWSD Revolving Water Bond Claims in Class |
|---|---|---|---|
| Ordinance No. 01-05 adopted January 26, 2005 ("Water Bond Ordinance")[1] <br><br> Trust Indenture dated as of February 1, 2013 among the City of Detroit ("City"), Detroit Water and Sewerage Department and U.S. Bank National Association, as trustee ("Water Indenture") <br><br> Bond Authorizing Resolution adopted April 29, 2005 ("2005 SRF Resolution") <br><br> Supplemental Agreement dated as of September 22, 2005 among City, Michigan Municipal Bond Authority ("Authority") and Michigan Department of Environmental Quality ("DEQ") | Series 2005-SRF-1 | Class 1F-1 | $10,022,619.00 |
| Water Bond Ordinance <br><br> Water Indenture <br><br> 2005 SRF Resolution <br><br> Supplemental Agreement regarding the Water Supply System SRF Junior Lien Revenue Bond, Series 2005-SRF2, dated September 22, 2005 among City, Authority and DEQ | Series 2005-SRF-2 | Class 1F-2 | $6,280,869.00 |
| Water Bond Ordinance <br><br> Water Indenture <br><br> Bond Authorizing Resolution adopted February 15, 2006 <br><br> Supplemental Agreement regarding the Water Supply System SRF Junior Lien Revenue Bond, Series 2006-SRF1, dated September 21, 2006 among City, Authority and DEQ | Series 2006-SRF-1 | Class 1F-3 | $3,739,227.00 |

---

[1]      Ordinance No. 0-05 amends and restates Ordinance No. 30-02 adopted November 27, 2002, which amended and restated Ordinance No. 06-01 adopted October 18, 2001, which amended and restated Ordinance No. 32-85, as amended.

13-53846-tjt  Doc 8738  Filed 12/16/14  Entered 12/16/14 08:40:38  Page 305 of 602
13-53846-swr  Doc 7382  Filed 09/11/14  Entered 09/11/14 16:06:38  Page 14 of 37
236

| | | | |
|---|---|---|---|
| Water Bond Ordinance<br><br>Water Indenture<br><br>Bond Authorizing Resolution and Bond Ordinance, adopted July 15, 2008<br><br>Supplemental Agreement regarding Water Supply System SRF Junior Lien Revenue Bonds, Series 2008-SRF1, dated September 29, 2008 among City, Authority and DEQ | Series 2008-SRF-1 | Class 1F-4 | $1,547,272.00 |

<u>**EXHIBIT I.A.148.b**</u>

PRINCIPAL TERMS OF GRS HYBRID PENSION PLAN

13-53846-tjt  Doc 8772  Filed 12/16/14  Entered 12/16/14 08:24:49  Page 307 of 602
13-53846-swr  Doc 3382-1  Filed 03/31/15  Entered 03/31/14 16:56:36  Page 145 of
236

## GRS HYBRID PLAN -- MATERIAL TERMS

1.   Benefit Formula:  FAC (average basic compensation over last 10 consecutive years of employment)  x Years of Service  x 1.5%.  Average base compensation means no overtime, no unused sick leave, no longevity or any other form of bonus.

2.   Actual time for accrual is actual time served.  For vesting and eligibility, 1,000 hours for a year of service.

3.   Normal Retirement Age – age 62

4.   10 Years of Service for vesting.

5.   Early retirement  -- Eligible at 60  & 30 years of service, with true actuarial reduction.  No pension payments allowed below age 60; terminated employees must wait until 62.

6.   Deferred Vested  -- 10 Years payable at  62.

7.   Duty Disability  -- to be provided by commercial insurance.

8.   Investment Return/Discount rate – 6.25%

9.   No COLA

10.  Shift funding obligation when hybrid plan underfunded

     a.  If funding falls below a certain level identified in the Hybrid Plan documents, employees and retirees will fund the shortfall until the GRS actuary can certify that – applying a 6.25% discount rate and return assumption – the projected GRS funding level will reach 100% within the next 5 years.

**EXHIBIT I.A.151**

FORM OF GRS TRUST AGREEMENT

**TRUST AGREEMENT**

**GENERAL RETIREMENT SYSTEM**

**OF THE**

**CITY OF DETROIT**

13-53846-tjt Doc 8772 Filed 12/16/14 Entered 12/16/14 08:24:49 Page 310 of 602
13-53846-swr Doc 3382 Filed 03/31/15 Entered 03/31/14 18:36:38 Page 149 of
236

# TRUST AGREEMENT

This Agreement is made as of _____, 2014 by and between the City of Detroit, Michigan (hereinafter referred to as the "City") and the individual trustees named in Section 2 hereof (hereinafter each referred to as a "Trustee" and collectively referred to as the "Board of Trustees" or "Board"), effective for all purposes as of _____, 2014 (the "Effective Date").

## WITNESSETH:

WHEREAS, the City maintains the General Retirement System of the City of Detroit (the "Retirement System") for the exclusive benefit of certain of its employees; and

WHEREAS, pursuant to the governing documents relating to the Retirement System, a trust was established for assets held under the Retirement System and a board of trustees was vested with authority to conduct the general investment operation and administration of the Retirement System and to act as trustee of the trust; and

WHEREAS, in order for the Retirement System to receive funding from the State of Michigan, and pursuant to legislation enacted by the State of Michigan, the City is required to establish an irrevocable trust pursuant to which assets currently held under the Retirement System and future contributions to the Retirement System, together with earnings and losses thereon, are to be transferred to and held by an independent board of trustees responsible for the management, investment and reinvestment of such assets for the exclusive benefit of the members of the Retirement System ("Members") and their beneficiaries ("Beneficiaries"); and

WHEREAS, the City desires to adopt this Trust Agreement in order to (i) establish an irrevocable trust (the "Trust") to provide for the custody and investment of the assets of the Retirement System as of the Effective Date and such additional property as may from time to time be contributed thereto under the terms of the Retirement System, which Trust is intended to

be exempt from taxation under section 501(a) of the Internal Revenue Code (the "Code"), by reason of its forming a part of a retirement plan qualified under section 401(a) of the Code, (ii) appoint independent trustees to serve as the trustees of the Trust, and (iii) grant to the Board of Trustees responsibility and authority for the proper administration of the Retirement System; and

WHEREAS, this Trust Agreement shall replace and supersede any and all contrary provisions contained in the Detroit City Code of Ordinances, the Home Rule Charter of the City of Detroit, or any collective bargaining agreements concerning the management and administration of the Retirement System or the custody, investment and reinvestment of the Retirement System's assets; and

WHEREAS, following establishment of the Trust, the assets held under the Retirement System shall be exclusively held and invested pursuant to this Trust Agreement.

NOW, THEREFORE, the City and the individual Trustees named herein do hereby adopt this Trust Agreement in order to establish and designate the Trust as the successor funding vehicle for the Retirement System, upon the terms and conditions hereinafter set forth, and in order to confer the responsibility for the management and administration of the Retirement System to the Board of Trustees.

1.     **CREATION OF IRREVOCABLE TRUST**

The City hereby establishes an irrevocable trust as the successor funding vehicle for the Retirement System.  The Trust created pursuant to this Trust Agreement shall, at all times, be maintained and administered in accordance with section 501(a) of the Code.  This Trust Agreement shall replace and supersede any and all contrary provisions concerning the management and administration of the Retirement System or the custody, investment and reinvestment of the Retirement System's assets, including, but not limited to, the Detroit City Code of Ordinances, the Home Rule Charter of the City of Detroit, and any collective bargaining

13-53846-tjt   Doc 8738-2   Filed 12/16/14   Entered 12/16/14 08:24:49   Page 312 of 602
13-53846-swr   Doc 7382-1   Filed 09/11/14   Entered 09/11/14 19:36:38   Page 15 of 47
236

agreements.   The Trust Agreement shall be incorporated into and considered part of the Retirement System's governing documents.   On and after the Effective Date, the Trust shall be a public corporation under Michigan law.

**2.     ESTABLISHMENT OF BOARD OF TRUSTEES; QUALIFICATION OF TRUSTEES; TERM OF OFFICE**

Prior to the Effective Date, the Retirement System was operated and administered by a board of trustees as described in the Retirement System's governing documents and by employees of the Retirement System under the direction and control of the City's Finance Department.   With respect to periods on and after the Effective Date, a newly-formed Board of Trustees is hereby appointed to administer, manage and operate the Retirement System and to invest the assets thereof in trust pursuant to this Trust Agreement.

The Board of Trustees shall consist of five (5) voting members, all of whom shall be residents of the State of Michigan and none of whom may be an employee, contractor, agent or affiliate of the City or any labor union representing employees of the City, a member of any such labor union, or a Member or Beneficiary of the Retirement System.   Each of the voting members shall have expert knowledge or extensive experience with respect to either (a) economics, finance, or institutional investments, or (b) administration of public or private retirement plans, executive management, benefits administration or actuarial science.   At least one (1) of the voting trustees shall satisfy the requirements of (a) above and at least (1) of the voting trustees shall satisfy the requirements of (b) above.   The voting members of the Board of Trustees as of the Effective Date shall be (1) _____, (2)_____, (3)_____, (4)_____, and (5) _____.   The  fixed term of office for the voting Trustees shall be as follows:

13-53846-tjt   Doc 8739   Filed 12/16/14   Entered 12/16/14 10:24:49   Page 313 of 602
13-53846-swr   Doc 7382-5   Filed 09/11/14   Entered 09/11/14 16:36:36   Page 15 of 63
236

| Voting Trustee | Term of Office |
|---|---|
| (1) and (2) | 2 years |
| (3) | 3 years |
| (4) | 4 years |
| (5) | 5 years |

In addition to the voting Trustees, there shall be two (2) nonvoting members of the Board appointed as follows: (a) one retiree Member who shall be appointed pursuant to a vote of retiree Members, and (b) one member appointed by the labor unions representing Members. The retiree and union-appointed members of the Board shall each serve for a term of four (4) years.

In accordance with Section 14, a Trustee may resign from office or be removed from office prior to the expiration of the Trustee's term. In the event of any vacancy among the voting Trustees by reason of resignation, removal or expiration of a term of office, the remaining voting members of the Board shall by majority vote select a replacement Trustee to fill such position. In the event of any vacancy among the nonvoting members of the Board, a replacement Trustee shall be appointed as provided above.

3.      **OPERATION OF THE BOARD; QUORUM**

The voting members of the Board of Trustees shall select from among the voting members a chair and a vice chair. The Board shall hold regular meetings, and shall designate the time and place thereof in advance. The Board shall adopt its own rules of procedure and shall keep a record of proceedings. Each voting Trustee shall be entitled to one vote on each question before the Board. Three (3) voting Trustees shall constitute a quorum at any meeting. A majority vote of the voting Trustees present at a meeting of the Board at which a quorum exists shall be necessary for a decision by the Board.

13-53846-tjt  Doc 8739-2  Filed 12/16/14  Entered 12/16/14 10:24:49  Page 314 of 602
13-53846-swr  Doc 7382-1  Filed 09/11/14  Entered 09/11/14 18:06:38  Page 151 of 207
236

## 4.   COMPENSATION AND EXPENSE REIMBURSEMENT

Each voting Trustee shall be paid a stipend of [$36,000] per year (payable ratably on a monthly basis).  The retiree and union-appointed members of the Board shall each be paid a stipend of [      ] per year (payable ratably on a monthly basis).  All Trustees shall be reimbursed for the reasonable, actual and necessary expenses incurred in the performance of their duties.  Compensation payable to the Trustees and all reasonable and proper expenses related to the administration of the Trust and the Retirement System shall be payable out of the Trust.

## 5.   CHIEF EXECUTIVE OFFICER; EMPLOYEES

The Board shall employ on behalf of the Retirement System a chief executive officer and any other employees for which the Board establishes positions.  The chief executive officer shall do all of the following:

> (a)   manage and administer the Retirement System under the supervision and direction of the Board;

> (b)    invest the assets of the Retirement System, as directed by the Board;

> (c)   annually prepare and submit to the Board for review, amendment, and adoption an itemized budget projecting  the amount required to pay the Retirement System's expenses for the following fiscal year; and

> (d)   perform such other duties as the Board, in its discretion, shall delegate to the chief executive officer.

The chief executive officer, unless such power is retained by the Board, shall determine the compensation of all persons (except the chief executive officer, whose compensation shall be determined by the Board) employed by the Retirement System and such compensation shall be payable from the  Trust.  Any person employed by the Retirement System shall not be an employee of the City.

13-53846-tjt   Doc 8738   Filed 12/16/14   Entered 12/16/14 08:41:49   Page 315 of 602
13-53846-swr   Doc 7382   Filed 09/11/14   Entered 09/11/14 18:56:36   Page 155 of 304
236

## 6. POWERS AND DUTIES OF BOARD OF TRUSTEES

The Board shall have the following powers and duties:

(a)     exclusive authority regarding the administration, management and operation of the Retirement System, including, but not limited to, the right to contract for office space, computer hardware and software, and human resource services (any or all of which may be obtained from the City), and to make rules and regulations with respect to the operation of the Retirement System not inconsistent with the terms of the Retirement System and applicable law, and to amend or rescind such rules and regulations;

(b)     to determine questions of law or fact that may arise as to the rights of any person claiming rights under the Retirement System;

(c)     to determine the contributions to the Trust required of the City and Members pursuant to the documents governing operation of the Retirement System;

(d)     to determine the impact of proposed benefit changes on the Retirement System and to require, in its sole and absolute discretion, that additional contributions be made to the Trust by the City and/or Members as needed to safeguard the long-term actuarial and financial integrity of the Retirement System;

(e)     to construe and interpret the provisions of the Retirement System and this Trust Agreement and to correct any defect, supply any omission or reconcile any inconsistencies;

(f)     to perform ministerial functions, whether or not expressly authorized, which the Board may deem necessary or desirable in carrying out its duties under the Retirement System and this Trust Agreement;

(g)     exclusive authority to employ, contract and pay for all professional services including, but not limited to, actuarial, investment, legal, accounting, medical, and any other services that the Board considers necessary for the proper operation of the Retirement System. The powers granted to the Board in this subparagraph include complete control of the procurement process, including contracts for office space, computer hardware and software, and human resource services.

(h)     to arrange for an annual actuarial valuation and report of the actuarial soundness of the Retirement System to be prepared by an independent actuary based upon data compiled and supplied by the Board. The Board shall furnish a copy of the annual reports to the mayor and finance director of the City and to the chair of the Detroit City Council. At intervals of five years, the actuary shall conduct an actuarial

13-53846-tjt Doc 8772 Filed 12/16/14 Entered 12/16/14 08:40:36 Page 316 of 602
13-53846-swr Doc 3382-1 Filed 06/31/15 Entered 05/31/14 18:06:38 Page 154 of 402
236

experience study of the Retirement System and report the results to the Board. The Board shall adopt actuarial tables, assumptions, and formulas for the Retirement System after consultation with the actuary, except to the extent such actuarial tables, assumptions, and formulas are mandated by the written documents governing the Retirement System;

(i)     to arrange for annual audits of the records and accounts of the Retirement System by a certified public accountant or by a firm of certified public accountants pursuant to generally accepted auditing standards;

(j)     to prepare an annual report for the Retirement System for each fiscal year in compliance with generally accepted accounting principles. The report shall contain information regarding the financial, actuarial, and other activities of the Retirement System during the fiscal year. The Board shall furnish a copy of the annual reports to the mayor and finance director of the City and to the chair of the Detroit City Council. The report shall also contain a review of the latest actuarial valuation required under subparagraph (h);

(k)     to appoint legal counsel who shall be directly responsible to and hold office at the pleasure of the Board. Legal counsel so appointed shall be an attorney licensed to practice in the State of Michigan who is experienced in matters relating to governmental retirement plans;

(l)     to appoint or employ custodians of the assets of the Retirement System. The custodians shall perform all duties necessary and incidental to the custodial responsibility and make disbursements as authorized by the Board;

(m)     in conjunction with the City, to provide that additional benefit programs for the benefit of the City's safety employees, including, but not limited to, defined benefit, defined contribution, ancillary benefit, health and welfare benefit, and other post employment benefit programs, may, in accordance with applicable law, participate in the Retirement System and be governed by this Trust Agreement or to enter into another agreement with the City, in accordance with the terms of this Trust Agreement, for the purposes of administering such additional benefit programs and investing the assets thereof;

(n)     to correct any error in the records of the Trust or the Retirement System that results in overpayment of contributions to the Retirement System by the City or a Member, or overpayment to a Member, former Member, or Beneficiary by the Trust or Retirement System. In the event of overpayment to a Member, former Member or Beneficiary, the Board may, as far as practicable, adjust future payments to such individual to correct for the error;

13-53846-tjt  Doc 8738-2  Filed 12/16/14  Entered 12/16/14 10:24:49  Page 317 of 502
13-53846-swr  Doc 7382-1  Filed 09/11/14  Entered 09/11/14 18:36:38  Page 155 of
236

(o)     to the extent permissible under Michigan law (and consistent with the Retirement System's favorable tax qualified status under section 401(a) of the Code), indemnify any person and such person's heirs and legal representatives who is made a party to (or threatened to be made a party to) any action, suit or proceeding whether brought by or in the right of the Board or the Retirement System or otherwise, by reason of the fact that such person is or was a Trustee, director, officer, employee or agent of the Board (or an advisory body or committee of the Board) or the Retirement System.  The Trustees shall not indemnify any person who is judicially determined to have incurred liability due to fraud, gross negligence or malfeasance in the performance of his duties; and

(p)     to perform any other function that is required for the proper administration of the Retirement System and the investment of the Trust.

## 7.     **TRUST**

7.1     <u>Receipt of Assets; Exclusive Benefit Rule</u>.  The Board shall receive and accept for the purposes of this Trust Agreement all sums of money and other property paid or transferred to it by or at the direction of the City, and pursuant to the terms of this Trust Agreement shall hold, invest, reinvest, manage, administer and distribute such monies and other property and the increments, proceeds, earnings and income thereof for the exclusive benefit of Members and their Beneficiaries.

The Board need not inquire into the source of any money or property received by it nor into the authority or right of the transferor of such money or property to transfer such money or property to the Retirement System.  All assets held by the Board in the Trust pursuant to the provisions of this Trust Agreement are referred to herein as the "Trust."  All right, title and interest in and to the assets of the Trust shall at all times be vested exclusively in the Board.  No portion of the principal or income of the Trust shall revert to the City or ever be used for or diverted to any purpose other than for (i) the exclusive benefit of the Members and Beneficiaries, and (ii) the payment of reasonable expenses of the Retirement System.

13-53846-tjt  Doc 8772-5  Filed 12/16/14  Entered 12/16/14 08:24:49  Page 318 of 602
13-53846-swr  Doc 7382-1  Filed 09/11/14  Entered 09/11/14 16:56:38  Page 156 of
236

7.2     <u>Contributions</u>.  Contributions to the Trust  shall be made at such times and in such amounts as are required by the governing documents of the Retirement System. The Board shall have the duty to require payment of any contributions required to be made to the Trust,  and to see that any payment made to it is computed in accordance with the governing documents of the Retirement System, but shall not be responsible for the adequacy of the Trust to meet and discharge any liabilities under the Retirement System.

7.3     <u>Trust Payments</u>.  The Board shall be responsible for making payments from the Trust  to Members, their Beneficiaries, and such other persons as the governing documents of the Retirement System may provide from time to time.   Such payments shall be made in such manner, in such amounts and for such purposes, including the payment of benefits and the payment of expenses of administration of the Retirement System, as may be specified in the documents governing the Retirement System or applicable law.  The Board shall not incur any liability or other damages on account of any payment or distribution made by the Trust  in accordance with this Section.

## 8.     <u>INVESTMENT OF ASSETS</u>

8.1     <u>Investment Powers of the Board of Trustees</u>.  The Board shall have full power and authority to manage, control, invest and reinvest the money and other assets of the Retirement System subject to all terms, conditions, limitations, and restrictions imposed on the investment of assets of public employee retirement systems or plans by Act No. 314 of the Public Acts of 1965, being sections 38.1132 *et seq.* of the Michigan Compiled Laws, as amended (the "Act").   The Board may employ outside advisors, including investment advisors, to advise it with regard to the investment of the assets of the Retirement System.  Any outside advisors who are investment fiduciaries (as defined in the Act) shall satisfy any applicable requirements of the Act.

13-53846-tjt   Doc 8739-5   Filed 12/16/14   Entered 12/16/14 08:21:49   Page 319 of 502
13-53846-swr   Doc 7382-1   Filed 09/11/14   Entered 09/11/14 16:56:38   Page 15 of 64
236

8.2 _Investment Manager Appointment_.  The Board, from time to time, may appoint one or more independent investment managers, pursuant to a written investment management agreement describing the powers and duties of the investment manager, to direct the investment and reinvestment of all or a portion of the Trust (hereinafter referred to as an "Investment Account").

The Board shall determine that each investment manager satisfies the requirements of section 38.1133(11) of the Act and, is entitled (under its investment management agreement) to direct the investment and reinvestment of the Investment Account for which it is responsible, in its sole and independent discretion and without limitation, except for any limitations which from time to time the Board determines shall modify the scope of such authority.

Provided that an investment manager is prudently selected and monitored by the Board, the Board shall have no liability (i) for the acts or omissions of such investment manager; (ii) for following directions of such investment manager which are given in accordance with this Trust Agreement; or (iii) for any loss of any kind which may result by reason of the manner of division of the Trust into Investment Accounts.

9. **VALUATION OF ASSETS**

Not less frequently than annually, the Board shall determine the fair market value of assets of the Trust based upon valuations provided by investment managers (if applicable), information and financial publications of general circulation, statistical and valuation services, records of security exchanges, appraisals by qualified persons, transactions and bona fide offers in assets of the type in question and other information customarily used in the valuation of property.  An investment manager shall certify, at the request of the Board, the value of any securities or other property held in any Investment Account managed by such investment manager, and such certification shall be regarded as a direction with regard to such valuation.

13-53846-tjt   Doc 8773-2   Filed 12/16/14   Entered 12/16/14 08:24:06   Page 320 of 602
13-53846-swr   Doc 3382-1   Filed 03/31/14   Entered 03/31/14 16:36:38   Page 158 of
236

The Board shall be entitled to conclusively rely upon an investment manager's valuation for all purposes under this Trust Agreement.

## 10.   ACCOUNTS; BOOKS AND RECORDS

The Board shall maintain or cause to be maintained such separate accounts as are required to be maintained under the provisions of the Retirement System and such additional accounts as the Board deems necessary or expedient for the proper administration of the Retirement System and the administration and investment of the Trust. The Board shall maintain suitable records, data and information in connection with the performance of its functions under this Trust Agreement, including, but not limited to, accurate and detailed accounts of all investments, receipts, disbursements, and other actions, including the proportionate interest therein and accumulated contributions of each Member who has made contributions to the Retirement System.

## 11.   LIMITATION OF RESPONSIBILITY

(a)     The Board shall have no duties other than those expressly set forth in this Trust Agreement or the governing documents of the Retirement System, which duties may not be enlarged or expanded without the consent of the Board.

(b)     The Board shall be responsible only for money and property actually received by it and only to the extent described in this Trust Agreement.

(c)     No member of the Board shall have any liability for the acts or omissions of any predecessor or successor in office.

(d)     The Board shall have no liability to a Member or Beneficiary for the Board's reliance on any provision of the governing documents pertaining to the Retirement System or upon any instrument, certificate, or paper provided to the Board by the City and believed by the Board to be genuine and signed or presented by any authorized person.

13-53846-tjt   Doc 8773-5   Filed 12/16/14   Entered 12/16/14 08:24:49   Page 321 of 602
13-53846-swr   Doc 7382-5   Filed 09/11/14   Entered 09/11/14 16:36:38   Page 159 of
236

## 12. **INDEMNIFICATION**

The Retirement System shall indemnify and save harmless the Board, and any individual Trustee, officer, director and employee appointed by the Board or the chief executive officer for and from any liability, loss or expense (including reasonable attorneys' fees and costs) arising (a) from such individual's performance of his  duties in conformance with the terms of the Retirement System and this Trust Agreement, or (b) by reason of any breach of any statutory or other duty owed to the Retirement System by the City, any investment manager or any delegate of any of them (and for the purposes of this sentence, a Trustee shall not be considered to be such a delegate), but not if the individual being indemnified is determined by a court of law to be liable for that other party's breach.  The foregoing provisions of this section shall not apply to any liability, loss or expense resulting from the willful misconduct, intentional wrongdoing, or breach of applicable fiduciary duty by the Board or an individual Trustee, officer, director, or employee, or to the extent that application of the foregoing provisions of this section would violate any law.

## 13. **JUDICIAL SETTLEMENT**

Nothing contained in this Trust Agreement or in the documents relating to the establishment or maintenance of the Retirement System shall deprive the Board of the right to have a judicial settlement of the Trust.  In any proceeding for a judicial settlement or for instructions in connection with the Trust, the only necessary party thereto shall be the Board, and neither the City nor any Member or other person having or claiming any interest in the Trust shall be entitled to any notice or service of process (except as required by law).  Any judgment, decision or award entered in any such proceeding or action shall be conclusive upon all interested persons.

## 14.    RESIGNATION AND REMOVAL OF TRUSTEES

A Trustee acting hereunder may resign at any time by giving ninety (90) days' prior written notice to the City and the Board, which notice or time period may be waived by the Board.  A Trustee who fails to attend three (3) consecutive scheduled meetings of the Board shall be deemed to have resigned, unless the failure is excused for good reason by majority vote of the voting Trustees attending the meeting.  A Trustee may be removed from office by majority vote of the other voting Trustees for reasons of nonfeasance or malfeasance. In case of the resignation or removal of a Trustee, a successor Trustee shall be appointed pursuant to Section 2. Successor Trustees shall have the  powers and duties conferred on Trustees under this Trust Agreement.  The removal of a Trustee and the appointment of a new Trustee shall be evidenced by a written instrument delivered to such Trustee, the City and the Board.

## 15.    AMENDMENT

This Trust Agreement may be amended by mutual agreement of the City and the Board at any time and in any manner permitted by Michigan law.  Any such amendment shall be expressed in an instrument executed by the City and the voting members of the Board and shall become effective as of the date designated in such instrument or, if no such date is designated, upon the date of the execution of such instrument.

## 16.    TERMINATION

This Trust Agreement and the Trust  created hereby are irrevocable and shall continue for the maximum period of time permitted by the laws of the State of Michigan.  In the event of the termination of the Retirement System, the Board shall not be required or permitted to pay out any asset of the Trust to Members and Beneficiaries until the Board has received written certification from the City, that is acceptable to the Board,  that all provisions of law with respect to such termination have been complied with and until the Board has made a determination that

13-53846-tjt  Doc 8738  Filed 12/16/14  Entered 12/16/14 08:24:09  Page 323 of 602
13-53846-swr   Doc 7382   Filed 06/31/14   Entered 06/31/14 19:06:38   Page 161 of
236

the fair market value of the assets attributable to the Retirement System are sufficient to discharge when due all obligations of the Retirement System required by law. In the event that participation in the Retirement System is terminated with respect to one or more groups of Members, the Board shall transfer the assets and liabilities of the Trust to which the termination applies to another trust or fund for the benefit of such Members and Beneficiaries, as the Board determines appropriate.

## 17.  PAYMENT OF TAXES

The Board shall pay out of the Trust all real and personal property taxes, income taxes and other taxes of any and all kinds levied or assessed under existing or future laws against the Trust. Until advised to the contrary by the City, the Trustee shall assume that the Trust is exempt from Federal, State and local income taxes, and shall act in accordance with that assumption.

## 18.  MISCELLANEOUS

18.1    Governing Law.  This Trust Agreement and the Board of Trustees shall be subject to the Code and the laws of the State of Michigan, including, but not limited to, the Constitution of the State of Michigan and Act No. 314 of the Public Acts of 1965, being sections 38.1132 *et seq.* of the Michigan Compiled Laws.

18.2    Validity of Trust.  The Trust created by this Trust Agreement shall not be deemed invalid by reason of indefiniteness or uncertainty of the Trust Agreement, nor shall the Trust be deemed invalid by reason of violating any existing law against perpetuities.

18.3    Construction.  In resolving any conflict among provisions of this Trust Agreement and in resolving any other uncertainty as to the meaning or intention of any provision of this Trust Agreement, the interpretation that causes the Retirement System to satisfy the applicable requirements of Act No. 314 of the Public Acts of 1965, section 401(a) of the Code and the Trust

13-53846-tjt   Doc 8738   Filed 12/16/14   Entered 12/16/14 08:24:49   Page 324 of 602
13-53846-swr   Doc 7382   Filed 09/11/14   Entered 09/11/14 18:06:38   Page 162 of 207
236

to be exempt from tax under section 501(a) of the Code shall prevail over any different interpretation.

18.4    Assignment Prohibited. Neither a Member nor the Retirement System may assign any part of its equity or interest in the Trust and any attempt to do so shall be void; provided, however, that the foregoing prohibition shall not apply to a domestic relations order with respect to a Member that the Retirement System determines satisfies the requirements of Code section 414(p).

18.5    No Guarantees.  Neither the City nor the Board guarantees the Trust from loss or depreciation, or the payment of any amount which may become due to any person under the Retirement System or this Trust Agreement.

18.6    Necessary Parties to Disputes.  Necessary parties to any accounting, litigation or other proceedings shall include only the Board and the City, and the settlement or judgment in any such case in which the City and the Board are duly served or cited shall be binding upon all Members and Beneficiaries, and upon all persons claiming by, through or under them.

18.7    Severability.  If any provision of this Trust Agreement shall be held by a court of competent jurisdiction to be invalid or unenforceable, the remaining provisions of this Trust Agreement shall continue to be fully effective.

18.8    References.  Unless the context clearly indicates to the contrary, a reference to a statute, regulation, document or provision shall be construed as referring to any subsequently enacted, adopted or executed counterpart.

18.9    Headings.  Headings and subheadings in this Trust Agreement are inserted for convenience of reference only and are not to be considered in the construction of its provisions.

18.10　Counterparts.　This Trust Agreement may be executed in one or more counterparts, each of which shall constitute an original.

18.11　Definitions.　Terms used herein with initial capital letters which are not defined herein shall, unless the context clearly indicates otherwise, have the meanings specified in the documents governing the operation of the Retirement System.

13-53846-tjt　Doc 8773　Filed 12/16/14　Entered 12/16/14 08:24:40　Page 326 of 602
13-53846-swr　Doc 3382-1　Filed 03/31/14　Entered 03/31/14 18:56:38　Page 164 of
236

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be executed by their duly authorized officers as of the day and year first above written.

THE CITY OF DETROIT

_____, 2014                BY:_____
                                          Kevyn D. Orr
                                          Emergency Manager


TRUSTEES

_____, 2014                BY:_____
                                          Independent Trustee

_____, 2014                BY:_____
                                          Independent Trustee

_____, 2014                BY:_____
                                          Independent Trustee

_____, 2014                BY:_____
                                          Independent Trustee

_____, 2014                BY:_____
                                          Independent Trustee

_____, 2014                BY:_____
                                          Retiree Trustee

_____, 2014                BY:_____
                                          Union-Appointed Trustee

13-53846-tjt  Doc 8733-2  Filed 12/16/14  Entered 12/16/14 08:24:49  Page 327 of 602
13-53846-swr  Doc 7382-1  Filed 09/11/14  Entered 09/11/14 16:56:38  Page 165 of
236
17

**EXHIBIT I.A.154**

SCHEDULE OF HUD INSTALLMENT NOTE
DOCUMENTS & RELATED HUD INSTALLMENT NOTES

| HUD Installment Note Documents (Identified by note number. Ancillary instruments and agreements related thereto are not separately identified) | HUD Installment Notes | Estimated Allowed Amount as of Petition Date (The estimated allowed amount is the sum of all advances and conversion date advances under the HUD Installment Notes identified in this schedule, less principal amounts paid through the Petition Date, plus interest due on principal amounts outstanding. The Estimated Aggregate HUD Installment Note Amount is the sum of the estimated allowed amount for all the HUD Installment Notes identified in this schedule) |
|---|---|---|
| City Note No. B-94-MC-26-0006-A | Garfield Project Note[*] | $764,442 |
| City Note No. B-94-MC-26-0006-D | Stuberstone Project Note* | $122,346 |
| City Note No. B-97-MC-26-0006 | Ferry Street Project Note* | $1,928,285 |
| City Note No. B-98-MC-26-0006-A | New Amsterdam Project Note* | $8,345,728 |
| City Note No. B-98-MC-26-0006-B | Vernor Lawndale Project Note* | $1,844,974 |
| City Note No. B-02-MC-26-0006 | Mexicantown Welcome Center Project Note* | $3,689,487 |
| City Note No. B-03-MC-26-0006 | Garfield II Note 1* | $6,570,458 |
| City Note No. B-03-MC-26-0006 | Garfield II Note 2* | $2,111,028 |
| City Note No. B-03-MC-26-0006 | Garfield II Note 3[°] | $6,717,760 |
| City Note No. B-03-MC-26-0006 | Garfield II Note 4° | $1,602,954 |
| City Note No. B-05-MC-26-0006 | Woodward Garden Project 1 Note* | $7,202,570 |
| City Note No. B-05-MC-26-0006 | Woodward Garden Project 2 Note | $6,315,019 |
| City Note No. B-05-MC-26-0006 | Woodward Garden Project 3 Note° | $5,770,733 |
| City Note No. B-05-MC-26-0006-A | Book Cadillac Project Note* | $7,486,218 |

---

[*] HUD Installment Note has a fixed interest rate. Estimated allowed amount represents the aggregate of outstanding principal and fixed interest payments set forth in the amortization schedule for the HUD Installment Note.

[°] HUD Installment Note has a variable interest rate. Estimated allowed amount represents the aggregate of outstanding principal and an estimate of the variable interest payments at the rate set forth in the HUD Installment Note.

| City Note No. B-05-MC-26-0006-A | Book Cadillac Project Note II* | $10,938,812 |
|---|---|---|
| City Note No. B-05-MC-26-0006-B | Fort Shelby Project Note* | $18,664,190 |

-2-

13-53846-tjt Doc 8778 Filed 12/16/14 Entered 12/16/14 08:24:49 Page 329 of 602
13-53846-swr Doc 7382 Filed 09/11/14 Entered 09/11/14 16:36:36 Page 16 of 236

**EXHIBIT I.A.159**

INTEREST RATE RESET CHART

| Series Name | CUSIP | Lien | Insurer | Final Maturity | Total Principal | Coupon | Call Date | New Interest Rate |
|---|---|---|---|---|---|---|---|---|
| **Sewer Bonds** | | | | | | | | |
| Sewer1998A | 251237S87 | Senior | MBIA | 7/1/2014 | 3,110,000 | 5.50% | N/A | Retired |
| Sewer1998A | 251237S95 | Senior | MBIA | 7/1/2015 | 3,225,000 | 5.50% | N/A | 0.75% |
| Sewer1998A | 251237T29 | Senior | MBIA | 7/1/2016 | 3,540,000 | 5.50% | N/A | 0.85% |
| Sewer1998A | 251237T37 | Senior | MBIA | 7/1/2017 | 3,660,000 | 5.50% | N/A | 1.20% |
| Sewer1998A | 251237T45 | Senior | MBIA | 7/1/2018 | 3,885,000 | 5.25% | 7/1/2017 | 1.54% |
| Sewer1998A | 251237T52 | Senior | MBIA | 7/1/2019 | 4,095,000 | 5.25% | 7/1/2017 | 1.93% |
| Sewer1998A | 251237T60 | Senior | MBIA | 7/1/2020 | 7,415,000 | 5.25% | 7/1/2017 | 2.29% |
| Sewer1998A | 251237T78 | Senior | MBIA | 7/1/2021 | 7,745,000 | 5.25% | 7/1/2017 | 2.65% |
| Sewer1998A | 251237T86 | Senior | MBIA | 7/1/2022 | 12,585,000 | 5.25% | 7/1/2017 | 2.97% |
| Sewer1998A | 251237T94 | Senior | MBIA | 7/1/2023 | 13,350,000 | 5.25% | 7/1/2017 | 3.28% |
| | | | | | 62,610,000 | | | |
| Sewer1998B | 251237U92 | Senior | MBIA | 7/1/2014 | 3,125,000 | 5.50% | N/A | Retired |
| Sewer1998B | 251237V26 | Senior | MBIA | 7/1/2015 | 3,240,000 | 5.50% | N/A | 0.75% |
| Sewer1998B | 251237V34 | Senior | MBIA | 7/1/2016 | 3,455,000 | 5.50% | N/A | 0.85% |
| Sewer1998B | 251237V42 | Senior | MBIA | 7/1/2017 | 3,575,000 | 5.50% | N/A | 1.20% |
| Sewer1998B | 251237V59 | Senior | MBIA | 7/1/2018 | 3,895,000 | 5.25% | 7/1/2017 | 1.54% |
| Sewer1998B | 251237V67 | Senior | MBIA | 7/1/2019 | 4,015,000 | 5.25% | 7/1/2017 | 1.93% |
| Sewer1998B | 251237V75 | Senior | MBIA | 7/1/2020 | 7,330,000 | 5.25% | 7/1/2017 | 2.29% |
| Sewer1998B | 251237V83 | Senior | MBIA | 7/1/2021 | 7,665,000 | 5.25% | 7/1/2017 | 2.65% |
| Sewer1998B | 251237V91 | Senior | MBIA | 7/1/2022 | 12,600,000 | 5.25% | 7/1/2017 | 2.97% |
| Sewer1998B | 251237W25 | Senior | MBIA | 7/1/2023 | 13,265,000 | 5.25% | 7/1/2017 | 3.28% |
| | | | | | 62,165,000 | | | |
| Sewer2001C1 (Ins) | 2512376G3 | Senior | Assured Guaranty | 7/1/2014 | 575,000 | 5.25% | N/A | Retired |
| Sewer2001C1 (Ins) | 2512376H1 | Senior | Assured Guaranty | 7/1/2015 | 600,000 | 5.25% | N/A | 0.75% |
| Sewer2001C1 (Ins) | 2512376J7 | Senior | Assured Guaranty | 7/1/2016 | 625,000 | 5.25% | N/A | 0.85% |
| Sewer2001C1 (Ins) | 2512376K4 | Senior | Assured Guaranty | 7/1/2017 | 655,000 | 5.25% | N/A | 1.20% |
| Sewer2001C1 (Ins) | 2512376L2 | Senior | Assured Guaranty | 7/1/2018 | 690,000 | 5.25% | N/A | 1.54% |
| Sewer2001C1 (Ins) | 2512376M0 | Senior | Assured Guaranty | 7/1/2019 | 720,000 | 5.25% | N/A | 1.93% |
| Sewer2001C1 (Ins) | 2512376P3 | Senior | Assured Guaranty | 7/1/2027 | 110,510,000 | 7.00% | 7/1/2019 | 3.97% |
| | | | | | 114,375,000 | | | |
| Sewer2001C1 (Unins) | 2512376N8 | Senior | N/A | 7/1/2024 | 38,000,000 | 6.50% | 7/1/2019 | 3.28% |
| | | | | | 38,000,000 | | | |
| Sewer2001C2 | 2512374G5 | Senior | FGIC / BHAC | 7/1/2014 | 310,000 | 4.00% | N/A | Retired |
| Sewer2001C2 | 2512374H3 | Senior | FGIC / BHAC | 7/1/2015 | 325,000 | 4.00% | N/A | 0.75% |
| Sewer2001C2 | 2512374J9 | Senior | FGIC / BHAC | 7/1/2016 | 345,000 | 4.00% | N/A | 0.85% |
| Sewer2001C2 | 2512374K6 | Senior | FGIC / BHAC | 7/1/2017 | 365,000 | 4.00% | N/A | 1.20% |
| Sewer2001C2 | 2512374L4 | Senior | FGIC / BHAC | 7/1/2018 | 380,000 | 4.00% | N/A | 1.54% |
| Sewer2001C2 | 2512374M2 | Senior | FGIC / BHAC | 7/1/2019 | 400,000 | 4.00% | 7/1/2018 | 1.93% |
| Sewer2001C2 | 2512374N0 | Senior | FGIC / BHAC | 7/1/2027 | 4,090,000 | 4.50% | 7/1/2018 | 3.42% |
| Sewer2001C2 | 2512374P5 | Senior | FGIC / BHAC | 7/1/2028 | 21,600,000 | 5.25% | 7/1/2018 | 4.38% |
| Sewer2001C2 | 2512374Q3 | Senior | FGIC / BHAC | 7/1/2029 | 93,540,000 | 5.25% | 7/1/2018 | 4.46% |
| | | | | | 121,355,000 | | | |

| Series Name | CUSIP | Lien | Insurer | Final Maturity | Total Principal | Coupon | Call Date | New Interest Rate |
|---|---|---|---|---|---|---|---|---|
| Sewer2003A (Call) | 251237K77 | Senior | Assured Guaranty | 7/1/2014 | 3,225,000 | 5.00% | 7/1/2013 | Retired |
| Sewer2003A (Call) | 251237YM9 | Senior | Assured Guaranty | 7/1/2015 | 275,000 | 3.65% | 7/1/2013 | 0.75% |
| Sewer2003A (Call) | 251237K85 | Senior | Assured Guaranty | 7/1/2015 | 3,325,000 | 5.00% | 7/1/2013 | 0.75% |
| Sewer2003A (Call) | 251237YQ0 | Senior | Assured Guaranty | 7/1/2016 | 190,000 | 3.70% | 7/1/2013 | 0.85% |
| Sewer2003A (Call) | 251237Q89 | Senior | Assured Guaranty | 7/1/2016 | 10,000 | 5.00% | 7/1/2013 | 0.85% |
| Sewer2003A (Call) | 251237YT4 | Senior | Assured Guaranty | 7/1/2017 | 250,000 | 3.80% | 7/1/2013 | 1.20% |
| Sewer2003A (Call) | 251237Q97 | Senior | Assured Guaranty | 7/1/2017 | 3,200,000 | 5.00% | 7/1/2013 | 1.20% |
| Sewer2003A (Call) | 251237YW7 | Senior | Assured Guaranty | 7/1/2018 | 535,000 | 4.00% | 7/1/2013 | 1.54% |
| Sewer2003A (Call) | 251237R21 | Senior | Assured Guaranty | 7/1/2018 | 180,000 | 5.00% | 7/1/2013 | 1.54% |
| Sewer2003A (Call) | 251237YZ0 | Senior | Assured Guaranty | 7/1/2019 | 300,000 | 4.00% | 7/1/2013 | 1.93% |
| Sewer2003A (Call) | 251237ZB2 | Senior | Assured Guaranty | 7/1/2020 | 50,000 | 4.00% | 7/1/2013 | 2.29% |
| Sewer2003A (Call) | 251237ZD8 | Senior | Assured Guaranty | 7/1/2021 | 4,795,000 | 5.00% | 7/1/2013 | 2.65% |
| Sewer2003A (Call) | 251237ZE6 | Senior | Assured Guaranty | 7/1/2022 | 25,000 | 4.25% | 7/1/2013 | 2.97% |
| Sewer2003A (Call) | 251237ZF3 | Senior | Assured Guaranty | 7/1/2022 | 5,440,000 | 5.00% | 7/1/2013 | 2.97% |
| Sewer2003A (Call) | 251237ZG1 | Senior | Assured Guaranty | 7/1/2023 | 1,000,000 | 4.30% | 7/1/2013 | 3.28% |
| Sewer2003A (Call) | 251237ZH9 | Senior | Assured Guaranty | 7/1/2023 | 7,935,000 | 5.00% | 7/1/2013 | 3.28% |
| Sewer2003A (Call) | 251237ZJ5 | Senior | Assured Guaranty | 7/1/2024 | 18,215,000 | 5.00% | 7/1/2013 | 3.56% |
| Sewer2003A (Call) | 251237Y72 | Senior | Assured Guaranty | 7/1/2025 | 13,210,000 | 5.00% | 7/1/2013 | 3.78% |
| Sewer2003A (Call) | 251237Y80 | Senior | Assured Guaranty | 7/1/2026 | 9,005,000 | 5.00% | 7/1/2013 | 3.99% |
| Sewer2003A (Call) | 251237Y98 | Senior | Assured Guaranty | 7/1/2028 | 19,485,000 | 5.00% | 7/1/2013 | 4.29% |
| Sewer2003A (Call) | 251237Z22 | Senior | Assured Guaranty | 7/1/2032 | 38,290,000 | 5.00% | 7/1/2013 | Not Changed |
| | | | | | 128,940,000 | | | |
| Sewer2003A (Not Call) | 251237YK3 | Senior | Assured Guaranty | 7/1/2014 | 3,815,000 | 3.50% | N/A | Retired |
| Sewer2003A (Not Call) | 251237YN7 | Senior | Assured Guaranty | 7/1/2015 | 11,880,000 | 5.50% | N/A | 0.75% |
| Sewer2003A (Not Call) | 251237YR8 | Senior | Assured Guaranty | 7/1/2016 | 12,535,000 | 5.50% | N/A | 0.85% |
| Sewer2003A (Not Call) | 251237YU1 | Senior | Assured Guaranty | 7/1/2017 | 13,215,000 | 5.50% | N/A | 1.20% |
| Sewer2003A (Not Call) | 251237YX5 | Senior | Assured Guaranty | 7/1/2018 | 13,950,000 | 5.50% | N/A | 1.54% |
| | | | | | 55,395,000 | | | |
| Sewer2003B | 2512376Q1 | Senior | Assured Guaranty | 7/1/2033 | 150,000,000 | 7.50% | 7/1/2019 | 4.89% |
| | | | | | 150,000,000 | | | |
| Sewer2004A | 251237B69 | Senior | Assured Guaranty | 7/1/2014 | 7,310,000 | 5.00% | N/A | Retired |
| Sewer2004A | 251237B77 | Senior | Assured Guaranty | 7/1/2019 | 14,830,000 | 5.25% | N/A | 1.93% |
| Sewer2004A | 251237B85 | Senior | Assured Guaranty | 7/1/2020 | 15,605,000 | 5.25% | N/A | 2.29% |
| Sewer2004A | 251237B93 | Senior | Assured Guaranty | 7/1/2021 | 5,525,000 | 5.25% | N/A | 2.65% |
| Sewer2004A | 251237C27 | Senior | Assured Guaranty | 7/1/2022 | 5,545,000 | 5.25% | N/A | 2.97% |
| Sewer2004A | 251237C35 | Senior | Assured Guaranty | 7/1/2023 | 5,835,000 | 5.25% | N/A | 3.28% |
| Sewer2004A | 251237C43 | Senior | Assured Guaranty | 7/1/2024 | 6,145,000 | 5.25% | N/A | 3.56% |
| | | | | | 60,795,000 | | | |
| Sewer2006C | 251237P31 | Senior | FGIC | 7/1/2016 | 8,495,000 | 5.25% | N/A | 0.85% |
| Sewer2006C | 251237P49 | Senior | FGIC | 7/1/2017 | 8,915,000 | 5.00% | 7/1/2016 | 1.20% |
| Sewer2006C | 251237P56 | Senior | FGIC | 7/1/2018 | 9,150,000 | 5.00% | 7/1/2016 | 1.54% |
| | | | | | 26,560,000 | | | |

13-53846-tjt Doc 8772-1 Filed 12/16/14 Entered 12/16/14 08:24:40 Page 232 of 602
13-53846-swr Doc 3382-1 Filed 03/31/14 Entered 03/31/14 18:36:38 Page 17 of 37

236

| Series Name | CUSIP | Lien | Insurer | Final Maturity | Total Principal | Coupon | Call Date | New Interest Rate |
|---|---|---|---|---|---|---|---|---|
| Sewer2012A (Ins) | 251250AC0 | Senior | Assured Guaranty | 7/1/2016 | 8,880,000 | 5.00% | N/A | 0.85% |
| Sewer2012A (Ins) | 251250AE6 | Senior | Assured Guaranty | 7/1/2018 | 9,750,000 | 5.00% | N/A | 1.54% |
| Sewer2012A (Ins) | 251250AS5 | Senior | Assured Guaranty | 7/1/2039 | 50,000,000 | 5.00% | 7/1/2022 | Not Changed |
| | | | | | 68,630,000 | | | |
| Sewer2012A (Unins - 22 Call) | 251250AA4 | Senior | N/A | 7/1/2014 | 5,820,000 | 5.00% | N/A | Retired |
| Sewer2012A (Unins - 22 Call) | 251250AB2 | Senior | N/A | 7/1/2015 | 6,005,000 | 5.00% | N/A | 0.75% |
| Sewer2012A (Unins - 22 Call) | 251250AD8 | Senior | N/A | 7/1/2017 | 6,430,000 | 5.00% | N/A | 1.20% |
| Sewer2012A (Unins - 22 Call) | 251250AF3 | Senior | N/A | 7/1/2019 | 19,930,000 | 5.00% | N/A | 1.93% |
| Sewer2012A (Unins - 22 Call) | 251250AG1 | Senior | N/A | 7/1/2020 | 13,925,000 | 5.00% | N/A | 2.29% |
| Sewer2012A (Unins - 22 Call) | 251250AH9 | Senior | N/A | 7/1/2021 | 9,845,000 | 5.00% | N/A | 2.65% |
| Sewer2012A (Unins - 22 Call) | 251250AJ5 | Senior | N/A | 7/1/2022 | 14,860,000 | 5.00% | N/A | 2.97% |
| Sewer2012A (Unins - 22 Call) | 251250AK2 | Senior | N/A | 7/1/2023 | 22,275,000 | 5.00% | 7/1/2022 | 3.28% |
| Sewer2012A (Unins - 22 Call) | 251250AN6 | Senior | N/A | 7/1/2026 | 13,170,000 | 5.25% | 7/1/2022 | 3.99% |
| Sewer2012A (Unins - 22 Call) | 251250AP1 | Senior | N/A | 7/1/2027 | 9,890,000 | 5.25% | 7/1/2022 | 4.19% |
| Sewer2012A (Unins - 22 Call) | 251250AQ9 | Senior | N/A | 7/1/2032 | 120,265,000 | 5.00% | 7/1/2022 | 4.74% |
| Sewer2012A (Unins - 22 Call) | 251250AR7 | Senior | N/A | 7/1/2039 | 292,865,000 | 5.25% | 7/1/2022 | Not Changed |
| | | | | | 535,280,000 | | | |
| Sewer2012A (Unins - 17 Call) | 251250AL0 | Senior | N/A | 7/1/2024 | 23,630,000 | 5.00% | 7/1/2017 | 3.56% |
| Sewer2012A (Unins - 17 Call) | 251250AM8 | Senior | N/A | 7/1/2025 | 32,240,000 | 5.00% | 7/1/2017 | 3.78% |
| | | | | | 55,870,000 | | | |
| Sewer2001B | 251237WV1 | Second | FGIC / BHAC | 7/1/2029 | 110,550,000 | 5.50% | N/A | 4.42% |
| | | | | | 110,550,000 | | | |
| Sewer2001E | 2512374R1 | Second | FGIC | 7/1/2031 | 136,150,000 | 5.75% | 7/1/2018 | 5.02% |
| | | | | | 136,150,000 | | | |
| Sewer2005A | 251237E41 | Second | MBIA | 7/1/2014 | 625,000 | 3.60% | N/A | Retired |
| Sewer2005A | 251237E58 | Second | MBIA | 7/1/2015 | 490,000 | 3.70% | N/A | 1.00% |
| Sewer2005A | 251237E66 | Second | MBIA | 7/1/2016 | 510,000 | 3.75% | 7/1/2015 | 1.11% |
| Sewer2005A | 251237E74 | Second | MBIA | 7/1/2017 | 545,000 | 4.00% | 7/1/2015 | 1.47% |
| Sewer2005A | 251237E82 | Second | MBIA | 7/1/2018 | 555,000 | 4.00% | 7/1/2015 | 1.82% |
| Sewer2005A | 251237E90 | Second | MBIA | 7/1/2019 | 830,000 | 4.00% | 7/1/2015 | 2.21% |
| Sewer2005A | 251237F24 | Second | MBIA | 7/1/2020 | 860,000 | 4.00% | 7/1/2015 | 2.58% |
| Sewer2005A | 251237F32 | Second | MBIA | 7/1/2021 | 905,000 | 4.10% | 7/1/2015 | 2.96% |
| Sewer2005A | 251237F40 | Second | MBIA | 7/1/2022 | 925,000 | 4.13% | 7/1/2015 | 3.28% |
| Sewer2005A | 251237F57 | Second | MBIA | 7/1/2023 | 970,000 | 4.25% | 7/1/2015 | 3.60% |
| Sewer2005A | 251237F65 | Second | MBIA | 7/1/2024 | 490,000 | 4.25% | 7/1/2015 | 3.88% |
| Sewer2005A | 251237Z55 | Second | MBIA | 7/1/2028 | 19,415,000 | 5.00% | 7/1/2015 | 4.57% |
| Sewer2005A | 251237Z63 | Second | MBIA | 7/1/2033 | 24,820,000 | 5.13% | 7/1/2015 | Not Changed |
| Sewer2005A | 251237F99 | Second | MBIA | 7/1/2035 | 138,945,000 | 5.00% | 7/1/2015 | Not Changed |
| Sewer2005A | 251237G23 | Second | MBIA | 7/1/2035 | 47,000,000 | 4.50% | 7/1/2015 | Not Changed |
| | | | | | 237,885,000 | | | |

13-53846-tjt Doc 8732 Filed 12/16/14 Entered 12/16/14 08:24:49 Page 333 of 602
13-53846-swr Doc 3382-1 Filed 03/31/14 Entered 03/31/14 18:56:38 Page 17 of 104
236

## DWSD Debt Analysis - Interest Rate Reset

| Series Name | CUSIP | Lien | Insurer | Final Maturity | Total Principal | Coupon | Call Date | New Interest Rate |
|---|---|---|---|---|---|---|---|---|
| Sewer2005B | 251237G64 | Second | MBIA | 7/1/2014 | 7,775,000 | 5.00% | N/A | Retired |
| Sewer2005B | 251237G72 | Second | MBIA | 7/1/2015 | 8,010,000 | 5.00% | N/A | 1.00% |
| Sewer2005B | 251237G80 | Second | MBIA | 7/1/2021 | 10,420,000 | 5.50% | N/A | 2.96% |
| Sewer2005B | 251237G98 | Second | MBIA | 7/1/2022 | 10,990,000 | 5.50% | N/A | 3.28% |
| | | | | | 37,195,000 | | | |
| | | | | | | | | |
| Sewer2005C | 251237J20 | Second | MBIA | 7/1/2014 | 4,140,000 | 5.00% | N/A | Retired |
| Sewer2005C | 251237J38 | Second | MBIA | 7/1/2015 | 4,345,000 | 5.00% | N/A | 1.00% |
| Sewer2005C | 251237J46 | Second | MBIA | 7/1/2016 | 4,570,000 | 5.00% | 7/1/2015 | 1.11% |
| Sewer2005C | 251237J53 | Second | MBIA | 7/1/2017 | 4,795,000 | 5.00% | 7/1/2015 | 1.47% |
| Sewer2005C | 251237J61 | Second | MBIA | 7/1/2018 | 5,030,000 | 5.00% | 7/1/2015 | 1.82% |
| Sewer2005C | 251237J79 | Second | MBIA | 7/1/2019 | 5,280,000 | 5.00% | 7/1/2015 | 2.21% |
| Sewer2005C | 251237J87 | Second | MBIA | 7/1/2020 | 7,355,000 | 5.00% | 7/1/2015 | 2.58% |
| Sewer2005C | 251237J95 | Second | MBIA | 7/1/2021 | 7,720,000 | 5.00% | 7/1/2015 | 2.96% |
| Sewer2005C | 251237K28 | Second | MBIA | 7/1/2025 | 6,345,000 | 5.00% | 7/1/2015 | 4.11% |
| | | | | | 49,580,000 | | | |
| | | | | | | | | |
| Sewer2006A | 2512373Z4 | Second | FGIC / BHAC | 7/1/2036 | 123,655,000 | 5.50% | 7/1/2018 | Not Changed |
| | | | | | 123,655,000 | | | |
| | | | | | | | | |
| Sewer2006B | 251237M83 | Second | FGIC | 7/1/2014 | 1,835,000 | 5.00% | N/A | Retired |
| Sewer2006B | 251237M91 | Second | FGIC | 7/1/2015 | 1,825,000 | 5.00% | N/A | 1.00% |
| Sewer2006B | 251237N25 | Second | FGIC | 7/1/2016 | 1,430,000 | 5.00% | N/A | 1.11% |
| Sewer2006B | 251237N33 | Second | FGIC | 7/1/2017 | 1,505,000 | 5.00% | 7/1/2016 | 1.47% |
| Sewer2006B | 251237N41 | Second | FGIC | 7/1/2018 | 1,590,000 | 5.00% | 7/1/2016 | 1.82% |
| Sewer2006B | 251237N58 | Second | FGIC | 7/1/2022 | 7,515,000 | 4.50% | 7/1/2016 | 2.79% |
| Sewer2006B | 251237N66 | Second | FGIC | 7/1/2025 | 6,540,000 | 4.25% | 7/1/2016 | Not Changed |
| Sewer2006B | 251237N74 | Second | FGIC | 7/1/2033 | 24,400,000 | 5.00% | 7/1/2016 | Not Changed |
| Sewer2006B | 251237N82 | Second | FGIC | 7/1/2034 | 40,000,000 | 4.63% | 7/1/2016 | Not Changed |
| Sewer2006B | 251237N90 | Second | FGIC | 7/1/2036 | 156,600,000 | 5.00% | 7/1/2016 | Not Changed |
| | | | | | 243,240,000 | | | |

## DWSD Debt Analysis - Interest Rate Reset

| Series Name | CUSIP | Lien | Insurer | Final Maturity | Total Principal | Coupon | Call Date | New Interest Rate |
|---|---|---|---|---|---|---|---|---|
| **Sewer Capital Appreciation and Variable Bonds** | | | | | | | | |
| Sewer1999A[1] | 251237VM2 | Senior | FGIC | 7/1/2014 | 8,395,000 | N/A | N/A | Retired |
| Sewer1999A[1] | 251237VN0 | Senior | FGIC | 7/1/2015 | 8,228,111 | 6.04% | N/A | 0.75% |
| Sewer1999A[1] | 251237VP5 | Senior | FGIC | 7/1/2016 | 8,174,016 | 6.09% | N/A | 0.85% |
| Sewer1999A[1] | 251237VQ3 | Senior | FGIC | 7/1/2017 | 7,597,422 | 6.14% | N/A | 1.20% |
| Sewer1999A[1] | 251237VR1 | Senior | FGIC | 7/1/2018 | 7,155,785 | 6.19% | 7/1/2017 | 1.54% |
| Sewer1999A[1] | 251237VS9 | Senior | FGIC | 7/1/2019 | 6,762,707 | 6.24% | 7/1/2017 | 1.93% |
| Sewer1999A[1] | 251237VT7 | Senior | FGIC | 7/1/2020 | 6,048,715 | 6.29% | 7/1/2017 | 2.29% |
| Sewer1999A[1] | 251237VU4 | Senior | FGIC | 7/1/2021 | 6,628,298 | 6.31% | 7/1/2017 | 2.65% |
| | | | | | **58,990,054** | | | |
| Sewer2006D[2] | 251237W66 | Senior | Assured Guaranty | 7/1/2032 | 288,780,000 | 0.77% | 7/1/2011 | Not Changed |
| | | | | | **288,780,000** | | | |
| Sewer2001D[3] | 251237WY5 | Second | MBIA | 7/1/2032 | 21,315,000 | 0.28% | 7/1/2012 | Not Changed |
| | | | | | **21,315,000** | | | |

**Notes**

(1) Sewer 1999A capital appreciation bonds amount outstanding as of 7/1/2014. Effective interest rate calculated.

(2) Variable interest rate: 67% of Three Month LIBOR plus 0.60%. New bonds will retain existing rate. Current coupon approximated to be 0.765%.

(3) Variable interest rate calculated per Auction Rate. New bonds will retain existing rate. Current coupon approximated to be 0.28%.

13-53846-tjt Doc 8738-2 Filed 12/16/14 Entered 12/16/14 08:24:40 Page 335 of 602
13-53846-swr Doc 7382 Filed 09/11/14 Entered 09/11/14 18:36:38 Page 17 of 34
236

## DWSD Debt Analysis - Interest Rate Reset

| Series Name | CUSIP | Lien | Insurer | Final Maturity | Total Principal | Coupon | Call Date | New Interest Rate |
|---|---|---|---|---|---|---|---|---|
| **Water Bonds** | | | | | | | | |
| Water1993 | 251255TP0 | Senior | FGIC | 7/1/2015 | 24,725,000 | 6.50% | N/A | 0.75% |
| | | | | | 24,725,000 | | | |
| | | | | | | | | |
| Water1997A | 251255XM2 | Senior | MBIA | 7/1/2014 | 6,520,000 | 6.00% | N/A | Retired |
| Water1997A | 251255XN0 | Senior | MBIA | 7/1/2015 | 6,910,000 | 6.00% | N/A | 0.75% |
| | | | | | 13,430,000 | | | |
| | | | | | | | | |
| Water2001A | 251255A21 | Senior | FGIC | 7/1/2030 | 73,790,000 | 5.00% | 7/1/2011 | 4.59% |
| | | | | | 73,790,000 | | | |
| | | | | | | | | |
| Water2003A | 251255D77 | Senior | MBIA | 7/1/2019 | 500,000 | 4.50% | 7/1/2013 | 1.93% |
| Water2003A | 251255D93 | Senior | MBIA | 7/1/2021 | 250,000 | 4.70% | 7/1/2013 | 2.65% |
| Water2003A | 251255E27 | Senior | MBIA | 7/1/2022 | 3,550,000 | 4.75% | 7/1/2013 | 2.97% |
| Water2003A | 2512255F8 | Senior | MBIA | 7/1/2025 | 9,970,000 | 5.00% | 7/1/2013 | 3.78% |
| Water2003A | 251255K20 | Senior | MBIA | 7/1/2026 | 20,955,000 | 5.00% | 7/1/2013 | 3.99% |
| Water2003A | 251255K38 | Senior | MBIA | 7/1/2027 | 21,900,000 | 5.00% | 7/1/2013 | 4.19% |
| Water2003A | 251255E68 | Senior | MBIA | 7/1/2034 | 121,660,000 | 5.00% | 7/1/2013 | Not Changed |
| | | | | | 178,785,000 | | | |
| | | | | | | | | |
| Water2003C (Fix) | 251255J22 | Senior | MBIA | 7/1/2015 | 2,120,000 | 4.25% | 7/1/2013 | 0.75% |
| Water2003C (Fix) | 251255J30 | Senior | MBIA | 7/1/2016 | 2,620,000 | 5.25% | 7/1/2013 | 0.85% |
| Water2003C (Fix) | 251255J48 | Senior | MBIA | 7/1/2017 | 2,655,000 | 5.25% | 7/1/2013 | 1.20% |
| Water2003C (Fix) | 251255J55 | Senior | MBIA | 7/1/2018 | 2,930,000 | 5.25% | 7/1/2013 | 1.54% |
| Water2003C (Fix) | 251255J63 | Senior | MBIA | 7/1/2019 | 2,790,000 | 5.25% | 7/1/2013 | 1.93% |
| Water2003C (Fix) | 251255J71 | Senior | MBIA | 7/1/2020 | 2,965,000 | 5.25% | 7/1/2013 | 2.29% |
| Water2003C (Fix) | 251255J89 | Senior | MBIA | 7/1/2021 | 4,580,000 | 5.00% | 7/1/2013 | 2.65% |
| Water2003C (Fix) | 251255J97 | Senior | MBIA | 7/1/2022 | 4,665,000 | 5.00% | 7/1/2013 | 2.97% |
| | | | | | 25,325,000 | | | |
| | | | | | | | | |
| Water2003D | 2512552T1 | Senior | MBIA | 7/1/2014 | 325,000 | 4.00% | N/A | Retired |
| Water2003D | 2512552U8 | Senior | MBIA | 7/1/2015 | 335,000 | 4.10% | N/A | 0.75% |
| Water2003D | 2512552V6 | Senior | MBIA | 7/1/2016 | 350,000 | 4.20% | N/A | 0.85% |
| Water2003D | 2512552W4 | Senior | MBIA | 7/1/2017 | 360,000 | 4.25% | 7/1/2016 | 1.20% |
| Water2003D | 2512552X2 | Senior | MBIA | 7/1/2018 | 370,000 | 4.25% | 7/1/2016 | 1.54% |
| Water2003D | 2512552Y0 | Senior | MBIA | 7/1/2024 | 2,585,000 | 5.00% | 7/1/2016 | 2.82% |
| Water2003D | 2512552Z7 | Senior | MBIA | 7/1/2027 | 29,410,000 | 5.00% | 7/1/2016 | 3.99% |
| Water2003D | 2512553A1 | Senior | MBIA | 7/1/2028 | 23,920,000 | 5.00% | 7/1/2016 | 4.38% |
| Water2003D | 2512553B9 | Senior | MBIA | 7/1/2033 | 82,930,000 | 5.00% | 7/1/2016 | Not Changed |
| | | | | | 140,585,000 | | | |

| Series Name | CUSIP | Lien | Insurer | Final Maturity | Total Principal | Coupon | Call Date | New Interest Rate |
|---|---|---|---|---|---|---|---|---|
| Water2004B | 2512554A0 | Senior | MBIA | 7/1/2014 | 85,000 | 4.00% | N/A | Retired |
| Water2004B | 2512554B8 | Senior | MBIA | 7/1/2015 | 90,000 | 4.00% | N/A | 0.75% |
| Water2004B | 2512554C6 | Senior | MBIA | 7/1/2016 | 10,000,000 | 5.00% | N/A | 0.85% |
| Water2004B | 2512554D4 | Senior | MBIA | 7/1/2016 | 3,545,000 | 4.25% | N/A | 0.85% |
| Water2004B | 2512554E2 | Senior | MBIA | 7/1/2017 | 13,925,000 | 5.00% | 7/1/2016 | 1.20% |
| Water2004B | 2512554F9 | Senior | MBIA | 7/1/2017 | 350,000 | 4.25% | 7/1/2016 | 1.20% |
| Water2004B | 2512554G7 | Senior | MBIA | 7/1/2018 | 14,940,000 | 5.00% | 7/1/2016 | 1.54% |
| Water2004B | 2512554H5 | Senior | MBIA | 7/1/2019 | 15,810,000 | 5.00% | 7/1/2016 | 1.93% |
| Water2004B | 2512554J1 | Senior | MBIA | 7/1/2020 | 16,665,000 | 5.00% | 7/1/2016 | 2.29% |
| Water2004B | 2512554K8 | Senior | MBIA | 7/1/2021 | 16,085,000 | 5.00% | 7/1/2016 | 2.65% |
| Water2004B | 2512554L6 | Senior | MBIA | 7/1/2022 | 16,935,000 | 5.00% | 7/1/2016 | 2.97% |
| Water2004B | 2512554M4 | Senior | MBIA | 7/1/2023 | 6,280,000 | 5.00% | 7/1/2016 | 3.28% |
| | | | | | 114,710,000 | | | |
| Water2005A | 251255M85 | Senior | FGIC | 7/1/2014 | 50,000 | 3.75% | N/A | Retired |
| Water2005A | 251255Q81 | Senior | FGIC | 7/1/2014 | 2,070,000 | 5.00% | N/A | Retired |
| Water2005A | 251255M93 | Senior | FGIC | 7/1/2015 | 85,000 | 3.85% | N/A | 0.75% |
| Water2005A | 251255Q99 | Senior | FGIC | 7/1/2015 | 2,145,000 | 5.00% | N/A | 0.75% |
| Water2005A | 251255N27 | Senior | FGIC | 7/1/2016 | 95,000 | 3.90% | 7/1/2015 | 0.85% |
| Water2005A | 251255R23 | Senior | FGIC | 7/1/2016 | 2,265,000 | 5.00% | 7/1/2015 | 0.85% |
| Water2005A | 251255N35 | Senior | FGIC | 7/1/2017 | 125,000 | 4.00% | 7/1/2015 | 1.20% |
| Water2005A | 251255R31 | Senior | FGIC | 7/1/2017 | 2,370,000 | 5.00% | 7/1/2015 | 1.20% |
| Water2005A | 251255N43 | Senior | FGIC | 7/1/2018 | 20,000 | 4.00% | 7/1/2015 | 1.54% |
| Water2005A | 251255R49 | Senior | FGIC | 7/1/2018 | 2,615,000 | 5.00% | 7/1/2015 | 1.54% |
| Water2005A | 251255N50 | Senior | FGIC | 7/1/2019 | 2,790,000 | 5.00% | 7/1/2015 | 1.93% |
| Water2005A | 251255N68 | Senior | FGIC | 7/1/2020 | 2,955,000 | 5.00% | 7/1/2015 | 2.29% |
| Water2005A | 251255N76 | Senior | FGIC | 7/1/2021 | 3,030,000 | 5.00% | 7/1/2015 | 2.65% |
| Water2005A | 251255N84 | Senior | FGIC | 7/1/2022 | 3,225,000 | 5.00% | 7/1/2015 | 2.97% |
| Water2005A | 251255N92 | Senior | FGIC | 7/1/2023 | 3,430,000 | 5.00% | 7/1/2015 | 3.28% |
| Water2005A | 251255P25 | Senior | FGIC | 7/1/2024 | 3,650,000 | 5.00% | 7/1/2015 | 3.56% |
| Water2005A | 251255P33 | Senior | FGIC | 7/1/2025 | 3,790,000 | 5.00% | 7/1/2015 | 3.78% |
| Water2005A | 251255P41 | Senior | FGIC | 7/1/2026 | 4,080,000 | 5.00% | 7/1/2015 | 3.99% |
| Water2005A | 251255P58 | Senior | FGIC | 7/1/2027 | 4,290,000 | 5.00% | 7/1/2015 | 4.19% |
| Water2005A | 251255P66 | Senior | FGIC | 7/1/2028 | 4,615,000 | 5.00% | 7/1/2015 | 4.38% |
| Water2005A | 251255P74 | Senior | FGIC | 7/1/2029 | 4,890,000 | 4.50% | 7/1/2015 | Not Changed |
| Water2005A | 251255P82 | Senior | FGIC | 7/1/2030 | 5,145,000 | 4.50% | 7/1/2015 | Not Changed |
| Water2005A | 251255P90 | Senior | FGIC | 7/1/2031 | 5,415,000 | 4.50% | 7/1/2015 | Not Changed |
| Water2005A | 251255Q24 | Senior | FGIC | 7/1/2032 | 5,715,000 | 4.50% | 7/1/2015 | Not Changed |
| Water2005A | 251255Q32 | Senior | FGIC | 7/1/2035 | 19,525,000 | 4.50% | 7/1/2015 | Not Changed |
| | | | | | 88,385,000 | | | |

13-53846-tjt  Doc 8738  Filed 12/16/14  Entered 12/16/14 10:24:49  Page 237 of 502
13-53846-swr  Doc 7382  Filed 09/11/14  Entered 09/11/14 18:06:38  Page 175 of

236

## DWSD Debt Analysis - Interest Rate Reset

| Series Name | CUSIP | Lien | Insurer | Final Maturity | Total Principal | Coupon | Call Date | New Interest Rate |
|---|---|---|---|---|---|---|---|---|
| Water2005B | 2512557R0 | Senior | FGIC / BHAC | 7/1/2014 | 2,125,000 | 5.00% | N/A | Retired |
| Water2005B | 2512557S8 | Senior | FGIC / BHAC | 7/1/2015 | 2,225,000 | 4.00% | N/A | 0.75% |
| Water2005B | 2512557T6 | Senior | FGIC / BHAC | 7/1/2016 | 2,305,000 | 4.00% | N/A | 0.85% |
| Water2005B | 2512557U3 | Senior | FGIC / BHAC | 7/1/2017 | 2,385,000 | 4.00% | N/A | 1.20% |
| Water2005B | 2512557V1 | Senior | FGIC / BHAC | 7/1/2018 | 2,465,000 | 5.50% | N/A | 1.54% |
| Water2005B | 2512557W9 | Senior | FGIC / BHAC | 7/1/2019 | 2,575,000 | 5.50% | 7/1/2018 | 1.93% |
| Water2005B | 2512557X7 | Senior | FGIC / BHAC | 7/1/2020 | 2,690,000 | 5.50% | 7/1/2018 | 2.29% |
| Water2005B | 2512557Y5 | Senior | FGIC / BHAC | 7/1/2021 | 2,905,000 | 5.50% | 7/1/2018 | 2.65% |
| Water2005B | 2512557Z2 | Senior | FGIC / BHAC | 7/1/2022 | 3,025,000 | 5.50% | 7/1/2018 | 2.97% |
| Water2005B | 2512558A6 | Senior | FGIC / BHAC | 7/1/2023 | 3,145,000 | 5.50% | 7/1/2018 | 3.28% |
| Water2005B | 2512558B4 | Senior | FGIC / BHAC | 7/1/2024 | 3,270,000 | 5.50% | 7/1/2018 | 3.56% |
| Water2005B | 2512558C2 | Senior | FGIC / BHAC | 7/1/2025 | 3,490,000 | 5.50% | 7/1/2018 | 3.78% |
| Water2005B | 2512558D0 | Senior | FGIC / BHAC | 7/1/2026 | 3,620,000 | 5.50% | 7/1/2018 | 3.99% |
| Water2005B | 2512558E8 | Senior | FGIC / BHAC | 7/1/2027 | 3,850,000 | 5.50% | 7/1/2018 | 4.19% |
| Water2005B | 2512558F5 | Senior | FGIC / BHAC | 7/1/2028 | 3,980,000 | 5.50% | 7/1/2018 | 4.38% |
| Water2005B | 2512558G3 | Senior | FGIC / BHAC | 7/1/2034 | 28,415,000 | 4.75% | 7/1/2018 | Not Changed |
| Water2005B | 2512558H1 | Senior | FGIC / BHAC | 7/1/2035 | 57,365,000 | 5.50% | 7/1/2018 | 4.98% |
| Water2005B | 2512558J7 | Senior | FGIC / BHAC | 7/1/2035 | 57,500,000 | 5.25% | 7/1/2018 | Not Changed |
| | | | | | **187,335,000** | | | |
| Water2005C | 251255S63 | Senior | FGIC | 7/1/2014 | 9,270,000 | 5.00% | N/A | Retired |
| Water2005C | 251255S71 | Senior | FGIC | 7/1/2015 | 9,735,000 | 5.00% | N/A | 0.75% |
| Water2005C | 251255S89 | Senior | FGIC | 7/1/2016 | 17,545,000 | 5.00% | 7/1/2015 | 0.85% |
| Water2005C | 251255S97 | Senior | FGIC | 7/1/2017 | 18,425,000 | 5.00% | 7/1/2015 | 1.20% |
| Water2005C | 251255T21 | Senior | FGIC | 7/1/2018 | 18,700,000 | 5.00% | 7/1/2015 | 1.54% |
| Water2005C | 251255T39 | Senior | FGIC | 7/1/2019 | 8,245,000 | 5.00% | 7/1/2015 | 1.93% |
| Water2005C | 251255T47 | Senior | FGIC | 7/1/2020 | 8,655,000 | 5.00% | 7/1/2015 | 2.29% |
| Water2005C | 251255T54 | Senior | FGIC | 7/1/2021 | 9,090,000 | 5.00% | 7/1/2015 | 2.65% |
| Water2005C | 251255T62 | Senior | FGIC | 7/1/2022 | 9,540,000 | 5.00% | 7/1/2015 | 2.97% |
| | | | | | **109,205,000** | | | |
| Water2006A | 251255V36 | Senior | Assured Guaranty | 7/1/2014 | 7,285,000 | 5.00% | N/A | Retired |
| Water2006A | 251255V44 | Senior | Assured Guaranty | 7/1/2015 | 7,650,000 | 5.00% | N/A | 0.75% |
| Water2006A | 251255V51 | Senior | Assured Guaranty | 7/1/2016 | 8,030,000 | 5.00% | N/A | 0.85% |
| Water2006A | 251255V69 | Senior | Assured Guaranty | 7/1/2017 | 8,430,000 | 5.00% | 7/1/2016 | 1.20% |
| Water2006A | 251255V77 | Senior | Assured Guaranty | 7/1/2018 | 8,855,000 | 5.00% | 7/1/2016 | 1.54% |
| Water2006A | 251255V85 | Senior | Assured Guaranty | 7/1/2019 | 9,295,000 | 5.00% | 7/1/2016 | 1.93% |
| Water2006A | 251255V93 | Senior | Assured Guaranty | 7/1/2020 | 9,760,000 | 5.00% | 7/1/2016 | 2.29% |
| Water2006A | 251255W27 | Senior | Assured Guaranty | 7/1/2021 | 10,250,000 | 5.00% | 7/1/2016 | 2.65% |
| Water2006A | 251255W35 | Senior | Assured Guaranty | 7/1/2022 | 10,760,000 | 5.00% | 7/1/2016 | 2.97% |
| Water2006A | 251255W43 | Senior | Assured Guaranty | 7/1/2023 | 11,300,000 | 5.00% | 7/1/2016 | 3.28% |
| Water2006A | 251255W50 | Senior | Assured Guaranty | 7/1/2024 | 11,865,000 | 5.00% | 7/1/2016 | 3.56% |
| Water2006A | 251255W68 | Senior | Assured Guaranty | 7/1/2025 | 12,460,000 | 5.00% | 7/1/2016 | 3.78% |
| Water2006A | 251255W76 | Senior | Assured Guaranty | 7/1/2026 | 13,080,000 | 5.00% | 7/1/2016 | 3.99% |
| Water2006A | 251255W84 | Senior | Assured Guaranty | 7/1/2034 | 131,150,000 | 5.00% | 7/1/2016 | Not Changed |
| | | | | | **260,170,000** | | | |

13-53846-tjt Doc 8732 Filed 12/16/14 Entered 12/16/14 10:21:40 Page 338 of 602
13-53846-swr Doc 3382-1 Filed 03/31/14 Entered 03/31/14 16:36:38 Page 17 of 37
236

| Series Name | CUSIP | Lien | Insurer | Final Maturity | Total Principal | Coupon | Call Date | New Interest Rate |
|---|---|---|---|---|---|---|---|---|
| Water2006D | 251255Z81 | Senior | Assured Guaranty | 7/1/2014 | 15,000 | 4.00% | N/A | Retired |
| Water2006D | 251255Z99 | Senior | Assured Guaranty | 7/1/2015 | 15,000 | 4.10% | N/A | 0.75% |
| Water2006D | 2512552A2 | Senior | Assured Guaranty | 7/1/2016 | 15,000 | 4.20% | N/A | 0.85% |
| Water2006D | 2512552B0 | Senior | Assured Guaranty | 7/1/2017 | 20,000 | 4.25% | 7/1/2016 | 1.20% |
| Water2006D | 2512552C8 | Senior | Assured Guaranty | 7/1/2018 | 20,000 | 4.30% | 7/1/2016 | 1.54% |
| Water2006D | 2512552D6 | Senior | Assured Guaranty | 7/1/2019 | 2,650,000 | 5.00% | 7/1/2016 | 1.93% |
| Water2006D | 2512552E4 | Senior | Assured Guaranty | 7/1/2020 | 3,200,000 | 5.00% | 7/1/2016 | 2.29% |
| Water2006D | 2512552F1 | Senior | Assured Guaranty | 7/1/2023 | 20,135,000 | 5.00% | 7/1/2016 | 3.28% |
| Water2006D | 2512552G9 | Senior | Assured Guaranty | 7/1/2024 | 27,425,000 | 5.00% | 7/1/2016 | 3.56% |
| Water2006D | 2512552H7 | Senior | Assured Guaranty | 7/1/2025 | 9,955,000 | 5.00% | 7/1/2016 | 3.78% |
| Water2006D | 2512552J3 | Senior | Assured Guaranty | 7/1/2032 | 21,105,000 | 4.63% | 7/1/2016 | Not Changed |
| Water2006D | 2512552K0 | Senior | Assured Guaranty | 7/1/2032 | 57,650,000 | 5.00% | 7/1/2016 | Not Changed |
| | | | | | **142,205,000** | | | |
| | | | | | | | | |
| Water2011A | 251256BA0 | Senior | N/A | 7/1/2014 | 3,410,000 | 5.00% | N/A | Retired |
| Water2011A | 251256BB8 | Senior | N/A | 7/1/2015 | 3,550,000 | 5.00% | N/A | 0.75% |
| Water2011A | 251256BC6 | Senior | N/A | 7/1/2016 | 3,695,000 | 5.00% | N/A | 0.85% |
| Water2011A | 251256BD4 | Senior | N/A | 7/1/2017 | 3,845,000 | 5.00% | N/A | 1.20% |
| Water2011A | 251256BE2 | Senior | N/A | 7/1/2018 | 4,000,000 | 5.00% | N/A | 1.54% |
| Water2011A | 251256BF9 | Senior | N/A | 7/1/2019 | 3,160,000 | 5.00% | N/A | 1.93% |
| Water2011A | 251256BG7 | Senior | N/A | 7/1/2020 | 3,225,000 | 5.00% | N/A | 2.29% |
| Water2011A | 251256BH5 | Senior | N/A | 7/1/2021 | 4,215,000 | 5.00% | N/A | 2.65% |
| Water2011A | 251256BJ1 | Senior | N/A | 7/1/2022 | 4,195,000 | 5.25% | 7/1/2021 | 2.97% |
| Water2011A | 251256BK8 | Senior | N/A | 7/1/2023 | 4,170,000 | 5.25% | 7/1/2021 | 3.28% |
| Water2011A | 251256BL6 | Senior | N/A | 7/1/2024 | 4,140,000 | 5.25% | 7/1/2021 | 3.56% |
| Water2011A | 251256BM4 | Senior | N/A | 7/1/2025 | 4,085,000 | 5.25% | 7/1/2021 | 3.78% |
| Water2011A | 251256BN2 | Senior | N/A | 7/1/2026 | 4,020,000 | 5.25% | 7/1/2021 | 3.99% |
| Water2011A | 251256BP7 | Senior | N/A | 7/1/2027 | 3,930,000 | 5.25% | 7/1/2021 | 4.19% |
| Water2011A | 251256BQ5 | Senior | N/A | 7/1/2031 | 14,665,000 | 5.00% | 7/1/2021 | 4.56% |
| Water2011A | 251256BR3 | Senior | N/A | 7/1/2036 | 28,890,000 | 5.00% | 7/1/2021 | Not Changed |
| Water2011A | 251256BT9 | Senior | N/A | 7/1/2037 | 49,315,000 | 5.75% | 7/1/2021 | 5.10% |
| Water2011A | 251256BS1 | Senior | N/A | 7/1/2041 | 224,300,000 | 5.25% | 7/1/2021 | Not Changed |
| | | | | | **370,810,000** | | | |
| | | | | | | | | |
| Water2011B | 251256AV5 | Senior | N/A | 7/1/2016 | 1,970,000 | 3.61% | N/A | 0.80% |
| Water2011B | 251256AW3 | Senior | N/A | 7/1/2021 | 3,760,000 | 5.00% | N/A | 1.96% |
| Water2011B | 251256AX1 | Senior | N/A | 7/1/2033 | 9,740,000 | 6.00% | 7/1/2021 | 4.16% |
| | | | | | **15,470,000** | | | |
| | | | | | | | | |
| Water2011C | 251256BV4 | Senior | N/A | 7/1/2021 | 2,700,000 | 5.00% | N/A | 2.65% |
| Water2011C | 251256BW2 | Senior | N/A | 7/1/2023 | 9,965,000 | 5.25% | 7/1/2021 | 3.28% |
| Water2011C | 251256BX0 | Senior | N/A | 7/1/2024 | 10,490,000 | 5.25% | 7/1/2021 | 3.56% |
| Water2011C | 251256BY8 | Senior | N/A | 7/1/2025 | 11,035,000 | 5.25% | 7/1/2021 | 3.78% |
| Water2011C | 251256BZ5 | Senior | N/A | 7/1/2026 | 11,615,000 | 5.25% | 7/1/2021 | 3.99% |
| Water2011C | 251256CA9 | Senior | N/A | 7/1/2027 | 5,000,000 | 5.25% | 7/1/2021 | 4.19% |
| Water2011C | 251256CC5 | Senior | N/A | 7/1/2027 | 7,230,000 | 4.50% | 7/1/2021 | 4.19% |
| Water2011C | 251256CB7 | Senior | N/A | 7/1/2041 | 44,630,000 | 5.00% | 7/1/2021 | Not Changed |
| | | | | | **102,665,000** | | | |

13-53846-tjt Doc 8738-2 Filed 12/16/14 Entered 12/16/14 18:24:49 Page 239 of 602
13-53846-swr Doc 3382 Filed 03/31/15 Entered 03/31/15 18:36:38 Page 17 of 64
236

| Series Name | CUSIP | Lien | Insurer | Final Maturity | Total Principal | Coupon | Call Date | New Interest Rate |
|---|---|---|---|---|---|---|---|---|
| Water2001C | 2512556U4 | Second | FGIC / BHAC | 7/1/2014 | 350,000 | 3.50% | N/A | Retired |
| Water2001C | 2512556V2 | Second | FGIC / BHAC | 7/1/2015 | 365,000 | 4.25% | N/A | 1.00% |
| Water2001C | 2512556W0 | Second | FGIC / BHAC | 7/1/2016 | 380,000 | 4.25% | N/A | 1.11% |
| Water2001C | 2512556X8 | Second | FGIC / BHAC | 7/1/2017 | 390,000 | 4.25% | N/A | 1.47% |
| Water2001C | 2512556Y6 | Second | FGIC / BHAC | 7/1/2018 | 415,000 | 4.25% | N/A | 1.82% |
| Water2001C | 2512556Z3 | Second | FGIC / BHAC | 7/1/2019 | 12,510,000 | 5.75% | 7/1/2018 | 2.21% |
| Water2001C | 2512557A7 | Second | FGIC / BHAC | 7/1/2020 | 13,235,000 | 5.75% | 7/1/2018 | 2.58% |
| Water2001C | 2512557B5 | Second | FGIC / BHAC | 7/1/2021 | 14,025,000 | 5.75% | 7/1/2018 | 2.96% |
| Water2001C | 2512557C3 | Second | FGIC / BHAC | 7/1/2022 | 14,865,000 | 5.75% | 7/1/2018 | 3.28% |
| Water2001C | 2512557D1 | Second | FGIC / BHAC | 7/1/2023 | 15,750,000 | 5.75% | 7/1/2018 | 3.60% |
| Water2001C | 2512557E9 | Second | FGIC / BHAC | 7/1/2024 | 16,690,000 | 5.75% | 7/1/2018 | 3.88% |
| Water2001C | 2512557F6 | Second | FGIC / BHAC | 7/1/2025 | 17,690,000 | 5.75% | 7/1/2018 | 4.11% |
| Water2001C | 2512557G4 | Second | FGIC / BHAC | 7/1/2026 | 18,735,000 | 5.75% | 7/1/2018 | 4.34% |
| Water2001C | 2512557H2 | Second | FGIC / BHAC | 7/1/2027 | 19,945,000 | 5.75% | 7/1/2018 | 4.54% |
| Water2001C | 2512557J8 | Second | FGIC / BHAC | 7/1/2028 | 4,000,000 | 5.75% | 7/1/2018 | 4.74% |
| Water2001C | 2512557L3 | Second | FGIC / BHAC | 7/1/2029 | 20,090,000 | 4.50% | 7/1/2018 | Not Changed |
| Water2001C | 2512557K5 | Second | FGIC / BHAC | 7/1/2029 | 18,815,000 | 4.75% | 7/1/2018 | Not Changed |
| | | | | | 188,250,000 | | | |
| | | | | | | | | |
| Water2003B | 2512555H4 | Second | MBIA | 7/1/2034 | 41,770,000 | 5.00% | 7/1/2013 | Not Changed |
| | | | | | 41,770,000 | | | |
| | | | | | | | | |
| Water2004A | 2512553G8 | Second | MBIA | 7/1/2014 | 4,250,000 | 5.25% | N/A | Retired |
| Water2004A | 2512553H6 | Second | MBIA | 7/1/2015 | 4,475,000 | 5.25% | N/A | 1.00% |
| Water2004A | 2512553J2 | Second | MBIA | 7/1/2016 | 4,710,000 | 5.25% | N/A | 1.11% |
| Water2004A | 2512553K9 | Second | MBIA | 7/1/2017 | 4,955,000 | 5.25% | 7/1/2016 | 1.47% |
| Water2004A | 2512553L7 | Second | MBIA | 7/1/2018 | 5,215,000 | 5.25% | 7/1/2016 | 1.82% |
| Water2004A | 2512553M5 | Second | MBIA | 7/1/2019 | 5,490,000 | 5.25% | 7/1/2016 | 2.21% |
| Water2004A | 2512553N3 | Second | MBIA | 7/1/2020 | 5,780,000 | 5.25% | 7/1/2016 | 2.58% |
| Water2004A | 2512553P8 | Second | MBIA | 7/1/2021 | 6,085,000 | 5.25% | 7/1/2016 | 2.96% |
| Water2004A | 2512553Q6 | Second | MBIA | 7/1/2022 | 6,400,000 | 5.25% | 7/1/2016 | 3.28% |
| Water2004A | 2512553R4 | Second | MBIA | 7/1/2023 | 6,735,000 | 5.25% | 7/1/2016 | 3.60% |
| Water2004A | 2512553S2 | Second | MBIA | 7/1/2025 | 14,505,000 | 4.50% | 7/1/2016 | 4.00% |
| | | | | | 68,600,000 | | | |
| | | | | | | | | |
| Water2006B | 251256AG8 | Second | Assured Guaranty | 7/1/2014 | 100,000 | 3.90% | N/A | Retired |
| Water2006B | 251256AH6 | Second | Assured Guaranty | 7/1/2015 | 100,000 | 4.00% | N/A | 1.00% |
| Water2006B | 251256AJ2 | Second | Assured Guaranty | 7/1/2016 | 100,000 | 4.25% | N/A | 1.11% |
| Water2006B | 251256AK9 | Second | Assured Guaranty | 7/1/2017 | 100,000 | 4.60% | N/A | 1.47% |
| Water2006B | 251256AL7 | Second | Assured Guaranty | 7/1/2018 | 100,000 | 4.80% | N/A | 1.82% |
| Water2006B | 251256AM5 | Second | Assured Guaranty | 7/1/2019 | 100,000 | 5.00% | N/A | 2.21% |
| Water2006B | 251256AN3 | Second | Assured Guaranty | 7/1/2023 | 400,000 | 5.50% | 7/1/2019 | 3.11% |
| Water2006B | 251256AP8 | Second | Assured Guaranty | 7/1/2036 | 56,600,000 | 7.00% | 7/1/2019 | 5.47% |
| Water2006B | 251256AQ6 | Second | Assured Guaranty | 7/1/2036 | 62,100,000 | 6.25% | 7/1/2019 | 5.47% |
| | | | | | 119,700,000 | | | |

13-53846-tjt Doc 8733-8 Filed 12/16/14 Entered 12/16/14 08:40:38 Page 340 of 602
13-53846-swr Doc 7382 Filed 06/31/15 Entered 05/31/14 18:06:38 Page 17 of 32
236

## DWSD Debt Analysis - Interest Rate Reset

| Series Name | CUSIP | Lien | Insurer | Final Maturity | Total Principal | Coupon | Call Date | New Interest Rate |
|---|---|---|---|---|---|---|---|---|
| Water2006C | 251255X83 | Second | Assured Guaranty | 7/1/2014 | 1,100,000 | 4.00% | N/A | Retired |
| Water2006C | 251255X91 | Second | Assured Guaranty | 7/1/2015 | 3,725,000 | 5.00% | N/A | 1.00% |
| Water2006C | 251255Y25 | Second | Assured Guaranty | 7/1/2016 | 3,795,000 | 5.00% | N/A | 1.11% |
| Water2006C | 251255Y33 | Second | Assured Guaranty | 7/1/2017 | 4,010,000 | 5.00% | 7/1/2016 | 1.47% |
| Water2006C | 251255Y41 | Second | Assured Guaranty | 7/1/2018 | 4,765,000 | 5.00% | 7/1/2016 | 1.82% |
| Water2006C | 251255Y58 | Second | Assured Guaranty | 7/1/2022 | 5,860,000 | 5.00% | 7/1/2016 | 2.78% |
| Water2006C | 251255Y66 | Second | Assured Guaranty | 7/1/2026 | 14,880,000 | 5.00% | 7/1/2016 | 4.18% |
| Water2006C | 251255Y74 | Second | Assured Guaranty | 7/1/2029 | 32,045,000 | 5.00% | 7/1/2016 | Not Changed |
| Water2006C | 251255Y82 | Second | Assured Guaranty | 7/1/2033 | 146,500,000 | 5.00% | 7/1/2016 | Not Changed |
| | | | | | **216,680,000** | | | |

| Water Variable Bonds | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Water2003C (Var)[4] | 251255H99 | Senior | MBIA | 7/1/2014 | 2,330,000 | 2.41% | 7/1/2013 | Retired |
| | | | | | **2,330,000** | | | |

**Notes**

(4) Variable interest rate based on MUNI - CPI Rate. New bonds will retain existing rate. Current coupon estimated at approximately 2.41%.

13-53846-tjt Doc 8738-2 Filed 12/16/14 Entered 12/16/14 08:24:40 Page 241 of 602
13-53846-swr Doc 3382 Filed 03/31/14 Entered 03/31/14 18:06:36 Page 17 of 607
236

**EXHIBIT I.A.163**

SCHEDULE OF LIMITED TAX GENERAL OBLIGATION BOND
DOCUMENTS & RELATED LIMITED TAX GENERAL OBLIGATION BONDS

13-53846-tjt Doc 8772-2 Filed 12/16/14 Entered 12/16/14 08:49:32 Page 342 of 602
13-53846-swr Doc 3382-1 Filed 03/31/14 Entered 03/31/14 18:56:38 Page 186 of
236

## SCHEDULE OF LIMITED TAX GENERAL OBLIGATION BOND
## DOCUMENTS & RELATED LIMITED TAX GENERAL OBLIGATION BONDS

| Limited Tax General Obligation Bond Documents | Series of Limited Tax General Obligation Bonds | Balance as of Petition Date |
|---|---|---|
| Bond Authorizing Resolution adopted May 26, 2004<br><br>Finance Director's Order approving sale of General Obligation Self-Insurance Bonds (Limited Tax) Series 2004, dated August 27, 2004 | Self Insurance - Series 2004 | $13,186,559 |
| Bond Authorizing Resolution adopted May 6, 2005 ("2005 LTGO Resolution")<br><br>Finance Director's Order dated June 24, 2005 ("2005 Sale Order") | Series 2005-A(1) | $60,776,168 |
| 2005 LTGO Resolution<br><br>2005 Sale Order | Series 2005-A(2) | $11,080,060 |
| 2005 LTGO Resolution<br><br>2005 Sale Order | Series 2005-B | $9,003,535 |
| Resolution of the City Council adopted November 17, 2006 ("2006 LTGO Resolution")<br><br>Finance Director's Order dated May 30, 2008 ("2008 LTGO Sale Order") | Series 2008-A(1) | $43,905,085 |
| 2006 LTGO Resolution<br><br>2008 LTGO Sale Order | Series 2008-A(2) | $25,591,781 |

13-53846-tjt  Doc 8738  Filed 12/16/14  Entered 12/16/14 08:24:49  Page 343 of 602
13-53846-swr  Doc 7382  Filed 09/11/15  Entered 09/11/14 18:56:38  Page 18 of 03
236

**EXHIBIT I.A.171**

NEW B NOTES

SUMMARY OF PRINCIPAL TERMS

13-53846-tjt Doc 8772 Filed 12/16/14 Entered 12/16/14 08:40:30 Page 344 of 602
13-53846-swr Doc 3382-1 Filed 03/31/15 Entered 03/31/14 18:56:36 Page 182 of
236

**NEW B NOTES**
**SUMMARY OF PRINCIPAL TERMS**[1]

On the Effective Date, the City shall issue the New B Notes and distribute them as set forth in the Plan. The definitive documentation governing the New B Notes shall provide generally for the following terms:

| | |
|---|---|
| Obligation | The City's obligations with respect to the New B Notes shall be a general and unsecured obligation of the City. |
| Initial Principal Amount | $650.0 million. |
| Interest Rate | 4.0%. |
| Maturity | 30 years. |
| Amortization | Interest only for 10 years; amortization in 20 equal annual installments beginning on the interest payment date nearest to the 11th anniversary from issuance. |

---

[1] Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan.

**EXHIBIT I.A.174**

NEW DWSD BONDS

SUMMARY OF PRINCIPAL TERMS

13-53846-tjt Doc 8772-5 Filed 12/16/14 Entered 12/16/14 08:49:36 Page 346 of 602
13-53846-swr Doc 3382-1 Filed 03/31/15 Entered 03/31/14 18:56:38 Page 184 of
236

# NEW DWSD BONDS
## SUMMARY OF PRINCIPAL TERMS[1]

       If a DWSD Transaction is not consummated, on the Effective Date, the City shall issue the New DWSD Bonds and distribute them as set forth in the Plan. The definitive documentation governing the New DWSD Bonds shall provide generally for the following terms:

| | |
|---|---|
| Principal | The principal shall be equal to the amount of DWSD Bonds receiving New DWSD Bonds, plus amounts necessary to pay expenses of the financing. |
| Interest Rate | The interest rate of the New DWSD Bonds shall be calculated by reference to the Interest Rate Reset Chart attached as Exhibit I.A.159 to the Plan. |
| Maturity Dates | The maturity date(s) of the New DWSD Bonds shall be the same as the existing maturity(ies) of each CUSIP of DWSD Bonds receiving New DWSD Bonds. |
| Prepayment | The City may prepay or redeem all or any portion of the New DWSD Bonds at any time at its option and without penalty or premium. |
| Transfer of Assets | The City shall have the authority to permit the lease or transfer of assets currently used in DWSD's operations to one or more new authorities formed to provide water and/or sewer services provided that such transferee(s) assume the applicable portion of the then outstanding New DWSD Bonds. In the event that such DWSD assets are leased or transferred, the definition of "operations and maintenance expenses" in the documentation for the New DWSD Bonds shall be amended to (i) include the amount of any lease payment payable to the City's General Fund; and (ii) exclude such amount from the liens securing the New DWSD Bonds. |
| Other Terms | The New DWSD Bonds otherwise shall have the same terms and conditions as the applicable CUSIP of DWSD Bonds receiving New DWSD Bonds. |

---

[1]     Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan.

**EXHIBIT I.A.176**

NEW EXISTING RATE DWSD BONDS

SUMMARY OF PRINCIPAL TERMS

13-53846-tj wr Doc 8738-2 Filed 12/16/14 Entered 12/16/14 08:24:40 Page 348 of 602
13-53846-swr Doc 3382-1 Filed 03/31/14 Entered 03/31/14 18:56:38 Page 186 of
236

# NEW EXISTING RATE DWSD BONDS
## SUMMARY OF PRINCIPAL TERMS[1]

If a DWSD Transaction is not consummated, on the Effective Date, the City shall issue the New Existing Rate DWSD Bonds and distribute them as set forth in the Plan. The definitive documentation governing the New Existing Rate DWSD Bonds shall provide generally for the following terms:

| | |
|---|---|
| Principal | The principal of the New Existing Rate DWSD Bonds shall be equal to the amount of DWSD Bonds receiving New Existing Rate DWSD Bonds, plus amounts necessary to pay expenses of the financing. |
| Interest Rate | The interest rate(s) of the New Existing Rate DWSD Bonds shall be the same as existing interest rates of each CUSIP of DWSD Bonds receiving New Existing Rate DWSD Bonds. |
| Maturity Dates | The maturity date(s) of the New Existing Rate DWSD Bonds shall be the same as the existing maturity(ies) of each CUSIP of DWSD Bonds receiving New Existing Rate DWSD Bonds. |
| Prepayment | The City may prepay or redeem all or any portion of the New Existing Rate DWSD Bonds at any time at its option and without penalty or premium. |
| Transfer of Assets | The City shall have the authority to permit the lease or transfer of assets currently used in DWSD's operations to one or more new authorities formed to provide water and/or sewer services provided that such transferee(s) assume the applicable portion of the then outstanding New Existing Rate DWSD Bonds. In the event that such DWSD assets are leased or transferred, the definition of "operations and maintenance expenses" in the documentation for the New Existing Rate DWSD Bonds shall be amended to (i) include the amount of any lease payment payable to the City's General Fund; and (ii) exclude such amount from the liens securing the New Existing Rate DWSD Bonds. |
| Other Terms | The New Existing Rate DWSD Bonds otherwise shall have the same terms and conditions as the applicable CUSIP of DWSD Bonds receiving New Existing Rate DWSD Bonds. |

---

[1]    Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan.

13-53846-tjt  Doc 8738  Filed 12/16/14  Entered 12/16/14 08:24:06  Page 349 of 602
13-53846-swr  Doc 3382-1  Filed 03/31/14  Entered 03/31/14 16:56:36  Page 18 of
236

**EXHIBIT I.A.178**

NEW EXISTING RATE GLWA BONDS

SUMMARY OF PRINCIPAL TERMS

# NEW EXISTING RATE GLWA BONDS
## SUMMARY OF PRINCIPAL TERMS[1]

      If a DWSD Transaction is consummated, on the Effective Date, the GLWA shall issue the New Existing Rate GLWA Bonds and distribute them as set forth in the Plan. The definitive documentation governing the New Existing Rate GLWA Bonds shall provide generally for the following terms:

| | |
|---|---|
| Obligations | The New Existing Rate GLWA Bonds shall be obligations of GLWA. |
| Principal | The principal shall be equal to the amount of DWSD Bonds receiving New Existing Rate GLWA Bonds, plus amounts necessary to pay expenses of the financing. |
| Interest Rate | The interest rate(s) of the New Existing Rate GLWA Bonds shall be the same as existing interest rates of each CUSIP of DWSD Bonds receiving New Existing Rate GLWA Bonds. |
| Maturity Dates | The maturity date(s) of the New Existing Rate GLWA Bonds shall be the same as the existing maturity(ies) of each CUSIP of DWSD Bonds receiving New Existing Rate GLWA Bonds. |
| Prepayment | GLWA may prepay or redeem all or any portion of the New Existing Rate GLWA Bonds at any time at its option and without penalty or premium. |
| Operation and Maintenance Expenses | The "operations and maintenance expenses" of GLWA shall (i) include the amount of any lease payment payable to the City's General Fund; and (ii) be excluded from the liens securing the New Existing Rate GLWA Bonds. |
| Other Terms | The New Existing Rate GLWA Bonds otherwise shall have the same terms and conditions as the applicable CUSIP of DWSD Bonds receiving New Existing Rate GLWA Bonds (to the extent not otherwise negotiated). |

---

[1]    Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan.

**EXHIBIT I.A.181**

NEW GLWA BONDS

SUMMARY OF PRINCIPAL TERMS

13-53846-tjt Doc 8772 Filed 12/16/14 Entered 12/16/14 08:24:40 Page 352 of 602
13-53846-swr Doc 3382-1 Filed 03/31/14 Entered 03/31/14 16:56:36 Page 190 of
236

# NEW GLWA BONDS
## SUMMARY OF PRINCIPAL TERMS[1]

       If a DWSD Transaction is consummated, on the Effective Date, the GLWA shall issue the New GLWA Bonds and distribute them as set forth in the Plan.  The definitive documentation governing the New GLWA Bonds shall provide generally for the following terms:

| | |
|---|---|
| Obligations | The New GLWA Bonds shall be obligations of GLWA. |
| Principal | The principal shall be equal to the amount of DWSD Bonds receiving New GLWA Bonds, plus amounts necessary to pay expenses of the financing. |
| Interest Rate | The interest rate of the New GLWA Bonds shall be calculated by reference to the Interest Rate Reset Chart attached as Exhibit I.A.159 to the Plan. |
| Maturity Dates | The maturity date(s) of the New GLWA Bonds shall be the same as the existing maturity(ies) of each CUSIP of DWSD Bonds receiving New GLWA Bonds. |
| Prepayment | GLWA may prepay or redeem all or any portion of the New GLWA Bonds at any time at its option and without penalty or premium. |
| Operation and Maintenance Expenses | The "operations and maintenance expenses" of GLWA shall (i) include the amount of any lease payment payable to the City's General Fund; and (ii) be excluded from the liens securing the New GLWA Bonds. |
| Other Terms | The New GLWA Bonds otherwise shall have the same terms and conditions as the applicable CUSIP of DWSD Bonds receiving New GLWA Bonds. |

---

[1]      Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan.

13-53846-tjt  Doc 8732  Filed 12/16/14  Entered 12/16/14 08:24:40  Page 353 of 602
13-53846-swr  Doc 3382-1  Filed 03/31/15  Entered 03/31/14 18:56:38  Page 191 of
236

**EXHIBIT I.A.183**

NEW GLWA REVOLVING BONDS
SUMMARY OF PRINCIPAL TERMS

13-53846-tjt Doc 8772 Filed 12/16/14 Entered 12/16/14 08:40:32 Page 354 of 602
13-53846-swr Doc 3382-1 Filed 03/31/15 Entered 03/31/14 18:56:36 Page 192 of
236

## NEW GLWA REVOLVING BONDS
## SUMMARY OF PRINCIPAL TERMS[1]

If a DWSD Transaction is consummated, on the Effective Date, the GLWA shall issue the New GLWA Revolving Bonds and distribute them as set forth in the Plan. The definitive documentation governing the New GLWA Revolving Bonds shall provide generally for the following terms:

| | |
|---|---|
| Obligations | The New GLWA Revolving Bonds shall be obligations of GLWA. |
| Principal | The principal of the New GLWA Revolving Bonds shall be equal to the outstanding principal on the relevant existing DWSD Revolving Bonds. |
| Interest Rate | The interest rate of the New GLWA Revolving Bonds shall be the same as existing interest rates of each DWSD Series of DWSD Revolving Bonds receiving New GLWA Revolving Bonds. |
| Maturity | 30 years. |
| Other Terms | The New GLWA Revolving Bonds otherwise shall have the same terms and conditions as the applicable DWSD Series of DWSD Revolving Bonds receiving New GLWA Revolving Bonds. |

---

[1] Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan.

**EXHIBIT I.A.202.b**

PRINCIPAL TERMS OF PFRS HYBRID PENSION PLAN

## PFRS HYBRID PLAN -- MATERIAL TERMS

1. Benefit Formula: FAC (average base compensation over last 10 consecutive years of employment) x Years of Service earned after June 30, 2014 x 2.0%. Average base compensation means no overtime, no unused sick leave, no longevity or any other form of bonus – just base salary.

2. Actual time for benefit accrual is actual time served. For vesting service, 1,000 hours in a 12 month period to earn a year of service.

3. Normal Retirement Age – a fixed age identified in the Hybrid Plan document, with 25 years of service

4. 10 Years of Service for vesting.

5. Deferred vested pension -- 10 years of service.

6. Duty Disability - same benefit as under current PFRS

7. Non-Duty Disability – same benefit as under current PFRS

8. Non-Duty Death Benefit for Surviving Spouse – same benefit as under current PFRS

9. Duty Death Benefit for Surviving Spouse – same benefit as under current PFRS

10. No COLA

11. DROP account – no future payments into DROP

12. Annuity Savings Fund – no future Annuity Savings Fund contributions

13. Investment Return/Discount rate – 6.50%

14. Contributions - City contributes 10% of the base compensation of eligible employees. A portion of such contribution is used to fund normal cost and a portion is credited to a rate stabilization fund. Employees contribute 5-6% of base compensation toward normal cost.

15. Shift funding obligation when hybrid plan underfunded
    a. If funding falls below a certain level identified in the Hybrid Plan documents, employees and retirees will fund the shortfall until the PFRS actuary can certify that – applying a 6.50% discount rate and return assumption – the projected PFRS funding level will reach 100% within the next 5 years.

**EXHIBIT I.A.205**

FORM OF PFRS TRUST AGREEMENT

# TRUST AGREEMENT

# POLICE AND FIRE RETIREMENT SYSTEM

## OF THE

# CITY OF DETROIT

13-53846-tj Doc 8772 Filed 12/16/14 Entered 12/16/14 08:24:40 Page 359 of 602
13-53846-swr Doc 3382 Filed 03/31/15 Entered 03/31/14 18:56:36 Page 191 of
236

# TRUST AGREEMENT

This Agreement is made as of _____, 2014 by and between the City of Detroit, Michigan (hereinafter referred to as the "City") and the individual trustees named in Section 2 hereof (hereinafter each referred to as a "Trustee" and collectively referred to as the "Board of Trustees" or "Board"), effective for all purposes as of _____, 2014 (the "Effective Date").

## WITNESSETH:

WHEREAS, the City maintains the Police and Fire Retirement System of the City of Detroit (the "Retirement System") for the exclusive benefit of certain of its employees; and

WHEREAS, pursuant to the governing documents relating to the Retirement System, a trust was established for assets held under the Retirement System and a board of trustees was vested with authority to conduct the general investment operation and administration of the Retirement System and to act as trustee of the trust; and

WHEREAS, in order for the Retirement System to receive funding from the State of Michigan, and pursuant to legislation enacted by the State of Michigan, the City is required to establish an irrevocable trust pursuant to which assets currently held under the Retirement System and future contributions to the Retirement System, together with earnings and losses thereon, are to be transferred to and held by an independent board of trustees responsible for the management, investment and reinvestment of such assets for the exclusive benefit of the members of the Retirement System ("Members") and their beneficiaries ("Beneficiaries"); and

WHEREAS, the City desires to adopt this Trust Agreement in order to (i) establish an irrevocable trust (the "Trust") to provide for the custody and investment of the assets of the Retirement System as of the Effective Date and such additional property as may from time to time be contributed thereto under the terms of the Retirement System, which Trust is intended to

13-53846-tjt  Doc 8738-2  Filed 12/16/14  Entered 12/16/14 08:24:49  Page 260 of 602
13-53846-swr  Doc 7382-1  Filed 09/11/14  Entered 09/11/14 18:56:38  Page 199 of
236

be exempt from taxation under section 501(a) of the Internal Revenue Code (the "Code"), by reason of its forming a part of a retirement plan qualified under section 401(a) of the Code, (ii) appoint independent trustees to serve as the trustees of the Trust, and (iii) grant to the Board of Trustees responsibility and authority for the proper administration of the Retirement System; and

WHEREAS, this Trust Agreement shall replace and supersede any and all contrary provisions contained in the Detroit City Code of Ordinances, the Home Rule Charter of the City of Detroit, or any collective bargaining agreements concerning the management and administration of the Retirement System or the custody, investment and reinvestment of the Retirement System's assets; and

WHEREAS, following establishment of the Trust, the assets held under the Retirement System shall be exclusively held and invested pursuant to this Trust Agreement.

NOW, THEREFORE, the City and the individual Trustees named herein do hereby adopt this Trust Agreement in order to establish and designate the Trust as the successor funding vehicle for the Retirement System, upon the terms and conditions hereinafter set forth, and in order to confer the responsibility for the management and administration of the Retirement System to the Board of Trustees.

1.      **CREATION OF IRREVOCABLE TRUST**

The City hereby establishes an irrevocable trust as the successor funding vehicle for the Retirement System. The Trust created pursuant to this Trust Agreement shall, at all times, be maintained and administered in accordance with section 501(a) of the Code. This Trust Agreement shall replace and supersede any and all contrary provisions concerning the management and administration of the Retirement System or the custody, investment and reinvestment of the Retirement System's assets, including, but not limited to, the Detroit City Code of Ordinances, the Home Rule Charter of the City of Detroit, and any collective bargaining

13-53846-tjt  Doc 8738-2  Filed 12/16/14  Entered 12/16/14 08:24:40  Page 361 of 602
13-53846-swr  Doc 3382-1  Filed 03/31/14  Entered 03/31/14 19:36:38  Page 199 of 236

agreements.  The Trust Agreement shall be incorporated into and considered part of the Retirement System's governing documents.  On and after the Effective Date, the Trust shall be a public corporation under Michigan law.

**2.      ESTABLISHMENT OF BOARD OF TRUSTEES; QUALIFICATION OF TRUSTEES; TERM OF OFFICE**

Prior to the Effective Date, the Retirement System was operated and administered by a board of trustees as described in the Retirement System's governing documents and by employees of the Retirement System under the direction and control of the City's Finance Department.   With respect to periods on and after the Effective Date, a newly-formed Board of Trustees is hereby appointed to administer, manage and operate the Retirement System and to invest the assets thereof in trust pursuant to this Trust Agreement.

The Board of Trustees shall consist of five (5) voting members, all of whom shall be residents of the State of Michigan and none of whom may be an employee, contractor, agent or affiliate of the City or any labor union representing employees of the City, a member of any such labor union, or a Member or Beneficiary of the Retirement System.  Each of the voting members shall have expert knowledge or extensive experience with respect to either (a) economics, finance, or institutional investments, or (b) administration of public or private retirement plans, executive management, benefits administration or actuarial science.   At least one (1) of the voting trustees shall satisfy the requirements of (a) above and at least (1) of the voting trustees shall satisfy the requirements of (b) above.  The voting members of the Board of Trustees as of the Effective Date shall be (1) _____, (2)_____, (3)_____, (4)_____, and (5) _____.  The  fixed term of office for the voting Trustees shall be as follows:

<div align="center">

Voting Trustee      Term of Office

</div>

| (1) and (2) | 2 years |
|-------------|---------|
| (3)         | 3 years |
| (4)         | 4 years |
| (5)         | 5 years |

In addition to the voting Trustees, there shall be two (2) nonvoting members of the Board appointed as follows: (a) one retiree Member who shall be appointed pursuant to a vote of retiree Members, and (b) one member appointed by the labor unions representing Members. The retiree and union-appointed members of the Board shall each serve for a term of four (4) years.

In accordance with Section 14, a Trustee may resign from office or be removed from office prior to the expiration of the Trustee's term. In the event of any vacancy among the voting Trustees by reason of resignation, removal or expiration of a term of office, the remaining voting members of the Board shall by majority vote select a replacement Trustee to fill such position. In the event of any vacancy among the nonvoting members of the Board, a replacement Trustee shall be appointed as provided above.

## 3. <u>OPERATION OF THE BOARD; QUORUM</u>

The voting members of the Board of Trustees shall select from among the voting members a chair and a vice chair. The Board shall hold regular meetings, and shall designate the time and place thereof in advance. The Board shall adopt its own rules of procedure and shall keep a record of proceedings. Each voting Trustee shall be entitled to one vote on each question before the Board. Three (3) voting Trustees shall constitute a quorum at any meeting. A majority vote of the voting Trustees present at a meeting of the Board at which a quorum exists shall be necessary for a decision by the Board.

## 4. <u>COMPENSATION AND EXPENSE REIMBURSEMENT</u>

Each voting Trustee shall be paid a stipend of [$36,000] per year (payable ratably on a monthly basis). The retiree and union-appointed members of the Board shall each be paid a

13-53846-tjt Doc 8772 Filed 12/16/14 Entered 12/16/14 08:24:06 Page 363 of 602
13-53846-swr Doc 7382-1 Filed 09/11/14 Entered 09/11/14 19:36:35 Page 20 of 107
236

stipend of [    ] per year (payable ratably on a monthly basis). All Trustees shall be reimbursed for the reasonable, actual and necessary expenses incurred in the performance of their duties. Compensation payable to the Trustees and all reasonable and proper expenses related to the administration of the Trust and the Retirement System shall be payable out of the Trust.

## 5.    CHIEF EXECUTIVE OFFICER; EMPLOYEES

The Board shall employ on behalf of the Retirement System a chief executive officer and any other employees for which the Board establishes positions. The chief executive officer shall do all of the following:

    (a)    manage and administer the Retirement System under the supervision and direction of the Board;

    (b)    invest the assets of the Retirement System, as directed by the Board;

    (c)    annually prepare and submit to the Board for review, amendment, and adoption an itemized budget projecting the amount required to pay the Retirement System's expenses for the following fiscal year; and

    (d)    perform such other duties as the Board, in its discretion, shall delegate to the chief executive officer.

The chief executive officer, unless such power is retained by the Board, shall determine the compensation of all persons (except the chief executive officer, whose compensation shall be determined by the Board) employed by the Retirement System and such compensation shall be payable from the Trust. Any person employed by the Retirement System shall not be an employee of the City.

## 6.    POWERS AND DUTIES OF BOARD OF TRUSTEES

The Board shall have the following powers and duties:

    (a)    exclusive authority regarding the administration, management and operation of the Retirement System, including, but not limited to, the right to contract for office space, computer hardware and software, and human resource services (any or all of which may be obtained from the

13-53846-tjt Doc 8738 Filed 12/16/14 Entered 12/16/14 08:24:06 Page 364 of 602
13-53846-swr Doc 3382 Filed 03/31/14 Entered 03/31/14 16:36:36 Page 202 of
236

City), and to make rules and regulations with respect to the operation of the Retirement System not inconsistent with the terms of the Retirement System and applicable law, and to amend or rescind such rules and regulations;

(b)     to determine questions of law or fact that may arise as to the rights of any person claiming rights under the Retirement System;

(c)     to determine the contributions to the Trust required of the City and Members pursuant to the documents governing operation of the Retirement System;

(d)     to determine the   impact of proposed benefit changes on the Retirement System and to require, in its sole and absolute discretion, that additional contributions be made to the Trust by the City and/or Members as needed to safeguard the long-term actuarial and financial integrity of the Retirement System;

(e)     to construe and interpret the provisions of the Retirement System and this Trust Agreement and to correct any defect, supply any omission or reconcile any inconsistencies;

(f)     to perform ministerial functions, whether or not expressly authorized, which the Board may deem necessary or desirable in carrying out its duties under the Retirement System and this Trust Agreement;

(g)     exclusive authority to employ, contract and pay for all professional services including, but not limited to, actuarial, investment, legal, accounting, medical, and any other services that the Board considers necessary for the proper operation of the Retirement System.   The powers granted to the Board in this subparagraph include complete control of the procurement process, including contracts for office space, computer hardware and software, and human resource services.

(h)     to arrange for an annual actuarial valuation and report of the actuarial soundness of the Retirement System to be prepared by an independent actuary based upon data compiled and supplied by the Board.   The Board shall furnish a copy of the annual reports to the mayor and finance director of the City and to the chair of the Detroit City Council. At intervals of five years, the actuary shall conduct an actuarial experience study of the Retirement System and report the results to the Board.   The Board shall adopt actuarial tables, assumptions, and formulas for the Retirement System after consultation with the actuary, except to the extent such actuarial tables, assumptions, and formulas are mandated by the written documents governing the Retirement System;

(i)     to arrange for annual audits of the records and accounts of the Retirement System by a certified public accountant or by a firm of

13-53846-tjt   Doc 8738   Filed 12/16/14   Entered 12/16/14 08:24:40   Page 365 of 602
13-53846-swr   Doc 3382-1   Filed 03/31/14   Entered 03/31/14 16:56:38   Page 20 of 47
236

certified public accountants pursuant to generally accepted auditing standards;

(j)     to prepare an annual report for the Retirement System for each fiscal year in compliance with generally accepted accounting principles. The report shall contain information regarding the financial, actuarial, and other activities of the Retirement System during the fiscal year. The Board shall furnish a copy of the annual reports to the mayor and finance director of the City and to the chair of the Detroit City Council. The report shall also contain a review of the latest actuarial valuation required under subparagraph (h);

(k)     to appoint legal counsel who shall be directly responsible to and hold office at the pleasure of the Board. Legal counsel so appointed shall be an attorney licensed to practice in the State of Michigan who is experienced in matters relating to governmental retirement plans;

(l)     to appoint or employ custodians of the assets of the Retirement System. The custodians shall perform all duties necessary and incidental to the custodial responsibility and make disbursements as authorized by the Board;

(m)     in conjunction with the City, to provide that additional benefit programs for the benefit of the City's safety employees, including, but not limited to, defined benefit, defined contribution, ancillary benefit, health and welfare benefit, and other post employment benefit programs, may, in accordance with applicable law, participate in the Retirement System and be governed by this Trust Agreement or to enter into another agreement with the City, in accordance with the terms of this Trust Agreement, for the purposes of administering such additional benefit programs and investing the assets thereof;

(n)     to correct any error in the records of the Trust or the Retirement System that results in overpayment of contributions to the Retirement System by the City or a Member, or overpayment to a Member, former Member, or Beneficiary by the Trust or Retirement System. In the event of overpayment to a Member, former Member or Beneficiary, the Board may, as far as practicable, adjust future payments to such individual to correct for the error;

(o)     to the extent permissible under Michigan law (and consistent with the Retirement System's favorable tax qualified status under section 401(a) of the Code), indemnify any person and such person's heirs and legal representatives who is made a party to (or threatened to be made a party to) any action, suit or proceeding whether brought by or in the right of the Board or the Retirement System or otherwise, by reason of the fact that such person is or was a Trustee, director, officer, employee or agent of the Board (or an advisory body or committee of

13-53846-tj   Doc 8732   Filed 12/16/14   Entered 12/16/14 08:24:49   Page 366 of 602
13-53846-swr   Doc 3382-1   Filed 03/31/15   Entered 03/31/14 18:56:38   Page 204 of 404
7
236

the Board) or the Retirement System. The Trustees shall not indemnify any person who is judicially determined to have incurred liability due to fraud, gross negligence or malfeasance in the performance of his duties; and

(p)     to perform any other function that is required for the proper administration of the Retirement System and the investment of the Trust.

## 7.    **TRUST**

7.1     <u>Receipt of Assets; Exclusive Benefit Rule</u>.  The Board shall receive and accept for the purposes of this Trust Agreement all sums of money and other property paid or transferred to it by or at the direction of the City, and pursuant to the terms of this Trust Agreement shall hold, invest, reinvest, manage, administer and distribute such monies and other property and the increments, proceeds, earnings and income thereof for the exclusive benefit of Members and their Beneficiaries.

The Board need not inquire into the source of any money or property received by it nor into the authority or right of the transferor of such money or property to transfer such money or property to the Retirement System.  All assets held by the Board in the Trust pursuant to the provisions of this Trust Agreement are referred to herein as the "Trust."  All right, title and interest in and to the assets of the Trust shall at all times be vested exclusively in the Board.  No portion of the principal or income of the Trust shall revert to the City or ever be used for or diverted to any purpose other than for (i) the exclusive benefit of the Members and Beneficiaries, and (ii) the payment of reasonable expenses of the Retirement System.

7.2     <u>Contributions</u>.  Contributions to the Trust  shall be made at such times and in such amounts as are required by the governing documents of the Retirement System. The Board shall have the duty to require payment of any contributions required to be made to the Trust,  and to see that any payment made to it is computed in accordance with the governing documents of the

13-53846-tjt   Doc 8739   Filed 12/16/14   Entered 12/16/14 10:24:49   Page 367 of 502
13-53846-swr   Doc 7382   Filed 09/11/14   Entered 09/11/14 16:56:38   Page 205 of
236

Retirement System, but shall not be responsible for the adequacy of the Trust to meet and discharge any liabilities under the Retirement System.

7.3 Trust Payments. The Board shall be responsible for making payments from the Trust to Members, their Beneficiaries, and such other persons as the governing documents of the Retirement System may provide from time to time. Such payments shall be made in such manner, in such amounts and for such purposes, including the payment of benefits and the payment of expenses of administration of the Retirement System, as may be specified in the documents governing the Retirement System or applicable law. The Board shall not incur any liability or other damages on account of any payment or distribution made by the Trust in accordance with this Section.

**8. INVESTMENT OF ASSETS**

8.1 Investment Powers of the Board of Trustees. The Board shall have full power and authority to manage, control, invest and reinvest the money and other assets of the Retirement System subject to all terms, conditions, limitations, and restrictions imposed on the investment of assets of public employee retirement systems or plans by Act No. 314 of the Public Acts of 1965, being sections 38.1132 *et seq.* of the Michigan Compiled Laws, as amended (the "Act"). The Board may employ outside advisors, including investment advisors, to advise it with regard to the investment of the assets of the Retirement System. Any outside advisors who are investment fiduciaries (as defined in the Act) shall satisfy any applicable requirements of the Act.

8.2 Investment Manager Appointment. The Board, from time to time, may appoint one or more independent investment managers, pursuant to a written investment management agreement describing the powers and duties of the investment manager, to direct the investment and reinvestment of all or a portion of the Trust (hereinafter referred to as an "Investment Account").

The Board shall determine that each investment manager satisfies the requirements of section 38.1133(11) of the Act and, is entitled (under its investment management agreement) to direct the investment and reinvestment of the Investment Account for which it is responsible, in its sole and independent discretion and without limitation, except for any limitations which from time to time the Board determines shall modify the scope of such authority.

Provided that an investment manager is prudently selected and monitored by the Board, the Board shall have no liability (i) for the acts or omissions of such investment manager; (ii) for following directions of such investment manager which are given in accordance with this Trust Agreement; or (iii) for any loss of any kind which may result by reason of the manner of division of the Trust into Investment Accounts.

## 9.    VALUATION OF ASSETS

Not less frequently than annually, the Board shall determine the fair market value of assets of the Trust based upon valuations provided by investment managers (if applicable), information and financial publications of general circulation, statistical and valuation services, records of security exchanges, appraisals by qualified persons, transactions and bona fide offers in assets of the type in question and other information customarily used in the valuation of property.  An investment manager shall certify, at the request of the Board, the value of any securities or other property held in any Investment Account managed by such investment manager, and such certification shall be regarded as a direction with regard to such valuation. The Board shall be entitled to conclusively rely upon an investment manager's valuation for all purposes under this Trust Agreement.

## 10.    ACCOUNTS; BOOKS AND RECORDS

The Board shall maintain or cause to be maintained such separate accounts as are required to be maintained under the provisions of the Retirement System and such additional

10
236

13-53846-tjt   Doc 8738-5   Filed 12/16/14   Entered 12/16/14 08:21:40   Page 269 of 602
13-53846-swr   Doc 7383-2   Filed 09/11/14   Entered 09/11/14 19:06:38   Page 20 of 24

accounts as the Board deems necessary or expedient for the proper administration of the

Retirement System and the administration and investment of the Trust. The Board shall maintain

suitable records, data and information in connection with the performance of its functions under

this Trust Agreement, including, but not limited to, accurate and detailed accounts of all

investments, receipts, disbursements, and other actions, including the proportionate interest

therein and accumulated contributions of each Member who has made contributions to the

Retirement System.

## 11. <u>LIMITATION OF RESPONSIBILITY</u>

(a) The Board shall have no duties other than those expressly set forth in this Trust Agreement or the governing documents of the Retirement System, which duties may not be enlarged or expanded without the consent of the Board.

(b) The Board shall be responsible only for money and property actually received by it and only to the extent described in this Trust Agreement.

(c) No member of the Board shall have any liability for the acts or omissions of any predecessor or successor in office.

(d) The Board shall have no liability to a Member or Beneficiary for the Board's reliance on any provision of the governing documents pertaining to the Retirement System or upon any instrument, certificate, or paper provided to the Board by the City and believed by the Board to be genuine and signed or presented by any authorized person.

## 12. <u>INDEMNIFICATION</u>

The Retirement System shall indemnify and save harmless the Board, and any individual

Trustee, officer, director and employee appointed by the Board or the chief executive officer for

and from any liability, loss or expense (including reasonable attorneys' fees and costs) arising (a)

from such individual's performance of his  duties in conformance with the terms of the

Retirement System and this Trust Agreement, or (b) by reason of any breach of any statutory or

other duty owed to the Retirement System by the City, any investment manager or any delegate

13-53846-tjt  Doc 8738-5  Filed 12/16/14  Entered 12/16/14 08:24:49  Page 370 of 602
13-53846-swr  Doc 7382-1  Filed 09/11/14  Entered 09/11/14 18:36:38  Page 208 of
236

of any of them (and for the purposes of this sentence, a Trustee shall not be considered to be such a delegate), but not if the individual being indemnified is determined by a court of law to be liable for that other party's breach. The foregoing provisions of this section shall not apply to any liability, loss or expense resulting from the willful misconduct, intentional wrongdoing, or breach of applicable fiduciary duty by the Board or an individual Trustee, officer, director, or employee, or to the extent that application of the foregoing provisions of this section would violate any law.

## 13. __JUDICIAL SETTLEMENT__

Nothing contained in this Trust Agreement or in the documents relating to the establishment or maintenance of the Retirement System shall deprive the Board of the right to have a judicial settlement of the Trust. In any proceeding for a judicial settlement or for instructions in connection with the Trust, the only necessary party thereto shall be the Board, and neither the City nor any Member or other person having or claiming any interest in the Trust shall be entitled to any notice or service of process (except as required by law). Any judgment, decision or award entered in any such proceeding or action shall be conclusive upon all interested persons.

## 14. __RESIGNATION AND REMOVAL OF TRUSTEES__

A Trustee acting hereunder may resign at any time by giving ninety (90) days' prior written notice to the City and the Board, which notice or time period may be waived by the Board. A Trustee who fails to attend three (3) consecutive scheduled meetings of the Board shall be deemed to have resigned, unless the failure is excused for good reason by majority vote of the voting Trustees attending the meeting. A Trustee may be removed from office by majority vote of the other voting Trustees for reasons of nonfeasance or malfeasance. In case of the resignation or removal of a Trustee, a successor Trustee shall be appointed pursuant to Section 2.

Successor Trustees shall have the powers and duties conferred on Trustees under this Trust Agreement. The removal of a Trustee and the appointment of a new Trustee shall be evidenced by a written instrument delivered to such Trustee, the City and the Board.

## 15.   AMENDMENT

This Trust Agreement may be amended by mutual agreement of the City and the Board at any time and in any manner permitted by Michigan law. Any such amendment shall be expressed in an instrument executed by the City and the voting members of the Board and shall become effective as of the date designated in such instrument or, if no such date is designated, upon the date of the execution of such instrument.

## 16.   TERMINATION

This Trust Agreement and the Trust created hereby are irrevocable and shall continue for the maximum period of time permitted by the laws of the State of Michigan. In the event of the termination of the Retirement System, the Board shall not be required or permitted to pay out any asset of the Trust to Members and Beneficiaries until the Board has received written certification from the City, that is acceptable to the Board, that all provisions of law with respect to such termination have been complied with and until the Board has made a determination that the fair market value of the assets attributable to the Retirement System are sufficient to discharge when due all obligations of the Retirement System required by law. In the event that participation in the Retirement System is terminated with respect to one or more groups of Members, the Board shall transfer the assets and liabilities of the Trust to which the termination applies to another trust or fund for the benefit of such Members and Beneficiaries, as the Board determines appropriate.

17. **PAYMENT OF TAXES**

The Board shall pay out of the Trust all real and personal property taxes, income taxes and other taxes of any and all kinds levied or assessed under existing or future laws against the Trust. Until advised to the contrary by the City, the Trustee shall assume that the Trust is exempt from Federal, State and local income taxes, and shall act in accordance with that assumption.

18. **MISCELLANEOUS**

18.1    <u>Governing Law</u>. This Trust Agreement and the Board of Trustees shall be subject to the Code and the laws of the State of Michigan, including, but not limited to, the Constitution of the State of Michigan and Act No. 314 of the Public Acts of 1965, being sections 38.1132 *et seq.* of the Michigan Compiled Laws.

18.2    <u>Validity of Trust</u>. The Trust created by this Trust Agreement shall not be deemed invalid by reason of indefiniteness or uncertainty of the Trust Agreement, nor shall the Trust be deemed invalid by reason of violating any existing law against perpetuities.

18.3    <u>Construction</u>. In resolving any conflict among provisions of this Trust Agreement and in resolving any other uncertainty as to the meaning or intention of any provision of this Trust Agreement, the interpretation that causes the Retirement System to satisfy the applicable requirements of Act No. 314 of the Public Acts of 1965, section 401(a) of the Code and the Trust to be exempt from tax under section 501(a) of the Code shall prevail over any different interpretation.

18.4    <u>Assignment Prohibited</u>. Neither a Member nor the Retirement System may assign any part of its equity or interest in the Trust and any attempt to do so shall be void; provided, however, that the foregoing prohibition shall not apply to a domestic relations order with respect to a Member that the Retirement System determines satisfies the requirements of Code section 414(p).

13-53846-tjt  Doc 8773-2  Filed 12/16/14  Entered 12/16/14 08:24:49  Page 373 of 602
13-53846-swr  Doc 73382-5  Filed 06/31/14  Entered 05/31/14 16:96:38  Page 21 of 07
236

18.5     No Guarantees.  Neither the City nor the Board guarantees the Trust from loss or depreciation, or the payment of any amount which may become due to any person under the Retirement System or this Trust Agreement.

18.6     Necessary Parties to Disputes.  Necessary parties to any accounting, litigation or other proceedings shall include only the Board and the City, and the settlement or judgment in any such case in which the City and the Board are duly served or cited shall be binding upon all Members and Beneficiaries, and upon all persons claiming by, through or under them.

18.7     Severability.  If any provision of this Trust Agreement shall be held by a court of competent jurisdiction to be invalid or unenforceable, the remaining provisions of this Trust Agreement shall continue to be fully effective.

18.8     References.  Unless the context clearly indicates to the contrary, a reference to a statute, regulation, document or provision shall be construed as referring to any subsequently enacted, adopted or executed counterpart.

18.9     Headings.  Headings and subheadings in this Trust Agreement are inserted for convenience of reference only and are not to be considered in the construction of its provisions.

18.10    Counterparts.    This Trust Agreement may be executed in one or more counterparts, each of which shall constitute an original.

18.11    Definitions.  Terms used herein with initial capital letters which are not defined herein shall, unless the context clearly indicates otherwise, have the meanings specified in the documents governing the operation of the Retirement System.

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be executed by their duly authorized officers as of the day and year first above written.

THE CITY OF DETROIT

_____, 2014       BY:_____
                                        Kevyn D. Orr
                                        Emergency Manager

TRUSTEES

_____, 2014       BY:_____
                                        Independent Trustee

_____, 2014       BY:_____
                                        Independent Trustee

_____, 2014       BY:_____
                                        Independent Trustee

_____, 2014       BY:_____
                                        Independent Trustee

_____, 2014       BY:_____
                                        Independent Trustee

_____, 2014       BY:_____
                                        Retiree Trustee

_____, 2014       BY:_____
                                        Union-Appointed Trustee

## EXHIBIT I.A.227

RETIREE HEALTH CARE SETTLEMENT AGREEMENT

13-53846-tjt Doc 8739 Filed 12/16/14 Entered 12/16/14 08:24:40 Page 376 of 602
13-53846-swr Doc 3382 Filed 03/31/15 Entered 03/31/14 18:56:38 Page 21 of
236

# SETTLEMENT AGREEMENT

**Plaintiffs, the Official Committee of Retirees of the City of Detroit, Michigan (the "Committee"), Detroit Retired City Employees Association, Retired Detroit Police and Fire Fighters Association, and AFSCME Sub-Chapter 98, City of Detroit Retirees (collectively with the Committee, the "Plaintiffs") and Defendants, the City of Detroit, Michigan (the "City") and Kevyn Orr, individually and in his official capacity as Emergency Manager of the City of Detroit, Michigan (collectively with the City, the "Defendants"), hereby enter into this Settlement Agreement as of the 14th day of February, 2014 (the "Agreement"), which contains the following terms:**

## I.  GENERAL PROVISIONS

**1.    Agreement Modifies March 1, 2014 Plan**.  The City agrees to make the changes listed in Part II herein to the City of Detroit Retiree Health Care Plan for the period March 1, 2014 through December 31, 2014.  The changes enumerated in Part II are modifications to the City of Detroit Retiree Health Care Plan described in the 2014 Health Care Plan Options Booklet ("Booklet") distributed approximately January 2, 2014.  These modifications are premised on the terms summarized in the Booklet going into effect on March 1, 2014, subject only to the modifications set forth in this Agreement, which resolves the Plaintiffs' claims in Adversary Proceeding No. 14-04015 (the "Adversary Proceeding").

**2.    Modifications Will Not Decrease Benefits Offered in March 1, 2014 Plan**. None of the modifications in Part II reduces or eliminates any of the benefits in the City of Detroit Retiree Health Care Plan for the period March 1, 2014 through December 31, 2014 as described in the Booklet, except as specified in Part II(4)(a) and (b) below.

**3.    Effective Date of Plan Modifications**.  The modifications listed in Part II of this Agreement shall be effective with the beginning of the plan on March 1, 2014 unless otherwise noted in the Agreement.

**4.    Aggregate Caps**.  Unless specifically noted below, there is no cap on the amount that the City will spend to fulfill the modifications listed in Part II.  For the two modifications listed in Part II(3)(a)/(b) and (d)/(e) that expressly include capped funds of $2,500,000 and $3,000,000, respectively, the City shall aggregate those caps to a total of $5,500,000 such that if one capped fund is exhausted the City must draw from the other capped fund to the extent that the other capped fund has not been exhausted.

**5.    Conditions on Agreement**.  This Agreement, and the additional benefits set forth herein, are conditioned upon the City receiving debtor in possession financing that can be used for quality of life purposes on or before May 1, 2014 (the "DIP").  In the event the DIP is not in effect on or before May 1, 2014 and the City is unable to otherwise perform under this

ATI-2594662v5

13-53846-tjt   Doc 8739   Filed 12/16/14   Entered 12/16/14 08:24:49   Page 377 of 502
13-53846-swr   Doc 3382-1   Filed 03/31/14   Entered 03/31/14 19:56:38   Page 215 of
236

Agreement, this Agreement shall be null and void and the parties shall be returned to their respective positions.

## II. MODIFICATIONS TO THE CITY'S RETIREE HEALTH CARE PLAN FOR THE PERIOD MARCH 1, 2014 THROUGH DECEMBER 31, 2014

**1.** **Modification of Dental and Vision Coverage**.

**(a)** **Dental Coverage**. The City will make available an additional dental benefits option in addition to the dental benefits coverage option described in the Booklet. The additional option will be offered by Golden Dental Inc. ("Golden"). The premium charged for this group coverage option will be no greater than $23.73 per month for single coverage, $38.83 per month for two-person coverage, and $57.17 per month for family coverage, and the benefits will be as described in Exhibit 1 hereto; provided, however, that the amount charged to the retiree shall be increased to include an additional administrative charge, which administrative charge shall not exceed 20% of the applicable premium. The enrolling retiree will be fully responsible to pay the premium associated with this dental option, including the additional administrative charge, and the City shall allow the retirees to utilize the pension reduction feature for payment of the monthly premium. The City will use Reasonable Efforts to have such coverage effective June 1, 2014, including taking Reasonable Efforts to notify retirees by mail of this option as soon as practicable, and taking Reasonable Efforts to minimize the administrative charge. Reasonable Efforts, as used in this Agreement, requires the City to use good faith and reasonable diligence in light of its capabilities.

**(b)** **Vision Coverage**. The City will make available an additional vision benefits option in addition to the vision benefits coverage option described in the Booklet. The additional option will be offered by Heritage Vision Plans, Inc. ("Heritage"). The premium for this group coverage option will be no greater than $6.95 per month for single coverage and $13.75 per month for 2 or more person coverage; provided, however, that the amount charged to the retiree shall be increased to include an additional administrative charge, which administrative charge shall not exceed 20% of the applicable premium. The option shall be a national network vision option similar to the option that the City provides to active employees. The enrolling retiree will be fully responsible to pay the premium associated with this vision option, including the additional administrative charge, and the City shall allow the retirees to utilize the pension reduction feature for payment of the monthly premium. The City will use Reasonable Efforts to have such coverage effective June 1, 2014, including taking Reasonable Efforts to notify retirees by mail of this option as soon as practicable, and taking Reasonable Efforts to minimize the administrative charge.

**2.** **Modifications for Retirees Eligible for Medicare**.

**(a)** **Extension of Enrollment Deadline to Opt Out of Medicare Advantage Plan Coverage**. For retirees of the City who are enrolled in Medicare and receive

ATI-2594662v5

-2-

13-53846-tjt  Doc 8772-2  Filed 12/16/14  Entered 12/16/14 10:24:49  Page 378 of 602
13-53846-swr  Doc 3382  Filed 03/31/14  Entered 03/31/14 16:36:38  Page 216 of 236

coverage under a City-sponsored Medicare Advantage Plan through February 28, 2014, the date to opt out of such coverage was extended to February 7, 2014. Such retirees may opt out by hand delivery (no later than close of business February 7) or first-class mail delivery (post-marked on or before February 7) of the designated opt out form to the City Benefits Administration Office at Suite 1026, 2 Woodward Avenue, Detroit MI 48226. Retirees were permitted to request the designated opt out form by calling the City's Benefit Administration Customer Service Line or contacting the City Benefits Administration Office at the address above. The City will use Reasonable Efforts to process any such opt outs for which it receives timely notice in a manner so as to eliminate such Medicare Advantage Plan coverage effective March 1, 2014. To the extent the City is not able to process the timely sent opt out notices in a manner so as to eliminate such coverage effective March 1, 2014, such coverage shall be eliminated effective April 1, 2014. Retirees who did not opt out by February 7, 2014 will be enrolled in a City-sponsored Medicare Advantage Plan as described in the Booklet.

(b) **HRA Contribution for Medicare-Eligible Retirees Who Opt Out**. For each Medicare-eligible retiree who opted out of coverage under the City-sponsored Medicare Advantage Plans on or prior to February 7, 2014, the City shall automatically enroll such retiree in a City-sponsored Health Reimbursement Arrangement ("HRA"). The HRA shall be administered by Flex Plan, Inc. The City will provide each electing enrollee with a vested $115 monthly contribution credit to his or her HRA during the remainder of 2014, which will carry forward until used by the retiree or otherwise forfeited under terms to be negotiated by the parties hereto. The City will make all Reasonable Efforts to implement the HRA credits effective May 1, 2014, retroactive to March 1, 2014. The initial monthly credit for May 2014 shall be in an amount equal to the total of $115 multiplied by the number of months starting March 2014 for which the enrolled retiree did not have Medicare Advantage Plan coverage (e.g., if John Smith had City-sponsored Medicare Advantage Plan coverage until February 28, 2014, the initial monthly credit for May 2014 will be $345, covering March, April, and May; thereafter, the payments shall be $115 per month for each month in 2014).

(c) **Medicare Advantage Plan Catastrophic Drug Expenses**. Each of the Medicare Advantage Plans sponsored by the City for the period March 1, 2014 through December 31, 2014 include Medicare Part D prescription drug coverage, under which, once the $4,550 out-of-pocket threshold is met, the participant's cost sharing obligation is limited to the greater of 5% of the cost of the prescription, or $2.55 per prescription for generic and preferred multi-source drugs or $6.35 per prescription for all other prescription drugs; provided, that the participant's cost sharing obligation shall never be greater than the cost sharing that applied prior to the participant meeting such threshold. For each participant who meets the $4,550 out-of-pocket threshold while enrolled in one of the City's Medicare Advantage Plans during the period March 1, 2014 through December 31, 2014, the City will reimburse the amount of this cost sharing obligation to the related

ATI-2594662v5                                      -3-

13-53846-tjt  Doc 8772  Filed 12/16/14  Entered 12/16/14 10:24:46  Page 379 of 602
13-53846-swr  Doc 7382  Filed 09/11/14  Entered 09/11/14 19:36:38  Page 21 of 64
236

retiree.  For the avoidance of doubt, participant means both retiree and any retiree's spouse who is covered by the City's Medicare Advantage Plans.

**3.**     <u>**Modifications for Retirees Not Eligible for Medicare**</u>.

**(a)**     <u>**Additional Stipend to Retirees With $75,000 or Lower Household Income Who Acquire  Health Care Coverage  on an Exchange**</u>.  The City will provide non-duty disabled retirees who are not eligible for Medicare a $125 stipend that they may use to purchase health care coverage.  The City will increase this stipend by $50 for any non-Medicare eligible retiree who either (i) was enrolled in the City's retiree health program on December 31, 2013 or (ii) transitioned from active City benefits to retiree City benefits on or after November 1, 2013; but only to the extent such retiree described in (i) or (ii) above meets the following requirements:

i)      Not eligible for Medicare or Medicaid;

ii)     Not eligible for a benefit under Part II(4);

iii)    Not a duty-disabled retiree (duty-disabled retirees are eligible for higher stipends as provided for in the Booklet);

iv)     Under 65 years old (non-Medicare eligible retirees age 65 and older may receive an increased stipend under Part II(3)(c) below);

v)      Household income is $75,000 or less, as demonstrated by satisfaction of the process set forth in Part II(3)(b);

vi)     Does not acquire a City-offered group health plan as set forth in Part II(3)(f); and

vii)    Purchases or is covered by a health insurance policy acquired through a health insurance exchange ("Exchange") established pursuant to the Patient Protection and Affordable Care Act.

**(b)**     <u>**Process to Obtain Additional $50 Monthly Stipend.**</u>

i)      The City will retain Aon Hewitt to administer the eligibility process for the additional $50 monthly stipend set forth above in Part II(3)(a).  Retirees will be given a 30-day notice period, to expire no later than April 30, 2014, during which they shall provide to Aon Hewitt the following:

(1)     Submission of having purchased an insurance policy through an Exchange that covers such retiree.  Such submission shall include information necessary to validate the retiree's eligibility, including the name of the insurer, monthly premium amount, and the amount of federal

ATI-2594662v5                                    -4-

13-53846-tjt  Doc 8738  Filed 12/16/14  Entered 12/16/14 08:24:49  Page 380 of 602
13-53846-swr  Doc 7382-1  Filed 09/11/15  Entered 09/11/14 19:06:38  Page 21 of 47
236

subsidy, if any, that the retiree is to receive in connection with such Exchange-acquired coverage; and

(2) If the proof of Exchange-acquired coverage shows that the retiree's premium does not also include a federal subsidy amount, such retiree shall also submit a copy of his or her most recently filed federal income tax return with proof of filing, but in no event a return prior to the 2011 tax year. If such federal income tax return shows household income in excess of $75,000 and the retiree believes that household income in 2013 was below $75,000, the retiree shall also submit – along with a copy of the most recently filed federal income tax return – proof sufficient for Aon Hewitt to conclude that his or her household income in 2013 was less than $75,000.

ii) Aon Hewitt shall submit to the City its list of retirees eligible for the additional $50 monthly stipend and the monthly stipends shall be paid to the approved eligible retirees beginning in the month of June 2014 or as soon thereafter as administratively practical, with payments retroactive to March 1, 2014. For example, if the first payment is made in June 2014, it will be in the amount of $200 for the months of March, April, May, and June; thereafter, the payments shall be $50 per month for each succeeding month in 2014. The list provided by Aon Hewitt shall be final and no changes shall be made to such list for the remainder of 2014.

*The City shall cap the amount that it pays for this additional $50 stipend during the period from March through December 2014 at $3,000,000. In the event that there are more retirees meeting the requirements in Part II(3)(a) and (b) (i.e., retirees listed on the final list) than can be paid in full for $3,000,000, each retiree will have his or her stipend amount reduced pro rata, unless there are additional funds that can be used as detailed in Part I(4).*

(c) **Additional Payment to Non-Medicare Eligible Retirees Age 65 and Older**. The City will increase the stipend that it gives non-Medicare eligible retirees who are 65-years-old and older to $300/month. For such purposes, a non-Medicare eligible retiree is any retiree age 65 or older who is not – directly or through his or her spouse – eligible to automatically enroll in and obtain premium-free coverage under Part A of Medicare as evidenced by a denial letter from the Centers for Medicare and Medicaid Services ("CMS"). Retirees who have previously submitted such a letter to the City will not be required to resubmit it. Non-Medicare eligible retirees who are duty-disabled will not be eligible for this increase because their stipend is already $300 or more. The City will coordinate with Blue Cross Blue Shield of Michigan to determine the number of non-Medicare eligible retirees who are eligible for this $300 stipend. The increased stipend will apply for each month from March 2014 through December 2014. The City will make all Reasonable Efforts to implement the $300 increased

13-53846-tjt  Doc 8773-2  Filed 12/16/14  Entered 12/16/14 10:24:49  Page 381 of 602
13-53846-swr  Doc 7382-1  Filed 09/11/14  Entered 09/11/14 16:06:38  Page 215 of
236

monthly stipend beginning April 1, 2014, with payment of the increased amount over the stipend otherwise paid for prior months being retroactive to March 1, 2014; thereafter, the stipend shall be $300 per month for each succeeding month in 2014. Such eligible retirees will not receive any other stipend amounts from the City that are described in the Booklet or this Agreement.

**(d)** **$125 Monthly Stipend For City Retirees' Spouses Who are Under Age 65, With $75,000 or Lower Household Income, and Are Enrolled in Health Care Coverage on an Exchange**. The City will provide a $125 stipend to certain married retirees whose spouses either (i) were enrolled in the City's retiree health program on December 31, 2013 or (ii) transitioned from active City benefits to retiree City benefits on or after November 1, 2013; but only to the extent such spouse described in (i) or (ii) above meets the following requirements:

i)    Not eligible to enroll in one of the City's Medicare Advantage Plans;

ii)   Not eligible for Medicaid;

iii)  Not eligible for a benefit under Part II(4);

iv)   Under 65 years old;

v)    Household income is $75,000 or less, as demonstrated by satisfaction of the process set forth in Part II(3)(e);

vi)   Does not acquire a City-offered group health plan as set forth in Part II(3)(f); and

vii)  Purchases or is covered by a health insurance policy acquired through an Exchange.

**(e)** **Process to Obtain $125 Monthly Spouse Stipend.**

i)    The City will retain Aon Hewitt to administer the eligibility process for the $125 monthly spouse stipend. Retirees will be given a 30-day notice period, to expire no later than April 30, 2014, during which they shall provide to Aon Hewitt the following proof:

(1)   Submission of proof that their spouse is covered under an insurance policy purchased through an Exchange, including information necessary to validate the retirees' eligibility, including the name of the insurer, monthly premium amount, and the amount of federal subsidy, if any, that the spouse is to receive in connection with such Exchange-acquired coverage; and

(2)   If the proof of Exchange-acquired coverage shows that the spouse's premium does not also include a federal subsidy

ATI-2594662v5                                    -6-

13-53846-tjt  Doc 8773-2  Filed 12/16/14  Entered 12/16/14 08:24:40  Page 382 of 602
13-53846-swr  Doc 7382  Filed 09/11/14  Entered 09/11/14 16:56:36  Page 22 of
236

amount, such retiree shall also submit a copy of his or her most recently filed federal income tax return with proof of filing, but in no event a return prior to the 2011 tax year. If such federal income tax return shows household income in excess of $75,000 and the retiree believes that household income in 2013 was below $75,000, the retiree shall also submit – along with a copy of the most recently filed federal income tax return – proof sufficient for Aon Hewitt to conclude that his or her household income in 2013 was less than $75,000.

ii)    Aon Hewitt shall submit to the City its list of retirees who are eligible for this $125 monthly stipend and the monthly stipends shall be paid to the approved married retirees beginning in the month of June 2014 or as soon thereafter as administratively practical, with payments retroactive to March 1, 2014. For example, if the first payment is made in June 2014, it will be in the amount of $500 for the months of March, April, May, and June; thereafter, the payments shall be $125 per month for each succeeding month in 2014. The list provided by Aon Hewitt shall be final and no changes shall be made to such list for the remainder of 2014, except as follows:

(1)    if an eligible retiree ceases to be married (whether by death or divorce), the retiree's spouse will cease to be eligible for this stipend and the retiree shall be removed from the list effective as of the month immediately following such event; and

(2)    if a retiree's spouse transitions from active City benefits to retiree City benefits during 2014 and meets the eligibility provisions described in Part II(3)(d) and is approved as eligible pursuant to the process described in Part II(3)(e), the related retiree shall be added to the list effective as of the month in which the transition to retiree City benefits occurs, provided there is sufficient availability under the Aggregate Caps as described below.

*The City will cap the amount that it pays for spousal stipends at $2,500,000.* In the event that there are more retirees initially satisfying the requirements in Part II(3)(e) (*i.e.*, retirees listed on the first list submitted by Aon Hewitt to the City) than can be paid in full for $2,500,000, each such retiree will have his or her stipend amount reduced pro rata, provided that if there are additional funds that can be used as detailed in Part I(4), each such retiree will only have his or her stipend amount reduced pro rata to the extent the aggregate amount is not sufficient to satisfy the full amount of such stipends. Retirees who become eligible for this spousal stipend during the year, as described above, shall only be eligible for a stipend to the extent there is sufficient availability under the

ATI-2594662v5
-7-

13-53846-tjt   Doc 8772   Filed 12/16/14   Entered 12/16/14 08:24:49   Page 383 of 602
13-53846-swr   Doc 7582   Filed 09/30/14   Entered 09/30/14 18:56:38   Page 22 of 104
236

Aggregate Caps detailed in Part I(4). The addition or removal of retirees from the list shall not impact the amount of the stipend being paid to other eligible retirees.

**(f)**     **City Group Plan**. In 2014, the City agrees to contract with Blue Cross Blue Shield of Michigan to offer a fully-insured group health plan option to retirees who are not eligible for Medicare. Such plan option shall be reasonably equivalent to the coverage offered by the City to active employees in 2014. The enrolling retiree will be fully responsible to pay the monthly premium associated with this option. The premium cost to retirees of such policy will include the cost to the City of enrollment and administration related to this policy option, so that the City will not incur any additional expense in offering this policy. The parties will use Reasonable Efforts to have such coverage effective May 1, 2014. The City shall provide a monthly stipend of $100 to each retiree who enrolls in the City group plan, beginning with the May 1, 2014 payment. No other stipend amounts from the City that are described in the Booklet or this Agreement shall be available to retirees enrolling in this group option, unless either (i) the retiree is duty-disabled, in which case, he or she will instead receive the stipend available to duty-disabled retirees described in the Booklet, or (ii) the retiree is eligible for the stipend described in Part II(3)I, in which case, he or she will instead receive such stipend.

**4.**     **Modifications for Retirees Below the Federal Poverty Level**.

**(a)**     **Coverage for Michigan Resident Retirees Eligible For Medicaid Coverage On or After April 1, 2014**. The parties recognize that CMS has approved the State of Michigan's request to operate the "Healthy Michigan" program for adults who will become eligible for Medicaid under Section 1902(a)(10)(A)(i)(VIII) of the Social Security Act, and that on April 1, 2014 Michigan will provide Medicaid coverage to all adults residing in the State with income up to and including 133% of the Federal Poverty Level. "Federal Poverty Level" means the applicable poverty guideline based on state of residence and household size issued annually by the U.S. Department of Health and Human Services. For those retirees who are eligible for Medicaid under the scheduled April 1, 2014 expansion, the City will facilitate their transition in the following manner: Within 10 days of the effective date of this Agreement, the City shall contact by letter those non-Medicare eligible retirees, who, according to the Retirement Systems' records, reside in Michigan and whose annual pension income is in an amount less than 100% of the Federal Poverty Level. Such retirees will be given a 30 day opportunity to submit to Aon Hewitt proof that their income falls below the Federal Poverty Level. Upon receipt by Aon Hewitt of a list of such retirees falling below the Federal Poverty Level, the City shall provide payment to such retirees of the amount equal to the value of the federal subsidy for the month of March that they would have received in connection with the second lowest cost Exchange-purchased silver plan, had such retiree, and to the extent the retiree is married, such retiree's spouse, been eligible for such subsidy for the month of March 2014 for such plan based on a determination of household income at 100% of the Federal Poverty Level. A similar payment will be made by the City in

ATI-2594662v5

-8-

13-53846-tjt Doc 8772 Filed 12/16/14 Entered 12/16/14 08:24:09 Page 384 of 602
13-53846-swr Doc 3382-1 Filed 03/31/14 Entered 03/31/14 18:06:38 Page 222 of 236

connection with insurance coverage for April 2014 if such retiree and spouse are not covered by Medicaid. To the extent that the Medicaid expansion rules in Michigan have not provided such retirees the opportunity to migrate into the Michigan Medicaid program by May 1, 2014, the City shall cease its continued payment but the parties agree to negotiate in good faith an additional reasonable accommodation to such retirees that balances the City's and such retirees' interests. *Retirees eligible for payments under this subsection are not eligible for any other payment offered by the City as set forth in the Booklet or as set forth in this Agreement.*

**(b)** **Coverage for Non-Medicare Eligible Retirees in States that Have Not Expanded Medicaid**. The City recognizes that not all States have chosen to expand Medicaid coverage in accordance with Title II of the Patient Protection and Affordable Care Act, and certain non-Medicare eligible retirees residing outside the State of Michigan whose incomes fall below 133% of the Federal Poverty Level will not be eligible for Medicaid coverage. Accordingly, in connection with such retirees, the City will pay a monthly amount equal to the lesser of: (1) the second lowest cost monthly premium for a silver plan for such retiree and spouse purchased through an Exchange in their place of residence; or (2) the ratable monthly amount necessary to increase the retiree's annual household income to 100% of the Federal Poverty Level. Within 10 days of the effective date of this Agreement, the City shall contact by letter those retirees, who, according to the Retirement Systems' records, reside in states that do not provide Medicaid coverage to adults up to the Federal Poverty Level, and whose annual pension income is in an amount less than 100% of the Federal Poverty Level. Such retirees will be given a 30 day opportunity to submit to Aon Hewitt proof that their income falls below the Federal Poverty Level. The City shall commence such payments as soon as reasonably practicable after receiving a list of such retirees from Aon Hewitt. *Retirees eligible for payments under this subsection are not eligible for any other payment offered by the City as set forth in the Booklet or as set forth in this Agreement.*

## III. RELEASES, FUTURE LEGAL PROCEEDINGS, AND MISCELLANEOUS

**1.** **Future Claims in City Plan Confirmation Proceedings**. This Agreement is entered into without prejudice to any party to this litigation with respect to any issue involving the rights, claims, obligations, and payments of health care and other post-employment benefits ("OPEB"); provided that the City will not seek to recover directly from the retirees any postpetition OPEB payments made to or on behalf of retirees. Each party expressly reserves its rights on OPEB issues in connection with negotiations of a plan of adjustment, and the Plaintiffs are free to pursue, and the City to oppose, their position that the postpetition OPEB payments the City made to or on behalf of retirees were a business necessity.

**2.** **Release**. Following the execution of this Agreement, the Plaintiffs will promptly dismiss the lawsuit – which solely addresses 2014 retiree health care benefits – with prejudice; provided, however, that any party to the lawsuit may bring an action in the Bankruptcy Court to enforce the terms of this Agreement resolving the lawsuit (an "Enforcement Action") and if the

ATI-2594662v5                                    -9-

13-53846-tjt   Doc 8772   Filed 12/16/14   Entered 12/16/14 08:21:49   Page 385 of 502
13-53846-swr   Doc 7382-1   Filed 09/11/14   Entered 09/11/14 16:36:38   Page 22 of 64
236

conditions contained in the last sentence of Part I(5) occur, then Plaintiffs are free to reinstate the Adversary Proceeding. Solely for purposes of an Enforcement Action, the City consents, pursuant to 11 U.S.C. § 904, to the Bankruptcy Court's hearing and deciding such Enforcement Action.

3. **Counterparts.** This Agreement may be signed in counterparts, and each counterpart shall be treated as an original.

4. **Good Faith.** As evidenced by the undersigned acknowledgment of Judge Wiley Daniel, Mediator, this Agreement was negotiated and entered into by all parties in good faith.

5. **Plan of Adjustment.** The terms of this Agreement, including Part III(4), shall be incorporated into any plan of adjustment filed by the City and confirmed by the Bankruptcy Court in 2014 in this bankruptcy case.

Agreed,

_____
Evan Miller, attorney for Defendants


_____
Sam J. Alberts, attorney for the Committee


_____
Brian O'Keefe, attorney for Detroit Retired City Employees Association and Retiree Police and Fire Fighters Association


_____
Richard Mack, attorney for AFSCME Sub-Chapter 98, City of Detroit Retirees


Acknowledged:


_____
Judge Wiley Daniel, Mediator

13-53846-tjt  Doc 8773-2  Filed 12/16/14  Entered 12/16/14 10:24:49  Page 386 of 602
13-53846-swr  Doc 3382-1  Filed 03/31/15  Entered 03/31/14 16:56:38  Page 22 of 24
236

conditions contained in the last sentence of Part I(5) occur, then Plaintiffs are free to reinstate the Adversary Proceeding. Solely for purposes of an Enforcement Action, the City consents, pursuant to 11 U.S.C. § 904, to the Bankruptcy Court's hearing and deciding such Enforcement Action.

**3.     Counterparts.**  This Agreement may be signed in counterparts, and each counterpart shall be treated as an original.

**4.     Good Faith.**  As evidenced by the undersigned acknowledgment of Judge Wiley Daniel, Mediator, this Agreement was negotiated and entered into by all parties in good faith.

**5.     Plan of Adjustment.**  The terms of this Agreement, including Part III(4), shall be incorporated into any plan of adjustment filed by the City and confirmed by the Bankruptcy Court in 2014 in this bankruptcy case.

Agreed,

_____
Evan Miller, attorney for Defendants

_____
Sam J. Alberts, attorney for the Committee

_____
Brian O'Keefe, attorney for Detroit Retired City Employees Association and Retiree Police and Fire Fighters Association

_____
Richard Mack, attorney for AFSCME Sub-Chapter 98, City of Detroit Retirees

Acknowledged:

_____
Judge Wiley Daniel, Mediator

conditions contained in the last sentence of Part I(5) occur, then Plaintiffs are free to reinstate the Adversary Proceeding. Solely for purposes of an Enforcement Action, the City consents, pursuant to 11 U.S.C. § 904, to the Bankruptcy Court's hearing and deciding such Enforcement Action.

3.    **Counterparts.**  This Agreement may be signed in counterparts, and each counterpart shall be treated as an original.

4.    **Good Faith.**  As evidenced by the undersigned acknowledgment of Judge Wiley Daniel, Mediator, this Agreement was negotiated and entered into by all parties in good faith.

5.    **Plan of Adjustment.**  The terms of this Agreement, including Part III(4), shall be incorporated into any plan of adjustment filed by the City and confirmed by the Bankruptcy Court in 2014 in this bankruptcy case.

Agreed,

_____
Evan Miller, attorney for Defendants


_____
Sam J. Alberts, attorney for the Committee


_____
Brian O'Keefe, attorney for Detroit Retired City Employees Association and Retiree Police and Fire Fighters Association


_____
Richard Mack, attorney for AFSCME Sub-Chapter 98, City of Detroit Retirees


Acknowledged:


_____
Judge Wiley Daniel, Mediator

conditions contained in the last sentence of Part I(5) occur, then Plaintiffs are free to reinstate the Adversary Proceeding. Solely for purposes of an Enforcement Action, the City consents, pursuant to 11 U.S.C. § 904, to the Bankruptcy Court's hearing and deciding such Enforcement Action.

     **3.**   <u>**Counterparts.**</u> This Agreement may be signed in counterparts, and each counterpart shall be treated as an original.

     **4.**   <u>**Good Faith.**</u> As evidenced by the undersigned acknowledgment of Judge Wiley Daniel, Mediator, this Agreement was negotiated and entered into by all parties in good faith.

     **5.**   <u>**Plan of Adjustment.**</u> The terms of this Agreement, including Part III(4), shall be incorporated into any plan of adjustment filed by the City and confirmed by the Bankruptcy Court in 2014 in this bankruptcy case.

Agreed,

_____

Evan Miller, attorney for Defendants

_____

Sam J. Alberts, attorney for the Committee

_____

Brian O'Keefe, attorney for Detroit Retired City Employees Association and Retiree Police and Fire Fighters Association

_____

Richard Mack, attorney for AFSCME Sub-Chapter 98, City of Detroit Retirees

Acknowledged:

_____

Judge Wiley Daniel, Mediator

conditions contained in the last sentence of Part I(5) occur, then Plaintiffs are free to reinstate the Adversary Proceeding. Solely for purposes of an Enforcement Action, the City consents, pursuant to 11 U.S.C. § 904, to the Bankruptcy Court's hearing and deciding such Enforcement Action.

3. **Counterparts.** This Agreement may be signed in counterparts, and each counterpart shall be treated as an original.

4. **Good Faith.** As evidenced by the undersigned acknowledgment of Judge Wiley Daniel, Mediator, this Agreement was negotiated and entered into by all parties in good faith.

5. **Plan of Adjustment.** The terms of this Agreement, including Part III(4), shall be incorporated into any plan of adjustment filed by the City and confirmed by the Bankruptcy Court in 2014 in this bankruptcy case.

Agreed,

_____
Evan Miller, attorney for Defendants

_____
Sam J. Alberts, attorney for the Committee

_____
Brian O'Keefe, attorney for Detroit Retired City Employees Association and Retiree Police and Fire Fighters Association

_____
Richard Mack, attorney for AFSCME Sub-Chapter 98, City of Detroit Retirees

Acknowledged:

_____
Judge Wiley Daniel, Mediator

13-53846-tjt  Doc 8738-2  Filed 12/16/14  Entered 12/16/14 08:24:09  Page 390 of 602
13-53846-swr  Doc 3382-1  Filed 03/31/15  Entered 03/31/15 14:16:36  Page 225 of
236

# EXHIBIT 1

(See next page)



January 2014

# Certificate of Coverage
# City of Detroit Retirees

## CLASS I
**Diagnostic and Preventive:**

Exams, X-Rays, Prophylaxis, Fluoride -up to age 19                **100%**

## CLASS II
**Restorative:**

Fillings, Root Canals, Routine Extractions                **100%**

## CLASS III
**Prosthetics:**

Crowns, Bridges, Partials, Dentures, Space Maintainers                **80%**

## CLASS IV
**Specialty Care:**

Periodontics
Endodontics
Oral Surgery                **70%**

## ORTHODONTICS (Interceptive excluded)

Lifetime Benefit Maximum: Dependents up to age 19                **$3,000**
Lifetime Benefit Maximum: Subscriber and Spouse                **$3,000**

**Out-Of-Area Emergency Coverage $100 reimbursement**

**Annual Maximum:**        $1,600.00
**Annual Renewal:**        **07/01**
**Membership Card Reads:**  Detroit Retirees

| Rate Type | Current Rates |
|---|---|
| Single Person | $23.73 |
| Family of two | $38.83 |
| Family | $57.17 |

13-53846-tit Doc 8738 Filed 12/16/11 Entered 12/16/14 08:24:49 Page 392 of 602
13-53846-swr Doc 7382 Filed 09/11/15 Entered 09/11/14 18:36:38 Page 236 of
236

**EXHIBIT I.A.232**

SCHEDULE OF SECURED GO BOND DOCUMENTS

## SCHEDULE OF SECURED GO BOND DOCUMENTS

| Secured GO Bond Documents | Series of Secured GO Bonds | Balance as of Petition Date |
|---|---|---|
| Resolution of the City Council adopted February 23, 2010 <br><br> Finance Director's Order dated March 11, 2010 <br><br> Master Debt Retirement Trust Indenture dated as of March 1, 2010, as supplemented and amended (the "Master Indenture"), between the City of Detroit and U.S. Bank National Association, as trustee | Distributable State Aid General Obligation Limited Tax Bonds, Series 2010 | $252,475,366 |
| Resolution of the City Council adopted July 20, 2010 <br><br> Finance Director's Order dated December 9, 2010 <br><br> Master Indenture | Distributable State Aid Second Lien Bonds (Unlimited Tax General Obligation), Series 2010(A) (Taxable-Recovery Zone Economic Development Bonds – Direct Payment) | $101,707,848 |
| Resolution of the City Council adopted March 27, 2012 <br><br> Finance Director's Order dated March 28, 2012 (Series 2012(A2) and Series 2012(B2)) <br><br> Finance Director's Order dated July 3, 2012 (Series 2012 (A2) and Series 2012(B2)) <br><br> Finance Director's Order dated August 16, 2012 (Series 2012(A2-B), Series 2012 (A2) and Series 2012(B2)) <br><br> Master Indenture | Self Insurance Distributable State Aid Third Lien Bonds (Limited Tax General Obligation), Series 2012(A2) | $39,254,171 |
| Resolution of the City adopted March 27, 2012 <br><br> Finance Director's Order dated August 16, 2012 (Series 2012(A2-B), Series 2012 (A2) and Series 2012(B2)) <br><br> Master Indenture | Self Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(A2-B) | $31,037,724 |

13-53846-tjt Doc 8772 Filed 12/16/14 Entered 12/16/14 08:21:49 Page 394 of 602
13-53846-swr Doc 3382-1 Filed 03/31/15 Entered 03/31/14 19:36:38 Page 232 of
236

| Secured GO Bond Documents | Series of Secured GO Bonds | Balance as of Petition Date |
|---|---|---|
| Resolution of the City Council adopted March 27, 2012<br><br>Finance Director's Order dated March 28, 2012 (Series 2012(B))<br><br>Finance Director's Order dated July 3, 2012 (Series 2012(B))<br><br>Finance Director's Order dated August 16, 2012 (Series 2012(B))<br><br>Master Indenture | General Obligation Distributable State Aid Third Lien Capital Improvement Refunding Bonds (Limited Tax General Obligation), Series 2012(B) | $6,469,135 |
| Resolution of the City Council adopted March 27, 2012<br><br>Finance Director's Order dated March 28, 2012 (Series 2012(A2) and Series 2012(B2))<br><br>Finance Director's Order dated July 3, 2012 (Series 2012 (A2) and Series 2012(B2))<br><br>Finance Director's Order dated August 16, 2012 (Series 2012(A2-B), Series 2012 (A2) and Series 2012(B2))<br><br>Master Indenture | Self Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(B2) | $54,055,927 |

-2-

13-53846-tjt Doc 8738 Filed 12/16/14 Entered 12/16/14 08:21:49 Page 395 of 602
13-53846-swr Doc 7382 Filed 09/11/15 Entered 09/11/14 19:56:38 Page 235 of 236

**EXHIBIT I.A.268**

SCHEDULE OF UNLIMITED TAX GENERAL OBLIGATION BOND
DOCUMENTS & RELATED UNLIMITED TAX GENERAL OBLIGATION BONDS

## SCHEDULE OF UNLIMITED TAX GENERAL OBLIGATION BOND
## DOCUMENTS & RELATED UNLIMITED TAX GENERAL OBLIGATION BONDS

| Unlimited Tax General Obligation Bond Documents | Series of Unlimited Tax General Obligation Bonds | Balance as of Petition Date |
|---|---|---|
| Resolution of the City Council adopted March 3, 1999<br><br>Finance Director's Order dated April 1, 1999 | Series 1999-A | $18,747,364 |
| Amended and Restated Resolution of the City Council adopted April 6, 2001 and Supplement No. 1 to Amended and Restated Resolution, adopted June 13, 2001 (collectively, "2001 UTGO Resolution")<br><br>Finance Director's Order dated August 1, 2001 ("2001 UTGO Sale Order") | Series 2001-A(1) | $78,787,556 |
| 2001 UTGO Resolution<br><br>2001 UTGO Sale Order | Series 2001-B | $4,063,616 |
| Resolution of the City Council adopted July 24, 2002<br><br>Finance Director's Order dated August 2, 2002 | Series 2002 | $6,745,767 |
| Resolution of the City Council adopted September 19, 2003<br><br>Finance Director's Order dated October 9, 2003 | Series 2003-A | $34,908,150 |
| Bond Authorizing Resolution adopted June 14, 2004 ("2004 UTGO Resolution")<br><br>Finance Director's Order dated August 27, 2004 ("2004 UTGO Sale Order") | Series 2004-A(1) | $39,872,258 |
| 2004 UTGO Resolution<br><br>2004 UTGO Sale Order | Series 2004-B(1) | $38,206,678 |
| 2004 UTGO Resolution<br><br>2004 UTGO Sale Order | Series 2004-B(2) | $736,241 |
| Resolution of the City Council adopted July 6, 2005 ("2005 UTGO Resolution")<br><br>Finance Director's Order dated December 5, 2005 ("2005 UTGO Sale Order") | Series 2005-B | $45,452,501 |
| 2005 UTGO Resolution<br><br>2005 UTGO Sale Order | Series 2005-C | $18,671,105 |

13-53846-tjt  Doc 8732  Filed 12/16/14  Entered 12/16/14 08:24:49  Page 397 of 602
13-53846-swr  Doc 7382  Filed 09/11/14  Entered 09/11/14 18:06:38  Page 235 of
236

| Unlimited Tax General Obligation Bond Documents | Series of Unlimited Tax General Obligation Bonds | Balance as of Petition Date |
|---|---|---|
| Resolution of the City Council adopted November 17, 2006 ("2008 UTGO Resolution")<br><br>Finance Director's Order dated May 30, 2008 ("2008 UTGO Sale Order") | Series 2008-A | $59,487,564 |
| 2008 UTGO Resolution<br><br>2008 UTGO Sale Order | Series 2008-B(1) | $28,982,532 |

**EXHIBIT B**

SEWAGE DISPOSAL SYSTEM BONDS & RELATED DWSD REVOLVING SEWER BONDS

**DWSD SEWER BONDS & RELATED DWSD**
**REVOLVING SEWER BONDS AS OF THE PETITION DATE**

| | Bond Date | Amount Issued | Range of Interest Rates | Maturity Date | Balance as of Petition Date | Insurer | |
|---|---|---|---|---|---|---|---|
| **Sewage Disposal System Revenue Bonds:** | | | | | | | |
| Series 1998-A | 12-14-06 | $ 67,615,000 | 5.25 to 5.50 % | 7/1/12-23 | $ 62,764,670 | MBIA | b |
| Series 1998-B | 12-14-06 | 67,520,000 | 5.25 to 5.50 | 7/1/12-23 | 62,318,566 | MBIA | b |
| Series 1999-A (* *) | 12-1-99 | 33,510,118 | 0.00 | 7/1/12-21 | 55,576,628 | NPFGC | |
| Series 2001-B | 9-15-01 | 110,550,000 | 5.50 | 7/1/23-29 | 110,833,190 | NPFGC | |
| Series 2001-C (1) | 6-5-09 | 154,870,000 | 5.25 to 7.00 | 7/1/12-27 | 152,859,785 | Assured Guaranty | b |
| Series 2001-C (2) | 5-8-08 | 122,905,000 | 3.50 to 5.25 | 7/1/14-29 | 121,649,072 | MBIA/Berkshire Hathaway | b |
| Series 2001-D | 9-23-01 | 92,450,000 | Variable (a) | 7/1/32 | 21,316,121 | MBIA | b |
| Series 2001-E | 5-7-08 | 136,150,000 | 5.75 | 7/1/24-31 | 136,514,621 | FGIC/Berkshire Hathaway | b |
| Series 2003-A | 5-22-03 | 599,380,000 | 3.30 to 5.50 | 7/1/12-32 | 184,772,445 | Assured Guaranty | |
| Series 2003-B | 6-5-09 | 150,000,000 | 7.50 | 7/1/32-33 | 150,523,973 | Assured Guaranty | |
| Series 2004-A | 1-09-04 | 101,435,000 | 5.00 to 5.25 | 7/1/12-24 | 60,942,805 | Assured Guaranty | |
| Series 2005-A | 3-17-05 | 273,355,000 | 3.40 to 5.125 | 7/1/12-35 | 238,425,912 | MBIA | b |
| Series 2005-B | 3-17-05 | 40,215,000 | 3.40 to 5.50 | 7/1/12-22 | 37,286,604 | MBIA | |
| Series 2005-C | 3-17-05 | 63,160,000 | 5.00 | 7/1/12-25 | 49,695,460 | MBIA | b |
| Series 2006-A | 5-7-08 | 123,655,000 | 5.50 | 7/1/34-36 | 123,971,760 | MBIA/Berkshire Hathaway | b |
| Series 2006-B | 8-10-06 | 250,000,000 | 4.00 to 5.00 | 7/1/12-36 | 243,795,428 | NPFGC | b |
| Series 2006-C | 8-10-06 | 26,560,000 | 5.00 to 5.25 | 7/1/16-18 | 26,622,841 | NPFGC | b |
| Series 2006-D | 12-14-06 | 370,000,000 | Variable (a) | 7/1/12-32 | 288,885,311 | Assured Guaranty/FSA | b |
| Series 2012-A | 6-26-12 | 659,780,000 | 5.00 to 5.50 | 7/1/14-39 | 661,353,260 | Assured Guaranty | b |

**Total Sewage Disposal System Revenue Bonds**        **$2,790,108,452**

\* \* - Capital Appreciation Bonds
a - Interest rates are set periodically at the stated current market interest rate.
b - Indicates certain of bonds within series are callable under terms specified in the indenture; all other bonds are noncallable.

| DWSD Revolving Sewer Bonds: | Bond Date | Amount Issued | Range of Interest Rates | Maturity Date | Balance as of Petition Date |
|---|---|---|---|---|---|
| Series 1992-B-SRF | 9-10-92 | $ 1,915,000 | 2.00 % | 10/1/12-13 | $ 115,679 |
| Series 1993-B-SRF | 9-30-93 | 6,603,996 | 2.00 | 10/1/12-14 | 779,574 |
| Series 1997-B-SRF | 9-30-97 | 5,430,174 | 2.25 | 10/1/12-18 | 1,882,416 |
| Series 1999-SRF-1 | 6-24-99 | 21,475,000 | 2.50 | 4/1/13-20 | 8,814,549 |
| Series 1999-SRF-2 | 9-30-99 | 46,000,000 | 2.50 | 10/1/12-22 | 26,050,770 |
| Series 1999-SRF-3 | 9-30-99 | 31,030,000 | 2.50 | 10/1/12-20 | 14,400,455 |
| Series 1999-SRF-4 | 9-30-99 | 40,655,000 | 2.50 | 10/1/12-20 | 18,863,135 |
| Series 2000-SRF-1 | 3-30-00 | 44,197,995 | 2.50 | 10/1/12-22 | 22,109,906 |
| Series 2000-SRF-2 | 9-28-00 | 64,401,066 | 2.50 | 10/1/12-22 | 36,317,016 |
| Series 2001-SRF-1 | 6-28-01 | 82,200,000 | 2.50 | 10/1/12-24 | 54,544,430 |
| Series 2001-SRF-2 | 12-20-01 | 59,850,000 | 2.50 | 10/1/12-24 | 39,720,877 |
| Series 2002-SRF-1 | 6-27-02 | 18,985,000 | 2.50 | 4/1/13-23 | 10,738,639 |
| Series 2002-SRF-2 | 6-27-02 | 1,545,369 | 2.50 | 4/1/13-23 | 871,753 |
| Series 2002-SRF-3 | 12-19-02 | 31,549,466 | 2.50 | 10/1/12-24 | 19,331,028 |
| Series 2003-SRF-1 | 6-28-03 | 48,520,000 | 2.50 | 10/1/12-25 | 34,467,406 |
| Series 2003-SRF-2 | 9-25-03 | 25,055,370 | 2.50 | 4/1/13-25 | 16,511,283 |
| Series 2004-SRF-1 | 6-24-04 | 2,910,000 | 2.125 | 10/1/12-24 | 1,901,851 |
| Series 2004-SRF-2 | 6-24-04 | 18,353,459 | 2.125 | 4/1/13-25 | 11,963,005 |
| Series 2004-SRF-3 | 6-24-04 | 12,722,575 | 2.125 | 4/1/13-25 | 8,284,197 |
| Series 2007-SRF-1 | 9-20-07 | 156,687,777 | 1.625 | 10/1/12-29 | 140,784,514 |
| Series 2009-SRF-1 | 4-17-09 | 22,684,557 | 2.50 | 4/1/13-30 | 9,878,643 |
| Series 2010-SRF-1 | 1-22-10 | 6,793,631 | 2.50 | 4/1/13-31 | 3,383,696 |
| Series 2012-SRF | 8-30-12 | 14,950,000 | 2.50 | 10/1/15-34 | 4,332,541 |

**Total DWSD Revolving Sewer Bonds Payable**      <u>**$486,047,363**</u>

# EXHIBIT C

WATER SYSTEM BONDS & RELATED DWSD REVOLVING WATER BONDS

**DWSD WATER BONDS & RELATED DWSD**
**REVOLVING WATER BONDS AS OF THE PETITION DATE**

| | Bond Date | Amount Issued | Range of Interest Rates | Maturity Date | Balance as of Petition Date | Insurer | |
|---|---|---|---|---|---|---|---|
| **Water Supply System Revenue Bonds:** | | | | | | | |
| Series 1993 | 10-15-93 | $ 38,225,000 | 6.50% | 7/1/14-15 | $ 24,799,852 | NPFGC | |
| Series 1997-A | 8-01-97 | 186,220,000 | 6.00 | 7/1/14-15 | 13,470,658 | MBIA | |
| Series 2001-A | 5-01-01 | 301,165,000 | 5.00 | 7/1/29-30 | 73,961,840 | NPFGC | b |
| Series 2001-C | 5-14-08 | 190,405,000 | 3.50 to 5.75 | 7/1/14-29 | 188,732,246 | FGIC/ Berkshire Hathaway | b |
| Series 2003-A | 1-28-03 | 234,805,000 | 4.50 to 5.00 | 7/1/19-34 | 179,200,784 | MBIA | b |
| Series 2003-B | 1-28-03 | 41,770,000 | 5.00 | 7/1/34 | 41,867,273 | MBIA | b |
| Series 2003-C | 1-28-03 | 29,660,000 | 4.25 to 5.25; Some are Variable (a) | 7/1/13-22 | 27,717,476 | MBIA | b |
| Series 2003-D | 8-14-06 | 142,755,000 | 4.00 to 5.00 | 7/1/12-33 | 140,911,713 | MBIA | b |
| Series 2004-A | 8-14-06 | 72,765,000 | 3.75 to 5.25 | 7/1/12-25 | 68,762,674 | MBIA | |
| Series 2004-B | 8-14-06 | 153,830,000 | 4.00 to 5.00 | 7/1/12-23 | 114,975,691 | MBIA | |
| Series 2005-A | 3-11-05 | 105,000,000 | 3.40 to 5.00 | 7/1/12-35 | 88,581,161 | NPFGC | b |
| Series 2005-B | 5-14-08 | 194,900,000 | 4.00 to 5.50 | 7/1/14-35 | 187,792,939 | FGIC/ Berkshire Hathaway | b |
| Series 2005-C | 3-11-05 | 126,605,000 | 5.00 | 7/1/12-22 | 109,459,313 | NPFGC | b |
| Series 2006-A | 8-14-06 | 280,000,000 | 5.00 | 7/1/13-34 | 260,775,875 | Assured Guaranty/FSA | b |
| Series 2006-B | 4-1-09 | 120,000,000 | 3.00 to 7.00 | 7/1/12-36 | 120,067,563 | Assured Guaranty/FSA | b |
| Series 2006-C | 8-14-06 | 220,645,000 | 4.00 to 5.00 | 7/1/12-33 | 217,184,085 | Assured Guaranty/FSA | b |
| Series 2006-D | 8-14-06 | 146,590,000 | 4.00 to 5.00 | 7/1/12-32 | 142,532,444 | Assured Guaranty/FSA | b |
| Series 2011-A | 12-22-11 | 379,590,000 | 3.00 to 5.75 | 7/1/12-41 | 371,720,309 | N/A | b |
| Series 2011-B | 12-22-11 | 17,195,000 | 2.496 to 6.00 | 7/1/12-33 | 15,509,284 | N/A | b |
| Series 2011-C | 12-22-11 | 103,890,000 | 3.00 to 5.25 | 7/1/12-41 | 102,908,415 | N/A | b |
| **Total Water System Revenue Bonds** | | | | | **$2,490,931,589** | | |

a - Interest rates are set periodically at the stated current market interest rate.
b - Indicates certain of bonds within series are callable under terms specified in the indenture; all other bonds are noncallable.

| | Bond Date | Amount Issued | Range of Interest Rates | Maturity Date | Balance as of Petition Date |
|---|---|---|---|---|---|
| **DWSD Revolving Water Bonds:** | | | | | |
| Series 2005 SRF-1 | 9-22-05 | $13,805,164 | 2.125 % | 10/1/13-26 | $10,022,619 |
| Series 2005 SRF-2 | 9-22-05 | 8,891,730 | 2.125 | 10/1/13-26 | 6,280,869 |
| Series 2006 SRF-1 | 9-21-06 | 5,180,926 | 2.125 | 10/1/13-26 | 3,739,227 |
| Series 2008 SRF-1 | 9-29-08 | 2,590,941 | 2.500 | 10/1/13-26 | 1,547,272 |
| **Total DWSD Revolving Water Bonds Payable** | | | | | **$21,589,987** |

**EXHIBIT D**

UNLIMITED TAX GENERAL OBLIGATION BONDS

# UNLIMITED TAX GENERAL OBLIGATION BONDS

## Unsecured Unlimited Tax General Obligation Bonds

| | Issue Date | Amount Issued | Range of Interest Rates | Maturity Date | Balance as of Petition Date | Insurer | |
|---|---|---|---|---|---|---|---|
| Series 1999-A | 4-1-99 | $28,020,000 | 5.00 to 5.25 % | 4/1/13-19 | $18,747,364 | Assured Guaranty | b |
| Series 2001-A(1) | 7-15-01 | 83,200,000 | 5.00 to 5.375 | 4/1/13-21 | 78,787,556 | MBIA | b |
| Series 2001-B | 7-15-01 | 23,235,000 | 5.375 | 4/1/13-14 | 4,063,616 | MBIA | b |
| Series 2002 | 8-2-02 | 29,205,000 | 4.00 to 5.13 | 4/1/13-22 | 6,745,767 | MBIA | b |
| Series 2003-A | 10-21-03 | 44,020,000 | 3.70 to 5.25 | 4/1/13-23 | 34,908,150 | Syncora | b |
| Series 2004-A(1) | 9-9-04 | 39,270,000 | 4.25 to 5.25 | 4/1/19-24 | 39,872,258 | Ambac | b |
| Series 2004-B(1) | 9-9-04 | 53,085,000 | 3.75 to 5.25 | 4/1/13-18 | 38,206,678 | Ambac | b |
| Series 2004-B(2) | 9-9-04 | 17,270,000 | 4.16 to 5.24 | 4/1/13-18 | 736,241 | Ambac | |
| Series 2005-B | 12-1-05 | 51,760,000 | 4.00 to 5.00 | 4/1/13-25 | 45,452,501 | Assured Guaranty | b |
| Series 2005-C | 12-1-05 | 30,805,000 | 4.00 to 5.25 | 4/1/13-20 | 18,671,105 | Assured Guaranty | a b |
| Series 2008-A | 6-9-08 | 58,630,000 | 4.00 to 5.00 | 4/1/14-28 | 59,487,564 | Assured Guaranty | b |
| Series 2008-B(1) | 6-9-08 | 66,475,000 | 5.00 | 4/1/13-18 | 28,982,532 | Assured Guaranty | |

### Total Unsecured Unlimited Tax General Obligation Bonds    $374,661,332

a - Interest rates are set periodically at the stated current market interest rate.
b - Indicates certain of bonds within series are callable under terms specified in the indenture; all other bonds are noncallable

## Secured Unlimited Tax General Obligation Bonds

| | Issue Date | Amount Issued | Range of Interest Rates | Maturity Date | Balance as of Petition Date | Insurer |
|---|---|---|---|---|---|---|
| Distributable State Aid 2010-A | 12/16/10 | $100,000,000 | 5.129 to 8.369 | 11/1/14-35 | 101,707,848 | N/A |

### Total Secured Unlimited Tax General Obligation Bonds    $101,707,848

### Total Unlimited Tax General Obligation Bonds    $476,369,180

## EXHIBIT E

LIMITED TAX GENERAL OBLIGATION BONDS

# LIMITED TAX GENERAL OBLIGATION BONDS

**Unsecured Limited Tax General Obligation Bonds**

| | Issue Date | Amount Issued | Range of Interest Rates | Maturity Date | Balance as of Petition Date | Insurer | |
|---|---|---|---|---|---|---|---|
| Self-Insurance Bonds: | | | | | | | |
| Series 2004 | 9-9-04 | 62,285,000 | 4.16 to 4.85 | 4/1/13-14 | $13,186,559 | Ambac | |
| General Obligation: | | | | | | | |
| Series 2005-A(1) | 6-24-05 | 73,500,000 | 4.27 to 5.15 | 4/1/13-25 | 60,776,168 | Ambac | b |
| Series 2005-A(2) | 6-24-05 | 13,530,000 | 3.50 to 5.00 | 4/1/12-25 | 11,080,060 | Ambac | b |
| Series 2005-B | 6-24-05 | 11,785,000 | 3.50 to 5.00 | 4/1/13-21 | 9,003,535 | Ambac | b |
| Series 2008-A(1) | 6-9-08 | 49,715,000 | 5.00 | 4/1/13-16 | 43,905,085 | N/A | |
| Series 2008-A(2) | 6-9-08 | 25,000,000 | 8.00 | 4/1/14 | 25,591,781 | N/A | |

**Total Unsecured Limited Tax General Obligation Bonds**     **$163,543,188**

a - Interest rates are set periodically at the stated current market interest rate.
b - Indicates certain of bonds within series are callable under terms specified in the indenture; all other bonds are noncallable.

**Secured Limited Tax General Obligation Bonds**

| | Issue Date | Amount Issued | Range of Interest Rates | Maturity Date | Balance as of Petition Date | Insurer |
|---|---|---|---|---|---|---|
| Distributable State Aid 2010 | 3/18/10 | 249,790,000 | 4.25 to 5.25 | 11/1/14-35 | 252,475,366 | N/A |
| Distributable State Aid 2012 | 8/23/12 | 129,520,000 | 3.00 to 5.00 | 11/1/14-32 | 130,827,617 | N/A |

**Total Secured Limited Tax General Obligation Bonds**     **$383,302,983**

**Total Limited Tax General Obligation Bonds**     **$546,846,171**

13-53846-tjt Doc 8739 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 408 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 18:36:58 Page 406 of 691
204

**EXHIBIT F**

PREPETITION STEADY STATE PROJECTION OF LEGACY EXPENDITURES

13-53846-tsw Doc 8739-2 Filed 12/10/14 Entered 12/10/14 09:24:43 Page 409 of 602
13-53846-swr Doc 6382-2 Filed 07/31/14 Entered 07/31/14 13:36:38 Page 110 of
204

## STEADY STATE PROJECTION OF LEGACY EXPENDITURES

($ in millions)

| | FISCAL YEAR ENDED ACTUAL | | | | | PRELIMINARY FORECAST | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2008** | **2009** | **2010** | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** | **2017** |
| **Legacy expenditures** | | | | | | | | | | |
| Debt Service (LTGO) | $(66.6) | $(106.2) | $(63.5) | $(64.5) | $(62.6) | $(70.8) | $(70.9) | $(61.8) | $(61.8) | $(38.5) |
| Debt Service (UTGO) | (67.2) | (71.5) | (72.4) | (72.8) | (73.0) | (70.6) | (64.9) | (62.5) | (57.6) | (57.6) |
| POC – Principal and Interest (GF) | (24.6) | (20.9) | (23.6) | (33.5) | (33.0) | (46.8) | (51.4) | (53.3) | (55.0) | (56.9) |
| POC – Principal and Interest (EF, excl. DDOT) | (1.8) | (1.4) | (1.5) | (1.8) | (2.0) | (5.3) | (5.9) | (6.1) | (6.4) | (6.6) |
| POC – Principal and Interest (DDOT) | (3.5) | (2.8) | (3.0) | (3.6) | (4.0) | (3.3) | (3.7) | (3.8) | (3.9) | (4.1) |
| POC – Swaps (GF) | (38.6) | (43.9) | (44.7) | (44.7) | (44.8) | (42.9) | (42.8) | (42.8) | (42.7) | (42.7) |
| POC – Swaps (EF, excl. DDOT) | (2.3) | (2.0) | (2.0) | (2.0) | (2.0) | (4.8) | (4.8) | (4.8) | (4.9) | (4.9) |
| POC – Swaps (DDOT) | (4.5) | (4.0) | (4.0) | (4.0) | (4.0) | (3.0) | (3.0) | (3.0) | (3.0) | (3.0) |
| Pension Contributions – Public Safety | (58.9) | (31.4) | (32.8) | (81.6) | (49.8) | (46.1) | (139.0) | (163.0) | (180.0) | (198.0) |
| Pension Contributions – Non-Public Safety | (10.6) | (27.0) | (11.1) | (28.3) | (25.4) | (19.9) | (36.9) | (42.5) | (47.7) | (53.1) |
| Pension Contributions – DDOT | (6.8) | (7.3) | (6.9) | (9.5) | (10.9) | (12.3) | (23.6) | (27.7) | (31.2) | (34.8) |
| Health Benefits – Retiree, Public Safety | (73.7) | (80.2) | (70.4) | (79.6) | (90.6) | (91.5) | (88.6) | (95.2) | (101.7) | (108.0) |
| Health Benefits – Retiree, Non-Public Safety | (47.4) | (51.6) | (50.6) | (49.0) | (49.2) | (49.7) | (38.8) | (41.5) | (44.6) | (47.7) |
| Health Benefits – Retiree, DDOT | (8.2) | (11.8) | (11.2) | (11.1) | (10.3) | (10.4) | (13.3) | (14.3) | (15.3) | (16.3) |
| **Total Legacy Expenditures** | $(414.6) | $(462.0) | $(397.9) | $(486.1) | $(461.6) | $(477.3) | $(587.6) | $(622.4) | $(655.9) | $(672.3) |
| **Total Revenues (excl. Financing Proceeds)** | $1,397.7 | $1,363.3 | $1,291.0 | $1,316.8 | $1,196.9 | $1,121.9 | $1,082.8 | $1,046.2 | $1,041.5 | $1,041.4 |
| **Total Legacy Expenditures as a % of Total Revenues** | 29.7% | 33.9% | 30.8% | 36.9% | 38.6% | 42.5% | 54.3% | 59.5% | 63.0% | 64.6% |

13-53846-tjt Doc 8739 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 410 of 602
13-53846-swr Doc 6382-2 Filed 03/31/14 Entered 03/31/14 18:36:38 Page 92 of 92
204

**EXHIBIT G**

PREPETITION FISCAL YEAR 2014 FORECASTED CASH FLOW

13-53846-tsw Doc 8739-2 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 411 of 602
13-53846-swr Doc 6382-2 Filed 03/31/14 Entered 03/31/14 18:36:58 Page 13 of
204

# FISCAL YEAR 2014 FORECASTED CASH FLOW

| $ in millions | Forecast Jul 13 | Forecast Aug-13 | Forecast Sep-13 | Forecast Oct-13 | Forecast Nov-13 | Forecast Dec-13 | Forecast Jan-14 | Forecast Feb-14 | Forecast Mar-14 | Forecast Apr-14 | Forecast May-14 | Forecast Jun-14 | Forecast Fiscal Year 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Receipts** | | | | | | | | | | | | | |
| Property Taxes | $37.8 | $166.6 | $13.0 | $6.6 | $3.1 | $21.5 | $139.1 | $20.8 | $4.8 | 1.3 | $2.5 | $51.1 | $468.4 |
| Income & Utility Taxes | 28.7 | 22.7 | 22.3 | 28.3 | 22.7 | 22.3 | 28.3 | 23.5 | 27.1 | 28.3 | 22.3 | 22.7 | 294.7 |
| Gaming Taxes | 14.6 | 14.1 | 8.9 | 23.1 | 10.4 | 9.4 | 22.1 | 9.9 | 15.1 | 17.4 | 13.2 | 11.8 | 170.0 |
| Municipal Service Fee to Casinos | - | 7.6 | - | - | 4.0 | 4.0 | 1.8 | - | - | - | - | - | 17.4 |
| State Revenue Sharing | 30.7 | - | 30.7 | - | 30.7 | - | 30.7 | - | 30.7 | - | 30.7 | - | 184.3 |
| Other Receipts | 27.2 | 25.8 | 25.9 | 32.9 | 26.3 | 25.9 | 32.9 | 27.1 | 26.3 | 32.9 | 25.9 | 26.3 | 335.9 |
| Refinancing Proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Operating Receipts** | **139.1** | **236.9** | **100.9** | **91.0** | **97.2** | **83.2** | **255.0** | **81.3** | **99.6** | **80.0** | **94.6** | **111.9** | **1,470.7** |
| **Operating Disbursements** | | | | | | | | | | | | | |
| Payroll, Taxes & Deductions | (31.0) | (26.6) | (26.6) | (35.5) | (26.6) | (26.6) | (31.0) | (26.6) | (26.6) | (35.5) | (26.6) | (26.6) | (345.6) |
| Benefits | (15.5) | (15.5) | (15.5) | (15.5) | (15.5) | (15.5) | (15.5) | (14.0) | (14.0) | (14.0) | (14.0) | (14.0) | (178.6) |
| Pension Contributions | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (175.9) |
| Subsidy Payments | (7.6) | (5.0) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (75.6) |
| Distributions – Tax Authorities | (14.8) | (72.4) | (40.0) | (5.7) | (1.0) | (1.3) | (57.3) | (20.9) | (14.0) | (1.7) | - | (24.0) | (253.1) |
| Distributions – UTGO | - | (12.0) | - | - | - | - | - | - | (44.9) | - | - | - | (56.9) |
| Distributions – DDA Increment | - | - | - | - | - | (8.0) | - | - | - | - | - | (1.0) | (9.0) |
| Income Tax Refunds | (2.5) | (2.7) | (0.6) | (0.3) | (1.5) | (1.0) | (0.6) | (0.3) | (0.4) | (2.3) | (1.2) | (3.7) | (17.0) |
| A/P and Other Disbursements | (36.3) | (37.9) | (29.3) | (37.1) | (30.1) | (25.6) | (40.8) | (23.0) | (33.5) | (39.7) | (30.0) | (30.0) | (393.2) |
| Sub-Total Operating Disbursements | (122.3) | (186.7) | (132.8) | (115.1) | (95.6) | (98.9) | (166.0) | (105.8) | (154.4) | (114.3) | (92.8) | (120.3) | (1,504.9) |
| POC and Debt-Related Payments | (7.4) | (4.2) | (5.8) | (8.5) | (7.3) | (15.4) | (7.3) | (4.2) | (5.7) | (51.9) | (7.3) | (39.1) | (164.2) |
| **Total Disbursements** | **(129.6)** | **(191.0)** | **(138.6)** | **(123.5)** | **(102.9)** | **(114.3)** | **(173.4)** | **(110.0)** | **(160.2)** | **(166.1)** | **(100.1)** | **(159.3)** | **(1,669.1)** |
| **Net Cash Flow** | **9.5** | **45.9** | **(37.7)** | **(32.6)** | **(5.7)** | **(31.1)** | **(81.6)** | **(28.7)** | **(60.6)** | **(86.1)** | **(5.5)** | **(47.4)** | **(198.5)** |
| Cumulative Net Cash Flow | 9.5 | 55.4 | 17.7 | (14.9) | (20.6) | (51.7) | 29.9 | 1.1 | (59.4) | (145.6) | (151.0) | (198.5) | |
| Beginning Cash Balance | 33.8 | 43.3 | 89.2 | 51.5 | 18.9 | 13.2 | (17.9) | 63.7 | 34.9 | 25.6 | (111.8) | (117.2) | 33.8 |
| Net Cash Flow | 9.5 | 45.9 | (37.7) | (32.6) | (5.7) | (31.1) | 81.6 | (28.7) | (60.6) | (86.1) | (5.5) | (47.4) | (198.5) |
| **Cash Before Required Distributions** | **$43.3** | **$89.2** | **$51.5** | **$18.9** | **$13.2** | **$(17.9)** | **$63.7** | **$34.9** | **$(25.6)** | **$(111.8)** | **$(117.2)** | **$(164.7)** | **$(164.7)** |
| Accumulated Property Tax Distributions | (29.8) | (55.4) | (24.0) | (22.7) | (23.7) | (38.6) | (86.5) | (82.2) | (27.1 ) | (26.5) | (28.5) | (19.7) | (19.7) |
| **Cash Net of Distributions** | **$13.5** | **$33.8** | **$27.4** | **$(3.8)** | **$(10.5)** | **$(56.5)** | **$(22.8)** | **$(47.2)** | **$(52.7)** | **$(138.2)** | **$(145.7)** | **$(184.4)** | **$(184.4)** |
| Memo: | | | | | | | | | | | | | |
| Accumulated Deferrals | (119.3) | (112.4) | (112.8) | (113.5) | (113.9) | (114.4) | (115.0) | (115.5) | (116.0) | (116.6) | (117.1) | (117.6) | (117.6) |
| Refunding Bond Proceeds in Escrow | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 |
| Reimbursements Owed to Other funds | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd |

13-53846-swr Doc 8382 Filed 12/01/41 Entered 12/01/41 09:24:10 Page 412 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 18:36:58 Page 94 of 92
204

**EXHIBIT H**

PREPETITION PROJECTED REVENUES, EXPENDITURES, OPERATING
SURPLUSES, LEGACY OBLIGATIONS & DEFICITS THROUGH FISCAL YEAR 2017

13-53846-tsw Doc 8772 Filed 12/10/14 Entered 12/10/14 09:24:43 Page 413 of 602
13-53846-swr Doc 6382-2 Filed 03/31/14 Entered 03/31/14 18:36:38 Page 15 of
204

**PROJECTED REVENUES, EXPENDITURES, OPERATING**
**SURPLUSES, LEGACY OBLIGATIONS & DEFICITS THROUGH FISCAL YEAR 2017**

($ in millions)

| | FISCAL YEAR ENDED ACTUAL | | | | | PRELIMINARY FORECAST | | | | | 5-YEAR TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | |
| **Revenues** | | | | | | | | | | | |
| Municipal Income Tax | $276.5 | $240.8 | $216.5 | $228.3 | $233.0 | $238.7 | $243.4 | $247.3 | $249.0 | $250.7 | $1,229.1 |
| State Revenue Sharing | 249.6 | 266.6 | 263.6 | 239.3 | 173.3 | 182.8 | 184.3 | 186.1 | 187.9 | 189.5 | 930.4 |
| Wagering Taxes | 180.4 | 173.0 | 183.3 | 176.9 | 181.4 | 173.0 | 170.0 | 168.3 | 170.0 | 171.7 | 853.0 |
| Sales & Charges for Services | 191.3 | 166.7 | 154.1 | 155.0 | 145.4 | 120.4 | 124.8 | 119.4 | 118.2 | 117.0 | 599.7 |
| Property Taxes | 155.2 | 163.7 | 143.0 | 182.7 | 147.8 | 134.9 | 118.4 | 110.2 | 105.7 | 100.8 | 570.0 |
| Utility Users & Other Taxes | 73.0 | 71.5 | 64.8 | 64.8 | 57.1 | 54.8 | 47.2 | 40.9 | 40.9 | 41.3 | 225.0 |
| Other Revenue | 156.9 | 142.7 | 134.2 | 152.4 | 125.5 | 93.4 | 75.6 | 55.8 | 55.8 | 55.9 | 336.4 |
| General Fund Reimbursements | 34.7 | 55.7 | 47.6 | 32.3 | 47.6 | 31.2 | 30.3 | 30.3 | 30.3 | 30.3 | 152.2 |
| Transfers in (UTGO Millage & Non-General Fund POCs) | 80.1 | 82.5 | 83.8 | 85.1 | 85.8 | 92.8 | 89.0 | 87.9 | 83.8 | 84.4 | 438.0 |
| **Total Revenues** | 1,397.7 | 1,363.3 | 1,291.0 | 1,316.8 | 1,196.9 | 1,121.9 | 1,082.8 | 1,046.2 | 1,041.5 | 1,041.4 | 5,333.8 |
| **Expenditures** | | | | | | | | | | | |
| Salaries/Overtime/Fringe | (509.9) | (506.6) | (466.4) | (454.8) | (431.5) | (357.3) | (341.5) | (341.9) | (346.4) | (352.5) | (1,739.7) |
| Health Benefits – Active | (49.9) | (54.4) | (70.8) | (64.6) | (54.3) | (43.1) | (51.2) | (54.0) | (57.4) | (61.0) | (266.7) |
| Other Operating Expenses | (551.2) | (464.3) | (427.5) | (368.2) | (371.3) | (291.6) | (292.9) | (288.2) | (295.9) | (301.5) | (1,470.2) |
| Operating Expenditures | (1,111.1) | (1,025.3) | (964.7) | (887.5) | (857.1) | (692.0) | (685.7) | (684.1) | (699.7) | (715.0) | (3,476.6) |
| **Net Operating Surplus** | 286.7 | 338.0 | 326.3 | 429.2 | 339.8 | 429.9 | 397.2 | 362.0 | 341.8 | 326.3 | 1,857.2 |
| Debt Service (LTGO & UTGO) | (133.8) | (177.6) | (135.9) | (137.3) | (135.6) | (141.4) | (135.9) | (124.4) | (119.4) | (96.1) | (617.2) |
| POC – Principal & Interest | (29.8) | (25.1) | (28.1) | (38.9) | (39.0) | (55.4) | (61.0) | (63.2) | (65.4) | (67.6) | (312.6) |
| POC Swaps | (45.3) | (49.9) | (50.7) | (50.7) | (50.7) | (50.6) | (50.6) | (50.6) | (50.6) | (50.6) | (253.1) |
| Pension Contributions | (76.3) | (65.7) | (50.8) | (119.5) | (86.1) | (78.3) | (199.5) | (233.1) | (258.9) | (285.9) | (1,055.8) |
| Health Benefits – Retiree | (129.3) | (143.7) | (132.3) | (139.7) | (150.1) | (151.6) | (140.7) | (151.1) | (161.6) | (172.0) | (776.9) |
| Legacy Expenditures | (414.6) | (462.0) | (397.9) | (486.1) | (461.6) | (477.3) | (587.6) | (622.4) | (655.9) | (672.3) | (3,015.6) |
| **Deficit (excl. Financing Proceeds)** | (127.9) | (124.1) | (71.7) | (56.9) | (121.8) | (47.4) | (190.5 ) | (260.4) | (314.1) | (346.0) | (1,158.4) |
| Financing Proceeds | 75.0 | - | 250.0 | - | - | 137.0 | - | - | - | - | 137.0 |
| **Total Surplus (deficit)** | $(52.9) | $(124.1) | $178.3 | $(56.9) | $(121.8) | $89.6 | $(190.5) | $(260.4) | $(314.1) | $(346.0) | $(1,021.4) |
| Accumulated Unrestricted General Fund Deficit | $(219.2) | $(331.9) | $(155.7) | $(196.6) | $(326.6) | $(237.0) | $(427.5) | $(687.9) | $(1,002.0) | $(1,348.0) | |

**\*Note:** The above projections were prepared based solely on the City's levels of operating expenses and capital expenditures as of the Petition Date and do not account for (i) increases in expenditures necessary to restore City services to adequate levels, (ii) additional investment by the City in services, assets or infrastructure or (iii) any changes to legacy liabilities.

13-53846-tjt Doc 8779 Filed 12/10/14 Entered 12/10/14 09:24:43 Page 414 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 18:36:58 Page 96 of 94
204

**EXHIBIT I**

TEN-YEAR SUMMARY OF RESTRUCTURING INITIATIVES

13-53846-tjt Doc 8739 Filed 12/10/14 Entered 12/10/14 09:24:03 Page 415 of 602
13-53846-swr Doc 6382-2 Filed 03/31/14 Entered 03/31/14 13:36:58 Page 176 of
204

# City of Detroit

Ten-Year Plan of Adjustment

Restructuring and Reinvestment Initiatives

|  | Page |
|---|---|
| • **Restructuring and Reinvestment Initiatives (Consolidated)** | 3 |
| - Consolidated - General Fund | 4 |
| • **Restructuring and Reinvestment Initiatives - Consolidated by Department** | 5 |
| - Revenue | 6 |
| - Operating Expenditures | 7 |
| - Technology Infrastructure | 8 |
| - Capital Expenditures | 9 |
| - Other Infrastructure | 10 |
| - Reorganization Costs | 11 |
| - Surplus / (Deficit) | 12 |
| - Incremental Headcount | 13 |
| **Restructuring Initiatives by Department** |  |
| • **Executive Agencies - Department Detail** | 14 |
| - Department of Administrative Hearings (DAH) | 15-16 |
| - Finance Department (Finance) | 17-18 |
| - Fire Department (DFD) | 19-20 |
| - General Services Department (GSD) | 21-22 |
| - Human Resources Department (HR) | 23-24 |
| - Human Resources Department - Labor Relations Division (LR) | 25-26 |
| - Human Rights / Board of Ethics Department (Human Rights) | 27-28 |
| - Law Department (Law) | 29-30 |
| - Mayor's Office | 31-32 |
| - Planning and Development Department (PDD) | 33-34 |
| - Police Department (DPD) | 35-36 |
| - Department of Public Works (DPW) | 37-38 |
| - Recreation Department | 39-40 |
| - Department of Health & Wellness Promotion (DHWP) | 41-42 |
| • **Legislative Agencies - Department Detail** | 43 |
| - Auditor General (AG) and Inspector General (IG) | 44-45 |
| - Board of Zoning Appeals (BZA) | 46-47 |
| - City Clerk | 48-49 |
| - City Council | 50-51 |
| - Department of Elections (Elections) | 52-53 |
| - Ombudsperson | 54-55 |
| • **Judicial Agencies - Department Detail** | 56 |
| - 36th District Court (36D) | 57-58 |
| • **Enterprise Agencies - Department Detail** | 59 |
| - Airport | 60-61 |
| - Building Safety Engineering and Environmental Department (BSEED) | 62-63 |
| - Detroit Department of Transportation (DDOT) | 64-65 |
| - Municipal Parking Department (Parking) | 66-67 |
| • **Other - Detail** | 68 |
| - Blight/Demolition | 69-70 |

# City of Detroit

Ten-Year Plan of Adjustment

Restructuring and Reinvestment Initiatives - Consolidated

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives**
**Consolidated - General Fund**
*($ in millions)*

| | | For the Fiscal Year Ended | | | | | | | | | | 10-Year |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Total |
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2. | a. Increased Collection Rate | 2.6 | 12.6 | 15.0 | 18.3 | 18.6 | 18.9 | 19.2 | 19.5 | 19.8 | 20.1 | 164.7 |
| 3. | b. Collection of Past Due | 1.5 | 4.9 | 5.7 | 2.5 | - | - | - | - | - | - | 14.7 |
| 4. | Pricing/Fees | 0.4 | 10.0 | 15.5 | 16.8 | 21.5 | 23.2 | 27.3 | 26.8 | 30.9 | 31.8 | 204.1 |
| 5. | Grant Revenue | 6.1 | 46.6 | (0.7) | 11.5 | 12.2 | (0.2) | (0.2) | (0.2) | (0.1) | (0.1) | 74.9 |
| 6. | Other | (0.1) | 3.9 | 3.9 | 4.0 | 3.9 | 4.0 | (0.1) | (0.1) | (0.1) | - | 19.2 |
| 7. | **Total Revenues** | 10.6 | 78.0 | 39.3 | 53.0 | 56.2 | 45.8 | 46.2 | 46.1 | 50.6 | 51.8 | 477.6 |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | (6.4) | (28.8) | (21.3) | (21.4) | (16.8) | (14.8) | (16.5) | (15.1) | (16.3) | (16.1) | (173.4) |
| 9. | Professional & Contract Services | (0.3) | 0.3 | 0.5 | 0.5 | 0.4 | 0.4 | 0.3 | 0.3 | 0.3 | 0.2 | 2.9 |
| 10. | Labor Costs / Service Contracts | (6.7) | (28.5) | (20.8) | (20.8) | (16.4) | (14.4) | (16.2) | (14.7) | (16.0) | (15.9) | (170.5) |
| 11. | Active Benefits | (3.1) | (14.3) | (11.6) | (13.8) | (11.0) | (10.0) | (10.8) | (9.8) | (10.4) | (10.3) | (104.9) |
| 12. | Training | 0.9 | (10.1) | 9.6 | (5.2) | (5.2) | (5.1) | (4.8) | (5.1) | (5.2) | (4.7) | (55.9) |
| 13. | Materials and Supplies | (5.3) | (7.9) | (10.9) | (10.1) | (8.2) | (9.2) | (9.1) | (9.6) | (10.1) | (10.6) | (91.1) |
| 14. | Utilities | (0.2) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (2.6) |
| 15. | Purchased services | (6.8) | (96.0) | (100.6) | (100.4) | (100.4) | (100.4) | (0.5) | (0.5) | (0.5) | (0.5) | (506.5) |
| 16. | Risk management / insurance | 0.0 | 2.1 | 6.1 | 6.1 | 6.1 | 6.1 | 6.1 | 6.1 | 6.1 | 6.1 | 50.7 |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | (0.6) | (2.1) | 2.5 | 3.3 | 2.9 | 3.8 | 3.9 | 3.4 | 3.9 | 4.0 | 25.0 |
| 19. | Grant related expenses | (2.3) | (18.0) | - | - | - | - | - | - | - | - | (20.3) |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | (0.7) | 1.0 | 1.0 | 1.0 | 1.0 | 0.9 | 1.0 | 1.0 | 1.0 | 1.1 | 8.2 |
| 22. | **Total Operating Expenditures** | (26.6) | (174.1) | (144.2) | (140.2) | (131.5) | (128.6) | (30.7) | (29.5) | (31.5) | (31.2) | (867.9) |
| 23. | **Total Operating Surplus (Deficit)** | $ (16.1) | $ (96.1) | $ (104.8) | $ (87.2) | $ (75.3) | $ (82.8) | $ 15.5 | $ 16.6 | $ 19.1 | $ 20.6 | $ (390.3) |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | (13.3) | (53.8) | (20.3) | (7.8) | (9.9) | (10.5) | (7.4) | (8.8) | (8.8) | (7.5) | (148.0) |
| 25. | Capital Expenditures | (24.1) | (41.9) | (27.0) | (29.0) | (22.9) | (22.8) | (17.8) | (18.4) | (18.1) | (18.1) | (240.1) |
| 26. | Other Infrastructure | (28.5) | (29.8) | (23.2) | (19.4) | (19.2) | (18.4) | (18.3) | (17.9) | (16.4) | (16.1) | (207.1) |
| 27. | Reorganization Costs | (6.3) | (12.3) | (5.6) | (0.9) | (1.2) | (1.0) | (2.6) | (1.8) | (1.2) | (1.0) | (33.9) |
| 28. | **Total Reorganization / Reinvestment** | (72.2) | (137.8) | (76.1) | (57.1) | (53.2) | (52.7) | (46.2) | (46.9) | (44.5) | (42.7) | (629.2) |
| 29. | **Total Surplus (Deficit)** | $ (88.2) | $ (233.9) | $ (180.9) | $ (144.3) | $ (128.5) | $ (135.4) | $ (30.7) | $ (30.2) | $ (25.4) | $ (22.0) | $ (1,019.5) |
| 30. | **Incremental Headcount (FTE)** | 451 | 568 | 485 | 634 | 642 | 616 | 607 | 591 | 597 | 598 | 598 |

13-53846-tjt Doc 8782 Filed 12/16/14 Entered 12/16/14 09:24:40 Page 419 of 602
13-53846-swr Doc 7382 Filed 03/31/14 Entered 03/31/14 18:36:58 Page 216 of
204

**City of Detroit**

Ten-Year Plan of Adjustment

Restructuring and Reinvestment Initiatives - Consolidated by Department

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Consolidated by Department**
**Revenues**
*($ in millions)*

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **EXECUTIVE AGENCIES** | | | | | | | | | | | |
| Administrative Hearings | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Finance | 3.1 | 7.9 | 8.4 | 8.7 | 6.2 | 6.3 | 6.3 | 6.3 | 6.3 | 6.3 | 65.8 |
| Fire | 2.0 | 8.1 | 6.6 | 18.3 | 19.0 | 6.7 | 6.6 | 6.6 | 6.6 | 6.6 | 87.0 |
| General Services | 1.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 20.3 |
| Human Resources | - | - | - | - | - | - | - | - | - | - | - |
| Labor Relations | - | - | - | - | - | - | - | - | - | - | - |
| Human Rights / Board of Ethics | - | - | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 0.3 | 0.4 | 0.4 | 2.5 |
| Human Services | - | - | - | - | - | - | - | - | - | - | - |
| Law | - | - | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 4.4 |
| Mayor's Office | - | - | - | - | - | - | - | - | - | - | - |
| Planning & Development | - | - | - | - | - | - | - | - | - | - | - |
| Police | - | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 32.6 |
| Public Lighting | - | - | - | - | - | - | - | - | - | - | - |
| Public Works (Solid Waste) | - | - | - | - | - | - | - | - | - | - | - |
| Recreation | - | - | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.5 |
| DHWP (Vital Records) | - | - | - | - | - | - | - | - | - | - | - |
| **LEGISLATIVE AGENCIES** | | | | | | | | | | | |
| Auditor General / Inspector General | - | - | - | - | - | - | - | - | - | - | - |
| Board of Zoning Appeals | - | - | - | - | - | - | - | - | - | - | - |
| City Clerk | - | - | - | - | - | - | - | - | - | - | - |
| City Council | - | - | - | - | - | - | - | - | - | - | - |
| Election Commission | - | - | - | - | - | - | - | - | - | - | - |
| Ombudsperson | - | - | - | - | - | - | - | - | - | - | - |
| **JUDICIAL AGENCY** | | | | | | | | | | | |
| 36th District Court | - | 5.8 | 8.2 | 8.5 | 8.7 | 9.0 | 9.2 | 9.5 | 9.8 | 10.1 | 78.8 |
| **ENTERPRISE AGENCIES** | | | | | | | | | | | |
| Airport | - | - | - | - | - | - | - | - | - | - | - |
| Buildings and Safety | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 1.7 |
| DDOT - Transportation | (1.7) | (5.7) | (1.5) | (0.1) | 4.6 | 6.3 | 10.4 | 10.0 | 14.1 | 15.0 | 51.4 |
| Municipal Parking | - | 5.6 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 60.3 |
| **OTHER** | | | | | | | | | | | |
| Blight | 6.0 | 50.3 | 4.0 | 4.0 | 4.0 | 4.0 | - | - | - | - | 72.3 |
| **TOTAL** | $ 10.6 | $ 78.0 | $ 39.3 | $ 53.0 | $ 56.2 | $ 45.8 | $ 46.2 | $ 46.1 | $ 50.6 | $ 51.8 | $ 477.6 |

6 of 70

13-53846-tit Doc 8779 Filed 12/10/14 Entered 12/10/14 08:24:40 Page 421 of 602
13-53846-swr Doc 8382 Filed 03/31/14 Entered 03/31/14 13:36:38 Page 23 of
204

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Consolidated by Department**
**Operating Expenditures**
*($ in millions)*

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | For the Fiscal Year Ended | | | | | | |
| **EXECUTIVE AGENCIES** | | | | | | | | | | | | |
| Administrative Hearings | $ | - | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.1 |
| Finance | | (2.3) | (7.5) | (4.3) | (4.3) | (1.7) | (2.2) | (2.7) | (3.2) | (3.6) | (4.1) | (35.8) |
| Fire | | (2.7) | (12.6) | (6.1) | (7.6) | (0.7) | 2.8 | 1.1 | 3.9 | 2.9 | 4.6 | (14.4) |
| General Services | | (5.4) | (14.4) | (14.4) | (14.5) | (14.6) | (14.7) | (14.8) | (14.9) | (15.0) | (15.1) | (137.7) |
| Human Resources | | (0.1) | (3.2) | (3.2) | (3.2) | (3.2) | (3.3) | (3.3) | (3.4) | (3.4) | (3.5) | (29.7) |
| Labor Relations | | - | (0.3) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.9) | (0.9) | (0.9) | (7.1) |
| Human Rights / Board of Ethics | | - | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.7) | (0.7) | (0.7) | (5.7) |
| Human Services | | - | - | - | - | - | - | - | - | - | - | - |
| Law | | (1.1) | 0.4 | 0.3 | 0.3 | 0.3 | 0.2 | 0.2 | 0.1 | 0.1 | 0.0 | 0.8 |
| Mayor's Office | | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.3) |
| Planning & Development | | (0.6) | (1.2) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.1) | (1.1) | (1.1) | (10.0) |
| Police | | (5.7) | (16.1) | (18.1) | (11.0) | (9.9) | (10.1) | (9.9) | (9.7) | (10.1) | (9.9) | (110.4) |
| Public Lighting | | - | - | - | - | - | - | - | - | - | - | - |
| Public Works (Solid Waste) | | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.3) |
| Recreation | | - | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.9) |
| DHWP (Vital Records) | | (0.3) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (1.8) |
| | | | | | | | | | | | | |
| **LEGISLATIVE AGENCIES** | | | | | | | | | | | | |
| Auditor General / Inspector General | | (0.0) | (0.4) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (4.4) |
| Board of Zoning Appeals | | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| City Clerk | | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 2.2 |
| City Council | | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 4.3 |
| Election Commission | | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.4 |
| Ombudsperson | | - | (0.6) | (1.0) | (1.1) | (1.1) | (1.1) | (1.1) | (1.1) | (1.2) | (1.2) | (9.5) |
| | | | | | | | | | | | | |
| **JUDICIAL AGENCY** | | | | | | | | | | | | |
| 36th District Court | | 0.7 | 2.5 | 3.1 | 3.1 | 3.2 | 3.3 | 3.4 | 3.4 | 3.5 | 3.6 | 29.8 |
| | | | | | | | | | | | | |
| **ENTERPRISE AGENCIES** | | | | | | | | | | | | |
| Airport | | (0.2) | (1.3) | (1.1) | (0.7) | (0.7) | (0.7) | (0.7) | (0.8) | (0.8) | (0.8) | (7.9) |
| Buildings and Safety | | (0.6) | (2.1) | 2.6 | 3.4 | 3.0 | 3.8 | 3.9 | 3.5 | 4.0 | 4.1 | 25.7 |
| DDOT - Transportation | | (1.4) | (3.4) | 0.8 | (2.2) | (3.5) | (4.1) | (4.1) | (4.7) | (5.2) | (6.1) | (33.8) |
| Municipal Parking | | (0.1) | (0.5) | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (1.0) |
| | | | | | | | | | | | | |
| **OTHER** | | | | | | | | | | | | |
| Blight | | (7.3) | (113.0) | (100.0) | (100.0) | (100.0) | (100.0) | - | - | - | - | (520.3) |
| | | | | | | | | | | | | |
| **TOTAL** | $ | (26.6) | $ (174.1) | $ (144.2) | $ (140.2) | $ (131.5) | $ (128.6) | $ (30.7) | $ (29.5) | $ (31.5) | $ (31.2) | $ (867.9) |

7 of 70
13-53846-tjt Doc 8782 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 422 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 18:36:58 Page 24 of 91
204

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Consolidated by Department**
**Technology Infrastructure**
*($ in millions)*

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | For the Fiscal Year Ended | | | | | | |
| **EXECUTIVE AGENCIES** | | | | | | | | | | | |
| Administrative Hearings | $ - | $ (0.5) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ (0.5) |
| Finance | (9.8) | (35.9) | (8.4) | (4.3) | (6.5) | (6.6) | (4.1) | (5.2) | (5.5) | (4.2) | (90.6) |
| Fire | (0.7) | (0.6) | (0.2) | (0.2) | (0.2) | (0.8) | (0.2) | (0.4) | (0.2) | (0.2) | (3.6) |
| General Services | - | - | - | - | - | - | - | - | - | - | - |
| Human Resources | - | (0.5) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (1.3) |
| Labor Relations | - | - | - | - | - | - | - | - | - | - | - |
| Human Rights / Board of Ethics | - | (0.1) | - | - | - | - | - | - | - | - | (0.1) |
| Human Services | - | - | - | - | - | - | - | - | - | - | - |
| Law | (0.5) | - | - | - | - | - | - | - | - | - | (0.5) |
| Mayor's Office | - | - | - | - | - | - | - | - | - | - | - |
| Planning & Development | (0.3) | (0.3) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.8) |
| Police | (1.9) | (11.2) | (10.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (38.4) |
| Public Lighting | - | - | - | - | - | - | - | - | - | - | - |
| Public Works (Solid Waste) | - | - | - | - | - | - | - | - | - | - | - |
| Recreation | - | - | - | - | - | - | - | - | - | - | - |
| DHWP (Vital Records) | - | - | - | - | - | - | - | - | - | - | - |
| **LEGISLATIVE AGENCIES** | | | | | | | | | | | |
| Auditor General / Inspector General | (0.0) | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.3) |
| Board of Zoning Appeals | - | - | - | - | - | - | - | - | - | - | - |
| City Clerk | - | - | - | - | - | - | - | - | - | - | - |
| City Council | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.2) |
| Election Commission | (0.0) | - | - | - | - | - | - | - | - | - | (0.0) |
| Ombudsperson | - | (3.0) | (0.5) | (0.5) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (7.6) |
| **JUDICIAL AGENCY** | | | | | | | | | | | |
| 36th District Court | - | (1.6) | (0.8) | (0.4) | (0.4) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (4.2) |
| **ENTERPRISE AGENCIES** | | | | | | | | | | | |
| Airport | - | (0.0) | - | - | - | - | - | - | - | - | (0.0) |
| Buildings and Safety | - | - | - | - | - | - | - | - | - | - | - |
| DDOT - Transportation | - | - | - | - | - | - | - | - | - | - | - |
| Municipal Parking | - | - | - | - | - | - | - | - | - | - | - |
| **OTHER** | | | | | | | | | | | |
| Blight | - | - | - | - | - | - | - | - | - | - | - |
| **TOTAL** | $ (13.3) | $ (53.8) | $ (20.3) | $ (7.8) | $ (9.9) | $ (10.5) | $ (7.4) | $ (8.8) | $ (8.8) | $ (7.5) | $ (148.0) |

13-53846-tif Doc 8739 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 423 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 18:36:38 Page 25 of
204

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Consolidated by Department**
**Capital Expenditures**
*($ in millions)*

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | For the Fiscal Year Ended | | | | | | |
| **EXECUTIVE AGENCIES** | | | | | | | | | | | |
| Administrative Hearings | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Finance | - | - | - | - | - | - | - | - | - | - | - |
| Fire | (5.5) | (11.0) | (7.4) | (10.5) | (5.8) | (12.7) | (4.8) | (5.6) | (5.5) | (5.5) | (74.3) |
| General Services | (6.1) | (5.9) | (4.1) | (4.2) | (4.5) | (4.3) | (4.3) | (4.5) | (4.4) | (4.4) | (46.6) |
| Human Resources | - | - | (1.0) | - | - | - | - | - | - | - | (1.0) |
| Labor Relations | - | - | - | - | - | - | - | - | - | - | - |
| Human Rights / Board of Ethics | - | - | - | - | - | - | - | - | - | - | - |
| Human Services | - | - | - | - | - | - | - | - | - | - | - |
| Law | - | - | - | - | - | - | - | - | - | - | - |
| Mayor's Office | - | - | - | - | - | - | - | - | - | - | - |
| Planning & Development | - | - | - | - | - | - | - | - | - | - | - |
| Police | (8.9) | (6.5) | (3.5) | (0.1) | (0.5) | (0.2) | (3.3) | (3.1) | (3.0) | (3.0) | (32.1) |
| Public Lighting | - | - | - | - | - | - | - | - | - | - | - |
| Public Works (Solid Waste) | - | - | - | - | - | - | - | - | - | - | - |
| Recreation | (0.9) | (8.9) | (3.1) | (3.3) | (3.0) | (4.0) | (4.3) | (4.0) | (4.0) | (4.0) | (39.5) |
| DHWP (Vital Records) | - | (5.1) | - | - | - | - | - | - | - | - | (5.1) |
| **LEGISLATIVE AGENCIES** | | | | | | | | | | | |
| Auditor General / Inspector General | - | - | - | - | - | - | - | - | - | - | - |
| Board of Zoning Appeals | - | - | - | - | - | - | - | - | - | - | - |
| City Clerk | - | - | - | - | - | - | - | - | - | - | - |
| City Council | - | - | - | - | - | - | - | - | - | - | - |
| Election Commission | (0.6) | (0.6) | - | - | - | - | (0.5) | (0.5) | (0.5) | (0.5) | (3.3) |
| Ombudsperson | - | - | - | - | - | - | - | - | - | - | - |
| **JUDICIAL AGENCY** | | | | | | | | | | | |
| 36th District Court | - | (1.0) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (5.0) |
| **ENTERPRISE AGENCIES** | | | | | | | | | | | |
| Airport | - | (0.4) | (5.0) | (7.8) | (7.5) | - | - | - | - | - | (20.7) |
| Buildings and Safety | - | (0.4) | - | - | - | - | - | - | - | - | (0.4) |
| DDOT - Transportation | (1.6) | (2.0) | (2.3) | (2.5) | (1.0) | (1.0) | - | - | - | - | (10.3) |
| Municipal Parking | (0.5) | (0.2) | (0.1) | (0.1) | (0.1) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (2.0) |
| **OTHER** | | | | | | | | | | | |
| Blight | - | - | - | - | - | - | - | - | - | - | - |
| **TOTAL** | $ (24.1) | $ (41.9) | $ (27.0) | $ (29.0) | $ (22.9) | $ (22.8) | $ (17.8) | $ (18.4) | $ (18.1) | $ (18.1) | $ (240.1) |

13-53846-tjt Doc 8773 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 424 of 602
13-53846-swr Doc 8382 Filed 03/31/14 Entered 03/31/14 18:36:58 Page 26 of 69
204

Ten-Year Plan of Adjustment
**Restructuring and Reinvestment Initiatives - Consolidated by Department**
**Other Infrastructure**
*($ in millions)*

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | For the Fiscal Year Ended | | | | | | |
| **EXECUTIVE AGENCIES** | | | | | | | | | | | | |
| Administrative Hearings | $ | - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Finance | | - | - | - | - | - | - | - | - | - | - | - |
| Fire | | (9.7) | (8.6) | (9.6) | (6.1) | (5.8) | (5.0) | (5.0) | (4.6) | (3.0) | (2.7) | (60.0) |
| General Services | | (5.9) | (5.7) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (16.4) |
| Human Resources | | - | - | - | - | - | - | - | - | - | - | - |
| Labor Relations | | - | - | - | - | - | - | - | - | - | - | - |
| Human Rights / Board of Ethics | | - | - | - | - | - | - | - | - | - | - | - |
| Human Services | | - | - | - | - | - | - | - | - | - | - | - |
| Law | | - | - | - | - | - | - | - | - | - | - | - |
| Mayor's Office | | - | - | - | - | - | - | - | - | - | - | - |
| Planning & Development | | - | - | - | - | - | - | - | - | - | - | - |
| Police | | (12.9) | (15.1) | (12.9) | (12.6) | (12.6) | (12.6) | (12.6) | (12.6) | (12.6) | (12.6) | (129.3) |
| Public Lighting | | - | - | - | - | - | - | - | - | - | - | - |
| Public Works (Solid Waste) | | - | - | - | - | - | - | - | - | - | - | - |
| Recreation | | - | - | - | - | - | - | - | - | - | - | - |
| DHWP (Vital Records) | | - | - | - | - | - | - | - | - | - | - | - |
| **LEGISLATIVE AGENCIES** | | | | | | | | | | | | |
| Auditor General / Inspector General | | - | - | - | - | - | - | - | - | - | - | - |
| Board of Zoning Appeals | | - | - | - | - | - | - | - | - | - | - | - |
| City Clerk | | - | - | - | - | - | - | - | - | - | - | - |
| City Council | | - | - | - | - | - | - | - | - | - | - | - |
| Election Commission | | - | - | - | - | - | - | - | - | - | - | - |
| Ombudsperson | | - | - | - | - | - | - | - | - | - | - | - |
| **JUDICIAL AGENCY** | | | | | | | | | | | | |
| 36th District Court | | - | - | - | - | - | - | - | - | - | - | - |
| **ENTERPRISE AGENCIES** | | | | | | | | | | | | |
| Airport | | - | - | - | - | - | - | - | - | - | - | - |
| Buildings and Safety | | - | - | - | - | - | - | - | - | - | - | - |
| DDOT - Transportation | | - | - | - | - | - | - | - | - | - | - | - |
| Municipal Parking | | - | (0.4) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (1.4) |
| **OTHER** | | | | | | | | | | | | |
| Blight | | - | - | - | - | - | - | - | - | - | - | - |
| **TOTAL** | $ | (28.5) | $ (29.8) | $ (23.2) | $ (19.4) | $ (19.2) | $ (18.4) | $ (18.3) | $ (17.9) | $ (16.4) | $ (16.1) | $ (207.1) |

10 of 70

13-53846-tjt  Doc 8773  Filed 12/10/14  Entered 12/10/14 08:24:40  Page 425 of 602
13-53846-swr  Doc 6382-2  Filed 03/31/14  Entered 03/31/14 16:36:38  Page 27 of 61
204

**City of Detroit**

Ten-Year Plan of Adjustment
**Restructuring and Reinvestment Initiatives - Consolidated by Department**
Reorganization Costs
*($ in millions)*

| | For the Fiscal Year Ended | | | | | | | | | | 10-Year |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Total |
| **EXECUTIVE AGENCIES** | | | | | | | | | | | |
| Administrative Hearings | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Finance | (2.5) | (5.5) | (3.4) | (0.5) | (0.9) | (0.6) | (1.4) | (0.6) | (0.9) | (0.6) | (17.1) |
| Fire | (0.3) | - | - | - | - | - | - | - | - | - | (0.3) |
| General Services | (0.4) | - | - | - | - | - | - | - | - | - | (0.4) |
| Human Resources | (0.4) | (1.0) | (1.0) | - | - | - | - | - | - | - | (2.4) |
| Labor Relations | - | - | - | - | - | - | - | - | - | - | - |
| Human Rights / Board of Ethics | - | - | - | - | - | - | - | - | - | - | - |
| Human Services | - | - | - | - | - | - | - | - | - | - | - |
| Law | (0.1) | - | - | - | - | - | - | - | - | - | (0.1) |
| Mayor's Office | - | - | - | - | - | - | - | - | - | - | - |
| Planning & Development | (2.4) | (4.1) | (0.7) | - | - | - | (0.8) | (0.8) | - | - | (8.9) |
| Police | (0.2) | (0.6) | (0.2) | - | - | - | - | - | - | - | (1.0) |
| Public Lighting | - | - | - | - | - | - | - | - | - | - | - |
| Public Works (Solid Waste) | - | - | - | - | - | - | - | - | - | - | - |
| Recreation | - | - | - | - | - | - | - | - | - | - | - |
| DHWP (Vital Records) | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | |
| **LEGISLATIVE AGENCIES** | | | | | | | | | | | |
| Auditor General / Inspector General | - | - | - | - | - | - | - | - | - | - | - |
| Board of Zoning Appeals | - | - | - | - | - | - | - | - | - | - | - |
| City Clerk | - | - | - | - | - | - | - | - | - | - | - |
| City Council | - | - | - | - | - | - | - | - | - | - | - |
| Election Commission | - | - | - | - | - | - | - | - | - | - | - |
| Ombudsperson | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | |
| **JUDICIAL AGENCY** | | | | | | | | | | | |
| 36th District Court | - | (1.0) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (3.7) |
| | | | | | | | | | | | |
| **ENTERPRISE AGENCIES** | | | | | | | | | | | |
| Airport | - | - | - | - | - | - | - | - | - | - | - |
| Buildings and Safety | - | - | - | - | - | - | - | - | - | - | - |
| DDOT - Transportation | - | - | - | - | - | - | - | - | - | - | - |
| Municipal Parking | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | |
| **OTHER** | | | | | | | | | | | |
| Blight | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | |
| **TOTAL** | $ (6.3) | $ (12.3) | $ (5.6) | $ (0.9) | $ (1.2) | $ (1.0) | $ (2.6) | $ (1.8) | $ (1.2) | $ (1.0) | $ (33.9) |

13-53846-swr  Doc 8372  Filed 12/10/14  Entered 12/10/14 09:24:40  Page 426 of 602
13-53846-swr  Doc 8382  Filed 03/31/14  Entered 03/31/14 18:36:58  Page 26 of

# City of Detroit

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Consolidated by Department**
**Surplus / (Deficit)**
*($ in millions)*

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | For the Fiscal Year Ended | | | | | | |
| **EXECUTIVE AGENCIES** | | | | | | | | | | | |
| Administrative Hearings | $ - | $ (0.5) | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ (0.4) |
| Finance | (11.5) | (41.0) | (7.7) | (0.5) | (2.8) | (3.2) | (1.9) | (2.8) | (3.7) | (2.6) | (77.7) |
| Fire | (16.9) | (24.6) | (16.7) | (6.0) | 6.6 | (9.0) | (2.3) | (0.1) | 0.8 | 2.8 | (65.6) |
| General Services | (16.7) | (23.9) | (17.0) | (17.2) | (17.5) | (17.4) | (17.5) | (17.8) | (17.8) | (17.9) | (180.8) |
| Human Resources | (0.5) | (4.7) | (5.3) | (3.3) | (3.3) | (3.4) | (3.4) | (3.5) | (3.5) | (3.6) | (34.4) |
| Labor Relations | - | (0.3) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.9) | (0.9) | (0.9) | (7.1) |
| Human Rights / Board of Ethics | - | (0.7) | (0.4) | (0.4) | (0.3) | (0.3) | (0.3) | (0.4) | (0.3) | (0.3) | (3.4) |
| Human Services | - | - | - | - | - | - | - | - | - | - | - |
| Law | (1.7) | 0.4 | 0.9 | 0.9 | 0.8 | 0.8 | 0.7 | 0.7 | 0.6 | 0.6 | 4.6 |
| Mayor's Office | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.3) |
| Planning & Development | (3.3) | (5.6) | (1.7) | (1.0) | (1.0) | (1.0) | (1.0) | (1.9) | (1.1) | (1.1) | (19.7) |
| Police | (29.6) | (45.8) | (41.3) | (22.3) | (21.6) | (21.4) | (24.3) | (24.0) | (24.3) | (24.1) | (278.6) |
| Public Lighting | - | - | - | - | - | - | - | - | - | - | - |
| Public Works (Solid Waste) | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.3) |
| Recreation | (0.9) | (9.0) | (3.1) | (3.3) | (3.1) | (4.0) | (4.3) | (4.0) | (4.0) | (4.0) | (39.8) |
| DHWP (Vital Records) | (0.3) | (5.3) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (6.9) |
| **LEGISLATIVE AGENCIES** | | | | | | | | | | | |
| Auditor General / Inspector General | (0.1) | (0.6) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (4.7) |
| Board of Zoning Appeals | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.2) |
| City Clerk | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 2.2 |
| City Council | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 4.2 |
| Election Commission | (0.6) | (0.6) | 0.0 | 0.0 | 0.0 | 0.0 | (0.5) | (0.5) | (0.5) | (0.5) | (2.9) |
| Ombudsperson | - | (3.7) | (1.6) | (1.6) | (1.6) | (1.7) | (1.7) | (1.7) | (1.8) | (1.8) | (17.2) |
| **JUDICIAL AGENCY** | | | | | | | | | | | |
| 36th District Court | 0.7 | 4.7 | 9.6 | 10.4 | 10.7 | 11.2 | 11.6 | 11.9 | 12.3 | 12.7 | 95.7 |
| **ENTERPRISE AGENCIES** | | | | | | | | | | | |
| Airport | (0.2) | (1.7) | (6.1) | (8.5) | (8.2) | (0.7) | (0.7) | (0.8) | (0.8) | (0.8) | (28.5) |
| Buildings and Safety | (0.4) | (2.3) | 2.7 | 3.5 | 3.2 | 4.0 | 4.1 | 3.7 | 4.2 | 4.2 | 27.0 |
| DDOT - Transportation | (4.7) | (11.1) | (2.9) | (4.8) | 0.1 | 1.2 | 6.3 | 5.3 | 8.9 | 8.9 | 7.3 |
| Municipal Parking | (0.6) | 4.5 | 6.6 | 6.6 | 6.6 | 6.5 | 6.5 | 6.5 | 6.5 | 6.5 | 55.9 |
| **OTHER** | | | | | | | | | | | |
| Blight | (1.3) | (62.6) | (96.0) | (96.0) | (96.0) | (96.0) | - | - | - | - | (447.9) |
| **TOTAL** | $ (88.2) | $ (233.9) | $ (180.9) | $ (144.3) | $ (128.5) | $ (135.4) | $ (30.7) | $ (30.2) | $ (25.4) | $ (22.0) | $ (1,019.5) |

13-53846-tjt Doc 8779 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 427 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 18:36:58 Page 29 of
204

**City of Detroit**

Ten-Year Plan of Adjustment
Restructuring and Reinvestment Initiatives - Consolidated by Department
Incremental Headcount

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | **For the Fiscal Year Ended** | | | | | |
| **EXECUTIVE AGENCIES** | | | | | | | | | | |
| Administrative Hearings | - | - | - | - | - | - | - | - | - | - |
| Finance | 55 | 120 | 121 | 121 | 112 | 112 | 112 | 112 | 112 | 112 |
| Fire | 162 | 96 | 84 | 182 | 193 | 165 | 153 | 135 | 129 | 117 |
| General Services | 112 | 112 | 112 | 112 | 112 | 112 | 112 | 112 | 112 | 112 |
| Human Resources | 3 | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 22 |
| Labor Relations | - | 3 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 |
| Human Rights / Board of Ethics | - | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 |
| Human Services | - | - | - | - | - | - | - | - | - | - |
| Law | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 |
| Mayor's Office | - | - | - | - | - | - | - | - | - | - |
| Planning & Development | 13 | (26) | (28) | (28) | (28) | (28) | (28) | (28) | (28) | (28) |
| Police | 125 | 250 | 175 | 163 | 150 | 150 | 150 | 150 | 150 | 150 |
| Public Lighting | - | - | - | - | - | - | - | - | - | - |
| Public Works (Solid Waste) | - | - | - | - | - | - | - | - | - | - |
| Recreation | - | - | - | - | - | - | - | - | - | - |
| DHWP (Vital Records) | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | |
| **LEGISLATIVE AGENCIES** | | | | | | | | | | |
| Auditor General / Inspector General | - | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| Board of Zoning Appeals | - | - | - | - | - | - | - | - | - | - |
| City Clerk | (1) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) |
| City Council | - | - | - | - | - | - | - | - | - | - |
| Election Commission | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) |
| Ombudsperson | - | 13 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 |
| | | | | | | | | | | |
| **JUDICIAL AGENCY** | | | | | | | | | | |
| 36th District Court | (41) | (56) | (66) | (66) | (66) | (66) | (66) | (66) | (66) | (66) |
| | | | | | | | | | | |
| **ENTERPRISE AGENCIES** | | | | | | | | | | |
| Airport | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| Buildings and Safety | 2 | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) |
| DDOT - Transportation | - | - | 14 | 77 | 96 | 98 | 100 | 102 | 115 | 128 |
| Municipal Parking | 1 | 7 | (6) | (6) | (6) | (6) | (6) | (6) | (6) | (6) |
| | | | | | | | | | | |
| **OTHER** | | | | | | | | | | |
| Blight | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | |
| **TOTAL** | **451** | **568** | **485** | **634** | **642** | **616** | **607** | **591** | **597** | **598** |

13 of 70

13-53846-tit Doc 8773 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 428 of 602
13-53846-swr Doc 6382-2 Filed 03/31/14 Entered 03/31/14 13:36:38 Page 90 of 91
204

# City of Detroit

Ten-Year Plan of Adjustment

Executive Agencies - Department Detail

13-53846-tit Doc 8773-2 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 420 of 602
13-53846-swr Doc 6382-2 Filed 03/31/14 Entered 03/31/14 18:36:58 Page 31 of
204

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Executive Agencies**
**Department of Administrative Hearings (DAH)**
*($ in millions)*

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **For the Fiscal Year Ended** | | | | | | | | | | | |
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| 2. | a. Increased Collection Rate | - | - | - | - | - | - | - | - | - | - | - |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | - | - | - | - | - | - | - | - | - | - | - |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | - | - | - | - | - | - | - | - | - | - | - |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | - | - | - | - | - | - | - | - | - | - | - |
| 9. | Professional & Contract Services | - | - | - | - | - | - | - | - | - | - | - |
| 10. | Labor Costs / Service Contracts | - | - | - | - | - | - | - | - | - | - | - |
| 11. | Active Benefits | - | - | - | - | - | - | - | - | - | - | - |
| 12. | Training | - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 |
| 13. | Materials and Supplies | - | - | - | - | - | - | - | - | - | - | - |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | - | - | - | - | - | - | - | - | - | - | - |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | - | - | - | - | - | - | - | - | - | - |
| 22. | **Total Operating Expenditures** | - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 |
| 23. | **Total Operating Surplus (Deficit)** | - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | - | (0.5) | - | - | - | - | - | - | - | - | (0.5) |
| 25. | Capital Expenditures | - | - | - | - | - | - | - | - | - | - | - |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | - | - | - | - | - | - | - | - | - | - | - |
| 28. | **Total Reorganization / Reinvestment** | - | (0.5) | - | - | - | - | - | - | - | - | (0.5) |
| 29. | **Total Surplus (Deficit)** | $ - | $ (0.5) | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | (0.4) |
| 30. | **Incremental Headcount (FTE)** | - | - | - | - | - | - | - | - | - | - | |

15 of 70

13-53846-tjtswr Doc 8379 Filed 12/10/14 Entered 12/10/14 08:24:40 Page 430 of 602
13-53846-swr Doc 6382-2 Filed 03/31/14 Entered 03/31/14 13:36:38 Page 430 of
204

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Executive Agencies**
**Department of Administrative Hearings (DAH)**
*($ in millions)*

|  |  | 10-Year Total | Assumptions / Comments |
|---|---|---|---|
|  | **Revenues** |  |  |
| 1. | Collections | $ - |  |
| 2. | a. Increased Collection Rate | - |  |
| 3. | b. Collection of Past Due | - |  |
| 4. | Pricing/Fees | - |  |
| 5. | Grant Revenue | - |  |
| 6. | Other | - |  |
| 7. | **Total Revenues** | - |  |
|  | **Expenditures** |  |  |
| 8. | Permanent Labor | - |  |
| 9. | Professional & Contract Services | - |  |
| 10. | Labor Costs / Service Contracts | - |  |
| 11. | Active Benefits | - |  |
| 12. | Training | 0.1 | Training cost for all department employees - $2.0k per employee through FY '16, $1.5k thereafter to establish a continuous training program |
| 13. | Materials and Supplies | - |  |
| 14. | Utilities | - |  |
| 15. | Purchased services | - |  |
| 16. | Risk management / insurance | - |  |
| 17. | Contributions to non EP funds | - |  |
| 18. | Transfers In/Out (General Fund) | - |  |
| 19. | Grant related expenses | - |  |
| 20. | Maintenance | - |  |
| 21. | All Other | - |  |
| 22. | **Total Operating Expenditures** | 0.1 |  |
| 23. | **Total Operating Surplus (Deficit)** | 0.1 |  |
|  | **Reorganization / Reinvestment** |  |  |
| 24. | Technology Infrastructure | (0.5) | Investment in case tracking system |
| 25. | Capital Expenditures | - |  |
| 26. | Other Infrastructure | - |  |
| 27. | Reorganization Costs | - |  |
| 28. | **Total Reorganization / Reinvestment** | (0.5) |  |
| 29. | **Total Surplus (Deficit)** | $ (0.4) |  |
| 30. | Incremental Headcount (FTE) | - |  |

16 of 70

13-53846-tjt Doc 8773 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 431 of 602
13-53846-swr Doc 6382-1 Filed 03/31/14 Entered 03/31/14 18:36:38 Page 93 of
204

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Executive Agencies**
**Finance Department (Finance)**
*($ in millions)*

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | For the Fiscal Year Ended | | | | | | |
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2. | a. Increased Collection Rate | 1.6 | 4.9 | 4.9 | 5.2 | 5.2 | 5.2 | 5.2 | 5.2 | 5.2 | 5.2 | 47.9 |
| 3. | b. Collection of Past Due | 1.5 | 3.0 | 3.0 | 2.5 | - | - | - | - | - | - | 10.0 |
| 4. | Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | - | - | 0.5 | 1.0 | 1.0 | 1.0 | 1.1 | 1.1 | 1.1 | 1.1 | 7.9 |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | 3.1 | 7.9 | 8.4 | 8.7 | 6.2 | 6.3 | 6.3 | 6.3 | 6.3 | 6.3 | 65.8 |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | (1.1) | (6.0) | (6.3) | (6.4) | (6.5) | (6.7) | (6.8) | (7.0) | (7.1) | (7.3) | (61.1) |
| 9. | Professional & Contract Services | (0.0) | 0.7 | 0.8 | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 | 7.6 |
| 10. | Labor Costs / Service Contracts | (1.2) | (5.3) | (5.4) | (5.5) | (5.7) | (5.8) | (5.9) | (6.1) | (6.2) | (6.4) | (53.5) |
| 11. | Active Benefits | (0.6) | (3.3) | (3.4) | (3.5) | (3.6) | (3.7) | (3.7) | (3.8) | (3.9) | (4.0) | (33.6) |
| 12. | Training | (0.3) | (0.9) | (0.9) | (0.7) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (6.6) |
| 13. | Materials and Supplies | (0.0) | 2.0 | 2.0 | 2.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 35.8 |
| 14. | Utilities | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.2) |
| 15. | Purchased services | - | - | 0.5 | 0.5 | 0.7 | 0.5 | 0.7 | 0.5 | 0.7 | 0.5 | 4.4 |
| 16. | Risk management / insurance | - | - | 3.0 | 3.0 | 2.5 | 2.5 | 2.0 | 2.0 | 1.5 | 1.5 | 18.0 |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | (0.1) | - | - | - | - | - | - | - | - | - | (0.1) |
| 22. | **Total Operating Expenditures** | (2.3) | (7.5) | (4.3) | (4.3) | (1.7) | (2.2) | (2.7) | (3.2) | (3.6) | (4.1) | (35.8) |
| 23. | **Total Operating Surplus (Deficit)** | 0.8 | 0.5 | 4.1 | 4.4 | 4.5 | 4.0 | 3.6 | 3.1 | 2.7 | 2.2 | 30.0 |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | (9.8) | (35.9) | (8.4) | (4.3) | (6.5) | (6.6) | (4.1) | (5.2) | (5.5) | (4.2) | (90.6) |
| 25. | Capital Expenditures | - | - | - | - | - | - | - | - | - | - | - |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | (2.5) | (5.5) | (3.4) | (0.5) | (0.9) | (0.6) | (1.4) | (0.6) | (0.9) | (0.6) | (17.1) |
| 28. | **Total Reorganization / Reinvestment** | (12.3) | (41.5) | (11.8) | (4.9) | (7.3) | (7.3) | (5.5) | (5.9) | (6.4) | (4.8) | (107.7) |
| 29. | **Total Surplus (Deficit)** | $ (11.5) | $ (41.0) | $ (7.7) | $ (0.5) | $ (2.8) | $ (3.2) | $ (1.9) | $ (2.8) | $ (3.7) | $ (2.6) | $ (77.7) |
| 30. | **Incremental Headcount (FTE)** | 55 | 120 | 121 | 121 | 112 | 112 | 112 | 112 | 112 | 112 | 112 |

17 of 70

13-53846-tit Doc 8772 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 432 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 16:36:38 Page 432 of 602

204

**City of Detroit**

Ten-Year Plan of Adjustment
Restructuring and Reinvestment Initiatives - Executive Agencies
Finance Department (Finance)
($ in millions)

| | | 10-Year Total | Assumptions / Comments |
|---|---|---:|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | 47.9 | Incremental collections primarily related to Income Tax non-filer project and Income Tax Task Force ($31.0MM); incremental revenue from Treasury related to additional staffing for collection activities ($13.5MM), additional Treasury collections related to the hiring of a third-party collection agency ($3.4MM) |
| 3. | b. Collection of Past Due | 10.0 | Collection of past due income tax receivables, net of 3rd party collection fees |
| 4. | Pricing/Fees | - | |
| 5. | Grant Revenue | 7.9 | Additional grant related revenue from establishment of a Grants administration function |
| 6. | Other | - | |
| 7. | **Total Revenues** | 65.8 | |
| | **Expenditures** | - | |
| 8. | Permanent Labor | (61.1) | FTE increases - Grants (27), Treasury (25), ITS (15), Accounting and Finance Admin. (14), Risk Management and Workers' Compensation (13), Assessing (6), Income Tax (7) and Purchasing (5) |
| 9. | Professional & Contract Services | 7.6 | Reduction to income tax contractual services subsequent to implementation of CityTax software solution |
| 10. | Labor Costs / Service Contracts | (53.5) | |
| 11. | Active Benefits | (33.6) | Benefits at 55% of Permanent Labor costs |
| 12. | Training | (6.6) | Training cost for all department employees - $2.0k per employee through FY '16, $1.5k thereafter to establish a continuous training program |
| 13. | Materials and Supplies | 35.8 | Purchase savings generated from process related enhancements, consolidation of vendors, and other Purchasing Division restructuring initiatives |
| 14. | Utilities | (0.2) | Grant related |
| 15. | Purchased services | 4.4 | Savings related to phasing out Plante Moran accounting related projects |
| 16. | Risk management / insurance | 18.0 | Estimated savings related to a improved risk management function and workers' compensation claim process |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | (0.1) | |
| 22. | **Total Operating Expenditures** | (35.8) | |
| 23. | **Total Operating Surplus (Deficit)** | 30.0 | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | (90.6) | Incremental IT costs primarily related to new ERP system ($29.0MM), Data Center Back-up ($10.9MM), software upgrades ($10.3MM), hardware upgrades ($9.5MM), implementation of CityTax ($5.6MM), installation of a document management system ($5.4MM), enhanced security system ($3.8MM), Workbrain upgrades ($3.6MM), and other infrastructure ($3.3MM) |
| 25. | Capital Expenditures | - | |
| 26. | Other Infrastructure | - | |
| 27. | Reorganization Costs | (17.1) | Primarily related to Assessing Division Corrective Action Plan ($12.7M) and Plante Moran Treasury restructuring project |
| 28. | **Total Reorganization / Reinvestment** | (107.7) | |
| 29. | **Total Surplus (Deficit)** | $ (77.7) | |
| 30. | **Incremental Headcount (FTE)** | 112 | |

18 of 70

13-53846-tit Doc 8789-2 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 433 of 602
13-53846-swr Doc 6382-2 Filed 03/31/14 Entered 03/31/14 18:36:38 Page 95 of
204

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Executive Agencies**
**Fire Department (DFD)**
($ in millions)

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Revenues** | | | | | For the Fiscal Year Ended | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2. | a. Increased Collection Rate | 0.9 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.7 | 3.7 | 33.7 |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 | 8.2 |
| 5. | Grant Revenue | 1.1 | 3.5 | 2.0 | 13.7 | 14.4 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 44.8 |
| 6. | Other | - | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | - | - | - | - | 0.4 |
| 7. | **Total Revenues** | 2.0 | 8.1 | 6.6 | 18.3 | 19.0 | 6.7 | 6.6 | 6.6 | 6.6 | 6.6 | 87.0 |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | (1.8) | (5.7) | (2.5) | (4.1) | 0.2 | 2.5 | 1.1 | 2.9 | 2.4 | 3.1 | (1.9) |
| 9. | Professional & Contract Services | (0.1) | - | - | - | - | - | - | - | - | - | (0.1) |
| 10. | Labor Costs / Service Contracts | (1.9) | (5.7) | (2.5) | (4.1) | 0.2 | 2.5 | 1.1 | 2.9 | 2.4 | 3.1 | (2.0) |
| 11. | Active Benefits | (1.1) | (2.0) | 0.9 | (2.7) | (0.1) | 1.1 | 0.5 | 1.7 | 1.4 | 1.9 | 1.6 |
| 12. | Training | 0.3 | (5.0) | (4.6) | (0.8) | (0.8) | (0.7) | (0.5) | (0.7) | (0.8) | (0.3) | (14.0) |
| 13. | Materials and Supplies | - | - | - | - | - | - | - | - | - | - | - |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | - | - | - | - | - | - | - | - | - | - | - |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | - | - | - | - | - | - | - | - | - | - |
| 22. | **Total Operating Expenditures** | (2.7) | (12.6) | (6.1) | (7.6) | (0.7) | 2.8 | 1.1 | 3.9 | 2.9 | 4.6 | (14.4) |
| 23. | **Total Operating Surplus (Deficit)** | (0.7) | (4.5) | 0.5 | 10.7 | 18.3 | 9.5 | 7.7 | 10.4 | 9.5 | 11.2 | 72.6 |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | (0.7) | (0.6) | (0.2) | (0.2) | (0.2) | (0.8) | (0.2) | (0.4) | (0.2) | (0.2) | (3.6) |
| 25. | Capital Expenditures | (5.5) | (11.0) | (7.4) | (10.5) | (5.8) | (12.7) | (4.8) | (5.6) | (5.5) | (5.5) | (74.3) |
| 26. | Other Infrastructure | (9.7) | (8.6) | (9.6) | (6.1) | (5.8) | (5.0) | (5.0) | (4.6) | (3.0) | (2.7) | (60.0) |
| 27. | Reorganization Costs | (0.3) | - | - | - | - | - | - | - | - | - | (0.3) |
| 28. | **Total Reorganization / Reinvestment** | (16.2) | (20.2) | (17.2) | (16.8) | (11.7) | (18.5) | (9.9) | (10.6) | (8.7) | (8.4) | (138.1) |
| 29. | **Total Surplus (Deficit)** | $ (16.9) | $ (24.6) | $ (16.7) | $ (6.0) | $ 6.6 | $ (9.0) | $ (2.3) | $ (0.1) | $ 0.8 | $ 2.8 | $ (65.6) |
| 30. | **Incremental Headcount (FTE)** | 162 | 96 | 84 | 182 | 193 | 165 | 153 | 135 | 129 | 117 | 117 |

13-53846-tjt Doc 8773-2 Filed 12/16/14 Entered 12/16/14 09:24:40 Page 434 of 602
13-53846-swr Doc 6382-2 Filed 03/31/14 Entered 03/31/14 16:36:38 Page 96 of

**City of Detroit**

**Ten-Year Plan of Adjustment**

**Restructuring and Reinvestment Initiatives - Executive Agencies**

**Fire Department (DFD)**

*($ in millions)*

| | | 10-Year Total | Assumptions / Comments |
|---|---|---:|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | 33.7 | Increased collections from additional EMS and fleet personnel ($26.8MM) and increased Fire Marshall personnel ($6.9MM) |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | 8.2 | Includes fire recovery billing for false alarms, vehicle fires, vehicle accidents |
| 5. | Grant Revenue | 44.8 | Assumes ability to receive SAFER grant funding in FY '17 and FY '18 and continued access to $2.0MM annually from FEMA grants for equipment related training |
| 6. | Other | 0.4 | Sale of closed facilities |
| 7. | **Total Revenues** | 87.0 | |
| | | | |
| | **Expenditures** | | |
| 8. | Permanent Labor | (1.9) | Labor estimate includes ideal staffing levels while taking into account attrition, efficiencies, reductions in overtime, multifunctioning department EMT / SAFER grant requirements |
| 9. | Professional & Contract Services | (0.1) | |
| 10. | Labor Costs / Service Contracts | (2.0) | |
| 11. | Active Benefits | 1.6 | Increased headcount and overtime assumptions |
| 12. | Training | (14.0) | Training cost for all civilian department employees - $2.0k per employee through FY '16, $1.5k thereafter to establish a continuous training program; Cross-training for uniform personnel (Medical First Responders and Fire Fighting) |
| 13. | Materials and Supplies | - | |
| 14. | Utilities | - | |
| 15. | Purchased services | - | |
| 16. | Risk management / insurance | - | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | - | |
| 22. | **Total Operating Expenditures** | (14.4) | |
| | | | |
| 23. | **Total Operating Surplus (Deficit)** | 72.6 | |
| | | | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | (3.6) | Incremental costs for Records Management System |
| 25. | Capital Expenditures | (74.3) | Repair and maintenance of existing facilities ($32.0MM), 7 new firehouses totaling ($21.0MM) and fleet equipment, turnout gear and breathing units replacement programs ($19.0MM) |
| 26. | Other Infrastructure | (60.0) | Implementation of apparatus (fleet) replacement program of approximately 20 vehicles per year as well as preventative maintenance program |
| 27. | Reorganization Costs | (0.3) | |
| 28. | **Total Reorganization / Reinvestment** | (138.1) | |
| | | | |
| 29. | **Total Surplus (Deficit)** | $ (65.6) | |
| | | | |
| 30. | **Incremental Headcount (FTE)** | 117 | |

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Executive Agencies**
**General Services Department (GSD)**
*($ in millions)*

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenues** | | | | | | | | | | | |
| 1. Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2. a. Increased Collection Rate | - | - | - | - | - | - | - | - | - | - | - |
| 3. b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. Grant Revenue | 1.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 20.3 |
| 6. Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. **Total Revenues** | 1.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 20.3 |
| **Expenditures** | | | | | | | | | | | |
| 8. Permanent Labor | (1.1) | (4.1) | (4.3) | (4.3) | (4.4) | (4.5) | (4.6) | (4.7) | (4.8) | (4.9) | (41.7) |
| 9. Professional & Contract Services | (0.2) | (0.3) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (2.4) |
| 10. Labor Costs / Service Contracts | (1.3) | (4.5) | (4.5) | (4.6) | (4.7) | (4.7) | (4.8) | (4.9) | (5.0) | (5.1) | (44.1) |
| 11. Active Benefits | (0.3) | (2.3) | (2.3) | (2.3) | (2.3) | (2.3) | (2.3) | (2.3) | (2.3) | (2.3) | (21.3) |
| 12. Training | (0.1) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (5.3) |
| 13. Materials and Supplies | (3.7) | (7.4) | (7.3) | (7.3) | (7.3) | (7.3) | (7.3) | (7.3) | (7.3) | (7.3) | (69.5) |
| 14. Utilities | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (2.4) |
| 15. Purchased services | - | - | - | - | - | - | - | - | - | - | - |
| 16. Risk management / insurance | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.7 |
| 17. Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. All Other | 0.2 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 4.1 |
| 22. **Total Operating Expenditures** | (5.4) | (14.4) | (14.4) | (14.5) | (14.6) | (14.7) | (14.8) | (14.9) | (15.0) | (15.1) | (137.7) |
| 23. **Total Operating Surplus (Deficit)** | (4.4) | (12.3) | (12.3) | (12.4) | (12.5) | (12.5) | (12.6) | (12.7) | (12.8) | (12.9) | (117.5) |
| **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. Technology Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 25. Capital Expenditures | (6.1) | (5.9) | (4.1) | (4.2) | (4.5) | (4.3) | (4.3) | (4.5) | (4.4) | (4.4) | (46.6) |
| 26. Other Infrastructure | (5.9) | (5.7) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (16.4) |
| 27. Reorganization Costs | (0.4) | - | - | - | - | - | - | - | - | - | (0.4) |
| 28. **Total Reorganization / Reinvestment** | (12.3) | (11.6) | (4.8) | (4.8) | (5.1) | (4.9) | (4.9) | (5.1) | (5.0) | (5.0) | (63.3) |
| 29. **Total Surplus (Deficit)** | $ (16.7) | $ (23.9) | $ (17.0) | $ (17.2) | $ (17.5) | $ (17.4) | $ (17.5) | $ (17.8) | $ (17.8) | $ (17.9) | $ (180.8) |
| 30. **Incremental Headcount (FTE)** | 112 | 112 | 112 | 112 | 112 | 112 | 112 | 112 | 112 | 112 | 112 |

*For the Fiscal Year Ended*

21 of 70

13-53846-tjt Doc 8773 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 436 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 13:36:38 Page 98 of
204

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Executive Agencies**
**General Services Department (GSD)**
*($ in millions)*

| | | 10-Year Total | Assumptions / Comments |
|---|---|---:|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | - | |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | - | |
| 5. | Grant Revenue | 20.3 | Street fund reimbursement of additional employees |
| 6. | Other | - | |
| 7. | **Total Revenues** | 20.3 | |
| | **Expenditures** | - | |
| 8. | Permanent Labor | (41.7) | Additional employees to reach standard level of service delivery. Assumes Solid Waste and Custodial Services privatization to enhance service and / or reduce cost beginning Q4 FY '14. Assumes no additional outsourcing being evaluated for all divisions. |
| 9. | Professional & Contract Services | (2.4) | Increased professional and contract services to achieve standard level of services |
| 10. | Labor Costs / Service Contracts | (44.1) | |
| 11. | Active Benefits | (21.3) | Benefits at 55% of Permanent Labor costs |
| 12. | Training | (5.3) | Training cost for all GSD employees - $2k per EE through FY '16, $1.5k thereafter |
| 13. | Materials and Supplies | (69.5) | Additional materials and supplies required to achieve required level of service; i.e. Building supplies and expenses ($1.0MM), fleet maintenance supplies and expenses (excluding solid waste) ($4.3MM); support additional building and grounds maintenance. requirements ($1.7MM); increased fuel cost / usage ($0.4MM) |
| 14. | Utilities | (2.4) | |
| 15. | Purchased services | - | |
| 16. | Risk management / insurance | 0.7 | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | 4.1 | |
| 22. | **Total Operating Expenditures** | (137.7) | |
| 23. | **Total Operating Surplus (Deficit)** | (117.5) | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | - | |
| 25. | Capital Expenditures | (46.6) | Facility improvements repairs / upgrades ($27.8MM) and additional facility space consolidation ($18.7MM) |
| 26. | Other Infrastructure | (16.4) | Replacement / refresh of vehicles and equipment |
| 27. | Reorganization Costs | (0.4) | |
| 28. | **Total Reorganization / Reinvestment** | (63.3) | |
| 29. | **Total Surplus (Deficit)** | $ (180.8) | |
| 30. | **Incremental Headcount (FTE)** | 112 | |

22 of 70

13-53846-tjt Doc 8773 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 437 of 602
13-53846-swr Doc 6382-2 Filed 03/31/14 Entered 03/31/14 18:36:38 Page 99 of
204

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Executive Agencies**
**Human Resources Department (HR)**
*($ in millions)*

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2. | a. Increased Collection Rate | - | - | - | - | - | - | - | - | - | - | - |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | - | - | - | - | - | - | - | - | - | - | - |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | - | - | - | - | - | - | - | - | - | - | - |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | (0.1) | (1.3) | (1.3) | (1.3) | (1.4) | (1.4) | (1.4) | (1.4) | (1.5) | (1.5) | (12.6) |
| 9. | Professional & Contract Services | - | - | - | - | - | - | - | - | - | - | - |
| 10. | Labor Costs / Service Contracts | (0.1) | (1.3) | (1.3) | (1.3) | (1.4) | (1.4) | (1.4) | (1.4) | (1.5) | (1.5) | (12.6) |
| 11. | Active Benefits | (0.0) | (0.7) | (0.7) | (0.7) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (6.9) |
| 12. | Training | - | (0.8) | (0.8) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (6.6) |
| 13. | Materials and Supplies | - | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (2.7) |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | - | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.9) |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | - | - | - | - | - | - | - | - | - | - |
| 22. | **Total Operating Expenditures** | (0.1) | (3.2) | (3.2) | (3.2) | (3.2) | (3.3) | (3.3) | (3.4) | (3.4) | (3.5) | (29.7) |
| 23. | **Total Operating Surplus (Deficit)** | (0.1) | (3.2) | (3.2) | (3.2) | (3.2) | (3.3) | (3.3) | (3.4) | (3.4) | (3.5) | (29.7) |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | - | (0.5) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (1.3) |
| 25. | Capital Expenditures | - | - | (1.0) | - | - | - | - | - | - | - | (1.0) |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | (0.4) | (1.0) | (1.0) | - | - | - | - | - | - | - | (2.4) |
| 28. | **Total Reorganization / Reinvestment** | (0.4) | (1.5) | (2.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (4.7) |
| 29. | **Total Surplus (Deficit)** | $ (0.5) | $ (4.7) | $ (5.3) | $ (3.3) | $ (3.3) | $ (3.4) | $ (3.4) | $ (3.5) | $ (3.5) | $ (3.6) | $ (34.4) |
| 30. | **Incremental Headcount (FTE)** | 3 | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 22 |

23 of 70
13-53846-tit Doc 8773 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 438 of 602
13-53846-swr Doc 6382-2 Filed 03/31/14 Entered 03/31/14 13:36:58 Page 40 of 61
204

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Executive Agencies**
**Human Resources Department (HR)**
*($ in millions)*

| | | 10-Year Total | Assumptions / Comments |
|---|---|---|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | - | |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | - | |
| 5. | Grant Revenue | - | |
| 6. | Other | - | |
| 7. | **Total Revenues** | - | |
| | | | |
| | **Expenditures** | - | |
| 8. | Permanent Labor | (12.6) | FTE increases - Administration (1), Records (2), Central Services (2), Employee Services (3), Recruitment (7), Career Development (5), and Testing (2). FTE increases primarily focused on establishing a functioning recruitment, and selection and training function |
| 9. | Professional & Contract Services | - | |
| 10. | Labor Costs / Service Contracts | (12.6) | |
| 11. | Active Benefits | (6.9) | Benefits at 55% of Permanent Labor costs |
| 12. | Training | (6.6) | Training cost for all HR employees - $2.0k per employee through FY '16, $1.5k thereafter and also includes $600k annual City-wide HR training |
| 13. | Materials and Supplies | (2.7) | Estimated training and test development materials and supplies |
| 14. | Utilities | - | |
| 15. | Purchased services | (0.9) | Estimated cost for recruitment advertising budget |
| 16. | Risk management / insurance | - | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | - | |
| 22. | **Total Operating Expenditures** | (29.7) | |
| | | | |
| 23. | **Total Operating Surplus (Deficit)** | (29.7) | |
| | | | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | (1.3) | Learning center one-time IT costs and related maintenance |
| 25. | Capital Expenditures | (1.0) | Estimated capital for training location ($1.0MM) |
| 26. | Other Infrastructure | - | |
| 27. | Reorganization Costs | (2.4) | Cultural Change Agent engagement, and job description / classification and market compensation study |
| 28. | **Total Reorganization / Reinvestment** | (4.7) | |
| | | | |
| 29. | **Total Surplus (Deficit)** | $ (34.4) | |
| | | | |
| 30. | **Incremental Headcount (FTE)** | 22 | |

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Executive Agencies**
**Human Resources Department - Labor Relations Division (LR)**
*($ in millions)*

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2. | a. Increased Collection Rate | - | - | - | - | - | - | - | - | - | - | - |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | - | - | - | - | - | - | - | - | - | - | - |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | - | - | - | - | - | - | - | - | - | - | - |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | - | (0.1) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.5) | (0.5) | (0.5) | (3.7) |
| 9. | Professional & Contract Services | - | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.9) |
| 10. | Labor Costs / Service Contracts | - | (0.2) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.6) | (0.6) | (0.6) | (4.6) |
| 11. | Active Benefits | - | (0.1) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.3) | (0.3) | (0.3) | (2.0) |
| 12. | Training | - | (0.0) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.5) |
| 13. | Materials and Supplies | - | - | - | - | - | - | - | - | - | - | - |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | - | - | - | - | - | - | - | - | - | - | - |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | - | - | - | - | - | - | - | - | - | - |
| 22. | **Total Operating Expenditures** | - | (0.3) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.9) | (0.9) | (0.9) | (7.1) |
| 23. | **Total Operating Surplus (Deficit)** | - | (0.3) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.9) | (0.9) | (0.9) | (7.1) |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 25. | Capital Expenditures | - | - | - | - | - | - | - | - | - | - | - |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | - | - | - | - | - | - | - | - | - | - | - |
| 28. | **Total Reorganization / Reinvestment** | - | - | - | - | - | - | - | - | - | - | - |
| 29. | **Total Surplus (Deficit)** | $ - | $ (0.3) | $ (0.8) | $ (0.8) | $ (0.8) | $ (0.8) | $ (0.8) | $ (0.9) | $ (0.9) | $ (0.9) | $ (7.1) |
| 30. | **Incremental Headcount (FTE)** | - | 3 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 |

For the Fiscal Year Ended

25 of 70
204
13-53846-tit Doc 8773 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 440 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 18:36:38 Page 420 of 601

**City of Detroit**

**Ten-Year Plan of Adjustment**

**Restructuring and Reinvestment Initiatives - Executive Agencies**

**Human Resources Department - Labor Relations Division (LR)**

*($ in millions)*

| | | 10-Year Total | Assumptions / Comments |
|---|---|---:|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | - | |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | - | |
| 5. | Grant Revenue | - | |
| 6. | Other | - | |
| 7. | **Total Revenues** | - | |
| | | | |
| | **Expenditures** | - | |
| 8. | Permanent Labor | (3.7) | Addition of 11 employees for labor relations and benefits functions. FTE increase primarily relates to establishing proper oversight, monitoring, and compliance with union contracts |
| 9. | Professional & Contract Services | (0.9) | |
| 10. | Labor Costs / Service Contracts | (4.6) | |
| 11. | Active Benefits | (2.0) | Benefits at 55% of Permanent Labor costs |
| 12. | Training | (0.5) | Training cost for all department employees - $2.0k per employee through FY '16, $1.5k thereafter to establish a continuous training program |
| 13. | Materials and Supplies | - | |
| 14. | Utilities | - | |
| 15. | Purchased services | - | |
| 16. | Risk management / insurance | - | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | - | |
| 22. | **Total Operating Expenditures** | (7.1) | |
| | | | |
| 23. | **Total Operating Surplus (Deficit)** | (7.1) | |
| | | | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | - | |
| 25. | Capital Expenditures | - | |
| 26. | Other Infrastructure | - | |
| 27. | Reorganization Costs | - | |
| 28. | **Total Reorganization / Reinvestment** | - | |
| | | | |
| 29. | **Total Surplus (Deficit)** | $ (7.1) | |
| | | | |
| 30. | **Incremental Headcount (FTE)** | 11 | |

13-53846-tjt  Doc 8773  Filed 12/10/14  Entered 12/10/14 09:24:40  Page 441 of 602
13-53846-swr  Doc 6382-2  Filed 03/31/14  Entered 03/31/14 13:36:38  Page 43 of 61

204

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Executive Agencies**
**Human Rights / Board of Ethics Department (Human Rights)**
*($ in millions)*

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | For the Fiscal Year Ended | | | | | | |
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| 2. | a. Increased Collection Rate | - | - | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 0.3 | 0.4 | 0.4 | 2.5 |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | - | - | - | - | - | - | - | - | - | - | - |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | - | - | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 0.3 | 0.4 | 0.4 | 2.5 |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | - | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.4) | (0.4) | (0.4) | (0.4) | (3.1) |
| 9. | Professional & Contract Services | - | - | - | - | - | - | - | - | - | - | - |
| 10. | Labor Costs / Service Contracts | - | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.4) | (0.4) | (0.4) | (0.4) | (3.1) |
| 11. | Active Benefits | - | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (1.7) |
| 12. | Training | - | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.9) |
| 13. | Materials and Supplies | - | - | - | - | - | - | - | - | - | - | - |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | - | - | - | - | - | - | - | - | - | - | - |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | - | - | - | - | - | - | - | - | - | - |
| 22. | **Total Operating Expenditures** | - | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.7) | (0.7) | (0.7) | (5.7) |
| 23. | **Total Operating Surplus (Deficit)** | - | (0.6) | (0.4) | (0.4) | (0.3) | (0.3) | (0.3) | (0.4) | (0.3) | (0.3) | (3.3) |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | - | (0.1) | - | - | - | - | - | - | - | - | (0.1) |
| 25. | Capital Expenditures | - | - | - | - | - | - | - | - | - | - | - |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | - | - | - | - | - | - | - | - | - | - | - |
| 28. | **Total Reorganization / Reinvestment** | - | (0.1) | - | - | - | - | - | - | - | - | (0.1) |
| 29. | **Total Surplus (Deficit)** | $ - | $ (0.7) | $ (0.4) | $ (0.4) | $ (0.3) | $ (0.3) | $ (0.3) | $ (0.4) | $ (0.3) | $ (0.3) | $ (3.4) |
| 30. | **Incremental Headcount (FTE)** | - | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 |

13-53846-tjt Doc 8779 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 442 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 18:36:38 Page 44 of 60
204

**City of Detroit**

Ten-Year Plan of Adjustment
Restructuring and Reinvestment Initiatives - Executive Agencies
Human Rights / Board of Ethics Department (Human Rights)
*($ in millions)*

| | | 10-Year Total | Assumptions / Comments |
|---|---|---:|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | 2.5 | Increased fees from Detroit based businesses |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | - | |
| 5. | Grant Revenue | - | |
| 6. | Other | - | |
| 7. | **Total Revenues** | 2.5 | |
| | | | |
| | **Expenditures** | - | |
| 8. | Permanent Labor | (3.1) | Addition of 6 employees to ensure compliance from various parties with City's ethics and human rights policies |
| 9. | Professional & Contract Services | - | |
| 10. | Labor Costs / Service Contracts | (3.1) | |
| 11. | Active Benefits | (1.7) | Benefits at 55% of Permanent Labor costs |
| 12. | Training | (0.9) | Training cost for all department employees - $2.0k per employee through FY '16, $1.5k thereafter to establish a continuous training program; Includes $100.0k annually for City-wide ethics training |
| 13. | Materials and Supplies | - | |
| 14. | Utilities | - | |
| 15. | Purchased services | - | |
| 16. | Risk management / insurance | - | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | - | |
| 22. | **Total Operating Expenditures** | (5.7) | |
| | | | |
| 23. | **Total Operating Surplus (Deficit)** | (3.3) | |
| | | | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | (0.1) | |
| 25. | Capital Expenditures | - | |
| 26. | Other Infrastructure | - | |
| 27. | Reorganization Costs | - | |
| 28. | **Total Reorganization / Reinvestment** | (0.1) | |
| | | | |
| 29. | **Total Surplus (Deficit)** | $ (3.4) | |
| | | | |
| 30. | **Incremental Headcount (FTE)** | 6 | |

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Executive Agencies**
**Law Department (Law)**
*($ in millions)*

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | For the Fiscal Year Ended | | | | | | |
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2. | a. Increased Collection Rate | - | - | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 4.4 |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | - | - | - | - | - | - | - | - | - | - | - |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | - | - | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 4.4 |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | (0.7) | (1.4) | (1.4) | (1.5) | (1.5) | (1.5) | (1.6) | (1.6) | (1.6) | (1.7) | (14.5) |
| 9. | Professional & Contract Services | - | - | - | - | - | - | - | - | - | - | - |
| 10. | Labor Costs / Service Contracts | (0.7) | (1.4) | (1.4) | (1.5) | (1.5) | (1.5) | (1.6) | (1.6) | (1.6) | (1.7) | (14.5) |
| 11. | Active Benefits | (0.4) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.9) | (0.9) | (0.9) | (0.9) | (8.0) |
| 12. | Training | - | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (1.5) |
| 13. | Materials and Supplies | - | - | - | - | - | - | - | - | - | - | - |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | - | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 6.8 |
| 16. | Risk management / insurance | - | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 18.0 |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | - | - | - | - | - | - | - | - | - | - |
| 22. | **Total Operating Expenditures** | (1.1) | 0.4 | 0.3 | 0.3 | 0.3 | 0.2 | 0.2 | 0.1 | 0.1 | 0.0 | 0.8 |
| 23. | **Total Operating Surplus (Deficit)** | (1.1) | 0.4 | 0.9 | 0.9 | 0.8 | 0.8 | 0.7 | 0.7 | 0.6 | 0.6 | 5.2 |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | (0.5) | - | - | - | - | - | - | - | - | - | (0.5) |
| 25. | Capital Expenditures | - | - | - | - | - | - | - | - | - | - | - |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | (0.1) | - | - | - | - | - | - | - | - | - | (0.1) |
| 28. | **Total Reorganization / Reinvestment** | (0.6) | - | - | - | - | - | - | - | - | - | (0.6) |
| 29. | **Total Surplus (Deficit)** | $ (1.7) | $ 0.4 | $ 0.9 | $ 0.9 | $ 0.8 | $ 0.8 | $ 0.7 | $ 0.7 | $ 0.6 | $ 0.6 | 4.6 |
| 30. | **Incremental Headcount (FTE)** | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 |

**City of Detroit**

**Ten-Year Plan of Adjustment**

**Restructuring and Reinvestment Initiatives - Executive Agencies**

**Law Department (Law)**

*($ in millions)*

| | | 10-Year Total | Assumptions / Comments |
|---|---|---|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | 4.4 | Assumes annual improvement to collections due to additional internal legal labor resources |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | - | |
| 5. | Grant Revenue | - | |
| 6. | Other | - | |
| 7. | **Total Revenues** | 4.4 | |
| | **Expenditures** | - | |
| 8. | Permanent Labor | (14.5) | 17 additional employees primarily dedicated to aggressively pursuing receivable collection efforts and to more rigorously defend City against certain legal actions |
| 9. | Professional & Contract Services | - | |
| 10. | Labor Costs / Service Contracts | (14.5) | |
| 11. | Active Benefits | (8.0) | Benefits at 55% of Permanent Labor costs |
| 12. | Training | (1.5) | Training cost for all department employees - $2.0k per employee through FY '16, $1.5k thereafter to establish a continuous training program |
| 13. | Materials and Supplies | - | |
| 14. | Utilities | - | |
| 15. | Purchased services | 6.8 | Assumes $750.0k annual reduction in outside legal costs due to additional internal labor resources |
| 16. | Risk management / insurance | 18.0 | Assumes $2.0MM annual reduction in lawsuit settlements as a result of additional internal labor resources |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | - | |
| 22. | **Total Operating Expenditures** | 0.8 | |
| 23. | **Total Operating Surplus (Deficit)** | 5.2 | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | (0.5) | Purchase of City Law IT application |
| 25. | Capital Expenditures | - | |
| 26. | Other Infrastructure | - | |
| 27. | Reorganization Costs | (0.1) | Implementation cost of City Law IT application |
| 28. | **Total Reorganization / Reinvestment** | (0.6) | |
| 29. | **Total Surplus (Deficit)** | $ 4.6 | |
| 30. | Incremental Headcount (FTE) | 17 | |

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Executive Agencies**
**Mayor's Office**
*($ in millions)*

|  |  | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | **Revenues** |  |  |  |  |  |  |  |  |  |  |  |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| 2. | a. Increased Collection Rate | - | - | - | - | - | - | - | - | - | - | - |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | - | - | - | - | - | - | - | - | - | - | - |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | - | - | - | - | - | - | - | - | - | - | - |
|  | **Expenditures** |  |  |  |  |  |  |  |  |  |  |  |
| 8. | Permanent Labor | - | - | - | - | - | - | - | - | - | - | - |
| 9. | Professional & Contract Services | - | - | - | - | - | - | - | - | - | - | - |
| 10. | Labor Costs / Service Contracts | - | - | - | - | - | - | - | - | - | - | - |
| 11. | Active Benefits | - | - | - | - | - | - | - | - | - | - | - |
| 12. | Training | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.3) |
| 13. | Materials and Supplies | - | - | - | - | - | - | - | - | - | - | - |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | - | - | - | - | - | - | - | - | - | - | - |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | - | - | - | - | - | - | - | - | - | - |
| 22. | **Total Operating Expenditures** | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.3) |
| 23. | **Total Operating Surplus (Deficit)** | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.3) |
|  | **Reorganization / Reinvestment** |  |  |  |  |  |  |  |  |  |  |  |
| 24. | Technology Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 25. | Capital Expenditures | - | - | - | - | - | - | - | - | - | - | - |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | - | - | - | - | - | - | - | - | - | - | - |
| 28. | **Total Reorganization / Reinvestment** | - | - | - | - | - | - | - | - | - | - | - |
| 29. | **Total Surplus (Deficit)** | $ - | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | (0.3) |
| 30. | **Incremental Headcount (FTE)** | - | - | - | - | - | - | - | - | - | - | - |

13-53846-tis̲wr Doc 8379̲2 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 446 of 602
13-53846-swr Doc 6382-1 Filed 03/31/14 Entered 03/31/14 13:36:38 Page 46 of 61
204

**City of Detroit**

**Ten-Year Plan of Adjustment**

**Restructuring and Reinvestment Initiatives - Executive Agencies**

**Mayor's Office**

*($ in millions)*

| | | 10-Year Total | Assumptions / Comments |
|---|---|---|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | - | |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | - | |
| 5. | Grant Revenue | - | |
| 6. | Other | - | |
| 7. | **Total Revenues** | - | |
| | | | |
| | **Expenditures** | | |
| 8. | Permanent Labor | - | |
| 9. | Professional & Contract Services | - | |
| 10. | Labor Costs / Service Contracts | - | |
| 11. | Active Benefits | - | |
| 12. | Training | (0.3) | Training cost for all department employees - $2k per employee through FY '16, $1.5k thereafter to establish a continuous training program |
| 13. | Materials and Supplies | - | |
| 14. | Utilities | - | |
| 15. | Purchased services | - | |
| 16. | Risk management / insurance | - | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | - | |
| 22. | **Total Operating Expenditures** | (0.3) | |
| | | | |
| 23. | **Total Operating Surplus (Deficit)** | (0.3) | |
| | | | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | - | |
| 25. | Capital Expenditures | - | |
| 26. | Other Infrastructure | - | |
| 27. | Reorganization Costs | - | |
| 28. | **Total Reorganization / Reinvestment** | - | |
| | | | |
| 29. | **Total Surplus (Deficit)** | $ (0.3) | |
| | | | |
| 30. | Incremental Headcount (FTE) | - | |

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Executive Agencies**
**Planning and Development Department (PDD)**
*($ in millions)*

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **For the Fiscal Year Ended** | | | | | | | | | | | |
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| 2. | a. Increased Collection Rate | - | - | - | - | - | - | - | - | - | - | - |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | - | - | - | - | - | - | - | - | - | - | - |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | - | - | - | - | - | - | - | - | - | - | - |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | (0.3) | (0.8) | (0.7) | (0.7) | (0.7) | (0.7) | (0.8) | (0.8) | (0.8) | (0.8) | (7.2) |
| 9. | Professional & Contract Services | - | - | - | - | - | - | - | - | - | - | - |
| 10. | Labor Costs / Service Contracts | (0.3) | (0.8) | (0.7) | (0.7) | (0.7) | (0.7) | (0.8) | (0.8) | (0.8) | (0.8) | (7.2) |
| 11. | Active Benefits | (0.2) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (3.9) |
| 12. | Training | (0.1) | (0.2) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (1.2) |
| 13. | Materials and Supplies | - | - | - | - | - | - | - | - | - | - | - |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | - | - | - | - | - | - | - | - | - | - | - |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | 0.2 | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 2.2 |
| 22. | **Total Operating Expenditures** | (0.6) | (1.2) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.1) | (1.1) | (1.1) | (10.0) |
| 23. | **Total Operating Surplus (Deficit)** | (0.6) | (1.2) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.1) | (1.1) | (1.1) | (10.0) |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | (0.3) | (0.3) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.8) |
| 25. | Capital Expenditures | - | - | - | - | - | - | - | - | - | - | - |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | (2.4) | (4.1) | (0.7) | - | - | - | (0.8) | (0.8) | - | - | (8.9) |
| 28. | **Total Reorganization / Reinvestment** | (2.7) | (4.4) | (0.7) | (0.0) | (0.0) | (0.0) | (0.9) | (0.9) | (0.0) | (0.0) | (9.7) |
| 29. | **Total Surplus (Deficit)** | $ (3.3) | $ (5.6) | $ (1.7) | $ (1.0) | $ (1.0) | $ (1.0) | $ (1.9) | $ (1.9) | $ (1.1) | $ (1.1) | $ (19.7) |
| 30. | **Incremental Headcount (FTE)** | 13 | (26) | (28) | (28) | (28) | (28) | (28) | (28) | (28) | (28) | (28) |

33 of 70

13-53846-tjt Doc 8779 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 448 of 602
13-53846-swr Doc 6382-2 Filed 03/31/14 Entered 03/31/14 18:36:38 Page 90 of 91
204

**City of Detroit**
**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Executive Agencies**
**Planning and Development Department (PDD)**
*($ in millions)*

| | | 10-Year Total | Assumptions / Comments |
|---|---|---:|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | - | |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | - | |
| 5. | Grant Revenue | - | |
| 6. | Other | - | |
| 7. | **Total Revenues** | - | |
| | | | |
| | **Expenditures** | - | |
| 8. | Permanent Labor | (7.2) | Hire City planning and other labor resources, transfer of personnel from City Council to PDD, efficiency improvements from grants management consolidation, and service delivery changes, and privatization of Real Estate, development (portion), neighborhood support (portion), and housing (portion) divisions |
| 9. | Professional & Contract Services | - | |
| 10. | Labor Costs / Service Contracts | (7.2) | |
| 11. | Active Benefits | (3.9) | Benefits at 55% of Permanent Labor costs |
| 12. | Training | (1.2) | Training cost for all department employees - $2.0k per employee through FY '16, $1.5k thereafter to establish a continuous training program |
| 13. | Materials and Supplies | - | |
| 14. | Utilities | - | |
| 15. | Purchased services | - | |
| 16. | Risk management / insurance | - | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | 2.2 | Savings due to PDD moving facilities from Cadillac Tower to CAYMC |
| 22. | **Total Operating Expenditures** | (10.0) | |
| | | | |
| 23. | **Total Operating Surplus (Deficit)** | (10.0) | |
| | | | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | (0.8) | IT infrastructure investment |
| 25. | Capital Expenditures | - | |
| 26. | Other Infrastructure | - | |
| 27. | Reorganization Costs | (8.9) | Update master plan and zoning ordinance, develop investment strategy ($4.0MM), surge resources (accounting staff / consultants) ($2.4MM), service / delivery model change ($1.5MM) and PDD facility consolidation ($1.0MM) |
| 28. | **Total Reorganization / Reinvestment** | (9.7) | |
| | | | |
| 29. | **Total Surplus (Deficit)** | $ (19.7) | |
| | | | |
| 30. | **Incremental Headcount (FTE)** | (28) | |

34 of 70

13-53846-tjt Doc 8779 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 449 of 602
13-53846-swr Doc 6382-2 Filed 03/31/14 Entered 03/31/14 18:36:38 Page 51 of 60
204

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Executive Agencies**
**Police Department (DPD)**
*($ in millions)*

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2. | a. Increased Collection Rate | - | - | - | - | - | - | - | - | - | - | - |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 18.0 |
| 5. | Grant Revenue | - | 1.6 | 1.6 | 1.6 | 1.6 | 1.6 | 1.6 | 1.6 | 1.6 | 1.6 | 14.6 |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | - | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 32.6 |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | (1.5) | (8.5) | (8.4) | (5.3) | (4.4) | (4.4) | (4.4) | (4.5) | (4.6) | (4.7) | (50.8) |
| 9. | Professional & Contract Services | - | - | - | - | - | - | - | - | - | - | - |
| 10. | Labor Costs / Service Contracts | (1.5) | (8.5) | (8.4) | (5.3) | (4.4) | (4.4) | (4.4) | (4.5) | (4.6) | (4.7) | (50.8) |
| 11. | Active Benefits | (0.8) | (4.7) | (4.6) | (2.9) | (2.4) | (2.4) | (2.4) | (2.5) | (2.5) | (2.6) | (27.9) |
| 12. | Training | - | (0.9) | (0.8) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (5.4) |
| 13. | Materials and Supplies | (1.2) | (1.2) | (3.4) | (1.5) | (1.5) | (2.0) | (1.5) | (1.5) | (1.5) | (1.6) | (16.9) |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | (1.4) | (1.2) | (1.4) | (1.2) | (1.4) | (1.2) | (1.4) | (1.2) | (1.4) | (1.2) | (13.0) |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | (0.8) | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.5 | 0.6 | 0.6 | 0.6 | 3.5 |
| 22. | **Total Operating Expenditures** | (5.7) | (16.1) | (18.1) | (11.0) | (9.9) | (10.1) | (9.9) | (9.7) | (10.1) | (9.9) | (110.4) |
| 23. | **Total Operating Surplus (Deficit)** | (5.7) | (12.5) | (14.5) | (7.4) | (6.3) | (6.5) | (6.2) | (6.1) | (6.5) | (6.3) | (77.8) |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | (1.9) | (11.2) | (10.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (38.4) |
| 25. | Capital Expenditures | (8.9) | (6.5) | (3.5) | (0.1) | (0.5) | (0.2) | (3.3) | (3.1) | (3.0) | (3.0) | (32.1) |
| 26. | Other Infrastructure | (12.9) | (15.1) | (12.9) | (12.6) | (12.6) | (12.6) | (12.6) | (12.6) | (12.6) | (12.6) | (129.3) |
| 27. | Reorganization Costs | (0.2) | (0.6) | (0.2) | - | - | - | - | - | - | - | (1.0) |
| 28. | **Total Reorganization / Reinvestment** | (23.9) | (33.3) | (26.8) | (14.9) | (15.3) | (14.9) | (18.1) | (17.9) | (17.8) | (17.8) | (200.8) |
| 29. | **Total Surplus (Deficit)** | $ (29.6) | $ (45.8) | $ (41.3) | $ (22.3) | $ (21.6) | $ (21.4) | $ (24.3) | $ (24.0) | $ (24.3) | $ (24.1) | $ (278.6) |
| 30. | **Incremental Headcount (FTE)** | 125 | 250 | 175 | 163 | 150 | 150 | 150 | 150 | 150 | 150 | 150 |

35 of 70

13-53846-tit Doc 8773-2 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 450 of 602
13-53846-swr Doc 6382-2 Filed 03/31/14 Entered 03/31/14 18:36:58 Page 62 of
204

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Executive Agencies**
**Police Department (DPD)**
*($ in millions)*

| | | 10-Year Total | Assumptions / Comments |
|---|---|---|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | - | |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | 18.0 | Increased collections from false alarm calls, new cost recovery, and adoption of State Motor Vehicle Code for greater capture of moving violation fees |
| 5. | Grant Revenue | 14.6 | Anticipated additional grant revenue through identification of new Federal, State, Foundation or other grants |
| 6. | Other | - | |
| 7. | **Total Revenues** | 32.6 | |
| | **Expenditures** | - | |
| 8. | Permanent Labor | (50.8) | Increased labor cost associated with hiring of 250 civilian positions and redeployment of uniform personnel. Civilianization costs offset by savings due to attrition of senior uniform personnel and hiring of less experienced uniform personnel ($17.2MM in total savings). Reduction of civilians through efficiency gains following implementation of fully integrated public safety IT system |
| 9. | Professional & Contract Services | - | |
| 10. | Labor Costs / Service Contracts | (50.8) | |
| 11. | Active Benefits | (27.9) | Benefits at 55% of Permanent Labor costs (civilians) |
| 12. | Training | (5.4) | Training cost for all DPD civilian employees - $2.0k per EE through FY '16, $1.5k thereafter |
| 13. | Materials and Supplies | (16.9) | Increased replacement cost of tasers / cartridges ($5.2MM), vests ($3.3MM), body cameras ($2.4MM) and other misc. spend ($6.0MM) |
| 14. | Utilities | - | |
| 15. | Purchased services | (13.0) | Primarily related to shot spotter "flex services" |
| 16. | Risk management / insurance | - | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | 3.5 | Savings from facility lease terminations ($10.5MM), partially offset by annual costs associated with new facilities ($4.1MM), increased helicopter maintenance ($2.8MM) and citizen patrol/reserve costs ($0.2MM). Still evaluating other lease options |
| 22. | **Total Operating Expenditures** | (110.4) | |
| 23. | **Total Operating Surplus (Deficit)** | (77.8) | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | (38.4) | Primarily related to replacement of prep / handheld radios ($22.0MM) and implementation of fully integrated Public Safety IT system ($13.8MM) |
| 25. | Capital Expenditures | (32.1) | Department-wide improvements / projects ($14.0MM), build-out of new precincts and training facility ($12.0MM), and other precinct/other facility improvements ($6.1MM) |
| 26. | Other Infrastructure | (129.3) | Includes fleet vehicle replacement cycle of 3 years |
| 27. | Reorganization Costs | (1.0) | IT temporary positions to assist with implementation of new fully integrated public safety IT system |
| 28. | **Total Reorganization / Reinvestment** | (200.8) | |
| 29. | **Total Surplus (Deficit)** | $ (278.6) | |
| 30. | Incremental Headcount (FTE) | 150 | |

36 of 70

13-53846-tjt Doc 8779 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 451 of 602
13-53846-swr Doc 6382-2 Filed 03/31/14 Entered 03/31/14 18:36:38 Page 93 of 204

**City of Detroit**

Ten-Year Plan of Adjustment
Restructuring and Reinvestment Initiatives - Executive Agencies
Department of Public Works (DPW) - General Fund
($ in millions)

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| 2. | a. Increased Collection Rate | - | - | - | - | - | - | - | - | - | - | - |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | - | - | - | - | - | - | - | - | - | - | - |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | - | - | - | - | - | - | - | - | - | - | - |
| 9. | Professional & Contract Services | - | - | - | - | - | - | - | - | - | - | - |
| 10. | Labor Costs / Service Contracts | - | - | - | - | - | - | - | - | - | - | - |
| 11. | Active Benefits | - | - | - | - | - | - | - | - | - | - | - |
| 12. | Training | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.3) |
| 13. | Materials and Supplies | - | - | - | - | - | - | - | - | - | - | - |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | - | - | - | - | - | - | - | - | - | - | - |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | - | - | - | - | - | - | - | - | - | - |
| 22. | **Total Operating Expenditures** | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.3) |
| | | | | | | | | | | | | |
| 23. | **Total Operating Surplus (Deficit)** | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.3) |
| | | | | | | | | | | | | |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 25. | Capital Expenditures | - | - | - | - | - | - | - | - | - | - | - |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | - | - | - | - | - | - | - | - | - | - | - |
| 28. | **Total Reorganization / Reinvestment** | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | |
| 29. | **Total Surplus (Deficit)** | $ - | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | (0.3) |
| | | | | | | | | | | | | |
| 30. | **Incremental Headcount (FTE)** | - | - | - | - | - | - | - | - | - | - | - |

37 of 70

13-53846-tsw Doc 8379 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 452 of 602
13-53846-swr Doc 6382-2 Filed 03/31/14 Entered 03/31/14 18:36:58 Page 94 of 161
204

**City of Detroit**

Ten-Year Plan of Adjustment
Restructuring and Reinvestment Initiatives - Executive Agencies
Department of Public Works (DPW) - General Fund
($ in millions)

|  |  | 10-Year Total | Assumptions / Comments |
|---|---|---|---|
|  | **Revenues** |  |  |
| 1. | Collections | $ - |  |
| 2. | a. Increased Collection Rate | - |  |
| 3. | b. Collection of Past Due | - |  |
| 4. | Pricing/Fees | - |  |
| 5. | Grant Revenue | - |  |
| 6. | Other | - |  |
| 7. | **Total Revenues** | - |  |
|  |  |  |  |
|  | **Expenditures** | - |  |
| 8. | Permanent Labor | - |  |
| 9. | Professional & Contract Services | - |  |
| 10. | Labor Costs / Service Contracts | - |  |
| 11. | Active Benefits | - |  |
| 12. | Training | (0.3) | Training cost for all department employees - $2.0k per employee through FY '16, $1.5k thereafter to establish a continuous training program |
| 13. | Materials and Supplies | - |  |
| 14. | Utilities | - |  |
| 15. | Purchased services | - |  |
| 16. | Risk management / insurance | - |  |
| 17. | Contributions to non EP funds | - |  |
| 18. | Transfers In/Out (General Fund) | - |  |
| 19. | Grant related expenses | - |  |
| 20. | Maintenance | - |  |
| 21. | All Other | - |  |
| 22. | **Total Operating Expenditures** | (0.3) |  |
|  |  |  |  |
| 23. | **Total Operating Surplus (Deficit)** | (0.3) |  |
|  |  |  |  |
|  | **Reorganization / Reinvestment** |  |  |
| 24. | Technology Infrastructure | - |  |
| 25. | Capital Expenditures | - |  |
| 26. | Other Infrastructure | - |  |
| 27. | Reorganization Costs | - |  |
|  |  |  |  |
| 28. | **Total Reorganization / Reinvestment** | - |  |
|  |  |  |  |
| 29. | **Total Surplus (Deficit)** | $ (0.3) |  |
|  |  |  |  |
| 30. | **Incremental Headcount (FTE)** | - |  |

38 of 70

13-53846-tjt Doc 8779 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 453 of 602
13-53846-swr Doc 6382-2 Filed 03/31/14 Entered 03/31/14 18:36:38 Page 95 of
204

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Executive Agencies**
**Recreation**
*($ in millions)*

|  |  | | | | | | For the Fiscal Year Ended | | | | | | 10-Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Total |
|  | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| 2. | a. Increased Collection Rate | - | - | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.5 |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | - | - | - | - | - | - | - | - | - | - | - |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | - | - | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.5 |
|  | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | - | - | - | - | - | - | - | - | - | - | - |
| 9. | Professional & Contract Services | - | - | - | - | - | - | - | - | - | - | - |
| 10. | Labor Costs / Service Contracts | - | - | - | - | - | - | - | - | - | - | - |
| 11. | Active Benefits | - | - | - | - | - | - | - | - | - | - | - |
| 12. | Training | - | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.9) |
| 13. | Materials and Supplies | - | - | - | - | - | - | - | - | - | - | - |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | - | - | - | - | - | - | - | - | - | - | - |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | - | - | - | - | - | - | - | - | - | - |
| 22. | **Total Operating Expenditures** | - | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.9) |
| 23. | **Total Operating Surplus (Deficit)** | - | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.3) |
|  | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 25. | Capital Expenditures | (0.9) | (8.9) | (3.1) | (3.3) | (3.0) | (4.0) | (4.3) | (4.0) | (4.0) | (4.0) | (39.5) |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | - | - | - | - | - | - | - | - | - | - | - |
| 28. | **Total Reorganization / Reinvestment** | (0.9) | (8.9) | (3.1) | (3.3) | (3.0) | (4.0) | (4.3) | (4.0) | (4.0) | (4.0) | (39.5) |
| 29. | **Total Surplus (Deficit)** | $ (0.9) | $ (9.0) | $ (3.1) | $ (3.3) | $ (3.1) | $ (4.0) | $ (4.3) | $ (4.0) | $ (4.0) | $ (4.0) | $ (39.8) |
| 30. | **Incremental Headcount (FTE)** | - | - | - | - | - | - | - | - | - | - | - |

39 of 70

13-53846-tjt  Doc 8739  Filed 12/10/14  Entered 12/10/14 09:24:40  Page 454 of 602
13-53846-swr  Doc 6382  Filed 03/31/14  Entered 03/31/14 13:36:38  Page 96 of

204

**City of Detroit**

**Ten-Year Plan of Adjustment**

**Restructuring and Reinvestment Initiatives - Executive Agencies**

**Recreation**

*($ in millions)*

| | | 10-Year Total | Assumptions / Comments |
|---|---|---:|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | 0.5 | Increase collection rates due to full implementation of online registration and collection system and improvements to Hart Plaza |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | - | |
| 5. | Grant Revenue | - | |
| 6. | Other | - | |
| 7. | **Total Revenues** | 0.5 | |
| | | | |
| | **Expenditures** | - | |
| 8. | Permanent Labor | - | |
| 9. | Professional & Contract Services | - | |
| 10. | Labor Costs / Service Contracts | - | |
| 11. | Active Benefits | - | |
| 12. | Training | (0.9) | Training cost for all department employees - $2.0k per employee through FY '16, $1.5k thereafter to establish a continuous training program |
| 13. | Materials and Supplies | - | |
| 14. | Utilities | - | |
| 15. | Purchased services | - | |
| 16. | Risk management / insurance | - | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | - | |
| 22. | **Total Operating Expenditures** | (0.9) | |
| | | | |
| 23. | **Total Operating Surplus (Deficit)** | (0.3) | |
| | | | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | - | |
| 25. | Capital Expenditures | (39.5) | Park and recreation facility improvements and upgrades ($34.5MM) and emergency repairs required for recreation centers ($5.0MM) |
| 26. | Other Infrastructure | - | |
| 27. | Reorganization Costs | - | |
| | | | |
| 28. | **Total Reorganization / Reinvestment** | (39.5) | |
| | | | |
| 29. | **Total Surplus (Deficit)** | $ (39.8) | |
| | | | |
| 30. | **Incremental Headcount (FTE)** | - | |

**City of Detroit**

Ten-Year Plan of Adjustment

Restructuring and Reinvestment Initiatives - Executive Agencies

Department of Health & Wellness Promotion (DHWP)

*($ in millions)*

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| 2. | a. Increased Collection Rate | - | - | - | - | - | - | - | - | - | - | - |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | - | - | - | - | - | - | - | - | - | - | - |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | - | - | - | - | - | - | - | - | - | - | - |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | - | - | - | - | - | - | - | - | - | - | - |
| 9. | Professional & Contract Services | - | - | - | - | - | - | - | - | - | - | - |
| 10. | Labor Costs / Service Contracts | - | - | - | - | - | - | - | - | - | - | - |
| 11. | Active Benefits | - | - | - | - | - | - | - | - | - | - | - |
| 12. | Training | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.1) |
| 13. | Materials and Supplies | - | - | - | - | - | - | - | - | - | - | - |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | (0.3) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (1.7) |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | - | - | - | - | - | - | - | - | - | - |
| 22. | **Total Operating Expenditures** | (0.3) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (1.8) |
| 23. | **Total Operating Surplus (Deficit)** | (0.3) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (1.8) |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 25. | Capital Expenditures | - | (5.1) | - | - | - | - | - | - | - | - | (5.1) |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | - | - | - | - | - | - | - | - | - | - | - |
| 28. | **Total Reorganization / Reinvestment** | - | (5.1) | - | - | - | - | - | - | - | - | (5.1) |
| 29. | **Total Surplus (Deficit)** | $ (0.3) | $ (5.3) | $ (0.2) | $ (0.2) | $ (0.2) | $ (0.2) | $ (0.2) | $ (0.2) | $ (0.2) | $ (0.2) | (6.9) |
| 30. | **Incremental Headcount (FTE)** | - | - | - | - | - | - | - | - | - | - | - |

13-53846-tjt Doc 8739 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 456 of 602
13-53846-swr Doc 6382-2 Filed 03/31/14 Entered 03/31/14 18:36:38 Page 93 of
204

**City of Detroit**

Ten-Year Plan of Adjustment

Restructuring and Reinvestment Initiatives - Executive Agencies

Department of Health & Wellness Promotion (DHWP)

*($ in millions)*

| | | 10-Year Total | Assumptions / Comments |
|---|---|---:|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | - | |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | - | |
| 5. | Grant Revenue | - | |
| 6. | Other | - | |
| 7. | **Total Revenues** | - | |
| | | | |
| | **Expenditures** | | |
| 8. | Permanent Labor | - | |
| 9. | Professional & Contract Services | - | |
| 10. | Labor Costs / Service Contracts | - | |
| 11. | Active Benefits | - | |
| 12. | Training | (0.1) | Training cost for all department employees - $2.0k per employee through FY '16, $1.5k thereafter to establish a continuous training program |
| 13. | Materials and Supplies | - | |
| 14. | Utilities | - | |
| 15. | Purchased services | (1.7) | Public Health Record management and storage fees |
| 16. | Risk management / insurance | - | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | - | |
| 22. | **Total Operating Expenditures** | (1.8) | |
| | | | |
| 23. | **Total Operating Surplus (Deficit)** | (1.8) | |
| | | | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | - | |
| 25. | Capital Expenditures | (5.1) | Herman Kiefer demolition costs |
| 26. | Other Infrastructure | - | |
| 27. | Reorganization Costs | - | |
| 28. | **Total Reorganization / Reinvestment** | (5.1) | |
| | | | |
| 29. | **Total Surplus (Deficit)** | $ (6.9) | |
| | | | |
| 30. | Incremental Headcount (FTE) | - | |

42 of 70

13-53846-tit Doc 8773 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 457 of 602
13-53846-swr Doc 6382-2 Filed 03/31/14 Entered 03/31/14 18:36:38 Page 59 of

204

# City of Detroit

Ten-Year Plan of Adjustment
Legislative Agencies - Department Detail

Ten-Year Plan of Adjustment
Restructuring and Reinvestment Initiatives - Legislative Agencies
Auditor General (AG) and Inspector General (IG)
*($ in millions)*

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | For the Fiscal Year Ended | | | | | | |
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| 2. | a. Increased Collection Rate | - | - | - | - | - | - | - | - | - | - | - |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | - | - | - | - | - | - | - | - | - | - | - |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | - | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (2.5) |
| 9. | Professional & Contract Services | - | - | - | - | - | - | - | - | - | - | - |
| 10. | Labor Costs / Service Contracts | - | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (2.5) |
| 11. | Active Benefits | - | (0.1) | (0.1) | (0.1) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (1.4) |
| 12. | Training | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.4) |
| 13. | Materials and Supplies | - | - | - | - | - | - | - | - | - | - | - |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | - | - | - | - | - | - | - | - | - | - | - |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | - | - | - | - | - | - | - | - | - | - |
| 22. | **Total Operating Expenditures** | (0.0) | (0.4) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (4.4) |
| | | | | | | | | | | | | |
| 23. | **Total Operating Surplus (Deficit)** | (0.0) | (0.4) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (4.4) |
| | | | | | | | | | | | | |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | (0.0) | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.3) |
| 25. | Capital Expenditures | - | - | - | - | - | - | - | - | - | - | - |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | - | - | - | - | - | - | - | - | - | - | - |
| 28. | **Total Reorganization / Reinvestment** | (0.0) | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.3) |
| | | | | | | | | | | | | |
| 29. | **Total Surplus (Deficit)** | $ (0.1) | $ (0.6) | $ (0.5) | $ (0.5) | $ (0.5) | $ (0.5) | $ (0.5) | $ (0.5) | $ (0.5) | $ (0.5) | (4.7) |
| | | | | | | | | | | | | |
| 30. | **Incremental Headcount (FTE)** | - | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |

44 of 70
13-53846-tyj Doc 8779 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 459 of 602
13-53846-swr Doc 6382-2 Filed 03/31/14 Entered 03/31/14 18:36:58 Page 459 of 602
204

**City of Detroit**

**Ten-Year Plan of Adjustment**

**Restructuring and Reinvestment Initiatives - Legislative Agencies**

**Auditor General (AG) and Inspector General (IG)**

*($ in millions)*

|  |  | 10-Year Total | Assumptions / Comments |
|---|---|---|---|
|  | **Revenues** |  |  |
| 1. | Collections | $ - |  |
| 2. | a. Increased Collection Rate | - |  |
| 3. | b. Collection of Past Due | - |  |
| 4. | Pricing/Fees | - |  |
| 5. | Grant Revenue | - |  |
| 6. | Other | - |  |
| 7. | **Total Revenues** | - |  |
|  |  |  |  |
|  | **Expenditures** | - |  |
| 8. | Permanent Labor | (2.5) | Addition of 4 employees to fill current vacancies and increase the frequency of the City's financial and operational audits |
| 9. | Professional & Contract Services | - |  |
| 10. | Labor Costs / Service Contracts | (2.5) |  |
| 11. | Active Benefits | (1.4) | Benefits at 55% of salary and wages |
| 12. | Training | (0.4) | Training cost for all department employees - $2.0k per employee through FY '16, $1.5k thereafter to establish a continuous training program |
|  |  |  |  |
| 13. | Materials and Supplies | - |  |
| 14. | Utilities | - |  |
| 15. | Purchased services | - |  |
| 16. | Risk management / insurance | - |  |
| 17. | Contributions to non EP funds | - |  |
| 18. | Transfers In/Out (General Fund) | - |  |
| 19. | Grant related expenses | - |  |
| 20. | Maintenance | - |  |
| 21. | All Other | - |  |
| 22. | **Total Operating Expenditures** | (4.4) |  |
|  |  |  |  |
| 23. | **Total Operating Surplus (Deficit)** | (4.4) |  |
|  |  |  |  |
|  | **Reorganization / Reinvestment** |  |  |
| 24. | Technology Infrastructure | (0.3) | Electronic work-papers and incremental hardware/software investment |
| 25. | Capital Expenditures | - |  |
| 26. | Other Infrastructure | - |  |
| 27. | Reorganization Costs | - |  |
|  |  |  |  |
| 28. | **Total Reorganization / Reinvestment** | (0.3) |  |
|  |  |  |  |
| 29. | **Total Surplus (Deficit)** | $ (4.7) |  |
|  |  |  |  |
| 30. | **Incremental Headcount (FTE)** | 4 |  |

**City of Detroit**

Ten-Year Plan of Adjustment
Restructuring and Reinvestment Initiatives - Legislative Agencies
Board of Zoning Appeals (BZA)
*($ in millions)*

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2. | a. Increased Collection Rate | - | - | - | - | - | - | - | - | - | - | - |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | - | - | - | - | - | - | - | - | - | - | - |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | - | - | - | - | - | - | - | - | - | - | - |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | - | - | - | - | - | - | - | - | - | - | - |
| 9. | Professional & Contract Services | - | - | - | - | - | - | - | - | - | - | - |
| 10. | Labor Costs / Service Contracts | - | - | - | - | - | - | - | - | - | - | - |
| 11. | Active Benefits | - | - | - | - | - | - | - | - | - | - | - |
| 12. | Training | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.2) |
| 13. | Materials and Supplies | - | - | - | - | - | - | - | - | - | - | - |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | - | - | - | - | - | - | - | - | - | - | - |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | - | - | - | - | - | - | - | - | - | - |
| 22. | **Total Operating Expenditures** | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.2) |
| 23. | **Total Operating Surplus (Deficit)** | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.2) |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 25. | Capital Expenditures | - | - | - | - | - | - | - | - | - | - | - |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | - | - | - | - | - | - | - | - | - | - | - |
| 28. | **Total Reorganization / Reinvestment** | - | - | - | - | - | - | - | - | - | - | - |
| 29. | **Total Surplus (Deficit)** | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.2) |
| 30. | **Incremental Headcount (FTE)** | - | - | - | - | - | - | - | - | - | - | - |

46 of 70
13-53846-tis-swr Doc 8782 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 461 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 18:36:58 Page 461 of 602
204

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Legislative Agencies**
**Board of Zoning Appeals (BZA)**
*($ in millions)*

| | | 10-Year Total | Assumptions / Comments |
|---|---|---|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | - | |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | - | |
| 5. | Grant Revenue | - | |
| 6. | Other | - | |
| 7. | **Total Revenues** | - | |
| | | | |
| | **Expenditures** | | |
| 8. | Permanent Labor | - | |
| 9. | Professional & Contract Services | - | |
| 10. | Labor Costs / Service Contracts | - | |
| 11. | Active Benefits | - | |
| 12. | Training | (0.2) | Training cost for all department employees - $2.0k per employee through FY '16, $1.5k thereafter to establish a continuous training program |
| 13. | Materials and Supplies | - | |
| 14. | Utilities | - | |
| 15. | Purchased services | - | |
| 16. | Risk management / insurance | - | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | - | |
| 22. | **Total Operating Expenditures** | (0.2) | |
| | | | |
| 23. | **Total Operating Surplus (Deficit)** | (0.2) | |
| | | | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | - | |
| 25. | Capital Expenditures | - | |
| 26. | Other Infrastructure | - | |
| 27. | Reorganization Costs | - | |
| | | | |
| 28. | **Total Reorganization / Reinvestment** | - | |
| | | | |
| 29. | **Total Surplus (Deficit)** | $ (0.2) | |
| | | | |
| 30. | **Incremental Headcount (FTE)** | - | |

13-53846-tit Doc 8739 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 462 of 602
13-53846-swr Doc 6382-2 Filed 03/31/14 Entered 03/31/14 18:36:58 Page 64 of

204

**City of Detroit**

Ten-Year Plan of Adjustment
Restructuring and Reinvestment Initiatives - Legislative Agencies
City Clerk
*($ in millions)*

| | | For the Fiscal Year Ended | | | | | | | | | | 10-Year |
| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| 2. | a. Increased Collection Rate | - | - | - | - | - | - | - | - | - | - | - |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | - | - | - | - | - | - | - | - | - | - | - |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | - | - | - | - | - | - | - | - | - | - | - |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | 0.0 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 1.6 |
| 9. | Professional & Contract Services | - | - | - | - | - | - | - | - | - | - | - |
| 10. | Labor Costs / Service Contracts | 0.0 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 1.6 |
| 11. | Active Benefits | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.9 |
| 12. | Training | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.2) |
| 13. | Materials and Supplies | - | - | - | - | - | - | - | - | - | - | - |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | - | - | - | - | - | - | - | - | - | - | - |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | - | - | - | - | - | - | - | - | - | - |
| 22. | **Total Operating Expenditures** | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 2.2 |
| 23. | **Total Operating Surplus (Deficit)** | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 2.2 |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 25. | Capital Expenditures | - | - | - | - | - | - | - | - | - | - | - |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | - | - | - | - | - | - | - | - | - | - | - |
| 28. | **Total Reorganization / Reinvestment** | - | - | - | - | - | - | - | - | - | - | - |
| 29. | **Total Surplus (Deficit)** | $ 0.1 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.3 | $ 0.3 | $ 0.3 | 2.2 |
| 30. | **Incremental Headcount (FTE)** | (1) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) |

48 of 70

13-53846-tit  Doc 8773  Filed 12/10/14  Entered 12/10/14 09:24:40  Page 463 of 602
13-53846-swr  Doc 6382-2  Filed 03/31/14  Entered 03/31/14 13:36:38  Page 463 of 591
204

**City of Detroit**

**Ten-Year Plan of Adjustment**

**Restructuring and Reinvestment Initiatives - Legislative Agencies**

**City Clerk**

*($ in millions)*

| | | 10-Year Total | Assumptions / Comments |
|---|---|---|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | - | |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | - | |
| 5. | Grant Revenue | - | |
| 6. | Other | - | |
| 7. | **Total Revenues** | - | |
| | | | |
| | **Expenditures** | - | |
| 8. | Permanent Labor | 1.6 | Headcount reduction through efficiency improvements, incremental costs associated with Blight remediation assumed to be funded by Blight initiative, Hardest Hit funds and other grants |
| 9. | Professional & Contract Services | - | |
| 10. | Labor Costs / Service Contracts | 1.6 | |
| 11. | Active Benefits | 0.9 | Benefits at 55% of Permanent Labor costs |
| 12. | Training | (0.2) | Training cost for all department employees - $2.0k per employee through FY '16, $1.5k thereafter to establish a continuous training program |
| 13. | Materials and Supplies | - | |
| 14. | Utilities | - | |
| 15. | Purchased services | - | |
| 16. | Risk management / insurance | - | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | - | |
| 22. | **Total Operating Expenditures** | 2.2 | |
| | | | |
| 23. | **Total Operating Surplus (Deficit)** | 2.2 | |
| | | | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | - | |
| 25. | Capital Expenditures | - | |
| 26. | Other Infrastructure | - | |
| 27. | Reorganization Costs | - | |
| | | | |
| 28. | **Total Reorganization / Reinvestment** | - | |
| | | | |
| 29. | **Total Surplus (Deficit)** | $ 2.2 | |
| | | | |
| 30. | Incremental Headcount (FTE) | (3) | |

49 of 70

13-53846-tjt Doc 8779 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 464 of 602
13-53846-swr Doc 6382-2 Filed 03/31/14 Entered 03/31/14 18:36:58 Page 66 of

204

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Legislative Agencies**
**City Council**
*($ in millions)*

|  |  | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | **Revenues** |  |  |  |  |  |  |  |  |  |  |  |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| 2. | a. Increased Collection Rate | - | - | - | - | - | - | - | - | - | - | - |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | - | - | - | - | - | - | - | - | - | - | - |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | - | - | - | - | - | - | - | - | - | - | - |
|  | **Expenditures** |  |  |  |  |  |  |  |  |  |  |  |
| 8. | Permanent Labor | - | - | - | - | - | - | - | - | - | - | - |
| 9. | Professional & Contract Services | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 4.3 |
| 10. | Labor Costs / Service Contracts | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 4.3 |
| 11. | Active Benefits | - | - | - | - | - | - | - | - | - | - | - |
| 12. | Training | - | - | - | - | - | - | - | - | - | - | - |
| 13. | Materials and Supplies | - | - | - | - | - | - | - | - | - | - | - |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | - | - | - | - | - | - | - | - | - | - | - |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | - | - | - | - | - | - | - | - | - | - |
| 22. | **Total Operating Expenditures** | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 4.3 |
| 23. | **Total Operating Surplus (Deficit)** | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 4.3 |
|  | **Reorganization / Reinvestment** |  |  |  |  |  |  |  |  |  |  |  |
| 24. | Technology Infrastructure | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.2) |
| 25. | Capital Expenditures | - | - | - | - | - | - | - | - | - | - | - |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | - | - | - | - | - | - | - | - | - | - | - |
| 28. | **Total Reorganization / Reinvestment** | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.2) |
| 29. | **Total Surplus (Deficit)** | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | 4.2 |
| 30. | **Incremental Headcount (FTE)** | - | - | - | - | - | - | - | - | - | - | - |

13-53846-tjt swr Doc 8373 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 465 of 602
13-53846-swr Doc 6382-2 Filed 03/31/14 Entered 03/31/14 18:36:58 Page 465 of 602
204

**City of Detroit**
**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Legislative Agencies**
City Council
*($ in millions)*

| | | 10-Year Total | Assumptions / Comments |
|---|---|---:|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | - | |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | - | |
| 5. | Grant Revenue | - | |
| 6. | Other | - | |
| 7. | **Total Revenues** | - | |
| | | | |
| | **Expenditures** | - | |
| 8. | Permanent Labor | - | |
| 9. | Professional & Contract Services | 4.3 | Savings due to transfer of 6 contractors from CPC / HDAB to PDD |
| 10. | Labor Costs / Service Contracts | 4.3 | |
| 11. | Active Benefits | - | |
| 12. | Training | - | |
| 13. | Materials and Supplies | - | |
| 14. | Utilities | - | |
| 15. | Purchased services | - | |
| 16. | Risk management / insurance | - | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | - | |
| 22. | **Total Operating Expenditures** | 4.3 | |
| | | | |
| 23. | **Total Operating Surplus (Deficit)** | 4.3 | |
| | | | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | (0.2) | Assumed $50.0K in FY 14 for hardware improvements and annual $15.0K increase from current run-rates |
| 25. | Capital Expenditures | - | |
| 26. | Other Infrastructure | - | |
| 27. | Reorganization Costs | - | |
| | | | |
| 28. | **Total Reorganization / Reinvestment** | (0.2) | |
| | | | |
| 29. | **Total Surplus (Deficit)** | $ 4.2 | |
| | | | |
| 30. | **Incremental Headcount (FTE)** | - | |

13-53846-tjt Doc 8773 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 466 of 602
13-53846-swr Doc 6382-2 Filed 03/31/14 Entered 03/31/14 18:36:58 Page 66 of
204

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Legislative Agencies**
**Department of Elections (Elections)**
*($ in millions)*

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2. | a. Increased Collection Rate | - | - | - | - | - | - | - | - | - | - | - |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | - | - | - | - | - | - | - | - | - | - | - |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | - | - | - | - | - | - | - | - | - | - | - |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.4 |
| 9. | Professional & Contract Services | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.4 |
| 10. | Labor Costs / Service Contracts | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.8 |
| 11. | Active Benefits | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.2 |
| 12. | Training | - | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.6) |
| 13. | Materials and Supplies | - | - | - | - | - | - | - | - | - | - | - |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | - | - | - | - | - | - | - | - | - | - | - |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | - | - | - | - | - | - | - | - | - | - |
| 22. | **Total Operating Expenditures** | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.4 |
| 23. | **Total Operating Surplus (Deficit)** | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.4 |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | (0.0) | - | - | - | - | - | - | - | - | - | (0.0) |
| 25. | Capital Expenditures | (0.6) | (0.6) | - | - | - | - | (0.5) | (0.5) | (0.5) | (0.5) | (3.3) |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | - | - | - | - | - | - | - | - | - | - | - |
| 28. | **Total Reorganization / Reinvestment** | (0.7) | (0.6) | - | - | - | - | (0.5) | (0.5) | (0.5) | (0.5) | (3.3) |
| 29. | **Total Surplus (Deficit)** | $ (0.6) | $ (0.6) | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ (0.5) | $ (0.5) | $ (0.5) | $ (0.5) | $ (2.9) |
| 30. | **Incremental Headcount (FTE)** | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) |

For the Fiscal Year Ended

52 of 70

13-53846-tit Doc 8773 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 467 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 18:36:38 Page 69 of

204

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Legislative Agencies**
**Department of Elections (Elections)**
*($ in millions)*

| | | 10-Year Total | Assumptions / Comments |
|---|---|---|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | - | |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | - | |
| 5. | Grant Revenue | - | |
| 6. | Other | - | |
| 7. | **Total Revenues** | - | |
| | | | |
| | **Expenditures** | - | |
| 8. | Permanent Labor | 0.4 | Reduction due to elimination of one employee |
| 9. | Professional & Contract Services | 0.4 | Reduction due to elimination of 50% of poll workers/ballot counters related to technology investment |
| 10. | Labor Costs / Service Contracts | 0.8 | |
| 11. | Active Benefits | 0.2 | Benefits at 55% of Permanent Labor costs |
| 12. | Training | (0.6) | Training cost for all department employees - $2.0k per employee through FY '16, $1.5k thereafter to establish a continuous training program |
| 13. | Materials and Supplies | - | |
| 14. | Utilities | - | |
| 15. | Purchased services | - | |
| 16. | Risk management / insurance | - | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | - | |
| 22. | **Total Operating Expenditures** | 0.4 | |
| | | | |
| 23. | **Total Operating Surplus (Deficit)** | 0.4 | |
| | | | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | (0.0) | Investment in Ballot counting technology solution |
| 25. | Capital Expenditures | (3.3) | Deferred maintenance / improvements ($2.0MM), window replacement ($0.7MM), elevator improvements ($0.5MM) and roof replacement ($0.1MM) |
| 26. | Other Infrastructure | - | |
| 27. | Reorganization Costs | - | |
| 28. | **Total Reorganization / Reinvestment** | (3.3) | |
| | | | |
| 29. | **Total Surplus (Deficit)** | $ (2.9) | |
| | | | |
| 30. | Incremental Headcount (FTE) | (1) | |

13-53846-tsw Doc 8772 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 468 of 602
13-53846-swr Doc 6382-2 Filed 03/31/14 Entered 03/31/14 13:36:39 Page 70 of
204

**City of Detroit**

Ten-Year Plan of Adjustment
Restructuring and Reinvestment Initiatives - Legislative Agencies
Ombudsperson
*($ in millions)*

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| 2. | a. Increased Collection Rate | - | - | - | - | - | - | - | - | - | - | - |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | - | - | - | - | - | - | - | - | - | - | - |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | - | - | - | - | - | - | - | - | - | - | - |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | - | (0.4) | (0.6) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (5.9) |
| 9. | Professional & Contract Services | - | - | - | - | - | - | - | - | - | - | - |
| 10. | Labor Costs / Service Contracts | - | (0.4) | (0.6) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (5.9) |
| 11. | Active Benefits | - | (0.2) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (3.3) |
| 12. | Training | - | (0.0) | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.3) |
| 13. | Materials and Supplies | - | - | - | - | - | - | - | - | - | - | - |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | - | - | - | - | - | - | - | - | - | - | - |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | - | - | - | - | - | - | - | - | - | - |
| 22. | **Total Operating Expenditures** | - | (0.6) | (1.0) | (1.1) | (1.1) | (1.1) | (1.1) | (1.1) | (1.2) | (1.2) | (9.5) |
| 23. | **Total Operating Surplus (Deficit)** | - | (0.6) | (1.0) | (1.1) | (1.1) | (1.1) | (1.1) | (1.1) | (1.2) | (1.2) | (9.5) |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | - | (3.0) | (0.5) | (0.5) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (7.6) |
| 25. | Capital Expenditures | - | - | - | - | - | - | - | - | - | - | - |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | - | - | - | - | - | - | - | - | - | - | - |
| 28. | **Total Reorganization / Reinvestment** | - | (3.0) | (0.5) | (0.5) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (7.6) |
| 29. | **Total Surplus (Deficit)** | $ - | $ (3.7) | $ (1.6) | $ (1.6) | $ (1.6) | $ (1.7) | $ (1.7) | $ (1.7) | $ (1.8) | $ (1.8) | $ (17.2) |
| 30. | **Incremental Headcount (FTE)** | - | 13 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 |

54 of 70

13-53846-tit Doc 8773-2 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 469 of 602
13-53846-swr Doc 6382-2 Filed 03/31/14 Entered 03/31/14 18:36:58 Page 469 of 602
204

**City of Detroit**
**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Legislative Agencies**
**Ombudsperson**
*($ in millions)*

| | | 10-Year Total | Assumptions / Comments |
|---|---|---|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | - | |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | - | |
| 5. | Grant Revenue | - | |
| 6. | Other | - | |
| 7. | **Total Revenues** | - | |
| | | | |
| | **Expenditures** | - | |
| 8. | Permanent Labor | (5.9) | Additional headcount for implementation of 311 system |
| | | | |
| 9. | Professional & Contract Services | - | |
| 10. | Labor Costs / Service Contracts | (5.9) | |
| 11. | Active Benefits | (3.3) | Benefits at 55% of Permanent Labor costs |
| 12. | Training | (0.3) | Training cost for all department employees - $2.0k per employee through FY '16, $1.5k thereafter to establish a continuous training program |
| 13. | Materials and Supplies | - | |
| 14. | Utilities | - | |
| 15. | Purchased services | - | |
| 16. | Risk management / insurance | - | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | - | |
| 22. | **Total Operating Expenditures** | (9.5) | |
| | | | |
| 23. | **Total Operating Surplus (Deficit)** | (9.5) | |
| | | | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | (7.6) | Establishment of technology infrastructure for 311 system and estimated software implementation costs including estimated annual maintenance |
| 25. | Capital Expenditures | - | |
| 26. | Other Infrastructure | - | |
| 27. | Reorganization Costs | - | |
| | | | |
| 28. | **Total Reorganization / Reinvestment** | (7.6) | |
| | | | |
| 29. | **Total Surplus (Deficit)** | $ (17.2) | |
| | | | |
| 30. | **Incremental Headcount (FTE)** | 20 | |

55 of 70
13-53846-tjt Doc 8773 Filed 12/10/14 Entered 12/10/14 08:24:40 Page 470 of 602
13-53846-swr Doc 6382-2 Filed 03/31/14 Entered 03/31/14 18:36:58 Page 472 of
204

# City of Detroit

Ten-Year Plan of Adjustment

Judicial Agency - Department Detail

**City of Detroit**

Ten-Year Plan of Adjustment
Restructuring and Reinvestment Initiatives - Judicial Agency
36th District Court (36D) - General fund
*($ in millions)*

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **For the Fiscal Year Ended** | | | | | | | | | | | |
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2. | a. Increased Collection Rate | - | 3.9 | 5.5 | 8.5 | 8.7 | 9.0 | 9.2 | 9.5 | 9.8 | 10.1 | 74.1 |
| 3. | b. Collection of Past Due | - | 1.9 | 2.7 | - | - | - | - | - | - | - | 4.7 |
| 4. | Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | - | - | - | - | - | - | - | - | - | - | - |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | - | 5.8 | 8.2 | 8.5 | 8.7 | 9.0 | 9.2 | 9.5 | 9.8 | 10.1 | 78.8 |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | 0.8 | 1.9 | 2.3 | 2.3 | 2.4 | 2.4 | 2.5 | 2.5 | 2.6 | 2.6 | 22.1 |
| 9. | Professional & Contract Services | - | - | - | - | - | - | - | - | - | - | - |
| 10. | Labor Costs / Service Contracts | 0.8 | 1.9 | 2.3 | 2.3 | 2.4 | 2.4 | 2.5 | 2.5 | 2.6 | 2.6 | 22.1 |
| 11. | Active Benefits | 0.4 | 1.0 | 1.2 | 1.3 | 1.3 | 1.3 | 1.3 | 1.4 | 1.4 | 1.4 | 12.2 |
| 12. | Training | (0.5) | (0.5) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (4.5) |
| 13. | Materials and Supplies | - | - | - | - | - | - | - | - | - | - | - |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | - | - | - | - | - | - | - | - | - | - | - |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | - | - | - | - | - | - | - | - | - | - |
| 22. | **Total Operating Expenditures** | 0.7 | 2.5 | 3.1 | 3.1 | 3.2 | 3.3 | 3.4 | 3.4 | 3.5 | 3.6 | 29.8 |
| 23. | **Total Operating Surplus (Deficit)** | 0.7 | 8.3 | 11.3 | 11.6 | 11.9 | 12.3 | 12.6 | 12.9 | 13.3 | 13.7 | 108.6 |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | - | (1.6) | (0.8) | (0.4) | (0.4) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (4.2) |
| 25. | Capital Expenditures | - | (1.0) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (5.0) |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | - | (1.0) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (3.7) |
| 28. | **Total Reorganization / Reinvestment** | - | (3.6) | (1.6) | (1.2) | (1.2) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (12.9) |
| 29. | **Total Surplus (Deficit)** | $ 0.7 | $ 4.7 | $ 9.6 | $ 10.4 | $ 10.7 | $ 11.2 | $ 11.6 | $ 11.9 | $ 12.3 | $ 12.7 | 95.7 |
| 30. | **Incremental Headcount (FTE)** | (41) | (56) | (66) | (66) | (66) | (66) | (66) | (66) | (66) | (66) | (66) |

57 of 70

13-53846-tit Doc 8779-2 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 472 of 602
13-53846-swr Doc 8382-2 Filed 03/31/14 Entered 03/31/14 18:36:58 Page 74 of

204

**City of Detroit**

Ten-Year Plan of Adjustment
Restructuring and Reinvestment Initiatives - Judicial Agency
36th District Court (36D) - General fund
*($ in millions)*

| | | 10-Year Total | Assumptions / Comments |
|---|---|---|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | 74.1 | Improved collection rate from current 26% to 65% over the ten-year period to achieve regional average collection rate |
| 3. | b. Collection of Past Due | 4.7 | |
| 4. | Pricing/Fees | - | |
| 5. | Grant Revenue | - | |
| 6. | Other | - | |
| 7. | **Total Revenues** | 78.8 | |
| | **Expenditures** | - | |
| 8. | Permanent Labor | 22.1 | Reduction of 66 FTEs through efficiency and technology improvements |
| 9. | Professional & Contract Services | - | |
| 10. | Labor Costs / Service Contracts | 22.1 | |
| 11. | Active Benefits | 12.2 | Benefits at 55% of Permanent Labor costs |
| 12. | Training | (4.5) | Training cost for all department employees - $2.0k per employee through FY '16, $1.5k thereafter to establish a continuous training program |
| 13. | Materials and Supplies | - | |
| 14. | Utilities | - | |
| 15. | Purchased services | - | |
| 16. | Risk management / insurance | - | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | - | |
| 22. | **Total Operating Expenditures** | 29.8 | |
| 23. | **Total Operating Surplus (Deficit)** | 108.6 | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | (4.2) | Increased technology investment for "paperless" cost initiatives ($3.7MM) and new telephone system ($0.5MM) |
| 25. | Capital Expenditures | (5.0) | Increased capital expenditures for building maintenance, repairs and upgrades |
| 26. | Other Infrastructure | - | |
| 27. | Reorganization Costs | (3.7) | Addition of contract employees in to assist with process flow mapping, process change, and other restructuring initiatives |
| 28. | **Total Reorganization / Reinvestment** | (12.9) | |
| 29. | **Total Surplus (Deficit)** | $ 95.7 | |
| 30. | **Incremental Headcount (FTE)** | (66) | |

# City of Detroit

Ten-Year Plan of Adjustment

Enterprise Agencies - Department Detail

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Enterprise Agencies**
**Airport**
*($ in millions)*

| | | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Revenues** | | | | | | For the Fiscal Year Ended | | | | | | |
| 1. | Collections | $ | - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2. | a. Increased Collection Rate | | - | - | - | - | - | - | - | - | - | - | - |
| 3. | b. Collection of Past Due | | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | | - | - | - | - | - | - | - | - | - | - | - |
| 6. | Other | | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | | - | - | - | - | - | - | - | - | - | - | - |
| | **Expenditures** | | | | | | | | | | | | |
| 8. | Permanent Labor | | (0.1) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (3.6) |
| 9. | Professional & Contract Services | | - | - | - | - | - | - | - | - | - | - | - |
| 10. | Labor Costs / Service Contracts | | (0.1) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (3.6) |
| 11. | Active Benefits | | (0.1) | (0.6) | (0.6) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (2.8) |
| 12. | Training | | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.1) |
| 13. | Materials and Supplies | | - | - | - | - | - | - | - | - | - | - | - |
| 14. | Utilities | | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | | (0.1) | (0.4) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (1.2) |
| 16. | Risk management / insurance | | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.2) |
| 22. | **Total Operating Expenditures** | | (0.2) | (1.3) | (1.1) | (0.7) | (0.7) | (0.7) | (0.7) | (0.8) | (0.8) | (0.8) | (7.9) |
| 23. | **Total Operating Surplus (Deficit)** | | (0.2) | (1.3) | (1.1) | (0.7) | (0.7) | (0.7) | (0.7) | (0.8) | (0.8) | (0.8) | (7.9) |
| | **Reorganization / Reinvestment** | | | | | | | | | | | | |
| 24. | Technology Infrastructure | | - | (0.0) | - | - | - | - | - | - | - | - | (0.0) |
| 25. | Capital Expenditures | | - | (0.4) | (5.0) | (7.8) | (7.5) | - | - | - | - | - | (20.7) |
| 26. | Other Infrastructure | | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | | - | - | - | - | - | - | - | - | - | - | - |
| 28. | **Total Reorganization / Reinvestment** | | - | (0.4) | (5.0) | (7.8) | (7.5) | - | - | - | - | - | (20.7) |
| 29. | **Total Surplus (Deficit)** | $ | (0.2) | $ (1.7) | $ (6.1) | $ (8.5) | $ (8.2) | $ (0.7) | $ (0.7) | $ (0.8) | $ (0.8) | $ (0.8) | $ (28.5) |
| 30. | **Incremental Headcount (FTE)** | | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |

13-53846-tjt  Doc 8382  Filed 12/10/14  Entered 12/10/14 08:24:40  Page 475 of 602
13-53846-swr  Doc 6382-1  Filed 03/31/14  Entered 03/31/14 13:36:38  Page 476 of 691

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Enterprise Agencies**
**Airport**
*($ in millions)*

|  |  | 10-Year Total | Assumptions / Comments |
|---|---|---|---|
|  | **Revenues** |  |  |
| 1. | Collections | $ - |  |
| 2. | a. Increased Collection Rate | - |  |
| 3. | b. Collection of Past Due | - |  |
| 4. | Pricing/Fees | - |  |
| 5. | Grant Revenue | - |  |
| 6. | Other | - |  |
| 7. | **Total Revenues** | - |  |
|  |  |  |  |
|  | **Expenditures** | - |  |
| 8. | Permanent Labor | (3.6) | Addition of 4 FTE positions required to be in compliance with FAA and MDOT standards |
|  |  |  |  |
| 9. | Professional & Contract Services | - |  |
| 10. | Labor Costs / Service Contracts | (3.6) |  |
| 11. | Active Benefits | (2.8) | Benefits at 55% of Permanent Labor |
| 12. | Training | (0.1) | Training cost for all department employees - $2.0k per employee through FY '16, $1.5k thereafter to establish a continuous training program |
| 13. | Materials and Supplies | - |  |
| 14. | Utilities | - |  |
| 15. | Purchased services | (1.2) | Assume additional cost for Airport security ($0.1MM per year) and Master Plan Study ($0.3MM in FY '15) |
| 16. | Risk management / insurance | - |  |
| 17. | Contributions to non EP funds | - |  |
| 18. | Transfers In/Out (General Fund) | - |  |
| 19. | Grant related expenses | - |  |
| 20. | Maintenance | - |  |
| 21. | All Other | (0.2) | Assume $25.0K per year for maintenance |
| 22. | **Total Operating Expenditures** | (7.9) |  |
|  |  |  |  |
| 23. | **Total Operating Surplus (Deficit)** | (7.9) |  |
|  |  |  |  |
|  | **Reorganization / Reinvestment** |  |  |
| 24. | Technology Infrastructure | (0.0) |  |
| 25. | Capital Expenditures | (20.7) | Executive bay upgrades ($10.0MM), new T-Hangars ($2.5MM), terminal upgrades ($2.0MM), new jetway ($2.0MM) and other capex required for airport operating certificate and master study |
| 26. | Other Infrastructure | - |  |
| 27. | Reorganization Costs | - |  |
| 28. | **Total Reorganization / Reinvestment** | (20.7) |  |
|  |  |  |  |
| 29. | **Total Surplus (Deficit)** | $ (28.5) |  |
|  |  |  |  |
| 30. | Incremental Headcount (FTE) | 4 |  |

61 of 70

13-53846-tjt Doc 8773 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 476 of 602
13-53846-swr Doc 6382-2 Filed 03/31/14 Entered 03/31/14 16:36:58 Page 76 of

204

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Enterprise Agencies**
**Building Safety Engineering Environmental Department (BSEED) - General Fund**
($ in millions)

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| 2. | a. Increased Collection Rate | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 1.7 |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | - | - | - | - | - | - | - | - | - | - | - |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 1.7 |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | (0.0) | (0.0) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.3 |
| 9. | Professional & Contract Services | - | - | - | - | - | - | - | - | - | - | - |
| 10. | Labor Costs / Service Contracts | (0.0) | (0.0) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.3 |
| 11. | Active Benefits | (0.0) | (0.0) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 |
| 12. | Training | | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.1) |
| 13. | Materials and Supplies | - | - | - | - | - | - | - | - | - | - | - |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | - | - | - | - | - | - | - | - | - | - | - |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | (0.6) | (2.1) | 2.5 | 3.3 | 2.9 | 3.8 | 3.9 | 3.4 | 3.9 | 4.0 | 25.0 |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.5 |
| 22. | **Total Operating Expenditures** | (0.6) | (2.1) | 2.6 | 3.4 | 3.0 | 3.8 | 3.9 | 3.5 | 4.0 | 4.1 | 25.7 |
| 23. | **Total Operating Surplus (Deficit)** | (0.4) | (1.9) | 2.7 | 3.5 | 3.2 | 4.0 | 4.1 | 3.7 | 4.2 | 4.2 | 27.3 |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 25. | Capital Expenditures | - | (0.4) | - | - | - | - | - | - | - | - | (0.4) |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | - | - | - | - | - | - | - | - | - | - | - |
| 28. | **Total Reorganization / Reinvestment** | - | (0.4) | - | - | - | - | - | - | - | - | (0.4) |
| 29. | **Total Surplus (Deficit)** | $ (0.4) | $ (2.3) | $ 2.7 | $ 3.5 | $ 3.2 | $ 4.0 | $ 4.1 | $ 3.7 | $ 4.2 | $ 4.2 | 27.0 |
| 30. | **Incremental Headcount (FTE)** | 2 | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) |

13-53846-tjt Doc 8773 Filed 12/10/14 Entered 12/10/14 09:24:49 Page 477 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 16:36:38 Page 476 of 602

**City of Detroit**

**Ten-Year Plan of Adjustment**

**Restructuring and Reinvestment Initiatives - Enterprise Agencies**

**Building Safety Engineering Environmental Department (BSEED) - General Fund**

(*$ in millions*)

| | | 10-Year Total | Assumptions / Comments |
|---|---|---:|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | 1.7 | Increase to collection rate due to change in collections process and higher staffing levels |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | - | |
| 5. | Grant Revenue | - | |
| 6. | Other | - | |
| 7. | **Total Revenues** | 1.7 | |
| | | | |
| | **Expenditures** | - | |
| 8. | Permanent Labor | 0.3 | Increase due to additional business investigator |
| | | | |
| 9. | Professional & Contract Services | - | |
| 10. | Labor Costs / Service Contracts | 0.3 | |
| 11. | Active Benefits | 0.1 | |
| 12. | Training | (0.1) | |
| | | | |
| 13. | Materials and Supplies | - | |
| 14. | Utilities | - | |
| 15. | Purchased services | - | |
| 16. | Risk management / insurance | - | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | 25.0 | Pay-back of BSEED General Fund loan |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | 0.5 | Savings on rent through facility consolidation |
| 22. | **Total Operating Expenditures** | 25.7 | |
| | | | |
| 23. | **Total Operating Surplus (Deficit)** | 27.3 | |
| | | | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | - | |
| 25. | Capital Expenditures | (0.4) | Costs related to facility build-out to consolidate facilities and improve efficiencies |
| 26. | Other Infrastructure | - | |
| 27. | Reorganization Costs | - | |
| 28. | **Total Reorganization / Reinvestment** | (0.4) | |
| | | | |
| 29. | **Total Surplus (Deficit)** | $ 27.0 | |
| | | | |
| 30. | **Incremental Headcount (FTE)** | (1) | |

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Enterprise Agencies**
**Detroit Department of Transportation (DDOT)**
*($ in millions)*

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2. | a. Increased Collection Rate | - | - | - | - | - | - | - | - | - | - | - |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | 0.4 | 1.5 | 5.7 | 7.1 | 11.7 | 13.4 | 17.5 | 17.1 | 21.2 | 22.0 | 117.6 |
| 5. | Grant Revenue | (2.0) | (7.0) | (7.0) | (7.0) | (7.0) | (7.0) | (7.0) | (7.0) | (7.0) | (7.0) | (65.0) |
| 6. | Other | (0.1) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.1) | (0.1) | (0.1) | - | (1.2) |
| 7. | **Total Revenues** | (1.7) | (5.7) | (1.5) | (0.1) | 4.6 | 6.3 | 10.4 | 10.0 | 14.1 | 15.0 | 51.4 |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | (0.6) | (1.5) | 3.0 | 1.8 | 1.4 | 1.4 | 1.5 | 1.4 | 1.2 | 1.0 | 10.6 |
| 9. | Professional & Contract Services | (0.3) | (0.4) | (0.4) | (0.5) | (0.6) | (0.6) | (0.7) | (0.7) | (0.7) | (0.8) | (5.8) |
| 10. | Labor Costs / Service Contracts | (1.0) | (1.9) | 2.5 | 1.3 | 0.8 | 0.8 | 0.8 | 0.7 | 0.4 | 0.2 | 4.8 |
| 11. | Active Benefits | - | - | (0.1) | (0.7) | (0.9) | (0.9) | (1.0) | (1.0) | (1.2) | (1.3) | (7.2) |
| 12. | Training | (0.1) | (0.5) | (0.5) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (5.2) |
| 13. | Materials and Supplies | (0.4) | (0.9) | (1.9) | (3.0) | (4.0) | (4.5) | (5.0) | (5.4) | (5.9) | (6.4) | (37.4) |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | (0.0) | (0.0) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.2) | (0.2) | (1.0) |
| 16. | Risk management / insurance | - | - | 1.0 | 1.0 | 1.5 | 1.5 | 2.0 | 2.0 | 2.5 | 2.5 | 14.0 |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | (0.0) | (0.0) | (0.1) | (0.1) | (0.2) | (0.2) | (0.2) | (0.2) | (0.3) | (0.3) | (1.7) |
| 22. | **Total Operating Expenditures** | (1.4) | (3.4) | 0.8 | (2.2) | (3.5) | (4.1) | (4.1) | (4.7) | (5.2) | (6.1) | (33.8) |
| 23. | **Total Operating Surplus (Deficit)** | (3.2) | (9.1) | (0.7) | (2.3) | 1.1 | 2.2 | 6.3 | 5.3 | 8.9 | 8.9 | 17.6 |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | - | - | - | - | - | - | | | | | |
| 25. | Capital Expenditures | (1.6) | (2.0) | (2.3) | (2.5) | (1.0) | (1.0) | - | - | - | - | (10.3) |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | - | - | - | - | - | - | - | - | - | - | - |
| 28. | **Total Reorganization / Reinvestment** | (1.6) | (2.0) | (2.3) | (2.5) | (1.0) | (1.0) | - | - | - | - | (10.3) |
| 29. | **Total Surplus (Deficit)** | $ (4.7) | $ (11.1) | $ (2.9) | $ (4.8) | $ 0.1 | $ 1.2 | $ 6.3 | $ 5.3 | $ 8.9 | $ 8.9 | $ 7.3 |
| 30. | **Incremental Headcount (FTE)** | - | - | 14 | 77 | 96 | 98 | 100 | 102 | 115 | 128 | 128 |

13-53846-tit Doc 8379 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 479 of 602
13-53846-swr Doc 8382 Filed 03/31/14 Entered 03/31/14 18:36:58 Page 470 of 602

**City of Detroit**

**Ten-Year Plan of Adjustment**

**Restructuring and Reinvestment Initiatives - Enterprise Agencies**

**Detroit Department of Transportation (DDOT)**

*($ in millions)*

| | | 10-Year Total | Assumptions / Comments |
|---|---|---:|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | - | |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | 117.6 | Increase in service miles / routes plus increase in fares |
| 5. | Grant Revenue | (65.0) | Assumed redistribution of grant monies to SMART and RTA |
| 6. | Other | (1.2) | Loss of advertising revenue |
| 7. | **Total Revenues** | 51.4 | |
| | | | |
| | **Expenditures** | - | |
| 8. | Permanent Labor | 10.6 | Reduction in OT ($51.0MM) offset by headcount increase resulting from increased service ($15.0MM) and establishment of security force ($25.0MM) |
| 9. | Professional & Contract Services | (5.8) | Operational consultant to achieve revenue, cost, and service improvements |
| 10. | Labor Costs / Service Contracts | 4.8 | |
| 11. | Active Benefits | (7.2) | Benefits at 55% of Permanent Labor costs |
| 12. | Training | (5.2) | Training cost for all DDOT employees |
| 13. | Materials and Supplies | (37.4) | Additional cost based on increased miles served. Each mile driven costs $1.52 per mile for gas, maintenance parts, supplies, etc. |
| 14. | Utilities | - | |
| 15. | Purchased services | (1.0) | Additional cost based on increased miles served |
| 16. | Risk management / insurance | 14.0 | Reduction of worker's comp cases as a result of improved risk management process and other efficiencies |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | (1.7) | Additional cost based on increased miles served |
| 22. | **Total Operating Expenditures** | (33.8) | |
| | | | |
| 23. | **Total Operating Surplus (Deficit)** | 17.6 | |
| | | | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | - | |
| 25. | Capital Expenditures | (10.3) | Non-grant funded facility improvements and upgrades ($8.3MM) and new transit police force equipment ($1.2MM) |
| 26. | Other Infrastructure | - | |
| 27. | Reorganization Costs | - | |
| 28. | **Total Reorganization / Reinvestment** | (10.3) | |
| | | | |
| 29. | **Total Surplus (Deficit)** | $ 7.3 | |
| | | | |
| 30. | **Incremental Headcount (FTE)** | 128 | |

**City of Detroit**

**Ten-Year Plan of Adjustment**

**Restructuring and Reinvestment Initiatives - Enterprise Agencies**

**Municipal Parking Department (Parking) - General Fund - PVB**

($ in millions)

|  |  | For the Fiscal Year Ended | | | | | | | | | | 10-Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Total |
|  | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2. | a. Increased Collection Rate | - | - | - | - | - | - | - | - | - | - | - |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | 5.6 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 60.3 |
| 5. | Grant Revenue | - | - | - | - | - | - | - | - | - | - | - |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | - | 5.6 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 60.3 |
|  | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | (0.0) | (0.2) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.2 |
| 9. | Professional & Contract Services | (0.1) | (0.1) | - | - | - | - | - | - | - | - | (0.2) |
| 10. | Labor Costs / Service Contracts | (0.1) | (0.3) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 |
| 11. | Active Benefits | (0.0) | (0.1) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 |
| 12. | Training | - | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.7) |
| 13. | Materials and Supplies | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.4) |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | - | - | - | - | - | - | - | - | - | - | - |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | - | - | - | - | - | - | - | - | - | - |
| 22. | **Total Operating Expenditures** | (0.1) | (0.5) | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (1.0) |
| 23. | **Total Operating Surplus (Deficit)** | (0.1) | 5.1 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 59.3 |
|  | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 25. | Capital Expenditures | (0.5) | (0.2) | (0.1) | (0.1) | (0.1) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (2.0) |
| 26. | Other Infrastructure | - | (0.4) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (1.4) |
| 27. | Reorganization Costs | - | - | - | - | - | - | - | - | - | - | - |
| 28. | **Total Reorganization / Reinvestment** | (0.5) | (0.6) | (0.2) | (0.2) | (0.2) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (3.4) |
| 29. | **Total Surplus (Deficit)** | $ (0.6) | $ 4.5 | $ 6.6 | $ 6.6 | $ 6.6 | $ 6.5 | $ 6.5 | $ 6.5 | $ 6.5 | $ 6.5 | $ 55.9 |
| 30. | **Incremental Headcount (FTE)** | 1 | 7 | (6) | (6) | (6) | (6) | (6) | (6) | (6) | (6) |  |

13-53846-tit swr Doc 8779 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 481 of 602
13-53846-swr Doc 6382-2 Filed 03/31/14 Entered 03/31/14 18:36:38 Page 93 of 97
204

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Enterprise Agencies**
**Municipal Parking Department (Parking) - General Fund - PVB**
($ in millions)

| | | 10-Year Total | Assumptions / Comments |
|---|---|---|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | - | |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | 60.3 | Primarily related to parking violation fee increases and added parking enforcement officers to generate additional ticket volume |
| 5. | Grant Revenue | - | |
| 6. | Other | - | |
| 7. | **Total Revenues** | 60.3 | |
| | | | |
| | **Expenditures** | - | |
| 8. | Permanent Labor | 0.2 | Elimination of non-productive heads offset partially by additional parking enforcement officers |
| 9. | Professional & Contract Services | (0.2) | Parking expert to assist with strategic alternatives and master plan |
| 10. | Labor Costs / Service Contracts | 0.0 | |
| 11. | Active Benefits | 0.1 | Benefits at 55% of Permanent Labor costs |
| 12. | Training | (0.7) | Training cost for all department employees - $2.0k per employee through FY '16, $1.5k thereafter to establish a continuous training program |
| 13. | Materials and Supplies | (0.4) | Primarily a result of additional parking enforcement officers in vehicles issuing tickets (reference Restructuring Actions) |
| 14. | Utilities | - | |
| 15. | Purchased services | - | |
| 16. | Risk management / insurance | - | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | - | |
| 22. | **Total Operating Expenditures** | (1.0) | |
| | | | |
| 23. | **Total Operating Surplus (Deficit)** | 59.3 | |
| | | | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | - | |
| 25. | Capital Expenditures | (2.0) | Primarily upgrades to Caniff Impound Lot |
| 26. | Other Infrastructure | (1.4) | Fleet replacement primarily for parking enforcement officers |
| 27. | Reorganization Costs | - | |
| 28. | **Total Reorganization / Reinvestment** | (3.4) | |
| | | | |
| 29. | **Total Surplus (Deficit)** | $ 55.9 | |
| | | | |
| 30. | **Incremental Headcount (FTE)** | (6) | |

67 of 70

13-53846-tjt Doc 8779 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 482 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 18:36:38 Page 94 of 691
204

# City of Detroit

Ten-Year Plan of Adjustment

Other - Detail

13-53846-tit Doc 8739 Filed 12/10/14 Entered 12/10/14 08:24:40 Page 483 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 13:36:38 Page 95 of
204

**City of Detroit**

Ten-Year Plan of Adjustment
Restructuring and Reinvestment Initiatives - Other
Blight / Demolition

*($ in millions)*

| | | For the Fiscal Year Ended | | | | | | | | | | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | |
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2. | a. Increased Collection Rate | - | - | - | - | - | - | - | - | - | - | - |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | 6.0 | 46.3 | - | - | - | - | - | - | - | - | 52.3 |
| 6. | Other | - | 4.0 | 4.0 | 4.0 | 4.0 | 4.0 | - | - | - | - | 20.0 |
| 7. | **Total Revenues** | 6.0 | 50.3 | 4.0 | 4.0 | 4.0 | 4.0 | - | - | - | - | 72.3 |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | - | - | - | - | - | - | - | - | - | - | - |
| 9. | Professional & Contract Services | - | - | - | - | - | - | - | - | - | - | - |
| 10. | Labor Costs / Service Contracts | - | - | - | - | - | - | - | - | - | - | - |
| 11. | Active Benefits | - | - | - | - | - | - | - | - | - | - | - |
| 12. | Training | - | - | - | - | - | - | - | - | - | - | - |
| 13. | Materials and Supplies | - | - | - | - | - | - | - | - | - | - | - |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | (5.0) | (95.0) | (100.0) | (100.0) | (100.0) | (100.0) | - | - | - | - | (500.0) |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | (2.3) | (18.0) | - | - | - | - | - | - | - | - | (20.3) |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | - | - | - | - | - | - | - | - | - | - |
| 22. | **Total Operating Expenditures** | (7.3) | (113.0) | (100.0) | (100.0) | (100.0) | (100.0) | - | - | - | - | (520.3) |
| 23. | **Total Operating Surplus (Deficit)** | (1.3) | (62.6) | (96.0) | (96.0) | (96.0) | (96.0) | - | - | - | - | (447.9) |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 25. | Capital Expenditures | - | - | - | - | - | - | - | - | - | - | - |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | - | - | - | - | - | - | - | - | - | - | - |
| 28. | **Total Reorganization / Reinvestment** | - | - | - | - | - | - | - | - | - | - | - |
| 29. | **Total Surplus (Deficit)** | $ (1.3) | $ (62.6) | $ (96.0) | $ (96.0) | $ (96.0) | $ (96.0) | $ - | $ - | $ - | $ - | $ (447.9) |
| 30. | Incremental Headcount (FTE) | - | - | - | - | - | - | - | - | - | - | - |

13-53846-tjt Doc 8783-2 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 484 of 602
13-53846-swr Doc 6382-2 Filed 03/31/14 Entered 03/31/14 18:36:38 Page 96 of 61

**City of Detroit**

Ten-Year Plan of Adjustment
Restructuring and Reinvestment Initiatives - Other
Blight / Demolition
($ in millions)

| | | 10-Year Total | Assumptions / Comments |
|---|---|---|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | - | |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | - | |
| 5. | Grant Revenue | 52.3 | Committed funding from Hardest Hit fund |
| 6. | Other | 20.0 | Current Fire escrow account balance |
| 7. | **Total Revenues** | 72.3 | |
| | | | |
| | **Expenditures** | - | |
| 8. | Permanent Labor | - | |
| 9. | Professional & Contract Services | - | |
| 10. | Labor Costs / Service Contracts | - | |
| 11. | Active Benefits | - | |
| 12. | Training | - | |
| 13. | Materials and Supplies | - | |
| 14. | Utilities | - | |
| 15. | Purchased services | (500.0) | Estimated costs for residential blight removal efforts |
| 16. | Risk management / insurance | - | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | (20.3) | Additional cost of demolition related to the committed funding from Hardest Hit fund |
| 20. | Maintenance | - | |
| 21. | All Other | - | |
| 22. | **Total Operating Expenditures** | (520.3) | |
| | | | |
| 23. | **Total Operating Surplus (Deficit)** | (447.9) | |
| | | | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | - | |
| 25. | Capital Expenditures | - | |
| 26. | Other Infrastructure | - | |
| 27. | Reorganization Costs | - | |
| 28. | **Total Reorganization / Reinvestment** | - | |
| | | | |
| 29. | **Total Surplus (Deficit)** | $ (447.9) | |
| | | | |
| | | | |
| 30. | **Incremental Headcount (FTE)** | - | |

70 of 70

13-53846-tit Doc 8779 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 485 of 602
13-53846-swr Doc 6382-2 Filed 03/31/14 Entered 03/31/14 13:36:58 Page 97 of 760
204

## EXHIBIT J

TEN-YEAR FINANCIAL PROJECTION

13-53846-tjt Doc 8739 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 486 of 602
13-53846-swr Doc 6382-2 Filed 03/31/14 Entered 03/31/14 13:36:58 Page 98 of
204

# City of Detroit

### Ten-Year Financial Projections

The attached 10 year preliminary forecast (the "10 Year Financial Projections"), its assumptions and underlying data are the product of the Client and its management ("Management") and consist of information obtained solely from the Client. With respect to prospective financial information relative to the Client, Ernst & Young LLP ("EY") did not examine, compile or apply agreed upon procedures to such information in accordance with attestation standards established by the AICPA and EY expresses no assurance of any kind on the information presented. It is the Client's responsibility to make its own decision based on the information available to it. Management has the knowledge, experience and ability to form its own conclusions related to the Client's 10 Year Financial Projections. There will usually be differences between forecasted and actual results because events and circumstances frequently do not occur as expected and those differences may be material. EY takes no responsibility for the achievement of forecasted results. Accordingly, reliance on this report is prohibited by any third party as the projected financial information contained herein is subject to material change and may not reflect actual results.

13-53846-tit Doc 8739 Filed 12/10/14 Entered 12/10/14 08:24:40 Page 487 of 602
13-53846-swr Doc 6382-2 Filed 03/31/14 Entered 03/31/14 13:36:38 Page 99 of 204

3/30/2014 11:01 PM

**City of Detroit**

**Ten-Year Financial Projections**
**Table of contents**

| Section | Exhibit | Description | Page |
|---|---|---|---|
| **Summary schedules** | | | |
| | 1 | General Fund assumptions | 4 |
| | 2 | General Fund summary view | 6 |
| | 3 | Restructuring scenario - Amount available for unsecured claims | 7 |
| | 4 | General Fund detail view | 8 |
| | 5a | Funds Available for Unsecured Claims Summary Bridge | 10 |
| | 5b | Funds Available for Unsecured Claims Detailed Bridge | 11 |

| Section | Appendix | Description | Page |
|---|---|---|---|
| **Departmental detail** | | | |
| | A | | 12 |
| | "a" pages | Departmental - General Fund detail | |
| | "b" pages | Departmental key assumptions | |
| | A.29 | Department of Transportation | 69 |
| **Key revenue drivers** | | | |
| | B.1a | Property tax revenue - without reinvestment | 71 |
| | B.1b | Property tax revenue - with reinvestment | 72 |
| | B.2a | Income tax revenue - without reinvestment | 73 |
| | B.2b | Income tax revenue - with reinvestment | 74 |
| | B.3 | Wagering tax revenue | 75 |
| | B.4 | State revenue sharing | 76 |
| **Key expense drivers** | | | |
| | C.1 | Headcount - Full-Time Equivalents | 78 |
| | C.2 | Payroll | 79 |
| | C.3 | Benefits | 80 |
| | C.4 | Pension | 81 |
| | D.1 | Debt summary | 82 |
| | D.2 | POC summary | 83 |

13-53846-tjt Doc 8739-82 Filed 12/16/14 Entered 12/16/14 09:24:40 Page 488 of 602
13-53846-swr Doc 5382-2 Filed 03/31/14 Entered 03/31/14 16:36:38 Page 90 of 92
204
3/30/2014 11:01 PM

**General Fund Summary**

**Ten-Year Financial Projections**
**General Fund assumptions**

Base projections represent trends from fiscal years 2012 and 2013 as well as certain operating assumptions within the 2014 Budget.

## Revenues (Exhibit 4)

| | |
|---|---|
| Municipal income tax | Increases due to improved employment outlook and wage inflation. FY 2013 reflects the impact of one-time items including tax amnesty program and one-time benefit from increase in capital gains tax rate |
| State revenue sharing | Increases due to anticipation of higher taxes collected and distributed by the State. Reflects input from Michigan State Treasury |
| Wagering taxes | Decreases through FY 2015 due to competition from Ohio casinos and recovers thereafter due to improved economic outlook |
| Sales and charges for services | Decreases primarily due to transition of Health and Wellness department, including Vital Records operations, and Public Lighting department distribution business |
| Property taxes | Continued decline in taxes collected through FY 2020 as a result of ongoing reductions in assessed values driven by sales study and reassessment process, with modest increases beginning FY 2021 |
| Utility users' and other taxes | Decreases beginning FY 2014 due to the annual allocation of $12.5m to the Public Lighting Authority. Inflationary increases assumed beginning FY 2017 |
| Parking/court fines and other revenue | Based on recent trends |
| Grant revenue | Decreases due to transition of Health and Wellness department and expiration of certain public safety grants |
| Licenses, permits and inspection charges | Based on recent trends. FY 2013 includes one-time permit and inspection revenues from utility providers |
| Revenue from use of assets | FY 2013 includes proceeds from the sale of assets. FY 2014 includes proceeds from sale of Veteran's Memorial building |
| Street fund reimbursement | Decreases beginning FY 2015 due to the assumed outsourcing of solid waste operations, which will no longer reimburse GSD for maintenance costs |
| DDOT risk mgmt reimbursement | Based on recent trends. Reimbursement not reflected in FY 2013 as General Fund made payments from refunding proceeds |
| Parking & vehicle fund reimbursement | Based on recent trends and scheduled debt service for vehicle fund through FY 2016 (revenues and associated expenses offset). FY 2012 includes $16m one-time contribution from DDOT |
| UTGO property tax millage | Property tax millage for UTGO debt service. Projections assume the City is able to collect UTGO property tax millage (currently being litigated). |
| POC allocation - governmental | Transfer from general city, non-General Fund for allocated POC debt service . Revenues and associated expenses offset |
| POC allocation - enterprise funds (excl. DDOT) | Transfer from enterprise funds for allocated POC debt service . Revenues and associated expenses offset |

## Expenditures (Exhibit 4)

Operating expenditures

| | |
|---|---|
| Salaries and wages | 10% wage reduction assumed for uniform employees beginning FY 2014 for contracts expiring FY 2013. Headcount ramp-up begins FY 2015 to return to previously projected levels due to lower actual headcount in FY 2014. 2.0% annual wage inflation assumed beginning FY 2015 for all employees. In addition, a one-time 5.0% wage increase assumed for public safety in FY 2020 |
| Overtime | Based on recent trends. Increases in FY 2014 due to higher police overtime primarily resulting from elimination of 12-hour shifts |
| Health benefits - active | Average 6.5% inflation assumed annually for hospitalization cost. Reflects cost of healthcare plan designs being offered for 2014 enrollment |
| Other benefits | Based on recent trends, projected by specific other benefit/fringe |
| Professional and contractual services | Decreases beginning FY 2014 primarily due to transition of Health and Wellness department. 1.0% cost inflation assumed beginning FY 2015 |
| Materials & supplies | Decreases beginning FY 2015 due to transition of Public Lighting department distribution business. 1.0% cost inflation assumed beginning FY 2015 |
| Utilities | Based on recent trends. 1.0% cost inflation assumed beginning FY 2015. Average cost inflation of 3.5% has been assumed for water/sewer rates beginning FY 2015 |
| Purchased services | Increases beginning FY 2014 due to prisoner pre-arraignment function costs and FY 2015 due to payroll processing management. 1.0% cost inflation assumed beginning FY 2015 |
| Risk management and insurance | 1.0% cost inflation assumed beginning FY 2015 |
| Maintenance capital | FY 2013 includes one-time capital outlays. 1.0% cost inflation assumed beginning FY 2015 |
| Other expenses | Primarily includes printing, rental and other operating costs. 1.0% cost inflation assumed to certain costs beginning FY 2015 |
| Contributions to non enterprise funds | Increases in FY 2015 and 2016 primarily due to scheduled vehicle fund debt service. Contributions to the Public Lighting Authority for operations begins FY 2015 |
| DDOT subsidy | Increases primarily due to personnel and operating cost inflation. FY 2012 includes $16m one-time contribution to General Fund. FY 2013 excludes risk management payment, made from refunding proceeds |
| Grant related expenses | Grant expenses captured within specific expense line items |

Legacy expenditures

| | |
|---|---|
| Debt service (UTGO & LTGO) | Reflects scheduled principal and interest payments |
| POC - principal, interest and swaps | Reflects principal, interest and swap payments. No acceleration or refinancing assumed |
| Pension contributions | Per actuarial analysis performed by the City's actuaries |
| Health benefits - retiree | Average 5% inflation assumed annually for hospitalization cost. Reflects cost of current healthcare plan designs |

## Other (Exhibit 4)

| | |
|---|---|
| Financing proceeds | FY 2013 includes $137m refunding proceeds ($129.5 bond issuance) |

13-53846-tjt Doc 8779 Filed 12/16/14 Entered 12/16/14 09:24:40 Page 490 of 602
13-53846-swr Doc 6382-2 Filed 03/31/14 Entered 03/31/14 18:36:38 Page 92 of 204

3/30/2014 11:01 PM

Ten-Year Financial Projections
General Fund assumptions


**Operational restructuring initiatives / Reinvestment in the City (Exhibit 4)**

| | |
|---|---|
| Department revenue initiatives | Reflects increases to fees, improved billing and collection efforts and collections of past due receivables |
| Additional operating expenditures | Primarily reflects increases to headcount to improve and provide adequate level of City services.  Costs are partially offset by potential savings |
| Technology | Reflects costs associated with information system upgrades and maintenance |
| Capital expenditures and other infrastructure | Primarily reflects City's capital improvement plan to invest in facilities and vehicles |
| Implementation costs | Primarily reflects non-recurring costs associated with implementing operational initiatives |
| Blight (excludes heavy commercial) | Reflects costs associated with demolition and clean up efforts of residential and light commercial. Heavy commercial blight removal would require significant additional funding |
| | Assumes all blight related expenditures are paid by the General Fund. Other funding sources may be available |


**Restructuring scenario (Exhibit 3)**

| | |
|---|---|
| Capital investment | Reflects technology, capital expenditures and implementation costs |
| Active pension contributions | Reflects contribution of 10% of salary assumed for uniformed employees; 5% assumed for non-uniformed |
| OPEB Payments - future retirees | Reflects contribution of 2% of salary assumed for future retirees |
| POC reimbursements | Includes revenue received from enterprise and other non-General Fund agencies |
| PLD decommission | Preliminary estimates for 31 substations, excluding Mistersky |
| Increased tax revenues | Reflects potential revenue opportunities due to increased property values and employment conditions resulting from restructuring efforts |
| Reduced UTGO tax millage | Reduction in millage to reflect treatment of UTGO as unsecured and corresponding reduction in property tax revenues |
| Payments to secured claims | Based on the unaltered scheduled payments of secured debt and other notes payable (with the exception of POC swap payments). No payments are scheduled for the secured notes payable |
| | Treatment of these debt instruments is subject to further review and negotiation |
| QOL / exit financing proceeds (net) | Assumes QOL net financing proceeds of $118m in FY 2014 and $175m of net additional proceeds from exit financing in FY 2015 |
| QOL / exit financing principal/interest payments | Exit financing assumes 8 year note funded 10/31/2014 with interest only payments in first 4 years and equal principal payments made in years 5 through 8 |
| Working capital | Primarily relates to past due vendor payments and required funding of the self insurance escrow set-aside |
| Contingency | Reflects amounts reserved for unexpected events |
| Deferral | Reflects timing adjustment of reinvestment initiatives to manage liquidity |

13-53846-tit Doc 8779-2 Filed 12/16/14 Entered 12/16/14 09:24:40 Page 491 of 602
13-53846-swr Doc 6382-2 Filed 03/31/14 Entered 03/31/14 16:36:38 Page 93 of 204

3/30/2014 11:01 PM

**Ten-Year Financial Projections**
**General Fund summary view**
*($ in millions)*

|  | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | | 10-year total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | total |
| **Revenues** | | | | | | | | | | | | | | | | | |
| Municipal income tax | $ 276.5 | $ 240.8 | $ 216.5 | $ 228.3 | $ 233.0 | $ 248.0 | $ 246.4 | $ 250.4 | $ 252.1 | $ 253.8 | $ 255.5 | $ 257.1 | $ 258.7 | $ 260.9 | $ 264.1 | $ 267.3 | $ 2,566.3 |
| State revenue sharing | 249.6 | 266.6 | 263.6 | 239.3 | 173.3 | 183.8 | 190.9 | 192.7 | 194.5 | 196.1 | 197.8 | 199.6 | 201.4 | 194.9 | 196.6 | 198.4 | 1,963.1 |
| Wagering taxes | 180.4 | 173.0 | 183.3 | 176.9 | 181.4 | 174.6 | 169.9 | 168.2 | 169.9 | 171.6 | 173.3 | 175.0 | 176.8 | 178.5 | 180.3 | 182.1 | 1,745.7 |
| Sales and charges for services | 193.3 | 167.4 | 154.1 | 154.9 | 149.2 | 123.8 | 131.5 | 118.0 | 115.8 | 113.7 | 111.5 | 109.3 | 107.1 | 104.5 | 103.4 | 104.1 | 1,118.9 |
| Property taxes | 155.2 | 163.7 | 143.0 | 182.7 | 147.8 | 133.6 | 114.9 | 104.2 | 100.1 | 97.2 | 97.1 | 95.2 | 89.6 | 89.5 | 90.1 | 90.7 | 968.6 |
| Utility users' and other taxes | 73.0 | 71.5 | 64.8 | 64.8 | 57.1 | 47.2 | 29.7 | 34.1 | 34.1 | 34.5 | 34.9 | 35.2 | 35.6 | 36.0 | 36.4 | 36.8 | 347.2 |
| Other revenue | 152.9 | 138.5 | 134.2 | 152.5 | 121.6 | 111.8 | 76.8 | 70.5 | 69.2 | 57.7 | 56.4 | 56.7 | 57.3 | 57.6 | 57.6 | 57.9 | 617.1 |
| General Fund reimbursements | 36.9 | 59.2 | 47.6 | 32.3 | 47.6 | 23.8 | 26.4 | 41.7 | 41.7 | 21.4 | 21.4 | 21.4 | 21.4 | 21.4 | 21.4 | 21.4 | 259.5 |
| Transfers in (UTGO millage & non-General Fund POCs) | 84.2 | 89.1 | 91.5 | 93.6 | 95.2 | 93.5 | 93.9 | 90.7 | 86.9 | 87.5 | 87.2 | 84.2 | 83.6 | 83.0 | 68.1 | 64.4 | 829.4 |
| **Total revenues** | 1,401.7 | 1,369.9 | 1,298.7 | 1,325.3 | 1,206.4 | 1,140.0 | 1,080.1 | 1,070.6 | 1,064.3 | 1,033.4 | 1,035.0 | 1,033.7 | 1,031.2 | 1,026.1 | 1,018.1 | 1,023.1 | 10,415.9 |
| **Expenditures** | | | | | | | | | | | | | | | | | |
| Salaries/overtime/fringe | (512.0) | (514.7) | (474.3) | (463.3) | (440.3) | (361.3) | (333.1) | (343.2) | (353.9) | (361.6) | (368.6) | (376.0) | (392.1) | (399.8) | (407.6) | (415.7) | (3,751.6) |
| Health benefits - active | (58.9) | (57.7) | (74.1) | (68.5) | (59.0) | (47.8) | (49.2) | (48.0) | (52.1) | (55.9) | (60.0) | (63.6) | (67.4) | (71.4) | (75.7) | (80.2) | (623.6) |
| Other operating expenses | (554.4) | (457.7) | (422.2) | (359.4) | (361.5) | (305.2) | (287.0) | (308.2) | (308.3) | (288.5) | (291.4) | (290.0) | (292.0) | (294.0) | (300.9) | (302.6) | (2,963.0) |
| Operating expenditures | (1,125.3) | (1,030.1) | (970.7) | (891.2) | (860.8) | (714.3) | (669.3) | (699.5) | (714.3) | (706.0) | (720.1) | (729.6) | (751.5) | (765.2) | (784.1) | (798.6) | (7,338.2) |
| **Net operating surplus** | 276.4 | 339.8 | 328.0 | 434.1 | 345.6 | 425.6 | 411.0 | 371.1 | 350.0 | 327.4 | 315.0 | 304.1 | 279.7 | 260.9 | 234.0 | 224.5 | 3,077.7 |
| Debt service (LTGO & UTGO) | (133.8) | (177.6) | (135.9) | (137.3) | (135.6) | (143.1) | (144.6) | (124.7) | (119.8) | (96.5) | (95.4) | (92.9) | (92.3) | (91.9) | (75.3) | (71.5) | (1,004.9) |
| POC - principal and interest | (42.8) | (39.7) | (44.2) | (55.7) | (56.4) | (61.2) | (66.7) | (68.9) | (71.1) | (73.3) | (75.7) | (73.9) | (74.7) | (75.5) | (76.2) | (76.8) | (732.7) |
| POC swaps | (40.5) | (45.1) | (45.9) | (45.1) | (45.1) | (45.9) | (45.9) | (45.9) | (45.9) | (45.9) | (45.9) | (45.0) | (45.0) | (44.2) | (43.5) | (42.8) | (450.8) |
| Pension contributions | (66.2) | (57.3) | (42.2) | (112.4) | (78.3) | (59.3) | (195.8) | (229.5) | (254.4) | (280.9) | (309.2) | (315.7) | (325.6) | (331.0) | (332.8) | (335.9) | (2,910.8) |
| Health benefits - retiree | (121.1) | (144.1) | (131.4) | (140.4) | (151.9) | (147.8) | (143.9) | (152.9) | (158.0) | (165.2) | (172.2) | (181.9) | (191.3) | (201.9) | (211.8) | (221.1) | (1,800.9) |
| Legacy expenditures | (404.4) | (463.9) | (399.7) | (491.0) | (467.3) | (457.3) | (596.9) | (621.9) | (649.2) | (661.8) | (698.3) | (710.2) | (728.8) | (744.6) | (739.6) | (748.9) | (6,900.2) |
| **Deficit (excl. financing proceeds)** | (127.9) | (124.1) | (71.7) | (56.9) | (121.8) | (31.7) | (185.8) | (250.8) | (299.2) | (334.4) | (383.3) | (406.1) | (449.1) | (483.7) | (505.6) | (524.5) | (3,822.5) |
| Financing proceeds | 75.0 | - | 250.0 | - | - | 143.5 | - | - | - | - | - | - | - | - | - | - | - |
| **Total surplus (deficit)** | $ (52.9) | $ (124.1) | $ 178.3 | $ (56.9) | $ (121.8) | $ 111.9 | $ (185.8) | $ (250.8) | $ (299.2) | $ (334.4) | $ (383.3) | $ (406.1) | $ (449.1) | $ (483.7) | $ (505.6) | $ (524.5) | $ (3,822.5) |
| **Accumulated unrestricted General Fund deficit (1)** | (219.2) | (331.9) | (155.7) | (196.6) | (326.6) | (214.8) | (400.6) | (651.4) | (950.6) | (1,285.0) | (1,668.3) | (2,074.4) | (2,523.5) | (3,007.2) | (3,512.8) | (4,037.2) | |
| **Reinvestment in the City** | | | | | | | | | | | | | | | | | |
| Department revenue initiatives | $ - | $ - | $ - | $ - | $ - | $ - | $ 10.6 | $ 78.0 | $ 39.3 | $ 53.0 | $ 56.2 | $ 45.8 | $ 46.2 | $ 46.1 | $ 50.6 | $ 51.8 | $ 477.6 |
| Additional operating expenditures | - | - | - | - | - | - | (21.7) | (79.1) | (44.2) | (40.2) | (31.5) | (28.6) | (30.7) | (29.5) | (31.5) | (31.2) | (368.0) |
| Capital investments | - | - | - | - | - | - | (72.2) | (137.8) | (76.1) | (57.1) | (53.2) | (52.7) | (46.2) | (46.9) | (44.5) | (42.7) | (629.2) |
| Blight (excludes heavy commercial) | - | - | - | - | - | - | (5.0) | (95.0) | (100.0) | (100.0) | (100.0) | - | - | - | - | - | (500.0) |
| Total reinvestment in the City | - | - | - | - | - | - | (88.2) | (233.9) | (180.9) | (144.3) | (128.5) | (135.4) | (30.7) | (30.2) | (25.4) | (22.0) | (1,019.5) |
| **Adjusted surplus (deficit)** | $ (52.9) | $ (124.1) | $ 178.3 | $ (56.9) | $ (121.8) | $ 111.9 | $ (274.1) | $ (484.7) | $ (480.1) | $ (478.7) | $ (511.8) | $ (541.5) | $ (479.8) | $ (513.9) | $ (531.0) | $ (546.5) | $ (4,842.0) |
| **Adj. accumulated unrestricted General Fund deficit** | (219.2) | (331.9) | (155.7) | (196.6) | (326.6) | (214.8) | (488.9) | (973.6) | (1,453.7) | (1,932.3) | (2,444.1) | (2,985.6) | (3,465.4) | (3,979.3) | (4,510.3) | (5,056.8) | |

*Footnotes:*
(1) Historical accumulated deficits may not equate to previous balance plus annual surplus/deficit due to changes in inventories, reserves, and the restricted deficit.

13-53846-tit Doc 8782 Filed 12/10/14 Entered 12/10/14 09:24:49 Page 492 of 602
13-53846-swr Doc 5382 Filed 03/31/14 Entered 03/31/14 18:36:58 Page 94 of 461
204
3/30/2014 11:01 PM

**Ten-Year Financial Projections**
**Restructuring scenario - Amount available for unsecured claims**
*($ in millions)*

| | | Preliminary forecast | | | | | | | | | | 10-year total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | |
| **Total revenues** | $ | 1,080.3 $ | 1,070.6 $ | 1,064.3 $ | 1,033.4 $ | 1,035.0 $ | 1,033.7 $ | 1,031.2 $ | 1,026.1 $ | 1,018.1 $ | 1,023.1 | $ 10,415.9 |
| **Department revenue initiatives** | | 10.6 | 78.0 | 39.3 | 53.0 | 56.2 | 45.8 | 46.2 | 46.1 | 50.6 | 51.8 | 477.6 |
| **Operating expenditures** | | (669.3) | (699.5) | (714.3) | (706.0) | (720.1) | (729.6) | (751.5) | (765.2) | (784.1) | (798.6) | (7,338.2) |
| **Additional operating expenditures** | | (21.7) | (79.1) | (44.2) | (40.2) | (31.5) | (28.6) | (30.7) | (29.5) | (31.5) | (31.2) | (368.0) |
| **Net operating surplus** | $ | 399.9 $ | 370.0 $ | 345.2 $ | 340.2 $ | 339.7 $ | 321.3 $ | 295.2 $ | 277.5 $ | 253.1 $ | 245.1 | $ 3,187.3 |
| Reinvestment expenditures/adjustments | | | | | | | | | | | | |
| Capital investments | | (72.2) | (137.8) | (76.1) | (57.1) | (53.2) | (52.7) | (46.2) | (46.9) | (44.5) | (42.7) | (629.2) |
| Restructuring professional fees | | (82.2) | (47.8) | - | - | - | - | - | - | - | - | (130.0) |
| Blight (excludes heavy commercial) | | (5.0) | (95.0) | (100.0) | (100.0) | (100.0) | (100.0) | - | - | - | - | (500.0) |
| Active pension contributions (10% Police/Fire, 5% other) | | (25.6) | (26.9) | (28.0) | (28.6) | (29.2) | (29.8) | (31.1) | (31.7) | (32.3) | (33.0) | (296.1) |
| OPEB payments - future retirees (2% of wages) | | (6.1) | (6.4) | (6.7) | (6.8) | (6.9) | (7.1) | (7.4) | (7.5) | (7.6) | (7.8) | (70.3) |
| POC reimbursements | | (24.0) | (27.0) | (29.2) | (29.9) | (30.6) | (30.1) | (30.2) | (30.3) | (30.4) | (30.5) | (292.1) |
| PLD decommission | | - | (25.0) | (25.0) | (25.0) | - | - | - | - | - | - | (75.0) |
| Increased income tax revenues | | 1.5 | 5.8 | 10.3 | 14.5 | 18.6 | 22.8 | 27.2 | 31.2 | 34.4 | 37.7 | 204.0 |
| Increased property tax revenues | | - | 0.2 | 6.6 | 8.0 | 8.2 | 11.4 | 17.2 | 20.1 | 23.1 | 26.3 | 121.1 |
| Increased utility users' tax revenues | | - | - | 0.4 | 0.6 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 5.6 |
| Reduced UTGO tax millage | | - | (44.0) | (39.8) | (39.8) | (38.9) | (36.8) | (36.2) | (35.6) | (23.2) | (20.0) | (314.3) |
| Total restructuring | | (213.6) | (403.8) | (287.5) | (264.1) | (231.3) | (221.4) | (105.8) | (99.9) | (79.7) | (69.2) | (1,976.3) |
| **Funds available for legacy liabilities** | | 186.3 | (33.7) | 57.7 | 76.1 | 108.4 | 99.9 | 189.4 | 177.6 | 173.3 | 175.9 | 1,211.0 |
| Payments to secured claims (Subject to further review/negotiation) | | | | | | | | | | | | |
| LTGO - secured | | (25.9) | (29.5) | (29.5) | (29.5) | (29.5) | (29.5) | (29.6) | (29.6) | (29.6) | (29.6) | (291.7) |
| UTGO - secured | | (9.6) | (9.9) | (9.9) | (9.9) | (9.9) | (9.9) | (9.9) | (9.9) | (9.9) | (10.0) | (98.8) |
| POC swaps (1) | | (45.9) | (15.7) | - | - | - | - | - | - | - | - | (61.6) |
| POC swaps settlement (1) | | - | (42.1) | - | - | - | - | - | - | - | - | (42.1) |
| Notes/loans payable | | - | - | - | - | - | - | - | - | - | - | - |
| Total payments to secured claims | | (81.3) | (97.2) | (39.4) | (39.4) | (39.4) | (39.4) | (39.5) | (39.5) | (39.5) | (39.6) | (494.2) |
| **Funds available for unsecured claims** | $ | 105.0 $ | (130.9) $ | 18.3 $ | 36.7 $ | 69.0 $ | 60.5 $ | 149.9 $ | 138.2 $ | 133.8 $ | 136.4 | $ 716.8 |
| Adjustments to funds available for unsecured claims | | | | | | | | | | | | |
| QOL / exit financing proceeds (net) | $ | 117.9 $ | 174.8 $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - | $ 292.7 |
| QOL / exit financing principal/interest payments | | (1.3) | (14.6) | (18.0) | (18.0) | (18.0) | (68.0) | (90.0) | (85.5) | (81.0) | (26.5) | (420.9) |
| Total QOL financing impact | | 116.6 | 160.2 | (18.0) | (18.0) | (18.0) | (68.0) | (90.0) | (85.5) | (81.0) | (26.5) | (128.3) |
| Working capital | | (39.8) | 15.0 | - | - | - | - | - | - | - | - | (24.8) |
| Contingency | | - | (12.6) | (10.5) | (10.4) | (10.5) | (10.5) | (10.6) | (10.6) | (10.7) | (10.9) | (97.2) |
| Reinvestment deferrals / timing adjustments | | - | 14.2 | 38.1 | 19.2 | (13.6) | 44.3 | (20.8) | (14.4) | (17.0) | (50.1) | - |
| Total adjustments to funds available | | 76.8 | 176.7 | 9.6 | (9.2) | (42.1) | (34.1) | (121.3) | (110.5) | (108.7) | (87.5) | (250.3) |
| **Adjusted funds available for unsecured claims** | $ | 181.8 $ | 45.8 $ | 27.9 $ | 27.5 $ | 26.9 $ | 26.3 $ | 28.6 $ | 27.7 $ | 25.1 $ | 48.9 | $ 466.5 |

Footnotes:
(1) Reflects an $85m settlement. POC swap payments made in full through October 2014, at which time the remainder of the settlement amount is paid. Subject further legal review.

13-53846-tit Doc 8782 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 493 of 502
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 18:36:38 Page 95 of 204

3/30/2014 11:01 PM

**Ten-Year Financial Projections**
**General Fund detail view**
($ in millions)

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | | 10-year total |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | |
| **Revenues** | | | | | | | | | | | | | | | | | |
| Municipal income tax | $ 276.5 | $ 240.8 | $ 216.5 | $ 228.3 | $ 233.0 | $ 248.0 | $ 246.4 | $ 250.4 | $ 252.1 | $ 253.8 | $ 255.5 | $ 257.1 | $ 258.7 | $ 260.9 | $ 264.1 | $ 267.3 | $ 2,566.3 |
| State revenue sharing | 249.6 | 266.6 | 263.6 | 239.3 | 173.3 | 183.8 | 190.9 | 192.7 | 194.5 | 196.1 | 197.8 | 199.6 | 201.4 | 194.9 | 196.6 | 198.4 | 1,963.1 |
| Wagering taxes | 180.4 | 173.0 | 183.3 | 176.9 | 181.4 | 174.6 | 169.9 | 168.2 | 169.9 | 171.6 | 173.3 | 175.0 | 176.8 | 178.5 | 180.3 | 182.1 | 1,745.7 |
| Sales and charges for services | 193.3 | 167.4 | 154.1 | 154.9 | 149.2 | 123.8 | 131.5 | 118.0 | 115.8 | 113.7 | 111.5 | 109.3 | 107.1 | 104.5 | 103.4 | 104.1 | 1,118.9 |
| Property taxes | 155.2 | 163.7 | 143.0 | 182.7 | 147.8 | 133.6 | 114.9 | 104.2 | 100.1 | 97.2 | 97.1 | 95.2 | 89.6 | 89.5 | 90.1 | 90.7 | 968.6 |
| Utility users' and other taxes | 73.0 | 71.5 | 64.8 | 64.8 | 57.1 | 47.2 | 29.7 | 34.1 | 34.1 | 34.5 | 34.9 | 35.2 | 35.6 | 36.0 | 36.4 | 36.8 | 347.2 |
| Parking/court fines and other revenue | 57.6 | 38.6 | 43.0 | 63.8 | 31.5 | 31.4 | 29.2 | 29.2 | 29.2 | 29.2 | 29.2 | 29.2 | 29.2 | 29.2 | 29.2 | 29.2 | 291.9 |
| Grant revenue | 63.5 | 65.1 | 77.6 | 76.0 | 80.6 | 58.2 | 27.9 | 27.0 | 25.7 | 14.2 | 14.5 | 14.7 | 15.0 | 15.3 | 15.5 | 15.8 | 185.7 |
| Licenses, permits and inspection charges | 9.0 | 6.7 | 8.7 | 8.6 | 7.4 | 10.7 | 9.0 | 9.1 | 9.1 | 9.1 | 9.2 | 9.2 | 9.3 | 9.3 | 9.3 | 9.4 | 92.0 |
| Revenue from use of assets | 22.8 | 28.1 | 4.9 | 4.1 | 2.1 | 11.5 | 10.6 | 5.2 | 5.2 | 5.2 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 47.6 |
| General Fund reimbursements from: | | | | | | | | | | | | | | | | | |
| Street fund | 14.0 | 12.4 | 19.3 | 9.0 | 9.0 | 9.3 | 9.3 | 4.2 | 4.2 | 4.2 | 4.2 | 4.2 | 4.2 | 4.2 | 4.2 | 4.2 | 46.8 |
| DDOT (risk mgmt) | 10.8 | 12.9 | 10.0 | 12.1 | 12.1 | 1.6 | 9.9 | 12.1 | 12.1 | 12.1 | 12.1 | 12.1 | 12.1 | 12.1 | 12.1 | 12.1 | 118.8 |
| Parking & vehicle fund | 12.1 | 33.9 | 18.4 | 11.2 | 26.4 | 12.9 | 7.3 | 25.4 | 25.5 | 5.1 | 5.1 | 5.1 | 5.1 | 5.1 | 5.1 | 5.1 | 94.0 |
| Transfers in for: | | | | | | | | | | | | | | | | | |
| UTGO property tax millage | 67.2 | 71.5 | 72.4 | 72.8 | 73.0 | 70.6 | 66.5 | 62.6 | 57.7 | 57.6 | 56.5 | 54.1 | 53.4 | 52.7 | 37.7 | 33.9 | 532.8 |
| POC allocation - other governmental | 8.7 | 9.1 | 9.8 | 10.7 | 11.4 | 11.4 | 15.2 | 15.6 | 16.4 | 16.8 | 17.2 | 16.9 | 17.0 | 17.0 | 17.1 | 17.2 | 166.2 |
| POC allocation - enterprise funds (excl. DDOT) | 8.2 | 8.6 | 9.3 | 10.1 | 10.8 | 11.5 | 12.2 | 12.5 | 12.8 | 13.1 | 13.4 | 13.2 | 13.2 | 13.3 | 13.3 | 13.3 | 130.4 |
| **Total revenues** | 1,401.7 | 1,369.9 | 1,298.7 | 1,325.3 | 1,206.4 | 1,140.0 | 1,080.1 | 1,070.6 | 1,064.3 | 1,035.0 | 1,035.0 | 1,033.7 | 1,031.2 | 1,026.1 | 1,018.1 | 1,023.1 | 10,415.9 |
| **Expenditures** | | | | | | | | | | | | | | | | | |
| Salaries and wages - Public Safety | (269.2) | (279.3) | (269.7) | (278.4) | (259.0) | (222.1) | (205.4) | (216.3) | (227.3) | (232.6) | (237.2) | (241.9) | (254.0) | (259.1) | (264.3) | (269.6) | (2,407.7) |
| Salaries and wages - Non-Public Safety | (146.9) | (149.6) | (131.1) | (105.3) | (101.5) | (75.5) | (71.7) | (71.9) | (71.2) | (72.4) | (73.7) | (75.2) | (76.7) | (78.1) | (79.5) | (81.1) | (751.4) |
| Overtime - Public Safety | (35.2) | (41.9) | (36.4) | (38.4) | (41.0) | (23.2) | (26.5) | (26.1) | (26.1) | (26.7) | (27.3) | (27.8) | (29.2) | (29.8) | (30.4) | (31.0) | (281.0) |
| Overtime - Non-Public Safety | (10.4) | (9.5) | (7.2) | (7.4) | (7.9) | (6.5) | (5.4) | (4.0) | (3.9) | (4.0) | (4.1) | (4.1) | (4.2) | (4.3) | (4.4) | (4.5) | (42.9) |
| Health benefits - active- Public Safety | (23.0) | (25.0) | (42.9) | (39.6) | (36.0) | (28.9) | (35.8) | (35.0) | (38.5) | (41.4) | (44.4) | (47.1) | (49.9) | (52.9) | (56.1) | (59.4) | (460.5) |
| Health benefits - active - Non-Public Safety | (35.9) | (32.7) | (31.3) | (28.8) | (23.0) | (19.0) | (13.5) | (13.0) | (13.6) | (14.5) | (15.6) | (16.5) | (17.5) | (18.5) | (19.6) | (20.8) | (163.1) |
| Other benefits - Public Safety | (27.4) | (18.6) | (16.3) | (18.4) | (16.8) | (18.5) | (13.4) | (14.1) | (14.7) | (15.0) | (15.3) | (15.6) | (16.4) | (16.8) | (17.1) | (17.4) | (155.9) |
| Other benefits - Non-Public Safety | (23.0) | (15.6) | (13.7) | (15.5) | (14.1) | (15.5) | (10.8) | (10.8) | (10.7) | (10.9) | (11.0) | (11.3) | (11.5) | (11.7) | (11.9) | (12.2) | (112.7) |
| Professional and contractual services | (115.1) | (124.9) | (113.1) | (78.1) | (97.9) | (76.3) | (52.6) | (62.7) | (59.2) | (56.1) | (56.9) | (53.1) | (52.2) | (51.2) | (54.1) | (51.3) | (549.4) |
| Materials & supplies | (88.1) | (72.4) | (61.4) | (69.1) | (64.0) | (63.2) | (66.0) | (34.8) | (34.8) | (35.0) | (34.7) | (34.1) | (33.7) | (33.3) | (33.3) | (33.6) | (373.4) |
| Utilities | (35.6) | (38.7) | (27.9) | (30.1) | (27.1) | (21.4) | (26.1) | (26.7) | (26.7) | (26.5) | (26.6) | (26.7) | (26.9) | (27.1) | (27.4) | (27.9) | (268.6) |
| Purchased services | (15.3) | (14.7) | (11.8) | (8.8) | (8.1) | (5.5) | (17.4) | (23.3) | (23.3) | (23.8) | (23.7) | (23.3) | (23.2) | (22.9) | (23.0) | (23.2) | (227.1) |
| Risk management and insurance | (63.2) | (51.7) | (54.4) | (63.6) | (40.1) | (43.5) | (35.8) | (43.7) | (44.1) | (44.6) | (45.0) | (45.5) | (45.9) | (46.4) | (46.8) | (47.3) | (445.1) |
| Maintenance capital | (43.1) | (22.6) | (9.2) | (12.3) | (12.6) | (14.0) | (5.9) | (6.0) | (6.1) | (6.1) | (6.2) | (6.2) | (6.3) | (6.4) | (6.4) | (6.5) | (62.0) |
| Other expenses | (43.9) | (33.1) | (48.5) | (6.5) | (28.7) | (37.6) | (34.9) | (39.7) | (36.4) | (35.8) | (35.2) | (35.2) | (35.3) | (35.3) | (35.4) | (35.5) | (358.7) |
| Contributions to non enterprise funds | (55.0) | (41.7) | (37.0) | (18.2) | (19.8) | (18.4) | (11.4) | (34.4) | (37.5) | (18.1) | (18.4) | (18.7) | (18.9) | (19.3) | (19.6) | (19.9) | (216.1) |
| DDOT subsidy | (92.8) | (55.2) | (57.7) | (50.3) | (61.7) | (25.0) | (36.8) | (36.9) | (40.1) | (42.4) | (44.9) | (47.2) | (49.7) | (52.2) | (54.8) | (57.5) | (462.5) |
| Grant related expenses (operating) | (2.3) | (2.8) | (1.4) | (2.5) | (1.4) | (0.4) | - | - | - | - | - | - | - | - | - | - | |
| Operating expenditures | (1,125.3) | (1,030.1) | (970.7) | (891.2) | (860.8) | (714.5) | (669.3) | (699.5) | (714.3) | (706.0) | (720.1) | (729.6) | (751.5) | (765.2) | (784.1) | (798.6) | (7,338.2) |
| **Net operating surplus** | 276.4 | 339.8 | 328.0 | 434.1 | 345.6 | 425.6 | 411.0 | 371.1 | 350.0 | 327.4 | 315.0 | 304.1 | 279.7 | 260.9 | 234.0 | 224.5 | 3,077.7 |
| Debt service (LTGO) | (66.6) | (105.9) | (63.2) | (64.2) | (62.3) | (71.4) | (77.8) | (59.2) | (59.2) | (38.9) | (38.8) | (38.8) | (38.9) | (39.3) | (37.6) | (37.5) | (466.0) |
| Debt service (LTGO - DDOT) | - | (0.3) | (0.3) | (0.3) | (0.3) | (1.1) | (0.3) | (2.9) | (2.9) | - | - | - | - | - | - | - | (6.1) |
| Debt service (UTGO) | (67.2) | (71.5) | (72.4) | (72.8) | (73.0) | (70.6) | (66.5) | (62.6) | (57.7) | (57.6) | (56.5) | (54.1) | (53.4) | (52.7) | (37.7) | (33.9) | (532.8) |
| POC - principal and interest (Governmental) | (34.5) | (31.4) | (34.9) | (45.0) | (44.5) | (47.6) | (51.7) | (52.6) | (54.3) | (56.0) | (57.7) | (56.4) | (57.0) | (57.6) | (58.1) | (58.6) | (560.1) |
| POC - principal and interest (EF, excl. DDOT) | (5.2) | (5.2) | (5.8) | (6.7) | (7.4) | (8.1) | (8.8) | (9.1) | (9.4) | (9.7) | (10.0) | (9.7) | (9.9) | (10.0) | (10.1) | (10.1) | (96.7) |
| POC - principal and interest (DDOT) | (2.8) | (2.8) | (3.2) | (3.6) | (4.0) | (4.4) | (4.8) | (4.9) | (5.1) | (5.2) | (5.4) | (5.3) | (5.3) | (5.4) | (5.5) | (5.5) | (52.5) |
| POC - principal and interest (General Fund grant) | (0.3) | (0.3) | (0.3) | (0.3) | (0.4) | (1.1) | (1.3) | (2.3) | (2.4) | (2.4) | (2.5) | (2.5) | (2.5) | (2.5) | (2.5) | (2.6) | (23.5) |
| POC - swaps (Governmental) | (35.5) | (39.5) | (40.2) | (39.5) | (39.5) | (39.2) | (39.3) | (38.9) | (38.9) | (38.9) | (38.9) | (38.9) | (38.2) | (37.5) | (36.9) | (36.3) | (382.6) |
| POC - swaps (EF, excl. DDOT) | (3.0) | (3.4) | (3.4) | (3.4) | (3.4) | (3.4) | (3.4) | (3.4) | (3.4) | (3.4) | (3.4) | (3.4) | (3.4) | (3.3) | (3.3) | (3.2) | (33.7) |
| POC - swaps (DDOT) | (1.6) | (1.8) | (1.9) | (1.8) | (1.8) | (1.9) | (1.9) | (1.9) | (1.9) | (1.9) | (1.9) | (1.9) | (1.8) | (1.8) | (1.8) | (1.7) | (18.3) |
| POC - swaps (General Fund grant) | (0.3) | (0.4) | (0.4) | (0.4) | (0.4) | (1.4) | (1.3) | (1.7) | (1.7) | (1.7) | (1.7) | (1.7) | (1.6) | (1.6) | (1.6) | (1.6) | (16.6) |
| Pension contributions - Public Safety | (47.6) | (37.9) | (32.6) | (91.8) | (58.8) | (50.2) | (133.1) | (156.0) | (172.4) | (180.7) | (207.9) | (209.8) | (214.6) | (215.5) | (212.7) | (211.7) | (1,923.3) |
| Pension contributions - Non-Public Safety | (10.7) | (11.5) | (1.7) | (9.4) | (7.6) | (4.0) | (32.8) | (36.5) | (40.4) | (44.9) | (49.9) | (52.4) | (55.0) | (57.4) | (59.9) | (62.1) | (491.3) |
| Pension contributions - DDOT | (6.8) | (7.3) | (6.9) | (9.5) | (10.9) | (2.8) | (23.6) | (27.7) | (31.2) | (34.8) | (38.7) | (40.6) | (42.7) | (44.5) | (46.6) | (48.3) | (378.9) |
| Pension contributions - General Fund grant | (1.0) | (0.7) | (0.9) | (1.7) | (1.0) | (2.4) | (6.4) | (9.4) | (10.4) | (11.5) | (12.6) | (12.9) | (13.3) | (13.5) | (13.6) | (13.8) | (117.5) |
| Health benefits - retiree - Public Safety | (73.7) | (80.2) | (70.4) | (79.6) | (90.6) | (83.1) | (89.4) | (94.4) | (97.5) | (102.0) | (106.3) | (112.2) | (118.0) | (124.6) | (130.7) | (136.9) | (1,112.0) |
| Health benefits - retiree - Non-Public Safety | (47.4) | (51.6) | (50.6) | (49.0) | (49.2) | (51.5) | (36.4) | (38.3) | (39.6) | (41.4) | (43.2) | (45.6) | (47.9) | (50.6) | (53.1) | (55.0) | (451.7) |
| Health benefits - retiree - DDOT | nav | (12.2) | (10.4) | (11.8) | (12.1) | (13.2) | (13.9) | (14.6) | (15.1) | (15.8) | (16.5) | (17.4) | (18.3) | (19.3) | (20.3) | (21.2) | (172.3) |
| Health benefits - retiree - General Fund grant | nav | nav | nav | nav | nav | nav | (4.2) | (5.6) | (5.8) | (6.0) | (6.3) | (6.7) | (7.0) | (7.4) | (7.7) | (8.1) | (64.9) |
| Legacy expenditures | (404.4) | (463.9) | (399.7) | (491.0) | (467.3) | (457.3) | (596.9) | (621.9) | (649.2) | (661.8) | (698.3) | (710.2) | (728.8) | (744.6) | (739.6) | (748.9) | (6,900.2) |
| **Deficit (excl. financing proceeds)** | (127.9) | (124.1) | (71.7) | (56.9) | (121.8) | (31.7) | (185.8) | (250.8) | (299.2) | (334.4) | (383.3) | (406.1) | (449.1) | (483.7) | (505.6) | (524.5) | (3,822.5) |
| Financing proceeds | 75.0 | - | 250.0 | - | - | 143.5 | - | - | - | - | - | - | - | - | - | - | |
| **Total surplus (deficit)** | $ (52.9) | $ (124.1) | $ 178.3 | $ (56.9) | $ (121.8) | $ 111.9 | $ (185.8) | $ (250.8) | $ (299.2) | $ (334.4) | $ (383.3) | $ (406.1) | $ (449.1) | $ (483.7) | $ (505.6) | $ (524.5) | $ (3,822.5) |

**Ten-Year Financial Projections**
**General Fund detail view**
*($ in millions)*

| | Fiscal year ended actual | | | | | | Preliminary forecast | | | | | | | | | | 10-year total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | |
| **Reinvestment in the City** | | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | | | | | | | | | | | | |
| Fire | $ - | $ - | $ - | $ - | $ - | $ - | $ 2.0 | $ 8.1 | 6.6 $ | 18.3 $ | 19.0 $ | 6.7 $ | 6.6 $ | 6.6 $ | 6.6 $ | 6.6 | $ 87.0 |
| 36th District Court | - | - | - | - | - | - | - | 5.8 | 8.2 | 8.5 | 8.7 | 9.0 | 9.2 | 9.5 | 9.8 | 10.1 | 78.8 |
| Blight | - | - | - | - | - | - | 6.0 | 50.3 | 4.0 | 4.0 | 4.0 | 4.0 | - | - | - | - | 72.3 |
| Municipal Parking | - | - | - | - | - | - | - | 5.6 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 60.3 |
| DDOT - Transportation | - | - | - | - | - | - | (1.7) | (5.7) | (1.5) | (0.1) | 4.6 | 6.3 | 10.4 | 10.0 | 14.1 | 15.0 | 51.4 |
| Police | - | - | - | - | - | - | - | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 32.6 |
| General Services | - | - | - | - | - | - | 1.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 20.3 |
| Other | - | - | - | - | - | - | 3.2 | 8.1 | 9.4 | 9.7 | 7.3 | 7.3 | 7.4 | 7.4 | 7.5 | 7.5 | 74.9 |
| Sub-total: Revenues initiatives | - | - | - | - | - | - | 10.6 | 78.0 | 39.3 | 53.0 | 56.2 | 45.8 | 46.2 | 46.1 | 50.6 | 51.8 | 477.6 |
| | | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | | | | | | | | | | | | |
| General Services | - | - | - | - | - | - | (5.4) | (14.4) | (14.4) | (14.5) | (14.6) | (14.7) | (14.8) | (14.9) | (15.0) | (15.1) | (137.7) |
| Police | - | - | - | - | - | - | (5.7) | (16.1) | (18.1) | (11.0) | (9.9) | (10.1) | (9.9) | (9.7) | (10.1) | (9.9) | (110.4) |
| Finance/Budget | - | - | - | - | - | - | (2.3) | (7.5) | (4.3) | (4.3) | (1.7) | (2.2) | (2.7) | (3.2) | (3.6) | (4.1) | (35.8) |
| Other | - | - | - | - | - | - | (8.3) | (41.1) | (7.3) | (10.5) | (5.3) | (1.6) | (3.4) | (1.7) | (2.8) | (2.0) | (84.0) |
| Sub-total: Add. operating exp. | - | - | - | - | - | - | (21.7) | (79.1) | (44.2) | (40.2) | (31.5) | (28.6) | (30.7) | (29.5) | (31.5) | (31.2) | (368.0) |
| | | | | | | | | | | | | | | | | | |
| Capital investments | | | | | | | | | | | | | | | | | |
| Technology | - | - | - | - | - | - | (13.3) | (53.8) | (20.3) | (7.8) | (9.9) | (10.5) | (7.4) | (8.8) | (8.8) | (7.5) | (148.0) |
| Capital expenditures and other infrastructure | - | - | - | - | - | - | (52.5) | (71.7) | (50.2) | (48.4) | (42.1) | (41.2) | (36.2) | (36.3) | (34.5) | (34.2) | (447.2) |
| Implementation costs | - | - | - | - | - | - | (6.3) | (12.3) | (5.6) | (0.9) | (1.2) | (1.0) | (2.6) | (1.8) | (1.2) | (1.0) | (33.9) |
| Sub-total: Capital investments | - | - | - | - | - | - | (72.2) | (137.8) | (76.1) | (57.1) | (53.2) | (52.7) | (46.2) | (46.9) | (44.5) | (42.7) | (629.2) |
| | | | | | | | | | | | | | | | | | |
| Blight (excludes heavy commercial) | - | - | - | - | - | - | (5.0) | (95.0) | (100.0) | (100.0) | (100.0) | (100.0) | - | - | - | - | (500.0) |
| | | | | | | | | | | | | | | | | | |
| **Total reinvestment in the City** | - | - | - | - | - | - | (88.2) | (233.9) | (180.9) | (144.3) | (128.5) | (135.4) | (30.7) | (30.2) | (25.4) | (22.0) | (1,019.5) |
| | | | | | | | | | | | | | | | | | |
| **Adjusted surplus (deficit)** | $ (52.9) $ | (124.1) $ | 178.3 $ | (56.9) $ | (121.8) | $ 111.9 $ | (274.1) $ | (484.7) $ | (480.1) $ | (478.7) $ | (511.8) $ | (541.5) $ | (479.8) $ | (513.9) $ | (531.0) $ | (546.5) | $ (4,842.0) |

13-53846-tjt Doc 8279 Filed 12/10/14 Entered 12/10/14 09:24:40 Page 495 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 18:36:38 Page 97 of
204

3/30/2014 11:01 PM

**Ten-Year Financial Projections**
**Funds Available for Unsecured Claims Summary Bridge**
*($ in millions)*

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10 yr total | Note |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Preliminary forecast | | | | | | | |
| **Funds available for unsecured claims - June 2013 Proposal** | $ 30.0 | $ 31.9 | $ 55.5 | $ 32.3 | $ 65.4 | $ 62.0 | $ 152.1 | $ 137.8 | $ 120.2 | $ 116.2 | $ 803.3 | |
| Property taxes | (3.5) | (6.0) | (5.5) | (3.6) | (3.4) | (4.4) | (10.2) | (10.6) | (10.7) | (11.5) | (69.4) | 1 |
| Municipal income taxes | 3.0 | 3.1 | 3.1 | 3.1 | 3.1 | 3.1 | 3.1 | 3.2 | 3.2 | 3.2 | 31.2 | 2 |
| State revenue sharing | 6.7 | 6.7 | 6.7 | 6.7 | 6.7 | 6.7 | 6.7 | 6.7 | 6.7 | 6.7 | 66.7 | 3 |
| Personnel expenses | 16.4 | 10.8 | 4.1 | 2.5 | 1.4 | 0.2 | (9.9) | (11.1) | (11.6) | (12.4) | (9.7) | 4 |
| Reinvestment initiatives | 100.3 | (94.6) | (45.2) | 5.4 | 2.1 | (6.7) | 2.1 | 3.2 | 7.2 | 11.8 | (14.4) | 5 |
| Restructuring professional fees | (22.9) | (10.6) | - | - | - | - | - | - | - | - | (33.5) | 6 |
| Active pension contributions for DDOT (5% of wages) | (1.5) | (1.6) | (1.7) | (1.7) | (1.8) | (1.8) | (1.8) | (1.9) | (1.9) | (2.0) | (17.8) | |
| OPEB payments | (6.1) | (6.4) | (6.7) | (6.8) | (6.9) | (7.1) | (7.4) | (7.5) | (7.6) | (7.8) | (70.3) | 7 |
| UTGO tax millage | - | (41.0) | (37.1) | (37.1) | (36.2) | (34.3) | (33.8) | (33.2) | (21.6) | (18.6) | (292.8) | 8 |
| LTGO secured payments | (7.2) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.4) | (0.4) | (10.1) | |
| POC swaps floating interest payments / settlement | 4.7 | (7.2) | 50.6 | 50.6 | 50.6 | 50.6 | 49.8 | 48.9 | 48.1 | 47.4 | 394.3 | 9 |
| Other | (14.8) | (15.7) | (5.1) | (14.4) | (11.6) | (7.5) | (0.5) | 3.1 | 2.2 | 3.7 | (60.8) | |
| **Funds available for unsecured claims - February 2014 Plan** | $ 105.0 | $ (130.9) | $ 18.3 | $ 36.7 | $ 69.0 | $ 60.5 | $ 149.9 | $ 138.2 | $ 133.8 | $ 136.4 | $ 716.8 | |
| QOL and exit financing and principal and interest | 116.6 | 160.2 | (18.0) | (18.0) | (18.0) | (68.0) | (90.0) | (85.5) | (81.0) | (26.5) | (128.3) | 10 |
| Working capital | (39.8) | 15.0 | - | - | - | - | - | - | - | - | (24.8) | 11 |
| Contingency | - | (12.6) | (10.5) | (10.4) | (10.5) | (10.5) | (10.6) | (10.6) | (10.7) | (10.9) | (97.2) | 12 |
| Deferral | - | 14.2 | 38.1 | 19.2 | (13.6) | 44.3 | (20.8) | (14.4) | (17.0) | (50.1) | - | 13 |
| **Adjusted funds available for unsecured claims - February 2014 Plan** | $ 181.8 | $ 45.8 | $ 27.9 | $ 27.5 | $ 26.9 | $ 26.3 | $ 28.6 | $ 27.7 | $ 25.1 | $ 48.9 | $ 466.5 | |

*Footnotes:*

1. Lower property tax revenues due to continued tax roll clean up and re-assessment assumed to be completed by FY 2020
2. Higher income taxes realized in FY 2013 assumed to carry forward
3. Higher state revenue sharing revenues due to increase in EVIP portion, assumed to carry forward through FY 2023
4. Lower personnel costs due to lower actual headcount in FY 2014, ramp up begins FY 2015. 5% wage increase assumed for public safety employees in FY 2020
5. Higher operating and capital investment expenses partially offset by higher revenues as a result of reinvestment activities
6. Higher restructuring professional fees due to higher than anticipated litigation activity and addition of costs related to retiree committee advisors
7. Reflects assumed OPEB payments for future retirees at 2% of wages, previously not reflected
8. Reduced millage to reflect treatment of UTGO as unsecured and corresponding reduction in property tax revenues
9. Assumes payments to swap counterparties based on the interest rate spread (i.e. fixed rate less the floating rate). Payments are assumed to be made monthly between January and October 2014, at which point the remaining balance of $85m is paid (~$42m)
10. Assumes QOL financing proceeds of $118m in FY 2014 and $175m of net additional proceeds from exit financing in FY 2015. Exit financing assumes 8 year note funded 10/31/2014 with interest only payments in first 4 years and equal principal payments made in years 5 through 8
11. Primarily relates to past due vendor payments and self insurance escrow funding activity
12. Amounts reserved for unexpected events
13. Reflects timing adjustment of reinvestment initiatives to maintain minimum liquidity levels and avoid annual deficits

13-53846-tit Doc 8772 Filed 12/10/14 Entered 12/10/14 09:24:49 Page 496 of 602
13-53846-swr Doc 6382 Filed 03/31/14 Entered 03/31/14 18:36:58 Page 98 of 91
204

3/30/2014 11:01 PM

**Ten-Year Financial Projections**
**Funds Available for Unsecured Claims Detailed Bridge**

*($ in millions)*

| | | 2014 | 2015 | 2016 | 2017 | Preliminary forecast 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10 yr total | Note |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Funds available for unsecured claims - June 2013 Proposal** | $ | 30.0 | $ 31.9 | $ 55.5 | $ 32.3 | $ 65.4 | $ 62.0 | $ 152.1 | $ 137.8 | $ 120.2 | $ 116.2 | $ 803.3 | |
| Property taxes | | (3.5) | (6.0) | (5.5) | (3.6) | (3.4) | (4.4) | (10.2) | (10.6) | (10.7) | (11.5) | (69.4) | 1 |
| Municipal income taxes | | 3.0 | 3.1 | 3.1 | 3.1 | 3.1 | 3.1 | 3.1 | 3.2 | 3.2 | 3.2 | 31.2 | 2 |
| Wagering taxes | | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (1.0) | |
| Utility users' taxes | | (14.2) | (3.5) | (3.5) | (3.5) | (3.5) | (3.6) | (3.6) | (3.6) | (3.7) | (3.7) | (46.2) | 3 |
| Other taxes | | (3.3) | (3.3) | (3.3) | (3.3) | (3.3) | (3.3) | (3.3) | (3.3) | (3.3) | (3.3) | (33.4) | 4 |
| State revenue sharing | | 6.7 | 6.7 | 6.7 | 6.7 | 6.7 | 6.7 | 6.7 | 6.7 | 6.7 | 6.7 | 66.7 | 5 |
| Sales and charges for services revenue | | 6.7 | (1.4) | (2.4) | (3.3) | (4.2) | (5.2) | (6.3) | (7.7) | (9.8) | (10.1) | (43.7) | 6 |
| Other revenue | | 1.2 | 14.7 | 13.3 | 1.8 | 0.5 | 0.7 | 1.0 | 1.3 | 1.5 | 1.8 | 37.9 | 7 |
| General Fund reimbursements | | (3.9) | 11.4 | 11.5 | (8.9) | (8.9) | (8.9) | (8.9) | (8.9) | (8.9) | (8.9) | (43.1) | 8 |
| General Fund transfers in | | 4.9 | 2.8 | 3.1 | 3.1 | 3.2 | 3.0 | 3.0 | 3.0 | 3.1 | 3.2 | 32.4 | 9 |
| Personnel expenses | | | | | | | | | | | | | |
| Salary and wages | | 20.3 | 11.3 | 5.2 | 4.2 | 3.9 | 3.2 | (4.7) | (5.1) | (5.1) | (5.2) | 28.0 | 10 |
| Overtime | | (5.8) | (5.4) | (4.9) | (5.1) | (5.1) | (5.2) | (6.2) | (6.3) | (6.3) | (6.4) | (56.5) | 11 |
| Active health benefits | | 2.8 | 6.8 | 6.2 | 6.1 | 5.6 | 5.5 | 4.9 | 4.4 | 4.0 | 3.4 | 49.8 | 12 |
| Other benefits / fringe | | (0.9) | (2.0) | (2.5) | (2.7) | (2.9) | (3.2) | (4.0) | (4.2) | (4.2) | (4.3) | (30.9) | 13 |
| Operating expenses | | (3.2) | (8.6) | (4.5) | (0.9) | 2.2 | 6.4 | 9.7 | 13.3 | 14.2 | 15.9 | 44.5 | 14 |
| DDOT operating subsidy | | (4.7) | (1.7) | (2.2) | (1.8) | (1.4) | (1.0) | (0.6) | (0.2) | 0.2 | 0.5 | (12.8) | 15 |
| Other contributions/subsidies | | 4.7 | (14.7) | (14.7) | 5.5 | 5.9 | 6.1 | 6.3 | 6.6 | 6.8 | 7.1 | 19.5 | 16 |
| Other expenses | | 3.5 | (1.2) | 2.3 | 3.0 | 3.7 | 3.8 | 3.9 | 4.0 | 4.0 | 4.0 | 31.0 | 17 |
| Reinvestment initiatives | | | | | | | | | | | | | |
| Reinvestment capital investments | | 35.6 | (63.4) | (37.3) | (5.2) | (19.9) | (21.9) | (17.7) | (17.4) | (16.0) | (13.6) | (176.8) | 18 |
| Reinvestment revenues/operating expenses | | 64.7 | (31.2) | (7.9) | 10.6 | 22.0 | 15.2 | 19.8 | 20.6 | 23.2 | 25.4 | 162.4 | 19 |
| Restructuring professional fees | | (22.9) | (10.6) | - | - | - | - | - | - | - | - | (33.5) | 20 |
| Active pension contributions for DDOT (5% of wages) | | (1.5) | (1.6) | (1.7) | (1.7) | (1.8) | (1.8) | (1.8) | (1.9) | (1.9) | (2.0) | (17.8) | |
| OPEB payments | | (6.1) | (6.4) | (6.7) | (6.8) | (6.9) | (7.1) | (7.4) | (7.5) | (7.6) | (7.8) | (70.3) | 21 |
| POC principal & interest reimbursement | | 0.1 | (1.6) | (3.0) | (3.1) | (3.2) | (2.9) | (2.9) | (2.9) | (3.0) | (3.1) | (25.4) | 22 |
| Increased tax revenues | | (5.9) | (6.1) | 0.9 | (0.7) | (0.8) | (1.0) | 3.3 | 3.6 | 2.0 | 0.9 | (3.9) | 23 |
| UTGO tax millage | | - | (41.0) | (37.1) | (37.1) | (36.2) | (34.3) | (33.8) | (32.3) | (21.6) | (18.6) | (292.8) | 24 |
| LTGO secured payments | | (7.2) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.4) | (0.4) | (10.1) | |
| POC swaps floating interest payments / settlement | | 4.7 | (7.2) | 50.6 | 50.6 | 50.6 | 50.6 | 49.8 | 48.9 | 48.1 | 47.4 | 394.3 | 25 |
| Other | | (0.7) | (2.5) | (2.5) | (2.2) | (1.8) | (1.5) | (2.0) | (1.9) | (0.9) | (0.6) | (16.5) | |
| **Funds available for unsecured claims - February 2014 Plan** | $ | 105.0 | $ (130.9) | $ 18.3 | $ 36.7 | $ 69.0 | $ 60.5 | $ 149.9 | $ 138.2 | $ 133.8 | $ 136.4 | $ 716.8 | |

*Footnotes:*

1. Continued tax roll clean up and re-assessment assumed to be completed by FY 2020
2. Higher income taxes realized in FY 2013 assumed to carry forward
3. FY 2014 reflects full Public Lighting Authority contribution in calendar year 2013. ~$3m decrease due to lower utility usage
4. Interest and penalties on taxes beginning FY 2013 assumed to be distributed to other taxing authorities based on updated information from the City
5. Revised forecast from State, EVIP ~$6m higher annually
6. $18m as a result of Vital Records transferred to Wayne County and lower revenues in certain departments due to FY 2013 actual run-rate updates
7. Higher Parking Dept. revenues due to FY 2013 actual run-rate updates and FY 2015 and 2016 include additional SAFER grant awarded
8. $48m Streets Fund reimbursement eliminated as Solid Waste operations assumed to be outsourced, associated expense also eliminated
9. Reflects revenue from non-General Fund entities (excl. DDOT). POC expense allocation revised to reflect updated information received from the City
10. Primarily due to public safety actual headcount lower than projected in FY 2014, ramp up beginning FY 2015. 5% wage increase assumed for public safety employees in FY 2020
11. Police Dept. run-rate increased to align with historicals (12 hour shift and expected efficiencies eliminated)
12. Primarily due to medical plan design with lower cost per head for non-public safety active employees
13. Revised forecast developed by specific other benefit/fringe by funding group, previously applied growth rate to actual expense recorded
14. $18m lower supplies costs due to Vital Records operations transfer; $40m lower maintenance costs due to Solid Waste outsourcing. Lower costs partially offset by increases due to FY 2013 run-rate updates
15. Higher DDOT subsidy due to FY 2013 run-rate updates of revenues and operating expenditures
16. Reflects transfers out for debt service/lease payments removed from the projections as debt matured and payments will no longer be made ($19m Finance and $5m Police)
17. Reflects non-recurring capital outlay expenses removed from the projections, partially offset by higher bank fees from tax return scanning/processing and Planning & Development cost re-allocation from grant to General Fund
18. Primarily due to higher capital expenditures and technology capital investments
19. Reflects higher revenues partially offset by higher operating expenses as a result of reinvestment activities
20. Higher restructuring professional fees due to higher than anticipated litigation activity and addition of costs related to retiree committee advisors
21. Reflects assumed OPEB payments for future retirees at 2% of wages, previously not reflected
22. Reflects POC principal and interest reimbursement (revenue) that is eliminated as claim is unsecured. POC principal and interest reimbursements higher due to change in allocation methodology as detailed in Note 9
23. Higher tax revenues due to reinvestment activities, based on revised forecast
24. Reduced millage to reflect treatment of UTGO as unsecured and corresponding reduction in property tax revenues
25. Assumes payments to swap counterparties based on new contractual fixed rate less the floating rate. Payments are assumed to be made monthly between January and October 2014, at which point the remaining balance of $85m is paid (~$42m)

# Appendix A
## General Fund Department detail

Note: Civic Center, Former Cost Center, and DWDD have been excluded from
the presentation as they do not contribute to the forecast and have minimal
impact in historical years.

13-53846-tjt Doc 8739 Filed 12/16/14 Entered 12/16/14 08:24:49 Page 498 of 602
13-53846-swr Doc 3382-2 Filed 03/31/14 Entered 03/31/14 18:56:38 Page 100 of
204

3/30/2014 11:01 PM

**Ten-Year Financial Projections**
**Budget - general fund**
*($ in millions)*

|  | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | - | - | 0.0 | 0.0 | 0.0 | 0.0 | - | - | - | - | - | - | - | - | - | - |
| Revenue from use of assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | 0.0 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total revenues** | 0.0 | - | 0.0 | 0.0 | 0.0 | 0.0 | - | - | - | - | - | - | - | - | - | - |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (1.4) | (1.4) | (1.2) | (1.1) | (1.1) | (0.9) | (1.0) | (1.0) | (1.0) | (1.1) | (1.1) | (1.1) | (1.1) | (1.1) | (1.2) | (1.2) |
| Overtime | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Pension | (0.0) | (0.0) | (0.0) | (0.0) | (0.1) | (0.1) | (0.6) | (0.8) | (0.9) | (1.0) | (1.1) | (1.1) | (1.2) | (1.2) | (1.3) | (1.4) |
| Medical & fringe benefits | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.7) | (0.8) | (0.8) | (0.9) | (0.9) | (0.9) | (1.0) | (1.0) | (1.1) | (1.1) | (1.2) |
| Professional and contractual services | - | (0.0) | 0.0 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Materials & supplies | (0.1) | (0.2) | (0.0) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Utilities | (0.0) | (0.0) | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Purchased services | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Risk management and insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | (0.2) | (0.1) | (0.2) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Debt service | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest (1) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) |
| Transfers out | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (2.6) | (2.6) | (2.4) | (2.3) | (2.4) | (2.2) | (3.1) | (3.3) | (3.5) | (3.7) | (3.9) | (4.0) | (4.1) | (4.3) | (4.4) | (4.5) |
| **Total surplus (deficit)** | $ (2.6) | $ (2.6) | (2.4) | $ (2.3) | (2.4) | $ (2.2) | $ (3.1) | $ (3.3) | $ (3.5) | $ (3.7) | $ (3.9) | $ (4.0) | $ (4.1) | $ (4.3) | $ (4.4) | (4.5) |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| *Expenses* | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Technology | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Capital expenditures and other infrastructure | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| **Operational restructuring** | | | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| **Adjusted surplus (deficit)** | | | | | | $ (2.2) | $ (3.1) | $ (3.3) | $ (3.5) | $ (3.7) | $ (3.9) | $ (4.0) | $ (4.1) | $ (4.3) | $ (4.4) | (4.5) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

**Ten-Year Financial Projections**
**Budget - general fund - Key assumptions**

| | | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 22 | 23 | 20 | 16 | 15 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 |
| Average salary & wages (1) | $ 62,323 | $ 62,796 | $ 62,338 | $ 71,811 | $ 73,322 | $ 57,557 | $ 64,173 | $ 65,456 | $ 66,765 | $ 68,100 | $ 69,462 | $ 70,852 | $ 72,269 | $ 73,714 | $ 75,188 | 76,692 |
| Average overtime | 864 | 891 | 925 | 1,177 | 1,022 | 1,583 | 1,765 | 1,800 | 1,836 | 1,873 | 1,910 | 1,948 | 1,987 | 2,027 | 2,068 | 2,109 |
| | $ 63,187 | $ 63,687 | $ 63,263 | $ 72,988 | $ 74,344 | $ 59,140 | $ 65,937 | $ 67,256 | $ 68,601 | $ 69,973 | $ 71,372 | $ 72,800 | $ 74,256 | $ 75,741 | $ 77,256 | 78,801 |
| Overtime as a % of salary & wages | 1.4% | 1.4% | 1.5% | 1.6% | 1.4% | 2.7% | 2.7% | 2.7% | 2.7% | 2.7% | 2.7% | 2.7% | 2.7% | 2.7% | 2.7% | 2.7% |
| Pension as a % of salary & wages | | | | | | 9.5% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| Medical & fringe as a % of salary & wages | 44.4% | 40.8% | 46.3% | 50.6% | 55.5% | 76.8% | 81.3% | 82.6% | 83.9% | 85.9% | 87.8% | 90.4% | 92.8% | 95.6% | 98.0% | 100.4% |

---

| Key Items | Comment/Reference |
|---|---|
| Expenses | |
|   Personnel expenses | Appendix C.1 - Appendix C.3 |
|   Other expenses | Primarily building rental expense |

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Additional Department employees | | | | | | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |

(1) Based on department salaries & wages and employees, see Appendix C.2.

13-53846-tjt Doc 8783-2 Filed 12/16/14 Entered 12/16/14 08:21:40 Page 500 of 602
13-53846-swr Doc 3362-2 Filed 03/31/14 Entered 03/31/14 16:56:30 Page 102 of
204
3/30/2014 11:01 PM

**Ten-Year Financial Projections**
**DPW - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | | | | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | 0.0 | 0.0 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | 4.3 | 2.4 | 5.1 | 2.7 | 3.5 | 5.6 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | 2.8 | 2.9 | 1.8 | 0.1 | (0.4) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Revenue from use of assets | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | 0.7 | 1.3 | 0.2 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | 0.0 | 1.0 | 0.4 | 0.0 | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | 0.2 | 0.6 | 0.1 | 0.3 | 0.0 | 0.3 | - | - | - | - | - | - | - | - | - | - |
| **Total revenues** | 8.1 | 8.3 | 7.6 | 3.1 | 3.1 | 6.0 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (7.6) | (7.5) | (3.6) | (2.3) | (1.8) | (0.9) | (0.7) | (0.8) | (0.8) | (0.8) | (0.9) | (0.9) | (0.9) | (0.9) | (0.9) | (0.9) |
| Overtime | (0.3) | (0.2) | (0.1) | (0.0) | (0.1) | (0.1) | (0.0) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Pension | (1.2) | (1.0) | (0.5) | (0.1) | (0.1) | (0.1) | (0.4) | (0.6) | (0.7) | (0.8) | (0.9) | (0.9) | (1.0) | (1.0) | (1.0) | (1.1) |
| Medical & fringe benefits | (4.0) | (3.8) | (2.0) | (1.3) | (1.3) | (0.4) | (1.0) | (1.2) | (1.2) | (1.3) | (1.3) | (1.4) | (1.4) | (1.5) | (1.6) | (1.7) |
| Professional and contractual services | (0.8) | (0.8) | (0.5) | (0.3) | (0.2) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Materials & supplies | 0.0 | (0.1) | (0.0) | 0.0 | (0.0) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Utilities | (2.3) | (1.0) | (0.2) | (0.3) | (0.0) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Purchased services | (0.1) | (0.1) | 0.0 | 0.0 | 0.0 | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) |
| Risk management and insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | (1.0) | (1.0) | (0.6) | (0.6) | (0.3) | (0.6) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) |
| Debt service | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (0.4) | (0.4) | (0.5) | (0.5) | (0.5) | (0.4) | (0.3) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) |
| Transfers out | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (17.8) | (15.9) | (7.9) | (5.4) | (4.4) | (2.6) | (3.0) | (3.5) | (3.7) | (3.9) | (4.1) | (4.2) | (4.3) | (4.5) | (4.6) | (4.7) |
| **Total surplus (deficit)** | $ (9.7) | (7.6) | (0.3) | (2.3) | (1.3) | $ 3.4 | 0.7 | 0.2 | (0.0) | (0.2) | (0.4) | (0.5) | (0.6) | (0.8) | (0.9) | (1.0) |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Expenses | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Technology | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Capital expenditures and other infrastructure | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| **Operational restructuring** | | | | | | $ - | $ - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| **Adjusted surplus (deficit)** | | | | | | $ 3.4 | 0.7 | 0.1 | (0.0) | (0.2) | (0.4) | (0.5) | (0.6) | (0.8) | (0.9) | (1.1) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

**Ten-Year Financial Projections**
**DPW - general fund - Key assumptions**

| | | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 184 | 179 | 123 | 114 | 114 | 41 | 14 | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 19 |
| Average salary & wages(1) | $ 30,107 | $ 30,392 | $ 35,862 | $ 30,300 | $ 32,448 | $ 31,439 | $ 33,550 | $ 34,154 | $ 34,837 | $ 35,534 | $ 36,245 | $ 36,970 | $ 37,709 | $ 38,463 | $ 39,233 | 40,017 |
| Average overtime | 1,609 | 1,151 | 523 | 383 | 828 | 1,505 | 3,346 | 3,039 | 3,100 | 3,162 | 3,225 | 3,290 | 3,355 | 3,422 | 3,491 | 3,561 |
| | $ 31,715 | $ 31,543 | $ 36,385 | $ 30,683 | $ 33,275 | $ 32,943 | $ 36,896 | $ 37,193 | $ 37,937 | $ 38,696 | $ 39,470 | $ 40,259 | $ 41,064 | $ 41,886 | $ 42,723 | 43,578 |
| Overtime as a % of salary & wages | 3.9% | 2.8% | 1.8% | 1.9% | 5.1% | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% |
| Pension as a % of salary & wages | | | | | | 7.1% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| Medical & fringe as a % of salary & wages | 53.0% | 50.8% | 55.9% | 55.7% | 69.0% | 47.9% | 158.4% | 142.6% | 144.9% | 148.6% | 152.1% | 157.0% | 161.6% | 166.8% | 171.3% | 175.9% |

| Key Items | Comment/Reference |
|---|---|
| Revenues | |
|   Licenses, permits and inspection charges | Inspection charges and street-use permits. FY 2013 includes payment from utilities for permits to complete work over several years. |
| Expenses | |
|   Personnel expenses | Appendix C.1 - Appendix C.3 |
| | Department moved positions between DPW general fund and DPW street fund in FY 2014 and FY 2015 to more accurately capture costs. |
|   Professional and contractual services | Contracted repair services |
|   Other expenses | Building rental expenses |

**Operational restructuring**

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Additional Department employees | | | | | - | - | - | - | - | - | - | - | - | - | - | - |

(1) Based on department salaries & wages and employees, see Appendix C.2.

**Ten-Year Financial Projections**
**Finance - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | 18.9 | 8.2 | 4.4 | 3.0 | 3.5 | 0.6 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| Revenue from use of assets | 0.0 | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Parking/court fines and other revenue | 0.1 | 0.6 | 1.3 | 0.7 | (0.1) | 0.0 | - | - | - | - | - | - | - | - | - | - |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | 3.5 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | 4.6 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total revenues** | 23.6 | 12.4 | 5.8 | 3.7 | 3.3 | 0.6 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (14.5) | (15.0) | (14.0) | (12.9) | (11.6) | (10.0) | (9.8) | (10.0) | (9.7) | (9.9) | (10.1) | (10.3) | (10.5) | (10.7) | (11.0) | (11.2) |
| Overtime | (1.2) | (1.0) | (0.7) | (0.8) | (0.8) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.8) | (0.8) | (0.8) | (0.8) |
| Pension | (0.5) | (0.3) | (0.4) | (0.7) | (0.9) | (1.1) | (6.2) | (7.4) | (8.2) | (9.1) | (10.2) | (10.7) | (11.2) | (11.7) | (12.2) | (12.7) |
| Medical & fringe benefits | (7.4) | (6.9) | (7.0) | (6.9) | (7.2) | (8.1) | (11.3) | (11.8) | (12.1) | (12.6) | (13.2) | (13.8) | (14.5) | (15.3) | (16.0) | (16.8) |
| Professional and contractual services | (2.9) | (8.2) | (5.1) | (6.9) | (5.2) | (3.6) | (3.6) | (3.6) | (3.6) | (3.7) | (3.7) | (3.7) | (3.8) | (3.8) | (3.9) | (3.9) |
| Materials & supplies | (0.4) | (0.3) | (0.3) | (0.3) | (0.2) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.2) | (0.2) |
| Utilities | (0.3) | (0.2) | (0.2) | (0.2) | (0.2) | (0.0) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) |
| Purchased services | (0.1) | (0.1) | (0.2) | (0.1) | (0.0) | (0.2) | (0.2) | (0.2) | (0.2) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) |
| Risk management and insurance | 0.0 | - | (0.1) | - | (0.3) | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | (3.2) | (3.1) | (5.4) | (2.7) | (2.8) | (3.3) | (4.2) | (4.2) | (4.2) | (4.2) | (4.3) | (4.3) | (4.3) | (4.3) | (4.3) | (4.4) |
| Debt service | (0.0) | 0.3 | (0.0) | (0.1) | (0.0) | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (2.7) | (2.8) | (3.0) | (3.3) | (3.5) | (3.4) | (4.4) | (4.6) | (4.6) | (4.8) | (4.9) | (4.8) | (4.8) | (4.8) | (4.9) | (4.9) |
| Transfers out | - | (1.0) | (1.0) | (0.9) | (1.7) | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (33.1) | (38.6) | (37.5) | (35.8) | (34.7) | (30.7) | (40.8) | (42.9) | (43.7) | (45.6) | (47.6) | (49.0) | (50.5) | (52.1) | (53.7) | (55.2) |
| **Total surplus (deficit)** | $ (9.6) | $ (26.2) | $ (31.6) | $ (32.1) | $ (31.4) | $ (30.0) | $ (40.6) | $ (42.7) | $ (43.5) | $ (45.4) | $ (47.4) | $ (48.8) | $ (50.3) | $ (51.9) | $ (53.5) | $ (55.0) |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | $ - | $ 0.5 | $ 1.0 | $ 1.0 | $ 1.0 | $ 1.1 | $ 1.1 | $ 1.1 | 1.1 |
| *Expenses* | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | (2.3) | (7.5) | (4.3) | (4.3) | (1.7) | (2.2) | (2.7) | (3.2) | (3.6) | (4.1) |
| Technology | | | | | | - | (9.8) | (35.9) | (8.4) | (4.3) | (6.5) | (6.6) | (4.1) | (5.2) | (5.5) | (4.2) |
| Capital expenditures and other infrastructure | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Implementation costs | | | | | | - | (2.5) | (5.5) | (3.4) | (0.5) | (0.9) | (0.6) | (1.4) | (0.6) | (0.9) | (0.6) |
| Subtotal: Expenses | | | | | | - | (14.6) | (48.9) | (16.1) | (9.2) | (9.1) | (9.5) | (8.2) | (9.0) | (10.0) | (8.9) |
| **Operational restructuring** | | | | | | $ - | $ (14.6) | $ (48.9) | $ (15.6) | $ (8.2) | $ (8.1) | $ (8.4) | $ (7.2) | $ (8.0) | $ (8.9) | (7.8) |
| **Adjusted surplus (deficit)** | | | | | | $ (30.0) | $ (55.1) | $ (91.6) | $ (59.1) | $ (53.6) | $ (55.5) | $ (57.2) | $ (57.5) | $ (59.9) | $ (62.4) | (62.8) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

13-53846-tjt Doc 8772 Filed 12/16/14 Entered 12/16/14 08:24:03 Page 593 of 602
13-53846-swr Doc 7382-2 Filed 09/11/14 Entered 09/11/14 16:36:38 Page 105 of 114
204

3/30/2014 11:01 PM

**Ten-Year Financial Projections**
**Finance - general fund - Key assumptions**

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 327 | 310 | 285 | 266 | 235 | 228 | 216 | 216 | 206 | 206 | 206 | 206 | 206 | 206 | 206 | 206 |
| | | | | | | | | | | | | | | | | |
| Average salary & wages(1) | $ 44,290 | $ 48,404 | $ 49,213 | $ 48,545 | $ 49,479 | $ 44,131 | $ 45,415 | $ 46,323 | $ 47,249 | $ 48,194 | $ 49,158 | $ 50,141 | $ 51,144 | $ 52,167 | $ 53,211 | 54,275 |
| Average overtime | 3,822 | 3,175 | 2,398 | 2,920 | 3,280 | 3,203 | 3,296 | 3,362 | 3,429 | 3,497 | 3,567 | 3,639 | 3,712 | 3,786 | 3,861 | 3,939 |
| | $ 48,113 | $ 51,580 | $ 51,611 | $ 51,465 | $ 52,759 | $ 47,333 | $ 48,710 | $ 49,685 | $ 50,678 | $ 51,692 | $ 52,726 | $ 53,780 | $ 54,856 | $ 55,953 | $ 57,072 | 58,213 |
| | | | | | | | | | | | | | | | | |
| Overtime as a % of salary & wages | 8.6% | 6.6% | 4.9% | 6.0% | 6.6% | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% |
| Pension as a % of salary & wages | | | | | | 10.5% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| Medical & fringe as a % of salary & wages | 50.9% | 46.3% | 50.1% | 53.8% | 62.1% | 81.1% | 115.7% | 117.8% | 123.8% | 127.0% | 130.0% | 134.1% | 137.9% | 142.3% | 146.1% | 149.9% |

| Key Items | Comment/Reference |
|---|---|
| Revenues | |
| Sales and charges for services | Pension system reimbursements, which are recorded in Non-Departmental beginning in FY 2013. The remainder represents interagency billings. |
| Expenses | |
| Personnel expenses | Appendix C.1 - Appendix C.3 |
| | Headcount reductions occur beginning in FY 2016 due to external payroll processing services provider. |
| Professional and contractual services | Other contracts for pension services, assessments, and general accounting |
| Other expenses | Primarily building rental expense and bank service charge |

**Operational restructuring**

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Additional Department employees | - | 55 | 120 | 121 | 121 | 112 | 112 | 112 | 112 | 112 | 112 |

(1) Based on department salaries & wages and employees, see Appendix C.2.

13-53846-tjt Doc 8738-2 Filed 12/16/14 Entered 12/16/14 08:24:49 Page 504 of 602
13-53846-swr Doc 7382-2 Filed 09/11/14 Entered 09/11/14 16:36:38 Page 106 of 204
3/30/2014 11:01 PM

**Ten-Year Financial Projections**
**Fire - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | 2.4 | 2.0 | 1.4 | 1.8 | 0.6 | 2.3 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | 16.2 | 17.6 | 15.9 | 16.3 | 13.1 | 12.6 | 14.9 | 14.9 | 14.9 | 14.9 | 14.9 | 14.9 | 14.9 | 14.9 | 14.9 | 14.9 |
| Revenue from use of assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.3 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | 0.1 | 0.1 | 0.0 | 0.4 | 0.2 | 13.6 | 13.7 | 11.7 | 11.2 | - | - | - | - | - | - | - |
| **Total revenues** | 18.8 | 19.8 | 17.4 | 18.6 | 14.0 | 28.8 | 31.4 | 29.5 | 29.0 | 17.8 | 17.8 | 17.8 | 17.8 | 17.8 | 17.8 | 17.8 |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (86.3) | (88.4) | (85.3) | (84.7) | (81.9) | (69.3) | (66.2) | (70.7) | (71.5) | (72.9) | (74.4) | (75.9) | (79.7) | (81.2) | (82.9) | (84.5) |
| Overtime | (7.5) | (10.1) | (11.5) | (12.7) | (15.1) | (4.9) | (5.6) | (4.2) | (4.3) | (4.4) | (4.5) | (4.6) | (4.8) | (4.9) | (5.0) | (5.1) |
| Pension | (16.7) | (6.9) | (9.2) | (26.4) | (17.3) | (17.0) | (44.8) | (53.2) | (56.5) | (62.0) | (67.9) | (68.6) | (70.1) | (70.4) | (69.5) | (69.2) |
| Medical & fringe benefits | (50.9) | (42.7) | (49.2) | (52.4) | (54.9) | (51.2) | (41.4) | (43.1) | (44.7) | (46.8) | (49.1) | (51.6) | (54.4) | (57.2) | (60.0) | (62.8) |
| Professional and contractual services | (3.0) | (2.9) | (2.6) | (3.0) | (2.9) | (2.9) | (2.9) | (2.9) | (2.9) | (3.0) | (3.0) | (3.0) | (3.0) | (3.1) | (3.1) | (3.1) |
| Materials & supplies | (1.9) | (1.8) | (1.6) | (1.9) | (1.8) | (1.9) | (1.9) | (2.0) | (2.0) | (2.0) | (2.0) | (2.0) | (2.0) | (2.0) | (2.0) | (2.0) |
| Utilities | (1.6) | (3.0) | (1.2) | (2.1) | (1.5) | (1.4) | (1.6) | (1.8) | (1.8) | (1.9) | (1.9) | (1.9) | (2.0) | (2.0) | (2.0) | (2.1) |
| Purchased services | (0.4) | (0.1) | 0.0 | 0.0 | (0.2) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Risk management and insurance | (1.4) | (1.6) | (2.2) | 0.1 | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Other expenses | (0.3) | (1.0) | (1.0) | (0.9) | (0.5) | (0.9) | (1.9) | (1.9) | (1.9) | (2.0) | (2.0) | (2.0) | (2.0) | (2.0) | (2.0) | (2.0) |
| Debt service | (0.0) | - | - | - | - | (0.5) | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (13.0) | (14.0) | (14.7) | (15.3) | (16.0) | (16.8) | (17.6) | (18.1) | (17.6) | (17.9) | (18.1) | (17.9) | (17.8) | (17.8) | (17.7) | (17.7) |
| Transfers out | - | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | (0.0) | 0.0 | - | (0.0) | (0.0) | (0.4) | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (183.1) | (172.4) | (178.6) | (199.3) | (192.1) | (167.2) | (184.0) | (197.9) | (203.4) | (212.8) | (222.8) | (227.5) | (235.8) | (240.7) | (244.2) | (248.6) |
| **Total surplus (deficit)** | $ (164.3) | $ (152.6) | $ (161.2) | $ (180.7) | $ (178.0) | $ (138.4) | $ (152.5) | $ (168.5) | $ (174.4) | $ (195.0) | $ (205.1) | $ (209.7) | $ (218.1) | $ (222.9) | $ (226.5) | $ (230.8) |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ 2.0 | $ 8.1 | $ 6.6 | $ 18.3 | $ 19.0 | $ 6.7 | $ 6.6 | $ 6.6 | $ 6.6 | 6.6 |
| *Expenses* | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | (2.7) | (12.6) | (6.1) | (7.6) | (0.7) | 2.8 | 1.1 | 3.9 | 2.9 | 4.6 |
| Technology | | | | | | - | (0.7) | (0.6) | (0.2) | (0.2) | (0.2) | (0.8) | (0.2) | (0.4) | (0.2) | (0.2) |
| Capital expenditures and other infrastructure | | | | | | - | (15.2) | (19.5) | (17.0) | (16.6) | (11.6) | (17.7) | (9.7) | (10.1) | (8.5) | (8.2) |
| Implementation costs | | | | | | - | (0.3) | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | (18.9) | (32.8) | (23.3) | (24.4) | (12.4) | (15.7) | (8.8) | (6.7) | (5.8) | (3.8) |
| **Operational restructuring** | | | | | | $ - | $ (16.9) | $ (24.6) | $ (16.7) | $ (6.0) | $ 6.6 | $ (9.0) | $ (2.3) | $ (0.1) | $ 0.8 | 2.8 |
| **Adjusted surplus (deficit)** | | | | | | $ (138.4) | $ (169.5) | $ (193.1) | $ (191.1) | $ (201.0) | $ (198.5) | $ (218.7) | $ (220.3) | $ (223.0) | $ (225.7) | (228.0) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

**Ten-Year Financial Projections**
**Fire - general fund - Key assumptions**

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 1,444 | 1,406 | 1,355 | 1,330 | 1,257 | 1,189 | 1,183 | 1,238 | 1,228 | 1,228 | 1,228 | 1,228 | 1,228 | 1,228 | 1,228 | 1,228 |
| Average salary & wages(1) | $ 59,754 | $ 62,869 | $ 62,968 | $ 63,698 | $ 65,189 | $ 58,311 | $ 55,950 | $ 57,069 | $ 58,210 | $ 59,374 | $ 60,562 | $ 61,773 | $ 64,862 | $ 66,159 | $ 67,482 | 68,832 |
| Average overtime | 5,176 | 7,152 | 8,484 | 9,522 | 11,983 | 4,084 | 4,756 | 3,424 | 3,493 | 3,562 | 3,634 | 3,706 | 3,892 | 3,970 | 4,049 | 4,130 |
| | $ 64,930 | $ 70,022 | $ 71,452 | $ 73,220 | $ 77,172 | $ 62,395 | $ 60,705 | $ 60,493 | $ 61,703 | $ 62,937 | $ 64,195 | $ 65,479 | $ 68,753 | $ 70,128 | $ 71,531 | 72,962 |
| Overtime as a % of salary & wages | 8.7% | 11.4% | 13.5% | 14.9% | 18.4% | 7.0% | 8.5% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% |
| Pension as a % of salary & wages | | | | | | 24.6% | 67.6% | 75.3% | 79.1% | 85.0% | 91.4% | 90.4% | 88.1% | 86.7% | 83.9% | 81.9% |
| Medical & fringe as a % of salary & wage | 59.0% | 48.3% | 57.7% | 61.8% | 66.9% | 73.9% | 62.5% | 61.0% | 62.5% | 64.2% | 66.0% | 68.0% | 68.3% | 70.4% | 72.4% | 74.3% |

| Key Items | Comment/Reference |
|---|---|
| **Revenues** | |
| Licenses, permits and inspection charges | Fire marshal inspections; increases represent FY 2014 budgeted revenues |
| Sales and charges for services | Primarily EMS administration service charges, for which there is a fee increase assumed beginning FY 2014 |
| Grant revenue | SAFER grant, which expires at the end of FY 2016 |
| **Expenses** | |
| Personnel expenses | Appendix C.1 - Appendix C.3 |
| Professional and contractual services | Other contracts - EMS administration and EMS-Casino municipal service costs |
| Materials & supplies | Operating supplies and repairs & maintenance |
| Utilities | Primarily telecommunication, natural gas, and electricity |
| Other expenses | Primarily building rental expense and capital outlays |

**Operational restructuring**

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Additional Department employees | - | 162 | 96 | 84 | 182 | 193 | 165 | 153 | 135 | 129 | 117 |

(1) Based on department salaries & wages and employees, see Appendix C.2.

**Ten-Year Financial Projections**
**Health & Wellness - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | 1.6 | 1.5 | 1.4 | 1.3 | 0.7 | 0.2 | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | 10.1 | 11.1 | 7.9 | 5.8 | 8.7 | 2.8 | 1.0 | - | - | - | - | - | - | - | - | - |
| Revenue from use of assets | 0.2 | 0.1 | 0.2 | 0.1 | 0.1 | 0.1 | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | 1.3 | 1.3 | 1.1 | 0.1 | 0.0 | 0.0 | - | - | - | - | - | - | - | - | - | - |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | 0.4 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | 54.5 | 52.0 | 64.3 | 53.4 | 57.3 | 28.3 | 1.6 | 1.7 | 1.8 | 1.9 | 2.0 | 2.0 | 2.1 | 2.2 | 2.2 | 2.3 |
| **Total revenues** | 68.1 | 66.0 | 74.9 | 60.7 | 66.8 | 31.4 | 2.5 | 1.7 | 1.8 | 1.9 | 2.0 | 2.0 | 2.1 | 2.2 | 2.2 | 2.3 |
| | | | | | | | | | | | | | | | | |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (13.4) | (13.3) | (11.6) | (9.7) | (7.9) | (2.4) | (0.9) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.8) | (0.8) | (0.8) |
| Overtime | (0.1) | (0.2) | (0.1) | 0.1 | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Pension | (2.0) | (1.8) | (1.9) | (2.3) | (1.3) | (0.2) | (0.5) | (0.5) | (0.6) | (0.6) | (0.7) | (0.8) | (0.8) | (0.8) | (0.9) | (0.9) |
| Medical & fringe benefits | (6.7) | (6.2) | (5.7) | (5.9) | (5.2) | (2.1) | (0.3) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) |
| Professional and contractual services | (49.2) | (49.2) | (60.4) | (49.3) | (52.6) | (21.4) | - | - | - | - | - | - | - | - | - | - |
| Materials & supplies | (3.3) | (2.5) | (1.8) | (1.1) | (1.2) | (0.3) | (0.1) | - | - | - | - | - | - | - | - | - |
| Utilities | (2.0) | (2.5) | (1.4) | (2.0) | (1.4) | (1.3) | (0.7) | - | - | - | - | - | - | - | - | - |
| Purchased services | (1.7) | (2.0) | (1.2) | (0.2) | (0.9) | (0.4) | - | - | - | - | - | - | - | - | - | - |
| Risk management and insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | (0.6) | (0.6) | (0.4) | (0.7) | (1.5) | (0.0) | (0.0) | - | - | - | - | - | - | - | - | - |
| Debt service | (0.1) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (0.7) | (0.7) | (0.8) | (0.9) | (0.9) | (0.6) | (0.4) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) |
| Transfers out | - | (0.1) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | (1.7) | (2.0) | (1.0) | (0.9) | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (81.6) | (81.2) | (86.3) | (72.8) | (73.0) | (28.6) | (2.8) | (1.7) | (1.8) | (1.9) | (2.0) | (2.0) | (2.1) | (2.2) | (2.2) | (2.3) |
| | | | | | | | | | | | | | | | | |
| **Total surplus (deficit)** | $ (13.5) | $ (15.2) | $ (11.5) | $ (12.1) | (6.2) | $ 2.8 | $ (0.3) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| <u>Expenses</u> | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | (0.3) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) |
| Technology | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Capital expenditures and other infrastructure | | | | | | - | - | (5.1) | - | - | - | - | - | - | - | - |
| Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | (0.3) | (5.3) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) |
| | | | | | | | | | | | | | | | | |
| **Operational restructuring** | | | | | | $ - | $ (0.3) | $ (5.3) | $ (0.2) | $ (0.2) | $ (0.2) | $ (0.2) | $ (0.2) | $ (0.2) | $ (0.2) | (0.2) |
| | | | | | | | | | | | | | | | | |
| **Adjusted surplus (deficit)** | | | | | | $ 2.8 | $ (0.6) | $ (5.3) | $ (0.2) | $ (0.2) | $ (0.2) | $ (0.2) | $ (0.2) | $ (0.2) | $ (0.2) | (0.2) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

**Ten-Year Financial Projections**
**Health & Wellness - general fund - Key assumptions**

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 348 | 317 | 262 | 243 | 185 | 80 | 14 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 |
| Average salary & wages(1) | $ 38,399 | $ 42,069 | $ 44,205 | $ 39,808 | $ 42,873 | $ 29,627 | $ 60,946 | $ 73,547 | $ 75,018 | $ 76,518 | $ 78,049 | $ 79,610 | $ 81,202 | $ 82,826 | $ 84,482 | $ 86,172 |
| Average overtime | 404 | 525 | 529 | (486) | 456 | 164 | 164 | 187 | 190 | 194 | 198 | 202 | 206 | 210 | 214 | 219 |
| | $ 38,804 | $ 42,594 | $ 44,734 | $ 39,322 | $ 43,329 | $ 29,791 | $ 61,110 | $ 73,734 | $ 75,208 | $ 76,712 | $ 78,247 | $ 79,812 | $ 81,408 | $ 83,036 | $ 84,697 | $ 86,391 |
| Overtime as a % of salary & wages | 1.1% | 1.2% | 1.2% | -1.2% | 1.1% | 0.6% | 0.3% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% |
| Pension as a % of salary & wages | | | | | | 8.1% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| Medical & fringe as a % of salary & wage | 50.3% | 46.6% | 49.3% | 61.0% | 65.3% | 88.6% | 29.6% | 26.8% | 27.3% | 27.9% | 28.5% | 29.0% | 29.4% | 30.0% | 30.5% | 31.1% |

| Key Items | Comment/Reference |
|---|---|
| General | Health & Wellness transitioned to Institute for Population Health (IPH) effective 10/31/12. The department will retain approximately 9 individuals to perform a required administrative function; the costs incurred by these individuals are assumed to be grant funded. |
| Revenue | |
| Sales and charges for services | Vital records revenue, which is assumed to be transferred to the County beginning 1/1/2014. |
| Expenses | |
| Personnel expenses | Appendix C.1 - Appendix C.3 |

**Operational restructuring**
Additional Department employees

(1) Based on department salaries & wages and employees, see Appendix C.2.

13-53846-tjt Doc 8773-2 Filed 12/16/14 Entered 12/16/14 08:21:49 Page 508 of 602
13-53846-swr Doc 7382-2 Filed 09/11/14 Entered 09/11/14 16:36:38 Page 11 of 104
204
3/30/2014 11:01 PM

**Ten-Year Financial Projections**
**Human Resources - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | 7.2 | 4.1 | 2.4 | 6.8 | 3.2 | (0.4) | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 |
| Revenue from use of assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | - | - | - | - | - | - | - | - | - | - | - |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total revenues** | 7.2 | 4.1 | 2.4 | 6.8 | 3.2 | (0.4) | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 |
| | | | | | | | | | | | | | | | | |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (9.2) | (9.2) | (8.5) | (6.8) | (5.9) | (4.2) | (4.2) | (4.3) | (3.1) | (3.2) | (3.2) | (3.3) | (3.4) | (3.4) | (3.5) | (3.6) |
| Overtime | (0.5) | (0.6) | (0.6) | (0.2) | (0.1) | (0.2) | (0.2) | (0.2) | (0.1) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) |
| Pension | (0.8) | (0.7) | (0.5) | (0.4) | (0.6) | (0.5) | (2.6) | (3.2) | (2.6) | (2.9) | (3.2) | (3.6) | (3.7) | (3.9) | (4.0) |
| Medical & fringe benefits | (4.8) | (4.4) | (4.5) | (3.8) | (3.7) | (3.4) | (5.0) | (5.2) | (5.0) | (5.2) | (5.4) | (5.7) | (6.0) | (6.3) | (6.6) | (6.9) |
| Professional and contractual services | (0.7) | (0.7) | (0.7) | (0.5) | (1.3) | (0.3) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) |
| Materials & supplies | (0.1) | (0.1) | (0.1) | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Utilities | (0.1) | (0.2) | (0.1) | (0.1) | (0.1) | (0.0) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Purchased services | (0.0) | (0.0) | (0.0) | (0.0) | 0.0 | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Risk management and insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | (0.8) | (1.0) | (0.6) | (0.5) | (0.7) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) |
| Debt service | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (1.2) | (1.2) | (1.3) | (1.5) | (1.6) | (1.5) | (1.9) | (2.0) | (1.5) | (1.5) | (1.6) | (1.5) | (1.5) | (1.5) | (1.5) | (1.6) |
| Transfers out | - | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (18.3) | (18.0) | (17.0) | (14.0) | (13.9) | (10.7) | (15.4) | (16.3) | (13.8) | (14.5) | (15.1) | (15.6) | (16.2) | (16.7) | (17.3) | (17.8) |
| | | | | | | | | | | | | | | | | |
| **Total surplus (deficit)** | $ (11.1) | (14.0) | (14.5) | (7.2) | (10.7) | $ (11.1) | $ (13.2) | $ (14.1) | $ (11.6) | $ (12.2) | $ (12.9) | $ (13.4) | $ (13.9) | $ (14.5) | $ (15.1) | (15.6) |
| | | | | | | | | | | | | | | | | |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| *Expenses* | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | (0.1) | (3.5) | (4.0) | (4.0) | (4.1) | (4.1) | (4.2) | (4.2) | (4.3) | (4.3) |
| Technology | | | | | | - | - | (0.5) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Capital expenditures and other infrastructure | | | | | | - | - | - | (1.0) | - | - | - | - | - | - | - |
| Implementation costs | | | | | | - | (0.4) | (1.0) | (1.0) | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | (0.5) | (5.0) | (6.1) | (4.1) | (4.2) | (4.2) | (4.3) | (4.3) | (4.4) | (4.4) |
| | | | | | | | | | | | | | | | | |
| **Operational restructuring** | | | | | | $ - | $ (0.5) | $ (5.0) | $ (6.1) | $ (4.1) | $ (4.2) | $ (4.2) | $ (4.3) | $ (4.3) | $ (4.4) | (4.4) |
| | | | | | | | | | | | | | | | | |
| **Adjusted surplus (deficit)** | | | | | | $ (11.1) | (13.7) | (19.1) | (17.7) | (16.3) | (17.1) | (17.6) | (18.2) | (18.8) | (19.4) | (20.0) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

3/30/2014 11:01 PM

**Ten-Year Financial Projections**
**Human Resources - general fund - Key assumptions**

| | | Fiscal year ended actual | | | | | | Preliminary forecast | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 175 | 168 | 171 | 176 | 107 | 93 | 84 | 84 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 |
| | | | | | | | | | | | | | | | | |
| Average salary & wages(1) | $ 52,849 | $ 55,000 | $ 49,465 | $ 38,861 | $ 55,145 | $ 44,710 | $ 49,727 | $ 50,722 | $ 51,736 | $ 52,771 | $ 53,826 | $ 54,903 | $ 56,001 | $ 57,121 | $ 58,263 | 59,428 |
| Average overtime | 2,760 | 3,423 | 3,558 | 944 | 925 | 2,125 | 2,363 | 2,410 | 2,458 | 2,508 | 2,558 | 2,609 | 2,661 | 2,714 | 2,769 | 2,824 |
| | $ 55,609 | $ 58,423 | $ 53,023 | $ 39,805 | $ 56,070 | $ 46,835 | $ 52,090 | $ 53,132 | $ 54,194 | $ 55,278 | $ 56,384 | $ 57,511 | $ 58,662 | $ 59,835 | $ 61,032 | 62,252 |
| | | | | | | | | | | | | | | | | |
| Overtime as a % of salary & wages | 5.2% | 6.2% | 7.2% | 2.4% | 1.7% | 4.8% | 4.8% | 4.8% | 4.8% | 4.8% | 4.8% | 4.8% | 4.8% | 4.8% | 4.8% | 4.8% |
| | | | | | | | | | | | | | | | | |
| Pension as a % of salary & wages | | | | | | 11.1% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| | | | | | | | | | | | | | | | | |
| Medical & fringe as a % of salary & wage | 52.0% | 47.7% | 52.8% | 55.1% | 62.4% | 82.6% | 118.7% | 121.0% | 159.6% | 163.6% | 167.4% | 172.8% | 177.8% | 183.5% | 188.5% | 193.4% |

| Key Items | Comment/Reference |
|---|---|
| General | Payroll administration will be managed by an external firm beginning in FY 2015. This results in decreased personnel costs beginning FY 2016; however, certain implementation costs will be incurred in FY 2015 (captured in Non-departmental) |
| Revenues | |
| Sales and charges for services | Interagency billings |
| Expenses | |
| Personnel expenses | Appendix C.1 - Appendix C.3 - Headcount reductions occur beginning FY 2016 due to external payroll processing services provider. |
| Professional and contractual services | Primarily labor relations administration |
| Other expenses | Building rental expenses |

| Operational restructuring | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Additional Department employees | | | | | | - | 3 | 25 | 33 | 33 | 33 | 33 | 33 | 33 | 33 | 33 |

(1) Based on department salaries & wages and employees, see Appendix C.2.

13-53846-tjt  Doc 8728  Filed 12/16/14  Entered 12/16/14 08:21:49  Page 510 of 602
13-53846-swr  Doc 3382-2  Filed 03/31/14  Entered 03/31/14 16:36:36  Page 11 of 204
204

3/30/2014 11:01 PM

**Ten-Year Financial Projections**
**Human Rights - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | 0.5 | 0.4 | 0.5 | 0.4 | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 |
| Revenue from use of assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | 0.0 | 0.0 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total revenues** | 0.5 | 0.4 | 0.5 | 0.4 | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (0.7) | (0.7) | (0.5) | (0.4) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.4) | (0.4) | (0.4) |
| Overtime | (0.0) | (0.0) | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pension | (0.1) | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.2) | (0.2) | (0.3) | (0.3) | (0.3) | (0.3) | (0.4) | (0.4) | (0.4) | (0.4) |
| Medical & fringe benefits | (0.3) | (0.3) | (0.2) | (0.2) | (0.2) | (0.2) | (0.4) | (0.4) | (0.4) | (0.5) | (0.5) | (0.5) | (0.5) | (0.6) | (0.6) | (0.6) |
| Professional and contractual services | (0.1) | (0.1) | (0.0) | (0.0) | (0.0) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Materials & supplies | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Utilities | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Purchased services | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Risk management and insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | (0.1) | (0.1) | (0.1) | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Debt service | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) |
| Transfers out | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | (0.0) | - | 0.0 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (1.4) | (1.3) | (0.9) | (0.9) | (0.7) | (0.7) | (1.2) | (1.2) | (1.3) | (1.3) | (1.4) | (1.5) | (1.5) | (1.6) | (1.6) | (1.7) |
| **Total surplus (deficit)** | $ (0.8) | $ (0.9) | $ (0.5) | $ (0.5) | (0.5) | $ (0.4) | $ (0.9) | $ (0.9) | $ (1.0) | $ (1.0) | $ (1.1) | $ (1.2) | $ (1.2) | $ (1.3) | $ (1.3) | (1.4) |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | $ - | 0.2 | $ 0.2 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.4 | 0.4 |
| **Expenses** | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | - | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.7) | (0.7) | (0.7) |
| Technology | | | | | | - | - | (0.1) | - | - | - | - | - | - | - | - |
| Capital expenditures and other infrastructure | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | - | (0.7) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.7) | (0.7) | (0.7) |
| **Operational restructuring** | | | | | | $ - | $ - | $ (0.7) | $ (0.4) | $ (0.4) | $ (0.3) | $ (0.3) | $ (0.3) | $ (0.4) | $ (0.3) | (0.3) |
| **Adjusted surplus (deficit)** | | | | | | $ (0.4) | $ (0.9) | $ (1.6) | $ (1.4) | $ (1.4) | $ (1.4) | $ (1.5) | $ (1.6) | $ (1.6) | $ (1.6) | (1.6) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

13-53846-tjt Doc 8738 Filed 12/16/14 Entered 12/16/14 08:24:49 Page 511 of 602
204
13-53846-swr Doc 3382-2 Filed 03/31/14 Entered 03/31/14 18:56:38 Page 11 of 14    3/30/2014 11:01 PM

**Ten-Year Financial Projections**
**Human Rights - general fund - Key assumptions**

| | | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 13 | 12 | n/a | 8 | 6 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 |
| | | | | | | | | | | | | | | | | |
| Average salary & wages(1) | $ 51,973 | $ 58,859 | n/a | $ 54,195 | $ 56,173 | $ 50,106 | $ 57,093 | $ 58,235 | $ 59,400 | $ 60,588 | $ 61,800 | $ 63,036 | $ 64,297 | $ 65,582 | $ 66,894 | $ 68,232 |
| Average overtime | 290 | 230 | n/a | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | $ 52,263 | $ 59,089 | $ - | $ 54,195 | $ 56,173 | $ 50,106 | $ 57,093 | $ 58,235 | $ 59,400 | $ 60,588 | $ 61,800 | $ 63,036 | $ 64,297 | $ 65,582 | $ 66,894 | $ 68,232 |
| | | | | | | | | | | | | | | | | |
| Overtime as a % of salary & wages | 0.6% | 0.4% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Pension as a % of salary & wages | | | | | | 10.4% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| Medical & fringe as a % of salary & wages | 41.8% | 38.4% | 42.5% | 47.6% | 55.3% | 72.7% | 134.0% | 137.0% | 139.0% | 142.5% | 145.7% | 150.3% | 154.6% | 159.5% | 163.8% | 168.0% |

| Key Items | Comment/Reference |
|---|---|
| Revenues | |
|     Parking/court fines and other revenue | Detroit Business Certification Program (DBCP) fees |
| Expenses | |
|     Personnel expenses | Appendix C.1 - Appendix C.3 |

**Operational restructuring**

| | | | | | | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Additional Department employees | | | | | | - | - | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 |

(1) Based on department salaries & wages and employees, see Appendix C.2.

13-53846-tjt Doc 8738 Filed 12/16/14 Entered 12/16/14 08:24:49 Page 512 of 602
13-53846-swr Doc 3382-2 Filed 03/31/14 Entered 03/31/14 16:56:36 Page 11 of 04
204

3/30/2014 11:01 PM

**Ten-Year Financial Projections**
**Human Services - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | 1.6 | 0.9 | - | - | (0.0) | 0.0 | - | - | - | - | - | - | - | - | - | - |
| Revenue from use of assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | (0.4) | 0.0 | 0.0 | 0.0 | - | - | - | - | - | - | - | - | - | - | - | - |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | 0.5 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | - | - | 0.1 | 0.1 | 0.1 | 0.0 | - | - | - | - | - | - | - | - | - | - |
| **Total revenues** | 1.7 | 0.9 | 0.1 | 0.1 | 0.1 | 0.0 | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | | | | | |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (0.7) | (0.4) | (0.3) | (0.2) | (0.1) | (0.0) | - | - | - | - | - | - | - | - | - | - |
| Overtime | (0.0) | (0.0) | - | - | (0.0) | - | - | - | - | - | - | - | - | - | - | - |
| Pension | (0.1) | (0.1) | (0.1) | (0.1) | (0.0) | - | - | - | - | - | - | - | - | - | - | - |
| Medical & fringe benefits | (0.4) | (0.2) | (0.2) | (0.1) | (0.1) | (0.0) | - | - | - | - | - | - | - | - | - | - |
| Professional and contractual services | (0.6) | (0.5) | (0.2) | 0.0 | 0.0 | - | - | - | - | - | - | - | - | - | - | - |
| Materials & supplies | (0.1) | (0.1) | (0.0) | 0.0 | 0.0 | - | - | - | - | - | - | - | - | - | - | - |
| Utilities | (0.0) | (0.0) | (0.0) | 0.0 | 0.0 | - | - | - | - | - | - | - | - | - | - | - |
| Purchased services | (0.0) | (0.1) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Risk management and insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | - | - | - | - | - | - | - | - | - | - |
| Debt service | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | - | - | - | - | - | - | - | - | - | - | - |
| Transfers out | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | (0.1) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (2.0) | (1.5) | (0.9) | (0.3) | (0.2) | (0.0) | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | | | | | |
| **Total surplus (deficit)** | (0.3) $ | (0.6) $ | (0.8) $ | (0.3) $ | (0.1) | $ (0.0) $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - |
| | | | | | | | | | | | | | | | | |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - |
| Expenses | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Technology | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Capital expenditures and other infrastructure | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | | | | | |
| **Operational restructuring** | | | | | | $ - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - |
| | | | | | | | | | | | | | | | | |
| **Adjusted surplus (deficit)** | | | | | | $ (0.0) $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

**Ten-Year Financial Projections**
**Human Services - general fund - Key assumptions**

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 117 | 91 | 95 | 85 | 52 | 22 | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | | | | | |
| Average salary & wages(1) | $ 42,296 | $ 53,028 | $ 47,676 | $ 46,749 | $ 64,791 | $ 44,951 | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| Average overtime | 60 | 56 | - | - | 4 | - | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| | $ 42,356 | $ 53,084 | $ 47,676 | $ 46,749 | $ 64,795 | $ 44,951 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | | | | | | | | | | |
| Overtime as a % of salary & wages | 1.0% | 1.2% | 0.0% | 0.0% | 0.2% | 0.0% | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| | | | | | | | | | | | | | | | | |
| Pension as a % of salary & wages | | | | | | 0.0% | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| | | | | | | | | | | | | | | | | |
| Medical & fringe as a % of salary & wages | 59.3% | 55.6% | 54.1% | 46.5% | 83.7% | 66.7% | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |

| Key Items | Comment/Reference |
|---|---|
| General | The Human Services department is being transitioned out of the City effective FY 2014 |

**Operational restructuring**
  Additional Department employees       -     -     -     -     -     -     -     -     -     -     -

(1) Based on department salaries & wages and employees, see Appendix C.2.

13-53846-tjt Doc 8732-2 Filed 12/16/14 Entered 12/16/14 08:21:49 Page 514 of 602
13-53846-swr Doc 3382-2 Filed 03/31/14 Entered 03/31/14 18:56:38 Page 11 of
204                                                                                                                    3/30/2014 11:01 PM

**Ten-Year Financial Projections**
**ITS - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | 0.5 | 0.5 | 0.2 | 1.3 | 0.4 | 0.7 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 |
| Revenue from use of assets | - | 0.0 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | (0.1) | - | - | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | 0.2 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | 0.1 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total revenues** | 0.9 | 0.5 | 0.2 | 1.3 | 0.4 | 0.7 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (5.1) | (5.1) | (4.0) | (3.4) | (2.6) | (2.0) | (2.0) | (2.2) | (2.3) | (2.3) | (2.4) | (2.4) | (2.5) | (2.5) | (2.6) | (2.6) |
| Overtime | (0.4) | (0.2) | (0.1) | (0.1) | (0.0) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Pension | (0.6) | (0.5) | (0.4) | (0.4) | (0.3) | (0.2) | (1.3) | (1.7) | (1.9) | (2.1) | (2.4) | (2.5) | (2.6) | (2.7) | (2.9) | (3.0) |
| Medical & fringe benefits | (2.6) | (2.3) | (1.9) | (1.8) | (1.5) | (1.5) | (2.4) | (2.5) | (2.6) | (2.7) | (2.9) | (3.0) | (3.2) | (3.3) | (3.5) | (3.6) |
| Professional and contractual services | (2.4) | (2.5) | (4.9) | (3.0) | (2.6) | (3.8) | (3.8) | (3.8) | (3.9) | (3.9) | (4.0) | (4.0) | (4.0) | (4.1) | (4.1) | (4.2) |
| Materials & supplies | (8.4) | (11.4) | (12.3) | (8.7) | (8.1) | (4.8) | (7.8) | (6.9) | (5.9) | (6.0) | (6.0) | (6.1) | (6.1) | (6.2) | (6.3) | (6.3) |
| Utilities | (0.8) | (1.4) | (0.5) | (0.8) | (0.5) | (2.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) |
| Purchased services | - | (0.2) | (0.2) | 0.1 | 0.0 | - | - | - | - | - | - | - | - | - | - | - |
| Risk management and insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | (1.7) | (1.7) | (1.8) | (1.5) | (0.8) | (1.5) | (1.5) | (1.5) | (1.5) | (1.5) | (1.5) | (1.5) | (1.5) | (1.5) | (1.5) | (1.5) |
| Debt service | (0.1) | - | - | - | - | (1.1) | (1.4) | (1.4) | (1.4) | (0.7) | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (0.5) | (0.5) | (0.6) | (0.6) | (0.7) | (0.6) | (0.9) | (1.0) | (1.1) | (1.1) | (1.1) | (1.1) | (1.1) | (1.1) | (1.1) | (1.1) |
| Transfers out | - | (0.1) | (0.1) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (22.7) | (26.0) | (26.7) | (20.3) | (17.0) | (18.1) | (21.7) | (21.7) | (21.2) | (21.0) | (20.9) | (21.2) | (21.7) | (22.1) | (22.6) | (23.0) |
| **Total surplus (deficit)** | $ (21.8) | $ (25.5) | $ (26.6) | $ (19.1) | $ (16.7) | $ (17.4) | $ (21.2) | $ (21.2) | $ (20.7) | $ (20.5) | $ (20.3) | $ (20.7) | $ (21.2) | $ (21.6) | $ (22.0) | $ (22.5) |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Expenses | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Technology | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Capital expenditures and other infrastructure | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| **Operational restructuring** | | | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| **Adjusted surplus (deficit)** | | | | | | $ (17.4) | $ (21.2) | $ (21.2) | $ (20.7) | $ (20.5) | $ (20.3) | $ (20.7) | $ (21.2) | $ (21.6) | $ (22.0) | $ (22.5) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

13-53846-tjt Doc 8783-2 Filed 12/16/14 Entered 12/16/14 10:21:49 Page 515 of 602
13-53846-swr Doc 7382-2 Filed 09/11/14 Entered 09/11/14 16:36:30 Page 11 of 64
204
3/30/2014 11:01 PM

**Ten-Year Financial Projections**
**ITS - general fund - Key assumptions**

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 99 | 92 | 65 | 46 | 43 | 35 | 35 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 |
| Average salary & wages(1) | $ 51,306 | $ 55,548 | $ 61,007 | $ 74,548 | $ 60,681 | $ 57,494 | $ 57,494 | $ 58,644 | $ 59,817 | $ 61,013 | $ 62,233 | $ 63,478 | $ 64,748 | $ 66,043 | $ 67,363 | 68,711 |
| Average overtime | 4,087 | 2,260 | 2,140 | 1,465 | 597 | 2,467 | 2,467 | 2,516 | 2,566 | 2,618 | 2,670 | 2,723 | 2,778 | 2,833 | 2,890 | 2,948 |
| | $ 55,393 | $ 57,808 | $ 63,147 | $ 76,013 | $ 61,278 | $ 59,961 | $ 59,961 | $ 61,160 | $ 62,383 | $ 63,631 | $ 64,903 | $ 66,201 | $ 67,525 | $ 68,876 | $ 70,253 | 71,658 |
| Overtime as a % of salary & wages | 8.0% | 4.1% | 3.5% | 2.0% | 1.0% | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% |
| Pension as a % of salary & wages | | | | | | 9.7% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| Medical & fringe as a % of salary & wage | 51.0% | 45.7% | 48.1% | 53.2% | 55.9% | 74.7% | 117.9% | 113.3% | 115.0% | 117.8% | 120.5% | 124.2% | 127.7% | 131.7% | 135.1% | 138.6% |

**Key Items**      **Comment/Reference**

Revenues
  Sales and charges for services      Primarily interagency billings
Expenses
  Personnel expenses      Appendix C.1 - Appendix C.3
  Professional and contractual services      Information technology contracts
  Materials & supplies      Primarily hardware (servers, Xerox, etc.) and software (Oracle, Groupwise, etc.) maintenance & upgrade costs; does not include upgrade costs in excess of 2012 levels.
         Beginning FY 2015, savings from payroll administration outsourcing reflected as certain upgrades would not be completed
  Other expenses      Rental expenses (building, computers, and other office equipment)
  Debt service      Payments for IBM product purchased through financing in FY 2013; purchase captured in Non-Departmental

**Operational restructuring**

| | | | | | | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Additional Department employees | | | | | | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |

(1) Based on department salaries & wages and employees, see Appendix C.2.

3/30/2014 11:01 PM

**Ten-Year Financial Projections**
**Law - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | (1.2) | 1.0 | 0.6 | 0.1 | 1.2 | 0.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 |
| Revenue from use of assets | - | - | - | - | 0.0 | - | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | 0.1 | 0.3 | 0.1 | 0.1 | 0.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total revenues** | (1.1) | 1.3 | 0.6 | 0.2 | 1.5 | 0.7 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (9.3) | (9.2) | (8.2) | (7.7) | (7.4) | (6.1) | (6.1) | (6.2) | (6.4) | (6.5) | (6.6) | (6.8) | (6.9) | (7.0) | (7.2) | (7.3) |
| Overtime | (0.0) | (0.1) | (0.0) | (0.0) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Pension | (0.3) | (0.2) | (0.0) | (0.2) | (0.5) | (0.6) | (3.9) | (4.6) | (5.3) | (6.0) | (6.6) | (7.0) | (7.3) | (7.6) | (8.0) | (8.3) |
| Medical & fringe benefits | (4.0) | (3.6) | (3.4) | (3.5) | (4.0) | (4.2) | (3.3) | (3.4) | (3.5) | (3.6) | (3.8) | (4.0) | (4.2) | (4.4) | (4.5) | (4.7) |
| Professional and contractual services | (3.3) | (3.5) | (3.0) | (2.1) | (1.6) | (1.7) | (1.7) | (1.7) | (1.8) | (1.8) | (1.8) | (1.8) | (1.8) | (1.8) | (1.9) | (1.9) |
| Materials & supplies | (0.5) | (0.3) | (0.4) | (0.3) | (0.2) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) |
| Utilities | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | 0.0 | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Purchased services | (1.2) | (0.9) | (1.4) | (1.2) | (1.4) | (1.3) | (1.3) | (1.3) | (1.4) | (1.4) | (1.4) | (1.4) | (1.4) | (1.4) | (1.4) | (1.5) |
| Risk management and insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | (1.1) | (1.2) | (1.1) | (0.9) | (0.1) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) |
| Debt service | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (1.6) | (1.6) | (1.8) | (1.9) | (2.0) | (2.0) | (2.8) | (2.9) | (3.0) | (3.1) | (3.2) | (3.1) | (3.1) | (3.2) | (3.2) | (3.2) |
| Transfers out | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (21.5) | (20.7) | (19.3) | (17.9) | (17.3) | (16.9) | (20.2) | (21.3) | (22.5) | (23.5) | (24.6) | (25.2) | (25.9) | (26.6) | (27.4) | (28.1) |
| **Total surplus (deficit)** | $ (22.6) | $ (19.4) | $ (18.6) | $ (17.8) | $ (15.8) | $ (16.2) | $ (18.4) | $ (19.6) | $ (20.7) | $ (21.7) | $ (22.8) | $ (23.4) | $ (24.1) | $ (24.9) | $ (25.6) | (26.3) |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | $ - | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 |
| *Expenses* | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | (1.1) | 0.4 | 0.3 | 0.3 | 0.3 | 0.2 | 0.2 | 0.1 | 0.1 | 0.0 |
| Technology | | | | | | - | (0.5) | - | - | - | - | - | - | - | - | - |
| Capital expenditures and other infrastructure | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Implementation costs | | | | | | - | (0.1) | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | (1.7) | 0.4 | 0.3 | 0.3 | 0.3 | 0.2 | 0.2 | 0.1 | 0.1 | 0.0 |
| **Operational restructuring** | | | | | | $ - | $ (1.7) | $ 0.4 | $ 0.9 | $ 0.9 | $ 0.8 | $ 0.8 | $ 0.7 | $ 0.7 | $ 0.6 | 0.6 |
| **Adjusted surplus (deficit)** | | | | | | $ (16.2) | $ (20.1) | $ (19.2) | $ (19.8) | $ (20.9) | $ (22.0) | $ (22.7) | $ (23.4) | $ (24.2) | $ (25.0) | (25.7) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 127 | 122 | 113 | 105 | 94 | 86 | 86 | 86 | 86 | 86 | 86 | 86 | 86 | 86 | 86 | 86 |
| | | | | | | | | | | | | | | | | |
| Average salary & wages(1) | $ 73,486 | $ 75,672 | $ 72,144 | $ 73,252 | $ 78,313 | $ 71,497 | $ 71,497 | $ 72,927 | $ 74,386 | $ 75,873 | $ 77,391 | $ 78,939 | $ 80,517 | $ 82,128 | $ 83,770 | 85,446 |
| Average overtime | 222 | 728 | 161 | 114 | 568 | 1,094 | 1,094 | 1,116 | 1,138 | 1,161 | 1,184 | 1,208 | 1,232 | 1,256 | 1,281 | 1,307 |
| | $ 73,709 | $ 76,400 | $ 72,305 | $ 73,366 | $ 78,881 | $ 72,591 | $ 72,591 | $ 74,043 | $ 75,524 | $ 77,034 | $ 78,575 | $ 80,146 | $ 81,749 | $ 83,384 | $ 85,052 | 86,753 |
| | | | | | | | | | | | | | | | | |
| Overtime as a % of salary & wages | 0.3% | 1.0% | 0.2% | 0.2% | 0.7% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% |
| | | | | | | | | | | | | | | | | |
| Pension as a % of salary & wages | | | | | | 10.0% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| | | | | | | | | | | | | | | | | |
| Medical & fringe as a % of salary & wage | 42.3% | 38.9% | 41.8% | 45.7% | 54.1% | 68.6% | 53.6% | 54.0% | 54.9% | 56.1% | 57.4% | 58.9% | 60.3% | 61.9% | 63.3% | 64.8% |

| Key Items | Comment/Reference |
|---|---|
| Revenues | |
| Sales and charges for services | Primarily interagency billings; Law department began invoicing other departments correctly in FY 2012 |
| Parking/court fines and other revenue | Miscellaneous receipts |
| Expenses | |
| Personnel expenses | Appendix C.1 - Appendix C.3 |
| Professional and contractual services | Contracts for legal work/assistance and other printing contracts/services |
| Purchased services | Purchased administration costs |
| Other expenses | Building rental expenses |

| Operational restructuring | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Additional Department employees | | | | | | - | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 |

(1) Based on department salaries & wages and employees, see Appendix C.2.

**Ten-Year Financial Projections**
**Mayor - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | 0.0 | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | - | 0.1 | 0.0 | 0.2 | 0.0 | 0.0 | - | - | - | - | - | - | - | - | - | - |
| Revenue from use of assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | (0.1) | (0.4) | 0.7 | (0.2) | 0.1 | 0.0 | - | - | - | - | - | - | - | - | - | - |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | 0.1 | - | - | 0.2 | 0.1 | (0.1) | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| **Total revenues** | 0.0 | (0.3) | 0.7 | 0.1 | 0.2 | (0.1) | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (5.7) | (5.3) | (4.6) | (4.0) | (3.1) | (2.2) | (2.1) | (2.3) | (2.3) | (2.4) | (2.4) | (2.5) | (2.5) | (2.6) | (2.6) | (2.7) |
| Overtime | (0.0) | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pension | (0.7) | (0.5) | (0.4) | (0.5) | (0.5) | (0.2) | (1.3) | (1.7) | (1.9) | (2.2) | (2.4) | (2.5) | (2.7) | (2.8) | (2.9) | (3.0) |
| Medical & fringe benefits | (2.6) | (2.1) | (1.9) | (1.6) | (1.5) | (1.2) | (1.8) | (1.9) | (1.9) | (2.0) | (2.1) | (2.2) | (2.3) | (2.4) | (2.5) | (2.7) |
| Professional and contractual services | (0.2) | (0.2) | (0.1) | (0.2) | (0.1) | (0.0) | (0.5) | (1.0) | (1.1) | (1.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Materials & supplies | (0.2) | (0.2) | (0.2) | (0.2) | 0.0 | (0.0) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.2) | (0.2) |
| Utilities | (0.3) | (0.2) | (0.1) | (0.2) | (0.2) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Purchased services | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Risk management and insurance | (0.0) | - | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Other expenses | (1.5) | (1.3) | (0.9) | (0.7) | (0.6) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) |
| Debt service | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (0.4) | (0.5) | (0.5) | (0.5) | (0.6) | (0.8) | (0.9) | (1.1) | (1.1) | (1.1) | (1.2) | (1.1) | (1.1) | (1.2) | (1.2) | (1.2) |
| Transfers out | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | 0.2 | 0.1 | 0.1 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (11.3) | (10.1) | (8.7) | (8.0) | (6.6) | (5.0) | (7.2) | (8.6) | (9.0) | (9.4) | (8.8) | (9.1) | (9.4) | (9.7) | (10.0) | (10.3) |
| **Total surplus (deficit)** | $ (11.3) | $ (10.5) | $ (8.0) | $ (7.8) | $ (6.4) | $ (5.0) | $ (7.2) | $ (8.5) | $ (9.0) | $ (9.4) | $ (8.8) | $ (9.0) | $ (9.3) | $ (9.6) | $ (9.9) | (10.2) |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Expenses | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Technology | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Capital expenditures and other infrastructure | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| **Operational restructuring** | | | | | | $ - | $ - | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | (0.0) |
| **Adjusted surplus (deficit)** | | | | | | $ (5.0) | $ (7.2) | $ (8.6) | $ (9.0) | $ (9.4) | $ (8.8) | $ (9.1) | $ (9.3) | $ (9.6) | $ (9.9) | (10.2) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

13-53846-tjt Doc 8733-2 Filed 12/16/14 Entered 12/16/14 08:24:40 Page 519 of 602
13-53846-swr Doc 7382-2 Filed 09/11/14 Entered 09/11/14 16:36:38 Page 121 of 204
3/30/2014 11:01 PM

**Ten-Year Financial Projections**
**Mayor - general fund - Key assumptions**

| | | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 108 | 74 | 63 | 52 | 39 | 22 | 22 | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 |
| | | | | | | | | | | | | | | | | |
| Average salary & wages(1) | $ 52,946 | $ 71,222 | $ 73,700 | $ 76,927 | $ 80,495 | $ 98,421 | $ 92,861 | $ 94,718 | $ 96,613 | $ 98,545 | $ 100,516 | $ 102,526 | $ 104,577 | $ 106,668 | $ 108,801 | $ 110,977 |
| Average overtime | 9 | 27 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | $ 52,955 | $ 71,248 | $ 73,700 | $ 76,927 | $ 80,495 | $ 98,421 | $ 92,861 | $ 94,718 | $ 96,613 | $ 98,545 | $ 100,516 | $ 102,526 | $ 104,577 | $ 106,668 | $ 108,801 | $ 110,977 |
| | | | | | | | | | | | | | | | | |
| Overtime as a % of salary & wages | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Pension as a % of salary & wages | | | | | | 11.2% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| Medical & fringe as a % of salary & wages | 45.0% | 40.6% | 41.4% | 40.8% | 48.4% | 56.0% | 85.9% | 82.5% | 83.6% | 85.5% | 87.3% | 89.9% | 92.2% | 95.0% | 97.3% | 99.7% |

| Key Items | Comment/Reference |
|---|---|
| Revenues | |
|   Parking/court fines and other revenue | Miscellaneous receipts |
| Expenses | |
|   Personnel expenses | Appendix C.1 - Appendix C.3 |
| | Headcount reduction due to reallocation of Neighborhood City Hall employees to Recreation department in FY 2013 |
|   Professional and contractual services | Contracts for legal work/assistance and PSCs |
|   Materials & supplies | Primarily repairs, maintenance, and supplies |
|   Other expenses | Primarily rental expenses |

**Operational restructuring**

| Additional Department employees | | | | | | - | - | - | - | - | - | - | - | - | - | - |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

(1) Based on department salaries & wages and employees, see Appendix C.2.

13-53846-tjt Doc 8739-2 Filed 12/16/14 Entered 12/16/14 08:21:49 Page 520 of 602
204
13-53846-swr Doc 3382-2 Filed 03/31/14 Entered 03/31/14 18:56:36 Page 122 of
3/30/2014 11:01 PM

**Ten-Year Financial Projections**
**Planning & Development - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | - | - | (0.1) | 0.0 | 0.8 | (0.4) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Revenue from use of assets | 3.3 | 18.4 | 1.0 | 0.2 | (1.5) | 7.9 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| Parking/court fines and other revenue | 0.4 | 1.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | 0.1 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | 2.0 | 1.8 | 1.5 | 2.0 | 0.7 | 1.6 | 1.4 | 4.5 | 4.6 | 4.6 | 4.7 | 4.8 | 4.9 | 4.9 | 5.0 | 5.1 |
| **Total revenues** | 5.9 | 21.7 | 2.5 | 2.2 | 0.1 | 9.1 | 1.6 | 4.7 | 4.8 | 4.9 | 5.0 | 5.0 | 5.1 | 5.2 | 5.3 | 5.3 |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (1.5) | (1.8) | (1.7) | (1.0) | (0.7) | (0.6) | (0.6) | (3.2) | (3.2) | (3.3) | (3.4) | (3.4) | (3.5) | (3.6) | (3.6) | (3.7) |
| Overtime | - | (0.0) | (0.0) | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - |
| Pension | (0.2) | (0.2) | (0.2) | (0.2) | (0.0) | (0.0) | (0.4) | (2.3) | (2.7) | (3.0) | (3.4) | (3.5) | (3.7) | (3.9) | (4.1) | (4.2) |
| Medical & fringe benefits | (0.7) | (0.8) | (0.8) | (0.5) | (0.4) | (0.3) | (0.5) | (2.2) | (2.3) | (2.4) | (2.5) | (2.6) | (2.7) | (2.8) | (3.0) | (3.1) |
| Professional and contractual services | (0.2) | (0.2) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.9) | (0.9) | (0.9) |
| Materials & supplies | (0.3) | (0.4) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) |
| Utilities | (0.0) | (0.0) | 0.1 | - | (0.0) | - | - | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Purchased services | - | (0.1) | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Risk management and insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | (5.3) | (5.4) | (4.8) | (3.8) | (2.7) | (2.9) | (2.9) | (7.5) | (4.1) | (4.1) | (4.1) | (4.2) | (4.2) | (4.2) | (4.3) | (4.3) |
| Debt service | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.3) | (1.5) | (1.5) | (1.6) | (1.6) | (1.6) | (1.6) | (1.6) | (1.6) | (1.6) |
| Transfers out | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (8.3) | (8.9) | (7.8) | (5.6) | (4.1) | (4.1) | (4.8) | (17.9) | (15.0) | (15.6) | (16.2) | (16.5) | (16.9) | (17.4) | (17.8) | (18.2) |
| **Total surplus (deficit)** | $ (2.5) | $ 12.8 | $ (5.3) | $ (3.4) | (4.0) | $ 5.0 | $ (3.2) | $ (13.1) | $ (10.2) | $ (10.7) | $ (11.2) | $ (11.5) | $ (11.8) | $ (12.2) | $ (12.5) | (12.9) |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| *Expenses* | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | (0.6) | (1.2) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.1) | (1.1) | (1.1) |
| Technology | | | | | | - | (0.3) | (0.3) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Capital expenditures and other infrastructure | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Implementation costs | | | | | | - | (2.4) | (4.1) | (0.7) | - | - | - | - | (0.8) | (0.8) | - |
| Subtotal: Expenses | | | | | | - | (3.3) | (5.6) | (1.7) | (1.0) | (1.0) | (1.0) | (1.9) | (1.9) | (1.1) | (1.1) |
| **Operational restructuring** | | | | | | $ - | $ (3.3) | $ (5.6) | $ (1.7) | $ (1.0) | $ (1.0) | $ (1.0) | $ (1.9) | $ (1.9) | $ (1.1) | (1.1) |
| **Adjusted surplus (deficit)** | | | | | | $ 5.0 | $ (6.4) | $ (18.8) | $ (11.9) | $ (11.7) | $ (12.2) | $ (12.5) | $ (13.7) | $ (14.1) | $ (13.6) | (14.0) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

Ten-Year Financial Projections
Planning & Development - general fund - Key assumptions

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 172 | 173 | 160 | 154 | 122 | 116 | 116 | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 113 |
| | | | | | | | | | | | | | | | | |
| Average salary & wages(1) | $ 54,225 | $ 54,491 | $ 55,121 | $ 51,860 | $ 59,007 | $ 53,640 | $ 53,640 | $ 54,713 | $ 55,807 | $ 56,923 | $ 58,061 | $ 59,223 | $ 60,407 | $ 61,615 | $ 62,848 | $ 64,105 |
| Average overtime | - | 0 | 2 | 0 | - | - | - | - | - | - | - | - | - | - | - | - |
| | $ 54,225 | $ 54,491 | $ 55,124 | $ 51,860 | $ 59,007 | $ 53,640 | $ 53,640 | $ 54,713 | $ 55,807 | $ 56,923 | $ 58,061 | $ 59,223 | $ 60,407 | $ 61,615 | $ 62,848 | $ 64,105 |
| | | | | | | | | | | | | | | | | |
| Overtime as a % of salary & wages | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Pension as a % of salary & wages | | | | | | 4.1% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| Medical & fringe as a % of salary & wages | 47.5% | 43.1% | 46.7% | 49.0% | 56.5% | 58.6% | 88.6% | 69.2% | 70.3% | 71.9% | 73.4% | 75.5% | 77.4% | 79.6% | 81.6% | 83.5% |

| Key Items | Comment/Reference |
|---|---|
| General | HUD is requiring the City to capture indirect costs and those related to Development/Real Estate and Planning functions in the General Fund and seek reimbursement after payment is made. Personnel costs related to Development/Real Estate and Planning functions transferred to the General Fund will no longer be reimbursed as those heads are not related to grant funded projects |
| Revenues | |
| Sales and charges for services | Block grant reimbursements |
| Revenue from use of assets | Real estate rentals. FY 2012 reflects a loss on sale of property and FY 2013 reflects proceeds from a sale; no gain/loss assumed in the projection period |
| Expenses | |
| Personnel expenses | Appendix C.1 - Appendix C.3 |
| Other expenses | Development costs. Includes one-time repayment ($3.5m) of grant funds to HUD due to FY12 and FY13 over reimbursements |

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Operational restructuring | | | | | | | | | | | | | | | | |
| Additional Department employees | | | | | | - | 13 | (26) | (28) | (28) | (28) | (28) | (28) | (28) | (28) | (28) |

(1) Based on department salaries & wages and employees, see Appendix C.2.

13-53846-tjt Doc 8739-2 Filed 12/16/14 Entered 12/16/14 08:24:49 Page 522 of 602
13-53846-swr Doc 3362-2 Filed 03/31/14 Entered 03/31/14 16:36:39 Page 124 of 204

3/30/2014 11:01 PM

**Ten-Year Financial Projections**
**Police - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | 51.7 | 49.9 | 44.2 | 44.6 | 39.8 | 35.3 | 20.1 | 24.5 | 24.5 | 24.9 | 25.3 | 25.7 | 26.1 | 26.4 | 26.8 | 27.2 |
| Licenses, permits and inspection charges | 0.6 | 0.9 | 0.8 | 0.8 | 0.8 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | 7.6 | 8.7 | 10.4 | 13.2 | 4.7 | 2.9 | 4.6 | 4.6 | 4.6 | 4.6 | 4.6 | 4.6 | 4.6 | 4.6 | 4.6 | 4.6 |
| Revenue from use of assets | 0.0 | 0.0 | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | 2.4 | 2.5 | 1.5 | 3.4 | 5.9 | 3.9 | 3.9 | 3.9 | 3.9 | 3.9 | 3.9 | 3.9 | 3.9 | 3.9 | 3.9 | 3.9 |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | 0.9 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | 1.7 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | 4.3 | 3.2 | 8.4 | 12.0 | 12.6 | 8.2 | 7.4 | 5.2 | 4.1 | 3.7 | 3.8 | 3.8 | 3.8 | 3.9 | 3.9 | 4.0 |
| **Total revenues** | 69.3 | 65.2 | 65.3 | 74.0 | 63.9 | 51.0 | 36.6 | 38.9 | 37.7 | 37.6 | 38.1 | 38.5 | 39.0 | 39.5 | 39.9 | 40.4 |
| | | | | | | | | | | | | | | | | |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (182.9) | (190.9) | (184.4) | (193.7) | (177.1) | (152.8) | (139.1) | (145.6) | (155.8) | (159.6) | (162.8) | (166.1) | (174.4) | (177.9) | (181.4) | (185.1) |
| Overtime | (27.7) | (31.9) | (24.9) | (25.7) | (25.9) | (18.4) | (20.9) | (21.9) | (21.8) | (22.4) | (22.8) | (23.3) | (24.4) | (24.9) | (25.4) | (25.9) |
| Pension | (31.1) | (31.0) | (23.6) | (66.3) | (42.2) | (35.5) | (94.1) | (109.6) | (123.2) | (135.7) | (148.8) | (150.1) | (153.6) | (154.2) | (152.2) | (151.5) |
| Medical & fringe benefits | (102.8) | (97.5) | (100.5) | (111.3) | (117.6) | (105.8) | (100.6) | (104.0) | (109.8) | (115.4) | (121.0) | (127.6) | (134.5) | (141.8) | (148.9) | (156.2) |
| Professional and contractual services | (4.9) | (6.7) | (4.0) | (3.6) | (4.5) | (5.1) | (5.1) | (5.2) | (5.2) | (5.3) | (5.3) | (5.4) | (5.5) | (5.5) | (5.6) | (5.6) |
| Materials & supplies | (3.4) | (3.2) | (3.1) | (3.0) | (2.7) | (2.2) | (3.2) | (3.2) | (3.2) | (3.2) | (3.3) | (3.3) | (3.3) | (3.4) | (3.4) | (3.4) |
| Utilities | (6.7) | (8.7) | (8.3) | (9.0) | (8.9) | (2.8) | (9.5) | (10.0) | (10.1) | (10.2) | (10.3) | (10.5) | (10.6) | (10.7) | (10.8) | (10.9) |
| Purchased services | (1.8) | (2.3) | (1.1) | (0.7) | (1.1) | (1.3) | (11.1) | (11.2) | (11.3) | (11.4) | (11.5) | (11.6) | (11.8) | (11.9) | (12.0) | (12.1) |
| Risk management and insurance | (0.0) | - | 0.0 | (0.0) | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Other expenses | (6.1) | (7.1) | (6.1) | (7.2) | (8.1) | (5.6) | (7.0) | (7.0) | (7.0) | (7.1) | (7.1) | (7.2) | (7.2) | (7.3) | (7.3) | (7.3) |
| Debt service | (0.1) | - | - | (0.1) | (0.0) | (1.6) | (0.0) | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (27.8) | (30.0) | (31.4) | (32.7) | (34.1) | (35.6) | (36.9) | (37.2) | (38.5) | (39.1) | (39.7) | (39.2) | (39.1) | (38.9) | (38.8) | (38.7) |
| Transfers out | - | (0.5) | (0.5) | (0.4) | (0.5) | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | (0.8) | (0.9) | (0.4) | (1.6) | (1.4) | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (396.2) | (410.8) | (388.3) | (455.2) | (424.2) | (366.4) | (427.4) | (454.8) | (486.0) | (509.6) | (532.8) | (544.3) | (564.3) | (576.5) | (585.8) | (596.8) |
| | | | | | | | | | | | | | | | | |
| **Total surplus (deficit)** | $ (326.9) | $ (345.6) | $ (323.1) | $ (381.2) | $ (360.3) | $ (315.4) | $ (390.8) | $ (416.0) | $ (448.3) | $ (472.0) | $ (494.7) | $ (505.8) | $ (525.3) | $ (537.0) | $ (545.9) | $ (556.4) |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 |
| *Expenses* | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | (5.7) | (16.1) | (18.1) | (11.0) | (9.9) | (10.1) | (9.9) | (9.7) | (10.1) | (9.9) |
| Technology | | | | | | - | (1.9) | (11.2) | (10.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) |
| Capital expenditures and other infrastructure | | | | | | - | (21.7) | (21.6) | (16.4) | (12.8) | (13.2) | (12.8) | (15.9) | (15.7) | (15.7) | (15.6) |
| Implementation costs | | | | | | - | (0.2) | (0.6) | (0.2) | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | (29.6) | (49.4) | (44.9) | (25.9) | (25.2) | (25.0) | (27.9) | (27.6) | (27.9) | (27.7) |
| | | | | | | | | | | | | | | | | |
| **Operational restructuring** | | | | | | $ - | (29.6) | (45.8) | (41.3) | (22.3) | (21.6) | (21.4) | (24.3) | (24.0) | (24.3) | (24.1) |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| **Adjusted surplus (deficit)** | | | | | | $ (315.4) | (420.4) | (461.8) | (489.6) | (494.3) | (516.3) | (527.2) | (549.6) | (561.0) | (570.1) | (580.5) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

**Ten-Year Financial Projections**
**Police - general fund - Key assumptions**

| | | Fiscal year ended actual | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 3,421 | 3,688 | 3,288 | 3,195 | 3,016 | 2,909 | 2,706 | 2,747 | 2,882 | 2,895 | 2,895 | 2,895 | 2,895 | 2,895 | 2,895 | 2,895 |
| Average salary & wages(1) | $ 53,597 | $ 51,883 | $ 56,204 | $ 60,742 | $ 58,848 | $ 52,625 | $ 51,514 | $ 53,099 | $ 54,161 | $ 55,244 | $ 56,349 | $ 57,476 | $ 60,350 | $ 61,557 | $ 62,788 | $ 64,044 |
| Average overtime | 8,104 | 8,646 | 7,576 | 8,050 | 8,590 | 6,312 | 7,719 | 7,956 | 7,574 | 7,726 | 7,880 | 8,038 | 8,440 | 8,609 | 8,781 | 8,956 |
| | $ 61,701 | $ 60,529 | $ 63,780 | $ 68,792 | $ 67,438 | $ 58,936 | $ 59,233 | $ 61,055 | $ 61,735 | $ 62,970 | $ 64,230 | $ 65,514 | $ 68,790 | $ 70,166 | $ 71,569 | $ 73,000 |
| Overtime as a % of salary & wages | 15.2% | 16.7% | 13.5% | 13.3% | 14.6% | 12.0% | 15.0% | 15.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% |
| Pension as a % of salary & wages | | | | | | 23.2% | 67.6% | 75.3% | 79.1% | 85.0% | 91.4% | 90.4% | 88.1% | 86.7% | 83.9% | 81.9% |
| Medical & fringe as a % of salary & wage | 56.2% | 51.1% | 54.5% | 57.5% | 66.4% | 69.0% | 72.3% | 71.4% | 70.5% | 72.3% | 74.3% | 76.8% | 77.1% | 79.7% | 82.1% | 84.4% |

**Key Items**                                    **Comment/Reference**

Revenues
- Utility users' and other taxes — Utility users' tax decreases beginning FY 2014 due to the allocation to the Public Lighting Authority ($17.0m in FY 2014; $12.5m thereafter). Inflationary increases assumed beginning FY 2017.
- Sales and charges for services — Interagency billings and charges for external services
- Revenue from use of assets — Real estate rentals and concessions. FY 2012 and FY 2013 reflect proceeds from sales; no gain/loss assumed in the projection period
- Parking/court fines and other revenue — Primarily court proceeds
- Grant revenue — Includes COPS grant

Expenses
- Personnel expenses — Appendix C.1 - Appendix C.3
- Professional and contractual services — Contracts such as crime scene services, E-911 improvements and technology support
- Materials & supplies — Operating supplies and repairs & maintenance
- Utilities — Primarily water, sewage and electricity
- Other expenses — Primarily capital outlays and rental expenses
- Transfers out — Retirement of debt principal

**Operational restructuring**

| | | | | | | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Additional Department employees | | | | | | - | 125 | 250 | 175 | 163 | 150 | 150 | 150 | 150 | 150 | 150 |

(1) Based on department salaries & wages and employees, see Appendix C.2.

13-53846-tjt Doc 8772 Filed 12/16/14 Entered 12/16/14 08:24:40 Page 524 of 602
204
13-53846-swr Doc 3362-2 Filed 03/31/14 Entered 03/31/14 16:36:38 Page 126 of
                                                                                                                                                    3/30/2014 11:01 PM

**Ten-Year Financial Projections**
**PLD - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | (0.0) | 0.0 | 0.0 | 0.1 | (0.0) | 0.0 | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | 0.0 | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and Charges for Services | 52.3 | 37.2 | 43.3 | 30.8 | 45.1 | 36.5 | 41.2 | 28.7 | 26.1 | 23.5 | 20.8 | 18.1 | 15.3 | 12.3 | 10.6 | 10.7 |
| Revenue from use of assets | - | 0.2 | - | 0.3 | 0.1 | 0.5 | 0.5 | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | 0.3 | 0.0 | 0.7 | 0.0 | 0.0 | 0.0 | 0.0 | - | - | - | - | - | - | - | - | - |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | 3.5 | 3.5 | 3.5 | 0.4 | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | - | - | - | - | - | 0.4 | - | - | - | - | - | - | - | - | - | - |
| **Total revenues** | 56.1 | 40.9 | 47.5 | 31.5 | 45.2 | 37.5 | 41.7 | 28.7 | 26.1 | 23.5 | 20.8 | 18.1 | 15.3 | 12.3 | 10.6 | 10.7 |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (10.1) | (9.6) | (8.0) | (6.8) | (5.8) | (4.8) | (3.4) | (1.0) | (0.6) | (0.4) | (0.2) | (0.2) | (0.2) | (0.2) | - | - |
| Overtime | (3.4) | (2.8) | (2.5) | (2.9) | (3.5) | (2.4) | (1.0) | (0.1) | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | - | - |
| Pension | (0.7) | (0.4) | (0.3) | (0.2) | (0.5) | (0.8) | (2.2) | (0.7) | (0.5) | (0.4) | (0.2) | (0.3) | (0.3) | (0.2) | - | - |
| Medical & fringe benefits | (5.7) | (5.0) | (4.8) | (4.9) | (5.1) | (5.1) | (1.1) | (0.3) | (0.2) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | - | - |
| Professional and contractual services | (0.1) | (0.2) | (0.2) | (0.1) | (0.1) | (0.0) | (2.6) | (14.1) | (10.2) | (6.6) | (4.6) | (3.7) | (2.3) | (0.9) | - | - |
| Materials & supplies | (43.1) | (37.8) | (27.5) | (37.4) | (36.5) | (39.1) | (39.4) | (12.4) | (13.3) | (13.3) | (12.8) | (12.0) | (11.4) | (10.7) | (10.6) | (10.7) |
| Utilities | (4.3) | (5.0) | (5.4) | (5.0) | (4.4) | (5.7) | (4.6) | (4.6) | (4.2) | (3.6) | (3.4) | (3.2) | (3.0) | (2.7) | (2.6) | (2.7) |
| Purchased services | (1.6) | (2.0) | (1.0) | (0.0) | (0.1) | (0.2) | (0.2) | (0.9) | (1.4) | (1.7) | (1.4) | (0.9) | (0.5) | (0.1) | - | - |
| Risk management and insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | (0.2) | (3.1) | (0.1) | (0.0) | (0.1) | (0.5) | (0.0) | (0.1) | (0.2) | (0.2) | (0.2) | (0.1) | (0.1) | (0.0) | - | - |
| Debt service | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | (0.8) | (5.3) | (8.4) | (9.3) | (9.6) | (9.9) | (10.2) | (10.5) | (10.8) | (11.1) |
| POC - principal and interest1 | (2.0) | (2.1) | (2.2) | (2.4) | (2.6) | (2.7) | (1.6) | (0.5) | (0.3) | (0.2) | (0.1) | (0.1) | (0.1) | (0.1) | - | - |
| Transfers out | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (71.2) | (68.0) | (52.1) | (59.8) | (58.8) | (61.3) | (57.0) | (40.0) | (39.1) | (35.8) | (32.6) | (30.4) | (28.1) | (25.5) | (24.0) | (24.5) |
| **Total surplus (deficit)** | $ (15.1) | $ (27.1) | $ (4.6) | $ (28.3) | $ (13.6) | $ (23.8) | $ (15.3) | $ (11.2) | $ (13.0) | $ (12.4) | $ (11.9) | $ (12.3) | $ (12.8) | $ (13.2) | $ (13.4) | $ (13.8) |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Expenses | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Technology | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Capital expenditures and other infrastructure | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| **Operational restructuring** | | | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| **Adjusted surplus (deficit)** | | | | | | $ (23.8) | $ (15.3) | $ (11.2) | $ (13.0) | $ (12.4) | $ (11.9) | $ (12.3) | $ (12.8) | $ (13.2) | $ (13.4) | $ (13.8) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

Ten-Year Financial Projections
PLD - general fund - Key assumptions

| | | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | | 225 | 206 | 160 | 123 | 103 | 99 | 70 | 12 | 7 | 5 | 3 | 3 | 3 | 2 | - | - |
| | | | | | | | | | | | | | | | | | |
| Average salary & wages(1) | $ | 44,676 $ | 46,839 $ | 50,059 $ | 55,114 $ | 55,866 | $ 48,724 $ | 49,211 $ | 84,190 $ | 81,474 $ | 79,817 $ | 79,591 $ | 81,182 $ | 82,806 $ | 84,462 | n/a | n/a |
| Average overtime | | 15,017 | 13,619 | 15,896 | 23,374 | 34,123 | 24,252 | 14,708 | 8,419 | 8,147 | 7,982 | 7,959 | 8,118 | 8,281 | 8,446 | n/a | n/a |
| | $ | 59,693 $ | 60,459 $ | 65,955 $ | 78,489 $ | 89,989 | $ 72,975 $ | 63,919 $ | 92,610 $ | 89,622 $ | 87,799 $ | 87,550 $ | 89,301 $ | 91,087 $ | 92,908 $ | - $ | - |
| | | | | | | | | | | | | | | | | | |
| Overtime as a % of salary & wages | | 33.6% | 29.1% | 31.8% | 42.4% | 61.1% | 49.8% | 29.9% | 10.0% | 10.0% | 10.0% | 10.0% | 10.0% | 10.0% | 10.0% | n/a | n/a |
| | | | | | | | | | | | | | | | | | |
| Pension as a % of salary & wages | | | | | | | 16.9% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | n/a | n/a |
| | | | | | | | | | | | | | | | | | |
| Medical & fringe as a % of salary & wages | | 57.1% | 51.4% | 59.8% | 72.5% | 89.0% | 105.7% | 32.7% | 25.7% | 26.6% | 27.6% | 28.5% | 29.0% | 29.5% | 30.0% | n/a | n/a |

| Key Items | Comment/Reference |
|---|---|
| General | Lighting (Street lights): Street lights will be transitioned to the Public Lighting Authority (PLA) over a 3-year period beginning FY 2014 (3/1/14 - 2/30/17). Overhead lights representing 85% of total PLA street lights are projected to be completed on an 18 month schedule while Underground lights (15% of final mix) are forecast over a 36 month period. The final system will have 55,000 street lights. |
| | City Grid: All customers currently on the City grid are assumed to be transitioned to a 3rd party provider effective beginning of FY 2015 (7/1/14). Once transitioned, the City will no longer collect revenue from external customers. The grid will be deactivated over a 7-year period beginning FY 2015 (7/1/14 - 6/30/21). |
| | PLD plans to utilize third party outsourced labor to maintain its portion of street lights until the transition to PLA is complete (by end-FY 2017) |
| Revenues | |
| Sales and Charges for Services[2] | Represents external and internal revenues. |
| External electricity sales | Decreasing consistent with the assumption that electricity customers are transitioned by end-FY 2014. FY 2014 includes $2.4 million of collections based on the Power Supply Cost Recovery Factor applied to customer bills beginning December 2013 |
| Internal electricity sales | Assumes PLD continues to provide electricity to City departments at current consumption level; departments are billed based on consumption at DTE Rate book |
| Third-party contributions | Represents reimbursement from 3rd party utility provider to operate and maintain PLD grid until fully transitioned. This reimbursement decreases through FY 2021 when the grid deactivation is complete. |
| Expenses | |
| Personnel expenses | Appendix C.1 - Appendix C.3 |
| | PLD plans to utilize third party outsourced labor to maintain its portion of street lights and grid until transition of street lights and grid (by end-FY 2021). Legacy health and pension costs are expected to remain. |
| Materials & supplies | Minimal PLD administrative staff remains until year 7 of transition (end of FY 2021) when grid deactivation is completed |
| Utilities | Grid: Fuel and lubricants - electricity purchased, which decreases due to amount purchased for internal consumption only. |
| | Street light electricity will continue to be purchased by the City, assumes 55,000 street lights full transition by end of FY 2017. Assumes power purchased at $0.0755/kWh |
| | Alley Lights: Additionally, 12,000 alley lights will remain on until the bulbs fail. The forecast assumes the bulbs to fail over a 5 year period or 20% a year. The City will purchase electricity for these street lights. |
| Contributions to non-enterprise funds | Represents contribution to Public Lighting Authority for operations; replaces decreases in personnel |
| | Lighting: Total operations & maintenance based the O&M agreement between the City and PLA includes a $126,500 monthly admin fee plus per streetlight O&M fee subject to 3% annual increase |

**Operational restructuring**

| Additional Department employees | - - - - - - - - |

(1) Based on department salaries & wages and employees, see Appendix C.2.

(2) FY 2012 includes a one-time payment from DPS to account for previous balances due.

13-53846-tjt Doc 8738 Filed 12/16/14 Entered 12/16/14 18:24:49 Page 526 of 602
13-53846-swr Doc 3382-1 Filed 06/31/14 Entered 06/31/14 16:36:36 Page 126 of 204
3/30/2014 11:01 PM

**Ten-Year Financial Projections**
Recreation - general fund
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | 0.1 | 0.0 | 0.1 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| Revenue from use of assets | 1.1 | 1.1 | 1.0 | 0.8 | 1.1 | 0.8 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 |
| Parking/court fines and other revenue | 0.8 | 0.8 | 0.5 | 0.4 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| DDOT risk mgmt reimbursement | - | - | | | | | | | | | | | | | | |
| Reimb. from parking & vehicle fund | 0.1 | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | 1.4 | 2.4 | 0.7 | 0.4 | 2.8 | 1.0 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.2 | 1.2 | 1.2 |
| **Total revenues** | 3.5 | 4.3 | 2.4 | 1.8 | 4.2 | 2.0 | 1.9 | 1.9 | 1.9 | 1.9 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (7.4) | (7.7) | (6.8) | (5.9) | (5.2) | (3.4) | (3.4) | (3.5) | (3.6) | (3.6) | (3.7) | (3.8) | (3.8) | (3.9) | (4.0) | (4.1) |
| Overtime | (0.1) | (0.2) | (0.1) | (0.1) | (0.2) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Pension | (0.5) | (0.5) | (0.3) | (0.3) | (0.3) | (0.3) | (2.2) | (2.6) | (3.0) | (3.3) | (3.7) | (3.9) | (4.1) | (4.3) | (4.5) | (4.6) |
| Medical & fringe benefits | (2.5) | (2.4) | (2.2) | (1.9) | (1.9) | (2.2) | (10.8) | (11.4) | (11.7) | (12.3) | (12.8) | (13.5) | (14.2) | (14.9) | (15.6) | (16.4) |
| Professional and contractual services | (1.0) | (1.0) | (0.3) | (0.5) | (0.3) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) |
| Materials & supplies | (0.1) | (0.1) | (0.1) | (0.3) | (0.3) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) |
| Utilities | (7.5) | (7.2) | (7.1) | (7.7) | (7.5) | (5.8) | (6.4) | (7.0) | (7.2) | (7.4) | (7.6) | (7.8) | (8.0) | (8.2) | (8.4) | (8.7) |
| Purchased services | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Risk management and insurance | - | - | 0.0 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | (3.4) | (4.7) | (2.9) | (2.7) | (3.7) | (1.7) | (1.5) | (1.5) | (1.5) | (1.5) | (1.6) | (1.6) | (1.6) | (1.6) | (1.6) | (1.6) |
| Debt service | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (0.8) | (0.8) | (0.9) | (0.9) | (1.0) | (1.0) | (1.5) | (1.6) | (1.7) | (1.7) | (1.8) | (1.8) | (1.8) | (1.8) | (1.8) | (1.8) |
| Transfers out | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (23.3) | (24.6) | (20.7) | (20.5) | (20.3) | (14.8) | (26.3) | (28.0) | (29.2) | (30.4) | (31.6) | (32.8) | (33.9) | (35.2) | (36.5) | (37.8) |
| **Total surplus (deficit)** | $ (19.8) | $ (20.3) | $ (18.3) | $ (18.7) | (16.2) | $ (12.9) | $ (24.4) | $ (26.1) | $ (27.3) | $ (28.5) | $ (29.7) | $ (30.8) | $ (32.0) | $ (33.2) | $ (34.5) | (35.7) |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | $ - | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| *Expenses* | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | - | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Technology | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Capital expenditures and other infrastructure | | | | | | - | (0.9) | (8.9) | (3.1) | (3.3) | (3.0) | (4.0) | (4.3) | (4.0) | (4.0) | (4.0) |
| Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | (0.9) | (9.0) | (3.2) | (3.4) | (3.1) | (4.1) | (4.4) | (4.1) | (4.1) | (4.1) |
| **Operational restructuring** | | | | | | $ - | $ (0.9) | $ (9.0) | $ (3.1) | $ (3.3) | $ (3.1) | $ (4.0) | $ (4.3) | $ (4.0) | $ (4.0) | (4.0) |
| **Adjusted surplus (deficit)** | | | | | | $ (12.9) | $ (25.3) | $ (35.1) | $ (30.4) | $ (31.8) | $ (32.7) | $ (34.8) | $ (36.3) | $ (37.2) | $ (38.5) | (39.7) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

**Ten-Year Financial Projections**
**Recreation - general fund - Key assumptions**

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 472 | 388 | 508 | 510 | 300 | 202 | 202 | 202 | 202 | 202 | 202 | 202 | 202 | 202 | 202 | 202 |
| | | | | | | | | | | | | | | | | |
| Average salary & wages(1) | $ 15,783 | $ 19,905 | $ 13,500 | $ 11,659 | $ 17,264 | $ 16,904 | $ 16,904 | $ 17,242 | $ 17,587 | $ 17,939 | $ 18,298 | $ 18,664 | $ 19,037 | $ 19,418 | $ 19,806 | $ 20,202 |
| Average overtime | 306 | 402 | 259 | 265 | 524 | 525 | 525 | 535 | 546 | 557 | 568 | 579 | 591 | 603 | 615 | 627 |
| | $ 16,088 | $ 20,307 | $ 13,759 | $ 11,924 | $ 17,787 | $ 17,429 | $ 17,429 | $ 17,777 | $ 18,133 | $ 18,496 | $ 18,866 | $ 19,243 | $ 19,628 | $ 20,020 | $ 20,421 | $ 20,829 |
| | | | | | | | | | | | | | | | | |
| Overtime as a % of salary & wages | 1.9% | 2.0% | 1.9% | 2.3% | 3.0% | 3.1% | 3.1% | 3.1% | 3.1% | 3.1% | 3.1% | 3.1% | 3.1% | 3.1% | 3.1% | 3.1% |
| | | | | | | | | | | | | | | | | |
| Pension as a % of salary & wages | | | | | | 8.7% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| | | | | | | | | | | | | | | | | |
| Medical & fringe as a % of salary & wages | 34.1% | 31.7% | 31.7% | 32.7% | 36.8% | 63.3% | 315.8% | 325.6% | 329.9% | 338.1% | 345.4% | 357.1% | 367.7% | 380.1% | 390.5% | 400.9% |

---

**Key Items** — **Comment/Reference**

Revenues
    Revenue from use of assets — Real estate rental and concessions. FY 2012 and FY 2013 include the gain on sale of property; no gain/loss is included going forward

Expenses
    Personnel expenses — Appendix C.1 - Appendix C.3
    Materials & supplies — Operating supplies
    Utilities — Sewage, water, and various other utilities
    Other expenses — Primarily capital outlays

**Operational restructuring**
    Additional Department employees

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |

(1) Based on department salaries & wages and employees, see Appendix C.2. Most Recreation department employees are part-time employees.

13-53846-tjt Doc 8782-2 Filed 12/16/14 Entered 12/16/14 08:24:49 Page 528 of 602
13-53846-swr Doc 3362-2 Filed 03/31/14 Entered 03/31/14 16:36:39 Page 180 of 204

3/30/2014 11:01 PM

**Ten-Year Financial Projections**
**Administrative Hearings - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - $ | - $ | - $ | - $ | - | $ - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | 0.2 | 0.2 | 1.2 | 0.8 | 0.9 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 |
| Revenue from use of assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | 0.0 | 0.1 | 0.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total revenues** | 0.2 | 0.3 | 1.5 | 0.8 | 0.9 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (0.3) | (0.3) | (0.4) | (0.4) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) |
| Overtime | - | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pension | 0.0 | 0.0 | 0.0 | (0.0) | (0.0) | (0.0) | (0.2) | (0.2) | (0.3) | (0.3) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) |
| Medical & fringe benefits | (0.2) | (0.1) | (0.2) | (0.2) | (0.2) | (0.2) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.2) |
| Professional and contractual services | (1.0) | (1.4) | (0.8) | (0.5) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) |
| Materials & supplies | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Utilities | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Purchased services | (0.0) | - | 0.0 | (0.2) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Risk management and insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | (0.2) | (0.2) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Debt service | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) |
| Transfers out | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (1.9) | (2.2) | (1.6) | (1.4) | (1.1) | (1.1) | (1.3) | (1.4) | (1.4) | (1.5) | (1.6) | (1.6) | (1.6) | (1.7) | (1.7) | (1.7) |
| **Total surplus (deficit)** | $ (1.7) $ | (1.9) $ | (0.1) $ | (0.6) $ | (0.2) | $ (0.6) $ | (0.8) $ | (0.9) $ | (0.9) $ | (1.0) $ | (1.0) $ | (1.1) $ | (1.1) $ | (1.1) $ | (1.2) $ | (1.2) |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - |
| *Expenses* | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Technology | | | | | | - | - | (0.5) | - | - | - | - | - | - | - | - |
| Capital expenditures and other infrastructure | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | - | (0.5) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Operational restructuring** | | | | | | $ - $ | - $ | (0.5) $ | 0.0 $ | 0.0 $ | 0.0 $ | 0.0 $ | 0.0 $ | 0.0 $ | 0.0 $ | 0.0 |
| **Adjusted surplus (deficit)** | | | | | | $ (0.6) $ | (0.8) $ | (1.3) $ | (0.9) $ | (1.0) $ | (1.0) $ | (1.1) $ | (1.1) $ | (1.1) $ | (1.2) $ | (1.2) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

Ten-Year Financial Projections
Administrative Hearings - general fund - Key assumptions

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 6 | 6 | 9 | 6 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| Average salary & wages(1) | $ 55,358 | $ 56,863 | $ 42,971 | $ 60,124 | $ 82,470 | $ 69,770 | $ 82,422 | $ 84,071 | $ 85,752 | $ 87,467 | $ 89,217 | $ 91,001 | $ 92,821 | $ 94,678 | $ 96,571 | $ 98,503 |
| Average overtime | - | 38 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | $ 55,358 | $ 56,901 | $ 42,971 | $ 60,124 | $ 82,470 | $ 69,770 | $ 82,422 | $ 84,071 | $ 85,752 | $ 87,467 | $ 89,217 | $ 91,001 | $ 92,821 | $ 94,678 | $ 96,571 | $ 98,503 |
| Overtime as a % of salary & wages | 0.0% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Pension as a % of salary & wages | | | | | | 10.0% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| Medical & fringe as a % of salary & wages | 53.9% | 42.8% | 43.5% | 50.2% | 55.5% | 66.3% | 33.0% | 32.8% | 33.4% | 34.0% | 34.7% | 35.4% | 36.1% | 36.9% | 37.6% | 38.3% |

| Key Items | Comment/Reference |
|---|---|
| Revenues | |
|     Sales and charges for services | Fees (Blight violation adjudication) and interagency billings |
| Expenses | |
|     Personnel expenses | Appendix C.1 - Appendix C.3 |
|     Professional and contractual services | Information technology contracts |

Operational restructuring
    Additional Department employees      -    -    -    -    -    -    -    -    -

(1) Based on department salaries & wages and employees, see Appendix C.2.

**Ten-Year Financial Projections**
**Homeland Security - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | - | - | - | - | - | - | - | - | - | - | - |
| Revenue from use of assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | 1.2 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | 0.2 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | 0.3 | 1.0 | 2.2 | 2.8 | 3.2 | 2.4 | 2.1 | 2.1 | 2.1 | 2.2 | 2.2 | 2.2 | 2.2 | 2.2 | 2.3 | 2.3 |
| **Total revenues** | 1.7 | 1.0 | 2.2 | 2.9 | 3.3 | 2.4 | 2.1 | 2.1 | 2.1 | 2.2 | 2.2 | 2.2 | 2.2 | 2.2 | 2.3 | 2.3 |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (0.3) | (0.3) | (0.2) | (0.1) | (0.1) | - | - | - | - | - | - | - | - | - | - | - |
| Overtime | (0.0) | (0.5) | (0.0) | (0.0) | (0.0) | - | - | - | - | - | - | - | - | - | - | - |
| Pension | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | - | - | - | - | - | - | - | - | - | - | - |
| Medical & fringe benefits | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | - | - | - | - | - | - | - | - | - | - | - |
| Professional and contractual services | (0.0) | - | (0.1) | (0.7) | (0.8) | (1.9) | (1.9) | (1.9) | (1.9) | (1.9) | (1.9) | (2.0) | (2.0) | (2.0) | (2.0) | (2.0) |
| Materials & supplies | (0.8) | (0.6) | (0.4) | (1.2) | (0.1) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.3) | (0.3) |
| Utilities | 0.0 | (0.0) | (0.0) | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Purchased services | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Risk management and insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | (0.8) | (0.1) | (1.6) | (0.8) | (2.4) | (2.4) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Debt service | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | - | - | - | - | - | - | - | - | - | - | - |
| Transfers out | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (2.2) | (1.7) | (2.4) | (2.9) | (3.5) | (4.5) | (2.1) | (2.1) | (2.1) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.3) | (2.3) |
| **Total surplus (deficit)** | $ (0.5) | $ (0.7) | $ (0.2) | $ (0.0) | $ (0.3) | $ (2.0) | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | 0.0 |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Expenses | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Technology | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Capital expenditures and other infrastructure | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| **Operational restructuring** | | | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| **Adjusted surplus (deficit)** | | | | | | $ (2.0) | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | 0.0 |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

Ten-Year Financial Projections
Homeland Security - general fund - Key assumptions

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 5 | 5 | 1 | 2 | 2 | 1 | - | - | - | - | - | - | - | - | - | - |
| Average salary & wages(1) | $ 67,938 | $ 69,172 | $ 185,204 | $ 69,322 | $ 73,932 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Average overtime | 2,699 | 90,636 | 254 | 583 | 1,297 | - | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| | $ 70,637 | $ 159,808 | $ 185,458 | $ 69,905 | $ 75,229 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Overtime as a % of salary & wages | 4.0% | 131.0% | 0.1% | 0.8% | 1.8% | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| Pension as a % of salary & wages | | | | | | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| Medical & fringe as a % of salary & wages | 40.1% | 36.7% | 59.1% | 40.8% | 49.9% | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |

| Key Items | Comment/Reference |
|---|---|
| Revenues | |
| Grant revenue | Federal grant proceeds |
| Expenses | |
| Personnel expenses | Appendix C.1 - Appendix C.3 |
| Professional and contractual services | Urban Area Security initiative |
| Other expenses | FY 2012 and FY 2013 include capital outlays, which will not persist |

| Operational restructuring | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Additional Department employees | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |

(1) Based on department salaries & wages and employees, see Appendix C.2.

13-53846-tjt Doc 8382-2 Filed 12/16/14 Entered 12/16/14 08:21:49 Page 532 of 602
13-53846-swr Doc 7382-2 Filed 09/11/14 Entered 09/11/14 18:56:38 Page 184 of
204
3/30/2014 11:01 PM

**Ten-Year Financial Projections**
**General Services - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | 1.7 | 1.9 | 5.4 | 0.7 | 1.3 | 0.9 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 |
| Revenue from use of assets | (0.0) | - | 0.8 | 1.0 | 1.2 | 1.7 | 8.2 | 3.4 | 3.4 | 3.4 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 |
| Parking/court fines and other revenue | 5.6 | 5.3 | 0.2 | 4.7 | 5.6 | 4.7 | 4.6 | 4.6 | 4.6 | 4.6 | 4.6 | 4.6 | 4.6 | 4.6 | 4.6 | 4.6 |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | - | - | 1.6 | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | 5.3 | 3.2 | 1.3 | 2.5 | 4.8 | 5.1 | 5.1 | - | - | - | - | - | - | - | - | - |
| Grant revenue | - | 0.0 | 0.2 | 4.6 | 3.5 | 1.4 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.8 | 0.8 | 0.8 | 0.8 |
| **Total revenues** | 12.6 | 10.4 | 7.8 | 15.1 | 16.3 | 13.7 | 20.9 | 11.0 | 11.0 | 11.0 | 9.3 | 9.4 | 9.4 | 9.4 | 9.4 | 9.4 |
| | | | | | | | | | | | | | | | | |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (21.0) | (20.4) | (17.5) | (16.2) | (12.0) | (9.1) | (10.0) | (9.3) | (9.5) | (9.7) | (9.9) | (10.1) | (10.3) | (10.5) | (10.7) | (10.9) |
| Overtime | (2.9) | (2.2) | (2.3) | (2.8) | (2.7) | (2.1) | (2.3) | (2.1) | (2.2) | (2.2) | (2.3) | (2.3) | (2.4) | (2.4) | (2.4) | (2.5) |
| Pension | (2.3) | (1.7) | (1.3) | (2.2) | (1.6) | (1.3) | (6.3) | (6.9) | (7.9) | (8.9) | (9.9) | (10.4) | (10.9) | (11.4) | (11.9) | (12.4) |
| Medical & fringe benefits | (12.1) | (11.1) | (10.5) | (10.4) | (9.6) | (9.0) | (8.7) | (8.5) | (8.9) | (9.3) | (9.7) | (10.2) | (10.7) | (11.3) | (11.8) | (12.4) |
| Professional and contractual services | (11.7) | (13.1) | (10.9) | (11.6) | (9.5) | (8.1) | (8.1) | (7.9) | (8.0) | (8.1) | (8.1) | (8.2) | (8.3) | (8.4) | (8.5) | (8.6) |
| Materials & supplies | (22.2) | (10.6) | (11.2) | (12.1) | (10.8) | (10.1) | (10.1) | (6.8) | (6.9) | (7.0) | (7.1) | (7.1) | (7.2) | (7.3) | (7.3) | (7.4) |
| Utilities | (0.2) | (0.5) | (0.8) | (1.4) | (1.0) | (0.9) | (0.9) | (0.7) | (0.7) | (0.7) | (0.7) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) |
| Purchased services | (2.5) | (1.7) | (1.9) | (1.2) | (1.2) | (0.9) | (0.9) | (0.9) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) |
| Risk management and insurance | - | - | - | - | (0.2) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.5) | (0.5) | (0.5) | (0.5) |
| Other expenses | (0.3) | (0.5) | (0.4) | (5.4) | (3.4) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.9) | (0.9) | (0.9) |
| Debt service | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (2.6) | (2.7) | (2.9) | (3.2) | (3.4) | (4.2) | (4.5) | (4.3) | (4.5) | (4.6) | (4.7) | (4.7) | (4.7) | (4.7) | (4.7) | (4.7) |
| Transfers out | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (77.7) | (64.6) | (59.8) | (66.5) | (55.3) | (46.9) | (53.0) | (48.8) | (50.8) | (52.7) | (54.7) | (56.0) | (57.5) | (59.0) | (60.5) | (62.0) |
| | | | | | | | | | | | | | | | | |
| **Total surplus (deficit)** | $ (65.0) | $ (54.1) | $ (51.9) | $ (51.4) | $ (39.0) | $ (33.2) | $ (32.1) | $ (37.8) | $ (39.8) | $ (41.7) | $ (45.3) | $ (46.7) | $ (48.1) | $ (49.6) | $ (51.2) | $ (52.6) |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ 1.1 | $ 2.1 | $ 2.1 | $ 2.1 | $ 2.1 | $ 2.1 | $ 2.1 | $ 2.1 | $ 2.1 | 2.1 |
| *Expenses* | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | (5.4) | (14.4) | (14.4) | (14.5) | (14.6) | (14.7) | (14.8) | (14.9) | (15.0) | (15.1) |
| Technology | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Capital expenditures and other infrastructure | | | | | | - | (12.0) | (11.6) | (4.8) | (4.8) | (5.1) | (4.9) | (4.9) | (5.1) | (5.0) | (5.0) |
| Implementation costs | | | | | | - | (0.4) | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | (17.8) | (26.1) | (19.2) | (19.3) | (19.7) | (19.5) | (19.7) | (19.9) | (19.9) | (20.1) |
| | | | | | | | | | | | | | | | | |
| **Operational restructuring** | | | | | | $ - | $ (16.7) | $ (23.9) | $ (17.0) | $ (17.2) | $ (17.5) | $ (17.4) | $ (17.5) | $ (17.8) | $ (17.8) | (17.9) |
| | | | | | | | | | | | | | | | | |
| **Adjusted surplus (deficit)** | | | | | | $ (33.2) | $ (48.8) | $ (61.7) | $ (56.9) | $ (58.9) | $ (62.9) | $ (64.1) | $ (65.6) | $ (67.4) | $ (68.9) | (70.5) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

13-53846-tjt Doc 8752-2 Filed 12/16/14 Entered 12/16/14 10:24:49 Page 533 of 602
13-53846-swr Doc 7383-2 Filed 09/11/14 Entered 09/11/14 18:56:38 Page 185 of 204
204
3/30/2014 11:01 PM

**Ten-Year Financial Projections**
**General Services - general fund - Key assumptions**

| | | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 676 | 528 | 481 | 447 | 343 | 298 | 298 | 272 | 272 | 272 | 272 | 272 | 272 | 272 | 272 | 272 |
| | | | | | | | | | | | | | | | | |
| Average salary & wages(1) | $ 31,804 | $ 39,503 | $ 36,473 | $ 36,309 | $ 34,874 | $ 30,695 | $ 33,501 | $ 34,171 | $ 34,855 | $ 35,552 | $ 36,263 | $ 36,988 | $ 37,728 | $ 38,483 | $ 39,252 | 40,037 |
| Average overtime | 4,326 | 4,194 | 4,758 | 6,245 | 7,778 | 7,045 | 7,689 | 7,842 | 7,999 | 8,159 | 8,322 | 8,489 | 8,659 | 8,832 | 9,008 | 9,189 |
| | $ 36,130 | $ 43,697 | $ 41,231 | $ 42,554 | $ 42,652 | $ 37,740 | $ 41,190 | $ 42,014 | $ 42,854 | $ 43,711 | $ 44,585 | $ 45,477 | $ 46,387 | $ 47,314 | $ 48,261 | 49,226 |
| | | | | | | | | | | | | | | | | |
| Overtime as a % of salary & wages | 13.9% | 10.8% | 13.1% | 17.2% | 22.3% | 22.9% | 22.9% | 22.9% | 22.9% | 22.9% | 22.9% | 22.9% | 22.9% | 22.9% | 22.9% | 22.9% |
| Pension as a % of salary & wages | | | | | | 13.9% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| Medical & fringe as a % of salary & wages | 57.6% | 54.3% | 59.7% | 64.3% | 80.2% | 98.3% | 86.7% | 91.9% | 93.7% | 96.2% | 98.7% | 101.8% | 104.6% | 107.9% | 110.8% | 113.7% |

**Key Items**      **Comment/Reference**

Revenues
- Sales and charges for services — Interagency billings
- Revenue from use of assets — Internal real estate rentals; FY 2014 includes the proceeds from sale of the Veteran's building; FY 2015 - FY2017 include receipt of $5m settlement from the Red Wings/Joe Lewis facility for past-due payments
- Parking/court fines and other revenue — Revenues for fleet management services
- Street fund reimb. and financing proceeds — Reimbursement from street funds for GSD services provided to solid waste; revenue are associated expenses are eliminated with the assumed outsourcing of solid waste beginning FY 2015
- Grant revenue — Federal grant proceeds

Expenses
- Personnel expenses — Appendix C.1 - Appendix C.3
- Professional and contractual services — Security expenses and inventory management
- Materials & supplies — Fuels & lubricant and repairs & maintenance
- Utilities — Primarily electricity
- Purchased services — Court building operating expense
- Other expenses — Primarily capital outlays

**Operational restructuring**

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Additional Department employees | | | | | | - | 112 | 112 | 112 | 112 | 112 | 112 | 112 | 112 | 112 | 112 |

(1) Based on department salaries & wages and employees, see Appendix C.2.

13-53846-tjt Doc 8739-2 Filed 12/16/14 Entered 12/16/14 08:24:40 Page 534 of 602
204
13-53846-swr Doc 7382-2 Filed 09/11/14 Entered 09/11/14 16:36:36 Page 186 of
3/30/2014 11:01 PM

**Ten-Year Financial Projections**
**Auditor General - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - $ | - $ | - $ | - $ | - | $ - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | - | 0.0 | - | - | - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Revenue from use of assets | - | - | - | - | - | - | - | - | - | | | - | | | - | |
| Parking/court fines and other revenue | 0.0 | 0.0 | 0.0 | - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total revenues** | 0.0 | 0.0 | 0.0 | - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| | | | | | | | | | | | | | | | | |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (1.0) | (1.2) | (1.1) | (1.0) | (0.9) | (0.8) | (1.1) | (1.1) | (1.1) | (1.1) | (1.2) | (1.2) | (1.2) | (1.2) | (1.3) | (1.3) |
| Overtime | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Pension | 0.0 | (0.0) | (0.0) | (0.0) | (0.0) | (0.1) | (0.7) | (0.8) | (0.9) | (1.1) | (1.2) | (1.2) | (1.3) | (1.3) | (1.4) | (1.5) |
| Medical & fringe benefits | (0.4) | (0.5) | (0.4) | (0.4) | (0.5) | (0.5) | (0.6) | (0.6) | (0.6) | (0.7) | (0.7) | (0.7) | (0.8) | (0.8) | (0.8) | (0.9) |
| Professional and contractual services | (2.7) | (3.5) | (5.7) | (1.3) | (1.8) | (1.6) | (1.6) | (1.7) | (1.7) | (1.7) | (1.7) | (1.7) | (1.7) | (1.8) | (1.8) | (1.8) |
| Materials & supplies | (0.0) | (0.0) | 0.0 | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Utilities | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Purchased services | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Risk management and insurance | - | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | (0.1) | (0.2) | (0.1) | (0.1) | (0.1) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) |
| Debt service | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (0.2) | (0.2) | (0.2) | (0.3) | (0.3) | (0.2) | (0.5) | (0.5) | (0.5) | (0.5) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) |
| Transfers out | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (4.5) | (5.6) | (7.6) | (3.1) | (3.6) | (3.6) | (4.7) | (4.9) | (5.2) | (5.4) | (5.6) | (5.7) | (5.8) | (6.0) | (6.1) | (6.2) |
| | | | | | | | | | | | | | | | | |
| **Total surplus (deficit)** | $ (4.5) $ | (5.5) $ | (7.6) $ | (3.1) $ | (3.6) | $ (3.6) $ | (4.7) $ | (4.9) $ | (5.2) $ | (5.4) $ | (5.6) $ | (5.7) $ | (5.8) $ | (6.0) $ | (6.1) $ | (6.2) |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - |
| Expenses | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | (0.0) | (0.4) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) |
| Technology | | | | | | - | (0.0) | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Capital expenditures and other infrastructure | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | (0.1) | (0.6) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) |
| | | | | | | | | | | | | | | | | |
| **Operational restructuring** | | | | | | $ - $ | (0.1) $ | (0.6) $ | (0.5) $ | (0.5) $ | (0.5) $ | (0.5) $ | (0.5) $ | (0.5) $ | (0.5) $ | (0.5) |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| **Adjusted surplus (deficit)** | | | | | | $ (3.6) $ | (4.8) $ | (5.5) $ | (5.6) $ | (5.8) $ | (6.0) $ | (6.2) $ | (6.3) $ | (6.5) $ | (6.6) $ | (6.8) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

**Ten-Year Financial Projections**
**Auditor General - general fund - Key assumptions**

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 21 | 18 | 17 | 15 | 12 | 14 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 |
| Average salary & wages(1) | $ 48,165 | $ 65,138 | $ 63,262 | $ 66,940 | $ 73,255 | $ 62,503 | $ 65,304 | $ 66,610 | $ 67,942 | $ 69,301 | $ 70,687 | $ 72,101 | $ 73,543 | $ 75,014 | $ 76,514 | $ 78,044 |
| Average overtime | 2,379 | 2,325 | 752 | 1,373 | 1,781 | 1,531 | 1,600 | 1,632 | 1,664 | 1,697 | 1,731 | 1,766 | 1,801 | 1,837 | 1,874 | 1,912 |
| | $ 50,544 | $ 67,463 | $ 64,014 | $ 68,313 | $ 75,036 | $ 64,034 | $ 66,904 | $ 68,242 | $ 69,606 | $ 70,999 | $ 72,419 | $ 73,867 | $ 75,344 | $ 76,851 | $ 78,388 | $ 79,956 |
| Overtime as a % of salary & wages | 4.9% | 3.6% | 1.2% | 2.1% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% |
| Pension as a % of salary & wages | | | | | | 8.5% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| Medical & fringe as a % of salary & wages | 42.5% | 38.8% | 40.3% | 44.8% | 53.0% | 62.5% | 56.0% | 56.5% | 57.4% | 58.7% | 60.1% | 61.7% | 63.2% | 64.9% | 66.4% | 68.0% |

| Key Items | Comment/Reference |
|---|---|
| Expenses | |
| Personnel expenses | Appendix C.1 - Appendix C.3 |
| Professional and contractual services | Auditing |

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Operational restructuring | | | | | | | | | | | |
| Additional Department employees | - | - | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |

(1) Based on department salaries & wages and employees, see Appendix C.2.

**Ten-Year Financial Projections**
**Zoning - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| Revenue from use of assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total revenues** | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (0.5) | (0.4) | (0.4) | (0.4) | (0.4) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) |
| Overtime | - | - | (0.0) | - | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Pension | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.2) | (0.2) | (0.2) | (0.3) | (0.3) | (0.3) | (0.3) | (0.4) | (0.4) | (0.4) |
| Medical & fringe benefits | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.4) | (0.4) | (0.4) | (0.4) |
| Professional and contractual services | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Materials & supplies | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Utilities | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Purchased services | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Risk management and insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | (0.1) | (0.1) | (0.1) | (0.0) | (0.0) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Debt service | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Transfers out | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (0.8) | (0.8) | (0.8) | (0.8) | (0.7) | (0.7) | (1.0) | (1.0) | (1.1) | (1.1) | (1.2) | (1.2) | (1.3) | (1.3) | (1.4) | (1.4) |
| **Total surplus (deficit)** | $ (0.7) | $ (0.7) | $ (0.7) | $ (0.7) | (0.7) | $ (0.7) | $ (0.9) | $ (0.9) | $ (1.0) | $ (1.0) | $ (1.1) | $ (1.1) | $ (1.2) | $ (1.2) | $ (1.2) | (1.3) |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| *Expenses* | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Technology | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Capital expenditures and other infrastructure | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| **Operational restructuring** | | | | | | $ - | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | (0.0) |
| **Adjusted surplus (deficit)** | | | | | | $ (0.7) | $ (0.9) | $ (0.9) | $ (1.0) | $ (1.0) | $ (1.1) | $ (1.1) | $ (1.2) | $ (1.2) | $ (1.3) | (1.3) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

13-53846-tjt Doc 2732-2 Filed 12/16/14 Entered 12/16/14 08:24:49 Page 537 of 602
204
13-53846-swr Doc 3382-1 Filed 03/31/14 Entered 03/31/14 19:36:38 Page 189 of
3/30/2014 11:01 PM

**Ten-Year Financial Projections**
**Zoning - general fund - Key assumptions**

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 16 | 15 | 15 | 15 | 12 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 |
| | | | | | | | | | | | | | | | | |
| Average salary & wages(1) | $ 28,828 | $ 29,822 | $ 29,517 | $ 27,705 | $ 29,516 | $ 25,120 | $ 25,120 | $ 25,622 | $ 26,134 | $ 26,657 | $ 27,190 | $ 27,734 | $ 28,289 | $ 28,854 | $ 29,432 | $ 30,020 |
| Average overtime | - | - | 0 | - | - | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| | $ 28,828 | $ 29,822 | $ 29,517 | $ 27,705 | $ 29,516 | $ 25,121 | $ 25,121 | $ 25,624 | $ 26,136 | $ 26,659 | $ 27,192 | $ 27,736 | $ 28,291 | $ 28,857 | $ 29,434 | $ 30,022 |
| | | | | | | | | | | | | | | | | |
| Overtime as a % of salary & wages | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Pension as a % of salary & wages | | | | | | 8.4% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| Medical & fringe as a % of salary & wage | 39.9% | 36.7% | 39.2% | 44.6% | 51.5% | 83.8% | 97.2% | 97.6% | 99.7% | 102.6% | 105.5% | 108.8% | 112.0% | 115.5% | 118.8% | 122.1% |

| Key Items | Comment/Reference |
|---|---|
| Revenues | |
| Sales and charges for services | Changed fees |
| Expenses | |
| Personnel expenses | Appendix C.1 - Appendix C.3 |

| Operational restructuring | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Additional Department employees | - | - | - | - | - | - | - | - | - | - | - |

(1) Based on department salaries & wages and employees, see Appendix C.2.

**Ten-Year Financial Projections**
**City Council - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | - | - | 0.0 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Revenue from use of assets | 0.0 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | 0.0 | (0.0) | 0.0 | 0.0 | 0.2 | 0.1 | - | - | - | - | - | - | - | - | - | - |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | (0.0) | - | 0.0 | - | 0.0 | 0.1 | - | - | - | - | - | - | - | - | - | - |
| **Total revenues** | (0.0) | (0.0) | 0.0 | 0.0 | 0.2 | 0.1 | - | - | - | - | - | - | - | - | - | - |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (5.8) | (6.0) | (5.3) | (4.1) | (3.4) | (2.9) | (0.6) | (0.7) | (0.7) | (0.7) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) |
| Overtime | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pension | (0.5) | (0.4) | (0.6) | (0.6) | (0.4) | (0.3) | (0.4) | (0.5) | (0.6) | (0.7) | (0.8) | (0.8) | (0.8) | (0.9) | (0.9) | (1.0) |
| Medical & fringe benefits | (2.6) | (2.5) | (2.5) | (2.2) | (2.4) | (2.2) | (1.6) | (1.7) | (1.7) | (1.8) | (1.9) | (2.0) | (2.1) | (2.2) | (2.3) | (2.4) |
| Professional and contractual services | (2.4) | (2.1) | (2.1) | (3.5) | (3.7) | (3.0) | (5.0) | (5.1) | (5.1) | (5.2) | (5.2) | (5.3) | (5.3) | (5.4) | (5.4) | (5.5) |
| Materials & supplies | (0.1) | (0.2) | (0.3) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Utilities | (0.2) | (0.1) | (0.1) | (0.1) | (0.1) | (0.0) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Purchased services | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Risk management and insurance | - | - | 0.0 | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | (1.4) | (0.9) | (0.7) | (0.6) | (0.6) | (0.7) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) |
| Debt service | (0.1) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (0.7) | (0.7) | (0.8) | (0.9) | (0.9) | (1.0) | (0.3) | (0.3) | (0.3) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) |
| Transfers out | - | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (13.6) | (13.0) | (12.4) | (12.2) | (11.7) | (10.2) | (8.6) | (9.1) | (9.3) | (9.5) | (9.7) | (9.9) | (10.1) | (10.4) | (10.6) | (10.8) |
| **Total surplus (deficit)** | $ (13.6) | $ (13.0) | $ (12.4) | $ (12.2) | $ (11.5) | $ (10.1) | $ (8.6) | $ (9.1) | $ (9.3) | $ (9.5) | $ (9.7) | $ (9.9) | $ (10.1) | $ (10.4) | $ (10.6) | (10.8) |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| *Expenses* | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 |
| Technology | | | | | | - | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Capital expenditures and other infrastructure | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 |
| **Operational restructuring** | | | | | | $ - | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | 0.4 |
| **Adjusted surplus (deficit)** | | | | | | $ (10.1) | $ (8.3) | $ (8.6) | $ (8.9) | $ (9.1) | $ (9.3) | $ (9.5) | $ (9.7) | $ (9.9) | $ (10.2) | (10.4) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

**Ten-Year Financial Projections**
**City Council - general fund - Key assumptions**

| | | Fiscal year ended actual | | | | | | Preliminary forecast | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 90 | 97 | 74 | 61 | 52 | 46 | 9 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 |
| Average salary & wages(1) | $ 64,504 | $ 61,899 | $ 71,166 | $ 67,902 | $ 66,094 | $ 63,205 | $ 68,378 | $ 71,500 | $ 72,930 | $ 74,389 | $ 75,876 | $ 77,394 | $ 78,942 | $ 80,521 | $ 82,131 | $ 83,774 |
| Average overtime | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | $ 64,504 | $ 61,899 | $ 71,166 | $ 67,902 | $ 66,094 | $ 63,205 | $ 68,378 | $ 71,500 | $ 72,930 | $ 74,389 | $ 75,876 | $ 77,394 | $ 78,942 | $ 80,521 | $ 82,131 | $ 83,774 |
| | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Overtime as a % of salary & wages | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Pension as a % of salary & wages | | | | | | 10.9% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| Medical & fringe as a % of salary & wages | 44.9% | 41.5% | 48.0% | 54.0% | 71.1% | 76.1% | 247.3% | 232.0% | 235.2% | 241.0% | 246.3% | 254.5% | 262.0% | 270.7% | 278.0% | 285.3% |

| Key Items | Comment/Reference |
|---|---|
| Expenses | |
| Personnel expenses | Appendix C.1 - Appendix C.3 |
| Professional and contractual services | Support staff personal service contracts and other City Council member's office expenses, media services, and board of review |
| Other expenses | Primarily rental expense |

**Operational restructuring**

| Additional Department employees | | | | | | - | - | - | - | - | - | - | - | - | - | - |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

(1) Based on department salaries & wages and employees, see Appendix C.2.

**Ten-Year Financial Projections**
**Ombudsperson - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Revenue from use of assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | 0.0 | - | 0.0 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total revenues** | 0.0 | - | 0.0 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (0.7) | (0.8) | (0.8) | (0.6) | (0.6) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) |
| Overtime | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pension | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.3) | (0.4) | (0.4) | (0.5) | (0.5) | (0.6) | (0.6) | (0.6) | (0.7) | (0.7) |
| Medical & fringe benefits | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.4) | (0.4) | (0.5) | (0.5) | (0.5) | (0.5) | (0.6) | (0.6) | (0.6) | (0.6) |
| Professional and contractual services | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Materials & supplies | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Utilities | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Purchased services | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Risk management and insurance | - | - | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | (0.1) | (0.1) | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Debt service | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.2) | (0.2) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) |
| Transfers out | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (1.4) | (1.4) | (1.3) | (1.1) | (1.1) | (0.9) | (1.5) | (1.6) | (1.7) | (1.8) | (1.9) | (2.0) | (2.0) | (2.1) | (2.2) | (2.2) |
| **Total surplus (deficit)** | $ (1.4) | $ (1.4) | $ (1.3) | $ (1.1) | $ (1.1) | $ (0.9) | $ (1.5) | $ (1.6) | $ (1.7) | $ (1.8) | $ (1.9) | $ (2.0) | $ (2.0) | $ (2.1) | $ (2.2) | (2.2) |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| _Expenses_ | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | - | (0.6) | (1.0) | (1.1) | (1.1) | (1.1) | (1.1) | (1.1) | (1.2) | (1.2) |
| Technology | | | | | | - | - | (3.0) | (0.5) | (0.5) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) |
| Capital expenditures and other infrastructure | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | - | (3.7) | (1.6) | (1.6) | (1.6) | (1.7) | (1.7) | (1.7) | (1.8) | (1.8) |
| **Operational restructuring** | | | | | | $ - | $ - | $ (3.7) | $ (1.6) | $ (1.6) | $ (1.6) | $ (1.7) | $ (1.7) | $ (1.7) | $ (1.8) | (1.8) |
| **Adjusted surplus (deficit)** | | | | | | $ (0.9) | $ (1.5) | $ (5.3) | $ (3.3) | $ (3.4) | $ (3.6) | $ (3.6) | $ (3.7) | $ (3.8) | $ (3.9) | (4.0) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

**Ten-Year Financial Projections**
**Ombudsperson - general fund - Key assumptions**

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 10 | 11 | 11 | 7 | 7 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 |
| Average salary & wages(1) | $ 73,193 | $ 75,227 | $ 69,371 | $ 82,534 | $ 79,133 | $ 72,256 | $ 81,064 | $ 82,685 | $ 84,339 | $ 86,025 | $ 87,746 | $ 89,501 | $ 91,291 | $ 93,117 | $ 94,979 | $ 96,879 |
| Average overtime | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | $ 73,193 | $ 75,227 | $ 69,371 | $ 82,534 | $ 79,133 | $ 72,256 | $ 81,064 | $ 82,685 | $ 84,339 | $ 86,025 | $ 87,746 | $ 89,501 | $ 91,291 | $ 93,117 | $ 94,979 | $ 96,879 |
| | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Overtime as a % of salary & wages | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Pension as a % of salary & wages | | | | | | 6.2% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| Medical & fringe as a % of salary & wages | 41.2% | 37.6% | 40.8% | 45.5% | 51.7% | 65.8% | 84.7% | 86.4% | 87.6% | 89.7% | 91.6% | 94.3% | 96.8% | 99.7% | 102.2% | 104.7% |

| Key Items | Comment/Reference |
|---|---|
| Expenses | |
| Personnel expenses | Appendix C.1 - Appendix C.3 |

| Operational restructuring | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Additional Department employees | | | | | | - | - | 13 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 |

(1) Based on department salaries & wages and employees, see Appendix C.2.

**Ten-Year Financial Projections**
**City Clerk - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Revenue from use of assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total revenues** | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (1.2) | (1.2) | (1.1) | (0.9) | (0.9) | (0.6) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) |
| Overtime | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Pension | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.4) | (0.5) | (0.6) | (0.7) | (0.7) | (0.8) | (0.8) | (0.9) | (0.9) | (0.9) |
| Medical & fringe benefits | (0.6) | (0.5) | (0.5) | (0.4) | (0.5) | (0.5) | (0.8) | (0.9) | (0.9) | (0.9) | (1.0) | (1.0) | (1.1) | (1.1) | (1.2) | (1.2) |
| Professional and contractual services | (0.0) | (0.0) | (0.0) | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.1) | (0.1) |
| Materials & supplies | (0.9) | (0.6) | (0.5) | (0.5) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) |
| Utilities | (0.0) | (0.1) | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Purchased services | (0.0) | 0.0 | (0.0) | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - |
| Risk management and insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | (0.5) | (0.5) | (0.5) | (0.4) | (0.7) | (0.3) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.6) |
| Debt service | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) |
| Transfers out | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (3.6) | (3.1) | (2.9) | (2.6) | (2.7) | (2.2) | (3.2) | (3.3) | (3.5) | (3.6) | (3.8) | (3.9) | (4.0) | (4.1) | (4.2) | (4.3) |
| **Total surplus (deficit)** | $ (3.6) | $ (3.1) | $ (2.9) | $ (2.6) | $ (2.7) | $ (2.2) | $ (3.2) | $ (3.3) | $ (3.5) | $ (3.6) | $ (3.7) | $ (3.8) | $ (4.0) | $ (4.1) | $ (4.2) | (4.3) |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| *Expenses* | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 |
| Technology | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Capital expenditures and other infrastructure | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 |
| **Operational restructuring** | | | | | | $ - | $ 0.1 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.3 | $ 0.3 | 0.3 |
| **Adjusted surplus (deficit)** | | | | | | $ (2.2) | $ (3.1) | $ (3.1) | $ (3.2) | $ (3.4) | $ (3.5) | $ (3.6) | $ (3.7) | $ (3.8) | $ (3.9) | (4.0) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

13-53846-tji Doc 2782-1 Filed 12/16/41/15 Entered 12/16/14 10:21:49 Page 543 of 602
13-53846-swr Doc 7382-2 Filed 09/11/14 Entered 09/11/14 18:36:38 Page 145 of
204

3/30/2014 11:01 PM

**Ten-Year Financial Projections**
**City Clerk - general fund - Key assumptions**

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 25 | 23 | 22 | 20 | 18 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 |
| | | | | | | | | | | | | | | | | |
| Average salary & wages(1) | $ 48,947 | $ 53,794 | $ 48,633 | $ 46,038 | $ 48,336 | $ 42,763 | $ 46,300 | $ 47,226 | $ 48,171 | $ 49,134 | $ 50,117 | $ 51,119 | $ 52,142 | $ 53,184 | $ 54,248 | 55,333 |
| Average overtime | 26 | 115 | 119 | 85 | 13 | 22 | 24 | 24 | 25 | 25 | 26 | 26 | 27 | 28 | 28 | 29 |
| | $ 48,973 | $ 53,909 | $ 48,752 | $ 46,123 | $ 48,349 | $ 42,785 | $ 46,324 | $ 47,251 | $ 48,196 | $ 49,160 | $ 50,143 | $ 51,146 | $ 52,169 | $ 53,212 | $ 54,276 | 55,362 |
| | | | | | | | | | | | | | | | | |
| Overtime as a % of salary & wages | 0.1% | 0.2% | 0.2% | 0.2% | 0.0% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% |
| Pension as a % of salary & wages | | | | | | 13.2% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| Medical & fringe as a % of salary & wage | 48.7% | 40.5% | 44.4% | 48.0% | 57.8% | 75.5% | 119.7% | 122.0% | 124.0% | 127.1% | 130.1% | 134.2% | 138.0% | 142.4% | 146.2% | 150.0% |

**Key Items**      **Comment/Reference**

| | |
|---|---|
| Expenses | |
| Personnel expenses | Appendix C.1 - Appendix C.3 |
| Materials & supplies | Printing supplies |
| Other expenses | Advertising and rental expenses |

**Operational restructuring**

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Additional Department employees | - | (1) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) |

(1) Based on department salaries & wages and employees, see Appendix C.2.

3/30/2014 11:01 PM

**Ten-Year Financial Projections**
**Elections - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | 1.2 | 0.0 | 0.0 | 0.0 | 0.0 | 1.1 | - | - | - | - | - | - | - | - | - | - |
| Revenue from use of assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | 0.0 | 0.0 | - | - | - | 0.1 | - | - | - | - | - | - | - | - | - | - |
| **Total revenues** | 1.2 | 0.0 | 0.0 | 0.0 | 0.0 | 1.2 | - | - | - | - | - | - | - | - | - | - |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (2.7) | (3.4) | (2.4) | (2.1) | (2.0) | (1.9) | (2.2) | (1.7) | (1.7) | (1.8) | (1.8) | (1.9) | (1.9) | (1.9) | (2.0) | (2.0) |
| Overtime | (0.5) | (0.8) | (0.3) | (0.4) | (0.2) | (0.4) | (0.5) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) |
| Pension | 0.1 | 0.0 | 0.2 | 0.2 | 0.2 | (0.2) | (1.4) | (1.3) | (1.5) | (1.6) | (1.8) | (1.9) | (2.0) | (2.1) | (2.2) | (2.3) |
| Medical & fringe benefits | (1.4) | (1.5) | (1.3) | (1.3) | (1.2) | (1.4) | (2.0) | (1.8) | (1.9) | (2.0) | (2.1) | (2.2) | (2.3) | (2.4) | (2.6) | (2.7) |
| Professional and contractual services | (4.2) | (6.5) | (3.4) | (2.9) | (2.5) | (3.3) | (6.1) | (3.3) | (3.3) | (3.3) | (6.6) | (3.3) | (3.3) | (3.3) | (6.6) | (3.3) |
| Materials & supplies | (0.6) | (0.5) | (0.3) | (0.5) | (0.7) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) |
| Utilities | (0.3) | (0.4) | (0.4) | (0.2) | (0.3) | (0.1) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) |
| Purchased services | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Risk management and insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | (0.4) | (0.2) | (0.2) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Debt service | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (0.7) | (0.7) | (0.8) | (0.8) | (0.9) | (0.6) | (1.0) | (0.8) | (0.8) | (0.9) | (0.9) | (0.9) | (0.9) | (0.9) | (0.9) | (0.9) |
| Transfers out | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (10.8) | (14.1) | (8.7) | (8.0) | (7.6) | (8.5) | (14.2) | (10.0) | (10.3) | (10.7) | (14.3) | (11.3) | (11.5) | (11.8) | (15.3) | (12.3) |
| **Total surplus (deficit)** | $ (9.7) | $ (14.0) | $ (8.7) | $ (8.0) | (7.6) | $ (7.3) | $ (14.2) | $ (10.0) | $ (10.3) | $ (10.7) | $ (14.3) | $ (11.3) | $ (11.5) | $ (11.8) | $ (15.3) | (12.3) |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| *Expenses* | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Technology | | | | | | - | (0.0) | - | - | - | - | - | - | - | - | - |
| Capital expenditures and other infrastructure | | | | | | - | (0.6) | (0.6) | - | - | - | - | (0.5) | (0.5) | (0.5) | (0.5) |
| Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | (0.6) | (0.6) | 0.0 | 0.0 | 0.0 | 0.0 | (0.5) | (0.5) | (0.5) | (0.5) |
| **Operational restructuring** | | | | | | $ - | $ (0.6) | $ (0.6) | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ (0.5) | $ (0.5) | $ (0.5) | (0.5) |
| **Adjusted surplus (deficit)** | | | | | | $ (7.3) | $ (14.7) | $ (10.6) | $ (10.3) | $ (10.6) | $ (14.3) | $ (11.2) | $ (12.0) | $ (12.2) | $ (15.8) | (12.8) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

**Ten-Year Financial Projections**
**Elections - general fund - Key assumptions**

|  | | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 68 | 102 | 55 | 51 | 83 | 80 | 80 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 |
| Average salary & wages(1) | $ 39,379 | $ 33,805 | $ 44,289 | $ 40,872 | $ 23,655 | $ 24,311 | $ 27,971 | $ 28,530 | $ 29,101 | $ 29,683 | $ 30,277 | $ 30,882 | $ 31,500 | $ 32,130 | $ 32,772 | $ 33,428 |
| Average overtime | 8,088 | 7,564 | 5,040 | 7,017 | 2,514 | 5,046 | 6,259 | 3,032 | 3,093 | 3,155 | 3,218 | 3,282 | 3,348 | 3,415 | 3,483 | 3,553 |
|  | $ 47,467 | $ 41,369 | $ 49,329 | $ 47,890 | $ 26,169 | $ 29,357 | $ 34,230 | $ 31,562 | $ 32,194 | $ 32,838 | $ 33,494 | $ 34,164 | $ 34,847 | $ 35,544 | $ 36,255 | $ 36,980 |
| Overtime as a % of salary & wages | 20.5% | 22.4% | 11.4% | 17.2% | 10.6% | 20.8% | 22.4% | 10.6% | 10.6% | 10.6% | 10.6% | 10.6% | 10.6% | 10.6% | 10.6% | 10.6% |
| Pension as a % of salary & wages |  |  |  |  |  | 9.1% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| Medical & fringe as a % of salary & wages | 53.5% | 43.5% | 52.9% | 62.6% | 62.0% | 73.3% | 90.9% | 107.1% | 109.2% | 112.3% | 115.3% | 118.9% | 122.4% | 126.2% | 129.7% | 133.3% |

| Key Items | Comment/Reference |
|---|---|
| General | Due to the FY 2014 election year, overtime and professional and contractual services are temporarily increased |
| Expenses |  |
| Personnel expenses | Appendix C.1 - Appendix C.3 |
| Professional and contractual services | Administration of conducting elections and information technology contracts |
| Materials & supplies | Primarily postage |
| Utilities | Steam, telecommunications, and electricity |

| Operational restructuring | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Additional Department employees | - | - | - | - | - | - | - | - | - | - | - |

(1) Based on department salaries & wages and employees, see Appendix C.2.

13-53846-tjt Doc 8783 Filed 12/16/14 Entered 12/16/14 08:21:49 Page 546 of 602
13-53846-swr Doc 3382-2 Filed 03/31/14 Entered 03/31/14 16:36:39 Page 14 of
204

3/30/2014 11:01 PM

**Ten-Year Financial Projections**
**36th District Court - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | 0.8 | 0.2 | 0.7 | 0.1 | 0.4 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 |
| Sales and charges for services | 11.2 | 11.1 | 9.2 | 10.1 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 |
| Revenue from use of assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | 7.5 | 7.4 | 6.7 | 6.8 | 6.2 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total revenues** | 19.6 | 18.7 | 16.6 | 17.1 | 16.6 | 17.6 | 17.6 | 17.6 | 17.6 | 17.6 | 17.6 | 17.6 | 17.6 | 17.6 | 17.6 | 17.6 |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (20.9) | (21.3) | (21.0) | (19.7) | (18.7) | (18.6) | (18.6) | (18.9) | (19.3) | (19.7) | (20.1) | (20.5) | (20.9) | (21.3) | (21.8) | (22.2) |
| Overtime | (0.2) | (0.3) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) |
| Pension | (4.1) | (4.3) | (4.7) | (4.7) | (5.1) | (5.0) | (5.0) | (5.0) | (5.0) | (5.0) | (5.0) | (5.0) | (5.0) | (5.0) | (5.0) | (5.0) |
| Medical & fringe benefits | (7.4) | (6.9) | (7.6) | (7.9) | (7.3) | (6.3) | (6.6) | (6.9) | (7.3) | (7.7) | (8.1) | (8.5) | (8.9) | (9.4) | (9.8) | (10.3) |
| Professional and contractual services | (2.3) | (2.2) | (2.2) | (2.3) | (2.2) | (2.1) | (2.1) | (2.1) | (2.1) | (2.2) | (2.2) | (2.2) | (2.2) | (2.3) | (2.3) | (2.3) |
| Materials & supplies | (1.0) | (1.0) | (0.9) | (0.8) | (0.5) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.9) | (0.9) | (0.9) | (0.9) | (0.9) |
| Utilities | (0.8) | (0.6) | (0.6) | (0.5) | (0.6) | (0.4) | (0.4) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) |
| Purchased services | (5.0) | (4.1) | (3.8) | (3.9) | (3.0) | (0.4) | (3.0) | (3.0) | (3.0) | (3.1) | (3.1) | (3.1) | (3.2) | (3.2) | (3.2) | (3.2) |
| Risk management and insurance | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Other expenses | (4.1) | (4.9) | (4.1) | (3.1) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) |
| Debt service | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Transfers out | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (45.8) | (45.6) | (45.0) | (43.2) | (37.7) | (34.1) | (36.9) | (37.7) | (38.5) | (39.3) | (40.2) | (41.1) | (42.0) | (42.9) | (43.9) | (44.9) |
| **Total surplus (deficit)** | $ (26.3) | $ (26.8) | $ (28.4) | $ (26.2) | $ (21.2) | $ (16.5) | $ (19.3) | $ (20.1) | $ (20.9) | $ (21.8) | $ (22.7) | $ (23.5) | $ (24.4) | $ (25.3) | $ (26.3) | (27.3) |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | 5.8 | 8.2 | 8.5 | 8.7 | 9.0 | 9.2 | 9.5 | 9.8 | 10.1 |
| *Expenses* | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | 0.7 | 2.5 | 3.1 | 3.1 | 3.2 | 3.3 | 3.4 | 3.4 | 3.5 | 3.6 |
| Technology | | | | | | - | - | (1.6) | 0.8 | 0.4 | 0.4 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| Capital expenditures and other infrastructure | | | | | | - | - | (1.0) | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 |
| Implementation costs | | | | | | - | - | (1.0) | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 |
| Subtotal: Expenses | | | | | | - | 0.7 | (1.2) | 1.4 | 1.9 | 2.0 | 2.3 | 2.3 | 2.4 | 2.5 | 2.6 |
| **Operational restructuring** | | | | | | $ - | $ 0.7 | 4.7 | 9.6 | 10.4 | 10.7 | 11.2 | 11.6 | 11.9 | 12.3 | 12.7 |
| **Adjusted surplus (deficit)** | | | | | | $ (16.5) | $ (18.6) | $ (15.4) | $ (11.2) | $ (11.4) | $ (12.0) | $ (12.3) | $ (12.8) | $ (13.4) | $ (14.0) | (14.6) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

**Ten-Year Financial Projections**
**36th District Court - general fund - Key assumptions**

| | | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 285 | 285 | 285 | 285 | 365 | 362 | 362 | 362 | 362 | 362 | 362 | 362 | 362 | 362 | 362 | 362 |
| | | | | | | | | | | | | | | | | |
| Average salary & wages(1) | $ 73,310 | $ 74,878 | $ 73,616 | $ 69,189 | $ 51,102 | $ 51,391 | $ 51,391 | $ 52,419 | $ 53,467 | $ 54,537 | $ 55,627 | $ 56,740 | $ 57,875 | $ 59,032 | $ 60,213 | 61,417 |
| Average overtime | 756 | 1,012 | 786 | 739 | 458 | 420 | 420 | 428 | 437 | 446 | 454 | 464 | 473 | 482 | 492 | 502 |
| | $ 74,067 | $ 75,891 | $ 74,403 | $ 69,928 | $ 51,559 | $ 51,811 | $ 51,811 | $ 52,847 | $ 53,904 | $ 54,982 | $ 56,082 | $ 57,203 | $ 58,347 | $ 59,514 | $ 60,705 | 61,919 |
| | | | | | | | | | | | | | | | | |
| Overtime as a % of salary & wages | 1.0% | 1.4% | 1.1% | 1.1% | 0.9% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% |
| | | | | | | | | | | | | | | | | |
| Pension as a % of salary & wages | | | | | | 26.7% | 26.7% | 26.1% | 25.6% | 25.1% | 24.6% | 24.2% | 23.7% | 23.2% | 22.8% | 22.3% |
| | | | | | | | | | | | | | | | | |
| Medical & fringe as a % of salary & wage | 35.4% | 32.1% | 36.1% | 39.9% | 39.0% | 33.9% | 35.4% | 36.5% | 37.7% | 39.0% | 40.4% | 41.5% | 42.7% | 43.9% | 45.1% | 46.4% |

| Key Items | Comment/Reference |
|---|---|
| Revenues | |
| State revenue sharing | State transferred court fines |
| Sales and charges for services | Court fees, including traffic, civil, real estate, and general administrative fees |
| Parking/court fines and other revenue | Court fines |
| Expenses | |
| Personnel expenses | Appendix C.1 - Appendix C.3 |
| Professional and contractual services | Legal and other contracts (court administration) |
| Materials & supplies | Repairs & maintenance, postage, and office supplies |
| Utilities | Electricity and telecommunications |
| Purchased services | Court security expense |

**Operational restructuring**

| | | | | | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Additional Department employees | | | | | - | (41) | (56) | (66) | (66) | (66) | (66) | (66) | (66) | (66) | (66) |

(1) Based on department salaries & wages and employees, see Appendix C.2.

13-53846-tjt Doc 8738-2 Filed 12/16/14 Entered 12/16/14 08:24:49 Page 548 of 602
13-53846-swr Doc 3382-2 Filed 02/31/14 Entered 02/31/14 18:06:38 Page 156 of 204
3/30/2014 11:01 PM

**Ten-Year Financial Projections**
**Non-Departmental - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ 155.2 | $ 163.7 | $ 143.0 | $ 182.7 | 147.8 | $ 133.6 | $ 114.9 | $ 104.2 | $ 100.1 | $ 97.2 | $ 97.1 | $ 95.2 | $ 89.6 | $ 89.5 | $ 90.1 | 90.7 |
| Municipal income tax | 276.5 | 240.8 | 216.5 | 228.3 | 233.0 | 248.0 | 246.4 | 250.4 | 252.1 | 253.8 | 255.5 | 257.1 | 258.7 | 260.9 | 264.1 | 267.3 |
| Wagering taxes | 180.4 | 173.0 | 183.3 | 176.9 | 181.4 | 174.6 | 169.9 | 168.2 | 169.9 | 171.6 | 173.3 | 175.0 | 176.8 | 178.5 | 180.3 | 182.1 |
| Utility users' and other taxes | 21.3 | 21.6 | 20.6 | 20.2 | 17.3 | 11.9 | 9.6 | 9.6 | 9.6 | 9.6 | 9.6 | 9.6 | 9.6 | 9.6 | 9.6 | 9.6 |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | 248.8 | 266.4 | 263.0 | 239.2 | 172.9 | 183.1 | 190.2 | 192.0 | 193.8 | 195.4 | 197.1 | 198.9 | 200.7 | 194.2 | 195.9 | 197.7 |
| Sales and fees for services | 62.5 | 61.6 | 50.7 | 64.9 | 56.4 | 54.7 | 51.8 | 51.7 | 52.2 | 52.7 | 53.2 | 53.7 | 54.2 | 54.8 | 55.3 | 55.9 |
| Revenue from use of assets | 12.9 | 3.7 | 1.3 | 1.6 | 1.0 | 0.4 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| Parking/court fines and other revenue | 26.9 | 26.0 | 24.8 | 37.2 | 6.8 | 3.8 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 |
| DDOT risk mgmt reimbursement | 10.8 | 12.9 | 10.0 | 12.1 | 12.1 | 1.6 | 9.9 | 12.1 | 12.1 | 12.1 | 12.1 | 12.1 | 12.1 | 12.1 | 12.1 | 12.1 |
| Reimb. from parking & vehicle fund | 61.6 | 78.8 | 66.7 | 50.1 | 62.3 | 74.0 | 11.9 | 25.4 | 25.5 | 5.1 | 5.1 | 5.1 | 5.1 | 5.1 | 5.1 | 5.1 |
| Street fund reimb. and financing proceeds | 73.6 | 4.7 | 264.1 | 6.0 | 4.3 | 147.7 | 4.2 | 4.2 | 4.2 | 4.2 | 4.2 | 4.2 | 4.2 | 4.2 | 4.2 | 4.2 |
| Grant revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total revenues** | 1,130.4 | 1,053.2 | 1,244.1 | 1,019.1 | 895.3 | 1,033.4 | 811.8 | 820.9 | 822.4 | 804.6 | 810.2 | 813.9 | 814.0 | 812.0 | 819.7 | 827.6 |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (2.3) | (3.9) | (5.6) | 4.7 | (6.7) | (0.9) | (0.9) | (0.7) | (0.7) | (0.7) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) |
| Overtime | (0.2) | (0.2) | 0.0 | - | (0.0) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Pension | (1.0) | (3.5) | 4.4 | (1.9) | (0.6) | 2.3 | (0.5) | (0.5) | (0.6) | (0.7) | (0.8) | (0.8) | (0.8) | (0.9) | (0.9) | (0.9) |
| Medical & fringe benefits | (7.1) | (19.6) | (15.4) | (9.5) | (1.1) | (8.1) | (0.4) | (0.3) | (0.3) | (0.3) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) |
| Professional and contractual services | (12.3) | (9.9) | (2.2) | (2.0) | (3.3) | (13.4) | (3.3) | (3.3) | (3.4) | (3.4) | (3.4) | (3.5) | (3.5) | (3.6) | (3.6) | (3.6) |
| Materials & supplies | (0.5) | (0.4) | (0.5) | (0.3) | (0.4) | (1.8) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) |
| Utilities | (0.3) | (0.0) | (0.2) | (0.0) | (0.1) | 0.0 | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Purchased services | (0.4) | (0.9) | (0.1) | (0.7) | 0.0 | (0.4) | (0.4) | (5.4) | (4.7) | (4.7) | (4.7) | (4.7) | (4.7) | (4.7) | (4.7) | (4.7) |
| Risk management and insurance | (112.4) | (96.2) | (100.4) | (104.0) | (75.2) | (104.0) | (35.2) | (43.2) | (43.6) | (44.0) | (44.5) | (44.9) | (45.4) | (45.8) | (46.3) | (46.7) |
| Other expenses | (48.7) | (32.4) | (32.5) | 19.8 | (9.1) | (21.9) | (10.8) | (10.8) | (10.8) | (10.8) | (10.9) | (10.9) | (10.9) | (10.9) | (11.0) | (11.0) |
| Debt service | (0.7) | (2.7) | (9.9) | (2.5) | (1.3) | (2.3) | (78.1) | (62.1) | (62.1) | (38.9) | (38.8) | (38.8) | (38.9) | (39.3) | (37.6) | (37.5) |
| Contributions to non-enterprise funds | (108.9) | (44.0) | (23.5) | (17.8) | (12.8) | (18.1) | (10.7) | (29.1) | (29.1) | (8.8) | (8.8) | (8.8) | (8.8) | (8.8) | (8.8) | (8.8) |
| POC - principal and interest1 | (5.2) | (2.0) | (2.2) | (7.1) | (2.6) | (4.9) | (0.4) | (0.3) | (0.3) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) |
| Transfers out | (112.5) | (179.0) | (136.5) | (138.0) | (156.5) | (115.7) | (85.5) | (86.0) | (93.4) | (100.2) | (107.4) | (112.4) | (117.8) | (123.3) | (128.9) | (134.2) |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (412.5) | (394.7) | (324.3) | (259.4) | (269.7) | (289.1) | (226.6) | (242.2) | (249.7) | (213.4) | (221.2) | (226.8) | (232.9) | (239.3) | (243.8) | (249.7) |
| **Total surplus (deficit)** | $ 717.8 | $ 658.5 | $ 919.9 | $ 759.8 | 625.7 | $ 744.3 | $ 585.2 | $ 578.6 | $ 572.8 | $ 591.2 | $ 589.0 | $ 587.1 | $ 581.1 | $ 572.7 | $ 575.9 | 577.9 |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ 3.1 | $ 7.9 | $ 7.9 | $ 7.7 | $ 5.2 | $ 5.2 | $ 5.2 | $ 5.2 | $ 5.2 | 5.2 |
| Expenses | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Technology | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Capital expenditures and other infrastructure | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| **Operational restructuring** | | | | | | $ - | $ 3.1 | $ 7.9 | $ 7.9 | $ 7.7 | $ 5.2 | $ 5.2 | $ 5.2 | $ 5.2 | $ 5.2 | 5.2 |
| **Adjusted surplus (deficit)** | | | | | | $ 744.3 | $ 588.3 | $ 586.6 | $ 580.7 | $ 598.9 | $ 594.2 | $ 592.3 | $ 586.4 | $ 577.9 | $ 581.1 | 583.1 |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

13-53846-tjt Doc 8738-2 Filed 12/16/14 Entered 12/16/14 10:21:40 Page 549 of 602
204
13-53846-swr Doc 7382-2 Filed 09/11/14 Entered 09/11/14 16:36:38 Page 15 of 102
3/30/2014 11:01 PM

**Ten-Year Financial Projections**
**Non-Departmental - general fund - Key assumptions**

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 44 | 33 | 21 | 20 | 14 | 21 | 21 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 |
| | | | | | | | | | | | | | | | | |
| Average salary & wages(1) | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| Average overtime | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| | | | | | | | | | | | | | | | | |
| Overtime as a % of salary & wages | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| Pension as a % of salary & wages | | | | | | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| Medical & fringe as a % of salary & wages | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |

| Key Items | Comment/Reference |
|---|---|
| **Revenues** | |
| Property taxes | Appendix B.1a |
| Municipal income tax | Appendix B.2 |
| Wagering taxes | Appendix B.3 |
| Utility users' and other taxes | Reimbursements, including cable franchise fees and interest/penalties on taxes |
| State revenue sharing | Appendix B.4; State shared taxes & liquor & beer license fees |
| Sales and charges for services | Primarily interagency billings and Casino municipal services fee |
| Parking/court fines and other revenue | Other revenue / Misc. receipts |
| Reimb. from parking & vehicle fund | Reimbursements from Parking Department & Vehicle Fund for amounts paid on their behalf |
| **Expenses** | |
| Personnel expenses | Appendix C.1 - Appendix C.3 |
| Materials & supplies | Primarily dues and memberships |
| Purchased services | One-time implementation and recurring payroll administration outsourcing costs reflected beginning Q3 FY 2015. Full year recurring costs reflected beginning FY 2016 |
| Risk management and insurance | General Fund risk management and insurance payments. Historical data captures double count, which gets eliminated by CAFR adjustments |
| Other expenses | Primarily development authority, construction and capital improvement costs (DDA & LDFA) funded by grants and special tax revenues |
| Debt service | General Fund debt service payments |
| Contributions to non-enterprise funds | Primarily contributions to Municipal Parking, Vehicle Fund, and the museum of African American History |
| Transfers out | Historical data represents debt service, which gets reallocated by CAFR adjustments |

**Operational restructuring**

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Additional Department employees | - | - | - | - | - | - | - | - | - | - | - | - | - |

(1) Based on department salaries & wages and employees, see Appendix C.2.

13-53846-tjt Doc 8779 Filed 12/16/14 Entered 12/16/14 08:24:49 Page 550 of 602
204
13-53846-swr Doc 3382-2 Filed 03/31/14 Entered 03/31/14 16:36:38 Page 152 of 204     3/30/2014 11:01 PM

**Ten-Year Financial Projections**
**BSED - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | (0.0) | - | - | 1.9 | 1.8 | 1.9 | 1.9 | 2.0 | 2.0 | 2.0 | 2.1 | 2.1 | 2.2 | 2.2 | 2.2 | 2.3 |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | - | - | - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Revenue from use of assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | - | 3.9 | - | - | 0.2 | 1.0 | - | - | - | - | - | - | - | - | - | - |
| **Total revenues** | (0.0) | 3.9 | - | 2.0 | 1.9 | 2.8 | 1.9 | 2.0 | 2.0 | 2.1 | 2.1 | 2.1 | 2.2 | 2.2 | 2.3 | 2.3 |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | - | - | - | (0.5) | (0.5) | (0.4) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.6) |
| Overtime | - | - | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Pension | 0.1 | 0.1 | 0.1 | (0.1) | (0.0) | (0.0) | (0.3) | (0.4) | (0.4) | (0.5) | (0.5) | (0.5) | (0.6) | (0.6) | (0.6) | (0.6) |
| Medical & fringe benefits | - | - | - | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.4) | (0.4) | (0.4) | (0.4) |
| Professional and contractual services | - | (3.4) | 0.9 | (0.7) | (0.4) | (0.6) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Materials & supplies | - | - | 0.0 | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - |
| Utilities | - | - | - | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - |
| Purchased services | - | - | - | (0.0) | - | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Risk management and insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | 0.0 | - | - | (0.0) | 0.0 | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Debt service | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) |
| Transfers out | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | 0.0 | (3.4) | 0.9 | (1.7) | (1.4) | (1.6) | (1.4) | (1.5) | (1.6) | (1.7) | (1.7) | (1.8) | (1.8) | (1.9) | (2.0) | (2.0) |
| **Total surplus (deficit)** | $ (0.0) | $ 0.6 | $ 0.9 | $ 0.2 | 0.6 | $ 1.2 | $ 0.5 | $ 0.5 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | 0.3 |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | 0.2 |
| _Expenses_ | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | (0.6) | (2.1) | 2.6 | 3.4 | 3.0 | 3.8 | 3.9 | 3.5 | 4.0 | 4.1 |
| Technology | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Capital expenditures and other infrastructure | | | | | | - | - | (0.4) | - | - | - | - | - | - | - | - |
| Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | (0.6) | (2.4) | 2.6 | 3.4 | 3.0 | 3.8 | 3.9 | 3.5 | 4.0 | 4.1 |
| **Operational restructuring** | | | | | | $ - | $ (0.4) | $ (2.3) | $ 2.7 | $ 3.5 | $ 3.2 | $ 4.0 | $ 4.1 | $ 3.7 | $ 4.2 | 4.2 |
| **Adjusted surplus (deficit)** | | | | | | $ 1.2 | $ 0.1 | $ (1.8) | $ 3.2 | $ 3.9 | $ 3.5 | $ 4.4 | $ 4.4 | $ 4.0 | $ 4.5 | 4.5 |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

13-53846-twr Doc 3382-2 Filed 12/16/41/15 Entered 12/16/41 08 21 40 Page 551 of 602
204
13-53846-swr Doc 7382-2 Filed 09/11/14 Entered 09/11/14 18:36:38 Page 155 of

3/30/2014 11:01 PM

**Ten-Year Financial Projections**
**BSED - general fund - Key assumptions**

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | - | - | - | 6 | 7 | 6 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 |
| Average salary & wages(1) | n/a | n/a | n/a $ | 83,261 $ | 72,376 | $ 67,350 $ | 67,006 $ | 68,346 $ | 69,713 $ | 71,107 $ | 72,529 $ | 73,980 $ | 75,459 $ | 76,968 $ | 78,508 $ | 80,078 |
| Average overtime | n/a | n/a | n/a | 4,143 | 1,797 | 2,426 | 2,414 | 2,462 | 2,511 | 2,561 | 2,612 | 2,665 | 2,718 | 2,772 | 2,828 | 2,884 |
| | $ - $ | - $ | - $ | 87,404 $ | 74,174 | $ 69,776 $ | 69,419 $ | 70,808 $ | 72,224 $ | 73,668 $ | 75,142 $ | 76,644 $ | 78,177 $ | 79,741 $ | 81,336 $ | 82,962 |
| Overtime as a % of salary & wages | n/a | n/a | n/a | 5.0% | 2.5% | 3.6% | 3.6% | 3.6% | 3.6% | 3.6% | 3.6% | 3.6% | 3.6% | 3.6% | 3.6% | 3.6% |
| Pension as a % of salary & wages | | | | | | 10.1% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| Medical & fringe as a % of salary & wages | n/a | n/a | n/a | 56.4% | 61.1% | 72.8% | 57.8% | 58.1% | 59.3% | 60.9% | 62.6% | 64.5% | 66.3% | 68.3% | 70.2% | 72.1% |

**Key Items** | **Comment/Reference**

Revenues
    Licenses, permits and inspection charges — Business license fees
Expenses
    Personnel expenses — Appendix C.1 - Appendix C.3
    Professional and contractual services — Demolition administration and business license center

**Operational restructuring**

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Additional Department employees | | | | | | - | 2 | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) |

(1) Based on department salaries & wages & employees, see Appendix C.2.

13-53846-tjt Doc 8732-2 Filed 12/16/14 Entered 12/16/14 08:21:40 Page 552 of 602
13-53846-swr Doc 3382-2 Filed 03/31/14 Entered 03/31/14 16:56:38 Page 154 of 204

3/30/2014 11:01 PM

**Ten-Year Financial Projections**
**Parking - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Revenue from use of assets | (0.0) | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | 10.4 | 12.5 | 9.8 | 10.5 | 9.0 | 11.4 | 11.4 | 11.4 | 11.4 | 11.4 | 11.4 | 11.4 | 11.4 | 11.4 | 11.4 | 11.4 |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total revenues** | 10.4 | 12.5 | 9.8 | 10.5 | 9.0 | 11.4 | 11.4 | 11.4 | 11.4 | 11.4 | 11.4 | 11.4 | 11.4 | 11.4 | 11.4 | 11.4 |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (1.9) | (1.9) | (1.8) | (1.6) | (1.6) | (1.4) | (1.6) | (1.6) | (1.6) | (1.7) | (1.7) | (1.7) | (1.8) | (1.8) | (1.8) | (1.9) |
| Overtime | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Pension | 0.0 | 0.0 | 0.0 | (0.0) | (0.1) | (0.2) | (1.0) | (1.2) | (1.4) | (1.5) | (1.7) | (1.8) | (1.9) | (1.9) | (2.0) | (2.1) |
| Medical & fringe benefits | (1.0) | (1.0) | (1.0) | (1.0) | (1.1) | (1.2) | (1.1) | (1.1) | (1.2) | (1.2) | (1.3) | (1.3) | (1.4) | (1.5) | (1.6) | (1.6) |
| Professional and contractual services | (4.7) | (2.7) | (3.2) | (3.3) | (1.9) | (2.6) | (2.6) | (2.6) | (2.6) | (2.6) | (2.7) | (2.7) | (2.7) | (2.8) | (2.8) | (2.8) |
| Materials & supplies | (0.0) | (0.1) | (0.0) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Utilities | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Purchased services | (0.3) | 0.0 | (0.9) | (0.5) | (0.2) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Risk management and insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | (0.0) | (0.3) | (0.2) | (0.3) | (0.2) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) |
| Debt service | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest (1) | (0.4) | (0.4) | (0.4) | (0.5) | (0.5) | (0.5) | (0.7) | (0.7) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) |
| Transfers out | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (8.6) | (6.4) | (7.8) | (7.3) | (5.7) | (6.4) | (7.4) | (7.7) | (8.1) | (8.4) | (8.7) | (8.9) | (9.1) | (9.3) | (9.6) | (9.8) |
| **Total surplus (deficit)** | $ 1.8 | $ 6.0 | $ 2.0 | $ 3.2 | 3.3 | $ 5.0 | $ 4.0 | $ 3.7 | $ 3.4 | $ 3.1 | $ 2.8 | $ 2.6 | $ 2.3 | $ 2.1 | $ 1.9 | 1.7 |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | 5.6 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 |
| *Expenses* | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | (0.1) | (0.5) | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Technology | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Capital expenditures and other infrastructure | | | | | | - | (0.5) | (0.6) | (0.2) | (0.2) | (0.2) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) |
| Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | (0.6) | (1.1) | (0.3) | (0.2) | (0.3) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) |
| **Operational restructuring** | | | | | | $ - | $ (0.6) | $ 4.5 | 6.6 | 6.6 | 6.6 | 6.5 | 6.5 | 6.5 | 6.5 | 6.5 |
| **Adjusted surplus (deficit)** | | | | | | $ 5.0 | $ 3.4 | $ 8.2 | 9.9 | 9.7 | 9.3 | 9.0 | 8.8 | 8.6 | 8.3 | 8.1 |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

13-53846-tjt Doc 8738-1 Filed 12/16/14 Entered 12/16/14 08:24:06 Page 553 of 602
13-53846-swr Doc 3382-2 Filed 03/31/14 Entered 03/31/14 18:36:36 Page 155 of 204

3/30/2014 11:01 PM

**Ten-Year Financial Projections**
**Parking - general fund - Key assumptions**

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 109 | 104 | 97 | 92 | 97 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 |
| | | | | | | | | | | | | | | | | |
| Average salary & wages (1) | $ 35,423 | $ 36,835 | $ 37,362 | $ 34,955 | $ 30,576 | $ 30,621 | $ 33,594 | $ 34,266 | $ 34,952 | $ 35,651 | $ 36,364 | $ 37,091 | $ 37,833 | $ 38,589 | $ 39,361 | 40,149 |
| Average overtime | 171 | 51 | 25 | 102 | 19 | 46 | 50 | 51 | 52 | 53 | 54 | 55 | 56 | 57 | 59 | 60 |
| | $ 35,594 | $ 36,886 | $ 37,387 | $ 35,057 | $ 30,594 | $ 30,667 | $ 33,644 | $ 34,317 | $ 35,004 | $ 35,704 | $ 36,418 | $ 37,146 | $ 37,889 | $ 38,647 | $ 39,420 | 40,208 |
| | | | | | | | | | | | | | | | | |
| Overtime as a % of salary & wages | 1.0% | 0.3% | 0.1% | 0.6% | 0.1% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% |
| | | | | | | | | | | | | | | | | |
| Pension as a % of salary & wages | | | | | | 11.6% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| | | | | | | | | | | | | | | | | |
| Medical & fringe as a % of salary & wages | 53.2% | 49.5% | 53.3% | 60.1% | 68.8% | 84.9% | 70.5% | 70.6% | 72.1% | 74.0% | 76.1% | 78.3% | 80.5% | 82.8% | 85.0% | 87.3% |

**Key Items** | **Comment/Reference**

Revenues
    Parking/court fines and other revenue      Parking fines
Expenses
    Personnel expenses      Appendix C.1 - Appendix C.3
    Professional and contractual services      Parking violations bureau contract services
    Other expenses      Development costs

**Operational restructuring**

| Additional Department employees | | | | | | - | 1 | 7 | (6) | (6) | (6) | (6) | (6) | (6) | (6) | (6) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

(1) Based on department salaries & wages and employees, see Appendix C.2.

**Ten-Year Financial Projections**
**Department of Transportation**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Fare box revenue | 28.0 | 27.3 | 25.0 | 26.2 | 21.7 | 21.3 | 21.3 | 21.3 | 21.3 | 21.3 | 21.3 | 21.3 | 21.3 | 21.3 | 21.3 | 21.3 |
| State operating assistance (State Act 51) | 55.1 | 51.6 | 53.0 | 53.8 | 47.6 | 47.4 | 46.4 | 46.4 | 46.4 | 46.4 | 46.4 | 46.4 | 46.4 | 46.4 | 46.4 | 46.4 |
| Grant revenue (1) | 50.8 | 54.4 | 63.6 | 47.8 | 60.0 | 34.4 | 13.3 | 22.9 | 22.9 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 |
| Subsidy from General Fund | 104.1 | 79.3 | 80.0 | 77.0 | 90.6 | 47.2 | 85.5 | 86.0 | 93.4 | 100.2 | 107.4 | 112.4 | 117.8 | 123.3 | 128.9 | 134.2 |
| Other revenue | 6.7 | 5.0 | 5.5 | 6.7 | 3.0 | (2.8) | 4.7 | 4.7 | 4.7 | 4.7 | 4.7 | 4.7 | 4.7 | 4.7 | 4.7 | 4.7 |
| **Total revenues** | 244.7 | 217.6 | 227.1 | 211.5 | 222.9 | 147.6 | 171.2 | 181.4 | 188.8 | 192.6 | 199.8 | 204.9 | 210.3 | 215.7 | 221.3 | 226.7 |
| | | | | | | | | | | | | | | | | |
| **Expenses** | | | | | | | | | | | | | | | | |
| Salaries and wages | (47.4) | (48.4) | (45.1) | (40.8) | (36.8) | (30.3) | (30.1) | (32.9) | (34.1) | (34.8) | (35.5) | (36.2) | (36.9) | (37.6) | (38.4) | (39.2) |
| Overtime | (20.4) | (22.1) | (21.2) | (19.7) | (14.4) | (13.0) | (12.0) | (13.2) | (13.6) | (13.9) | (14.2) | (14.5) | (14.8) | (15.1) | (15.4) | (15.7) |
| Pension | (6.8) | (7.3) | (6.9) | (9.5) | (10.9) | (2.8) | (23.6) | (27.7) | (31.2) | (34.8) | (38.7) | (40.6) | (42.7) | (44.5) | (46.6) | (48.3) |
| Benefits (2) | (45.8) | (52.6) | (47.9) | (47.2) | (41.4) | (46.3) | (43.0) | (43.7) | (45.2) | (46.6) | (48.2) | (49.9) | (51.6) | (53.5) | (55.4) | (57.4) |
| Professional and contractual services | (22.1) | (14.1) | (13.7) | (14.9) | (28.5) | (13.5) | (15.5) | (15.7) | (15.8) | (16.0) | (16.1) | (16.3) | (16.5) | (16.6) | (16.8) | (17.0) |
| Materials & supplies | (34.7) | (26.5) | (22.5) | (24.9) | (23.9) | (21.6) | (21.6) | (21.9) | (22.1) | (22.3) | (22.5) | (22.7) | (23.0) | (23.2) | (23.4) | (23.7) |
| Utilities | (4.0) | (4.3) | (3.7) | (4.4) | (3.5) | (2.8) | (3.5) | (4.0) | (4.1) | (4.1) | (4.2) | (4.2) | (4.3) | (4.3) | (4.4) | (4.5) |
| Purchased services | (5.5) | (8.8) | (9.5) | (16.7) | (6.9) | (10.1) | (10.1) | (10.2) | (10.2) | (10.2) | (10.2) | (10.2) | (10.2) | (10.2) | (10.2) | (10.2) |
| Risk management and insurance | (11.1) | (10.9) | (18.7) | (19.2) | (12.5) | (0.4) | (10.3) | (12.6) | (12.7) | (12.8) | (13.0) | (13.1) | (13.2) | (13.4) | (13.5) | (13.6) |
| Other expenses | (23.0) | (21.2) | (17.3) | (17.2) | (22.9) | (20.0) | (0.9) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) |
| Debt service | - | - | - | - | - | (7.1) | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | (6.2) | (6.2) | (6.2) | (4.4) | (3.4) | - | (4.0) | (4.0) | (4.0) | (4.0) | (4.0) | (4.0) | (4.0) | (4.0) | (4.0) | (4.0) |
| POC - principal and interest (3) | (4.5) | (4.7) | (5.0) | (5.5) | (5.9) | (6.2) | (6.6) | (6.8) | (6.9) | (7.1) | (7.3) | (7.1) | (7.2) | (7.2) | (7.2) | (7.2) |
| Transfer - debt service | | | | | (7.5) | (1.6) | (4.9) | (2.9) | (2.9) | | | | | | | |
| **Total expenditures** | (231.7) | (227.2) | (217.8) | (224.2) | (218.4) | (175.7) | (186.2) | (196.4) | (203.8) | (207.6) | (214.8) | (219.9) | (225.3) | (230.7) | (236.3) | (241.7) |
| | | | | | | | | | | | | | | | | |
| **Total surplus (deficit)** | $ 13.0 | $ (9.6) | $ 9.3 | $ (12.7) | $ 4.5 | $ (28.1) | $ (15.0) | $ (15.0) | $ (15.0) | $ (15.0) | $ (15.0) | $ (15.0) | $ (15.0) | $ (15.0) | $ (15.0) | $ (15.0) |
| | | | | | | | | | | | | | | | | |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ (1.7) | $ (5.7) | $ (1.5) | $ (0.1) | $ 4.6 | $ 6.3 | $ 10.4 | $ 10.0 | $ 14.1 | $ 15.0 |
| *Expenses* | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | (1.4) | (3.4) | 0.8 | (2.2) | (3.5) | (4.1) | (4.1) | (4.7) | (5.2) | (6.1) |
| Technology | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Capital expenditures and other infrastructure | | | | | | - | (1.6) | (2.0) | (2.3) | (2.5) | (1.0) | (1.0) | - | - | - | - |
| Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | (3.0) | (5.4) | (1.4) | (4.7) | (4.5) | (5.1) | (4.1) | (4.7) | (5.2) | (6.1) |
| | | | | | | | | | | | | | | | | |
| **Operational restructuring** | | | | | | $ - | $ (4.7) | $ (11.1) | $ (2.9) | $ (4.8) | $ 0.1 | $ 1.2 | $ 6.3 | $ 5.3 | $ 8.9 | 8.9 |
| | | | | | | | | | | | | | | | | |
| **Adjusted surplus (deficit)** | | | | | | $ (28.1) | $ (19.7) | $ (26.1) | $ (17.9) | $ (19.8) | $ (14.9) | $ (13.8) | $ (8.7) | $ (9.7) | $ (6.1) | (6.1) |

(1) Forecast excludes capital grants and related expenses.
(2) Includes ~$15m non-cash OPEB expense which is the difference between the annual required contribution (per actuarial analysis) and actual payments made for retiree benefits.
(3) Historical POC payments have been split out from debt service based on forecasted POC allocation.

13-53846-tjt Doc 8773-2 Filed 12/16/14 Entered 12/16/14 08:24:49 Page 555 of 602
204
13-53846-swr Doc 7382-2 Filed 09/11/14 Entered 09/11/14 16:36:38 Page 15 of 94     3/30/2014 11:01 PM

**Appendix B**

Key revenue drivers

**Ten-Year Financial Projections**
**Property tax revenue - without reinvestment**
($ in millions)

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Change in assessed values** | | | | | | | | | | | | | | | | |
| Real Property | n/a | 1.9% | -4.4% | -5.7% | -5.0% | -5.4% | -7.9% | -9.4% | -4.4% | -3.4% | -3.0% | -2.4% | -12.7% | -0.1% | 0.7% | 0.7% |
| Personal Property | n/a | -1.9% | -0.6% | -6.2% | -13.9% | -5.4% | 8.1% | -2.1% | -1.4% | -0.7% | -0.2% | -0.1% | 0.3% | 0.3% | 0.4% | 0.4% |
| Renaissance Zone | n/a | 3.5% | 23.9% | -20.3% | 70.6% | 26.2% | 44.0% | 1.0% | 1.0% | 1.0% | -2.5% | 1.5% | 2.0% | 2.0% | 2.0% | 2.0% |
| **Values** | | | | | | | | | | | | | | | | |
| Real Property | $ 8,149.5 | $ 8,302.7 | $ 7,937.2 | $ 7,483.9 | $ 7,112.6 | $ 6,729.4 | $ 6,200.3 | $ 5,619.5 | $ 5,369.7 | $ 5,186.9 | $ 5,029.1 | $ 4,910.4 | $ 4,287.3 | $ 4,282.7 | $ 4,312.8 | $ 4,343.1 |
| Personal Property | 1,469.0 | 1,440.6 | 1,431.9 | 1,343.6 | 1,157.5 | 1,095.2 | 1,183.7 | 1,158.3 | 1,142.4 | 1,134.5 | 1,131.8 | 1,130.4 | 1,133.3 | 1,136.3 | 1,140.6 | 1,145.0 |
| Total Valuation (for Non-Departmental & Library) | $ 9,618.5 | $ 9,743.3 | $ 9,369.1 | $ 8,827.5 | $ 8,270.2 | $ 7,824.6 | $ 7,384.0 | $ 6,777.9 | $ 6,512.1 | $ 6,321.4 | $ 6,160.9 | $ 6,040.8 | $ 5,420.6 | $ 5,419.0 | $ 5,453.4 | $ 5,488.1 |
| Renaissance Zone | 278.2 | 287.9 | 356.8 | 284.4 | 485.2 | 612.5 | 882.0 | 890.8 | 899.7 | 908.7 | 885.6 | 898.9 | 916.9 | 935.2 | 953.9 | 973.0 |
| Total Valuation (for Debt Service) | $ 9,896.7 | $ 10,031.3 | $ 9,725.9 | $ 9,111.9 | $ 8,755.4 | $ 8,437.1 | $ 8,266.0 | $ 7,668.6 | $ 7,411.8 | $ 7,230.1 | $ 7,046.5 | $ 6,939.7 | $ 6,337.5 | $ 6,354.2 | $ 6,407.3 | $ 6,461.1 |
| *Millage* | | | | | | | | | | | | | | | | |
| *Non-Departmental (General City)* | 19.952 | 19.952 | 19.952 | 19.952 | 19.952 | 19.952 | 19.952 | 19.952 | 19.952 | 19.952 | 19.952 | 19.952 | 19.952 | 19.952 | 19.952 | 19.952 |
| *Debt Service* | 8.068 | 7.478 | 7.477 | 8.916 | 9.556 | 9.614 | 9.813 | 10.465 | 9.977 | 10.223 | 10.030 | 9.744 | 10.030 | 9.865 | 7.008 | 6.249 |
| *Library* | 4.631 | 4.631 | 4.631 | 4.631 | 4.631 | 4.631 | 4.631 | 4.631 | 4.631 | 4.631 | 4.631 | 4.631 | 4.631 | 4.631 | 4.631 | 4.631 |
| **Tax Levy** | | | | | | | | | | | | | | | | |
| Non-Departmental (General City) | $ 191.9 | $ 194.4 | $ 186.9 | $ 176.1 | 165.0 | 156.1 | 147.3 | 135.2 | 129.9 | 126.1 | 122.9 | 120.5 | 108.2 | 108.1 | 108.8 | 109.5 |
| Debt Service | 79.8 | 75.0 | 72.7 | 81.3 | 83.7 | 81.1 | 81.1 | 80.3 | 73.9 | 73.9 | 70.7 | 67.6 | 63.6 | 62.7 | 44.9 | 40.4 |
| Library | 44.5 | 45.1 | 43.4 | 40.9 | 38.3 | 36.2 | 34.2 | 31.4 | 30.2 | 29.3 | 28.5 | 28.0 | 25.1 | 25.1 | 25.3 | 25.4 |
| **Levy adjustments** | | | | | | | | | | | | | | | | |
| Non-Departmental (General City) | $ (4.5) | $ (4.5) | $ (6.0) | $ (2.9) | $ (4.3) | - | $ - | $ (1.6) | $ (1.6) | $ (1.5) | $ (1.5) | $ (1.5) | $ (1.5) | $ (1.5) | $ (1.5) | (1.6) |
| Debt Service | (0.3) | (2.3) | (1.1) | (1.5) | (1.5) | - | - | - | - | - | - | - | - | - | - | - |
| Library | (0.4) | (0.4) | (0.8) | (1.0) | (1.0) | - | - | - | - | - | - | - | - | - | - | - |
| **Adjusted tax levy** | | | | | | | | | | | | | | | | |
| Non-Departmental (General City) | $ 187.4 | $ 189.9 | $ 180.9 | $ 173.2 | 160.7 | 156.1 | 147.3 | 133.6 | 128.4 | 124.6 | 121.4 | 119.0 | 106.6 | 106.6 | 107.3 | 107.9 |
| Debt Service | 79.5 | 72.7 | 71.7 | 79.7 | 82.2 | 81.1 | 81.1 | 80.3 | 73.9 | 73.9 | 70.7 | 67.6 | 63.6 | 62.7 | 44.9 | 40.4 |
| Library | 44.2 | 44.8 | 42.6 | 39.9 | 37.3 | 36.2 | 34.2 | 31.4 | 30.2 | 29.3 | 28.5 | 28.0 | 25.1 | 25.1 | 25.3 | 25.4 |
| Total | $ 311.1 | $ 307.4 | $ 295.1 | $ 292.8 | $ 280.1 | $ 273.5 | $ 262.6 | $ 245.3 | $ 232.5 | $ 227.8 | $ 220.6 | $ 214.6 | $ 195.3 | $ 194.4 | $ 177.4 | $ 173.7 |
| *Collection rate* | | | | | | | | | | | | | | | | |
| *Non-Departmental (General City)* | 82.8% | 86.2% | 79.1% | 78.8% | 77.6% | 85.6% | 78.0% | 78.0% | 78.0% | 78.0% | 80.0% | 80.0% | 84.0% | 84.0% | 84.0% | 84.0% |
| *Debt Service* | 88.9% | 92.4% | 82.1% | 87.0% | 84.1% | 87.0% | 82.0% | 78.0% | 78.0% | 78.0% | 80.0% | 80.0% | 84.0% | 84.0% | 84.0% | 84.0% |
| *Library* | 96.1% | 78.9% | 84.4% | 84.5% | 84.0% | 84.2% | 82.0% | 82.0% | 82.0% | 84.0% | 85.0% | 85.0% | 85.0% | 85.0% | 85.0% | 85.0% |
| **City collections** | | | | | | | | | | | | | | | | |
| Non-Departmental (General City) [A] | $ 155.2 | $ 163.7 | $ 143.0 | $ 136.5 | 124.7 | 133.6 | 114.9 | 104.2 | 100.1 | 97.2 | 97.1 | 95.2 | 89.6 | 89.5 | 90.1 | 90.7 |
| Debt Service | 70.7 | 67.2 | 58.8 | 69.3 | 69.1 | 70.6 | 66.5 | 62.6 | 57.7 | 57.6 | 56.5 | 54.1 | 53.4 | 52.7 | 37.7 | 33.9 |
| Library | 42.5 | 35.3 | 35.9 | 33.7 | 31.3 | 30.5 | 28.0 | 25.7 | 24.7 | 24.6 | 24.2 | 23.8 | 21.3 | 21.3 | 21.5 | 21.6 |
| Total | $ 268.3 | $ 266.2 | $ 237.8 | $ 239.6 | $ 225.2 | $ 234.7 | $ 209.5 | $ 192.6 | $ 182.5 | $ 179.4 | $ 177.9 | $ 173.1 | $ 164.3 | $ 163.5 | $ 149.3 | $ 146.2 |
| **Non-Departmental adjustments [B]** | | | | | | | | | | | | | | | | |
| Prior Year delinquent collections | - | - | - | 5.8 | 5.7 | - | - | - | - | - | - | - | - | - | - | - |
| Chargeback Liability Reduction | - | - | - | 26.9 | 5.7 | - | - | - | - | - | - | - | - | - | - | - |
| DDA/LDFA Capture - Part of special act millage | - | - | - | 9.1 | 7.3 | - | - | - | - | - | - | - | - | - | - | - |
| Other adjustments | - | - | - | 4.4 | 4.3 | - | - | - | - | - | - | - | - | - | - | - |
| **General fund collections [A]+[B]** | $ 155.2 | $ 163.7 | $ 143.0 | $ 182.7 | $ 147.8 | $ 133.6 | $ 114.9 | $ 104.2 | $ 100.1 | $ 97.2 | $ 97.1 | $ 95.2 | $ 89.6 | $ 89.5 | $ 90.1 | $ 90.7 |

**Ten-Year Financial Projections**
**Property tax revenue - with reinvestment**
($ in millions)

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Change in assessed values** | | | | | | | | | | | | | | | | |
| Real Property | n/a | 1.9% | -4.4% | -5.7% | -5.0% | -5.4% | -7.9% | -9.3% | -3.3% | -2.0% | -0.1% | 1.1% | -7.1% | 2.8% | 3.5% | 3.5% |
| Personal Property | n/a | -1.9% | -0.6% | -6.2% | -13.9% | -7.5% | 8.1% | -1.2% | -0.3% | 1.0% | 1.0% | 1.7% | 1.8% | 2.0% | 2.2% | 2.2% |
| Renaissance Zone | n/a | 3.5% | 23.9% | -20.3% | 70.6% | 26.2% | 48.1% | 1.0% | 1.0% | 1.0% | 0.1% | 1.5% | 2.0% | 2.0% | 2.0% | 2.0% |
| **Values** | | | | | | | | | | | | | | | | |
| Real Property | $ 8,149.5 | $ 8,302.7 | $ 7,937.2 | $ 7,483.9 | $ 7,112.6 | $ 6,729.4 | $ 6,200.3 | $ 5,624.2 | $ 5,439.7 | $ 5,330.9 | $ 5,327.9 | $ 5,388.2 | $ 5,004.6 | $ 5,145.5 | $ 5,327.4 | $ 5,515.8 |
| Personal Property | 1,469.0 | 1,440.6 | 1,431.9 | 1,343.6 | 1,157.5 | 1,095.2 | 1,183.7 | 1,169.4 | 1,165.6 | 1,177.2 | 1,189.0 | 1,209.8 | 1,230.9 | 1,255.2 | 1,282.8 | 1,311.0 |
| Total Valuation (for Non-Departmental & Library) | $ 9,618.5 | $ 9,743.3 | $ 9,369.1 | $ 8,827.5 | $ 8,270.2 | $ 7,824.6 | $ 7,384.0 | $ 6,793.6 | $ 6,605.2 | $ 6,508.1 | $ 6,516.9 | $ 6,597.9 | $ 6,235.5 | $ 6,400.7 | $ 6,610.1 | $ 6,826.8 |
| Renaissance Zone | 278.2 | 287.9 | 356.8 | 284.4 | 485.2 | 612.5 | 907.0 | 916.1 | 925.3 | 934.5 | 935.8 | 949.8 | 968.8 | 988.2 | 1,007.9 | 1,028.1 |
| Total Valuation (for Debt Service) | $ 9,896.7 | $ 10,031.3 | $ 9,725.9 | $ 9,111.9 | $ 8,755.4 | $ 8,437.1 | $ 8,291.0 | $ 7,709.7 | $ 7,530.5 | $ 7,442.6 | $ 7,452.6 | $ 7,547.7 | $ 7,204.3 | $ 7,388.9 | $ 7,618.1 | $ 7,854.9 |
| *Millage* | | | | | | | | | | | | | | | | |
| *Non-Departmental (General City)* | *19.952* | *19.952* | *19.952* | *19.952* | *19.952* | *19.952* | *19.952* | *19.952* | *19.952* | *19.952* | *19.952* | *19.952* | *19.952* | *19.952* | *19.952* | *19.952* |
| *Debt Service* | *8.068* | *7.478* | *7.477* | *8.916* | *9.556* | *9.614* | *9.783* | *10.410* | *9.340* | *9.446* | *9.252* | *8.741* | *8.519* | *8.191* | *5.691* | *4.963* |
| *Library* | *4.631* | *4.631* | *4.631* | *4.631* | *4.631* | *4.631* | *4.631* | *4.631* | *4.631* | *4.631* | *4.631* | *4.631* | *4.631* | *4.631* | *4.631* | *4.631* |
| **Tax Levy** | | | | | | | | | | | | | | | | |
| Non-Departmental (General City) | $ 191.9 | $ 194.4 | $ 186.9 | $ 176.1 | $ 165.0 | $ 156.1 | $ 147.3 | $ 135.5 | $ 131.8 | $ 129.8 | $ 130.0 | $ 131.6 | $ 124.4 | $ 127.7 | $ 131.9 | $ 136.2 |
| Debt Service | 79.8 | 75.0 | 72.7 | 81.2 | 83.7 | 81.1 | 81.1 | 80.3 | 70.3 | 70.3 | 69.0 | 66.0 | 61.4 | 60.5 | 43.4 | 39.0 |
| Library | 44.5 | 45.1 | 43.4 | 40.9 | 38.3 | 36.2 | 34.2 | 34.2 | 31.5 | 30.6 | 30.1 | 30.2 | 30.6 | 29.6 | 30.6 | 31.6 |
| **Levy adjustments** | | | | | | | | | | | | | | | | |
| Non-Departmental (General City) | $ (4.5) | $ (4.5) | $ (6.0) | $ (2.9) | $ (4.3) | $ - | $ - | $ (1.6) | $ (1.6) | $ (1.6) | $ (1.6) | $ (1.7) | $ (1.7) | $ (1.7) | $ (1.8) | $ (1.8) |
| Debt Service | (0.3) | (2.3) | (1.1) | (1.5) | (1.5) | - | - | - | - | - | - | - | - | - | - | - |
| Library | (0.4) | (0.4) | (0.8) | (1.0) | (1.0) | - | - | - | - | - | - | - | - | - | - | - |
| **Adjusted tax levy** | | | | | | | | | | | | | | | | |
| Non-Departmental (General City) | $ 187.4 | $ 189.9 | $ 180.9 | $ 173.2 | $ 160.7 | $ 156.1 | $ 147.3 | $ 133.9 | $ 130.2 | $ 128.2 | $ 128.4 | $ 130.0 | $ 122.7 | $ 126.0 | $ 130.1 | $ 134.4 |
| Debt Service | 79.5 | 72.7 | 71.7 | 79.7 | 82.2 | 81.1 | 81.1 | 80.3 | 70.3 | 70.3 | 69.0 | 66.0 | 61.4 | 60.5 | 43.4 | 39.0 |
| Library | 44.2 | 44.8 | 42.6 | 39.9 | 37.3 | 36.2 | 34.2 | 31.5 | 30.6 | 30.1 | 30.2 | 30.6 | 28.9 | 29.6 | 30.6 | 31.6 |
| Total | $ 311.1 | $ 307.4 | $ 295.1 | $ 292.8 | $ 280.1 | $ 273.5 | $ 262.6 | $ 245.6 | $ 231.1 | $ 228.7 | $ 227.5 | $ 226.5 | $ 213.0 | $ 216.2 | $ 204.1 | $ 205.0 |
| *Collection rate* | | | | | | | | | | | | | | | | |
| *Non-Departmental (General City)* | *82.8%* | *86.2%* | *79.1%* | *78.8%* | *77.6%* | *85.6%* | *78.0%* | *78.0%* | *82.0%* | *82.0%* | *82.0%* | *82.0%* | *87.0%* | *87.0%* | *87.0%* | *87.0%* |
| *Debt Service* | *88.9%* | *92.4%* | *82.1%* | *76.9%* | *80.3%* | *87.0%* | *82.0%* | *78.0%* | *82.0%* | *82.0%* | *82.0%* | *82.0%* | *87.0%* | *87.0%* | *87.0%* | *87.0%* |
| *Library* | *92.6%* | *91.4%* | *92.7%* | *85.7%* | *86.7%* | *84.2%* | *82.0%* | *82.0%* | *82.0%* | *84.0%* | *85.0%* | *85.0%* | *85.0%* | *85.0%* | *85.0%* | *85.0%* |
| **City collections** | | | | | | | | | | | | | | | | |
| Non-Departmental (General City) [A] | $ 155.2 | $ 163.7 | $ 143.0 | $ 136.5 | $ 124.7 | $ 133.6 | $ 114.9 | $ 104.5 | $ 106.8 | $ 105.2 | $ 105.3 | $ 106.6 | $ 106.8 | $ 109.6 | $ 113.2 | 116.9 |
| Debt Service | 70.7 | 67.2 | 58.8 | 61.3 | 66.0 | 70.6 | 66.5 | 62.6 | 57.7 | 57.6 | 56.5 | 54.1 | 53.4 | 52.7 | 37.7 | 33.9 |
| Library | 40.9 | 40.9 | 39.5 | 34.2 | 32.4 | 30.5 | 28.0 | 25.8 | 25.1 | 25.3 | 25.7 | 26.0 | 24.5 | 25.2 | 26.0 | 26.9 |
| Total | $ 266.8 | $ 271.7 | $ 241.3 | $ 232.0 | $ 223.0 | $ 234.7 | $ 209.5 | $ 192.9 | $ 189.5 | $ 188.1 | $ 187.5 | $ 186.7 | $ 184.7 | $ 187.5 | $ 176.9 | 177.7 |
| **Non-Departmental adjustments [B]** | | | | | | | | | | | | | | | | |
| Prior Year delinquent collections | - | - | - | 5.8 | 5.7 | - | - | - | - | - | - | - | - | - | - | - |
| Chargeback Liability Reduction | - | - | - | 26.9 | 5.7 | - | - | - | - | - | - | - | - | - | - | - |
| DDA/LDFA Capture - Part of special act millage | - | - | - | 9.1 | 7.3 | - | - | - | - | - | - | - | - | - | - | - |
| Other adjustments | - | - | - | 4.4 | 4.3 | - | - | - | - | - | - | - | - | - | - | - |
| **GF collections - restructuring [A]+[B]** | $ 155.2 | $ 163.7 | $ 143.0 | $ 182.7 | $ 147.8 | $ 133.6 | $ 114.9 | $ 104.5 | $ 106.8 | $ 105.2 | $ 105.3 | $ 106.6 | $ 106.8 | $ 109.6 | $ 113.2 | 116.9 |
| GF collections - without reinvestment | | | | | | | 114.9 | 104.2 | 100.1 | 97.2 | 97.1 | 95.2 | 89.6 | 89.5 | 90.1 | 90.7 |
| Increased collections | | | | | | | $ - | $ 0.2 | 6.6 | 8.0 | 8.2 | 11.4 | 17.2 | 20.1 | 23.1 | 26.3 |

**Ten-Year Financial Projections**
**Income tax revenue - without reinvestment**
($ in millions)

| | | Fiscal year ended actual | | | | | | | | Preliminary forecast | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Municipal Income Taxes Calculation** | | | | | | | | | | | | | | | | |
| **City Residents (A)** | | | | | | | | | | | | | | | | |
| Taxable income growth | | | | | | 2.8% | 1.9% | 1.5% | 0.5% | 0.5% | 0.5% | 0.5% | 0.7% | 0.7% | 1.0% | 1.0% |
| Taxable income | $ 7,142.5 | $ 6,207.7 | $ 5,581.3 | $ 5,838.5 | $ 6,003.4 | $ 6,174.3 | $ 6,294.0 | $ 6,385.5 | $ 6,414.7 | $ 6,444.0 | $ 6,473.5 | $ 6,503.3 | $ 6,545.8 | $ 6,588.6 | $ 6,654.5 | $ 6,721.1 |
| Income tax rate | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% |
| Total City Resident income taxes | 178.6 | 155.2 | 139.5 | 146.0 | 150.1 | 148.2 | 151.1 | 153.3 | 154.0 | 154.7 | 155.4 | 156.1 | 157.1 | 158.1 | 159.7 | 161.3 |
| *growth rate* | | *-15.1%* | *-11.2%* | *4.4%* | *2.7%* | *-1.3%* | *1.9%* | *1.4%* | *0.5%* | *0.5%* | *0.5%* | *0.5%* | *0.6%* | *0.6%* | *1.0%* | *1.0%* |
| **Non-Residents (B)** | | | | | | | | | | | | | | | | |
| Taxable income growth | | | | | | 2.6% | 2.2% | 1.7% | 0.7% | 0.7% | 0.7% | 0.7% | 0.5% | 1.2% | 1.7% | 1.7% |
| Taxable income | 6,848.7 | 5,952.3 | 5,351.6 | 5,598.2 | 5,784.5 | 5,932.5 | 6,065.0 | 6,168.1 | 6,211.2 | 6,254.4 | 6,297.9 | 6,341.7 | 6,373.4 | 6,449.4 | 6,558.5 | 6,669.3 |
| Income tax rate | 1.3% | 1.3% | 1.3% | 1.3% | 1.3% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% |
| Total Non-Resident income taxes | 85.6 | 74.4 | 66.9 | 70.0 | 72.3 | 71.2 | 72.8 | 74.0 | 74.5 | 75.1 | 75.6 | 76.1 | 76.5 | 77.4 | 78.7 | 80.0 |
| *growth rate* | | *-15.1%* | *-11.2%* | *4.4%* | *3.2%* | *-1.6%* | *2.2%* | *1.7%* | *0.7%* | *0.7%* | *0.7%* | *0.7%* | *0.5%* | *1.2%* | *1.7%* | *1.7%* |
| **Corporations (C)** | | | | | | | | | | | | | | | | |
| Net tax collection growth | | | | | | | 2.3% | 2.5% | 2.0% | 2.0% | 2.0% | 1.5% | 1.0% | 1.0% | 1.0% | 1.0% |
| Taxable income (implied) | 1,238.7 | 907.7 | 1,033.4 | 1,043.7 | 1,064.6 | 1,102.5 | 1,128.3 | 1,156.5 | 1,179.6 | 1,203.2 | 1,227.3 | 1,245.7 | 1,258.2 | 1,270.7 | 1,283.5 | 1,296.3 |
| Corporate tax rate | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% |
| Net tax collections | 12.4 | 9.1 | 10.3 | 10.4 | 10.6 | 22.1 | 22.6 | 23.1 | 23.6 | 24.1 | 24.5 | 24.9 | 25.2 | 25.4 | 25.7 | 25.9 |
| *growth rate* | | *-36.5%* | *12.2%* | *1.0%* | *2.0%* | *51.7%* | *2.3%* | *2.4%* | *2.0%* | *2.0%* | *2.0%* | *1.5%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* |
| **Total Municipal income taxes (D) = (A+B+C)** | | | | | | | | | | | | | | | | |
| Taxable income | 15,229.9 | 13,067.7 | 11,966.3 | 12,480.4 | 12,852.4 | 13,209.2 | 13,487.3 | 13,710.2 | 13,805.5 | 13,901.7 | 13,998.8 | 14,090.7 | 14,177.4 | 14,308.8 | 14,496.4 | 14,686.7 |
| Calculated tax rate | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% |
| Total Municipal income taxes | 276.6 | 238.7 | 216.8 | 226.4 | 233.0 | 241.4 | 246.4 | 250.4 | 252.1 | 253.8 | 255.5 | 257.1 | 258.7 | 260.9 | 264.1 | 267.3 |
| **Adjustment Municipal income taxes** | | | | | | | | | | | | | | | | |
| Adjustment for actuals | (0.1) | 2.2 | (0.2) | 1.9 | 0.0 | 6.6 | - | - | - | - | - | - | - | - | - | - |
| Total Adjusted Municipal income taxes | $ 276.5 | $ 240.8 | $ 216.5 | $ 228.3 | $ 233.0 | $ 248.0 | $ 246.4 | $ 250.4 | $ 252.1 | $ 253.8 | $ 255.5 | $ 257.1 | $ 258.7 | $ 260.9 | $ 264.1 | $ 267.3 |

**Ten-Year Financial Projections**
**Income tax revenue - with reinvestment**
($ in millions)

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Municipal Income Taxes Calculation** | | | | | | | | | | | | | | | | |
| **City Residents (A)** | | | | | | | | | | | | | | | | |
| Taxable income growth | | | | | | 2.8% | 2.6% | 3.2% | 2.3% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% |
| Taxable income | $ 7,142.5 | $ 6,207.7 | $ 5,581.3 | $ 5,838.5 | $ 6,003.4 | $ 6,174.3 | $ 6,332.7 | $ 6,533.4 | $ 6,680.7 | $ 6,827.2 | $ 6,974.0 | $ 7,124.5 | $ 7,279.5 | $ 7,437.9 | $ 7,599.7 | $ 7,765.0 |
| Income tax rate | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% |
| Total City Resident income taxes | 178.6 | 155.2 | 139.5 | 146.0 | 150.1 | 148.2 | 152.0 | 156.8 | 160.3 | 163.9 | 167.4 | 171.0 | 174.7 | 178.5 | 182.4 | 186.4 |
| *growth rate* | | *-15.1%* | *-11.2%* | *4.4%* | *2.7%* | *-1.3%* | *2.5%* | *3.1%* | *2.2%* | *2.1%* | *2.1%* | *2.1%* | *2.1%* | *2.1%* | *2.1%* | *2.1%* |
| **Non-Residents (B)** | | | | | | | | | | | | | | | | |
| Taxable income growth | | | | | | 2.6% | 2.9% | 3.3% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% |
| Taxable income | 6,848.7 | 5,952.3 | 5,351.6 | 5,598.2 | 5,784.5 | 5,932.5 | 6,105.4 | 6,306.5 | 6,444.0 | 6,584.5 | 6,728.0 | 6,874.7 | 7,024.6 | 7,177.7 | 7,334.2 | 7,494.1 |
| Income tax rate | 1.3% | 1.3% | 1.3% | 1.3% | 1.3% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% |
| Total Non-Resident income taxes | 85.6 | 74.4 | 66.9 | 70.0 | 72.3 | 71.2 | 73.3 | 75.7 | 77.3 | 79.0 | 80.7 | 82.5 | 84.3 | 86.1 | 88.0 | 89.9 |
| *growth rate* | | *-15.1%* | *-11.2%* | *4.4%* | *3.2%* | *-1.6%* | *2.8%* | *3.2%* | *2.1%* | *2.1%* | *2.1%* | *2.1%* | *2.1%* | *2.1%* | *2.1%* | *2.1%* |
| **Corporations (C)** | | | | | | | | | | | | | | | | |
| Net tax collection growth | | | | | | 2.8% | 4.7% | 4.0% | 3.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% |
| Taxable income (implied) | 1,238.7 | 907.7 | 1,033.4 | 1,043.7 | 1,064.6 | 1,102.5 | 1,133.4 | 1,186.6 | 1,234.1 | 1,271.1 | 1,296.5 | 1,322.5 | 1,348.9 | 1,375.9 | 1,403.4 | 1,431.5 |
| Corporate tax rate | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% |
| Net tax collections | 12.4 | 9.1 | 10.3 | 10.4 | 10.6 | 22.1 | 22.7 | 23.7 | 24.7 | 25.4 | 25.9 | 26.4 | 27.0 | 27.5 | 28.1 | 28.6 |
| *growth rate* | | *-36.5%* | *12.2%* | *1.0%* | *2.0%* | *51.7%* | *2.7%* | *4.5%* | *3.8%* | *2.9%* | *2.0%* | *2.0%* | *2.0%* | *2.0%* | *2.0%* | *2.0%* |
| **Total Municipal income taxes (D) = (A+B+C)** | | | | | | | | | | | | | | | | |
| Taxable income | 15,229.9 | 13,067.7 | 11,966.3 | 12,480.4 | 12,852.4 | 13,209.2 | 13,571.4 | 14,026.5 | 14,358.7 | 14,682.8 | 14,998.6 | 15,321.7 | 15,653.0 | 15,991.5 | 16,337.3 | 16,690.6 |
| Calculated tax rate | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% |
| Total Municipal income taxes | 276.6 | 238.7 | 216.8 | 226.4 | 233.0 | 241.4 | 247.9 | 256.2 | 262.3 | 268.3 | 274.0 | 279.9 | 286.0 | 292.2 | 298.5 | 304.9 |
| **Adjustment Municipal income taxes** | | | | | | | | | | | | | | | | |
| Adjustment for actuals | (0.6) | 0.0 | (0.0) | 0.0 | 0.0 | 6.6 | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| **Income tax revenue - restructuring** | $ 276.0 | $ 238.7 | $ 216.8 | $ 226.4 | $ 233.0 | $ 248.0 | $ 247.9 | $ 256.2 | $ 262.3 | $ 268.3 | $ 274.0 | $ 279.9 | $ 286.0 | $ 292.2 | $ 298.5 | $ 304.9 |
| Income tax revenue - without reinvestment | | | | | | | 246.4 | 250.4 | 252.1 | 253.8 | 255.5 | 257.1 | 258.7 | 260.9 | 264.1 | 267.3 |
| Increased income tax revenues | | | | | | | $ 1.5 | $ 5.8 | $ 10.3 | $ 14.5 | $ 18.6 | $ 22.8 | $ 27.2 | $ 31.2 | $ 34.4 | $ 37.7 |

3/30/2014 11:01 PM

**Ten-Year Financial Projections**

**Wagering tax revenue**

($ in millions)

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Wagering Taxes Drivers** | | | | | | | | | | | | | | | | |
| % Change in Gross Receipts | | | | | | -4.0% | -2.5% | -1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% |
| | | | | | | | | | | | | | | | | |
| **Adjusted Gross Receipts** | | | | | | | | | | | | | | | | |
| MGM | | | | | $ 608.4 | $ 580.2 | $ 565.4 | $ 559.7 | $ 565.3 | $ 571.0 | $ 576.7 | $ 582.5 | $ 588.3 | $ 594.2 | $ 600.1 | $ 606.1 |
| Motorcity | | | | | 468.7 | 457.3 | 445.6 | 441.2 | 445.6 | 450.0 | 454.5 | 459.1 | 463.7 | 468.3 | 473.0 | 477.7 |
| Greektown | | | | | 358.0 | 340.3 | 331.6 | 328.3 | 331.6 | 334.9 | 338.2 | 341.6 | 345.0 | 348.5 | 352.0 | 355.5 |
| | | | | | | | | | | | | | | | | |
| **Wagering Taxes Calculation** | | | | | | | | | | | | | | | | |
| **Adjusted Gross Receipts (A)** | | | | | | | | | | | | | | | | |
| MGM | $ 560.2 | $ 564.8 | $ 562.1 | $ 589.6 | $ 608.4 | $ 580.2 | $ 565.4 | $ 559.7 | $ 565.3 | $ 571.0 | $ 576.7 | $ 582.5 | $ 588.3 | $ 594.2 | $ 600.1 | $ 606.1 |
| Motorcity | 478.9 | 459.6 | 437.4 | 460.1 | 468.7 | 457.3 | 445.6 | 441.2 | 445.6 | 450.0 | 454.5 | 459.1 | 463.7 | 468.3 | 473.0 | 477.7 |
| Greektown | 331.2 | 319.0 | 356.6 | 350.0 | 358.0 | 340.3 | 331.6 | 328.3 | 331.6 | 334.9 | 338.2 | 341.6 | 345.0 | 348.5 | 352.0 | 355.5 |
| | | | | | | | | | | | | | | | | |
| **Wagering Tax Rate (B)** | 11.4% | 11.2% | 11.1% | 10.9% | 10.9% | 10.9% | 10.9% | 10.9% | 10.9% | 10.9% | 10.9% | 10.9% | 10.9% | 10.9% | 10.9% | 10.9% |
| | | | | | | | | | | | | | | | | |
| **Additional Payment (per 2006 operating agreement) (C)** | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% |
| | | | | | | | | | | | | | | | | |
| **Subtotal Wagering Tax (D) = (A)*(B+C)** | | | | | | | | | | | | | | | | |
| MGM | 67.9 | 67.2 | 66.9 | 70.2 | 72.4 | 69.0 | 67.3 | 66.6 | 67.3 | 67.9 | 68.6 | 69.3 | 70.0 | 70.7 | 71.4 | 72.1 |
| Motorcity | 59.4 | 54.7 | 52.1 | 54.8 | 55.8 | 54.4 | 53.0 | 52.5 | 53.0 | 53.6 | 54.1 | 54.6 | 55.2 | 55.7 | 56.3 | 56.8 |
| Greektown | 42.5 | 41.2 | 44.5 | 41.7 | 42.6 | 40.5 | 39.5 | 39.1 | 39.5 | 39.9 | 40.3 | 40.7 | 41.1 | 41.5 | 41.9 | 42.3 |
| | | | | | | | | | | | | | | | | |
| **Revenue Target Supplemental Wagering Tax (E)** | | | | | | | | | | | | | | | | |
| MGM | 5.6 | 5.7 | 5.6 | 5.9 | 6.1 | 5.8 | 5.7 | 5.6 | 5.7 | 5.7 | 5.8 | 5.8 | 5.9 | 6.0 | 6.0 | 6.1 |
| Motorcity | 4.8 | 4.6 | 4.4 | 4.6 | 4.7 | 4.6 | 4.5 | 4.4 | 4.5 | 4.5 | 4.6 | 4.6 | 4.6 | 4.7 | 4.7 | 4.8 |
| Greektown | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | | | | | |
| **Total Wagering Tax (F) = (D+E)** | | | | | | | | | | | | | | | | |
| MGM | 73.5 | 72.9 | 72.5 | 76.1 | 78.5 | 74.9 | 72.9 | 72.2 | 72.9 | 73.7 | 74.4 | 75.1 | 75.9 | 76.7 | 77.4 | 78.2 |
| Motorcity | 64.2 | 59.3 | 56.4 | 59.4 | 60.5 | 59.0 | 57.5 | 56.9 | 57.5 | 58.1 | 58.6 | 59.2 | 59.8 | 60.4 | 61.0 | 61.6 |
| Greektown | 42.5 | 41.2 | 44.5 | 41.7 | 42.6 | 40.5 | 39.5 | 39.1 | 39.5 | 39.9 | 40.3 | 40.7 | 41.1 | 41.5 | 41.9 | 42.3 |
| Total Wagering Tax | 180.1 | 173.3 | 173.4 | 177.1 | 181.6 | 174.3 | 169.9 | 168.2 | 169.9 | 171.6 | 173.3 | 175.0 | 176.8 | 178.5 | 180.3 | 182.1 |
| | | | | | | | | | | | | | | | | |
| **Adjustment Wagering Taxes** | | | | | | | | | | | | | | | | |
| Adjustment for Actuals | 0.3 | (0.3) | 9.9 | (0.2) | (0.1) | 0.3 | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total Adjusted Wagering Taxes | $180.4 | $173.0 | $183.3 | $176.9 | $181.4 | $174.6 | $169.9 | $168.2 | $169.9 | $171.6 | $173.3 | $175.0 | $176.8 | $178.5 | $180.3 | $182.1 |

**Ten-Year Financial Projections**

**State revenue sharing**

($ in millions)

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **State Revenue Sharing Calculations** | | | | | | | | | | | | | | | | |
| **Constitutional** | | | | | | | | | | | | | | | | |
| 2000 Population | 949,231 | 949,231 | 949,231 | 949,231 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| 2010 Population | -- | -- | -- | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | -- | -- |
| 2020 Population | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | 625,152 | 625,152 | 625,152 |
| | | | | | | | | | | | | | | | | |
| Population | 949,231 | 949,231 | 949,231 | 949,231 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 625,152 | 625,152 |
| Distribution Rate | 12.443 | 11.812 | 10.837 | 11.353 | 12.456 | 13.001 | 12.848 | 12.848 | 12.848 | 12.848 | 12.848 | 12.848 | 12.848 | 12.848 | 12.848 | 12.848 |
| October Payment | 11.8 | 11.2 | 10.3 | 10.8 | 8.9 | 9.3 | 9.2 | 9.2 | 9.2 | 9.2 | 9.2 | 9.2 | 9.2 | 9.2 | 8.0 | 8.0 |
| | | | | | | | | | | | | | | | | |
| Population | 949,231 | 949,231 | 949,231 | 949,231 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 625,152 | 625,152 |
| Distribution Rate | 11.554 | 12.370 | 10.291 | 10.381 | 12.215 | 12.287 | 13.089 | 13.089 | 13.089 | 13.089 | 13.089 | 13.089 | 13.089 | 13.089 | 13.089 | 13.089 |
| December Payment | 11.0 | 11.7 | 9.8 | 9.9 | 8.7 | 8.8 | 9.3 | 9.3 | 9.3 | 9.3 | 9.3 | 9.3 | 9.3 | 9.3 | 8.2 | 8.2 |
| | | | | | | | | | | | | | | | | |
| Population | 949,231 | 949,231 | 949,231 | 949,231 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 625,152 | 625,152 |
| Distribution Rate | 12.010 | 11.540 | 11.223 | 11.969 | 12.106 | 12.596 | 12.949 | 12.949 | 12.949 | 12.949 | 12.949 | 12.949 | 12.949 | 12.949 | 12.949 | 12.949 |
| February Payment | 11.4 | 11.0 | 10.7 | 11.4 | 8.6 | 9.0 | 9.2 | 9.2 | 9.2 | 9.2 | 9.2 | 9.2 | 9.2 | 9.2 | 8.1 | 8.1 |
| | | | | | | | | | | | | | | | | |
| Population | 949,231 | 949,231 | 949,231 | 949,231 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 625,152 | 625,152 |
| Distribution Rate | 10.744 | 8.954 | 9.423 | 10.254 | 11.497 | 11.214 | 11.565 | 11.565 | 11.565 | 11.565 | 11.565 | 11.565 | 11.565 | 11.565 | 11.565 | 11.565 |
| April Payment | 10.2 | 8.5 | 8.9 | 9.7 | 8.2 | 8.0 | 8.2 | 8.2 | 8.2 | 8.2 | 8.2 | 8.2 | 8.2 | 8.2 | 7.2 | 7.2 |
| | | | | | | | | | | | | | | | | |
| Population | 949,231 | 949,231 | 949,231 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 625,152 | 625,152 | 625,152 |
| Distribution Rate | 10.809 | 10.623 | 10.830 | 11.003 | 11.645 | 11.802 | 12.166 | 12.166 | 12.166 | 12.166 | 12.166 | 12.166 | 12.166 | 12.166 | 12.166 | 12.166 |
| June Payment | 10.3 | 10.1 | 10.3 | 7.8 | 8.3 | 8.4 | 8.7 | 8.7 | 8.7 | 8.7 | 8.7 | 8.7 | 8.7 | 7.6 | 7.6 | 7.6 |
| | | | | | | | | | | | | | | | | |
| Population | 949,231 | 949,231 | 949,231 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 625,152 | 625,152 | 625,152 |
| Distribution Rate | 11.920 | 10.228 | 10.916 | 11.010 | 11.620 | 12.398 | 12.222 | 12.222 | 12.222 | 12.222 | 12.222 | 12.222 | 12.222 | 12.222 | 12.222 | 12.222 |
| August Payment | 11.3 | 9.7 | 10.4 | 7.8 | 8.3 | 8.8 | 8.7 | 8.7 | 8.7 | 8.7 | 8.7 | 8.7 | 8.7 | 7.6 | 7.6 | 7.6 |
| | | | | | | | | | | | | | | | | |
| Adjustment (1) | - | - | - | (10.2) | - | (0.0) | (0.0) | 1.8 | 3.6 | 5.2 | 6.9 | 8.7 | 10.5 | 6.1 | 12.2 | 14.0 |
| Adjustment for Actuals | 0.4 | 0.9 | 0.6 | 0.5 | | | | | | | | | | | | |
| **Total Constitutional Payment** | $ 66.4 | $ 63.1 | $ 60.9 | $ 47.6 | $ 51.0 | $ 52.2 | $ 53.3 | $ 55.1 | $ 56.9 | $ 58.5 | $ 60.2 | $ 62.0 | $ 63.8 | $ 57.3 | $ 59.0 | $ 60.8 |
| | | | | | | | | | | | | | | | | |
| **Statutory (EVIP)** | | | | | | | | | | | | | | | | |
| Accounting and Transparency | | | | | 40.5 | 43.3 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 |
| Consolidation of Services | | | | | 40.5 | 43.3 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 |
| Employee Compensation | | | | | 40.5 | 43.3 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 |
| Adjustment for Actuals | | | | | - | 0.2 | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| **Total Statutory Payment (EVIP)** | - | - | - | - | 121.4 | 130.3 | 136.3 | 136.3 | 136.3 | 136.3 | 136.3 | 136.3 | 136.3 | 136.3 | 136.3 | 136.3 |
| | | | | | | | | | | | | | | | | |
| Total Constitutional Payment | 66.4 | 63.1 | 60.9 | 47.6 | 51.0 | 52.2 | 53.3 | 55.1 | 56.9 | 58.5 | 60.2 | 62.0 | 63.8 | 57.3 | 59.0 | 60.8 |
| Total Statutory Payment | 181.8 | 202.6 | 201.5 | 191.5 | 121.4 | 130.3 | 136.3 | 136.3 | 136.3 | 136.3 | 136.3 | 136.3 | 136.3 | 136.3 | 136.3 | 136.3 |
| **Estimated State Revenue Sharing** | $ 248.2 | $ 265.8 | $ 262.4 | $ 239.2 | $ 172.3 | $ 182.5 | $ 189.6 | $ 191.4 | $ 193.2 | $ 194.8 | $ 196.5 | $ 198.3 | $ 200.1 | $ 193.6 | $ 195.3 | $ 197.1 |
| State calculations used for FY15 and beyond | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| Other shared taxes (including liquor and beer licenses) | $ 1.4 | $ 0.8 | $ 1.3 | $ 0.1 | $ 1.0 | $ 1.3 | $ 1.3 | $ 1.3 | $ 1.3 | $ 1.3 | $ 1.3 | $ 1.3 | $ 1.3 | $ 1.3 | $ 1.3 | $ 1.3 |
| **Total State Revenue Sharing** | $ 249.6 | $ 266.6 | $ 263.7 | $ 239.3 | $ 173.3 | $ 183.8 | $ 190.9 | $ 192.7 | $ 194.5 | $ 196.1 | $ 197.8 | $ 199.6 | $ 201.4 | $ 194.9 | $ 196.6 | $ 198.4 |

**Notes:**

(1) Adjustment due to estimated increases in sales tax collections by the State, resulting in higher assumed distributions

**Appendices C - D**
Key expense drivers

**Ten-Year Financial Projections**
**Headcount - Full-Time Equivalents**

| | | | Detailed Headcount by Department | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | |
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Uniform** | | | | | | | | | | | | | | | | |
| Police | 3,421 | 3,688 | 3,288 | 3,195 | 3,016 | 2,909 | 2,706 | 2,747 | 2,882 | 2,895 | 2,895 | 2,895 | 2,895 | 2,895 | 2,895 | 2,895 |
| Fire | 1,444 | 1,406 | 1,355 | 1,330 | 1,257 | 1,189 | 1,183 | 1,238 | 1,228 | 1,228 | 1,228 | 1,228 | 1,228 | 1,228 | 1,228 | 1,228 |
| Total Uniform | 4,865 | 5,094 | 4,643 | 4,525 | 4,273 | 4,098 | 3,890 | 3,986 | 4,110 | 4,123 | 4,123 | 4,123 | 4,123 | 4,123 | 4,123 | 4,123 |
| **Civilian** | | | | | | | | | | | | | | | | |
| Budget | 22 | 23 | 20 | 16 | 15 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 |
| DPW | 803 | 788 | 659 | 642 | 542 | 505 | 509 | 509 | 509 | 509 | 509 | 509 | 509 | 509 | 509 | 509 |
| DWDD | 91 | 99 | 113 | 73 | 46 | 7 | - | - | - | - | - | - | - | - | - | - |
| Finance | 327 | 310 | 285 | 266 | 235 | 228 | 216 | 216 | 206 | 206 | 206 | 206 | 206 | 206 | 206 | 206 |
| Health & Wellness | 348 | 317 | 262 | 243 | 185 | 80 | 14 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 |
| Human Resources | 175 | 168 | 171 | 176 | 107 | 93 | 84 | 84 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 |
| Human Services | 117 | 91 | 95 | 85 | 52 | 22 | - | - | - | - | - | - | - | - | - | - |
| ITS | 99 | 92 | 65 | 46 | 43 | 35 | 35 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 |
| Law | 127 | 122 | 113 | 105 | 94 | 86 | 86 | 86 | 86 | 86 | 86 | 86 | 86 | 86 | 86 | 86 |
| Mayor | 108 | 74 | 63 | 52 | 39 | 22 | 22 | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 |
| Planning & Development | 172 | 173 | 160 | 154 | 122 | 116 | 116 | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 113 |
| PLD | 225 | 206 | 160 | 123 | 103 | 99 | 70 | 12 | 7 | 5 | 3 | 3 | 3 | 2 | - | - |
| Recreation | 472 | 388 | 508 | 510 | 300 | 202 | 202 | 202 | 202 | 202 | 202 | 202 | 202 | 202 | 202 | 202 |
| General Services | 676 | 528 | 481 | 447 | 343 | 298 | 298 | 272 | 272 | 272 | 272 | 272 | 272 | 272 | 272 | 272 |
| Legislative (1) | 230 | 266 | 194 | 169 | 184 | 172 | 138 | 119 | 119 | 119 | 119 | 119 | 119 | 119 | 119 | 119 |
| 36th District Court | 32 | 33 | 33 | 35 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 |
| Other (2) | 103 | 89 | 31 | 36 | 26 | 32 | 30 | 26 | 26 | 26 | 26 | 26 | 26 | 26 | 26 | 26 |
| Total Civilian | 4,127 | 3,767 | 3,413 | 3,178 | 2,467 | 2,043 | 1,868 | 1,757 | 1,718 | 1,716 | 1,714 | 1,714 | 1,714 | 1,713 | 1,711 | 1,711 |
| **Total General Fund** | 8,992 | 8,861 | 8,056 | 7,703 | 6,740 | 6,140 | 5,758 | 5,743 | 5,828 | 5,839 | 5,837 | 5,837 | 5,837 | 5,836 | 5,834 | 5,834 |
| **Enterprise** | | | | | | | | | | | | | | | | |
| Airport | 11 | 10 | 9 | 8 | 7 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 |
| BSED | 296 | 276 | 258 | 235 | 204 | 192 | 192 | 192 | 192 | 192 | 192 | 192 | 192 | 192 | 192 | 192 |
| Transportation | 1,512 | 1,514 | 1,351 | 1,292 | 1,131 | 1,060 | 978 | 1,048 | 1,065 | 1,065 | 1,065 | 1,065 | 1,065 | 1,065 | 1,065 | 1,065 |
| Parking | 109 | 104 | 97 | 92 | 97 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 |
| Water | 1,045 | 1,012 | 962 | 981 | 930 | 873 | 873 | 873 | 873 | 873 | 873 | 873 | 873 | 873 | 873 | 873 |
| Sewer | 1,215 | 1,177 | 1,119 | 1,142 | 1,082 | 1,016 | 1,016 | 1,016 | 1,016 | 1,016 | 1,016 | 1,016 | 1,016 | 1,016 | 1,016 | 1,016 |
| Library | 460 | 466 | 450 | 371 | 334 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 |
| Total Enterprise | 4,648 | 4,559 | 4,246 | 4,121 | 3,785 | 3,572 | 3,490 | 3,560 | 3,577 | 3,577 | 3,577 | 3,577 | 3,577 | 3,577 | 3,577 | 3,577 |
| **Total City** | 13,640 | 13,420 | 12,302 | 11,824 | 10,525 | 9,712 | 9,248 | 9,303 | 9,405 | 9,417 | 9,415 | 9,415 | 9,415 | 9,414 | 9,412 | 9,412 |

(1) Most Recreation department employees are part-time employees.
(2) Includes: Civic Center, Human Rights, Administrative Hearings, Homeland Security, Non-departmental

13-53846-tjt Doc 8738-2 Filed 12/16/14 Entered 12/16/14 08:21:49 Page 564 of 602
13-53846-swr Doc 3382-2 Filed 03/31/14 Entered 03/31/14 16:36:38 Page 166 of 204

3/30/2014 11:01 PM

**Average Salary**

| | Fiscal year ended actual | | | | Actual | Preliminary forecast | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Uniform** | | | | | | | | | | | | | | | | |
| Police | $53,597 | $51,883 | $56,204 | $60,742 | $58,848 | $52,625 | $51,514 | $53,099 | $54,161 | $55,244 | $56,349 | $57,476 | $60,350 | $61,557 | $62,788 | $64,044 |
| Fire | 59,754 | 62,869 | 62,968 | 63,698 | 65,189 | 58,311 | 55,950 | 57,069 | 58,210 | 59,374 | 60,562 | 61,773 | 64,862 | 66,159 | 67,482 | 68,832 |
| Average Uniform | $55,424 | $54,915 | $58,178 | $61,611 | $60,713 | $54,274 | $52,864 | $54,332 | $55,371 | $56,474 | $57,604 | $58,756 | $61,694 | $62,927 | $64,186 | $65,470 |
| **Civilian** | | | | | | | | | | | | | | | | |
| Budget | $62,323 | $62,796 | $62,338 | $71,811 | $73,322 | $57,557 | $64,173 | $65,456 | $66,765 | $68,100 | $69,462 | $70,852 | $72,269 | $73,714 | $75,188 | $76,692 |
| DPW | 30,107 | 30,392 | 35,862 | 30,300 | 32,448 | 31,439 | 33,550 | 34,154 | 34,837 | 35,534 | 36,245 | 36,970 | 37,709 | 38,463 | 39,233 | 40,017 |
| DWDD | 69,476 | 72,088 | 105,969 | 104,180 | 96,126 | n/a | - | - | - | - | - | - | - | - | - | - |
| Finance | 44,290 | 48,404 | 49,213 | 48,545 | 49,479 | 44,131 | 45,415 | 46,323 | 47,249 | 48,194 | 49,158 | 50,141 | 51,144 | 52,167 | 53,211 | 54,275 |
| Health & Wellness | 38,399 | 42,069 | 44,205 | 39,808 | 42,873 | 29,627 | 60,946 | 73,547 | 75,018 | 76,518 | 78,049 | 79,610 | 81,202 | 82,826 | 84,482 | 86,172 |
| Human Resources | 52,849 | 55,000 | 49,465 | 38,861 | 55,145 | 44,710 | 49,727 | 50,722 | 51,736 | 52,771 | 53,826 | 54,903 | 56,001 | 57,121 | 58,263 | 59,428 |
| Human Services | 42,296 | 53,028 | 47,676 | 46,749 | 64,791 | 44,951 | 55,538 | 56,648 | 57,781 | 58,937 | 60,116 | 61,318 | 62,544 | 63,795 | 65,071 | 66,372 |
| ITS | 51,306 | 55,548 | 61,007 | 74,548 | 60,681 | 57,494 | 57,494 | 58,644 | 59,817 | 61,013 | 62,233 | 63,478 | 64,748 | 66,043 | 67,363 | 68,711 |
| Law | 73,486 | 75,672 | 72,144 | 73,252 | 78,313 | 71,497 | 71,497 | 72,927 | 74,386 | 75,873 | 77,391 | 78,939 | 80,517 | 82,128 | 83,770 | 85,446 |
| Mayor | 52,946 | 71,222 | 73,700 | 76,927 | 80,495 | 98,421 | 92,861 | 94,718 | 96,613 | 98,545 | 100,516 | 102,526 | 104,577 | 106,668 | 108,801 | 110,977 |
| Planning & Development | 54,225 | 54,491 | 55,121 | 51,860 | 59,007 | 53,640 | 53,640 | 54,713 | 55,807 | 56,923 | 58,061 | 59,223 | 60,407 | 61,615 | 62,848 | 64,105 |
| PLD | 44,676 | 46,839 | 50,059 | 55,114 | 55,866 | 48,724 | 49,211 | 84,190 | 81,474 | 79,817 | 79,591 | 81,182 | 82,806 | 84,462 | - | - |
| Recreation (1) | 15,783 | 19,905 | 13,500 | 11,659 | 17,264 | 16,904 | 16,904 | 17,242 | 17,587 | 17,939 | 18,298 | 18,664 | 19,037 | 19,418 | 19,806 | 20,202 |
| General Services | 31,804 | 39,503 | 36,473 | 36,309 | 34,874 | 30,695 | 33,501 | 34,171 | 34,855 | 35,552 | 36,263 | 36,988 | 37,728 | 38,483 | 39,252 | 40,037 |
| Legislative (2) | 51,789 | 49,387 | 56,976 | 54,111 | 43,790 | 41,106 | 39,284 | 42,347 | 43,194 | 44,058 | 44,939 | 45,837 | 46,754 | 47,689 | 48,643 | 49,616 |
| 36th District Court | 73,310 | 74,878 | 73,616 | 69,189 | 51,102 | 51,391 | 51,391 | 52,419 | 53,467 | 54,537 | 55,627 | 56,740 | 57,875 | 59,032 | 60,213 | 61,417 |
| Other (3) | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| Total Civilian | $37,952 | $41,894 | $43,048 | $39,407 | $42,474 | $37,652 | $39,201 | $40,255 | $40,724 | $41,480 | $42,261 | $43,106 | $43,968 | $44,825 | $45,674 | $46,587 |
| **Total General Fund** | $47,405 | $49,380 | $51,768 | $52,450 | $54,037 | $48,745 | $48,432 | $50,025 | $51,053 | $52,068 | $53,099 | $54,161 | $56,489 | $57,614 | $58,757 | $59,932 |
| **Enterprise** | | | | | | | | | | | | | | | | |
| Airport | $46,972 | $51,750 | $49,202 | $44,746 | $42,833 | $39,678 | $64,882 | $66,180 | $67,503 | $68,853 | $70,230 | $71,635 | $73,068 | $74,529 | $76,020 | $77,540 |
| BSED | 44,694 | 49,103 | 50,316 | 49,154 | 48,069 | 40,757 | 47,306 | 48,252 | 49,218 | 50,202 | 51,206 | 52,230 | 53,275 | 54,340 | 55,427 | 56,535 |
| Transportation | 31,375 | 31,991 | 33,352 | 31,553 | 32,578 | 28,576 | 30,767 | 31,383 | 32,010 | 32,651 | 33,304 | 33,970 | 34,649 | 35,342 | 36,049 | 36,770 |
| Parking | 35,423 | 36,835 | 37,362 | 34,955 | 30,576 | 30,621 | 33,594 | 34,266 | 34,952 | 35,651 | 36,364 | 37,091 | 37,833 | 38,589 | 39,361 | 40,149 |
| Water | 36,004 | 41,942 | 29,473 | 35,952 | 36,621 | 39,949 | 40,481 | 41,291 | 42,117 | 42,959 | 43,818 | 44,695 | 45,589 | 46,500 | 47,430 | 48,379 |
| Sewer | 35,082 | 39,467 | 29,002 | 37,896 | 38,784 | 32,781 | 56,127 | 57,249 | 58,394 | 59,562 | 60,753 | 61,968 | 63,208 | 64,472 | 65,761 | 67,076 |
| Library | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| Total Enterprise | $31,260 | $34,050 | $28,948 | $32,623 | $33,273 | $30,596 | $38,662 | $39,276 | $40,023 | $40,824 | $41,640 | $42,473 | $43,322 | $44,189 | $45,073 | $45,974 |
| **Total City** | $41,903 | $44,172 | $43,892 | $45,540 | $46,570 | $42,070 | $44,744 | $45,911 | $46,858 | $47,796 | $48,745 | $49,720 | $51,486 | $52,512 | $53,556 | $54,627 |

(1) Most Recreation department employees are part-time employees.
(2) Includes: Auditor General, Zoning, City Council, Ombudsperson, City Clerk, and Elections.
(3) Includes: Civic Center, Human Rights, Administrative Hearings, Homeland Security, Non-departmental

**Ten-Year Financial Projections**
**Benefits**
($ in millions)

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Preliminary forecast 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Active employees** | | | | | | | | | | | |
| Assumed inflation | | | | | | | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% |
| *Medical costs per head ($ in actuals) (1)* | | | | | | | | | | | |
| PFRS | $ | 9,205 $ | 8,795 $ | 9,388 $ | 10,051 $ | 10,786 $ | 11,433 $ | 12,119 $ | 12,846 $ | 13,617 $ | 14,434 |
| General City | | 8,124 | 7,954 | 8,491 | 9,088 | 9,751 | 10,336 | 10,956 | 11,614 | 12,311 | 13,049 |
| Department of Transportation | | 9,841 | 8,729 | 9,316 | 9,968 | 10,604 | 11,336 | 12,016 | 12,737 | 13,501 | 14,312 |
| Water/Sewer | | 8,421 | 8,309 | 8,871 | 9,493 | 10,187 | 10,799 | 11,446 | 12,133 | 12,861 | 13,633 |
| Library | | 7,441 | 7,240 | 7,708 | 8,255 | 8,854 | 9,385 | 9,949 | 10,545 | 11,178 | 11,849 |
| 36 District Court | | 12,098 | 12,944 | 13,819 | 14,793 | 15,875 | 16,828 | 17,838 | 18,908 | 20,042 | 21,245 |
| *Heads* | | | | | | | | | | | |
| PFRS | | 3,890 | 3,986 | 4,110 | 4,123 | 4,123 | 4,123 | 4,123 | 4,123 | 4,123 | 4,123 |
| General City | | 1,963 | 1,853 | 1,813 | 1,811 | 1,809 | 1,809 | 1,809 | 1,808 | 1,806 | 1,806 |
| Department of Transportation | | 978 | 1,048 | 1,065 | 1,065 | 1,065 | 1,065 | 1,065 | 1,065 | 1,065 | 1,065 |
| Water/Sewer | | 1,890 | 1,890 | 1,890 | 1,890 | 1,890 | 1,890 | 1,890 | 1,890 | 1,890 | 1,890 |
| Library | | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 |
| 36 District Court | | 362 | 362 | 362 | 362 | 362 | 362 | 362 | 362 | 362 | 362 |
| *Total Active Medical costs* | | | | | | | | | | | |
| PFRS | $ | 35.8 $ | 35.1 $ | 38.6 $ | 41.4 $ | 44.5 $ | 47.1 $ | 50.0 $ | 53.0 $ | 56.1 $ | 59.5 |
| General City | | 15.9 | 14.7 | 15.4 | 16.5 | 17.6 | 18.7 | 19.8 | 21.0 | 22.2 | 23.6 |
| Department of Transportation | | 9.6 | 9.1 | 9.9 | 10.6 | 11.4 | 12.1 | 12.8 | 13.6 | 14.4 | 15.2 |
| Water/Sewer | | 15.9 | 15.7 | 16.8 | 17.9 | 19.3 | 20.4 | 21.6 | 22.9 | 24.3 | 25.8 |
| Library | | 2.5 | 2.4 | 2.6 | 2.8 | 3.0 | 3.1 | 3.3 | 3.5 | 3.7 | 4.0 |
| 36 District Court | | 4.4 | 4.7 | 5.0 | 5.3 | 5.7 | 6.1 | 6.4 | 6.8 | 7.2 | 7.7 |
| | $ | 84.2 $ | 81.7 $ | 88.2 $ | 94.6 $ | 101.5 $ | 107.6 $ | 114.0 $ | 120.8 $ | 128.1 $ | 135.7 |
| *General Fund Active Medical costs* | | | | | | | | | | | |
| PFRS | $ | 35.8 $ | 35.0 $ | 38.5 $ | 41.4 $ | 44.4 $ | 47.1 $ | 49.9 $ | 52.9 $ | 56.1 $ | 59.4 |
| General City | | 9.1 | 8.4 | 8.6 | 9.2 | 9.8 | 10.4 | 11.0 | 11.7 | 12.4 | 13.1 |
| 36 District Court | | 4.4 | 4.7 | 5.0 | 5.3 | 5.7 | 6.1 | 6.4 | 6.8 | 7.2 | 7.7 |
| | $ | 49.2 $ | 48.0 $ | 52.1 $ | 55.9 $ | 60.0 $ | 63.6 $ | 67.4 $ | 71.4 $ | 75.7 $ | 80.2 |
| **Retirees** | | | | | | | | | | | |
| Assumed inflation (2) | | 5.0% | 5.6% | 3.3% | 4.6% | 4.2% | 5.6% | 5.2% | 5.6% | 4.9% | 4.8% |
| Implied Medical costs per head ($ in actuals) | $ | 10,683 $ | 11,213 $ | 11,836 $ | 12,230 $ | 12,790 $ | 13,330 $ | 14,078 $ | 14,804 $ | 15,631 $ | 16,391 $ 17,178 |
| Heads | | 17,027 | 17,027 | 17,027 | 17,027 | 17,027 | 17,027 | 17,027 | 17,027 | 17,027 | 17,027 |
| Total Retiree Medical costs | $ | 181.9 $ | 190.9 $ | 201.5 $ | 208.2 $ | 217.8 $ | 227.0 $ | 239.7 $ | 252.1 $ | 266.1 $ | 279.1 $ 292.5 |
| General Fund portion of Retiree Medical costs (3) (4) | | 130.0 $ | 138.3 $ | 142.9 $ | 149.4 $ | 155.7 $ | 164.5 $ | 173.0 $ | 182.6 $ | 191.5 $ | 200.7 |
| *% of total* | | *68.1%* | *68.6%* | *68.6%* | *68.6%* | *68.6%* | *68.6%* | *68.6%* | *68.6%* | *68.6%* | *68.6%* |

*Footnotes:*
(1) Based on Milliman letter dated November 3, 2013, Re: City of Detroit Active Health Plan Projections.
(2) Based on census data of Retirees by department. Unknown retirees have been allocated across all non-uniform departments. Individuals having retired from departments that no longer exist have been allocated across active General Fund departments.
(3) Growth assumptions based on plan provisions outline in Milliman letter dated June 30, 2013.
(4) Retirees representing departments in transition, such as Health & Wellness and PLD, have been included in the allocation across active General Fund departments.

13-53846-tjt Doc 8772 Filed 12/16/14 Entered 12/16/14 08:24:49 Page 566 of 602
13-53846-swr Doc 7382-2 Filed 09/11/14 Entered 09/11/14 18:36:38 Page 166 of 204
204
3/30/2014 11:01 PM

**Ten-Year Financial Projections**

**Pension**

*($ in millions)*

| | | | | | Preliminary forecast | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |

**Third-party projections**

*Milliman*

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|
| PFRS + GRS (baseline @ 7%) | $ 277.0 | $ 325.0 | $ 363.0 | $ 402.0 | $ 444.0 | $ 457.0 | $ 474.0 | $ 486.0 | $ 495.0 | $ 504.0 |
| Normal | 75.0 | 76.0 | 77.0 | 78.0 | 80.0 | 81.0 | 81.5 | 82.0 | 82.6 | 83.1 |
| UAAL | 43.0 | 64.0 | 87.0 | 110.0 | 135.0 | 137.0 | 138.0 | 139.1 | 140.1 | 141.2 |
| Existing DC plan (PFRS) | 2.0 | 3.0 | 4.0 | 4.0 | 5.0 | 6.0 | 6.6 | 7.3 | 8.0 | 8.8 |

**Total City**

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|
| PFRS | $ 139.0 | $ 163.0 | $ 180.0 | $ 198.0 | $ 217.0 | $ 219.0 | $ 224.0 | $ 225.0 | $ 222.0 | 221.0 |
| General City | 54.4 | 63.8 | 72.1 | 80.4 | 89.4 | 93.7 | 98.5 | 102.8 | 107.5 | 111.5 |
| DOT | 23.6 | 27.7 | 31.2 | 34.8 | 38.7 | 40.6 | 42.7 | 44.5 | 46.6 | 48.3 |
| Water/Sewer | 56.7 | 66.6 | 75.2 | 83.9 | 93.3 | 97.8 | 102.8 | 107.3 | 112.2 | 116.3 |
| Library | 3.4 | 3.9 | 4.5 | 5.0 | 5.5 | 5.8 | 6.1 | 6.4 | 6.6 | 6.9 |
| Total City Pension plans | $ 277.0 | $ 325.0 | $ 363.0 | $ 402.0 | $ 444.0 | $ 457.0 | $ 474.0 | $ 486.0 | $ 495.0 | $ 504.0 |
| | | | | | | | | | | |
| 36th District Court (State plan) | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 |
| Total estimated City Pension | $ 282.0 | $ 330.0 | $ 368.0 | $ 407.0 | $ 449.0 | $ 462.0 | $ 479.0 | $ 491.0 | $ 500.0 | $ 509.0 |

**General Fund**

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|
| PFRS | $ 138.8 | $ 162.8 | $ 179.8 | $ 197.7 | $ 216.7 | $ 218.7 | $ 223.7 | $ 224.7 | $ 221.7 | 220.7 |
| General City - General Fund | 33.4 | 39.1 | 43.4 | 48.4 | 53.7 | 56.4 | 59.2 | 61.8 | 64.5 | 66.9 |
| Estimated City Pension plans (GF) | $ 172.2 | $ 201.9 | $ 223.2 | $ 246.1 | $ 270.5 | $ 275.1 | $ 282.9 | $ 286.5 | $ 286.2 | $ 287.6 |
| | | | | | | | | | | |
| 36th District Court (State plan) | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 |
| Total estimated GF Pension | $ 177.2 | $ 206.8 | $ 228.2 | $ 251.0 | $ 275.4 | $ 280.0 | $ 287.8 | $ 291.4 | $ 291.2 | $ 292.5 |

**Pension unfunded liability**

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|
| PFRS | $ 1,446.0 | $ 1,428.0 | $ 1,389.0 | $ 1,327.0 | $ 1,241.0 | $ 1,148.0 | $ 1,040.0 | $ 925.0 | n/a | n/a |
| GRS | 2,077.0 | 2,095.0 | 2,095.0 | 2,075.0 | 2,031.0 | 1,976.0 | 1,906.0 | 1,821.0 | n/a | n/a |

*Footnotes:*

(1) Actual FY13 pension expenses accrued are being investigated.

**Ten-Year Financial Projections**

**Debt summary**

*($ in millions)*

| Type | Funding source | Maturity | Interest rate | Beg. Bal. 2013 | Paid by General Fund |
|---|---|---|---|---|---|
| LTGO | Sr. Lien on DSA & Self-Insurance | 2013-2035 | 4.00%-8.00% | $ 452.6 | ✓ |
| Refinance (LTGO) | 3rd Lien on DSA | 2033 | 2.50%-5.30% | 129.5 | ✓ |
| UTGO | Property taxes | 2014-2028 | 3.75%-5.375% | 510.8 | |
| Capital Lease | n/a | n/a | n/a | 1.6 | ✓ |
| POC | n/a | 2025-2035 | Floating-5.989% | 1,451.9 | Portion |
| POC swap | Wagering taxes | 2029-2034 | 6.323%-6.356% | n/a | ✓ |
| Total principal | | | | $ 2,546.4 | |

**Debt Service** — Preliminary forecast

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Partially General Fund |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Principal** | | | | | | | | | | | | |
| LTGO | $ 41.8 | $ 47.7 | $ 33.5 | $ 35.1 | $ 13.6 | $ 14.2 | 14.9 | $ 15.7 | $ 16.8 | 16.0 | $ 16.7 | ✓ |
| Refinance (LTGO) | - | 2.9 | 4.4 | 4.4 | 4.9 | 5.1 | 5.3 | 5.6 | 5.8 | 6.1 | 6.5 | ✓ |
| UTGO | 41.7 | 39.8 | 37.9 | 34.9 | 36.7 | 37.5 | 37.0 | 38.2 | 39.5 | 26.6 | 24.2 | |
| Capital Lease | 0.5 | 0.1 | - | - | - | - | - | - | - | - | - | ✓ |
| Total debt principal | 84.0 | 90.5 | 75.8 | 74.6 | 55.1 | 56.8 | 57.2 | 59.4 | 62.1 | 48.7 | 47.3 | |
| **Interest** | | | | | | | | | | | | |
| LTGO | 23.3 | 21.3 | 18.2 | 16.5 | 14.8 | 14.1 | 13.4 | 12.7 | 11.9 | 11.1 | 10.4 | ✓ |
| Refinance (LTGO) | 4.2 | 6.1 | 6.0 | 5.8 | 5.6 | 5.4 | 5.1 | 4.9 | 4.7 | 4.4 | 4.1 | ✓ |
| UTGO | 28.9 | 26.7 | 24.7 | 22.8 | 21.0 | 19.1 | 17.1 | 15.2 | 13.2 | 11.2 | 9.7 | |
| Capital Lease | 0.0 | 0.0 | - | - | - | - | - | - | - | - | - | ✓ |
| Total debt interest | 56.4 | 54.1 | 48.9 | 45.2 | 41.4 | 38.6 | 35.7 | 32.8 | 29.8 | 26.6 | 24.2 | |
| GF adjustment (1) | 2.7 | - | - | - | - | - | - | - | - | - | - | |
| Total debt service | $ 143.1 | $ 144.6 | $ 124.7 | $ 119.8 | $ 96.5 | $ 95.4 | 92.9 | $ 92.3 | $ 91.9 | 75.3 | $ 71.5 | |
| | | | | | | | | | | | | |
| **GF debt service (LTGO)** | $ 72.6 | $ 78.1 | $ 62.1 | $ 62.1 | $ 38.9 | $ 38.8 | 38.8 | $ 38.9 | $ 39.3 | 37.6 | $ 37.5 | |
| Debt service fund (UTGO) (2) | 70.6 | 66.5 | 62.6 | 57.7 | 57.6 | 56.5 | 54.1 | 53.4 | 52.7 | 37.7 | 33.9 | |
| | | | | | | | | | | | | |
| **POC (3)** | | | | | | | | | | | | |
| **Principal** | | | | | | | | | | | | |
| POC - Governmental | $ 18.4 | $ 23.6 | $ 26.5 | $ 29.4 | $ 32.6 | $ 36.1 | 36.4 | $ 38.3 | $ 40.3 | 42.4 | $ 44.6 | ✓ |
| POC - EF (incl. DDOT) | 4.7 | 6.0 | 6.8 | 7.5 | 8.3 | 9.2 | 9.3 | 9.8 | 10.3 | 10.8 | 11.4 | |
| Total POC principal | 23.1 | 29.6 | 33.3 | 37.0 | 41.0 | 45.3 | 45.7 | 48.1 | 50.6 | 53.2 | 56.0 | |
| **Interest** | | | | | | | | | | | | |
| POC - Governmental | 30.3 | 29.5 | 28.4 | 27.2 | 25.8 | 24.2 | 22.5 | 21.2 | 19.8 | 18.3 | 16.6 | ✓ |
| POC - EF (incl. DDOT) | 7.7 | 7.5 | 7.3 | 6.9 | 6.6 | 6.2 | 5.7 | 5.4 | 5.1 | 4.7 | 4.2 | |
| POC swap - Governmental | 40.6 | 40.6 | 40.6 | 40.6 | 40.6 | 40.6 | 40.6 | 39.8 | 39.1 | 38.5 | 37.9 | ✓ |
| POC swap - EF (incl. DDOT) | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 | 5.2 | 5.1 | 5.0 | 4.9 | |
| Total POC interest | 84.0 | 82.9 | 81.5 | 80.0 | 78.2 | 76.2 | 74.1 | 71.6 | 69.1 | 66.4 | 63.6 | |
| | | | | | | | | | | | | |
| Total POC | $ 107.1 | $ 112.6 | $ 114.8 | $ 116.9 | $ 119.2 | $ 121.5 | 119.7 | $ 119.7 | $ 119.7 | 119.7 | $ 119.7 | |
| | | | | | | | | | | | | |
| Total POC - Governmental | $ 89.3 | $ 93.7 | $ 95.5 | $ 97.2 | $ 99.0 | $ 100.8 | 99.4 | $ 99.3 | $ 99.2 | 99.2 | $ 99.1 | |
| General Fund adjustment (1) | (11.4) | (15.2) | (15.6) | (16.4) | (16.8) | (17.2) | (16.9) | (17.0) | (17.0) | (17.1) | (17.2) | |
| **General Fund POC** | $ 77.9 | $ 78.5 | $ 79.9 | $ 80.8 | $ 82.2 | $ 83.6 | 82.5 | $ 82.4 | $ 82.2 | 82.0 | $ 81.9 | ✓ |
| | | | | | | | | | | | | |
| **Debt service + POC** | | | | | | | | | | | | |
| Total GF debt service + POC | $ 150.5 | $ 156.6 | $ 142.0 | $ 142.9 | $ 121.0 | $ 122.4 | 121.3 | $ 121.2 | $ 121.5 | 119.6 | $ 119.5 | |
| POC allocation to enterprise and other funds | 29.1 | 34.0 | 34.9 | 36.1 | 37.0 | 37.9 | 37.2 | 37.4 | 37.5 | 37.6 | 37.7 | |
| Debt service fund (UTGO debt service) | 70.6 | 66.5 | 62.6 | 57.7 | 57.6 | 56.5 | 54.1 | 53.4 | 52.7 | 37.7 | 33.9 | |
| Total | $ 250.2 | $ 257.2 | $ 239.5 | $ 236.7 | $ 215.7 | $ 216.9 | 212.7 | $ 212.0 | $ 211.6 | 195.0 | $ 191.1 | |

*Footnotes:*

(1) Represents allocations to/from other funds/departments.

(2) UTGO debt service already accounted for within gross property taxes, from which a transfer is made to the Debt Service fund.

(3) See Appendix D.2 for additional POC allocation detail.

**Ten-Year Financial Projections**

**POC summary**

*($ in millions)*

| | | Preliminary forecast | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |

**Total POC payments**

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Principal Payments | | $ (29.6) $ | (33.3) $ | (37.0) $ | (41.0) $ | (45.3) $ | (45.7) $ | (48.1) $ | (50.6) $ | (53.2) $ | (56.0) |
| Total Interest Payments | | (32.2) | (30.8) | (29.3) | (27.5) | (25.5) | (23.4) | (21.9) | (20.2) | (18.4) | (16.3) |
| Total Quarterly Interest (Part of Set-Aside Requirements) | | (4.8) | (4.8) | (4.8) | (4.8) | (4.8) | (4.8) | (4.8) | (4.7) | (4.6) | (4.5) |
| Total Interest Swap Payments - PFRS (1) | | (29.6) | (29.6) | (29.6) | (29.6) | (29.6) | (29.6) | (29.1) | (28.5) | (28.1) | (27.6) |
| Total Interest Swap Payments - GRS (1) | | (16.3) | (16.3) | (16.3) | (16.3) | (16.3) | (16.3) | (16.0) | (15.7) | (15.4) | (15.2) |
| **Total payments** | | $ (112.6) $ | (114.8) $ | (116.9) $ | (119.2) $ | (121.5) $ | (119.7) $ | (119.7) $ | (119.7) $ | (119.7) $ | (119.7) |

**POC payments by Pension system**

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PFRS | | | | | | | | | | | |
| Principal | | $ (11.1) $ | (12.4) $ | (13.8) $ | (15.3) $ | (16.9) $ | (17.1) $ | (18.0) $ | (18.9) $ | (19.9) $ | (21.0) |
| Interest | | (12.0) | (11.5) | (11.0) | (10.3) | (9.6) | (8.7) | (8.2) | (7.6) | (6.9) | (6.1) |
| Quarterly | | (1.8) | (1.8) | (1.8) | (1.8) | (1.8) | (1.8) | (1.8) | (1.7) | (1.7) | (1.7) |
| Swap | | (29.6) | (29.6) | (29.6) | (29.6) | (29.6) | (29.6) | (29.1) | (28.5) | (28.1) | (27.6) |
| Subtotal: PFRS | | (54.6) | (55.4) | (56.2) | (57.0) | (57.9) | (57.2) | (57.0) | (56.8) | (56.6) | (56.4) |
| DGRS | | | | | | | | | | | |
| Principal | | (18.6) | (20.8) | (23.1) | (25.6) | (28.3) | (28.6) | (30.1) | (31.7) | (33.3) | (35.1) |
| Interest | | (20.1) | (19.3) | (18.3) | (17.2) | (16.0) | (14.6) | (13.7) | (12.7) | (11.5) | (10.2) |
| Quarterly | | (3.0) | (3.0) | (3.0) | (3.0) | (3.0) | (3.0) | (3.0) | (2.9) | (2.9) | (2.8) |
| Swap | | (16.3) | (16.3) | (16.3) | (16.3) | (16.3) | (16.3) | (16.0) | (15.7) | (15.4) | (15.2) |
| Subtotal: DGRS | | (58.0) | (59.4) | (60.8) | (62.2) | (63.6) | (62.5) | (62.7) | (62.9) | (63.1) | (63.3) |
| **Total payments** | | $ (112.6) $ | (114.8) $ | (116.9) $ | (119.2) $ | (121.5) $ | (119.7) $ | (119.7) $ | (119.7) $ | (119.7) $ | (119.7) |

**DGRS POC payments by funding group**

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DDOT | 11.4% | $ (6.6) $ | (6.8) $ | (6.9) $ | (7.1) $ | (7.3) $ | (7.1) $ | (7.2) $ | (7.2) $ | (7.2) $ | (7.2) |
| Water/Sewer | 18.5% | (10.7) | (11.0) | (11.2) | (11.5) | (11.7) | (11.5) | (11.6) | (11.6) | (11.6) | (11.7) |
| Library | 2.6% | (1.5) | (1.6) | (1.6) | (1.6) | (1.7) | (1.6) | (1.7) | (1.7) | (1.7) | (1.7) |
| General City (2) | 67.5% | (39.1) | (40.1) | (41.0) | (41.9) | (42.9) | (42.2) | (42.3) | (42.5) | (42.6) | (42.7) |
| **Total GRS payments** | 100.0% | $ (58.0) $ | (59.4) $ | (60.8) $ | (62.2) $ | (63.6) $ | (62.5) $ | (62.7) $ | (62.9) $ | (63.1) $ | (63.3) |

**POC Swap payments by funding group**

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PFRS | | $ (29.6) $ | (29.6) $ | (29.6) $ | (29.6) $ | (29.6) $ | (29.6) $ | (29.1) $ | (28.5) $ | (28.1) $ | (27.6) |
| DDOT | | (1.9) | (1.9) | (1.9) | (1.9) | (1.9) | (1.9) | (1.8) | (1.8) | (1.8) | (1.7) |
| Water/Sewer | | (3.0) | (3.0) | (3.0) | (3.0) | (3.0) | (3.0) | (2.9) | (2.9) | (2.8) | (2.8) |
| Library | | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) |
| General City (2) | | (11.0) | (11.0) | (11.0) | (11.0) | (11.0) | (11.0) | (10.8) | (10.6) | (10.4) | (10.2) |
| **Total POC swap payments** | | $ (45.9) $ | (45.9) $ | (45.9) $ | (45.9) $ | (45.9) $ | (45.9) $ | (45.0) $ | (44.2) $ | (43.5) $ | (42.8) |

**Supporting allocations**

| Funding Group | 2005-A 2006-A, 2006-B Refunding Tranaction | Allocations | | |
|---|---|---|---|---|
| | | Principal & Interest | GRS Swap | PFRS Swap |
| DDOT | $ 106.3 | 7.2% | 11.4% | 0.0% |
| Water/Sewer | 171.4 | 11.5% | 18.5% | 0.0% |
| Library | 24.5 | 1.6% | 2.6% | 0.0% |
| General City (2) | 626.9 | 42.2% | 67.5% | 0.0% |
| Subtotal: DGRS | $ 929.1 | 62.6% | 100.0% | 0.0% |
| PFRS | $ 555.4 | 37.4% | 0.0% | 100.0% |
| **Total** | $ 1,484.5 | 100.0% | 100.0% | 100.0% |

**Footnotes:**

(1) Allocation of swap interest based on $283.7 million of notional principal for GRS and $516.3 million of notional principal for PFRS.

(2) General City is comprised of a General Fund component as well as a portion allocated to other funds (i.e. Solid Waste fund, Street funds, and certain cost centers within Planning & Development, BSEED and Parking).

This page intentionally left blank

13-53846-tjt Doc 8779-2 Filed 12/16/14 Entered 12/16/14 08:24:49 Page 570 of 602
13-53846-swr Doc 3382-2 Filed 03/31/14 Entered 03/31/14 18:56:36 Page 172 of
204

3/30/2014 11:01 PM

**EXHIBIT K**

DWSD CURRENT AND HISTORICAL FINANCIAL INFORMATION

# City of Detroit
## Detroit Water and Sewer Department
## Water Fund
## Historical Water Fund Income Statement

| | For the Fiscal Year Ended | | | | |
|---|---|---|---|---|---|
| | 6/30/2008 | 6/30/2009 | 6/30/2010 | 6/30/2011 | 6/30/2012 |
| Water Sales - Detroit | $ 74,442,186 | $ 65,360,449 | $ 65,580,546 | $ 74,810,362 | $ 71,540,060 | $ 75,653,761 |
| Water Sales - Suburban | 216,867,005 | 206,282,285 | 210,662,057 | 237,099,865 | 258,587,439 | 275,185,243 |
| Miscellaneous | 1,674,029 | 2,452,729 | 9,227,823 | 4,091,974 | 6,002,446 | 4,688,757 |
| Total Revenues | 292,983,220 | 274,095,463 | 285,470,426 | 316,002,201 | 336,129,945 | 355,527,761 |
| | | | | | | |
| Source of Supply | 1,991,566 | 1,435,307 | 1,600,836 | 5,683,036 | 9,680,853 | 3,787,570 |
| Low-lift Pumping | 5,070,132 | 6,136,788 | 4,897,562 | 8,269,998 | 8,145,801 | 7,152,542 |
| High-lift Pumping | 21,329,905 | 22,052,260 | 17,971,502 | 19,581,883 | 22,998,901 | 21,686,100 |
| Purification | 17,077,316 | 19,062,007 | 15,464,412 | 17,681,131 | 19,335,784 | 15,998,705 |
| Water Quality Operations | 1,244,597 | 1,111,392 | 792,590 | 787,600 | 815,616 | 782,672 |
| Pumping Stations | 0 | 0 | 0 | 16,741,756 | 24,908,886 | 19,328,514 |
| Transmission and Distributions | 26,448,973 | 43,536,055 | 34,158,895 | 28,596,533 | 23,503,906 | 28,420,176 |
| Services and Meters | 5,977,508 | 5,812,986 | 8,096,307 | 13,235,615 | 11,678,595 | 16,750,695 |
| Hydrant Division | 128,697 | 3,489 | 314,729 | 697,442 | 417,833 | 508,762 |
| Commercial | 6,112,874 | 7,046,284 | 7,632,044 | 6,129,979 | 7,572,727 | 6,919,951 |
| Operations and Maintenance | 30,371,887 | 33,709,777 | 45,426,798 | 0 | 0 | 0 |
| Central City Staff Services | 7,994,520 | 5,664,954 | 6,225,681 | 0 | 0 | |
| Administrative and General | 17,621,924 | 20,172,634 | 15,351,608 | 29,475,444 | 36,021,547 | 24,996,371 |
| Nonrecurring Capital Asset Adjustments | 28,283,497 | 0 | 0 | 0 | 0 | 18,735,709 |
| Net OPEB Obligation | | | | | | 17,248,909 |
| Other Items | 0 | 0 | 0 | 14,638,350 | 15,124,239 | |
| Depreciation | 67,504,841 | 71,084,673 | 81,660,122 | 71,995,060 | 81,602,960 | 83,031,094 |
| Total Operating Expenses | 237,158,237 | 236,828,606 | 239,593,086 | 233,513,827 | 261,807,648 | 265,347,771 |
| | | | | | | |
| Operating Income | 55,824,983 | 37,266,857 | 45,877,340 | 82,488,374 | 74,322,297 | 90,179,990 |
| | | | | | | |
| Investment Earnings (Losses) | 29,312,849 | 13,749,381 | (23,979,799) | 14,479,871 | (72,582,266) | (6,941,979) |
| Loss on Disposal of Capital Assets | 0 | 0 | 0 | 0 | 0 | |
| Interest Expense, Net of Capitalized Interest | (123,619,840) | (112,905,999) | (107,044,663) | (111,666,753) | (108,750,464) | (127,866,520) |
| Amortization of Bond Issuance Costs | 0 | 0 | 0 | 0 | (7,059,640) | (8,533,883) |
| Miscellaneous Revenue (Expense) | 1,679,909 | (7,920,379) | 664,100 | 1,588,987 | 453,615 | 6,404,158 |
| Total Other Income (Expenses) | (92,627,082) | (107,076,997) | (130,360,362) | (95,597,895) | (187,938,755) | (136,938,224) |
| | | | | | | |
| Decrease in Net Assets before Capital | | | | | | |
| Contributions, Transfers, and Special Items | (36,802,099) | (69,810,140) | (84,483,022) | (13,109,521) | (113,616,458) | (46,758,234) |
| | | | | | | |
| Capital Contributions | 605,746 | 340,076 | 111,777 | 211,745 | 20,500 | 165,403 |
| Transfers In | 9,575,331 | 0 | 0 | 0 | 0 | |
| Transfers Out | 0 | 0 | 0 | 0 | 0 | |
| Special Items | 0 | 0 | 0 | 0 | 0 | |
| Capital Contributions, Transfers In, Transfers | | | | | | |
| Out, and Special Items | 10,181,077 | 340,076 | 111,777 | 211,745 | 20,500 | 165,403 |
| | | | | | | |
| Increase (Decrease) in Net Assets | (26,621,022) | (69,470,064) | (84,371,245) | (12,897,776) | (113,595,958) | (46,592,831) |
| | | | | | | |
| Net Assets, Beginning | 400,952,650 | 374,331,628 | 304,861,564 | 136,375,840 | 123,478,064 | 9,882,106 |
| Adjustments to Net Assets | 0 | 0 | (84,114,479) | 0 | 0 | 0 |
| Net Assets, Beginning (Adjusted) | 400,952,650 | 374,331,628 | 220,747,085 | 136,375,840 | 123,478,064 | 9,882,106 |
| Increase (Decrease) in Net Assets | (26,621,022) | (69,470,064) | (84,371,245) | (12,897,776) | (113,595,958) | (46,592,831) |
| **Net Assets, Ending** | **$ 374,331,628** | **$ 304,861,564** | **$ 136,375,840** | **$ 123,478,064** | **$ 9,882,106** | **$ (36,710,725)** |
| | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | 0 |

Source: FY 2013 information obtained from draft audited financial statements; Audited financial statements

13-53846-tjt  Doc 8739-2  Filed 12/16/14  Entered 12/16/14 08:40:39  Page 572 of 602
13-53846-swr  Doc 3382-1  Filed 03/31/14  Entered 03/31/14 18:56:38  Page 17 of 24
204

City of Detroit
**Detroit Water and Sewer Department**
**Sewage Disposal Fund**
**Historical Sewage Fund Income Statement**

| | For the Fiscal Year Ended | | | | |
|---|---|---|---|---|---|
| | 6/30/2008 | 6/30/2009 | 6/30/2010 | 6/30/2011 | 6/30/2012 | 6/30/2013 |
| General Customers | $ 135,966,630 | $ 162,813,091 | $ 167,986,001 | $ 188,929,588 | $ 186,551,894 | $ 193,098,413 |
| Suburban Customers | 201,722,312 | 219,638,029 | 187,874,924 | 213,888,870 | 242,759,761 | 238,301,009 |
| City Departments | 3,441,917 | 642,654 | 532,109 | 567,670 | 617,325 | 635,188 |
| Sewage Surcharge | 1,435,519 | 2,957,031 | 3,730,043 | 3,424,043 | 2,601,809 | 5,204,732 |
| Miscellaneous | 4,342,453 | 4,075,593 | 5,414,313 | 3,908,904 | 5,124,102 | 3,623,918 |
| Total Revenues | 346,908,831 | 390,126,398 | 365,537,390 | 410,719,075 | 437,654,891 | 440,863,260 |
| | | | | | | |
| Sewage Treatment Plant | 131,877,214 | 129,314,215 | 141,078,880 | 149,268,127 | 144,270,145 | 128,418,729 |
| Interceptors and Regulators | 3,419,697 | 6,363,301 | 2,175,886 | 9,867,867 | 14,030,425 | 8,456,026 |
| Sewer Pumping Stations | 3,220,434 | 7,362,432 | 2,684,307 | 13,671,159 | 8,458,261 | 8,444,193 |
| Sewer Maintenance and Engineering | 13,027,555 | 19,710,820 | 20,009,122 | 8,585,844 | 4,581,284 | 0 |
| Meters | 0 | 0 | 0 | 0 | 0 | 142,199 |
| Industrial Waste Control | 0 | 0 | 0 | 0 | 0 | 4,145,645 |
| Sewer | 0 | 0 | 0 | 0 | 0 | 8,201,988 |
| Combined Sewage Overflow Control Basins | 489,622 | 569,971 | 714,292 | 4,608,783 | 5,042,764 | 5,319,475 |
| Commercial | 7,610,884 | 8,107,329 | 6,655,589 | 9,290,038 | 5,970,441 | 6,519,748 |
| Operations and Maintenance | 16,152,236 | 16,626,233 | 13,624,330 | 9,517,917 | 5,240,561 | 0 |
| Central Services and General Fund Reimbursements | 5,688,320 | 7,778,365 | 4,046,518 | 0 | 0 | 0 |
| Administrative and General | 32,943,836 | 24,906,841 | 19,465,067 | 26,001,080 | 29,429,706 | 35,065,939 |
| Other Items | 0 | 0 | 0 | 16,439,026 | 15,332,241 | 50,579,250 |
| Depreciation | 94,145,601 | 96,509,481 | 97,713,277 | 150,660,578 | 115,604,049 | 121,464,302 |
| Total Operating Expenses | 308,575,399 | 317,248,988 | 308,167,268 | 397,910,347 | 347,959,877 | 376,757,496 |
| | | | | | | |
| Operating Income | 38,333,432 | 72,877,410 | 57,370,122 | 12,808,728 | 89,695,014 | 64,105,764 |
| | | | | | | |
| Investment Earnings (Losses) | 27,634,679 | 11,501,806 | (23,300,503) | (1,168,864) | (64,450,366) | (7,939,285) |
| Loss on Disposal of Capital Assets | 0 | 0 | 0 | (91,476,801) | 0 | (2,752) |
| Interest Expense, Net of Capitalized Interest | (120,537,137) | (133,029,160) | (118,561,130) | (119,734,891) | (108,153,176) | (142,081,167) |
| Amortization of Bond Issuance Costs | 0 | 0 | 0 | 0 | (8,796,332) | (14,978,455) |
| Miscellaneous Revenue | 1,548,292 | 9,331,912 | 124,285 | 2,209,701 | 1,846,318 | 861,759 |
| Total Other Income (Expenses) | (91,354,166) | (112,195,442) | (141,737,348) | (210,170,855) | (179,553,556) | (164,139,900) |
| | | | | | | |
| Decrease in Net Assets before Capital | | | | | | |
| Contributions, Transfers, and Special Items | (53,020,734) | (39,318,032) | (84,367,226) | (197,362,127) | (89,858,542) | (100,034,136) |
| | | | | | | |
| Capital Contributions | 0 | 2,322,233 | 6,610,573 | 5,523,194 | 0 | 0 |
| Transfers In | 1,511,419 | 0 | 0 | 0 | 0 | 0 |
| Transfers Out | (8,063,912) | 0 | 0 | 0 | 0 | 0 |
| Special Items | (141,962,894) | (36,900,173) | 0 | 0 | 0 | 0 |
| Capital Contributions, Transfers In, Transfers | | | | | | |
| Out, and Special Items | (148,515,387) | (34,577,940) | 6,610,573 | 5,523,194 | 0 | 0 |
| | | | | | | |
| Increase (Decrease) in Net Assets | (201,536,121) | (73,895,972) | (77,756,653) | (191,838,933) | (89,858,542) | (100,034,136) |
| | | | | | | |
| Net Assets, Beginning | 877,308,457 | 675,772,336 | 601,876,364 | 439,161,426 | 247,322,493 | 157,463,951 |
| Adjustments to Net Assets | 0 | 0 | (84,358,285) | 0 | 0 | 0 |
| Increase (Decrease) in Net Assets | (201,536,121) | (73,895,972) | (77,756,653) | (191,838,933) | (89,858,542) | (100,034,136) |
| **Net Assets, Ending** | **$ 675,772,336** | **$ 601,876,364** | **$ 439,161,426** | **$ 247,322,493** | **$ 157,463,951** | **$ 57,429,815** |

Source: FY 2013 information obtained from draft audited financial statements; Audited financial statements

City of Detroit
**Detroit Water and Sewer Department**
Water Fund
Historical Water Fund Balance Sheet

|  | As of: | | | | | |
|---|---|---|---|---|---|---|
|  | 6/30/2008 | 6/30/2009 | 6/30/2010 | 6/30/2011 | 6/30/2012 | 6/30/2013 |
| Cash and Cash Equivalents | $ 48,660,120 | $ 80,194 | $ 11,585,084 | $ 7,357,748 | $ 17,969,040 | $ 21,321,725 |
| Investments | 49,496,338 | 44,013,126 | 21,192,353 | 84,018,134 | 0 | 55,599,174 |
| Billed Accounts Receivable | 62,904,132 | 70,619,839 | 61,573,023 | 72,914,205 | 85,327,741 | 76,807,485 |
| Unbilled Accounts Receivable | 23,088,374 | 24,551,149 | 26,702,430 | 30,350,253 | 37,465,551 | 31,426,122 |
| Other Accounts Receivable | 1,740,581 | 0 | 2,284,629 | 3,757,139 | 4,410,841 | 2,827,025 |
| Less: Allowance for Doubtful Accounts | (35,952,199) | (41,327,531) | (25,061,864) | (25,387,639) | (28,259,741) | (27,158,423) |
| Total Accounts Receivable, Net | 51,780,888 | 53,843,457 | 65,498,218 | 81,633,958 | 98,944,392 | 83,902,209 |
| Due from Other Funds | 21,334,188 | 67,887,115 | 118,670,060 | 66,690,098 | 41,459,509 | 48,334,968 |
| Due from Fiduciary Funds | 0 | 0 | 0 | 0 | 0 | 1,680,314 |
| Inventories | 7,350,654 | 5,554,349 | 7,251,842 | 5,939,985 | 5,660,326 | 6,261,724 |
| Prepaid Expenses | 1,498,226 | 1,211,910 | 1,273,189 | 1,510,001 | 4,497,545 | 3,819,179 |
| Restricted Cash and Cash Equivalents | 23,731,177 | 27,303,429 | 5,554,329 | 8,870,389 | 40,565,853 | 0 |
| Restricted Investments | 106,114,606 | 84,743,357 | 106,879,144 | 134,715,746 | 139,056,728 | 0 |
| Restricted Other Accounts Receivable | 0 | 0 | 339,247 | 0 | 0 | 0 |
| Restricted Due from Other Funds | 13,824,852 | 6,610,671 | 9,393,793 | 4,045,774 | 0 | 0 |
| Total Current Assets | 323,791,049 | 291,247,608 | 347,637,259 | 394,781,833 | 348,153,393 | 220,919,293 |
| Restricted Cash and Cash Equivalents | 11,884,886 | 15,461,872 | 14,192,858 | 3,810,114 | 2,179,760 | 24,045,179 |
| Restricted Investments | 435,763,345 | 338,514,873 | 221,486,588 | 45,032,315 | 195,711,983 | 281,068,512 |
| Other Receivables | 0 | 0 | 0 | 0 | 0 | 5,121,918 |
| Net Pension Asset | 77,642,310 | 81,680,247 | 85,525,858 | 88,474,553 | 90,677,096 | 101,134,107 |
| Deferred Charges | 0 | 42,545,292 | 40,268,106 | 37,990,918 | 38,321,804 | 36,280,286 |
| Fair Value of Derivatives | 0 | 0 | 26,984,477 | 27,693,455 | 0 | 0 |
| Bond and Pension Obligation Certificate Issuance Costs | 45,222,267 | 0 | 0 | 0 | 0 | 0 |
| Total Non-Current Assets | 570,512,808 | 478,202,284 | 388,457,887 | 203,001,355 | 326,890,643 | 447,650,002 |
| Net Capital Assets | 2,045,920,357 | 2,131,725,774 | 2,164,861,726 | 2,172,321,545 | 2,157,804,200 | 2,083,632,381 |
| Deferred Outflows of Resources | 0 | 0 | 4,500,379 | 1,927,019 | 14,179,042 | 0 |
| **Total Assets** | **$ 2,940,224,214** | **$ 2,901,175,666** | **$ 2,905,457,251** | **$ 2,772,031,752** | **$ 2,847,027,278** | **$ 2,752,201,676** |
| Current Liabilities |  |  |  |  |  |  |
| Accounts and Contracts Payable | $ 36,663,387 | $ 32,601,306 | $ 33,222,785 | $ 28,951,855 | $ 36,736,029 | $ 23,947,477 |
| Accrued Salaries and Wages | 3,114,934 | 2,418,786 | 2,519,342 | 922,524 | 1,096,137 | 969,965 |
| Due to Other Funds | 15,392,726 | 58,809,093 | 115,215,099 | 36,204,233 | 14,972,320 | 8,272,748 |
| Due to Fiduciary Funds | 1,788,861 | 3,226,516 | 5,056,959 | 8,549,055 | 10,952,567 | 0 |
| Accrued Interest Payable | 49,685,756 | 57,500,394 | 58,466,386 | 57,839,797 | 66,907,594 | 66,454,704 |
| Other Accrued Liabilities | 5,226,448 | 5,612,337 | 12,532,988 | 18,295,619 | 10,092,925 | 13,592,704 |
| Revenue Bonds and State Revolving Loans Payable, Net | 32,890,000 | 35,170,000 | 36,760,000 | 45,090,000 | 33,195,000 | 41,380,000 |
| Pension Obligation Certificates of Participation | 0 | 257,831 | 593,104 | 913,613 | 1,250,905 | 2,855,885 |
| Capital Leases Payable within One Year | 863,422 | 894,020 | 663,649 | 30,534 | 0 | 0 |
| Accrued Compensated Absences | 7,288,290 | 7,091,446 | 7,078,769 | 6,427,622 | 6,806,399 | 9,340,642 |
| Accrued Workers' Compensation | 2,056,000 | 2,087,000 | 2,011,000 | 1,868,000 | 1,489,000 | 1,435,000 |
| Claims and Judgements | 528,700 | 6,000 | 80,000 | 3,531,000 | 68,000 | 17,236 |
| Pollution Remediation Obligations | 0 | 20,992 | 0 | 0 | 0 | 0 |
| Total Current Liabilities | 155,502,524 | 205,695,721 | 274,200,281 | 208,623,852 | 183,566,876 | 168,266,361 |
| Long-Term Liabilities |  |  |  |  |  |  |
| Revenue Bonds and State Revolving Loans Payable, Net | 2,295,236,002 | 2,263,338,649 | 2,153,379,619 | 2,114,741,662 | 2,485,717,942 | 2,447,241,502 |
| Pension Obligation Certificates of Participation Payable, Net | 81,333,125 | 81,072,429 | 80,477,124 | 79,560,644 | 78,306,872 | 76,699,025 |
| Capital Leases Payable | 1,503,991 | 657,430 | 22,423 | 0 | 0 | 0 |
| Net OPEB Obligation | 7,614,170 | 16,611,769 | 27,944,436 | 40,578,926 | 53,303,165 | 70,552,075 |
| Accrued Compensated Absences | 8,620,754 | 11,919,904 | 4,059,727 | 4,453,598 | 2,614,912 | 1,282,223 |
| Accrued Workers' Compensation | 9,072,000 | 8,608,000 | 8,942,000 | 8,469,000 | 8,850,000 | 8,155,000 |
| Claims and Judgements | 7,010,000 | 8,410,200 | 4,469,000 | 243,000 | 218,500 | 226,750 |
| Pollution Remediation Obligations | 0 | 0 | 80,000 | 0 | 0 | 0 |
| Derivative Instruments - Swap Liability | 0 | 0 | 215,506,801 | 191,883,006 | 24,566,905 | 16,489,465 |
| Total Long-Term Liabilities | 2,410,390,062 | 2,390,618,381 | 2,494,881,130 | 2,439,929,836 | 2,653,578,296 | 2,620,646,040 |
| **Total Liabilities** | **2,565,892,586** | **2,596,314,102** | **2,769,081,411** | **2,648,553,688** | **2,837,145,172** | **2,788,912,401** |
| Invested in Capital Assets, Net of Debt Related | 131,959,821 | 98,352,666 | 131,394,921 | 62,141,704 | 235,302,277 | (22,450,280) |
| Restricted for Capital Acquisitions | 57,338,174 | 87,293,229 | 25,818,115 | 22,648,822 | 0 | 0 |
| Restricted for Debt Service | 66,934,304 | 78,420,017 | 97,828,028 | 101,862,800 | 203,831,414 | 142,557,878 |
| Unrestricted | 118,099,329 | 40,795,652 | (118,665,224) | (63,175,262) | (429,251,585) | (156,818,323) |
| **Total Net Assets** | **$ 374,331,628** | **$ 304,861,564** | **$ 136,375,840** | **$ 123,478,064** | **$ 9,882,106** | **$ (36,710,725)** |

|  | - | - | - | - | - | - |

Footnotes:
Reporting classification of current liabilities differs from audited financial statements for comparison

Source: FY 2013 information obtained from draft audited financial statements; Audited financial statements

13-53846-tjt Doc 8732 Filed 12/16/14 Entered 12/16/14 08:24:49 Page 574 of 602
13-53846-swr Doc 3362-2 Filed 03/31/14 Entered 03/31/14 18:36:38 Page 17 of 604
204

City of Detroit
**Detroit Water and Sewer Department**
Sewage Disposal Fund
Historical Sewage Fund Balance Sheet

| | As of: | | | | | |
|---|---|---|---|---|---|---|
| | 6/30/2008 | 6/30/2009 | 6/30/2010 | 6/30/2011 | 6/30/2012 | 6/30/2013 |
| Cash and Cash Equivalents | $ 42,472,216 | $ 6,913,527 | $ 4,088,652 | $ 5,292,173 | $ 25,643,695 | $ 11,071,610 |
| Investments | 29,222,612 | 36,722,118 | 32,055,864 | 125,640,610 | 0 | 0 |
| | | | | | | |
| Billed Accounts Receivable | 129,857,010 | 130,776,339 | 111,384,353 | 123,620,671 | 131,636,100 | 126,545,085 |
| Unbilled Accounts Receivable | 46,995,974 | 55,982,465 | 54,205,923 | 63,807,974 | 55,915,921 | 67,490,396 |
| Grants Receivable | 0 | 0 | 1,083,458 | 0 | 0 | 0 |
| Other Accounts Receivable | 2,271,581 | 168,267 | 10,850,578 | 25,485,867 | 25,910,127 | 10,800,510 |
| Less: Allowance for Doubtful Accounts | (90,605,647) | (81,078,369) | (54,927,143) | (57,467,793) | (70,130,129) | (68,548,573) |
| Total Accounts Receivable, Net | 88,518,918 | 105,848,702 | 122,597,169 | 155,446,719 | 143,332,019 | 136,287,418 |
| | | | | | | |
| Due from Other Funds | 20,030,027 | 67,772,718 | 102,440,110 | 30,251,006 | 14,898,805 | 14,751,256 |
| Due from Fiduciary Funds | 0 | 0 | 0 | 0 | 0 | 1,409,855 |
| Inventories | 7,972,508 | 7,823,491 | 6,561,739 | 6,977,146 | 8,884,679 | 9,762,803 |
| Prepaid Expenses | 1,870,227 | 1,851,410 | 3,538,840 | 3,441,704 | 1,819,151 | 853,192 |
| Restricted Cash and Cash Equivalents | 19,993,654 | 35,118,436 | 8,136,025 | 3,015,785 | 215,249,247 | 0 |
| Restricted Investments | 71,438,000 | 109,529,976 | 125,839,450 | 143,315,183 | 146,371,609 | 0 |
| Restricted Due from Other Funds | 13,500,000 | 2,537,711 | 12,105,832 | 12,570,717 | 10,640,798 | 0 |
| Total Current Assets | 295,018,162 | 374,118,089 | 417,363,681 | 485,951,043 | 566,840,003 | 174,136,134 |
| | | | | | | |
| Restricted Cash and Cash Equivalents | 0 | 5,491,507 | 6,334,576 | 2,556,843 | 0 | 100,037,594 |
| Restricted Investments | 475,640,082 | 290,953,454 | 210,268,220 | 84,171,807 | 129,227,781 | 355,482,764 |
| Other Receivables | 0 | 0 | 0 | 0 | 0 | 3,750,000 |
| Net Pension Asset | 84,465,857 | 87,286,366 | 88,455,199 | 86,874,832 | 86,245,896 | 91,319,602 |
| Deferred Charges | 0 | 47,480,761 | 44,772,379 | 42,063,997 | 45,428,167 | 43,193,749 |
| Fair Value of Derivatives | 0 | 0 | 14,947,297 | 14,408,688 | 0 | 0 |
| Bond and Pension Obligation Certificate Issuance Costs | 50,203,227 | 0 | 0 | 0 | 0 | 0 |
| Total Non-Current Assets | 610,309,166 | 431,212,058 | 364,777,671 | 230,076,167 | 260,901,844 | 593,783,709 |
| | | | | | | |
| Net Capital Assets | 3,022,810,992 | 3,094,661,240 | 3,130,366,599 | 2,929,134,451 | 2,923,013,636 | 2,861,256,656 |
| | | | | | | |
| Deferred Outflows of Resources | 0 | 0 | 73,286,652 | 63,548,517 | 15,979,577 | 0 |
| | | | | | | |
| **Total Assets** | **$ 3,928,138,320** | **$ 3,899,991,387** | **$ 3,985,794,603** | **$ 3,708,710,178** | **$ 3,766,735,060** | **$ 3,629,176,499** |
| | | | | | | |
| **Current Liabilities** | | | | | | |
| Accounts and Contracts Payable | $ 36,518,723 | $ 33,436,847 | $ 29,902,794 | $ 49,085,299 | $ 53,141,033 | $ 50,488,376 |
| Accrued Salaries and Wages | 1,494,149 | 1,579,810 | 1,608,515 | 519,646 | 705,067 | 602,720 |
| Due to Other Funds | 22,823,654 | 72,444,082 | 131,927,362 | 70,900,052 | 40,083,914 | 52,036,220 |
| Due to Fiduciary Funds | 7,150,822 | 16,970,730 | 1,772,294 | 8,603,294 | 6,989,284 | 0 |
| Accrued Interest Payable | 48,788,672 | 52,830,943 | 62,455,024 | 61,396,780 | 54,945,024 | 70,858,984 |
| Revenue Bonds and State Revolving Loans Payable, Net | 58,645,000 | 60,630,000 | 70,345,000 | 72,944,000 | 76,575,000 | 78,385,000 |
| Pension Obligation Certificates of Participation Payable | 0 | 290,746 | 672,089 | 1,035,281 | 1,417,492 | 3,236,213 |
| Other Accrued Liabilities | 7,051,673 | 9,316,193 | 16,208,631 | 16,667,493 | 17,811,488 | 23,327,269 |
| Capital Leases Payable within One Year | 863,422 | 894,020 | 663,649 | 30,534 | 0 | 0 |
| Accrued Compensated Absences | 4,590,574 | 4,577,518 | 4,293,031 | 4,120,387 | 3,830,144 | 717,569 |
| Accrued Workers' Compensation | 797,000 | 784,000 | 741,000 | 667,000 | 565,000 | 551,000 |
| Claims and Judgements | 80,000 | 625,500 | 865,074 | 0 | 19,500 | 0 |
| Pollution Remediation Obligations | 0 | 890,000 | 956,878 | 973,113 | 340,613 | 0 |
| Total Current Liabilities | 188,803,689 | 255,270,389 | 322,411,341 | 286,942,879 | 256,423,559 | 280,203,351 |
| | | | | | | |
| **Long-Term Liabilities** | | | | | | |
| Revenue Bonds and State Revolving Loans Payable, Net | 2,948,130,743 | 2,920,111,415 | 2,870,184,745 | 2,821,254,302 | 3,173,429,787 | 3,112,192,669 |
| Pension Obligation Certificates of Participation Payable, Net | 92,165,806 | 91,871,829 | 91,195,843 | 90,157,332 | 88,736,610 | 86,914,659 |
| Capital Leases Payable | 1,503,991 | 657,430 | 22,423 | 0 | 0 | 0 |
| Net OPEB Obligation | 8,868,194 | 17,924,439 | 30,452,039 | 43,203,439 | 56,836,081 | 70,445,095 |
| Accrued Compensated Absences | 6,301,361 | 8,277,527 | 3,266,334 | 3,803,238 | 1,672,337 | 477,410 |
| Accrued Workers' Compensation | 3,185,000 | 2,883,000 | 2,969,000 | 2,875,000 | 2,989,000 | 2,742,000 |
| Claims and Judgements | 3,407,000 | 261,494 | 43,392 | 1,540,000 | 1,500,000 | 190,000 |
| Pollution Remediation Obligations | 0 | 857,500 | 151,157 | 0 | 0 | 0 |
| Derivative Instruments - Swap Liability | 0 | 0 | 225,936,903 | 211,651,095 | 27,683,735 | 18,581,500 |
| Total Long-Term Liabilities | 3,063,562,295 | 3,042,844,634 | 3,224,221,836 | 3,174,444,806 | 3,352,847,550 | 3,291,543,333 |
| | | | | | | |
| **Total Liabilities** | **3,252,365,984** | **3,298,115,023** | **3,546,633,177** | **3,461,387,685** | **3,609,271,109** | **3,571,746,684** |
| | | | | | | |
| Invested in Capital Assets, Net of Debt Related | 427,406,590 | 397,705,998 | 423,561,717 | 122,747,952 | 553,873,948 | 216,368,007 |
| Restricted for Capital Acquisitions | 60,588,611 | 36,232,528 | 30,070,066 | 31,318,712 | 0 | 0 |
| Restricted for Debt Service | 112,949,550 | 142,214,512 | 127,990,977 | 145,174,047 | 255,972,332 | 227,211,405 |
| Unrestricted | 74,827,585 | 25,723,326 | (142,461,334) | (51,918,218) | (652,382,329) | (386,149,597) |
| **Total Net Assets** | **$ 675,772,336** | **$ 601,876,364** | **$ 439,161,426** | **$ 247,322,493** | **$ 157,463,951** | **$ 57,429,815** |

| - | - | - | - | - | - | - |

Footnotes:
Reporting classification of current liabilities differs from audited financial statements for comparison

Source: FY 2013 information obtained from draft audited financial statements; Audited financial statements

**EXHIBIT L**

DWSD FINANCIAL PROJECTIONS

# City of Detroit
# Water and Sewage Disposal Fund
*10-Year Projections*

| Assumptions | | Description |
|---|---|---|
| **Revenue:** | | |
| Volumes | | |
| | Detroit Retail - Water/Sewer | FY 2014 and FY 2015 based on DWSD budget estimates. Approximately 6.3% in total volume decline from FYs' 2015 - 2023 based upon SEMCOG population decline. |
| | Wholesale - Sewer | FY 2014 and FY 2015 based on DWSD budget estimates by customer. FYs' 2016 - 2023 reflect no growth from FY 2015 estimates. |
| | Wholesale - Water | FY 2014 based on DWSD budget estimate by customer less 2.0%. FY 2015 based on DWSD budget estimate by customer. FY's 2015 - 2023 reflect total volume decline of approximately 2.0%. |
| | Flint - Water | Assumed to exit the Water System in FY 2017. |
| Bad debt | | |
| | Detroit Retail - Sewer | 15.0% of retail revenues in FY 2014 improving to 11.0% by FY 2018 and staying constant at 11.0% of retail revenues through the forecast period. |
| | Wholesale - Sewer | 2.0% of suburban revenues throughout the forecast period. |
| | Wholesale - Water | n/a |
| | Detroit Retail - Water | 14.0% of retail revenues in FY 2014 improving to 10.0% by FY 2018 and staying constant at 10.0% of retail revenues through the forecast period. |
| Miscellaneous operating | | |
| | IWC Charges | FY 2014 represents DWSD budget estimates and increases 4.0% annually thereafter. |
| | Industrial Surcharges | FY 2014 and FY 2015 represent DWSD budget estimates. FYs' 2016 - 2023 reflect no growth from FY 2015 budget estimates. |
| | Other | Base amount represents normalized historical average, assumed to increase annually by inflation growth rate. |
| Nonoperating | | Base amount represents normalized historical average, assumed to increase annually by inflation growth rate. |
| Earnings on investment | | 1.5% of adjusted annual fund balances. Return based on adjusted average return in prior three years. |

# City of Detroit
## Water and Sewage Disposal Fund
### Assumptions (cont'd)

| Assumptions | Description |
|---|---|
| **Operating & maintenance expenditures:** | |
| Salaries & wages | |
| Headcount | Beginning FTE of 1,706 based on 6/30/13 level. Optimization of labor to 1,000 FTE by FY 2020 through natural attrition assumed to be 10.0% in FY 2014 and 5.0% in FYs' 2015 - 2018. FYs' 2019 and 2020 reflect attrition required to reach FTE goal of 1,000. Total headcount allocation assumed to be 63.0% Water and 37.0% Sewer per management estimates. Employees whose services are shared between Water and Sewer Systems are budgeted in the Water System. Shared labor costs are transferred from the Water System to the Sewer System. |
| Average wages | FY 2014 average wage rate of $43,600 based on current DWSD budget analysis. Assumed 10.0% increase in FY 2015 related to job classification and management input on related compensation changes due to optimization. FYs' 2016 - 2023 reflect FY 2015 base amount with annual inflationary increases. |
| Overtime | FYs' 2014 - 2020 base amount represents historical average dollar amount with slow decline; FYs' 2021 - 2023 based upon historical average percentage of salaries and wages. |
| Pension | Represents required reimbursements to general fund per Plan of Adjustment ("POA") forecast; additional amounts for defined contribution plan of 5.0% of salaries and wages. |
| Other fringes | OPEB - Represents required reimbursements to general fund per POA forecast, additional 2.0% of salaries and wages for future retiree healthcare; Active employee healthcare - assumed to be $8,250 per FTE in FY 2014 (active employee healthcare growth rates: FY 2015 7.5%; FY 2016 7.0%; FY 2017 6.5%; FY 2018 6.0%; FY 2019 5.5%; FYs' 2020 - 2023 5.0%); Other fringe benefits - includes fixed and variable expenses, variable portion based upon historical average of salaries and wages, fixed portion assumed to be inflationary. |
| Purchased services | Base amount represents FY 2014 DWSD budgeted amount reduced for various City of Detroit shared costs in FY 2015 and FY 2016; inflationary growth thereafter. |
| Telecommunications | Base amount represents FY 2014 budgeted amount; inflationary growth thereafter. |
| Contractual services | Based on normalized amounts with additional outsourcing costs; inflationary growth thereafter. |
| Repairs & maintenance | FY 2014 represents adjusted budgeted amount; inflationary growth thereafter. |
| Utilities | Based upon forecasted volumes with 80.0% variable and 20.0% fixed, cost per mcf increase of 3.2% annually. |
| Chemicals | Based upon forecasted volumes with 80.0% variable and 20.0% fixed, cost per mcf increase inflationary. |
| Other | Base amount represents normalized historical average; inflationary growth thereafter. |

## City of Detroit
## Water and Sewage Disposal Fund
### Assumptions (cont'd)

| Assumptions | Description |
|---|---|
| **Financing:** | |
| Debt | |
|     Existing debt | Represents existing debt amortization on currently outstanding DWSD debt. |
|     New money bonds | Issuance amounts necessary to fund CIP requirements; interest rate - 4.63% based upon Miller Buckfire analysis. |
| Issuance costs | Cost of issuance - 1.5% of the size of issuance. |
| Debt service reserve | Reserve funding - 6.5% of the size of issuance. |
| **Reserve funding:** | |
| O&M fund | Operating reserve fund increase from 45 days to 90 days of O&M expenses by FY 2023. |
| ER&R fund | Maintained at bond ordinance requirements. |
| **Other:** | |
| Transfer account | Represents transfer of expenses between Water and Sewer Systems.  Based upon management allocation. |
| Biosolids savings | Projected operating expense savings related to biosolids program assumed to begin in FY 2017. *Source: PMA Consultants* |
| **Capital Improvement Program:** | |
| Annual estimates | Based upon 10-year study completed by OHM Advisors.  Additional CIP added (unidentified capital projects) in FYs' 2020 - 2023. FY 2014 and FY 2015 reflect CIP amounts per DWSD's budget. |

13-53846-tjt Doc 8779 Filed 12/16/14 Entered 12/16/14 08:24:49 Page 580 of 602
13-53846-swr Doc 3382-2 Filed 03/31/14 Entered 03/31/14 16:56:38 Page 182 of 204

3

# City of Detroit
## Consolidated Systems
Proforma Income Statement Projections
*(in millions of dollars)*

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **For the Fiscal Year Ended** | | | | | |
| Revenues: | | | | | | | | | | | |
| Operating revenues | | $ 894.4 | $ 909.2 | $ 953.0 | $ 968.1 | $ 995.8 | $1,032.2 | $1,070.1 | $1,111.3 | $1,154.2 | $1,198.8 |
| Expenses: | | | | | | | | | | | |
| Operating & maintenance | | 388.8 | 415.4 | 429.0 | 439.2 | 454.0 | 461.5 | 465.1 | 472.8 | 487.3 | 496.9 |
| Depreciation | | 201.8 | 207.4 | 213.1 | 218.8 | 223.4 | 228.0 | 232.6 | 237.8 | 243.1 | 249.2 |
| Total operating expenses | | 590.6 | 622.8 | 642.1 | 657.9 | 677.4 | 689.4 | 697.7 | 710.7 | 730.4 | 746.1 |
| Operating income | | 303.8 | 286.4 | 311.0 | 310.2 | 318.4 | 342.8 | 372.4 | 400.7 | 423.8 | 452.8 |
| Nonoperating revenues (expenses): | | | | | | | | | | | |
| Interest expense | | (278.0) | (278.7) | (281.9) | (284.5) | (285.8) | (286.7) | (286.3) | (285.4) | (283.0) | (280.6) |
| Amortization of bond issuance costs | | (23.3) | (23.4) | (23.5) | (23.4) | (23.5) | (23.6) | (23.6) | (23.7) | (23.8) | (22.7) |
| Earnings on investments | | 10.6 | 10.4 | 9.7 | 10.2 | 10.5 | 10.9 | 11.5 | 12.1 | 12.8 | 13.4 |
| Nonoperating revenue | | 0.6 | 0.6 | 0.6 | 0.6 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 |
| Total nonoperating income (expenses) | | (290.1) | (291.0) | (295.0) | (296.9) | (298.2) | (298.7) | (297.8) | (296.3) | (293.3) | (289.2) |
| Increase (decrease) in net assets | | 13.7 | (4.6) | 16.0 | 13.3 | 20.2 | 44.0 | 74.6 | 104.4 | 130.5 | 163.6 |
| Fund net assets - beginning[1] | | 20.7 | 34.4 | 29.8 | 45.8 | 59.1 | 79.3 | 123.3 | 198.0 | 302.4 | 432.9 |
| Fund net assets - ending | | $ 34.4 | $ 29.8 | $ 45.8 | $ 59.1 | $ 79.3 | $ 123.3 | $ 198.0 | $ 302.4 | $ 432.9 | $ 596.4 |

*Footnotes:*

[1] FY 2014 beginning fund net assets obtained from preliminary draft audited financial statements subject to audit opinion issuance.

**City of Detroit**
**Consolidated Systems**
Revenue Requirement Projections
*(in millions of dollars)*

| | | | | | For the Fiscal Year Ended | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** |
| Revenue available: | | | | | | | | | | |
| Operating revenue | $ 832.2 | $ 817.6 | $ 851.2 | $ 869.8 | $ 917.1 | $ 950.9 | $ 986.1 | $1,024.4 | $1,064.3 | $1,105.8 |
| Rate increases | - | 32.7 | 41.9 | 46.5 | 36.7 | 38.0 | 39.4 | 41.0 | 42.6 | 44.2 |
| Other revenue | 73.4 | 69.9 | 70.3 | 62.7 | 53.1 | 54.8 | 56.7 | 58.8 | 60.9 | 63.0 |
| Total revenue available | 905.6 | 920.2 | 963.4 | 979.0 | 1,006.9 | 1,043.7 | 1,082.3 | 1,124.2 | 1,167.7 | 1,213.0 |
| Revenue requirements: | | | | | | | | | | |
| Operating & maintenance | 388.8 | 415.4 | 429.0 | 439.2 | 454.0 | 461.5 | 465.1 | 472.8 | 487.3 | 496.9 |
| Net revenue | 516.8 | 504.9 | 534.4 | 539.9 | 553.0 | 582.3 | 617.2 | 651.3 | 680.4 | 716.1 |
| Debt service: | | | | | | | | | | |
| New issuances | 0.1 | 7.8 | 22.3 | 36.6 | 47.6 | 58.6 | 68.5 | 78.4 | 86.9 | 96.8 |
| Senior lien | 251.3 | 258.6 | 258.9 | 267.0 | 266.8 | 266.2 | 256.6 | 254.9 | 245.9 | 258.1 |
| Second lien | 95.1 | 103.1 | 105.1 | 96.3 | 96.3 | 96.9 | 105.2 | 106.9 | 117.5 | 109.1 |
| Junior lien | 48.3 | 48.1 | 48.3 | 48.2 | 48.2 | 47.9 | 47.6 | 46.3 | 41.9 | 41.2 |
| Total debt service | 394.7 | 417.7 | 434.7 | 448.1 | 458.9 | 469.6 | 477.9 | 486.5 | 492.2 | 505.3 |
| Pension obligation certificates | 3.0 | 3.0 | 1.5 | - | - | - | 2.1 | 2.1 | 2.1 | 2.1 |
| Renewals & replacements | 15.0 | 15.0 | 15.3 | 15.6 | 15.9 | 16.0 | 16.0 | 16.0 | 16.0 | 16.0 |
| Fund deposits | 18.3 | 13.1 | 9.9 | 9.2 | 11.0 | 8.9 | 7.7 | 9.4 | 12.2 | 10.6 |
| Revenue financed capital | 85.8 | 56.1 | 73.1 | 67.0 | 67.1 | 87.8 | 113.5 | 137.4 | 157.9 | 182.1 |
| Total revenue requirements | $ 905.6 | $ 920.2 | $ 963.4 | $ 979.0 | $1,006.9 | $1,043.7 | $1,082.3 | $1,124.2 | $1,167.7 | $1,213.0 |
| Debt service coverage[1]: | | | | | | | | | | |
| Senior lien | 206% | 189% | 190% | 178% | 176% | 179% | 190% | 195% | 204% | 202% |
| Second lien | 149% | 137% | 138% | 135% | 135% | 138% | 143% | 148% | 151% | 154% |
| Junior lien | 131% | 121% | 123% | 120% | 120% | 124% | 129% | 134% | 138% | 142% |

*Footnotes:*

[1] New debt issuances treated as senior lien in coverage calculations.

# City of Detroit
# Consolidated Systems
Capital Improvement Program Financing
*(in millions of dollars)*

| | | | | | For the Fiscal Year Ended | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Capital spending: | | | | | | | | | | |
| OHM Advisors CIP Estimates[1] | $ 229.0 | $ 281.2 | $ 284.4 | $ 284.4 | $ 229.4 | $ 229.4 | $ 229.2 | $ 229.2 | $ 136.7 | $ 136.7 |
| Unidentified capital projects | - | - | - | - | - | - | 4.6 | 30.4 | 127.1 | 166.6 |
| Total capital spending | 229.0 | 281.2 | 284.4 | 284.4 | 229.4 | 229.4 | 233.8 | 259.6 | 263.8 | 303.3 |
| | | | | | | | | | | |
| Sources & Uses: | | | | | | | | | | |
| | | | | | | | | | | |
| Improvement & Extension Fund[2] | | | | | | | | | | |
| Beginning balance | 6.3 | 85.8 | 56.1 | 73.1 | 67.0 | 67.1 | 87.8 | 113.5 | 137.4 | 157.9 |
| Plus: Revenue deposits | 85.8 | 56.1 | 73.1 | 67.0 | 67.1 | 87.8 | 113.5 | 137.4 | 157.9 | 182.1 |
| Less: Use of funds | (6.3) | (85.8) | (56.1) | (73.1) | (67.0) | (67.1) | (87.8) | (113.5) | (137.4) | (157.9) |
| Ending balance | 85.8 | 56.1 | 73.1 | 67.0 | 67.1 | 87.8 | 113.5 | 137.4 | 157.9 | 182.1 |
| Construction Bond Fund[2] | | | | | | | | | | |
| Beginning balance | 312.7 | 93.0 | 14.2 | - | - | - | - | - | - | - |
| Plus: Bond issuance | - | 123.5 | 231.0 | 229.7 | 176.5 | 176.3 | 158.7 | 158.8 | 137.4 | 157.9 |
| Plus: SRF funds | 3.0 | 3.0 | 1.5 | - | - | - | - | - | - | - |
| Less: Fees and reserve deposits | - | (9.9) | (18.5) | (18.4) | (14.1) | (14.1) | (12.7) | (12.7) | (11.0) | (12.6) |
| Less: Use of funds | (222.7) | (195.4) | (228.2) | (211.3) | (162.4) | (162.2) | (146.0) | (146.1) | (126.4) | (145.3) |
| Ending balance | 93.0 | 14.2 | - | - | - | - | - | - | - | - |
| Total use of funds | $ (229.0) | $ (281.2) | $ (284.4) | $ (284.4) | $ (229.4) | $ (229.4) | $ (233.8) | $ (259.6) | $ (263.8) | $ (303.3) |

*Footnotes:*

[1] FY 2014 and FY 2015 reflect CIP amounts per DWSD's budget.

[2] FY 2014 beginning reserve balances obtained from DWSD management.

**City of Detroit**
**Consolidated Systems**
Reserve Balance Projections[1]
*(in millions of dollars)*

| | | 2014 | 2015 | 2016 | 2017 | As of Fiscal Year End 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating & maintenance:** | | | | | | | | | | | |
| Beginning balance | $ | 31.7 | $ 48.6 | $ 57.7 | $ 65.5 | $ 73.2 | $ 82.0 | $ 89.7 | $ 96.9 | $ 105.1 | $ 115.1 |
| Plus: Deposits | | 16.9 | 9.1 | 7.8 | 7.7 | 8.8 | 7.8 | 7.2 | 8.2 | 10.0 | 9.2 |
| Less: Use of funds | | - | - | - | - | - | - | - | - | - | - |
| Ending balance | | 48.6 | 57.7 | 65.5 | 73.2 | 82.0 | 89.7 | 96.9 | 105.1 | 115.1 | 124.2 |
| *Days of operating reserve* | | *45* | *50* | *55* | *60* | *65* | *70* | *75* | *80* | *85* | *90* |
| **Extraordinary repair & replacement:** | | | | | | | | | | | |
| Beginning balance | | 57.0 | 58.3 | 62.3 | 64.3 | 65.9 | 68.1 | 69.2 | 69.8 | 70.9 | 73.1 |
| Plus: Deposits | | 1.3 | 4.0 | 2.0 | 1.5 | 2.2 | 1.1 | 0.5 | 1.2 | 2.2 | 1.4 |
| Less: Use of funds | | - | - | - | - | - | - | - | - | - | - |
| Ending balance | | 58.3 | 62.3 | 64.3 | 65.9 | 68.1 | 69.2 | 69.8 | 70.9 | 73.1 | 74.5 |
| **Improvement & extension:** | | | | | | | | | | | |
| Beginning balance | | 6.3 | 85.8 | 56.1 | 73.1 | 67.0 | 67.1 | 87.8 | 113.5 | 137.4 | 157.9 |
| Plus: Deposits | | 85.8 | 56.1 | 73.1 | 67.0 | 67.1 | 87.8 | 113.5 | 137.4 | 157.9 | 182.1 |
| Less: Use of funds | | (6.3) | (85.8) | (56.1) | (73.1) | (67.0) | (67.1) | (87.8) | (113.5) | (137.4) | (157.9) |
| Ending balance | | 85.8 | 56.1 | 73.1 | 67.0 | 67.1 | 87.8 | 113.5 | 137.4 | 157.9 | 182.1 |
| **Total revenue generated funds:** | | | | | | | | | | | |
| Beginning balance | | 94.9 | 192.7 | 176.1 | 203.0 | 206.1 | 217.2 | 246.8 | 280.2 | 313.4 | 346.1 |
| Plus (less): Net deposits (uses) | | 97.8 | (16.6) | 26.8 | 3.1 | 11.1 | 29.5 | 33.4 | 33.2 | 32.7 | 34.8 |
| Ending balance | | 192.7 | 176.1 | 203.0 | 206.1 | 217.2 | 246.8 | 280.2 | 313.4 | 346.1 | 380.9 |
| **Construction bond fund:** | | | | | | | | | | | |
| Beginning balance | | 312.7 | 93.0 | 14.2 | - | - | - | - | - | - | - |
| Plus: Bond issuance | | - | 123.5 | 231.0 | 229.7 | 176.5 | 176.3 | 158.7 | 158.8 | 137.4 | 157.9 |
| Plus: SRF funds | | 3.0 | 3.0 | 1.5 | - | - | - | - | - | - | - |
| Less: Fees and reserve deposits | | - | (9.9) | (18.5) | (18.4) | (14.1) | (14.1) | (12.7) | (12.7) | (11.0) | (12.6) |
| Less: Use of funds | | (222.7) | (195.4) | (228.2) | (211.3) | (162.4) | (162.2) | (146.0) | (146.1) | (126.4) | (145.3) |
| Ending balance | $ | 93.0 | $ 14.2 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

*Footnotes:*

[1] FY 2014 beginning reserve balances obtained from DWSD management.

13-53846-tjt Doc 8379 Filed 12/16/14 Entered 12/16/14 08:24:49 Page 584 of 602
13-53846-swr Doc 7382-5 Filed 09/11/14 Entered 09/11/14 18:36:38 Page 186 of 204

7

**City of Detroit**
**Consolidated Systems**
Debt Balances
*(in millions of dollars)*

| | | | | | As of Fiscal Year End | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** |
| New issues[1]: | | | | | | | | | | |
| Beginning balance | $ - | $ 3.0 | $ 127.5 | $ 354.2 | $ 574.2 | $ 737.6 | $ 897.5 | $1,036.5 | $1,172.1 | $1,283.0 |
| New issues | 3.0 | 126.5 | 232.5 | 229.7 | 176.5 | 176.3 | 158.7 | 158.8 | 137.4 | 157.9 |
| Principal amortization | - | (2.0) | (5.8) | (9.7) | (13.0) | (16.4) | (19.7) | (23.2) | (26.5) | (30.2) |
| Ending balance | 3.0 | 127.5 | 354.2 | 574.2 | 737.6 | 897.5 | 1,036.5 | 1,172.1 | 1,283.0 | 1,410.7 |
| Senior lien bonds: | | | | | | | | | | |
| Beginning balance | 3,745.1 | 3,677.7 | 3,599.1 | 3,515.9 | 3,419.9 | 3,319.0 | 3,213.4 | 3,112.1 | 3,007.2 | 2,905.8 |
| Principal amortization | (70.9) | (81.7) | (86.0) | (98.4) | (102.9) | (107.1) | (102.4) | (105.5) | (101.3) | (119.0) |
| Accrued PIK interest | 3.4 | 3.1 | 2.8 | 2.4 | 2.0 | 1.6 | 1.1 | 0.6 | - | - |
| Ending balance | 3,677.7 | 3,599.1 | 3,515.9 | 3,419.9 | 3,319.0 | 3,213.4 | 3,112.1 | 3,007.2 | 2,905.8 | 2,786.9 |
| Second lien bonds: | | | | | | | | | | |
| Beginning balance | 1,606.0 | 1,594.6 | 1,574.4 | 1,551.1 | 1,535.6 | 1,519.3 | 1,501.6 | 1,474.4 | 1,443.9 | 1,400.9 |
| Principal amortization | (11.5) | (20.2) | (23.3) | (15.5) | (16.3) | (17.7) | (27.2) | (30.4) | (43.0) | (36.8) |
| Ending balance | 1,594.6 | 1,574.4 | 1,551.1 | 1,535.6 | 1,519.3 | 1,501.6 | 1,474.4 | 1,443.9 | 1,400.9 | 1,364.1 |
| Junior lien bonds: | | | | | | | | | | |
| Beginning balance | 504.3 | 466.9 | 428.7 | 389.5 | 349.5 | 308.6 | 267.0 | 224.8 | 182.8 | 144.4 |
| Principal amortization | (37.5) | (38.2) | (39.2) | (40.0) | (40.9) | (41.6) | (42.2) | (41.9) | (38.4) | (38.7) |
| Ending balance | 466.9 | 428.7 | 389.5 | 349.5 | 308.6 | 267.0 | 224.8 | 182.8 | 144.4 | 105.8 |
| Total debt | $5,742.1 | $5,729.7 | $5,810.7 | $5,879.2 | $5,884.5 | $5,879.6 | $5,847.7 | $5,806.0 | $5,734.2 | $5,667.6 |

*Footnotes:*

[1] Assumed senior lien.

13-53846-tjt Doc 8779-2 Filed 12/16/14 Entered 12/16/14 08:24:40 Page 585 of 602
13-53846-swr Doc 7382-2 Filed 08/31/14 Entered 08/31/14 16:36:38 Page 161 of
204

8

# City of Detroit
## Consolidated Systems
Operating & Maintenance Expense Projections
*(in millions of dollars)*

| | Actual | For the Fiscal Year Ended | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Personnel expenses: | | | | | | | | | | | |
| Salaries & wages | $ 70.3 | $ 70.7 | $ 71.9 | $ 70.0 | $ 68.1 | $ 66.3 | $ 62.9 | $ 57.7 | $ 55.7 | $ 57.1 | $ 58.5 |
| Overtime | 14.1 | 14.5 | 14.8 | 14.8 | 14.5 | 13.9 | 13.2 | 12.1 | 10.6 | 10.9 | 11.1 |
| Subtotal | 84.4 | 85.1 | 86.7 | 84.8 | 82.6 | 80.3 | 76.2 | 69.8 | 66.3 | 67.9 | 69.6 |
| Pension & fringes[1] | 60.5 | 71.7 | 85.2 | 92.6 | 100.4 | 108.8 | 111.2 | 113.2 | 116.4 | 121.5 | 121.4 |
| Total personnel expenses | 144.9 | 156.9 | 171.9 | 177.4 | 183.0 | 189.1 | 187.4 | 183.0 | 182.7 | 189.4 | 191.1 |
| Non-personnel expenses: | | | | | | | | | | | |
| Purchased services | 10.3 | 14.2 | 9.4 | 8.1 | 8.3 | 8.5 | 8.7 | 9.0 | 9.2 | 9.4 | 9.6 |
| Telecommunications | 7.6 | 6.8 | 6.9 | 7.1 | 7.3 | 7.5 | 7.7 | 7.9 | 8.0 | 8.2 | 8.5 |
| Contractual services | 122.7 | 85.9 | 99.2 | 104.7 | 109.8 | 114.2 | 118.8 | 121.7 | 124.8 | 127.9 | 131.1 |
| Repairs & maintenance | 15.6 | 16.2 | 16.6 | 17.0 | 17.5 | 17.9 | 18.4 | 18.8 | 19.3 | 19.8 | 20.3 |
| Utilities | 76.5 | 77.8 | 78.9 | 81.2 | 81.5 | 83.9 | 86.4 | 88.9 | 91.6 | 94.5 | 97.4 |
| Chemicals | 21.4 | 23.8 | 23.9 | 24.4 | 24.5 | 25.1 | 25.7 | 26.2 | 26.9 | 27.5 | 28.2 |
| Other | 15.8 | 12.5 | 13.6 | 14.0 | 14.3 | 14.7 | 15.0 | 15.4 | 15.8 | 16.2 | 16.6 |
| Clearing account | (8.2) | (5.1) | (5.2) | (4.9) | (4.6) | (4.3) | (3.8) | (3.2) | (2.7) | (2.7) | (2.8) |
| Biosolids savings | - | - | - | - | (2.5) | (2.5) | (2.6) | (2.7) | (2.8) | (2.8) | (2.9) |
| Total non-labor expenses | 261.7 | 232.0 | 243.4 | 251.6 | 256.1 | 264.9 | 274.1 | 282.1 | 290.1 | 297.9 | 305.8 |
| Total operating & maintenance expense | $ 406.6 | $ 388.8 | $ 415.4 | $ 429.0 | $ 439.2 | $ 454.0 | $ 461.5 | $ 465.1 | $ 472.8 | $ 487.3 | $ 496.9 |

Footnotes:

[1] FY 2013 actual reduced by net OPEB obligation to allow for comparison.

13-53846-tjt Doc 8379-2 Filed 12/16/14 Entered 12/16/14 08:24:06 Page 586 of 602
13-53846-swr Doc 7382-3 Filed 03/31/14 Entered 03/31/14 16:36:38 Page 168 of 204

9

# City of Detroit
## Consolidated Systems
Pension & Fringes Projection Detail
*(in millions of dollars)*

| | | | | | For the Fiscal Year Ended | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Pension & fringes: | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| GF pension reimbursements[1] | $ 24.3 | $ 50.5 | $ 58.3 | $ 66.3 | $ 74.9 | $ 78.2 | $ 82.0 | $ 85.9 | $ 90.0 | $ 88.9 |
| GF OPEB reimbursements[1] | 14.7 | 4.2 | 3.8 | 3.8 | 3.8 | 3.8 | 3.8 | 3.7 | 3.7 | 3.7 |
| New defined contribution plan[2] | 3.5 | 3.6 | 3.5 | 3.4 | 3.3 | 3.1 | 2.9 | 2.8 | 2.9 | 2.9 |
| New retiree healthcare[3] | - | 1.4 | 1.4 | 1.4 | 1.3 | 1.3 | 1.2 | 1.1 | 1.1 | 1.2 |
| Active employee healthcare[4] | 13.4 | 13.3 | 13.5 | 13.7 | 13.7 | 13.4 | 12.6 | 12.5 | 13.1 | 13.7 |
| Social security[5] | 6.5 | 6.6 | 6.5 | 6.3 | 6.1 | 5.8 | 5.3 | 5.1 | 5.2 | 5.3 |
| Other fringes[6] | 9.4 | 5.6 | 5.6 | 5.6 | 5.6 | 5.5 | 5.4 | 5.4 | 5.5 | 5.7 |
| Total pension & fringes | $ 71.7 | $ 85.2 | $ 92.6 | $ 100.4 | $ 108.8 | $ 111.2 | $ 113.2 | $ 116.4 | $ 121.5 | $ 121.4 |

| | | | | | As of Fiscal Year End | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| FTE Schedule: | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| FTE count - beginning | 1,706 | 1,535 | 1,459 | 1,386 | 1,316 | 1,251 | 1,125 | 1,000 | 1,000 | 1,000 |
| Less: Attrition | (171) | (77) | (73) | (69) | (66) | - | - | - | - | - |
| Less: Layoffs | - | - | - | - | - | (125) | (125) | - | - | - |
| Ending FTE count | 1,535 | 1,459 | 1,386 | 1,316 | 1,251 | 1,125 | 1,000 | 1,000 | 1,000 | 1,000 |

Assumptions:

[1] Based upon amounts included in Plan of Adjustment (Disclosure Statement - Exhibit II.B.3.u.ii.A).

[2] 5.0% of salaries and wages.

[3] 2.0% of salaries and wages.

[4] $8,250 per FTE in FY 2014 (active employee healthcare growth rates: FY 2015 7.5%; FY 2016 7.0%; FY 2017 6.5%; FY 2018 6.0%; FY 2019 5.5%; FYs' 2020 - 2023 5.0%).

[5] 7.65% of salaries, wages, and overtime.

[6] Includes fixed and variable expenses, variable portion based upon historical average of salaries and wages, fixed portion assumed to be inflationary.

# City of Detroit
## Water Fund
Proforma Income Statement Projections
*(in millions of dollars)*

| | | | | | For the Fiscal Year Ended | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** |
| Revenues: | | | | | | | | | | |
| Water Sales | $ 379.2 | $ 391.2 | $ 414.5 | $ 417.6 | $ 434.1 | $ 450.0 | $ 466.6 | $ 484.5 | $ 503.2 | $ 522.5 |
| Miscellaneous | 4.1 | 4.2 | 4.3 | 4.4 | 4.5 | 4.6 | 4.8 | 4.9 | 5.0 | 5.1 |
| Total operating revenues | 383.3 | 395.4 | 418.8 | 422.0 | 438.6 | 454.7 | 471.4 | 489.4 | 508.2 | 527.6 |
| Expenses: | | | | | | | | | | |
| Operating & maintenance | 154.4 | 165.7 | 171.4 | 175.8 | 182.0 | 184.4 | 185.2 | 187.9 | 193.8 | 197.3 |
| Depreciation | 82.9 | 85.4 | 88.3 | 91.2 | 93.8 | 96.5 | 98.6 | 101.3 | 104.4 | 107.8 |
| Total operating expenses | 237.3 | 251.0 | 259.7 | 267.0 | 275.8 | 280.9 | 283.9 | 289.2 | 298.3 | 305.0 |
| Operating income | 146.0 | 144.4 | 159.1 | 155.0 | 162.9 | 173.8 | 187.5 | 200.2 | 209.9 | 222.6 |
| Nonoperating revenues (expenses): | | | | | | | | | | |
| Interest expense | (131.7) | (129.4) | (130.3) | (131.2) | (132.5) | (133.3) | (132.1) | (131.3) | (130.8) | (130.2) |
| Amortization of bond issuance costs | (8.2) | (8.2) | (8.3) | (8.1) | (8.1) | (8.2) | (8.2) | (8.2) | (8.3) | (7.9) |
| Earnings on investments | 4.4 | 4.7 | 4.1 | 4.3 | 4.4 | 4.6 | 4.9 | 5.2 | 5.5 | 5.7 |
| Nonoperating revenue | 0.5 | 0.5 | 0.5 | 0.5 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 |
| Total nonoperating income (expenses) | (135.0) | (132.4) | (133.9) | (134.4) | (135.7) | (136.3) | (134.9) | (133.8) | (133.0) | (131.7) |
| Increase (decrease) in net assets | 11.0 | 12.0 | 25.2 | 20.6 | 27.2 | 37.5 | 52.7 | 66.4 | 76.9 | 90.9 |
| Fund net assets - beginning[1] | (36.7) | (25.7) | (13.7) | 11.5 | 32.1 | 59.3 | 96.7 | 149.4 | 215.8 | 292.7 |
| Fund net assets - ending | $ (25.7) | $ (13.7) | $ 11.5 | $ 32.1 | $ 59.3 | $ 96.7 | $ 149.4 | $ 215.8 | $ 292.7 | $ 383.6 |

*Footnotes:*

[1] FY 2014 beginning fund net assets obtained from preliminary draft audited financial statements subject to audit opinion issuance.

# City of Detroit
## Water Fund
### Revenue Requirement Projections
*(in millions of dollars)*

| | For the Fiscal Year Ended | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** |
| Revenue available: | | | | | | | | | | |
| Water sales | $ 379.2 | $ 376.2 | $ 391.0 | $ 390.3 | $ 417.4 | $ 432.7 | $ 448.7 | $ 465.9 | $ 483.8 | $ 502.4 |
| Rate increases | - | 15.0 | 23.5 | 27.3 | 16.7 | 17.3 | 17.9 | 18.6 | 19.4 | 20.1 |
| Miscellaneous operating | 4.1 | 4.2 | 4.3 | 4.4 | 4.5 | 4.6 | 4.8 | 4.9 | 5.0 | 5.1 |
| Nonoperating | 4.9 | 5.2 | 4.6 | 4.8 | 4.9 | 5.2 | 5.4 | 5.8 | 6.1 | 6.3 |
| Total revenue available | 388.3 | 400.6 | 423.4 | 426.8 | 443.6 | 459.8 | 476.8 | 495.2 | 514.2 | 534.0 |
| Revenue requirements: | | | | | | | | | | |
| Operating & maintenance | 154.4 | 165.7 | 171.4 | 175.8 | 182.0 | 184.4 | 185.2 | 187.9 | 193.8 | 197.3 |
| Net revenue | 233.9 | 235.0 | 252.0 | 251.0 | 261.6 | 275.4 | 291.6 | 307.3 | 320.4 | 336.7 |
| Debt service: | | | | | | | | | | |
| New issuances | - | - | 6.2 | 12.6 | 18.6 | 24.5 | 28.0 | 32.3 | 37.4 | 42.8 |
| Senior lien | 129.4 | 139.0 | 138.9 | 139.0 | 138.9 | 138.2 | 128.9 | 128.8 | 129.1 | 129.2 |
| Second lien | 40.3 | 40.3 | 42.8 | 42.7 | 42.7 | 43.2 | 51.4 | 51.3 | 51.3 | 51.3 |
| Junior lien | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 1.7 | 1.6 | 1.6 | 1.6 | 1.6 |
| Total debt service | 171.7 | 181.3 | 189.8 | 196.2 | 202.2 | 207.6 | 209.9 | 214.1 | 219.5 | 224.9 |
| Pension obligation certificates | 1.4 | 1.4 | 0.7 | - | - | - | 1.0 | 1.0 | 1.0 | 1.0 |
| Renewals & replacements | 7.5 | 7.5 | 7.7 | 7.8 | 7.9 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 |
| Fund deposits | 6.8 | 5.4 | 4.0 | 3.8 | 4.5 | 3.4 | 2.9 | 3.6 | 4.9 | 4.1 |
| Revenue financed capital | 46.5 | 39.4 | 49.8 | 43.2 | 47.0 | 56.4 | 69.9 | 80.7 | 87.0 | 98.7 |
| Total revenue requirements | $ 388.3 | $ 400.6 | $ 423.4 | $ 426.8 | $ 443.6 | $ 459.8 | $ 476.8 | $ 495.2 | $ 514.2 | $ 534.0 |
| Debt service coverage[1]: | | | | | | | | | | |
| Senior lien | 181% | 169% | 174% | 166% | 166% | 169% | 186% | 191% | 192% | 196% |
| Second lien | 138% | 131% | 134% | 129% | 131% | 134% | 140% | 145% | 147% | 151% |
| Junior lien | 136% | 130% | 133% | 128% | 129% | 133% | 139% | 144% | 146% | 150% |
| % Rate increase[2] | n/a | 4% | 6% | 7% | 4% | 4% | 4% | 4% | 4% | 4% |

---

*Footnotes:*

[1] New debt issuances treated as senior lien in coverage calculations.

[2] Represents an average customer rate increase, not specific to any customer or customer class.

13-53846-tjt Doc 8779 Filed 12/16/14 Entered 12/16/14 08:24:49 Page 589 of 602
13-53846-swr Doc 7382-2 Filed 09/11/14 Entered 09/11/14 16:36:38 Page 191 of 204

12

**City of Detroit**
**Water Fund**
Capital Improvement Program Financing
*(in millions of dollars)*

| | | | | | For the Fiscal Year Ended | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** |
| Capital spending: | | | | | | | | | | |
| OHM Advisors CIP Estimates[1] | $ 63.4 | $ 125.2 | $ 144.4 | $ 144.4 | $ 132.9 | $ 132.9 | $ 103.7 | $ 103.7 | $ 64.5 | $ 64.5 |
| Unidentified capital projects | - | - | - | - | - | - | 4.6 | 30.4 | 90.4 | 102.6 |
| Total capital spending | 63.4 | 125.2 | 144.4 | 144.4 | 132.9 | 132.9 | 108.3 | 134.1 | 154.9 | 167.0 |
| Sources & Uses: | | | | | | | | | | |
| Improvement & Extension Fund[2]: | | | | | | | | | | |
| Beginning balance | 6.3 | 46.5 | 39.4 | 49.8 | 43.2 | 47.0 | 56.4 | 69.9 | 80.7 | 87.0 |
| Plus: Revenue deposits | 46.5 | 39.4 | 49.8 | 43.2 | 47.0 | 56.4 | 69.9 | 80.7 | 87.0 | 98.7 |
| Less: Use of funds | (6.3) | (46.5) | (39.4) | (49.8) | (43.2) | (47.0) | (56.4) | (69.9) | (80.7) | (87.0) |
| Ending balance | 46.5 | 39.4 | 49.8 | 43.2 | 47.0 | 56.4 | 69.9 | 80.7 | 87.0 | 98.7 |
| Construction Bond Fund[2]: | | | | | | | | | | |
| Beginning balance | 150.1 | 92.9 | 14.2 | - | - | - | - | - | - | - |
| Plus: Bond issuance | - | - | 98.8 | 102.8 | 97.5 | 93.3 | 56.4 | 69.9 | 80.7 | 87.0 |
| Less: Fees and reserve deposits | - | - | (7.9) | (8.2) | (7.8) | (7.5) | (4.5) | (5.6) | (6.5) | (7.0) |
| Less: Use of funds | (57.1) | (78.8) | (105.0) | (94.6) | (89.7) | (85.8) | (51.9) | (64.3) | (74.2) | (80.0) |
| Ending balance | 92.9 | 14.2 | - | - | - | - | - | - | - | - |
| Total use of funds | $ (63.4) | $(125.2) | $(144.4) | $(144.4) | $(132.9) | $(132.9) | $(108.3) | $(134.1) | $(154.9) | $(167.0) |

*Footnotes:*

[1] FY 2014 and FY 2015 reflect CIP amounts per DWSD's budget.

[2] FY 2014 beginning reserve balances obtained from DWSD management.

**City of Detroit**
**Water Fund**
Reserve Balance Projections[1]
*(in millions of dollars)*

|  | As of Fiscal Year End | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
|  | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** |
| Operating & maintenance: | | | | | | | | | | |
| Beginning balance | $ 12.7 | $ 19.3 | $ 23.0 | $ 26.2 | $ 29.3 | $ 32.9 | $ 35.9 | $ 38.6 | $ 41.8 | $ 45.8 |
| Plus: Deposits | 6.6 | 3.7 | 3.2 | 3.1 | 3.5 | 3.0 | 2.7 | 3.2 | 4.0 | 3.5 |
| Less: Use of funds | - | - | - | - | - | - | - | - | - | - |
| Ending balance | 19.3 | 23.0 | 26.2 | 29.3 | 32.9 | 35.9 | 38.6 | 41.8 | 45.8 | 49.3 |
| *Days of operating reserve* | *45* | *50* | *55* | *60* | *65* | *70* | *75* | *80* | *85* | *90* |
| Extraordinary repair & replacement: | | | | | | | | | | |
| Beginning balance | 22.9 | 23.2 | 24.9 | 25.7 | 26.4 | 27.3 | 27.7 | 27.8 | 28.2 | 29.1 |
| Plus: Deposits | 0.2 | 1.7 | 0.9 | 0.7 | 0.9 | 0.4 | 0.1 | 0.4 | 0.9 | 0.5 |
| Less: Use of funds | - | - | - | - | - | - | - | - | - | - |
| Ending balance | 23.2 | 24.9 | 25.7 | 26.4 | 27.3 | 27.7 | 27.8 | 28.2 | 29.1 | 29.6 |
| Improvement & extension: | | | | | | | | | | |
| Beginning balance | 6.3 | 46.5 | 39.4 | 49.8 | 43.2 | 47.0 | 56.4 | 69.9 | 80.7 | 87.0 |
| Plus: Deposits | 46.5 | 39.4 | 49.8 | 43.2 | 47.0 | 56.4 | 69.9 | 80.7 | 87.0 | 98.7 |
| Less: Use of funds | (6.3) | (46.5) | (39.4) | (49.8) | (43.2) | (47.0) | (56.4) | (69.9) | (80.7) | (87.0) |
| Ending balance | 46.5 | 39.4 | 49.8 | 43.2 | 47.0 | 56.4 | 69.9 | 80.7 | 87.0 | 98.7 |
| Total revenue generated funds: | | | | | | | | | | |
| Beginning balance | 42.0 | 88.9 | 87.2 | 101.7 | 98.9 | 107.2 | 119.9 | 136.2 | 150.6 | 161.9 |
| Plus (less): Net deposits (uses) | 47.0 | (1.7) | 14.5 | (2.8) | 8.3 | 12.7 | 16.3 | 14.4 | 11.2 | 15.8 |
| Ending balance | 88.9 | 87.2 | 101.7 | 98.9 | 107.2 | 119.9 | 136.2 | 150.6 | 161.9 | 177.6 |
| Construction bond fund: | | | | | | | | | | |
| Beginning balance | 150.1 | 92.9 | 14.2 | - | - | - | - | - | - | - |
| Plus: Bond issuance | - | - | 98.8 | 102.8 | 97.5 | 93.3 | 56.4 | 69.9 | 80.7 | 87.0 |
| Less: Fees and reserve deposits | - | - | (7.9) | (8.2) | (7.8) | (7.5) | (4.5) | (5.6) | (6.5) | (7.0) |
| Less: Use of funds | (57.1) | (78.8) | (105.0) | (94.6) | (89.7) | (85.8) | (51.9) | (64.3) | (74.2) | (80.0) |
| Ending balance | $ 92.9 | $ 14.2 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

Footnotes:
[1] FY 2014 beginning reserve balances obtained from DWSD management.

# City of Detroit
## Water Fund
Debt Balances
*(in millions of dollars)*

| | | | | | As of Fiscal Year End | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** |
| **New issues[1]:** | | | | | | | | | | |
| Beginning balance | $ - | $ - | $ - | $ 97.2 | $ 196.7 | $ 289.1 | $ 375.7 | $ 424.1 | $ 484.5 | $ 554.0 |
| New issues | - | - | 98.8 | 102.8 | 97.5 | 93.3 | 56.4 | 69.9 | 80.7 | 87.0 |
| Principal amortization | - | - | (1.6) | (3.3) | (5.0) | (6.7) | (8.0) | (9.5) | (11.2) | (13.1) |
| Ending balance | - | - | 97.2 | 196.7 | 289.1 | 375.7 | 424.1 | 484.5 | 554.0 | 627.9 |
| **Senior lien bonds:** | | | | | | | | | | |
| Beginning balance | 1,884.2 | 1,849.9 | 1,803.9 | 1,755.5 | 1,704.4 | 1,650.9 | 1,595.2 | 1,546.3 | 1,495.0 | 1,440.6 |
| Principal amortization | (34.3) | (46.0) | (48.4) | (51.1) | (53.6) | (55.6) | (49.0) | (51.3) | (54.4) | (57.2) |
| Ending balance | 1,849.9 | 1,803.9 | 1,755.5 | 1,704.4 | 1,650.9 | 1,595.2 | 1,546.3 | 1,495.0 | 1,440.6 | 1,383.4 |
| **Second lien bonds:** | | | | | | | | | | |
| Beginning balance | 640.6 | 635.0 | 629.2 | 620.5 | 611.6 | 602.1 | 591.6 | 572.1 | 551.6 | 529.9 |
| Principal amortization | (5.6) | (5.8) | (8.7) | (9.0) | (9.5) | (10.5) | (19.5) | (20.5) | (21.7) | (22.9) |
| Ending balance | 635.0 | 629.2 | 620.5 | 611.6 | 602.1 | 591.6 | 572.1 | 551.6 | 529.9 | 507.0 |
| **Junior lien bonds:** | | | | | | | | | | |
| Beginning balance | 21.5 | 19.9 | 18.4 | 16.8 | 15.2 | 13.5 | 12.1 | 10.7 | 9.2 | 7.8 |
| Principal amortization | (1.5) | (1.6) | (1.6) | (1.6) | (1.7) | (1.4) | (1.4) | (1.4) | (1.5) | (1.5) |
| Ending balance | 19.9 | 18.4 | 16.8 | 15.2 | 13.5 | 12.1 | 10.7 | 9.2 | 7.8 | 6.3 |
| Total debt | $2,504.8 | $2,451.5 | $2,490.0 | $2,527.8 | $2,555.6 | $2,574.6 | $2,553.2 | $2,540.3 | $2,532.3 | $2,524.6 |

Footnotes:
[1] Assumed senior lien.

# City of Detroit
## Water Fund
Operating & Maintenance Expense Projections
*(in millions of dollars)*

| | **Actual** | | | | | **For the Fiscal Year Ended** | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** |
| Personnel expenses: | | | | | | | | | | | |
| Salaries & wages | $ 47.1 | $ 44.5 | $ 45.3 | $ 44.1 | $ 42.9 | $ 41.8 | $ 39.7 | $ 36.4 | $ 35.1 | $ 35.9 | $ 36.8 |
| Overtime | 6.9 | 7.1 | 7.3 | 7.3 | 7.1 | 6.7 | 6.4 | 5.8 | 4.7 | 4.8 | 4.9 |
| Subtotal | 54.0 | 51.6 | 52.5 | 51.4 | 50.0 | 48.5 | 46.1 | 42.1 | 39.8 | 40.8 | 41.8 |
| Pension & fringes[1] | 31.2 | 40.5 | 47.6 | 51.4 | 55.4 | 59.6 | 60.7 | 61.4 | 63.0 | 65.7 | 65.8 |
| Total personnel expenses | 85.3 | 92.1 | 100.2 | 102.8 | 105.4 | 108.2 | 106.7 | 103.5 | 102.7 | 106.5 | 107.6 |
| Non-personnel expenses: | | | | | | | | | | | |
| Purchased services | 4.4 | 6.5 | 4.1 | 3.5 | 3.6 | 3.7 | 3.8 | 3.8 | 3.9 | 4.0 | 4.1 |
| Telecommunications | 7.2 | 6.3 | 6.5 | 6.6 | 6.8 | 6.9 | 7.1 | 7.3 | 7.5 | 7.7 | 7.9 |
| Contractual services | 36.5 | 44.8 | 46.3 | 48.9 | 51.4 | 53.4 | 55.5 | 56.9 | 58.3 | 59.8 | 61.3 |
| Repairs & maintenance | 7.0 | 7.7 | 7.9 | 8.1 | 8.3 | 8.5 | 8.7 | 8.9 | 9.1 | 9.4 | 9.6 |
| Utilities | 40.5 | 40.1 | 41.0 | 42.2 | 41.3 | 42.4 | 43.6 | 44.9 | 46.2 | 47.6 | 49.1 |
| Chemicals | 8.6 | 8.8 | 8.9 | 9.1 | 8.8 | 9.0 | 9.2 | 9.4 | 9.6 | 9.8 | 10.1 |
| Other | 10.2 | 5.2 | 7.9 | 8.1 | 8.3 | 8.5 | 8.7 | 8.9 | 9.2 | 9.4 | 9.6 |
| Clearing account | (34.5) | (57.0) | (57.1) | (57.8) | (57.9) | (58.6) | (59.0) | (58.5) | (58.8) | (60.3) | (62.0) |
| Total non-labor expenses | 79.8 | 62.3 | 65.5 | 68.6 | 70.4 | 73.8 | 77.7 | 81.7 | 85.2 | 87.4 | 89.7 |
| Total operating & maintenance expense | $ 165.0 | $ 154.4 | $ 165.7 | $ 171.4 | $ 175.8 | $ 182.0 | $ 184.4 | $ 185.2 | $ 187.9 | $ 193.8 | $ 197.3 |

Footnotes:

[1] FY 2013 actual reduced by net OPEB obligation to allow for comparison.

13-53846-tjt Doc 8779 Filed 12/16/14 Entered 12/16/14 08:24:06 Page 593 of 602
13-53846-swr Doc 7882-1 Filed 03/31/14 Entered 03/31/14 16:36:38 Page 195 of 204

16

# City of Detroit
# Water Fund
## Pension & Fringes Projection Detail
### *(in millions of dollars)*

| | | For the Fiscal Year Ended | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** |
| **Pension & fringes:** | | | | | | | | | | |
| GF pension reimbursements[1] | $ 14.8 | $ 25.9 | $ 29.9 | $ 34.0 | $ 38.4 | $ 40.1 | $ 42.0 | $ 44.0 | $ 46.1 | $ 45.6 |
| GF OPEB reimbursements[1] | 6.3 | 1.8 | 1.6 | 1.6 | 1.6 | 1.6 | 1.6 | 1.6 | 1.6 | 1.6 |
| New defined contribution plan[2] | 2.2 | 2.3 | 2.2 | 2.1 | 2.1 | 2.0 | 1.8 | 1.8 | 1.8 | 1.8 |
| New retiree healthcare[3] | - | 0.9 | 0.9 | 0.9 | 0.8 | 0.8 | 0.7 | 0.7 | 0.7 | 0.7 |
| Active employee healthcare[4] | 8.4 | 8.4 | 8.5 | 8.6 | 8.7 | 8.5 | 7.9 | 7.9 | 8.2 | 8.7 |
| Social security[5] | 3.9 | 4.0 | 3.9 | 3.8 | 3.7 | 3.5 | 3.2 | 3.0 | 3.1 | 3.2 |
| Other fringes[6] | 4.9 | 4.4 | 4.4 | 4.3 | 4.3 | 4.2 | 4.0 | 4.0 | 4.1 | 4.2 |
| Total pension & fringes | $ 40.5 | $ 47.6 | $ 51.4 | $ 55.4 | $ 59.6 | $ 60.7 | $ 61.4 | $ 63.0 | $ 65.7 | $ 65.8 |

| | | As of Fiscal Year End | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** |
| **FTE Schedule[7]:** | | | | | | | | | | |
| FTE count - beginning | 1,075 | 967 | 919 | 873 | 829 | 788 | 709 | 630 | 630 | 630 |
| Less: Attrition | (107) | (48) | (46) | (44) | (41) | - | - | - | - | - |
| Less: Layoffs | - | - | - | - | - | (79) | (79) | - | - | - |
| Ending FTE count | 967 | 919 | 873 | 829 | 788 | 709 | 630 | 630 | 630 | 630 |

Assumptions:

[1] Based upon amounts included in Plan of Adjustment (Disclosure Statement - Exhibit II.B.3.u.ii.A).

[2] 5.0% of salaries and wages.

[3] 2.0% of salaries and wages.

[4] $8,250 per FTE in FY 2014 (active employee healthcare growth rates: FY 2015 7.5%; FY 2016 7.0%; FY 2017 6.5%; FY 2018 6.0%; FY 2019 5.5%; FYs' 2020 - 2023 5.0%).

[5] 7.65% of salaries, wages, and overtime.

[6] Includes fixed and variable expenses, variable portion based upon historical average of salaries and wages, fixed portion assumed to be inflationary.

Footnotes:

[7] Employees whose services are shared between Water and Sewer Systems are budgeted in the Water System. Shared labor costs are transferred from the Water System to the Sewer System.

**City of Detroit**
**Sewage Disposal Fund**
Proforma Income Statement Projections
*(in millions of dollars)*

| | | | | | For the Fiscal Year Ended | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** |
| Revenues: | | | | | | | | | | |
| Sewer sales | $ 485.3 | $ 493.3 | $ 513.8 | $ 535.0 | $ 557.1 | $ 577.5 | $ 598.7 | $ 621.9 | $ 646.1 | $ 671.2 |
| Look-back revenues | 25.7 | 20.5 | 20.5 | 11.1 | - | - | - | - | - | - |
| Total operating revenues | 511.0 | 513.8 | 534.2 | 546.2 | 557.1 | 577.5 | 598.7 | 621.9 | 646.1 | 671.2 |
| Expenses: | | | | | | | | | | |
| Operating & maintenance | 234.4 | 249.7 | 257.6 | 263.3 | 272.0 | 277.0 | 279.8 | 284.9 | 293.5 | 299.6 |
| Depreciation | 118.9 | 122.0 | 124.8 | 127.6 | 129.6 | 131.5 | 134.0 | 136.5 | 138.7 | 141.4 |
| Total operating expenses | 353.3 | 371.7 | 382.4 | 390.9 | 401.6 | 408.5 | 413.8 | 421.5 | 432.2 | 441.1 |
| Operating income | 157.7 | 142.1 | 151.8 | 155.2 | 155.5 | 169.0 | 184.9 | 200.4 | 213.9 | 230.2 |
| Nonoperating revenues (expenses): | | | | | | | | | | |
| Interest expense | (146.2) | (149.3) | (151.6) | (153.3) | (153.4) | (153.4) | (154.2) | (154.1) | (152.2) | (150.5) |
| Amortization of bond issuance costs | (15.1) | (15.2) | (15.2) | (15.3) | (15.4) | (15.4) | (15.5) | (15.5) | (15.5) | (14.9) |
| Earnings on investments | 6.2 | 5.7 | 5.6 | 5.9 | 6.2 | 6.3 | 6.6 | 7.0 | 7.3 | 7.7 |
| Nonoperating revenue | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| Total nonoperating income (expenses) | (155.0) | (158.6) | (161.1) | (162.5) | (162.5) | (162.4) | (162.9) | (162.5) | (160.3) | (157.5) |
| Increase (decrease) in net assets | 2.7 | (16.6) | (9.3) | (7.3) | (6.9) | 6.6 | 22.0 | 38.0 | 53.6 | 72.7 |
| Fund net assets - beginning[1] | 57.4 | 60.1 | 43.6 | 34.3 | 27.0 | 20.1 | 26.6 | 48.6 | 86.6 | 140.1 |
| Fund net assets - ending | $ 60.1 | $ 43.6 | $ 34.3 | $ 27.0 | $ 20.1 | $ 26.6 | $ 48.6 | $ 86.6 | $ 140.1 | $ 212.8 |

*Footnotes:*

[1] FY 2014 beginning fund net assets obtained from preliminary draft audited financial statements subject to audit opinion issuance.

13-53846-tjt Doc 8779 Filed 12/16/14 Entered 12/16/14 08:24:49 Page 595 of 602
13-53846-swr Doc 7382-1 Filed 08/31/14 Entered 08/31/14 18:36:38 Page 191 of 204

18

**City of Detroit**
**Sewage Disposal Fund**
Revenue Requirement Projections
*(in millions of dollars)*

| | For the Fiscal Year Ended | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** |
| Revenue available: | | | | | | | | | | |
| Sewer sales | $ 452.9 | $ 441.5 | $ 460.1 | $ 479.5 | $ 499.7 | $ 518.2 | $ 537.4 | $ 558.5 | $ 580.5 | $ 603.4 |
| Rate increases | - | 17.7 | 18.4 | 19.2 | 20.0 | 20.7 | 21.5 | 22.3 | 23.2 | 24.1 |
| Look-back revenues | 25.7 | 20.5 | 20.5 | 11.1 | - | - | - | - | - | - |
| Miscellaneous operating | 32.4 | 34.2 | 35.2 | 36.3 | 37.4 | 38.6 | 39.8 | 41.1 | 42.4 | 43.7 |
| Nonoperating | 6.3 | 5.8 | 5.7 | 6.0 | 6.3 | 6.4 | 6.7 | 7.1 | 7.5 | 7.8 |
| Total revenue available | 517.3 | 519.6 | 540.0 | 552.2 | 563.4 | 583.9 | 605.4 | 629.0 | 653.5 | 679.1 |
| Revenue requirements: | | | | | | | | | | |
| Operating & maintenance | 234.4 | 249.7 | 257.6 | 263.3 | 272.0 | 277.0 | 279.8 | 284.9 | 293.5 | 299.6 |
| Net revenue | 282.9 | 269.9 | 282.4 | 288.9 | 291.4 | 306.9 | 325.6 | 344.0 | 360.0 | 379.4 |
| Debt service: | | | | | | | | | | |
| New issuances | 0.1 | 7.8 | 16.1 | 24.0 | 29.0 | 34.1 | 40.5 | 46.1 | 49.6 | 54.0 |
| Senior lien | 121.8 | 119.6 | 120.0 | 127.9 | 127.9 | 128.0 | 127.7 | 126.1 | 116.7 | 128.9 |
| Second lien | 54.8 | 62.8 | 62.3 | 53.7 | 53.7 | 53.6 | 53.9 | 55.6 | 66.2 | 57.8 |
| Junior lien | 46.3 | 46.2 | 46.3 | 46.2 | 46.2 | 46.2 | 46.0 | 44.7 | 40.2 | 39.6 |
| Total debt service | 223.0 | 236.3 | 244.8 | 251.9 | 256.8 | 262.0 | 268.0 | 272.4 | 272.7 | 280.3 |
| Pension obligation certificates | 1.6 | 1.6 | 0.8 | - | - | - | 1.1 | 1.1 | 1.1 | 1.1 |
| Renewals & replacements | 7.5 | 7.5 | 7.7 | 7.8 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 |
| Fund deposits | 11.5 | 7.7 | 5.8 | 5.4 | 6.5 | 5.5 | 4.8 | 5.8 | 7.2 | 6.5 |
| Revenue financed capital | 39.3 | 16.8 | 23.3 | 23.8 | 20.1 | 31.4 | 43.6 | 56.7 | 70.9 | 83.4 |
| Total revenue requirements | $ 517.3 | $ 519.6 | $ 540.0 | $ 552.2 | $ 563.4 | $ 583.9 | $ 605.4 | $ 629.0 | $ 653.5 | $ 679.1 |
| Debt service coverage[1]: | | | | | | | | | | |
| Senior lien | 232% | 212% | 207% | 190% | 186% | 189% | 194% | 200% | 216% | 207% |
| Second lien | 160% | 142% | 142% | 140% | 138% | 142% | 147% | 151% | 155% | 158% |
| Junior lien | 127% | 114% | 115% | 115% | 113% | 117% | 121% | 126% | 132% | 135% |
| % Rate increase[2] | n/a | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% |

Footnotes:

[1] New debt issuances treated as senior lien in coverage calculations.

[2] Represents an average customer rate increase, not specific to any customer or customer class.

# City of Detroit
## Sewage Disposal Fund
### Capital Improvement Program Financing
*(in millions of dollars)*

| | | | | | For the Fiscal Year Ended | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** |
| Capital spending: | | | | | | | | | | |
| OHM Advisors CIP Estimates[1] | $ 165.6 | $ 156.0 | $ 140.0 | $ 140.0 | $ 96.5 | $ 96.5 | $ 125.5 | $ 125.5 | $ 72.2 | $ 72.2 |
| Unidentified capital projects | - | - | - | - | - | - | - | - | 36.7 | 64.0 |
| Total capital spending | 165.6 | 156.0 | 140.0 | 140.0 | 96.5 | 96.5 | 125.5 | 125.5 | 108.9 | 136.2 |
| | | | | | | | | | | |
| Sources & Uses: | | | | | | | | | | |
| | | | | | | | | | | |
| Improvement & Extension Fund[2]: | | | | | | | | | | |
| Beginning balance | - | 39.3 | 16.8 | 23.3 | 23.8 | 20.1 | 31.4 | 43.6 | 56.7 | 70.9 |
| Plus: Revenue deposits | 39.3 | 16.8 | 23.3 | 23.8 | 20.1 | 31.4 | 43.6 | 56.7 | 70.9 | 83.4 |
| Less: Use of funds | - | (39.3) | (16.8) | (23.3) | (23.8) | (20.1) | (31.4) | (43.6) | (56.7) | (70.9) |
| Ending balance | 39.3 | 16.8 | 23.3 | 23.8 | 20.1 | 31.4 | 43.6 | 56.7 | 70.9 | 83.4 |
| Construction Bond Fund[2]: | | | | | | | | | | |
| Beginning balance | 162.6 | 0.1 | - | - | - | - | - | - | - | - |
| Plus: Bond issuance | - | 123.5 | 132.2 | 126.9 | 79.0 | 83.0 | 102.3 | 89.0 | 56.7 | 70.9 |
| Plus: SRF funds | 3.0 | 3.0 | 1.5 | - | - | - | - | - | - | - |
| Less: Fees and reserve deposits | - | (9.9) | (10.6) | (10.1) | (6.3) | (6.6) | (8.2) | (7.1) | (4.5) | (5.7) |
| Less: Use of funds | (165.6) | (116.7) | (123.2) | (116.7) | (72.7) | (76.4) | (94.1) | (81.9) | (52.2) | (65.3) |
| Ending balance | 0.1 | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | |
| Total use of funds | $(165.6) | $(156.0) | $(140.0) | $(140.0) | $ (96.5) | $ (96.5) | $(125.5) | $(125.5) | $(108.9) | $(136.2) |

*Footnotes:*

[1] FY 2014 and FY 2015 reflect CIP amounts per DWSD's budget.

[2] FY 2014 beginning reserve balances obtained from DWSD management.

13-53846-tjt Doc 8779 Filed 12/16/14 Entered 12/16/14 08:24:40 Page 597 of 602
13-53846-swr Doc 7382-2 Filed 08/31/14 Entered 08/31/14 18:36:38 Page 199 of 204

20

**City of Detroit**
**Sewage Disposal Fund**
Reserve Balance Projections[1]
*(in millions of dollars)*

| | As of Fiscal Year End | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** |
| Operating & maintenance: | | | | | | | | | | |
| Beginning balance | 18.9 | 29.3 | 34.7 | 39.3 | 43.9 | 49.1 | 53.9 | 58.3 | 63.3 | 69.3 |
| Plus: Deposits | 10.4 | 5.4 | 4.7 | 4.5 | 5.2 | 4.8 | 4.4 | 5.0 | 6.0 | 5.6 |
| Less: Use of funds | - | - | - | - | - | - | - | - | - | - |
| Ending balance | 29.3 | 34.7 | 39.3 | 43.9 | 49.1 | 53.9 | 58.3 | 63.3 | 69.3 | 74.9 |
| *Days of operating reserve* | *45* | *50* | *55* | *60* | *65* | *70* | *75* | *80* | *85* | *90* |
| Extraordinary repair & replacement: | | | | | | | | | | |
| Beginning balance | 34.1 | 35.2 | 37.5 | 38.6 | 39.5 | 40.8 | 41.6 | 42.0 | 42.7 | 44.0 |
| Plus: Deposits | 1.1 | 2.3 | 1.2 | 0.9 | 1.3 | 0.7 | 0.4 | 0.8 | 1.3 | 0.9 |
| Less: Use of funds | - | - | - | - | - | - | - | - | - | - |
| Ending balance | 35.2 | 37.5 | 38.6 | 39.5 | 40.8 | 41.6 | 42.0 | 42.7 | 44.0 | 44.9 |
| Improvement & extension: | | | | | | | | | | |
| Beginning balance | - | 39.3 | 16.8 | 23.3 | 23.8 | 20.1 | 31.4 | 43.6 | 56.7 | 70.9 |
| Plus: Deposits | 39.3 | 16.8 | 23.3 | 23.8 | 20.1 | 31.4 | 43.6 | 56.7 | 70.9 | 83.4 |
| Less: Use of funds | - | (39.3) | (16.8) | (23.3) | (23.8) | (20.1) | (31.4) | (43.6) | (56.7) | (70.9) |
| Ending balance | 39.3 | 16.8 | 23.3 | 23.8 | 20.1 | 31.4 | 43.6 | 56.7 | 70.9 | 83.4 |
| Total revenue generated funds: | | | | | | | | | | |
| Beginning balance | 53.0 | 103.8 | 88.9 | 101.2 | 107.2 | 110.0 | 126.8 | 143.9 | 162.8 | 184.3 |
| Plus (less): Net deposits (uses) | 50.8 | (14.9) | 12.3 | 6.0 | 2.8 | 16.8 | 17.1 | 18.9 | 21.5 | 19.0 |
| Ending balance | 103.8 | 88.9 | 101.2 | 107.2 | 110.0 | 126.8 | 143.9 | 162.8 | 184.3 | 203.3 |
| Construction bond fund: | | | | | | | | | | |
| Beginning balance | 162.6 | 0.1 | - | - | - | - | - | - | - | - |
| Plus: Bond issuance | - | 123.5 | 132.2 | 126.9 | 79.0 | 83.0 | 102.3 | 89.0 | 56.7 | 70.9 |
| Plus: SRF funds | 3.0 | 3.0 | 1.5 | - | - | - | - | - | - | - |
| Less: Fees and reserve deposits | - | (9.9) | (10.6) | (10.1) | (6.3) | (6.6) | (8.2) | (7.1) | (4.5) | (5.7) |
| Less: Use of funds | (165.6) | (116.7) | (123.2) | (116.7) | (72.7) | (76.4) | (94.1) | (81.9) | (52.2) | (65.3) |
| Ending balance | 0.1 | - | - | - | - | - | - | - | - | - |

*Footnotes:*

[1] FY 2014 beginning reserve balances obtained from DWSD management.

**City of Detroit**
**Sewage Disposal Fund**
Debt Balances
*(in millions of dollars)*

| | | | | As of Fiscal Year End | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** |
| New issues[1]: | | | | | | | | | | |
| Beginning balance | $ - | $ 3.0 | $ 127.5 | $ 257.0 | $ 377.5 | $ 448.5 | $ 521.8 | $ 612.3 | $ 687.6 | $ 729.0 |
| New issues | 3.0 | 126.5 | 133.8 | 126.9 | 79.0 | 83.0 | 102.3 | 89.0 | 56.7 | 70.9 |
| Principal amortization | - | (2.0) | (4.2) | (6.4) | (8.0) | (9.7) | (11.8) | (13.7) | (15.3) | (17.1) |
| Ending balance | 3.0 | 127.5 | 257.0 | 377.5 | 448.5 | 521.8 | 612.3 | 687.6 | 729.0 | 782.8 |
| Senior lien bonds: | | | | | | | | | | |
| Beginning balance | 1,860.9 | 1,827.7 | 1,795.2 | 1,760.4 | 1,715.5 | 1,668.2 | 1,618.2 | 1,565.8 | 1,512.2 | 1,465.2 |
| Principal amortization | (36.6) | (35.7) | (37.6) | (47.3) | (49.4) | (51.5) | (53.4) | (54.2) | (47.0) | (61.8) |
| Accrued PIK interest | 3.4 | 3.1 | 2.8 | 2.4 | 2.0 | 1.6 | 1.1 | 0.6 | - | - |
| Ending balance | 1,827.7 | 1,795.2 | 1,760.4 | 1,715.5 | 1,668.2 | 1,618.2 | 1,565.8 | 1,512.2 | 1,465.2 | 1,403.5 |
| Second lien bonds: | | | | | | | | | | |
| Beginning balance | 965.5 | 959.6 | 945.2 | 930.5 | 924.0 | 917.2 | 910.0 | 902.2 | 892.3 | 871.0 |
| Principal amortization | (5.9) | (14.4) | (14.7) | (6.5) | (6.8) | (7.2) | (7.8) | (9.9) | (21.3) | (13.8) |
| Ending balance | 959.6 | 945.2 | 930.5 | 924.0 | 917.2 | 910.0 | 902.2 | 892.3 | 871.0 | 857.2 |
| Junior lien bonds: | | | | | | | | | | |
| Beginning balance | 482.9 | 446.9 | 410.3 | 372.8 | 334.4 | 295.1 | 255.0 | 214.1 | 173.6 | 136.7 |
| Principal amortization | (35.9) | (36.6) | (37.6) | (38.4) | (39.2) | (40.2) | (40.8) | (40.5) | (36.9) | (37.2) |
| Ending balance | 446.9 | 410.3 | 372.8 | 334.4 | 295.1 | 255.0 | 214.1 | 173.6 | 136.7 | 99.5 |
| Total debt | $3,237.3 | $3,278.2 | $3,320.7 | $3,351.4 | $3,329.0 | $3,305.0 | $3,294.5 | $3,265.7 | $3,201.9 | $3,143.0 |

*Footnotes:*

[1] Assumed senior lien.

13-53846-tjt Doc 8779 Filed 12/16/14 Entered 12/16/14 08:24:40 Page 599 of 602
13-53846-swr Doc 7382-2 Filed 09/11/14 Entered 09/11/14 16:36:38 Page 201 of 204

22

**City of Detroit**
**Sewage Disposal Fund**
Operating & Maintenance Expense Projections
*(in millions of dollars)*

| | **Actual** | | | | **For the Fiscal Year Ended** | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** |
| Personnel expenses: | | | | | | | | | | | |
| Salaries & wages | $ 23.2 | $ 26.1 | $ 26.6 | $ 25.9 | $ 25.2 | $ 24.5 | $ 23.3 | $ 21.4 | $ 20.6 | $ 21.1 | $ 21.6 |
| Overtime | 7.2 | 7.4 | 7.5 | 7.5 | 7.4 | 7.2 | 6.8 | 6.3 | 5.9 | 6.1 | 6.2 |
| Subtotal | 30.4 | 33.5 | 34.1 | 33.4 | 32.6 | 31.7 | 30.1 | 27.7 | 26.5 | 27.2 | 27.8 |
| Pension & fringes[1] | 29.3 | 31.2 | 37.6 | 41.2 | 45.1 | 49.2 | 50.5 | 51.8 | 53.5 | 55.8 | 55.6 |
| Total personnel expenses | 59.6 | 64.7 | 71.7 | 74.6 | 77.6 | 80.9 | 80.6 | 79.5 | 80.0 | 83.0 | 83.5 |
| Non-personnel expenses: | | | | | | | | | | | |
| Purchased services | 5.9 | 7.8 | 5.3 | 4.6 | 4.7 | 4.9 | 5.0 | 5.1 | 5.2 | 5.4 | 5.5 |
| Telecommunications | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.6 | 0.6 | 0.6 | 0.6 |
| Contractual services | 86.2 | 41.1 | 52.9 | 55.7 | 58.4 | 60.8 | 63.2 | 64.8 | 66.4 | 68.1 | 69.8 |
| Repairs & maintenance | 8.6 | 8.5 | 8.7 | 9.0 | 9.2 | 9.4 | 9.7 | 9.9 | 10.1 | 10.4 | 10.7 |
| Utilities | 36.0 | 37.6 | 37.9 | 39.0 | 40.2 | 41.5 | 42.7 | 44.0 | 45.4 | 46.8 | 48.3 |
| Chemicals | 12.8 | 15.0 | 15.0 | 15.4 | 15.7 | 16.1 | 16.5 | 16.8 | 17.3 | 17.7 | 18.1 |
| Other | 5.6 | 7.3 | 5.7 | 5.9 | 6.0 | 6.1 | 6.3 | 6.5 | 6.6 | 6.8 | 7.0 |
| Clearing account | 26.4 | 51.9 | 51.9 | 52.9 | 53.3 | 54.3 | 55.1 | 55.3 | 56.1 | 57.6 | 59.1 |
| Biosolids savings | - | - | - | - | (2.5) | (2.5) | (2.6) | (2.7) | (2.8) | (2.8) | (2.9) |
| Total non-labor expenses | 181.9 | 169.7 | 178.0 | 182.9 | 185.7 | 191.1 | 196.4 | 200.3 | 205.0 | 210.5 | 216.2 |
| Total operating & maintenance expense | $ 241.6 | $ 234.4 | $ 249.7 | $ 257.6 | $ 263.3 | $ 272.0 | $ 277.0 | $ 279.8 | $ 284.9 | $ 293.5 | $ 299.6 |

Footnotes:
 [1] FY 2013 actual reduced by net OPEB obligation to allow for comparison.

13-53846-tjt Doc 8779 Filed 12/16/14 Entered 12/16/14 08:24:49 Page 600 of 602
13-53846-swr Doc 7382-1 Filed 03/31/14 Entered 03/31/14 16:36:38 Page 202 of 204

23

# City of Detroit
## Sewage Disposal Fund
Pension & Fringes Projection Detail
*(in millions of dollars)*

| | | | | For the Fiscal Year Ended | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Pension & fringes: | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** |
| GF pension reimbursements[1] | $ 9.5 | $ 24.6 | $ 28.4 | $ 32.3 | $ 36.5 | $ 38.1 | $ 40.0 | $ 41.9 | $ 43.9 | $ 43.3 |
| GF OPEB reimbursements[1] | 8.4 | 2.4 | 2.2 | 2.2 | 2.2 | 2.2 | 2.2 | 2.1 | 2.1 | 2.1 |
| New defined contribution plan[2] | 1.3 | 1.3 | 1.3 | 1.3 | 1.2 | 1.2 | 1.1 | 1.0 | 1.1 | 1.1 |
| New retiree healthcare[3] | - | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.4 | 0.4 | 0.4 | 0.4 |
| Active employee healthcare[4] | 4.9 | 4.9 | 5.0 | 5.1 | 5.1 | 5.0 | 4.7 | 4.6 | 4.8 | 5.1 |
| Social security[5] | 2.6 | 2.6 | 2.6 | 2.5 | 2.4 | 2.3 | 2.1 | 2.0 | 2.1 | 2.1 |
| Other fringes[6] | 4.5 | 1.2 | 1.2 | 1.3 | 1.3 | 1.3 | 1.4 | 1.4 | 1.4 | 1.5 |
| Total pension & fringes | $ 31.2 | $ 37.6 | $ 41.2 | $ 45.1 | $ 49.2 | $ 50.5 | $ 51.8 | $ 53.5 | $ 55.8 | $ 55.6 |

| | | | | As of Fiscal Year End | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| FTE Schedule[7]: | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** |
| FTE count - beginning | 631 | 568 | 540 | 513 | 487 | 463 | 416 | 370 | 370 | 370 |
| Less: Attrition | (63) | (28) | (27) | (26) | (24) | - | - | - | - | - |
| Less: Layoffs | - | - | - | - | - | (46) | (46) | - | - | - |
| Ending FTE count | 568 | 540 | 513 | 487 | 463 | 416 | 370 | 370 | 370 | 370 |

Assumptions:

[1] Based upon amounts included in Plan of Adjustment (Disclosure Statement - Exhibit II.B.3.u.ii.A).

[2] 5.0% of salaries and wages.

[3] 2.0% of salaries and wages.

[4] $8,250 per FTE in FY 2014 (active employee healthcare growth rates: FY 2015 7.5%; FY 2016 7.0%; FY 2017 6.5%; FY 2018 6.0%; FY 2019 5.5%; FYs' 2020 - 2023 5.0%).

[5] 7.65% of salaries, wages, and overtime.

[6] Includes fixed and variable expenses, variable portion based upon historical average of salaries and wages, fixed portion assumed to be inflationary.

Footnotes:

[7] Employees whose services are shared between Water and Sewer Systems are budgeted in the Water System. Shared labor costs are transferred from the Water System to the Sewer System.

**City of Detroit**
**Water and Sewerage Disposal Fund**
Volume Projections
*(in mcf)*

| | **Actual** | | | | | **For the Fiscal Year Ended** | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2013** | **2014 (B)[1]** | **2015 (B)** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** |
| Water System | | | | | | | | | | | |
| Wholesale | 15,687,868 | 15,890,308 | 15,852,800 | 15,812,817 | 14,588,930 | 14,552,134 | 14,515,431 | 14,478,821 | 14,442,304 | 14,405,878 | 14,369,544 |
| Retail | 3,660,327 | 4,000,000 | 3,775,000 | 3,731,972 | 3,689,434 | 3,647,381 | 3,605,808 | 3,564,708 | 3,555,996 | 3,547,306 | 3,538,637 |
| Total Volumes | 19,348,195 | 19,890,308 | 19,627,800 | 19,544,789 | 18,278,364 | 18,199,515 | 18,121,239 | 18,043,529 | 17,998,300 | 17,953,184 | 17,908,181 |
| | | | | | | | | | | | |
| Sewer System | | | | | | | | | | | |
| Wholesale | 13,286,460 | 15,124,450 | 14,884,500 | 14,884,500 | 14,884,500 | 14,884,500 | 14,884,500 | 14,884,500 | 14,884,500 | 14,884,500 | 14,884,500 |
| Retail | 3,087,199 | 3,600,000 | 3,275,000 | 3,237,671 | 3,200,767 | 3,164,284 | 3,128,217 | 3,092,561 | 3,085,003 | 3,077,464 | 3,069,943 |
| Total Volumes | 16,373,659 | 18,724,450 | 18,159,500 | 18,122,171 | 18,085,267 | 18,048,784 | 18,012,717 | 17,977,061 | 17,969,503 | 17,961,964 | 17,954,443 |

*Footnotes:*

   [1] FY 2014 water wholesale budgeted volumes have been reduced by 2.0%.

(B) - Budgeted

13-53846-tjt  Doc 8779  Filed 12/16/14  Entered 12/16/14 10:21:49  Page 602 of 602
13-53846-swr  Doc 7382  Filed 09/11/14  Entered 09/11/14 18:36:38  Page 204 of
204

25