THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT MAY BE REVISED TO REFLECT EVENTS THAT OCCUR AFTER THE DATE HEREOF BUT PRIOR TO THE BANKRUPTCY COURT'S APPROVAL OF THE DISCLOSURE STATEMENT.

## UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

---------------------------------------------------------------x
:
In re                        :     Chapter 9
:
CITY OF DETROIT, MICHIGAN,     :     Case No. 13-53846
:
           Debtor.     :     Hon. Steven W. Rhodes
:
---------------------------------------------------------------x

---

## DISCLOSURE STATEMENT WITH RESPECT TO
## PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT

---

DAVID G. HEIMAN
HEATHER LENNOX
THOMAS A. WILSON
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com
tawilson@jonesday.com

BRUCE BENNETT
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

JONATHAN S. GREEN
STEPHEN S. LAPLANTE
MILLER, CANFIELD,
    PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE DEBTOR

**DISCLOSURE STATEMENT, DATED FEBRUARY 21, 2014**
**SOLICITATION OF VOTES WITH RESPECT TO**
**PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT, MICHIGAN**

_____

The City of Detroit ("Detroit" or the "City") believes that the Plan for the Adjustment of Debts of the City of Detroit (the "Plan") attached as Exhibit A to this Disclosure Statement (this "Disclosure Statement") is in the best interests of creditors. All creditors entitled to vote thereon are urged to vote in favor of the Plan. A summary of the voting instructions is set forth beginning on page 110 of this Disclosure Statement. Additional instructions are contained on the ballots distributed to the creditors entitled to vote on the Plan. To be counted, your ballot must be duly completed, executed and received by the City at or before [4]:00 p.m., Eastern Time, on [_____], 2014 (the "Voting Deadline"), unless the Voting Deadline is extended.

_____

The effectiveness of the proposed Plan is subject to material conditions precedent, some of which may not be satisfied. See Section V.D.1. There is no assurance that these conditions will be satisfied or waived.

_____

All capitalized terms used in this Disclosure Statement and not otherwise defined herein shall have the meanings given to them in the Plan.

_____

This Disclosure Statement is the only document that the Bankruptcy Court has approved for use in connection with the solicitation of votes on the Plan. No entity is authorized by the City to give any information or to make any representation other than as contained in this Disclosure Statement and the exhibits attached hereto or incorporated by reference or referred to herein in connection with the Plan or the solicitation of acceptances of the Plan. Information or representations derived from any other source may not be relied upon as having been authorized by the City.

_____

**ALL CREDITORS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE PLAN ATTACHED AS EXHIBIT A AND THE RISK FACTORS DESCRIBED UNDER SECTION XII, PRIOR TO SUBMITTING BALLOTS IN RESPONSE TO THIS SOLICITATION.**

_____

The summaries of the Plan and other documents contained in this Disclosure Statement are qualified by reference to the Plan itself, the exhibits and supplemental documents thereto (collectively, the "Plan Supplement Documents") and documents described therein as Filed prior to approval of this Disclosure Statement. In the event that any inconsistency or conflict exists between this Disclosure Statement and the Plan, the terms of the Plan will control. Except as otherwise indicated, the City will File all Plan Supplement Documents with the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") and make them available for review on the Document Website (*www.kccllc.net/detroit*) prior to the Confirmation Hearing; *provided, however*, that (a) exhibits relating to the assumption and rejection of Executory Contracts and Unexpired Leases under the Plan will be filed no later than seven calendar days prior to the Voting Deadline and (b) other key exhibits to the Plan will be either (i) included in any solicitation materials distributed to Holders of Claims in Classes entitled to vote to accept or reject the Plan or (ii) Filed as a supplement to the Plan no later than seven calendar days prior to the Voting Deadline.

This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Plan. The City reserves the right to modify the Plan consistent with section 942 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 3019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and other applicable law.

The statements contained in this Disclosure Statement are made as of the date of this Disclosure Statement, and there can be no assurance that the statements contained herein will be correct at any time after this date. The information

contained in this Disclosure Statement, including the information regarding the history and operations of the City and any financial information regarding the City, is included for the purpose of soliciting acceptances of the Plan.  As to contested matters, adversary proceedings or any other litigation, the statements made in this Disclosure Statement are not to be construed as admissions or stipulations, but rather as statements made in settlement negotiations as part of the City's attempt to settle and resolve its Liabilities pursuant to the Plan.  This Disclosure Statement shall not be admissible in any non-bankruptcy proceeding, nor shall it be construed to be conclusive advice on the tax, securities or other legal effects of the Plan as to any party, including any Holder of a Claim against the City.  Except where specifically noted, the financial information contained in this Disclosure Statement and in its Exhibits has not been audited by a certified public accountant and may not have been prepared in accordance with standards promulgated by the Government Accounting Standards Board or generally accepted accounting principles in the United States.

––––––––––––––––––––––––

### FORWARD-LOOKING STATEMENTS

This Disclosure Statement contains forward-looking statements based primarily on the current expectations of the City and projections about future events and financial trends affecting the financial condition of the City and its assets. The words "believe," "may," "estimate," "continue," "anticipate," "intend," "expect" and similar expressions identify these forward-looking statements.  These forward-looking statements are subject to a number of risks, uncertainties and assumptions, including those described below under the caption "Risk Factors" in Section XII.  In light of these risks and uncertainties, the forward-looking events and trends discussed in this Disclosure Statement may not occur, and actual results could differ materially from those anticipated in the forward-looking statements.  The City does not undertake any obligation to update or revise publicly any forward-looking statements, whether as a result of new information, future events or otherwise.

**This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC"), any state securities commission or any securities exchange or association nor has the SEC, any state securities commission or any securities exchange or association passed upon the accuracy or adequacy of the statements contained herein.**

––––––––––––––––––––––––

# TABLE OF CONTENTS

I. INTRODUCTION ..................................................................................................................... 1

    A.    Parties Entitled to Vote on the Plan ................................................................. 1

    B.    Solicitation Package........................................................................................ 2

    C.    Voting Procedures, Ballots and Voting Deadline ............................................ 3

    D.    Plan Supplement Documents ........................................................................... 3

    E.    Confirmation Hearing and Deadline for Objections to Confirmation................ 3

II. SUMMARY OF CLASSIFICATION  AND TREATMENT OF CLAIMS UNDER THE PLAN ................... 4

    A.    Overview ........................................................................................................ 4

          1.    Introduction to the Plan ..................................................................... 4

          2.    Special Information Regarding Pension Claims ................................... 4

    B.    Classification and Treatment of Claims Under the Plan ................................... 9

III. EVENTS PRECEDING THE CITY'S CHAPTER 9 CASE ................................................................ 19

    A.    Background..................................................................................................... 19

          1.    General Information ............................................................................ 19

          2.    Municipal Services ............................................................................. 20

          3.    City Funds .......................................................................................... 20

          4.    Sources of General Fund Revenue ...................................................... 23

          5.    Assets ................................................................................................. 26

    B.    Outstanding Financial Obligations of the City as of the Petition Date .............. 28

          1.    Obligations Secured by Special Revenues ........................................... 28

          2.    Long-Term General Fund Obligations ................................................ 29

          3.    Certificates of Participation ................................................................ 30

          4.    Swap Liabilities .................................................................................. 31

          5.    Pension Obligations............................................................................ 32

          6.    Other Post-Employment Benefit Obligations ...................................... 35

          7.    Other Liabilities ................................................................................. 37

    C.    The City's Steady Operational and Financial Decline ...................................... 38

          1.    Declines in Population and the City's Manufacturing Base.................... 38

          2.    Declining Revenues ............................................................................ 39

          3.    Eroding Tax Base ................................................................................ 41

          4.    High Labor Costs/Restrictive Employment Terms ............................... 43

          5.    Growing Budget Deficits .................................................................... 44

          6.    Declining Credit Ratings .................................................................... 44

          7.    Inadequate Municipal Services ........................................................... 44

          8.    Obsolete Information Technology ....................................................... 51

9.    Steady State Prepetition Financial Projections ...................................................52

D.    Prepetition Measures Taken by City to Address Challenges ....................................52

    1.    Consent Agreement/Creation of Financial Advisory Board ........................52

    2.    Headcount Reductions ...............................................................................53

    3.    Imposition of City Employment Terms ......................................................54

    4.    Revenue Generating Initiatives ..................................................................54

    5.    Reduced Operating Expenditures ...............................................................54

    6.    Deferred Capital Expenditures ...................................................................54

    7.    Cash Conservation Measures .....................................................................54

    8.    Demolition Initiatives ................................................................................55

    9.    Appointment of the Emergency Manager ...................................................55

    10.    The June 14 Creditor Proposal ..................................................................56

    11.    Barriers to Out-of-Court Restructuring ......................................................57

    12.    Insolvency ................................................................................................59

IV. THE CHAPTER 9 CASE ........................................................................................................59

A.    Commencement of the Chapter 9 Case ....................................................................59

B.    Retiree Committee ..................................................................................................59

C.    Eligibility ...............................................................................................................61

D.    Swap Settlement .....................................................................................................62

    1.    Forbearance and Optional Termination Agreement .....................................62

    2.    Litigation Regarding the Casino Revenues and the FOTA ..........................63

    3.    Litigation Regarding the COPs ..................................................................65

E.    Mediation ...............................................................................................................65

    1.    Restructuring Mediation ............................................................................65

    2.    Labor/OPEB Mediation .............................................................................65

    3.    Other Mediation ........................................................................................66

F.    Postpetition Financing ............................................................................................66

    1.    Purpose .....................................................................................................66

G.    Claims Process and Establishment of Bar Dates ......................................................67

    1.    Section 924/925 Lists ...............................................................................67

    2.    Bar Date Order ..........................................................................................67

    3.    ADR Procedures .......................................................................................67

H.    Chapter 9 Stay Matters ...........................................................................................69

    1.    Generally ..................................................................................................69

    2.    Challenges to PA 436 (Phillips) .................................................................69

# TABLE OF CONTENTS
(continued)

| | | | Page |
|---|---|---|---|
| I. | | Fee Matters | 69 |
| J. | | Operational Restructuring Initiatives/Asset Dispositions | 70 |
| | 1. | DWSD Transaction | 70 |
| | 2. | Modification of Retiree Benefits/Healthcare Redesign | 70 |
| | 3. | Transition of Lighting Grid to DTE | 73 |
| | 4. | Transition of Lighting Work to PLA | 73 |
| | 5. | Land/Blight Initiatives | 74 |
| | 6. | Belle Isle Lease | 74 |
| | 7. | Detroit Institute of Arts | 75 |
| | 8. | Joe Louis Arena | 76 |
| | 9. | Sale of Veterans' Memorial Building | 76 |
| | 10. | Coleman A. Young Airport | 77 |
| V. THE PLAN | | | 77 |
| A. | | General | 77 |
| B. | | Classification and Treatment of Claims | 77 |
| | 1. | Unclassified Claims | 77 |
| | 2. | Classified Claims | 78 |
| C. | | Treatment of Executory Contracts and Unexpired Leases | 86 |
| | 1. | Assumption | 86 |
| | 2. | Assumption of Ancillary Agreements | 86 |
| | 3. | Approval of Assumptions and Assignments | 87 |
| | 4. | Payments Related to the Assumption of Executory Contracts and Unexpired Leases | 87 |
| | 5. | Contracts and Leases Entered Into After the Petition Date | 87 |
| | 6. | Rejection of Executory Contracts and Unexpired Leases | 87 |
| | 7. | Rejection Damages Bar Date | 88 |
| | 8. | Preexisting Obligations to the City Under Rejected Executory Contracts and Unexpired Leases | 88 |
| | 9. | Insurance Policies | 88 |
| D. | | Effectiveness of the Plan | 88 |
| | 1. | Conditions Precedent to the Effective Date | 88 |
| | 2. | Waiver of Conditions to the Effective Date | 89 |
| | 3. | Effect of Nonoccurrence of the Effective Date | 89 |
| | 4. | Request for Waiver of Automatic Stay of Confirmation Order | 89 |
| E. | | Effects of Confirmation | 89 |
| | 1. | Binding Effect | 89 |
| | 2. | Dissolution of Official Committees | 90 |

# TABLE OF CONTENTS
(continued)

|   |   |   |   |
|---|---|---|---|
| | 3. | Preservation of Rights of Action by the City | 90 |
| | 4. | Comprehensive Settlement of Claims and Controversies | 90 |
| | 5. | Discharge of Claims | 90 |
| | 6. | Injunction. | 91 |
| | 7. | Exculpation | 91 |
| | 8. | Releases | 92 |
| F. | | Retention of Jurisdiction by the Bankruptcy Court | 92 |

**VI. MEANS OF IMPLEMENTATION OF THE PLAN** ... 93

| | | | |
|---|---|---|---|
| A. | | The New Notes | 93 |
| | 1. | The New B Notes | 93 |
| | 2. | The New C Notes | 93 |
| B. | | Alternatives Related to DWSD | 94 |
| | 1. | DWSD Remains a Department of the City | 94 |
| | 2. | Potential DWSD Transaction | 96 |
| C. | | The Plan COP Settlement | 97 |
| D. | | The Plan PFRS Settlement | 97 |
| E. | | The Plan GRS Settlement | 97 |
| F. | | The OPEB Claims Note | 98 |
| G. | | The DIA Settlement | 98 |
| | 1. | Funding Contributions | 98 |
| | 2. | Transfer of DIA Assets | 98 |
| | 3. | Conditions to the Foundations' Participation | 98 |
| H. | | Issuance of the New Securities | 99 |
| I. | | Cancellation of Existing Bonds and Bond Documents | 99 |
| J. | | Release of Liens | 99 |
| K. | | Professional Fee Reserve | 99 |
| L. | | Assumption of Indemnification Obligations | 99 |
| M. | | Incorporation of Retiree Health Care Settlement | 100 |
| N. | | Exit Facility | 100 |
| O. | | Provisions Regarding Distributions Under the Plan | 100 |
| | 1. | Appointment of Disbursing Agent | 100 |
| | 2. | Distributions on Account of Allowed Claims | 100 |
| | 3. | Certain Claims to Be Expunged | 100 |
| | 4. | Record Date for Distributions; Exception for Bond Claims | 100 |
| | 5. | Means of Cash Payments | 101 |

6. Selection of Distribution Dates for Allowed Claims ...................................... 101

7. Limitations on Amounts to Be Distributed to Holders of Allowed Claims Otherwise Insured ................................................................................................ 101

8. City's Rights of Setoff Preserved .................................................................. 101

9. Delivery of Distributions and Undeliverable or Unclaimed Distributions. .......... 101

10. Other Provisions Applicable to Distributions in All Classes ......................... 102

P. Procedures for Resolving Disputed Claims ............................................................ 103

1. Treatment of Disputed Claims .................................................................... 103

2. Disputed Claims Reserve ............................................................................ 104

3. Objections to Claims .................................................................................. 104

VII. VOTING REQUIREMENTS ........................................................................................ 105

A. Voting Deadline ................................................................................................... 106

B. Holders of Claims Entitled to Vote ...................................................................... 106

C. Vote Required for Acceptance by a Class .............................................................. 106

D. Voting Procedures ................................................................................................ 107

1. Ballots ....................................................................................................... 107

2. Beneficial Owners of Old Securities ........................................................... 107

3. Brokerage Firms, Banks and Other Nominees ............................................. 108

4. Withdrawal or Change of Votes on the Plan ................................................ 108

5. Voting Multiple Claims .............................................................................. 108

6. Voting Transferred Claims .......................................................................... 109

VIII. CONFIRMATION OF THE PLAN .............................................................................. 109

A. Confirmation Hearing .......................................................................................... 109

B. Deadline to Object to Confirmation ...................................................................... 109

C. Requirements for Confirmation of the Plan ........................................................... 109

1. Acceptance or Cramdown ........................................................................... 110

2. Alternatives to Confirmation and Consummation of the Plan ....................... 113

IX. REINVESTMENT INITIATIVES ................................................................................... 114

A. Public Safety ........................................................................................................ 114

1. Police ......................................................................................................... 114

2. Fire/EMS .................................................................................................... 115

B. Blight Removal ..................................................................................................... 115

C. Information Systems Upgrades .............................................................................. 115

D. DDOT ................................................................................................................... 116

E. Labor Costs & Terms and Conditions ................................................................... 117

X. REVENUE ADJUSTMENTS AND TAX REFORM ........................................................ 118

-v-

A. Expansion of the Tax Base ....................................................................................... 118

B. Rationalization of Nominal Tax Rates ...................................................................... 118

C. Increasing Collection Rates ..................................................................................... 119

XI. PROJECTED FINANCIAL INFORMATION ................................................................. 120

A. Projections .............................................................................................................. 120

1. Assumptions ................................................................................................. 121

XII. CERTAIN RISK FACTORS TO BE CONSIDERED ..................................................... 123

A. Non-Confirmation of the Plan ................................................................................. 123

B. Nonconsensual Confirmation .................................................................................. 123

C. Inability to Confirm Plan Prior to Potential Removal of Emergency Manager ...................... 124

D. Conditions to Effectiveness of the Plan ................................................................... 124

E. Non-Occurrence of DIA Settlement or Non-Receipt of the Full Amount of the DIA Proceeds, the State GRS Consideration or the State PFRS Consideration ........................ 124

F. Failure to Secure Exit Facility ................................................................................. 124

G. Inability to Raise Tax Revenue ................................................................................ 124

H. Failure to Achieve Projected Financial Performance ............................................... 124

I. Unforeseen Financial Circumstances Affecting the City's Future Financial Performance ............ 125

J. Litigation if Unlimited Tax General Obligation Bonds Are Impaired ......................... 125

K. Other Litigation ....................................................................................................... 125

L. City Credit May be Viewed Negatively By The Market ............................................ 125

M. Population Loss ........................................................................................................ 125

N. The City Has No Duty to Update ............................................................................. 125

O. No Representations Outside This Disclosure Statement Are Authorized .................. 126

P. Nature and Amount of Allowed Claims .................................................................... 126

XIII. FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN .................. 126

A. Exchange of Property Differing Materially in Kind or Extent, Generally ................. 127

B. Treatment of Claim Holders Receiving Distributions Under the Plan ....................... 127

1. Holders Whose Existing Bonds or Other Debt Obligations Will Be Exchanged for Property Including New Securities ................................................ 127

2. PFRS Claims and GRS Claims .................................................................... 129

C. Certain Other Tax Considerations for Holders of Claims ......................................... 129

1. Accrued but Unpaid Interest ........................................................................ 129

2. Post-Effective Date Distributions ................................................................ 129

3. Bad Debt and/or Worthless Securities Deduction ........................................ 130

4. Information Reporting and Backup Withholding .......................................... 130

5. Importance of Obtaining Professional Tax Assistance .................................. 130

XIV. APPLICABILITY OF CERTAIN FEDERAL AND STATE SECURITIES LAWS ................................................. 130

    A.     General ............................................................................................................................. 130

           1.     Registration Of Securities ............................................................................... 130

           2.     Market Disclosure ............................................................................... 131

XV. ADDITIONAL INFORMATION .................................................................................................................... 132

XVI. RECOMMENDATION AND CONCLUSION ............................................................................................... 132

## TABLE OF EXHIBITS

**Exhibit A:**     Plan for the Adjustment of Debts of the City of Detroit

**Exhibit B:**     DWSD Sewer Bonds & DWSD Revolving Sewer Bonds

**Exhibit C:**     DWSD Water Bonds & DWSD Revolving Water Bonds

**Exhibit D:**     Unlimited Tax General Obligation Bonds

**Exhibit E:**     Limited Tax General Obligation Bonds

**Exhibit F:**     Prepetition Steady State Projection of Legacy Expenditures

**Exhibit G:**     Prepetition Fiscal Year 2014 Forecasted Cash Flow

**Exhibit H:**     Prepetition Projected Revenues, Expenditures, Operating Surpluses, Legacy Obligations & Deficits Through Fiscal Year 2017

**Exhibit I:**     Ten-Year Plan of Adjustment Restructuring and Reinvestment Initiatives

**Exhibit J:**     Ten-Year Financial Projections

# INDEX OF DEFINED TERMS

1983 Claims ................................................. 69
2005 COPs ................................................. 30
2005 Funding Trust ..................................... 31
2005 Service Contracts ............................... 31
2006 COPs ................................................. 31
2006 Funding Trust ..................................... 30
2013 Financial Review Team Report ............ 55
2014 Retiree Health Care Plan .................... 71
36th Judicial District ................................. 37
ACO ........................................................... 21
Act 392 Bonds ........................................... 72
Actuary Application ................................... 60
ADR Procedures Order .............................. 69
ADR Procedures ........................................ 66
ADR Procedures Motion ............................ 67
Affordable Care Act ................................... 71
AFSCME .................................................... 60
Allowed Pension Claims .............................. 6
Ambac ....................................................... 29
Amended List of Creditors ........................ 28
American Roads ......................................... 27
Annuity Savings Plan ................................ 33
Appointment Order .................................... 59
Appraised Art ............................................ 75
APS ........................................................... 22
Asset Transfer ........................................... 26
Assured ..................................................... 28
Automobile Parking Fund .......................... 22
Balloting Agent ........................................... 3
Bankruptcy Code ............................. preamble
Bankruptcy Court ............................ preamble
Bankruptcy Rules ............................ preamble
Bar Date Order .......................................... 67
Belle Isle Agreement ................................. 74
Bench Decision ......................................... 61
Berkshire Hathaway .................................. 28
Brooks Wilkins .......................................... 60
BSEED ...................................................... 52
C&F Agreement ......................................... 72
Case Evaluation ........................................ 67
Casino Revenue Proceeding ..................... 63
Casino Revenue Stay Order ...................... 64
Casino Revenues ...................................... 32
CBAs ......................................................... 36
Certification Order ..................................... 62
CETs .......................................................... 44
Chapter 9 Stay .......................................... 58
Christie's ................................................... 26
City ................................................. preamble
City Charter ............................................... 19
Collateral Agreement ................................. 32
Confirmation Hearing .................................. 3
Confirmation Hearing Notice ....................... 2
Consent Agreement ................................... 53

COPs .......................................................... 31
CRT ............................................................ 93
CWA ........................................................... 21
DDA ........................................................... 28
DDOT ......................................................... 22
Dentons ..................................................... 60
Designated Claims ..................................... 67
Detroit .............................................. preamble
DFD ........................................................... 35
DFFA .......................................................... 35
DIA ............................................................... 4
DIA Collection ........................................... 26
DIA Corp. ................................................... 26
Disclosure Statement ...................... preamble
Disclosure Statement Order ........................ 3
Disk ............................................................. 2
Disputed Claims Reserve ......................... 104
District Court ............................................. 21
Document Website ....................................... 2
DPD ........................................................... 35
DPOA ........................................................ 35
DRCEA ....................................................... 62
DTE ........................................................... 47
DWSD ........................................................ 21
DWSD Revolving Bonds ............................ 28
DWSD Sewer Bonds .................................. 28
DWSD Transaction .................................... 70
DWSD Water Bonds .................................. 29
Eligibility ................................................... 61
Eligibility Order ......................................... 61
Eligibility Proceedings .............................. 61
Eligibility Trial ........................................... 61
Emergency Manager .................................. 56
EMS ........................................................... 50
Enterprise Funds ....................................... 20
EPA ............................................................ 21
EVIP ........................................................... 29
Excess Allocations ...................................... 7
FAB ............................................................ 53
FBI ............................................................. 34
Fee Examiner ............................................ 70
Fee Review Order ...................................... 60
FGIC .......................................................... 28
Final Report .............................................. 75
Financial and Operating Plan .................... 56
Financial Review Team .............................. 52
Financing Motion ...................................... 66
First Retiree Proceeding ............................ 71
Fitch .......................................................... 44
Flowers Plaintiffs ...................................... 58
FMV ........................................................... 75
Forbearance Period ................................... 63
FOTA ......................................................... 62
Foundation Funds ..................................... 76

# INDEX OF DEFINED TERMS

Foundations .................................................. 76
FSA ........................................................... 71
Funding Trusts ............................................ 31
General Bar Date .......................................... 67
General Fund ............................................... 20
General Obligation Bonds ............................ 29
General Receipts Account ............................. 32
GLWA ....................................................... 70
Governor .................................................... 44
GRS ........................................................... 32
GRS Trustees .............................................. 33
GSTR ......................................................... 93
Health & Wellness Department .................. 121
Health/Life Benefit Plan ............................. 35
Holdback Account ....................................... 32
Home Rule City Act .................................... 19
HUD .......................................................... 49
IG/AG Report ............................................. 33
Ingham County Court .................................. 58
Injunction Orders ........................................ 58
IPH .......................................................... 121
IRC .......................................................... 126
IRS .......................................................... 126
IT ............................................................. 51
Judge Perris ................................................ 64
Judge Rosen ................................................ 64
Judicature Act ............................................. 37
June 14 Creditor Proposal ........................... 56
Lazard ........................................................ 60
LEFALB ..................................................... 20
Legislature .................................................. 25
Limited Tax General Obligation Bonds ........ 29
List of Claims ............................................. 28
LTGO Litigation ......................................... 30
MCR .......................................................... 37
MDEQ ....................................................... 21
Mediation Order ......................................... 65
Michigan Constitution ................................... 4
Monthly Invoices ........................................ 70
Moore Declaration ...................................... 34
Most Valuable Works .................................. 75
Motion to Withdraw .................................... 61
MPD .......................................................... 22
MTA .......................................................... 67
Municipal Finance Act ................................ 31
NAACP Lawsuit .......................................... 69
NAACP Plaintiffs ........................................ 69
New Debt Securities .................................. 128
New JLA Sublease ....................................... 76
New York Bankruptcy Court ........................ 27
NPDES ....................................................... 21
NPFGC ....................................................... 28
Objection .................................................... 61
OID .......................................................... 129
Old Securities ........................................... 107
Olympia ..................................................... 27
OPEB ......................................................... 35
OPEB Plans ................................................ 35
Optional Termination Payment ..................... 63

Optional Termination Right .......................... 63
Order Appointing Fee Examiner .................... 60
Order for Relief ........................................... 61
Original JLA Lease ....................................... 27
Original List of Creditors ............................. 28
PA 100 ....................................................... 24
PA 392 ....................................................... 72
PA 4 ........................................................... 52
PA 436 ....................................................... 20
PA 436 Challenge Stay Order ........................ 69
PA 59 ......................................................... 25
PA 72 ......................................................... 55
Parking Bonds ............................................ 29
Pensions Clause ............................................ 4
Petition Date ................................................. 9
PFRS .......................................................... 32
Phillips Lawsuit ........................................... 69
Phillips Plaintiffs ......................................... 69
Phillips Stay Relief Motion ........................... 69
PLA ........................................................... 24
PLA Bonds .................................................. 43
PLA Order ................................................... 72
Plan .................................................... preamble
Plan Injunction ........................................... 68
Plan Supplement Documents ................. preamble
PLD ........................................................... 47
Pledged Revenues ....................................... 72
Postpetition Financing ................................. 67
Preliminary Report ...................................... 75
Professionals .............................................. 70
Projections ............................................... 120
Purchaser .................................................... 66
PVB ........................................................... 22
Quality of Life Loan .................................... 66
RDPFFA ..................................................... 62
RDPMA ...................................................... 62
Recent Debt Issuances ................................. 44
Red Wings .................................................. 27
Retiree Committee ....................................... 59
Retiree Representatives ................................ 71
Retirees ...................................................... 59
Retirement Systems ....................................... 4
Revenue Bond Act ....................................... 28
Revenue Bonds ........................................... 28
Revenue Hurdle ........................................... 93
RTA ......................................................... 116
Rule ......................................................... 131
S&P ........................................................... 44
SBS ........................................................... 31
SEC .................................................... preamble
Second Retiree Proceeding ........................... 72
SEIU .......................................................... 66
Service Contracts ........................................ 31
Service Corporations ................................... 30
Sewage Disposal Fund ................................. 31
Sixth Circuit ............................................... 62
Solicitation Package ...................................... 2
State ............................................................ 4
State Treasurer ............................................ 53

Stay Relief Motion ................................................ 68
Supplemental Plan ............................................... 35
Swap Contracts .................................................... 31
Swap Counterparties ............................................ 31
Swap Insurers ..................................................... 31
Swap Settlement Motion ....................................... 63
Swap Settlement Proceeding .................................. 64
Swap Termination Loan ........................................ 66
Syncora ............................................................ 27
Syncora Settlement Objection ................................ 64
Third Mediation Order ......................................... 65
Transferred Art ................................................... 26
Transportation Fund ............................................ 22
Treasury ........................................................... 25
Trust Agreement .................................................. 72
Trustee ............................................................. 72
Tunnel Lease ...................................................... 27
U.S. Bank .......................................................... 31
U.S. Trustee ....................................................... 59
UAAL ................................................................ 5
UAW ................................................................ 60
Unlimited Tax General Obligation Bonds .............. 29
UTGO Litigation ................................................. 29
Voting Deadline ........................................... preamble
Water Fund ........................................................ 21

# I.

# INTRODUCTION

The City, as the debtor in the above-captioned chapter 9 case pending before the United States Bankruptcy Court, has prepared this Disclosure Statement to solicit votes of creditors to accept the Plan proposed by the City. A copy of the Plan is attached as <u>Exhibit A</u> to this Disclosure Statement.

This Disclosure Statement contains information regarding the City's prepetition operating and financial history, significant events leading up to the commencement of the City's chapter 9 case, significant events that have occurred during the City's chapter 9 case and the restructuring transactions that will take place if the Plan is confirmed and becomes effective. This Disclosure Statement also describes the terms and conditions of the Plan, including certain effects of Confirmation of the Plan, certain risk factors (including those associated with securities to be issued under the Plan) and the manner in which Distributions will be made under the Plan. In addition, this Disclosure Statement describes the Plan Confirmation process and the voting procedures that Holders of Claims entitled to vote on the Plan must follow for their votes to be counted.

On **[_____]**, 2014, the Bankruptcy Court entered an order approving this Disclosure Statement as containing "adequate information," *i.e.*, information of a kind and in sufficient detail to enable a hypothetical reasonable investor typical of the Holders of Claims to make an informed judgment about the Plan. THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT CONSTITUTES NEITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN NOR AN ENDORSEMENT OF THE MERITS OF THE PLAN BY THE BANKRUPTCY COURT.

## A.    Parties Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all creditors are entitled to vote on a chapter 9 plan. Creditors whose Claims are not impaired by a plan are deemed to accept the plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote. In addition, creditors whose claims are impaired by a plan and who will receive no distribution under such plan also are not entitled to vote because they are deemed to have rejected the plan under section 1126(g) of the Bankruptcy Code. For a discussion of these matters, see Section VII, "Voting Requirements" and Section VIII, "Confirmation of the Plan."

The following sets forth which Classes are entitled to vote on the Plan and which are not:

- The City is not seeking votes from the Holders of Claims in Classes 2A (Secured GO Series 2010 Claims), 2B (Secured GO Series 2010(A) Claims), 2C (Secured GO Series 2012(A2) Claims), 2D (Secured GO Series 2012(A2-B), 2E (Secured GO Series 2012(B) Claims), 2F (Secured GO Series 2012(B2) Claims), 3 (Other Secured Claims), 4 (HUD Installment Notes Claims) and 6 (Parking Bond Claims) because the City believes those claims are not impaired by the Plan. Pursuant to section 1126(f) of the Bankruptcy Code, Holders of these Claims are conclusively presumed to have accepted the Plan. Accordingly, Holders of Claims in classes 2A, 2B, 2C, 2D, 2E, 2F, 3, 4 and 6 will not have the right to vote with respect to the Plan.

- Holders of Claims in Class 15 (Subordinated Claims) will be impaired under the Plan. Because the City does not anticipate that such Holders will receive any Distributions pursuant to the Plan, and consistent with the language of section 1126(g) of the Bankruptcy Code, each Holder of a Claim in Class 15 will be deemed to have rejected the Plan. Accordingly, Holders of Class 15 Claims will not have the right to vote with respect to the Plan.

- The City is seeking votes from the Holders of Allowed Claims in Class 1A (DWSD Class A Water Claims), Class 1B (DWSD Class B Water Claims), Class 1C (DWSD Class A Sewer Claims), Class 1D (DWSD Class B Sewer Claims), Class 1E (DWSD Revolving Sewer Bonds Claims), Class 1F (DWSD Revolving Water Bonds Claims, Class 7 (Limited Tax General Obligation Bond Claims), Class 8 (Unlimited Tax General Obligation Bond Claims), Class 9 (COP Claims), Class 10 (PFRS Claims), Class 11 (GRS Claims), Class 12 (Downtown Development Authority Claims), Class 13 (Other Unsecured Claims) and Class 14 (Convenience Claims) because those Claims are impaired under the Plan, and the Holders of Allowed Claims in such Classes are receiving a distribution under the Plan on account

-1-

13-53846-swr   Doc 2709   Filed 02/21/14   Entered 02/21/14 20:59:30   Page 15 of 440
13-53846-tjt   Doc 8709   Filed 12/16/14   Entered 12/16/14 10:57:23   Page 15 of 440

of such Allowed Claims.  The Holders of such Claims will have the right to vote to accept or reject the Plan.

- The treatment of Claims in Class 5 (Cop Swap Claims) is to be determined.

- **IF YOU ARE RETIRED FROM THE CITY OF DETROIT AND ARE RECEIVING A PENSION, OR ARE AN ACTIVE EMPLOYEE ENTITLED TO A PENSION UPON YOUR RETIREMENT, OR ARE RECEIVING RETIREE HEALTH BENEFITS FROM THE CITY, YOU ARE A HOLDER OF EITHER A CLASS 10 OR CLASS 11 CLAIM AND YOU ARE ENTITLED TO VOTE ON THIS PLAN OF ADJUSTMENT.**

For a detailed description of the Classes of Claims and their treatment under the Plan, see Section II, "Summary of Classification and Treatment of Claims Under the Plan."

## B.    Solicitation Package

The package of materials (the "Solicitation Package") to be sent to Holders of Claims entitled to vote on the Plan will contain:

1. A cover letter describing:  (a) the contents of the Solicitation Package; (b) the contents of any enclosed CD or DVD (a "Disk") and instructions for use of the Disk; and (c) information about how to obtain, at no charge, paper copies of any materials provided on the Disk.

2. A paper copy of the notice of the Confirmation Hearing (the "Confirmation Hearing Notice").

3. For retirees, a notice providing a clear, concise summary of (a) the process for obtaining approval of the Plan; (b) the likely effect of the Plan on retiree pension and other post-employment benefits; and (c) instructions on how to vote on the Plan.

4. The Disclosure Statement together with the exhibits thereto, including the Plan, that have been Filed with the Bankruptcy Court before the date of the mailing.  This Disclosure Statement and the Plan, including exhibits, total well over 400 pages in length.   To reduce the costs of printing and mailing such a voluminous document, the City may, but is not required to, serve the Disclosure Statement and the Plan (including exhibits) via Disk instead of in printed format.  In addition to the service procedures outlined above (and to accommodate creditors who wish to review exhibits not included in the Solicitation Packages in the event of paper service):  (a) the Plan, the Disclosure Statement and, once they are filed, all exhibits to both documents will be made available at no charge via the internet at *http://www.kccllc.net/detroit* (the "Document Website"); and (b) the City will provide parties in interest (at no charge) with paper copies of the Plan and/or Disclosure Statement upon written request.

5. A letter from the City recommending that creditors vote to accept the Plan.

6. For Holders of Claims in voting Classes, an appropriate form of Ballot, instructions on how to complete the Ballot and a Ballot return envelope and such other materials as the Bankruptcy Court may direct (Ballots are provided only to Holders of Claims in Class 1A (DWSD Class A Water Claims), Class 1B (DWSD Class B Water Claims), Class 1C (DWSD Class A Sewer Claims), Class 1D (DWSD Class B Sewer Claims), Class 1E (DWSD Revolving Sewer Bonds Claims), Class 1F (DWSD Revolving Water Bonds Claims, Class 7 (Limited Tax General Obligation Bond Claims), Class 8 (Unlimited Tax General Obligation Bond Claims), Class 9 (COP Claims), Class 10 (PFRS Claims), Class 11 (GRS Claims), Class 12 (Downtown Development Authority Claims), Class 13 (Other Unsecured Claims) and Class 14 (Convenience Claims), *i.e.*, the Classes of Claims that are entitled to vote on the Plan). For Retiree Creditors, paper worksheets that may be used to calculate the pension benefits that will be provided under the Plan and under a settlement with the City and the State that Holders of Pension Claims may elect under the Plan.

## C. Voting Procedures, Ballots and Voting Deadline

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan.

After carefully reviewing: (1) the Plan; (2) this Disclosure Statement; (3) the order entered by the Bankruptcy Court (Docket No. [__]) (the "Disclosure Statement Order") that, among other things, established procedures for voting on the Plan, scheduled a hearing to consider Confirmation of the Plan (the "Confirmation Hearing") and set the Voting Deadline and the deadline for objecting to Confirmation of the Plan; and (4) the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan. For your vote to be counted, you must complete and sign your original Ballot (copies will not be accepted) and return it so that it is actually received at either of the addresses set forth below by the Voting Deadline.

Each Ballot has been coded to reflect the Class of Claims it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement. To be counted, all Ballots must be properly completed in accordance with the voting instructions on the Ballot and received no later than the Voting Deadline (i.e., [_____], 2014 at 5:00 p.m. (Eastern Time)) via regular mail, overnight courier or personal delivery at the following address: City of Detroit Ballot Processing Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245. Ballots may not be submitted by facsimile or electronic mail, and any Ballots submitted by facsimile or electronic mail will not be accepted or counted. Ballots sent to any other address will not be counted.

If you are a Holder of a Claim who is entitled to vote on the Plan as set forth in the Disclosure Statement Order and did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the Disclosure Statement, the Plan, the Ballot or the procedures for voting on the Plan, please contact Kurtzman Carson Consultants LLC (the "Balloting Agent"): (1) by telephone (a) for U.S. and Canadian callers toll-free at 877-298-6236 and (b) for international callers at +1 310-751-2658; or (2) in writing at City of Detroit c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245.

FOR FURTHER INFORMATION AND INSTRUCTIONS ON VOTING TO ACCEPT OR REJECT THE PLAN, SEE SECTION VII, "VOTING REQUIREMENTS."

Before voting on the Plan, each creditor should read this Disclosure Statement, the Plan, the Disclosure Statement Order, the Confirmation Hearing Notice and the instructions accompanying the Ballots. These documents contain important information concerning how Claims are classified for voting purposes and how votes will be tabulated.

## D. Plan Supplement Documents

The City will separately file copies of all Plan Supplement Documents with the Bankruptcy Court prior to the Confirmation Hearing; provided, however, that (1) exhibits relating to the assumption and rejection of Executory Contracts and Unexpired Leases pursuant to the Plan will be filed no later than seven calendar days prior to the Voting Deadline and (2) other key exhibits to the Plan (as detailed in the definition of Plan Supplement Documents in the Plan) will be either (a) included in any solicitation materials distributed to Holders of Claims in Classes entitled to vote to accept or reject the Plan or (b) Filed as a supplement to the Plan no later than seven calendar days prior to the Voting Deadline. All Plan Supplement Documents will be made available on the Document Website once they are Filed. The City reserves the right to modify, amend, supplement, restate or withdraw any of the Plan Supplement Documents after they are Filed and shall promptly make such changes available on the Document Website.

## E. Confirmation Hearing and Deadline for Objections to Confirmation

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on whether the City has fulfilled the confirmation requirements of sections 943 and 1129 of the Bankruptcy Code. The Confirmation Hearing has been scheduled for [_____], 2014 at [____], Eastern Time, before the Honorable Steven W. Rhodes, United States Bankruptcy Judge for the Eastern District of Michigan, in **[courtroom and address]**. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

Any objection to Confirmation must (1) be in writing, (2) state the name and address of the objecting party and the nature of the Claim of such party and (3) state with particularity the basis and nature of such objection. Any such

-3-

13-53846-swr   Doc 2709   Filed 02/21/14   Entered 02/21/14 00:53:30   Page 17 of 440
13-53846-swr   Doc 8709   Filed 12/16/14   Entered 12/16/14 00:57:23   Page 17 of 440

objections must be Filed and served upon the persons designated in the Confirmation Hearing Notice in the manner and by the deadline described therein.

## II.

## SUMMARY OF CLASSIFICATION
## AND TREATMENT OF CLAIMS UNDER THE PLAN

*The following Plan summary is a general overview only, which is qualified in its entirety by, and should be read in conjunction with, the more detailed information appearing elsewhere in this Disclosure Statement and the Plan.*

A.      **Overview**

1.      **Introduction to the Plan**

The Plan provides for the resolution of a variety of complex financial and operational issues faced by the City. The adjustment of the City's debts pursuant to the Plan will provide the greatest recovery for creditors of the City, while simultaneously allowing for meaningful and necessary investment in the City. The Plan contemplates the City's emergence from chapter 9 this year and represents a crucial step toward the City's rehabilitation and recovery from a decades-long downward spiral.

The Plan includes settlements that will inure to the benefit of the City's creditors and its residents. The City settled controversial and sensitive issues relating to the Detroit Institute of Arts (the "DIA"), which settlement is expected to yield at least $465 million to provide a source of recovery for the approximately 33,000 individuals who participate in the City's retirement systems – the General Retirement System and the Police and Fire Retirement System (together, the "Retirement Systems") – and negotiated a settlement with the State of Michigan (the "State") that Holders of Pension Claims may, in certain circumstances, elect to accept.

Except in the case of subordinated Claims, the Plan provides a recovery to all classes of Claims. The Plan also allows for critical and meaningful investment in the City of approximately $1.5 billion over ten years in order to, among other things: (1) provide (and improve) basic, essential services to City residents; (2) attract new residents and businesses to foster growth and redevelopment; (3) reduce crime; (4) demolish blighted and dangerous properties; (5) provide functional streetlights that are aligned with the current population footprint; (6) improve information technology systems, thereby increasing efficiency and decreasing costs; and (7) otherwise set the City on a path toward a better future.

The City believes that the Plan gives the City the best chance of effectively adjusting its debts and reestablishing itself as a prosperous and productive American city. All creditors entitled to vote are encouraged to vote in favor of the Plan.

2.      **Special Information Regarding Pension Claims**

THE PLAN, AND THE TREATMENT OF ALLOWED PENSION CLAIMS IN THE PLAN, ASSUME THE EXISTENCE AND THE IMPLEMENTATION OF THE DIA SETTLEMENT AND THE RECEIPT OF THE FULL AMOUNTS OF THE STATE GRS CONSIDERATION AND THE STATE PFRS CONSIDERATION. IF THE DIA SETTLEMENT DOES NOT, IN FACT, OCCUR, OR IF THE FULL AMOUNTS OF THE STATE GRS CONSIDERATION AND THE STATE PFRS CONSIDERATION ARE NOT, IN FACT, RECEIVED, THEN THE TREATMENT OF ALLOWED PENSION CLAIMS IN CLASSES 10 AND 11 WILL BE MATERIALLY WORSE THAN (AND COMMENSURATELY REDUCED BELOW) THE TREATMENT PROVIDED FOR IN THE PLAN. THE TREATMENT OF ALLOWED CLAIMS IN CLASSES 10 AND 11, AND THE SOURCES OF FUNDING FOR SUCH TREATMENT, ARE DISCUSSED BELOW.

In connection with the Bankruptcy Court's determination that the City is eligible to be a debtor under chapter 9 of the Bankruptcy Code, numerous City retirees, employees, their representatives and other parties, including the Attorney General of the State of Michigan, advanced the argument that the Bankruptcy Court may not impair pension benefits because they are protected under Article IX, Section 24 (the "Pensions Clause") of Michigan's State Constitution of 1963 (the "Michigan Constitution"). As more fully described in Section IV.C, however, on December 3, 2013, the Bankruptcy Court ruled that the federal Bankruptcy Code authorizes the City to impair its pension obligations, notwithstanding the Pensions Clause. Several objectors have appealed that ruling.

The Plan provides that, on the Effective Date, the City will assume the obligations related to the already accrued benefits under the GRS pension plan and the PFRS pension plan *as those benefits will have been modified in the Plan*. This means that the City will not seek to terminate the GRS or the PFRS. The City will continue to retain the responsibility to fund all amounts necessary to provide the adjusted (reduced) pension benefits to its employees and retirees who will have accrued benefits in either of the GRS or PFRS pension plans as of the Effective Date, although the City's contributions will be fixed during the period ending June 30, 2023. Thereafter, the City will be required to contribute all amounts necessary to fund the modified accrued pensions regardless of the actual future investment performance of the pension plan assets.

In the past, the Retirement Systems engaged in a variety of practices that contributed considerably to the underfunding of the pension plans, particularly with respect to the GRS pension plan. As more fully discussed in Section III.B.5, these practices included: (a) consuming pension fund assets to pay promised returns under the separate "annuity savings plan," (b) dissipating pension fund assets during the years when returns on investment exceeded expectations through the so-called "13th check" program, (c) deferring required pension fund contributions from the City each year and financing the deferred amounts at a rate of 8%. Serious allegations also have been made that various former officials of the Retirement Systems accepted bribes and/or misappropriated assets of the Retirement Systems for their own personal gain. In addition, the Retirement Systems have made many poor investments that have reduced the funded status of the two pension plans. Finally, it appears that a large portion of the assets of the respective Retirement Systems is invested in alternative investments for which no recognized market valuation exists. As of June 30, 2013, approximately 24% of PFRS assets and 33% of GRS assets had estimated, rather than readily ascertainable, market values.

As a result of, among other things, these past practices, each of the GRS and the PFRS the underfunded. Each of the Retirement Systems has reported unfunded actuarial accrued liabilities ("UAAL") that are substantially lower than the amounts disclosed by the City in the List of Claims. In particular, as of June 30, 2012, the GRS reported that it was 77.0% funded with a UAAL of $837.7 million out of $3.644 billion in accrued liabilities. As of June 30, 2012, the PFRS reported that it was 96.2% funded with a UAAL of $147.2 million out of $3.823 billion in accrued liabilities. Thus, based on actuarial assumptions and methods employed by the Retirement Systems prior to the commencement of the chapter 9 case, the estimated UAAL as of the end of Fiscal Year 2012 for both Retirement Systems combined was $984.9 million.

The City believes that the UAAL figures reported by the Retirement Systems were substantially understated because they were based upon various actuarial assumptions and methods that served to substantially understate the Retirement Systems' UAAL. The assumptions and methods included: (a) annual net rates of return on investments (GRS – 7.9%; PFRS – 8.0%) that were unrealistic in light of the Retirement Systems' demographics, the targeted mix of the Retirement Systems' assets and the inability of the City to budget for and fund pension investment loss in the event the sought-after returns were not achieved; (b) the "smoothing" (reallocation over a period of years) of asset gains and losses over a seven year period, which masks the funding shortfall; and (c) the use of 29 year (PFRS) and 30-year (GRS) amortization periods for funding UAAL – which is applied anew each year to the full amount of unfunded liability – that allows unfunded liabilities to continue to grow rapidly as a result of compounding.

In the List of Claims, the City set forth what it believes is a more realistic total UAAL for the Retirement Systems of $3.474 billion, consisting of $2.037 billion in UAAL owed to the GRS and $1.437 billion in UAAL owed to the PFRS. As set forth in the Declaration of Charles M. Moore in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (Docket No. 13), which was filed on the Petition Date, the City's actuary, Milliman Inc., calculated this UAAL figure merely by substituting the estimated market value of the Retirement Systems' assets for their actuarial value and using a more achievable assumed rate of return of 7.0% instead of the rates of return of 7.9% or 8.0% assumed by the Retirement Systems. If one were to apply even more realistic assumed rates of return of 6.25% for GRS and 6.50% for PFRS, respectively, the UAAL totals increase to $2.299 billion for the GRS, and $1.588 billion for the PFRS, as of the end of Fiscal Year 2012

To reduce the risk that the City has experienced from the past investment and discretionary benefit allowance practices of the GRS and PFRS pension funds, which contributed to the current underfunding in each of the pension funds, and to ensure that pension funding obligations do not impair the crucial Plan objective of assuring that the City will have suffcient funds to operate and to improve infrastructure and public safety, the City has developed the following pension restructuring approach: (a) the City has set a goal of achieving a 70% and 75% funded status for GRS and PFRS, respectively each pension plan by June 30, 2023 (based on the market value of assets, not a smoothed value of assets); (b) the City has determined the cash contributions it can reasonably afford to make to each pension plan during the period ending June 30, 2023; and (c) the City has utilized a conservative investment return rate for each pension plan (discussed below). Based on these parameters, which were chosen to achieve predictable pension contributions over the long term and sufficient pension funding to provide benefits as modified, and to align the City's required future cash contributions to the

plans with its reasonably projected revenues, the City has determined what pension benefit cuts are necessary from the participants in each pension plan.

Specifically, the calculation of the aggregate amount of the Allowed PFRS Claims in Class 10 utilizes, among other assumptions, a 6.50% discount rate to value liabilities and a 6.50% investment return rate for future growth of assets. This investment return rate is less than the net 8% investment return rate historically utilized by PFRS in calculating the actuarial underfunding of the PFRS pension plan. The calculation of the aggregate amount of the Allowed GRS Claims in Class 11 utilizes, among other assumptions, a 6.25% discount rate to value liabilities and a 6.25% investment return rate for future growth of assets. This investment return rate is less than the net 7.9% investment return rate historically utilized by GRS in calculating the actuarial underfunding of the GRS pension plan. In both cases, the City has utilized the lower rate as a measure to ensure that both GRS and PFRS utilize prudent and conservative investment policies going forward to protect the assets in both pension plans from unnecessary and imprudent risk of depletion to the detriment of the plan beneficiaries and also to insulate the City – given its extremely limited cash resources – from unforeseen and unbudgeted increases in required future contributions to the pension plans that could cause the City to experience budget deficits in the future. The use of these investment return assumptions is consistent with the trend by governmental entities to reduce pension funding assumptions, and the particular rates used in the Plan – although lower than most jurisdictions – nonetheless align with the unique financial inability of the City to weather unanticipated pension investment loss. These conservative assumptions are also appropriate given the large percentage of investments held by the pension funds that do not have a readily determinable market value and the uncertainty to actual asset values held by the pension plans as a result.

Based on the City's projected cash flows, as more fully discussed in Section XI and Exhibits I and J**,** there is insufficient funding generated *solely* by projected City revenues in the first 10 years after the Effective Date to provide the returns to all creditors – including Holders of GRS Pension Claims and PFRS Pension Claims – that are contemplated in the Plan. As noted above, the Plan, and the treatment of Allowed GRS Claims and Allowed PFRS Claims (together, the "Allowed Pension Claims"), assume the existence and the implementation of the DIA Settlement and the receipt of the full amounts of the State GRS Consideration and the State PFRS Consideration, all of which amounts are assumed to be paid in equal installments over 20 years. If the DIA Settlement does not occur, or if the full amounts of the State GRS Consideration and the State PFRS Consideration are not received, then the recoveries on account of all Unsecured Claims, including Pension Claims, will be materially diminished. *See* Comparison below.

Because the Plan assumes the existence of the DIA Settlment, and the State settlement funds, the Plan assumes that, through June 30, 2023, the sole sources of funding for Allowed Pension Claims in Classes 10 and 11 consist of: (a) for PFRS, $175 million from the DIA Settlement and all of the State PFRS Consideration; and (b) for GRS, amounts received on an accelerated basis from DWSD for its portion of the GRS pension plan underfunding and $50 million from the DIA Settlement. *There is no funding available to the pension funds from the City's General Fund through June 30, 2023.* Instead, any excess cash not required for City operations in this time frame will be utilized for reinvestment in City services and payments to the Holders of Allowed Unsecured Claims in Classes 7, 9, 12, 13 and 14. For the 10 years following June 30, 2023, the Plan assumes that the sources of funding for Allowed Pension Claims in Classes 10 and 11 consist of: (a) for PFRS, amounts received from the DIA Settlement and from the City's General Fund; and (b) for GRS, amounts received from the DIA Settlement and the State GRS Consideration as well as amounts from the City's General Fund. Importantly, the Plan assumes that DWSD will accelerate, or prefund, the majority of its full allocable share of the GRS UAAL such that, after the initial 10 year period through June 30, 2023 is completed and the unused DIA Settlement and State settlement moneys are received by the GRS, DWSD will have very small contributions, if any, to make to the GRS. The City believes that such prefunding is consonant with applicable state and local law that permits DWSD to be charged, and pay directly to the GRS, its allocable share of the periodic contributions required to be made to the GRS as a cost and expense of operating the City's water and sewer systems. Although DWSD will be prefunding most or all of its full allocable share of the City's GRS pension funding obligations (*i.e.*, funding the majority of such share over 10 years instead of a longer period), it will not be funding any more than its full actual, allocable share of the GRS UAAL. If DWSD can not prefund its actual allocable share to the GRS pension fund, then the cuts to GRS pension beneficiaries would have to be higher than those contemplated in the Plan.

Funding of the City's obligations to the GRS and PFRS pension plans after year 2033 will come from the City's General Fund.

**If the pension plan contribution amounts through June 30, 2023 are not approved as part of confirming the Plan, then the cuts to accrued pension benefits will be significantly greater than the cuts assumed in the Plan. See Comparison below.**

***Holders of PFRS Pension Claims and GRS Pension Claims will generally receive the following amounts:***

      **(a)**      **PFRS Pension Claim Holders**

*Retired Beneficiaries.* A Holder of a PFRS Pension Claim who is retired from the City, or disabled, or who is a surviving beneficiary and is drawing a monthly pension from PFRS will have his or her pension *reduced by an estimated 10%,* and will receive a monthly pension equal to an estimated 90% of the amount currently being received. In addition, such Holder will not receive the value of any future cost of living allowances – also known as COLA payments – to his or her monthly pension. ***If such Holder were to agree to enter into a timely settlement with the City and the State of Michigan, the reduction to such Holder's monthly pension would be reduced by an estimated 4% and such Holder would receive a monthly pension equal to an estimated 96% of the current monthly amount, with no future COLA payments.***

*Active Beneficiaries.* A Holder of a PFRS Pension Claim who is an active employee of the City and who has accrued a pension from PFRS as of July 1, 2014 will have such accrued pension frozen and then *reduced by an estimated 10%.* In addition, he or she will not receive COLA payments. ***If such Holder were to agree to enter into a timely settlement with the City and the State of Michigan, the reduction to the pension that will be earned as of July 1, 2014 will be an estimated 4%, and the Holder will receive a monthly pension at retirement equal to an estimated 96% of the amount earned as of July 1, 2014 with no COLA payments.*** Moreover, in the event the unfunded liabilities of the PFRS for the Fiscal Year ending June 30, 2014 exceed the unfunded PFRS liabilities as of June 30, 2013, active employees who are Holders of PFRS Pension Claims will have their monthly pension amounts further reduced to take account of the increase in the unfunded liabilities.

These reductions for both retired beneficiaries and active beneficiaries will remain in effect for the 10-year period ending June 30, 2023. If, during this 10-year period, the returns on PFRS' invested assets, other actuarial experience or other contributions result in an improvement to the funding level (based on the market value of assets) of PFRS so that PFRS is projected to have a funding level of more than 80% by June 30, 2023 (based on the market value of assets), modified accrued benefits reduced as described herein may be restored, but only by an amount such that, when taking into account the value of the restored benefits, PFRS will still have a projected 80% funding level.

      **(b)**      **GRS Pension Claim Holders**

*Retired Beneficiaries.* A Holder of a GRS Pension Claim who is retired from the City, or disabled, or a surviving beneficiary, and is drawing a monthly pension from GRS will have such pension *reduced by an estimated 34%,* and will receive a monthly pension equal to an estimated 66% of the amount currently being received. In addition, such Holder will lose eligibility for, and will not receive the value of, any future cost of living allowances – also known as COLA payments – to his or her monthly pension. ***If such Holder were to agree to enter into a timely settlement with the City and the State of Michigan, such Holder's monthly pension would be reduced by an estimated 26% and he or she would receive a monthly pension equal to an estimated 74% of the current monthly amount, with no future COLA payments***.

*Active Beneficiaries.* A Holder of a GRS Pension Claim who is an active employee of the City and who has accrued a pension from the GRS as of July 1, 2014, will have such accrued pension frozen and then *reduced by an estimated 34%* and will not receive COLA payments. ***If such Holder were to agree to enter into a timely settlement with the City and the State of Michigan, the reduction to the pension that will be earned as of July 1, 2014 would be 26%, and such Holder will receive a monthly pension at retirement equal to an estimated 74% of the amount earned as of July 1, 2014, with no COLA payments.*** Moreover, in the event the unfunded liabilities of the GRS for the Fiscal Year ending June 30, 2014 exceed the unfunded GRS liabilities as of June 30, 2013, active employees who are Holders of GRS Pension Claims will have their monthly pension amounts further reduced to take account of the increase in the unfunded liabilities.

Allocations to the Annuity Savings Fund Accounts over and above the actual rates of return during the period beginning January 1, 1999 and ending December 31, 2012 ("Excess Allocations") may be applied to reduce (i) Annuity Savings Fund Accounts of active employees who are Holders of GRS Pension Claims and (ii) the monthly pension amounts of current retirees who are Holders of GRS Pension Claims. *The pension reductions for GRS Pension Claim Holders described herein, however, will be lower in the event that the GRS pension plan recovers Excess Allocations to the Annuity Savings Fund.*

These reductions for both retired beneficiaries and active beneficiaries will remain in effect for the 10-year period ending June 30, 2023. If, during this 10 year period, the returns on GRS' invested assets, other actuarial experience or other contributions result in an improvement of the funding level (based on the market value of assets) of GRS so that GRS is projected to have a funding level of more than 80% by June 30, 2023 (based on the market value of assets), modified accrued benefits reduced as described herein may be restored, but only by an amount such that, when taking into account the value of the restored benefits, GRS will still have a projected 80% funding level.

**(c)     All Holders of Pension Claims**

Under the Plan, additional benefits will be provided to those Holders of PFRS Pension Claims and GRS Pension Claims who are most in need. In particular, a portion of the State PFRS Consideration and the State GRS Consideration will be attributed to the payment of pension benefits owing to Holders of PFRS Pension Claims and GRS Pension Claims who accept the settlement and have household income less than a threshold amount to be determined pursuant to further discussions between the City and the State and tied to federal poverty levels.

THE ESTIMATED PENSION REDUCTIONS DESCRIBED ABOVE ASSUME THE EXISTENCE AND THE IMPLEMENTATION OF THE DIA SETTLEMENT AND THE RECEIPT OF THE FULL AMOUNTS OF THE STATE GRS CONSIDERATION AND THE STATE PFRS CONSIDERATION AS WELL AS DWSD'S MAKING ACCELERATED PENSION CONTRIBUTIONS TO THE GRS OVER THE FISCAL PERIOD ENDING JUNE 30, 2023. IN THE EVENT THAT ANY OF THESE EVENTS DO NOT OCCUR, THE REDUCTIONS TO ACCRUED BENEFITS DESCRIBED IN THIS SECTION WILL BE MATERIALLY GREATER. See Section XII.E.

## B.    Classification and Treatment of Claims Under the Plan

Except for Administrative Claims, which are not required to be classified, all Claims that existed on July 18, 2013 (the "Petition Date") are divided into classes under the Plan.  The following summarizes the treatment of the classified Claims under the Plan.

| Description and Amount of Claims | Treatment |
| --- | --- |
| **Class 1A - DWSD Class A Water Claims (with subclasses for each DWSD Series of DWSD Class A Water Bonds)**: Consists of all Claims arising under or evidenced by the DWSD Class A Water Documents, including a Claim for principal and interest on the DWSD Class A Water Bonds.<br><br>Estimated Aggregate Allowed Amount: $322,747,372 | Impaired.  Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed DWSD Class A Water Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as reasonably practicable after the Effective Date:<br><br>If a DWSD Transaction is consummated on the Effective Date, at the option of the City, either (1) New GLWA Bonds having a principal amount equal to the principal amount of the DWSD Class A Water Bonds held by such Holder; or (2) Cash in the full amount of such Allowed DWSD Class A Water Claim.  Each Holder of an Allowed DWSD Class A Water Claim in a Class of DWSD Class A Water Claims that accepts the Plan may elect to receive New Existing Rate DWSD Bonds having a principal amount equal to the principal amount of the DWSD Class A Water Bonds held by such Holder in lieu of New GLWA Bonds.<br><br>If a DWSD Transaction is not consummated on the Effective Date, New DWSD Bonds having a principal amount equal to the principal amount of the DWSD Class A Water Bonds held by such Holder; provided, that, in lieu of the foregoing treatment, the City alternatively may elect to Reinstate any DWSD Series of DWSD Class A Water Bonds by filing a notice of such Reinstatement prior to the commencement of the Confirmation Hearing.  Each Holder of an Allowed DWSD Class A Water Claim in a Class of DWSD Class A Water Claims that accepts the Plan may elect to receive New Existing Rate DWSD Bonds having a principal amount equal to the principal amount of the DWSD Class A Water Bonds held by such Holder in lieu of New DWSD Bonds.<br><br>Estimated Percentage Recovery:  100% of principal amount |
| **Class 1B - DWSD Class B Water Claims (with subclasses for each DWSD Series of DWSD Class B Water Bonds)**: Consists of all Claims arising under or evidenced by the DWSD Class B Water Documents, including a Claim for principal and interest on the DWSD Class B Water Bonds.<br><br>Estimated Aggregate Allowed Amount: $2,168,184,217 | Impaired. Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed DWSD Class B Water Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as reasonably practicable after the Effective Date:<br><br>If a DWSD Transaction is consummated on the Effective Date, at the option of the City, either (1) New GLWA Bonds having a principal amount equal to the principal amount of the DWSD Class B Water Bonds held by such Holder; or (2) Cash in the full amount of such Allowed DWSD Class B Water Claim.  Each Holder of an Allowed DWSD Class B Water Claim in a Class of DWSD Class B Water Claims that accepts the Plan may elect to receive New Existing Rate GLWA Bonds having a principal amount equal to the principal amount of the DWSD Class B Water Bonds held by such Holder in lieu of New GLWA Bonds.<br><br>If a DWSD Transaction is not consummated on the Effective Date, New DWSD Bonds having a principal amount equal to the principal amount of the DWSD Class B Water Bonds held by such Holder; provided, that, in lieu of the foregoing treatment, the City alternatively may elect to Reinstate any DWSD Series of DWSD Class B Water Bonds by filing a notice of such Reinstatement prior to the commencement of the Confirmation Hearing.  Each Holder of an Allowed DWSD Class B Water Claim in a Class of DWSD Class B Water Claims that accepts the Plan may elect to receive New Existing Rate DWSD Bonds having a principal amount equal to the principal amount of the DWSD Class B Water Bonds held by such Holder in lieu of New DWSD Bonds.<br><br>Estimated Percentage Recovery:  100% of principal amount |

| Description and Amount of Claims | Treatment |
|---|---|
| **Class 1C - DWSD Class A Sewer Claims (with subclasses for each DWSD Series of DWSD Class A Sewer Bonds):** Consists of all Claims arising under or evidenced by the DWSD Class A Sewer Documents, including a Claim for principal and interest on the DWSD Class A Sewer Bonds.<br><br>Estimated Aggregate Allowed Amount: $439,440,528 | Impaired. Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed DWSD Class A Sewer Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as reasonably practicable after the Effective Date:<br><br>If a DWSD Transaction is consummated on the Effective Date, at the option of the City, either (1) New GLWA Bonds having a principal amount equal to the principal amount of the DWSD Class A Sewer Bonds held by such Holder; or (2) Cash in the full amount of such Allowed DWSD Class A Sewer Claim. Each Holder of an Allowed DWSD Class A Sewer Claim in a Class of DWSD Class A Sewer Claims that accepts the Plan may elect to receive New Existing Rate GLWA Bonds having a principal amount equal to the principal amount of the DWSD Class A Sewer Bonds held by such Holder in lieu of New GLWA Bonds.<br><br>If a DWSD Transaction is not consummated on the Effective Date, New DWSD Bonds having a principal amount equal to the principal amount of the DWSD Class A Sewer Bonds held by such Holder; provided, that, in lieu of the foregoing treatment, the City alternatively may elect to Reinstate any DWSD Series of DWSD Class A Sewer Bonds by filing a notice of such Reinstatement prior to the commencement of the Confirmation Hearing. Each Holder of an Allowed DWSD Class A Sewer Claim in a Class of DWSD Class A Sewer Claims that accepts the Plan may elect to receive New Existing Rate DWSD Bonds having a principal amount equal to the principal amount of the DWSD Class A Sewer Bonds held by such Holder in lieu of New DWSD Bonds.<br><br>Estimated Percentage Recovery: 100% of principal amount |
| **Class 1D - DWSD Class B Sewer Claims (with subclasses for each DWSD Series of DWSD Class B Sewer Bonds):** Consists of all Claims arising under or evidenced by the DWSD Class B Sewer Documents, including a Claim for principal and interest on the DWSD Class B Sewer Bonds.<br><br>Estimated Aggregate Allowed Amount: $2,350,667,924 | Impaired. Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed DWSD Class B Sewer Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as reasonably practicable after the Effective Date:<br><br>If a DWSD Transaction is consummated on the Effective Date, at the option of the City, either (1) New GLWA Bonds having a principal amount equal to the principal amount of the DWSD Class B Sewer Bonds held by such Holder; or (2) Cash in the full amount of such Allowed DWSD Class B Sewer Claim. Each Holder of an Allowed DWSD Class B Sewer Claim in a Class of DWSD Class B Sewer Claims that accepts the Plan may elect to receive New Existing Rate GLWA Bonds having a principal amount equal to the principal amount of the DWSD Class B Sewer Bonds held by such Holder in lieu of New GLWA Bonds.<br><br>If a DWSD Transaction is not consummated on the Effective Date, New DWSD Bonds having a principal amount equal to the principal amount of the DWSD Class B Sewer Bonds held by such Holder; provided, that, in lieu of the foregoing treatment, the City alternatively may elect to Reinstate any DWSD Series of DWSD Class B Sewer Bonds by filing a notice of such Reinstatement prior to the commencement of the Confirmation Hearing. Each Holder of an Allowed DWSD Class B Sewer Claim in a Class of DWSD Class B Sewer Claims that accepts the Plan may elect to receive New Existing Rate DWSD Bonds having a principal amount equal to the principal amount of the DWSD Class B Sewer Bonds held by such Holder in lieu of New DWSD Bonds.<br><br>Estimated Percentage Recovery: 100% of principal amount |
| **Class 1E - DWSD Revolving Sewer Bond Claims:** Consists of all Claims arising under or evidenced by the DWSD Revolving Sewer Bond Documents, including a Claim for principal and interest on the DWSD Revolving Sewer Bonds.<br><br>Estimated Aggregate Allowed Amount: $486,047,364 | Impaired. Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed DWSD Revolving Sewer Bond Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as reasonably practicable after the Effective Date: (1) if a DWSD Transaction is consummated on the Effective Date, New GLWA Revolving Bonds having a principal amount equal to the principal amount of the DWSD Revolving Sewer Bonds held by such Holder; or (2) if a DWSD Transaction is not consummated on the Effective Date, New DWSD Revolving Bonds having a principal amount equal to the principal amount of the DWSD Revolving Sewer Bonds held by such Holder.<br><br>Estimated Percentage Recovery: 100% of principal amount |

| Description and<br>Amount of Claims | Treatment |
|---|---|
| **Class 1F - DWSD Revolving Water Bond Claims**: Consists of all Claims arising under or evidenced by the DWSD Revolving Water Bond Documents, including a Claim for principal and interest on the DWSD Revolving Water Bonds.<br><br>Estimated Aggregate Allowed Amount: $21,589,986 | Impaired. Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed DWSD Revolving Water Bond Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as reasonably practicable after the Effective Date: (1) if a DWSD Transaction is consummated on the Effective Date, New GLWA Revolving Bonds having a principal amount equal to the principal amount of the DWSD Revolving Water Bonds held by such Holder; or (2) if a DWSD Transaction is not consummated on the Effective Date, New DWSD Revolving Bonds having a principal amount equal to the principal amount of the DWSD Revolving Water Bonds held by such Holder.<br><br>Estimated Percentage Recovery: 100% of principal amount |
| **Class 2A - Secured GO Series 2010 Claims**: Consists of all Claims arising under or evidenced by the Secured GO Series 2010 Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010 Bonds.<br><br>Estimated Aggregate Allowed Amount: $252,475,366 | Unimpaired. On the Effective Date, each Holder of an Allowed Secured GO Series 2010 Claim shall have its Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.<br><br>Estimated Percentage Recovery: 100% |
| **Class 2B - Secured GO Series 2010(A) Claims**: Consists of all Claims arising under or evidenced by the Secured GO Series 2010(A) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010(A) Bonds.<br><br>Estimated Aggregate Allowed Amount: $101,707,848 | Unimpaired. On the Effective Date, each Holder of an Allowed Secured GO Series 2010(A) Claim shall have its Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.<br><br>Estimated Percentage Recovery: 100% |
| **Class 2C - Secured GO Series 2012(A)(2) Claims**: Consists of all Claims arising under or evidenced by the Secured GO Series 2012(A)(2) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010(A)(2) Bonds.<br><br>Estimated Aggregate Allowed Amount: $39,254,171 | Unimpaired. On the Effective Date, each Holder of an Allowed Secured GO Series 2012(A)(2) Claim shall have its Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.<br><br>Estimated Percentage Recovery: 100% |
| **Class 2D - Secured GO Series 2012(A2-B) Claims**: Consists of all Claims arising under or evidenced by the Secured GO Series 2012(A2-B) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(A2-B) Bonds.<br><br>Estimated Aggregate Allowed Amount: $54,055,927 | Unimpaired. On the Effective Date, each Holder of an Allowed Secured GO Series 2012(A2-B) Claim shall have its Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.<br><br>Estimated Percentage Recovery: 100% |

| Description and<br>Amount of Claims | Treatment |
|---|---|
| **Class 2E - Secured GO Series 2012(B) Claims**: Consists of all Claims arising under or evidenced by the Secured GO Series 2012(B) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(B) Bonds.<br><br>Estimated Aggregate Allowed Amount: $6,469,135 | Unimpaired. On the Effective Date, each Holder of an Allowed Secured GO Series 2012(B) Claim shall have its Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.<br><br>Estimated Percentage Recovery: 100% |
| **Class 2F - Secured GO Series 2012(B2) Claims**: Consists of all Claims arising under or evidenced by the Secured GO Series 2012(B2) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(B2) Bonds.<br><br>Estimated Aggregate Allowed Amount: $31,037,724 | Unimpaired. On the Effective Date, each Holder of an Allowed Secured GO Series 2012(B2) Claim shall have its Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.<br><br>Estimated Percentage Recovery: 100% |
| **Class 3 - Other Secured Claims**: Consists of all Secured Claims, other than COP Swap Claims, DWSD Class A Sewer Claims, DWSD Class A Water Claims, DWSD Class B Sewer Claims, DWSD Class B Water Claims, DWSD Revolving Bond Claims, HUD Installment Note Claims, Parking Bond Claims or Secured GO Bond Claims.<br><br>Estimated Aggregate Allowed Amount: $8,855,456 | Unimpaired. On the Effective Date, each Holder of an Allowed Other Secured Claim shall have its Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.<br><br>Estimated Percentage Recovery: 100% |
| **Class 4 - HUD Installment Note Claims**: Consists of all Claims arising under or evidenced by the HUD Installment Note Documents, including a Claim for principal and interest on the HUD Installment Notes.<br><br>Estimated Aggregate Allowed Amount: $90,075,002 | Unimpaired. On the Effective Date, each Holder of an Allowed HUD Installment Note Claim shall have its Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.<br><br>Estimated Percentage Recovery: 100% |
| **Class 5 - COP Swap Claims**: Consists of all Claims arising under the COP Swap Documents.<br><br>Estimated Aggregate Allowed Amount: *To Be Determined* | The Allowance of, and treatment to be accorded to, COP Swap Claims is the subject of continuing discussions between the City and the COP Swap Counterparties, is yet to be determined and will be supplied shortly.<br><br>Estimated Percentage Recovery: Unknown |

-12-

13-53846-swr   Doc 2709   Filed 02/21/14   Entered 02/21/14 20:59:30   Page 26 of 440
13-53846-swr   Doc 2709   Filed 02/21/14   Entered 02/21/14 20:57:23   Page 26 of 440

| Description and<br>Amount of Claims | Treatment |
|---|---|
| **Class 6 – Parking Bond Claims**: Consists of all Claims arising under or evidenced by the Parking Bond Documents, including a Claim for principal and interest on the Parking Bonds.<br><br>Estimated Aggregate Allowed Amount: $8,099,287 | Unimpaired. On the Effective Date, each Holder of an Allowed Parking Bond Claim shall have its Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.<br><br>Estimated Percentage Recovery: 100% |
| **Class 7 – Limited Tax General Obligation Bond Claims**: Consists of all Claims arising under or evidenced by the Limited Tax General Obligation Bond Documents, including a Claim for principal and interest on the Limited Tax General Obligation Bonds.<br><br>Estimated Aggregate Allowed Amount: $163,543,187 | Impaired. Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Limited Tax General Obligation Bond Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, Unsecured Pro Rata Shares of (1) New B Notes and (2) New C Notes.<br><br>Estimated Percentage Recovery: 20% |
| **Class 8 – Unlimited Tax General Obligation Bond Claims**: Consists of all Claims arising under or evidenced by the Unlimited Tax General Obligation Bond Documents, including a Claim for principal and interest on the Unlimited Tax General Obligation Bonds.<br><br>Estimated Aggregate Allowed Amount: $374,661,332 | Impaired. Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Unlimited Tax General Obligation Bond Claim, in full satisfaction of such Allowed Claim, shall receive its Pro Rata share of Plan UTGO Notes on or as soon as reasonably practicable after the Effective Date. The maturity(ies) of the Plan UTGO Notes shall be no longer than the existing maturity(ies) of each series of Unlimited Tax General Obligation Bonds receiving Plan UTGO Notes. The Plan UTGO Notes shall contain such other terms as will result in each Holder of an Allowed Unlimited Tax General Obligation Bond Claim receiving a payment stream the present value of which is equal to approximately 20% of such Holder's Allowed Unlimited Tax General Obligation Bond Claim as of the Effective Date.<br><br>Estimated Percentage Recovery: 20% |

| Description and<br>Amount of Claims | Treatment |
|---|---|
| **Class 9 - COP Claims**: Consists of all Claims under or evidenced by the COP Service Contracts.<br><br>Estimated Aggregate Allowed Amount: *To Be Determined* | *The COP Claims are Disputed Claims and are not Allowed by the Plan, and the City reserves all rights to: (1) object to, avoid or subordinate such Claims on any and all available grounds, including through the assertion of any and all grounds asserted in the COP Litigation; and (2) assign the right to object to, avoid or subordinate such Claims or the City's rights in the COP Litigation to the Creditor Representative. The treatment set forth below in respect of the COP Claims is afforded only if and to the extent that such Claims ultimately become Allowed Claims.*<br><br>Impaired. Solely for purposes of facilitating Distributions under this Plan and for no other purpose, on and as of the Effective Date, those portions of COP Claims that relate to, and are measured by, the payment schedule under the COPs shall be deemed assigned to the beneficial holders of the COPs on a Pro Rata basis, with each beneficial holder deemed to receive such portions of COP Claims in an amount equal to the proportion that the unpaid principal amount of such holder's COPs bears to the aggregate unpaid principal amount of all COPs. Each beneficial holder of COPs may elect to participate in the Plan COP Settlement in respect of some or all of those portions of COP Claims that would be deemed assigned to it and its Affiliates in the event that the Effective Date occurs.<br><br>Each beneficial holder of COPs may settle issues relating to allowance of the COP Claims that are deemed assigned to it and become a Settling COP Claimant as to some or all COPs held by it and its Affiliates by electing to participate in the Plan COP Settlement on a timely-returned Ballot accepting the Plan. Each Settling COP Claimant shall have its COP Claims deemed to be Allowed Claims in an amount equal to 40% of the aggregate unpaid principal amount of COPs held by such Settling COP Claimant and shall receive, on or as soon as reasonably practicable after the Effective Date, Unsecured Pro Rata Shares of (1) New B Notes and (2) New C Notes.<br><br>On the Effective Date, the City shall establish the Disputed COP Claims Reserve. The Disputed COP Claims Reserve shall contain no less than (1) Unsecured Pro Rata Shares of New B Notes and New C Notes, in each case calculated as if such Disputed COP Claims were Allowed in an amount equal to the aggregate unpaid principal amount as of the Petition Date for the COPs not subject to the Plan COP Settlement; and (2) any distributions made on account of New B Notes and New C Notes held in the Disputed COP Claims Reserve.<br><br>If and to the extent that Disputed COP Claims become Allowed Claims, the Holders of such Allowed Claims shall be sent a Distribution from the Disputed COP Claims Reserve of no less than (1) the portions of New B Notes and New C Notes held in the Disputed COP Claims Reserve initially allocated to the Disputed COP Claims that became Allowed Claims; and (2) any distributions received by the Disputed COP Claims Reserve on account of such portions of New B Notes and New C Notes. Upon the entry of an order by the trial court having jurisdiction over the objections to the Disputed COP Claims resolving all objections to the Disputed COP Claims and after all Distributions on account of Allowed COP Claims have been made or provided for, 70% of any New B Notes, New C Notes and distributions thereon remaining in the Disputed COP Claims Reserve shall be distributed to holders of Claims entitled to receive New B Notes and New C Notes under the Plan, each of which shall receive their Unsecured Pro Rata Share of such property. The remaining 30% of any New B Notes, New C Notes and distributions thereon shall be cancelled (with respect to the New B Notes and New C Notes) or revert to the City and be transferred to the General Fund (with respect to the distributions on such portion of New B Notes and New C Notes).<br><br>Estimated Percentage Recovery: Unknown |

-14-

13-53846-swr Doc 2709 Filed 02/21/14 Entered 02/21/14 20:59:30 Page 28 of 440
13-53846-swr Doc 2709 Filed 02/21/14 Entered 02/21/14 20:59:30 Page 28 of 440

| Description and Amount of Claims | Treatment |
|---|---|
| **Class 10 - PFRS Claims**:  Consists of: (1) all PFRS Pension Claims and (2) all OPEB Claims held by Holders of PFRS Pension Claims.<br><br>PFRS Pension Claims means any Claims (other than OPEB Claims), whether asserted by current or former employees of the City, their heirs or beneficiaries or by the PFRS or any trustee thereof of any other Entity acting on the PFRS's behalf, against the City or any fund managed by the City (including, but not limited to, the General Fund, the Police and Fire Retirement System Service Corporation fund or the pension funds) based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law for (1) any pension, disability, or other post retirement payment or distribution to be made by the PFRS in respect of the employment of such current or former employees or (2) the payment by the PFRS to persons who at any time participated in, were beneficiaries of or accrued post-retirement pension or financial benefits under the PFRS.<br><br>OPEB Claims means any Claim against the City for post-retirement health, life and death benefits provided to:  (1) retired employees of the City and their dependents pursuant to the Employee Health and Life Insurance Benefit Plan and the Employee Supplemental Death Benefit Plan; and (2) the plaintiffs in the action captioned *Weiler et. al. v. City of Detroit*, Case No. 06-619737-CK (Wayne County Circuit Court), pursuant to the "Consent Judgment and Order of Dismissal" entered in that action on August 26, 2009.<br><br>Estimated Aggregate Allowed Amount: $3,281,800,000 | Impaired.  During the Fiscal Years from the Effective Date through the Fiscal Year ending June 30, 2023, annual contributions shall be made to the PFRS only in the amounts identified on Exhibit II.B.3.t.ii.A to the Plan.  The exclusive source for such contributions shall be DIA Proceeds equal to $175,000,000.  After June 30, 2023, the City will contribute sufficient funds required to pay each Holder of a PFRS Pension Claim his or her PFRS Adjusted Pension Amount in accordance with and as modified by the terms and conditions contained in the Plan and the Plan PFRS Settlement.<br><br>During the period that ends on June 30, 2023, the trustees of the PFRS, or the trustees of any successor trust or pension plan, shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the PFRS that shall not be higher than 6.50%.<br><br>During the period that ends no earlier than June 30, 2023, the pension benefits payable to each Holder of a PFRS Pension Claim shall be equal to the PFRS Adjusted Pension Amount for such Holder, provided that such PFRS Adjusted Pension Amount shall be (1) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (2) increased by (a) the Plan PFRS Settlement (as set forth in Section II.B.3.t.ii.G of the Plan) and (b) any PFRS Restoration Payment.<br><br>Each Holder of a PFRS Pension Claim who is an Active Employee shall receive, in addition to his or her PFRS Adjusted Pension Amount, as may be modified herein, such additional pension benefit for service on or after July 1, 2014 consistent with the terms and conditions of the PFRS Hybrid Pension Formula.<br><br>The composition of the board of trustees of the PFRS and the manner in which it is operated and administered shall be consistent with such governance provisions as are (1) required by the DIA Settlement Documents and the Plan PFRS Settlement and (2) acceptable to the State and the DIA Funding Parties.<br><br>The Confirmation Order shall include an injunction against the subsequent amendment of the terms and conditions, and rules of operation, of the PFRS, or any successor plan or trust, that governs the calculation of pension benefits (including the PFRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, the PFRS Restoration Payment and the PFRS Hybrid Pension Formula and terms of the hybrid arrangement) or against any action that governs the selection of the investment return assumption described in Section II.B.3.t.ii.B of the Plan, the contribution to the PFRS or the calculation or amount of PFRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.<br><br>If Classes 10 and 11 accept the Plan, Holders of PFRS Pension Claims who accept the Plan will have the option to enter into a settlement with the City and the State by electing to participate in the Plan PFRS Settlement on a timely-returned Ballot accepting the Plan. The Plan PFRS Settlement shall include the following principal terms:  (1) the State will deposit the State PFRS Consideration into the PFRS in equal annual installments over a period of 20 years, (2) each Electing PFRS Holder shall be entitled to the PFRS Settlement Benefit Amount in addition to such Holder's PFRS Adjusted Pension Amount and (3) each Electing PFRS Holder will release the City and its Related Entities and the State and the State Related Entities from all PFRS Pension Claims, as more particularly described in the Plan PFRS Settlement Documents.<br><br>[CONTINUED ON FOLLOWING PAGE] |

| Description and<br>Amount of Claims | Treatment |
|---|---|
| **Class 10 - PFRS Claims** (continued) | On or as soon as practicable following the Effective Date, the City will establish the Detroit VEBA to provide health care, life and other legally authorized welfare benefits to Detroit VEBA Beneficiaries and certain of their dependents and future City retirees. The Detroit VEBA will be governed by a board of trustees that will be responsible for, among other things, management of property held by the Detroit VEBA, administration of the Detroit VEBA and determination of the level of and distribution of benefits to Detroit VEBA Beneficiaries. The Detroit VEBA Trust Agreement and related plan documentation will be substantially in the form set forth on Exhibit I.A.62 to the Plan, which shall, among other things, identify the members of the Detroit VEBA's initial board of trustees. Promptly after the Detroit VEBA is established, the City shall (1) distribute the OPEB Claims Note to the Detroit VEBA and (2) direct the trustees of the Employee Death Benefit Plan to terminate that plan and transfer all assets (net of expenses of termination) to the Detroit VEBA. The City shall have no responsibility following the Effective Date to provide life insurance or death benefits to retirees. Holders of PFRS Claims that also hold OPEB Claims shall be Detroit VEBA Beneficiaries.<br><br>Estimated Percentage Recovery: 20.8-29.8% |
| **Class 11 – GRS Claims**: Consists of: (1) all GRS Pension Claims and (2) all OPEB Claims held by Holders of GRS Pension Claims.<br><br>GRS Pension Claims means any Claims (other than OPEB Claims), whether asserted by current or former employees of the City, their heirs or beneficiaries or by the GRS or any trustee thereof or any other Entity acting on the GRS's behalf, against the City or any fund managed by the City (including, but not limited to, the General Fund, the water fund, the sewage disposal fund, the Detroit General Retirement System Service Corporation fund or the pension funds) based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law for (1) any pension, disability or other post retirement payment or distribution to be made by the GRS in respect of the employment of current or former employees or (2) the payment by the GRS to persons who at any time participated in, were beneficiaries of or accrued post-retirement pension or financial benefits under the GRS. | Impaired. During the Fiscal Years from the Effective Date through the Fiscal Year ending June 30, 2023, annual contributions shall be made to the GRS only in the amounts identified on Exhibit II.B.3.u.ii.A to the Plan. The exclusive sources for such contributions shall be pension-related payments received by the City from the DWSD equal to approximately $675,000,000, and proceeds received from the DIA Funding Parties in the amount of approximately $50,000,000. After June 30, 2023, (1) approximately $195,000,000 of proceeds contributed by the DIA Funding Parties in connection with the DIA Settlement shall be contributed to the GRS and (2) the City will contribute such additional funds as are necessary to pay each Holder of a GRS Pension Claim his or her GRS Adjusted Pension Amount in accordance with and as modified by the terms and conditions contained in the Plan and the Plan GRS Settlement.<br><br>During the period that ends on June 30, 2023, the board of trustees of the GRS, or the trustees of any successor trust or pension plan, shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the GRS that shall not be higher than 6.25%.<br><br>During the period that ends no earlier than June 30, 2023, the pension benefits payable to each Holder of a GRS Pension Claim shall be equal to the GRS Adjusted Pension Amount for such Holder, provided that such GRS Adjusted Pension Amount shall be (1) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (2) increased by (a) the Plan GRS Settlement (as set forth in Section II.B.3.u.ii.I of the Plan) and (b) any GRS Restoration Payment.<br><br>Excess Allocations to Annuity Savings Fund Accounts during the period beginning January 1, 1999 and ending December 31, 2012 may be applied to reduce (1) Annuity Savings Fund Accounts of Active Employees who participate in the GRS and (2) the Current Accrued Annual Pension of former participants in the Annuity Savings Fund Account now receiving monthly pensions, in accordance with the formulae set forth on Exhibit II.B.3.u.ii.D to the Plan. In the event of any such reduction, a Holder's GRS Adjusted Pension Amount shall be increased to take into account such Annuity Savings Fund Account restitution reduction.<br><br>Each Holder of a GRS Pension Claim who is an Active Employee shall receive, in addition to his or her GRS Adjusted Pension Amount, as may be modified herein, such additional pension benefit for service on or after July 1, 2014 consistent with the terms and conditions of the GRS Hybrid Pension Formula.<br><br>[CONTINUED ON FOLLOWING PAGE] |

-16-

13-53846-swr Doc 8709 Filed 12/16/14 Entered 12/16/14 02:59:30 Page 30 of 440
13-53846-swr Doc 8709 Filed 12/16/14 Entered 12/16/14 02:59:30 Page 30 of 440

| Description and Amount of Claims | Treatment |
|---|---|
| **Class 11 – GRS Claims** (continued)<br><br>OPEB Claims means any Claim against the City for post-retirement health, life and death benefits provided to: (1) retired employees of the City and their dependents pursuant to the Employee Health and Life Insurance Benefit Plan and the Employee Supplemental Death Benefit Plan; and (2) the plaintiffs in the action captioned *Weiler et. al. v. City of Detroit*, Case No. 06-619737-CK (Wayne County Circuit Court), pursuant to the "Consent Judgment and Order of Dismissal" entered in that action on August 26, 2009.<br><br>Estimated Aggregate Allowed Amount: $3,790,100,000 | The composition of the board of trustees of the GRS and the manner in which it is operated and administered shall be consistent with such governance provisions as are (1) required by the DIA Settlement Documents and the Plan GRS Settlement and (2) acceptable to the State and the DIA Funding Parties.<br><br>If the City consummates a DWSD Transaction on or prior to the Effective Date, the GLWA will assume the pension liability associated with DWSD employees and retirees as accrued through the closing date of a DWSD Transaction. A pro rata share of the existing GRS assets and liabilities will be transferred to a successor pension fund managed by the GLWA. The successor pension plan will be closed to new GLWA employees and benefit levels frozen.<br><br>The Confirmation Order shall include an injunction against the subsequent amendment of the terms and conditions, and rules of operation, of the GRS, or any successor plan or trust, that govern the calculation of pension benefits (including the GRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, GRS Restoration Payment and the GRS Hybrid Pension Formula and terms of the hybrid arrangement) or against any action that governs the selection of the investment return assumption described in Section II.B.3.u.ii.B of the Plan, the contribution to the GRS, or the calculation or amount of GRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.<br><br>If Classes 10 and 11 accept the Plan, Holders of GRS Pension Claims who accept the Plan will have the option to enter into a settlement with the City and the State by electing to participate in the Plan GRS Settlement on a timely-returned Ballot accepting the Plan. The Plan GRS Settlement shall include the following principal terms: (1) the State will deposit the State GRS Consideration into the GRS in equal annual installments over a period of 20 years, (2) each Electing GRS Holder shall be entitled to the GRS Settlement Benefit Amount in addition to such Holder's GRS Adjusted Pension Amount and (3) each Electing GRS Holder will release the City and its Related Entities and the State and the State Related Entities from all GRS Pension Claims, as more particularly described in the Plan GRS Settlement Documents.<br><br>Holders of GRS Claims that also hold OPEB Claims shall be Detroit VEBA Beneficiaries of the Detroit VEBA.<br><br>Estimated Percentage Recovery: 27.5-33.3% |
| **Class 12 - Downtown Development Authority Claims**: Consists of all Claims in respect of the Downtown Development Authority Loans.<br><br>Estimated Aggregate Allowed Amount: $33,600,000 | Impaired. Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Downtown Development Authority Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, Unsecured Pro Rata Shares of (1) New B Notes and (2) New C Notes.<br><br>Estimated Percentage Recovery: 20% |

-17-

13-53846-swr Doc 2709 Filed 02/21/14 Entered 02/21/14 20:57:23 Page 31 of 440

| Description and Amount of Claims | Treatment |
|---|---|
| **Class 13 - Other Unsecured Claims**: Consists of all Claims that are unpaid as of the Effective Date and that are not Administrative Claims, Convenience Claims, COP Claims, Downtown Development Authority Claims, General Obligation Bond Claims, GRS Claims, PFRS Claims, Secured GRS Claims, Small GRS Claims, Small PFRS Claims or Subordinated Claims. For the avoidance of doubt, Section 1983 Claims are included within the definition of Other Unsecured Claims.<br><br>Estimated Aggregate Allowed Amount: *Unknown* | Impaired. Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Other Unsecured Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, Unsecured Pro Rata Shares of (1) New B Notes and (2) New C Notes.<br><br>Estimated Percentage Recovery: 20% |
| **Class 14 - Convenience Claims**: Consists of all Claims that would otherwise be Other Unsecured Claims that are (1) Allowed Claims in an amount less than or equal to $25,000; or (2) in an amount that has been reduced to $25,000 pursuant to an election made by the Holder of such Claim; *provided* that, where any portion(s) of a single Claim has been transferred, (a) the amount of all such portions will be aggregated to determine whether a Claim qualifies as a Convenience Claim and for purposes of the Convenience Claim election and (b) unless all transferees make the Convenience Claim election on the applicable Ballots, the Convenience Claim election will not be recognized for such Claim.<br><br>Estimated Aggregate Allowed Amount: *Unknown* | Impaired. Each Holder of an Allowed Convenience Claim, in full satisfaction of such Allowed Claim, shall receive Cash equal to the amount of 25% of such Allowed Claim (as reduced, if applicable, pursuant to an election by such Holder in accordance with Section I.A.44 of the Plan) on or as soon as reasonably practicable after the Effective Date, unless such Holder agrees to a different treatment of such Claim.<br><br>Estimated Percentage Recovery: 25% |
| **Class 15 - Subordinated Claims**: Consists of all Claims of the kind described in sections 726(a)(3) or 726(a)(4) of the Bankruptcy Code and or Claims subordinated under sections 510(b) or 510(c) of the Bankruptcy Code.<br><br>Estimated Aggregate Allowed Amount: *Unknown* | Impaired. On the Effective Date, all Subordinated Claims shall be disallowed, extinguished and discharged without Distribution under the Plan, and Holders of Subordinated Claims shall not receive or retain any property on account of such Claims. Pursuant to section 1126(g) of the Bankruptcy Code, Class 15 is deemed to have rejected the Plan, and Holders of Subordinated Claims are not entitled to cast a Ballot in respect of such Claims.<br><br>Estimated Percentage Recovery: 0% |

Based footer

-18-

13-53846-swr   Doc 8709   Filed 12/12/14   Entered 12/12/14 10:59:30   Page 32 of 440
13-53846-swr   Doc 2709   Filed 02/21/14   Entered 02/21/14 10:27:23   Page 32 of 440

# III.

## EVENTS PRECEDING THE CITY'S CHAPTER 9 CASE

**A.     Background**

**1.     General Information**

Founded in 1701 and incorporated in 1806, Detroit is a political subdivision of the State of Michigan and is its largest city.  Detroit is located on an international waterway, which is linked via the St. Lawrence Seaway to seaports around the world.  As of December 2012, the City had a population of approximately 685,000 (down from a peak population of nearly 2 million in 1950).

The City is a home rule city and body corporate organized under Michigan Public Act 279 of 1909 (as amended), the Home Rule City Act, MCL §§ 117.1-117.38 (the "Home Rule City Act").  The City has comprehensive home rule power under the Michigan Constitution, the Home Rule City Act and the 2012 Charter of the City of Detroit (the "City Charter"), subject to the limitations on the exercise of that power contained in the Michigan Constitution, the City Charter or applicable Michigan statutes.

Ordinarily, the City is managed by an executive branch and a legislative branch.  The organization of City agencies within the executive and legislative branches of government is set forth at Table III.A.1.a below.

Table III.A.1.a



-19-

13-53846-tjt   Doc 8700   Filed 12/12/14   Entered 12/12/14 00:27:23   Page 33 of 440
13-53846-swr   Doc 2709   Filed 02/21/14   Entered 02/21/14 10:59:30   Page 33 of 440

The Mayor heads the executive branch. The citizens of Detroit elect the Mayor to a four-year term. The City Charter grants the Mayor broad managerial powers including the authority to appoint department directors, deputy directors and other executive branch officials. The responsibility to implement most programs, provide services and manage day-to-day operations is delegated by the City Charter to the executive branch. The legislative branch is comprised of the City Council and its agencies. The nine members of City Council also are elected to four-year terms. Many significant decisions, including budget appropriations, procurement of goods and services and certain policy matters must be approved by the City Council.

Since March 14, 2013, the City has been operating under the authority of an Emergency Manager (as defined in Section III.D.9.c), originally appointed by the State of Michigan Local Emergency Financial Assistance Loan Board (the "LEFALB"). Pursuant to Section 9(1) of Michigan Public Act 436 of 2012, the Local Financial Stability and Choice Act, MCL §§ 141.1541-141.1575 ("PA 436"), the Emergency Manager acts "for and in the place and stead of the governing body and the office of chief administrative officer of the local government" and possesses "broad powers in receivership to rectify the financial emergency and to assure the fiscal accountability of the local government and the local government's capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare." As such, during the Emergency Manager's appointment, the executive and legislative branches of City government generally are prohibited by Section 9(1) of PA 436 from exercising any of their usual powers except as may be specifically authorized in writing by the Emergency Manager. For additional information see Section III.D.9 of this Disclosure Statement.

2.      **Municipal Services**

Pursuant to the City Charter, the City is responsible for providing for the public peace, health and safety of persons and property within its jurisdictional limits. The City provides the following major services to City residents and businesses: police and fire protection, sanitation and streets, parks and recreation, health, planning and development, public lighting, transportation, water supply, sewage disposal and parking. In addition, the City is the "District Control Unit" responsible for certain duties and costs relating to the 36th District Court, a unit of the judicial branch of the State.

The preamble to the City Charter describes certain expectations of City residents with respect to municipal services that the City provides. These expectations include: (a) decent housing; (b) job opportunities; (c) reliable, convenient and comfortable transportation; (d) recreational facilities and activities; (e) cultural enrichment; (f) clean air and waterways; (g) safe drinking water; and (h) a sanitary, environmentally sound City.

3.      **City Funds**

The City uses various accounting funds to keep track of specific sources of funding and spending for particular purposes. The City's funds are divided into three categories – governmental, proprietary and fiduciary. Most of the City's basic services are reported in the governmental funds, which focus on cash flows related to such services and funds available for future spending. Proprietary funds report services for which the City charges customers, including individuals, outside entities and other agencies within the City. Fiduciary funds are funds with respect to which the City acts as a trustee or fiduciary, including pension (and other employee benefit) funds and agency funds.

(a)      **General Fund**

The primary governmental fund and the chief operating fund of the City is the General Fund (the "General Fund"). Many key services of the City are paid for from the General Fund (including, among others, police, fire, public works, community and youth services), which is comprised of 28 discrete departments. During the City's 2013 Fiscal Year, which began on July 1, 2012 and ended on June 30, 2013, the General Fund had total revenues of $1,047.1 million and the General Fund had total expenditures of $867.2 million.

(b)      **Enterprise Funds**

Proprietary funds that are used to provide supplies and services to the general public are referred to as "Enterprise Funds." During Fiscal Year 2013, the various Enterprise Funds collectively had total operating revenues of $839.8 million and had total operating expenses in the total amount of $831.5 million. The following paragraphs describe the major Enterprise Funds reported by the City and any related City departments.

### i. Water Fund and Sewage Disposal Fund/DWSD

The Detroit Water and Sewerage Department (the "DWSD") is far and away the largest enterprise fund managed by the City. Detroit's water fund (the "Water Fund") and sewage disposal fund (the "Sewage Disposal Fund") account for the City's water and sewage systems, which are administered by the DWSD. The DWSD is a department of the City and is responsible for the water supply and the control and treatment of wastewater for most of southeastern Michigan. The DWSD traces its roots to 1836, when the City purchased a private water works and began maintaining, improving and expanding the City's water distribution system. Since 1853, the DWSD has been governed by the Board of Water Commissioners which, today, is a seven-member board appointed by the Mayor and comprised of four residents of the City, and three representatives representing, respectively, the Counties of Macomb, Oakland and Wayne. The Board of Water Commissioners has overseen construction of, among other innovations, the City's first reservoir (completed in 1857), its first public drinking fountains (completed in 1871) and what was, upon its opening in 1923, the largest water filtration plant in the world. The DWSD's wastewater treatment plant, which began operating in 1940, is the largest single-site wastewater treatment facility in the nation; its construction, during the Great Depression, is widely viewed as one of the most notable engineering accomplishments of the twentieth century in Michigan. During its history, the DWSD was known by several names, including, in chronological order, the Detroit Hydraulic Works, the Detroit Water Works, the Department of Water Supply, the Detroit Metropolitan Water Service and the Detroit Metro Water Department. The DWSD adopted its current name in 1975. The DWSD operates, and the Board of Water Commissioners oversees the DWSD, pursuant to chapter 12 of section 7 of the City Charter.

Today, the DWSD is one of the largest municipal water and sewerage departments in the nation. It supplies water to approximately four million customers throughout the City and in 127 suburban communities comprising, altogether, a 1,079-square-mile water service area. The DWSD also provides wastewater collection, treatment and disposal services to the entire City and 76 suburban communities – a 946-square-mile wastewater service area. The DWSD draws fresh water from the Detroit River and Lake Huron, treating and supplying, on average, 616 million gallons of potable water daily. The DWSD supplies water to customers via 3,438 miles of transmission and distribution mains within City limits and 402 miles of transmission mains throughout the suburban service area. The DWSD's sewer system consists of the Wastewater Treatment Plant, 3,433 miles of sewer lines (carrying both rainwater and wastewater to the treatment plant), ten pump stations, six sewer overflow retention treatment basins and three screening and disinfection facilities. The Wastewater Treatment Plant treats, on average, 710 million gallons of water daily. In addition, the DWSD is responsible for maintaining and repairing more than 27,000 fire hydrants throughout the City.

The City owns the water supply system and the sewage disposal system and operates, manages and accounts for each system as a separate Enterprise Fund within the DWSD. The DWSD's combined budgeted revenues for Fiscal Year 2014 is $934.7 million. As of the Petition Date, the DWSD had commenced a capital improvement initiative – the "January 2013 Capital Improvement Program" – by which the DWSD plans to invest approximately $1.4 billion in infrastructure improvements and necessary repairs, technological upgrades and systems rationalization over a five-year period. Pursuant to this program, the DWSD budgeted $114.7 million for Fiscal Year 2013, $127.6 million for Fiscal Year 2014 and $150.0 million for Fiscal Year 2015, for various water and sewer improvement and repair projects, including: upgrades to the DWSD's water and wastewater treatment plants, pumping stations and reservoirs; the replacement of aging water mains, sewer lines and outfalls; and the construction of combined sewer overflow control facilities to better handle storm water flows and reduce water pollution.

For more than 35 years, the DWSD was a defendant in a lawsuit initiated by the United States Environmental Protection Agency (the "EPA"). In 1977, the EPA sued the City and the DWSD, alleging violations of the federal Clean Water Act (the "CWA"). See United States v. City of Detroit, No. 77-71100, 2013 WL 1282021, at *3 (E.D. Mich. Mar. 27, 2013). The case was pending in the United States District Court for the Eastern District of Michigan (the "District Court") – and the DWSD operated under federal court oversight – until March of 2013 due to "a recurring cycle" of compliance failures with regard to the CWA and National Pollutant Discharge Elimination System ("NPDES") permits required by the Michigan Department of Environmental Quality (the "MDEQ"). See United States v. City of Detroit, No. 77-71100, 2011 WL 4014409, at *1 (E.D. Mich. Sept. 9, 2011). Pursuant to an Administrative Consent Order (the "ACO") with the MDEQ, in July 2011 the DWSD agreed to undertake certain remedial measures to address what the District Court had identified as areas of persistent dysfunction, including deficiencies in maintenance, capital expenditures, planning, staffing and procurement. See United States v. City of Detroit, Exhibit A to Motion to Dismiss, No. 77-71100 (E.D. Mich. July 25, 2011) (Docket No. 2365). As of the Petition Date, the ACO remained effective, allowing the MDEQ to continue its oversight of the DWSD.

-21-

13-53846-swr   Doc 2709   Filed 02/21/14   Entered 02/21/14 00:27:23   Page 35 of 440
13-53846-swr   Doc 2709   Filed 02/21/14   Entered 02/21/14 00:27:23   Page 35 of 440

Determining that the ACO, standing alone, was insufficient to guarantee the DWSD's long-term compliance with the CWA and NPDES standards, in 2011 the District Court ordered a "Root Cause Committee" comprised of City and DWSD officials to formulate a plan to address the root causes of the DWSD's persistent noncompliance. See City of Detroit, Order, at 3, No. 77-71100 (Nov. 4, 2011) (Docket No. 2410). The Root Cause Committee drafted – and the District Court adopted – a "Plan of Action," which proposed to restructure the DWSD to address systemic dysfunction and achieve long-term compliance with federal and state environmental standards. Id. at 3-4. In March 2013, the Root Cause Committee submitted a plan to the District Court recommending the creation of an autonomous DWSD. See City of Detroit, Director's Compliance Report, at 23, No. 77-71100 (E.D. Mich. Mar. 18, 2013) (Docket No. 2526). On March 27, 2013, the District Court issued an order closing the case and declining to address the Root Cause Committee's recommendation for further restructuring the DWSD. See City of Detroit, 2013 WL 1282021, at *2. In its order dismissing the case, the District Court stated that it was satisfied that the court's orders and the ACO "have been substantially implemented." Id. at *13. Closing the case was appropriate, the court said, "because the existing [ACO] is a sufficient mechanism to address any future issues regarding compliance with the DWSD's NPDES permit and the [CWA]." Id. at *17. On April 8, 2013, the Sixth Circuit Court of Appeals issued a ruling in favor of certain unions that had sought to intervene in the case prior to the dismissal, reversing the District Court's denial of certain motions to intervene and remanding for a limited grant of intervention. See United States v. City of Detroit, 712 F.3d 925, 926 (6th Cir. 2013). On June 5, 2013, the District Court issued an order to show cause regarding the question of whether the District Court is divested of jurisdiction to address the remanded issues as a result of the order of dismissal. See City of Detroit, Order to Show Cause, at 4, No. 77-71100 (E.D. Mich. June 5, 2013) (Docket No. 2535). The City also has commenced an appeal in this case. See City of Detroit, Notice of Appeal, at 1, No. 77-71100 (E.D. Mich. May 22, 2013) (Docket No. 2532). On July 30, 2013, the Sixth Circuit Court of Appeals stayed the City's appeal pending resolution of the City's chapter 9 case. See United States v. City of Detroit, Order, at 1, No. 13-1708 (6th Cir. July 30, 2013).

During Fiscal Year 2013, the City received payments into the Water Fund and the Sewage Disposal Fund in the total amounts of $370.4 million and $451.8 million, respectively, and made payments from the Water Fund and Sewage Disposal Fund in the total amounts of $327.1 million and $409.6 million, respectively.

The Plan provides that the functions of DWSD may be transferred and the properties of DWSD will be leased to a newly formed Great Lakes Water Authority. For additional information see Section VI.B, below.

### ii.    Transportation Fund/DDOT

Detroit's transportation fund (the "Transportation Fund") accounts for the City's mass transit system, which is administered by the Detroit Department of Transportation ("DDOT"). Established in 1922 as the Department of Street Railways and providing mass transit bus service to City residents since 1925, DDOT is the largest public transit provider in Michigan. A municipal department of the City, DDOT operates a fleet of more than 400 buses on 36 routes daily and serving riders at approximately 6,000 bus stops throughout the City and in some nearby suburban communities. DDOT employed 1,198 workers during Fiscal Year 2012 and, as of the Petition Date, consisted of 13 divisions: an Administrative Division, a Capital Projects Division, a Customer Relations and Communications Division, a Finance Division, a Human Resources Division, a Transportation Operations Division, a Management Information Services Division, a Materials Management Division, a Building Maintenance Division, a Purchasing and Contract Administration Division, a Security and Risk Management Division, a Strategic Planning Division and a Vehicle Maintenance Division. DDOT ranks 39th in ridership among public transit agencies nationwide; it provided 32.8 million passenger trips during Fiscal Year 2012.

During Fiscal Year 2013, the City received payments into the Transportation Fund in the total amount of approximately $148.0 million (including a General Fund subsidy of approximately $47.2 million) and made payments from the Transportation Fund in the total amount of $175.7 million.

### iii.    Automobile Parking Fund/MPD

The City's Municipal Parking Department ("MPD") consists of two divisions which include the Auto Parking System ("APS") and the Parking Violations Bureau ("PVB"). APS is primarily responsible for the operation and maintenance of seven parking garages and certain on-street parking spaces. The activities of APS are accounted for in the "Automobile Parking Fund," which is an Enterprise Fund that services the City's Parking Bonds. PVB is primarily responsible for the enforcement of on-street parking ordinances, including the issuance, processing and collection of parking tickets. PVB's revenues net of expenses are accounted for in the General Fund.

As of the Petition Date, APS managed seven parking garages containing a total of 6,793 spaces and approximately 3,404 on-street metered parking spaces. As of the Petition Date, projected revenue of APS for Fiscal Year 2013 was approximately $12.9 million. Expenses were projected to be approximately $12.9 million for the same period, with any "due to/due from" activity with the General Fund projected to net out to zero.

PVB was projected to issue 323,000 tickets and immobilize 2,760 vehicles with parking boots during Fiscal Year 2013, yielding projected revenues of approximately $11.4 million. Expenses were projected to be approximately $7.8 million for the same period, with the projected surplus of $3.6 million inuring to the General Fund. As of the end of Fiscal Year 2013, MPD's headcount totaled 90 full-time employees, with 35 such employees allocated to APS and 55 allocated to the PVB (including four full-time contractors).

Several factors have limited the MPD's ability to raise revenues in recent years. Budgetary cuts, headcount reductions and unfavorable work rules have reduced the number and frequency of parking violation patrols and have contributed to a sharp decline in the number of tickets issued by the MPD, from 535,000 tickets in Fiscal Year 2002 to 323,000 in Fiscal Year 2012. Budget constraints have prevented the MPD from repairing or replacing broken parking meters, towing boots and vehicles used by parking enforcement officers. Certain parking spaces that require structural repairs have been taken out of service indefinitely. Meter rates and parking violation fines are underpriced in comparison with those of other large cities and frequently are considerably lower than parking rates charged by neighboring privately-operated garages and lots. The MPD also has been hampered by inefficient and ineffective collection practices in recent years, much of which is now uncollectible due to the age of the violations. In addition, the MPD's information technology systems are outdated and offer little or no meaningful real-time financial metrics.

During Fiscal Year 2013, the City received payments into the Automobile Parking Fund in the total amount of approximately $11.1 million and made payments from the Automobile Parking Fund in the total amount of $11.2 million.

At the request of the Emergency Manager, the City has been exploring a potential monetization of the assets constituting the Automobile Parking Fund. To this end, the City has retained a parking specialist to conduct due diligence and produce a report on the long term value potential of the parking assets currently held by the City. This report is expected to serve as a basis for the solicitation of potentially interested bidders for the parking assets, and the City anticipates that that transaction may close during Fiscal Year 2015.

### 4. Sources of General Fund Revenue

The City's principal sources of General Fund tax revenues are (a) municipal income taxes, (b) property taxes, (c) casino wagering taxes, (d) state shared tax revenues and (e) taxes on utility users. These sources of revenue collectively account for approximately $774.6 million for Fiscal Year 2013, an amount that is almost three fourths of the City's aggregate Fiscal Year 2013 General Fund revenues of $1.05 billion. In addition, the City's General Fund receives revenue from, among other sources: (a) fees for services directly provided by the City; (b) licenses, permits and inspection charges; (c) grants and contributions from federal and state intergovernmental sources (principally the State); and (d) ordinance fines and forfeitures.

The City currently levies all taxes at or near statutory maximum levels. As described in Section III.C.3.c, the comparative tax burden imposed on residents of the City is one of the highest in the State. Consequently, the Emergency Manager has determined that the City cannot gain additional revenue through the imposition of increased rates or additional taxes on City residents.

### (a) Income Taxes

Income tax revenues totaled $248.0 million for Fiscal Year 2013, an amount that accounts for approximately 23.7% of total Fiscal Year 2013 General Fund revenues. Income tax revenues totaled $233.0 million during Fiscal Year 2012. Michigan Public Act 284 of 1964, the City Income Tax Act, MCL §§ 141.501-141.787, authorizes Michigan cities to impose a municipal income tax. Detroit has taxed incomes since 1964 and is one of only 22 Michigan municipalities to do so. The City taxes the incomes of individuals who are Detroit residents, nonresident individuals who work in Detroit and resident businesses. Income taxes traditionally have constituted the City's largest single source of revenue. Further details regarding the City's historic income tax revenues and projected future revenues as of the Petition Date are provided in Section III.C.2, below.

-23-

13-53846-swr Doc 2709 Filed 02/21/14 Entered 02/21/14 00:57:30 Page 37 of 440
13-53846-swr Doc 2709 Filed 02/21/14 Entered 02/21/14 00:57:30 Page 37 of 440

### (b)    Property Taxes

Detroit levies *ad valorem* property taxes to fund general operations (19.9520 mills) and to support unlimited tax debt (9.6136 mills).  Detroit residents also pay property taxes to a number of additional entities including the Detroit Public Library, Detroit Public Schools, Wayne County, Wayne County Community College, a number of special authorities and the State.  The total tax rate on homeowners in Detroit is 67.5159 mills and the rate on non-homestead property is 85.3467 mills.  Detroit residents face one of the highest property tax rates in Michigan, but much of the property tax paid by Detroit residents does not support City services, and instead supports the other entities listed above.

Although Detroit's property tax rate of 19.9520 mills for general operations is constitutionally capped close to the statutory maximum of 20 mills, Detroit has the third lowest per capita taxable value of Michigan's largest cities.  As a result, Detroit's property tax revenue *per capita* ranks 18th highest of the State's 24 largest cities.  For Fiscal Year 2013, the general operating levy on the *ad valorem* tax roll was $156.1 million, and the levy for debt service was $80.8 million.

General fund property tax revenues totaled $131.7 million for Fiscal Year 2013, accounting for approximately 12.5% of total Fiscal Year 2013 General Fund revenues.  General fund property tax revenues for Fiscal Year 2012 totaled $147.8 million.  Further details regarding the City's historic and projected future property tax revenues as of the Petition Date are provided in Section III.C.3, below.

### (c)    Casino Wagering Taxes

Casino wagering taxes totaled $174.6 million for Fiscal Year 2013, accounting for approximately 16.7% of total Fiscal Year 2013 General Fund revenues.  Casino wagering tax revenues for Fiscal Year 2012 totaled $181.4 million.  Michigan Initiated Law 1 of 1996, the Michigan Gaming Control and Revenue Act, MCL §§ 432.201-432.226, as amended by Michigan Public Act 306 of 2004, authorizes the City to impose a 10.9% wagering tax on casinos operating within City limits.  In addition to wagering taxes, the City collects certain other fees from casinos operating within the City, including a municipal services fee – $17.5 million in Fiscal Year 2013 (from $17.9 million in Fiscal Year 2012) – and a fee based on a percentage payment from the casino development agreements, which totaled $24.2 million in Fiscal Year 2013 (from $25.1 million in Fiscal Year 2012).  Further details regarding the City's historic and projected future wagering tax revenues as of the Petition Date are provided in Section III.C.2, below.

### (d)    Utility Users' Tax

Taxes collected from utility users are expected to total $35.3 million during Fiscal Year 2013, accounting for approximately 3.4% of total Fiscal Year 2013 General Fund revenues.  Utility users' tax revenues for Fiscal Year 2012 totaled $39.8 million.  Pursuant to Michigan Public Act 100 of 1990, the City Utility Users' Tax Act, MCL §§ 141.1151-141.1177 ("PA 100"), Detroit is the only city in Michigan authorized to impose a 5% utility users' excise tax.  The City imposes this tax on consumers of telephone, electric, steam and gas services.  The utility users' tax appears as a charge on consumers' utility bills.  Utility companies remit the proceeds of the tax to a trustee who distributes such proceeds to the City and the PLA (as defined below).  As originally enacted, PA 100 required that all revenues from the utility users' tax be used for the hiring or retention of police officers.  Michigan Public Act 392 of 2012, the Municipal Lighting Authority Act, MCL §§ 123.1261-123.1295, however, authorized the City to use up to $12.5 million of utility users' tax revenues per year to retire debt issued by a newly-formed Public Lighting Authority (the "PLA").  As more fully discussed in Section IV.J.4, the PLA has been formed during the course of this chapter 9 case, and the $12.5 million in utility users' tax revenues has been utilized.  Further details regarding the City's historic and projected future utility users' tax revenues as of the Petition Date are provided in Section III.C.2, below.

### (e)    State Revenue Sharing

As of the Petition Date, Detroit received unrestricted aid from the State in connection with constitutional and statutory sharing of sales tax revenue and economic vitality incentive payments ("EVIP").  The State has shared a portion of state sales tax revenues with Michigan municipalities since the 1930s.  In particular, pursuant to Article IX Section 10 of the Michigan Constitution, the State is required to distribute 15% of all state taxes imposed on retailers on taxable sales at retail of tangible personal property at a rate of not more than 4% to its townships, cities and villages based on their population.  The amount of constitutional state revenue sharing received by the City, therefore, is a function of amount of qualifying tax revenues and the population of the City relative to other municipalities eligible to receive revenue sharing payments and cannot easily be modified.

In addition to constitutional revenue sharing provided to the City, the State provides certain funds to cities, villages and townships (and, under a separate program, counties) by statute. The statutory distribution is authorized by legislative action and is subject to annual appropriation by the Michigan Legislature (the "Legislature"). Beginning with the State's Fiscal Year 2012, the State has replaced the prior statutory revenue sharing distribution (determined by a formula based on a municipality's taxable value and population) with incentive-based EVIP payments that are distributed to municipalities that comply with certain "best practices" and reporting requirements. Most recently, under Michigan Public Act 59 of 2013 ("PA 59"), the EVIP requirements for Fiscal Year 2014 are separated into three categories. A municipality receives one-third of the maximum EVIP distribution for which it is eligible for satisfying each of three categories of requirements, as follows:

- Category 1 - Accountability and Transparency. Each eligible city, village, township or county is required to certify by October 1, or the first day of a payment month, that it has produced a citizen's guide of its most recent local finances, including a recognition of its unfunded liabilities; a performance dashboard; a debt service report containing a detailed listing of its debt service requirements, including, at a minimum, the issuance date, issuance amount, type of debt instrument, a listing of all revenues pledged to finance debt service by debt instrument, and a listing of the annual payment amounts; and a projected budget report, including, at a minimum, the current fiscal year and a projection for the immediately following fiscal year.

- Category 2 - Consolidation of Services. Each eligible city, village, township or county is required to certify by February 1, or the first day of a payment month for this category, that it has produced a service consolidation plan and submit a copy of the consolidation plan to the Michigan Department of the Treasury (the "Treasury"). The consolidation plan is required to include details of any previous service cooperations, collaborations, consolidations, innovations or privatizations with an estimated cost savings amount for each cooperation, collaboration, consolidation, innovation or privatization. In addition, the consolidation plan is required to include at least one new proposal to increase its existing level of cooperation, collaboration, consolidation, innovation or privatization either within the jurisdiction or with other jurisdictions, an estimate of the potential savings amount and an estimated timeline for implementing the new proposal or proposals.

- Category 3 – Unfunded Accrued Liability Plan. Each eligible city, village, township or county with unfunded accrued liabilities as of its most recent audited financial report is required to submit, by June 1, a plan to lower all such unfunded accrued liabilities. The plan is required to include a listing of all previous actions taken to reduce its unfunded accrued liabilities with an estimated cost savings of those actions; a detailed description of how it will continue to implement and maintain previous actions taken; and a listing of additional actions it could take. If no actions have been taken to reduce the municipality's unfunded accrued liabilities, it is required to provide a detailed explanation of why no actions have been taken and a listing of actions it could implement to reduce unfunded accrued liabilities. Actuarial assumption changes and issuance of debt instruments do not qualify as a new proposal.

Because EVIP funds are appropriated by the Legislature and not constitutionally mandated, they are subject to change and inherently less certain than constitutional revenue sharing funds. The City's total portion of state shared revenue totaled $182.5 million for Fiscal Year 2013, accounting for approximately 17.4% of total Fiscal Year 2013 General Fund revenues. During Fiscal Year 2012, the City's portion of state shared revenue was $172.7 million. Further details regarding the City's historic and projected future state revenue sharing revenues as of the Petition Date are provided in Section III.C.2, below.

### (f) Other Revenue

In addition to the tax revenue streams described above, the City receives revenues from fees for City-provided services, permits, licenses and parking fines. General fund revenues from these sources totaled approximately $166.4 million in Fiscal Year 2013 (from approximately $171.1 million in Fiscal Year 2012). The City also receives revenue from grants and programs subsidized by other governments (including, for example, the federal government, the State and Wayne County) and non-profit organizations, such as funding for community development and blight elimination projects. General fund revenues from these sources totaled approximately $61.1 million during Fiscal Year 2013 (from $81.0 million in Fiscal Year 2012). State law precludes the City for charging fees that exceed the costs of providing the relevant services.

5.     **Assets**

(a)     **Art Housed at Detroit Institute of Arts**

The DIA houses an art collection (the "DIA Collection") that has been described as one of the top six art collections in the United States. The DIA Collection consists of, among other things, works by European masters as well as significant pieces of African, Asian, Native American, Oceanic, Islamic, Ancient and Contemporary art. The City owns a significant portion of the DIA Collection comprised of (i) some portion of the art collection transferred to the City in 1919 (the "Transferred Art") pursuant to an asset transfer (the "Asset Transfer") between the City and an entity then-incorporated as the "Detroit Museum of Art;" (ii) certain art purchased by the City following the Asset Transfer; and (iii) certain art donated after the Asset Transfer. From its inception in 1885 until the Asset Transfer, the corporation then-known as the Detroit Museum of Art owned the Transferred Art and the original museum building. Pursuant to the Asset Transfer – which was specifically authorized by Michigan Public Act 67 of 1919 and Section 7(c) of Chapter 19 of the Detroit City Charter of 1918 – the Detroit Museum of Art conveyed the Transferred Art, along with the museum building and certain real property, to the City in 1919.

Today, the DIA Collection is considerably larger than was the collection of Transferred Art in 1919. The City has purchased numerous works of art since the Asset Transfer and, in particular, acquired many of the DIA Collection's most notable pieces between 1922 and 1930. Prior to the Asset Transfer, in 1915, the Detroit Museum of Art owned approximately 4,400 works of art; by 1930, the DIA Collection contained nearly 12,000 works. To house the rapidly-growing DIA Collection, the City financed the construction of the current DIA museum building, which opened in 1927 and cost an estimated $4 million. The DIA Collection also has been augmented by many gifts acquired during the 95-year period since the Asset Transfer. As of the Petition Date, the DIA Collection consisted of approximately 65,000 works of art. The corporation formerly known as the Detroit Museum of Art continued to exist after the Asset Transfer. Today, that corporation – which has changed its name several times since 1919 and now bears the name "The Detroit Institute of Arts" and is referred to in this Disclosure Statement as the "DIA Corp." – contracts with the City to operate the museum building and manage, preserve and display the DIA Collection.

In an opinion dated June 13, 2013 (Opinion No. 7272), the Michigan Attorney General asserted that the DIA Collection is held in charitable trust and stated that the City may not transfer any portion of the DIA Collection because the City is a mere trustee of the works that comprise the DIA Collection. A position paper commissioned by the DIA in 2013 took the same position and also advanced an alternative argument that the DIA Collection is subject to the public trust doctrine, a legal doctrine that protects public rights in natural resources. It is anticipated that these positions may be disputed by parties in interest in the City's chapter 9 case.

As discussed in greater detail in Section IV.J.7 below, in 2013, the City engaged Christie's Inc. ("Christie's") to appraise the portion of the DIA Collection that was acquired using City funds. On December 17, 2013, Christie's issued its final appraisal, estimating the aggregate fair market value of the Appraised Art (as defined in Section IV.J.7) to be between $454 million and $867 million.

(b)     **City-Owned Land**

An estimated 22 square miles of land within City limits is government-owned, including parcels owned by the City, Wayne County and the State. Many of these parcels are vacant overgrown lots with illegal dumping or contain abandoned buildings in need of demolition. It has been estimated that the City owns approximately 60,000 parcels of vacant land and approximately 10% of the estimated 78,000 vacant structures within City limits. The vast majority of City-owned parcels have limited present commercial value. The City's efforts to address blight, remove vacant structures and encourage beneficial uses of City-owned land – which measures include initiatives involving the Detroit Land Bank Authority and the Michigan Land Bank – are addressed in Section IV.J.5, below.

(c)     **Belle Isle Park**

The City owns Belle Isle Park, a 982-acre park situated on an island in the Detroit River designed by Frederick Law Olmsted. Belle Isle Park features numerous historical and recreational attractions, including the James Scott Memorial Fountain (designed by Cass Gilbert, architect of the United States Supreme Court building), the Anna Scripps Whitcomb Conservatory (also known as the Belle Isle Conservatory, a greenhouse and botanical garden built in 1904, designed by Detroit architect Albert Kahn and modeled after a portion of Thomas Jefferson's Monticello), the Belle Isle Casino building (built in 1908 and which, despite its name, is used for special events rather than gambling), the Dossin Great Lakes

Museum, the Livingstone Memorial Lighthouse (the only lighthouse in the United States made entirely of marble), the Nancy Brown Peace Carillon, the Detroit Yacht Club, an aquarium, golf courses and a swimming beach. Belle Isle Park is larger than New York City's Central Park. As of the Petition Date, Belle Isle Park was the nation's largest municipally-operated island park.

In recent years, the City's Recreation Department has maintained and operated Belle Isle Park at an annual cost of approximately $6 million. Pursuant to a lease agreement between the City and the State approved by the LEFALB on November 12, 2013 (discussed in greater detail in Section IV.J.6, below), as of February 10, 2014, Belle Isle Park is being operated as a state park.

### (d)    Detroit-Windsor Tunnel

The Detroit-Windsor Tunnel is an 83-year-old automotive tunnel beneath the Detroit River that connects Detroit and Windsor, Ontario. The City owns the portion of the tunnel located in the United States. Approximately two million vehicles pass through the tunnel annually. Detroit Windsor Tunnel LLC leases the City's portion of the tunnel for an annual rental payment equal to 20% of the average annual revenue derived from the operations of the Detroit side of the tunnel over the most recent five years, which recently has been less than $1 million per year, as operating revenue for the Detroit side of the tunnel has totaled less than $5 million annually during recent years. The lease (the "Tunnel Lease") runs through 2020.

On July 25, 2013, American Roads LLC ("American Roads") – the parent of Detroit Windsor Tunnel LLC – commenced a chapter 11 bankruptcy case in the United States Bankruptcy Court for the Southern District of New York (the "New York Bankruptcy Court"). See In re Am. Roads LLC, Chapter 11 Petition, No. 13-12412 (Bankr. S.D.N.Y. July 25, 2013) (Docket No. 1). On August 21, 2013, the bankruptcy court issued an order authorizing American Roads to assume the Tunnel Lease. Am. Roads, Order Authorizing the Debtors to Assume the Detroit-Windsor Tunnel Leases with the City of Detroit (Bankr. S.D.N.Y. Aug. 21, 2013) (Docket No. 97). The New York Bankruptcy Court approved American Roads' prepackaged plan of reorganization on August 28, 2013, pursuant to which plan Syncora Guarantee Inc. ("Syncora") will become the owner of American Roads and its debtor-subsidiaries, including Detroit Windsor Tunnel LLC. See Am. Roads, Order Approving Debtors' Disclosure Statement for, and Confirming, Debtors' Joint Prepackaged Chapter 11 Plan (Bankr. S.D.N.Y. Aug. 28, 2013) (Docket No. 129).

### (e)    Coleman A. Young Airport

The City owns Coleman A. Young International Airport, a two-runway general aviation airport located on approximately 263 acres within the City limits. Approximately 225 private flights depart from, or arrive at, the airport daily. The airport features a 53,000-square-foot passenger terminal with space available for restaurants, retail concessions, passenger lounges, ticketing desks and baggage claims. The airport has not offered commercial carrier service since 2000 in part due to the fact that the airport's runways lack the length required to accommodate many types of commercial passenger jets. The City has subsidized the airport in recent years because the airport's revenues have fallen far short of expenses. In Fiscal Year 2013, the City's General Fund contributed $0.3 million to fund the airport's operations and maintenance. The airport's General Fund contribution for Fiscal Year 2014 was increased to $0.6 million.

### (f)    Joe Louis Arena

The City owns Joe Louis Arena, a 20,058-seat indoor arena that is home to the Detroit Red Wings of the National Hockey League. Completed in 1979, Joe Louis Arena is the City's largest indoor entertainment venue. In addition to professional hockey, Joe Louis Arena hosts concerts, circuses, ice shows and various occasional professional and college sporting events.

In 2009, Olympia Entertainment ("Olympia"), the parent of the Detroit Red Wings (the "Red Wings"), declined to renew its lease of Joe Louis Arena (the "Original JLA Lease"). The 30-year term of the Original JLA Lease expired on July 1, 2010; since that date, the Red Wings have occupied Joe Louis Arena as a holdover tenant. As of the Petition Date, certain disputes existed between the parties with respect to amounts the City maintained it was due under the Original JLA Lease.

In July 2013, Olympia proposed a project to build a new arena in downtown Detroit – which would replace Joe Louis Arena as the home of the Red Wings – along with a mixed-use residential, retail and entertainment district. The proposed project involves a cooperative arrangement between Olympia and the City of Detroit Downtown

Development Authority (the "<u>DDA</u>"). The DDA was created by the Detroit City Council by Ordinance No. 119-H on May 20, 1976, under the provisions of Michigan Public Act 197 of 1975, the Downtown Development Authority Act, MCL §§ 125.1651-125.1681. The DDA was established for the purpose of promoting and developing economic growth in Detroit's downtown business district. The DDA funds its activities by an *ad valorem* tax of one mill on real and tangible personal property not exempt by laws in the downtown development district, and the issuance of negotiable revenue and tax increment obligations. For financial reporting purposes, the DDA is a component unit of the City because the members of the DDA's Board of Directors are appointed by the City's mayor and are confirmed by the Detroit City Council, which approves the DDA's budget. Further developments during this chapter 9 case regarding this transaction are provided in Section IV.J.8.

**B.     Outstanding Financial Obligations of the City as of the Petition Date**

On the Petition Date, the City filed its List of Creditors Pursuant to Section 924 of the Bankruptcy Code and Bankruptcy Rule 1007 (Docket No. 16) (the "<u>Original List of Creditors</u>"). On August 1, 2013, the City filed its Amended List of Creditors Pursuant to Section 924 of the Bankruptcy Code and Bankruptcy Rule 1007 (Docket No. 258) (the "<u>Amended List of Creditors</u>"), which replaced the Original List of Creditors and redacted certain personal information contained in the Original List of Creditors. On September 30, 2013, the City filed its Second Amended List of Creditors and Claims, Pursuant to Sections 924 and 925 of the Bankruptcy Code (Docket No. 1059), which supplemented and amended the information in the Amended List of Creditors. The Second Amended List of Creditors is the currently effective list of the Claims against the City under section 925 of the Bankruptcy Code (as amended or supplemented from time to time, the "<u>List of Claims</u>").

In the List of Claims, the City identified a total of approximately $17.976 billion in prepetition obligations, including approximately $17.914 billion in long term obligations described in the paragraphs below.

**1.     Obligations Secured by Special Revenues**

Michigan Public Act 94 of 1933, the Revenue Bond Act, MCL §§ 141.101-141.140 (the "<u>Revenue Bond Act</u>") authorizes the City to issue bonds secured by the property and revenues of certain City enterprises ("<u>Revenue Bonds</u>"). Revenue Bonds issued by the City are not included in the general limit of indebtedness prescribed by Michigan law so long as they do not impose any liability upon the City itself. As of the Petition Date, the City owed approximately $5.359 billion in outstanding principal and interest amount of Revenue Bonds which includes approximately $504.3 million in outstanding principal and interest amount of related revolving bonds (collectively, the "<u>DWSD Revolving Bonds</u>"). The Revenue Bonds and the DWSD Revolving Bonds are serviced from the following Enterprise Funds:

**(a)     Sewage Disposal Fund Revenue Bonds & DWSD Revolving Sewer Bonds**

As of the Petition Date, the City owed approximately $2.826 billion in outstanding principal and interest amount of Revenue Bonds (consisting of first lien bonds totaling approximately $1.861 billion and second lien bonds totaling approximately $965 million) serviced from the City's sewage disposal fund (the "<u>DWSD Sewer Bonds</u>"). The DWSD Sewer Bonds consist of 19 series of Revenue Bonds issued between 1998 and 2012, bearing interest rates between 1.625% and 7.50% and maturing July 1, 2014 through July 1, 2039. The 19 series of DWSD Sewer Bonds outstanding as of the Petition Date are insured by various entities, including National Public Finance Guarantee Corporation ("<u>NPFGC</u>") (12 series), Assured Guaranty Municipal Corporation ("<u>Assured</u>") (six series) and Financial Guaranty Insurance Company ("<u>FGIC</u>") (one series). Berkshire Hathaway Assurance Corporation ("<u>Berkshire Hathaway</u>") reinsures three series of DWSD Sewer Bonds.

The City used the proceeds of the DWSD Sewer Bonds for the construction and maintenance of the sewage disposal system as well as the refunding of other liabilities. Revenues of the sewage disposal system, net of operating expenses, were pledged to secure payment of principal and interest on the DWSD Sewer Bonds.

In addition, as of the Petition Date, the City owed approximately $482.9 million in outstanding principal and interest amount of DWSD Revolving Sewer Bonds related to the DWSD Sewer Bonds. During Fiscal Year 2013, the sewage disposal system received net system revenues of approximately $461.8 million versus expected debt service requirements of approximately $200.0 million.

A schedule of the DWSD Sewer Bonds and related DWSD Revolving Sewer Bonds is attached hereto as Exhibit B.

### (b) Water Fund Revenue Bonds & DWSD Revolving Water Bonds

The City also owed approximately $2.525 billion in outstanding principal and interest amount of Revenue Bonds (consisting of first lien bonds totaling approximately $1.884 billion and second lien bonds totaling approximately $641 million) serviced from the City's water fund as of the Petition Date (the "DWSD Water Bonds"). The DWSD Water Bonds consist of 20 series of Revenue Bonds issued between 1993 and 2011, bearing interest rates between 2.496% and 7.00% and maturing July 1, 2014 through July 1, 2041. Of the 20 series of DWSD Water Bonds outstanding as of the Petition Date, 17 are insured by various entities, including by NPFGC (10 series), Assured (four series) and FGIC (three series). Berkshire Hathaway reinsures two series of DWSD Water Bonds.

The City used the proceeds of the DWSD Water Bonds for the construction and maintenance of the water supply system as well as the refunding of certain other liabilities. Substantially all of the revenues of the City's water supply system, net of operating expenses, were pledged to secure payment of principal and interest on the DWSD Water Bonds.

The City also owed approximately $21.5 million in outstanding principal and interest amount of DWSD Revolving Water Bonds related to the DWSD Water Bonds as of the Petition Date. During Fiscal Year 2013, the water system received net system revenues of approximately $370.1 million versus expected debt service requirements of approximately $153.4 million.

A schedule of the DWSD Water Bonds and related DWSD Revolving Water Bonds is attached hereto as Exhibit C.

### (c) Automobile Parking Fund Revenue Bonds

As of the Petition Date, the City owed approximately $9.3 million in outstanding principal and interest amount of Detroit Building Authority Revenue Refunding Bonds: Parking System, Series 1998-A, bearing interest rates between 4.70% and 5.125% and maturing July 1, 2014 through July 1, 2019 (the "Parking Bonds"). Substantially all revenues of the City's parking system, net of operating expenses, were pledged to secure payments of principal and interest on the Parking Bonds. During Fiscal Year 2013, the parking system received net system revenues of approximately $11.1 million versus expected debt service requirements of approximately $1.7 million.

### 2. Long-Term General Fund Obligations

The City issues general obligation bonds (collectively, "General Obligation Bonds") to provide funds for the acquisition and construction of major capital facilities and equipment. General Obligation Bonds have been issued for both governmental and business-type activities. As of the Petition Date, the City had a total of $1.023 billion in outstanding principal and interest amount of unlimited tax general obligation bonds (collectively, "Unlimited Tax General Obligation Bonds") and limited tax general obligation bonds (collectively, "Limited Tax General Obligation Bonds"). In addition, certain of the Unlimited Tax General Obligation Bonds and the Limited Tax General Obligation Bonds are secured by a lien in or other rights to distributable state aid. The General Obligation Bonds consist of the following:

### (a) Unlimited Tax General Obligation Bonds

Pursuant to the Home Rule City Act, the City levies the taxes used to pay debt service charges or obligations (including (i) principal and interest due during the current tax year, (ii) amounts necessary to fund deposits into sinking funds with respect to any mandatory redemptions and (iii) amounts due but unpaid from the immediately preceding year) on Unlimited Tax General Obligation Bonds issued with the approval of the electorate. The amount of taxes levied to service Unlimited Tax General Obligation Bonds is in addition to other taxes that the City is authorized to levy, without limitation as to rate and amount and without regard to any City Charter, statutory or constitutional caps on taxation.

As of the Petition Date, the City owed approximately $479.4 million in outstanding principal and interest amount of 13 series of Unlimited Tax General Obligation Bonds maturing from April 1, 2014 through November 1, 2035 and bearing interest rates between 3.70% and 5.375%. Of this amount approximately $101.7 million in outstanding principal and interest amount of one series of Unlimited Tax General Obligation Bonds issued in 2010 is secured by or has a right to be paid from distributable state aid held by the State and not disbursed to the City. Each series of unsecured Unlimited Tax General Obligation Bonds is insured by National, Assured or Ambac Assurance Corporation ("Ambac").

On November 8, 2013, National and Assured filed a joint complaint against the City commencing an adversary proceeding in the Bankruptcy Court, Case No. 13-05309 (the "UTGO Litigation"). In the UTGO Litigation, National and

Assured allege that the City's Unlimited Tax General Obligation Bond debt is entitled to special treatment in the City's chapter 9 case. National and Assured seek a declaratory judgment and order that the City must segregate certain tax revenues from the City's other sources of revenue and apply them solely for the purpose of servicing the City's obligations under the Unlimited Tax General Obligation Bonds, thereby essentially elevating the Unlimited Tax General Obligation Bonds to secured status. The City disputes National's and Assured's characterization of the City's obligations with respect to the Unlimited Tax General Obligation Bonds. As of the date of this Disclosure Statement, the UTGO Litigation remains pending.

It is the City's position that the Unlimited Tax General Obligation Bond debt is a general unsecured obligation, and the Plan treats it accordingly. See Section V.B.2. That position is contested in the UTGO Litigation. That litigation, ot the settlement thereof, may have an effect on the City's ability to continue to collect the ad valorem tax related to the Unlimited Tax General Obligation Bond debt.

A schedule of the secured and unsecured Unlimited Tax General Obligation Bonds is attached hereto as Exhibit D.

**(b)      Limited Tax General Obligation Bonds**

In addition to Unlimited Tax General Obligation Bonds, the City is authorized under Michigan law to issue Limited Tax General Obligation Bonds without the approval of the electorate. Limited Tax General Obligation Bonds are serviced from the City's General Fund, including *ad valorem* taxes levied for general operations purposes as a general obligation of the City.

As of the Petition Date, the City owed approximately $546.8 million in outstanding principal and interest amount of nine series of Limited Tax General Obligation Bonds maturing April 1, 2014 through November 1, 2035. Of this amount, (i) approximately $252.5 million in outstanding principal and interest amount of one series of Limited Tax General Obligation Bonds issued in 2010 is secured by a first lien on distributable state aid and (ii) approximately $130.8 million in outstanding principal and interest amount of one series of Limited Tax General Obligation Bonds issued in 2012 is has the right to be paid by the State using distributable state aid held by the State and not disbursed to the City. Four of the six series of unsecured Limited Tax General Obligation Bonds are insured by Ambac. The other two series of unsecured Limited Tax General Obligation Bonds are not insured.

On November 8, 2013, Ambac filed a complaint against the City commencing an adversary proceeding in the Bankruptcy Court, Case No. 13-05310 (the "LTGO Litigation"). In the LTGO Litigation, in addition to repeating the arguments raised by National and Assured in the UTGO Litigation, Ambac alleges that the City is obligated to use general tax revenues collected within the City's charter, statutory or constitutional limitations to service the Limited Tax General Obligation Bonds. The City disputes Ambac's characterization of the City's obligations with respect to the Unlimited Tax General Obligation Bonds and the Limited Tax General Obligation Bonds. As of the date of this Disclosure Statement, the LTGO Litigation remains pending,

A schedule of the secured and unsecured Limited Tax General Obligation Bonds is attached hereto as Exhibit E.

**(c)      Outstanding Installment Notes and Loans**

As of the Petition Date, the City owed approximately $123.8 million in other outstanding installment notes and loans payable related to various public improvement projects. These obligations included: (i) $90.1 million in notes payable, which notes were issued in connection with the "Section 108" HUD Loan Guarantee Program and are secured by future "Block Grant" revenues; and (ii) approximately $33.7 million in loans payable ($33.6 million of which is a non-interest bearing unsecured loan, with flexible maturity, payable to the DDA as general operating funds become available).

**3.      Certificates of Participation**

In 2005, the City entered into a series of transactions involving the issuance to investors of approximately $1.4 billion of instruments known as certificates of participation (the "2005 COPs"). Pursuant to City Ordinance No. 05-05, the City organized two nonprofit entities known as "service corporations" – the Detroit General Retirement System Service Corporation and the Detroit Police and Fire Retirement System Service Corporation (together, the "Service Corporations") – to provide "services," including providing funding to the Retirement Systems by facilitating the financing of the 2005 COPs. The Service Corporations in turn created a funding trust (the "2005 Funding Trust") to issue

and sell the 2005 COPs. The 2005 Funding Trust issued the 2005 COPs in 2005. The City entered into a separate service contract with each of the Service Corporations (the "2005 Service Contracts") pursuant to which the City agreed to make certain payments in return for the Service Corporations' future assistance in funding transactions for the Retirement Systems.

The Service Corporations are Michigan nonprofit corporations incorporated by the City pursuant to state law and are legally separate from the City. Both of the Service Corporations, however, are fiscally dependent upon and provide services entirely to the City. The governing body of each Service Corporation is its Board of Directors, each of which consists of three officials of the City, the Finance Director, the Budget Director and the Corporation Counsel, plus two members of the City Council, selected and appointed by the City Council.

In 2006, the Service Corporations established another funding trust (the "2006 Funding Trust" and, together with the 2005 Funding Trust, the "Funding Trusts") and entered into a trust agreement with U.S. Bank National Association ("U.S. Bank") as trustee, pursuant to which agreement the 2006 Funding Trust issued the "2006 COPs" (together with the 2005 COPs, the "COPs"). One series of 2006 COPs had a fixed interest rate and was issued in the original aggregate principal amount of $148.54 million; the other series of 2006 COPs was issued in the original aggregate principal amount of $800 million and had a floating interest rate. The proceeds of the 2006 COPs were used, in large part, to fund the optional redemption and cancellation of certain of the 2005 COPs. As of June 7, 2006, the Service Corporations each entered into a service contract with the City in connection with the issuance of the 2006 COPs (together with the 2005 Service Contracts, the "Service Contracts").

As of the Petition Date, there were three series of COPs outstanding in the aggregate amount of approximately $1.473 billion, as follows: (a) the Series 2005-A COPs in the aggregate amount of approximately $517.6 million, bearing interest at 4.50 to 4.95%; (b) the Series 2006-A COPs in the aggregate amount of $153.7 million, bearing interest at 5.989%; and (c) the Series 2006-B COPs in the aggregate amount of $801.6 million, bearing interest at a floating rate.

The COPs may not be authorized under Michigan law. The City is subject to both the Home Rule City Act and the Revised Municipal Finance Act of 2001, MCL §§ 141.2101-141.2821 (the "Municipal Finance Act"). Section 117.4a(2) of the Home Rule City Act prescribes certain limitations on the amount of "indebtedness" that the City may incur. If the City's obligations under the Service Contracts constitute "indebtedness" within the meaning of the Home Rule City Act, then the issuance of the COPs may have exceeded the limitations on indebtedness imposed by the Home Rule City Act and, thus, may not have been authorized under applicable Michigan law. Similarly, Sections 301 and 103 of the Municipal Finance Act prohibit a "municipality" from issuing a "municipal security," except in accordance with the provisions of the Municipal Finance Act. In addition, the issuance of some or all of the COPs may have constituted the issuance of a municipal security by a municipality other than in conformity with the Municipal Finance Act.

## 4. Swap Liabilities

Ostensibly to protect against the risk of rising interest rates on the floating-rate COPs (the 2006-B COPs), those COPs were restructured to have a "synthetic" fixed interest rate. To this end, in 2006, the Service Corporations entered into pay fixed, receive variable interest rate swap transactions with an aggregate notional amount equal to the then-outstanding amount of the 2006-B COPS, or $800 million, under eight separate master agreements (collectively, the "Swap Contracts") with either (a) UBS AG and (b) SBS Financial Products Company LLC ("SBS" and, together with UBS AG, the "Swap Counterparties"). Merrill Lynch Capital Services, Inc. provided credit support to SBS with respect to the transaction.

Under the Swap Contracts, the Service Corporations and Swap Counterparties agreed effectively to convert the floating interest rate exposure of the Service Corporations into a fixed payment. Under this arrangement, the Swap Counterparties agreed to make payments to the Service Corporations in the event the floating rates on the COPs exceeded certain levels. Conversely, when the interest rate falls below the fixed rate, however, the Service Corporations must pay the Swap Counterparties the difference between the lower floating rate and the higher agreed-upon fixed rate, on a quarterly basis. The Service Corporations' sole source of funding for payments owed under the Swap Contracts is payments owed by the City under the Service Contracts.

The Swap Counterparties required protection against the possibility that the Service Corporations might default on their quarterly swap payments. Consequently, the City arranged for insurance policies to guaranty certain of the payments on the Swap Contracts with FGIC and Syncora (together with FGIC, the "Swap Insurers"), as successor to XL Capital Assurance Inc. The policies insure the quarterly payments owed under the Swap Contracts as well as a certain portion of the termination payments that may be owed thereunder. In certain circumstances (*e.g.*, when the Swap Insurer directs

13-53846-swr   Doc 8720   Filed 12/11/14   Entered 12/11/14 00:57:30   Page 45 of 440

termination), there is no cap on the amount the Swap Insurer would owe with respect to a Claim based on a termination payment. In the event the Swap Counterparties terminate the Swap Contracts, unless the Swap Insurers are otherwise released, Syncora's maximum exposure is $27 million, and FGIC's maximum exposure is $50 million under their respective policies relating to the Swap Contracts. Each of the policies is unconditional and irrevocable, and may not be cancelled for any reason.

In or around January 2009, downgrades of the 2006 COPs' debt rating provided the Swap Counterparties the right, pursuant to the Swap Contracts, to designate an early termination date for the transactions under the Swap Contracts. Given the low prevailing interest rates in 2009, such early termination would have resulted in a lump-sum payment owed to the Swap Counterparties of between $300 million and $400 million. To avoid such an early termination payment, the City, the Service Corporations and the Swap Counterparties agreed to restructure the swap obligations. As part of this restructuring, the City provided collateral to the Swap Counterparties for amounts owed to them under the Swap Contracts pursuant to a Collateral Agreement dated June 15, 2009 (the "Collateral Agreement"), among the City, the Service Corporations, the Swap Counterparties and U.S. Bank, as custodian. To secure the obligations to the Swap Counterparties, the City agreed to direct its wagering tax revenues (the "Casino Revenues") into a lockbox account (the "General Receipts Account") pending payment each month into a second lockbox account (the "Holdback Account") of one third of the quarterly payment next due to the Swap Counterparties.

As of the Petition Date, each day, on average, approximately $0.5 million in Casino Revenues was deposited into the General Receipts Account which, at the end of each 30-day period, amounted to approximately $15 million. Under the Collateral Agreement, U.S. Bank releases the funds accumulating in the General Receipts Account to the City only after the City deposits approximately $4 million – one-third of its quarterly swap payment – into the Holdback Account. Once the City makes this deposit into the Holdback Account, U.S. Bank gives the City complete access to the Casino Revenues in the General Receipts Account, as it is deposited, until the beginning of the next payment period. If the City fails to make a quarterly swap payment, the Swap Counterparties are empowered under the Collateral Agreement to notify U.S. Bank that it should not release – or should "trap" – the Casino Revenues owed to the City. The Swap Counterparties are permitted to do this even if the amounts in the General Receipts Account exceed the amount of the missed swap payment. As of the Petition Date, the City had not defaulted on any of its payments to the Swap Counterparties through the Holdback Account.

Section IV.D, below, summarizes litigation and settlement efforts regarding the City's swap obligations.

5.      **Pension Obligations**

(a)      **Description of Retirement Systems**

The Retirement Systems consist of the General Retirement System of the City of Detroit (the "GRS") and the Police & Fire Retirement System of the City of Detroit (the "PFRS"). For financial statement purposes, the Retirement Systems are included as fiduciary trust funds of the City. Each system is a single-employer plan composed of a defined benefit plan and a defined contribution annuity program. The plans provide retirement, disability and pre-retirement death benefits to plan members and beneficiaries. The plans are administered in accordance with the City Charter, the Detroit City Code and union contracts, which assign the authority to establish and amend contributions and benefit provisions to each plan's Board of Trustees. As of the Petition Date, Section 11-103(1) of the City Charter established the composition of the GRS Board of Trustees, as follows, although the actual composition has been changed pursuant to certain collective bargaining dispute arbitration awards: (i) the Mayor; (ii) one City Council member selected by the City Council; (iii) the City Treasurer; (iv) five members of the GRS, elected by the GRS membership; (v) one City resident who is neither a City employee nor eligible to receive GRS benefits, appointed by the Mayor and approved by the GRS Board of Trustees; and (vi) one current GRS retiree who is receiving benefits under the GRS, elected by "retired City employees." Section 11-103(2) of the City Charter provided, as of the Petition Date, that the PFRS Board of Trustees shall consist of: (i) the Mayor or a designee of the Mayor; (ii) one City Council member selected by the City Council; (iii) the City Treasurer; (iv) the Chief of Police; (v) the Fire Commissioner; (vi) three firefighters who are PFRS members, elected by PFRS members who are firefighters; (vii) three police officers who are PFRS members, elected by PFRS members who are police officers; and (viii) two current PFRS retirees who are residents of the City and are receiving benefits under the PFRS, with one such retiree elected by "retired firefighters" and one elected by "retired police officers." The Retirement Systems' investment policies are governed in accordance with Michigan Public Act 314 of 1965 (as amended), the Public Employee Retirement System Investment Act, MCL §§ 38.1121-38.1141.

(b)     **Underfunding**

i.     **Retirement Systems' Prepetition Estimates**

Each of the Retirement Systems has reported UAAL totals that are substantially lower than the amounts disclosed by the City in the List of Claims.  In particular, as of June 30, 2012, the GRS reported that it was 77.0% funded with a UAAL of $837.7 million out of $3.644 billion in accrued liabilities.  As of June 30, 2012, the PFRS reported that it was 96.2% funded with a UAAL of $147.2 million out of $3.823 billion in accrued liabilities.  Thus, based on actuarial assumptions and methods employed by the Retirement Systems prior to the commencement of the chapter 9 case, the estimated UAAL as of the end of Fiscal Year 2012 for both Retirement Systems combined was $984.9 million.

ii.     **Unrealistic Assumptions**

The City believes that the UAAL figures reported by the Retirement Systems were substantially understated because they were based upon various actuarial assumptions and methods that served to substantially understate the Retirement Systems' UAAL.  The assumptions and methods included:  (A) annual net rates of return on investments (GRS – 7.9%; PFRS – 8.0%) that were unrealistic in light of the Retirement Systems' demographics, the targeted mix of the Retirement Systems' assets and the inability of the City to budget for and fund pension investment loss in the event the sought-after returns were not achieved; (B) the "smoothing" (reallocation over a period of years) of asset gains and losses over a seven-year period, which masks the funding shortfall; and (C) the use of 29-year (PFRS) and 30-year (GRS) amortization periods for funding UAAL – which is applied anew each year to the full amount of unfunded liability – that allows unfunded liabilities to continue to grow rapidly as a result of compounding.

iii.     **Past Pension Practices**

The Retirement Systems' trustees and certain City officials also have engaged in a variety of practices that exacerbated and, in certain cases, masked the extent of the Retirement Systems' UAAL, particularly with respect to the GRS.

(A)     **Annuity Savings Plan and 13th Check Program**

Perhaps most damaging to the fiscal health of the Retirement Systems was the GRS board of trustees' (the "GRS Trustees") actions in connection with the "annuity savings plan" offered to certain beneficiaries of the GRS (the "Annuity Savings Plan").  Under the terms of the Annuity Savings Plan, active City employees were allowed to elect to invest zero, three, five or seven percent of their salaries on an after-tax basis into a discrete defined contribution plan that earned interest based on a rate of return established at the discretion of the GRS Trustees.  These employee contributions were aggregated and invested with the other assets of the GRS on a commingled basis.  In many years, however, the GRS Trustees chose to credit employees' Annuity Savings Plan accounts with rates of return that were far greater than the actual rate of return earned on investments by the GRS.  For a long period of time, the GRS Trustees essentially operated the Annuity Savings Plan as a guaranteed investment contract with a guaranteed floor investment return approaching 7.9%.  For example, in 2009, the GRS lost 24.1% of the value of its assets, yet the GRS Trustees credited Annuity Savings Plan accounts with a positive investment return of approximately 7.9%.

These inflated rates of return on Annuity Savings Plan accounts were funded with GRS assets attributable to the City's contributions to fund the GRS's defined benefit pension.  Hundreds of millions of dollars of GRS plan assets intended to support the traditional defined benefit pensions that the City had promised were reallocated to the Annuity Savings Plan and provided a windfall to the Annuity Savings Plan accounts of active employees outside of the defined benefit pension plan.  According to the "Initial 60 Day Report" issued by the Office of the Auditor General and the Office of the Inspector General on August 20, 2013 (the "IG/AG Report"), this practice resulted in an effective rate of return of over 20% on Annuity Savings Plan accounts for Fiscal Years 1984-86, 1995-2000 and 2005-07.  The IG/AG Report also revealed that interest dividend credits were given disproportionately to employees with Annuity Savings Plan accounts, resulting in "excessively disproportionate" annuity refund amounts to such employees.

For the GRS, the transfer of assets that were otherwise intended to fund defined benefit pensions was not limited to practices involving Annuity Savings Plan accounts.  For example, in years in which the actual investment return exceeded the assumed rate of return, the GRS Trustees paid out a portion of the excess to already retired pensioners.  Referred to as the "13th check" program – because the additional pension check would be in excess of the 12 monthly

pension checks the retiree normally received in that year – these payments were made in excess of the pensioner's earned pension and to the detriment of the Retirement Systems.

An average of nearly 55% of earnings over and above assumed rates of return were diverted from GRS defined benefit pension plans into the Annuity Savings Plan accounts of active employees. An additional 17% of any such earnings on average was distributed to retirees directly via the "13th check" program. Instead of being retained by the GRS, the remaining 28% of these "excess" earnings on average was used to discount the City's forthcoming required pension contributions, thus ensuring that the net performance of the GRS would never exceed the assumed rate of return in any given year and that UAAL would continue to increase. These practices deprived the GRS of assets that would be needed to support liabilities, especially in light of the fact that in certain years, the GRS' investment returns inevitably would fall short of their assumed rates of return. See Declaration of Charles M. Moore in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (Docket No. 13) (the "Moore Declaration"), at ¶ 19.

According to a report that was provided to City Council members by the Fiscal Analysis Division on November 21, 2011, the total cost to the City of the GRS practices of distributing pension-fund earnings over assumed rates of return to retirees and active employees – whether by direct payment via a "13th check" or through excess contributions to employees' Annuity Savings Plan accounts – as of June 30, 2008, was $1.92 billion. See Report of Joseph Esuchanko dated March 8, 2011, at 9.

### (B) Fiduciary Malfeasance

There are also serious allegations that former Retirement Systems officials have engaged in additional fiduciary misconduct that has harmed the Retirement Systems. For example, in January 2012, a trustee of the Retirement Systems was indicted by a federal grand jury on charges that he conspired with others to personally enrich himself and his co-conspirators by accepting bribes from individuals who conducted business with the Retirement Systems. These bribes took the form of cash, travel, meals, golf clubs, drinks, gambling money, hotel stays, entertainment, Las Vegas concert tickets, massages, limousine service, private plane flights, and other things of value. According to a Federal Bureau of Investigation ("FBI") Press Release dated February 28, 2012, the Retirement Systems suffered more than $84 million in losses from investments associated with the charged-trustee's alleged bribery conspiracy. In March 2013, the former general counsel of both Retirement Systems and a former PFRS trustee were also indicted for having participated in the aforementioned bribery and kickback conspiracy, which involved steering more than $200 million in Retirement System investments. According to an FBI Press Release dated March 20, 2013, these Retirement Systems officials and others collectively conspired to defraud current and retired employees of the City of their right to the honest services of Retirement Systems officials free from bribery and corruption.

In 2009, it was reported that certain Retirement System trustees and their lawyers and staff billed the Retirement Systems $380,000 for traveling around the world to attend conferences. The GRS trustee who spent the most time traveling to such conferences reportedly billed the GRS for $105,000 in travel expenses, including three trips to Singapore and one trip to Hong Kong. Some of this travel occurred during an 18-month period during which the Retirement Systems lost billions of dollars in investments. The misconduct of these Retirement System officials has contributed, in a not insignificant way, to the underfunding of the Retirement Systems.

### (C) Deferrals of Current Contributions

The City also periodically deferred payment of its year-end PFRS contributions (and financed such deferrals at a rate of 8%). As of May 2013, the City had deferred approximately $58 million in pension contributions owing for Fiscal Year 2013. Contributions made in the form of notes were treated as timely funding contributions made to the pension trust during the applicable financial year. In addition, the City was granted a funding credit by PFRS in the amount of $25 million for each of the Fiscal Years 2008 through 2010, resulting in under-contributions by the City toward its pension liabilities for each of those years.

### iv. Pre-Chapter 9 Estimates of Extent of Underfunding Using Realistic Assumptions

In the List of Claims, the City set forth what it believes it a more realistic total UAAL for the Retirement Systems of $3.474 billion, consisting of $2.037 billion in UAAL owed to the GRS and $1.437 billion in UAAL owed to the PFRS. As set forth in the Moore Declaration, which was filed on the Petition Date, the City's actuary, Milliman Inc., calculated this UAAL figure merely by substituting the estimated market value of the Retirement Systems' assets for their actuarial value and using a somewhat more achievable assumed rate of return of 7.0% instead of the rates of return of 7.9% or 8.0%

assumed by the GRS and the PFRS, respectively. If one were to apply assumed rates of return of 6.25% for GRS and 6.50% for PFRS – which under the Plan are more reasonable discount rates in light of relevant circumstances – the UAAL totals increase to $2.299 billion for the GRS, and $1.588 billion for the PFRS, as of the end of Fiscal Year 2012.

### 6. Other Post-Employment Benefit Obligations

#### (a) General

Prior to the Petition Date, the City provided substantial post-retirement health benefits – also known as other (non-pension) post-employment benefits or "OPEB" benefits – to current and future retirees and their dependents. The City provides OPEBs under two umbrella plans – the Health and Life Insurance Benefit Plan (the "Health/Life Benefit Plan") and the City of Detroit Employee Benefit Plan, which operates and administers the Employee Supplemental Death Benefit Plan (the "Supplemental Plan" and, together with the Health/Life Plan, the "OPEB Plans").

The List of Claims estimated liabilities in the aggregate amount of $5.718 billion for UAAL associated with the OPEB Plans. This amount included the present value of OPEB liabilities for active employees of the City not yet retired. The OPEB liability amount for former employees retired from the City and continuing to obtain retiree health and life insurance is approximately $3.185 billion. In the aggregate, 99.6% of the City's OPEB liabilities were unfunded as of the Petition Date. As of June 30, 2011 (the most recently published actuarial valuation), there were 19,389 retirees eligible to receive benefits under the City's OPEB Plans. The number of retirees receiving benefits from the City is expected to increase over time.

The City's OPEB liabilities are particularly high due to, among other things: (i) the fact that retirees can choose from 22 different plan options with varying structures and terms, which creates a high level of complexity and cost in benefit administration; and (ii) the extremely generous benefit features of the programs, especially for dependent coverage, which create high costs to the City on a per retiree basis.

#### (b) Health/Life Benefit Plan

The Health/Life Benefit Plan is a single-employer defined benefit plan that provides hospitalization, dental care, vision care and life insurance to all officers and employees of the City who were employed on the day preceding the effective date of the Health/Life Benefit Plan and who continue in the employ of the City on and after the effective date of the Health/Life Benefit Plan. Retirees were allowed to enroll in any of the group plans offered by the City to active employees. The City provides health care coverage for substantially all retirees in accordance with terms set forth in union contracts.

General City employees hired before 1995 were eligible for health care benefits if they satisfy any of the following criteria: (i) 30 years of creditable service (or 25 years of creditable service for an EMS member), (ii) 10 years of creditable service having attained age 60 or (iii) 8 years of creditable service having attained age 65. The health care benefit eligibility conditions for general City employees hired on or after 1995 are (i) 30 years of creditable service having attained age (55, 60 or 65, as applicable), (ii) 10 years of creditable service (having attained age (55, 60 or 65, as applicable) or (iii) 8 years of creditable service (having attained age (55, 60 or 65, as applicable). The City provided full health care coverage to general City employees who retired prior to January 1, 1984 (except for a "Master Medical" benefit that was added on to the coverage after that date). The City pays up to 90 percent of health care coverage for employees who retired after January 1, 1984; however, for employees who retired between January 1, 1984 and June 30, 1994, the retiree share had been reduced by 50 percent by appropriations from City Council. The City also paid health coverage for an eligible retiree's spouse that was married to the retiree as of the date of retirement, under the same formulas noted above, as long as the retiree continued to receive a pension, and for dependents. Dental and vision coverage also were provided for retirees, spouses and dependents.

The health care benefit eligibility conditions for employees of the Detroit Police Department ("DPD") and the Detroit Fire Department ("DFD") were (i) any age with 25 years of creditable service or (ii) any age with 20 years of service for Detroit Police Officers Association ("DPOA") members, effective March 8, 2007, and Allied Detroit Fire Fighters Association ("DFFA") members, effective March 8, 2008. The City paid up to 90 percent of health care coverage for the retiree and any eligible spouse. Spouses (widows or widowers) of "Straight Life Option" retirees who retired prior to July 1, 1987 continued to receive hospitalization coverage. Coverage also was provided to dependents. Dental and vision coverage were also provided for retirees, spouses and dependents.

The City also provided health care coverage to general City employees and DPD and DFD employees that opted for early retirement. For general City employees hired before 1995, the health care benefit eligibility conditions were 25 years of creditable service; for employees hired after 1995, the health care benefit eligibility conditions were 25 years of creditable service (having attained age 55). The coverage began when the retiree would have been eligible for ordinary retirement. The City paid up to 90 percent of health care coverage for the retiree and any eligible spouse. For DPD and DFD employees, the health care coverage began when (i) the retiree reached the date he/she would have completed 25 years of creditable service or (ii) for DPOA and DFFA member, the retiree would have completed 20 years of creditable service (effective March 8, 2007). The City paid up to 90 percent of health care coverage for the retiree and any eligible spouse. Spouses (widows or widowers) of Straight Life Option retirees who retired prior to July 1, 1987 received hospitalization coverage, as did dependents. Dental and vision coverage were also provided for retirees, spouses and dependents.

The City also provided health care coverage at reduced rates to general City employees and DPD and DFD employees who met certain health care benefit eligibility conditions and retired under the "Deferred Retirement Benefits (Vested)," the "Death-in-Service Retirement Benefits Duty and Non-Duty Related" and the "Disability Retirement Benefits Duty and Non-Duty Related" programs. Complementary health care coverage was provided by the City for those retirees that are Medicare-Eligible. Retirees who opted out of the retiree health care coverage could have obtained coverage at a later date.

In addition to health care coverage, the City allowed its retirees to continue life insurance coverage under the "Group Insurance Protection Plan" offered to active employees in accordance with Section 13, Article 9 of the Detroit City Code. The basic life insurance coverage for general City employees and Police and Fire employees was based on the employee's basic annual earnings to the next higher thousand dollars. The life insurance benefit amounts ranged from $3,750 to $12,500.

The Health/Life Benefit Plan is financed entirely on a "pay-as-you-go" basis and is 0% funded. As of June 30, 2011, the City had $5,718,286,228 in actuarial liabilities under the Health/Life Benefit Plan. The cost to the City on account of retiree benefits provided under the Health/Life Benefit Plan in Fiscal Year 2012 was $177,460,627. This contribution by the City was in addition to $23,516,879 contributed by retirees during Fiscal Year 2012.

As of the Petition Date, the City's OPEB costs were expected to increase as a result of the growing number, and relatively young age, of City retirees (pension and health care plans have no age restrictions and early vesting ages) as well as increases in health care costs, particularly hospitalization costs.

In addition, although the Health/Life Benefit Plan is secondary to Medicare for eligible employees over the age of 65, many retired DPD and DFD employees are not eligible to receive free Medicare Part A benefits due to state-regulated Social Security "opt-out" provisions.

(c)    **Supplemental Plan**

The Supplemental Plan is a pre-funded single-employer defined benefit plan providing death benefits based upon the retiree's years of City service ranging from $1,860 (for 8 to 10 years of service) to $3,720 (for 30 years of service, with $93.00 per year added for each additional year of service beyond the 30th year). As of June 30, 2011, the City had $34,564,960 in actuarially accrued liabilities under the Supplemental Plan. As of the Petition Date, the Supplemental Plan was 74.3% funded, with approximately $8.9 million in UAAL. In Fiscal Year 2012, the cost to the City on account of benefits provided under the Supplemental Plan was $131,116. This contribution by the City was in addition to $15,944 contributed by retirees during Fiscal Year 2012.

(d)    ***Weiler*** **Class**

In July 2006, the City made a number of unilateral changes to healthcare benefits for unionized police and firefighter retirees, including increases to co-payments and deductibles and higher contributions for monthly healthcare premiums. On July 12, 2006, retiree Alan Weiler filed a class action lawsuit against the City on behalf of approximately 8,000 retirees alleging violations of various collective bargaining agreements ("CBAs"). Mr. Weiler contended that the relevant CBAs promised vested, lifetime and unalterable healthcare benefits. The Wayne County Circuit Court certified the case as a class action. During litigation, the City maintained that it had the right to change retiree health benefits.

On March 14, 2007, the Wayne County Circuit Court denied the plaintiffs' motion to reverse the City's changes to healthcare benefits. Ultimately, the Court concluded that the relevant CBAs were ambiguous as to whether the retirees had been promised vested lifetime retiree health benefits. Accordingly, the Court concluded that a trial was necessary. Before the trial occurred, the City and plaintiffs agreed to settle the case. On August 26, 2009, the Court approved and entered the parties' settlement agreement, reducing it to a binding consent judgment, *i.e.*, a judgment of the Court that is fully enforceable by either party to the agreement.

The settlement agreement requires the City to provide *Weiler* class members with generous health benefits for as long as class members receive a City pension. The cost to the City of the benefits payable to the *Weiler* class retirees/beneficiaries currently is approximately $75 million per year, representing over 40% of retiree benefits costs under the Health/Life Benefit Plan. The *Weiler* plaintiffs are expected to assert that the settlement restricts the ability of the City to alter the benefit provisions included in the settlement. The City believes that the Claims of the *Weiler* plaintiffs are no different than other unsecured Claims that are asserted by creditors of the City and that such Claims can be modified in the City's chapter 9 case.

### 7. Other Liabilities

In addition to the liabilities described in Sections III.B.1 through III.B.6, as of June 30, 2013, the City had approximately $313 million in other outstanding liabilities, including, among other obligations: (a) outstanding trade debt of approximately $73.0 million; (b) liability for accrued compensated absences (including unpaid and accumulated vacation and sick leave balances) of approximately $81.9 million; (c) accrued workers' compensation claims, for which the City is self-insured, of approximately $86.4 million; (d) various claims and judgments (including lawsuits and claims other than workers' compensation claims but excluding disputed or unliquidated claims) of approximately $63.9 million; and (e) capital leases payable totaling approximately $8.1 million.

Additionally, the City estimates that, as of June 30, 2013, the General Fund had outstanding interfund loans, deferrals and other amounts due to Enterprise Funds, other taxing authorities and the Retirement Systems of approximately $274.3 million, which deferrals and amounts are effectively borrowings. These amounts include: (a) approximately $53.8 million in interfund loans owed to Enterprise Funds; (b) approximately $77.2 million in cash belonging to Enterprise Funds held in the operating account of the General Fund; (c) approximately $35.3 million in property taxes collected on behalf of other taxing authorities; and (d) approximately $108.0 million in deferred pension contributions owed to the Retirement Systems for Fiscal Year 2013 and prior Fiscal Years (as described in Section III.B.5.b.iii.C).

In addition to these liabilities, the City is required under state law to fund the operations of the 36th District Court, which is located within the City. Detroit's 36th District Court is one of the largest and busiest courts in the United States, processing more than 500,000 cases annually. Within the 36th Judicial District of the State of Michigan (the "36th Judicial District") – consisting solely of the City of Detroit – the 36th District Court has original jurisdiction over (a) all City traffic and ordinance violations, (b) all criminal misdemeanor cases, (c) preliminary examinations for felony cases, (d) small claims suits, (e) civil lawsuits up to $25,000 and (f) real estate matters involving rent and land contract disputes.

Pursuant to section 8101 of Michigan Public Act 236 of 1961, the Revised Judicature Act, MCL §§ 600.101-600.9948 (the "Judicature Act"), the State is divided into judicial districts under the superintending control of the Michigan Supreme Court. The districts established by the Judicature Act are categorized into three classes. "Third-class districts" consist of one or more political subdivisions within a county. Each political subdivision within a third-class district generally is responsible for the cost of maintaining, financing and operating the district court within its borders, except as otherwise provided in the Judicature Act. The 36th Judicial District is a district of the third class. The 36th District Court is the court for the 36th Judicial District. Thus, pursuant to the Judicature Act, the City is responsible for maintaining and financing the operations of the 36th District Court except as to certain expenses expressly excluded by the Judicature Act. Although the 36th District Court receives funding from the City, it is not a City department and the City is not involved in managing, and thus cannot directly restructure, the 36th District Court's operations. The City spent approximately $34.0 million to finance the 36th District Court during Fiscal Year 2013.

There are numerous inefficiencies in the 36th District Court's operations, such as: (a) low fine collection rates and ineffective collection practices; (b) an overreliance on, and redundant checks relating to, paper documents and physical case files; (c) inefficient docket management systems; (d) limited use of operating performance metrics; (e) obsolete computer hardware and software; and (f) pervasive overstaffing. In May of 2013, the administrative office of the Michigan Supreme Court appointed a "Special Judicial Administrator" to restructure the 36th District Court. To date, the Special Judicial Administrator has (a) reduced the 36th District Court's employee headcount, (b) instituted a 10% pay cut, (c) procured a

$1 million grant from the State to upgrade the court's information technology systems, (d) transitioned employees to a more cost-effective healthcare program and (e) initiated various pilot projects – such as electronic ticketing – to increase fine collection rates. See Section IX.C for further detail regarding restructuring initiatives related to the 36th District Court.

## C. The City's Steady Operational and Financial Decline

The circumstances that led the City to commence its chapter 9 case were not of recent origin. Rather, they were the product of demographic and economic forces that had been mounting for decades. In 1952, at the height of its prosperity and prestige, Detroit – frequently referred to as the cradle of the American automobile industry – had a population of approximately 1.85 million, a 600% increase from the population in 1900. Detroit's expansion coincided with the rise of the automakers. From 1900 to 1930, Detroit was the fastest growing city in the world, and by 1929 it was the fourth largest city in America. In 1950, Detroit was building half of the world's cars. During that period, half a million people came to Detroit looking for work.

### 1. Declines in Population and the City's Manufacturing Base

From the 1950s to the Petition Date, Detroit lost both residents and a significant percentage of its manufacturing base. Detroit's population declined by nearly 45% to just over one million as of June 1990. In the following 23 years, the population decline continued, falling by a further 25% between 2000 and 2010. Detroit's population stood at 684,799 as of December 2012, a 63% decline from its postwar peak of 1.85 million residents. Detroit has gone from the fourth largest city in America in 1929 to the eighteenth largest today. No other American city has experienced a comparable decline in population over a similar period of time.

A considerable amount of migration out of the City was a result of economic dislocation. In particular, changes in the auto industry over the years had an outsized impact on Detroit's economy. Almost immediately after World War II, Detroit began to lose manufacturing jobs as the auto companies automated their facilities and moved their remaining jobs out of the City. Between 1947 and 1963, Detroit lost approximately 150,000 manufacturing jobs as smaller auto manufacturers disappeared (e.g., Packard and Studebaker), and the "Big Three" began to move operations to the suburbs and out of the State.

These trends only accelerated as the Detroit automakers began to lose ground to international competitors. Foreign automakers entered the U.S. market during the 1950s with fuel-efficient vehicles and, when the oil crisis of 1973 hit, U.S. automakers were unprepared. Automobile production fell nearly 30% in the next two years, and the market share of U.S. automobile companies declined from 95% in 1955 to 75% in 1980. By 2008, Detroit's share of U.S. auto sales had declined to 47%.

The collapse of Detroit's manufacturing industry during the second half of the 20th century was not limited to the automobile sector. Non-auto companies also shuttered operations. In the 1970s and 1980s, companies such as Uniroyal, Vernor's Ginger Ale and Revere Copper closed their plants and left abandoned sites behind. From 1972 to 2007, the City lost approximately 80% of its manufacturing establishments and 78% of its retail establishments, many of which relocated from the City to its suburbs, beyond the reach of public transportation.

Table III.C.1.a



**Population**

## 2. Declining Revenues

Declines in both population and the economy were mutually reinforcing trends. As more people left the City, there was less economic activity and, thus, a decreased need for workers. Less economic activity and fewer jobs induced yet more people to leave, thus further reducing economic activity and exacerbating job losses. This decades-long vicious spiral took a tremendous toll on the City's ability to generate revenue. Detroit's municipal income tax receipts – traditionally the City's largest source of revenue – have decreased by approximately $95 million (or 30%) since 2002 and by $43 million (or more than 15%) since 2008, driven lower primarily by high unemployment and declining *per capita* income. Despite a small recovery in municipal income tax revenues since 2010, as of the Petition Date, the City projected that by 2023 municipal income tax revenues would not have recovered even to their 2008 levels.

<u>Table III.C.2.a</u>

**Income Tax Revenues**



Ancillary taxes imposed by the City likewise either had declined or were expected to decline on a prospective basis as of the Petition Date. Detroit is the only city in Michigan to impose a "utility users' tax" on its citizens. The City's receipts from this utility users' tax decreased approximately 28% over the last decade (from approximately $55.3 million in Fiscal Year 2003 to approximately $39.8 million in Fiscal Year 2012). As of the Petition Date, the City projected that utility users' tax revenues would remain approximately flat with projected revenues of approximately $40.4 million by Fiscal Year 2023.

Detroit is also the only municipality in Michigan authorized to levy a casino wagering tax. These wagering tax revenues recently have remained steady at approximately $180 million per year. As a result of expected loss of market share to casinos opening in nearby locations (*e.g.*, Toledo and Cleveland, Ohio), the City estimates that its wagering tax revenues would decrease in Fiscal Year 2013 by approximately 5% and continue to decline to approximately $168.2 million in Fiscal Year 2015, failing to recover their Fiscal Year 2012 level until Fiscal Year 2023.

Due to the City's declining population and significant cuts by the State, Detroit's share of distributed state revenue for Fiscal Year 2012 had decreased by more than $161 million (or approximately 48%) since Fiscal Year 2002 and by approximately $76 million (or approximately 31%) since 2008. Although higher projected tax revenues collected by the State are expected to halt the decline in the City's receipt of shared revenue over the coming Fiscal Years, revenue sharing payments: (a) remain at risk of further decrease given the City's declining population; and (b) are projected to remain approximately 20% below Fiscal Year 2011 levels for the foreseeable future.

-40-

13-53846-swr   Doc 8709   Filed 12/16/14   Entered 12/16/14 20:57:23   Page 54 of 440
13-53846-swr   Doc 2709   Filed 02/21/14   Entered 02/21/14 10:59:30   Page 54 of 440

Table III.C.2.b

**State Shared Revenues**



3.    **Eroding Tax Base**

(a)    **Unemployment**

The demise of Detroit's industrial sector proved catastrophic for its citizens' employment prospects.  The number of jobs in Detroit (for residents and non-residents) declined from 735,104 in 1970, to 562,120 in 1980, to 412,490 in 1990, to 346,545 in 2012.  The "Great Recession" of the past decade dealt an especially punishing blow.  Detroit's unemployment rate already stood at an alarming 16% as of June 2008.  When the recession took hold, the production and sales of automobiles in the U.S. cratered.  Combined sales for Detroit's automakers fell from 8.1 million in 2007 to 4.6 million in 2009, with two of the Big Three and numerous parts suppliers filing for bankruptcy in 2009.  The decline in production and the restructuring of Detroit's auto industry resulted in massive job cuts.  Detroit's unemployment rate skyrocketed to 23.4% as of June 2010 and remained above 18% well into 2012.  The number of employed Detroit residents fell sharply, from approximately 353,000 in 2000 to fewer than 280,000 in 2012.

Table III.C.3.a.i

**Unemployment**



Detroiters' average *per capita* annual income from 2007 to 2011 was $15,261; the median household income for that same period was $27,862. During that period, an estimated 36% of Detroiters were living below the poverty line. Only 54% of Detroiters owned a home, the median value of which was $71,100. To put these numbers in perspective, the average *per capita* annual income in Michigan from 2007 to 2011 was $25,482, the median household income was $48,669 and only 16% of Michigan citizens lived below the poverty line. The state-wide home ownership rate was 74%, and the median home value was $137,300.

    **(b)**    **Assessor's Office and Property Tax Division**

Detroit's property tax receipts likewise suffered. Between 1970 and 1990, the real value of the City's property tax base declined by nearly two thirds. This trend reasserted itself in earnest in the wake of the Great Recession. According to the Citizens' Research Council of Michigan, over the last five years, Detroit's assessed property values have decreased by approximately $1.6 billion. In addition, collection rates declined from 92.64 percent in Fiscal Year 2008 to 83.68 percent in Fiscal Year 2012. Property tax revenues for Fiscal Year 2013 were $131.7 million, a $16.1 million (or approximately 11%) reduction from Fiscal Year 2012 and $26.8 million (or approximately 17%) lower than the average property tax revenue for the preceding five Fiscal Years. As of the Petition Date, the City projected that property tax would continue to decline to as low as $84.2 million by Fiscal Year 2020 before recovering to approximately $85.3 million by Fiscal Year 2023. Further information regarding the City's property tax reassessment initiative is provided in Section X.B.

    **(c)**    **Comparative Tax Burden**

A number of factors render the challenges posed by the City's declining tax revenue essentially intractable. The *per capita* tax burden on Detroit residents is one of the highest in Michigan, which burden is made heavier still by the residents' relative inability to pay given their level of *per capita* income. In addition to the utility users' tax and wagering tax discussed above, the City's income tax – 2.4% for residents, 1.2% for nonresidents and 2.0% for businesses – is the highest in Michigan, and Detroiters pay the highest total property tax rates of residents of Michigan cities with a population over 50,000 (inclusive of property taxes paid to overlapping jurisdictions (*e.g.*, the State, Wayne County)). City property owners are burdened with high total property tax rates in part because Detroit residents pay property taxes imposed by the Detroit Public Library, the Detroit Public Schools, Wayne County, Wayne County Community College, the State and various other special authorities in addition to the property taxes imposed by the City. As of the Petition Date, the total

-42-

13-53846-swr Doc 8709 Filed 12/12/14 Entered 12/12/14 20:57:23 Page 56 of 440
13-53846-swr Doc 2709 Filed 02/21/14 Entered 02/21/14 20:59:30 Page 56 of 440

property tax rate imposed upon City homeowners was 67.5159 mills; for business property, the total property tax rate was 85.3467 mills.

The City currently levies all taxes at the statutory maximum levels. In particular, as of the Petition Date: (i) Michigan Public Act 394 of 2012, an amendment to the City Income Tax Act, fixed the City's maximum income tax rates at their current levels as long as bonds issued by the PLA ("PLA Bonds") remain outstanding; (ii) state law limited municipalities' property tax rates to 20 mills and a constitutionally required "Headlee rollback" further limited that rate to 19.952 mills (which was the rate charged by the City as of the Petition Date); and (iii) the utility users' tax and casino wagering tax were fixed at their 5% and 10.9% levels, respectively, by the State statutes authorizing these Detroit-specific taxes. Even absent such limitations, however, it would not be practical for the City to raise taxes at this time. Increasing Detroit's already high tax rates would deter individuals and businesses from relocating to, or remaining in, Detroit at precisely the time at which the City most needs to retain and attract taxpayers and capital investment. Moreover, even if the City raised taxes, it is uncertain whether it would be able to collect any additional revenues. Nearly half of all Detroit property owners failed to pay property taxes assessed by the City in 2011.

### 4. High Labor Costs/Restrictive Employment Terms

Despite recent headcount reductions, labor costs related to General Fund active employees (*i.e.*, wages, pension and benefits) represent more than 41% of the City's estimated gross revenues for Fiscal Year 2013 as set forth in Table III.C.4.a below:

Table III.C.4.a

| Labor Cost | Estimated cost to General Fund in Fiscal Year 2013 | Percentage of estimated gross revenues for Fiscal Year 2013 |
|---|---|---|
| Wages | $333.8 million | 29.8% |
| Benefits (fringes including health for active employees) | $66.5 million | 5.9% |
| Pension Contributions (including normal and UAAL portion) | $66.0 million | 5.9% |

Although pension contributions are based on active payroll, some portion of the contribution is intended to cover the UAAL, which technically benefits all participants in the plan, including retirees. Benefit and pension costs per active employee have increased by approximately 33% in the last thirteen years, from approximately $18,000 in Fiscal Year 2000 to approximately $24,000 in Fiscal Year 2013.

The City's unionized employees are represented by 47 bargaining units. The City's pre-bankruptcy CBAs with these bargaining units imposed work rules and other restrictions that impaired the efficient functioning of City government. These onerous work rules and other restrictions include the following, among others:

- **Staffing**. In many circumstances, staffing is based solely on seniority, rather than merit, qualifications or experience.

- **"Bumping" Rights**. Historically, employees were permitted to transfer across departments based solely on seniority (without regard to merit, relevant qualifications or experience for the new position).

- **Limitations on Management Rights**. The CBAs contained limitations on management rights and responsibilities, which impaired the City's ability to manage policies, goals and the scope of operations for many City departments (most notably with respect to the right to implement and modify disciplinary policies).

- **Arbitration Rights**. Historically, arbitrators were able to uphold future grievances based on expired bargaining agreement provisions or past practice.

- **Lack of Reimbursement Rights**. Historically, the unions did not (a) reimburse the City for full-time and part-time paid union officials or (b) pay any fees for the City's collection and remittance of union dues and service fees.

The CBAs covering 44 bargaining units were expired as of September 30, 2012, and the majority of the employees represented thereby are subject to the City Employment Terms (the "CETs"). The CBAs with the three remaining bargaining units expired as of June 30, 2013, at which point the affected employees became subject to the CETs.

The CETs provide some relief from the work rules and restrictions described above, in part through incorporation of a broad management rights clause. In addition to concessions imposed by the CETs, other concessions have been granted through statutory interest arbitration. These concessions have not been uniformly applied to all bargaining units, and some City employees have not been affected by these measures. In some cases, changes to the City Charter and the Detroit City Code, or other legislative initiatives, may be necessary to support needed operational enhancements and reduce unnecessary bureaucracy. The City estimates that it has been able to realize more than $200 million in annual savings as a result of the CETs. However, these savings have not been sufficient to balance the City's budget.

5.     **Growing Budget Deficits**

The City incurred substantial deficits (excluding financing proceeds) for the six Fiscal Years preceding the Petition Date of approximately $128 million (2008), $124 million (2009), $72 million (2010), $57 million (2011), $122 million (2012) and $34 million (2013). Including the effect of recent debt issuances (*e.g.*, $75 million in Fiscal Year 2008; $250 million in Fiscal Year 2010; $129.5 million in Fiscal Year 2013) (the "Recent Debt Issuances"), the City's accumulated general fund deficit stood at approximately $327 million as of the end of Fiscal Year 2012 and $217 million as of the end of Fiscal Year 2013. *Excluding* the effect of the Recent Debt Issuances (which, as an accounting matter, reduce the amount of the accumulated deficit by an amount equal to the funds borrowed), the City's accumulated general fund deficit: (a) has grown continuously over an extended period; and (b) would have been over $650 million for Fiscal Year 2012 and approximately $700 million for Fiscal Year 2013. Without structural changes, the City projects that its accumulated deficit would grow to approximately $1.3 billion by Fiscal Year 2017. The City funded its continuing deficits in a variety of ways, including: (a) deferral of pension contributions (resulting in larger funding deficits and requirements for additional contributions in later periods); (b) issuance of short term and long term debt; (c) deferral of trade payments; and (d) borrowing by the General Fund from other funds, deferrals and cash pooling.

6.     **Declining Credit Ratings**

Prior to the Petition Date, the City's ability to access the credit markets to satisfy its cash needs was compromised by plummeting credit ratings that had reached historic lows and were below investment grade. No major U.S. city had a lower credit rating than Detroit. As of June 17, 2013, following the City's announcement of a moratorium on the payment of unsecured debt and its non-payment of amounts owing with respect to the COPs, Fitch Ratings, Inc. ("Fitch"), Standard and Poor's Financial Services LLC ("S&P") and Moody's Investors Service, Inc. lowered the credit ratings on the City's general obligation debt to "C", "CC" and "Caa3", respectively. Following the City's postpetition default on certain general fund obligations, Fitch and S&P both further downgraded the City's general obligation debt to "D" on September 30, 2013 and October 2, 2013, respectively.

7.     **Inadequate Municipal Services**

(a)     **Detroit Police Department**

The DPD was established in 1861 by a four-member Police Commission appointed by the Governor of Michigan (the "Governor"). During the first decades of the twentieth century, the DPD was notable for its early adoption of new technologies. For example, the DPD was one of the first police departments in the country to use automobiles for neighborhood patrols and, in 1922, it became the first police force in the nation to dispatch officers via radio. Historically, the DPD patrolled several neighborhood precincts. In 2005, due to budget constraints, the DPD consolidated its 13 precincts into six larger districts and closed some precinct facilities. In recent years, however, the DPD has reopened certain precinct stations. As of the Petition Date, the DPD divided its operations geographically into four districts and four neighborhood precincts. The DPD employed approximately 2,570 sworn officers and 313 civilian employees during calendar year 2012. In recent years, the DPD has received more than 700,000 calls for service annually. General Fund expenditures for the DPD totaled $397.0 million during Fiscal Year 2012.

As crime rates have increased in recent years, the DPD has faced numerous administrative, operational and technological challenges that have limited the DPD's effectiveness and efficiency.

### i.    Administrative Obstacles

In recent years, the DPD has faced obstacles with respect to manpower, continuity of leadership, morale and efficiency, among other problems. Five different police chiefs have led the DPD during the last five years. These leadership changes contributed to low employee morale, a problem made worse by dwindling budgets, layoffs, unfavorable work rules imposed by CBAs, pay reductions and periods during which officers have been required to work 12-hour shifts. The DPD's headcount has been reduced by approximately 40% over the last ten years. Consequently, it lacks the manpower to adequately respond to the more than 700,000 calls for service it receives annually. In addition, over 450 uniformed DPD officers were eligible for retirement in 2013. An additional 150 officers are eligible for retirement in each of the years from 2014 through 2019. As of the Petition Date, the DPD had not yet fully implemented the type of data-driven policing that has become standard in many other large cities. The DPD's information technology infrastructure is outdated and, as of the Petition Date, was not integrated between departments and functions, meaning that the DPD's various precincts had no ability to share information with one another electronically and in real time. The DPD had no central case management system as of the Petition Date, and systems to ensure the accountability of officers and detectives were inadequate. In recent years, community policing efforts have been underfunded, uncoordinated and have been deemphasized by the DPD. The DPD's many administrative challenges have contributed to its widely publicized operational difficulties. As of the Petition Date, the DPD's average response time during 2013 for top priority emergency calls was 58 minutes (the national average police response time was 11 minutes).

### ii.    Facilities/Fleet

As of the Petition Date, the DPD operated with an extremely old fleet of 1,291 vehicles, a majority of which had reached replacement age and lacked modern information technology. In 2013, the DPD was forced to accept charitable donations to upgrade its fleet of police cars. In March 2013, a group of corporations pledged to donate approximately $8 million to the City, a portion of which was used to replace one hundred DPD police cruisers.

### iii.    High Crime Rate

As the DPD struggled to overcome the obstacles described immediately above, the crime rate in Detroit – and violent crime in particular – increased to unacceptable levels. During calendar year 2012, the City recorded 15,011 violent crimes (such as murder, rape, robbery and aggravated assault) and 40,956 property crimes. While the total number of violent crimes reported in Detroit dropped slightly in 2012 (15,245 violent crimes were reported in 2011), the number of homicides rose sharply, from 344 in 2011 to 386 in 2012. Detroit's murder rate for calendar year 2012 was 54.6 per 100,000 residents, a figure that was the highest in the nation among large cities and more than ten times the national average. In 2012, the number of violent crimes in Detroit exceeded that of Cleveland, Pittsburgh and St. Louis combined. The City's 2011 case clearance rates for violent crimes and all crimes (18.6% and 8.7%, respectively) were substantially below those of comparable municipalities nationally and surrounding local municipalities. It has been reported that in recent years certain business owners have taken the extraordinary step of hiring off-duty police officers and renting police cruisers to patrol sections of the City underserved by the DPD.

Table III.C.7.a.iv.A

**Offenses Known to Law Enforcement, Local & National Comparables – 2012 (Most Recent Data Available)**

| City | Population | Violent Crime | Murder/ Non-negligent Manslaughter | Forcible Rape | Robbery | Aggravated Assault | Property Crime | Burglary | Larceny/ Theft | Motor Vehicle Theft | Arson |
|------|-----------|--------------|-----------------------------------|--------------|---------|-------------------|----------------|----------|----------------|---------------------|-------|
| Detroit | 707,096 | 15,011 | 386 | 441 | 4,843 | 9,341 | 40,956 | 13,488 | 15,968 | 11,500 | 562 |
| **Local Comparison** | | | | | | | | | | | |
| Dearborn | 97,215 | 322 | 1 | 24 | 107 | 190 | 3,282 | 462 | 2,463 | 357 | 20 |
| Livonia | 96,028 | 146 | 3 | 19 | 32 | 92 | 2,124 | 323 | 1,601 | 200 | 13 |
| Southfield | 72,253 | 352 | 2 | 34 | 136 | 180 | 2,549 | 625 | 1,530 | 394 | 9 |
| **National Comparison** | | | | | | | | | | | |
| Cleveland | 393,781 | 5,449 | 84 | 363 | 3,252 | 1,750 | 24,309 | 9,740 | 10,808 | 3,761 | 302 |
| Pittsburgh | 312,112 | 2,347 | 41 | 47 | 1,134 | 1,125 | 10,691 | 2,537 | 7,610 | 544 | 248 |
| St. Louis | 318,667 | 5,661 | 113 | 199 | 1,778 | 3,571 | 21,995 | 4,986 | 13,520 | 3,489 | 196 |
| Milwaukee | 599,395 | 7,759 | 91 | 230 | 3,027 | 4,411 | 30,228 | 6,977 | 18,448 | 4,803 | 306 |

Table III.C.7.a.iv.B

**Incidents & Case Clearance Rates, National Comparables – 2011 (Most Recent Data Available)**

| City | Violent Crime | Murder | Force Rape | Robbery | Aggravated Assault | Simple Assault | Property Crime | Burglary | Larceny/ Theft | Motor Vehicle Theft | Arson | Total |
|------|--------------|--------|-----------|---------|-------------------|----------------|----------------|----------|----------------|---------------------|-------|-------|
| **Detroit** | | | | | | | | | | | | |
| Cases Assigned | 15,254 | 344 | 426 | 4,976 | 9,508 | 17,240 | 43,759 | 16,032 | 16,500 | 11,227 | 958 | 136,224 |
| Cleared | 2,841 | 39 | 54 | 401 | 2,347 | 2,427 | 1,844 | 730 | 578 | 536 | 57 | 11,854 |
| **Clearance Rate** | **18.6%** | **11.3%** | **12.7%** | **8.1%** | **24.7%** | **14.1%** | **4.2%** | **4.6%** | **3.5%** | **4.8%** | **5.9%** | **8.7%** |
| **Pittsburgh** | | | | | | | | | | | | |
| Cases Assigned | 2,476 | 44 | 67 | 1,126 | 1,239 | 5,619 | 10,063 | 2,686 | 6,897 | 480 | 195 | 30,892 |
| Cleared | 1,247 | 22 | 61 | 435 | 729 | 3,963 | 1,997 | 498 | 1,312 | 187 | 55 | 10,506 |
| **Clearance Rate** | **50.4%** | **50.0%** | **91.0%** | **38.6%** | **58.8%** | **70.5%** | **19.8%** | **18.5%** | **19.0%** | **39.0%** | **28.2%** | **34.0%** |
| **Milwaukee** | | | | | | | | | | | | |
| Cases Assigned | 6,637 | 86 | 205 | 3,091 | 3,255 | 7,253 | 30,669 | 7,079 | 19,030 | 4,560 | 272 | 82,137 |
| Cleared | 2,465 | 58 | 159 | 764 | 1,484 | 4,701 | 4,718 | 808 | 3,769 | 141 | 34 | 19,101 |
| **Clearance Rate** | **37.1%** | **67.4%** | **77.6%** | **24.7%** | **45.6%** | **64.8%** | **15.4%** | **11.4%** | **19.8%** | **3.1%** | **13%** | **23.3%** |
| **St. Louis** | | | | | | | | | | | | |
| Cases Assigned | 5,950 | 113 | 188 | 2,127 | 3,522 | 4,866 | 25,669 | 7,015 | 15,285 | 3,369 | 191 | 68,295 |
| Cleared | 2,835 | 75 | 135 | 619 | 2,006 | 3,745 | 3,296 | 1,109 | 1,987 | 200 | 19 | 16,026 |
| **Clearance Rate** | **47.6%** | **66.4%** | **71.8%** | **29.1%** | **57.0%** | **77.0%** | **12.8%** | **15.8%** | **13.0%** | **5.9%** | **9.9%** | **23.5%** |
| **Cleveland** | | | | | | | | | | | | |
| Cases Assigned | 5,431 | 74 | 356 | 3,157 | 1,844 | 16,257 | 25,418 | 10,724 | 10,598 | 4,096 | 319 | 78,274 |
| Cleared | 1,072 | 26 | 89 | 447 | 510 | 3,346 | 1,685 | 793 | 718 | 174 | 46 | 8,906 |
| **Clearance Rate** | **19.7%** | **35.1%** | **25.0%** | **14.2%** | **27.7%** | **20.6%** | **6.6%** | **7.4%** | **6.8%** | **4.2%** | **14.4%** | **11.4%** |

Table III.C.7.a.iv.C

**Incidents & Case Clearance Rates, Local Comparables – 2011 (Most Recent Data Available)**

| City | Violent Crime | Murder | Force Rape | Robbery | Aggravated Assault | Simple Assault | Property Crime | Burglary | Larceny Theft | Motor Vehicle Theft | Arson | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Detroit** | | | | | | | | | | | | |
| Cases Assigned | 15,254 | 344 | 426 | 4,976 | 9,508 | 17,240 | 43,759 | 16,032 | 16,500 | 11,227 | 958 | 136,224 |
| Cleared | 2,841 | 39 | 54 | 401 | 2,347 | 2,427 | 1,844 | 730 | 578 | 536 | 57 | 11,854 |
| **Clearance Rate** | **18.6%** | **11.3%** | **12.7%** | **8.1%** | **24/%** | **141%** | **4.2%** | **4.6%** | **3.5%** | **4.8%** | **5.9%** | **8.7%** |
| **Southfield** | | | | | | | | | | | | |
| Cases Assigned | 380 | 4 | 36 | 116 | 224 | 1178 | 2688 | 710 | 1602 | 376 | 5 | 7,319 |
| Cleared | 149 | 3 | 8 | 27 | 111 | 276 | 398 | 58 | 312 | 28 | 3 | 1,373 |
| **Clearance Rate** | **39.2%** | **75.0%** | **22.2%** | **23.3%** | **49.6%** | **23.4%** | **14.8%** | **8.2%** | **19.5%** | **7.4%** | **60.0%** | **18.8%** |
| **Livonia** | | | | | | | | | | | | |
| Cases Assigned | 168 | 1 | 19 | 40 | 108 | 552 | 2,114 | 309 | 1,595 | 210 | 11 | 5,127 |
| Cleared | 69 | 1 | 1 | 15 | 52 | 201 | 563 | 33 | 505 | 25 | 0 | 1,465 |
| **Clearance Rate** | **41.1%** | **100.0%** | **5.3%** | **37.5%** | **48.1%** | **36.4%** | **26.6%** | **10.7%** | **31.7%** | **11.9%** | **0.0%** | **28.6%** |
| **Dearborn** | | | | | | | | | | | | |
| Cases Assigned | 361 | 3 | 24 | 104 | 230 | 1,346 | 3,756 | 609 | 2,709 | 438 | 12 | 9,592 |
| Cleared | 180 | 3 | 6 | 37 | 134 | 419 | 1,229 | 70 | 1,124 | 35 | 3 | 3,240 |
| **Clearance Rate** | **49.9%** | **100.0%** | **25.0%** | **35.6%** | **58.3%** | **31.1%** | **32.7%** | **11.5%** | **41.5%** | **8.0%** | **25.0%** | **33.8%** |

### (b)      Lighting

The City's Public Lighting Department (the "PLD"), formerly known as the Public Lighting Commission, was created in March 1893 to supply power to the City's street lighting system and public buildings. Today, the PLD is responsible for operating and maintaining 88,000 streetlights and owns and operates a distribution-only electricity grid. The PLD provides power to more than 890 public buildings. Among the PLD's 114 customers are City departments, the Detroit Board of Education, Wayne State University, Joe Louis Arena, Wayne County Community College District, Cobo Conference/Exhibit Center, Coleman A. Young Municipal Center, Detroit Public Library and other federal, state and county agencies.

In addition to providing power to its customers and powering and maintaining the City's streetlights, the PLD: (i) inspects and regulates the use of utility poles in the City; (ii) maintains the City's traffic signal system, which includes approximately 1,286 intersections; and (iii) maintains the Detroit Police Department and Detroit Fire Department communications network, which includes the extended 911 and automated dispatch systems.

### i.      Non-Functioning Streetlights

As of April 2013, about 40% of the approximately 88,000 streetlights operated and maintained by the PLD were not working, primarily due to disrepair, vandalism, component theft and neglect. Outages exist on both lights powered by DTE Energy Company ("DTE") and PLD-powered lights. Many outages are attributable to burned-out bulbs, but others are the result of the obsolescence of the grid maintained by the PLD. The total of functioning streetlights per square mile in the City generally was less than half that of comparable national municipalities. These shortages are compounded by the fact that many of the streetlights that were working did not meet the residents' actual needs. Functioning street lights often served underpopulated sections of the City's historical population footprint, and there was a backlog of approximately 3,300 complaints related to the City's lighting.

ii.     **Inadequately Maintained Grid/Fixtures**

In addition, the PLD's electricity grid has not been adequately maintained and is deteriorating. To repair and modernize the grid, the City would need to incur the significant expense of decommissioning a number of segments and stations (*e.g.*, the City-owned Mistersky power plant, which has been idle for two to three years; 31 substations).

(c)     **Blight**

i.     **Scope**

Perhaps no issue has been as fundamental to – or emblematic of – Detroit's decline as its extensive urban blight. The City's long-term population decline and falling property values has resulted in large numbers of abandoned, forfeited or foreclosed land and structures within the City. As of the Petition Date, there were approximately 78,000 abandoned and blighted residential structures in the City, which number encompassed approximately 20% of the City's housing stock. 80% of these structures are privately-owned, and 10% are owned by the City. As of the Petition Date, 16,700 of these structures had been inspected by the City and classified as dangerous, 14,263 had open complaints of being dangerous, 6,657 were scheduled to go before the City Council for orders of demolition and 1,159 were considered emergency demolitions. The number of these dangerous structures continues to increase steadily due to vacancy (particularly foreclosures) and fires, among other things. In addition to blighted structures, there are approximately 66,000 parcels of blighted land within the City limits. Approximately 60,000 of these parcels of land (representing 15% of all publicly and privately owned land parcels in Detroit) are owned by the City.

Blighted and abandoned parcels and structures dramatically undermine the City's efforts to maintain public safety, because they contribute to the proliferation of crime and arson. For example, approximately 60% of the 11,000 to 12,000 fires that the City experiences each year occur in blighted and unoccupied buildings, forcing the DFD to expend a disproportionate amount of time and resources fighting fires in vacant structures. Attending to callouts at vacant blighted structures results in injuries and occasionally fatalities among DFD employees. Moreover, the existence of blighted properties reinforces a vicious cycle: declining property values lead to increased blight, which in turn contributes to further declines in property values.

ii.     **Obstacles to Solutions**

(A)     **Cost**

The City's ability to arrest and alleviate its crippling urban blight is limited by the fact that removing such blight is an expensive and time-consuming endeavor. As set forth in Table <u>III.C.7.c.ii.A.1</u> below, the average cost to demolish a residential structure has been estimated at approximately $8,500, with an equalized cost of $5.74 per square foot (with costs varying depending on the size of, and the materials used to construct, the structure). Recent demolition costs have averaged approximately $10,000 per structure, due predominately to hazardous material remediation.

<u>Table III.C.7.c.ii.A.1</u>

| AVERAGE COST OF RESIDENTIAL DEMOLITION | |
|---|---|
| **Expense** | **Amount** |
| Demolition Contract | $5,000 |
| Survey and Abatement | $1,500 |
| Gas Disconnect Fee | $750 |
| Administration Costs | $720 |
| Water Disconnect Fee | $550 |
| *Lis Pendens* | $15 |
| **Total Cost of Demolition** | **$8,535** |

**(B)      Regulation & Agency Coordination**

The intractability of blight removal is compounded by the complex regulatory framework that such removal necessarily implicates. This framework increases demolition costs and slows the removal process. Blight removal is governed by multiple codes and regulations and a number of overlapping jurisdictions. Examples include:

- *Code Enforcement and Adjudication*:  implicating the State of Michigan Housing Law; Zoning Ordinance, Chapter 61; Property Maintenance Ordinance, Chapter 9; Blight Violations Ordinance, Chapters 8.5 and 22; Sale of One- and Two-Family Home Ordinance;

- *Condemnation and Demolition*:  implicating the State of Michigan Housing Law; City Ordinance 290-H – Wrecking Structures; Industry Standard Building Officials Code Administration; and

- *Foreclosure and Land Disposition*:  implicating Michigan Public Act 123 and various City codes addressing non-federal property.

Moreover, addressing blight requires the coordination of several state, City, county and federal agencies, as well as various non-governmental stakeholders, including:

- at the state level:  the State Fast Track Land Bank Authority, the Michigan Department of Transportation (which coordinates graffiti removal), the Michigan Land Bank, the Michigan State Housing Development Authority and the Treasury;

- at the City level:  the Building Safety Engineering and Environmental Department (which enforces building and construction codes), the Planning and Development Department (which designates sites for removal and allocates funds received from the United States Department of Housing and Urban Development ("HUD")), the General Services Department (which is responsible for maintenance of vacant lots), the Department of Administrative Hearings (which adjudicates blight violations and, where appropriate, imposes civil penalties), the DFD, the DPD, the Detroit Land Bank Authority and the Detroit Housing Commission (one of the largest landlords);

- at the county level:  the Wayne County Treasurer (which controls the inventory of tax foreclosed properties) and the Wayne County Land Bank;

- at the federal level, HUD, the EPA and the United States Department of the Treasury; and

- with respect to non-governmental stakeholders:  the Detroit Economic Growth Corporation (a section 501(c)(3) entity contracted by the City to provide real estate, development and fiduciary services), the Blight Authority (a Michigan non-profit entity specializing in scale and brush clearing) and DTE (responsible for supplying or cutting power to blighted structures/parcels), among numerous other interested parties.

**(d)      Detroit Fire Department**

The DFD was established in 1860 when the City hired its first paid firefighters and purchased its first steam-powered fire engine. As of the Petition Date, the DFD employed approximately 780 firefighters and consisted of eight battalions operating out of 44 fire stations. Administratively, the DFD is comprised of ten divisions:  an Administration Division, a Firefighting Division, a Fire Marshal Division, a Community Relations Division, an Emergency Medical Services Division, an Apparatus Division, a Communications Division, a Medical Division, a Research and Development Division and a Training Academy. The DFD responds to approximately 165,000 emergency calls – including medical emergencies and fires – annually. In recent years, the DFD annually has responded to approximately 11,000 to 12,000 fires. General Fund expenditures for the DFD totaled $178.0 million during Fiscal Year 2012.

As of the Petition Date, the stations, equipment and vehicle fleet of the DFD were old and in states of disrepair. Budget cuts in recent years necessitated the closure of numerous engine and ladder companies, reduced the DFD's manpower and forced firefighters to rely upon aged and unreliable equipment at a time when the DFD is required to respond to, among other emergencies, approximately 5,000 arsons per year. As of the Petition Date, fire and Emergency

-49-

13-53846-swr   Doc 8709   Filed 12/11/14   Entered 12/11/14 20:59:30   Page 63 of 440

Medical Service ("EMS") response times had increased to 7 minutes and 15 minutes respectively, times well above national averages.

### i. Fire Stations

The average age of the City's 44 fire stations was 80 years as of the Petition Date. In recent years maintenance costs have exceeded $1 million annually. Due to lack of funding, Detroit's firefighters frequently have been forced to make necessary repairs to the fire stations themselves, and the fire stations often lack basic supplies.

### ii. Apparatus/Equipment

Detroit firefighters frequently have operated shorthanded in recent years due to a lack of serviceable vehicles and equipment. As of the Petition Date, the DFD's fire apparatus fleet included 26 engines, 15 ladder trucks, six squads (specialized rescue vehicles with no watering or laddering capacity), one hazardous material apparatus and one TAC unit (a mini-pumper for use in low-clearance structures such as parking garages). In recent years, the DFD fleet has been plagued with mechanical issues, contained no reserve vehicles and lacked equipment ordinarily regarded as standard. With less than half of its original staff as of the Petition Date, the DFD's Apparatus Division (which services the City's EMS fleet as well) had a vehicle to mechanic ratio of 39 to 1, resulting in an inability to complete preventative maintenance on schedule. In May of 2013, the City received a donation to fund inspections of fire ladders on trucks and ground ladders because it could not afford the required inspections. This donation was offered after it was reported, in February of 2013, that then Detroit Fire Commissioner Donald Austin ordered firefighters not to use hydraulic ladders on DFD ladder trucks except in cases involving an "immediate threat to life" because the ladders had not received safety inspections "for years."

### iii. EMS Fleet

The City's EMS vehicles also were aged, obsolete and unreliable as of the Petition Date. During the first quarter of 2013, frequently only 10 to 14 of the City's 36 ambulances were in service. Some of the City's EMS vehicles had been driven 250,000 to 300,000 miles and suffered frequent breakdowns. The City accepted charitable donations to upgrade its EMS fleet. In March 2013, a group of corporations pledged to donate approximately $8 million to the City, a portion of which was used to purchase 23 new ambulances.

### (e) DDOT

DDOT is plagued by a variety of problems. For example, while grant monies typically are a significant revenue source for bus transit systems, DDOT has not been able to maximize the grant dollars available to it. In addition, DDOT's bus fares are lower than comparable bus transit systems by approximately 30% on average, and its bus transfers are offered at significantly reduced rates, both of which result in decreased revenues. DDOT also experiences high absenteeism among its bus drivers, which causes inefficiencies, disrupted transit service, poor customer service and higher costs. For example, in January 2013, DDOT experienced 35% absenteeism for bus operations. Even without long term disability, occupational injury, illness and accidents, absenteeism would have been 21%.

DDOT's maintenance operations also are highly inefficient (58% less efficient) as compared with similar bus transit systems. DDOT vehicle maintenance relies heavily (31% of hours) on overtime and other time premiums to conduct maintenance, and its maintenance union has been resistant to initiatives that would improve maintenance service at a lower cost. In addition, poor service and operating performance has led to dissatisfied riders and low morale among employees. These factors are believed to be contributors to an increase in safety incidents on buses and at transportation facilities. DDOT historically has not maintained a police presence on buses, which likely would have reduced crime and other safety issues. Likewise, DDOT only recently began to install security cameras on buses, which would have assisted with prosecution of past crimes.

### (f) Parks

The number of open City parks dwindled in the years leading up to the Petition Date, with many considered to be in poor or fair condition due to lack of funding. The City closed 210 parks during Fiscal Year 2009, reducing its park portfolio by 66%, from 317 parks to 107 parks. The City announced in February 2013 that (i) 50 of its remaining 107 parks would need to be closed, (ii) another 38 parks would shift to limited maintenance and (iii) the already underserved Belle Isle Park would receive decreased services. Thanks to $14 million in civic donations, the 50 parks slated to be closed

remained open temporarily through the summer of 2013. Belle Isle was recently leased to the State (see Section IV.J.6 below).

## 8. Obsolete Information Technology

As of the Petition Date, nearly all of the City's departments were saddled with an obsolete information technology ("IT") infrastructure and software in urgent need of upgrade or replacement. The City's IT infrastructure was not integrated between departments and functions (e.g., there was no integration between core City financial systems and department level operating systems) or even within departments (e.g., police precincts and districts could not share information across their systems), and the City lacked a formal documented IT governance structure, although one was established after the Petition Date. The following paragraphs provide illustrations of the IT challenges faced by specific City departments and divisions.

### (a) DPD, DFD & EMS

The IT systems used by the DPD, DFD and EMS: (i) were outdated to the point that the system vendors no longer provided full support; and (ii) lacked integrated solutions, resulting in redundant data entry, no meaningful reporting and limited query capabilities. DPD's IT systems, in particular, were highly manual, poorly implemented and non-integrated, resulting in highly inefficient operations. As of the Petition Date, the DPD had no IT systems in place at all for such functions as jail management, electronic ticketing and activity logs. The vehicles and equipment employed by DPD, DFD and EMS personnel likewise lacked adequate information technology.

### (b) Payroll Systems

The City's payroll systems were similarly anachronistic, resulting in massive inefficiencies and excessive costs. As of the Petition Date, the City used multiple, non-integrated payroll systems that were highly manual (70% of the City's payroll costs were attributable to labor) and prone to human error and erroneous payments. A majority of the City's employees were on an archaic payroll system that had limited reporting capabilities and no way to clearly track, monitor or report expenditures by category. Accordingly, the City's cost of payroll administration was significantly higher than for comparable entities. For example, the cost to the City to process payroll was $62 per check (or approximately $19.2 million per year) more than four times the general average of $15 per paycheck, and almost 3.5 times the average of $18 per paycheck for other public sector organizations. The payroll process involved 149 full-time employees, 51 of whom were uniformed officers (i.e., highly and expensively trained and high cost personnel assigned to perform clerical duties).

### (c) Income Tax & Property Tax Divisions

Similar IT issues handicapped the City's tax collection systems. As of the Petition Date, the City's highly manual income tax collection and data management systems were simply outdated (having been purchased in the mid-1990s) with little to no automation capability; in July 2012, they were characterized as "catastrophic" by the IRS. The billing, processing and collection of property taxes likewise was inefficient. Recommendations received from a third party consultant designed to increase the efficiency of the City's property tax collection process had not been implemented, and the City was forced to rely on Wayne County for the funding and collection of delinquent property taxes.

### (d) Budgeting, Accounting & Financial Reporting Systems

The City's core financial, accounting and budgeting systems likewise suffered from the lack of modern IT. As of the Petition Date, the City's financial reporting and budget development systems: (i) were 10 to 15 years old; (ii) required a manual interface (70% of journal entries were booked manually); (iii) lacked reliable fail-over and back-up systems; and (iv) lacked a formal, documented IT governance structure, all of which impaired the reporting, efficiency and accuracy of the data and the accountability of the systems.

### (e) Grant Management System

As of the Petition Date, the City's grant tracking systems were fragmented, such that the City was unable to comprehensively track City-wide grant funds and status. In addition, the City's grant reporting was not standardized, such that the City was unable to prevent disallowed costs.

Aged IT infrastructure within the City's Buildings, Safety Engineering and Environmental Department ("BSEED") and the DFD led to bottlenecks in both permit invoicing and the collection of fees. BSEED's system for licensing and permitting is more than ten years old, and the DFD's system for inspections and permitting is more than 20 years old. Both systems required replacement.

## 9.        Steady State Prepetition Financial Projections

Exhibits F, G and H contain projections (developed by the City in the months immediately preceding the Petition Date) demonstrating the City's financial condition in the absence of any restructuring initiatives. Specifically: (a) Exhibit F projects the amount of the City's legacy expenditures (*i.e.*, debt service on its UTGO Debt, LTGO Debt and COPs; pension contributions and retiree benefit obligations) through its 2017 Fiscal Year and expresses those legacy expenditures as a percentage of anticipated revenues; (b) Exhibit G projects the City's cash flow for its 2014 Fiscal Year; and (c) Exhibit H projects the City's anticipated revenues, expenditures, operating surpluses, legacy obligations and annual and accumulated deficits through the 2017 Fiscal Year.

## D.        Prepetition Measures Taken by City to Address Challenges

The City took numerous steps to improve its financial condition prior to commencing its chapter 9 case, by adopting various measures to reduce expenses and increase revenues. These initiatives saved the City an estimated $200 million per year, but they also imposed substantial burdens on the City's workforce and residents. The following paragraphs provide detail on certain of the key actions taken by the City to alleviate its liquidity pressures, redress its lopsided balance sheet and address its operational challenges in the period leading up to the commencement of the City's chapter 9 case.

## 1.        Consent Agreement/Creation of Financial Advisory Board

### (a)        Finding of "Probable Financial Stress"

On December 6, 2011, the Treasury initiated a preliminary review of the City's financial condition pursuant to former Michigan Public Act 4 of 2011, the Local Government and School District Fiscal Accountability Act, MCL §§ 141.1501-141.1531 ("PA 4"). On December 21, 2011, having completed its preliminary review, the Treasury reported to the Governor that "probable financial stress" existed in Detroit and recommended the appointment of a "Financial Review Team" pursuant to PA 4. The Treasury's finding of "probable financial stress" was based upon the following considerations, among others:

- Violation of Uniform Budget and Accounting Act. Detroit arguably had violated Section 17 of Michigan Public Act 2 of 1968 (as amended), the Uniform Budget and Accounting Act, MCL §§ 141.421-141.440a by failing to amend the City's general appropriations act when it became apparent that various line items in the City's budget for Fiscal Year 2010 exceeded appropriations by an aggregate of nearly $58 million (and that unaudited Fiscal Year 2011 figures indicated that expenditures would exceed appropriations by $97 million).

- Inadequate Deficit Elimination Efforts. City officials did not file an adequate or approved "deficit elimination plan" with the Treasury for Fiscal Year 2010. The Treasury found that the City's recent efforts at deficit reduction had been "unrealistic" and that "[c]ity officials either had been incapable or unwilling to manage the finances of the City."

- Mounting Debt Problems. The City had a "mounting debt problem" with debt service requirements exceeding $597 million in 2010 and long term debt exceeding $8 billion as of June 2011 (excluding the City's then-estimated $615 million in unfunded actuarial pension liabilities, $4.9 billion in OPEB liability and other "discretely presented component" debt). The ratio of the City's total long term debt to total net assets for 2010 was 32.64 to 1.

- Risk of Termination Payment Under Swap Contracts. The Treasury identified a significant risk that the City would become subject to a demand for a termination payment (estimated at the time to be in the range of $280 million to $400 million) under its Swap Contracts.

- <u>Falling Credit Ratings</u>. The City's long term bond ratings had fallen below the BBB category and were considered "junk," speculative or highly speculative.

- <u>Cash Flow Shortages</u>. The City was experiencing significant cash flow shortages. The City projected that its cash balance of $96.1 million as of October 28, 2011 (which was nearly $20 million lower than the City's previous estimates) would quickly be eroded and that the City would experience a cash shortage of $1.6 million in April 2012 and would end Fiscal Year 2012 with a cash shortfall of $44.1 million absent remedial action.

### (b) Financial Review Team Finding of "Severe Financial Stress"

On March 26, 2012, the Financial Review Team appointed by the Governor pursuant to PA 4 submitted its report to the Governor, finding that "the City of Detroit is in a condition of severe financial stress … and that a consent agreement has not been adopted [pursuant to PA 4]." The Financial Review Team's finding of "severe financial stress" was based upon the following considerations, among others:

- <u>Increasing Budget Deficit</u>. The City's cumulative General Fund deficit for Fiscal Year 2011 had increased from $91 million to $148 million, primarily as a result of transfers made from the General Fund to support other operations, such as transportation. The City had not experienced a positive year-end fund balance since 2004. The City was predicting a $270 million General Fund deficit for Fiscal Year 2012.

- <u>Variances from Budgets</u>. Audits for the City's previous nine Fiscal Years reflected significant variances between budgeted and actual revenues and expenditures, owing primarily to the City's admitted practice of knowingly overestimating revenues and underestimating expenditures.

- <u>Cash Crisis</u>. The City was continuing to experience significant cash depletion. The City had proposed adjustments to CBAs to save $102 million in Fiscal Year 2012 and $258 million in Fiscal Year 2013, but the tentative CBAs negotiated as of the date of the report were projected to yield savings of only $219 million.

- <u>Debt Downgrades</u>. The City's existing debt had suffered significant downgrades.

- <u>Failure to File Adequate Deficit Elimination Plans</u>. The City had not filed adequate or approvable deficit elimination plans for the 2010 or 2011 Fiscal Years.

### (c) Entry Into the Consent Agreement

Contemporaneously with the investigation of Detroit's financial condition by the Financial Review Team, in early 2012, the City and the State negotiated a "Financial Stability Agreement" (the "<u>Consent Agreement</u>") in an effort to achieve (i) financial stability for the City and (ii) a stable platform for the City's future growth. The City Council approved the Consent Agreement on April 4, 2012. The Consent Agreement subsequently was executed by the Mayor, the members of the Financial Review Team, the Treasurer of the State of Michigan (the "<u>State Treasurer</u>") and the Governor as of April 5, 2012. Having negotiated and executed a "consent agreement" within the meaning of PA 4, no emergency manager was appointed for the City despite the Financial Review Team's finding of "severe financial stress."

The Consent Agreement created a "Financial Advisory Board" (the "<u>FAB</u>") of nine members selected by the Governor, the State Treasurer, the Mayor and City Council. The Consent Agreement granted the FAB an oversight role and limited powers over certain City reform and budget activities. The FAB has held, and continues to hold, regular public meetings and to exercise its oversight functions consistent with the Consent Agreement. To implement the reform efforts set forth in the Consent Agreement, the positions of "Chief Financial Officer" and "Program Management Director" were established, each reporting to the Mayor.

### 2. Headcount Reductions

Between 2010 and the Petition Date, the City reduced its employee headcount by more than 2,700 (from 12,302 employees as of the close of Fiscal Year 2010 to approximately 9,591 as of June 30, 2013). The City estimated that its headcount reductions resulted in annual savings of over $100 million.

### 3. Imposition of City Employment Terms

On July 12, 2012, the FAB approved certain CETs effective as of July 17, 2012 for: (a) employees in unions with expired CBAs; and (b) non-union employees. The CETs were imposed on union employees with expired CBAs pursuant to the Consent Agreement. PA 4 suspended the City's obligation to engage in collective bargaining upon entry of the Consent Agreement. CBAs for approximately 80% of union employees expired as of June 30, 2012; the remaining CBAs expired as of June 13, 2013.

Among other things, the CETs provided for (a) wage reductions (implemented through the imposition of furlough days), (b) caps/reductions on vacation/holiday pay/overtime/sick days, (c) the reduction of pension multipliers and (d) changes to healthcare coverage. The City estimated that implementation of the CETs resulted in $102 million in annual savings ($25 million in savings attributable to wage reductions; $59 million in savings attributable to reduced active and retiree benefits; $9 million in savings attributable to reduced pension costs; and $8 million in savings attributable to changes to work rules).

### 4. Revenue Generating Initiatives

#### (a) Increased Corporate Tax Rate

In January 2012, the City's corporate income tax rate was raised to 2.0% from 1.0%. This increased rate was projected to generate an estimated $6 million in additional annual revenue for the City.

#### (b) Enhanced Tax Collection Initiatives

The City implemented – and continues to implement – initiatives designed to (i) improve collection of past due taxes and (ii) enhance collection efforts on a prospective basis. These efforts to enhance collection of taxes were expected to generate an estimated $13 million in additional annual revenue for the City.

#### (c) Increased Lighting Rates

In January 2013, the PLD increased its rates to more closely align with market rates and eliminate the practice of charging customers less for power than the City itself was paying. The increased rates will likely have a short term impact on revenues given the planned transition of the City's electricity grid to a third party provider.

### 5. Reduced Operating Expenditures

The City implemented an initiative to reduce certain vendor costs by 10%. Reductions in these vendor costs were expected to save the City an estimated $10 million annually.

### 6. Deferred Capital Expenditures

The City deferred capital expenditures on a number of its assets (notably its public lighting and its water and sewer system). The City's average aggregate capital outlays for the five Fiscal Years from 2008 to 2012 ($82.98 million) was less than 55% of the average aggregate capital outlays for the five Fiscal Years preceding that period (2003 to 2007; $151.94 million).

### 7. Cash Conservation Measures

In the weeks preceding the commencement of its chapter 9 case, the City was forced to suspend payments on unsecured debt to conserve its dwindling cash. Specifically, on June 14, 2013, the City (a) did not make a $39.7 million payment due and owing to the Service Corporations in connection with the COPs and (b) publicly declared a moratorium on principal and interest payments related to unsecured debt going forward. The City also had deferred and not paid required pension contributions and other payments (including approximately $37 million in pension contributions for Fiscal Year 2012 and an estimated $71 million in such contributions for Fiscal Year 2013).

-54-

13-53846-swr   Doc 8709   Filed 12/11/14   Entered 12/11/14 20:27:23   Page 68 of 440
13-53846-swr   Doc 2709   Filed 02/21/14   Entered 02/21/14 20:59:30   Page 68 of 440

### 8. Demolition Initiatives

In April 2010, the City launched a program to take initial steps toward addressing urban blight within the City. This program had the goal of demolishing 10,000 vacant structures (*i.e.*, approximately 13% of the vacant structures within the City and 26% of such buildings classified as dangerous) within three years. Over 5,000 structures had been demolished, but the City lacked sufficient funding to complete the project by its target date of December 2013. The City also commenced an ancillary demolition initiative in partnership with the State, pursuant to which $10 million has been allocated to the targeted demolition of 1,234 structures located in the vicinity of schools. As of February 28, 2013, 179 structures had been demolished pursuant to this ancillary initiative (and another 56 were under contract to be demolished).

### 9. Appointment of the Emergency Manager

#### (a) Legislation Authorizing Emergency Manager

In 1990, the Legislature enacted Michigan Public Act 72 of 1990, the Local Government Fiscal Responsibility Act, MCL §§ 141.1201-141.1291 ("PA 72"), which empowered the State to intervene with respect to municipalities facing financial crisis through the appointment of an emergency manager who, once appointed, would assume many of the powers ordinarily held by local elected officials. Effective March 16, 2011, the Legislature repealed PA 72 and enacted PA 4. On November 5, 2012, Michigan voters rejected PA 4 by referendum, which rejection automatically revived PA 72.

#### (b) 2013 Financial Review Team Report

On December 11, 2012, because of the City's diminishing liquidity, the FAB requested that the State initiate a preliminary review of the City's financial condition pursuant to PA 72. The Treasury reported to the Governor on December 14, 2012 that, based on its preliminary review, a "serious financial problem" existed within the City.

On December 18, 2012, pursuant to PA 72, the Governor appointed another Financial Review Team to review the City's financial condition. On February 19, 2013, the Financial Review Team submitted its report (the "2013 Financial Review Team Report") to the Governor, concluding that a "local government financial emergency" existed with the City because no satisfactory plan existed to resolve a serious financial problem.

The Financial Review Team's finding of a "local government financial emergency" was based primarily upon the following considerations:

- Cash Crisis. The City continued to experience a significant depletion of its cash, with a projected $100 million cumulative cash deficit as of June 30, 2013. Cost-cutting measures undertaken by the Mayor and City Council were characterized as too heavily weighted to one-time savings and non-union personnel.

- General Fund Deficits. The City's cumulative General Fund deficit had not experienced a positive year-end fund balance since 2004 and stood at $326.6 million as of June 30, 2012. If the City had not issued substantial debt to reduce the cumulative fund balance over the prior ten years, the accumulated General Fund deficit would have been $936.8 million for Fiscal Year 2012.

- Long Term Liabilities. The City's long term liabilities (calculated by the Financial Review Team using the City's then-estimated pension UAAL) exceeded $14 billion as of June 30, 2013, with approximately $1.9 billion coming due over the next five years and the City had not devised a satisfactory plan to address these liabilities.

- Bureaucratic Structure. The City Charter contained numerous restrictions and structural details that made it extremely difficult to restructure the City's operations in a meaningful or timely manner.

- Variances from Budgets. Audits for the City's previous six Fiscal Years reflected significant variances between budgeted and actual revenues and expenditures, owing primarily to the City's admitted practice of knowingly overestimating revenues and underestimating expenditures.

- <u>Weaknesses in Internal Controls</u>. The management letter accompanying the City's Fiscal Year 2012 financial audit report identified numerous material weaknesses and significant deficiencies in the City's financial and accounting operations.

### (c) Appointment of Kevyn D. Orr

On March 1, 2013, in response to the 2013 Financial Review Team Report and in accordance with Section 15(1) of PA 72, the Governor announced his determination that a "financial emergency" existed within the City. After a public hearing to consider the City Council's appeal of the Governor's determination, on March 14, 2013, the Governor confirmed his determination of a "financial emergency" within the City in accordance with Section 15(2) of PA 72 and requested that the LEFALB appoint an emergency manager. On March 14, 2013, pursuant to Section 18(1) of PA 72, the LEFALB appointed Kevyn D. Orr as the "emergency financial manager" in accordance with the Governor's request, and Mr. Orr formally took office on March 25, 2013. On March 28, 2013, upon the effectiveness of PA 436 and in accordance with Section 9(10) thereof, Mr. Orr became the "emergency manager" with respect to the City under PA 436 (in such capacity, the "<u>Emergency Manager</u>").

### (d) Financial and Operating Plan

On May 12, 2013, the Emergency Manager submitted the Financial and Operating Plan (the "<u>Financial and Operating Plan</u>") to the State Treasurer in accordance with Section 11(2) of PA 436. The Financial and Operating Plan summarized the financial condition of the City and the strategic and operational considerations facing the Emergency Manager and presented the Emergency Manager's preliminary views on the development of a restructuring plan with respect to the City.

### 10. The June 14 Creditor Proposal

Immediately following his appointment, the Emergency Manager began to focus on developing a comprehensive restructuring plan to: (a) ensure that the City is able to provide or procure governmental services essential to the public health, safety and welfare of its citizens; (b) assure the fiscal accountability and stability of the City; and (c) promote investment in the City and revitalization of the community in a sustainable fashion. On June 14, 2013 (*i.e.*, less than three months after formally assuming the position of Emergency Manager), at a meeting in the Detroit area, the Emergency Manager presented this restructuring plan (the "<u>June 14 Creditor Proposal</u>") to approximately 150 invited representatives of the City's creditors, including representatives of (a) all of the City's funded debt, (b) the insurers of such debt, (c) all of the City's unions, (d) certain retiree associations, (e) the Retirement Systems and (f) many individual bondholders.

At this meeting, the Emergency Manager presented an executive summary of the June 14 Creditor Proposal, and attendees received the full proposal as they exited. The Emergency Manager also caused the full proposal and the executive summary to be posted on the City's publicly accessible website the same day. The meeting lasted approximately two hours, and the Emergency Manager and his advisors answered all questions posed by attendees. At the conclusion of the meeting, all creditor representatives were invited to meet and engage in a dialogue with City representatives regarding the proposal. The Emergency Manager also indicated that he would welcome proposed modifications and alternative ideas consistent with the City's (a) urgent need for reinvestment to improve essential City services and (b) then-current and projected cash flows.

In addition to describing the economic circumstances that resulted in Detroit's current financial condition, the 128-page June 14 Creditor Proposal described a thorough overhaul and restructuring of the City's operations, finances and capital structure, as well as proposed recoveries for each creditor group. The Bankruptcy Court later found that the proposed recoveries for Holders of Claims for pension benefits were not specific enough to require a response.

Among other things, the June 14 Creditor Proposal discussed:

### (a) Investment in Infrastructure

The June 14 Creditor Proposal outlined the City's plans to achieve a sustainable restructuring through investing approximately $1.25 billion over ten years to improve basic and essential City services to citizens, including: (i) substantial investment in, and/or the restructuring of, various City departments; (ii) substantial investment in the City's blight removal efforts; (iii) the transition of the City's electricity transmission business to an alternative provider; (iv) the implementation of a population-based streetlight footprint and the outsourcing of lighting operations to the newly-created PLA;

(v) substantial investments in upgraded information technology for police, fire, EMS, transportation, payroll, grant management, tax collection, budgeting and accounting and the City's court system; (vi) a comprehensive review of the City's leases and contracts; and (vii) a proposed overhaul of the City's labor costs and related work rules.

### (b)     Increased Revenues

The June 14 Creditor Proposal also set forth the City's intention to increase revenues to the City through:  (i) the expansion of its income and property tax bases, rationalization and adjustment of its nominal tax rates and various initiatives to improve and enhance its tax and fee collection efforts; (ii) its intention to potentially realize value from the DWSD through the creation of the GLWA to conduct the operations currently conducted by the DWSD pursuant to the City's concession or lease of the DWSD's assets in exchange for a recurring (and unrestricted) payment in lieu of taxes, lease payment or other form of payment; (iii) the potential realization of value from City-owned assets currently exhibited and/or housed at the DIA; and (iv) the commitment to evaluate what value may be realized from other City assets (*e.g.*, City-owned real property; municipal parking operations; the Detroit-Windsor Tunnel; and Belle Isle Park).

### (c)     Financial Statements

The June 14 Creditor Proposal also set forth:  (i) the City's projected financial statements over a ten-year period, as well as the assumptions underlying those projections; and (ii) the City's actual and forecasted cash flows for the 2013 and 2014 Fiscal Years in the absence of restructuring.

### (d)     Potential Creditor Recoveries

The June 14 Creditor Proposal further estimated creditor recoveries based upon the City's actual and projected financial condition.

Having provided the facts and strategies contained in the June 14 Creditor Presentation to its creditor body *en masse*, the City followed up with individual meetings with attendees during the period between June 14, 2013 and the commencement of this case.  At these meetings, further data and legal viewpoints were exchanged and many questions were answered; however, no meaningful progress toward a comprehensive resolution of the City's obligations occurred. Importantly, following the June 14 Creditor Presentation, the City:  (i) sought a resolution of various issues related to its pension-related Swap Contracts through extensive negotiations with the Swap Counterparties thereto and the insurers of the Swap Obligations; and (ii) held several follow-up meetings with various creditor representatives.

### 11.     Barriers to Out-of-Court Restructuring

### (a)     Negotiations with Creditors

The Bankruptcy Court later found that the City could not practicably negotiate a consensual restructuring with its creditor constituencies in an out-of-court setting.  The pool of potential creditors in the City's chapter 9 case was vast. The City estimated that the number of employees, retirees, vendors, bondholders, insurers and other parties in interest in this case reached into the many tens of thousands (and that many of these creditors were unknown and unidentified). Collectively, the City's creditors held up to an estimated $18 billion in Claims against the City.  Moreover, some of the largest components of the City's debt including, for example, the City's actuarially accrued $6.4 billion in unfunded OPEB obligations were fragmented among thousands of individuals.

With respect to the City's retirees, many of the unions took the position that they did not and could not represent their former members who are current retirees.  The City understood that, absent their consent, the approximately 20,000 retirees entitled to receive retiree healthcare and pension benefits from the City cannot be bound by out-of-court negotiations between the City and the bargaining units that might represent and previously did represent these retirees. Moreover, even if such retirees had been willing to be bound by the City's negotiations with the bargaining units (which would have been unlikely), the majority of those units refused to represent such retirees. Despite the City's best efforts to organize the retirees prior to the commencement of the City's chapter 9 case, most retirees remained unrepresented in negotiations.  Accordingly, the negotiation of changes to pension and retiree benefits with the City's retiree constituency – changes that are critical to any restructuring of the City given the amounts owed to these constituencies – was impracticable (if not impossible) outside of the chapter 9 context.

With respect to the City's bond debt, certain of the City's bond issuances permitted a majority of Holders to agree to certain amendments to the terms of such bonds. However, in many, if not all, cases, an extension of the maturity date of the indebtedness or an agreement to reduce its principal amount required the consent of all outstanding bondholders. In many instances, the City was unable to negotiate with a single contact with the authority to bind bondholders of a particular series of debt, thus rendering negotiations regarding the out-of-court restructuring of such bonds impracticable. In any event, as of the Petition Date, no bondholder group holding a majority of any of the 60 series of debt issued by the City had proposed that the City could negotiate with it.

The City's restructuring proposals to its creditor constituencies were met with resistance. The feedback received from creditors led the City to determine that a comprehensive agreement was unlikely in the near term without the commencement of this chapter 9 case. On July 8, 2013, for example, a bond insurer serving as surety for approximately $170 million of the City's limited and unlimited tax general obligation debt issued a public statement declaring that the June 14 Creditor Proposal was "harmful to Detroit and the interests of the taxpayers in Michigan" and "necessarily imperiled" the City's access to cost effective financing. Further negotiations with all of the City's various stakeholders was impracticable in light of the City's cash crisis and the urgent need to move forward with its restructuring. The City required a clear and centralized forum within which parties could negotiate and ultimately be bound.

(b)    Prepetition Litigation

Several lawsuits were filed against various entities (including, among others, the Governor, the Emergency Manager and the State Treasurer) during the period immediately prior to the Petition Date effectively seeking to bar the commencement of a chapter 9 case by the City. On July 3, 2013, certain current and former employees of the City filed a complaint against the State, the Governor and the State Treasurer seeking: (i) a declaratory judgment that PA 436 violated the Michigan Constitution to the extent that it purported to authorize chapter 9 cases within which vested pension benefits might be compromised; and (ii) an injunction preventing the defendants from authorizing any chapter 9 case for the City within which vested pension benefits might be adjusted. Webster v. State, No. 13-734-CZ (Ingham Cnty. Cir. Ct. July 3, 2013). Also on July 3, 2013, a separate complaint was filed by certain current and former employees of the City (the "Flowers Plaintiffs") against the State, the Governor and the State Treasurer seeking relief similar to that sought in Webster. Flowers v. Snyder, No. 13-729-CZ (Ingham Cnty. Cir. Ct. July 3, 2013). In addition, on July 17, 2013, the Retirement Systems commenced a lawsuit against the Emergency Manager and the Governor seeking declaratory judgments that PA 436 (i) does not authorize them to take any action that may result in the compromise of the City's pension obligations; and (ii) when read in conjunction with applicable provisions of the Michigan Constitution, requires the defendants to refrain from attempting to compromise pension obligations in a chapter 9 case (or, alternatively, that PA 436 violates the Michigan Constitution). Gen. Ret. Sys. v. Orr, No. 13-768-CZ (Ingham Cnty. Cir. Ct. Jul. 17, 2013).

Had the City not sought the protections of chapter 9 and the automatic stay (the "Chapter 9 Stay") on the Petition Date or sooner, these lawsuits could have significantly delayed the City's restructuring process at a time when the City was in a state of financial emergency, was insolvent and was failing to provide an adequate level of even the most basic services to the residents of Detroit. The plaintiffs in each of these lawsuits sought *ex parte* orders (the "Injunction Orders") from the Circuit Court of Ingham County, Michigan (the "Ingham County Court") temporarily or preliminarily enjoining the defendants from (i) taking certain actions toward authorizing a chapter 9 filing by the City; and (ii) with respect to the City, availing itself of the protections and powers of chapter 9 in any case actually commenced. On the Petition Date – but after the filing of the City's petition – the Ingham County Court entered the Injunction Orders sought by the plaintiffs in each of these cases. Each of these actions is stayed by the automatic stay in this chapter 9 case and pursuant to the Bankruptcy Court's Order Pursuant to Section 105(a) of the Bankruptcy Code Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non-Officer Employees and (C) Agents and Representatives of the Debtor (Docket No. 166), entered on July 25, 2013.

In addition to the Webster, Flowers and General Retirement System lawsuits, certain other prepetition litigation threatened to impede the City's attempts to restructure out-of-court pursuant to PA 436 or, at a minimum, distract the City's leadership from focusing on uncovering the nature and extent of the City's financial problems and implementing urgently-needed reforms. E.g., Phillips v. Snyder, No. 2:13-cv-11370 (E.D. Mich.) (lawsuit against the Governor and State Treasurer seeking (i) a declaratory judgment that PA 436 violates, among other things, the United States Constitution and the Voting Rights Act; (ii) injunctive relief, among other things, preventing the defendants and any emergency managers from exercising rights under PA 436; and (iii) liquidated, compensatory and punitive damages and attorneys' fees and costs); NAACP v. Snyder, No. 2:13-cv-12098 (E.D. Mich.) (seeking the same relief as was sought in Phillips – except making no prayer for damages – on substantially similar grounds); Citizens United Against Corrupt Gov't v. Local Emergency Fin. Assistance Loan Bd., No. 13-281-NZ (Ingham Cnty. Cir. Ct.) (lawsuit against the LEFALB, the Governor and the State Treasurer seeking, among other things, to invalidate the appointment of the Emergency Manager).

12.     **Insolvency**

    (a)     **Not Paying Debts as They Come Due**

As of the Petition Date, the City was generally not paying its debts as they become due. As described above, the City's cash crisis had become particularly acute in the weeks preceding the commencement of this chapter 9 case and, in response, the City was forced to suspend payments on unsecured debt including payments of $37 million to the Service Corporations on account of the COPs and deferral of required pension contributions. As of June 30, 2013, the City had only $36 million in cash on hand (net of accumulated property tax distributions), but had outstanding deferrals (including the $108 million in deferred pension contributions referenced above) and amounts due to other funds and entities of approximately $274.3 million.

    (b)     **Cash Flow Insolvency**

The City also was unlikely to be able to service its debts in the foreseeable future. The City had negative cash flows of $115.5 million in Fiscal Year 2012. The City's preliminary estimates showed positive cash flows of $31.5 million (excluding the impact of borrowings) for Fiscal Year 2013, but only as a result of, among other things, the deferral of nearly $108 million in pension contributions and the City's decision, on June 14, 2013, not to make $39.7 million in payments due and owing to the Service Corporations. Absent restructuring, the City projected cash flows of negative $198.5 million in Fiscal Year 2014 and negative $260.4 million in Fiscal Year 2015. This cash depletion would have left the City in a net cash position (after required property tax distributions) of negative $11.6 million as early as December 2013. In the absence of restructuring, the City's net negative cash position (after required property tax distributions) would have continued its downward spiral, reaching negative $143.3 million as of the end of Fiscal Year 2014 and negative $404.5 million as of the end of Fiscal Year 2015.

    (c)     **Bankruptcy Court Ruling on Insolvency**

On December 5, 2013, in connection with the issuance of the Eligibility Order, the Bankruptcy Court ruled that the City was insolvent as of the Petition Date. See Eligibility Order, at 110.

**IV.**

**THE CHAPTER 9 CASE**

A.     **Commencement of the Chapter 9 Case**

After more than one month of negotiations with its creditor constituencies, the City was unable to negotiate – and saw no prospect of negotiating – an out-of-court resolution that would address the City's financial situation and lay a foundation for a strong and prosperous City going forward. Accordingly, on July 16, 2013, and in accordance with section 18(1) of PA 436, the Emergency Manager submitted a written recommendation to the Governor and the State Treasurer that the City seek relief under chapter 9 of the Bankruptcy Code. The Emergency Manager's recommendation was based on his judgment that no reasonable alternative to rectifying the financial emergency of the City existed because the City could not adopt a feasible financial plan that could satisfactorily rectify the financial emergency in a timely manner. On July 18, 2013, in accordance with section 18(1) of PA 436, the Emergency Manager received the written authorization of the Governor to commence a chapter 9 case. On July 18, 2013, consistent with the Governor's written approval, the Emergency Manager issued an order directing the City to commence a chapter 9 case, and the City's petition for relief was filed at 4:06 p.m., Eastern Time, that day.

B.     **Retiree Committee**

Prior to the Petition Date, no single party was empowered to represent retired employees of the City entitled to receive pension benefits and health and other post-employment welfare benefits (collectively, the "Retirees") regarding the billions of dollars of legacy claims that must be addressed in the City's restructuring. Anticipating the necessity of negotiations regarding the treatment of the legacy claims of Retirees and their beneficiaries under a plan of adjustment, on July 19, 2013 (i.e., the day after the Petition Date), the City filed a motion (Docket No. 20) requesting the appointment of an official committee (the "Retiree Committee") to act as the Retirees' authorized representative in the City's chapter 9 case. On August 2, 2013, the Bankruptcy Court entered an order (Docket No. 279) (the "Appointment Order") directing the Office of the United States Trustee for the Eastern District of Michigan (the "U.S. Trustee") to appoint the Retiree

Committee pursuant to section 1102(a)(2) of the Bankruptcy Code. On August 22, 2013, the U.S. Trustee filed its Corrected Appointment of Official Committee of Retirees (Docket No. 575) with the Bankruptcy Court, appointing the following individuals to the Retiree Committee: (a) Edward L. MacNeil (on behalf of Detroit, Michigan, Retiree Sub-Chapter 98 of the American Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME")); (b) Michael J. Karwoski; (c) Shirley V. Lightsey; (d) Terri Renshaw; (e) Robert A. Shinske; (f) Donald Taylor; (g) Gail Wilson Turner; (h) Gail M. Wilson; and (i) Wendy Fields-Jacobs (on behalf of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW")).

On August 29, 2013, the law firms Dentons US LLP and Salans FMC SNR Denton Europe LLP (together, "Dentons") filed a notice of appearance (Docket No. 683) on behalf of the Retiree Committee. Dentons filed amended notices of appearance (Docket Nos. 1012; 1017) on September 24, 2013. On October 21, 2013, the Retiree Committee filed its application (Docket No. 1299) seeking to retain Dentons as counsel, effective as of August 28, 2013. Following the City's filing of a limited objection (Docket No. 1527) and the submission of a revised proposed order resolving the City's concerns (Docket No. 1655), on November 12, 2013, the Bankruptcy Court entered an order (Docket No. 1668) approving the retention of Dentons.

On September 5, 2013, the law firm Brooks Wilkins Sharkey & Turco PLLC ("Brooks Wilkins") filed notices of appearance (Docket Nos. 716; 718) on behalf of the Retiree Committee. On October 25, 2013, the Retiree Committee filed its application (Docket No. 1392) seeking to retain Brooks Wilkins as counsel, effective as of September 3, 2013. On November 12, 2013, the Bankruptcy Court entered an order (Docket No. 1664) approving the retention of Brooks Wilkins.

On October 31, 2013, the Retiree Committee filed its application (Docket No. 1476) to employ Lazard Freres & Co. LLC ("Lazard") as financial advisor to the Retiree Committee. The Retiree Committee proposed that Lazard be paid $175,000 per month plus expenses and an undetermined transaction fee upon the approval of a settlement of retiree Claims or the consummation of the City's chapter 9 case. Following the City's filing of a limited objection (Docket No. 1703) and the submission of a stipulated proposed order resolving the City's concerns (Docket No. 1832), on November 27, 2013, the Bankruptcy Court entered an interim order (Docket No. 1854) (a) continuing the hearing on the Retiree Committee's application to December 16, 2013 (to allow testimony from Lazard) and (b) approving the retention of Lazard on an interim basis through the date of the continued hearing. On December 19, 2013, the Bankruptcy Court entered an order (Docket No. 2250) approving the retention of Lazard effective as of September 3, 2013.

On December 2, 2013, the Retiree Committee filed its application (Docket No. 1882) to employ The Segal Company as actuarial consultant to the Retiree Committee (the "Actuary Application"). The City responded informally to the Actuary Application by raising certain concerns directly with the Retiree Committee. On December 26, 2013, the parties submitted a stipulated proposed order resolving the City's concerns (Docket No. 2330), and on January 21, 2014, the Bankruptcy Court entered an order (Docket No. 2528) authorizing the Retiree Committee's retention of The Segal Company.

Paragraph 5 of the Appointment Order (a) acknowledged the City's agreement to pay the reasonable professional expenses of the Retiree Committee and (b) noted that such expenses would be subject to any order appointing a fee examiner entered by the Court. Paragraph 2 of the Bankruptcy Court's "Order Appointing Fee Examiner" (Docket No. 383), entered on August 19, 2013, provided that "Professional Fee Expenses" incurred by the City subject thereto (and to any subsequent "Fee Review Order") would include "Fees payable to the professionals of any official committee." Paragraph 24 of the "Fee Review Order" (Docket No. 810) entered by the Bankruptcy Court on September 11, 2013, acknowledged the City's agreement to pay "the reasonable fees and expenses" of the Retiree Committee's professionals and the "reasonable expenses" of the members of the Retiree Committee, subject to the City's right to seek a judicial determination of reasonableness. In compliance with, and in accordance with the terms of, the Appointment Order, the Order Appointing Fee Examiner and the Fee Review Order, the City has paid the reasonable fees and expenses of the Retiree Committee's professionals and the reasonable expenses of the Retiree Committee's members. See Section IV.I below for a more detailed discussion of the fee process prevailing in the City's chapter 9 case.

Following its appointment, the Retiree Committee has been an active participant with respect to various matters before the Bankruptcy Court, and the City has conducted continuous discussions with the Retiree Committee and its professionals regarding the City's restructuring and the Retirees' Claims. See Sections IV.C (describing the Retiree Committee's role in the litigation regarding the City's eligibility to be a chapter 9 debtor); IV.E.3 (describing the Retiree Committee's participation in Court-ordered mediation); IV.J.2.c (describing certain litigation initiated by the Retiree Committee in connection with modifications to retiree health benefits proposed by the City).

## C.     Eligibility

The primary issue before the Bankruptcy Court since the commencement of the City's chapter 9 case has been the determination of the City's eligibility to be a debtor under chapter 9 of the Bankruptcy Code (such issue, "Eligibility"). The determination of Eligibility is governed by sections 109(c) and 921(c) of the Bankruptcy Code, which provisions require the Bankruptcy Court, among other things, to determine whether: (1) the City is a municipality (11 U.S.C. § 109(c)(1)); (2) the City was specifically authorized to be a debtor by state law (11 U.S.C. § 109(c)(2)); (3) the City was insolvent as of the Petition Date (11 U.S.C. § 109(c)(3)); (4) the City desires to effectuate a plan to adjust its debts (11 U.S.C. § 109(c)(4)); (5) either (a) the City negotiated in good faith with its various creditor constituencies (11 U.S.C. § 109(c)(5)(B)) or (b) it was impracticable for the City to do so (11 U.S.C. § 109(c)(5)(C)); and (6) the City's petition was filed in good faith (11 U.S.C. § 921(c)). On the Petition Date, in support of Eligibility, the City filed its (1) Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (Docket No. 10) and (2) Memorandum in Support of Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (Docket No. 14), demonstrating its satisfaction of the requirements set forth at section 109(c) of the Bankruptcy Code. To resolve the threshold issue of Eligibility as promptly as possible, the City filed a motion (Docket No. 18) on the Petition Date seeking an order establishing a schedule for, and expediting the process of, identifying and adjudicating any objections to Eligibility. On August 6, 2013, the Bankruptcy Court entered an order (Docket No. 296) establishing a deadline of August 19, 2013 for the filing objections to Eligibility and a schedule for the adjudication of such objections.

Approximately 110 objections to Eligibility (each, an "Objection") were filed prior to the deadline established by the Bankruptcy Court (or deemed timely filed). The majority of such Objections were filed by individuals. The Objections (1) raised numerous issues of law and fact (including threshold challenges to the constitutionality of chapter 9 and PA 436 and the City's power to impair pension benefits in chapter 9) and (2) challenged (a) the City's satisfaction of all subsections of section 109(c)(5) of the Bankruptcy Code (with the exception of subsection 109(c)(1)) and (b) the "good faith" of the City's chapter 9 petition within the meaning of section 921(c) of the Bankruptcy Code. In addition to the Objections, Michigan Attorney General Bill Schuette filed a "Statement Regarding the Michigan Constitution and the Bankruptcy of the City of Detroit" (Docket No. 481), arguing that, although the City was eligible to be a chapter 9 debtor, the Pensions Clause of the Michigan Constitution barred the City from impairing its obligations to pensioners.

On September 11, 2013, the Retiree Committee filed a motion to withdraw the reference (Docket No. 806) (the "Motion to Withdraw") of certain state law and constitutional issues raised in its Objection from the Bankruptcy Court to the District Court. The Retiree Committee's filing of the Motion to Withdraw initiated a separate proceeding before the District Court captioned as Official Committee of Retirees v. City of Detroit (In re City of Detroit), No. 13-cv-13873 (E.D. Mich.). The Motion to Withdraw was fully briefed by the City and the Retiree Committee as of October 5, 2013. Shortly after filing the Motion to Withdraw, on September 13, 2013, the Retiree Committee filed a motion (Docket No. 837) with the Bankruptcy Court seeking a stay of all deadlines and the trial related to Eligibility (the "Eligibility Proceedings") pending the District Court's disposition of the Motion to Withdraw. Following briefing and a hearing, on September 26, 2013, the Bankruptcy Court entered an opinion and order (Docket No. 1039) denying the Retiree Committee's motion to stay the Eligibility Proceedings, finding, among other things, that the Retiree Committee was unlikely to succeed on the merits of the Motion to Withdraw. The District Court has not taken any action to withdraw the reference of the Eligibility Proceedings.

Following the filing of the Objections, and pursuant to certain scheduling orders entered by the Bankruptcy Court (Docket Nos. 642; 821), the Bankruptcy Court conducted hearings related to the City's eligibility, including (1) a hearing on September 19, 2013, at which all individual objectors were provided the opportunity to be heard on their Objections (and at which approximately 50 such individual objectors appeared before the Bankruptcy Court); (2) hearings on October 15, 2013 and October 16, 2013, at which the Bankruptcy Court heard oral argument on portions of the Objections that raised strictly legal issues; (3) various hearings on motions raising certain discovery and privilege disputes; and (4) a nine-day bench trial (the "Eligibility Trial") spanning the period October 23, 2013 to November 8, 2013 at which argument and testimony were presented with respect to Objections requiring the resolution of genuine issues of material fact. Sixteen witnesses – including the Governor, the former State Treasurer and the Emergency Manager – testified at the Eligibility Trial and 310 exhibits were introduced into evidence.

On December 3, 2013, the Bankruptcy Court issued a bench decision determining that the City was eligible to be a chapter 9 debtor (the "Bench Decision"). On December 5, 2013, the Bankruptcy Court entered its Opinion Regarding Eligibility (Docket No. 1945) (the "Eligibility Order") memorializing the Bench Decision. Also on December 5, 2013, the Bankruptcy Court entered an Order for Relief Under Chapter 9 of the Bankruptcy Code (Docket No. 1946) (the "Order for Relief"), determining that the City (1) met all of the applicable requirements under section 109(c) of the Bankruptcy Code,

-61-

13-53846-swr   Doc 8709   Filed 12/11/14   Entered 12/11/14 10:27:23   Page 75 of 440
13-53846-tjt   Doc 2709   Filed 02/21/14   Entered 02/21/14 00:25:30   Page 75 of 440

(2) is eligible to be a debtor under chapter 9 of the Bankruptcy Code and (3) filed its chapter 9 petition in good faith. In the Bench Decision and Eligibility Order, the Bankruptcy Court further held that, notwithstanding the state law protections afforded by the Pensions Clause, the City may impair its pension obligations under chapter 9 of the federal Bankruptcy Code. Notices of appeal of the Eligibility Order were filed by: (1) AFSCME (Docket No. 1907); (2) the Retirement Systems (Docket No. 1930); (3) the Retiree Committee (Docket No. 2057); (4) the Retired Detroit Police & Fire Fighters Association (the "RDPFFA"), the Detroit Retired City Employees Association (the "DRCEA") and affiliated individuals (Docket No. 2070); (5) the Retired Detroit Police Members Association (the "RDPMA") (Docket No. 2111); (6) the DFFA and the DPOA (Docket No. 2137); and (7) the UAW together with the Flowers Plaintiffs (Docket No. 2165).

Motions for certification of direct appeal of the Order for Relief to the United States Court of Appeals for the Sixth Circuit (the "Sixth Circuit") were filed by: (1) the Retirement Systems (Docket No. 1933); (2) the Retiree Committee (Docket No. 2060); (3) the RDPFFA, the DRCEA and affiliated individuals (Docket No. 2068); (4) the RDPMA (Docket No. 2113); (5) the DFFA and the DPOA (Docket No. 2139); (6) the UAW and the Flowers Plaintiffs (Docket No. 2192); and (7) AFSCME (Docket No. 2376). After a hearing, on December 20, 2013, the Bankruptcy Court issued an order certifying to the Sixth Circuit that appeals of the Eligibility Order "involve a 'matter of public importance'" (Docket No. 2268, as amended by Docket No. 2274) (the "Certification Order"). In a memorandum issued contemporaneously with the Certification Order (Docket No. 2269), the Bankruptcy Court recommended that (1) notwithstanding the fact that appeals of the Eligibility Order involve "a matter of public importance," authorization for direct appeals to the Sixth Circuit should be denied; and (2) should the Sixth Circuit authorize a direct appeal of the Eligibility Order, such an appeal should not be expedited and, in considering requests to expedite any such an appeal, the Sixth Circuit should consult with the mediator in the City's chapter 9 case to determine whether expediting such an appeal "is in the best interest of the City, its creditors and its residents."

Petitions for permission to appeal the Eligibility Order directly to the Sixth Circuit have been filed with the Sixth Circuit by each of the entities that filed a notice of appeal of the Eligibility Order with the Bankruptcy Court. All of these petitions are currently pending. All appeals of the Eligibility Order pending in the District Court have been stayed pending the Sixth Circuit's disposition of the various petitions for permission to appeal.

## D.     Swap Settlement

As described in greater detail in Section III.B.4, *supra*, as part of a 2009 restructuring of the City's swap obligations, the City entered into the Collateral Agreement with the Swap Counterparties, the Service Corporations and U.S. Bank, whereby the City avoided a substantial early termination fee under the Swap Contracts, in return for securing its quarterly swap payments with collateral consisting of certain Casino Revenues. In March 2012, the City suffered ratings downgrades with respect to its unlimited tax general obligation bonds, which again gave rise to the risk that the Swap Counterparties could terminate the Swap Contracts and seek a termination payment from the City. The City commenced negotiations with the Swap Counterparties to resolve issues arising in connection with the credit rating downgrade.

Despite the significant time and effort devoted to reaching a resolution that would permit the City access to the Casino Revenues, following the assertion of alleged rights by insurer Syncora, the City's access to funds was blocked. Accordingly, the City acted to protect its interests and preserve its access to the Casino Revenues – a critical funding source for the City – by commencing litigation against Syncora (among others) in the Circuit Court for Wayne County, Michigan to seek (1) the release of Casino Revenues held by U.S. Bank as custodian and (2) the recovery of damages suffered by the City due to Syncora's interference with its banking relationships. In that proceeding, the Emergency Manager submitted an affidavit in support of the City's Verified Complaint for Declaratory and Injunctive Relief, which contains additional factual background concerning the Swap Contracts, related Collateral Agreement and other matters. On July 5, 2013, the City obtained a temporary restraining order against Syncora and U.S. Bank, thus temporarily preserving the City's access to the Casino Revenues. Following those activities, the City was able to make timely payment on its swap obligations, making the required deposit into the Holdback Account and triggering the release of Casino Revenues to the City.

### 1.     Forbearance and Optional Termination Agreement

Prior to and concurrently with the litigation against Syncora, the City engaged in negotiations with the Swap Counterparties. These negotiations culminated three days prior to the Petition Date, when the Emergency Manager reached an agreement with the Swap Counterparties to eliminate one of the City's largest secured obligations at a discount and ensure ongoing access to critical Casino Revenues that were pledged to support the swap arrangements. This agreement is evidence by the Forbearance and Optional Termination Agreement, dated July 15, 2013, by and among the City, the Swap Counterparties and the Service Corporations (the "FOTA").

-62-

13-53846-swr   Doc 8709   Filed 12/12/14   Entered 12/12/14 20:39:30   Page 76 of 440
13-53846-swr   Doc 2709   Filed 02/21/14   Entered 02/21/14 02:59:30   Page 76 of 440

On the Petition Date, the City filed a motion with the Bankruptcy Court to assume the FOTA under section 365 of the Bankruptcy Code and requesting that the Bankruptcy Court approve the parties' settlement under Bankruptcy Rule 9019 (Docket No. 17) (the "Swap Settlement Motion"). The principal terms of the FOTA were as follows:

- Forbearance. The FOTA provided for a period (the "Forbearance Period") during which the Swap Counterparties would forbear from (a) terminating the Swap Agreements and (b) blocking the City's access to the Casino Revenues in the General Receipts Account. In addition, the FOTA required the Swap Counterparties to use their best efforts to ensure the City's continued access to the Casino Revenues and to support the City's efforts to obtain turnover of the Casino Revenues in the event of a chapter 9 filing. Following the Forbearance Period, the Swap Counterparties would no longer be obligated to forbear from exercising their rights and the City would no longer entitled to exercise its option to terminate the Swap Agreements. In certain situations, the covenants of the City, the Service Corporations and the Emergency Manager contained in the FOTA would survive if the Swap Counterparties terminated the Forbearance Period based on certain occurrences. In other instances, a termination of the forbearance period would revert the parties' rights to the *status quo ante*.

- Forbearance Period. The Forbearance Period would end upon the earliest of: (a) June 30, 2014; (b) a payment default under the Swap Agreements or the voluntary bankruptcy filing of the Service Corporations; (c) an involuntary bankruptcy filing of the Service Corporations; (d) certain credit support defaults under the Swap Agreements; (e) certain Additional Termination Events under the Swap Agreements – specifically including third party challenges to validity or the City's attempt to reduce the casino taxes; (f) breach of the covenants or representations in the FOTA; (g) a judgment of a court rendering documents relating to the transaction invalid or holding the certain COPs should be paid prior to maturity; (h) certain legislative acts with similar effects; (i) the failure to obtain a final, non-appealable order approving the FOTA within 60 days of any bankruptcy filing, the denial of the Swap Settlement Motion, the dismissal of the City's chapter 9 case (if not re-filed within 30 days), and a failure to include a stay waiver within the approval order; or (j) the occurrence of the effective date of the City's plan of adjustment. In addition, the City was authorized to terminate the Forbearance Period if the City did not receive the Casino Revenues from the General Receipts Account by July 31, 2013 or had reasonable grounds to believe that its access to the Casino Revenues would be blocked.

- Optional Termination Payment. The FOTA further provided the City with the right (the "Optional Termination Right") to direct the Swap Counterparties to exercise their optional right of termination of the Swap Agreements. In the event the City exercised its Optional Termination Right, the Service Corporations would be relieved of any payment obligations to the Swap Counterparties under the Swap Agreements. In addition, no Swap Counterparty would present any payment notice to a Swap Insurer as a result of the exercise of the Termination Right and the Swap Counterparties would irrevocably waive all future rights to do so.

  As a termination payment (the "Optional Termination Payment") the City would pay: (a) 75% of the then mid-market value of the Swap Agreements, if the option was exercised between the date of the Agreement and October 31, 2013; (b) 77% if the option was exercised after October 31, 2013 but on or before November 15, 2013; or (c) 82% if exercised after November 15, 2013 and on or before March 13, 2014. In addition, the City would pay any unpaid amounts then owing under the Swap Agreements. As of the end of June 2013, 18 days before the Petition Date, the City estimated the negative value of the Swap Agreements at $296.5 million. In addition to unhindered access to the Casino Revenues, therefore, the FOTA offered the City a potential saving in excess of $70 million as of the Petition Date.

## 2. Litigation Regarding the Casino Revenues and the FOTA

There has been significant litigation with respect to the Casino Revenues and the FOTA during the City's chapter 9 case. On July 11, 2013, Syncora removed a lawsuit commenced in Wayne County Circuit Court (the "Casino Revenue Proceeding") to the District Court. The Casino Revenue Proceeding was referred to the Bankruptcy Court on August 8, 2013 and is now called City of Detroit v. Syncora Guarantee Inc., *et al.*, Adv. Proc. No. 13-04942. On November 25, 2013, the Bankruptcy Court entered a stipulated order that, among other things, stayed the Casino Revenue Proceeding for a period of 60 days from the date of the Bankruptcy Court's order. The stipulated stay expired on January 24, 2014 and, on

January 27, 2014, Syncora filed a motion to withdraw the reference of the Casino Revenue Proceeding to the Bankruptcy Court. As of the date hereof, Syncora's motion has been fully briefed but has not been determined by the District Court.

On July 24, 2013, six days after the Petition Date, Syncora commenced a lawsuit against the Swap Counterparties in New York state court (the "Swap Settlement Proceeding") seeking to enjoin the Swap Counterparties from entering into the FOTA. The Swap Settlement Proceeding, now called Syncora Guarantee Inc. v. UBS AG, et al., Adv. Proc. No. 13-05395, was removed to the United States District Court for the Southern District of New York, transferred to the District Court and then referred to the Bankruptcy Court. In the Swap Settlement Proceeding, Syncora alleged that the Swap Counterparties may not exercise any optional right of termination of the Swap Agreements – at the City's direction, as envisaged by the FOTA - without Syncora's prior written consent. Syncora sought declaratory and injunctive relief, including a declaration that the Swap Counterparties may not terminate the Swap Agreements without Syncora's consent (and that any such termination will be void *ab initio*) and an injunction permanently enjoining the Swap Counterparties from terminating the Swap Agreements. On October 10, 2013, the City filed a motion to intervene in the Swap Settlement Proceeding. On January 29, 2014, the Bankruptcy Court granted the City's motion to intervene. The Swap Counterparties filed a motion to dismiss the Swap Settlement Proceeding, and Syncora filed (a) a motion seeking a determination that the proceeding was a non-core proceeding with respect to which the Bankruptcy Court lacks authority to enter a final judgment and (b) a motion for summary judgment. On February 9, 2014, Syncora filed a notice with the Bankruptcy Court withdrawing the Swap Settlement Proceeding without prejudice.

There was also significant opposition to the Swap Settlement Motion in the City's chapter 9 case, particularly from Syncora and other monoline insurers. On August 16, 2013, for example, Syncora filed its objection to the Swap Settlement Motion (Docket No. 366) (the "Syncora Settlement Objection"). In the Syncora Settlement Objection, Syncora argued that the City failed to satisfy the requirements for approval of the Swap Settlement Motion under Bankruptcy Rule 9019, because the FOTA allegedly was not a settlement or compromise and was not fair and equitable or in the best interests of the City's creditors. Syncora Settlement Objection, at ¶¶ 78-106. In addition, Syncora argued that assumption of the FOTA was improper because the City allegedly (a) was not seeking to assume the FOTA *cum onere*, (b) failed to satisfy the appropriate standard for assumption under section 365 of the Bankruptcy Code and (c) could not assume the FOTA because, absent Syncora's consent, the FOTA was not a valid and enforceable contract. Id. at ¶¶ 107-34.

Syncora also argued that the Casino Revenues were not subject to the Chapter 9 Stay or, alternatively, that they were excepted from the Chapter 9 Stay by operation of either section 362(b)(17) or Section 922(d) of the Bankruptcy Code. At a hearing on August 28, 2013, the Court ruled that the Casino Revenues are property of the City and that the application of the Casino Revenues was not excepted from the Chapter 9 Stay either by section 362(b)(17) or section 922(d) of the Bankruptcy Code. That same day, the Court entered an order (Docket No. 670) (the "Casino Revenue Stay Order") providing that the Casino Revenues are property of the City and subject to the Chapter 9 Stay for the reasons set forth at the hearing. On September 10, 2013, Syncora filed a notice of appeal of the Casino Revenue Stay Order (Docket No. 797). As of the date hereof, the appeal has been fully briefed but has not been determined by the District Court.

On August 22, 2013, the Bankruptcy Court entered its "Second Order Referring Matters to Facilitative Mediation" (Docket No. 562), which referred all disputes arising in connection with the FOTA for facilitative mediation. Mediation regarding the Swap Settlement Motion and the FOTA was conducted before District Court Chief Judge Gerald E. Rosen ("Judge Rosen") and Judge Elizabeth Perris ("Judge Perris") of the United States Bankruptcy Court for the District of Oregon.

An evidentiary hearing to consider the Swap Settlement Motion, as well as the Postpetition Financing, was commenced on December 17, 2013. On December 18, 2013, Judge Rhodes ordered the parties back to mediation to discuss a reduction of the Optional Termination Payment.

Additional mediation sessions were convened on December 23, 2013 and December 24, 2013. These discussions led to an agreement to fix the Optional Termination Payment at the reduced amount of $165 million. The hearing on the Swap Settlement Motion and the Financing Motion was concluded on January 13, 2014. On January 17, 2014, the Bankruptcy Court issued its order (Docket No. 2511) declining to approve the Swap Settlement Motion or the portion of the Postpetition Financing that was to be used to finance the payment of the Optional Termination Payment. The City filed a notice of termination of the FOTA (Docket No. 2655) on January 6, 2014.

-64-

13-53846-swr   Doc 8709   Filed 12/16/14   Entered 12/16/14 20:59:23   Page 78 of 440
13-53846-swr   Doc 8209   Filed 11/11/14   Entered 11/11/14 02:57:30   Page 78 of 440

### 3. Litigation Regarding the COPs

On January 31, 2014, the City filed a complaint against the Service Corporations and the Funding Trusts alleging that the 2005 and 2006 transactions and agreements resulting in the sale of the COPs to the public was invalid, illegal and unenforceable because the $1.5 billion of debt incurred by the City exceeded the City's statutory debt limit and was not incurred in conformity with other state laws. The complaint alleges that, to eliminate a large portion of the underfunding existing in the City's two public employee pension plans, the City borrowed approximately $1.5 billion through the sale of the COPs to the public – even though it had only $660 million remaining under its statutory debt limit at the time – by engaging in a complex series of transactions aimed at effectively circumventing the debt limit. To do this, the City created two non-profit shell corporations with which it entered into the Service Contracts, whereby the City promised to make periodic payments to the Service Corporations in amounts identical to the debt service owing on the COPs (which COPs were to be issued by the discrete Funding Trusts that were created for that purpose). Through the establishment of this structure and payment mechanism, the City was advised that it could call the payments it made to the Service Corporations "contractual obligations" rather than "debt," thereby avoiding the statutory debt limit. In its complaint, however, the City has alleged that the purpose and effect of the COPs transactions was the incurrence of debt in excess of the debt limit because the Service Corporations have provided no ongoing services to the City that would justify treating the City's payments as contractual obligations instead of debt. As a result, any amount of indebtedness in excess of the City's statutory debt limit is illegal and unenforceable. Moreover, the complaint alleges that, to avoid characterizing the COPs payments as debt, the City failed to comply with other requirements of state law for the issuance of debt, including obtaining required approvals from the State Treasurer. These failures render the entirety of the debt incurred by the City in the COPs transactions illegal and unenforceable. The complaint seeks (a) a declaratory judgment that the COPs transactions are illegal, void and of no effect whatsoever; (b) a declaratory judgment that any Claims based on the City's obligations under the Service Contracts on account of the COPs should be disallowed pursuant to 11 U.S.C. § 502(b)(1); and (c) an injunction prohibiting the defendants from taking any action to require the City to make payments or provide distributions under a plan of adjustment on account of the COPs.

## E. Mediation

In addition to mediation of the Swap Settlement Motion disputes, the City has devoted substantial time and effort to negotiating other key restructuring issues through a mediation program established by the Bankruptcy Court to facilitate these efforts. On August 13, 2013, the Bankruptcy Court entered its "Mediation Order" (Docket No. 322), stating the Bankruptcy Court's belief that "it is necessary and appropriate to order the parties to engage in the facilitative mediation of any matters that the [Bankruptcy] Court refers in this case." Paragraph 2 of the Mediation Order appointed (with his consent) Judge Rosen to serve as the primary mediator for purposes of such facilitative mediation and authorized Judge Rosen "to enter any order necessary for the facilitation of mediation proceedings." Paragraph 3 of the Mediation Order further authorized Judge Rosen to direct the parties to engage in facilitative mediation of any substantive, process or discovery issue (as such issues were referred by the Bankruptcy Court) before any mediators (judicial or non-judicial) as Judge Rosen might appoint. Judge Rosen appointed the following mediators to assist him with the various issues that might be referred by the Bankruptcy Court: (1) Judge Victoria Roberts (E.D. Mich.) (lead mediator on labor issues); (2) Judge Perris (lead mediator on borrowed money and swap issues); (3) Judge Wiley Daniel (D. Colo.) (lead mediator on OPEB issues); (4) former Judge David Coar (N.D. Ill.); (5) Eugene Driker (lead mediator on pension issues); and (6) Professor Gina Torielli (University of Michigan) (issues of municipal finance law).

### 1. Restructuring Mediation

On August 16, 2013, the Bankruptcy Court entered its First Order Referring Matters to Facilitative Mediation (Docket No. 333), referring (a) the treatment of the Claims of the various creditor classes in a plan of adjustment and (b) the negotiation and renegotiation of CBAs for facilitative mediation. Pursuant to certain orders of the District Court (Docket Nos. 334; 527; 704), the initial facilitative mediation session on such issues – involving the City, the Emergency Manager, the Retiree Committee, the Retirement Systems, AFSCME, the UAW, U.S. Bank, certain public safety unions, certain insurers, certain holders of the City's debt obligations, the DDA, the State and the Michigan Attorney General – was scheduled for, and held on, September 17, 2013. Numerous additional mediation sessions among the foregoing parties followed.

### 2. Labor/OPEB Mediation

On October 7, 2013, the Bankruptcy Court entered its Third Order Referring Matters to Facilitative Mediation (Docket No. 1101) (the "Third Mediation Order"), referring for facilitative mediation all disputes between the City, on one

hand, and the following unions on the other: (a) Assistant Supervisors of Street Maintenance & Construction Association; (b) Association of City of Detroit Supervisors; (c) Association of Detroit Engineers; (d) Association of Municipal Engineers; (e) Association of Municipal Inspectors; (f) Association of Professional Construction Inspectors; (g) Association of Professional & Technical Employees; (h) Building & Construction Trades Council; (i) Detroit Income Tax Investigators Association; (j) Emergency Medical Service Officers Association (EMSOA); (k) Field Engineers Association; (l) International Union of Operating Engineers Local 324 – Operating Engineers, Detroit Principal Clerks & Park Management; (m) Police Officers Association of Michigan; (n) Police Officers Labor Council; (o) Police Officers Labor Council – Health Department; (p) Police Officers Labor Council – Detention Facility Officers; (q) Senior Accountants, Analysts & Appraisers Association; (r) Service Employees International Union ("SEIU") Local 517M – Supervisory & Non Supervisory Units; (s) SEIU Local 517M – Professional & Technical Unit; and (t) Teamsters, Local 214. The City has participated in numerous mediation sessions with these unions – as well as several other unions not specifically referenced in the Third Mediation Order.

### 3. Other Mediation

In addition to facilitative mediation proceedings under the Mediation Order, the City obtained approval of certain alternative dispute resolution procedures (the "ADR Procedures") to assist in liquidating certain contingent, unliquidated or disputed Claims designated by the City for resolution through the ADR Procedures. Outside of the facilitative mediation sessions and the ADR Procedures throughout the process of developing the Plan, the City has engaged in dialogues with unions, pension systems, debtholders (trustees, individual holders and *ad hoc* groups), the Retiree Committee and other interested parties.

## F. Postpetition Financing

### 1. Purpose

As described in more detail below, in order to fund the proposed settlement with the Swap Counterparties and obtain monies necessary to make critical reinvestments in the City, the City determined to obtain postpetition financing. On November 5, 2013, the City moved the Bankruptcy Court (Docket No. 1520) (the "Financing Motion") for entry of an order authorizing the City to, among other things, obtain senior secured postpetition financing on a superpriority basis and on the terms and conditions set forth in (a) the Commitment Letter dated October 6, 2013 by and among the City and Barclays Capital Inc., (b) those certain Bond Purchase Agreements by and among the City and Barclays Capital Inc., as Purchaser (the "Purchaser"), and (c) the Financial Recovery Bond Trust Indenture by and among the City and the indenture trustee to be named thereunder.

The Financing Motion originally sought approval of $350 million in secured postpetition financing, of which $230 million was to be used to fund the settlement with the Swap Counterparties (the "Swap Termination Loan") and $120 million was to be used to advance certain key investment initiatives of the City (the "Quality of Life Loan"), as described in more detail below. After filing the Financing Motion, the City renegotiated the settlement with the Swap Counterparties, which resulted in the requested Swap Termination Loan being reduced to $165 million (with the requested Quality of Life Loan remaining at $120 million). Thus, as a result of the renegotiated settlement, the total amount of secured postpetition financing sought by the City pursuant to the Financing Motion was reduced to $285 million.

As discussed in Section IV.D.2, on January 17, 2014, the Bankruptcy Court issued its order (Docket No. 2511) declining to approve the Swap Settlement Motion or the portion of the Postpetition Financing that was to be used to finance the payment of the Optional Termination Payment. At the hearing on the Financing Motion and the Swap Settlement Motion, however, the Bankruptcy Court stated that it would approve in principle the Financing Motion with respect to the Quality of Life Loan, thereby potentially authorizing the City to obtain postpetition secured financing of up to $120 million (the "Postpetition Financing"), subject to certain conditions, including that the proceeds of the Quality of Life Loan may be used only for functions approved by the Michigan Gaming Act and may not be used for working capital.

The City continues to discuss a potential Postpetition Financing transaction. Although the funds sought via the Postpetition Financing would not address all of the City's reinvestment initiatives, the Postpetition Financing would kick-start this long-term reinvestment process at the rate of approximately $20 million per month (beginning in January 2014) of net reinvestment activity during the end of Fiscal Year 2014 and the beginning of Fiscal Year 2015. Without borrowed funds, there is a material risk that the City would have to substantially cut back or eliminate its reinvestment efforts in the near-term, and the City's ability to invest in the future would continue to be hamstrung and imperiled by the

-66-

13-53846-tjt Doc 2709 Filed 02/21/14 Entered 02/21/14 00:27:23 Page 80 of 440
13-53846-swr Doc 2709 Filed 02/21/14 Entered 02/21/14 00:25:30 Page 80 of 440

City's ongoing financial constraints. The City hopes to be in a position to seek Bankruptcy Court approval of a Postpetition Financing transaction in the near term.

### G. Claims Process and Establishment of Bar Dates

#### 1. Section 924/925 Lists

Section 924 of the Bankruptcy Code requires the City to file a list of creditors. Section 925 of the Bankruptcy Code provides that "[a] proof of claim is deemed filed" for Claims set forth on the list of creditors required by section 924 of the Bankruptcy Code except as to Claims that are "listed as disputed, contingent, or unliquidated." 11 U.S.C. § 925. As discussed in greater detail in section III.B, *supra*, the City has filed a List of Claims which satisfies the requirements of sections 924 and 925 of the Bankruptcy Code.

#### 2. Bar Date Order

Pursuant to an order dated November 21, 2013 (Docket No. 1782) (the "Bar Date Order"), the Bankruptcy Court established the following bar dates for filing proofs of claim in this chapter 9 case:

- February 21, 2014 at 5:00 p.m., Eastern Time, as the general bar date for the filing of all proofs of claim (the "General Bar Date"), except as noted below;

- 5:00 p.m. on the date that is 180 days after the date of entry of an order for relief in the City's chapter 9 case (*i.e.*, June 3, 2014) as the bar date for government units holding Claims against the City;

- the later of (a) the General Bar Date or (b) 5:00 p.m., Eastern Time, on the date that is 30 days after the date of entry of the applicable order rejecting an executory contract or unexpired lease as the bar date for any Claims arising from the rejection of such executory contract or unexpired lease;

- the later of (a) the General Bar Date or (b) 5:00 p.m., Eastern Time, on the date that is 30 days after the date that a notice of an amendment to the List of Claims is served on a claimant as the bar date for any Claims relating to such amendment to the List of Claims.

#### 3. ADR Procedures

On November 12, 2013, the City filed the Motion of Debtor, Pursuant to Sections 105 and 502 of the Bankruptcy Code, for Entry of an Order Approving Alternative Dispute Resolution Procedures to Promote the Liquidation of Certain Prepetition Claims (Docket No. 1665) (the "ADR Procedures Motion") seeking the approval of the ADR Procedures to facilitate the resolution of certain contingent, unliquidated and/or disputed prepetition Claims. The City developed the ADR Procedures in consultation with the Wayne County Mediation Tribunal Association (the "MTA"). The MTA is an independent nonprofit organization created in 1979 by the Third Judicial Circuit Court of Michigan to provide a pool of mediators and to administer procedures for the out-of-court resolution of certain cases brought in the Circuit Court. Since that time, the MTA's role has expanded to include varied alternative dispute resolution services including, as applicable herein, case evaluation ("Case Evaluation") and arbitration services. The MTA's leading role in providing Case Evaluation services in the Detroit area is recognized by Local Rule 16.3 of the United States District Court for the Eastern District of Michigan, which also incorporates Rule 2.403 of the Michigan Court Rules of 1985 ("MCR") setting forth various procedures for Case Evaluation. In addition, where Case Evaluation alone is unsuccessful in resolving a Claim, the MTA has substantial experience facilitating and coordinating binding arbitration proceedings.

As proposed by the City in the ADR Procedures Motion, the ADR Procedures contemplate the imposition of mandatory alternative dispute resolution procedures on certain Claims designated by the City, in its sole discretion (collectively, the "Designated Claims"). During the period prior to the completion of the ADR Procedures, the Holders of Designated Claims are enjoined from filing or prosecuting any motion (any such motion, a "Stay Relief Motion") for relief from the Chapter 9 Stay, or otherwise seeking to establish, liquidate, collect on or enforce the applicable Designated Claim(s). In addition, the City proposed that certain types of Claims including: (a) personal injury tort or wrongful death Claims; (b) property damage Claims; or (c) Claims relating to the operation of motor vehicles for which the City is self-insured pursuant to chapter 31 of Michigan's Insurance Code of 1956, MCL §§ 500.3101, *et seq.* are appropriate for liquidation through the ADR Procedures should be considered to be Designated Claims even in advance of the City

-67-

13-53846-swr   Doc 2709   Filed 02/21/14   Entered 02/21/14 00:57:23   Page 81 of 440
13-53846-tjt   Doc 8709   Filed 12/16/14   Entered 12/16/14 00:25:30   Page 81 of 440

serving notice of their designation on the applicable claimant. The ADR Procedures, therefore, contemplate that, for the period commencing on the date of entry of an order approving the relief requested in the ADR Procedures Motion until the date that is 119 days after the General Bar Date, any claimant holding an Initial Designated Claim (and any other person or entity asserting an interest in such Claim) will be enjoined from filing or prosecuting, with respect to such Initial Designated Claim, any Stay Relief Motion or similar motion for relief from any injunction that may be imposed upon the confirmation or effectiveness of a Plan (a "Plan Injunction").

Throughout the ADR Procedures, the City retains the authority to settle any Designated Claim by agreement or to terminate the ADR Procedures with respect to any Designated Claim and proceed to liquidation of the Designated Claim in an appropriate forum. The ADR Procedures proposed by the City generally consist of three phases, as follows:

- Offer Exchange. Pursuant to the ADR Procedures, the City is required to make an offer to liquidate the claimant's Designated Claim in the notice informing a claimant that its Claim has been designated to the ADR Procedures. The claimant has a period of 28 days to respond to the City's offer and is permitted to make a counteroffer. The City then has a period of 14 days to respond to the claimant's counteroffer. The ADR Procedures contemplate further periods of negotiation and offer exchange, where appropriate.

- Case Evaluation. If the Designated Claim is not resolved through the offer exchange phase of the ADR Procedures then the Designated Claim proceeds to Case Evaluation before the MTA under the procedures set forth in MCR §§ 2.403 and 2.404. Following Case Evaluation, the parties have a period of 28 days to accept or reject the valuation provided by the MTA. If the City and the claimant do not both accept the MTA's valuation of the Designated Claim, then the parties have a further 28 days to negotiate a resolution of the Claim.

- Optional Binding Arbitration. The final phase of the ADR Procedures is binding arbitration, if previously consented to by the Holder of a Designated Claim in writing as a means to resolve its Designated Claim (either in its response to the City's notice designating the Designated Claim or by the terms of a separate written agreement either before or after the Petition Date), and if the City agrees to binding arbitration.

Several parties filed responses to the ADR Procedures Motion (see Docket Nos. 1763, 1765, 1828, 1834, 1866, 1902, 1915, 2211). In addition, the City received informal responses to the ADR Procedures Motion from a number of parties. These responses generally (a) sought clarification that the ADR Procedures would not apply to certain specific classes of Claims or else (b) special accommodations with respect to certain types of Claim. The City worked with these parties and, where possible, incorporated their suggestions into the ADR Procedures. In connection with the resolution of the responses to the ADR Procedures Motion, among other modifications to the ADR Procedures, the City agreed that the following types of Claim would not be subject to the ADR Procedures:

- Claims solely for unpaid pension contributions, unfunded actuarially accrued pension liabilities and/or unpaid pension benefits (whether asserted by the PFRS, the GRS or directly or derivatively by or on behalf of retirees or active employees, and whether filed by the applicable claimant or scheduled by the City);

- Claims for liabilities associated with post-employment benefits under the Health/Life Benefit Plan, the Supplemental Plan or other non-pension post employment welfare benefits, including unfunded actuarially accrued liabilities;

- Claims arising from labor-related grievances;

- Claims solely asserting workers' compensation liabilities against the City;

- Claims, if any, arising from or related to the Service Contracts;

- Claims by Holders for amounts owed under the City's Unlimited Tax General Obligation Bonds, Limited Tax General Obligation Bonds and general fund bonds and related Claims by bond insurers; and

- Claims filed by the United States government.

On December 24, 2013, the Bankruptcy Court entered an order (Docket No. 2302) (the "ADR Procedures Order") granting the relief requested in the ADR Procedures Motion and approving the ADR Procedures, as modified, except with respect to lawsuits alleging claims against the City, its employees or both under 42 U.S.C. § 1983 that are pending in the District Court (collectively, the "1983 Claims"). Pursuant to the ADR Procedures Order, all pending 1983 Claims have been referred to Judge Rosen for mediation under such procedures as he determines.

## H.    Chapter 9 Stay Matters

### 1.    Generally

Since the Petition Date, the Emergency Manager has taken various steps to preserve the benefits and protections afforded by the Chapter 9 Stay. For example, at the outset of this chapter 9 case, the City obtained orders of the Bankruptcy Court: (a) confirming the application of the Chapter 9 Stay to the City and its officers and inhabitants; and (b) extending the protections of the Chapter 9 Stay to, among others, (i) non-officer City employees, (ii) certain state officials and (iii) the 36th District Court (a non-debtor entity for which the City generally is financially responsible). The Chapter 9 Stay has provided the City with an important "breathing spell" to address the City's financial circumstances and craft a plan of adjustment without interference from adverse creditor actions.

### 2.    Challenges to PA 436 (Phillips)

Several parties have filed Stay Relief Motions to allow them to continue their prepetition challenges to the constitutionality of PA 436. In particular, on March 27, 2013, Catherine Phillips and several other plaintiffs (collectively, the "Phillips Plaintiffs") filed a lawsuit (the "Phillips Lawsuit") in the District Court against the Governor and the State Treasurer, asserting that PA 436 is unconstitutional. The lawsuit seeks damages, declaratory relief and injunctive relief, including relief "restraining the Defendants and any present and future [emergency managers] from implementing or exercising authority and powers purportedly conveyed by [PA 436]." Following the commencement of the City's chapter 9 case, the Phillips Plaintiffs filed a motion (Docket No. 1004) (the "Phillips Stay Relief Motion") seeking relief from the Chapter 9 Stay to allow them to continue the Phillips Lawsuit.

In addition, on May 13, 2013, various plaintiffs related to the NAACP (collectively, the "NAACP Plaintiffs") commenced a lawsuit (the "NAACP Lawsuit") in the District Court against the Governor, the State Treasurer and the Michigan Secretary of State, Ruth Johnson, in their official capacities, alleging that PA 436 violates constitutional voting rights under the Equal Protection the Due Process Clauses of the 14th Amendment to the United States Constitution. In their first amended complaint, filed June 27, 2013, the plaintiffs sought (a) to enjoin the defendants and others from implementing or enforcing PA 436, (b) an order prohibiting any emergency manager appointed under PA 436 from exercising any authority, (c) an order that actions exercised by any emergency manager are unenforceable and (d) preclearance of the cities and school districts currently with emergency managers under Section 3(c) of the Voting Rights Act. On September 6, 2013, the NAACP Plaintiffs filed a motion (Docket No. 740) for relief from the Chapter 9 Stay to allow the NAACP Lawsuit to continue in the District Court.

On November 6, 2013, the Court entered an order (Docket No. 1536) (the "PA 436 Challenge Stay Order") granting the relief requested by the Phillips Plaintiffs with respect to the Phillips Stay Relief Motion and thereby allowing the Phillips Lawsuit to continue. In addition, the Court denied the relief requested by the NAACP Plaintiffs with respect to the NAACP Lawsuit. According to the Court, the primary, if not sole, objective of the NAACP Lawsuit was the removal of the Emergency Manager. As such, the continuation of the NAACP Lawsuit would interfere with the City's chapter 9 case. The PA 436 Challenge Stay Order has been appealed by the NAACP, the State and the City, and each of these appeals is currently pending before the District Court.

## I.    Fee Matters

A municipality may retain professionals in its discretion to assist with a chapter 9 case, and those professionals may be paid their customary fees without the need to file applications for compensation with the bankruptcy court and await court approval. One of the requirements for the confirmation of a plan of debt adjustment in chapter 9, however, is that all amounts paid by the debtor for services in connection with the plan have to be fully disclosed and reasonable.

A chapter 9 debtor is not required to pay the fees and expenses of professionals that represent an official committee. Although chapter 9 incorporates the provision of the Bankruptcy Code that provides for the potential appointment of an official committee, it does not incorporate the provision of the Bankruptcy Code that requires the debtor

-69-

13-53846-swr   Doc 2709   Filed 02/21/14   Entered 02/21/14 20:59:23   Page 83 of 440
13-53846-swr   Doc 2709   Filed 02/21/14   Entered 02/21/14 20:59:30   Page 83 of 440

to pay the professional fees and other costs of an official committee. As a practical matter, however, a municipality may agree – as the City did in this case, as discussed below – to pay the reasonable professional fees of an official committee to facilitate the negotiation of a consensual plan of adjustment.

In the City's chapter 9 case, the Bankruptcy Court appointed a fee examiner (the "<u>Fee Examiner</u>") to review professional fees for reasonableness on an ongoing basis pursuant to the Order Appointing Fee Examiner entered on August 18, 2013 (Docket No. 383). Consistent with this order, the City's attorneys and the Fee Examiner negotiated and submitted to the Bankruptcy Court a proposed order establishing a protocol for the Fee Examiner's review of professional fees, the Fee Review Order. Comments on the proposed Fee Review Order were solicited, and a hearing on the Fee Review Order was held on September 10, 2013. On September 11, 2013, the Bankruptcy Court entered the Fee Review Order (Docket No. 810).

The Fee Review Order establishes procedures for, among other things, (1) the City to publicly disclose its professional fee expenses, (2) the Fee Examiner to review the City's professional fee expenses and to file reports addressing whether such expenses have been fully disclosed and are reasonable and (3) periodically disclosing and paying the Fee Examiner's fees and expenses. Pursuant to the Fee Review Order, the City agreed to pay the reasonable fees and expenses of the professionals retained by the Retiree Committee to render services in connection with the City's chapter 9 case (together with the professionals retained by the City to render services in connection with the case, the "<u>Professionals</u>").

Among other things, the Fee Review Order provides that each Professional must provide to the Fee Examiner and its respective client a complete copy of its respective monthly invoice, including detailed descriptions of the services rendered and costs advanced and a summary description, by category, of the work performed (the "<u>Monthly Invoices</u>"), within 49 days after the end of each calendar month. The Fee Review Order establishes a process by which the Fee Examiner and the Professionals may resolve any issues raised by the Fee Examiner regarding the reasonableness of any fees or expenses set forth in the Monthly Invoices, as well as a process for the City's payment of the Monthly Invoices.

Ordinary course professionals hired by the City not in conjunction with its chapter 9 case, but rather in the same contexts and capacities as they typically were hired by the City prior to the Petition Date, are not "Professionals" within the meaning of the Fee Review Order and their invoices are not subject to review thereunder. Consistent with the Fee Review Order, the City submitted a list of ordinary course professionals to the Fee Examiner, which list the Fee Examiner determined to be reasonably acceptable.

## J. Operational Restructuring Initiatives/Asset Dispositions

### 1. DWSD Transaction

The City may enter into a transaction (a "<u>DWSD Transaction</u>") that will include the formation of a new Great Lakes Water and Sewer Authority ("<u>GLWA</u>") to conduct the operations currently conducted by the DWSD. The City will enter into a DWSD Transaction only if it enables the City to make larger, more rapid or more certain distributions to at least some of its creditors as compared to the distributions specified in the Plan and described in this Disclosure Statement. Additional information concerning a potential DWSD Transaction is included in Section VI.B below.

### 2. Modification of Retiree Benefits/Healthcare Redesign

#### (a) Modification of Retiree Benefits

As set forth above, the City is obligated to provide OPEB benefits expected to cost approximately $3.185 billion in current dollars to existing retirees. None of these obligations is funded. The City has determined that its successful restructuring must include modification to retiree health benefits. Accordingly, the City has proposed to make the following changes to the health benefits that it provides to its retired employees.

Effective March 1, 2014, the City of Detroit changed the health insurance coverage offered to Retirees. As described in more detail below, the health benefits a Retiree receives from the City effective March 1, 2014 depends upon whether the Retiree is "Medicare eligible." Generally a Retiree is Medicare eligible if he or she is age 65 or older and has worked to earn Medicare coverage or has eligibility through a spouse.

Claims related to the City's obligations to provide OPEB benefits to retirees are further addressed by the Plan. <u>See</u> Section II.B.

Effective March 1, 2014, Medicare eligible Retirees were able to select either (i) one of three Medicare Advantage insurance plans that included drug benefits for which the City pays most or all of the premium or (ii) a Medicare Part D drug benefit only plan for which the City pays all of the premium. Except for one of the Medicare Advantage Plan options (BCBSM Medicare Plus Blue PPO), the monthly premium cost to the Medicare eligible retiree was zero. These new options were available to all City Retirees who were Medicare eligible whether or not the Retiree (i) worked as a general employee or uniformed employee prior to retirement or (ii) was part of the *Weiler* class action. If the individual was a Medicare-eligible Retiree, these were the only choices that the City offered for health coverage for 2014.

Effective March 1, 2014, non-Medicare eligible Retirees were required to obtain their own health insurance coverage (for themselves or their dependent family members). Under the Patient Protection and Affordable Care Act (the "Affordable Care Act," sometimes referred to as "Obamacare"), Health Insurance Marketplaces – also known as "exchanges" – were to be made available in every state, including Michigan. Non-Medicare eligible Retirees were permitted to enroll in and obtain an individual insurance policy to cover the Retiree and his or her family from the Heath Insurance Marketplace that served the state where the Retiree lived. A non-Medicare eligible Retiree also may have been eligible to enroll in coverage offered by their current employer or their spouse's employer. For most non-Medicare eligible Retirees, effective March 1, 2014, the City agreed to provide a stipend of $125 per month ($300 or $400 per month for duty disabled non-Medicare retirees, depending upon whether the disabled person is a uniform retiree). Eligible Retirees were permitted to use this stipend to defray the cost of premiums for health insurance coverage acquired through a Health Insurance Marketplace, through the Retiree's or the Retiree's spouse's employer or through other available health insurance programs.

The City no longer subsidized dental and vision coverage effective March 1, 2014 for all Retirees. All Retirees, regardless of age or Medicare eligibility, who wanted dental and vision coverage were required to pay the full cost of such coverage. The City offered Blue Cross Blue Shield of Michigan dental and Heritage Vision plan options. All other plan options were eliminated. For more information regarding modifications to retiree health benefits, please refer to the March 1, 2014 Through December 31, 2014 City of Detroit Retiree Health Care Plan (the "2014 Retiree Health Care Plan"), available at *http://www.detroitmi.gov/EmergencyManager.aspx*.

**(b)    Healthcare Redesign for Active Employees**

Due to the City's need to act quickly to alleviate its dire financial situation and cash position, the City determined that it needed to make changes to the benefit plan options and health insurance benefits that it would offer to active employees in 2014. The revised medical, dental, vision, life insurance and flexible spending account benefit options described below applied to all active City employees, regardless of whether they were uniformed or non-uniformed. These benefit options also applied to any new employee enrolling in the City's medical, dental, vision, life insurance and flexible spending account benefits for the first time. In general, the City made changes to medical coverage in 2014 designed to provide active employees with coverage that would be equivalent to "Gold" level coverage under the Affordable Care Act. Previously, most active employees in the City were receiving coverage that would be equivalent to "Platinum" level coverage under the Affordable Care Act.

In general, the changes for 2014 are summarized as follows:

- The City offered a PPO option from Blue Cross Blue Shield of Michigan, and an HMO option from Health Alliance Plan.

- The PPO and HMO options increased the annual deductible amount to $750.

- The PPO and HMO options increased the out-of-pocket annual coinsurance maximum payment for family coverage to $4,500. The out-of-pocket annual coinsurance maximum excluded the deductible.

- All active employees were required to pay 20% of the premium cost for health care coverage. This share is the same percentage that most active employees paid in 2013, generally for higher cost coverage.

- In 2014, most employees will pay less than they did in 2013.

Beginning January 1, 2014, the City offered all health care plan eligible employees the option to elect participation in a Flexible Spending Account ("FSA"). There were three pre-tax options available with the FSA – health care, day care, and commuter benefit.

Also in 2014, there was one dental and one vision benefit option available. The dental option will be Traditional Blue Cross Blue Shield of Michigan and the vision option will be Heritage Vision Plans. The life insurance plan remained unchanged.

If the City employs more than one member of a family, or the family unit includes a Retiree of the City, the spouse and eligible dependents of that family were covered by one City employee – no duplicate coverage was permitted. Furthermore, a Retiree of the City was prohibited from being enrolled as a spouse of an active employee. Only a Retiree could receive Retiree health coverage. It was the responsibility of the family to select a single health plan. Under no circumstances was the City obligated to provide more than one health policy or plan, or duplicate coverage for any employee or dependent.

Active employees were required to enroll for coverage. If an active employee who was enrolled in health care coverage failed to complete the mandatory enrollment process, the employee (i) defaulted to single medical only coverage, as described in the chart below, and (ii) was not enrolled in dental or vision. In addition, that employee's spouse and children did not have coverage from the City in 2014. If an active employee who was not enrolled in health care coverage does not complete the mandatory enrollment process, that employee did not have medical, dental or vision coverage from the City in 2014. If an active employee did nothing, he or she automatically became enrolled for 2014 as set forth in Table IV.J.2.b.i below.

Table IV.J.2.b.i

| Current (2013 Plan) | NEW 2014 Carrier | NEW 2014 Coverage Level |
|---|---|---|
| Community Blue PPO | Community Blue PPO | SINGLE |
| Blue Care Network HMO | Community Blue PPO | SINGLE |
| HAP HMO | HAP HMO | SINGLE |
| Total Health Care HMO | Community Blue PPO | SINGLE |
| US Health (COPS Trust) | Community Blue PPO | SINGLE |
| Any Dental Plan | BCBS Dental | NO COVERAGE |
| Any Vision Plan | Heritage Vision | NO COVERAGE |
| Not Enrolled in Medical, Dental or Vision | NO COVERAGE | NO COVERAGE |

For more information regarding modifications to active employee benefits, please refer to the 2014 City of Detroit Active Employee Benefits booklet, available at *http://www.detroitmi.gov/EmergencyManager.aspx*.

(c)     **Litigation with Retiree Representatives**

On October 22, 2013, the Retiree Committee, the DRCEA, the RDPFFA and AFSCME Subchapter 98, City of Detroit Retirees (collectively, the "Retiree Representatives") filed a complaint against the City and Kevyn Orr, individually and in his official capacity as Emergency Manager, thereby commencing an adversary proceeding in the Bankruptcy Court (Adv. Proc. No. 13-05244) (the "First Retiree Proceeding"), together with a motion for: (i) a preliminary injunction to enjoin the defendants from modifying retiree benefits as proposed in the 2014 Retiree Health Care Plan or; (ii) in the alternative, relief from the automatic stay to obtain the requested relief in the appropriate non-bankruptcy forum (Adv. Proc. Docket No. 3). The City and Mr. Orr disputed the relief sought in the preliminary injunction motion on the grounds that the Bankruptcy Court lacks jurisdiction – as a result of section 904 of the Bankruptcy Code and as affirmed in a recent decision from the bankruptcy court in the chapter 9 case of the City of Stockton, California – to enjoin the City from temporarily modifying retiree benefits. On November 8, 2013, prior to the filing of the defendants' objection to the preliminary injunction motion, the Retiree Representatives voluntarily dismissed without prejudice all claims pending against the City in the First Retiree Proceeding (Adv. Proc. Docket No. 34).

Initially, the City had proposed that the above-described modifications to retiree health benefits would take effect on January 1, 2014. Due to delays associated with the rollout of the federal government's Health Insurance Marketplace website, however, the City decided to delay the effective date of its modifications until January 31, 2014. In its

negotiations with the Retiree Committee regarding the preliminary injunction motion, the City agreed to further extend the effective date of the modifications until February 28, 2014, as set forth above.

On January 9, 2014, the Retiree Representatives commenced a second proceeding against the City and the Emergency Manager, captioned as <u>Official Committee of Retirees of the City of Detroit, Michigan, *et al.* v. City of Detroit, Michigan, *et al.*</u>, (Adv. Proc. No. 14-04015) (the "<u>Second Retiree Proceeding</u>"), seeking similar relief to that requested in the First Retiree Proceeding with respect to the retiree healthcare modifications announced by the Emergency Manager effective March 1, 2014 and described above in Section IV.J.2.a. By a settlement agreement effective February 14, 2014, the parties agreed to certain modifications to the changes to retiree health benefits set forth in the 2014 Retiree Health Care Plan. The settlement agreement modifications include an obligation by the City to provide additional stipend amounts during a portion of 2014 to Non-Medicare eligible Retirees and to offer Medicare eligible retirees certain additional options. The complete terms and conditions of the settlement agreement are set forth in Exhibit I.A.220 to the Plan.

### 3. Transition of Lighting Grid to DTE

The City's proposed restructuring/reinvestment initiatives with respect to its electricity grid are focused on the following objectives: (a) improving the performance of the grid and the services provided to the citizens of Detroit; (b) decommissioning, as necessary, certain segments of the grid, certain substations and the Mistersky power plant; and (c) increasing revenue collection from customers. To achieve these objectives, the City has entered into an "Energy Services Delivery Agreement" with DTE, whereby the City will exit the electricity business by migrating customers to DTE over a seven-year period, with DTE paying capital and transition costs. In year one of this seven-year build-out, meters will be changed to DTE's system and customers will be transitioned to DTE. In years two to seven of the build-out, customers will migrate to DTE's grid on a substation by substation basis as the PLD operation is simultaneously scaled down. Customers (including the City) will pay DTE's rate book, which could be higher than the current rate charged/incurred by City. Subject to regulatory approval, PLD workers and/or third party contractors will operate and maintain the City's electrical grid until the build-out is finished, with DTE reimbursing the City for the costs of such operation and maintenance.

### 4. Transition of Lighting Work to PLA

The City's proposed restructuring/reinvestment initiatives with respect to its lighting work are focused on the following objectives: (a) implementing a current population-based streetlight footprint, (b) outsourcing operations and maintenance to the newly-created PLA structure, (c) improving service to citizens and (d) achieving better cost management. To achieve these objectives, the City has begun a systematic effort to address bulb outages and restore light. In addition, the City has obtained an order of the Bankruptcy Court (Docket No. 1955) (the "<u>PLA Order</u>") authorizing the City to enter into and perform under certain transaction documents with the PLA, as described below. On December 20, 2013, Syncora filed a notice of appeal of the PLA Order (Docket No. 2273).

On February 5, 2013, the City created the PLA, a separate municipal corporation, pursuant to Michigan Public Act 392 of 2012 (as amended), the Municipal Lighting Authority Act, MCL §§ 123.1261-123.1295 ("<u>PA 392</u>") and the PLA Order, to manage and maintain the City's public lighting system. Pursuant to PA 392, the PLA has issued bonds (the "<u>Act 392 Bonds</u>"), the proceeds of which the PLA will use to construct and improve the public street lighting system of the City, pursuant to the terms of the "Interlocal Agreement for the Construction and Financing of a Public Lighting System" between the City and the PLA (the "<u>C&F Agreement</u>"). The PLA also will bear responsibility for the operation and maintenance of the portion of the City's public lighting system that the PLA has constructed and improved, in accordance with the terms of the "Interlocal Agreement for the Operation, Maintenance and Management of a Public Lighting System" between the City and the PLA. Under PA 392 and the various agreements with the PLA, the City has no liability for, and undertakes no full faith and credit obligation in connection with, the Act 392 Bonds or the C&F Agreement.

In connection with the transition of the City's lighting work to the PLA, the City is required to cause the existing and future revenue generated from the utility tax that it will continue to levy (the "<u>Pledged Revenues</u>") to be directed to Wilmington Trust, National Association, as trustee (the "<u>Trustee</u>") under a trust agreement by and among the City, the PLA, the Michigan Finance Authority and the Trustee (the "<u>Trust Agreement</u>"), as security for, and the primary source for the repayment of, the Act 392 Bonds. The total amount of the Pledged Revenues to which the PLA is entitled, in any calendar year, is the lesser of (a) $12.5 million and (b) the total revenues generated by the utility tax levied by the City (*i.e.*, the Trustee must disburse to the City all amounts in excess of $12.5 million).

The City believes that the transition of the City's lighting work to the PLA and the transactions described above are the City's best viable option to fix its public lighting system and provide the level of lighting services that the City's residents expect.

### 5. Land/Blight Initiatives

Reduction of urban blight is among the City's highest reinvestment priorities. The City anticipates that a substantial reduction in blighted structures and properties would, among other things: (a) stabilize the City's eroding property values and property tax base; (b) allow the City to more efficiently and effectively deliver municipal services; (c) improve the health, safety and quality of life for City residents; (d) foster increased land utilization within the City; and (e) dramatically improve the national perception of the City.

To this end, the City proposes to invest $520.3 million over the course of the next six Fiscal Years (from 2014 through 2019) to remediate residential blight within the City. Specifically, the City intends to incur expenses related to blight removal of (a) $7.3 million in Fiscal Year 2014, (b) $113.0 million in Fiscal Year 2015 and (c) $100 million in each of the Fiscal Years 2016 through 2019. Among other things, this investment will allow the BSEED to increase the rate of residential demolitions from an average of 114 demolitions per week to an average of between 400 to 450 per week. The City intends to focus its initial demolition efforts around schools and other areas identified by the Detroit Works Project and the Detroit Future City project.

These efforts currently are – and will continue to be – complemented by discrete blight remediation efforts. For example, the Michigan State Housing Development Authority has allocated $52 million to the City (out of $100 million received from the U.S. Treasury from its "Hardest Hit Fund"). These funds – administered through the Detroit Land Bank Authority (in conjunction with the Michigan Land Bank) – will allow for blight elimination on 4,000 to 6,000 publicly-owned residential structures over a 15-month period. Other complementary blight elimination efforts include: (a) a pilot program implemented by the nongovernmental Blight Authority (addressing blight in the Eastern Market and Brightmoor sections of the City); (b) the "Hantz Woodlands" urban farming project, in connection with which a 150-acre, 1,500-parcel tract of land on the City's lower east side has been acquired by a private party and is being cleared of blight and maintained; and (c) the devotion of $12 million in recently-repurposed HUD funds for the targeting of commercial demolition during Fiscal Year 2014.

As set forth at Section III.C.7.c above, remediating blight requires the coordination of – and the City intends to coordinate with – a multiplicity of government agencies at the local, state and federal levels, and certain interested nongovernmental organizations. Coordination and cooperation among these entities is critical to the success of the City's reinvestment efforts. Among other things, an uncoordinated effort would result in the inefficient application of scarce resources, fragmented remediation activities and investments and duplicative investments in tools and technology, all resulting in slowed and more costly re-development. By coordinating the efforts of all interested stakeholders, the City can leverage multiple resources to target specific areas for improvement, leverage existing technology investments and maximize the potential for the long-term success of its remediation efforts. In so doing, the City can raise investor confidence and effect lasting change in economic growth and quality of life.

### 6. Belle Isle Lease

In September 2013, the City reached an agreement with the State (the "Belle Isle Agreement") whereby the State of Michigan agreed to lease Belle Isle Park for 30 years, with two optional 15-year renewals. The Governor authorized the Belle Isle Agreement on October 1, 2013. The Belle Isle Agreement was not immediately effective upon its signing, or upon the Governor's authorization, because pursuant to sections 12(1)(r) and 19 of PA 436, the Emergency Manager is required to submit any proposed lease of City property to the City Council for approval. If the City Council rejects such a proposal and offers a competing proposal, section 19 of PA 436 provides that the LEFALB is empowered to review the competing proposals and issue final authorization to the proposal "that best serves the interest of the public." MCL § 141.1559(2). On October 14, 2013, the City Council voted to reject the Belle Isle Agreement and proposed an alternative plan involving a ten-year lease of Belle Isle Park to the State. The LEFALB considered both proposals and, on November 12, 2013, unanimously approved the Belle Isle Agreement.

Pursuant to the Belle Isle Agreement, the State agreed to invest between $10 million and $20 million to upgrade and repair portions of Belle Isle Park during the first three years of the lease. The City will continue to pay for Belle Isle Park's water and sewer services – costs that in recent years have totaled between $1.5 million and $2.5 million annually – but the State will pay to maintain and operate Belle Isle Park in all other respects during the lease term.

On February 10, 2014, the State began operating Belle Isle Park as a state park. While pedestrians and bicyclists will continue to be able to access Belle Isle Park free of charge, visitors arriving by motor vehicle will be required to purchase an annual $11-per-vehicle "Recreation Passport" from the State that will provide access to all Michigan state parks.

### 7. Detroit Institute of Arts

#### (a) Appraisal

As discussed in Section III.A.5.a, *supra*, the City engaged Christie's to appraise the value of the DIA Collection. On December 3, 2013, Christie's issued a preliminary report (the "Preliminary Report") (a) describing the methodology used in making the appraisal; (b) providing a preliminary aggregate valuation of certain works in the DIA Collection; and (c) recommending various options the City could pursue to generate revenue from the DIA Collection not involving the outright sale of any works in the DIA Collection. As explained in the Preliminary Report, Christie's appraised a portion of the DIA Collection consisting of those works that "were either purchased entirely by the City, or in part with City funds" (the "Appraised Art"). As of the date of the Preliminary Report, the Appraised Art consisted of 2,781 works. Both the preliminary and final appraisals conducted by Christie's were based on a fair market value ("FMV") analysis of the Appraised Art. According to the Preliminary Report, "FMV is the price at which a work would change hands between a willing buyer and a willing seller in the relevant marketplace. It is determined by using the market data approach which compares the subject work to similar works sold in the marketplace, makes appropriate adjustments to allow for any differences between the subject work and the comparables, and reflects the current market place." In the Preliminary Report, Christie's estimated the aggregate value of the Appraised Art to be between $452 million and $866 million, with "the lower number represent[ing] a conservative price, and the higher number represent[ing] the most advantageous price at which the property would likely change hands."

The Preliminary Report recommended consideration of five potential strategies for revenue generation not involving the outright sale of any of the works in the DIA Collection. First, Christie's proposed that the City could pledge some or all of the Appraised Art as collateral for a loan or line of credit. According to the Preliminary Report, "[t]he current robust global art market coupled with the fact that the [C]ity-owned collection contains some high-quality and valuable works, suggest this could be an effective financing arrangement." Second, Christie's suggested that "[r]evenue could be generated from a partnership agreement with another museum or museums whereby masterpieces from the DIA would be leased on a long-term basis." Third, Christie's proposed that the City consider establishing a "masterpiece trust," an arrangement that is "[u]nprecedented in the art world." The Preliminary Report described this concept as follows: "City-owned art would be transferred into the Trust and minority interests would be sold to individual museums, making them a member of a larger consortium of institutions. Revenue generated by the sale of shares in the Trust would be paid to the City. Ownership of shares in the Trust would entitle members to borrow works for predetermined periods of time." Fourth, Christie's suggested that the City could consider selling one or more works in the DIA Collection to a philanthropist or charitable organization on the condition that the buyer agree to permanently lend the purchased work(s) to the DIA. Finally, the Preliminary Report discussed the possibility of mounting a traveling exhibition of works in the DIA Collection. Although Christie's described this option as potentially "the least viable in terms of generating a revenue stream for the City" because traveling exhibitions generally "are not a substantial revenue generator," it concluded that "[t]he media attention the DIA has received in connection with Detroit's bankruptcy filing and the accompanying outpouring of public support for the City's artworks could help to generate interest, and thereby revenue, from tour sponsors and patrons."

Christie's issued its final report on December 17, 2013 (the "Final Report"). For purposes of the Final Report, the Appraised Art consisted of 2,773 works. In the Final Report, Christie's stated that the aggregate FMV of the Appraised Art was between $454 million and $867 million. Christie's performed a detailed appraisal of only 1,741 of the 2,773 works consisting of the Appraised Art (the "Most Valuable Works"), explaining in the Final Report that the Most Valuable Works accounted for "over 99% of the total projected value" of the Appraised Art. Christie's attached to the Final Report an itemized list of 406 of the Most Valuable Works with individual values exceeding $50,000. Of these, 11 works accounted for 75% percent of the total estimated value of the Appraised Art:

- Pieter Bruegel the Elder, *The Wedding Dance*     $100-200 million
- Vincent van Gogh, *Self Portrait with Straw Hat*     $80-150 million
- Rembrandt, *The Visitation*     $50-90 million
- Henri Matisse, *Le Guéridon*     $40-80 million
- Edgar Degas, *Danseuses au Foyer (La Contrebasse)*     $20-40 million
- Claude Monet, *Gladioli*     $12-20 million

- Michelangelo, *Scheme for the Decoration of the Ceiling of the Sistine Chapel*          $12-20 million
- Neri di Bicci, *The Palla Alterpiece: Tobias and Three Archangels*    $8-15 million
- Giovanni Bellini and Workshop, *Madonna and Child*        $4-10 million
- Frans Hals, *Portrait of Hendrik Swalmius*          $6-10 million
- Michiel Sweerts, *In the Studio*              $5-10 million

According to the Final Report, each of the 1,032 works of Appraised Art not given detailed, individual appraisals are items currently held in storage which have "modest commercial value." These items include, among other things, various textile fragments, coins, pieces of furniture and works of art by artists "who command only very low prices."

        **(b)**      **The DIA Settlement**

On January 13, 2014, mediators in the City's chapter 9 case announced that certain charitable foundations and other entities (collectively, the "<u>Foundations</u>") had agreed in principle to pledge certain funds (the "<u>Foundation Funds</u>") as part of a potential multiparty settlement that, if finalized, would (a) shield the DIA Collection from potential sales to satisfy creditors of the City and (b) reduce the Retirement Systems' current levels of underfunding. As of the date of filing of this Disclosure Statement, the Foundations had tentatively agreed to pledge at least $365 million in Foundation Funds, payable over a period of 20 years, in support of this arrangement.

On January 22, 2014, the Governor announced a plan pursuant to which the State would potentially pledge up to $350 million in state funds in support of the DIA Settlement and certain creditor recoveries in exchange for certain releases to be contained in the Plan. As settlement negotiations continued, on January 29, 2014, DIA Corp. pledged to raise an additional $100 million over 20 years to "ensure long-term support for the City's pension funds and sustainability for the DIA." More specific detail regarding the DIA Settlement is provided in Section VI.G, below. Further details regarding the potential for State funding are provided in connection with the description of the Plan GRS Settlement and the Plan PFRS Settlement in Section VI.D below.

        **8.**      **Joe Louis Arena**

Olympia, the Red Wings and the City have resolved all of their issues under the Original JLA Lease and agreed to enter into a new lease of Joe Louis Arena (the "<u>New JLA Sublease</u>") and a related parking agreement. The term of the New JLA Sublease will be five years, retroactive to July 1, 2010, the date of expiration of the Original JLA Lease. The initial term of the New JLA Sublease will therefore end on June 30, 2015. Thereafter, Olympia and the Red Wings will have five one-year options to extend the New JLA Lease. Olympia will pay the City rent of $1 million per year during the term of the New JLA Sublease and any extensions thereof. In addition to rent, the parties have agreed that Olympia and the Red Wings will provide total consideration valued at over $12 million to the City over the next three years.

The project to develop and construct a replacement venue for the Red Wings will continue while the team continues to play at Joe Louis Arena. As of the date hereof, it is estimated that the new arena will be completed in 2016 or 2017. Under the proposed plan, the DDA will own the new arena, and the arena will be managed by Olympia. Olympia and the DDA have proposed funding the project with a combination of private monies and private activity bonds which would be issued by the Michigan Strategic Fund (an entity created pursuant to Michigan Public Act 270 of 1984, the Michigan Strategic Fund Act, MCL §§ 125.2001-125.2094, to support economic development and job creation projects).

        **9.**      **Sale of Veterans' Memorial Building**

The City owns the building originally built, and commonly referred to, as the Veterans' Memorial Building. The building, located at 151 West Jefferson Avenue in Detroit, currently houses the UAW-Ford National Programs Center operated by UAW-Ford, a non-profit social welfare organization jointly created by the Ford Motor Company and the UAW and organized pursuant to section 501(c)(4) of the United States Internal Revenue Code. The City and UAW-Ford currently are negotiating a potential sale of the building to UAW-Ford, which sale would contain a deed restriction with respect to the property's use and maintenance of the building's exterior. Any final agreement will be submitted to City Council for approval under section 19 of PA 436.

### 10. Coleman A. Young Airport

The City is investigating various alternatives for generating revenue with respect to Coleman A. Young International Airport, including possible sale or lease transactions, modernization initiatives designed to attract core users of the airport and/or reducing airport costs by outsourcing certain functions. In November 2012, a consultant prepared a ten-year capital improvement program for the airport which included several rehabilitation plans, ranging from approximately $55 million (for upgrades to facilities other than runways) to $273 million (for a rehabilitation including a replacement runway funded in part by federal grants). The City plans to continue to subsidize and operate the airport until a viable transaction or rehabilitation plan is identified, in part because closing the airport would terminate certain federal subsidies and would require the City to repay certain grant monies previously received by the City from the Federal Aviation Administration.

## V.

## THE PLAN

### A. General

THE FOLLOWING SUMMARY HIGHLIGHTS CERTAIN OF THE SUBSTANTIVE PROVISIONS OF THE PLAN, AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OR A SUBSTITUTE FOR A FULL AND COMPLETE REVIEW OF THE PLAN. THE CITY URGES ALL HOLDERS OF CLAIMS TO CAREFULLY READ AND STUDY THE PLAN, A COPY OF WHICH IS ATTACHED HERETO AS <u>EXHIBIT A</u>.

Section 1123 of the Bankruptcy Code provides that, except for Administrative Claims, a plan of adjustment must categorize claims against a debtor into individual classes. Although the Bankruptcy Code gives a chapter 9 debtor significant flexibility in classifying claims, section 1122 of the Bankruptcy Code dictates that a plan of adjustment may only place a claim into a class containing claims that are substantially similar.

The Plan identifies 26 Classes of Claims (certain of which encompass numerous sub-classes related to individual series of the relevant classified debt, as set forth on the Exhibits to the Plan. These Classes take into account the differing nature and priority of Claims against the City. Administrative Claims are not classified for purposes of voting or receiving distributions under the Plan (as is permitted by section 1123(a)(1) of the Bankruptcy Code) but are treated separately as unclassified Claims.

The Plan provides specific treatment for each Class of Claims. Only certain Holders of Claims that are impaired under the Plan are entitled to vote and receive Distributions under the Plan.

Unless otherwise provided in the Plan or the Confirmation Order, the treatment of any Claim under the Plan will be in full satisfaction, settlement, release and discharge of, and in exchange for, such Claim.

The following discussion sets forth the classification and treatment of all Claims against the City. It is qualified in its entirety by the terms of the Plan, which is attached hereto as Exhibit A, and which should be read carefully by you in considering whether to vote to accept or reject the Plan.

### B. Classification and Treatment of Claims

If the Plan is confirmed by the Bankruptcy Court, each Allowed Claim in a particular Class will receive the same treatment as the other Allowed Claims in such Class, whether or not the Holder of such Claim voted to accept the Plan. Such treatment will be in exchange for and in full satisfaction, release and discharge of, the Holder's respective Claims against the City, except as otherwise provided in the Plan. Upon Confirmation, the Plan will be binding on all Holders of a Claim regardless of whether such Holders voted to accept the Plan.

### 1. Unclassified Claims

An Administrative Claim is a Claim against the City arising on or after the Petition Date and prior to the Effective Date for a cost or expense of administration related to the City's chapter 9 case that is entitled to priority or superpriority under sections 364(c)(1), 503(b) or 507(a)(2) of the Bankruptcy Code and, in any event does not include any claim for professional fees or any other costs or expenses incurred by the Creditors' Committee. Administrative Claims may include:

(a) the actual and necessary costs and expenses incurred by the City in the ordinary course of its operations after the Petition Date (*e.g.*, wages, salaries, payments for services and lease payments); (b) Claims under any Postpetition Financing Agreement; (c) any Allowed Claims for reclamation under section 546(c)(1) of the Bankruptcy Code; and (d) Claims, pursuant to section 503(b)(9) of the Bankruptcy Code, for the value of goods received by the City in the 20 days immediately prior to the Petition Date and sold to the City in the ordinary course of its operations. In addition, section 503(b) of the Bankruptcy Code provides for payment of compensation or reimbursement of expenses to creditors and other entities making a "substantial contribution" to a chapter 9 case and to attorneys for, and other professional advisors to, such entities. The amounts, if any, that such Entities may seek for such compensation or reimbursement are not known by the City at this time. Requests for such compensation or reimbursement must be approved by the Bankruptcy Court after notice and a hearing at which the City and other parties in interest may participate and, if appropriate, object to the allowance of any such compensation or reimbursement.

Except as specified in Section II.A.1 of the Plan, and subject to the bar date provisions therein, unless otherwise agreed by the Holder of an Administrative Claim and the City, or ordered by the Bankruptcy Court, each Holder of an Allowed Administrative Claim will receive, in full satisfaction of such Allowed Administrative Claim, Cash in an amount equal to such Allowed Administrative Claim either: (a) on the Effective Date or as soon as reasonably practicable thereafter; or (b) if the Administrative Claim is not Allowed as of the Effective Date, 30 days after the date on which an order of the Bankruptcy Court Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter.

Unless otherwise agreed by the Postpetition Lenders pursuant to any Postpetition Financing Agreement, on or before the Effective Date, any Postpetition Lender Claims that are Allowed Administrative Claims will be paid in Cash equal to the amount of those Allowed Administrative Claims.

Except as otherwise provided in Section II.A.2.b of the Plan or in a Bar Date Order or other order of the Bankruptcy Court, unless previously Filed, requests for payment of an Administrative Claim must be Filed and served upon the City no later than 30 days after the date on which the notice of the Effective Date is mailed pursuant to Section VIII.H of the Plan. Any Administrative Claim for which a request for payment is not timely Filed by such date shall be forever discharged and barred, and Holders shall be forever barred from asserting such Administrative Claims in any manner against the City or any of its property.

Holders of Administrative Claims that are Postpetition Lender Claims will not be required to File or serve any request for payment or application for allowance of such Claims. Such Administrative Claims will be satisfied pursuant to Section II.A.1.b of the Plan.

Allowed Administrative Claims based on liabilities incurred by the City in the ordinary course of its business, including Administrative Claims arising from or with respect to the sale of goods or provision of services on or after the Petition Date in the ordinary course of the City's business and Administrative Claims arising from those contracts and leases of the kind described in Section II.D.5 of the Plan, will be paid by the City, pursuant to the terms and conditions of the particular transaction giving rise to those Administrative Claims, without further action by the holders of such Administrative Claims or further approval by the Bankruptcy Court.

The Plan does not modify any Bar Date Order already in place, including Bar Dates for Claims entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

2.      **Classified Claims**

*Class 1: Secured DWSD-Related Claims*, subclassified as follows:

> *Class 1A: DWSD Class A Water Claims (One Class for each DWSD Series of DWSD Class A Water Bonds, as set forth on Exhibit I.A.91 to the Plan).*

> Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed DWSD Class A Water Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as reasonably practicable after the Effective Date:

If a DWSD Transaction is consummated on the Effective Date, at the option of the City, either (a) New GLWA Bonds having a principal amount equal to the principal amount of the DWSD Class A Water Bonds held by such Holder; or (b) Cash in the full amount of such Allowed DWSD Class A Water Claim. Each Holder of an Allowed DWSD Class A Water Claim in a Class of DWSD Class A Water Claims that accepts the Plan may elect to receive New Existing Rate GLWA Bonds having a principal amount equal to the principal amount of the DWSD Class A Water Bonds held by such Holder in lieu of New GLWA Bonds.

If a DWSD Transaction is not consummated on the Effective Date, New DWSD Bonds having a principal amount equal to the principal amount of the DWSD Class A Water Bonds held by such Holder; provided, that, in lieu of the foregoing treatment, the City alternatively may elect to Reinstate any DWSD Series of DWSD Class A Water Bonds by filing a notice of such Reinstatement prior to the commencement of the Confirmation Hearing. Each Holder of an Allowed DWSD Class A Water Claim in a Class of DWSD Class A Water Claims that accepts the Plan may elect to receive New Existing Rate DWSD Bonds having a principal amount equal to the principal amount of the DWSD Class A Water Bonds held by such Holder in lieu of New DWSD Bonds.

Class 1A Claims are impaired.

*Class 1B: DWSD Class B Water Claims (One Class for each DWSD Series of DWSD Class B Water Bonds, as set forth on Exhibit I.A.97 to the Plan).*

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed DWSD Class B Water Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as reasonably practicable after the Effective Date:

If a DWSD Transaction is consummated on the Effective Date, at the option of the City, either (a) New GLWA Bonds having a principal amount equal to the principal amount of the DWSD Class B Water Bonds held by such Holder; or (b) Cash in the full amount of such Allowed DWSD Class B Water Claim. Each Holder of an Allowed DWSD Class B Water Claim in a Class of DWSD Class B Water Claims that accepts the Plan may elect to receive New Existing Rate GLWA Bonds having a principal amount equal to the principal amount of the DWSD Class B Water Bonds held by such Holder in lieu of New GLWA Bonds.

If a DWSD Transaction is not consummated on the Effective Date, New DWSD Bonds having a principal amount equal to the principal amount of the DWSD Class B Water Bonds held by such Holder; provided, that, in lieu of the foregoing treatment, the City alternatively may elect to Reinstate any DWSD Series of DWSD Class B Water Bonds by filing a notice of such Reinstatement prior to the commencement of the Confirmation Hearing. Each Holder of an Allowed DWSD Class B Water Claim in a Class of DWSD Class B Water Claims that accepts the Plan may elect to receive New Existing Rate DWSD Bonds having a principal amount equal to the principal amount of the DWSD Class B Water Bonds held by such Holder in lieu of New DWSD Bonds.

Class 1B Claims are impaired.

*Class 1C: DWSD Class A Sewer Claims (One Class for each DWSD Series of DWSD Class A Sewer Bonds, as set forth on Exhibit I.A.88 to the Plan).*

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed DWSD Class A Sewer Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as reasonably practicable after the Effective Date:

If a DWSD Transaction is consummated on the Effective Date, at the option of the City, either (a) New GLWA Bonds having a principal amount equal to the principal amount of the DWSD Class A Sewer Bonds held by such Holder; or (b) Cash in the full amount of such Allowed DWSD Class A Sewer Claim. Each Holder of an Allowed DWSD Class A Sewer Claim in a Class of DWSD Class A Sewer Claims that accepts the Plan may elect to receive New Existing Rate GLWA Bonds having a principal amount equal

-79-

13-53846-swr   Doc 8709   Filed 12/11/14   Entered 12/11/14 20:59:30   Page 93 of 440
13-53846-swr   Doc 8709   Filed 12/11/14   Entered 12/11/14 20:59:30   Page 93 of 440

to the principal amount of the DWSD Class A Sewer Bonds held by such Holder in lieu of New GLWA Bonds.

If a DWSD Transaction is not consummated on the Effective Date, New DWSD Bonds having a principal amount equal to the principal amount of the DWSD Class A Sewer Bonds held by such Holder; provided, that, in lieu of the foregoing treatment, the City alternatively may elect to Reinstate any DWSD Series of DWSD Class A Sewer Bonds by filing a notice of such Reinstatement prior to the commencement of the Confirmation Hearing. Each Holder of an Allowed DWSD Class A Sewer Claim in a Class of DWSD Class A Sewer Claims that accepts the Plan may elect to receive New Existing Rate DWSD Bonds having a principal amount equal to the principal amount of the DWSD Class A Sewer Bonds held by such Holder in lieu of New DWSD Bonds.

Class 1C Claims are impaired.

*Class 1D: DWSD Class B Sewer Claims (One Class for each DWSD Series of DWSD Class B Sewer Bonds, as set forth on Exhibit I.A.94 to the Plan).*

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed DWSD Class B Sewer Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as reasonably practicable after the Effective Date:

If a DWSD Transaction is consummated on the Effective Date, at the option of the City, either (a) New GLWA Bonds having a principal amount equal to the principal amount of the DWSD Class B Sewer Bonds held by such Holder; or (b) Cash in the full amount of such Allowed DWSD Class B Sewer Claim. Each Holder of an Allowed DWSD Class B Sewer Claim in a Class of DWSD Class B Sewer Claims that accepts the Plan may elect to receive New Existing Rate GLWA Bonds having a principal amount equal to the principal amount of the DWSD Class B Sewer Bonds held by such Holder in lieu of New GLWA Bonds.

If a DWSD Transaction is not consummated on the Effective Date, New DWSD Bonds having a principal amount equal to the principal amount of the DWSD Class B Sewer Bonds held by such Holder; provided, that, in lieu of the foregoing treatment, the City alternatively may elect to Reinstate any DWSD Series of DWSD Class B Sewer Bonds by filing a notice of such Reinstatement prior to the commencement of the Confirmation Hearing. Each Holder of an Allowed DWSD Class B Sewer Claim in a Class of DWSD Class B Sewer Claims that accepts the Plan may elect to receive New Existing Rate DWSD Bonds having a principal amount equal to the principal amount of the DWSD Class B Sewer Bonds held by such Holder in lieu of New DWSD Bonds.

Class 1D Claims are impaired.

*Class 1E: DWSD Revolving Sewer Bond Claims (One Class for each DWSD Series of DWSD Revolving Sewer Bonds, as set forth on Exhibit I.A.102 to the Plan).*

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed DWSD Revolving Sewer Bond Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as reasonably practicable after the Effective Date: (a) if a DWSD Transaction is consummated on the Effective Date, New GLWA Revolving Bonds having a principal amount equal to the principal amount of the DWSD Revolving Sewer Bonds held by such Holder; or (b) if a DWSD Transaction is not consummated on the Effective Date, New DWSD Revolving Bonds having a principal amount equal to the principal amount of the DWSD Revolving Sewer Bonds held by such Holder.

Class 1E Claims are impaired.

*Class 1F: DWSD Revolving Water Bond Claims (One Class for each DWSD Series of DWSD Revolving Water Bonds, as set forth on Exhibit I.A.105 to the Plan).*

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed DWSD Revolving Water Bond Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as

-80-

13-53846-swr   Doc 8709   Filed 12/12/14   Entered 12/12/14 00:57:23   Page 94 of 440
13-53846-tjt   Doc 2709   Filed 02/21/14   Entered 02/21/14 20:59:30   Page 94 of 440

reasonably practicable after the Effective Date: (a) if a DWSD Transaction is consummated on the Effective Date, New GLWA Revolving Bonds having a principal amount equal to the principal amount of the DWSD Revolving Water Bonds held by such Holder; or (b) if a DWSD Transaction is not consummated on the Effective Date, New DWSD Revolving Bonds having a principal amount equal to the principal amount of the DWSD Revolving Water Bonds held by such Holder.

Class 1F Claims are impaired.

*Class 2:  Secured GO Debt Claims*, subclassified as follows:

*Class 2A:  Secured GO Series 2010 Claims.*

On the Effective Date, (a) the Secured GO Series 2010 Claims shall be deemed Allowed in the aggregate amount of $252,475,366.00 and (b) each Holder of an Allowed Secured GO Series 2010 Claim shall have its Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

Class 2A Claims are unimpaired.

*Class 2B:  Secured GO Series 2010(A) Claims.*

On the Effective Date, (a) the Secured GO Series 2010(A) Claims shall be deemed Allowed in the aggregate amount of $101,707,848.00 and (b) each Holder of an Allowed Secured GO Series 2010(A) Claim shall have its Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

Class 2B Claims are unimpaired.

*Class 2C:  Secured GO Series 2012(A)(2) Claims.*

On the Effective Date, (a) the Secured GO Series 2012(A)(2) Claims shall be deemed Allowed in the aggregate amount of $39,254,171 and (b) each Holder of an Allowed Secured GO Series 2012(A)(2) Claim shall have its Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

Class 2C Claims are unimpaired.

*Class 2D:  Secured GO Series 2012(A2-B) Claims.*

On the Effective Date, (a) the Secured GO Series 2012(A2-B) Claims shall be deemed Allowed in the aggregate amount of $54,055,927 and (b) each Holder of an Allowed Secured GO Series 2012(A2-B) Claim shall have its Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

Class 2D Claims are unimpaired.

*Class 2E:  Secured GO Series 2012(B) Claims.*

On the Effective Date, (a) the Secured GO Series 2012(B) Claims shall be deemed Allowed in the aggregate amount of $6,469,135 and (b) each Holder of an Allowed Secured GO Series 2012(B) Claim shall have its Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

Class 2E Claims are unimpaired.

*Class 2F:*  Secured GO Series 2012(B2) Claims.

On the Effective Date, (a) the Secured GO Series 2012(B2) Claims shall be deemed Allowed in the aggregate amount of $31,037,724 and (b) each Holder of an Allowed Secured GO Series 2012(B2) Claim shall have its Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

Class 2F Claims are unimpaired.

*Class 3: Other Secured Claims*

On the Effective Date, each Holder of an Allowed Other Secured Claim shall have its Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

Class 3 Claims are unimpaired.

*Class 4: HUD Installment Note Claims*

On the Effective Date, (a) the HUD Installment Note Claims shall be deemed Allowed in the aggregate amount of $90,075,002.00 and (b) each Holder of an Allowed HUD Installment Note Claim shall have its Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

Class 4 Claims are unimpaired.

*Class 5: COP Swap Claims*

The Allowance of, and treatment to be accorded to, COP Swap Claims is the subject of continuing discussions between the City and the COP Swap Counterparties, is yet to be determined and will be supplied shortly.

*Class 6: Parking Bond Claims*

On the Effective Date, (a) the Parking Bonds Claims shall be deemed Allowed in the amount of $8,099,287.00 and (b) each Holder of an Allowed Parking Bond Claim shall have its Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

Class 6 Claims are unimpaired.

*Class 7: Limited Tax General Obligation Bond Claims*

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Limited Tax General Obligation Bond Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, Unsecured Pro Rata Shares of (a) New B Notes and (b) New C Notes.

Class 7 Claims are impaired.

*Class 8: Unlimited Tax General Obligation Bond Claims*

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Unlimited Tax General Obligation Bond Claim, in full satisfaction of such Allowed Claim, shall receive its Pro Rata share of Plan UTGO Notes on or as soon as reasonably practicable after the Effective Date. The maturity(ies) of the Plan UTGO Notes shall be no longer than the existing maturity(ies) of each series of Unlimited Tax General Obligation Bonds receiving Plan UTGO Notes. The Plan UTGO Notes shall contain such other terms as will result in each Holder of an Allowed Unlimited Tax General Obligation Bond Claim receiving a payment stream the present value of which is equal to approximately 20% of such Holder's Allowed Unlimited Tax General Obligation Bond Claim as of the Effective Date.

Class 8 Claims are impaired.

*Class 9: COP Claims*

*The COP Claims are Disputed Claims and are not Allowed by the Plan, and the City reserves all rights to: (a) object to, avoid or subordinate such Claims on any and all available grounds, including through the assertion of any and all grounds asserted in the COP Litigation; and (b) assign the right to object to, avoid or subordinate such Claims or the City's rights in the COP Litigation to the Creditor*

-82-

13-53846-swr   Doc 2709   Filed 02/21/14   Entered 02/21/14 10:27:23   Page 96 of 440
13-53846-swr   Doc 2709   Filed 02/21/14   Entered 02/21/14 10:59:50   Page 96 of 440

*Representative. The treatment set forth below in respect of the COP Claims is afforded only if and to the extent that such Claims ultimately become Allowed Claims.*

Solely for purposes of facilitating Distributions under this Plan and for no other purpose, on and as of the Effective Date, those portions of COP Claims that relate to, and are measured by, the payment schedule under the COPs shall be deemed assigned to the beneficial holders of the COPs on a Pro Rata basis, with each beneficial holder deemed to receive such portions of COP Claims in an amount equal to the proportion that the unpaid principal amount of such holder's COPs bears to the aggregate unpaid principal amount of all COPs. Each beneficial holder of COPs may elect to participate in the Plan COP Settlement in respect of some or all of those portions of COP Claims that would be deemed assigned to it and its Affiliates in the event that the Effective Date occurs.

Each beneficial holder of COPs may settle issues relating to allowance of the COP Claims that are deemed assigned to it and become a Settling COP Claimant as to some or all COPs held by it and its Affiliates by electing to participate in the Plan COP Settlement on a timely-returned Ballot accepting the Plan. Each Settling COP Claimant shall have its COP Claims deemed to be Allowed Claims in an amount equal to 40% of the aggregate unpaid principal amount of COPs held by such Settling COP Claimant and shall receive, on or as soon as reasonably practicable after the Effective Date, Unsecured Pro Rata Shares of (a) New B Notes and (b) New C Notes.

On the Effective Date, the City shall establish the Disputed COP Claims Reserve. The Disputed COP Claims Reserve shall contain no less than (a) Unsecured Pro Rata Shares of New B Notes and New C Notes, in each case calculated as if such Disputed COP Claims were Allowed in an amount equal to the aggregate unpaid principal amount as of the Petition Date for the COPs not subject to the Plan COP Settlement; and (b) any distributions made on account of New B Notes and New C Notes held in the Disputed COP Claims Reserve.

If and to the extent that Disputed COP Claims become Allowed Claims, the Holders of such Allowed Claims shall be sent a Distribution from the Disputed COP Claims Reserve of no less than (a) the portions of New B Notes and New C Notes held in the Disputed COP Claims Reserve initially allocated to the Disputed COP Claims that became Allowed Claims; and (b) any distributions received by the Disputed COP Claims Reserve on account of such portions of New B Notes and New C Notes. Upon the entry of an order by the trial court having jurisdiction over the objections to the Disputed COP Claims resolving all objections to the Disputed COP Claims and after all Distributions on account of Allowed COP Claims have been made or provided for, 70% of any New B Notes, New C Notes and distributions thereon remaining in the Disputed COP Claims Reserve shall be distributed to holders of Claims entitled to receive New B Notes and New C Notes under the Plan, each of which shall receive their Unsecured Pro Rata Share of such property. The remaining 30% of any New B Notes, New C Notes and distributions thereon shall be cancelled (with respect to the New B Notes and New C Notes) or revert to the City and be transferred to the General Fund (with respect to the distributions on such portion of New B Notes and New C Notes).

Class 9 Claims are impaired.

## *Class 10: PFRS Claims*

During the Fiscal Years from the Effective Date through the Fiscal Year ending June 30, 2023, annual contributions shall be made to the PFRS only in the amounts identified on Exhibit II.B.3.t.ii.A to the Plan. The exclusive source for such contributions shall be DIA Proceeds equal to $175,000,000. After June 30, 2023, the City will contribute sufficient funds required to pay each Holder of a PFRS Pension Claim his or her PFRS Adjusted Pension Amount in accordance with and as modified by the terms and conditions contained in the Plan and the Plan PFRS Settlement.

During the period that ends on June 30, 2023, the trustees of the PFRS, or the trustees of any successor trust or pension plan, shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the PFRS that shall not be higher than 6.50%.

During the period that ends no earlier than June 30, 2023, the pension benefits payable to each Holder of a PFRS Pension Claim shall be equal to the PFRS Adjusted Pension Amount for such Holder, provided that such PFRS Adjusted Pension Amount shall be (a) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (b) increased by (i) the Plan PFRS Settlement (as set forth in Section II.B.3.t.ii.G to the Plan) and (ii) any PFRS Restoration Payment.

Each Holder of a PFRS Pension Claim who is an Active Employee shall receive, in addition to his or her PFRS Adjusted Pension Amount, as may be modified herein, such additional pension benefit for service on or after July 1, 2014 consistent with the terms and conditions of the PFRS Hybrid Pension Formula.

The composition of the board of trustees of the PFRS and the manner in which it is operated and administered shall be consistent with such governance provisions as are (a) required by the DIA Settlement Documents and the Plan PFRS Settlement and (b) acceptable to the State and the DIA Funding Parties.

The Confirmation Order shall include an injunction against the subsequent amendment of the terms and conditions, and rules of operation, of the PFRS, or any successor plan or trust, that governs the calculation of pension benefits (including the PFRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, the PFRS Restoration Payment and the PFRS Hybrid Pension Formula and terms of the hybrid arrangement) or against any action that governs the selection of the investment return assumption described in Section II.B.3.t.ii.B of the Plan, the contribution to the PFRS or the calculation or amount of PFRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.

If Classes 10 and 11 accept the Plan, Holders of PFRS Pension Claims who accept the Plan will have the option to enter into a settlement with the City and the State by electing to participate in the Plan PFRS Settlement on a timely-returned Ballot accepting the Plan. The Plan PFRS Settlement shall include the following principal terms: (a) the State will deposit the State PFRS Consideration into the PFRS in equal annual installments over a period of 20 years, (b) each Electing PFRS Holder shall be entitled to the PFRS Settlement Benefit Amount in addition to such Holder's PFRS Adjusted Pension Amount and (c) each Electing PFRS Holder will release the City and its Related Entities and the State and the State Related Entities from all PFRS Pension Claims, as more particularly described in the Plan PFRS Settlement Documents.

On or as soon as practicable following the Effective Date, the City will establish the Detroit VEBA to provide health care, life and other legally authorized welfare benefits to Detroit VEBA Beneficiaries and certain of their dependents and future City retirees. The Detroit VEBA will be governed by a board of trustees that will be responsible for, among other things, management of property held by the Detroit VEBA, administration of the Detroit VEBA and determination of the level of and distribution of benefits to Detroit VEBA Beneficiaries. The Detroit VEBA Trust Agreement and related plan documentation will be substantially in the form set forth on Exhibit I.A.62 to the Plan, which shall, among other things, identify the members of the Detroit VEBA's initial board of trustees. Promptly after the Detroit VEBA is established, the City shall (a) distribute the OPEB Claims Note to the Detroit VEBA and (b) direct the trustees of the Employee Death Benefit Plan to terminate that plan and transfer all assets (net of expenses of termination) to the Detroit VEBA. The City shall have no responsibility following the Effective Date to provide life insurance or death benefits to retirees. Holders of PFRS Claims that also hold OPEB Claims shall be Detroit VEBA Beneficiaries.

Class 10 Claims are impaired.

*Class 11: GRS Claims*

During the Fiscal Years from the Effective Date through the Fiscal Year ending June 30, 2023, annual contributions shall be made to the GRS only in the amounts identified on Exhibit II.B.3.u.ii.A to the Plan. The exclusive sources for such contributions shall be pension-related payments received by the City from the DWSD equal to approximately $675,000,000, and proceeds received from the DIA Funding

Parties in the amount of approximately $50,000,000. After June 30, 2023, (a) approximately $195,000,000 of proceeds contributed by the DIA Funding Parties in connection with the DIA Settlement shall be contributed to the GRS and (b) the City will contribute such additional funds as are necessary to pay each Holder of a GRS Pension Claim his or her GRS Adjusted Pension Amount in accordance with and as modified by the terms and conditions contained in the Plan and the Plan GRS Settlement.

During the period that ends on June 30, 2023, the board of trustees of the GRS, or the trustees of any successor trust or pension plan, shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the GRS that shall not be higher than 6.25%.

During the period that ends no earlier than June 30, 2023, the pension benefits payable to each Holder of a GRS Pension Claim shall be equal to the GRS Adjusted Pension Amount for such Holder, provided that such GRS Adjusted Pension Amount shall be (a) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (b) increased by (i) the Plan GRS Settlement (as set forth in Section II.B.3.u.ii.I of the Plan) and (ii) any GRS Restoration Payment.

Excess Allocations to Annuity Savings Fund Accounts during the period beginning January 1, 1999 and ending December 31, 2012 may be applied to reduce (a) Annuity Savings Fund Accounts of Active Employees who participate in the GRS and (b) the Current Accrued Annual Pension of former participants in the Annuity Savings Fund Account now receiving monthly pensions, in accordance with the formulae set forth on Exhibit II.B.3.u.ii.D to the Plan. In the event of any such reduction, a Holder's GRS Adjusted Pension Amount shall be increased to take into account such Annuity Savings Fund Account restitution reduction.

Each Holder of a GRS Pension Claim who is an Active Employee shall receive, in addition to his or her GRS Adjusted Pension Amount, as may be allowed herein, such additional pension benefit for service on or after July 1, 2014 consistent with the terms and conditions of the GRS Hybrid Pension Formula.

The composition of the board of trustees of the GRS and the manner in which it is operated and administered shall be consistent with such governance provisions as are (a) required by the DIA Settlement Documents and the Plan GRS Settlement and (b) acceptable to the State and the DIA Funding Parties.

If the City consummates a DWSD Transaction on or prior to the Effective Date, the GLWA will assume the pension liability associated with DWSD employees and retirees as accrued through the closing date of the DWSD Transaction. A pro rata share of the existing GRS assets and liabilities will be transferred to a successor pension fund managed by the GLWA. The successor pension plan will be closed to new GLWA employees and benefit levels frozen.

The Confirmation Order shall include an injunction against the subsequent amendment of the terms and conditions, and rules of operation, of the GRS, or any successor plan or trust, that govern the calculation of pension benefits (including the GRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, GRS Restoration Payment and the GRS Hybrid Pension Formula and terms of the hybrid arrangement) or against any action that governs the selection of the investment return assumption described in Section II.B.3.u.ii.B of the Plan, the contribution to the GRS, or the calculation or amount of GRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.

If Classes 10 and 11 accept the Plan, Holders of GRS Pension Claims who accept the Plan will have the option to enter into a settlement with the City and the State by electing to participate in the Plan GRS Settlement on a timely-returned Ballot accepting the Plan. The Plan GRS Settlement shall include the following principal terms: (a) the State will deposit the State GRS Consideration into the GRS in equal annual installments over a period of 20 years, (b) each Electing GRS Holder shall be entitled to the GRS Settlement Benefit Amount in addition to such Holder's GRS Adjusted Pension Amount and (c) each Electing GRS Holder will release the City and its Related Entities and the State and the State Related

Entities from all GRS Pension Claims, as more particularly described in the Plan GRS Settlement Documents.

Holders of GRS Claims that also hold OPEB Claims shall be Detroit VEBA Beneficiaries of the Detroit VEBA.

Class 11 Claims are impaired.

*Class 12: Downtown Development Authority Claims*

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Downtown Development Authority Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, Unsecured Pro Rata Shares of (a) New B Notes and (b) New C Notes.

Class 12 Claims are impaired.

*Class 13: Other Unsecured Claims*

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Other Unsecured Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, Unsecured Pro Rata Shares of (a) New B Notes and (b) New C Notes.

Class 13 Claims are impaired.

*Class 14: Convenience Claims*

Each Holder of an Allowed Convenience Claim, in full satisfaction of such Allowed Claim, shall receive Cash equal to the amount of 25% of such Allowed Claim (as reduced, if applicable, pursuant to an election by such Holder in accordance with Section I.A.44 of the Plan) on or as soon as reasonably practicable after the Effective Date, unless such Holder agrees to a different treatment of such Claim.

Class 14 Claims are impaired.

*Class 15: Subordinated Claims*

On the Effective Date, all Subordinated Claims shall be disallowed, extinguished and discharged without Distribution under the Plan, and Holders of Subordinated Claims shall not receive or retain any property on account of such Claims. Pursuant to section 1126(g) of the Bankruptcy Code, Class 15 is deemed to have rejected the Plan, and Holders of Subordinated Claims are not entitled to cast a Ballot in respect of such Claims.

Class 15 Claims are impaired.

**C.      Treatment of Executory Contracts and Unexpired Leases**

**1.      Assumption**

Except as otherwise provided in the Plan, in any contract, instrument, release or other agreement or document entered into in connection with the Plan or in a Final Order of the Bankruptcy Court, or as requested in any motion Filed on or prior to the Effective Date, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the City will be deemed to assume all Executory Contracts and Unexpired Leases to which it is a party.

**2.      Assumption of Ancillary Agreements**

Each Executory Contract and Unexpired Lease assumed pursuant to Section II.D.1 of the Plan will include any modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement,

instrument or other document that in any manner affects such Executory Contract or Unexpired Lease, unless any such modification, amendment, supplement, restatement or other agreement is rejected pursuant to Section II.D.6 of the Plan or designated for rejection in accordance with Section II.D.3 of the Plan.

### 3.    Approval of Assumptions and Assignments

The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumption of Executory Contracts or Unexpired Leases pursuant to Section II.D.1 of the Plan (and any related assignment) as of the Effective Date, except for Executory Contracts or Unexpired Leases that (a) have been rejected pursuant to a Final Order of the Bankruptcy Court, (b) are subject to a pending motion for reconsideration or appeal of an order authorizing the rejection of such Executory Contract or Unexpired Lease, (c) are subject to a motion to reject such Executory Contract or Unexpired Lease Filed on or prior to the Effective Date, (d) are rejected pursuant to Section II.D.6 of the Plan or (e) are designated for rejection in accordance with the last sentence of this paragraph. An order of the Bankruptcy Court (which may be the Confirmation Order) entered on or prior to the Confirmation Date will specify the procedures for providing notice to each party whose Executory Contract or Unexpired Lease is being assumed pursuant to the Plan of:  (a) the Executory Contract or Unexpired Lease being assumed; (b) the Cure Amount Claim, if any, that the City believes it would be obligated to pay in connection with such assumption; (c) any assignment of an Executory Contract or Unexpired Lease; and (d) the procedures for such party to object to the assumption of the applicable Executory Contract or Unexpired Lease, the amount of the proposed Cure Amount Claim or any assignment of an Executory Contract or Unexpired Lease. If an objection to a proposed assumption, assumption and assignment or Cure Amount Claim is not resolved in favor of the City, the applicable Executory Contract or Unexpired Lease may be designated by the City for rejection, which shall be deemed effective as of the Effective Date.

### 4.    Payments Related to the Assumption of Executory Contracts and Unexpired Leases

To the extent that such Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract or Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the City:  (a) by payment of the Cure Amount Claim in Cash on the Effective Date or (b) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease. If there is a dispute regarding:  (a) the amount of any Cure Amount Claim, (b) the ability of the City or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to the assumption of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code will be made within 30 days following the entry of a Final Order resolving the dispute and approving the assumption.

### 5.    Contracts and Leases Entered Into After the Petition Date

Contracts, leases and other agreements entered into after the Petition Date by the City, including (a) any Executory Contracts or Unexpired Leases assumed by the City and (b) the collective bargaining agreements identified on Exhibit II.D.5 to the Plan, will be performed by the City in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts or Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

### 6.    Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, each Executory Contract and Unexpired Lease that is listed on Exhibit II.D.6 to the Plan shall be deemed rejected pursuant to section 365 of the Bankruptcy Code. The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the later of: (a) the Effective Date or (b) the resolution of any objection to the proposed rejection of an Executory Contract or Unexpired Lease. Each contract or lease listed on Exhibit II.D.6 to the Plan shall be rejected only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease. The City reserves its right, at any time on or prior to the Effective Date, to amend Exhibit II.D.6 to the Plan to delete any Executory Contract or Unexpired Lease therefrom, thus providing for its assumption pursuant to Section II.D.1 of the Plan or add any Executory Contract or Unexpired Lease thereto, thus providing for its rejection pursuant to this Section II.D.6 of the Plan. The City will provide notice of any amendments to Exhibit II.D.6 to the Plan to the parties to the Executory Contracts or Unexpired Leases affected thereby and to the parties on the then-applicable service list in this chapter 9 case. Listing a contract or lease on Exhibit II.D.6 to the Plan shall not constitute an admission by the City that such contract or lease is an Executory Contract or Unexpired Lease or that the City has any liability thereunder. Any Claims arising from the rejection of an Executory Contract or

Unexpired Lease pursuant to the Plan shall be treated as Class 13 Claims (Other Unsecured Claims), subject to the provisions of section 502 of the Bankruptcy Code.

### 7. Rejection Damages Bar Date

Except as otherwise provided in a Final Order of the Bankruptcy Court approving the rejection of an Executory Contract or Unexpired Lease, Claims arising out of the rejection of an Executory Contract or Unexpired Lease must be Filed with the Bankruptcy Court and served upon counsel to the City on or before the later of: (a) 30 days after the Effective Date or (b) 30 days after such Executory Contract or Unexpired Lease is rejected pursuant to a Final Order or designated for rejection in accordance with Section II.D.3 of the Plan. Any Claims not Filed within such applicable time periods will be forever barred from receiving a Distribution from, and shall not be enforceable against, the City.

### 8. Preexisting Obligations to the City Under Rejected Executory Contracts and Unexpired Leases

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the City under such contract or lease. Notwithstanding any applicable non-bankruptcy law to the contrary, the City expressly reserves and does not waive any right to receive, or any continuing obligation of a non-City party to provide, warranties, indemnifications or continued maintenance obligations on goods previously purchased, or services previously received, by the City from non-City parties to rejected Executory Contracts or Unexpired Leases, and any such rights shall remain vested in the City as of the Effective Date.

### 9. Insurance Policies

From and after the Effective Date, each of the City's insurance policies (other than welfare benefits insurance policies) in existence as of or prior to the Effective Date shall be reinstated and continue in full force and effect in accordance with its terms and, to the extent applicable, shall be deemed assumed by the City pursuant to section 365 of the Bankruptcy Code and Section II.D.1 of the Plan. Nothing contained herein shall constitute or be deemed a waiver of any Causes of Action that the City may hold against any Entity, including any insurer under any of the City's insurance policies.

## D. Effectiveness of the Plan

The Plan shall become effective on the Effective Date. Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

### 1. Conditions Precedent to the Effective Date

The Effective Date will not occur, and the Plan will not be consummated, unless and until the City has determined that all of following conditions have been satisfied or waived in accordance with Section III.B of the Plan:

- The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the City.

- The Bankruptcy Court shall have entered an order (which may be included in the Confirmation Order) approving and authorizing the City to take all actions necessary or appropriate to implement the Plan, including the transactions contemplated by the Plan and the implementation and consummation of the contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan.

- The Confirmation Order shall not be stayed in any respect.

- All actions and all contracts, instruments, releases and other agreements or documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable, in form and substance satisfactory to the City.

- All authorizations, consents and regulatory approvals, if any, required in connection with the consummation of the Plan have been obtained and not revoked.

- The Plan and all Exhibits shall have been Filed and shall not have been materially amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with Section VIII.A of the Plan.

- If Classes 10 and 11 accept the Plan, all conditions to the effectiveness of (a) the Plan PFRS Settlement set forth in the Plan PFRS Settlement Documents and (b) the Plan GRS Settlement set forth in the Plan GRS Settlement Documents have been satisfied.

- Sufficient value shall have been realized from the DIA Assets (through the DIA Settlement or otherwise) to fund contributions to the PFRS as set forth on Exhibit II.B.3.t.ii.A to the Plan.

- The Effective Date shall occur within 180 days of the entry of the Confirmation Order, unless such deadline is extended by the Bankruptcy Court.

## 2. Waiver of Conditions to the Effective Date

The conditions to the Effective Date set forth in Section III.A of the Plan may be waived in whole or part at any time by the City in its sole and absolute discretion.

## 3. Effect of Nonoccurrence of the Effective Date

If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with Section III.B of the Plan, then upon motion by the City made before the time that each of such conditions has been satisfied and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order will be vacated by the Bankruptcy Court; provided, however, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is satisfied before the Bankruptcy Court enters an order granting such motion. If the Confirmation Order is vacated pursuant to Section III.C of the Plan: (a) the Plan will be null and void in all respects, including with respect to (i) the discharge of Claims pursuant to section 944(b) of the Bankruptcy Code, (ii) the assumptions, assignments or rejections of Executory Contracts and Unexpired Leases pursuant to Section II.D of the Plan and (iii) the releases described in Section III.D.7 of the Plan; and (b) nothing contained in the Plan, nor any action taken or not taken by the City with respect to the Plan, the Disclosure Statement or the Confirmation Order, will be or will be deemed to be (i) a waiver or release of any Claims by or against the City, (ii) an admission of any sort by the City or any other party in interest or (iii) prejudicial in any manner the rights of the City or any other party in interest.

## 4. Request for Waiver of Automatic Stay of Confirmation Order

The Plan shall serve as a motion seeking a waiver of the automatic stay of the Confirmation Order imposed by Bankruptcy Rule 3020(e). Any objection to this request for waiver shall be Filed and served on the parties listed in Section VIII.L of the Plan on or before the Voting Deadline.

## E. Effects of Confirmation

### 1. Binding Effect

Pursuant to section 944(a) of the Bankruptcy Code, on and after the Effective Date, the provisions of the Plan shall bind all Holders of Claims, and their respective successors and assigns, whether or not the Claim of any such Holder is Impaired under the Plan and whether or not such Holder has accepted the Plan. The releases and settlements effected under the Plan will be operative, and subject to enforcement by the Bankruptcy Court, from and after the Effective Date, including pursuant to the injunctive provisions of the Plan. Once approved, the compromises and settlements embodied in the Plan, along with the treatment of any associated Allowed Claims, shall not be subject to any collateral attack or other challenge by any Entity in any court or other forum. As such, any Entity that opposes the terms of any compromise and settlement set forth in the Plan must (a) challenge such compromise and settlement prior to Confirmation of the Plan and (b) demonstrate appropriate standing to object and that the subject compromise and settlement does not meet the standards governing bankruptcy settlements under Bankruptcy Rule 9019 and other applicable law.

2. **Dissolution of Official Committees.**

Following the Effective Date, all Official Committees, to the extent not previously dissolved or disbanded, will dissolve and disband, and the members of the Official Committees and their respective professionals will cease to have any role arising from or related to the City's chapter 9 case, *provided*, *however*, that, if and only if the Retiree Committee is the Creditor Representative under the Plan, the Retiree Committee shall continue to exist solely for the purposes of objecting to or otherwise asserting the City's or its creditors' rights with respect to Disputed COP Claims pursuant to Section II.B.3.s.i of the Plan. If the Retiree Committee is the Creditor Representative, it shall be disbanded upon the final resolution of all Disputed COP Claims or pursuant to an order of the Bankruptcy Court, which order may be sought by the City for good cause shown. All fees and expenses of the Creditor Representative shall be subject to the approval of the City. All disputes relating to the approval of fees and expenses shall be determined by the Bankruptcy Court. No party to any such dispute shall have any right to appeal an order of the Bankruptcy Court resolving any such dispute.

3. **Preservation of Rights of Action by the City.**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code, the City will retain and may enforce any claims, demands, rights, defenses and Causes of Action that it may hold against any Entity, to the extent not expressly released under the Plan or pursuant to any Final Order of the Bankruptcy Court. A nonexclusive schedule of currently pending actions and claims brought by the City is attached as Exhibit III.D.2 to the Plan. The City's inclusion or failure to include any right of action or claim on Exhibit III.D.2 to the Plan shall not be deemed an admission, denial or waiver of any claims, demands, rights or Causes of Action that the City may hold against any Entity, and all Entities are hereby notified that the City intends to preserve all such claims, demands, rights or Causes of Action.

4. **Comprehensive Settlement of Claims and Controversies.**

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all claims or controversies relating to the rights that a Holder of a Claim may have with respect to any Allowed Claim or any Distribution to be made pursuant to the Plan on account of any Allowed Claim. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements are (a) in the best interests of the City, its property and Claim Holders and (b) fair, equitable and reasonable.

5. **Discharge of Claims**

(a) **Complete Satisfaction, Discharge and Release.**

Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims arising on or before the Effective Date, including any interest accrued on Claims from and after the Petition Date. Except as provided in the Plan or in the Confirmation Order, Confirmation will, as of the Effective Date, discharge the City from all Claims or other debts that arose on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (iii) the Holder of a Claim based on such debt has accepted the Plan.

(b) **Discharge.**

In accordance with Section III.D.4.a of the Plan, except as expressly provided otherwise in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination, as of the Effective Date, of a discharge of all Claims and other debts and Liabilities against the City, pursuant to sections 524(a)(1), 524(a)(2) and 944(b) of the Bankruptcy Code, and such discharge will void any judgment obtained against the City at any time, to the extent that such judgment relates to a discharged Claim; *provided* that such discharge will not apply to (i) Claims specifically exempted from discharge under the Plan; and (ii) Claims held by an Entity that, before the Confirmation Date, had neither notice nor actual knowledge of the City's chapter 9 case.

6. **Injunction.**

**On the Effective Date, except as otherwise provided herein or in the Confirmation Order,**

- **all Entities that have been, are or may be Holders of Claims against the City or Indirect 36th District Court Claims, along with their Related Entities, shall be permanently enjoined from taking any of the following actions against or affecting the City or its property, DIA Corp. or its property, the DIA Assets, the Foundations or their respective property, if a DWSD transaction is consummated on or prior to the Effective Date, the GLWA and its property and the Related Entities of each of the foregoing, with respect to such Claims (other than actions brought to enforce any rights or obligations under the Plan and appeals, if any, from the Confirmation Order):**

  - **commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against or affecting the City or its property (including (a) all suits, actions and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice and (b) Indirect 36th District Court Claims);**

  - **enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order against the City or its property;**

  - **creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the City or its property;**

  - **asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the City or its property;**

  - **proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan or the settlements set forth herein to the extent such settlements have been approved by the Bankruptcy Court in connection with Confirmation of the Plan; and**

  - **taking any actions to interfere with the implementation or consummation of the Plan.**

- **All Entities that have held, currently hold or may hold any Liabilities released or exculpated pursuant to the Plan will be permanently enjoined from taking any of the following actions against any Released Party or its property on account of such released Liabilities:  (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (b) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien; (d) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due a Released Party; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.**

7. **Exculpation.**

From and after the Effective Date, to the fullest extent permitted under applicable law, neither the City, its Related Entities (including the members of the City Council, the Mayor, and the Emergency Manager), to the extent a claim arises from actions taken by such Related Entity in its capacity as a Related Entity of the City, nor the Released Parties shall have or incur any liability to any person or Entity for any act or omission in connection with, relating to or arising out of the City's restructuring efforts and the City's chapter 9 case, including the formulation, preparation, negotiation, dissemination, consummation, implementation, confirmation or approval (as applicable) of the Plan, the property to be distributed under the Plan, the Exhibits, the Disclosure Statement, any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan or the management or operation of the City (except for any liability that results from willful misconduct or gross negligence as determined by a Final Order or from any act or omission occurring before the Petition Date).  The City, its Related Entities (with respect to actions taken by such Related Entities in their capacities as Related Entities of the City) and the Released Parties shall be entitled to rely upon the advice of counsel and financial advisors with respect to their duties and responsibilities under, or in connection with, the City's chapter 9 case, the administration thereof and the Plan.

**8.     Releases**

Without limiting any other applicable provisions of, or releases contained in, the Plan or any contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, as of the Effective Date, in consideration for the obligations of the City under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, (a) each Holder of a Claim that votes in favor of the Plan, to the fullest extent permissible under law, will be deemed to forever release, waive and discharge all Liabilities in any way relating to the City, the City's chapter 9 case, the Plan, the Exhibits or the Disclosure Statement that such entity has, had or may have against any Released Party (which release will be in addition to the discharge of Claims provided herein and under the Confirmation Order and the Bankruptcy Code) and (b) if the Plan PFRS Settlement and the Plan GRS Settlement are consummated, the City will be deemed to forever release, waive and discharge all Liabilities in any way related to the Pension Claims that the City has, had or may have against any Released Party.

**F.     Retention of Jurisdiction by the Bankruptcy Court**

Pursuant to sections 105(c), 945 and 1142(b) of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the City's chapter 9 case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

- Allow, disallow, estimate, determine, liquidate, reduce, classify, re-classify, estimate or establish the priority or secured or unsecured status, or amount of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the amount, allowance, priority or classification of Claims;

- Enforce the term (maturity) of the collective bargaining agreements identified on Exhibit II.D.5 to the Plan, notwithstanding any state law to the contrary;

- Resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including Claims for payment of any cure amount;

- Ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

- Adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving the City that may be pending on the Effective Date or brought thereafter;

- Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

- Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents;

- Approve any modification of the Plan or approve any modification of the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any order, the Plan, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, or enter any order in aid of confirmation pursuant to sections 945 and 1142(b) of the Bankruptcy Code, in such manner as may be necessary or appropriate to consummate the Plan;

- Issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

- Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or Distributions pursuant to the Plan are enjoined or stayed;

- Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

- Enforce or clarify any orders previously entered by the Bankruptcy Court in the City's chapter 9 case;

- Enter a final decree closing the City's chapter 9 case pursuant to section 945(b) of the Bankruptcy Code; and

- Hear any other matter over which the Bankruptcy Court has jurisdiction under the provisions of the Bankruptcy Code and the Bankruptcy Rules subject to any limits on the Bankruptcy Court's jurisdiction and powers under sections 903 and 904 of the Bankruptcy Code.

# VI.

## MEANS OF IMPLEMENTATION OF THE PLAN

A.     **The New Notes**

1.     **The New B Notes**

On the Effective Date, the City shall issue the New B Notes and distribute them as set forth in the Plan. The definitive documentation governing the New B Notes shall provide generally for the following terms:

- *Obligation*:  The New B Notes shall be a general and unsecured obligation of the City.

- *Initial Principal Amount*:  $360.0 million.

- *Interest Rate*:  5.0%, payable semi-annually in cash, except for initial five-year PIK period.  Interest may be paid in kind through and including the interest payment date closest to the fifth anniversary of issuance.

- *Maturity*:  30 years.

- *Amortization*:  Amortization in 20 equal annual installments beginning on the interest payment date nearest to the 11th anniversary from issuance.

2.     **The New C Notes**

On the Effective Date, the City shall issue the New C Notes and distribute them as set forth in the Plan. The definitive documentation governing the New C Notes shall provide generally for the following terms:

- *Establishment of Creditor Recovery Trust*:  The City will set up a creditors recovery trust (the "<u>CRT</u>") that will allow creditors to benefit from certain incremental recurring gross specified tax receipts ("<u>GSTR</u>"), as (and if) the City recovers such receipts over the next thirty years.

- *Initial Revenue Hurdle*:  As of the later of (a) the initial refinancing/refunding of the Exit Facility and (b) the tenth anniversary of the Effective Date, the City will calculate an initial revenue hurdle (the "Revenue Hurdle"), to be established at 105% of the trailing average of GSTR for the three audited financial statements most recently filed as of the date of such calculation..

- *Adjustments to Revenue Hurdle*:  The Revenue Hurdle will increase 2.0% per year beginning on the first anniversary of the calculation of the initial Revenue Hurdle.  The Revenue Hurdle will be recalculated to reflect changes in the millage rates underlying the taxes that contribute to the GSTR, which recalculation will be based on a revised initial Revenue Hurdle based on the new tax rates and actual collection rates.

- *Funding of the Creditor Recovery Trust*:  If the City is not then in default on any general obligation debt, then no later than 365 days after the end of a Fiscal Year following the calculation of the initial Revenue Hurdle, the City will fund the CRT with the lesser of (a) 10% of the amount of GSTR that exceeds the Revenue Hurdle and (b) $100 million; *provided* that the City shall not fund the CRT at any time after the end of the 30th Fiscal Year following the Effective Date.

- *Dissolution of the Creditor Recovery Trust*:  If no payments have been made to the CRT by the City within ten years of calculating the initial Revenue Hurdle, the CRT will be dissolved.

- *Distributions from the Creditor Recovery Trust*:  Distributions to creditors from the CRT will occur within 60 days of any funding of the CRT by the City.

## B.    Alternatives Related to DWSD

### 1.    DWSD Remains a Department of the City

#### (a)    Rates and Revenues

The DWSD will maintain Fiscal Year 2015 rate setting protocols for a minimum of five years, subject to certain changes necessary to stabilize water and sewer revenues.  Immediately following the Effective Date, the City will begin planning a rate stability program for City residents. Such program may provide for affordability of retail rates to be taken into account in the development of wholesale rates across the system.

#### (b)    DWSD CBAs

Collective bargaining agreements with respect to current DWSD employees that are in effect as of the Effective Date will be assumed by the City.

#### (c)    The New DWSD Bonds

If a DWSD transaction is not consummated, on the Effective Date, DWSD shall, as necessary, issue the New DWSD Bonds, in one or more series and distribute them as set forth in the Plan.  The definitive documentation governing the New DWSD Bonds shall be filed with the Plan Supplement, and shall provide generally for the following:

- *Principal*:  Equal to the amount of each DWSD Series of DWSD Bonds receiving New DWSD Bonds, plus amounts necessary to pay expenses of the financing.

- *Interest rate*:  Calculated by reference to the Interest Rate Reset Chart attached as Exhibit I.A.150 to the Plan.

- *Maturity Dates*:  Equal to the existing maturity(ies) of each series of DWSD Series of DWSD Bonds receiving New DWSD Bonds.

- *Prepayment*:  The City may prepay or redeem all or any portion of the New DWSD Bonds at any time at its option and without penalty or premium.

- *Transfer of Assets*:  The City shall have the authority to permit the lease or transfer of assets currently used in DWSD's operations to one or more new authorities formed to provide water and/or sewer services

provided that such transferee(s) assume the applicable portion of the then outstanding New DWSD Bonds. In the event that such DWSD assets are leased or transferred, the definition of "operations and maintenance expenses" in the documentation for the New DWSD Bonds shall be amended to (i) include the amount of any lease payment payable to the City's General Fund; and (ii) exclude such amount from the liens securing the New DWSD Bonds.

- *Other Terms*: The New DWSD Bonds otherwise shall have the same terms and conditions as the applicable DWSD Series of DWSD Bonds receiving New DWSD Bonds.

### (d)     The New Existing Rate DWSD Bonds

If a DWSD transaction is not consummated, on the Effective Date, the City shall, as necessary, issue the New Existing Rate DWSD Bonds, in one or more series, and distribute them as set forth in the Plan. The definitive documentation governing the New Existing Rate DWSD Bonds shall be filed with the Plan Supplement, and shall provide generally for the following:

- *Principal*: Equal to the amount of each DWSD Series of DWSD Bonds receiving New Existing Rate DWSD Bonds, plus amounts necessary to pay expenses of the financing.

- *Interest rate*: Equal to the existing rates of each series of DWSD Bonds receiving New Existing Rate DWSD Bonds.

- *Maturity Dates*: Equal to the existing maturity(ies) of each series of DWSD Bonds receiving New Existing Rate DWSD Bonds.

- *Prepayment*: The City may prepay or redeem all or any portion of the New Existing Rate DWSD Bonds at any time at its option and without penalty or premium.

- *Transfer of Assets*: The City shall have the authority to permit the lease or transfer of assets currently used in DWSD's operations to one or more new authorities formed to provide water and/or sewer services provided that such transferee(s) assume the applicable portion of the then outstanding New Existing Rate DWSD Bonds. In the event that such DWSD assets are leased or transferred, the definition of "operations and maintenance expenses" in the documentation for the New Existing Rate DWSD Bonds shall be amended to (i) include the amount of any lease or PILOT payment payable to the City's General Fund; and (ii) exclude such amount from the liens securing the New Existing Rate DWSD Bonds.

- *Other Terms*: The New Existing Rate DWSD Bonds otherwise shall have the same terms as conditions as the applicable DWSD Series of DWSD Bonds receiving New Existing Rate DWSD Bonds.

### (e)     The New DWSD Revolving Bonds

If a DWSD transaction is not consummated, on the Effective Date, the City shall, as necessary, issue the New DWSD Revolving Bonds, in one or more series, and distribute them as set forth in the Plan. The definitive documentation governing the New DWSD Revolving Bonds shall be filed with the Plan Supplement, and shall provide generally for the following:

- *Principal*: Equal to the outstanding principal on the relevant existing DWSD Revolving Bonds.

- *Interest rate*: Calculated by reference to the Interest Rate Reset Chart attached as Exhibit I.A.150 to the Plan.

- *Maturity Dates*: Equal to the existing maturity(ies) of each series of DWSD Series of DWSD Revolving Bonds receiving New DWSD Revolving Bonds.

- *Prepayment*: The City may prepay or redeem all or any portion of the New DWSD Revolving Bonds at any time at its option and without penalty or premium.

- *Transfer of Assets*:  The City shall have the authority to permit the lease or transfer of assets currently used in DWSD's operations to one or more new authorities formed to provide water and/or sewer services provided that such transferee(s) assume the applicable portion of the then outstanding New DWSD Revolving Bonds.  In the event that such DWSD assets are leased or transferred, the definition of "operations and maintenance expenses" in the documentation for the New DWSD Revolving Bonds shall be amended to (i) include the amount of any lease payment payable to the City's General Fund; and (ii) exclude such amount from the liens securing the New DWSD Revolving Bonds.

## 2.  Potential DWSD Transaction

The City may enter into a DWSD Transaction that will include the formation of the GLWA to conduct the operations currently conducted by the DWSD.  The City will only enter into a DWSD Transaction if such transaction enables the City to make larger, more rapid or more certain distributions to at least some of its creditors as compared to the Distributions specified in Section II.B of the Plan.

### (a)  The New GLWA Bonds

If a DWSD Transaction is consummated, on the Effective Date, the GLWA shall, as necessary, issue the New GLWA Bonds, in one or more series, and distribute them as set forth in the Plan.  The definitive documentation governing the New GLWA Bonds shall be filed with the Plan Supplement, and shall provide generally for the following:

- *Obligation*:  The New GLWA Bonds shall be obligations of GLWA.

- *Principal*:  Equal to the amount of each DWSD Series of DWSD Bonds receiving New GLWA Bonds, plus amounts necessary to pay expenses of the financing.

- *Interest rate*:  Calculated by reference to the Interest Rate Reset Chart attached as Exhibit I.A.150 to the Plan.

- *Maturity Dates*:  Equal to the existing maturity(ies) of each series of each DWSD Series of DWSD Bonds receiving New GLWA Bonds.

- *Prepayment*:  GLWA may prepay or redeem all or any portion of the New GLWA Bonds at any time at its option and without penalty or premium.

- *Operations and Maintenance Expenses*:  The "operations and maintenance expenses" of GLWA shall (i) include the amount of any lease payment payable to the City's General Fund; and (ii) be excluded from the liens securing the New GLWA Bonds.

- *Other Terms*:  The New GLWA Bonds otherwise shall have the same terms and conditions as the applicable DWSD Series of DWSD Bonds receiving New GLWA Bonds.

### (b)  The New Existing Rate GLWA Bonds

If a DWSD Transaction is consummated, on the Effective Date, GLWA shall, as necessary, issue the New Existing Rate GLWA Bonds, in one or more series, and distribute them as set forth in the Plan.  The definitive documentation governing the New Existing Rate GLWA Bonds shall be filed with the Plan Supplement, and shall provide generally for the following:

- *Obligation*:  The New Existing Rate GLWA Bonds shall be obligations of GLWA.

- *Principal*:  Equal to the amount of each DWSD Series of DWSD Bonds receiving New Existing Rate GLWA Bonds, plus amounts necessary to pay expenses of the financing.

- *Interest rate*:  Equal to the existing interest rates of each series of DWSD Bonds receiving New Existing Rate GLWA Bonds.

- *Maturity Dates*: Equal to the existing maturity(ies) of each series of DWSD Bonds receiving New Existing Rate GLWA Bonds.

- *Prepayment*: GLWA may prepay or redeem all or any portion of the New Existing Rate GLWA Bonds at any time at its option and without penalty or premium.

- *Operations and Maintenance Expenses*: The "operations and maintenance expenses" of GLWA shall (i) include the amount of any lease payment payable to the City's General Fund; and (ii) be excluded from the liens securing the New Existing Rate GLWA Bonds.

- *Other Terms*: The New Existing Rate GLWA Bonds otherwise shall have the same terms and conditions as the applicable DWSD Series of DWSD Bonds receiving New Existing Rate GLWA Bonds (to the extent not otherwise negotiated).

### (c) The New GLWA Revolving Bonds

If a DWSD Transaction is consummated, on the Effective Date, the GLWA shall, as necessary, issue the New GLWA Revolving Bonds, in one or more series, and distribute them as set forth in the Plan. The definitive documentation governing the New GLWA Revolving Bonds shall be filed with the Plan Supplement, and shall provide generally for the following:

- *Obligation*: The New GLWA Revolving Bonds shall be obligations of GLWA.

- *Principal*: Equal to the outstanding principal on the relevant existing DWSD Revolving Bonds.

- *Interest rate*: Calculated by reference to the Interest Rate Reset Chart attached as Exhibit I.A.150 to the Plan.

- *Maturity Dates*: Equal to the existing maturity(ies) of each series of DWSD Series of DWSD Revolving Bonds receiving New GLWA Revolving Bonds.

- *Prepayment*: GLWA may prepay or redeem all or any portion of the New GLWA Revolving Bonds at any time at its option and without penalty or premium.

## C. The Plan COP Settlement

The City shall consummate the Plan COP Settlement on the Effective Date, substantially on the terms set forth on Exhibit I.A.201 to the Plan. Settling COP Claimants shall receive the treatment described in Section II.B.3.s.iii.A of the Plan.

## D. The Plan PFRS Settlement

The City shall consummate the Plan PFRS Settlement on the Effective Date, substantially on the terms set forth on Exhibit I.A.205 to the Plan. Electing PFRS Holders shall receive the treatment described in Section II.B.3.t.ii.G of the Plan.

## E. The Plan GRS Settlement

The Plan GRS Settlement shall include the following principal terms: (1) the State will deposit the State GRS Consideration into the GRS in equal annual installments over a period of 20 years, (2) each Electing GRS Holder shall be entitled to the GRS Settlement Benefit Amount in addition to such Holder's GRS Adjusted Pension Amount and (3) each Electing GRS Holder will release the City and its Related Entities and the State and the State Related Entities from all GRS Pension Claims, as more particularly described in the Plan GRS Settlement Documents.

The City shall consummate the Plan GRS Settlement on the Effective Date, substantially on the terms set forth on Exhibit I.A.203 to the Plan. Electing GRS Holders shall receive the treatment described in Section II.B.3.u.ii.I of the Plan.

### F. The OPEB Claims Note

On or as soon as practicable following the Effective Date, the City shall distribute the OPEB Claims Note to the Detroit VEBA established to provide health care benefits to Detroit VEBA Beneficiaries. The definitive documentation governing the OPEB Claims Note shall provide generally for the following terms:

- *Principal*: The principal of the OPEB Claims Note shall be $526.5 million, minus the aggregate amount paid or accrued by the City for OPEB Benefits during the period beginning on the Petition Date and ending on the later of the Effective Date or the date of formation for the Detroit VEBA.

- *Interest Rate*: The OPEB Claims Note shall not pay interest.

- *Maturity*: 20 years.

- *Prepayment*: The City may prepay all or any portion of the OPEB Claims Note at any time at its option and without penalty or premium.

- *Amortization*: Payable in 10 equal annual installments, such that, as of the 10th anniversary of issuance, the principal remaining is $100 million, which remainder shall be payable in 10 equal annual installments beginning on the 11 anniversary of issuance.

### G. The DIA Settlement

On the Effective Date, the City and the DIA Funding Parties will enter into the DIA Settlement, pursuant to which (1) the DIA Funding Parties have committed to assist in the funding of the City's restructured legacy pension obligations and (2) the City has agreed to enter into certain transactions that will cause the DIA Assets to remain in the City in perpetuity and to otherwise make the DIA Assets available for the benefit of the residents of the City and the Counties and the citizens of the State. The definitive documentation governing the DIA Settlement is attached as Exhibit I.A.71 to the Plan and provides generally for, and entirely qualifies, the following:

#### 1. Funding Contributions

The DIA Settlement will be funded as follows: (a) an irrevocable commitment of at least $365 million by the Foundations; and (b) in addition to its continuing commitments outside of the DIA Settlement, an irrevocable commitment from DIA Corp. to raise at least $100 million from its donors. The foregoing commitments shall be funded over the course of the 20-year period immediately following the Effective Date (subject to the annual confirmation of the City's continuing compliance with the terms of the DIA Settlement). Amounts committed by the Foundations will be paid to the CFSEM Supporting Organization, which will (a) transfer such amounts for the purpose of funding the Retirement Systems upon the City's satisfaction of certain conditions and (b) not be subject to claims of creditors of the Community Foundation for Southeast Michigan.

#### 2. Transfer of DIA Assets

On the Effective Date, the City shall irrevocably transfer the DIA Assets to DIA Corp., as trustee, to be held in perpetual charitable trust, and within the City limits, for the primary benefit of the residents of the City and the Counties and the citizens of the State.

#### 3. Conditions to the Foundations' Participation

The Foundations' participation in the DIA Settlement is conditioned upon, among other things, the following: (a) the irrevocable commitment from the DIA Corp. described in Section IV.F.1 of the Plan; (b) the acceptance of the Plan by Classes 10 and 11; (c) the irrevocable transfer by the City of the DIA Assets described in Section IV.F.2 of the Plan; (d) the existence of appropriate governance and oversight structures at DIA Corp. that include representation of the City, the DIA Funding Parties and other stakeholders; (e) the earmarking of all funds provided by the DIA Funding Parties towards the recoveries upon Pension Claims under the Plan for Holders of Claims in Classes 10 and 11; (f) the existence of appropriate prospective governance and financial oversight mechanisms for the Retirement Systems; (g) the affirmation by County authorities of certain existing funding obligations with respect to DIA Corp.; (h) the approval of the DIA Settlement by the Attorney General for the State; (i) the agreement of the State to provide the State GRS Consideration and the State

PFRS Consideration in an aggregate amount up to $350 million; (j) the occurrence of the Confirmation Date no later than December 31, 2014; and (k) the City's agreement to indemnify and hold harmless the Foundations and the CFSEM Supporting Organization pursuant to, and in accordance with, the terms of the DIA Settlement Documents.

## H. Issuance of the New Securities

The City shall issue the New Securities on the Effective Date or a subsequent Distribution Date, as applicable. To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non bankruptcy law, the issuance of New Securities will be exempt from registration under the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder and any other applicable non-bankruptcy law or regulation.

## I. Cancellation of Existing Bonds and Bond Documents

Except (1) as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan, (2) for purposes of evidencing a right to Distribution under the Plan or (3) as specifically provided otherwise in the Plan, on the Effective Date, the Bonds and the Bond Documents will be deemed automatically cancelled, terminated and of no further force or effect against the City without any further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the parties, as applicable, under the Bonds and the Bond Documents shall be discharged; provided, however, that the Bond Documents shall continue in effect solely (i) to allow the Disbursing Agent to make any Distributions as set forth in the Plan and to perform such other necessary administrative or other functions with respect thereto, (ii) for any trustee, agent or similar entity under the Bond Documents to have the benefit of all the rights and protections and other provisions of the Bond Documents and all other related agreements with respect to priority in payment and lien rights with respect to any Distribution and (iii) as may be necessary to preserve any claim by a Bondholder and/or Bond Agent under a Bond Insurance Policy or against any Bond Insurer. Nothing in the Plan is intended to impair, modify, affect or otherwise alter the rights of Bondholders and/or Bond Agents with respect to claims under applicable Bond Insurance Policies and/or against the Bond Insurers.

## J. Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date, all Liens against the City's property will be deemed fully released and discharged, and all of the right, title and interest of any holder of such Liens, including any rights to any collateral thereunder, will revert to the City. As of the Effective Date, (1) the holders of such Liens will be authorized and directed to release any collateral or other property of the City (including any cash collateral) held by such Holder and to take such actions as may be requested by the City to evidence the release of such Lien, including the execution, delivery, filing or recording of such releases as may be requested by the City, and (2) the City shall be authorized to execute and file on behalf of creditors Form UCC-3 Termination Statements or such other forms as may be necessary or appropriate to implement the provisions of Section IV.I of the Plan.

## K. Professional Fee Reserve

On the Effective Date, the City shall establish and fund the Professional Fee Reserve. The Professional Fee Reserve shall be funded in an amount sufficient to pay the Fee Review Professional Fees that remain unpaid as of the Effective Date. The funds held in the Professional Fee Reserve may not be used for any purpose other than the payment of Fee Review Professional Fees until any and all disputes regarding the Fee Review Professional Fees, including any disputes arising under the Fee Review Order, have been fully and finally resolved pursuant to a Final Order or a stipulation between the disputing parties. Any amounts remaining in the Professional Fee Reserve after final resolution of all such disputes and the payment of all Fee Review Professional Fees determined to be reasonable in accordance with the Fee Review Order shall be released to the General Fund.

## L. Assumption of Indemnification Obligations

Notwithstanding anything otherwise to the contrary in the Plan, nothing in the Plan shall discharge or impair the obligations of the City as provided in the City Charter of the City or other organizational documents, resolutions, employment contracts, applicable law or other applicable agreements as of the Petition Date to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of officers and employees of the City (including without limitation the members of the City Council, the Mayor and the Emergency Manager) and their Related Entities, in

each case to the extent such Entities were acting in such capacity, against any claims or causes of action whether direct or derivative, liquidated or unliquidated, foreseen or unforeseen, asserted or unasserted.

**M.      Incorporation of Retiree Health Care Settlement**

The terms of the Retiree Health Care Settlement Agreement resolving the Retiree Health Care Litigation, as set forth on Exhibit I.A.220 to the Plan, are incorporated into the Plan by reference and shall be binding upon the parties thereto.

**N.      Exit Facility**

On the Effective Date, the City shall enter into the Exit Facility, as well as any ancillary notes, documents or agreements in connection therewith, including, without limitation, any documents required in connection with the creation or perfection of the liens securing the Exit Facility.

**O.      Provisions Regarding Distributions Under the Plan**

**1.      Appointment of Disbursing Agent**

The City may act as Disbursing Agent or may employ or contract with other Entities to act as the Disbursing Agent or to assist in or make the Distributions required by the Plan. Any Disbursing Agent appointed by the City will serve without bond. Other than as specifically set forth in the Plan, the Disbursing Agent shall make all Distributions required to be made under the Plan.

**2.      Distributions on Account of Allowed Claims**

Except as otherwise provided in the Plan, on the Effective Date or as soon as practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive from the Disbursing Agent the Distributions that the Plan provides for Allowed Claims in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Section VI.B of the Plan. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the Distributions provided for in the Plan, regardless of whether such Distributions are delivered on or at any time after the Effective Date. Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Distribution in excess of the Allowed amount of such Claim.

**3.      Certain Claims to Be Expunged**

Any Claim that has been or is hereafter listed in the List of Creditors as contingent, unliquidated or disputed, and for which no proof of Claim is or has been timely Filed, is not considered to be an Allowed Claim and shall be expunged without further action by the City and without further notice to any party or any action, approval or order of the Bankruptcy Court.

**4.      Record Date for Distributions; Exception for Bond Claims**

With the exception of Bond Claims, neither the City nor any Disbursing Agent will have any obligation to recognize the transfer of, or the sale of any participation in, any Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute only to those Holders of Allowed Claims (including Holders of Claims that become Allowed after the Distribution Record Date) that are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date. With the exception of the Bond Claims, the City and any Disbursing Agent shall instead be entitled to recognize and deal for all purposes under the Plan with only those record Holders stated on the official Claims Register as of the close of business on the Distribution Record Date. Unless otherwise set forth in the Confirmation Order, the City shall not establish a record date for Distributions to Holders of Bond Claims.

## 5. Means of Cash Payments

Except as otherwise specified herein, all Cash payments made pursuant to the Plan shall be in U.S. currency and made by check drawn on a domestic bank selected by the Disbursing Agent or, at the option of the Disbursing Agent, by wire transfer, electronic funds transfer or ACH from a domestic bank selected by the Disbursing Agent; *provided*, *however*, that Cash payments to foreign Holders of Allowed Claims may be made, at the option of the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

## 6. Selection of Distribution Dates for Allowed Claims

Except where the Plan requires the making of a Distribution on account of a particular Allowed Claim within a particular time, the Disbursing Agent shall have the authority to select Distribution Dates that, in the judgment of the Disbursing Agent, provide Holders of Allowed Claims with payments as quickly as reasonably practicable while limiting the costs incurred in the distribution process. Upon the selection of a Distribution Date by the Disbursing Agent, the Disbursing Agent shall File a notice of such Distribution Date that provides information regarding the Distribution to be made.

## 7. Limitations on Amounts to Be Distributed to Holders of Allowed Claims Otherwise Insured

No Distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the City's insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy; provided that, if the City believes a Holder of an Allowed Claim has recourse to an insurance policy and intends to direct the Disbursing Agent to withhold a Distribution pursuant to Section V.G of the Plan, the City shall provide written notice to such Holder regarding what the City believes to be the nature and scope of applicable insurance coverage. To the extent that one or more of the City's insurance carriers agrees to satisfy a Claim in full, then immediately upon such agreement such Claim may be expunged without a Claims objection having to be Filed and without any further notice or any action, order or approval of the Bankruptcy Court. Nothing in the Plan, including Section V.G of the Plan, shall constitute a waiver of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities that any Entity may hold against any other Entity other than the City, including the City's insurance carriers. For the avoidance of doubt, Section V.G of the Plan shall not apply to Bond Insurance Policies.

## 8. City's Rights of Setoff Preserved

Notwithstanding anything to the contrary in the Plan, pursuant to section 553 of the Bankruptcy Code or otherwise applicable non-bankruptcy law, the City may set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Allowed Claim the claims, rights and Causes of Action of any nature that the City may assert against the Holder of such Claim; *provided*, *however*, that neither the failure to effect a setoff nor the allowance of any Claim pursuant to the terms of the Plan shall constitute a waiver or release by the City of any claims, rights and Causes of Action that the City may assert against such Holder, all of which are expressly preserved.

## 9. Delivery of Distributions and Undeliverable or Unclaimed Distributions.

### (a) Delivery of Distributions Generally

Except as set forth in Section V.I.2 of the Plan, Distributions to Holders of Allowed Claims shall be made at the addresses set forth in the City's records unless such addresses are superseded by proofs of Claim or transfers of Claim Filed pursuant to Bankruptcy Rule 3001.

### (b) Delivery of Distributions on Account of Bond Claims

Distributions on account of the Bond Claims shall (i) be made by the Disbursing Agent to the Bond Agent under the applicable Bond Documents for the benefit of Holders of Bond Claims and (ii) be deemed completed when made by the Disbursing Agent to the Bond Agent as if such Distributions were made directly to the Holders of such Claims. The applicable Bond Agent, in turn, shall make such distributions to the applicable Holders pursuant to the terms and conditions of the applicable Bond Documents and subject to the respective rights, claims and interests, if any, that the Bond Agent may have under the applicable Bond Documents or otherwise to the recovery and/or reimbursement of their fees, costs and expenses (including the fees, costs and expenses of counsel and financial advisors) from any distribution hereunder, whether such rights, claims or interests are in the nature of a charging lien or otherwise. The Bond Agent shall

not be required to give any bond, surety or other security for the performance of its duties with respect to such Distributions.

### (c)    *De Minimis* Distributions / No Fractional New Securities

No distribution shall be made by the Disbursing Agent on account of an Allowed Claim if the amount to be distributed to the specific Holder of an Allowed Claim on the applicable Distribution Date has an economic value of less than $25.00.  No fractional New Securities shall be distributed.  Where a fractional portion of a New Security otherwise would be called for under the Plan, the actual issuance shall reflect a rounding down to the nearest whole New Security.

### (d)    Undeliverable or Unclaimed Distributions

In the event that any Distribution to any Holder is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such Distribution shall be made to such Holder without interest.

Any Holder of an Allowed Claim that does not claim an undeliverable or unclaimed Distribution within six months after the Effective Date shall be deemed to have forfeited its claim to such Distribution and shall be forever barred and enjoined from asserting any such claim against the City or its property.  In such cases, any Cash held by the City on account of such undeliverable or unclaimed Distributions shall become the property of the City free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary.  Any New Securities held for distribution on account of such Claims shall be canceled and of no further force or effect.  Nothing contained in the Plan shall require any Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

### (e)    Time Bar to Cash Payment Rights

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof.  Requests for reissuance of any check shall be made to the Disbursing Agent by the Holder of the Allowed Claim to whom such check originally was issued within 180 days after the date of the original check issuance.  After such date, the Claim of any Holder to the amount represented by such voided check shall be released and forever barred from assertion against the City and its property.

### 10.    Other Provisions Applicable to Distributions in All Classes

### (a)    No Postpetition Interest

Except as otherwise specifically provided for in the Plan, or required by applicable bankruptcy law, the City shall have no obligation to pay interest on an Allowed Claim accrued after the Petition Date and no Holder of a Claim shall be entitled to be paid interest accruing on or after the Petition Date on any Claim without regard to whether such amount has accrued for federal income tax purposes.  Any such interest that has been accrued and has not been paid by the City shall be cancelled as of the Effective Date for federal income tax purposes.

### (b)    Compliance with Tax Requirements

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the City and any Disbursing Agent shall comply with all Tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions under the Plan shall be subject to such withholding and reporting requirements. All such amounts withheld and paid to the appropriate governmental unit shall be treated as if made directly to the Holder of an Allowed Claim.  The City and the Disbursing Agent shall be authorized to take any actions that they determine, in their reasonable discretion, to be necessary or appropriate to comply with such withholding and reporting requirements, including withholding Distributions pending receipt of information necessary to facilitate such Distributions, or establishing any other mechanisms they believe are reasonable and appropriate.

Notwithstanding any other provision of the Plan, each Entity receiving or deemed to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any Tax imposed on such Entity on account of such Distribution, including income, withholding and other Tax obligations.  The City has the right, but not the obligation, to refuse, or to direct a Disbursing Agent to refuse, to make a Distribution until a Holder of an Allowed Claim has made arrangements satisfactory to the City and any Disbursing Agent for payment of any such Tax

obligations. The City may require, as a condition to making a Distribution, that the Holder of an Allowed Claim provide the City or any Disbursing Agent with a completed Form W-8, W-9 and/or other Tax information, certifications and supporting documentation, as applicable.

If the City makes such a request and the Holder of an Allowed Claim fails to comply before the date that is 180 days after the initial request is made, the amount of such Distribution shall irrevocably revert to the City and any Claim in respect of such Distribution shall be released and forever barred from assertion against the City and its property.

### (c)　　Allocation of Distributions

All Distributions to Holders of Allowed Claims that have components of principal and interest shall be deemed to apply first to the principal amount of such Claim until such principal amount is paid in full, and then the remaining portion of such Distributions, if any, shall be deemed to apply to any applicable accrued interest included in such Claim to the extent interest is payable under the Plan.

### (d)　　Surrender of Instruments

As a condition to participation under this Plan, the Holder of a note, debenture or other evidence of indebtedness of the City that desires to receive the property to be distributed on account of an Allowed Claim based on such note, debenture or other evidence of indebtedness shall surrender such note, debenture or other evidence of indebtedness to the City or its designee (unless such Holder's Claim will not be Impaired by the Plan, in which case such surrender shall not be required), and shall execute and deliver such other documents as are necessary to effectuate the Plan; provided, however, that, if a claimant is a Holder of a note, debenture or other evidence of indebtedness for which no physical certificate was issued to the Holder but which instead is held in book-entry form pursuant to a global security held by the Depository Trust Company or other securities depository or custodian thereof, the City or the applicable Bond Agent for such note, debenture or other evidence of indebtedness may waive the requirement of surrender. In the City's sole discretion, if no surrender of a note, debenture or other evidence of indebtedness occurs and the Holder of Claim does not provide an affidavit and indemnification agreement, in form and substance reasonably satisfactory to the City, that such note, debenture or other evidence of indebtedness was lost, then no distribution may be made to such Holder in respect of the Claim based on such note, debenture or other evidence of indebtedness. For the avoidance of doubt, no Bond, note, debenture or other evidence of indebtedness of the City shall be surrendered or deemed surrendered by the Plan to the extent necessary to make and/or preserve a claim under any Bond Insurance Policy or against any Bond Insurer.

## P.　　Procedures for Resolving Disputed Claims

### 1.　　Treatment of Disputed Claims

#### (a)　　General

No Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order (including the Confirmation Order) allowing such Claim. Notwithstanding any other provision of the Plan, no payments or Distributions shall be made on account of a Disputed Claim until such Claim becomes an Allowed Claim. Without limiting the foregoing in any way, no partial payments and no partial Distributions will be made with respect to a disputed, contingent or unliquidated Claim, or with respect to any Claim for which a proof of Claim has been Filed but not Allowed, until the resolution of such disputes or estimation or liquidation of such Claim by settlement or by Final Order.

#### (b)　　ADR Procedures

At the City's option, any Disputed Claim designated or eligible to be designated for resolution through the ADR Procedures may be submitted to the ADR Procedures in accordance with the terms thereof and the ADR Procedures Order. For the avoidance of doubt, the designation of a Disputed Claim for resolution through the ADR Procedures, either prior to or after the Effective Date, will not modify, and will not be deemed to have modified, the terms of any injunction imposed pursuant to the ADR Procedures Order. Disputed Claims not resolved through the ADR Procedures will be resolved pursuant to the Plan.

### (c) Tort Claims

At the City's option, any unliquidated Tort Claim (as to which a proof of Claim was timely Filed in the Chapter 9 Case) not resolved through the ADR Procedures or pursuant to a Final Order of the Bankruptcy Court will be determined and liquidated in the administrative or judicial tribunal(s) in which it is pending on the Effective Date (subject to the City's right to seek removal or transfer of venue) or, if no action was pending on the Effective Date, in an administrative or judicial tribunal of appropriate jurisdiction selected by the City that (i) has personal jurisdiction over the parties, (ii) has subject matter jurisdiction over the Tort Claim and (iii) is a proper venue. The City may exercise the above option by service upon the Holder of the applicable Tort Claim of a notice informing such Holder that the City has exercised such option (which notice shall be deemed to satisfy the notice requirements of Section I.B of the ADR Procedures). Upon the City's service of such notice, the Chapter 9 Stay or, after the Effective Date, the Plan Injunction, will be deemed modified, without the necessity for further Bankruptcy Court approval or any further action by the City, solely to the extent necessary to allow the parties to determine or liquidate the Tort Claim in the applicable administrative or judicial tribunal(s); *provided* that nothing contained in this Section will modify, or will be deemed to have modified, the terms of the Stay Extension Order with respect to any Tort Claim prior to the City having served notice of its intent to determine and liquidate such Tort Claim pursuant to this Section. If the City does not serve such a notice upon a Holder of a Tort Claim by the Claims Objection Bar Date, such Holder may file a motion with the Bankruptcy Court seeking relief from the Plan Injunction to liquidate and determine its Claim.

Any Tort Claim determined and liquidated pursuant to these procedures and applicable non-bankruptcy law that is no longer appealable or subject to review will be deemed an Allowed Claim, provided that only the amount of such Allowed Tort Claim that is not satisfied from proceeds of insurance payable to the Holder of such Allowed Tort Claim will be treated as an Allowed Claim for the purposes of distributions under the Plan. Distributions on account of any such Allowed Tort Claim shall be made in accordance with the Plan. Nothing contained in this Section will constitute or be deemed a waiver of any claim, right or Cause of Action that the City may have against any Entity in connection with or arising out of any Tort Claim, including any rights under section 157(b)(5) of title 28 of the United States Code. All claims, demands, rights, defenses and Causes of Action that the City may have against any Entity in connection with or arising out of any Tort Claim are expressly retained and preserved.

### 2. Disputed Claims Reserve

On and after the Effective Date, until such time as all Disputed Claims have been compromised and settled or determined by Final Order and before making any Distributions, consistent with and subject to section 1123(a)(4) of the Bankruptcy Code, the City shall establish and maintain a reserve (the "Disputed Claims Reserve") of property equal to the Distributions to which Holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims in the Face Amount of such Disputed Claims or such lesser amount as required by an order of the Bankruptcy Court.

On the first Distribution Date that is at least 30 days (or such fewer days as may be agreed to by the City in its sole discretion) after the date on which a Disputed Claim becomes an Allowed Claim, the Disbursing Agent shall remit to the Holder of such Allowed Claim any Distributions such Holder would have been entitled to under the Plan on account of such Allowed Claim had such Claim been Allowed as of the Effective Date. If a Disputed Claim is disallowed by Final Order, the property reserved on account shall become available for Distribution to the Holders of Allowed Claims within the Class(es) entitled to receive such property. Each Holder of a Disputed Claim that ultimately becomes an Allowed Claim will have recourse only to the assets held in the Disputed Claims Reserve and not to any other assets held by the City, its property or any property previously distributed on account of any Allowed Claim. Notwithstanding the foregoing, the Disputed Claims Reserve established pursuant to Section VI.B of the Plan shall not include any reserve of property on account of Disputed COP Claims, which shall receive the treatment set forth in Section II.B.3.s.iii of the Plan.

### 3. Objections to Claims

### (a) Authority to Prosecute, Settle and Compromise

The City's rights to object to, oppose and defend against all Claims on any basis are fully preserved. Except as otherwise provided in Section II.B.3.s.i of the Plan with respect to Disputed COP Claims, as of the Effective Date, objections to, and requests for estimation of, all Claims may be interposed and prosecuted only by the City.

The City may object to any Claims not previously Allowed by an order of the Bankruptcy Court or pursuant to the Plan prior to the Claims Objection Bar Date.  Except as otherwise provided in Section II.B.3.s.i of the Plan with respect to Disputed COP Claims, as of the Effective Date, only the City shall have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims, including pursuant to any alternative dispute resolution or similar procedures approved by the Bankruptcy Court.  On and after the Effective Date, the City may settle or compromise any Disputed Claim or any objection or controversy relating to any Claim without any further notice or any action, order or approval of the Bankruptcy Court.

### (b)      Application of Bankruptcy Rules

To facilitate the efficient resolution of Disputed Claims, the City shall be permitted to File omnibus objections to Claims notwithstanding Bankruptcy Rule 3007(c).

### (c)      Expungement or Adjustment of Claims Without Objection

Any Claim that has been paid, satisfied or superseded shall be expunged from the Claims Register by the Claims and Balloting Agent at the request of the City, and any Claim that has been amended by the Holder of such Claim shall be adjusted on the Claims Register by the Claims and Balloting Agent at the request of the City, without the Filing of an objection and without any further notice or any action, order or approval of the Bankruptcy Court.

### (d)      Deadline to File Objections to Claims

Any objections to Claims shall be Filed no later than the Claims Objection Bar Date.  Upon motion to the Bankruptcy Court, the City may request, and the Bankruptcy Court may grant, an extension to the Claims Objection Bar Date generally or with respect to specific Claims.  Any extension granted by the Bankruptcy Court shall not be considered to be a modification to the Plan under section 1127 of the Bankruptcy Code.

### (e)      Claims Estimation

At any time the City may request that the Bankruptcy Court estimate (i) any Disputed Claim pursuant to applicable law and (ii) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, regardless of whether the City has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection.

Notwithstanding any other provision of the Plan, a Claim that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  Except as set forth below with respect to reconsideration under section 502(j) of the Bankruptcy Code, in the event that the Bankruptcy Court estimates any Disputed Claim, contingent Claim or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan, including for purposes of Distributions.  If the estimated amount constitutes a maximum limitation on such Claim, the City may elect to pursue any supplemental proceedings to object to any ultimate Distribution on account of such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated.  All of the aforementioned Claims and objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

## VII.

## VOTING REQUIREMENTS

The Disclosure Statement Order, the notice of the Confirmation Hearing and the instructions attached to your Ballot should be read in connection with this section of this Disclosure Statement as they set forth in detail, among other things, procedures governing voting deadlines and objection deadlines.

If you have any questions about the procedure for voting your Claim, the solicitation packet of materials you received, or if you wish to obtain a paper copy of the Plan, this Disclosure Statement or any Exhibits to such documents, please contact the Balloting Agent (A) by telephone (1) for U.S. and Canadian callers toll-free at 877-298-6236 and (2) for international callers at +1 310-751-2658; or (B) in writing at City of Detroit c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245.

## A. Voting Deadline

This Disclosure Statement and the appropriate Ballot(s) are being distributed to all holders of Claims that are entitled to vote on the Plan. In order to facilitate vote tabulation, there is a separate Ballot designated for each impaired voting Class; however, all Ballots are substantially similar in form and substance, and the term "Ballot" is used without intended reference to the Ballot of any specific Class of Claims or Interests.

IN ACCORDANCE WITH THE DISCLOSURE STATEMENT ORDER, TO BE CONSIDERED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN, ALL BALLOTS MUST BE RECEIVED BY THE BALLOTING AGENT NO LATER THAN [_____].M. (EASTERN TIME) ON [_____], 2014. ONLY THOSE BALLOTS ACTUALLY RECEIVED BY THE BALLOTING AGENT BEFORE THE VOTING DEADLINE WILL BE COUNTED AS EITHER ACCEPTING OR REJECTING THE PLAN. NO BALLOTS MAY BE SUBMITTED BY FACSIMILE OR ELECTRONIC MAIL, AND ANY BALLOTS SUBMITTED BY FACSIMILE OR ELECTRONIC MAIL WILL NOT BE ACCEPTED BY THE BALLOTING AGENT.

## B. Holders of Claims Entitled to Vote

Under section 1124 of the Bankruptcy Code, a class of claims is deemed to be "impaired" under a plan unless (1) the plan leaves unaltered the legal, equitable and contractual rights to which such claim entitles the holder thereof; or (2) notwithstanding any legal right to an accelerated payment of such claim, the plan (a) cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy), (b) reinstates the maturity of such claim as it existed before the default, (c) compensates the holder of such claim for any damages resulting from such holder's reasonable reliance on such legal right to an accelerated payment, and (d) does not otherwise alter the legal, equitable or contractual rights to which such claim entitles the holder of such claim.

In general, a holder of a claim may vote to accept or reject a plan if (1) the claim is "allowed," which means generally that it is not disputed, contingent or unliquidated, and (2) the claim is impaired by a plan. However, if the holder of an impaired claim will not receive any distribution under the plan in respect of such claim, the Bankruptcy Code deems such holder to have rejected the plan and provides that the holder of such claim is not entitled to vote. If the claim is not impaired, the Bankruptcy Code conclusively presumes that the holder of such claim has accepted the plan and provides that the holder is not entitled to vote.

Except as otherwise provided in the Disclosure Statement Order, the holder of a Claim that is "impaired" under the Plan is entitled to vote to accept or reject the Plan if (1) the Plan provides a distribution in respect of such Claim, (2) the Claim has been scheduled by the City (and is not scheduled as disputed, contingent, or unliquidated), (3) the holder of such Claim has timely filed a proof of Claim, or (4) a proof of Claim was deemed timely filed by an order of the Bankruptcy Court prior to the Voting Deadline. AS SET FORTH IN THE NOTICE OF THE CONFIRMATION HEARING AND IN THE DISCLOSURE STATEMENT ORDER, OTHER HOLDERS OF CLAIMS MUST FILE MOTIONS TO HAVE THEIR CLAIMS TEMPORARILY ALLOWED FOR VOTING PURPOSES ON OR BEFORE [_____], 2014.

A vote on the Plan may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code. The Disclosure Statement Order also sets forth assumptions and procedures for tabulating Ballots that are not completed fully or correctly.

## C. Vote Required for Acceptance by a Class

A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have voted on the Plan in accordance with the Disclosure Statement Order.

## D.    Voting Procedures

### 1.    Ballots

All votes to accept or reject the Plan with respect to any Class of Claims must be cast by properly submitting the duly completed and executed form of Ballot designated for such Class.  Holders of impaired Claims voting on the Plan should complete and sign the Ballot in accordance with the instructions thereon, being sure to check the appropriate box entitled "Accept the Plan" or "Reject the Plan."

ANY BALLOT RECEIVED WHICH DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR WHICH INDICATES BOTH ACCEPTANCE AND REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF DETERMINING ACCEPTANCE OR REJECTION OF THE PLAN.

ANY BALLOT RECEIVED WHICH IS NOT SIGNED OR WHICH CONTAINS INSUFFICIENT INFORMATION TO PERMIT THE IDENTIFICATION OF THE CLAIMANT WILL BE AN INVALID BALLOT AND WILL NOT BE COUNTED FOR PURPOSES OF DETERMINING ACCEPTANCE OR REJECTION OF THE PLAN.

Ballots must be delivered to the Balloting Agent, at its address set forth above, and received by the Voting Deadline.  THE METHOD OF SUCH DELIVERY IS AT THE ELECTION AND RISK OF THE VOTER.  If such delivery is by mail, it is recommended that voters use an air courier with a guaranteed next day delivery or registered mail, properly insured, with return receipt requested.  In all cases, sufficient time should be allowed to ensure timely delivery.  No Ballots may be submitted by facsimile or electronic mail, and any ballots submitted by facsimile or electronic mail will not be accepted by the Balloting Agent.

In accordance with Bankruptcy Rule 3018(c), the Ballots are based on Official Form No. 14, but have been modified to meet the particular needs of this chapter 9 case.  PLEASE CAREFULLY FOLLOW THE DIRECTIONS CONTAINED ON EACH ENCLOSED BALLOT.

The Ballot enclosed with this Disclosure Statement may be encoded with the amount of the Allowed Claim for voting purposes (if the Claim is a Disputed Claim, this amount may not be the amount ultimately allowed for purposes of Distribution) and the Class into which the Claim has been placed under the Plan.

### 2.    Beneficial Owners of Old Securities

If you are the beneficial owner of any DWSD Bonds, DWSD Revolving Bonds, Secured GO Bonds, Parking Bonds, COPs, Unlimited Tax General Obligation Bonds, or Limited Tax General Obligation Bonds (collectively, the "Old Securities") and hold them in your own name, you can vote by completing and signing the enclosed Ballot and returning it directly to the Balloting Agent using the enclosed pre-addressed, postage prepaid envelope.

If you hold Old Securities in "street name" (*i.e.*, through a brokerage firm, commercial bank, trust company or other nominee) or an authorized signatory (a brokerage firm or other intermediary having power of attorney to vote on behalf of a beneficial owner), you can vote by following the instructions set forth below:

- Fill in all the applicable information on the Ballot;

- Sign the Ballot (unless the ballot has already been signed by the bank, trust company or other nominee); and

- Return the Ballot to the address indicated on the Ballot.

If you hold your Old Securities in street name, you should return your Ballot no later than [_____], 2014 to provide sufficient time for your brokerage firm, commercial bank, trust company or other nominee, or the agent thereof, to process and tally your Ballot and deliver it to the Balloting Agent by the Voting Deadline.

You may receive multiple mailings of this Disclosure Statement, especially if you own Old Securities through more than one brokerage firm, commercial bank, trust company or other nominee.  If you submit more than one Ballot for a Class because you beneficially own the securities in that Class through more than one broker or bank, you must indicate in

the appropriate item of the Ballot(s) the names of ALL broker dealers or other intermediaries who hold securities for you in the same Class.

Authorized signatories voting on behalf of more than one beneficial owner must complete a separate Ballot for each such beneficial owner. Any Ballot submitted to a brokerage firm or proxy intermediary will not be counted until the brokerage firm or proxy intermediary (a) properly executes the Ballot(s) and delivers them to the Balloting Agent, or (b) properly completes and delivers a corresponding Master Ballot to the Balloting Agent.

By voting on the Plan, you are certifying that you are the beneficial owner of the Old Securities being voted or an authorized signatory for the beneficial owner. Your submission of a Ballot will also constitute a request that you (or in the case of an authorized signatory, the beneficial owner) be treated as the record holder of those securities for purposes of voting on the Plan.

3. **Brokerage Firms, Banks and Other Nominees**

A brokerage firm, commercial bank, trust company or other nominee that is the registered holder of an Old Security for a beneficial owner, or that is a participant in a securities clearing agency and is authorized to vote in the name of the securities clearing agency pursuant to an omnibus proxy and is acting for a beneficial owner, can vote on behalf of such beneficial owner by:

- distributing a copy of this Disclosure Statement and all appropriate Ballots to the beneficial owner;

- collecting all such Ballots;

- completing a Master Ballot compiling the votes and other information from the Ballots collected; and

- transmitting the completed Master Ballot to the Balloting Agent.

A proxy intermediary acting on behalf of a brokerage firm or bank may follow the procedures outlined in the preceding sentence to vote on behalf of the beneficial owner.

If you are entitled to vote and you did not receive a Ballot, received a damaged Ballot or lost your Ballot, please contact the Balloting Agent in the manner set forth above.

4. **Withdrawal or Change of Votes on the Plan**

A Ballot may be withdrawn by delivering a written notice of withdrawal to the Balloting Agent, so that the Balloting Agent receives the notice prior to the Voting Deadline. Thereafter, withdrawal may be effected only with the approval of the Bankruptcy Court.

To be valid, a notice of withdrawal must (a) specify the name of the holder who submitted the Ballot to be withdrawn, (b) contain a description of the Claim(s) to which it relates and (c) be signed by the Holder in the same manner as on the Ballot. The City expressly reserves the absolute right to contest the validity of any such withdrawals of votes on the Plan.

Any Holder who has submitted a properly completed Ballot to the Balloting Agent prior to the Voting Deadline may change its vote by submitting to the Balloting Agent prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan. In the case where more than one timely, properly completed Ballot is received with respect to the same Claim, the Ballot that will be counted for purposes of determining whether sufficient acceptances required to confirm the Plan have been received will be the Ballot that the Balloting Agent determines was the last to be received.

5. **Voting Multiple Claims**

Separate forms of Ballots are provided for voting the various Classes of Claims. A *separate* Ballot must be used for each Claim. Any Entity that holds Claims in more than one Class is required to vote separately with respect to each Claim. Please sign, and return in accordance with the instructions in this section, a separate Ballot with respect to each such Claim. However, holders of Claims are required to vote all of their Claims within a particular Class under the Plan

and may not split their votes. In the event that a Ballot or a group of Ballots within a Class received from a single creditor partially rejects and partially accepts the Plan, such Ballots will *not* be accepted or counted. Ballots partially accepting and partially rejecting the Plan may be objected to by the City as Ballots not cast in good faith. Only Ballots with original signatures will be accepted. Ballots with copied signatures will *not* be accepted or counted.

###### 6. Voting Transferred Claims

The transferee of a transferred Claim is entitled to receive a Solicitation Package and cast a Ballot on account of such transferred Claim only if (a) all actions necessary to effect the transfer of the Claim pursuant to Bankruptcy Rule 3001(e) have been completed or (b) the transferee files by the Voting Record Date: (i) documentation required by Bankruptcy Rule 3001(e) to evidence the transfer and (ii) a sworn statement of the transferor supporting the validity of the transfer. Where a portion of a single Claim has been transferred to a transferee, all holders of any portion of such single Claim will be (a) treated as a single creditor for purposes of the numerosity requirements in section 1126(c) of the Bankruptcy Code (and for the other voting and solicitation procedures set forth in the Disclosure Statement Order) and (b) required to vote every portion of such Claim collectively to either accept or reject the Plan. In the event that a group of Ballots received from the various holders of multiple portions of a single Claim partially rejects and partially accepts the Plan, such Ballots will *not* be accepted or counted.

## VIII.

## CONFIRMATION OF THE PLAN

### A. Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to conduct a Confirmation Hearing at which it will hear objections (if any) and consider evidence with respect to whether the Plan should be confirmed. At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 943(b) of the Bankruptcy Code described below are met.

The Confirmation Hearing has been scheduled to begin on **[_____]**, 2014, at **[_____]** Eastern Time before the Honorable Steven W. Rhodes, United States Bankruptcy Judge, United States Bankruptcy Court for the Eastern District of Michigan, **[courtroom and address]**. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

### B. Deadline to Object to Confirmation

Objections, if any, to the confirmation of the Plan must: (1) be in writing; (2) state the name and address of the objecting party and the nature of the Claim of such party; (3) state with particularity the basis and nature of any objection; and (4) be filed with the Bankruptcy Court, and served on the following parties so that they are received no later than **[___]** p.m., Eastern Time, on **[_____]**, 2014: (a) the City, c/o Kevyn D. Orr, Emergency Manager, 2 Woodward Avenue, Suite 1126, Detroit, Michigan 48226; (b) counsel to the City, JONES DAY, 555 South Flowers Street, Fiftieth Floor, Los Angeles, California 90071 (Attn: Bruce Bennett, Esq.); JONES DAY, North Point, 901 Lakeside Avenue, Cleveland, Ohio 44114 (Attn: David G. Heiman, Esq., Heather Lennox, Esq. and Thomas A. Wilson, Esq.); (c) counsel to the City, MILLER, CANFIELD, PADDOCK AND STONE, P.L.C., 150 West Jefferson, Suite 2500, Detroit, Michigan 48226 (Attn: Jonathan S. Green, Esq. and Stephen S. LaPlante, Esq.). For purposes of filing objections in these cases, the address of the Bankruptcy Court is 211 West Fort Street, Detroit, Michigan 48226. Attorneys may also file pleadings on the Bankruptcy Court's Document Filing System (ECF) by completing and submitting the Electronic Filing Registration Form, available at *http://www.mieb.uscourts.gov/ecf-registration*.

### C. Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 943(b) of the Bankruptcy Code are met. Among the requirements for Confirmation are that the Plan (1) is accepted by the requisite holders of impaired Classes of Claims or, if not so accepted, is "fair and equitable" and does not discriminate unfairly as to the non-accepting class, (2) is in the "best interests" of each holder of a Claim and each impaired Class under the Plan, (3) is feasible, and (4) complies with the applicable provisions of the Bankruptcy Code.

1. **Acceptance or Cramdown**

A Plan is accepted by an impaired Class of Claims if holders of two-thirds in dollar amount and a majority in number of Allowed Claims of that Class vote to accept the Plan. Only those holders of Claims who actually vote to accept or reject the Plan count in the tabulation. The impaired Classes must accept the Plan in order for the Plan to be confirmed without application of the "cramdown" test contained in sections 1129(b)(i), (b)(2)(A) and (b)(2)(B) of the Bankruptcy Code.

    **(a)    Cramdown**

The Bankruptcy Code provides that the Bankruptcy Court may confirm a Plan that is not accepted by all impaired classes if at least one impaired Class of Claims accepts the Plan and the so-called "cramdown" provisions set forth in sections 1129(b)(l), (b)(2)(A) and (b)(2)(B) of the Bankruptcy Code are satisfied. The Plan may be confirmed under the cramdown provisions if, in addition to satisfying the other requirements of section 943(b) of the Bankruptcy Code, it (i) is "fair and equitable" and (ii) does not discriminate unfairly with respect to each Class of Claims that is impaired under and has not accepted the Plan. The City believes that the Plan and the treatment of all Classes of Claims under the Plan satisfy the following requirements for nonconsensual confirmation of the Plan.

    **i.    "Fair and Equitable"**

The "fair and equitable" standard, also known as the "absolute priority rule," requires, among other things, that unless a dissenting unsecured Class of Claims receives payment in full for its Allowed Claims, no holder of Allowed Claims in any class junior to that Class may receive or retain any property on account of such Claims. The Bankruptcy Code establishes different "cramdown" tests for determining whether a plan is "fair and equitable" to dissenting impaired classes of secured creditors and unsecured creditors holders as follows:

- *Secured Creditors.* A plan is fair and equitable to a class of secured claims that rejects the plan if the plan provides: (A) that each of the holders of the secured claims included in the rejecting class (1) retains the liens securing its claim to the extent of the allowed amount of such claim, whether the property subject to those liens is retained by the debtor or transferred to another entity, and (2) receives on account of its secured claim deferred cash payments having a present value, as of the effective date of the plan, at least equal to such holder's interest in the estate's interest in such property; (B) that each of the holders of the secured claims included in the rejecting class realizes the "indubitable equivalent" of its allowed secured claim; or (C) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of such liens with such liens to attach to the proceeds of the sale, and the treatment of such liens on proceeds in accordance with clause (A) or (B) of this paragraph.

- *Unsecured Creditors.* A plan is fair and equitable as to a class of unsecured claims that rejects the plan if the plan provides that: (A) each holder of a claim included in the rejecting class receives or retains under the plan, property of a value, as of the effective date of the plan, equal to the amount of its allowed claim; or (B) the holders of claims and interests that are junior to the claims of the rejecting class will not receive or retain any property under the plan.

The City believes the Plan is fair and equitable as to secured creditors holding claims in Classes 1A, 1B, 1C, 1D because the Plan provides that each such creditor will receive on or as soon as reasonably practicable after the Effective Date either: (A) New GLWA Bonds, New Existing Rate GLWA Bonds, New DWSD Bonds or New Existing Rate DWSD Bonds having a principal amount equal to the principal amount of such creditor's applicable allowed secured claim in such Classes secured by a Lien on, as applicable, GLWA or DWSD assets/revenues in the same priority as such creditor's allowed secured claim; or (B) cash in the full amount of such creditor's allowed secured claim.

The City believes the Plan is fair and equitable as to secured creditors in Classes 1E and 1F, because the Plan provides that each such creditor will receive on or as soon as reasonably practicable after the Effective Date New GLWA Revolving Bonds or New DWSD Revolving Bonds having a principal amount equal to the principal amount of such creditor's applicable allowed secured claim in such Classes secured by a Lien on, as applicable, GLWA or DWSD assets/revenues in the same priority as such creditor's allowed secured claim.

The City believes the Plan is fair and equitable as to secured creditors in Classes 2A, 2B, 2C, 2D, 2E, 2F, 3, 4 and 6 because the Plan provides that their Claims will be either unimpaired or they will receive their entitlements under the Bankruptcy Code.

The City believes the Plan will be fair and equitable as to creditors in Class 5 when the treatment of Claims in Class 5 has been finally determined.

The City also believes the Plan is fair and equitable as to the holders of unsecured claims in Classes 7, 8, 9, 10, 11, 12, 13, 14 and 15 because the Plan provides that no holder of any claim junior to these Classes will receive or retain any property under the Plan.

### ii.     Unfair Discrimination

A plan of reorganization does not "discriminate unfairly" if a dissenting class is treated substantially equally with respect to other classes similarly situated, and no class receives more than it is legally entitled to receive for its claims. The City does not believe that the Plan discriminates unfairly against any impaired Class of Claims.

**IN THE EVENT OF REJECTION OF THE PLAN BY ONE OR MORE IMPAIRED CLASSES, THE CITY RESERVES THE RIGHT TO REQUEST THE BANKRUPTCY COURT TO CONFIRM THE PLAN IN ACCORDANCE WITH SECTION 1129(b)(1), (b)(2)(A) AND (b)(2)(B) OF THE BANKRUPTCY CODE. THE CITY HAS RESERVED THE RIGHT TO MODIFY THIS PLAN TO THE EXTENT, IF ANY, THAT CONFIRMATION OF THIS PLAN UNDER SECTIONS 943 AND 1129(b) OF THE BANKRUPTCY CODE REQUIRES MODIFICATION.**

### (b)     The "Best Interests of Creditors" Test

Notwithstanding acceptance of the Plan by each impaired Class of Claims, the Bankruptcy Court also must determine that the Plan is in the best interests of creditors pursuant to section 943(b)(7) of the Bankruptcy Code. To satisfy this "best interests of creditors" test, a chapter 9 debtor must establish that confirmation of its proposed plan of adjustment, more likely than not, would leave the debtor's creditors in a better position than would dismissal of the debtor's chapter 9 bankruptcy case. Because the failure of plan confirmation and dismissal of a chapter 9 debtor's bankruptcy case, in most instances, would result in a race to the courthouse that would leave many creditors with no recovery at all, the best interests of creditors test is a flexible standard that is less stringent than a test requiring that a plan be "fair and equitable."

A chapter 9 debtor satisfies the best interests of creditors test if its plan of adjustment makes a reasonable effort to provide a recovery for creditors. The best interests of creditors test does not require a chapter 9 debtor to increase taxes above reasonable levels to maximize creditor recoveries. Similarly, the best interest of creditors test does not prohibit a municipal debtor from retaining sufficient levels of cash and other assets that it may reasonably require to (i) provide adequate levels of services, (ii) make necessary improvements and (iii) maintain its property and continue normal operations. Although the debtor bears the burden of proving, by a preponderance of the evidence, that its plan of adjustment satisfies the best interests of creditors test, the Bankruptcy Court must limit any examination of a municipal debtor's ability to pay creditors so as to not "interfere with" the "political or governmental powers of the debtor," the debtor's "property or revenues" or "the debtor's use or enjoyment of any income producing property," as directed by section 904 of the Bankruptcy Code.

The City believes that its Plan plainly satisfies the best interest of creditors test set forth at section 943(b)(7) of the Bankruptcy Code. Confirmation of the Plan relieves the City of a substantial portion of its crushing debt burden and provides the City with the opportunity to implement the restructuring initiatives (as discussed at Section IX and described in detail at Exhibit I). In the absence of confirmation and the fresh start it promises, the City, its stakeholders and, importantly, its residents are compelled to return to the downward spiral that produced this chapter 9 filing. The adverse consequences attendant upon a dismissal of the chapter 9 case are legion, and moreover ensure continued deterioration of the City:

- Recoveries for the City's stakeholders diminish to practically nothing. As set forth in the Declaration of Kevyn D. Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (Docket No. 10), filed contemporaneously with the City's chapter 9 petition on July 18, 2013, in the absence of financial restructuring, (i) payments due on the City's general obligation debt, the COPs and retiree pension and health obligations will consume approximately 65% of the City's general

fund revenues by Fiscal Year 2017 and (ii) the City's net cash position will be hundreds of millions of dollars in the red in the coming Fiscal Years, among sundry other negative economic consequences. Under such dire circumstances, recoveries may be denied altogether for substantial portions of the City's creditor constituency. Put simply, the City cannot distribute cash it does not have to its creditors. As but one example, if the plan is not confirmed and the City's chapter 9 case is dismissed, the City projects that the assets of the Retirement Systems will be exhausted within 10 to 13 years, effectively depriving the City's active and retired employees of all pension benefits.

- The $1.50 billion in gross reinvestment contemplated by the City discussed in Section IX evaporates and the substantial benefits promised thereby are lost to the City and its 685,000 residents. Proposed investments in and improvements to the DPD, the DFD, lighting, the City's information technology infrastructure and its tax collection abilities (to name just a few) are irretrievably lost. The absence of this reinvestment deprives the City both of badly needed short-term relief and the opportunity to lay the foundation for long-terrm prosperity, ensuring inadequate provision of municipal services to the City's residents for the foreseeable future.

- The City returns to being an unattractive investment for financial, business and human capital. The City's access to further financing will be essentially non-existent and both business owners and residents will be reluctant to stay in, or relocate to, the City. Detroit has been expereiencing the consequences of similar disincentives for decades, with a dwindling population and business base resulting in a diminished tax base and plummeting revenue which in turn lead to draconian cuts in City services.

The foregoing demonstrates the simple proposition that prompted the City's chapter 9 filing in the first instance: *there is no non-bankruptcy solution to the problems facing the City, its stakeholders and its residents*. The Plan embodies the City's attempt to provide Claimants with the highest possible recovery (consistent with their relative rights against the City) while allowing for the reinvestment which is the foundation of a revitalized City able to pay its adjusted debts and provide basic services to its citizens going forward. Accordingly, the City believes that the Plan satisfies the "best interest of creditors" test set forth at section 943(b)(7) of the Bankruptcy Code.

### (c) Feasibility

Section 943(b)(7) of the Bankruptcy Code also requires that a plan of adjustment be feasible. While the best interests of creditors test establishes a "floor" with respect to how much a chapter 9 debtor can be expected to pay creditors under a plan of adjustment, the feasibility standard of section 943(b)(7) of the Bankruptcy Code imposes a "ceiling" on creditor recoveries under such a plan. To satisfy the feasibility requirement, a chapter 9 debtor must demonstrate, by a preponderance of the evidence, that it has the ability to make the payments set forth in the proposed plan of adjustment while also maintaining sufficient assets to (i) provide adequate levels of municipal services, (ii) fund normal municipal operations and (iii) remain financially viable after the conclusion of the chapter 9 case and during the contemplated payment period.

To determine whether a proposed plan of adjustment satisfies the feasibility standard of section 943(b)(7) of the Bankruptcy Code, a bankruptcy court must analyze the debtor's income and expense projections. A plan of adjustment is feasible if the debtor's income and expense projections (i) are realistic, reliable and not unreasonably optimistic and (ii) the plan is workable and appears to have a reasonable prospect of success; *i.e.*, it appears reasonably probable that the debtor will be able to make the payments to creditors contemplated in the plan of adjustment while maintaining adequate levels of municipal services. As with the determination of whether a plan of adjustment satisfies the best interests of creditors test, the scope of the bankruptcy court's inquiry into the feasibility of a plan of adjustment is limited by section 904 of the Bankruptcy Code. Accordingly, the feasibility inquiry is relatively narrow. The bankruptcy court must simply (i) determine whether the debtor's projected revenues and expenses are reasonable and (ii) if so, decide whether the debtor will be able to make the contemplated payments while providing adequate services to residents and avoiding a recurrence of the type of financial distress that caused the debtor to commence its chapter 9 case.

For purposes of determining whether the Plan meets this requirement, the City has prepared (i) a detailed analysis of its proposed ten-year, $1.5 billion reinvestment in various City departments and infrastructure (as set forth on Exhibit I hereto), which reinvestment lays the long-term foundation for a prosperous Detroit and enables the City to once again provide its residents with adequate levels of municipal services and (ii) ten-year financial projections (as set forth in greater detail in Section XI ("Projected Financial Information") and Exhibit J) that demonstrate the City's ability to fulfill its obligations under the Plan – and to its residents – on a prospective basis. The City believes that (i) its reinvestment

initiative is indispensible to fulfilling the purpose of this Chapter 9 Case and (ii) its financial projections (and its underlying assumptions) are reasonable and demonstrate a probability that the City will be able to satisfy its obligations under the Plan and otherwise while avoiding financial distress. Accordingly, the City believes that the Plan meets the feasibility requirement of section 943(b)(7) of the Bankruptcy Code.

### (d) Compliance With Applicable Provisions of the Bankruptcy Code

In addition to the foregoing, the Plan must comply with other applicable provisions of the Bankruptcy Code, as follows:

- The Plan must comply with the provisions of the Bankruptcy Code made applicable by sections 103(e) and 901 of the Bankruptcy Code (11 U.S.C. § 943(b)(l));

- The Plan must comply with the provisions of chapter 9 (11 U.S.C. § 943(b)(2));

- All amounts to be paid by the City or by any person for services or expenses in the City's chapter 9 case or incident to the Plan must be fully disclosed and must be reasonable (11 U.S.C. § 943(b)(3));

- The City must not be prohibited by law from taking any action necessary to carry out the Plan (11 U.S.C. § 943(b)(4));

- Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan must provide that, on the Effective Date, each holder of a Claim of a kind specified in section 507(a)(2) of the Bankruptcy Code will receive on account of such Claim cash equal to the allowed amount of such Claim (11 U.S.C. § 943(b)(5));

- Any regulatory or electoral approval necessary under applicable non-bankruptcy law in order to carry out any provision of the Plan must be obtained, or such provision must be expressly conditioned upon such approval (11 U.S.C. § 943(b)(6));

- The City, as the proponent of the Plan, must have complied with all provisions of the Bankruptcy Code (11 U.S.C. § 1129(a)(2));

- The Plan must have been proposed in good faith and not by any means forbidden by law (11 U.S.C. § 1129(a)(3)); and

- Any governmental regulatory commission with jurisdiction, after confirmation of the Plan, over the rates of the City must have approved any rate change provided for in the Plan, or such rate change is expressly conditioned on such approval (11 U.S.C. § 1129(a)(6)).

### 2. Alternatives to Confirmation and Consummation of the Plan

The City has evaluated numerous alternatives to the Plan, including alternative structures and terms of the Plan and delaying the adoption thereof. While the City has concluded that the Plan is the best alternative and will maximize recoveries by holders of Claims, if the Plan is not confirmed, the City could attempt to formulate and propose a different plan of adjustment. The Plan was formulated after months of difficult negotiations among numerous creditor constituencies, including in connection with numerous mediation sessions ordered by the Bankruptcy Court (see Section IV.E). The formulation of an alternative plan of adjustment can be expected to consume additional time. Furthermore, there can be no assurance that the City can formulate and propose an acceptable alternative plan of adjustment. If no plan of adjustment can be confirmed, the Bankruptcy Court may dismiss the City's chapter 9 case, in which event multi-party, multifaceted litigation likely would ensue, as holders of claims compete for the limited City resources available to pay those claims. The City therefore believes that Confirmation and consummation of the Plan is preferable to the alternatives described above.

**REINVESTMENT INITIATIVES**

The City proposes to spend approximately $1.50 billion over the next ten years to, among other things, (A) improve the operating performance and infrastructure of its police, fire, EMS and transportation departments (among other departments), (B) comprehensively address and remediate residential urban blight, (C) modernize its information technology systems on a City-wide basis and (D) address lingering issues plaguing the City's electrical grid and lighting. The assumptions and forecasts underlying the City's proposed reinvestment initiatives were developed using a "bottom-up," department-level review that identified, among other things, (A) opportunities and initiatives to enhance revenues and improve the collection of accounts receivable, (B) reinvestment in labor to improve City services and operations, (C) capital expenditures for necessary information technology, fleet and facility improvements and (D) various department-specific expenditures necessary to facilitate the City's restructuring.

Although, as provided in Section III.D.10.a, the June 14 Creditor Proposal contemplated investment by the City in the total amount of approximately $1.25 billion, the City has expanded its planned expenditures through the period ending June 30, 2023 based on further needed spending on infrastructure as well as enhanced services for residents. Specifically, the City plans to spend approximately $148 million on technology investments, an increase of approximately $65 million from the June 14 Creditor Proposal. Spending on capital expenditures and other infrastructure items, namely fleet and facilities, are projected to be approximately $447 million for the period ending June 30, 2023, an increase of approximately $123 million from the June 14 Creditor Proposal. The additional expenditures relate mainly to facility costs for police, fire and recreation, along with fleet costs for police and fire. Lastly, operating expenditures related to the restructuring initiatives are projected to be approximately $868 million for the period ending June 30, 2023, an increase of approximately $72 million from the June 14 Creditor Proposal. The increase relates primarily to grant administration expenditures and added costs for recreation.

As a result of these expenditures, as well as operating expenditures related to restructuring, the City anticipates it will be able to realize additional revenue of approximately $478 million through the period ending June 30, 2023, an increase of approximately $233 million from the June 14 Creditor Presentation. The net amount of reinvestment and restructuring expenditures, after taking into account anticipated revenue enhancement from restructuring initiatives, will be approximately $1 billion, similar to the net amount contained in the June 14 Creditor Proposal.

A.      **Public Safety**

A significant percentage of the funds to be devoted to reinvestment will be used to improve the performance and infrastructure of the City's police and fire departments. The City believes that its reorganization and successful redevelopment depends upon its ability to offer adequate public safety services to existing City residents and those who may consider relocating to Detroit in the future.

1.      **Police**

As discussed in Section III.C.7(a), *supra*, the DPD has been plagued in recent years with debilitating problems including (a) obsolete information technology; (b) poor performance, as evidenced by high response times and low case clearance rates; (c) chronic understaffing; (d) low employee morale; (e) a lack of employee accountability; and (f) an aging and unreliable fleet and facilities. These difficulties have contributed to the DPD's inability to reduce Detroit's exceedingly high crime rate. To combat these problems, the City has proposed to make targeted investments in the DPD in order to (a) reduce response times to the national average; (b) improve case clearance rates and first responder investigations; (c) update the DPD's fleet and facilities; (d) modernize the DPD's information technology systems; (e) achieve compliance with federal consent decrees; (f) overhaul the structure, staffing and organization of the DPD to better serve the citizens of Detroit; and (g) improve employee morale and accountability. The City estimates that the proposed reinvestment in the DPD will have the following financial impact during Fiscal Year 2014 and going forward (numbers in brackets represent increases in expenditures):

Table IX.A.1.a

| ($ in millions) | Fiscal Year 2014 | Fiscal Year 2015 | Fiscal Year 2016 | Fiscal Year 2017 | Fiscal Year 2018 |
|---|---|---|---|---|---|
| Total Restructuring/Reinvestment | | | | | |
|   Facility Costs | (8.9) | (6.5) | (3.5) | (0.1) | (0.5) |
|   Fleet Update - Repairs & Maintenance | (12.9) | (15.1) | (12.9) | (12.6) | (12.6) |
|   Technology/Other | (2.1) | (11.8) | (10.4) | (2.2) | (2.2) |
| Total | (23.9) | (33.3) | (26.8) | (14.9) | (15.3) |

## 2. Fire/EMS

As discussed in Section III.C.7.d, *supra*, the City's fire and EMS services have struggled – and have frequently failed – to provide prompt and reliable service due to broken and outdated equipment, aging and inadequately-maintained facilities and vehicles and an obsolete information technology system. To remedy these problems, the City has proposed to, among other things, (a) modernize the City's fleet of fire and EMS vehicles, fire apparatus equipment (such as ladders and pumping equipment) and facilities; (b) update the DFD's computer hardware and software; (c) improve the DFD's operating efficiency and cost structure; and (d) implement revenue enhancements such as improvements to billing and collection procedures and grant identification and management. The City estimates that the proposed reinvestment in the DFD will have the following financial impact during Fiscal Year 2014 and going forward (numbers in brackets represent increases in expenditures):

Table IX.A.2.a

| ($ in millions) | Fiscal Year 2014 | Fiscal Year 2015 | Fiscal Year 2016 | Fiscal Year 2017 | Fiscal Year 2018 |
|---|---|---|---|---|---|
| Total Restructuring/Reinvestment | | | | | |
|   Facility Costs | (2.6) | (9.0) | (6.0) | (8.4) | (4.1) |
|   Fleet Update - Repairs & Maintenance | (9.7) | (8.6) | (9.6) | (6.1) | (5.8) |
|   Technology/Other | (3.9) | (2.6) | (1.6) | (2.3) | (1.9) |
| Total | (16.2) | (20.2) | (17.2) | (16.8) | (11.7) |

## B. Blight Removal

As discussed in Section IV.J.5, the City proposes to invest $520.3 million over the course of the next six Fiscal Years (Fiscal Years 2014 through 2019) to remediate urban blight with the City. Specifically, the City currently intends to incur expenses related to blight removal of (1) $7.3 million in Fiscal Year 2014, (2) $113 million in Fiscal Year 2015 and (3) $100 million in each of the Fiscal Years 2016 through 2019.

## C. Information Systems Upgrades

Investment by the City in upgraded information technology is critical to achieving almost all of the City's restructuring and reinvestment objectives. The City's proposed restructuring/reinvestment initiatives with respect to its IT systems are focused on the following objectives: (1) enhancing City-wide IT infrastructure to assist with effectuating change and augmenting workflows; (2) increasing integration between finance and operational systems City-wide in order to decrease labor costs and improve efficiencies; and (3) improving financial and operational reporting in order to (a) monitor and improve operating performance, (b) more timely and accurately report financial information to interested parties and (c) improve revenue and collection efforts as a result of streamlined processes.

The City intends to undertake the following reinvestment initiatives in order to achieve the foregoing objectives:

- Integrated Public Safety Solution for DPD, DFD & EMS. The DPD has identified a fully integrated public safety solution that can provide DPD, DFD and EMS with integrated computer aided dispatch, records management and reporting. An integrated product such as this will allow for much-needed data

exchanges between agencies and will improve efficiency and operations. This public safety solution will cost the City approximately $7 million.

- Centralized Grant Management Function. The City receives approximately $293 million in grants related to its services each year. The City may invest in an overhaul of the administration of its grant management system, including centralizing oversight and support and standardizing information technology. In addition, the City may appoint an auditor general to screen for potential mismanagement of grant funding. Implementing a centralized and standardized grant management system is expected is expected to result in the City receiving more grant funds with better compliance at a lower cost. It would also be expected to: (1) enable the City to comprehensively track City-wide grant funds and status; (2) help prevent disallowed costs and improve service delivery; (3) improve relations with federal, state and private funders; and (4) enable the City to discover and apply for more grant opportunities. The ten-year net cost for a grants management division is approximately $13 million.

- Assessor's Office and Property Tax Division. A consultant was engaged to identify issues and make recommendations to the Assessor's Office Division. As a result of the findings from the consultant's analysis, the City has developed an Assessing Division Corrective Action Plan to reappraise and reassess all properties within the City. The Corrective Action Plan also addresses continued updates to valuations of all properties after the initial reappraisal and reassessment is completed.

- Implement New Enterprise Resource Planning System. The City is currently evaluating proposals in order to upgrade the current Enterprise Resource Planning system. The new system will provide for improved reporting, efficiency, accuracy and accountability. The one-time costs to implement the new enterprise resource planning system are estimated to be approximately $26 million.

- Permitting. The City intends to implement a new permit management system to replace the two different permitting systems currently being utilized by the BSEED and the DFD. Implementation of the Enterprise Resource Planning system is expected to cost the City approximately $4.3 million

- 36th District Court. The City expects to invest $12.9 million in the 36th District Court over the next ten years, primarily to improve facilities implement restructuring initiatives and to further invest in technology upgrades to support electronic processes. These investments, in part, are projected to increase collections and reduce expenses to achieve an average savings of $7.5 million per year over the next ten years.

- Income Tax Division. The City is currently implementing a new Income Tax System, which will result in (1) increased revenues for the City through improved revenue tax processing, tax compliance and collection; and (2) improved reporting, efficiency and accuracy. A new tax system that allows for automated processing and e-filing capability will free up City resources to focus on compliance.

**D.     DDOT**

The City seeks to minimize its annual General Fund subsidy to DDOT while improving service levels by targeting reinvestment to address the key issues limiting DDOT's revenues, including, as discussed in Section III.C.7.e, *supra*, (1) an ongoing failure to maximize grant opportunities; (2) poor maintenance of vehicles and facilities; (3) high employee absenteeism (causing service disruptions) and low employee morale; (4) low fare rates; (5) a lack of adequate security on busses, which has suppressed ridership; and (6) higher-than-average risk management costs (including workers' compensation and related costs). The City also is investigating certain other restructuring alternatives, including transitioning DDOT to the new Regional Transit Authority (the "RTA") and/or outsourcing certain aspects – or all – of DDOT's operations. The following table summarizes the expected financial impact of the overhauls of DDOT contemplated by the City as of the Petition Date to address these issues, not including the potential outsourcing of operations or transition to the RTA (numbers in brackets represent increases in expenditures):

Table IX.D.1

| ($ in millions) | Fiscal Year 2014 | Fiscal Year 2015 | Fiscal Year 2016 | Fiscal Year 2017 | Fiscal Year 2018 |
|---|---|---|---|---|---|
| Total Restructuring/Reinvestment | | | | | |
|     Facility Costs | (1.2) | (2.0) | (2.2) | (2.5) | - |
|     Fleet Update - Repairs & Maintenance | - | - | - | - | - |
|     Technology/Other | (0.4) | - | (0.1) | - | (1.0) |
| Total | (1.6) | (2.0) | (2.3) | (2.5) | (1.0) |

Since the Petition Date, consultants have identified certain specific overhauls that could increase the efficiency of DDOT, such as (1) reducing the amount of overtime devoted to vehicle maintenance; (2) seeking grants to offset preventative maintenance costs and/or capital expenditures for the modernization of facilities; (3) increasing fares; (4) merging shared services with the Suburban Mobility Authority for Regional Transportation and the Detroit People Mover to gain efficiencies and economies of scale; (5) consolidating certain garages; (6) installing transit surveillance technology (including cameras) on all buses to improve security; (7) implementing an improved bus maintenance plan to reduce the number of out-of-service buses and improve on-time route performance; (8) upgrading DDOT's information technology system to provide daily performance metrics and streamline operations; and (9) introducing a transit system police force.

E.     **Labor Costs & Terms and Conditions**

As part of the City's overall financial restructuring, reductions in costs associated with represented and unrepresented workers will be necessary. The adoption of modifications to wages and work rules similar to those imposed pursuant to the CETs will serve as a baseline position for the City in its union negotiations, although the City may seek (1) cuts/changes beyond those included in the CETs and (2) different language that that used in the CETs.

Key elements of the strategy for making these modifications include the following:

- Collective Bargaining Agreements. Significant modifications to CBAs and labor-related obligations will be necessary to optimize staffing and reduce employment costs. The City currently does not have agreements with the majority of labor unions representing its employees. Instead, most employees are working under the CETs. As part of its restructuring effort, the City will work cooperatively with organized labor to improve existing relationships and, where possible, reach agreements to implement changes in terms and conditions of employment that mirror the changes included in the CETs. The City will attempt to structure all new labor agreements using a common form of agreement that will promote ease of administration and enable a known, measurable basis for cost evaluation and comparison. If it is not possible to reach agreements with labor representatives to restructure employment liabilities, the City will retain the authority to unilaterally implement restructuring initiatives pursuant to the emergency manager powers established under PA 436. Pursuant to Section 13(c) of the Federal Transit Act, the City is required to engage in collective bargaining with labor unions representing transportation workers and has certain limitations in terms of its rights to make unilateral changes to employment terms. The City will work within the framework established by the FTA to achieve any labor cost reductions for these workers through collective bargaining.

- Salaries and Wages. The City must reduce employment costs for both represented and unrepresented workers as part of its restructuring. However, the potential for reductions in wages and salaries must be balanced against likely reductions in benefits and the City's need to attract and retain skilled workers. Both represented and unrepresented City workers have already been subjected to salary and wage reductions; most City workers covered by CETs already have taken 5-10% salary and/or wage reductions. As a result, the City will need to carefully evaluate the utility of any additional reductions. Reductions in non-wage compensation, overtime and premium payments may be achievable. Other areas where the City is evaluating potential cost reductions include: (1) attendance policies; (2) leaves of absence; (3) vacation days; (4) holidays; (5) union reimbursement of City costs associated with paid union time and dues check off; (6) tuition reimbursement and other loan programs; (7) overtime; (8) shift scheduling; (9) shift premiums; (10) creation of new positions (and establishment of wage scale for new positions); and (11) temporary assignments.

- Operational Efficiencies/Work Rules.  Significant labor cost reductions may be possible by restructuring jobs and streamlining work rules for both represented and unrepresented workers using the work rule changes implemented pursuant to the CETs as a template.  The City will work with labor representatives to make these improvements, including structuring the DPD, DFD, and other groups to improve operating efficiency and effectiveness.  Dispute resolution procedures under the City's CBAs will be simplified and expedited to achieve predictability for both sides.  Further, the City will attempt to eliminate undesirable practices and assure that these practices cannot be revived through dispute resolution procedures.  The City will attempt to restructure CBAs so that employment decisions including promotions, transfers and assignments will be based upon the quality of the employee (*e.g.*, performance, attendance, experience, skill, ability, etc.) rather than by seniority.  The City will attempt to (1) reduce lateral transfers by limiting bumping rights in its CBAs to job classifications that an employee currently holds or held within the prior year and (2) increase flexibility to assign employees to work out of classification.   Joint labor management committees, if any, will be patterned in structure and role after the committees included in the State's CBAs.

- Staffing Levels and Headcount.  Significant labor cost savings may be achievable by rationalizing staffing levels and reducing employee headcounts.  Consolidation of departments and elimination of redundant functions will be implemented where service improvements or cost savings can be achieved.  If necessary, the City will retain the right to reduce salary and wage costs by implementing unpaid furlough days.  The City will work with labor representatives to minimize the effects of any headcount reductions and enter into effects bargaining agreements in connection with headcount reductions when appropriate.

- Outsourcing.  Where cost savings or service improvements can be achieved, the City will explore potential outsourcing of functions.  The City will provide unions with advance notice of competitive bids and allow the unions to bid on the work.  The City will work with labor representatives to minimize the effects of any headcount reductions resulting from outsourcing initiatives and enter into effects bargaining agreements when appropriate

# X.

# REVENUE ADJUSTMENTS AND TAX REFORM

As part of its broader restructuring effort, the City seeks to increase tax revenues – and thus strengthen its long-term cash position and its ability to reliably provide adequate municipal services – by implementing certain necessary, strategic reforms involving the assessment and collection of municipal taxes.  Such reforms include:  (A) expanding the City's tax base; (B) rationalizing nominal tax rates currently assessed by the City; and (C) improving the City's tax collection system to increase collection rates.

## A.      Expansion of the Tax Base

The City seeks to increase the revenues it receives from personal income taxes by broadening the City's tax base and creating conditions that are likely to foster economic growth.  By reducing crime and blight, providing adequate levels of services and rationalizing the City's bureaucratic and tax structures, the City believes that, going forward, it can attract and retain employers – and encourage the growth of local startup ventures – that will expand (or, at a minimum, arrest the shrinkage of) the City's income tax base by providing more jobs, higher wages, or both.  Fostering conditions that promote economic growth also could help to expand the City's property tax base by encouraging both new construction and the appreciation in value of existing real estate**.**

## B.      Rationalization of Nominal Tax Rates

As discussed in Sections III.A.4 and III.C.3.c, *supra*, the City currently is levying taxes at or near the maximum levels permitted by statute.  The City believes that the imposition of comparatively high and ever-increasing individual and corporate tax rates, in recent decades, has contributed to the City's population loss, dwindling tax base and overall economic decline.  Even if applicable statutes did not prevent the City from increasing tax rates (which they do), the City believes that increasing its already-high tax rates would have a negative impact on the City's revenue going forward and would inhibit efforts to revive economic growth.  The City believes that lowering selected income and property tax rates to levels that are competitive with surrounding localities is critical to reversing the City's population decline, fostering job growth and expanding the overall tax base.  Although tax rate reform likely would cause tax revenues to decrease

somewhat in the near term – which decreases may be partially offset by improved collection efforts – the City believes that the City's long-term growth depends upon such reform and anticipates that such reform would be revenue-neutral within a reasonable period of time.

On January 27, 2014, the City announced a major reform in property assessments that will reduce the residential property assessment for the great majority of Detroiters and result in a tax cut ranging from 5 to 20 percent in 2014. The purpose of the property tax reassessment initiative is to make the City more appealing to current and prospective residents. It is based on a comprehensive review of current assessments and actual home sales between October 1, 2011 and September 30, 2013. This review revealed, for example, that, with the exception of some neighborhoods that have maintained their sales value, nearly the entire northwest side of the city was over-assessed by a minimum of 20 percent.

In addition, over the next three to five years, the city intends to conduct individual assessments of single family homes across the City to further improve evaluations. The City anticipates a reduction in property tax revenue of about 13% for Fiscal Year 2015, and the assessment reductions are in line with those estimates. The City projects, however, that fairer assessments will lead to an increase in the number of people paying their property taxes. As discussed in Section X.C, below, the City also is evaluating strategies to increase property tax collection rates.

## C.    Increasing Collection Rates

The City is implementing and will continue to implement initiatives designed to (1) identify and collect taxes from individual and business non-filers, (2) improve the collection of past-due taxes and (3) enhance tax collection efforts on a prospective basis.

In an effort to collect taxes from individuals that did not file a tax return between 2006 and 2011, the City has mailed approximately 181,000 letters to individuals as of January 2014. As of January 31, 2014, this collection effort, along with a March 2013 tax amnesty program, has yielded approximately $3.8 million in additional collections from these non-filers. Additionally the Income Tax Division is pursing, likely through a third-party collection agency, the collection of $42 million in past due income taxes.

Prior to the Petition Date, the City also had commenced the implementation of initiatives designed to enhance tax collection rates going forward. In October 2012, the City created a Tax Compliance & Enforcement Unit for this purpose. In January 2013, the City launched an online registration system for businesses which, among other things, automatically captures employers' W-2 form data, enabling more accurate tracking of income taxes owed to the City. The City is currently implementing a new income tax system which currently is used by 19 of the 22 Michigan cities that collect income taxes. The new income tax system will allow the City the option to utilize the "common form."

In 2011, only 53% of City residents and businesses owning taxable property paid property taxes. Approximately $246.5 million in taxes and fees owed by City Residents (of which approximately $131.0 million was owed to the City itself) went uncollected during Fiscal Year 2011. In addition to the property tax reassessment efforts described in Section X.B, the City continues to explore potential reforms and initiatives specifically designed to increase property tax collection rates.

In addition to tax reform initiatives, as of the Petition Date, the City had commenced efforts to collect on significant past-due invoices and improve invoice-collection procedures going forward. For example, the City is currently seeking payment of approximately $50 million in outstanding accounts receivable owed to the BSEED. The City anticipates that necessary upgrades to its IT systems will alleviate bottlenecks that have inhibited the efficient collection of such invoices in recent years. In addition, the City seeks to increase the revenues derived from permits and licenses issued by the City.

Prior to the Petition Date, the City also had commenced the implementation of initiatives designed to enhance tax collection rates going forward. In October 2012, the City created a Tax Compliance & Enforcement Unit for this purpose. In January 2013, the City launched an online registration system for businesses which, among other things, automatically captures employers' W-2 form data, enabling more accurate tracking of income taxes owed to the City. As of the Petition Date, the City also was considering the purchase of a new income tax system and upgrading to a "common form" that would be compatible with such new system and which currently is used by 19 of the 22 Michigan cities that collect income taxes. In addition, the City is considering the enactment of a local ordinance that would require employers to withhold City income taxes of reverse commuters.

In addition to the property tax reassessment efforts described in Section X.B, the City continues to explore potential reforms and initiatives specifically designed to increase property tax collection rates. In 2011, only 53% of City residents and businesses owning taxable property paid property taxes. Approximately $246.5 million in taxes and fees owed by City Residents (of which approximately $131.0 million was owed to the City itself) went uncollected during Fiscal Year 2011. Prior to the Petition Date, the City engaged consultants to conduct two separate reviews of the City's property tax collections system. The City's review of these studies, and its consideration of available reform options, remains ongoing.

In addition to tax reform initiatives, as of the Petition Date, the City had commenced efforts to collect on significant past-due invoices and improve invoice-collection procedures going forward. For example, as of the Petition Date, the City was seeking payment of approximately $50 million in outstanding accounts receivable owed to the BSEED, and approximately $8 million in past-due permitting, licensing and other fees owed to the City by Wayne County. The City anticipates that necessary upgrades to its IT systems will alleviate bottlenecks that have inhibited the efficient collection of such invoices in recent years. In addition, the City seeks to increase the revenues derived from permits and licenses issued by the City. As of the Petition Date, only 30% of businesses operating within City limits had valid licenses. To increase revenues from licensing and fee collection, the City ceased its practice of waiving certain permit fees, in March 2012, and is considering strategies to identify, and collect fees from, unlicensed businesses.

# XI.

# PROJECTED FINANCIAL INFORMATION

## A. Projections

Attached to this Disclosure Statement as Exhibit I and Exhibit J are certain financial documents (together, the "Projections"), which provide details regarding the City's projected operations under the Plan, subject to the assumptions set forth below. In particular, the Projections consist of:

- A ten-year summary of restructuring initiatives, attached hereto as Exhibit I

- A ten-year statement of projected cash flows, attached hereto as Exhibit J

THE PROJECTIONS WERE NOT PREPARED TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, THE FINANCIAL ACCOUNTING STANDARDS BOARD, THE GOVERNMENTAL ACCOUNTING STANDARDS BOARD OR THE RULES AND REGULATIONS OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION. THE CITY'S INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM HAS NEITHER COMPILED NOR EXAMINED THE ACCOMPANYING PROJECTIONS AND, ACCORDINGLY, DOES NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE PROJECTIONS, ASSUMES NO RESPONSIBILITY FOR THE PROJECTIONS AND DISCLAIMS ANY ASSOCIATION WITH THE PROJECTIONS. EXCEPT FOR PURPOSES OF THIS DISCLOSURE STATEMENT, THE CITY DOES NOT PUBLISH PROJECTIONS OF ITS ANTICIPATED FINANCIAL POSITION. THE CITY DOES NOT INTEND TO UPDATE OR OTHERWISE REVISE THESE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE OF THIS DISCLOSURE STATEMENT OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS.

WHILE PRESENTED WITH NUMERICAL SPECIFICITY, THE PROJECTIONS ARE BASED UPON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT THE CITY BELIEVES ARE REASONABLE (WHICH ASSUMPTIONS ARE DESCRIBED IN FURTHER DETAIL IMMEDIATELY BELOW). THE ESTIMATES AND ASSUMPTIONS MAY NOT BE REALIZED, HOWEVER, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT ECONOMIC UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE CITY'S CONTROL. NO REPRESENTATIONS CAN BE OR ARE MADE AS TO WHETHER THE ACTUAL RESULTS WILL BE WITHIN THE RANGE SET FORTH IN THE PROJECTIONS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE, AND EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED, OR MAY BE UNANTICIPATED, AND THEREFORE MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

1. **Assumptions**

The Projections were prepared by the City with the assistance of its professionals to present the anticipated impact of the Plan. The Projections all assume that the Plan will be confirmed before and implemented on the Effective Date in accordance with its stated terms. In addition, the Projections and the Plan are premised upon other assumptions, including the anticipated future performance of the City, general economic and business conditions, no material changes in the laws and regulations applicable to the operation of municipalities such as the City, and other matters largely or completely outside of the City's control. Each of the Projections should be read in conjunction with the significant assumptions, qualifications, and notes set forth in the Disclosure Statement, the Plan, the Plan Supplement, the Projections themselves, the historical financial information for the County contained or referenced herein, and other information submitted to the Bankruptcy Court during the course of the City's chapter 9 case.

(a) **Revenue Assumptions**

- <u>Municipal Income Tax</u>. Municipal income tax revenues increase over the period of the Projections due to (i) a general improved employment outlook and (ii) anticipated wage inflation. Projected revenues for Fiscal Year 2013 reflect the impact of certain one-time items, including a tax amnesty program and a one-time benefit from an increase in the capital gains tax rate.

- <u>State Revenue Sharing</u>. Projected revenues for state revenue sharing were developed in consultation with the Treasury. These revenues increase due to anticipated higher tax revenue collections and distribution by the State.

- <u>Wagering Tax</u>. The Projections assume that wagering tax revenues will decrease through Fiscal Year 2015 due to competition from other casinos, primarily those in Ohio, before recovering as a result of an improved general economic outlook.

- <u>Sales and Charges for Services</u>. Revenues from sales and charges for services are projected to decline primarily as a result of the transfer of: (i) vital records operations from the City's Department of Health and Wellness Promotion (the "<u>Health & Wellness Department</u>") to Wayne County effective December 2013; and (ii) electricity distribution services from the Public Lighting Department to third party provider.

- <u>Property Tax</u>. The City projects that property tax revenues will continue to decline through Fiscal Year 2020 as a result of ongoing reductions in assessed property values with modest increases beginning in Fiscal Year 2021.

- <u>Utility Users Tax</u>. The Projections assume that utility users tax revenues will decrease from Fiscal Year 2013 as a result of the transfer of lighting operation, service and repair to the PLA and the related allocation of $12.5 million of utility users tax revenues to the PLA. Inflationary revenue increases have been assumed beginning in Fiscal Year 2017.

- <u>Other Taxes</u>. Inflationary revenue increases have been assumed for all other taxes, beginning in Fiscal Year 2017.

- <u>Parking/Court Fines and Other Revenue</u>. The amounts provided in the Projections for parking and court fines and other revenue are derived from recent trends.

- <u>Grant Revenue</u>. The City projects that grant revenues will decrease as a result of the (i) transition of the Health & Wellness Department to the Institute for Population Health ("<u>IPH</u>") and (ii) expiration of certain public safety grants.

- <u>Licenses, Permits and Inspection Charges</u>. The amount provided in the Projections for licenses, permits and inspection charges is derived primarily from recent trends. The City's projection for Fiscal Year 2013 includes one-time permit and inspection revenues from utility providers.

- <u>Revenue from Use of Assets</u>. The City's projected revenue for Fiscal Year 2014 includes proceeds from sale of Veteran's Memorial Building.

- Street Fund Reimbursement.  Street Fund reimbursement from solid waste revenues are projected to decline beginning Fiscal Year 2015 due to the assumed outsourcing of solid waste operations.  The solid waste portion of the Street Fund, therefore, would no longer reimburse the General Services Department (a department accounted for in the General Fund) for maintenance costs.

- DDOT Risk Management Reimbursement.  The projected revenues for DDOT risk management reimbursement are based on recent trends.  No reimbursement is reflected in Fiscal Year 2013 because, as set forth in subsection (b) below, in Fiscal Year 2013, the General Fund made risk management payments from refunding proceeds.

- Parking and Vehicle Fund Reimbursement.  Based on recent trends and scheduled debt service for the Vehicle Fund through Fiscal Year 2016 with revenues and associated expenses being offset.  A one-time contribution from DDOT in the amount of $16 million is included in revenues for Fiscal Year 2012.

- UTGO Property Tax Millage.  The Projections assume treatment consistent with the Plan.

**(b)      Operating Expenditure Assumptions**

- Salaries and Wages.  The Projections assume a 10% wage reduction for uniformed employees beginning in Fiscal Year 2014 for contracts expiring during Fiscal Year 2013.  Headcount is assumed to increase beginning in Fiscal Year 2015 to allow for improved levels of services to City residents.  Wage inflation of 2.0% has been assumed beginning in Fiscal Year 2015.  A 5% wage increase is assumed for uniformed employees beginning in Fiscal Year 2020.

- Overtime.  The projected future costs of overtime are based upon recent trends.

- Health Benefits (Active Employees).  The projected cost of health benefits for active employees is based upon the healthcare plan designs being offered for 2014 enrollment and assumes an average rate of healthcare inflation of 6.5%.

- Other Employment Benefits.  The City has calculated the Projections for other employment benefits separately by specific benefit based upon recent trends.

- Professional and Contractual Services.  The Projections assume a decrease in costs incurred for professional and contractual services beginning Fiscal Year 2014 primarily due to the transition of the Health & Wellness Department to IPH.  Cost inflation in the amount of 1.0% has been assumed beginning in Fiscal Year 2015.

- Materials and Supplies.  The Projections provide for decreases in expenditures beginning in Fiscal Year 2015 due to the transition of the PLD distribution business to third party provider.  Cost inflation of 1.0% has been assumed beginning in Fiscal Year 2015.

- Utilities.  The City's projected utility cost is based on recent trends and assumes cost inflation of 1.0% beginning in Fiscal Year 2015.  Average cost inflation of 3.5% has been assumed for water and sewer rates beginning in Fiscal Year 2015.

- Purchased Services.  The Projections assume increased costs beginning in Fiscal Year 2014 due to prisoner pre-arraignment function costs and beginning in Fiscal Year 2015 as a result of outsourced payroll processing management.  In addition, cost inflation of 1.0% has been assumed beginning in Fiscal Year 2015.

- Risk Management and Insurance.  Cost inflation of 1.0% has been assumed beginning in Fiscal Year 2015.

- Maintenance Capital (Current Run Rate).  Fiscal Year 2013 includes one-time capital outlays.  Cost inflation of 1.0% has been assumed beginning in Fiscal Year 2015.

- **Other Expenses.** Cost inflation of 1.0% has been assumed beginning in Fiscal Year 2015 with respect to certain costs.

- **Contributions to Non-Enterprise Funds.** Assumed contributions are projected to increase in Fiscal Years 2015 and 2016 primarily due to scheduled vehicle fund debt service. In addition, contributions for the operations of PLA begin in Fiscal Year 2015.

- **DDOT Subsidy.** The General Fund's subsidy to DDOT is projected to increase primarily due to personnel and operating cost inflation. A one-time contribution to the General Fund of $16 million has been included for Fiscal Year 2012. The costs for Fiscal Year 2013 exclude a risk management payment, made from refunding proceeds.

- **Grant Related Expenses.** Projected grant expenses have been captured within the specific expense line items.

  **(c)**    **Legacy Expenditure Assumptions**

- **Debt Service.** The Projections assume treatment consistent with the Plan.

- **COP and Swap Service.** The Projections assume treatment consistent with the Plan.

- **Pension Contributions.** The Projections assume treatment consistent with the Plan.

- **Health Benefits (Retirees).** The Projections assume treatment consistent with the Plan.

**XII.**

**CERTAIN RISK FACTORS TO BE CONSIDERED**

The implementation of the Plan, and the New Securities to be issued on the Effective Date, are subject to a number of material risks. Prior to voting on the Plan, each party entitled to vote should carefully consider these risks, as well as all of the information contained in this Disclosure Statement, including the Exhibits hereto. If any of these risks actually occurs, the City's financial condition and operations could be seriously harmed. In addition to the risks set forth below, risks and uncertainties not presently known to the City, or risks that the City currently considers immaterial, may also impair the City's financial condition and operations.

**A.    Non-Confirmation of the Plan**

Even if all impaired Classes accept or could be deemed to have accepted the Plan, the Plan may not be confirmed by the Bankruptcy Court. As set forth above, section 943(b) of the Bankruptcy Code identifies the requirements for plan Confirmation. Although the City believes that the Plan will meet all applicable requirements, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

In particular, under the Plan, (1) a PFRS Claim includes the value of (a) PFRS OPEB Claims and (b) PFRS Pension Claims and (2) a GRS Claim includes the value of (a) GRS OPEB Claims and (b) GRS Pension Claims. See Sections I.A.139 and I.A.194 of the Plan. If the Bankruptcy Court does not approve the aggregation of OPEB and Pension Claims for Plan treatment purposes, the likely impact will be that the OPEB Claims will receive a greater payment but the respective GRS Pension Claims and PFRS Pension Claims will receive lower payments. This will result in even larger cuts to accrued pension benefits for Holders of GRS Pension Claims and PFRS Pension Claims, respectively.

**B.    Nonconsensual Confirmation**

As described above, pursuant to the "cramdown" provisions of section 1129(b) of the Bankruptcy Code, the Bankruptcy Court can confirm the Plan at the City's request if at least one impaired Class has accepted the Plan and, as to each impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such impaired Class. The City reserves the right to modify the terms of the Plan as necessary for Confirmation without the acceptance of all impaired Classes. Such modification could result in less favorable treatment for any non-accepting Classes than the treatment currently provided for in the Plan.

**C. Inability to Confirm Plan Prior to Potential Removal of Emergency Manager**

Pursuant to Section 9(6)(c) of PA 436, if an emergency manager has served for at least 18 months after his or her appointment under PA 436, such emergency manager may, by resolution, be removed by a two-thirds vote of the City Council. The Emergency Manager was appointed on March 14, 2013. As of September 14, 2013, therefore, the City Council may resolve to remove the Emergency Manager pursuant to PA 436. In the event that the Emergency Manager is removed prior to confirmation of the Plan, the City may be unable to confirm the Plan.

**D. Conditions to Effectiveness of the Plan**

Section III.A of the Plan provides for certain conditions that must be satisfied (or waived) prior to the Effective Date. Many of the conditions are outside of the control of the City. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions to effectiveness of the Plan will be satisfied (or waived). Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the adjustment of the City's debts completed. See Section V.D.1 of this Disclosure Statement for a description of the conditions to the effectiveness of the Plan.

**E. Non-Occurrence of DIA Settlement or Non-Receipt of the Full Amount of the DIA Proceeds, the State GRS Consideration or the State PFRS Consideration**

The Plan and the treatment of Allowed Pension Claims assume the existence and the implementation of the DIA Settlement and the receipt of the full amounts of the DIA Proceeds, the State GRS Consideration and the State PFRS Consideration, all of which amounts are assumed to be paid in equal installments over 20 years. If the DIA Settlement does not occur, or if the full amounts of the DIA Proceeds, the State GRS Consideration and/or the State PFRS Consideration are not received, then the recoveries on account of all Unsecured Claims, including Pension Claims, will be materially diminished.

**F. Failure to Secure Exit Facility**

As discussed above, the City eill seek to enter into a $300 million Exit Facility on the Effective Date of the Plan. The purpose of the Exit Facility would be to refinance any indebtedness under a Postpetition Financing Agreement, provide the City with necessary cash to satisfy its near-term obligations and begin to implement its proposed reinvestment initiatives. In the event that the City fails to obtain an Exit Facility, the City's ability to fulfill its obligations under the Plan may be compromised.

**G. Inability to Raise Tax Revenue**

As discussed above, the City currently levies all taxes at the statutory maximum levels. In particular, as of the Petition Date: (1) Michigan Public Act 394 of 2012, an amendment to the City Income Tax Act, fixed the City's maximum income tax rates at their current levels so long as PLA Bonds remain outstanding; (2) state law limited municipalities' property tax rates to 20 mills and a constitutionally required "Headlee rollback" further limited that rate to 19.952 mills (which was the rate charged by the City as of the Petition Date); and (3) the utility users' tax and casino wagering tax were fixed at their 5% and 10.9% levels, respectively, by the state statutes authorizing these Detroit-specific taxes. In proposing the Plan, the City has assumed that the Legislature will not approve either the increase of any existing taxes currently levied by the City or the imposition of any new taxes by the City. Moreover, as described above in Section X.B, the City intends to rationalize the nominal tax rates currently assessed by the City to bring them in line with those assessed by surrounding localities. If the City's revenues are less than its total obligations, the City's ability to perform its obligations under the Plan could be jeopardized.

**H. Failure to Achieve Projected Financial Performance**

The Projections are dependent upon the successful implementation of the City's budget and the reliability of other estimates and assumptions accompanying the Projections. The Projections are based on estimates and assumptions relating to the City's projected revenues and expenditures and prevailing economic conditions. In addition, the Projections assume that the Plan will be confirmed in accordance with its terms. However, these estimates and assumptions may not be realized and are inherently subject to significant economic uncertainties and contingencies, many of which are beyond the City's control. No representations can be or are made as to whether the actual results will be within the range set forth in the Projections. Some assumptions inevitably will not materialize, and events and circumstances occurring subsequent to

the date on which the Projections were prepared may be different from those assumed or may be unanticipated and, therefore, may affect financial results in a material and possibly adverse manner. The Projections, therefore, may not be relied upon as a guarantee or other assurance of the actual results that will occur.

**I.      Unforeseen Financial Circumstances Affecting the City's Future Financial Performance**

The Plan and the Projections underlying the Plan are based on certain assumptions about the City's future financial performance. Unforeseen events and circumstances may occur affecting the City's future financial performance, resulting in those assumptions proving inaccurate and the City being unable to fulfill its obligations under the Plan. No guarantee can be made as to the City's future financial performance due to a variety of unforeseeable circumstances that may affect such performance.

**J.      Litigation if Unlimited Tax General Obligation Bonds Are Impaired**

As discussed above, pursuant to the Home Rule City Act, the City, with the approval of the electorate, levies the taxes used to pay debt service charges or obligations on Unlimited Tax General Obligation Bonds. The amount of taxes levied to service Unlimited Tax General Obligation Bonds is in addition to other taxes that the City is authorized to levy, without limitation as to rate and amount and without regard to any City Charter, statutory or constitutional caps on taxation. If: (1) the Bankruptcy Court determines in the UTGO Litigation that Unlimited Tax General Obligation Bond Claims may be impaired pursuant to the Plan; and (2) the Plan, which proposes to impair Unlimited Tax General Obligation Bond Claims, is confirmed, litigation against the City could ensue regarding the existing levy of additional taxes to service the Unlimited Tax General Obligation Bonds. In the event the City is precluded from levying these taxes, it anticipates borrowing funds sufficient to replace this lost revenue. In that event, there can be no assurance that the City will be successful in obtaining the financing.

**K.      Other Litigation**

The City will be subject to various claims and legal actions arising in the ordinary course of its operations, including, but not limited to, personal injury actions. The City is not able to predict the nature and extent of any such claims and actions and cannot guarantee that the ultimate resolution of such claims and actions will not have a material adverse effect on the City after its emergence from chapter 9.

**L.      City Credit May be Viewed Negatively By The Market**

Holders of the New Securities may encounter limited market acceptance of City credit upon any attempt to sell City debt obligations, making sales at or near par potentially difficult. Holders of City debt after the Effective Date may not be able to sell such debt for any price for some time. Alternatively, potential purchasers may demand discounts to the par amount of obligations before a potential purchaser would be willing to purchase City debt of any kind. There can be no assurance that a secondary market will exist for any City debt.

**M.      Population Loss**

The City has experienced steady population loss for over a half-century. Since its peak in the 1950s, the City has been losing both people and jobs. The City's population declined by nearly 45% to just over one million as of June 1990. In the 23 years since, this population decline has continued unabated. The City's population stood at 684,799 as of December of 2012, representing a 63% decline from its postwar peak of 1.85 million residents. The City has gone from the fifth largest city in America in 1950 to the eighteenth largest today. No other American city has experienced a comparable decline in population over a similar period of time. In addition to its inability to increase tax rates, the steady population loss experience by the City over the last 50 years limits the City's ability to grow tax revenues. Although the City intends to increase the revenues it receives from personal income taxes by broadening the City's tax base and creating conditions that are likely to foster economic growth, there can be no guarantee that these efforts will be successful.

**N.      The City Has No Duty to Update**

The statements contained in this Disclosure Statement are made by the City as of February 21, 2014, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The City has no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

## O. No Representations Outside This Disclosure Statement Are Authorized

No representations concerning or related to the City, the City's chapter 9 case or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement and any other Plan solicitation materials that accompany this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should be relied upon by you at your own risk in arriving at your decision.

## P. Nature and Amount of Allowed Claims

The City's review of Claims is in its beginning stages and, accordingly, the ultimate amount of Allowed Claims against the City is unknown. If the amount of Allowed Claims is higher than expected or predicted, recoveries for Holders of Claims in certain Classes may be negatively impacted. In addition, given the sheer volume of Claims expected to be filed against the City, the cost of administering such Claims will be substantial and may also adversely impact recoveries for Holders of Claims in certain Classes. Any such adverse effects could be material.

## XIII.

## FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN

Circular 230 Disclosure: TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, EACH HOLDER OF A CLAIM IS HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER OF A CLAIM FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED UNDER THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "IRC"); (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE CONFIRMATION OF THE PLAN TO WHICH THE TRANSACTIONS DESCRIBED IN THIS DISCLOSURE STATEMENT ARE ANCILLARY; AND (C) ANY HOLDER OF A CLAIM SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

A DESCRIPTION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO HOLDERS OF CERTAIN CLAIMS IS PROVIDED BELOW. THE DESCRIPTION IS BASED ON THE IRC, TREASURY REGULATIONS, JUDICIAL DECISIONS AND ADMINISTRATIVE DETERMINATIONS, ALL AS IN EFFECT ON THE DATE OF THIS DISCLOSURE STATEMENT AND ALL SUBJECT TO CHANGE, POSSIBLY WITH RETROACTIVE EFFECT. CHANGES IN ANY OF THESE AUTHORITIES OR IN THEIR INTERPRETATION COULD CAUSE THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO DIFFER MATERIALLY FROM THE CONSEQUENCES DESCRIBED BELOW.

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. NO RULING HAS BEEN REQUESTED FROM THE INTERNAL REVENUE SERVICE (THE "IRS"); NO OPINION HAS BEEN REQUESTED FROM THE CITY'S COUNSEL CONCERNING ANY TAX CONSEQUENCE OF THE PLAN; AND NO TAX OPINION IS GIVEN BY THIS DISCLOSURE STATEMENT.

THE DESCRIPTION THAT FOLLOWS DOES NOT COVER ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO HOLDERS OF CLAIMS. FOR EXAMPLE, THE DESCRIPTION DOES NOT ADDRESS ISSUES OF SPECIAL CONCERN TO CERTAIN TYPES OF TAXPAYERS, SUCH AS DEALERS IN SECURITIES, FINANCIAL INSTITUTIONS, INSURANCE COMPANIES, PASS-THROUGH ENTITIES AND INVESTORS THEREIN, TAX-EXEMPT ORGANIZATIONS, PERSONS SUBJECT TO THE ALTERNATIVE MINIMUM TAX AND NON-U.S. TAXPAYERS. IN ADDITION, THE DESCRIPTION DOES NOT DISCUSS STATE, LOCAL OR NON-U.S. INCOME OR OTHER TAX CONSEQUENCES (INCLUDING ESTATE OR GIFT TAX CONSEQUENCES).

FOR THESE REASONS, THE DESCRIPTION THAT FOLLOWS IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND PROFESSIONAL TAX ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM. HOLDERS OF CLAIMS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.

The federal income tax consequences of the Plan to a Holder of a Claim will depend, in part, on the nature of the Claim, what type of consideration was received in exchange for the Claim, whether the Holder reports income on the accrual or cash basis, whether the Holder has taken a bad debt deduction or worthless security deduction with respect to the Claim and whether the Holder receives Distributions under the Plan in more than one taxable year.

## A. Exchange of Property Differing Materially in Kind or Extent, Generally

An exchange of property for other property differing materially either in kind or extent generally is considered a taxable exchange for U.S. federal income tax purposes, and the holder of such property generally will realize gain or loss on such exchange for U.S. federal income tax purposes. In the case of an exchange of a new debt instrument for an existing debt instrument, such an exchange is considered to be an exchange of property differing materially in kind or extent if the terms of the new debt instrument are considered to be a "significant modification" of the terms of the existing debt instrument.

Various changes in the terms of a debt instrument can constitute a "modification" of the terms of an existing debt instrument for U.S. federal income tax purposes, such as a change in the amount or yield of the instrument, a change in the term of the instrument, a change in the obligor of the instrument, a change in the security or credit enhancement of the instrument or a change in the nature of the instrument. A modification may be considered to be "significant" for U.S. federal income tax purposes if, based on all the facts and circumstances, the legal rights or obligations that are altered and the degree to which they are altered are economically significant. When making such a determination, all modifications to the debt instrument generally are considered collectively, subject to certain exclusions.

A change in the yield of a debt instrument is considered to be a significant modification of the debt instrument if the yield of the modified instrument, as computed in accordance with the Treasury Regulations, varies from the annual yield of the unmodified instrument by more than the greater of one quarter of one percent or five percent of the annual yield of the unmodified instrument. A change in the timing of payments of a debt instrument, including an extension of the final maturity date, may be a considered a significant modification if it results in a material deferral of scheduled payments under the relevant facts and circumstances. A deferral of one or more scheduled payments will not be considered material if the payment is deferred no longer than the lesser of five years or fifty percent of the original term of the debt instrument. A substitution of a new obligor on a recourse obligation generally is considered a significant modification, but in the case of a tax-exempt bond, such a substitution is not a significant modification if the old and new obligors are both governmental units, agencies or instrumentalities that derive their powers, rights and duties in whole or part from the same sovereign authority (such as a state), and if the collateral securing the instrument continues to include the original collateral. The substitution of a new obligor on a nonrecourse debt instrument is not a significant modification. A change in the security or credit enhancement of a recourse debt instrument that releases, substitutes, adds or otherwise alters the collateral for, a guarantee on, or other form of credit enhancement is a significant modification if it results in a change in payment expectations from adequate to primarily speculative, or from primarily speculative to adequate. A change in the security or credit enhancement of a nonrecourse debt instrument generally is a significant modification if it releases, substitutes, adds or otherwise alters the collateral for, a guarantee on, or other form of credit enhancement, unless the collateral is fungible. A change in the nature of an instrument, from recourse (or substantially all recourse) to nonrecourse (or substantially all nonrecourse), or from nonrecourse (or substantially all nonrecourse) to recourse (or substantially all recourse), is generally a significant modification. Likewise, a change in the nature of an instrument that results in an instrument or property right that is not debt for U.S. federal income tax purposes is a significant modification. Other changes to an instrument, such as a change in the status of the debt instrument from being a tax-exempt obligation to a taxable obligation, may be considered to be a material modification if such a change is considered to be economically significant.

Holders of Claims are urged to consult their tax advisors regarding the applicability of the above rules to any Distributions they may receive pursuant to the Plan.

## B. Treatment of Claim Holders Receiving Distributions Under the Plan

### 1. Holders Whose Existing Bonds or Other Debt Obligations Will Be Exchanged for Property Including New Securities

The U.S. federal income tax treatment of Holders who hold Claims with respect to existing Bonds or other debt obligations and who receive Distributions of property, including New Securities, pursuant to the Plan (which may include Holders of the DWSD Bonds, Holders of COP Claims, Holders of Limited Tax General Obligation Bonds, Holders of Unlimited Tax General Obligation Bonds, and, to the extent such Claims are for existing Bonds or other debt obligations,

Holders of Unsecured Claims) will depend upon whether the terms of the New Securities received differ materially in kind or extent from the terms of the existing Bonds or other debt obligations relinquished by such Holder pursuant to the Plan, as discussed above under "Exchange of Property Differing Materially in Kind or Extent, Generally." If the terms of such New Securities do not differ materially from the terms of the existing Bonds or other debt obligations relinquished, then the U.S. federal income tax consequences should be as described below under "Holders of Allowed Claims Receiving New Securities that are Not Materially Different." If the terms of such New Securities differ materially from the terms of the Claims relinquished, then the U.S. federal income tax consequences should be as described below under "Holders of Allowed Claims Receiving Cash, Other Property or New Debt Securities with Materially Different Terms."

It is anticipated that interest on the New DWSD Bonds or, if the DWSD Transaction is consummated, the New GLWA Bonds, will be tax-exempt for U.S. federal income tax purposes. The City intends to seek opinions of nationally recognized bond counsel addressing the tax status of the interest payable on the New DWSD Bonds (or, if the DWSD Transaction is consummated, the New GLWA Bonds), which are expected to be delivered with such New DWSD Bonds (or such New GLWA Bonds) on the Effective Date. Recipients of such bonds should refer to such opinions for more information as to the tax status of the interest payable on such bonds.

As of the date of this Disclosure Statement, it is not known whether interest on any New Securities other than the New DWSD Bonds or the New GLWA Bonds will be taxable or tax-exempt for U.S. federal income tax purposes.

It is not certain whether the New C Notes will be treated as debt or equity for U.S. federal income tax purposes. Holders of Claims receiving New C Notes pursuant to the Plan should consult their tax advisors regarding the treatment of the New C Notes as debt or equity for U.S. federal income tax purposes.

Holders of Claims are urged to consult their tax advisors regarding whether the terms of any New Securities received pursuant to the Plan differ materially from the terms of any Claims relinquished pursuant to the Plan.

**(a)      Holders of Allowed Claims Receiving New Securities that are Not Materially Different**

A Holder of an Allowed Claim who receives New Securities that are not materially different in kind or extent from the Claims for existing Bonds relinquished by such Holder pursuant to the Plan, generally should not recognize gain, loss or other taxable income for U.S. federal income tax purposes upon the receipt of such New Securities in exchange for their Claims under the Plan. Such Holder's holding period for the New Securities will include its holding period for the Claims exchanged therefor, and such Holder's basis in the New Securities will be the same as its basis in the Claims immediately before the exchange.

Taxable income, however, may be recognized by those Holders for U.S. federal income tax purposes if such Holders are considered to receive interest, damages or other income in connection with the exchange, as described in "Holders of Allowed Claims Receiving Cash, Other Property or New Debt Securities with Materially Different Terms," below.

**(b)      Holders of Allowed Claims Receiving Cash, Other Property or New Debt Securities with Materially Different Terms**

A Holder of an Allowed Claim who receives cash, other property or New Securities that are treated as debt for U.S. federal income tax purposes ("New Debt Securities") with materially different terms from the Claims relinquished by such Holder pursuant to the Plan, in exchange for such Holder's Claim, would recognize gain or loss in an amount equal to the difference between (i) the amount realized under the Plan in respect of its Claim, which will generally equal (A) the amount of any cash received, plus (B) the fair market value of any property received (including any New Securities that are not treated as debt for U.S. federal income tax purposes) and (C) the issue price of any New Debt Security received by the Holder with respect to its Claim and (ii) the Holder's adjusted tax basis, if any, in its Allowed Claim (other than any Claim for accrued but unpaid interest).

As a general matter, the "issue price" of a New Debt Security should equal its fair market value, if treated as "publicly traded" within the meaning of the IRC and applicable Treasury Regulations, or, if the New Debt Securities are not publicly traded, but the existing Bonds are publicly traded, the fair market value of the existing Bond as of the day immediately prior to the effective date of the Plan. Debt instruments generally will be treated as "publicly traded" if they are traded on an established securities market or if certain firm or indicative price quotes are available for such debt

instruments, or if other conditions are satisfied. If neither the existing Bonds nor the New Debt Securities are considered to be publicly traded, the issue price of the New Debt Securities will equal their stated principal amount.

In addition, the New Debt Securities may be treated as issued with original issue discount ("OID") for U.S. federal income tax purposes in an amount equal to the excess of their stated principal amount and any PIK interest over their "issue price" (subject to a *de minimis* exception). A Holder of a New Debt Security that is not a tax-exempt bond generally will be required to include any OID in gross income as it accrues over the term of the New Debt Securities based on a constant yield to maturity method, regardless of the U.S. Holder's method of tax accounting. However, if the Holder's basis in the New Debt Security equals or exceeds the issue price of the New Security, the amount of OID that has to be included in income may be reduced or eliminated. As a result, the Holder generally will include OID that is not otherwise offset on such taxable New Debt Securities in gross income in advance of the receipt of cash payments attributable to that income.

The tax basis of a New Debt Security received in the hands of a Holder will be equal to the "issue price" of the New Debt Security received in the exchange. The holding period of the New Debt Security will commence on the day after the exchange date and it will not include the U.S. Holder's holding period of the existing Bond deemed surrendered in the exchange.

Any gain or loss recognized would be capital or ordinary, depending on the status of the Claim in the Holder's hands, including whether the Claim constitutes a market discount bond in the Holder's hands. Generally, any gain or loss recognized by a Holder of a Claim would be a long term capital gain if the Claim is a capital asset in the hands of the Holder and the Holder has held such Claim for more than one year, unless the Holder had previously claimed a bad debt or worthless securities deduction or the Holder had accrued market discount, which is generally treated as ordinary income, with respect to such Claim. If the Holder realizes a capital loss, the Holder's deduction for the loss may be subject to limitation.

### 2. PFRS Claims and GRS Claims

Holders of PFRS Claims and Holders of GRS Claims who receive any PFRS Adjusted Pension Amount, PFRS Settlement Benefit Amount, GRS Adjusted Pension Amount, GRS Settlement Benefit Amount, or other future benefit payments, as applicable, generally will recognize taxable, ordinary income to the extent of such amounts received, which amounts may be treated as compensation income to them, depending on the nature of the Claims and the payments received.

## C. Certain Other Tax Considerations for Holders of Claims

### 1. Accrued but Unpaid Interest

In general, a Claim Holder that was not previously required to include in taxable income any accrued but unpaid interest on a Claim that is not a tax-exempt Bond may be required to take such amount into income as taxable interest for U.S. federal income tax purposes upon receipt of a Distribution with respect to such interest. A Claim Holder that was previously required to include in taxable income any accrued but unpaid interest on the Claim may be entitled to recognize a deductible loss to the extent that such interest is not satisfied under the Plan. The Plan provides that, to the extent applicable, all Distributions to a Holder of an Allowed Claim will apply first to the principal amount of such Claim until such principal amount is paid in full and then to any applicable accrued interest included in such Claim to the extent that interest is payable under the Plan. There is no assurance, however, that the IRS will respect this treatment and will not determine that all or a portion of amounts distributed to such Holder and attributable to principal under the Plan is properly allocable to interest. Each Holder of a Claim on which interest has accrued is urged to consult its tax advisor regarding the tax treatment of Distributions under the Plan and the deductibility of any accrued but unpaid interest for U.S. federal income tax purposes.

### 2. Post-Effective Date Distributions

Holders of Claims may receive Distributions of Cash or property, including New Securities, subsequent to the Effective Date. The imputed interest provisions of the IRC may apply to treat a portion of any post-Effective Date distribution as imputed interest for U.S. federal income tax purposes. Imputed interest may, with respect to certain Holders, accrue over time using the constant interest method, in which event the Holder may, under some circumstances, be required to include imputed interest in income prior to receipt of a Distribution.

In addition, because additional Distributions may be made to Holders of Claims after the initial Distribution, any loss and a portion of any gain realized by a Holder may be deferred until the Holder has received its final Distribution. All Holders are urged to consult their tax advisors regarding the possible application of, or ability to elect out of, the "installment method" of reporting gain that may be recognized in respect of a Claim.

### 3. Bad Debt and/or Worthless Securities Deduction

A Holder who, under the Plan, receives in respect of an Allowed Claim an amount less than the Holder's tax basis in the Allowed Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under section 166(a) of the IRC or a worthless securities deduction under section 165(g) of the IRC. The rules governing the character, timing and amount of bad debt or worthless securities deductions place considerable emphasis on the facts and circumstances of the Holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

### 4. Information Reporting and Backup Withholding

All Distributions under the Plan will be subject to applicable U.S. federal income tax reporting and withholding. The IRC imposes "backup withholding" (currently at a rate of 28%) on certain "reportable" payments to certain taxpayers, including payments of interest. Under the IRC's backup withholding rules, a Holder of a Claim may be subject to backup withholding with respect to Distributions or payments made pursuant to the Plan, unless the Holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional federal income tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of income tax. A Holder of a Claim may be required to establish an exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

### 5. Importance of Obtaining Professional Tax Assistance

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX OR LEGAL ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

### XIV.

### APPLICABILITY OF CERTAIN FEDERAL AND STATE SECURITIES LAWS

A. **General**

### 1. Registration Of Securities

In general, securities issued by the City, such as the New Securities are exempt from the registration requirements of the Securities Act under section 3(a)(2) of the Securities Act.

In addition to exemptions provided to local governments such as the City under the Securities Act, section 1145(a)(1) of the Bankruptcy Code provides an exemption to all kinds of debtors from the registration requirements of the Securities Act and from any requirements arising under state securities laws in conjunction with the offer and sale of securities of the debtor under a plan of adjustment where such securities are issued to a creditor of the debtor. The Bankruptcy code provides that certain creditors, which are deemed "underwriters" within the meaning of the Bankruptcy Code, may not resell obligations of a debtor, which they receive pursuant to a plan of adjustment without registration. Since obligations of the City are exempt from registration under generally applicable securities law, this exception is not relevant to securities of the City, although the provisions of section 1145 of the Bankruptcy Code which suspend the operation of securities laws may not be available to "underwriters" within the meaning of the Bankruptcy Code.

Creditors of the City who believe they meet the definition of "underwriter" within the meaning of the Bankruptcy Code should consult qualified counsel with respect to their obligations under relevant federal and state securities laws.

Because the Exit Facility is not being issued directly to the creditors of the City in connection with the Plan, but will be publically offered, the City intends to rely on generally applicable securities law exemptions for the offering and sale of the Exit Facility. The City does not expect to offer the Exit Facility in states where registration of City securities may be required by the applicable state securities law, unless first registered. The New Securities issued under the Plan of Adjustment will also be exempt from registration under federal or state securities law to the maximum extent provided under section 1145 of the Bankruptcy Code. The remainder of the City's publicly traded securities will not be exchanged, reoffered or refinanced by the Plan, and therefore, the City does not expect implementation of the Plan to implicate federal securities laws with respect to those obligations. Holders of the City's publicly traded securities not specifically mentioned in this paragraph should consult with qualified counsel to determine if any state securities laws may be implicated in connection with the Plan.

Like the exemption from registration provided by the City under section 3(a)(2) of the Securities Act, generally applicable securities laws provide an exemption from qualification for certain trust indentures entered into by governmental entities. Therefore, each trust indenture, ordinance and resolution relating to DWSD Bonds or the Bonds will be exempt from qualification under section 304(a)(4) of the Trust Indenture Act.

### 2. Market Disclosure

#### (a) Initial Offer and Sale

Although exempt from registration, securities issued by the City are subject to the anti-fraud provisions of federal securities laws. Section 10(b) of the Securities Act and Rule 10b-5 promulgated by the SEC under the Securities Act generally prohibit fraud in the purchase and sale of securities. Therefore, each publicly offered sale of City obligations typically is accompanied by an offering document that is referred to as an "Official Statement" and contains disclosure of material information regarding the issuer and the securities being sold so that investors may make an informed investment decisions as to whether to purchase the securities being offered. Section 1125(d) of the Bankruptcy Code provides that the adequacy of any disclosure to creditors and hypothetical investors typical of Holders of Claims in this case is not subject to principals of any otherwise applicable non-bankruptcy law, rule or regulation, which includes federal securities laws. Instead, section 1124(d) of the Bankruptcy Code provides disclosure regulation by requiring that adequate information be provided to the various classes of creditors of the City and to hypothetical investors in obligations of the City through a disclosure statement such as this.

However, as described in the Plan, the City will issue bonds pursuant to the Exit Facility. In connection with the sale of the Exit Facility bonds in a public offering, the City will prepare an Official Statement

#### (b) Continuing Disclosure

Publicly offered securities of the City generally are subject to the requirements of Rule 15c2-12 (the "Rule"), promulgated by the SEC under the Securities Act, unless such securities meet certain exemptions provided for in the Rule. Among other requirements, the Rule requires underwriters participating in an offering to obtain an agreement imposing ongoing market disclosure requirements upon an issue of municipal securities, such as the City. The Rule will apply to the issuance and sale of the Exit Facility by the City, and the City intends to comply with the Rule by delivering a continuing disclosure undertaking in customary form contemporaneously with the delivery of the Exit Facility.

The delivery of the New Securities pursuant to the Plan is not covered by the Rule because the New Securities are proposed to be issued in exchange for a claimholder's Claim without the involvement of an underwriter as defined in the Rule. However, the City intends to voluntarily execute and deliver for the benefit of Holders of the New Securities, a new continuing Disclosure Undertaking containing certain disclosure obligations to be delivered on the Plan of Adjustment Effective Date.

State securities laws generally provide registration exemptions for subsequent transfers by a bona fide owner for the owner's own account and subsequent transfers to institutional or accredited investors. Such exemptions generally are expected to be available for subsequent transfers of the New Securities.

## XV.

## ADDITIONAL INFORMATION

Any statements in this Disclosure Statement concerning the provisions of any document are not necessarily complete, and in each instance reference is made to such document for the full text thereof. Certain documents described or referred to in this Disclosure Statement have not been attached as Exhibits because of the impracticability of furnishing copies of these documents to all recipients of this Disclosure Statement. All Exhibits to the Plan will be Filed with the Bankruptcy Court and available for review, free of charge, on the Document Websites prior to the Voting Deadline. Copies of all Exhibits to the Plan also may be obtained, free of charge, by contacting the Solicitation and Tabulation Agent (A) by telephone (1) for U.S. and Canadian callers toll-free at 877-298-6236 and (2) for international callers at +1 310-751-2658; or (B) in writing at City of Detroit c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245. All parties entitled to vote on the Plan are encouraged to obtain and review all Exhibits to the Plan prior to casting their vote

## XVI.

## RECOMMENDATION AND CONCLUSION

The City believes that the Confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the City urges all parties entitled to vote to accept the Plan and to evidence their acceptance by duly completing and returning their Ballots so that they will be received on or before the Voting Deadline.


Dated: February 21, 2014                    Respectfully submitted,


                                            City of Detroit, Michigan


                                            By:    /s/  Kevyn D. Orr
                                                   Name:   Kevyn D. Orr
                                                   Title:    Emergency Manager

COUNSEL:


  /s/ David G. Heiman
David G. Heiman
Heather Lennox
Thomas A. Wilson
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Bruce Bennett
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243 2382
Facsimile:  (213) 243 2539

Jonathan S. Green
Stephen S. LaPlante
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500

ATTORNEYS FOR THE DEBTOR

**EXHIBIT A**

PLAN OF ADJUSTMENT

THE BANKRUPTCY COURT HAS NOT APPROVED THE PROPOSED DISCLOSURE STATEMENT TO ACCOMPANY THIS PLAN. THE DISTRIBUTION OF THIS PLAN AND THE DISCLOSURE STATEMENT IS NOT INTENDED TO BE, AND SHOULD NOT BE CONSTRUED AS, A SOLICITATION OF VOTES ON THIS PLAN. THE CITY OF DETROIT, MICHIGAN RESERVES THE RIGHT TO MODIFY, AMEND, SUPPLEMENT, RESTATE OR WITHDRAW THIS PLAN, THE DISCLOSURE STATEMENT AND ALL ANCILLARY DOCUMENTS AT ANY TIME.

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF MICHIGAN

```
------------------------------------------------------- x
                                             :
In re                                        :      Chapter 9
                                             :
CITY OF DETROIT, MICHIGAN,                    :      Case No. 13-53846
                                             :
          Debtor.                            :      Hon. Steven W. Rhodes
                                             :
                                             :
------------------------------------------------------- x
```

---

## PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT
### (February 21, 2014)

---

DAVID G. HEIMAN
HEATHER LENNOX
THOMAS A. WILSON
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

BRUCE BENNETT
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 489-3939
Facsimile: (213) 243-2539
bbennett@jonesday.com

JONATHAN S. GREEN
STEPHEN S. LAPLANTE
MILLER, CANFIELD,
     PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE DEBTOR

# TABLE OF CONTENTS

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME ................. 1

    A.    Defined Terms. ................................................................................................................. 1

    B.    Rules of Interpretation and Computation of Time. ........................................................ 21

        1.    Rules of Interpretation. ....................................................................................... 21

        2.    Computation of Time. ......................................................................................... 21

ARTICLE II CLASSIFICATION OF CLAIMS; CRAMDOWN; EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................................................................................................ 21

    A.    Unclassified Claims. ..................................................................................................... 21

        1.    Payment of Administrative Claims. .................................................................... 21

        2.    Bar Dates for Administrative Claims. ................................................................. 22

    B.    Classified Claims. ......................................................................................................... 22

        1.    Designation of Classes. ....................................................................................... 22

        2.    Subordination; Reservation of Rights to Reclassify Claims. ............................. 23

        3.    Treatment of Claims. ........................................................................................... 24

    C.    Confirmation Without Acceptance by All Impaired Classes .......................................... 34

    D.    Treatment of Executory Contracts and Unexpired Leases ............................................. 34

        1.    Assumption. ......................................................................................................... 34

        2.    Assumption of Ancillary Agreements. ................................................................ 34

        3.    Approval of Assumptions and Assignments. ...................................................... 34

        4.    Payments Related to the Assumption of Executory Contracts and Unexpired Leases ................................................................................................................... 35

        5.    Contracts and Leases Entered Into After the Petition Date................................. 35

        6.    Rejection of Executory Contracts and Unexpired Leases................................... 35

        7.    Rejection Damages Bar Date. ............................................................................. 35

        8.    Preexisting Obligations to the City Under Rejected Executory Contracts and Unexpired Leases. ............................................................................................... 36

        9.    Insurance Policies. ............................................................................................... 36

ARTICLE III CONFIRMATION OF THE PLAN............................................................................... 36

    A.    Conditions Precedent to the Effective Date. ................................................................. 36

    B.    Waiver of Conditions to the Effective Date. ................................................................. 37

    C.    Effect of Nonoccurrence of Conditions to the Effective Date. ..................................... 37

    D.    Effect of Confirmation of the Plan. ............................................................................... 37

        1.    Dissolution of Official Committees. ................................................................... 37

        2.    Preservation of Rights of Action by the City. .................................................... 37

        3.    Comprehensive Settlement of Claims and Controversies................................... 38

        4.    Discharge of Claims. ........................................................................................... 38

| | 5. | Injunction. | 38 |
| | 6. | Exculpation. | 39 |
| | 7. | Releases | 39 |
| E. | | Effectiveness of the Plan. | 40 |
| F. | | Binding Effect of Plan. | 40 |

ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN ... 40

| A. | | Alternatives Related to the DWSD. | 40 |
| | 1. | DWSD Remains a Department of the City. | 40 |
| | 2. | Potential DWSD Transaction. | 40 |
| B. | | The New Securities. | 41 |
| C. | | The Plan COP Settlement. | 41 |
| D. | | The Plan GRS Settlement. | 41 |
| E. | | The Plan PFRS Settlement. | 41 |
| F. | | The DIA Settlement. | 41 |
| | 1. | Funding Contributions. | 42 |
| | 2. | Transfer of DIA Assets. | 42 |
| | 3. | Conditions to the Foundations' Participation. | 42 |
| G. | | Issuance of the New Securities. | 42 |
| H. | | Cancellation of Existing Bonds and Bond Documents. | 42 |
| I. | | Release of Liens. | 43 |
| J. | | Professional Fee Reserve | 43 |
| K. | | Assumption Of Indemnification Obligations. | 43 |
| L. | | Incorporation of Retiree Health Care Settlement Agreement. | 43 |
| M. | | Exit Facility. | 43 |

ARTICLE V PROVISIONS REGARDING DISTRIBUTIONS UNDER THE PLAN ... 44

| A. | | Appointment of Disbursing Agent. | 44 |
| B. | | Distributions on Account of Allowed Claims. | 44 |
| C. | | Certain Claims to Be Expunged. | 44 |
| D. | | Record Date for Distributions; Exception for Bond Claims. | 44 |
| E. | | Means of Cash Payments. | 44 |
| F. | | Selection of Distribution Dates for Allowed Claims | 45 |
| G. | | Limitations on Amounts to Be Distributed to Holders of Allowed Claims Otherwise Insured. | 45 |
| H. | | City's Rights of Setoff Preserved. | 45 |
| I. | | Delivery of Distributions and Undeliverable or Unclaimed Distributions. | 45 |
| | 1. | Delivery of Distributions Generally. | 45 |
| | 2. | Delivery of Distributions on Account of Bond Claims. | 45 |

|       | 3.    | De Minimis Distributions / No Fractional New Securities. | 46 |
|       | 4.    | Undeliverable or Unclaimed Distributions. | 46 |
|       | 5.    | Time Bar to Cash Payment Rights. | 46 |
| J.    |       | Other Provisions Applicable to Distributions in All Classes | 46 |
|       | 1.    | No Postpetition Interest. | 46 |
|       | 2.    | Compliance with Tax Requirements. | 46 |
|       | 3.    | Allocation of Distributions. | 47 |
|       | 4.    | Surrender of Instruments. | 47 |

**ARTICLE VI PROCEDURES FOR RESOLVING DISPUTED CLAIMS** ........ 47

| A.    |       | Treatment of Disputed Claims. | 47 |
|       | 1.    | General. | 47 |
|       | 2.    | ADR Procedures. | 48 |
|       | 3.    | Tort Claims. | 48 |
| B.    |       | Disputed Claims Reserve. | 48 |
| C.    |       | Objections to Claims. | 49 |
|       | 1.    | Authority to Prosecute, Settle and Compromise. | 49 |
|       | 2.    | Application of Bankruptcy Rules. | 49 |
|       | 3.    | Expungement or Adjustment of Claims Without Objection. | 49 |
|       | 4.    | Extension of Claims Objection Bar Date. | 49 |
|       | 5.    | Authority to Amend List of Creditors. | 49 |

**ARTICLE VII RETENTION OF JURISDICTION** ........ 49

**ARTICLE VIII MISCELLANEOUS PROVISIONS** ........ 51

| A.    | Modification of the Plan. | 51 |
| B.    | Revocation of the Plan. | 51 |
| C.    | Disclosure of Amounts to Be Paid for Chapter 9 Case Services. | 51 |
| D.    | Severability of Plan Provisions. | 51 |
| E.    | Effectuating Documents and Transactions. | 51 |
| F.    | Successors and Assigns. | 52 |
| G.    | Plan Controls. | 52 |
| H.    | Notice of the Effective Date. | 52 |
| I.    | Governing Law. | 52 |
| J.    | Request for Waiver of Automatic Stay of Confirmation Order. | 52 |
| K.    | Term of Existing Injunctions and Stays. | 52 |
| L.    | Service of Documents | 52 |
|       | 1.    | The City | 53 |
|       | 2.    | The Retiree Committee | 53 |

# TABLE OF EXHIBITS

| | |
|---|---|
| Exhibit I.A.50 | Schedule of COP Swap Agreements |
| Exhibit I.A.62 | Form of Detroit VEBA Trust Agreement |
| Exhibit I.A.64 | Schedule of DIA Assets |
| Exhibit I.A.71 | Form of DIA Settlement Documents |
| Exhibit I.A.88 | Schedule of DWSD Class A Sewer Documents & Related DWSD Class A Sewer Bonds |
| Exhibit I.A.91 | Schedule of DWSD Class A Water Documents & Related DWSD Class A Water Bonds |
| Exhibit I.A.94 | Schedule of DWSD Class B Sewer Documents & Related DWSD Class B Sewer Bonds |
| Exhibit I.A.97 | Schedule of DWSD Class B Water Documents & Related DWSD Class B Water Bonds |
| Exhibit I.A.102 | Schedule of DWSD Revolving Sewer Bond Documents & Related DWSD Revolving Sewer Bonds |
| Exhibit I.A.105 | Schedule of DWSD Revolving Water Bond Documents & Related DWSD Revolving Water Bonds |
| Exhibit I.A.119 | Principal Terms of Exit Facility |
| Exhibit I.A.140 | Material Terms Related to GRS Hybrid Pension Formula |
| Exhibit I.A.146 | Schedule of HUD Installment Note Documents & Related HUD Installment Notes |
| Exhibit I.A.150 | Interest Rate Reset Chart |
| Exhibit I.A.154 | Schedule of Limited Tax General Obligation Bond Documents & Related Limited Tax General Obligation Bonds |
| Exhibit I.A.160 | Principal Terms of New B Notes |
| Exhibit I.A.161 | Form of New B Notes Documents |
| Exhibit I.A.162 | New B Notes Valuation |
| Exhibit I.A.163 | Principal Terms of New C Notes |
| Exhibit I.A.164 | Form of New C Notes Documents |
| Exhibit I.A.165 | Form of New DWSD Bond Documents |
| Exhibit I.A.166 | Principal Terms of New DWSD Bonds |
| Exhibit I.A.167 | Form of New DWSD Revolving Bond Documents |

| Exhibit I.A.168 | Principal Terms of New DWSD Revolving Bonds |
| Exhibit I.A.169 | Form of New Existing Rate DWSD Bond Documents |
| Exhibit I.A.170 | Principal Terms of New Existing Rate DWSD Bonds |
| Exhibit I.A.171 | Form of New Existing Rate GLWA Bond Documents |
| Exhibit I.A.172 | Principal Terms of New Existing Rate GLWA Bonds |
| Exhibit I.A.173 | Form of New GLWA Bond Documents |
| Exhibit I.A.174 | Principal Terms of New GLWA Bonds |
| Exhibit I.A.175 | Form of New GLWA Revolving Bond Documents |
| Exhibit I.A.176 | Principal Terms of New GLWA Revolving Bonds |
| Exhibit I.A.182.a | Principal Terms of OPEB Claims Note |
| Exhibit I.A.182.b | Form of OPEB Claims Note |
| Exhibit I.A.195 | Material Terms Related to PFRS Hybrid Pension Formula |
| Exhibit I.A.201 | Form of Plan COP Settlement Documents |
| Exhibit I.A.203 | Form of Plan GRS Settlement Documents |
| Exhibit I.A.205 | Form of Plan PFRS Settlement Documents |
| Exhibit I.A.206 | Principal Terms of Plan UTGO Notes |
| Exhibit I.A.207 | Form of Plan UTGO Note |
| Exhibit I.A.220 | Principal Terms of Retiree Health Care Settlement Agreement |
| Exhibit I.A.225 | Schedule of Secured GO Bond Documents |
| Exhibit I.A.258 | Schedule of Unlimited Tax General Obligation Bond Documents & Related Unlimited Tax General Obligation Bonds |
| Exhibit II.B.3.t.i | Schedule of Reductions to Allowed PFRS Claims and Related Allowed OPEB Claims |
| Exhibit II.B.3.t.ii.A | Schedule of Payments and Sources of Payments for Modified PFRS Pension Benefits |
| Exhibit II.B.3.u.i | Schedule of Reductions to Allowed GRS Claims and Related Allowed OPEB Claims |
| Exhibit II.B.3.u.ii.A | Schedule of Payments and Sources of Payments for Modified GRS Pension Benefits |
| Exhibit II.B.3.u.ii.D | Reduction Formula for Participants in Annuity Savings Fund Accounts |
| Exhibit II.D.5 | Schedule of Postpetition Collective Bargaining Agreements |
| Exhibit II.D.6 | Executory Contracts and Unexpired Leases to Be Rejected |

Exhibit III.D.2          Retained Causes of Action

**INTRODUCTION**

The City of Detroit proposes the following plan for the adjustment of its debts pursuant to and in accordance with chapter 9 of the Bankruptcy Code.

A discussion of the City's organizational structure, operations, capital structure and events leading to the commencement of the City's Chapter 9 Case, as well as a summary and description of the Plan and certain related matters, is included in the Disclosure Statement. Other agreements and documents, which have been or will be Filed with the Bankruptcy Court, are referenced in the Plan or the Disclosure Statement and are available for review.

The City encourages all of its creditors to read the Plan, the Disclosure Statement and the other material that has been approved for use in soliciting votes on the Plan before casting a vote to accept or reject the Plan and before choosing among available treatment options.

**ARTICLE I**
**DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME**

A.    **Defined Terms.**

Capitalized terms used in the Plan have the meanings set forth in this Section I.A. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

1.    "2005 COPs" means, collectively, the Detroit Retirement Systems Funding Trust 2005 Certificates of Participation Series 2005-A, issued by the Detroit Retirement Systems Funding Trust 2005 pursuant to the 2005 COPs Agreement, in an initial principal amount of $640 million, bearing interest at 4.0% to 4.948%.

2.    "2005 COPs Agreement" means that certain Trust Agreement by and between the COP Service Corporations and U.S. Bank National Association, as trustee, dated June 2, 2005, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary instruments and agreements related thereto.

3.    "2006 COPs" means, collectively, the (a) Detroit Retirement Systems Funding Trust 2006 Certificates of Participation Series 2006-A, issued by the Detroit Retirement Systems Funding Trust 2006 pursuant to the 2006 COPs Agreement, in an initial principal amount of $148.5 million, bearing interest at 5.989%; and (b) Detroit Retirement Systems Funding Trust 2006 Certificates of Participation Series 2006-B, issued by the Detroit Retirement Systems Funding Trust 2006 pursuant to the 2006 COPs Agreement, in an initial principal amount of $800 million, bearing interest at a floating rate.

4.    "2006 COPs Agreement" means that certain Trust Agreement by and between the COP Service Corporations and U.S. Bank National Association, as trustee, dated June 12, 2006, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary instruments and agreements related thereto.

5.    "36th District Court" means the district court for the thirty-sixth judicial district of the State.

6.    "Active Employee" means an active employee of the City on and after the Confirmation Date.

7.    "Adjusted Pension Amount" means the GRS Adjusted Pension Amount and/or the PFRS Adjusted Pension Amount, as applicable.

8.    "Administrative Claim" means a Claim against the City arising on or after the Petition Date and prior to the Effective Date for a cost or expense of administration related to the Chapter 9 Case that is entitled to priority or superpriority under sections 364(c)(1), 503(b) or 507(b)(2) of the Bankruptcy Code; <u>provided</u> that any

claim for professional fees or any other costs or expenses incurred by the Creditors' Committee shall not be considered an Administrative Claim.

9.  "ADR Injunction" means the injunction set forth at Section I.B of the ADR Procedures.

10.  "ADR Procedures" means the alternative dispute resolution procedures approved by the ADR Procedures Order, as such procedures may be modified by further order of the Bankruptcy Court.

11.  "ADR Procedures Order" means the Order, Pursuant to Sections 105 and 502 of the Bankruptcy Code, Approving Alternative Dispute Resolution Procedures to Promote the Liquidation of Certain Prepetition Claims (Docket No. 2302), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on December 24, 2013, as it may be subsequently amended, supplemented or otherwise modified.

12.  "Affiliate" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

13.  "Allowed Claim(s)" means: (a) a Claim, proof of which has been timely Filed by the applicable Bar Date (or for which Claim under express terms of the Plan, the Bankruptcy Code or a Final Order of the Bankruptcy Court, a proof of Claim is not required to be Filed); (b) a Claim (i) that is listed in the List of Creditors, (ii) that is not identified on the List of Creditors as contingent, unliquidated or disputed and (iii) for which no proof of Claim has been timely Filed; (c) a Claim allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; (d) a Claim designated as allowed in a stipulation or agreement between the City and the Holder of the Claim that is Filed; or (e) a Claim designated as allowed in a pleading entitled "Designation of Allowed Claims" (or a similar title of the same import) that is Filed; *provided*, that with respect to any Claim described in clauses (a) or (b) above, such Claim shall be considered allowed only if and to the extent that (x) no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or (y) if an objection is so interposed, the Claim shall have been allowed by a Final Order. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed to be an Allowed Claim unless and until such Entity pays in full the amount that it owes the City. "Allow" and "Allowing" shall have correlative meanings.

14.  "Annuity Savings Fund Account" means that sub-account and pension benefit arrangement that that is part of the GRS and operated by the trustees of the GRS.

15.  "Ballot" means the ballot upon which a Holder of an Impaired Claim entitled to vote shall cast its vote to accept or reject the Plan and make certain elections provided for in the Plan.

16.  "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as now in effect or hereafter amended.

17.  "Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Michigan having jurisdiction over the Chapter 9 Case, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to § 151 of title 28 of the United States Code, the District Court.

18.  "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the general, local and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended, as applicable to the Chapter 9 Case.

19.  "Bar Date" means the applicable bar date by which a proof of Claim must be or must have been Filed, as established by a Final Order of the Bankruptcy Court, including a Bar Date Order and the Confirmation Order.

20.  "Bar Date Order" means any order of the Bankruptcy Court establishing Bar Dates for Filing proofs of Claim in the Chapter 9 Case, including the Order, Pursuant to Sections 105, 501 and 503 of the Bankruptcy Code and Bankruptcy Rules 2002 and 3003(c), Establishing Bar Dates for Filing Proofs of Claim and

Approving Form and Manner of Notice Thereof (Docket No. 1782), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on November 21, 2013, as it may be amended, supplemented or otherwise modified.

21.     "Bond Agent" means a trustee, paying agent or similar Entity, as applicable, under the Bond Documents.

22.     "Bond Claims" means, collectively, the DWSD Class A Sewer Claims, the DWSD Class A Water Claims, the DWSD Class B Sewer Claims, the DWSD Class B Water Claims, the DWSD Revolving Bond Claims, the General Obligation Bond Claims, the HUD Installment Note Claims, the Parking Bond Claims and the Secured GO Bond Claims.

23.     "Bond Documents" means, collectively, the DWSD Class A Sewer Documents, the DWSD Class A Water Documents, the DWSD Class B Sewer Documents, the DWSD Class B Water Documents, the DWSD Revolving Bond Documents, the General Obligation Bond Documents, the HUD Installment Note Documents, the Parking Bond Documents and the Secured GO Bond Documents.

24.     "Bond(s)" means, individually or collectively, the DWSD Class A Sewer Bonds, the DWSD Class A Water Bonds, the DWSD Class B Sewer Bonds, the DWSD Class B Water Bonds, the DWSD Revolving Sewer Bonds, the DWSD Revolving Water Bonds, the General Obligation Bonds, the HUD Installment Notes, the Parking Bonds and/or the Secured GO Bonds.

25.     "Bondholder" means any beneficial or record holder of a Bond.

26.     "Bond Insurance Policies" means those policies and/or other instruments insuring certain Bonds and obligations related thereto.

27.     "Bond Insurer" means any party, other than the City, that has issued a Bond Insurance Policy.

28.     "Business Day" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

29.     "Cash" means legal tender of the United States of America and equivalents thereof.

30.     "Causes of Action" means, without limitation, any and all actions, causes of action, controversies, liabilities, obligations, rights, suits, damages, judgments, claims and demands whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Effective Date, including without limitation (a) claims and causes of action under sections 502(d), 510, 544, 545, 547, 548, 549(a), 549(c), 549(d), 550, 551 and 553 of the Bankruptcy Code and (b) any other avoidance or similar claims or actions under the Bankruptcy Code or under similar or related state or federal statutes or common law, and, in the case of each Cause of Action, the proceeds thereof, whether received by judgment, settlement or otherwise.

31.     "CFSEM Supporting Organization" means the Foundation for Detroit's Future, a supporting organization of, and an Entity legally separate from, the Community Foundation for Southeast Michigan.

32.     "Chapter 9 Case" means the bankruptcy case commenced by the City under chapter 9 of the Bankruptcy Code, captioned as *In re City of Detroit, Michigan*, Case No. 13-53846 (Bankr. E.D. Mich.), and currently pending before the Bankruptcy Court.

33.     "City" means the City of Detroit, Michigan.

34.     "City Council" means the duly-elected City Council of the City.

35.     "Claim" means a claim, as defined in section 101(5) of the Bankruptcy Code, against the City.

36.     "Claims and Balloting Agent" means Kurtzman Carson Consultants, LLC, in its capacity as Bankruptcy Court-appointed claims and balloting agent for the Chapter 9 Case.

37.     "Claims Objection Bar Date" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) one year after the Effective Date, subject to extension by an order of the Bankruptcy Court, (b) 90 days after the Filing of a proof of Claim for such Claim and (c) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court.

38.     "Claims Register" means the official register of Claims maintained by the Claims and Balloting Agent.

39.     "Class" means a class of Claims, as described in Section II.B.

40.     "Confirmation" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 9 Case.

41.     "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket in the Chapter 9 Case, within the meaning of Bankruptcy Rules 5003 and 9021.

42.     "Confirmation Hearing" means the hearing held by the Bankruptcy Court on Confirmation of the Plan, as such hearing may be continued.

43.     "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 943 of the Bankruptcy Code, as it may be subsequently amended, supplemented or otherwise modified.

44.     "Convenience Claim" means a Claim that would otherwise be an Other Unsecured Claim that is (a) an Allowed Claim in an amount less than or equal to $25,000.00; or (b) in an amount that has been reduced to $25,000.00 pursuant to an election made by the Holder of such Claim; *provided* that, where any portion(s) of a single Claim has been transferred, (y) the amount of all such portions will be aggregated to determine whether a Claim qualifies as a Convenience Claim and for purposes of the Convenience Claim election and (z) unless all transferees make the Convenience Claim election on the applicable Ballots, the Convenience Claim election will not be recognized for such Claim.

45.     "COPs" means, collectively, the 2005 COPs and the 2006 COPs.

46.     "COP Claim" means a Claim under or evidenced by the COP Service Contracts.

47.     "COP Litigation" means the adversary proceeding captioned as *City of Detroit, Michigan v. Detroit General Retirement System Service Corporation, Detroit Police and Fire Retirement System Service Corporation, Detroit Retirement Systems Funding Trust 2005 and Detroit Retirement Systems Funding Trust 2006*, Case No. 14-04112 (Bankr. E.D. Mich.), filed in the Chapter 9 Case on January 31, 2014.

48.     "COP Service Contracts" means, collectively, the (a) the GRS Service Contract 2005, dated May 25, 2005, by and between the City and the Detroit General Retirement System Service Corporation; (b) the PFRS Service Contract 2005, dated May 25, 2005, by and between the City and the Detroit Police and Fire Retirement System Service Corporation; (c) the GRS Service Contract 2006, dated June 7, 2006, by and between the City and the Detroit General Retirement System Service Corporation; and (d) the PFRS Service Contract 2006, dated June 7, 2006, by and between the City and the Detroit Police and Fire Retirement System Service Corporation, as each of the foregoing may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary instruments and agreements related thereto.

49.     "COP Service Corporations" means, collectively, the Detroit General Retirement System Service Corporation and the Detroit Police and Fire Retirement System Service Corporation.

50.      "COP Swap Agreements" means the 1992 ISDA Master Agreements (Local Currency Single Jurisdiction) between the COP Service Corporations and the COP Swap Counterparties, as set forth on Exhibit I.A.50, together with all ancillary instruments and agreements related thereto, as the same may have been subsequently amended, restated, supplemented or otherwise modified.

51.      "COP Swap Claim" means a Claim arising under the COP Swap Documents.

52.      "COP Swap Collateral Agreement" means the Collateral Agreement among the City, the Service Corporations, the COP Swap Collateral Agreement Custodian and the COP Swap Counterparties, together with all ancillary instruments and agreements related thereto.

53.      "COP Swap Counterparties" means UBS AG or Merrill Lynch Capital Services, Inc., as successor to SBS Financial Products Company LLC under the COP Swap Documents.

54.      "COP Swap Documents" means the COP Swap Agreements and the COP Swap Collateral Agreement.

55.      "Counties" means, collectively, Macomb County, Oakland County and Wayne County.

56.      "Creditor Representative" means (a) if all Retiree Classes accept the plan, the Retiree Committee, (b) if any Retiree Class rejects the Plan and Class 7 accepts the Plan, a person or committee of persons appointed by the five largest beneficial holders of Class 7 Claims other than the LTGO Insurer and (c) if any Retiree Class rejects the plan and Class 7 rejects the plan, a person or committee of persons appointed by the Emergency Manager.

57.      "Creditors' Committee" means the statutory official committee of unsecured creditors first appointed by the United States Trustee in the Chapter 9 Case on December 23, 2013 (Docket No. 2290), as such committee may be reconstituted.

58.      "Cure Amount Claim" means a Claim based upon the City's defaults under an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the City under section 365 of the Bankruptcy Code to the extent such Claim is required to be cured by section 365 of the Bankruptcy Code.

59.      "Current Accrued Annual Pension" means, with respect to any Holder of a Pension Claim, the amount of annual pension benefits that the applicable Retirement System (a) is obligated to pay to such Holder as of June 30, 2014 to the extent such Holder is retired and receiving, or terminated from City employment and eligible to receive, a monthly pension as of such date or (b) would pay such Holder were such Holder to terminate active employment with the City on June 30, 2014 and defer his or her vested pension, in either case as reflected on the books and records of the applicable Retirement System as of such date, but in no case shall such Current Accrued Annual Pension include a right to supplemental pension benefits to be paid after July 1, 2014 in respect of cost of living allowances.

60.      "Detroit VEBA" means a voluntary employees' beneficiary association established in accordance with section 501(c)(9) of the Internal Revenue Code of 1986 and regulations thereunder that provides life, sickness, accident or other similar benefits to Detroit VEBA Beneficiaries, certain of their dependents and future retirees of the City.

61.      "Detroit VEBA Beneficiary" means a Holder of an OPEB Claim.

62.      "Detroit VEBA Trust Agreement" means the definitive documentation to be executed in connection with the formation of the Detroit VEBA, in substantially the form attached hereto as Exhibit I.A.62.

63.      "DIA" means The Detroit Institute of Arts, a museum and cultural facility located at 5200 Woodward Avenue, Detroit, Michigan 48202.

64.     "DIA Assets" means the assets identified on Exhibit I.A.64, to the extent that the City holds title to any such assets as of the Effective Date.

65.     "DIA Corp." means The Detroit Institute of Arts, a Michigan non-profit corporation.

66.     "DIA Funding Parties" means the Foundations and DIA Corp.

67.     "DIA Proceeds" means, collectively, the irrevocable funding commitments described in Section IV.F.1.

68.     "DIA Proceeds Default Amount" means a reduction in the Adjusted Pension Amount of a Holder of a Pension Claim (or a surviving spouse thereof) by virtue of a DIA Proceeds Payment Default, as determined by the trustees of GRS or PFRS, or any successor plan or trust thereto, in an amount commensurate with the amounts scheduled to be paid to the City in accordance with the DIA Settlement but not received.

69.     "DIA Proceeds Payment Default" means a default which has not been cured during any applicable grace period, as determined by the trustees of the GRS or the PFRS, or of any successor plan or trust thereto, by one or more DIA Funding Parties respecting material amounts scheduled to be paid to the City in accordance with the DIA Settlement, and which the City is required to pay over to the GRS or the PFRS in accordance with the terms and conditions of the Plan.

70.     "DIA Settlement" means the comprehensive settlement regarding the DIA Assets, as described at Section IV.F and as definitively set forth in the DIA Settlement Documents.

71.     "DIA Settlement Documents" means the definitive documentation to be executed in connection with the DIA Settlement, in substantially the form attached hereto as Exhibit I.A.71.

72.     "Disbursing Agent" means the disbursing agent(s) appointed pursuant to Section V.A.

73.     "Disclosure Statement" means the disclosure statement (including all exhibits and schedules thereto or referenced therein) that relates to the Plan and has been prepared and distributed by the City and approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, as the same may be amended, supplemented or otherwise modified.

74.     "Disclosure Statement Order" means the [_____] (Docket No. [___]), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on [_____], 2014, approving the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, as it may have been subsequently amended, supplemented or otherwise modified.

75.     "Disputed Claim" means any Claim that is not Allowed.

76.     "Disputed COP Claims Reserve" means the reserve for Disputed COP Claims established pursuant to Section II.B.3.s.iii.B.1.

77.     "Distribution" means any initial or subsequent payment or transfer made on account of an Allowed Claim under or in connection with the Plan.

78.     "Distribution Date" means any date on which a Distribution is made.

79.     "Distribution Record Date" means 5:00 p.m., Eastern Time, on the Confirmation Date.

80.     "District Court" means the United States District Court for the Eastern District of Michigan.

81.     "Document Website" means the internet site address http://www.kccllc.net/Detroit, at which the Plan, the Disclosure Statement and all Filed Exhibits to the Plan shall be available to any party in interest and the public, free of charge.

82.     "Downtown Development Authority Claims" means Claims in respect of the Downtown Development Authority Loans.

83.     "Downtown Development Authority Loans" means loans made pursuant to that certain Loan Agreement, dated August 26, 1991, by and between the City and the City of Detroit Downtown Development Authority, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary instruments and agreements related thereto.

84.     "DWSD" means the Detroit Water and Sewerage Department, which is a department of the City.

85.     "DWSD Bonds" means, collectively, the DWSD Class A Sewer Bonds, the DWSD Class B Sewer Bonds, the DWSD Class A Water Bonds and the DWSD Class B Water Bonds.

86.     "DWSD Class A Sewer Bonds" means the secured notes issued pursuant to the DWSD Class A Sewer Documents, as set forth on Exhibit I.A.88.

87.     "DWSD Class A Sewer Claims" means any Claim against the City arising under or evidenced by the DWSD Class A Sewer Documents, including a Claim for principal and interest on the DWSD Class A Sewer Bonds.

88.     "DWSD Class A Sewer Documents" means the ordinances passed, resolutions adopted, orders issued and/or indentures executed with respect to the DWSD Class A Sewer Bonds, as set forth on Exhibit I.A.88, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary instruments and agreements related thereto.

89.     "DWSD Class A Water Bonds" means the secured notes issued pursuant to the DWSD Class A Water Documents, as set forth on Exhibit I.A.91.

90.     "DWSD Class A Water Claims" means any Claim against the City arising under or evidenced by the DWSD Class A Water Documents, including a Claim for principal and interest on the DWSD Class A Water Bonds.

91.     "DWSD Class A Water Documents" means the ordinances passed, resolutions adopted, orders issued and/or indentures executed with respect to the DWSD Class A Water Bonds, as set forth on Exhibit I.A.91, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary instruments and agreements related thereto.

92.     "DWSD Class B Sewer Bonds" means the secured notes issued pursuant to the DWSD Class B Sewer Documents, as set forth on Exhibit I.A.94.

93.     "DWSD Class B Sewer Claims" means any Claim against the City arising under or evidenced by the DWSD Class B Sewer Documents, including a Claim for principal and interest on the DWSD Class B Sewer Bonds.

94.     "DWSD Class B Sewer Documents" means the ordinances passed, resolutions adopted, orders issued and/or indentures executed with respect to the DWSD Class B Sewer Bonds, as set forth on Exhibit I.A.94, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary instruments and agreements related thereto.

95.     "DWSD Class B Water Bonds" means the secured notes issued pursuant to the DWSD Class B Water Documents, as set forth on Exhibit I.A.97.

96.     "DWSD Class B Water Claims" means any Claim against the City arising under or evidenced by the DWSD Class B Water Documents, including a Claim for principal and interest on the DWSD Class B Water Bonds.

97.     "DWSD Class B Water Documents" means the ordinances passed, resolutions adopted, orders and reports issued and/or indentures executed with respect to the DWSD Class B Water Bonds, as set forth on Exhibit I.A.97, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary instruments and agreements related thereto.

98.     "DWSD Revolving Bond Claims" means, collectively, the DWSD Revolving Sewer Bond Claims and the DWSD Revolving Water Bond Claims.

99.     "DWSD Revolving Bond Documents" means, collectively, the DWSD Revolving Sewer Bond Documents and the DWSD Revolving Water Bond Documents.

100.    "DWSD Revolving Bonds" means, collectively, the DWSD Revolving Sewer Bonds and the DWSD Revolving Water Bonds.

101.    "DWSD Revolving Sewer Bond Claims" means any Claim against the City arising under or evidenced by the DWSD Revolving Sewer Bond Documents, including a Claim for principal and interest on the DWSD Revolving Sewer Bonds.

102.    "DWSD Revolving Sewer Bond Documents" means the ordinances passed, resolutions adopted and/or indentures or agreements executed with respect to the DWSD Revolving Sewer Bonds, as set forth on Exhibit I.A.102, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary instruments and agreements related thereto.

103.    "DWSD Revolving Sewer Bonds" means the secured notes issued pursuant to the DWSD Revolving Sewer Bond Documents, as set forth on Exhibit I.A.102.

104.    "DWSD Revolving Water Bond Claims" means any Claim against the City arising under or evidenced by the DWSD Revolving Water Bond Documents, including a Claim for principal and interest on the DWSD Revolving Water Bonds.

105.    "DWSD Revolving Water Bond Documents" means the ordinances passed, resolutions adopted and/or indentures or agreements executed with respect to the DWSD Revolving Water Bonds, as set forth on Exhibit I.A.105, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary instruments and agreements related thereto.

106.    "DWSD Revolving Water Bonds" means the secured notes issued pursuant to the DWSD Revolving Water Bond Documents, as set forth on Exhibit I.A.105.

107.    "DWSD Series" means an individual issue of DWSD Bonds or DWSD Revolving Bonds having the same lien priority, issue date and series designation.

108.    "DWSD Transaction" means the potential formation (including the transfer of certain assets owned by the DWSD) and operation of the GLWA, as described in Section IV.A.2.

109.    "Effective Date" means the Business Day, as determined by the City, on which each applicable condition contained in Section III.A has been satisfied or waived.

110.    "Electing GRS Holder" means any Holder of a GRS Pension Claim who elects to participate in the Plan GRS Settlement on a timely-returned Ballot accepting the Plan.

111. "Electing PFRS Holder" means any Holder of a PFRS Pension Claim who elects to participate in the Plan PFRS Settlement on a timely-returned Ballot accepting the Plan.

112. "Emergency Manager" means Kevyn D. Orr, in his capacity as emergency manager for the City serving in accordance with PA 436 or any successor emergency manager.

113. "Employee Health and Life Insurance Benefit Plan" means the Employee Health and Life Insurance Benefit Plan, a welfare benefit plan sponsored and administered by the City, which provides hospitalization, dental care, vision care and life insurance to (a) all officers and employees of the City who were employed on the day preceding the effective date of the benefit plan, and who continued in the employ of the City on and after the Effective Date and (b) substantially all retired officers and employees of the City.

114. "Employees Death Benefit Board of Trustees" means the governing board of the City of Detroit Employee Benefit Plan, which operates and administers the Employee Death Benefit Plan for retired officers and employees of the City.

115. "Employees Death Benefit Plan" means the City of Detroit Employee Death Benefit Plan, a pre-funded defined benefit plan and trust administered by the Employee Death Benefit Board of Trustees that provides supplemental death benefits to retired officers and employees of the City.

116. "Entity" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

117. "Executory Contract" means a contract to which the City is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code.

118. "Exhibits" means, collectively, the documents listed on the "Table of Exhibits" included herein, which documents will be Filed no later than five days before the Confirmation Hearing, to the extent not Filed earlier; *provided*, *however*, that (a) Exhibits I.A.140, I.A.162, I.A.195, I.A.206, II.B.3.t.i, II.B.3.u.i, II.B.3.u.ii.D and II.D.6 will be Filed no later than five Business Days prior to the Voting Deadline; and (b) Exhibits I.A.64, I.A.71, I.A.119, I.A.203 and I.A.205 will be Filed only if the transactions related to and/or underlying such Exhibits are to be consummated by the City. All Exhibits will be made available on the Document Website once they are Filed. The City reserves the right, in accordance with the terms hereof, to modify, amend, supplement, restate or withdraw any of the Exhibits after they are Filed and shall promptly make such changes available on the Document Website.

119. "Exit Facility" means a credit facility that will be entered into by the City, the Exit Facility Agent and the other financial institutions party thereto on the Effective Date on substantially the terms set forth on Exhibit I.A.119.

120. "Exit Facility Agent" means the agent under the Exit Facility.

121. "Face Amount" means (a) if a proof of Claim has been Filed by the applicable Bar Date: (i) if only a liquidated amount is provided on the proof of Claim, the full stated amount claimed by the Holder in such proof of Claim, and (ii) if a portion of the Claim is stated as unliquidated, the liquidated amount claimed by the Holder in such proof of Claim; or (b) if a proof of Claim has not been Filed, the liquidated, undisputed, non-contingent amount, if any, set forth for a Claim in the List of Creditors.

122. "Fee Examiner" means Robert M. Fishman, in his capacity as the fee examiner appointed pursuant to the Fee Examiner Order.

123. "Fee Examiner Order" means the Order Appointing Fee Examiner (Docket No. 383), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on August 19, 2013, as it may have been amended, supplemented or otherwise modified.

124. "Fee Examiner Parties" means, collectively, (a) the Fee Examiner and (b) any counsel or other professional advising the Fee Examiner whose fees and expenses are subject to the Fee Review Order.

125. "Fee Review Order" means the Fee Review Order (Docket No. 810), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on September 11, 2013, as it may have been amended, supplemented or otherwise modified.

126. "Fee Review Professionals" means, collectively, (a) those professionals retained by the City and the Retiree Committee to render services in connection with the Chapter 9 Case who seek payment of compensation and reimbursement of expenses from the City for postpetition services pursuant to and in accordance with the Fee Review Order and (b) the Fee Examiner Parties. For the avoidance of doubt, any professionals retained by the Creditors' Committee or any other official committee appointed in the Chapter 9 Case other than the Retiree Committee are not Fee Review Professionals.

127. "Fee Review Professional Fees" means the fees and expenses of the Fee Review Professionals incurred during the period beginning on the Petition Date and ending on the Effective Date.

128. "File," "Filed," or "Filing" means file, filed or filing with the Bankruptcy Court or the Claims and Balloting Agent, as applicable, in the Chapter 9 Case.

129. "Final Order" means an order or judgment of the Bankruptcy Court, or any other court of competent jurisdiction, as entered on the docket in the Chapter 9 Case or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move, under Bankruptcy Rule 9023 and/or Rule 59 of the Federal Rules of Civil Procedure, for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied or resulted in no modification of such order; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed shall not prevent such order from being a Final Order.

130. "Fiscal Year" means a fiscal year for the City, commencing on July 1 of a year and ending on June 30 of the following year. A Fiscal Year is identified by the calendar year in which the Fiscal Year ends, such that, for example, the 2015 Fiscal Year is the Fiscal Year commencing on July 1, 2014, and ending on June 30, 2015.

131. "Foundation" means any Entity, other than DIA Corp., that is a contributing party to the DIA Settlement.

132. "General Fund" means the primary governmental fund and the chief operating fund of the City, which fund accounts for several of the City's primary services, including police, fire, public works, community and youth services.

133. "General Obligation Bond Claims" means, collectively, the Limited Tax General Obligation Bond Claims and the Unlimited Tax General Obligation Bond Claims.

134. "General Obligation Bond Documents" means, collectively, the Limited Tax General Obligation Bond Documents and the Unlimited Tax General Obligation Bond Documents.

135. "General Obligation Bonds" means, collectively, the Limited Tax General Obligation Bonds and the Unlimited Tax General Obligation Bonds.

136. "GLWA" means the Great Lakes Water and Sewer Authority, to be formed pursuant to a DWSD Transaction to conduct the operations currently conducted by the DWSD as described in Section IV.A.2.

137. "GRS" means the General Retirement System for the City of Detroit.

138.     "GRS Adjusted Pension Amount" means, with respect to a Holder of a GRS Pension Claim, the Current Accrued Annual Pension payable to such Holder as adjusted in accordance with the following formula: (a) for such a Holder who is either retired and receiving a monthly pension or a surviving beneficiary, a 34% reduction in the monthly pension amount; and (b) for such a Holder who is an Active Employee, a 34% reduction in the monthly pension amount; provided that, with respect to Holders who are Active Employees, in the event the unfunded liabilities of the GRS for the plan year ending June 30, 2014 are greater than the unfunded liabilities of the GRS as of June 30, 2013, the reduction in the monthly pension amount shall be increased to the extent necessary to ensure that there is no change in the amount of the underfunding between Fiscal Years 2013 and 2014.

139.     "GRS Claim" means, with respect to any Holder of a GRS Pension Claim, (a) such GRS Pension Claim and (b) any OPEB Claim held by such Holder.

140.     "GRS Hybrid Pension Formula" means an accrual rate for active employee participants in the GRS for benefits earned for service on or after July 1, 2014 that equals the product of (a) 1.5% multiplied by (b) such employee's average base compensation over an employee's final 10 years of service, multiplied by (c) such employee's years of service after July 1, 2014.  For purposes of this definition, base compensation will exclude overtime, longevity or other bonuses, and unused sick leave, and the GRS Hybrid Pension Formula will be part of a hybrid program that will contain rules to shift funding risk to participants in the event of underfunding of hybrid pensions, and mandate minimum retirement ages for unreduced pensions and other material terms as set forth in Exhibit I.A.140.

141.     "GRS Pension Claim" means any Claim (other than an OPEB Claim), whether asserted by current or former employees of the City, their heirs or beneficiaries or by the GRS or any trustee thereof or any other Entity acting on the GRS's behalf, against the City or any fund managed by the City (including, but not limited to, the General Fund, the water fund, the sewage disposal fund, the Detroit General Retirement System Service Corporation fund or the pension funds) based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law for (a) any pension, disability or other post-retirement payment or distribution to be made by the GRS in respect of the employment of current or former employees or (b) the payment by the GRS to persons who at any time participated in, were beneficiaries of or accrued post-retirement pension or financial benefits under the GRS.

142.     "GRS Restoration Payment" means an addition to the pension benefits that comprise the GRS Adjusted Pension Amount during the period ending June 30, 2023.  A GRS Restoration Payment may be made and approved only by the trustees of the GRS, or of any successor trust or pension plan, and only in the event that the funding level of the GRS for Fiscal Year 2023 is projected to exceed 80%, based on the then-market value of assets projected forward at an assumed 6.25% investment return rate.  For purposes of calculating a GRS Restoration Payment, market value of assets shall not include any City contributions other than those listed on Exhibit II.B.3.u.ii.A.  A GRS Restoration Payment may be made in amounts, and only to the extent, that the projected funding level of the GRS for Fiscal Year 2023 as an immediate consequence of such GRS Restoration Payment is not less than 80%.

143.     "GRS Settlement Benefit Amount" means, with respect to any Electing GRS Holder, an amount equal to such Holder's Pro Rata share (calculated by reference to the GRS Pension Claims held by Electing GRS Holders) of such percentage of the State OPEB Consideration as is equal to the ratio of Electing GRS Holders to all Holders of GRS Pension Claims, which GRS Settlement Benefit Amount is estimated to equal 8.0% of such Electing GRS Holder's Current Accrued Annual Pension.

144.     "Holder" means an Entity holding a Claim.

145.     "HUD Installment Note Claims" means any Claim against the City arising under or evidenced by the HUD Installment Note Documents, including a Claim for principal and interest on the HUD Installment Notes.

146.     "HUD Installment Note Documents" means the promissory notes executed with respect to the HUD Installment Notes, as set forth on Exhibit I.A.146, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary instruments and agreements related thereto.

147. "HUD Installment Notes" means, collectively, the secured notes issued under the HUD Installment Note Documents, as set forth on Exhibit I.A.146.

148. "Impaired" means, with respect to a Class or a Claim, that such Class or Claim is impaired within the meaning of section 1124 of the Bankruptcy Code.

149. "Indirect 36th District Court Claim" means any claim arising in connection with a Cause of Action against the 36th District Court, solely to the extent that (a) the 36th District Court is entitled to receive funding from the City to satisfy any such claim and (b) any Claim for such funding by the 36th District Court is resolved pursuant to the Plan and the treatment accorded to any Allowed Other Unsecured Claims held by the 36th District Court pursuant to Section II.B.3.w.

150. "Interest Rate Reset Chart" means a chart identifying interest rates for the New DWSD Bonds, the New DWSD Revolving Bonds, the New GLWA Bonds and the New GLWA Revolving Bonds, attached as Exhibit I.A.150.

151. "Liabilities" means any and all claims, obligations, suits, judgments, damages, demands, debts, rights, derivative claims, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, arising in law, equity or otherwise, that are based in whole or in part on any act, event, injury, omission, transaction, agreement, employment, exposure or other occurrence taking place on or prior to the Effective Date.

152. "Lien" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

153. "Limited Tax General Obligation Bond Claims" means any Claim against the City arising under or evidenced by the Limited Tax General Obligation Bond Documents, including a Claim for principal and interest on the Limited Tax General Obligation Bonds.

154. "Limited Tax General Obligation Bond Documents" means the resolutions adopted and orders issued with respect to the Limited Tax General Obligation Bonds, as set forth on Exhibit I.A.154, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary instruments and agreements related thereto.

155. "Limited Tax General Obligation Bonds" means, collectively, the unsecured notes issued under the Limited Tax General Obligation Bond Documents, as set forth on Exhibit I.A.154.

156. "List of Creditors" means the Second Amended List of Creditors and Claims, Pursuant to Sections 924 and 925 of the Bankruptcy Code (together with the summaries and schedules attached thereto), attached as Exhibit A to the Notice of Filing of Second Amended List of Creditors and Claims, Pursuant to Sections 924 and 925 of the Bankruptcy Code (Docket No. 1059), Filed by the City on September 30, 2013, as such list, summaries and/or schedules may be amended, restated, supplemented or otherwise modified.

157. "LTGO Insurer" means Ambac Assurance Corp., solely in its capacity as insurer of the City's obligations with respect to the Limited Tax General Obligation Bonds.

158. "Macomb County" means the County of Macomb, Michigan.

159. "Mayor" means the duly-elected mayor of the City.

160. "New B Notes" means the unsecured notes to be issued by the City pursuant to the New B Notes Documents, substantially on the terms set forth on Exhibit I.A.160.

161. "New B Notes Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued and/or indentures to be executed with respect to the New B Notes, in substantially the form attached hereto as Exhibit I.A.161.

162. "New B Notes Valuation" means the valuations of each of the New B Notes, as set forth on Exhibit I.A.162.

163. "New C Notes" means the unsecured notes to be issued by the City pursuant to the New C Notes Documents, substantially on the terms set forth on Exhibit I.A.163.

164. "New C Notes Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued and/or indentures to be executed with respect to the New C Notes, in substantially the form attached hereto as Exhibit I.A.164.

165. "New DWSD Bond Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued and/or indentures to be executed with respect to the New DWSD Bonds if a DWSD Transaction is not consummated, in substantially the form attached hereto as Exhibit I.A.165.

166. "New DWSD Bonds" means the secured notes to be issued by the City pursuant to the New DWSD Bond Documents if a DWSD Transaction is not consummated, substantially on the terms set forth on Exhibit I.A.166.

167. "New DWSD Revolving Bond Documents" means the ordinances to be passed, resolutions to be adopted and/or indentures or agreements to be executed with respect to the New DWSD Revolving Bonds if a DWSD Transaction is not consummated, in substantially the form attached hereto as Exhibit I.A.167.

168. "New DWSD Revolving Bonds" means the secured notes to be issued by the City pursuant to the New DWSD Revolving Bond Documents if a DWSD Transaction is not consummated, on substantially on the terms set forth on Exhibit I.A.168.

169. "New Existing Rate DWSD Bond Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued and/or indentures to be executed to be executed with respect to the New Existing Rate DWSD Bonds if a DWSD Transaction is not consummated, in substantially the form attached hereto as Exhibit I.A.169.

170. "New Existing Rate DWSD Bonds" means the secured notes to be issued by the City pursuant to the New Existing Rate DWSD Bond Documents if a DWSD Transaction is not consummated, substantially on the terms set forth on Exhibit I.A.170.

171. "New Existing Rate GLWA Bond Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued and/or indentures to be executed with respect to the New Existing Rate GLWA Bonds if a DWSD Transaction is consummated, in substantially the form attached hereto as Exhibit I.A.171.

172. "New Existing Rate GLWA Bonds" means the secured notes to be issued by the GLWA pursuant to the New Existing Rate GLWA Bond Documents if a DWSD Transaction is consummated, substantially on the terms set forth on Exhibit I.A.172.

173. "New GLWA Bond Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued and/or indentures to be executed with respect to the New GLWA Bonds if a DWSD Transaction is consummated, in substantially the form attached hereto as Exhibit I.A.173.

174. "New GLWA Bonds" means the secured notes to be issued by the GLWA pursuant to the New GLWA Bond Documents if a DWSD Transaction is consummated, substantially on the terms set forth on Exhibit I.A.174.

175. "New GLWA Revolving Bond Documents" means the ordinances to be passed, resolutions to be adopted and/or indentures or agreements to be executed with respect to the New GLWA Revolving Bonds if a DWSD Transaction is consummated, in substantially the form attached hereto as Exhibit I.A.175.

176. "New GLWA Revolving Bonds" means the secured notes to be issued by the GLWA pursuant to the New GLWA Revolving Bond Documents if a DWSD Transaction is consummated, on substantially on the terms set forth on Exhibit I.A.176.

177. "New Securities" means, collectively, the New DWSD Bonds, the New DWSD Revolving Bonds, the New Existing Rate DWSD Bonds, the New Existing Rate GLWA Bonds, the New GLWA Bonds, the New GLWA Revolving Bonds, the New B Notes, the New C Notes, the OPEB Claims Note and the Plan UTGO Notes.

178. "Oakland County" means the County of Oakland, Michigan.

179. "Official Committees" means the Creditors' Committee and the Retiree Committee.

180. "OPEB Benefits" means, collectively, post-retirement health, life and death benefits provided to retired employees of the City and their dependents (including surviving spouses) pursuant to the Employee Health and Life Insurance Benefit Plan and the Employee Supplemental Death Benefit Plan, including the members of the certified class in the action captioned *Weiler et. al. v. City of Detroit*, Case No. 06-619737-CK (Wayne County Circuit Court), pursuant to the "Consent Judgment and Order of Dismissal" entered in that action on August 26, 2009.

181. "OPEB Claim" means any Claim against the City for OPEB Benefits.

182. "OPEB Claims Note" means the unsecured note to be issued by the City to the Detroit VEBA, substantially on the terms set forth on Exhibit I.A.182.a and substantially in the form set forth on Exhibit I.A.182.b.

183. "Other Secured Claim" means a Secured Claim, other than a COP Swap Claim, a DWSD Class A Sewer Claim, a DWSD Class A Water Claim, a DWSD Class B Sewer Claim, a DWSD Class B Water Claim, a DWSD Revolving Bond Claim, a HUD Installment Note Claim, a Parking Bond Claim or a Secured GO Bond Claim.

184. "Other Unsecured Claim" means any Claim that is not an Administrative Claim, a Convenience Claim, a COP Claim, a Downtown Development Authority Claim, a General Obligation Bond Claim, a GRS Pension Claim, an OPEB Claim, a PFRS Pension Claim, a Secured Claim or a Subordinated Claim. For the avoidance of doubt, Section 1983 Claims are included within the definition of Other Unsecured Claim.

185. "PA 436" means Public Act 436 of 2012 of the State, also known as the Local Financial Stability and Choice Act, Michigan Compiled Laws §§ 141.1541-141.1575.

186. "Parking Bond Documents" means the resolutions adopted, ordinances passed and orders issued with respect to the Parking Bonds, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary instruments and agreements related thereto.

187. "Parking Bonds" means the secured $9,300,000 Outstanding Principal Amount City of Detroit Building Authority Revenue Bonds (Parking and Arena System), Series 1998A, issued pursuant to the Parking Bond Documents.

188. "Parking Bonds Claim" means any Claim against the City arising under or evidenced by the Parking Bond Documents, including a Claim for principal and interest on the Parking Bonds.

189. "Patient Protection and Affordable Care Act" means Public Law 111-148, 111th Congress, 42 U.S.C. §§ 18001, *et seq.*

190. "Pension Claim" means a GRS Pension Claim or a PFRS Pension Claim.

191. "Petition Date" means July 18, 2013.

192.    "PFRS" means the Police and Fire Retirement System for the City of Detroit.

193.    "PFRS Adjusted Pension Amount" means, with respect to a Holder of a PFRS Pension Claim, the Current Accrued Annual Pension payable to such Holder as adjusted in accordance with the following formula: (a) for such a Holder who is either retired and receiving a monthly pension or a surviving beneficiary, a 10% reduction in the monthly pension amount; and (b) for such a Holder who is an Active Employee, elimination of the deferred retirement option plan feature of PFRS and a 10% reduction in the monthly pension amount; provided that, with respect to Holders that are Active Employees, in the event the unfunded liabilities of the PFRS for the plan year ending June 30, 2014 are greater than the unfunded liabilities of the PFRS as of June 30, 2013, the reduction in the monthly pension amount shall be increased to the extent necessary to ensure that there is no change in the amount of the underfunding between plan years ending 2013 and 2014.

194.    "PFRS Claim" means, with respect to any Holder of a PFRS Pension Claim, (a) such PFRS Pension Claim and (b) any OPEB Claim held by such Holder.

195.    "PFRS Hybrid Pension Formula" means an accrual rate for active employee participants in the PFRS for benefits earned on or after July 1, 2014 that equals the product of (a) 2.0% multiplied by (b) an employee's average base compensation over the employee's final 10 years of service, multiplied by (c) such employee's years of service after July 1, 2014. For purposes of this definition, base compensation will mean the actual employee's base compensation and will exclude overtime, longevity or other bonuses, and unused sick leave, and the PFRS Hybrid Pension Formula will be part of a hybrid program that will contain rules to shift funding risk to participants in the event of underfunding of hybrid pensions, and mandate minimum retirement ages for unreduced pensions and other material terms as set forth on Exhibit I.A.195.

196.    "PFRS Pension Claim" means any Claims (other than an OPEB Claim), whether asserted by current or former employees of the City, their heirs or beneficiaries or by the PFRS or any trustee thereof or any other Entity acting on the PFRS's behalf, against the City or any fund managed by the City (including, but not limited to, the General Fund, the Police and Fire Retirement System Service Corporation fund or the pension funds) based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law for (a) any pension, disability, or other post-retirement payment or distribution to be made by the PFRS in respect of the employment of such current or former employees or (b) the payment by the PFRS to persons who at any time participated in, were beneficiaries of or accrued post-retirement pension or financial benefits under the PFRS.

197.    "PFRS Restoration Payment" means an addition to the pension benefits that comprise the PFRS Adjusted Pension Amount during the period ending June 30, 2023. A PFRS Restoration Payment may be made and approved only by the trustees of the PFRS, or of any successor trust or pension plan, and only in the event that the funding level of the PFRS for Fiscal Year 2023 is projected to exceed 80%, based on the then-market value of assets projected forward at an assumed 6.50% investment return rate. For purposes of calculating a PFRS Restoration Payment, market value of assets shall not include any City contributions other than those listed on Exhibit II.B.3.t.ii.A. A PFRS Restoration Payment may be made in amounts, and only to the extent, that the projected funding level of the PFRS for Fiscal Year 2023 as an immediate consequence of such PFRS Restoration Payment is not less than 80%.

198.    "PFRS Settlement Benefit Amount" means, with respect to any Electing PFRS Holder, an amount equal to such Holder's Pro Rata share (calculated by reference to the PFRS Pension Claims held by Electing PFRS Holders) of such percentage of the State PFRS Consideration as is equal to the ratio of Electing PFRS Holders to all Holders of PFRS Pension Claims, which PFRS Settlement Benefit Amount is estimated to equal 4.0% of such Electing PFRS Holder's Current Accrued Annual Pension.

199.    "Plan" means this plan of adjustment and all Exhibits attached hereto or referenced herein, as the same may be amended, restated, supplemented or otherwise modified.

200.    "Plan COP Settlement" means the comprehensive settlement regarding COP Claims on terms and conditions described in Section II.B.3.s.iii.A and definitively set forth in the Plan COP Settlement Documents.

201.     "Plan COP Settlement Documents" means the definitive documentation to be executed in connection with the Plan COP Settlement, in substantially the form attached hereto as Exhibit I.A.201.

202.     "Plan GRS Settlement" means the comprehensive settlement regarding GRS Pension Claims on terms and conditions described in Section II.B.3.u.ii.I and definitively set forth in the Plan GRS Settlement Documents.

203.     "Plan GRS Settlement Documents" means the definitive documentation to be executed in connection with the Plan GRS Settlement, in substantially the form attached hereto as Exhibit I.A.203.

204.     "Plan PFRS Settlement" means the comprehensive settlement regarding PFRS Pension Claims on terms and conditions described in Section II.B.3.t.ii.G and definitively set forth in the Plan PFRS Settlement Documents.

205.     "Plan PFRS Settlement Documents" means the definitive documentation to be executed in connection with the Plan PFRS Settlement, in substantially the form attached hereto as Exhibit I.A.205.

206.     "Plan UTGO Notes" means the notes to be issued by the City pursuant to the Plan UTGO Notes Documents, substantially on the terms set forth on Exhibit I.A.206.

207.     "Plan UTGO Notes Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued and/or indentures to be executed with respect to the Plan UTGO Notes, in substantially the form attached hereto as Exhibit I.A.207.

208.     "Postpetition Financing Agreement" means any financing agreement (a) entered into by the City and the Postpetition Lenders after the Petition Date but prior to the Effective Date and (b) approved by the Bankruptcy Court.

209.     "Postpetition Financing Order" means an order entered by the Bankruptcy Court on the docket of the Chapter 9 Case approving the Postpetition Financing Agreement.

210.     "Postpetition Lender Claims" means any Claim against the City under or evidenced by (a) the Postpetition Financing Agreement and (b) the Postpetition Financing Order.

211.     "Postpetition Lenders" means those entities identified as lenders in the Postpetition Financing Agreement and their respective permitted successors and assigns (solely in their capacity as lenders under the Postpetition Financing Agreement.

212.     "Pro Rata" means, when used with reference to a distribution of property to Holders of Allowed Claims in a particular Class or other specified group of Claims, proportionately so that with respect to a particular Allowed Claim in such Class or in such group, the ratio of (a)(i) the amount of property to be distributed on account of such Claim to (ii) the amount of such Claim, is the same as the ratio of (b)(i) the amount of property to be distributed on account of all Allowed Claims in such Class or group of Claims to (ii) the amount of all Allowed Claims in such Class or group of Claims. Until all Disputed Claims in a Class or other specified group of Claims are resolved, Disputed Claims shall be treated as Allowed Claims in their Face Amount for purposes of calculating a Pro Rata distribution of property to holders of Allowed Claims in such Class or group of Claims.

213.     "Professional Fee Reserve" means the reserve for Fee Review Professional Fees established pursuant to Section IV.J.

214.     "Reinstated" means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the Holder or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) the cure of any such default other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) the reinstatement of the

maturity of such Claim as such maturity existed before such default; (iii) compensation of the Holder of such Claim for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim arises from any failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensation of the Holder of such Claim for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the Holder.  "Reinstate" and "Reinstatement" shall have correlative meanings.

215.     "Related Entity" means, with respect to any Entity, such Entity's Affiliates, predecessors, successors and assigns (whether by operation of law or otherwise), and with respect to any of the foregoing their respective present and former Affiliates and each of their respective current and former officials, officers, directors, employees, managers, attorneys, advisors and professionals, each acting in such capacity, and any Entity claiming by or through any of them (including their respective officials, officers, directors, employees, managers, advisors and professionals).

216.     "Released Parties" means, collectively and individually, the State and the State Related Entities.

217.     "Retiree Classes" means Classes 10 and 11, as set forth in Section II.B.

218.     "Retiree Committee" means the official committee of retired employees first appointed by the United States Trustee in the Chapter 9 Case on August 22, 2013 (Docket No. 566), as such committee may be reconstituted.

219.     "Retiree Health Care Litigation" means the adversary proceeding captioned as *Official Committee of Retirees of the City of Detroit, Michigan, et al. v. City of Detroit, Michigan, et al.*, Case No. 14-04015 (Bankr. E.D. Mich.), filed in the Chapter 9 Case on January 9, 2014.

220.     "Retiree Health Care Settlement Agreement" means the Settlement Agreement, effective February 14, 2014, between the parties to the Retiree Health Care Litigation pursuant to which such parties agreed to certain modifications to changes to retiree health care proposed by the City, the principal terms of which agreement are set forth at Exhibit I.A.220.

221.     "Retirement Systems" means, collectively, the GRS and the PFRS.

222.     "Section 1983 Claim" means any Claim against the City, its employees or both arising under 42 U.S.C. § 1983 that has not been settled, compromised or otherwise resolved and with respect to which Claim a lawsuit was pending before the District Court on or prior to the Petition Date.

223.     "Secured Claim" means a Claim that is secured by a Lien on property in which the City has an interest or that is subject to valid setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the City's interest in such property or to the extent of the amount subject to valid setoff, as applicable, as determined pursuant to section 506 of the Bankruptcy Code.

224.     "Secured GO Bond Claims" means, collectively, the Secured GO Series 2010 Claims, the Secured GO Series 2010(A) Claims, the Secured GO Series 2012(A)(2) Claims, the Secured GO Series 2012(A2-B) Claims, the Secured GO Series 2012(B) Claims and the Secured GO Series 2012(B2) Claims.

225.     "Secured GO Bond Documents" means, collectively, the Secured GO Series 2010 Bond Documents, the Secured GO Series 2010(A) Bond Documents, the Secured GO Series 2012(A)(2) Bond Documents, the Secured GO Series 2012(A2-B) Bond Documents, the Secured GO Series 2012(B) Bond Documents and the Secured GO Series 2012(B2) Bond Documents.

226.     "Secured GO Bonds" means, collectively, the Secured GO Series 2010 Bonds, the Secured GO Series 2010(A) Bonds, the Secured GO Series 2012(A)(2) Bonds, the Secured GO Series 2012(A2-B) Bonds, the Secured GO Series 2012(B) Bonds and the Secured GO Series 2012(B2) Bonds.

227.     "Secured GO Series 2010 Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2010 Bonds, as set forth on Exhibit I.A.225, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary instruments and agreements related thereto.

228.     "Secured GO Series 2010 Bonds" means the secured $249,790,000 Distributable State Aid General Obligation (Limited Tax) Bonds, Series 2010, issued pursuant to the Secured GO Series 2010 Bond Documents.

229.     "Secured GO Series 2010 Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2010 Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010 Bonds.

230.     "Secured GO Series 2010(A) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2010(A) Bonds, as set forth on Exhibit I.A.225, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary instruments and agreements related thereto.

231.     "Secured GO Series 2010(A) Bonds" means the secured $100,000,000 Distributable State Aid Second Lien Bonds (Unlimited Tax General Obligation), Series 2010(A) (Taxable-Recovery Zone Economic Development Bonds – Direct Payment), issued pursuant to the Secured GO Series 2010(A) Bond Documents.

232.     "Secured GO Series 2010(A) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2010(A) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010(A) Bonds.

233.     "Secured GO Series 2012(A)(2) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(A)(2) Bonds, as set forth on Exhibit I.A.225, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary instruments and agreements related thereto.

234.     "Secured GO Series 2012(A)(2) Bonds" means the secured $38,865,000 Outstanding Principal Amount Self-Insurance Distributable State Aid Third Lien Bonds (Limited Tax General Obligation), Series 2012(A)(2), issued pursuant to the Secured GO Series 2012(A)(2) Bond Documents.

235.     "Secured GO Series 2012(A)(2) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(A)(2) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010(A)(2) Bonds.

236.     "Secured GO Series 2012(A2-B) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(A2-B) Bonds, as set forth on Exhibit I.A.225, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary instruments and agreements related thereto.

237.     "Secured GO Series 2012(A2-B) Bonds" means the secured $53,520,000 Self-Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(A2-B), issued pursuant to the Secured GO Series 2012(A2-B) Bond Documents.

238.     "Secured GO Series 2012(A2-B) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(A2-B) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(A2-B) Bonds.

239.     "Secured GO Series 2012(B) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(B) Bonds, as set forth on Exhibit I.A.225, as the

same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary instruments and agreements related thereto.

240.     "Secured GO Series 2012(B) Bonds" means the $6,405,000 General Obligation Distributable State Aid Third Lien Capital Improvement Refunding Bonds (Limited Tax General Obligation), Series 2012(B), issued pursuant to the Secured GO Series 2012(B) Bond Documents.

241.     "Secured GO Series 2012(B) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(B) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(B) Bonds.

242.     "Secured GO Series 2012(B2) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(B2) Bonds, as set forth on Exhibit I.A.225, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary instruments and agreements related thereto.

243.     "Secured GO Series 2012(B2) Bonds" means the $30,730,000 Self-Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(B2), issued pursuant to the Secured GO Series 2012(B2) Bond Documents.

244.     "Secured GO Series 2012(B2) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(B2) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(B2) Bonds.

245.     "Settling COP Claimant" means a beneficial holder of a COP Claim that elects to participate in the Plan COP Settlement as to some or all COP Claims held by or assigned to it and its Affiliates by so indicating on a timely-returned Ballot.

246.     "State" means the state of Michigan.

247.     "State GRS Consideration" means an amount up to $175,000,000.00 to be deposited by the State into the GRS in accordance with the Plan GRS Settlement and Section II.B.3.u.ii.I; provided that the amount of the State GRS Consideration shall be reduced by certain amounts attributable to the payment of pension benefits owing to Holders of GRS Pension Claims with household income less than a threshold amount (a) tied to a percentage of federal poverty levels and (b) to be determined pursuant to further discussions between the City and the State.

248.     "State PFRS Consideration" means an amount up to $175,000,000.00 to be deposited by the State into the PFRS in accordance with the Plan PFRS Settlement and Section II.B.3.t.ii.G; provided that the amount of the State PFRS Consideration shall be reduced by certain amounts attributable to the payment of pension benefits owing to Holders of PFRS Pension Claims with household income less than a threshold amount (a) tied to a percentage of federal poverty levels and (b) to be determined pursuant to further discussions between the City and the State.

249.     "State Related Entities" means, collectively: (a) all officers, legislators, judges and justices of the State; (b) the Governor of the State; (c) the Treasurer of the State; (d) all members of the Local Emergency Financial Assistance Loan Board created under the Emergency Municipal Loan Act, Michigan Compiled Laws §§ 141.931-141.942; (e) each of the State's agencies and departments; and (f) the Related Entities of each of the foregoing.

250.     "Stay Extension Order" means the Order Pursuant to Section 105(a) of the Bankruptcy Code Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non-Officer Employees and (C) Agents and Representatives of the Debtor (Docket No. 166), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on July 25, 2013, as it may be amended, supplemented or otherwise modified.

251.    "Subordinated Claim" means a Claim of the kind described in sections 726(a)(3) or 726(a)(4) of the Bankruptcy Code and/or Claims subordinated under sections 510(b) or 510(c) of the Bankruptcy Code.

252.    "Tax" means:  (a) any net income, alternative or add-on minimum, gross income, gross receipts, gross margins, sales, use, stamp, real estate transfer, mortgage recording, ad valorem, value added, transfer, franchise, profits, license, property, payroll, employment, unemployment, occupation, disability, excise, severance, withholding, environmental or other tax, assessment or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any federal, state, local or foreign taxing authority; or (b) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a transferee or successor or a party to any agreement or arrangement whereby liability for payment of any such amounts is determined by reference to the liability of any other Entity.

253.    "Tort Claim" means any Claim that has not been settled, compromised or otherwise resolved that arises out of allegations of personal injury or wrongful death claims and is not a Section 1983 Claim.

254.    "Unexpired Lease" means a lease to which the City is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code.

255.    "Unimpaired" means, with respect to a Class or a Claim, that such Class or Claim is not Impaired.

256.    "United States Trustee" means the Office of the United States Trustee for the Eastern District of Michigan.

257.    "Unlimited Tax General Obligation Bond Claims" means any Claim against the City arising under or evidenced by the Unlimited Tax General Obligation Bond Documents, including a Claim for principal and interest on the Unlimited Tax General Obligation Bonds.

258.    "Unlimited Tax General Obligation Bond Documents" means the resolutions passed and orders issued with respect to the Unlimited Tax General Obligation Bonds, as set forth on Exhibit I.A.258, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all instruments and agreements related thereto.

259.    "Unlimited Tax General Obligation Bonds" means, collectively, the notes issued under the Unlimited Tax General Obligation Bond Documents, as set forth on Exhibit I.A.258.

260.    "Unsecured Claim" means a Claim that is not a Secured Claim or an Administrative Claim.

261.    "Unsecured Pro Rata Share" means, when used with reference to a Distribution of New B Notes to Holders of Allowed Claims within Classes 7, 9, 12 and 13 entitled to receive a distribution of New B Notes, the proportion that an Allowed Claim bears to the sum of all Allowed Claims and Disputed Claims within such Classes. Until all Disputed Claims in a Class are resolved, Disputed Claims shall be treated as Allowed Claims in their Face Amount for purposes of calculating the Unsecured Pro Rata Share of property to be distributed to Holders of Allowed Claims in such Class, unless otherwise ordered by the Bankruptcy Court.

262.    "Voting Deadline" means the deadline fixed by the Bankruptcy Court in the Disclosure Statement Order for submitting Ballots to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code.

263.    "Voting Record Date" means the record date fixed by the Bankruptcy Court in the Disclosure Statement Order establishing the Holders of Claims entitled to vote to accept or reject the Plan.

264.    "Wayne County" means the Charter County of Wayne, Michigan.

B.      **Rules of Interpretation and Computation of Time.**

1.      **Rules of Interpretation.**

For purposes of the Plan, unless otherwise provided herein:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter gender; (b) unless otherwise provided in the Plan, any reference in the Plan to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference herein to an existing document or Exhibit Filed or to be Filed shall mean such document or Exhibit, as it may have been or may be amended, restated, supplemented or otherwise modified pursuant to the Plan, the Confirmation Order or otherwise; (d) any reference to an Entity as a Holder of a Claim includes that Entity's successors, assigns and Affiliates; (e) all references to Sections or Exhibits are references to Sections and Exhibits of or to the Plan; (f) the words "herein," "hereunder," "hereof" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (h) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; and (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the extent not inconsistent with any other provision of this Section.

2.      **Computation of Time.**

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**ARTICLE II**
**CLASSIFICATION OF CLAIMS; CRAMDOWN;**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims are classified under the Plan for all purposes, including voting, Confirmation and Distribution.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, as described in Section II.A, have not been classified and thus are excluded from the Classes described in Section II.B.1.  A Claim shall be deemed classified in a particular Class only to the extent that the Claim qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim qualifies within the description of such other Class. Notwithstanding the foregoing, in no event shall any Holder of an Allowed Claim be entitled to receive payments or Distributions under the Plan that, in the aggregate, exceed the Allowed amount of such Holder's Claim.

A.      **Unclassified Claims.**

1.      **Payment of Administrative Claims.**

a.      **Administrative Claims in General.**

Except as specified in this Section II.A.1, and subject to the bar date provisions herein, unless otherwise agreed by the Holder of an Administrative Claim and the City, or ordered by the Bankruptcy Court, each Holder of an Allowed Administrative Claim will receive, in full satisfaction of such Allowed Administrative Claim, Cash in an amount equal to such Allowed Administrative Claim either:  (1) on the Effective Date or as soon as reasonably practicable thereafter; or (2) if the Administrative Claim is not Allowed as of the Effective Date, 30 days after the date on which such Administrative Claim becomes an Allowed Claim.  No Claim of any official or unofficial creditors' committee (other than the Retiree Committee) or any member thereof for professionals' fees or other costs and expenses incurred by such creditors' committee or by a member of such creditors' committee shall constitute an Allowed Administrative Claim.

b.    **Claims Under the Postpetition Financing Agreement.**

Unless otherwise agreed by the Postpetition Lenders pursuant to the Postpetition Financing Agreement, on or before the Effective Date, Postpetition Lender Claims that are Allowed Administrative Claims will be paid in Cash equal to the amount of those Allowed Administrative Claims.

2.    **Bar Dates for Administrative Claims.**

a.    **General Bar Date Provisions**

Except as otherwise provided in Section II.A.2.b or in a Bar Date Order or other order of the Bankruptcy Court, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the City pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than 30 days after the Effective Date. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date will be forever barred from asserting such Administrative Claims against the City or its property, and such Administrative Claims will be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the City and the requesting party by the later of (i) 150 days after the Effective Date, (ii) 60 days after the Filing of the applicable request for payment of Administrative Claims or (iii) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Administrative Claims.

b.    **Claims Under the Postpetition Financing Agreement.**

Holders of Administrative Claims that are Postpetition Lender Claims will not be required to File or serve any request for payment or application for allowance of such Claims. Such Administrative Claims will be satisfied pursuant to Section II.A.1.b.

c.    **No Modification of Bar Date Order.**

The Plan does not modify any Bar Date Order already in place, including Bar Dates for Claims entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

B.    **Classified Claims.**

1.    **Designation of Classes.**

The following table designates the Classes and specifies whether such Classes are Impaired or Unimpaired by the Plan.

| CLASS | NAME | IMPAIRMENT |
|-------|------|------------|
| *Secured Claims* | | |
| 1A | All Classes of DWSD Class A Water Claims (One Class for each DWSD Series of DWSD Class A Water Bonds, as set forth on Exhibit I.A.91) | Impaired/Voting |
| 1B | All Classes of DWSD Class B Water Claims (One Class for each DWSD Series of DWSD Class B Water Bonds, as set forth on Exhibit I.A.97) | Impaired/Voting |
| 1C | All Classes of DWSD Class A Sewer Claims (One Class for each DWSD Series of DWSD Class A Sewer Bonds, as set forth on Exhibit I.A.88) | Impaired/Voting |

| Class | Name | Impairment |
|-------|------|-----------|
| 1D | All Classes of DWSD Class B Sewer Claims (One Class for each DWSD Series of DWSD Class B Sewer Bonds, as set forth on Exhibit I.A.94) | Impaired/Voting |
| 1E | All Classes of DWSD Revolving Sewer Bond Claims (One Class for each DWSD Series of DWSD Revolving Sewer Bonds, as set forth on Exhibit I.A.102) | Impaired/Voting |
| 1F | All Classes of DWSD Revolving Water Bond Claims (One Class for each DWSD Series of DWSD Revolving Water Bonds, as set forth on Exhibit I.A.105) | Impaired/Voting |
| 2A | Secured GO Series 2010 Claims | Unimpaired/Nonvoting |
| 2B | Secured GO Series 2010(A) Claims | Unimpaired/Nonvoting |
| 2C | Secured GO Series 2012(A)(2) Claims | Unimpaired/Nonvoting |
| 2D | Secured GO Series 2012(A2-B) Claims | Unimpaired/Nonvoting |
| 2E | Secured GO Series 2012(B) Claims | Unimpaired/Nonvoting |
| 2F | Secured GO Series 2012(B2) Claims | Unimpaired/Nonvoting |
| 3 | Other Secured Claims | Unimpaired/Nonvoting |
| 4 | HUD Installment Notes Claims | Unimpaired/Nonvoting |
| 5 | COP Swap Claims | To be determined |
| 6 | Parking Bond Claims | Unimpaired/Nonvoting |
| *Unsecured Claims* | | |
| 7 | Limited Tax General Obligation Bond Claims | Impaired/Voting |
| 8 | Unlimited Tax General Obligation Bond Claims | Impaired/Voting |
| 9 | COP Claims | Impaired/Voting |
| 10 | PFRS Claims | Impaired/Voting |
| 11 | GRS Claims | Impaired/Voting |
| 12 | Downtown Development Authority Claims | Impaired/Voting |
| 13 | Other Unsecured Claims | Impaired/Voting |
| 14 | Convenience Claims | Impaired/Voting |
| 15 | Subordinated Claims | Impaired/Nonvoting |

2.    **Subordination; Reservation of Rights to Reclassify Claims.**

The allowance, classification and treatment of Allowed Claims and the respective Distributions and treatments specified in the Plan take into account the relative priority and rights of the Claims in each Class and all contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise. Pursuant to section 510 of the Bankruptcy Code, the City reserves the right to re-classify any Disputed Claim in accordance with any applicable contractual, legal or equitable subordination.

3. **Treatment of Claims.**

a. **Class 1A – DWSD Class A Water Claims.**

i. **Classification and Allowance.**

DWSD Class A Water Claims relating to each DWSD Series of DWSD Class A Water Bonds shall be separately classified, as reflected on Exhibit I.A.91, with each Class receiving the treatment set forth below. On the Effective Date, the DWSD Class A Water Claims shall be deemed Allowed in the amounts set forth on Exhibit I.A.91.

ii. **Treatment.**

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed DWSD Class A Water Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as reasonably practicable after the Effective Date:

A. **Treatment if DWSD Transaction Consummated.**

If a DWSD Transaction is consummated on the Effective Date, at the option of the City, either (1) New GLWA Bonds having a principal amount equal to the principal amount of the DWSD Class A Water Bonds held by such Holder; or (2) Cash in the full amount of such Allowed DWSD Class A Water Claim. Each Holder of an Allowed DWSD Class A Water Claim in a Class of DWSD Class A Water Claims that accepts the Plan may elect to receive New Existing Rate GLWA Bonds having a principal amount equal to the principal amount of the DWSD Class A Water Bonds held by such Holder in lieu of New GLWA Bonds.

B. **Treatment If DWSD Transaction Not Consummated.**

If a DWSD Transaction is not consummated on the Effective Date, New DWSD Bonds having a principal amount equal to the principal amount of the DWSD Class A Water Bonds held by such Holder; provided, that, in lieu of the foregoing treatment, the City alternatively may elect to Reinstate any DWSD Series of DWSD Class A Water Bonds by filing a notice of such Reinstatement prior to the commencement of the Confirmation Hearing. Each Holder of an Allowed DWSD Class A Water Claim in a Class of DWSD Class A Water Claims that accepts the Plan may elect to receive New Existing Rate DWSD Bonds having a principal amount equal to the principal amount of the DWSD Class A Water Bonds held by such Holder in lieu of New DWSD Bonds.

b. **Class 1B – DWSD Class B Water Claims.**

i. **Classification and Allowance.**

DWSD Class B Water Claims relating to each DWSD Series of DWSD Class B Water Bonds shall be separately classified, as reflected on Exhibit I.A.97, with each Class receiving the treatment set forth below. On the Effective Date, the DWSD Class B Water Claims shall be deemed Allowed in the amounts set forth on Exhibit I.A.97.

ii. **Treatment.**

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed DWSD Class B Water Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as reasonably practicable after the Effective Date:

A. **Treatment if DWSD Transaction Consummated.**

If a DWSD Transaction is consummated on the Effective Date, at the option of the City, either (1) New GLWA Bonds having a principal amount equal to the principal amount of the DWSD Class B Water Bonds

held by such Holder; or (2) Cash in the full amount of such Allowed DWSD Class B Water Claim. Each Holder of an Allowed DWSD Class B Water Claim in a Class of DWSD Class B Water Claims that accepts the Plan may elect to receive New Existing Rate GLWA Bonds having a principal amount equal to the principal amount of the DWSD Class B Water Bonds held by such Holder in lieu of New GLWA Bonds.

### B. Treatment If DWSD Transaction Not Consummated.

If a DWSD Transaction is not consummated on the Effective Date, New DWSD Bonds having a principal amount equal to the principal amount of the DWSD Class B Water Bonds held by such Holder; provided, that, in lieu of the foregoing treatment, the City alternatively may elect to Reinstate any DWSD Series of DWSD Class B Water Bonds by filing a notice of such Reinstatement prior to the commencement of the Confirmation Hearing. Each Holder of an Allowed DWSD Class B Water Claim in a Class of DWSD Class B Water Claims that accepts the Plan may elect to receive New Existing Rate DWSD Bonds having a principal amount equal to the principal amount of the DWSD Class B Water Bonds held by such Holder in lieu of New DWSD Bonds

### c. Class 1C – DWSD Class A Sewer Claims.

#### i. Classification and Allowance.

DWSD Class A Sewer Claims relating to each DWSD Series of DWSD Class A Sewer Bonds shall be separately classified, as reflected on Exhibit I.A.88, with each Class receiving the treatment set forth below. On the Effective Date, the DWSD Class A Sewer Claims shall be deemed Allowed in the amounts set forth on Exhibit I.A.88.

#### ii. Treatment.

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed DWSD Class A Sewer Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as reasonably practicable after the Effective Date:

### A. Treatment if DWSD Transaction Consummated.

If a DWSD Transaction is consummated on the Effective Date, at the option of the City, either (1) New GLWA Bonds having a principal amount equal to the principal amount of the DWSD Class A Sewer Bonds held by such Holder; or (2) Cash in the full amount of such Allowed DWSD Class A Sewer Claim. Each Holder of an Allowed DWSD Class A Sewer Claim in a Class of DWSD Class A Sewer Claims that accepts the Plan may elect to receive New Existing Rate GLWA Bonds having a principal amount equal to the principal amount of the DWSD Class A Sewer Bonds held by such Holder in lieu of New GLWA Bonds.

### B. Treatment If DWSD Transaction Not Consummated.

If a DWSD Transaction is not consummated on the Effective Date, New DWSD Bonds having a principal amount equal to the principal amount of the DWSD Class A Sewer Bonds held by such Holder; provided, that, in lieu of the foregoing treatment, the City alternatively may elect to Reinstate any DWSD Series of DWSD Class A Sewer Bonds by filing a notice of such Reinstatement prior to the commencement of the Confirmation Hearing. Each Holder of an Allowed DWSD Class A Sewer Claim in a Class of DWSD Class A Sewer Claims that accepts the Plan may elect to receive New Existing Rate DWSD Bonds having a principal amount equal to the principal amount of the DWSD Class A Sewer Bonds held by such Holder in lieu of New DWSD Bonds.

### d. Class 1D – DWSD Class B Sewer Claims.

#### i. Classification and Allowance.

DWSD Class B Sewer Claims relating to each DWSD Series of DWSD Class B Sewer Bonds shall be separately classified, as reflected on Exhibit I.A.94, with each Class receiving the treatment set forth below.

On the Effective Date, the DWSD Class B Sewer Claims shall be deemed Allowed in the amounts set forth on Exhibit I.A.94.

### ii. Treatment.

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed DWSD Class B Sewer Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as reasonably practicable after the Effective Date:

### A. Treatment if DWSD Transaction Consummated.

If a DWSD Transaction is consummated on the Effective Date, at the option of the City, either (1) New GLWA Bonds having a principal amount equal to the principal amount of the DWSD Class B Sewer Bonds held by such Holder; or (2) Cash in the full amount of such Allowed DWSD Class B Sewer Claim. Each Holder of an Allowed DWSD Class B Sewer Claim in a Class of DWSD Class B Sewer Claims that accepts the Plan may elect to receive New Existing Rate GLWA Bonds having a principal amount equal to the principal amount of the DWSD Class B Sewer Bonds held by such Holder in lieu of New GLWA Bonds.

### B. Treatment If DWSD Transaction Not Consummated.

If a DWSD Transaction is not consummated on the Effective Date, New DWSD Bonds having a principal amount equal to the principal amount of the DWSD Class B Sewer Bonds held by such Holder; provided, that, in lieu of the foregoing treatment, the City alternatively may elect to Reinstate any DWSD Series of DWSD Class B Sewer Bonds by filing a notice of such Reinstatement prior to the commencement of the Confirmation Hearing. Each Holder of an Allowed DWSD Class B Sewer Claim in a Class of DWSD Class B Sewer Claims that accepts the Plan may elect to receive New Existing Rate DWSD Bonds having a principal amount equal to the principal amount of the DWSD Class B Sewer Bonds held by such Holder in lieu of New DWSD Bonds.

### e. Class 1E – DWSD Revolving Sewer Bond Claims

### i. Classification and Allowance.

DWSD Revolving Sewer Bond Claims relating to each DWSD Series of DWSD Revolving Sewer Bonds shall be separately classified, as reflected on Exhibit I.A.102, with each Class receiving the treatment set forth below. On the Effective Date, the DWSD Revolving Sewer Bond Claims shall be deemed Allowed in the aggregate amounts set forth on Exhibit I.A.102.

### ii. Treatment.

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed DWSD Revolving Sewer Bond Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as reasonably practicable after the Effective Date: (A) if a DWSD Transaction is consummated on the Effective Date, New GLWA Revolving Bonds having a principal amount equal to the principal amount of the DWSD Revolving Sewer Bonds held by such Holder; or (B) if a DWSD Transaction is not consummated on the Effective Date, New DWSD Revolving Bonds having a principal amount equal to the principal amount of the DWSD Revolving Sewer Bonds held by such Holder.

### f. Class 1F – DWSD Revolving Water Bond Claims

### i. Classification and Allowance.

DWSD Revolving Water Bond Claims relating to each DWSD Series of DWSD Revolving Water Bonds shall be separately classified, as reflected on Exhibit I.A.105, with each Class receiving the treatment set forth below. On the Effective Date, the DWSD Revolving Water Bond Claims shall be deemed Allowed in the amounts set forth on Exhibit I.A.105.

ii.    **Treatment.**

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed DWSD Revolving Water Bond Claim, in full satisfaction of such Allowed Claim, shall receive on or as soon as reasonably practicable after the Effective Date:  (A) if a DWSD Transaction is consummated on the Effective Date, New GLWA Revolving Bonds having a principal amount equal to the principal amount of the DWSD Revolving Water Bonds held by such Holder; or (B) if a DWSD Transaction is not consummated on the Effective Date, New DWSD Revolving Bonds having a principal amount equal to the principal amount of the DWSD Revolving Water Bonds held by such Holder.

g.    **Class 2A – Secured GO Series 2010 Claims.**

On the Effective Date, (i) the Secured GO Series 2010 Claims shall be deemed Allowed in the aggregate amount of $252,475,366.00 and (ii) each Holder of an Allowed Secured GO Series 2010 Claim shall have its Allowed Secured GO Series 2010 Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

h.    **Class 2B – Secured GO Series 2010(A) Claims.**

On the Effective Date, (i) the Secured GO Series 2010(A) Claims shall be deemed Allowed in the aggregate amount of $101,707,848.00 and (ii) each Holder of an Allowed Secured GO Series 2010(A) Claim shall have its Allowed Secured GO Series 2010(A) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

i.    **Class 2C – Secured GO Series 2012(A)(2) Claims.**

On the Effective Date, (i) the Secured GO Series 2012(A)(2) Claims shall be deemed Allowed in the aggregate amount of $39,254,171 and (ii) each Holder of an Allowed Secured GO Series 2012(A)(2) Claim shall have its Allowed Secured GO Series 2012(A)(2) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

j.    **Class 2D – Secured GO Series 2012(A2-B) Claims.**

On the Effective Date, (i) the Secured GO Series 2012(A2-B) Claims shall be deemed Allowed in the aggregate amount of $54,055,927 and (ii) each Holder of an Allowed Secured GO Series 2012(A2-B) Claim shall have its Allowed Secured GO Series 2012(A2-B) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

k.    **Class 2E - Secured GO Series 2012(B) Claims.**

On the Effective Date, (i) the Secured GO Series 2012(B) Claims shall be deemed Allowed in the aggregate amount of $6,469,135 and (ii) each Holder of an Allowed Secured GO Series 2012(B) Claim shall have its Allowed Secured GO Series 2012(B) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

l.    **Class 2F – Secured GO Series 2012(B2) Claims.**

On the Effective Date, (i) the Secured GO Series 2012(B2) Claims shall be deemed Allowed in the aggregate amount of $31,037,724 and (ii) each Holder of an Allowed Secured GO Series 2012(B2) Claim shall have its Allowed Secured GO Series 2012(B2) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

m.    **Class 3 – Other Secured Claims.**

On the Effective Date, each Holder of an Allowed Other Secured Claim shall have its Allowed Other Secured Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

n.    **Class 4 – HUD Installment Note Claims.**

On the Effective Date, (i) the HUD Installment Note Claims shall be deemed Allowed in the aggregate amount of $90,075,002.00 and (ii) each Holder of a HUD Installment Note Claim shall have its Allowed HUD Installment Note Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

o.    **Class 5 – COP Swap Claims.**

The Allowance of, and treatment to be accorded to, COP Swap Claims is the subject of continuing discussions between the City and the COP Swap Counterparties, is yet to be determined and will be supplied shortly.

p.    **Class 6 – Parking Bond Claims.**

On the Effective Date, (i) the Parking Bond Claims shall be deemed Allowed in the amount of $8,099,287.00 and (ii) each Holder of an Allowed Parking Bond Claim shall have its Allowed Parking Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

q.    **Class 7 – Limited Tax General Obligation Bond Claims.**

i.    **Allowance.**

On the Effective Date, the Limited Tax General Obligation Bond Claims shall be deemed Allowed in the amount of $163,543,187.86.

ii.    **Treatment.**

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Limited Tax General Obligation Bond Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, Unsecured Pro Rata Shares of (A) New B Notes and (B) New C Notes.

r.    **Class 8 – Unlimited Tax General Obligation Bond Claims.**

i.    **Allowance.**

On the Effective Date, the Unlimited Tax General Obligation Bond Claims shall be deemed Allowed in the amount of $374,661,332.97.

ii.    **Treatment.**

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Unlimited Tax General Obligation Bond Claim, in full satisfaction of such Allowed Claim, shall receive its Pro Rata share of Plan UTGO Notes on or as soon as reasonably practicable after the Effective Date. The maturity(ies) of the Plan UTGO Notes shall be no longer than the existing maturity(ies) of each series of Unlimited Tax General Obligation Bonds receiving Plan UTGO Notes. The Plan UTGO Notes shall contain such other terms as will result in each Holder of an Allowed Unlimited Tax General Obligation Bond Claim receiving a payment stream the present value of which is equal to approximately 20% of such Holder's Allowed Unlimited Tax General Obligation Bond Claim as of the Effective Date.

s. **Class 9 – COP Claims.**

i. **Disputed.**

The COP Claims are Disputed Claims and are not Allowed by the Plan, and the City reserves all rights to (A) object to, avoid or subordinate such Claims on any and all available grounds, including through the assertion of any and all grounds asserted in the COP Litigation, and (B) assign the right to object to, avoid or subordinate such Claims or the City's rights in the COP Litigation to the Creditor Representative.

ii. **Assignment.**

Solely for purposes of facilitating Distributions under this Plan and for no other purpose, on and as of the Effective Date, those portions of COP Claims that relate to, and are measured by, the payment schedule under the COPs shall be deemed assigned to the beneficial holders of the COPs on a Pro Rata basis, with each beneficial holder deemed to receive such portions of COP Claims in an amount equal to the proportion that the unpaid principal amount of such holder's COPs bears to the aggregate unpaid principal amount of all COPs. Each beneficial holder of COPs may elect to participate in the Plan COP Settlement in respect of some or all of those portions of COP Claims that would be deemed assigned to it and its Affiliates in the event that the Effective Date occurs.

iii. **Treatment.**

A. **Plan COP Settlement Option.**

Each beneficial holder of COPs may settle issues relating to allowance of the COP Claims that are deemed assigned to it and become a Settling COP Claimant as to some or all COPs held by it and its Affiliates by electing to participate in the Plan COP Settlement on a timely-returned Ballot accepting the Plan. Each Settling COP Claimant shall have its COP Claims deemed to be Allowed Claims in an amount equal to 40% of the aggregate unpaid principal amount of COPs held by such Settling COP Claimant and shall receive, on or as soon as reasonably practicable after the Effective Date, Unsecured Pro Rata Shares of (A) New B Notes and (B) New C Notes.

B. **Non-Settling Holders.**

Each beneficial holder of COPs shall receive the following treatment on account of its COP Claims unless such holder agrees to a different treatment of such Claims:

1. **Disputed COP Claims Reserve.**

On the Effective Date, the City shall establish the Disputed COP Claims Reserve. The Disputed COP Claims Reserve shall contain no less than (a) Unsecured Pro Rata Shares of New B Notes and New C Notes, in each case calculated as if such Disputed COP Claims were Allowed in an amount equal to the aggregate unpaid principal amount as of the Petition Date for the COPs not subject to the Plan COP Settlement; and (b) any distributions made on account of New B Notes and New C Notes held in the Disputed COP Claims Reserve.

2. **Distributions From The Disputed COP Claims Reserve.**

If and to the extent that Disputed COP Claims become Allowed Claims, the Holders of such Allowed Claims shall be sent a Distribution from the Disputed COP Claims Reserve of no less than (A) the portions of New B Notes and New C Notes held in the Disputed COP Claims Reserve initially allocated to the Disputed COP Claims that became Allowed Claims; and (B) any distributions received by the Disputed COP Claims Reserve on account of such portions of New B Notes and New C Notes. Upon the entry of an order by the trial court having jurisdiction over the objections to the Disputed COP Claims resolving all objections to the Disputed COP Claims and after all Distributions on account of Allowed COP Claims have been made or provided for, 70% of any New B Notes, New C Notes and distributions thereon remaining in the Disputed COP Claims Reserve shall be

distributed to holders of Claims entitled to receive New B Notes and New C Notes under the Plan, each of which shall receive their Unsecured Pro Rata Share of such property. The remaining 30% of any New B Notes, New C Notes and distributions thereon shall be cancelled (with respect to the New B Notes and New C Notes) or revert to the City and be transferred to the General Fund (with respect to the distributions on such portion of New B Notes and New C Notes).

**t.    Class 10 – PFRS Claims.**

**i.    Allowance.**

The PFRS Claims shall be allowed in an aggregate amount equal to the sum of approximately $3,281,800,000. All OPEB Claims included in such PFRS Claims shall be allowed as general Unsecured Claims in an aggregate amount equal to approximately $1,693,800,000; provided that the aggregate amounts of the Allowed OPEB Claims and, correspondingly, the Allowed PFRS Claims described in this Section II.B.3.t.i shall be reduced to reflect mitigation of damages resulting from the projected value of, as applicable, (A) federal governmental subsidies toward the payment of health benefit premiums provided under the Patient Protection and Affordable Care Act or (B) federal governmental health care plans, as set forth on Exhibit II.B.3.t.i.

**ii.    Treatment.**

**A.    Contributions to PFRS.**

During the Fiscal Years from the Effective Date through the Fiscal Year ending June 30, 2023, annual contributions shall be made to the PFRS only in the amounts identified on Exhibit II.B.3.t.ii.A. The exclusive source for such contributions shall be DIA Proceeds equal to $175,000,000. After June 30, 2023, the City will contribute sufficient funds required to pay each Holder of a PFRS Pension Claim his or her PFRS Adjusted Pension Amount in accordance with and as modified by the terms and conditions contained in the Plan and the Plan PFRS Settlement.

**B.    Investment Return Assumption.**

During the period that ends on June 30, 2023, the trustees of the PFRS, or the trustees of any successor trust or pension plan, shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the PFRS that shall not be higher than 6.50%.

**C.    Modification of Benefits for PFRS Participants.**

During the period that ends no earlier than June 30, 2023, the pension benefits payable to each Holder of a PFRS Pension Claim shall be equal to the PFRS Adjusted Pension Amount for such Holder, provided that such PFRS Adjusted Pension Amount shall be (1) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (2) increased by (a) the Plan PFRS Settlement (as set forth in Section II.B.3.t.ii.G) and (b) any PFRS Restoration Payment.

**D.    Accrual of Future Benefits.**

Each Holder of a PFRS Pension Claim who is an Active Employee shall receive, in addition to his or her PFRS Adjusted Pension Amount, as may be modified herein, such additional pension benefit for service on or after July 1, 2014 consistent with the terms and conditions of the PFRS Hybrid Pension Formula.

**E.    Governance.**

The composition of the board of trustees of the PFRS and the manner in which it is operated and administered shall be consistent with such governance provisions as are (1) required by the DIA Settlement Documents and the Plan PFRS Settlement and (2) acceptable to the State and the DIA Funding Parties.

### F. No Changes in Terms for Ten Years.

The Confirmation Order shall include an injunction against the subsequent amendment of the terms and conditions, and rules of operation, of the PFRS, or any successor plan or trust, that governs the calculation of pension benefits (including the PFRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, the PFRS Restoration Payment and the PFRS Hybrid Pension Formula and terms of the hybrid arrangement) or against any action that governs the selection of the investment return assumption described in Section II.B.3.t.ii.B, the contribution to the PFRS or the calculation or amount of PFRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.

### G. Plan PFRS Settlement.

If Classes 10 and 11 accept the Plan, Holders of PFRS Pension Claims who accept the Plan will have the option to enter into a settlement with the City and the State by electing to participate in the Plan PFRS Settlement on a timely-returned Ballot accepting the Plan. The Plan PFRS Settlement shall include the following principal terms: (1) the State will deposit the State PFRS Consideration into the PFRS in equal annual installments over a period of 20 years, (2) each Electing PFRS Holder shall be entitled to the PFRS Settlement Benefit Amount in addition to such Holder's PFRS Adjusted Pension Amount and (3) each Electing PFRS Holder will release the City and its Related Entities and the State and the State Related Entities from all PFRS Pension Claims, as more particularly described in the Plan PFRS Settlement Documents.

### H. Establishment of Detroit VEBA.

On or as soon as practicable following the Effective Date, the City will establish the Detroit VEBA to provide health care, life and other legally authorized welfare benefits to Detroit VEBA Beneficiaries and certain of their dependents and future City retirees. The Detroit VEBA will be governed by a board of trustees that will be responsible for, among other things, management of property held by the Detroit VEBA, administration of the Detroit VEBA and determination of the level of distribution of benefits to Detroit VEBA Beneficiaries. The Detroit VEBA Trust Agreement and related plan documentation will be substantially in the form set forth on Exhibit I.A.62, which shall, among other things, identify the members of the Detroit VEBA's initial board of trustees. Promptly after the Detroit VEBA is established, the City shall (1) distribute the OPEB Claims Note to the Detroit VEBA and (2) direct the trustees of the Employee Death Benefit Plan to terminate that plan and transfer all assets (net of expenses of termination) to the Detroit VEBA. The City shall have no responsibility following the Effective Date to provide life insurance or death benefits to retirees. Holders of PFRS Claims that also hold OPEB Claims shall be Detroit VEBA Beneficiaries.

### u. Class 11 – GRS Claims.

#### i. Allowance.

The GRS Claims shall be allowed in an aggregate amount equal to the sum of approximately $3,790,100,000. All OPEB Claims included in such GRS Claims shall be allowed as general Unsecured Claims in an aggregate amount equal to approximately $1,491,100,00; provided that the aggregate amounts of the Allowed OPEB Claims and, correspondingly, the Allowed GRS Claims described in this Section II.B.3.u.i shall be reduced to reflect mitigation of damages resulting from the projected value of, as applicable, (A) federal governmental subsidies toward the payment of health benefit premiums provided under the Patient Protection and Affordable Care Act or (B) federal governmental health care plans, as set forth on Exhibit II.B.3.u.i.

ii.     Treatment.

A.     Contributions to GRS.

During the Fiscal Years from the Effective Date through the Fiscal Year ending June 30, 2023, annual contributions shall be made to the GRS only in the amounts identified on Exhibit II.B.3.u.ii.A. The exclusive sources for such contributions shall be pension-related payments received by the City from the DWSD equal to approximately $675,000,000, and proceeds received from the DIA Funding Parties in the amount of approximately $50,000,000. After June 30, 2023, (1) approximately $195,000,000 of proceeds contributed by the DIA Funding Parties in connection with the DIA Settlement shall be contributed to the GRS and (2) the City will contribute such additional funds as are necessary to pay each Holder of a GRS Pension Claim his or her GRS Adjusted Pension Amount in accordance with and as modified by the terms and conditions contained in the Plan and the Plan GRS Settlement.

B.     Investment Return Assumption

During the period that ends on June 30, 2023, the board of trustees of the GRS, or the trustees of any successor trust or pension plan, shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the GRS that shall not be higher than 6.25%.

C.     Modification of Benefits for GRS Participants.

During the period that ends no earlier than June 30, 2023, the pension benefits payable to each Holder of a GRS Pension Claim shall be equal to the GRS Adjusted Pension Amount for such Holder, provided that such GRS Adjusted Pension Amount shall be (1) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (2) increased by (a) the Plan GRS Settlement (as set forth in Section II.B.3.u.ii.I) and (b) any GRS Restoration Payment.

D.     Annuity Savings Fund Restitution.

Excess allocations to Annuity Savings Fund Accounts during the period beginning January 1, 1999 and ending December 31, 2012 may be applied to reduce (1) Annuity Savings Fund Accounts of Active Employees who participate in the GRS and (2) the Current Accrued Annual Pension of former participants in the Annuity Savings Fund Account now receiving monthly pensions, in accordance with the formulae set forth on Exhibit II.B.3.u.ii.D. In the event of any such reduction, a Holder's GRS Adjusted Pension Amount shall be increased to take into account such Annuity Savings Fund Account restitution reduction.

E.     Accrual of Future Benefits.

Each Holder of a GRS Pension Claim who is an Active Employee shall receive, in addition to his or her GRS Adjusted Pension Amount, as may be modified herein, such additional pension benefit for service on or after July 1, 2014 consistent with the terms and conditions of the GRS Hybrid Pension Formula.

F.     Governance.

The composition of the board of trustees of the GRS and the manner in which it is operated and administered shall be consistent with such governance provisions as are (1) required by the DIA Settlement Documents and the Plan GRS Settlement and (2) acceptable to the State and the DIA Funding Parties.

G.     Potential Transfer of DWSD-Related Pension Liabilities.

If the City consummates a DWSD Transaction on or prior to the Effective Date, the GLWA will assume the pension liability associated with DWSD employees and retirees as accrued through the closing date of the DWSD Transaction. A pro rata share of the existing GRS assets and liabilities will be transferred to a successor

pension fund managed by the GLWA. The successor pension plan will be closed to new GLWA employees and benefit levels frozen.

### H. No Changes in Terms for Ten Years.

The Confirmation Order shall include an injunction against the subsequent amendment of the terms and conditions, and rules of operation, of the GRS, or any successor plan or trust, that govern the calculation of pension benefits (including the GRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, GRS Restoration Payment and the GRS Hybrid Pension Formula and terms of the hybrid arrangement) or against any action that governs the selection of the investment return assumption described in Section II.B.3.u.ii.B, the contribution to the GRS, or the calculation or amount of GRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.

### I. Plan GRS Settlement

If Classes 10 and 11 accept the Plan, Holders of GRS Pension Claims who accept the Plan will have the option to enter into a settlement with the City and the State by electing to participate in the Plan GRS Settlement on a timely-returned Ballot accepting the Plan. The Plan GRS Settlement shall include the following principal terms: (1) the State will deposit the State GRS Consideration into the GRS in equal annual installments over a period of 20 years, (2) each Electing GRS Holder shall be entitled to the GRS Settlement Benefit Amount in addition to such Holder's GRS Adjusted Pension Amount and (3) each Electing GRS Holder will release the City and its Related Entities and the State and the State Related Entities from all GRS Pension Claims, as more particularly described in the Plan GRS Settlement Documents.

### J. GRS Claim Holders with OPEB Claims.

Holders of GRS Claims that also hold OPEB Claims shall be Detroit VEBA Beneficiaries of the Detroit VEBA.

### v. Class 12 – Downtown Development Authority Claims.

#### i. Allowance.

On the Effective Date, the Downtown Development Authority Claims shall be deemed Allowed in the amount of $33,600,000.

#### ii. Treatment.

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Downtown Development Authority Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, Unsecured Pro Rata Shares of (A) New B Notes and (B) New C Notes.

### w. Class 13 – Other Unsecured Claims.

#### i. Treatment.

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Other Unsecured Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, Unsecured Pro Rata Shares of (A) New B Notes and (B) New C Notes.

x.      **Class 14 – Convenience Claims.**

i.      **Treatment.**

Each Holder of an Allowed Convenience Claim, in full satisfaction of such Allowed Claim, shall receive Cash equal to the amount of 25% of such Allowed Claim (as reduced, if applicable, pursuant to an election by such Holder in accordance with Section I.A.44) on or as soon as reasonably practicable after the Effective Date, unless such Holder agrees to a different treatment of such Claim.

y.      **Class 15 – Subordinated Claims.**

i.      **Treatment.**

On the Effective Date, all Subordinated Claims shall be disallowed, extinguished and discharged without Distribution under the Plan, and Holders of Subordinated Claims shall not receive or retain any property on account of such Claims.  Pursuant to section 1126(g) of the Bankruptcy Code, Class 15 is deemed to have rejected the Plan and Holders of Subordinated Claims are not entitled to cast a Ballot in respect of such Claims.

**C.      Confirmation Without Acceptance by All Impaired Classes**

The City requests Confirmation under section 1129(b) of the Bankruptcy Code in the event that any impaired Class does not accept or is deemed not to accept the Plan pursuant to section 1126 of the Bankruptcy Code.  The Plan shall constitute a motion for such relief.

**D.      Treatment of Executory Contracts and Unexpired Leases**

**1.      Assumption.**

Except as otherwise provided in the Plan, in any contract, instrument, release or other agreement or document entered into in connection with the Plan or in a Final Order of the Bankruptcy Court, or as requested in any motion Filed on or prior to the Effective Date, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the City will be deemed to assume all Executory Contracts and Unexpired Leases to which it is a party.

**2.      Assumption of Ancillary Agreements.**

Each Executory Contract and Unexpired Lease assumed pursuant to Section II.D.1 will include any modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such Executory Contract or Unexpired Lease, unless any such modification, amendment, supplement, restatement or other agreement is rejected pursuant to Section II.D.6 or designated for rejection in accordance with Section II.D.3.

**3.      Approval of Assumptions and Assignments.**

The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumption of Executory Contracts or Unexpired Leases pursuant to Section II.D.1 (and any related assignment) as of the Effective Date, except for Executory Contracts or Unexpired Leases that (a) have been rejected pursuant to a Final Order of the Bankruptcy Court, (b) are subject to a pending motion for reconsideration or appeal of an order authorizing the rejection of such Executory Contract or Unexpired Lease, (c) are subject to a motion to reject such Executory Contract or Unexpired Lease Filed on or prior to the Effective Date, (d) are rejected pursuant to Section II.D.6 or (e) are designated for rejection in accordance with the last sentence of this paragraph.  An order of the Bankruptcy Court (which may be the Confirmation Order) entered on or prior to the Confirmation Date will specify the procedures for providing notice to each party whose Executory Contract or Unexpired Lease is being assumed pursuant to the Plan of:  (a) the Executory Contract or Unexpired Lease being assumed; (b) the Cure Amount Claim, if any, that the City believes it would be obligated to pay in connection with such assumption; (c) any assignment of an Executory Contract or Unexpired Lease; and (d) the procedures for such party to object to

the assumption of the applicable Executory Contract or Unexpired Lease, the amount of the proposed Cure Amount Claim or any assignment of an Executory Contract or Unexpired Lease. If an objection to a proposed assumption, assumption and assignment or Cure Amount Claim is not resolved in favor of the City, the applicable Executory Contract or Unexpired Lease may be designated by the City for rejection, which shall be deemed effective as of the Effective Date.

4.      **Payments Related to the Assumption of Executory Contracts and Unexpired Leases**

To the extent that such Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract or Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the City: (a) by payment of the Cure Amount Claim in Cash on the Effective Date or (b) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease. If there is a dispute regarding: (a) the amount of any Cure Amount Claim, (b) the ability of the City or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to the assumption of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code will be made within 30 days following the entry of a Final Order resolving the dispute and approving the assumption.

5.      **Contracts and Leases Entered Into After the Petition Date**

Contracts, leases and other agreements entered into after the Petition Date by the City, including (a) any Executory Contracts or Unexpired Leases assumed by the City and (b) the collective bargaining agreements identified on Exhibit II.D.5, will be performed by the City in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts or Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

6.      **Rejection of Executory Contracts and Unexpired Leases.**

On the Effective Date, each Executory Contract and Unexpired Lease that is listed on Exhibit II.D.6 shall be deemed rejected pursuant to section 365 of the Bankruptcy Code. The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the later of: (a) the Effective Date or (b) the resolution of any objection to the proposed rejection of an Executory Contract or Unexpired Lease. Each contract or lease listed on Exhibit II.D.6 shall be rejected only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease. The City reserves its right, at any time on or prior to the Effective Date, to amend Exhibit II.D.6 to delete any Executory Contract or Unexpired Lease therefrom, thus providing for its assumption pursuant to Section II.D.1 or add any Executory Contract or Unexpired Lease thereto, thus providing for its rejection pursuant to this Section II.D.6. The City will provide notice of any amendments to Exhibit II.D.6 to the parties to the Executory Contracts or Unexpired Leases affected thereby and to the parties on the then-applicable service list in the Chapter 9 Case. Listing a contract or lease on Exhibit II.D.6 shall not constitute an admission by the City that such contract or lease is an Executory Contract or Unexpired Lease or that the City has any liability thereunder. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan shall be treated as Class 13 Claims (Other Unsecured Claims), subject to the provisions of section 502 of the Bankruptcy Code.

7.      **Rejection Damages Bar Date.**

Except as otherwise provided in a Final Order of the Bankruptcy Court approving the rejection of an Executory Contract or Unexpired Lease, Claims arising out of the rejection of an Executory Contract or Unexpired Lease must be Filed with the Bankruptcy Court and served upon counsel to the City on or before the later of: (a) 30 days after the Effective Date or (b) 30 days after such Executory Contract or Unexpired Lease is rejected pursuant to a Final Order or designated for rejection in accordance with Section II.D.3. Any Claims not Filed within such applicable time periods will be forever barred from receiving a Distribution from, and shall not be enforceable against, the City.

8.      **Preexisting Obligations to the City Under
Rejected Executory Contracts and Unexpired Leases.**

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the City under such contract or lease. Notwithstanding any applicable non-bankruptcy law to the contrary, the City expressly reserves and does not waive any right to receive, or any continuing obligation of a non-City party to provide, warranties, indemnifications or continued maintenance obligations on goods previously purchased, or services previously received, by the City from non-City parties to rejected Executory Contracts or Unexpired Leases, and any such rights shall remain vested in the City as of the Effective Date.

9.      **Insurance Policies.**

From and after the Effective Date, each of the City's insurance policies (other than welfare benefits insurance policies) in existence as of or prior to the Effective Date shall be reinstated and continue in full force and effect in accordance with its terms and, to the extent applicable, shall be deemed assumed by the City pursuant to section 365 of the Bankruptcy Code and Section II.D.1. Nothing contained herein shall constitute or be deemed a waiver of any Causes of Action that the City may hold against any Entity, including any insurer under any of the City's insurance policies.

## ARTICLE III
## CONFIRMATION OF THE PLAN

A.      **Conditions Precedent to the Effective Date.**

The Effective Date will not occur, and the Plan will not be consummated, unless and until the City has determined that all of following conditions have been satisfied or waived in accordance with Section III.B:

1.      The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the City.

2.      The Bankruptcy Court shall have entered an order (which may be included in the Confirmation Order) approving and authorizing the City to take all actions necessary or appropriate to implement the Plan, including the transactions contemplated by the Plan and the implementation and consummation of the contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan.

3.      The Confirmation Order shall not be stayed in any respect.

4.      All actions and all contracts, instruments, releases and other agreements or documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable, in form and substance satisfactory to the City.

5.      All authorizations, consents and regulatory approvals, if any, required in connection with the consummation of the Plan have been obtained and not revoked.

6.      The Plan and all Exhibits shall have been Filed and shall not have been materially amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with Section VIII.A.

7.      If Classes 10 and 11 accept the Plan, all conditions to the effectiveness of (a) the Plan PFRS Settlement set forth in the Plan PFRS Settlement Documents and (b) the Plan GRS Settlement set forth in the Plan GRS Settlement Documents have been satisfied.

8.      Sufficient value shall have been realized from the DIA Assets (through the DIA Settlement or otherwise) to fund contributions to the PFRS as set forth on Exhibit II.B.3.t.ii.A.

9.      The Effective Date shall occur within 180 days of the entry of the Confirmation Order, unless such deadline is extended by the Bankruptcy Court.

**B.      Waiver of Conditions to the Effective Date.**

The conditions to the Effective Date set forth in Section III.A may be waived in whole or part at any time by the City in its sole and absolute discretion.

**C.      Effect of Nonoccurrence of Conditions to the Effective Date.**

If each of the conditions to the Effective Date is not satisfied, or duly waived in accordance with Section III.B, then upon motion by the City made before the time that each of such conditions has been satisfied and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order will be vacated by the Bankruptcy Court; provided, however, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is satisfied before the Bankruptcy Court enters an order granting such motion. If the Confirmation Order is vacated pursuant to this Section III.C: (1) the Plan will be null and void in all respects, including with respect to (a) the discharge of Claims pursuant to section 944(b) of the Bankruptcy Code, (b) the assumptions, assignments or rejections of Executory Contracts and Unexpired Leases pursuant to Section II.D and (c) the releases described in Section III.D.7; and (2) nothing contained in the Plan, nor any action taken or not taken by the City with respect to the Plan, the Disclosure Statement or the Confirmation Order, will be or will be deemed to be (a) a waiver or release of any Claims by or against the City, (b) an admission of any sort by the City or any other party in interest or (c) prejudicial in any manner the rights of the City or any other party in interest.

**D.      Effect of Confirmation of the Plan.**

**1.      Dissolution of Official Committees.**

Following the Effective Date, all Official Committees, to the extent not previously dissolved or disbanded, will dissolve and disband, and the members of the Official Committees and their respective professionals will cease to have any role arising from or related to the Chapter 9 Case, provided, however, that, if and only if the Retiree Committee is the Creditor Representative under the Plan, the Retiree Committee shall continue to exist solely for the purposes of objecting to or otherwise asserting the City's or its creditors' rights with respect to Disputed COP Claims pursuant to Section II.B.s.i. If the Retiree Committee is the Creditor Representative, it shall be disbanded upon the final resolution of all Disputed COP Claims or pursuant to an order of the Bankruptcy Court, which order may be sought by the City for good cause shown. All fees and expenses of the Creditor Representative shall be subject to the approval of the City. All disputes relating to the approval of fees and expenses shall be determined by the Bankruptcy Court. No party to any such dispute shall have any right to appeal an order of the Bankruptcy Court resolving any such dispute.

**2.      Preservation of Rights of Action by the City.**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code, the City will retain and may enforce any claims, demands, rights, defenses and Causes of Action that it may hold against any Entity, to the extent not expressly released under the Plan or pursuant to any Final Order of the Bankruptcy Court. A nonexclusive schedule of currently pending actions and claims brought by the City is attached as Exhibit III.D.2. The City's inclusion or failure to include any right of action or claim on Exhibit III.D.2 shall not be deemed an admission, denial or waiver of any claims, demands, rights or Causes of Action that the City may hold against any Entity, and all Entities are hereby notified that the City intends to preserve all such claims, demands, rights or Causes of Action.

3.        **Comprehensive Settlement of Claims and Controversies.**

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all claims or controversies relating to the rights that a holder of a Claim may have with respect to any Allowed Claim or any Distribution to be made pursuant to the Plan on account of any Allowed Claim. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements are (a) in the best interests of the City, its property and Claim Holders and (b) fair, equitable and reasonable.

4.        **Discharge of Claims.**

a.        **Complete Satisfaction, Discharge and Release.**

Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims arising on or before the Effective Date, including any interest accrued on Claims from and after the Petition Date. Except as provided in the Plan or in the Confirmation Order, Confirmation will, as of the Effective Date, discharge the City from all Claims or other debts that arose on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (iii) the Holder of a Claim based on such debt has accepted the Plan.

b.        **Discharge.**

In accordance with Section III.D.4.a, except as expressly provided otherwise in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination, as of the Effective Date, of a discharge of all Claims and other debts and Liabilities against the City, pursuant to sections 524(a)(1), 524(a)(2) and 944(b) of the Bankruptcy Code, and such discharge will void any judgment obtained against the City at any time, to the extent that such judgment relates to a discharged Claim; <u>provided</u> that such discharge will not apply to (i) Claims specifically exempted from discharge under the Plan; and (ii) Claims held by an Entity that, before the Confirmation Date, had neither notice nor actual knowledge of the Chapter 9 Case.

5.        **Injunction.**

**On the Effective Date, except as otherwise provided herein or in the Confirmation Order,**

a.        **all Entities that have been, are or may be holders of Claims against the City or Indirect 36th District Court Claims, along with their Related Entities, shall be permanently enjoined from taking any of the following actions against or affecting the City or its property, DIA Corp. or its property, the DIA Assets, the Foundations or their respective property, if a DWSD Transaction is consummated on or prior to the Effective Date, the GLWA and its property and the Related Entities of each of the foregoing, with respect to such claims (other than actions brought to enforce any rights or obligations under the Plan and appeals, if any, from the Confirmation Order):**

1.        **commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against or affecting the City or its property (including (A) all suits, actions and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice and (B) Indirect 36th District Court Claims);**

2.        **enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order against the City or its property;**

3.      creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the City or its property;

4.      asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the City or its property;

5.      proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan or the settlements set forth herein to the extent such settlements have been approved by the Bankruptcy Court in connection with Confirmation of the Plan; and

6.      taking any actions to interfere with the implementation or consummation of the Plan.

b.      All Entities that have held, currently hold or may hold any Liabilities released or exculpated pursuant to the Plan will be permanently enjoined from taking any of the following actions against any Released Party or its property on account of such released Liabilities: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien; (iv) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due a Released Party; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

6.      **Exculpation.**

From and after the Effective Date, to the fullest extent permitted under applicable law, neither the City, its Related Entities (including the members of the City Council, the Mayor and the Emergency Manager), to the extent a claim arises from actions taken by such Related Entity in its capacity as a Related Entity of the City, nor the Released Parties shall have or incur any liability to any person or Entity for any act or omission in connection with, relating to or arising out of the City's restructuring efforts and the Chapter 9 Case, including the formulation, preparation, negotiation, dissemination, consummation, implementation, confirmation or approval (as applicable) of the Plan, the property to be distributed under the Plan, the Exhibits, the Disclosure Statement, any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan or the management or operation of the City (except for any liability that results from willful misconduct or gross negligence as determined by a Final Order or from any act or omission occurring before the Petition Date). The City, its Related Entities (with respect to actions taken by such Related Entities in their capacities as Related Entities of the City) and the Released Parties shall be entitled to rely upon the advice of counsel and financial advisors with respect to their duties and responsibilities under, or in connection with, the Chapter 9 Case, the administration thereof and the Plan.

7.      **Releases**

Without limiting any other applicable provisions of, or releases contained in, the Plan or any contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, as of the Effective Date, in consideration for the obligations of the City under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, (a) each holder of a Claim that votes in favor of the Plan, to the fullest extent permissible under law, will be deemed to forever release, waive and discharge all Liabilities in any way relating to the City, the Chapter 9 Case, the Plan, the Exhibits or the Disclosure Statement that such entity has, had or may have against any Released Party (which release will be in addition to the discharge of Claims provided herein and under the Confirmation Order and the Bankruptcy Code) and (b) if the Plan PFRS Settlement and the Plan GRS Settlement are consummated, the City will be deemed to forever release, waive and discharge all Liabilities in any way related to the Pension Claims that the City has, had or may have against any Released Party.

E.      **Effectiveness of the Plan.**

        The Plan shall become effective on the Effective Date.  Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

F.      **Binding Effect of Plan.**

        Pursuant to section 944(a) of the Bankruptcy Code, on and after the Effective Date, the provisions of the Plan shall bind all Holders of Claims, and their respective successors and assigns, whether or not the Claim of any such Holder is Impaired under the Plan and whether or not such Holder has accepted the Plan.  The releases and settlements effected under the Plan will be operative, and subject to enforcement by the Bankruptcy Court, from and after the Effective Date, including pursuant to the injunctive provisions of the Plan.  Once approved, the compromises and settlements embodied in the Plan, along with the treatment of any associated Allowed Claims, shall not be subject to any collateral attack or other challenge by any Entity in any court or other forum.  As such, any Entity that opposes the terms of any compromise and settlement set forth in the Plan must (1) challenge such compromise and settlement prior to Confirmation of the Plan and (2) demonstrate appropriate standing to object and that the subject compromise and settlement does not meet the standards governing bankruptcy settlements under Bankruptcy Rule 9019 and other applicable law.

**ARTICLE IV**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

A.      **Alternatives Related to the DWSD.**

        1.      **DWSD Remains a Department of the City.**

                a.      **Rates and Revenues.**

        The DWSD will maintain Fiscal Year 2015 rate setting protocols for a minimum of five years, subject to certain changes necessary to stabilize water and sewer revenues.  Immediately following the Effective Date, the City will begin planning a rate stability program for City residents. Such program may provide for affordability of retail rates to be taken into account in the development of wholesale rates across the system.

                b.      **DWSD CBAs.**

        Collective bargaining agreements with respect to current DWSD employees that are in effect as of the Effective Date will be assumed by the City.

                c.      **The New DWSD Bonds, New Existing Rate DWSD Bonds and New DWSD Revolving Bonds.**

        If a DWSD Transaction is not consummated, the DWSD shall, as necessary:  (1) execute the New DWSD Bond Documents, issue the New DWSD Bonds, in one or more series, substantially on the terms set forth on Exhibit I.A.166, and distribute the New DWSD Bonds as set forth in the Plan; (2) execute the New Existing Rate DWSD Bond Documents, issue the New Existing Rate DWSD Bonds, in one or more series, substantially on the terms set forth on Exhibit I.A.170, and distribute the New Existing Rate DWSD Bonds as set forth in the Plan; and (3) execute the New DWSD Revolving Bond Documents, issue the New DWSD Revolving Bonds, in one or more series, substantially on the terms set forth on Exhibit I.A.168, and distribute the New DWSD Revolving Bonds as set forth in the Plan.

        2.      **Potential DWSD Transaction.**

        The City may enter into a DWSD Transaction that will include the formation of the GLWA to conduct the operations currently conducted by the DWSD.  The City will only enter into a DWSD Transaction if

such transaction enables the City to make larger, more rapid or more certain distributions to at least some of its creditors as compared to the Distributions specified in Section II.B.

        **a.**        **The New GLWA Bonds, New Existing Rate GLWA Bonds and New GLWA Revolving Bonds.**

        If the City enters into a DWSD Transaction, the GLWA shall, as necessary:  (a) execute the New GLWA Bond Documents, issue the New GLWA Bonds, in one or more series, substantially on the terms set forth on Exhibit I.A.174 and distribute the New GLWA Bonds as set forth in the Plan; (b) execute the New Existing Rate GLWA Bond Documents, issue the New Existing Rate GLWA Bonds, in one or more series, substantially on the terms set forth on Exhibit I.A.172, and distribute the New Existing Rate GLWA Bonds as set forth in the Plan; and (c) execute the New GLWA Revolving Bond Documents, issue the New GLWA Revolving Bonds, in one or more series, substantially on the terms set forth on Exhibit I.A.176, and distribute the New GLWA Revolving Bonds as set forth in the Plan.

**B.**        **The New Securities.**

        On the Effective Date, the City shall (1) execute the New B Notes Documents, issue the New B Notes, substantially on the terms set forth on Exhibit I.A.160, and distribute the New B Notes as set forth in the Plan; (2) execute the New C Notes Documents, issue the New C Notes, substantially on the terms set forth on Exhibit I.A.163, and distribute the New C Notes as set forth in the Plan; (3) execute and issue the OPEB Claims Note, substantially on the terms set forth on Exhibit I.A.182.a, and distribute the OPEB Claims Note as set forth in the Plan; and (4) execute the Plan UTGO Notes Documents, issue the Plan UTGO Notes, substantially on the terms set forth on Exhibit I.A.206, and distribute the Plan UTGO Notes as set forth in the Plan.

**C.**        **The Plan COP Settlement.**

        The City shall consummate the Plan COP Settlement on the Effective Date, substantially on the terms set forth on Exhibit I.A.201.  Settling COP Claimants shall receive the treatment described in Section II.B.3.s.iii.A.

**D.**        **The Plan GRS Settlement.**

        The City shall consummate the Plan GRS Settlement on the Effective Date, substantially on the terms set forth on Exhibit I.A.203.  Electing GRS Holders shall receive the treatment described in Section II.B.3.u.ii.I.

**E.**        **The Plan PFRS Settlement.**

        The City shall consummate the Plan PFRS Settlement on the Effective Date, substantially on the terms set forth on Exhibit I.A.205.  Electing PFRS Holders shall receive the treatment described in Section II.B.3.t.ii.G.

**F.**        **The DIA Settlement.**

        On the Effective Date, the City and the DIA Funding Parties will enter into the DIA Settlement, pursuant to which (1) the DIA Funding Parties have committed to assist in the funding of the City's restructured legacy pension obligations and (2) the City has agreed to enter into certain transactions that will cause the DIA Assets to remain in the City in perpetuity and to otherwise make the DIA Assets available for the benefit of the residents of the City and the Counties and the citizens of the State.  The definitive documentation governing the DIA Settlement is attached hereto at Exhibit I.A.71 and provides generally for, and entirely qualifies, the following:

1.      **Funding Contributions.**

        The DIA Settlement will be funded as follows:  (a) an irrevocable commitment of at least $365 million by the Foundations; and (b) in addition to its continuing commitments outside of the DIA Settlement, an irrevocable commitment from DIA Corp. to raise at least $100 million from its donors.  The foregoing commitments shall be funded over the course of the 20-year period immediately following the Effective Date (subject to the annual confirmation of the City's continuing compliance with the terms of the DIA Settlement). Amounts committed by the Foundations will be paid to the CFSEM Supporting Organization, which will (a) transfer such amounts for the purpose of funding the Retirement Systems upon the City's satisfaction of certain conditions and (b) not be subject to claims of creditors of the Community Foundation for Southeast Michigan.

2.      **Transfer of DIA Assets.**

        On the Effective Date, the City shall irrevocably transfer the DIA Assets to DIA Corp., as trustee, to be held in perpetual charitable trust, and within the City limits, for the primary benefit of the residents of the City and the Counties and the citizens of the State.

3.      **Conditions to the Foundations' Participation.**

        The Foundations' participation in the DIA Settlement is conditioned upon, among other things, the following:  (i) the irrevocable commitment from the DIA Corp. described in Section IV.F.1; (ii) the acceptance of the Plan by Classes 10 and 11; (iii) the irrevocable transfer by the City of the DIA Assets described in Section IV.F.2; (iv) the existence of appropriate governance and oversight structures at DIA Corp. that include representation of the City, the DIA Funding Parties and other stakeholders; (v) the earmarking of all funds provided by the DIA Funding Parties towards the recoveries upon Pension Claims under the Plan for Holders of Claims in Classes 10 and 11; (vi) the existence of appropriate prospective governance and financial oversight mechanisms for the Retirement Systems; (vii) the affirmation by County authorities of certain existing funding obligations with respect to DIA Corp.; (viii) the approval of the DIA Settlement by the Attorney General for the State; (ix) the agreement of the State to provide the State GRS Consideration and the State PFRS Consideration in an aggregate amount up to $350 million; (x) the occurrence of the Confirmation Date no later than December 31, 2014; and (xi) the City's agreement to indemnify and hold harmless the Foundations and the CFSEM Supporting Organization pursuant to, and in accordance with, the terms of the DIA Settlement Documents.

G.      **Issuance of the New Securities.**

        The City shall issue the New Securities on the Effective Date or a subsequent Distribution Date, as applicable.  To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the issuance of New Securities will be exempt from registration under the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder and any other applicable non-bankruptcy law or regulation.

H.      **Cancellation of Existing Bonds and Bond Documents.**

        Except (a) as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan, (b) for purposes of evidencing a right to Distribution under the Plan or (c) as specifically provided otherwise in the Plan, on the Effective Date, the Bonds and the Bond Documents will be deemed automatically cancelled, terminated and of no further force or effect against the City without any further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the parties, as applicable, under the Bonds and the Bond Documents shall be discharged; provided, however, that the Bond Documents shall continue in effect solely (i) to allow the Disbursing Agent to make any Distributions as set forth in the Plan and to perform such other necessary administrative or other functions with respect thereto, (ii) for any trustee, agent or similar entity under the Bond Documents to have the benefit of all the rights and protections and other provisions of the Bond Documents and all other related agreements with respect to priority in payment and lien rights with respect to any Distribution and (iii) as may be necessary to preserve any claim by a Bondholder and/or Bond Agent under a Bond Insurance Policy or against any Bond Insurer.  Nothing in the Plan is intended to

impair, modify, affect or otherwise alter the rights of Bondholders and/or Bond Agents with respect to claims under applicable Bond Insurance Policies and/or against the Bond Insurers.

**I.**      **Release of Liens.**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date, all Liens against the City's property will be deemed fully released and discharged, and all of the right, title and interest of any holder of such Liens, including any rights to any collateral thereunder, will revert to the City. As of the Effective Date, (1) the holders of such Liens will be authorized and directed to release any collateral or other property of the City (including any cash collateral) held by such Holder and to take such actions as may be requested by the City to evidence the release of such Lien, including the execution, delivery, filing or recording of such releases as may be requested by the City, and (2) the City shall be authorized to execute and file on behalf of creditors Form UCC-3 Termination Statements or such other forms as may be necessary or appropriate to implement the provisions of this Section.

**J.**      **Professional Fee Reserve**

On the Effective Date, the City shall establish and fund the Professional Fee Reserve. The Professional Fee Reserve shall be funded in an amount sufficient to pay the Fee Review Professional Fees that remain unpaid as of the Effective Date. The funds held in the Professional Fee Reserve may not be used for any purpose other than the payment of Fee Review Professional Fees until any and all disputes regarding the Fee Review Professional Fees, including any disputes arising under the Fee Review Order, have been fully and finally resolved pursuant to a Final Order or a stipulation between the disputing parties. Any amounts remaining in the Professional Fee Reserve after final resolution of all such disputes and the payment of all Fee Review Professional Fees determined to be reasonable in accordance with the Fee Review Order shall be released to the General Fund.

**K.**      **Assumption Of Indemnification Obligations.**

Notwithstanding anything otherwise to the contrary in the Plan, nothing in the Plan shall discharge or impair the obligations of the City as provided in the City Charter of the City or other organizational documents, resolutions, employment contracts, applicable law or other applicable agreements as of the Petition Date to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of officers and employees of the City (including without limitation the members of the City Council, the Mayor and the Emergency Manager) and their Related Entities, in each case to the extent such Entities were acting in such capacity, against any claims or causes of action whether direct or derivative, liquidated or unliquidated, foreseen or unforeseen, asserted or unasserted.

**L.**      **Incorporation of Retiree Health Care Settlement Agreement.**

The terms of the Retiree Health Care Settlement Agreement resolving the Retiree Health Care Litigation, as set forth on Exhibit I.A.220, are incorporated herein by reference and shall be binding upon the parties thereto.

**M.**      **Exit Facility.**

On the Effective Date, the City shall enter into the Exit Facility, as well as any ancillary notes, documents or agreements in connection therewith, including, without limitation, any documents required in connection with the creation or perfection of the liens securing the Exit Facility.

# ARTICLE V
## PROVISIONS REGARDING DISTRIBUTIONS UNDER THE PLAN

**A.** **Appointment of Disbursing Agent.**

The City may act as Disbursing Agent or may employ or contract with other Entities to act as the Disbursing Agent or to assist in or make the Distributions required by the Plan. Any Disbursing Agent appointed by the City will serve without bond. Other than as specifically set forth in the Plan, the Disbursing Agent shall make all Distributions required to be made under the Plan.

**B.** **Distributions on Account of Allowed Claims.**

Except as otherwise provided in the Plan, on the Effective Date or as soon as practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive from the Disbursing Agent the Distributions that the Plan provides for Allowed Claims in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Section VI.B. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the Distributions provided for in the Plan, regardless of whether such Distributions are delivered on or at any time after the Effective Date. Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Distribution in excess of the Allowed amount of such Claim.

**C.** **Certain Claims to Be Expunged.**

Any Claim that has been or is hereafter listed in the List of Creditors as contingent, unliquidated or disputed, and for which no proof of Claim is or has been timely Filed, is not considered to be an Allowed Claim and shall be expunged without further action by the City and without further notice to any party or any action, approval or order of the Bankruptcy Court.

**D.** **Record Date for Distributions; Exception for Bond Claims.**

With the exception of Bond Claims, neither the City nor any Disbursing Agent will have any obligation to recognize the transfer of, or the sale of any participation in, any Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute only to those Holders of Allowed Claims (including Holders of Claims that become Allowed after the Distribution Record Date) that are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date. With the exception of the Bond Claims, the City and any Disbursing Agent shall instead be entitled to recognize and deal for all purposes under the Plan with only those record Holders stated on the official Claims Register as of the close of business on the Distribution Record Date. Unless otherwise set forth in the Confirmation Order, the City shall not establish a record date for Distributions to Holders of Bond Claims.

**E.** **Means of Cash Payments.**

Except as otherwise specified herein, all Cash payments made pursuant to the Plan shall be in U.S. currency and made by check drawn on a domestic bank selected by the Disbursing Agent or, at the option of the Disbursing Agent, by wire transfer, electronic funds transfer or ACH from a domestic bank selected by the Disbursing Agent; provided, however, that Cash payments to foreign Holders of Allowed Claims may be made, at the option of the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

## F.    Selection of Distribution Dates for Allowed Claims.

Except where the Plan requires the making of a Distribution on account of a particular Allowed Claim within a particular time, the Disbursing Agent shall have the authority to select Distribution Dates that, in the judgment of the Disbursing Agent, provide Holders of Allowed Claims with payments as quickly as reasonably practicable while limiting the costs incurred in the distribution process. Upon the selection of a Distribution Date by the Disbursing Agent, the Disbursing Agent shall File a notice of such Distribution Date that provides information regarding the Distribution to be made.

## G.    Limitations on Amounts to Be Distributed to Holders of Allowed Claims Otherwise Insured.

No Distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the City's insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy; provided that, if the City believes a Holder of an Allowed Claim has recourse to an insurance policy and intends to direct the Disbursing Agent to withhold a Distribution pursuant to this Section V.G, the City shall provide written notice to such Holder regarding what the City believes to be the nature and scope of applicable insurance coverage. To the extent that one or more of the City's insurance carriers agrees to satisfy a Claim in full, then immediately upon such agreement such Claim may be expunged without a Claims objection having to be Filed and without any further notice or any action, order or approval of the Bankruptcy Court. Nothing in the Plan, including this Section V.G, shall constitute a waiver of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities that any Entity may hold against any other Entity other than the City, including the City's insurance carriers. For the avoidance of doubt, this Section shall not apply to Bond Insurance Policies.

## H.    City's Rights of Setoff Preserved.

Notwithstanding anything to the contrary in the Plan, pursuant to section 553 of the Bankruptcy Code or otherwise applicable non-bankruptcy law, the City may set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Allowed Claim the claims, rights and Causes of Action of any nature that the City may assert against the Holder of such Claim; provided, however, that neither the failure to effect a setoff nor the allowance of any Claim pursuant to the terms of the Plan shall constitute a waiver or release by the City of any claims, rights and Causes of Action that the City may assert against such Holder, all of which are expressly preserved.

## I.    Delivery of Distributions and Undeliverable or Unclaimed Distributions.

### 1.    Delivery of Distributions Generally.

Except as set forth in Section V.I.2, Distributions to Holders of Allowed Claims shall be made at the addresses set forth in the City's records unless such addresses are superseded by proofs of Claim or transfers of Claim Filed pursuant to Bankruptcy Rule 3001.

### 2.    Delivery of Distributions on Account of Bond Claims.

Distributions on account of the Bond Claims shall (a) be made by the Disbursing Agent to the Bond Agent under the applicable Bond Documents for the benefit of Holders of Bond Claims and (b) be deemed completed when made by the Disbursing Agent to the Bond Agent as if such Distributions were made directly to the Holders of such Claims. The applicable Bond Agent, in turn, shall make such distributions to the applicable Holders pursuant to the terms and conditions of the applicable Bond Documents and subject to the respective rights, claims and interests, if any, that the Bond Agent may have under the applicable Bond Documents or otherwise to the recovery and/or reimbursement of their fees, costs and expenses (including the fees, costs and expenses of counsel and financial advisors) from any distribution hereunder, whether such rights, claims or interests are in the nature of a charging lien or otherwise. The Bond Agent shall not be required to give any bond, surety or other security for the performance of its duties with respect to such Distributions.

3.        **De Minimis Distributions / No Fractional New Securities.**

No distribution shall be made by the Disbursing Agent on account of an Allowed Claim if the amount to be distributed to the specific Holder of an Allowed Claim on the applicable Distribution Date has an economic value of less than $25.00. No fractional New Securities shall be distributed. Where a fractional portion of a New Security otherwise would be called for under the Plan, the actual issuance shall reflect a rounding down to the nearest whole New Security.

4.        **Undeliverable or Unclaimed Distributions.**

In the event that any Distribution to any Holder is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such Distribution shall be made to such Holder without interest.

Any Holder of an Allowed Claim that does not claim an undeliverable or unclaimed Distribution within six months after the Effective Date shall be deemed to have forfeited its claim to such Distribution and shall be forever barred and enjoined from asserting any such claim against the City or its property. In such cases, any Cash held by the City on account of such undeliverable or unclaimed Distributions shall become the property of the City free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary. Any New Securities held for distribution on account of such Claims shall be canceled and of no further force or effect. Nothing contained in the Plan shall require any Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

5.        **Time Bar to Cash Payment Rights.**

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof. Requests for reissuance of any check shall be made to the Disbursing Agent by the Holder of the Allowed Claim to whom such check originally was issued within 180 days after the date of the original check issuance. After such date, the Claim of any Holder to the amount represented by such voided check shall be released and forever barred from assertion against the City and its property.

J.        **Other Provisions Applicable to Distributions in All Classes**

1.        **No Postpetition Interest.**

Except as otherwise specifically provided for in the Plan, or required by applicable bankruptcy law, the City shall have no obligation to pay interest on an Allowed Claim accrued after the Petition Date and no Holder of a Claim shall be entitled to be paid interest accruing on or after the Petition Date on any Claim without regard to whether such amount has accrued for federal income tax purposes. Any such interest that has been accrued and has not been paid by the City shall be cancelled as of the Effective Date for federal income tax purposes.

2.        **Compliance with Tax Requirements.**

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the City and any Disbursing Agent shall comply with all Tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions under the Plan shall be subject to such withholding and reporting requirements. All such amounts withheld and paid to the appropriate governmental unit shall be treated as if made directly to the Holder of an Allowed Claim. The City and the Disbursing Agent shall be authorized to take any actions that they determine, in their reasonable discretion, to be necessary or appropriate to comply with such withholding and reporting requirements, including withholding Distributions pending receipt of information necessary to facilitate such Distributions, or establishing any other mechanisms they believe are reasonable and appropriate.

Notwithstanding any other provision of the Plan, each Entity receiving or deemed to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any

Tax imposed on such Entity on account of such Distribution, including income, withholding and other Tax obligations. The City has the right, but not the obligation, to refuse, or to direct a Disbursing Agent to refuse, to make a Distribution until a Holder of an Allowed Claim has made arrangements satisfactory to the City and any Disbursing Agent for payment of any such Tax obligations. The City may require, as a condition to making a Distribution, that the Holder of an Allowed Claim provide the City or any Disbursing Agent with a completed Form W-8, W-9 and/or other Tax information, certifications and supporting documentation, as applicable.

If the City makes such a request and the Holder of an Allowed Claim fails to comply before the date that is 180 days after the initial request is made, the amount of such Distribution shall irrevocably revert to the City and any Claim in respect of such Distribution shall be released and forever barred from assertion against the City and its property.

**3.      Allocation of Distributions.**

All Distributions to Holders of Allowed Claims that have components of principal and interest shall be deemed to apply first to the principal amount of such Claim until such principal amount is paid in full, and then the remaining portion of such Distributions, if any, shall be deemed to apply to any applicable accrued interest included in such Claim to the extent interest is payable under the Plan.

**4.      Surrender of Instruments.**

As a condition to participation under this Plan, the Holder of a note, debenture or other evidence of indebtedness of the City that desires to receive the property to be distributed on account of an Allowed Claim based on such note, debenture or other evidence of indebtedness shall surrender such note, debenture or other evidence of indebtedness to the City or its designee (unless such Holder's Claim will not be Impaired by the Plan, in which case such surrender shall not be required), and shall execute and deliver such other documents as are necessary to effectuate the Plan; provided, however, that, if a claimant is a Holder of a note, debenture or other evidence of indebtedness for which no physical certificate was issued to the Holder but which instead is held in book-entry form pursuant to a global security held by the Depository Trust Company or other securities depository or custodian thereof, the City or the applicable Bond Agent for such note, debenture or other evidence of indebtedness may waive the requirement of surrender. In the City's sole discretion, if no surrender of a note, debenture or other evidence of indebtedness occurs and the Holder of Claim does not provide an affidavit and indemnification agreement, in form and substance reasonably satisfactory to the City, that such note, debenture or other evidence of indebtedness was lost, then no distribution may be made to such Holder in respect of the Claim based on such note, debenture or other evidence of indebtedness. For the avoidance of doubt, no Bond, note, debenture or other evidence of indebtedness of the City shall be surrendered or deemed surrendered hereby to the extent necessary to make and/or preserve a claim under any Bond Insurance Policy or against any Bond Insurer.

**ARTICLE VI
PROCEDURES FOR RESOLVING DISPUTED CLAIMS**

**A.      Treatment of Disputed Claims.**

**1.      General.**

No Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order (including the Confirmation Order) allowing such Claim. Notwithstanding any other provision of the Plan, no payments or Distributions shall be made on account of a Disputed Claim until such Claim becomes an Allowed Claim. Without limiting the foregoing in any way, no partial payments and no partial Distributions will be made with respect to a disputed, contingent or unliquidated Claim, or with respect to any Claim for which a proof of Claim has been Filed but not Allowed, until the resolution of such disputes or estimation or liquidation of such Claim by settlement or by Final Order.

### 2. ADR Procedures.

At the City's option, any Disputed Claim designated or eligible to be designated for resolution through the ADR Procedures may be submitted to the ADR Procedures in accordance with the terms thereof and the ADR Procedures Order. For the avoidance of doubt, the designation of a Disputed Claim for resolution through the ADR Procedures, either prior to or after the Effective Date, will not modify, and will not be deemed to have modified, the terms of the ADR Injunction imposed pursuant to the ADR Procedures Order. Disputed Claims not resolved through the ADR Procedures will be resolved pursuant to the Plan.

### 3. Tort Claims.

At the City's option, any unliquidated Tort Claim (as to which a proof of Claim was timely Filed in the Chapter 9 Case) not resolved through the ADR Procedures or pursuant to a Final Order of the Bankruptcy Court will be determined and liquidated in the administrative or judicial tribunal(s) in which it is pending on the Effective Date (subject to the City's right to seek removal or transfer of venue) or, if no action was pending on the Effective Date, in an administrative or judicial tribunal of appropriate jurisdiction selected by the City that (a) has personal jurisdiction over the parties, (b) has subject matter jurisdiction over the Tort Claim and (c) is a proper venue. The City may exercise the above option by service upon the holder of the applicable Tort Claim of a notice informing such holder that the City has exercised such option (which notice shall be deemed to satisfy the notice requirements of Section I.B of the ADR Procedures). Upon the City's service of such notice, the automatic stay imposed pursuant to sections 362 and 922 of the Bankruptcy Code (along with any extension of such stay pursuant to the terms of the Stay Extension Order) or, after the Effective Date, the injunction set forth at Section III.D.5, will be deemed modified, without the necessity for further Bankruptcy Court approval or any further action by the City, solely to the extent necessary to allow the parties to determine or liquidate the Tort Claim in the applicable administrative or judicial tribunal(s); provided that nothing contained in this Section will modify, or will be deemed to have modified, the terms of the Stay Extension Order with respect to any Tort Claim prior to the City having served notice of its intent to determine and liquidate such Tort Claim pursuant to this Section. If the City does not serve such a notice upon a holder of a Tort Claim by the Claims Objection Bar Date, such holder may file a motion with the Bankruptcy Court seeking relief from the discharge injunction imposed pursuant to Section III.D.5 in order to liquidate and determine its Claim.

Any Tort Claim determined and liquidated pursuant to a judgment obtained in accordance with this Section VI.A.3 and applicable non-bankruptcy law that is no longer appealable or subject to review will be deemed an Allowed Claim, provided that only the amount of such Allowed Tort Claim that is not satisfied from proceeds of insurance payable to the holder of such Allowed Tort Claim will be treated as an Allowed Claim for the purposes of distributions under the Plan. Distributions on account of any such Allowed Tort Claim shall be made in accordance with the Plan. Nothing contained in this Section will constitute or be deemed a waiver of any claim, right or Cause of Action that the City may have against any Entity in connection with or arising out of any Tort Claim, including any rights under section 157(b)(5) of title 28 of the United States Code. All claims, demands, rights, defenses and Causes of Action that the City may have against any Entity in connection with or arising out of any Tort Claim are expressly retained and preserved.

### B. Disputed Claims Reserve.

On and after the Effective Date, until such time as all Disputed Claims have been compromised and settled or determined by Final Order and before making any Distributions, consistent with and subject to section 1123(a)(4) of the Bankruptcy Code, the City shall establish and maintain a reserve of property equal to the Distributions to which Holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims in the Face Amount of such Disputed Claims or such lesser amount as required by an order of the Bankruptcy Court. On the first Distribution Date that is at least 30 days (or such fewer days as may be agreed to by the City in its sole discretion) after the date on which a Disputed Claim becomes an Allowed Claim, the Disbursing Agent shall remit to the Holder of such Allowed Claim any Distributions such Holder would have been entitled to under the Plan on account of such Allowed Claim had such Claim been Allowed as of the Effective Date. If a Disputed Claim is disallowed by Final Order, the property reserved on account shall become available for Distribution to the Holders of Allowed Claims within the Class(es) entitled to receive such property. Each Holder of

a Disputed Claim that ultimately becomes an Allowed Claim will have recourse only to the assets held in the disputed claims reserve and not to any other assets held by the City, its property or any property previously distributed on account of any Allowed Claim. Notwithstanding the foregoing, the disputed claim reserve established pursuant to this Section shall not include any reserve of property on account of Disputed COP Claims, which shall receive the treatment set forth in Section II.B.3.s.iii.

**C. Objections to Claims.**

**1. Authority to Prosecute, Settle and Compromise.**

The City's rights to object to, oppose and defend against all Claims on any basis are fully preserved. Except as otherwise provided in Section II.B.3.s.i with respect to Disputed COP Claims, as of the Effective Date, only the City shall have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims, including pursuant to the ADR Procedures or any similar procedures approved by the Bankruptcy Court. Any objections to Claims shall be Filed no later than the Claims Objection Bar Date. On and after the Effective Date, the City may settle or compromise any Disputed Claim or any objection or controversy relating to any Claim without any further notice or any action, order or approval of the Bankruptcy Court.

**2. Application of Bankruptcy Rules.**

To facilitate the efficient resolution of Disputed Claims, the City shall be permitted to File omnibus objections to claims notwithstanding Bankruptcy Rule 3007(c).

**3. Expungement or Adjustment of Claims Without Objection.**

Any Claim that has been paid, satisfied or superseded shall be expunged from the Claims Register by the Claims and Balloting Agent at the request of the City, and any Claim that has been amended by the Holder of such Claim shall be adjusted on the Claims Register by the Claims and Balloting Agent at the request of the City, without the Filing of an objection and without any further notice or any action, order or approval of the Bankruptcy Court.

**4. Extension of Claims Objection Bar Date.**

Upon motion to the Bankruptcy Court, the City may request, and the Bankruptcy Court may grant, an extension to the Claims Objection Bar Date generally or with respect to specific Claims. Any extension granted by the Bankruptcy Court shall not be considered to be a modification to the Plan under section 1127 of the Bankruptcy Code.

**5. Authority to Amend List of Creditors.**

The City will have the authority to amend the List of Creditors with respect to any Claim and to make Distributions based on such amended List of Creditors without approval of the Bankruptcy Court. If any such amendment to the List of Creditors reduces the amount of a Claim or changes the nature or priority of a Claim, the City will provide the Holder of such Claim with notice of such amendment and such Holder will have 20 days to File an objection to such amendment with the Bankruptcy Court. If no such objection is Filed, the Disbursing Agent may proceed with Distributions based on such amended List of Creditors without approval of the Bankruptcy Court.

**ARTICLE VII**
**RETENTION OF JURISDICTION**

Pursuant to sections 105(c), 945 and 1142(b) of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 9 Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

A.      Allow, disallow, estimate, determine, liquidate, reduce, classify, re-classify, estimate or establish the priority or secured or unsecured status of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the amount, allowance, priority or classification of Claims;

B.      Enforce the term (maturity) of the collective bargaining agreements identified on Exhibit II.D.5 of the Plan, notwithstanding any state law to the contrary;

C.      Resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including claims for payment of any cure amount;

D.      Ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

E.      Adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving the City that may be pending on the Effective Date or brought thereafter;

F.      Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

G.      Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents;

H.      Approve any modification of the Plan or approve any modification of the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any order, the Plan, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, or enter any order in aid of confirmation pursuant to sections 945 and 1142(b) of the Bankruptcy Code, in such manner as may be necessary or appropriate to consummate the Plan;

I.      Issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

J.      Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or Distributions pursuant to the Plan are enjoined or stayed;

K.      Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

L.      Enforce or clarify any orders previously entered by the Bankruptcy Court in the Chapter 9 Case;

M.      Enter a final decree closing the Chapter 9 Case pursuant to section 945(b) of the Bankruptcy Code; and

N.      Hear any other matter over which the Bankruptcy Court has jurisdiction under the provisions of the Bankruptcy Code and the Bankruptcy Rules subject to any limits on the Bankruptcy Court's jurisdiction and powers under sections 903 and 904 of the Bankruptcy Code.

## ARTICLE VIII
## MISCELLANEOUS PROVISIONS

**A.      Modification of the Plan.**

Subject to section 942 and 1127(d) of the Bankruptcy Code, the City may alter, amend or modify the Plan or the Exhibits at any time prior to or after the Confirmation Date but prior to the substantial consummation of the Plan.  A Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as altered, amended or modified so long as the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

**B.      Revocation of the Plan.**

The City reserves the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the City revokes or withdraws the Plan, or if the Confirmation Date does not occur, then the Plan shall be null and void in all respects, and nothing contained in the Plan, nor any action taken or not taken by the City with respect to the Plan, the Disclosure Statement or the Confirmation Order, shall be or shall be deemed to be:  (1) a waiver or release of any claims by or against the City; (2) an admission of any sort by the City or any other party in interest, or (3) prejudicial in any manner to the rights of the City or any other party in interest.

**C.      Disclosure of Amounts to Be Paid for Chapter 9 Case Services.**

No later than five days before the Confirmation Hearing, (1) the City shall File a statement of all amounts to be paid by it for services or expenses in the Chapter 9 Case or incident to the Plan; and (2) as applicable, all other persons shall File statements of all amounts to be paid by them for services or expenses in the Chapter 9 Case or incident to the Plan.  Pursuant to section 943(b)(3) of the Bankruptcy Code, the Bankruptcy Court must approve such amounts as reasonable as a condition to Confirmation.

**D.      Severability of Plan Provisions.**

If any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, in each case at the election of and with the consent of the City, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the City's consent; and (3) non-severable and mutually dependent.

**E.      Effectuating Documents and Transactions.**

The City is authorized to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and any notes or securities issued pursuant to the Plan.  All such actions shall be deemed to have occurred and shall be in effect pursuant to applicable non-bankruptcy law and the Bankruptcy Code, without any requirement of further action by the City Council, the Emergency Manager, the Mayor or any employees or officers of the City.  On the Effective Date, the appropriate employees and officers of the City are authorized and directed to execute and deliver the agreements, documents and instruments contemplated by the Plan, and to take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan, in the name and on behalf of the City.

**F.     Successors and Assigns.**

Except as expressly provided otherwise in the Plan, the rights, benefits and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, representative, beneficiary or guardian, if any, of each Entity.

**G.     Plan Controls.**

In the event and to the extent that any provision of the Plan is inconsistent with the provisions of the Disclosure Statement, the provisions of the Plan shall control and take precedence.

**H.     Notice of the Effective Date.**

On or before ten Business Days after occurrence of the Effective Date, the City shall mail or cause to be mailed to all Holders of Claims a notice that informs such Holders of (1) entry of the Confirmation Order; (2) the occurrence of the Effective Date; (3) the assumption and rejection of Executory Contracts and Unexpired Leases pursuant to the Plan, as well as the deadline for the filing of Claims arising from such rejection; (4) the deadline for the filing of Administrative Claims; and (5) such other matters as the City deems to be appropriate.

**I.     Governing Law.**

Unless (1) a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or (2) otherwise specifically stated herein or in any contract, articles or certificates of incorporation, bylaws, codes of regulation, ordinance, similar constituent documents, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the laws of the State of Michigan, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction and implementation of the Plan and any contract, articles or certificates of incorporation, bylaws, codes of regulation, similar constituent documents, instrument, release or other agreement or document entered into or delivered in connection with the Plan.

**J.     Request for Waiver of Automatic Stay of Confirmation Order.**

The Plan shall serve as a motion seeking a waiver of the automatic stay of the Confirmation Order imposed by Bankruptcy Rule 3020(e).  Any objection to this request for waiver shall be Filed and served on the parties listed in Section VIII.L on or before the Voting Deadline.

**K.     Term of Existing Injunctions and Stays.**

All injunctions or stays provided for in the Chapter 9 Case under sections 105, 362 or 922 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

**L.     Service of Documents**

Any pleading, notice or other document required by the Plan or the Confirmation Order to be served on or delivered to (1) the City and (2) the Retiree Committee must be sent by overnight delivery service, facsimile transmission, courier service or messenger to:

1.      **The City**

David G. Heiman, Esq.
Heather Lennox, Esq.
Thomas A. Wilson, Esq.
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212

Bruce Bennett, Esq.
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 243 2382
Facsimile: (213) 243 2539

Jonathan S. Green, Esq.
Stephen S. LaPlante, Esq.
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500

(Counsel to the City)

2.      **The Retiree Committee**

Claude Montgomery, Esq.
Carole Neville, Esq.
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 768-6700
Facsimile: (212) 768-6800

Matthew E. Wilkins, Esq.
Paula A. Hall, Esq.
BROOKS WILKINS SHARKEY & TURCO PLLC
401 South Old Woodward, Suite 400
Birmingham, Michigan 48009
Telephone: (248) 971-1711
Facsimile: (248) 971-1801

(Counsel to the Retiree Committee)

Dated:  February 21, 2014

Respectfully submitted,

The City of Detroit, Michigan

By:  ___/s/  Kevyn D. Orr_____
Name:  Kevyn D. Orr
Title:  Emergency Manager for the City of Detroit, Michigan

COUNSEL:


 /s/ David G. Heiman
David G. Heiman
Heather Lennox
Thomas A. Wilson
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Bruce Bennett
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243 2382
Facsimile:  (213) 243 2539

Jonathan S. Green
Stephen S. LaPlante
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500

ATTORNEYS FOR THE DEBTOR

**EXHIBIT I.A.50**

SCHEDULE OF COP SWAP AGREEMENTS

## SCHEDULE OF COP SWAP AGREEMENTS

| COP Swap Agreements |
|---|
| ISDA Master Agreement (including the Schedule thereto) dated as of May 25, 2005, between Detroit Police and Fire Retirement System Service Corporation ("DPFRS Service Corporation") and Merrill Lynch Capital Services, Inc. (as successor to SBS Financial Products Company LLC) ("Merrill Lynch") and the Confirmation thereunder dated June 7, 2006 (bearing Reference No. SBSFPC-0010) (as amended, modified or supplemented). |
| ISDA Master Agreement (including the Schedule thereto) dated as of May 25, 2005 between DFPRS Service Corporation and Merrill Lynch and the Confirmation thereunder dated June 7, 2006 (bearing Reference No. SBSFPC-0011) (as amended, modified or supplemented). |
| ISDA Master Agreement (including the Schedule thereto) dated as of May 25, 2005 between Detroit General Retirement System Service Corporation ("DGRS Service Corporation") and Merrill Lynch and the Confirmation thereunder dated June 7, 2006 (bearing Reference No. SBSFPC-0009) (as amended, modified or supplemented). |
| ISDA Master Agreement (including the Schedule thereto) dated as of June 7, 2006 between DGRS Service Corporation and Merrill Lynch and the Confirmation thereunder dated June 7, 2006 (bearing Reference No. SBSFPC-0012) (as amended, modified or supplemented). |
| ISDA Master Agreement between DGRS Service Corporation and UBS AG, dated as of June 7, 2006, including the Schedule and Credit Support Annex thereto and the Confirmations thereunder, dated June 7, 2006, bearing UBS AG Reference No. 37380291 (as amended, modified or supplemented). |
| ISDA Master Agreement between DFPRS Service Corporation and UBS AG, dated as of May 25, 2005, including the Schedule and Credit Support Annex thereto and the Confirmations thereunder, dated June 7, 2006, bearing UBS AG Reference No. 37380351 (as amended, modified or supplemented). |
| ISDA Master Agreement between DFPRS Service Corporation and UBS AG, dated as of May 25, 2005, including the Schedule and Credit Support Annex thereto and the Confirmations thereunder, dated June 7, 2006, bearing UBS Reference No. 37380313 (as amended, modified or supplemented). |
| ISDA Master Agreement between DGRS Service Corporation and UBS AG, dated as of May 25, 2005, including the Schedule and Credit Support Annex thereto and the Confirmations thereunder, dated June 7, 2006, bearing UBS Reference No. 37380341 (as amended, modified or supplemented). |

**EXHIBIT I.A.88**

SCHEDULE OF DWSD CLASS A SEWER DOCUMENTS & RELATED DWSD CLASS A SEWER BONDS

## SCHEDULE OF (I) DWSD CLASS A SEWER DOCUMENTS, (II) RELATED DWSD CLASS A SEWER BONDS, (III) CLASSES OF DWSD CLASS A SEWER CLAIMS AND (IV) ALLOWED AMOUNTS OF DWSD CLASS A SEWER CLAIMS

| DWSD Class A Sewer Documents | DWSD Series of DWSD Class A Sewer Bonds | Class | Allowed Amount of DWSD Class A Sewer Claims in Class |
|---|---|---|---|
| Ordinance No. 18-01 adopted October 18, 2001 ("Sewage Bond Ordinance")[1]<br><br>Trust Indenture dated as of June 1, 2012 among the City of Detroit, Detroit Water and Sewage Department and U.S. Bank National Association, as trustee ("Sewage Indenture")<br><br>Bond Authorizing Resolution adopted on August 1, 2001 and Amendment dated October 10, 2001<br><br>Composite Sale Order of the Finance Director of the City of Detroit dated August 1, 2001 | Series 2001-D | Class 1C-1 | $21,316,121.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution of the City Council adopted May 7, 2003<br><br>Composite Sale Order of the Finance Director of the City of Detroit dated May 14, 2003 | Series 2003-A | Class 1C-2[2] | $129,239,097.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Resolution of the City Council adopted February 15, 2006<br><br>Sale Order of Finance Director of the City of Detroit dated November 29, 2006 | Series 2006-D | Class 1C-3 | $288,885,311.00 |

---

[1] Ordinance No. 18-01 amended and restated Ordinance No. 27-86 adopted on December 9, 1986, as amended.

[2] Bonds within Series 2003-A that are callable under the terms specified under the related sewer bond documents are DWSD Class A Sewer Bonds. All other bonds within Series 2003-A are DWSD Class B Sewer Bonds.

**EXHIBIT I.A.91**

SCHEDULE OF DWSD CLASS A WATER DOCUMENTS & RELATED DWSD CLASS A WATER BONDS

**SCHEDULE OF (I) DWSD CLASS A WATER DOCUMENTS, (II) RELATED
DWSD CLASS A WATER BONDS, (III) CLASSES OF DWSD CLASS A WATER CLAIMS
AND (IV) ALLOWED AMOUNTS OF DWSD CLASS A WATER CLAIMS**

| DWSD Class A Water Documents | DWSD Series of DWSD Class A Water Bonds | Class | Allowed Amount of DWSD Class A Water Claims in Class |
|---|---|---|---|
| Ordinance No. 01-05 adopted January 26, 2005 ("Water Bond Ordinance")[1]<br><br>Trust Indenture dated as of February 1, 2013 among the City of Detroit, Detroit Water and Sewerage Department and U.S. Bank National Association, as trustee ("Water Indenture")<br><br>Bond Authorizing Resolution of the City Council adopted January 31, 2001 and a Resolution Amending the Bond Authorizing Resolution, adopted April 25, 2001<br><br>Sale Order of Finance Director of the City of Detroit dated May 17, 2001 | Series 2001-A | Class 1A-1 | $73,961,840.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>Bond Authorizing Resolution of the City Council adopted Nov. 27, 2002 ("2003 Water Resolution")<br><br>Sale Order of the Finance Director of the City of Detroit dated January 24, 2003 and Supplement to Sale Order of the Finance Director – 2003 Bonds, dated February 6, 2003 (collectively, "2003 Sale Order") | Series 2003-A | Class 1A-2 | $179,200,784.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>2003 Water Resolution<br><br>2003 Sale Order | Series 2003-B | Class 1A-3 | $41,867,273.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>2003 Water Resolution<br><br>2003 Sale Order | Series 2003-C | Class 1A-4 | $27,717,476.00 |

---

[1]     Ordinance No. 0-05 amends and restates Ordinance No. 30-02 adopted November 27, 2002, which amended and restated Ordinance No. 06-01 adopted October 18, 2001, which amended and restated Ordinance No. 32-85, as amended.

**EXHIBIT I.A.94**

SCHEDULE OF DWSD CLASS B SEWER DOCUMENTS & RELATED DWSD CLASS B SEWER BONDS

**SCHEDULE OF (I) DWSD CLASS B SEWER DOCUMENTS, (II) RELATED
DWSD CLASS B SEWER BONDS, (III) CLASSES OF DWSD CLASS B SEWER CLAIMS
AND (IV) ALLOWED AMOUNTS OF DWSD CLASS B SEWER CLAIMS**

| DWSD Class B Sewer Documents | DWSD Series of DWSD Class B Sewer Bonds | Class | Allowed Amount of DWSD Class B Sewer Claims in Class |
|---|---|---|---|
| Ordinance No. 18-01 adopted October 18, 2001 ("<u>Sewage Bond Ordinance</u>")[1]<br><br>Trust Indenture dated as of June 1, 2012 among the City of Detroit, Detroit Water and Sewage Department and U.S. Bank National Association, as trustee ("<u>Sewage Indenture</u>")<br><br>Resolution of the City Council adopted May 6, 1998 ("<u>1998 Bond Resolution</u>")<br><br>Sale Order of the Finance Director of the City of Detroit dated December 9, 1998 ("<u>1998 Sale Order</u>") | Series 1998-A | Class 1D-1 | $62,764,670.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>1998 Bond Resolution<br><br>1998 Sale Order | Series 1998-B | Class 1D-2 | $62,318,566.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Resolution adopted on November 24, 1999<br><br>Sale Order of the Finance Director of the City of Detroit dated December 10, 1999 | Series 1999-A | Class 1D-3 | $55,576,628.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted on August 1, 2001 and Amendment dated October 10, 2001 (collectively, "<u>2001 Bond Resolution</u>")<br><br>Composite Sale Order of the Finance Director of the City of Detroit dated August 1, 2001 ("<u>2001 Sale Order</u>") | Series 2001-B | Class 1D-4 | $110,833,190.00 |

---

[1]     Ordinance No. 18-01 amended and restated Ordinance No. 27-86 adopted on December 9, 1986, as amended.

| | | | |
|---|---|---|---|
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2001 Bond Resolution<br><br>2001 Sale Order | Series 2001-C(1) | Class 1D-5 | $152,859,785.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2001 Bond Resolution<br><br>2001 Sale Order and Amendment No. 1 to Sale Order of the Finance Director (2001(C-2) and (E)) dated April 23, 2008 ("2001 Sale Order Amendment") and Supplement to Prior Sale Orders (2001(C-2), 2001(E) and 2006(A)) dated May 1, 2008 ("2001/2006 Supplement to Sale Orders") | Series 2001-C(2) | Class 1D-6 | $121,649,072.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2001 Bond Resolution<br><br>2001 Sale Order, 2001 Sale Order Amendment and 2001/2006 Supplement to Sale Orders | Series 2001-E | Class 1D-7 | $136,514,621.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution of the City Council adopted May 7, 2003 ("2003 Bond Resolution")<br><br>Composite Sale Order of the Finance Director of the City of Detroit dated May 14, 2003 | Series 2003-A | Class 1D-8[2] | $55,533,349.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2003 Bond Resolution<br><br>Composite Sale Order of the Finance Director of the City of Detroit dated May 22, 2003 | Series 2003-B | Class 1D-9 | $150,523,973.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution of the City Council adopted May 7, 2003<br><br>Composite Sale Order of the Finance Director dated January 9, 2004 | Series 2004-A | Class 1D-10 | $60,942,805.00 |

---

[2]    Bonds within Series 2003-A that are callable under the terms specified under the related sewer bond documents are DWSD Class A Sewer Bonds. All other bonds within Series 2003-A are DWSD Class B Sewer Bonds.

| | | | |
|---|---|---|---|
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Resolution of the City Council authorizing sale of the 2005 adopted November 17, 2004 ("2005 Bond Resolution")<br><br>Sale Order of the Finance Director of the City of Detroit, Series 2005-A, dated March 9, 2005 | Series 2005-A | Class 1D-11 | $238,425,912.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2005 Bond Resolution<br><br>Sale Order of the Finance Director of the City of Detroit, Series 2005-B, dated March 9, 2005 | Series 2005-B | Class 1D-12 | $37,286,604.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2005 Bond Resolution<br><br>Sale Order of the Finance Director of the City of Detroit, Series 2005-C, dated March 9, 2005 | Series 2005-C | Class 1D-13 | $49,695,460.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Resolution of the City Council adopted February 15, 2006 ("2006 Bond Resolution")<br><br>Sale Order of Finance Director of the City of Detroit, Series 2006(A), dated August 4, 2006, Amendment No. 1 to Sale Order dated April 23, 2008 and 2001/2006 Supplement to Sale Orders | Series 2006-A | Class 1D-14 | $123,971,760.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2006 Bond Resolution<br><br>Sale Order of Finance Director of the City of Detroit, Series 2006(B), dated July 27, 2006 | Series 2006-B | Class 1D-15 | $243,795,428.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2006 Bond Resolution<br><br>Sale Order of Finance Director of the City of Detroit, Series 2006(C), dated August 4, 2006 | Series 2006-C | Class 1D-16 | $26,622,841.00 |

| | | | |
|---|---|---|---|
| Sewage Bond Ordinance<br>Sewage Indenture<br>Resolution of the City Council adopted July 19, 2011<br>Sale Order of the Finance Director of the City of Detroit dated June 20, 2012 | Series 2012-A | Class 1D-17 | $661,353,260.00 |

**EXHIBIT I.A.97**

SCHEDULE OF DWSD CLASS B WATER DOCUMENTS & RELATED DWSD CLASS B WATER BONDS

## SCHEDULE OF (I) DWSD CLASS B WATER DOCUMENTS, (II) RELATED DWSD CLASS B WATER BONDS, (III) CLASSES OF DWSD CLASS B WATER CLAIMS AND (IV) ALLOWED AMOUNTS OF DWSD CLASS B WATER CLAIMS

| DWSD Class B Water Documents | DWSD Series of DWSD Class B Water Bonds | Class | Allowed Amount of DWSD Class B Water Claims in Class |
|---|---|---|---|
| Ordinance No. 01-05 adopted January 26, 2005 ("Water Bond Ordinance")[1] <br> Trust Indenture dated as of February 1, 2013 among the City of Detroit, Detroit Water and Sewerage Department and U.S. Bank National Association, as trustee ("Water Indenture") <br> Bond Resolution adopted on October 14, 1993 <br> Resolution adopted October 22, 1993 <br> Final Report of the Finance Director delivered to City Council December 22, 1993 | Series 1993 | Class 1B-1 | $24,799,852.00 |
| Water Bond Ordinance <br> Water Indenture <br> Bond Resolution adopted July 9, 1997 <br> Sale Order of the Finance Director of the City of Detroit dated August 6, 1997 | Series 1997-A | Class 1B-2 | $13,470,658.00 |
| Water Bond Ordinance <br> Water Indenture <br> Resolution of the City Council adopted April 25, 2001 <br> Sale Order of the Finance Director of the City of Detroit dated May 31, 2001 and Supplement to Prior Sale Orders of Finance Director dated May 6, 2008 | Series 2001-C | Class 1B-3 | $188,732,240.00 |
| Water Bond Ordinance <br> Water Indenture <br> Bond Authorizing Resolution of the City Council adopted November 27, 2002 <br> Sale Order of Finance Director of the City of Detroit dated February 5, 2003 | Series 2003-D | Class 1B-4 | $140,911,713.00 |

---

[1]     Ordinance No. 0-05 amends and restates Ordinance No. 30-02 adopted November 27, 2002, which amended and restated Ordinance No. 06-01 adopted October 18, 2001, which amended and restated Ordinance No. 32-85, as amended.

| | | | |
|---|---|---|---|
| Water Bond Ordinance<br><br>Water Indenture<br><br>Bond Authorizing Resolution of the City Council adopted January 21, 2004 ("2004 Bond Resolution")<br><br>Sale Order of Finance Director of the City of Detroit dated May 12, 2004 ("2004 Sale Order") | Series 2004-A | Class 1B-5 | $68,762,674.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>2004 Bond Resolution<br><br>2004 Sale Order | Series 2004-B | Class 1B-6 | $114,975,691.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>Amended and Restated Resolution of the City Council adopted January 26, 2005 ("2005-A/C Bond Resolution")<br><br>Sale Order of Finance Director of the City of Detroit dated March 3, 2005 (Series 2005-A) | Series 2005-A | Class 1B-7 | $88,581,161.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>Amended and Restated Resolution of the City Council dated March 22, 2005 (Series 2005-B)<br><br>Sale Order of Finance Director of the City of Detroit dated March 22, 2005 (Series 2005-B), Amendment No. 1 to Sale Order of the Finance Director dated April 23, 2008 and Supplement to Prior Sale Orders of Finance Director dated May 6, 2008 | Series 2005-B | Class 1B-8 | $187,792,939.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>2005-A/C Bond Resolution<br><br>Sale Order of Finance Director of the City of Detroit dated March 3, 2005 (Series 2005-C) | Series 2005-C | Class 1B-9 | $109,459,313.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>Resolution of the City Council adopted November 18, 2005 ("2006 Bond Resolution")<br><br>Sale Order of Finance Director of the City of Detroit dated July 19, 2006 (Series 2006-A) | Series 2006-A | Class 1B-10 | $260,775,875.00 |

| | | | |
|---|---|---|---|
| Water Bond Ordinance<br><br>Water Indenture<br><br>2006 Bond Resolution<br><br>Sale Order of Finance Director of the City of Detroit dated August 15, 2006 (Series 2006-B) | Series 2006-B | Class 1B-11 | $120,067,563.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>2006 Bond Resolution<br><br>Sale Order of Finance Director of the City of Detroit dated July 19, 2006 (Series 2006-C) | Series 2006-C | Class 1B-12 | $217,184,085.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>2006 Bond Resolution<br><br>Sale Order of Finance Director of the City of Detroit dated July 19, 2006 (Series 2006-D | Series 2006-D | Class 1B-13 | $142,532,444.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>Resolution of the City Council adopted April 5, 2011 ("2011 Bond Resolution")<br><br>Sale Order of the Finance Director dated as of December 15, 2011 ("2011 Sale Order") | Series 2011-A | Class 1B-14 | $371,720,309.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>2011 Bond Resolution<br><br>2011 Sale Order | Series 2011-B | Class 1B-15 | $15,509,284.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>2011 Bond Resolution<br><br>2011 Sale Order | Series 2011-C | Class 1B-16 | $102,908,415.00 |

**EXHIBIT I.A.102**

SCHEDULE OF DWSD REVOLVING SEWER BONDS
DOCUMENTS & RELATED DWSD REVOLVING SEWER BONDS

**SCHEDULE OF (I) DWSD REVOLVING SEWER BOND DOCUMENTS, (II) RELATED
DWSD REVOLVING SEWER BONDS, (III) CLASSES OF DWSD REVOLVING SEWER BOND
CLAIMS AND (IV) ALLOWED AMOUNTS OF DWSD REVOLVING SEWER BOND CLAIMS**

| DWSD Revolving Sewer Bond Documents | Series of DWSD Revolving Sewer Bonds | Class | Allowed Amount of DWSD Revolving Sewer Bond Claims in Class |
|---|---|---|---|
| Ordinance No. 18-01 adopted October 18, 2001 ("Sewage Bond Ordinance")[1]<br><br>Trust Indenture dated as of June 1, 2012 among the City of Detroit ("City"), Detroit Water and Sewage Department and U.S. Bank National Association, as trustee ("Sewage Indenture")<br><br>Bond Authorizing Resolution adopted September 9, 1992<br><br>Supplemental Agreement dated September 24, 1992, among City, Michigan Bond Authority ("Authority") and the State of Michigan acting through the Department of Natural Resources | Series 1992-B-SRF | Class 1E-1 | $115,679.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted September 30, 1993<br><br>Supplemental Agreement regarding $6,603,996 Sewage Disposal System Revenue Bond Series 1993-B -SRF, among the City, Authority and DEQ | Series 1993-B-SRF | Class 1E-2 | $779,574.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted July 30, 1997<br><br>Supplemental Agreement dated September 30, 1997, among City, the Authority and the State of Michigan acting through the Department of Environmental Quality ("DEQ") | Series 1997-B-SRF | Class 1E-3 | $1,882,416.00 |

---

[1]      Ordinance No. 18-01 amended and restated Ordinance No. 27-86 adopted on December 9, 1986, as amended.

| | | | |
|---|---|---|---|
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted May 12, 1999<br><br>Supplemental Agreement regarding $21,475,000 City Sewage Disposal System Revenue Bond, Series 1999-SRF1, dated June 24, 1999, among City, Authority and DEQ | Series 1999-SRF-1 | Class 1E-4 | $8,814,549.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted August 4, 1999 ("1999 SRF Resolution")<br><br>Supplemental Agreement regarding $46,000,000 SRF-2, $31,030,000 SRF-3, $40,655,000 SRF-4 dated September 30, 1999 ("1999 SRF Supplemental Agreement"), among City, Authority and DEQ | Series 1999-SRF-2 | Class 1E-5 | $26,050,770.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>1999 SRF Resolution<br><br>1999 SRF Supplemental Agreement | Series 1999-SRF-3 | Class 1E-6 | $14,400,455.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>1999 SRF Resolution<br><br>1999 SRF Supplemental Agreement | Series 1999-SRF-4 | Class 1E-7 | $18,863,135.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted February 9, 2000<br><br>Supplemental Agreement regarding Sewage Disposal System Revenue Bond (SRF Junior Lien), Series 2000-SRF1, dated March 30, 2000, among City, Authority and DEQ | Series 2000-SRF-1 | Class 1E-8 | $22,109,906.00 |

| | | | |
|---|---|---|---|
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted July 19, 2000<br><br>Supplemental Agreement regarding Sewage Disposal System Revenue Bond (SRF Junior Lien) Series 2000-SRF2 dated September 28, 2000, among City, Authority and DEQ | Series 2000-SRF-2 | Class 1E-9 | $36,317,016.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted March 7, 2001<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System Revenue Bonds (SRF Junior Lien), Series 2001-SRF-1, dated June 28, 2001 among City, Authority and DEQ | Series 2001-SRF-1 | Class 1E-10 | $54,544,430.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted November 21, 2001<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2001-SRF2, dated December 20, 2001 among City, Authority and DEQ | Series 2001-SRF-2 | Class 1E-11 | $39,720,877.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted June 5, 2002<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2002-SRF1, dated June 27, 2002 among City, Authority and DEQ | Series 2002-SRF-1 | Class 1E-12 | $10,738,639.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted June 5, 2002<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2002-SRF2, dated June 27, 2002 among City, Authority and DEQ | Series 2002-SRF-2 | Class 1E-13 | $871,753.00 |

-3-

| | | | |
|---|---|---|---|
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted November 13, 2002<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2002-SRF3, dated December 19, 2002 among City, Authority and DEQ | Series 2002-SRF-3 | Class 1E-14 | $19,331,028.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted May 14, 2003<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2003-SRF1, dated June 26, 2003 among City, Authority and DEQ | Series 2003-SRF-1 | Class 1E-15 | $34,467,406.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted July 9, 2003<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2003-SRF2, dated September 25, 2003 among City, Authority and DEQ | Series 2003-SRF-2 | Class 1E-16 | $16,511,283.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted April 21, 2004 ("2004 SRF Resolution")<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2004-SRF1, dated June 24, 2004 among City, Authority and DEQ | Series 2004-SRF-1 | Class 1E-17 | $1,901,851.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2004 SRF Resolution<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2004-SRF2, dated June 24, 2004 among City, Authority and DEQ | Series 2004-SRF-2 | Class 1E-18 | $11,963,005.00 |

| | | | |
|---|---|---|---|
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2004 SRF Resolution<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2004-SRF3, dated June 24, 2004 among City, Authority and DEQ | Series 2004-SRF-3 | Class 1E-19 | $8,284,197.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted May 16, 2007<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2007-SRF1, dated September 20, 2007 among City, Authority and DEQ | Series 2007-SRF-1 | Class 1E-20 | $140,784,514.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted November 5, 2008<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2009-SRF1, dated April 17, 2009 among City, Authority and DEQ | Series 2009-SRF-1 | Class 1E-21 | $9,878,643.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted September 29, 2009<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2010-SRF1, dated January 22, 2010 among City, Authority and DEQ | Series 2010-SRF-1 | Class 1E-22 | $3,383,696.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted December 13, 2011<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2012-SRF1, dated August 30, 2012 among City, Authority and DEQ | Series 2012-SRF | Class 1E-23 | $4,332,541.00 |

13-53846-swr   Doc 8709   Filed 12/16/14   Entered 12/16/14 10:59:30   Page 231 of 440

**EXHIBIT I.A.105**

SCHEDULE OF DWSD REVOLVING WATER BOND
DOCUMENTS & RELATED DWSD REVOLVING WATER BONDS

**SCHEDULE OF (I) DWSD REVOLVING WATER BOND DOCUMENTS, (II) RELATED
DWSD REVOLVING WATER BONDS, (III) CLASSES OF DWSD REVOLVING WATER BOND
CLAIMS AND (IV) ALLOWED AMOUNTS OF DWSD REVOLVING WATER BOND CLAIMS**

| DWSD Revolving Water Bond Documents | Series of DWSD Revolving Water Bonds | Class | Allowed Amount of DWSD Revolving Water Bond Claims in Class |
|---|---|---|---|
| Ordinance No. 01-05 adopted January 26, 2005 ("Water Bond Ordinance")[1]<br><br>Trust Indenture dated as of February 1, 2013 among the City of Detroit ("City"), Detroit Water and Sewerage Department and U.S. Bank National Association, as trustee ("Water Indenture")<br><br>Bond Authorizing Resolution adopted April 29, 2005 ("2005 SRF Resolution")<br><br>Supplemental Agreement dated as of September 22, 2005 among City, Michigan Municipal Bond Authority ("Authority") and Michigan Department of Environmental Quality ("DEQ") | Series 2005-SRF-1 | Class 1F-1 | $10,022,619.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>2005 SRF Resolution<br><br>Supplemental Agreement regarding the Water Supply System SRF Junior Lien Revenue Bond, Series 2005-SRF2, dated September 22, 2005 among City, Authority and DEQ | Series 2005-SRF-2 | Class 1F-2 | $6,280,869.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>Bond Authorizing Resolution adopted February 15, 2006<br><br>Supplemental Agreement regarding the Water Supply System SRF Junior Lien Revenue Bond, Series 2006-SRF1, dated September 21, 2006 among City, Authority and DEQ | Series 2006-SRF-1 | Class 1F-3 | $3,739,227.00 |

---

[1]     Ordinance No. 0-05 amends and restates Ordinance No. 30-02 adopted November 27, 2002, which amended and restated Ordinance No. 06-01 adopted October 18, 2001, which amended and restated Ordinance No. 32-85, as amended.

| | | | |
|---|---|---|---|
| Water Bond Ordinance<br><br>Water Indenture<br><br>Bond Authorizing Resolution and Bond Ordinance, adopted July 15, 2008<br><br>Supplemental Agreement regarding Water Supply System SRF Junior Lien Revenue Bonds, Series 2008-SRF1, dated September 29, 2008 among City, Authority and DEQ | Series 2008-SRF-1 | Class 1F-4 | $1,547,272.00 |

**EXHIBIT I.A.146**

SCHEDULE OF HUD INSTALLMENT NOTE
DOCUMENTS & RELATED HUD INSTALLMENT NOTES

## SCHEDULE OF HUD INSTALLMENT NOTE
## DOCUMENTS & RELATED HUD INSTALLMENT NOTES

| HUD Installment Note Documents | HUD Installment Notes | Balance as of Petition Date |
|---|---|---|
| City Note No. B-94-MC-26-0006-A | Garfield Project Note | $764,442 |
| City Note No. B-94-MC-26-0006-D | Stuberstone Project Note | $122,346 |
| City Note No. B-97-MC-26-0006 | Ferry Street Project Note | $1,928,285 |
| City Note No. B-98-MC-26-0006-A | New Amsterdam Project Note | $8,345,728 |
| City Note No. B-98-MC-26-0006-B | Vernor Lawndale Project Note | $1,844,974 |
| City Note No. B-02-MC-26-0006 | Mexicantown Welcome Center Project Note | $3,689,487 |
| City Note No. B-03-MC-26-0006 | Garfield II Note 1 | $6,570,458 |
| City Note No. B-03-MC-26-0006 | Garfield II Note 2 | $2,111,028 |
| City Note No. B-03-MC-26-0006 | Garfield II Note 3 | $6,717,760 |
| City Note No. B-03-MC-26-0006 | Garfield II Note 4 | $1,602,954 |
| City Note No. B-05-MC-26-0006 | Woodward Garden Project 1 Note | $7,202,570 |
| City Note No. B-05-MC-26-0006 | Woodward Garden Project 2 Note | $6,315,019 |
| City Note No. B-05-MC-26-0006 | Woodward Garden Project 3 Note | $5,770,733 |
| City Note No. B-05-MC-26-0006-A | Book Cadillac Project Note | $7,486,218 |
| City Note No. B-05-MC-26-0006-A | Book Cadillac Project Note II | $10,938,812 |
| City Note No. B-05-MC-26-0006-B | Fort Shelby Project Note | $18,664,190 |

**EXHIBIT I.A.150**

INTEREST RATE RESET CHART

| Series Name | CUSIP | Lien | Insurer | Maturity | Amount | Coupon | Call Date | Indicative Interest Rates | | | Rate Reset Analysis (Push Market Rates on 6/30/2014) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Sr. Curve | 2nd Curve | Indicative CUSIP Reset Rate | Coupon less Sr. Curve | Coupon less 2nd Curve |
| **Sewer Bonds** | | | | | | | | | | | | |
| Sewer1998A | 251237S87 | Senior | MBIA | 7/1/2014 | 3,110,000 | 5.500% | N/A | N/A | | | N/A | |
| Sewer1998A | 251237S95 | Senior | MBIA | 7/1/2015 | 3,225,000 | 5.500% | N/A | 0.68% | | | 4.82% | |
| Sewer1998A | 251237T29 | Senior | MBIA | 7/1/2016 | 3,540,000 | 5.500% | N/A | 0.85% | | | 4.65% | |
| Sewer1998A | 251237T37 | Senior | MBIA | 7/1/2017 | 3,660,000 | 5.500% | N/A | 1.14% | | | 4.36% | |
| Sewer1998A | 251237T45 | Senior | MBIA | 7/1/2018 | 3,885,000 | 5.250% | 7/1/2017 | 1.50% | | | 3.75% | |
| Sewer1998A | 251237T52 | Senior | MBIA | 7/1/2019 | 4,095,000 | 5.250% | 7/1/2017 | 1.89% | | | 3.36% | |
| Sewer1998A | 251237T60 | Senior | MBIA | 7/1/2020 | 7,415,000 | 5.250% | 7/1/2017 | 2.27% | | | 2.98% | |
| Sewer1998A | 251237T78 | Senior | MBIA | 7/1/2021 | 7,745,000 | 5.250% | 7/1/2017 | 2.65% | | | 2.60% | |
| Sewer1998A | 251237S87 | Senior | MBIA | 7/1/2022 | 12,585,000 | 5.250% | 7/1/2017 | 3.00% | | | 2.25% | |
| Sewer1998A | 251237T94 | Senior | MBIA | 7/1/2023 | 13,350,000 | 5.250% | 7/1/2017 | 3.34% | | | 1.91% | |
| | | | | | | | | | | | | |
| Sewer1998B | 251237U92 | Senior | MBIA | 7/1/2014 | 3,125,000 | 5.500% | N/A | N/A | | | N/A | |
| Sewer1998B | 251237V26 | Senior | MBIA | 7/1/2015 | 3,240,000 | 5.500% | N/A | 0.68% | | | 4.82% | |
| Sewer1998B | 251237V34 | Senior | MBIA | 7/1/2016 | 3,455,000 | 5.500% | N/A | 0.85% | | | 4.65% | |
| Sewer1998B | 251237V42 | Senior | MBIA | 7/1/2017 | 3,575,000 | 5.500% | N/A | 1.14% | | | 4.36% | |
| Sewer1998B | 251237V59 | Senior | MBIA | 7/1/2018 | 3,895,000 | 5.250% | 7/1/2017 | 1.50% | | | 3.75% | |
| Sewer1998B | 251237V67 | Senior | MBIA | 7/1/2019 | 4,015,000 | 5.250% | 7/1/2017 | 1.89% | | | 3.36% | |
| Sewer1998B | 251237V75 | Senior | MBIA | 7/1/2020 | 7,330,000 | 5.250% | 7/1/2017 | 2.27% | | | 2.98% | |
| Sewer1998B | 251237V83 | Senior | MBIA | 7/1/2021 | 7,665,000 | 5.250% | 7/1/2017 | 2.65% | | | 2.60% | |
| Sewer1998B | 251237V91 | Senior | MBIA | 7/1/2022 | 12,600,000 | 5.250% | 7/1/2017 | 3.00% | | | 2.25% | |
| Sewer1998B | 251237W25 | Senior | MBIA | 7/1/2023 | 13,265,000 | 5.250% | 7/1/2017 | 3.34% | | | 1.91% | |
| | | | | | | | | | | | | |
| Sewer2001C1 (Ins) | 251237G3 | Senior | Assured Guaranty | 7/1/2014 | 575,000 | 5.250% | N/A | N/A | | | N/A | |
| Sewer2001C1 (Ins) | 2512376H1 | Senior | Assured Guaranty | 7/1/2015 | 600,000 | 5.250% | N/A | 0.68% | | | 4.57% | |
| Sewer2001C1 (Ins) | 2512376J7 | Senior | Assured Guaranty | 7/1/2016 | 625,000 | 5.250% | N/A | 0.85% | | | 4.40% | |
| Sewer2001C1 (Ins) | 2512376K4 | Senior | Assured Guaranty | 7/1/2017 | 655,000 | 5.250% | N/A | 1.14% | | | 4.11% | |
| Sewer2001C1 (Ins) | 2512376L2 | Senior | Assured Guaranty | 7/1/2018 | 690,000 | 5.250% | N/A | 1.50% | | | 3.75% | |
| Sewer2001C1 (Ins) | 2512376M0 | Senior | Assured Guaranty | 7/1/2019 | 720,000 | 5.250% | N/A | 1.89% | | | 3.36% | |
| Sewer2001C1 (Ins) | | Senior | Assured Guaranty | 7/1/2024 | 10,100,000 | 7.000% | 7/1/2019 | 3.62% | | | 3.38% | |
| Sewer2001C1 (Ins) | | Senior | Assured Guaranty | 7/1/2025 | 27,325,000 | 7.000% | 7/1/2019 | 3.83% | | | 3.17% | |
| Sewer2001C1 (Ins) | | Senior | Assured Guaranty | 7/1/2026 | 35,705,000 | 7.000% | 7/1/2019 | 4.05% | | | 2.96% | |
| Sewer2001C1 (Ins) | 2512376P3 | Senior | Assured Guaranty | 7/1/2027 | 37,380,000 | 7.000% | 7/1/2019 | 4.21% | | 4.01% | 2.79% | |
| | | | | | | | | | | | | |
| Sewer2001C1 (Unins) | | Senior | N/A | 7/1/2020 | 755,000 | 6.500% | 7/1/2019 | 2.27% | | | 4.23% | |
| Sewer2001C1 (Unins) | | Senior | N/A | 7/1/2021 | 790,000 | 6.500% | 7/1/2019 | 2.65% | | | 3.85% | |
| Sewer2001C1 (Unins) | | Senior | N/A | 7/1/2022 | 10,225,000 | 6.500% | 7/1/2019 | 3.00% | | | 3.50% | |
| Sewer2001C1 (Unins) | | Senior | N/A | 7/1/2023 | 10,150,000 | 6.500% | 7/1/2019 | 3.34% | | | 3.16% | |
| Sewer2001C1 (Unins) | 2512376N8 | Senior | N/A | 7/1/2024 | 16,080,000 | 6.500% | 7/1/2019 | 3.62% | | 3.33% | 2.88% | |
| | | | | | | | | | | | | |
| Sewer2001C2 | 2512374G5 | Senior | FGIC / BHAC | 7/1/2014 | 310,000 | 4.000% | N/A | N/A | | | N/A | |
| Sewer2001C2 | 2512374H3 | Senior | FGIC / BHAC | 7/1/2015 | 325,000 | 4.000% | N/A | 0.68% | | | 3.32% | |
| Sewer2001C2 | 2512374J9 | Senior | FGIC / BHAC | 7/1/2016 | 345,000 | 4.000% | N/A | 0.85% | | | 3.15% | |
| Sewer2001C2 | 2512374K6 | Senior | FGIC / BHAC | 7/1/2017 | 365,000 | 4.000% | N/A | 1.14% | | | 2.86% | |
| Sewer2001C2 | 2512374L4 | Senior | FGIC / BHAC | 7/1/2018 | 380,000 | 4.000% | N/A | 1.50% | | | 2.50% | |
| Sewer2001C2 | 2512374M2 | Senior | FGIC / BHAC | 7/1/2019 | 400,000 | 4.000% | 7/1/2018 | 1.89% | | | 2.11% | |
| Sewer2001C2 | | Senior | FGIC / BHAC | 7/1/2020 | 420,000 | 4.500% | 7/1/2018 | 2.27% | | | 2.23% | |
| Sewer2001C2 | | Senior | FGIC / BHAC | 7/1/2021 | 440,000 | 4.500% | 7/1/2018 | 2.65% | | | 1.85% | |
| Sewer2001C2 | | Senior | FGIC / BHAC | 7/1/2022 | 470,000 | 4.500% | 7/1/2018 | 3.00% | | | 1.50% | |
| Sewer2001C2 | | Senior | FGIC / BHAC | 7/1/2023 | 495,000 | 4.500% | 7/1/2018 | 3.34% | | | 1.16% | |
| Sewer2001C2 | | Senior | FGIC / BHAC | 7/1/2024 | 520,000 | 4.500% | 7/1/2018 | 3.62% | | | 0.88% | |
| Sewer2001C2 | | Senior | FGIC / BHAC | 7/1/2025 | 550,000 | 4.500% | 7/1/2018 | 3.83% | | | 0.67% | |
| Sewer2001C2 | | Senior | FGIC / BHAC | 7/1/2026 | 580,000 | 4.500% | 7/1/2018 | 4.05% | | | 0.46% | |
| Sewer2001C2 | 2512374N0 | Senior | FGIC / BHAC | 7/1/2027 | 615,000 | 4.500% | 7/1/2018 | 4.21% | | 3.45% | 0.29% | |
| Sewer2001C2 | 2512374P5 | Senior | FGIC / BHAC | 7/1/2028 | 55,840,000 | 5.250% | 7/1/2018 | 4.37% | | | 0.88% | |
| Sewer2001C2 | 2512374Q3 | Senior | FGIC / BHAC | 7/1/2029 | 59,300,000 | 5.250% | 7/1/2018 | 4.50% | | | 0.75% | |
| | | | | | | | | | | | | |
| Sewer2003A (Call) | 251237K77 | Senior | Assured Guaranty | 7/1/2014 | 3,225,000 | 5.000% | 6/30/2014 | N/A | | | N/A | |
| Sewer2003A (Call) | 251237YM9 | Senior | Assured Guaranty | 7/1/2015 | 275,000 | 3.650% | 6/30/2014 | 0.68% | | | 2.97% | |
| Sewer2003A (Call) | 251237K85 | Senior | Assured Guaranty | 7/1/2015 | 3,325,000 | 5.000% | 6/30/2014 | 0.68% | | | 4.32% | |
| Sewer2003A (Call) | 251237YQ0 | Senior | Assured Guaranty | 7/1/2016 | 190,000 | 3.700% | 6/30/2014 | 0.85% | | | 2.85% | |
| Sewer2003A (Call) | 251237Q89 | Senior | Assured Guaranty | 7/1/2016 | 10,000 | 5.000% | 6/30/2014 | 0.85% | | | 4.15% | |
| Sewer2003A (Call) | 251237YT4 | Senior | Assured Guaranty | 7/1/2017 | 250,000 | 3.800% | 6/30/2014 | 1.14% | | | 2.66% | |
| Sewer2003A (Call) | 251237Q97 | Senior | Assured Guaranty | 7/1/2017 | 3,200,000 | 5.000% | 6/30/2014 | 1.14% | | | 3.86% | |
| Sewer2003A (Call) | 251237YW7 | Senior | Assured Guaranty | 7/1/2018 | 535,000 | 4.000% | 6/30/2014 | 1.50% | | | 2.50% | |
| Sewer2003A (Call) | 251237R21 | Senior | Assured Guaranty | 7/1/2018 | 180,000 | 5.000% | 6/30/2014 | 1.50% | | | 3.50% | |
| Sewer2003A (Call) | 251237YZ0 | Senior | Assured Guaranty | 7/1/2019 | 300,000 | 4.000% | 6/30/2014 | 1.89% | | | 2.11% | |
| Sewer2003A (Call) | 251237ZB2 | Senior | Assured Guaranty | 7/1/2020 | 50,000 | 4.000% | 6/30/2014 | 2.27% | | | 1.73% | |
| Sewer2003A (Call) | 251237ZD8 | Senior | Assured Guaranty | 7/1/2021 | 4,795,000 | 5.000% | 6/30/2014 | 2.65% | | | 2.35% | |
| Sewer2003A (Call) | 251237ZE6 | Senior | Assured Guaranty | 7/1/2022 | 25,000 | 4.250% | 6/30/2014 | 3.00% | | | 1.25% | |
| Sewer2003A (Call) | 251237ZF3 | Senior | Assured Guaranty | 7/1/2022 | 5,440,000 | 5.000% | 6/30/2014 | 3.00% | | | 2.00% | |
| Sewer2003A (Call) | 251237ZG1 | Senior | Assured Guaranty | 7/1/2023 | 1,000,000 | 4.300% | 6/30/2014 | 3.34% | | | 0.96% | |
| Sewer2003A (Call) | 251237ZH9 | Senior | Assured Guaranty | 7/1/2023 | 7,935,000 | 5.000% | 6/30/2014 | 3.34% | | | 1.66% | |
| Sewer2003A (Call) | 251237ZJ5 | Senior | Assured Guaranty | 7/1/2024 | 18,215,000 | 5.000% | 6/30/2014 | 3.62% | | | 1.38% | |
| Sewer2003A (Call) | 251237Y72 | Senior | Assured Guaranty | 7/1/2025 | 13,210,000 | 5.000% | 6/30/2014 | 3.83% | | | 1.17% | |
| Sewer2003A (Call) | 251237Y80 | Senior | Assured Guaranty | 7/1/2026 | 9,005,000 | 5.000% | 6/30/2014 | 4.05% | | | 0.96% | |
| Sewer2003A (Call) | | Senior | Assured Guaranty | 7/1/2027 | 9,520,000 | 5.000% | 6/30/2014 | 4.21% | | | 0.79% | |
| Sewer2003A (Call) | 251237Y98 | Senior | Assured Guaranty | 7/1/2028 | 9,965,000 | 5.000% | 6/30/2014 | 4.37% | | 4.29% | 0.63% | |
| Sewer2003A (Call) | | Senior | Assured Guaranty | 7/1/2029 | 10,540,000 | 5.000% | 6/30/2014 | 4.50% | | | 0.50% | |
| Sewer2003A (Call) | | Senior | Assured Guaranty | 7/1/2030 | 11,055,000 | 5.000% | 6/30/2014 | 4.61% | | | 0.39% | |
| Sewer2003A (Call) | | Senior | Assured Guaranty | 7/1/2031 | 11,270,000 | 5.000% | 6/30/2014 | 4.71% | | | 0.29% | |
| Sewer2003A (Call) | 251237Z22 | Senior | Assured Guaranty | 7/1/2032 | 5,425,000 | 5.000% | 6/30/2014 | 4.79% | | 4.63% | 0.21% | |
| | | | | | | | | | | | | |
| Sewer2003A (Not Call) | 251237YK3 | Senior | Assured Guaranty | 7/1/2014 | 3,815,000 | 3.500% | N/A | N/A | | | N/A | |
| Sewer2003A (Not Call) | 251237YN7 | Senior | Assured Guaranty | 7/1/2015 | 11,880,000 | 5.500% | N/A | 0.68% | | | 4.82% | |
| Sewer2003A (Not Call) | 251237YR8 | Senior | Assured Guaranty | 7/1/2016 | 12,535,000 | 5.500% | N/A | 0.85% | | | 4.65% | |
| Sewer2003A (Not Call) | 251237YU1 | Senior | Assured Guaranty | 7/1/2017 | 13,215,000 | 5.500% | N/A | 1.14% | | | 4.36% | |
| Sewer2003A (Not Call) | 251237YX5 | Senior | Assured Guaranty | 7/1/2018 | 13,950,000 | 5.500% | N/A | 1.50% | | | 4.00% | |

| Series Name | CUSIP | Lien | Insurer | Maturity | Amount | Coupon | Call Date | Indicative Interest Rates | | | Rate Reset Analysis (Push Market Rates on 6/30/2014) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Sr. Curve | 2nd Curve | Indicative CUSIP Reset Rate | Coupon less Sr. Curve | Coupon less 2nd Curve |
| Sewer2003B | | Senior | Assured Guaranty | 7/1/2032 | 24,500,000 | 7.500% | 7/1/2019 | 4.79% | | | 2.71% | |
| Sewer2003B | 2512376Q1 | Senior | Assured Guaranty | 7/1/2033 | 125,500,000 | 7.500% | 7/1/2019 | 4.86% | | 4.85% | 2.64% | |
| | | | | | | | | | | | | |
| Sewer2004A | 251237B69 | Senior | Assured Guaranty | 7/1/2018 | 7,310,000 | 5.000% | N/A | N/A | | | N/A | |
| Sewer2004A | 251237B77 | Senior | Assured Guaranty | 7/1/2019 | 14,830,000 | 5.250% | N/A | 1.89% | | | 3.36% | |
| Sewer2004A | 251237B85 | Senior | Assured Guaranty | 7/1/2020 | 15,605,000 | 5.250% | N/A | 2.27% | | | 2.98% | |
| Sewer2004A | 251237B93 | Senior | Assured Guaranty | 7/1/2021 | 5,525,000 | 5.250% | N/A | 2.65% | | | 2.60% | |
| Sewer2004A | 251237C27 | Senior | Assured Guaranty | 7/1/2022 | 5,545,000 | 5.250% | N/A | 3.00% | | | 2.25% | |
| Sewer2004A | 251237C35 | Senior | Assured Guaranty | 7/1/2023 | 5,835,000 | 5.250% | N/A | 3.34% | | | 1.91% | |
| Sewer2004A | 251237C43 | Senior | Assured Guaranty | 7/1/2024 | 6,145,000 | 5.250% | N/A | 3.62% | | | 1.63% | |
| | | | | | | | | | | | | |
| Sewer2006C | 251237P31 | Senior | FGIC | 7/1/2016 | 8,495,000 | 5.250% | N/A | 0.85% | | | 4.40% | |
| Sewer2006C | 251237P49 | Senior | FGIC | 7/1/2017 | 8,915,000 | 5.000% | 7/1/2016 | 1.14% | | | 3.86% | |
| Sewer2006C | 251237P56 | Senior | FGIC | 7/1/2018 | 9,150,000 | 5.000% | 7/1/2016 | 1.50% | | | 3.50% | |
| | | | | | | | | | | | | |
| Sewer2012A (Ins) | 251250AC0 | Senior | Assured Guaranty | 7/1/2016 | 8,880,000 | 5.000% | N/A | 0.85% | | | 4.15% | |
| Sewer2012A (Ins) | 251250AE6 | Senior | Assured Guaranty | 7/1/2018 | 9,750,000 | 5.000% | N/A | 1.50% | | | 3.50% | |
| Sewer2012A (Ins) | 251250AC0 | Senior | Assured Guaranty | 7/1/2037 | 15,830,000 | 5.000% | 7/1/2022 | 5.10% | | | -0.10% | |
| Sewer2012A (Ins) | 251250AE6 | Senior | Assured Guaranty | 7/1/2038 | 16,650,000 | 5.000% | 7/1/2022 | 5.15% | | | -0.15% | |
| Sewer2012A (Ins) | 251250AS5 | Senior | Assured Guaranty | 7/1/2039 | 17,520,000 | 5.000% | 7/1/2022 | 5.21% | | 5.15% | -0.21% | |
| | | | | | | | | | | | | |
| Sewer2012A (Unins – 22 Call) | 251250AA4 | Senior | N/A | 7/1/2014 | 5,820,000 | 5.000% | N/A | N/A | | | N/A | |
| Sewer2012A (Unins – 22 Call) | 251250AB2 | Senior | N/A | 7/1/2015 | 6,005,000 | 5.000% | N/A | 0.68% | | | 4.32% | |
| Sewer2012A (Unins – 22 Call) | 251250AD8 | Senior | N/A | 7/1/2017 | 6,430,000 | 5.000% | N/A | 1.14% | | | 3.86% | |
| Sewer2012A (Unins – 22 Call) | 251250AF3 | Senior | N/A | 7/1/2019 | 19,930,000 | 5.000% | N/A | 1.89% | | | 3.11% | |
| Sewer2012A (Unins – 22 Call) | 251250AG1 | Senior | N/A | 7/1/2020 | 13,925,000 | 5.000% | N/A | 2.27% | | | 2.73% | |
| Sewer2012A (Unins – 22 Call) | 251250AH9 | Senior | N/A | 7/1/2021 | 9,845,000 | 5.000% | N/A | 2.65% | | | 2.35% | |
| Sewer2012A (Unins – 22 Call) | 251250AJ5 | Senior | N/A | 7/1/2022 | 14,860,000 | 5.000% | N/A | 3.00% | | | 2.00% | |
| Sewer2012A (Unins – 22 Call) | 251250AK2 | Senior | N/A | 7/1/2023 | 22,275,000 | 5.000% | 7/1/2022 | 3.34% | | | 1.66% | |
| Sewer2012A (Unins – 22 Call) | 251250AN6 | Senior | N/A | 7/1/2026 | 13,170,000 | 5.250% | 7/1/2022 | 4.05% | | | 1.21% | |
| Sewer2012A (Unins – 22 Call) | 251250AP1 | Senior | N/A | 7/1/2027 | 9,800,000 | 5.250% | 7/1/2022 | 4.21% | | | 1.04% | |
| Sewer2012A (Unins – 22 Call) | | Senior | N/A | 7/1/2028 | 11,010,000 | 5.000% | 7/1/2022 | 4.37% | | | 0.63% | |
| Sewer2012A (Unins – 22 Call) | | Senior | N/A | 7/1/2029 | 2,780,000 | 5.000% | 7/1/2022 | 4.50% | | | 0.50% | |
| Sewer2012A (Unins – 22 Call) | | Senior | N/A | 7/1/2030 | 11,710,000 | 5.000% | 7/1/2022 | 4.61% | | | 0.39% | |
| Sewer2012A (Unins – 22 Call) | | Senior | N/A | 7/1/2031 | 25,225,000 | 5.000% | 7/1/2022 | 4.71% | | | 0.29% | |
| Sewer2012A (Unins – 22 Call) | 251250AQ9 | Senior | N/A | 7/1/2032 | 69,540,000 | 5.000% | 7/1/2022 | 4.79% | | 4.71% | 0.21% | |
| Sewer2012A (Unins – 22 Call) | | Senior | N/A | 7/1/2034 | 1,470,000 | 5.250% | 7/1/2022 | 4.92% | | | 0.33% | |
| Sewer2012A (Unins – 22 Call) | | Senior | N/A | 7/1/2035 | 1,440,000 | 5.250% | 7/1/2022 | 4.98% | | | 0.27% | |
| Sewer2012A (Unins – 22 Call) | | Senior | N/A | 7/1/2036 | 1,400,000 | 5.250% | 7/1/2022 | 5.04% | | | 0.21% | |
| Sewer2012A (Unins – 22 Call) | | Senior | N/A | 7/1/2037 | 91,340,000 | 5.250% | 7/1/2022 | 5.10% | | | 0.15% | |
| Sewer2012A (Unins – 22 Call) | | Senior | N/A | 7/1/2038 | 96,105,000 | 5.250% | 7/1/2022 | 5.15% | | | 0.10% | |
| Sewer2012A (Unins – 22 Call) | 251250AR7 | Senior | N/A | 7/1/2039 | 101,110,000 | 5.250% | 7/1/2022 | 5.21% | | 5.15% | 0.04% | |
| | | | | | | | | | | | | |
| Sewer2012A (Unins – 17 Call) | 251250AL0 | Senior | N/A | 7/1/2024 | 23,630,000 | 5.000% | 7/1/2017 | 3.62% | | | 1.38% | |
| Sewer2012A (Unins – 17 Call) | 251250AM8 | Senior | N/A | 7/1/2025 | 32,240,000 | 5.000% | 7/1/2017 | 3.83% | | | 1.17% | |
| | | | | | | | | | | | | |
| Sewer2001B | | Second | FGIC / BHAC | 7/1/2023 | 2,825,000 | 5.500% | N/A | | 3.66% | | | 1.84% |
| Sewer2001B | | Second | FGIC / BHAC | 7/1/2024 | 15,835,000 | 5.500% | N/A | | 3.95% | | | 1.55% |
| Sewer2001B | | Second | FGIC / BHAC | 7/1/2025 | 16,635,000 | 5.500% | N/A | | 4.17% | | | 1.33% |
| Sewer2001B | | Second | FGIC / BHAC | 7/1/2026 | 17,480,000 | 5.500% | N/A | | 4.39% | | | 1.11% |
| Sewer2001B | | Second | FGIC / BHAC | 7/1/2027 | 18,345,000 | 5.500% | N/A | | 4.56% | | | 0.94% |
| Sewer2001B | | Second | FGIC / BHAC | 7/1/2028 | 19,260,000 | 5.500% | N/A | | 4.73% | | | 0.77% |
| Sewer2001B | 251237WV1 | Second | FGIC / BHAC | 7/1/2029 | 20,170,000 | 5.500% | N/A | | 4.87% | 4.45% | | 0.63% |
| | | | | | | | | | | | | |
| Sewer2001E | | Second | FGIC | 7/1/2024 | 1,750,000 | 5.750% | 7/1/2018 | | 3.95% | | | 1.80% |
| Sewer2001E | | Second | FGIC | 7/1/2025 | 1,870,000 | 5.750% | 7/1/2018 | | 4.17% | | | 1.58% |
| Sewer2001E | | Second | FGIC | 7/1/2026 | 1,885,000 | 5.750% | 7/1/2018 | | 4.39% | | | 1.36% |
| Sewer2001E | | Second | FGIC | 7/1/2027 | 1,890,000 | 5.750% | 7/1/2018 | | 4.56% | | | 1.19% |
| Sewer2001E | | Second | FGIC | 7/1/2028 | 1,160,000 | 5.750% | 7/1/2018 | | 4.73% | | | 1.02% |
| Sewer2001E | | Second | FGIC | 7/1/2029 | 1,100,000 | 5.750% | 7/1/2018 | | 4.87% | | | 0.88% |
| Sewer2001E | | Second | FGIC | 7/1/2030 | 62,305,000 | 5.750% | 7/1/2018 | | 4.99% | | | 0.76% |
| Sewer2001E | 2512374R1 | Second | FGIC | 7/1/2031 | 64,190,000 | 5.750% | 7/1/2018 | | 5.10% | 5.00% | | 0.65% |
| | | | | | | | | | | | | |
| Sewer2005A | 251237E41 | Second | MBIA | 7/1/2014 | 625,000 | 3.600% | N/A | | N/A | | | N/A |
| Sewer2005A | 251237E58 | Second | MBIA | 7/1/2015 | 490,000 | 3.700% | N/A | | 0.93% | | | 2.77% |
| Sewer2005A | 251237E66 | Second | MBIA | 7/1/2016 | 510,000 | 3.750% | 7/1/2015 | | 1.11% | | | 2.64% |
| Sewer2005A | 251237E74 | Second | MBIA | 7/1/2017 | 545,000 | 4.000% | 7/1/2015 | | 1.41% | | | 2.59% |
| Sewer2005A | 251237E82 | Second | MBIA | 7/1/2018 | 555,000 | 4.000% | 7/1/2015 | | 1.78% | | | 2.22% |
| Sewer2005A | 251237E90 | Second | MBIA | 7/1/2019 | 830,000 | 4.000% | 7/1/2015 | | 2.17% | | | 1.83% |
| Sewer2005A | 251237F24 | Second | MBIA | 7/1/2020 | 860,000 | 4.000% | 7/1/2015 | | 2.56% | | | 1.44% |
| Sewer2005A | 251237F32 | Second | MBIA | 7/1/2021 | 905,000 | 4.100% | 7/1/2015 | | 2.96% | | | 1.14% |
| Sewer2005A | 251237F40 | Second | MBIA | 7/1/2022 | 925,000 | 4.125% | 7/1/2015 | | 3.31% | | | 0.82% |
| Sewer2005A | 251237F57 | Second | MBIA | 7/1/2023 | 970,000 | 4.250% | 7/1/2015 | | 3.66% | | | 0.59% |
| Sewer2005A | 251237F65 | Second | MBIA | 7/1/2024 | 490,000 | 4.250% | 7/1/2015 | | 3.95% | | | 0.30% |
| Sewer2005A | | Second | MBIA | 7/1/2026 | 4,475,000 | 5.000% | 7/1/2015 | | 4.39% | | | 0.61% |
| Sewer2005A | | Second | MBIA | 7/1/2027 | 7,290,000 | 5.000% | 7/1/2015 | | 4.56% | | | 0.44% |
| Sewer2005A | 251237Z55 | Second | MBIA | 7/1/2028 | 7,650,000 | 5.000% | 7/1/2015 | | 4.73% | 4.59% | | 0.27% |
| Sewer2005A | 251237Z63 | Second | MBIA | 7/1/2033 | 24,820,000 | 5.125% | 7/1/2015 | | 5.27% | | | -0.14% |
| Sewer2005A | | Second | MBIA | 7/1/2034 | 67,705,000 | 5.000% | 7/1/2015 | | 5.34% | | | -0.34% |
| Sewer2005A | | Second | MBIA | 7/1/2034 | 23,000,000 | 4.500% | 7/1/2015 | | 5.34% | | | -0.84% |
| Sewer2005A | 251237F99 | Second | MBIA | 7/1/2035 | 71,240,000 | 5.000% | 7/1/2015 | | 5.40% | 5.37% | | -0.40% |

| Series Name | CUSIP | Lien | Insurer | Maturity | Amount | Coupon | Call Date | Indicative Interest Rates | | | Rate Reset Analysis (Push Market Rates on 6/30/2014) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Sr. Curve | 2nd Curve | Indicative CUSIP Reset Rate | Coupon less Sr. Curve | Coupon less 2nd Curve |
| Sewer2005A | 251237G23 | Second | MBIA | 7/1/2035 | 24,000,000 | 4.500% | 7/1/2015 | | 5.40% | 5.37% | | -0.90% |
| Sewer2005B | 251237G64 | Second | MBIA | 7/1/2014 | 7,775,000 | 5.000% | N/A | | N/A | | | N/A |
| Sewer2005B | 251237G72 | Second | MBIA | 7/1/2015 | 8,010,000 | 5.000% | N/A | | 0.93% | | | 4.07% |
| Sewer2005B | 251237G80 | Second | MBIA | 7/1/2021 | 10,420,000 | 5.500% | N/A | | 2.96% | | | 2.54% |
| Sewer2005B | 251237G98 | Second | MBIA | 7/1/2022 | 10,990,000 | 5.500% | N/A | | 3.31% | | | 2.19% |
| Sewer2005C | 251237J20 | Second | MBIA | 7/1/2014 | 4,140,000 | 5.000% | N/A | | N/A | | | N/A |
| Sewer2005C | 251237J38 | Second | MBIA | 7/1/2015 | 4,345,000 | 5.000% | N/A | | 0.93% | | | 4.07% |
| Sewer2005C | 251237J46 | Second | MBIA | 7/1/2016 | 4,570,000 | 5.000% | 7/1/2015 | | 1.11% | | | 3.89% |
| Sewer2005C | 251237J53 | Second | MBIA | 7/1/2017 | 4,795,000 | 5.000% | 7/1/2015 | | 1.41% | | | 3.59% |
| Sewer2005C | 251237J61 | Second | MBIA | 7/1/2018 | 5,030,000 | 5.000% | 7/1/2015 | | 1.78% | | | 3.22% |
| Sewer2005C | 251237J79 | Second | MBIA | 7/1/2019 | 5,280,000 | 5.000% | 7/1/2015 | | 2.17% | | | 2.83% |
| Sewer2005C | 251237J87 | Second | MBIA | 7/1/2020 | 7,355,000 | 5.000% | 7/1/2015 | | 2.56% | | | 2.44% |
| Sewer2005C | 251237J95 | Second | MBIA | 7/1/2021 | 7,720,000 | 5.000% | 7/1/2015 | | 2.96% | | | 2.04% |
| Sewer2005C | 251237K28 | Second | MBIA | 7/1/2025 | 6,345,000 | 5.000% | 7/1/2015 | | 4.17% | | | 0.83% |
| Sewer2006A | | Second | FGIC / BHAC | 7/1/2034 | 7,525,000 | 5.500% | 7/1/2018 | | 5.34% | | | 0.16% |
| Sewer2006A | | Second | FGIC / BHAC | 7/1/2035 | 7,880,000 | 5.500% | 7/1/2018 | | 5.40% | | | 0.10% |
| Sewer2006A | 251237Z4 | Second | FGIC / BHAC | 7/1/2036 | 108,250,000 | 5.500% | 7/1/2018 | | 5.47% | 5.46% | | 0.03% |
| Sewer2006B | 251237M83 | Second | FGIC | 7/1/2014 | 1,835,000 | 5.000% | N/A | | N/A | | | N/A |
| Sewer2006B | 251237M91 | Second | FGIC | 7/1/2015 | 1,825,000 | 5.000% | N/A | | 0.93% | | | 4.07% |
| Sewer2006B | 251237N25 | Second | FGIC | 7/1/2016 | 1,430,000 | 5.000% | N/A | | 1.11% | | | 3.89% |
| Sewer2006B | 251237N33 | Second | FGIC | 7/1/2017 | 1,505,000 | 5.000% | 7/1/2016 | | 1.41% | | | 3.59% |
| Sewer2006B | 251237N41 | Second | FGIC | 7/1/2018 | 1,590,000 | 5.000% | 7/1/2016 | | 1.78% | | | 3.22% |
| Sewer2006B | | Second | FGIC | 7/1/2019 | 1,660,000 | 4.500% | 7/1/2016 | | 2.17% | | | 2.33% |
| Sewer2006B | | Second | FGIC | 7/1/2020 | 1,690,000 | 4.500% | 7/1/2016 | | 2.56% | | | 1.94% |
| Sewer2006B | | Second | FGIC | 7/1/2021 | 2,240,000 | 4.500% | 7/1/2016 | | 2.96% | | | 1.54% |
| Sewer2006B | 251237N58 | Second | FGIC | 7/1/2022 | 1,925,000 | 4.500% | 7/1/2016 | | 3.31% | 2.78% | | 1.19% |
| Sewer2006B | | Second | FGIC | 7/1/2023 | 1,585,000 | 4.250% | 7/1/2016 | | 3.66% | | | 0.59% |
| Sewer2006B | | Second | FGIC | 7/1/2024 | 2,115,000 | 4.250% | 7/1/2016 | | 3.95% | | | 0.30% |
| Sewer2006B | 251237N66 | Second | FGIC | 7/1/2025 | 2,840,000 | 4.250% | 7/1/2016 | | 4.17% | 3.97% | | 0.08% |
| Sewer2006B | | Second | FGIC | 7/1/2026 | 1,840,000 | 5.000% | 7/1/2016 | | 4.39% | | | 0.61% |
| Sewer2006B | | Second | FGIC | 7/1/2027 | 2,425,000 | 5.000% | 7/1/2016 | | 4.56% | | | 0.44% |
| Sewer2006B | | Second | FGIC | 7/1/2028 | 2,550,000 | 5.000% | 7/1/2016 | | 4.73% | | | 0.27% |
| Sewer2006B | | Second | FGIC | 7/1/2029 | 2,675,000 | 5.000% | 7/1/2016 | | 4.87% | | | 0.13% |
| Sewer2006B | | Second | FGIC | 7/1/2030 | 2,810,000 | 5.000% | 7/1/2016 | | 4.99% | | | 0.01% |
| Sewer2006B | | Second | FGIC | 7/1/2031 | 3,835,000 | 5.000% | 7/1/2016 | | 5.10% | | | -0.10% |
| Sewer2006B | | Second | FGIC | 7/1/2032 | 4,035,000 | 5.000% | 7/1/2016 | | 5.18% | | | -0.18% |
| Sewer2006B | 251237N74 | Second | FGIC | 7/1/2033 | 4,230,000 | 5.000% | 7/1/2016 | | 5.27% | 4.96% | | -0.27% |
| Sewer2006B | | Second | FGIC | 7/1/2034 | 22,460,000 | 5.000% | 7/1/2016 | | 5.34% | | | -0.34% |
| Sewer2006B | 251237N82 | Second | FGIC | 7/1/2034 | 40,000,000 | 4.625% | 7/1/2016 | | 5.34% | 5.34% | | -0.71% |
| Sewer2006B | | Second | FGIC | 7/1/2035 | 65,435,000 | 5.000% | 7/1/2016 | | 5.40% | | | -0.40% |
| Sewer2006B | 251237N90 | Second | FGIC | 7/1/2036 | 68,705,000 | 5.000% | 7/1/2016 | | 5.47% | 5.44% | | -0.47% |
| **Sewer Capital Appreciation and Variable Bonds** | | | | | | | | | | | | |
| Sewer1999A[1] | 251237VM2 | Senior | FGIC | 7/1/2014 | 8,395,000 | N/A | N/A | | N/A | | | N/A |
| Sewer1999A[1] | 251237VN0 | Senior | FGIC | 7/1/2015 | 8,228,111 | 6.039% | N/A | | 0.68% | | | 5.36% |
| Sewer1999A[1] | 251237VP5 | Senior | FGIC | 7/1/2016 | 8,174,016 | 6.090% | N/A | | 0.85% | | | 5.24% |
| Sewer1999A[1] | 251237VQ3 | Senior | FGIC | 7/1/2017 | 7,597,422 | 6.142% | N/A | | 1.14% | | | 5.00% |
| Sewer1999A[1] | 251237VR1 | Senior | FGIC | 7/1/2018 | 7,155,785 | 6.193% | 7/1/2017 | | 1.50% | | | 4.69% |
| Sewer1999A[1] | 251237VS9 | Senior | FGIC | 7/1/2019 | 6,762,707 | 6.245% | 7/1/2017 | | 1.89% | | | 4.36% |
| Sewer1999A[1] | 251237VT7 | Senior | FGIC | 7/1/2020 | 6,048,715 | 6.286% | 7/1/2017 | | 2.27% | | | 4.02% |
| Sewer1999A[1] | 251237VU4 | Senior | FGIC | 7/1/2021 | 6,628,298 | 6.307% | 7/1/2017 | | 2.65% | | | 3.65% |
| Sewer2006D[2] | | Senior | Assured Guaranty | 7/1/2026 | 36,570,000 | Variable | 6/30/2014 | | 4.05% | | | N/A |
| Sewer2006D[2] | | Senior | Assured Guaranty | 7/1/2027 | 42,480,000 | Variable | 6/30/2014 | | 4.21% | | | N/A |
| Sewer2006D[2] | | Senior | Assured Guaranty | 7/1/2028 | 28,795,000 | Variable | 6/30/2014 | | 4.37% | | | N/A |
| Sewer2006D[2] | | Senior | Assured Guaranty | 7/1/2029 | 38,225,000 | Variable | 6/30/2014 | | 4.50% | | | N/A |
| Sewer2006D[2] | | Senior | Assured Guaranty | 7/1/2030 | 60,880,000 | Variable | 6/30/2014 | | 4.61% | | | N/A |
| Sewer2006D[2] | | Senior | Assured Guaranty | 7/1/2031 | 61,645,000 | Variable | 6/30/2014 | | 4.71% | | | N/A |
| Sewer2006D[2] | 251237W66 | Senior | Assured Guaranty | 7/1/2032 | 20,185,000 | Variable | 6/30/2014 | | 4.79% | 4.47% | | N/A |
| Sewer2001D[3] | 251237WY5 | Second | MBIA | 7/1/2032 | 21,315,000 | Variable | 6/30/2014 | | 5.18% | | | N/A |

Notes
(1) Sewer 1999A capital appreciation bonds amount outstanding as of 7/1/2014. Effective interest rate calculated.
(2) Variable interest rate calculated as follows: 67% of Three Month LIBOR plus 0.60%.
(3) Variable interest rate calculated per Auction Rate (determined based on AA Financial Commercial Paper). Approximated to be 0.24%.

| Series Name | CUSIP | Lien | Insurer | Maturity | Amount | Coupon | Call Date | Indicative Interest Rates | | | Rate Reset Analysis (Push Market Rates on 6/30/2014) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Sr. Curve | 2nd Curve | Indicative CUSIP Reset Rate | Coupon less Sr. Curve | Coupon less 2nd Curve |
| **Water Bonds** | | | | | | | | | | | | |
| Water1993 | | Senior | FGIC | 7/1/2014 | 11,815,000 | 6.500% | N/A | N/A | | | N/A | |
| Water1993 | 251255TP0 | Senior | FGIC | 7/1/2015 | 12,910,000 | 6.500% | N/A | 0.68% | | 0.36% | 5.82% | |
| Water1997A | 2512557T6 | Senior | MBIA | 7/1/2014 | 6,520,000 | 6.500% | N/A | N/A | | | N/A | |
| Water1997A | 2512557R0 | Senior | MBIA | 7/1/2015 | 6,910,000 | 6.500% | N/A | 0.68% | | | 5.82% | |
| Water2001A | | Senior | FGIC | 7/1/2029 | 25,020,000 | 5.000% | 6/30/2014 | 4.50% | | | 0.50% | |
| Water2001A | 251255A21 | Senior | FGIC | 7/1/2030 | 48,770,000 | 5.000% | 6/30/2014 | 4.61% | | 4.57% | 0.39% | |
| Water2003A | 251255D77 | Senior | MBIA | 7/1/2020 | 500,000 | 4.500% | 6/30/2014 | 1.89% | | | 2.61% | |
| Water2003A | 251255D93 | Senior | MBIA | 7/1/2021 | 250,000 | 4.700% | 6/30/2014 | 2.65% | | | 2.05% | |
| Water2003A | 251255E27 | Senior | MBIA | 7/1/2022 | 3,550,000 | 4.750% | 6/30/2014 | 3.00% | | | 1.75% | |
| Water2003A | 251255F8 | Senior | MBIA | 7/1/2025 | 9,970,000 | 5.000% | 6/30/2014 | 3.83% | | | 1.17% | |
| Water2003A | 251255K20 | Senior | MBIA | 7/1/2026 | 20,955,000 | 5.000% | 6/30/2014 | 4.05% | | | 0.96% | |
| Water2003A | 251255K38 | Senior | MBIA | 7/1/2027 | 21,900,000 | 5.000% | 6/30/2014 | 4.21% | | | 0.79% | |
| Water2003A | | Senior | MBIA | 7/1/2028 | 22,985,000 | 5.000% | 6/30/2014 | 4.37% | | | 0.63% | |
| Water2003A | | Senior | MBIA | 7/1/2029 | 24,120,000 | 5.000% | 6/30/2014 | 4.50% | | | 0.50% | |
| Water2003A | | Senior | MBIA | 7/1/2030 | 2,825,000 | 5.000% | 6/30/2014 | 4.61% | | | 0.39% | |
| Water2003A | | Senior | MBIA | 7/1/2031 | 2,970,000 | 5.000% | 6/30/2014 | 4.71% | | | 0.29% | |
| Water2003A | | Senior | MBIA | 7/1/2032 | 3,115,000 | 5.000% | 6/30/2014 | 4.79% | | | 0.21% | |
| Water2003A | | Senior | MBIA | 7/1/2033 | 3,275,000 | 5.000% | 6/30/2014 | 4.86% | | | 0.14% | |
| Water2003A | 251255E68 | Senior | MBIA | 7/1/2034 | 62,370,000 | 5.000% | 6/30/2014 | 4.92% | | 4.72% | 0.08% | |
| Water2003C (Fix) | 251255J22 | Senior | MBIA | 7/1/2015 | 2,120,000 | 4.250% | 6/30/2014 | 0.68% | | | 3.57% | |
| Water2003C (Fix) | 251255J30 | Senior | MBIA | 7/1/2016 | 2,620,000 | 5.250% | 6/30/2014 | 0.85% | | | 4.40% | |
| Water2003C (Fix) | 251255J48 | Senior | MBIA | 7/1/2017 | 2,655,000 | 5.250% | 6/30/2014 | 1.14% | | | 4.11% | |
| Water2003C (Fix) | 251255J55 | Senior | MBIA | 7/1/2018 | 2,930,000 | 5.250% | 6/30/2014 | 1.50% | | | 3.75% | |
| Water2003C (Fix) | 251255J63 | Senior | MBIA | 7/1/2019 | 2,790,000 | 5.250% | 6/30/2014 | 1.89% | | | 3.36% | |
| Water2003C (Fix) | 251255J71 | Senior | MBIA | 7/1/2020 | 2,965,000 | 5.250% | 6/30/2014 | 2.27% | | | 2.98% | |
| Water2003C (Fix) | 251255J89 | Senior | MBIA | 7/1/2021 | 4,580,000 | 5.000% | 6/30/2014 | 2.65% | | | 2.35% | |
| Water2003C (Fix) | 251255J97 | Senior | MBIA | 7/1/2022 | 4,665,000 | 5.000% | 6/30/2014 | 3.00% | | | 2.00% | |
| Water2003D | 251255T1 | Senior | MBIA | 7/1/2014 | 325,000 | 4.000% | N/A | N/A | | | N/A | |
| Water2003D | 2512552U8 | Senior | MBIA | 7/1/2015 | 335,000 | 4.100% | N/A | 0.68% | | | 3.42% | |
| Water2003D | 2512552V6 | Senior | MBIA | 7/1/2016 | 350,000 | 4.200% | N/A | 0.85% | | | 3.35% | |
| Water2003D | 2512552W4 | Senior | MBIA | 7/1/2017 | 360,000 | 4.250% | 7/1/2016 | 1.14% | | | 3.11% | |
| Water2003D | 2512552X2 | Senior | MBIA | 7/1/2018 | 370,000 | 4.250% | 7/1/2016 | 1.50% | | | 2.75% | |
| Water2003D | | Senior | MBIA | 7/1/2019 | 385,000 | 5.000% | 7/1/2016 | 1.89% | | | 3.11% | |
| Water2003D | | Senior | MBIA | 7/1/2020 | 405,000 | 5.000% | 7/1/2016 | 2.27% | | | 2.73% | |
| Water2003D | | Senior | MBIA | 7/1/2021 | 420,000 | 5.000% | 7/1/2016 | 2.65% | | | 2.35% | |
| Water2003D | | Senior | MBIA | 7/1/2022 | 440,000 | 5.000% | 7/1/2016 | 3.00% | | | 2.00% | |
| Water2003D | | Senior | MBIA | 7/1/2023 | 455,000 | 5.000% | 7/1/2016 | 3.34% | | | 1.66% | |
| Water2003D | 2512552Y0 | Senior | MBIA | 7/1/2024 | 480,000 | 5.000% | 7/1/2016 | 3.62% | | 2.84% | 1.38% | |
| Water2003D | | Senior | MBIA | 7/1/2025 | 9,360,000 | 5.000% | 7/1/2016 | 3.83% | | | 1.17% | |
| Water2003D | | Senior | MBIA | 7/1/2026 | 9,800,000 | 5.000% | 7/1/2016 | 4.05% | | | 0.96% | |
| Water2003D | 2512552Z7 | Senior | MBIA | 7/1/2027 | 10,250,000 | 5.000% | 7/1/2016 | 4.21% | | 4.03% | 0.79% | |
| Water2003D | 2512553A1 | Senior | MBIA | 7/1/2028 | 23,920,000 | 5.000% | 7/1/2016 | 4.37% | | | 0.63% | |
| Water2003D | | Senior | MBIA | 7/1/2032 | 26,325,000 | 5.000% | 7/1/2016 | 4.79% | | | 0.21% | |
| Water2003D | 2512553B9 | Senior | MBIA | 7/1/2033 | 56,605,000 | 5.000% | 7/1/2016 | 4.86% | | 4.84% | 0.14% | |
| Water2004B | 2512554A0 | Senior | MBIA | 7/1/2014 | 85,000 | 4.000% | N/A | N/A | | | N/A | |
| Water2004B | 2512554B8 | Senior | MBIA | 7/1/2015 | 90,000 | 4.000% | N/A | 0.68% | | | 3.32% | |
| Water2004B | 2512554C6 | Senior | MBIA | 7/1/2016 | 10,000,000 | 5.000% | N/A | 0.85% | | | 4.15% | |
| Water2004B | 2512554D4 | Senior | MBIA | 7/1/2016 | 3,545,000 | 4.250% | 7/1/2016 | 0.85% | | | 3.40% | |
| Water2004B | 2512554E2 | Senior | MBIA | 7/1/2017 | 13,925,000 | 5.000% | 7/1/2016 | 1.14% | | | 3.86% | |
| Water2004B | 2512554F9 | Senior | MBIA | 7/1/2017 | 350,000 | 4.250% | 7/1/2016 | 1.14% | | | 3.11% | |
| Water2004B | 2512554G7 | Senior | MBIA | 7/1/2018 | 14,940,000 | 5.000% | 7/1/2016 | 1.50% | | | 3.50% | |
| Water2004B | 2512554H5 | Senior | MBIA | 7/1/2019 | 15,810,000 | 5.000% | 7/1/2016 | 1.89% | | | 3.11% | |
| Water2004B | 2512554J1 | Senior | MBIA | 7/1/2020 | 16,665,000 | 5.000% | 7/1/2016 | 2.27% | | | 2.73% | |
| Water2004B | 2512554K8 | Senior | MBIA | 7/1/2021 | 16,085,000 | 5.000% | 7/1/2016 | 2.65% | | | 2.35% | |
| Water2004B | 2512554L6 | Senior | MBIA | 7/1/2022 | 16,935,000 | 5.000% | 7/1/2016 | 3.00% | | | 2.00% | |
| Water2004B | 2512554M4 | Senior | MBIA | 7/1/2023 | 6,280,000 | 5.000% | 7/1/2016 | 3.34% | | | 1.66% | |
| Water2005A | 251255M85 | Senior | FGIC | 7/1/2014 | 50,000 | 3.750% | N/A | N/A | | | N/A | |
| Water2005A | 251255Q81 | Senior | FGIC | 7/1/2014 | 2,070,000 | 5.000% | N/A | N/A | | | N/A | |
| Water2005A | 251255M93 | Senior | FGIC | 7/1/2015 | 85,000 | 3.850% | N/A | 0.68% | | | 3.17% | |
| Water2005A | 251255Q99 | Senior | FGIC | 7/1/2015 | 2,145,000 | 5.000% | N/A | 0.68% | | | 4.32% | |
| Water2005A | 251255N27 | Senior | FGIC | 7/1/2016 | 95,000 | 3.900% | 7/1/2015 | 0.85% | | | 3.05% | |
| Water2005A | 251255R23 | Senior | FGIC | 7/1/2016 | 2,265,000 | 5.000% | 7/1/2015 | 0.85% | | | 4.15% | |
| Water2005A | 251255N35 | Senior | FGIC | 7/1/2017 | 125,000 | 4.000% | 7/1/2015 | 1.14% | | | 2.86% | |
| Water2005A | 251255R31 | Senior | FGIC | 7/1/2017 | 2,370,000 | 5.000% | 7/1/2015 | 1.14% | | | 3.86% | |
| Water2005A | 251255N43 | Senior | FGIC | 7/1/2018 | 20,000 | 4.000% | 7/1/2015 | 1.50% | | | 2.50% | |
| Water2005A | 251255R49 | Senior | FGIC | 7/1/2018 | 2,615,000 | 5.000% | 7/1/2015 | 1.50% | | | 3.50% | |
| Water2005A | 251255N50 | Senior | FGIC | 7/1/2019 | 2,790,000 | 5.000% | 7/1/2015 | 1.89% | | | 3.11% | |
| Water2005A | 251255N68 | Senior | FGIC | 7/1/2020 | 2,955,000 | 5.000% | 7/1/2015 | 2.27% | | | 2.73% | |
| Water2005A | 251255N76 | Senior | FGIC | 7/1/2021 | 3,030,000 | 5.000% | 7/1/2015 | 2.65% | | | 2.35% | |
| Water2005A | 251255N84 | Senior | FGIC | 7/1/2022 | 3,225,000 | 5.000% | 7/1/2015 | 3.00% | | | 2.00% | |
| Water2005A | 251255N92 | Senior | FGIC | 7/1/2023 | 3,430,000 | 5.000% | 7/1/2015 | 3.34% | | | 1.66% | |
| Water2005A | 251255P25 | Senior | FGIC | 7/1/2024 | 3,650,000 | 5.000% | 7/1/2015 | 3.62% | | | 1.38% | |
| Water2005A | 251255P33 | Senior | FGIC | 7/1/2025 | 3,790,000 | 5.000% | 7/1/2015 | 3.83% | | | 1.17% | |
| Water2005A | 251255P41 | Senior | FGIC | 7/1/2026 | 4,080,000 | 5.000% | 7/1/2015 | 4.05% | | | 0.96% | |
| Water2005A | 251255P58 | Senior | FGIC | 7/1/2027 | 4,290,000 | 5.000% | 7/1/2015 | 4.21% | | | 0.79% | |
| Water2005A | 251255P66 | Senior | FGIC | 7/1/2028 | 4,615,000 | 5.000% | 7/1/2015 | 4.37% | | | 0.63% | |
| Water2005A | 251255P74 | Senior | FGIC | 7/1/2029 | 4,890,000 | 4.500% | 7/1/2015 | 4.50% | | | -0.00% | |
| Water2005A | 251255P82 | Senior | FGIC | 7/1/2030 | 5,145,000 | 4.500% | 7/1/2015 | 4.61% | | | -0.11% | |
| Water2005A | 251255P90 | Senior | FGIC | 7/1/2031 | 5,415,000 | 4.500% | 7/1/2015 | 4.71% | | | -0.21% | |
| Water2005A | 251255Q24 | Senior | FGIC | 7/1/2032 | 5,715,000 | 4.500% | 7/1/2015 | 4.79% | | | -0.29% | |
| Water2005A | 251255Q32 | Senior | FGIC | 7/1/2033 | 6,095,000 | 4.500% | 7/1/2015 | 4.86% | | | -0.36% | |

| Series Name | CUSIP | Lien | Insurer | Maturity | Amount | Coupon | Call Date | Indicative Interest Rates | | | Rate Reset Analysis (Push Market Rates on 6/30/2014) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Sr. Curve | 2nd Curve | Indicative CUSIP Reset Rate | Coupon less Sr. Curve | Coupon less 2nd Curve |
| Water2005A | | Senior | FGIC | 7/1/2034 | 6,550,000 | 4.500% | 7/1/2015 | 4.92% | | | -0.42% | |
| Water2005A | 251255Q32 | Senior | FGIC | 7/1/2035 | 6,880,000 | 4.500% | 7/1/2015 | 4.98% | | 4.92% | -0.48% | |
| | | | | | | | | | | | | |
| Water2005B | 251255R70 | Senior | FGIC / BHAC | 7/1/2014 | 2,125,000 | 5.000% | N/A | N/A | | | N/A | |
| Water2005B | 2512557S8 | Senior | FGIC / BHAC | 7/1/2015 | 2,225,000 | 4.000% | N/A | 0.68% | | | 3.32% | |
| Water2005B | 2512557T6 | Senior | FGIC / BHAC | 7/1/2016 | 2,305,000 | 4.000% | N/A | 0.85% | | | 3.15% | |
| Water2005B | 2512557U3 | Senior | FGIC / BHAC | 7/1/2017 | 2,385,000 | 4.000% | N/A | 1.14% | | | 2.86% | |
| Water2005B | 2512557V1 | Senior | FGIC / BHAC | 7/1/2018 | 2,465,000 | 5.500% | N/A | 1.50% | | | 4.00% | |
| Water2005B | 2512557W9 | Senior | FGIC / BHAC | 7/1/2019 | 2,575,000 | 5.500% | 7/1/2018 | 1.89% | | | 3.61% | |
| Water2005B | 2512557X7 | Senior | FGIC / BHAC | 7/1/2020 | 2,690,000 | 5.500% | 7/1/2018 | 2.27% | | | 3.23% | |
| Water2005B | 2512557Y5 | Senior | FGIC / BHAC | 7/1/2021 | 2,905,000 | 5.500% | 7/1/2018 | 2.65% | | | 2.85% | |
| Water2005B | 2512557Z2 | Senior | FGIC / BHAC | 7/1/2022 | 3,025,000 | 5.500% | 7/1/2018 | 3.00% | | | 2.50% | |
| Water2005B | 2512558A6 | Senior | FGIC / BHAC | 7/1/2023 | 3,145,000 | 5.500% | 7/1/2018 | 3.34% | | | 2.16% | |
| Water2005B | 2512558B4 | Senior | FGIC / BHAC | 7/1/2024 | 3,270,000 | 5.500% | 7/1/2018 | 3.62% | | | 1.88% | |
| Water2005B | 2512558C2 | Senior | FGIC / BHAC | 7/1/2025 | 3,490,000 | 5.500% | 7/1/2018 | 3.83% | | | 1.67% | |
| Water2005B | 2512558D0 | Senior | FGIC / BHAC | 7/1/2026 | 3,620,000 | 5.500% | 7/1/2018 | 4.05% | | | 1.46% | |
| Water2005B | 2512558E8 | Senior | FGIC / BHAC | 7/1/2027 | 3,850,000 | 5.500% | 7/1/2018 | 4.21% | | | 1.29% | |
| Water2005B | 2512558F5 | Senior | FGIC / BHAC | 7/1/2028 | 3,980,000 | 5.500% | 7/1/2018 | 4.37% | | | 1.13% | |
| Water2005B | | Senior | FGIC / BHAC | 7/1/2029 | 4,215,000 | 4.750% | 7/1/2018 | 4.50% | | | 0.25% | |
| Water2005B | | Senior | FGIC / BHAC | 7/1/2030 | 4,425,000 | 4.750% | 7/1/2018 | 4.61% | | | 0.14% | |
| Water2005B | | Senior | FGIC / BHAC | 7/1/2031 | 4,630,000 | 4.750% | 7/1/2018 | 4.71% | | | 0.04% | |
| Water2005B | | Senior | FGIC / BHAC | 7/1/2032 | 4,840,000 | 4.750% | 7/1/2018 | 4.79% | | | -0.04% | |
| Water2005B | | Senior | FGIC / BHAC | 7/1/2033 | 5,050,000 | 4.750% | 7/1/2018 | 4.86% | | | -0.11% | |
| Water2005B | 2512558G3 | Senior | FGIC / BHAC | 7/1/2034 | 5,255,000 | 4.750% | 7/1/2018 | 4.92% | | 4.74% | -0.17% | |
| Water2005B | 2512558H1 | Senior | FGIC / BHAC | 7/1/2034 | 57,365,000 | 5.500% | 7/1/2018 | 4.98% | | | 0.52% | |
| Water2005B | 2512558J7 | Senior | FGIC / BHAC | 7/1/2035 | 57,500,000 | 5.250% | 7/1/2018 | 4.98% | | | 0.27% | |
| | | | | | | | | | | | | |
| Water2005C | 251255S63 | Senior | FGIC | 7/1/2014 | 9,270,000 | 5.000% | N/A | N/A | | | N/A | |
| Water2005C | 251255S71 | Senior | FGIC | 7/1/2015 | 9,735,000 | 5.000% | N/A | 0.68% | | | 4.32% | |
| Water2005C | 251255S89 | Senior | FGIC | 7/1/2016 | 17,545,000 | 5.000% | 7/1/2015 | 0.85% | | | 4.15% | |
| Water2005C | 251255S97 | Senior | FGIC | 7/1/2017 | 18,425,000 | 5.000% | 7/1/2015 | 1.14% | | | 3.86% | |
| Water2005C | 251255T21 | Senior | FGIC | 7/1/2018 | 18,700,000 | 5.000% | 7/1/2015 | 1.50% | | | 3.50% | |
| Water2005C | 251255T39 | Senior | FGIC | 7/1/2019 | 8,245,000 | 5.000% | 7/1/2015 | 1.89% | | | 3.11% | |
| Water2005C | 251255T47 | Senior | FGIC | 7/1/2020 | 8,655,000 | 5.000% | 7/1/2015 | 2.27% | | | 2.73% | |
| Water2005C | 251255T54 | Senior | FGIC | 7/1/2021 | 9,090,000 | 5.000% | 7/1/2015 | 2.65% | | | 2.35% | |
| Water2005C | 251255T62 | Senior | FGIC | 7/1/2022 | 9,540,000 | 5.000% | 7/1/2015 | 3.00% | | | 2.00% | |
| | | | | | | | | | | | | |
| Water2006A | 251255V36 | Senior | Assured Guaranty | 7/1/2014 | 7,285,000 | 5.000% | N/A | N/A | | | N/A | |
| Water2006A | 251255V44 | Senior | Assured Guaranty | 7/1/2015 | 7,650,000 | 5.000% | N/A | 0.68% | | | 4.32% | |
| Water2006A | 251255V51 | Senior | Assured Guaranty | 7/1/2016 | 8,030,000 | 5.000% | N/A | 0.85% | | | 4.15% | |
| Water2006A | 251255V69 | Senior | Assured Guaranty | 7/1/2017 | 8,430,000 | 5.000% | 7/1/2016 | 1.14% | | | 3.86% | |
| Water2006A | 251255V77 | Senior | Assured Guaranty | 7/1/2018 | 8,855,000 | 5.000% | 7/1/2016 | 1.50% | | | 3.50% | |
| Water2006A | 251255V85 | Senior | Assured Guaranty | 7/1/2019 | 9,295,000 | 5.000% | 7/1/2016 | 1.89% | | | 3.11% | |
| Water2006A | 251255V93 | Senior | Assured Guaranty | 7/1/2020 | 9,760,000 | 5.000% | 7/1/2016 | 2.27% | | | 2.73% | |
| Water2006A | 251255W27 | Senior | Assured Guaranty | 7/1/2021 | 10,250,000 | 5.000% | 7/1/2016 | 2.65% | | | 2.35% | |
| Water2006A | 251255W35 | Senior | Assured Guaranty | 7/1/2022 | 10,760,000 | 5.000% | 7/1/2016 | 3.00% | | | 2.00% | |
| Water2006A | 251255W43 | Senior | Assured Guaranty | 7/1/2023 | 11,300,000 | 5.000% | 7/1/2016 | 3.34% | | | 1.66% | |
| Water2006A | 251255W50 | Senior | Assured Guaranty | 7/1/2024 | 11,865,000 | 5.000% | 7/1/2016 | 3.62% | | | 1.38% | |
| Water2006A | 251255W68 | Senior | Assured Guaranty | 7/1/2025 | 12,460,000 | 5.000% | 7/1/2016 | 3.83% | | | 1.17% | |
| Water2006A | 251255W76 | Senior | Assured Guaranty | 7/1/2026 | 13,080,000 | 5.000% | 7/1/2016 | 4.05% | | | 0.96% | |
| Water2006A | | Senior | Assured Guaranty | 7/1/2027 | 13,735,000 | 5.000% | 7/1/2016 | 4.21% | | | 0.79% | |
| Water2006A | | Senior | Assured Guaranty | 7/1/2028 | 14,420,000 | 5.000% | 7/1/2016 | 4.37% | | | 0.63% | |
| Water2006A | | Senior | Assured Guaranty | 7/1/2029 | 15,140,000 | 5.000% | 7/1/2016 | 4.50% | | | 0.50% | |
| Water2006A | | Senior | Assured Guaranty | 7/1/2030 | 15,900,000 | 5.000% | 7/1/2016 | 4.61% | | | 0.39% | |
| Water2006A | | Senior | Assured Guaranty | 7/1/2031 | 16,695,000 | 5.000% | 7/1/2016 | 4.71% | | | 0.29% | |
| Water2006A | | Senior | Assured Guaranty | 7/1/2032 | 17,530,000 | 5.000% | 7/1/2016 | 4.79% | | | 0.21% | |
| Water2006A | | Senior | Assured Guaranty | 7/1/2033 | 18,405,000 | 5.000% | 7/1/2016 | 4.86% | | | 0.14% | |
| Water2006A | 251255W84 | Senior | Assured Guaranty | 7/1/2034 | 19,325,000 | 5.000% | 7/1/2016 | 4.92% | | 4.65% | 0.08% | |
| | | | | | | | | | | | | |
| Water2006D | 251255Z81 | Senior | Assured Guaranty | 7/1/2015 | 15,000 | 4.000% | N/A | N/A | | | N/A | |
| Water2006D | 251255Z99 | Senior | Assured Guaranty | 7/1/2015 | 15,000 | 4.100% | N/A | 0.68% | | | 3.42% | |
| Water2006D | 2512552A2 | Senior | Assured Guaranty | 7/1/2016 | 15,000 | 4.200% | N/A | 0.85% | | | 3.35% | |
| Water2006D | 2512552B0 | Senior | Assured Guaranty | 7/1/2017 | 20,000 | 4.250% | 7/1/2016 | 1.14% | | | 3.11% | |
| Water2006D | 2512552C8 | Senior | Assured Guaranty | 7/1/2018 | 20,000 | 4.300% | 7/1/2016 | 1.50% | | | 2.80% | |
| Water2006D | 2512552D6 | Senior | Assured Guaranty | 7/1/2019 | 2,650,000 | 5.000% | 7/1/2016 | 1.89% | | | 3.11% | |
| Water2006D | 2512552E4 | Senior | Assured Guaranty | 7/1/2020 | 3,200,000 | 5.000% | 7/1/2016 | 2.27% | | | 2.73% | |
| Water2006D | | Senior | Assured Guaranty | 7/1/2021 | 5,000 | 5.000% | 7/1/2016 | 2.65% | | | 2.35% | |
| Water2006D | | Senior | Assured Guaranty | 7/1/2022 | 5,000 | 5.000% | 7/1/2016 | 3.00% | | | 2.00% | |
| Water2006D | 2512552F1 | Senior | Assured Guaranty | 7/1/2023 | 20,125,000 | 5.000% | 7/1/2016 | 3.34% | | 3.34% | 1.66% | |
| Water2006D | 2512552G9 | Senior | Assured Guaranty | 7/1/2024 | 27,425,000 | 5.000% | 7/1/2016 | 3.62% | | | 1.38% | |
| Water2006D | 2512552H7 | Senior | Assured Guaranty | 7/1/2025 | 9,755,000 | 5.000% | 7/1/2016 | 3.83% | | | 1.17% | |
| Water2006D | | Senior | Assured Guaranty | 7/1/2026 | 40,000 | 4.625% | 7/1/2016 | 4.05% | | | 0.58% | |
| Water2006D | | Senior | Assured Guaranty | 7/1/2027 | 40,000 | 4.625% | 7/1/2016 | 4.21% | | | 0.42% | |
| Water2006D | | Senior | Assured Guaranty | 7/1/2028 | 40,000 | 4.625% | 7/1/2016 | 4.37% | | | 0.25% | |
| Water2006D | | Senior | Assured Guaranty | 7/1/2029 | 45,000 | 4.625% | 7/1/2016 | 4.50% | | | 0.12% | |
| Water2006D | | Senior | Assured Guaranty | 7/1/2030 | 45,000 | 4.625% | 7/1/2016 | 4.61% | | | 0.02% | |
| Water2006D | | Senior | Assured Guaranty | 7/1/2031 | 13,615,000 | 4.625% | 7/1/2016 | 4.71% | | | -0.08% | |
| Water2006D | | Senior | Assured Guaranty | 7/1/2031 | 37,535,000 | 5.000% | 7/1/2016 | 4.71% | | | 0.29% | |
| Water2006D | 2512552J3 | Senior | Assured Guaranty | 7/1/2032 | 7,280,000 | 4.625% | 7/1/2016 | 4.79% | | 4.73% | -0.16% | |
| Water2006D | 2512552K0 | Senior | Assured Guaranty | 7/1/2032 | 20,095,000 | 5.000% | 7/1/2016 | 4.79% | | 4.75% | 0.21% | |
| | | | | | | | | | | | | |
| Water2011A | 251256BA0 | Senior | N/A | 7/1/2014 | 3,410,000 | 5.000% | N/A | N/A | | | N/A | |
| Water2011A | 251256BB8 | Senior | N/A | 7/1/2015 | 3,550,000 | 5.000% | N/A | 0.68% | | | 4.32% | |
| Water2011A | 251256BC6 | Senior | N/A | 7/1/2016 | 3,695,000 | 5.000% | N/A | 0.85% | | | 4.15% | |
| Water2011A | 251256BD4 | Senior | N/A | 7/1/2017 | 3,845,000 | 5.000% | N/A | 1.14% | | | 3.86% | |
| Water2011A | 251256BE2 | Senior | N/A | 7/1/2018 | 4,000,000 | 5.000% | N/A | 1.50% | | | 3.50% | |
| Water2011A | 251256BF9 | Senior | N/A | 7/1/2019 | 3,160,000 | 5.000% | N/A | 1.89% | | | 3.11% | |
| Water2011A | 251256BG7 | Senior | N/A | 7/1/2020 | 4,225,000 | 5.000% | N/A | 2.27% | | | 2.73% | |
| Water2011A | 251256BH5 | Senior | N/A | 7/1/2021 | 4,215,000 | 5.000% | N/A | 2.65% | | | 2.35% | |

| Series Name | CUSIP | Lien | Insurer | Maturity | Amount | Coupon | Call Date | Indicative Interest Rates | | | Rate Reset Analysis (Push Market Rates on 6/30/2014) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Sr. Curve | 2nd Curve | Indicative CUSIP Reset Rate | Coupon less Sr. Curve | Coupon less 2nd Curve |
| Water2011A | 251256BJ1 | Senior | N/A | 7/1/2022 | 4,195,000 | 5.250% | 7/1/2021 | 3.00% | | | 2.25% | |
| Water2011A | 251256BK8 | Senior | N/A | 7/1/2023 | 4,170,000 | 5.250% | 7/1/2021 | 3.34% | | | 1.91% | |
| Water2011A | 251256BL6 | Senior | N/A | 7/1/2024 | 4,140,000 | 5.250% | 7/1/2021 | 3.62% | | | 1.63% | |
| Water2011A | 251256BM4 | Senior | N/A | 7/1/2025 | 4,085,000 | 5.250% | 7/1/2021 | 3.83% | | | 1.42% | |
| Water2011A | 251256BN2 | Senior | N/A | 7/1/2026 | 4,020,000 | 5.250% | 7/1/2021 | 4.05% | | | 1.21% | |
| Water2011A | 251256BP7 | Senior | N/A | 7/1/2027 | 3,930,000 | 5.250% | 7/1/2021 | 4.21% | | | 1.04% | |
| Water2011A | | Senior | N/A | 7/1/2028 | 3,935,000 | 5.000% | 7/1/2021 | 4.37% | | | 0.63% | |
| Water2011A | | Senior | N/A | 7/1/2029 | 3,910,000 | 5.000% | 7/1/2021 | 4.50% | | | 0.50% | |
| Water2011A | | Senior | N/A | 7/1/2030 | 3,550,000 | 5.000% | 7/1/2021 | 4.61% | | | 0.39% | |
| Water2011A | 251256BQ5 | Senior | N/A | 7/1/2031 | 3,470,000 | 5.000% | 7/1/2021 | 4.71% | | 4.54% | 0.29% | |
| Water2011A | | Senior | N/A | 7/1/2032 | 3,590,000 | 5.000% | 7/1/2021 | 4.79% | | | 0.21% | |
| Water2011A | | Senior | N/A | 7/1/2033 | 3,725,000 | 5.000% | 7/1/2021 | 4.86% | | | 0.14% | |
| Water2011A | | Senior | N/A | 7/1/2034 | 3,850,000 | 5.000% | 7/1/2021 | 4.92% | | | 0.08% | |
| Water2011A | | Senior | N/A | 7/1/2035 | 3,990,000 | 5.000% | 7/1/2021 | 4.98% | | | 0.02% | |
| Water2011A | 251256BR3 | Senior | N/A | 7/1/2036 | 13,735,000 | 5.000% | 7/1/2021 | 5.04% | | 4.96% | -0.04% | |
| Water2011A | 251256BF19 | Senior | N/A | 7/1/2037 | 49,315,000 | 5.750% | 7/1/2021 | 5.10% | | | 0.65% | |
| Water2011A | | Senior | N/A | 7/1/2038 | 52,150,000 | 5.250% | 7/1/2021 | 5.15% | | | 0.10% | |
| Water2011A | | Senior | N/A | 7/1/2039 | 54,885,000 | 5.250% | 7/1/2021 | 5.21% | | | 0.04% | |
| Water2011A | | Senior | N/A | 7/1/2040 | 57,770,000 | 5.250% | 7/1/2021 | 5.22% | | | 0.03% | |
| Water2011A | 251256BS1 | Senior | N/A | 7/1/2041 | 59,495,000 | 5.250% | 7/1/2021 | 5.23% | | 5.21% | 0.02% | |
| | | | | | | | | | | | | |
| Water2011B | | Senior | N/A | 7/1/2014 | 685,000 | 3.607% | N/A | N/A | | | N/A | |
| Water2011B | | Senior | N/A | 7/1/2015 | 630,000 | 3.607% | N/A | 0.68% | | | 2.93% | |
| Water2011B | 251256AV5 | Senior | N/A | 7/1/2016 | 655,000 | 3.607% | N/A | 0.85% | | 0.50% | 2.76% | |
| Water2011B | | Senior | N/A | 7/1/2017 | 680,000 | 5.000% | N/A | 1.14% | | | 3.86% | |
| Water2011B | | Senior | N/A | 7/1/2018 | 715,000 | 5.000% | N/A | 1.50% | | | 3.50% | |
| Water2011B | | Senior | N/A | 7/1/2019 | 750,000 | 5.000% | N/A | 1.89% | | | 3.11% | |
| Water2011B | | Senior | N/A | 7/1/2020 | 790,000 | 5.000% | N/A | 2.27% | | | 2.73% | |
| Water2011B | 251256AW3 | Senior | N/A | 7/1/2021 | 825,000 | 5.000% | N/A | 2.65% | | 1.93% | 2.35% | |
| Water2011B | | Senior | N/A | 7/1/2022 | 865,000 | 6.000% | 7/1/2021 | 3.00% | | | 3.00% | |
| Water2011B | | Senior | N/A | 7/1/2023 | 915,000 | 6.000% | 7/1/2021 | 3.34% | | | 2.66% | |
| Water2011B | | Senior | N/A | 7/1/2024 | 735,000 | 6.000% | 7/1/2021 | 3.62% | | | 2.38% | |
| Water2011B | | Senior | N/A | 7/1/2025 | 780,000 | 6.000% | 7/1/2021 | 3.83% | | | 2.17% | |
| Water2011B | | Senior | N/A | 7/1/2026 | 650,000 | 6.000% | 7/1/2021 | 4.05% | | | 1.96% | |
| Water2011B | | Senior | N/A | 7/1/2027 | 690,000 | 6.000% | 7/1/2021 | 4.21% | | | 1.79% | |
| Water2011B | | Senior | N/A | 7/1/2028 | 730,000 | 6.000% | 7/1/2021 | 4.37% | | | 1.63% | |
| Water2011B | | Senior | N/A | 7/1/2029 | 775,000 | 6.000% | 7/1/2021 | 4.50% | | | 1.50% | |
| Water2011B | | Senior | N/A | 7/1/2030 | 825,000 | 6.000% | 7/1/2021 | 4.61% | | | 1.39% | |
| Water2011B | | Senior | N/A | 7/1/2031 | 870,000 | 6.000% | 7/1/2021 | 4.71% | | | 1.29% | |
| Water2011B | | Senior | N/A | 7/1/2032 | 925,000 | 6.000% | 7/1/2021 | 4.79% | | | 1.21% | |
| Water2011B | 251256AX1 | Senior | N/A | 7/1/2033 | 980,000 | 6.000% | 7/1/2021 | 4.86% | | 4.17% | 1.14% | |
| | | | | | | | | | | | | |
| Water2011C | 251256BV4 | Senior | N/A | 7/1/2021 | 2,700,000 | 5.000% | N/A | 2.65% | | | 2.35% | |
| Water2011C | 251256BW2 | Senior | N/A | 7/1/2023 | 9,965,000 | 5.250% | 7/1/2021 | 3.34% | | | 1.91% | |
| Water2011C | 251256BX0 | Senior | N/A | 7/1/2024 | 10,490,000 | 5.250% | 7/1/2021 | 3.62% | | | 1.63% | |
| Water2011C | 251256BY8 | Senior | N/A | 7/1/2025 | 11,035,000 | 5.250% | 7/1/2021 | 3.83% | | | 1.42% | |
| Water2011C | 251256BZ5 | Senior | N/A | 7/1/2026 | 11,615,000 | 5.250% | 7/1/2021 | 4.05% | | | 1.21% | |
| Water2011C | 251256CA9 | Senior | N/A | 7/1/2027 | 5,000,000 | 5.250% | 7/1/2021 | 4.21% | | | 1.04% | |
| Water2011C | 251256CC5 | Senior | N/A | 7/1/2027 | 7,230,000 | 4.500% | 7/1/2021 | 4.21% | | | 0.29% | |
| Water2011C | | Senior | N/A | 7/1/2037 | 8,075,000 | 5.000% | 7/1/2021 | 5.10% | | | -0.10% | |
| Water2011C | | Senior | N/A | 7/1/2038 | 8,480,000 | 5.000% | 7/1/2021 | 5.15% | | | -0.15% | |
| Water2011C | | Senior | N/A | 7/1/2039 | 8,905,000 | 5.000% | 7/1/2021 | 5.21% | | | -0.21% | |
| Water2011C | | Senior | N/A | 7/1/2040 | 9,350,000 | 5.000% | 7/1/2021 | 5.22% | | | -0.22% | |
| Water2011C | 251256CB7 | Senior | N/A | 7/1/2041 | 9,820,000 | 5.000% | 7/1/2021 | 5.23% | | 5.19% | -0.23% | |
| | | | | | | | | | | | | |
| Water2001C | 2512556U4 | Second | FGIC / BHAC | 7/1/2014 | 350,000 | 3.500% | N/A | N/A | | | N/A | |
| Water2001C | 251256V2 | Second | FGIC / BHAC | 7/1/2015 | 365,000 | 4.250% | N/A | 0.93% | | | 3.32% | |
| Water2001C | 2512556W0 | Second | FGIC / BHAC | 7/1/2016 | 380,000 | 4.250% | N/A | 1.11% | | | 3.14% | |
| Water2001C | 2512556X8 | Second | FGIC / BHAC | 7/1/2017 | 390,000 | 4.250% | N/A | 1.41% | | | 2.84% | |
| Water2001C | 2512556Y6 | Second | FGIC / BHAC | 7/1/2018 | 415,000 | 4.250% | N/A | 1.78% | | | 2.47% | |
| Water2001C | 2512556Z3 | Second | FGIC / BHAC | 7/1/2019 | 12,510,000 | 5.750% | 7/1/2018 | 2.17% | | | 3.58% | |
| Water2001C | 2512557A7 | Second | FGIC / BHAC | 7/1/2020 | 13,235,000 | 5.750% | 7/1/2018 | 2.56% | | | 3.19% | |
| Water2001C | 2512557B5 | Second | FGIC / BHAC | 7/1/2021 | 14,025,000 | 5.750% | 7/1/2018 | 2.96% | | | 2.79% | |
| Water2001C | 2512557C3 | Second | FGIC / BHAC | 7/1/2022 | 14,865,000 | 5.750% | 7/1/2018 | 3.31% | | | 2.44% | |
| Water2001C | 2512557D1 | Second | FGIC / BHAC | 7/1/2023 | 15,750,000 | 5.750% | 7/1/2018 | 3.66% | | | 2.09% | |
| Water2001C | 2512557E9 | Second | FGIC / BHAC | 7/1/2024 | 16,690,000 | 5.750% | 7/1/2018 | 3.95% | | | 1.80% | |
| Water2001C | 2512557F6 | Second | FGIC / BHAC | 7/1/2025 | 17,690,000 | 5.750% | 7/1/2018 | 4.17% | | | 1.58% | |
| Water2001C | 2512557G4 | Second | FGIC / BHAC | 7/1/2026 | 18,735,000 | 5.750% | 7/1/2018 | 4.39% | | | 1.36% | |
| Water2001C | 2512557H2 | Second | FGIC / BHAC | 7/1/2027 | 19,945,000 | 5.750% | 7/1/2018 | 4.56% | | | 1.19% | |
| Water2001C | 2512557J8 | Second | FGIC / BHAC | 7/1/2028 | 4,000,000 | 5.750% | 7/1/2018 | 4.73% | | | 1.02% | |
| Water2001C | | Second | FGIC / BHAC | 7/1/2028 | 7,090,000 | 4.500% | 7/1/2018 | 4.73% | | | -0.23% | |
| Water2001C | | Second | FGIC / BHAC | 7/1/2028 | 10,115,000 | 4.750% | 7/1/2018 | 4.73% | | | 0.02% | |
| Water2001C | 2512557L3 | Second | FGIC / BHAC | 7/1/2029 | 13,000,000 | 4.500% | 7/1/2018 | 4.87% | 4.83% | | -0.37% | |
| Water2001C | 2512557K5 | Second | FGIC / BHAC | 7/1/2029 | 8,700,000 | 4.750% | 7/1/2018 | 4.87% | 4.80% | | -0.12% | |
| | | | | | | | | | | | | |
| Water2003B | 2512555H4 | Second | MBIA | 7/1/2034 | 41,770,000 | 5.000% | 6/30/2014 | 5.34% | | | -0.34% | |
| | | | | | | | | | | | | |
| Water2004A | 2512553G8 | Second | MBIA | 7/1/2014 | 4,250,000 | 5.250% | N/A | N/A | | | N/A | |
| Water2004A | 2512553H6 | Second | MBIA | 7/1/2015 | 4,475,000 | 5.250% | N/A | 0.93% | | | 4.32% | |
| Water2004A | 2512553J2 | Second | MBIA | 7/1/2016 | 4,710,000 | 5.250% | N/A | 1.11% | | | 4.14% | |
| Water2004A | 2512553K9 | Second | MBIA | 7/1/2017 | 4,955,000 | 5.250% | 7/1/2016 | 1.41% | | | 3.84% | |
| Water2004A | 2512553L7 | Second | MBIA | 7/1/2018 | 5,215,000 | 5.250% | 7/1/2016 | 1.78% | | | 3.47% | |
| Water2004A | 2512553M5 | Second | MBIA | 7/1/2019 | 5,490,000 | 5.250% | 7/1/2016 | 2.17% | | | 3.08% | |
| Water2004A | 2512553N3 | Second | MBIA | 7/1/2020 | 5,780,000 | 5.250% | 7/1/2016 | 2.56% | | | 2.69% | |
| Water2004A | 2512553P8 | Second | MBIA | 7/1/2021 | 6,085,000 | 5.250% | 7/1/2016 | 2.96% | | | 2.29% | |
| Water2004A | 2512553Q6 | Second | MBIA | 7/1/2022 | 6,400,000 | 5.250% | 7/1/2016 | 3.31% | | | 1.94% | |
| Water2004A | 2512553R4 | Second | MBIA | 7/1/2023 | 6,735,000 | 5.250% | 7/1/2016 | 3.66% | | | 1.59% | |
| Water2004A | | Second | MBIA | 7/1/2024 | 7,090,000 | 4.500% | 7/1/2016 | 3.95% | | | 0.55% | |
| Water2004A | 2512553S2 | Second | MBIA | 7/1/2025 | 7,415,000 | 4.500% | 7/1/2016 | 4.17% | 4.06% | | 0.33% | |

| Series Name | CUSIP | Lien | Insurer | Maturity | Amount | Coupon | Call Date | Indicative Interest Rates | | Indicative CUSIP Reset Rate | Rate Reset Analysis (Push Market Rates on 6/30/2014) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Sr. Curve | 2nd Curve | | Coupon less Sr. Curve | Coupon less 2nd Curve |
| Water2006B | 251256AG8 | Second | Assured Guaranty | 7/1/2014 | 100,000 | 3.900% | N/A | N/A | | | | N/A |
| Water2006B | 251256AH6 | Second | Assured Guaranty | 7/1/2015 | 100,000 | 4.000% | N/A | 0.93% | | | | 3.07% |
| Water2006B | 251256AJ2 | Second | Assured Guaranty | 7/1/2016 | 100,000 | 4.250% | N/A | 1.11% | | | | 3.14% |
| Water2006B | 251256AK9 | Second | Assured Guaranty | 7/1/2017 | 100,000 | 4.600% | N/A | 1.41% | | | | 3.19% |
| Water2006B | 251256AL7 | Second | Assured Guaranty | 7/1/2018 | 100,000 | 4.800% | N/A | 1.78% | | | | 3.02% |
| Water2006B | 251256AM5 | Second | Assured Guaranty | 7/1/2019 | 100,000 | 5.000% | N/A | 2.17% | | | | 2.83% |
| Water2006B | | Second | Assured Guaranty | 7/1/2020 | 100,000 | 5.500% | 7/1/2019 | 2.56% | | | | 2.94% |
| Water2006B | | Second | Assured Guaranty | 7/1/2021 | 100,000 | 5.500% | 7/1/2019 | 2.96% | | | | 2.54% |
| Water2006B | | Second | Assured Guaranty | 7/1/2022 | 100,000 | 5.500% | 7/1/2019 | 3.31% | | | | 2.19% |
| Water2006B | 251256AN3 | Second | Assured Guaranty | 7/1/2023 | 100,000 | 5.500% | 7/1/2019 | 3.66% | 3.12% | | | 1.84% |
| Water2006B | | Second | Assured Guaranty | 7/1/2024 | 100,000 | 6.625% | 7/1/2019 | 3.95% | | | | 2.68% |
| Water2006B | | Second | Assured Guaranty | 7/1/2025 | 100,000 | 6.625% | 7/1/2019 | 4.17% | | | | 2.46% |
| Water2006B | | Second | Assured Guaranty | 7/1/2026 | 100,000 | 6.625% | 7/1/2019 | 4.39% | | | | 2.24% |
| Water2006B | | Second | Assured Guaranty | 7/1/2027 | 100,000 | 6.625% | 7/1/2019 | 4.56% | | | | 2.06% |
| Water2006B | | Second | Assured Guaranty | 7/1/2028 | 100,000 | 6.625% | 7/1/2019 | 4.73% | | | | 1.89% |
| Water2006B | | Second | Assured Guaranty | 7/1/2029 | 100,000 | 6.625% | 7/1/2019 | 4.87% | | | | 1.75% |
| Water2006B | | Second | Assured Guaranty | 7/1/2030 | 100,000 | 6.625% | 7/1/2019 | 4.99% | | | | 1.64% |
| Water2006B | | Second | Assured Guaranty | 7/1/2031 | 100,000 | 6.625% | 7/1/2019 | 5.10% | | | | 1.53% |
| Water2006B | | Second | Assured Guaranty | 7/1/2032 | 100,000 | 6.625% | 7/1/2019 | 5.18% | | | | 1.44% |
| Water2006B | | Second | Assured Guaranty | 7/1/2033 | 100,000 | 6.625% | 7/1/2019 | 5.27% | | | | 1.36% |
| Water2006B | | Second | Assured Guaranty | 7/1/2034 | 100,000 | 6.625% | 7/1/2019 | 5.34% | | | | 1.29% |
| Water2006B | | Second | Assured Guaranty | 7/1/2035 | 100,000 | 6.625% | 7/1/2019 | 5.40% | | | | 1.22% |
| Water2006B | 251256AP8 | Second | Assured Guaranty | 7/1/2036 | 56,000,000 | 7.000% | 7/1/2019 | 5.47% | | | | 1.53% |
| Water2006B | 251256AQ6 | Second | Assured Guaranty | 7/1/2036 | 61,500,000 | 6.250% | 7/1/2019 | 5.47% | 5.46% | | | 0.78% |
| | | | | | | | | | | | | |
| Water2006C | 251255X83 | Second | Assured Guaranty | 7/1/2014 | 1,100,000 | 4.000% | N/A | N/A | | | | N/A |
| Water2006C | 251255X91 | Second | Assured Guaranty | 7/1/2015 | 3,725,000 | 5.000% | | 0.93% | | | | 4.07% |
| Water2006C | 251255Y25 | Second | Assured Guaranty | 7/1/2016 | 3,795,000 | 5.000% | | 1.11% | | | | 3.89% |
| Water2006C | 251255Y33 | Second | Assured Guaranty | 7/1/2017 | 4,010,000 | 5.000% | 7/1/2016 | 1.41% | | | | 3.59% |
| Water2006C | 251255Y41 | Second | Assured Guaranty | 7/1/2018 | 4,765,000 | 5.000% | 7/1/2016 | 1.78% | | | | 3.22% |
| Water2006C | | Second | Assured Guaranty | 7/1/2019 | 1,360,000 | 5.000% | 7/1/2016 | 2.17% | | | | 2.83% |
| Water2006C | | Second | Assured Guaranty | 7/1/2020 | 1,425,000 | 5.000% | 7/1/2016 | 2.56% | | | | 2.44% |
| Water2006C | | Second | Assured Guaranty | 7/1/2021 | 1,500,000 | 5.000% | 7/1/2016 | 2.96% | | | | 2.04% |
| Water2006C | 251255Y58 | Second | Assured Guaranty | 7/1/2022 | 1,575,000 | 5.000% | 7/1/2016 | 3.31% | 2.77% | | | 1.69% |
| Water2006C | | Second | Assured Guaranty | 7/1/2023 | 1,650,000 | 5.000% | 7/1/2016 | 3.66% | | | | 1.34% |
| Water2006C | | Second | Assured Guaranty | 7/1/2024 | 1,730,000 | 5.000% | 7/1/2016 | 3.95% | | | | 1.05% |
| Water2006C | | Second | Assured Guaranty | 7/1/2025 | 1,820,000 | 5.000% | 7/1/2016 | 4.17% | | | | 0.83% |
| Water2006C | 251255Y66 | Second | Assured Guaranty | 7/1/2026 | 9,680,000 | 5.000% | 7/1/2016 | 4.39% | 4.23% | | | 0.61% |
| Water2006C | | Second | Assured Guaranty | 7/1/2027 | 10,165,000 | 5.000% | 7/1/2016 | 4.56% | | | | 0.44% |
| Water2006C | | Second | Assured Guaranty | 7/1/2028 | 10,675,000 | 5.000% | 7/1/2016 | 4.73% | | | | 0.27% |
| Water2006C | 251255Y74 | Second | Assured Guaranty | 7/1/2029 | 11,205,000 | 5.000% | 7/1/2016 | 4.87% | 4.73% | | | 0.13% |
| Water2006C | | Second | Assured Guaranty | 7/1/2030 | 33,990,000 | 5.000% | 7/1/2016 | 4.99% | | | | 0.01% |
| Water2006C | | Second | Assured Guaranty | 7/1/2031 | 35,690,000 | 5.000% | 7/1/2016 | 5.10% | | | | -0.10% |
| Water2006C | | Second | Assured Guaranty | 7/1/2032 | 37,475,000 | 5.000% | 7/1/2016 | 5.18% | | | | -0.18% |
| Water2006C | 251255Y82 | Second | Assured Guaranty | 7/1/2033 | 39,345,000 | 5.000% | 7/1/2016 | 5.27% | 5.14% | | | -0.27% |
| **Water Variable Rate Bonds** | | | | | | | | | | | | |
| Water2003C (Var)[4] | 251255H99 | Senior | MBIA | 7/1/2014 | 2,330,000 | 2.410% | 6/30/2014 | N/A | N/A | | | N/A |

**Notes**

(4) Variable interest rate based on MUNI - CPI Rate. Estimated to be 2.41%.

**EXHIBIT I.A.154**

SCHEDULE OF LIMITED TAX GENERAL OBLIGATION BOND
DOCUMENTS & RELATED LIMITED TAX GENERAL OBLIGATION BONDS

## SCHEDULE OF LIMITED TAX GENERAL OBLIGATION BOND
## DOCUMENTS & RELATED LIMITED TAX GENERAL OBLIGATION BONDS

| Limited Tax General Obligation Bond Documents | Series of Limited Tax General Obligation Bonds | Balance as of Petition Date |
|---|---|---|
| Bond Authorizing Resolution adopted May 26, 2004<br><br>Finance Director's Order approving sale of General Obligation Self-Insurance Bonds (Limited Tax) Series 2004, dated August 27, 2004 | Self Insurance - Series 2004 | $13,186,559 |
| Bond Authorizing Resolution adopted May 6, 2005 ("2005 LTGO Resolution")<br><br>Finance Director's Order dated June 24, 2005 ("2005 Sale Order") | Series 2005-A(1) | $60,776,168 |
| 2005 LTGO Resolution<br><br>2005 Sale Order | Series 2005-A(2) | $11,080,060 |
| 2005 LTGO Resolution<br><br>2005 Sale Order | Series 2005-B | $9,003,535 |
| Resolution of the City Council adopted November 17, 2006 ("2006 LTGO Resolution")<br><br>Finance Director's Order dated May 30, 2008 ("2008 LTGO Sale Order") | Series 2008-A(1) | $43,905,085 |
| 2006 LTGO Resolution<br><br>2008 LTGO Sale Order | Series 2008-A(2) | $25,591,781 |

**EXHIBIT I.A.160**

NEW B NOTES

SUMMARY OF PRINCIPAL TERMS

**NEW B NOTES**
**SUMMARY OF PRINCIPAL TERMS**[1]

On the Effective Date, the City shall issue the New B Notes and distribute them as set forth in the Plan. The definitive documentation governing the New B Notes shall provide generally for the following terms:

| | |
|---|---|
| Obligation | The City's obligations with respect to the New B Notes shall be a general and unsecured obligation of the City. |
| Initial Principal Amount | $360.0 million. |
| Interest Rate | 5.0%, payable semi-annually in cash, except for initial PIK period described below. |
| Initial PIK Period | Interest may be paid in kind through and including the interest payment date closest to the fifth anniversary of issuance. |
| Maturity | 30 years. |
| Amortization | Amortization in 20 equal annual installments beginning on the interest payment date nearest to the 11th anniversary from issuance. |

---

[1]        Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan.

**EXHIBIT I.A.166**

NEW DWSD BONDS

SUMMARY OF PRINCIPAL TERMS

# NEW DWSD BONDS
## SUMMARY OF PRINCIPAL TERMS[1]

       If a DWSD Transaction is not consummated, on the Effective Date, the City shall issue the New DWSD Bonds, in one or more series, and distribute them as set forth in the Plan. The definitive documentation governing the New DWSD Bonds shall provide generally for the following terms:

| | |
|---|---|
| Principal | The principal shall be equal to the amount of each DWSD Series of DWSD Bonds receiving New DWSD Bonds, plus amounts necessary to pay expenses of the financing. |
| Interest Rate | The interest rate of the New DWSD Bonds shall be calculated by reference to the Interest Rate Reset Chart attached as Exhibit I.A.150 to the Plan. |
| Maturity Dates | The maturity date(s) of the New DWSD Bonds shall be the same as the existing maturity(ies) of each series of DWSD Series of DWSD Bonds receiving New DWSD Bonds. |
| Prepayment | The City may prepay or redeem all or any portion of the New DWSD Bonds at any time at its option and without penalty or premium. |
| Transfer of Assets | The City shall have the authority to permit the lease or transfer of assets currently used in DWSD's operations to one or more new authorities formed to provide water and/or sewer services provided that such transferee(s) assume the applicable portion of the then outstanding New DWSD Bonds. In the event that such DWSD assets are leased or transferred, the definition of "operations and maintenance expenses" in the documentation for the New DWSD Bonds shall be amended to (i) include the amount of any lease payment payable to the City's General Fund; and (ii) exclude such amount from the liens securing the New DWSD Bonds. |
| Other Terms | The New DWSD Bonds otherwise shall have the same terms and conditions as the applicable DWSD Series of DWSD Bonds receiving New DWSD Bonds. |

---

[1]       Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan.

**EXHIBIT I.A.168**

NEW DWSD REVOLVING BONDS

SUMMARY OF PRINCIPAL TERMS

# NEW DWSD REVOLVING BONDS
## SUMMARY OF PRINCIPAL TERMS[1]

       If a DWSD Transaction is not consummated, on the Effective Date, the City shall issue the New DWSD Revolving Bonds, in one or more series, and distribute them as set forth in the Plan. The definitive documentation governing the New DWSD Revolving Bonds shall provide generally for the following terms:

| | |
|---|---|
| Principal | The principal of the New DWSD Revolving Bonds shall be equal to the outstanding principal on the relevant existing DWSD Revolving Bonds. |
| Interest Rate | The interest rate of the New DWSD Revolving Bonds shall be calculated by reference to the Interest Rate Reset Chart attached as Exhibit I.A.150 to the Plan. |
| Maturity Dates | The maturity date(s) of the New DWSD Revolving Bonds shall be the same as the existing maturity(ies) of each series of DWSD Series of DWSD Revolving Bonds receiving New DWSD Revolving Bonds. |
| Prepayment | The City may prepay or redeem all or any portion of the New DWSD Revolving Bonds at any time at its option and without penalty or premium. |
| Transfer of Assets | The City shall have the authority to permit the lease or transfer of assets currently used in DWSD's operations to one or more new authorities formed to provide water and/or sewer services provided that such transferee(s) assume the applicable portion of the then outstanding New DWSD Revolving Bonds. In the event that such DWSD assets are leased or transferred, the definition of "operations and maintenance expenses" in the documentation for the New DWSD Revolving Bonds shall be amended to (i) include the amount of any lease payment payable to the City's General Fund; and (ii) exclude such amount from the liens securing the New DWSD Revolving Bonds. |

---

[1]      Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan.

**EXHIBIT I.A.170**

NEW EXISTING RATE DWSD BONDS

SUMMARY OF PRINCIPAL TERMS

**NEW EXISTING RATE DWSD BONDS**
**SUMMARY OF PRINCIPAL TERMS[1]**

       If a DWSD Transaction is not consummated, on the Effective Date, the City shall issue the New Existing Rate DWSD Bonds, in one or more series, and distribute them as set forth in the Plan. The definitive documentation governing the New Existing Rate DWSD Bonds shall provide generally for the following terms:

| | |
|---|---|
| Principal | The principal of the New Existing Rate DWSD Bonds shall be equal to the amount of each DWSD Series of DWSD Bonds receiving New Existing Rate DWSD Bonds, plus amounts necessary to pay expenses of the financing. |
| Interest Rate | The interest rate(s) of the New Existing Rate DWSD Bonds shall be the same as existing interest rates of each series of DWSD Bonds receiving New Existing Rate DWSD Bonds. |
| Maturity Dates | The maturity date(s) of the New Existing Rate DWSD Bonds shall be the same as the existing maturity(ies) of each series of DWSD Bonds receiving New Existing Rate DWSD Bonds. |
| Prepayment | The City may prepay or redeem all or any portion of the New Existing Rate DWSD Bonds at any time at its option and without penalty or premium. |
| Transfer of Assets | The City shall have the authority to permit the lease or transfer of assets currently used in DWSD's operations to one or more new authorities formed to provide water and/or sewer services provided that such transferee(s) assume the applicable portion of the then outstanding New Existing Rate DWSD Bonds. In the event that such DWSD assets are leased or transferred, the definition of "operations and maintenance expenses" in the documentation for the New Existing Rate DWSD Bonds shall be amended to (i) include the amount of any lease payment payable to the City's General Fund; and (ii) exclude such amount from the liens securing the New Existing Rate DWSD Bonds. |
| Other Terms | The New Existing Rate DWSD Bonds otherwise shall have the same terms and conditions as the applicable DWSD Series of DWSD Bonds receiving New Existing Rate DWSD Bonds. |

---

[1]     Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan.

**EXHIBIT I.A.172**

NEW EXISTING RATE GLWA BONDS

SUMMARY OF PRINCIPAL TERMS

# NEW EXISTING RATE GLWA BONDS
## SUMMARY OF PRINCIPAL TERMS[1]

If a DWSD Transaction is consummated, on the Effective Date, the GLWA shall issue the New Existing Rate GLWA Bonds, in one or more series, and distribute them as set forth in the Plan. The definitive documentation governing the New Existing Rate GLWA Bonds shall provide generally for the following terms:

| | |
|---|---|
| Obligations | The New Existing Rate GLWA Bonds shall be obligations of GLWA. |
| Principal | The principal shall be equal to the amount of each DWSD Series of DWSD Bonds receiving New Existing Rate GLWA Bonds, plus amounts necessary to pay expenses of the financing. |
| Interest Rate | The interest rate(s) of the New Existing Rate GLWA Bonds shall be the same as existing interest rates of each series of DWSD Bonds receiving New Existing Rate GLWA Bonds. |
| Maturity Dates | The maturity date(s) of the New Existing Rate GLWA Bonds shall be the same as the existing maturity(ies) of each series of DWSD Bonds receiving New Existing Rate GLWA Bonds. |
| Prepayment | GLWA may prepay or redeem all or any portion of the New Existing Rate GLWA Bonds at any time at its option and without penalty or premium. |
| Operation and Maintenance Expenses | The "operations and maintenance expenses" of GLWA shall (i) include the amount of any lease payment payable to the City's General Fund; and (ii) be excluded from the liens securing the New Existing Rate GLWA Bonds. |
| Other Terms | The New Existing Rate GLWA Bonds otherwise shall have the same terms and conditions as the applicable DWSD Series of DWSD Bonds receiving New Existing Rate GLWA Bonds (to the extent not otherwise negotiated). |

---

[1]      Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan.

**EXHIBIT I.A.174**

NEW GLWA BONDS

SUMMARY OF PRINCIPAL TERMS

**NEW GLWA BONDS**
**SUMMARY OF PRINCIPAL TERMS[1]**

   If a DWSD Transaction is consummated, on the Effective Date, the GLWA shall issue the New GLWA Bonds, in one or more series, and distribute them as set forth in the Plan. The definitive documentation governing the New GLWA Bonds shall provide generally for the following terms:

| | |
|---|---|
| Obligations | The New GLWA Bonds shall be obligations of GLWA. |
| Principal | The principal shall be equal to the amount of each DWSD Series of DWSD Bonds receiving New GLWA Bonds, plus amounts necessary to pay expenses of the financing. |
| Interest Rate | The interest rate of the New GLWA Bonds shall be calculated by reference to the Interest Rate Reset Chart attached as Exhibit I.A.150 to the Plan. |
| Maturity Dates | The maturity date(s) of the New GLWA Bonds shall be the same as the existing maturity(ies) of each series of DWSD Series of DWSD Bonds receiving New GLWA Bonds. |
| Prepayment | GLWA may prepay or redeem all or any portion of the New GLWA Bonds at any time at its option and without penalty or premium. |
| Operation and Maintenance Expenses | The "operations and maintenance expenses" of GLWA shall (i) include the amount of any lease payment payable to the City's General Fund; and (ii) be excluded from the liens securing the New GLWA Bonds. |
| Other Terms | The New GLWA Bonds otherwise shall have the same terms and conditions as the applicable DWSD Series of DWSD Bonds receiving New GLWA Bonds. |

---

[1]   Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan.

**EXHIBIT I.A.176**

NEW GLWA REVOLVING BONDS

SUMMARY OF PRINCIPAL TERMS

**NEW GLWA REVOLVING BONDS**
**SUMMARY OF PRINCIPAL TERMS[1]**

      If a DWSD Transaction is consummated, on the Effective Date, the GLWA shall issue the New GLWA Revolving Bonds, in one or more series, and distribute them as set forth in the Plan. The definitive documentation governing the New GLWA Revolving Bonds shall provide generally for the following terms:

| | |
|---|---|
| Obligations | The New GLWA Revolving Bonds shall be obligations of GLWA. |
| Principal | The principal of the New GLWA Revolving Bonds shall be equal to the outstanding principal on the relevant existing DWSD Revolving Bonds. |
| Interest Rate | The interest rate of the New GLWA Revolving Bonds shall be calculated by reference to the Interest Rate Reset Chart attached as Exhibit I.A.150 to the Plan. |
| Maturity Dates | The maturity date(s) of the New GLWA Revolving Bonds shall be the same as the existing maturity(ies) of each series of DWSD Series of DWSD Revolving Bonds receiving New GLWA Revolving Bonds. |
| Prepayment | The GLWA may prepay or redeem all or any portion of the New GLWA Revolving Bonds at any time at its option and without penalty or premium. |

---

[1]    Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan.

**EXHIBIT I.A.182.a**

OPEB CLAIMS NOTE

SUMMARY OF PRINCIPAL TERMS

**OPEB CLAIMS NOTE**
**SUMMARY OF PRINCIPAL TERMS**[1]

On or as soon as practicable following the Effective Date, the City shall distribute the OPEB Claims Note to the Detroit VEBA established to provide health care benefits to Detroit VEBA Beneficiaries. The definitive documentation governing the OPEB Claims Note shall provide generally for the following terms:

| | |
|---|---|
| Principal | The principal of the OPEB Claims Note shall be $526.5 million, minus the aggregate amount paid or accrued by the City for OPEB Benefits during the period beginning on the Petition Date and ending on the later of the Effective Date or the date of formation for the Detroit VEBA. |
| Interest Rate | The OPEB Claims Note shall not pay interest. |
| Maturity | 20 years. |
| Prepayment | The City may prepay all or any portion of the OPEB Claims Note at any time at its option and without penalty or premium. |
| Amortization | Payable in 10 equal annual installments, such that, as of the 10th anniversary of issuance, the principal remaining is $100 million, which remainder shall be payable in 10 equal annual installments beginning on the 11 anniversary of issuance. |

---

[1]     Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan.

## EXHIBIT I.A.225

SCHEDULE OF SECURED GO BOND DOCUMENTS

## SCHEDULE OF SECURED GO BOND DOCUMENTS

| Secured GO Bond Documents | Series of Secured GO Bonds | Balance as of Petition Date |
|---|---|---|
| Resolution of the City Council adopted February 23, 2010<br><br>Finance Director's Order dated March 11, 2010<br><br>Master Debt Retirement Trust Indenture dated as of March 1, 2010, as supplemented and amended (the "Master Indenture"), between the City of Detroit and U.S. Bank National Association, as trustee | Distributable State Aid General Obligation Limited Tax Bonds, Series 2010 | $252,475,366 |
| Resolution of the City Council adopted July 20, 2010<br><br>Finance Director's Order dated December 9, 2010<br><br>Master Indenture | Distributable State Aid Second Lien Bonds (Unlimited Tax General Obligation), Series 2010(A) (Taxable-Recovery Zone Economic Development Bonds – Direct Payment) | $101,707,848 |
| Resolution of the City Council adopted March 27, 2012<br><br>Finance Director's Order dated March 28, 2012 (Series 2012(A2) and Series 2012(B2))<br><br>Finance Director's Order dated July 3, 2012 (Series 2012 (A2) and Series 2012(B2))<br><br>Finance Director's Order dated August 16, 2012 (Series 2012(A2-B), Series 2012 (A2) and Series 2012(B2))<br><br>Master Indenture | Self Insurance Distributable State Aid Third Lien Bonds (Limited Tax General Obligation), Series 2012(A2) | $39,254,171 |
| Resolution of the City adopted March 27, 2012<br><br>Finance Director's Order dated August 16, 2012 (Series 2012(A2-B), Series 2012 (A2) and Series 2012(B2))<br><br>Master Indenture | Self Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(A2-B) | $31,037,724 |

| Secured GO Bond Documents | Series of Secured GO Bonds | Balance as of Petition Date |
|---|---|---|
| Resolution of the City Council adopted March 27, 2012<br><br>Finance Director's Order dated March 28, 2012 (Series 2012(B))<br><br>Finance Director's Order dated July 3, 2012 (Series 2012(B))<br><br>Finance Director's Order dated August 16, 2012 (Series 2012(B))<br><br>Master Indenture | General Obligation Distributable State Aid Third Lien Capital Improvement Refunding Bonds (Limited Tax General Obligation), Series 2012(B) | $6,469,135 |
| Resolution of the City Council adopted March 27, 2012<br><br>Finance Director's Order dated March 28, 2012 (Series 2012(A2) and Series 2012(B2))<br><br>Finance Director's Order dated July 3, 2012 (Series 2012 (A2) and Series 2012(B2))<br><br>Finance Director's Order dated August 16, 2012 (Series 2012(A2-B), Series 2012 (A2) and Series 2012(B2))<br><br>Master Indenture | Self Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(B2) | $54,055,927 |

**EXHIBIT I.A.258**

SCHEDULE OF UNLIMITED TAX GENERAL OBLIGATION BOND
DOCUMENTS & RELATED UNLIMITED TAX GENERAL OBLIGATION BONDS

## SCHEDULE OF UNLIMITED TAX GENERAL OBLIGATION BOND
## DOCUMENTS & RELATED UNLIMITED TAX GENERAL OBLIGATION BONDS

| Unlimited Tax General Obligation Bond Documents | Series of Unlimited Tax General Obligation Bonds | Balance as of Petition Date |
|---|---|---|
| Resolution of the City Council adopted March 3, 1999<br><br>Finance Director's Order dated April 1, 1999 | Series 1999-A | $18,747,364 |
| Amended and Restated Resolution of the City Council adopted April 6, 2001 and Supplement No. 1 to Amended and Restated Resolution, adopted June 13, 2001 (collectively, "2001 UTGO Resolution")<br><br>Finance Director's Order dated August 1, 2001 ("2001 UTGO Sale Order") | Series 2001-A(1) | $78,787,556 |
| 2001 UTGO Resolution<br><br>2001 UTGO Sale Order | Series 2001-B | $4,063,616 |
| Resolution of the City Council adopted July 24, 2002<br><br>Finance Director's Order dated August 2, 2002 | Series 2002 | $6,745,767 |
| Resolution of the City Council adopted September 19, 2003<br><br>Finance Director's Order dated October 9, 2003 | Series 2003-A | $34,908,150 |
| Bond Authorizing Resolution adopted June 14, 2004 ("2004 UTGO Resolution")<br><br>Finance Director's Order dated August 27, 2004 ("2004 UTGO Sale Order") | Series 2004-A(1) | $39,872,258 |
| 2004 UTGO Resolution<br><br>2004 UTGO Sale Order | Series 2004-B(1) | $38,206,678 |
| 2004 UTGO Resolution<br><br>2004 UTGO Sale Order | Series 2004-B(2) | $736,241 |
| Resolution of the City Council adopted July 6, 2005 ("2005 UTGO Resolution")<br><br>Finance Director's Order dated December 5, 2005 ("2005 UTGO Sale Order") | Series 2005-B | $45,452,501 |
| 2005 UTGO Resolution<br><br>2005 UTGO Sale Order | Series 2005-C | $18,671,105 |

| Unlimited Tax General Obligation Bond Documents | Series of Unlimited Tax General Obligation Bonds | Balance as of Petition Date |
|---|---|---|
| Resolution of the City Council adopted November 17, 2006 ("2008 UTGO Resolution")<br><br>Finance Director's Order dated May 30, 2008 ("2008 UTGO Sale Order") | Series 2008-A | $59,487,564 |
| 2008 UTGO Resolution<br><br>2008 UTGO Sale Order | Series 2008-B(1) | $28,982,532 |

**EXHIBIT B**

SEWAGE DISPOSAL SYSTEM BONDS & RELATED DWSD REVOLVING SEWER BONDS

## DWSD SEWER BONDS & RELATED DWSD
## REVOLVING SEWER BONDS AS OF THE PETITION DATE

| Sewage Disposal System Revenue Bonds: | Bond Date | Amount Issued | Range of Interest Rates | Maturity Date | Balance as of Petition Date | Insurer | |
|---|---|---|---|---|---|---|---|
| Series 1998-A | 12-14-06 | $ 67,615,000 | 5.25 to 5.50 % | 7/1/12-23 | $ 62,764,670 | MBIA | b |
| Series 1998-B | 12-14-06 | 67,520,000 | 5.25 to 5.50 | 7/1/12-23 | 62,318,566 | MBIA | b |
| Series 1999-A (* *) | 12-1-99 | 33,510,118 | 0.00 | 7/1/12-21 | 55,576,628 | FGIC | |
| Series 2001-B | 9-15-01 | 110,550,000 | 5.50 | 7/1/23-29 | 110,833,190 | FGIC | |
| Series 2001-C (1) | 6-5-09 | 154,870,000 | 5.25 to 7.00 | 7/1/12-27 | 152,859,785 | Assured Guaranty | b |
| Series 2001-C (2) | 5-8-08 | 122,905,000 | 3.50 to 5.25 | 7/1/12-29 | 121,649,072 | FGIC/Berkshire Hathaway | b |
| Series 2001-D | 9-23-01 | 92,450,000 | Variable (a) | 7/1/32 | 21,316,121 | MBIA | b |
| Series 2001-E | 5-8-08 | 136,150,000 | 5.75 | 7/1/24-31 | 136,514,621 | FGIC/Berkshire Hathaway | b |
| Series 2003-A | 5-22-03 | 599,380,000 | 3.30 to 5.50 | 7/1/12-32 | 184,772,445 | Assured Guaranty | |
| Series 2003-B | 6-5-09 | 150,000,000 | 7.50 | 7/1/32-33 | 150,523,973 | Assured Guaranty | |
| Series 2004-A | 1-09-04 | 101,435,000 | 5.00 to 5.25 | 7/1/12-24 | 60,942,805 | Assured Guaranty | |
| Series 2005-A | 3-17-05 | 273,355,000 | 3.40 to 5.125 | 7/1/12-35 | 238,425,912 | MBIA | b |
| Series 2005-B | 3-17-05 | 40,215,000 | 3.40 to 5.50 | 7/1/12-22 | 37,286,604 | MBIA | |
| Series 2005-C | 3-17-05 | 63,160,000 | 5.00 | 7/1/12-25 | 49,695,460 | MBIA | b |
| Series 2006-A | 5-8-08 | 123,655,000 | 5.50 | 7/1/34-36 | 123,971,760 | FGIC/Berkshire Hathaway | b |
| Series 2006-B | 8-10-06 | 250,000,000 | 4.00 to 5.00 | 7/1/12-36 | 243,795,428 | FGIC | b |
| Series 2006-C | 8-10-06 | 26,560,000 | 5.00 to 5.25 | 7/1/16-18 | 26,622,841 | FGIC | b |
| Series 2006-D | 12-14-06 | 370,000,000 | Variable (a) | 7/1/12-32 | 288,885,311 | Assured Guaranty/FSA | b |
| Series 2012-A | 6-26-12 | 659,780,000 | 5.00 to 5.50 | 7/1/14-39 | 661,353,260 | Assured Guaranty | b |

**Total Sewage Disposal System Revenue Bonds**     <u>**$2,790,108,452**</u>

\* \* - Capital Appreciation Bonds
a - Interest rates are set periodically at the stated current market interest rate.
b - Indicates certain of bonds within series are callable under terms specified in the indenture; all other bonds are noncallable.

| DWSD Revolving Sewer Bonds: | Bond Date | Amount Issued | Range of Interest Rates | Maturity Date | Balance as of Petition Date |
|---|---|---|---|---|---|
| Series 1992-B-SRF | 9-10-92 | $ 1,915,000 | 2.00 % | 10/1/12-13 | $ 115,679 |
| Series 1993-B-SRF | 9-30-93 | 6,603,996 | 2.00 | 10/1/12-14 | 779,574 |
| Series 1997-B-SRF | 9-30-97 | 5,430,174 | 2.25 | 10/1/12-18 | 1,882,416 |
| Series 1999-SRF-1 | 6-24-99 | 21,475,000 | 2.50 | 4/1/13-20 | 8,814,549 |
| Series 1999-SRF-2 | 9-30-99 | 46,000,000 | 2.50 | 10/1/12-22 | 26,050,770 |
| Series 1999-SRF-3 | 9-30-99 | 31,030,000 | 2.50 | 10/1/12-20 | 14,400,455 |
| Series 1999-SRF-4 | 9-30-99 | 40,655,000 | 2.50 | 10/1/12-20 | 18,863,135 |
| Series 2000-SRF-1 | 3-30-00 | 44,197,995 | 2.50 | 10/1/12-22 | 22,109,906 |
| Series 2000-SRF-2 | 9-28-00 | 64,401,066 | 2.50 | 10/1/12-22 | 36,317,016 |
| Series 2001-SRF-1 | 6-28-01 | 82,200,000 | 2.50 | 10/1/12-24 | 54,544,430 |
| Series 2001-SRF-2 | 12-20-01 | 59,850,000 | 2.50 | 10/1/12-24 | 39,720,877 |
| Series 2002-SRF-1 | 6-27-02 | 18,985,000 | 2.50 | 4/1/13-23 | 10,738,639 |
| Series 2002-SRF-2 | 6-27-02 | 1,545,369 | 2.50 | 4/1/13-23 | 871,753 |
| Series 2002-SRF-3 | 12-19-02 | 31,549,466 | 2.50 | 10/1/12-24 | 19,331,028 |
| Series 2003-SRF-1 | 6-28-03 | 48,520,000 | 2.50 | 10/1/12-25 | 34,467,406 |
| Series 2003-SRF-2 | 9-25-03 | 25,055,370 | 2.50 | 4/1/13-25 | 16,511,283 |
| Series 2004-SRF-1 | 6-24-04 | 2,910,000 | 2.125 | 10/1/12-24 | 1,901,851 |
| Series 2004-SRF-2 | 6-24-04 | 18,353,459 | 2.125 | 4/1/13-25 | 11,963,005 |
| Series 2004-SRF-3 | 6-24-04 | 12,722,575 | 2.125 | 4/1/13-25 | 8,284,197 |
| Series 2007-SRF-1 | 9-20-07 | 156,687,777 | 1.625 | 10/1/12-29 | 140,784,514 |
| Series 2009-SRF-1 | 4-17-09 | 22,684,557 | 2.50 | 4/1/13-30 | 9,878,643 |
| Series 2010-SRF-1 | 1-22-10 | 6,793,631 | 2.50 | 4/1/13-31 | 3,383,696 |
| Series 2012-SRF | 8-30-12 | 14,950,000 | 2.50 | 10/1/15-34 | 4,332,541 |

**Total DWSD Revolving Sewer Bonds Payable**        <u>**$486,047,363**</u>

**EXHIBIT C**

WATER SYSTEM BONDS & RELATED DWSD REVOLVING WATER BONDS

# DWSD WATER BONDS & RELATED DWSD
## REVOLVING SEWER BONDS AS OF THE PETITION DATE

| Water Supply System Revenue Bonds: | Bond Date | Amount Issued | Range of Interest Rates | Maturity Date | Balance as of Petition Date | Insurer | |
|---|---|---|---|---|---|---|---|
| Series 1993 | 10-15-93 | $ 38,225,000 | 6.50% | 7/1/14-15 | $ 24,799,852 | FGIC | |
| Series 1997-A | 8-01-97 | 186,220,000 | 6.00 | 7/1/14-15 | 13,470,658 | MBIA | |
| Series 2001-A | 5-01-01 | 301,165,000 | 5.00 | 7/1/29-30 | 73,961,840 | FGIC | b |
| Series 2001-C | 5-08-08 | 190,405,000 | 3.50 to 5.75 | 7/1/12-29 | 188,732,240 | FGIC | b |
| Series 2003-A | 1-28-03 | 234,805,000 | 4.50 to 5.00 | 7/1/19-34 | 179,200,784 | MBIA | b |
| Series 2003-B | 1-28-03 | 41,770,000 | 5.00 | 7/1/34 | 41,867,273 | MBIA | b |
| Series 2003-C | 1-28-03 | 29,660,000 | 4.25 to 5.25; Some are Variable (a) | 7/1/13-22 | 27,717,476 | MBIA | b |
| Series 2003-D | 8-14-06 | 142,755,000 | 4.00 to 5.00 | 7/1/12-33 | 140,911,713 | MBIA | b |
| Series 2004-A | 8-14-06 | 72,765,000 | 3.75 to 5.25 | 7/1/12-25 | 68,762,674 | MBIA | b |
| Series 2004-B | 8-14-06 | 153,830,000 | 4.00 to 5.00 | 7/1/12-23 | 114,975,691 | MBIA | b |
| Series 2005-A | 3-11-05 | 105,000,000 | 3.40 to 5.00 | 7/1/12-35 | 88,581,161 | FGIC | b |
| Series 2005-B | 5-08-08 | 194,900,000 | 4.00 to 5.50 | 7/1/12-35 | 187,792,939 | FGIC | b |
| Series 2005-C | 3-11-05 | 126,605,000 | 5.00 | 7/1/12-22 | 109,459,313 | FGIC | b |
| Series 2006-A | 8-14-06 | 280,000,000 | 5.00 | 7/1/13-34 | 260,775,875 | Assured Guaranty/FSA | b |
| Series 2006-B | 4-1-09 | 120,000,000 | 3.00 to 7.00 | 7/1/12-36 | 120,067,563 | Assured Guaranty/FSA | b |
| Series 2006-C | 8-14-06 | 220,645,000 | 4.00 to 5.00 | 7/1/12-33 | 217,184,085 | Assured Guaranty/FSA | b |
| Series 2006-D | 8-14-06 | 146,590,000 | 4.00 to 5.00 | 7/1/12-32 | 142,532,444 | Assured Guaranty/FSA | b |
| Series 2011-A | 12-22-11 | 379,590,000 | 3.00 to 5.75 | 7/1/12-41 | 371,720,309 | N/A | b |
| Series 2011-B | 12-22-11 | 17,195,000 | 2.496 to 6.00 | 7/1/12-33 | 15,509,284 | N/A | b |
| Series 2011-C | 12-22-11 | 103,890,000 | 3.00 to 5.25 | 7/1/12-41 | 102,908,415 | N/A | b |

**Total Water System Revenue Bonds**     <u>**$2,490,931,589**</u>

a - Interest rates are set periodically at the stated current market interest rate.
b - Indicates certain of bonds within series are callable under terms specified in the indenture; all other bonds are noncallable.

| | Bond Date | Amount Issued | Range of Interest Rates | Maturity Date | Balance as of Petition Date |
|---|---|---|---|---|---|
| **DWSD Revolving Water Bonds:** | | | | | |
| Series 2005 SRF-1 | 9-22-05 | $13,805,164 | 2.125 % | 10/1/12-26 | $10,022,619 |
| Series 2005 SRF-2 | 9-22-05 | 8,891,730 | 2.125 | 10/1/12-26 | 6,280,869 |
| Series 2006 SRF-1 | 9-21-06 | 5,180,926 | 2.125 | 10/1/12-26 | 3,739,227 |
| Series 2008 SRF-1 | 9-29-08 | 2,590,941 | 2.500 | 10/1/12-26 | 1,547,272 |

**Total DWSD Revolving Water Bonds Payable**  <u>**$21,589,987**</u>

# EXHIBIT D

UNLIMITED TAX GENERAL OBLIGATION BONDS

# UNLIMITED TAX GENERAL OBLIGATION BONDS

## Unsecured Unlimited Tax General Obligation Bonds

| | Issue Date | Amount Issued | Range of Interest Rates | Maturity Date | Balance as of Petition Date | Insurer | |
|---|---|---|---|---|---|---|---|
| Series 1999-A | 4-1-99 | $28,020,000 | 5.00 to 5.25 % | 4/1/13-19 | $18,747,364 | Assured Guaranty | b |
| Series 2001-A(1) | 7-15-01 | 83,200,000 | 5.00 to 5.375 | 4/1/13-21 | 78,787,556 | MBIA | b |
| Series 2001-B | 7-15-01 | 23,235,000 | 5.375 | 4/1/13-14 | 4,063,616 | MBIA | b |
| Series 2002 | 8-2-02 | 29,205,000 | 4.00 to 5.13 | 4/1/13-22 | 6,745,767 | MBIA | b |
| Series 2003-A | 10-21-03 | 44,020,000 | 3.70 to 5.25 | 4/1/13-23 | 34,908,150 | Syncora | b |
| Series 2004-A(1) | 9-9-04 | 39,270,000 | 4.25 to 5.25 | 4/1/19-24 | 39,872,258 | Ambac | b |
| Series 2004-B(1) | 9-9-04 | 53,085,000 | 3.75 to 5.25 | 4/1/13-18 | 38,206,678 | Ambac | b |
| Series 2004-B(2) | 9-9-04 | 17,270,000 | 4.16 to 5.24 | 4/1/13-18 | 736,241 | Ambac | |
| Series 2005-B | 12-1-05 | 51,760,000 | 4.00 to 5.00 | 4/1/13-25 | 45,452,501 | Assured Guaranty | b |
| Series 2005-C | 12-1-05 | 30,805,000 | 4.00 to 5.25 | 4/1/13-20 | 18,671,105 | Assured Guaranty | a b |
| Series 2008-A | 6-9-08 | 58,630,000 | 4.00 to 5.00 | 4/1/14-28 | 59,487,564 | Assured Guaranty | b |
| Series 2008-B(1) | 6-9-08 | 66,475,000 | 5.00 | 4/1/13-18 | 28,982,532 | Assured Guaranty | |

### Total Unsecured Unlimited Tax General Obligation Bonds          $374,661,332

a - Interest rates are set periodically at the stated current market interest rate.
b - Indicates certain of bonds within series are callable under terms specified in the indenture; all other bonds are noncallable

## Secured Unlimited Tax General Obligation Bonds

| | Issue Date | Amount Issued | Range of Interest Rates | Maturity Date | Balance as of Petition Date | Insurer |
|---|---|---|---|---|---|---|
| Distributable State Aid 2010-A | 12/16/10 | $100,000,000 | 5.129 to 8.369 | 11/1/14-35 | 101,707,848 | N/A |

### Total Secured Unlimited Tax General Obligation Bonds          $101,707,848

### Total Unlimited Tax General Obligation Bonds          $476,369,180

## EXHIBIT E

LIMITED TAX GENERAL OBLIGATION BONDS

# LIMITED TAX GENERAL OBLIGATION BONDS

**Unsecured Limited Tax General Obligation Bonds**

| | Issue Date | Amount Issued | Range of Interest Rates | Maturity Date | Balance as of Petition Date | Insurer | |
|---|---|---|---|---|---|---|---|
| Self-Insurance Bonds: | | | | | | | |
| Series 2004 | 9-9-04 | 62,285,000 | 4.16 to 4.85 | 4/1/13-14 | $13,186,559 | Ambac | |
| General Obligation: | | | | | | | |
| Series 2005-A(1) | 6-24-05 | 73,500,000 | 4.27 to 5.15 | 4/1/13-25 | 60,776,168 | Ambac | b |
| Series 2005-A(2) | 6-24-05 | 13,530,000 | 3.50 to 5.00 | 4/1/12-25 | 11,080,060 | Ambac | b |
| Series 2005-B | 6-24-05 | 11,785,000 | 3.50 to 5.00 | 4/1/13-21 | 9,003,535 | Ambac | b |
| Series 2008-A(1) | 6-9-08 | 49,715,000 | 5.00 | 4/1/13-16 | 43,905,085 | N/A | |
| Series 2008-A(2) | 6-9-08 | 25,000,000 | 8.00 | 4/1/14 | 25,591,781 | N/A | |

**Total Unsecured Limited Tax General Obligation Bonds**     **$163,543,188**

a - Interest rates are set periodically at the stated current market interest rate.
b - Indicates certain of bonds within series are callable under terms specified in the indenture; all other bonds are noncallable.

**Secured Limited Tax General Obligation Bonds**

| | Issue Date | Amount Issued | Range of Interest Rates | Maturity Date | Balance as of Petition Date | Insurer |
|---|---|---|---|---|---|---|
| Distributable State Aid 2010 | 3/18/10 | 249,790,000 | 4.25 to 5.25 | 11/1/14-35 | 252,475,366 | N/A |
| Distributable State Aid 2012 | 8/23/12 | 129,520,000 | 3.00 to 5.00 | 11/1/14-32 | 130,827,617 | N/A |

**Total Secured Limited Tax General Obligation Bonds**     **$383,302,983**

**Total Limited Tax General Obligation Bonds**     **$546,846,171**

# EXHIBIT F

PREPETITION STEADY STATE PROJECTION OF LEGACY EXPENDITURES

# STEADY STATE PROJECTION OF LEGACY EXPENDITURES

($ in millions)

| | FISCAL YEAR ENDED ACTUAL | | | | | PRELIMINARY FORECAST | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2008** | **2009** | **2010** | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** | **2017** |
| **Legacy expenditures** | | | | | | | | | | |
| Debt Service (LTGO) | $(66.6) | $(106.2) | $(63.5) | $(64.5) | $(62.6) | $(70.8) | $(70.9) | $(61.8) | $(61.8) | $(38.5) |
| Debt Service (UTGO) | (67.2) | (71.5) | (72.4) | (72.8) | (73.0) | (70.6) | (64.9) | (62.5) | (57.6) | (57.6) |
| POC – Principal and Interest (GF) | (24.6) | (20.9) | (23.6) | (33.5) | (33.0) | (46.8) | (51.4) | (53.3) | (55.0) | (56.9) |
| POC – Principal and Interest (EF, excl. DDOT) | (1.8) | (1.4) | (1.5) | (1.8) | (2.0) | (5.3) | (5.9) | (6.1) | (6.4) | (6.6) |
| POC – Principal and Interest (DDOT) | (3.5) | (2.8) | (3.0) | (3.6) | (4.0) | (3.3) | (3.7) | (3.8) | (3.9) | (4.1) |
| POC – Swaps (GF) | (38.6) | (43.9) | (44.7) | (44.7) | (44.8) | (42.9) | (42.8) | (42.8) | (42.7) | (42.7) |
| POC – Swaps (EF, excl. DDOT) | (2.3) | (2.0) | (2.0) | (2.0) | (2.0) | (4.8) | (4.8) | (4.8) | (4.9) | (4.9) |
| POC – Swaps (DDOT) | (4.5) | (4.0) | (4.0) | (4.0) | (4.0) | (3.0) | (3.0) | (3.0) | (3.0) | (3.0) |
| Pension Contributions – Public Safety | (58.9) | (31.4) | (32.8) | (81.6) | (49.8) | (46.1) | (139.0) | (163.0) | (180.0) | (198.0) |
| Pension Contributions – Non-Public Safety | (10.6) | (27.0) | (11.1) | (28.3) | (25.4) | (19.9) | (36.9) | (42.5) | (47.7) | (53.1) |
| Pension Contributions – DDOT | (6.8) | (7.3) | (6.9) | (9.5) | (10.9) | (12.3) | (23.6) | (27.7) | (31.2) | (34.8) |
| Health Benefits – Retiree, Public Safety | (73.7) | (80.2) | (70.4) | (79.6) | (90.6) | (91.5) | (88.6) | (95.2) | (101.7) | (108.0) |
| Health Benefits – Retiree, Non-Public Safety | (47.4) | (51.6) | (50.6) | (49.0) | (49.2) | (49.7) | (38.8) | (41.5) | (44.6) | (47.7) |
| Health Benefits – Retiree, DDOT | (8.2) | (11.8) | (11.2) | (11.1) | (10.3) | (10.4) | (13.3) | (14.3) | (15.3) | (16.3) |
| **Total Legacy Expenditures** | $(414.6) | $(462.0) | $(397.9) | $(486.1) | $(461.6) | $(477.3) | $(587.6) | $(622.4) | $(655.9) | $(672.3) |
| **Total Revenues (excl. Financing Proceeds)** | $1,397.7 | $1,363.3 | $1,291.0 | $1,316.8 | $1,196.9 | $1,121.9 | $1,082.8 | $1,046.2 | $1,041.5 | $1,041.4 |
| **Total Legacy Expenditures as a % of Total Revenues** | 29.7% | 33.9% | 30.8% | 36.9% | 38.6% | 42.5% | 54.3% | 59.5% | 63.0% | 64.6% |

# EXHIBIT G

PREPETITION FISCAL YEAR 2014 FORECASTED CASH FLOW

# FISCAL YEAR 2014 FORECASTED CASH FLOW

| $ in millions | Forecast Jul 13 | Forecast Aug-13 | Forecast Sep-13 | Forecast Oct-13 | Forecast Nov-13 | Forecast Dec-13 | Forecast Jan-14 | Forecast Feb-14 | Forecast Mar-14 | Forecast Apr-14 | Forecast May-14 | Forecast Jun-14 | Forecast Fiscal Year 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Receipts** | | | | | | | | | | | | | |
| Property Taxes | $37.8 | $166.6 | $13.0 | $6.6 | $3.1 | $21.5 | $139.1 | $20.8 | $4.8 | 1.3 | $2.5 | $51.1 | $468.4 |
| Income & Utility Taxes | 28.7 | 22.7 | 22.3 | 28.3 | 22.7 | 22.3 | 28.3 | 23.5 | 22.7 | 28.3 | 22.3 | 22.7 | 294.7 |
| Gaming Taxes | 14.6 | 14.1 | 8.9 | 23.1 | 10.4 | 9.4 | 22.1 | 9.9 | 15.1 | 17.4 | 13.2 | 11.8 | 170.0 |
| Municipal Service Fee to Casinos | - | 7.6 | | | 4.0 | 4.0 | 1.8 | | | | | | 17.4 |
| State Revenue Sharing | 30.7 | - | 30.7 | - | 30.7 | - | 30.7 | - | 30.7 | - | 30.7 | - | 184.3 |
| Other Receipts | 27.2 | 25.8 | 25.9 | 32.9 | 26.3 | 25.9 | 32.9 | 27.1 | 26.3 | 32.9 | 25.9 | 26.3 | 335.9 |
| Refinancing Proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Operating Receipts** | **139.1** | **236.9** | **100.9** | **91.0** | **97.2** | **83.2** | **255.0** | **81.3** | **99.6** | **80.0** | **94.6** | **111.9** | **1,470.7** |
| **Operating Disbursements** | | | | | | | | | | | | | |
| Payroll, Taxes & Deductions | (31.0) | (26.6) | (26.6) | (35.5) | (26.6) | (26.6) | (31.0) | (26.6) | (26.6) | (35.5) | (26.6) | (26.6) | (345.6) |
| Benefits | (15.5) | (15.5) | (15.5) | (15.5) | (15.5) | (15.5) | (15.5) | (14.0) | (14.0) | (14.0) | (14.0) | (14.0) | (178.6) |
| Pension Contributions | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (175.9) |
| Subsidy Payments | (7.6) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (75.6) |
| Distributions – Tax Authorities | (14.8) | (72.4) | (40.0) | (5.7) | (1.0) | (1.3) | (57.3) | (20.9) | (14.0) | (1.7) | - | (24.0) | (253.1) |
| Distributions – UTGO | - | (12.0) | - | - | - | - | - | - | (44.9) | - | - | - | (56.9) |
| Distributions – DDA Increment | - | - | - | - | - | (8.0) | - | - | - | - | - | (1.0) | (9.0) |
| Income Tax Refunds | (2.5) | (2.7) | (0.6) | (0.3) | (1.5) | (1.0) | (0.6) | (0.3) | (0.4) | (2.3) | (1.2) | (3.7) | (17.0) |
| A/P and Other Disbursements | (36.3) | (37.9) | (29.3) | (37.1) | (30.1) | (25.6) | (40.8) | (23.0) | (33.5) | (39.7) | (30.0) | (30.0) | (393.2) |
| Sub-Total Operating Disbursements | (122.3) | (186.7) | (132.8) | (115.1) | (95.6) | (98.9) | (166.0) | (105.8) | (154.4) | (114.3) | (92.8) | (120.3) | (1,504.9) |
| POC and Debt-Related Payments | (7.4) | (4.2) | (5.8) | (8.5) | (7.3) | (15.4) | (7.3) | (4.2) | (5.7) | (51.9) | (7.3) | (39.1) | (164.2) |
| **Total Disbursements** | **(129.6)** | **(191.0)** | **(138.6)** | **(123.5)** | **(102.9)** | **(114.3)** | **(173.4)** | **(110.0)** | **(160.2)** | **(166.1)** | **(100.1)** | **(159.3)** | **(1,669.1)** |
| **Net Cash Flow** | **9.5** | **45.9** | **(37.7)** | **(32.6)** | **(5.7)** | **(31.1)** | **(81.6)** | **(28.7)** | **(60.6)** | **(86.1)** | **(5.5)** | **(47.4)** | **(198.5)** |
| Cumulative Net Cash Flow | 9.5 | 55.4 | 17.7 | (14.9) | (20.6) | (51.7) | 29.9 | 1.1 | (59.4) | (145.6) | (151.0) | (198.5) | |
| Beginning Cash Balance | 33.8 | 43.3 | 89.2 | 51.5 | 18.9 | 13.2 | (17.9) | 63.7 | 34.9 | 25.6 | (111.8) | (117.2) | 33.8 |
| Net Cash Flow | 9.5 | 45.9 | (37.7) | (32.6) | (5.7) | (31.1) | 81.6 | (28.7) | (60.6) | (86.1) | (5.5) | (47.4) | (198.5) |
| **Cash Before Required Distributions** | **$43.3** | **$89.2** | **$51.5** | **$18.9** | **$13.2** | **$(17.9)** | **$63.7** | **$34.9** | **$(25.6)** | **$(111.8)** | **$(117.2)** | **$(164.7)** | **$(164.7)** |
| Accumulated Property Tax Distributions | (29.8) | (55.4) | (24.0) | (22.7) | (23.7) | (38.6) | (86.5) | (82.2) | (27.1 ) | (26.5) | (28.5) | (19.7) | (19.7) |
| **Cash Net of Distributions** | **$13.5** | **$33.8** | **$27.4** | **$(3.8)** | **$(10.5)** | **$(56.5)** | **$22.8** | **$(47.2)** | **$(52.7)** | **$(138.2)** | **$(145.7)** | **$(184.4)** | **$(184.4)** |
| Memo: | | | | | | | | | | | | | |
| Accumulated Deferrals | (119.3) | (112.4) | (112.8) | (113.5) | (113.9) | (114.4) | (115.0) | (115.5) | (116.0) | (116.6) | (117.1) | (117.6) | (117.6) |
| Refunding Bond Proceeds in Escrow | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 |
| Reimbursements Owed to Other funds | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd |

# EXHIBIT H

PREPETITION PROJECTED REVENUES, EXPENDITURES, OPERATING
SURPLUSES, LEGACY OBLIGATIONS & DEFICITS THROUGH FISCAL YEAR 2017

**PROJECTED REVENUES, EXPENDITURES, OPERATING**
**SURPLUSES, LEGACY OBLIGATIONS & DEFICITS THROUGH FISCAL YEAR 2017**

($ in millions)

| | FISCAL YEAR ENDED ACTUAL | | | | | PRELIMINARY FORECAST | | | | | 5-YEAR TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | |
| **Revenues** | | | | | | | | | | | |
| Municipal Income Tax | $276.5 | $240.8 | $216.5 | $228.3 | $233.0 | $238.7 | $243.4 | $247.3 | $249.0 | $250.7 | $1,229.1 |
| State Revenue Sharing | 249.6 | 266.6 | 263.6 | 239.3 | 173.3 | 182.8 | 184.3 | 186.1 | 187.9 | 189.5 | 930.4 |
| Wagering Taxes | 180.4 | 173.0 | 183.3 | 176.9 | 181.4 | 173.0 | 170.0 | 168.3 | 170.0 | 171.7 | 853.0 |
| Sales & Charges for Services | 191.3 | 166.7 | 154.1 | 155.0 | 145.4 | 120.4 | 124.8 | 119.4 | 118.2 | 117.0 | 599.7 |
| Property Taxes | 155.2 | 163.7 | 143.0 | 182.7 | 147.8 | 134.9 | 118.4 | 110.2 | 105.7 | 100.8 | 570.0 |
| Utility Users & Other Taxes | 73.0 | 71.5 | 64.8 | 64.8 | 57.1 | 54.8 | 47.2 | 40.9 | 40.9 | 41.3 | 225.0 |
| Other Revenue | 156.9 | 142.7 | 134.2 | 152.4 | 125.5 | 93.4 | 75.6 | 55.8 | 55.8 | 55.9 | 336.4 |
| General Fund Reimbursements | 34.7 | 55.7 | 47.6 | 32.3 | 47.6 | 31.2 | 30.3 | 30.3 | 30.3 | 30.3 | 152.2 |
| Transfers in (UTGO Millage & Non-General Fund POCs) | 80.1 | 82.5 | 83.8 | 85.1 | 85.8 | 92.8 | 89.0 | 87.9 | 83.8 | 84.4 | 438.0 |
| **Total Revenues** | 1,397.7 | 1,363.3 | 1,291.0 | 1,316.8 | 1,196.9 | 1,121.9 | 1,082.8 | 1,046.2 | 1,041.5 | 1,041.4 | 5,333.8 |
| **Expenditures** | | | | | | | | | | | |
| Salaries/Overtime/Fringe | (509.9) | (506.6) | (466.4) | (454.8) | (431.5) | (357.3) | (341.5) | (341.9) | (346.4) | (352.5) | (1,739.7) |
| Health Benefits – Active | (49.9) | (54.4) | (70.8) | (64.6) | (54.3) | (43.1) | (51.2) | (54.0) | (57.1) | (61.0) | (266.7) |
| Other Operating Expenses | (551.2) | (464.3) | (427.5) | (368.2) | (371.3) | (291.6) | (292.9) | (288.2) | (295.9) | (301.5) | (1,470.2) |
| Operating Expenditures | (1,111.1) | (1,025.3) | (964.7) | (887.5) | (857.1) | (692.0) | (685.7) | (684.1) | (699.7) | (715.0) | (3,476.6) |
| **Net Operating Surplus** | 286.7 | 338.0 | 326.3 | 429.2 | 339.8 | 429.9 | 397.2 | 362.0 | 341.8 | 326.3 | 1,857.2 |
| Debt Service (LTGO & UTGO) | (133.8) | (177.6) | (135.9) | (137.3) | (135.6) | (141.4) | (135.9) | (124.4) | (119.4) | (96.1) | (617.2) |
| POC – Principal & Interest | (29.8) | (25.1) | (28.1) | (38.9) | (39.0) | (55.4) | (61.0) | (63.2) | (65.4) | (67.6) | (312.6) |
| POC Swaps | (45.3) | (49.9) | (50.7) | (50.7) | (50.7) | (50.6) | (50.6) | (50.6) | (50.6) | (50.6) | (253.1) |
| Pension Contributions | (76.3) | (65.7) | (50.8) | (119.5) | (86.1) | (78.3) | (199.5) | (233.1) | (258.9) | (285.9) | (1,055.8) |
| Health Benefits – Retiree | (129.3) | (143.7) | (132.3) | (139.7) | (150.1) | (151.6) | (140.7) | (151.1) | (161.6) | (172.0) | (776.9) |
| Legacy Expenditures | (414.6) | (462.0) | (397.9) | (486.1) | (461.6) | (477.3) | (587.6) | (622.4) | (655.9) | (672.3) | (3,015.6) |
| **Deficit (excl. Financing Proceeds)** | (127.9) | (124.1) | (71.7) | (56.9) | (121.8) | (47.4) | (190.5 ) | (260.4) | (314.1) | (346.0) | (1,158.4) |
| Financing Proceeds | 75.0 | - | 250.0 | - | - | 137.0 | - | - | - | - | 137.0 |
| **Total Surplus (deficit)** | $(52.9) | $(124.1) | $178.3 | $(56.9) | $(121.8) | $89.6 | $(190.5) | $(260.4) | $(314.1) | $(346.0) | $(1,021.4) |
| Accumulated Unrestricted General Fund Deficit | $(219.2) | $(331.9) | $(155.7) | $(196.6) | $(326.6) | $(237.0) | $(427.5) | $(687.9) | $(1,002.0) | $(1,348.0) | |

**\*Note:** The above projections were prepared based solely on the City's levels of operating expenses and capital expenditures as of the Petition Date and do not account for (i) increases in expenditures necessary to restore City services to adequate levels, (ii) additional investment by the City in services, assets or infrastructure or (iii) any changes to legacy liabilities.

**EXHIBIT I**

TEN-YEAR SUMMARY OF RESTRUCTURING INITIATIVES

# City of Detroit

Ten-Year Plan of Adjustment

Restructuring and Reinvestment Initiatives

**City of Detroit**
Ten-Year Plan of Adjustment
Restructuring and Reinvestment Initiatives
Table of Contents

**Page**

- Restructuring and Reinvestment Initiatives (Consolidated) ... 3
  - Consolidated - General Fund ... 4
- Restructuring and Reinvestment Initiatives - Consolidated by Department ... 5
  - Revenue ... 6
  - Operating Expenditures ... 7
  - Technology Infrastructure ... 8
  - Capital Expenditures ... 9
  - Other Infrastructure ... 10
  - Reorganization Costs ... 11
  - Surplus / (Deficit) ... 12
  - Incremental Headcount ... 13

Restructuring Initiatives by Department

- **Executive Agencies - Department Detail** ... 14
  - Department of Administrative Hearings (DAH) ... 15-16
  - Finance Department (Finance) ... 17-18
  - Fire Department (DFD) ... 19-20
  - General Services Department (GSD) ... 21-22
  - Human Resources Department (HR) ... 23-24
  - Human Resources Department - Labor Relations Division (LR) ... 25-26
  - Human Rights / Board of Ethics Department (Human Rights) ... 27-28
  - Law Department (Law) ... 29-30
  - Mayor's Office ... 31-32
  - Planning and Development Department (PDD) ... 33-34
  - Police Department (DPD) ... 35-36
  - Department of Public Works (DPW) ... 37-38
  - Recreation Department ... 39-40
  - Department of Health & Wellness Promotion (DHWP) ... 41-42
- **Legislative Agencies - Department Detail** ... 43
  - Auditor General (AG) and Inspector General (IG) ... 44-45
  - Board of Zoning Appeals (BZA) ... 46-47
  - City Clerk ... 48-49
  - City Council ... 50-51
  - Department of Elections (Elections) ... 52-53
  - Ombudsperson ... 54-55
- **Judicial Agencies - Department Detail** ... 56
  - 36th District Court (36D) ... 57-58
- **Enterprise Agencies - Department Detail** ... 59
  - Airport ... 60-61
  - Building Safety Engineering and Environmental Department (BSEED) ... 62-63
  - Detroit Department of Transportation (DDOT) ... 64-65
  - Municipal Parking Department (Parking) ... 66-67
- **Other - Detail** ... 68
  - Blight/Demolition ... 69-70

2 of 70

13-53846-swr   Doc 8709   Filed 12/16/14   Entered 12/16/14 10:59:30   Page 287 of 440

# City of Detroit

Ten-Year Plan of Adjustment

Restructuring and Reinvestment Initiatives - Consolidated

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives**
**Consolidated - General Fund**
*($ in millions)*

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2. | a. Increased Collection Rate | 2.6 | 12.6 | 15.0 | 18.3 | 18.6 | 18.9 | 19.2 | 19.5 | 19.8 | 20.1 | 164.7 |
| 3. | b. Collection of Past Due | 1.5 | 4.9 | 5.7 | 2.5 | - | - | - | - | - | - | 14.7 |
| 4. | Pricing/Fees | 0.4 | 10.0 | 15.5 | 16.8 | 21.5 | 23.2 | 27.3 | 26.8 | 30.9 | 31.8 | 204.1 |
| 5. | Grant Revenue | 6.1 | 46.6 | (0.7) | 11.5 | 12.2 | (0.2) | (0.2) | (0.2) | (0.1) | (0.1) | 74.9 |
| 6. | Other | (0.1) | 3.9 | 3.9 | 4.0 | 3.9 | 4.0 | (0.1) | (0.1) | (0.1) | - | 19.2 |
| 7. | **Total Revenues** | 10.6 | 78.0 | 39.3 | 53.0 | 56.2 | 45.8 | 46.2 | 46.1 | 50.6 | 51.8 | 477.6 |
| | | | | | | | | | | | | |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | (6.4) | (28.8) | (21.3) | (21.4) | (16.8) | (14.8) | (16.5) | (15.1) | (16.3) | (16.1) | (173.4) |
| 9. | Professional & Contract Services | (0.3) | 0.3 | 0.5 | 0.5 | 0.4 | 0.4 | 0.3 | 0.3 | 0.3 | 0.2 | 2.9 |
| 10. | Labor Costs / Service Contracts | (6.7) | (28.5) | (20.8) | (20.8) | (16.4) | (14.4) | (16.2) | (14.7) | (16.0) | (15.9) | (170.5) |
| 11. | Active Benefits | (3.1) | (14.3) | (11.6) | (13.8) | (11.0) | (10.0) | (10.8) | (9.8) | (10.4) | (10.3) | (104.9) |
| 12. | Training | 0.9 | (10.1) | 9.6 | (5.2) | (5.2) | (5.1) | (4.8) | (5.1) | (5.2) | (4.7) | (55.9) |
| 13. | Materials and Supplies | (5.3) | (7.9) | (10.9) | (10.1) | (8.2) | (9.2) | (9.1) | (9.6) | (10.1) | (10.6) | (91.1) |
| 14. | Utilities | (0.2) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (2.6) |
| 15. | Purchased services | (6.8) | (96.0) | (100.6) | (100.4) | (100.4) | (100.4) | (0.5) | (0.5) | (0.5) | (0.5) | (506.5) |
| 16. | Risk management / insurance | 0.0 | 2.1 | 6.1 | 6.1 | 6.1 | 6.1 | 6.1 | 6.1 | 6.1 | 6.1 | 50.7 |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | (0.6) | (2.1) | 2.5 | 3.3 | 2.9 | 3.8 | 3.9 | 3.4 | 3.9 | 4.0 | 25.0 |
| 19. | Grant related expenses | (2.3) | (18.0) | - | - | - | - | - | - | - | - | (20.3) |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | (0.7) | 1.0 | 1.0 | 1.0 | 1.0 | 0.9 | 1.0 | 1.0 | 1.0 | 1.1 | 8.2 |
| 22. | **Total Operating Expenditures** | (26.6) | (174.1) | (144.2) | (140.2) | (131.5) | (128.6) | (30.7) | (29.5) | (31.5) | (31.2) | (867.9) |
| | | | | | | | | | | | | |
| 23. | **Total Operating Surplus (Deficit)** | $ (16.1) | $ (96.1) | $ (104.8) | $ (87.2) | $ (75.3) | $ (82.8) | $ 15.5 | $ 16.6 | $ 19.1 | $ 20.6 | $ (390.3) |
| | | | | | | | | | | | | |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | (13.3) | (53.8) | (20.3) | (7.8) | (9.9) | (10.5) | (7.4) | (8.8) | (8.8) | (7.5) | (148.0) |
| 25. | Capital Expenditures | (24.1) | (41.9) | (27.0) | (29.0) | (22.9) | (22.8) | (17.8) | (18.4) | (18.1) | (18.1) | (240.1) |
| 26. | Other Infrastructure | (28.5) | (29.8) | (23.2) | (19.4) | (19.2) | (18.4) | (18.3) | (17.9) | (16.4) | (16.1) | (207.1) |
| 27. | Reorganization Costs | (6.3) | (12.3) | (5.6) | (0.9) | (1.2) | (1.0) | (2.6) | (1.8) | (1.2) | (1.0) | (33.9) |
| 28. | **Total Reorganization / Reinvestment** | (72.2) | (137.8) | (76.1) | (57.1) | (53.2) | (52.7) | (46.2) | (46.9) | (44.5) | (42.7) | (629.2) |
| | | | | | | | | | | | | |
| 29. | **Total Surplus (Deficit)** | $ (88.2) | $ (233.9) | $ (180.9) | $ (144.3) | $ (128.5) | $ (135.4) | $ (30.7) | $ (30.2) | $ (25.4) | $ (22.0) | $ (1,019.5) |
| | | | | | | | | | | | | |
| 30. | **Incremental Headcount (FTE)** | 451 | 568 | 485 | 634 | 642 | 616 | 607 | 591 | 597 | 598 | 598 |

For the Fiscal Year Ended

# City of Detroit

Ten-Year Plan of Adjustment

Restructuring and Reinvestment Initiatives - Consolidated by Department

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Consolidated by Department**
**Revenues**
*($ in millions)*

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **EXECUTIVE AGENCIES** | | | | | | | | | | | |
| Administrative Hearings | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Finance | 3.1 | 7.9 | 8.4 | 8.7 | 6.2 | 6.3 | 6.3 | 6.3 | 6.3 | 6.3 | 65.8 |
| Fire | 2.0 | 8.1 | 6.6 | 18.3 | 19.0 | 6.7 | 6.6 | 6.6 | 6.6 | 6.6 | 87.0 |
| General Services | 1.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 20.3 |
| Human Resources | - | - | - | - | - | - | - | - | - | - | - |
| Labor Relations | - | - | - | - | - | - | - | - | - | - | - |
| Human Rights / Board of Ethics | - | - | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 0.3 | 0.4 | 0.4 | 2.5 |
| Human Services | - | - | - | - | - | - | - | - | - | - | - |
| Law | - | - | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 4.4 |
| Mayor's Office | - | - | - | - | - | - | - | - | - | - | - |
| Planning & Development | - | - | - | - | - | - | - | - | - | - | - |
| Police | - | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 32.6 |
| Public Lighting | - | - | - | - | - | - | - | - | - | - | - |
| Public Works (Solid Waste) | - | - | - | - | - | - | - | - | - | - | - |
| Recreation | - | - | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.5 |
| DHWP (Vital Records) | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | |
| **LEGISLATIVE AGENCIES** | | | | | | | | | | | |
| Auditor General / Inspector General | - | - | - | - | - | - | - | - | - | - | |
| Board of Zoning Appeals | - | - | - | - | - | - | - | - | - | - | |
| City Clerk | - | - | - | - | - | - | - | - | - | - | |
| City Council | - | - | - | - | - | - | - | - | - | - | |
| Election Commission | - | - | - | - | - | - | - | - | - | - | |
| Ombudsperson | - | - | - | - | - | - | - | - | - | - | |
| | | | | | | | | | | | |
| **JUDICIAL AGENCY** | | | | | | | | | | | - |
| 36th District Court | - | 5.8 | 8.2 | 8.5 | 8.7 | 9.0 | 9.2 | 9.5 | 9.8 | 10.1 | 78.8 |
| | | | | | | | | | | | - |
| **ENTERPRISE AGENCIES** | | | | | | | | | | | |
| Airport | - | - | - | - | - | - | - | - | - | - | |
| Buildings and Safety | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 1.7 |
| DDOT - Transportation | (1.7) | (5.7) | (1.5) | (0.1) | 4.6 | 6.3 | 10.4 | 10.0 | 14.1 | 15.0 | 51.4 |
| Municipal Parking | - | 5.6 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 60.3 |
| | | | | | | | | | | | - |
| **OTHER** | | | | | | | | | | | - |
| Blight | 6.0 | 50.3 | 4.0 | 4.0 | 4.0 | 4.0 | - | - | - | - | 72.3 |
| | | | | | | | | | | | |
| **TOTAL** | $ 10.6 | $ 78.0 | $ 39.3 | $ 53.0 | $ 56.2 | $ 45.8 | $ 46.2 | $ 46.1 | $ 50.6 | $ 51.8 | $ 477.6 |

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Consolidated by Department**
**Operating Expenditures**
*($ in millions)*

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **EXECUTIVE AGENCIES** | | | | | | | | | | | |
| Administrative Hearings | $ - | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.1 |
| Finance | (2.3) | (7.5) | (4.3) | (4.3) | (1.7) | (2.2) | (2.7) | (3.2) | (3.6) | (4.1) | (35.8) |
| Fire | (2.7) | (12.6) | (6.1) | (7.6) | (0.7) | 2.8 | 1.1 | 3.9 | 2.9 | 4.6 | (14.4) |
| General Services | (5.4) | (14.4) | (14.4) | (14.5) | (14.6) | (14.7) | (14.8) | (14.9) | (15.0) | (15.1) | (137.7) |
| Human Resources | (0.1) | (3.2) | (3.2) | (3.2) | (3.2) | (3.3) | (3.3) | (3.4) | (3.4) | (3.5) | (29.7) |
| Labor Relations | - | (0.3) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.9) | (0.9) | (0.9) | (7.1) |
| Human Rights / Board of Ethics | - | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.7) | (0.7) | (0.7) | (5.7) |
| Human Services | - | - | - | - | - | - | - | - | - | - | - |
| Law | (1.1) | 0.4 | 0.3 | 0.3 | 0.3 | 0.2 | 0.2 | 0.1 | 0.1 | 0.0 | 0.8 |
| Mayor's Office | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.3) |
| Planning & Development | (0.6) | (1.2) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.1) | (1.1) | (1.1) | (10.0) |
| Police | (5.7) | (16.1) | (18.1) | (11.0) | (9.9) | (10.1) | (9.9) | (9.7) | (10.1) | (9.9) | (110.4) |
| Public Lighting | - | - | - | - | - | - | - | - | - | - | - |
| Public Works (Solid Waste) | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.3) |
| Recreation | - | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.9) |
| DHWP (Vital Records) | (0.3) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (1.8) |
| | | | | | | | | | | | - |
| **LEGISLATIVE AGENCIES** | | | | | | | | | | | |
| Auditor General / Inspector General | (0.0) | (0.4) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (4.4) |
| Board of Zoning Appeals | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| City Clerk | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 2.2 |
| City Council | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 4.3 |
| Election Commission | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.4 |
| Ombudsperson | - | (0.6) | (1.0) | (1.1) | (1.1) | (1.1) | (1.1) | (1.1) | (1.2) | (1.2) | (9.5) |
| | | | | | | | | | | | - |
| **JUDICIAL AGENCY** | | | | | | | | | | | |
| 36th District Court | 0.7 | 2.5 | 3.1 | 3.1 | 3.2 | 3.3 | 3.4 | 3.4 | 3.5 | 3.6 | 29.8 |
| | | | | | | | | | | | - |
| **ENTERPRISE AGENCIES** | | | | | | | | | | | - |
| Airport | (0.2) | (1.3) | (1.1) | (0.7) | (0.7) | (0.7) | (0.7) | (0.8) | (0.8) | (0.8) | (7.9) |
| Buildings and Safety | (0.6) | (2.1) | 2.6 | 3.4 | 3.0 | 3.8 | 3.9 | 3.5 | 4.0 | 4.1 | 25.7 |
| DDOT - Transportation | (1.4) | (3.4) | 0.8 | (2.2) | (3.5) | (4.1) | (4.1) | (4.7) | (5.2) | (6.1) | (33.8) |
| Municipal Parking | (0.1) | (0.5) | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (1.0) |
| | | | | | | | | | | | - |
| **OTHER** | | | | | | | | | | | |
| Blight | (7.3) | (113.0) | (100.0) | (100.0) | (100.0) | (100.0) | - | - | - | - | (520.3) |
| | | | | | | | | | | | |
| **TOTAL** | $ (26.6) | $ (174.1) | $ (144.2) | $ (140.2) | $ (131.5) | $ (128.6) | $ (30.7) | $ (29.5) | $ (31.5) | $ (31.2) | $ (867.9) |

# City of Detroit

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Consolidated by Department**
**Technology Infrastructure**
*($ in millions)*

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **EXECUTIVE AGENCIES** | | | | | | | | | | | |
| Administrative Hearings | $ - | $ (0.5) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ (0.5) |
| Finance | (9.82) | (35.92) | (8.38) | (4.34) | (6.45) | (6.62) | (4.15) | (5.25) | (5.48) | (4.15) | (90.6) |
| Fire | (0.74) | (0.61) | (0.17) | (0.17) | (0.17) | (0.81) | (0.17) | (0.40) | (0.17) | (0.17) | (3.6) |
| General Services | - | - | - | - | - | - | - | - | - | - | - |
| Human Resources | - | (0.50) | (0.10) | (0.10) | (0.10) | (0.10) | (0.10) | (0.10) | (0.10) | (0.10) | (1.3) |
| Labor Relations | - | - | - | - | - | - | - | - | - | - | - |
| Human Rights / Board of Ethics | - | (0.10) | - | - | - | - | - | - | - | - | (0.1) |
| Human Services | - | - | - | - | - | - | - | - | - | - | - |
| Law | (0.50) | - | - | - | - | - | - | - | - | - | (0.5) |
| Mayor's Office | - | - | - | - | - | - | - | - | - | - | - |
| Planning & Development | (0.25) | (0.30) | (0.03) | (0.03) | (0.03) | (0.03) | (0.03) | (0.03) | (0.03) | (0.03) | (0.8) |
| Police | (1.91) | (11.15) | (10.23) | (2.16) | (2.16) | (2.16) | (2.16) | (2.16) | (2.16) | (2.16) | (38.4) |
| Public Lighting | - | - | - | - | - | - | - | - | - | - | - |
| Public Works (Solid Waste) | - | - | - | - | - | - | - | - | - | - | - |
| Recreation | - | - | - | - | - | - | - | - | - | - | - |
| DHWP (Vital Records) | - | - | - | - | - | - | - | - | - | - | - |
| **LEGISLATIVE AGENCIES** | | | | | | | | | | | |
| Auditor General / Inspector General | (0.02) | (0.12) | (0.02) | (0.02) | (0.02) | (0.02) | (0.02) | (0.02) | (0.02) | (0.02) | (0.3) |
| Board of Zoning Appeals | - | - | - | - | - | - | - | - | - | - | - |
| City Clerk | - | - | - | - | - | - | - | - | - | - | - |
| City Council | (0.05) | (0.02) | (0.02) | (0.02) | (0.02) | (0.02) | (0.02) | (0.02) | (0.02) | (0.02) | (0.2) |
| Election Commission | (0.03) | - | - | - | - | - | - | - | - | - | (0.0) |
| Ombudsperson | - | (3.00) | (0.54) | (0.55) | (0.56) | (0.57) | (0.58) | (0.59) | (0.61) | (0.62) | (7.6) |
| **JUDICIAL AGENCY** | | | | | | | | | | | |
| 36th District Court | - | (1.60) | (0.80) | (0.40) | (0.40) | (0.20) | (0.20) | (0.20) | (0.20) | (0.20) | (4.2) |
| **ENTERPRISE AGENCIES** | | | | | | | | | | | |
| Airport | - | (0.01) | - | - | - | - | - | - | - | - | (0.0) |
| Buildings and Safety | - | - | - | - | - | - | - | - | - | - | - |
| DDOT - Transportation | - | - | - | - | - | - | - | - | - | - | - |
| Municipal Parking | - | - | - | - | - | - | - | - | - | - | - |
| **OTHER** | | | | | | | | | | | |
| Blight | - | - | - | - | - | - | - | - | - | - | - |
| **TOTAL** | $ (13.3) | $ (53.8) | $ (20.3) | $ (7.8) | $ (9.9) | $ (10.5) | $ (7.4) | $ (8.8) | $ (8.8) | $ (7.5) | $ (148.0) |

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Consolidated by Department**
**Capital Expenditures**
*($ in millions)*

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | For the Fiscal Year Ended | | | | | | |
| **EXECUTIVE AGENCIES** | | | | | | | | | | | |
| Administrative Hearings | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Finance | - | - | - | - | - | - | - | - | - | - | - |
| Fire | (5.5) | (11.0) | (7.4) | (10.5) | (5.8) | (12.7) | (4.8) | (5.6) | (5.5) | (5.5) | (74.3) |
| General Services | (6.1) | (5.9) | (4.1) | (4.2) | (4.5) | (4.3) | (4.3) | (4.5) | (4.4) | (4.4) | (46.6) |
| Human Resources | - | - | (1.0) | - | - | - | - | - | - | - | (1.0) |
| Labor Relations | - | - | - | - | - | - | - | - | - | - | - |
| Human Rights / Board of Ethics | - | - | - | - | - | - | - | - | - | - | - |
| Human Services | - | - | - | - | - | - | - | - | - | - | - |
| Law | - | - | - | - | - | - | - | - | - | - | - |
| Mayor's Office | - | - | - | - | - | - | - | - | - | - | - |
| Planning & Development | - | - | - | - | - | - | - | - | - | - | - |
| Police | (8.9) | (6.5) | (3.5) | (0.1) | (0.5) | (0.2) | (3.3) | (3.1) | (3.0) | (3.0) | (32.1) |
| Public Lighting | - | - | - | - | - | - | - | - | - | - | - |
| Public Works (Solid Waste) | - | - | - | - | - | - | - | - | - | - | - |
| Recreation | (0.9) | (8.9) | (3.1) | (3.3) | (3.0) | (4.0) | (4.3) | (4.0) | (4.0) | (4.0) | (39.5) |
| DHWP (Vital Records) | - | (5.1) | - | - | - | - | - | - | - | - | (5.1) |
| | | | | | | | | | | | |
| **LEGISLATIVE AGENCIES** | | | | | | | | | | | |
| Auditor General / Inspector General | - | - | - | - | - | - | - | - | - | - | - |
| Board of Zoning Appeals | - | - | - | - | - | - | - | - | - | - | - |
| City Clerk | - | - | - | - | - | - | - | - | - | - | - |
| City Council | - | - | - | - | - | - | - | - | - | - | - |
| Election Commission | (0.6) | (0.6) | - | - | - | - | (0.5) | (0.5) | (0.5) | (0.5) | (3.3) |
| Ombudsperson | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | |
| **JUDICIAL AGENCY** | | | | | | | | | | | |
| 36th District Court | - | (1.0) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (5.0) |
| | | | | | | | | | | | |
| **ENTERPRISE AGENCIES** | | | | | | | | | | | |
| Airport | - | (0.4) | (5.0) | (7.8) | (7.5) | - | - | - | - | - | (20.7) |
| Buildings and Safety | - | (0.4) | - | - | - | - | - | - | - | - | (0.4) |
| DDOT - Transportation | (1.6) | (2.0) | (2.3) | (2.5) | (1.0) | (1.0) | - | - | - | - | (10.3) |
| Municipal Parking | (0.5) | (0.2) | (0.1) | (0.1) | (0.1) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (2.0) |
| | | | | | | | | | | | |
| **OTHER** | | | | | | | | | | | |
| Blight | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | |
| **TOTAL** | $ (24.1) | $ (41.9) | $ (27.0) | $ (29.0) | $ (22.9) | $ (22.8) | $ (17.8) | $ (18.4) | $ (18.1) | $ (18.1) | $ (240.1) |

# City of Detroit

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Consolidated by Department**
**Other Infrastructure**
*($ in millions)*

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | For the Fiscal Year Ended | | | | | | |
| **EXECUTIVE AGENCIES** | | | | | | | | | | | |
| Administrative Hearings | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Finance | - | - | - | - | - | - | - | - | - | - | - |
| Fire | (9.7) | (8.6) | (9.6) | (6.1) | (5.8) | (5.0) | (5.0) | (4.6) | (3.0) | (2.7) | (60.0) |
| General Services | (5.9) | (5.7) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (16.4) |
| Human Resources | - | - | - | - | - | - | - | - | - | - | - |
| Labor Relations | - | - | - | - | - | - | - | - | - | - | - |
| Human Rights / Board of Ethics | - | - | - | - | - | - | - | - | - | - | - |
| Human Services | - | - | - | - | - | - | - | - | - | - | - |
| Law | - | - | - | - | - | - | - | - | - | - | - |
| Mayor's Office | - | - | - | - | - | - | - | - | - | - | - |
| Planning & Development | - | - | - | - | - | - | - | - | - | - | - |
| Police | (12.9) | (15.1) | (12.9) | (12.6) | (12.6) | (12.6) | (12.6) | (12.6) | (12.6) | (12.6) | (129.3) |
| Public Lighting | - | - | - | - | - | - | - | - | - | - | - |
| Public Works (Solid Waste) | - | - | - | - | - | - | - | - | - | - | - |
| Recreation | - | - | - | - | - | - | - | - | - | - | - |
| DHWP (Vital Records) | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | |
| **LEGISLATIVE AGENCIES** | | | | | | | | | | | |
| Auditor General / Inspector General | - | - | - | - | - | - | - | - | - | - | - |
| Board of Zoning Appeals | - | - | - | - | - | - | - | - | - | - | - |
| City Clerk | - | - | - | - | - | - | - | - | - | - | - |
| City Council | - | - | - | - | - | - | - | - | - | - | - |
| Election Commission | - | - | - | - | - | - | - | - | - | - | - |
| Ombudsperson | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | |
| **JUDICIAL AGENCY** | | | | | | | | | | | |
| 36th District Court | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | |
| **ENTERPRISE AGENCIES** | | | | | | | | | | | |
| Airport | - | - | - | - | - | - | - | - | - | - | - |
| Buildings and Safety | - | - | - | - | - | - | - | - | - | - | - |
| DDOT - Transportation | - | - | - | - | - | - | - | - | - | - | - |
| Municipal Parking | - | (0.4) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (1.4) |
| | | | | | | | | | | | |
| **OTHER** | | | | | | | | | | | |
| Blight | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | |
| **TOTAL** | $ (28.5) | $ (29.8) | $ (23.2) | $ (19.4) | $ (19.2) | $ (18.4) | $ (18.3) | $ (17.9) | $ (16.4) | $ (16.1) | $ (207.1) |

**City of Detroit**

Ten-Year Plan of Adjustment
**Restructuring and Reinvestment Initiatives - Consolidated by Department**
**Reorganization Costs**
*($ in millions)*

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | For the Fiscal Year Ended | | | | | | |
| **EXECUTIVE AGENCIES** | | | | | | | | | | | |
| Administrative Hearings | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Finance | (2.5) | (5.5) | (3.4) | (0.5) | (0.9) | (0.6) | (1.4) | (0.6) | (0.9) | (0.6) | (17.1) |
| Fire | (0.3) | - | - | - | - | - | - | - | - | - | (0.3) |
| General Services | (0.4) | - | - | - | - | - | - | - | - | - | (0.4) |
| Human Resources | (0.4) | (1.0) | (1.0) | - | - | - | - | - | - | - | (2.4) |
| Labor Relations | - | - | - | - | - | - | - | - | - | - | - |
| Human Rights / Board of Ethics | - | - | - | - | - | - | - | - | - | - | - |
| Human Services | - | - | - | - | - | - | - | - | - | - | - |
| Law | (0.1) | - | - | - | - | - | - | - | - | - | (0.1) |
| Mayor's Office | | | | | | | | | | | - |
| Planning & Development | (2.4) | (4.1) | (0.7) | - | - | - | (0.8) | (0.8) | - | - | (8.9) |
| Police | (0.2) | (0.6) | (0.2) | - | - | - | - | - | - | - | (1.0) |
| Public Lighting | - | - | - | - | - | - | - | - | - | - | - |
| Public Works (Solid Waste) | - | - | - | - | - | - | - | - | - | - | - |
| Recreation | - | - | - | - | - | - | - | - | - | - | - |
| DHWP (Vital Records) | - | - | - | - | - | - | - | - | - | - | - |
| **LEGISLATIVE AGENCIES** | | | | | | | | | | | |
| Auditor General / Inspector General | - | - | - | - | - | - | - | - | - | - | - |
| Board of Zoning Appeals | - | - | - | - | - | - | - | - | - | - | - |
| City Clerk | - | - | - | - | - | - | - | - | - | - | - |
| City Council | - | - | - | - | - | - | - | - | - | - | - |
| Election Commission | - | - | - | - | - | - | - | - | - | - | - |
| Ombudsperson | - | - | - | - | - | - | - | - | - | - | - |
| **JUDICIAL AGENCY** | | | | | | | | | | | |
| 36th District Court | - | (1.0) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (3.7) |
| **ENTERPRISE AGENCIES** | | | | | | | | | | | |
| Airport | - | - | - | - | - | - | - | - | - | - | - |
| Buildings and Safety | - | - | - | - | - | - | - | - | - | - | - |
| DDOT - Transportation | - | - | - | - | - | - | - | - | - | - | - |
| Municipal Parking | - | - | - | - | - | - | - | - | - | - | - |
| **OTHER** | | | | | | | | | | | |
| Blight | - | - | - | - | - | - | - | - | - | - | - |
| **TOTAL** | $ (6.3) | $ (12.3) | $ (5.6) | $ (0.9) | $ (1.2) | $ (1.0) | $ (2.6) | $ (1.8) | $ (1.2) | $ (1.0) | $ (33.9) |

**City of Detroit**

Ten-Year Plan of Adjustment
Restructuring and Reinvestment Initiatives - Consolidated by Department
Surplus / (Deficit)
*($ in millions)*

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | For the Fiscal Year Ended | | | | | | |
| **EXECUTIVE AGENCIES** | | | | | | | | | | | |
| Administrative Hearings | $ - | $ (0.5) | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ (0.4) |
| Finance | (11.5) | (41.0) | (7.7) | (0.5) | (2.8) | (3.2) | (1.9) | (2.8) | (3.7) | (2.6) | (77.7) |
| Fire | (16.9) | (24.6) | (16.7) | (6.0) | 6.6 | (9.0) | (2.3) | (0.1) | 0.8 | 2.8 | (65.6) |
| General Services | (16.7) | (23.9) | (17.0) | (17.2) | (17.5) | (17.4) | (17.5) | (17.8) | (17.8) | (17.9) | (180.8) |
| Human Resources | (0.5) | (4.7) | (5.3) | (3.3) | (3.3) | (3.4) | (3.4) | (3.5) | (3.5) | (3.6) | (34.4) |
| Labor Relations | - | (0.3) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.9) | (0.9) | (0.9) | (7.1) |
| Human Rights / Board of Ethics | - | (0.7) | (0.4) | (0.4) | (0.3) | (0.3) | (0.3) | (0.4) | (0.3) | (0.3) | (3.4) |
| Human Services | - | - | - | - | - | - | - | - | - | - | - |
| Law | (1.7) | 0.4 | 0.9 | 0.9 | 0.8 | 0.8 | 0.7 | 0.7 | 0.6 | 0.6 | 4.6 |
| Mayor's Office | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.3) |
| Planning & Development | (3.3) | (5.6) | (1.7) | (1.0) | (1.0) | (1.0) | (1.9) | (1.9) | (1.1) | (1.1) | (19.7) |
| Police | (29.6) | (45.8) | (41.3) | (22.3) | (21.6) | (21.4) | (24.3) | (24.0) | (24.3) | (24.1) | (278.6) |
| Public Lighting | - | - | - | - | - | - | - | - | - | - | - |
| Public Works (Solid Waste) | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.3) |
| Recreation | (0.9) | (9.0) | (3.1) | (3.3) | (3.1) | (4.0) | (4.3) | (4.0) | (4.0) | (4.0) | (39.8) |
| DHWP (Vital Records) | (0.3) | (5.3) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (6.9) |
| | | | | | | | | | | | - |
| **LEGISLATIVE AGENCIES** | | | | | | | | | | | |
| Auditor General / Inspector General | (0.1) | (0.6) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (4.7) |
| Board of Zoning Appeals | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.2) |
| City Clerk | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 2.2 |
| City Council | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 4.2 |
| Election Commission | (0.6) | (0.6) | 0.0 | 0.0 | 0.0 | 0.0 | (0.5) | (0.5) | (0.5) | (0.5) | (2.9) |
| Ombudsperson | - | - | - | - | - | - | - | - | - | - | - |
| | - | (3.7) | (1.6) | (1.6) | (1.6) | (1.7) | (1.7) | (1.7) | (1.8) | (1.8) | (17.2) |
| **JUDICIAL AGENCY** | | | | | | | | | | | - |
| 36th District Court | | | | | | | | | | | - |
| | 0.7 | 4.7 | 9.6 | 10.4 | 10.7 | 11.2 | 11.6 | 11.9 | 12.3 | 12.7 | 95.7 |
| **ENTERPRISE AGENCIES** | | | | | | | | | | | |
| Airport | | | | | | | | | | | - |
| Buildings and Safety | (0.2) | (1.7) | (6.1) | (8.5) | (8.2) | (0.7) | (0.7) | (0.8) | (0.8) | (0.8) | (28.5) |
| DDOT - Transportation | (0.4) | (2.3) | 2.7 | 3.5 | 3.2 | 4.0 | 4.1 | 3.7 | 4.2 | 4.2 | 27.0 |
| Municipal Parking | (4.7) | (11.1) | (2.9) | (4.8) | 0.1 | 1.2 | 6.3 | 5.3 | 8.9 | 8.9 | 7.3 |
| | - | - | - | - | - | - | - | - | - | - | - |
| **OTHER** | | | | | | | | | | | |
| Blight | (1.3) | (62.6) | (96.0) | (96.0) | (96.0) | (96.0) | - | - | - | - | (447.9) |
| | | | | | | | | | | | |
| **TOTAL** | $ (88.2) | $ (233.9) | $ (180.9) | $ (144.3) | $ (128.5) | $ (135.4) | $ (30.7) | $ (30.2) | $ (25.4) | $ (22.0) | $ (1,019.5) |

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Consolidated by Department**
**Incremental Headcount**

| | | | | | For the Fiscal Year Ended | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **EXECUTIVE AGENCIES** | | | | | | | | | | |
| Administrative Hearings | - | - | - | - | - | - | - | - | - | - |
| Finance | 55 | 120 | 121 | 121 | 112 | 112 | 112 | 112 | 112 | 112 |
| Fire | 162 | 96 | 84 | 182 | 193 | 165 | 153 | 135 | 129 | 117 |
| General Services | 112 | 112 | 112 | 112 | 112 | 112 | 112 | 112 | 112 | 112 |
| Human Resources | 3 | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 22 |
| Labor Relations | - | 3 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 |
| Human Rights / Board of Ethics | - | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 |
| Human Services | - | - | - | - | - | - | - | - | - | - |
| Law | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 |
| Mayor's Office | - | - | - | - | - | - | - | - | - | - |
| Planning & Development | 13 | (26) | (28) | (28) | (28) | (28) | (28) | (28) | (28) | (28) |
| Police | 125 | 250 | 175 | 163 | 150 | 150 | 150 | 150 | 150 | 150 |
| Public Lighting | - | - | - | - | - | - | - | - | - | - |
| Public Works (Solid Waste) | - | - | - | - | - | - | - | - | - | - |
| Recreation | - | - | - | - | - | - | - | - | - | - |
| DHWP (Vital Records) | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | |
| **LEGISLATIVE AGENCIES** | | | | | | | | | | |
| Auditor General / Inspector General | - | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| Board of Zoning Appeals | - | - | - | - | - | - | - | - | - | - |
| City Clerk | (1) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) |
| City Council | - | - | - | - | - | - | - | - | - | - |
| Election Commission | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) |
| Ombudsperson | - | 13 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 |
| | | | | | | | | | | |
| **JUDICIAL AGENCY** | | | | | | | | | | |
| 36th District Court | (41) | (56) | (66) | (66) | (66) | (66) | (66) | (66) | (66) | (66) |
| | | | | | | | | | | |
| **ENTERPRISE AGENCIES** | | | | | | | | | | |
| Airport | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| Buildings and Safety | 2 | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) |
| DDOT - Transportation | - | - | 14 | 77 | 96 | 98 | 100 | 102 | 115 | 128 |
| Municipal Parking | 1 | 7 | (6) | (6) | (6) | (6) | (6) | (6) | (6) | (6) |
| | | | | | | | | | | |
| **OTHER** | | | | | | | | | | |
| Blight | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | |
| **TOTAL** | 451 | 568 | 485 | 634 | 642 | 616 | 607 | 591 | 597 | 598 |

**City of Detroit**
Ten-Year Plan of Adjustment
Executive Agencies - Department Detail

**City of Detroit**

Ten-Year Plan of Adjustment
Restructuring and Reinvestment Initiatives - Executive Agencies
Department of Administrative Hearings (DAH)
*($ in millions)*

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | For the Fiscal Year Ended | | | | | | |
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2. | a. Increased Collection Rate | - | - | - | - | - | - | - | - | - | - | - |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | - | - | - | - | - | - | - | - | - | - | - |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | - | - | - | - | - | - | - | - | - | - | - |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | - | - | - | - | - | - | - | - | - | - | - |
| 9. | Professional & Contract Services | - | - | - | - | - | - | - | - | - | - | - |
| 10. | Labor Costs / Service Contracts | - | - | - | - | - | - | - | - | - | - | - |
| 11. | Active Benefits | - | - | - | - | - | - | - | - | - | - | - |
| 12. | Training | - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 |
| 13. | Materials and Supplies | - | - | - | - | - | - | - | - | - | - | - |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | - | - | - | - | - | - | - | - | - | - | - |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | - | - | - | - | - | - | - | - | - | - |
| 22. | **Total Operating Expenditures** | - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 |
| 23. | **Total Operating Surplus (Deficit)** | - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | - | (0.5) | - | - | - | - | - | - | - | - | (0.5) |
| 25. | Capital Expenditures | - | - | - | - | - | - | - | - | - | - | - |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | - | - | - | - | - | - | - | - | - | - | - |
| 28. | **Total Reorganization / Reinvestment** | - | (0.5) | - | - | - | - | - | - | - | - | (0.5) |
| 29. | **Total Surplus (Deficit)** | $ - | $ (0.5) | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ (0.4) |
| 30. | **Incremental Headcount (FTE)** | - | - | - | - | - | - | - | - | - | - | - |

**City of Detroit**

Ten-Year Plan of Adjustment
Restructuring and Reinvestment Initiatives - Executive Agencies
Department of Administrative Hearings (DAH)
*($ in millions)*

| | | 10-Year Total | Assumptions / Comments |
|---|---|---|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | - | |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | - | |
| 5. | Grant Revenue | - | |
| 6. | Other | - | |
| 7. | **Total Revenues** | - | |
| | | | |
| | **Expenditures** | | |
| 8. | Permanent Labor | - | |
| 9. | Professional & Contract Services | - | |
| 10. | Labor Costs / Service Contracts | - | |
| 11. | Active Benefits | - | |
| 12. | Training | 0.1 | Training cost for all department employees - $2.0k per employee through FY '16, $1.5k thereafter to establish a continuous training program |
| 13. | Materials and Supplies | - | |
| 14. | Utilities | - | |
| 15. | Purchased services | - | |
| 16. | Risk management / insurance | - | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | - | |
| 22. | **Total Operating Expenditures** | 0.1 | |
| 23. | **Total Operating Surplus (Deficit)** | 0.1 | |
| | | | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | (0.5) | Investment in case tracking system |
| 25. | Capital Expenditures | - | |
| 26. | Other Infrastructure | - | |
| 27. | Reorganization Costs | - | |
| 28. | **Total Reorganization / Reinvestment** | (0.5) | |
| | | | |
| 29. | **Total Surplus (Deficit)** | $ (0.4) | |
| | | | |
| 30. | Incremental Headcount (FTE) | - | |

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Executive Agencies**
**Finance Department (Finance)**
*($ in millions)*

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | For the Fiscal Year Ended | | | | | | |
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| 2. | a. Increased Collection Rate | 1.6 | 4.9 | 4.9 | 5.2 | 5.2 | 5.2 | 5.2 | 5.2 | 5.2 | 5.2 | 47.9 |
| 3. | b. Collection of Past Due | 1.5 | 3.0 | 3.0 | 2.5 | - | - | - | - | - | - | 10.0 |
| 4. | Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | - | - | 0.5 | 1.0 | 1.0 | 1.0 | 1.1 | 1.1 | 1.1 | 1.1 | 7.9 |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | 3.1 | 7.9 | 8.4 | 8.7 | 6.2 | 6.3 | 6.3 | 6.3 | 6.3 | 6.3 | 65.8 |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | (1.1) | (6.0) | (6.3) | (6.4) | (6.5) | (6.7) | (6.8) | (7.0) | (7.1) | (7.3) | (61.1) |
| 9. | Professional & Contract Services | (0.0) | 0.7 | 0.8 | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 | 7.6 |
| 10. | Labor Costs / Service Contracts | (1.2) | (5.3) | (5.4) | (5.5) | (5.7) | (5.8) | (5.9) | (6.1) | (6.2) | (6.4) | (53.5) |
| 11. | Active Benefits | (0.6) | (3.3) | (3.4) | (3.5) | (3.6) | (3.7) | (3.7) | (3.8) | (3.9) | (4.0) | (33.6) |
| 12. | Training | (0.3) | (0.9) | (0.9) | (0.7) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (6.6) |
| 13. | Materials and Supplies | (0.0) | 2.0 | 2.0 | 2.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 35.8 |
| 14. | Utilities | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.2) |
| 15. | Purchased services | - | - | 0.5 | 0.5 | 0.7 | 0.5 | 0.7 | 0.5 | 0.7 | 0.5 | 4.4 |
| 16. | Risk management / insurance | - | - | 3.0 | 3.0 | 2.5 | 2.5 | 2.0 | 2.0 | 1.5 | 1.5 | 18.0 |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | (0.1) | - | - | - | - | - | - | - | - | - | (0.1) |
| 22. | **Total Operating Expenditures** | (2.3) | (7.5) | (4.3) | (4.3) | (1.7) | (2.2) | (2.7) | (3.2) | (3.6) | (4.1) | (35.8) |
| 23. | **Total Operating Surplus (Deficit)** | 0.8 | 0.5 | 4.1 | 4.4 | 4.5 | 4.0 | 3.6 | 3.1 | 2.7 | 2.2 | 30.0 |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | (9.8) | (35.9) | (8.4) | (4.3) | (6.5) | (6.6) | (4.1) | (5.2) | (5.5) | (4.2) | (90.6) |
| 25. | Capital Expenditures | - | - | - | - | - | - | - | - | - | - | - |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | (2.5) | (5.5) | (3.4) | (0.5) | (0.9) | (0.6) | (1.4) | (0.6) | (0.9) | (0.6) | (17.1) |
| 28. | **Total Reorganization / Reinvestment** | (12.3) | (41.5) | (11.8) | (4.9) | (7.3) | (7.3) | (5.5) | (5.9) | (6.4) | (4.8) | (107.7) |
| 29. | **Total Surplus (Deficit)** | $ (11.5) | $ (41.0) | $ (7.7) | $ (0.5) | $ (2.8) | $ (3.2) | $ (1.9) | $ (2.8) | $ (3.7) | $ (2.6) | $ (77.7) |
| 30. | **Incremental Headcount (FTE)** | 55 | 120 | 121 | 121 | 112 | 112 | 112 | 112 | 112 | 112 | 112 |

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Executive Agencies**
**Finance Department (Finance)**
*($ in millions)*

| | | 10-Year Total | Assumptions / Comments |
|---|---|---|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | 47.9 | Incremental collections primarily related to Income Tax non-filer project and Income Tax Task Force ($31.0MM); incremental revenue from Treasury related to additional staffing for collection activities ($13.5MM), additional Treasury collections related to the hiring of a third-party collection agency ($3.4MM) |
| 3. | b. Collection of Past Due | 10.0 | Collection of past due income tax receivables, net of 3rd party collection fees |
| 4. | Pricing/Fees | - | |
| 5. | Grant Revenue | 7.9 | Additional grant related revenue from establishment of a Grants administration function |
| 6. | Other | - | |
| 7. | **Total Revenues** | 65.8 | |
| | **Expenditures** | - | |
| 8. | Permanent Labor | (61.1) | FTE increases - Grants (27), Treasury (25), ITS (15), Accounting and Finance Admin. (14), Risk Management and Workers' Compensation (13), Assessing (6), Income Tax (7) and Purchasing (5) |
| 9. | Professional & Contract Services | 7.6 | Reduction to income tax contractual services subsequent to implementation of CityTax software solution |
| 10. | Labor Costs / Service Contracts | (53.5) | |
| 11. | Active Benefits | (33.6) | Benefits at 55% of Permanent Labor costs |
| 12. | Training | (6.6) | Training cost for all department employees - $2.0k per employee through FY '16, $1.5k thereafter to establish a continuous training program |
| 13. | Materials and Supplies | 35.8 | Purchase savings generated from process related enhancements, consolidation of vendors, and other Purchasing Division restructuring initiatives |
| 14. | Utilities | (0.2) | Grant related |
| 15. | Purchased services | 4.4 | Savings related to phasing out Plante Moran accounting related projects |
| 16. | Risk management / insurance | 18.0 | Estimated savings related to a improved risk management function and workers' compensation claim process |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | (0.1) | |
| 22. | **Total Operating Expenditures** | (35.8) | |
| 23. | **Total Operating Surplus (Deficit)** | 30.0 | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | (90.6) | Incremental IT costs primarily related to new ERP system ($29.0MM), Data Center Back-up ($10.9MM), software upgrades ($10.3MM), hardware upgrades ($9.5MM), implementation of CityTax ($5.6MM), installation of a document management system ($5.4MM), enhanced security system ($3.8MM), Workbrain upgrades ($3.6MM), and other infrastructure ($3.3MM) |
| 25. | Capital Expenditures | - | |
| 26. | Other Infrastructure | - | |
| 27. | Reorganization Costs | (17.1) | Primarily related to Assessing Division Corrective Action Plan ($12.7M) and Plante Moran Treasury restructuring project |
| 28. | **Total Reorganization / Reinvestment** | (107.7) | |
| 29. | **Total Surplus (Deficit)** | $ (77.7) | |
| 30. | **Incremental Headcount (FTE)** | 112 | |

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Executive Agencies**
**Fire Department (DFD)**
*($ in millions)*

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **For the Fiscal Year Ended** | | | | | | | | | | | |
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2. | a. Increased Collection Rate | 0.9 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.7 | 3.7 | 33.7 |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 | 8.2 |
| 5. | Grant Revenue | 1.1 | 3.5 | 2.0 | 13.7 | 14.4 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 44.8 |
| 6. | Other | - | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | - | - | - | - | 0.4 |
| 7. | **Total Revenues** | 2.0 | 8.1 | 6.6 | 18.3 | 19.0 | 6.7 | 6.6 | 6.6 | 6.6 | 6.6 | 87.0 |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | (1.8) | (5.7) | (2.5) | (4.1) | 0.2 | 2.5 | 1.1 | 2.9 | 2.4 | 3.1 | (1.9) |
| 9. | Professional & Contract Services | (0.1) | - | - | - | - | - | - | - | - | - | (0.1) |
| 10. | Labor Costs / Service Contracts | (1.9) | (5.7) | (2.5) | (4.1) | 0.2 | 2.5 | 1.1 | 2.9 | 2.4 | 3.1 | (2.0) |
| 11. | Active Benefits | (1.1) | (2.0) | 0.9 | (2.7) | (0.1) | 1.1 | 0.5 | 1.7 | 1.4 | 1.9 | 1.6 |
| 12. | Training | 0.3 | (5.0) | (4.6) | (0.8) | (0.8) | (0.7) | (0.5) | (0.7) | (0.8) | (0.3) | (14.0) |
| 13. | Materials and Supplies | - | - | - | - | - | - | - | - | - | - | - |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | - | - | - | - | - | - | - | - | - | - | - |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | - | - | - | - | - | - | - | - | - | - |
| 22. | **Total Operating Expenditures** | (2.7) | (12.6) | (6.1) | (7.6) | (0.7) | 2.8 | 1.1 | 3.9 | 2.9 | 4.6 | (14.4) |
| 23. | **Total Operating Surplus (Deficit)** | (0.7) | (4.5) | 0.5 | 10.7 | 18.3 | 9.5 | 7.7 | 10.4 | 9.5 | 11.2 | 72.6 |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | (0.7) | (0.6) | (0.2) | (0.2) | (0.2) | (0.8) | (0.2) | (0.4) | (0.2) | (0.2) | (3.6) |
| 25. | Capital Expenditures | (5.5) | (11.0) | (7.4) | (10.5) | (5.8) | (12.7) | (4.8) | (5.6) | (5.5) | (5.5) | (74.3) |
| 26. | Other Infrastructure | (9.7) | (8.6) | (9.6) | (6.1) | (5.8) | (5.0) | (5.0) | (4.6) | (3.0) | (2.7) | (60.0) |
| 27. | Reorganization Costs | (0.3) | - | - | - | - | - | - | - | - | - | (0.3) |
| 28. | **Total Reorganization / Reinvestment** | (16.2) | (20.2) | (17.2) | (16.8) | (11.7) | (18.5) | (9.9) | (10.6) | (8.7) | (8.4) | (138.1) |
| 29. | **Total Surplus (Deficit)** | $ (16.9) | $ (24.6) | $ (16.7) | $ (6.0) | $ 6.6 | $ (9.0) | $ (2.3) | $ (0.1) | $ 0.8 | $ 2.8 | $ (65.6) |
| 30. | **Incremental Headcount (FTE)** | 162 | 96 | 84 | 182 | 193 | 165 | 153 | 135 | 129 | 117 | 117 |

**City of Detroit**

**Ten-Year Plan of Adjustment**

**Restructuring and Reinvestment Initiatives - Executive Agencies**

**Fire Department (DFD)**

*($ in millions)*

| | | 10-Year Total | Assumptions / Comments |
|---|---|---:|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | 33.7 | Increased collections from additional EMS and fleet personnel ($26.8MM) and increased Fire Marshall personnel ($6.9MM) |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | 8.2 | Includes fire recovery billing for false alarms, vehicle fires, vehicle accidents |
| 5. | Grant Revenue | 44.8 | Assumes ability to receive SAFER grant funding in FY '17 and FY '18 and continued access to $2.0MM annually from FEMA grants for equipment related training |
| 6. | Other | 0.4 | Sale of closed facilities |
| 7. | **Total Revenues** | 87.0 | |
| | **Expenditures** | | |
| 8. | Permanent Labor | (1.9) | Labor estimate includes ideal staffing levels while taking into account attrition, efficiencies, reductions in overtime, multifunctioning department EMT / SAFER grant requirements |
| 9. | Professional & Contract Services | (0.1) | |
| 10. | Labor Costs / Service Contracts | (2.0) | |
| 11. | Active Benefits | 1.6 | Increased headcount and overtime assumptions |
| 12. | Training | (14.0) | Training cost for all civilian department employees - $2.0k per employee through FY '16, $1.5k thereafter to establish a continuous training program; Cross-training for uniform personnel (Medical First Responders and Fire Fighting) |
| 13. | Materials and Supplies | - | |
| 14. | Utilities | - | |
| 15. | Purchased services | - | |
| 16. | Risk management / insurance | - | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | - | |
| 22. | **Total Operating Expenditures** | (14.4) | |
| 23. | **Total Operating Surplus (Deficit)** | 72.6 | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | (3.6) | Incremental costs for Records Management System |
| 25. | Capital Expenditures | (74.3) | Repair and maintenance of existing facilities ($32.0MM), 7 new firehouses totaling ($21.0MM) and fleet equipment, turnout gear and breathing units replacement programs ($19.0MM) |
| 26. | Other Infrastructure | (60.0) | Implementation of apparatus (fleet) replacement program of approximately 20 vehicles per year as well as preventative maintenance program |
| 27. | Reorganization Costs | (0.3) | |
| 28. | **Total Reorganization / Reinvestment** | (138.1) | |
| 29. | **Total Surplus (Deficit)** | $ (65.6) | |
| 30. | **Incremental Headcount (FTE)** | 117 | |

13-53846-swr   Doc 8720   Filed 12/16/14   Entered 12/16/14 10:27:23   Page 305 of 440
13-53846-swr   Doc 8720   Filed 12/16/14   Entered 12/16/14 10:59:30   Page 305 of 440

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Executive Agencies**
**General Services Department (GSD)**
($ in millions)

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| 2. | a. Increased Collection Rate | - | - | - | - | - | - | - | - | - | - | - |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | 1.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 20.3 |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | 1.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 20.3 |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | (1.1) | (4.1) | (4.3) | (4.3) | (4.4) | (4.5) | (4.6) | (4.7) | (4.8) | (4.9) | (41.7) |
| 9. | Professional & Contract Services | (0.2) | (0.3) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (2.4) |
| 10. | Labor Costs / Service Contracts | (1.3) | (4.5) | (4.5) | (4.6) | (4.7) | (4.7) | (4.8) | (4.9) | (5.0) | (5.1) | (44.1) |
| 11. | Active Benefits | (0.3) | (2.3) | (2.3) | (2.3) | (2.3) | (2.3) | (2.3) | (2.3) | (2.3) | (2.3) | (21.3) |
| 12. | Training | (0.1) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (5.3) |
| 13. | Materials and Supplies | (3.7) | (7.4) | (7.3) | (7.3) | (7.3) | (7.3) | (7.3) | (7.3) | (7.3) | (7.3) | (69.5) |
| 14. | Utilities | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (2.4) |
| 15. | Purchased services | - | - | - | - | - | - | - | - | - | - | - |
| 16. | Risk management / insurance | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.7 |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | 0.2 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 4.1 |
| 22. | **Total Operating Expenditures** | (5.4) | (14.4) | (14.4) | (14.5) | (14.6) | (14.7) | (14.8) | (14.9) | (15.0) | (15.1) | (137.7) |
| 23. | **Total Operating Surplus (Deficit)** | (4.4) | (12.3) | (12.3) | (12.4) | (12.5) | (12.5) | (12.6) | (12.7) | (12.8) | (12.9) | (117.5) |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 25. | Capital Expenditures | (6.1) | (5.9) | (4.1) | (4.2) | (4.5) | (4.3) | (4.3) | (4.5) | (4.4) | (4.4) | (46.6) |
| 26. | Other Infrastructure | (5.9) | (5.7) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (16.4) |
| 27. | Reorganization Costs | (0.4) | - | - | - | - | - | - | - | - | - | (0.4) |
| 28. | **Total Reorganization / Reinvestment** | (12.3) | (11.6) | (4.8) | (4.8) | (5.1) | (4.9) | (4.9) | (5.1) | (5.0) | (5.0) | (63.3) |
| 29. | **Total Surplus (Deficit)** | $ (16.7) | $ (23.9) | $ (17.0) | $ (17.2) | $ (17.5) | $ (17.4) | $ (17.5) | $ (17.8) | $ (17.8) | $ (17.9) | $ (180.8) |
| 30. | **Incremental Headcount (FTE)** | 112 | 112 | 112 | 112 | 112 | 112 | 112 | 112 | 112 | 112 | 112 |

For the Fiscal Year Ended

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Executive Agencies**
**General Services Department (GSD)**
*($ in millions)*

| | | 10-Year Total | Assumptions / Comments |
|---|---|---:|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | - | |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | - | |
| 5. | Grant Revenue | 20.3 | Street fund reimbursement of additional employees |
| 6. | Other | - | |
| 7. | **Total Revenues** | 20.3 | |
| | **Expenditures** | - | |
| 8. | Permanent Labor | (41.7) | Additional employees to reach standard level of service delivery. Assumes Solid Waste and Custodial Services privatization to enhance service and / or reduce cost beginning Q4 FY '14. Assumes no additional outsourcing being evaluated for all divisions. |
| 9. | Professional & Contract Services | (2.4) | Increased professional and contract services to achieve standard level of services |
| 10. | Labor Costs / Service Contracts | (44.1) | |
| 11. | Active Benefits | (21.3) | Benefits at 55% of Permanent Labor costs |
| 12. | Training | (5.3) | Training cost for all GSD employees - $2k per EE through FY '16, $1.5k thereafter |
| 13. | Materials and Supplies | (69.5) | Additional materials and supplies required to achieve required level of service; i.e. Building supplies and expenses ($1.0MM), fleet maintenance supplies and expenses (excluding solid waste) ($4.3MM); support additional building and grounds maintenance. requirements ($1.7MM); increased fuel cost / usage ($0.4MM) |
| 14. | Utilities | (2.4) | |
| 15. | Purchased services | - | |
| 16. | Risk management / insurance | 0.7 | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | 4.1 | |
| 22. | **Total Operating Expenditures** | (137.7) | |
| 23. | **Total Operating Surplus (Deficit)** | (117.5) | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | - | |
| 25. | Capital Expenditures | (46.6) | Facility improvements repairs / upgrades ($27.8MM) and additional facility space consolidation ($18.7MM) |
| 26. | Other Infrastructure | (16.4) | Replacement / refresh of vehicles and equipment |
| 27. | Reorganization Costs | (0.4) | |
| 28. | **Total Reorganization / Reinvestment** | (63.3) | |
| 29. | **Total Surplus (Deficit)** | $ (180.8) | |
| 30. | **Incremental Headcount (FTE)** | 112 | |

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Executive Agencies**
**Human Resources Department (HR)**
*($ in millions)*

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | For the Fiscal Year Ended | | | | | | |
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2. | a. Increased Collection Rate | - | - | - | - | - | - | - | - | - | - | - |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | - | - | - | - | - | - | - | - | - | - | - |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | - | - | - | - | - | - | - | - | - | - | - |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | (0.1) | (1.3) | (1.3) | (1.3) | (1.4) | (1.4) | (1.4) | (1.4) | (1.5) | (1.5) | (12.6) |
| 9. | Professional & Contract Services | - | - | - | - | - | - | - | - | - | - | - |
| 10. | Labor Costs / Service Contracts | (0.1) | (1.3) | (1.3) | (1.3) | (1.4) | (1.4) | (1.4) | (1.4) | (1.5) | (1.5) | (12.6) |
| 11. | Active Benefits | (0.0) | (0.7) | (0.7) | (0.7) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (6.9) |
| 12. | Training | - | (0.8) | (0.8) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (6.6) |
| 13. | Materials and Supplies | - | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (2.7) |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | - | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.9) |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | - | - | - | - | - | - | - | - | - | - |
| 22. | **Total Operating Expenditures** | (0.1) | (3.2) | (3.2) | (3.2) | (3.2) | (3.3) | (3.3) | (3.4) | (3.4) | (3.5) | (29.7) |
| 23. | **Total Operating Surplus (Deficit)** | (0.1) | (3.2) | (3.2) | (3.2) | (3.2) | (3.3) | (3.3) | (3.4) | (3.4) | (3.5) | (29.7) |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | - | (0.5) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (1.3) |
| 25. | Capital Expenditures | - | - | (1.0) | - | - | - | - | - | - | - | (1.0) |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | (0.4) | (1.0) | (1.0) | - | - | - | - | - | - | - | (2.4) |
| 28. | **Total Reorganization / Reinvestment** | (0.4) | (1.5) | (2.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (4.7) |
| 29. | **Total Surplus (Deficit)** | $ (0.5) | $ (4.7) | $ (5.3) | $ (3.3) | $ (3.3) | $ (3.4) | $ (3.4) | $ (3.5) | $ (3.5) | $ (3.6) | $ (34.4) |
| 30. | **Incremental Headcount (FTE)** | 3 | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 22 |

13-53846-swr   Doc 8700   Filed 12/16/14   Entered 12/16/14 20:59:30   Page 308 of 440

**City of Detroit**
**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Executive Agencies**
**Human Resources Department (HR)**
*($ in millions)*

| | | 10-Year Total | Assumptions / Comments |
|---|---|---:|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | - | |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | - | |
| 5. | Grant Revenue | - | |
| 6. | Other | - | |
| 7. | **Total Revenues** | - | |
| | | | |
| | **Expenditures** | - | |
| 8. | Permanent Labor | (12.6) | FTE increases - Administration (1), Records (2), Central Services (2), Employee Services (3), Recruitment (7), Career Development (5), and Testing (2). FTE increases primarily focused on establishing a functioning recruitment, and selection and training function |
| 9. | Professional & Contract Services | - | |
| 10. | Labor Costs / Service Contracts | (12.6) | |
| 11. | Active Benefits | (6.9) | Benefits at 55% of Permanent Labor costs |
| 12. | Training | (6.6) | Training cost for all HR employees - $2.0k per employee through FY '16, $1.5k thereafter and also includes $600k annual City-wide HR training |
| 13. | Materials and Supplies | (2.7) | Estimated training and test development materials and supplies |
| 14. | Utilities | - | |
| 15. | Purchased services | (0.9) | Estimated cost for recruitment advertising budget |
| 16. | Risk management / insurance | - | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | - | |
| 22. | **Total Operating Expenditures** | (29.7) | |
| | | | |
| 23. | **Total Operating Surplus (Deficit)** | (29.7) | |
| | | | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | (1.3) | Learning center one-time IT costs and related maintenance |
| 25. | Capital Expenditures | (1.0) | Estimated capital for training location ($1.0MM) |
| 26. | Other Infrastructure | - | |
| 27. | Reorganization Costs | (2.4) | Cultural Change Agent engagement, and job description / classification and market compensation study |
| 28. | **Total Reorganization / Reinvestment** | (4.7) | |
| | | | |
| 29. | **Total Surplus (Deficit)** | $ (34.4) | |
| | | | |
| 30. | **Incremental Headcount (FTE)** | 22 | |

**City of Detroit**

Ten-Year Plan of Adjustment
Restructuring and Reinvestment Initiatives - Executive Agencies
Human Resources Department - Labor Relations Division (LR)

($ in millions)

| | | | | | | For the Fiscal Year Ended | | | | | | 10-Year |
| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| 2. | a. Increased Collection Rate | - | - | - | - | - | - | - | - | - | - | - |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | - | - | - | - | - | - | - | - | - | - | - |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | - | - | - | - | - | - | - | - | - | - | - |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | - | (0.1) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.5) | (0.5) | (0.5) | (3.7) |
| 9. | Professional & Contract Services | - | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.9) |
| 10. | Labor Costs / Service Contracts | - | (0.2) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.6) | (0.6) | (0.6) | (4.6) |
| 11. | Active Benefits | - | (0.1) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.3) | (0.3) | (0.3) | (2.0) |
| 12. | Training | - | (0.0) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.5) |
| 13. | Materials and Supplies | - | - | - | - | - | - | - | - | - | - | - |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | - | - | - | - | - | - | - | - | - | - | - |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | - | - | - | - | - | - | - | - | - | - |
| 22. | **Total Operating Expenditures** | - | (0.3) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.9) | (0.9) | (0.9) | (7.1) |
| 23. | **Total Operating Surplus (Deficit)** | - | (0.3) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.9) | (0.9) | (0.9) | (7.1) |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 25. | Capital Expenditures | - | - | - | - | - | - | - | - | - | - | - |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | - | - | - | - | - | - | - | - | - | - | - |
| 28. | **Total Reorganization / Reinvestment** | - | - | - | - | - | - | - | - | - | - | - |
| 29. | **Total Surplus (Deficit)** | $ - | $ (0.3) | $ (0.8) | $ (0.8) | $ (0.8) | $ (0.8) | $ (0.8) | $ (0.9) | $ (0.9) | $ (0.9) | (7.1) |
| 30. | **Incremental Headcount (FTE)** | - | 3 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 |

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Executive Agencies**
**Human Resources Department - Labor Relations Division (LR)**
($ in millions)

| | | 10-Year Total | Assumptions / Comments |
|---|---|---|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | - | |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | - | |
| 5. | Grant Revenue | - | |
| 6. | Other | - | |
| 7. | **Total Revenues** | - | |
| | | | |
| | **Expenditures** | | |
| 8. | Permanent Labor | (3.7) | Addition of 11 employees for labor relations and benefits functions. FTE increase primarily relates to establishing proper oversight, monitoring, and compliance with union contracts |
| 9. | Professional & Contract Services | (0.9) | |
| 10. | Labor Costs / Service Contracts | (4.6) | |
| 11. | Active Benefits | (2.0) | Benefits at 55% of Permanent Labor costs |
| 12. | Training | (0.5) | Training cost for all department employees - $2.0k per employee through FY '16, $1.5k thereafter to establish a continuous training program |
| 13. | Materials and Supplies | - | |
| 14. | Utilities | - | |
| 15. | Purchased services | - | |
| 16. | Risk management / insurance | - | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | - | |
| 22. | **Total Operating Expenditures** | (7.1) | |
| | | | |
| 23. | **Total Operating Surplus (Deficit)** | (7.1) | |
| | | | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | - | |
| 25. | Capital Expenditures | - | |
| 26. | Other Infrastructure | - | |
| 27. | Reorganization Costs | - | |
| 28. | **Total Reorganization / Reinvestment** | - | |
| | | | |
| 29. | **Total Surplus (Deficit)** | $ (7.1) | |
| | | | |
| 30. | **Incremental Headcount (FTE)** | 11 | |

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Executive Agencies**
**Human Rights / Board of Ethics Department (Human Rights)**
*($ in millions)*

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| 2. | a. Increased Collection Rate | - | - | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 0.3 | 0.4 | 0.4 | 2.5 |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | - | - | - | - | - | - | - | - | - | - | - |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | - | - | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 0.3 | 0.4 | 0.4 | 2.5 |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | - | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.4) | (0.4) | (0.4) | (0.4) | (3.1) |
| 9. | Professional & Contract Services | - | - | - | - | - | - | - | - | - | - | - |
| 10. | Labor Costs / Service Contracts | - | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.4) | (0.4) | (0.4) | (0.4) | (3.1) |
| 11. | Active Benefits | - | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (1.7) |
| 12. | Training | - | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.9) |
| 13. | Materials and Supplies | - | - | - | - | - | - | - | - | - | - | - |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | - | - | - | - | - | - | - | - | - | - | - |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | - | - | - | - | - | - | - | - | - | - |
| 22. | **Total Operating Expenditures** | - | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.7) | (0.7) | (0.7) | (5.7) |
| 23. | **Total Operating Surplus (Deficit)** | - | (0.6) | (0.4) | (0.4) | (0.3) | (0.3) | (0.3) | (0.4) | (0.3) | (0.3) | (3.3) |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | - | (0.1) | - | - | - | - | - | - | - | - | (0.1) |
| 25. | Capital Expenditures | - | - | - | - | - | - | - | - | - | - | - |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | - | - | - | - | - | - | - | - | - | - | - |
| 28. | **Total Reorganization / Reinvestment** | - | (0.1) | - | - | - | - | - | - | - | - | (0.1) |
| 29. | **Total Surplus (Deficit)** | $ - | $ (0.7) | $ (0.4) | $ (0.4) | $ (0.3) | $ (0.3) | $ (0.3) | $ (0.4) | $ (0.3) | $ (0.3) | $ (3.4) |
| 30. | **Incremental Headcount (FTE)** | - | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 |

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Executive Agencies**
**Human Rights / Board of Ethics Department (Human Rights)**
*($ in millions)*

| | | 10-Year Total | Assumptions / Comments |
|---|---|---|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | 2.5 | Increased fees from Detroit based businesses |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | - | |
| 5. | Grant Revenue | - | |
| 6. | Other | - | |
| 7. | **Total Revenues** | 2.5 | |
| | | | |
| | **Expenditures** | - | |
| 8. | Permanent Labor | (3.1) | Addition of 6 employees to ensure compliance from various parties with City's ethics and human rights policies |
| 9. | Professional & Contract Services | - | |
| 10. | Labor Costs / Service Contracts | (3.1) | |
| 11. | Active Benefits | (1.7) | Benefits at 55% of Permanent Labor costs |
| 12. | Training | (0.9) | Training cost for all department employees - $2.0k per employee through FY '16, $1.5k thereafter to establish a continuous training program; Includes $100.0k annually for City-wide ethics training |
| 13. | Materials and Supplies | - | |
| 14. | Utilities | - | |
| 15. | Purchased services | - | |
| 16. | Risk management / insurance | - | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | - | |
| 22. | **Total Operating Expenditures** | (5.7) | |
| | | | |
| 23. | **Total Operating Surplus (Deficit)** | (3.3) | |
| | | | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | (0.1) | |
| 25. | Capital Expenditures | - | |
| 26. | Other Infrastructure | - | |
| 27. | Reorganization Costs | - | |
| 28. | **Total Reorganization / Reinvestment** | (0.1) | |
| | | | |
| 29. | **Total Surplus (Deficit)** | $ (3.4) | |
| | | | |
| 30. | Incremental Headcount (FTE) | 6 | |

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Executive Agencies**
**Law Department (Law)**
*($ in millions)*

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2. | a. Increased Collection Rate | - | - | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 4.4 |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | - | - | - | - | - | - | - | - | - | - | - |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | - | - | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 4.4 |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | (0.7) | (1.4) | (1.4) | (1.5) | (1.5) | (1.5) | (1.6) | (1.6) | (1.6) | (1.7) | (14.5) |
| 9. | Professional & Contract Services | - | - | - | - | - | - | - | - | - | - | - |
| 10. | Labor Costs / Service Contracts | (0.7) | (1.4) | (1.4) | (1.5) | (1.5) | (1.5) | (1.6) | (1.6) | (1.6) | (1.7) | (14.5) |
| 11. | Active Benefits | (0.4) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.9) | (0.9) | (0.9) | (0.9) | (8.0) |
| 12. | Training | - | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (1.5) |
| 13. | Materials and Supplies | - | - | - | - | - | - | - | - | - | - | - |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | - | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 6.8 |
| 16. | Risk management / insurance | - | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 18.0 |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | - | - | - | - | - | - | - | - | - | - |
| 22. | **Total Operating Expenditures** | (1.1) | 0.4 | 0.3 | 0.3 | 0.3 | 0.2 | 0.2 | 0.1 | 0.1 | 0.0 | 0.8 |
| 23. | **Total Operating Surplus (Deficit)** | (1.1) | 0.4 | 0.9 | 0.9 | 0.8 | 0.8 | 0.7 | 0.7 | 0.6 | 0.6 | 5.2 |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | (0.5) | - | - | - | - | - | - | - | - | - | (0.5) |
| 25. | Capital Expenditures | - | - | - | - | - | - | - | - | - | - | - |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | (0.1) | - | - | - | - | - | - | - | - | - | (0.1) |
| 28. | **Total Reorganization / Reinvestment** | (0.6) | - | - | - | - | - | - | - | - | - | (0.6) |
| 29. | **Total Surplus (Deficit)** | $ (1.7) | $ 0.4 | $ 0.9 | $ 0.9 | $ 0.8 | $ 0.8 | $ 0.7 | $ 0.7 | $ 0.6 | $ 0.6 | $ 4.6 |
| 30. | **Incremental Headcount (FTE)** | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 |

**City of Detroit**
**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Executive Agencies**
**Law Department (Law)**
*($ in millions)*

| | | 10-Year Total | Assumptions / Comments |
|---|---|---|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | 4.4 | Assumes annual improvement to collections due to additional internal legal labor resources |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | - | |
| 5. | Grant Revenue | - | |
| 6. | Other | - | |
| 7. | **Total Revenues** | 4.4 | |
| | | | |
| | **Expenditures** | - | |
| 8. | Permanent Labor | (14.5) | 17 additional employees primarily dedicated to aggressively pursuing receivable collection efforts and to more rigorously defend City against certain legal actions |
| 9. | Professional & Contract Services | - | |
| 10. | Labor Costs / Service Contracts | (14.5) | |
| 11. | Active Benefits | (8.0) | Benefits at 55% of Permanent Labor costs |
| 12. | Training | (1.5) | Training cost for all department employees - $2.0k per employee through FY '16, $1.5k thereafter to establish a continuous training program |
| 13. | Materials and Supplies | - | |
| 14. | Utilities | - | |
| 15. | Purchased services | 6.8 | Assumes $750.0k annual reduction in outside legal costs due to additional internal labor resources |
| 16. | Risk management / insurance | 18.0 | Assumes $2.0MM annual reduction in lawsuit settlements as a result of additional internal labor resources |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | - | |
| 22. | **Total Operating Expenditures** | 0.8 | |
| | | | |
| 23. | **Total Operating Surplus (Deficit)** | 5.2 | |
| | | | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | (0.5) | Purchase of City Law IT application |
| 25. | Capital Expenditures | - | |
| 26. | Other Infrastructure | - | |
| 27. | Reorganization Costs | (0.1) | Implementation cost of City Law IT application |
| 28. | **Total Reorganization / Reinvestment** | (0.6) | |
| | | | |
| 29. | **Total Surplus (Deficit)** | $ 4.6 | |
| | | | |
| 30. | **Incremental Headcount (FTE)** | 17 | |

**City of Detroit**

Ten-Year Plan of Adjustment
Restructuring and Reinvestment Initiatives - Executive Agencies
Mayor's Office
*($ in millions)*

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2. | a. Increased Collection Rate | - | - | - | - | - | - | - | - | - | - | - |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | - | - | - | - | - | - | - | - | - | - | - |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | - | - | - | - | - | - | - | - | - | - | - |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | - | - | - | - | - | - | - | - | - | - | - |
| 9. | Professional & Contract Services | - | - | - | - | - | - | - | - | - | - | - |
| 10. | Labor Costs / Service Contracts | - | - | - | - | - | - | - | - | - | - | - |
| 11. | Active Benefits | - | - | - | - | - | - | - | - | - | - | - |
| 12. | Training | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.3) |
| 13. | Materials and Supplies | - | - | - | - | - | - | - | - | - | - | - |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | - | - | - | - | - | - | - | - | - | - | - |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | - | - | - | - | - | - | - | - | - | - |
| 22. | **Total Operating Expenditures** | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.3) |
| 23. | **Total Operating Surplus (Deficit)** | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.3) |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 25. | Capital Expenditures | - | - | - | - | - | - | - | - | - | - | - |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | - | - | - | - | - | - | - | - | - | - | - |
| 28. | **Total Reorganization / Reinvestment** | - | - | - | - | - | - | - | - | - | - | - |
| 29. | **Total Surplus (Deficit)** | $ - | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.3) |
| 30. | **Incremental Headcount (FTE)** | - | - | - | - | - | - | - | - | - | - | - |

| | | 10-Year Total | Assumptions / Comments |
|---|---|---|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | - | |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | - | |
| 5. | Grant Revenue | - | |
| 6. | Other | - | |
| 7. | **Total Revenues** | - | |
| | | | |
| | **Expenditures** | - | |
| 8. | Permanent Labor | - | |
| 9. | Professional & Contract Services | - | |
| 10. | Labor Costs / Service Contracts | - | |
| 11. | Active Benefits | - | |
| 12. | Training | (0.3) | Training cost for all department employees - $2k per employee through FY '16, $1.5k thereafter to establish a continuous training program |
| 13. | Materials and Supplies | - | |
| 14. | Utilities | - | |
| 15. | Purchased services | - | |
| 16. | Risk management / insurance | - | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | - | |
| 22. | **Total Operating Expenditures** | (0.3) | |
| | | | |
| 23. | **Total Operating Surplus (Deficit)** | (0.3) | |
| | | | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | - | |
| 25. | Capital Expenditures | - | |
| 26. | Other Infrastructure | - | |
| 27. | Reorganization Costs | - | |
| 28. | **Total Reorganization / Reinvestment** | - | |
| | | | |
| 29. | **Total Surplus (Deficit)** | $ (0.3) | |
| | | | |
| | | | |
| 30. | Incremental Headcount (FTE) | - | |

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Executive Agencies**
**Planning and Development Department (PDD)**
($ in millions)

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| 2. | a. Increased Collection Rate | - | - | - | - | - | - | - | - | - | - | - |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | - | - | - | - | - | - | - | - | - | - | - |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | - | - | - | - | - | - | - | - | - | - | - |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | (0.3) | (0.8) | (0.7) | (0.7) | (0.7) | (0.7) | (0.8) | (0.8) | (0.8) | (0.8) | (7.2) |
| 9. | Professional & Contract Services | - | - | - | - | - | - | - | - | - | - | - |
| 10. | Labor Costs / Service Contracts | (0.3) | (0.8) | (0.7) | (0.7) | (0.7) | (0.7) | (0.8) | (0.8) | (0.8) | (0.8) | (7.2) |
| 11. | Active Benefits | (0.2) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (3.9) |
| 12. | Training | (0.1) | (0.2) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (1.2) |
| 13. | Materials and Supplies | - | - | - | - | - | - | - | - | - | - | - |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | - | - | - | - | - | - | - | - | - | - | - |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | 0.2 | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 2.2 |
| 22. | **Total Operating Expenditures** | (0.6) | (1.2) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.1) | (1.1) | (1.1) | (10.0) |
| 23. | **Total Operating Surplus (Deficit)** | (0.6) | (1.2) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.1) | (1.1) | (1.1) | (10.0) |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | (0.3) | (0.3) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.8) |
| 25. | Capital Expenditures | - | - | - | - | - | - | - | - | - | - | - |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | (2.4) | (4.1) | (0.7) | - | - | - | (0.8) | (0.8) | - | - | (8.9) |
| 28. | **Total Reorganization / Reinvestment** | (2.7) | (4.4) | (0.7) | (0.0) | (0.0) | (0.0) | (0.9) | (0.9) | (0.0) | (0.0) | (9.7) |
| 29. | **Total Surplus (Deficit)** | $ (3.3) | $ (5.6) | $ (1.7) | $ (1.0) | $ (1.0) | $ (1.0) | $ (1.9) | $ (1.9) | $ (1.1) | $ (1.1) | $ (19.7) |
| 30. | **Incremental Headcount (FTE)** | 13 | (26) | (28) | (28) | (28) | (28) | (28) | (28) | (28) | (28) | (28) |

**City of Detroit**

**Ten-Year Plan of Adjustment**

**Restructuring and Reinvestment Initiatives - Executive Agencies**

**Planning and Development Department (PDD)**

*($ in millions)*

| | | 10-Year Total | Assumptions / Comments |
|---|---|---|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | - | |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | - | |
| 5. | Grant Revenue | - | |
| 6. | Other | - | |
| 7. | **Total Revenues** | - | |
| | | | |
| | **Expenditures** | - | |
| 8. | Permanent Labor | (7.2) | Hire City planning and other labor resources, transfer of personnel from City Council to PDD, efficiency improvements from grants management consolidation, and service delivery changes, and privatization of Real Estate, development (portion), neighborhood support (portion), and housing (portion) divisions |
| 9. | Professional & Contract Services | - | |
| 10. | Labor Costs / Service Contracts | (7.2) | |
| 11. | Active Benefits | (3.9) | Benefits at 55% of Permanent Labor costs |
| 12. | Training | (1.2) | Training cost for all department employees - $2.0k per employee through FY '16, $1.5k thereafter to establish a continuous training program |
| 13. | Materials and Supplies | - | |
| 14. | Utilities | - | |
| 15. | Purchased services | - | |
| 16. | Risk management / insurance | - | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | 2.2 | Savings due to PDD moving facilities from Cadillac Tower to CAYMC |
| 22. | **Total Operating Expenditures** | (10.0) | |
| | | | |
| 23. | **Total Operating Surplus (Deficit)** | (10.0) | |
| | | | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | (0.8) | IT infrastructure investment |
| 25. | Capital Expenditures | - | |
| 26. | Other Infrastructure | - | |
| 27. | Reorganization Costs | (8.9) | Update master plan and zoning ordinance, develop investment strategy ($4.0MM), surge resources (accounting staff / consultants) ($2.4MM), service / delivery model change ($1.5MM) and PDD facility consolidation ($1.0MM) |
| 28. | **Total Reorganization / Reinvestment** | (9.7) | |
| | | | |
| 29. | **Total Surplus (Deficit)** | $ (19.7) | |
| | | | |
| 30. | **Incremental Headcount (FTE)** | (28) | |

**City of Detroit**

**Ten-Year Plan of Adjustment**

**Restructuring and Reinvestment Initiatives - Executive Agencies**

**Police Department (DPD)**

*($ in millions)*

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2. | a. Increased Collection Rate | - | - | - | - | - | - | - | - | - | - | - |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 18.0 |
| 5. | Grant Revenue | - | 1.6 | 1.6 | 1.6 | 1.6 | 1.6 | 1.6 | 1.6 | 1.6 | 1.6 | 14.6 |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | - | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 32.6 |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | (1.5) | (8.5) | (8.4) | (5.3) | (4.4) | (4.4) | (4.4) | (4.5) | (4.6) | (4.7) | (50.8) |
| 9. | Professional & Contract Services | - | - | - | - | - | - | - | - | - | - | - |
| 10. | Labor Costs / Service Contracts | (1.5) | (8.5) | (8.4) | (5.3) | (4.4) | (4.4) | (4.4) | (4.5) | (4.6) | (4.7) | (50.8) |
| 11. | Active Benefits | (0.8) | (4.7) | (4.6) | (2.9) | (2.4) | (2.4) | (2.4) | (2.5) | (2.5) | (2.6) | (27.9) |
| 12. | Training | - | (0.9) | (0.8) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (5.4) |
| 13. | Materials and Supplies | (1.2) | (1.2) | (3.4) | (1.5) | (1.5) | (2.0) | (1.5) | (1.5) | (1.5) | (1.6) | (16.9) |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | (1.4) | (1.2) | (1.4) | (1.2) | (1.4) | (1.2) | (1.4) | (1.2) | (1.4) | (1.2) | (13.0) |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | (0.8) | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.5 | 0.6 | 0.6 | 0.6 | 3.5 |
| 22. | **Total Operating Expenditures** | (5.7) | (16.1) | (18.1) | (11.0) | (9.9) | (10.1) | (9.9) | (9.7) | (10.1) | (9.9) | (110.4) |
| 23. | **Total Operating Surplus (Deficit)** | (5.7) | (12.5) | (14.5) | (7.4) | (6.3) | (6.5) | (6.2) | (6.1) | (6.5) | (6.3) | (77.8) |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | (1.9) | (11.2) | (10.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (38.4) |
| 25. | Capital Expenditures | (8.9) | (6.5) | (3.5) | (0.1) | (0.5) | (0.2) | (3.3) | (3.1) | (3.0) | (3.0) | (32.1) |
| 26. | Other Infrastructure | (12.9) | (15.1) | (12.9) | (12.6) | (12.6) | (12.6) | (12.6) | (12.6) | (12.6) | (12.6) | (129.3) |
| 27. | Reorganization Costs | (0.2) | (0.6) | (0.2) | - | - | - | - | - | - | - | (1.0) |
| 28. | **Total Reorganization / Reinvestment** | (23.9) | (33.3) | (26.8) | (14.9) | (15.3) | (14.9) | (18.1) | (17.9) | (17.8) | (17.8) | (200.8) |
| 29. | **Total Surplus (Deficit)** | $ (29.6) | $ (45.8) | $ (41.3) | $ (22.3) | $ (21.6) | $ (21.4) | $ (24.3) | $ (24.0) | $ (24.3) | $ (24.1) | $ (278.6) |
| 30. | **Incremental Headcount (FTE)** | 125 | 250 | 175 | 163 | 150 | 150 | 150 | 150 | 150 | 150 | 150 |

**City of Detroit**

Ten-Year Plan of Adjustment
Restructuring and Reinvestment Initiatives - Executive Agencies
Police Department (DPD)
($ in millions)

| | | 10-Year Total | Assumptions / Comments |
|---|---|---|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | - | |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | 18.0 | Increased collections from false alarm calls, new cost recovery, and adoption of State Motor Vehicle Code for greater capture of moving violation fees |
| 5. | Grant Revenue | 14.6 | Anticipated additional grant revenue through identification of new Federal, State, Foundation or other grants |
| 6. | Other | - | |
| 7. | **Total Revenues** | 32.6 | |
| | **Expenditures** | - | |
| 8. | Permanent Labor | (50.8) | Increased labor cost associated with hiring of 250 civilian positions and redeployment of uniform personnel. Civilianization costs offset by savings due to attrition of senior uniform personnel and hiring of less experienced uniform personnel ($17.2MM in total savings). Reduction of civilians through efficiency gains following implementation of fully integrated public safety IT system |
| 9. | Professional & Contract Services | - | |
| 10. | Labor Costs / Service Contracts | (50.8) | |
| 11. | Active Benefits | (27.9) | Benefits at 55% of Permanent Labor costs (civilians) |
| 12. | Training | (5.4) | Training cost for all DPD civilian employees - $2.0k per EE through FY '16, $1.5k thereafter |
| 13. | Materials and Supplies | (16.9) | Increased replacement cost of tasers / cartridges ($5.2MM), vests ($3.3MM), body cameras ($2.4MM) and other misc. spend ($6.0MM) |
| 14. | Utilities | - | |
| 15. | Purchased services | (13.0) | Primarily related to shot spotter "flex services" |
| 16. | Risk management / insurance | - | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | 3.5 | Savings from facility lease terminations ($10.5MM), partially offset by annual costs associated with new facilities ($4.1MM), increased helicopter maintenance ($2.8MM) and citizen patrol/reserve costs ($0.2MM). Still evaluating other lease options |
| 22. | **Total Operating Expenditures** | (110.4) | |
| 23. | **Total Operating Surplus (Deficit)** | (77.8) | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | (38.4) | Primarily related to replacement of prep / handheld radios ($22.0MM) and implementation of fully integrated Public Safety IT system ($13.8MM) |
| 25. | Capital Expenditures | (32.1) | Department-wide improvements / projects ($14.0MM), build-out of new precincts and training facility ($12.0MM), and other precinct/other facility improvements ($6.1MM) |
| 26. | Other Infrastructure | (129.3) | Includes fleet vehicle replacement cycle of 3 years |
| 27. | Reorganization Costs | (1.0) | IT temporary positions to assist with implementation of new fully integrated public safety IT system |
| 28. | **Total Reorganization / Reinvestment** | (200.8) | |
| 29. | **Total Surplus (Deficit)** | $ (278.6) | |
| 30. | Incremental Headcount (FTE) | 150 | |

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Executive Agencies**
**Department of Public Works (DPW) - General Fund**
($ in millions)

|  |  | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | **Revenues** |  |  |  |  |  |  |  |  |  |  |  |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| 2. | a. Increased Collection Rate | - | - | - | - | - | - | - | - | - | - | - |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | - | - | - | - | - | - | - | - | - | - | - |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | - | - | - | - | - | - | - | - | - | - | - |
|  | **Expenditures** |  |  |  |  |  |  |  |  |  |  |  |
| 8. | Permanent Labor | - | - | - | - | - | - | - | - | - | - | - |
| 9. | Professional & Contract Services | - | - | - | - | - | - | - | - | - | - | - |
| 10. | Labor Costs / Service Contracts | - | - | - | - | - | - | - | - | - | - | - |
| 11. | Active Benefits | - | - | - | - | - | - | - | - | - | - | - |
| 12. | Training | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.3) |
| 13. | Materials and Supplies | - | - | - | - | - | - | - | - | - | - | - |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | - | - | - | - | - | - | - | - | - | - | - |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | - | - | - | - | - | - | - | - | - | - |
| 22. | **Total Operating Expenditures** | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.3) |
| 23. | **Total Operating Surplus (Deficit)** | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.3) |
|  | **Reorganization / Reinvestment** |  |  |  |  |  |  |  |  |  |  |  |
| 24. | Technology Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 25. | Capital Expenditures | - | - | - | - | - | - | - | - | - | - | - |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | - | - | - | - | - | - | - | - | - | - | - |
| 28. | **Total Reorganization / Reinvestment** | - | - | - | - | - | - | - | - | - | - | - |
| 29. | **Total Surplus (Deficit)** | $ - | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | (0.3) |
| 30. | **Incremental Headcount (FTE)** | - | - | - | - | - | - | - | - | - | - | - |

**City of Detroit**

Ten-Year Plan of Adjustment
Restructuring and Reinvestment Initiatives - Executive Agencies
Department of Public Works (DPW) - General Fund
*($ in millions)*

| | | 10-Year Total | Assumptions / Comments |
|---|---|---|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | - | |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | - | |
| 5. | Grant Revenue | - | |
| 6. | Other | - | |
| 7. | **Total Revenues** | - | |
| | | | |
| | **Expenditures** | | |
| 8. | Permanent Labor | - | |
| 9. | Professional & Contract Services | - | |
| 10. | Labor Costs / Service Contracts | - | |
| 11. | Active Benefits | - | |
| 12. | Training | (0.3) | Training cost for all department employees - $2.0k per employee through FY '16, $1.5k thereafter to establish a continuous training program |
| 13. | Materials and Supplies | - | |
| 14. | Utilities | - | |
| 15. | Purchased services | - | |
| 16. | Risk management / insurance | - | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | - | |
| 22. | **Total Operating Expenditures** | (0.3) | |
| | | | |
| 23. | **Total Operating Surplus (Deficit)** | (0.3) | |
| | | | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | - | |
| 25. | Capital Expenditures | - | |
| 26. | Other Infrastructure | - | |
| 27. | Reorganization Costs | - | |
| 28. | **Total Reorganization / Reinvestment** | - | |
| | | | |
| 29. | **Total Surplus (Deficit)** | $ (0.3) | |
| | | | |
| 30. | **Incremental Headcount (FTE)** | - | |

**City of Detroit**

Ten-Year Plan of Adjustment
Restructuring and Reinvestment Initiatives - Executive Agencies
Recreation
*($ in millions)*

| | | | | | For the Fiscal Year Ended | | | | | | 10-Year |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Total |
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| 2. | a. Increased Collection Rate | - | - | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.5 |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | - | - | - | - | - | - | - | - | - | - | - |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | - | - | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.5 |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | - | - | - | - | - | - | - | - | - | - | - |
| 9. | Professional & Contract Services | - | - | - | - | - | - | - | - | - | - | - |
| 10. | Labor Costs / Service Contracts | - | - | - | - | - | - | - | - | - | - | - |
| 11. | Active Benefits | - | - | - | - | - | - | - | - | - | - | - |
| 12. | Training | - | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.9) |
| 13. | Materials and Supplies | - | - | - | - | - | - | - | - | - | - | - |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | - | - | - | - | - | - | - | - | - | - | - |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | - | - | - | - | - | - | - | - | - | - |
| 22. | **Total Operating Expenditures** | - | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.9) |
| 23. | **Total Operating Surplus (Deficit)** | - | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.3) |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 25. | Capital Expenditures | (0.9) | (8.9) | (3.1) | (3.3) | (3.0) | (4.0) | (4.3) | (4.0) | (4.0) | (4.0) | (39.5) |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | - | - | - | - | - | - | - | - | - | - | - |
| 28. | **Total Reorganization / Reinvestment** | (0.9) | (8.9) | (3.1) | (3.3) | (3.0) | (4.0) | (4.3) | (4.0) | (4.0) | (4.0) | (39.5) |
| 29. | **Total Surplus (Deficit)** | $ (0.9) | $ (9.0) | $ (3.1) | $ (3.3) | $ (3.1) | $ (4.0) | $ (4.3) | $ (4.0) | $ (4.0) | $ (4.0) | $ (39.8) |
| 30. | **Incremental Headcount (FTE)** | - | - | - | - | - | - | - | - | - | - | - |

**City of Detroit**

Ten-Year Plan of Adjustment
Restructuring and Reinvestment Initiatives - Executive Agencies
Recreation
*($ in millions)*

| | | 10-Year Total | Assumptions / Comments |
|---|---|---:|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | 0.5 | Increase collection rates due to full implementation of online registration and collection system and improvements to Hart Plaza |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | - | |
| 5. | Grant Revenue | - | |
| 6. | Other | - | |
| 7. | **Total Revenues** | 0.5 | |
| | **Expenditures** | - | |
| 8. | Permanent Labor | - | |
| 9. | Professional & Contract Services | - | |
| 10. | Labor Costs / Service Contracts | - | |
| 11. | Active Benefits | - | |
| 12. | Training | (0.9) | Training cost for all department employees - $2.0k per employee through FY '16, $1.5k thereafter to establish a continuous training program |
| 13. | Materials and Supplies | - | |
| 14. | Utilities | - | |
| 15. | Purchased services | - | |
| 16. | Risk management / insurance | - | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | - | |
| 22. | **Total Operating Expenditures** | (0.9) | |
| 23. | **Total Operating Surplus (Deficit)** | (0.3) | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | - | |
| 25. | Capital Expenditures | (39.5) | Park and recreation facility improvements and upgrades ($34.5MM) and emergency repairs required for recreation centers ($5.0MM) |
| 26. | Other Infrastructure | - | |
| 27. | Reorganization Costs | - | |
| 28. | **Total Reorganization / Reinvestment** | (39.5) | |
| 29. | **Total Surplus (Deficit)** | $ (39.8) | |
| 30. | **Incremental Headcount (FTE)** | - | |

**City of Detroit**

Ten-Year Plan of Adjustment
Restructuring and Reinvestment Initiatives - Executive Agencies
Department of Health & Wellness Promotion (DHWP)
*($ in millions)*

|   | | For the Fiscal Year Ended | | | | | | | | | | 10-Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|   | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Total |
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2. | a. Increased Collection Rate | - | - | - | - | - | - | - | - | - | - | - |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | - | - | - | - | - | - | - | - | - | - | - |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | - | - | - | - | - | - | - | - | - | - | - |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | - | - | - | - | - | - | - | - | - | - | - |
| 9. | Professional & Contract Services | - | - | - | - | - | - | - | - | - | - | - |
| 10. | Labor Costs / Service Contracts | - | - | - | - | - | - | - | - | - | - | - |
| 11. | Active Benefits | - | - | - | - | - | - | - | - | - | - | - |
| 12. | Training | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.1) |
| 13. | Materials and Supplies | - | - | - | - | - | - | - | - | - | - | - |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | (0.3) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (1.7) |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | - | - | - | - | - | - | - | - | - | - |
| 22. | **Total Operating Expenditures** | (0.3) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (1.8) |
| 23. | **Total Operating Surplus (Deficit)** | (0.3) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (1.8) |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 25. | Capital Expenditures | - | (5.1) | - | - | - | - | - | - | - | - | (5.1) |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | - | - | - | - | - | - | - | - | - | - | - |
| 28. | **Total Reorganization / Reinvestment** | - | (5.1) | - | - | - | - | - | - | - | - | (5.1) |
| 29. | **Total Surplus (Deficit)** | $ (0.3) | $ (5.3) | $ (0.2) | $ (0.2) | $ (0.2) | $ (0.2) | $ (0.2) | $ (0.2) | $ (0.2) | $ (0.2) | $ (6.9) |
| 30. | **Incremental Headcount (FTE)** | - | - | - | - | - | - | - | - | - | - | - |

**City of Detroit**

Ten-Year Plan of Adjustment
Restructuring and Reinvestment Initiatives - Executive Agencies
Department of Health & Wellness Promotion (DHWP)
*($ in millions)*

| | | 10-Year Total | Assumptions / Comments |
|---|---|---|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | - | |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | - | |
| 5. | Grant Revenue | - | |
| 6. | Other | - | |
| 7. | **Total Revenues** | - | |
| | | | |
| | **Expenditures** | | |
| 8. | Permanent Labor | - | |
| 9. | Professional & Contract Services | - | |
| 10. | Labor Costs / Service Contracts | - | |
| 11. | Active Benefits | - | |
| 12. | Training | (0.1) | Training cost for all department employees - $2.0k per employee through FY '16, $1.5k thereafter to establish a continuous training program |
| 13. | Materials and Supplies | - | |
| 14. | Utilities | - | |
| 15. | Purchased services | (1.7) | Public Health Record management and storage fees |
| 16. | Risk management / insurance | - | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | - | |
| 22. | **Total Operating Expenditures** | (1.8) | |
| | | | |
| 23. | **Total Operating Surplus (Deficit)** | (1.8) | |
| | | | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | - | |
| 25. | Capital Expenditures | (5.1) | Herman Kiefer demolition costs |
| 26. | Other Infrastructure | - | |
| 27. | Reorganization Costs | - | |
| 28. | **Total Reorganization / Reinvestment** | (5.1) | |
| | | | |
| 29. | **Total Surplus (Deficit)** | $ (6.9) | |
| | | | |
| | | | |
| 30. | **Incremental Headcount (FTE)** | - | |

**City of Detroit**

Ten-Year Plan of Adjustment

Legislative Agencies - Department Detail

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Legislative Agencies**
**Auditor General (AG) and Inspector General (IG)**
*($ in millions)*

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **For the Fiscal Year Ended** | | | | | | | | | | | |
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| 2. | a. Increased Collection Rate | - | - | - | - | - | - | - | - | - | - | - |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | - | - | - | - | - | - | - | - | - | - | - |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | - | - | - | - | - | - | - | - | - | - | - |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | - | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (2.5) |
| 9. | Professional & Contract Services | - | - | - | - | - | - | - | - | - | - | - |
| 10. | Labor Costs / Service Contracts | - | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (2.5) |
| 11. | Active Benefits | - | (0.1) | (0.1) | (0.1) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (1.4) |
| 12. | Training | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.4) |
| 13. | Materials and Supplies | - | - | - | - | - | - | - | - | - | - | - |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | - | - | - | - | - | - | - | - | - | - | - |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | - | - | - | - | - | - | - | - | - | - |
| 22. | **Total Operating Expenditures** | (0.0) | (0.4) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (4.4) |
| 23. | **Total Operating Surplus (Deficit)** | (0.0) | (0.4) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (4.4) |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | (0.0) | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.3) |
| 25. | Capital Expenditures | - | - | - | - | - | - | - | - | - | - | - |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | - | - | - | - | - | - | - | - | - | - | - |
| 28. | **Total Reorganization / Reinvestment** | (0.0) | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.3) |
| 29. | **Total Surplus (Deficit)** | $ (0.1) | $ (0.6) | $ (0.5) | $ (0.5) | $ (0.5) | $ (0.5) | $ (0.5) | $ (0.5) | $ (0.5) | $ (0.5) | (4.7) |
| 30. | **Incremental Headcount (FTE)** | - | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |

**City of Detroit**

**Ten-Year Plan of Adjustment**

**Restructuring and Reinvestment Initiatives - Legislative Agencies**

**Auditor General (AG) and Inspector General (IG)**

*($ in millions)*

| | | 10-Year Total | Assumptions / Comments |
|---|---|---|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | - | |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | - | |
| 5. | Grant Revenue | - | |
| 6. | Other | - | |
| 7. | **Total Revenues** | - | |
| | | | |
| | **Expenditures** | - | |
| 8. | Permanent Labor | (2.5) | Addition of 4 employees to fill current vacancies and increase the frequency of the City's financial and operational audits |
| 9. | Professional & Contract Services | - | |
| 10. | Labor Costs / Service Contracts | (2.5) | |
| 11. | Active Benefits | (1.4) | Benefits at 55% of salary and wages |
| 12. | Training | (0.4) | Training cost for all department employees - $2.0k per employee through FY '16, $1.5k thereafter to establish a continuous training program |
| 13. | Materials and Supplies | - | |
| 14. | Utilities | - | |
| 15. | Purchased services | - | |
| 16. | Risk management / insurance | - | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | - | |
| 22. | **Total Operating Expenditures** | (4.4) | |
| | | | |
| 23. | **Total Operating Surplus (Deficit)** | (4.4) | |
| | | | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | (0.3) | Electronic work-papers and incremental hardware/software investment |
| 25. | Capital Expenditures | - | |
| 26. | Other Infrastructure | - | |
| 27. | Reorganization Costs | - | |
| | | | |
| 28. | **Total Reorganization / Reinvestment** | (0.3) | |
| | | | |
| 29. | **Total Surplus (Deficit)** | $ (4.7) | |
| | | | |
| 30. | **Incremental Headcount (FTE)** | 4 | |

13-53846-swr   Doc 8700   Filed 12/11/14   Entered 12/11/14 10:59:30   Page 330 of 440

**City of Detroit**

Ten-Year Plan of Adjustment
Restructuring and Reinvestment Initiatives - Legislative Agencies
Board of Zoning Appeals (BZA)
*($ in millions)*

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| 2. | a. Increased Collection Rate | - | - | - | - | - | - | - | - | - | - | - |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | - | - | - | - | - | - | - | - | - | - | - |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | - | - | - | - | - | - | - | - | - | - | - |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | - | - | - | - | - | - | - | - | - | - | - |
| 9. | Professional & Contract Services | - | - | - | - | - | - | - | - | - | - | - |
| 10. | Labor Costs / Service Contracts | - | - | - | - | - | - | - | - | - | - | - |
| 11. | Active Benefits | - | - | - | - | - | - | - | - | - | - | - |
| 12. | Training | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.2) |
| 13. | Materials and Supplies | - | - | - | - | - | - | - | - | - | - | - |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | - | - | - | - | - | - | - | - | - | - | - |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | - | - | - | - | - | - | - | - | - | - |
| 22. | **Total Operating Expenditures** | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.2) |
| 23. | **Total Operating Surplus (Deficit)** | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.2) |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 25. | Capital Expenditures | - | - | - | - | - | - | - | - | - | - | - |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | - | - | - | - | - | - | - | - | - | - | - |
| 28. | **Total Reorganization / Reinvestment** | - | - | - | - | - | - | - | - | - | - | - |
| 29. | **Total Surplus (Deficit)** | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | (0.2) |
| 30. | **Incremental Headcount (FTE)** | - | - | - | - | - | - | - | - | - | - | - |

**City of Detroit**

**Ten-Year Plan of Adjustment**

**Restructuring and Reinvestment Initiatives - Legislative Agencies**

**Board of Zoning Appeals (BZA)**

*($ in millions)*

| | | 10-Year Total | Assumptions / Comments |
|---|---|---|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | - | |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | - | |
| 5. | Grant Revenue | - | |
| 6. | Other | - | |
| 7. | **Total Revenues** | - | |
| | | | |
| | **Expenditures** | | |
| 8. | Permanent Labor | - | |
| 9. | Professional & Contract Services | - | |
| 10. | Labor Costs / Service Contracts | - | |
| 11. | Active Benefits | - | |
| 12. | Training | (0.2) | Training cost for all department employees - $2.0k per employee through FY '16, $1.5k thereafter to establish a continuous training program |
| 13. | Materials and Supplies | - | |
| 14. | Utilities | - | |
| 15. | Purchased services | - | |
| 16. | Risk management / insurance | - | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | - | |
| 22. | **Total Operating Expenditures** | (0.2) | |
| | | | |
| 23. | **Total Operating Surplus (Deficit)** | (0.2) | |
| | | | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | - | |
| 25. | Capital Expenditures | - | |
| 26. | Other Infrastructure | - | |
| 27. | Reorganization Costs | - | |
| | | | |
| 28. | **Total Reorganization / Reinvestment** | - | |
| | | | |
| 29. | **Total Surplus (Deficit)** | $ (0.2) | |
| | | | |
| 30. | **Incremental Headcount (FTE)** | - | |

**City of Detroit**

**Ten-Year Plan of Adjustment**

**Restructuring and Reinvestment Initiatives - Legislative Agencies**

**City Clerk**

*($ in millions)*

| | For the Fiscal Year Ended | | | | | | | | | | 10-Year |
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenues** | | | | | | | | | | | |
| 1. Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| 2. a. Increased Collection Rate | - | - | - | - | - | - | - | - | - | - | - |
| 3. b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. Grant Revenue | - | - | - | - | - | - | - | - | - | - | - |
| 6. Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. **Total Revenues** | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | |
| **Expenditures** | | | | | | | | | | | |
| 8. Permanent Labor | 0.0 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 1.6 |
| 9. Professional & Contract Services | - | - | - | - | - | - | - | - | - | - | - |
| 10. Labor Costs / Service Contracts | 0.0 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 1.6 |
| 11. Active Benefits | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.9 |
| 12. Training | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.2) |
| 13. Materials and Supplies | - | - | - | - | - | - | - | - | - | - | - |
| 14. Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. Purchased services | - | - | - | - | - | - | - | - | - | - | - |
| 16. Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. All Other | - | - | - | - | - | - | - | - | - | - | - |
| 22. **Total Operating Expenditures** | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 2.2 |
| | | | | | | | | | | | |
| 23. **Total Operating Surplus (Deficit)** | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 2.2 |
| | | | | | | | | | | | |
| **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. Technology Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 25. Capital Expenditures | - | - | - | - | - | - | - | - | - | - | - |
| 26. Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. Reorganization Costs | - | - | - | - | - | - | - | - | - | - | - |
| 28. **Total Reorganization / Reinvestment** | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | |
| 29. **Total Surplus (Deficit)** | $ 0.1 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.3 | $ 0.3 | $ 0.3 | 2.2 |
| | | | | | | | | | | | |
| 30. Incremental Headcount (FTE) | (1) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) |

13-53846-swr   Doc 8720   Filed 12/12/14   Entered 12/12/14 10:59:30   Page 333 of 440

**City of Detroit**

**Ten-Year Plan of Adjustment**

**Restructuring and Reinvestment Initiatives - Legislative Agencies**

**City Clerk**

*($ in millions)*

| | | 10-Year Total | Assumptions / Comments |
|---|---|---|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | - | |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | - | |
| 5. | Grant Revenue | - | |
| 6. | Other | - | |
| 7. | **Total Revenues** | - | |
| | | | |
| | **Expenditures** | - | |
| 8. | Permanent Labor | 1.6 | Headcount reduction through efficiency improvements, incremental costs associated with Blight remediation assumed to be funded by Blight initiative, Hardest Hit funds and other grants |
| 9. | Professional & Contract Services | - | |
| 10. | Labor Costs / Service Contracts | 1.6 | |
| 11. | Active Benefits | 0.9 | Benefits at 55% of Permanent Labor costs |
| 12. | Training | (0.2) | Training cost for all department employees - $2.0k per employee through FY '16, $1.5k thereafter to establish a continuous training program |
| 13. | Materials and Supplies | - | |
| 14. | Utilities | - | |
| 15. | Purchased services | - | |
| 16. | Risk management / insurance | - | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | - | |
| 22. | **Total Operating Expenditures** | 2.2 | |
| | | | |
| 23. | **Total Operating Surplus (Deficit)** | 2.2 | |
| | | | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | - | |
| 25. | Capital Expenditures | - | |
| 26. | Other Infrastructure | - | |
| 27. | Reorganization Costs | - | |
| | | | |
| 28. | **Total Reorganization / Reinvestment** | - | |
| | | | |
| 29. | **Total Surplus (Deficit)** | $ 2.2 | |
| | | | |
| 30. | Incremental Headcount (FTE) | (3) | |

**City of Detroit**

Ten-Year Plan of Adjustment
Restructuring and Reinvestment Initiatives - Legislative Agencies
City Council
*($ in millions)*

| | | 2014 | 2015 | 2016 | 2017 | For the Fiscal Year Ended 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| 2. | a. Increased Collection Rate | - | - | - | - | - | - | - | - | - | - | - |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | - | - | - | - | - | - | - | - | - | - | - |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | - | - | - | - | - | - | - | - | - | - | - |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | - | - | - | - | - | - | - | - | - | - | - |
| 9. | Professional & Contract Services | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 4.3 |
| 10. | Labor Costs / Service Contracts | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 4.3 |
| 11. | Active Benefits | - | - | - | - | - | - | - | - | - | - | - |
| 12. | Training | - | - | - | - | - | - | - | - | - | - | - |
| 13. | Materials and Supplies | - | - | - | - | - | - | - | - | - | - | - |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | - | - | - | - | - | - | - | - | - | - | - |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | - | - | - | - | - | - | - | - | - | - |
| 22. | **Total Operating Expenditures** | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 4.3 |
| 23. | **Total Operating Surplus (Deficit)** | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 4.3 |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.2) |
| 25. | Capital Expenditures | - | - | - | - | - | - | - | - | - | - | - |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | - | - | - | - | - | - | - | - | - | - | - |
| 28. | **Total Reorganization / Reinvestment** | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.2) |
| 29. | **Total Surplus (Deficit)** | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | 4.2 |
| 30. | **Incremental Headcount (FTE)** | - | - | - | - | - | - | - | - | - | - | - |

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Legislative Agencies**
**City Council**
*($ in millions)*

| | | 10-Year Total | Assumptions / Comments |
|---|---|---:|---|
| | **Revenues** | | |
| 1. | Collections | $        - | |
| 2. | a. Increased Collection Rate | - | |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | - | |
| 5. | Grant Revenue | - | |
| 6. | Other | - | |
| 7. | **Total Revenues** | - | |
| | | | |
| | **Expenditures** | - | |
| 8. | Permanent Labor | - | |
| 9. | Professional & Contract Services | 4.3 | Savings due to transfer of 6 contractors from CPC / HDAB to PDD |
| 10. | Labor Costs / Service Contracts | 4.3 | |
| 11. | Active Benefits | - | |
| 12. | Training | - | |
| 13. | Materials and Supplies | - | |
| 14. | Utilities | - | |
| 15. | Purchased services | - | |
| 16. | Risk management / insurance | - | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | - | |
| 22. | **Total Operating Expenditures** | 4.3 | |
| | | | |
| 23. | **Total Operating Surplus (Deficit)** | 4.3 | |
| | | | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | (0.2) | Assumed $50.0K in FY 14 for hardware improvements and annual $15.0K increase from current run-rates |
| 25. | Capital Expenditures | - | |
| 26. | Other Infrastructure | - | |
| 27. | Reorganization Costs | - | |
| | | | |
| 28. | **Total Reorganization / Reinvestment** | (0.2) | |
| | | | |
| 29. | **Total Surplus (Deficit)** | $     4.2 | |
| | | | |
| 30. | Incremental Headcount (FTE) | - | |

**City of Detroit**

Ten-Year Plan of Adjustment
Restructuring and Reinvestment Initiatives - Legislative Agencies
Department of Elections (Elections)
*($ in millions)*

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| 2. | a. Increased Collection Rate | - | - | - | - | - | - | - | - | - | - | - |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | - | - | - | - | - | - | - | - | - | - | - |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | - | - | - | - | - | - | - | - | - | - | - |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.4 |
| 9. | Professional & Contract Services | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.4 |
| 10. | Labor Costs / Service Contracts | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.8 |
| 11. | Active Benefits | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.2 |
| 12. | Training | - | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.6) |
| 13. | Materials and Supplies | - | - | - | - | - | - | - | - | - | - | - |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | - | - | - | - | - | - | - | - | - | - | - |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | - | - | - | - | - | - | - | - | - | - |
| 22. | **Total Operating Expenditures** | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.4 |
| 23. | **Total Operating Surplus (Deficit)** | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.4 |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | (0.0) | - | - | - | - | - | - | - | - | - | (0.0) |
| 25. | Capital Expenditures | (0.6) | (0.6) | - | - | - | - | (0.5) | (0.5) | (0.5) | (0.5) | (3.3) |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | - | - | - | - | - | - | - | - | - | - | - |
| 28. | **Total Reorganization / Reinvestment** | (0.7) | (0.6) | - | - | - | - | (0.5) | (0.5) | (0.5) | (0.5) | (3.3) |
| 29. | **Total Surplus (Deficit)** | $ (0.6) | $ (0.6) | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ (0.5) | $ (0.5) | $ (0.5) | $ (0.5) | $ (2.9) |
| 30. | **Incremental Headcount (FTE)** | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) |

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Legislative Agencies**
**Department of Elections (Elections)**
*($ in millions)*

| | | 10-Year Total | Assumptions / Comments |
|---|---|---:|---|
| | **Revenues** | | |
| 1. | Collections | $        - | |
| 2. | a. Increased Collection Rate | - | |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | - | |
| 5. | Grant Revenue | - | |
| 6. | Other | - | |
| 7. | **Total Revenues** | - | |
| | | | |
| | **Expenditures** | - | |
| 8. | Permanent Labor | 0.4 | Reduction due to elimination of one employee |
| 9. | Professional & Contract Services | 0.4 | Reduction due to elimination of 50% of poll workers/ballot counters related to technology investment |
| 10. | Labor Costs / Service Contracts | 0.8 | |
| 11. | Active Benefits | 0.2 | Benefits at 55% of Permanent Labor costs |
| 12. | Training | (0.6) | Training cost for all department employees - $2.0k per employee through FY '16, $1.5k thereafter to establish a continuous training program |
| 13. | Materials and Supplies | - | |
| 14. | Utilities | - | |
| 15. | Purchased services | - | |
| 16. | Risk management / insurance | - | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | - | |
| 22. | **Total Operating Expenditures** | 0.4 | |
| | | | |
| 23. | **Total Operating Surplus (Deficit)** | 0.4 | |
| | | | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | (0.0) | Investment in Ballot counting technology solution |
| 25. | Capital Expenditures | (3.3) | Deferred maintenance / improvements ($2.0MM), window replacement ($0.7MM), elevator improvements ($0.5MM) and roof replacement ($0.1MM) |
| 26. | Other Infrastructure | - | |
| 27. | Reorganization Costs | - | |
| 28. | **Total Reorganization / Reinvestment** | (3.3) | |
| | | | |
| 29. | **Total Surplus (Deficit)** | $    (2.9) | |
| | | | |
| 30. | Incremental Headcount (FTE) | (1) | |

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Legislative Agencies**
**Ombudsperson**
*($ in millions)*

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Revenues** | For the Fiscal Year Ended | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| 2. | a. Increased Collection Rate | - | - | - | - | - | - | - | - | - | - | - |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | - | - | - | - | - | - | - | - | - | - | - |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | - | - | - | - | - | - | - | - | - | - | - |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | - | (0.4) | (0.6) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (5.9) |
| 9. | Professional & Contract Services | - | - | - | - | - | - | - | - | - | - | - |
| 10. | Labor Costs / Service Contracts | - | (0.4) | (0.6) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (5.9) |
| 11. | Active Benefits | - | (0.2) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (3.3) |
| 12. | Training | - | (0.0) | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.3) |
| 13. | Materials and Supplies | - | - | - | - | - | - | - | - | - | - | - |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | - | - | - | - | - | - | - | - | - | - | - |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | - | - | - | - | - | - | - | - | - | - |
| 22. | **Total Operating Expenditures** | - | (0.6) | (1.0) | (1.1) | (1.1) | (1.1) | (1.1) | (1.1) | (1.2) | (1.2) | (9.5) |
| 23. | **Total Operating Surplus (Deficit)** | - | (0.6) | (1.0) | (1.1) | (1.1) | (1.1) | (1.1) | (1.1) | (1.2) | (1.2) | (9.5) |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | - | (3.0) | (0.5) | (0.5) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (7.6) |
| 25. | Capital Expenditures | - | - | - | - | - | - | - | - | - | - | - |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | - | - | - | - | - | - | - | - | - | - | - |
| 28. | **Total Reorganization / Reinvestment** | - | (3.0) | (0.5) | (0.5) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (7.6) |
| 29. | **Total Surplus (Deficit)** | $ - | $ (3.7) | $ (1.6) | $ (1.6) | $ (1.6) | $ (1.7) | $ (1.7) | $ (1.7) | $ (1.8) | $ (1.8) | $ (17.2) |
| 30. | **Incremental Headcount (FTE)** | - | 13 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 |

**City of Detroit**

**Ten-Year Plan of Adjustment**

**Restructuring and Reinvestment Initiatives - Legislative Agencies**

**Ombudsperson**

*($ in millions)*

| | | 10-Year Total | Assumptions / Comments |
|---|---|---|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | - | |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | - | |
| 5. | Grant Revenue | - | |
| 6. | Other | - | |
| 7. | **Total Revenues** | - | |
| | **Expenditures** | - | |
| 8. | Permanent Labor | (5.9) | Additional headcount for implementation of 311 system |
| 9. | Professional & Contract Services | | |
| 10. | Labor Costs / Service Contracts | (5.9) | |
| 11. | Active Benefits | (3.3) | Benefits at 55% of Permanent Labor costs |
| 12. | Training | (0.3) | Training cost for all department employees - $2.0k per employee through FY '16, $1.5k thereafter to establish a continuous training program |
| 13. | Materials and Supplies | - | |
| 14. | Utilities | - | |
| 15. | Purchased services | - | |
| 16. | Risk management / insurance | - | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | - | |
| 22. | **Total Operating Expenditures** | (9.5) | |
| 23. | **Total Operating Surplus (Deficit)** | (9.5) | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | (7.6) | Establishment of technology infrastructure for 311 system and estimated software implementation costs including estimated annual maintenance |
| 25. | Capital Expenditures | - | |
| 26. | Other Infrastructure | - | |
| 27. | Reorganization Costs | - | |
| 28. | **Total Reorganization / Reinvestment** | (7.6) | |
| 29. | **Total Surplus (Deficit)** | $ (17.2) | |
| 30. | Incremental Headcount (FTE) | 20 | |

**City of Detroit**
Ten-Year Plan of Adjustment
Judicial Agency - Department Detail

**City of Detroit**

Ten-Year Plan of Adjustment
Restructuring and Reinvestment Initiatives - Judicial Agency
36th District Court (36D) - General fund
*($ in millions)*

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | For the Fiscal Year Ended | | | | | | |
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2. | a. Increased Collection Rate | - | 3.9 | 5.5 | 8.5 | 8.7 | 9.0 | 9.2 | 9.5 | 9.8 | 10.1 | 74.1 |
| 3. | b. Collection of Past Due | - | 1.9 | 2.7 | - | - | - | - | - | - | - | 4.7 |
| 4. | Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | - | - | - | - | - | - | - | - | - | - | - |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | - | 5.8 | 8.2 | 8.5 | 8.7 | 9.0 | 9.2 | 9.5 | 9.8 | 10.1 | 78.8 |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | 0.8 | 1.9 | 2.3 | 2.3 | 2.4 | 2.4 | 2.5 | 2.5 | 2.6 | 2.6 | 22.1 |
| 9. | Professional & Contract Services | - | - | - | - | - | - | - | - | - | - | - |
| 10. | Labor Costs / Service Contracts | 0.8 | 1.9 | 2.3 | 2.3 | 2.4 | 2.4 | 2.5 | 2.5 | 2.6 | 2.6 | 22.1 |
| 11. | Active Benefits | 0.4 | 1.0 | 1.2 | 1.3 | 1.3 | 1.3 | 1.3 | 1.4 | 1.4 | 1.4 | 12.2 |
| 12. | Training | (0.5) | (0.5) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (4.5) |
| 13. | Materials and Supplies | - | - | - | - | - | - | - | - | - | - | - |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | - | - | - | - | - | - | - | - | - | - | - |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | - | - | - | - | - | - | - | - | - | - |
| 22. | **Total Operating Expenditures** | 0.7 | 2.5 | 3.1 | 3.1 | 3.2 | 3.3 | 3.4 | 3.4 | 3.5 | 3.6 | 29.8 |
| 23. | **Total Operating Surplus (Deficit)** | 0.7 | 8.3 | 11.3 | 11.6 | 11.9 | 12.3 | 12.6 | 12.9 | 13.3 | 13.7 | 108.6 |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | - | (1.6) | (0.8) | (0.4) | (0.4) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (4.2) |
| 25. | Capital Expenditures | - | (1.0) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (5.0) |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | - | (1.0) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (3.7) |
| 28. | **Total Reorganization / Reinvestment** | - | (3.6) | (1.6) | (1.2) | (1.2) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (12.9) |
| 29. | **Total Surplus (Deficit)** | $ 0.7 | $ 4.7 | $ 9.6 | $ 10.4 | $ 10.7 | $ 11.2 | $ 11.6 | $ 11.9 | $ 12.3 | $ 12.7 | 95.7 |
| 30. | **Incremental Headcount (FTE)** | (41) | (56) | (66) | (66) | (66) | (66) | (66) | (66) | (66) | (66) | (66) |

**City of Detroit**

Ten-Year Plan of Adjustment
Restructuring and Reinvestment Initiatives - Judicial Agency
36th District Court (36D) - General fund
*($ in millions)*

| | | 10-Year Total | Assumptions / Comments |
|---|---|---:|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | 74.1 | Improved collection rate from current 26% to 65% over the ten-year period to achieve regional average collection rate |
| 3. | b. Collection of Past Due | 4.7 | |
| 4. | Pricing/Fees | - | |
| 5. | Grant Revenue | - | |
| 6. | Other | - | |
| 7. | **Total Revenues** | 78.8 | |
| | | | |
| | **Expenditures** | - | |
| 8. | Permanent Labor | 22.1 | Reduction of 66 FTEs through efficiency and technology improvements |
| 9. | Professional & Contract Services | - | |
| 10. | Labor Costs / Service Contracts | 22.1 | |
| 11. | Active Benefits | 12.2 | Benefits at 55% of Permanent Labor costs |
| 12. | Training | (4.5) | Training cost for all department employees - $2.0k per employee through FY '16, $1.5k thereafter to establish a continuous training program |
| 13. | Materials and Supplies | - | |
| 14. | Utilities | - | |
| 15. | Purchased services | - | |
| 16. | Risk management / insurance | - | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | - | |
| 22. | **Total Operating Expenditures** | 29.8 | |
| | | | |
| 23. | **Total Operating Surplus (Deficit)** | 108.6 | |
| | | | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | (4.2) | Increased technology investment for "paperless" cost initiatives ($3.7MM) and new telephone system ($0.5MM) |
| 25. | Capital Expenditures | (5.0) | Increased capital expenditures for building maintenance, repairs and upgrades |
| 26. | Other Infrastructure | - | |
| 27. | Reorganization Costs | (3.7) | Addition of contract employees in to assist with process flow mapping, process change, and other restructuring initiatives |
| 28. | **Total Reorganization / Reinvestment** | (12.9) | |
| | | | |
| 29. | **Total Surplus (Deficit)** | $ 95.7 | |
| | | | |
| 30. | **Incremental Headcount (FTE)** | (66) | |

# City of Detroit

Ten-Year Plan of Adjustment

Enterprise Agencies - Department Detail

**City of Detroit**

Ten-Year Plan of Adjustment

Restructuring and Reinvestment Initiatives - Enterprise Agencies

Airport

*($ in millions)*

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| 2. | a. Increased Collection Rate | - | - | - | - | - | - | - | - | - | - | - |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | - | - | - | - | - | - | - | - | - | - | - |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | - | - | - | - | - | - | - | - | - | - | - |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | (0.1) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (3.6) |
| 9. | Professional & Contract Services | - | - | - | - | - | - | - | - | - | - | - |
| 10. | Labor Costs / Service Contracts | (0.1) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (3.6) |
| 11. | Active Benefits | (0.1) | (0.6) | (0.6) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (2.8) |
| 12. | Training | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.1) |
| 13. | Materials and Supplies | - | - | - | - | - | - | - | - | - | - | - |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | (0.1) | (0.4) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (1.2) |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.2) |
| 22. | **Total Operating Expenditures** | (0.2) | (1.3) | (1.1) | (0.7) | (0.7) | (0.7) | (0.7) | (0.8) | (0.8) | (0.8) | (7.9) |
| 23. | **Total Operating Surplus (Deficit)** | (0.2) | (1.3) | (1.1) | (0.7) | (0.7) | (0.7) | (0.7) | (0.8) | (0.8) | (0.8) | (7.9) |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | - | (0.0) | - | - | - | - | - | - | - | - | (0.0) |
| 25. | Capital Expenditures | - | (0.4) | (5.0) | (7.8) | (7.5) | - | - | - | - | - | (20.7) |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | - | - | - | - | - | - | - | - | - | - | - |
| 28. | **Total Reorganization / Reinvestment** | - | (0.4) | (5.0) | (7.8) | (7.5) | - | - | - | - | - | (20.7) |
| 29. | **Total Surplus (Deficit)** | $ (0.2) | $ (1.7) | $ (6.1) | $ (8.5) | $ (8.2) | $ (0.7) | $ (0.7) | $ (0.8) | $ (0.8) | $ (0.8) | (28.5) |
| 30. | **Incremental Headcount (FTE)** | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |

For the Fiscal Year Ended

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Enterprise Agencies**
**Airport**
*($ in millions)*

| | | 10-Year Total | Assumptions / Comments |
|---|---|---|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | - | |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | - | |
| 5. | Grant Revenue | - | |
| 6. | Other | - | |
| 7. | **Total Revenues** | - | |
| | | | |
| | **Expenditures** | - | |
| 8. | Permanent Labor | (3.6) | Addition of 4 FTE positions required to be in compliance with FAA and MDOT standards |
| | | | |
| 9. | Professional & Contract Services | - | |
| 10. | Labor Costs / Service Contracts | (3.6) | |
| 11. | Active Benefits | (2.8) | Benefits at 55% of Permanent Labor |
| 12. | Training | (0.1) | Training cost for all department employees - $2.0k per employee through FY '16, $1.5k thereafter to establish a continuous training program |
| 13. | Materials and Supplies | - | |
| 14. | Utilities | - | |
| 15. | Purchased services | (1.2) | Assume additional cost for Airport security ($0.1MM per year) and Master Plan Study ($0.3MM in FY '15) |
| 16. | Risk management / insurance | - | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | (0.2) | Assume $25.0K per year for maintenance |
| 22. | **Total Operating Expenditures** | (7.9) | |
| | | | |
| 23. | **Total Operating Surplus (Deficit)** | (7.9) | |
| | | | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | (0.0) | |
| 25. | Capital Expenditures | (20.7) | Executive bay upgrades ($10.0MM), new T-Hangars ($2.5MM), terminal upgrades ($2.0MM), new jetway ($2.0MM) and other capex required for airport operating certificate and master study |
| 26. | Other Infrastructure | - | |
| 27. | Reorganization Costs | - | |
| 28. | **Total Reorganization / Reinvestment** | (20.7) | |
| | | | |
| 29. | **Total Surplus (Deficit)** | $ (28.5) | |
| | | | |
| 30. | Incremental Headcount (FTE) | 4 | |

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Enterprise Agencies**
**Building Safety Engineering Environmental Department (BSEED) - General Fund**
($ in millions)

| | | | | | | For the Fiscal Year Ended | | | | | | 10-Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Total |
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2. | a. Increased Collection Rate | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 1.7 |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | - | - | - | - | - | - | - | - | - | - | - |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 1.7 |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | (0.0) | (0.0) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.3 |
| 9. | Professional & Contract Services | - | - | - | - | - | - | - | - | - | - | - |
| 10. | Labor Costs / Service Contracts | (0.0) | (0.0) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.3 |
| 11. | Active Benefits | (0.0) | (0.0) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 |
| 12. | Training | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.1) |
| 13. | Materials and Supplies | - | - | - | - | - | - | - | - | - | - | - |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | - | - | - | - | - | - | - | - | - | - | - |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | (0.6) | (2.1) | 2.5 | 3.3 | 2.9 | 3.8 | 3.9 | 3.4 | 3.9 | 4.0 | 25.0 |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.5 |
| 22. | **Total Operating Expenditures** | (0.6) | (2.1) | 2.6 | 3.4 | 3.0 | 3.8 | 3.9 | 3.5 | 4.0 | 4.1 | 25.7 |
| 23. | **Total Operating Surplus (Deficit)** | (0.4) | (1.9) | 2.7 | 3.5 | 3.2 | 4.0 | 4.1 | 3.7 | 4.2 | 4.2 | 27.3 |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 25. | Capital Expenditures | - | (0.4) | - | - | - | - | - | - | - | - | (0.4) |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | - | - | - | - | - | - | - | - | - | - | - |
| 28. | **Total Reorganization / Reinvestment** | - | (0.4) | - | - | - | - | - | - | - | - | (0.4) |
| 29. | **Total Surplus (Deficit)** | $ (0.4) | $ (2.3) | $ 2.7 | $ 3.5 | $ 3.2 | $ 4.0 | $ 4.1 | $ 3.7 | $ 4.2 | $ 4.2 | $ 27.0 |
| 30. | **Incremental Headcount (FTE)** | 2 | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) |

**City of Detroit**

**Ten-Year Plan of Adjustment**

**Restructuring and Reinvestment Initiatives - Enterprise Agencies**

**Building Safety Engineering Environmental Department (BSEED) - General Fund**

*($ in millions)*

| | | 10-Year Total | Assumptions / Comments |
|---|---|---|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | 1.7 | Increase to collection rate due to change in collections process and higher staffing levels |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | - | |
| 5. | Grant Revenue | - | |
| 6. | Other | - | |
| 7. | **Total Revenues** | 1.7 | |
| | | | |
| | **Expenditures** | - | |
| 8. | Permanent Labor | 0.3 | Increase due to additional business investigator |
| | | | |
| 9. | Professional & Contract Services | - | |
| 10. | Labor Costs / Service Contracts | 0.3 | |
| 11. | Active Benefits | 0.1 | |
| 12. | Training | (0.1) | |
| | | | |
| 13. | Materials and Supplies | - | |
| 14. | Utilities | - | |
| 15. | Purchased services | - | |
| 16. | Risk management / insurance | - | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | 25.0 | Pay-back of BSEED General Fund loan |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | 0.5 | Savings on rent through facility consolidation |
| 22. | **Total Operating Expenditures** | 25.7 | |
| | | | |
| 23. | **Total Operating Surplus (Deficit)** | 27.3 | |
| | | | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | - | |
| 25. | Capital Expenditures | (0.4) | Costs related to facility build-out to consolidate facilities and improve efficiencies |
| 26. | Other Infrastructure | - | |
| 27. | Reorganization Costs | - | |
| 28. | **Total Reorganization / Reinvestment** | (0.4) | |
| | | | |
| 29. | **Total Surplus (Deficit)** | $ 27.0 | |
| | | | |
| 30. | **Incremental Headcount (FTE)** | (1) | |

**City of Detroit**

Ten-Year Plan of Adjustment
Restructuring and Reinvestment Initiatives - Enterprise Agencies
Detroit Department of Transportation (DDOT)
*($ in millions)*

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2. | a. Increased Collection Rate | - | - | - | - | - | - | - | - | - | - | - |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | 0.4 | 1.5 | 5.7 | 7.1 | 11.7 | 13.4 | 17.5 | 17.1 | 21.2 | 22.0 | 117.6 |
| 5. | Grant Revenue | (2.0) | (7.0) | (7.0) | (7.0) | (7.0) | (7.0) | (7.0) | (7.0) | (7.0) | (7.0) | (65.0) |
| 6. | Other | (0.1) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.1) | (0.1) | (0.1) | - | (1.2) |
| 7. | **Total Revenues** | (1.7) | (5.7) | (1.5) | (0.1) | 4.6 | 6.3 | 10.4 | 10.0 | 14.1 | 15.0 | 51.4 |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | (0.6) | (1.5) | 3.0 | 1.8 | 1.4 | 1.4 | 1.5 | 1.4 | 1.2 | 1.0 | 10.6 |
| 9. | Professional & Contract Services | (0.3) | (0.4) | (0.4) | (0.5) | (0.6) | (0.6) | (0.7) | (0.7) | (0.7) | (0.8) | (5.8) |
| 10. | Labor Costs / Service Contracts | (1.0) | (1.9) | 2.5 | 1.3 | 0.8 | 0.8 | 0.8 | 0.7 | 0.4 | 0.2 | 4.8 |
| 11. | Active Benefits | - | - | (0.1) | (0.7) | (0.9) | (0.9) | (1.0) | (1.0) | (1.2) | (1.3) | (7.2) |
| 12. | Training | (0.1) | (0.5) | (0.5) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (5.2) |
| 13. | Materials and Supplies | (0.4) | (0.9) | (1.9) | (3.0) | (4.0) | (4.5) | (5.0) | (5.4) | (5.9) | (6.4) | (37.4) |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | (0.0) | (0.0) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.2) | (0.2) | (1.0) |
| 16. | Risk management / insurance | - | - | 1.0 | 1.0 | 1.5 | 1.5 | 2.0 | 2.0 | 2.5 | 2.5 | 14.0 |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | (0.0) | (0.0) | (0.1) | (0.1) | (0.2) | (0.2) | (0.2) | (0.2) | (0.3) | (0.3) | (1.7) |
| 22. | **Total Operating Expenditures** | (1.4) | (3.4) | 0.8 | (2.2) | (3.5) | (4.1) | (4.1) | (4.7) | (5.2) | (6.1) | (33.8) |
| 23. | **Total Operating Surplus (Deficit)** | (3.2) | (9.1) | (0.7) | (2.3) | 1.1 | 2.2 | 6.3 | 5.3 | 8.9 | 8.9 | 17.6 |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | - | - | - | - | - | - | | | | | |
| 25. | Capital Expenditures | (1.6) | (2.0) | (2.3) | (2.5) | (1.0) | (1.0) | - | - | - | - | (10.3) |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | - | - | - | - | - | - | - | - | - | - | - |
| 28. | **Total Reorganization / Reinvestment** | (1.6) | (2.0) | (2.3) | (2.5) | (1.0) | (1.0) | - | - | - | - | (10.3) |
| 29. | **Total Surplus (Deficit)** | $ (4.7) | $ (11.1) | $ (2.9) | $ (4.8) | $ 0.1 | $ 1.2 | $ 6.3 | $ 5.3 | $ 8.9 | $ 8.9 | $ 7.3 |
| 30. | **Incremental Headcount (FTE)** | - | - | 14 | 77 | 96 | 98 | 100 | 102 | 115 | 128 | 128 |

For the Fiscal Year Ended

**City of Detroit**

**Ten-Year Plan of Adjustment**

**Restructuring and Reinvestment Initiatives - Enterprise Agencies**

**Detroit Department of Transportation (DDOT)**

*($ in millions)*

| | | 10-Year Total | Assumptions / Comments |
|---|---|---|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | - | |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | 117.6 | Increase in service miles / routes plus increase in fares |
| 5. | Grant Revenue | (65.0) | Assumed redistribution of grant monies to SMART and RTA |
| 6. | Other | (1.2) | Loss of advertising revenue |
| 7. | **Total Revenues** | 51.4 | |
| | **Expenditures** | - | |
| 8. | Permanent Labor | 10.6 | Reduction in OT ($51.0MM) offset by headcount increase resulting from increased service ($15.0MM) and establishment of security force ($25.0MM) |
| 9. | Professional & Contract Services | (5.8) | Operational consultant to achieve revenue, cost, and service improvements |
| 10. | Labor Costs / Service Contracts | 4.8 | |
| 11. | Active Benefits | (7.2) | Benefits at 55% of Permanent Labor costs |
| 12. | Training | (5.2) | Training cost for all DDOT employees |
| 13. | Materials and Supplies | (37.4) | Additional cost based on increased miles served. Each mile driven costs $1.52 per mile for gas, maintenance parts, supplies, etc. |
| 14. | Utilities | - | |
| 15. | Purchased services | (1.0) | Additional cost based on increased miles served |
| 16. | Risk management / insurance | 14.0 | Reduction of worker's comp cases as a result of improved risk management process and other efficiencies |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | (1.7) | Additional cost based on increased miles served |
| 22. | **Total Operating Expenditures** | (33.8) | |
| 23. | **Total Operating Surplus (Deficit)** | 17.6 | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | - | |
| 25. | Capital Expenditures | (10.3) | Non-grant funded facility improvements and upgrades ($8.3MM) and new transit police force equipment ($1.2MM) |
| 26. | Other Infrastructure | - | |
| 27. | Reorganization Costs | - | |
| 28. | **Total Reorganization / Reinvestment** | (10.3) | |
| 29. | **Total Surplus (Deficit)** | $ 7.3 | |
| 30. | **Incremental Headcount (FTE)** | 128 | |

**City of Detroit**

**Ten-Year Plan of Adjustment**
**Restructuring and Reinvestment Initiatives - Enterprise Agencies**
**Municipal Parking Department (Parking) - General Fund - PVB**
($ in millions)

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | For the Fiscal Year Ended | | | | | | |
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| 2. | a. Increased Collection Rate | - | - | - | - | - | - | - | - | - | - | - |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | 5.6 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 60.3 |
| 5. | Grant Revenue | - | - | - | - | - | - | - | - | - | - | - |
| 6. | Other | - | - | - | - | - | - | - | - | - | - | - |
| 7. | **Total Revenues** | - | 5.6 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 60.3 |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | (0.0) | (0.2) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.2 |
| 9. | Professional & Contract Services | (0.1) | (0.1) | - | - | - | - | - | - | - | - | (0.2) |
| 10. | Labor Costs / Service Contracts | (0.1) | (0.3) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 |
| 11. | Active Benefits | (0.0) | (0.1) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 |
| 12. | Training | - | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.7) |
| 13. | Materials and Supplies | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.4) |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | - | - | - | - | - | - | - | - | - | - | - |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | - | - | - | - | - | - | - | - | - | - | - |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | - | - | - | - | - | - | - | - | - | - |
| 22. | **Total Operating Expenditures** | (0.1) | (0.5) | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (1.0) |
| 23. | **Total Operating Surplus (Deficit)** | (0.1) | 5.1 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 59.3 |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 25. | Capital Expenditures | (0.5) | (0.2) | (0.1) | (0.1) | (0.1) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (2.0) |
| 26. | Other Infrastructure | - | (0.4) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (1.4) |
| 27. | Reorganization Costs | - | - | - | - | - | - | - | - | - | - | - |
| 28. | **Total Reorganization / Reinvestment** | (0.5) | (0.6) | (0.2) | (0.2) | (0.2) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (3.4) |
| 29. | **Total Surplus (Deficit)** | $ (0.6) | $ 4.5 | $ 6.6 | $ 6.6 | $ 6.6 | $ 6.5 | $ 6.5 | $ 6.5 | $ 6.5 | $ 6.5 | 55.9 |
| 30. | **Incremental Headcount (FTE)** | 1 | 7 | (6) | (6) | (6) | (6) | (6) | (6) | (6) | (6) | |

**City of Detroit**

**Ten-Year Plan of Adjustment**

**Restructuring and Reinvestment Initiatives - Enterprise Agencies**

**Municipal Parking Department (Parking) - General Fund - PVB**

*($ in millions)*

| | | 10-Year Total | Assumptions / Comments |
|---|---|---:|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | - | |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | 60.3 | Primarily related to parking violation fee increases and added parking enforcement officers to generate additional ticket volume |
| 5. | Grant Revenue | - | |
| 6. | Other | - | |
| 7. | **Total Revenues** | 60.3 | |
| | | | |
| | **Expenditures** | - | |
| 8. | Permanent Labor | 0.2 | Elimination of non-productive heads offset partially by additional parking enforcement officers |
| 9. | Professional & Contract Services | (0.2) | Parking expert to assist with strategic alternatives and master plan |
| 10. | Labor Costs / Service Contracts | 0.0 | |
| 11. | Active Benefits | 0.1 | Benefits at 55% of Permanent Labor costs |
| 12. | Training | (0.7) | Training cost for all department employees - $2.0k per employee through FY '16, $1.5k thereafter to establish a continuous training program |
| 13. | Materials and Supplies | (0.4) | Primarily a result of additional parking enforcement officers in vehicles issuing tickets (reference Restructuring Actions) |
| 14. | Utilities | - | |
| 15. | Purchased services | - | |
| 16. | Risk management / insurance | - | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | - | |
| 20. | Maintenance | - | |
| 21. | All Other | - | |
| 22. | **Total Operating Expenditures** | (1.0) | |
| | | | |
| 23. | **Total Operating Surplus (Deficit)** | 59.3 | |
| | | | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | - | |
| 25. | Capital Expenditures | (2.0) | Primarily upgrades to Caniff Impound Lot |
| 26. | Other Infrastructure | (1.4) | Fleet replacement primarily for parking enforcement officers |
| 27. | Reorganization Costs | - | |
| 28. | **Total Reorganization / Reinvestment** | (3.4) | |
| | | | |
| 29. | **Total Surplus (Deficit)** | $ 55.9 | |
| | | | |
| 30. | **Incremental Headcount (FTE)** | (6) | |

# City of Detroit

Ten-Year Plan of Adjustment

Other - Detail

**City of Detroit**

Ten-Year Plan of Adjustment
Restructuring and Reinvestment Initiatives - Other
Blight / Demolition
($ in millions)

| | | | | | | For the Fiscal Year Ended | | | | | | 10-Year |
| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Revenues** | | | | | | | | | | | |
| 1. | Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2. | a. Increased Collection Rate | - | - | - | - | - | - | - | - | - | - | - |
| 3. | b. Collection of Past Due | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Pricing/Fees | - | - | - | - | - | - | - | - | - | - | - |
| 5. | Grant Revenue | 6.0 | 46.3 | - | - | - | - | - | - | - | - | 52.3 |
| 6. | Other | - | 4.0 | 4.0 | 4.0 | 4.0 | 4.0 | - | - | - | - | 20.0 |
| 7. | **Total Revenues** | 6.0 | 50.3 | 4.0 | 4.0 | 4.0 | 4.0 | - | - | - | - | 72.3 |
| | | | | | | | | | | | | |
| | **Expenditures** | | | | | | | | | | | |
| 8. | Permanent Labor | - | - | - | - | - | - | - | - | - | - | - |
| 9. | Professional & Contract Services | - | - | - | - | - | - | - | - | - | - | - |
| 10. | Labor Costs / Service Contracts | - | - | - | - | - | - | - | - | - | - | - |
| 11. | Active Benefits | - | - | - | - | - | - | - | - | - | - | - |
| 12. | Training | - | - | - | - | - | - | - | - | - | - | - |
| 13. | Materials and Supplies | - | - | - | - | - | - | - | - | - | - | - |
| 14. | Utilities | - | - | - | - | - | - | - | - | - | - | - |
| 15. | Purchased services | (5.0) | (95.0) | (100.0) | (100.0) | (100.0) | (100.0) | - | - | - | - | (500.0) |
| 16. | Risk management / insurance | - | - | - | - | - | - | - | - | - | - | - |
| 17. | Contributions to non EP funds | - | - | - | - | - | - | - | - | - | - | - |
| 18. | Transfers In/Out (General Fund) | - | - | - | - | - | - | - | - | - | - | - |
| 19. | Grant related expenses | (2.3) | (18.0) | - | - | - | - | - | - | - | - | (20.3) |
| 20. | Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| 21. | All Other | - | - | - | - | - | - | - | - | - | - | - |
| 22. | **Total Operating Expenditures** | (7.3) | (113.0) | (100.0) | (100.0) | (100.0) | (100.0) | - | - | - | - | (520.3) |
| | | | | | | | | | | | | |
| 23. | **Total Operating Surplus (Deficit)** | (1.3) | (62.6) | (96.0) | (96.0) | (96.0) | (96.0) | - | - | - | - | (447.9) |
| | | | | | | | | | | | | |
| | **Reorganization / Reinvestment** | | | | | | | | | | | |
| 24. | Technology Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 25. | Capital Expenditures | - | - | - | - | - | - | - | - | - | - | - |
| 26. | Other Infrastructure | - | - | - | - | - | - | - | - | - | - | - |
| 27. | Reorganization Costs | - | - | - | - | - | - | - | - | - | - | - |
| 28. | **Total Reorganization / Reinvestment** | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | |
| 29. | **Total Surplus (Deficit)** | $ (1.3) | $ (62.6) | $ (96.0) | $ (96.0) | $ (96.0) | $ (96.0) | $ - | $ - | $ - | $ - | $ (447.9) |
| | | | | | | | | | | | | |
| 30. | **Incremental Headcount (FTE)** | - | - | - | - | - | - | - | - | - | - | - |

**City of Detroit**

Ten-Year Plan of Adjustment
Restructuring and Reinvestment Initiatives - Other
Blight / Demolition
*($ in millions)*

| | | 10-Year Total | Assumptions / Comments |
|---|---|---|---|
| | **Revenues** | | |
| 1. | Collections | $ - | |
| 2. | a. Increased Collection Rate | - | |
| 3. | b. Collection of Past Due | - | |
| 4. | Pricing/Fees | - | |
| 5. | Grant Revenue | 52.3 | Committed funding from Hardest Hit fund |
| 6. | Other | 20.0 | Current Fire escrow account balance |
| 7. | **Total Revenues** | 72.3 | |
| | | | |
| | **Expenditures** | - | |
| 8. | Permanent Labor | - | |
| 9. | Professional & Contract Services | - | |
| 10. | Labor Costs / Service Contracts | - | |
| 11. | Active Benefits | - | |
| 12. | Training | - | |
| 13. | Materials and Supplies | - | |
| 14. | Utilities | - | |
| 15. | Purchased services | (500.0) | Estimated costs for residential blight removal efforts |
| 16. | Risk management / insurance | - | |
| 17. | Contributions to non EP funds | - | |
| 18. | Transfers In/Out (General Fund) | - | |
| 19. | Grant related expenses | (20.3) | Additional cost of demolition related to the committed funding from Hardest Hit fund |
| 20. | Maintenance | - | |
| 21. | All Other | - | |
| 22. | **Total Operating Expenditures** | (520.3) | |
| | | | |
| 23. | **Total Operating Surplus (Deficit)** | (447.9) | |
| | | | |
| | **Reorganization / Reinvestment** | | |
| 24. | Technology Infrastructure | - | |
| 25. | Capital Expenditures | - | |
| 26. | Other Infrastructure | - | |
| 27. | Reorganization Costs | - | |
| 28. | **Total Reorganization / Reinvestment** | - | |
| | | | |
| 29. | **Total Surplus (Deficit)** | $ (447.9) | |
| | | | |
| | | | |
| 30. | **Incremental Headcount (FTE)** | - | |

**EXHIBIT J**

TEN-YEAR FINANCIAL PROJECTIONS



# City of Detroit

Ten-Year Financial Projections

The attached 10 year preliminary forecast (the "10 Year Financial Projections"), its assumptions and underlying data are the product of the Client and its management ("Management") and consist of information obtained solely from the Client. With respect to prospective financial information relative to the Client, Ernst & Young LLP ("EY") did not examine, compile or apply agreed upon procedures to such information in accordance with attestation standards established by the AICPA and EY expresses no assurance of any kind on the information presented. It is the Client's responsibility to make its own decision based on the information available to it. Management has the knowledge, experience and ability to form its own conclusions related to the Client's 10 Year Financial Projections. There will usually be differences between forecasted and actual results because events and circumstances frequently do not occur as expected and those differences may be material. EY takes no responsibility for the achievement of forecasted results. Accordingly, reliance on this report is prohibited by any third party as the projected financial information contained herein is subject to material change and may not reflect actual results.

# City of Detroit

**Ten-Year Financial Projections**

**Table of contents**

| Section | Exhibit | Description | Page |
|---|---|---|---|
| **Summary schedules** | | | |
| | 1 | General Fund assumptions | 4 |
| | 2 | General Fund summary view | 6 |
| | 3 | Restructuring scenario - Amount available for unsecured claims | 7 |
| | 4 | General Fund detail view | 8 |
| | 5a | Funds Available for Unsecured Claims Summary Bridge | 10 |
| | 5b | Funds Available for Unsecured Claims Detailed Bridge | 11 |

| Section | Appendix | Description | Page |
|---|---|---|---|
| **Departmental detail** | | | |
| | A | | 12 |
| | "a" pages | Departmental - General Fund detail | |
| | "b" pages | Departmental key assumptions | |
| | A.29 | Department of Transportation | 69 |
| **Key revenue drivers** | | | |
| | B.1a | Property tax revenue - without reinvestment | 71 |
| | B.1b | Property tax revenue - with reinvestment | 72 |
| | B.2a | Income tax revenue - without reinvestment | 73 |
| | B.2b | Income tax revenue - with reinvestment | 74 |
| | B.3 | Wagering tax revenue | 75 |
| | B.4 | State revenue sharing | 76 |
| **Key expense drivers** | | | |
| | C.1 | Headcount - Full-Time Equivalents | 78 |
| | C.2 | Payroll | 79 |
| | C.3 | Benefits | 80 |
| | C.4 | Pension | 81 |
| | D.1 | Debt summary | 82 |
| | D.2 | POC summary | 83 |

**General Fund Summary**

Ten-Year Financial Projections
General Fund assumptions

**Base projections represent trends from fiscal years 2012 and 2013 as well as certain operating assumptions within the 2014 Budget.**

## Revenues (Exhibit 4)

| | |
|---|---|
| Municipal income tax | Increases due to improved employment outlook and wage inflation. FY 2013 reflects the impact of one-time items including tax amnesty program and one-time benefit from increase in capital gains tax rate |
| State revenue sharing | Increases due to anticipation of higher taxes collected and distributed by the State. Reflects input from Michigan State Treasury |
| Wagering taxes | Decreases through FY 2015 due to competition from Ohio casinos and recovers thereafter due to improved economic outlook |
| Sales and charges for services | Decreases primarily due to transition of Health and Wellness department, including Vital Records operations, and Public Lighting department distribution business |
| Property taxes | Continued decline through FY 2020 as a result of ongoing reductions in assessed values driven by sales study and reassessment process, with modest increases beginning FY 2021 |
| Utility users' and other taxes | Decreases beginning FY 2014 due to the annual allocation of $12.5m to the Public Lighting Authority. Inflationary increases assumed beginning FY 2017 |
| Parking/court fines and other revenue | Based on recent trends |
| Grant revenue | Decreases due to transition of Health and Wellness department and expiration of certain public safety grants |
| Licenses, permits and inspection charges | Based on recent trends. FY 2013 includes one-time permit and inspection revenues from utility providers |
| Revenue from use of assets | FY 2013 includes proceeds from the sale of assets. FY 2014 includes proceeds from sale of Veteran's Memorial building |
| Street fund reimbursement | Decreases beginning FY 2015 due to the assumed outsourcing of solid waste operations, which will no longer reimburse GSD for maintenance costs |
| DDOT risk mgmt reimbursement | Based on recent trends. Reimbursement not reflected in FY 2013 as General Fund made payments from refunding proceeds |
| Parking & vehicle fund reimbursement | Based on recent trends and scheduled debt service for vehicle fund through FY 2016 (revenues and associated expenses offset). FY 2012 includes $16m one-time contribution from DDOT |
| UTGO property tax millage | Property tax millage for UTGO debt service. Projections assume the City is able to continue to collect UTGO property tax millage (currently being litigated). |
| POC allocation - governmental | Transfer from general city, non-General Fund for allocated POC debt service . Revenues and associated expenses offset |
| POC allocation - enterprise funds (excl. DDOT) | Transfer from enterprise funds for allocated POC debt service . Revenues and associated expenses offset |

## Expenditures (Exhibit 4)

### Operating expenditures

| | |
|---|---|
| Salaries and wages | 10% wage reduction assumed for uniform employees beginning FY 2014 for contracts expiring FY 2013. Headcount ramp-up begins FY 2015 to return to previously projected levels due to lower actual headcount in FY 2014. 2.0% annual wage inflation assumed beginning FY 2015 for all employees. In addition, a one-time 5.0% wage increase assumed for public safety in FY 2020 |
| Overtime | Based on recent trends. Increases in FY 2014 due to higher police overtime primarily resulting from elimination of 12-hour shifts |
| Health benefits - active | Average 6.5% inflation assumed annually for hospitalization cost. Reflects cost of healthcare plan designs being offered for 2014 enrollment |
| Other benefits | Based on recent trends, projected by specific other benefit/fringe |
| Professional and contractual services | Decreases beginning FY 2014 primarily due to transition of Health and Wellness department. 1.0% cost inflation assumed beginning FY 2015 |
| Materials & supplies | Decreases beginning FY 2015 due to transition of Public Lighting department distribution business. 1.0% cost inflation assumed beginning FY 2015 |
| Utilities | Based on recent trends. 1.0% cost inflation assumed beginning FY 2015. Average cost inflation of 3.5% has been assumed for water/sewer rates beginning FY 2015 |
| Purchased services | Increases beginning FY 2014 due to prisoner pre-arraignment function costs and FY 2015 due to payroll processing management. 1.0% cost inflation assumed beginning FY 2015 |
| Risk management and insurance | 1.0% cost inflation assumed beginning FY 2015 |
| Maintenance capital | FY 2013 includes one-time capital outlays. 1.0% cost inflation assumed beginning FY 2015 |
| Other expenses | Primarily includes printing, rental and other operating costs. 1.0% cost inflation assumed to certain costs beginning FY 2015 |
| Contributions to non enterprise funds | Increases in FY 2015 and 2016 primarily due to scheduled vehicle fund debt service. Contributions to the Public Lighting Authority for operations begins FY 2015 |
| DDOT subsidy | Increases primarily due to personnel and operating cost inflation. FY 2012 includes $16m one-time contribution to General Fund. FY 2013 excludes risk management payment, made from refunding proceeds |
| Grant related expenses | Grant expenses captured within specific expense line items |

### Legacy expenditures

| | |
|---|---|
| Debt service (UTGO & LTGO) | Reflects scheduled principal and interest payments |
| POC - principal, interest and swaps | Reflects principal, interest and swap payments. No acceleration or refinancing assumed |
| Pension contributions | Per actuarial analysis performed by the City's actuaries |
| Health benefits - retiree | Average 5% inflation assumed annually for hospitalization cost. Reflects cost of current healthcare plan designs |

## Other (Exhibit 4)

| | |
|---|---|
| Financing proceeds | FY 2013 includes $137m refunding proceeds ($129.5 bond issuance) |

**Ten-Year Financial Projections**
**General Fund assumptions**

**Operational restructuring initiatives / Reinvestment in the City (Exhibit 4)**

| | |
|---|---|
| Department revenue initiatives | Reflects increases to fees, improved billing and collection efforts and collections of past due receivables |
| Additional operating expenditures | Primarily reflects increases to headcount to improve and provide adequate level of City services.  Costs are partially offset by potential savings |
| Technology | Reflects costs associated with information system upgrades and maintenance |
| Capital expenditures and other infrastructure | Primarily reflects City's capital improvement plan to invest in facilities and vehicles |
| Implementation costs | Primarily reflects non-recurring costs associated with implementing operational initiatives |
| Blight (excludes heavy commercial) | Reflects costs associated with demolition and clean up efforts of residential and light commercial. Heavy commercial blight removal would require significant additional funding |
| | Assumes all blight related expenditures are paid by the General Fund. Other funding sources may be available |

**Restructuring scenario (Exhibit 3)**

| | |
|---|---|
| Capital investment | Reflects technology, capital expenditures and implementation costs |
| Active pension contributions | Reflects contribution of 10% of salary assumed for uniformed employees; 5% assumed for non-uniformed |
| OPEB Payments - future retirees | Reflects contribution of 2% of salary assumed for future retirees |
| POC reimbursements | Includes revenue received from enterprise and other non-General Fund agencies |
| PLD decommission | Preliminary estimates for 31 substations, excluding Mistersky |
| Increased tax revenues | Reflects potential revenue opportunities due to increased property values and employment conditions resulting from restructuring efforts |
| Reduced UTGO tax millage | Reduction in millage to reflect treatment of UTGO as unsecured and corresponding reduction in property tax revenues |
| Payments to secured claims | Based on the unaltered scheduled payments of secured debt and other notes payable (with the exception of POC swap payments). No payments are scheduled for the secured notes payable |
| | Treatment of these debt instruments is subject to further review and negotiation |
| QOL / exit financing proceeds (net) | Assumes QOL net financing proceeds of $118m in FY 2014 and $175m of net additional proceeds from exit financing in FY 2015 |
| QOL / exit financing principal/interest payments | Exit financing assumes 8 year note funded 10/31/2014 with interest only payments in first 4 years and equal principal payments made in years 5 through 8 |
| Working capital | Primarily relates to past due vendor payments and required funding of the self insurance escrow set-aside |
| Contingency | Reflects amounts reserved for unexpected events |
| Deferral | Reflects timing adjustment of reinvestment initiatives to manage liquidity |

**Ten-Year Financial Projections**
**General Fund summary view**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | | 10-year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | total |
| **Revenues** | | | | | | | | | | | | | | | | | |
| Municipal income tax | $ 276.5 | $ 240.8 | $ 216.5 | $ 228.3 | $ 233.0 | $ 248.0 | $ 246.4 | $ 250.4 | $ 252.1 | $ 253.8 | $ 255.5 | $ 257.1 | $ 258.7 | $ 260.9 | $ 264.1 | $ 267.3 | $ 2,566.3 |
| State revenue sharing | 249.6 | 266.6 | 263.6 | 239.3 | 173.3 | 183.8 | 190.9 | 192.7 | 194.5 | 196.1 | 197.8 | 199.6 | 201.4 | 194.9 | 196.6 | 198.4 | 1,963.1 |
| Wagering taxes | 180.4 | 173.0 | 183.3 | 176.9 | 181.4 | 174.6 | 169.9 | 168.2 | 169.9 | 171.6 | 173.3 | 175.0 | 176.8 | 178.5 | 180.3 | 182.1 | 1,745.7 |
| Sales and charges for services | 193.3 | 167.4 | 154.1 | 154.9 | 149.2 | 123.8 | 131.5 | 118.0 | 115.8 | 113.7 | 111.5 | 109.3 | 107.1 | 104.5 | 103.8 | 104.1 | 1,118.9 |
| Property taxes | 155.2 | 163.7 | 143.0 | 182.7 | 147.8 | 133.6 | 114.9 | 104.2 | 100.1 | 97.2 | 97.1 | 95.2 | 89.6 | 89.5 | 90.1 | 90.7 | 968.6 |
| Utility users' and other taxes | 73.0 | 71.5 | 64.8 | 64.8 | 57.1 | 47.2 | 29.7 | 34.1 | 34.1 | 34.5 | 34.9 | 35.2 | 35.6 | 36.0 | 36.4 | 36.8 | 347.2 |
| Other revenue | 152.9 | 138.5 | 134.2 | 152.5 | 121.6 | 111.8 | 76.8 | 70.5 | 69.2 | 57.7 | 56.4 | 56.7 | 57.0 | 57.3 | 57.6 | 57.9 | 617.1 |
| General Fund reimbursements | 36.9 | 59.2 | 47.6 | 32.3 | 47.6 | 23.8 | 26.4 | 41.7 | 41.7 | 21.4 | 21.4 | 21.4 | 21.4 | 21.4 | 21.4 | 21.4 | 259.5 |
| Transfers in (UTGO millage & non-General Fund POCs) | 84.2 | 89.1 | 91.5 | 93.6 | 95.2 | 93.5 | 93.9 | 90.7 | 86.9 | 87.5 | 87.2 | 84.2 | 83.6 | 83.0 | 68.1 | 124.4 | 829.4 |
| **Total revenues** | 1,401.7 | 1,369.9 | 1,298.7 | 1,325.3 | 1,206.4 | 1,140.0 | 1,080.3 | 1,070.6 | 1,064.3 | 1,033.4 | 1,035.0 | 1,033.7 | 1,031.2 | 1,026.1 | 1,018.1 | 1,023.1 | 10,415.9 |
| | | | | | | | | | | | | | | | | | |
| **Expenditures** | | | | | | | | | | | | | | | | | |
| Salaries/overtime/fringe | (512.0) | (514.7) | (474.3) | (463.3) | (440.3) | (361.3) | (333.1) | (343.2) | (353.9) | (361.6) | (368.6) | (376.0) | (392.1) | (399.8) | (407.6) | (415.7) | (3,751.6) |
| Health benefits - active | (58.9) | (57.7) | (74.1) | (68.5) | (59.0) | (47.8) | (49.2) | (48.0) | (52.1) | (55.9) | (60.0) | (63.6) | (67.4) | (71.4) | (75.7) | (80.2) | (623.6) |
| Other operating expenses | (554.4) | (457.7) | (422.2) | (359.4) | (361.5) | (305.2) | (287.0) | (308.2) | (308.5) | (288.5) | (291.4) | (290.0) | (292.0) | (294.0) | (300.9) | (302.6) | (2,963.0) |
| Operating expenditures | (1,125.3) | (1,030.1) | (970.7) | (891.2) | (860.8) | (714.3) | (669.3) | (699.5) | (714.3) | (706.0) | (720.1) | (729.6) | (751.5) | (765.2) | (784.1) | (798.6) | (7,338.2) |
| | | | | | | | | | | | | | | | | | |
| **Net operating surplus** | 276.4 | 339.8 | 328.0 | 434.1 | 345.6 | 425.6 | 411.0 | 371.1 | 350.0 | 327.4 | 315.0 | 304.1 | 279.7 | 260.9 | 234.0 | 224.5 | 3,077.7 |
| | | | | | | | | | | | | | | | | | |
| Debt service (LTGO & UTGO) | (133.8) | (177.6) | (135.9) | (137.3) | (135.6) | (143.1) | (144.6) | (124.7) | (119.6) | (96.5) | (95.4) | (92.9) | (92.3) | (91.9) | (75.3) | (71.5) | (1,004.9) |
| POC - principal and interest | (42.8) | (39.7) | (44.2) | (55.7) | (56.4) | (61.2) | (66.7) | (68.9) | (71.1) | (73.3) | (75.7) | (73.9) | (74.7) | (75.5) | (76.2) | (76.8) | (732.7) |
| POC swaps | (40.5) | (45.1) | (45.9) | (45.1) | (45.1) | (45.9) | (45.9) | (45.9) | (45.9) | (45.9) | (45.9) | (45.0) | (45.0) | (44.2) | (43.5) | (42.8) | (450.8) |
| Pension contributions | (66.2) | (57.3) | (42.2) | (112.4) | (78.3) | (59.3) | (195.8) | (229.5) | (254.4) | (280.9) | (309.2) | (315.7) | (325.6) | (331.0) | (332.8) | (335.9) | (2,910.8) |
| Health benefits - retiree | (121.1) | (144.1) | (131.4) | (140.4) | (151.9) | (147.8) | (143.9) | (152.9) | (158.0) | (165.2) | (172.2) | (181.9) | (191.3) | (201.9) | (211.8) | (221.9) | (1,800.9) |
| Legacy expenditures | (404.4) | (463.9) | (399.7) | (491.0) | (467.3) | (457.3) | (596.9) | (621.9) | (649.2) | (661.8) | (698.3) | (710.2) | (728.8) | (744.6) | (739.6) | (748.9) | (6,900.2) |
| | | | | | | | | | | | | | | | | | |
| **Deficit (excl. financing proceeds)** | (127.9) | (124.1) | (71.7) | (56.9) | (121.8) | (31.7) | (185.8) | (250.8) | (299.2) | (334.4) | (383.3) | (406.1) | (449.1) | (483.7) | (505.6) | (524.5) | (3,822.5) |
| | | | | | | | | | | | | | | | | | |
| Financing proceeds | 75.0 | - | 250.0 | - | - | 143.5 | - | - | - | - | - | - | - | - | - | - | - |
| **Total surplus (deficit)** | $ (52.9) | $ (124.1) | $ 178.3 | $ (56.9) | $ (121.8) | $ 111.9 | $ (185.8) | $ (250.8) | $ (299.2) | $ (334.4) | $ (383.3) | $ (406.1) | $ (449.1) | $ (483.7) | $ (505.6) | $ (524.5) | $ (3,822.5) |
| | | | | | | | | | | | | | | | | | |
| **Accumulated unrestricted General Fund deficit (1)** | (219.2) | (331.9) | (155.7) | (196.6) | (326.6) | (214.8) | (400.6) | (651.4) | (950.6) | (1,285.0) | (1,668.3) | (2,074.4) | (2,523.5) | (3,007.2) | (3,512.8) | (4,037.2) | |
| | | | | | | | | | | | | | | | | | |
| **Reinvestment in the City** | | | | | | | | | | | | | | | | | |
| Department revenue initiatives | $ - | $ - | $ - | $ - | $ - | $ - | $ 10.6 | $ 78.0 | $ 39.3 | $ 53.0 | $ 56.2 | $ 45.8 | $ 46.2 | $ 46.1 | $ 50.6 | $ 51.8 | $ 477.6 |
| Additional operating expenditures | - | - | - | - | - | - | (21.7) | (79.1) | (44.2) | (40.2) | (31.5) | (28.6) | (30.7) | (29.5) | (31.5) | (31.2) | (368.0) |
| Capital investments | - | - | - | - | - | - | (72.2) | (137.8) | (76.1) | (57.1) | (53.2) | (52.7) | (46.2) | (46.9) | (44.5) | (42.7) | (629.2) |
| Blight (excludes heavy commercial) | - | - | - | - | - | - | (5.0) | (95.0) | (100.0) | (100.0) | (100.0) | - | - | - | - | - | (500.0) |
| Total reinvestment in the City | | | | | | - | (88.2) | (233.9) | (180.9) | (144.3) | (128.5) | (35.4) | (30.7) | (30.2) | (25.4) | (22.0) | (1,019.5) |
| | | | | | | | | | | | | | | | | | |
| **Adjusted surplus (deficit)** | $ (52.9) | $ (124.1) | $ 178.3 | $ (56.9) | $ (121.8) | $ 111.9 | $ (274.1) | $ (484.7) | $ (480.1) | $ (478.7) | $ (511.8) | $ (541.5) | $ (479.8) | $ (513.9) | $ (531.0) | $ (546.5) | $ (4,842.0) |
| | | | | | | | | | | | | | | | | | |
| **Adj. accumulated unrestricted General Fund deficit** | (219.2) | (331.9) | (155.7) | (196.6) | (326.6) | (214.8) | (488.9) | (973.6) | (1,453.7) | (1,932.3) | (2,444.1) | (2,985.6) | (3,465.4) | (3,979.3) | (4,510.3) | (5,056.8) | |

*Footnotes:*
(1) Historical accumulated deficits may not equate to previous balance plus annual surplus/deficit due to changes in inventories, reserves, and the restricted deficit.

# City of Detroit

Exhibit 3

**Ten-Year Financial Projections**
**Restructuring scenario - Amount available for unsecured claims**
*($ in millions)*

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-year total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Preliminary forecast | | | | | | |
| **Total revenues** | $ 1,080.3 | $ 1,070.6 | $ 1,064.3 | $ 1,033.4 | $ 1,035.0 | $ 1,033.7 | $ 1,031.2 | $ 1,026.1 | $ 1,018.1 | $ 1,023.1 | $ 10,415.9 |
| **Department revenue initiatives** | 10.6 | 78.0 | 39.3 | 53.0 | 56.2 | 45.8 | 46.2 | 46.1 | 50.6 | 51.8 | 477.6 |
| **Operating expenditures** | (669.3) | (699.5) | (714.3) | (706.0) | (720.1) | (729.6) | (751.5) | (765.2) | (784.1) | (798.6) | (7,338.2) |
| **Additional operating expenditures** | (21.7) | (79.1) | (44.2) | (40.2) | (31.5) | (28.6) | (30.7) | (29.5) | (31.5) | (31.2) | (368.0) |
| **Net operating surplus** | $ 399.9 | $ 370.0 | $ 345.2 | $ 340.2 | $ 339.7 | $ 321.3 | $ 295.2 | $ 277.5 | $ 253.1 | $ 245.1 | $ 3,187.3 |
| *Reinvestment expenditures/adjustments* | | | | | | | | | | | |
| Capital investments | (72.2) | (137.8) | (76.1) | (57.1) | (53.2) | (52.7) | (46.2) | (46.9) | (44.5) | (42.7) | (629.2) |
| Restructuring professional fees | (82.2) | (47.8) | - | - | - | - | - | - | - | - | (130.0) |
| Blight (excludes heavy commercial) | (5.0) | (95.0) | (100.0) | (100.0) | (100.0) | (100.0) | - | - | - | - | (500.0) |
| Active pension contributions (10% Police/Fire, 5% other) | (25.6) | (26.9) | (28.0) | (28.6) | (29.2) | (29.8) | (31.1) | (31.7) | (32.3) | (33.0) | (296.1) |
| OPEB payments - future retirees (2% of wages) | (6.1) | (6.4) | (6.7) | (6.8) | (6.9) | (7.1) | (7.4) | (7.5) | (7.6) | (7.8) | (70.3) |
| POC reimbursements | (24.0) | (27.0) | (29.2) | (29.9) | (30.6) | (30.1) | (30.2) | (30.3) | (30.4) | (30.5) | (292.1) |
| PLD decommission | - | (25.0) | (25.0) | (25.0) | - | - | - | - | - | - | (75.0) |
| Increased income tax revenues | 1.5 | 5.8 | 10.3 | 14.5 | 18.6 | 22.8 | 27.2 | 31.2 | 34.4 | 37.7 | 204.0 |
| Increased property tax revenues | - | 0.2 | 6.6 | 8.0 | 8.2 | 11.4 | 17.2 | 20.1 | 23.1 | 26.3 | 121.1 |
| Increased utility users' tax revenues | - | - | 0.4 | 0.6 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 5.6 |
| Reduced UTGO tax millage | - | (41.0) | (37.1) | (37.1) | (36.2) | (34.3) | (33.8) | (33.2) | (21.6) | (18.6) | (292.8) |
| Total restructuring | (213.6) | (400.8) | (284.8) | (261.4) | (228.6) | (218.9) | (103.3) | (97.5) | (78.1) | (67.8) | (1,954.8) |
| **Funds available for legacy liabilities** | 186.3 | (30.7) | 60.4 | 78.8 | 111.1 | 102.4 | 191.9 | 180.1 | 174.9 | 177.3 | 1,232.5 |
| *Payments to secured claims (Subject to further review/negotiation)* | | | | | | | | | | | |
| LTGO - secured | (25.9) | (29.5) | (29.5) | (29.5) | (29.5) | (29.5) | (29.6) | (29.6) | (29.6) | (29.6) | (291.7) |
| UTGO - secured | (9.6) | (9.9) | (9.9) | (9.9) | (9.9) | (9.9) | (9.9) | (9.9) | (9.9) | (10.0) | (98.8) |
| POC swaps (1) | (45.9) | (15.7) | - | - | - | - | - | - | - | - | (61.6) |
| POC swaps settlement (1) | - | (42.1) | - | - | - | - | - | - | - | - | (42.1) |
| Notes/loans payable | - | - | - | - | - | - | - | - | - | - | - |
| Total payments to secured claims | (81.3) | (97.2) | (39.4) | (39.4) | (39.4) | (39.4) | (39.5) | (39.5) | (39.5) | (39.6) | (494.2) |
| **Funds available for unsecured claims** | $ 105.0 | $ (127.9) | $ 21.0 | $ 39.4 | $ 71.6 | $ 63.0 | $ 152.4 | $ 140.6 | $ 135.4 | $ 137.7 | $ 738.3 |
| *Adjustments to funds available for unsecured claims* | | | | | | | | | | | |
| QOL / exit financing proceeds (net) | $ 117.9 | $ 174.8 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 292.7 |
| QOL / exit financing principal/interest payments | (1.3) | (14.6) | (18.0) | (18.0) | (18.0) | (68.0) | (90.0) | (85.5) | (81.0) | (26.5) | (420.9) |
| Total QOL financing impact | 116.6 | 160.2 | (18.0) | (18.0) | (18.0) | (68.0) | (90.0) | (85.5) | (81.0) | (26.5) | (128.3) |
| Working capital | (39.8) | 15.0 | - | - | - | - | - | - | - | - | (24.8) |
| Contingency | - | (12.6) | (10.5) | (10.4) | (10.5) | (10.5) | (10.6) | (10.6) | (10.7) | (10.9) | (97.5) |
| Reinvestment deferrals / timing adjustments | - | 4.8 | 42.5 | 23.6 | (9.1) | 48.8 | 4.1 | 10.4 | 7.6 | (50.3) | 82.4 |
| Total adjustments to funds available | 76.8 | 167.3 | 14.0 | (4.8) | (37.6) | (29.7) | (96.5) | (85.7) | (84.2) | (87.7) | (168.1) |
| **Adjusted funds available for unsecured claims** | $ 181.8 | $ 39.4 | $ 35.0 | $ 34.6 | $ 34.0 | $ 33.3 | $ 55.9 | $ 54.9 | $ 51.2 | $ 50.1 | $ 570.2 |

Footnotes:
(1) Reflects an $85m settlement. POC swap payments made in full through October 2014, at which time the remainder of the settlement amount is paid. Subject further legal review.

**Ten-Year Financial Projections**
**General Fund detail view**

*($ in millions)*

|  | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | | 10-year total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | |
| **Revenues** | | | | | | | | | | | | | | | | | |
| Municipal income tax | $ 276.5 | $ 240.8 | $ 216.5 | $ 228.3 | $ 233.0 | $ 248.0 | $ 246.4 | $ 250.4 | $ 252.1 | $ 253.8 | $ 255.5 | $ 257.1 | $ 258.7 | $ 260.9 | $ 264.1 | $ 267.3 | $ 2,566.3 |
| State revenue sharing | 249.6 | 266.6 | 263.6 | 239.3 | 173.3 | 183.8 | 190.9 | 192.7 | 194.5 | 196.1 | 197.8 | 199.6 | 201.4 | 194.9 | 196.6 | 198.4 | 1,963.1 |
| Wagering taxes | 180.4 | 173.0 | 183.3 | 176.9 | 181.4 | 174.6 | 169.9 | 168.2 | 169.9 | 171.6 | 173.3 | 175.0 | 176.8 | 178.5 | 180.3 | 182.1 | 1,745.7 |
| Sales and charges for services | 193.3 | 167.4 | 154.1 | 154.9 | 149.2 | 123.8 | 131.5 | 118.0 | 115.8 | 113.7 | 111.5 | 109.3 | 107.1 | 104.5 | 103.4 | 104.1 | 1,118.9 |
| Property taxes | 155.2 | 163.7 | 143.0 | 182.7 | 147.8 | 133.6 | 114.9 | 104.2 | 100.1 | 97.2 | 97.1 | 95.2 | 89.6 | 89.5 | 90.1 | 90.7 | 968.6 |
| Utility users' and other taxes | 73.0 | 71.5 | 64.8 | 64.8 | 57.1 | 47.2 | 29.7 | 34.1 | 34.1 | 34.5 | 34.9 | 35.2 | 35.6 | 36.0 | 36.4 | 36.8 | 347.2 |
| Parking/court fines and other revenue | 57.6 | 38.6 | 43.0 | 63.8 | 31.5 | 31.4 | 29.2 | 29.2 | 29.2 | 29.2 | 29.2 | 29.2 | 29.2 | 29.2 | 29.2 | 29.2 | 291.9 |
| Grant revenue | 63.5 | 65.1 | 77.6 | 76.0 | 80.6 | 58.2 | 27.9 | 27.0 | 25.7 | 14.2 | 14.5 | 14.7 | 15.0 | 15.3 | 15.5 | 15.8 | 185.7 |
| Licenses, permits and inspection charges | 9.0 | 6.7 | 8.7 | 8.6 | 7.4 | 10.7 | 9.0 | 9.1 | 9.1 | 9.1 | 9.2 | 9.2 | 9.3 | 9.3 | 9.3 | 9.4 | 92.0 |
| Revenue from use of assets | 22.8 | 28.1 | 4.9 | 4.1 | 2.1 | 11.5 | 10.6 | 5.2 | 5.2 | 5.2 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 47.6 |
| General Fund reimbursements from: | | | | | | | | | | | | | | | | | |
| Street fund | 14.0 | 12.4 | 19.3 | 9.0 | 9.0 | 9.3 | 9.3 | 4.2 | 4.2 | 4.2 | 4.2 | 4.2 | 4.2 | 4.2 | 4.2 | 4.2 | 46.8 |
| DDOT (risk mgmt) | 10.8 | 12.9 | 10.0 | 12.1 | 12.1 | 1.6 | 9.9 | 12.1 | 12.1 | 12.1 | 12.1 | 12.1 | 12.1 | 12.1 | 12.1 | 12.1 | 118.8 |
| Parking & vehicle fund | 12.1 | 33.9 | 18.4 | 11.2 | 26.4 | 12.9 | 7.3 | 25.4 | 25.5 | 5.1 | 5.1 | 5.1 | 5.1 | 5.1 | 5.1 | 5.1 | 94.0 |
| Transfers in from: | | | | | | | | | | | | | | | | | |
| UTGO property tax millage | 67.2 | 71.5 | 72.4 | 72.8 | 73.0 | 70.6 | 66.5 | 62.6 | 57.7 | 57.6 | 56.5 | 54.1 | 53.4 | 52.7 | 37.7 | 33.9 | 532.8 |
| POC allocation - other governmental | 8.7 | 9.1 | 9.8 | 10.7 | 11.4 | 11.4 | 15.2 | 15.6 | 16.4 | 16.8 | 17.2 | 16.9 | 17.0 | 17.0 | 17.1 | 17.2 | 166.2 |
| POC allocation - enterprise funds (excl. DDOT) | 8.2 | 8.6 | 9.3 | 10.1 | 10.8 | 11.5 | 12.2 | 12.5 | 12.8 | 13.1 | 13.4 | 13.2 | 13.2 | 13.3 | 13.3 | 13.3 | 130.4 |
| **Total revenues** | 1,401.7 | 1,369.9 | 1,298.7 | 1,325.3 | 1,206.4 | 1,140.0 | 1,080.1 | 1,070.6 | 1,064.3 | 1,035.0 | 1,035.0 | 1,033.7 | 1,031.2 | 1,026.1 | 1,018.1 | 1,023.1 | 10,415.9 |
| **Expenditures** | | | | | | | | | | | | | | | | | |
| Salaries and wages - Public Safety | (269.2) | (279.3) | (269.7) | (278.4) | (259.0) | (222.1) | (205.4) | (216.3) | (227.3) | (232.6) | (237.2) | (241.9) | (254.0) | (259.1) | (264.3) | (269.6) | (2,407.7) |
| Salaries and wages - Non-Public Safety | (146.9) | (149.6) | (131.1) | (105.3) | (101.5) | (75.5) | (71.7) | (71.9) | (71.2) | (72.4) | (73.7) | (75.2) | (76.7) | (78.1) | (79.5) | (81.1) | (751.4) |
| Overtime - Public Safety | (35.2) | (41.9) | (36.4) | (38.4) | (41.0) | (23.2) | (26.5) | (28.1) | (26.1) | (26.7) | (27.3) | (27.8) | (29.2) | (29.8) | (30.4) | (31.0) | (281.0) |
| Overtime - Non-Public Safety | (10.4) | (9.5) | (7.2) | (7.4) | (7.9) | (6.5) | (5.4) | (4.0) | (3.9) | (4.0) | (4.1) | (4.1) | (4.2) | (4.3) | (4.4) | (4.5) | (42.9) |
| Health benefits - active- Public Safety | (23.0) | (25.0) | (42.9) | (39.6) | (36.0) | (28.9) | (35.8) | (35.0) | (38.5) | (41.4) | (44.4) | (47.1) | (49.9) | (52.9) | (56.1) | (59.4) | (460.5) |
| Health benefits - active - Non-Public Safety | (35.9) | (32.7) | (31.3) | (28.8) | (23.0) | (19.0) | (13.5) | (13.0) | (13.6) | (14.5) | (15.6) | (16.5) | (17.5) | (18.5) | (19.6) | (20.8) | (163.1) |
| Other benefits - Public Safety | (27.4) | (18.6) | (16.3) | (18.4) | (16.8) | (18.5) | (13.4) | (14.1) | (14.7) | (15.0) | (15.3) | (15.6) | (16.4) | (16.8) | (17.1) | (17.4) | (155.9) |
| Other benefits - Non-Public Safety | (23.0) | (15.6) | (13.7) | (15.5) | (14.1) | (15.5) | (10.8) | (10.8) | (10.7) | (10.9) | (11.0) | (11.3) | (11.5) | (11.7) | (11.9) | (12.2) | (117.2) |
| Professional and contractual services | (115.1) | (124.9) | (113.1) | (98.1) | (97.9) | (76.3) | (52.6) | (62.7) | (59.2) | (56.1) | (56.9) | (53.1) | (52.2) | (51.2) | (54.1) | (51.3) | (549.4) |
| Materials & supplies | (88.1) | (72.4) | (61.4) | (69.1) | (64.0) | (63.2) | (66.0) | (34.8) | (34.8) | (35.0) | (34.7) | (34.1) | (33.7) | (33.3) | (33.3) | (33.6) | (373.4) |
| Utilities | (35.6) | (38.7) | (27.9) | (30.1) | (27.1) | (21.4) | (26.1) | (26.7) | (26.7) | (26.5) | (26.6) | (26.7) | (26.9) | (27.1) | (27.4) | (27.9) | (268.6) |
| Purchased services | (15.3) | (14.7) | (11.8) | (8.8) | (8.1) | (5.5) | (17.4) | (23.3) | (23.3) | (23.8) | (23.7) | (23.3) | (23.2) | (22.9) | (23.0) | (23.2) | (227.1) |
| Risk management and insurance | (63.2) | (51.7) | (54.4) | (63.6) | (40.1) | (43.5) | (35.8) | (43.7) | (44.1) | (44.6) | (45.0) | (45.5) | (45.9) | (46.4) | (46.8) | (47.3) | (445.1) |
| Maintenance capital | (43.1) | (22.6) | (9.2) | (12.3) | (12.6) | (14.0) | (5.9) | (6.0) | (6.1) | (6.1) | (6.2) | (6.2) | (6.3) | (6.4) | (6.4) | (6.5) | (62.0) |
| Other expenses | (43.9) | (33.1) | (48.5) | (6.5) | (28.7) | (37.6) | (34.9) | (39.7) | (36.4) | (35.8) | (35.8) | (35.2) | (35.3) | (35.3) | (35.4) | (35.5) | (358.7) |
| Contributions to non enterprise funds | (55.0) | (41.7) | (37.0) | (18.2) | (19.8) | (18.4) | (11.4) | (34.4) | (37.5) | (18.1) | (18.4) | (18.7) | (18.9) | (19.3) | (19.6) | (19.9) | (216.1) |
| DDOT subsidy | (92.8) | (55.2) | (57.7) | (50.3) | (61.7) | (25.0) | (36.8) | (36.9) | (40.1) | (42.4) | (44.9) | (47.2) | (49.7) | (52.2) | (54.8) | (57.5) | (462.5) |
| Grant related expenses (operating) | (2.3) | (2.8) | (1.4) | (2.5) | (1.4) | (0.4) | - | - | - | - | - | - | - | - | - | - | - |
| Operating expenditures | (1,125.3) | (1,030.1) | (970.7) | (891.2) | (860.8) | (714.5) | (669.3) | (699.5) | (714.3) | (706.0) | (720.1) | (729.6) | (751.5) | (765.2) | (784.1) | (798.6) | (7,338.2) |
| **Net operating surplus** | 276.4 | 339.8 | 328.0 | 434.1 | 345.6 | 425.6 | 411.0 | 371.1 | 350.0 | 327.4 | 315.0 | 304.1 | 279.7 | 260.9 | 234.0 | 224.5 | 3,077.7 |
| Debt service (LTGO) | (66.6) | (105.9) | (63.2) | (64.2) | (62.3) | (71.4) | (77.8) | (59.2) | (59.2) | (38.9) | (38.8) | (38.8) | (38.9) | (39.3) | (37.6) | (37.5) | (466.0) |
| Debt service (LTGO - DDOT) | - | (0.3) | (0.3) | (0.3) | (0.3) | (1.1) | (0.3) | (2.9) | (2.9) | - | - | - | - | - | - | - | (6.1) |
| Debt service (UTGO) | (67.2) | (71.5) | (72.4) | (72.8) | (73.0) | (70.6) | (66.5) | (62.6) | (57.7) | (57.6) | (56.5) | (54.1) | (53.4) | (52.7) | (37.7) | (33.9) | (532.8) |
| POC - principal and interest (Governmental) | (34.5) | (31.4) | (34.9) | (45.0) | (44.5) | (47.6) | (51.7) | (52.6) | (54.3) | (56.0) | (57.7) | (56.4) | (57.0) | (57.6) | (58.1) | (58.6) | (560.1) |
| POC - principal and interest (EF, excl. DDOT) | (5.2) | (5.2) | (5.8) | (6.7) | (7.4) | (8.1) | (8.8) | (9.1) | (9.4) | (9.7) | (10.0) | (9.7) | (9.9) | (10.0) | (10.1) | (10.1) | (96.7) |
| POC - principal and interest (DDOT) | (2.8) | (2.8) | (3.2) | (3.6) | (4.0) | (4.4) | (4.8) | (4.9) | (5.1) | (5.2) | (5.4) | (5.3) | (5.3) | (5.4) | (5.5) | (5.5) | (52.5) |
| POC - principal and interest (General Fund grant) | (0.3) | (0.3) | (0.3) | (0.3) | (0.4) | (1.1) | (1.3) | (2.3) | (2.4) | (2.4) | (2.5) | (2.5) | (2.5) | (2.5) | (2.5) | (2.6) | (23.5) |
| POC - swaps (Governmental) | (35.5) | (39.5) | (40.2) | (39.5) | (39.5) | (39.2) | (39.3) | (38.9) | (38.9) | (38.9) | (38.9) | (38.9) | (38.2) | (37.5) | (36.9) | (36.3) | (382.6) |
| POC - swaps (EF, excl. DDOT) | (3.0) | (3.4) | (3.4) | (3.4) | (3.4) | (3.4) | (3.4) | (3.4) | (3.4) | (3.4) | (3.4) | (3.4) | (3.4) | (3.3) | (3.3) | (3.2) | (33.7) |
| POC - swaps (DDOT) | (1.6) | (1.8) | (1.9) | (1.8) | (1.8) | (1.9) | (1.9) | (1.9) | (1.9) | (1.9) | (1.9) | (1.9) | (1.8) | (1.8) | (1.8) | (1.7) | (18.3) |
| POC - swaps (General Fund grant) | (0.3) | (0.4) | (0.4) | (0.4) | (0.4) | (1.4) | (1.3) | (1.7) | (1.7) | (1.7) | (1.7) | (1.7) | (1.6) | (1.6) | (1.6) | (1.6) | (16.1) |
| Pension contributions - Public Safety | (47.6) | (37.9) | (32.6) | (91.8) | (59.8) | (50.2) | (133.1) | (156.0) | (172.4) | (189.7) | (207.9) | (209.8) | (214.6) | (215.5) | (212.7) | (211.7) | (1,923.3) |
| Pension contributions - Non-Public Safety | (10.7) | (11.5) | (1.7) | (9.4) | (7.6) | (4.0) | (32.8) | (36.5) | (40.4) | (44.9) | (49.9) | (52.4) | (55.0) | (57.4) | (59.9) | (62.1) | (491.3) |
| Pension contributions - DDOT | (6.8) | (7.3) | (6.9) | (9.5) | (10.9) | (2.8) | (23.6) | (27.7) | (31.2) | (34.8) | (38.7) | (40.6) | (42.7) | (44.5) | (46.6) | (48.3) | (378.8) |
| Pension contributions - General Fund grant | (1.0) | (0.7) | (0.9) | (1.7) | (1.0) | (2.4) | (6.4) | (9.4) | (10.4) | (11.5) | (12.6) | (12.9) | (13.3) | (13.5) | (13.6) | (13.8) | (117.5) |
| Health benefits - retiree - Public Safety | (73.7) | (80.2) | (70.4) | (79.6) | (90.6) | (83.1) | (89.4) | (94.4) | (97.5) | (102.0) | (106.3) | (112.2) | (118.0) | (124.6) | (130.7) | (136.9) | (1,112.0) |
| Health benefits - retiree - Non-Public Safety | (47.4) | (51.6) | (50.6) | (42.9) | (49.2) | (51.5) | (36.4) | (38.3) | (39.6) | (41.4) | (43.2) | (45.6) | (47.9) | (50.6) | (53.1) | (56.0) | (451.7) |
| Health benefits - retiree - DDOT | nav | (12.6) | (10.4) | (11.8) | (12.1) | (13.2) | (13.9) | (14.6) | (15.1) | (15.8) | (16.5) | (17.4) | (18.3) | (19.3) | (20.3) | (21.2) | (172.3) |
| Health benefits - retiree - General Fund grant | nav | nav | nav | nav | nav | nav | (4.2) | (5.6) | (5.8) | (6.0) | (6.3) | (6.7) | (7.0) | (7.4) | (7.7) | (8.1) | (64.9) |
| Legacy expenditures | (404.4) | (463.9) | (399.7) | (491.0) | (467.3) | (457.3) | (596.9) | (621.9) | (649.2) | (661.8) | (698.3) | (710.2) | (728.8) | (744.6) | (739.6) | (748.9) | (6,900.2) |
| **Deficit (excl. financing proceeds)** | (127.9) | (124.1) | (71.7) | (56.9) | (121.8) | (31.7) | (185.8) | (250.8) | (299.2) | (334.4) | (383.3) | (406.1) | (449.1) | (483.7) | (505.6) | (524.5) | (3,822.5) |
| Financing proceeds | 75.0 | - | 250.0 | - | - | 143.5 | - | - | - | - | - | - | - | - | - | - | - |
| **Total surplus (deficit)** | $ (52.9) | $ (124.1) | $ 178.3 | $ (56.9) | $ (121.8) | $ 111.9 | $ (185.8) | $ (250.8) | $ (299.2) | $ (334.4) | $ (383.3) | $ (406.1) | $ (449.1) | $ (483.7) | $ (505.6) | $ (524.5) | $ (3,822.5) |

**Ten-Year Financial Projections**
**General Fund detail view**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | | 10-year total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | |
| **Reinvestment in the City** | | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | | | | | | | | | | | | |
| Fire | $ - | $ - | $ - | $ - | $ - | $ - | $ 2.0 | $ 8.1 | 6.6 | $ 18.3 | $ 19.0 | $ 6.7 | $ 6.6 | $ 6.6 | $ 6.6 | 6.6 | $ 87.0 |
| 36th District Court | - | - | - | - | - | - | - | 5.8 | 8.2 | 8.5 | 8.7 | 9.0 | 9.2 | 9.5 | 9.8 | 10.1 | 78.8 |
| Blight | - | - | - | - | - | - | 6.0 | 50.3 | 4.0 | 4.0 | 4.0 | 4.0 | - | - | - | - | 72.3 |
| Municipal Parking | - | - | - | - | - | - | - | 5.6 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 60.3 |
| DDOT - Transportation | - | - | - | - | - | - | (1.7) | (5.7) | (1.5) | (0.1) | 4.6 | 6.3 | 10.4 | 10.0 | 14.1 | 15.0 | 51.4 |
| Police | - | - | - | - | - | - | - | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 32.6 |
| General Services | - | - | - | - | - | - | 1.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 20.3 |
| Other | - | - | - | - | - | - | 3.2 | 8.1 | 9.4 | 9.7 | 7.3 | 7.3 | 7.4 | 7.4 | 7.5 | 7.5 | 74.9 |
| Sub-total: Revenues initiatives | - | - | - | - | - | - | 10.6 | 78.0 | 39.3 | 53.0 | 56.2 | 45.8 | 46.2 | 46.1 | 50.6 | 51.8 | 477.6 |
| Additional operating expenditures | | | | | | | | | | | | | | | | | |
| General Services | - | - | - | - | - | - | (5.4) | (14.4) | (14.4) | (14.5) | (14.6) | (14.7) | (14.8) | (14.9) | (15.0) | (15.1) | (137.7) |
| Police | - | - | - | - | - | - | (5.7) | (16.1) | (18.1) | (11.0) | (9.9) | (10.1) | (9.9) | (9.7) | (10.1) | (9.9) | (110.4) |
| Finance/Budget | - | - | - | - | - | - | (2.3) | (7.5) | (4.3) | (4.3) | (1.7) | (2.2) | (2.7) | (3.2) | (3.6) | (4.1) | (35.8) |
| Other | - | - | - | - | - | - | (8.3) | (41.1) | (7.3) | (10.5) | (5.3) | (1.6) | (3.4) | (1.7) | (2.8) | (2.0) | (84.0) |
| Sub-total: Add. operating exp. | - | - | - | - | - | - | (21.7) | (79.1) | (44.2) | (40.2) | (31.5) | (28.6) | (30.7) | (29.5) | (31.5) | (31.2) | (368.0) |
| Capital investments | | | | | | | | | | | | | | | | | |
| Technology | - | - | - | - | - | - | (13.3) | (53.8) | (20.3) | (7.8) | (9.9) | (10.5) | (7.4) | (8.8) | (8.8) | (7.5) | (148.0) |
| Capital expenditures and other infrastructure | - | - | - | - | - | - | (52.5) | (71.7) | (50.2) | (48.4) | (42.1) | (41.2) | (36.2) | (36.3) | (34.5) | (34.2) | (447.2) |
| Implementation costs | - | - | - | - | - | - | (6.3) | (12.3) | (5.6) | (0.9) | (1.2) | (1.0) | (2.6) | (1.8) | (1.2) | (1.0) | (33.9) |
| Sub-total: Capital investments | - | - | - | - | - | - | (72.2) | (137.8) | (76.1) | (57.1) | (53.2) | (52.7) | (46.2) | (46.9) | (44.5) | (42.7) | (629.2) |
| Blight (excludes heavy commercial) | - | - | - | - | - | - | (5.0) | (95.0) | (100.0) | (100.0) | (100.0) | (100.0) | - | - | - | - | (500.0) |
| **Total reinvestment in the City** | - | - | - | - | - | - | (88.2) | (233.9) | (180.9) | (144.3) | (128.5) | (135.4) | (30.7) | (30.2) | (25.4) | (22.0) | (1,019.5) |
| **Adjusted surplus (deficit)** | $ (52.9) | $ (124.1) | $ 178.3 | $ (56.9) | $ (121.8) | $ 111.9 | $ (274.1) | $ (484.7) | $ (480.1) | $ (478.7) | $ (511.8) | $ (541.5) | $ (479.8) | $ (513.9) | $ (531.0) | $ (546.5) | $ (4,842.0) |

**Ten-Year Financial Projections**
**Funds Available for Unsecured Claims Summary Bridge**
*($ in millions)*

| | | | | | Preliminary forecast | | | | | | 10 yr | Note |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | total | |
| **Funds available for unsecured claims - June 2013 Proposal** | $ 30.0 | $ 31.9 | $ 55.5 | $ 32.3 | $ 65.4 | $ 62.0 | $ 152.1 | $ 137.8 | $ 120.2 | $ 116.2 | $ 803.3 | |
| Property taxes | (3.5) | (6.0) | (5.5) | (3.6) | (3.4) | (4.4) | (10.2) | (10.6) | (10.7) | (11.5) | (69.4) | 1 |
| Municipal income taxes | 3.0 | 3.1 | 3.1 | 3.1 | 3.1 | 3.1 | 3.1 | 3.2 | 3.2 | 3.2 | 31.2 | 2 |
| State revenue sharing | 6.7 | 6.7 | 6.7 | 6.7 | 6.7 | 6.7 | 6.7 | 6.7 | 6.7 | 6.7 | 66.7 | 3 |
| Personnel expenses | 16.4 | 10.8 | 4.1 | 2.5 | 1.4 | 0.2 | (9.9) | (11.1) | (11.6) | (12.4) | (9.7) | 4 |
| Reinvestment initiatives | 100.3 | (94.6) | (45.2) | 5.4 | 2.1 | (6.7) | 2.1 | 3.2 | 7.2 | 11.8 | (14.4) | 5 |
| Restructuring professional fees | (22.9) | (10.6) | - | - | - | - | - | - | - | - | (33.5) | 6 |
| Active pension contributions for DDOT (5% of wages) | (1.5) | (1.6) | (1.7) | (1.7) | (1.8) | (1.8) | (1.8) | (1.9) | (1.9) | (2.0) | (17.8) | |
| OPEB payments | (6.1) | (6.4) | (6.7) | (6.8) | (6.9) | (7.1) | (7.4) | (7.5) | (7.6) | (7.8) | (70.3) | 7 |
| UTGO tax millage | - | (41.0) | (37.1) | (37.1) | (36.2) | (34.3) | (33.8) | (33.2) | (21.6) | (18.6) | (292.8) | 8 |
| LTGO secured payments | (7.2) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.4) | (0.4) | (10.1) | |
| POC swaps floating interest payments / settlement | 4.7 | (7.2) | 50.6 | 50.6 | 50.6 | 50.6 | 49.8 | 48.9 | 48.1 | 47.4 | 394.3 | 9 |
| Other | (14.8) | (12.7) | (2.4) | (11.7) | (9.0) | (5.0) | 2.0 | 5.5 | 3.8 | 5.1 | (39.3) | |
| **Funds available for unsecured claims - February 2014 Plan** | $ 105.0 | $ (127.9) | $ 21.0 | $ 39.4 | $ 71.6 | $ 63.0 | $ 152.4 | $ 140.6 | $ 135.4 | $ 137.7 | $ 738.3 | |
| QOL and exit financing and principal and interest | 116.6 | 160.2 | (18.0) | (18.0) | (18.0) | (68.0) | (90.0) | (85.5) | (81.0) | (26.5) | (128.3) | 10 |
| Working capital | (39.8) | 15.0 | - | - | - | - | - | - | - | - | (24.8) | 11 |
| Contingency | - | (12.6) | (10.5) | (10.4) | (10.5) | (10.5) | (10.6) | (10.6) | (10.7) | (10.9) | (97.5) | 12 |
| Deferral | - | 4.8 | 42.5 | 23.6 | (9.1) | 48.8 | 4.1 | 10.4 | 7.6 | (50.3) | 82.4 | 13 |
| **Adjusted funds available for unsecured claims - February 2014 Plan** | $ 181.8 | $ 39.4 | $ 35.0 | $ 34.6 | $ 34.0 | $ 33.3 | $ 55.9 | $ 54.9 | $ 51.2 | $ 50.1 | $ 570.2 | |

*Footnotes:*

1. Lower property tax revenues due to continued tax roll clean up and re-assessment assumed to be completed by FY 2020
2. Higher income taxes realized in FY 2013 assumed to carry forward
3. Higher state revenue sharing revenues due to increase in EVIP portion, assumed to carry forward through FY 2023
4. Lower personnel costs due to lower actual headcount in FY 2014, ramp up begins FY 2015. 5% wage increase assumed for public safety employees in FY 2020
5. Higher operating and capital investment expenses partially offset by higher revenues as a result of reinvestment activities
6. Higher restructuring professional fees due to higher than anticipated litigation activity and addition of costs related to retiree committee advisors
7. Reflects assumed OPEB payments for future retirees at 2% of wages, previously not reflected
8. Reduced millage to reflect treatment of UTGO as unsecured and corresponding reduction in property tax revenues
9. Assumes payments to swap counterparties based on the interest rate spread (i.e. fixed rate less the floating rate). Payments are assumed to be made monthly between January and October 2014,
   at which point the remaining balance of $85m is paid (~$42m)
10. Assumes QOL net financing proceeds of $118m in FY 2014 and $175m of net additional proceeds from exit financing in FY 2015. Exit financing assumes 8 year note funded 10/31/2014 with interest only
    payments in first 4 years and equal principal payments made in years 5 through 8
11. Primarily relates to past due vendor payments and self insurance escrow funding activity
12. Reflects amounts reserved for unexpected events
13. Reflects timing adjustment of reinvestment initiatives to maintain minimum liquidity levels and avoid annual deficits

**Ten-Year Financial Projections**
**Funds Available for Unsecured Claims Detailed Bridge**
*($ in millions)*

| | | | | | Preliminary forecast | | | | | | 10 yr total | Note |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | | |
| **Funds available for unsecured claims - June 2013 Proposal** | $ 30.0 | $ 31.9 | $ 55.5 | $ 32.3 | $ 65.4 | $ 62.0 | $ 152.1 | $ 137.8 | $ 120.2 | $ 116.2 | $ 803.3 | |
| Property taxes | (3.5) | (6.0) | (5.5) | (3.6) | (3.4) | (4.4) | (10.2) | (10.6) | (10.7) | (11.5) | (69.4) | 1 |
| Municipal income taxes | 3.0 | 3.1 | 3.1 | 3.1 | 3.1 | 3.1 | 3.1 | 3.2 | 3.2 | 3.2 | 31.2 | 2 |
| Wagering taxes | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (1.0) | |
| Utility users' taxes | (14.2) | (3.5) | (3.5) | (3.5) | (3.5) | (3.6) | (3.6) | (3.6) | (3.7) | (3.7) | (46.2) | 3 |
| Other taxes | (3.3) | (3.3) | (3.3) | (3.3) | (3.3) | (3.3) | (3.3) | (3.3) | (3.3) | (3.3) | (33.4) | 4 |
| State revenue sharing | 6.7 | 6.7 | 6.7 | 6.7 | 6.7 | 6.7 | 6.7 | 6.7 | 6.7 | 6.7 | 66.7 | 5 |
| Sales and charges for services revenue | 6.7 | (1.4) | (2.4) | (3.3) | (4.2) | (5.2) | (6.3) | (7.7) | (9.8) | (10.1) | (43.7) | 6 |
| Other revenue | 1.2 | 14.7 | 13.3 | 1.8 | 0.5 | 0.7 | 1.0 | 1.3 | 1.5 | 1.8 | 37.9 | 7 |
| General Fund reimbursements | (3.9) | 11.4 | 11.5 | (8.9) | (8.9) | (8.9) | (8.9) | (8.9) | (8.9) | (8.9) | (43.1) | 8 |
| General Fund transfers in | 4.9 | 2.8 | 3.1 | 3.1 | 3.2 | 3.0 | 3.0 | 3.0 | 3.1 | 3.2 | 32.4 | 9 |
| **Personnel expenses** | | | | | | | | | | | | |
| Salary and wages | 20.3 | 11.3 | 5.2 | 4.2 | 3.9 | 3.2 | (4.7) | (5.1) | (5.1) | (5.2) | 28.0 | 10 |
| Overtime | (5.8) | (5.4) | (4.9) | (5.1) | (5.1) | (5.2) | (6.2) | (6.3) | (6.3) | (6.4) | (56.5) | 11 |
| Active health benefits | 2.8 | 6.8 | 6.2 | 6.1 | 5.6 | 5.5 | 4.9 | 4.4 | 4.0 | 3.4 | 49.8 | 12 |
| Other benefits/fringes | (0.9) | (2.0) | (2.5) | (2.7) | (2.9) | (3.2) | (4.0) | (4.2) | (4.2) | (4.3) | (30.9) | 13 |
| Operating expenses | (3.2) | (8.6) | (4.5) | (0.9) | 2.2 | 6.4 | 9.7 | 13.3 | 14.2 | 15.9 | 44.5 | 14 |
| DDOT operating subsidy | (4.7) | (1.7) | (2.2) | (1.8) | (1.4) | (1.0) | (0.6) | (0.2) | 0.2 | 0.5 | (12.8) | 15 |
| Other contributions/subsidies | 4.7 | (14.7) | (14.7) | 5.5 | 5.9 | 6.1 | 6.3 | 6.6 | 6.8 | 7.1 | 19.5 | 16 |
| Other expenses | 3.5 | (1.2) | 2.3 | 3.0 | 3.7 | 3.8 | 3.9 | 4.0 | 4.0 | 4.0 | 31.0 | 17 |
| **Reinvestment initiatives** | | | | | | | | | | | | |
| Reinvestment capital investments | 35.6 | (63.4) | (37.3) | (5.2) | (19.9) | (21.9) | (17.7) | (17.4) | (16.0) | (13.6) | (176.8) | 18 |
| Reinvestment revenues/operating expenses | 64.7 | (31.2) | (7.9) | 10.6 | 22.0 | 15.2 | 19.8 | 20.6 | 23.2 | 25.4 | 162.4 | 19 |
| Restructuring professional fees | (22.9) | (10.6) | - | - | - | - | - | - | - | - | (33.5) | 20 |
| Active pension contributions for DDOT (5% of wages) | (1.5) | (1.6) | (1.7) | (1.7) | (1.8) | (1.8) | (1.8) | (1.9) | (1.9) | (2.0) | (17.8) | |
| OPEB payments | (6.1) | (6.4) | (6.7) | (6.8) | (6.9) | (7.1) | (7.4) | (7.5) | (7.6) | (7.8) | (70.3) | 21 |
| POC principal & interest reimbursement | 0.1 | (1.6) | (3.0) | (3.1) | (3.2) | (2.9) | (2.9) | (2.9) | (3.0) | (3.1) | (25.4) | 22 |
| Increased tax revenues | (5.9) | (6.1) | 0.9 | (0.7) | (0.8) | (1.0) | 3.3 | 3.6 | 2.0 | 0.9 | (3.9) | 23 |
| UTGO tax millage | - | (41.0) | (37.1) | (37.1) | (36.2) | (34.3) | (33.8) | (33.2) | (21.6) | (18.6) | (292.8) | 24 |
| LTGO secured payments | (7.2) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.4) | (0.4) | (10.1) | |
| POC swaps floating interest payments / settlement | 4.7 | (7.2) | 50.6 | 50.6 | 50.6 | 50.6 | 49.8 | 48.9 | 48.1 | 47.4 | 394.3 | 25 |
| Other | (0.7) | 0.5 | 0.3 | 0.5 | 0.9 | 1.0 | 0.4 | 0.6 | 0.6 | 0.8 | 5.0 | |
| **Funds available for unsecured claims - February 2014 Plan** | $ 105.0 | $ (127.9) | $ 21.0 | $ 39.4 | $ 71.6 | $ 63.0 | $ 152.4 | $ 140.6 | $ 135.4 | $ 137.7 | $ 738.3 | |

*Footnotes:*

1. Continued tax roll clean up and re-assessment assumed to be completed by FY 2020
2. Higher income taxes realized in FY 2013 assumed to carry forward
3. FY 2014 reflects full Public Lighting Authority contribution in calendar year 2013. ~$3m decrease due to lower utility usage
4. Interest and penalties on taxes beginning FY 2013 assumed to be distributed to other taxing authorities based on updated information from the City
5. Revised forecast from State, EVIP ~$6m higher annually
6. $18m as a result of Vital Records operations transferred to Wayne County and lower revenues in certain departments due to FY 2013 actual run-rate updates
7. Higher Parking Dept. revenues due to FY 2013 actual run-rate updates and FY 2015 and 2016 include additional SAFER grant awarded
8. $48m Streets Fund reimbursement eliminated as Solid Waste operations assumed to be outsourced, associated expense also eliminated
9. Reflects revenue from non-General Fund entities (excl. DDOT). POC expense allocation revised to reflect updated information received from the City
10. Primarily due to public safety actual headcount lower than projected in FY 2014, ramp up beginning FY 2015. 5% wage increase assumed for public safety employees in FY 2020
11. Police Dept. run-rate increased to align with historicals (12 hour shift and expected efficiencies eliminated)
12. Primarily due to medical plan design with lower cost per head for non-public safety active employees
13. Revised forecast developed by specific other benefit/fringe by funding group, previously applied growth rate to actual expense recorded
14. $18m lower supplies costs due to Vital Records operations transfer; $40m lower maintenance costs due to Solid Waste outsourcing. Lower costs partially offset by increases due to FY 2013 run-rate updates
15. Higher DDOT subsidy due to FY 2013 run-rate updates of revenues and operating expenditures
16. Reflects transfers out for debt service/lease payments removed from the projections as debt matured and payments will no longer be made ($19m Finance and $5m Police)
17. Reflects non-recurring capital outlay expenses removed from the projections, partially offset by higher bank fees from tax return scanning/processing and Planning & Development cost re-allocation from grant to General Fund
18. Primarily due to higher capital expenditures and technology capital investments
19. Reflects higher revenues partially offset by higher operating expenses as a result of reinvestment activities
20. Higher restructuring professional fees due to higher than anticipated litigation activity and addition of costs related to retiree committee advisors
21. Reflects assumed OPEB payments for future retirees at 2% of wages, previously not reflected
22. Reflects POC principal and interest reimbursement (revenue) that is eliminated as claim is unsecured. POC principal and interest reimbursements higher due to change in allocation methodology as detailed in Note 9
23. Higher tax revenues due to reinvestment activities, based on revised forecast
24. Reduced millage to reflect treatment of UTGO as unsecured and corresponding reduction in property tax revenues
25. Assumes payments to swap counterparties based on current index (i.e. fixed-rate less floating rate). Payments are assumed to be made monthly between January and October 2014, which repay the remaining balance of $85m (approx.~$42m)

# Appendix A
## General Fund Department detail

Note: Civic Center, Former Cost Center, and DWDD have been excluded from the presentation as they do not contribute to the forecast and have minimal impact in historical years.

**Ten-Year Financial Projections**
**Budget - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | - | - | 0.0 | 0.0 | 0.0 | 0.0 | - | - | - | - | - | - | - | - | - | - |
| Revenue from use of assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | 0.0 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total revenues** | 0.0 | - | 0.0 | 0.0 | 0.0 | 0.0 | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | | | | | |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (1.4) | (1.4) | (1.2) | (1.1) | (1.1) | (0.9) | (1.0) | (1.0) | (1.0) | (1.1) | (1.1) | (1.1) | (1.1) | (1.1) | (1.2) | (1.2) |
| Overtime | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Pension | (0.0) | (0.0) | (0.0) | (0.0) | (0.1) | (0.1) | (0.6) | (0.8) | (0.9) | (1.0) | (1.1) | (1.1) | (1.2) | (1.2) | (1.3) | (1.4) |
| Medical & fringe benefits | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.7) | (0.8) | (0.8) | (0.9) | (0.9) | (0.9) | (1.0) | (1.0) | (1.1) | (1.1) | (1.2) |
| Professional and contractual services | - | (0.0) | 0.0 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Materials & supplies | (0.1) | (0.2) | (0.0) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Utilities | (0.0) | (0.0) | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Purchased services | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Risk management and insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | (0.2) | (0.1) | (0.2) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Debt service | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest (1) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) |
| Transfers out | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (2.6) | (2.6) | (2.4) | (2.3) | (2.4) | (2.2) | (3.1) | (3.3) | (3.5) | (3.7) | (3.9) | (4.0) | (4.1) | (4.3) | (4.4) | (4.5) |
| | | | | | | | | | | | | | | | | |
| **Total surplus (deficit)** | $ (2.6) | $ (2.6) | $ (2.4) | $ (2.3) | $ (2.4) | $ (2.2) | $ (3.1) | $ (3.3) | $ (3.5) | $ (3.7) | $ (3.9) | $ (4.0) | $ (4.1) | $ (4.3) | $ (4.4) | $ (4.5) |
| | | | | | | | | | | | | | | | | |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Expenses | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Technology | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Capital expenditures and other infrastructure | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | | | | | |
| **Operational restructuring** | | | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| | | | | | | | | | | | | | | | | |
| **Adjusted surplus (deficit)** | | | | | | $ (2.2) | $ (3.1) | $ (3.3) | $ (3.5) | $ (3.7) | $ (3.9) | $ (4.0) | $ (4.1) | $ (4.3) | $ (4.4) | $ (4.5) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

**Ten-Year Financial Projections**
**Budget - general fund - Key assumptions**

| | | Fiscal year ended actual | | | | | | | | Preliminary forecast | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 22 | 23 | 20 | 16 | 15 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 |
| | | | | | | | | | | | | | | | | |
| Average salary & wages (1) | $ 62,323 | $ 62,796 | $ 62,338 | $ 71,811 | $ 73,322 | $ 57,557 | $ 64,173 | $ 65,456 | $ 66,765 | $ 68,100 | $ 69,462 | $ 70,852 | $ 72,269 | $ 73,714 | $ 75,188 | $ 76,692 |
| Average overtime | 864 | 891 | 925 | 1,177 | 1,022 | 1,583 | 1,765 | 1,800 | 1,836 | 1,873 | 1,910 | 1,948 | 1,987 | 2,027 | 2,068 | 2,109 |
| | $ 63,187 | $ 63,687 | $ 63,263 | $ 72,988 | $ 74,344 | $ 59,140 | $ 65,937 | $ 67,256 | $ 68,601 | $ 69,973 | $ 71,372 | $ 72,800 | $ 74,256 | $ 75,741 | $ 77,256 | $ 78,801 |
| | | | | | | | | | | | | | | | | |
| Overtime as a % of salary & wages | 1.4% | 1.4% | 1.5% | 1.6% | 1.4% | 2.7% | 2.7% | 2.7% | 2.7% | 2.7% | 2.7% | 2.7% | 2.7% | 2.7% | 2.7% | 2.7% |
| | | | | | | | | | | | | | | | | |
| Pension as a % of salary & wages | | | | | | 9.5% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| | | | | | | | | | | | | | | | | |
| Medical & fringe as a % of salary & wages | 44.4% | 40.8% | 46.3% | 50.6% | 55.5% | 76.8% | 81.3% | 82.6% | 83.9% | 85.9% | 87.8% | 90.4% | 92.8% | 95.6% | 98.0% | 100.4% |

| Key Items | Comment/Reference |
|---|---|
| Expenses | |
| Personnel expenses | Appendix C.1 - Appendix C.3 |
| Other expenses | Primarily building rental expense |

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Additional Department employees | | | | | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |

(1) Based on department salaries & wages and employees, see Appendix C.2.

**Ten-Year Financial Projections**
**DPW - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | 0.0 | 0.0 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | 4.3 | 2.4 | 5.1 | 2.7 | 3.5 | 5.6 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | 2.8 | 2.9 | 1.8 | 0.1 | (0.4) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Revenue from use of assets | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | 0.7 | 1.3 | 0.2 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | 0.0 | 1.0 | 0.4 | 0.0 | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | 0.2 | 0.6 | 0.1 | 0.3 | 0.0 | 0.3 | - | - | - | - | - | - | - | - | - | - |
| **Total revenues** | 8.1 | 8.3 | 7.6 | 3.1 | 3.1 | 6.0 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (7.6) | (7.5) | (3.6) | (2.3) | (1.8) | (0.9) | (0.7) | (0.8) | (0.8) | (0.8) | (0.9) | (0.9) | (0.9) | (0.9) | (0.9) | (0.9) |
| Overtime | (0.3) | (0.2) | (0.1) | (0.0) | (0.1) | (0.1) | (0.0) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Pension | (1.2) | (1.0) | (0.5) | (0.1) | (0.1) | (0.1) | (0.4) | (0.6) | (0.7) | (0.8) | (0.9) | (0.9) | (1.0) | (1.0) | (1.1) |
| Medical & fringe benefits | (4.0) | (3.8) | (2.0) | (1.3) | (1.3) | (0.4) | (1.0) | (1.2) | (1.2) | (1.3) | (1.3) | (1.4) | (1.4) | (1.5) | (1.6) | (1.7) |
| Professional and contractual services | (0.8) | (0.8) | (0.5) | (0.3) | (0.2) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Materials & supplies | 0.0 | (0.1) | (0.0) | 0.0 | (0.0) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Utilities | (2.3) | (1.0) | (0.2) | (0.3) | (0.0) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Purchased services | (0.1) | (0.1) | 0.0 | 0.0 | 0.0 | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) |
| Risk management and insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | (1.0) | (1.0) | (0.6) | (0.6) | (0.3) | (0.6) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) |
| Debt service | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (0.4) | (0.4) | (0.5) | (0.5) | (0.5) | (0.4) | (0.3) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) |
| Transfers out | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (17.8) | (15.9) | (7.9) | (5.4) | (4.4) | (2.6) | (3.0) | (3.5) | (3.7) | (3.9) | (4.1) | (4.2) | (4.3) | (4.5) | (4.6) | (4.7) |
| **Total surplus (deficit)** | $ (9.7) | $ (7.6) | $ (0.3) | $ (2.3) | $ (1.3) | $ 3.4 | $ 0.7 | $ 0.2 | $ (0.0) | $ (0.2) | $ (0.4) | $ (0.5) | $ (0.6) | $ (0.8) | $ (0.9) | (1.0) |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Expenses | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Technology | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Capital expenditures and other infrastructure | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| **Operational restructuring** | | | | | | $ - | $ - | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | (0.0) |
| **Adjusted surplus (deficit)** | | | | | | $ 3.4 | $ 0.7 | $ 0.1 | $ (0.0) | $ (0.2) | $ (0.4) | $ (0.5) | $ (0.6) | $ (0.8) | $ (0.9) | (1.1) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

**Ten-Year Financial Projections**
**DPW - general fund - Key assumptions**

| | | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 184 | 179 | 123 | 114 | 114 | 41 | 14 | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 19 |
| | | | | | | | | | | | | | | | | |
| Average salary & wages(1) | $ 30,107 | $ 30,392 | $ 35,862 | $ 30,300 | $ 32,448 | $ 31,439 | $ 33,550 | $ 34,154 | $ 34,837 | $ 35,534 | $ 36,245 | $ 36,970 | $ 37,709 | $ 38,463 | $ 39,233 | 40,017 |
| Average overtime | 1,609 | 1,151 | 523 | 383 | 828 | 1,505 | 3,346 | 3,039 | 3,100 | 3,162 | 3,225 | 3,290 | 3,355 | 3,422 | 3,491 | 3,561 |
| | $ 31,715 | $ 31,543 | $ 36,385 | $ 30,683 | $ 33,275 | $ 32,943 | $ 36,896 | $ 37,193 | $ 37,937 | $ 38,696 | $ 39,470 | $ 40,259 | $ 41,064 | $ 41,886 | $ 42,723 | 43,578 |
| | | | | | | | | | | | | | | | | |
| Overtime as a % of salary & wages | 3.9% | 2.8% | 1.8% | 1.9% | 5.1% | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% |
| | | | | | | | | | | | | | | | | |
| Pension as a % of salary & wages | | | | | | 7.1% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| | | | | | | | | | | | | | | | | |
| Medical & fringe as a % of salary & wages | 53.0% | 50.8% | 55.9% | 55.7% | 69.0% | 47.9% | 158.4% | 142.6% | 144.9% | 148.6% | 152.1% | 157.0% | 161.6% | 166.8% | 171.3% | 175.9% |

| Key Items | Comment/Reference |
|---|---|
| Revenues | |
|    Licenses, permits and inspection charges | Inspection charges and street-use permits. FY 2013 includes payment from utilities for permits to complete work over several years. |
| Expenses | |
|    Personnel expenses | Appendix C.1 - Appendix C.3 |
| | Department moved positions between DPW general fund and DPW street fund in FY 2014 and FY 2015 to more accurately capture costs. |
|    Professional and contractual services | Contracted repair services |
|    Other expenses | Building rental expenses |

**Operational restructuring**

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Additional Department employees | - | - | - | - | - | - | - | - | - | - | - |

(1) Based on department salaries & wages and employees, see Appendix C.2.

**Ten-Year Financial Projections**
**Finance - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | 18.9 | 8.2 | 4.4 | 3.0 | 3.5 | 0.6 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| Revenue from use of assets | 0.0 | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Parking/court fines and other revenue | 0.1 | 0.6 | 1.3 | 0.7 | (0.1) | 0.0 | - | - | - | - | - | - | - | - | - | - |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | 3.5 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | 4.6 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total revenues** | 23.6 | 12.4 | 5.8 | 3.7 | 3.3 | 0.6 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (14.5) | (15.0) | (14.0) | (12.9) | (11.6) | (10.0) | (9.8) | (10.0) | (9.7) | (9.9) | (10.1) | (10.3) | (10.5) | (10.7) | (11.0) | (11.2) |
| Overtime | (1.2) | (1.0) | (0.7) | (0.8) | (0.8) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.8) | (0.8) | (0.8) | (0.8) |
| Pension | (0.5) | (0.3) | (0.4) | (0.7) | (0.9) | (1.1) | (6.2) | (7.4) | (8.2) | (9.1) | (10.2) | (10.7) | (11.2) | (11.7) | (12.2) | (12.7) |
| Medical & fringe benefits | (7.4) | (6.9) | (7.0) | (6.9) | (7.2) | (8.1) | (11.3) | (11.8) | (12.1) | (12.6) | (13.2) | (13.8) | (14.5) | (15.3) | (16.0) | (16.8) |
| Professional and contractual services | (2.9) | (8.2) | (5.1) | (6.9) | (5.2) | (3.6) | (3.6) | (3.6) | (3.6) | (3.7) | (3.7) | (3.7) | (3.8) | (3.8) | (3.9) | (3.9) |
| Materials & supplies | (0.4) | (0.3) | (0.3) | (0.3) | (0.2) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.2) | (0.2) |
| Utilities | (0.3) | (0.2) | (0.2) | (0.2) | (0.2) | (0.0) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) |
| Purchased services | (0.1) | (0.1) | (0.2) | (0.1) | (0.0) | (0.2) | (0.2) | (0.2) | (0.2) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) |
| Risk management and insurance | 0.0 | - | (0.1) | - | (0.3) | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | (3.2) | (3.1) | (5.4) | (2.7) | (2.8) | (3.3) | (4.2) | (4.2) | (4.2) | (4.2) | (4.3) | (4.3) | (4.3) | (4.3) | (4.3) | (4.4) |
| Debt service | (0.0) | 0.3 | (0.0) | (0.1) | (0.0) | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (2.7) | (2.8) | (3.0) | (3.3) | (3.5) | (3.4) | (4.4) | (4.6) | (4.6) | (4.8) | (4.9) | (4.8) | (4.8) | (4.8) | (4.9) | (4.9) |
| Transfers out | - | (1.0) | (1.0) | (0.9) | (1.9) | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (33.1) | (38.6) | (37.5) | (35.8) | (34.7) | (30.7) | (40.8) | (42.9) | (43.7) | (45.6) | (47.6) | (49.0) | (50.5) | (52.1) | (53.7) | (55.2) |
| **Total surplus (deficit)** | $ (9.6) | $ (26.2) | $ (31.6) | $ (32.1) | $ (31.4) | $ (30.0) | $ (40.6) | $ (42.7) | $ (43.5) | $ (45.4) | $ (47.4) | $ (48.8) | $ (50.3) | $ (51.9) | $ (53.5) | $ (55.0) |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | $ - | 0.5 | 1.0 | 1.0 | 1.0 | 1.1 | 1.1 | 1.1 | 1.1 |
| Expenses | | | | | | | | | | | | | | | | |
|   Additional operating expenditures | | | | | | - | (2.3) | (7.5) | (4.3) | (4.3) | (1.7) | (2.2) | (2.7) | (3.2) | (3.6) | (4.1) |
|   Technology | | | | | | - | (9.8) | (35.9) | (8.4) | (4.3) | (6.5) | (6.6) | (4.1) | (5.2) | (5.5) | (4.2) |
|   Capital expenditures and other infrastructure | | | | | | - | - | - | - | - | - | - | - | - | - | - |
|   Implementation costs | | | | | | - | (2.5) | (5.5) | (3.4) | (0.5) | (0.9) | (0.6) | (1.4) | (0.6) | (0.9) | (0.6) |
| Subtotal: Expenses | | | | | | - | (14.6) | (48.9) | (16.1) | (9.2) | (9.1) | (9.5) | (8.2) | (9.0) | (10.0) | (8.9) |
| **Operational restructuring** | | | | | | $ - | $ (14.6) | $ (48.9) | $ (15.6) | $ (8.2) | $ (8.1) | $ (8.4) | $ (7.2) | $ (8.0) | $ (8.9) | (7.8) |
| **Adjusted surplus (deficit)** | | | | | | $ (30.0) | $ (55.1) | $ (91.6) | $ (59.1) | $ (53.6) | $ (55.5) | $ (57.2) | $ (57.5) | $ (59.9) | $ (62.4) | (62.8) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

**Ten-Year Financial Projections**
**Finance - general fund - Key assumptions**

| | | Fiscal year ended actual | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | | 327 | 310 | 285 | 266 | 235 | 228 | 216 | 216 | 206 | 206 | 206 | 206 | 206 | 206 | 206 | 206 |
| Average salary & wages(1) | $ | 44,290 $ | 48,404 $ | 49,213 $ | 48,545 $ | 49,479 | $ 44,131 $ | 45,415 $ | 46,323 $ | 47,249 $ | 48,194 $ | 49,158 $ | 50,141 $ | 51,144 $ | 52,167 $ | 53,211 $ | 54,275 |
| Average overtime | | 3,822 | 3,175 | 2,398 | 2,920 | 3,280 | 3,203 | 3,296 | 3,362 | 3,429 | 3,497 | 3,567 | 3,639 | 3,712 | 3,786 | 3,861 | 3,939 |
| | $ | 48,113 $ | 51,580 $ | 51,611 $ | 51,465 $ | 52,759 | $ 47,333 $ | 48,710 $ | 49,685 $ | 50,678 $ | 51,692 $ | 52,726 $ | 53,780 $ | 54,856 $ | 55,953 $ | 57,072 $ | 58,213 |
| Overtime as a % of salary & wages | | 8.6% | 6.6% | 4.9% | 6.0% | 6.6% | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% |
| Pension as a % of salary & wages | | | | | | | 10.5% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| Medical & fringe as a % of salary & wages | | 50.9% | 46.3% | 50.1% | 53.8% | 62.1% | 81.1% | 115.7% | 117.8% | 123.8% | 127.0% | 130.0% | 134.1% | 137.9% | 142.3% | 146.1% | 149.9% |

---

**Key Items**                                                    **Comment/Reference**

Revenues
  Sales and charges for services              Pension system reimbursements, which are recorded in Non-Departmental beginning in FY 2013. The remainder represents interagency billings.
Expenses
  Personnel expenses                          Appendix C.1 - Appendix C.3
                                              Headcount reductions occur beginning in FY 2016 due to external payroll processing services provider.

  Professional and contractual services       Other contracts for pension services, assessments, and general accounting
  Other expenses                              Primarily building rental expense and bank service charge

**Operational restructuring**

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Additional Department employees | | | | | | | - | 55 | 120 | 121 | 121 | 112 | 112 | 112 | 112 | 112 | 112 |

(1) Based on department salaries & wages and employees, see Appendix C.2.

**Ten-Year Financial Projections**
**Fire - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | 2.4 | 2.0 | 1.4 | 1.8 | 0.6 | 2.3 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | 16.2 | 17.6 | 15.9 | 16.3 | 13.1 | 12.6 | 14.9 | 14.9 | 14.9 | 14.9 | 14.9 | 14.9 | 14.9 | 14.9 | 14.9 | 14.9 |
| Revenue from use of assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.3 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | 0.1 | 0.1 | 0.0 | 0.4 | 0.2 | 13.6 | 13.7 | 11.7 | 11.2 | - | - | - | - | - | - | - |
| **Total revenues** | 18.8 | 19.8 | 17.4 | 18.6 | 14.0 | 28.8 | 31.4 | 29.5 | 29.0 | 17.8 | 17.8 | 17.8 | 17.8 | 17.8 | 17.8 | 17.8 |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (86.3) | (88.4) | (85.3) | (84.7) | (81.9) | (69.3) | (66.2) | (70.7) | (71.5) | (72.9) | (74.4) | (75.9) | (79.7) | (81.2) | (82.9) | (84.5) |
| Overtime | (7.5) | (10.1) | (11.5) | (12.7) | (15.1) | (4.9) | (5.6) | (4.2) | (4.3) | (4.4) | (4.5) | (4.6) | (4.8) | (4.9) | (5.0) | (5.1) |
| Pension | (16.7) | (6.9) | (9.2) | (26.4) | (17.3) | (17.0) | (44.8) | (53.2) | (56.5) | (62.0) | (67.9) | (68.6) | (70.1) | (70.4) | (69.5) | (69.2) |
| Medical & fringe benefits | (50.9) | (42.7) | (49.2) | (52.4) | (54.9) | (51.2) | (41.4) | (43.1) | (44.7) | (46.8) | (49.1) | (51.6) | (54.4) | (57.2) | (60.0) | (62.8) |
| Professional and contractual services | (3.0) | (2.9) | (2.6) | (3.0) | (2.9) | (2.9) | (2.9) | (2.9) | (2.9) | (3.0) | (3.0) | (3.0) | (3.0) | (3.1) | (3.1) | (3.1) |
| Materials & supplies | (1.9) | (1.8) | (1.6) | (1.9) | (1.8) | (1.9) | (1.9) | (2.0) | (2.0) | (2.0) | (2.0) | (2.0) | (2.0) | (2.0) | (2.0) | (2.0) |
| Utilities | (1.6) | (3.0) | (1.2) | (2.1) | (1.5) | (1.4) | (1.6) | (1.8) | (1.8) | (1.9) | (1.9) | (1.9) | (2.0) | (2.0) | (2.0) | (2.1) |
| Purchased services | (0.4) | (0.1) | 0.0 | 0.0 | (0.2) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Risk management and insurance | (1.4) | (1.6) | (2.2) | 0.1 | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Other expenses | (0.3) | (1.0) | (1.0) | (0.9) | (0.5) | (0.9) | (1.9) | (1.9) | (1.9) | (2.0) | (2.0) | (2.0) | (2.0) | (2.0) | (2.0) | (2.0) |
| Debt service | (0.0) | - | - | - | - | (0.5) | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (13.0) | (14.0) | (14.7) | (15.3) | (16.0) | (16.8) | (17.6) | (18.1) | (17.6) | (17.9) | (18.1) | (17.9) | (17.8) | (17.8) | (17.7) | (17.7) |
| Transfers out | - | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | (0.0) | 0.0 | - | (0.0) | (0.0) | (0.4) | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (183.1) | (172.4) | (178.6) | (199.3) | (192.1) | (167.2) | (184.0) | (197.9) | (203.4) | (212.8) | (222.8) | (227.5) | (235.8) | (240.7) | (244.2) | (248.6) |
| **Total surplus (deficit)** | $ (164.3) | $ (152.6) | $ (161.2) | $ (180.7) | $ (178.0) | $ (138.4) | $ (152.5) | $ (168.5) | $ (174.4) | $ (195.0) | $ (205.1) | $ (209.7) | $ (218.1) | $ (222.9) | $ (226.5) | $ (230.8) |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ 2.0 | $ 8.1 | $ 6.6 | $ 18.3 | $ 19.0 | $ 6.7 | $ 6.6 | $ 6.6 | $ 6.6 | 6.6 |
| *Expenses* | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | (2.7) | (12.6) | (6.1) | (7.6) | (0.7) | 2.8 | 1.1 | 3.9 | 2.9 | 4.6 |
| Technology | | | | | | - | (0.7) | (0.6) | (0.2) | (0.2) | (0.2) | (0.8) | (0.2) | (0.4) | (0.2) | (0.2) |
| Capital expenditures and other infrastructure | | | | | | - | (15.2) | (19.5) | (17.0) | (16.6) | (11.6) | (17.7) | (9.7) | (10.1) | (8.5) | (8.2) |
| Implementation costs | | | | | | - | (0.3) | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | (18.9) | (32.8) | (23.3) | (24.4) | (12.4) | (15.7) | (8.8) | (6.7) | (5.8) | (3.8) |
| **Operational restructuring** | | | | | | $ - | $ (16.9) | $ (24.6) | $ (16.7) | $ (6.0) | 6.6 | $ (9.0) | $ (2.3) | $ (0.1) | $ 0.8 | 2.8 |
| **Adjusted surplus (deficit)** | | | | | | $ (138.4) | $ (169.5) | $ (193.1) | $ (191.1) | $ (201.0) | $ (198.5) | $ (218.7) | $ (220.3) | $ (223.0) | $ (225.7) | (228.0) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

**Ten-Year Financial Projections**
**Fire - general fund - Key assumptions**

| | | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | | 1,444 | 1,406 | 1,355 | 1,330 | 1,257 | 1,189 | 1,183 | 1,238 | 1,228 | 1,228 | 1,228 | 1,228 | 1,228 | 1,228 | 1,228 | 1,228 |
| Average salary & wages(1) | $ | 59,754 | 62,869 | 62,968 | 63,698 | 65,189 | 58,311 | 55,950 | 57,069 | 58,210 | 59,374 | 60,562 | 61,773 | 64,862 | 66,159 | 67,482 | 68,832 |
| Average overtime | | 5,176 | 7,152 | 8,484 | 9,522 | 11,983 | 4,084 | 4,756 | 3,424 | 3,493 | 3,562 | 3,634 | 3,706 | 3,892 | 3,970 | 4,049 | 4,130 |
| | $ | 64,930 | 70,022 | 71,452 | 73,220 | 77,172 | 62,395 | 60,705 | 60,493 | 61,703 | 62,937 | 64,195 | 65,479 | 68,753 | 70,128 | 71,531 | 72,962 |
| Overtime as a % of salary & wages | | 8.7% | 11.4% | 13.5% | 14.9% | 18.4% | 7.0% | 8.5% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% |
| Pension as a % of salary & wages | | | | | | | 24.6% | 67.6% | 75.3% | 79.1% | 85.0% | 91.4% | 90.4% | 88.1% | 86.7% | 83.9% | 81.9% |
| Medical & fringe as a % of salary & wage | | 59.0% | 48.3% | 57.7% | 61.8% | 66.9% | 73.9% | 62.5% | 61.0% | 62.5% | 64.2% | 66.0% | 68.0% | 68.3% | 70.4% | 72.4% | 74.3% |

**Key Items** — **Comment/Reference**

Revenues
- Licenses, permits and inspection charges — Fire marshal inspections; increases represent FY 2014 budgeted revenues
- Sales and charges for services — Primarly EMS administration service charges, for which there is a fee increase assumed beginning FY 2014
- Grant revenue — SAFER grant, which expires at the end of FY 2016

Expenses
- Personnel expenses — Appendix C.1 - Appendix C.3
- Professional and contractual services — Other contracts - EMS administration and EMS-Casino municipal service costs
- Materials & supplies — Operating supplies and repairs & maintenance
- Utilities — Primarily telecommunication, natural gas, and electricity
- Other expenses — Primarily building rental expense and capital outlays

**Operational restructuring**

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Additional Department employees | - | 162 | 96 | 84 | 182 | 193 | 165 | 153 | 135 | 129 | 117 |

(1) Based on department salaries & wages and employees, see Appendix C.2.

**Ten-Year Financial Projections**
**Health & Wellness - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | 1.6 | 1.5 | 1.4 | 1.3 | 0.7 | 0.2 | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | 10.1 | 11.1 | 7.9 | 5.8 | 8.7 | 2.8 | 1.0 | - | - | - | - | - | - | - | - | - |
| Revenue from use of assets | 0.2 | 0.1 | 0.2 | 0.1 | 0.1 | 0.1 | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | 1.3 | 1.3 | 1.1 | 0.1 | 0.0 | 0.0 | - | - | - | - | - | - | - | - | - | - |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | 0.4 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | 54.5 | 52.0 | 64.3 | 53.4 | 57.3 | 28.3 | 1.6 | 1.7 | 1.8 | 1.9 | 2.0 | 2.0 | 2.1 | 2.2 | 2.2 | 2.3 |
| **Total revenues** | 68.1 | 66.0 | 74.9 | 60.7 | 66.8 | 31.4 | 2.5 | 1.7 | 1.8 | 1.9 | 2.0 | 2.0 | 2.1 | 2.2 | 2.2 | 2.3 |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (13.4) | (13.3) | (11.6) | (9.7) | (7.9) | (2.4) | (0.9) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.8) | (0.8) | (0.8) |
| Overtime | (0.1) | (0.2) | (0.1) | 0.1 | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Pension | (2.0) | (1.8) | (1.9) | (2.3) | (1.3) | (0.2) | (0.5) | (0.5) | (0.6) | (0.6) | (0.7) | (0.8) | (0.8) | (0.8) | (0.9) | (0.9) |
| Medical & fringe benefits | (6.7) | (6.2) | (5.7) | (5.9) | (5.2) | (2.1) | (0.3) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) |
| Professional and contractual services | (49.2) | (49.2) | (60.4) | (49.3) | (52.6) | (21.4) | - | - | - | - | - | - | - | - | - | - |
| Materials & supplies | (3.3) | (2.5) | (1.8) | (1.1) | (1.2) | (0.3) | (0.1) | - | - | - | - | - | - | - | - | - |
| Utilities | (2.0) | (2.5) | (1.4) | (2.0) | (1.4) | (1.3) | (0.7) | - | - | - | - | - | - | - | - | - |
| Purchased services | (1.7) | (2.0) | (1.2) | (0.2) | (0.9) | (0.4) | - | - | - | - | - | - | - | - | - | - |
| Risk management and insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | (0.6) | (0.6) | (0.4) | (0.7) | (1.5) | (0.0) | (0.0) | - | - | - | - | - | - | - | - | - |
| Debt service | (0.1) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (0.7) | (0.7) | (0.8) | (0.9) | (0.9) | (0.6) | (0.4) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) |
| Transfers out | - | (0.1) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | (1.7) | (2.0) | (1.0) | (0.9) | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (81.6) | (81.2) | (86.3) | (72.8) | (73.0) | (28.6) | (2.8) | (1.7) | (1.8) | (1.9) | (2.0) | (2.0) | (2.1) | (2.2) | (2.2) | (2.3) |
| **Total surplus (deficit)** | $ (13.5) | $ (15.2) | $ (11.5) | $ (12.1) | $ (6.2) | $ 2.8 | $ (0.3) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| **Expenses** | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | (0.3) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) |
| Technology | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Capital expenditures and other infrastructure | | | | | | - | - | (5.1) | - | - | - | - | - | - | - | - |
| Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | (0.3) | (5.3) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) |
| **Operational restructuring** | | | | | | $ - | $ (0.3) | $ (5.3) | $ (0.2) | $ (0.2) | $ (0.2) | $ (0.2) | $ (0.2) | $ (0.2) | $ (0.2) | (0.2) |
| **Adjusted surplus (deficit)** | | | | | | $ 2.8 | $ (0.6) | $ (5.3) | $ (0.2) | $ (0.2) | $ (0.2) | $ (0.2) | $ (0.2) | $ (0.2) | $ (0.2) | (0.2) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Department employees (baseline) | 348 | 317 | 262 | 243 | 185 | 80 | 14 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 |
| Average salary & wages(1) | $ 38,399 | $ 42,069 | $ 44,205 | $ 39,808 | $ 42,873 | $ 29,627 | $ 60,946 | $ 73,547 | $ 75,018 | $ 76,518 | $ 78,049 | $ 79,610 | $ 81,202 | $ 82,826 | $ 84,482 | $ 86,172 |
| Average overtime | 404 | 525 | 529 | (486) | 456 | 164 | 164 | 187 | 190 | 194 | 198 | 202 | 206 | 210 | 214 | 219 |
| | $ 38,804 | $ 42,594 | $ 44,734 | $ 39,322 | $ 43,329 | $ 29,791 | $ 61,110 | $ 73,734 | $ 75,208 | $ 76,712 | $ 78,247 | $ 79,812 | $ 81,408 | $ 83,036 | $ 84,697 | $ 86,391 |
| Overtime as a % of salary & wages | 1.1% | 1.2% | 1.2% | -1.2% | 1.1% | 0.6% | 0.3% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% |
| Pension as a % of salary & wages | | | | | | 8.1% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| Medical & fringe as a % of salary & wage | 50.3% | 46.6% | 49.3% | 61.0% | 65.3% | 88.6% | 29.6% | 26.8% | 27.3% | 27.9% | 28.5% | 29.0% | 29.4% | 30.0% | 30.5% | 31.1% |

| Key Items | Comment/Reference |
|---|---|
| General | Health & Wellness transitioned to Institute for Population Health (IPH) effective 10/31/12. The department will retain approximately 9 individuals to perform a required administrative function; the costs incurred by these individuals are assumed to be grant funded. |
| Revenue | |
| Sales and charges for services | Vital records revenue, which is asssumed to be transferred to the County beginning 1/1/2014. |
| Expenses | |
| Personnel expenses | Appendix C.1 - Appendix C.3 |

**Operational restructuring**
Additional Department employees    -    -    -    -    -    -    -    -    -    -    -

(1) Based on department salaries & wages and employees, see Appendix C.2.

**Ten-Year Financial Projections**
**Human Resources - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | 7.2 | 4.1 | 2.4 | 6.8 | 3.2 | (0.4) | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 |
| Revenue from use of assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | - | - | - | - | - | - | - | - | - | - | - |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total revenues** | 7.2 | 4.1 | 2.4 | 6.8 | 3.2 | (0.4) | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (9.2) | (9.2) | (8.5) | (6.8) | (5.9) | (4.2) | (4.2) | (4.3) | (3.1) | (3.2) | (3.2) | (3.3) | (3.4) | (3.4) | (3.5) | (3.6) |
| Overtime | (0.5) | (0.6) | (0.6) | (0.2) | (0.1) | (0.2) | (0.2) | (0.2) | (0.1) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) |
| Pension | (0.8) | (0.7) | (0.5) | (0.4) | (0.6) | (0.5) | (2.6) | (3.2) | (2.6) | (2.9) | (3.2) | (3.4) | (3.6) | (3.7) | (3.9) | (4.0) |
| Medical & fringe benefits | (4.8) | (4.4) | (4.5) | (3.8) | (3.7) | (3.4) | (5.0) | (5.2) | (5.0) | (5.2) | (5.4) | (5.7) | (6.0) | (6.3) | (6.6) | (6.9) |
| Professional and contractual services | (0.7) | (0.7) | (0.7) | (0.5) | (1.3) | (0.3) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) |
| Materials & supplies | (0.1) | (0.1) | (0.1) | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Utilities | (0.1) | (0.2) | (0.1) | (0.1) | (0.1) | (0.0) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Purchased services | (0.0) | (0.0) | (0.0) | (0.0) | 0.0 | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Risk management and insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | (0.8) | (1.0) | (0.6) | (0.5) | (0.7) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) |
| Debt service | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (1.2) | (1.2) | (1.3) | (1.5) | (1.6) | (1.5) | (1.9) | (2.0) | (1.5) | (1.5) | (1.6) | (1.5) | (1.5) | (1.5) | (1.5) | (1.6) |
| Transfers out | - | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (18.3) | (18.0) | (17.0) | (14.0) | (13.9) | (10.7) | (15.4) | (16.3) | (13.8) | (14.5) | (15.1) | (15.6) | (16.2) | (16.7) | (17.3) | (17.8) |
| **Total surplus (deficit)** | $ (11.1) | $ (14.0) | $ (14.5) | $ (7.2) | $ (10.7) | $ (11.1) | $ (13.2) | $ (14.1) | $ (11.6) | $ (12.2) | $ (12.9) | $ (13.4) | $ (13.9) | $ (14.5) | $ (15.1) | $ (15.6) |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| *Expenses* | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | (0.1) | (3.5) | (4.0) | (4.0) | (4.1) | (4.1) | (4.2) | (4.2) | (4.3) | (4.3) |
| Technology | | | | | | - | - | (0.5) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Capital expenditures and other infrastructure | | | | | | - | - | - | (1.0) | - | - | - | - | - | - | - |
| Implementation costs | | | | | | - | (0.4) | (1.0) | (1.0) | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | (0.5) | (5.0) | (6.1) | (4.1) | (4.2) | (4.2) | (4.3) | (4.3) | (4.4) | (4.4) |
| **Operational restructuring** | | | | | | $ - | $ (0.5) | $ (5.0) | $ (6.1) | $ (4.1) | $ (4.2) | $ (4.2) | $ (4.3) | $ (4.3) | $ (4.4) | (4.4) |
| **Adjusted surplus (deficit)** | | | | | | $ (11.1) | $ (13.7) | $ (19.1) | $ (17.7) | $ (16.3) | $ (17.1) | $ (17.6) | $ (18.2) | $ (18.8) | $ (19.4) | $ (20.0) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

**Ten-Year Financial Projections**
**Human Resources - general fund - Key assumptions**

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 175 | 168 | 171 | 176 | 107 | 93 | 84 | 84 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 |
| | | | | | | | | | | | | | | | | |
| Average salary & wages(1) | $ 52,849 | $ 55,000 | $ 49,465 | $ 38,861 | $ 55,145 | $ 44,710 | $ 49,727 | $ 50,722 | $ 51,736 | $ 52,771 | $ 53,826 | $ 54,903 | $ 56,001 | $ 57,121 | $ 58,263 | 59,428 |
| Average overtime | 2,760 | 3,423 | 3,558 | 944 | 925 | 2,125 | 2,363 | 2,410 | 2,458 | 2,508 | 2,558 | 2,609 | 2,661 | 2,714 | 2,769 | 2,824 |
| | $ 55,609 | $ 58,423 | $ 53,023 | $ 39,805 | $ 56,070 | $ 46,835 | $ 52,090 | $ 53,132 | $ 54,194 | $ 55,278 | $ 56,384 | $ 57,511 | $ 58,662 | $ 59,835 | $ 61,032 | $ 62,252 |
| | | | | | | | | | | | | | | | | |
| Overtime as a % of salary & wages | 5.2% | 6.2% | 7.2% | 2.4% | 1.7% | 4.8% | 4.8% | 4.8% | 4.8% | 4.8% | 4.8% | 4.8% | 4.8% | 4.8% | 4.8% | 4.8% |
| Pension as a % of salary & wages | | | | | | 11.1% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| Medical & fringe as a % of salary & wage | 52.0% | 47.7% | 52.8% | 55.1% | 62.4% | 82.6% | 118.7% | 121.0% | 159.6% | 163.6% | 167.4% | 172.8% | 177.8% | 183.5% | 188.5% | 193.4% |

| Key Items | Comment/Reference |
|---|---|
| General | Payroll administration will be managed by an external firm beginning in FY 2015. This results in decreased personnel costs beginning FY 2016; however, certain implementation costs will be incurred in FY 2015 (captured in Non-departmental) |
| Revenues | |
| Sales and charges for services | Interagency billings |
| Expenses | |
| Personnel expenses | Appendix C.1 - Appendix C.3 - Headcount reductions occur beginning FY 2016 due to external payroll processing services provider. |
| Professional and contractual services | Primarily labor relations administration |
| Other expenses | Building rental expenses |

**Operational restructuring**

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Additional Department employees | | | | | | - | 3 | 25 | 33 | 33 | 33 | 33 | 33 | 33 | 33 | 33 |

(1) Based on department salaries & wages and employees, see Appendix C.2.

**Ten-Year Financial Projections**
**Human Rights - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | 0.5 | 0.4 | 0.5 | 0.4 | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 |
| Revenue from use of assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | 0.0 | 0.0 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total revenues** | 0.5 | 0.4 | 0.5 | 0.4 | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (0.7) | (0.7) | (0.5) | (0.4) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.4) | (0.4) | (0.4) |
| Overtime | (0.0) | (0.0) | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pension | (0.1) | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.2) | (0.2) | (0.3) | (0.3) | (0.3) | (0.3) | (0.4) | (0.4) | (0.4) | (0.4) |
| Medical & fringe benefits | (0.3) | (0.3) | (0.2) | (0.2) | (0.2) | (0.2) | (0.4) | (0.4) | (0.4) | (0.5) | (0.5) | (0.5) | (0.5) | (0.6) | (0.6) | (0.6) |
| Professional and contractual services | (0.1) | (0.1) | (0.0) | (0.0) | (0.0) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Materials & supplies | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Utilities | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Purchased services | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Risk management and insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | (0.1) | (0.1) | (0.1) | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Debt service | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) |
| Transfers out | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | (0.0) | - | 0.0 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (1.4) | (1.3) | (0.9) | (0.9) | (0.7) | (0.7) | (1.2) | (1.2) | (1.3) | (1.3) | (1.3) | (1.4) | (1.5) | (1.5) | (1.6) | (1.6) | (1.7) |
| **Total surplus (deficit)** | $ (0.8) | $ (0.9) | $ (0.5) | $ (0.5) | $ (0.5) | $ (0.4) | $ (0.9) | $ (0.9) | $ (1.0) | $ (1.0) | $ (1.1) | $ (1.2) | $ (1.2) | $ (1.3) | $ (1.3) | (1.4) |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | $ - | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 0.3 | 0.4 | 0.4 |
| *Expenses* | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | - | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.7) | (0.7) | (0.7) |
| Technology | | | | | | - | - | (0.1) | - | - | - | - | - | - | - | - |
| Capital expenditures and other infrastructure | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | - | (0.7) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.7) | (0.7) | (0.7) |
| **Operational restructuring** | | | | | | $ - | $ - | $ (0.7) | $ (0.4) | $ (0.4) | $ (0.3) | $ (0.3) | $ (0.3) | $ (0.4) | $ (0.3) | (0.3) |
| **Adjusted surplus (deficit)** | | | | | | $ (0.4) | $ (0.9) | $ (1.6) | $ (1.4) | $ (1.4) | $ (1.4) | $ (1.5) | $ (1.6) | $ (1.6) | $ (1.6) | (1.6) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

**Ten-Year Financial Projections**
**Human Rights - general fund - Key assumptions**

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 13 | 12 | n/a | 8 | 6 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 |
| | | | | | | | | | | | | | | | | |
| Average salary & wages(1) | $ 51,973 | $ 58,859 | n/a | $ 54,195 | $ 56,173 | $ 50,106 | $ 57,093 | $ 58,235 | $ 59,400 | $ 60,588 | $ 61,800 | $ 63,036 | $ 64,297 | $ 65,582 | $ 66,894 | $ 68,232 |
| Average overtime | 290 | 230 | n/a | - | - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | $ 52,263 | $ 59,089 | $ - | $ 54,195 | $ 56,173 | $ 50,106 | $ 57,093 | $ 58,235 | $ 59,400 | $ 60,588 | $ 61,800 | $ 63,036 | $ 64,297 | $ 65,582 | $ 66,894 | $ 68,232 |
| | | | | | | | | | | | | | | | | |
| Overtime as a % of salary & wages | 0.6% | 0.4% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Pension as a % of salary & wages | | | | | | 10.4% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| Medical & fringe as a % of salary & wages | 41.8% | 38.4% | 42.5% | 47.6% | 55.3% | 72.7% | 134.0% | 137.0% | 139.0% | 142.5% | 145.7% | 150.3% | 154.6% | 159.5% | 163.8% | 168.0% |

| Key Items | Comment/Reference |
|---|---|
| Revenues | |
|     Parking/court fines and other revenue | Detroit Business Certification Program (DBCP) fees |
| Expenses | |
|     Personnel expenses | Appendix C.1 - Appendix C.3 |

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operational restructuring** | | | | | | | | | | | | | | | | |
|     Additional Department employees | | | | | | - | - | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 |

(1) Based on department salaries & wages and employees, see Appendix C.2.

**Ten-Year Financial Projections**
**Human Services - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | 1.6 | 0.9 | - | - | (0.0) | 0.0 | - | - | - | - | - | - | - | - | - | - |
| Revenue from use of assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | (0.4) | 0.0 | 0.0 | 0.0 | - | - | - | - | - | - | - | - | - | - | - | - |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | 0.5 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | - | - | 0.1 | 0.1 | 0.1 | 0.0 | - | - | - | - | - | - | - | - | - | - |
| **Total revenues** | 1.7 | 0.9 | 0.1 | 0.1 | 0.1 | 0.0 | - | - | - | - | - | - | - | - | - | - |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (0.7) | (0.4) | (0.3) | (0.2) | (0.1) | (0.0) | - | - | - | - | - | - | - | - | - | - |
| Overtime | (0.0) | (0.0) | - | - | (0.0) | - | - | - | - | - | - | - | - | - | - | - |
| Pension | (0.1) | (0.1) | (0.1) | (0.1) | (0.0) | - | - | - | - | - | - | - | - | - | - | - |
| Medical & fringe benefits | (0.4) | (0.2) | (0.2) | (0.1) | (0.1) | (0.0) | - | - | - | - | - | - | - | - | - | - |
| Professional and contractual services | (0.6) | (0.5) | (0.2) | 0.0 | 0.0 | - | - | - | - | - | - | - | - | - | - | - |
| Materials & supplies | (0.1) | (0.1) | (0.0) | 0.0 | 0.0 | - | - | - | - | - | - | - | - | - | - | - |
| Utilities | (0.0) | (0.0) | (0.0) | 0.0 | 0.0 | - | - | - | - | - | - | - | - | - | - | - |
| Purchased services | (0.0) | (0.1) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Risk management and insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | - | - | - | - | - | - | - | - | - | - |
| Debt service | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | - | - | - | - | - | - | - | - | - | - | - |
| Transfers out | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | (0.1) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (2.0) | (1.5) | (0.9) | (0.3) | (0.2) | (0.0) | - | - | - | - | - | - | - | - | - | - |
| **Total surplus (deficit)** | $ (0.3) | $ (0.6) | $ (0.8) | $ (0.3) | (0.1) | $ (0.0) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Expenses | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Technology | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Capital expenditures and other infrastructure | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| **Operational restructuring** | | | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Adjusted surplus (deficit)** | | | | | | $ (0.0) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

| | | Fiscal year ended actual | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 117 | 91 | 95 | 85 | 52 | 22 | - | - | - | - | - | - | - | - | - | - |
| Average salary & wages(1) | $ 42,296 | $ 53,028 | $ 47,676 | $ 46,749 | $ 64,791 | $ 44,951 | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| Average overtime | 60 | 56 | - | - | 4 | - | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| | $ 42,356 | $ 53,084 | $ 47,676 | $ 46,749 | $ 64,795 | $ 44,951 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Overtime as a % of salary & wages | 1.0% | 1.2% | 0.0% | 0.0% | 0.2% | 0.0% | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| Pension as a % of salary & wages | | | | | | 0.0% | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| Medical & fringe as a % of salary & wages | 59.3% | 55.6% | 54.1% | 46.5% | 83.7% | 66.7% | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |

| Key Items | Comment/Reference |
|---|---|
| General | The Human Services department is being transitioned out of the City effective FY 2014 |

| Operational restructuring | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Additional Department employees | | - | - | - | - | - | - | - | - | - | - | - |

(1) Based on department salaries & wages and employees, see Appendix C.2.

2/21/2014 9:05 AM

**Ten-Year Financial Projections**
**ITS - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | 0.5 | 0.5 | 0.2 | 1.3 | 0.4 | 0.7 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 |
| Revenue from use of assets | - | 0.0 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | (0.1) | - | - | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | 0.2 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | 0.1 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total revenues** | 0.9 | 0.5 | 0.2 | 1.3 | 0.4 | 0.7 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (5.1) | (5.1) | (4.0) | (3.4) | (2.6) | (2.0) | (2.0) | (2.2) | (2.3) | (2.3) | (2.4) | (2.4) | (2.5) | (2.5) | (2.6) | (2.6) |
| Overtime | (0.4) | (0.2) | (0.1) | (0.1) | (0.0) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Pension | (0.6) | (0.5) | (0.4) | (0.4) | (0.3) | (0.2) | (1.3) | (1.7) | (1.9) | (2.1) | (2.4) | (2.5) | (2.6) | (2.7) | (2.9) | (3.0) |
| Medical & fringe benefits | (2.6) | (2.3) | (1.9) | (1.8) | (1.5) | (1.5) | (2.4) | (2.5) | (2.6) | (2.7) | (2.9) | (3.0) | (3.2) | (3.3) | (3.5) | (3.6) |
| Professional and contractual services | (2.4) | (2.5) | (4.9) | (3.0) | (2.6) | (3.8) | (3.8) | (3.8) | (3.9) | (3.9) | (4.0) | (4.0) | (4.0) | (4.1) | (4.1) | (4.2) |
| Materials & supplies | (8.4) | (11.4) | (12.3) | (8.7) | (8.1) | (4.8) | (7.8) | (6.9) | (5.9) | (6.0) | (6.0) | (6.1) | (6.1) | (6.2) | (6.3) | (6.3) |
| Utilities | (0.8) | (1.4) | (0.5) | (0.8) | (0.5) | (2.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) |
| Purchased services | - | (0.2) | (0.2) | 0.1 | 0.0 | - | - | - | - | - | - | - | - | - | - | - |
| Risk management and insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | (1.7) | (1.7) | (1.8) | (1.5) | (0.8) | (1.5) | (1.5) | (1.5) | (1.5) | (1.5) | (1.5) | (1.5) | (1.5) | (1.5) | (1.5) | (1.5) |
| Debt service | (0.1) | - | - | - | - | (1.1) | (1.4) | (1.4) | (1.4) | (0.7) | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (0.5) | (0.5) | (0.6) | (0.6) | (0.7) | (0.6) | (0.9) | (1.0) | (1.1) | (1.1) | (1.1) | (1.1) | (1.1) | (1.1) | (1.1) | (1.1) |
| Transfers out | - | (0.1) | (0.1) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (22.7) | (26.0) | (26.7) | (20.3) | (17.0) | (18.1) | (21.7) | (21.7) | (21.2) | (21.0) | (20.9) | (21.2) | (21.7) | (22.1) | (22.6) | (23.0) |
| **Total surplus (deficit)** | $ (21.8) | $ (25.5) | $ (26.6) | $ (19.1) | $ (16.7) | $ (17.4) | $ (21.2) | $ (21.2) | $ (20.7) | $ (20.5) | $ (20.3) | $ (20.7) | $ (21.2) | $ (21.6) | $ (22.0) | $ (22.5) |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Expenses | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Technology | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Capital expenditures and other infrastructure | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| **Operational restructuring** | | | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| **Adjusted surplus (deficit)** | | | | | | $ (17.4) | $ (21.2) | $ (21.2) | $ (20.7) | $ (20.5) | $ (20.3) | $ (20.7) | $ (21.2) | $ (21.6) | $ (22.0) | $ (22.5) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

Ten-Year Financial Projections
ITS - general fund - Key assumptions

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 99 | 92 | 65 | 46 | 43 | 35 | 35 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 |
| Average salary & wages(1) | $ 51,306 | $ 55,548 | $ 61,007 | $ 74,548 | $ 60,681 | $ 57,494 | $ 57,494 | $ 58,644 | $ 59,817 | $ 61,013 | $ 62,233 | $ 63,478 | $ 64,748 | $ 66,043 | $ 67,363 | 68,711 |
| Average overtime | 4,087 | 2,260 | 2,140 | 1,465 | 597 | 2,467 | 2,467 | 2,516 | 2,566 | 2,618 | 2,670 | 2,723 | 2,778 | 2,833 | 2,890 | 2,948 |
| | $ 55,393 | $ 57,808 | $ 63,147 | $ 76,013 | $ 61,278 | $ 59,961 | $ 59,961 | $ 61,160 | $ 62,383 | $ 63,631 | $ 64,903 | $ 66,201 | $ 67,525 | $ 68,876 | $ 70,253 | 71,658 |
| Overtime as a % of salary & wages | 8.0% | 4.1% | 3.5% | 2.0% | 1.0% | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% |
| Pension as a % of salary & wages | | | | | | 9.7% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| Medical & fringe as a % of salary & wage | 51.0% | 45.7% | 48.1% | 53.2% | 55.9% | 74.7% | 117.9% | 113.3% | 115.0% | 117.8% | 120.5% | 124.2% | 127.7% | 131.7% | 135.1% | 138.6% |

| Key Items | Comment/Reference |
|---|---|
| Revenues | |
| Sales and charges for services | Primarily interagency billings |
| Expenses | |
| Personnel expenses | Appendix C.1 - Appendix C.3 |
| Professional and contractual services | Information technology contracts |
| Materials & supplies | Primarily hardware (servers, Xerox, etc.) and software (Oracle, Groupwise, etc.) maintenance & upgrade costs; does not include upgrade costs in excess of 2012 levels. |
| | Beginning FY 2015, savings from payroll administration outsourcing reflected as certain upgrades would not be completed |
| Other expenses | Rental expenses (building, computers, and other office equipment) |
| Debt service | Payments for IBM product purchased through financing in FY 2013; purchase captured in Non-Departmental |

Operational restructuring

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Additional Department employees | | | | | | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |

(1) Based on department salaries & wages and employees, see Appendix C.2.

**Ten-Year Financial Projections**
**Law - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | (1.2) | 1.0 | 0.6 | 0.1 | 1.2 | 0.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 |
| Revenue from use of assets | - | - | - | - | 0.0 | - | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | 0.1 | 0.3 | 0.1 | 0.1 | 0.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total revenues** | (1.1) | 1.3 | 0.6 | 0.2 | 1.5 | 0.7 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (9.3) | (9.2) | (8.2) | (7.7) | (7.4) | (6.1) | (6.1) | (6.2) | (6.4) | (6.5) | (6.6) | (6.8) | (6.9) | (7.0) | (7.2) | (7.3) |
| Overtime | (0.0) | (0.1) | (0.0) | (0.0) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Pension | (0.3) | (0.2) | (0.0) | (0.2) | (0.5) | (0.6) | (3.9) | (4.6) | (5.3) | (6.0) | (6.6) | (7.0) | (7.3) | (7.6) | (8.0) | (8.3) |
| Medical & fringe benefits | (4.0) | (3.6) | (3.4) | (3.5) | (4.0) | (4.2) | (3.3) | (3.4) | (3.5) | (3.6) | (3.8) | (4.0) | (4.2) | (4.4) | (4.5) | (4.7) |
| Professional and contractual services | (3.3) | (3.5) | (3.0) | (2.1) | (1.6) | (1.7) | (1.7) | (1.7) | (1.8) | (1.8) | (1.8) | (1.8) | (1.8) | (1.8) | (1.9) | (1.9) |
| Materials & supplies | (0.5) | (0.3) | (0.4) | (0.3) | (0.2) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) |
| Utilities | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | 0.0 | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Purchased services | (1.2) | (0.9) | (1.4) | (1.2) | (1.4) | (1.3) | (1.3) | (1.3) | (1.4) | (1.4) | (1.4) | (1.4) | (1.4) | (1.4) | (1.4) | (1.5) |
| Risk management and insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | (1.1) | (1.2) | (1.1) | (0.9) | (0.1) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) |
| Debt service | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (1.6) | (1.6) | (1.8) | (1.9) | (2.0) | (2.0) | (2.8) | (2.9) | (3.0) | (3.1) | (3.2) | (3.1) | (3.1) | (3.2) | (3.2) | (3.2) |
| Transfers out | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (21.5) | (20.7) | (19.3) | (17.9) | (17.3) | (16.9) | (20.2) | (21.3) | (22.5) | (23.5) | (24.6) | (25.2) | (25.9) | (26.6) | (27.4) | (28.1) |
| **Total surplus (deficit)** | $ (22.6) | $ (19.4) | $ (18.6) | $ (17.8) | $ (15.8) | $ (16.2) | $ (18.4) | $ (19.6) | $ (20.7) | $ (21.7) | $ (22.8) | $ (23.4) | $ (24.1) | $ (24.9) | $ (25.6) | (26.3) |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | $ - | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 |
| *Expenses* | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | (1.1) | 0.4 | 0.3 | 0.3 | 0.3 | 0.2 | 0.2 | 0.1 | 0.1 | 0.0 |
| Technology | | | | | | - | (0.5) | - | - | - | - | - | - | - | - | - |
| Capital expenditures and other infrastructure | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Implementation costs | | | | | | - | (0.1) | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | (1.7) | 0.4 | 0.3 | 0.3 | 0.3 | 0.2 | 0.2 | 0.1 | 0.1 | 0.0 |
| **Operational restructuring** | | | | | | $ - | $ (1.7) | $ 0.4 | $ 0.9 | $ 0.9 | $ 0.8 | $ 0.8 | $ 0.7 | $ 0.7 | $ 0.6 | 0.6 |
| **Adjusted surplus (deficit)** | | | | | | $ (16.2) | $ (20.1) | $ (19.2) | $ (19.8) | $ (20.9) | $ (22.0) | $ (22.7) | $ (23.4) | $ (24.2) | $ (25.0) | (25.7) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

**Ten-Year Financial Projections**
**Law - general fund - Key assumptions**

| | | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 127 | 122 | 113 | 105 | 94 | 86 | 86 | 86 | 86 | 86 | 86 | 86 | 86 | 86 | 86 | 86 |
| Average salary & wages(1) | $ 73,486 | $ 75,672 | $ 72,144 | $ 73,252 | $ 78,313 | $ 71,497 | $ 71,497 | $ 72,927 | $ 74,386 | $ 75,873 | $ 77,391 | $ 78,939 | $ 80,517 | $ 82,128 | $ 83,770 | $ 85,446 |
| Average overtime | 222 | 728 | 161 | 114 | 568 | 1,094 | 1,094 | 1,116 | 1,138 | 1,161 | 1,184 | 1,208 | 1,232 | 1,256 | 1,281 | 1,307 |
| | $ 73,709 | $ 76,400 | $ 72,305 | $ 73,366 | $ 78,881 | $ 72,591 | $ 72,591 | $ 74,043 | $ 75,524 | $ 77,034 | $ 78,575 | $ 80,146 | $ 81,749 | $ 83,384 | $ 85,052 | $ 86,753 |
| Overtime as a % of salary & wages | 0.3% | 1.0% | 0.2% | 0.2% | 0.7% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% |
| Pension as a % of salary & wages | | | | | | 10.0% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| Medical & fringe as a % of salary & wage | 42.3% | 38.9% | 41.8% | 45.7% | 54.1% | 68.6% | 53.6% | 54.0% | 54.9% | 56.1% | 57.4% | 58.9% | 60.3% | 61.9% | 63.3% | 64.8% |

**Key Items** | **Comment/Reference**

Revenues
   Sales and charges for services — Primarily interagency billings; Law department began invoicing other departments correctly in FY 2012
   Parking/court fines and other revenue — Miscellaneous receipts
Expenses
   Personnel expenses — Appendix C.1 - Appendix C.3
   Professional and contractual services — Contracts for legal work/assistance and other printing contracts/services
   Purchased services — Purchased administration costs
   Other expenses — Building rental expenses

**Operational restructuring**

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Additional Department employees | | | | | | - | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 |

(1) Based on department salaries & wages and employees, see Appendix C.2.

**Ten-Year Financial Projections**
**Mayor - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | 0.0 | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | - | 0.1 | 0.0 | 0.2 | 0.0 | 0.0 | - | - | - | - | - | - | - | - | - | - |
| Revenue from use of assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | (0.1) | (0.4) | 0.7 | (0.2) | 0.1 | 0.0 | - | - | - | - | - | - | - | - | - | - |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | 0.1 | - | - | 0.2 | 0.1 | (0.1) | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| Total revenues | 0.0 | (0.3) | 0.7 | 0.1 | 0.2 | (0.1) | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (5.7) | (5.3) | (4.6) | (4.0) | (3.1) | (2.2) | (2.1) | (2.3) | (2.3) | (2.4) | (2.4) | (2.5) | (2.5) | (2.6) | (2.6) | (2.7) |
| Overtime | (0.0) | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pension | (0.7) | (0.5) | 0.4 | (0.5) | (0.5) | (0.2) | (1.3) | (1.7) | (1.9) | (2.2) | (2.4) | (2.5) | (2.7) | (2.8) | (2.9) | (3.0) |
| Medical & fringe benefits | (2.6) | (2.1) | (1.9) | (1.6) | (1.5) | (1.2) | (1.8) | (1.9) | (1.9) | (2.0) | (2.1) | (2.2) | (2.3) | (2.4) | (2.5) | (2.7) |
| Professional and contractual services | (0.2) | (0.2) | (0.1) | (0.2) | (0.1) | (0.0) | (0.5) | (1.0) | (1.1) | (1.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Materials & supplies | (0.2) | (0.2) | (0.2) | (0.2) | 0.0 | (0.0) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.2) | (0.2) |
| Utilities | (0.3) | (0.2) | (0.1) | (0.2) | (0.2) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Purchased services | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Risk management and insurance | (0.0) | - | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Other expenses | (1.5) | (1.3) | (0.9) | (0.7) | (0.6) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) |
| Debt service | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (0.4) | (0.5) | (0.5) | (0.5) | (0.6) | (0.8) | (0.9) | (1.1) | (1.1) | (1.1) | (1.2) | (1.1) | (1.1) | (1.2) | (1.2) | (1.2) |
| Transfers out | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | 0.2 | 0.1 | 0.1 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total expenditures | (11.3) | (10.1) | (8.7) | (8.0) | (6.6) | (5.0) | (7.2) | (8.6) | (9.0) | (9.4) | (8.8) | (9.1) | (9.4) | (9.7) | (10.0) | (10.3) |
| **Total surplus (deficit)** | $ (11.3) | $ (10.5) | $ (8.0) | $ (7.8) | $ (6.4) | $ (5.0) | $ (7.2) | $ (8.5) | $ (9.0) | $ (9.4) | $ (8.8) | $ (9.0) | $ (9.3) | $ (9.6) | $ (9.9) | (10.2) |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Expenses | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Technology | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Capital expenditures and other infrastructure | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| **Operational restructuring** | | | | | | $ - | $ - | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | (0.0) |
| **Adjusted surplus (deficit)** | | | | | | $ (5.0) | $ (7.2) | $ (8.6) | $ (9.0) | $ (9.4) | $ (8.8) | $ (9.1) | $ (9.3) | $ (9.6) | $ (9.9) | (10.2) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

**Ten-Year Financial Projections**
**Mayor - general fund - Key assumptions**

| | | Fiscal year ended actual | | | | | | Preliminary forecast | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 108 | 74 | 63 | 52 | 39 | 22 | 22 | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 |
| | | | | | | | | | | | | | | | | |
| Average salary & wages(1) | $ 52,946 | $ 71,222 | $ 73,700 | $ 76,927 | 80,495 | $ 98,421 | $ 92,861 | $ 94,718 | $ 96,613 | $ 98,545 | $ 100,516 | $ 102,526 | $ 104,577 | $ 106,668 | $ 108,801 | $ 110,977 |
| Average overtime | 9 | 27 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | $ 52,955 | $ 71,248 | $ 73,700 | $ 76,927 | 80,495 | $ 98,421 | $ 92,861 | $ 94,718 | $ 96,613 | $ 98,545 | $ 100,516 | $ 102,526 | $ 104,577 | $ 106,668 | $ 108,801 | $ 110,977 |
| | | | | | | | | | | | | | | | | |
| Overtime as a % of salary & wages | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Pension as a % of salary & wages | | | | | | 11.2% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| Medical & fringe as a % of salary & wages | 45.0% | 40.6% | 41.4% | 40.8% | 48.4% | 56.0% | 85.9% | 82.5% | 83.6% | 85.5% | 87.3% | 89.9% | 92.2% | 95.0% | 97.3% | 99.7% |

**Key Items** | **Comment/Reference**

Revenues
  Parking/court fines and other revenue — Miscellaneous receipts
Expenses
  Personnel expenses — Appendix C.1 - Appendix C.3
    Headcount reduction due to reallocation of Neighborhood City Hall employees to Recreation department in FY 2013
  Professional and contractual services — Contracts for legal work/assistance and PSCs
  Materials & supplies — Primarily repairs, maintenance, and supplies
  Other expenses — Primarily rental expenses

**Operational restructuring**
  Additional Department employees        -    -    -    -    -    -    -    -    -    -    -

(1) Based on department salaries & wages and employees, see Appendix C.2.

**Ten-Year Financial Projections**
**Planning & Development - general fund**
*($ in millions)*

|  | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | - | - | (0.1) | 0.0 | 0.8 | (0.4) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Revenue from use of assets | 3.3 | 18.4 | 1.0 | 0.2 | (1.5) | 7.9 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| Parking/court fines and other revenue | 0.4 | 1.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | 0.1 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | 2.0 | 1.8 | 1.5 | 2.0 | 0.7 | 1.6 | 1.4 | 4.5 | 4.6 | 4.6 | 4.7 | 4.8 | 4.9 | 4.9 | 5.0 | 5.1 |
| **Total revenues** | 5.9 | 21.7 | 2.5 | 2.2 | 0.1 | 9.1 | 1.6 | 4.7 | 4.8 | 4.9 | 5.0 | 5.0 | 5.1 | 5.2 | 5.3 | 5.3 |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (1.5) | (1.8) | (1.7) | (1.0) | (0.7) | (0.6) | (0.6) | (3.2) | (3.2) | (3.3) | (3.4) | (3.4) | (3.5) | (3.6) | (3.6) | (3.7) |
| Overtime | - | (0.0) | (0.0) | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - |
| Pension | (0.2) | (0.2) | (0.2) | (0.2) | (0.0) | (0.0) | (0.4) | (2.3) | (2.7) | (3.0) | (3.4) | (3.5) | (3.7) | (3.9) | (4.1) | (4.2) |
| Medical & fringe benefits | (0.7) | (0.8) | (0.8) | (0.5) | (0.4) | (0.3) | (0.5) | (2.2) | (2.3) | (2.4) | (2.5) | (2.6) | (2.7) | (2.8) | (3.0) | (3.1) |
| Professional and contractual services | (0.2) | (0.2) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.9) | (0.9) | (0.9) |
| Materials & supplies | (0.3) | (0.4) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) |
| Utilities | (0.0) | (0.0) | 0.1 | - | (0.0) | - | - | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Purchased services | - | (0.1) | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Risk management and insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | (5.3) | (5.4) | (4.8) | (3.8) | (2.7) | (2.9) | (2.9) | (7.5) | (4.1) | (4.1) | (4.1) | (4.2) | (4.2) | (4.2) | (4.3) | (4.3) |
| Debt service | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.3) | (1.5) | (1.5) | (1.6) | (1.6) | (1.6) | (1.6) | (1.6) | (1.6) | (1.6) |
| Transfers out | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (8.3) | (8.9) | (7.8) | (5.6) | (4.1) | (4.1) | (4.8) | (17.9) | (15.0) | (15.6) | (16.2) | (16.5) | (16.9) | (17.4) | (17.8) | (18.2) |
| **Total surplus (deficit)** | $ (2.5) | $ 12.8 | $ (5.3) | $ (3.4) | (4.0) | $ 5.0 | $ (3.2) | $ (13.1) | $ (10.2) | $ (10.7) | $ (11.2) | $ (11.5) | $ (11.8) | $ (12.2) | $ (12.5) | (12.9) |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| *Expenses* | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | (0.6) | (1.2) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.1) | (1.1) | (1.1) |
| Technology | | | | | | - | (0.3) | (0.3) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Capital expenditures and other infrastructure | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Implementation costs | | | | | | - | (2.4) | (4.1) | (0.7) | - | - | - | (0.8) | (0.8) | - | - |
| Subtotal: Expenses | | | | | | - | (3.3) | (5.6) | (1.7) | (1.0) | (1.0) | (1.0) | (1.9) | (1.9) | (1.1) | (1.1) |
| **Operational restructuring** | | | | | | $ - | $ (3.3) | $ (5.6) | $ (1.7) | $ (1.0) | $ (1.0) | $ (1.0) | $ (1.9) | $ (1.9) | $ (1.1) | (1.1) |
| **Adjusted surplus (deficit)** | | | | | | $ 5.0 | $ (6.4) | $ (18.8) | $ (11.9) | $ (11.7) | $ (12.2) | $ (12.5) | $ (13.7) | $ (14.1) | $ (13.6) | (14.0) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

**Ten-Year Financial Projections**
**Planning & Development - general fund - Key assumptions**

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 172 | 173 | 160 | 154 | 122 | 116 | 116 | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 113 |
| Average salary & wages(1) | $ 54,225 | $ 54,491 | $ 55,121 | $ 51,860 | $ 59,007 | $ 53,640 | $ 53,640 | $ 54,713 | $ 55,807 | $ 56,923 | $ 58,061 | $ 59,223 | $ 60,407 | $ 61,615 | $ 62,848 | $ 64,105 |
| Average overtime | - | 0 | 2 | 0 | - | - | - | - | - | - | - | - | - | - | - | - |
| | $ 54,225 | $ 54,491 | $ 55,124 | $ 51,860 | $ 59,007 | $ 53,640 | $ 53,640 | $ 54,713 | $ 55,807 | $ 56,923 | $ 58,061 | $ 59,223 | $ 60,407 | $ 61,615 | $ 62,848 | $ 64,105 |
| Overtime as a % of salary & wages | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Pension as a % of salary & wages | | | | | | 4.1% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| Medical & fringe as a % of salary & wages | 47.5% | 43.1% | 46.7% | 49.0% | 56.5% | 58.6% | 88.6% | 69.2% | 70.3% | 71.9% | 73.4% | 75.5% | 77.4% | 79.6% | 81.6% | 83.5% |

| Key Items | Comment/Reference |
|---|---|
| General | HUD is requiring the City to capture indirect costs and those related to Development/Real Estate and Planning functions in the General Fund and seek reimbursement after payment is made. Personnel costs related to Development/Real Estate and Planning functions transferred to the General Fund will no longer be reimbursed as those heads are not related to grant funded projects |
| Revenues | |
| Sales and charges for services | Block grant reimbursements |
| Revenue from use of assets | Real estate rentals. FY 2012 reflects a loss on sale of property and FY 2013 reflects proceeds from a sale; no gain/loss assumed in the projection period |
| Expenses | |
| Personnel expenses | Appendix C.1 - Appendix C.3 |
| Other expenses | Development costs. Includes one-time repayment ($3.5m) of grant funds to HUD due to FY12 and FY13 over reimbursements |

**Operational restructuring**

| | | | | | | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Additional Department employees | | | | | | - | 13 | (26) | (28) | (28) | (28) | (28) | (28) | (28) | (28) | (28) |

(1) Based on department salaries & wages and employees, see Appendix C.2.

**Ten-Year Financial Projections**
**Police - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | 51.7 | 49.9 | 44.2 | 44.6 | 39.8 | 35.3 | 20.1 | 24.5 | 24.5 | 24.9 | 25.3 | 25.7 | 26.1 | 26.4 | 26.8 | 27.2 |
| Licenses, permits and inspection charges | 0.6 | 0.9 | 0.8 | 0.8 | 0.8 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | 7.6 | 8.7 | 10.4 | 13.2 | 4.7 | 2.9 | 4.6 | 4.6 | 4.6 | 4.6 | 4.6 | 4.6 | 4.6 | 4.6 | 4.6 | 4.6 |
| Revenue from use of assets | 0.0 | 0.0 | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | 2.4 | 2.5 | 1.5 | 3.4 | 5.9 | 3.9 | 3.9 | 3.9 | 3.9 | 3.9 | 3.9 | 3.9 | 3.9 | 3.9 | 3.9 | 3.9 |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | 0.9 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | 1.7 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | 4.3 | 3.2 | 8.4 | 12.0 | 12.6 | 8.2 | 7.4 | 5.2 | 4.1 | 3.6 | 3.7 | 3.8 | 3.9 | 3.9 | 4.0 | 4.0 |
| **Total revenues** | 69.3 | 65.2 | 65.3 | 74.0 | 63.9 | 51.0 | 36.6 | 38.9 | 37.7 | 37.6 | 38.1 | 38.5 | 39.0 | 39.5 | 39.9 | 40.4 |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (182.9) | (190.9) | (184.4) | (193.7) | (177.1) | (152.8) | (139.1) | (145.6) | (155.8) | (159.6) | (162.8) | (166.1) | (174.4) | (177.9) | (181.4) | (185.1) |
| Overtime | (27.7) | (31.9) | (24.9) | (25.7) | (25.9) | (18.4) | (20.9) | (21.9) | (21.8) | (22.4) | (22.8) | (23.3) | (24.4) | (24.9) | (25.4) | (25.9) |
| Pension | (31.1) | (31.0) | (23.6) | (66.3) | (42.2) | (35.5) | (94.1) | (109.6) | (123.2) | (135.7) | (148.8) | (150.1) | (153.6) | (154.2) | (152.2) | (151.5) |
| Medical & fringe benefits | (102.8) | (97.5) | (100.5) | (111.3) | (117.6) | (105.8) | (100.6) | (104.0) | (109.8) | (115.4) | (121.0) | (127.6) | (134.5) | (141.8) | (148.9) | (156.2) |
| Professional and contractual services | (4.9) | (6.7) | (4.0) | (3.6) | (4.5) | (5.1) | (5.1) | (5.2) | (5.2) | (5.3) | (5.3) | (5.4) | (5.5) | (5.5) | (5.6) | (5.6) |
| Materials & supplies | (3.4) | (3.2) | (3.1) | (3.0) | (2.7) | (2.2) | (3.2) | (3.2) | (3.2) | (3.2) | (3.3) | (3.3) | (3.3) | (3.4) | (3.4) | (3.4) |
| Utilities | (6.7) | (8.7) | (8.3) | (9.0) | (8.9) | (2.8) | (9.5) | (10.0) | (10.1) | (10.2) | (10.3) | (10.5) | (10.6) | (10.7) | (10.8) | (10.9) |
| Purchased services | (1.8) | (2.3) | (1.1) | (0.7) | (1.1) | (1.3) | (11.1) | (11.2) | (11.3) | (11.4) | (11.5) | (11.6) | (11.8) | (11.9) | (12.0) | (12.1) |
| Risk management and insurance | (0.0) | - | 0.0 | (0.0) | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Other expenses | (6.1) | (7.1) | (6.1) | (7.2) | (8.1) | (5.6) | (7.0) | (7.0) | (7.0) | (7.1) | (7.1) | (7.2) | (7.2) | (7.3) | (7.3) | (7.3) |
| Debt service | (0.1) | - | - | (0.1) | (0.0) | (1.6) | (0.0) | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (27.8) | (30.0) | (31.4) | (32.7) | (34.1) | (35.6) | (36.9) | (37.2) | (38.5) | (39.1) | (39.7) | (39.2) | (39.1) | (38.9) | (38.8) | (38.7) |
| Transfers out | - | (0.5) | (0.5) | (0.4) | (0.5) | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | (0.8) | (0.9) | (0.4) | (1.6) | (1.4) | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (396.2) | (410.8) | (388.3) | (455.2) | (424.2) | (366.4) | (427.4) | (454.8) | (486.0) | (509.6) | (532.8) | (544.3) | (564.3) | (576.5) | (585.8) | (596.8) |
| **Total surplus (deficit)** | $ (326.9) | $ (345.6) | $ (323.1) | $ (381.2) | $ (360.3) | $ (315.4) | $ (390.8) | $ (416.0) | $ (448.3) | $ (472.0) | $ (494.7) | $ (505.8) | $ (525.3) | $ (537.0) | $ (545.9) | (556.4) |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 |
| *Expenses* | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | (5.7) | (16.1) | (18.1) | (11.0) | (9.9) | (10.1) | (9.9) | (9.7) | (10.1) | (9.9) |
| Technology | | | | | | - | (1.9) | (11.2) | (10.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) |
| Capital expenditures and other infrastructure | | | | | | - | (21.7) | (21.6) | (16.4) | (12.8) | (13.2) | (12.8) | (15.9) | (15.7) | (15.7) | (15.6) |
| Implementation costs | | | | | | - | (0.2) | (0.6) | (0.2) | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | (29.6) | (49.4) | (44.9) | (25.9) | (25.2) | (25.0) | (27.9) | (27.6) | (27.9) | (27.7) |
| **Operational restructuring** | | | | | | $ - | (29.6) | (45.8) | (41.3) | (22.3) | (21.6) | (21.4) | (24.3) | (24.0) | (24.3) | (24.1) |
| **Adjusted surplus (deficit)** | | | | | | $ (315.4) | $ (420.4) | $ (461.8) | $ (489.6) | $ (494.3) | $ (516.3) | $ (527.2) | $ (549.6) | $ (561.0) | $ (570.1) | (580.5) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

**Ten-Year Financial Projections**
**Police - general fund - Key assumptions**

| | | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | | 3,421 | 3,688 | 3,288 | 3,195 | 3,016 | 2,909 | 2,706 | 2,747 | 2,882 | 2,895 | 2,895 | 2,895 | 2,895 | 2,895 | 2,895 | 2,895 |
| Average salary & wages(1) | $ | 53,597 $ | 51,883 $ | 56,204 $ | 60,742 $ | 58,848 $ | 52,625 $ | 51,514 $ | 53,099 $ | 54,161 $ | 55,244 $ | 56,349 $ | 57,476 $ | 60,350 $ | 61,557 $ | 62,788 $ | 64,044 |
| Average overtime | | 8,104 | 8,646 | 7,576 | 8,050 | 8,590 | 6,312 | 7,719 | 7,956 | 7,574 | 7,726 | 7,880 | 8,038 | 8,440 | 8,609 | 8,781 | 8,956 |
| | $ | 61,701 $ | 60,529 $ | 63,780 $ | 68,792 $ | 67,438 $ | 58,936 $ | 59,233 $ | 61,055 $ | 61,735 $ | 62,970 $ | 64,230 $ | 65,514 $ | 68,790 $ | 70,166 $ | 71,569 $ | 73,000 |
| Overtime as a % of salary & wages | | 15.2% | 16.7% | 13.5% | 13.3% | 14.6% | 12.0% | 15.0% | 15.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% |
| Pension as a % of salary & wages | | | | | | | 23.2% | 67.6% | 75.3% | 79.1% | 85.0% | 91.4% | 90.4% | 88.1% | 86.7% | 83.9% | 81.9% |
| Medical & fringe as a % of salary & wage | | 56.2% | 51.1% | 54.5% | 57.5% | 66.4% | 69.0% | 72.3% | 71.4% | 70.5% | 72.3% | 74.3% | 76.8% | 77.1% | 79.7% | 82.1% | 84.4% |

| Key Items | Comment/Reference |
|---|---|
| Revenues | |
| Utility users' and other taxes | Utility users' tax decreases beginning FY 2014 due to the allocation to the Public Lighting Authority ($17.0m in FY 2014; $12.5m thereafter). Inflationary increases assumed beginning FY 2017. |
| Sales and charges for services | Interagency billings and charges for external services |
| Revenue from use of assets | Real estate rentals and concessions. FY 2012 and FY 2013 reflect proceeds from sales; no gain/loss assumed in the projection period |
| Parking/court fines and other revenue | Primarily court proceeds |
| Grant revenue | Includes COPS grant |
| Expenses | |
| Personnel expenses | Appendix C.1 - Appendix C.3 |
| Professional and contractual services | Contracts such as crime scene services, E-911 improvements and technology support |
| Materials & supplies | Operating supplies and repairs & maintenance |
| Utilities | Primarily water, sewage and electricity |
| Other expenses | Primarily capital outlays and rental expenses |
| Transfers out | Retirement of debt principal |

**Operational restructuring**

| | | | | | | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Additional Department employees | | | | | | - | 125 | 250 | 175 | 163 | 150 | 150 | 150 | 150 | 150 | 150 |

(1) Based on department salaries & wages and employees, see Appendix C.2.

**Ten-Year Financial Projections**
**PLD - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | (0.0) | 0.0 | 0.0 | 0.1 | (0.0) | 0.0 | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | 0.0 | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and Charges for Services | 52.3 | 37.2 | 43.3 | 30.8 | 45.1 | 36.5 | 41.2 | 28.7 | 26.1 | 23.5 | 20.8 | 18.1 | 15.3 | 12.3 | 10.6 | 10.7 |
| Revenue from use of assets | - | 0.2 | - | 0.3 | 0.1 | 0.5 | 0.5 | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | 0.3 | 0.0 | 0.7 | 0.0 | 0.0 | 0.0 | 0.0 | - | - | - | - | - | - | - | - | - |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | 3.5 | 3.5 | 3.5 | 0.4 | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | - | - | - | - | - | 0.4 | - | - | - | - | - | - | - | - | - | - |
| **Total revenues** | 56.1 | 40.9 | 47.5 | 31.5 | 45.2 | 37.5 | 41.7 | 28.7 | 26.1 | 23.5 | 20.8 | 18.1 | 15.3 | 12.3 | 10.6 | 10.7 |
| | | | | | | | | | | | | | | | | |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (10.1) | (9.6) | (8.0) | (6.8) | (5.8) | (4.8) | (3.4) | (1.0) | (0.6) | (0.4) | (0.2) | (0.2) | (0.2) | (0.2) | - | - |
| Overtime | (3.4) | (2.8) | (2.5) | (2.9) | (3.5) | (2.4) | (1.0) | (0.1) | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | - | - |
| Pension | (0.7) | (0.4) | (0.3) | (0.2) | (0.5) | (0.8) | (2.2) | (0.7) | (0.5) | (0.4) | (0.2) | (0.3) | (0.3) | (0.2) | - | - |
| Medical & fringe benefits | (5.7) | (5.0) | (4.8) | (4.9) | (5.1) | (5.1) | (1.1) | (0.3) | (0.2) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | - | - |
| Professional and contractual services | (0.1) | (0.2) | (0.2) | (0.1) | (0.1) | (0.0) | (2.6) | (14.1) | (10.2) | (6.6) | (4.6) | (3.7) | (2.3) | (0.9) | - | - |
| Materials & supplies | (43.1) | (37.8) | (27.5) | (37.4) | (36.5) | (39.1) | (39.4) | (12.4) | (13.3) | (13.3) | (12.8) | (12.0) | (11.4) | (10.7) | (10.6) | (10.7) |
| Utilities | (4.3) | (5.0) | (5.4) | (5.0) | (4.4) | (5.7) | (4.6) | (4.6) | (4.2) | (3.6) | (3.4) | (3.2) | (3.0) | (2.7) | (2.6) | (2.7) |
| Purchased services | (1.6) | (2.0) | (1.0) | (0.0) | (0.1) | (0.2) | (0.2) | (0.9) | (1.4) | (1.7) | (1.4) | (0.9) | (0.5) | (0.1) | - | - |
| Risk management and insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | (0.2) | (3.1) | (0.1) | (0.0) | (0.1) | (0.5) | (0.0) | (0.1) | (0.2) | (0.2) | (0.2) | (0.1) | (0.1) | (0.0) | - | - |
| Debt service | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | (0.8) | (5.3) | (8.4) | (9.3) | (9.6) | (9.9) | (10.2) | (10.5) | (10.8) | (11.1) |
| POC - principal and interest1 | (2.0) | (2.1) | (2.2) | (2.4) | (2.6) | (2.7) | (1.6) | (0.5) | (0.3) | (0.2) | (0.1) | (0.1) | (0.1) | (0.1) | - | - |
| Transfers out | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (71.2) | (68.0) | (52.1) | (59.8) | (58.8) | (61.3) | (57.0) | (40.0) | (39.1) | (35.8) | (32.6) | (30.4) | (28.1) | (25.5) | (24.0) | (24.5) |
| | | | | | | | | | | | | | | | | |
| **Total surplus (deficit)** | $ (15.1) | $ (27.1) | $ (4.6) | $ (28.3) | $ (13.6) | $ (23.8) | $ (15.3) | $ (11.2) | $ (13.0) | $ (12.4) | $ (11.9) | $ (12.3) | $ (12.8) | $ (13.2) | $ (13.4) | (13.8) |
| | | | | | | | | | | | | | | | | |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| *Expenses* | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Technology | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Capital expenditures and other infrastructure | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | | | | | |
| **Operational restructuring** | | | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| | | | | | | | | | | | | | | | | |
| **Adjusted surplus (deficit)** | | | | | | $ (23.8) | $ (15.3) | $ (11.2) | $ (13.0) | $ (12.4) | $ (11.9) | $ (12.3) | $ (12.8) | $ (13.2) | $ (13.4) | (13.8) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

Ten-Year Financial Projections
PLD - general fund - Key assumptions

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 225 | 206 | 160 | 123 | 103 | 99 | 70 | 12 | 7 | 5 | 3 | 3 | 3 | 2 | - | - |
| Average salary & wages(1) | $ 44,676 | $ 46,839 | $ 50,059 | $ 55,114 | $ 55,866 | $ 48,724 | $ 49,211 | $ 84,190 | $ 81,474 | $ 79,817 | $ 79,591 | $ 81,182 | $ 82,806 | $ 84,462 | n/a | n/a |
| Average overtime | 15,017 | 13,619 | 15,896 | 23,374 | 34,123 | 24,252 | 14,708 | 8,419 | 8,147 | 7,982 | 7,959 | 8,119 | 8,281 | 8,446 | n/a | n/a |
| | $ 59,693 | $ 60,459 | $ 65,955 | $ 78,489 | $ 89,989 | $ 72,975 | $ 63,919 | $ 92,610 | $ 89,622 | $ 87,799 | $ 87,550 | $ 89,301 | $ 91,087 | $ 92,908 | $ - | $ - |
| Overtime as a % of salary & wages | 33.6% | 29.1% | 31.8% | 42.4% | 61.1% | 49.8% | 29.9% | 10.0% | 10.0% | 10.0% | 10.0% | 10.0% | 10.0% | 10.0% | n/a | n/a |
| Pension as a % of salary & wages | | | | | | 16.9% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | n/a | n/a |
| Medical & fringe as a % of salary & wages | 57.1% | 51.4% | 59.8% | 72.5% | 89.0% | 105.7% | 32.7% | 25.7% | 26.6% | 27.6% | 28.5% | 29.0% | 29.5% | 30.0% | n/a | n/a |

| Key Items | Comment/Reference |
|---|---|
| General | Lighting (Street lights): Street lights will be transitioned to the Public Lighting Authority (PLA) over a 3-year period beginning FY 2014 (3/1/14 - 2/30/17).  Overhead lights representing 85% of total PLA street lights are projected to be completed on an 18 month schedule while Underground lights (15% of final mix) are forecast over a 36 month period.  The final system will have 55,000 street lights. |
| | City Grid: All customers currently on the City grid are assumed to be transitioned to a 3rd party provider effective beginning of  FY 2015 (7/1/14).  Once transitioned, the City will no longer collect revenue from external customers. The grid will be deactivated over a 7-year period beginning FY 2015 (7/1/14 - 6/30/21). |
| | PLD plans to utilize third party outsourced labor to maintain its portion of street lights until the transition to PLA is complete (by end-FY 2017) |
| Revenues | |
| Sales and Charges for Services[2] | Represents external and internal revenues. |
| External electricity sales | Decreasing consistent with the assumption that electricity customers are transitioned by end-FY 2014. FY 2014 includes $2.4 million of collections based on the Power Supply Cost Recovery Factor applied to customer bills beginning December 2013 |
| Internal electricity sales | Assumes PLD continues to provide electricity to City departments at current consumption level; departments are billed based on consumption at DTE Rate book |
| Third-party contributions | Represents reimbursement from 3rd party utility provider to operate and maintain PLD grid until fully transitioned.  This reimbursement decreases through FY 2021 when the grid deactivation is complete. |
| Expenses | |
| Personnel expenses | Appendix C.1 - Appendix C.3 |
| | PLD plans to utilize third party outsourced labor to maintain its portion of street lights and grid until transition of street lights and grid (by end-FY 2021). Legacy health and pension costs are expected to remain. |
| Materials & supplies | Minimal PLD administrative staff remains until year 7 of transition (end of FY 2021) when grid deactivation  is completed |
| | Grid: Fuel and lubricants - electricity purchased, which decreases due to amount purchased for internal consumption only. |
| Utilities | Street light electricity will continue to be purchased by the City, assumes 55,000 street lights full transition by end of FY 2017.  Assumes power purchased at $0.0755/kWh |
| | Alley Lights: Additionally, 12,000 alley lights will remain until the bulbs fail.  The forecast assumes the bulbs to fail over a 5 year period at 20% a year.  The City will purchase electricity for these street lights. |
| Contributions to non-enterprise funds | Represents contribution to Public Lighting Authority for operations; replaces decreases in personnel |
| | Lighting: Total operations & maintenance based the O&M agreement between the City and PLA includes a $126,500 monthly admin fee plus per streetlight O&M fee subject to 3% annual increase |
| **Operational restructuring** | |
| Additional Department employees | -        -        -        -        -        -        -        -        - |

(1) Based on department salaries & wages and employees, see Appendix C.2.

(2) FY 2012 includes a one-time payment from DPS to account for previous balances due.

**Ten-Year Financial Projections**
**Recreation - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | 0.1 | 0.0 | 0.1 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| Revenue from use of assets | 1.1 | 1.1 | 1.0 | 0.8 | 1.1 | 0.8 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 |
| Parking/court fines and other revenue | 0.8 | 0.8 | 0.5 | 0.4 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | 0.1 | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | 1.4 | 2.4 | 0.7 | 0.4 | 2.8 | 1.0 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.2 | 1.2 | 1.2 |
| **Total revenues** | 3.5 | 4.3 | 2.4 | 1.8 | 4.2 | 2.0 | 1.9 | 1.9 | 1.9 | 1.9 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (7.4) | (7.7) | (6.8) | (5.9) | (5.2) | (3.4) | (3.4) | (3.5) | (3.6) | (3.6) | (3.7) | (3.8) | (3.8) | (3.9) | (4.0) | (4.1) |
| Overtime | (0.1) | (0.2) | (0.1) | (0.1) | (0.2) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Pension | (0.5) | (0.5) | (0.3) | (0.3) | (0.3) | (0.3) | (2.2) | (2.6) | (3.0) | (3.3) | (3.7) | (3.9) | (4.1) | (4.3) | (4.5) | (4.6) |
| Medical & fringe benefits | (2.5) | (2.4) | (2.2) | (1.9) | (1.9) | (2.2) | (10.8) | (11.4) | (11.7) | (12.3) | (12.8) | (13.5) | (14.2) | (14.9) | (15.6) | (16.4) |
| Professional and contractual services | (1.0) | (1.0) | (0.3) | (0.5) | (0.3) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) |
| Materials & supplies | (0.1) | (0.1) | (0.1) | (0.3) | (0.3) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) |
| Utilities | (7.5) | (7.2) | (7.1) | (7.7) | (7.5) | (5.8) | (6.4) | (7.0) | (7.2) | (7.4) | (7.6) | (7.8) | (8.0) | (8.2) | (8.4) | (8.7) |
| Purchased services | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Risk management and insurance | - | - | 0.0 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | (3.4) | (4.7) | (2.9) | (2.7) | (3.7) | (1.7) | (1.5) | (1.5) | (1.5) | (1.5) | (1.6) | (1.6) | (1.6) | (1.6) | (1.6) | (1.6) |
| Debt service | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (0.8) | (0.8) | (0.9) | (0.9) | (1.0) | (1.0) | (1.5) | (1.6) | (1.7) | (1.7) | (1.8) | (1.8) | (1.8) | (1.8) | (1.8) | (1.8) |
| Transfers out | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (23.3) | (24.6) | (20.7) | (20.5) | (20.3) | (14.8) | (26.3) | (28.0) | (29.2) | (30.4) | (31.6) | (32.8) | (33.9) | (35.2) | (36.5) | (37.8) |
| **Total surplus (deficit)** | $ (19.8) | (20.3) | (18.3) | (18.7) | (16.2) | $ (12.9) | $ (24.4) | $ (26.1) | $ (27.3) | $ (28.5) | $ (29.7) | $ (30.8) | $ (32.0) | $ (33.2) | $ (34.5) | (35.7) |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | $ - | 0.1 | $ 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| *Expenses* | | | | | | | | | | | | | | | | |
|   Additional operating expenditures | | | | | | - | - | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
|   Technology | | | | | | - | - | - | - | - | - | - | - | - | - | - |
|   Capital expenditures and other infrastructure | | | | | | - | (0.9) | (8.9) | (3.1) | (3.3) | (3.0) | (4.0) | (4.3) | (4.0) | (4.0) | (4.0) |
|   Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
|   Subtotal: Expenses | | | | | | - | (0.9) | (9.0) | (3.2) | (3.4) | (3.1) | (4.1) | (4.4) | (4.1) | (4.1) | (4.1) |
| **Operational restructuring** | | | | | | $ - | (0.9) | (9.0) | (3.1) | (3.3) | (3.1) | (4.0) | (4.3) | (4.0) | (4.0) | (4.0) |
| **Adjusted surplus (deficit)** | | | | | | $ (12.9) | (25.3) | (35.1) | (30.4) | (31.8) | (32.7) | (34.8) | (36.3) | (37.2) | (38.5) | (39.7) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

**Ten-Year Financial Projections**
Recreation - general fund - Key assumptions

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Department employees (baseline) | 472 | 388 | 508 | 510 | 300 | 202 | 202 | 202 | 202 | 202 | 202 | 202 | 202 | 202 | 202 | 202 |
| Average salary & wages(1) | $ 15,783 | $ 19,905 | $ 13,500 | $ 11,659 | $ 17,264 | $ 16,904 | $ 16,904 | $ 17,242 | $ 17,587 | $ 17,939 | $ 18,298 | $ 18,664 | $ 19,037 | $ 19,418 | $ 19,806 | $ 20,202 |
| Average overtime | 306 | 402 | 259 | 265 | 524 | 525 | 525 | 535 | 546 | 557 | 568 | 579 | 591 | 603 | 615 | 627 |
| | $ 16,088 | $ 20,307 | $ 13,759 | $ 11,924 | $ 17,787 | $ 17,429 | $ 17,429 | $ 17,777 | $ 18,133 | $ 18,496 | $ 18,866 | $ 19,243 | $ 19,628 | $ 20,020 | $ 20,421 | $ 20,829 |
| Overtime as a % of salary & wages | 1.9% | 2.0% | 1.9% | 2.3% | 3.0% | 3.1% | 3.1% | 3.1% | 3.1% | 3.1% | 3.1% | 3.1% | 3.1% | 3.1% | 3.1% | 3.1% |
| Pension as a % of salary & wages | | | | | | 8.7% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| Medical & fringe as a % of salary & wages | 34.1% | 31.7% | 31.7% | 32.7% | 36.8% | 63.3% | 315.8% | 325.6% | 329.9% | 338.1% | 345.4% | 357.1% | 367.7% | 380.1% | 390.5% | 400.9% |

| Key Items | Comment/Reference |
|---|---|
| **Revenues** | |
| Revenue from use of assets | Real estate rental and concessions. FY 2012 and FY 2013 include the gain on sale of property; no gain/loss is included going forward |
| **Expenses** | |
| Personnel expenses | Appendix C.1 - Appendix C.3 |
| Materials & supplies | Operating supplies |
| Utilities | Sewage, water, and various other utilities |
| Other expenses | Primarily capital outlays |

**Operational restructuring**
Additional Department employees    -    -    -    -    -    -    -    -    -    -    -

(1) Based on department salaries & wages and employees, see Appendix C.2. Most Recreation department employees are part-time employees.

**Ten-Year Financial Projections**
**Administrative Hearings - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | 0.2 | 0.2 | 1.2 | 0.8 | 0.9 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 |
| Revenue from use of assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | 0.0 | 0.1 | 0.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total revenues** | 0.2 | 0.3 | 1.5 | 0.8 | 0.9 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (0.3) | (0.3) | (0.4) | (0.4) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) |
| Overtime | - | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pension | 0.0 | 0.0 | 0.0 | (0.0) | (0.0) | (0.0) | (0.2) | (0.2) | (0.3) | (0.3) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) |
| Medical & fringe benefits | (0.2) | (0.1) | (0.2) | (0.2) | (0.2) | (0.2) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.2) |
| Professional and contractual services | (1.0) | (1.4) | (0.8) | (0.5) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) |
| Materials & supplies | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Utilities | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Purchased services | (0.0) | - | 0.0 | (0.2) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Risk management and insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | (0.2) | (0.2) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Debt service | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) |
| Transfers out | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (1.9) | (2.2) | (1.6) | (1.4) | (1.1) | (1.1) | (1.3) | (1.4) | (1.4) | (1.5) | (1.6) | (1.6) | (1.6) | (1.7) | (1.7) | (1.7) |
| **Total surplus (deficit)** | $ (1.7) | $ (1.9) | $ (0.1) | $ (0.6) | $ (0.2) | $ (0.6) | $ (0.8) | $ (0.9) | $ (0.9) | $ (1.0) | $ (1.0) | $ (1.1) | $ (1.1) | $ (1.1) | $ (1.2) | (1.2) |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| *Expenses* | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Technology | | | | | | - | - | (0.5) | - | - | - | - | - | - | - | - |
| Capital expenditures and other infrastructure | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | - | (0.5) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Operational restructuring** | | | | | | $ - | $ - | $ (0.5) | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | 0.0 |
| **Adjusted surplus (deficit)** | | | | | | $ (0.6) | $ (0.8) | $ (1.3) | $ (0.9) | $ (1.0) | $ (1.0) | $ (1.1) | $ (1.1) | $ (1.1) | $ (1.2) | (1.2) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

Ten-Year Financial Projections
Administrative Hearings - general fund - Key assumptions

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 6 | 6 | 9 | 6 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| | | | | | | | | | | | | | | | | |
| Average salary & wages(1) | $ 55,358 | $ 56,863 | $ 42,971 | $ 60,124 | $ 82,470 | $ 69,770 | $ 82,422 | $ 84,071 | $ 85,752 | $ 87,467 | $ 89,217 | $ 91,001 | $ 92,821 | $ 94,678 | $ 96,571 | $ 98,503 |
| Average overtime | - | 38 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | $ 55,358 | $ 56,901 | $ 42,971 | $ 60,124 | $ 82,470 | $ 69,770 | $ 82,422 | $ 84,071 | $ 85,752 | $ 87,467 | $ 89,217 | $ 91,001 | $ 92,821 | $ 94,678 | $ 96,571 | $ 98,503 |
| | | | | | | | | | | | | | | | | |
| Overtime as a % of salary & wages | 0.0% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Pension as a % of salary & wages | | | | | | 10.0% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| Medical & fringe as a % of salary & wages | 53.9% | 42.8% | 43.5% | 50.2% | 55.5% | 66.3% | 33.0% | 32.8% | 33.4% | 34.0% | 34.7% | 35.4% | 36.1% | 36.9% | 37.6% | 38.3% |

| Key Items | Comment/Reference |
|---|---|
| Revenues | |
|     Sales and charges for services | Fees (Blight violation adjudication) and interagency billings |
| Expenses | |
|     Personnel expenses | Appendix C.1 - Appendix C.3 |
|     Professional and contractual services | Information technology contracts |

Operational restructuring
    Additional Department employees      -    -    -    -    -    -    -    -    -    -    -

(1) Based on department salaries & wages and employees, see Appendix C.2.

**Ten-Year Financial Projections**
**Homeland Security - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | - | - | - | - | - | - | - | - | - | - | - |
| Revenue from use of assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | 1.2 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | 0.2 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | 0.3 | 1.0 | 2.2 | 2.8 | 3.2 | 2.4 | 2.1 | 2.1 | 2.1 | 2.2 | 2.2 | 2.2 | 2.2 | 2.3 | 2.3 | 2.3 |
| **Total revenues** | 1.7 | 1.0 | 2.2 | 2.9 | 3.3 | 2.4 | 2.1 | 2.1 | 2.1 | 2.2 | 2.2 | 2.2 | 2.2 | 2.3 | 2.3 | 2.3 |
| | | | | | | | | | | | | | | | | |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (0.3) | (0.3) | (0.2) | (0.1) | (0.1) | - | - | - | - | - | - | - | - | - | - | - |
| Overtime | (0.0) | (0.5) | (0.0) | (0.0) | (0.0) | - | - | - | - | - | - | - | - | - | - | - |
| Pension | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | - | - | - | - | - | - | - | - | - | - | - |
| Medical & fringe benefits | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | - | - | - | - | - | - | - | - | - | - | - |
| Professional and contractual services | (0.0) | - | (0.1) | (0.7) | (0.8) | (1.9) | (1.9) | (1.9) | (1.9) | (1.9) | (1.9) | (2.0) | (2.0) | (2.0) | (2.0) | (2.0) |
| Materials & supplies | (0.8) | (0.6) | (0.4) | (1.2) | (0.1) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.3) | (0.3) |
| Utilities | 0.0 | (0.0) | (0.0) | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Purchased services | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Risk management and insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | (0.8) | (0.1) | (1.6) | (0.8) | (2.4) | (2.4) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Debt service | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | - | - | - | - | - | - | - | - | - | - | - |
| Transfers out | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (2.2) | (1.7) | (2.4) | (2.9) | (3.5) | (4.5) | (2.1) | (2.1) | (2.1) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.3) | (2.3) |
| | | | | | | | | | | | | | | | | |
| **Total surplus (deficit)** | $ (0.5) | $ (0.7) | $ (0.2) | $ (0.0) | (0.3) | $ (2.0) | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | 0.0 |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Expenses | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Technology | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Capital expenditures and other infrastructure | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | | | | | |
| **Operational restructuring** | | | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| | | | | | | | | | | | | | | | | |
| **Adjusted surplus (deficit)** | | | | | | $ (2.0) | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | 0.0 |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

**Ten-Year Financial Projections**
**Homeland Security - general fund - Key assumptions**

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Department employees (baseline)** | 5 | 5 | 1 | 2 | 2 | 1 | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | | | | | |
| **Average salary & wages(1)** | $ 67,938 | $ 69,172 | $ 185,204 | $ 69,322 | $ 73,932 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Average overtime** | 2,699 | 90,636 | 254 | 583 | 1,297 | - | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| | $ 70,637 | $ 159,808 | $ 185,458 | $ 69,905 | $ 75,229 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | | | | | | | | | | |
| **Overtime as a % of salary & wages** | 4.0% | 131.0% | 0.1% | 0.8% | 1.8% | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| | | | | | | | | | | | | | | | | |
| **Pension as a % of salary & wages** | | | | | | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| | | | | | | | | | | | | | | | | |
| **Medical & fringe as a % of salary & wages** | 40.1% | 36.7% | 59.1% | 40.8% | 49.9% | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |

| **Key Items** | **Comment/Reference** |
|---|---|
| Revenues | |
|    Grant revenue | Federal grant proceeds |
| Expenses | |
|    Personnel expenses | Appendix C.1 - Appendix C.3 |
|    Professional and contractual services | Urban Area Security initiative |
|    Other expenses | FY 2012 and FY 2013 include capital outlays, which will not persist |

**Operational restructuring**
| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Additional Department employees | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |

(1) Based on department salaries & wages and employees, see Appendix C.2.

**Ten-Year Financial Projections**
**General Services - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | 1.7 | 1.9 | 5.4 | 0.7 | 1.3 | 0.9 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 |
| Revenue from use of assets | (0.0) | - | 0.8 | 1.0 | 1.2 | 1.7 | 8.2 | 3.4 | 3.4 | 3.4 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 |
| Parking/court fines and other revenue | 5.6 | 5.3 | 0.2 | 4.7 | 5.6 | 4.7 | 4.6 | 4.6 | 4.6 | 4.6 | 4.6 | 4.6 | 4.6 | 4.6 | 4.6 | 4.6 |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | - | - | 1.6 | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | 5.3 | 3.2 | 1.3 | 2.5 | 4.8 | 5.1 | 5.1 | - | - | - | - | - | - | - | - | - |
| Grant revenue | - | 0.0 | 0.2 | 4.6 | 3.5 | 1.4 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.8 | 0.8 | 0.8 | 0.8 |
| **Total revenues** | 12.6 | 10.4 | 7.8 | 15.1 | 16.3 | 13.7 | 20.9 | 11.0 | 11.0 | 11.0 | 9.3 | 9.4 | 9.4 | 9.4 | 9.4 | 9.4 |
| | | | | | | | | | | | | | | | | |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (21.0) | (20.4) | (17.5) | (16.2) | (12.0) | (9.1) | (10.0) | (9.3) | (9.5) | (9.7) | (9.9) | (10.1) | (10.3) | (10.5) | (10.7) | (10.9) |
| Overtime | (2.9) | (2.2) | (2.3) | (2.8) | (2.7) | (2.1) | (2.3) | (2.1) | (2.2) | (2.2) | (2.3) | (2.3) | (2.4) | (2.4) | (2.4) | (2.5) |
| Pension | (2.3) | (1.7) | (1.3) | (2.2) | (1.6) | (1.3) | (6.3) | (6.9) | (7.9) | (8.9) | (9.9) | (10.4) | (11.9) | (11.4) | (11.9) | (12.4) |
| Medical & fringe benefits | (12.1) | (11.1) | (10.5) | (10.4) | (9.6) | (9.0) | (8.7) | (8.5) | (8.9) | (9.3) | (9.7) | (10.2) | (10.7) | (11.3) | (11.8) | (12.4) |
| Professional and contractual services | (11.7) | (13.1) | (10.9) | (11.6) | (9.5) | (8.1) | (8.1) | (7.9) | (8.0) | (8.1) | (8.1) | (8.2) | (8.3) | (8.4) | (8.5) | (8.6) |
| Materials & supplies | (22.2) | (10.6) | (11.2) | (12.1) | (10.8) | (10.1) | (10.1) | (6.8) | (6.9) | (7.0) | (7.1) | (7.1) | (7.2) | (7.3) | (7.3) | (7.4) |
| Utilities | (0.2) | (0.5) | (0.8) | (1.4) | (1.0) | (0.9) | (0.9) | (0.7) | (0.7) | (0.7) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) |
| Purchased services | (2.5) | (1.7) | (1.9) | (1.2) | (1.2) | (0.9) | (0.9) | (0.9) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) |
| Risk management and insurance | - | - | - | - | (0.2) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.5) | (0.5) | (0.5) | (0.5) |
| Other expenses | (0.3) | (0.5) | (0.4) | (5.4) | (3.4) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.9) | (0.9) | (0.9) |
| Debt service | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (2.6) | (2.7) | (2.9) | (3.2) | (3.4) | (4.2) | (4.5) | (4.3) | (4.5) | (4.6) | (4.7) | (4.7) | (4.7) | (4.7) | (4.7) | (4.7) |
| Transfers out | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (77.7) | (64.6) | (59.8) | (66.5) | (55.3) | (46.9) | (53.0) | (48.8) | (50.8) | (52.7) | (54.7) | (56.0) | (57.5) | (59.0) | (60.5) | (62.0) |
| | | | | | | | | | | | | | | | | |
| **Total surplus (deficit)** | $ (65.0) | $ (54.1) | $ (51.9) | $ (51.4) | $ (39.0) | $ (33.2) | $ (32.1) | $ (37.8) | $ (39.8) | $ (41.7) | $ (45.3) | $ (46.7) | $ (48.1) | $ (49.6) | $ (51.2) | $ (52.6) |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ 1.1 | $ 2.1 | $ 2.1 | $ 2.1 | $ 2.1 | $ 2.1 | $ 2.1 | $ 2.1 | $ 2.1 | 2.1 |
| *Expenses* | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | (5.4) | (14.4) | (14.4) | (14.5) | (14.6) | (14.7) | (14.8) | (14.9) | (15.0) | (15.1) |
| Technology | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Capital expenditures and other infrastructure | | | | | | - | (12.0) | (11.6) | (4.8) | (4.8) | (5.1) | (4.9) | (4.9) | (5.1) | (5.0) | (5.0) |
| Implementation costs | | | | | | - | (0.4) | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | (17.8) | (26.1) | (19.2) | (19.3) | (19.7) | (19.5) | (19.7) | (19.9) | (19.9) | (20.1) |
| | | | | | | | | | | | | | | | | |
| **Operational restructuring** | | | | | | $ - | $ (16.7) | $ (23.9) | $ (17.0) | $ (17.2) | $ (17.5) | $ (17.4) | $ (17.5) | $ (17.8) | $ (17.8) | (17.9) |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| **Adjusted surplus (deficit)** | | | | | | $ (33.2) | $ (48.8) | $ (61.7) | $ (56.9) | $ (58.9) | $ (62.9) | $ (64.1) | $ (65.6) | $ (67.4) | $ (68.9) | (70.5) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

**Ten-Year Financial Projections**
**General Services - general fund - Key assumptions**

| | | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | | 676 | 528 | 481 | 447 | 343 | 298 | 298 | 272 | 272 | 272 | 272 | 272 | 272 | 272 | 272 | 272 |
| Average salary & wages(1) | $ | 31,804 $ | 39,503 $ | 36,473 $ | 36,309 $ | 34,874 | 30,695 $ | 33,501 $ | 34,171 $ | 34,855 $ | 35,552 $ | 36,263 $ | 36,988 $ | 37,728 $ | 38,483 $ | 39,252 $ | 40,037 |
| Average overtime | | 4,326 | 4,194 | 4,758 | 6,245 | 7,778 | 7,045 | 7,689 | 7,842 | 7,999 | 8,159 | 8,322 | 8,489 | 8,659 | 8,832 | 9,008 | 9,189 |
| | $ | 36,130 $ | 43,697 $ | 41,231 $ | 42,554 $ | 42,652 | 37,740 $ | 41,190 $ | 42,014 $ | 42,854 $ | 43,711 $ | 44,585 $ | 45,477 $ | 46,387 $ | 47,314 $ | 48,261 $ | 49,226 |
| Overtime as a % of salary & wages | | 13.9% | 10.8% | 13.1% | 17.2% | 22.3% | 22.9% | 22.9% | 22.9% | 22.9% | 22.9% | 22.9% | 22.9% | 22.9% | 22.9% | 22.9% | 22.9% |
| Pension as a % of salary & wages | | | | | | | 13.9% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| Medical & fringe as a % of salary & wages | | 57.6% | 54.3% | 59.7% | 64.3% | 80.2% | 98.3% | 86.7% | 91.9% | 93.7% | 96.2% | 98.7% | 101.8% | 104.6% | 107.9% | 110.8% | 113.7% |

| Key Items | Comment/Reference |
|---|---|
| Revenues | |
| Sales and charges for services | Interagency billings |
| Revenue from use of assets | Internal real estate rentals; FY 2014 includes the proceeds from sale of the Veteran's building; FY 2015 - FY2017 include receipt of $5m settlement from the Red Wings/Joe Lewis facility for past-due payments |
| Parking/court fines and other revenue | Revenues for fleet management services |
| Street fund reimb. and financing proceeds | Reimbursement from street funds for GSD services provided to solid waste; revenue are associated expenses are eliminated with the assumed outsourcing of solid waste beginning FY 2015 |
| Grant revenue | Federal grant proceeds |
| Expenses | |
| Personnel expenses | Appendix C.1 - Appendix C.3 |
| Professional and contractual services | Security expenses and inventory management |
| Materials & supplies | Fuels & lubricant and repairs & maintenance |
| Utilities | Primarily electricity |
| Purchased services | Court building operating expense |
| Other expenses | Primarily capital outlays |

| Operational restructuring | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Additional Department employees | | | | | | | - | 112 | 112 | 112 | 112 | 112 | 112 | 112 | 112 | 112 | 112 |

(1) Based on department salaries & wages and employees, see Appendix C.2.

**Ten-Year Financial Projections**
**Auditor General - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | - | 0.0 | - | - | - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Revenue from use of assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | 0.0 | 0.0 | 0.0 | - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total revenues** | 0.0 | 0.0 | 0.0 | - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (1.0) | (1.2) | (1.1) | (1.0) | (0.9) | (0.8) | (1.1) | (1.1) | (1.1) | (1.1) | (1.2) | (1.2) | (1.2) | (1.2) | (1.3) | (1.3) |
| Overtime | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Pension | 0.0 | (0.0) | (0.0) | (0.0) | (0.0) | (0.1) | (0.7) | (0.8) | (0.9) | (1.1) | (1.2) | (1.2) | (1.3) | (1.3) | (1.4) | (1.5) |
| Medical & fringe benefits | (0.4) | (0.5) | (0.4) | (0.4) | (0.5) | (0.5) | (0.6) | (0.6) | (0.6) | (0.7) | (0.7) | (0.7) | (0.8) | (0.8) | (0.8) | (0.9) |
| Professional and contractual services | (2.7) | (3.5) | (5.7) | (1.3) | (1.8) | (1.6) | (1.6) | (1.7) | (1.7) | (1.7) | (1.7) | (1.7) | (1.7) | (1.8) | (1.8) | (1.8) |
| Materials & supplies | (0.0) | (0.0) | 0.0 | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Utilities | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Purchased services | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Risk management and insurance | - | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | (0.1) | (0.2) | (0.1) | (0.1) | (0.1) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) |
| Debt service | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (0.2) | (0.2) | (0.2) | (0.3) | (0.3) | (0.2) | (0.5) | (0.5) | (0.5) | (0.5) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) |
| Transfers out | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (4.5) | (5.6) | (7.6) | (3.1) | (3.6) | (3.6) | (4.7) | (4.9) | (5.2) | (5.4) | (5.6) | (5.7) | (5.8) | (6.0) | (6.1) | (6.2) |
| **Total surplus (deficit)** | $ (4.5) | $ (5.5) | $ (7.6) | $ (3.1) | $ (3.6) | $ (3.6) | $ (4.7) | $ (4.9) | $ (5.2) | $ (5.4) | $ (5.6) | $ (5.7) | $ (5.8) | $ (6.0) | $ (6.1) | $ (6.2) |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| *Expenses* | | | | | | | | | | | | | | | | |
|   Additional operating expenditures | | | | | | - | (0.0) | (0.4) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) |
|   Technology | | | | | | - | (0.0) | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
|   Capital expenditures and other infrastructure | | | | | | - | - | - | - | - | - | - | - | - | - | - |
|   Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
|   Subtotal: Expenses | | | | | | - | (0.1) | (0.6) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) |
| **Operational restructuring** | | | | | | $ - | $ (0.1) | $ (0.6) | $ (0.5) | $ (0.5) | $ (0.5) | $ (0.5) | $ (0.5) | $ (0.5) | $ (0.5) | (0.5) |
| **Adjusted surplus (deficit)** | | | | | | $ (3.6) | $ (4.8) | $ (5.5) | $ (5.6) | $ (5.8) | $ (6.0) | $ (6.2) | $ (6.3) | $ (6.5) | $ (6.6) | $ (6.8) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

**Ten-Year Financial Projections**
**Auditor General - general fund - Key assumptions**

| | | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 21 | 18 | 17 | 15 | 12 | 14 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 |
| | | | | | | | | | | | | | | | | |
| Average salary & wages(1) | $ 48,165 | $ 65,138 | $ 63,262 | $ 66,940 | $ 73,255 | $ 62,503 | $ 65,304 | $ 66,610 | $ 67,942 | $ 69,301 | $ 70,687 | $ 72,101 | $ 73,543 | $ 75,014 | $ 76,514 | $ 78,044 |
| Average overtime | 2,379 | 2,325 | 752 | 1,373 | 1,781 | 1,531 | 1,600 | 1,632 | 1,664 | 1,697 | 1,731 | 1,766 | 1,801 | 1,837 | 1,874 | 1,912 |
| | $ 50,544 | $ 67,463 | $ 64,014 | $ 68,313 | $ 75,036 | $ 64,034 | $ 66,904 | $ 68,242 | $ 69,606 | $ 70,999 | $ 72,419 | $ 73,867 | $ 75,344 | $ 76,851 | $ 78,388 | $ 79,956 |
| | | | | | | | | | | | | | | | | |
| Overtime as a % of salary & wages | 4.9% | 3.6% | 1.2% | 2.1% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% |
| | | | | | | | | | | | | | | | | |
| Pension as a % of salary & wages | | | | | | 8.5% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| | | | | | | | | | | | | | | | | |
| Medical & fringe as a % of salary & wages | 42.5% | 38.8% | 40.3% | 44.8% | 53.0% | 62.5% | 56.0% | 56.5% | 57.4% | 58.7% | 60.1% | 61.7% | 63.2% | 64.9% | 66.4% | 68.0% |

| **Key Items** | **Comment/Reference** |
|---|---|
| Expenses | |
| Personnel expenses | Appendix C.1 - Appendix C.3 |
| Professional and contractual services | Auditing |

| **Operational restructuring** | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Additional Department employees | | | | | | - | - | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |

(1) Based on department salaries & wages and employees, see Appendix C.2.

**Ten-Year Financial Projections**
**Zoning - general fund**
*($ in millions)*

|  | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| Revenue from use of assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total revenues** | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (0.5) | (0.4) | (0.4) | (0.4) | (0.4) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) |
| Overtime | - | - | (0.0) | - | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Pension | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.2) | (0.2) | (0.2) | (0.3) | (0.3) | (0.3) | (0.3) | (0.4) | (0.4) | (0.4) |
| Medical & fringe benefits | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.4) | (0.4) | (0.4) | (0.4) |
| Professional and contractual services | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Materials & supplies | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Utilities | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Purchased services | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Risk management and insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | 0.1 | (0.1) | (0.1) | (0.0) | (0.0) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Debt service | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Transfers out | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (0.8) | (0.8) | (0.8) | (0.8) | (0.7) | (0.7) | (1.0) | (1.0) | (1.1) | (1.1) | (1.2) | (1.2) | (1.3) | (1.3) | (1.4) | (1.4) |
| **Total surplus (deficit)** | $ (0.7) | $ (0.7) | $ (0.7) | $ (0.7) | $ (0.7) | $ (0.7) | $ (0.9) | $ (0.9) | $ (1.0) | $ (1.0) | $ (1.1) | $ (1.1) | $ (1.2) | $ (1.2) | $ (1.2) | (1.3) |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Expenses | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Technology | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Capital expenditures and other infrastructure | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| **Operational restructuring** | | | | | | $ - | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | (0.0) |
| **Adjusted surplus (deficit)** | | | | | | $ (0.7) | $ (0.9) | $ (0.9) | $ (1.0) | $ (1.0) | $ (1.1) | $ (1.1) | $ (1.2) | $ (1.2) | $ (1.3) | (1.3) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

**Ten-Year Financial Projections**
**Zoning - general fund - Key assumptions**

| | | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
| Department employees (baseline) | | 16 | 15 | 15 | 15 | 12 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 |
| Average salary & wages(1) | $ | 28,828 | 29,822 | 29,517 | 27,705 | 29,516 | 25,120 | 25,120 | 25,622 | 26,134 | 26,657 | 27,190 | 27,734 | 28,289 | 28,854 | 29,432 | 30,020 |
| Average overtime | | - | - | 0 | - | - | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| | $ | 28,828 | 29,822 | 29,517 | 27,705 | 29,516 | 25,121 | 25,121 | 25,624 | 26,136 | 26,659 | 27,192 | 27,736 | 28,291 | 28,857 | 29,434 | 30,022 |
| Overtime as a % of salary & wages | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Pension as a % of salary & wages | | | | | | | 8.4% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| Medical & fringe as a % of salary & wages | | 39.9% | 36.7% | 39.2% | 44.6% | 51.5% | 83.8% | 97.2% | 97.6% | 99.7% | 102.6% | 105.5% | 108.8% | 112.0% | 115.5% | 118.8% | 122.1% |

| Key Items | Comment/Reference |
|---|---|
| Revenues | |
| Sales and charges for services | Changed fees |
| Expenses | |
| Personnel expenses | Appendix C.1 - Appendix C.3 |

**Operational restructuring**

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Additional Department employees | - | - | - | - | - | - | - | - | - | - | - |

(1) Based on department salaries & wages and employees, see Appendix C.2.

**Ten-Year Financial Projections**
**City Council - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | - | - | 0.0 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Revenue from use of assets | 0.0 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | 0.0 | (0.0) | 0.0 | 0.0 | 0.2 | 0.1 | - | - | - | - | - | - | - | - | - | - |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | (0.0) | - | 0.0 | - | 0.0 | 0.1 | - | - | - | - | - | - | - | - | - | - |
| **Total revenues** | (0.0) | (0.0) | 0.0 | 0.0 | 0.2 | 0.1 | - | - | - | - | - | - | - | - | - | - |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (5.8) | (6.0) | (5.3) | (4.1) | (3.4) | (2.9) | (0.6) | (0.7) | (0.7) | (0.7) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) |
| Overtime | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pension | (0.5) | (0.4) | (0.6) | (0.6) | (0.4) | (0.3) | (0.4) | (0.5) | (0.6) | (0.7) | (0.8) | (0.8) | (0.8) | (0.9) | (0.9) | (1.0) |
| Medical & fringe benefits | (2.6) | (2.5) | (2.5) | (2.2) | (2.4) | (2.2) | (1.6) | (1.7) | (1.7) | (1.8) | (1.9) | (2.0) | (2.1) | (2.2) | (2.3) | (2.4) |
| Professional and contractual services | (2.4) | (2.1) | (2.1) | (3.5) | (3.7) | (3.0) | (5.0) | (5.1) | (5.1) | (5.2) | (5.2) | (5.3) | (5.3) | (5.4) | (5.4) | (5.5) |
| Materials & supplies | (0.1) | (0.2) | (0.3) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Utilities | (0.2) | (0.1) | (0.1) | (0.1) | (0.1) | (0.0) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Purchased services | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Risk management and insurance | - | - | 0.0 | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | (1.4) | (0.9) | (0.7) | (0.6) | (0.6) | (0.7) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) |
| Debt service | (0.1) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (0.7) | (0.7) | (0.8) | (0.9) | (0.9) | (1.0) | (0.3) | (0.3) | (0.3) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) |
| Transfers out | - | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (13.6) | (13.0) | (12.4) | (12.2) | (11.7) | (10.2) | (8.6) | (9.1) | (9.3) | (9.5) | (9.7) | (9.9) | (10.1) | (10.4) | (10.6) | (10.8) |
| **Total surplus (deficit)** | $ (13.6) | $ (13.0) | (12.4) | (12.2) | (11.5) | $ (10.1) | $ (8.6) | $ (9.1) | $ (9.3) | $ (9.5) | $ (9.7) | $ (9.9) | $ (10.1) | $ (10.4) | $ (10.6) | (10.8) |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| *Expenses* | | | | | | | | | | | | | | | | |
|   Additional operating expenditures | | | | | | - | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 |
|   Technology | | | | | | - | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
|   Capital expenditures and other infrastructure | | | | | | - | - | - | - | - | - | - | - | - | - | - |
|   Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
|   Subtotal: Expenses | | | | | | - | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 |
| **Operational restructuring** | | | | | | $ - | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | 0.4 |
| **Adjusted surplus (deficit)** | | | | | | $ (10.1) | $ (8.3) | $ (8.6) | $ (8.9) | $ (9.1) | $ (9.3) | $ (9.5) | $ (9.7) | $ (9.9) | $ (10.2) | (10.4) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

Ten-Year Financial Projections
City Council - general fund - Key assumptions

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 90 | 97 | 74 | 61 | 52 | 46 | 9 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 |
| Average salary & wages(1) | $ 64,504 $ | 61,899 $ | 71,166 $ | 67,902 $ | 66,094 | $ 63,205 $ | 68,378 $ | 71,500 $ | 72,930 $ | 74,389 $ | 75,876 $ | 77,394 $ | 78,942 $ | 80,521 $ | 82,131 $ | 83,774 |
| Average overtime | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | $ 64,504 $ | 61,899 $ | 71,166 $ | 67,902 $ | 66,094 | $ 63,205 $ | 68,378 $ | 71,500 $ | 72,930 $ | 74,389 $ | 75,876 $ | 77,394 $ | 78,942 $ | 80,521 $ | 82,131 $ | 83,774 |
| Overtime as a % of salary & wages | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Pension as a % of salary & wages | | | | | | 10.9% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| Medical & fringe as a % of salary & wages | 44.9% | 41.5% | 48.0% | 54.0% | 71.1% | 76.1% | 247.3% | 232.0% | 235.2% | 241.0% | 246.3% | 254.5% | 262.0% | 270.7% | 278.0% | 285.3% |

| Key Items | Comment/Reference |
|---|---|
| Expenses | |
| Personnel expenses | Appendix C.1 - Appendix C.3 |
| Professional and contractual services | Support staff personal service contracts and other City Council member's office expenses, media services, and board of review |
| Other expenses | Primarily rental expense |

Operational restructuring
  Additional Department employees          -       -       -       -       -       -       -       -       -       -       -

(1) Based on department salaries & wages and employees, see Appendix C.2.

**Ten-Year Financial Projections**
**Ombudsperson - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Revenue from use of assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | 0.0 | - | 0.0 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total revenues** | 0.0 | - | 0.0 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (0.7) | (0.8) | (0.8) | (0.6) | (0.6) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) |
| Overtime | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pension | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.3) | (0.4) | (0.4) | (0.5) | (0.5) | (0.6) | (0.6) | (0.6) | (0.7) | (0.7) |
| Medical & fringe benefits | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.4) | (0.4) | (0.5) | (0.5) | (0.5) | (0.5) | (0.6) | (0.6) | (0.6) | (0.6) |
| Professional and contractual services | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Materials & supplies | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Utilities | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Purchased services | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Risk management and insurance | - | - | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | (0.1) | (0.1) | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Debt service | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.2) | (0.2) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) |
| Transfers out | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (1.4) | (1.4) | (1.3) | (1.1) | (1.1) | (0.9) | (1.5) | (1.6) | (1.7) | (1.8) | (1.9) | (2.0) | (2.0) | (2.1) | (2.2) | (2.2) |
| **Total surplus (deficit)** | $ (1.4) | $ (1.4) | $ (1.3) | $ (1.1) | $ (1.1) | $ (0.9) | $ (1.5) | $ (1.6) | $ (1.7) | $ (1.8) | $ (1.9) | $ (2.0) | $ (2.0) | $ (2.1) | $ (2.2) | (2.2) |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| *Expenses* | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | - | (0.6) | (1.0) | (1.1) | (1.1) | (1.1) | (1.1) | (1.1) | (1.2) | (1.2) |
| Technology | | | | | | - | - | (3.0) | (0.5) | (0.5) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) | (0.6) |
| Capital expenditures and other infrastructure | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | - | (3.7) | (1.6) | (1.6) | (1.6) | (1.7) | (1.7) | (1.7) | (1.8) | (1.8) |
| **Operational restructuring** | | | | | | $ - | $ - | $ (3.7) | $ (1.6) | $ (1.6) | $ (1.6) | $ (1.7) | $ (1.7) | $ (1.7) | $ (1.8) | (1.8) |
| **Adjusted surplus (deficit)** | | | | | | $ (0.9) | $ (1.5) | $ (5.3) | $ (3.3) | $ (3.4) | $ (3.6) | $ (3.6) | $ (3.7) | $ (3.8) | $ (3.9) | (4.0) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

**Ten-Year Financial Projections**
**Ombudsperson - general fund - Key assumptions**

| | | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 10 | 11 | 11 | 7 | 7 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 |
| | | | | | | | | | | | | | | | | |
| Average salary & wages(1) | $ 73,193 | $ 75,227 | $ 69,371 | $ 82,534 | $ 79,133 | $ 72,256 | $ 81,064 | $ 82,685 | $ 84,339 | $ 86,025 | $ 87,746 | $ 89,501 | $ 91,291 | $ 93,117 | $ 94,979 | $ 96,879 |
| Average overtime | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | $ 73,193 | $ 75,227 | $ 69,371 | $ 82,534 | $ 79,133 | $ 72,256 | $ 81,064 | $ 82,685 | $ 84,339 | $ 86,025 | $ 87,746 | $ 89,501 | $ 91,291 | $ 93,117 | $ 94,979 | $ 96,879 |
| | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Overtime as a % of salary & wages | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Pension as a % of salary & wages | | | | | | 6.2% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| Medical & fringe as a % of salary & wages | 41.2% | 37.6% | 40.8% | 45.5% | 51.7% | 65.8% | 84.7% | 86.4% | 87.6% | 89.7% | 91.6% | 94.3% | 96.8% | 99.7% | 102.2% | 104.7% |

| Key Items | Comment/Reference |
|---|---|
| Expenses | |
| Personnel expenses | Appendix C.1 - Appendix C.3 |

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Operational restructuring | | | | | | | | | | | | | | | | |
| Additional Department employees | | | | | - | - | 13 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 |

(1) Based on department salaries & wages and employees, see Appendix C.2.

**Ten-Year Financial Projections**
**City Clerk - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Revenue from use of assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total revenues** | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (1.2) | (1.2) | (1.1) | (0.9) | (0.9) | (0.6) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) |
| Overtime | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Pension | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.4) | (0.5) | (0.6) | (0.7) | (0.7) | (0.8) | (0.8) | (0.9) | (0.9) | (0.9) |
| Medical & fringe benefits | (0.6) | (0.5) | (0.5) | (0.4) | (0.5) | (0.5) | (0.8) | (0.9) | (0.9) | (0.9) | (1.0) | (1.0) | (1.1) | (1.1) | (1.2) | (1.2) |
| Professional and contractual services | (0.0) | (0.0) | (0.0) | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.1) | (0.1) |
| Materials & supplies | (0.9) | (0.6) | (0.5) | (0.5) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) |
| Utilities | (0.0) | (0.1) | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Purchased services | (0.0) | (0.0) | (0.0) | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - |
| Risk management and insurance | - | 0.0 | (0.0) | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | (0.5) | (0.5) | (0.5) | (0.4) | (0.7) | (0.3) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.6) |
| Debt service | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) |
| Transfers out | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (3.6) | (3.1) | (2.9) | (2.6) | (2.7) | (2.2) | (3.2) | (3.3) | (3.5) | (3.6) | (3.8) | (3.9) | (4.0) | (4.1) | (4.2) | (4.3) |
| **Total surplus (deficit)** | $ (3.6) | $ (3.1) | $ (2.9) | $ (2.6) | $ (2.7) | $ (2.2) | $ (3.2) | $ (3.3) | $ (3.5) | $ (3.6) | $ (3.7) | $ (3.8) | $ (4.0) | $ (4.1) | $ (4.2) | (4.3) |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | - | - | - | - | - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| *Expenses* | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 |
| Technology | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Capital expenditures and other infrastructure | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 |
| **Operational restructuring** | | | | | | $ - | $ 0.1 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.3 | $ 0.3 | 0.3 |
| **Adjusted surplus (deficit)** | | | | | | $ (2.2) | $ (3.1) | $ (3.1) | $ (3.2) | $ (3.4) | $ (3.5) | $ (3.6) | $ (3.7) | $ (3.8) | $ (3.9) | (4.0) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

**Ten-Year Financial Projections**
**City Clerk - general fund - Key assumptions**

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 25 | 23 | 22 | 20 | 18 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 |
| | | | | | | | | | | | | | | | | |
| Average salary & wages(1) | $ 48,947 | $ 53,794 | $ 48,633 | $ 46,038 | $ 48,336 | $ 42,763 | $ 46,300 | $ 47,226 | $ 48,171 | $ 49,134 | $ 50,117 | $ 51,119 | $ 52,142 | $ 53,184 | $ 54,248 | 55,333 |
| Average overtime | 26 | 115 | 119 | 85 | 13 | 22 | 24 | 24 | 25 | 25 | 26 | 26 | 27 | 28 | 28 | 29 |
| | $ 48,973 | $ 53,909 | $ 48,752 | $ 46,123 | $ 48,349 | $ 42,785 | $ 46,324 | $ 47,251 | $ 48,196 | $ 49,160 | $ 50,143 | $ 51,146 | $ 52,169 | $ 53,212 | $ 54,276 | 55,362 |
| | | | | | | | | | | | | | | | | |
| Overtime as a % of salary & wages | 0.1% | 0.2% | 0.2% | 0.2% | 0.0% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% |
| | | | | | | | | | | | | | | | | |
| Pension as a % of salary & wages | | | | | | 13.2% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| | | | | | | | | | | | | | | | | |
| Medical & fringe as a % of salary & wage | 48.7% | 40.5% | 44.4% | 48.0% | 57.8% | 75.5% | 119.7% | 122.0% | 124.0% | 127.1% | 130.1% | 134.2% | 138.0% | 142.4% | 146.2% | 150.0% |

| Key Items | Comment/Reference |
|---|---|
| Expenses | |
| Personnel expenses | Appendix C.1 - Appendix C.3 |
| Materials & supplies | Printing supplies |
| Other expenses | Advertising and rental expenses |

**Operational restructuring**

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Additional Department employees | | | | | | - | (1) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) |

(1) Based on department salaries & wages and employees, see Appendix C.2.

**Ten-Year Financial Projections**
**Elections - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | 1.2 | 0.0 | 0.0 | 0.0 | 0.0 | 1.1 | - | - | - | - | - | - | - | - | - | - |
| Revenue from use of assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | 0.0 | 0.0 | - | - | - | 0.1 | - | - | - | - | - | - | - | - | - | - |
| **Total revenues** | 1.2 | 0.0 | 0.0 | 0.0 | 0.0 | 1.2 | - | - | - | - | - | - | - | - | - | - |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (2.7) | (3.4) | (2.4) | (2.1) | (2.0) | (1.9) | (2.2) | (1.7) | (1.7) | (1.8) | (1.8) | (1.9) | (1.9) | (1.9) | (2.0) | (2.0) |
| Overtime | (0.5) | (0.8) | (0.3) | (0.4) | (0.2) | (0.4) | (0.5) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) |
| Pension | 0.1 | 0.0 | 0.2 | 0.2 | 0.2 | (0.2) | (1.4) | (1.3) | (1.5) | (1.6) | (1.8) | (1.9) | (2.0) | (2.1) | (2.2) | (2.3) |
| Medical & fringe benefits | (1.4) | (1.5) | (1.3) | (1.3) | (1.2) | (1.4) | (2.0) | (1.8) | (1.9) | (2.0) | (2.1) | (2.2) | (2.3) | (2.4) | (2.6) | (2.7) |
| Professional and contractual services | (4.2) | (6.5) | (3.4) | (2.9) | (2.5) | (3.3) | (6.1) | (3.3) | (3.3) | (3.3) | (6.6) | (3.3) | (3.3) | (3.3) | (6.6) | (3.3) |
| Materials & supplies | (0.6) | (0.5) | (0.3) | (0.5) | (0.7) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) |
| Utilities | (0.3) | (0.4) | (0.4) | (0.2) | (0.3) | (0.1) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) |
| Purchased services | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Risk management and insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | (0.4) | (0.2) | (0.2) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Debt service | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (0.7) | (0.7) | (0.8) | (0.8) | (0.9) | (0.6) | (1.0) | (0.8) | (0.8) | (0.9) | (0.9) | (0.9) | (0.9) | (0.9) | (0.9) | (0.9) |
| Transfers out | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (10.8) | (14.1) | (8.7) | (8.0) | (7.6) | (8.5) | (14.2) | (10.0) | (10.3) | (10.7) | (14.3) | (11.3) | (11.5) | (11.8) | (15.3) | (12.3) |
| **Total surplus (deficit)** | $ (9.7) | $ (14.0) | $ (8.7) | $ (8.0) | (7.6) | $ (7.3) | $ (14.2) | $ (10.0) | $ (10.3) | $ (10.7) | $ (14.3) | $ (11.3) | $ (11.5) | $ (11.8) | $ (15.3) | (12.3) |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| *Expenses* | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Technology | | | | | | - | (0.0) | - | - | - | - | - | - | - | - | - |
| Capital expenditures and other infrastructure | | | | | | - | (0.6) | (0.6) | - | - | - | - | (0.5) | (0.5) | (0.5) | (0.5) |
| Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | (0.6) | (0.6) | 0.0 | 0.0 | 0.0 | 0.0 | (0.5) | (0.5) | (0.5) | (0.5) |
| **Operational restructuring** | | | | | | $ - | $ (0.6) | $ (0.6) | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ (0.5) | $ (0.5) | $ (0.5) | (0.5) |
| **Adjusted surplus (deficit)** | | | | | | $ (7.3) | $ (14.7) | $ (10.6) | $ (10.3) | $ (10.6) | $ (14.3) | $ (11.2) | $ (12.0) | $ (12.2) | $ (15.8) | (12.8) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

**Ten-Year Financial Projections**
**Elections - general fund - Key assumptions**

| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
| Department employees (baseline) | 68 | 102 | 55 | 51 | 83 | 80 | 80 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 |
| Average salary & wages(1) | $ 39,379 | $ 33,805 | $ 44,289 | $ 40,872 | $ 23,655 | $ 24,311 | $ 27,971 | $ 28,530 | $ 29,101 | $ 29,683 | $ 30,277 | $ 30,882 | $ 31,500 | $ 32,130 | $ 32,772 | 33,428 |
| Average overtime | 8,088 | 7,564 | 5,040 | 7,017 | 2,514 | 5,046 | 6,259 | 3,032 | 3,093 | 3,155 | 3,218 | 3,282 | 3,348 | 3,415 | 3,483 | 3,553 |
| | $ 47,467 | $ 41,369 | $ 49,329 | $ 47,890 | $ 26,169 | $ 29,357 | $ 34,230 | $ 31,562 | $ 32,194 | $ 32,838 | $ 33,494 | $ 34,164 | $ 34,847 | $ 35,544 | $ 36,255 | 36,980 |
| Overtime as a % of salary & wages | 20.5% | 22.4% | 11.4% | 17.2% | 10.6% | 20.8% | 22.4% | 10.6% | 10.6% | 10.6% | 10.6% | 10.6% | 10.6% | 10.6% | 10.6% | 10.6% |
| Pension as a % of salary & wages | | | | | | 9.1% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| Medical & fringe as a % of salary & wages | 53.5% | 43.5% | 52.9% | 62.6% | 62.0% | 73.3% | 90.9% | 107.1% | 109.2% | 112.3% | 115.3% | 118.9% | 122.4% | 126.2% | 129.7% | 133.3% |

| Key Items | Comment/Reference |
|---|---|
| General | Due to the FY 2014 election year, overtime and professional and contractual services are temporarily increased |
| Expenses | |
|   Personnel expenses | Appendix C.1 - Appendix C.3 |
|   Professional and contractual services | Administration of conducting elections and information technology contracts |
|   Materials & supplies | Primarily postage |
|   Utilities | Steam, telecommunications, and electricity |

**Operational restructuring**

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Additional Department employees | | | | | | - | - | - | - | - | - | - | - | - | - | - |

(1) Based on department salaries & wages & employees, see Appendix C.2.

**Ten-Year Financial Projections**
**36th District Court - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | 0.8 | 0.2 | 0.7 | 0.1 | 0.4 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 |
| Sales and charges for services | 11.2 | 11.1 | 9.2 | 10.1 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 |
| Revenue from sale of assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | 7.5 | 7.4 | 6.7 | 6.8 | 6.2 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total revenues** | 19.6 | 18.7 | 16.6 | 17.1 | 16.6 | 17.6 | 17.6 | 17.6 | 17.6 | 17.6 | 17.6 | 17.6 | 17.6 | 17.6 | 17.6 | 17.6 |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (20.9) | (21.3) | (21.0) | (19.7) | (18.7) | (18.6) | (18.6) | (18.9) | (19.3) | (19.7) | (20.1) | (20.5) | (20.9) | (21.3) | (21.8) | (22.2) |
| Overtime | (0.2) | (0.3) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) |
| Pension | (4.1) | (4.3) | (4.7) | (4.7) | (5.1) | (5.0) | (5.0) | (5.0) | (5.0) | (5.0) | (5.0) | (5.0) | (5.0) | (5.0) | (5.0) | (5.0) |
| Medical & fringe benefits | (7.4) | (6.9) | (7.6) | (7.9) | (7.3) | (6.3) | (6.6) | (6.9) | (7.3) | (7.7) | (8.1) | (8.5) | (8.9) | (9.4) | (9.8) | (10.3) |
| Professional and contractual services | (2.3) | (2.2) | (2.2) | (2.3) | (2.2) | (2.1) | (2.1) | (2.1) | (2.1) | (2.2) | (2.2) | (2.2) | (2.2) | (2.3) | (2.3) | (2.3) |
| Materials & supplies | (1.0) | (1.0) | (0.9) | (0.8) | (0.5) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.9) | (0.9) | (0.9) | (0.9) | (0.9) |
| Utilities | (0.8) | (0.6) | (0.6) | (0.5) | (0.6) | (0.4) | (0.4) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) |
| Purchased services | (5.0) | (4.1) | (3.8) | (3.9) | (3.0) | (0.4) | (3.0) | (3.0) | (3.0) | (3.1) | (3.1) | (3.1) | (3.2) | (3.2) | (3.2) | (3.2) |
| Risk management and insurance | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Other expenses | (4.1) | (4.9) | (4.1) | (3.1) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) |
| Debt service | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Transfers out | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (45.8) | (45.6) | (45.0) | (43.2) | (37.7) | (34.1) | (36.9) | (37.7) | (38.5) | (39.3) | (40.2) | (41.1) | (42.0) | (42.9) | (43.9) | (44.9) |
| **Total surplus (deficit)** | $ (26.3) | $ (26.8) | $ (28.4) | $ (26.2) | (21.2) | $ (16.5) | $ (19.3) | $ (20.1) | $ (20.9) | $ (21.8) | $ (22.7) | $ (23.5) | $ (24.4) | $ (25.3) | $ (26.3) | (27.3) |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | 5.8 | 8.2 | 8.5 | 8.7 | 9.0 | 9.2 | 9.5 | 9.8 | 10.1 |
| *Expenses* | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | 0.7 | 2.5 | 3.1 | 3.1 | 3.2 | 3.3 | 3.4 | 3.4 | 3.5 | 3.6 |
| Technology | | | | | | - | - | (1.6) | (0.8) | (0.4) | (0.4) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) |
| Capital expenditures and other infrastructure | | | | | | - | - | (1.0) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) |
| Implementation costs | | | | | | - | - | (1.0) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) |
| Subtotal: Expenses | | | | | | - | 0.7 | (1.2) | 1.4 | 1.9 | 2.0 | 2.3 | 2.3 | 2.4 | 2.5 | 2.6 |
| **Operational restructuring** | | | | | | $ - | 0.7 | 4.7 | 9.6 | 10.4 | 10.7 | 11.2 | 11.6 | 11.9 | 12.3 | 12.7 |
| **Adjusted surplus (deficit)** | | | | | | $ (16.5) | (18.6) | (15.4) | (11.2) | (11.4) | (12.0) | (12.3) | (12.8) | (13.4) | (14.0) | (14.6) |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

**Ten-Year Financial Projections**
**36th District Court - general fund - Key assumptions**

| | | | Fiscal year ended actual | | | | | | | | Preliminary forecast | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 285 | 285 | 285 | 285 | 365 | 362 | 362 | 362 | 362 | 362 | 362 | 362 | 362 | 362 | 362 | 362 |
| | | | | | | | | | | | | | | | | |
| Average salary & wages(1) | $ 73,310 | $ 74,878 | $ 73,616 | $ 69,189 | $ 51,102 | $ 51,391 | $ 51,391 | $ 52,419 | $ 53,467 | $ 54,537 | $ 55,627 | $ 56,740 | $ 57,875 | $ 59,032 | $ 60,213 | 61,417 |
| Average overtime | 756 | 1,012 | 786 | 739 | 458 | 420 | 420 | 428 | 437 | 446 | 454 | 464 | 473 | 482 | 492 | 502 |
| | $ 74,067 | $ 75,891 | $ 74,403 | $ 69,928 | $ 51,559 | $ 51,811 | $ 51,811 | $ 52,847 | $ 53,904 | $ 54,982 | $ 56,082 | $ 57,203 | $ 58,347 | $ 59,514 | $ 60,705 | 61,919 |
| | | | | | | | | | | | | | | | | |
| Overtime as a % of salary & wages | 1.0% | 1.4% | 1.1% | 1.1% | 0.9% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% |
| Pension as a % of salary & wages | | | | | | 26.7% | 26.7% | 26.1% | 25.6% | 25.1% | 24.6% | 24.2% | 23.7% | 23.2% | 22.8% | 22.3% |
| Medical & fringe as a % of salary & wage | 35.4% | 32.1% | 36.1% | 39.9% | 39.0% | 33.9% | 35.4% | 36.5% | 37.7% | 39.0% | 40.4% | 41.5% | 42.7% | 43.9% | 45.1% | 46.4% |

**Key Items**      **Comment/Reference**

Revenues
- State revenue sharing — State transferred court fines
- Sales and charges for services — Court fees, including traffic, civil, real estate, and general administrative fees
- Parking/court fines and other revenue — Court fines

Expenses
- Personnel expenses — Appendix C.1 - Appendix C.3
- Professional and contractual services — Legal and other contracts (court administration)
- Materials & supplies — Repairs & maintenance, postage, and office supplies
- Utilities — Electricity and telecommunications
- Purchased services — Court security expense

**Operational restructuring**

| Additional Department employees | - | (41) | (56) | (66) | (66) | (66) | (66) | (66) | (66) | (66) | (66) |
|---|---|---|---|---|---|---|---|---|---|---|---|

(1) Based on department salaries & wages and employees, see Appendix C.2.

**Ten-Year Financial Projections**
**Non-Departmental - general fund**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ 155.2 | $ 163.7 | $ 143.0 | $ 182.7 | 147.8 | $ 133.6 | $ 114.9 | $ 104.2 | $ 100.1 | $ 97.2 | $ 97.1 | $ 95.2 | $ 89.6 | $ 89.5 | $ 90.1 | 90.7 |
| Municipal income tax | 276.5 | 240.8 | 216.5 | 228.3 | 233.0 | 248.0 | 246.4 | 250.4 | 252.1 | 253.8 | 255.5 | 257.1 | 258.7 | 260.9 | 264.1 | 267.3 |
| Wagering taxes | 180.4 | 173.0 | 183.3 | 176.9 | 181.4 | 174.6 | 169.9 | 168.2 | 169.9 | 171.6 | 173.3 | 175.0 | 176.8 | 178.5 | 180.3 | 182.1 |
| Utility users' and other taxes | 21.3 | 21.6 | 20.6 | 20.2 | 17.3 | 11.9 | 9.6 | 9.6 | 9.6 | 9.6 | 9.6 | 9.6 | 9.6 | 9.6 | 9.6 | 9.6 |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | 248.8 | 266.4 | 263.0 | 239.2 | 172.9 | 183.1 | 190.2 | 192.0 | 193.8 | 195.4 | 197.1 | 198.9 | 200.7 | 194.2 | 195.9 | 197.7 |
| Sales and charges for services | 62.5 | 61.6 | 50.7 | 64.9 | 56.4 | 54.7 | 51.8 | 51.7 | 52.2 | 52.7 | 53.2 | 53.7 | 54.2 | 54.8 | 55.3 | 55.9 |
| Revenue from use of assets | 12.9 | 3.7 | 1.3 | 1.6 | 1.0 | 0.4 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| Parking/court fines and other revenue | 26.9 | 26.0 | 24.8 | 37.2 | 6.8 | 3.8 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 |
| DDOT risk mgmt reimbursement | 10.8 | 12.9 | 10.0 | 12.1 | 12.1 | 1.6 | 9.9 | 12.1 | 12.1 | 12.1 | 12.1 | 12.1 | 12.1 | 12.1 | 12.1 | 12.1 |
| Reimb. from parking & vehicle fund | 61.6 | 78.8 | 66.7 | 50.1 | 62.3 | 74.0 | 11.9 | 25.4 | 25.5 | 5.1 | 5.1 | 5.1 | 5.1 | 5.1 | 5.1 | 5.1 |
| Street fund reimb. and financing proceeds | 73.6 | 4.7 | 264.1 | 6.0 | 4.3 | 147.7 | 4.2 | 4.2 | 4.2 | 4.2 | 4.2 | 4.2 | 4.2 | 4.2 | 4.2 | 4.2 |
| Grant revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total revenues** | 1,130.4 | 1,053.2 | 1,244.1 | 1,019.1 | 895.3 | 1,033.4 | 811.8 | 820.9 | 822.4 | 804.6 | 810.2 | 813.9 | 814.0 | 812.0 | 819.7 | 827.6 |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (2.3) | (3.9) | (5.6) | 4.7 | (6.7) | (0.9) | (0.9) | (0.7) | (0.7) | (0.7) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) |
| Overtime | (0.2) | (0.2) | 0.0 | - | (0.0) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Pension | (1.0) | (3.5) | 4.4 | (1.9) | (0.6) | 2.3 | (0.5) | (0.5) | (0.6) | (0.7) | (0.8) | (0.8) | (0.8) | (0.9) | (0.9) | (0.9) |
| Medical & fringe benefits | (7.1) | (19.6) | (15.4) | (9.5) | (1.1) | (8.1) | (0.4) | (0.3) | (0.3) | (0.3) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) |
| Professional and contractual services | (12.3) | (9.9) | (2.2) | (2.0) | (3.3) | (13.4) | (3.3) | (3.3) | (3.4) | (3.4) | (3.4) | (3.5) | (3.5) | (3.6) | (3.6) | (3.6) |
| Materials & supplies | (0.5) | (0.4) | (0.3) | (0.3) | (0.4) | (1.8) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) |
| Utilities | (0.3) | (0.0) | (0.2) | (0.0) | (0.1) | 0.0 | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Purchased services | (0.4) | (0.9) | (0.1) | (0.7) | 0.0 | (0.4) | (0.4) | (5.4) | (4.7) | (4.7) | (4.7) | (4.7) | (4.7) | (4.7) | (4.7) | (4.7) |
| Risk management and insurance | (112.4) | (96.2) | (100.4) | (104.0) | (75.2) | (104.0) | (35.2) | (43.2) | (43.6) | (44.0) | (44.5) | (44.9) | (45.4) | (45.8) | (46.3) | (46.7) |
| Other expenses | (48.7) | (32.4) | (32.5) | 19.8 | (9.1) | (21.9) | (10.8) | (10.8) | (10.8) | (10.8) | (10.9) | (10.9) | (10.9) | (10.9) | (11.0) | (11.0) |
| Debt service | (0.7) | (2.7) | (9.9) | (2.5) | (1.3) | (2.3) | (78.1) | (62.1) | (62.1) | (38.9) | (38.8) | (38.8) | (38.9) | (39.3) | (37.6) | (37.5) |
| Contributions to non-enterprise funds | (108.9) | (44.0) | (23.5) | (17.8) | (12.8) | (18.1) | (10.7) | (29.1) | (29.1) | (8.8) | (8.8) | (8.8) | (8.8) | (8.8) | (8.8) | (8.8) |
| POC - principal and interest1 | (5.2) | (2.0) | (2.2) | (7.1) | (2.6) | (4.9) | (0.4) | (0.3) | (0.3) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) |
| Transfers out | (112.5) | (179.0) | (136.5) | (138.0) | (156.5) | (115.7) | (85.5) | (86.0) | (93.4) | (100.2) | (107.4) | (112.4) | (117.8) | (123.3) | (128.9) | (134.2) |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (412.5) | (394.7) | (324.3) | (259.4) | (269.7) | (289.1) | (226.6) | (242.2) | (249.7) | (213.4) | (221.2) | (226.8) | (232.9) | (239.3) | (243.8) | (249.7) |
| **Total surplus (deficit)** | $ 717.8 | $ 658.5 | $ 919.9 | $ 759.8 | 625.7 | $ 744.3 | $ 585.2 | $ 578.6 | $ 572.8 | $ 591.2 | $ 589.0 | $ 587.1 | $ 581.1 | $ 572.7 | $ 575.9 | 577.9 |
| | | | | | | | | | | | | | | | | |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ 3.1 | $ 7.9 | $ 7.9 | $ 7.7 | $ 5.2 | $ 5.2 | $ 5.2 | $ 5.2 | $ 5.2 | 5.2 |
| Expenses | | | | | | | | | | | | | | | | |
|   Additional operating expenditures | | | | | | - | - | - | - | - | - | - | - | - | - | - |
|   Technology | | | | | | - | - | - | - | - | - | - | - | - | - | - |
|   Capital expenditures and other infrastructure | | | | | | - | - | - | - | - | - | - | - | - | - | - |
|   Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
|   Subtotal: Expenses | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| **Operational restructuring** | | | | | | $ - | $ 3.1 | $ 7.9 | $ 7.9 | $ 7.7 | $ 5.2 | $ 5.2 | $ 5.2 | $ 5.2 | $ 5.2 | 5.2 |
| **Adjusted surplus (deficit)** | | | | | | $ 744.3 | $ 588.3 | $ 586.6 | $ 580.7 | $ 598.9 | $ 594.2 | $ 592.3 | $ 586.4 | $ 577.9 | $ 581.1 | 583.1 |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

**Ten-Year Financial Projections**
**Non-Departmental - general fund - Key assumptions**

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 44 | 33 | 21 | 20 | 14 | 21 | 21 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 |
| Average salary & wages(1) | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| Average overtime | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| Overtime as a % of salary & wages | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| Pension as a % of salary & wages | | | | | | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| Medical & fringe as a % of salary & wages | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |

| Key Items | Comment/Reference |
|---|---|
| Revenues | |
| Property taxes | Appendix B.1a |
| Municipal income tax | Appendix B.2 |
| Wagering taxes | Appendix B.3 |
| Utility users' and other taxes | Reimbursements, including cable franchise fees and interest/penalties on taxes |
| State revenue sharing | Appendix B.4; State shared taxes and liquor & beer license fees |
| Sales and charges for services | Primarily interagency billings and Casino municipal services fee |
| Parking/court fines and other revenue | Other revenue / Misc. receipts |
| Reimb. from parking & vehicle fund | Reimbursements from Parking Department & Vehicle Fund for amounts paid on their behalf |
| Expenses | |
| Personnel expenses | Appendix C.1 - Appendix C.3 |
| Materials & supplies | Primarily dues and memberships |
| Purchased services | One-time implementation and recurring payroll administration outsourcing costs reflected beginning Q3 FY 2015. Full year recurring costs reflected beginning FY 2016 |
| Risk management and insurance | General Fund risk management and insurance payments. Historical data captures double count, which gets eliminated by CAFR adjustments |
| Other expenses | Primarily development authority, construction and capital improvement costs (DDA & LDFA) funded by grants and special tax revenues |
| Debt service | General Fund debt service payments |
| Contributions to non-enterprise funds | Primarily contributions to Municipal Parking, Vehicle Fund, and the museum of African American History |
| Transfers out | Historical data represents debt service, which gets reallocated by CAFR adjustments |

**Operational restructuring**

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Additional Department employees | - | - | - | - | - | - | - | - | - | - | - | - |

(1) Based on department salaries & wages and employees, see Appendix C.2.

**Ten-Year Financial Projections**
**BSED - general fund**
*($ in millions)*

|  | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | (0.0) | - | - | 1.9 | 1.8 | 1.9 | 1.9 | 2.0 | 2.0 | 2.0 | 2.1 | 2.1 | 2.2 | 2.2 | 2.2 | 2.3 |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | - | - | - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Revenue from use of assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | - | 3.9 | - | - | 0.2 | 1.0 | - | - | - | - | - | - | - | - | - | - |
| **Total revenues** | (0.0) | 3.9 | - | 2.0 | 1.9 | 2.8 | 1.9 | 2.0 | 2.0 | 2.1 | 2.1 | 2.1 | 2.2 | 2.2 | 2.3 | 2.3 |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | - | - | - | (0.5) | (0.5) | (0.4) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.6) |
| Overtime | - | - | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Pension | 0.1 | 0.1 | 0.1 | (0.1) | (0.0) | (0.0) | (0.3) | (0.4) | (0.4) | (0.5) | (0.5) | (0.5) | (0.6) | (0.6) | (0.6) | (0.6) |
| Medical & fringe benefits | - | - | - | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.4) | (0.4) | (0.4) | (0.4) |
| Professional and contractual services | - | (3.4) | 0.9 | (0.7) | (0.4) | (0.6) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Materials & supplies | - | - | 0.0 | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - |
| Utilities | - | - | - | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - |
| Purchased services | - | - | - | (0.0) | - | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Risk management and insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | 0.0 | - | - | (0.0) | 0.0 | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Debt service | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest1 | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) |
| Transfers out | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | 0.0 | (3.4) | 0.9 | (1.7) | (1.4) | (1.6) | (1.4) | (1.5) | (1.6) | (1.7) | (1.7) | (1.8) | (1.8) | (1.9) | (2.0) | (2.0) |
| **Total surplus (deficit)** | $ (0.0) | $ 0.6 | $ 0.9 | $ 0.2 | 0.6 | $ 1.2 | $ 0.5 | $ 0.5 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | 0.3 |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | 0.2 |
| _Expenses_ | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | (0.6) | (2.1) | 2.6 | 3.4 | 3.0 | 3.8 | 3.9 | 3.5 | 4.0 | 4.1 |
| Technology | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Capital expenditures and other infrastructure | | | | | | - | - | (0.4) | - | - | - | - | - | - | - | - |
| Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | (0.6) | (2.4) | 2.6 | 3.4 | 3.0 | 3.8 | 3.9 | 3.5 | 4.0 | 4.1 |
| **Operational restructuring** | | | | | | $ - | $ (0.4) | $ (2.3) | 2.7 | 3.5 | 3.2 | 4.0 | 4.1 | 3.7 | 4.2 | 4.2 |
| **Adjusted surplus (deficit)** | | | | | | $ 1.2 | $ 0.1 | $ (1.8) | 3.2 | 3.9 | 3.5 | 4.4 | 4.4 | 4.0 | 4.5 | 4.5 |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

**Ten-Year Financial Projections**
**BSED - general fund - Key assumptions**

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | - | - | - | 6 | 7 | 6 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 |
| Average salary & wages(1) | n/a | n/a | n/a $ | 83,261 $ | 72,376 | $ 67,350 $ | 67,006 $ | 68,346 $ | 69,713 $ | 71,107 $ | 72,529 $ | 73,980 $ | 75,459 $ | 76,968 $ | 78,508 $ | 80,078 |
| Average overtime | n/a | n/a | n/a | 4,143 | 1,797 | 2,426 | 2,414 | 2,462 | 2,511 | 2,561 | 2,612 | 2,665 | 2,718 | 2,772 | 2,828 | 2,884 |
| | $ - $ | - $ | - $ | 87,404 $ | 74,174 | $ 69,776 $ | 69,419 $ | 70,808 $ | 72,224 $ | 73,668 $ | 75,142 $ | 76,644 $ | 78,177 $ | 79,741 $ | 81,336 $ | 82,962 |
| Overtime as a % of salary & wages | n/a | n/a | n/a | 5.0% | 2.5% | 3.6% | 3.6% | 3.6% | 3.6% | 3.6% | 3.6% | 3.6% | 3.6% | 3.6% | 3.6% | 3.6% |
| Pension as a % of salary & wages | | | | | | 10.1% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| Medical & fringe as a % of salary & wages | n/a | n/a | n/a | 56.4% | 61.1% | 72.8% | 57.8% | 58.1% | 59.3% | 60.9% | 62.6% | 64.5% | 66.3% | 68.3% | 70.2% | 72.1% |

| Key Items | Comment/Reference |
|---|---|
| Revenues | |
| Licenses, permits and inspection charges | Business license fees |
| Expenses | |
| Personnel expenses | Appendix C.1 - Appendix C.3 |
| Professional and contractual services | Demolition administration and business license center |

| Operational restructuring | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Additional Department employees | | | | | | - | 2 | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) |

(1) Based on department salaries & wages & employees, see Appendix C.2.

**Ten-Year Financial Projections**
**Parking - general fund**
*($ in millions)*

| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
| **Revenues** | | | | | | | | | | | | | | | | |
| Property taxes | $ - | $ - | $ - | $ - | - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Municipal income tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wagering taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility users' and other taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Licenses, permits and inspection charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State revenue sharing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales and charges for services | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Revenue from use of assets | (0.0) | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parking/court fines and other revenue | 10.4 | 12.5 | 9.8 | 10.5 | 9.0 | 11.4 | 11.4 | 11.4 | 11.4 | 11.4 | 11.4 | 11.4 | 11.4 | 11.4 | 11.4 | 11.4 |
| DDOT risk mgmt reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimb. from parking & vehicle fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Street fund reimb. and financing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total revenues** | 10.4 | 12.5 | 9.8 | 10.5 | 9.0 | 11.4 | 11.4 | 11.4 | 11.4 | 11.4 | 11.4 | 11.4 | 11.4 | 11.4 | 11.4 | 11.4 |
| **Expenditures** | | | | | | | | | | | | | | | | |
| Salaries and wages | (1.9) | (1.9) | (1.8) | (1.6) | (1.6) | (1.4) | (1.6) | (1.6) | (1.6) | (1.7) | (1.7) | (1.7) | (1.8) | (1.8) | (1.8) | (1.9) |
| Overtime | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Pension | 0.0 | 0.0 | 0.0 | (0.0) | (0.1) | (0.2) | (1.0) | (1.2) | (1.4) | (1.5) | (1.7) | (1.8) | (1.9) | (1.9) | (2.0) | (2.1) |
| Medical & fringe benefits | (1.0) | (1.0) | (1.0) | (1.0) | (1.1) | (1.2) | (1.1) | (1.1) | (1.2) | (1.2) | (1.3) | (1.3) | (1.4) | (1.5) | (1.6) | (1.6) |
| Professional and contractual services | (4.7) | (2.7) | (3.2) | (3.3) | (1.9) | (2.6) | (2.6) | (2.6) | (2.6) | (2.6) | (2.7) | (2.7) | (2.7) | (2.8) | (2.8) | (2.8) |
| Materials & supplies | (0.0) | (0.1) | (0.0) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Utilities | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Purchased services | (0.3) | 0.0 | (0.9) | (0.5) | (0.2) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Risk management and insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other expenses | (0.0) | (0.3) | (0.2) | (0.3) | (0.2) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) |
| Debt service | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| POC - principal and interest (1) | (0.4) | (0.4) | (0.4) | (0.5) | (0.5) | (0.5) | (0.7) | (0.7) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) |
| Transfers out | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Grant expenses (before reallocation) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total expenditures** | (8.6) | (6.4) | (7.8) | (7.3) | (5.7) | (6.4) | (7.4) | (7.7) | (8.1) | (8.4) | (8.7) | (8.9) | (9.1) | (9.3) | (9.6) | (9.8) |
| **Total surplus (deficit)** | $ 1.8 | $ 6.0 | $ 2.0 | $ 3.2 | 3.3 | $ 5.0 | $ 4.0 | $ 3.7 | $ 3.4 | $ 3.1 | $ 2.8 | $ 2.6 | $ 2.3 | $ 2.1 | $ 1.9 | 1.7 |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ - | 5.6 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 | 6.8 |
| *Expenses* | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | (0.1) | (0.5) | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Technology | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Capital expenditures and other infrastructure | | | | | | - | (0.5) | (0.6) | (0.2) | (0.2) | (0.2) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) |
| Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | (0.6) | (1.1) | (0.3) | (0.2) | (0.3) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) |
| **Operational restructuring** | | | | | | $ - | $ (0.6) | 4.5 | 6.6 | 6.6 | 6.6 | 6.5 | 6.5 | 6.5 | 6.5 | 6.5 |
| **Adjusted surplus (deficit)** | | | | | | $ 5.0 | $ 3.4 | 8.2 | 9.9 | 9.7 | 9.3 | 9.0 | 8.8 | 8.6 | 8.3 | 8.1 |

(1) Historical POC payments have been split out from total pension expense based on forecasted POC allocation.

**Ten-Year Financial Projections**
**Parking - general fund - Key assumptions**

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Department employees (baseline) | 109 | 104 | 97 | 92 | 97 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 |
| Average salary & wages (1) | $ 35,423 | $ 36,835 | $ 37,362 | $ 34,955 | $ 30,576 | $ 30,621 | $ 33,594 | $ 34,266 | $ 34,952 | $ 35,651 | $ 36,364 | $ 37,091 | $ 37,833 | $ 38,589 | $ 39,361 | $ 40,149 |
| Average overtime | 171 | 51 | 25 | 102 | 19 | 46 | 50 | 51 | 52 | 53 | 54 | 55 | 56 | 57 | 59 | 60 |
| | $ 35,594 | $ 36,886 | $ 37,387 | $ 35,057 | $ 30,594 | $ 30,667 | $ 33,644 | $ 34,317 | $ 35,004 | $ 35,704 | $ 36,418 | $ 37,146 | $ 37,889 | $ 38,647 | $ 39,420 | $ 40,208 |
| Overtime as a % of salary & wages | 1.0% | 0.3% | 0.1% | 0.6% | 0.1% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% |
| Pension as a % of salary & wages | | | | | | 11.6% | 62.9% | 73.8% | 83.8% | 91.8% | 100.3% | 103.1% | 106.2% | 108.8% | 111.7% | 113.6% |
| Medical & fringe as a % of salary & wages | 53.2% | 49.5% | 53.3% | 60.1% | 68.8% | 84.9% | 70.5% | 70.6% | 72.1% | 74.0% | 76.1% | 78.3% | 80.5% | 82.8% | 85.0% | 87.3% |

| Key Items | Comment/Reference |
|---|---|
| Revenues | |
|    Parking/court fines and other revenue | Parking fines |
| Expenses | |
|    Personnel expenses | Appendix C.1 - Appendix C.3 |
|    Professional and contractual services | Parking violations bureau contract services |
|    Other expenses | Development costs |

| | | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operational restructuring** | | | | | | | | | | | | |
|    Additional Department employees | | - | 1 | 7 | (6) | (6) | (6) | (6) | (6) | (6) | (6) | (6) |

(1) Based on department salaries & wages and employees, see Appendix C.2.

**Ten-Year Financial Projections**
**Department of Transportation**
*($ in millions)*

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenues** | | | | | | | | | | | | | | | | |
| Fare box revenue | 28.0 | 27.3 | 25.0 | 26.2 | 21.7 | 21.3 | 21.3 | 21.3 | 21.3 | 21.3 | 21.3 | 21.3 | 21.3 | 21.3 | 21.3 | 21.3 |
| State operating assistance (State Act 51) | 55.1 | 51.6 | 53.0 | 53.8 | 47.6 | 47.4 | 46.4 | 46.4 | 46.4 | 46.4 | 46.4 | 46.4 | 46.4 | 46.4 | 46.4 | 46.4 |
| Grant revenue (1) | 50.8 | 54.4 | 63.6 | 47.8 | 60.0 | 34.4 | 13.3 | 22.9 | 22.9 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 |
| Subsidy from General Fund | 104.1 | 79.3 | 80.0 | 77.0 | 90.6 | 47.2 | 85.5 | 86.0 | 93.4 | 100.2 | 107.4 | 112.4 | 117.8 | 123.3 | 128.9 | 134.2 |
| Other revenue | 6.7 | 5.0 | 5.5 | 6.7 | 3.0 | (2.8) | 4.7 | 4.7 | 4.7 | 4.7 | 4.7 | 4.7 | 4.7 | 4.7 | 4.7 | 4.7 |
| **Total revenues** | 244.7 | 217.6 | 227.1 | 211.5 | 222.9 | 147.6 | 171.2 | 181.4 | 188.8 | 192.6 | 199.8 | 204.9 | 210.3 | 215.7 | 221.3 | 226.7 |
| | | | | | | | | | | | | | | | | |
| **Expenses** | | | | | | | | | | | | | | | | |
| Salaries and wages | (47.4) | (48.4) | (45.1) | (40.8) | (36.8) | (30.3) | (30.1) | (32.9) | (34.1) | (34.8) | (35.5) | (36.2) | (36.9) | (37.6) | (38.4) | (39.2) |
| Overtime | (20.4) | (22.1) | (21.2) | (19.7) | (14.4) | (13.0) | (12.0) | (13.2) | (13.6) | (13.9) | (14.2) | (14.5) | (14.8) | (15.1) | (15.4) | (15.7) |
| Pension | (6.8) | (7.3) | (6.9) | (9.5) | (10.9) | (2.8) | (23.6) | (27.7) | (31.2) | (34.8) | (38.7) | (40.6) | (42.7) | (44.5) | (46.6) | (48.3) |
| Benefits (2) | (45.8) | (52.6) | (47.9) | (47.2) | (41.4) | (46.3) | (43.0) | (43.7) | (45.2) | (46.6) | (48.2) | (49.9) | (51.6) | (53.5) | (55.4) | (57.4) |
| Professional and contractual services | (22.1) | (14.1) | (13.7) | (14.9) | (28.5) | (13.5) | (15.5) | (15.7) | (15.8) | (16.0) | (16.1) | (16.3) | (16.5) | (16.6) | (16.8) | (17.0) |
| Materials & supplies | (34.7) | (26.5) | (22.5) | (24.9) | (23.9) | (21.6) | (21.6) | (21.9) | (22.1) | (22.3) | (22.5) | (22.7) | (23.0) | (23.2) | (23.4) | (23.7) |
| Utilities | (4.0) | (4.3) | (3.7) | (4.4) | (3.5) | (2.8) | (3.5) | (4.0) | (4.1) | (4.1) | (4.2) | (4.2) | (4.3) | (4.3) | (4.4) | (4.5) |
| Purchased services | (5.5) | (8.8) | (9.5) | (16.7) | (6.9) | (10.1) | (10.1) | (10.2) | (10.2) | (10.2) | (10.2) | (10.2) | (10.2) | (10.2) | (10.2) | (10.2) |
| Risk management and insurance | (11.1) | (10.9) | (18.7) | (19.2) | (12.5) | (0.4) | (10.3) | (12.6) | (12.7) | (12.8) | (13.0) | (13.1) | (13.2) | (13.4) | (13.5) | (13.6) |
| Other expenses | (23.0) | (21.2) | (17.3) | (17.2) | (22.9) | (20.0) | (0.9) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) |
| Debt service | - | - | - | - | - | (7.1) | - | - | - | - | - | - | - | - | - | - |
| Contributions to non-enterprise funds | (6.2) | (6.2) | (6.2) | (4.4) | (3.4) | - | (4.0) | (4.0) | (4.0) | (4.0) | (4.0) | (4.0) | (4.0) | (4.0) | (4.0) | (4.0) |
| POC - principal and interest (3) | (4.5) | (4.7) | (5.0) | (5.5) | (5.9) | (6.2) | (6.6) | (6.8) | (6.9) | (7.1) | (7.3) | (7.1) | (7.2) | (7.2) | (7.2) | (7.2) |
| Transfer - debt service | | | | | (7.5) | (1.6) | (4.9) | (2.9) | (2.9) | | | | | | | |
| **Total expenditures** | (231.7) | (227.2) | (217.8) | (224.2) | (218.4) | (175.7) | (186.2) | (196.4) | (203.8) | (207.6) | (214.8) | (219.9) | (225.3) | (230.7) | (236.3) | (241.7) |
| | | | | | | | | | | | | | | | | |
| **Total surplus (deficit)** | $ 13.0 | $ (9.6) | $ 9.3 | $ (12.7) | $ 4.5 | $ (28.1) | $ (15.0) | $ (15.0) | $ (15.0) | $ (15.0) | $ (15.0) | $ (15.0) | $ (15.0) | $ (15.0) | $ (15.0) | $ (15.0) |
| | | | | | | | | | | | | | | | | |
| **Operational restructuring** | | | | | | | | | | | | | | | | |
| Department revenue initiatives | | | | | | $ - | $ (1.7) | $ (5.7) | $ (1.5) | $ (0.1) | $ 4.6 | $ 6.3 | $ 10.4 | $ 10.0 | $ 14.1 | $ 15.0 |
| *Expenses* | | | | | | | | | | | | | | | | |
| Additional operating expenditures | | | | | | - | (1.4) | (3.4) | 0.8 | (2.2) | (3.5) | (4.1) | (4.1) | (4.7) | (5.2) | (6.1) |
| Technology | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Capital expenditures and other infrastructure | | | | | | - | (1.6) | (2.0) | (2.3) | (2.5) | (1.0) | (1.0) | - | - | - | - |
| Implementation costs | | | | | | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal: Expenses | | | | | | - | (3.0) | (5.4) | (1.4) | (4.7) | (4.5) | (5.1) | (4.1) | (4.7) | (5.2) | (6.1) |
| | | | | | | | | | | | | | | | | |
| **Operational restructuring** | | | | | | $ - | $ (4.7) | $ (11.1) | $ (2.9) | $ (4.8) | $ 0.1 | $ 1.2 | $ 6.3 | $ 5.3 | $ 8.9 | $ 8.9 |
| | | | | | | | | | | | | | | | | |
| **Adjusted surplus (deficit)** | | | | | | $ (28.1) | $ (19.7) | $ (26.1) | $ (17.9) | $ (19.8) | $ (14.9) | $ (13.8) | $ (8.7) | $ (9.7) | $ (6.1) | $ (6.1) |

(1) Forecast excludes capital grants and related expenses.
(2) Includes ~$15m non-cash OPEB expense which is the difference between the annual required contribution (per actuarial analysis) and actual payments made for retiree benefits.
(3) Historical POC payments have been split out from debt service based on forecasted POC allocation.

**Appendix B**
Key revenue drivers

**Ten-Year Financial Projections**
**Property tax revenue - without reinvestment**
($ in millions)

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Change in assessed values** | | | | | | | | | | | | | | | | |
| Real Property | n/a | 1.9% | -4.4% | -5.7% | -5.0% | -5.4% | -7.9% | -9.4% | -4.4% | -3.4% | -3.0% | -2.4% | -12.7% | -0.1% | 0.7% | 0.7% |
| Personal Property | n/a | -1.9% | -0.6% | -6.2% | -13.9% | -5.4% | 8.1% | -2.1% | -1.4% | -0.7% | -0.2% | -0.1% | 0.3% | 0.3% | 0.4% | 0.4% |
| Renaissance Zone | n/a | 3.5% | 23.9% | -20.3% | 70.6% | 26.2% | 44.0% | 1.0% | 1.0% | 1.0% | -2.5% | 1.5% | 2.0% | 2.0% | 2.0% | 2.0% |
| **Values** | | | | | | | | | | | | | | | | |
| Real Property | $ 8,149.5 | $ 8,302.7 | $ 7,937.2 | $ 7,483.9 | $ 7,112.6 | $ 6,729.4 | $ 6,200.3 | $ 5,619.5 | $ 5,369.7 | $ 5,186.9 | $ 5,029.1 | $ 4,910.4 | $ 4,287.3 | $ 4,282.7 | $ 4,312.8 | $ 4,343.1 |
| Personal Property | 1,469.0 | 1,440.6 | 1,431.9 | 1,343.6 | 1,157.5 | 1,095.2 | 1,183.7 | 1,158.3 | 1,142.4 | 1,134.5 | 1,131.8 | 1,130.4 | 1,133.3 | 1,136.3 | 1,140.6 | 1,145.0 |
| Total Valuation (for Non-Departmental & Library) | $ 9,618.5 | $ 9,743.3 | $ 9,369.1 | $ 8,827.5 | $ 8,270.2 | $ 7,824.6 | $ 7,384.0 | $ 6,777.9 | $ 6,512.1 | $ 6,321.4 | $ 6,160.9 | $ 6,040.8 | $ 5,420.6 | $ 5,419.0 | $ 5,453.4 | $ 5,488.1 |
| Renaissance Zone | 278.2 | 287.9 | 356.8 | 284.4 | 485.2 | 612.5 | 882.0 | 890.8 | 899.7 | 908.7 | 885.6 | 898.9 | 916.9 | 935.2 | 953.9 | 973.0 |
| Total Valuation (for Debt Service) | $ 9,896.7 | $ 10,031.3 | $ 9,725.9 | $ 9,111.9 | $ 8,755.4 | $ 8,437.1 | $ 8,266.0 | $ 7,668.6 | $ 7,411.8 | $ 7,230.1 | $ 7,046.5 | $ 6,939.7 | $ 6,337.5 | $ 6,354.2 | $ 6,407.3 | $ 6,461.1 |
| *Millage* | | | | | | | | | | | | | | | | |
| *Non-Departmental (General City)* | *19.952* | *19.952* | *19.952* | *19.952* | *19.952* | *19.952* | *19.952* | *19.952* | *19.952* | *19.952* | *19.952* | *19.952* | *19.952* | *19.952* | *19.952* | *19.952* |
| *Debt Service* | *8.068* | *7.478* | *7.477* | *8.916* | *9.556* | *9.614* | *9.813* | *10.465* | *9.977* | *10.223* | *10.030* | *9.744* | *10.030* | *9.865* | *7.008* | *6.249* |
| *Library* | *4.631* | *4.631* | *4.631* | *4.631* | *4.631* | *4.631* | *4.631* | *4.631* | *4.631* | *4.631* | *4.631* | *4.631* | *4.631* | *4.631* | *4.631* | *4.631* |
| **Tax Levy** | | | | | | | | | | | | | | | | |
| Non-Departmental (General City) | $ 191.9 | $ 194.4 | $ 186.9 | $ 176.1 | 165.0 | 156.1 | 147.3 | 135.2 | 129.9 | 126.1 | 122.9 | 120.5 | 108.2 | 108.1 | 108.8 | 109.5 |
| Debt Service | 79.8 | 75.0 | 72.7 | 81.2 | 83.7 | 81.1 | 81.1 | 80.3 | 73.9 | 73.9 | 70.7 | 67.6 | 63.6 | 62.7 | 44.9 | 40.4 |
| Library | 44.5 | 45.1 | 43.4 | 40.9 | 38.3 | 36.2 | 34.2 | 31.4 | 30.2 | 29.3 | 28.5 | 28.0 | 25.1 | 25.1 | 25.3 | 25.4 |
| **Levy adjustments** | | | | | | | | | | | | | | | | |
| Non-Departmental (General City) | $ (4.5) | $ (4.5) | $ (6.0) | $ (2.9) | $ (4.3) | $ - | $ - | (1.6) | (1.6) | (1.5) | (1.5) | (1.5) | (1.5) | (1.5) | (1.5) | (1.6) |
| Debt Service | (0.3) | (2.3) | (1.1) | (1.5) | (1.5) | - | - | - | - | - | - | - | - | - | - | - |
| Library | (0.4) | (0.4) | (0.8) | (1.0) | (1.0) | - | - | - | - | - | - | - | - | - | - | - |
| **Adjusted tax levy** | | | | | | | | | | | | | | | | |
| Non-Departmental (General City) | $ 187.4 | $ 189.9 | $ 180.9 | $ 173.2 | 160.7 | 156.1 | 147.3 | 133.6 | 128.4 | 124.6 | 121.4 | 119.0 | 106.6 | 106.6 | 107.3 | 107.9 |
| Debt Service | 79.5 | 72.7 | 71.7 | 79.7 | 82.2 | 81.1 | 81.1 | 80.3 | 73.9 | 73.9 | 70.7 | 67.6 | 63.6 | 62.7 | 44.9 | 40.4 |
| Library | 44.2 | 44.8 | 42.6 | 39.9 | 37.3 | 36.2 | 34.2 | 31.4 | 30.2 | 29.3 | 28.5 | 28.0 | 25.1 | 25.1 | 25.3 | 25.4 |
| Total | $ 311.1 | $ 307.4 | $ 295.1 | $ 292.8 | $ 280.1 | $ 273.5 | $ 262.6 | $ 245.3 | $ 232.5 | $ 227.8 | $ 220.6 | $ 214.6 | $ 195.3 | $ 194.4 | $ 177.4 | $ 173.7 |
| *Collection rate* | | | | | | | | | | | | | | | | |
| *Non-Departmental (General City)* | *82.8%* | *86.2%* | *79.1%* | *78.8%* | *77.6%* | *85.6%* | *78.0%* | *78.0%* | *78.0%* | *78.0%* | *80.0%* | *80.0%* | *84.0%* | *84.0%* | *84.0%* | *84.0%* |
| *Debt Service* | *88.9%* | *92.4%* | *82.1%* | *87.0%* | *84.1%* | *87.0%* | *82.0%* | *78.0%* | *78.0%* | *78.0%* | *80.0%* | *80.0%* | *84.0%* | *84.0%* | *84.0%* | *84.0%* |
| *Library* | *96.1%* | *78.9%* | *84.4%* | *84.5%* | *84.0%* | *84.2%* | *82.0%* | *82.0%* | *82.0%* | *84.0%* | *85.0%* | *85.0%* | *85.0%* | *85.0%* | *85.0%* | *85.0%* |
| **City collections** | | | | | | | | | | | | | | | | |
| Non-Departmental (General City) [A] | $ 155.2 | $ 163.7 | $ 143.0 | $ 136.5 | 124.7 | 133.6 | 114.9 | 104.2 | 100.1 | 97.2 | 97.1 | 95.2 | 89.6 | 89.5 | 90.1 | 90.7 |
| Debt Service | 70.7 | 67.2 | 58.8 | 69.5 | 69.1 | 70.6 | 66.5 | 62.6 | 57.7 | 57.6 | 56.5 | 54.1 | 53.4 | 52.7 | 37.7 | 33.9 |
| Library | 42.5 | 35.3 | 35.9 | 33.7 | 31.3 | 30.5 | 28.0 | 25.7 | 24.7 | 24.6 | 24.2 | 23.8 | 21.3 | 21.3 | 21.5 | 21.6 |
| Total | $ 268.3 | $ 266.2 | $ 237.8 | $ 239.6 | $ 225.2 | $ 234.7 | $ 209.5 | $ 192.6 | $ 182.5 | $ 179.4 | $ 177.9 | $ 173.1 | $ 164.3 | $ 163.5 | $ 149.3 | $ 146.2 |
| **Non-Departmental adjustments [B]** | | | | | | | | | | | | | | | | |
| Prior Year delinquent collections | - | - | - | 5.8 | 5.7 | - | - | - | - | - | - | - | - | - | - | - |
| Chargeback Liability Reduction | - | - | - | 26.9 | 5.7 | - | - | - | - | - | - | - | - | - | - | - |
| DDA/LDFA Capture - Part of special act millage | - | - | - | 9.1 | 7.3 | - | - | - | - | - | - | - | - | - | - | - |
| Other adjustments | - | - | - | 4.4 | 4.3 | - | - | - | - | - | - | - | - | - | - | - |
| **General fund collections [A]+[B]** | $ 155.2 | $ 163.7 | $ 143.0 | $ 182.7 | $ 147.8 | $ 133.6 | $ 114.9 | $ 104.2 | $ 100.1 | $ 97.2 | $ 97.1 | $ 95.2 | $ 89.6 | $ 89.5 | $ 90.1 | $ 90.7 |

**Ten-Year Financial Projections**
**Property tax revenue - with reinvestment**
($ in millions)

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Change in assessed values** | | | | | | | | | | | | | | | | |
| Real Property | n/a | 1.9% | -4.4% | -5.7% | -5.0% | -5.4% | -7.9% | -9.3% | -3.3% | -2.0% | -0.1% | 1.1% | -7.1% | 2.8% | 3.5% | 3.5% |
| Personal Property | n/a | -1.9% | -0.6% | -6.2% | -13.9% | -5.4% | 8.1% | -1.2% | -0.3% | 1.0% | 1.0% | 1.7% | 1.8% | 2.0% | 2.2% | 2.2% |
| Renaissance Zone | n/a | 3.5% | 23.9% | -20.3% | 70.6% | 26.2% | 48.1% | 1.0% | 1.0% | 1.0% | 0.1% | 1.5% | 2.0% | 2.0% | 2.0% | 2.0% |
| **Values** | | | | | | | | | | | | | | | | |
| Real Property | $ 8,149.5 | $ 8,302.7 | $ 7,937.2 | $ 7,483.9 | $ 7,112.6 | $ 6,729.4 | $ 6,200.3 | $ 5,624.2 | $ 5,439.7 | $ 5,330.9 | $ 5,327.9 | $ 5,388.2 | $ 5,004.6 | $ 5,145.5 | $ 5,327.4 | $ 5,515.8 |
| Personal Property | 1,469.0 | 1,440.6 | 1,431.9 | 1,343.6 | 1,157.5 | 1,095.2 | 1,183.7 | 1,169.4 | 1,165.6 | 1,177.2 | 1,189.0 | 1,209.8 | 1,230.9 | 1,255.2 | 1,282.8 | 1,311.0 |
| Total Valuation (for Non-Departmental & Library) | $ 9,618.5 | $ 9,743.3 | $ 9,369.1 | $ 8,827.5 | $ 8,270.2 | $ 7,824.6 | $ 7,384.0 | $ 6,793.6 | $ 6,605.2 | $ 6,508.1 | $ 6,516.9 | $ 6,597.9 | $ 6,235.5 | $ 6,400.7 | $ 6,610.1 | $ 6,826.8 |
| Renaissance Zone | 278.2 | 287.9 | 356.8 | 284.4 | 485.2 | 612.5 | 907.0 | 916.1 | 925.3 | 934.5 | 935.8 | 949.8 | 968.8 | 988.2 | 1,007.9 | 1,028.1 |
| Total Valuation (for Debt Service) | $ 9,896.7 | $ 10,031.3 | $ 9,725.9 | $ 9,111.9 | $ 8,755.4 | $ 8,437.1 | $ 8,291.0 | $ 7,709.7 | $ 7,530.5 | $ 7,442.6 | $ 7,452.6 | $ 7,547.7 | $ 7,204.3 | $ 7,388.9 | $ 7,618.1 | $ 7,854.9 |
| *Millage* | | | | | | | | | | | | | | | | |
| *Non-Departmental (General City)* | *19.952* | *19.952* | *19.952* | *19.952* | *19.952* | *19.952* | *19.952* | *19.952* | *19.952* | *19.952* | *19.952* | *19.952* | *19.952* | *19.952* | *19.952* | *19.952* |
| *Debt Service* | *8.068* | *7.478* | *7.477* | *8.916* | *9.556* | *9.614* | *9.783* | *10.410* | *9.340* | *9.446* | *9.252* | *8.741* | *8.519* | *8.191* | *5.691* | *4.963* |
| *Library* | *4.631* | *4.631* | *4.631* | *4.631* | *4.631* | *4.631* | *4.631* | *4.631* | *4.631* | *4.631* | *4.631* | *4.631* | *4.631* | *4.631* | *4.631* | *4.631* |
| **Tax Levy** | | | | | | | | | | | | | | | | |
| Non-Departmental (General City) | $ 191.9 | $ 194.4 | $ 186.9 | $ 176.1 | $ 165.0 | $ 156.1 | $ 147.3 | $ 135.5 | $ 131.8 | $ 129.8 | $ 130.0 | $ 131.6 | $ 124.4 | $ 127.7 | $ 131.9 | $ 136.2 |
| Debt Service | 79.8 | 75.0 | 72.7 | 81.2 | 83.7 | 81.1 | 81.1 | 80.3 | 70.3 | 70.3 | 69.0 | 66.0 | 61.4 | 60.5 | 43.4 | 39.0 |
| Library | 44.5 | 45.1 | 43.4 | 40.9 | 38.3 | 36.2 | 34.2 | 31.5 | 30.6 | 30.1 | 30.2 | 30.6 | 28.9 | 29.6 | 30.6 | 31.6 |
| **Levy adjustments** | | | | | | | | | | | | | | | | |
| Non-Departmental (General City) | $ (4.5) | $ (4.5) | $ (6.0) | $ (2.9) | $ (4.3) | $ - | $ - | $ (1.6) | $ (1.6) | $ (1.6) | $ (1.6) | $ (1.7) | $ (1.7) | $ (1.7) | $ (1.8) | $ (1.8) |
| Debt Service | (0.3) | (2.3) | (1.1) | (1.5) | (1.5) | - | - | - | - | - | - | - | - | - | - | - |
| Library | (0.4) | (0.4) | (0.8) | (1.0) | (1.0) | - | - | - | - | - | - | - | - | - | - | - |
| **Adjusted tax levy** | | | | | | | | | | | | | | | | |
| Non-Departmental (General City) | $ 187.4 | $ 189.9 | $ 180.9 | $ 173.2 | $ 160.7 | $ 156.1 | $ 147.3 | $ 133.9 | $ 130.2 | $ 128.2 | $ 128.4 | $ 130.0 | $ 122.7 | $ 126.0 | $ 130.1 | $ 134.4 |
| Debt Service | 79.5 | 72.7 | 71.7 | 79.7 | 82.2 | 81.1 | 81.1 | 80.3 | 70.3 | 70.3 | 69.0 | 66.0 | 61.4 | 60.5 | 43.4 | 39.0 |
| Library | 44.2 | 44.8 | 42.6 | 39.9 | 37.3 | 36.2 | 34.2 | 31.5 | 30.6 | 30.1 | 30.2 | 30.6 | 28.9 | 29.6 | 30.6 | 31.6 |
| Total | $ 311.1 | $ 307.4 | $ 295.1 | $ 292.8 | $ 280.1 | $ 273.5 | $ 262.6 | $ 245.6 | $ 231.1 | $ 228.7 | $ 227.5 | $ 226.5 | $ 213.0 | $ 216.2 | $ 204.1 | $ 205.0 |
| *Collection rate* | | | | | | | | | | | | | | | | |
| *Non-Departmental (General City)* | *82.8%* | *86.2%* | *79.1%* | *78.8%* | *77.6%* | *85.6%* | *78.0%* | *78.0%* | *82.0%* | *82.0%* | *82.0%* | *82.0%* | *87.0%* | *87.0%* | *87.0%* | *87.0%* |
| *Debt Service* | *88.9%* | *92.4%* | *82.1%* | *76.9%* | *80.3%* | *87.0%* | *82.0%* | *78.0%* | *82.0%* | *82.0%* | *82.0%* | *82.0%* | *87.0%* | *87.0%* | *87.0%* | *87.0%* |
| *Library* | *92.6%* | *91.4%* | *92.7%* | *85.7%* | *86.7%* | *84.2%* | *82.0%* | *82.0%* | *82.0%* | *84.0%* | *85.0%* | *85.0%* | *85.0%* | *85.0%* | *85.0%* | *85.0%* |
| **City collections** | | | | | | | | | | | | | | | | |
| Non-Departmental (General City) [A] | $ 155.2 | $ 163.7 | $ 143.0 | $ 136.5 | $ 124.7 | $ 133.6 | $ 114.9 | $ 104.5 | $ 106.8 | $ 105.2 | $ 105.3 | $ 106.6 | $ 106.8 | $ 109.6 | $ 113.2 | 116.9 |
| Debt Service | 70.7 | 67.2 | 58.8 | 61.3 | 66.0 | 70.6 | 66.5 | 62.6 | 57.7 | 57.6 | 56.5 | 54.1 | 53.4 | 52.7 | 37.7 | 33.9 |
| Library | 40.9 | 40.9 | 39.5 | 34.2 | 32.4 | 30.5 | 28.0 | 25.8 | 25.1 | 25.3 | 25.7 | 26.0 | 24.5 | 25.2 | 26.0 | 26.9 |
| Total | $ 266.8 | $ 271.7 | $ 241.3 | $ 232.0 | $ 223.0 | $ 234.7 | $ 209.5 | $ 192.9 | $ 189.5 | $ 188.1 | $ 187.5 | $ 186.7 | $ 184.7 | $ 187.5 | $ 176.9 | 177.7 |
| **Non-Departmental adjustments [B]** | | | | | | | | | | | | | | | | |
| Prior Year delinquent collections | - | - | - | 5.8 | 5.7 | - | - | - | - | - | - | - | - | - | - | - |
| Chargeback Liability Reduction | - | - | - | 26.9 | 5.7 | - | - | - | - | - | - | - | - | - | - | - |
| DDA/LDFA Capture - Part of special act millage | - | - | - | 9.1 | 7.3 | - | - | - | - | - | - | - | - | - | - | - |
| Other adjustments | - | - | - | 4.4 | 4.3 | - | - | - | - | - | - | - | - | - | - | - |
| **GF collections - restructuring [A]+[B]** | $ 155.2 | $ 163.7 | $ 143.0 | $ 182.7 | $ 147.8 | $ 133.6 | $ 114.9 | $ 104.5 | $ 106.8 | $ 105.2 | $ 105.3 | $ 106.6 | $ 106.8 | $ 109.6 | $ 113.2 | 116.9 |
| GF collections - without reinvestment | | | | | | | 114.9 | 104.2 | 100.1 | 97.2 | 97.1 | 95.2 | 89.6 | 89.5 | 90.1 | 90.7 |
| Increased collections | | | | | | | $ - | $ 0.2 | $ 6.6 | $ 8.0 | $ 8.2 | $ 11.4 | $ 17.2 | $ 20.1 | $ 23.1 | $ 26.3 |

**Ten-Year Financial Projections**
**Income tax revenue - without reinvestment**
($ in millions)

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Municipal Income Taxes Calculation** | | | | | | | | | | | | | | | | |
| **City Residents (A)** | | | | | | | | | | | | | | | | |
| Taxable income growth | | | | | | 2.8% | 1.9% | 1.5% | 0.5% | 0.5% | 0.5% | 0.5% | 0.7% | 0.7% | 1.0% | 1.0% |
| Taxable income | $ 7,142.5 | $ 6,207.7 | $ 5,581.3 | $ 5,838.5 | $ 6,003.4 | $ 6,174.3 | $ 6,294.0 | $ 6,385.5 | $ 6,414.7 | $ 6,444.0 | $ 6,473.5 | $ 6,503.3 | $ 6,545.8 | $ 6,588.6 | $ 6,654.5 | $ 6,721.1 |
| Income tax rate | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% |
| Total City Resident income taxes | 178.6 | 155.2 | 139.5 | 146.0 | 150.1 | 148.2 | 151.1 | 153.3 | 154.0 | 154.7 | 155.4 | 156.1 | 157.1 | 158.1 | 159.7 | 161.3 |
| *growth rate* | | *-15.1%* | *-11.2%* | *4.4%* | *2.7%* | *-1.3%* | *1.9%* | *1.4%* | *0.5%* | *0.5%* | *0.5%* | *0.5%* | *0.6%* | *0.6%* | *1.0%* | *1.0%* |
| **Non-Residents (B)** | | | | | | | | | | | | | | | | |
| Taxable income growth | | | | | | 2.6% | 2.2% | 1.7% | 0.7% | 0.7% | 0.7% | 0.7% | 0.5% | 1.2% | 1.7% | 1.7% |
| Taxable income | 6,848.7 | 5,952.3 | 5,351.6 | 5,598.2 | 5,784.5 | 5,932.5 | 6,065.0 | 6,168.1 | 6,211.2 | 6,254.4 | 6,297.9 | 6,341.7 | 6,373.4 | 6,449.4 | 6,558.5 | 6,669.3 |
| Income tax rate | 1.3% | 1.3% | 1.3% | 1.3% | 1.3% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% |
| Total Non-Resident income taxes | 85.6 | 74.4 | 66.9 | 70.0 | 72.3 | 71.2 | 72.8 | 74.0 | 74.5 | 75.1 | 75.6 | 76.1 | 76.5 | 77.4 | 78.7 | 80.0 |
| *growth rate* | | *-15.1%* | *-11.2%* | *4.4%* | *3.2%* | *-1.6%* | *2.2%* | *1.7%* | *0.7%* | *0.7%* | *0.7%* | *0.7%* | *0.5%* | *1.2%* | *1.7%* | *1.7%* |
| **Corporations (C)** | | | | | | | | | | | | | | | | |
| Net tax collection growth | | | | | | | 2.3% | 2.5% | 2.0% | 2.0% | 2.0% | 2.0% | 1.5% | 1.0% | 1.0% | 1.0% |
| Taxable income (implied) | 1,238.7 | 907.7 | 1,033.4 | 1,043.7 | 1,064.6 | 1,102.5 | 1,128.3 | 1,156.5 | 1,179.6 | 1,203.2 | 1,227.3 | 1,245.7 | 1,258.2 | 1,270.7 | 1,283.5 | 1,296.3 |
| Corporate tax rate | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% |
| Net tax collections | 12.4 | 9.1 | 10.3 | 10.4 | 10.6 | 22.1 | 22.6 | 23.1 | 23.6 | 24.1 | 24.5 | 24.9 | 25.2 | 25.4 | 25.7 | 25.9 |
| *growth rate* | | *-36.5%* | *12.2%* | *1.0%* | *2.0%* | *51.7%* | *2.3%* | *2.4%* | *2.0%* | *2.0%* | *2.0%* | *1.5%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* |
| **Total Municipal income taxes (D) = (A+B+C)** | | | | | | | | | | | | | | | | |
| Taxable income | 15,229.9 | 13,067.7 | 11,966.3 | 12,480.4 | 12,852.4 | 13,209.2 | 13,487.3 | 13,710.2 | 13,805.5 | 13,901.7 | 13,998.8 | 14,090.7 | 14,177.4 | 14,308.8 | 14,496.4 | 14,686.7 |
| Calculated tax rate | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% |
| Total Municipal income taxes | 276.6 | 238.7 | 216.8 | 226.4 | 233.0 | 241.4 | 246.4 | 250.4 | 252.1 | 253.8 | 255.5 | 257.1 | 258.7 | 260.9 | 264.1 | 267.3 |
| **Adjustment Municipal income taxes** | | | | | | | | | | | | | | | | |
| Adjustment for actuals | (0.1) | 2.2 | (0.2) | 1.9 | 0.0 | 6.6 | - | - | - | - | - | - | - | - | - | - |
| Total Adjusted Municipal income taxes | $ 276.5 | $ 240.8 | $ 216.5 | $ 228.3 | $ 233.0 | $ 248.0 | $ 246.4 | $ 250.4 | $ 252.1 | $ 253.8 | $ 255.5 | $ 257.1 | $ 258.7 | $ 260.9 | $ 264.1 | $ 267.3 |

**Ten-Year Financial Projections**
**Income tax revenue - with reinvestment**
($ in millions)

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Municipal Income Taxes Calculation** | | | | | | | | | | | | | | | | |
| **City Residents (A)** | | | | | | | | | | | | | | | | |
| Taxable income growth | | | | | | 2.8% | 2.6% | 3.2% | 2.3% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% |
| Taxable income | $ 7,142.5 | $ 6,207.7 | $ 5,581.3 | $ 5,838.5 | $ 6,003.4 | $ 6,174.3 | $ 6,332.7 | $ 6,533.4 | $ 6,680.7 | $ 6,827.2 | $ 6,974.0 | $ 7,124.5 | $ 7,279.5 | $ 7,437.9 | $ 7,599.7 | $ 7,765.0 |
| Income tax rate | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% |
| Total City Resident income taxes | 178.6 | 155.2 | 139.5 | 146.0 | 150.1 | 148.2 | 152.0 | 156.8 | 160.3 | 163.9 | 167.4 | 171.0 | 174.7 | 178.5 | 182.4 | 186.4 |
| *growth rate* | | *-15.1%* | *-11.2%* | *4.4%* | *2.7%* | *-1.3%* | *2.5%* | *3.1%* | *2.2%* | *2.1%* | *2.1%* | *2.1%* | *2.1%* | *2.1%* | *2.1%* | *2.1%* |
| **Non-Residents (B)** | | | | | | | | | | | | | | | | |
| Taxable income growth | | | | | | 2.6% | 2.9% | 3.3% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% |
| Taxable income | 6,848.7 | 5,952.3 | 5,351.6 | 5,598.2 | 5,784.5 | 5,932.5 | 6,105.4 | 6,306.5 | 6,444.0 | 6,584.5 | 6,728.0 | 6,874.7 | 7,024.6 | 7,177.7 | 7,334.2 | 7,494.1 |
| Income tax rate | 1.3% | 1.3% | 1.3% | 1.3% | 1.3% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% |
| Total Non-Resident income taxes | 85.6 | 74.4 | 66.9 | 70.0 | 72.3 | 71.2 | 73.3 | 75.7 | 77.3 | 79.0 | 80.7 | 82.5 | 84.3 | 86.1 | 88.0 | 89.9 |
| *growth rate* | | *-15.1%* | *-11.2%* | *4.4%* | *3.2%* | *-1.6%* | *2.8%* | *3.2%* | *2.1%* | *2.1%* | *2.1%* | *2.1%* | *2.1%* | *2.1%* | *2.1%* | *2.1%* |
| **Corporations (C)** | | | | | | | | | | | | | | | | |
| Net tax collection growth | | | | | | 2.8% | 4.7% | 4.0% | 3.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% |
| Taxable income (implied) | 1,238.7 | 907.7 | 1,033.4 | 1,043.7 | 1,064.6 | 1,102.5 | 1,133.4 | 1,186.6 | 1,234.1 | 1,271.1 | 1,296.5 | 1,322.5 | 1,348.9 | 1,375.9 | 1,403.4 | 1,431.5 |
| Corporate tax rate | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% |
| Net tax collections | 12.4 | 9.1 | 10.3 | 10.4 | 10.6 | 22.1 | 22.7 | 23.7 | 24.7 | 25.4 | 25.9 | 26.4 | 27.0 | 27.5 | 28.1 | 28.6 |
| *growth rate* | | *-36.5%* | *12.2%* | *1.0%* | *2.0%* | *51.7%* | *2.7%* | *4.5%* | *3.8%* | *2.9%* | *2.0%* | *2.0%* | *2.0%* | *2.0%* | *2.0%* | *2.0%* |
| **Total Municipal income taxes (D) = (A+B+C)** | | | | | | | | | | | | | | | | |
| Taxable income | 15,229.9 | 13,067.7 | 11,966.3 | 12,480.4 | 12,852.4 | 13,209.2 | 13,571.4 | 14,026.5 | 14,358.7 | 14,682.8 | 14,998.6 | 15,321.7 | 15,653.0 | 15,991.5 | 16,337.3 | 16,690.6 |
| Calculated tax rate | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% |
| Total Municipal income taxes | 276.6 | 238.7 | 216.8 | 226.4 | 233.0 | 241.4 | 247.9 | 256.2 | 262.3 | 268.3 | 274.0 | 279.9 | 286.0 | 292.2 | 298.5 | 304.9 |
| **Adjustment Municipal income taxes** | | | | | | | | | | | | | | | | |
| Adjustment for actuals | (0.6) | 0.0 | (0.0) | 0.0 | 0.0 | 6.6 | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| **Income tax revenue - restructuring** | $ 276.0 | $ 238.7 | $ 216.8 | $ 226.4 | $ 233.0 | $ 248.0 | $ 247.9 | $ 256.2 | $ 262.3 | $ 268.3 | $ 274.0 | $ 279.9 | $ 286.0 | $ 292.2 | $ 298.5 | $ 304.9 |
| Income tax revenue - without reinvestment | | | | | | | 246.4 | 250.4 | 252.1 | 253.8 | 255.5 | 257.1 | 258.7 | 260.9 | 264.1 | 267.3 |
| Increased income tax revenues | | | | | | | $ 1.5 | $ 5.8 | $ 10.3 | $ 14.5 | $ 18.6 | $ 22.8 | $ 27.2 | $ 31.2 | $ 34.4 | 37.7 |

**Ten-Year Financial Projections**
**Wagering tax revenue**
($ in millions)

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Wagering Taxes Drivers** | | | | | | | | | | | | | | | | |
| % Change in Gross Receipts | | | | | | -4.0% | -2.5% | -1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% |
| **Adjusted Gross Receipts** | | | | | | | | | | | | | | | | |
| MGM | | | | | $ 608.4 | $ 580.2 | $ 565.4 | $ 559.7 | $ 565.3 | $ 571.0 | $ 576.7 | $ 582.5 | $ 588.3 | $ 594.2 | $ 600.1 | $ 606.1 |
| Motorcity | | | | | 468.7 | 457.3 | 445.6 | 441.2 | 445.6 | 450.0 | 454.5 | 459.1 | 463.7 | 468.3 | 473.0 | 477.7 |
| Greektown | | | | | 358.0 | 340.3 | 331.6 | 328.3 | 331.6 | 334.9 | 338.2 | 341.6 | 345.0 | 348.5 | 352.0 | 355.5 |
| **Wagering Taxes Calculation** | | | | | | | | | | | | | | | | |
| **Adjusted Gross Receipts (A)** | | | | | | | | | | | | | | | | |
| MGM | $ 560.2 | $ 564.8 | $ 562.1 | $ 589.6 | $ 608.4 | $ 580.2 | $ 565.4 | $ 559.7 | $ 565.3 | $ 571.0 | $ 576.7 | $ 582.5 | $ 588.3 | $ 594.2 | $ 600.1 | $ 606.1 |
| Motorcity | 478.9 | 459.6 | 437.4 | 460.1 | 468.7 | 457.3 | 445.6 | 441.2 | 445.6 | 450.0 | 454.5 | 459.1 | 463.7 | 468.3 | 473.0 | 477.7 |
| Greektown | 331.2 | 319.0 | 356.6 | 350.0 | 358.0 | 340.3 | 331.6 | 328.3 | 331.6 | 334.9 | 338.2 | 341.6 | 345.0 | 348.5 | 352.0 | 355.5 |
| **Wagering Tax Rate (B)** | 11.4% | 11.2% | 11.1% | 10.9% | 10.9% | 10.9% | 10.9% | 10.9% | 10.9% | 10.9% | 10.9% | 10.9% | 10.9% | 10.9% | 10.9% | 10.9% |
| **Additional Payment (per 2006 operating agreement) (C)** | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% |
| **Subtotal Wagering Tax (D) = (A)*(B+C)** | | | | | | | | | | | | | | | | |
| MGM | | 67.9 | 67.2 | 66.9 | 70.2 | 72.4 | 69.0 | 67.3 | 66.6 | 67.3 | 67.9 | 68.6 | 69.3 | 70.0 | 70.7 | 71.4 | 72.1 |
| Motorcity | | 59.4 | 54.7 | 52.1 | 54.8 | 55.8 | 54.4 | 53.0 | 52.5 | 53.0 | 53.6 | 54.1 | 54.6 | 55.2 | 55.7 | 56.3 | 56.8 |
| Greektown | | 42.5 | 41.2 | 44.5 | 41.7 | 42.6 | 40.5 | 39.5 | 39.1 | 39.5 | 39.9 | 40.3 | 40.7 | 41.1 | 41.5 | 41.9 | 42.3 |
| **Revenue Target Supplemental Wagering Tax (E)** | | | | | | | | | | | | | | | | |
| MGM | | 5.6 | 5.7 | 5.6 | 5.9 | 6.1 | 5.8 | 5.7 | 5.6 | 5.7 | 5.7 | 5.8 | 5.8 | 5.9 | 6.0 | 6.0 | 6.1 |
| Motorcity | | 4.8 | 4.6 | 4.4 | 4.6 | 4.7 | 4.6 | 4.5 | 4.4 | 4.5 | 4.5 | 4.6 | 4.6 | 4.6 | 4.7 | 4.7 | 4.8 |
| Greektown | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Wagering Tax (F) = (D+E)** | | | | | | | | | | | | | | | | |
| MGM | | 73.5 | 72.9 | 72.5 | 76.1 | 78.5 | 74.9 | 72.9 | 72.2 | 72.9 | 73.7 | 74.4 | 75.1 | 75.9 | 76.7 | 77.4 | 78.2 |
| Motorcity | | 64.2 | 59.3 | 56.4 | 59.4 | 60.5 | 59.0 | 57.5 | 56.9 | 57.5 | 58.1 | 58.6 | 59.2 | 59.8 | 60.4 | 61.0 | 61.6 |
| Greektown | | 42.5 | 41.2 | 44.5 | 41.7 | 42.6 | 40.5 | 39.5 | 39.1 | 39.5 | 39.9 | 40.3 | 40.7 | 41.1 | 41.5 | 41.9 | 42.3 |
| Total Wagering Tax | | 180.1 | 173.3 | 173.4 | 177.1 | 181.6 | 174.3 | 169.9 | 168.2 | 169.9 | 171.6 | 173.3 | 175.0 | 176.8 | 178.5 | 180.3 | 182.1 |
| **Adjustment Wagering Taxes** | | | | | | | | | | | | | | | | |
| Adjustment for Actuals | | 0.3 | (0.3) | 9.9 | (0.2) | (0.1) | 0.3 | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total Adjusted Wagering Taxes | | $180.4 | $173.0 | $183.3 | $176.9 | $181.4 | $174.6 | $169.9 | $168.2 | $169.9 | $171.6 | $173.3 | $175.0 | $176.8 | $178.5 | $180.3 | $182.1 |

**Ten-Year Financial Projections**
**State revenue sharing**
($ in millions)

|  | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **State Revenue Sharing Calculations** | | | | | | | | | | | | | | | | |
| **Constitutional** | | | | | | | | | | | | | | | | |
| 2000 Population | 949,231 | 949,231 | 949,231 | 949,231 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| 2010 Population | -- | -- | -- | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | -- | -- |
| 2020 Population | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | 625,152 | 625,152 | 625,152 |
| Population | 949,231 | 949,231 | 949,231 | 949,231 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 625,152 | 625,152 |
| Distribution Rate | 12.443 | 11.812 | 10.837 | 11.353 | 12.456 | 13.001 | 12.848 | 12.848 | 12.848 | 12.848 | 12.848 | 12.848 | 12.848 | 12.848 | 12.848 | 12.848 |
| October Payment | 11.8 | 11.2 | 10.3 | 10.8 | 8.9 | 9.3 | 9.2 | 9.2 | 9.2 | 9.2 | 9.2 | 9.2 | 9.2 | 9.2 | 8.0 | 8.0 |
| Population | 949,231 | 949,231 | 949,231 | 949,231 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 625,152 | 625,152 |
| Distribution Rate | 11.554 | 12.370 | 10.291 | 10.381 | 12.215 | 12.287 | 13.089 | 13.089 | 13.089 | 13.089 | 13.089 | 13.089 | 13.089 | 13.089 | 13.089 | 13.089 |
| December Payment | 11.0 | 11.7 | 9.8 | 9.9 | 8.7 | 8.8 | 9.3 | 9.3 | 9.3 | 9.3 | 9.3 | 9.3 | 9.3 | 9.3 | 8.2 | 8.2 |
| Population | 949,231 | 949,231 | 949,231 | 949,231 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 625,152 | 625,152 |
| Distribution Rate | 12.010 | 11.540 | 11.223 | 11.969 | 12.106 | 12.596 | 12.949 | 12.949 | 12.949 | 12.949 | 12.949 | 12.949 | 12.949 | 12.949 | 12.949 | 12.949 |
| February Payment | 11.4 | 11.0 | 10.7 | 11.4 | 8.6 | 9.0 | 9.2 | 9.2 | 9.2 | 9.2 | 9.2 | 9.2 | 9.2 | 9.2 | 8.1 | 8.1 |
| Population | 949,231 | 949,231 | 949,231 | 949,231 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 625,152 | 625,152 |
| Distribution Rate | 10.744 | 8.954 | 9.423 | 10.254 | 11.497 | 11.214 | 11.565 | 11.565 | 11.565 | 11.565 | 11.565 | 11.565 | 11.565 | 11.565 | 11.565 | 11.565 |
| April Payment | 10.2 | 8.5 | 8.9 | 9.7 | 8.2 | 8.0 | 8.2 | 8.2 | 8.2 | 8.2 | 8.2 | 8.2 | 8.2 | 8.2 | 7.2 | 7.2 |
| Population | 949,231 | 949,231 | 949,231 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 625,152 | 625,152 | 625,152 |
| Distribution Rate | 10.809 | 10.623 | 10.830 | 11.003 | 11.645 | 11.802 | 12.166 | 12.166 | 12.166 | 12.166 | 12.166 | 12.166 | 12.166 | 12.166 | 12.166 | 12.166 |
| June Payment | 10.3 | 10.1 | 10.3 | 7.8 | 8.3 | 8.4 | 8.7 | 8.7 | 8.7 | 8.7 | 8.7 | 8.7 | 8.7 | 7.6 | 7.6 | 7.6 |
| Population | 949,231 | 949,231 | 949,231 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 712,501 | 625,152 | 625,152 | 625,152 |
| Distribution Rate | 11.920 | 10.228 | 10.916 | 11.010 | 11.620 | 12.398 | 12.222 | 12.222 | 12.222 | 12.222 | 12.222 | 12.222 | 12.222 | 12.222 | 12.222 | 12.222 |
| August Payment | 11.3 | 9.7 | 10.4 | 7.8 | 8.3 | 8.8 | 8.7 | 8.7 | 8.7 | 8.7 | 8.7 | 8.7 | 8.7 | 7.6 | 7.6 | 7.6 |
| Adjustment (1) | - | - | - | (10.2) | - | (0.0) | (0.0) | 1.8 | 3.6 | 5.2 | 6.9 | 8.7 | 10.5 | 6.1 | 12.2 | 14.0 |
| Adjustment for Actuals | 0.4 | 0.9 | 0.6 | 0.5 |  |  |  |  |  |  |  |  |  |  |  |  |
| **Total Constitutional Payment** | $ 66.4 | $ 63.1 | $ 60.9 | $ 47.6 | $ 51.0 | $ 52.2 | $ 53.3 | $ 55.1 | $ 56.9 | $ 58.5 | $ 60.2 | $ 62.0 | $ 63.8 | $ 57.3 | $ 59.0 | $ 60.8 |
| **Statutory (EVIP)** | | | | | | | | | | | | | | | | |
| Accounting and Transparency |  |  |  |  | 40.5 | 43.3 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 |
| Consolidation of Services |  |  |  |  | 40.5 | 43.3 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 |
| Employee Compensation |  |  |  |  | 40.5 | 43.3 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 |
| Adjustment for Actuals |  |  |  |  | - | 0.2 | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| **Total Statutory Payment (EVIP)** | - | - | - | - | 121.4 | 130.3 | 136.3 | 136.3 | 136.3 | 136.3 | 136.3 | 136.3 | 136.3 | 136.3 | 136.3 | 136.3 |
| Total Constitutional Payment | 66.4 | 63.1 | 60.9 | 47.6 | 51.0 | 52.2 | 53.3 | 55.1 | 56.9 | 58.5 | 60.2 | 62.0 | 63.8 | 57.3 | 59.0 | 60.8 |
| Total Statutory Payment | 181.8 | 202.6 | 201.5 | 191.5 | 121.4 | 130.3 | 136.3 | 136.3 | 136.3 | 136.3 | 136.3 | 136.3 | 136.3 | 136.3 | 136.3 | 136.3 |
| **Estimated State Revenue Sharing** | $ 248.2 | $ 265.8 | $ 262.4 | $ 239.2 | 172.3 | $ 182.5 | $ 189.6 | $ 191.4 | $ 193.2 | $ 194.8 | $ 196.5 | $ 198.3 | $ 200.1 | $ 193.6 | $ 195.3 | $ 197.1 |
| State calculations used for FY15 and beyond | | | | | | | | | | | | | | | | |
| Other shared taxes (including liquor and beer licenses) | $ 1.4 | $ 0.8 | $ 1.3 | $ 0.1 | $ 1.0 | $ 1.3 | $ 1.3 | $ 1.3 | $ 1.3 | $ 1.3 | $ 1.3 | $ 1.3 | $ 1.3 | $ 1.3 | $ 1.3 | $ 1.3 |
| **Total State Revenue Sharing** | $ 249.6 | $ 266.6 | $ 263.7 | $ 239.3 | 173.3 | $ 183.8 | $ 190.9 | $ 192.7 | $ 194.5 | $ 196.1 | $ 197.8 | $ 199.6 | $ 201.4 | $ 194.9 | $ 196.6 | $ 198.4 |

**Notes:**
(1) Adjustment due to estimated increases in sales tax collections by the State, resulting in higher assumed distributions

**Appendices C - D**
Key expense drivers

**City of Detroit**

**Ten-Year Financial Projections**
**Headcount - Full-Time Equivalents**

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Uniform** | | | | | | | | | | | | | | | | |
| Police | 3,421 | 3,688 | 3,288 | 3,195 | 3,016 | 2,909 | 2,706 | 2,747 | 2,882 | 2,895 | 2,895 | 2,895 | 2,895 | 2,895 | 2,895 | 2,895 |
| Fire | 1,444 | 1,406 | 1,355 | 1,330 | 1,257 | 1,189 | 1,183 | 1,238 | 1,228 | 1,228 | 1,228 | 1,228 | 1,228 | 1,228 | 1,228 | 1,228 |
| Total Uniform | 4,865 | 5,094 | 4,643 | 4,525 | 4,273 | 4,098 | 3,890 | 3,986 | 4,110 | 4,123 | 4,123 | 4,123 | 4,123 | 4,123 | 4,123 | 4,123 |
| **Civilian** | | | | | | | | | | | | | | | | |
| Budget | 22 | 23 | 20 | 16 | 15 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 |
| DPW | 803 | 788 | 659 | 642 | 542 | 505 | 509 | 509 | 509 | 509 | 509 | 509 | 509 | 509 | 509 | 509 |
| DWDD | 91 | 99 | 113 | 73 | 46 | 7 | - | - | - | - | - | - | - | - | - | - |
| Finance | 327 | 310 | 285 | 266 | 235 | 228 | 216 | 216 | 206 | 206 | 206 | 206 | 206 | 206 | 206 | 206 |
| Health & Wellness | 348 | 317 | 262 | 243 | 185 | 80 | 14 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 |
| Human Resources | 175 | 168 | 171 | 176 | 107 | 93 | 84 | 84 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 |
| Human Services | 117 | 91 | 95 | 85 | 52 | 22 | - | - | - | - | - | - | - | - | - | - |
| ITS | 99 | 92 | 65 | 46 | 43 | 35 | 35 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 |
| Law | 127 | 122 | 113 | 105 | 94 | 86 | 86 | 86 | 86 | 86 | 86 | 86 | 86 | 86 | 86 | 86 |
| Mayor | 108 | 74 | 63 | 52 | 39 | 22 | 22 | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 |
| Planning & Development | 172 | 173 | 160 | 154 | 122 | 116 | 116 | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 113 |
| PLD | 225 | 206 | 160 | 123 | 103 | 99 | 70 | 12 | 7 | 5 | 3 | 3 | 3 | 2 | - | - |
| Recreation | 472 | 388 | 508 | 510 | 300 | 202 | 202 | 202 | 202 | 202 | 202 | 202 | 202 | 202 | 202 | 202 |
| General Services | 676 | 528 | 481 | 447 | 343 | 298 | 298 | 272 | 272 | 272 | 272 | 272 | 272 | 272 | 272 | 272 |
| Legislative (1) | 230 | 266 | 194 | 169 | 184 | 172 | 138 | 119 | 119 | 119 | 119 | 119 | 119 | 119 | 119 | 119 |
| 36th District Court | 32 | 33 | 33 | 35 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 |
| Other (2) | 103 | 89 | 31 | 36 | 26 | 32 | 30 | 26 | 26 | 26 | 26 | 26 | 26 | 26 | 26 | 26 |
| Total Civilian | 4,127 | 3,767 | 3,413 | 3,178 | 2,467 | 2,043 | 1,868 | 1,757 | 1,718 | 1,716 | 1,714 | 1,714 | 1,714 | 1,713 | 1,711 | 1,711 |
| **Total General Fund** | 8,992 | 8,861 | 8,056 | 7,703 | 6,740 | 6,140 | 5,758 | 5,743 | 5,828 | 5,839 | 5,837 | 5,837 | 5,837 | 5,836 | 5,834 | 5,834 |
| **Enterprise** | | | | | | | | | | | | | | | | |
| Airport | 11 | 10 | 9 | 8 | 7 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 |
| BSED | 296 | 276 | 258 | 235 | 204 | 192 | 192 | 192 | 192 | 192 | 192 | 192 | 192 | 192 | 192 | 192 |
| Transportation | 1,512 | 1,514 | 1,351 | 1,292 | 1,131 | 1,060 | 978 | 1,048 | 1,065 | 1,065 | 1,065 | 1,065 | 1,065 | 1,065 | 1,065 | 1,065 |
| Parking | 109 | 104 | 97 | 92 | 97 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 |
| Water | 1,045 | 1,012 | 962 | 981 | 930 | 873 | 873 | 873 | 873 | 873 | 873 | 873 | 873 | 873 | 873 | 873 |
| Sewer | 1,215 | 1,177 | 1,119 | 1,142 | 1,082 | 1,016 | 1,016 | 1,016 | 1,016 | 1,016 | 1,016 | 1,016 | 1,016 | 1,016 | 1,016 | 1,016 |
| Library | 460 | 466 | 450 | 371 | 334 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 |
| Total Enterprise | 4,648 | 4,559 | 4,246 | 4,121 | 3,785 | 3,572 | 3,490 | 3,560 | 3,577 | 3,577 | 3,577 | 3,577 | 3,577 | 3,577 | 3,577 | 3,577 |
| **Total City** | 13,640 | 13,420 | 12,302 | 11,824 | 10,525 | 9,712 | 9,248 | 9,303 | 9,405 | 9,417 | 9,415 | 9,415 | 9,415 | 9,414 | 9,412 | 9,412 |

(1) Most Recreation department employees are part-time employees.
(2) Includes: Civic Center, Human Rights, Administrative Hearings, Homeland Security, Non-departmental

**Average Salary**

| | Fiscal year ended actual | | | | Actual | Preliminary forecast | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Uniform** | | | | | | | | | | | | | | | | |
| Police | $53,597 | $51,883 | $56,204 | $60,742 | $58,848 | $52,625 | $51,514 | $53,099 | $54,161 | $55,244 | $56,349 | $57,476 | $60,350 | $61,557 | $62,788 | $64,044 |
| Fire | 59,754 | 62,869 | 62,968 | 63,698 | 65,189 | 58,311 | 55,950 | 57,069 | 58,210 | 59,374 | 60,562 | 61,773 | 64,862 | 66,159 | 67,482 | 68,832 |
| Average Uniform | $55,424 | $54,915 | $58,178 | $61,611 | $60,713 | $54,274 | $52,864 | $54,332 | $55,371 | $56,474 | $57,604 | $58,756 | $61,694 | $62,927 | $64,186 | $65,470 |
| **Civilian** | | | | | | | | | | | | | | | | |
| Budget | $62,323 | $62,796 | $62,338 | $71,811 | $73,322 | $57,557 | $64,173 | $65,456 | $66,765 | $68,100 | $69,462 | $70,852 | $72,269 | $73,714 | $75,188 | $76,692 |
| DPW | 30,107 | 30,392 | 35,862 | 30,300 | 32,448 | 31,439 | 33,550 | 34,154 | 34,837 | 35,534 | 36,245 | 36,970 | 37,709 | 38,463 | 39,233 | 40,017 |
| DWDD | 69,476 | 72,088 | 105,969 | 104,180 | 96,126 | n/a | - | - | - | - | - | - | - | - | - | - |
| Finance | 44,290 | 48,404 | 49,213 | 48,545 | 49,479 | 44,131 | 45,415 | 46,323 | 47,249 | 48,194 | 49,158 | 50,141 | 51,144 | 52,167 | 53,211 | 54,275 |
| Health & Wellness | 38,399 | 42,069 | 44,205 | 39,808 | 42,873 | 29,627 | 60,946 | 73,547 | 75,018 | 76,518 | 78,049 | 79,610 | 81,202 | 82,826 | 84,482 | 86,172 |
| Human Resources | 52,849 | 55,000 | 49,465 | 38,861 | 55,145 | 44,710 | 49,727 | 50,722 | 51,736 | 52,771 | 53,826 | 54,903 | 56,001 | 57,121 | 58,263 | 59,428 |
| Human Services | 42,296 | 53,028 | 47,676 | 46,749 | 64,791 | 44,951 | 55,538 | 56,648 | 57,781 | 58,937 | 60,116 | 61,318 | 62,544 | 63,795 | 65,071 | 66,372 |
| ITS | 51,306 | 55,548 | 61,007 | 74,548 | 60,681 | 57,494 | 57,494 | 58,644 | 59,817 | 61,013 | 62,233 | 63,478 | 64,748 | 66,043 | 67,363 | 68,711 |
| Law | 73,486 | 75,672 | 72,144 | 73,252 | 78,313 | 71,497 | 71,497 | 72,927 | 74,386 | 75,873 | 77,391 | 78,939 | 80,517 | 82,128 | 83,770 | 85,446 |
| Mayor | 52,946 | 71,222 | 73,700 | 76,927 | 80,495 | 98,421 | 92,861 | 94,718 | 96,613 | 98,545 | 100,516 | 102,526 | 104,577 | 106,668 | 108,801 | 110,977 |
| Planning & Development | 54,225 | 54,491 | 55,121 | 51,860 | 59,007 | 53,640 | 53,640 | 54,713 | 55,807 | 56,923 | 58,061 | 59,223 | 60,407 | 61,615 | 62,848 | 64,105 |
| PLD | 44,676 | 46,839 | 50,059 | 55,114 | 55,866 | 48,724 | 49,211 | 84,190 | 81,474 | 79,817 | 79,591 | 81,182 | 82,806 | 84,462 | - | - |
| Recreation (1) | 15,783 | 19,905 | 13,500 | 11,659 | 17,264 | 16,904 | 16,904 | 17,242 | 17,587 | 17,939 | 18,298 | 18,664 | 19,037 | 19,418 | 19,806 | 20,202 |
| General Services | 31,804 | 39,503 | 36,473 | 36,309 | 34,874 | 30,695 | 33,501 | 34,171 | 34,855 | 35,552 | 36,263 | 36,988 | 37,728 | 38,483 | 39,252 | 40,037 |
| Legislative (2) | 51,789 | 49,387 | 56,976 | 54,111 | 43,790 | 41,106 | 39,284 | 42,347 | 43,194 | 44,058 | 44,939 | 45,837 | 46,754 | 47,689 | 48,643 | 49,616 |
| 36th District Court | 73,310 | 74,878 | 73,616 | 69,189 | 51,102 | 51,391 | 51,391 | 52,419 | 53,467 | 54,537 | 55,627 | 56,740 | 57,875 | 59,032 | 60,213 | 61,417 |
| Other (3) | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| Total Civilian | $37,952 | $41,894 | $43,048 | $39,407 | $42,474 | $37,652 | $39,201 | $40,255 | $40,724 | $41,480 | $42,261 | $43,106 | $43,968 | $44,825 | $45,674 | $46,587 |
| **Total General Fund** | $47,405 | $49,380 | $51,768 | $52,450 | $54,037 | $48,745 | $48,432 | $50,025 | $51,053 | $52,068 | $53,099 | $54,161 | $56,489 | $57,614 | $58,757 | $59,932 |
| **Enterprise** | | | | | | | | | | | | | | | | |
| Airport | $46,972 | $51,750 | $49,202 | $44,746 | $42,833 | $39,678 | $64,882 | $66,180 | $67,503 | $68,853 | $70,230 | $71,635 | $73,068 | $74,529 | $76,020 | $77,540 |
| BSED | 44,694 | 49,103 | 50,316 | 49,154 | 48,069 | 40,757 | 47,306 | 48,252 | 49,218 | 50,202 | 51,206 | 52,230 | 53,275 | 54,340 | 55,427 | 56,535 |
| Transportation | 31,375 | 31,991 | 33,352 | 31,553 | 32,578 | 28,576 | 30,767 | 31,383 | 32,010 | 32,651 | 33,304 | 33,970 | 34,649 | 35,342 | 36,049 | 36,770 |
| Parking | 35,423 | 36,835 | 37,362 | 34,955 | 30,576 | 30,621 | 33,594 | 34,266 | 34,952 | 35,651 | 36,364 | 37,091 | 37,833 | 38,589 | 39,361 | 40,149 |
| Water | 36,004 | 41,942 | 29,473 | 35,952 | 36,621 | 39,949 | 40,481 | 41,291 | 42,117 | 42,959 | 43,818 | 44,695 | 45,589 | 46,500 | 47,430 | 48,379 |
| Sewer | 35,082 | 39,467 | 29,002 | 37,896 | 38,784 | 32,781 | 56,127 | 57,249 | 58,394 | 59,562 | 60,753 | 61,968 | 63,208 | 64,472 | 65,761 | 67,076 |
| Library | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| Total Enterprise | $31,260 | $34,050 | $28,948 | $32,623 | $33,273 | $30,596 | $38,662 | $39,276 | $40,023 | $40,824 | $41,640 | $42,473 | $43,322 | $44,189 | $45,073 | $45,974 |
| **Total City** | $41,903 | $44,172 | $43,892 | $45,540 | $46,570 | $42,070 | $44,744 | $45,911 | $46,858 | $47,796 | $48,745 | $49,720 | $51,486 | $52,512 | $53,556 | $54,627 |

(1) Most Recreation department employees are part-time employees.
(2) Includes: Auditor General, Zoning, City Council, Ombudsperson, City Clerk, and Elections.
(3) Includes: Civic Center, Human Rights, Administrative Hearings, Homeland Security, Non-departmental

**Ten-Year Financial Projections**
**Benefits**
($ in millions)

| | | | | | | Preliminary forecast | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Active employees** | | | | | | | | | | | |
| | | | | | | Assumed inflation | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% |
| Medical costs per head ($ in actuals) (1) | | | | | | | | | | | |
| PFRS | $ 9,205 | $ 8,795 | $ 9,388 | $ 10,051 | $ 10,786 | $ 11,433 | $ 12,119 | $ 12,846 | $ 13,617 | $ 14,434 | |
| General City | 8,124 | 7,954 | 8,491 | 9,088 | 9,751 | 10,336 | 10,956 | 11,614 | 12,311 | 13,049 | |
| Department of Transportation | 9,841 | 8,729 | 9,316 | 9,968 | 10,694 | 11,336 | 12,016 | 12,737 | 13,501 | 14,312 | |
| Water/Sewer | 8,421 | 8,309 | 8,871 | 9,493 | 10,187 | 10,799 | 11,446 | 12,133 | 12,861 | 13,633 | |
| Library | 7,441 | 7,240 | 7,708 | 8,255 | 8,854 | 9,385 | 9,949 | 10,545 | 11,178 | 11,849 | |
| 36 District Court | 12,098 | 12,944 | 13,819 | 14,793 | 15,875 | 16,828 | 17,838 | 18,908 | 20,042 | 21,245 | |
| **Heads** | | | | | | | | | | | |
| PFRS | 3,890 | 3,986 | 4,110 | 4,123 | 4,123 | 4,123 | 4,123 | 4,123 | 4,123 | 4,123 | |
| General City | 1,963 | 1,853 | 1,813 | 1,811 | 1,809 | 1,809 | 1,809 | 1,808 | 1,806 | 1,806 | |
| Department of Transportation | 978 | 1,048 | 1,065 | 1,065 | 1,065 | 1,065 | 1,065 | 1,065 | 1,065 | 1,065 | |
| Water/Sewer | 1,890 | 1,890 | 1,890 | 1,890 | 1,890 | 1,890 | 1,890 | 1,890 | 1,890 | 1,890 | |
| Library | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | |
| 36 District Court | 362 | 362 | 362 | 362 | 362 | 362 | 362 | 362 | 362 | 362 | |
| **Total Active Medical costs** | | | | | | | | | | | |
| PFRS | $ 35.8 | $ 35.1 | $ 38.6 | $ 41.4 | $ 44.5 | $ 47.1 | $ 50.0 | $ 53.0 | $ 56.1 | $ 59.5 | |
| General City | 15.9 | 14.7 | 15.4 | 16.5 | 17.6 | 18.7 | 19.8 | 21.0 | 22.2 | 23.6 | |
| Department of Transportation | 9.6 | 9.1 | 9.9 | 10.6 | 11.4 | 12.1 | 12.8 | 13.6 | 14.4 | 15.2 | |
| Water/Sewer | 15.9 | 15.7 | 16.8 | 17.9 | 19.3 | 20.4 | 21.6 | 22.9 | 24.3 | 25.8 | |
| Library | 2.5 | 2.4 | 2.6 | 2.8 | 3.0 | 3.1 | 3.3 | 3.5 | 3.7 | 4.0 | |
| 36 District Court | 4.4 | 4.7 | 5.0 | 5.3 | 5.7 | 6.1 | 6.4 | 6.8 | 7.2 | 7.7 | |
| | $ 84.2 | $ 81.7 | $ 88.2 | $ 94.6 | $ 101.5 | $ 107.6 | $ 114.0 | $ 120.8 | $ 128.1 | $ 135.7 | |
| **General Fund Active Medical costs** | | | | | | | | | | | |
| PFRS | $ 35.8 | $ 35.0 | $ 38.5 | $ 41.4 | $ 44.4 | $ 47.1 | $ 49.9 | $ 52.9 | $ 56.1 | $ 59.4 | |
| General City | 9.1 | 8.4 | 8.6 | 9.2 | 9.8 | 10.4 | 11.0 | 11.7 | 12.4 | 13.1 | |
| 36 District Court | 4.4 | 4.7 | 5.0 | 5.3 | 5.7 | 6.1 | 6.4 | 6.8 | 7.2 | 7.7 | |
| | $ 49.2 | $ 48.0 | $ 52.1 | $ 55.9 | $ 60.0 | $ 63.6 | $ 67.4 | $ 71.4 | $ 75.7 | $ 80.2 | |
| **Retirees** | | | | | | | | | | | |
| | Assumed inflation (2) | 5.0% | 5.6% | 3.3% | 4.6% | 4.2% | 5.6% | 5.2% | 5.6% | 4.9% | 4.8% |
| Implied Medical costs per head ($ in actuals) | $ 10,683 | $ 11,213 | $ 11,836 | $ 12,230 | $ 12,790 | $ 13,330 | $ 14,078 | $ 14,804 | $ 15,631 | $ 16,391 | $ 17,178 |
| Heads | 17,027 | 17,027 | 17,027 | 17,027 | 17,027 | 17,027 | 17,027 | 17,027 | 17,027 | 17,027 | 17,027 |
| Total Retiree Medical costs | $ 181.9 | $ 190.9 | $ 201.5 | $ 208.2 | $ 217.8 | $ 227.0 | $ 239.7 | $ 252.1 | $ 266.1 | $ 279.1 | $ 292.5 |
| General Fund portion of Retiree Medical costs (3) (4) | | $ 130.0 | $ 138.3 | $ 142.9 | $ 149.4 | $ 155.7 | $ 164.5 | $ 173.0 | $ 182.6 | $ 191.5 | $ 200.7 |
| % of total | | 68.1% | 68.6% | 68.6% | 68.6% | 68.6% | 68.6% | 68.6% | 68.6% | 68.6% | 68.6% |

*Footnotes:*
(1) Based on Milliman letter dated November 3, 2013, Re: City of Detroit Active Health Plan Projections.
(2) Based on census data of Retirees by department. Unknown retirees have been allocated across all non-uniform departments. Individuals having retired from departments that no longer exist have been allocated across active General Fund departments.
(3) Growth assumptions based on plan provisions outline in Milliman letter dated June 30, 2013.
(4) Retirees representing departments in transition, such as Health & Wellness and PLD, have been included in the allocation across active General Fund departments.

**Ten-Year Financial Projections**

**Pension**

*($ in millions)*

|  |  | Preliminary forecast | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Third-party projections** | | | | | | | | | | | |
| *Milliman* | | | | | | | | | | | |
|  | PFRS + GRS (baseline @ 7%) | $ 277.0 | $ 325.0 | $ 363.0 | $ 402.0 | $ 444.0 | $ 457.0 | $ 474.0 | $ 486.0 | $ 495.0 | $ 504.0 |
|  | Normal | 75.0 | 76.0 | 77.0 | 78.0 | 80.0 | 81.0 | 81.5 | 82.0 | 82.6 | 83.1 |
|  | UAAL | 43.0 | 64.0 | 87.0 | 110.0 | 135.0 | 137.0 | 138.0 | 139.1 | 140.1 | 141.2 |
|  | Existing DC plan (PFRS) | 2.0 | 3.0 | 4.0 | 4.0 | 5.0 | 6.0 | 6.6 | 7.3 | 8.0 | 8.8 |
| **Total City** | | | | | | | | | | | |
| PFRS | | $ 139.0 | $ 163.0 | $ 180.0 | $ 198.0 | $ 217.0 | $ 219.0 | $ 224.0 | $ 225.0 | $ 222.0 | 221.0 |
| General City | | 54.4 | 63.8 | 72.1 | 80.4 | 89.4 | 93.7 | 98.5 | 102.8 | 107.5 | 111.5 |
| DOT | | 23.6 | 27.7 | 31.2 | 34.8 | 38.7 | 40.6 | 42.7 | 44.5 | 46.6 | 48.3 |
| Water/Sewer | | 56.7 | 66.6 | 75.2 | 83.9 | 93.3 | 97.8 | 102.8 | 107.3 | 112.2 | 116.3 |
| Library | | 3.4 | 3.9 | 4.5 | 5.0 | 5.5 | 5.8 | 6.1 | 6.4 | 6.6 | 6.9 |
|  | Total City Pension plans | $ 277.0 | $ 325.0 | $ 363.0 | $ 402.0 | $ 444.0 | $ 457.0 | $ 474.0 | $ 486.0 | $ 495.0 | $ 504.0 |
|  | 36th District Court (State plan) | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 |
|  | Total estimated City Pension | $ 282.0 | $ 330.0 | $ 368.0 | $ 407.0 | $ 449.0 | $ 462.0 | $ 479.0 | $ 491.0 | $ 500.0 | 509.0 |
| **General Fund** | | | | | | | | | | | |
|  | PFRS | $ 138.8 | $ 162.8 | $ 179.8 | $ 197.7 | $ 216.7 | $ 218.7 | $ 223.7 | $ 224.7 | $ 221.7 | 220.7 |
|  | General City - General Fund | 33.4 | 39.1 | 43.4 | 48.4 | 53.7 | 56.4 | 59.2 | 61.8 | 64.5 | 66.9 |
|  | Estimated City Pension plans (GF) | $ 172.2 | $ 201.9 | $ 223.2 | $ 246.1 | $ 270.5 | $ 275.1 | $ 282.9 | $ 286.5 | $ 286.2 | 287.6 |
|  | 36th District Court (State plan) | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 |
|  | Total estimated GF Pension | $ 177.2 | $ 206.8 | $ 228.2 | $ 251.0 | $ 275.4 | $ 280.0 | $ 287.8 | $ 291.4 | $ 291.2 | 292.5 |
|  | **Pension unfunded liability** | | | | | | | | | | |
|  | PFRS | $ 1,446.0 | $ 1,428.0 | $ 1,389.0 | $ 1,327.0 | $ 1,241.0 | $ 1,148.0 | $ 1,040.0 | 925.0 | n/a | n/a |
|  | GRS | 2,077.0 | 2,095.0 | 2,095.0 | 2,075.0 | 2,031.0 | 1,976.0 | 1,906.0 | 1,821.0 | n/a | n/a |

*Footnotes:*
(1) Actual FY13 pension expenses accrued are being investigated.

**Ten-Year Financial Projections**
**Debt summary**
*($ in millions)*

| Type | Funding source | Maturity | Interest rate | Beg. Bal. 2013 | Paid by General Fund |
|---|---|---|---|---|---|
| LTGO | Sr. Lien on DSA & Self-Insurance | 2013-2035 | 4.00%–8.00% | $ 452.6 | ✓ |
| Refinance (LTGO) | 3rd Lien on DSA | 2033 | 2.50%–5.30% | 129.5 | ✓ |
| UTGO | Property taxes | 2014-2028 | 3.75%–5.375% | 510.8 | |
| Capital Lease | n/a | n/a | n/a | 1.6 | ✓ |
| POC | n/a | 2025-2035 | Floating-5.989% | 1,451.9 | Portion |
| POC swap | Wagering taxes | 2029-2034 | 6.323%–6.356% | n/a | ✓ |
| | Total principal | | | $ 2,546.4 | |

**Debt Service — Preliminary forecast**

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Partially General Fund |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Principal** | | | | | | | | | | | | |
| LTGO | $ 41.8 | $ 47.7 | 33.5 | 35.1 | 13.6 | 14.2 | 14.9 | 15.7 | 16.8 | 16.0 | 16.7 | ✓ |
| Refinance (LTGO) | - | 2.9 | 4.4 | 4.4 | 4.9 | 5.1 | 5.3 | 5.6 | 5.8 | 6.1 | 6.5 | ✓ |
| UTGO | 41.7 | 39.8 | 37.9 | 34.9 | 36.7 | 37.5 | 37.0 | 38.2 | 39.5 | 26.6 | 24.2 | |
| Capital Lease | 0.5 | 0.1 | - | - | - | - | - | - | - | - | - | ✓ |
| Total debt principal | 84.0 | 90.5 | 75.8 | 74.6 | 55.1 | 56.8 | 57.2 | 59.4 | 62.1 | 48.7 | 47.3 | |
| **Interest** | | | | | | | | | | | | |
| LTGO | 23.3 | 21.3 | 18.2 | 16.5 | 14.8 | 14.1 | 13.4 | 12.7 | 11.9 | 11.1 | 10.4 | ✓ |
| Refinance (LTGO) | 4.2 | 6.1 | 6.0 | 5.8 | 5.6 | 5.4 | 5.1 | 4.9 | 4.7 | 4.4 | 4.1 | ✓ |
| UTGO | 28.9 | 26.7 | 24.7 | 22.8 | 21.0 | 19.1 | 17.1 | 15.2 | 13.2 | 11.2 | 9.7 | |
| Capital Lease | 0.0 | 0.0 | - | - | - | - | - | - | - | - | - | ✓ |
| Total debt interest | 56.4 | 54.1 | 48.9 | 45.2 | 41.4 | 38.6 | 35.7 | 32.8 | 29.8 | 26.6 | 24.2 | |
| GF adjustment (1) | 2.7 | - | - | - | - | - | - | - | - | - | - | |
| Total debt service | $ 143.1 | $ 144.6 | 124.7 | 119.8 | 96.5 | 95.4 | 92.9 | 92.3 | 91.9 | 75.3 | 71.5 | |
| | | | | | | | | | | | | |
| **GF debt service (LTGO)** | $ 72.6 | $ 78.1 | 62.1 | 62.1 | 38.9 | 38.8 | 38.8 | 38.9 | 39.3 | 37.6 | 37.5 | |
| Debt service fund (UTGO) (2) | 70.6 | 66.5 | 62.6 | 57.7 | 57.6 | 56.5 | 54.1 | 53.4 | 52.7 | 37.7 | 33.9 | |
| **POC (3)** | | | | | | | | | | | | |
| **Principal** | | | | | | | | | | | | |
| POC - Governmental | $ 18.4 | $ 23.6 | 26.5 | 29.4 | 32.6 | 36.1 | 36.4 | 38.3 | 40.3 | 42.4 | 44.6 | ✓ |
| POC - EF (incl. DDOT) | 4.7 | 6.0 | 6.8 | 7.5 | 8.3 | 9.2 | 9.3 | 9.8 | 10.3 | 10.8 | 11.4 | |
| Total POC principal | 23.1 | 29.6 | 33.3 | 37.0 | 41.0 | 45.3 | 45.7 | 48.1 | 50.6 | 53.2 | 56.0 | |
| **Interest** | | | | | | | | | | | | |
| POC - Governmental | 30.3 | 29.5 | 28.4 | 27.2 | 25.8 | 24.2 | 22.5 | 21.2 | 19.8 | 18.3 | 16.6 | ✓ |
| POC - EF (incl. DDOT) | 7.7 | 7.5 | 7.3 | 6.9 | 6.6 | 6.2 | 5.7 | 5.4 | 5.1 | 4.7 | 4.2 | |
| POC swap - Governmental | 40.6 | 40.6 | 40.6 | 40.6 | 40.6 | 40.6 | 40.6 | 39.8 | 39.1 | 38.5 | 37.9 | ✓ |
| POC swap - EF (incl. DDOT) | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 | 5.2 | 5.1 | 5.0 | 4.9 | |
| Total POC interest | 84.0 | 82.9 | 81.5 | 80.0 | 78.2 | 76.2 | 74.1 | 71.6 | 69.1 | 66.4 | 63.6 | |
| Total POC | $ 107.1 | $ 112.6 | 114.8 | 116.9 | 119.2 | 121.5 | 119.7 | 119.7 | 119.7 | 119.7 | 119.7 | |
| | | | | | | | | | | | | |
| Total POC - Governmental | $ 89.3 | $ 93.7 | 95.5 | 97.2 | 99.0 | 100.8 | 99.4 | 99.3 | 99.2 | 99.2 | 99.1 | |
| General Fund adjustment (1) | (11.4) | (15.2) | (15.6) | (16.4) | (16.8) | (17.2) | (16.9) | (17.0) | (17.0) | (17.1) | (17.2) | |
| **General Fund POC** | $ 77.9 | $ 78.5 | 79.9 | 80.8 | 82.2 | 83.6 | 82.5 | 82.4 | 82.2 | 82.0 | 81.9 | ✓ |
| | | | | | | | | | | | | |
| **Debt service + POC** | | | | | | | | | | | | |
| Total GF debt service + POC | $ 150.5 | $ 156.6 | 142.0 | 142.9 | 121.0 | 122.4 | 121.3 | 121.2 | 121.5 | 119.6 | 119.5 | |
| POC allocation to enterprise and other funds | 29.1 | 34.0 | 34.9 | 36.1 | 37.0 | 37.9 | 37.2 | 37.4 | 37.5 | 37.6 | 37.7 | |
| Debt service fund (UTGO debt service) | 70.6 | 66.5 | 62.6 | 57.7 | 57.6 | 56.5 | 54.1 | 53.4 | 52.7 | 37.7 | 33.9 | |
| Total | $ 250.2 | $ 257.2 | 239.5 | 236.7 | 215.7 | 216.9 | 212.7 | 212.0 | 211.6 | 195.0 | 191.1 | |

*Footnotes:*
(1) Represents allocations to/from other funds/departments.
(2) UTGO debt service already accounted for within gross property taxes, from which a transfer is made to the Debt Service fund.
(3) See Appendix D.2 for additional POC allocation detail.

**Ten-Year Financial Projections**

**POC summary**

*($ in millions)*

| | | | | | Preliminary forecast | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Total POC payments** | | | | | | | | | | | |
| Total Principal Payments | | $ (29.6) $ | (33.3) $ | (37.0) $ | (41.0) $ | (45.3) $ | (45.7) $ | (48.1) $ | (50.6) $ | (53.2) $ | (56.0) |
| Total Interest Payments | | (32.2) | (30.8) | (29.3) | (27.5) | (25.5) | (23.4) | (21.9) | (20.2) | (18.4) | (16.3) |
| Total Quarterly Interest (Part of Set-Aside Requirements) | | (4.8) | (4.8) | (4.8) | (4.8) | (4.8) | (4.8) | (4.8) | (4.7) | (4.6) | (4.5) |
| Total Interest Swap Payments - PFRS (1) | | (29.6) | (29.6) | (29.6) | (29.6) | (29.6) | (29.6) | (29.1) | (28.5) | (28.1) | (27.6) |
| Total Interest Swap Payments - GRS (1) | | (16.3) | (16.3) | (16.3) | (16.3) | (16.3) | (16.3) | (16.0) | (15.7) | (15.4) | (15.2) |
| **Total payments** | | $ (112.6) $ | (114.8) $ | (116.9) $ | (119.2) $ | (121.5) $ | (119.7) $ | (119.7) $ | (119.7) $ | (119.7) $ | (119.7) |
| **POC payments by Pension system** | | | | | | | | | | | |
| PFRS | | | | | | | | | | | |
| Principal | | $ (11.1) $ | (12.4) $ | (13.8) $ | (15.3) $ | (16.9) $ | (17.1) $ | (18.0) $ | (18.9) $ | (19.9) $ | (21.0) |
| Interest | | (12.0) | (11.5) | (11.0) | (10.3) | (9.6) | (8.7) | (8.2) | (7.6) | (6.9) | (6.1) |
| Quarterly | | (1.8) | (1.8) | (1.8) | (1.8) | (1.8) | (1.8) | (1.8) | (1.7) | (1.7) | (1.7) |
| Swap | | (29.6) | (29.6) | (29.6) | (29.6) | (29.6) | (29.6) | (29.1) | (28.5) | (28.1) | (27.6) |
| Subtotal: PFRS | | (54.6) | (55.4) | (56.2) | (57.0) | (57.9) | (57.2) | (57.0) | (56.8) | (56.6) | (56.4) |
| DGRS | | | | | | | | | | | |
| Principal | | (18.6) | (20.8) | (23.1) | (25.6) | (28.3) | (28.6) | (30.1) | (31.7) | (33.3) | (35.1) |
| Interest | | (20.1) | (19.3) | (18.3) | (17.2) | (16.0) | (14.6) | (13.7) | (12.7) | (11.5) | (10.2) |
| Quarterly | | (3.0) | (3.0) | (3.0) | (3.0) | (3.0) | (3.0) | (3.0) | (2.9) | (2.9) | (2.8) |
| Swap | | (16.3) | (16.3) | (16.3) | (16.3) | (16.3) | (16.3) | (16.0) | (15.7) | (15.4) | (15.2) |
| Subtotal: DGRS | | (58.0) | (59.4) | (60.8) | (62.2) | (63.6) | (62.5) | (62.7) | (62.9) | (63.1) | (63.3) |
| **Total payments** | | $ (112.6) $ | (114.8) $ | (116.9) $ | (119.2) $ | (121.5) $ | (119.7) $ | (119.7) $ | (119.7) $ | (119.7) $ | (119.7) |

| | | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **DGRS POC payments by funding group** | | | | | | | | | | | | |
| DDOT | 11.4% | | $ (6.6) $ | (6.8) $ | (6.9) $ | (7.1) $ | (7.3) $ | (7.1) $ | (7.2) $ | (7.2) $ | (7.2) $ | (7.2) |
| Water/Sewer | 18.5% | | (10.7) | (11.0) | (11.2) | (11.5) | (11.7) | (11.5) | (11.6) | (11.6) | (11.6) | (11.7) |
| Library | 2.6% | | (1.5) | (1.6) | (1.6) | (1.6) | (1.7) | (1.6) | (1.7) | (1.7) | (1.7) | (1.7) |
| General City (2) | 67.5% | | (39.1) | (40.1) | (41.0) | (41.9) | (42.9) | (42.2) | (42.3) | (42.5) | (42.6) | (42.7) |
| **Total GRS payments** | 100.0% | | $ (58.0) $ | (59.4) $ | (60.8) $ | (62.2) $ | (63.6) $ | (62.5) $ | (62.7) $ | (62.9) $ | (63.1) $ | (63.3) |
| **POC Swap payments by funding group** | | | | | | | | | | | | |
| PFRS | | | $ (29.6) $ | (29.6) $ | (29.6) $ | (29.6) $ | (29.6) $ | (29.6) $ | (29.1) $ | (28.5) $ | (28.1) $ | (27.6) |
| DDOT | | | (1.9) | (1.9) | (1.9) | (1.9) | (1.9) | (1.9) | (1.8) | (1.8) | (1.8) | (1.7) |
| Water/Sewer | | | (3.0) | (3.0) | (3.0) | (3.0) | (3.0) | (3.0) | (2.9) | (2.9) | (2.8) | (2.8) |
| Library | | | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) |
| General City (2) | | | (11.0) | (11.0) | (11.0) | (11.0) | (11.0) | (11.0) | (10.8) | (10.6) | (10.4) | (10.2) |
| **Total POC swap payments** | | | $ (45.9) $ | (45.9) $ | (45.9) $ | (45.9) $ | (45.9) $ | (45.9) $ | (45.0) $ | (44.2) $ | (43.5) $ | (42.8) |

**Supporting allocations**

| | 2005-A 2006-A, 2006-B Refunding Tranaction | | Allocations | | |
|---|---|---|---|---|---|
| **Funding Group** | | Principal & Interest | GRS Swap | PFRS Swap |
| DDOT | $ 106.3 | 7.2% | 11.4% | 0.0% |
| Water/Sewer | 171.4 | 11.5% | 18.5% | 0.0% |
| Library | 24.5 | 1.6% | 2.6% | 0.0% |
| General City (2) | 626.9 | 42.2% | 67.5% | 0.0% |
| Subtotal: DGRS | $ 929.1 | 62.6% | 100.0% | 0.0% |
| PFRS | $ 555.4 | 37.4% | 0.0% | 100.0% |
| **Total** | $ 1,484.5 | 100.0% | 100.0% | 100.0% |

**Footnotes:**

(1) Allocation of swap interest based on $283.7 million of notional principal for GRS and $516.3 million of notional principal for PFRS.

(2) General City is comprised of a General Fund component as well as a portion allocated to other funds (i.e. Solid Waste fund, Street funds, and certain cost centers within Planning & Development, BSEED and Parking).

This page intentionally left blank