# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 9 |
|  | ) |  |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
|  | ) |  |
|  | ) | Hon. Steven W. Rhodes |
| Debtor. | ) |  |
| _____ | ) |  |

## OBJECTION OF THE DETROIT RETIREMENT SYSTEMS TO THE ELIGIBILITY OF THE CITY OF DETROIT, MICHIGAN TO BE A DEBTOR UNDER CHAPTER 9 OF THE BANKRUPTCY CODE

Robert D. Gordon (P48627)
Shannon L. Deeby (P60242)
Jennifer K. Green (P69019)
Evan J. Feldman (P73437)
CLARK HILL PLC
151 South Old Woodward Avenue
Suite 200
Birmingham, Michigan 48009
Telephone: (248) 988-5882
Facsimile: (248) 988-2502
rgordon@clarkhill.com

*Counsel to the Police and Fire Retirement System of the
City of Detroit and the General Retirement System of the City of Detroit*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................1

FACTUAL AND PROCEDURAL BACKGROUND ...........................................3
I.     The Retirement Systems ...............................................................3
II.    The Michigan Constitution............................................................4
III.   The Municipal Code of the City of Detroit ...................................6
IV.    The Governor.................................................................................6
V.     The Emergency Manager and the Restructuring Proposal.............7
VI.    The Pre-Petition Lawsuits .............................................................9
VII.   The Authorization and Filing of the Chapter 9 Bankruptcy Petition ...........10
VIII.  The Declaratory Judgment in *Webster* .......................................12
IX.    The July 24, 2013 Hearings in the Bankruptcy Court...................13

ARGUMENT .............................................................................................15
I.     The City of Detroit Cannot Satisfy the Eligibility Requirements of
       Section 109(c)(2) of the Bankruptcy Code, and Its Bankruptcy Case
       Must Be Dismissed as a Matter of Law...........................................15
       A.    Standard of Review ...........................................................15
       B.    The Supremacy Clause and Concepts of Preemption Do Not
             Apply Because Congress Gave States the Authority to Regulate
             Their Municipalities' Access to Chapter 9 Bankruptcy.....................19
             1.    The threshold issues of eligibility and access to Chapter 9
                   are the sole issues before the Court presently...........................24
       C.    The Court Must Construe Section 109(c)(2) To Require
             Compliance with State Law. .............................................26
       D.    The City is Not Specifically Authorized to be a Chapter 9
             Debtor Under State Law.....................................................27
             1.    The Governor and the Emergency Manager must uphold
                   the Michigan Constitution.......................................31

i

2.  Article IX, section 24 of the Michigan Constitution prohibits the Governor and the Emergency Manager from taking any action that causes accrued public pension benefits to be diminished or impaired..................33

3.  The Governor's Authorization of the City's bankruptcy without imposing conditions prohibiting the diminishment or impairment of accrued public pension benefits violated the Michigan Constitution and is void *ab initio*. ...................................................................36

4.  The Governor cannot abrogate provisions of the Michigan Constitution, directly or indirectly. .........................41

5.  The Emergency Manager's authorization of the City's bankruptcy without imposing conditions prohibiting the diminishment or impairment of accrued financial benefits violated the Municipal Code of the City of Detroit and is void *ab initio*. ...........................................................42

6.  Alternatively, if PA 436 does purport to permit the impairment of accrued financial benefits, then it is unconstitutional and the Governor's Authorization and initiation of the Chapter 9 bankruptcy was *ultra vires* and void *ab initio*. ...........................................................43

E.  Collateral Estoppel Precludes the City from Relitigating the Threshold Issue of Whether the City Received Valid Authorization from the Governor to File the Petition Because That Issue Has Already Been Litigated and a Declaratory Judgment Rendered. ..........................................................44

1.  The Declaratory Judgment is entitled to full faith and credit.........................................................................45

2.  The preclusive effect of the Declaratory Judgment is governed by Michigan law..........................................48

3.  The elements for collateral estoppel under Michigan law are satisfied in this matter. .......................................49

    a.  The Governor's authority to authorize the bankruptcy petition was actually litigated and determined by a valid final judgment......................................................49

    b.  The same parties or their privies had a full and fair opportunity to litigate this issue in the state court..........51

ii

9301723.3 14893/161046
13-53846-swr  Doc 8051-9  Filed 10/22/14  Entered 10/22/14 15:19:28  Page 3 of 143
13-53846-swr  Doc 8051-9  Filed 10/22/14  Entered 10/22/14 15:19:28  Page 3 of 143

i.     Privity exists between *Webster* and the Retirement Systems. ...................................................52

ii.    Privity exists between the *Webster* Defendants and the Emergency Manager/City. ............................53

c.    The parties had a full and fair opportunity to litigate. .....56

d.    Mutuality of estoppel exists. ...........................................58

II.    The City Failed to Negotiate With Its Creditors in Good Faith and Such Negotiations Were Not Impracticable. ..........................................................59

CONCLUSION .......................................................................................61

9301723.3 14893/161046

# TABLE OF AUTHORITIES

## Cases

*Accident Victims Home Health Care v. Allstate Ins. Co.*,
2006 Mich. App. Lexis 1791 (Mich. Ct. App. June 6, 2006) .............................57

*Allen v. McCurry*,
449 U.S. 90 (1980) ..........................................................................................47

*Ashton v. Cameron County Water Improvement Dist.*,
298 U.S. 513 (1936) ........................................................................................19

*Attorney Gen ex rel Eaves v. State Bridge Com.*
269 N.W. 388 (Mich. 1936) ............................................................................41

*Baker v. General Motors Corp.*,
522 U.S. 222 (1998) ........................................................................................46

*Bay Area Factors v. Calvert (In re Calvert)*,
105 F.3d 315 (6th Cir. 1997) ..................................................................... 46, 48

*Bowen v. Public Agencies opposed to Soc. Sec. Entrapment*,
477 U.S. 41 (1986) ............................................................................................5

*City of Pontiac Retired Employees Ass'n v. Schimmel*,
2013 U.S. App. LEXIS 16519 (6th Cir. August 9, 2013) ............................ 25-26

*City of Troy Bldg. Inspector v. Hershberger*,
183 N.W. 2d 430 (Mich. App. 1970) ...............................................................*50*

*Cogan v. Cogan*,
385 N.W.2d 793 (Mich. App. 1986) .................................................................49

*Connolly v. Pension Benefit Guar. Corp.*,
475 U.S. 211 (1986) ..........................................................................................5

*Dearborn Heights Sch. Dist. No. 7 v. Wayne County MEA/NEA*,
592 N.W.2d 408 (Mich. App. 1998) ...................................................... 52-53, 58

*Detroit Auto. Inter-Insurance Exchange v. Sanford*,
369 N.W.2d 239, 242 (Mich. App. 1985) .........................................................57

*Detroit v. Nortown Theatre, Inc.*,
323 N.W.2d 411, 413-14 (Mich. App. 1982) .....................................................57

*Ditmore v. Michalik*,
625 N.W.2d 462 (Mich. App. 2001) .......................................................... 49, 57

9301723.3 14893/161046

*Dullam v. Willson*,
    19 N.W. 112 (Mich. 1884) ........................................................................... 38-39

*Elder v. Harrison Twp.*,
    786 F. Supp. 2d 1314 (E.D. Mich. 2011) *rev'd on other grnds*,
    489 Fed. Appx. 934 (6th Cir. 2012) ....................................................53

*Eisfelder v. Michigan Dept. of Natural Resources*,
    847 F. Supp. 78 (W.D. Mich. 1993) ....................................................50

*Farmers Ins. Exch. v. Young*,
    2010 Mich. App. LEXIS 1499 (Mich. Ct. App. Aug. 3, 2010) ...........................57

*Hansen v. State Farm Fire and Cas. Co.*,
    2006 Mich. App. LEXIS 1556 (Mich. Ct. App. May 9, 2006) ...........................57

*Hill v. Wall St. Sys.*,
    2003 Mich. App. LEXIS 1261 (Mich. Ct. App. May 27, 2003) ...........................57

*In re City of Harrisburg*,
    465 B.R. 744, 752 (Bankr. M.D. Pa. 2011) ................................................ *passim*

*In re City of Stockton*,
    2013 Bankr. LEXIS 2416, 21 (Bankr. E.D. Cal. June 12, 2013) .......................18

*In re City of Stockton*,
    475 B.R. 720, 725 (Bankr. E.D. Cal. 2012) ........................................... 17-18, 21

*In re City of Vallejo*,
    403 B.R. 72 (Bankr. E.D. Cal. 2009), *aff'd IBEW, Local 2376
    v. City of Vallejo (In re City of Vallejo)*, 432 B.R. 262 (E.D. Cal. 2010) ...........18

*In re Miloszar*,
    238 B.R. 266 (D.N.J. 1999) ..................................................................46

*In re New York City Off-Track Betting Corporation*,
    427 B.R. 256 (Bankr. S.D.N.Y. 2010) ........................................... 16-17

*In re Suffolk Regional Off-Track Betting Corp.*,
    462 B.R. 397 (Bankr. E.D.N.Y. 2011) ............................................. 17-18, 40, 42

*Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo
(In re City of Vallejo)*, 408 B.R. 280 (9th Cir. B.A.P. 2009) .............................16

*Kim v. JPMorgan Chase Bank, N.A.*,
    825 N.W.2d 329 (Mich. 2012) ..................................................................40

*Kosa v. State Treasurer*,
    292 N.W.2d 452 (Mich. 1980) ..................................................................33

9301723.3 14893/161046

*Laethem Equip. Co., et al. v. J & D Implement, Inc., et al.*,
  2007 Mich. App. LEXIS 1769, *17 (Mich. Ct. App. July 19, 2007)..................57

*McCartney v. Attorney General*,
  587 N.W.2d 824 (Mich. App. 1998) ...................................................39

*McKane v. City of Lansing*,
  1998 U.S. App. LEXIS 649 (6th Cir. Jan. 14, 1998) ................................... 39, 42

*Migra v. Warren City Sch. Dist. Bd. of Ed.*,
  465 U.S. 75 (1984) .......................................................................48

*Moldovan v. A&P*,
  1985 U.S. Dist. LEXIS 20659 (W.D. Pa. Apr. 17, 1985) ...................................53

*Monat v. State Farm Ins. Co.*,
  677 N.W.2d 843 (Mich. 2004) ........................................................ *passim*

*Murphy v. Wayne County Employees Retirement Bd. of Trustees*,
  192 N.W.2d 568 (Mich. App. 1971) ....................................................33

*Musselman v. Governor of Mich.*,
  533 N.W.2d 237 (Mich. 1995) ........................................................ 32-35

*Oshtemo Charter Twp. v. Kalamazoo County Rd. Comm'n*,
  2013 Mich. App. LEXIS 1163 (Mich. Ct. App. June 25, 2013).............. 32, 34-35

*People ex rel Metevier v. Therrien*,
  45 N.W. 78 (Mich. 1890) ...............................................................32

*People v. Neumayer*,
  275 N.W.2d 230 (Mich. 1979) .........................................................43

*Phinisee v. Rogers*,
  582 N.W.2d 852 (Mich. App. 1998) ....................................................52

*Rhodes v. Stewart*,
  705 F.2d 159 (6th Cir. 1983) ...........................................................22

*Seitz v. Probate Judges Retirement System*,
  474 N.W.2d 125 (Mich. App. 1991) ...................................................33

*Sittler v. Bd. of Control*,
  53 N.W.2d 681 (Mich. 1952) ..........................................................32

*Sloan v. Madison Heights*,
  389 N.W.2d 418 (Mich. 1986) ........................................................52

*Smith v. Michigan*,
  410 N.W. 2d 749 (Mich. 1987) ........................................................32

9301723.3 14893/161046
13-53846-tdsw Doc 8807-1 Filed 12/16/14 Entered 12/16/14 15:59:20 Page 7 of 143

*Storer v. French,*
  58 F.2d 1125 (6th Cir. 1995) ....................................................... 21-22

*Temple v. Kelel Distributing Co., Inc.*
  454 N.W. 2d 610 (Mich. App. 1990) ................................................50

*Tinsman v. City of Southfield,*
  1999 Mich. App. LEXIS 2112 (Dec. 3, 1999) ....................................33

*Tripati v. Henman,*
  857 F.2d 1366 (9th Cir. 1988) .........................................................51

*Twp. Of Dearborn v. Dearborn Twp. Clerk,*
  334 Mich. 673 (1952) ......................................................................32

*UAW v. Central Mich. Univ. Trustees,*
  815 N.W.2d 132, 138 (Mich. App. 2012) .........................................50

*United States v. Bekins,*
  304 U.S. 27 (1938) ..................................................................... 19-20

*United States v. Security Indus. Bank,*
  459 U.S. 70 (1982) ..................................................................... 26-27

*Utica State Sav. Bank v. Oak Park,*
  273 N.W. 271 (Mich. 1937) .............................................................39

*Warwick Corp. v. Maryland Dep't of Transp.,*
  573 F. Supp. 1011 (D. Md. 1983)......................................................51

*Wayside Transp. Co. v. Marcell's Motor Express, Inc.,*
  284 F.2d 868 (1st Cir. 1960) ............................................................45

**Statutes**

11 U.S.C. § 109(c) ..................................................................... *passim*

11 U.S.C. § 921(c) ...............................................................................16

11 U.S.C. § 943(b)(4)...........................................................................11

28 U.S.C. § 1738 ...................................................................... 46, 49-50

29 U.S.C. § 1321 ...................................................................................4

M.C.L. § 141.1558 .................................................................... 36-37, 43

M.C.L. § 141.1560 ...............................................................................55

M.C.L. § 141.1566 .................................................................... 36-37, 43

M.C.L. § 15.151 ............................................................................7, 31

9301723.3 14893/161046

M.C.L. § 38.851 ................................................................................5

M.C.L. §117.1 ...................................................................................4

M.C.L. §141.1201 .............................................................................7

M.C.L. §141.1541 .............................................................................7

M.C.L. §141.1549 ...........................................................................54

M.C.L. §141.1552 ...................................................................... 37, 42

M.C.L. §168.1 ...................................................................................6

M.C.L. §168.64 ...............................................................................31

Mich. Const., art. IX, § 24 ...................................................... *passim*

Mich. Const. art. V, § 8 ...................................................................31

Mich. Const. art. XII, § 1-3 .............................................................36

U.S. Const. art. IV, § 1 ....................................................................45

U.S. Const. art. VI, cl 2 ..................................................................19

U.S. Const. amend. X .....................................................................19

**Other Authorities**

Q & A with Kevyn Orr:  Detroit's Emergency Manager Talks About
   City's Future, Detroit Free Press (June 16, 2013) ................................8

**Regulations**

20 C.F.R. § 404.1206 .......................................................................5

20 C.F.R. § 404.1212 .......................................................................5

**Rules**

M.C.R. 2.605 ...................................................................................50

9301723.3 14893/161046

The Police and Fire Retirement System of the City of Detroit ("PFRS") and the General Retirement System of the City of Detroit ("GRS," and together with PFRS, the "Retirement Systems") object to and contest the eligibility of the City of Detroit, Michigan (the "City") to be a debtor under Chapter 9 of title 11 of the United States Code, 11 U.S.C. § 101, *et seq*. (the "Bankruptcy Code"). [1]

## PRELIMINARY STATEMENT

In order to avail itself of the Bankruptcy Court, the City must first overcome the threshold issue of whether it is "eligible" to be a debtor under Chapter 9 of the Bankruptcy Code. The City cannot meet its burden. Pursuant to section 109(c)(2), a prospective municipal debtor must be "specifically authorized" under ***state law*** to become a debtor. The state law in this case—as embodied in the state's highest legal authority, the Michigan Constitution—forbids any act that would diminish or impair accrued public pension benefits. The Governor of the State of Michigan is duty-bound to uphold this provision, and any act in violation of the Michigan Constitution is void.

Prior to and in connection with seeking authorization to file this case, the Emergency Manager made abundantly clear his intention to impair and diminish the accrued financial benefits of each of the City's pension plans and retirement

---

[1]  This Objection is filed subject to the reservations of rights in the Appearances filed by the undersigned counsel in this case, including the Retirement Systems' right to argue that this Court lacks subject-matter jurisdiction.

1

systems, in violation of the Michigan Constitution. However, since the Governor cannot unilaterally abrogate the constitutional protections of accrued pension benefits, he also has no power to authorize the Emergency Manager to do so pursuant to this Chapter 9 case. Therefore, by authorizing a contingency-free bankruptcy that makes no exception for the accrued pension benefits of the City's past and present employees, the Governor stepped outside the bounds of his authority, rendering his "authorization" an *ultra vires* act that is void *ab initio*. In fact, a Michigan state court has already held *exactly this*, and therefore, the City is collaterally estopped from attempting to assert otherwise in this Court.

Further, because section 109(c)(2) of the Bankruptcy Code explicitly directs this Court to apply state law, any argument by the City that Michigan law is preempted by federal law is simply wrong. Indeed, the Bankruptcy Court for the Middle District of Pennsylvania specifically held that in the context of an eligibility proceeding under section 109(c)(2), the Supremacy Clause and principles of preemption never come into play, because section 109(c)(2) expressly grants *states* the authority to decide this issue. *See In re City of Harrisburg*, 465 B.R. 744 (Bankr. M.D. Pa. 2011). Thus, the Michigan Constitution simply cannot be ignored. Under these circumstances, if section 109(c)(2) was applied in any manner to permit this Chapter 9 filing in derogation of state constitutional law,

9301723.3 14893/161046

then that application would violate the Tenth Amendment of the U.S. Constitution and would render section 109(c)(2) itself unconstitutional.

Similarly, because section 109(c)(2) is purely a question of state law, *all* facets of Michigan law must be complied with, or the requisite "authorization" is not valid. Thus, in this case, the City's superficial compliance with PA 436 is not sufficient for the City to meet its burden. Instead, as the Court held in *Harrisburg*, all state law must be reconciled—the authorizing statute itself as well as any other relevant laws—and if a bar exists under state law that prevents the filing, that state law must be honored and the petition must be dismissed.

Lastly, if this Court is not persuaded that the City lacks specific authorization under section 109(c)(2), the City's petition is also barred by section 109(c)(5), because it cannot demonstrate that it negotiated with its creditors in good faith prepetition or that such negotiations were impracticable. Thus, the City cannot satisfy the eligibility requirements under section 109, and its petition must be dismissed.

I. **The Retirement Systems**

The residents of the City established the Retirement Systems through amendments to the City's Charter of 1918 (effective July 1, 1938, and effective July 1, 1941, respectively) as authorized by Article VII, section 22 of the Michigan

3

Constitution and sections 4i, 4j, and 21 of the Home Rule City Act, 1909 PA 267 (as amended), M.C.L. § 117.1 *et seq*. (the "Home Rule City Act"). Among other things, the Retirement Systems: (i) administer retirement, disability, and survivor benefits to eligible uniformed and non-uniformed City employees and their beneficiaries (*i.e.,* the participants); (ii) ensure that the City actually honors its collective bargaining agreements by tendering to the Retirement Systems the City's annual and obligatory pension contributions; and (iii) protect the vested pension benefits (*i.e.,* "accrued financial benefits") of the Retirement Systems and their participants. There are more than 32,000 active and retired employees of the City, who are participants in the Retirement Systems and whose "accrued financial benefits" the Retirement Systems must protect.

## II.      The Michigan Constitution

To ensure protection of public pension benefits, the Michigan Constitution states: "The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby." MICH. CONST., art. IX, § 24.

Unlike private employees, public employees—such as the City's past and present employees—are not protected by the federal Employee Retirement Income Security Act ("ERISA") nor by the federal Pension Benefit Guaranty Corporation ("PBGC"). *See* 29 U.S.C. § 1321(b)(2) ("This section does not apply to any

4

plan . . . established and maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing . . . .").[2] *For the City's retirees, there is no federal "insurance program," and their only pension "guarantee" is in the Michigan Constitution.*

Furthermore, many of the retirees are not covered by Social Security. When the Social Security Act (the "SSA") was first adopted in 1935, it did not extend coverage to state and local government workers. *See, e.g., Bowen v. Public Agencies opposed to Soc. Sec. Entrapment,* 477 U.S. 41, 45 (1986). In 1950, Congress amended the SSA to allow states to elect coverage for certain state and local employees. *Id.* at 45. A year later, in 1951, Michigan elected to extend federal SSA benefits to state and local employees. *See* M.C.L. § 38.851. However, states can elect to extend SSA benefits to only specific "coverage groups" of workers, so police and firefighters are not automatically covered. *Bowen,* 477 U.S. at 45; *see also* 20 C.F.R. § 404.1206(a)(8), 20 C.F.R. § 404.1212.

---

[2] Congress enacted ERISA in 1974 to provide comprehensive regulation for *private* pension plans." *Connolly v. Pension Benefit Guar. Corp.,* 475 U.S. 211, 214 (1986) (emphasis added). ERISA was designed "to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits . . . Congress wanted to guarantee that if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he will actually receive it." *Id.* (citations and quotations omitted). To achieve this goal of protecting "anticipated retirement benefits," Congress created the PBGC, a wholly owned Government corporation, which functions as "an insurance program" for participants in pension plans. *Id.*

5

*As a result, a significant number of the City's retirees (in particular, the police and firefighters) have no social security benefits to fall back on,* because these City employees were never added as a "covered group" and, therefore, have not accumulated SSA benefits.

## III. The Municipal Code of the City of Detroit

Article 11, section 11-101 of the Municipal Code of the City of Detroit provides:

1. The City shall provide, by ordinance, for the establishment and maintenance of retirement plan coverage for city employees.

2. Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and that funding shall not be used for financing unfunded accrued liabilities.

3. The accrued financial benefits of active and retired city employees, being contractual obligations of the city, shall in no event be diminished or impaired.

## IV. The Governor

On November 2, 2010, the people of the State of Michigan elected Richard D. Snyder to serve as their Governor (the "<u>Governor</u>"). On December 30, 2010 (as mandated by Article XI, section 1 of the Michigan Constitution and section 64 of the Michigan Election Law, 1954 P.A. 116, M.C.L. §168.1 *et seq.*), the Governor swore the following oath, which was later filed with the Michigan Secretary of

6

*As a result, a significant number of the City's retirees (in particular, the police and firefighters) have no social security benefits to fall back on,* because these City employees were never added as a "covered group" and, therefore, have not accumulated SSA benefits.

## III. The Municipal Code of the City of Detroit

Article 11, section 11-101 of the Municipal Code of the City of Detroit provides:

1. The City shall provide, by ordinance, for the establishment and maintenance of retirement plan coverage for city employees.

2. Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and that funding shall not be used for financing unfunded accrued liabilities.

3. The accrued financial benefits of active and retired city employees, being contractual obligations of the city, shall in no event be diminished or impaired.

## IV. The Governor

On November 2, 2010, the people of the State of Michigan elected Richard D. Snyder to serve as their Governor (the "<u>Governor</u>"). On December 30, 2010 (as mandated by Article XI, section 1 of the Michigan Constitution and section 64 of the Michigan Election Law, 1954 P.A. 116, M.C.L. §168.1 *et seq.*), the Governor swore the following oath, which was later filed with the Michigan Secretary of

6

*As a result, a significant number of the City's retirees (in particular, the police and firefighters) have no social security benefits to fall back on,* because these City employees were never added as a "covered group" and, therefore, have not accumulated SSA benefits.

## III. The Municipal Code of the City of Detroit

Article 11, section 11-101 of the Municipal Code of the City of Detroit provides:

1. The City shall provide, by ordinance, for the establishment and maintenance of retirement plan coverage for city employees.

2. Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and that funding shall not be used for financing unfunded accrued liabilities.

3. The accrued financial benefits of active and retired city employees, being contractual obligations of the city, shall in no event be diminished or impaired.

## IV. The Governor

On November 2, 2010, the people of the State of Michigan elected Richard D. Snyder to serve as their Governor (the "<u>Governor</u>"). On December 30, 2010 (as mandated by Article XI, section 1 of the Michigan Constitution and section 64 of the Michigan Election Law, 1954 P.A. 116, M.C.L. §168.1 *et seq.*), the Governor swore the following oath, which was later filed with the Michigan Secretary of

6

*As a result, a significant number of the City's retirees (in particular, the police and firefighters) have no social security benefits to fall back on,* because these City employees were never added as a "covered group" and, therefore, have not accumulated SSA benefits.

## III. The Municipal Code of the City of Detroit

Article 11, section 11-101 of the Municipal Code of the City of Detroit provides:

1. The City shall provide, by ordinance, for the establishment and maintenance of retirement plan coverage for city employees.

2. Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and that funding shall not be used for financing unfunded accrued liabilities.

3. The accrued financial benefits of active and retired city employees, being contractual obligations of the city, shall in no event be diminished or impaired.

## IV. The Governor

On November 2, 2010, the people of the State of Michigan elected Richard D. Snyder to serve as their Governor (the "<u>Governor</u>"). On December 30, 2010 (as mandated by Article XI, section 1 of the Michigan Constitution and section 64 of the Michigan Election Law, 1954 P.A. 116, M.C.L. §168.1 *et seq.*), the Governor swore the following oath, which was later filed with the Michigan Secretary of

6

State: "*I do solemnly swear that I will support the Constitution of the United States and the Constitution of this State, and that I will faithfully discharge the duties of the office of Governor according to the best of my ability*."

