For members with a parity relationship with the DPOA, retiring on or after July 1, 2001, under the new plan provisions, the 2.25% per annum escalation amount shall be re-computed each fiscal year on the basis of the amount of pension received in the previous year.[71]

---



## DPCOA

Pension benefits based on service rendered after the effective date of this CET-DPCOA shall not be subject to any escalation amounts.[72]

---

## DPLSA / DPOA

On or after July 1, 1992, and the first of July each year thereafter, the pension portion of any retirement allowance or death benefit of a member or beneficiary of a member as defined in Article VI, Section 1(d) of the plan provisions, and **[Article 51.G. of the DPLSA CBA or Article 33.K. of the CPOA CBA]** (to include those members who opt to retire under the new plan provisions) shall be increased at the rate of 2.25% per annum computed on the basis of the amount of the pension received at the time of retirement by all new plan members who are currently retired or who retire on or after July 1, 1992.

The pension portion of any retirement allowance or death benefit of a member, or beneficiary of a member as defined in Article IV, Section 1(d) of the plan provisions, and **[Article 51.G. of the DPLSA CBA or Article 3.K. of the DPOA CBA]** (to include those members who opt out to retire under the new plan provisions) earned after **[the date of the Act 312 Award in D09 G-0786 or September 1, 2011]**, shall not be increased whatsoever, per annum or otherwise. The pension portion of any retirement allowance or death benefit of a member, or beneficiary of a member as defined herein, accrued prior to **[the date of the Act 312 Award in D09 G-0786 or September 1, 2011]**, shall still be increased as provided herein. Hence, pension benefits earned based on service rendered after **[the date of this Award or September 1, 2011]** is issued will no longer receive the 2.25% per annum escalation amount. The 2.25% per annum escalation amount shall continue to apply to pension benefits earned based on service rendered before **[the date this Award was issued or September 1, 2011]**.[73]

**[Pension benefits based on service rendered after the effective date of this Agreement shall continue to not be subject to any escalation amounts.[74]]**

---

[71]     DFFA (§ 22.A.14.a.).

[72]     DPCOA (§ 41.M.).

[73]     DPLSA (§ 51.L.) (all references to the DPLSA CBA, or "the date of the Act 312 Award in D09 G-0786," or "the date of this Award," or "the date this Award was issued" apply to this DPLSA CBA); DPOA (§ 33.K.)(all references to the CPOA CBA or the date of September 1, 2011 apply to this DPOA CBA).

[74]     DPOA (as modified by 312 Award # 1, Issue # 61, pgs. 121–24).

## Sec. 3.    Payment.

The escalation factor contained in section 2 above shall be payable to the member or beneficiary of a member as defined in article IV, section 1 (d), notwithstanding any retirement allowance or pension amount limitation provisions in this chapter to the contrary.  (As amended November 5, 1968.  In effect January 1, 1969.)  (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part C, § 3.)

## Part D — Death Benefits.

## Sec. 1.    Generally.

If a member, or a beneficiary who was a member, is killed in the performance of his duty or dies as the result of illness contracted or injuries received while in the performance of his duty and such death, illness or injuries resulting in death, be found by the board of trustees to have resulted from the performance of his duty, the following applicable benefits shall be paid, subject to part I, section 1, of this article.

(a)    His accumulated contributions standing to his credit in the Annuity Savings Fund at the time of his death shall be paid to such person or persons as he shall have nominated by written designation duly executed and filed with the board of trustees.  If there be no such designated person surviving, his said accumulated contributions shall be paid to his legal representative, subject to subsection (e) of this section.

(b)    His widow shall receive a pension of five-elevenths of the maximum earnable compensation for the rank of patrolman or fire fighter as the case may be, to continue during her widowhood.  If his child or children under age eighteen years also survive the deceased member each such child shall receive a pension of one-tenth of such maximum earnable compensation; provided, that if there be more than two such surviving children under age eighteen years each such child's pension shall be an equal share of seven thirty-thirds of such maximum earnable compensation.  Upon the death, marriage, adoption, or attainment of age eighteen years of any such child his pension shall terminate and there shall be a redistribution by the board of trustees to the deceased member's remaining eligible children, if any; provided, that in no case shall any such child's pension exceed one-tenth of such maximum earnable compensation.  In no case shall the total of the pensions, provided for in this sub-section, payable on account of the death of a member exceed two-thirds of the maximum earnable compensation for the rank of patrolman or fire fighter, as the case may be.

Effective July 1, 1986, widows of Fire Department employees who have been receiving a flat monthly benefit of $300.00 pursuant to the authority of Title IV, Chapter 15, Section 16 of the 1918 City of Detroit Charter, and Section 13-107 of the July 1, 1974 Charter should receive an increase

- 54 -

13-53846-tjt  Doc 8810-2  Filed 12/09/14  Entered 12/09/14 15:20:42  Page 2 of 100
13-53846-swr  Doc 6879-2-3  Filed 09/16/14  Entered 09/16/14 01:20:42  Page 6 of 100
201

of $500.00 per month thereby making the flat monthly benefit $800.00. (Ord. No. 11-86, Sec. 47-10-3; Ord. No. 348-H, Sec. 54-100-3.)

Effective July 1,1986, widows of Police Department employees who have been receiving a flat monthly benefit of $300.00 pursuant to the authority of Title IV, Chapter 21, Section 19 of the 1918 City of Detroit Charter, and Section 13-107 of the July 1, 1974 Charter, should receive an Increase of $500.00 per month thereby making the flat monthly benefit $800.00. (Ord. No. 11-86, Sec. 47-10-4; Ord. No. 349-H, Sec. 54-100-4.)

(c)     If no widow survives the deceased member or if his widow dies or remarries before his youngest unmarried surviving child attains age eighteen years, his unmarried child or children under age eighteen years shall each receive a pension of one-fourth of the maximum earnable compensation for the rank of patrolman or fire fighter, as the case may be; provided that if there be more than two such surviving children under age 18 years, each such child's pension shall be an equal share of one-half of such maximum earnable compensation.  Upon the death, marriage, adoption, or attainment of age eighteen years of any such child his pension shall terminate and there shall be a redistribution by the board of trustees to the deceased member's remaining eligible children, if any; provided, that in no case shall any such child's pension exceed one-fourth of the maximum earnable compensation for the rank of patrolman or fire fighter, as the case may be.

(d)     If there be no widow and if there be no children under age eighteen years surviving such deceased member and if he leaves surviving him either or both a father and mother, whom the board of trustees shall find to be actually dependent upon such member for financial support, such dependent father and mother shall each receive a pension of one-sixth of the maximum earnable compensation for the rank of patrolman or fire fighter, as the case may be.

(e)     If a member dies intestate, without having designated a person or persons, as provided in sub-section (a) of this section, and without heirs, the amount of his accumulated contributions in the Annuity Savings Fund, not to exceed a reasonable sum, to be determined by the board of trustees, shall be used to pay his burial expenses, provided he leave no other estate sufficient for such purpose; any balance credited to such member in the Annuity Savings Fund, and not used for burial expenses shall remain a part of the funds of the retirement system and shall be credited to the Pension Accumulation Fund.

(f)     If the maximum earnable compensation for the rank of patrolman or fire fighter, as the case may be, is subsequently changed, the pensions provided in this section for beneficiaries of members as defined in article IV, section 1 (a), (b), or (c) shall be proportionately changed.

(g)     The maximum earnable compensation for the rank of patrolman or fire-fighter, as the case may be, to be used in computing the pensions provided in this section for beneficiaries of members as defined in article IV, section 1 (d) shall be the maximum earnable compensation of the rank of patrolman or fire-fighter as established by the city's budget for the fiscal year of the member's death.  (As amended September 1, 1964.  In effect September 15, 1964.  As amended November 5, 1968.  In effect January 1, 1969.)

(1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part D.)

## By Agreement

The City agrees that in the Policemen and Firemen Retirement System Article VI, D and Article VI, E, all references to "widow" shall include "widower" and in Article VI, E, Section 2(a), the disability and dependency restrictions on widowers shall be removed.[75]

## DPOA

Duty and non-duty death benefits under the City of Detroit Policemen and Firemen Retirement System shall be payable to widowers in the same manner as they are now payable to widows. Widowers seeking non-duty death benefits under the system shall not be required to demonstrate any degree of dependency on their wives.[76]

## DFFA / DPOA

Effective July 1, 2001, **[for DPOA allied members,[77]]** the re-marriage penalty on any pension shall be removed.[78]

## Part E — Nonduty Death.

### Sec. 1.     Payment of accumulated contributions.

If a member, or a member who retires after June 30, 1965, under part B, section 1 of this article, dies and no pension or pensions become payable under this chapter on account of his death, his accumulated contributions standing to his credit in the Annuity Savings Fund at the time of his death shall be paid to such person or persons as he shall have nominated by written designation duly executed and filed with the board of trustees.  If there be no such designated person or persons surviving the said member, his said accumulated contributions shall be paid to his legal representative.  If such member dies intestate, without having designated a person as

[75]     DFFA (§ 22.A.14.a.); DPCOA (§ 41.A.); DPLSA (§ 51.A.).

[76]     DPOA (§ 33.C.).

[77]     DFFA (§ 42.A.14.j.).

[78]     DFFA (§ 42.A.14.i.); DPOA (§ 33.P.).

- 56 -
13-53846-tjt   Doc 8819-2   Filed 12/19/14   Entered 12/19/14 20:21:42   Page 4 of 100
13-53846-swr   Doc 6379-2   Filed 09/16/14   Entered 09/16/14 01:20:42   Page 59 of 100
201

above provided, and without heirs, his said accumulated contributions not to exceed a reasonable sum to be determined by the board of trustees, shall be used to pay his burial expenses, provided he leaves no other estate sufficient for such purpose; and any balance credited to such member in the Annuity Savings Fund not so used for burial expenses shall be transferred to the Survivors Benefit Fund.  (As amended September 1, 1964.  In effect September 15, 1964.  As amended November 5, 1968.  In effect January 1, 1969.)  (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part E, § 1.)

## Sec. 2.    Allowances to widows, etc.

Upon the death of a member, or a member who retires after June 30, 1965, under part B, section 1 of this article, and such death was found by the board of trustees not to have resulted from the performance of his duty, the applicable retirement allowances provided in paragraphs (a), (b), (c) and (d) of this section shall be paid from the Survivors Benefit Fund and shall be subject to paragraphs (e), (f) and (g) of this section.

(a)    His widow, or in the case of a female member, her widower, whom the board of trustees finds to be totally and permanently disabled and to have been dependent upon the said female member for at least fifty per cent of his financial support, shall receive a retirement allowance computed in the same manner in all respects as if the said member had (1) regularly retired the day preceding the date of his death, notwithstanding that he might not have acquired twenty-five years of creditable service, in the case of a member as defined in article IV, section 1 (a), (b), or (c), or notwithstanding that he might not have acquired twenty-five years of service or more and had not attained age fifty-five, in the case of a member as defined in article IV, section 1 (d), (2) elected option 2 provided for in part H of this article, and (3) nominated his said widow or widower as joint beneficiary; provided, that in no case shall the retirement allowance payable to such joint beneficiary be less than twenty per cent of said member's average final compensation.  If a member who had less than twenty-five years of creditable service dies prior to July 1, 2001, the retirement allowance payable to the widow/widower shall be terminated in the event the widow/widower remarries.

(b)    His unmarried child or children under age eighteen years shall each receive a retirement allowance of one-seventh of the annual maximum earnable compensation of the rank of a patrolman or a fire fighter, as the case may be; provided, that if there be more than two such children, each child shall receive a retirement allowance of an equal share of two-sevenths of said annual maximum earnable compensation of a patrolman or a fire fighter.  Upon any such child's adoption, marriage, death or attainment of age eighteen years, whichever occurs first, his retirement allowance shall terminate, and there shall be a redistribution by the board of trustees to the deceased member's remaining eligible children under age eighteen years; provided, that in no case shall the retirement allowance

13-53846-tjt  Doc 8819-2  Filed 12/19/14  Entered 12/19/14 15:20:42  Page 5 of 100
13-53846-swr  Doc 8790-3  Filed 09/16/14  Entered 09/16/14 01:20:42  Page 5 of 100

payable to any such child exceed one-seventh of the said annual maximum earnable compensation of a patrolman or a fire fighter.

(c)    If, at the time of the said member's death, there shall be neither a widow nor children eligible for a retirement allowance provided for in this section, each of his parents shall receive a retirement allowance of one-seventh of the annual maximum earnable compensation of a patrolman, or a fire fighter, as the case may be; provided, that the board of trustees finds that such parent was dependent upon the said member for at least fifty per cent of his financial support. Upon the remarriage of any such parent, his retirement allowance shall thereupon terminate.

(d)    In the event all the retirement allowances, provided for in this section, payable on account of the death of a member, terminate before there has been paid an aggregate amount equal to the said member's accumulated contributions standing to his credit in the Annuity Savings Fund at the time of his death, the difference between his said accumulated contributions and the said aggregate amount of retirement allowances shall be paid to such person or persons as the said member shall have nominated by written designation duly executed and filed with the board of trustees. If there be no such designated person or persons surviving the said member such difference, if any, shall be paid to his legal representative.

(e)    In no case shall any retirement allowance be paid under this section on account of the death of a member if any benefits are paid under part D of this article on account of his death. The retirement allowance provided for in this section shall be subject to part I of this article.

(f)    All benefits provided in this part E for beneficiaries of members as defined in article IV, section 1 (a), (b), or (c) shall be based on the maximum earnable compensation of the rank of patrolman or fire fighter, as the case may be. If hereafter the compensation of such rank shall be changed, the benefits provided shall be changed proportionately. All benefits provided in this part E for beneficiaries of members as defined in article VI, section 1 (d) shall be based on the maximum earnable compensation of the rank of patrolman or fire-fighter as established in the city's budget for the fiscal year of the member's death.

(g)    In the event a member has withdrawn his accumulated contributions from the Annuity Savings Fund and has not returned in full all amounts due the fund by him, the survivors benefits provided in paragraphs (a), (b), (c) and (d) of this section shall be reduced to the proportion that the member's accumulated contributions standing to his credit in the Annuity Savings Fund, at the time of his death bears to the amount his accumulated contributions would have been had he not made a withdrawal from the Annuity Savings Fund. (As amended September 1, 1964. In effect

September 15, 1964.  As amended November 5, 1968.  In effect January 1, 1969.)

(1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part E, § 2.)

---

## By Agreement

The City agrees that in the Policemen and Firemen Retirement System Article VI, D and Article VI, E, all references to "widow" shall include "widower" and in Article VI, E, Section 2(a), the disability and dependency restrictions on widowers shall be removed.[79]

---

## DPOA

Duty and non-duty death benefits under the City of Detroit Policemen and Firemen Retirement System shall be payable to widowers in the same manner as they are now payable to widows. Widowers seeking non-duty death benefits under the system shall not be required to demonstrate any degree of dependency on their wives.[80]

---

## DFFA / DPOA

Effective July 1, 2001, [for DPOA allied members,[81]] the re-marriage penalty on any pension shall be removed.[82]

---

### Part F — Termination of Membership Otherwise than by Retirement, Death or Becoming a Beneficiary.

**Sec. 1.    Payment of benefits.**

If the membership of a member as defined in article IV, section 1 (a), (b), or (c) shall terminate for any reason other than his retirement, his becoming a beneficiary, or his death, he shall be paid the accumulated contributions standing to the credit of his individual account in the Annuity Savings Fund, such payment to be made within ninety days after such termination of membership; provided, however, that if a member eligible for retirement shall resign or be dismissed from the service, the Board of Trustees, on the written petition of such member filed within one year from his separation from service and prior to the withdrawal of his accumulated contributions in the Annuity Savings Fund, shall grant such member service retirement benefits computed in accordance with article VI, part A, section 2, subject to the provisions of part G of this article.  (As amended November 5, 1968.  In effect January 1, 1969.)  (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part F, § 1.)

---

[79]    DFFA (§ 22.A.14.a.); DPCOA (§ 41.A.); DPLSA (§ 51.A.).

[80]    DPOA (§ 33.C.).

[81]    DFFA (§ 42.A.14.j.).

[82]    DFFA (§ 42.A.14.i.); DPOA (§ 33.P.).

## Sec. 2. Payment of benefits.

If the membership of a member as defined in article IV, section 1(d) shall terminate for any reason other than his retirement, his becoming a beneficiary or his death, he shall be paid the accumulated contributions standing to the credit of his individual account in the Annuity Savings Fund, such payment to be made within ninety days after such termination of membership; provided, however, that if a member having twenty-five or more years of service and having attained age fifty-five shall resign or be dismissed from the service, the Board of Trustees, on the written petition of such member filed within one year from his separation from service and prior to the withdrawal of his accumulated contributions in the Annuity Savings Fund, shall grant such members service retirement benefits computed in accordance with article VI, part A, section 2.1, subject to the provisions of part G of this article. (As amended November 5, 1968. In effect January 1, 1969.) (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part F, § 2.)

## Sec. 3. Deferred vested benefits.

A member (i) whose employment is terminated before August 28, 2003 and who is credited with eight or more years of creditable service and has attained age forty, or (ii) whose employment is terminated after August 27, 2008 and who is credited with ten or more years of creditable service, but in each case less than twenty-five years (effective as of March 8, 2007, twenty years for DPOA members and fire equivalents) of creditable service shall be eligible to receive a full retirement allowance beginning on the date upon which the member would have been eligible to commence a full retirement allowance had he continued in the service of the City until such date. Alternatively, such member may elect to receive an actuarially reduced early retirement allowance at any time following his termination of employment with the City.

## Part G — Conviction of Felony.

## Sec. 1. Forfeiture of rights.

If a member or beneficiary as defined in Article IV, section 1 (a), (b), (c) or (d) shall be convicted by a court of competent jurisdiction of a felony or high misdemeanor involving moral turpitude committed during active service, the Board of Trustees shall have the power to order the forfeiture of all rights of the member or beneficiary to benefits hereunder, except the return of his accumulated contributions. (As amended November 5, 1968. In effect January 1, 1969.) (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part G, § 1.)

## Part H — Option Elections.

## Sec. 1. Generally.

(a) Prior to the first payment of any retirement allowance normally due, except a disability pension payable under Part B, Sections 2 and 2.1 of this article, a member may elect to receive his or her retirement allowance as a straight life retirement allowance payable throughout the member's life; or the member may elect to receive the actuarial equivalent, as of the date of the member's retirement, of his or her straight life retirement allowance in a reduced retirement allowance payable throughout the member's life and

- 60 -

13-53846-tjt Doc 8119-2 Filed 12/09/14 Entered 12/09/14 15:20:42 Page 8 of 100
13-53846-swr Doc 6979-2 Filed 09/16/14 Entered 09/16/14 01:20:42 Page 9 of 101

201

nominate a joint beneficiary, in accordance with the provisions of Options 1, 2 or 3 as follows:

(1)     OPTION 1. *Cash Refund Annuity*. Under Option 1, a member will receive a reduced retirement allowance. If a member who selected Option 1 dies before full payment of the annuity has been received, the person or persons nominated by that member's written designation duly executed by the member and filed with the Board of Trustees shall receive in a single payment the difference between the present value of the member's annuity on the date the member retired, minus the amount of annuity payments already paid to the member. If there is no such designated person(s) surviving the retired deceased member, such difference, if any, shall be paid to the member's legal representative; or

(2)     OPTION 2. *Joint and Last Survivorship Retirement Allowance*. Under Option 2, upon a member's death, payment of a reduced retirement allowance shall be continued through the life of and paid the person having an insurable interest in the member's life and nominated by written designation duly executed by the member and filed with the Board of Trustees prior to the first payment of the member's retirement allowance is due; or

(3)     OPTION 3. *Modified Joint and Last Survivorship Allowance*. Under Option 3, upon a member's death, payment of one-half of the member's reduced retirement allowance shall be continued throughout the life of and paid to the person having an insurable interest in the member's life and nominated by that member's written designation duly executed by the member and filed with the Board of Trustees prior to the date the first payment of the retirement allowance is due.

(b)     This Section shall be applicable to those members receiving benefits on the effective date of this Section who are not covered by the arbitration decision regarding the Detroit Police Officers Association which became effective July 1, 1995, or the arbitration decision regarding the Detroit Police Lieutenant's and Sergeant's Association arbitration decision which became effective June 30, 1998.

(c)     This Section does not rescind any substantive rights of disability retirees from the Policemen and Firemen Retirement System who retired prior to the July 1,1995 arbitration award, or the substantive rights of disability retirees from the Detroit Police Lieutenant's and Sergeant's Association who retired prior to the June 30,1998 arbitration award.

(d)     This Section does not amend any computations used to determine benefits under Part B, Sections 2 and 2.1 of this Code, or result in an increase or decrease in such benefits.

- 61 -

13-53846-tjt Doc 8310-2 Filed 12/09/14 Entered 12/09/14 15:20:42 Page 9 of 100
13-53846-swr Doc 6079-2-3 Filed 09/16/14 Entered 09/16/14 01:20:42 Page 9 of 100
201

(e)     Existing 1099R reporting procedures shall continue as currently in effect. A change in said procedures shall only occur as the result of an Internal Revenue Service ruling letter in favor of such change.

(Ord. 5-00, Sec. 54-2-14; Ord. 4-00, Sec. 54-2-14.)

*Joint and Survivor Optional Forms of Payment.* The Joint and Survivor Optional Forms of Payment provided under the retirement system shall be made available in either the standard form or the pop-up form, as follows:

(1)     *Standard Form.* Under the *Standard Form,* the reduced retirement allowance shall be paid throughout the lifetime of the retiree.

(2)     *Pop-up Form.* Under the *Pop-up Form,* the reduced allowance shall be paid throughout the lifetime of the retiree and the designated beneficiary. In the event of the death of the designated beneficiary during the lifetime of the retiree, the amount of the allowance shall be changed to the amount that would have been payable had the retiree elected the Straight Life Form of Payment.

In addition, a member may elect to have all or part of his accumulated contributions paid to the member in a single sum or used to purchase an annuity contract from an insurance company of his choice in which case, any annuity payments attributable to such amount under the retirement system shall not be payable from the annuity reserve fund but shall be the responsibility of the insurance company.  A member' s retirement allowance shall be reduced by the actuarial equivalent of the amount so paid or used.

Effective July 1, 1992, retirees of the Policemen and Firemen Retirement System shall be entitled to change their pension option from either Option 2 or Option 3 **[or effective July 1, 2000, Option A[83]]** to a straight life pension after they have commenced collection of the pension if the member's beneficiary predeceases the member.  The actuarial cost of the change in benefit shall be borne by the member who seeks change in his option election. The pop-up option shall be based upon the investment return assumption as recommended by the Board's actuary and adopted by the Board of Trustees. **[This provision shall be effective July 1, 1986.[84]]**  (Ord. No. 18-93, Sec. 47-12.6H-1(A).)