## V.     The Emergency Manager and the Restructuring Proposal

On March 14, 2013, Kevyn D. Orr was appointed as the emergency financial manager of the City pursuant to Public Act 72 of 1990, the Local Government Fiscal Responsibility Act, M.C.L. §141.1201, *et seq.*  On March 28, 2013, upon the effectiveness of Public Act 436, the Local Financial Stability and Choice Act, M.C.L. §141.1541, *et seq.* ("PA 436"), Mr. Orr became, and continues to act as, the emergency manager with respect to the City (the "Emergency Manager").

On March 14, 2013, as mandated by Article XI, section 1 of the Michigan Constitution and section 1 of the Constitutional Oath of Office Act, 1951 PA 22, M.C.L. § 15.151 *et seq.*, ("PA 22"), the Emergency Manager swore the following oath, which was later filed with the Michigan Secretary of State: "*I do solemnly swear that I will support the Constitution of the United States and the Constitution of this State, and that I will faithfully discharge the duties of the office of Emergency Financial Manager – City of Detroit according to the best of my ability.*"

In a June 13, 2013 interview with The Detroit Free Press, the Emergency Manager addressed the protection under Article IX, section 24 of the Michigan

7

Constitution against the impairment of accrued public pension benefits, expressing his intention to evade this provision of the Michigan Constitution through a federal Chapter 9 bankruptcy proceeding: [3]

> Q: You said in this report that you don't believe there is an obligation under our state constitution to pay pensions if the city can't afford it?
>
> A: The reason we said it that way is to quantify the bankruptcy question. We think federal supremacy trumps state law.
>
> Q: Which the 9th Circuit agrees for now.
>
> A: It is what it is—so we said that in a soft way of saying, "Don't make us go into bankruptcy." **If you think your state-vested pension rights, either as an employee or retiree—that's not going to protect you. If we don't reach an agreement one way or the other, we feel fairly confident that the state federal law, federalism, will trump state law** or negotiate. The irony of the situation is we might reach a deal with creditors quicker because employees and retirees think there is some benefit and that might force our hand. That might force a bankruptcy.

On June 14, 2013, the Emergency Manager issued his Proposal for Creditors (the "Restructuring Proposal") wherein he took the position that: (i) pension debts are unsecured claims that may be, and must be, impaired in any prospective Chapter 9 bankruptcy proceeding; and (ii) the City's alleged approximate $3.5

---

[3]  *See Q & A with Kevyn Orr:  Detroit's Emergency Manager Talks About City's Future*, Detroit Free Press (June 16, 2013), *available at* http://www.freep.com/article/20130616/OPINION05/306160052/kevyn-orr-detroit-emergency-manager-creditors-fiscal-crisis.

8

billion underfunding liability would be placed in a pool of unsecured claims comprising approximately $11.5 billion in claims, and exchanged for a *pro rata* share of an unsecured note in the face amount of $2.0 billion. The Restructuring Proposal is attached as Exhibit A to the Declaration of Kevyn D. Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code. [Docket No. 11] (the "Orr Declaration").

## VI.    The Pre-Petition Lawsuits

On July 3, 2013, four participants of GRS filed two separate lawsuits against the Governor, the State Treasurer, and the State of Michigan in the Ingham County Circuit Court, both seeking: (i) a declaration that PA 436 violates Article IX, section 24 of the Michigan Constitution by purporting to permit the impairment of accrued financial benefits in a Chapter 9 bankruptcy proceeding; and (ii) a temporary restraining order or preliminary injunction precluding the Governor and Treasurer from authorizing a Chapter 9 bankruptcy proceeding. *Flowers, et al. v. Snyder*, *et al.*, Case No. 13-729-CZ (Hon. Rosemarie Aquilina) (the "Flowers Case"); *Gracie Webster, et al. v. The State of Michigan, et al.*, Case No. 13-734-CZ (Hon. Rosemarie Aquilina) (the "Webster Case," and together with the Flowers Case, the "Companion Cases").[4]   On July 3, 2013, the Webster plaintiffs filed a motion for declaratory judgment and sought expedited relief.   On July 15, 2013,

---

[4] The Governor, the State Treasurer, and the State of Michigan are collectively referred to herein as the "Webster Defendants."

9

the Webster Defendants filed a motion for summary disposition seeking, on an expedited basis, adjudication of their request for dismissal. *See* Webster Defendants' Motion for Summary Disposition attached as Exhibit 1.

On July 17, 2013, the Retirement Systems filed a Complaint for Declaratory Relief against the Governor and the Emergency Manager in the Ingham County Circuit Court, Case No. 13-768-CZ (the "<u>Retirement Systems Lawsuit</u>" and, together with the Companion Cases, the "<u>Pre-petition Lawsuits</u>").

## VII. The Authorization and Filing of the Chapter 9 Bankruptcy Petition

On July 16, 2013, upon information and belief, the Emergency Manager delivered a letter to the Governor and the State Treasurer recommending, pursuant to section 18(l) of PA 436, that the City be authorized to file a case under Chapter 9 of the Bankruptcy Code (the "<u>Bankruptcy Recommendation</u>"). The Bankruptcy Recommendation is attached as Exhibit J to the Orr Declaration. In the Bankruptcy Recommendation, the Emergency Manager states that "[t]he City's debt and legacy liabilities must be significantly reduced" and that, in recommending a Chapter 9 bankruptcy, "the negotiation of changes to pension and retiree benefits with the City's retiree constituency is impracticable without court intervention." Bankruptcy Recommendation at pp. 2, 8. Based on the foregoing and many other excerpts from the Bankruptcy Recommendation, it is clear that the Emergency Manager contemplated use of the Chapter 9 process to implement his

9301723.3 14893/161046

13-53846-swr Doc 8807-1 Filed 12/16/14 Entered 12/16/14 23:55:20 Page 19 of 70
13-53846-swr Doc 813 Filed 08/19/13 Entered 08/19/13 23:55:10 Page 19 of 70
143

Restructuring Proposal, including the impairment and diminishment of "legacy" accrued pension benefits.

On July 18, 2013, the Governor sent a letter to the Emergency Manager and the State Treasurer purporting to grant to the Emergency Manager authorization to place the City into Chapter 9 bankruptcy (the "Governor's Authorization"). The Governor's Authorization is attached as Exhibit K to the Orr Declaration. The Governor expressly recognized that section 18(1) of PA 436 authorized him to place "contingencies" on a bankruptcy filing, but he nevertheless declined to do so. *Id.* at p. 4. Citing section 943(b)(4) of the Bankruptcy Code, the Governor concluded: "Federal law already contains the most important contingency—a requirement that the plan be legally executable." *Id.*

On July 18, 2013 (the "Petition Date"), the City filed its Voluntary Petition under Chapter 9 of the Bankruptcy Code (the "Bankruptcy Petition") and also filed the City Eligibility Submissions.[5]

_____

[5] The Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code [DN 10] (the "Statement of Qualifications"), the Orr Declaration, the Declaration of Gaurav Malhortra in Support of Statement of Qualifications [DN 12] (the "Malhortra Declaration"), the Declaration of Charles M. Moore in Support of Statement of Qualifications [DN 13] (the "Moore Declaration"), and the Memorandum in Support of Statement of Qualifications [DN 14] (the "Eligibility Memorandum") are collectively referred to herein as the "City Eligibility Submissions."

11

## VIII. The Declaratory Judgment in *Webster*

On July 19, 2013, the Circuit Court for Ingham County held a hearing on the Webster Plaintiffs' Motion for Declaratory Judgment and on the Webster Defendants' Motion for Summary Disposition. Following the hearing, the court entered its Order of Declaratory Judgment (the "Declaratory Judgment") in the Webster Case, a copy of which is attached as Exhibit 2. The Declaratory Judgment was entered against the Webster Defendants—all non-Debtor entities relative to the City's bankruptcy case. In the Declaratory Judgment, the Ingham County Circuit Court ruled:

> On July 16, 2013, City of Detroit Emergency Manager Kevyn Orr submitted a recommendation to Defendant Governor Snyder and Defendant Treasurer Dillon pursuant to Section 18(1) of PA 436 to proceed under Chapter 9, which together with the facts presented in Plaintiffs' filings, reflect that Emergency Manager Orr intended to diminish or impair accrued pension benefits if he were authorized to proceed under Chapter 9. On July 18, 2013, Defendant Governor Snyder approved the Emergency Manager's recommendation without placing any contingencies on a Chapter 9 filing by the Emergency Manager; and the Emergency Manager filed a Chapter 9 petition shortly thereafter. ***By authorizing the Emergency Manager to proceed under Chapter 9 to diminish or impair accrued pension benefits, Defendant Snyder acted without authority under Michigan law and in violation of Article IX Section 24 of the Michigan Constitution***.

*Id.* (emphasis added).

12

9301723.3 14893/161046

The Ingham County Circuit Court further ruled that "PA 436 is unconstitutional and in violation of Article IX Section 24 of the Michigan Constitution to the extent that it permits the Governor to authorize an emergency manager to proceed under Chapter 9 in any manner which threatens to diminish or impair accrued pension benefits; and PA 436 is to that extent of no force or effect." *Id.*[6]

## IX. The July 24, 2013 Hearings in the Bankruptcy Court

On July 19, 2013, in response to the Pre-Petition Lawsuits, the City filed the Stay Motions.[7] The Retirement Systems filed an objection [Docket No. 141] to the Stay Motions, arguing (i) that in light of the absence of valid state authorization for the filing of the Bankruptcy Petition (per the Declaratory Judgment), the filing was void, and there could not be any discussion of the application of a non-existent automatic stay, and (ii) other substantive objections.

---

[6] The Retirement Systems Lawsuit was subsequently removed and transferred to the United States District Court for the Eastern District of Michigan, Case No. 13-13255, and was assigned to the Honorable Paul D. Borman. On August 7, 2013, Judge Borman issued an Opinion and Order Remanding This Case to State Court for Lack of Jurisdiction/No Case or Controversy [Dist. Ct. Docket No. 7].

[7] The Motion of Debtor, Pursuant to Section 105(a) of the Bankruptcy Code, for Entry of an Order Confirming the Protections of Sections 362, 365 and 922 of the Bankruptcy Code [Docket No. 53] (the "Stay Confirmation Motion"), and the Motion of Debtor, Pursuant to Section 105(a) of the Bankruptcy Code, for Entry of an Order Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non-Officer Employees and (C) Agents and Representatives of the Debtor [Docket No. 56] (the "Stay Extension Motion," and together with the Stay Confirmation Motion, the "Stay Motions").

On July 24, 2013, the Court held a hearing on the Stay Motions. Although the Court granted the Stay Motions, it also made clear that:

> The Court is making no ruling whatsoever on whether the City of Detroit is eligible to be a debtor in Chapter 9. The Court is making no ruling on whether the state constitution prohibited the emergency manager's appointment or prohibited the emergency—excuse me— prohibited the [G]overnor from authorizing this Chapter 9 filing without excepting from it the constitutionally protected pension rights of its citizens. The Court is not ruling on whether the state court orders that were entered either pre- or post-bankruptcy should be given preclusive effect under principles of res judicata, collateral estoppel, Rooker-Feldman, or any other preclusive doctrine. The Court is not ruling on whether any orders entered by the state court after this bankruptcy case was filed violated the automatic stay. The Court is not ruling on whether the City of Detroit can propose a feasible or confirmable plan in light of the state constitution or any other consideration, for that matter.

> All of these issues on which the Court is not ruling today are fully preserved. Of course, when and if these issues are raised in an appropriate way, the Court will rule on them in due course with adequate notice and opportunity to be heard. [8]

---

[8] As discussed in more detail at Argument section I.B.1, *infra*, this Objection focuses on eligibility issues and not on the issue described by the Court as "whether the City of Detroit can propose a feasible or confirmable plan in light of the state constitution or any other consideration." As indicated by the Court, this issue, among other issues, is "fully preserved" and shall be raised "in due course."

Exhibit 3, 7/24/2013 Hrg. Tr. at p. 84, lines 1-24. On July 25, 2013, the Court

entered orders granting the Stay Motions.[9]

**Argument**

I.     **The City of Detroit Cannot Satisfy the Eligibility Requirements of
       Section 109(c)(2) of the Bankruptcy Code, and Its Bankruptcy Case
       Must Be Dismissed as a Matter of Law.**

   A.     **Standard of Review**

The City may be a debtor under Chapter 9 of the Bankruptcy Code if and

only if it:

> (1)     is a municipality;
>
> (2)     is *specifically authorized*, in its capacity as a
>         municipality or by name, to be a debtor under such
>         chapter *by State law*, or by a governmental officer
>         or organization *empowered by State Law* to
>         authorize such entity to be a debtor under such
>         chapter;
>
> (3)     is insolvent;
>
> (4)     desires to effect a plan to adjust such debts; and
>
> (5)     (A) has obtained the agreement of creditors
>         holding at least a majority in amount of the claims
>         of each class that such entity intends to impair
>         under a plan in a case under such chapter;

---

[9] *See* Order Pursuant to Section 105(a) of the Bankruptcy Code Extending the
Chapter 9 Stay to Certain (A) State Entities, (B) Non Officer Employees and (C)
Agents and Representatives of the Debtor [Docket No. 166] and Order Pursuant to
Section 105(a) of the Bankruptcy Code Confirming the Protections of Sections
362, 365 and 922 of the Bankruptcy Code [Docket No. 167].

15

9301723.3 14893/161046
13-53846-swr   Doc 8807-1   Filed 12/16/14   Entered 12/16/14 23:55:10   Page 24 of 70
13-53846-swr   Doc 817   Filed 08/19/13   Entered 08/19/13 23:55:20   Page 24 of 70
143

(B) has negotiated in good faith with creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

(C) is unable to negotiate with creditors because such negotiation is impracticable; or

(D) reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title.

11 U.S.C. § 109(c)(1-5) (emphasis added).

Section 921(c) of the Bankruptcy Code provides that "[a]fter any objection to the petition, the court, after notice and a hearing, may dismiss the petition if the debtor did not file the petition in good faith or if the petition does not meet the requirements of [the Bankruptcy Code]." 11 U.S.C. § 921(c).[10]

Courts have ruled that after an objection to the petition, the bankruptcy court must dismiss the case if the petition does not meet the requirements of the Bankruptcy Code, notwithstanding the seemingly permissive language of section 921(c). *See, e.g., In re New York City Off-Track Betting Corporation*, 427 B.R. 256, 264 (Bankr. S.D.N.Y. 2010) ("Courts must dismiss the petitions of debtors filing under chapter 9 who fail to satisfy [the] requirements [of section 109(c)]."), citing *Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo (In re City of*

---

[10] While the arguments in this Objection focus on the City's inability to satisfy the eligibility requirements under sections 109(c)(2) and (5) of the Bankruptcy Code, the same arguments support a dismissal of the City's petition for lack of good faith under section 921(c).

16

*Vallejo)*, 408 B.R. 280, 289 (9th Cir. B.A.P. 2009); *In re Suffolk Regional Off-Track Betting Corp.*, 462 B.R. 397, 421 (Bankr. E.D.N.Y. 2011) (citation omitted) ("Despite the permissive statutory language, courts have construed § 921(c) to require the mandatory dismissal of a petition filed by a debtor who fails to meet the eligibility requirements under §109(c).").

The burden rests with the debtor to establish by a preponderance of the evidence that the requirements of Bankruptcy Code section 109(c) have been met. *In re City of Stockton*, 475 B.R. 720, 725 (Bankr. E.D. Cal. 2012) (internal citations omitted) ("The burden of proof, at least as to the five § 109(c) elements, is on the municipality as the proponent of voluntary relief. . . . The quantum of proof . . . is the familiar preponderance-of-evidence standard of basic civil litigation."); *In re City of Harrisburg*, 465 B.R. 744, 752 (Bankr. M.D. Pa. 2011) (citations omitted) ("The burden of establishing eligibility is on the debtor."); *Suffolk Regional Off-Track Betting Corp.*, 462 B.R. at 414 (citations omitted) ("The debtor bears the burden to establish that the requirements of § 109(c) are satisfied."). In order to satisfy § 109(c)(2), that "explicit authorization must be written, 'exact, plain, and direct with well-defined limits so that nothing is left to inference or implication.'" *New York City Off-Track Betting Corporation*, 427 B.R.at 267 (citations omitted).

17

The eligibility requirements, with the exception of the section 109(c)(2) requirement, are "federal questions based on, and created by, the federal Bankruptcy Code and subject to a federal rule of decision." *Stockton*, 475 B.R. at 729. The eligibility determination under section 109(c)(2), however, presents a *question purely of state law. Id.*; *In re City of Stockton*, 2013 Bankr. LEXIS 2416, 21 (Bankr. E.D. Cal. June 12, 2013) ("California law governs the question whether the City [of Stockton] is authorized to be a chapter 9 debtor."). As one bankruptcy court has observed, states "act as gatekeepers to their municipalities' access to relief under the Bankruptcy Code." *In re City of Vallejo*, 403 B.R. 72, 76 (Bankr. E.D. Cal. 2009), *aff'd IBEW, Local 2376 v. City of Vallejo (In re City of Vallejo)*, 432 B.R. 262 (E.D. Cal. 2010). Bankruptcy courts exercise jurisdiction carefully when the authority to file bankruptcy under state law is questioned "in light of the interplay between Congress' bankruptcy power and the limitations on federal power under the Tenth Amendment." *Harrisburg*, 465 B.R. at 754 (internal citation omitted); *see also Suffolk Regional Off-Track Betting Corp.*, 462 B.R. at 420 (internal citations omitted) (emphasis added) ("Although §109(c) should be construed broadly to give effect to Congress'[s] intent 'to expand the applicability of chapter IX as much as possible' . . . the Court may not accomplish this by turning a blind eye to New York law governing the scope of a county's authority.").

9301723.3 14893/161046

**B.     The Supremacy Clause and Concepts of Preemption Do Not Apply Because Congress Gave States the Authority to Regulate Their Municipalities' Access to Chapter 9 Bankruptcy.**

Under the Supremacy Clause, "the Laws of the United States . . . shall be the supreme Law of the Land." U.S. CONST. art. VI, cl 2. The Tenth Amendment, however, provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people." U.S. CONST. amend. X.

Under section 109(c)(2), the relevant federal law *directs* that eligibility turns on proper state authorization under state law. This, in turn, reflects a further federal constitutional norm of critical importance: political subdivisions of a state can only seek bankruptcy relief to the extent authorized by state law. *See Ashton v. Cameron County Water Improvement Dist.,* 298 U.S. 513 (1936); *United States v. Bekins,* 304 U.S. 27 (1938).

In *Ashton*, the Supreme Court struck down as unconstitutional the provisions of Chapter IX of the former Bankruptcy Act, because they authorized political subdivisions of a state to file for federal bankruptcy relief without state authorization. *Ashton,* 298 U.S. at 531-32. Following *Ashton*, Congress amended the Bankruptcy Act to include a mechanism in Chapter X that permitted state entities to file for federal bankruptcy relief if the state authorized them to do so and, critically, required dismissal if the relevant plan was not "authorized by law,"

19

meaning "state law." *Bekins*, 304 U.S. at 49.[11]  In upholding the new statutory provision under Chapter X, the Court in *Bekins* concluded that the debtor in that case—a California irrigation district—was eligible to file for relief because California statutory law authorized it to do so.  Moreover, in remarking on the statute, the Court observed that it was otherwise carefully drawn to preserve the State's sovereignty and Tenth Amendment concerns because "[t]he bankruptcy power is exercised . . . only in a case where the action of the [debtor] in carrying out a plan of composition approved by the bankruptcy court is authorized by state law." *Id.* at 51.[12]

Accordingly, the current Bankruptcy Code ***expressly*** reserves the question of eligibility to state law.  *See* 11 U.S.C. § 109(c)(2) (requiring a municipal debtor to be "specifically authorized . . . to be a debtor . . . ***by State law***, or by a governmental officer or organization empowered ***by State law*** to authorize such entity to be a debtor") (emphasis added).  While the majority of Bankruptcy Code provisions are governed by federal law, this particular Code provision explicitly

---

[11] Following *Ashton*, Congress amended the Bankruptcy Act to include Chapter X, which was later redesignated as Chapter IX pursuant to the Chandler Act in 1938.

[12] To address Tenth Amendment concerns, Congress has amended the municipal bankruptcy statute several times, gradually requiring more rigorous state-law authorization.  *See, e.g.,* H. Rep. 95-595, 95th Cong., 1st Sess. 319 (1977) (recognizing that *Ashton* and *Bekins* require state authorization of municipal bankruptcy to protect state sovereignty); *see also Harrisburg*, 465 B.R. at 753-55.

demands that state law—not federal law—be applied. Indeed, as one court has observed:

> Section 109(c)(2) presents a question of pure state law . . . . All other eligibility questions under § 109(c)— § 109(c)(1) municipality; § 109(c)(3) insolvent; § 109(c)(4) desire to effect plan of adjustment; and § 109(c)(5) creditor negotiation—and the good faith question under § 921(c) *are federal questions based on, and created by, the federal Bankruptcy Code and subject to a federal rule of decision.*

*Stockton*, 475 B.R. at 729 (emphasis added).

Where the Code expressly reserves authority to the states (such as it does with exemptions, for example),[13] the Sixth Circuit Court of Appeals has held that the Supremacy Clause and preemption principles do not apply:

> It is fundamental that the state and federal legislatures share concurrent authority to promulgate bankruptcy laws, . . . and that the Supremacy Clause and the doctrine of preemption will serve to invalidate state promulgations to the extent that they are inconsistent with or contrary to federal law. *It is equally axiomatic, however, that Congress has not preempted an area wherein it has legislated when it expressly and concurrently authorizes the state legislatures to disregard or opt-out of such federal legislative area. In such instance, rather than preempting the area, Congress expressly authorizes the*

---

[13]   With respect to exemptions, "Bankruptcy Code § 522(b)(1) gives the debtor a choice between exempting the property specified in Bankruptcy Code § 522(d) or exempting the property protected by federal non-bankruptcy law or state or local law 'unless the State law that is applicable to the debtor . . . specifically does not so authorize.' . . . Thus, Congress vested states with the authority to deny their citizens the ability to use the federal exemption scheme[.]" *Storer v. French (In re Storer)*, 58 F.2d 1125, 1127 (6th Cir. 1995) (citation omitted).

21

**states to "preempt" the federal legislation.** Congress did not intend to preempt bankruptcy exemptions through the promulgation of 11 U.S.C. § 522(d) since it vested in the states the ultimate authority to determine their own bankruptcy exemptions.

*Rhodes v. Stewart*, 705 F.2d 159, 163 (6th Cir. 1983), *cert. denied*, 464 U.S. 983 (1983) (internal citations omitted) (emphasis added); *see also Storer*, 58 F.3d at 1127. By the same reasoning, the Supremacy Clause and preemption principles do not apply to consideration of whether a Chapter 9 debtor has met the state law eligibility requirement under Bankruptcy Code section 109(c)(2).

The debtor in *Harrisburg* unsuccessfully relied on the Supremacy Clause to argue that any infirmity in its authorization to file a Chapter 9 petition should be ignored. In *Harrisburg*, the Harrisburg City Council contended that Act 26 (a statute that precluded third-class cities, including Harrisburg, from filing a bankruptcy petition), could not prevent Harrisburg's bankruptcy filing because it violated the Supremacy Clause of the U.S. Constitution. *Harrisburg*, 465 B.R. at 755. The *Harrisburg* court rejected that argument:

> [The *Supremacy Clause* does not invalidate] the actions taken by the [state of Pennsylvania] to regulate the use of the bankruptcy process by distressed third class cities. **The citation to the Supremacy Clause does not support City Council's argument because, as noted above, in regard to <u>admission</u> into the bankruptcy process, § 109(c)(2) recognizes that a <u>state</u> serves as a municipality's gatekeeper into Chapter 9. It is only <u>after</u> a state specifically authorizes a municipality to file a bankruptcy petition <u>and an order for relief is entered</u>**

22

> **_under 11 U.S.C. § 921(d)_** *that the Supremacy Clause would become relevant to matters before this Court*.

*Id.* (emphasis added).[14]   The rationale for this was succinctly explained by the court in *Harrisburg*:

> The allegation that the [city of Harrisburg] has sought bankruptcy relief in defiance of this [state] statutory bar ***raises important concerns of federalism and respect for the power of states to manage their internal affairs***. Primary among these concerns is the Tenth Amendment to the U.S. Constitution, which provides that "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the People." U.S. Const. amend. X. ***Although Congress has the sole power to establish "uniform Laws on the subject of Bankruptcies throughout the United States" (U.S. Const. art. I, § 8), where federal bankruptcy law intersects with the rights of states to regulate the activities of political subdivisions created by the state, principles of dual sovereignty as defined by the Tenth Amendment must be considered. Congress has made bankruptcy available to municipalities, but states retain their concomitant rights to limit access by their political subdivisions to bankruptcy relief.***

*Harrisburg*, 465 B.R. at 753.   Accordingly, any notion that the Michigan Constitution is preempted in this matter is incorrect.

---

[14]   The court also noted that: "Even after an order for relief is granted, states maintain significant control over their political subdivisions. This position is set forth bluntly in § 903 of the Bankruptcy Code, which states that Chapter 9 does not 'limit or impair the power of a State to control, by legislation or otherwise, a municipality . . . in the exercise of the political or governmental powers of such municipality . . . .'" *Harrisburg*, 465 B.R. at 755 (citing 11 U.S.C. § 903).