---

### By Agreement

---

Effective July 1, 2000, members shall have the option of selecting a 75% surviving beneficiary option.[85]

---

[83]     DFFA (§ 22.A.14.l.).

[84]     DPOA (§ 33.M.).

[85]     DPLSA (§ 51.M.).

## Sec. 2. Disposition of surplus benefits upon death of member and beneficiary.

In the event a member elected Option 2 or 3 provided for in section 1 of this part H and his designated joint beneficiary die before there has been paid in retirement allowances an aggregate amount equal to his accumulated contributions standing to his credit in the Annuity Savings Fund at the time of his retirement, the difference between his said accumulated contributions and the said aggregate amount of retirement allowances paid shall be paid to the said retired member's legal representative. (As amended September 1, 1964. In effect September 15, 1964.) (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part H, § 2.)

## Part I — Pension Offset by Compensation Benefits.

## Sec. 1. Generally.

Any amounts which may be paid under the provisions of any workmen's compensation, or pension, or similar law to a member, or to the dependents of a member on account of any disability or death, shall be offset against and payable out of funds provided by the City under the provisions of the system on account of the same disability or death. In case the present value of the total commuted benefits under said workmen's compensation, pension, or similar law, is less than the pension reserve on benefits otherwise payable from the funds provided by the City under this System, then the present value of the commuted payments shall be deducted from the pension reserve, and such benefits as may be provided by the pension reserve, so reduced, shall be payable under the provisions of the System. (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part I, § 1.)

## Part J — Monthly Payments.

Unless otherwise herein provided, all benefits payable under this system shall be paid in equal monthly installments. (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part J.)

## Part K — Re-Examination of Beneficiaries.

## Sec. 1. Authority of Board.

(a) Once each year during the first five years following retirement of a member on a disability pension or a disability retirement allowance and at least once in every three year period thereafter the Board of Trustees may, and upon his application, shall require any disability beneficiary, if he would not then be eligible for a service retirement allowance had he remained in active service; to undergo a medical examination: such examination shall be made by, or under the direction of the Medical Director at a place to be fixed by the Board of Trustees. Except when the examination is on the application of the beneficiary, if the beneficiary shall be required to travel more than twenty miles to reach such place, the Board of Trustees shall pay his reasonable traveling expenses. Should such disability beneficiary refuse to submit to such examination his disability pension or disability retirement allowance may be discontinued until he shall submit to such examination and should such refusal continue

for one year, all his rights in and to a pension may be revoked by the Board of Trustees. If on medical examination of a beneficiary, the Medical Director reports, and the report is concurred in by the Board of Trustees, that the beneficiary is physically able and capable of resuming active duty as a Policeman or Fireman, he shall be restored to such duty and his disability pension or disability retirement allowance shall cease. Such member so restored to active duty shall be returned to duty in a rank or grade equivalent to or higher than the rank or grade in which he was serving at the time of his last retirement and his compensation shall be that provided for the rank or grade in which he is restored to service. It shall be the duty of the Commissioner of Police or the Board of Fire Commissioners to restore such member to duty forthwith.

(b)    If the Medical Director reports and certifies to the Board of Trustees that a disabled old plan member is engaged in a gainful occupation, paying more than the difference between his final compensation and his disability pension, or disability retirement allowance, and if the Board of Trustees concurs, the amount of his pension shall be reduced to an amount, which together with the amount earned by him, shall equal the amount of his final compensation. If the Medical Director reports and certifies to the Board of Trustees that a disabled new plan member is engaged in a gainful occupation, paying more than the difference between his base salary at the time of disability increased by two and twenty-five one hundredths percent (2.25%) for each full year from the date of disability and his disability pension, or disability retirement allowance, and if the Board of Trustees concurs, the amount of his pension shall be reduced to an amount, which together with the amount earned by him, shall equal the amount of his final compensation. Should his earnings be later changed, the amount of his pension may be further modified in like manner.

(c)    A disability beneficiary, who shall be reinstated to active service, as provided in this section, shall from the date of such restoration again become a member of the System; and he shall contribute to the System thereafter in the same manner and at the same rate as he paid prior to his disability retirement. Any prior service and membership service on the basis of which his services were computed at the time of his retirement shall be restored to full force and effect, and he shall be given service credit for the period of time he was in retirement due to such disability, except in the case of nonservice connected disability.

(1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part K, § 1.)

## Part L — Medical Board of Review

As to all applications under this Article, the medical findings of the Medical Board of Review shall be binding on the Board of Trustees. (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part L.)

## Part M — Benefit Limitations

The Defined Benefit Plan of the Retirement System is subject to Section 415 of the Internal Revenue Code. The Retirement System shall be administered, operated and limited consistent with all applicable Sections of the Internal Revenue Code (IRC) including Section 415, as described in Article IX, Section 8.

## Part N — Withdrawal of Accumulated Contributions

### Sec. 1. Member With Twenty or Twenty-Five Years of Service.

Effective July 1, 1982, a member with twenty-five years or more of creditable service (effective as of March 8, 2007, twenty years for DPOA members and fire equivalents) shall be allowed to withdraw either a partial or the full amount of his accumulated contributions, one time only, whether or not the member retires. A member shall make such election prior to the receipt of his first retirement benefit check.

### Sec. 2. Disabled Member

A member who is receiving disability benefits (duty or non-duty) from the System and who has twenty-five years (effective as of March 8, 2007, twenty years for DPOA members and fire equivalents) or more of creditable service shall have the right to withdraw the full amount of his accumulated contributions. If such member withdraws his accumulated contributions, his retirement benefit shall be actuarially reduced to reflect such withdrawal.

---

### By Agreement

(a)    Optional Annuity Withdrawal

1.    **[Effective for those retiring on or after July 1, 1974;[86]**] a member shall have the right to elect to receive on the effective date of his service retirement a partial or total refund of his accumulated contributions. If a member makes such an election, an annuity payable under any retirement allowance or reduced retirement allowance shall be reduced proportionally. If the total accumulated contributions are withdrawn, no annuity shall be payable.

The limitation of fifteen twenty-seconds of the maximum earnable compensation of a patrolman and fireman continues in effect. For purposes of determining the fifteen twenty-seconds limitation, a computation based on the annuity which is an actuarial equivalent of the accumulated contributions standing to a member's credit in the Annuity Savings Fund prior to any partial or total refund will be used.

This provision affords the members of this collective bargaining unit a similar option available to members of the General Retirement System pursuant to 1973 Amendment K. The parties agree that no other benefits or amounts payable

---

[86]    DPOA (§ 33.D.).

pursuant to the Policemen and Firemen Retirement System are affected by this contractual provision.[87]

**[On or after July 1, 1974, members or former members who are entitled to begin to receive the "40 & 8" benefit will be entitled to the annuity refund withdrawal option.**

**On or after July 1, 1974, non-duty disability retirants who retired pursuant to Title IX, Chapter IV, Article IV, Section 1, a, b or c prior to having twenty-five years of service credit, shall be entitled to the annuity refund withdrawal option on the date he/she would have had twenty-five years of service credit had he/she continued as an active member. Said option shall only apply to the balance of accumulated contributions, if any, remaining in such retirant's credit in accordance with the existing annuity refund provisions.**

**Survivor benefit beneficiaries as defined in Title IX, Chapter VII, Article VI, Part E, Section 2, parts (a), (b) and (c) of the 1918 City Charter in effect as of June 30, 1974, and continued in effect by Section 11-102 of the July 1, 1974, City Charter shall be entitled to the annuity withdrawal refund option subject to the same rules that would have been applicable to the deceased member or members had he/she not died. Said option shall only apply to the balance of accumulated contributions, if any, remaining in applicable former member's credit.**

**In any case of doubt, the Board of Trustees shall decide whether a member or beneficiary is entitled to an annuity refund withdrawal option.[88]]**

2.    In addition to the provisions of the current CET or collective bargaining agreement, pension charter and ordinance provisions and all other pension rights of members, a member shall have the right on or after the effective date of his becoming eligible for a full service retirement allowance (members who have twenty-five (25) years of creditable service) to elect to receive a partial or total refund of his accumulated contributions to the Annuity Savings Fund. If a member makes such an election, an annuity payable under any retirement allowance or reduced retirement allowance shall be reduced proportionally. If the total accumulated contributions are withdrawn, no annuity shall be payable.

If a member makes such an election, the retirement allowance shall be reduced to reflect the value of the annuity withdrawn. The amount of the annuity at the time of such election shall be the amount used at the time of retirement for purposes of computing the retirement allowance.

---

[87]     DFFA (§ 22.A.14.b.); DPCOA (§ 39.A.); DPLSA (§ 48.H.); DPOA (§ 33.D.).

[88]     DFFA (§ 22.A.14.b.); DPCOA (§ 39.B-E.); DPLSA (§ 48.H.).

**[Beginning July 1, 1982, and thereafter,[89]]** all members who complete their required years of service, shall have the right to withdraw all or part of their accumulated contributions whether they choose to retire or not. [90]

**[For members having a parity relationship with the DPOA and the DPCOA Inspector beginning July 21, 2000,[91]] [Effective July 1, 2003,[92]] [Beginning July 21, 2000,[93]] [a member who has elected to retire and elected to withdraw his/her annuity for the purposes of calculating his/her retirement allowance (thereby lowering the retirement allowance), may nevertheless choose to leave the annuity in the Retirement System collecting regular annuity interest with the option of a one-time withdrawal of the annuity funds at a later date.[94]]**

**[For members [or employees with a parity relationship with the DPLSA and the DPCOA Inspector[95]] who retire on or after July 1, 1990, and who have made or make an election to receive a total or partial refund of his/her accumulated contribution to the Defined Contribution Plan, there shall be no reduction of retirement allowances due to the portion of withdrawal representing interest credits.[96]] [This subsection shall be controlled by the requirements of the Act 312 arbitration award issued June 25, 1990 (MERC Case No. B89 C-0622, page numbers 22 and 23.[97]]**

**[Effective January 15, 2010[98] or December 15, 2008[99] or March 8, 2007,[100]]** a member **[or a DPOA, DPLSA, or DPCOA allied member of DFFA[101]]** who retires and elects to leave a balance in the Defined Contribution Plan (Annuity Savings Fund) would have the option of receiving a quarterly payment of interest earnings only or to allow periodic withdraws of principal, in addition to a one time complete withdrawal. [102] **[Members must make their selection a minimum**

---

[89]  DPOA (§ 33.F.).

[90]  DFFA (§ 22.A.14.b.); DPCOA (§ 39.F.); DPLSA (§ 48.H.); DPOA (§ 33.F.).

[91]  DFFA (§ 22.A.14.b.).

[92]  DPLSA (§ 48.I.).

[93]  DPOA (§ 33.F.).

[94]  DFFA (§ 22.A.14.b.); DPLSA (§ 48.I.); DPOA (§ 33.F.).

[95]  DFFA (§ 22.A.14.b.2.).

[96]  DFFA (§ 22.A.14.b.2.); DPCOA (§ 39.H.); DPLSA (§ 48.H.).

[97]  DFFA (§ 22.A.14.b.2.); DPLSA (§ 48.H.).

[98]  DFFA (§ 22.A.14.b.)(effective date for DPCOA allied members); DPCOA (§ 39.J.)("Effective with the Act 312 Award in MERC Case No. D07 K-1456, dated January 15, 2010…")

[99]  DFFA (§ 22.A.14.b.3.)(effective date for DPLSA allied members ); DPLSA (§ 48.J.).

[100]  DFFA (§ 22.A.14.b.)(effective date for DPOA allied members); DPOA (§ 33.S.).

[101]  DFFA (§ 22A.14.b.3.)

[102]  DFFA (§ 22.A.14.b.); DPCOA (§ 39.A-H, J.); DPLSA (§ 48.A-H, J.); DPOA (§ 33.S.).

**of thirty (30) days before the beginning of a quarter; quarter defined as beginning March 1, June 1, September 1, and December 1.**[103]**]**

**[An employee who is entitled to a retirement allowance under Article VI, Part A, Section 4 of the Policemen and Firemen Retirement System and who leaves the employ of the Police or Fire Department of the City of Detroit on or after July 1, 1982 shall have the right to elect to receive on the effective date of termination a partial or total refund of his accumulated contributions. The pension portion of his retirement allowance shall be computed as if the member had not withdrawn his/her accumulated contributions from the Annuity Savings Fund until the date he/she was eligible to retire had he/she continued in City employment.**[104]**]**

---

## DPCOA

Effective in accordance with the specific date and terms of the Detroit Police Officers Association (DPOA) award in Act 312 No. D98 E-0840 (Chairman Donald F. Sugerman, dated July 21, 2000) the membership of this bargaining unit shall have the right to leave his/her withdrawn annuity in the pension system and accumulating interest, as provided therein.[105]

---

[103]     DFFA (§ 22.A.14.b.)(applicable to DPLSA and DPCOA allied members); DPCOA (§ 39.A-H, J.); DPLSA (§ 48.A-H, J.).

[104]     DFFA (§ 22.A.14.b.); DPCOA (§ 39.G.); DPLSA (§ 48.H.).

[105]     DPCOA (§§ 39.I.).

# ARTICLE VII.

## Method of Financing.

The funds of the retirement system shall be the Annuity Savings Fund, Annuity Reserve Fund, Pension Accumulation Fund, Pension Reserve Fund and the Survivors Benefit Fund. (As amended September 1, 1964. In effect September 15, 1964. As amended November 5, 1968. In effect January 1, 1969.) (1918 Detroit City Charter, Title IX, Ch. VII, Art. VII.)

## Sec. 1.  Annuity Savings Fund.

(a)  The Annuity Savings Fund shall be the fund in which shall be accumulated at regular interest, the contributions deducted from compensation of members to provide for their annuities. The contributions of a member as defined in article IV, section 1 (a), (b) or (c) shall be five percent of a member's compensation until the member has acquired twenty-five years of creditable service. The contribution of a member as defined in article IV, section 1(d) shall be five per cent of his compensation until he has acquired at least twenty-five years of creditable service (effective as of March 8, 2007, twenty years for DPOA members and fire equivalents) and attained age fifty-five. No member shall have the option of choosing to receive the compensation required to be contributed hereunder directly instead of having such amounts paid by the City to the Annuity Savings Fund.

(b)  The officer or officers responsible for making up the payroll shall cause the contributions provided for in paragraph (a) above to be deducted from the compensation of each member on each and every payroll, for each and every payroll period, from the date of his entrance in the system to the date he ceases to be a member.

(c)  The deductions provided for herein shall be made notwithstanding that the minimum compensation provided by law for any member shall be reduced thereby. Every member shall be deemed to consent and agree to the deductions made and provided for herein, and payment of his salary or compensation, less said deduction, shall be a full and complete discharge and acquittance of all claims and demands whatsoever for the services rendered by such person during the period covered by such payments, except as to the benefits provided under this chapter. The amounts to be deducted shall be deducted by the city treasurer and when deducted shall be paid into the Annuity Savings Fund and shall be credited to the individual account of the member from whose compensation said deduction was made.

(d)  If, under the provisions of this chapter, any person shall withdraw or be paid any part or all of his accumulated contributions and shall thereafter again become a member, he shall, in addition to the contributions provided

- 69 -

13-53846-swr   Doc 8300-23   Filed 09/16/14   Entered 09/16/14 15:20:42   Page 17 of
101

for in paragraph (a) above, redeposit in the Annuity Savings Fund, by an increased rate of contribution to be determined by the board of trustees, or by a single payment, such amount that his accumulated contributions at the date of his eligibility for retirement will be the same amount it would have been had no withdrawal or payment been made therefrom.

(e)     Except as is otherwise provided in this chapter, upon the death or retirement of a member, his accumulated contributions shall be transferred from the Annuity Savings Fund to the Annuity Reserve Fund. (As amended September 1, 1964. In effect September 15, 1964. As amended November 5, 1968. In effect January 1, 1969.)

(1918 Detroit City Charter, Title IX, Ch. VII, Art. VII, § 1.)

## Sec. 2.     Annuity Reserve Fund.

The Annuity Reserve Fund shall be the fund from which shall be paid all annuities payable as provided in this chapter, except annuities which are payable from the Survivors Benefit Fund. Should a disability beneficiary be restored to active service, his annuity reserve at the time shall be transferred from the Annuity Reserve Fund to the Annuity Savings Fund and credited to his individual account therein. (As amended September 1, 1964. In effect September 15, 1964.) (1918 Detroit City Charter, Title IX, Ch. VII, Art. VII, § 2.)

## Sec. 3.     Alternative Financing Method.

Except as provided regarding the survivors benefit fund, the pension accumulation fund shall be the fund in which shall be accumulated reserves for the pensions and other benefits payable from contributions made by the city, and from which transfers shall be made as provided in this section.

(a)     Accrued Liability Fund. Pursuant to Ordinance No. 05-05, which authorizes the creation of the Detroit Police and Fire Retirement System Service Corporation, the City has entered into a transaction ("the Pension Funding Transaction") to obtain funds as an alternative to those available through the traditional funding mechanism described in Section 4. The proceeds generated by the Pension Funding Transaction (or any Additional Pension Funding Transaction, as described below) that will be deposited into the System will be termed the "Funding Proceeds." The Funding Proceeds will be deposited into a new Fund in the System to be called the Accrued Liability Fund. The purpose of the Funding Proceeds will be to fund all or part of the heretofore unfunded accrued liabilities ("UAAL") of the System, as determined as of a date certain, i.e., the "Determination Date," pursuant to the System's actuarial valuation as of that date. The Funding Proceeds will be assets of the System and will be applied, together with all other assets of the System, to fund the System's obligation to pay accrued benefits.

This Accrued Liability Fund shall contain only the Funding Proceeds of the Pension Funding Transaction, and any earnings thereon. Should the City, by future ordinance, choose to raise additional monies by additional pension funding transactions ("Additional Pension Funding Transactions") in order to fund the then existing UAAL of the System as of a future date certain, a new and separate Accrued Liability Fund shall be created within the System to contain the proceeds, and any earnings thereon, of any Additional Pension Funding Transactions, and a new Accrued Liability Fund will be created for each successive Additional Pension Funding Transaction entered into by the City, if any. The treatment of any Additional Accrued Liability Funds shall be the same as described below.

(b) The Funding Proceeds deposited in the applicable Accrued Liability Fund will be subject to the oversight and investment direction of the Board of Trustees of the Police and Fire Retirement System, consistent with the Board's obligations under Article VIII (Management of Funds), The Board will invest the Funding Proceeds as part of the System's overall assets, and will not differentiate the Funding Proceeds from other System assets for investment purposes.

(c) All Interest, dividends and other income derived from the investment of the Funding Proceeds shall be credited annually to the Accrued Liability Fund on a total System rate of return basis, determined by crediting the applicable Accrued Liability Fund with the investment return experienced by the System in total for all of its investments for the year. This shall be done by first determining the rate of return for the total assets of the System for the fiscal year, and then crediting back to each Accrued Liability Fund an amount that is determined by multiplying that rate of return times the balance in the Accrued Liability Fund as of the beginning of the fiscal year.

The interest, dividends and other income derived from the investment of the Funding Proceeds deposited in any Accrued Liability Fund will not be credited to any Funds other than the Pension Accumulation Fund. Morever, because the Accrued Liability Fund has been impressed with a certain and definite purpose, it shall be accounted for separately as provided for in Section 8, Maintenance of Reserves.

(d) Upon the creation of an Accrued Liability Fund and the deposit of the Funding Proceeds into the applicable Accrued Liability Fund, there shall be established a schedule for transferring assets of the applicable Accrued Liability Fund by crediting them to the Pension Accumulation Fund on an annual basis over the period required to fully amortize the System's UAAL determined as of the applicable Determination Date.

The System's UAAL determined as of the Determination Date shall be the "Determined Accrued Liability." The period over which the Determined

Accrued Liability is to be fully amortized, as specified in the System's actuarial valuation as of the applicable Determination Date, is the "Amortizing Period." The amount to be transferred each fiscal year to the Pension Accumulation Fund from the Accrued Liability Fund is the "Scheduled Amortizing Amount."

With respect to the Pension Funding Transaction and any Additional Pension Funding Transactions, the Scheduled Amortizing Amount will equal a level percentage of the City's payroll for each fiscal year. The level percentage of the City payroll that will be used to determine the Scheduled Amortizing Amount shall be a level percentage that is equal to the percentage that is specified in the actuarial valuation as of the applicable Determination Date as being the percentage of City's annual payroll required to amortize the Determined Accrued Liability over the Amortizing Period, multiplied by a fraction. The numerator of the fraction shall be the amount of the applicable Funding Proceeds up to the full amount of the Determined Accrued Liability as of the Determination Date. The denominator of the fraction shall be the System's Determined Accrued Liability on that date.

**Commentary**: By way of example only, the Scheduled Amortizing Amount would be determined as follows: (1) the Determination Date is June 30, 2004, (2) the Funding Proceeds are deposited into the System during the 2004-2005 Fiscal Year, (3) the June 30, 2004 actuarial valuation produced a UAAL of $600 million, (4) the City's contribution required to amortize that UAAL is 21% of the City's payroll, and (5) the Funding Proceeds are $400 million, then the Scheduled Amortizing Amount for Fiscal Year 2005-06 would be 21% times ($400 million/$600 million) times the City's payroll for 2005-2006.This would be 14% times the City's payroll for that fiscal year.

With respect to the Pension Funding Transaction or any Additional Pension Funding Transactions, where the applicable Determination Date occurs after the date of the actuarial valuation that determines the City's contribution for the fiscal year during which the applicable Funding Proceeds are deposited into the System, for each fiscal year, there will be transferred from the applicable Accrued Liability Fund to the Pension Accumulation Fund, an amount that is specified in such actuarial valuation as being the City's required contribution needed to amortize the System's UAAL as of the date of such actuarial valuation, multiplied by a fraction. The numerator of the fraction shall be the amount of the applicable Funding Proceeds up to the full amount of the UAAL specified in such actuarial valuation, and the denominator of the fraction shall be the System's total UAAL as set forth in that same actuarial valuation.

**Commentary**: By way of example only, the Scheduled Amortizing Amount in this case would be determined as follows: (1) the

Determination Date is June 30, 2004, (2) the Funding Proceeds had been deposited into the System during the 2004-2005 Fiscal Year, (3) the June 30, 2003 actuarial valuation produced a UAAL of $516 million, (4) the City's contribution required to amortize that UAAL is 19.07% of the City's payroll and (5) the Funding Proceeds are $400 million, then the Scheduled Amortizing Amount for Fiscal Year 2004-2005 would be 19.07% times ($400 milllon/$516 million) times the City's payroll for 2004-2005. This would be 14.77% times the City's payroll for that fiscal year.