23

### 1. The threshold issues of eligibility and access to Chapter 9 are the sole issues before the Court presently.

The Retirement Systems submit that it is important to clarify what is and is not before the Court at this juncture in the case. As discussed above, what is before the Court is the threshold or gating issue of whether the City is authorized to commence this case under Bankruptcy Code section 109(c)(2). This issue turns on state law. As discussed *infra*, the Court should construe section 109(c)(2) as requiring compliance with state law in order to avoid rendering Chapter 9 unconstitutional. Other elements of eligibility or lack of good faith are or may be before the Court at this time as well.

What is not before the Court at this juncture (without limitation and reserving all rights) is the issue of whether otherwise-applicable state constitutional law can be abrogated in a Chapter 9 proceeding (specifically, whether accrued public pension benefits protected under state constitutional law can be diminished or impaired by a debtor in a Chapter 9 proceeding, pursuant to a plan of adjustment or otherwise)—even assuming that the debtor has satisfied the eligibility requirements of the Bankruptcy Code. This issue includes but is not limited to the question of whether, under Bankruptcy Code sections 943(b)(4) and/or 903, a debtor may confirm a plan that violates state law by impairing accrued pension benefits.

9301723.3 14893/161046

This separation of issues follows not only as a matter of logic but also in light of: (a) the Court's indication that only issues of "eligibility" would be addressed at this time in connection with the scheduled October 23, 2013 hearing; and (b) the doctrine of constitutional avoidance, as recently relied upon by the United States Court of Appeals for the Sixth Circuit in *City of Pontiac Retired Employees Ass'n v. Schimmel*, 2013 U.S. App. LEXIS 16519 (6th Cir. August 9, 2013) (recommended for full-text publication).[15]   The Sixth Circuit Court of Appeals stated in that case:

> Under the doctrine of constitutional avoidance, we avoid constitutional determinations when a case can be resolved on other grounds.  *See Ashwander v. TVA*, 297 U.S. 288, 347, 56 S. Ct. 466, 80 L. Ed. 688 (1936) (Brandeis, J., concurring) ("It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case.") (internal citation and quotation marks omitted); *see also Muller Optical Co. v. EEOC,* 743 F.2d 380, 386 (6th Cir. 1984) ("The duty to avoid decisions of constitutional questions . . . [is]  based upon the general policy of judicial restraint."). When a case can be resolved on state constitutional grounds, we should decide the state issue so as to avoid rendering a decision under the Federal Constitution. *See Siler v. Louisville & Nashville R.R. Co.,* 213 U.S. 175, 191, 29 S. Ct. 451, 53 L. Ed. 753 (1909) ("This court has the same right, and can, if it deem it proper, decide the local questions only, and omit to decide the federal questions, or decide them adversely to the party claiming their benefit.") (citations omitted).

---

[15] All unpublished cases cited herein are attached collectively as Exhibit 7.

*City of Pontiac Retired Employees Ass'n,* 2013 U.S. App. LEXIS at 8-9. By the same reasoning, if the Court determines that the City is not eligible for bankruptcy relief as a matter of state law, it need not consider the federal constitutional questions involved with respect to sections 943(b)(4) and/or 903. Under the canon of constitutional avoidance, the Court should first address, in the context of construing and applying section 109(c)(2), the state law issue of the validity and state constitutionality of the Governor's Authorization, to possibly avoid having to address potential federal constitutional issues regarding (without limitation and reserving all rights) the Supremacy Clause, the Bankruptcy Clause, and the Tenth Amendment to the U.S. Constitution that may be implicated in determining the ability of a Chapter 9 debtor to abrogate state constitutional law via a plan of adjustment or otherwise.

### C. The Court Must Construe Section 109(c)(2) To Require Compliance with State Law.

Congress included section 109(c)(2) as part of Chapter 9 for a particular and important purpose—to preserve the role of state law in determining the eligibility of a state municipality to file for bankruptcy relief. Moreover, Congress did so for compelling constitutional reasons in the wake of *Ashton* and *Bekins*. As the Supreme Court has directed, in construing a federal statutory provision such as section 109(c)(2), federal courts should do so not only to effectuate its object and purpose but also to avoid questions about its constitutionality. *See United States v.*

26

*Security Indus. Bank*, 459 U.S. 70, 78 (1982) (reciting the "cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the constitutional question may be avoided") (citations and internal marks omitted).

In this case, construing section 109(c)(2) to permit the City to commence a Chapter 9 case notwithstanding that the relevant state official's authorization violated state law would do more than simply cast doubt on the constitutionality of section 109(c)(2); it would render it unconstitutional. The deference owed under the Tenth Amendment and the Supreme Court's decisions in *Ashton* and *Bekins* is not to state officials, but to state law. In this case, it is clear that Michigan law does not permit the Governor to authorize the City's bankruptcy filing under the circumstances present here—as already determined by an appropriate state court. In order to fully respect state law as Congress has directed, and likewise avoid any constitutional question regarding section 109(c)(2), this Court should conclude that the City is not eligible for bankruptcy relief.

### D. The City is Not Specifically Authorized to be a Chapter 9 Debtor Under State Law.

The Bankruptcy Code is explicit as to who may be a debtor under Chapter 9. Pursuant to Bankruptcy Code section 109(c)(2), the only entity that may be a Chapter 9 debtor is one that is *specifically authorized by State law* or by a governmental officer or organization *empowered by State law* to authorize such

27

9301723.3 14893/161046
13-53846-swr   Doc 8807-1   Filed 12/16/14   Entered 12/16/14 15:12:18   Page 36 of 70
13-53846-swr   Doc 513   Filed 08/19/13   Entered 08/19/13 23:55:20   Page 36 of 70
143

entity to be a debtor under Chapter 9. 11 U.S.C. § 109(c)(2). In its Eligibility Memorandum, the City argues that it satisfied section 109(c)(2) because (a) PA 436 authorized the Emergency Manager to recommend that the City commence a Chapter 9 bankruptcy proceeding, provided certain statutory requirements were satisfied; (b) the statutory requirements of PA 436 have been satisfied; (c) the Governor provided written authorization for the City to commence a Chapter 9 bankruptcy proceeding; and (d) upon receipt of the Governor's Authorization, PA 436 authorized the Emergency Manager to commence this case. *See* Eligibility Memorandum at pp. 9-11. This kind of technical argument, however, is insufficient to meet the City's burden. What matters is the substance of the City's authority, not its superficial form. The United States Bankruptcy Court for the Middle District of Pennsylvania rejected a similar argument in the *Harrisburg* case, and it properly fails as a matter of law.

In *Harrisburg, supra*, the city council adopted a resolution authorizing the city to file a Chapter 9 bankruptcy case. The authorizing statute at issue, Pennsylvania's Municipal Financial Recovery Act ("Act 47"), provided authority for a city to file bankruptcy if any one of five statutory conditions were satisfied. *Harrisburg*, 465 B.R. at 751. A second act, Act 26, restricted the ability of a financially distressed city of the third class to file Chapter 9 bankruptcy and prohibited government agencies from authorizing a distressed third-class city from

28

becoming a debtor under Chapter 9 of the Bankruptcy Code. *Id.* A third act, the Optional Third Class City Charter Law (the "Charter Law"), authorized the mayor to appoint a solicitor with the advice and consent of the city council. *Id.* at 764-65. Against this legislative backdrop, the *Harrisburg* court held that the city council did not have the authority to commence a bankruptcy case on behalf of the city of Harrisburg and it was not authorized under state law to be a debtor under the Bankruptcy Code. *Id.* at 765. The court thus dismissed the debtor's bankruptcy case. *Id.*

The *Harrisburg* court first concluded that, on its face, the city had complied with Act 47 and "would have been specifically authorized to file a petition under Chapter 9," absent the filing bar imposed by Act 26. *Harrisburg*, 465 B.R. at 754-55. Turning to the question of whether Act 26 eliminated the city's ability to file for bankruptcy, the court considered and disregarded challenges to the constitutionality of Act 26 based upon federal and state law. *Id.* at 755-63. The Court concluded that Act 26 eliminated the city of Harrisburg's ability to file bankruptcy, reasoning:

> Act 47 is intended to address the needs of financially distressed cities. It's [sic] provisions, however, ***are not intended to replace the entire scheme of governance set forth in the Charter Law and the Third Class City Code. Statutory provisions should be construed with reference to similar enactments and not simply read in a vacuum.*** *. . .* When § 261(b) of Act 47 is read in *pari materia* with the Third Class City Code and the Charter Law, ***§ 261(b)***

29

> *provides a limitation on the otherwise unfettered right of the Mayor to commence legal action on behalf of the City. Section 261(b) does not supplant other law allocating power between the executive and legislative branches of municipal government*, it simply clarifies that a mayor in a city operating under Plan A may not cause a petition to be filed unless a majority of the council also agrees that this is an appropriate course of action. *Accordingly, City Council's usurpation of the executive power of the Mayor by commencing litigation of behalf of the City of Harrisburg violated the Charter Law and the Third Class City Code.*

*Harrisburg*, 465 B.R. at 764-65 (internal citation omitted) (emphasis added).

Based upon state law and its analysis of the relationship between Act 47, Act 26, and the Charter Law, the *Harrisburg* court determined that the city council: (i) usurped the executive power of the mayor by commencing the bankruptcy; (ii) violated the Charter Law and the Third Class City Code; and (iii) did not have the authority to commence a bankruptcy case on behalf of the city. *Id.* As a result, the court concluded that the city was not specifically authorized to be a debtor as required by section 109(c)(2) and dismissed the bankruptcy case. *Id.*

Consistent with *Harrisburg*, Michigan's authorizing statute (PA 436) and the Governor's Authorization granted thereunder, must be construed with reference to the other laws of the state—specifically, Article IX, section 24 of the Michigan Constitution. The City is not eligible to be a Chapter 9 debtor simply because it "technically" received authorization from the Governor under PA 436 to file this case. *Harrisburg* requires a more rigorous review of the relevant state laws and

30

directs that even if the City technically complied with PA 436, the Governor is not empowered to authorize a bankruptcy if the filing simultaneously offends some other state law. Instead, the City must demonstrate that it received authorization from the Governor to be a Chapter 9 debtor, and that this authorization itself was valid under all of the laws of the State of Michigan (*i.e.,* both PA 436 and the Michigan Constitution). When PA 436 is read in conjunction with Article IX, section 24 of the Michigan Constitution, it becomes readily apparent that, although the City obtained a *superficial* authorization to commence this case from the Governor, that authorization is **invalid**. The City cannot satisfy section 109(c)(2), and the City is ineligible to be a debtor under Chapter 9 of the Bankruptcy Code.

### 1. The Governor and the Emergency Manager must uphold the Michigan Constitution.

The Michigan Constitution demands that "the governor shall take care that the laws be faithfully executed." MICH. CONST. art. V, § 8.[16] The single most important law for the Governor to uphold is the Michigan Constitution. "[T]he

---

[16] The Michigan Constitution requires that all officers—legislative, executive and judicial—in the state of Michigan must take an oath to support the Constitution of the United States and the Constitution of the state of Michigan. MICH. CONST. 1963, art. XI, § 1. Michigan law also requires that "[e]very person elected to the office of governor . . . before entering upon the duties of his office, shall take and subscribe to the oath as provided in section 1 of article 11 of the state constitution and deposit same with the secretary of state." M.C.L. § 168.64. In addition: "All persons now employed, or who may be employed by the state of Michigan . . . shall . . . take and subscribe to the oath or affirmation required of members of the legislature and other public officers by [MICH. CONST., art. XI, § 1]." M.C.L. § 15.151.

plain provisions of the Constitution are paramount." *Twp. of Dearborn v. Dearborn Twp. Clerk*, 55 N.W.2d 201, 207 (1952). The proposition that the "Michigan Constitution is a limitation on the plenary power of government" is one "so basic as to require no citation." *Smith v. Michigan*, 410 N.W.2d 749 (Mich. 1987) (J. Boyle, concurring in part and dissenting in part). It "is the fundamental law to which all other laws must conform." *Id.*

"Public officers have and can exercise only such powers as are conferred on them by law." *Sittler v. Bd. of Control*, 53 N.W.2d 681, 684 (Mich. 1952) (citations omitted). It is thus clear that the Michigan Constitution provides clear limitations on actions that may be taken by each branch of government, and no branch has the authority to eradicate constitutional guarantees. *See Musselman v. Governor of Mich.*, 533 N.W.2d 237, 244-45 (Mich. 1995); *Oshtemo Charter Twp. v. Kalamazoo County Rd. Comm'n*, 2013 Mich. App. LEXIS 1163, *19 (Mich. Ct. App. June 25, 2013) ("The Legislature's authority does not extend to eradicating constitutional guarantees."); *People ex rel Metevier v. Therrien*, 45 N.W. 78, 80 (Mich. 1890) ("The Governor cannot, by any act of his own, enlarge the power granted him by the Legislature . . . [and] cannot foreclose the right of the courts to preserve . . . constitutional rights."). Accordingly, the Governor can only exercise the power granted to him by law, and he is unable to act in violation of the State Constitution.

### 2. Article IX, section 24 of the Michigan Constitution prohibits the Governor and the Emergency Manager from taking any action that causes accrued public pension benefits to be diminished or impaired.

The Michigan Constitution prohibits the State of Michigan and its political subdivisions from diminishing or impairing the "accrued financial benefits" of their pension plans and retirement systems. MICH. CONST. art. IX, § 24. The Michigan Supreme Court has defined the term "accrued financial benefit" as "the right to receive certain pension payments upon retirement, based on service performed." *Kosa v. State Treasurer*, 292 N.W.2d 452, 459-60 (Mich. 1980) (citation omitted).[17] Action that diminishes or impairs "accrued financial benefits" is in violation of a "solemn" obligation "between public employees and the Legislature guaranteeing that pension benefit payments cannot be constitutionally impaired." *Id.* at 465.

---

[17] *See also Tinsman v. City of Southfield*, 1999 Mich. App. LEXIS 2112, at *10 (Mich. Ct. App. Dec. 3, 1999) (unpublished) ("By changing the formula and applying it to all current employees, the net effect was to diminish or impair plaintiffs' accrued financial benefits in the pension plan, contrary to Mich. Const. 1963, art. 9, § 24."); *Seitz v. Probate Judges Retirement System*, 474 N.W.2d 125, 130 (Mich. App. 1991) ("[T]he state may not reduce the pension benefit of any state employee or official, or local employee or official, once a pension right has been granted"); *Murphy v. Wayne County Employees Retirement Bd. of Trustees*, 192 N.W.2d 568 (Mich. App. 1971) (affirming grant of summary judgment in favor of plaintiff on his request for specific relief in the form of reinstatement of his retirement benefits which were unconstitutionally impaired and diminished by legislative act).

33

As established above, the Governor is required to uphold the Michigan Constitution and, therefore, is duty-bound to prevent the City from diminishing or impairing the "accrued financial benefits" of its pension plan and retirement systems. Moreover, financial distress is not grounds for the Legislature or the Executive branch to abrogate the Michigan Constitution. Indeed, the Michigan Supreme Court has specifically ruled that the Governor cannot violate Article IX, section 24—even if only done so "temporarily" or in response to a financial crisis. In *Musselman, supra,* a former Michigan governor attempted to reduce expenditures by decreasing appropriations to the schools' retirement system by $54 million. The plaintiffs, a group of current and retired public school employees, argued that the governor's actions violated the second sentence of Article IX, section 24, which requires "financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities." The governor argued that his power under Michigan Constitution article 5, section 20 (which permits the governor to "reduce expenditures") authorized him to do so. *Musselman*, 533 N.W.2d at 239-40.

The court disagreed with the governor and started by acknowledging the unique status of pension benefits: "pension obligations differ from nearly every other type of government spending insofar as they simply cannot be reduced or cut

. . . Michigan governmental units do not have the option . . . of not paying retirement benefits." *Musselman*, 533 N.W.2d at 243. The Court ruled that although the Michigan Constitution expressly allowed the Governor to reduce expenditures and that "education has not been immunized from emergency reductions," the governor still could not reduce expenditures if it ran afoul of another constitutional provision (namely, Article IX, section 24). *Id.* at 244. Further, "[Article 5, section 20] certainly would not authorize the government to refuse to satisfy its contractual obligations, such as pension payments to retirees," even "in an emergency." *Id.* The court also rejected the governor's argument that the violation was merely "temporary," holding that Governor lacks "authority to violate other constitutional provisions even temporarily." *Id.* at 245. Lastly, the court ruled that the Legislature was likewise barred from adopting the governor's unconstitutional strategy: "Insofar as it authorizes the Governor to select and implement spending cuts in an emergency, it simply affords him legislative power. But the Legislature does not have authority to fail to prefund a pension fund, even temporarily."[18] *Id.*

---

[18] On rehearing, the majority wrote that they would "affirm all portions of this Court's April 25, 1995, majority opinion [in *Musselman I*]." *Musselman v. Governor*, 545 N.W.2d 346, 346 (1996). Justice Brickley, who had previously been in the majority, dissented on the grounds that it was not "necessary to interpret the meaning of 'financial benefits' as the term applies to Const 1963, art 9, § 24," so he would no longer hold that health care benefits constitute "financial benefits" within the meaning of Article IX, section 24. *Id.* at 349. This does not change the validity of *Musselman I* as it relates to the Retirement Systems' analysis, however, because it is not being cited for the proposition that "accrued financial benefits" includes health care benefits.

Thus, the Governor, the Legislature, and the Emergency Manager must all abide by the Michigan Constitution and cannot take any act that would impair or diminish accrued financial benefits—even temporarily—regardless of any financial circumstances they believe to be exigent.

> **3.** **The Governor's Authorization of the City's bankruptcy without imposing conditions prohibiting the diminishment or impairment of accrued public pension benefits violated the Michigan Constitution and is void *ab initio*.**

Sections 18 and 26 of PA 436 permit the Governor to authorize the Emergency Manager to initiate a Chapter 9 bankruptcy proceeding. M.C.L. § 141.1558(1); M.C.L. § 141.1566(1). If the Governor does grant such an authorization, those same provisions of PA 436 permit the Emergency Manager to file a petition under Chapter 9. *Id.*

However, PA 436 does not enable the Governor to authorize a Chapter 9 filing if such filing would violate the Michigan Constitution—indeed, the statute could not permit this, as the Governor and the Legislature do not have the authority to simply legislate amendments to the Michigan Constitution.[19]  In addition, nothing in PA 436 expressly authorizes the Governor or Emergency Manager to seek to have municipal pension debts or the accrued financial benefits of municipal

---

[19] The Michigan Constitution can be amended three ways, none of which have occurred here—(i) by legislative proposal and a vote of electors, (ii) by petition and a vote of electors, or (iii) by a general revision at a constitutional convention. See MICH. CONST. art. XII, § 1-3.

36

pension plans impaired under Chapter 9. To the contrary, section 12(1)(m)(ii) of

PA 436 states that if appointed sole trustee of either of the Retirement Systems,

**"[t]he emergency manager shall fully comply with . . . section 24 of article IX**

**of the state constitution of 1963.**" M.C.L. § 141.1552(1)(m)(ii) (emphasis

added).[20]

Further, sections 18(1) and 26(2) of PA 436 state that "[t]he governor may

place *contingencies* on a local government in order to proceed under chapter 9."

M.C.L. § 141.1558(1); M.C.L. § 141.1566(2) (emphasis added). By authorizing the

Governor to place conditions on a Chapter 9 authorization, it can be presumed that

the Legislature intended for Chapter 9 authorizations, in applicable situations, to be

contingent upon, among other things, the Emergency Manager not being permitted

to seek or accede to the impairment of accrued pension benefits, in order to uphold

the State Constitution.

The Governor's Authorization acknowledges that section 18(1) of PA 436

permitted him to place "contingencies" on a bankruptcy filing, but the Governor

nevertheless declined to do so.  Exhibit K to Orr Declaration, p. 4.  In so declining,

the Governor violated the Michigan Constitution.  Citing section 943(b)(4) of the

Bankruptcy Code, the Governor concluded:  "Federal law already contains the

---

[20] Section 11(1)(d) of PA 436 also requires that any financial and operating plan
developed by the Emergency Manager shall provide for "[t]he timely deposit of
required payments to the pension fund for the local government or in which the
local government participates." M.C.L. § 141.1551(1)(d).

37

9301723.3 14893/161046
13-53846-swr   Doc 8307-1   Filed 03/19/13   Entered 08/19/13 23:55:10   Page 46 of 70
143

most important contingency - - a requirement that the plan be legally executable."
*Id.* This reasoning, however, is faulty. It confuses and conflates two different issues. The first issue arises under section 109(c)(2) regarding whether the Governor even has the authority under applicable state law to authorize the Chapter 9 filing. As discussed *supra*, this is a separate and threshold issue that must be addressed before one considers the interplay of federal and state constitutional issues implicated by an analysis of section 943(b)(4). An analysis of that first, threshold issue leads to the conclusion that a contingency for preserving the state constitutional protection of accrued pension benefits is a mandatory contingency upon the authorization of the City's filing of its Chapter 9 Bankruptcy Petition.

Michigan courts have long held that a Governor's actions outside the confines of the Michigan Constitution are "null and void." In the early Michigan Supreme Court case of *Dullam v. Willson*, the court found unconstitutional the Governor's action in attempting to remove a state school trustee from his post without a hearing. *Dullam v. Willson*, 19 N.W. 112 (Mich. 1884). In *Dullam*, Justice Cooley noted:

> Courts, in determining whether rights exist, or whether vested rights have ceased to exist, do not act necessarily or usually as appellate tribunals, whose judgments operate on the tribunals or persons whose invasions of right are complained of. They may or may not do so. **But in a constitutional government the action of all**

38

> *persons, official or private, which is in violation of constitutional rights, is simply null and void, and usually needs no reversal.   And the action of any department of government, whether legislative, executive or judicial, beyond its jurisdiction, or against the constitutional limitations of its authority, is in law the same as if there had been no action, and cannot be recognized as having legal effect. . . . No executive authority exists outside of its legal boundaries.*

*Id.* at 120-21 (Cooley, J., concurring) (emphasis added).

Given this legal framework, it is clear that actions taken by the Governor that are outside of his constitutional power are *ultra vires*.  "The term 'ultra vires' means outside the scope of authority." *McCartney v. Attorney General*, 587 N.W.2d 824, 826 (Mich. App. 1998) (citation omitted). "Thus, if the Governor acts outside the scope of his authority, his actions are considered ultra vires." *Id.*

*Ultra vires* acts are void *ab initio*.  *See, e.g., McKane v. City of Lansing*, 1998 U.S. App. LEXIS 649, *12-15 (6th Cir. Jan. 14, 1998) (affirming district court determination that city council's adoption of an early retirement plan was void *ab initio* when adopted via resolution, not ordinance); *Utica State Sav. Bank v. Oak Park*, 273 N.W. 271, 274 (Mich. 1937) ("Surely no one, in view of the constitutional, statutory and charter provisions noted herein, could successfully assert that the legislature had the power to make a contract of this character in behalf of the defendant village.  It follows that notwithstanding the remedial act of

9301723.3 14893/161046

the legislature, the contract under which plaintiffs assert their rights was void in its inception and still remains so.").

If an act is void *ab initio*, it is as though the act never occurred in the first place. *See Kim v. JPMorgan Chase Bank, N.A.*, 825 N.W.2d 329, 330 (Mich. 2012) (citing Black's Law Dictionary (9th ed.) and defining void *ab initio* as "[n]ull from the beginning, as from the first moment. . .").

In the municipal bankruptcy context, if the government official or entity authorizing the bankruptcy is acting *ultra vires*, then the bankruptcy filing is *not* "specifically authorized" and the petition must be dismissed. *See Suffolk Off-Track Betting Corp.*, 462 B.R. at 420-21 ("The County Resolution exceeded Suffolk County's authority and is therefore unconstitutional and void . . . Accordingly, Suffolk OTB has not complied with § 109(c)(2), and is therefore ineligible to be a debtor under chapter 9.") (internal citations omitted).

In this case, the Governor exceeded his authority under the Michigan Constitution by authorizing the Emergency Manager to file a Chapter 9 petition without conditioning that authorization upon the preservation of the State constitutional protection of accrued pension benefits, and his action was therefore *ultra vires* and void *ab initio*. Because the Governor's action was void *ab initio*, the Emergency Manager had no authority to file a Chapter 9 petition under PA 436, and his actions in doing so were similarly void *ab initio*.

9301723.3 14893/161046

### 4. The Governor cannot abrogate provisions of the Michigan Constitution, directly or indirectly.

The Governor is bound to uphold the State Constitution, including the provisions of Article IX, section 24. He does not have the authority to unilaterally abrogate provisions of the State Constitution. Similarly, he cannot delegate authority that he does not have to a third party (*i.e.*, the Emergency Manager) to take actions that would result in an abrogation of constitutional provisions. In essence, the Governor cannot do indirectly what he cannot do directly. *See Attorney Gen ex rel Eaves v. State Bridge Com.*, 269 N.W. 388, 392 (Mich. 1936) ("It is a fundamental and familiar proposition of law that the State may not do indirectly that which it is forbidden to do directly.").[21]

It therefore follows that neither the Legislature nor the Governor may delegate to the Emergency Manager the authority to impair or diminish the accrued financial benefits of the Retirement Systems and their participants because Article

---

[21] See also *Blank v. Dep't. of Corrections*, 564 N.W.2d 130, 136 (Mich. App. 1997) ("The Legislature may not do indirectly what it cannot do directly."); *Socialist Workers Party v. Secretary of State*, 317 N.W. 1, 11 (Mich. 1982) (holding that the Legislature could not "do indirectly what art 2, § 4, forbids it from doing directly."); *Regents of University of Mich. v. State*, 235 N.W.2d 1, 17 (Mich. 1975) ("The condition may not be designed to permit the Legislature to indirectly accomplish that which it may not do directly."); *Toebe v. Munising*, 275 N.W. 744, 748 (Mich. 1937) ("This manner of doing indirectly that which may be done directly, is not proscribed by the language of the Constitution.").