Should the Board at some future time adopt a different period for amortizing the System's UAAL (a "Revised Amortizing Period"), the Scheduled Amortizing Amount for ensuing years may change. If the Revised Amortizing Period provides for a longer period during which to amortize the System's UAAL (i.e., an "Extended Amortizing Period"), then the Amortizing Period initially used to amortize the applicable Determined Accrued Liability will also be revised. There will then be established a new schedule for amortizing the Determined Accrued Liability and the Scheduled Amortizing Amount will be based on the level percentage of the City's payroll being equal to what it would be if the then unamortized balance of the Determined Accrued Liability were re-amortized over the Extended Amortizing Period. If the Revised Amortizing Period is changed so that the System's UAAL is to be amortized over a shorter period than the one initially used to amortize the applicable Determined Accrued Liability, then that Scheduled Amortizing Amount will not be changed.

(e)     Each year, when the City is required to make its annual contribution to the System — the amount of which is to be determined pursuant to Section 4 and the timing of which is set forth in Section 4(b) — the Board will transfer the Scheduled Amortizing Amount from the Accrued Liability Fund and credit it to the Pension Accumulation Fund; provided, however, that this transfer cannot occur unless and until the Board has been notified pursuant to the Pension Funding Transaction, or any Additional Pension Funding Transaction, that the City is current on the service payments required under the applicable Pension Funding Transaction.

(f)     Should the Scheduled Amortizing Amount not be available for transfer because of the City's failure to make a timely service payment as required by the applicable Pension Funding Transaction, the Board will take any permitted action, including the filing of a civil action against the City, as contemplated in Article VIII, Section 7, to effectuate the transfer of the Scheduled Amortizing Amount.

Should the City's Finance Director certify to the Board by a duly attested notice that the City has no available funds to make the service payments required by the applicable Pension Funding Transaction, in that specific circumstance, the Board shall be authorized to transfer the Scheduled

Amortizing Amount for that fiscal year to the Pension Accumulation Fund, absent the notice requirement set forth in Section 3(e).

(g) Since the Funding Proceeds are to be considered assets of the System and are intended to fund the applicable Determined Accrued Liability, the City shall be required to make only a proportional contribution for any fiscal year ending after the date the Funding Proceeds are deposited into the applicable Accrued Liability Fund, but prior to a fiscal year whose corresponding actuarial valuation includes the Funding Proceeds in the System's total assets. The proportional contribution to fund the System's then existing UAAL, if any, shall be the level percentage of the City's payroll specified in the actuarial valuation for the applicable fiscal year as the City's required contribution needed to amortize the System's then existing UAAL, multiplied by a fraction. The numerator of the fraction shall be the amount of the System's total UAAL as determined in such actuarial valuation minus the amount of the applicable Funding Proceeds, but not less than zero. The denominator of the fraction shall be the amount of the System's total UAAL in such valuation. Actuarial valuations following the deposit of the applicable Funding Proceeds into the System shall Include the Funding Proceeds in the total assets of the System to determine any ensuing UAAL of the System, and the Funding Proceeds shall offset any such actuarial liability accordingly.

**Commentary**: By way of example, the following indicates how the procedure describe above would operate. Assume the following facts — (1) the Determination Date was June 30, 2004, (2) the June 30, 2004 actuarial valuation produced a UAAL of $600 million and a contribution toward the UAAL of 21% of the City's payroll, (3) the Funding Proceeds were $400 million and were deposited in the System during the 2004-2005 Fiscal Year, (4) the first actuarial valuation which included the Funding Proceeds in the System's assets was as of June 30, 2005 and (5) the June 30, 2003 valuation which determines the City's required contribution for fiscal 2004- 05 produced a total UAAL of $516 million and a contribution toward that UAAL of 19.07% of the City's payroll. Then:

• The fiscal year ending after the date of deposit would be the year ending June 30, 2005, or the 2004-2005 Fiscal Year

• The first fiscal year whose corresponding valuation reflected the Funding Proceeds in its assets would be the 2006- 2007 year.

• Thus, the City's required UAAL. contribution for fiscal 2004-2005 would be 19.07% of the payroll times ($516 million — $400 million) divided by $516 million, or 4.3% of payroll. The City's required UAAL contribution for fiscal 2005-06 would be 21% of payroll times ($800 million — $400 million) divided by $600 million, or 7% of the City's payroll.

• Beginning with the Fiscal Year 2006- 2007, whose contribution is determined by the June 30, 2005 actuarial valuation, the City's required UAAL contribution would be the percentage of payroll developed in the corresponding actuarial valuation that included the Funding Proceeds as being part of the System's assets.

Any contribution the City has made to the System for any fiscal year prior to the date the Funding Proceeds from any applicable Pension Funding Transaction have become assets of the System. Where the amount of the contribution is equal to or less than the normal cost of that fiscal year it shall be deemed to have been made in satisfaction of the City's obligation to contribute an amount equal to the System's normal cost for that fiscal year, and not as payment towards any portion of its obligation to pay an amortized portion of the System's UAAL due in that fiscal year. The term "normal cost" as used in this Section 3(g), shall be given its generally accepted actuarial meaning.

To the extent the City's contribution for that fiscal year exceeds its required contribution for the normal cost owed in that fiscal year, its excess contributions shall be deemed as having been made for that immediately following fiscal year, and shall offset the City's normal cost contribution obligation for that immediately following fiscal year.

**Commentary**: By way of example, the following indicates how the procedure described in the preceding paragraphs would operate. Assuming the same facts as in the prior Commentary, and the City contributed $40 million for the 2004-2005 Fiscal Year and the total normal cost for that year was $40 million:

• The entire $40 million would be deemed as payment of the required normal cost for 2004-2005, and

• No part of the $40 million contribution would be deemed payment toward UAAL, as no UAAL contribution is required for that year.

Now assume that the facts remain the same, but that the City had contributed a total of $45 million for 2004-2005:

• The City's total required contribution for 2004-2005 would be deemed paid in full, and

• $5 million, i.e., $45 million minus $40 million, would be deemed prepayment of the City's required normal cost for 2005-2006 and its required normal cost contribution for 2005-2006 would be reduced accordingly.

(h)     The System's auditor shall verify (1) the assets credited to the Pension Accumulation Fund and any Accrued Liability Fund at the beginning and

end of each fiscal year, (2) that each Fund had been properly credited, and (3) that transfers from the Accrued Liability Fund(s) to the Pension Accumulation Fund had occurred as intended, under this Section 3.

(i) Should the System's auditor certify that the total assets then remaining in the System, not including the assets of any Accrued Liability Fund, together are insufficient to pay the benefits then currently due under the System, the System's auditor will then determine and certify the minimum amount needed to fund the benefits then due and owing (the "Minimum Necessary Amount"). In this limited circumstance, the Board is authorized to transfer the Minimum Necessary Amount from the Accrued Liability Fund to the Pension Accumulation Fund absent the notification required pursuant to Section 3(e).

At the end of the Amortizing Period, or the end of the Extended Amortizing Period, if applicable, should there be any moneys that remain credited to the Accrued Liability Fund, the Board may transfer, at its discretion, any such remaining funds, in whole or in part, by crediting them to the Pension Accumulation Fund. The Pension Accumulation Fund is the only Fund into which the remaining moneys credited to the Accrued Liability Fund may be transferred.

(Ord. No. 04-05, Sec. 54-43-4.)

## Sec. 4.    Contributions to and payments from pension accumulation fund.

Contributions to and payments from the pension accumulation fund shall be made as follows:

(a) Upon the basis of such assumptions as to future financial experiences as the board of trustees shall from time to time adopt, the actuary shall annually compute the city's contribution, expressed as a percent of active member contributions, to provide the pension reserves covering the pensions or other city-financed benefits to which members might be entitled or which might be payable at the time of their discontinuances of city employment; provided, such contribution percents shall not be less than amounts which, expressed as percents of active member compensations, will remain level from generation to generation of Detroit citizens. Upon the retirement or death of a member, the pension reserve for any benefits payable on his behalf shall be transferred from the pension accumulation fund to the pension reserve fund, to the extent of there being assets in the pension accumulation fund.

(b) The board of trustees shall annually ascertain and report to the mayor and the council the amount of contributions due the retirement system by the city, and the council shall appropriate and the city shall pay such contributions to the retirement system during the ensuing fiscal year.

When paid, such contributions shall be credited to the pension accumulation fund.

(Ord. No. 04-05, Sec. 54-43-5; Ord. No. 76-H, Sec. 54-43-4.)

**Sec. 5. Retiree payments from Pension Reserve Fund; reinstatement of disability retirees to active service.**

Except as to the survivor's benefit fund, the pension reserve fund shall be the fund from which shall be paid pensions on account of members. Should a disability retirant be reinstated to active service, the member's pension reserve, at that time, shall be transferred from the pension reserve fund to the pension accumulation fund. (Ord. No. 04-05, Sec. 54-43-6; Ord. No. 76-H, Sec. 54-43-5.)

**Sec. 6. Expense Fund.**

The Expense Fund shall be the fund to which shall be credited all money provided by the City to pay the administration expenses of the system, and from which shall be paid all the expenses necessary in connection with the administration and operation of the System. (1918 Detroit City Charter, Title IX, Ch. VII, Art. VII, § 5.)

**Sec. 7. Appropriations.**

(a) The Board of Trustees shall certify the amount of the appropriation necessary to pay to the various funds of the System the amounts payable by the City as enumerated in this amendment, according to legal budget procedure.

(b) To cover the requirements of the System temporarily, such amounts as shall be necessary to cover the needs of the System shall be paid into the Pension Accumulation Fund and the Expense Fund by special appropriations or transfers to the System; provided, however that no transfers can be made from the accrued liability fund other than the annual transfer of the scheduled amortizing amount, or transfers under special circumstances pursuant to Sections 3(f) and 3(I).

(Ord. No. 04-05, Sec. 54-43-7; 1918 Detroit City Charter, Title IX, Ch. VII, Art. VII, § 6.)

**Sec. 8. Maintenance of reserves.**

The maintenance of the annuity reserves in the Annuity Reserve Fund and the pension reserves in the Pension Reserve Fund are hereby made obligations of the Pension Accumulation Fund. All income, interest, and dividends derived from deposits and investments authorized by this ordinance, excluding any amounts credited to the Accrued Liability Fund, which are not required for the allowance of interest to the funds of the System as provided herein, shall be credited to the Pension Accumulation Fund. The moneys credited to the Accrued Liability Fund shall be credited to the Pension Accumulation Fund only to the extent of the annual transfer of the Scheduled Amortizing Amount or the special circumstance transfers authorized pursuant to

Sections 3(f) and 3(i). Any contributions by the City to the System from any Fund impressed by law with a certain and definite purpose shall be accounted for separately. (Ord. No. 04-05, Sec. 54-43-8; 1918 Detroit City Charter, Title IX, Ch. VII, Art. VII, § 7.)

### Sec. 9.    Survivors Benefit Fund.

    (a)    The Survivors Benefit Fund shall be the fund in which shall be accumulated, at regular interest, the reserves for survivors benefits provided for in article VI, part E, section 2, hereof, and from which such benefits shall be paid.

    (b)    After June 30, 1965 and prior to July 1, 1986, each member shall contribute to the Survivors Benefit Fund one per cent of his compensation paid by the city until he has acquired twenty-five years of creditable service. The officer or officers responsible for making up the payroll shall cause the said contributions to be deducted from the member's compensation, on each and every payroll, for each and every payroll period so long as he remains a member and has not acquired twenty-five years of creditable service. Each and every member shall be deemed to consent and agree to the said deductions. Said contributions, when deducted, shall be credited to the Survivors Benefit Fund and shall in no case become a part of the said member's accumulated contributions, nor be subject to refund.

    (c)    Each member who retires after June 30, 1965, under part B, section 1 of article VI shall, prior to July 1, 1986, contribute to the Survivors Benefit Fund one per cent of his final compensation as defined until he would have had a total of twenty-five years of creditable service had he continued in active service. The officer or officers responsible for making up the retirement roll shall cause the said contribution to be deducted from the pension of each such retired member on each and every retirement roll, for each and every retirement roll period, so long as he is receiving a pension under part B, section 2(a) of article VI. Each and every such retired member who is receiving a pension under part B, section 2(a) of article VI shall be deemed to consent and agree to said deductions. Said contributions, when deducted, shall be credited to the Survivors Benefit Fund and shall in no case become a part of said member's accumulated contributions, nor be subject to refund.

---

**By Agreement**

---

**Survivor's Benefit Fund**

The contributions, required by Article VII, Section 8(b) and 8(c) of the Policemen and Firemen Retirement System, to the Survivor's Benefit Fund shall be eliminated for Union members.[106]
**[The City shall make the contributions necessary to maintain the benefit level by**

---

[106]    DFFA (§ 22.A.14.g.); DPCOA (§ 41.B.); DPLSA (§ 51.B.); DPOA (§ 33.L.).

**contributing that amount necessary to replace the members' contributions to the Survivor's Benefit Fund.[107]]**

**[This provision shall be effective July 1, 1986.[108]]**

---

(d)     Upon the basis of such mortality and other tables of experience, and regular interest, as the board of trustees shall from time to time adopt, the actuary shall annually compute the liabilities for benefits being paid from the Survivors Benefit Fund. The board of trustees shall report to the mayor and the common council the amount of contributions to be made by the city to the Survivors Benefit Fund, and the council shall appropriate and the city shall pay such amount to the retirement system during the ensuing fiscal year. When paid, such appropriations shall be credited to the Survivors Benefit Fund. If the balance in the fund is not sufficient to fully cover the liabilities so computed, the city shall appropriate and pay, in the ensuing fiscal year, the amount of such insufficiency.

(e)     Upon the death of a member, on whose account survivors benefits become payable as provided in article VI, part B, section 2, hereof, his accumulated contributions standing to his credit in the Annuity Savings Fund at the time of his death shall be transferred from the Annuity Savings Fund to, and shall become a part of, the Survivors Benefit Fund, notwithstanding any provisions in this chapter to the contrary. (As amended September 1, 1964. In effect September 15, 1964.)

(1918 Detroit City Charter, Title IX, Ch. VII, Art. VII, § 8.)

### Sec. 10.     Computation of annuity and pension reserve liabilities for members, retirants and beneficiaries.

In computing the annuity and pension reserve liabilities for members, retirants and beneficiaries, the board of trustees shall cause the following annual decrement probabilities, salary factors and interest assumption to be used.

(a)     The annual decrement probabilities and salary factors to be used in evaluating the annuity and pension liabilities for members shall be as shown in Tables 1 and 2 hereinafter set forth.

(b)     The total of active member annual compensations shall be assumed to increase three percent per annum, compounded annually.

---

[107]     DFFA (§ 22.A.14.g.); DPOA (§ 33.L.).

[108]     DPOA (§ 33.L.).

(c)   The mortality assumption for retirants and beneficiaries shall be the mortality rates contained in the 1971 group annuity male mortality table, without setback for men and set back five years for women.

(d)   The investment return assumption shall be five percent per annum, compounded annually.

### TABLE 1.

### City of Detroit Policemen and Firemen
### Retirement System
### Active Member Annual Decrement Probabilities
### and Salary Factors

| Age | Withdrawal from Service | Death in Service | Salary Factors |
|---|---|---|---|
| 18 | .04120 | .00098 | .10561 |
| 19 | .04090 | .04099 | .11327 |
| 20 | .04030 | .00100 | .12126 |
| 21 | .04000 | .00101 | .12988 |
| 22 | .03960 | .00102 | .13913 |
| 23 | .03910 | .00103 | .14913 |
| 24 | .03890 | .00104 | .15971 |
| 25 | .03840 | .00105 | .17068 |
| 26 | .03800 | .00107 | .18204 |
| 27 | .03700 | .00108 | .19347 |
| 28 | .03600 | .00111 | .20527 |
| 29 | .03480 | .00113 | .21712 |
| 30 | .03340 | .00117 | .22916 |
| 31 | .03200 | .00121 | .24124 |
| 32 | .03000 | .00126 | .25321 |
| 33 | .02730 | .00133 | .26522 |
| 34 | .02370 | .00143 | .27753 |
| 35 | .01990 | .00154 | .29015 |
| 36 | .01500 | .00168 | .30306 |
| 37 | .01160 | .00184 | .31637 |
| 38 | .00850 | .00204 | .32995 |
| 39 | .00600 | .00227 | .34405 |
| 40 | .00390 | .00252 | .35851 |
| 41 | .00210 | .00281 | .37333 |
| 42 | .00090 | .00313 | .38861 |
| 43 | .00000 | .00348 | .40435 |
| 44 | .00000 | .00387 | .42051 |
| 45 | .00000 | .00429 | .43709 |
| 46 | .00000 | .00475 | .45395 |
| 47 | .00000 | .00526 | .47144 |

- 80 -

| Age | Withdrawal from Service | Death in Service | Salary Factors |
|---|---|---|---|
| 48 | .00000 | .00582 | .48929 |
| 49 | .00000 | .00643 | .50750 |
| 50 | .00000 | .00710 | .52639 |
| 51 | .00000 | .00783 | .54560 |
| .52 | .00000 | .00864 | .56535 |
| 53 | .00000 | .00953 | .58548 |
| 54 | .00000 | .01051 | .60612 |
| 55 | .00000 | .01157 | .62711 |
| 56 | .00000 | .01270 | .64867 |
| 57 | .00000 | .01392 | .67066 |
| 58 | .00000 | .01520 | .69319 |
| 59 | .00000 | .01656 | .71610 |
| 60 | .00000 | .01802 | .73939 |
| 61. | .00000 | .01959 | .76316 |
| 62 | .00000 | .02133 | .78747 |
| 63 | .00000 | .02322 | .81211 |
| 64 | .00000 | .02526 | .83715 |
| 65 | .00000 | .02750 | .86258 |
| 66 | .00000 | .03000 | .88848 |
| 67 | .00000 | .03277 | .91514 |
| 68 | .00000 | .03584 | .94264 |
| 69 | .00000 | .03919 | .97094 |
| 70 | .00000 | .04278 | 1.00000 |

**TABLE 2.**

**City of Detroit Policemen and Firemen
Retirement System
Annual Probabilities of Age and Service
Retirement Applicable to Members
Who Are Eligible to Retire**

| Age | Probabilities of Retirement |
|---|---|
| 45 | 25% |
| 46 | 25 |
| 47 | 25 |
| 48 | 25 |
| 49 | 25 |
| 50 | 25 |
| 51 | 25 |
| 52 | 25 |
| 53 | 25 |
| 54 | 20 |

| | |
|---|---|
| 55 | 20 |
| 56 | 15 |
| 57 | 10 |
| 58 | 15 |
| 59 | 30 |
| 60 | 100 |

(Ord. No. 77-H, Sec. 54-2-2; Ord. No. 462-f, Sec. 2.)

## Sec. 11.  Determination of city's annual contribution — Disability pension liabilities.

The city's annual contribution, expressed as a percent of active member compensations, to finance disability pensions shall be determined by dividing the average of the pension reserve liabilities for disability retirements incurred, during the three fiscal years ending with the date of the valuation by one percent of the active members' annual compensation used in the valuation. (Ord. No. 77-H, Sec. 54-2-3; Ord. No. 462-F, Sec. 3.)

## Sec. 12.  Determination of city's annual contribution — Death pension liabilities.

The city's annual contribution, expressed as a percent of active member compensations, to finance death-in-service pensions shall be determined by dividing the average of the pension, reserve liabilities for death-in-service claims incurred during the three fiscal years ending with the date of the valuation by one percent of the active member's annual compensations used in the valuation.  (Ord. No. 77-H, Sec. 54-2-4; Ord. No. 462-F, Sec. 4.)

## Sec. 13.  Determination of city's annual contribution — Actuarial evaluation of annuity and pension reserve liabilities.

The annuity and pension reserve liabilities for members, retirants and beneficiaries shall be actuarially evaluated as set forth in this article.  (Ord. No. 77-H, Sec. 54-2-5.)

## Sec. 14.  Determination of city's annual contribution — Service pension liabilities.

(a)     The service pension liabilities for members shall be determined using the entry age-normal cost method of actuarial valuation.

(b)     The city's annual contribution, expressed as a percent of active member compensations, to finance the prospective service pension liabilities shall be determined by dividing the total of the individual annual normal costs of the active members by one percent (1%) of the active members' annual compensations used in the valuation.

(c)     The city's annual contribution, expressed as a percent of active member compensations, to finance any unfunded accrued service pension liabilities, including instances in which assets exceed liabilities, shall be determined by dividing such unfunded accrued service pension liabilities by one percent (1%) of the present value of future compensations payable during a period of future years.  Such period of future years shall be thirty

(30) years for the actuarial valuation as of June 30, 1974, decreasing one (1) year at each subsequent June 30th until a twenty (20) year period is reached, which twenty (20) year period shall be used in each subsequent actuarial valuation until June 30th, 2004 when the period shall again be thirty (30) years.

(Ord. No. 39-05, Sec. 54-43-3; Ord. No. 77-H, Sec. 54-2-6; Ord. No. 462-F, Secs. 5, 6.)

### Sec. 15.    Board of trustees to compute city's annual contribution.

Based upon the provisions of this article, including any amendments, the board of trustees shall compute the city's annual contributions, expressed as a percent of active member compensations, to the retirement system for the fiscal year beginning July 1, 1975, using actuarial valuation data as June 30, 1974, and for each subsequent fiscal year using actuarial valuation data as of the June 30th date which date is a year and a day before the first day of such fiscal year.  The board shall report to the mayor and to the city council the contribution percents so computed, and such contribution percents shall be used in determining the contribution dollars to be appropriated by the city council and paid to the retirement system.  For each fiscal year beginning July 1, 1975 and each fiscal year thereafter, such contribution dollars shall be determined by multiplying the applicable contribution percent for such fiscal year by the member compensations paid for such fiscal year; provided for the one fiscal year beginning July 1, 1975 and ending June 30, 1976 such member compensations so used shall not exceed 106.09 percent of the active members' annual compensations used in the actuarial valuation determining such contribution percent.  (Ord. No. 77-H, Sec. 54-2-7; Ord. No. 462-F, Sec. 8.)

### Sec. 16.    Repealed.  (Ordinance No. 77-H, Sec. 54-2-8).

### Sec. 17.    Refunds for certain members.

Effective July 1, 1974, a member of the policemen and firemen retirement system who holds the rank of police inspector and above and who is not covered by a collective bargaining agreement shall, notwithstanding any other pension provisions to the contrary, have the right to elect to receive on the effective date of his service retirement a partial or total refund of his accumulated contributions. Effective as of March 8, 2007, a DPOA and fire equivalent retiree who elects not to withdraw his accumulated contributions as of the effective date of his service retirement shall have the option of receiving a quarterly payment of interest credited to his accumulated contributions or to receive periodic withdrawals of the contributions such retiree made to the plan.  If a member makes such an election, an annuity payable under any retirement allowance or reduced retirement allowance shall be reduced proportionately.  If the total accumulated contributions are withdrawn no annuity shall be payable.  The limitations of fifteen twenty-seconds of the maximum earnable compensation of a patrolman and fireman continues in effect.  For purposes of determining the fifteen twenty-seconds limitation, a computation based on the annuity which is an actuarial equivalent of the accumulated contributions standing to an above-defined member's credit in the annuity savings fund prior to any partial or total refund will be used.  This provision affords the members as defined above a similar option available to members of the general retirement system pursuant to 1973 Charter Amendment K.  No other benefits or amounts payable pursuant to other provisions of the policemen and firemen

retirement system are increased by this section. The mechanical steps involved in computing the service retirement allowance of a member as defined above shall be determined by the board of trustees of the policemen and firemen retirement system subject to approval of the law department. (Ord. No. 29-H, § 1; Sec. 54-2-9.)