41

IX, section 24 of the Michigan Constitution expressly denies the Legislative and

Executive branches that power.  *See Musselman,* 533 N.W.2d at 245.

> **5.     The Emergency Manager's authorization of the City's bankruptcy without imposing conditions prohibiting the diminishment or impairment of accrued financial benefits violated the Municipal Code of the City of Detroit and is void *ab initio*.**

Article 11, section 11-101(3) of the Municipal Code of the City of Detroit

also prohibits the diminishment or impairment of accrued financial benefits of

active and retired city employees.  When the Emergency Manager recommended

that the City be authorized to file bankruptcy and when the Emergency Manager

commenced this case without conditioning such filing upon the protection of

accrued pension benefits of active and retired city employees, the Emergency

Manager violated the Detroit Municipal Code.[22]  Thus, for this additional reason,

his actions were *ultra vires* and void *ab initio.  See McKane and Suffolk, supra.*

Accordingly, the City was not validly authorized to be a debtor under Chapter 9, it

---

[22] Reserving all rights, the Retirement Systems note that PA 436, on its face, appears to authorize the Emergency Manager to suspend, amend, or repeal ordinances of a municipality.  M.C.L. § 141.1552(2) ("Except as otherwise provided in this act, during the pendency of the receivership, the authority of the chief administrative officer and governing body to exercise power for and on behalf of the local government under law, charter, and ordinance shall be suspended and vested in the emergency manager.").  However, the Emergency Manager did not suspend Article 11, section 11-101(3) of the Detroit Municipal Code as of the date of his recommendation or the Petition Date.  *See* Emergency Manager Order No. 13, July 18, 2013, attached to the City's Bankruptcy Petition (Docket No. 1) at 9-11 (no suspension of Article 11, section 11-101(3) mentioned).

42

cannot satisfy the requirements of section 109(c)(2), and the case must be dismissed.

> **6. Alternatively, if PA 436 does purport to permit the impairment of accrued financial benefits, then it is unconstitutional and the Governor's Authorization and initiation of the Chapter 9 bankruptcy was *ultra vires* and void *ab initio*.**

If this Court determines that PA 436 does indeed provide that the Governor and the Emergency Manager can take actions that may impair the City's obligations for accrued pension benefits, then, for the reasons discussed above, PA 436 contravenes Article IX, section 24 of the Michigan Constitution and is of no force and effect.

It is a well-established rule that courts "will presume that all legislation is constitutional and will attempt to construe legislation so as to preserve its constitutionality." *People v. Neumayer*, 275 N.W.2d 230, 237 (Mich. 1979). Here, sections 18(1) and 26(2) of PA 436 provide this Court with an opportunity to save PA 436 from being unconstitutional by finding that PA 436 does **not** authorize the Governor or Emergency Manager to cause the impairment of constitutionally-protected accrued public pension benefits through authorization of a Chapter 9 bankruptcy. Both provisions state that "[t]he governor may place contingencies on a local government in order to proceed under chapter 9." M.C.L. § 141.1558(1); M.C.L. § 141.1566(2). By authorizing the Governor to place conditions on a

Chapter 9 authorization, it may thus be presumed that the Legislature intended for Chapter 9 authorizations, in applicable situations, to be contingent on the Emergency Manager not being permitted to seek or accede to the impairment of accrued financial benefits.

E. **Collateral Estoppel Precludes the City from Relitigating the Threshold Issue of Whether the City Received Valid Authorization from the Governor to File the Petition Because That Issue Has Already Been Litigated and a Declaratory Judgment Rendered.**

On July 19, 2013, the Ingham County Circuit Court—a court of competent jurisdiction—entered the Declaratory Judgment stating: "PA 436 is unconstitutional and in violation of Article IX Section 24 of the Michigan Constitution to the extent that it permits the Governor to authorize an emergency manager to proceed under chapter 9 in any manner which threatens to diminish or impair accrued pension benefits; and **PA 436 is to that extent of no force or effect**." (Exhibit 2, Declaratory Judgment, pg. 2) (emphasis added). The Declaratory Judgment further states: "The Governor is prohibited by Article IX Section 24 . . . from authorizing an emergency manager . . . to proceed under Chapter 9 in a manner which threatens to diminish or impair accrued pension benefits, and **any such action by the Governor is without authority**. . .[.]" *Id.* (emphasis added). The City ignores that the very statute it relies upon to demonstrate that it was "specifically authorized" under Section 109(c)(2) has been

44

9301723.3 14893/161046

13-53846-swr Doc 8807-1 Filed 12/16/14 Entered 12/16/14 15:12:18 Page 53 of 70
13-53846-swr Doc 8817 Filed 08/19/13 Entered 08/19/13 23:55:20 Page 53 of 70
143

deemed "unconstitutional" and "of no force and effect" by a Michigan state court to the extent that statute is being relied upon to support the Governor's Authorization of the filing of the Bankruptcy Petition. It also ignores that the Governor was specifically found to *lack* the authority to grant such authorization. Collateral estoppel, however, prevents the City (and this Court) from ignoring the Declaratory Judgment, and the City is barred from re-litigating this issue in this forum.

### 1. The Declaratory Judgment is entitled to full faith and credit.

The Full Faith and Credit Clause in the United States' Constitution commands that "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof." U.S. CONST. art. IV, § 1. While this clause is binding only upon the States, "Congress imposed on the federal courts the duty to give full faith and credit to judgments of the state courts" by implementing the Full Faith and Credit Statute, codified at 28 U.S.C. § 1738. *Wayside Transp. Co. v. Marcell's Motor Express, Inc.*, 284 F.2d 868, 870-71 (1st Cir. 1960). The Full Faith and Credit Statute states:

> The . . . judicial proceedings of any court of any . . . State
> . . . shall have the same full faith and credit in every court

> within the United States . . . as they have by law or usage
> in the courts of such State . . . from which they are taken.

28 U.S.C. § 1738.

Under the Full Faith and Credit Statute, state court judgments must be honored by federal bankruptcy courts. "When a federal court re-examines an issue that has already been determined in the State Courts, tension may develop. To avoid this imminent conflict, Congress passed the 'Full Faith and Credit Act.'" *In re Miloszar*, 238 B.R. 266, 269 (D.N.J. 1999) (internal citations and quotations omitted). The Full Faith and Credit Statute "requires the federal courts to give a prior State Court judgment the same preclusive effect that it would be given in subsequent proceedings in the same state." *Id.* As a result, for example "[t]he Bankruptcy Court does not have the power to vacate a State Court default judgment." *Id.*; *see also Bay Area Factors v. Calvert (In re Calvert)*, 105 F.3d 315, 317 (6th Cir. 1997) ("Our determination of the collateral estoppel effect of a state court default judgment in bankruptcy dischargeability proceedings begins with the Full Faith and Credit Statute, 28 U.S.C. § 1738, which requires the federal courts to give full faith and credit to the judicial proceedings of state courts.")

Notably, a state court's *judgment* is entitled to stricter compliance than a state's general *laws*. *See Baker v. General Motors Corp.*, 522 U.S. 222, 233 (1998). In *Baker*, the United States Supreme Court distinguished between the credit a court must give to another state's *laws* versus the credit owed to another

46

court's *judgments* and concluded that a court cannot refuse to give effect to another

court's judgment:

> The Full Faith and Credit Clause does not compel a state to substitute the statutes of other states for its own statutes dealing with a subject matter concerning which it is competent to legislate. ***Regarding judgments, however, the full faith and credit obligation is <u>exacting</u>.*** A final judgment in one State, if rendered by a court with adjudicatory authority over the subject matter and persons governed by the judgment, ***qualifies for recognition throughout the land.*** For claim and issue preclusion (*res judicata*) purposes, in other words, the judgment of the rendering State gains nationwide force.

*Id.* (internal quotations and citations omitted, emphasis added). The Supreme

Court has acknowledged the importance of judgment recognition between the state

and federal courts:

> [I]nvocation of *res judicata* and collateral estoppel [relieves] parties of the cost and vexation of multiple lawsuits, [conserves] judicial resources, and, by preventing inconsistent decisions, [encourages] reliance on adjudication . . . [T]hese doctrines also serve to promote the comity between state and federal courts that has been recognized as a bulwark of the federal system.[23]

*Allen v. McCurry*, 449 U.S. 90, 94-96 (1980) (internal quotes omitted).

___

[23] Coincidentally, the Court acknowledged these concerns when ordering the stay be extended to the Governor and the Treasurer; the Court noted dual proceedings are "costly, expensive, and inefficient" and there is "of course, a danger of potentially inconsistent results." (Exhibit 3, 7/24/2013 Hrg. Tr., pg. 81). This is precisely why the declaratory judgment must be given effect—a second crack at this argument in the bankruptcy court is "costly, expensive, and inefficient," and could lead to "inconsistent results."

9301723.3 14893/161046

Under the Full Faith and Credit Act, this Court is bound by the Declaratory Judgment.

### 2. The preclusive effect of the Declaratory Judgment is governed by Michigan law.

The Full Faith and Credit Clause directs a federal court to apply the law of the state in which the judgment was rendered for purposes of determining its preclusive effect:

> **This statute directs a federal court to refer to the preclusion law of the State in which judgment was rendered**. "It has long been established that § 1738 does not allow federal courts to employ their own rules . . . in determining the effect of state judgments. Rather, it goes beyond the common law and commands a federal court to accept the rules chosen by the State from which the judgment is taken.

*Bay Area Factors*, 105 F.3d at 317 (citing *Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985) (quoting *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 481-82 (1982)) (emphasis added); *Migra v. Warren City Sch. Dist. Bd. of Ed.*, 465 U.S. 75, 81 (1984) ("It is now settled that a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered."). In this case, the applicable preclusion law is that of the State of Michigan.

9301723.3 14893/161046

### 3. The elements for collateral estoppel under Michigan law are satisfied in this matter.

Under Michigan law, "[c]ollateral estoppel, or issue preclusion, precludes relitigation of an issue in a subsequent, different cause of action between the same parties or their privies when the prior proceeding culminated in a valid final judgment and the issue was actually and necessarily determined in the prior proceeding." *Ditmore v. Michalik*, 625 N.W.2d 462, 467 (Mich. Ct. App. 2001). The elements that must be satisfied before collateral estoppel may be applied are: (1) a question of fact essential to the judgment must have been actually litigated and determined by a valid and final judgment; (2) the same parties or their privies must have had a full and fair opportunity to litigate the issue; and (3) there must be mutuality of estoppel, if collateral estoppel is being applied offensively. *Monat v. State Farm Ins. Co*., 677 N.W.2d 843, 845-46 (Mich. 2004).

### a. The Governor's authority to authorize the bankruptcy petition was actually litigated and determined by a valid final judgment.

To be considered "actually litigated," the issue must be "put into issue by the pleadings, submitted to the trier of fact for a determination, and thereafter determined." *Cogan v. Cogan*, 385 N.W.2d 793, 795 (Mich. App. 1986).

In this case, the Governor's "authority" and the validity of PA 436 was fully briefed by all of the parties, and a hearing was held where both parties argued their relative positions (and notably, the Attorney General's office argued the Webster

Defendants' position and represented the Emergency Manager and the City's interests). (*See* Exhibit 4, Webster Verified Complaint; Exhibit 5, 7/19/2013 Hrg. Tr.; Exhibit 1, Webster Defendants' Motion for Summary Disposition). The Declaratory Judgment squarely adjudicated the authority issue and found the Governor lacked authority "to authorize an emergency manager to proceed under Chapter 9" and that the Governor is "prohibited . . . from authorizing an emergency manager under PA 436 to proceed under Chapter 9. . .[.]"

Further, the Declaratory Judgment is a valid final judgment. M.C.R. 2.605(E) ("Declaratory judgments have the force and effect of, and are reviewable as, final judgments").[24] It is irrelevant for collateral estoppel purposes that the Declaratory Judgment was appealed by the Webster Defendants, because an appeal does not affect the "finality" of a judgment for claim and issue preclusion purposes.[25]

---

[24] Michigan courts are empowered to "declare the rights and other legal relations of an interested party seeking a declaratory judgment." M.C.R. 2.605(A)(1). The purpose of a declaratory judgment is to "guide" the parties' "future conduct." *UAW v. Central Mich. Univ. Trustees*, 815 N.W.2d 132, 138 (Mich. App. 2012).

[25] "The rule in Michigan is that a judgment pending on appeal is deemed *res judicata*." *City of Troy Bldg. Inspector v. Hershberger*, 183 N.W. 2d 430, 433 (Mich. App. 1970); *see also Temple v. Kelel Distributing Co., Inc.*, 454 N.W. 2d 610, 611 (Mich. App. 1990) (defendant appealed an adverse ruling, but the decision still had *res judicata* effect); *Eisfelder v. Michigan Dept. of Natural Resources*, 847 F. Supp. 78, 83 (W.D. Mich. 1993) ("It is also . . . clear under Michigan law that the fact an appeal is pending does not affect an order's finality.").

9301723.3 14893/161046

It is anticipated that the City will argue that the Declaratory Judgment is not

a "valid" judgment, because the bankruptcy petition was filed at 4:06 p.m. on July

18, 2013 (thereby triggering the automatic stay), and the Declaratory Judgment

was not issued until the following day. The automatic stay, however, did not apply

to the Webster Defendants when the Declaratory Judgment was entered: the

Declaratory Judgment was issued on July 19, and the Court did not extend the

automatic stay to the Webster Defendants until July 25. *See* Docket No. 166, pg.

2. Thus, the Retirement Systems have satisfied the first prong of the collateral

estoppel analysis.

> **b.      The same parties or their privies litigated this issue in the state court.**

For collateral estoppel to be applied, the same parties or their privies must

have had a full and fair opportunity to litigate the issue. *Monat*, 577 N.W.2d at

685. "A party is one who was directly interested in the subject matter, and who

had a right to defend in, or control, the proceedings, and who had a right to appeal

---

As one judge has aptly observed, to deny preclusion because a judgment was pending appeal "would be laughable. If a judgment was denied its *res judicata* effect merely because an appeal was pending, litigants would be able to refile an identical case in another trial court while the appeal is pending, which would hog-tie the trial courts with duplicative litigation." *Warwick Corp. v. Maryland Dep't of Transp.*, 573 F. Supp. 1011, 1014 (D. Md. 1983); *see also Tripati v. Henman*, 857 F.2d 1366, 1367 (9th. Cir. 1988) ("To deny preclusion in these circumstances would lead to an absurd result: Litigants would be able to refile identical cases while appeals are pending, enmeshing their opponents and the court system in tangles of duplicative litigation.").

51

from the judgment." *Dearborn Heights Sch. Dist. No. 7 v. Wayne County MEA/NEA*, 592 N.W.2d 408, 412 (Mich. App. 1998).

Privity is defined as "mutual or successive relationships to the same right of property, or such an identification of interest of one person with another as to represent the same legal right." *Sloan v. Madison Heights,* 389 N.W.2d 418, 422 (Mich. 1986). For collateral estoppel purposes, privity between a party and non-party can exist where there is a "substantial identity of interests" and a "working or functional relationship. . . in which the interests of the non-party are presented and protected by the party in the litigation." *Phinisee v. Rogers*, 582 N.W.2d 852, 854 (Mich. App. 1998). Accordingly, a nonparty to the prior proceeding may be bound if "that party controlled the earlier proceeding or if the party's interests were adequately represented in the original matter." *Dearborn Heights*, 592 N.W.2d at 412.

### i.  *Privity exists between Webster and the Retirement Systems.*

Privity exists between an individual pension member, such as Webster, and the Retirement System itself. There is both a "substantial identity of interests" and a "working or functional relationship . . . in which the interests of the non-party are presented and protected by the party in the litigation." *Phinisee*, 582 N.W.2d at 854. In similar contexts, courts have found privity. For example, in *Dearborn Heights*, the court found that "individual employees are 'substantially identical to

52

the labor organizations which represented them as charging parties before MERC [Michigan Employee Relations Commission].'" *Dearborn Heights*, 592 N.W.2d at 412 (citation omitted). Similarly, in *O'Keefe v Merrill Lynch & Co.*, 32 Kan. App. 2d 474, 488-489 (2004), the court found that an administrator of an estate is sufficiently in privity with heirs or beneficiaries of an estate to be subjected to principles of claim preclusion, and in *Moldovan v. A&P*, 1985 U.S. Dist. LEXIS 20659 (W.D. Pa. Apr. 17, 1985), the court found privity between a local union chapter and the trustees for a multiemployer benefit plan.

ii. ***Privity exists between the Webster Defendants and the Emergency Manager/City.***

As noted above, the defendants in the Webster Case were (i) the State of Michigan, (ii) the Governor, and (iii) the Treasurer. The Emergency Manager and the City were not named defendants. However, privity exists between the Webster Defendants and the Emergency Manager (and by extension, the City) such that collateral estoppel applies.

In the context of public officials, "[p]rivity may exist between individual government officials and the entities that they work for even if the officers were not named defendants in the previous action." *Elder v. Harrison Twp.*, 786 F. Supp. 2d 1314, 1324-25 (E.D. Mich. 2011) *rev'd on other grnds*, 489 Fed. Appx. 934 (6th Cir. 2012) (internal citation omitted) ("When officers are sued in their official capacity, privity is often found.") In this case, the City has already

53

admitted that: "[t]he State of Michigan. . . acts through its officials. . . . So to the extent that the named parties in there are the governor and the treasurer, the state acts through those officials." (Exhibit 3, 7/24/13 Hrg. Tr., pg. 68). Similarly, the City has admitted that "the emergency manager assumed all of the powers and acts for and in the place of and in the stead of the mayor and the city council. . . [.]" (*Id.* at pp. 7-8).

Furthermore, the terms of PA 436 itself establishes privity between the Governor, the Emergency Manager, and the City. The general powers of the Emergency Manager are set forth in Section 9 of PA 436, which provides, in relevant part, that "an emergency manager shall act for and in the place and stead of the office of chief administrative officer of the local government" and serves "at the pleasure of the governor." M.C.L. § 141.1549(2) and M.C.L. §141.1549(3)(d).

Moreover, any recommendation that the City of Detroit proceed under Chapter 9 is explicitly controlled by the Governor, and the Emergency Manager can only act at the behest of the Governor.

Indeed, the City has conceded that such an "identity of interests" exists here—the City based its entire Stay Extension Motion on the premise that there was an "identity of interests" between the Governor, the Treasurer, the Emergency Manager and the City. *See, e.g.*, Docket No. 56, ¶ 19-21. The City admitted in its motion that the Governor and the Treasurer are "***closely connected to the City and***

54

***the Emergency Manager***." *Id.* (emphasis added). At the hearing on July 24, 2013, the City again admitted the reason it needed the stay extended was because it was concerned that lawsuits involving the Webster Defendants could potentially bind the City. (Exhibit 3, 7/24/2013, pg. 12) (emphasis added).

In granting the Stay Extension Motion, this Court acknowledged the close connection: "In this case, the Court readily finds that the debtor—the interests of the debtor and the interests of those potential defendants to whom the debtor seeks to extend the automatic stay [*i.e.*, the Governor and the Treasurer] ***are so intertwined*** that the unusual circumstances test is met." (Exhibit 3, 7/24/2013 Hrg. Tr. at pg. 78) (emphasis added).

Lastly, the same attorney (the Attorney General of Michigan) represents the Governor, the State, and the Emergency Manager. While this alone is not dispositive, it is significant because it illustrates the close connection between the relevant governmental officials—state officers such as the Attorney General represent state agents and interests, not those of strangers to state government. In this case, the Attorney General's Office has a duty to defend the Emergency Manager from all civil claims challenging the validity of PA 436 or the authority of the Emergency Manager. M.C.L. § 141.1560(2)-(3). Thus, the City's interests were adequately represented by the Attorney General. Accordingly, based on the

9301723.3 14893/161046

entire scheme and structure of PA 436, the City is certainly a "privy" to the Webster Defendants and is thus bound by the Declaratory Judgment.

### c. The parties had a full and fair opportunity to litigate.

In determining whether a party has had a "full and fair" opportunity to litigate the issue, Michigan courts may look to the factors outlined in the Restatement of Judgments. *Monat*, 469 Mich. at 685, n. 2 (citing Rest. 2d Judgments § 28-29). However, failure to exhaust all appeals does not mean a party lacked a full and fair opportunity to litigate, nor does it delay application of collateral estoppel. *See footnote 25, supra.*

In this case, the Declaratory Judgment was entered after a Motion for Summary Disposition was filed by the Webster Defendants. The Webster Defendants chose to file this dispositive motion just twelve days after the complaint was filed by Webster, thereby foregoing discovery or other litigation processes. (Exhibit 6, Register of Actions). The Webster Defendants even requested an expedited ruling from the state court, urging: "a speedy resolution of this action is required to avoid adversely impacting the City of Detroit's Emergency Manager's current efforts to reach a consensus that could achieve some financial stability for the City [and] . . . [d]elaying a resolution of this case would certainly have a negative impact on those efforts. . .[.]" (Exhibit 1, Webster Defendants' Motion for Summary Disposition, pg. 4). The City can hardly

complain that its position was not fully and fairly litigated when the Governor, the State, and the Treasurer filed a motion *affirmatively seeking summary adjudication of this very issue on an expedited basis.*

Further, a full jury trial on the merits is not necessary in order for a matter to be deemed fully and fairly litigated; declaratory judgments are entitled to preclusive effect.[26] *See Farmers Ins. Exch. v. Young*, 2010 Mich. App. LEXIS 1499, at *22 (Mich. Ct. App. Aug. 3, 2010) (concluding that a declaratory judgment was a final judgment for purposes of collateral estoppel or *res judicata*); *Hansen v. State Farm Fire and Cas. Co.*, 2006 Mich. App. LEXIS 1556, at *8 (Mich. Ct. App. May 9, 2006) (affirming the trial court's summary disposition ruling in favor of defendant by applying collateral estoppel based on a declaratory judgment); *Hill v. Wall St. Sys.*, 2003 Mich. App. LEXIS 1261, *11-14 (Mich. Ct. App. May 27, 2003) (applying collateral estoppel to an earlier declaratory judgment).

Thus, sufficient privity exists between the various parties to permit the

---

[26] Similarly, arbitration awards, consent judgments, settlement agreements, and cases resolved by dispositive motion are also entitled to preclusive effect. *Laethem Equip. Co., et al. v. J & D Implement, Inc., et al.*, 2007 Mich. App. LEXIS 1769, *17 (Mich. Ct. App. July 19, 2007) (settlement agreement); *Accident Victims Home Health Care v. Allstate Ins. Co.*, 2006 Mich. App. Lexis 1791, *6-7 (Mich. Ct. App. June 6, 2006) (settlement agreement); *Ditmore*, 625 N.W.2d at 466 (consent judgment); *Detroit Auto. Inter-Insurance Exchange v. Sanford*, 369 N.W.2d 239, 242 (Mich. App. 1985) (arbitration award); *Detroit v. Nortown Theatre, Inc.*, 323 N.W.2d 411, 413-14 (Mich. App. 1982) (summary or default judgment).

9301723.3 14893/161046

application of collateral estoppel, and those privies had a full and fair opportunity to litigate the issue.

### d. *Mutuality of estoppel exists.*

"Mutuality of estoppel requires that in order for a party to estop an adversary from relitigating an issue that party must have been a party, or in privy to a party, in the previous action." *Monat,* 677 N.W.2d at 846. Estoppel is considered "mutual" if the party taking advantage of the earlier adjudication "would have been bound by it, had it gone against him." *Id.* at 846-47.

Here, mutuality is present on both sides. The facts, circumstances and entire structure of PA 436 demonstrate that mutuality exists to justify the Retirement Systems' use of collateral estoppel offensively against the City. The plaintiffs in Webster are participants in the GRS and thus share identical interests with the Retirement Systems – protecting their accrued financial benefits from being impaired. *See Dearborn Heights*, 592 N.W.2d. at 412. There is also little doubt that a judgment against the Webster plaintiffs would bind the Retirement Systems. More important, had the Webster court found in favor of the Webster Defendants and ruled that the Governor *did* have authority to authorize the City's Chapter 9 case, the City would undoubtedly be relying on the Declaratory Judgment to support its position in the eligibility proceedings. Thus, mutuality of estoppel exists because both sides are bound by the judgment.