---

**By Agreement**

---

**Employer Contribution**

**[Effective January 1, 1987 [109] or upon issuance of the 1986-89 Act 312 Award [110]]** the employee contributions to the Policemen and Firemen Retirement System Annuity Fund, although designated as employee contributions, shall be paid by the City of Detroit in lieu of contributions by the employee. The employee shall not have the option of choosing to receive the contributed amount directly instead of having them paid by the employer to the annuity fund. There shall be no additional contribution expense to the City of Detroit, and the amounts so contributed by the employer on behalf of the employee shall be treated, for tax purposes, as employer contributions and thus shall not be taxable to the employee until these amounts are distributed or made available to the employee.

This provision shall not affect the amount or benefit level of the retirement allowance, or the City of Detroit's obligation thereto. [111]

---

[109] DFFA (§ 22.A.14.h.); DPLSA (§ 51.J.).

[110] DPOA (§ 33.O.).

[111] DFFA (§ 22.A.14.h.); DPCOA (§ 41.K.); DPLSA (§ 51.J.); DPOA (§ 33.O.).

# ARTICLE VIII.

## Management of Funds.

### Sec. 1.    Board named Trustees for various funds.

The Board shall be the Trustee of the several funds provided for in this Article, and shall have full power to invest and reinvest such funds subject to all terms, conditions, limitations, fiduciary duties, and restrictions imposed by The Public Employee Retirement System Investment Act, as amended, provided, that notes, bonds, or obligations of the City shall not be subject to said restrictions or limitations. The Board shall have the power to purchase notes, bonds, or obligations of the City before or after the same are offered to the public and with or without advertising for bids.  (Ord. No. 04-05, Sec. 54-43-9(a); 1918 Detroit City Charter, Title IX, Ch. VII, Art. VIII, § 1.)

### Sec. 2.    Purchase, sale, etc., of securities and investments.

The Board shall have full power to hold, purchase, sell, assign, transfer, and dispose of any of the securities and investments of the Retirement System, as well as the proceeds of said investments and any moneys belonging to the System.  (Ord. No. 04-05, Sec. 54-43-9(b); 1918 Detroit City Charter, Title IX, Ch. VII, Art. VIII, § 2.)

### Sec. 3.    Annual interest.

The Board annually shall allow Regular Interest on the mean amount of assets in each of the Funds for the preceding year. The amounts so allowed shall be due and payable to said Funds, and shall be annually credited thereto by the Board from interest and other earnings on the moneys of the System; provided, however, that the balance in any Accrued Liability Fund shall not be included in determining the mean amount of assets of the System when the Board makes this determination, and no Regular Interest on the mean amount of assets in the Accrued Liability Fund shall be credited to other Funds in the System until transferred to the Pension Accumulation Fund pursuant to Article VII, Section 3(e) or under special circumstances pursuant to Article VII, Sections 3(f) and 3(i). Any additional amount, required to meet the Regular Interest on the Funds of the System, shall be paid by the City and any excess of earnings, over such amount required, shall be a portion of the amounts to be contributed by the City.  (Ord. No. 04-05, Sec. 54-43-9(c); 1918 Detroit City Charter, Title IX, Ch. VII, Art. VIII, § 3.)

### Sec. 4.    Custodian of funds.

The City Treasurer or other person or entity designated by the Board shall be the custodian of the Funds of the Police and Fire Retirement System. All payments from such Funds shall be made by the Treasurer or other designated custodian. Payments made by the System shall be based upon vouchers signed by two persons designated by the Board. A duly attested copy of a resolution of the Board designating such persons and bearing upon its face specimen signatures of such persons, shall be filed with the Finance Director and the custodian of the Funds as their authority for making payments upon such vouchers. No voucher shall be drawn unless it shall have been previously authorized by a specific or continuing resolution adopted by

the Board.  (Ord. No. 04-05, Sec. 54-43-9(d); 1918 Detroit City Charter, Title IX, Ch. VII, Art. VIII, § 4.)

**Sec. 5.      Available funds shall be kept upon deposit.**

Available funds shall be kept on deposit for the purpose of meeting disbursements for pensions, annuities, and other payments.  (Ord. No. 04-05, Sec. 54-43-9(e); 1918 Detroit City Charter, Title IX, Ch. VII, Art. VIII, § 5.)

**Sec. 6.      Prohibition against reversion of funds to the City.**

This pension plan and trust has been created for the exclusive benefit of the members and beneficiaries as set forth herein.  The funds thereof have been established for the benefit of the members and for the operation of the pension system.  No part of the principal and income of any of the funds of this plan and trust shall revert to or be returned to the city prior to the satisfaction of all liabilities, hereunder to all members, beneficiaries and anyone claiming by or through them.  (Ord. No. 153-H, Sec. 54-45-6.)

**Sec. 7.      Enforcement; Civil Action.**

A civil action for relief against any act or practice which violates the state law, the 1997 Detroit City Charter, the 1984 Detroit City Code or the terms of the System, may be brought by:

(a)      A member or retiree who is or may become eligible to receive a benefit under the System;

(b)      A beneficiary who is or may become eligible to receive a benefit under the System;

(c)      A Plan fiduciary, including a Trustee; or

(d)      The Finance Director, on behalf of the City as sponsor of the System.

(Ord. No. 04-05, Sec. 54-43-10.)

# ARTICLE IX.

## Miscellaneous.

### Sec. 1.     Assignments prohibited.

The right of a person to a pension, an annuity, or a retirement allowance, to return of contributions, the pension, annuity, or retirement allowance itself, an optional benefit, any other right accrued or accruing to any person under the provisions of this amendment and the moneys in the various funds created by this amendment shall not be subject to execution, garnishment, attachment, the operation of bankruptcy or insolvency law, or any other process of law whatsoever and shall be unassignable except as in this amendment specifically provided.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. IX, § 1.)

### Sec. 2.     Protection against fraud.

Whoever with intent to deceive, shall make any statement or report required under this amendment which is untrue, or shall falsify or permit to be falsified any record or records of this System, or who shall otherwise violate with intent to deceive, any of the terms or provisions of this amendment, upon conviction thereof, shall be fined not to exceed five hundred dollars or imprisoned in the Detroit House of Correction for a period not to exceed ninety days, or both. (1918 Detroit City Charter, Title IX, Ch. VII, Art. IX, § 2.)

### Sec. 3.     Errors.

Should any change or error in the records result in any member or beneficiary receiving from the System, more or less than he would have been entitled to receive had the records been correct, the Board of Trustees shall correct such error, and as far as practicable, shall adjust the payment in such a manner that the actuarial equivalent of the benefit to which such member or beneficiary was correctly entitled shall be paid.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. IX, § 3.)

### Sec. 4.     Recall of beneficiaries during emergencies.

During an emergency declared by the Commissioner of Police or the Board of Fire Commissioners, the Commissioner or the Board, as the case may be, shall have power, with the consent of a beneficiary, to recall to active duty a beneficiary for such period of service as the commissioner or the Board shall deem advisable; provided, however, that the foregoing power shall not apply in the case of a beneficiary who has reached the age of sixty-four years, and provided further, that any beneficiary so recalled may, at any time, separate from active duty on his own application or by order of the Commissioner or the Board.  A beneficiary so recalled shall serve in the rank at which he retired, or a higher rank, and shall receive the pay of such rank without deduction.  On subsequent separation from active duty, such beneficiary shall resume the beneficiary status held by him prior to such recall.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. IX, § 4.)

**Sec. 5.** **Limitation of other statutes.**

No other provision of law, Charter or Ordinance, which provides wholly or partly at the expense of the City for pensions or retirement benefits for Policemen or Firemen, their widows, or other dependents, shall apply to members or beneficiaries of the System established by this amendment, their widows, or other dependents.

(a)     All provisions of laws, inconsistent with the provisions of this amendment, are hereby repealed to the extent of such inconsistency.

(b)     This amendment shall not apply to any person who, at the effective date of this amendment shall be receiving a pension or other benefit from the City under the provisions of Chapter XV or XXI of Title IV of the 1918 Detroit City Charter, or who is excluded from membership in this System as provided by article IV, section 1 (a) of this amendment.

(c)     Savings clause. If any part, article, chapter, section, subsection, sentence, clause or phrase of this amendment is for any reason held to be unconstitutional, such decision shall not affect the validity of the remaining parts, articles, chapters, sections, subsections, sentences, clauses and phrases of this amendment or the amendment as an entirety.

(d)     Effective date. The 1940 amendments of this chapter are effective July 1, 1941.

The 1951 amendments to this chapter are effective November 15, 1951.
The 1953 amendments to this chapter are effective November 13, 1953.
The 1964 amendments to this chapter are effective July 1, 1965.
The 1968 amendments to this chapter are effective January 1, 1969.

(e)     (Adopted November 5, 1940. In effect November 15, 1940. As amended November 5, 1968. In effect January 1, 1969) (Historical Reference: Certain amendments and benefits became effective per defacto operation due to historical administration and collective bargaining agreements. Public Employment Relations Act became effective in 1965. Supreme Court ruling that pensions are a mandatory subject of bargaining was issued on February 1, 1974.)

(1918 Detroit City Charter, Title IX, Ch. VII, Art. IX, § 5.)

(f)     System provisions are subject to Public Act 314 of 1965 as amended and applicable case law.

(g)     Distributions. The System will apply the minimum distribution requirements of IRC 401(a)(9) in accordance with the final regulations under IRC 401(a)(9), notwithstanding any provision in the System to the contrary. Pursuant to IRC 401(a)(9), a member's interest must begin to be distributed by the later of (i) April 1 of the calendar year following the

calendar year that he attains the age of 70-1/2, or (ii) April 1 of the calendar year he retires. Distributions will be made in accordance with this Section and Regulations 1.401(a)(9)-2 through 1.401(a)(9)-9. The provisions of this Section and the regulations cited herein and incorporated by reference override any inconsistent plan distribution options. Pursuant to Code Section 401(a)(9)(H), Annuity Savings Fund minimum required contributions otherwise required for 2009 ("2009 RMDs") will not be distributed for 2009 unless the member so chooses to receive them and 2009 RMDs will be treated as eligible rollover distributions.

(h) Termination. Upon System termination or upon complete discontinuance of contributions under the System, the rights of all employees to benefits accrued to the date of such termination or discontinuance to the extent then funded, or the amounts credited to the employees' accounts are nonforfeitable.

## Sec. 6.    Tax Qualified Plan.

The Retirement System is intended and has been administered to be a qualified pension plan under § 401 of the Internal Revenue Code, as amended ("IRC" or "Code"), or successor provisions of law, including the Tax Reform Act of 1986 (TRA '86); the Technical and Miscellaneous Revenue Act of 1988 (TAMRA); the Unemployment Compensation Amendments of 1992 (UCA); the Omnibus Budget Reconciliation Acts (OBRA); the Uniformed Service Employment and Reemployment Rights Act of 1994 (USERRA); the Uruguay Round Agreements Act of 1994 (GATT); the Small Business Job Protection Act of 1996 (SBJPA '96); the Taxpayer Relief Act of 1997 (TRA '97); the Internal Revenue Service Restructuring and Reform Act of 1998 (RRA '98); the Economic Growth and Tax Relief Reconciliation Act of 2001 (EGTRRA), and other applicable laws, regulations and administrative authority. The Retirement System is a governmental plan under IRC § 414(d) and is administered for the exclusive benefit of the plan's participants and their beneficiaries. The Retirement System trust is an exempt organization under IRC §501. All applicable provisions of the Internal Revenue Code are incorporated by herein by reference and such IRC provisions supercede any contrary provisions of the Retirement System.

## Sec. 7.    Definition of Compensation

Compensation will mean compensation as that term is defined in Article II, Sections 14 and 15 of the Plan. For any self-employed individual covered under the Plan, compensation will mean earned income. Compensation shall include only the compensation which is actually paid to the participant during the determination period. The determination period shall be the plan year.

Notwithstanding the above, compensation shall not include any amount which is contributed by the employer pursuant to a salary reduction agreement and which is not includible in the gross income of the employee under sections 125, 402(e)(3), 402(h) or 403(b) of the Internal Revenue Code.

The term compensation means the compensation of the member (participant) from the employer for the year consistent with Article II, Sections 14 and 15. The term "compensation" shall include any elective deferral (as defined in IRC Section 402(g)(3)) and any amount which is contributed or deferred by the employer at the election of the employee and which is not includible in the gross income of the employee by reason of IRC Sections 125, 132(f)(4), or 457.

For purposes of the Internal Revenue Code Section 415 limits, Compensation is defined pursuant to IRC Section 415(c)(3), by incorporating by reference the definition of Compensation pursuant to Treas. Reg. 1.415(c)-2. (Note: Notwithstanding that IRC 415(c)(3) applies only to defined contribution plans, this language is added to the defined benefit plan to satisfy the requirements of the Internal Revenue Service.)

## Sec. 8.      Limitation of Compensation

The Plan is subject to IRC 401(a)(17) and applicable regulations, as amended which currently provide:

Compensation shall not include any amount which is contributed by the employer pursuant to a salary reduction agreement and which is not includible in the gross income of the employee under sections 125, 402(e)(3), 402(h) or 403(b) or other applicable sections of the Internal Revenue Code.

For years beginning on or after January 1, 1989, and before January 1, 1994, the annual compensation of each participant taken into account for determining all benefits provided under the plan for any plan year shall not exceed $200,000. This limitation shall be adjusted by the Secretary at the same time and in the same manner as under section 415(d) of the Internal Revenue Code, except that the dollar increase in effect on January 1 of any calendar year is effective for plan years beginning in such calendar year and the first adjustment to the $200,000 limitation is effective on January 1, 1990.

For years beginning on or after January 1, 1994, the annual compensation limit of each participant taken into account for determining all benefits provided under the plan for any determination period shall not exceed $150,000, as adjusted for the cost-of-living in accordance with section 401(a)(17)(B) of the Internal Revenue Code. The cost-of-living adjustment in effect for a calendar year applies to any determination period beginning in such calendar year.

If a determination period consists of fewer than 12 months, the annual compensation limit is an amount equal to the otherwise applicable annual compensation limit multiplied by a fraction, the numerator of which is the number of months in the short determination period, and the denominator of which is 12.

If compensation for any prior determination period is taken into account in determining a participant's benefits for the current plan year, the compensation for such prior determination period is subject to the applicable annual compensation limit in effect for that prior period. For this purpose, in determining benefits in plan years beginning on or after January 1, 1989, the annual compensation limit in effect for determination periods beginning before that date is $200,000. In addition, in determining benefits in plan years beginning on or after January 1,

1994, the annual compensation limit in effect for determination periods beginning before that date is $150,000.

For year beginning on and after July 1, 2001, the annual compensation of a member taken into account for determining benefits for any plan year shall not exceed $200,000.00.

### Sec. 9.     Limitation of Benefits.

The amount of annual benefits and contributions that is credited a member in any given year shall be subject to the following limitations:

(a)     **Defined Benefit Plans.**  The maximum permissible Annual Pension Benefit with respect to any member shall be in accordance with IRC §415(b) which provides that such Annual Pension Benefit shall not exceed $90,000, as adjusted for inflation, which for 2002 is $160,000 (the "Dollar Limit").

(1)     Special Dollar Limitations.  If the benefit is payable prior to age 62, the dollar limitation shall be reduced to the actuarial equivalent of a benefit commencing at age 62.  In the case of any full-time police or fire employee who is a Qualified Participant as defined in IRC §415(b)(2)(G), there is no reduction in the dollar limitation.  If the benefit is not payable until after age 65, the dollar limitation shall be increased to the actuarial equivalent of a benefit commencing at age 65.

(2)     In the case of an employee who has less than ten (10) years of participation in the Plan, the Dollar Limitation shall be reduced 1/10 for each year of participation in accordance with IRC §415(b)(5).

(b)     **Defined Contribution Plans.**

(1)     For limitation years beginning after December 31, 1986 the term "annual addition" means, for purposes of this section the sum, credited to a participant's account for any limitation year, of:

a.     Employer contributions;

b.     Employee contributions; and

c.     Forfeitures.

(2)     Annual additions that may be contributed or allocated to a participant's account for a limitation year will not exceed the lesser of:

a.     100% percent of participant's compensation, within the meaning of IRC §415(c)(3), or

b. $40,000, as adjusted for increases in the cost of living pursuant to IRC §415(d).

## Sec. 10.   Direct Rollovers.

The defined benefit plan does not currently provide for lump sum payments.  However, to the extent lump sum payments are allowed, the plan will meet the following requirements regarding IRC 401(a)(31).

(a) **Direct Rollovers.**  This section applies to distributions made on or after January 1, 1993.  Notwithstanding any provision of the plan to the contrary that would otherwise limit a distributee's election under this part, a distributee may elect, at the time and in the manner prescribed by the plan administrator, to have any portion of an eligible rollover distribution that is equal to at least $500 paid directly to an eligible retirement plan specified by the distributee in a direct rollover.

(b) **Eligible rollover distribution**:  An eligible rollover distribution is any distribution of all or any portion of the balance to the credit of the distributee, except that an eligible rollover distribution does not include: any distribution that is one of a series of substantially equal periodic payments (not less frequently that annually) made for the life (or life expectancy) of the distributee or the joint lives (or joint life expectancies) of the distributee and the distributee's designated beneficiary, or for a specified period of ten years or more; any distribution to the extent such distribution is required under section 401(a)(9) of the Internal Revenue Code; any hardship distribution described in section 401(k)(2)(B)(i)(iv) received after 12-31-98; the portion of any other distribution(s) that is not includible in gross income (determined without regard to the exclusion for net unrealized appreciation with respect to employer securities); and any other distribution(s) that is reasonably expected to total less than $200 during a year.

(c) **Eligible retirement plan**:  An eligible retirement plan is an individual retirement account described in section 408(a) of the Code, an individual retirement annuity described in section 408(b) of the Code, or an annuity plan described in section 403(a) of the Code, or a qualified plan described in section 401(a) of the Code, that accepts the distributee's eligible rollover distribution.  However, in the case of an eligible rollover distribution to the surviving spouse, an eligible retirement plan is an individual retirement account or individual retirement annuity. On and after January 1, 2008, an eligible retirement plan, for purposes of accepting a rollover, shall include a Roth IRA to the extent permitted by Code Section 408A, and the regulations promulgated thereunder.

(d) **Distributee**: A distributee includes an employee or former employee.  In addition, the employee's or former employee's surviving spouse and the

employee's or former employee's spouse or former spouse who is the alternate payee under a qualified domestic relations order, as defined in section 414(p) of the Code, are distributees with regard to the interest of the spouse or former spouse. On and after January 1, 2008, the retirement system shall allow nonspousal beneficiary transfers to an individual retirement plan in accordance with and subject to Internal Revenue Code Section 402(c)(11).

(e)     **Direct rollover**:  A direct rollover is a payment by the plan to the eligible retirement plan specified by the distributee.

# ARTICLE X.

## Collective Bargaining Agreements.

Collective Bargaining Agreement Provisions. Under Michigan Law if there is any conflict between the Retirement System provisions and collective bargaining agreement provisions, the terms of the collective bargaining agreement control.

(a)     The Board of Trustees shall administer the Retirement System consistent with the pension provisions of the 1998-2001 collective bargaining agreement between the City of Detroit and the Detroit Police Officers Association with respect to police officers covered by said collective bargaining agreement. Said provisions are attached as Exhibit A.

(b)     The Board of Trustees shall administer the Retirement System consistent with the pension provisions of the 1998-2001 collective bargaining agreement between the City of Detroit and the Detroit Police Lieutenants and Sergeants Association. Said provisions are attached as Exhibit B.

(c)     The Board of Trustees shall administer the Retirement System consistent with the pension provisions of the July 1, 1996 - June 30, 2004 collective bargaining agreement between the City of Detroit and the Detroit Police Command Officers Association. Said provisions are attached as Exhibit C.

(d)     The Board of Trustees shall administer the Retirement System consistent with the pension provisions of the July 1, 1998 - June 30, 2001 collective bargaining agreement between the City of Detroit and the Detroit Fire Fighters Association. Said provisions are attached as Exhibit D.

# ARTICLE XI.

## Compliance With USERRA.

USERRA.  The Retirement System shall comply with applicable, required provisions of Internal Revenue Code Section 414(u).  On and after January 1, 2007, notwithstanding anything to the contrary herein, if a member dies while performing qualified military service (as defined in Internal Revenue Code Section 414(u)), to the extent required by Internal Revenue Code Section 401(a)(37) the survivors of the member are entitled to any additional benefits (if any, and other than benefit accruals relating to the period of qualified military service) provided under the Retirement System as if the member had resumed and then terminated employment on account of death.

Notwithstanding anything to the contrary herein, on and after January 1, 2009, if the City decides to provide Differential Wage Payments to individuals who are performing service in the uniformed services (as defined in Chapter 43 of Title 238, United States Code) while on active duty for a period of more than 30 days, such Differential Wage Payment will be treated as compensation under Code Section 415(c)(3) limits, but not for purposes of Plan benefit accruals. For these purposes the term "Differential Wage Payment" means a payment defined in Code Section 3401(h)(2) that is made by the Retirement System to an individual who is performing service in the uniformed services while on active duty for a period of more than 30 days.

# ARTICLE XII.

## Deferred Retirement Option Plan.

The following provisions are hereby established as the Deferred Retirement Option Plan ("Drop") Program with respect to those members of the Retirement System who are covered by a collective bargaining agreement with a DROP Program (currently DPOA, DPCOA and DFFA and non-union executives of the Police Department and Fire Department).

(a)    In lieu of terminating employment and accepting a service retirement allowance under the plan provisions, any applicable member of this system who is eligible for the DROP Program and who is eligible to immediately receive a 25 year service retirement allowance may elect to participate in the Deferred Retirement Option Plan (DROP) and defer the receipt of retirement benefits in accordance with the provisions of this resolution. This DROP feature is effective for DROP eligible members retiring on or after March 1, 2002 or after IRS approval of the DROP provisions, whichever is later.

(b)    No additional service credit shall be earned by a participant in the DROP program.

(c)    There is no limit to the duration of participation in the DROP program.