9301723.3 14893/161046

## II. The City Failed to Negotiate With Its Creditors in Good Faith and Such Negotiations Were Not Impracticable.

In his Declaration, the Emergency Manager describes a series of informational and presentational meetings that he and his advisors conducted with various creditor constituents and their representatives, including the Retirement Systems, over the course of several weeks prior to the Petition Date. *See* Orr Declaration at ¶¶ 80-81, ¶¶85-103. The Emergency Manager also attests that negotiations with the City's creditors were impracticable due to the sheer volume of creditors, certain creditors' alleged refusal to compromise their positions, and as a result of the Pre-Petition Lawsuits, and that despite this impracticability, the City attempted to negotiate with its creditors in good faith. *Id.* at ¶¶ 108-111**.** The City alleges that these allegations support a finding that it meets the negotiation requirements set forth in section 109(c)(5)(B) and (C), and that it is eligible to be a debtor under chapter 9 of the Bankruptcy Code. Eligibility Memorandum at pp. 39-61.

In the weeks prior to the commencement of this bankruptcy case, the Retirement Systems, its counsel and advisors, devoted significant resources to researching and reviewing both the City's and the Retirement Systems' financial situations, including attending the informational presentations on June 14, June 20, June 25, July 10 and July 11, 2013 that were referenced in the Orr Declaration. As stated, these sessions were primarily presentational, with multiple parties in

59

attendance; there was no opportunity at these meetings for meaningful bilateral discussions. In fact, both the City and the Retirement Systems were in no position to discuss matters substantively because material prerequisite financial information required for such discussions was, and is, not yet complete.

Admittedly, the Retirement Systems filed the Retirement Systems Lawsuit, seeking *declaratory relief* that neither the Governor nor the Emergency Manager has authority to file a Chapter 9 or take other actions that will result in the impairment or diminishment of the accrued pension benefits of the Retirement Systems and their participants. The Retirement Systems Lawsuit, however, does not evidence a refusal to engage in discussions with the City, but instead evidences an effort to obtain a judicial declaration of state law and its impact upon City of Detroit pension benefits. Subject to their position that accrued pension benefits are constitutionally protected, the Retirement Systems have never indicated that the Retirement Systems Lawsuit and bilateral discussions are mutually exclusive initiatives. To the contrary, the Retirement Systems have always indicated a willingness to pursue these initiatives in parallel (assuming adequate financial information is made available to facilitate such discussions). Discussions between the City and the Retirement Systems were thus not impracticable merely because of the Retirement Systems Lawsuit. Accordingly, the City cannot meet its burden of proof to establish its eligibility to be a Chapter 9 debtor under Bankruptcy Code

section 109(c)(5).[27]

<b>CONCLUSION</b>

The City cannot meet its burden of proof to establish that it has satisfied the eligibility requirements of Bankruptcy Code section 109(c)(2) and 109(c)(5). Therefore, this case should be dismissed as a matter of law, pursuant to Bankruptcy Code section 921(c).

CLARK HILL PLC

/s/ Robert D. Gordon
Robert D. Gordon (P48627)
Shannon L. Deeby (P60242)
Jennifer K. Green (P69019)
Evan J. Feldman (P73437)
151 South Old Woodward Avenue
Suite 200
Birmingham, Michigan 48009
Telephone: (248) 988-5882
Facsimile: (248) 988-2502
rgordon@clarkhill.com

Dated: August 19, 2013

*Counsel to the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit*

---

[27] The Retirement Systems anticipate that other creditors will object to the City's eligibility on the grounds of section 109(c)(5) and will conduct discovery on the issue. The Retirement Systems expressly reserve the right to participate in the discovery process and request access to all discovery, documents exchanged, and depositions.

9301723.3 14893/161046
13-53846-swr Doc 8807-1 Filed 12/16/14 Entered 12/16/14 15:10:18 Page 70 of 70
13-53846-swr Doc 517 Filed 08/19/13 Entered 08/19/13 23:55:20 Page 70 of 70
143

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 9 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
| | ) | |
| | ) | Hon. Steven W. Rhodes |
| Debtor. | ) | |

## EXHIBIT LIST

| Exhibit No. | Description |
|---|---|
| 1 | Webster Defendants' Motion for Summary Disposition |
| 2 | Webster Declaratory Judgment |
| 3 | Transcript July 24, 2013 Hearing |
| 4 | Webster Verified Complaint |
| 5 | Transcript July 19, 2013 Hearing Webster Case |
| 6 | Webster Case Register of Actions |
| 7 | Unpublished Cases Cited in Eligibility Objection |

# EXHIBIT 1

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

GRACIE WEBSTER and
VERONICA THOMAS,

    Plaintiffs,

No. 13-734-CZ

v

HON. ROSEMARIE AQUILINA

THE STATE OF MICHIGAN, RICK SNYDER,
Governor of the State of Michigan, and ANDY
DILLON, Treasurer of the State of Michigan,

**DEFENDANTS' MOTION FOR
SUMMARY DISPOSITION**

    Defendants.

---

| | |
|---|---|
| John R. Canzano (P30417)<br>McKnight, McClow, Canzano,<br>  Smith & Radke, P.C.<br>Counsel for Plaintiffs<br>400 Galleria Officentre, Suite 117<br>Southfield, MI 48034<br>248-345-9650<br>jcanzano@michworklaw.com | Thomas Quasarano (P27982)<br>Brian Devlin (P34685)<br>Assistant Attorneys General<br>Attorney for Defendants<br>Department of Attorney General<br>P.O. Box 30754<br>Lansing, MI 48909<br>517-373-1162<br>quasaranot@michigan.gov<br>devlinb@michigan.gov |

---

    Defendants move, under MCR 2.116(C)(4), (5), and (8), for Summary Disposition

dismissing Plaintiffs' Complaint with prejudice, as supported by Defendants' Brief in Support.

    WHEREFORE, Defendants respectfully request that this Honorable Court grant

Defendants' Motion for Summary Disposition and dismiss Plaintiffs' Complaint with prejudice.

                    Respectfully submitted,

                    Bill Schuette
                    Attorney General

                    *Thomas Quasarano*

                    Thomas Quasarano (P27982)
                    Brian Devlin (P34685)
                    Assistant Attorneys General
                    Attorneys for Defendants
                    (517) 373-1162

Dated: July 15, 2013
AG# 2013-0048624-A – Webster-SOM – Motion

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

GRACIE WEBSTER and
VERONICA THOMAS,

      Plaintiffs,

v

THE STATE OF MICHIGAN,  RICK SNYDER,
Governor of the State of Michigan, and ANDY
DILLON, Treasurer of the State of Michigan,

      Defendants.

No. 13-734-CZ

HON. ROSEMARIE AQUILINA

FILED-30th CIRCUIT COURT

JUL 1 5 2013

BY: _____
Deputy Clerk

<table>
<tr><td>

John R. Canzano (P30417)<br>
McKnight, McClow, Canzano,<br>
  Smith & Radke, P.C.<br>
Counsel for Plaintiffs<br>
400 Galleria Officentre, Suite 117<br>
Southfield, MI  48034<br>
248-345-9650<br>
jcanzano@michworklaw.com

</td><td>

Thomas Quasarano (P27982)<br>
Brian Devlin (P34685)<br>
Assistant Attorneys General<br>
Attorney for Defendants<br>
Department of Attorney General<br>
P.O. Box 30754<br>
Lansing, MI  48909<br>
517-373-1162<br>
quasaranot@michigan.gov<br>
devlinb@michigan.gov

</td></tr>
</table>

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR DECLARATORY
JUDGMENT OR PRELIMINARY INJUNCTION AND BRIEF IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY DISPOSITION**

**Statement of Facts**

Plaintiffs, as beneficiaries of the City of Detroit's pension system, bring a facial

constitutional challenge to the Local Financial Stability and Choice Act (Act), MCL 141.1541, *et*

*seq*, asserting that the Act is unconstitutional because it permits the Governor to authorize a

proceeding in Chapter 9 bankruptcy, allegedly in violation of Const 1963, art 9, § 24.[1] They

seek a declaratory judgment that the Act "is unconstitutional and in violation of [art 9, § 24] of

the Michigan Constitution because [the Act] permits accrued pension benefits to be diminished

or impaired by bankruptcy proceedings in direct contravention of the Constitution." (Complaint,

¶ 1). Plaintiffs have moved for an expedited hearing on their request for declaratory relief, or

request in the alternative a preliminary injunction enjoining the Governor from authorizing a

bankruptcy proceeding under the Act.

> Section 18(1), MCL 141.1558(1), of the Act provides, in part:
>
> If, in the judgment of the emergency manager, no reasonable alternative to
> rectifying the financial emergency of the local government which is in
> receivership exists, then the emergency manager may recommend to the governor
> and the state treasurer that the local government be authorized to proceed under
> chapter 9. If the governor approves of the recommendation, the governor shall
> inform the state treasurer and the emergency manager in writing of the decision,
> with a copy to the superintendent of public instruction if the local government is a
> school district. The governor may place contingencies on a local government in
> order to proceed under chapter 9. Upon receipt of the written approval, the
> emergency manager is authorized to proceed under chapter 9.

Plaintiffs allege they are entitled to declaratory relief and a final judgment that the Act is

unconstitutional because the Act does not prohibit the Governor from authorizing a Chapter 9

bankruptcy, which threatens to diminish or impair Plaintiffs' accrued pension benefits contrary

to art 9, § 24. (Complaint, ¶26). Plaintiffs request relief and ask this Court to intrude upon the

Governor's authority and discretion based on their speculation that the Governor might exercise

his authority and approve a recommendation that the City proceed in bankruptcy; and that the

City's pension funds might be detrimentally affected during a Chapter 9 proceeding in federal

bankruptcy court. (Complaint, ¶27 and 28). But this Court should deny Plaintiffs' expedited

---

[1] Const 1963, art 9, § 24 provides, in part: "The accrued financial benefits of each pension plan
and retirement system of the state and its political subdivisions shall be a contractual obligation
thereof which shall not be diminished or impaired thereby."

2

motion for declaratory relief or, alternatively, preliminary injunction and dismiss the Complaint because Plaintiffs lack standing to sue, their claim is unripe, their facial constitutional challenge fails as a matter of law, and they cannot satisfy any of the factors necessary for granting injunctive relief.

### Argument

I.    **Plaintiffs' motion for expedited declaratory relief should be denied and their Complaint dismissed pursuant to MCR 2.116(C)(4), (C)(5), and (C)(8) because Plaintiffs' lack standing, their claim is unripe, and their facial constitutional challenge fails as a matter of law.**

    A.    **Standard of Review.**

A party is entitled to summary disposition under MCR 2.116(C)(4) if the lower court "lacks jurisdiction of the subject matter." This Court must determine whether the affidavits, together with the pleadings, depositions, admissions, and documentary evidence demonstrate a lack of subject-matter jurisdiction. *Toaz v Dep't of Treasury*, 280 Mich App 457, 459, 459; 760 NW2d 325 (2008) (quotation omitted). "[S]ummary disposition [under MCR 2.116(C)(5)] is merited when the plaintiffs lack the capacity to sue. In reviewing these motions, [the] Court must consider the parties' pleadings, depositions, admissions, affidavits, and other documentary evidence to determine whether the defendant is entitled to judgment as a matter of law." *In re Estate of Quintero*, 224 Mich App 682, 692; 569 NW2d 889 (1997). A motion brought under MCR 2.116(C)(8) tests the legal sufficiency of a claim based upon the pleadings alone. *Maiden v Rozwood*, 461 Mich 109, 119; 597 NW2d 817 (1999). The motion should be granted when a plaintiff's claims are "so clearly unenforceable as a matter of law that no factual development could possibly justify recovery." *Id.* (quotation omitted).

3

**B.    Analysis.**

Plaintiffs have requested and moved for expedited treatment of their Complaint for

declaratory and injunctive relief under MCR 2.605(D).  Defendants do not object and agree that

the matter should be accorded expedited review with the exception that judgment for Defendants

should be entered.  To that end, Defendants' have also moved for summary disposition under

MCR 2.116(C)(4) (subject matter jurisdiction – ripeness), (C)(5) (capacity to sue – standing),

and (C)(8) (failure to state a claim).  This Court should waive or adjust the customary response

time for such motions, and decide Defendants' motion concurrent with Plaintiffs' motion for

accelerated judgment.  As demonstrated below, this Court lacks jurisdiction to entertain

Plaintiffs' Complaint because their claim is unripe, they do not have standing to bring this action,

and their facial challenge fails as a matter of law.  Further, a speedy resolution of this action is

required to avoid adversely impacting the City of Detroit Emergency Manager's current efforts

to reach a consensus that could achieve some financial stability for the City without recourse to

bankruptcy.  Delaying a resolution of this case would certainly have a negative impact on those

efforts and send the wrong message to the citizens of Detroit and Michigan.

### 1.    Plaintiffs' lack standing to bring this action.

In *Lansing School Education Ass'n v Lansing Board of Education*,

487 Mich 349, 355, 372; 792 NW2d 686 (2010), the Michigan Supreme Court reinstated

Michigan's previous "prudential" standing test, which automatically conferred standing upon

any party who has a "legal cause of action," regardless of whether the underlying issue is

justiciable.  "Under this approach, a litigant has standing whenever there is a legal cause of

action" or the requirements of MCR 2.605 to seek a declaratory judgment are satisfied. *Id*. at

372. If a specific cause of action at law does not exist for the plaintiff, then the following

applies:

> A litigant may have standing in this context if the litigant has a special injury or
> right, or substantial interest, that will be detrimentally affected in a manner
> different from the citizenry at large or if the statutory scheme implies that the
> Legislature intended to confer standing on the litigant. [Id.]

In this case, Plaintiffs cannot meet even this liberalized standard.

### a. Plaintiffs have not pled facts sufficient to establish a legal cause of action.

Plaintiffs have not pled facts sufficient to establish that a violation of their rights under

Const 1963, art 9, § 24 has occurred or to establish that a cause of action exists under the Act;

they do not even attempt to do so. Indeed, the Act expressly states that it provides no cause of

action:

> A cause of action against this state or any department, agency, or entity of this
> state, or any officer or employee of this state acting in his or her official capacity,
> or any membership of a receivership transition advisory board acting in his or her
> official capacity, *may not be maintained for any activity authorized by this act, or
> for the act of a local government filing under chapter 9, including any proceeding
> following a local government's filing.* [MCL 141.1572 (emphasis added).]

Plaintiffs further acknowledge that the Governor has not authorized a bankruptcy filing as

required under the Act. MCL 141.1558(1). Moreover, there are other contingencies that would

need to occur before any "threat" to Plaintiffs' pension benefits could arise because:

- Even with the filing of a bankruptcy action, the City of Detroit must meet additional
  requirements before the case may proceed including completing a Plan of Reorganization
  to adjust its debts. The City must either obtain an agreement from creditors holding a
  majority of the amount of claims of each class the debtor intends to impair under a plan,
  negotiate in good faith with creditors and fail to obtain an agreement of creditors holding
  a majority of the amount of claims of each class the debtor intends to impair under a plan,
  be unable to negotiate with creditors because it is impractical, or reasonably believe a
  creditor may attempt to obtain a preference. 11 USC 109(c). The plan would have to
  include the pension beneficiaries as a "class of creditors" and propose a reduction of
  benefits; and

- The plan must be confirmed by the bankruptcy court. The plan must meet seven specific criteria for confirmation, including that "the debtor is not prohibited by law from taking any action necessary to carry out the plan." 11 USC 943(4).

No violation of art 9, § 24 could or would occur if the Governor authorizes the City of Detroit to proceed under Chapter 9 because the bankruptcy court would still have to find the City eligible for bankruptcy, and the court would have to approve a plan in bankruptcy that impairs vested pension benefits, or at least have such a plan presented to it.

Ignoring these contingencies, Plaintiffs' fact assertions center upon their alleged apprehension as to what *might* happen. Plaintiffs contend they are entitled to a declaratory judgment that the Act is facially unconstitutional because it "nowhere requires that in considering whether to approve an emergency manager's recommendation to proceed under Chapter 9, the Governor shall not approve such recommendation if accrued pension benefits may be diminished or impaired in violation of [art 9, § 24]." (Complaint, ¶¶ 18 and 19). Accordingly, Plaintiffs assert, "because [the Act] does not prohibit a municipality from proceeding under Chapter 9 of the US Bankruptcy Code if accrued pension benefits may be unconstitutionally diminished or impaired, [the Act] is unconstitutional on its face in violation of" art 9, § 24. *Id.* This allegation mistakes the scope of the "authorization"—it is not approval of the actual bankruptcy filing or plan— and presumes the Governor would act unconstitutionally.

Plaintiffs further allege that their:

[R]ights under the Michigan Constitution not to have their pension benefits "diminished or impaired" can only be guaranteed if this Court acts *before* the Governor approves a request to proceed under Chapter 9. Moreover, Emergency Manager Orr's threats that he will unconstitutionally diminish or impair Plaintiffs' vested pension rights have themselves harmed Plaintiffs by instilling in Plaintiffs a reasonable fear that their constitutional rights will be trampled upon and, in the process, their future source of income drastically eroded. [Complaint, ¶ 28.]

6

This Court cannot assume that there will be a Chapter 9 bankruptcy proceeding involving the City of Detroit. The Governor has not yet authorized such a proceeding at this time nor has the Governor had the opportunity to disapprove, approve, or approve and "place contingencies on a local government in order to proceed under chapter 9," as provided for in MCL 141.1558(1). And even if the Court assumes that there will be a Chapter 9 proceeding, this Court cannot assume what the contents of the City's plan might be, or that the federal bankruptcy court will approve a plan that will diminish or impair Plaintiffs' pension benefits. Because Plaintiffs' claim is based on a speculative threat of future injury, they have failed to allege a legal cause of action for which they have standing to seek relief from this Court. *Lansing School Education Ass'n*, 487 Mich at 372.

### b. Plaintiffs do not meet the requirements of MCR 2.605.

With respect to declaratory judgment actions, MCR 2.605(A)(1) provides:

> In a case of *actual controversy* within its jurisdiction, a Michigan court of record may declare the rights and other legal relations of an interested party seeking a declaratory judgment, whether or not other relief is or could be sought or granted. [Emphasis added.]

MCR 2.605 "does not limit or expand the subject-matter jurisdiction of the courts, but instead incorporates the doctrines of standing, ripeness, and mootness." *UAW v Central Mich Univ Trustees*, 295 Mich App 486, 495; 815 NW2d 132 (2012). "The existence of an 'actual controversy' is a condition precedent to invocation of declaratory relief." *Shavers v Attorney General*, 402 Mich 554, 588; 267 NW2d 72 (1978); see also *Genesis Ctr, PLC v Comm'r of Financial & Ins Servs*, 246 Mich App 531, 544; 633 NW2d 834 (2001). "An 'actual controversy' . . . exists when a declaratory judgment is necessary to guide a plaintiff's future conduct in order to preserve legal rights. The requirement prevents a court from deciding hypothetical issues." *UAW*, 295 Mich App at 495 (citations omitted) (footnotes omitted). "The

7

essential requirement of an 'actual controversy' under the rule is that the plaintiff pleads and proves facts that demonstrate an ' " " 'adverse interest necessitating the sharpening of the issues raised.' " ' " *Id.* (citations omitted) (footnotes omitted).

As discussed above, the parties are many steps away from a point at which an actual controversy will exist between them. Presently, the possibility of Chapter 9 bankruptcy represents only a possibility, and thus whether Plaintiffs' pension benefits might be impacted somewhere in the future in a bankruptcy proceeding is purely speculative. Thus, the Plaintiffs' interests and the Governor's, Treasurer's, and State's interests are not yet adverse, and therefore no sharpening of the issues through issuance of a declaratory judgment is required. Plaintiffs have failed to satisfy the requirements of MCR 2.605, and do not have standing to seek relief from this Court. *Lansing School Education Ass'n*, 487 Mich at 372.

> **c.** **Plaintiffs have not established a special injury, right, or substantial interest that will be detrimentally affected in a manner different from that of the citizenry at large.**

Even where there is no cause of action provided at law, a court may, in its discretion, determine whether a litigant has standing. *Lansing Schools*, 487 Mich at 372. This requires a showing that the litigant has a special injury or right, or substantial interest, that will be detrimentally affected in a manner different from the citizenry at large or if the statutory scheme implies that the Legislature intended to confer standing on the litigant.

Here, as noted above, the Legislature did not intend to confer standing on any person to challenge the Act. Rather, it expressly provided that there is no cause of action under the Act. MCL 141.1572. And even if Plaintiffs have a special injury, right or interest based on their participation in the City's pension plan, which Defendants do not concede, it is not at all certain that this interest will be detrimentally affected. Again, no authorization to proceed in a Chapter 9

8

bankruptcy with respect to the City has been made, it remains hypothetical. It is also speculative to assume that Plaintiffs' pensions will be part of any bankruptcy proceeding. Moreover, a Chapter 9 bankruptcy proceeding affords various interested parties protections under the federal Bankruptcy Code.

Bankruptcy Code provisions applicable to a Chapter 9 bankruptcy are set forth under 11 USC 901(a). For instance, § 943, 11 USC 943, of the Bankruptcy Code regulates confirmation of a debtor's plan of adjustment. Section 943(b) sets forth seven criteria that must be met before a federal Bankruptcy Court can confirm the plan. The fourth and seventh requirements are noteworthy here. The fourth criteria requires the bankruptcy court determine "the debtor is not prohibited by law from taking any action necessary to carry out the plan." 11 USC 943(b)(4). The seventh criteria requires a determination that the plan be in the best interest of creditors, and that it be feasible. 11 USC 943(b)(7).

At this time, it is purely speculative as to whether Plaintiffs' interests will be detrimentally affected should the Governor authorize the City to proceed in Chapter 9. Plaintiffs therefore do not have standing to seek relief from this Court. *Lansing School Education Ass'n*, 487 Mich at 372.

### 3. Plaintiffs' alleged constitutional claim is not ripe for review.

While both standing and ripeness are justiciability doctrines that assess pending claims to discern whether an actual or imminent injury in fact is present, they address different underlying concerns. *Michigan Chiropractic Council v Comm'r of Ins,* 475 Mich 363, 378-379; 716 NW2d 561 (2006). The standing doctrine "is designed to determine whether a particular party may properly litigate the asserted claim for relief." *Id.,* at 379. The ripeness doctrine, on the other hand, "does not focus on the suitability of the party; rather, ripeness focuses on the *timing* of the

9

action." *Id.* (emphasis in original). The ripeness doctrine precludes the adjudication of hypothetical or contingent claims before an actual injury has been sustained. An action is not ripe if it rests on contingent future events that may not occur as anticipated or may not occur at all. *Id.,* at 371 n. 14.

For the reasons already discussed above, Plaintiffs' contention that a future Chapter 9 bankruptcy could represent what they characterize as a "threat" to their interests in their pensions is not ripe because it rests on contingent future events that may or may not occur, to wit; that the Governor will approve proceeding in Chapter 9, that the approval will be without any contingencies, and that their pensions will be impaired as a result of the federal bankruptcy proceeding. Under these circumstances, this Court should dismiss Plaintiffs' Complaint as unripe for review. See *Strauss v Governor*, 459 Mich 526, 544, 545 n. 14; 592 NW2d 53 (1999), quoting *Straus v Governor*, 230 Mich App 222; 583 NW2d 520 (1998) (citation omitted) ("unless and until such [a constitutional] encroachment actually occurs, the issue is not ripe for adjudication," and "[w]here a constitutional question is presented anticipatorily, the Court is required by the limits on its authority to decline to rule.").

**4.    Plaintiffs' complaint fails to state a claim upon which this Court may grant relief.**

Plaintiffs bring a facial constitutional challenge to the Local Financial Stability and Choice Act. They broadly assert that the Act is unconstitutional under Const 1963, art 9, § 24 because it empowers the Governor to authorize a proceeding in Chapter 9. (Complaint, ¶ 19).

"A facial challenge is a claim that the law is 'invalid *in toto* - and therefore incapable of any valid application. . . .' " *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71*, 479 Mich 1, 11 n 20; 740 NW2d 444 (2007) (citation omitted) (emphasis in original). "A party challenging the facial constitutionality of a statute faces an extremely

10

rigorous standard, and must show that no set of circumstances exists under which the [a]ct would be valid." *Id.* at 11 (internal quotation marks and citation omitted). Plaintiffs cannot satisfy this standard.

As discussed above, § 18(1) of the Act, MCL 141.1558(1), simply authorizes an emergency manager to recommend, and the Governor to authorize, proceeding under Chapter 9. It is silent with respect to what course of action an emergency manager should pursue in bankruptcy, including how a local government unit's assets and liabilities should be treated in bankruptcy. And relevant here, it does not require any particular treatment of pension funds. Indeed, section 18 does not even mention or allude to pension funds. Compare this to section 12(1)(m), MCL 141.1552(1)(m), of the Act, which describes an emergency manager's authority and duties with respect to a "municipal government's pension fund." Thus, nothing in the Act compels or requires any impairment of Plaintiffs' pension benefits contrary to art 9, § 24. The Act is therefore not facially unconstitutional. Moreover, Plaintiffs clearly cannot establish "that no set of circumstances exists under which the [a]ct would be valid," because the Governor could place a contingency eliminating the pension fund, payments and liabilities from a Chapter 9 proceeding. Additionally, the City may not include the pension funds, payments and liabilities in its plan; or the federal court may determine that federal bankruptcy law controls the analysis. Plaintiffs' facial constitutional challenge to the Act thus fails as a matter of law, and should be dismissed.

## II. Plaintiffs' alternative request for preliminary injunctive relief is premature, overbroad, and constitutionally infirm, and fails to satisfy the four requirements for issuance of a preliminary injunction.