(d)    Participation in the DROP program shall be consistent with applicable collective bargaining agreements. For DPOA members, Section 33N of the 1998-2001 collective bargaining agreement between the DPOA and the City of Detroit shall be controlling unless modified by future collective bargaining agreement.

(e)    Upon the effective date of the commencement of participation in the plan, active membership in the Retirement System shall terminate. However employer contributions shall continue to be paid into the Retirement System for the DROP participant as if the DROP participant was not a DROP participant. For purposes of this section, compensation and credit service shall remain as they existed on the effective date of commencement of participation in the DROP program. Seventy-five (75%) percent of the monthly retirement benefits (including applicable escalator increases) that would have been payable, had a member elected to cease employment and receive a service retirement allowance, shall be paid into the deferred retirement option plan (DROP) account. Upon termination of employment, deferred benefits (i.e. the DROP account balance) shall be paid as provided by this resolution.

(f)    The ICMA Retirement Trust has been selected as the initial DROP depository entity.

(g)    The Deferred Retirement Option Plan applicable amounts shall be invested as directed by the member within the investment choices as provided by the ICMA Retirement Trust (or substitute entity).

(h)    The fees for the DROP account shall be determined by the ICMA Retirement Trust (or substitute entity), which fees shall be paid by the DROP participant per deduction from the DROP account.

(i) Upon termination of employment, a participant in the DROP program shall receive, at his or her option either a lump sum payment from the DROP account equal to the payments to the account plus earnings adjusted for any losses or a true annuity based upon his or her adjusted account, or he or she may elect any other method of payment allowed by the ICMA Retirement Trust (or substitute entity); provided, notwithstanding anything to the contrary herein, the Participant's adjusted DROP account balance at termination of employment shall not be less than total system DROP payments into his or her account (not including earnings and losses). The participant's monthly benefits that would have otherwise been paid at retirement prior to participation in the DROP program (i.e. 100%) shall begin to be paid to the retiree. Termination of employment includes termination of any kind, such as, resignation, discharge or disability.

(j) If a participant dies during the period of participation in the DROP program a lump sum payment equal to his or her account balance shall be paid to his or her named beneficiary, or if none, to his or her estate; provided, notwithstanding anything to the contrary herein, the Participant's adjusted DROP account balance at death during the period of participation shall not be less than total system DROP payments into his or her account (not including earnings and losses).

(k) In the event that a member dies prior to termination of employment while participating in the DROP, the member's designated beneficiary(ies) shall be entitled to the funds in the DROP account. In addition, the member's retirement allowance, with escalators, will be restored to one hundred percent (100%) of the amount that would have been paid, but for the member's decision to participate in the DROP program shall be paid in accordance with the deceased member's election option; provided, notwithstanding anything to the contrary herein, the Participant's adjusted DROP account balance at death shall not be less than total system DROP payments into his or her account (not including earnings and losses)..

(l) If an employee becomes disabled after the period of participation in the DROP program but while still an employee and his employment is terminated because he is disabled, he or she (A) shall be immediately retired with the form of retirement selected by the employee at the commencement of the DROP program plus any applicable pension improvement increases, and (B) shall be entitled to the funds in the DROP account (as a lump sum or other allowed method). Such employee shall not be entitled to disability retirement benefits.

(m) The ICMA Retirement Trust (or substitute entity), consisting of five (5) pages which are attached hereto, will receive the DROP funds and the funds of each participant shall be invested as directed by the member within the investment choices provided by the ICMA Retirement Trust (or substitute entity).

(n) The Board of Trustees of the Policemen and Firemen Retirement System will enter into an Administrative Services Agreement with the International City Management Association Retirement Corporation "RC" (or substitute entity) which will serve as Investment Advisor to the ICMA Retirement Trust (or substitute entity).

(o)     The ICMA Retirement Trust (or substitute entity) will offer a series of separate funds for the investment of DROP account assets as referenced in the ICMA Retirement Trust's (or substitute entity) disclosure documents.

(p)     Any matters relating to the DROP program not covered by the July 21, 2000 DPOA Act 312 Act Award, collective bargaining provisions, the ICMA Retirement Trust (or substitute entity) or any applicable law or authority shall be resolved by decision of the Board of Trustees of the Policemen and Firemen Retirement System.

(q)     The Board of Trustees may replace the ICMA Retirement Trust with an equivalent trust type vehicle subject to approval of the applicable collective bargaining associations.

(r)     The effective date of the foregoing DROP Program provisions are subject to confirmation from the Internal Revenue Service that the DROP Program does not adversely affect the qualified status of the Defined Benefit Plan of the Policemen and Firemen Retirement System.  The appropriate forms applying for a qualified plan determination letter with the DROP provisions shall be filed by the Retirement System and any other applicable party.

The DROP program is subject to all applicable Internal Revenue Service rules, regulations, authority and applicable provisions of the Internal Revenue Code.

---

## By Agreement

---

**Deferred Retirement Option Program (DROP)**

**[The Deferred Retirement Option Program (DROP) plan option shall be discontinued and no longer available to members not currently enrolled in the plan.  The plan shall remain in effect for all members currently enrolled.[112]]**

**[Effective July 1, 2003[113] or July 21, 2000[114]]** a Deferred Retirement Option Program (DROP) plan option shall be made available as a retirement option with the following features:

(a)     **[To participate in the program a member must have at least twenty-five (25) [or twenty (20)[115]] years of [active[116]] service with the City as a member of the Policemen and Firemen Retirement System.[117]] [Members entering the DROP Plan after the date of the Award must remain in a full-duty status for the duration of their participation in the DROP Plan.  If a member is not able to return to full-duty**

---

[112]     DPCOA (§ 43.A.).

[113]     DPLSA (§ 51.O.).

[114]     DPOA (§ 33.R.).

[115]     DPOA (§ 33.R.1.).

[116]     DPOA (§ 33.R.1.).

[117]     DFFA (§ 22.A.14.r.); DPLSA (§ 51.O.1.).

**status within six months, their participation in the DROP Plan shall terminate and he/she shall revert to a regular pension.[118]**

(b)   There will be no limit on the number of years a member may participate in the program. **[For members of the bargaining unit entering into the DROP Plan after the date of this Award, participation in the DROP Plan shall be limited to ten (10) years.[119]]**

(c)   If a member is injured to the point that the member is disabled and placed off on a duty disability per the Retirement System, the member will revert to his regular pension.

(d)   A DROP accumulation account will be established with an outside investment company chosen by the Union.

(e)   The amount paid into the DROP accumulation account shall be 75% of the member's regular retirement allowance plus the applicable annual escalator **[of 2.25% times that portion of any retirement allowance earned prior to the date of the Award.[120]] [applicable to the credited service years.[121]] [(applicable escalator x the full regular retirement allowance x 75%)[122]] [or (2.25% x the full regular retirement x 75%).[123]]**

(f)   Once a member has chosen to place his DROP proceeds into the DROP accumulation account, the member shall not be allowed to remove those funds until the member permanently retires.

(g)   Upon permanent retirement, the member shall be given the right to remove funds from the DROP accumulation account.

(h)   When the member permanently retires, the member will receive a regular retirement allowance calculated as if the member retired on the day the DROP account started. The member's retirement allowance shall include all annual escalator amounts **[(2.25%)[124] or subject to Article 31(K)[125]]** that would have been added while the member was participating in the DROP plan.[126]

---

118   DPLSA (§ 51.O.1.)(All references to "the Award" in this section mean the Act 312 Award in MERC Case No. D09 G-0786, as cited in the CBA.)

119   DPLSA (§ 51.O.2.).

120   DPLSA (§ 51.O.5.).

121   DPOA (312 Award # 1, Issue # 62, pgs. 120–21 deleted the reference to 2.25%; Issue # 64, pgs. 121–24 modified the language to the current version.).

122   DPCOA (§ 43.A.4.).

123   DFFA (§ 22.A.14.r.).

124   DFFA (§ 22.A.14.r.); DPLSA (§ 51.O.8.).  Although referenced by DPOA (§ 33.R.8.), 312 Award # 1, Issue # 62, pgs. 120–21 deleted the reference to 2.25%.

125   DPOA (as modified by 312 Award # 1, Issue # 65, pgs. 121–24.  It is unclear whether this intends to reference Section 33.K. of the DPOA CBA.).

126   DFFA (§ 22.A.14.r.); DPCOA (§ 43.); DPLSA (§ 51.O.); DPOA (§ 33.R.).

(i)     [This program will not be put into effect unless it is certified by the IRS that it will not affect the tax exempt status of the Retirement System under the Internal Revenue Code.

(j)     This program shall be effective only for as long as it is cost-neutral to the City, provided however, that the DROP Plan shall continue during the pendency of proceedings, described below, designed to restore the Plan to cost neutrality.

(k)     If the City contends that the program is costing it money, including, but not limited to, making the City's annual contribution to the P&F Pension System higher than it would be if the DROP Plan was not in effect, the parties, along with the Plan's actuary as well as an actuary appointed by the City, shall meet and confer in good faith regarding the cost.  If the parties are unable to reach an understanding, the matter shall be submitted to a third, independent, actuary, chosen or agreed upon by the Plan's actuary and the City's actuary who will be an associate or a fellow of the Society of Actuaries and a member of the American Academy of Actuaries.  This actuary, when rendering a decision, will be limited to ordering implementation of changes necessary to make the program cost neutral.  Upon the implementation of changes necessary to make the program cost neutral, participants shall have thirty days to elect (a) retiring from active employment or (b) withdraw from the DROP Plan, continuing active employment and resuming participation in the regular retirement plan. The Board shall notify the participant of these changes prior to implementation. Those resuming participation in the regular retirement plan shall not accumulate service credit for any time that they were participating in the DROP Plan.  Those not making either election shall remain participants in the DROP Plan.

(l)     In the event the DROP Plan cannot be changed to restore cost neutrality, it shall be discontinued and participants shall have the option of either (a) retiring, or (b) continuing active employment and resuming participation in the regular retirement plan.[127]]

---

[127]     DFFA (§ 22.A.14.r.9-12.); DPLSA (§ 51.O.9-12.); DPOA (§ 33.R.9-12.).

# ARTICLE XIII.

## Participant Annuity Savings Fund Loan Program

---
### By Agreement
---

**Participant Annuity Savings Fund Loan Program**

The undersigned parties have agreed that a Participant Annuity Savings Fund Loan Program (Participant Loan Program) will be established and available to bargaining unit members. Its terms will be as follows:

(a) **Established:** Any loans granted or renewed shall conform to the requirements of Section 72(p) of the Internal Revenue Code, 26 U.S.C.1 et seq. Such loan program shall be established in writing by the Board of Trustees of the Police and Fire Retirement System, in conformity with the terms of this Memorandum of Agreement, and must include, but need not be limited to the following:

    1. The identity of the administrator of the Participant Loan Program;

    2. A procedure to apply for loans, the amount of loan that will be approved or denied, and limitations, if any, on the types and amount of loans offered;

    3. The procedure under the program for determining a reasonable rate of interest;

    4. The events constituting default and the steps that will be taken to preserve plan assets.

(b) **The Loan Program:** The Participant Loan Program shall be contained in a separate written document copies of which shall be made available in the offices of the City of Detroit Police and Fire Retirement System for prospective participants in the program. The Board of Trustees is authorized to adopt rules and regulations, from time to time, to govern the administration and the operation of this program. Copies of the rules shall also be made available to prospective participating members of the system in the offices of the Police and Fire Retirement System.

(c) **Eligibility:** Subject to the rules and procedures established by the Police and Fire Retirement System Board, loans may be made to bargaining unit members from such member's contributions to the Annuity Savings Fund. Former participants, spouses of participants, and beneficiaries are not eligible to receive any loans from the Plan. Subject to rules and procedures established by the Board, a participant who has been in the plan for twelve (12) months or more is eligible to apply for a loan from this plan.

(d) **Amount of Loan:** A participant who has satisfied applicable rules and procedures may borrow from his or her annuity savings fund account an amount, which does not exceed fifty percent (50%) of the participant's vested accumulated balance, up to fifteen thousand dollars ($15,000.00) reduced by the excess, if any, of: (1) the highest

outstanding balance of loans from the trust during the one (1) year period ending on the day before the date on which the loan is made, or (2) the outstanding balance of loans from the trust on the date on which the loan is made, whichever is less. The minimum loan amount shall be one thousand dollars ($1,000.00).

(e)     **Terms and Conditions:**  In addition to such rules and procedures that are established by the Board, all loans shall comply with the following terms and conditions:

1.      Loan applications shall be in writing.

2.      All loans shall be memorialized by a promissory note made to the Police and Fire Retirement System and properly executed by the participant.

3.      Loan shall be repaid by equal payroll deductions over a period not to exceed five (5) years, or, where the loan is for the purpose of buying a principal residence, a period not to exceed fifteen (15) years.  In no case shall the amount of the payroll deduction be less than twenty dollars ($20.00) for any two-week period.

4.      Each loan shall be made against the assignment of the participant's entire right, title, and interest in and to the trust supported by the participant's collateral promissory note for the amount of the loan, including interest payable to the order of the trustee.

5.      Each loan shall bear interest at a rate determined by the Board.  The Board shall not discriminate among participants in its determination of interest rates on loans. Loans initiated at different times may bear different interest rates, where, in the opinion of the Board, the difference in rates is supported by a change in market interest rates or a change in the pension system's current assumed rate of return. The loan interest rate shall bear a reasonable relationship to market rates for secured loans of a similar duration and shall bear a reasonable relationship to the costs to the pension trust of administering the trust.  The loan interest rate shall be calculated in a manner that will not negatively affect the City's costs to the trust or the return to trust members.

6.      Loan repayments shall be suspended under this plan as permitted by Section 414(u)(4) of the Internal Revenue Code, 26 U.S.C. 414(u)(4).  A participant who has an outstanding loan balance from the plan who is absent from employment with the employer, and who has satisfied the requirements of 26 USC 414(u) of the Internal Revenue Code shall not be required to make loan repayments to the fund during said periods of absence.

(f)     **Renewal of Loan:**  Any loans granted or renewed shall be made and administered pursuant to the participant loan program and Section 72(p) of the Internal Revenue Code, 26 U.S.C.72(p) and the regulations thereunder.

(g)     **Loan Balance:**  A participant's outstanding loan balance shall be considered a directed investment by the participant and interest payments shall be credited to the participant's account balance (provided that the interest credited shall be reduced appropriately to

cover the administrative cost of the loan program and avoid negatively affecting the City's costs or the trust's investment returns), and shall not be part of net investment income or part of the participant's account balance for the purpose of allocation of net investment income under [Article VII].

(h)     **Distribution:**   No distributions shall be made to a participant, former participant, or beneficiary until all loan balances drawn on the applicable vested accumulated balance and applicable accrued interest have been liquidated.

(i)     **Annual Report:**   The Police and Fire Retirement System shall include, in their annual report to all members, an accounting of the loan program established by this section, which contains *the* number and amount of loans made, the costs of administering the program, the amount of payments made including interest received by the trust, the amount of loans outstanding, including any defaults or delinquencies, and an evaluation as to whether the interest charged in the fiscal year covered the costs of administering the program.

The parties agree that eligibility for participation in said loan program will be in accordance with the provisions contained herein, and shall be effective immediately upon the signing of this Memorandum of Understanding.   All necessary steps shall be taken to ensure that the implementation date of the Employee Loan Program for members of this bargaining unit shall occur as soon as administratively possible so that it coincides with the initial implementation date established by the Police and Fire Retirement System.

The parties agree that this Memorandum of Understanding represents the sole and complete agreement regarding the Participant Loan Program for members of this bargaining unit, that this Agreement shall be incorporated in the Labor Agreement and shall remain in full force for the duration of said agreement, and that no modifications can be made unless collectively bargained and mutually agreed between the parties hereto.[128]

---

[128]          DPLSA (MOU, pg. 87.); DPOA (MOU, pg. 108.).

# LEGEND TO FOOTNOTES

As used in the footnotes to this compilation, the acronyms below refer to the following documents:

- **DFFA** means the Master Agreement between the City of Detroit and the Detroit Fire Fighters Association (2009–2013). Although the CBA is expired, the Director of Labor Relations kept the current terms in place until a subsequent agreement is negotiated in a letter dated June 28, 2013, "Re: Terms and Conditions of employment following the expiration of the 09-13 Collective Bargaining Agreement (CBA)."

- **DPCOA** means the City Employment Terms Between the City of Detroit and Detroit Police Command Officers Association, executed on July 18, 2012.

- **DPLSA** means the Master Agreement Between the City of Detroit and the Detroit Police Lieutenants and Sergeants Association (2009–2013), as modified by the Act 312 Award executed March-April, 2011 in the matter of CITY OF DETROIT and DETROIT POLICE LIEUTENANTS AND SERGEANTS ASSOCIATION, MERC Case No. D09 G-0786 before Chairman Thomas W. Brookover.

- **DPOA** means the Master Agreement Between the City of Detroit and the Detroit Police Officers Association (2009–2012).

- **312 Award # 1** means the Act 312 Award effective March 25, 2013 in the Matter of CITY OF DETROIT and DETROIT POLICE OFFICERS ASSOCIATION, MERC Case No. D12 D-0354 before Chairman George T. Roumell, Jr. This Award invalidated the City Employment Terms between the City of Detroit and Detroit Police Officers Associated, executed on July 18, 2012, and reinstated the Master Agreement Between the City of Detroit and the Detroit Police Officers Association (2009–2012), subject to the modifications made by the Award. See pg. 6 of 312 Award # 1.

- **312 Award # 2** means the Act 312 Award effective January 15, 2010 in the Matter of CITY OF DETROIT and DETROIT COMMAND OFFICERS ASSOCIATION, MERC Case No. D07 K-1456 before Chairman Mark J. Glazer.

- **DPLSA MOU** means the Memorandum of Understanding Between the City of Detroit and Detroit Police Lieutenants and Sergeants Association regarding Adding Unused Sick Leave to Average Final Compensation, dated May 13, 2008.

LAI-3214123v5

**EXHIBIT I.A.287**

RESTORATION TRUST AGREEMENT

## CITY OF DETROIT PENSION RESTORATION TRUST

THIS TRUST AGREEMENT, entered into effective _____, 2014, by and among, the City of Detroit ("Detroit" or the "City") acting by and through **[Kevyn Orr acting as the appointed Emergency Manager pursuant to PA 436, M.C.L. §141.1541 et seq./Mayor Michael E. Duggan]** and each member of the Board of Trustees named herein.

## WITNESSETH:

WHEREAS, Detroit filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code on July 18, 2013 in the United States Bankruptcy Court for the United States Bankruptcy Court Eastern District of Michigan, Case No. 13-53846 (the "Court");

WHEREAS, pursuant to the Plan for the Adjustment of Debts of the City of Detroit (as confirmed by the Court, the "Plan of Adjustment"), the City agreed to establish a trust upon the Effective Date of the Plan of Adjustment (i) to hold the DWSD CVR (as defined in the Plan of Adjustment) and enforce rights related to its terms, and to consult with the trustees and investment committee of the Police and Fire Retirement System for the City of Detroit ("PFRS") and the General Retirement System for the City of Detroit ("GRS"), respectively in connection with General Restoration and Special Restoration relating to the DWSD CVR, each as defined below;

WHEREAS, Detroit hereby establishes this City of Detroit Pension Restoration Trust (the "Trust");

WHEREAS, the Board of Trustees shall be responsible for maintaining and administering this Trust and managing the property held by this Trust;

WHEREAS, the members of the Board of Trustees are willing to exercise the authority and rights of consultation granted to it herein with regard to the Trust; and

NOW THEREFORE, in consideration of the premises and the covenants contained herein, Detroit and the members of the Board of Trustees agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    Board of Trustees or Board.  The Board of Trustees is the body described in Article VII to which Detroit has delegated responsibility for: (i) maintaining and administering this Trust and managing the property held by this Trust; and (ii) exercising the duties and responsibilities of the Board of Trustees set forth in this Trust Agreement. The Board of Trustees shall be constituted in accordance with Article VII and shall have the duties and authorities described in Article V.

Section 1.2    Code.  Means the Internal Revenue Code of 1986, as amended, and any successor statute thereto.

Section 1.3     Beneficiaries.  Means the beneficiaries of this Trust, which beneficiaries shall be the GRS, the PFRS and the participants in GRS and PFRS entitled to the benefits of the Restoration Plan.

Section 1.4     DWSD CVR.  Has the meaning given to that term in the Plan of Adjustment.

Section 1.5     General Restoration.  Means the potential restoration or replacement of benefit reductions imposed by the Plan of Adjustment pursuant to the terms of the Restoration Plan.

Section 1.6     GRS.  Means the General Retirement System for the City of Detroit.

Section 1.7     Holder of Pension Claims.  Has the meaning given to that term in the Plan of Adjustment.

Section 1.8     Plan of Adjustment.  Means the Plan for the Adjustment of Debts of the City of Detroit, as confirmed by order of the Court dated [---], a copy of which is attached hereto as Exhibit A.

Section 1.9     PFRS.  Means the Police and Fire Retirement System for the City of Detroit.

Section 1.10     Qualifying DWSD Transaction.  Has the meaning given to that term in the Plan of Adjustment.

Section 1.11     Restoration Plan.  Means the general rules governing pension benefit restoration to the PFRS and the GRS as set forth in Exhibit II.B.3.q.ii.C and Exhibit II.B.3.r.ii.C of the Plan of Adjustment.  A copy of the Restoration Plan is attached hereto as Exhibit B.

Section 1.12     Retiree Committee.  Has the meaning given to that term in the Plan of Adjustment.

Section 1.13     Special Restoration.  Means the potential restoration or replacement of benefit reductions imposed by the Plan of Adjustment in connection with a Qualifying DWSD Transaction, as described in Section IV.F of the Plan of Adjustment.

Section 1.14     Trust Agreement.  This agreement as it may be amended hereafter from time to time by the parties hereto.

Section 1.15     Trust or Trust Fund.  The City of Detroit Pension Restoration Trust established by this Trust Agreement, comprising all property or interests in property held by, or under the custody and control of, the Board from time to time under this Trust Agreement.

## ARTICLE II
## ESTABLISHMENT OF TRUST

Section 2.1    Purpose.  The Trust is established to receive and hold the DWSD CVR and enforce rights related to its terms, and to consult with the trustees and investment committee of the PFRS and the GRS, respectively in connection with General Restoration and Special Restoration relating to the DWSD CVR.

Section 2.2    Receipt of Funds.  The Board shall accept all sums of money and other property contributed to the Trust by Detroit pursuant to Article III.  The Board shall hold, manage and administer the Trust Fund without distinction between principal and income.

Section 2.3    Inurement and Reversion Prohibited.  At no time shall any part of the principal or income of the Trust Fund be used for, or diverted to, any purpose other than distributing proceeds from the DWSD CVR in the manner described by Section IV.F of the Plan of Adjustment.  Nothing in this Trust Agreement shall be construed in such a way as to prohibit the Board from using the assets of the Trust Fund to pay reasonable fees and other expenses and obligations incurred in maintaining and administering the Trust or to maintain a reserve of funds needed to pay reasonable fees and expenses expected to be incurred in the future.