Injunctive relief is an extraordinary remedy that issues only when justice requires, there is no adequate remedy at law, and there exists a real and imminent danger of irreparable injury.

11

MCR 3.310(A); *Davis v City of Detroit Financial Review Team*, 296 Mich App 568, 613-614;

821 NW2d 896 (2012); *Michigan Coalition of State Employee Unions, et al v Civil Service*

*Commission*, 465 Mich 212, 226, n 11; 634 NW2d 692 (2001). In order to obtain a preliminary

injunction, a plaintiff must prove that (1) he is likely to prevail on the merits; (2) he will be

irreparably harmed if an injunction is not issued; (3) the harm to him absent an injunction

outweighs the harm that an injunction would cause the defendants; and (4) there will be no harm

to the public interest if an injunction is issued. *Detroit Fire Fighters Ass'n v Detroit*, 482 Mich

18, 34; 753 NW2d 579 (2008). A court's exercise of its discretion to consider injunctive relief

may not be arbitrary, but rather must be in accordance with the fixed principles of equity

jurisdiction and the evidence in the case. *Jeffrey v Clinton Twp*, 195 Mich App 260, 263; 489

NW2d 211 (1992). When seeking injunctive relief, the plaintiff has the burden of proof on each

of these factors. MCR 3.310(A)(4). Plaintiffs have not met their burden here, and their motion

should be denied.

### A. Plaintiffs' alternative request for preliminary injunctive relief is premature, overbroad, and constitutionally infirm.

Plaintiffs alternatively seek a preliminary injunction. But Plaintiffs' request should be

denied because it is premature, overbroad, and unsupported by precedent.

This Court "at all times is required to question sua sponte its own jurisdiction (whether over a

person, the subject matter of an action, *or the limits on the relief it may afford*)." *Strauss*, 459

Mich at 532, quoting *Straus*, 230 Mich App 222 (citation omitted) (emphasis added). In *Strauss*,

the Michigan Supreme Court, in adopting the Court of Appeals' opinion, expressed "doubt with

respect to the propriety of injunctive relief against the Governor," and observed that "separation

of powers principles, preclude *mandatory* injunctive relief, mandamus, against the Governor."

*Id.* (citations omitted) (emphasis added). The Court further observed that whether the same

12

reasoning also precludes "*prohibitory* injunctive relief" was an open question "that need not be resolved in [that] case." *Id.* (emphasis added). However, the Court also recognized, if not emphasized that

> declaratory relief normally will suffice to induce the legislative and *executive* branches, the principal members of which have taken oaths of fealty to the constitution identical to that taken by the judiciary, to conform their actions to constitutional requirements or confine them within constitutional limits. *Only when declaratory relief has failed should the courts even begin to consider additional forms of relief in these situations.* [*Id.* (emphasis added). See also *Davis v City of Detroit Financial Review Team*, 296 Mich App 568, 614, 632-635; 821 NW2d 896 (2012) (O'Connell, J., concurring).]

There is then almost a presumption that injunctive relief, of any kind, may not be entered against the Governor unless declaratory relief has failed. That has not happened here. Their request for an injunction should thus be denied as a premature.

Plaintiffs' request for injunctive relief should also be denied because it is overbroad. Plaintiffs ask this Court to enjoin the Governor from authorizing *any* bankruptcy for the City of Detroit. (Complaint, ¶ 31-34). This would include a bankruptcy proceeding in which pension funds were *not* at issue or at risk. Additionally, the authorization Plaintiffs seek to enjoin is to proceed in Chapter 9 only, not the actual bankruptcy Petition or plan. This court cannot determine, based on the record Plaintiffs' present, how any bankruptcy proceeding for the City of Detroit, if filed, may impact their pension benefits or if at all, until the bankruptcy plan is filed with the bankruptcy court and ultimately confirmed. 11 USC 943. Plaintiffs alleged constitutional violation and claimed injury is currently nothing more than pure speculation. Thus, Plaintiffs' request should be denied to the extent it is overbroad and not narrowly tailored to the facts and legal arguments.

Finally, Plaintiffs' request for injunctive relief should be denied to the extent it is a request for mandatory injunctive relief. Although Plaintiffs' have couched their request for

injunctive relief in prohibitory language, in reality they seek to compel the Governor to exercise his discretion in a particular manner.

Under § 18(1), MCL 141.1558(1), the Governor may (1) disapprove the recommendation; (2) approve the recommendation; or (3) approve the recommendation and place contingencies on the local government in proceeding under Chapter 9. Plaintiffs' seek to have this Court compel the Governor to exercise the first option, disapproval. But it is clear that this Court cannot constitutionally issue a mandatory injunction compelling the Governor to exercise his discretion and act in a particular manner. *Strauss*, 459 Mich at 532. See also *Flint City Council v State of Michigan*, 253 Mich App 378, 387; 655 NW2d 604 (2002) (Observing that Court had previously reversed circuit court "[b]ecause the court's order . . . required the Governor to take specific, court-ordered action, . . . in the nature of mandamus and in violation of the Michigan constitution"); *Musselman v Governor*, 200 Mich App 656, 662; 505 NW2d 288 (1993) ("mandamus will not lie to compel the Governor to act, regardless of whether the actions sought to be compelled are discretionary or ministerial"). Accordingly, Plaintiffs' request for preliminary or permanent injunctive relief must be denied.

**B.      Plaintiffs have failed to satisfy any of the four requirements for issuance of a preliminary injunction.**

### 1.      Plaintiffs are not likely to succeed on the merits.

Plaintiffs cannot demonstrate a substantial likelihood of success on the merits of their claim that the Act is unconstitutional under art 9, § 24 because, as set forth above in Argument I, they lack standing to sue; their claim is unripe; and their facial constitutional challenge fails as a matter of a law.

14

## 2. Plaintiffs will not suffer irreparable harm if an injunction is not issued.

Again, if justiciable, the underlying issue in this case is properly raised in the federal Bankruptcy Court in the context of the actual bankruptcy plan during the confirmation process and not in the state trial court. 11 USC 943. Plaintiffs' legal claims would ripen only if and when a bankruptcy proceeding includes a possible reduction or adverse impact on their pension benefits. It is in that forum, in the context of the specific bankruptcy plan, that these legal issues should be addressed and resolved. Because Plaintiffs have a legal remedy – litigation in the context of the bankruptcy action –they will not suffer irreparable harm if an injunction is not issued now. They have identified no immediate threat to their pension benefits.

## 3. Defendants would be harmed more by the granting of the relief than would Plaintiffs in the absence of an injunction.

While Plaintiffs retain their access to the remedies set forth in the federal Bankruptcy Code without need of court-granted injunctive relief, the grant of Plaintiffs' alternative motion for preliminary injunction would harm Defendants, the operation of state government, the City of Detroit and its fiscal recovery. As discussed above, the grant of such relief would require that this Court disregard the separation of powers doctrine. Const 1963, art 3, § 2. The granting of such relief also would unlawfully intrude on the Governor's executive powers to authorize a Chapter 9 bankruptcy under section 18 of the Act, MCL 141.1558, by barring him from implementing the Act. The breadth of the injunction sought would preclude the authorization of *any* bankruptcy proceeding thereby prohibiting the State, the Emergency Manager and the City of Detroit from accessing an important tool for resolution of the existing fiscal crisis. The impact on the State's and City's economy would be devastating and the consequent impact on Plaintiffs pension benefits potentially worse than any bankruptcy action would produce.

15

4. **The harm to the public interest if the injunction is issued is readily apparent.**

In that Defendants would be harmed more by the granting of the injunctive relief than would Plaintiffs in the absence of an injunction, likewise the public at large will be harmed for the same reasons. An affront to the separation of powers doctrine and an unlawful intrusion into the Governor's executive powers can never be in the public interest.

The administration of any statute is essentially a matter of public and not of individual concern. Accordingly, in this case, the public is not benefited by a court order that would bar the Governor from authorizing a Chapter 9 bankruptcy under section 18 of the Act, MCL 141.1558.

Furthermore, improper interference with these gubernatorial powers directly contravenes the Act's measures to "assure the fiscal accountability of the local government and the local government's capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare." MCL 141.1549(2). An injunction would place the citizens of the City of Detroit at greater risk because it would eliminate access to an important tool to resolve the existing fiscal crisis, causing further detrimental impact to public safety, services, and welfare.

For all of these reasons, the Court's issuance of injunctive relief or other such relief would be unwarranted and inappropriate.

## Conclusion and Relief Requested

For the reasons stated above, Defendants respectfully request that this Honorable Court deny Plaintiffs' motion for expedited declaratory relief and/or for a preliminary injunction, and grant Defendants' motion for summary disposition dismissing Plaintiffs' Complaint under MCR 2.116(C)(4), (5), and (8) with prejudice.

Respectfully submitted,

Bill Schuette
Attorney General

Thomas Quasarano (P27982)
Brian Devlin (P34685)
Assistant Attorneys General
Attorneys for Defendants
State Operations Division
(517) 373-1162

Dated: July 15, 2013
AG# 2013-0048624-A – Webster-SOM – Response to Mtn Declaratory Judgment

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

GRACIE WEBSTER and
VERONICA THOMAS,

      Plaintiffs,                         No. 13-734-CZ

v                                  HON. ROSEMARIE AQUILINA

THE STATE OF MICHIGAN, RICHARD SNYDER,
as Governor of the State of Michigan, and ANDY
DILLON, as Treasurer of the State of Michigan,      **NOTICE OF HEARING**

      Defendants.

| | |
|---|---|
| John R. Canzano (P30417) | Thomas Quasarano (P27982) |
| McKnight, McClow, Canzano, Smith & Radtke, P.C. | Brian Devlin (P34685) |
| Attorney for Plaintiffs | Assistant Attorneys General |
| 400 Galleria Officentre, Suite 117 | Attorney for Defendants |
| Southfield, MI 48034 | P.O. Box 30754 |
| (248) 354-9650 | Lansing, MI 48909 |
| jcanzano@michworklaw.com | (517) 373-1162 |
| | quasaranot@michigan.gov |
| | devlinb@michigan.gov |

      PLEASE TAKE NOTICE that Defendants' Motion For Summary Disposition under

MCR 2.116(C)(4), (5), and (8), shall be brought on for hearing before the Honorable Rosemarie

Aquilina in her courtroom in Lansing, Michigan, on **Monday, July 22, 2013 at 9:00 a.m.**, or as

soon thereafter as counsel may be heard.

                          Respectfully submitted,

                          Bill Schuette
                          Attorney General

                          *Thomas Quasarano*

                          Thomas Quasarano (P27982)
                          Brian Devlin (P34685)
                          Assistant Attorneys General

Dated: July 15, 2013
AG# 2013-0048624 – S – Webster v SOM – Notice of Hearing

# EXHIBIT 2

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

GRACIE WEBSTER and
VERONICA THOMAS,

      Plaintiffs,

vs

THE STATE OF MICHIGAN;
RICHARD SNYDER, as Governor
of the State of Michigan; and
ANDY DILLON, as Treasurer of
the State of Michigan,

      Defendants.

Case No. 13-734-CZ
Hon.  Rosemarie Aquilina

_____/

ORDER OF DECLARATORY JUDGMENT

At a session of said Court held in Ingham County Circuit Court,
State of Michigan, this _19th_ day of July, 2013.

PRESENT: _Rosemarie E Aquilina_
           Circuit Court Judge

Plaintiffs request declaratory relief pursuant to MCR 2.605 concerning (1) the

constitutionality under Article IX Section 24 of the Michigan Constitution of the Local Financial

Stability and Choice Act, 2012 PA 436, MCL 141.1541, *et seq.* ("PA 436"), insofar as PA 436

permits the Governor to authorize an emergency manager to proceed under chapter 9 of the

bankruptcy code, chapter 9 of title 11 of the United States Code, 29 USC 901 to 946 ("Chapter

9") in a manner which threatens to diminish or impair accrued pension benefits; and (2) the

authority of the Governor and/or State Treasurer to authorize an emergency manager to proceed under Chapter 9 in a manner which threatens to diminish or impair accrued pension benefits.

Plaintiffs have requested, and Defendants have agreed in their Response, that the hearing in this matter may be advanced pursuant to MCR 2.605(D) and the court finds that expedited treatment is appropriate and that final declaratory relief is proper at this time.

The Court having reviewed the parties filings and submissions, and having heard oral argument by counsel for the parties, and being otherwise fully advised in the premises, and for the reasons stated on the record,

IT IS HEREBY ORDERED:

PA 436 is unconstitutional and in violation of Article IX Section 24 of the Michigan Constitution to the extent that it permits the Governor to authorize an emergency manager to proceed under Chapter 9 in any manner which threatens to diminish or impair accrued pension benefits; and PA 436 is to that extent of no force or effect;

The Governor is prohibited by Article IX Section 24 of the Michigan Constitution from authorizing an emergency manager under PA 436 to proceed under Chapter 9 in a manner which threatens to diminish or impair accrued pension benefits, and any such action by the Governor is without authority and in violation of Article IX Section 24 of the Michigan Constitution.

On July 16, 2013, City of Detroit Emergency Manager Kevyn Orr submitted a recommendation to Defendant Governor Snyder and Defendant Treasurer Dillon pursuant to Section 18(1) of PA 436 to proceed under Chapter 9, which together with the facts presented in Plaintiffs' filings, reflect that Emergency Manager Orr intended to diminish or impair accrued pension benefits if he were authorized to proceed under Chapter 9. On July 18, 2013, Defendant

Governor Snyder approved the Emergency Manager's recommendation without placing any contingencies on a Chapter 9 filing by the Emergency Manager; and the Emergency Manager filed a Chapter 9 petition shortly thereafter. By authorizing the Emergency Manager to proceed under Chapter 9 to diminish or impair accrued pension benefits, Defendant Snyder acted without authority under Michigan law and in violation of Article IX Section 24 of the Michigan Constitution.

In order to rectify his unauthorized and unconstitutional actions described above, the Governor must (1) direct the Emergency Manager to immediately withdraw the Chapter 9 petition filed on July 18, and (2) not authorize any further Chapter 9 filing which threatens to diminish or impair accrued pension benefits.

*A copy of this Order shall be transmitted to President Obama.*

*It is so Ordered.*

Rosemarie E. Aquilina
P 57670

Circuit Court Judge

# EXHIBIT 3

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE: CITY OF DETROIT,      .      Docket No. 13-53846
      MICHIGAN,               .
                    .      Detroit, Michigan
                    .      July 24, 2013
           Debtor.      .      10:02 a.m.
. . . . . . . . . . . . . . . .

HEARING RE. MOTION OF DEBTOR, PURSUANT TO SECTION 105(a)
OF THE BANKRUPTCY CODE, FOR ENTRY OF AN ORDER CONFIRMING
THE PROTECTIONS OF SECTIONS 362, 365 AND 922 OF THE
BANKRUPTCY CODE (DOCKET #53) AND MOTION OF DEBTOR, PURSUANT
TO SECTION 105(a) OF THE BANKRUPTCY CODE, FOR ENTRY OF AN
ORDER EXTENDING THE CHAPTER 9 STAY TO CERTAIN (A) STATE
ENTITIES, (B) NON-OFFICER EMPLOYEES AND (C) AGENTS AND
REPRESENTATIVES OF THE DEBTOR (DOCKET #56)
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:       Jones Day
                    By: HEATHER LENNOX
                    North Point
                    901 Lakeside Avenue
                    Cleveland, OH  44114-1190
                    (216) 586-3939

For AFSCME:           Lowenstein Sandler, LLP
                    By: SHARON L. LEVINE
                    65 Livingston Avenue
                    Roseland, NJ  07068
                    (973) 597-2374

For Syncora           Kirkland & Ellis, LLP
Guarantee and         By: RYAN BENNETT
Syncora Capital       300 North LaSalle
Assurance:            Chicago, IL  60654
                    (312) 862-2074

For Public Safety     Erman, Teicher, Miller, Zucker &
Unions:                  Freedman, PC
                    By: BARBARA PATEK
                    400 Galleria Officentre, Suite 444
                    Southfield, MI  48034
                    (248) 827-4100

13-53846-swr  Doc 8207-1  Filed 09/19/14  Entered 09/19/14 15:50:18  Page 27 of 99
13-53846-swr  Doc 8107-1  Filed 09/19/14  Entered 09/19/14 15:50:18  Page 27 of 99
143

APPEARANCES (continued):

| | |
|---|---|
| For Police and Fire Retirement System and General Retirement System of the City of Detroit: | Clark Hill, PLC<br>By: ROBERT GORDON<br>151 South Old Woodward, Suite 200<br>Birmingham, MI 48009<br>(248) 988-5882 |
| For the UAW: | Cohen, Weiss & Simon, LLP<br>By: BABETTE CECCOTTI<br>330 West 42nd Street, 25th Floor<br>New York, NY 10036<br>(212) 356-0227 |
| For the Flowers Plaintiffs: | Law Offices of William A. Wertheimer<br>By: WILLIAM WERTHEIMER<br>30515 Timberbrook Lane<br>Bingham Farms, MI 48025<br>(248) 644-9200 |
| For Nathaniel Brent: | In pro per<br>NATHANIEL BRENT<br>538 South Livernois<br>Detroit, MI 48209 |
| For the Phillips Plaintiffs: | The Sanders Law Firm, PC<br>By: HERBERT A. SANDERS<br>615 Griswold, Suite 913<br>Detroit, MI 48226<br>(313) 962-0099 |
| For the State of Michigan: | Michigan Department of Attorney General<br>By: MATTHEW SCHNEIDER<br>525 West Ottawa Street, Fl. 7<br>P.O. Box 30212<br>Lansing, MI 48909<br>(517) 241-8403 |
| For the Webster Plaintiffs: | McKnight, McClow, Canzano, Smith &<br>  Radtke, PC<br>By: JOHN R. CANZANO<br>400 Galleria Officentre, Suite 117<br>Southfield, MI 48034<br>(248) 354-9650 |

```
Court Recorder:      Letrice Calloway
                     United States Bankruptcy Court
                     211 West Fort Street
                     21st Floor
                     Detroit, MI  48226-3211
                     (313) 234-0068

Transcribed By:      Lois Garrett
                     1290 West Barnes Road
                     Leslie, MI  49251
                     (517) 676-5092
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
 1          THE CLERK:  Case Number 13-53846, City of Detroit,
 2    Michigan.
 3          THE COURT:  Good morning.  Stand by one moment for
 4    me, please, sir.  I'd like to begin by reviewing with
 5    everyone the order of proceedings here, and then we'll get
 6    right to the arguments.  The first thing I'd like to do is
 7    administer the oath to attorneys who seek to become members
 8    of the Bar of this Court, and then I will give a brief
 9    opening statement, and then we will proceed with the
10    arguments.  It is my intent to allow the city, who is the
11    movant here, 15 minutes for its initial argument and then to
12    allow each of those creditors who have filed objections to
13    the motion 15 minutes each as well and then a 15-minute
14    rebuttal for the city.  Oh, actually, before that rebuttal I
15    want to give any attorneys who would like to be heard on the
16    record but who did not file objections to be heard as well
17    and then a rebuttal by the city.  And then we'll take a break
18    so that I can deliberate on the motions and then after a
19    period of time come back out and give you my decision.
20          So let's begin with the administration of the oath
21    to those attorneys who need admission.  Would those of you
22    who do seek admission to the Bar of the Court step forward,
23    please?  You can actually just stand right there in front of
24    the bench and tell me who you are.
25          MR. LEMKE:  I'm David Lemke, your Honor, from
```

1  Nashville, Tennessee.

2       MR. SMITH:  Bill Smith, your Honor, from Chicago.

3       MR. BENNETT:  Ryan Bennett, your Honor, from

4  Chicago.

5       THE COURT:  Okay.  One second, please.  Here we go.

6  And raise your right hands.  Do you affirm that you will

7  conduct yourselves as attorneys and counselors of this Court

8  with integrity and respect for the law, that you have read

9  and will abide by the civility principles approved by the

10  Court, and that you will support and defend the Constitution

11  and laws of the United States?

12       ATTORNEYS:  I do (collectively).

13       THE COURT:  All right.  Welcome to the Bar of our

14  Court.  Counsel, we will take care of filing your papers for

15  you.

16       ATTORNEYS:  Thank you, your Honor (collectively).

17       THE COURT:  One more moment, please.  Okay.  I'd

18  like to begin by describing for those who may be watching or

19  listening in what the matters are before the Court today.

20  There are two motions before the Court today.  The parties

21  refer to one of the motions as the stay confirmation motion,

22  and they refer to the second motion as the stay extension

23  motion.

24       When anyone files bankruptcy, all of the legal

25  proceedings against that person are stopped.  We call that a

1   stay, a stay of proceedings.  When a municipality like the

2   City of Detroit files bankruptcy, all of the legal

3   proceedings against the city and its officers to collect on a

4   claim against the city are also stopped.  The stay

5   confirmation motion simply requests an order confirming these

6   stays under the United States Bankruptcy Code are in effect.

7   The stay extension motion requests that the Court extend or

8   expand those statutory stays by entering an injunction to

9   stop proceedings against other employees of the city and

10  against the governor and the treasurer of the state.  Those

11  are the only two motions before the Court here today.  Not

12  before the Court is whether the city is eligible to file

13  bankruptcy or whether any plan that the debtor might propose

14  in the case is confirmable under the Bankruptcy Code.  Those

15  issues will be, I expect, fully litigated in due course in

16  this case.

17          So now we are ready for arguments on these two

18  motions first by the city, and, counsel, I need to remind you

19  because of our equipment in this room, when you address the

20  Court, you do need to stand at the lectern and speak into the

21  microphone there.

22          MS. LENNOX:  Good morning, your Honor.  Heather

23  Lennox of Jones Day on behalf of the city.

24          THE COURT:  You may proceed.

25          MS. LENNOX:  Thank you, your Honor.  With respect to

1   the stay confirmation motion, your Honor, I think your Honor
2   summarized exactly what we're looking for quite cogently and
3   concisely.  The reason we filed the motion, your Honor, as
4   has been evident by some activity we've seen in the last week
5   or so, is that not all people understand the concept of the
6   stay or, frankly, how it works in Chapter 9.  We have had
7   state court orders issued against the city after the petition
8   date.  We've had some other Circuit Court judges express --
9   in other city litigation express some uncertainty about
10  whether the stay applies.  We've had vendors with contracts
11  seek to stop shipping, and we have a new officer.  We have an
12  emergency manager, and we want to make it clear that the
13  protections of the stay do apply to the emergency manager
14  because, as your Honor indicated, under Section 922(a), the
15  stay does apply to officers of the city for collections of
16  claims against the city.

17       So I would like to address in particular, your
18  Honor, the emergency manager.  Under Section 922(a), the
19  stay -- we believe the stay applies to the emergency manager.
20  Under Section 9.2 of PA 436, on appointment, the emergency
21  manager assumed all of the powers and acts for and in the
22  place of and in the stead of the mayor and the city council,
23  meaning the governing bodies of the city.  And during the
24  pendency of the emergency manager's appointment, the other
25  governing bodies shall not exercise any of the powers of

1   their officers except as may be specifically authorized in

2   writing by the emergency manager.

3           Furthermore, your Honor, Section 18(1) of PA 436

4   empowers the emergency manager to act exclusively on the

5   city's behalf in this case, so we do believe that he is an

6   officer entitled to the protections of the Chapter 9 stays.

7           We have also requested a clarification, your Honor,

8   because the Code does just simply reference officers of the

9   city, that it would be officers of the city serving in any

10  capacity.  Some city officers do serve in other roles on

11  behalf of or at the request of or pursuant to ordinance in

12  other manners in the performance of their duties as officers

13  of the city.  For example, Mr. Brown, who is the chief

14  compliance officer, sits on the root cause committee.  We do

15  have a finance --

16          THE COURT:  Sorry.  Sits on what committee?

17          MS. LENNOX:  The root cause committee, your Honor.

18  We do have the finance director, the budget director, and

19  corporation counsel of the city that are directors of the

20  service corporations that are formed in connection with the

21  pension certificates.  They sit as directors of that

22  corporation through Ordinance Number 03-05 of the City Code,

23  so they are performing their official duties.

24          Finally, with respect to this motion, your Honor,

25  the State of Michigan has asked me to confirm on the record,

1    which I now do, that by this motion the city does not seek to

2    abrogate the exceptions to the stay identified in Section

3    362(b) of the Bankruptcy Code nor do we seek to vitiate the

4    state's powers under Section 903 of the Bankruptcy Code.

5         I think this motion, your Honor, is not uncommon, is

6    fairly straightforward, and merely seeks to confirm the

7    protections that are already granted by the Bankruptcy Code.

8    So with your Court's permission, unless you have questions, I

9    would move to the motion to extend.

10         THE COURT:  Please.

11         MS. LENNOX:  In this motion, your Honor -- and this

12   is a little more complicated -- the city seeks to extend the

13   stay provisions of Section 362 and 922 of the Bankruptcy Code

14   to certain parties that are or are likely to become targets

15   of claims or lawsuits or other enforcement actions that would

16   have the direct or practical effect of denying the city the

17   protections of the automatic stay imposed by the Code or

18   seeking to collect or enforce a claim against the city.  Your

19   Honor, as you may be aware, we have had several pre-petition

20   lawsuits that have attempted these actions.  We do describe

21   them in the papers.  Some of the objectors describe further

22   developments in their papers.  If it would aid the Court, I

23   do have a short summary as a demonstrative exhibit that I

24   could hand the Court that would show the Court the state of

25   play in each of these actions.  Would that be helpful to the

13-53846-tjr   Doc 8307-1   Filed 12/10/14   Entered 12/10/14 15:10:18   Page 105 of 99
13-53846-swr   Doc 819-1   Filed 08/19/13   Entered 08/19/13 23:59:28   Page 105 of 99
143

1   Court?

2           THE COURT:  That's fine.  You should assume and all

3   of you should assume in your presentations that I have

4   thoroughly read and reviewed all of your papers, even those

5   that were filed last night.