Section 2.4    No Residual Interest.  Detroit shall not have any legal or equitable interest in the assets of the Trust Fund at any time, including following the termination of the Trust.

## ARTICLE III
## CONTRIBUTIONS TO THE TRUST FUND

Section 3.1    Detroit Contributions.  The Board will accept the City's contribution of the DWSD CVR to the Trust Fund pursuant to the Plan of Adjustment.  Apart from the contribution of the DWSD CVR (and any amounts payable to the Trust Fund pursuant to the terms of the DWSD CVR), Detroit shall have no further obligation to contribute to the Trust.

## ARTICLE IV
## PAYMENTS FROM THE TRUST FUND

Section 4.1    Payments from the Trust Fund.

(a)    Subject to paragraph (b) below, the Board shall within a reasonable time after receiving proceeds from the DWSD CVR distribute such proceeds (less the amount retained by the Trust Fund in the sole discretion of the Board to pay reasonable fees and expenses previously incurred or expected to be incurred to maintain and administer the Trust) directly to the GRS and PFRS in the manner described in Section IV.F of the Plan of Adjustment.

(b)    The Board may retain or withhold all or any part of any payment as the Board in the exercise of its reasonable discretion may deem proper, to protect the Board and the Trust against any liability or claim on account of any income or other tax whatsoever; and with all or any part of any such payment so retained or withheld, may discharge any such liability. Any part of any such payment so retained or withheld by the Board that may be determined by

the Board to be in excess of any such liability will upon such determination by the Board be paid to the GRS and PFRS in the manner described in Section IV.F of the Plan of Adjustment.

Section 4.2    Excessive Payments.  If the payment of any distributions under the Trust is determined to have been excessive or improper, and the recipient thereof fails to make repayment to the Board or Board's agent of such excessive or improper payment upon the Board's request, the Board shall deduct the amount of such excessive or improper payment from any other benefits thereafter payable to such person.  Until repaid to the Board or Board's agent, the amount of said excessive or improper payment shall not be included in the Trust Fund.

## ARTICLE V
## BOARD POWERS AND DUTIES

Section 5.1    Powers of the Board Generally.  The Board has whatever lawful powers are required to discharge its obligations and to accomplish any of the purposes of this Trust Agreement, including (but not limited to) the powers specified in the following Sections of this Article, and the powers and authority granted to the Board under other provisions of this Trust Agreement.  The enumeration of any power herein shall not be by way of limitation, but shall be cumulative and construed as full and complete power in favor of the Board.

Section 5.2    Powers Exercisable by the Board.  The Board is authorized and empowered to exercise the following powers at its discretion in satisfaction of the duties imposed on it under this Trust Agreement:

(a)    To place securities orders, settle securities trades, hold securities in custody, deposit securities with custodians or securities clearing corporations or depositories or similar organizations, and other related activities as shall be necessary and appropriate in performing its duties under this Trust Agreement.  Trades and related activities conducted through a broker shall be subject to reasonable fees and commissions established by the broker, which may be paid from the Trust Fund or netted from the proceeds of trades.

(b)    To make, execute, acknowledge and deliver any and all documents of transfer and conveyance and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted.

(c)    To cause any investment in the Trust Fund to be registered in, or transferred into, the name of any institutional custodian appointed by the Board, or the name of its nominee or nominees, or to retain such investments unregistered in a form permitting transfer by delivery, but the books and records of the Board shall at all times show that all such investments are part of the Trust Fund, and the Board shall be fully responsible for any misappropriation in respect of any investment held by its nominee or held in unregistered form; and shall cause the indicia of ownership to be maintained within the jurisdiction of the district courts of the United States;

(d)    To receive, hold, invest and reinvest Trust Fund assets and income under provisions of law from time to time existing and in accordance with Article V;

(e)     To exercise or abstain from exercising any option, privilege or right attaching to any Trust Fund assets;

(f)     To make payments from the Trust Fund in accordance with Article IV and for the payment of expenses as provided in Section 5.5;

(g)     To employ suitable agents and depositaries (domestic or foreign), public accountants, brokers, custodians, ancillary trustees, appraisers, legal counsel and other expert advisors as shall be necessary and appropriate, and to pay their reasonable expenses and compensation;

(h)     To pay any income or other tax or estimated tax, charge or assessment attributable to any property or benefit out of such property or benefit in its sole discretion, or any tax on income of the Trust, if any, out of the Trust Fund;

(i)     To file all reports and returns that are required to be made with respect to the Trust:

(j)     To vote, in person or by general or limited proxy, at any election of any corporation in which the Trust Fund is invested, and similarly to exercise, personally or by a general or limited power of attorney, any right appurtenant to any investment held in the Trust Fund; and

(k)     To accept, compromise or otherwise settle any obligations or liability due to or from the Trust as the Board hereunder, including any claim that may be asserted for taxes, assessments or penalties under present or future laws, or to enforce or contest the same by appropriate legal proceedings.

Notwithstanding the foregoing, the Board shall not (i) assign, transfer, convey or sell its interest in the DWSD CVR except for an assignment due to the appointment of successors to members of the Board in accordance with Section 7.2; and (ii) invest any assets in real estate or real estate securities

Section 5.3     Title to Trust Fund.  All rights, title and interest in and to the Trust Fund shall at all times be vested exclusively in the Board.

Section 5.4     General Duties and Obligations of Board.

(a)     In accordance with Article II but subject to Section 4.1, the Board shall hold all property received by it and any income and gains thereupon.  In accordance with this Article, the Board shall manage, invest and reinvest the Trust Fund, shall collect the income therefrom, and shall make payments or disbursements in accordance with Section 4.1.

(b)     The Board shall confer with the trustees and investment committee of the GRS and PFRS, respectively, with respect to the Special Restoration and General Restoration; provided, however, that the Board shall not have any right to initiate any enforcement

proceedings against the trustees or investment committee of either GRS or PFRS with respect to Special Restoration or General Restoration.

            (c)     The Board shall discharge its duties in the interests of the Beneficiaries and for the exclusive purpose of making distributions to the GRS and PFRS as provided in Section 4.1 and defraying reasonable expenses of administering the Trust and shall act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in like capacity and familiar with such matters would use in conduct of an enterprise of like character and with like aims.

       Section 5.5     <u>Payment of Expenses</u>.  The Board shall apply the assets of the Trust Fund to pay all reasonable costs, charges, and expenses (including, but not limited to, all brokerage fees and transfer tax expenses and other expenses incurred in connection with the sale or purchase of investments, all real and personal property taxes, income taxes and other taxes of any kind at any time levied or assessed under any present or future law upon, or with respect to, the Trust Fund or any property included in the Trust Fund and all legal, actuarial, accounting and financial advisory expenses) reasonably incurred by the Board in connection with maintaining and administering the Trust, including attendance at meetings related thereto.  The expenses of the Board shall constitute a lien on the Trust Fund.

       Section 5.6     <u>No Board Compensation</u>.  Except as provided in Section 5.5, the members of the Board shall serve without compensation.

# ARTICLE VI
# BOARD ACCOUNTS

       Section 6.1     <u>Records</u>.  The Board shall maintain accurate and detailed records and accounts of all investments, receipts, disbursements, and other transactions with respect to the Trust, and all accounts, books and records relating thereto shall be open at all reasonable times to inspection and audit by interested persons at the principal office of the Trust.

       Section 6.2     <u>Annual Audit</u>.  The Trust Fund shall be audited annually by an independent firm of certified public accountants, and a statement of the results of such audit shall be provided to the Board and also made available for inspection by interested persons at the principal office of the Trust.

       Section 6.3     <u>No Interest by Beneficiaries</u>.  In no event shall any Beneficiary have any interest in any specific asset of the Trust Fund.  At no time shall any account or separate fund be considered a savings account or investment or asset of any particular Beneficiary, or class of Beneficiaries, and no Beneficiary shall have any right to any particular asset which the Board may have allocated to any account or separate fund for accounting purposes.

       Section 6.4     <u>Accounting Year, Cash Basis</u>.  The accounting year of the Trust shall be the calendar year.  All accounts of the Board shall be kept on a cash basis.

# ARTICLE VII
## COMPOSITION OF AND PROCEDURES FOR THE BOARD OF TRUSTEES

Section 7.1    Number and Appointment of Members.  The Board of Trustees shall consist of five (5) voting members.  The Retiree Committee has selected the following initial members of the Board of Trustees:[_____, _____, _____, _____, and _____.]

By execution of this Trust Agreement each Board member hereby acknowledges his or her appointment and acceptance of the duties and responsibilities set forth in this Trust Agreement.

Section 7.2    Term of Office.  Each member of the Board shall serve a period of four years until the termination of the Trust, or if earlier, until his or her death, incapacity to serve hereunder, or resignation.  In the event of a vacancy, the replacement Board member shall be appointed pursuant to procedures established by the Board.

Section 7.3    Resignation.  A Board member may resign, and shall be fully discharged from further duty or responsibility under this Trust Agreement to the extent permitted by law, by giving at least ninety (90) days' advance written notice to the remaining Board Members stating a date when such resignation shall take effect, which notice or time period may be waived by the Board.

Section 7.4    Operation of the Board; Quorum.  The Board shall select from among its members a chair and a vice chair.  The Board shall hold regular meetings, and shall designate the time and place thereof in advance.  The Board shall adopt its own rules of procedure and shall keep a record of proceedings.  Each Board Member shall be entitled to one vote on each question before the Board.  Three (3) members shall constitute a quorum at any meeting.  A majority vote of the members present at a meeting of the Board at which a quorum exists shall be necessary for a decision by the Board.

Section 7.5    Reliance on Written Instruments.  Each member of the Board shall be fully protected in acting upon any instrument, certificate or paper believed by him or her to be genuine and to be signed or presented by a duly authorized person or persons, and shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing, but may accept the same as conclusive evidence of the truth and accuracy of the statements therein contained.

Section 7.6    No Individual Liability on Contracts.  The members of the Board shall not be liable personally for any debts, obligations, or undertakings contracted by them, or for the breach of any contracts.  Such claims and obligations shall be paid out of the Trust; provided, however, that the Board shall not be exempt from personal liability for willful misconduct, intentional wrongdoing, breach of applicable fiduciary duty, negligence or fraud, and the Trust shall not indemnify the Board for such liabilities, or to the extent that application of this sentence would violate any law.

Section 7.7    <u>City Not Liable for Conduct of Board</u>.  The Board is not, in its capacity as the Board of Trustees, an officer, agent, employee, or representative of Detroit.  In its capacity as the Board of Trustees, the Board is a principal acting independently of the City, which shall not be liable for any act, omission, contract, obligation, or undertaking of the Trust, the Board or its officers, agents, or representatives.

Section 7.8    <u>Liability Insurance</u>.  The Board may obtain and keep current a policy or policies of insurance, insuring the members of the Board from and against any and all liabilities, costs and expenses incurred by such persons as a result of any act, or omission to act, in connection with the performance of their duties, responsibilities and obligations under this Trust Agreement or the Plan.  To the extent permitted by applicable law, the premiums on such policies may be paid from the Trust Fund.

Section 7.9    <u>Reimbursement for Defense of Claims</u>.  To the extent permitted by applicable law and not otherwise covered by liability insurance purchased by the Trust (without regard to any non-recourse rider purchased by the insured), the Board, employees of the Board and persons acting on the Board's behalf pursuant to an express written delegation (each separately, the "Indemnified Party") shall be reimbursed by the Trust Fund for reasonable expenses, including without limitation attorneys fees, incurred in defense of any claim that seeks a recovery of any loss to the Plan or Trust Fund or for any damages suffered by any party to, or beneficiary of this Trust Agreement (a) for which the Indemnified Party is adjudged not liable, or (b) which is dismissed or compromised in a final settlement, where the Board or, where required by applicable law, an independent fiduciary determines that the settling Indemnified Party was not primarily responsible (in such cases, all or only a portion of the settling Indemnified Party's reasonable expenses may be reimbursed, as directed by the Board or an independent fiduciary), provided that, the Board shall have the right to approve of the retention of any counsel whose fees would be reimbursed by the Trust Fund, but such approval shall not be withheld unreasonably.

## ARTICLE VIII
## AMENDMENT, TERMINATION AND MERGER

Section 8.1    <u>Duration of the Trust</u>.  Unless terminated earlier pursuant to Section 8.3, this Trust Agreement shall terminate automatically on the earlier of:  (a) the eighth anniversary of the Effective Date of the Plan of Adjustment if the City and the Board shall have agreed in writing that no Qualifying DWSD Transaction has occurred; or (b) the later of (i) written notice from GRS and PFRS of the death of the last individual who was a participant in such pension plans on the Effective Date of the Plan of Adjustment or (ii) the 90th anniversary of the effective date of this Trust Agreement.

Section 8.2    <u>Amendment</u>.  The Trust Agreement may be amended at any time in writing by the Board or by Court order upon proper motion by the Board or the City, provided, however, that no amendment may impose a contribution obligation on the City beyond that specified in Section 3.1.  No amendment to the Trust Agreement shall modify the responsibilities of the Board hereunder unless the Board has first consented to such amendment.

Section 8.3    Termination.

(a)    Notwithstanding Section 8.1, the Trust and this Trust Agreement may be terminated at any time in writing by the Board with a copy of such written instrument to be provided to the City, or by Court order upon proper motion.  Upon termination of this Trust Agreement, the assets of the Trust Fund, if any, shall be paid out at the direction of the Board to the GRS and PFRS as provided in Section IV.F of the Plan of Adjustment.  Neither Detroit nor the Board shall have any beneficial interest in the Trust Fund.  If the Trust Fund has assets at the time of its termination, it shall remain in existence only until all such assets have been distributed.

(b)    Upon termination of the Trust pursuant to Section 8.1 or 8.3, the Board shall continue to have all of the powers provided in this Trust Agreement as are necessary or desirable for the orderly liquidation and distribution of the Trust Fund in accordance with the provisions hereof.

# ARTICLE IX
# MISCELLANEOUS

Section 9.1    Rights in Trust Fund.  No Beneficiary or other person shall have any right, title or interest in the Trust Fund or any legal or equitable right against the Board, the Board, or Detroit, except as may be otherwise expressly provided in this Trust Agreement.

Section 9.2    Non-Alienation.  Except to the extent required by applicable law, the rights or interest of any Beneficiary to any future distributions under the provisions of the GRS or PFRS shall not be subject to attachment or garnishment or other legal process by any creditor of any such Beneficiary, nor shall any such Beneficiary have any right to alienate, anticipate, commute, pledge, encumber or assign any of the benefits or payments which he may expect to receive, contingent or otherwise, under GRS or PFRS.

Section 9.3    Controlling Laws.  The Trust shall be construed and the terms hereof applied according to the laws of the state of Michigan to the extent not superseded by federal law.

Section 9.4    Counterparts.  This Trust Agreement may be executed in any number of counterparts, each of which shall be considered as an original.

Section 9.5    Headings.  The headings and subheadings of this Trust Agreement are for convenience of reference only and shall have no substantive effect on the provisions of this Trust Agreement.

Section 9.6    Notices.  All notices, requests, demands and other communications under this Trust Agreement shall be in writing and shall be deemed to have been duly given (a) on the date of receipt if served personally or by confirmed facsimile or other similar confirmed electronic communication; (b) on the first business day after sending if sent for guaranteed next day delivery by Federal Express or other next-day courier service; or (c) on the fourth business

82645430\V-2

CLI-2245193v3

9

day after mailing if mailed to the party or parties to whom notice is to be given by registered or certified mail, return receipt requested, postage prepaid, and properly addressed as follows:

<u>If to the City:</u>

**[insert name and address]**

<u>If to the Board:</u>

**[insert name and address]**

IN WITNESS WHEREOF, and as evidence of the establishment of the Trust created hereunder, the parties hereto have caused this instrument to be executed as of the date above first written.

**CITY OF DETROIT**

By: _____
     Print Name: _____
     Title: _____
     Date: _____

**MEMBERS OF THE BOARD OF TRUSTEES**

By: _____
Print Name: _____

     Acknowledged by me on the _____ day of _____ ,
     Signature_____
     Printed name_____

     Notary public, State of Michigan, County of _____
     My commission expires_____

By: _____
Print Name: _____

     Acknowledged by me on the _____ day of _____ ,
     Signature_____
     Printed name_____

     Notary public, State of Michigan, County of _____
     My commission expires_____

By: _____
Print Name: _____

     Acknowledged by me on the _____ day of _____ ,
     Signature_____
     Printed name_____

     Notary public, State of Michigan, County of _____
     My commission expires_____

82645430\V-2           11

CLI-2245193v3

By: _____

Print Name: _____

     Acknowledged by me on the _____ day of _____ ,

     Signature _____

     Printed name _____

     Notary public, State of Michigan, County of _____

     My commission expires _____


By: _____

Print Name: _____

     Acknowledged by me on the _____ day of _____ ,

     Signature _____

     Printed name _____

     Notary public, State of Michigan, County of _____

     My commission expires _____

**EXHIBIT A**

**PLAN OF ADJUSTMENT**

82645430\V-2

13

CLI-2245193v3

13-53846-swr   Doc 7802-3   Filed 10/16/14   Entered 10/16/14 05:20:22   Page 66 of
100
13-53846-swr   Doc 7802-3   Filed 09/16/14   Entered 09/16/14 05:20:21   Page 631 of
701

**EXHIBIT B**

**RESTORATION PLAN**

**EXHIBIT C**

**CONFIRMATION ORDER**

82645430\V-2

15

CLI-2245193v3

# EXHIBIT I.A.293

RETIREE HEALTH CARE SETTLEMENT AGREEMENT

13-53846-swr    Doc 7802-3    Filed 10/16/14    Entered 10/16/14 05:20:21    Page 69 of
100
13-53846-swr    Doc 7802-3    Filed 09/16/14    Entered 09/16/14 05:20:21    Page 134 of
201

# SETTLEMENT AGREEMENT

**Plaintiffs, the Official Committee of Retirees of the City of Detroit, Michigan (the "Committee"), Detroit Retired City Employees Association, Retired Detroit Police and Fire Fighters Association, and AFSCME Sub-Chapter 98, City of Detroit Retirees (collectively with the Committee, the "Plaintiffs") and Defendants, the City of Detroit, Michigan (the "City") and Kevyn Orr, individually and in his official capacity as Emergency Manager of the City of Detroit, Michigan (collectively with the City, the "Defendants"), hereby enter into this Settlement Agreement as of the 14th day of February, 2014 (the "Agreement"), which contains the following terms:**

## I. GENERAL PROVISIONS

**1.** **Agreement Modifies March 1, 2014 Plan**. The City agrees to make the changes listed in Part II herein to the City of Detroit Retiree Health Care Plan for the period March 1, 2014 through December 31, 2014. The changes enumerated in Part II are modifications to the City of Detroit Retiree Health Care Plan described in the 2014 Health Care Plan Options Booklet ("Booklet") distributed approximately January 2, 2014. These modifications are premised on the terms summarized in the Booklet going into effect on March 1, 2014, subject only to the modifications set forth in this Agreement, which resolves the Plaintiffs' claims in Adversary Proceeding No. 14-04015 (the "Adversary Proceeding").

**2.** **Modifications Will Not Decrease Benefits Offered in March 1, 2014 Plan**. None of the modifications in Part II reduces or eliminates any of the benefits in the City of Detroit Retiree Health Care Plan for the period March 1, 2014 through December 31, 2014 as described in the Booklet, except as specified in Part II(4)(a) and (b) below.

**3.** **Effective Date of Plan Modifications**. The modifications listed in Part II of this Agreement shall be effective with the beginning of the plan on March 1, 2014 unless otherwise noted in the Agreement.

**4.** **Aggregate Caps**. Unless specifically noted below, there is no cap on the amount that the City will spend to fulfill the modifications listed in Part II. For the two modifications listed in Part II(3)(a)/(b) and (d)/(e) that expressly include capped funds of $2,500,000 and $3,000,000, respectively, the City shall aggregate those caps to a total of $5,500,000 such that if one capped fund is exhausted the City must draw from the other capped fund to the extent that the other capped fund has not been exhausted.

**5.** **Conditions on Agreement**. This Agreement, and the additional benefits set forth herein, are conditioned upon the City receiving debtor in possession financing that can be used for quality of life purposes on or before May 1, 2014 (the "DIP"). In the event the DIP is not in effect on or before May 1, 2014 and the City is unable to otherwise perform under this

Agreement, this Agreement shall be null and void and the parties shall be returned to their respective positions.

## II. MODIFICATIONS TO THE CITY'S RETIREE HEALTH CARE PLAN FOR THE PERIOD MARCH 1, 2014 THROUGH DECEMBER 31, 2014

**1.** **Modification of Dental and Vision Coverage**.

**(a)** **Dental Coverage**. The City will make available an additional dental benefits option in addition to the dental benefits coverage option described in the Booklet. The additional option will be offered by Golden Dental Inc. ("Golden"). The premium charged for this group coverage option will be no greater than $23.73 per month for single coverage, $38.83 per month for two-person coverage, and $57.17 per month for family coverage, and the benefits will be as described in Exhibit 1 hereto; provided, however, that the amount charged to the retiree shall be increased to include an additional administrative charge, which administrative charge shall not exceed 20% of the applicable premium. The enrolling retiree will be fully responsible to pay the premium associated with this dental option, including the additional administrative charge, and the City shall allow the retirees to utilize the pension reduction feature for payment of the monthly premium. The City will use Reasonable Efforts to have such coverage effective June 1, 2014, including taking Reasonable Efforts to notify retirees by mail of this option as soon as practicable, and taking Reasonable Efforts to minimize the administrative charge. Reasonable Efforts, as used in this Agreement, requires the City to use good faith and reasonable diligence in light of its capabilities.

**(b)** **Vision Coverage**. The City will make available an additional vision benefits option in addition to the vision benefits coverage option described in the Booklet. The additional option will be offered by Heritage Vision Plans, Inc. ("Heritage"). The premium for this group coverage option will be no greater than $6.95 per month for single coverage and $13.75 per month for 2 or more person coverage; provided, however, that the amount charged to the retiree shall be increased to include an additional administrative charge, which administrative charge shall not exceed 20% of the applicable premium. The option shall be a national network vision option similar to the option that the City provides to active employees. The enrolling retiree will be fully responsible to pay the premium associated with this vision option, including the additional administrative charge, and the City shall allow the retirees to utilize the pension reduction feature for payment of the monthly premium. The City will use Reasonable Efforts to have such coverage effective June 1, 2014, including taking Reasonable Efforts to notify retirees by mail of this option as soon as practicable, and taking Reasonable Efforts to minimize the administrative charge.