6           MS. LENNOX:  Certainly, your Honor.  If your Honor

7   does -- perhaps if your Honor would like to see it --

8           THE COURT:  Okay.

9           MS. LENNOX:  -- I'll hand it up.  Thank you.  May I

10  approach, your Honor?

11          THE COURT:  Please.

12          MS. LENNOX:  Thank you, your Honor.  We do have

13  three lawsuits that attempt to prevent either the filing of

14  this case or the conduct of the city's actions within this

15  case.  One of the suits has been filed against the governor

16  and the emergency manager.  That case -- we don't need a stay

17  extension for the emergency manager.  That case is stayed as

18  to the emergency manager.  Two other cases have been filed

19  solely against the governor and the state treasurer that seek

20  to prevent the authorization of the filing and to

21  circumscribe the emergency manager's powers within this case.

22  Those are the kinds of things, your Honor -- there's been a

23  flurry of activity.  Most of the orders entered in those

24  three cases were entered after -- the TRO's were initially

25  entered after this petition was filed.  There were further

1   orders entered by the state court on the 19th of July that

2   amended the two temporary restraining orders, and in the

3   Webster case, which is the one case that involves only the

4   state treasurer and the governor, there was a declaratory

5   judgment action or a declaratory judgment that was filed

6   declaring PA 436 unconstitutional because it could affect the

7   city's rights within this case.  Those actions have all been

8   appealed by the state attorney general.  The state court has

9   ordered a briefing to go forward in one of the cases and had

10  ordered that the morning of the 22nd, and yesterday the

11  appellate court issued stays in all three of the cases.

12         THE COURT:  If the Court grants your relief, what

13  would be the impact on that appeal?

14         MS. LENNOX:  We believe, your Honor, that the -- we

15  believe that those cases should be permanently stayed, and

16  the issues that are addressed in those cases regarding the

17  constitutionality of PA 436, because they seek to -- the

18  arguments about constitutionality on PA 436 aren't straight

19  constitutionality issues.  They say it's unconstitutional

20  because of what can happen and because of the powers that may

21  be granted under the Bankruptcy Code, and under this Court's

22  jurisdiction and under the emergency manager's rights under

23  Chapter 9, because that is the basis for the challenge to

24  unconstitutionality, we believe those decisions must be made

25  and can only be made by this Court in an action brought

13-53846-tjt   Doc 8307-1   Filed 08/19/14   Entered 08/19/13 15:10:18   Page 12 of 99
13-53846-swr   Doc 810-1   Filed 09/19/13   Entered 09/19/13 23:59:20   Page 107 of
143

1 before this Court under the supremacy clause and the
2 bankruptcy clause of the United States, so we would expect
3 those actions to be stayed, and any issues that the litigants
4 would have, they would have to bring before this Court for a
5 determination by a court of competent jurisdiction.

6      Unless your Honor has any other questions with
7 respect to the procedural posture of some of these cases, I
8 will move on.  It's as a result of these cases -- and these
9 are all certainly public pleadings for which your Honor may
10 take judicial notice under Federal Rule of Evidence 201(c).
11 It's because of these proceedings that we sought to file this
12 motion, and I'd like to explain the -- first of all, I'd like
13 to articulate the standard under which we're proceeding, and
14 then I would like to explain in more detail about why and the
15 three categories of extensions we are seeking.

16      First of all, the standard for a case for extending
17 the stay is that unusual circumstances may exist, and they
18 can exist when there is an identity between the third party
19 and the debtor such that a judgment against the third party
20 would, in effect, be a judgment against the debtor or that
21 the actions taken by the third party would pose a substantial
22 risk to the reorganization of the case.  Some courts also say
23 that such actions would significantly impair the
24 administration of this case.  So based on the backdrop of
25 that standard, we have asked for the stay to be extended

1  under certain circumstances to three different categories of

2  persons.  The first, as your Honor indicated, are the state

3  entities.  We are asking the Chapter 9 stay to be extended to

4  the governor, the state treasurer, and the members of the

5  local Emergency Financial Assistance Loan Board for

6  actions -- excuse me -- that seek to enforce claims against

7  the city to interfere with the city's activities in this

8  Chapter 9 case or otherwise deny the city the protections of

9  the Chapter 9 stay and interfere with this Court's

10  jurisdiction over these matters.  To be clear, your Honor,

11  because I think there was some confusion about this on the

12  part of some parties, we are seeking to extend the stay

13  protections that the city currently enjoys to the state

14  officials that I identified in the context of lawsuits like

15  the three already filed against state officials that, in

16  substance, seek to interfere with the city's rights as a

17  Chapter 9 debtor and that seriously jeopardize the city's

18  rehabilitation or seek to, in a back-door way, preserve

19  collect, and enforce claims against the city.  This motion

20  does not seek to stay state officials' actions.  Rather, it

21  seeks to stay third-party actions against state officials.

22  The reasons and the evidence for this, your Honor, I think

23  are well-documented in all of the flurry of activity that has

24  taken place in the last week, and there -- that kind of

25  activity needs to stop.  This Court has jurisdiction over

 1    this case, this Court has jurisdiction of all federal matters
 2    arising in this case, and only this Court has jurisdiction to
 3    determine them.  Having widespread litigation in various
 4    state tribunals that can come to different decisions when
 5    it's doubtful that they have jurisdiction to do that can only
 6    confuse the parties, confuse the case, and create serious
 7    barriers to an efficient administration of this case.
 8            The second request that we make for an extension,
 9    your Honor, is to extend this Chapter 9 stay to actions or
10    proceedings against employees of the city's that are neither
11    city officers nor inhabitants of the city because Section
12    922(a) refers to inhabitants.  Many of our nonofficer
13    employees are inhabitants of the city and could be covered,
14    but many are not, and so we are seeking this extension.
15            Your Honor should know that by virtue of city
16    ordinance 13-11-1, the city does indemnify its employees for
17    lawsuits that arise from the good faith performance of their
18    duties.  The city is also self-insured for all of these
19    actions, so the --
20            THE COURT:  So this extension seeks -- or would only
21    apply to claims against employees for which the city might be
22    obligated to indemnify?
23            MS. LENNOX:  Correct, your Honor.  Because the city
24    would be responsible for indemnification because the city is
25    self-insured, we believe that these actions are an action to

13-53846-tjr   Doc 8307-1   Filed 08/19/14   Entered 08/19/14 15:10:18   Page 15 of 99
13-53846-swr   Doc 810-1   Filed 09/19/13   Entered 09/19/13 23:50:20   Page 110 of 99
143

1 collect from the city, and we would ask the stay to be

2 extended in this instance.

3        The third request, your Honor, is tied to some of

4 the language in Judge Aquilina's orders, and it's a little

5 unusual, but under the circumstances, we believe it's

6 warranted.

7        THE COURT:  Excuse me one second.  Before you move

8 on to that, this ordinance that you mentioned --

9        MS. LENNOX:  Yes, sir.

10        THE COURT:  -- was that in your brief or in your

11 motion?

12        MS. LENNOX:  That was not in the brief and the

13 motion, your Honor.

14        THE COURT:  Would you give us the number again?

15        MS. LENNOX:  Yes, sir.  It is Section 13-11-1 et

16 seq.

17        THE COURT:  Does anyone have a copy of that?

18        MS. LENNOX:  I do not have a copy with me, your

19 Honor, but we can endeavor to get the Court one

20 expeditiously.  Actually, your Honor, may I check my

21 materials?  I might have a copy of it, if you'd like.

22        THE COURT:  Why don't you do that while the

23 creditors are arguing, and you can present it to the Court

24 later, or actually do you know if the City of Detroit

25 ordinances are on Westlaw?

1        MS. LENNOX:  I do not know that, your Honor.

2        THE COURT:  Anybody know?  Somebody says no.  All

3   right.  I'll need a copy then.

4        MS. LENNOX:  Moving on to the third category, your

5   Honor -- and, again, this is a little unusual, and it arises

6   directly out of some of the orders that have been entered in

7   the state court litigation.  We request to extend the Chapter

8   9 stay to, quote, "city's" -- "the city's agents and

9   representatives," which are the terms used in the state court

10  orders.  That would directly or indirectly seek to enforce

11  claims against the city or, again, to interfere with the

12  city's activities and this Court's jurisdiction in this

13  Chapter 9 case or otherwise deny the city the protections of

14  the Chapter 9 stay.  Again, your Honor, it's unusual, but

15  under the circumstances and what's been going on in the past

16  week, we believe it's warranted under the circumstances and

17  does meet the standard that I articulated earlier.

18        That's the extent of the relief that we seek, your

19  Honor.  If your Honor has no further questions, then I would

20  reserve remarks for rebuttal.

21        THE COURT:  I do have a couple of questions for you.

22        MS. LENNOX:  Yes.

23        THE COURT:  Can you summarize how you deal with the

24  adversary proceeding issue, the argument that the request to

25  extend the stay under Section 105 of the Bankruptcy Code

13-53846-tjt   Doc 8307-1   Filed 08/19/14   Entered 08/19/14 15:50:28   Page 112 of 99
13-53846-swr   Doc 810-1   Filed 09/19/13   Entered 09/19/13 23:59:26   Page 17 of 99
143

1    should have been in the form of an adversary proceeding?

2         MS. LENNOX: Um-hmm. Yes, your Honor. I actually

3    don't -- first of all, in many cases, including cases before

4    this Court in the Collins & Aikman case, the requests for

5    extension of a stay are made by motion. The Sixth Circuit

6    case law that we cite in our brief also suggests that

7    extensions can be made under 105 by motion. In practice,

8    they are often made by motion. I think it is important to

9    make it by motion here, and it is completely impractical to

10   try to file an adversary proceeding with respect to this

11   because of the nature of what we are asking for. For

12   example, with respect to the state entities, we know of three

13   lawsuits that have been filed. We have plaintiffs that we

14   could name in an adversary proceeding, but what we're asking

15   for goes beyond that. We want the stay to apply to these

16   actions or any actions somebody might think to bring in the

17   future. I don't know how to name, you know, unknown

18   plaintiffs in the future. The scope of what we're asking for

19   is broader than that, which is why it makes sense when you're

20   proceeding under Section 362 to move by motion. There's

21   motions to lift stay even though ostensibly that would be an

22   injunctive action, but the motions to lift and motions to

23   extend and motions to enforce are done by motion. Certainly

24   people have done it by the method of preliminary injunction.

25   I don't dispute that, but usually when that happens there is

1   one specific lawsuit that they seek to stay, and that is the
2   sole extension that they're asking for.  We are asking for
3   something much broader here, and I think an adversary
4   proceeding procedurally would be improper.
5           We have also cited -- and we believe it to be
6   true -- in our papers that courts often will say -- will not
7   elevate form over substance, and there are cases that we cite
8   in our reply, including the In re. Cannonsburg Environmental
9   Associates case from the Sixth Circuit that says -- where
10  very clearly the action in that case should have been filed
11  as an adversary proceeding, and the judge said, "Look, you've
12  had due process.  You've had notice.  You have an opportunity
13  to respond.  We have had a full hearing of all the views.
14  You have not been prejudiced."  That exists in this case as
15  well, your Honor, as evidenced by the long and lengthy
16  objections that have been filed to the motion that we ask as
17  it stands.
18          THE COURT:  My second question related to the
19  requirement that the defendants -- that the creditors say
20  apply that to issue the kind of order that you seek, the
21  traditional four factors of a preliminary injunction need to
22  be considered, but in light of the fact that you're over
23  time, I will ask you to address that when you come back
24  after.
25          MS. LENNOX:  Thank you, your Honor.

1      THE COURT:  All right.  So I will allow 15 minutes

2  for each of the creditors that have filed objections.  These

3  are the Michigan Council 25 of AFSCME, Syncora, the UAW

4  together with Creditors Robbie Flowers, Michael Wells, Janet

5  Whitson, Mary Washington, and Bruce Goldman, the Detroit

6  public safety unions, if I can refer them -- refer to them by

7  that, and the General Retirement System of the City of

8  Detroit and the Police and Fire Retirement System of the

9  city.  It doesn't matter to me, counsel, the order in which

10 you proceed, so I will leave that to you to work out.

11      MS. LEVINE:  I'm going to go with alphabetical.

12      THE COURT:  Okay.

13      MS. LEVINE:  Good morning, your Honor.  Sharon

14 Levine, Lowenstein Sandler, for Michigan Council 25 of the

15 American Federation of State, County, and Municipal Employees

16 or AFSCME, as it's been referred to here today.

17      Your Honor, very briefly, it's clear that your Honor

18 has read all the papers, and we very much appreciate that

19 given the short time frame that we've been before this Court.

20 Bankruptcy Code Section 105 is extraordinary relief,

21 extraordinary in that it's only used to enforce rights that

22 already exist under the Bankruptcy Code, so it's not there to

23 create new rights that don't currently exist under the Code.

24 What we have here in a Chapter 9 case, which is more

25 restrictive than, for example, a Chapter 11 case, is the

13-53846-swr   Doc 8307-1   Filed 08/19/14   Entered 08/19/14 15:50:20   Page 215 of 99
13-53846-tjt   Doc 8307-1   Filed 08/19/14   Entered 08/19/14 23:59:20   Page 215 of 99
143

1    situation where if, in fact, the state has not properly
2    authorized the Chapter 9 filing, there are rights that don't
3    exist under the Bankruptcy Code.  If Chapter 9, as has
4    historically been seen through the unconstitutional finding
5    of predecessors to Chapter 9, is really being used here to
6    avoid state constitutional rights, then Chapter 9 in and of
7    itself is potentially unconstitutional.  If not, it has to be
8    construed narrowly in order to read it constitutionally.  We
9    would respectfully submit that using 105 to find rights that
10   don't otherwise exist, particularly of a constitutional
11   nature, is an extremely broad use of 105.  This isn't a
12   situation where we're saying to the controller or the
13   governor or Mr. Orr, you know, don't respond to discovery
14   requests in a state court action in a foreign jurisdiction
15   because we need your attention here.  We're taking away very
16   fundamental constitutional rights.

17          Secondly, your Honor, if, in fact --

18          THE COURT:  So your argument about the narrow
19   application of Section 105 in this case is really a result of
20   the fact that it's a Chapter 9.

21          MS. LEVINE:  Yes, your Honor.

22          THE COURT:  It's not an argument that's based on
23   Section 105, per se.

24          MS. LEVINE:  Yes, your Honor.  In a Chapter 11
25   you'll have circumstances, for example, where even in the

1    broader case of a Chapter 11, you won't use Article -- you

2    won't use Section 105 to grant a casino license or a liquor

3    license or tell a utility board they can't change rates, but

4    we have an even narrower situation here because we're in

5    Chapter 9.

6          Two, Chapter 9 can't be used if, in fact, the state

7    has not authorized under its constitution and its laws the

8    Chapter 9 filing.  The Chapter 9 filing here is arguably

9    flawed because it intends to go after the pensions.  If it

10   goes after the pensions, it arguably violates the state

11   constitution and can't be before this Court, so, again, the

12   issue with regard to whether or not we have an appropriate

13   state constitutional flaw -- sorry.  The issue with regard to

14   whether or not we have an appropriate filing is necessarily

15   limited by whether or not we have an appropriate state -- we

16   have an inappropriate state constitutional authorization.  If

17   we have an inappropriate state constitutional authorization,

18   that is not simply an implementation tool under 105.  That

19   is, in essence, a substantive right that's being creative --

20   created under 105 that does not exist in the state court.

21         In addition to that, your Honor, and also

22   importantly, three, individual citizens of the City of

23   Detroit have the absolute right to protect their own

24   constitutional rights.  If I say to them they can't go to

25   the state courts that are there for the protection of their

13-53846-swr   Doc 8307-1   Filed 08/19/14   Entered 08/19/14 23:50:28   Page 217 of 99
13-53846-swr   Doc 8307-1   Filed 08/19/14   Entered 08/19/14 23:50:28   Page 22 of 99
143

1  constitutional rights in part, then we are -- then we're

2  using 105 again way more broadly than it gets used in the

3  ordinary course as simply an implementation tool.  We're

4  creating more substantive rights.  And while this Court

5  has --

6         THE COURT:  Well, but why isn't the extended stay

7  that the city seeks here simply a procedural mechanism to

8  funnel such challenges to the Bankruptcy Court and,

9  therefore, does not have the effect of denying citizens or

10 other creditors of their rights to have their constitutional

11 claims heard?

12        MS. LEVINE:  Your Honor, if this Court is a court of

13 secondary jurisdiction, no disrespect, with -- but if you

14 look at federalism, comity, abstention, and the state courts

15 are the courts of primary jurisdiction, we would respectfully

16 submit that unlike, for example, determining in a Chapter 11

17 case that there's a validly perfected security interest

18 because you've looked at state law and the UCC is properly

19 filed, we have a very fundamental right here that this Court

20 is being asked to address, so what we're saying is instead of

21 going to the court that's primarily responsible, we're going

22 to come into this Court instead, and it's not as if there's

23 delay or uncertainty with regard to the fact that those

24 matters are going to get heard and considered quickly.  We

25 already have state court litigation pending, and the state

13-53846-tjt   Doc 8307-1   Filed 12/10/14   Entered 12/10/14 15:50:18   Page 118 of
13-53846-swr   Doc 810-1   Filed 08/19/13   Entered 08/19/13 23:59:20   Page 23 of 99
143

1   appellate courts are poised and ready to rule, so there's no
2   reason to divest them of that appropriate jurisdiction under
3   concepts of federalism, comity, and abstention and move that
4   here to a court of secondary jurisdiction on those issues.

5          Your Honor, fourth, with regard to the form over
6   substance, the procedural arguments with regard to 105, in
7   certain circumstances where 105 is being used for things like
8   stopping discovery or minimal things like that, that's one
9   set, but the Federal Rules of Civil Procedure are put in
10  place in order to protect parties and provide due process.
11  There can't be a more fundamental situation where you need to
12  enforce those types of rights than when you're dealing with
13  basic fundamental constitutional rights, and we respectfully
14  submit that even though there are circumstances where
15  expediency mandates the use of 105 quickly, this is not one
16  of those circumstances.

17         Your Honor, the breathing spell under 105 -- the
18  breathing spell under the Bankruptcy Code and the use of 105
19  to extend the breathing spell is only appropriate if, in
20  fact, the underlying bankruptcy is an appropriate bankruptcy.
21  The idea that there's a breathing spell to continue what is
22  potentially an unconstitutional or illegal -- not
23  intentionally, no motive or anything, your Honor, but --
24  proceeding is clearly not anything that 105 was designed to
25  implement.

1    Your Honor, we would respectfully submit that these
2  are very, very fundamental rights, and unlike a Chapter 11
3  case where you have a defined benefit plan where if, in fact,
4  it is terminated, there's federal insurance under the PBGC up
5  to $57,000, or if you have a multi-employer plan, even if an
6  employer withdraws, the beneficiaries themselves are
7  protected, here our members who participate at most are at or
8  below $19,000 a year.  Clearly there's no safety net.  These
9  issues are hard issues.  The collateral advantage to sending
10  this back to the state court for an appropriate decision is
11  that the conversations which we believe should have been
12  happening more robustly before the filing could happen now.
13  We respectfully -- we thank your Honor for the time, and we
14  appreciate your Honor's consideration.
15          THE COURT:  Thank you.  Sir.
16          MR. BENNETT:  Good morning, your Honor.  Ryan
17  Bennett of Kirkland & Ellis on behalf of Syncora Guarantee
18  and Syncora Capital Assurance.  Your Honor, as we attempted
19  to describe in our papers, my client insures, in some cases
20  owns certain securities called the certificates of
21  participation, which were taken out in 2006 to fund some of
22  the city's pension liabilities.  We also insure a swap --
23  four swaps related to those securities that are tied to the
24  interest rate, the floating interest rate associated with
25  them.

1    We object to the debtor's stay motions to the extent
2  they contain broad and unqualified language that we feel will
3  impair our client's rights against a number of nondebtor
4  third parties under our various transactional documents, as
5  your Honor could probably tell from --

6    THE COURT:  Can you identify some of those parties
7  for us?

8    MR. BENNETT:  Yes, your Honor.  So under the
9  transactional documents, which we attempted to describe in
10 the papers, there are parties called service corporations,
11 which are separate stand-alone entities with their own
12 directors to whom we believe they owe us fiduciary duties in
13 our role as stakeholders.  At very least they owe a duty to
14 the corporations themselves, and our rights are derivative
15 from them.  We also have swap counterparties who are parties
16 to a swap agreement and a swap insurance agreement where
17 we've got third-party beneficiary rights to those
18 arrangements, and the city is not even a party.

19   THE COURT:  Well, let me ask you this question --
20   MR. BENNETT:  Yes, sir.
21   THE COURT:  -- about those parties.
22   MR. BENNETT:  Um-hmm.
23   THE COURT:  To the extent the Court agrees with you
24 and then your client pursues those parties, to what extent,
25 if any, would your client's success on those claims impact

13-53846-tjt   Doc 8307-1   Filed 12/10/14   Entered 12/10/14 15:50:28   Page 121 of 99
13-53846-swr   Doc 819-1   Filed 08/19/13   Entered 08/19/13 23:59:28   Page 26 of 99
143

1    claims against the city?

2        MR. BENNETT:  Your Honor, that's unclear to us from

3    this vantage.  I mean we're still developing our litigation

4    strategy and our claim strategy, and --

5        THE COURT:  This is not a question of your strategy.

6    This assumes your strategy is successful.

7        MR. BENNETT:  Right.

8        THE COURT:  The question then remains, though, if

9    you are successful in your claims after being allowed to

10   pursue them --

11       MR. BENNETT:  Um-hmm.

12       THE COURT:  -- to what extent would that impact

13   claims against the city perhaps by those parties?

14       MR. BENNETT:  Um-hmm.  Yeah.  That's unclear to us.

15   I mean perhaps in the case of service corporation directors,

16   to the extent that there's an indemnity, as Ms. Lennox

17   pointed out -- I think that's where your Honor is going --

18   there may be an impact there, but, again, I haven't looked at

19   the ordinance.  I don't know if it applies to these

20   individuals, so I'm not sure, but that could be the case.

21       With respect to other parties, swap counterparties,

22   for example, I mean they're not party -- the debtor is not a

23   party to the swap agreement.  While there may be some ripple

24   effect down the road that I'm sure counsel may try to

25   explain -- debtor counsel may try to explain, I mean that's

13-53846-tjr   Doc 8307-1   Filed 08/19/14   Entered 08/19/14 15:50:28   Page 22 of 99
13-53846-swr   Doc 8307-1   Filed 08/19/14   Entered 08/19/14 15:50:28   Page 27 of 99
143

1    unclear to us how we'd ultimately get there, sir.

2            THE COURT:  Okay.

3            MR. BENNETT:  Yeah.  As I said, you know, really

4    putting aside the procedural issue, which I do believe the

5    debtor failed to comply with, you know, your Honor did --

6    there was discourse from the bench to the podium in Collins &

7    Aikman where I believe my firm actually brought forward that

8    motion, and we agreed to drop it because we did not bring it

9    forward in the proper procedural way.  We think the city

10   should also be obligated to do that, particularly where in

11   circumstances like this with respect to our client, you

12   know -- and we just found this out, your Honor, when we got

13   handed this little handout at the start of the hearing that

14   it looks like they're trying to enjoin with -- you know, to

15   the same standards of a preliminary injunction the suit that

16   they brought against us prior to the petition date with

17   probably the same amount of notice that we got here today.

18   This suit, which is listed on here -- and, again, oddly

19   enough it's a suit brought by Detroit against us, not like

20   everybody else where they brought the suit against Detroit or

21   one of the extended defendants, you know, we're just not sure

22   what that means, and I'm sure they'll come and tell us, but,

23   in any event, we feel like we've not received notice of this,

24   and we're entitled to some process there to the extent

25   they're trying to impair our rights, which I'm sure they are.

13-53846-swr   Doc 8907-1   Filed 12/19/14   Entered 12/19/14 15:10:18   Page 123 of
13-53846-swr   Doc 8907-1   Filed 08/19/13   Entered 08/19/13 23:59:20   Page 26 of 99
143

1      And, your Honor, that really sums it up from our

2  point.  I mean largely our filing was a reservation of

3  rights.  We wanted to make clear that to the extent this is

4  trying to be used at some later point to prejudice my client

5  in whatever strategies that we -- strategies we employ to

6  exercise our property and contractual rights, we do not want

7  to be impaired.

8      One final point, your Honor, is that the city has

9  filed that motion for the investment -- or the forbearance

10  agreement that your Honor posted up for a hearing on August

11  2nd.  We just wanted to get a little clarity from your Honor

12  because that does impact some rights of ours.

13      THE COURT:  I saw your motion, and I will enter an

14  order clarifying that for you later today or tomorrow.