**2.** **Modifications for Retirees Eligible for Medicare**.

**(a)** **Extension of Enrollment Deadline to Opt Out of Medicare Advantage Plan Coverage**. For retirees of the City who are enrolled in Medicare and receive

ATI-2594662v5

coverage under a City-sponsored Medicare Advantage Plan through February 28, 2014, the date to opt out of such coverage was extended to February 7, 2014. Such retirees may opt out by hand delivery (no later than close of business February 7) or first-class mail delivery (post-marked on or before February 7) of the designated opt out form to the City Benefits Administration Office at Suite 1026, 2 Woodward Avenue, Detroit MI 48226. Retirees were permitted to request the designated opt out form by calling the City's Benefit Administration Customer Service Line or contacting the City Benefits Administration Office at the address above. The City will use Reasonable Efforts to process any such opt outs for which it receives timely notice in a manner so as to eliminate such Medicare Advantage Plan coverage effective March 1, 2014. To the extent the City is not able to process the timely sent opt out notices in a manner so as to eliminate such coverage effective March 1, 2014, such coverage shall be eliminated effective April 1, 2014. Retirees who did not opt out by February 7, 2014 will be enrolled in a City-sponsored Medicare Advantage Plan as described in the Booklet.

(b) **HRA Contribution for Medicare-Eligible Retirees Who Opt Out**. For each Medicare-eligible retiree who opted out of coverage under the City-sponsored Medicare Advantage Plans on or prior to February 7, 2014, the City shall automatically enroll such retiree in a City-sponsored Health Reimbursement Arrangement ("HRA"). The HRA shall be administered by Flex Plan, Inc. The City will provide each electing enrollee with a vested $115 monthly contribution credit to his or her HRA during the remainder of 2014, which will carry forward until used by the retiree or otherwise forfeited under terms to be negotiated by the parties hereto. The City will make all Reasonable Efforts to implement the HRA credits effective May 1, 2014, retroactive to March 1, 2014. The initial monthly credit for May 2014 shall be in an amount equal to the total of $115 multiplied by the number of months starting March 2014 for which the enrolled retiree did not have Medicare Advantage Plan coverage (e.g., if John Smith had City-sponsored Medicare Advantage Plan coverage until February 28, 2014, the initial monthly credit for May 2014 will be $345, covering March, April, and May; thereafter, the payments shall be $115 per month for each month in 2014).

(c) **Medicare Advantage Plan Catastrophic Drug Expenses**. Each of the Medicare Advantage Plans sponsored by the City for the period March 1, 2014 through December 31, 2014 include Medicare Part D prescription drug coverage, under which, once the $4,550 out-of-pocket threshold is met, the participant's cost sharing obligation is limited to the greater of 5% of the cost of the prescription, or $2.55 per prescription for generic and preferred multi-source drugs or $6.35 per prescription for all other prescription drugs; provided, that the participant's cost sharing obligation shall never be greater than the cost sharing that applied prior to the participant meeting such threshold. For each participant who meets the $4,550 out-of-pocket threshold while enrolled in one of the City's Medicare Advantage Plans during the period March 1, 2014 through December 31, 2014, the City will reimburse the amount of this cost sharing obligation to the related

retiree.  For the avoidance of doubt, participant means both retiree and any retiree's spouse who is covered by the City's Medicare Advantage Plans.

**3.**     <u>**Modifications for Retirees Not Eligible for Medicare**</u>.

**(a)**     <u>**Additional Stipend to Retirees With $75,000 or Lower Household Income Who Acquire  Health Care Coverage  on an Exchange**</u>.  The City will provide non-duty disabled retirees who are not eligible for Medicare a $125 stipend that they may use to purchase health care coverage.  The City will increase this stipend by $50 for any non-Medicare eligible retiree who either (i) was enrolled in the City's retiree health program on December 31, 2013 or (ii) transitioned from active City benefits to retiree City benefits on or after November 1, 2013; but only to the extent such retiree described in (i) or (ii) above meets the following requirements:

    i)         Not eligible for Medicare or Medicaid;

    ii)        Not eligible for a benefit under Part II(4);

    iii)      Not a duty-disabled retiree (duty-disabled retirees are eligible for higher stipends as provided for in the Booklet);

    iv)      Under 65 years old (non-Medicare eligible retirees age 65 and older may receive an increased stipend under Part II(3)(c) below);

    v)       Household income is $75,000 or less, as demonstrated by satisfaction of the process set forth in Part II(3)(b);

    vi)      Does not acquire a City-offered group health plan as set forth in Part II(3)(f); and

    vii)     Purchases or is covered by a health insurance policy acquired through a health insurance exchange ("Exchange") established pursuant to the Patient Protection and Affordable Care Act.

**(b)**     <u>**Process to Obtain Additional $50 Monthly Stipend.**</u>

    i)         The City will retain Aon Hewitt to administer the eligibility process for the additional $50 monthly stipend set forth above in Part II(3)(a).  Retirees will be given a 30-day notice period, to expire no later than April 30, 2014, during which they shall provide to Aon Hewitt the following:

               (1)      Submission of having purchased an insurance policy through an Exchange that covers such retiree.  Such submission shall include information necessary to validate the retiree's eligibility, including the name of the insurer, monthly premium amount, and the amount of federal

subsidy, if any, that the retiree is to receive in connection with such Exchange-acquired coverage; and

(2) If the proof of Exchange-acquired coverage shows that the retiree's premium does not also include a federal subsidy amount, such retiree shall also submit a copy of his or her most recently filed federal income tax return with proof of filing, but in no event a return prior to the 2011 tax year. If such federal income tax return shows household income in excess of $75,000 and the retiree believes that household income in 2013 was below $75,000, the retiree shall also submit – along with a copy of the most recently filed federal income tax return – proof sufficient for Aon Hewitt to conclude that his or her household income in 2013 was less than $75,000.

ii) Aon Hewitt shall submit to the City its list of retirees eligible for the additional $50 monthly stipend and the monthly stipends shall be paid to the approved eligible retirees beginning in the month of June 2014 or as soon thereafter as administratively practical, with payments retroactive to March 1, 2014. For example, if the first payment is made in June 2014, it will be in the amount of $200 for the months of March, April, May, and June; thereafter, the payments shall be $50 per month for each succeeding month in 2014. The list provided by Aon Hewitt shall be final and no changes shall be made to such list for the remainder of 2014.

*The City shall cap the amount that it pays for this additional $50 stipend during the period from March through December 2014 at $3,000,000.* In the event that there are more retirees meeting the requirements in Part II(3)(a) and (b) (*i.e.*, retirees listed on the final list) than can be paid in full for $3,000,000, each retiree will have his or her stipend amount reduced pro rata, unless there are additional funds that can be used as detailed in Part I(4).

**(c)** __Additional Payment to Non-Medicare Eligible Retirees Age 65 and Older__. The City will increase the stipend that it gives non-Medicare eligible retirees who are 65-years-old and older to $300/month. For such purposes, a non-Medicare eligible retiree is any retiree age 65 or older who is not – directly or through his or her spouse – eligible to automatically enroll in and obtain premium-free coverage under Part A of Medicare as evidenced by a denial letter from the Centers for Medicare and Medicaid Services ("CMS"). Retirees who have previously submitted such a letter to the City will not be required to resubmit it. Non-Medicare eligible retirees who are duty-disabled will not be eligible for this increase because their stipend is already $300 or more. The City will coordinate with Blue Cross Blue Shield of Michigan to determine the number of non-Medicare eligible retirees who are eligible for this $300 stipend. The increased stipend will apply for each month from March 2014 through December 2014. The City will make all Reasonable Efforts to implement the $300 increased

monthly stipend beginning April 1, 2014, with payment of the increased amount over the stipend otherwise paid for prior months being retroactive to March 1, 2014; thereafter, the stipend shall be $300 per month for each succeeding month in 2014.  Such eligible retirees will not receive any other stipend amounts from the City that are described in the Booklet or this Agreement.

**(d)** **$125 Monthly Stipend For City Retirees' Spouses Who are Under Age 65, With $75,000 or Lower Household Income, and Are Enrolled in Health Care Coverage on an Exchange**.  The City will provide a $125 stipend to certain married retirees whose spouses either (i) were enrolled in the City's retiree health program on December 31, 2013 or (ii) transitioned from active City benefits to retiree City benefits on or after November 1, 2013; but only to the extent such spouse described in (i) or (ii) above meets the following requirements:

i)      Not eligible to enroll in one of the City's Medicare Advantage Plans;

ii)     Not eligible for Medicaid;

iii)    Not eligible for a benefit under Part II(4);

iv)     Under 65 years old;

v)      Household income is $75,000 or less, as demonstrated by satisfaction of the process set forth in Part II(3)(e);

vi)     Does not acquire a City-offered group health plan as set forth in Part II(3)(f); and

vii)    Purchases or is covered by a health insurance policy acquired through an Exchange.

**(e)** **Process to Obtain $125 Monthly Spouse Stipend.**

i)      The City will retain Aon Hewitt to administer the eligibility process for the $125 monthly spouse stipend.  Retirees will be given a 30-day notice period, to expire no later than April 30, 2014, during which they shall provide to Aon Hewitt the following proof:

(1)     Submission of proof that their spouse is covered under an insurance policy purchased through an Exchange, including information necessary to validate the retirees' eligibility, including the name of the insurer, monthly premium amount, and the amount of federal subsidy, if any, that the spouse is to receive in connection with such Exchange-acquired coverage; and

(2)     If the proof of Exchange-acquired coverage shows that the spouse's premium does not also include a federal subsidy

ATI-2594662v5                                    -6-

13-53846-swr    Doc 7502-3    Filed 09/16/14    Entered 09/16/14 05:20:21    Page 75 of
13-53846-swr    Doc 8300-2    Filed 11/16/14    Entered 11/16/14 15:20:21    Page 150 of
100
201

amount, such retiree shall also submit a copy of his or her most recently filed federal income tax return with proof of filing, but in no event a return prior to the 2011 tax year. If such federal income tax return shows household income in excess of $75,000 and the retiree believes that household income in 2013 was below $75,000, the retiree shall also submit – along with a copy of the most recently filed federal income tax return – proof sufficient for Aon Hewitt to conclude that his or her household income in 2013 was less than $75,000.

ii) Aon Hewitt shall submit to the City its list of retirees who are eligible for this $125 monthly stipend and the monthly stipends shall be paid to the approved married retirees beginning in the month of June 2014 or as soon thereafter as administratively practical, with payments retroactive to March 1, 2014. For example, if the first payment is made in June 2014, it will be in the amount of $500 for the months of March, April, May, and June; thereafter, the payments shall be $125 per month for each succeeding month in 2014. The list provided by Aon Hewitt shall be final and no changes shall be made to such list for the remainder of 2014, except as follows:

(1) if an eligible retiree ceases to be married (whether by death or divorce), the retiree's spouse will cease to be eligible for this stipend and the retiree shall be removed from the list effective as of the month immediately following such event; and

(2) if a retiree's spouse transitions from active City benefits to retiree City benefits during 2014 and meets the eligibility provisions described in Part II(3)(d) and is approved as eligible pursuant to the process described in Part II(3)(e), the related retiree shall be added to the list effective as of the month in which the transition to retiree City benefits occurs, provided there is sufficient availability under the Aggregate Caps as described below.

*The City will cap the amount that it pays for spousal stipends at $2,500,000.* In the event that there are more retirees initially satisfying the requirements in Part II(3)(e) (*i.e.*, retirees listed on the first list submitted by Aon Hewitt to the City) than can be paid in full for $2,500,000, each such retiree will have his or her stipend amount reduced pro rata, provided that if there are additional funds that can be used as detailed in Part I(4), each such retiree will only have his or her stipend amount reduced pro rata to the extent the aggregate amount is not sufficient to satisfy the full amount of such stipends. Retirees who become eligible for this spousal stipend during the year, as described above, shall only be eligible for a stipend to the extent there is sufficient availability under the

Aggregate Caps detailed in Part I(4).  The addition or removal of retirees from the list shall not impact the amount of the stipend being paid to other eligible retirees.

**(f)**    **City Group Plan**.  In 2014, the City agrees to contract with Blue Cross Blue Shield of Michigan to offer a fully-insured group health plan option to retirees who are not eligible for Medicare.  Such plan option shall be reasonably equivalent to the coverage offered by the City to active employees in 2014.  The enrolling retiree will be fully responsible to pay the monthly premium associated with this option.  The premium cost to retirees of such policy will include the cost to the City of enrollment and administration related to this policy option, so that the City will not incur any additional expense in offering this policy.  The parties will use Reasonable Efforts to have such coverage effective May 1, 2014.  The City shall provide a monthly stipend of $100 to each retiree who enrolls in the City group plan, beginning with the May 1, 2014 payment.  No other stipend amounts from the City that are described in the Booklet or this Agreement shall be available to retirees enrolling in this group option, unless either (i) the retiree is duty-disabled, in which case, he or she will instead receive the stipend available to duty-disabled retirees described in the Booklet, or (ii) the retiree is eligible for the stipend described in Part II(3)I, in which case, he or she will instead receive such stipend.

**4.**    **Modifications for Retirees Below the Federal Poverty Level**.

**(a)**    **Coverage for Michigan Resident Retirees Eligible For Medicaid Coverage On or After April 1, 2014**.  The parties recognize that CMS has approved the State of Michigan's request to operate the "Healthy Michigan" program for adults who will become eligible for Medicaid under Section 1902(a)(10)(A)(i)(VIII) of the Social Security Act, and that on April 1, 2014 Michigan will provide Medicaid coverage to all adults residing in the State with income up to and including 133% of the Federal Poverty Level.  "Federal Poverty Level" means the applicable poverty guideline based on state of residence and household size issued annually by the U.S. Department of Health and Human Services.  For those retirees who are eligible for Medicaid under the scheduled April 1, 2014 expansion, the City will facilitate their  transition in the following manner: Within 10 days of the effective date of this Agreement, the City shall contact by letter those non-Medicare eligible retirees, who, according to the Retirement Systems' records, reside in Michigan and whose annual pension income is in an amount less than 100% of the Federal Poverty Level.  Such retirees will be given a 30 day opportunity to submit to Aon Hewitt proof that their income falls below the Federal Poverty Level.  Upon receipt by Aon Hewitt of a list of such retirees falling below the Federal Poverty Level, the City shall provide payment to such retirees of the amount equal to the value of the federal subsidy for the month of March that they would have received in connection with the second lowest cost Exchange-purchased silver plan, had such retiree, and to the extent the retiree is married, such retiree's spouse, been eligible for such subsidy for the month of March 2014 for such plan based on a determination of household income at 100% of the Federal Poverty Level.  A similar payment will be made by the City in

ATI-2594662v5                                      -8-

13-53846-swr    Doc 7802-3    Filed 02/16/14    Entered 02/16/14 05:20:21    Page 77 of
13-53846-swr    Doc 2802-2    Filed 02/16/14    Entered 02/16/14 15:20:21    Page 112 of
101

connection with insurance coverage for April 2014 if such retiree and spouse are not covered by Medicaid.  To the extent that the Medicaid expansion rules in Michigan have not provided such retirees the opportunity to migrate into the Michigan Medicaid program by May 1, 2014, the City shall cease its continued payment but the parties agree to negotiate in good faith an additional reasonable accommodation to such retirees that balances the City's and such retirees' interests.  *Retirees eligible for payments under this subsection are not eligible for any other payment offered by the City as set forth in the Booklet or as set forth in this Agreement.*

**(b)** **Coverage for Non-Medicare Eligible Retirees in States that Have Not Expanded Medicaid**.  The City recognizes that not all States have chosen to expand Medicaid coverage in accordance with Title II of the Patient Protection and Affordable Care Act, and certain non-Medicare eligible retirees residing outside the State of Michigan whose incomes fall below 133% of the Federal Poverty Level will not be eligible for Medicaid coverage.  Accordingly, in connection with such retirees, the City will pay a monthly amount equal to the lesser of:  (1) the second lowest cost monthly premium for a silver plan for such retiree and spouse purchased through an Exchange in their place of residence; or (2) the ratable monthly amount necessary to increase the retiree's annual household income to 100% of the Federal Poverty Level.  Within 10 days of the effective date of this Agreement, the City shall contact by letter those retirees, who, according to the Retirement Systems' records, reside in states that do not provide Medicaid coverage to adults up to the Federal Poverty Level, and whose annual pension income is in an amount less than 100% of the Federal Poverty Level.  Such retirees will be given a 30 day opportunity to submit to Aon Hewitt proof that their income falls below the Federal Poverty Level.  The City shall commence such payments as soon as reasonably practicable after receiving a list of such retirees from Aon Hewitt.  *Retirees eligible for payments under this subsection are not eligible for any other payment offered by the City as set forth in the Booklet or as set forth in this Agreement.*

### III.  RELEASES, FUTURE LEGAL PROCEEDINGS, AND MISCELLANEOUS

**1.** **Future Claims in City Plan Confirmation Proceedings**.  This Agreement is entered into without prejudice to any party to this litigation with respect to any issue involving the rights, claims, obligations, and payments of health care and other post-employment benefits ("OPEB"); provided that the City will not seek to recover directly from the retirees any postpetition OPEB payments made to or on behalf of retirees.  Each party expressly reserves its rights on OPEB issues in connection with negotiations of a plan of adjustment, and the Plaintiffs are free to pursue, and the City to oppose, their position that the postpetition OPEB payments the City made to or on behalf of retirees were a business necessity.

**2.** **Release**.  Following the execution of this Agreement, the Plaintiffs will promptly dismiss the lawsuit – which solely addresses 2014 retiree health care benefits – with prejudice; provided, however, that any party to the lawsuit may bring an action in the Bankruptcy Court to enforce the terms of this Agreement resolving the lawsuit (an "Enforcement Action") and if the

conditions contained in the last sentence of Part I(5) occur, then Plaintiffs are free to reinstate the Adversary Proceeding. Solely for purposes of an Enforcement Action, the City consents, pursuant to 11 U.S.C. § 904, to the Bankruptcy Court's hearing and deciding such Enforcement Action.

     **3.**     <u>**Counterparts.**</u> This Agreement may be signed in counterparts, and each counterpart shall be treated as an original.

     **4.**     <u>**Good Faith.**</u> As evidenced by the undersigned acknowledgment of Judge Wiley Daniel, Mediator, this Agreement was negotiated and entered into by all parties in good faith.

     **5.**     <u>**Plan of Adjustment.**</u> The terms of this Agreement, including Part III(4), shall be incorporated into any plan of adjustment filed by the City and confirmed by the Bankruptcy Court in 2014 in this bankruptcy case.

Agreed,

_____
Evan Miller, attorney for Defendants


_____
Sam J. Alberts, attorney for the Committee


_____
Brian O'Keefe, attorney for Detroit Retired City Employees Association and Retiree Police and Fire Fighters Association


_____
Richard Mack, attorney for AFSCME Sub-Chapter 98, City of Detroit Retirees


Acknowledged:


_____
Judge Wiley Daniel, Mediator

conditions contained in the last sentence of Part I(5) occur, then Plaintiffs are free to reinstate the Adversary Proceeding. Solely for purposes of an Enforcement Action, the City consents, pursuant to 11 U.S.C. § 904, to the Bankruptcy Court's hearing and deciding such Enforcement Action.

**3.** **Counterparts.** This Agreement may be signed in counterparts, and each counterpart shall be treated as an original.

**4.** **Good Faith.** As evidenced by the undersigned acknowledgment of Judge Wiley Daniel, Mediator, this Agreement was negotiated and entered into by all parties in good faith.

**5.** **Plan of Adjustment.** The terms of this Agreement, including Part III(4), shall be incorporated into any plan of adjustment filed by the City and confirmed by the Bankruptcy Court in 2014 in this bankruptcy case.

Agreed,

_____
Evan Miller, attorney for Defendants

_____
Sam J. Alberts, attorney for the Committee

_____
Brian O'Keefe, attorney for Detroit Retired City Employees Association and Retiree Police and Fire Fighters Association

_____
Richard Mack, attorney for AFSCME Sub-Chapter 98, City of Detroit Retirees

Acknowledged:

_____
Judge Wiley Daniel, Mediator

conditions contained in the last sentence of Part I(5) occur, then Plaintiffs are free to reinstate the Adversary Proceeding. Solely for purposes of an Enforcement Action, the City consents, pursuant to 11 U.S.C. § 904, to the Bankruptcy Court's hearing and deciding such Enforcement Action.

3. **Counterparts.** This Agreement may be signed in counterparts, and each counterpart shall be treated as an original.

4. **Good Faith.** As evidenced by the undersigned acknowledgment of Judge Wiley Daniel, Mediator, this Agreement was negotiated and entered into by all parties in good faith.

5. **Plan of Adjustment.** The terms of this Agreement, including Part III(4), shall be incorporated into any plan of adjustment filed by the City and confirmed by the Bankruptcy Court in 2014 in this bankruptcy case.

Agreed,

_____
Evan Miller, attorney for Defendants

_____
Sam J. Alberts, attorney for the Committee

_____
Brian O'Keefe, attorney for Detroit Retired City Employees Association and Retiree Police and Fire Fighters Association

_____
Richard Mack, attorney for AFSCME Sub-Chapter 98, City of Detroit Retirees

Acknowledged:

_____
Judge Wiley Daniel, Mediator

ATI-2594662v5

-10-

conditions contained in the last sentence of Part I(5) occur, then Plaintiffs are free to reinstate the Adversary Proceeding. Solely for purposes of an Enforcement Action, the City consents, pursuant to 11 U.S.C. § 904, to the Bankruptcy Court's hearing and deciding such Enforcement Action.

     **3.**    <u>**Counterparts.**</u> This Agreement may be signed in counterparts, and each counterpart shall be treated as an original.

     **4.**    <u>**Good Faith.**</u> As evidenced by the undersigned acknowledgment of Judge Wiley Daniel, Mediator, this Agreement was negotiated and entered into by all parties in good faith.

     **5.**    <u>**Plan of Adjustment.**</u> The terms of this Agreement, including Part III(4), shall be incorporated into any plan of adjustment filed by the City and confirmed by the Bankruptcy Court in 2014 in this bankruptcy case.

Agreed,

_____
Evan Miller, attorney for Defendants

_____
Sam J. Alberts, attorney for the Committee

_____
Brian O'Keefe, attorney for Detroit Retired City Employees Association and Retiree Police and Fire Fighters Association

_____
Richard Mack, attorney for AFSCME Sub-Chapter 98, City of Detroit Retirees

Acknowledged:

_____
Judge Wiley Daniel, Mediator

conditions contained in the last sentence of Part I(5) occur, then Plaintiffs are free to reinstate the Adversary Proceeding. Solely for purposes of an Enforcement Action, the City consents, pursuant to 11 U.S.C. § 904, to the Bankruptcy Court's hearing and deciding such Enforcement Action.

3.     **Counterparts.** This Agreement may be signed in counterparts, and each counterpart shall be treated as an original.