15      MR. BENNETT:  Great.  Thank you, sir.  Nothing

16  further.

17      MS. PATEK:  Good morning, your Honor.  Barbara Patek

18  appearing on behalf of the public safety unions that are

19  comprised of the Detroit Fire Fighters Association, the

20  Detroit Police Command Officers Association, the Detroit

21  Police Lieutenants and Sergeants Association, and the Detroit

22  Police Officers Association.  We have filed a concurrence and

23  a limited objection in the two motions before the Court, and

24  I will address them serially.  With respect to the stay

25  motion, we agree that the stay applies, and we agree in

1  concept with the issuance of the stay order as requested by
2  the city. We want to clarify -- and I believe the Court
3  asked the question of the city's counsel -- that that stays
4  all further proceedings in the state court action, including
5  the pending application for leave to appeal that has been
6  filed by the attorney general. And I believe the city,
7  having submitted itself or consented to the application of
8  362 and 922, that the Sixth Circuit law on that issue should
9  control.
10         With respect to the extension of the stay, we concur
11  in that as well, and we have, in fact, asked for some
12  affirmative relief, and I want to at the outset of my
13  argument address the question raised by the Court with
14  respect to the preliminary injunction standard. I think in
15  this case -- I mean there obviously is some flexibility in
16  Section 105 that the Court has, but if you look at those four
17  factors that govern preliminary injunctions, this is a case
18  where the public interest trumps all of them, and we, on
19  behalf of public safety unions, strongly believe that that --
20  that the public interest is at stake and that the stay
21  provided by this Court will give the parties the breathing
22  space to perhaps have that robust discussion that was
23  mentioned by -- in one of the earlier arguments.
24         We do want to make it clear that in concurring in
25  the relief requested, the public safety unions are not

1   conceding that the city is eligible to be a debtor in this
2   case.  We believe there are very, very serious constitutional
3   arguments on that issue as set forth in our papers.  We
4   simply believe that this Court is the proper forum because of
5   the intersection of state and federal constitutional law and
6   Bankruptcy Code issues, some of which are novel and
7   uncharted.
8           The other issue that we want to address with regard
9   to the stay extension deals -- there are three points.  One,
10  we're asking for the affirmative relief of broadening the
11  stay to include particularly the employees and retirees of
12  the public safety unions and some former employees who may be
13  the subject now or in the future of lawsuits and whose only
14  source of indemnification would be the city.
15          Second, we want it clarified because we do not
16  believe that anybody is giving up any claim by coming before
17  this Court that all claims against any nondebtor parties are
18  preserved and, third, that to the extent that those actions
19  are stayed, that the protections of 108(c) apply.  Those are
20  essentially the relief that we're requesting.
21          THE COURT:  Let me ask you to go back to number one
22  for a second.  You mentioned former employees, so there are
23  lawsuits against former employees for which the city might be
24  liable for indemnification?
25          MS. PATEK:  And to clarify, your Honor, I don't know

1  about -- I don't have a list of lawsuits, but I'm concerned

2  with the situation, and we're really tailoring this narrowly

3  to -- that the lawsuit relates to their employment by the

4  city and acting, you know, within the scope of their

5  employment with the city and --

6          THE COURT:  Well, is it your position that under the

7  ordinance that Ms. Lennox identified, former employees are

8  also entitled to indemnification?

9          MS. PATEK:  Your Honor, I'm going to be candid with

10  you.  As I have not seen that ordinance, I don't know the

11  answer to that question, and I'd be happy --

12          THE COURT:  All right.  Well, perhaps Ms. Lennox can

13  address that.  Thank you.

14          MS. PATEK:  Thank you, your Honor.

15          MR. GORDON:  Good morning, your Honor.  Robert

16  Gordon of Clark Hill on behalf of the Police and Fire

17  Retirement System and the General Retirement System of the

18  City of Detroit.

19          THE COURT:  Yes, sir.

20          MR. GORDON:  Thank you, your Honor.

21          THE COURT:  Your Honor, while many of the arguments

22  that have been made, particularly by counsel for AFSCME, are

23  positions that we have concurred in, the thrust of our papers

24  I think focuses on a slightly different issue to some extent,

25  and for purposes of this argument I'd like to focus on those

1   for your Honor.

2          It's our position that the stay motions presume

3   facts that are not in evidence.  There is a threshold issue

4   here under Section 109(c)(2) of the Bankruptcy Code that

5   needs to be dealt with first, 109(c)(2) requiring that in

6   order for a municipality to avail itself of the protections

7   of Chapter 9, it must have received valid state authorization

8   to do so.  The situation here I believe is unique.  I'm not

9   aware of any other case really on point.  We have a situation

10  where there is Michigan state constitutional protection for

11  accrued pension benefits.  We have in this state a statutory

12  framework in which the governor is required to provide the

13  authorization for the filing of a Chapter 9.  The governor is

14  also sworn to uphold the state constitution.  So our position

15  is, as we've indicated in our papers, that if the governor

16  cannot directly abrogate -- unilaterally abrogate

17  constitutional rights under Michigan's constitution, he also

18  respectfully cannot do indirectly what he cannot do directly,

19  so, in other words, he cannot authorize a Chapter 9

20  bankruptcy filing that has as an explicit stated goal, among

21  others, to impair and diminish accrued pension benefits which

22  are protected by the state constitution.  Since he doesn't

23  have that authority, the issue isn't one of whether there's

24  an action that's voidable here.  It is void, void ab initio,

25  and it is as if it never occurred.  So our argument is that

13-53846-tjr   Doc 8307-1   Filed 08/19/14   Entered 08/19/13 23:59:20   Page 32 of 99
13-53846-swr   Doc 819-1   Filed 09/19/13   Entered 09/19/13 15:10:18   Page 128 of 99
143

1   there isn't -- to talk about the stay and talk about the

2   Court's jurisdiction presumes that there has been a valid

3   state authorization, and there hasn't been any valid state

4   authorization.

5          Now, as to that issue, a state court has ruled on

6   that issue.  Judge Aquilina in the Ingham County Circuit

7   Court in the case of Webster v. Snyder ruled and issued a

8   declaratory judgment, not an injunction, a declaratory

9   judgment against the governor, who is a nondebtor party, and

10  at the time and as of today there is no stay and was no stay

11  against declaratory judgment against the governor, and the

12  Court entered a declaratory judgment ruling along the lines

13  of what I just argued and declaring that the governor did not

14  have authority to authorize this Chapter 9 bankruptcy filing.

15  To be clear, that matter has not been stayed by the Court of

16  Appeals.  The Court of Appeals stayed certain TRO orders that

17  have been entered by Judge Aquilina, but the declaratory

18  judgment is a final order that has not been stayed.  So the

19  question becomes where should the 109(c)(2) issue be

20  addressed, and we have submitted that it ought to be

21  addressed by the state courts because unlike the other

22  eligibility requirements under Section 109(c) for determining

23  whether a debtor is eligible to proceed under Chapter 9,

24  Section 109(c)(2) is specifically a creature of state law,

25  and the Bankruptcy Code and Chapter 9 evinces a deep and

13-53846-swr   Doc 8907-1   Filed 12/10/14   Entered 12/10/14 15:10:18   Page 129 of 9
13-53846-swr   Doc 810-1   Filed 08/19/13   Entered 08/19/13 23:59:28   Page 34 of 99
143

1  abiding respect for federalism and Tenth Amendment concerns,

2  and in that light we think it is appropriate to allow the

3  state judiciary, which is a co-equal partner of the executive

4  branch and of the legislative branch in this state --

5         THE COURT:  Okay.  So how do you deal with the

6  city's argument that 28 U.S.C., Section 1334, gives this

7  Court exclusive jurisdiction over the bankruptcy petition

8  and, therefore, over the eligibility issues under Chapter 9?

9         MR. GORDON:  Again, your Honor, our position would

10  be that it presumes something that is not in evidence here.

11  It presumes that there has been a valid petition filed, and

12  there simply has not been a valid petition.  That's our

13  argument.  Our argument as to supremacy clause --

14         THE COURT:  But Chapter 9 makes -- Chapter 9 makes

15  that issue an eligibility question, doesn't it?

16         MR. GORDON:  I guess it depends on how you look at

17  it, but from our point of view, if an action has been void ab

18  initio, it's a circular issue to some extent.  I understand

19  your point, your Honor.  It's a bit of a circular issue, but

20  from our position, we think that to assume in the first

21  instance that there's been valid action by the governor and

22  that this Court should determine it presumes something that

23  hasn't yet been established.  If, however, of course, this

24  Court feels that it has jurisdiction to address that issue,

25  we would submit that -- again, without waiving the argument

13-53846-swr  Doc 8307-1  Filed 08/19/14  Entered 08/19/14 15:50:18  Page 130 of 99
13-53846-swr  Doc 8107-1  Filed 08/19/14  Entered 08/19/14 15:50:18  Page 35 of 99
143

1   that this really should be addressed in the state court, we
2   would submit that the 109(c)(2) issue of whether there's been
3   valid state authorization is the first issue this Court
4   should address and not the stay motions and that that issue
5   ought to be addressed upon full briefing in the context of a
6   Section 921(c) motion to dismiss.  I think that that comports
7   with the process.
8           THE COURT:  Let's talk about that.  What's the
9   prejudice to your client or the interest that your client
10  seeks to vindicate by having this issue resolved before any
11  other issue?
12          MR. GORDON:  Having which issue resolved, your
13  Honor?
14          THE COURT:  This issue of whether the governor
15  constitutionally authorized the filing.  Why does your client
16  need that to be resolved before anything else?
17          MR. GORDON:  Well, I think as a matter of just
18  jurisprudence to be proceeding with issues regarding a stay
19  when there's a fundamental issue of subject matter
20  jurisdiction, to me it would make sense to address the issue
21  of whether there is subject matter jurisdiction before we
22  proceed with all sorts of matters that may be of no effect.
23  They may be completely void, so I think that we --
24          THE COURT:  Okay.  So you're not representing to the
25  Court, for example -- and I don't mean to suggest this --

13-53846-swr   Doc 8307-1   Filed 08/19/14   Entered 08/19/14 15:10:18   Page 36 of 99
13-53846-tjt   Doc 8907-1   Filed 12/10/14   Entered 12/10/14 15:50:26   Page 131 of
143

1  that your clients were intending to file a lawsuit against

2  the city to enforce this constitutional right imminently, are

3  you, or are you?

4      MR. GORDON:  I'm sorry.  Can you repeat the

5  question, your Honor?

6      THE COURT:  I asked you how your clients would be

7  prejudiced by dealing with this issue of the

8  constitutionality of this filing later in the context of

9  eligibility, and you talked about issues of jurisprudence,

10  just prudence, so I asked you are you, therefore, not

11  suggesting to the Court that your client had a lawsuit

12  against the city in mind to file imminently to enforce this

13  constitutional right, which would be stayed if the Court

14  granted the motion?

15      MR. GORDON:  Understood, your Honor.  No, we do not.

16      THE COURT:  Okay.

17      MR. GORDON:  No, we do not.  So, your Honor, again,

18  we think that this is a threshold issue that ought to be

19  dealt with not on the fourth business day of the case but

20  through a little bit more of a robust process if this Court

21  is inclined to --

22      THE COURT:  Well, let's talk about that even.  If

23  the Court grants this motion, it would be, wouldn't it,

24  without prejudice to your right to seek relief from the stay

25  and/or abstention?

13-53846-tjt   Doc 8307-1   Filed 08/19/14   Entered 08/19/14 15:50:28   Page 132 of 99
13-53846-swr   Doc 830-1   Filed 08/19/14   Entered 08/19/14 15:50:28   Page 37 of 99
143

 1          MR. GORDON:  Yes, but, again, the question is
 2   whether there's a stay at all because there's a question of
 3   the validity of the ongoing bankruptcy, so --
 4          THE COURT:  Well, but if those rights are preserved,
 5   the prejudice of which you speak is reduced, not eliminated,
 6   but reduced.
 7          MR. GORDON:  Possibly, although abstention is not
 8   as -- certainly is not the same argument, of course.
 9          THE COURT:  But I'm just asking.
10          MR. GORDON:  Yes.
11          THE COURT:  Yes.
12          MR. GORDON:  I understand.  Your Honor, so that is
13   our position on that.  As far as the actual request for stay
14   relief, our papers speak for themselves to a great extent.  I
15   won't repeat what's been said here.  I would say this,
16   though.  As to the stay confirmation order, I think it ought
17   be explicit that if all they're asking -- all the city is
18   asking for is confirmation, then it should be clear that it's
19   not expanding anything.  If it's just the confirmation, then
20   we don't object to it because they're not doing -- by
21   claiming that they're confirming the stay, they're stating
22   that they are not expanding and exceeding the --
23          THE COURT:  Right.
24          MR. GORDON:  -- scope of the Bankruptcy Code --
25          THE COURT:  Okay.

1    MR. GORDON: -- so that would be our comment on
2    that. As far as the request to extend the stay, you know,
3    again, on day four it's very unclear to know how far they're
4    intending to stay this. There has been no discussion between
5    the parties. I've now heard from another counsel, who just
6    preceded me, that she would like to see the stay extended to
7    other people as well. Again, I would submit that there ought
8    to be an opportunity to discuss that. The argument has been
9    made that an adversary proceeding is necessary to enforce a
10   105 stay. The arguments that say that a 105 -- that you
11   don't need to have an adversary proceeding, that form should
12   not rule over substance, we understand those arguments, but
13   nothing should overrule due process, and I think it's really
14   an issue of due process. We don't know the contours of
15   really at the end of the day -- the papers are not clear as
16   to what the contours are, what they're seeking to extend to,
17   and, quite frankly, they haven't -- the papers do not
18   establish unusual circumstances here. The Eagle-Picher case
19   is inapposite to what is at issue here. All that's been
20   alleged is a sort of murky mere closeness of relationship
21   between the governor and the city, which we submit is
22   insufficient. The declaratory judgment that was entered by
23   Judge Aquilina has not been stayed, but this motion for stay
24   extension is seeking to do just that, and to stay a
25   declaratory judgment is really to essentially eviscerate the

13-53846-swr   Doc 8307-1   Filed 12/19/14   Entered 12/19/14 15:50:28   Page 134 of 99
13-53846-swr   Doc 8197-1   Filed 08/19/14   Entered 08/19/13 23:59:28   Page 39 of 99
143

1  declaratory judgment.  There's no action to be taken, so to

2  stay it is to basically vacate it.  We submit that that's not

3  appropriate under the circumstances here.  And we've raised

4  issues about Rooker-Feldman and so forth, and, again, we

5  would submit that if the Court were going to discuss the

6  extension of the stay, it should not extend to affect the

7  rights of parties relative to the declaratory judgment and

8  its winding its way through the state court system.

9         THE COURT:  Thank you, sir.

10        MR. GORDON:  Thank you, your Honor.

11        MS. CECCOTTI:  Good morning, Judge Rhodes.  Babette

12 Ceccotti, Cohen, Weiss & Simon, LLP, for the UAW, and with me

13 is Mr. Wertheimer, counsel to the Flowers plaintiffs.  As

14 your Honor is hopefully aware, the Flowers plaintiffs and the

15 UAW filed a joint objection, and Mr. Wertheimer is here in

16 case the Court has any questions regarding the Flowers

17 lawsuit, and I will state the objection of the UAW from the

18 U -- representing the UAW.  Excuse me, your Honor.

19        As is evident from our objection, we have largely

20 joined -- in the interest of brevity and not overwhelming the

21 Court with duplicative papers, we have largely joined in the

22 arguments already briefed and addressed by Ms. Levine on

23 behalf of AFSCME.  I do have a couple of other points that I

24 would like to make but, in particular, perhaps revisit some

25 of the ground already covered in part by other counsel in

1  response to Ms. Lennox's presentation on a couple of matters
2  that I found quite extraordinary and think that it is worth
3  focusing on again.
4         First, the notion that this Court could permanently,
5  permanently stay the state court lawsuits is I would submit
6  well beyond any power of this Court under 105 or 362 or any
7  other ground being suggested to you by the city.  These are
8  not -- as Ms. Levine stated, we're not here about an
9  implementation tool to keep others from diverting the city's
10 attention and running around and trying to collect on claims.
11 As you've heard this morning already, the issues raised by
12 the state -- by the state court lawsuits go to -- they not
13 only go to the eligibility of the city to file, they -- it
14 is -- it's actually -- it's more fundamental than that.
15 These are issues that arise under state law.
16        Chapter 9, of course, reflects dual sovereignty and
17 in part reflects that most significantly in the eligibility
18 criteria, which requires that the municipality be authorized
19 under state law or by a governmental officer.  The key here
20 is under state law.  The pre-petition lawsuits address the
21 state law issues as to whether the state law bases under
22 which the governor issued his authorization for the filing
23 violate the Michigan state constitution to the extent that
24 the authorization does not except out the pension benefits.
25 These are totally state court issues.  So if we look at 1334,

1   just to take that point, while this Court may have original

2   and exclusive jurisdiction of all cases under Title 11, the

3   use of the word "cases" must be read specific to the case

4   that we have, and the case that we have here is a Chapter 9

5   case with all of the dual sovereignty attributes of that,

6   including the eligibility criteria, which fundamentally are

7   grounded on an authorization under state law, so I do not

8   believe that 1334(a) can be read to simply write out of the

9   statute the unique character, if you will, of Chapter 9 vis-

10  a-vis the other chapters of the Bankruptcy Code, which is so

11  dependent on the state court authorization to --

12          THE COURT:  So is it your argument that this Court

13  doesn't have the jurisdiction to decide this constitutional

14  issue or that it is concurrent?

15          MS. CECCOTTI:  Your Honor, I was getting to that

16  when I was going to move on to 1334(b).

17          THE COURT:  Okay.

18          MS. CECCOTTI:  To the extent that anybody would

19  argue or perhaps decide or say that the eligibility features

20  and the ability to file a motion to dismiss based on those

21  features would be a proceeding under a case, then 1334(b)

22  makes clear that the District Courts have original but not

23  exclusive jurisdiction on those questions so that while this

24  Court arguably would have jurisdiction in the context of a

25  motion under 109(c), it is not exclusive, and the state -- to

1  the extent the issue of the state's authorization and whether
2  that authorization should have excepted the pensions
3  consistent with or under -- directly covered under -- the
4  prohibition under the Michigan state constitution, at a
5  minimum, if we're talking about a proceeding, the state
6  courts -- the state courts and this Court would both consider
7  that issue, and now here we do get into important and serious
8  questions of federalism and abstention.  The state courts
9  already have the authorization issue teed up in the three
10  lawsuits in slightly different fashions, but the gravamen of
11  all of them, if you boil it down, is the scope of the
12  authorization issued by the governor and whether the failure
13  to except the pensions -- the accrued pensions from the
14  authorization to use Chapter 9 violated the state
15  constitution.  Therefore, the Court's prudential or juris --
16  the Court's prudential or discretion perhaps to take that
17  issue up would be guided, as it is in other matters where a
18  party comes in to lift the stay to have a state court proceed
19  with a lawsuit perhaps of the type that Ms. Levine mentioned,
20  perhaps a pre-petition state lawsuit having to do with a
21  particular piece of property or a lien, those issues all come
22  into play and, in fact, weighing the factors that apply in
23  those cases, it is not always the case that the Bankruptcy
24  Court keeps those matters.  It depends on the issues.  It
25  depends on five or six or seven factors, depending on which

1  court you're in.

2        THE COURT:  Okay.  Well, let's focus on this issue

3  and ask whether there are any cases that have addressed the

4  argument that you make that this specific element of

5  eligibility should be resolved in the state court rather than

6  in the Bankruptcy Court.

7        MS. CECCOTTI:  Your Honor, I cannot standing here

8  today cite to a case, but I'm very confident that there are

9  such cases, perhaps not in the -- necessarily in the Chapter

10 9 context given the relative paucity of jurisprudence under

11 Chapter 9, but there are myriad cases that have arisen, for

12 example, under Chapter 11 where by balancing the various

13 factors, including the importance of respecting federalism

14 and noninterference with the state court's ability to

15 determine matters under their own laws --

16       THE COURT:  Well, but isn't it the case that every

17 Chapter 9 case which has been dismissed for lack of proper

18 authorization -- and there have been a few -- have been

19 dismissed by the Bankruptcy Court based on the Bankruptcy

20 Court's determination of authorization.

21       MS. CECCOTTI:  That's correct, but how many of those

22 cases -- and we'd have to look, but I'm going to place a

23 small bet here and say none, involved --

24       THE COURT:  We don't permit that here.

25       MS. CECCOTTI:  -- three lawsuits, three lawsuits

1  filed on -- against slightly different but all -- but
2  theories that -- the gravamen of which are the same?  So in
3  those cases, I'm not sure they're instructive because they
4  wouldn't say -- they wouldn't tell us that the Bankruptcy
5  Court versus those prefiling lawsuits was the only -- the
6  appropriate --
7            THE COURT:  Well, but to what extent is --
8            MS. CECCOTTI:  -- or certainly not the only place.
9            THE COURT:  To what extent is your argument -- would
10 your argument be diminished if there weren't such lawsuits,
11 if the --
12           MS. CECCOTTI:  I think -- I think --
13           THE COURT:  -- individuals here simply requested
14 this Court to permit the state court --
15           MS. CECCOTTI:  Your Honor, the essence of the
16 objection is, in fact, that these lawsuits exist and what
17 they are based in.  If the lawsuits did not exist, we would
18 have a different argument before you today.
19           THE COURT:  Okay.
20           MS. CECCOTTI:  But they do exist, and the fact that
21 they exist we think is simply -- must be the primary
22 consideration by this Court in determining the relief and we
23 respectfully submit denying the relief requested by the city.
24           I would like to make two other points, one of which
25 I regret we didn't raise in our papers, but it struck me

1    reading -- when I listened to Ms. Lennox this morning

2    articulate for the Court the relief that they are seeking

3    with respect to matters that haven't been lodged as lawsuits.

4    I believe she read that the -- paragraph 20 of her papers in

5    looking for prospective relief or -- against entity -- people

6    or entities that might become targets.  I did notice that the

7    proposed form of order merely states that the motion is

8    granted, and I would submit to the Court that if any type of

9    injunction is issued -- and we strongly urge the Court not to

10   grant the motion, but to any extent any -- the Court deems

11   any type of stay possible, any such relief should provide

12   fair notice to parties who have not yet done anything as to

13   the conduct that is potentially going to be covered by the

14   order, and we submit that, at least based on the filings

15   here, your Honor does not have sufficiently specific language

16   to issue such an order.

17          Finally, the proposed relief is overly broad even

18   with respect to the pre-petition lawsuits to the extent that

19   they ask this Court to simply rule that those lawsuits are

20   stayed.  I wish to -- we do want to point out to the Court

21   that the lawsuits -- the Flowers lawsuit certainly and

22   perhaps some of the others have named the State of Michigan

23   as defendants.  We don't understand the city's request for

24   relief in terms of a stay extension to extend to the State of

25   Michigan; therefore, the stay -- a stay is not -- has not

1   been -- such a stay has not appropriately been sought and if

2   the Court again were to grant a stay, that, again, the relief

3   is --

4           THE COURT: Let's assume there --

5           MS. CECCOTTI: -- would be overly broad.

6           THE COURT: Let's assume there's no order staying a

7   lawsuit against the state. What does that do for your

8   clients?

9           MS. CECCOTTI: The State of Michigan is a defendant,

10  and --

11          THE COURT: What relief can the Court order against

12  the state that would help your clients?

13          MS. CECCOTTI: To permit -- the lawsuits would be

14  able to proceed against the state.

15          THE COURT: Right, but what ultimate relief could

16  the state court grant against the state that would help your

17  clients?

18          MS. CECCOTTI: There I would need to ask the counsel

19  for the Flowers plaintiffs --

20          THE COURT: Okay. Okay.

21          MS. CECCOTTI: -- if you don't mind, just because my

22  familiarity is not primarily with those cases.

23          THE COURT: No, not at all.

24          MS. CECCOTTI: Those were my points, your Honor.

25          THE COURT: Thank you. Would you like to try to

1   address that for me, sir?

2        MR. WERTHEIMER:  Yes, your Honor.  William

3   Wertheimer, your Honor, appearing on behalf of the <u>Flowers</u>

4   plaintiffs.  In answer to that last question, first of all,

5   it is correct that the <u>Flowers</u> case, the state is a defendant

6   as an entity, and the same is true of the <u>Webster</u> and the

7   pension systems case.  All three cases seek declaratory

8   judgments, and a declaratory judgment can issue against the

9   state because --

10        THE COURT:  Right.  But what does that do --

11        MR. WERTHEIMER:  -- it's a declaratory judgment --

12        THE COURT:  What does that do for your clients?

13        MR. WERTHEIMER:  It depends upon what effect that

14   judgment would have with this Court as a practical matter.

15        THE COURT:  Oh, so you're thinking it may have some

16   res judicata or Rooker-Feldman effect?

17        MR. WERTHEIMER:  Well, you know, your Honor, your

18   Honor, our basic point is that this is a state law issue that

19   we brought to the state courts before this proceeding was

20   brought in good faith attempting to get an order and a ruling

21   from the state courts, and we would want to continue to do

22   that, and we think we can do that even under the motion they

23   filed, if it's granted, given the fact that the state as an

24   entity remains as a defendant in the three cases.

25        THE COURT:  All right.  Thank you.