4.     **Good Faith.** As evidenced by the undersigned acknowledgment of Judge Wiley Daniel, Mediator, this Agreement was negotiated and entered into by all parties in good faith.

5.     **Plan of Adjustment.** The terms of this Agreement, including Part III(4), shall be incorporated into any plan of adjustment filed by the City and confirmed by the Bankruptcy Court in 2014 in this bankruptcy case.

Agreed,

_____
Evan Miller, attorney for Defendants


_____
Sam J. Alberts, attorney for the Committee


_____
Brian O'Keefe, attorney for Detroit Retired City Employees Association and Retiree Police and Fire Fighters Association


_____
Richard Mack, attorney for AFSCME Sub-Chapter 98, City of Detroit Retirees


Acknowledged:

_____
Judge Wiley Daniel, Mediator

# EXHIBIT 1

(See next page)



January 2014

# Certificate of Coverage
# City of Detroit Retirees

## CLASS I
**Diagnostic and Preventive:**

Exams, X-Rays, Prophylaxis, Fluoride -up to age 19 **100%**

## CLASS II
**Restorative:**

Fillings, Root Canals, Routine Extractions **100%**

## CLASS III
**Prosthetics:**

Crowns, Bridges, Partials, Dentures, Space Maintainers **80%**

## CLASS IV
**Specialty Care:**

Periodontics
Endodontics
Oral Surgery **70%**

## ORTHODONTICS (Interceptive excluded)

Lifetime Benefit Maximum: Dependents up to age 19 **$3,000**
Lifetime Benefit Maximum: Subscriber and Spouse **$3,000**

**Out-Of-Area Emergency Coverage $100 reimbursement**

**Annual Maximum:**   $1,600.00
**Annual Renewal:**   **07/01**
**Membership Card Reads:**   Detroit Retirees

| Rate Type | Current Rates |
| --- | --- |
| Single Person | $23.73 |
| Family of two | $38.83 |
| Family | $57.17 |

**EXHIBIT I.A.300**

SCHEDULE OF SECURED GO BOND DOCUMENTS

## SCHEDULE OF SECURED GO BOND DOCUMENTS

| Secured GO Bond Documents | Series of Secured GO Bonds | Balance as of Petition Date |
|---|---|---|
| Resolution of the City Council adopted February 23, 2010<br><br>Finance Director's Order dated March 11, 2010<br><br>Master Debt Retirement Trust Indenture dated as of March 1, 2010, as supplemented and amended (the "Master Indenture"), between the City of Detroit and U.S. Bank National Association, as trustee | Distributable State Aid General Obligation Limited Tax Bonds, Series 2010 | $252,475,366 |
| Resolution of the City Council adopted July 20, 2010<br><br>Finance Director's Order dated December 9, 2010<br><br>Master Indenture | Distributable State Aid Second Lien Bonds (Unlimited Tax General Obligation), Series 2010(A) (Taxable-Recovery Zone Economic Development Bonds – Direct Payment) | $101,707,848 |
| Resolution of the City Council adopted March 27, 2012<br><br>Finance Director's Order dated March 28, 2012 (Series 2012(A2) and Series 2012(B2))<br><br>Finance Director's Order dated July 3, 2012 (Series 2012 (A2) and Series 2012(B2))<br><br>Finance Director's Order dated August 16, 2012 (Series 2012(A2-B), Series 2012 (A2) and Series 2012(B2))<br><br>Master Indenture | Self Insurance Distributable State Aid Third Lien Bonds (Limited Tax General Obligation), Series 2012(A2) | $39,254,171 |
| Resolution of the City adopted March 27, 2012<br><br>Finance Director's Order dated August 16, 2012 (Series 2012(A2-B), Series 2012 (A2) and Series 2012(B2))<br><br>Master Indenture | Self Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(A2-B) | $31,037,724 |

| Secured GO Bond Documents | Series of Secured GO Bonds | Balance as of Petition Date |
|---|---|---|
| Resolution of the City Council adopted March 27, 2012<br><br>Finance Director's Order dated March 28, 2012 (Series 2012(B))<br><br>Finance Director's Order dated July 3, 2012 (Series 2012(B))<br><br>Finance Director's Order dated August 16, 2012 (Series 2012(B))<br><br>Master Indenture | General Obligation Distributable State Aid Third Lien Capital Improvement Refunding Bonds (Limited Tax General Obligation), Series 2012(B) | $6,469,135 |
| Resolution of the City Council adopted March 27, 2012<br><br>Finance Director's Order dated March 28, 2012 (Series 2012(A2) and Series 2012(B2))<br><br>Finance Director's Order dated July 3, 2012 (Series 2012 (A2) and Series 2012(B2))<br><br>Finance Director's Order dated August 16, 2012 (Series 2012(A2-B), Series 2012 (A2) and Series 2012(B2))<br><br>Master Indenture | Self Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(B2) | $54,055,927 |

-2-

## EXHIBIT I.A.327

STATE CONTRIBUTION AGREEMENT

13-53846-swr    Doc 7802-3    Filed 09/16/14    Entered 09/16/14 05:20:21    Page 89 of
101
13-53846-swr    Doc 8000-2    Filed 10/16/14    Entered 10/16/14 15:20:22    Page 134 of
200

## CONTRIBUTION AGREEMENT

This Contribution Agreement ("Agreement"), dated as of _____, 2014, is made by and among the Michigan Settlement Administration Authority, a Michigan body public corporate (the "Authority"), the General Retirement System of the City of Detroit, the Police and Fire Retirement System of the City of Detroit and the City of Detroit (the "City").

## RECITALS

A.      The City filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code on July 18, 2013 (the "Chapter 9 Case") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Court").

B.      During the course of the Chapter 9 Case, the City has asserted that the City's Police and Fire Retirement System (the "PFRS" or a "System") and the General Retirement System (the "GRS" or a "System" and collectively with the PFRS, the "Systems") are underfunded.

C.      During the course of the Chapter 9 Case, there have been suggestions that the State of Michigan (the "State") may be obligated to pay all or a portion of the underfunding of pension benefits payable to retirees, a suggestion the State vigorously disputes.

D.      As part of the mediation process in the Chapter 9 Case, the mediators asked the State and other parties to assist in reducing the amount of underfunding in the PFRS and GRS pension funds by providing settlement funds for the benefit of pensioners that would not be otherwise available.

E.      As part of its determination that the City was eligible to file the Chapter 9 Case, the Court determined that pension obligations of the City can be impaired or diminished in the Chapter 9 Case and are not protected from such impairment or diminution by the State Constitution.

F.      In support of confirmation of the City's Fourth Amended Plan of Adjustment dated May 5, 2014 (as may be further amended from time to time, the "Plan"), the State has agreed, subject to satisfaction of the terms and conditions set forth herein and in the Plan, to make a contribution to the GRS and PFRS in return for releases from, among others, the GRS and PFRS as set forth in the Support and Release Agreement entered into by the State and each of the Systems in connection with this matter.

G.      On June 20, 2014, the Authority was established as the disbursement agent for the State with respect to the State Contribution (as defined below).

H.      Capitalized terms used in this Agreement but not defined have the same meanings as set forth in the Plan.

NOW THEREFORE, THE PARTIES HERETO AGREE AS FOLLOWS:

1.  State Contribution.   On the later of (a) the date on which the Conditions Precedent have been satisfied, and (b) 60 days after the Effective Date of the Plan, the Authority shall disburse $98,800,000 to GRS and $96,000,000 to PFRS (collectively, the "State Contribution") for the purpose of increasing the assets of the PFRS and GRS.   The total aggregate State Contribution is equal to the net present value of $350,000,000 payable over 20 years determined using a discount rate of 6.75%, which results in a total contribution by the State of $194,800,000.  The State Contribution shall only be used to fund payments to holders of GRS Pension Claims and PFRS Pension Claims, each as defined in the Plan.

2.  Governance Requirements of the GRS and PFRS.  At all times during the 20 year period following the disbursement of the State Contribution to the GRS and PFRS, the GRS and PFRS each must establish an investment committee (the "Investment Committee") for the purpose of making recommendations to, and approving certain actions by, the respective System's board of trustees and/or making determinations and taking action under and with respect to Investment Management, as set forth in the terms and conditions enumerated on **Exhibit A** and **Exhibit B**, respectively, each attached to and incorporated by reference into this Agreement.   Further, the Emergency Manager for the City and any subsequently appointed emergency manager for the City, appointed under PA 436 or under any successor or replacement statutes to PA 436, shall not seek to exercise any powers granted under section 12(1)(m) of PA 436 (or equivalent provision under any successor or replacement statute) against the Board of GRS or the Board of PFRS until the earlier of (a) one year following entry of an order confirming the Plan, and (b) December 31, 2015.

3.  Income Stabilization Funds and Income Stabilization Payments.  The City, GRS and PFRS shall establish an income stabilization program and amend the governing documents for GRS and the governing documents for PFRS to include the following:

    a.  A supplemental pension income stabilization payment (the "Income Stabilization Payments") payable on an annual basis beginning not later than 120 days after the Effective Date, to each Eligible Pensioner equal to the lesser of (a) the amount needed to restore the Eligible Pensioner's reduced pension benefit to the amount of the pension benefit that the Eligible Pensioner received from GRS or PFRS in 2013, or (b) the amount needed to bring the total annual household income of the Eligible Pensioner up to 130% of the Federal Poverty Level in 2013.

    b.  In addition, to the extent an Eligible Pension's Estimated Adjusted Annual Household Income in any calendar year is less than 105% of the Federal Poverty Level in that year, the Eligible Pensioner will receive an additional benefit ("Income Stabilization Benefit Plus"). The Income Stabilization Benefit Plus shall be equal to the lesser of either (a) 100% restoration of pension benefits, including escalators and cost of living adjustments; or (b) the amount needed to bring the Eligible Pensioner's Estimated Adjusted Annual Household Income in that calendar year up to 105% of the Federal Poverty Level in that year.

2

c.    An Eligible Pensioner's "<u>Estimated Adjusted Annual Household Income</u>" shall be calculated as follows: (i) the annual pension benefit amount paid in 2013 shall be subtracted from the Eligible Pensioner's 2013 total household income (per their (or in the case of minor children, their legal guardian's) 2013 income tax returns or equivalent documentation) as adjusted for inflation or Social Security COLA increases to create a base additional income amount, plus (ii) the following three items as applicable, (x) the reduced pension benefit that GRS will pay the Eligible Pensioner for that year, (y) any GRS pension restoration due to an improved GRS funding level, and (z) the Eligible Pensioner's Income Stabilization Benefit. Notwithstanding the foregoing, Income Stabilization Payments, including the Income Stabilization Benefit Plus, under both GRS and PFRS shall not exceed $20 million in aggregate.

d.    A separate recordkeeping sub-account called the "<u>Income Stabilization Fund</u>" will be set up under each of GRS and PFRS for the sole purpose of paying the Income Stabilization Payments to Eligible Pensioners. The assets credited to the sub-accounts will be invested on a commingled basis with the applicable System's assets and will be credited with a pro-rata portion of the System's earnings and losses.

e.    Amounts credited to the Income Stabilization Fund, including the Assigned UTGO Bond Tax Proceeds, may not be used for any purpose other than the payment of Income Stabilization Payments to Eligible Pensioners, except as expressly provided in subparagraph (f) below.

f.    In 2022, provided that the State has not issued a certificate of default with respect to a System at any time prior to 2022, the Investment Committee for that System shall conduct a valuation to determine the Income Stabilization Payments anticipated to be made from the System in the future, in order for the System to fulfill the obligation to make Income Stabilization Payments (the "<u>Estimated Future Liability</u>"). In the event that 75% of the independent members of the Investment Committee determine that the GRS or PFRS Income Stabilization Fund is credited with assets in excess of its Estimated Future Liability (the "<u>Excess Assets</u>"), the Investment Committee may, in its sole discretion, recommend to the Board of Trustees that the Excess Assets, but not more than $35 million, be used to fund each System's payment of Adjusted Pension Amounts. The Investment Committee shall have the right to engage professionals to assist in this task as necessary, and such expenses shall be paid by the Systems. If any funds remain in the GRS or PFRS Income Stabilization Fund on the date upon which no Eligible Pensioners under their respective System are living, the remainder of each System's Income Stabilization Fund shall be used to fund each System's payment of Adjusted Pension Amounts.

3

g. "Eligible Pensioners" are those retirees or surviving spouses who are at least 60 years of age or those minor children receiving survivor benefits from GRS or PFRS, each as of the Effective Date, whose pension benefit from GRS or PFRS will be reduced by the confirmed Plan, and who have a total household income equal to or less than 140% of the Federal Poverty Line in 2013 (per their (or in the case of minor children, their legal guardian's) 2013 income tax returns or equivalent documentation). No new persons will be eligible to receive an Income Stabilization Payment at any time in the future, and any minor child receiving survivor benefits shall cease to be an Eligible Pensioner after he or she turns 18 years of age.

h. The initial determination of Eligible Pensioners, and the amounts of Income Stabilization Payments payable to Eligible Pensioners shall be made by the State in its sole discretion. The State shall transmit the list of Eligible Pensioners to the Investment Committee and the Board of Trustees of GRS and PFRS, as applicable. The Board of Trustees, with the assistance of the Investment Committee of GRS and PFRS, shall be responsible for properly administering the respective Income Stabilization Fund and annually certifying to the Treasurer that it has properly administered the requirements for eligibility and payment of benefits with respect to Eligible Pensioners.

4. Conditions Precedent. The Authority's obligations under this Agreement are not effective or enforceable until each of the following conditions (the "Conditions Precedent") have been met to the satisfaction of the Authority and the Treasurer, unless any one or more of such conditions are waived in a writing executed by the Authority and the Treasurer:

a. The Authority receives the State Contribution from the State.

b. An endorsement of the Plan by the Official Retiree Committee which will include a letter from the Official Retiree Committee as part of the Plan solicitation package recommending to Classes 10 and 11 a vote in favor of the Plan, or equivalent assurances from member organizations representing a majority of retirees in the respective classes.

c. Cessation of all litigation, including the cessation of funding of any litigation initiated by any other party, as it relates to the City (a) challenging PA 436 or any actions taken pursuant to PA 436, including but not limited to, a dismissal with prejudice of the cases set forth on **Exhibit D**, or (b) seeking to enforce Article IX, Section 24 of the Michigan Constitution; provided, however, (i) until the State Contribution is received by the Systems, the Systems agree to stay any pending litigation described in this subparagraph, and (ii) that as a condition precedent to the GRS and the PFRS dismissing any pending litigation described in this subparagraph that they are prosecuting, the GRS and the PFRS have the right to receive written confirmation from the Authority

4

that the Authority is prepared and authorized to disburse the State Contribution in accordance with this Agreement and the Plan, subject only to the dismissal by the GRS and PFRS of any pending litigation described in this subparagraph that they are prosecuting.

d.     Active support of the Plan by, a release of and covenant not to sue the State from, and an agreement not to support in any way (including funding) the litigation described in subparagraph 4(c) by the parties listed on **Exhibit C**, or equivalent assurance of litigation finality (which, as to the Systems, shall be deemed satisfied by the execution of the Support and Release Agreement to be entered into by the State and each of the Systems in connection with this matter).

e.     Classes 10 and 11 accept the Plan.

f.     By December 31, 2014, the Court enters a final, non-appealable order confirming the Plan that includes, at a minimum, the following:

i.     A release of the State and State Related Entities by each holder of a Pension Claim of all Liabilities arising from or related to the City, the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution that such party has, had or may have against the State and any State Related Entities.

ii.    A requirement that the governing documents of GRS and the governing documents of PFRS be amended to include:

a)    the governance terms and conditions set forth in Paragraph 2, Exhibit A and Exhibit B of this Agreement; and

b)    the Income Stabilization Payments and Income Stabilization Fund described in Paragraph 3 of this Agreement.

iii.   Approval of, and authority for the City to enter into, the UTGO Settlement.

iv.    A requirement that the City irrevocably assigns the right to receive not less than an aggregate amount of $20,000,000 of the payments on the Reinstated Stub UTGO Bonds to the Income Stabilization Funds of the GRS and PFRS. Such payments will be made to the Income Stabilization Funds in the form of annual installment payments over a 14 year period, pursuant to a payment schedule approved by the State.

5

> v. Approval of, and authority for the City to enter into, the DIA Settlement.

> vi. Agreement to and compliance with MCL 141.1561 and cooperation with the transition advisory board appointed pursuant to MCL 141.1563, or compliance with any new legislation that is enacted regarding post-bankruptcy governance.

g. Evidence satisfactory to the State of an irrevocable commitment by:

> i. The Foundations to fund $366,000,000 (or the net present value thereof) as part of the DIA Settlement; and

> ii. The DIA Corp. to fund $100,000,000 (or the net present value thereof) as part of the DIA Settlement.

h. The Plan Effective Date occurs on or before April 1, 2015.

5. <u>Non-occurrence of Conditions Precedent</u>. If the Conditions Precedent are not met to the satisfaction of the Authority and the Treasurer on or before April 1, 2015, upon written request of the Treasurer, the Authority shall remit the State Contribution to the Department and shall have no further obligations under this Agreement.

6. <u>Default by GRS and PFRS; Cure Period; Remedies</u>.

a. A System will be in default if the System has not materially complied with any of the terms and conditions set forth in (i) the Plan, (ii) the Governing Documents, or (iii) this Agreement, including, but not limited to, failing to make the required Income Stabilization Payments or using funds in the Income Stabilization Fund for unauthorized purposes. For the purposes of this Agreement, "<u>Governing Documents</u>" shall mean, (x) for the GRS, the Combined Plan for the General Retirement System of the City of Detroit, Michigan, and (y) for the PFRS, the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan. Notwithstanding subparagraph 'e' below, there shall not be an event of default for purposes of this paragraph 6 unless and until the Treasurer delivers to the alleged defaulting System a written notice declaring and specifically identifying the facts of an alleged default (the "<u>Default Notice</u>"). Nothing herein shall prohibit the subject System from contesting the alleged default; provided, however, until the contest over the alleged default is resolved, the subject System may not include its State Contribution, as adjusted for earnings and losses, for purposes of determining whether benefits reduced by the Plan may be restored.

b. In the event of a default by a System, the System shall have 100 days after receiving the Default Notice in accordance with subparagraph 'a' above (the "<u>Cure Period</u>") to cure such default by remedying the damages sustained as a result of the default, as well as making any delinquent

Income Stabilization Payments, and restoring any funds improperly removed from any other fund maintained by the System, including the Income Stabilization Fund, as applicable. Prior to the expiration of the Cure Period, at least six of the seven total aggregate votes of the Investment Committee for the defaulting System must certify to the Treasurer that (i) the default has been cured, and (ii) that no material damages have been caused by the default that have not otherwise been remedied (the "Cure Certification"). During the Cure Period, the defaulting System may not include its State Contribution, as adjusted for earnings and losses, for purposes of determining whether benefits reduced by the Plan may be restored.

c.    If the Investment Committee for the defaulting System provides the Cure Certification to the Treasurer in accordance with subparagraph 'b' above, then the default will be deemed cured and the defaulting System may once again include its State Contribution, as adjusted for earnings and losses, for purposes of determining whether benefits reduced by the Plan may be restored.

d.    If the Investment Committee for the defaulting System fails to provide the Cure Certification to the Treasurer in accordance with subparagraph 'b' above, then no portion of the total State Contribution to the defaulting system, as adjusted for earnings and losses, may be taken into consideration by the System during the remainder of the 20 year period following the date of such default for purposes of determining whether benefits reduced by the Plan may be restored. Notwithstanding the foregoing, if at any time during or after the Cure Period the Investment Committee certifies by a simple majority vote, that (i) the default has been cured; and (ii) that no material damages have been caused by the default that have not otherwise been remedied, then the Treasurer may consent to the defaulting System once again including its State Contribution, as adjusted for earnings and losses, for purposes of determining whether benefits reduced by the Plan may be restored, which consent shall not be unreasonably withheld.

e.    Each Investment Committee shall provide compliance reports to the Treasurer on a semi-annual basis and at such other times as the Treasurer reasonably may request (each, a "Compliance Report") that certifies that the Investment Committee is not aware of any defaults, or, if the Investment Committee is aware of a default, specifically identifying the facts of such default. After review of a Compliance Report, the Treasurer shall provide to the System either a certificate of compliance or a Default Notice.

f.    Notwithstanding the foregoing, in the event of a default, the Treasurer and the Authority shall have the right to pursue all available legal and

7

equitable remedies against the Board of Trustees for the defaulting System, the Investment Committee, or any other person.

7.  Execution in Counterparts.  This Agreement may be executed in counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.

8.  Governing Law/Jurisdiction.  This Agreement shall be construed in accordance with the laws of the State of Michigan, without reference to its conflict of law provisions, and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws.  The Bankruptcy Court of the Eastern District of Michigan shall have exclusive jurisdiction over any action or proceeding solely with respect to this Agreement, and each party, to the extent permitted by law, agrees to submit to such jurisdiction and to waive any defense based on venue or jurisdiction of such court.

9.  Amendment.  This Agreement may be amended, modified, superseded or canceled, and any of the terms, covenants, representations, warranties or conditions hereof may be waived only by an instrument in writing signed by each of the Parties.

10.  Limitation of Liability.  The obligation to make the State Contribution is not a general obligation or indebtedness of the State or the Authority and is subject to satisfaction of the conditions described herein.  Furthermore, neither the State nor the Authority has any liability or obligation arising from or related to the contributions and funding of the Income Stabilization Fund of each System.   Notwithstanding anything contained herein to the contrary, no State Related Entity or board member of the Authority shall have any liability for the representations, warranties, covenants, agreements or other obligations of the State or the Authority hereunder or in any of the certificates, notices or agreements delivered pursuant hereto.

11.  Severability.  If any one or more of the covenants, agreements or provisions of this Agreement shall be determined by a court of competent jurisdiction to be invalid, the invalidity of any such covenants, agreements and provisions shall in no way affect the validity or effectiveness of the remainder of this Agreement, and it shall continue in force to the fullest extent permitted by law.

12.  Headings.  Any headings preceding the text of the several articles and sections hereof, and any table of contents or marginal notes appended to copies hereof, shall be solely for convenience or reference and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect.

[Remainder of Page Intentionally Left Blank – Signatures on Following Page]

**MICHIGAN SETTLEMENT ADMINISTRATION
AUTHORITY**


By: _____
Title: Authorized Officer


**GENERAL RETIREMENT SYSTEM OF THE
CITY OF DETROIT**


By: _____
Title: Authorized Officer


By: _____
Title: Authorized Officer


**POLICE AND FIRE RETIREMENT SYSTEM OF
THE CITY OF DETROIT**


By: _____
Title: Authorized Officer


By: _____
Title: Authorized Officer


**CITY OF DETROIT**

By: _____
Title: Emergency Manager

9

# EXHIBIT A – GRS Governance Terms

**EXHIBIT B – PFRS Governance Terms**